# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Putative Medical Benefits Settlement Class,<br><br>Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## THE PLAINTIFFS' AND BP'S MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED MEDICAL BENEFITS CLASS ACTION SETTLEMENT, APPROVAL OF CLASS NOTICE, AND RELATED MATTERS

*COUNSEL FOR ALL MOVING PARTIES ARE LISTED AT END OF MEMORANDUM*

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................. ii

Introduction .............................................................................................................1

Factual and Procedural Background ........................................................................2

The Parties' Settlement Negotiations.......................................................................4

Summary of the Proposed Settlement ......................................................................5

Argument ................................................................................................................14

I.      The Court Should Preliminarily Approve the Proposed Medical Benefits Class
        Action Settlement........................................................................................14

        A.      The Proposed Medical Benefits Settlement Far Exceeds the Requirements
                for Preliminary Approval of a Class Settlement. ...............................14

        B.      The Proposed Medical Benefits Settlement Meets the Higher Standard for
                Final Approval. ..................................................................................20

II.     The Court Should Certify the Proposed Settlement Class. ...........................28

III.    The Proposed Form and Method of Class Notice Is More Than Adequate and
        Satisfies the Requirements of Rule 23. ........................................................29

        A.      The Proposed Notice Distribution Method and Notice Comply with
                Rule 23(c)(2)......................................................................................29

        B.      The Proposed Notice Complies with Rule 23(e). ..............................33

IV.     Request to Appoint Garretson Resolution Group as Claims Administrator. ...34

V.      Request to Appoint the Honorable Jack C. Watson (Ret.) as Guardian Ad Litem...........36

VI.     Request for Additional Appointments, Establishment of Deadlines, and Other
        Relief..........................................................................................................37

VII.    The Court Should Stay or Adjourn the Phase I Trial of Liability, Exoneration, and
        Fault Allocation Pending Final Approval of the Settlement..........................38

Conclusion .............................................................................................................40

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ....................................................................................... 17

*Association For Disabled Americans, Inc. v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002) ............................................................... 19, 23

*Ayers v. Thompson*,
  358 F.3d 356 (5th Cir. 2004)...................................................................... 24, 26

*Bano v. Union Carbide Corp.*,
  273 F.3d 120 (2d Cir. 2001)............................................................................ 14

*Battle v. Liberty National Life Insurance Co*.,
  660 F. Supp. 1449 (N.D. Ala. 1987), *aff'd*, 877 F.2d 877 (11th Cir. 1989)............................ 40

*Beaulieu v. EQ Industrial Services, Inc.*,
  No. 5:06-CV-00400, 2009 WL 2208131 (E.D.N.C. July 22, 2009) ........................................ 21

*Carlough v. Amchem Products, Inc.*,
  10 F.3d 189 (3d Cir. 1993)............................................................................... 40

*Collins v. Sanderson Farms*,
  568 F. Supp. 2d 714 (E.D. La. 2008) .................................................................... 22

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977)................................................................. 14, 18, 25, 28

*DeHoyos v. Allstate Corp.*,
  240 F.R.D. 269 (W.D. Tex. 2007).................................................................. 26, 28, 39

*Domingue v. Sun Electrical & Instrumentation*,
  No. 09-682, 2010 WL 1688793 (M.D. La. Apr. 26, 2010) .............................................. 17

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010).............................................................................. 14

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ..................................................................................... 23

*Faircloth v. Certified Finance, Inc.*,
  No. 99-3097, 2001 WL 527489 (E.D. La. May 16, 2001) ......................................... 22, 23, 25

*Feinberg v. Hibernia Corp.*,
   966 F. Supp. 442 (E.D. La. 1997) ................................................. 26

*Fowler v. Birmingham News Co.*,
   608 F.2d 1055 (5th Cir. 1979) ..................................................... 33

*Granada Investments, Inc. v. DWG Corp.*,
   962 F.2d 1203 (6th Cir. 1992) ..................................................... 17

*Holman v. Student Loan Xpress, Inc.*,
   No. 8:08-cv-305, 2009 WL 4015573 (M.D. Fla. Nov. 19, 2009) ........................................... 39

*In re Baldwin-United Corp.*,
   105 F.R.D. 475 (S.D.N.Y. 1984) ..................................................... 19

*In re CertainTeed Roofing Shingle Products Liability Litigation*,
   269 F.R.D. 468 (E.D. Pa. 2010) ..................................................... 29

*In re Chinese-Manufactured Drywall*,
   MDL No. 2047, 2012 WL 92498 (E.D. La. Jan. 10, 2012) ................................................. 30, 31

*In re Combustion, Inc.*,
   968 F. Supp. 1116 (W.D. La. 1997) ................................................. passim

*In re Corrugated Container Anti-Trust Litigation*,
   643 F.2d 195 (5th Cir. 1981) ..................................................... 15, 21, 25

*In re Currency Conversion Fee Antitrust Litigation*,
   263 F.R.D. 110 (S.D.N.Y. 2009), *aff'd*, 405 F. App'x 532 (2d Cir. 2010) ........................... 21

*In re Diet Drugs*,
   282 F.3d 220 (3d Cir. 2002) ..................................................... 39

*In re Educational Testing Services*,
   447 F. Supp. 2d 612 (E.D. La. 2006) ................................................. 24

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
   No. MDL-1446, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ................................................. 33

*In re Ikon Office Solutions, Inc. Securities Litigation*,
   194 F.R.D. 166 (E.D. Pa. 2000) ..................................................... 31

*In re Lease Oil Antitrust Litigation*,
   186 F.R.D. 403 (S.D. Tex. 1999) ..................................................... 20

*In re Napster, Inc. Copyright Litigation*,
   No. C-MDL-00-1369, 2007 WL 2907892 (N.D. Cal. Oct. 2, 2007) ........................................ 39

*In re Nasdaq Market-Makers Anti-Trust Litigation*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ................................................................. 15

*In re OCA, Inc. Securities & Derivative Litigation*,
  No. 05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ......................... 15, 17, 32

*In re Prudential Insurance Co. of America Sales Practices Litigation*,
  962 F. Supp. 450 (D.N.J. 1997) ................................................................. 31

*In re Serzone Products Liability Litigation*,
  231 F.R.D. 221 (S.D. W. Va. 2005) ........................................................... 29

*In re Shell Oil Refinery*,
  155 F.R.D. 552 (E.D. La. 1993) ................................................... 16, 21, 22, 24

*In re Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices
  & Products Liability Litigation*,
  No. 09-MD02102, 2010 WL 1993817 (S.D.N.Y. May 19, 2010) ........................ 39

*In re Traffic Executive Association Eastern Railroads*,
  627 F.2d 631 (2d Cir. 1980) ...................................................................... 16

*In re Train Derailment Near Amite, Louisiana*,
  MDL No. 1531, 2006 WL 1561470 (E.D. La. May 24, 2006) ........................... 16

*In re U.S. Oil & Gas Litigation*,
  967 F.2d 489 (11th Cir. 1992) .................................................................... 22

*International Union, United Auto., Aerospace, & Agricultural Implement
  Workers of American v. General Motors Corp.*,
  497 F.3d 615 (6th Cir. 2007) ........................................................... 14, 19, 33

*Mars Steel Corp. v. Continental Illinois National Bank & Trust Co. of Chicago*,
  834 F.2d 677 (7th Cir 1987) ...................................................................... 20

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1995) ...................................................................... 21

*McNamara v. Bre-X Minerals Ltd.*,
  214 F.R.D. 424 (E.D. Tex. 2002) ................................................................ 15

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ................................................................................. 33

*Navarro-Ayala v. Hernandez-Colon*,
  951 F.2d 1325 (1st Cir. 1991) .................................................................... 33

*Newby v. Enron Corp.*,
   394 F.3d 296 (5th Cir. 2004)..................................................................... 20, 25

*Quigley v. Braniff Airways, Inc.*,
   85 F.R.D. 74 (N.D. Tex. 1977) .......................................................................... 33

*Radosti v. Envision EMI*,
   717 F. Supp. 2d 37 (D.D.C. 2010) .................................................................... 28

*Reed v. General Motors Corp.*,
   703 F.2d 170 (5th Cir. 1983)................................................................. 20, 24, 26

*Ruiz v. McKaskle*,
   724 F.2d 1149 (5th Cir. 1984)........................................................................... 16

*Salinas v. Roadway Express, Inc.*,
   802 F.2d 787 (5th Cir. 1986) ............................................................................ 24

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................................ 20

*Smith v. Crystian*,
   91 F. App'x 952 (5th Cir. 2004)........................................................................ 14

*Smith v. Tower Loan of Mississippi, Inc.*,
   216 F.R.D. 338 (S.D. Miss. 2003)..................................................................... 21

*Turner v. Murphy Oil USA, Inc.*,
   472 F. Supp. 2d 830 (E.D. La. 2007) .......................................................... passim

*UAW v. General Motors Corp.*,
   235 F.R.D. 383 (E.D. Mich. 2006)................................................................... 27

**Other Authorities**

All Writs Act, 28 U.S.C § 1651(a).......................................................................... 39

*Exxon Shipping Co. v. Baker*,
   Brief for Respondents
   No. 07-219, 2008 WL 194284  (U.S. Jan. 22, 2008) ........................................ 23

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist
   and Plain Language Guide (2010)* ................................................................... 32

J. Steven Picou, WHEN THE SOLUTION BECOMES THE PROBLEM:
   THE IMPACTS OF ADVERSARIAL LITIGATION ON SURVIVORS OF THE EXXON VALDEZ OIL SPILL,
   7 U. St. Thomas L.J. 68 (2009) ........................................................................ 23

MANUAL FOR COMPLEX LITIGATION (4th ed.) §§ 21.632 & 21.633............................ 15

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... 2, 29, 32, 34

Fed. R. Civ. P. 23(b)(3) .................................................................................................. 29, 33

Fed. R. Civ. P. 23(c)(2) .................................................................................................. 29, 33

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................................... 29, 30, 31, 33

Fed. R. Civ. P. 23(c)(3) ........................................................................................................ 30

Fed. R. Civ. P. 23(e) ............................................................................................. 14, 15, 29, 33

Fed. R. Civ. P. 23(e)(1) ..................................................................................................... 1, 33

Fed. R. Civ. P. 23(e)(2) ......................................................................................................... 15

Fed. R. Civ. P. 23(e)(3) ........................................................................................................... 5

Fed. R. Civ. P. 23(g) .............................................................................................................. 28

## INTRODUCTION

Plaintiffs, individually and on behalf of all others similarly situated, and Defendants BP Exploration & Production Inc. and BP America Production Company (collectively, "BP") jointly move for preliminary approval of the proposed Medical Benefits Class Action Settlement. For nearly ten months, the parties have engaged in intense, arms' length settlement negotiations. After numerous proposals and counter-proposals, these negotiations have resulted in a proposed Settlement that is more than "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).[1]

The proposed Settlement resolves the claims of clean-up workers and certain residents of specified Gulf Coast beachfront and wetlands areas for certain bodily and/or personal injuries arising from the *Deepwater Horizon* oil spill and response activities. The proposed Settlement provides a range of benefits to qualifying class members, including:

- Compensation for Specified Physical Conditions claimed to be caused by exposure to oil and/or dispersants;

- A comprehensive Periodic Medical Consultation Program providing regular medical examinations and tests to class members every three years over a 21-year period;

- Preservation of class members' rights to sue BP for compensatory damages for physical conditions that manifest at a later date; and

- A transparent and efficient claims administration process.

In addition, the proposed Settlement establishes a Gulf Region Health Outreach Program that will benefit both class members and other residents of coastal areas of the Gulf States, providing $105 million over five years to integrated programs designed to improve healthcare capacity and health literacy in the region.

---

[1] Terms with initial capital letters used in this Memorandum have the meanings ascribed to the fully capitalized rendering of such terms in the Medical Benefits Class Action Settlement Agreement. In addition, Class, Class Members, Medical Settlement Agreement (or Agreement), and Settlement are also used herein to refer, respectively, to the Medical Benefits Settlement Class, the Medical Benefits Settlement Class Members, the Medical Benefits Class Action Settlement Agreement, and the Medical Benefits Class Action Settlement.

The proposed Settlement, in short, provides significant and comprehensive benefits to the class—including certain benefits that could not be obtained in litigation. Because it unquestionably falls within the range of possible approval, the parties' proposed Settlement easily satisfies the standard for preliminary approval. Indeed, even at this initial stage of the proceedings, it is clear that the proposed Settlement satisfies the higher standard necessary for final approval under Federal Rule of Civil Procedure 23. Accordingly, the Court should grant preliminary approval of the Settlement, approve and direct notice to the class, and schedule a fairness hearing to consider final approval of the Settlement. The parties also respectfully request that the Court make certain necessary appointments and grant the additional relief requested. Finally, BP requests that the Court stay or adjourn any trial proceeding (including the previously set Phase I Trial of Liability, Exoneration, and Fault Allocation) that would or might determine BP's liability to the Medical Benefits Settlement Class. Medical Benefits Class Counsel and the Medical Benefits Class Representatives do not oppose that request.

## FACTUAL AND PROCEDURAL BACKGROUND

The BP defendants are corporations engaged in the business of oil and gas exploration and production. Plaintiffs are the Medical Benefits Settlement Class Representatives named in the Medical Class Action Complaint and have filed a Motion for Certification of a Medical Benefits Class for Purposes of Settlement. Plaintiffs' claims for bodily and/or personal injury arise from and were filed as a result of their alleged exposure to oil and/or dispersants in the wake of the *Deepwater Horizon* Incident. The events leading to the alleged exposure include: (i) the blowout of the MC252 Well; (ii) the explosions and fire on board the *Deepwater Horizon* on or about April 20, 2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010; (iv) the release of oil, other hydrocarbons, and other substances from the MC252 Well

and/or the *Deepwater Horizon* and its appurtenances; (v) the efforts to contain the MC252 Well; and (vi) Response Activities.

In accordance with this Court's pretrial orders, plaintiffs filed the B3 Master Complaint on December 15, 2010 (Rec. Doc. 881), and filed an amended B3 Master Complaint on March 30, 2011 (Rec. Doc. 1812).  To date, approximately 16,000 claimants have filed short-form joinders in MDL 2179 adopting the B3 Master Complaint.

BP moved to dismiss the B3 Master Complaint on February 28, 2011.  (Rec. Doc. 1406.) The Court issued a decision granting in part and denying in part BP's motion on September 30, 2011.  (Rec. Doc. 4159.)  The Court ruled that plaintiffs' claims were governed by maritime law, rather than state law, and that plaintiffs had stated certain valid maritime law claims against BP. (*Id.* at 23-24.)  The Court dismissed plaintiffs' claims for negligence *per se*, battery, and nuisance under state law, but held that plaintiffs could replead their claim for negligence *per se*.

Plaintiffs' Medical Class Action Complaint, filed on April 16, 2012, is brought on behalf of the thousands of individuals asserting bodily and/or personal injury claims from alleged exposure to oil and/or dispersants arising from the *Deepwater Horizon* Incident.  Plaintiffs assert claims under maritime law for negligence, negligence *per se*, and gross negligence and seek compensatory damages, punitive damages, and costs for medical monitoring.   BP denies plaintiffs' allegations and claims, and asserts various legal, affirmative, and other defenses that it will state in its forthcoming Answer and Affirmative Defenses to Plaintiffs' Medical Class Action Complaint.

The parties have engaged in substantial discovery and exchanges of information to evaluate the merits of plaintiffs' claims and BP's defenses.  Indeed, the parties only agreed to settle this case after Phase I (as set by Pre-Trial Order 41, as amended (Rec. Doc. 4083))

discovery was complete and on the eve of Phase I of the Limitation and Liability trial. Moreover, Phase II discovery was well under way at the time the parties agreed to settle.

## THE PARTIES' SETTLEMENT NEGOTIATIONS

The parties have engaged in protracted, intense, good-faith, and arms' length settlement negotiations. These extensive settlement negotiations, conducted in person and via telephone and web conferences, occurred over approximately ten months. Judge Shushan also mediated discussions related to material terms of the Medical Settlement Agreement between the parties.

A core group of four highly experienced personal injury and class action lawyers served as lead negotiators on behalf of plaintiffs, and a core group of similarly experienced mass tort and complex litigation defense lawyers served as lead negotiators for BP. These negotiating teams met or spoke on a nearly daily basis over approximately ten months. Face-to-face meetings were held virtually every week from late July 2011, until the filing of the Agreement with the Court. In addition, on days when no face-to-face meetings occurred, telephone and web conferences were frequently held. Negotiations occurred with regard to every aspect of this settlement: standards of proof, levels of compensation, and conditions to be included in the Specified Physical Conditions Matrix; components, duration, and frequency of the Periodic Medical Consultation Program; scientific support for plaintiffs' claims and BP's defenses; BP's alleged liability; the need for, components of, and appropriate funding for the Gulf Region Health Outreach Program; circumstances under which lawsuits for Later-Manifested Physical Conditions could be brought; the terms and provisions of the Agreement; notice documents, forms, and other exhibits; and procedures for resolving liens. The negotiations were characterized by a "ground-up" approach; the parties designed from scratch a settlement structure that would fairly address the plaintiffs' claims. In addition, the parties consulted with

medical and scientific experts concerning the structure of benefits under the proposed Settlement.

The parties' Medical Settlement Agreement resulting from these negotiations is filed contemporaneously with this Memorandum.  There is no "agreement made in connection with the [settlement] proposal" other than the parties' written settlement agreement.  Fed. R. Civ. P.  23(e)(3).

## SUMMARY OF THE PROPOSED SETTLEMENT

Subject to the Court's entry of a Final Order And Judgment following notice to the Medical Benefits Settlement Class (the "Class") and a Fairness Hearing, the proposed Settlement will resolve personal and bodily injury claims asserted by the Class.  The Class consists of:

> [A]ll Natural Persons who resided in the United States as of April 16, 2012, and who:
>
> 1)      Worked as Clean-Up Workers at any time between April 20, 2010, and April 16, 2012;
>
> 2)      Resided in Zone A for some time on each of at least sixty days between April 20, 2010, and September 30, 2010 ("Zone A Resident"),  and  developed  one  or  more  Specified  Physical Conditions between April 20, 2010, and September 30, 2010; or
>
> 3)      Resided in Zone B for some time on each of at least sixty days between April 20, 2010, and December 31, 2010 ("Zone B Resident").[2]

(Medical Settlement Agreement ("MSA") § I.A.[3]  The Class definition was crafted to encompass those individuals involved in Response Activities following the *Deepwater Horizon* Incident, including workers employed on Vessels of Opportunity ("VoO") or other vessels, workers who

---

[2]  Zone A includes specified Gulf Coast beachfront areas and Zone B includes specified Gulf Coast wetlands areas. Both Zones are clearly and objectively described in the Agreement.

[3]  The Medical Benefits Settlement Class excludes (i) those who timely elect to be excluded from the class; (ii) BP employees; (iii) the Court; (iv) anyone who was on the *Deepwater Horizon* on April 20, 2010; (v) any person who has previously asserted and released his or her claims against BP that would be covered by the Agreement; and (vi) any Zone A or Zone B Resident who was not a Clean-Up Worker and who worked in certain capacities for at least five years prior to April 20, 2010.  (*See* MSA § I.B.)

performed decontamination of vessels, onshore personnel, and workers involved with the recovery, transport, and decontamination of wildlife. It also encompasses individuals who resided in the most affected areas along the Gulf Coast during relevant times following the *Deepwater Horizon* Incident. (*Id.* Exs. 9-11.)

The proposed Settlement will provide significant benefits to the class. As described in greater detail below, the proposed Settlement (i) compensates qualifying class members for Specified Physical Conditions; (ii) establishes a Periodic Medical Consultation Program for qualifying class members that is to remain in place for 21 years; (iii) provides for a Back-End Litigation Option process that allows class members to engage in litigation or mediation of claims for Later-Manifested Physical Conditions diagnosed after the filing of the Medical Class Action Complaint; and (iv) creates a Gulf Region Health Outreach Program to strengthen healthcare capacity and increase health literacy throughout the Gulf Coast areas of Louisiana, Mississippi, Alabama, and the Florida Panhandle. The proposed Settlement also requires BP to pay all costs associated with the Settlement, (*Id.* § IV.E), and sets forth an extensive notice program designed to reach as many class members as practicable. (*Id.* § XI.B; Ex. 2 to the Decl. of Cameron R. Azari, Esq., which is itself Ex. A to this Mem.)

**Compensation for Specified Physical Conditions.** Clean-Up Workers and residents of Zone A or Zone B may qualify for compensation for various Specified Physical Conditions. (*Id.* § VI.) The level of compensation is determined by the Specified Physical Conditions Matrix, attached as Exhibit 8 to the Agreement, which sets compensation levels based on the class member's status as a Clean-Up Worker or Zone A or Zone B resident, whether the Class Member's Specified Physical Condition is acute or chronic, and the type of proof that the Class Member submits to the Claims Administrator.

The Specified Physical Condition program is an uncapped, claims-made process. A simplified version of the Specified Physical Conditions Matrix showing the range of payments available to Class Members follows:

| Level | Clean-Up Workers | Zone A and Zone B Residents | Enhancer for Overnight Hospitalization and Payment of Actual Hospital Expenses, if applicable |
|-------|------------------|-----------------------------|-----------------------------------------------------------------------------------------------|
| A1 | $1,300 | $900 | No |
| A2 | $7,750 | $5,450 | Yes |
| A3 | $12,350 | Not applicable | Yes |
| A4 | $2,700 | Not applicable | Yes |
| B1 | $60,700 | $36,950 | Yes |

The Specified Physical Conditions compensated under levels A1 to A3 include acute ocular, respiratory, ear/nose/throat, dermal, and neurophysical/neurological/odor-related conditions described in greater detail in the Specified Physical Conditions Matrix. Compensation may be provided under A4 only to Clean-Up Workers who experienced heat-related conditions that occurred during or immediately following a shift working as a Clean-Up Worker. Compensation may be provided under level B1 for certain chronic ocular, respiratory, and dermal conditions.

For example, a Clean-Up Worker may qualify for a payment of $7,750 under level A2, plus additional payments for any overnight hospitalization and Actual Hospital Expenses, by providing a declaration under penalty of perjury asserting the manifestation of one of the acute conditions described above, accompanied by medical records supporting the assertions in the declaration. Similarly, Clean-Up Workers who provide a declaration and whose condition is reported in a database documenting visits to medic stations during the Response Activities may recover $12,350 under level A3, and more for overnight hospitalization and Actual Hospital Expenses. Clean-Up Workers with certain chronic conditions who qualify under level B1 and

submit appropriate medical documentation are eligible for payments of $60,700, plus additional compensation for overnight hospitalization and reimbursement for Actual Hospital Expenses.

Similarly, the payments available to residents of Zone A (specified beachfront areas) and Zone B (specified wetlands areas) with qualifying Specified Physical Conditions vary depending on whether a class member's condition is acute or chronic and the extent of proof submitted in support of the claim. For example, a qualifying resident with an acute condition and appropriate medical records may receive $5,450, plus additional payments for any overnight hospitalization and Actual Hospital Expenses. Qualifying residents with chronic conditions may receive $36,950, as well as the additional payments for overnight hospitalization and Actual Hospital Expenses. Residents without medical records are eligible to recover $900 for Acute Conditions by submitting declarations under oath attesting to the conditions or symptoms within the applicable timeframe, identifying the route, circumstances, and dates of alleged exposure, and providing certain additional corroborating information.

The Specified Physical Conditions Matrix was specifically negotiated and designed to address the claims of the class. The Specified Physical Conditions Matrix accounts for medical conditions that reasonably could arise from exposure to oil, other hydrocarbons, or other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, as well as exposure to dispersants or decontaminants used during the Response Activities. The proposed Settlement provides compensation to all qualifying Class Members who identify the route, circumstances, and dates of alleged exposure to oil and/or dispersants without requiring further medical proof of causation.

***Periodic Medical Consultation Program.*** Under the proposed Settlement, BP will fund a Periodic Medical Consultation Program available to all Clean-Up Workers and Zone B

Residents, as well as those Zone A Residents who qualify for compensation for a Specified Physical Condition.  (*Id.* § VII.)  Under the Program, these class members are entitled to an initial medical consultation followed by additional visits every three years during the 21-year life of the program.  (*Id.* § VII.B.)  The Claims Administrator will establish a network of medical services providers to provide the consultation visits, selected based on their geographic proximity to class members and their ability to provide the consultation services required by the Program, among other things.  (*Id.* § VII.C.)  The Claims Administrator will communicate annually with class members participating in the Program and will set up a call center and website to schedule appointments for medical consultation visits.  (*Id.* § VII.D.)  The Program does not provide medical monitoring.

   ***Back-End Litigation Option.***     The proposed Settlement also provides a mediation/litigation process for Class Members who seek compensation from BP in the future for a Later-Manifested Physical Condition (*i.e.*, a condition diagnosed in the class member after the filing of the Medical Class Action Complaint but claimed to be due to exposure prior to the filing of that complaint) that is claimed to have resulted from exposure to oil, other hydrocarbons, or other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or exposure to dispersants and/or decontaminants used during the response activities.  (*Id.* § VIII.)  The proposed Settlement requires that class members diagnosed with a Later-Manifested Physical Condition elect to seek relief for that condition either pursuant to the Back-End Litigation Option or pursuant to workers' compensation law or the Longshore and Harbor Workers' Compensation Act, as applicable.  (*Id.* § VIII.B.)

   If the class member elects to proceed with the Back-End Litigation Option, he or she must notify BP within four years of either the first diagnosis of the condition or the Effective

Date of the Settlement, whichever is later.  (*Id.* § VIII.A.)  BP has the option to mediate the claim and thus attempt to resolve it without a trial.  (*Id.* § VIII.C.)  If the mediation does not resolve the claim, or if BP decides not to mediate, then the class member has the right to file a Back-End Litigation Option Lawsuit.  (*Id.* §§ VIII.C.2; VIII.F.)  The parties have stipulated that in such a lawsuit the following need not be proven and may not be litigated at trial: the fact and/or existence of the Agreement to prove liability, the alleged fault of BP for the *Deepwater Horizon* Incident, and exposure of the class member to oil and/or dispersants during the *Deepwater Horizon* Incident or Response Activities.  BP shall also agree to forego defenses based on prescription, any statute of limitations or repose, the doctrine of laches, and certain other defenses.  (*Id.* § VIII.G.2.)  As a result, the only issues to be litigated would be the fact of diagnosis; the amount, location, and timing of oil, other hydrocarbons, and other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants or decontaminants used in connection with Response Activities; the level and duration of exposure; causation, including potential alternative causes; and the amount, if any, of compensatory damages.  (*Id.* § VIII.G.3.)  The class member may not seek or recover punitive damages against BP in a Back-End Litigation Option Lawsuit.  (*Id.* § VIII.G.2.)

*Gulf Region Health Outreach Program ("Outreach Program").*  The Outreach Program will be established "to expand capacity for and access to high quality, sustainable community-based healthcare services, including primary care, behavioral and mental health care, and environmental medicine, in the Gulf Coast."  (*Id.* § IX.A.)  The projects contemplated by the Outreach Program are based on the fact that many of the Gulf Coast residents most affected by the *Deepwater Horizon* Incident lack ready access to effective elective and emergent physical

and mental/behavioral health care.  These gaps are longstanding and exist in all aspects of healthcare capacity, including:

- Scope: various critical health services, such as environmental health specialists and adequate numbers of behavioral and mental healthcare providers, are not available;

- Scale: existing providers, where the capacity exists, are overwhelmed and have limited ability to  respond during an emergency;

- Quality: there is a need for resources to improve the quality of the care available; and

- Efficiency: existing providers lack the administrative skills and technology to provide health services efficiently.

The proposed Outreach Program is designed to bridge these gaps.  BP will provide $105 million of grants in Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle to (i) expand and improve access to health care in underserved areas; (ii) address behavioral and mental health needs, expertise, capacity, and literacy; (iii) train community health workers on peer listening, community resiliency, and other issues; and (iv) expand and improve environmental health expertise, capacity, and literacy.  (*Id.* § IX.C.)  Rather than waiting for the Effective Date of the Settlement, BP will begin funding this program after Preliminary Approval of the proposed Settlement.  (*Id.* § IX.B.)

A Gulf Region Health Outreach Program Coordinating Committee, with members from each of the programs as well as independent members, will be organized to ensure the programs function in a cooperative and integrated manner and have the flexibility to adjust their respective implementation to respond to changed needs and circumstances.  (*Id.* § IX.G.)  BP also will fund the creation and maintenance of a publicly accessible, text-searchable, and indexed online library of health and environmental-related materials related to the *Deepwater Horizon* Incident and Response Activities.  (*Id.* § IX.H.)  Benefits from the Outreach Program will be available to both class members and the general public.

11

***Notice.***   The proposed Settlement provides for a comprehensive class notice program consisting of mailed notice to identifiable individual Class Members and, to the extent known, their attorneys, as well as broad-reaching published notices in numerous national and local media.  (*Id.* § XI.B; Ex. 2 to the Azari Decl., Ex. A to this Mem.)  The class notice program, the components of which were negotiated in detail by the parties, with the assistance of experts, is designed to cast the widest net possible and aims to reach all potential Class Members.

***Release.***   In exchange for the benefits provided to Class Members, the proposed Settlement provides for a comprehensive Release of specified physical and bodily injury claims against BP and other parties and entities involved in the *Deepwater Horizon* Incident.  (MSA § XVI.)   Under these provisions, Class Members agree to release, forever discharge, and covenant not to sue BP and each one of the Other Released Parties identified on Exhibit 6 of the Agreement (including other defendants in the *Deepwater Horizon* litigation except Transocean and Halliburton, who are not Released Parties and as to whom different provisions apply as discussed below) for any liability for all class members' claims arising from the *Deepwater Horizon* Incident in connection with personal or bodily injury, progression or exacerbation of an injury, loss of support, services, consortium, companionship, society, or affection, increased risk, possibility, or fear of suffering in the future, and medical screening and monitoring.  (*Id.* § XVI.A.)   However, class members do not release claims for Later-Manifested Physical Conditions provided that they follow the procedures for asserting such claims established by the Agreement.  (*Id.* § XVI.B.)  The release also excludes medical claims (i) arising from alleged exposure of a class member, *in utero*, to dispersants and/or decontaminants used in connection with Response Activities, and (ii) for non-exposure-based physical or bodily trauma injury (other than a heat-related injury) related to the *Deepwater Horizon* Incident.  (*Id.* § XVI.G.)  Under the

proposed Settlement, Class Members also agree not to accept or attempt to recover any compensatory damages from Transocean and Halliburton, but they preserve their ability to seek and recover punitive damages from those parties. (*Id.* § XVII.B.)

*Attorneys' Fees and Costs.* The proposed Settlement also provides for attorneys' fees, expenses, and costs for Medical Benefits Class Counsel. These were negotiated by counsel for the Parties after full agreement was reached as to all other terms of the proposed Settlement. Under the Agreement, BP has agreed not to contest a request by Medical Benefits Class Counsel for fees, expenses, and costs of 6% of the value of benefits actually provided to Class Members pursuant to the Medical Settlement Agreement, provided that the amount paid by BP for fees, expenses, and costs under the Medical Settlement Agreement and the Economic and Property Damages Settlement Agreement cannot jointly exceed a total of $600 million. Any such awards must be approved by the Court, will be paid separately from amounts paid to the Class under the proposed Settlement, and will not reduce payments or benefits to the Class. (*Id*. § XIX and Ex. 19.)

*Claims Administration*. The proposed Settlement provides for an efficient and transparent claims administration process. The standards for proof under the Specified Physical Conditions Matrix are clear. Moreover, class members will have an opportunity to cure any deficiencies with their claims and a right to re-review of their claim in the case of an allegedly erroneous factual determination. (*Id.* § V.M.) In addition, although payments will not be made until after the Effective Date, Class Members will be permitted to file claim forms in advance of the Effective Date, and the Claims Administrator will take all steps necessary to process and pay claims promptly after the Effective Date.

<u>ARGUMENT</u>

I.   **THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED MEDICAL BENEFITS CLASS ACTION SETTLEMENT.**

The proposed Settlement easily satisfies the criteria for preliminary approval of a class settlement.  Indeed, any doubt on this score is erased by the fact that, even at this preliminary stage, the proposed Settlement satisfies the more stringent requirements for final approval of a class settlement.

   **A.   The Proposed Medical Benefits Settlement Far Exceeds the Requirements for Preliminary Approval of a Class Settlement.**

Federal Rule of Civil Procedure 23(e) requires that class action settlements be court-approved.  It is well-settled that compromises of disputed claims are favored, particularly in connection with class actions.  *See, e.g.*, *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *see also Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) ("This presumption [in favor of settlement] is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.") (internal quotation marks omitted); *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (similar); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) ("[T]he public interest in amicable resolution of cases is particularly strong in the context of mass tort and similar litigation."); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) ("[T]here is a 'strong judicial policy favoring the resolution of disputes through settlement.'  . . . The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.") (quoting *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004)).

If a class action settlement is "fair, reasonable, and adequate," then the court should approve the settlement.  Fed. R. Civ. P. 23(e)(2).  "[A] presumption is made in favor of the settlement's fairness, absent contrary evidence."  *Turner*, 472 F. Supp. 2d at 843 (citing *Smith*, 91 F. App'x at 955).

The procedures leading to a fairness hearing and final approval of a class settlement are well-established:  "First, counsel submit the proposed terms of the settlement and the judge makes a preliminary fairness evaluation. . . .  Once the judge is satisfied as to the certifiability of the class and the results of the initial inquiry into the fairness, reasonableness, and adequacy of the settlement, notice of a formal Rule 23(e) fairness hearing is given to the class members."  MANUAL FOR COMPLEX LITIGATION (4th ed.) §§ 21.632 & 21.633; *see also In re Corrugated Container Anti-Trust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981); *In re Nasdaq Market-Makers Anti-Trust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y. 1997).

At the preliminary approval stage, the Court's review is less stringent than at the final fairness hearing.  *See*, *e.g.*, *In re OCA, Inc. Secs. & Derivative Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) ("As this motion is for *preliminary* approval of a class action settlement, the standards are not as stringent as those applied to a motion for final approval.").  In deciding whether there is good cause to issue notice to the class and to proceed with a fairness hearing, the Court must only determine that the proposed settlement (i) appears to be the product of serious, informed, non-collusive negotiations, (ii) has no obvious deficiencies, (iii) does not improperly grant preferential treatment to class representatives or segments of the class, and (iv) falls within the range of possible judicial approval.  *See*, *e.g.*, *id.* at *11; *McNamara v. Bre-X Minerals Ltd.*, 214 F.R.D. 424, 430 (E.D. Tex. 2002) (citing MANUAL FOR COMPLEX LITIGATION); *In re Combustion, Inc.,* 968 F. Supp. 1116, 1124 (W.D. La. 1997); *In re*

15

*Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1993).   Indeed, preliminary approval constitutes "at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."   *In re Traffic Executive Ass'n-E. R.Rs.*, 627 F.2d 631, 634 (2d Cir. 1980).

The proposed Settlement far exceeds the threshold requirements for preliminary approval. ***First***, the proposed Settlement is the result of serious, informed, and non-collusive negotiations. The lawyers who negotiated on behalf of the Class Representatives (two of whom are members of the Plaintiffs' Steering Committee) developed a comprehensive, thorough knowledge of this litigation and, based on their in-depth understanding of the respective strengths and weaknesses of each party's position, favor settlement.   This conclusion is based not only on counsel's extensive investigation and hard-fought negotiations in this matter, but also on their substantial experience in litigating and settling complex matters, including large-scale class actions such as this one.

The Agreement resulted from lengthy negotiations between the negotiating plaintiffs' counsel and BP's counsel.   Counsel for both plaintiffs and BP are thoroughly familiar with the factual and legal issues in this action and have vigorously represented their respective clients' interests throughout the litigation, including in the negotiation process.   The Agreement was reached only after many months of negotiations, including mediations with Judge Shushan.   This arms' length negotiation process supports eventual final approval of the proposed Settlement. *See In re Train Derailment Near Amite La.*, MDL No. 1531, 2006 WL 1561470, at *19 (E.D. La. May 24, 2006) ("The fact that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate."); *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) ("trial court

'should be hesitant to substitute its own judgment for that of counsel'" when the settlement has been reached at arms' length without fraud or collusion); *see also Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."); *Domingue v. Sun Elec. & Instrumentation*, No. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010) ("[T]hat this settlement is the negotiated result of an adversarial proceeding is an indication of its fairness.").

*Second*, the Settlement does not suffer from any of the obvious structural deficiencies that courts consider at the preliminary approval stage.  The Release, for example, is properly limited to claims relating to the factual issues of the Medical Class Action Complaint.  *Cf. In re OCA*, 2008 WL 4681369, at *13 (finding no obvious deficiency with release that applied to known and unknown claims arising from the same facts and circumstances alleged in the complaint).  Nor does the proposed Settlement create the type of class conflicts that precluded class certification in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Unlike in *Amchem*, there are no conflicts between currently injured class members and "exposure-only" class members who have not yet manifested injuries.  *Id.* at 626.  Instead, the Settlement preserves the rights of all class members with Later-Manifested Physical Conditions to seek compensation through the Back-End Litigation Option.  Here, all class members—those with and without already manifested injuries—have the same interest in being able to seek compensation for Later-Manifested Physical Conditions.  Payment to a class member with a qualifying Specified Physical Condition in no way affects the claim of, or the possible compensation available to, a class member who claims a Later-Manifested Physical Condition in the future.

*Third*, the proposed Settlement does not improperly grant preferential treatment to the Medical Benefits Class Representatives or any segment of the class.  The class representatives

are treated the same as all class members.  Like other members of the class, the class representatives' compensation for Specified Physical Conditions, if any, will be determined in accordance with the Specified Physical Conditions Matrix, and they will be eligible for enrollment in the Periodic Medical Consultation Program on the same terms and conditions as other class members.  All class members' compensation is based on their alleged exposure, whether their condition is chronic or acute, the level of proof substantiating their claim, and whether they were hospitalized for the condition/symptoms.  For example, all Clean-Up Workers receive higher payments than Residents under the Specified Physical Conditions Matrix because Clean-Up Workers typically were in closer proximity to the oil and/or dispersants.  Likewise, class members who were hospitalized due to a Specified Physical Condition receive additional compensation (a payment based on the number of nights spent in the hospital plus Actual Hospital Expenses) both because of the additional expense of hospitalization and the likely greater severity of a Specified Physical Condition resulting in hospitalization.  In addition, *all* segments of the class are eligible for the Periodic Medical Consultation Program, and *all* retain a Back-End Litigation Option for any Later-Manifested Physical Conditions that are diagnosed in the future.

***Finally***, the proposed Settlement provides substantial, far-reaching, and concrete benefits to members of the class, and so falls easily within the broad range of possible judicial approval. Here, the proposed Settlement provides for compensation somewhere between each side's best-case scenario, which is all the law requires.  The "trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."  *Cotton*, 559 F.2d at 1330 (internal quotations marks

18

omitted); *see also Int'l Union*, 497 F.3d at 632 ("Our task is not to decide whether one side is right or even whether one side has the better of these arguments.  Otherwise, we would be compelled to defeat the purpose of a settlement in order to approve a settlement.  The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement."); *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("In evaluating these considerations, the Court must not try the case on the merits.").

The proposed Settlement provides meaningful benefits for each qualifying class member. The Specified Physical Conditions Matrix addresses and provides compensation for the types of alleged injuries and conditions caused by exposure to oil and/or dispersants.  The additional benefits provided under the proposed Settlement—medical consultations over a 21-year period under the Periodic Medical Consultation Program and primary care, behavioral and mental health care, environmental medicine, and health education services provided under the Gulf Region Health Outreach Program—provide further evidence that the proposed Settlement is fair and falls within the range of judicial approval.  Settlement of this action unquestionably provides the Class with immediate and tangible benefits without the further expense, risk, and delay of litigation.

In sum, the proposed Settlement easily satisfies and, indeed exceeds, the standard necessary for preliminary approval.  The proposed Settlement is the result of serious, hard fought negotiations, and it is "sufficiently fair, reasonable and adequate to justify notice to those affected and an opportunity to be heard."  *In re Baldwin-United Corp.*, 105 F.R.D. 475, 482 (S.D.N.Y. 1984).

**B.   The Proposed Medical Benefits Settlement Meets the Higher Standard for Final Approval.**

Even at this preliminary stage, it is clear that the proposed Settlement will satisfy the more exacting standards for final approval of a class settlement.  Courts in the Fifth Circuit apply the six *Reed* factors in determining whether to grant final approval to a proposed class action settlement:   (1) the assurance that there is no fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the state of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.  *See Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *see also Newby v. Enron Corp.*, 394 F.3d 296, 308 (5th Cir. 2004); *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 431 (S.D. Tex. 1999) (*citing Reed*, 703 F.2d at 172).

The Court need not rule on the *Reed* factors at this stage of the proceedings.  Nonetheless, the fact that approval of the proposed Settlement would be appropriate under the higher standards applicable to final approval mandates the conclusion that the proposed Settlement should be preliminarily approved under the lower standard.

***No fraud or collusion***.   As discussed in greater detail above, there is and can be no suggestion of fraud or collusion in the negotiation of this settlement.   Agreement was only reached after months of intense negotiations conducted entirely at arms' length.   The absence of collusion can also be presumed based on the overall fairness and generosity of the proposed settlement toward plaintiffs.  If the terms of the proposed settlement are fair, then the reviewing court can deem the formative negotiations to have been proper.  *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 588 (N.D. Ill. 2011) (quoting *Mars Steel Corp. v. Cont'l Ill. Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir 1987) ("Rather than attempt to prescribe the

20

modalities of negotiation, the district judge permissibly focused on the end result of the negotiation, which was more favorable to the class than any class member could reasonably have expected.  The proof of the pudding was indeed in the eating.")); *see also In re Corrugated Container*, 643 F.2d at 212 ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting."); *Turner*, 472 F. Supp. 2d at 846 ("[A] presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair.").

In addition, Judge Shushan oversaw and mediated negotiations over key elements of the Agreement.  Her involvement further supports approval.  *See, e.g.*, *Maywalt v. Parker & Parsley Pet. Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("[T]he supervision of settlement negotiations by a magistrate judge, as occurred here, makes it less likely that . . . [class counsel have promoted] their own interests over those of the class."); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (settlement reached after mediation is entitled to a presumption of arms' length dealings and fairness), *aff'd*, 405 F. App'x 532 (2d Cir. 2010); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003) (upholding settlement where the Magistrate Judge's "mediation efforts" helped facilitate the settlement).

**Complexity, expense, and likely duration of the litigation**.  In assessing this factor, courts consider the vagaries of litigation and compare the settlement to potential future relief.  *In re Shell Oil*, 155 F.R.D. at 563; *see also Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-00400, 2009 WL 2208131, at *26 (E.D.N.C. July 22, 2009) ("[T]he settlement terms reflect plaintiffs' counsel's consideration of the strength of their case, and the delay and cost of proceeding to trial balanced against the certainty, relative promptness, and amount of relief the settlement

provides.").   As in *In re Shell Oil*, there can be "no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases" in the history of the United States.   155 F.R.D. at 559; *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.").

The burdens of litigation here are immense.   The Court's pre-trial orders provide for at least three trial phases, each of which would last months.   Moreover, these three phases would only partially address the claims of the approximately 16,000 existing claimants that have filed MDL 2179 Short Form Joinders alleging injury from exposure to oil, dispersants, or other chemicals released or used in the wake of the *Deepwater Horizon* Incident.   These individual claims would likely entail many years of expensive litigation and require testimony from numerous witnesses and medical experts, with no certainty as to the outcome.

Although remarkable and swift progress has been made in MDL 2179 under this Court's oversight, even after the completion of the already-planned phases of the trial, which were scheduled to begin in February 2012 and would not have ended until many months from now, further years of litigation would likely be required before any individual B3 plaintiff received a recovery.   *See Collins v. Sanderson Farms*, 568 F. Supp. 2d 714, 726 (E.D. La. 2008) (potential trial lasting "several weeks" weighed in favor of approving a settlement); *Faircloth v. Certified Fin., Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving settlement where trial "was estimated to last at least two weeks"); *In re Combustion*, 968 F. Supp. at 1127 (finding "the prospect of a trial lasting months" weighed heavily in favor of approving a settlement); *In re Shell Oil*, 155 F.R.D. at 560 ("[E]ven a six month trial is considered extremely

lengthy and the expense for the parties, the claimants, and the judicial system would be enormous.").  Moreover, should this case proceed to trial, it risks becoming more complicated, as there "is no reason to suppose that the case would become less complex or contentious as trial began."  *Faircloth*, 2001 WL 527489, at *4; *see also id.* (concluding from the "contentious motion practice on behalf of virtually all parties involved" that the case "would undoubtedly continue on a protracted litigation path absent approval of the proposed settlement agreement").

The history of the *Exxon Valdez* litigation is instructive in this regard.  Nearly twenty years elapsed between the *Exxon Valdez* oil spill and the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).  Many of the plaintiffs had died before the case reached the Supreme Court, *see* Brief for Respondents, *Exxon Shipping Co. v. Baker*, No. 07-219, 2008 WL 194284, at *16 (U.S. Jan. 22, 2008), and others suffered due to the lengthy litigation process, causing experts who studied the effects of the *Exxon Valdez* litigation on the local populace to argue that the litigation "produce[d] an independent secondary disaster, which [rather than the original spill] is the primary source of ongoing secondary trauma."  J. Steven Picou, *WHEN THE SOLUTION BECOMES THE PROBLEM: THE IMPACTS OF ADVERSARIAL LITIGATION ON SURVIVORS OF THE EXXON VALDEZ OIL SPILL*, 7 U. St. Thomas L.J. 68, 81 (2009).  Litigation represents "an enormous financial and psychological burden on all parties involved" and counsels in favor of settlement.  *In re Combustion*, 968 F. Supp. at 1127; *see also Ass'n For Disabled Americans*, 211 F.R.D. at 469 ("[A]bsent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain.").

In addition, the necessary litigation costs for the extensive pre-trial and trial activity would likely outweigh recovery for many Class Members.  In contrast, this Settlement now

maximizes the benefits available to the Class.  Those with qualifying Specified Physical
Conditions can receive certain compensation under the Settlement.  If they instead proceeded
with litigation, recovery would not be certain and would take significantly longer.  Additionally,
Clean-Up Workers, Zone B Residents, and qualifying Zone A Residents will be able to receive
regular medical examinations over decades to assist them in managing their health.

Because many of "the most controversial and hard-fought of all the issues in this case,"
*Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986), remain to be litigated, the
proposed Settlement "eliminates the transaction costs that further proceedings would impose"
and "provides relief for the class sooner than continued litigation would."  *Ayers v. Thompson*,
358 F.3d 356, 369 (5th Cir. 2004).  For the parties, it is therefore entirely "proper to take the bird
in the hand instead of a prospective flock in the bush."  *In re Shell Oil*, 155 F.R.D. at 560.  This
*Reed* factor counsels strongly in favor of approval, particularly at this stage.

**State of the proceeding and amount of discovery**.  This factor "asks whether the parties
have obtained sufficient information to evaluate the merits of the competing positions."  *In re
Educ. Testing Servs.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (quotations omitted).  "Thus, the
question is not whether the parties have completed a particular amount of discovery, but whether
the parties have obtained sufficient information about the strengths and weaknesses of their
respective cases to make a reasoned judgment about the desirability of settling the case on the
terms proposed."  *Id.* at 620-21.  Here, where the parties have obtained extensive information
through both formal discovery and informal alternatives, there can be no doubt that the parties
have the necessary information to evaluate all aspects of the case and the proposed Settlement.

First, the parties have completed an extraordinary amount of discovery in a remarkably
short period of time for litigation on this scale.  Over the course of 19 months, the parties have

already deposed 311 fact and expert witnesses, with 7,416 documents marked as deposition exhibits.  In addition, the parties have produced approximately 90 million pages of documents and approximately 20 terabytes of data.  By any measure, the amount of discovery that has already occurred is more than sufficient to ensure a fair settlement.  *Cf. Faircloth*, 2001 WL 527489, at *4 (approving a settlement where "thousands" of pages were produced).  Although discovery for later phases of the trial is not as advanced as Phase I discovery, the depth and breadth of discovery already completed provides the parties with necessary and extensive information regarding the potential liability of BP and other defendants for the bodily and personal injury claims alleged by the class.

Equally important, the Fifth Circuit has made clear that formal discovery is not a prerequisite to the approval of a class settlement.  Even when "very little formal discovery was conducted," this "does not compel the conclusion that insufficient discovery was conducted." *Cotton*, 559 F.2d at 1332; *see also In re Corrugated Container*, 643 F.2d at 211, 204 n.10 (noting that even if little formal discovery has been completed, plaintiffs may still have access to information obtained in other ways; "we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table"); *Newby*, 394 F.3d at 306 ("Generally speaking, a settlement should stand or fall on the adequacy of its terms.").

In addition to the formal discovery conducted in MDL 2179, the parties have benefited from numerous other sources of information.  These include: (1) extensive scientific data in the public domain concerning the effect of oil exposure on health, specific exposure and sampling data collected during the *Deepwater Horizon* Incident, and analyses from government agencies; (2) health incident reports relating to Clean-Up Workers; (3) investigations conducted by the parties and their consultants; and (4) government investigations and hearings.  Although this

information was gathered outside of the litigation and, in some cases, is not admissible in any trial on the merits, the existence of these extensive alternate sources of information is important in evaluating whether the parties are sufficiently informed to reach a settlement.  *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007).

Here, in light of the massive amount of formal discovery, as well as substantial informal discovery and investigation, the Court should conclude that the proposed Settlement represents an informed, educated, and fair resolution of this dispute.  *See, e.g., Turner*, 472 F. Supp. 2d at 847; *DeHoyos*, 240 F.R.D. at 292; *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997).   Clearly, all of the information developed to date allows the parties to assess their respective positions in fine-grained detail and make a reasonable decision on settlement, which is all that is required.  *See, e.g., In re Combustion*, 968 F. Supp. at 1127.

***Probability of plaintiffs' success on the merits***.   This factor also guides the court in determining whether a settlement is adequate.   Evaluating this factor requires the Court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case."  *Reed*, 703 F.2d at 172.   If further litigation is unlikely to lead to greater relief for the class, then this factor weighs in favor of settlement.  *Ayers*, 358 F.3d at 373. The parties hotly dispute whether the plaintiffs would ultimately succeed in this litigation and on the quantum of damages, if any, that would be awarded.   Plaintiffs contend they would be successful in proving the class members were harmed by exposure to the oil and/or dispersants. BP disagrees and disputes this, contending (among other defenses) that many class members would not be able to establish exposure and medical causation and that any damages ultimately awarded would be limited.   Plaintiffs acknowledge that for any individual class member who obtained a favorable verdict at trial, the resulting recovery, likely years from now, would be

diminished by the costs of litigation.  In light of these considerations, certain recovery through settlement is by far the preferable result.

*Range of possible recovery*.  To merit approval, the proposed Settlement must only represent a fair, reasonable, and adequate estimation of the value of the case.  *In re Combustion*, 968 F. Supp. at 1129; *cf. UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) ("[A] fairness hearing is not a trial, but instead has a very singular and narrow purpose—to determine whether the settlement at issue is fair, reasonable, and adequate.").  The proposed Settlement here reflects the kind of monetary recovery that a class could obtain at trial, and indeed provides additional relief that would be unavailable through litigation.  It provides compensation for qualifying Specified Physical Conditions, without the need for protracted litigation or proof of individual causation.  The Specified Physical Conditions Matrix sets forth recoveries based on whether a condition is acute or chronic and the amount of documentation available to the claimant.

In addition, the proposed Settlement provides Periodic Medical Consultation Program visits for all qualifying Class Members, including Clean-Up Workers and Zone B residents who have not claimed a Specified Physical Condition.  This Periodic Medical Consultation Program provides a substantial benefit to the class.  The Gulf Region Health Outreach Program provides additional benefits to the class and the general public that could only be achieved through settlement.

*Opinions of the class counsel, class representatives, and absent class members*.  In evaluating a settlement, the Court should rely on counsel, who know the strengths and weaknesses of their cases.  *See Turner*, 472 F. Supp. 2d at 852 ("Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an

27

intimate familiarity with the lawsuit."). Where "counsel for both parties have significant experience in litigating and negotiating settlement of class actions," this fact is strong evidence that the settlement is fair and reasonable. *DeHoyos*, 240 F.R.D. at 287 (internal quotation marks omitted); *see Cotton*, 559 F.2d at 1330 ("In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties."). Negotiating plaintiffs' counsel and counsel for BP have thorough knowledge of the case and substantial experience litigating and settling complex matters and class actions. After evaluating the risks and benefits of continued litigation, they believe that settlement is more beneficial to the class than litigation, and that the proposed Settlement is fair, reasonable, and more than adequate.

## II.      THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS.

To effectuate the proposed Settlement, the parties request that the Court certify, solely for the settlement purposes, a Medical Benefits Settlement Class, as described above and defined in the Agreement. If the Court agrees and certifies a settlement class, it must also appoint class counsel. *See* FED. R. CIV. P. 23(g); *Radosti v. Envision EMI*, 717 F. Supp. 2d 37, 54 (D.D.C. 2010).

In the Medical Class Action Complaint, plaintiffs allege that questions of law and fact common to the members of the putative class exist and indeed predominate over any questions affecting only individual class members. (Master Compl. (Rec. Doc. 1 in Case No. 12-cv-968) ¶¶ 91-95; 99-101) In addition, plaintiffs allege that a class action is superior to litigation via multiple trials, the only other method available for the fair and efficient adjudication of this controversy. (*Id.* at ¶ 102-03.) Plaintiffs further allege that the class is sufficiently numerous that joinder of all members is impossible, (*id.* at ¶ 90), that the claims in the complaint are typical of the claims of the class, (*id.* at ¶ 96-97), and that plaintiffs and class counsel will fairly and adequately represent and protect the interests of the Class. (*Id.* at ¶ 98.)

28

Plaintiffs have filed a separate motion seeking certification of the Class for purposes of settlement only.  BP does not oppose that motion.  Accordingly, to effectuate the settlement, the parties request that the Court certify, solely for the purposes of settlement, the Medical Benefits Settlement Class.

## III.    THE PROPOSED FORM AND METHOD OF CLASS NOTICE IS MORE THAN ADEQUATE AND SATISFIES THE REQUIREMENTS OF RULE 23.

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e), "notice of the class action must meet the requirements of both Rule 23(c)(2) and Rule 23(e)."  *In re CertainTeed Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005).   In this case, the parties submit that the agreed-upon comprehensive notice program easily satisfies these requirements.  The parties therefore request that the Court approve the Medical Benefits Settlement Class Notice Plan that is attached as Exhibit 2 to the Declaration of Cameron R. Azari, Esq., which is itself Exhibit A to this Memorandum.  The individual and publication Medical Benefits Settlement Class Notices are exhibits to the Notice Plan.

### A.    The Proposed Notice Distribution Method and Notice Comply with Rule 23(c)(2).

In an action certified as a class (including a settlement class) pursuant to Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The notice must inform the class in "plain, easily understood language" of "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the

29

class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." *Id.*

Here, the Notice is written using concise and simple terminology and addresses all of the elements of Rule 23(c)(2)(B). *See In re Chinese-Manufactured Drywall*, MDL No. 2047, 2012 WL 92498, at *13 (E.D. La. Jan. 10, 2012) (approving notice "written in plain and straightforward language . . . [that] also objectively and neutrally apprises all Class Members on the nature of the action, the definition of Class and Subclasses, and relevant deadlines and restrictions, as well as the date and location for the final Fairness Hearing."). The Notice includes, among other things: (i) a description of the Class; (ii) a description of the litigation and the proposed Settlement; (iii) an explanation of the rights of class members including the deadlines for filing a claim form; (iv) the names of counsel for the class; (v) the fairness hearing date; (vi) a description of the opportunity to appear at the hearing; (vii) a statement of the maximum amount of attorneys' fees that may be sought by Class Counsel; (viii) a statement of the deadline for filing objections to the proposed Settlement; and (ix) how to obtain further information.

The Notice provides clear and specific direction and instructions to class members regarding their four options under the Settlement: (1) apply for settlement benefits; (2) opt out of the Settlement, in which case they will not participate in the Settlement and will retain all their rights to pursue individual claims against BP; (3) object to the Settlement, in which case they will nonetheless remain class members; or (4) do nothing, in which case they will also remain class members.[4]  The Notice more than satisfies the Rule's form and content requirements. *See,*

---

[4] The Notice provides that Medical Benefits Settlement Class Members who wish to opt out of the class must submit a written request to opt out within the time period set forth in the Medical Benefits Settlement Agreement and the Notice.  A class member may revoke his or her opt out election before the Court enters a Final Order and Judgment by submitting a written request to the Claims Administrator.  Class members who wish to object to the settlement

*e.g.*, *id.* at \*13; *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 175 (E.D. Pa. 2000); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997).  *See* Affidavit of Shannon R. Wheatman, Ph.D., attached as Exhibit D.

The broad dissemination method provided for in the Notice Plan also satisfies Fed. R. Civ. P. 23(c)(2)(B).  The plan contemplates direct mailed notice to identifiable individual class members and, to the extent known, their attorneys.  In addition, there will be a broad-reaching published notice in numerous national and local media, with a notice effort covering the entire United States, primarily focusing on the coastal areas of Louisiana, Alabama, Mississippi, and the Florida Panhandle.  Specifically, the Notice Agent will send to individuals identified as likely class members via United States mail a notice packet, which will include, among other things, a cover letter informing them of the key features of the Settlement and where additional information may be found, a detailed notice, and a claim form.  The media notice effort will include publication in over 1,100 local newspapers nationwide and in leading national consumer magazines and trade, business, and specialty publications, as well as in local television programming, radio spots, and newspapers in the Gulf region, and in appropriate foreign language and African-American publications.  In addition, banner notice ads will appear on national and local web properties.  There will also be a case notice website where potential class members can obtain additional information and documents.

Between direct mail and media, the Notice Plan is estimated to reach at least 95% of adults in the Gulf Coast Areas an average of 7.7 times each and an estimated 83% of all U.S. adults an average of 3.8 times each, which more than satisfies the guidance provided by the Federal Judicial Center and exceeds the median reach calculation of other effective court-

must file and serve a notice of their intention to appear and object, also within the time period and manner specified in the Medical Benefits Settlement Agreement and Notice, which further advises that objectors may also appear before the Court at the Fairness Hearing.

approved notice plans.  *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010)*, at 3 (prescribing that a proposed notice effort should reach between 70 - 95% of the class and observing, "A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%.").

This Court and others have approved class notice distribution plans less comprehensive than that contemplated here.  For example, in *In re Chinese-Manufactured Drywall*, this Court approved a notice program consisting of individual notice to all class members and their counsel, and the posting of the Agreement on the Court's MDL website.  *See* 2012 WL 92498, at *13.  In *In re Combustion,* in addition to mailing individual notice to class members, the class notice was "published in two local newspapers, the Baton Rouge Morning Advocate and the Denham Springs News on March 13, 1997."  968 F. Supp. at 1129.  The court found the "direct mailings as well as publication in two local newspapers is reasonable and sufficient to satisfy the Due Process requirement of notice, as well as all notice requirements of [Rule 23]."  *Id.*; *see also In re OCA* , 2008 WL 4681369, at *16 (notice plan calling for direct mailing to class members, as well as publication in the national edition of the Wall Street Journal and distribution by a news wire and the Depository Trust Company's Legal Electronic Notice System was sufficient).

Other courts presiding over prominent class actions have likewise approved notice plans where the estimated reach was less than the 95% estimated here:

- *In re Trans Union Corp. Privacy Litig.*, MDL 1350 (N.D. Ill) (reached 87.54% of United States adults);

- *In Re Countrywide Customer Data Breach Litig.*, No. 3:08-md-01998-TBR, MDL 1998 (W. D. Ky.) (reached 81.8 of all United States adults);

- *Wilson v. Airborne, Inc.,* No. 07-cv-00770-VAP (C.D. Cal.) (reached 80.2% of all United States adults);

- *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, No. 01-CV-12257, MDL No. 1456, (D. Mass) (various notice efforts ranging from 80% - 92.8% reach toward target audiences).

The Notice Plan here clearly complies with the requirements of Fed. R. Civ. P. 23(c)(2)(B). *See* Azari Decl., attached as Exhibit A; Declaration of Katherine Kinsella, attached as Exhibit C.

### B.    The Proposed Notice Complies with Rule 23(e).

Rule 23(e) gives the Court more discretion in approving notice than Rule 23(b)(3) with its specific requirements.  Rule 23(e) requires only that the Court "direct notice in a *reasonable manner* to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1) (emphasis added).  Under this Rule, subject to the minimum requirements of due process, the Court has complete discretion over the form and manner of notice.  *See, e.g., Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979) (noting the "mechanics of the notice process are left to the discretion of the district court subject only to the broad 'reasonableness' standards imposed by due process"); *see also Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1337 (1st Cir. 1991) (same principle); *Quigley v. Braniff Airways, Inc.*, 85 F.R.D. 74, 77 (N.D. Tex. 1977) (noting a district court's "virtually complete discretion as to the manner and method of notice").

Due process requires only that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord, e.g., Int'l Union*, 497 F.3d at 629.  Significantly, compliance with Rule 23(c)(2) itself can satisfy the Due Process Clause.  *See In re Enron Corp. Secs., Derivs., & "ERISA" Litig.,* No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008).  The extensive Notice Plan here is eminently reasonable and, in fact, is exceptionally far-reaching.

In short, the form and content of the Notice, together with the manner of dissemination under the Notice Plan, is reasonably calculated to reach all class members and is the best form of notice available under the circumstances. The Notice and Notice Plan fully satisfy the dictates of Rule 23 and due process, and the Court should therefore approve them.

## IV.   REQUEST TO APPOINT GARRETSON RESOLUTION GROUP AS CLAIMS ADMINISTRATOR.

The parties have jointly selected and nominate for preliminary approval Garretson Firm Resolution Group, Inc. (d/b/a Garretson Resolution Group) ("GRG") as the Claims Administrator of the proposed Settlement.

Under the proposed Settlement, the Claims Administrator is responsible for implementing and administering the Settlement for the benefit of the class, including, among other duties, (i) processing all claims for Specified Physical Conditions; (ii) determining qualification for and implementing the Periodic Medical Consultation Program; (iii) performing certain administrative functions regarding the Gulf Region Health Outreach Program, including creation and maintenance of the library; (iv) administering the Back-End Litigation Option process; and (v) serving as trustee for the Medical Settlement Trust. *See* MSA § II.P; *see generally id.* § XXI.A (detailing the responsibilities of the Claims Administrator). This Court has ongoing and exclusive jurisdiction over the Claims Administrator and retains that jurisdiction through and after the Effective Date. *Id.* § XXI.A.5.

Should the Court grant Preliminary Approval, the Agreement requires the Claims Administrator to fulfill certain essential duties immediately. For example, as discussed above, the Medical Benefits Settlement Notice Plan requires the Claims Administrator to disseminate direct mail notice to identifiable class members. The Claims Administrator must establish a call center and web portals to address questions generated by the Notice, and eventually, to assist

with the filing of claims.  In addition, the Claims Administrator must begin administration of the Gulf Region Health Outreach Program.  Given the volume of work to be completed to effectuate the agreement, combined with the importance of beginning that work as soon as practicable, the parties respectfully and jointly request that the Court preliminarily appoint GRG as the Claims Administrator simultaneously with preliminary approval of the proposed Settlement.

GRG has more than fourteen years of experience in the administration and resolution of mass tort and complex class action settlements, including the Vioxx®, Medtronic, and World Trade Center settlements, among many other high profile matters.  *See* Affidavit of Matthew L. Garretson, attached as Exhibit B.  GRG has expertise in several areas specific to medical settlement claim resolution, and vital to the proposed Settlement.  For example, GRG specializes, and indeed has pioneered procedures related to lien resolution and Medicare-related administration, both of which are conditions precedent to the provision of benefits under the proposed Settlement.  *Id*.  With over 200 employees, including attorneys, healthcare analysts, nurses, billing and coding experts, GRG also has the resources to administer a settlement matter of this size.  *Id*.  GRG has an office in New Orleans that will perform much of the settlement administration.

GRG has consulted with the parties regarding numerous administrative aspects necessary to implement the proposed Settlement, including the creation of settlement forms, procedures, and processes.  The parties believe that based both on GRG's experience in administering other settlement agreements, and its knowledge of the administrative aspects of this particular agreement, appointment of GRG as Claims Administrator for the proposed Settlement following Preliminary Approval would best serve the interests of the Class Members.

## V.   REQUEST TO APPOINT THE HONORABLE JACK C. WATSON (RET.) AS GUARDIAN AD LITEM.

The parties have jointly selected and nominate former Louisiana Supreme Court Justice Jack C. Watson as Guardian Ad Litem.

The purpose of appointing a Guardian Ad Litem is to provide a neutral party whose sole responsibility is to assess the fairness of the agreement for those class members who lack the capacity to determine for themselves whether the agreement adequately and fairly represents their interests.  The Medical Settlement Agreement provides that the Guardian Ad Litem will "make an independent investigation . . . into the terms and provisions of [the] Medical Settlement Agreement" on behalf of those members and then "report to the [parties] and make a recommendation to the Court as to the fairness of this Medical Settlement Agreement with respect to Medical Benefits Settlement Class Members who are minors, lack capacity or are incompetent." *Id.* § III.C.2.  The agreement further provides that the Guardian Ad Litem should produce its recommendation prior to the Fairness Hearing, allowing the Parties and the Court to address any concerns.  *Id.*

Justice Watson is a lifelong resident of Louisiana who served on the Louisiana Supreme Court for 17 years.  Prior to that, he served as a judge in Louisiana's trial and intermediate appellate courts.  In between his undergraduate and law degrees, Justice Watson served as a Lieutenant in the United States Air Force for four years.  In his 32 years on the bench, Justice Watson had broad exposure to a variety of litigation and litigants, including class actions, personal injury cases, and cases involving the rights of minors and incompetents.  Following his tenure on the Court, Justice Watson taught at both Tulane Law School (Summer Law) and at the Southern Law School in Baton Rouge, as a Common Law professor.  He has taught Admiralty, Torts, Appellate Practice, and Law Practice.  Justice Watson also served as President of the

36

Southwestern Louisiana Bar Association.  Currently, Justice Watson practices with the law firm Baggett-McCall in Lake Charles, where he has been involved in a range of cases, including complex class actions and admiralty and maritime law cases.

The parties believe that based on his qualifications, the appointment of Justice Watson as Guardian Ad Litem would best serve the interests of the Medical Benefits Settlement Class Members whom the Guardian Ad Litem is charged to protect.

## VI. REQUEST FOR ADDITIONAL APPOINTMENTS, ESTABLISHMENT OF DEADLINES, AND OTHER RELIEF.

In connection with this Settlement, certain named plaintiffs, Kip Plaisance, Jason Perkins, Camille Warren, Christian Pizani, Max Plaisance, Benjamin Judah Barbee, Cornelius Divinity, Janice Brown, Carlton Caster, George Baker, and Duffy Hall, seek appointment as Medical Benefits Class Representatives on behalf of the Medical Benefits Settlement Class that they represent.  In addition, Plaintiffs' Co-Liaison Counsel and Interim Class Counsel (Stephen J. Herman and James Parkerson Roy) seek appointment as Medical Benefits Class Counsel and Lead Class Counsel.  The members of the Plaintiffs' Steering Committee listed below seek appointment as Medical Benefits Class Counsel:

| | |
|---|---|
| Brian H. Barr | Rhon E. Jones |
| Jeffery A. Breit | Matthew E. Lundy |
| Elizabeth J. Cabraser | Michael C. Palmintier |
| Philip F. Cossich, Jr. | Joseph F. Rice |
| Robert T. Cunningham | Paul M. Sterbcow |
| Alphonso Michael Espy | Scott Summy |
| Calvin C. Fayard, Jr. | Mikal C. Watts |
| Robin L. Greenwald | Conrad S. P. Williams |
| Ervin A. Gonzalez | |

Furthermore, the parties request that Hilsoft Notifications be appointed as the Medical Benefits Settlement Class Notice Agent to implement the Medical Benefits Settlement Class Notice Plan.

In addition, the parties request that the Court approve the creation of a "qualified settlement fund," as described in Sections XXII.C and D of the Agreement and as defined in Section 468B(d)(2) of the Internal Revenue Code of 1986, as amended, and Treasury Regulation Section 1.468B-1, that will be consistent with all terms and conditions of the Medical Settlement Agreement.  The parties request that the Court retains continuing jurisdiction and supervision over the qualified settlement fund.

The parties also request that the Court toll and stay the statutes of limitation applicable to any and all claims or causes of action for Released Claims that have been or could be asserted by or on behalf of any Medical Benefits Settlement Class Member unless and until he or she Opts Out of the Medical Benefits Settlement Class or the Agreement is terminated pursuant to Section XIV.

Finally, the parties respectfully propose that the Court establish the following deadlines:

- May 3, 2012 --  Notice period starts

- August 13, 2012 -- Motion papers in support of settlement

- August 31, 2012 --  Objection deadline

- October 1, 2012 -- Opt out deadline

- October 22, 2012 - Reply submissions

- November 8, 2012 -- Fairness hearing

## VII.   THE COURT SHOULD STAY OR ADJOURN THE PHASE I TRIAL OF LIABILITY, EXONERATION, AND FAULT ALLOCATION PENDING FINAL APPROVAL OF THE SETTLEMENT.

BP separately requests that the Court stay or adjourn any trial proceeding (including the previously set Phase I Trial of Liability, Exoneration, and Fault Allocation) that would or might determine BP'S liability to the Medical Benefits Settlement Class.  Medical Benefits Class Counsel and the Medical Benefits Class Representatives do not oppose that request.  Such an

38

adjournment makes the best use of the Court's resources and permits certain parts of the case to progress while at the same time safeguarding the rights of both Class Members and BP.

Orders granting much more extensive relief in the form of broad adjournments or stays of *all* related litigation are routine in class and multi-district litigation.   For example, Courts regularly exercise their power to stay related matters in multi-district litigation pending final approval of a proposed settlement.  *See*, *e.g.*, *In re Sony Corp. SXRD Rear Projection Television Mktg., Sales Practices & Prods. Liab. Litig*., No. 09-MD02102, 2010 WL 1993817, at *6 (S.D.N.Y. May 19, 2010) ("So that the parties may proceed in the most efficient and expeditious matter, all related matters in this multi-district litigation . . . are hereby stayed pending the issuance of a decision by the Court granting or denying final approval of the proposed settlement.").  In addition, courts have stayed all proceedings, including discovery, pending final approval of a proposed settlement.  *See, e.g.*, *In re Napster, Inc. Copyright Litig*., No. C-MDL-00-1369, 2007 WL 2907892, at *2 (N.D. Cal. Oct. 2, 2007) ("Upon the Court's entry of this Order, all further proceedings in this lawsuit (including, but not limited to, any existing discovery obligations) shall be stayed pending Final Settlement Approval or termination of the Settlement Agreement, whichever occurs earlier, except for those matters necessary to obtain and/or effectuate the Final Settlement Approval.").  Indeed, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), a court considering whether to preliminarily approve a settlement can enjoin any overlapping or parallel actions to allow the court to administer the proposed settlement agreement.  *See Holman v. Student Loan Xpress, Inc*., No. 8:08-cv-305, 2009 WL 4015573, at *5 (M.D. Fla. Nov. 19, 2009).[5]

---

[5] *See also In re Diet Drugs,* 282 F.3d 220, 236 (3d Cir. 2002) (noting "[t]he threat to the federal court's jurisdiction [over a preliminary settlement] posed by parallel state actions is particularly significant"); *DeHoyos*, 240 F.R.D. at 310-11 ("[T]his Court found the issuance of a preliminary injunction was necessary and appropriate in aid of the Court's jurisdiction over the action and to protect and effectuate the Court's review of the settlement."); *Carlough v.*

Given the Court's broad power to issue such stays, the modest adjournment of Phase I of the Trial of Limitation and Liability is well within the Court's discretion and authority. The adjournment requested is limited; it allows Phase II discovery to continue; all that it does is adjourn the Phase I trial to enable the parties to settle a large portion of this case, while at the same time protecting the rights of the class as well as BP. Accordingly, BP requests that the Court adjourn Phase I of the trial pending the fairness hearing and final approval of the Settlement.

## CONCLUSION

For the foregoing reasons, the parties respectfully request the entry of an Order, a proposed form of which accompanies the parties' joint motion:

1.     preliminarily approving the Settlement and the Agreement;

2.     approving the Medical Benefits Settlement Class Notice and the Medical Benefits Settlement Class Notice Plan, and directing notice to the Medical Benefits Settlement Class as set forth in the Medical Benefits Settlement Class Notice Plan;

3.     preliminarily appointing Garretson Resolution Group as Claims Administrator;

4.     appointing the Honorable Jack C. Watson (ret.) as Guardian Ad Litem;

5.     appointing Kip Plaisance, Jason Perkins, Camille Warren, Christian Pizani, Max Plaisance, Benjamin Judah Barbee, Cornelius Divinity, Janice Brown, Carlton Caster, George Baker, and Duffy Hall as Medical Benefits Class Representatives;

6.     appointing Plaintiffs' Co-Liaison Counsel and Interim Class Counsel (Stephen J. Herman and James Parkerson Roy) as Medical Benefits Class Counsel and Lead Class Counsel;

7.     appointing the members of the Plaintiffs' Steering Committee as Medical Benefits Class Counsel;

---

*Amchem Prods., Inc.*, 10 F.3d 189, 203-04 (3d Cir. 1993) (finding district court's preliminary injunction enjoining absent members of purported federal class in an asbestos related tort action from prosecuting state claims was necessary in aid of its jurisdiction because prospect of settlement was imminent after years of pre-trial negotiations in complex matter); *Battle v. Liberty Nat'l Life Ins. Co.*, 660 F. Supp. 1449, 1455 (N.D. Ala. 1987), *aff'd*, 877 F.2d 877 (11th Cir. 1989) (enjoining class members from prosecuting state court action where state court action would directly interfere with district court's ability to supervise and dispose of federal action involving multiple parties and complex antitrust issues and would remove federal court's flexibility in reaching a just solution, protecting settling defendants, and avoiding conflicting results).

8.      appointing Hilsoft Notifications as Medical Benefits Settlement Class Notice Agent;

9.      approving the creation of a "qualified settlement fund," as described in Sections XXII.C and D of the Agreement and as defined in Section 468B(d)(2) of the Internal Revenue Code of 1986, as amended, and Treasury Regulation Section 1.468B-1, that will be consistent with all terms and conditions of the Medical Settlement Agreement and ordering that the Court retains continuing jurisdiction and supervision over the qualified settlement fund;

10.     tolling and staying the statutes of limitation applicable to any and all claims or causes of action for Released Claims that have been or could be asserted by or on behalf of any Medical Benefits Settlement Class Member unless and until he or she Opts Out of the Medical Benefits Settlement Class or the Agreement is terminated pursuant to Section XIV;

11.     scheduling a Fairness Hearing;

12.     designating the period and method for Medical Benefits Class Members to Opt Out;

13.     setting the other deadlines reflected in the parties' proposed timetable; and

14.     staying or adjourning, until the Court's determination of the fairness of this Settlement, any trial proceeding (including the previously set Phase I of the Limitation and Liability Trial) that would or might determine BP's liability to the Medical Benefits Settlement Class.

April 18, 2012                                    Respectfully submitted,


/s/ Stephen J. Herman                            /s/ James Parkerson Roy
Stephen J. Herman, La. Bar No. 23129             James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR                      DOMENGEAUX WRIGHT ROY &
LLP                                              EDWARDS LLC
820 O'Keefe Avenue                               556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                     Lafayette, Louisiana 70501
Telephone: (504) 581-4892                        Telephone: (337) 233-3033
Fax No. (504) 569-6024                           Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                         E-Mail: jimr@wrightroy.com

*Interim Class Counsel and Proposed Medical*     *Interim Class Counsel and Proposed Medical*
*Benefits Class Counsel*                          *Benefits Class Counsel*


### PLAINTIFFS' STEERING COMMITTEE
### AND PROPOSED MEDICAL BENEFITS CLASS COUNSEL

Joseph F. Rice                                   Conrad S.P. "Duke" Williams
MOTLEY RICE LLC                                  WILLIAMS LAW GROUP
28 Bridgeside Blvd.                              435 Corporate Drive, Suite 101
Mount Pleasant, SC 29464                         Maison Grand Caillou
Office: (843) 216-9159                           Houma, LA 70360
Telefax: (843) 216-9290                          Office: (985) 876-7595
E-Mail: jrice@motleyrice.com                     Telefax: (985) 876-7594
                                                 E-Mail: duke@williamslawgroup.org


Brian H. Barr                                    Robin L. Greenwald
LEVIN, PAPANTONIO, THOMAS,                        WEITZ & LUXENBERG, PC
MITCHELL, ECHSNER & PROCTOR, PA                  700 Broadway
316 South Baylen St., Suite 600                  New York, NY 10003
Pensacola, FL 32502-5996                         Office: (212) 558-5802
Office: (850) 435-7045                           Telefax: (212) 344-5461
Telefax: (850) 436-6187                          E-Mail: rgreenwald@weitzlux.com
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX 77079
Telephone: (281) 366-2000
Telefax: (312) 862-2200

Ellen K. Reisman
ARNOLD & PORTER LLP
777 South Figueroa Street
Los Angeles, CA 90017-5844

James P. Joseph
Ethan P. Greene
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206

*Of Counsel*

*/s/ Richard C. Godfrey, P.C.*            .
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Elizabeth A. Larsen
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

*/s/ Don K. Haycraft*            .
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 662-5985
Telefax: (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of April, 2012.

*/s/ Don K. Haycraft*
Don K. Haycraft
