GOODWIN | PROCTER

Dahlia S. Fetouh
617.570.1263
dfetouh@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

April 5, 2012

**Via Electronic Mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
Room B345
500 Poydras St.
New Orleans, LA  70130

Re:     *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (Docket No. MDL 2179); Subpoena Served on Woods Hole Oceanographic Institution

Dear Judge Shushan:

        We write in response to BP's March 15, 2012 letter to the Court regarding the subpoena served on Woods Hole Oceanographic Institution ("WHOI") demanding, among many other things, draft manuscripts and confidential internal discussions of scientists regarding academic articles.  By these demands, BP has made it clear to scientists that writing an academic article that reflects poorly on BP may carry significant collateral consequences, including a potential public assault on your methodology (and, by extension, your reputation), along with the risk of significant costs, both in terms of lost time and money.  Whether intentional or not, BP's aggressive pursuit of WHOI's scientists threatens to stifle future scholarly publications and research in all scientific disciplines, ranging from medicine to engineering and beyond, and is dangerous precedent.

        Of utmost importance to this dispute is the fact that WHOI was acting in its capacity as a non-profit oceanographic research institution when it dispatched its scientists in April 2010 to collect raw data on the effects of the *Deepwater Horizon* oil spill.  Although it undertook this task at the request of the United States Coast Guard, WHOI's contract with the Coast Guard was principally intended to cover the bare costs associated with the initial field research, and only provided WHOI with a nominal "fee" of $4,762.  *See* Contract and Award (the "Contract") (Exh. 1).  The value of the hours spent and the expenses incurred by WHOI's team of scientists—both

GOODWIN | PROCTER

The Honorably Sally Shushan
April 5, 2012
Page 2

in collecting the raw data and participating in the Flow Rate Technical Group—quickly and
substantially exceeded this minimal "fee" paid to WHOI. Nevertheless, WHOI scientists
continued their research related to the spill, even after the expiration of the Contract, in their role
as academics. The articles that were eventually published as a result of this work—the very
articles that BP now seeks to question—were authored by WHOI scientists in their capacity as
academics working at a non-profit research institution.[1] The work reflects the tireless efforts of
scientists who devoted their nights and weekends to aid in this scientific pursuit. The articles
were ultimately published by the leading scientific journal worldwide in this area, which required
the devotion of even more time and effort by the WHOI scientists and their co-authors.

Whatever need BP might have for the Contract deliverables, including any drafts and
internal discussions related to WHOI scientists' participation in the Flow Rate Technical Group,
that need has already been satisfied. The Government has already produced relevant
information, including hundreds of emails of WHOI scientists reflecting discussions of the initial
plume analysis done as part of the Flow Rate Technical Group. Moreover, WHOI has now
produced the raw data, documents, and files that BP needs to test and replicate WHOI's work.[2]
All that is left—and what BP now seeks to gather and scrutinize—are the e-mails and drafts
pertaining to the multiple academic papers WHOI scientists went on to write regarding their
research after the Contract with the Coast Guard was completed.

Regardless of BP's assertion to the contrary, BP has no valid need for these documents.
BP clearly seeks the e-mails, drafts, and internal notes of WHOI scientists related to their
academic publications purely for the purpose of impeaching WHOI's scientists—a point made
plain by BP's demand that WHOI produce any "communications regarding the techniques or
methodologies used (or considered for use but rejected) . . . *bearing on the validity and
reliability* of WHOI's work." BP's March 15 letter to the Court, at 2 (emphasis added). As
WHOI has previously explained, however, seeking confidential academic documents for
impeachment purposes is not a compelling "necessity" sufficient to warrant disclosure under
Federal Rule of Civil Procedure 26(b)(2)(C)(iii). *See In re Bextra & Celebrex Mktg. Sales
Practices & Prod. Liab. Litig.*, 249 F.R.D. 8, 12 (D. Mass. 2008) (noting that, although
"comments . . . which could form a basis for impeachment of the authors [may be relevant],"
their "probative value is nevertheless limited" (citing *Cusumano v. Microsoft Corp*, 162 F.3d

---

[1]   BP concedes as much in its March 15, 2012 letter. Moreover, as WHOI's Contract with the Coast Guard
      makes clear, these articles were not a part of the required deliverables; instead, what the Coast Guard sought
      was the raw data underlying the articles—information which WHOI has already shared with BP through its
      two productions to date.

[2]   To date, WHOI has produced more than 1100 pages of responsive documents, along with ten DVDs and 3 CDs
      containing responsive data and documentation.

GOODWIN | PROCTER

The Honorably Sally Shushan
April 5, 2012
Page 3

708, 716 (1st Cir. 1998))).  Therefore, WHOI asks this Court's protection against BP's unjustifiable demands.

BP is also incorrect in its assertion that "[t]here is simply no law anywhere supporting a protection for discussions between researchers."  BP's March 15 letter to the Court, at 2.  In *Plough Inc. v. National Academy of Sciences*, 530 A.2d 1152 (D.C. 1987), for instance, the District of Columbia Court of Appeals affirmed the protection from disclosure given to internal documents regarding the National Academy of Sciences' ("NAS") final reports on an aspirin study.  As here, the defendant sought the "closed deliberations" concerning the methodology of the study, preliminary drafts of various related reports, and the "confidential internal deliberations" of the NAS scientists. *Plough Inc*, 530 A.2d at 1156.

In protecting these materials from disclosure, the *Plough* court noted that "courts, in order to prevent a chilling of the uninhibited conduct of academic and scientific research, have recognized an interest in protecting from discovery the analyses, opinions and conclusions drawn by researchers from their data." *Id.* at 1157; *see also Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1274 n.20 (7th Cir. 1982) (quashing a subpoena of university researchers for all "letters, memoranda, correspondence, reports, notes, drafts, working papers, protocols for scientific studies, laboratory notebooks, raw data, data compilations, graphs, charts or papers of any kind" regarding their study); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 269 F.R.D. 360, 364–65 (S.D.N.Y. 2010) (noting that "[i]t is not uncommon for courts to quash subpoenas seeking discovery from research institutions" out of concern for the chilling effect it may have, and that "this concern is at its peak when a party seeks . . . the *internal communications or work product* of the research body," and requiring the research institution to turn over only the raw data from the study, the final report, and any communication it had between itself and the defendant); *cf. In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, MDL No. 2100, 2011 WL 5547133, at *2–3 (S.D. Ill. Nov. 15, 2011) (denying defendant's motion to compel production of the peer review comments on an academic paper, and observing that the "pillars of a successful peer review process are confidentiality and anonymity; anything less discourages candid discussion and weakens the process").

Courts protect academic researchers because the disclosure of internal deliberations, laboratory notes, and drafts of study publications would, if not protected, "'inevitably tend[] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.'" *Dow Chemical*, 672 F.2d at 1276 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957)).[3]

---

[3] It is important to note that this protection is distinct from the deliberative process protection currently in dispute between BP and the United States.  The protection invoked by WHOI is a separate, free-standing protection given to academics and scholars by the courts.

GOODWIN | PROCTER

The Honorably Sally Shushan
April 5, 2012
Page 4


*          *          *

In light of the above, and previous submissions to the Court, WHOI respectfully requests
that the Court issue an order denying BP's request for additional discovery and protecting WHOI
from disclosure of internal confidential scientific deliberations, draft manuscripts, laboratory
notes, and other internal documents reflecting the academic and scientific process.



Respectfully,

*Dahlia Fetouh*

Dahlia S. Fetouh


cc:    Robert R. Gasaway, Esq.
       Karen McCartan DeSantis, Esq.