# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL No. 2179 |
| | * | SECTION: J |
| | * | |
| This document refers to: *All Cases.* | * * | |
| | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc. et al., individually and on behalf of themselves and all others similarly situated, | * * * | No. 12-970 |
| | * | SECTION: J |
| Plaintiffs, | * | |
| | * | |
| v. | * | HONORABLE CARL J. BARBIER |
| | * | |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| Defendants. | * | |
| | * | |

---

### MEMORANDUM IN SUPPORT OF MOTION FOR CONDITIONAL AND PRELIMINARY CERTIFICATION OF ECONOMIC AND PROPERTY DAMAGES CLASS FOR SETTLEMENT PURPOSES; APPOINTMENT OF CLASS REPRESENTATIVES; AND APPOINTMENT OF CLASS COUNSEL

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND BACKGROUND ........................................................... 1

II.   THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT
      CLASS DEFINITION ........................................................................... 1

III.  THE PRELIMINARY AND CONDITIONAL CERTIFICATION OF
      THE ECONOMIC CLASS WILL ENABLE, FACILITATE, AND
      IMPLEMENT THE ORDERLY CLASS NOTICE AND SETTLEMENT
      APPROVAL PROCESS CONTEMPLATED BY RULE 23(e) AND
      DEVELOPED BY THE MANUAL FOR COMPLEX LITIGATION AND
      THE COURTS OF THIS CIRCUIT ............................................................ 2

IV.   THE ECONOMIC CLASS MERITS PRELIMINARY CERTIFICATION
      FOR SETTLEMENT PURPOSES UNDER RULES 23(a)(1)-(4) AND
      23(b)(3), WHICH SHOULD BE GRANTED TO FACILITATE THE
      SETTLEMENT APPROVAL PROCESS ........................................................ 6

      A.   The Proposed Class Satisfies the Requirements of Rule 23(a) —
           Definition, Numerosity, Commonality, Typicality, and Adequacy
           of Representation ...................................................................... 7

           1.   Numerosity................................................................. 9

           2.   Commonality.............................................................. 9

           3.   Typicality ................................................................. 11

           4.   Adequacy of Representation ....................................... 12

      B.   Structural Assurances of Adequacy ...................................... 21

      C.   The Proposed Class Satisfies the Requirements of Rule 23(b)(3):
           Predominance; Superiority; and Manageability in the Settlement
           Context.................................................................................. 24

V.    THE MEMBERS OF THE PSC HAVE SERVED THE COMMON
      BENEFIT THROUGHOUT THE NEGOTIATION AND TRIAL
      PREPARATION PROCESSES AND MERIT APPOINTMENT AS
      SETTLEMENT CLASS COUNSEL UNDER RULE 23(g).............................. 30

VI.   CONCLUSION.................................................................................. 32

## TABLE OF AUTHORITIES

**Page**

### CASES

*Amchem Products, Inc.  v. Windsor,*
521 U.S. 591 (1997)................................................................................*passim*

*Bates v. Tenco Servs., Inc.,*
132 F.R.D. 160 (D.S.C. 1990) ...................................................... 26

*Bell v. DuPont Dow Elastomers,*
640 F.Supp.2d 890 (W.D. Ky 2009)................................................ 26

*Bentley v. Honeywell Int'l, Inc.,*
223 F.R.D. 471 (S.D. Ohio 2004)................................................. 26

*Berger v. Compaq Computer Corp.,*
257 F.3d 475 (5th Cir. 2001) ..................................................... 12

*Billitteri v. Securities America, Inc.,*
204 U.S. Dist. LEXIS 92713 (N.D. Tex. 2011)................................ 28

*Boggs v. Divested Atomic Corp.,*
141 F.R.D. 58 (S.D. Ohio 1991) .................................................. 26

*Collins v. Olin Corp.,*
248 F.R.D. 95 (D. Conn. 2008) ................................................... 26

*Cook v. Rockwell Int'l Corp.,*
151 F.R.D. 378 (D. Colo. 1993) .................................................. 26

*DeBremaecker v. Short,*
433 F.2d 733 (5th Cir. 1970) ...................................................... 7

*Dukes v. Wal-Mart,*
131 S. Ct. 2531 (2011).......................................................... 9, 10

*Gates v. Rohm & Haas Co.,*
248 F.R.D. 434 (E.D. Pa. 2008) .................................................. 26

*Gen. Tel. Co. of Sw v. Falcon,*
457 U.S. 147 (1982)................................................................. 12

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.,*
____ F.Supp.2d ____, 2012 WL 92498 (E.D. La. 2012)...................... 11, 12, 28

*In re Corrugated Container Antitrust Lit.,*
1980-1 Trade Reg. Rep. (CCH) ¶ 63,163 (S.D. Tex. 1979))................. 23

- ii -

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Corrugated Container Antitrust Lit.,*
  643 F.2d 195 (5th Cir. Tex. 1981) ..................................................................... 23

*In re Dell Inc.,*
  No 06-726, 2010 WL 2371834 (W.D. Tex. June 11, 2010), *aff'd,*
  *Union Asset Management Holding A.G. v. Dell, Inc.*, No 08–51163, 2012 WL 375249
  (5th Cir. Feb. 7, 2012) .......................................................................................... 25

*In re Heartland Payment Sys., Inc. Customer Data Security Breach Lit.,*
  2012 U.S. Dist. LEXIS 37326 (S.D. Tex. March 20, 2012) ............................. *passim*

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
  241 F.R.D. 435 (S.D.N.Y. 2007) ......................................................................... 26

*In re Oil Spill, MDL 2179,*
  808 F.Supp.2d 943 (E.D. La 2011) ..................................................................... 29

*In re Sch. Asbestos Litig.,*
  789 F.2d 996 (3d Cir. 1986) ................................................................................ 25

*In re Shell Oil Refinery*,
  136 F.R.D. at 589 (E.D. La. 1991) ...................................................................... 26

*In re Vioxx Prods. Liab. Litig.,*
  239 F.R.D. at 462 (E.D. La. 2006) ...................................................................... 26

*Jack v. Am. Linen Supply Co.,*
  498 F.2d 122 (5th Cir. 1974) .............................................................................. 10

*James v. City of Dallas*,
  254 F.3d 551 (5th Cir. 2001) .............................................................................. 11

*Jenkins v. Raymark Indus.,*
  782 F.2d 468 (5th Cir. 1986) .............................................................................. 24

*Jones v. Diamond,*
  519 F.2d 1090 (5th Cir. 1975) ............................................................................ 10

*LeClercq v. Lockformer Co.,*
  No. 00-7164, 2001 WL 199840 (N.D. Ill. Feb 28, 2001) .................................... 26

*Lightbourn v. County of El Paso*,
  118 F.3d 421 (5th Cir. 1997) .............................................................................. 11

*Ludwig v. Pilkington N. Am.,*
  No. 03-1086, 2003 WL 22478842 (N.D. Ill. Nov. 4, 2003) ................................ 26

**TABLE OF AUTHORITIES**
(continued)

Page

*Mehl v. Canadian Pac. Rwy. Ltd.*,
227 F.R.D. 505 (D.N.D. 2005) ............................................................. 25

*Mejdreck v. Lockformer Co.*,
No. 01-6107, 2002 WL 1838141 (N.D. Ill. Aug. 12, 2002),
*aff'd*, 319 F.3d 910 (7th Cir. 2003) ......................................................... 26

*Mullen v. Treasure Chest Casino LLC*,
186 F 3d 620 (5th Cir. 1999) ....................................................... 10, 11, 24

*Muniz v. Rexnord Corp.*,
No. 04-2405, 2005 WL 1243428 (N.D. Ill. Feb. 10, 2005) .................... 26

*O'Connor v. Boeing N. Am., Inc.*,
184 F.R.D. 311 (C.D. Cal. 1998) .......................................................... 26

*Olden v. LaFarge Corp.*,
383 F.3d 495 (6th Cir. 2004) ............................................................... 26

*Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*,
No. 05-445, 2007 WL 28243 (W.D. Okla. Jan. 3, 2007) ....................... 26

*Sagers v. Yellow Freight Sys.*,
529 F.2d 721 (5th Cir. 1976) ............................................................... 10

*Singleton v. Northfield Ins. Co.*,
826 So.2d 55 (La. Ct. App. 2002) ........................................................ 26

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ............................................................... 12

*Turner v. Murphy Oil USA, Inc.*,
234 F.R.D. 597 (E.D. La. 2006) .......................................................... 26

*Union Asset Management Holding AG v. Dell*,
669 F.3d 632 (5th Cir. 2012) ............................................................. 7, 8

*Watson v. Shell Oil Co.*,
979 F.2d 1014 (5th Cir. 1992) *on reh'g*, 53 F.3d 663 (5th Cir. 1994) ............. 24, 25

*Wehner v. Syntex Corp.*,
117 F.R.D. 641 (N.D. Cal. 1987) ......................................................... 26

*Zeidman v. J. Ray McDermott & Co., Inc.*,
651 F.2d 1030 (5th Cir. 1981) ............................................................. 10

- iv -

# TABLE OF AUTHORITIES
## (continued)

Page

### STATUTES

28 U.S.C.
§ 1407 .................................................................................................................. 2

33 U.S.C.
§ 2702(b)(2)(E) .............................................................................................. *passim*

### RULES

Federal Rules of Civil Procedure
Rule 23 ...................................................................................................... 3, 7, 30
Rule 23(a)(1)(A)(i)-(iv) .................................................................................... 30
Rule 23(a)(2)....................................................................................................... 9
Rule 23(a)(3)..................................................................................................... 11
Rule 23(a)(4)..................................................................................................... 12
Rule 23(e) .......................................................................................................... 1
Rule 23(g) ............................................................................................. 1, 30, 31

### TREATISES

7A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE
(2d ed. 1986)
§ 1778 ............................................................................................................ 24
§ 1783 ............................................................................................................ 25

*Manual for Complex Litigation, 4th* (Federal Judicial Center 2004)
§ 21.132 ........................................................................................................... 7
§ 21.222 ........................................................................................................... 8
§ 21.6 ............................................................................................................... 2
§ 21.63 ............................................................................................................. 3
§ 21.632 ........................................................................................................... 7
§ 21.633 ........................................................................................................... 3

William B. Rubenstein, Alba Conte, and Herbert B. Newberg,
*1 Newberg on Class Actions* (4th ed. 2010)
§ 3:3 ................................................................................................................. 9

## I.     INTRODUCTION AND BACKGROUND

The undersigned Plaintiffs' Interim Class and Co-Liaison Counsel and members of the Court-appointed Plaintiffs' Steering Committee ("PSC") hereby respectfully move for an order of this Court initiating, facilitating, and implementing the settlement approval process for the proposed Economic and Property Damages Settlement, pursuant to the requirements and criteria of Federal Rule of Civil Procedure 23(e), under the procedure recommended by the *Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004) and utilized by the courts of this circuit by granting conditional and preliminary certification to the proposed Economic and Property Damages Settlement Class for settlement purposes only.

The undersigned further respectfully request that this Court appoint the named and representative Plaintiffs listed on, and described in, the Class Action Complaint (styled *Bon Secour Fisheries, Inc.  v. BP Exploration & Production Inc.*) filed on April 16, 2012, in connection herewith, to serve as Class Representatives for the Economic and Property Damages Settlement Class ("Economic Class"), and that the Court also appoint, under Federal Rule of Civil Procedure 23(g), the undersigned Interim Class Counsel to serve as Lead Settlement Class Counsel, and the undersigned PSC Members to serve as Settlement Class Counsel, for the Economic Class.

## II.    THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS DEFINITION

The Economic and Property Damages Settlement Class Definition, and the Exclusions therefrom, as they appear in the accompanying Deepwater Horizon Economic and Property Damages Settlement Agreement ("Agreement") are attached hereto as Exhibit A, including Maps pertinent to the geographic boundaries of the Class.  The Definition and Exclusions include references to bolded, capitalized words, which are defined terms in, and have the meanings set

- 1 -

forth in, the Agreement, and to numbered Exhibits, which are Exhibits to and part of the Agreement.

III.   **THE PRELIMINARY AND CONDITIONAL CERTIFICATION OF THE ECONOMIC CLASS WILL ENABLE, FACILITATE, AND IMPLEMENT THE ORDERLY CLASS NOTICE AND SETTLEMENT APPROVAL PROCESS CONTEMPLATED BY RULE 23(e) AND DEVELOPED BY THE MANUAL FOR COMPLEX LITIGATION AND THE COURTS OF THIS CIRCUIT**

The *Deepwater Horizon* litigation, over which this Court presides, in the exercise of its original jurisdiction, under 28 U.S.C. § 1404, and as 28 U.S.C. § 1407 Transferee Judge for MDL No. 2179, is an array of individual actions and class actions constituting litigation of immense complexity.  Nonetheless, its components share a common genesis and common questions of fact, determinable under a common body of federal law.  While a number of the complaints filed in and transferred to this Court were styled as class actions, and the B1 Bundle Master Complaint filed pursuant to this Court's Case Management Orders includes class action allegations, no class was certified for litigation purposes prior to the negotiation and execution of the proposed Economic and Property Damage Settlement Agreement.  Hence, this Court must consider concurrently both the approval of the Settlement under Rule 23(e) (discussed via separate joint motion) and the certification of the Settlement Class that would be entitled to its benefits and bound by its terms and provisions, discussed in this Motion.

Courts presiding over modern complex litigation are familiar with such situations, in which multiple related actions come before the same court for management and resolution, and in which the Rule 23 mechanism is invoked to accomplish, simultaneously, both the settlement class certification and settlement approval process.  This recurring procedural scenario has led to the evolution of the procedure recommended by the *Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004) ("MCL 4th"), § 21.6, and adopted as a best practice by the courts of this and other federal circuits.

- 2 -

As described more fully in the memorandum in support of the parties' accompanying Joint Motion for Preliminary Approval,[1] federally courts typically follow a two-stage settlement review and approval process, which commences with an initial "preliminary fairness review." At this starting point, the Court determines whether the proposed Settlement is within the range of possible final approval.  If so (and if the class has not previously been certified for trial purposes), the Court may simultaneously grant preliminary (often called conditional) certification to the class, appoint Class Counsel and Class Representatives, approve the forms of class notice, direct the implementation of the Court-approved Notice Program, schedule a Formal Fairness Hearing to occur after dissemination of Class notice, and set dates and deadlines for the filing of any opt-outs from the class or objections to the Settlement.  *See* MCL 4th, § 21.63-21.633.

The final determination as to whether the proposed Settlement Class meets the applicable Rule 23 criteria, in the context of a settlement-purposes class, is made at or after the Formal Fairness hearing.  Nonetheless, the Class must be at least preliminarily formed, and Class Representatives and Class Counsel appointed, to ensure that the settlement approval process is conducted fairly, openly, with integrity, and pursuant to the Court's orders therefor. Accordingly, the undersigned respectfully seek such certification and appointment at this time.

The parties determined, in the course of a year of intensive settlement discussions, that a Rule 23 class action structure best suited the economic settlement now before this Court.  The settlement creates claims processes for multiple Damage categories that are unprecedented in their attention to individual needs and circumstances, and that are designed to ensure fairness,

---

[1] Memorandum Of Fact And Law In Support Of Interim Class Counsel's Motion For Conditional And Preliminary Certification Of Economic And Property Damages Class For Settlement Purposes; Appointment Of Class Representatives; And Appointment Of Class Counsel.

transparency, ongoing Court supervision, and with a goal of full and fair compensation to individuals, businesses, and property owners for their economic and property damages arising from the Deepwater Horizon events.  The settlements do not provide for a capped recovery; BP has instead agreed to pay in full each and every claim that meets the standards of the claims processes.

Under the Settlement Agreement, the GCCF will be replaced by a new Deepwater Horizon Court Supervised Settlement Program.  This new Program, implementing the Settlement under the Court's auspices, will use a highly transparent and objective process to provide compensation to individuals and businesses harmed by the spill.  BP has agreed to pay all administrative costs and the new claims program is and will remain independent of BP.  To aid in the transition from the GCCF, the Court has already appointed Patrick Juneau as the Claims Administrator and directed him to establish a Transition Process  [Dkt. No. 5995].  *See* Office of Court Appointed Claims Administrator, Court Supervised Claim Program, Press Release, *available at* http://www.gulfcoastclaimsfacility.cora/PressRelease -03-23-12 .pdf (March 23, 2012).  Likewise, the Court has already appointed (a) Lynn Greer as Transition Coordinator, Dkt. No. 5995; (b) James Parkerson Roy and Stephen J. Herman as Interim Class Counsel, Dkt. No. 5960; and (c) John W. Perry, Jr. as a neutral to preside over structuring the proposed settlement of the seafood program, Dkt. No. 5998.[2]

The Settlement Agreement provides for a claims deadline of April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

---

[2] According to this Court's Amended Transition Order, "The Transition Coordinator will:
(a) evaluate claims currently pending with the Gulf Coast Claims Facility ("GCCF"); and
(b) evaluate any new claims submitted before the proposed Court supervised claims program."
Dkt. No. 5995, at 2.  Following this Court's direction since March 8, 2012 the Transition Coordinator has paid 1,096 claimants a total of nearly $27 million.
http://www.gulfcoastclaimsfacility.com/PressRelease-03-23- 12.pdf.

The Damage Categories are discussed in full detail in the Agreement. For all their detail, their animating impulse is simple: BP and the PSC negotiated claims processes that provide the fullest and fairest compensation possible for each identifiable category of individual and entity whose profits, revenues, wages, income, or properties were affected by the *Deepwater Horizon* Incident.[3] In order to accomplish this goal, the claims process must take into account the individual circumstances of each claimant, requiring careful and systematized calculation methods. While necessarily detailed, each framework is transparent and predictable. In every instance the payment formulas are designed to be objective, and fair for the individuals and businesses that will be compensated under them.

The settlement permits Class Members to submit multiple claims and receive compensation for multiple categories of damage. The formulas were developed with the assistance of various experts (including economists, accountants, and real estate experts) who analyzed and responded to questions posed by both BP and the PSC throughout the negotiation process.[4] The settlement provides for reimbursement to all categories of claimants for accounting services required for filing their claims. This reduces the burdens associated with presenting a claim and enhances the fairness of the settlement.

---

[3] More specifically, the "*Deepwater Horizon* Incident" refers to the events, actions, inactions, and omissions leading up to and including (i) the blowout of the Macondo well on April 20, 2010, (ii) the explosions and fire aboard the *Deepwater Horizon*, (iii) the sinking of the *Deepwater Horizon* on April 22, 2010, (iv) the release of oil, other hydrocarbons, and other substances from the blown-out well and the *Deepwater Horizon*, (v) the efforts to contain the blown-out well, (vi) response activities, including the VoO Program; (vii) the operation of the GCCF; and (viii) BP's public statements relating to all of the foregoing. Settlement Agreement, Section 38.43.

[4] BP has also agreed to fund settlement and claims administration and the notice program; to provide a separate fund of $57 million to promote the Gulf Coast and its waters, and to provide a Supplemental Information Program of $5 million to be designed and administered by the PSC.

- 5 -

The recovery BP has agreed to provide is not limited by any factor, save for the underlying value of each class member's claims.  In this, the Settlement is not only unprecedented in size (at an initially estimated $7.8 Billion, and uncapped in actual amount, it may be the largest private class action settlement in history) but in its attendance to details, its design of a comprehensive structure with built-in protections for claimants, its custom tailoring of each damage category, and systematic fairness to the class.

As part of its focus on fairness and individualized attention, the Settlement meets the criteria of Federal Rule of Civil Procedure 23 for class certification.  Through a complex set of frameworks that detail claims processes and compensation amounts for each type of loss, the Settlement provides a highly structured, negotiated answer to a single common question of law and fact: whether class members suffered harm as a consequence of the *Deepwater Horizon* oil spill.  Though type and extent of harm suffered by the particular class members vary, it is the spill that binds them into a cohesive unit.  Their economic fortunes were all altered by a single event, arising at the same time, affecting the same region:  the *Deepwater Horizon* disaster.  Their claims rise and fall as one, subject only to the factual circumstances surrounding the spill and the extent of liability of the parties in the litigation: crucial questions that would each have had common answers had the claims gone to trial against BP.  As the accompanying PSC motion demonstrates more fully, the Economic Class should thus be certified for settlement purposes under Rule 23(b)(3).

**IV.   THE ECONOMIC CLASS MERITS PRELIMINARY CERTIFICATION FOR SETTLEMENT PURPOSES UNDER RULES 23(a)(1)-(4) AND 23(b)(3), WHICH SHOULD BE GRANTED TO FACILITATE THE SETTLEMENT APPROVAL PROCESS**

Typically, courts will certify a settlement class at the preliminary fairness stage in advance of final approval, at which time settlement class certification is confirmed.  Where the

case, as here, is submitted for settlement approval and class certification at the same time, the Court may thus combine the class certification and the preliminary fairness evaluations, as well as notice for class certification and the settlement of the class action.  MCL 4th § 21.632.

In certifying a settlement class, the familiar standards of Rule 23 apply equally as though the Court were certifying a litigation class, with one important exception: because the settlement will necessarily obviate trial, the Court need not evaluate the manageability of the proposed class for trial.  *See* MCL 4th § 21.132; *Amchem Products, Inc.  v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there would be no trial.").  For purposes of the preliminary fairness review, the Court need only make a preliminary determination that the standards of Rule 23 are met.  A final determination on class certification is reserved for the final fairness review, after notice to the class, in connection with the Formal Fairness Hearing.

### A.     The Proposed Class Satisfies the Requirements of Rule 23(a) — Definition, Numerosity, Commonality, Typicality, and Adequacy of Representation

Rule 23(a) sets forth four requirements that must be met by any proposed class: numerosity, commonality, typicality, and adequacy of representation.  Rule 23(a) also implies an additional requirement of an objective, ascertainable class definition.  The proposed class here satisfies all of these requirements.

The proposed Class is objectively defined and clearly ascertainable, as required by Rule 23 caselaw.  *See Union Asset Management Holding AG v. Dell, Inc.*, 669 F.3d 632, 639–40 (5th Cir. 2012) (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam)).  Though the Class definition is comprehensive and detailed, its central effect is to include only those people and entities within the geographical bounds of the Class who also have cognizable

- 7 -

claims for benefits under the Settlement, and to exclude anyone whose claims do not meet the description of one or more of the damage categories of the Settlement Agreement.  In this, the Class definition achieves an important goal: to grant BP a release of only those claims for which class members could recover, if they make claims and demonstrate loss under criteria which have been negotiated and agreed upon, and which will be communicated to the Class through the Settlement Agreement and its Exhibits, the Notice Program, and the claim forms themselves. This in turn achieves the Settlement's goals of transparency, consistency, and equal treatment of those similarly situated.  The Notice Program leads recipients through the process of determining whether they are in the geographical boundaries of the Class and whether their claims fall within one of the damage categories.

The proposed Class is thus "clearly ascertainable" because the Class definition and the Settlement Agreement make clear what types of damage a person or entity must have experienced in order to be included.  This is a "routine" and recommended method of defining a class that provides a "mechanical and objective standard" for potential class members and the Court to utilize in determining who is in, and who is out.  *See Dell*, 669 F.3d at 640; MCL 4th, § 21.222, "Definition of Class" ("An identifiable class exists if its members can be ascertained by reference to objective criteria").  The geographical boundaries and the descriptions of the damage categories under which the Settlement Agreement provides compensation, supply these objective criteria.

The structure and definition of the Class was determined by the scope and nature of the disaster.  As to scope, its geographical boundaries are both objective and related to the area in which spill-caused economic harm can be reasonably presumed or predictably proven.  As to nature, this is the largest oil spill disaster after the enactment of the Oil Pollution Act.  Federal

law required BP to develop a systematic approach to pay the claims for which it was a Responsible Party.  *See* OPA, 33 U.S.C. § 2702(b)(2)(E).  The resulting Gulf Coast Claims Facility ("GCCF") could be seen as a quasi-class action, mandated by BP's statutory legal obligation.  The proposed settlement expands the categories of claims paid by the GCCF, provides larger payments, and supplies the objective framework and fair and responsive administrative features the GCCF had been criticized for lacking — features which a formal Rule 23 class action is best suited to supply: court jurisdiction and supervision, internal appellate procedures and other protections for claimants, transparency and consistency in all stages of the claims process, and the ongoing assistance of Class Counsel.

### 1.    <u>Numerosity</u>

The proposed class is also sufficiently numerous.  *See* FED. R. CIV. P. 23(a)(1).  As the Court well knows, the class numbers at least in the hundreds of thousands, over one hundred thousand of whom have already identified themselves through the short form joinder procedure in the Limitation proceeding.  *See* William B. Rubenstein, Alba Conte, and Herbert B. Newberg, *1 Newberg On Class Actions*, § 3:3 (4th ed. 2010) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.").  *See also In re Heartland Payment Sys., Inc. Customer Data Security Breach Lit.*, 2012 U.S. Dist. LEXIS 37326, at *28 (S.D. Tex. March 20, 2012).

### 2.    <u>Commonality</u>

The proposed class shares numerous common questions of law and fact.  *See* FED. R. CIV. P. 23(a)(2).  The commonality inquiry focuses on questions with common answers that drive the resolution of the litigation.  *See Dukes v. Wal-Mart*, 131 S. Ct. 2531, 2541 (2011).  The central common questions of law and fact in the case against BP determine the extent to which BP is liable for the *Deepwater Horizon* oil spill and its resulting damage to property, individuals, and

972494.10

other entities.  An answer to this question, in this litigation, would resolve, in one stroke, the

central question in each of the absent Class members' cases against BP.  *See Sullivan v. DB*

*Invs., Inc.*, 667 F.3d. 273, 335 (3d Cir 2011), *cert. denied sub nom. Murray v. Sullivan*, 2012

U.S. LEXIS 2656 (2012); *In re Heartland*, 2012 U.S. Dist. LEXIS 37326, at *29.  *See generally*

*Mullen v. Treasure Chest Casino LLC*, 186 F 3d 620, 624 (5th Cir. 1999); *Jack v. Am. Linen*

*Supply Co.*, 498 F.2d 122 (5th Cir. 1974); *Sagers v. Yellow Freight Sys.*, 529 F.2d 721, 734 (5th

Cir. 1976); *Jones v. Diamond*, 519 F.2d 1090, 1100, n. 18 (5th Cir. 1975); *Zeidman v. J. Ray*

*McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981).

Commonality is met when there is at least one issue the resolution of which will affect all

or a significant number of the class members.  *Mullen*, 186 F.3d at 620 .  And though only one

common question is required to satisfy the commonality inquiry, the proposed class shares

numerous others, such as the extensive questions of fact necessary to establish the precise

happenings over the course of the almost three months that followed the initial explosion on the

*Deepwater Horizon.  Dukes*, 131 S.Ct. at 2556.  Commonality "is informed by the defendant's

conduct as to all class members," *Sullivan*, 667 F.3d at 297.  *See In re Heartland*, 2012 U.S. Dist.

LEXIS 37326, at *29, *33.  Here, Plaintiffs contend that BP's deepwater drilling conduct created

the Class.

As the Supreme Court stated in *Amchem*, ". . . mass tort cases arising from a common

cause or disaster meets such circumstances.  It may, depending upon the circumstances, satisfy

the predominance request."  521 U.S. at 594.  This single event disaster meets such

circumstances.  It raises common fact questions:  what the defendants did and did not do, and

whether or how these actions or inactions caused or contributed to the disaster that is the

common source of harm.  These questions have the same answers, no matter who asks them, or

- 10 -

how often they are asked.  These common fact questions could be overshadowed, in a diffuse

mass tort unfolding across the country, by the different legal theories of multiple states' laws, or

by individualized questions of comparative fault on the part of plaintiffs.  But none of these

situations exists here.  The Class's claims are governed by a unitary body of federal statutory and

uniform federal common law, and none of the claimants share BP's fault:  no class member's

negligence played any role in causing the disaster or resulting harm.

The nature and scale of this oil spill disaster implicates Rule 23 in ways that go beyond

commonality, to also satisfy Rule 23(b)(3) superiority.  The OPA statute itself imposes a unitary

obligation in BP as "responsible party": pay all claims, without the need for expensive,

inefficient, formal litigation.  In a mass disaster of this scale, a class action is superior because it

provides the fairest, most transparent, most consistent structure and the best of all available

methods by which to fulfill this obligation.

### 3.　　Typicality

The proposed class representatives' claims are typical of the absent Class members'

claims.  *See* FED. R. CIV. P. 23(a)(3).  The typicality inquiry "'focuses on the similarity between

the Named Plaintiff's legal and remedial theories and the theories of those whom they purport to

represent.'"  *Mullen*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. County of El

Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).  "Typicality does not require complete identity of

claims.  Rather, the critical inquiry is whether the class representative's claims have the same

essential characteristics of those of the putative class.  If the claims arise from a similar course of

conduct and share the same legal theory, factual differences will not defeat typicality."  *James v.

City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001).  *See In re Heartland*, 2012 U.S. Dist LEXIS

37326, at *34; *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, ____ F.Supp.2d ____,

2012 WL 92498, at *10 (E.D. La. 2012); *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.

2003).  Here, the proposed Class Representatives' legal and remedial theories are shared with the Class because the entire Class shares the same foundational theories of liability under federal statutory and general maritime law, arising out of the same event and BP's conduct prior to and following the explosion and oil spill.  Importantly, the typicality inquiry does not test whether the Class members suffered varying harms; diversity in damages "will not affect their legal or remedial theories, and thus does not defeat typicality."  *Mullen*, 186 F.3d at 625.

### 4.    <u>Adequacy of Representation</u>

Finally, the proposed class enjoys adequate representation by its proposed class representatives and class counsel.  *See* Fed. R. Civ. P. 23(a)(4).  The adequacy requirement focuses on the relationship between the class representatives and their counsel.  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001); *In re Chinese-Manufactured Drywall Prods.* 2012 WL 92498, at *11.  In *Amchem*, the Supreme Court noted that the adequacy requirement "tends to merge" with the commonality and typicality requirements, which all "serve as guideposts for determining whether" a class action is "economical and whether the named plaintiff's claim[s] and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Amchem*, 521 U.S. at 626 (quoting *Gen. Tel. Co. of Sw v. Falcon*, 457 U.S. 147, 157, n.13 (1982)) (internal quotations omitted).

Here, Interim Class Counsel and the PSC clearly satisfy the requirement that class counsel have the zeal and competence necessary to represent the proposed class.  That is why the Court has appointed and re-appointed the PSC to represent the common interests of Plaintiffs.  *See, e.g., In re Heartland*, 2012 U.S. Dist. LEXIS 37326, at *38 (adequacy is met where counsel have "extensive experience" in litigation with similar subject matter).

The proposed Class Representatives easily satisfy this requirement also. Their claims, as described in the *Bon Secour Fisheries v. BP* Class Action Complaint, are typical of the Class' claims, and their willingness to pursue the litigation is precisely why they have volunteered to represent the Class. The economic damages and resulting claims of each of the Class Representatives share, with each other and with the entire Economic Class, a common nucleus of operative fact: all of their claims arose from the *Deepwater Horizon* Incident. Were their claims to be tried in this litigation, the answers to the crucial common questions about what BP did or did not do, should have done but failed to do, and how this conduct or failure to act caused or exacerbated the string of decisions and events that constitute this Incident would be uniform. The Class Representatives, like the Class itself, are a wide array of individuals and businesses, from a variety of walks of life, making their living in a variety of ways, all of which were disrupted, in varying degrees, by the Incident. They are a cohesive group because their damages, although differing in amount and extent, share the same cause, raise the same questions, and would be decided by the same answers with respect to BP's conduct and BP's role in the Incident. The named Plaintiffs who seek appointment as Economic Class Representatives include individuals and entities in each of the categories in which class members are eligible to make claims. *See In re Heartland*, 2012 U.S. Dist. LEXIS 37326, at *39. They are:

        (a)     Bon Secour Fisheries

Representative Plaintiff Bon Secour Fisheries, Inc. ("Bon Secour") is an Alabama corporation with its principal place of business in Bon Secour, Alabama. Bon Secour is a sixth-generation, family-owned company that has been in business for more than 100 years processing and selling seafood, including shrimp and oysters, harvested from the Gulf of Mexico. The Oil Spill caused a drastic decrease in the quantity and quality of available Gulf shrimp, oysters and

- 13 -

other seafood products.  The lack of adequate supplies of seafood to process and sell caused Bon Secour to loose customers and revenue.  Bon Secour continued to process and sell shrimp, oysters and seafood, but the higher post-Spill prices reduced their profits.  Thus Bon Secour has suffered, and continues to suffer, economic damages as a result of the Deepwater Horizon Incident.

      (b)    Fort Morgan Realty

Plaintiff Fort Morgan Realty, Inc. has its principal place of business in Gulf Shores, Alabama.  Fort Morgan Realty sells real estate and manages approximately 85 beach vacation rental properties along the Gulf Coast in Baldwin County, Alabama.  In its vacation rental property management business, Fort Morgan Realty derives income from rental commissions and related fees. Because of the oil spill, Fort Morgan Realty experienced economic damage and loss of income caused by multiple vacation cancellations and a severe reduction in tourist-related bookings for the properties it manages.

      (c)    GW Fins

Representative Plaintiff LFBP #1, LLC d/b/a GW Fins ("GW Fins") is a fine-dining seafood restaurant located in the historic French Quarter of New Orleans, owned and operated by Gary Wollerman and his partner, Executive Chef Tenney Flynn.  GW Fins' business success turns on its use of the highest quality seafood.  As a result of the Oil Spill, the available supply of high-quality Gulf of Mexico seafood decreased, which caused GW Fins to have to pay more to import seafood from other areas.  Further, tourists and locals avoided Gulf seafood – and the restaurants that served it – due to the pervasive perception of oil contamination, which decreased GW Fins' revenue.  GW Fins suffered, and will continue to suffer, economic damage as a result of the spill.

- 14 -

(d)      Panama City Beach Dolphin Tours

Representative Plaintiff Panama City Beach Dolphin Tours & More, LLC ("PCB Dolphin") is a Florida business.  Owner Dane Taylor started PCB Dolphin in February of 2010, with the intention of offering dolphin-sighting tours along Florida's Gulf Coast, as well as snorkeling trips to local wrecks, and other marine tourism activities.  Just as PCB Dolphin was ramping up for its first season, the *Deepwater Horizon* disaster brought business to a halt – demand for marine tourism plummeted, and PCB Dolphin's harbor inlet was gated off almost entirely, so PCB Dolphin's boats had to fight heavy traffic of clean-up vessels for passage through the narrow channel that was left open.  The oil spill effectively destroyed PCB Dolphin's maiden season; Mr. Taylor was forced to try to hold on through 2010 and try to keep PCB Dolphin afloat in hopes that 2011 would be a better year.  Thus PCB Dolphin suffered, and continues to suffer, economic damage as a result of the oil spill.

(e)      Zeke's Charter Fleet

Representative Plaintiff Zeke's Charter Fleet, LLC ("Zeke's Charter") is a booking business for a fleet of 30 off-shore and 10 in-shore charter fishing vessels home-harbored at Zeke's Landing Marina on Cotton Bayou, Orange Beach, Alabama.  Zeke's Charter's business was negatively impacted by the oil spill because Gulf of Mexico fishing areas were closed and demand for Gulf fishing activates plummeted.  Even after some fishing areas reopened, demand for charter fishing stayed low, despite Zeke's Charter's best efforts to drum up business with heavy marketing and discounting.  Thus Zeke's Charter suffered, and continues to suffer, economic damage as a result of the *Deepwater Horizon* Incident.

- 15 -

(f)     William Sellers

Representative Plaintiff William Sellers is an Alabama resident and, at the time of the *Deepwater Horizon* Incident, was an owner of residential property located at 28101 Perdido Beach Boulevard, Orange Beach, Alabama.  The Oil Spill caused oiling of the waters and beaches visible and accessible from Mr. Sellers' property, as well as an unpleasant petroleum-type odor around his property.  After and because of the oil spill, Mr. Sellers experienced a loss on the sale of his residential property.  Also, because of the *Deepwater Horizon* Incident but prior to the sale, Mr. Sellers suffered a loss of the use and enjoyment of his property.

(g)     Kathleen Irwin

Representative Plaintiff Kathleen Irwin is a Florida resident and owner of a Gulf-front residential property at 3650 Scenic Highway 98, Destin, Florida.  Prior to the Oil Spill, Ms. Irwin enjoyed views of, and access to, the beach and the Gulf of Mexico from her property, and hosted visiting guests and family at her beachfront home.  The Oil Spill caused oiling of the waters and beaches visible and accessible from Ms. Irwin's property, fouling her view and preventing her from enjoying the beach and the Gulf waters.  Because of the oiling, Ms. Irwin could not invite her young grandchildren to visit and swim in the Gulf.  To this day, clean-up crews continue to collect tar balls and other Spill-related remnants from the beach in front of Ms. Irwin's property.  Thus Ms. Irwin suffered a loss of the use and enjoyment of her Gulf-front residential property as a result of the *Deepwater Horizon* Incident.

(h)     Maurice Phillips

Representative Plaintiff Maurice Phillips is a Louisiana resident and a commercial fisherman and subsistence-use fisherman of the Atakapa-Ishak tribe.  Mr. Phillips provides the main portion of his extended family's diet via hunting, fishing, gathering, and trapping, and he

- 16 -

also shares his catch within his community.  Prior to the oil spill, Mr. Phillips typically brought home enough seafood and wild game to fill his upright freezer to the top, which was enough to feed his family year-round.  Whatever he could not fit in his freezer he gave away to family and friends.  Over the course of shrimping season (May to October), Mr. Phillips typically brought home four or five large baskets (each approximately 100 lbs.) of shrimp, as well as bycatch that would normally be tossed back overboard: redfish, speckled trout, drum, flounder, crab, etc. During trapping and hunting season, Mr. Phillips caught nutria, mink, otters, raccoons, muskrats, and alligator: typically 20 to 30 animals per season.  Since the Oil Spill, Mr. Phillips has been unable to provide for his family and community in this manner because shrimping grounds were closed and the wild game and vegetation was negatively impacted by oiled marshes and shorelines.  Purchasing the equivalent seafood, game, and vegetables at local stores is too expensive, especially since Mr. Phillips' income from commercial fishing has also been reduced by the Oil Spill.  Thus Mr. Phillips has suffered a loss of subsistence use of Gulf of Mexico resources, to his economic detriment, as a result of the oil spill.

        (i)     Ronald Lundy

Representative Plaintiff Ronald Lundy is a Mississippi resident and a subsistence-use fisherman who provides approximately 75% of his household's diet via fishing.  Prior to the *Deepwater Horizon* Incident, Mr. Lundy typically brought home enough seafood to feed his family year-round.   Since the Oil Spill, Mr. Lundy has been unable to provide for his family in this manner because fishing grounds were closed or otherwise negatively impacted by the Oil Spill.  Purchasing the equivalent seafood at local stores is too expensive for Mr. Lundy and his family.  Thus Mr. Lundy has suffered a loss of subsistence use of Gulf of Mexico resources, to his economic detriment, as a result of the *Deepwater Horizon* Incident.

(j)     Kip Plaisance

Representative Plaintiff Kip Plaisance is a Louisiana resident and a charter boat captain and owner of charter boat tour company.  After the Oil Spill, Mr. Plaisance enrolled in the Vessels of Opportunity ("VoO") program with his boat *Mad Max*.  Mr. Plaisance received program safety training in mid-May 2010, and was instructed to work from June 1, 2010 onward. Every day from June 1, 2010 to August 6, 2010, Mr. Plaisance worked from approximately 5:00 a.m. to 5:00 p.m., except for bad weather days.  Although he did receive some wages from the VoO program, Mr. Plaisance did not receive all amounts owed to him under the Master Vessel Charter Agreement ("MVCA") he signed with BP.  In addition to his VoO program losses, Mr. Plaisance suffered economic damage from loss of revenue caused by the *Deepwater Horizon* Incident.  Mr. Plaisance's charter fishing boat business was negatively impacted because fishing grounds were closed and demand for Gulf fishing activities plummeted as a result of the Deepwater Horizon Incident.

(k)     Corliss Gallo

Representative Plaintiff Corliss Gallo is a Louisiana resident and owner of an undivided interest in the islands of Grand Terre, an ecologically vital and delicate set of barrier islands off the coast of Louisiana.  The islands are lined by sand beaches and the center portion of the islands includes marshy wetlands.  The *Deepwater Horizon* Incident damaged Ms. Gallo's property when oil, tar balls, and clean-up and dispersant chemicals from the Oil Spill washed onto the islands of Grand Terre, followed by heavy foot and equipment traffic from disaster response teams, which, without permission from Ms. Gallo, used her property as a staging area for the clean-up effort.  Tar balls covered the beaches of the islands, and oil washed into the marshy center portions of the islands as well.  The resulting long-term damage to Ms. Gallo's

property has significantly devastated the ecology and environmental profile of the islands of Grand Terre, requiring extensive remediation much beyond that which has been attempted thus far.  The extensive damage has also reduced the value of Ms. Gallo's property.

(l)     Lake Eugenie Land & Development

Representative Plaintiff Lake Eugenie Land & Development, Inc. ("Lake Eugenie Land") owns 50,000 acres of marshland in St. Bernard Parish, Louisiana.  The Deepwater Horizon Incident damaged Lake Eugenie Land's property when oil, tar balls, and clean-up and dispersant chemicals from the Oil Spill repeatedly washed into the wetland property.  The resulting long-term damage to Lake Eugenie Land's property has significantly devastated the ecology and environmental profile of the wetland property, and has also reduced the value of the property. Therefore, Lake Eugenie Land suffered, and continues to suffer, wetland property damage due to the oil spill.

(m)     Phuong Nguyen

Representative Plaintiff Phuong Thanh Nguyen is a resident of Buras, Louisiana and a commercial fisherman who depends solely on the waters of the Gulf to live and to feed his family.  Mr. Nguyen owns and operates a twenty-four foot crab boat and a thirty-eight foot shrimp skiff to fish the bays and state waters of the Gulf of Mexico.  Mr. Nguyen's boats dock and sell their catch to commercial docks as well as businesses across Southeast Louisiana. Immediately after the Oil Spill, Mr. Nguyen's business was negatively impacted by fishery closures.  Mr. Nguyen attempted to supplement his income during the fishery closures by participating in the VoO Program, but Mr. Nguyen did not receive all amounts owed to him under the VoO Master Vessel Charter Agreement he signed with BP.  Even though some Gulf of Mexico fisheries have now reopened, Mr. Nguyen's catch, particularly of crabs, has continued to

be greatly reduced, causing Mr. Nguyen continuing loss of income.  The reduced ability to catch seafood has also reduced Mr. Nguyen's ability to bring home seafood every trip to feed his family and store for off-season months.  Therefore, Mr. Nguyen has suffered, and continues to suffer, economic damage, VoO program underpayment, and a loss of subsistence use of Gulf of Mexico natural resources due to the *Deepwater Horizon* Incident.

        (n)     John Tesvich

Representative Plaintiff John Tesvich is a Louisiana resident and the owner or part-owner and operator of several oyster-related businesses on the Louisiana coast.  Mr. Tesvich personally holds approximately 925 acres of oyster leases and is active in the harvesting of oysters.  Mr. Tesvich's involvement in the oyster industry literally stretches from the oyster beds to the consumer, and he has been a leader in the oystering community for many years as the Chairman of the Louisiana Oyster Task Force and head of the Plaquemines Oyster Association.

Mr. Tesvich's largest operation is Port Sulphur Fisheries, Inc., a Louisiana company that owns approximately 2,000 acres of oyster leases, harvests from those leases for sale, and operates several docks where the company purchases oysters from other harvesters for processing and resale.  The Oil Spill has had an immense impact on Port Sulphur Fisheries and its revenues due to oyster-ground closures, damage to oysters, damage to oyster beds, and the decline in the market for Gulf of Mexico oysters.

Mr. Tesvich's other companies own vessels (oyster and non-oyster), own oyster leases, operate dock facilities, purchase and process oysters, and are otherwise involved in the oyster industry.  Mr. Tesvich and his oyster-industry companies have depended on the condition of his oyster leases and strength of his harvesting operations for financial success.  Together, the harm to the oysters and oyster reefs of the Gulf of Mexico, and the sullied reputation and marketability

of the Gulf of Mexico oyster have caused, and continue to cause economic damage to Mr. Tesvich and his companies, including Port Sulphur Fisheries, due to the *Deepwater Horizon* Incident.

      (o)     Michael Guidry

Representative Plaintiff Michael Guidry is a Louisiana resident and a commercial fisherman and owner/Captain of M/V Michael John, a 38' skimmer Shrimping Boat. Mr. Guidry primarily earns his income by shrimping; shrimps alone, without any crew, because of the small size of his boat. Because of the Oil Spill, shrimp fisheries were closed, depriving Mr. Guidry of that annual income. Also because of the Oil Spill, Mr. Guidry was not able to hunt for crabs, further depriving him of income. During the fishery closures, Mr. Guidry attempted to supplement his income by participating in the VoO Program. Although Mr. Guidry worked regularly for the VoO Program from June 1, 2010 to September 20, 2010, he did not receive a formal written off-charter dispatch notification until November 26, 2010, and Mr. Guidry was not fully paid for all his time spent under charter in the VoO Program. Therefore, Mr. Guidry suffered, and continues to suffer, economic loss and VoO Program underpayment due to the *Deepwater Horizon* Incident. He is claiming subsistence loss of approx. $1,000 a month for him and his family and a loss of enjoyment of his hunting lease for the year 2010.

      **B.**     **Structural Assurances of Adequacy**

The requirements for a properly structured class and an approvable class settlement converge in the "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Sullivan*, 667 F.3d at 336 (quoting *Amchem*, 521 U.S. at 627). The Class Settlement and the Settlement Class definition reflect the fulfillment of this principle in the following ways:

- 21 -

First, structural assurances of fair treatment and adequate representation of all Class members are literally built into the structure of the program that will consider and pay claims. The Court-Supervised Settlement Program replaces the GCCF with a system that is under the ongoing jurisdiction and supervision of the Court, that expands the categories of claims paid and the amounts paid to claimants, that provides appellate procedures and claimant assistance features the GCCF lacked, and that prescribes and enforces a responsive attitude toward claimants and an injunction to maximize the recovery of each claimant based on all objectively demonstrable loss.

Additionally, the Settlement negotiations were not designed to strike a bargain for an aggregate settlement amount that would then be divided among claimant groups.  The parties recognized that there were a variety of claimant categories — the nature of the disaster itself and the experience of the GCCF confirmed this — and the PSC insisted that these groups or categories not be pitted against each other in competition for a fixed fund.  The PSC rejected the notion that the class should be divided and conquered.  Instead, the negotiations for each class program were informed and assisted by counsel with relevant expertise, experience, and contacts with clients in these categories.

This is true, too, with respect to the Seafood Compensation Program, which was agreed to at the very last stages of the negotiations.  After exploring, for months, the relative strengths and weaknesses of the claims, through arms-length negotiations, and with input from various attorneys, experts, and interested constituencies, the parties finally agreed to the creation of a $2.3 billion guaranteed fund as the appropriate mechanism to compensate seafood industry participants.[5]  The parties then asked the Court to appoint a distinguished neutral, John W. Perry,

---

[5] Under the agreement, BP would also assume responsibility for a number of opt-outs.  All Class

*Footnote continued on next page*

Jr., to preside over the allocation.  Mr. Perry was provided with all of the relevant underlying Government data, peer-reviewed studies, and available expert reports developed by different plaintiff groups and defendants, and was introduced to numerous PSC attorneys, non-PSC attorneys, plaintiffs (including proposed Class Representatives), representatives of industry organizations (such as the Louisiana Shrimper's Association), and industry experts, as well as various written submissions from interested parties, before making the determination on allocation.

As the Fifth Circuit has held, in this regard: "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."  *In re Corrugated Container Antitrust Lit.*, 643 F.2d 195, 208 (5th Cir. Tex. 1981) (quoting opinion below, *In re Corrugated Container Antitrust Lit.*, 1980-1Trade Reg. Rep. (CCH) ¶ 63,163 at 77, 788 n.10 (S.D. Tex. 1979)).

Finally, there will be no deduction from the settlement benefits for Class Counsel common benefit fees or costs. This is an unusual feature, given the norm of court-awarded fees to class counsel in common fund class actions. Here, attorneys fees were negotiated only after all other terms of the settlement were finalized, and only after court authorization. They do not reduce the overall value of the settlement to the class, or the payments to individual class members. The fee, subject to court approval, will be paid by BP, and compensate common benefit work performed to date, as well as the work Class Counsel will perform over the life of the Settlement Program.  The PSC will, at the same time, will petition the Court to amend the

---

*Footnote continued from previous page*

members, including those participating in the Seafood Compensation Program, would, moreover, reserve their punitive damage claims, (as well as BP-assigned claims), against Transocean and Halliburton.

972494.10

existing Hold-Back Order to eliminate the hold-back with respect to settlement benefits paid to Class Members in the Court-Supervised Settlement Program.

### C. The Proposed Class Satisfies the Requirements of Rule 23(b)(3): Predominance; Superiority; and Manageability in the Settlement Context

In addition to satisfying the requirements of Rule 23(a), the proposed class must also satisfy the requirements of Rule 23(b)(3).  Here, there is ample reason for the Court to make a preliminary determination that these requirements have been met.

**Predominance**:  Questions of law or fact common to Class members predominate over any questions affecting only individual members.  FED. R. CIV. P. 23(b)(3).  The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  In assessing whether common questions predominate, most courts have adopted a pragmatic approach that emphasizes the efficiencies of class treatment.  *See, e.g.*, *Jenkins v. Raymark Indus.*, 782 F.2d 468,472 (5th Cir. 1986).

At its core, the predominance inquiry focuses on the relationship between common and individual issues.  "When common issues present a significant aspect of the case and it can be resolved for all members of the Class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  7A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1778 (2d ed. 1986); *see also, e.g.*, *Jenkins*, 782 F.2d at 472.  Accordingly, '[i]n the context of mass tort litigation, [the Fifth Circuit] ha[s] held that a class issue predominates if it constitutes a significant part of the individual cases."  *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022-23 (5th Cir. 1992) *on reh'g,* 53 F.3d 663 (5th Cir. 1994).  This is a matter of weighing, not counting, issues.  *Mullen*, 186 F.3d at 626.

- 24 -

Defendants' conduct presents predominant factual questions.  Fundamentally, all Plaintiffs' claims arise out of a single course of conduct by Defendants that caused a single, unfolding, and disastrous event — the Macondo well blowout, the *Deepwater Horizon* explosions, and the subsequent oil spill.  This is a single-event, single-location mass disaster that has affected, and will continue to affect a large geographic area and many individuals for some time to come.  Its wide-ranging effects can be traced back to the chain of decisions and actions made by BP and those with whom it collaborated in operating the Macondo Well.  Courts have recognized that in such single-event mass tort actions, predominance is more easily satisfied because there is a single, identifiable tortfeasor that caused all of the plaintiffs' harms in a single act.  *See, e.g.*, *Mehl v. Canadian Pac. Ry. Ltd.*, 227 F.R.D. 505, 521-22 (D.N.D. 2005) (train derailment and subsequent release of toxic chemicals).  Indeed, as noted in Wright & Miller, FEDERAL PRACTICE PROCEDURE, § 1783 ("Mass-Accident Cases"), "the argument for class-action treatment is particularly strong in cases arising out of mass disasters such as an airplane or train crash in which there is little chance of individual defenses being presented."

In short, BP's conduct was common to all Class members.  Were these cases to proceed on an individual basis, the issue of whether BP's conduct constituted negligence, recklessness, gross negligence, and the extent to which it caused each of the phases of the *Deepwater Horizon* Incident, would be re-litigated thousands of times over.  *See In re Dell Inc.*, No 06-726, 2010 WL 2371834, at *4 (W.D. Tex. June 11, 2010), *aff'd, Union Asset Management Holding A.G. v. Dell, Inc.*, No 08–51163, 2012 WL 375249 (5th Cir. Feb. 7, 2012); *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir. 1986).

Indeed, environmental disasters are frequently and easily certified as class actions.  *See, e.g.*, *Watson v. Shell Oil*, 979 F.2d 1014 (5th Cir. 1992); *In re Vioxx Prods. Liab. Litig.*, 239

F.R.D. at 462 (E.D. La. 2006); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. 2006); *In re Shell Oil Refinery*, 136 F.R.D. at 589 (E.D. La. 1991); *Olden v. LaFarge Corp.*, 383 F.3d 495, 508 (6th Cir. 2004); *Bell v. DuPont Dow Elastomers*, 640 F.Supp.2d 890, 895 (W.D. Ky 2009); *Collins v. Olin Corp.*, 248 F.R.D. 95, 103-05 (D. Conn. 2008); *Singleton v. Northfield Ins. Co.*, 826 So.2d 55, 68 (La. Ct. App. 2002); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 443 (E.D. Pa. 2008); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435, 448 (S.D.N.Y. 2007); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 487 (S.D. Ohio 2004); *Mejdreck v. Lockformer Co.*, No. 01-6107, 2002 WL 1838141, at *6-7 (N.D. Ill. Aug. 12, 2002), *aff'd*, 319 F.3d 910 (7th Cir. 2003); *LeClercq v. Lockformer Co.*, No. 00-7164, 2001 WL 199840, at *7 (N.D. Ill. Feb 28, 2001); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998); *Bates v. Tenco Servs., Inc.*, 132 F.R.D. 160 (D.S.C. 1990); *Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*, No. 05-445, 2007 WL 28243, at *8 (W.D. Okla. Jan. 3, 2007); *Muniz v. Rexnord Corp.*, No. 04-2405, 2005 WL 1243428, at *4 (N.D. Ill. Feb. 10, 2005); *Ludwig v. Pilkington N. Am.*, No. 03-1086, 2003 WL 22478842, at *4 (N.D. Ill. Nov. 4, 2003); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D. Ohio 1991); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388-89 (D. Colo. 1993); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987).

Courts recognize that settlement is relevant to class certification. *Amchem*, 521 U.S. at 619. Here, BP has agreed not to contest class certification for purposes of this Settlement, and that, in the absence of an agreed class resolution, the issue of class certification itself would continue to be hotly contested. The cohesiveness of the class, the predominance of the common questions of law or fact that unite it, and the decisive factor of whether a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons

similarly situated," FED. R. CIV. P. 23(b)(3) advisory committee's note to 1966 amendment; *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011), are all inflected by the fact that the parties have reached and propose a Settlement which they wish to see implemented to the fullest and fairest extent.  Thus, in the settlement context, the cohesive qualities that unite a class and satisfy rule 23(b)(3) requirements are not defeated by variations in law, or variations in the amount or types of damage, instead, the "focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injuries suffered as a consequence.  The claim or claims must be related and cohesive and should all arise out of the same nucleus of operative fact.  *Sullivan*, 667 F.3d at 335 (Scirica, J., concurring).

The claims categories and programs each took, as their touchstones, the types and extent of damages that each category of claimants could reasonably prove, in a claims process less formal and rigorous than a trial, with documentation and information available to the claimants, damages and losses that arose from the spill.  Thus, the Class includes those with maritime and/or OPA claims, those who were not physically "oiled" but nonetheless affected economically by the disaster, and everyone whose economic world changed for the worse as the *Deepwater Horizon* Incident unfolded.

**Superiority**:  A class action is the superior method by which to adjudicate the disputes between the parties in *the Deepwater Horizon* spill litigation.  FED. R. CIV. P. 23(b)(3).  Unlike most mast torts, this case arises out of a single incident disaster, governed predominantly by a single body of federal law, involving no comparative fault on the part of Plaintiffs, and involving no future latent personal injury claims.  Common factual and legal questions include liability for economic damages arising from the *Deepwater Horizon* disaster.  In the absence of settlement, as the design of the Limitation Trial illustrates, liability would be determined predominantly under

- 27 -

a single body of federal statutory and common law.  However, this Court need not decide whether a class is superior from the standpoint of trial management, nor need the parties agree or concede on this point.  When confronted with a "request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620; *Billitteri v. Securities America, Inc.*, 204 U.S. Dist. LEXIS 92713 (N.D. Tex. 2011); *In re Chinese-Manufactured Drywall Prods.*, 2012 WL 92498.

In the real world of post-*Deepwater Horizon* economic harm, and in Rule 23(b)(3) superiority terms, the class action structure and proposed Settlement are better methods to fairly manage and pay economic damage claims resulting from the spill than either of the other alternative available methods:  (1) a GCCF-type, defendant-controlled facility; or (2) piecemeal formal litigation.

The settlement negotiations were claims-based.  That is why they focused on the detailed, objective, internally consistent claims framework the parties spent a year negotiating and refining, and the administrative, appellate, and enforcement infrastructure and mechanism they designed, down to the most specific details.  The Class definition and the settlement structure thus demonstrate the superiority, under Rule 23(b)(3), of a class structure as the best available method to fulfill the statutory obligations OPA places upon BP and the statutory promises OPA makes to those harmed.  They likewise demonstrate the fairness, adequacy, and reasonableness of the Court-Supervised Claims Program, with its structural assurances of fair treatment, its claimant-protective systems, and its enhanced benefits — in fulfillment of Rule 23(e)'s approval standards.

- 28 -

To give it utmost credit, the GCCF can be said to be a good faith effort to fulfill BP's OPA obligations, an effort which was swamped by the sheer scale of a mega-disaster far larger than *Exxon Valdez*.  Class action settlements are best designed to deal with such scenarios.  As recently observed in *Sullivan v. DB Invs., Inc.*, 667 F.3d at 334 (Scirica, J., concurring) large non-class settlements lack the "prescribed independent review of the structural, and substantive fairness" that are the hallmarks of a Rule 23 settlement program.  These difficulties affected the GCCF, and the Economic Settlement's class action framework fills the gap.

Because the GCCF had to bargain with claimants as they appeared, each claimant was in a position of negotiating anew.  Absent the advantages of a formal class structure which guaranteed *ex ante* fair treatment for all claimants and equal treatment of like claims, the inevitable result, or at least the perception, was of disproportionate treatment of like claims.  The Settlement brings a class structure with Rule 23's protections to bear on the legal obligations OPA mandated, but left undefined; it provides ongoing Court oversight, uniform rules that treat similarly situated claimants similarly, and Class Counsel to support and assist Class members through the Claims process.

The class action possesses unique efficacy in "resolving mass claims when courts have insisted on structural, procedural, and substantive fairness.  Among the goals are redress of injuries, procedural due process, efficacy, horizontal equity among injured claimants, and finality.  Arguably, a legal system that permits robust litigation of mass claims should also provide ways to fairly and effectively resolve those claims."  *Sullivan*, 667 F.3d at 340.  OPA imposed an obligation on BP to resolve the economic damage claims resulting from the spill.  As this Court has observed, the intent of the OPA standard was to encourage settlement and reduce the need for litigation.  *In re Oil Spill, MDL 2179*, 808 F.Supp.2d 943, 959–60 (E.D. La 2011).

- 29 -

While OPA imposed the obligation, Rule 23 supplies the best method to fulfill that obligation, with its "independent review and court supervision." *Sullivan*, 667 F.3d at 340.

## V.   THE MEMBERS OF THE PSC HAVE SERVED THE COMMON BENEFIT THROUGHOUT THE NEGOTIATION AND TRIAL PREPARATION PROCESSES AND MERIT APPOINTMENT AS SETTLEMENT CLASS COUNSEL UNDER RULE 23(g)

Rule 23(g) provides that a court that certifies a class must appoint class counsel, and that in doing so, the court must consider:

- The work counsel has done in identifying or investigating potential claims in the action;

- Counsel's experience in handling class actions, other complex litigation, and the type of claims asserted in the action;

- Counsel's knowledge of applicable law; and

- The resources that counsel will commit to representing the class.

FED. R. CIV. P. 23(g)(1)(A)(i)-(iv).

The undersigned have been working under court appointment for the common benefit in high-profile and intense litigation, under the supervision of the Court and the scrutiny of claimants and the public.  The 23(g) factors listed above are functionally equivalent and essentially identical to the factors considered by this Court in appointing Co-Liaison Counsel and the PSC under Pre-Trial Orders 1, 8, 9, and 46.  The undersigned have committed hundreds of thousands of hours and millions of dollars to the common benefit and the representation of the class.  The process has been transparent.  The PSC has regularly reported its time and costs to the Court-designated arbitrator; and the product of that and investment is palpable and substantial: hundreds of depositions; millions of documents produced, reviewed and analyzed; a trial-ready case in litigation of immense technical complexity; briefing, argument, and appellate work on challenging legal issues, and the contribution of expertise from the fields of maritime, OPA,

- 30 -

class action, and MDL litigation to assist the Court in steering the litigation along the prudent and expeditious course it has set.  The qualities the Court sought in forming the PSC, and that its members have demonstrated on a daily basis in prosecuting this case, are those the Court must consider under 23(g).

The undersigned are cognizant of, and negotiated the proposed settlement, with the ongoing duties of Class Counsel in the context of this particular settlement's structure firmly in mind.  The Economic Settlement places under the rigorous oversight of a class action a claims process (the GCCF) that had sparked criticism for being inconsistent, opaque, and difficult to navigate.  The Court now has before it a settlement structure that is fair and transparent, with expanded eligibility and increased benefits.  The new program has a new attitude of responsiveness toward claimants, and pro-active claims assistance (including accounting support and reimbursement).

While great time and care went into the negotiation of the details of administration of the Court-supervised Settlement Program to insure this attitude will be actualized in the Program's respectful, helpful, and legitimate claims-managing mindset and procedures, the undersigned recognize their ongoing involvement, assistance, and advocacy will be essential.  This role is embedded in the structure itself.  Class Counsel will have the ongoing power and responsibility to ensure the fair and efficient operation of the Settlement Program for the benefit of Class members throughout its existence, until all timely filed claims are finally determined.

The undersigned Interim Class Counsel and proposed Settlement Class Counsel stand ready, willing, and able to undertake these ongoing duties for the benefit of the Economic Class and respectfully request appointment as Settlement Class Counsel in order to do so.

## VI.   **CONCLUSION**

Based upon the foregoing, the accompanying submissions, and this Court's consideration of all events unfolding in the *Deepwater Horizon* litigation entrusted to its judicial management and determination, the undersigned respectfully request preliminary certification of the Economic and Property Damages Class for settlement purposes, appointment of the Plaintiffs named in the *Bon Secour Fisheries v. BP* Class Action Complaint as Class Representatives, appointment of the undersigned Interim Class Counsel as Lead Class Counsel, and appointment of the undersigned PSC members as Class Counsel for the Class.

This 18th day of April, 2012.


Respectfully submitted,


_____*/s/ Stephen J. Herman*_____          _____*/s/ James Parkerson Roy*_____
Stephen J. Herman, La. Bar No. 23129          James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ                            DOMENGEAUX WRIGHT ROY
   & COTLAR LLP                      & EDWARDS LLC
820 O'Keefe Avenue                            556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                  Lafayette, Louisiana 70501
Telephone: (504) 581-4892                     Telephone: (337) 233-3033
Fax No. (504) 569-6024                        Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                      E-Mail: jimr@wrightroy.com

*Interim Class Counsel*                        *Interim Class Counsel*
*Plaintiffs Co-Liaison Counsel*                *Plaintiffs' Co-Liaison Counsel*
*Proposed Lead Class Counsel*                  *Proposed Lead Class Counsel*

- 32 -

### *PLAINTIFFS' STEERING COMMITTEE*
### <u>*And PROPOSED SETTLEMENT CLASS COUNSEL*</u>

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:  (843) 216-9159
Telefax: (843) 216-9290
E-Mail:  jrice@motleyrice.com

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA 70360
Office:  (985) 876-7595
Telefax: (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

972494.10

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

- 34 -

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on <u>April</u> <u>18</u>, <u>2012</u>.

<u>/s/ Stephen J. Herman and James Parkerson Roy</u>

972494.10