# ATTACHMENT A

GOODWIN | PROCTER

Dahlia S. Fetouh                    Goodwin Procter LLP
617.570.1263                        Counselors at Law
dfetouh@goodwinprocter.com          Exchange Place
                                    Boston, MA 02109
                                    T: 617.570.1000
                                    F: 617.523.1231

April 5, 2012

**Via Electronic Mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
Room B345
500 Poydras St.
New Orleans, LA  70130

Re:   *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20,*
      *2010* (Docket No. MDL 2179); Subpoena Served on Woods Hole Oceanographic
      Institution

Dear Judge Shushan:

        We write in response to BP's March 15, 2012 letter to the Court regarding the subpoena
served on Woods Hole Oceanographic Institution ("WHOI") demanding, among many other
things, draft manuscripts and confidential internal discussions of scientists regarding academic
articles.  By these demands, BP has made it clear to scientists that writing an academic
article that reflects poorly on BP may carry significant collateral consequences, including a potential
public assault on your methodology (and, by extension, your reputation), along with the risk of
significant costs, both in terms of lost time and money.  Whether intentional or not, BP's
aggressive pursuit of WHOI's scientists threatens to stifle future scholarly publications and
research in all scientific disciplines, ranging from medicine to engineering and beyond, and is
dangerous precedent.

        Of utmost importance to this dispute is the fact that WHOI was acting in its capacity as a
non-profit oceanographic research institution when it dispatched its scientists in April 2010 to
collect raw data on the effects of the *Deepwater Horizon* oil spill.  Although it undertook this
task at the request of the United States Coast Guard, WHOI's contract with the Coast Guard was
principally intended to cover the bare costs associated with the initial field research, and only
provided WHOI with a nominal "fee" of $4,762.  *See* Contract and Award (the "Contract") (Exh.
1).  The value of the hours spent and the expenses incurred by WHOI's team of scientists—both

GOODWIN | PROCTER

The Honorably Sally Shushan
April 5, 2012
Page 2

in collecting the raw data and participating in the Flow Rate Technical Group—quickly and substantially exceeded this minimal "fee" paid to WHOI. Nevertheless, WHOI scientists continued their research related to the spill, even after the expiration of the Contract, in their role as academics. The articles that were eventually published as a result of this work—the very articles that BP now seeks to question—were authored by WHOI scientists in their capacity as academics working at a non-profit research institution.[1] The work reflects the tireless efforts of scientists who devoted their nights and weekends to aid in this scientific pursuit. The articles were ultimately published by the leading scientific journal worldwide in this area, which required the devotion of even more time and effort by the WHOI scientists and their co-authors.

Whatever need BP might have for the Contract deliverables, including any drafts and internal discussions related to WHOI scientists' participation in the Flow Rate Technical Group, that need has already been satisfied. The Government has already produced relevant information, including hundreds of emails of WHOI scientists reflecting discussions of the initial plume analysis done as part of the Flow Rate Technical Group. Moreover, WHOI has now produced the raw data, documents, and files that BP needs to test and replicate WHOI's work.[2] All that is left—and what BP now seeks to gather and scrutinize—are the e-mails and drafts pertaining to the multiple academic papers WHOI scientists went on to write regarding their research after the Contract with the Coast Guard was completed.

Regardless of BP's assertion to the contrary, BP has no valid need for these documents. BP clearly seeks the e-mails, drafts, and internal notes of WHOI scientists related to their academic publications purely for the purpose of impeaching WHOI's scientists—a point made plain by BP's demand that WHOI produce any "communications regarding the techniques or methodologies used (or considered for use but rejected) . . . *bearing on the validity and reliability* of WHOI's work." BP's March 15 letter to the Court, at 2 (emphasis added). As WHOI has previously explained, however, seeking confidential academic documents for impeachment purposes is not a compelling "necessity" sufficient to warrant disclosure under Federal Rule of Civil Procedure 26(b)(2)(C)(iii). *See In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8, 12 (D. Mass. 2008) (noting that, although "comments . . . which could form a basis for impeachment of the authors [may be relevant]," their "probative value is nevertheless limited" (citing *Cusumano v. Microsoft Corp*, 162 F.3d

---

[1]     BP concedes as much in its March 15, 2012 letter. Moreover, as WHOI's Contract with the Coast Guard makes clear, these articles were not a part of the required deliverables; instead, what the Coast Guard sought was the raw data underlying the articles—information which WHOI has already shared with BP through its two productions to date.

[2]     To date, WHOI has produced more than 1100 pages of responsive documents, along with ten DVDs and 3 CDs containing responsive data and documentation.

GOODWIN | PROCTER

The Honorably Sally Shushan
April 5, 2012
Page 3

708, 716 (1st Cir. 1998))).  Therefore, WHOI asks this Court's protection against BP's unjustifiable demands.

BP is also incorrect in its assertion that "[t]here is simply no law anywhere supporting a protection for discussions between researchers."  BP's March 15 letter to the Court, at 2.  In *Plough Inc. v. National Academy of Sciences*, 530 A.2d 1152 (D.C. 1987), for instance, the District of Columbia Court of Appeals affirmed the protection from disclosure given to internal documents regarding the National Academy of Sciences' ("NAS") final reports on an aspirin study.  As here, the defendant sought the "closed deliberations" concerning the methodology of the study, preliminary drafts of various related reports, and the "confidential internal deliberations" of the NAS scientists.  *Plough Inc*, 530 A.2d at 1156.

In protecting these materials from disclosure, the *Plough* court noted that "courts, in order to prevent a chilling of the uninhibited conduct of academic and scientific research, have recognized an interest in protecting from discovery the analyses, opinions and conclusions drawn by researchers from their data."  *Id.* at 1157; *see also Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1274 n.20 (7th Cir. 1982) (quashing a subpoena of university researchers for all "letters, memoranda, correspondence, reports, notes, drafts, working papers, protocols for scientific studies, laboratory notebooks, raw data, data compilations, graphs, charts or papers of any kind" regarding their study); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 269 F.R.D. 360, 364–65 (S.D.N.Y. 2010) (noting that "[i]t is not uncommon for courts to quash subpoenas seeking discovery from research institutions" out of concern for the chilling effect it may have, and that "this concern is at its peak when a party seeks . . . the *internal communications or work product* of the research body," and requiring the research institution to turn over only the raw data from the study, the final report, and any communication it had between itself and the defendant); *cf. In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, MDL No. 2100, 2011 WL 5547133, at *2–3 (S.D. Ill. Nov. 15, 2011) (denying defendant's motion to compel production of the peer review comments on an academic paper, and observing that the "pillars of a successful peer review process are confidentiality and anonymity; anything less discourages candid discussion and weakens the process").

Courts protect academic researchers because the disclosure of internal deliberations, laboratory notes, and drafts of study publications would, if not protected, "'inevitably tend[] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.'"  *Dow Chemical*, 672 F.2d at 1276 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957)).[3]

---

[3]     It is important to note that this protection is distinct from the deliberative process protection currently in dispute between BP and the United States.  The protection invoked by WHOI is a separate, free-standing protection given to academics and scholars by the courts.

GOODWIN | PROCTER

The Honorably Sally Shushan
April 5, 2012
Page 4

\*          \*          \*

In light of the above, and previous submissions to the Court, WHOI respectfully requests that the Court issue an order denying BP's request for additional discovery and protecting WHOI from disclosure of internal confidential scientific deliberations, draft manuscripts, laboratory notes, and other internal documents reflecting the academic and scientific process.

Respectfully,

Dahlia S. Fetouh

cc:    Robert R. Gasaway, Esq.
       Karen McCartan DeSantis, Esq.

# ATTACHMENT B

National Incident Command, Interagency Solutions Group, Flow Rate Technical Group

# Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill



U.S. Department of the Interior

Cover: Satellite image of the oil spill in the Gulf of Mexico on April 29, 2010 (NASA Goddard Space Flight Center photo); oil floating on the surface of the water in the Gulf of Mexico on June 12, 2010 (photo by Petty Officer First Class Tasha Tully).

# Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill

National Incident Command, Interagency Solutions Group, Flow Rate Technical Group

Prepared by:

Marcia McNutt, U.S. Geological Survey: Flow Rate Technical Group Chair

Richard Camilli, Woods Hole Oceanographic Institution:  WHOI Flow Rate Measurement Group Lead

George Guthrie, Department of Energy, National Energy Technology Lab:  Flow Rate Technical Group, Nodal Analysis Team Lead

Paul Hsieh, U.S. Geological Survey, National Research Program

Victor Labson, U.S. Geological Survey: Flow Rate Technical Group, Mass Balance Team Lead

Bill Lehr, National Oceanic and Atmospheric Administration: Flow Rate Technical Group, Plume Analysis Team Lead

Don Maclay, Bureau of Ocean Energy Management, Regulation and Enforcement: Flow Rate Technical Group, Reservoir Modeling Team Lead

Art Ratzel, Department of Energy, Sandia National Laboratories: DOE-NNSA Team Lead

Mark Sogge, U.S. Geological Survey: Flow Rate Technical Group Deputy Chair

**March 10, 2011**

**U.S. Department of the Interior**

Suggested citation:

McNutt, M, R. Camilli, G. Guthrie, P. Hsieh, V. Labson, B. Lehr, D. Maclay, A. Ratzel, and M. Sogge. 2011. Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill.  Flow Rate Technical Group report to the National Incident Command, Interagency Solutions Group, March 10, 2011.

# Contents

Executive Summary...................................................................................................1

Background on the Macondo Well and Oil Spill Origin..................................................3

Subsequent Well Control Efforts.................................................................................4

Motivation for Flow Estimates ...................................................................................5

General Approach to Flow Estimation.........................................................................6

Strengths and Limitations of the Various Flow Estimation Methodologies...................8

    Mass Balance Estimate ......................................................................................8

    Acoustics Analysis ............................................................................................10

    Video PIV Analysis............................................................................................11

    Reservoir and Well Modeling ...........................................................................12

        Reservoir Modeling ...................................................................................13

        Well Modeling ..........................................................................................13

    Convergence of Gas-Oil Ratio from Surface Collection to Deep-Sea Value ...........15

Discussion ...............................................................................................................17

Acknowledgements..................................................................................................18

Literature Cited.......................................................................................................19

Appendices..............................................................................................................21

    Appendix A – Hsieh 2010; Reservoir Depletion Report

    Appendix B – Labson et al. 2010; Mass Balance Team Report

    Appendix C – Camilli 2010; Woods Hole Oceanographic Institution Acoustics Analysis Report

    Appendix D – Plume Calculation Team 2010; Particle Image Velocimetry Report

    Appendix E - Reservoir Modeling Team 2010; Reservoir Modeling Report

    Appendix F – Guthrie et al. 2010; Nodal Analysis Team Report

# Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill

## EXECUTIVE SUMMARY

The April 20, 2010, explosion on board the Deepwater Horizon drilling platform led to an 87-day blowout of the Macondo oil well nearly one mile deep in the Gulf of Mexico that was only partially contained through collection of up to 25,000 barrels per day of oil (plus natural gas) to surface ships during the latter portion of the incident. For a number of reasons related to the response effort, it was important to have an accurate estimate of the rate of release of hydrocarbons, especially oil, from the well, and yet no proven techniques existed for estimating the flow under such conditions. The National Incident Command (NIC), Interagency Solutions Group established the Flow Rate Technical Group (FRTG) and assigned it two primary functions: (1) quickly generate a preliminary estimate of the flow rate from the Macondo well, and (2) use multiple, peer-reviewed methodologies to later generate a final estimate of flow rate and volume of oil released. The purpose of this report is to describe the relative advantages of the different methods that were used to measure flow rate from the Macondo well, so that if this process needs to be used again in an emergency situation, quick decisions can be made to mobilize the techniques most appropriate to that future emergency.

Given the lack of precedents, the FRTG used all practical methodologies to estimate the flow rate (defined in this report as equivalent stock tank barrels of oil at sea level), each with its inherent strengths and limitations. One technique (mass balance) relied only on observations available on the ocean surface and yielded a flow rate of 13,000 to 22,000 barrels per day (BPD) early on in the incident. Two techniques (video and acoustic) acquired in situ observations from remotely operated vehicles (ROVs) of the oil plume as it exited the well in water 5067 feet deep at the wellhead. These techniques yielded fairly consistent flow rates of 25,000 to 60,000 BPD. An in situ hydrocarbon sample not only improved these flow estimates, but also was combined independently with surface collection data to yield a flow rate of 48,000 to 66,000 BPD. The final approach (reservoir and well modeling) needed no new observations but did rely on industry proprietary data (seismic data on the reservoir structure, rock and fluid properties, well logs, etc.) to constrain model parameters. This approach produced the largest range in estimated flow rates (from less than 30,000 to more than 100,000 BPD) and had the largest number of uncertain parameters. On June 15, 2010, using flow estimates available at the time (primarily video and acoustic), the government released an updated estimate of 35,000 to 60,000 BPD.

Three days after a capping stack was installed on the well on July 12, 2010, the choke valve was closed and oil stopped flowing into the Gulf. Three different teams from Department of Energy (DOE) labs used pressure measurements recorded as the valve was closed to yield the most precise and accurate estimation of flow from the Macondo well: 53,000 barrels/day at the time just prior to shut in. The teams assigned an uncertainty on that value of ±10% based on their collective experience and judgment. The flow rate immediately prior to shut in was then extended back to day one of the spill using a U.S. Geological Survey (USGS) model simulation for the rate of depletion of the reservoir calibrated by pressure data from the well integrity test to produce an estimate of the flow rate as a function of time throughout the incident. The net result was a time-varying flow rate, announced on August 2, 2010, that decreased over the 87 days from an initial 62,000 to a final 53,000 barrels per day, for a total release of 4.9 million barrels of oil, before accounting for containment. The estimated

uncertainty on these flow values is also ±10%. In this report, the post-shut-in, time-dependent estimate announced on August 2, 2010 (the "August estimate"), is considered to be the ground truth against which the June estimates are compared to answer the question of which methods are best suited for measuring flow rate during an ongoing incident.

Based on attributes such as timeliness of the information and accuracy of the estimation, the technique that performed the best during the ongoing emergency was the acoustic technique (combining sonar to image plume size with acoustic Doppler to measure plume velocity). The video technique was deployed more rapidly and could be the first recourse to get a quick, initial flow rate if such an event were to be repeated. Various members of the video team used different analysis techniques, with some providing better matches to the August estimate than others. Every attempt should be made to get an in situ sample of produced reservoir fluids or repeated samples if the incident is not rapidly contained.

There were some scenarios of the reservoir and well models (typically the "most likely" scenario) that predicted flow rates close to the August estimate. Given the very large range of uncertainty in the well and reservoir conditions that existed prior to shut in, whether the flow predictions from these models could have been useful for decisionmaking had they been available sooner would have depended on the criteria for model selection from among a number of plausible alternatives. For example, the "worst case scenario" required a containment capacity for surface ships that was more than five times that of the "best case scenario" for flow rate. Of course, any future oil spill event would have certain unique features, and therefore each of these methods would have to be judged on its own merits for the situation at hand.

The mass-balance flow rate was significantly lower than the rate determined by the other methods and is not a reliable technique for estimating flow from deep-sea releases. Much environmental modification of the oil, especially in its ascent from a mile of water depth, had already happened by the time the surface slick was imaged by the airborne instrument; thus, the combined effects of dispersion, dissolution, and evaporation simply left too much oil unaccounted for. Expanded research on the physical, chemical, biological, and geological fate of oil released in the deep marine environment will aid in the response to future oil spills.

# Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill

## Background on the Macondo Well and Oil Spill Origin

The Macondo well is located in the Mississippi Canyon Block 252 (MC252) of the Gulf of Mexico, approximately 50 nautical miles (93 km) southeast of the Mississippi River delta (28.74°N, 88.39°W) (Figure 1). BP America purchased the mineral rights to this block in 2008, and in October 2009 drilling of the exploratory well began in water approximately 5000 ft (1500 m) deep. On April 20, 2010, an explosion occurred on the drilling rig Deepwater Horizon, which then burned and sank on April 22. This incident severely damaged the underwater riser – the pipe connecting the ocean floor well to the drilling platform – about 4000 feet (1200 m) of which fell back to the seafloor. The riser looped around back as it fell, such that its broken end was less than 2000 feet (600 m) from the wellhead.

The first news reports from the explosion and fire were that the well was not leaking oil. However, it was apparent to the remotely operated vehicles (ROVs) diving near the wellhead as early as April 22 that hydrocarbons were escaping from tears where the riser pipe was bent over at the wellhead, the so-called "kink" in the riser (Figure 2). At this time the ROVs had been dispatched to the seafloor to intervene with the blowout preventer (BOP) to activate the blind shear rams by directly plugging into the system hydraulics. However, this maneuver had no effect on the flow through the kink at the wellhead. The much larger flow from the well through two other leaks further up the riser was first discovered on April 24 by the ROVs with their scanning sonars, far beyond the region illuminated with their lights. Up through May 5 there were repeated efforts to directly activate various rams in the BOP. Only activation of the casing shears on April 29 had any effect at all, and it was a momentary hesitation in the flow through one of the leaks. On May 5 the problem of attempting to contain the flow from the damaged riser was simplified by cutting off the damaged end of the drill pipe at one of the leak points and capping it off such that all flow was channeled either through the kink in the riser at the wellhead or out the broken (open) end of the riser (Figure 2).



**Figure 1.** Location of the Deepwater Horizon / Macondo well oil spill, in the Gulf of Mexico approximately 50 miles (80 km) southeast of the Mississippi Delta. Source: U.S. Geological Survey.



**Figure 2.** Diagram of damaged riser at the Macondo well spill site. Most hydrocarbon release occurred in the areas highlighted by black rectangles, emanating from the kink immediately above the Blowout Preventer (BOP) stack and the open end of the riser/drill pipe. LMRP refers to the Lower Marine Riser Package, which is at the top of the BOP stack. Source: BP web.

## Subsequent Well Control Efforts

BP attempted additional control of the plume on May 8, when a large coffer dam (or "dome") was lowered to the seafloor over the broken riser end. This failed when the coffer dam filled with methane hydrates caused by the interaction of methane gas from the hydrocarbon plume with seawater. The icy hydrates changed the buoyancy of the coffer dam, threatening to make the large structure unstable. The hydrates would also have prevented hydrocarbon flow through the coffer dam and its riser up to the sea surface. On May 16, the Riser Insertion Tube Tool (RITT), a snorkel-type device, was placed in the broken riser end to capture some of the escaping oil (Figure 3). The rate of capture varied over time, peaking for short periods at a rate that, had it been sustained, would have yielded 8000 barrels per day (BPD). On May 26, BP attempted a "Top Kill" procedure by pumping heavy mud and some bridging material into the well through the BOP; this failed and the attempt was ended on May 29.

In order to consolidate the escaping flow into a single outlet and to set the stage for future control attempts, BP severed the riser just above the Lower Marine Riser Package (LMRP, the uppermost unit of the BOP stack) on June 3 (Figure 4). That same day, Top Hat #4 was placed on top of the LMRP and began recovering hydrocarbons from the severed Macondo well (Figure 5). The captured flow was transferred to the vessel *Discoverer Enterprise*; oil recovery rate ramped up over the next few days to peak at approximately 15,000 BPD. On June 11, additional capacity for hydrocarbon collection was brought on line by converting the manifolds that were used to pump mud in the Top Kill procedure to collect oil on the *Q4000* semi-submersible from the choke line of the BOP. Oil recovery rates for the *Q4000* proved to be quite reliable and robust, with a peak rate of approximately 9000 BPD. These two concurrent collection efforts failed to capture all of the hydrocarbon flow from the well; video from ROVs clearly showed hydrocarbons leaking through the vents and through the skirt in the Top Hat. In order to keep the work area at the sea surface free of volatile organic chemicals (VOCs), which are a human health hazard to the hundreds of workers in the immediate vicinity of the wellhead, subsea dispersant chemicals were added to the plume via a dispersant wand deployed from an ROV. These chemicals reduce the average oil droplet size, which aids dispersal into the water column and reduces the amount of oil reaching the surface.



**Figure 3.** Diagram of Riser Insertion Tube Tool (RITT) that was used in mid-May to capture hydrocarbons being released from the open end of the damaged riser at the Macondo well spill site. Source: BP web.

On July 10, government researchers in Houston encouraged BP to accelerate a procedure to remove Top Hat #4 and replace it with a three-bore capping stack that would allow for greater containment of the flowing oil and potentially full closure of the well. After the capping stack was successfully installed, the National Incident Command (NIC) approved a well integrity test that would temporarily stop the oil flow by closing all valves on the capping stack. For the first time in 87 days, all oil from the Macondo well ceased flowing into the ocean at 14:20 CDT on July 15, 2010. Government and independent scientists carefully monitored the ocean and subsurface for any sign of hydrocarbons leaking from the well into surrounding rock formations or into the ocean via pressure and temperature gages and seismic, acoustic, sonar, and visual surveys using ships and ROVs. The monitoring progressively gave government officials confidence that the well had integrity and could remain shut in, such that no new oil/natural gas was released after July 15. On August 3, the Static Kill process was conducted and the well was filled with heavy mud, significantly reducing pressure at the wellhead. Cement was injected into the Macondo well from above on August 5, and on September 17 the well kill process was completed when cement was pumped into the annulus from the relief well drilled by the Development Driller III.

## Motivation for Flow Estimates

Initially, BP's estimate of the flow from the well was approximately 1000 BPD. On April 28, the National Oceanic and Atmospheric Administration (NOAA) released the first official government flow rate of 5000 BPD. At the time, this number was highly uncertain and based on satellite views of the area of oil on the surface of the ocean. After the May 12 public release of videos showing the plume of hydrocarbons escaping from the damaged riser in the deep sea, many scientists insisted that the flow rate was much higher than 5000 BPD. On May 14, 2010, the NIC



**Figure 4.** Hydrocarbons (oil and natural gas) escaping from the end of the riser tube, after it was severed on June 3 immediately above the Macondo well Blowout Preventer (BOP) stack. Source: BP video from Remotely Operated Vehicles (ROVs).

asked its Interagency Solutions Group (IASG) to provide scientifically based information on the discharge rate of oil from the well. In response, the NIC IASG chartered the Flow Rate Technical Group (FRTG) on May 19. Experts from many scientific disciplines were brought together to perform the FRTG's two primary functions: (1) as soon as possible, generate a preliminary estimate of the flow rate, and (2) within approximately two months, use multiple, peer-reviewed methodologies to generate a final estimate of flow rate and volume of oil released.

There are a number of reasons for needing a more accurate estimate of the flow rate, beyond the public's interest in the magnitude of the Deepwater Horizon incident. To begin with, a number of operations and interventions associated with the well were sensitive to flow rate. For example, higher-than-anticipated flow rates likely contributed to failure of the coffer dam, and the likelihood of success of the Top Kill was dependent on the flow rate from the well. The amount of dispersant that should be applied by the ROVs to prevent an oil slick and release of volatile organic compounds on the surface, where they posed a health hazard to hundreds of workers involved in well intervention, was proportional to the flow rate. The planning for containment of oil at the sea surface while the relief wells were being drilled required a realistic assessment of how much oil needed to be accommodated. The rate of depletion of the reservoir, which therefore determined the final shut-in pressure when the capping stack was closed, depended on the amount of oil withdrawn. Much discussion by the government science team in Houston immediately after the well was shut in centered on whether the low shut-in pressure was the result of high depletion of the reservoir (exacerbated by a high flow rate) or the effect of a well that was leaking below the sea floor. Ultimately, the impact of the oil on the environment depends primarily on the total volume of oil released.

## General Approach to Flow Estimation

Despite the need for an accurate flow estimate, the challenge of providing such information should not be underestimated. Typically for oil spills that involve ship groundings, the amount of oil spilled is exactly known because the volume of oil in the tanks is measured before the ship

sails. The Deepwater Horizon incident was unprecedented in terms of the water depth at which the blowout occurred, and no methods existed for measuring multiphase flow at these pressures and temperatures. The Ixtoc I blowout of a Mexican well in 1979 in the Gulf of Mexico is the nearest analogue, but the water was only about 160 feet (50 m) deep, thus completely avoiding the very serious methane hydrate complications. The official rates of flow for the Ixtoc I well were about a factor of two less than for the Macondo well and were estimated by Petroleos Mexicanos (PEMEX), the responsible party (Jernelöv and Lindén,1981). After the well was capped, PEMEX revised the flow rate and total release downward. Given the different conditions and the absence of peer-reviewed papers describing the methodology used to constrain the estimate, it is not possible to use Ixtoc I as an example for how to approach the problem of measuring flow rate from a deep-water blowout.

Acknowledging the challenges of measuring the flow from the Macondo well, the FRTG leadership concluded that the best way to deal with the research nature of the problem was to have multiple independent teams use different methods, each with its own inherent strengths and limitations. At the time that the FRTG was established, there was no guarantee that ground truth for the flow rate would ever be established. The goal was to find convergence from multiple methodologies on a flow rate with reasonable precision. At one point, it appeared that BP might contain all of the flow on surface ships, which would have provided an excellent final measure of flow rate (at least at that one point in time), but the flow rate proved too large for the available surface containment capacity prior to closure of the capping stack. Additional capacity was not brought on line prior to shutting in the well for good. Fortunately, when the choke valve in the capping stack was



**Figure 5.** Diagram of LMRP Cap (a.k.a., Top Hat #4) that was used in June and early July to capture hydrocarbons being released from the Macondo well, after the damaged riser was severed immediately above the Blowout Preventer (BOP) stack. Source: BP web.

throttled back in a series of precisely controlled steps to close off the well, the pressure readings taken at the time were analyzed by three separate Department of Energy (DOE) laboratories to yield very consistent results for the flow rate of the well at the time of shut in: 53,000 BPD (Ratzel 2011). When combined with a U.S. Geological Survey (USGS) model for reservoir depletion as a function of time (Hsieh 2010; Appendix A), these post-shut-in results provided a flow rate estimate for the entire duration of the oil spill with reasonably high precision that confirmed the best of the June pre-shut in estimates. Based on this convergence of results, the Department of Interior (DOI) and DOE released, on August 2, 2010, a time-varying flow rate for the well as a function of time (Figure 6) that was estimated by the team of scientists to be accurate to ±10%. Although this figure does not represent a formal statistical error estimate, it approximately accounts for errors in the pressure readings (based on two redundant pressure gauges) and unmodeled multiphase effects. With a few discontinuities to account for changing resistance at the wellhead (i.e., removal of riser, addition of capping stack), the flow rate was estimated to have decreased from 62,000 BPD to 53,000 BPD over the 87 days of the incident, for a total release of 4.9 million barrels of oil. This includes the approximately 800,000 barrels of oil directly collected from the well that never reached the environment.

## Strengths and Limitations of the Various Flow Estimation Methodologies

Below we review with the benefit of hindsight the issues with each of the methods used in the case of this particular incident. Each of the methods was reviewed in terms of the following three criteria: (1) how accurately it measured the flow rate assuming the August flow estimate as the ground truth; (2) the complexity and costs of deploying the method; and (3) the timeliness of results. Note that for any other oil spill the situation could be different depending on availability of subsurface equipment in the field, remote sensing equipment over the ocean, and geophysical/ reservoir data from the various parties involved in developing the field.

### Mass Balance Estimate (Labson et al. 2010; Appendix B): 13,000-22,000 BPD (Lower Bound)

The mass balance estimate took advantage of a novel NASA sensor, the Airborne Visible InfraRed Imaging Spectrometer (AVIRIS), to calculate the amount of oil on the ocean surface as of May 17, 2010. The advantage of this approach over the previous mass balance estimate of 5000 BPD is that AVIRIS measures not only the area of the ocean that is oiled, but also the thickness of the oil. The scientists then corrected the observed amount of oil by adding in the amount that was skimmed and burned plus estimates of the amount that was dispersed or evaporated up to that day after reaching the sea surface; this sum of all known oil represented an estimate of the amount that had been released to date. An average of daily flow was generated by dividing by the number of days of flow to the surface through May 17. The calculation based on mass balance is an average rate for the first 27 days of the spill, assuming that the 5 days that sea-bottom dispersants were being applied prior to May 17 did not contribute to the observable surface spill. The range in flow rates derived depended on how aggressively the scientists interpreted the sensor data in terms of oil in each pixel of ocean surface imaged. However, there is likely additional uncertainty in the estimates arising from the modeled effects such as evaporation and dispersion at the sea surface, and dissolution and dispersion within the subsea.

The mass balance method has the following strengths and limitations.



**Figure 6.** Summary of flow rate estimates. The continuous curve represents the best estimate of the evolution in flow rate throughout the oil spill incident (announced on August 2, 2010), obtained by extrapolating the 53,000 BPD estimate from Department of Energy at the time that the capping stack was closed (Ratzel 2011) back to the beginning of the incident using the reservoir depletion model of Hsieh (2010; Appendix A). In this extrapolation, a flow rate increase of 4% was estimated to have occurred when the riser was severed and a decrease of 4% when the capping stack was installed. The stippled band represents a +/- 10% uncertainty in the flow rate model. Compared to this August estimate are earlier estimates made as the incident was ongoing and discussed in the text, plotted as a function of the day that the data for that flow rate were collected. Flow rates were typically reported at later dates. The estimates from mass balance (dark blue) and video (green) were reported first, shown as arrows because both were lower bounds. The light blue bar indicates the later, improved video estimate before the riser was cut. The red circle is the pre-riser-cut flow rate from the Woods Hole Oceanographic Institute acoustics method. The orange bar is the government flow rate estimate, released on June 15, for the period immediately after the riser was cut (June 3), based on all available information at the time (video plus acoustic). Flow estimates made available after shut in were as follows: from reservoir modeling by Gemini, Kelkar and Hughes teams and by Hsieh (shown by the indicated symbols), well modeling (lavender arrow off chart to 118 BPD), trends in gas-oil ratio in surface collection (purple box to show range in dates of collection and values).

## Strengths

- Measures oil likely to impact shorelines/wildlife because it focuses on oil on the ocean surface;

- Requires no subsea assets;

- Independent of oil/gas ratio;

- Assesses oil thickness as well as area to get true volume indication.

## Limitations

- Misses an unknown amount of oil remaining in or returned to the subsurface;

- Would underestimate relatively large quantities of oil that may accumulate in tar balls;

- Requires a very specialized sensor deployed from an expensive platform (aircraft);

- Needs low sea state to obtain a reliable measurement;

- For large spills, cannot in one day get the synoptic view, so must interpolate assuming area imaged is representative.

The first limitation was considered by the mass balance team to be an important one: they missed a significant fraction of oil that either never made it to the surface from the mile-deep wellhead or was dispersed from the surface and sank. For that reason, the 13,000 to 22,000 BPD flow estimates were considered minimum or lower bound values.

## Acoustics Analysis (Camilli 2010; Appendix C): 60,000 BPD

The U.S. Coast Guard (USCG) supported the work of researchers from the Woods Hole Oceanographic Institution (WHOI) to generate a flow rate estimate by deploying a 1.8 MHz multi-beam imaging sonar and a 1.2 MHz Acoustic Doppler Current Profiler (ADCP) from a work-class ROV. The field data were acquired on a "not to interfere" basis by placing oceanographic research equipment on ROVs that were under contract to BP to conduct well intervention and oil containment efforts.

On May 31, 2010, the WHOI team obtained their estimates of plume flow rates, using the imaging sonar to determine the cross sectional area of the plumes at the end of the riser and at the kink (Figure 2) and the ADCP to measure the velocity of the flow field. The flow velocity and area estimates were then multiplied to produce an ensemble estimate of the total volumetric flow rate (oil plus gas) of 0.25 m$^3$/s. The acoustics group did not give a formal uncertainty on its estimate because the natural variability of the turbulent jets exceeded the statistical uncertainty of instantaneous velocity and cross section measurements.

On June 21, 2010, the WHOI team returned to the field with a pressure-qualified sample bottle and gathered 100 mL of uncontaminated discharge of hydrocarbons inside Top Hat #4 as they exited the well. This sample allowed the best estimate of the volumetric oil fraction at ambient seafloor conditions (150 atm and 4.4 ° C): 42.8% liquid petroleum hydrocarbons (pentane and higher), 57.2% gas (natural gas, condensates, and non-hydrocarbon gases) (Chris Reddy, WHOI, pers. comm.).

Based on WHOI's early results, an oil flow rate was initially estimated to be 59,000 BPD (described in Richard Camilli's September 27, 2010, testimony to the National Commission and in Appendix C). This flow rate estimate has since been updated to explicitly account for turbulent jet source and expansion characteristics, improved measurement of the inside diameter of the riser after it was recovered from the seafloor, and to account for natural gas, hydrocarbon condensates, and non-hydrocarbon gas contributions to the bulk flow, as detailed in the previous paragraph. As

a result, since Appendix C was prepared, the liquid petroleum hydrocarbon (pentane and higher hydrocarbons) flow rate has been revised upward to 60,000 BPD for May 31, 2010.

The acoustic analysis method has the following strengths and limitations.

## Strengths

- Measurement is taken near the wellhead before the plume is dispersed and so captures the full flow;

- Allows for a full 3-D image of the plume velocity field;

- Measurement can be repeated for different periods to get time variation;

- Independent sensors measure both plume cross-section and velocity.

## Limitations

- Requires specialized oceanographic equipment that is uncommon for work-class ROVs;

- Requires access to the deep sea;

- Depends on knowing the oil/gas ratio (which must be measured or estimated).

The certification requirement which required extra time and effort for deploying the specialized fluid sampling gear from the contractor's ROV could have been alleviated had it been possible to bring in an additional research-class ROV and oceanographic support vessel. However, in this particular instance, the workspace above the wellhead was so congested with ships supporting the well control and oil containment efforts throughout the duration of the incident that bringing in additional vessels dedicated to the problem of measuring flow rate was not a priority. All data gathering had to be accomplished on a "not to interfere" basis given the importance everyone, from the public to the highest officials, placed on stopping oil from flowing into the Gulf of Mexico.

## Video PIV Analysis (Plume Calculation Team 2010; Appendix D): 25,000 to 30,000 BPD (pre-riser cut), 35,00 to 50,000 BPD (post-riser cut)

A relatively large group of scientists examined underwater video of the oil plumes and estimated flow rates. Three of the teams used a fluid dynamic technique called Particle Image Velocimetry (PIV), while other individuals used video analysis methods that tended to produce higher flow rates than the PIV results. The video data examined were either opportunistic from work-class ROVs working in and around the incident site or specifically commissioned by the video team to be collected by an ROV for flow-rate analysis. In the PIV method a flow event (e.g., an eddy or other identifiable feature) is observed in two consecutive video frames. Distance moved per time between frames gives a velocity, after adjustment for viewing angle and other factors. This process is repeated at multiple interrogation points and on different scale flow features to characterize the plume velocity field. These velocities correspond to fluid velocities at the surface of the plume and were acquired close to the point of exit to minimize buoyancy effects. The conversion of surface velocity of the flow to mean velocity within the plume is then based on a model. For the measurements at the open end of the sheared riser (Figure 2, right hand side) or at the top of the LMRP after the riser was cut off, surface velocities were used to estimate centerline velocities at the exit, which were then multiplied by a scaling factor and the plume cross-sectional area to get volumetric fluxes. For flow at the kink in the riser, a velocity profile based on the development of a round turbulent jet was used to correlate these surface velocities with volumetric fluxes.

The PIV analysis yields only an estimate of total volumetric flow of hydrocarbons. As with the acoustics analyses discussed above, some assumption must be made about the gas-to-oil ratio in order to estimate the fraction of liquid oil relative to all of the hydrocarbons released from the well. Early on, in the absence of independent information, the scientists used BP's pre-accident estimate that 29% by volume of the reservoir fluid was liquid oil at seafloor conditions (based on early samples). There was some indication based on the color of the discharge that the riser was acting as a gas/oil separator, such that the gas-to-oil ratio in the plumes varied widely both in time and space. Later on, when the collection system associated with Top Hat #4 started to provide consistent data about the oil and gas collection at the surface, a liquid oil fraction of 41% was used to convert the measurements of total volumetric flow rate at the wellhead to equivalent stock tank barrels at the surface.

Initially, the team analyzed May 17 video from both the end of the riser where the majority of the flow was escaping (prior to insertion of the RITT) and from the kink in the riser where a smaller amount exited through narrow slits where the riser bent over the top of the LMRP. This analysis was more complicated on account of the multiple exit points and resulted in flow rate estimates of 20,000 to 40,000 BPD with a best estimate of 25,000 to 30,000 BPD. Later analysis was based on video taken from the single flow point immediately after the riser was cut just above the LMRP on June 3 and yielded best-estimate flow rates between 35,000 and 45,000 BPD from PIV analysis, but possibly as high as 50,000 BPD based on other methods.

This video analysis method has the following strengths and limitations.

## Strengths

- Video data are relatively easily acquired from any number of manned or unmanned deep sea systems;

- PIV is a common technique that is widespread with many practitioners who can provide peer review;

- The measurement is taken right at the wellhead before the fluid dissipates and so captures the full flow;

- Observations can be readily repeated at multiple periods to get time variation of flow.

## Limitations

- Dependent on assumed oil-to-gas ratio;

- More successful with high-quality, clear video data from a stationary viewing platform, which can be challenging to obtain;

- Dependent on assumed relation of flow on surface of plume to flow within plume interior;

- Requires access to the deep sea.

## Reservoir and Well Modeling

Two groups were involved in reservoir and well modeling exercises, one concentrating on modeling the evolution of the producing reservoir at 18,000 feet (5500 m) below sea surface and the other on the various possible flow paths up through the well. Unlike the previous approaches, neither of these teams required access to the field or new data acquisition. However, both required access to industry proprietary data in order to constrain model parameters (for example, fluid and reservoir properties). The two model approaches can be considered in some sense complementary,

in that results from the reservoir model can be expressed as a bottom-hole pressure that would then be input to the well model, to simulate flow up through the well to the sea. In fact, the original intent was for the two teams to work together. However, the time needed to get contracts and non-disclosure agreements in place for the reservoir modeling groups delayed the initiation of the research. This meant that each group was required to make some simplifying assumptions concerning the other part of the model in order to meet required deadlines. Hence, the reservoir modeling group considered some simplified well flow paths (i.e., hydrocarbons traveling up the annulus around the production tubing or within the production tubing itself), and the well modeling group considered bottom-hole pressures as a function of flow rate derived from simplified reservoir models. Even though modeling activities were expedited to the greatest degree possible, because of the complexity of the task, the results were not delivered until after the June flow rate estimate was announced.

## Reservoir Modeling (Reservoir Modeling Team 2010; Appendix E) : 27,000 to 102,000 BPD

Three independent groups of researchers in the field of reservoir simulation calculated the rate at which oil and gas can be produced from the sands penetrated by BP's Macondo well. The reservoir geometry was prescribed by maps generated from 3-D seismic data interpreted by Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) geophysicists. The models were constrained using Macondo reservoir rock and fluid properties derived from open-hole logs; pressure transient tests; pressure, volume, and temperature measurements; core samples; and reservoir data from an analogous well drilled 20 miles (32 km) away. The researchers populated computer models and determined flow rates from the targeted sands in the well as a function of bottom-hole pressure. This provided an estimate of the rate at which oil could theoretically flow into the well. Permeability assumptions significantly impacted the results. In addition, the particular flow path through the well was as important as any reservoir parameter in determining the final flow rate. On account of time constraints, the modelers concentrated on two scenarios: the maximum flow (worst case) conditions and the most likely flow scenario. The Hughes team (Louisiana State University) estimated most likely peak flows of 63,000 to 66,000 BPD after a 10-day ramp up period following the blowout, with worst case assumptions about reservoir structure (aside from permeability) increasing flow rates by only 1400 BPD. The Kelkar team (University of Tulsa) had systematically lower peak flow rates (which in its model occurred in the first day after the blowout): 27,000 to 32,000 and 37,000 to 45,000 BPD for the most likely and maximum scenarios, respectively, with the range in each scenario dependent on the flow path through the well (tubing versus annulus), size of the restriction in the BOP choke, and pipe roughness. Gemini Solutions Group, an industry team, produced the most simulations. The most likely (base case) scenario predicted an initial flow rate of 58,000 BPD. The range of initial flow rates for the majority of its simulations was 41,000 to 73,000 BPD, depending primarily on the well flow path and to a lesser extent on reservoir permeability. For these models, the time history also predicted that after 87 days of flow, the rate would drop from about 60,000 BPD to about 50,000 BPD, in agreement with trends predicted by Hsieh (2010). Gemini also produced a worst case scenario of initial flow ~102,000 BPD in the case of tubing plus annular flow.

## Well Modeling (Guthrie et al. 2010; Appendix F): 30,000 to 118,000 BPD

Five DOE National Labs used different but comparable methodologies to estimate hydrocarbon flow from the reservoir through the well to the surface; the National Institute of Standards and Technology (NIST) then performed a statistical synthesis of these results. This Nodal modeling is based on pressure drops from the reservoir to the ocean floor that result from restrictions to flow through the well-BOP-riser system. The team used input from various reservoir models (including pressure, temperature, fluid composition and properties over time) and pressure

and temperature conditions at the exit points on the seafloor, along with details of the geometries of the well, BOP, and riser (when applicable) to calculate fluid compositions, properties, and fluxes from each exit point. This provided an estimated range of possible flows, based on differing scenarios of how the fluid was flowing through the well. The flow into the base of the system was prescribed as bottom-hole pressure.

Many of the lab teams considered a number of different time periods for the flow as different resistance was present at the wellhead. All teams considered the flow conditions that existed after cutting of the riser but prior to emplacement of the Top Hat, which is considered the base case. Three flow scenarios were modeled (Figure 7; also Appendix F):

1. flow in the annulus surrounding the 9-7/8" x 7" production casing, exiting the well predominately through the BOP;

2. flow inside the production casing, exiting the well through the BOP and drill pipe;

3. flow initiating in the annulus surrounding the production casing that breaches into the production casing higher up the well, exiting the well through the BOP and drill pipe.

The modelers consistently found that flow paths 1 and 3 produced the lowest (and similar) flow rates, while flow path 2 produced the highest rates. Models for the base case considering flow paths 1 and 3 ranged from 30,000 to 64,000 BPD, while for flow path 2 base case rates had a larger spread among the various teams: 44,000 to 118,000 BPD.

The most significant factor impacting the model results was the bottom-hole pressure (i.e., flow into the bottom of the well), although choice of flow paths 1 and 3 versus flow path 2 had a very big effect as well. The model results from the various teams for the base case clustered into two probability distributions such that the choice was bimodal: with a best estimate for flow rate either around 84,000 BPD for flow path 2 or around 50,000 BPD for flow paths 1 and 3. Without additional information on the flow path, it would have been difficult to choose between these two rates.

The overall reservoir/well modeling effort had the following strengths and limitations.

## Strengths

- Required no new field experiments or data collection;

- Owing to widespread expertise in these disciplines and accepted analysis techniques, could involve numerous academic, government, and commercial experts for internal consistency checks and model validation;

- Can ask "what if" questions about well interventions going forward in time to predict impact on flow;

- Can model entire history of reservoir/well/resistance to predict time variation of flow.

## Limitations

- Strongly dependent on access to industry proprietary data, especially reservoir/fluid properties and details on wellbore construction;

- Many unknowns (dominant well flow path, wellhead restrictions, extent of formation damage) with no way to constrain them;

- Hard to choose among equally plausible model outcomes.



**Figure 7.** Schematic diagram of possible well flows modeled by the Nodal Analysis team. Scenario 1 (left): Flow initiates in the annular space between liner and casing, flowing through a breach at the top (in the seal assembly) into Blowout Preventer (BOP) and then riser; depending on flow restrictions in BOP, some flow may re-enter the casing to flow down to enter the drill pipe. Scenario 2 (middle): Flow initiates in a breach of the 7″ casing, flowing up the casing. Some flow enters drill pipe, some continues up the casing to BOP. Scenario 3 (right): Flow initiates in the annular space between liner and casing, entering a breach in 9-7/8″ casing and continuing to flow upward inside the casing. Some flow enters drill pipe, some continues up the casing to BOP. From Guthrie et al. 2010 (Appendix F).

## Convergence of Gas-Oil Ratio (GOR) from Surface Collection to Deep-Sea Value: 48,000 to 66,000 BPD

After the riser was severed from the top of the LMRP, BP was able to collect hydrocarbons through Top Hat #4 and a riser system to the *Discoverer Enterprise* recovery vessel at the ocean surface where gas and oil were separated and their volumes measured. Surface collection was later increased via the BOP choke and kill lines to the *Q4000* and *Helix Producer 1* (*HP1*), respectively. Comparing the gas-oil ratio (GOR) of the hydrocarbons collected on surface ships to the GOR value from a seafloor sample provided an additional technique to estimate oil flow rate.

Statistical analysis of the GOR values as recorded on the sea surface during the recovery period strongly supports the hypothesis that most of the scatter in the GOR observations is a result of the hydrocarbon recovery process, rather than a reflection of inherent variability in the GOR of the fluids escaping from the well. As a particularly clear example, on June 24, 2010, the GOR for fluids recovered from the BOP choke line to the *Q4000* recovery vessel underwent an abrupt increase. *Q4000* daily GOR values from the time periods before and after this date (1814 ±71 and 2380 ±59, respectively) indicate statistically different means and distributions with a greater than 99% level of confidence. In contrast, hydrocarbons captured simultaneously by the Top Hat #4 to the *Discoverer Enterprise* recovery vessel, from the same well through the same riser, do not exhibit a statistically significant change in daily GOR values. Therefore, we assume that the apparent temporal variability in daily GORs collected by these surface vessels is attributable to the collection, separation, and metering processes, not actual variability in end member GOR.

Although the recorded daily GOR data from the *Discoverer Enterprise* and *Q4000* are variable, both indicate a decreasing GOR (i.e., the overall yield at the surface became more oily) as a greater percentage of the total hydrocarbon flow was produced to the surface. There is no trend in daily GOR data for the *HP1* surface vessel because BP assumed a static GOR of 2380 based on *Q4000* data, apparently the average from the time period exclusively after June 24, 2010 (post-GOR shift). *Q4000* trends for the two time periods (pre and post-GOR shift) indicate slope trends similar to the *Discoverer Enterprise* data but with differing offsets. The explanation for

this trending behavior is that the collection devices were linked to the well in an open configuration with the BOP choke line and LMRP Top Hat #4 riser acting as gas/oil separators, causing the lighter gas component to be preferentially favored at lower production rates. The recorded daily GOR trends suggest that if the entire flow were captured, the GOR recorded by the surface vessels would match the true GOR of the well.

The availability of the in situ hydrocarbon sample obtained by the WHOI team on June 21, 2010, not only provided a direct measurement of the well fluid's oil volume fraction at seafloor conditions but when combined with surface collection data also allowed for an independent estimate of flow rate. Figure 8 shows the *Discoverer Enterprise* daily GOR (recovered from Top Hat #4) plotted as a function of oil produced, as reported by BP from June 5 through July 11, 2010. The horizontal line at a GOR of 1600 is the surface GOR equivalent of the IGT-8 sample taken by WHOI on June 21, which was also obtained from within the Top Hat #4 at the LMRP. This in situ sample was collected at the point of exit at the wellhead and thus indeed represents the true GOR of the well. If we assume that the daily GOR data acquired at the surface would trend linearly to the actual GOR (IGT-8 end member), then the intercept should indicate the total oil flow rate. The intercept of this best-fitting linear trend with the actual GOR indicates that had BP been able to



**Figure 8.** The daily gas-oil ratio (GOR) at the ocean surface as reported by BP, plotted as a function of oil produced. The general trend indicates that the GOR drops as a greater percentage of the total flow is produced to the surface but with considerable scatter. If entire flow were captured, the GOR would match the true GOR of the well. The horizontal line at a GOR of 1600 is equivalent to the surface GOR of the IGT-8 sample taken by Woods Hole Oceanographic Institute on June 21, which was obtained at the point of exit at the wellhead, and is taken to represent the true GOR of the Macondo reservoir fluids escaping from the well. Assuming that GOR samples acquired at the surface would trend linearly to the actual GOR (IGT-8 end member), then the intercept should indicate the total oil flow rate on June 21. The best-fitting linear trend to the GOR data as a function of surface oil yield indicates that had BP been able to capture the total flow at a GOR of 1600, the oil captured would have been 57,000 BPD on June 21. The one-standard-deviation uncertainty on the best-fitting line to the GOR data allow the flow rate at the GOR of 1600 to lie between 48,000 and 66,000 BPD.

capture the total hydrocarbon flow from the well, the oil capture rate would have averaged 57,000 BPD for the period from June 5 through July 11, 2010. The one-standard-deviation uncertainty (calculated as the root mean square deviation from the best-fitting line to the GOR data) allows the average flow rate to lie between 48,000 and 66,000 BPD.

The GOR/collection method for estimating flow rate has the following strengths and limitations.

## Strengths

• Does not require imaging of plume;

• Makes very few assumptions (i.e., linear approach to true GOR);

• Relatively independent estimate of flow rate that can be used to check other methods.

## Limitations

• Unlikely to produce an early estimate of flow rate due to complex sample collection effort;

• Difficult to resolve temporal variations in flow rate;

• Requires access to deep-sea in situ hydrocarbon sample.

# Discussion

Figure 6 compares the best estimates of the various methods used by the FRTG against the post-shut-in estimate released on August 2, 2010. Note that most of the methods used by the FRTG did a credible job of predicting the flow rate from the well, although some clearly with less uncertainty than others. Any of the methods were adequate to determine that the true flow was many times greater than the 1000 BPD or 5000 BPD early estimates, concern over which had led to the formation of the FRTG and the initiation of other flow studies.

The acoustic method acquired the most comprehensive data set (plume size, velocity profiles, and oil fraction) under the most challenging flow geometry (riser flow plus kink flow) and resulted in an excellent match to the August estimate. The video (PIV) approach was easier to execute and reported more timely results. It provided reasonable agreement with the August estimate, especially when the flow geometry was simple (post riser cut). The PIV method, however, tended to produce flow rate estimates that were 20–50% lower than flow rates obtained by other methods observing the flow during the same time period.

The FRTG would have concluded on the basis of the reservoir and well modeling results alone that the best estimate for flow rate of the Macondo well was in the range of 50,000 BPD rather than 5000 BPD, albeit with larger uncertainty than the deep-sea methods. For situations in which direct access to the flowing well might be precluded for data gathering for whatever reason, such modeling would indeed be a useful exercise. Furthermore, reservoir and well modeling provides the capability to run "what if" scenarios into the future to answer questions such as:

• How quickly will the flow rate ramp down as the reservoir depletes itself?

• What happens to the flow rate if the riser is removed?

• If production is begun in a relief well, how much will that reduce the flow in the well?

• How would leakage below the seafloor (i.e., loss of well integrity) be manifest in wellhead pressure?

Therefore, reservoir and well modeling is an excellent adjunct to field programs and well remediation even if it is not needed as the only source of flow rate information.

The great utility of pressure readings from the capping stack during well shut in for refining models of reservoir behavior (Hsieh 2010; Appendix A) suggests that the task of the reservoir and well modeling groups would have benefitted from the availability of reliable pressure measurements during the period of oil discharge. During the majority of the oil spill, the only pressure reading came from one highly erratic pressure gage at the base of the BOP, designed to be accurate only to ±400 psi. In contrast, the capping stack installed on July 12 had two redundant pressure gages providing much more accurate information.

It is perhaps not surprising that the flow rate derived from mass balance, which used as its input oil on the ocean surface, was significantly lower than the rate determined by the other methods. Soon after the mass-balance flow rate was released, oceanographers discovered plumes of oil underwater that never reached the surface. Certain crude components (e.g., benzene, toluene, ethylbenzene, and xylenes and other less hydrophobic aromatics) will dissolve into the water column and not contribute to surface expression. The physics and chemistry of oil dispersion and dissolution, particularly when the release is a mile beneath the ocean surface, are poorly known. Furthermore, in a highly dynamic canyon setting, oil can be entrained in sediments and over time can concentrate in tar balls and thus become virtually invisible to airborne and satellite remote sensing. Improving the understanding of behavior of oil underwater should clearly be a high priority for future oil spills. The mass balance method was far better suited for helping response coordinators assess the location and amount of oil likely to impact shorelines and wildlife than for estimating flow rate.

## Acknowledgements

The results and insights presented in this report were derived from the dedicated efforts of a large and diverse team of scientists and engineers from Federal agencies, universities around the country, and independent organizations. This team included representatives from the U.S. Geological Survey, National Oceanic and Atmospheric Administration, Department of Energy (DOE), Bureau of Ocean Energy Management, Regulation, and Enforcement, and the National Institute of Standards and Technology. Seven DOE National Labs were involved, including Los Alamos National Laboratory, Lawrence Berkeley National Laboratory, Lawrence Livermore National Laboratory, National Energy Technology Laboratory, Pacific Northwest National Laboratory, Oak Ridge National Laboratory, and Sandia National Laboratories. Members also included staff of the Woods Hole Oceanographic Institution (WHOI) and academic researchers from Clarkson University, John Hopkins University, Massachusetts Institute of Technology, Purdue University, University of California (UC) Berkeley, UC San Diego, UC Santa Barbara, University of Georgia, University of Texas, and University of Washington. The National Aeronautics and Space Administration and its Jet Propulsion Laboratory provided invaluable assistance with AVIRIS instrumentation and data collection. Our scientific activities were greatly aided by a talented pool of administrative, science support, and communication professionals from numerous agencies and organizations. David Rainey, Cynthia Yielding and others at BP Inc. provided invaluable assistance in acquiring data that were critical to the analyses and estimates described in this report. Getting the WHOI team in the field required great cooperation from BP, the contractors, the U.S. Coast Guard, and the researchers. It was through the good will and extra efforts of all involved that the necessary cross-referencing of safety standards was made and the equipment safely deployed. Charlotte Barbier, Barbara Bekins, Catherine Enomoto, David Hetrick, and Steve Hickman provided insightful reviews of earlier drafts of this report, improving its accuracy and exposition. Paul Cascio and Lara Schmit provided assistance formatting this document.

# Literature Cited

Camilli, R. 2010. Final Oil Spill Flow Rate Report and Characterization Analysis, Deepwater
    Horizon Well, Mississippi Canyon Block 252. Woods Hole Oceanographic Institution report to
    the U.S. Coast Guard. August 10, 2010.

Guthrie, G., R. Pawar, C. Oldenburg, T. Weisgraber, G. Bromhal, and P. Gauglitz. 2010. Nodal
    Analysis Estimates of Fluid Flow from the BP Macondo MC252 Well. Nodal Team report to the
    Flow Rate Technical Group.

Hsieh, Paul A. 2010. Computer Simulation of Reservoir Depletion and Oil Flow from the
    Macondo Well Following the Deepwater Horizon Blowout. USGS Open-File Report 2010-
    1266.

Jernelöv, Arne and Olof Lindén 1981. Ixtoc I: A Case Study of the World's Largest Oil Spill.
    Ammbio, Vol. 10, No. 6, The Caribbean, pp. 299-306. Royal Swedish Academy of Sciences

Labson, V.F., R.N. Clark, G.A. Swayze, T.M. Hoefen, R. Kokaly, K.E. Livo, M.H. Powers, G.S.
    Plumlee, and G.P. Meeker. Estimated Minimum Discharge Rates of the Deepwater Horizon
    Spill – Interim Report to the Flow Rate Technical Group from the Mass Balance Team. USGS
    Open-File Report 2010-1132.

Plume Calculation Team. 2010. Deepwater Horizon Release, Estimate of Rate by PIV. Plume
    Team report to the Flow Rate Technical Group. July 21, 2010.

Ratzel, A.C. 2011. DOE-NNSA Flow Analysis Studies Associated with the Oil Release Following
    the Deepwater Horizon Accident. Sandia National Laboratories Report (Under Final Review)
    (March 2011).

Reservoir Modeling Team. 2010. Flow Rate Technical Group Reservoir Modeling Team Summary
    Report. August 11, 2010.

# Appendices

## Appendix A – Hsieh 2010; Reservoir Depletion Report

Hsieh, Paul A. 2010. Computer Simulation of Reservoir Depletion and Oil Flow from the Macondo
    Well Following the Deepwater Horizon Blowout. USGS Open-File Report 2010-1266.

## Appendix B – Labson et al. 2010; Mass Balance Team Report

Labson, V.F., R.N. Clark, G.A. Swayze, T.M. Hoefen, R. Kokaly, K.E. Livo, M.H. Powers, G.S.
    Plumlee, and G.P. Meeker. Estimated Minimum Discharge Rates of the Deepwater Horizon Spill –
    Interim Report to the Flow Rate Technical Group from the Mass Balance Team. USGS Open-File
    Report 2010-1132.

## Appendix C – Camilli 2010; Woods Hole Oceanographic Institution Acoustics Analysis Report

Camilli, R. 2010. Final Oil Spill Flow Rate Report and Characterization Analysis, Deepwater Hori-
    zon Well, Mississippi Canyon Block 252. Woods Hole Oceanographic Institution report to the
    U.S. Coast Guard. August 10, 2010.

## Appendix D – Plume Calculation Team 2010; Particle Image Velocimetry Report

Plume Calculation Team. 2010. Deepwater Horizon Release, Estimate of Rate by PIV. Plume Team
    report to the Flow Rate Technical Group. July 21, 2010.

Note: Due to the length of the full Plume Calculation Team report, this appendix includes only the
    summary section. The full report can be downloaded at: http://www.usgs.gov/oilspill/ and http://
    www.doi.gov/deepwaterhorizon/index.cfm

## Appendix E - Reservoir Modeling Team 2010; Reservoir Modeling Report

Reservoir Modeling Team. 2010. Flow Rate Technical Group Reservoir Modeling Team Summary
    Report. August 11, 2010.

Note: This report was not previously released as a separate document.

## Appendix F – Guthrie et al. 2010; Nodal Analysis Team Report

Guthrie, G., R. Pawar, C. Oldenburg, T. Weisgraber, G. Bromhal, and P. Gauglitz. 2010. Nodal
    Analysis Estimates of Fluid Flow from the BP Macondo MC252 Well. Nodal Team report to the
    Flow Rate Technical Group.

Note: This report was not previously released as a separate document.

22    Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill

This page intentionally left blank

# ATTACHMENT C

SPECIAL FEATURE: PERSPECTIVE

# Review of flow rate estimates of the *Deepwater Horizon* oil spill

Marcia K. McNutt[a,1], Rich Camilli[b], Timothy J. Crone[c], George D. Guthrie[d], Paul A. Hsieh[e], Thomas B. Ryerson[f], Omer Savas[g], and Frank Shaffer[d]

[a]Office of the Director, US Geological Survey, Reston, VA 20192; [b]Department of Applied Ocean Physics and Engineering, Woods Hole Oceanographic Institution, Woods Hole, MA 02543; [c]Lamont–Doherty Earth Observatory, Columbia University, Palisades, NY 10964; [d]National Energy Technology Laboratory, Department of Energy, Pittsburgh, PA 15236-0940; [e]US Geological Survey, Menlo Park, CA 94025; [f]Chemical Sciences Division, National Oceanic and Atmospheric Administration Earth System Research Laboratory, Boulder, CO 80305; and [g]Department of Mechanical Engineering, University of California, Berkeley, CA 94720-1740

Edited by Jane Lubchenco, Oregon State University, Corvallis, OR, and approved October 28, 2011 (received for review July 27, 2011)

The unprecedented nature of the *Deepwater Horizon* oil spill required the application of research methods to estimate the rate at which oil was escaping from the well in the deep sea, its disposition after it entered the ocean, and total reservoir depletion. Here, we review what advances were made in scientific understanding of quantification of flow rates during deep sea oil well blowouts. We assess the degree to which a consensus was reached on the flow rate of the well by comparing in situ observations of the leaking well with a time-dependent flow rate model derived from pressure readings taken after the Macondo well was shut in for the well integrity test. Model simulations also proved valuable for predicting the effect of partial deployment of the blowout preventer rams on flow rate. Taken together, the scientific analyses support flow rates in the range of ~50,000–70,000 barrels/d, perhaps modestly decreasing over the duration of the oil spill, for a total release of ~5.0 million barrels of oil, not accounting for BP's collection effort. By quantifying the amount of oil at different locations (wellhead, ocean surface, and atmosphere), we conclude that just over 2 million barrels of oil (after accounting for containment) and all of the released methane remained in the deep sea. By better understanding the fate of the hydrocarbons, the total discharge can be partitioned into separate components that pose threats to deep vs. coastal ecosystems, allowing responders in future events to scale their actions accordingly.

oil budget | particle image velocimetry | manual feature tracking

The *Deepwater Horizon* oil platform suffered a catastrophic explosion and fire off the coast of Louisiana (Fig. 1) on April 20, 2010, and sank 2 d later. Its blowout preventer (BOP) failed to seal the well, setting off the worst marine oil spill in US history. There were a number of reasons for needing to know the flow rate for the well. First, the optimal design, procedures for execution, or prospects for success of well interventions, such as the coffer dam or top kill, were dependent on flow rate. Second, the amount of dispersant that should be applied by the remotely operated vehicles (ROVs) to minimize an oil slick and release of volatile organic compounds on the surface, where they posed a health hazard to hundreds of workers involved in well intervention, was proportional to the flow rate. Third, the planning for containment of oil at the sea surface while the relief wells were being drilled required a realistic assessment of how much oil needed to be accommodated. Fourth, the rate of depletion of the reservoir, which therefore, determined the final shut-in pressure when the capping stack was closed, depended on the total amount of oil withdrawn. Much discussion by the government science team in Houston immediately after the well was shut in on July 15, 2010, centered on whether the low shut-in pressure was the result of high depletion of the reservoir (exacerbated by

a high flow rate) or the effect of a well that was leaking below the sea floor. Ultimately, the partitioning of the plume in the water column and the impact of the oil on the environment depend on the rate at which the oil is released.

Initially, on April 24, 2010, the US Coast Guard's Federal On-Scene Coordinator, in consultation with BP, estimated that the flow from the well was ~1,000 barrels/d (BPD) (1). On April 28, 2010, the National Oceanic and Atmospheric Administration (NOAA) released the first official flow rate of 5,000 BPD (1). At the time, this number was highly uncertain and based on satellite views of the area of oil on the surface of the ocean. After the public release of videos showing the plume of hydrocarbons escaping from the damaged riser (Fig. 2) in the deep sea on May 12, 2010, many scientists suggested that the flow rate was much higher than 5,000 BPD, although these early estimates from video did not account for the gas to oil ratio as needed to convert total hydrocarbon (gas + oil) flux to oil flow rate. On May 14, 2010, the National Incident Command (NIC) asked its Interagency Solutions Group (IASG) to provide scientifically based information on the discharge rate of oil from the well. In response, the NIC IASG chartered the Flow Rate Technical Group (FRTG) on May 19, 2010. Experts from many scientific disciplines were brought together to perform the FRTG's two primary functions:

(i) as soon as possible, generate a preliminary estimate of the flow rate, and (ii) within approximately 2 mo, use multiple, peer-reviewed methodologies to generate a final estimate of flow rate and volume of oil released.

The results of the FRTG's work are summarized and evaluated for their applicability to accurate and timely estimation of flow rate during an ongoing oil spill incident in the work by McNutt et al. (2). Here, we review the results of flow rate analyses, including work not conducted under the auspices of the FRTG, and place the results in terms of the advancement in scientific knowledge in contrast to contributions to ongoing spill response. We consider not just the best estimates of flow emanating from the wellhead but also how quantifying flow at different locations other than the sea-floor can aid in understanding the fate of oil in the environment.

Author contributions: R.C., T.J.C., P.A.H., T.B.R., O.S., and F.S. designed research; M.K.M., R.C., T.J.C., G.D.G., P.A.H., T.B.R., O.S., and F.S. performed research; P.A.H. contributed new reagents/analytic tools; M.K.M., R.C., T.J.C., G.D.G., P.A.H., T.B.R., O.S., and F.S. analyzed data; and M.K.M., P.A.H., and F.S. wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission.

[1]To whom correspondence should be addressed. E-mail: mcnutt@usgs.gov.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1112139108/-/DCSupplemental.



**Fig. 1.** Location of the Macondo well/*Deepwater Horizon* spill in the Gulf of Mexico ~50 miles (80 km) southeast of the Mississippi Delta. (Modified from the US Geological Survey).

## Flow Rate Estimates from Surface Collection

The flow rate of the Macondo well is a simple concept but surprisingly difficult to measure. The flow from the well consisted of oil plus natural gas, with some of the gas reacting rapidly with seawater to form methane hydrate. Response workers and the public were primarily interested in the oil fraction, and the charge to the FRTG was to measure the oil discharge but to do so required understanding of how much of the total flow was oil and how much was natural gas. Obvious methods that might be perfectly sensible for measuring single-phase flow, such as a spinning paddle wheel, would fail because of icing by methane hydrates.



**Fig. 2.** Schematic diagram of damaged riser at the Macondo well spill site. Most hydrocarbon release occurred in the areas highlighted by black rectangles, emanating from the kink in the riser immediately above the blowout preventer (BOP) stack and the open end of the riser/drill pipe before June 3 and through the lower marine riser package (LMRP) after the damaged riser was cut away.

BP was working up until the well was finally capped to muster enough capacity to contain all of the flow on surface ships, which would have provided an excellent final measure of flow rate (at least at that one point in time). By mid-June, BP was collecting 25,000 BPD of oil through two containment systems: a riser to the vessel *Discoverer Enterprise* and the choke line to the *Q4000* semisubmersible (3). Video showed that a substantial amount of oil was still discharging into the ocean, and therefore, this rate provided only a lower bound on the flow rate for the well. Tropical storms delayed BP's plans to deploy additional containment systems before closure of the well through the capping stack on July 15, 2010.

Even with only partial surface containment, Camilli (described in ref. 2) devised a method using gas to oil ratios of hydrocarbons recovered to the surface for estimating the total flow of the well (Fig. 3). The apparent gas to oil ratio of the flow collected at the surface (3) indicates a relatively larger gas component than the flow from the subsurface well, because the riser from the wellhead to the ship seemed to act as a separator, preferentially siphoning the lighter components to the surface in the case of incomplete capture. As the collection approaches 100% of total flow in this extrapolation, the gas to oil ratio

must trend to the true value at the seafloor, which was obtained with a pressurized sampling bottle deployed from an ROV by Woods Hole Oceanographic Institution (WHOI). This method of estimating flow rate is not highly precise on account of both the scatter in BP's collection data and the need to extrapolate the line some distance outside the region of the data, but it yields a flow rate of 48,000–66,000 BPD (2) corresponding to the time of sample collection on June 21, 2010.

**Flow Rate Estimates from in Situ Observations**

At the time of the *Deepwater Horizon* blowout, there were no proven methods for directly measuring the deep sea discharge of hydrocarbons at the relevant pressures and temperatures. Oceanographers had experience in quantifying flow rates from deep sea hydrothermal vents at midocean ridges (4, 5), but methods developed from those environments had not previously been applied to mixtures of oil, gas, and water. Thus, a variety of approaches were pursued. Table 1 summarizes the flow rates that were obtained from acoustic and video observations in the deep sea, and Fig. 4 plots those flow rates as a function of the event day (ED) (Table 1, ED) of the measure-

ment. Rates are given for two key flow periods: before severing the sunken riser (Fig. 2), which had been left in place to aid in the Top Kill procedure, and after severing the riser (Fig. 5). The flow geometry before severing the riser was more complex, because in addition to a large plume emanating from the end of the riser, several jets of oil and gas were escaping from tears in the kink in the collapsed pipe at the top of the lower marine riser package (LMRP). After the riser was severed, all discharge flowed through the top of the LMRP.

The majority of the flow rates from independent teams listed in Table 1 and shown in Fig. 4 relied on underwater video of hydrocarbon plumes taken by ROVs as the primary data for assessing the flow of the Macondo well. The video data examined were either opportunistic from work-class ROVs working in and around the incident site or specifically commissioned by the FRTG to be collected by an ROV for flow rate analysis. In all of these cases, an oil volume fraction [i.e., oil/(gas + oil)] of ~0.4 was assumed based on early time series analysis of video showing alternating oil vs. gassy discharge when humps and cooling in the riser (Fig. 2) caused the flow to separate (6).

Several expert teams used a flow visualization and measurement technique

Method for calculating DWH Macondo well oil flow rate using LMRP oil production rate vs GOR



**Fig. 3.** Daily averages of GOR as a function of oil produced. The general trend indicates that the GOR drops as a greater percentage of the total flow is produced to the surface but with considerable scatter. If the entire flow was captured, the GOR would match the true GOR of the well. The horizontal line at a GOR of 1,600 is equivalent to the surface GOR of the IGT-8 sample taken by WHOI on June 21, which was obtained at the point of exit at the wellhead and is taken to represent the true GOR of the Macondo reservoir fluids escaping from the well. Assuming that GOR samples acquired at the surface would trend linearly to the actual GOR (IGT-8 sample collected by WHOI at well head), then the intercept should indicate the total oil flow rate on June 21. The best-fitting linear trend to the GOR data as a function of surface oil yields indicates that, if BP had been able to capture the total flow at a GOR of 1,600, then the oil captured would have been 57,000 BPD on June 21. The 1 SD uncertainty on the best-fitting line to the GOR data allows the flow rate at the GOR of 1,600 to be between 48,000 and 66,000 BPD. (Modified from ref. 2.)



**Cumulative Release:  ~4.9 million barrels**
**Cumulative Oil Collected:  ~0.8 million barrels (results from BP)**

**Fig. 4.** Summary of flow rate estimates from Table 1. The continuous curve represents the August model for the evolution in flow rate throughout the oil spill incident obtained by extrapolating the 53,000 BPD estimate from DOE at the time that the capping stack was closed (12) back to the beginning of the incident using the reservoir depletion model of Hsieh (13). In this extrapolation, a flow rate increase of 4% was estimated to have occurred when the riser was severed, and a decrease of 4% was estimated when the capping stack was installed. The stippled band represents a ±10% uncertainty in the August flow rate model. Compared with this August model are flow rate estimates from in situ ocean data plotted as a function of the day that the data for that flow rate were collected. Flow rates were typically reported at later dates. The postriser cut estimates all used data obtained on event day 45, but they are slightly offset from each other in time for ease of viewing. The upper bounds of the postrise cut UCSB estimate is shown as an arrow where it goes off the chart. The PIV estimates from the various sources are pooled together, with the thick part of the bar showing the range of the means and the thin part showing the range of the SD.

called particle image velocimetry (PIV) to estimate the velocity of the outer surface of oil leak jets. PIV was originally developed as a laboratory technique to measure a 2D velocity field in a transparent gas or fluid illuminated with a thin sheet of laser light (7). To see the motion of the transparent gas/fluid, seed particles small enough to follow the fluid flow (i.e., with a low Stokes number) are added to the fluid: typically 1–10 μm for gases and 1–100 μm for liquids. A digital camera with line of view normal to the laser sheet records two or more consecutive images of the seed particles. The displacement of particles between consecutive frames gives a 2D velocity vector field. PIV software has been developed to analyze automatically sequences of video frames using cross-correlation analyses of small interrogation windows. In the Macondo application, PIV analysis software attempted to measure the velocity of visible features (vortices, eddies, white particles presumed to be methane hydrates, etc.) on the surface of the opaque oil leak jets. With assumptions for the radial velocity profile (typically Gaussian), oil leak rates could be calculated from measured jet surface velocities.

The National Energy Technology Laboratory (NETL), University of California at Berkeley and University of California at Santa Barbara (UCSB) experts adopted various forms of manual feature-tracking velocimetry (FTV). Manual FTV was performed by visually detecting the displacement of easily recognizable features, such as vortices and eddies, between consecutive video frames. Presumed methane hydrates, bright white particles against a dark jet background, were also easily recognized and tracked. Although there were some minor variations in the manual FTV technique applications (details in appendices in ref. 6), all experts measured similar jet velocities. After jet velocities were measured with manual FTV, volumetric flow rate was determined by multiplying the measured jet velocity times the cross-sectional area of the jet, with appropriate corrections for the gas to oil ratio (GOR). Because measurements were made close to the jet exit (within five jet exit diameters), the radial profile of average jet velocity could be assumed to be uniform and constant (top hat profile).

The work by Crone and Tolstoy (8) used optical plume velocimetry (OPV), a method that was developed and calibrated using laboratory simulations of turbulent

buoyant jets (5). In this method, the image velocity field is established by cross-correlating time series values of image intensity from pixel pairs separated by some distance in the direction of flow. The flow rate was then calculated from the image velocity field using an empirically derived shear-layer correction factor.

The PIV analyses performed by experts A, B, C, and E (Table 1) agreed with each other but produced flow rate estimates that were about one-half the magnitude estimated by the other methods, even using the same primary video observations (6). Other research teams also tried to use PIV but determined that it was not producing reliable fluid velocities in this application. For example, Crone and Tolstoy (8) cite experiments completed before the Macondo crisis (5), showing that PIV would underestimate flow rates by about a factor of two when applied to turbulent buoyant jets. Savas (6) carried out a systematic image velocimetry study of using sections of video where the drifting motion of the ROV camera caused an apparent displacement/velocity of the riser flange. The results showed that PIV software was able to correctly measure the motion of the riser flange only when large interrogation windows were used. For a wide range of interrogation window sizes, PIV software erroneously yielded random values of velocity. The work by Shaffer et al. (9) points out that PIV is a laboratory technique applied under carefully controlled conditions to map the motion of particles a few pixels in diameter in a transparent fluid. At Macondo, PIV software was applied to measure the velocity of transient opaque features from 1 to 500 pixels.

The relatively poor performance of PIV in this particular application thus had several potential causes. Automatic PIV analysis software may be confused by rotating flow structures, can lock on to separated or smaller flow features that are moving more slowly and/or not sampling deeper parts of the flow, and can alias turbulent flow, because correlation window sizes are typically fixed, whereas flow structure sizes are not (5, 6). All of these issues can bias velocity estimates lower and artificially reduce flow rate estimates. More details on how the case was made to discount the PIV estimates in this application are provided in *SI Text*. The manual FTV method overcame the problems of PIV by using the human brain as an expert system to painstakingly choose large and fast structures to track. OPV inherently avoids many of the problems associated with spatial cross-correlation techniques. Thus, as work on this problem progressed during the crisis, it became clear to many that, although PIV software can correctly analyze videos

PNAS

**Table 1.  Flow rate estimates from in situ observations**

| 2010 Date event day | Method | Flow rate (1,000 BPD) | Source |
|---|---|---|---|
| Preriser cut estimates | | | |
| May 13–16 ED 24–27 | Large eddy tracking | 30 ± 12 | Berkeley (BKY) (6) |
| May 13–16 ED 24–27 | Particle image velocimetry | 23 ± 9 | Expert E (6) |
| May 13–16 ED 24–27 | Particle image velocimetry | 25 ± 8 | Experts A, B, C (6) |
| May 13–16 ED 24–27 | Feature tracking velocimetry | 55 ± 14 | National Energy Technology Laboratory (NETL) (6) |
| May 14 ED 25 | Optical plume velocimetry | 56 ± 12 | Lamont–Doherty Earth Observatory (LDEO) (8) |
| May 31 ED 42 | Acoustic Doppler velocity + sonar | 57 ± 10 | Woods Hole Oceanographic Institution (WHOI) (11) |
| Postriser cut estimates | | | |
| June 3 ED 45 | Large eddy tracking | 46 ± 4* | Berkeley (BKY) (6) |
| June 3 ED 45 | Particle image velocimetry | 35 ± 5* | Expert E (6) |
| June 3 ED 45 | Particle image velocimetry | 32 ± 8* | Experts A, B, and C (6) |
| June 3 ED 45 | Digital image velocimetry | 62 ± 58* | University of California at Santa Barbara (UCSB) (6) |
| June 3 ED 45 | Feature tracking velocimetry | 61 ± 15* | National Energy Technology Laboratory (NETL) (6) |
| June 3 ED 45 | Optical plume velocimetry | 68 ± 14 | Lamont–Doherty Earth Observatory (LDEO) (8) |

All rates expressed in stock tank barrels (stb = 0.159 m³) at the ocean surface for consistency.
*Rates from p. 15 in ref. 6. In some cases, mean and SD values were not identical to values in the appendices of ref. 6, which were finalized after official flow rates were publicly reported.

taken under certain conditions, it was not well-suited for analysis of ROV videos of uncontrolled opaque turbulent oil jets.

Table 1 and Fig. 4 also include the flow rate of a WHOI team (10) derived from acoustic Doppler current profiler measurements (ADCP). They collected time series measurements over periods of minutes using an imaging sonar to determine the cross-sectional area of the plume at

the end of the riser and the jets at the kink (Fig. 2) and the ADCP to measure the tens of thousands of individual velocities within the flow field. The flow velocity and area estimates were then multiplied to produce an ensemble estimate of the total volumetric flow rate (oil plus gas) of 0.25 m³/s. This approach had the benefit of mapping the interior of the entire hydrocarbon plume acoustically despite the fact that it is opaque to video images. On June 21, 2010, the WHOI team returned to the field with a high-pressure sample bottle and gathered 100 mL uncontaminated discharge of hydrocarbons inside Top Hat #4 as they exited the well. Chemical analysis of this sample revealed that the fluids were by mass less than 1% carbon dioxide and nitrogen, 15% methane, 7% ethane through pentanes, and 77% hexanes and higher petroleum hydrocarbons (11). This detailed understanding of the fluid composition enabled calculation of the volumetric oil and gas fractions under varying temperature, pressure, and phase conditions encountered during their initial transport through the water column (11). This sample became the basis for the oil ratio = oil/(gas + oil) = 0.41 used by the various experts, consistent with previous indications that a value of ~0.4 was appropriate (6). Given the very dissimilar nature of the acoustic vs. video observations, the different methods of analysis, and the independent sources of error, the fact that the flow rates from the WHOI acoustic measurements (Fig. 4) agree with those rates derived from video is exceptionally strong evidence that, in late May/early June, the flow rate of the Macondo well was ~60,000 BPD.

## Flow Rate at Well Shut in

Additional estimates of the flow rate were derived when the well was shut in for the well integrity test on July 15, 2010. The mechanism for shutting in the well was to close off the flow with a three-ram capping stack that was mated with the upper flange of the LMRP on the top of the BOP. Government scientists in Houston had requested that the capping stack be equipped with redundant pressure gauges. When the choke valve in the capping stack was throttled back in a series of precisely controlled steps to close off the well, pressure readings from the capping stack taken at the time were analyzed by three separate Department of Energy (DOE) laboratories to yield very consistent results for the flow rate of the well at the time of shut in: 53,000 BPD (12). When combined with a US Geological Survey (USGS) model for reservoir depletion as a function of time (13), these postshut-in results provided flow rate estimates for the entire duration of the oil spill that can be compared against the observations



**Fig. 5.**  Hydrocarbons (oil and natural gas) escaping from the end of the riser tube after it was severed on June 3 immediately above the Macondo well BOP stack. (Modified from BP video from ROVs.)

taken during the ongoing incident. Additional details on these calculations are provided in SI Text. Based on this analysis, the Department of Interior and DOE released, on August 2, 2010, a time-varying flow rate for the well as a function of time (Fig. 4) that was estimated by the team of scientists from government and academia to be accurate to ±10% (12). Although this figure does not represent a formal statistical error estimate, it approximately accounts for errors in the pressure readings (based on the two redundant pressure gauges) and unmodeled multiphase effects (12). Including discontinuities to account for changing resistance at the well head (i.e., removal of riser or addition of capping stack), the flow rate was estimated to have decreased from 62,000 to 53,000 BPD over the 86 d of the incident for a total release of ~5 million barrels of oil. Subtracting the ~800,000 barrels of oil that never reached the environment because of BP's containment efforts (3) would yield 4.2 million barrels of oil released to the ocean and atmosphere. We call this the August model to correspond to the release month of the estimate and distinguish it from earlier FRTG flow estimates. The other observed flow rates reported here, except as noted, were calculated in a blind manner, without knowledge of the August model. The agreement between this model and the observations of in situ flow in Fig. 4 provide sound evidence that the Macondo well flowed between 70,000 and 50,000 BPD.

## Scientific Contributions from Modeling

A number of teams were involved in reservoir and well modeling exercises, some concentrating on modeling the evolution of the producing reservoir at 18,000 ft (5,500 m) below sea surface and others working on the various possible flow paths up through the well and the behavior of the fluids on ascent. Unlike the previous approaches, these teams did not require access to the field or new data acquisition. However, they did gain access to industry proprietary data to constrain model parameters (for example, fluid and reservoir properties, well casings and liners, etc.).

Five DOE national laboratories (Los Alamos, Lawrence Berkeley, Lawrence Livermore, NETL, and Pacific Northwest) independently calculated the flow from the top of the reservoir (representing the reservoir response as a bottom hole pressure) to the release point at the sea floor (14). A statistical sampling method was used with these independent estimates to develop a set of pooled estimates of flow that allowed detailed assessment of flow conditions as related to a variety of factors in the reservoir and the engineered part

of the system (wellbore, BOP, riser, etc.). As shown in Table 2, there was a large spread in the 95% confidence interval in their flow rates for two key time periods, but the best estimate was very close to the August model. The large range in possible flow rates stemmed from uncertainty whether the flow through the well was primarily inside the casing or in the annular space outside the casing (Fig. 6), with the latter flow scenario resulting in significantly lower estimates of flow. One rather significant contribution from modeling was the capacity to consider the effect of restrictions in the BOP on flow rate (15). After the BOP was recovered from the seafloor, a postincident investigation was conducted to determine what could be concluded about the functioning of the various rams in the BOP system. One finding was that the blind shear rams had, at some point, deployed, forming at least a partial restriction to flow through the BOP. Oldenburg et al. (15) modeled the behavior of flow of oil and gas in the reservoir and up through the well as a function of the resistance in the BOP as parameterized by the unknown pressure at the bottom of the BOP ($P_{BOP}$), which is the top of their model reservoir–wellbore system. They found effects of phase interference of gas and oil that were unanticipated such that oil flow rate is independent of the restriction in the BOP until $P_{BOP}$ equals about 6,600 psia (45 MPa), the pressure above which no gas exsolves (i.e., the Macondo hydrocarbons are single phase). Although a $P_{BOP}$ larger than 6,600 psia would imply that flow is restricted in the BOP, estimation of the precise degree of restriction for any assumed $P_{BOP}$ is complicated because of the strong interplay between pressure and gas exsolution in the whole system (reservoir–well–BOP) (15).

Three independent groups of researchers in the field of reservoir simulation calculated the rate at which oil and gas can be produced from the sands penetrated by BP's Macondo well (16). The reservoir geometry was prescribed by maps generated from 3D seismic data interpreted by the Bureau of Ocean Energy Management (BOEM) geophysicists. The models were constrained using Macondo reservoir rock

and fluid properties derived from open-hole logs, pressure transient tests, pressure, volume, and temperature measurements, and core samples as well as reservoir data from an analogous well drilled 20 miles (32 km) away. The researchers populated computer models and determined flow rates from the targeted sands in the well as a function of bottom-hole pressure. This modeling provided an estimate of the rate at which oil could theoretically flow into the well. Permeability assumptions significantly impacted the results. In addition, the particular flow path through the well was as important as any reservoir parameter in determining the final flow rate. Because of time constraints, the modelers concentrated on two scenarios: the maximum flow (worst case) conditions and the most likely flow scenario. The results are summarized in Table 3. Two of three groups determined most likely flow rates that were excellent matches to the August flow model. Although the reservoir modeling results were not available early enough to impact the oil spill response in any substantive manner, the well did not need to be flowing to conduct the model simulations. Therefore, theoretically, these flow rates could have been produced before the Deepwater Horizon accident. Based on the success of this approach, BOEM is using reservoir modeling to calculate worst case discharge as part of permit conditions before wells enter production, and therefore, some estimate of flow rate would be available should a subsea blowout occur.

## Apparent Flow at Ocean Surface

Two teams provided estimates of flow from the Macondo well at the ocean surface using unique approaches. A USGS/National Aeronautics and Space Administration team deployed the Airborne Visible/Infrared Imaging Spectrometer (AVIRIS) from an ER-2 research aircraft to quantify both the area and thickness of oil on the ocean surface on May 17, 2010. This instrument had previously been used in such ground-breaking applications as the detection of asbestos in the rubble of the World Trade Center Towers (17). Depending on the aggressiveness with which the team members interpreted the

**Table 2.  Flow rate estimates from DOE National Laboratory models of flow through well**

| Date (2010) | 95% confidence interval for flow rate (1,000 BPD) | Best estimate for flow rate (1,000 BPD) | August model flow rate (1,000 BPD) |
|---|---|---|---|
| April 25 to May 5 | 40–91 | 65 | 56–67 |
| June 1–3 | 35–106 | 70 | 55–65 |



**Fig. 6.** Schematic diagram of possible well flows modeled by the well modeling teams from the DOE National Laboratories. (*A*) Scenario 1: flow initiates in the annular space between liner and casing, flowing through a breach at the top (in the seal assembly) into BOP and then riser; depending on flow restrictions in BOP, some flow may reenter the 9 7/8-in casing to flow down to enter the drill pipe. (*B*) Scenario 2: flow initiates in a breach of the 7-in casing, flowing up the casing. Some flow enters the drill pipe, and some continues up the casing to BOP. (*C*) Scenario 3: flow initiates in the annular space between liner and casing, entering a breach in 9 7/8-in casing and continuing to flow up inside the casing. Some flow enters the drill pipe, and some continues up the casing to BOP. [Modified from Guthrie et al. (14).]

presence of oil in each pixel imaged on the sea surface, they estimated that the amount of oil on the sea surface on May 17 was between 129,000 and 246,000 barrels (18). They converted these numbers to a lower-bound flow rate by accounting for the amount that had been skimmed and burned according to the US Coast Guard tally (19). They also modeled the likely amount that had been evaporated by assuming that 40% of the oil consisted of volatile components lost to evaporation or dissolution based on available NOAA information. Although a lower bound, their estimate of the flow rate of 12,500–21,500 BPD underestimated the government's final August result by a factor of three, even at the upper bound. Three factors likely contributed to the underestimate. Within a few days of the team's release of their estimate of the Macondo flow rate, the first scientific reports of a plume of oil trapped in the deep sea were publicized. Clearly not all of the flow from the Macondo well was appearing at the ocean surface. A second problem could be a contribution from tar balls. Submerged tar balls are concentrations of oil that are easily missed in the inventory from the air. The third problem is that the near-infrared

spectroscopy method of AVIRIS was only able to measure oil up to 4 mm in thickness, but patches of oil at least 2 cm in thickness were observed during the field calibration of the sensor. Clark et al. (18) estimated that the surface oil could have been as much as 500,000 barrels on May 17 on account of failure to accurately measure thick oil.

A NOAA team (20) analyzed airborne atmospheric data obtained from a P3 research aircraft to quantify the amount of hydrocarbons (gas plus oil) evaporating from the *Deepwater Horizon* oil spill. They calculated that ~458,000 kg/day hydrocarbons were evaporating from the ocean surface. Certain volatile organic compounds in the Macondo reservoir fluids, including isomers between 2,2-dimethylbutane and n-nonane, were found in the atmosphere in the same proportion as in the reservoir, suggesting that they were insoluble in seawater and fully evaporated. However, methane, ethane, benzene, toluene, and n-butane were absent or substantially depleted in the atmosphere relative to the reservoir, indicating total to partial removal of soluble species in the water column. Their observations allowed a precise calculation of the percentage of evaporation (14%) and dissolution in seawater (33%) for early June compared with the 40% combined total of evaporation and dissolution assumed by Labson et al. (19) in computing a flow estimate from AVIRIS data. From the insoluble species, it was possible to derive a flow rate for how much of the Macondo oil was surfacing on the date of the flights (June 10, 2010: ~6,200–12,400 BPD). This flow rate assumes that dissolution affected the gas fraction only, which is supported by the data, and an oil/(oil + gas) volume fraction of 0.41. At this time, ~17,000 BPD oil were being collected through Top Hat #4, such that the entire flow of the well was not entering the ocean. This method of measuring the surfacing oil avoids the problem of tar balls but again, does not measure the oil that remains in the deep sea. This estimate of flow was published after the August model was released and therefore, was not an entirely blind analysis. It places only a lower bound on flow rate, because it did not quantify oil that did not surface.

The availability of apparent flow rate estimates at the ocean surface provides an opportunity to estimate the amount of the Macondo flow that did not rise to the surface. Given that the best estimate for full flow of the well from in situ observations on June 10, 2010 is 59,000 ± 9,000 BPD, subtracting from that flow the collection rate of 17,000 BPD yields a net flux of 42,000 ± 9,000 BPD entering the ocean. Using the upper bound on the surface flow from the NOAA P3 data (20)

**Table 3.   Flow rate estimates from reservoir modeling**

| Group | Most likely flow rate (1,000 BPD) | Worst case discharge (1,000 BPD) | August model flow rate (1,000 BPD) |
|---|---|---|---|
| Hughes (Louisiana State University) | 63 (channel/levee complex) | 64 (extensive sheet sands) | 62 decreasing to 53 |
| Kelkar (University of Tulsa)* | 27–32 | 37–45 | 62 decreasing to 53 |
| Gemini Solutions Group | 60 decreasing to 50 | 102 (flow-through multiple paths in well)† | 62 decreasing to 53 |

*Lower Kelkar estimates result from more conservative permeability and flow path assumptions compared with those assumptions adopted by other modeling teams.
†Larger worst case discharge for Gemini team results from considering multiple flow paths through the well, whereas other teams considered only geologic controls on maximum flow.

and the lower bound on the total Macondo well flow-rate data (2) yields an extreme lower bound on the flux of oil into the deep sea of 29,600 BPD. Taking the upper bound on the Macondo well flow rate and the lower bound on the P3 data yields the maximum flux to the deep sea: 44,800 BPD. The most likely value is about 33,000 BPD or approximately one-half of the total Macondo oil flux remaining in the deep sea. The NOAA results also confirm that the methane remained in the deep sea (20). The net result, therefore, of this deep sea release is a very substantial fraction of the total hydrocarbon budget being absorbed in the deep ocean: one-half of the oil and essentially all of the methane. These values also imply that the oil flux to the surface on May 17, before BP's containment efforts, would have been ~24,000–30,000 BPD, thus explaining the lower values derived from the AVIRIS measurements without needing to assume that much of the oil had been missed in the form of thick oil or tar balls.

## Conclusions

The following scientific understanding will better prepare scientists and the oil spill response community for future deep sea blowouts.

i) The method of automated PIV, used by several groups of experts during the spill to analyze video segments, was inappropriate for this application and resulted in oil flow rates that were biased too low by a factor of two.

ii) Except for the PIV estimates, there is remarkable agreement for the discharge rate for the well, regardless of whether the estimate was derived from ROV video, acoustic Doppler data, pressure measurements during well shut in, reservoir modeling, or trends in gas to oil ratio during surface collection. Flow rates fall between 50,000 and 70,000 BPD.

iii) These estimates do not require but do not preclude a modest reduction in flow rate over time, which might be caused by reservoir depletion.

iv) Modeling also proved to be an extremely valuable exercise in terms of providing insight to the likely effect of the deployment of the blind shear rams and suggesting that modeling be used as a tool that can assess the impact of future spills before they happen.

v) Estimates of flow rate at the ocean surface derived from multispectral imaging of oil on the ocean surface and chemical sensing of the hydrocarbons evaporating off the ocean surface coupled with the total flow rate from the well indicate that ~50% of the oil (>2 million barrels) and essentially all of the methane did not reach the ocean surface.

**ACKNOWLEDGMENTS.** We are grateful to numerous experts who read and improved various versions of this manuscript, including Don Maclay and colleagues at the Bureau of Ocean Energy Management, Steve Hickman, Mark Sogge, Curt Oldenburg, Bill Lehr, Gregg Swayze, Art Ratzel, Vic Labson, Roger Clark, and two anonymous reviewers.

1. US Coast Guard (2011) *BP Deepwater Horizon Oil Spill: Incident Specific Preparedness Review (ISPR), Final Report.* Department of Homeland Security, Washington DC. Available at http://www.uscg.mil/foia/docs/DWH/BPDWH.pdf. Accessed November 29, 2011.
2. McNutt MK, et al. (2011) *Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill. Flow Rate Technical Group Report to the National Incident Command Interagency Solutions Group.* Available at http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=237763. Accessed November 29, 2011.
3. United States Department of Energy (2010) *Combined Total Amount of Oil and Gas Recovered Daily from the Top Hat and Choke Line Oil Recovery Systems.* Available at http://energy.gov/downloads/oil-and-gas-flow-data-top-hat-and-choke-line-xls. Accessed November 29, 2011.
4. Crone TJ, Wilcox WSD, McDuff RE (2010) Flow rate perturbations in a black smoker hydrothermal vent in response to a mid-ocean ridge earthquake swarm. *Geochem Geophys Geosys,* 11, Q03012, doi:10.1029/2009GC002926.
5. Crone TJ, McDuff RE, Wilcox WSD (2008) Optical plume velocimetry: A new flow measurement technique for use in seafloor hydrothermal systems. *Exp Fluids* 45: 899–915.
6. Plume Modeling Team (2010) *Deepwater Horizon Release Estimate of Rate by PIV. Report to the Flow Rate Technical Group.* Available at http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=68011. Accessed November 29, 2011.
7. Adrian RJ (2005) Twenty years of particle image velocimetry. *Exp Fluids* 39:159–169.
8. Crone TJ, Tolstoy M (2010) Magnitude of the 2010 Gulf of Mexico oil leak. *Science* 330:634.
9. Shaffer F, Weiland N, Shahnam M, Syamlal M, Richards G (2010) *Estimate of Maximum Oil Leak Rate from the BP Deepwater Horizon by the National Energy Technology Laboratory,* in Plume Modeling Team, *Deepwater Horizon Release Estimate of Rate by PIV. Report to the Flow Rate Technical Group.* Available at http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=68011. Accessed November 29, 2011.
10. Camilli R, et al. (2011) Acoustic measurement of the Deepwater Horizon Macondo well flow rate. *Proc Natl Acad Sci USA,* 10.1073/pnas.1100385108.
11. Reddy CM, et al. (2011) Composition and fate of gas and oil released to the water column during the Deepwater Horizon oil spill. *Proc Natl Acad Sci USA,* 10.1073/pnas.1101242108.
12. Ratzel AC, et al. (2011) *DOE-NNSA Flow Analysis Studies Associated with the Oil Release Following the Deepwater Horizon Accident. Report of the DOE-NNSA Flow Analysis Team; Sandia National Laboratories, Lawrence Livermore National Laboratory and Los Alamos National Laboratory. Sandia Report SAND2011-1653, August 2011,* (Department of Energy, Albuquerque, NM).
13. Hsieh PA (2010) *Computer Simulation of Reservoir Depletion and Oil Flow from the Macondo Well Following the Deepwater Horizon Blowout. USGS Open-File Report 2010-1266.* Available at http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&pageid=237562. Accessed November 29, 2011.
14. Guthrie G, et al. (2010) *Nodal Analysis Estimates of Fluid Flow from the BP Macondo MC252 Well. Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill. Flow Rate Technical Group Report to the National Incident Command Interagency Solutions Group, Appendix F.* Available at http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&pageid=237567. Accessed November 29, 2011.
15. Oldenburg CM, et al. (2011) Numerical simulations of the Macondo well blowout reveal strong control of oil flow by reservoir permeability and exsolution of gas. *Proc Natl Acad Sci USA,* 10.1073/pnas.1105165108.
16. Reservoir Modeling Team (2010) *Flow Rate Technical Group Reservoir Modeling Team Summary Report. Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill. Flow Rate Technical Group Report to the National Incident Command Interagency Solutions Group, Appendix F.* Available at http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&pageid=237566. Accessed November 29, 2011.
17. Clark RN, et al. (2001) *Environmental Studies of the World Trade Center Area After the September 11th, 2001 Attack. USGS Open File Report 01-0429,* (US Geological Survey, Denver, CO). Available at http://pubs.usgs.gov/of/2001/ofr-01-0429/. Accessed November 29, 2011.
18. Clark RN, et al. (2010) *A Method for Quantitative Mapping of Thick Oil Spills Using Imaging Spectroscopy. USGS Open-File Report 2010-1167.* Available at http://pubs.usgs.gov/of/2010/1167/. Accessed November 29, 2011.
19. Labson VF, et al. (2010) *Estimated Minimum Discharge Rates of the Deepwater Horizon Spill—Interim Report to the Flow Rate Technical Group from the Mass Balance Team. USGS Open-File Report 2010-1132* (US Geological Survey, Denver, CO). Available at http://pubs.usgs.gov/of/2010/1132/. Accessed November 29, 2011.
20. Ryerson TB, et al. (2011) Atmospheric emissions from the Deepwater Horizon spill constrain air-water partitioning, hydrocarbon fate, and leak rate. *Geophys Res Lett* 38:L07803.

# Supporting Information

## McNutt et al. 10.1073/pnas.1112139108

### SI Text

**Discussion of Particle Image Velocimetry Applied to Opaque Oil Leak Jets of the Macondo Well.** There are many significant differences between the application of particle image velocimetry (PIV) under typical laboratory settings and the application of PIV to opaque oil leak jets 1 mi below the sea surface. These differences led to velocity values from PIV software that were unrealistically low, and this value, in turn, led to an estimate of the oil leak that was ~50% too low. The Macondo oil spill was an atypical application of PIV to measure the velocity of features on the external boundary of opaque, turbulent jets.

For example, in typical laboratory applications of PIV, the appearance of particle images detected by PIV software is uniform and constant, and particle images are a few pixels in diameter. In the remotely operated vehicle (ROV) videos of the oil leak jets, the appearance of images detected by PIV software changed between camera frames, and the size of images varied from 1 to 500 pixels. The major differences between the laboratory application of PIV and the application of PIV to the Macondo oil leak jets are listed in Table S1.

Initially, it was not known how significantly these differences would affect the results from applying PIV software. However, by early June of 2010, there were several indications that PIV software was producing unrealistically low values for jet velocities.

*i*) Three of the experts compared jet velocities from manual feature tracking velocimetry (manual FTV) with those velocities from PIV. All three members produced similar jet velocities with manual FTV (ref. 1, p. 202) that were one order of magnitude higher than those velocities produced by PIV.

*ii*) Computational fluid dynamical (CFD) simulations by the National Energy Technology Laboratory (NETL) (1) of the riser end jet indicated that actual jet velocities were one order of magnitude higher than those velocities being measured by PIV.

*iii*) Onishi (2) applied Lagrangian theory of buoyant jets to estimate the average velocity of the riser end jet. Onishi's (2) analysis indicated that jet velocities of the riser end jet were one order of magnitude higher than the velocities produced by PIV.

*iv*) In one of the videos of the riser end jet, an eel swam directly across the riser end jet. The eel paused (stopped swimming) when its body spanned the jet diameter. The eel was moved in the direction of the jet flow at a velocity one order of magnitude higher than velocities produced by PIV. The velocity of the eel agreed with the velocities measured with manual FTV, CFD, and jet theory (ref. 1, p. 45).

Table S2 shows the velocity values measured with PIV and manual FTV for the three oil leak jets studied by the Plume Team. A comparison of the PIV vs. FTV velocities indicates a bias to lower values by factors of 2–10 consistently.

**Estimation of Oil Flow Rate from Capping Stack Pressure.** After the installation of the three-ram capping stack on July 12, accurate pressure data (measured at the capping stack) were available to permit more accurate flow estimates than at any time. The pressure data were analyzed by scientists and engineers from Los Alamos National Laboratory (LANL), Lawrence Livermore National Laboratory (LLNL), Sandia National Laboratories (SNL), and the US Geological Survey (USGS). The three National Laboratory teams focused on analyzing pressure data collected during the

~24-h period before shut in (July 14 and 15, 2010). The teams separately developed their own models to simulate 1D compressible flow through the kill line and the choke line of the capping stack. The analysis by the USGS focused on pressure data collected during the approximately 2-wk period from the time that the well was shut in to the end of July. The pressure data were used to develop a model of the M56 oil reservoir from which the Macondo well produced oil. The combined results of these analyses formed the basis of the August 2, 2010, press release by the Department of Interior and Department of Energy giving the government's estimates of flow rate and total volume of oil discharged from the Macondo well.

The analyses by the three National Laboratory teams required the geometry of the piping system in the capping stack (Fig. S1), the pressure–loss factors (K factors) of the pipe segments and valves in the piping system, and the multiphase equation of state (EOS) for the hydrocarbons. The K factors were used to calculate pressure drop ($\Delta P$) across a pipe segment or a valve by $\Delta P = K \rho V^2/2$, where $\rho$ is fluid density and $V$ is fluid velocity. The EOS described the hydrocarbon fluid properties for various pressures and temperatures. Each team estimated its own K factors (from published handbooks and manufacturer's data sheets) and implemented its own EOS. The LLNL team built a two-fluid EOS model based on the black oil tables provided by BP. The LANL team interpolated between tabular data in the same black oil tables. The SNL team used chemical assays of the oil to generate an EOS model from fundamental principles.

The National Laboratory teams also used different methods to solve the equations of mass, momentum, and energy conservation for 1D flow through the pipe network in the capping stack. The LLNL team constructed its flow model using Sinda/Fluint, a commercial software package from Cullimore & Ring Technologies, Inc., designed for solving general purpose, 1D fluid dynamics and heat transfer problems. (Any use of trade, product, or firm names is for descriptive purposes only and does not imply endorsement by the US Government.) The model was run under adiabatic conditions and assumed that the fluid could be approximated by a mixture of oil and gas with a constant gas mass fraction. The LANL team used the finite difference algorithm and implemented the model calculations in a spreadsheet. The model simulated separate velocities for the gas and liquid phases, and temperature was set equal to 180 °F. By contrast, the SNL team used a single velocity for both the gas and oil flow and assumed adiabatic conditions. All three teams assumed that flow was at steady state. Because the pressure gauge was mounted near the bottom of the capping stack, the measured pressure could be considered the inlet pressure of the pipe network. The outlet pressure was the ambient sea pressure. These two pressures served as boundary conditions for the flow models.

During the 24-h period before shut in, four time points were chosen for model analysis (Table S3). These time points were selected during periods when the pressure in the capping stack was steady, indicating steady flow. During Time Points 1, 2, and 3, flow through the capping stack was directed solely out of the kill line; the choke line and the stacking cap middle ram were closed. Below the capping stack, the original blowout preventer was still connected with lines for shipboard collection at sea surface. However, during Time Point 1, there was no shipboard collection, and thus, the estimated flow rate out of the kill line was also the total flow rate out of the Macondo well. For Time Points 2 and 3, shipboard collection had resumed. The estimated flow rate out of

the kill line was added to the measured shipboard collection rate to obtain the total flow rate out of the Macondo well.

An alternative method was also used to estimate the flow rate out of the kill line. This method assumed that the pressure loss through the entire kill side of the capping stack is proportional to the square of the flow rate through the capping stack. For Time Point 1, the pressure loss equation is written as (Eq. S1)

$$\Delta P_1 = RQ_1^2, \qquad [S1]$$

where $\Delta P_1$ is the pressure drop from the capping stack inlet (location of the pressure gauge) to the kill line outlet (ambient sea pressure), $Q_1$ is the flow rate through the capping stack, and $R$ is a proportionality constant. Similarly, for Time Point 2, assuming that $R$ is unchanged, the pressure–loss equation is (Eq. S2)

$$\Delta P_2 = RQ_2^2. \qquad [S2]$$

Because shipboard collection occurred during Time Point 2, $Q_2$ is only a portion of the total well flow, which is $Q_2 + C_2$, where $C_2$ is the rate of shipboard collection (through the lines connected to the blowout preventer below the capping stack). By contrast, during Time Point 1, there was no shipboard collection, and the entire well flow was directed through the capping stack. Therefore, more flow runs through the capping stack during Time Point 1 than during Time Point 2 (i.e., $Q_1 > Q_2$). However, $Q_1$ is not as large as $Q_2 + C_2$, because a higher back pressure occurs in the well during Time Point 1 than Time Point 2. In other words, the flow rates during the two time points are related by (Eq. S3)

$$Q_1 = Q_2 + C_2 - g, \qquad [S3]$$

where $g$ is the change in the flow rate because of increased back pressure in the well. Earlier analyses obtained from detailed models of the well and the oil reservoir indicated that $g$ was ~1,000 barrels/d (BPD). Using this knowledge, Eqs. S1–S3 can be solved as a system of three equations in three unknowns. The unknown quantities are $Q_1$, $Q_2$, and $R$, whereas the known quantities are $\Delta P_1$, $\Delta P_2$, $C_2$, and $g$. This alternative method can also be applied to Time Points 1 and 3 by replacing the subscript 2 with the subscript 3 in Eqs. S2 and S3. The results of this alternative method are shown in Table S3 in the rows labeled 1 + 2 and 1 + 3.

At ~11:00 AM on July 15 (Time Point 4), all of the flow through the capping stack was directed out of the choke line. The kill line was closed, and shipboard collection had been discontinued. This setting provided a different set of conditions for application of the flow models by the National Laboratory teams. The estimated flows out of the choke line are given at the bottom portion of Table S3.

Taken together, the National Laboratory teams' estimates of flow from the Macondo well from July 14 to 15 ranged from 48,500 to 55,300 BPD. Differences in the estimates are attributed to the different K factors, EOS implementations, and assumptions used in the flow models. However, the narrow range spanned by the estimates suggests that, although the details of the implementation differ, the overall simulated flow processes are consistent across the models.

At ~2:20 PM on July 15, 2010, the well shut-in procedure was completed, and hydrocarbons stopped flowing from the Macondo well into the Gulf of Mexico. The Macondo well remained shut until August 3, 2010, when mud was injected into the well for the static kill operation. The shut-in pressures in the capping stack during the second half of July of 2010 were used by the USGS to develop a model of the M56 reservoir, the source of oil for the Macondo well. This model provided an oil flow estimate that was obtained independently from the estimates by the National Laboratory teams.

M56 oil reservoir consists of three oil-producing sand layers, with a combined pay thickness of ~90 ft. The top of the reservoir was penetrated by the Macondo well at a depth of ~18,000 ft below sea surface. The initial reservoir pressure is 11,850 psi. The reservoir temperature is ~240 °F. Because the bubble point of the oil in the reservoir is ~6,500 psi, the reservoir is believed to be under single-phase (liquid oil) condition. The sedimentary history of the Gulf Coast in the vicinity of the Macondo well suggests that the oil-producing sands composing the M56 reservoir are submarine channel fills (3). In the model, the oil reservoir is assumed to be a long, narrow channel having a rectangular cross-section (Fig. S2). The reservoir is modeled as a closed system. In other words, all six faces of the channel are impermeable boundaries.

The reservoir model solves the equation of oil flow (4) (Eq. S4),

$$\frac{\partial^2 P}{\partial x^2} + \frac{\partial^2 P}{\partial y^2} = \frac{\phi \mu c}{k} \frac{\partial P}{\partial t}, \qquad [S4]$$

where $P$ is pressure, $c$ is system compressibility, $k$ is permeability, and $\mu$ is oil viscosity. The system compressibility is expressed as (Eq. S5)

$$c = (1 - S_w)c_o + S_w c_w + c_f, \qquad [S5]$$

where $S_w$ is water saturation, $c_o$ is oil compressibility, $c_w$ is water compressibility, and $c_f$ is effective formation (or pore) compressibility. The oil flow rate ($Q$) from the reservoir through the Macondo well and exiting the blowout preventer is modeled by (Eq. S6)

$$GQ^2 = (p_w - p_e - \rho_o gH), \qquad [S6]$$

where $G$ is a coefficient of pressure loss through the well, $p_w$ is the reservoir pressure at the well face (Fig. S3), $p_e$ is the ambient pressure at the exit point of the blowout preventer, $\rho_o$ is oil density, $g$ is gravitational acceleration, and $H$ is the elevation difference between the M56 reservoir and the exit point at the blowout preventer. Eq. S6 is similar to Eqs. S1 and S2 implemented by the National Laboratory teams to describe friction loss in a pipe. Note that the reservoir model assumes that $G$ is constant for the entire period of well flow, which assumes that the changes in outlet configuration, such as cutting of the riser pipe, do not significantly impact the oil flow rate. The USGS model known as MODFLOW-2000 (5) was used to solve the oil flow (Eq. S4). Although MODFLOW-2000 was originally designed to simulate the flow of groundwater in aquifers, it can be readily adapted for simulating flow of oil in reservoirs under single-phase and isothermal conditions.

The reservoir model was calibrated by adjusting model parameters, and therefore, the simulated pressure in the capping stack during shut in matched the observed pressure. The following model parameters were adjusted: the horizontal dimensions of the reservoir ($L$ and $W$ in Fig. S2), the location of the Macondo well in the reservoir ($x_w$ and $y_w$ in Fig. S2), permeability, and the coefficient of pressure loss through the well ($G$). All other model parameters were set to values provided by BP during meetings and working sessions. The horizontal dimensions $L$ and $W$ were constrained, and therefore, the volume of oil in the reservoir was equal to the initial oil in place estimated by BP.

Fig. S4 is a Horner plot showing the simulated shut-in pressures (solid line) in the capping stack. The horizontal axis of the Horner plot shows the quantity $(t_p + \Delta t)/\Delta t$, where $t_p$ is the period of oil flow (86 d) and $\Delta t$ is the elapsed time since shut in. Note that, on the horizontal axis, time increases to the left. The diamond symbols in Fig. S4 show observed pressures that were announced in daily government press releases and BP technical briefings. These daily readings are a subset of the continuously recorded

shut-in pressure data that might be considered proprietary. Fig. S4 shows that the simulated shut-in pressures closely matched the observed pressures.

Fig. S5 shows the simulated oil flow rate during the 86 d of flow. The simulated initial oil flow rate is 63,600 BPD. As the reservoir depletes, the simulated oil flow rate decreases to 52,600 BPD on day 86, just before shut in. The simulated total volume of oil discharged over the 86-d period is 4.92 million stock tank barrels.

During July 29 and 30, 2010, the flow rate estimates by the National Laboratory teams and the USGS were merged into a combined estimate of flow rate history. The combined estimate also included additional analyses showing that the cutting of the riser pipe on June 3, 2010, increased the flow rate by about 4%, whereas the installation of the capping stack on July 13, 2010, decreased the flow rate by also about 4%. The final result is shown in Fig. 4 in the text.

1. Plume Modeling Team (2010) Deepwater Horizon *Release Estimate of Rate by PIV Report to the Flow Rate Technical Group.* Available at http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=68011. Accessed.
2. Onishi O (2010) *Review of* Deepwater Horizon *Release Estimate of Rate by PIV. Pacific Northwest National Laboratory Report PNNL-19525* (Department of Energy, Richland, WA).
3. Posamentier HW (2003) Depositional elements associated with a basin floor channel-levee system—case study from the Gulf of Mexico. *Mar Pet Geol* 20:677–690.
4. Matthews CS, Russell DG (1967) *Pressure Buildup and Flow Test in Wells* (Society of Petroleum Engineers of AIME, New York).
5. Harbaugh AW, Banta ER, Hill MC, McDonald MG (2000) *MODFLOW-2000, the US Geological Survey Modular Ground-Water Model—User Guide to Modularization Concepts and the Ground-Water Flow Process. US Geological Survey Open-File Report 00–92* (US Geological Survey, Reston, VA).



**Fig. S1.** Capping stack geometry, with the K factor locations shown. Note that the top ram (Ram #3) of the capping stack is not shown.



**Fig. S2.** Oblique schematic view of the M56 oil reservoir.



**Fig. S3.** Schematic vertical section showing flow of oil from M56 reservoir through the Macondo well and exiting at the top of the blowout preventer.



**Fig. S4.** Horner plot of shut-in pressure in the capping stack of the Macondo well; $t_p$ is the period of oil flow, which is 86 d, and $\Delta t$ is elapsed time since shut in. Note that time increases to the left on the horizontal axis. The solid line shows the simulated shut-in pressure in the capping stack. Diamond symbols show pressure readings that were announced in daily government press releases and BP technical briefings.



**Fig. S5.** Simulated volumetric flow rate (BPD) from the Macondo. Volume is expressed in terms of stock tank barrels. The origin of the time axis ($t = 0$) corresponds to April 20, 2010, the date of the *Deepwater Horizon* explosion.

**Table S1.   Comparison of particle image velocimetry applied in laboratory versus the Macondo conditions**

| | PIV applied in a laboratory | PIV applied to oil leak jets |
|---|---|---|
| Objects detected | Marker particles that have been intentionally added to a fluid/gas | Jet features: turbulent eddies, vortices, and hydrate crystals |
| Size of object images detected by PIV | Constant with time and uniform throughout flow field; particle images are 2–3 pixels in diameter | Changing rapidly (between two consecutive camera frames); varying in size from 1 to 500 pixels |
| Size of object images relative to interrogation window | Particle images are usually 10–100 times smaller than the interrogation window | Images of jet features ranged from 100 times smaller to >10 times larger than an interrogation window |
| Shape and appearance of objects images | Round and constant | Complex and varying significantly between consecutive video frames |
| Number of particle/object images in each interrogation window | 5–10 | A few to less than one; objects were often larger than the interrogation windows |
| Fluid | Transparent | Opaque |
| Illumination | 2D laser sheet, precisely positioned inside transparent gas/fluid | 3D illumination from ROV lights; entire boundary of jet was illuminated, and exact orientation of the ROV lighting was unknown |
| Measurement region | 2D plane | Constantly varying 3D surface of the outer boundary of an oil jet |

**Table S2.   Comparison of jet velocities measured by team members (six) using automatic PIV and team members using manual feature tracking**

| | Automatic PIV | | | | | Manual FTV | | |
|---|---|---|---|---|---|---|---|---|
| | A | B | E | Berkeley | UCSB | UCSB | Berkeley | NETL |
| Riser kink jet | | 1.25 m/s | 0.18 m/s | | | | 1.5 m/s | 1.7 m/s |
| Riser end jet | 0.12 m/s | 0.12 m/s | 0.19 m/s | | | 1 m/s | 1 m/s | 0.8 m/s |
| Postriser cut jet | 0.25–0.58 m/s | 0.4–0.5 m/s | 0.51 m/s | 0.03–0.35 m/s | 0.2–0.3 m/s | 1.3 m/s | 1.1 m/s | 1.5 m/s |

UCSB, University of California at Santa Barbara.

**Table S3.   Flow rates (BPD) estimated by national laboratory teams (flow rates in stock tank barrels)**

| Time point number | Time | National laboratory team | Flow rate out of kill line | Flow rate out of choke line | Flow rate collected at surface vessels | Total flow rate from Macondo well |
|---|---|---|---|---|---|---|
| 1 | 7/14/2010 at ~7:00 PM Central Daylight Time | LANL | 48,900 | 0 | 0 | 48,900 |
| | | LLNL | 48,500 | | | 48,500 |
| | | SNL | 52,800 | | | 52,800 |
| 2 | 7/15/2010 at 5:00 AM Central Daylight Time | LANL | 28,800 | 0 | 22,100 | 50,900 |
| | | LLNL | 27,500 | | | 49,600 |
| | | SNL | 30,800 | | | 52,900 |
| 3 | 7/15/2010 at ~7:00 AM Central Daylight Time | LANL | 31,900 | 0 | 18,900 | 50,800 |
| | | LLNL | 30,600 | | | 49,500 |
| | | SNL | 34,100 | | | 53,000 |
| 1 + 2 | | | | | | 51,800 |
| 1 + 3 | | | | | | 52,300 |
| 4 | 7/15/2010 at ~11 AM Central Daylight Time | LANL | 0 | 48,900 | 0 | 48,900 |
| | | LLNL | | 49,400 | | 49,400 |
| | | SNL | | 55,300 | | 55,300 |

# ATTACHMENT D

From: Fetouh, Dahlia S [mailto:DFetouh@goodwinprocter.com]
Sent: Friday, April 06, 2012 01:16 PM
To: DeSantis, Karen McCartan
Cc: Land, Christopher <CLand@goodwinprocter.com>; Remis, Shepard M
<SRemis@goodwinprocter.com>
Subject: RE: WHOI production status


Karen:

We believe WHOI's production to be complete at this time and do not
anticipate any further productions.


Thanks,
Dahlia


Dahlia S. Fetouh
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

-----Original Message-----
From: DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
Sent: Friday, April 06, 2012 10:08 AM
To: Fetouh, Dahlia S
Subject: WHOI production status


Dahlia,

Can you kindly update as to whether any additional documents will be
produced and when that might be?  Any description of the nature of those
documents would be appreciated.


Thank you,
Karen

Karen McCartan DeSantis
    Kirkland and Ellis, LLP
    655 Fifteenth Street, NW
    Washington, DC 20005

    (202) 879 5217


IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal
Revenue Service, we inform you that any tax advice contained in this
communication (including any attachments) was not intended or written to
be used, and cannot be used, by any taxpayer for the purpose of (1)
avoiding tax-related penalties under the U.S. Internal Revenue Code or
(2) promoting, marketing or recommending to another party any
tax-related matters addressed herein.


************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.

# ATTACHMENT E

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

1

1              UNITED STATES DISTRICT COURT

2            THE EASTERN DISTRICT OF LOUISIANA

3                   AT NEW ORLEANS

4

5    IN RE:  OIL SPILL BY THE OIL RIG     *   10-MD-2179-CJB-SS
                DEEPWATER HORIZON IN THE    *
6               GULF OF MEXICO ON           *
                APRIL 20, 2010              *   March 30, 2012
7                                           *
                                            *
8    Applies to:   All Cases               *   9:30 a.m.
     **************************************

9

10

11              DISCOVERY STATUS CONFERENCE

12          BEFORE THE HONORABLE SALLY SHUSHAN

13            UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19   SUSAN A. ZIELIE, RPR, FCRR
     Official Court Reporter
20   HB 406
     500 Poydras Street
21   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
22   504.589.7781

23

     Proceedings Recorded by Computer-aided Stenography Transcription
24   Software.

25

                                                    2

1    APPEARANCES:

2

3    For the Plaintiffs              LEVIN PAPANTONIO THOMAS MITCHELL
     Steering Committee:                 RAFFERTY & PROCTOR

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

```
 4                                BY:  BRIAN H. BARR, ESQ.
                                  316 South Baylen Street
 5                                Suite 600
                                  Pensacola FL 32502
 6
                                  WILLIAMSON & RUSNAK
 7                                BY:  JIMMY WILLIAMSON, ESQ.
                                  4310 Yoakum Boulevard
 8                                Houston TX 77006

 9                                LEWIS KULLMAN STERBCOW
                                    & ABRAMSON
10                                BY:   PAUL STERBCOW, ESQ.
                                  Pan American Life Building
11                                601 Poydras Street
                                  New Orleans LA 70130
12

13     For the Federal           US DEPARTMENT OF JUSTICE
       Government Interests:      BY:  NATHANIEL CHAKERES, ESQ.
14                                450 Golden Gate Avenue
                                  7th Floor, Room 5395
15                                San Francisco CA 94102

16
       For the United States     ENVIRONMENTAL ENFORCEMENT
17     Of America:                 SECTION
                                  US DEPARTMENT OF JUSTICE
18                                BY:   STEVE O'ROURKE, ESQ.
                                        STEVE FLYNN, ESQ.
19                                PO Box 7611
                                  Washington DC 20044
20

21     For the State Interests:  KANNER & WHITELEY, LLC
           Louisiana             BY:   DOUGLAS R.   KRAUS, ESQ.
22                                701 Camp Street
                                  New Orleans LA 70130
23

24       Alabama                 ATTORNEY GENERAL OF ALABAMA
                                  BY:  COREY L. MAZE, ESQ.
25                                500 Dexter Avenue
                                  Montgomery Al 36130
```

                                                                    3

```
 1     APPEARANCES:

 2

 3     For Defendant BP:         LISKOW & LEWIS, APLC
                                 BY:   DON K. HAYCRAFT, ESQ.
 4                               701 Poydras Street
                                 Suite 5000
 5                               New Orleans LA 70139

 6                               KIRKLAND & ELLIS, LLP
                                 BY:   ROBERT R. GASAWAY, ESQ.
 7                               655 Fifteenth Street NW
                                 Washington DC 20005
 8
```

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

```
                                           KIRKLAND & ELLIS, LLP
      9                                    BY:  J. ANDREW LANGAN, ESQ.
                                                RYAN BABIUCH, ESQ.
     10                                    300 N. Lasalle
                                           Chicago, IL 60654
     11

     12    For Defendant Transocean:       FRILOT, LLC
                                           BY:  KERRY J. MILLER, ESQ.
     13                                    1100 Poydras Street
                                           Suite 3700
     14                                    New Orleans LA 70163

     15                                    SUTHERLAND ASBILL & BRENNAN
                                           BY:  STEVE ROBERTS, ESQ.
     16                                         DAVID BAAY, ESQ.
                                           1001 Fannin Street
     17                                    Suite 3700
                                           Houston TX 77002
     18

     19    For Defendant Halliburton:      GODWIN RONQUILLO, PC
                                           BY:  DONALD E. GODWIN, ESQ.
     20                                         JENNY MARTINEZ, ESQ.
                                                STEFANIE MAJOR, ESQ.
     21                                         SEAN FLEMING, ESQ.
                                                LAUREN MITCHELL, ESQ.
     22                                    1201 Elm Street
                                           Suite 1700
     23                                    Dallas TX 75270

     24

     25
```

                                                                    4


```
      1    APPEARANCES:

      2

      3    For Defendant Halliburton:      GODWIN RONQUILLO, PC
                                           BY:  R. ALAN YORK, ESQ.
      4                                         GWEN RICHARD, ESQ.
                                           1331 Lamar
      5                                    Suite 1665
                                           Houston TX 770101

      6

      7    For Defendant Anadarko:         BINGHAM MCCUTCHEN, LLP
                                           BY:  WARREN A. FITCH, ESQ.
      8                                    2020 K Street NW
                                           Washington DC 20006
      9
                                           KUCHLER POLK SCHELL WEINER
     10                                       & RICHARDSON, LLC
                                           BY: SARAH IIAMS, ESQ.
     11                                    1615 Poydras Street.
                                           Suite 1300
     12                                    New Orleans LA 70112

     13
```

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

```
            For Defendant M-I, LLC:          MORGAN LEWIS & BOCKIUS
   14                                        BY:   STEVE LUXTON ESQ.
                                                   DENISE SCOFIELD, ESQ.
   15                                        1000 Louisiana Street
                                             Suite 4000
   16                                        Houston TX 77002

   17

   18

   19

   20

   21

   22

   23

   24

   25
                                                                      5


    1    APPEARING TELEPHONICALLY:

    2

    3    PSC:                                ANTHONY IRPINO, ESQ.

    4    BP:                                 JIM LICO, ESQ.
                                             MIKE PETRINO, ESQ.
    5                                        FRANK MONAGO, ESQ.
                                             JOSEPH RUSSELL, ESQ.
    6                                        ALLEN PIXTON, ESQ.
                                             JOEL GROSS, ESQ.
    7                                        JOE EISERT, ESQ.

    8    O'Brien & NRC:                      TED SKERIDES, ESQ.

    9    Cameron:                            JEFF GANAWAY, ESQ.
                                             KAT ELLIGER, ESQ.
   10
         Transocean:                         PAUL THIBODEAUX, ESQ.
   11
         DOJ:                                GORDON YOUNG, ESQ.
   12
         US:                                 MIKE UNDERHILL, ESQ.
   13                                        ABBY ANDRE, ESQ.
                                             SCOTT CERNICH, ESQ.
   14
         Airborne Support:                   BEN MAYEAUX, ESQ.
   15

   16

   17

   18
                                   Page 4
```

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

```
                19
                20
                21
                22
                23
                24
                25
  ♀
                                                                          6
```

```
                1                        I N D E X

                2     Agenda Items                                     Page

                3

                4     BOP & Capping Stack                              8

08:36:18        5     Fluids Issue a Nonissue                         9
08:36:18
08:36:18        6     Ownership discussion between Transocean and BP  9
08:36:18
08:37:21        7     Forensic examination of computer is
08:37:24                going forward                                 10
08:37:24        8
08:38:22              Laser scanning of the capping stack data
08:38:31        9       available to be sent out to the parties
08:38:32                very soon                                     10
               10
                      Halliburton Computer                            11
               11
                      Woods Hole                                      11
               12
08:39:50       13     Response brief to the Woods Hole brief
08:40:00                due Wednesday, April 11th, 2012               12

               14     Rule 30(b)(6) Notices for Depositions of
                        Exxon/Mobile and Cudd Well Control            12
               15
                      US and BP Production of Documents               12
               16
                      Rule 30(b)(6) Notice for Deposition of the US   13
               17
                      Rule 30(b)(6) Notice for Deposition of BP       13
               18
                      Potential Rule 30(b)(6) Notice for Deposition
               19     Of Anadarko                                     16

               20     Other Rule 30(b)(6) Notices
                        MOEX and Weatherford                          18
               21
                      Rule 30(b)(6) Notice for Deposition of
               22     Other Non-Parties                               18

08:51:21       23     Transocean's response to Court's
```

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT
```
08:51:22        question as to cap and contain issues
08:51:29 24     of Phase Two and the need to go forward;
08:51:35        and, if so, how to proceed                      20
         25
♀
                                                                    7

         1

         2

         3

         4

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25
♀
                                                                    8

         1                        I N D E X
```

Page 6

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

| | | Agenda Items | Page |
|---|---|---|---|
| | 2 | | |
| | 3 | Halliburton's response to Court's | |
| 08:51:22 | | question as to cap and contain issues | |
| 08:51:29 | 4 | of Phase Two and the need to go forward; | |
| 08:51:35 | | and, if so, how to proceed | 24 |
| 08:51:35 | 5 | | |
| 09:00:57 | | Copy of revised answer to Interrogatory | |
| 09:00:57 | 6 | to be sent to Judge Shusan | 27 |
| 09:00:57 | | | |
| 09:00:57 | 7 | United State's response to Court's | |
| 08:51:22 | | question as to cap and contain issues | |
| 08:51:29 | 8 | of Phase Two and the need to go forward; | |
| 08:51:35 | | and, if so, how to proceed | 29 |
| 08:51:35 | 9 | | |
| 09:05:28 | | Proposed settlement document on personal | |
| 09:05:30 | 10 | injuries execution difficulties. | |
| | | Judge Shushan willing to take a conference | |
| | 11 | Call to help work on a solution | 31 |

                    12

                    13

                    14

                                The next WGC meeting is scheduled for:

                    15

                        Friday, April 13, 2012 at 9:30 a.m.

                    16

                    17

                    18

                    19

                    20

                    21

                    22

                    23

                    24

                    25

♀

                                                                9

08:26:34  1              NEW ORLEANS, LOUISIANA; FRIDAY, MARCH 30, 2012

08:26:46  2                          9:30 A.M.

08:34:48  3          THE COURT:  Good morning, everybody.  Have a seat.

08:34:57  4              How you doing?

08:34:59  5              We've got quite the group on the phone today.  How

08:35:02  6  are you?

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:35:03  7        PERSON ON TELEPHONE:  Good morning, Judge.

08:35:04  8        THE COURT:  There, you can hear me?

08:35:07  9        PERSON ON THE TELEPHONE:  Morning, Judge.

08:35:08 10        THE COURT:  How you doing?

08:35:10 11            Mike, we've got to remember about the Elmo.  I

08:35:14 12    mean, we look empty.

08:35:23 13            MR. O'KEEFE:  You want to put a picture of Judge

08:35:31 14    Barbier up there?

08:35:35 15            THE COURT:  Judge Barbier?

08:35:37 16            Let's get rolling.

08:35:39 17            We heard from Captain Englebert that the regular

08:35:41 18    inspection of the equipment, including the blowout and the lower

08:35:44 19    marine riser, looks fine.  So everything is good out there.

08:35:51 20            We understand that the Department of Justice is

08:35:53 21    going to visit the site in the next couple of weeks, and

08:35:57 22    thereafter she's telling us that she may make some new request

08:36:01 23    for release of evidence.

08:36:05 24            Rob, do you want to update us, or is there any

08:36:08 25    update on the other issues we were talking about, particularly

                                                                          10

08:36:10  1    the capping stack?

08:36:13  2            MR. GASAWAY:  Good morning, Your Honor.  Rob Gasaway

08:36:16  3    for BP.

08:36:16  4            I'm happy to report the fluids issue was a

08:36:20  5    nonissue.  It was not in the capping stack, it was in two large

08:36:24  6    totes.  Those totes are owned by Transocean.  They're not

08:36:27  7    causing a problem.  There is not even a conversation about where

08:36:30  8    they should be showing.  So the fluids issue has been resolved,

08:36:34  9    I think.

08:36:35 10            In terms of the other issue we talked about last

08:36:37 11    week, that was ownership discussion between Transocean and BP.

                                Page 8

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:36:40 12                          Mr. Baay sent to us some helpful documents.  We

08:36:44 13      have our own documents.  I think that conversation is ongoing.

08:36:47 14      I can give a weather report.  I think we have some questions

08:36:50 15      about the documentation.

08:36:51 16                          At the end of the day, I think it's probably going

08:36:53 17      to turn out to be the case that Transocean owns some components

08:36:57 18      of the capping stack, BP owns others, and others probably

08:37:01 19      there's incomplete documentation for.  But I think, right now,

08:37:04 20      it's best just to let the conversation continue.

08:37:07 21                          THE COURT:  Fine.  No problem.

08:37:10 22                          Do you think that's an accurate report?

08:37:13 23                          MR. BAAY:  That is a very accurate report.

08:37:14 24                          THE COURT:  There you go.

08:37:15 25                          Thanks, Rob, I appreciate it.

♀
                                                                        11

08:37:18  1                          The captain also reports that the forensic

08:37:22  2      examination of the computer is going forward.  No hitches there.

08:37:28  3                          Anything else to add to that, Alan?

08:37:28  4                          (No response.)

08:37:32  5                          THE COURT:  Okay.  Thank you.

08:37:34  6                          MR. GASAWAY:  I was --

08:37:40  7                          THE COURT:  I'm sorry.  Rob.  How could I miss you?

08:37:42  8                          MR. GASAWAY:  Good morning, Your Honor, again.

08:37:45  9                          I was just going to add one note on that.  That

08:37:47 10      there's the discussion that's going on, and it may or may not be

08:37:51 11      the case that we're able to recover the files forensically.

08:37:55 12                          And, if we're not, BP would like to revisit the

08:37:58 13      issue of whether there would be a way to use software to

08:38:01 14      recreate them.

08:38:02 15                          That's not ripe today.  It's probably not going to

08:38:05 16      be ripe for a couple of weeks.  But I just wanted to put that on

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:38:08 17   the Court's radar screen, and Halliburton's, for down the road.

08:38:12 18             THE COURT:  Good.

08:38:12 19             MR. GASAWAY:  If I might, also on the point of computer

08:38:15 20   files, you will recall that there was a forensic -- not a

08:38:20 21   forensic investigation -- but I would say measurements, laser

08:38:23 22   scanning and so forth of the capping stack earlier in the year,

08:38:26 23   and we've been collecting the data from that.

08:38:29 24             It does look like that data will be available to

08:38:31 25   be sent out to the parties very soon, maybe today, maybe Monday.

♀
                                                                    12

08:38:35  1   So I just wanted to let everybody know.

08:38:36  2             THE COURT:  Good.

08:38:37  3             And how is that going to be sent out, Rob?  Are

08:38:40  4   you going to put it on drives, or are you going to put it up on

08:38:44  5   an FTP site?

08:38:45  6             MR. GASAWAY:  I think we're going to put it up on an

08:38:48  7   FTP site.  Unless it's too voluminous, and then we'll have to go

08:38:48  8   to the drives.  Which is what we do if it's too voluminous.

08:38:54  9             THE COURT:  If anyone doesn't want the data, why don't

08:38:57 10   you let Rob know.

08:38:58 11             Is that the best way to do it?

08:39:00 12             MR. GASAWAY:  That's the best way to do it.

08:39:02 13             THE COURT:  Okay.  Thanks, Rob.  Appreciate it.

08:39:06 14             Okay.  We've been working on the Woods Hole

08:39:13 15   information.  All of the deliverables have been delivered to BP

08:39:19 16   at this point, as I understand it, and the only issues we have

08:39:23 17   remaining for the Court to talk about and resolve is the

08:39:30 18   scholastic privilege which is being raised by Woods Hole, as

08:39:34 19   well as the issue of costs incurred of production.

08:39:38 20             Anything that you need to add to that, Rob?

08:39:40 21             MR. GASAWAY:  No.  We're just going to be going through

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:39:43 22    the productions.  As they get in, we'll report any updates on

08:39:46 23    those, Your Honor.

08:39:47 24              THE COURT:  Good.

08:39:48 25              MR. GASAWAY:  The one thing I would ask, if we might
♀

                                                                        13

08:39:50  1    have a response brief to the brief that it looks like Woods Hole

08:39:53  2    is going to file.

08:39:54  3              THE COURT:  Yeah.  They've asked for next Thursday.

08:39:57  4              MR. GASAWAY:  Right.  If we can have maybe the

08:39:59  5    following Wednesday, something like that.  Wednesday, April

08:40:01  6    11th.

08:40:02  7              THE COURT:  That will be fine.  Because you've got

08:40:04  8    plenty of data to keep you busy until then; is that right?

08:40:09  9              MR. GASAWAY:  We're going to try to work through the

08:40:11 10    data and see what we have and what we don't have, and we will

08:40:14 11    bring our concerns to the Court on the 11th.  Thank you, Your

08:40:17 12    Honor.

08:40:17 13              THE COURT:  No problem.

08:40:21 14              On the 30(b)(6) notice for Exxon/Mobile and Cudd

08:40:25 15    Well Control, we've entered the order staying those deposition

08:40:30 16    notices.  So that's gone out.

08:40:32 17              Has anyone heard anything or do we need to update

08:40:35 18    on that?

08:40:38 19              (No response.)

08:40:38 20              THE COURT:  Thank you.

08:40:41 21              Relative to the United States' production of

08:40:45 22    documents, we've been having regular telephone conferences with

08:40:49 23    BP and the United States, and I feel as though we're making good

08:40:52 24    progress.  We're going to continue to do that.

08:40:59 25              We are going to get out this morning an order on
♀
                                                                        14

                                    Page 11

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:41:03  1  briefing of the deliberative process privilege claim that's

08:41:08  2  being asserted, and we'll bring that up for hearing and

08:41:11  3  determination pretty shortly.

08:41:16  4             The final notice for the Rule 30(b)(6) of the

08:41:19  5  United States has been served.

08:41:21  6             And we are still working on, as I understand it,

08:41:25  7  the Rule 30(b)(6) deposition notice of BP.

08:41:34  8             How are we coming on the meet-and-confer process

08:41:37  9  there?

08:41:39 10            Good morning.

08:41:41 11       MR. CHAKERES:  Good morning, Your Honor.  Nat Chakeres.

08:41:43 12            As BP indicated in its filing, it had reached out

08:41:46 13 to the United States and offered some times next week for a

08:41:52 14 meet-and-confer.  And we are hopeful that -- we haven't had the

08:41:56 15 chance to have that, but we're going to be able to report fairly

08:42:00 16 soon some progress on that.

08:42:01 17       THE COURT:  Good.

08:42:02 18            And, Corey, you all have been involved in that

08:42:05 19 scheduling?

08:42:09 20       MR. MAZE:  Actually, no.

08:42:12 21       MR. CHAKERES:  Not yet.  Your Honor, actually we have

08:42:14 22 not yet brought Alabama into the quantification conversation.

08:42:19 23 We are intending, in terms of what source control depositions

08:42:23 24 should be going forward, to not do anything without being in

08:42:29 25 consultation with Alabama.

                                                           15

08:42:31  1        THE COURT:  Perfect.  So I've got the states covered.

08:42:33  2  Good, thank you.

08:42:34  3         Corey?

08:42:35  4        MR. MAZE:  Your Honor, I know that we're not supposed

08:42:37  5  to update you on source control until next week, but I just

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:42:40  6    wanted to put one thing out there.  I've talked with the United

08:42:43  7    States, who -- they can speak for themselves -- but I don't

08:42:46  8    think their position has changed.  And we've met with Louisiana

08:42:49  9    and talked to them on the phone this week.  And I think we have

08:42:52  10   a pretty common agreement about what Louisiana and Alabama do

08:42:56  11   and don't want out of the source control.

08:42:58  12          That said, I do want to raise the point that,

08:43:01  13   whatever the government decides they want from source control,

08:43:05  14   I've also talked to the non-BP defendants; and, even if we limit

08:43:09  15   or we decide that we would live with limiting some source

08:43:14  16   control documents, I think that they are going to be pretty

08:43:16  17   adamant that we not.  That they would like all of the source

08:43:20  18   control documents to go forward.

08:43:21  19          The question then is, is it worth our time, as is

08:43:25  20   the government's, as to what source control topics we might be

08:43:28  21   able to take off the table if the defendants will say but we

08:43:32  22   want to keep them on the table.

08:43:34  23          THE COURT:  Well, I think that's a good point.  I guess

08:43:36  24   what I'd like to know is what the defendants' thinking on that

08:43:39  25   issue is.  And so we'll have to explore that.  I'm not going to
♀
                                                                         16

08:43:44  1    ask you to answer that question.

08:43:45  2          MR. MAZE:  I just wanted to bring it up as we were

08:43:48  3    getting closer.

08:43:49  4          THE COURT:  I hear you.  I just don't understand what

08:43:51  5    the thinking is.  But we'll get them to report to us.

08:43:54  6          MR. MAZE:  Understood.

08:43:55  7          THE COURT:  Which defendant in particular should I

08:43:57  8    address my comments to?

08:44:00  9          MR. MAZE:  How harshly are you going to address them so

08:44:03  10   I'll know which one to say?

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:44:04 11          THE COURT:  I'm not going to address them harshly at

08:44:08 12     all.

08:44:09 13          MR. MAZE:  I've talked to both Halliburton and

08:44:12 14     Transocean last week and this.  We talked after the conference

08:44:13 15     last week and then by phone this week as well.

08:44:14 16          THE COURT:  So they've been fingered.

08:44:16 17          MR. MAZE:  Well, not by me.  You made me do that.

08:44:20 18          MR. MILLER:  He's saying he's the messenger.

08:44:23 19          THE COURT:  Don't kill the messenger, is what he's

08:44:25 20     saying.

08:44:26 21               That's good, Corey.  I like the heads-up.  So

08:44:28 22     that's fine.

08:44:29 23          MR. MAZE:  Also, I think it would heavily depend on

08:44:32 24     what sort of trial we go forward on, and we just don't know.

08:44:35 25          THE COURT:  Well, we're going to know pretty soon;

                                                                    17

08:44:38  1     aren't we?

08:44:39  2          MR. MAZE:  Yes.  So I'll leave it at that.

08:44:43  3          THE COURT:  Corey, you're right, what kind of trial are

08:44:45  4     we going forward on.  I think we're going forward on the

08:44:48  5     remainder of Phase One and then moving into Phase Two.  How's

08:44:52  6     that for an answer?

08:44:53  7          MR. MAZE:  That's the best answer I've heard, Judge.

08:44:55  8          THE COURT:  There you go.

08:44:57  9          MR. MAZE:  Maybe the only answer I've heard.

08:44:59 10          THE COURT:  Oh, really?

08:45:00 11          MR. MAZE:  But certainly the best.

08:45:03 12          THE COURT:  I didn't know that was subject to debate.

08:45:06 13     But okay.  That's my position and I'm sticking with it.

08:45:08 14               All right.  So that answers that question.

08:45:10 15               Let's see.  We wanted to get a report from

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:45:17 16    Anadarko relative to the 30(b)(6) notice for its deposition.

08:45:23 17    Anything to report there?

08:45:26 18             MR. FITCH:  Good morning, Judge.  Tony Fitch for

08:45:28 19    Anadarko.

08:45:30 20             Corey and I had a meet-and-confer for this past

08:45:34 21    week.  It consisted mainly of my bringing Corey up to speed on a

08:45:38 22    series of discussions, negotiations, that Brian and I had had

08:45:43 23    over the course of time.  And I think that, as I mentioned last

08:45:47 24    week, Corey now understands that we have a number -- there are a

08:45:53 25    number of quantification topics that we're going to introduce

♀
                                                                      18

08:45:57 1     witnesses on, a number of topics we don't have any information

08:46:00 2     on.  And I'd suggested a way to Corey to address that.

08:46:04 3             And, with respect to source control related

08:46:08 4     topics, that sort of depends on what is decided in that regard.

08:46:13 5     I'd mentioned to you last week that we have a position probably

08:46:19 6     somewhat a little bit different from BP's, for example, because

08:46:22 7     of the different situation of the companies.  But that's where

08:46:25 8     we stand at the present time.  Corey may have some additional

08:46:30 9     thoughts.

08:46:30 10            THE COURT:  Okay.  Thank you, Tony.

08:46:33 11            MR. MAZE:  The only thing additional -- and I'd agree

08:46:34 12    with everything Tony said -- we've talked to Louisiana about

08:46:37 13    Anadarko as well, and we may take a different position than

08:46:42 14    Anadarko.  But we'll let the Court know.  But we're working well

08:46:46 15    with Tony, and we don't see any problems.

08:46:48 16            THE COURT:  Good.  All right.  Thank you.

08:46:49 17            Let's see.  We had 30(b)(6) notices for MOEX and

08:46:56 18    Weatherford.  Are there any issues we should be focusing on

08:46:59 19    there?

08:47:04 20            MR. CHAKERES:  Your Honor, Nat Chakeres for the United

                                    Page 15

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:47:06 21    States.

08:47:07 22              Weatherford is one deposition that we --

08:47:14 23              (Cat sound.)

08:47:14 24         THE COURT:  Here's the issue --

08:47:16 25         PERSON ON TELEPHONE:  Is there a cat in the courtroom?

                                                              19

08:47:18 1          THE COURT:  The issue is, that's a cat or a child.

08:47:23 2               Phone participants, let us know, is that a cat or

08:47:26 3     a child?

08:47:30 4          MR. MAZE:  It's a cat being chased by a child.

08:47:33 5          THE COURT:  Whoever it was, put us on mute.

08:47:39 6               Go ahead, Nat.

08:47:40 7          MR. CHAKERES:  Thank you.

08:47:42 8               The Weatherford deposition is in relation to work

08:47:45 9     that was performed that is relevant to quantification.  And,

08:47:50 10    we've been in touch with counsel for Weatherford, and I think

08:47:53 11    they understand that.

08:47:54 12              The MOEX, I don't know that I can say definitively

08:47:59 13    at this point, but it looks like there's a much better chance

08:48:04 14    that that one doesn't need to go forward.

08:48:05 15         THE COURT:  Okay, good.  Well, I'm just keeping that as

08:48:07 16    an update.

08:48:20 17              All right.  Non-parties, we were going to try to

08:48:25 18    start the survey of the notices of the non-parties.  Is there an

08:48:33 19    update that we need to get, or are we just going to do that all

08:48:37 20    in writing?

08:48:39 21              I guess I'll look at you, Rob.

08:48:42 22         MR. GASAWAY:  Your Honor, as you know, we have agreed

08:48:48 23    with the United States to take this on.  We're going to try to

08:48:52 24    do about a third of them today, a third of them on Tuesday and a

08:48:56 25    third of them the following Friday, even though there's not

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT
♀
20

08:48:59  1    going to be a court hearing.

08:49:01  2             I think our thought was just to send a letter in

08:49:04  3    to you today, would give you an update the first third of the

08:49:08  4    non-parties.  I saw RRB Energy was served.  That's obviously one

08:49:14  5    that will be on today's report.

08:49:15  6             THE COURT:  Right.

08:49:16  7             MR. GASAWAY:  And so what we're going to do is, after

08:49:19  8    this hearing, check off as many as we could and give you the

08:49:23  9    update today.  And I think we will hit a third of the overall

08:49:26  10   non-parties.

08:49:29  11            I should say we sent around the current state of

08:49:33  12   all of the nonparty depositions to the Court and others this

08:49:35  13   week with the exquisite edging that you saw that they were

08:49:40  14   drafts, we didn't know where they stood, et cetera.

08:49:42  15            THE COURT:  Right.  So now we've got them and we've

08:49:45  16   looked at most of them, and we're now prepared to talk about

08:49:48  17   modifications if need be.

08:49:50  18            MR. GASAWAY:  Okay.

08:49:51  19            THE COURT:  Okay.

08:49:52  20            MR. GASAWAY:  I don't know if Mr. Chakeres has a

08:49:55  21   different view on how we should proceed.

08:49:59  22            MR. CHAKERES:  Your Honor, I think we had one question.

08:50:03  23   We wanted to make sure -- we've been working smoothly with BP to

08:50:08  24   conduct this survey; but, in terms of the reports that you're

08:50:14  25   seeking over the course of the next week, we can provide the
♀
21

08:50:18  1    status of where we are with each of these parties.

08:50:22  2             Was it also the Court's wish to know what topics

08:50:27  3    might be able to be taken off the table if we go forward without

Page 17

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:50:31  4    source control?  Because that might be a little bit more

08:50:33  5    difficult.

08:50:34  6              THE COURT:  I think we could defer that for the time

08:50:36  7    being based on the rumblings we're hearing about defendants who

08:50:41  8    might want to go forward with source control.  So let's figure

08:50:44  9    out what that's all about before we put you through those paces.

08:50:49 10              MR. CHAKERES:  Thank you, Your Honor.  We appreciate

08:50:50 11    that.

08:50:50 12              THE COURT:  Okay, Nat.

08:50:53 13              MR. GASAWAY:  Your Honor, just a quick word.  I think

08:50:55 14    that's the right way to go.

08:50:57 15              But, from BP's perspective, we would be very

08:51:01 16    interested in smoking out the parties and seeing who wants to go

08:51:04 17    forward and why and whether or not there was a good reason.

08:51:06 18              THE COURT:  Absolutely.  How did you know that was my

08:51:09 19    next topic of business, now that I know I have trouble?

08:51:12 20              So, yes.  I would like to hear from the

08:51:17 21    defendants, specifically, as I understand it, Halliburton and

08:51:21 22    Transocean, as to what you're thinking is as to the cap and

08:51:28 23    contain issues of Phase Two and whether or not you think we need

08:51:32 24    to go forward on that point; and, if so, how you anticipate

08:51:38 25    proceeding.
♀

                                                                    22

08:51:47  1              You can do it, Kerry.

08:51:48  2              MR. MILLER:  Your Honor, I think, as Corey said, it's

08:51:51  3    premised on a working assumption of the trial and how the trial

08:51:59  4    may change based upon the BP/PSC settlement.  And I think the

08:52:05  5    working assumption is that the main thrust of the trial that we

08:52:09  6    do have, whenever we have it later on this year or whenever, is

08:52:14  7    going to be the Clean Water Act claim of the United States.

08:52:19  8    That is, the governmental interests are going to the be primary

                                   Page 18

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

```
08:52:23  9   plaintiffs for the main thrust of the case.  And, if that's so,
08:52:27 10   it may not be proper to call the discovery source control
08:52:31 11   discovery.
08:52:31 12           But I think there was a discussion two conferences
08:52:34 13   ago in which Andy participated in which -- and Mike Underhill
08:52:40 14   was here -- in which the discussion was the penalty factors
08:52:43 15   under the Clean Water Act and how source control or what we
08:52:48 16   previously had called source control discovery, at least the
08:52:52 17   substance of it, and the penalty factors under the Clean Water
08:52:55 18   Act had substantial overlap.
08:52:57 19           So we're most interested in the substance of that
08:53:02 20   discovery as it relates to the Transocean's role as defendant in
08:53:05 21   the Clean Water Act case and our working assumption that the US
08:53:10 22   is going to make a very strong argument to Judge Barbier on May
08:53:14 23   3rd, and maybe certain other governmental interests are going to
08:53:18 24   make strong arguments to Judge Barbier on May 3rd, that in light
08:53:22 25   of the BP/PSE settlement, they really should be the lead
```

                                                                    23

```
08:53:27  1   plaintiff and have a lot of influence over the structure of the
08:53:30  2   next trial in this MDL.
08:53:32  3           So it's based on a working assumption of what this
08:53:35  4   next trial is going to look at and what the main thrust or
08:53:38  5   primary plaintiff claims are going to be.
08:53:41  6           THE COURT:  Okay.
08:53:44  7           MR. MILLER:  And, if that's the case, then we think we
08:53:46  8   need to get to that substantive discovery sooner, as opposed to
08:53:49  9   later.  Because, based upon the history of this Court, we are
08:53:53 10   not under a separate working assumption that we're going to have
08:53:58 11   two years to prepare for that trial.
08:54:01 12           THE COURT:  That would be a fair assumption.
08:54:04 13           MR. MILLER:  And our concern really is being jammed on
```

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:54:06 14    discovery.  But we don't know the exact contours of the next

08:54:11 15    trial, and we don't know the trial date.

08:54:13 16              But the working assumption is that the Court is

08:54:14 17    going to push us very hard, number one.  And, number two, the

08:54:17 18    main thrust of the next trial may be governmental interest as

08:54:20 19    opposed to PSC-based interest.

08:54:23 20              THE COURT:  Okay.  Let me ask you this question; and

08:54:27 21    then, Alan, I'm come to you next; okay?

08:54:29 22              But have you all looked at the draft stipulations

08:54:34 23    that have been confected, and do you think that brings us along

08:54:39 24    the path to --

08:54:45 25              MR. MILLER:  Yeah.  I think we have to think about that

♀

24

08:54:47  1    again in that context.  Again, I think the problem is, is we're

08:54:51  2    using what may be old labels to deal with possibly different or

08:54:57  3    slightly altered concepts for the next phase of the trial.  The

08:55:00  4    concern mainly is substantive; but, you know, I'll let David

08:55:05  5    talk about it.  I'll be happy to go back and take a look at the

08:55:10  6    Phase Two stipulations and see if those allow for some

08:55:13  7    curtailment of the substantive discovery into capping stack

08:55:17  8    post-incident, non-quantification, whatever you want to call it

08:55:21  9    at this point in time.

08:55:22 10              THE COURT:  Exactly.  But I would like you to take a

08:55:23 11    look at that and see if that doesn't help shortcut what you all

08:55:28 12    are anticipating, and maybe we do need to come up with a new way

08:55:35 13    of talking about cap and containment.

08:55:39 14              MR. BAAY:  David Baay for Transocean.

08:55:40 15              We will definitely look at the stipulations.  And

08:55:42 16    we were heavily involved with them when they were being worked

08:55:45 17    up prior to Phase Two.

08:55:46 18              THE COURT:  And they were a good piece of work.

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:55:50 19          MR. BAAY:   They were.

08:55:51 20          THE COURT:   They really were.

08:55:56 21          MR. BAAY:   Not to interrupt you, but I think there are

08:55:58 22   source control stipulations that go down the road but don't get

08:56:02 23   us all the way there in terms of issues that need to be

08:56:04 24   discovered.

08:56:04 25          THE COURT:   Okay.   So let's think about that and let's

                                                                    25

08:56:05 1    start talking about what issues need to be discovered beyond the

08:56:09 2    stipulation, or can we build on the stipulations.

08:56:12 3           MR. BAAY:   We'll look at them with that in mind.

08:56:15 4           THE COURT:   Okay, good.

08:56:15 5               Alan.

08:56:22 6           MR. YORK:   Good morning, Your Honor.   Alan York for

08:56:25 7    Halliburton.

08:56:25 8               I'm not sure that we necessarily agree with the

08:56:29 9    premise that we start with Transocean, but part of that is

08:56:33 10   because we don't know exactly what the next phase of the trial

08:56:35 11   is going to look like.   As you mentioned a moment ago, could be

08:56:39 12   that we're going forward with what is left of Phase One and then

08:56:43 13   on to Phase Two issues.   So we're sort of the speculating a

08:56:46 14   little bit.

08:56:46 15              But, recognizing that, Halliburton's position has

08:56:49 16   always been that the allocation issues in this case, especially

08:56:54 17   with regard to the pollution claims, which seem to be the

08:56:58 18   biggest chunk of claims at this point, necessarily involve a

08:57:05 19   component of source control.   Because, as you'll remember during

08:57:09 20   our initial pretrial conversations, there was a question of

08:57:12 21   whether there was going to be a single allocation, whether there

08:57:15 22   was going to be more than one allocation.

08:57:15 23          THE COURT:   Right.

                              Page 21

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:57:17 24                MR. YORK:   The PSC at one point took the position that

08:57:20 25    because the source control issues were much more on BP's

⚲

26

08:57:25  1    shoulders, that it needed at least two allocations so you

08:57:29  2    capture the difference there.  And so we think that those issues

08:57:31  3    are still alive as evidenced by the fact that just this week the

08:57:35  4    United States filed a supplementation to Interrogatory No. 6

08:57:40  5    which outlined again what the actual relationship was between

08:57:44  6    the BP and the USAC during the source control phases, such that

08:57:51  7    according to, as I read the supplementation, BP was making a lot

08:57:53  8    of the calls.  And then, once the calls were made, then the

08:57:56  9    procedures would be passed to the United States.

08:57:58 10                And so, to the extent that we have a party who is

08:58:01 11    principally collecting the source control efforts, who has

08:58:04 12    potentially -- and, again, we haven't gotten any discovery on

08:58:08 13    this -- but potentially has the ability to stop the flow earlier

08:58:12 14    to mitigate the damages, all of those things flow in to the

08:58:15 15    allocation issues that are associated with the pollution claims,

08:58:18 16    which now form the biggest part of what's remaining of the case.

08:58:21 17                So those are the reasons that -- and Corey and I

08:58:24 18    did speak on Thursday.  Just so the record is clear, there were

08:58:29 19    no specific topics that were tendered to Halliburton that we

08:58:32 20    said, no, we can't agree to take those down.  We're happy to

08:58:35 21    look at specific topics and see if there is something that the

08:58:39 22    stipulations address that we can narrow or do something.

08:58:43 23                But I think that there are two overriding points.

08:58:46 24    Number one is, we think the source control remains an important

08:58:49 25    topic.  And, number two, it's a topic that remains wedded with

⚲

27

08:58:55  1    quantification.  In other words, even if we prioritize

08:58:58  2    quantification, quantification can't be viewed without being in

Page 22

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

08:59:01  3      conjunction with source control.  Those two topics have to go

08:59:05  4      together.

08:59:06  5              THE COURT:  Okay.  And, Alan, if you'll also take a

08:59:08  6      look at those stipulations and start thinking about what it

08:59:12  7      covers for you and what might be remaining.

08:59:15  8              MR. YORK:  We're happy to do that, Your Honor.

08:59:18  9              THE COURT:  Good.  Thank you.

08:59:18  10             MR. MAZE:  Just very briefly.  Corey Maze for Alabama.

08:59:21  11                  This is why I brought it up earlier, because these

08:59:23  12     are the discussions that we had.  And I think that Alabama's and

08:59:26  13     Louisiana's answer next week when we're supposed to tell about

08:59:30  14     source control would be different depending on whether the trial

08:59:33  15     coming up is the same Phase One/Phase Two trial that we were

08:59:37  16     scheduled to have, versus let's go ahead and put a government

08:59:41  17     penalty trial up first.  Because our interests would be

08:59:44  18     different.

08:59:44  19                  You know, if it was a Phase One/Phase Two trial

08:59:47  20     with a promise of a penalty trial later, which we had discovery,

08:59:51  21     like we talked about two weeks ago, then we would be able to

08:59:53  22     limit what we were looking for.  So that's why I brought it up.

08:59:56  23                  And I guess what may be best for the Court is, do

08:59:58  24     you want us just to answer you next week on what is our position

09:00:02  25     under each of those two scenarios?

                                                                            28

09:00:04  1              THE COURT:  I think that would be helpful.  So

09:00:06  2      everybody can start thinking about, if we take this leg or that

09:00:11  3      leg, what your position would be.

09:00:14  4              MR. MAZE:  Okay.  I'll get with Louisiana this week and

09:00:17  5      we'll give you our answer under both.  And I will not say which

09:00:20  6      of these we prefer at this point, because I think that's for the

09:00:23  7      briefing and the discussion on May 3rd.

                                    Page 23

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

09:00:25  8                     And we don't agree that there's a presumption that

09:00:27  9      it's one over the other at this point, other than you've said

09:00:30 10      earlier.

09:00:30 11                     THE COURT:  Right.  Well, you know, I'm not the final

09:00:35 12      authority on that.  But I do know that we want to get back on

09:00:40 13      track and get a new trial date set.  What that trial looks like,

09:00:44 14      I don't think any of us knows.

09:00:46 15                     MR. MAZE:  Very well.

09:00:47 16                     THE COURT:  Okay.

09:00:48 17                     And, Mr. O'Rourke, come on up.

09:00:52 18                     Could I ask you a question before you pipe in?

09:00:56 19      Could you send me a copy of that revised answer to

09:00:58 20      interrogatory?

09:01:01 21                     MR. O'ROURKE:  Certainly.  It's just about a paragraph

09:01:03 22      long.

09:01:03 23                     THE COURT:  Fine.  As you know, it's not filed of

09:01:05 24      record, so I don't have access to it.

09:01:08 25                     MR. O'ROURKE:  Fine.

                                                                      29

09:01:09  1                     Steve O'Rourke for the United States.  And I'm

09:01:18  2      introducing Steve Flynn.

09:01:21  3                     MR. FLYNN:  Good morning, Your Honor.  Steven Flynn for

09:01:24  4      the United States.

09:01:25  5                     THE COURT:  Mr. Flynn, for the purposes of the phone

09:01:27  6      participants, speak up a little bit.

09:01:28  7                     Thank you.

09:01:28  8                     MR. FLYNN:  Certainly.

09:01:29  9                     I just wanted to point out that I helped draft

09:01:31 10      that interrogatory update.  And I think the whole point of it

09:01:33 11      was that, early on in the proceeding, the United States was

09:01:36 12      allowing -- at least, it's the Coast Guard's position, that the

                                         Page 24

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

09:01:40 13    United States was allowing BP to develop different ideas as to

09:01:44 14    how to contain the well, and which ones it promoted to the

09:01:49 15    unified command was really its decision.

09:01:52 16              That changed early in May.  And, from then on, the

09:01:54 17    United States was more involved in the initial discussion.

09:01:58 18              That's really all that interrogatory was going to.

09:02:02 19         THE COURT:  Yeah.  I'm just trying to keep up with you.

09:02:05 20    It's not that I have any kind of serious interest in your

09:02:07 21    interrogatory update, other than to stay up to date with you.

09:02:12 22         MR. FLYNN:  Thank you.

09:02:12 23         THE COURT:  Okay.

09:02:13 24              Now Mr. O'Rourke.  How are you today?

09:02:18 25         MR. O'ROURKE:  Great.  How are you, Your Honor?
♀
                                                                      30

09:02:18  1         THE COURT:  Good.  Thank you.

09:02:19  2         MR. O'ROURKE:  So Steve O'Rourke for the United States.

09:02:20  3              Talking about the big picture here about what this

09:02:23  4    is about, we agree with what Mr. Miller said, that the United

09:02:27  5    States' claim will probably be a more significant part of this

09:02:30  6    case.

09:02:31  7              We'd like to lodge an objection, though.  It was

09:02:34  8    me two weeks ago who talked about that, and I do not like being

09:02:38  9    confused with Underhill.

09:02:41 10         MR. MILLER:  You have my apology on that.  I

09:02:43 11    understand.

09:02:43 12         THE COURT:  Everybody understands that.

09:02:47 13         MR. O'ROURKE:  So that's stipulated and in the record.

09:02:50 14              And so the Clean Water Act claim will probably be

09:02:52 15    the bigger claim in the case.  I don't think that necessarily

09:02:55 16    means that we're looking for a see change in how the phases are

09:03:00 17    phased out.

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

09:03:00 18                    This case has never been operated really on what
09:03:03 19    claims are being tried, so much as on what bundles of types of
09:03:06 20    evidence.  And the first bundle, Phase One, was about rig
09:03:09 21    operations.  Second bundle was about subsea responses.
09:03:14 22                    I don't think we're going say that all has to be
09:03:16 23    wiped out and we have to start over and do one giant trial.  We
09:03:20 24    can probably continue to live with some phasing.
09:03:23 25                    We will advocate that Phase Three should be killed
♀
                                                                        31

09:03:25 1     off.  We never wanted that.  We had advocated that Phase Two,
09:03:29 2     source control, should be canceled.  This is the subject of
09:03:31 3     debate.
09:03:33 4                     I think I should also foreshadow that we might
09:03:37 5     need an extension of time to get back to you, in case we have to
09:03:40 6     negotiate with the others parties, you know, the government.
09:03:44 7                     And, as for the other penalty factors, those types
09:03:50 8     of things might be things like prior violations of a different
09:03:53 9     defendant.  Because that was excluded from Phase One.
09:03:55 10           THE COURT:  That's right.
09:03:57 11           MR. O'ROURKE:  To show negligence.  But it's expressly
09:03:59 12    allowed under the statute under the penalty factor.  But, again,
09:04:03 13    that would be a different set of evidence.
09:04:04 14                    So I don't think we're going to say it all has to
09:04:08 15    be squished into one mega-trial.  It can continue to operate on
09:04:08 16    phasing phases.
09:04:14 17                    I like to hear what you just said about going
09:04:17 18    forward with Phase One, having a Phase One track, and then
09:04:21 19    continue onto the Phase Two track.
09:04:22 20           THE COURT:  Good.  I'm glad somebody likes it.
09:04:24 21                    Thanks, Dave.
09:04:26 22                    All right.  I think that is it for my agenda.
                                     Page 26

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

09:04:31 23   Let's throw the floor open for any other issues that might want

09:04:38 24   to be raised.

09:04:38 25                  Mr. Sterbcow, I didn't know you were still

♀

32

09:04:41 1   involved in the litigation.

09:04:44 2                  MR. STERBCOW:  Most people would tell you I'm not, but

09:04:47 3   -- well, this is a separate issue that I spoke to Don Haycraft

09:04:50 4   about this morning.  I just wanted to bring it to your attention

09:04:53 5   so it's on the radar.

09:04:55 6                  We've been working to get the personal injury

09:04:58 7   cases settled.  I reached an agreement in principal on a

09:05:03 8   personal injury case that I'm involved in.  Received a proposed

09:05:06 9   receipt and release that purports to require me to represent

09:05:11 10  that I represent the wife of a Jones Act seaman and that she is

09:05:16 11  releasing her claims and that she will sign off on the release.

09:05:19 12                 The law does not permit a wife of a Jones Act

09:05:23 13  seaman to bring a claim.  I never represented the lady.  And, at

09:05:27 14  this point, I'm being told that there is no settlement unless I

09:05:29 15  agree to execute the document as it's written.  Which I can't

09:05:33 16  do.

09:05:34 17                 So I talked to Don.  We just got a chance to talk

09:05:37 18  about it this morning.  He's going to go back and take a look.

09:05:40 19                 I just wanted to put this on the radar screen,

09:05:42 20  because I don't want this to upset an agreement in principal

09:05:47 21  that we had.

09:05:48 22                 There may also be some issues with

09:05:50 23  confidentiality, because there's a long confidentiality

09:05:53 24  provision that, I mean, really is not going to bother me one way

09:05:57 25  or the other in the end.  But it's not a negotiated paragraph.

♀

33

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

```
09:06:00  1    And I just wanted to let you know -- I'm don't know that I'm the
09:06:03  2    only one that's going to have this problem.
09:06:05  3              THE COURT:  It may not be, and that's the kind of thing
09:06:07  4    that I'm sure we can work our way around.  If you all want to
09:06:11  5    have a conference call later today or early next week, I'd be
09:06:16  6    glad to work with you on this one.
09:06:18  7              MR. STERBCOW:  I'm looking forward to the trial
09:06:21  8    whenever we set it.  Just let me know, I'll be there.
09:06:22  9              THE COURT:  You got your box ready?
09:06:25 10              MR. STERBCOW:  I've got my box ready.
09:06:26 11              THE COURT:  Good.
09:06:27 12              Don, if you all want to follow-up with me on that,
09:06:30 13    I'll be happy to work with you.
09:06:32 14              All right.  What else?
09:06:34 15              Telephone participants, there's a lot of you.  Is
09:06:38 16    there something on one of your, or more, minds?
09:06:41 17              (No response.)
09:06:42 18              THE COURT:  That's good.
09:06:43 19              All right.  Well, if there's nothing else we need
09:06:45 20    to discuss, thank you for coming.  And we won't see you next
09:06:48 21    week.  Have a happy, happy Good Friday and Easter.
09:06:55 22              PERSON ON TELEPHONE:  Thank you, Judge.  You, too.
09:06:57 23              THE COURT:  Thank you.  I appreciate it.
09:06:57 24              See you the week after.
09:06:59 25              (10:07 a.m., Proceedings concluded.)
```
♀
                                                                        34

```
          1

          2                       CERTIFICATE

          3

          4
                   I, Susan A. Zielie, Official Court Reporter, do hereby
          5    certify that the foregoing transcript is correct.
```

2012-03-30 MDL2179 Transcript of Discovery Status Proceedings - Judge Shushan_(22280198_1) (2).TXT

```
 6
 7                                      /S/ SUSAN A. ZIELIE, FCRR
 8                                    _____
                                       Susan A. Zielie, FCRR
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# ATTACHMENT F

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig        MDL NO. 2179
       "Deepwater Horizon" in the Gulf
       of Mexico, on April 20, 2010        SECTION J

Applies to: *All Cases*        JUDGE BARBIER
       MAGISTRATE JUDGE SHUSHAN

## ORDER

### [Working Group Conference on Friday, March 30, 2012]

**NOTE TO CELL PHONE PARTICIPANTS:** Please do not put your phone on hold during the conference as it causes an annoying beeping sound for everyone else. If you cannot participate for part of the conference, put your phone on mute. Likewise for those who type during the conference.

1.    **BOP & Capping Stack**.

Captain Englebert reported that she completed her regular inspections of the equipment, including the Blowout Preventer and Lower Marine Riser. All of the equipment in her custody was fine. By June 1, the United States is to notify her of its position on preservation of the Capping Stack. After the Department of Justice visits the site in the next few weeks, she may submit a new request for release of evidence.

BP reported that the fluids issue was resolved. BP and Transocean are continuing their discussions on the issue of the ownership of the Capping Stack and its components. BP reported that the data from the laser scan measurements of the Capping Stack would be sent out to the parties shortly.

2.    **Halliburton Computer**.

Captain Englebert reports that the work on the forensic examination of the Halliburton

computer is proceeding. BP reported that the forensic consultant may not be able to recover the information from the computer and if so, it may want to revisit the option of whether the files can be recreated with Halliburton's software.

**3.      Woods Hole.**

On March 29, the U.S. reported that the documents sent to the Coast Guard for review before production to BP were produced by WHOI to BP. This includes all of the "deliverables" under the contract between the Coast Guard and WHOI. The only remaining issues to be resolved are the scholastic privilege raised by WHOI and the costs incurred by it. WHOI will submit a further letter brief on **Thursday, April 6**. BP may reply **on or before Wednesday, April 11.**

**4.      Rule 30(b)(6) Notices for Depositions of Exxon/Mobil and Cudd Well Control.**

The depositions of Exxon/Mobil and Cudd Well Control have been stayed (Rec. doc. 6101).

**5.      U.S. and BP Production of Documents.**

The Court conducted telephone discovery conferences with BP and U.S. on Tuesday and Thursday. Further conferences are set. A schedule was set for the resolution of the deliberative process privilege issue (Rec. doc. 6151).

**6.      Rule 30(b)(6) Notice for Deposition of the U.S..**

The final notice for the Rule 30(b)(6) deposition of the U.S. was served.

**7.      Rule 30(b)(6) Notice for Deposition of BP**.

BP and the U.S. are conferring on BP's objections to the Rule 30(b)(6) notice for deposition of BP. Although the States are not yet participants in the process, the U.S. will not proceed on source control depositions without consulting with the States.

8.   **Potential Rule 30(b)(6) Notice for Deposition of Anadarko**.

      Anadarko reported that it brought the States current on the communications between the PSC and it regarding the Rule 30(b)(6) notice.  They are determining the quantification topics where Anadarko will present testimony and those where it does not have any information.  The States noted that Alabama and Louisiana may have different positions regarding Anadarko.

9.   **Rule 30(b)(6) Notices for MOEX and Weatherford.**

      The U.S. reported that the Rule 30(b)(6) notice for Weatherford concerns quantification.  It communicated this to counsel for Weatherford.  It reported that it may not be necessary to depose MOEX.

10.   **Rule 30(b)(6) Notices for Depositions of Other Non-Parties**.

      BP and the U.S. agreed to conduct a survey on the remaining notices of depositions for non-parties.  BP will provide a report on the survey by March 30.  The Court reported that it was not necessary that BP and the U.S. determine whether source control topics could be eliminated from the notices.

11.   **Source Control**.

      The States reported that there is agreement as to what Alabama and Louisiana want from source control.  The States communicated with the U.S. on source control topics which can be deferred and those which they believe should not be deferred.  They reported that Transocean and Halliburton wanted discovery on all of the source control topics.  They raised the issue of whether they should proceed further in trying to determine what source control topics are not required if the other defendants want them all.  They indicated that the scope of source control discovery would depend on the revision of the trial plan.  The Court responded that the trial plan will require

proceeding with the remainder of Phase One and moving into Phase Two. The States were asked, however, to report under two scenarios: (1) the Phase One trial followed by Phase Two; and (2) a U.S. Clean Water Act penalty trial first.

Transocean reported that if the main thrust of a trial concerns the claims of the U.S., it will be necessary for it to conduct discovery on issues concerning the penalty factors of the Clean Water Act. It is concerned with the discovery as it relates to its role as a defendant in the CWA claims and the need to proceed with such discovery sooner rather than later.

Halliburton reported that the pollution claims and the allocation issues within those claims involve a component of source control. It contends that: (1) source control remains an important topic; and (2) source control remains wedded to quantification.

The Court asked Transocean and Halliburton to review the proposed Phase Two stipulations and determine whether the stipulations eliminated some of the discovery required by them. The goal will be to use the stipulations as a base and determine what discovery is required beyond the base of information found in the stipulations.

## CONFERENCE SCHEDULE

| | |
|---|---|
| Friday, April 6, 2012 is Good Friday | No meeting |
| Friday, April 13, 2012 at 9:30 a.m. | WGC meeting |
| Friday, April 20, 2012 at 9:30 a.m. | WGC meeting |
| Friday, April 27, 2012 at 9:30 a.m. | WGC meeting |
| Thursday, May 3, 2012 at 8:30 a.m. | Liaison Counsel meeting with Judge Barbier WGC meeting to follow at 9:30 a.m. |
| Friday, May 11, 2012 at 9:30 a.m. | WGC meeting |
| Friday, May 18, 2012 at 9:30 a.m. | WGC meeting |

Friday, May 25, 2012 at 9:30 a.m.          WGC meeting

New Orleans, Louisiana, this 2nd day of April, 2012.



**SALLY SHUSHAN**
**United States Magistrate Judge**

# ATTACHMENT G

### STATEMENT OF WORK
### DEEPWATER HORIZON Oil Spill Flow Rate and Characteristics Analysis

**1.0    Background**

The explosion and sinking of the BP-leased DEEPWATER HORIZON oil rig (from here on referred to as the "site") resulted in a major oil spill in the Gulf of Mexico. Presently, the Unified Incident Command Post is directing the response effort in the vicinity of the release.  BP is the responsible party for the stoppage and cleanup of the spill.  BP has provided flow rate estimates but they are not consistent with other estimations. The Government seeks to provide accurate assessments of the oil flow characteristics and hydrocarbon releases into the water column.

**2.0    Scope**

The objective of this contract is to provide a comprehensive analysis of the oil flow releasing at the site.

**3.0    Requirements Tasking**

The requirements are to 1) conduct on-site data collection of the available oil spill flow characteristics with specific attention to rate estimation; 2) analyze the data gathered, and 3) provide a comprehensive analysis report.

**3.1    Data Collection Plan**

Prior to departure for on-site data collection, the Contractor shall provide a Data Collection Test Plan as Deliverable 1.  The plan shall include the description and sequence of operations.

**3.2    On-Site Data Collection**

The Contractor shall conduct on-site research into the flow rate of the oil spill in accordance with the Deliverable 1.  The Contractor shall provide daily reports as Deliverable 2; which include, but are not limited to: personnel involvement, equipment status, and a field analysis of data collected. The Contractor shall provide a trip report as Deliverable 3, which includes, but is not limited to: a summary of significant events during the deployment; equipment and sensor performance assessment, and a preliminary analysis of data collected.

**3.3    Data Analysis**

The Contractor shall analyze the data collected under Task 3.2 to provide a Final Oil Spill Flow Rate Report and Characterization Analysis Report as Deliverable 4.  This report shall be submitted within 5 business days after the conclusion of data collection period.

**3.4    Contract Archive**

The Contractor shall provide an electronic archive of all reports, test data, and other information gathered during the contract as Deliverable 5.  This archive shall be delivered at the conclusion of the period of performance.

**4.0    Other**

**4.1    Period of Performance**

The period of performance for this task is 30 days from contract award.

**STATEMENT OF WORK**
**DEEPWATER HORIZON Oil Spill Flow Rate and Characteristics Analysis**

**4.2    Travel**

Travel to the U.S. Gulf Coast region is required for the research team.  All personnel and equipment required to gather data for oil spill analysis shall be deployed to the site.

**4.3    Government Furnished Information**

The following information will be provided upon contract award:

  1) USCG Marine Safety Lab oil test sample data.

**4.4    Security**

This project is unclassified.

**4.5    Contracting Officer's Technical Representative (COTR)**

The COTR for this task is Lieutenant Joseph Kusek.  He can be reached  at (860) 271-2789 or by email joseph.w.kusek@uscg.mil.

# ATTACHMENT H

SPECIAL FEATURE

# Acoustic measurement of the *Deepwater Horizon* Macondo well flow rate

Richard Camilli[a,1], Daniela Di Iorio[b], Andrew Bowen[a], Christopher M. Reddy[c], Alexandra H. Techet[d], Dana R. Yoerger[a], Louis L. Whitcomb[a,e], Jeffrey S. Seewald[c], Sean P. Sylva[c], and Judith Fenwick[a]

[a]Department of Applied Ocean Physics and Engineering, Woods Hole Oceanographic Institution, Woods Hole, MA 02543; [b]Department of Marine Sciences, University of Georgia, Athens, GA 30602; [c]Department of Marine Chemistry and Geochemistry, Woods Hole Oceanographic Institution, Woods Hole, MA 02543; [d]Department of Mechanical Engineering, Massachusetts Institute of Technology, Cambridge, MA 02139; and [e]Department of Mechanical Engineering, Johns Hopkins University, Baltimore, MD 21218

Edited* by Marcia K. McNutt, US Geological Survey, Reston, VA, and approved August 11, 2011 (received for review January 25, 2011)

On May 31, 2010, a direct acoustic measurement method was used to quantify fluid leakage rate from the *Deepwater Horizon* Macondo well prior to removal of its broken riser. This method utilized an acoustic imaging sonar and acoustic Doppler sonar operating onboard a remotely operated vehicle for noncontact measurement of flow cross-section and velocity from the two leak sites. Over 2,500 sonar cross-sections and over 85,000 Doppler velocity measurements were recorded during the acquisition process. This data were then applied to turbulent jet and plume flow models to account for entrained water and calculate a combined hydrocarbon flow rate from the two leak sites at seafloor conditions. Based on the chemical composition of end-member samples collected from within the well, this bulk volumetric rate was then normalized to account for contributions from gases and condensates at initial leak source conditions. Results from this investigation indicate that on May 31, 2010, the well's oil flow rate was approximately $0.10 \pm 0.017$ m$^3$ s$^{-1}$ at seafloor conditions, or approximately $85 \pm 15$ kg s$^{-1}$ ($7.4 \pm 1.3$ Gg d$^{-1}$), equivalent to approximately $57,000 \pm 9,800$ barrels of oil per day at surface conditions. End-member chemical composition indicates that this oil release rate was accompanied by approximately an additional $24 \pm 4.2$ kg s$^{-1}$ ($2.1 \pm 0.37$ Gg d$^{-1}$) of natural gas (methane through pentanes), yielding a total hydrocarbon release rate of $110 \pm 19$ kg s$^{-1}$ ($9.5 \pm 1.6$ Gg d$^{-1}$).

Gulf of Mexico | oil spill | buoyant plume | buoyant jet | subsurface

**A**ccurate assessment of the hydrocarbon fluid release rate from well blowouts such as that of the *Deepwater Horizon* Macondo well provides fundamental information for evaluating intervention options to regain well control, properly scaling oil collection and containment operations, estimating the total spill volume, assessing environmental damage, and investigating well casing or blowout preventer (BOP) failure modes. On May 31, 2010, a direct acoustic technique was used to measure the volumetric flow rate of fluids (liquid and gas) emitted from the *Deepwater Horizon* Macondo well. This method, which adapts acoustic techniques previously developed for deep-sea hydrothermal vent research (1), enabled observation from a remotely operated vehicle (ROV) (Fig. S1) at horizontal standoff distances of between 2 and 7 m, providing a noncontact method of measurement wherein the sensors did not disturb the flow or become fouled with oil or gas hydrate accretions. Despite the optical opacity of the fluid, this acoustic technique enabled quantitatively detailed measurement of the leaks' cross-sectional areas and velocity profiles. This acoustic flow rate assessment was conducted on a "not to interfere basis" due to the well containment operations being carried out from late April through mid-July. Data were thus collected on an opportunistic basis during short time intervals between containment procedures.

Acoustic measurement commenced immediately following the unsuccessful "top kill" attempt, before the riser was removed and the lower marine riser package Top Hat #4 containment system was placed on top of the BOP. At this time the well's leaks

were located in two distinct areas: a kinked section of the riser pipe immediately above the BOP's flex joint (28.7381° N 88.3660° W), and at the broken end of the riser approximately 225 m north-northwest of the well's BOP. Independent acoustic measurements were required at each site.

## Results

Horizontal cross-section images of fluids flowing from the well were recorded above each of the leak locations using the imaging sonar (1,089 cross-section images at $3.0 \pm 0.1$ m above the broken riser source, and 1,500 cross-section images $1.3 \pm 0.1$ m above the BOP-kink source), requiring between 3 and 4 min of acquisition per leak site (Fig. 1). To aid these operations, the ROV was equipped with a pair of parallel-sighting lasers that assisted in aiming the imaging sonar and Doppler sonar at the centers of the hydrocarbon leaks (Fig. S1). Cross-section area calculation was based on interframe motion tracking of acoustic returns using a standard threshold of 3.5 dB (signal-to-noise ratio of 1.5:1) or more above background noise (2), and flow areas were counted only if the contiguous area was equal to or greater than 0.01 m$^2$. The threshold for contiguous region was defined as an area larger than the Nyquist theorem limit of the imaging sonar's pixel resolution at a range of approximately 7 m. Using this method, the mean cross-section areas of the leak jets of the broken riser and BOP kink are 1.10 and 0.996 m$^2$, respectively, with the standard error of the mean for each leak site of $\pm 0.005$ and $\pm 0.004$ m$^2$ (equivalent to $\pm 0.45$ and $\pm 0.42\%$ relative standard error), respectively. Optical observation of flow width using the parallel-sighting lasers (0.1-m beam spacing) indicates that the acoustic cross-section values are valid (Fig. S2). The ROV's high-definition video camera was, however, uncalibrated and did not account for optical distortions, making it inappropriate for quantitatively precise size estimation.

At each of the two leak sites, the ROV was positioned facing the rising source fluids with vehicle headings of 120°, 240°, and 360°. Doppler sonar data were obtained with the ROV holding station in a fixed position within 0.5 m of a desired positional set point at each station for durations of approximately 5 min. The flow velocity data from a 60° upward pointing Doppler beam (Fig. S3) were postprocessed and combined with ROV navigation position estimates to compute the instantaneous vertical velocity for each ping ensemble within a 3D coordinate frame. The velo-

Author contributions: R.C., D.D., A.B., D.R.Y., and L.L.W. designed research; R.C., A.B., C.M.R., and S.P.S. performed research; R.C., D.D., A.B., C.M.R., A.H.T., D.R.Y., L.L.W., and J.S.S. contributed new reagents/analytic tools; R.C., D.D., A.B., C.M.R., A.H.T., D.R.Y., L.L.W., J.S.S., S.P.S., and J.F. analyzed data; and R.C., D.D., A.B., C.M.R., A.H.T., D.R.Y., L.L.W., and J.F. wrote the paper.

The authors declare no conflict of interest.

*This Direct Submission article had a prearranged editor.

[1]To whom correspondence should be addressed. E-mail: rcamilli@whoi.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1100385108/-/DCSupplemental.

ENVIRONMENTAL SCIENCES

PNAS



**Fig. 1.** Measured jet cross-section areas based on imaging sonar using motion tracking with a 3.5 dB (signal-to-noise ratio = 1.5:1) threshold at a horizontal plane 3 m above the broken riser leak source (*Upper*), and 1.3 m above the BOP-kink leak source (*Lower*). X-axis values denote the sample number, with a total of 1098 cross-section measurements taken for the broken riser leak and 1,500 cross-section measurements for the BOP kink. Measurements were recorded at a rate of approximately 6 Hz, for durations of 3 min at the broken riser site, and 4 min at the BOP-kink site. The periodic variability in cross-section areas for each of the leak sites is consistent with turbulent flow.

city calculations are based on an initial set of 42,270 broken riser and 42,894 BOP-kink Doppler sonar measurements.

The momentum length scale, $L_M$, of the jet sources, was approximately 0.6 m for the broken riser and 0.1 m for the BOP kink (*SI Text*). The differing source sizes and geometries may have influenced the length scale, with the BOP-kink leak site being made up of numerous small diameter sources acting as diffusers, whereas the broken riser was comprised of a single large diameter source. In comparison, the $L_M$ of deep-sea hydrothermal vent flows are at most 1 m (3). Based on the estimated momentum length scales, Doppler measurements at both sites were determined to be within the region of buoyancy-driven plume flow, as characterized by Papanicolaou and List (4). The BOP-kink imaging sonar measurement cross-section plane was determined to be within the plume region, whereas the broken riser cross-section plane was within the upper limits of its jet flow region.

With these flow correspondences, the perimeter of fluid flow at each leak site is defined using the cross-section area of the imaging sonar measurement and augmented by empirically derived expansion rates of 0.108 and 0.105 (4) for jet and plume flow, respectively, where the horizontal radius of fluid flow, $b_w$, expands upward or contracts downward in the plume flow region as $b_w \sim 0.105z$, where $z$ is the vertical distance from the sonar imaging plane and $b_w$, similarly expands upward or contracts downward in the jet flow region as $b_w \sim 0.108z$. Downward continuing the expansion models from the measured cross-section planes to their respective sources predict a source diameter of $0.53 \pm .02$ m for broken riser, and a $0.84 \pm .02$ m effective source diameter for the multiple closely spaced leak orifices at BOP-kink site.

ROV video imagery showed that the broken riser orifice was modestly deformed but maintained a generally circular shape and that the multiple BOP-kink leaks were arranged in a pattern that approximated an oval (5). Consequently, flow rates were determined using accepted models of free round jets emanating into a quiescent fluid and transitioning to buoyancy-driven plumes (4, 6, 7). Under these models, at sufficient distance from the orifice the flow becomes fully developed. Within this region, the velocity profiles become self-similar and the initial jet velocity profile at the orifice becomes inconsequential (8, 9). A distance, $z_c$, corresponding to 5 times the orifice diameter, is typically considered sufficient for fully developed flow.

Raw Doppler measurements within the plume volumes reveal negative (downward) velocities with maximum magnitude approaching that of positive (upward) velocities (Figs. 2 and 3), symptomatic of intense turbulence. Optical imagery shows turbulent mixing well fluids rapidly transitioning to fine emulsions of hydrocarbons and water (Fig. S2) that are visually indistinguishable from the emulsion layer described at approximately 1,100- to 1,300-m depth (10).

Using the previously described buoyancy-driven plume expansion model, velocity measurements recorded at varying heights within this control volume are downward-continued to a plane common with the cross-section plane (*SI Text*).

Downward-continued vertical velocity measurements within the broken riser and BOP-kink plume measurement volumes indicate normal distributions about their means, with respective median values of 0.11 and $1.4 \times 10^{-4}$ m s$^{-1}$. When binned at equally spaced intervals along their respective axial radii, the downward-continued vertical velocities are highest at the axial center, transitioning to lower velocities as a function of radial distance from the center, generally following a 2D Gaussian distribution about the centerline (Fig. 3). The spatially and temporally averaged vertical velocity, $w_{avg}$, at the cross-section plane height for the broken riser and BOP kink are, respectively, 0.14 and 0.05 m s$^{-1}$. Standard error values for these vertical velocity estimates are, respectively, $\pm 0.003$ and $\pm 0.008$ m s$^{-1}$ (equivalent to $\pm 2$ and $\pm 16\%$ relative standard error).

Volumetric fluid flow rate (well fluids and entrained seawater), $\mu$, is computed at the cross-section plane height as the product of the cross-sectional area multiplied by its respective $w_{avg}$, yielding $0.154 \pm 0.004$ m$^3$ s$^{-1}$ for the broken riser and $0.050 \pm 0.008$ m$^3$ s$^{-1}$ for the BOP kink. Entrained seawater, $Q_{water}$, is estimated for the cross-section plane as a function of the flow's lateral surface area, $A_{lat}$, extending between the source and cross-section plane (6), $w_{avg}$, and an entrainment coefficient (4), $\alpha$, where $\alpha_{jet} = 0.0535 \pm 0.0025$ is used for the broken riser site, and $\alpha_{plume} = 0.0833 \pm 0.0042$ is used for the BOP-kink site (*SI Text*). Based on calculated $A_{lat}$ surface areas of $8.1 \pm 0.17$ and $4.0 \pm 0.27$ m$^2$ for the broken riser jet and BOP-kink plume, respectively, and their associated $w_{avg}$ velocities, the water entrainment rate at the cross-section planes are $0.057 \pm 0.006$ and $0.016 \pm 0.004$ m$^3$ s$^{-1}$, respectively. These water volume entrainment values compare favorably to dilution estimated as a dimensionless function of distance from the jet orifice (7).

SPECIAL FEATURE

ENVIRONMENTAL SCIENCES



**Fig. 2.** Three-dimensional reconstruction of velocity fields based on Doppler sonar velocity field measurements recorded at the BOP-kink leak site (*Upper*) and the broken riser leak site (*Lower*). Each colored dot represents the location of a Doppler ping ensemble, with the dot color describing the estimated velocity in meters per second (as specified in the colorbar). The black ellipse in each graph indicates the calculated size and location of the leak source; blue dashed ellipses indicate the calculated flow perimeters. Black dots indicate the position of the ROV-mounted Doppler sonar during measurement.



**Fig. 3.** Vertical velocity profiles of flow at the BOP kink and broken riser. *A* shows the raw vertical velocities for all recorded heights within the BOP plume measurement volume, *B* shows the calculated velocity profile at BOP-kink cross-section measurement plane using the downward-continued plume model. Velocities are binned at equally spaced intervals of 0.1 $r/b_w$, where $-r/b_w$ is the region recorded between the ROV and the jet's vertical axis, and $+r/b_w$ is the distal region opposite $-r/b_w$. The number of measurements recorded within each bin is described as n, and error bars represent the standard error of the mean for each bin. *C* shows the raw vertical velocities for all recorded heights within the broken riser flow measurement volume, and *D* shows the calculated velocity profile at the broken riser cross-section measurement plane using the downward-continued plume model.

The net volumetric fluid flux rates from the Macondo well leak sites, $Q$, are obtained by subtracting $Q_{water}$ from $\mu$. Calculated $Q$ values are thus $0.097 \pm 0.011$ m³ s⁻¹ for the broken riser leak and $0.034 \pm 0.009$ m³ s⁻¹ for the BOP-kink leak, yielding a combined well flux rate of approximately $0.131 \pm 0.02$ m³ s⁻¹.

The volumetric well fluid-to-seawater mixing ratios at the broken riser and BOP-kink cross-section planes indicate that the ambient seawater entrained with the well fluids caused rapid cooling of these jets. Based on the ambient seawater temperature of 4.4 °C (10), a maximum measured temperature of 37 °C at a well fluid exit vent (11), and the specific heat of crude oil being approximately half that of seawater, the bulk fluid temperature of the BOP-kink jet was less than 14 °C and the bulk fluid temperature of the jet at the broken riser cross-section plane is calculated

to have been less than 13 °C, although the actual temperature at the broken riser source was presumably lower due to conductive cooling during well fluid transport within the several hundred meters of coiled riser pipe linking the BOP to the broken riser end location.

End-member chemical composition analysis by Reddy et al. (11) reveals that the well fluids contained no detectable formation water and were by mass approximately 15% methane, 7% ethane through pentanes, 77% hexanes and higher petroleum hydrocarbons, and less than 1% carbon dioxide and nitrogen (overall error ±2%). Thermodynamic calculations indicate that under initial source conditions ethane and higher hydrocarbons would remain in liquid form, suggesting that gas phase components would be limited to methane, carbon dioxide, and nitrogen.

Based on nonideal gas compressibility and a methane hydrate stability point of approximately 15.5 °C at ambient hydrostatic

pressure (approximately 150 atm), the water that became turbulently entrained with the jet subjected these free gases to aqueous dissolution while simultaneously causing carbon dioxide to condense into liquid phase and transitioning methane into a hydrate phase. Under these conditions the well fluids at the cross-section plane heights were by volume 76% oil (i.e., hexanes and higher hydrocarbons), with the remaining fluid balance composed of methane hydrate, liquefied ethane through pentanes, and nonhydrocarbon gases.

Multiplying the estimated $Q$ of each leak source with the calculated oil fraction, $0.76 \pm 0.02$, yields a net oil flow rate, $Q_{oil}$, of $0.074 \pm 0.0096$ and $0.026 \pm 0.0077$ m$^3$ s$^{-1}$ of oil from the broken riser and BOP kink, respectively, for a combined total of $0.10 \pm 0.017$ m$^3$ s$^{-1}$. Socolofsky et al. (12) estimated an oil density at ambient seafloor conditions of 858 kg m$^{-3}$, indicating a combined oil transport of approximately $85 \pm 15$ kg s$^{-1}$ (or $7.4 \pm 1.3$ Gg d$^{-1}$) from the two leak sites. Measured oil density was 821 kg m$^{-3}$ at surface conditions (11), indicating that the volumetric oil flux rate calculated at ambient seafloor conditions would expand by 4.5% at surface conditions to approximately $0.104 \pm 0.018$ m$^3$ s$^{-1}$, equivalent to $57,000 \pm 9,800$ barrels of oil per day. As indicated by the end-member chemical composition (11), this oil release rate was accompanied by an additional $24 \pm 4.2$ kg s$^{-1}$ ($2.1 \pm 0.37$ Gg d$^{-1}$) of natural gas (methane through pentanes) from the two leak sites, yielding a total hydrocarbon release rate of $110 \pm 19$ kg s$^{-1}$ ($9.5 \pm 1.6$ Gg d$^{-1}$).

## Discussion

Although the overall statistical measurement error is inclusive of recorded natural variability in the turbulent flow, the methods described here may be subject to additional nonstatistical uncertainty caused by systematic observational or model biases. The extremely limited opportunity for data collection at the leak sites did not permit additional investigation. Nonetheless, comparison of measurement data with theoretical bounds and other independent measurements provide some indication of model performance and potential biases.

The sonar-derived source diameter calculations derived from average measured flow cross-section and distance-dependent jet flow expansion are in close agreement with other independent measurements. The broken riser source diameter, calculated at $0.53 \pm 0.02$ m, is nearly identical to the nominal 0.492 m (19.375 in.) internal diameter of the *Deepwater Horizon* riser pipe (13, 14). Similarly, the sonar estimated BOP-kink source diameter, at $0.84 \pm 0.02$ m, matches the maximum measured distance between individual leak orifices at the flattened riser section of the BOP kink (5).

Fluid velocity measurement errors due to ROV vehicle motions were calculated for each station. The ROV's mean X, Y, and Z component velocities during acoustic flow measurements were, respectively, $-0.00009$, $0.00016$, and $0.00023$ m s$^{-1}$ for the broken riser site, and $-0.00122$, $-0.0015$, and $-0.00056$ m s$^{-1}$ for the BOP-kink site. These measured mean vehicle velocities are negligible in comparison to the measured fluid flow velocities.

Unlike shallow water releases of oil and natural gas, which tend to generate two phase flow with a large initial density defect and bubble slip velocities (15), the ambient seafloor pressure and temperature regime at the Macondo well site impose a minimum initial gas phase density of at least approximately 120 kg m$^{-3}$ and an initial bulk (oil and gas) fluid density within a factor of two of the ambient seawater. Moreover, entrainment of the low temperature seawater indicates rapid density increases through cooling and phase transformations of methane and carbon dioxide, evolving the fluids into a single phase before the turbulent jet flow is fully developed. These near-source effects increase the bulk fluid density to approximately 950 kg m$^{-3}$, sharply eroding the initial density deficit and associated buoyancy forces (16). Optical imagery at each of the leak sites confirmed methane hydrate

formation within the near-field measurement volumes, indicating that the well fluids had rapidly cooled to a temperature of 15.5 °C or less. Atmospheric observations in the vicinity of the well site also show that methane did not reach the sea surface (17, 18), and subsurface chemical measurements reveal that the methane instead formed a neutrally buoyant plume at approximately 1,100-m depth (10, 19), indicating that buoyancy-driven methane flux ceased within the initial 400 m of vertical water column transport.

Horizontal water currents measured in the vicinity of the well were less than $0.08$ m s$^{-1}$ (10), indicating that the horizontal water currents did not significantly influence the leaks' flow regimes and plume spreading rates within the length scales of the measurement regions. The minimum height, $z_B$, at which horizontal water column currents would cause the flow to bend horizontally and increase the lateral expansion rate as a result of horizontal momentum entrainment were at least an order of magnitude greater than the measurement volumes' vertical length scales (*SI Text*). Optical imagery recorded during ROV inspection of the leak sites confirmed that source fluids flowed along vertical axes to heights of substantially more than 10 m without any discernible lateral deviation above their respective source locations.

The calculations described here make use of the well's end-member chemical composition, which has an appreciably lower natural gas mass fraction than those reported from surface containment vessels (20) or from samples collected from within a leak source jet (11). If the source jet sample composition (11) is instead applied, the volume fraction of the oil would decrease from 0.76 to 0.68. This would decrease the net oil flux rate by approximately 11%, while simultaneously increasing the natural gas fraction (methane through pentanes) by an equivalent percentage.

The single day acoustic flow rate estimate reported here corresponds with other independently determined oil release estimates (21–23). The acoustic flow rate estimate may be used in conjunction with these independent well flow rate estimates from other dates to characterize potential release rate variability due to factors such as reservoir depletion and modification of the well structure during containment operations (24). As an ensemble, these estimates suggest a modestly decreasing trend in the well's flow rate as a function of time. If, however, this May 31, 2010, acoustic flow rate estimate of $57,000 \pm 9,800$ barrels of oil per day is extrapolated as a static rate for the interval following the Macondo well blowout and continuing until well shut-in, it indicates a total release of $4,800,000 \pm 800,000$ barrels of oil ($0.81 \pm 0.1$ Tg total hydrocarbons) from the Macondo well from April 20, 2010, to July 14, 2010. Net oil leak to the ocean, calculated as this cumulative release, minus the oil collected using the riser insertion tube tool (25), Top Hat #4, and BOP choke and kill lines (20), totals approximately $4,000,000 \pm 800,000$ barrels.

Considering that there existed no industry-accepted technologies for measuring hydrocarbon flow rate from this leaking deepwater well (26, 27), the acoustic methods described here provide a useful means for quantitative assessment of leakage rate. Prior to removal of the riser, the Macondo well's optically opaque, initially multiphase fluids and multiple irregularly shaped source jets (5) introduced a level of complexity that made flow estimation with optical methods difficult. Although this acoustic method requires integration of specialized hardware, it permitted a three-dimensional view through these fluids enabling highly resolved measurements of cross-sections and characterization of velocity fields within these complex flow regimes. Future deepwater well failure assessment efforts should include a portfolio of techniques that account for the physical and chemical complexity of the leak as well as mobilization requirements.

SPECIAL FEATURE

## Methods

These acoustic measurement methods were undertaken using a work-class ROV (Maxximum, Oceaneering International) that was specifically equipped by the authors for these operations with a dual-frequency identification sonar (DIDSON 3000 imaging sonar, Sound Metrics) and a 1.2-MHz acoustic Doppler sonar (acoustic Doppler current profiler, 1,200-kHz Workhorse, Teledyne RD) for direct measurement of the well fluid expulsion cross-sections and velocity distributions, respectively (Figs. S1 and S3).

The position and orientation of acoustic measurements were obtained by combining data from the ROV's standard suite of navigation sensors. The ship's survey (*MSV Ocean Intervention III*) provided 1-Hz position estimates of an ROV acoustic beacon, as reported by the ultrashort baseline (USBL) navigation system on the vessel (Sonardyne USBL, with integrated survey by Fugro Chance Inc.). These navigation estimates were augmented with 10-Hz heading, pitch, and roll of the ROV recorded by its inertial navigation system (Meridian Gyrocompass, Teledyne TSS). ROV depth was measured using a quartz depth sensor (Digiquartz®, Paroscientific). The vehicle's relative motion was also obtained from a Doppler velocity log (DVL) (300-kHz Navigator, Teledyne RD Instruments) operated in bottom-lock mode and recorded at 4 Hz. The USBL, orientation, and DVL data were processed using a complementary filter that combines the low-frequency content of the USBL position with the high-frequency content of the relative position from the DVL (28), (break frequency 0.002 Hz). In instances where the USBL position was unreliable (possibly due to interference from the leak sources or other vehicles operating in the area), an estimate of the distance to the jet flow was used to transform the DVL's relative displacements into a relative coordinate frame.

The sonar imaging plane was located $3.0 \pm 0.1$ m above the broken riser source and $1.3 \pm 0.1$ m above the BOP-kink source, with the imaging sonar transducer located at a horizontal distance of between 4 and 7 m from the leak sources (Fig. S3). These imaging sonar cross-section measurements were recorded using a 1.8-MHz acoustic frequency and with an acquisition rate of

approximately 6 Hz. The imaging sonar resolution is calculated based on its 96 beam array with individual beam widths of 0.3° and range bin size of 0.022 m. Interframe motion tracking of acoustic returns was calculated using DIDSON Version 5.25.11 software (Sound Metrics Corporation). Cross-section estimates used the DIDSON beam correction software feature and each cross-section was compensated by cosine 10° (due to the sonar being mounted to the ROV with an upward viewing angle of 10°) (Fig. S3).

The 1.2-MHz Doppler sonar was configured to record velocities with an acquisition rate of approximately 5 Hz from each of its four acoustic beams at locations up to 15 m from the instrument at fixed intervals along each beam. The Doppler sonar beams were arranged with beam number four aimed horizontally and beam number three pointing upward at 60° (Figs. S1 and S3). The lateral Doppler sonar standoff distance from the flow was between 2 and 5 m, depending on field of view obstructions.

**ACKNOWLEDGMENTS.** The authors thank the US Coast Guard Research and Development Center (RDC), particularly RDC Executive Director Donald Cundy, LT. Joseph Kusek, LT. Jarrett Parker, and SK1 Omar Arredondo for their assistance with field operations, with additional support from CDR Michael Rorstad at the US Coast Guard Lockport Louisiana facility; Matt Burdyny and Teledyne RD Instruments for assistance with field operations and Doppler data analysis; Bill Hanot and Sound Metrics for assistance with imaging sonar data analysis; the *MSV Ocean Intervention III* ROV crews for assistance with field operations; the National Deep Submergence Facility [Woods Hole Oceanographic Institution (WHOI)] and Dr. Hanumant Singh for generous loan of equipment; and Flow Rate Technical Group leader Dr. Marcia McNutt, as well as the many other individuals within National Incident Command for their valuable assistance. Finally, the authors wish to acknowledge Dr. John Trowbridge for his key insights and suggestions, as well as the anonymous peer reviewers and editors for their input. This work was supported through US Coast Guard Contract HSCG32-10-C-R00020 with additional support from NSF RAPID Grant OCE-1045025 and the WHOI Coastal Ocean Institute.

1. Rona PA, et al. (2006) Entrainment and bending in a major hydrothermal plume, Main Endeavour Field, Juan de Fuca Ridge. *Geophys Res Lett* 33:L19313, 10.1029/2006GL027211.
2. Sound Metrics Corp. (2010) *Didson V5.25 Software Manual* (Sound Metrics Corp., Lake Forest Park, WA) p 81.
3. Speer KG (1999) Thermocline penetration of buoyant plumes. *Mid-Ocean Ridges, Dynamics of Processes Associated with Creation of New Ocean Crust*, eds JR Cann, H Elderfield, and A Laughton (Cambridge Univ Press), pp 249–263.
4. Papanicolaou PN, List E (1988) Investigations of round vertical turbulent buoyant jets. *J Fluid Mech* 195:341–391.
5. Kusek J (2010) *DH Riser Kink Holes—Measurement with Field Drawings and Image* (US Coast Guard Research and Development Center, New London, CT) p 14.
6. Morton B, et al. (1956) Turbulent Gravitational Convection from Maintained and Instantaneous Sources. *Proc R Soc Lond A Math Phys Sci* 234(1196):1–23.
7. Fischer HB, et al. (1979) *Mixing in Inland and Coastal Waters* (Academic, San Diego) p 483.
8. Pope SB (2000) *Turbulent Flows* (Cambridge Univ Press, New York) p 771.
9. Hinze JO (1975) *Turbulence* (McGraw-Hill, New York) p 790.
10. Camilli R, et al. (2010) Tracking hydrocarbon plume transport and biodegradation at Deepwater Horizon. *Science* 330:201–204.
11. Reddy CM, et al. (2011) Composition and fate of gas and oil released to the water column during the *Deepwater Horizon* oil spill. *Proc Natl Acad Sci USA*, 10.1073/pnas.1101242108.
12. Socolofsky S, et al. (2011) Formation dynamics of subsurface hydrocarbon intrusions following the Deepwater Horizon blowout. *Geophys Res Lett* 38:L09602, 10.1029/2011GL047174.
13. Transocean (2010) *Deepwater Horizon fact sheet*, available from http://www.deepwater.com/fw/filemanager/fm_file_manager_download.asp?FileName=Deepwater_Horizon_spec_sheet.pdf&FilePath=/_filelib/FileCabinet/Horizon/ (accessed December 30, 2010).
14. Vetcogray (2008) *HMF Marine Drilling Riser Coupling product information sheet*, available from http://hydrilpressurecontrol.com/_pdf/pressureControlBrochures/VG_hmf_marine_drc.pdf (accessed February 27, 2011).
15. Milgram JH (1983) Mean flow in round bubble plumes. *J Fluid Mech* 133:345–376.
16. Cardoso SSS, McHugh ST (2009) Turbulent plumes with heterogeneous chemical reaction on the surface of small buoyant droplets. *J Fluid Mech* 642:49–77.

17. Yvon-Lewis SA, et al. (2011) Methane flux to the atmosphere from the Deepwater Horizon oil disaster. *Geophys Res Lett* 38:L01602, 10.1029/2010GL045928.
18. Ryerson TB, et al. (2011) Atmospheric emissions from the Deepwater Horizon spill constrain air-water partitioning, hydrocarbon fate, and leak rate. *Geophys Res Lett* 38:L07803, 10.1029/2011GL046726.
19. Valentine DL, et al. (2010) Propane respiration jump-starts microbial response to a deep oil spill. *Science* 330:208–211.
20. US Department of Energy (2010) *Combined Total Amount of Oil and Gas Recovered Daily from the Top Hat and Choke Line Oil Recovery Systems* (US Department of Energy, Washington, DC).
21. National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (2010) *The Amount and Fate of the Oil—Draft—Staff Working Paper No. 3* (National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Washington, DC) p 29.
22. Crone TJ, Tolstoy M (2010) Magnitude of the 2010 Gulf of Mexico oil leak. *Science* 330 (6004):634–634.
23. McNutt MK, et al. (2011) *Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill. Flow Rate Technical Group Report to the National Incident Command, Interagency Solutions Group* (US Department of Interior, Reston, VA) p 22.
24. Bristol S (2010) Government estimates—Through August 01 (Day 104). *Deepwater Horizon MC252 Gulf Incident Oil Budget* (National Oceanic and Atmospheric Administration, Silver Spring, MD).
25. US Department of Energy (2010) *Oil and Gas Recovery Data from the Riser Insertion Tube from May 17 until the Riser Insertion Tube Was Disconnected on May 24 in Preparation for Cutting Off the Riser.*
26. McKay L (2010) Congressional Hearing Testimony, Deepwater Horizon: Oil Spill Prevention and Response Measures and Natural Resource Impacts, House Transportation and Infrastructure Committee, May 19, 2010, Washington. DC.
27. Harris R (2010) "Gulf Spill May Far Exceed Official Estimates" (interview with BP Spokesman Bill Salvin), *Morning Edition: May 14, 2010* (National Public Radio).
28. Whitcomb LL, et al. (2000) Advances in underwater robot vehicles for deep ocean exploration: Navigation, control, and survey operations. *Robotics Research-The Ninth International Symposium* (Springer, London).

ENVIRONMENTAL SCIENCES

# Supporting Information

## Camilli et al. 10.1073/pnas.1100385108

### SI Text

**Approximating Momentum Length Scale.** The momentum length scale, $L_M$, of the jet sources, was approximated by estimating the specific buoyancy transport, $B$, and the specific momentum transport, $M$, for the broken riser and blowout preventer (BOP) kink sites using Doppler velocity measurements from within the flow region, where

$$w = 3.85 \sqrt[3]{\frac{B}{z}} \exp\left[-90\left(\frac{r}{z}\right)^2\right]$$

plume model for Doppler velocities, **[S1]**

$$w = 7.58 \frac{\sqrt{M}}{z} \exp\left[-86\left(\frac{r}{z}\right)^2\right]$$

jet model at the cross-section plane, **[S2]**

$$L_M = \frac{M^{3/4}}{B^{1/2}},$$ **[S3]**

and $M$ and $B$ are conserved quantities. These curves can be fitted to the cross-section measurement plane using velocity values calculated for the measurement plane using a downward-continued plume expansion model (described in the main text) increasing as $b_w = 0.105z$. Raw Doppler measurements within the defined plume volume can be applied to Eq. **S1** to solve for $B$. Each of the downward-continued Doppler measurements ($w_1$, $r_1$, $z_1$) at the cross-section plane can be applied to Eq. **S2** to solve for $M$. Single point values of $M$ and $B$ can then be averaged together to estimate mean values of $M$ and $B$. Values of $M$ are approximately 0.11 and approximately 0.06 $m^4 s^{-2}$ for the broken riser and BOP kink, respectively; values for $B$ are approximately 0.1 and approximately 0.9 $m^4 s^{-3}$, respectively. These values can then be applied to Eq. **S3** in order to approximate $L_M$. Broken riser and BOP kink $L_M$ values are approximated as 0.6 and 0.1 m, respectively.

### Downward Continuing Vertical Velocity Measurements.

Vertical velocity within a plume is well characterized and follows the relation,

$$w = \frac{A}{\sqrt[3]{z}} \exp\left(-90\left(\frac{r}{z}\right)^2\right),$$ **[S4]**

where $A$ is a constant that is dependent on $B$, $z$ is the distance from the source, and $r$ is the radial distance from centerline (1).

Through algebraic substitution of $A$, each of the nonzero Doppler velocity bins (bins lacking valid returns are recorded as zeros) positioned within the expanding radius of the calculated plume volumes and at a distance greater than $z_c$ above the source (5,532 and 504 data points for the broken riser and BOP kink, respectively) is then downward-continued to the cross-section plane using

$$w_1(r_1) = w_2 \sqrt[3]{\frac{z_2}{z_1}} \exp\left[90\left(\left(\frac{r_2}{z_2}\right)^2 - \left(\frac{r_1}{z_1}\right)^2\right)\right],$$ **[S5]**

where $w_1$ is the calculated velocity at the cross-section plane, $w_2$ is the measured velocity at a height of $z_2$ above the source at a radial distance $r_2$ from the center axis, and $z_1$ is the cross-section plane height above the source (Fig. S3) at a radial distance of $r_1$. The value of $r_1$ is determined from the relationship

$$\frac{r_1}{b_w(z_1)} = \frac{r_2}{b_w(z_2)},$$ **[S6]**

where $b_w(z)$ is the width of the flow that scales as a function of $z$ and the expansion coefficient. Individual velocity measurements, $w_1$, are then averaged together to produce a radially and time-averaged vertical velocity, $w_{avg}$, of the flow at the cross-section plane height for each leak site.

### Estimating Water Entrainment.

Water entrainment between the source and the cross-section measurement plane is calculated according to the following relationship:

$$Q_{water} = \alpha w_{avg} A_{lat},$$ **[S7]**

where $A_{lat}$ is the flow's lateral surface area extending between the source and cross-section plane, and $\alpha$ is the entrainment coefficient. Based on estimated flow regimes the broken riser uses $\alpha_{jet} = 0.0535 \pm 0.0025$, whereas the BOP-kink flow uses $\alpha_{plume} = 0.0833 \pm 0.0042$.

The minimum height, $z_B$, at which horizontal water column currents would cause the flow to bend horizontally and increase the lateral expansion rate as a result of horizontal momentum entrainment is $z_B = B/U^3$ (2). Using a horizontal water current, $U$, of approximately 0.08 $m s^{-1}$ (3), and the previously computed specific buoyancy transport values, the horizontal current would only distort the plume flows at distances in excess of approximately 1,700 and 200 m above the broken riser and BOP-kink sources, respectively. The vertical length scales of the respective measurement volumes were, by comparison, at least an order of magnitude smaller.

1. Papanicolaou PN, List E (1988) Investigation of round vertical turbulent buoyant jet. *J Fluid Mech* 195:341–391.
2. Fischer HB, et al. (1979) *Mixing in Inland and Coastal Waters* (Academic, San Diego), p 483.
3. Camilli R, et al. (2010) Tracking hydrocarbon plume transport and biodegradation at Deepwater Horizon. *Science* 330:201–204.



**Fig. S1.** Photo of Oceaneering *MAXXIMUM 3* work-class remotely operated vehicle (ROV) prior to acoustic flow rate survey operations. The ROV is equipped with a forward-looking 1.2-MHz Doppler sonar (visible as green object with four red piezo-acoustic disks), and a 1.8 MHz acoustic imaging sonar (visible as yellow rectangular and black cylindrical objects directly above the Doppler sonar). Parallel sighting lasers are attached in a vertical configuration to the starboard side of the imaging sonar.

**Fig. S2.**   Photographs of near-field jet flow leaks at (*a*) the BOP kink and (*b*) the broken riser. Both sources exhibit turbulent mixing of well fluids into a fine emulsion. Multiple individual jet sources at the BOP kink and obstructions caused by the riser's conductor pipes are clearly visible. Parallel sighting lasers are visible as two vertically aligned red dots with beam spacing of 0.1 m.



**Fig. S3.** Diagram of computational model to calculate flow rate using imaging sonar measured cross-sectional area estimates and Doppler sonar velocity measurements.

# ATTACHMENT I

# PNAS Information for Authors

REVISED January 2012

## PURPOSE AND SCOPE

The *Proceedings of the National Academy of Sciences USA* (PNAS) publishes research reports, commentaries, perspectives, and colloquium papers. In accordance with the guiding principles established by George Ellery Hale in 1914, PNAS publishes brief first announcements of Academy members' and foreign associates' (hereafter referred to as members) more important contributions to research and of work that appears to a member to be of particular importance. PNAS is a general science journal and all papers should be intelligible to a broad scientific audience.

**Research Reports** describe the results of original research of exceptional importance.

**Feature Articles** are in-depth research reports with exceptional breadth and may be up to 10 pages in length.

**Commentaries** call attention to papers of particular note and are written at the invitation of the Editorial Board.

**Perspectives** present a viewpoint on an important area of research and are written only at the invitation of the Editorial Board. Perspectives focus on a specific field or subfield within a larger discipline and discuss current advances and future directions. Perspectives are of broad interest to nonspecialists and may add personal insight to a field.

**Colloquium Papers** are reports of scientific colloquia held under Academy auspices.

**Letters** are brief online-only comments that allow readers to constructively address a difference of opinion with authors of a PNAS article published within the last 3 months. Readers are encouraged to comment on exceptional studies or to point out potential flaws in studies published in the journal. Letters may not include requests to cite the letter writer's work, accusations of misconduct, or personal comments to an author. Letters are limited to 500 words and no more than five references. Letters must be submitted within 3 months of the online publication date of the subject article.

## EDITORIAL POLICIES
## PNAS Submission Guidelines

**Direct Submission.** The standard mode of transmitting manuscripts is for authors to use Direct Submission. Authors must recommend three appropriate Editorial Board members, three NAS members who are expert in the paper's scientific area, and five qualified reviewers. The Board may choose someone who is or is not on that list or may reject the paper without further review. Authors are encouraged to indicate why their suggested editors are well qualified to handle the paper. A directory of PNAS member editors and their research interests is available at http://nrc88.nas.edu/pnas_search. The editor may obtain reviews of the paper from at least two qualified reviewers, each from a different institution and not from the authors' institutions. For Direct Submission papers, the PNAS Office will invite the reviewers, secure the reviews, and forward them to the editor. The PNAS Office will also secure any revisions and subsequent reviews. The name of the editor, who is to remain anonymous to the author until the paper is accepted, will be published in PNAS as editor of the article. Direct Submissions are published as "Edited by" the responsible editor and have an identifying footnote.

**Prearranged Editors.** Prior to submission to PNAS, an author may ask an NAS member to oversee the review process of a Direct Submission. Prearranged editors should be used only when an article falls into an area without broad representation in the Academy, or for research that may be considered counter to a prevailing view or too far ahead of its time to receive a fair hearing, and in which the member is expert. If the NAS member agrees, the author should coordinate submission to ensure that the member is available, and should alert the member that he or she will be contacted by the PNAS Office within 48 hours of submission to confirm his or her willingness to serve as a prearranged editor and to comment on the importance of the work. The Board cannot guarantee that the member designated by the author will be assigned the manuscript or that it will be sent for review. If the Board decides to reject the paper without review or if the Board selects another member to handle the submission, the prearranged editor will be notified. Throughout the review process, all correspondence with an editor must be handled by the PNAS Office; authors are not permitted to contact an editor directly. Papers with a prearranged editor are published with a footnote to that effect. As of July 1, 2011, an NAS member may serve as a prearranged editor on as many as four papers per year. Note that the standard submission process does not require a prearranged editor.

**Feature Articles.** Authors submitting Feature Articles are not permitted to use a prearranged editor.

**PNAS Plus.** All authors may submit to a section called PNAS Plus, in which research reports appear exclusively online in an expanded format up to 10 pages in length and may include limited supporting information (SI). The full research article is accompanied by a one- to two-page summary (ideally 850 words) written by the authors for a general scientific audience. The author summary is published in print and online. Authors are required to submit their summary with the initial submission, and the summary will be reviewed for clarity and accuracy by the Editorial Board, assigned editor, and reviewers along with the PNAS Plus article, following the standard review process. The summary and full article share a title and DOI. PNAS Plus articles cost $215 per research article page, with no additional charges for the author summary, color figures, or up to four pages of SI. Please see the editorial at www.pnas.org/content/107/35/15309.full.

The author summary must clearly and succinctly explain the findings to a broad scientific audience (see sample summary at www.pnas.org/content/108/14/E51/1.full.pdf+html). The summary should avoid acronyms, excessive methodological detail, and technical jargon, and must contain either one figure or one table that summarizes the main results of the paper. Authors are encouraged to provide a title that is accessible to a nonspecialist and should use the template at www.pnas.org/site/misc/au_summary.doc. A list of frequently asked questions is available at www.pnas.org/site/misc/pnasplus_faq.shtml.

**Contributed Submission.** An Academy member may submit up to four of his or her own manuscripts for publication per year. To contribute an article, the member must affirm that he or she had a direct role in the design and execution of all or a significant fraction of the work and the subject matter must be within the member's own area of expertise. Contributed articles must report the results of original research. A special obligation applies to a Contributed paper for which the member or coauthors disclose a significant

financial or other competing interest in the work. We no longer consider such submissions using the contributed route. Members who disclose a significant conflict of interest must submit their manuscripts using Direct Submission. When submitting using the contributed process, members must secure the comments of at least two qualified reviewers. Reviewers should be asked to evaluate revised manuscripts to ensure that their concerns have been adequately addressed. Members' submissions must be accompanied by the names and contact information, including e-mails, of knowledgeable experts who reviewed the paper, along with all of the reviews received and the authors' response for each round of review, and a brief statement endorsing publication in PNAS. Reviews must be on the PNAS review form. Members must select reviewers who have not collaborated with the authors in the past 24 months. See Section iii for the full conflict of interest policy. Members must verify that reviewers are free of conflicts of interest, or must disclose any conflicts and explain their choice of reviewers. The Academy member must be one of the corresponding authors on the paper. These papers are published as "Contributed by" the responsible editor. As of July 1, 2011, members may contribute PNAS Plus articles.

All manuscripts are evaluated by the Editorial Board. The Board may reject manuscripts without further review or may subject manuscripts to review and reject those that do not meet PNAS standards. Manuscripts rejected by one member cannot be resubmitted through another member or as a Direct Submission. When revisions are requested prior to final decision, revised papers must be received within 2 months or they will be treated as new submissions.

## Journal Policies

(*i*) Articles are considered provided they have not been **Published Previously** or concurrently submitted for publication elsewhere. Related manuscripts that are in press or submitted elsewhere must be included with a PNAS submission.

Figures or tables that have been published elsewhere must be identified, and permission of the copyright holder for both the print and the online editions of the journal must be provided (see www.pnas.org/site/misc/permissions_letter.pdf).

(*ii*) **Authorship** should be limited to those who have contributed substantially to the work. The corresponding author must have obtained permission from all authors for the submission of each version of the paper and for any change in authorship.

All collaborators share some degree of responsibility for any paper they coauthor. Some coauthors have responsibility for the entire paper as an accurate, verifiable report of the research. These include coauthors who are accountable for the integrity of the data reported in the paper, carry out the analysis, write the manuscript, present major findings at conferences, or provide scientific leadership to junior colleagues. Coauthors who make specific, limited contributions to a paper are responsible for their contributions but may have only limited responsibility for other results. While not all coauthors may be familiar with all aspects of the research presented in their paper, all collaborators should have in place an appropriate process for reviewing the accuracy of the reported results. Authors must indicate their specific contributions to the published work. This information will be published as a footnote to the paper. Examples of designations will include:
• Designed research
• Performed research
• Contributed new reagents or analytic tools
• Analyzed data
• Wrote the paper
An author may list more than one contribution, and more than one author may have contributed to the same aspect of the work.

(*iii*) All authors, members, reviewers, and editors must disclose any association that poses a **Conflict of Interest** in connection with the manuscript. Authors must acknowledge all funding sources supporting the work. Recent collaborators, defined as people who have coauthored a paper or were a principal investigator on a grant with the author or member within the past 24 months, must be excluded as editors and reviewers. Other examples of possible conflicts include a close personal friendship, past or present association as thesis advisor or thesis student, or a family relationship. Please see www.pnas.org/site/misc/coi.shtml for details.

(*iv*) All work should be free of fabrication, falsification, and plagiarism as defined by the Office of Research Integrity (ori.hhs.gov/misconduct/definition_misconduct.shtml).

(*v*) Completion of the online submission form electronically gives an exclusive license to publish the work to the National Academy of Sciences. If a paper is declined for publication, the license to publish is terminated.

(*vi*) The Academy may distribute **Embargoed** copies of an accepted article to the press prior to publication. Embargoes expire at 3 PM Eastern time on the Monday before publication. Authors may talk freely with the press about their work but should coordinate with the PNAS News Office so that reporters are aware of PNAS policy. If you plan on presenting your embargoed paper at a conference prior to publication, please contact the PNAS News Office immediately at 202-334-1310 or PNASnews@nas.edu.

(*vii*) Research involving **Human and Animal Participants** and **Clinical Trials** must have been approved by the author's institutional review board. Authors must follow the International Committee of Medical Journal Editors' (www.icmje.org) policy and deposit trial information and design into an accepted clinical trial registry before the onset of patient enrollment. Authors must include in the Methods section a brief statement identifying the institutional and/or licensing committee approving the experiments. For experiments involving human participants, authors must also include a statement confirming that informed consent was obtained from all participants. All experiments must have been conducted according to the principles expressed in the Declaration of Helsinki.

(*viii*) **Dual Use Research of Concern.** Authors and reviewers must notify the editor-in-chief if a manuscript reports potential dual use research of concern. The editor-in-chief will evaluate potential dual use research of concern papers and, if necessary, will consult additional reviewers.

(*ix*) For research using **Recombinant DNA,** physical and biological containment must conform to National Institutes of Health guidelines or those of a corresponding agency.

(*x*) **Materials and Data Availability.** To allow others to replicate and build on work published in PNAS, authors must make materials, data, and associated protocols available to readers. Authors must disclose upon submission of the manuscript any restrictions on the availability of materials or information. Data not shown and personal communications cannot be used to support claims in the work. Authors are encouraged to use SI to show all necessary data. Authors are encouraged to deposit as much of their data as possible in publicly accessible databases. Such deposition may facilitate access to data during the review process and post-publication.

Authors must make **Unique Materials** (e.g., cloned DNAs; antibodies; bacterial, animal, or plant cells; viruses; and algorithms and computer codes) promptly available on request by qualified researchers for their own use. Failure to comply will preclude future publication in the journal. It is reasonable for authors to charge a modest amount to cover the cost of preparing and shipping the requested material. Contact pnas@nas.edu if you have difficulty obtaining materials.

**Plasmids:** Authors are encouraged to deposit plasmid constructs in a public repository such as Addgene (www.addgene.org).

**Databases:** Before publication, authors must deposit large datasets (including microarray data, protein or nucleic acid sequences, and atomic coordinates for macromolecular structures) in an approved database and provide an accession number for inclusion in the published paper. When no public repository exists, authors must provide the data as SI online or, in special circumstances when this is not possible, on the author's institutional Web site, provided that a copy of the data is provided to PNAS.

***Characterization of Chemical Compounds:*** Authors must provide sufficient information to establish the identity of a new compound and its purity. Sufficient experimental details must be included to allow other researchers to reproduce the synthesis. Characterization data and experimental details must be included either in the text or in the SI.

***Protein and Nucleic Acid Sequences:*** Authors must deposit data in a publicly available database such as GenBank/EMBL/DNA Data Bank of Japan, UniProtKB/Swiss-Prot, or PRIDE (www.ebi.ac.uk/pride/).

***Structural Studies:*** For papers describing structures of biological macromolecules and small molecules, the atomic coordinates and the related experimental data (structure factor amplitudes/intensities and/or NMR restraints) must be deposited at a member site of the Worldwide Protein Data Bank (www.wwpdb.org): RCSB PDB (www.pdb.org), PDBe (www.ebi.ac.uk/pdbe), PDBj (www.pdbj.org), or BMRB (www.bmrb.wisc.edu). The PDB ID should be included in the manuscript. For nuclear magnetic resonance structures, data deposited should include resonance assignments and all restraints used in structure determination and the derived atomic coordinates for both an individual structure and a family of acceptable structures. Articles must include literature references for all coordinate datasets as well as dataset identification. Authors must agree to release the atomic coordinates and experimental data when the associated article is published. Questions relating to depositions should be sent to deposit@wwpdb.org.

For papers describing structures of biological macromolecules from electron microscopy experiments, the 3D map should be deposited at either the EMBL-EBI (UK) or RCSB (USA) EMDB deposition site (www.emdatabank.org).

Prior to submission, authors are encouraged to use the International Union of Crystallography (IUCr) checkCIF service (http://checkcif.iucr.org) to validate their crystallographic information files (CIFs) and structure factors. Validation reports may be submitted as SI for editors and reviewers.

***Functional Magnetic Resonance Imaging (fMRI) Studies:*** Authors should deposit data with the SumsDB (www.sumsdb.wustl.edu/sums/index.jsp), XNAT Central (central.xnat.org), or other suitable public resources.

***Genomic and Proteomic Studies:*** Authors of papers that include genomic, proteomic, or other high-throughput data are required to submit their data to the NCBI gene expression and hybridization array data repository (GEO, www.ncbi.nlm.nih.gov/geo) or equivalent publicly accessible database and must provide the accession number. Access to the information in the database must be available at the time of publication. Submitted data should follow the MIAME checklist (for more information, see www.mged.org/Workgroups/MIAME/miame_checklist.html).

***Enzymology Data:*** Authors are encouraged to follow the Standards for Reporting Enzymology Data (STRENDA) commission guidelines when reporting kinetic and equilibrium binding data. See the Beilstein Institut/STRENDA commission Web site (www.beilstein-institut.de/en/projekte/strenda/guidelines) for details.

(*xi*) **Figure Preparation.** No specific feature within an image may be enhanced, obscured, moved, removed, or introduced. The grouping or consolidation of images from multiple sources must be made explicit by the arrangement of the figure and in the figure legend. Adjustments of brightness, contrast, or color balance are acceptable if they are applied to the whole image and if they do not obscure, eliminate, or misrepresent any information present in the original, including backgrounds. Questions about images raised during image screening will be referred to the editors, who may request the original data from the authors for comparison with the prepared figures. If the original data cannot be produced, the manuscript may be rejected. Cases of deliberate misrepresentation of data will result in rejection of the paper and will be reported to the corresponding author's home institution or funding agency.

(*xii*) **SI.** SI enhances papers in PNAS by providing additional substantive material, but the print version of the paper must stand on its own merits. SI is reviewed along with the paper and must be approved by the editors and reviewers. Instead of appearing in the printed version of the journal, SI is posted on the PNAS Web site at the time of publication. SI is referred to in the text and cannot be altered by authors after acceptance. Data not shown and personal communications cannot be used to support claims in the work. Authors are encouraged to use SI to show all necessary data.

SI may take the form of supplemental figures, tables, datasets, derivations, and videos. Editors may suggest that part of the submitted data could be more suitably presented online only to save journal space and to focus the article.

(*xiii*) **PNAS Early Edition (EE).** PNAS articles are published daily online before print. Papers may be published online 1 to 4 weeks before they appear in print. Authors who return proofs quickly and keep changes to a minimum get maximum publication speed. The EE publication date is the official date of record.

(*xiv*) **Errata.** PNAS publishes corrections for errors, made by the journal or authors, of a scientific nature that do not alter the overall basic results or conclusions of a published article. PNAS publishes retractions for major errors that may call into question the source of the data or the validity of the results and conclusions of an article. Errata are published at the discretion of the editors and appear as formal printed and online notices in the journal.

## PROCEDURES FOR SUBMITTING MANUSCRIPTS

**Contact Information.** PNAS, 700 11th Street, NW, Suite 450, Washington, DC 20001 USA. Phone 1-202-334-2679, fax 1-202-334-2739, e-mail pnas@nas.edu.

**Publication Fees.** PNAS depends, in part, on the payment of publication fees to finance its operations. Articles are accepted or rejected for publication and published solely on the basis of merit. All authors will be assessed the following fees:

- *Page charges:* $70 per page, from all authors who have funds available for that purpose.
- *SI:* $250 per article for up to five pages of SI and $500 per article for six or more pages of SI.
- *Color charges:* $200 for each color figure or table. A single figure is defined as original art that can be processed as a unit and printed on one page without intervening type.
- *Replacement or deletion of figures:* $150 per color figure or table, $25 per black and white figure, $25 per figure in SI (color or black and white).
- *PNAS Plus:* $215 per research article page. No additional charges for print summary, color figures, or SI (up to four pages).
- *Open Access:* Authors of research articles may pay a surcharge of $1,300 to make their paper freely available through PNAS open access option. If your institution has a Site License, the open access surcharge is $975. All articles are free online after 6 months.

Authors will also be charged for excessive alterations on proofs and submission of revised files after the article has been transmitted to the printer. Requests for waiver of charges should be submitted to pnas@nas.edu.

Publication charges may be paid by credit card, check, or

wire transfer. Upon receipt of the publication estimate, authors are required to log into the author billing system to provide payment arrangements and designate an individual responsible for payment and follow up. For questions regarding billing and payment of fees, please e-mail aubilling.djs@sheridan.com, phone 1-802-560-8518, or fax 1-802-882-1639.

## Manuscript Preparation

**Language-Editing Services.** Prior to submission, authors who believe their manuscripts would benefit from professional editing are encouraged to use a language-editing service (see list at www.pnas. org/site/misc/language-editing.shtml). PNAS does not take responsibility for or endorse these services, and their use has no bearing on acceptance of a manuscript for publication.

**Submitting Manuscripts.** Authors must submit their articles at www.PNAScentral.org. A surcharge of $50 will be assessed for all hardcopy submissions. A single PDF file is permitted for initial Direct Submissions, but source files are required for all resubmissions, including revisions. Members contributing papers should also submit via the Web and provide source files. Corresponding authors of contributed papers will be provided a URL for submission after the member has initiated the process by providing his or her endorsement and copies of the reviews received. SI must be submitted online.

**Digital Figures.** Only TIFF, EPS, and high-resolution PDF for Mac or PC are allowed for figures that will appear in the print journal. Authors may submit U3D files for 3D images to be published online; these must be accompanied by 2D representations in TIF, EPS, or high-resolution PDF format to be used in the print journal. (See *SI* below for online-only material.) Color images must be in RGB (red, green, blue) mode. Include the font files for any text. Images must be final size, preferably one column width (8.7 cm). Figures wider than one column should be between 10.5 and 18.0 cm wide. Numbers, letters, and symbols should be no smaller than 6 points (2 mm) and no larger than 12 points (6 mm) after reduction and must be consistent. Composite figures must be preassembled. Figures must be submitted as separate files, not embedded in manuscript text. See www.pnas.org/site/misc/digitalart.pdf or contact pnas_specialist.djs@sheridan.com.

**Tables.** Each table should have a brief title and be on a separate page. Tables must be submitted as separate files, not embedded in the manuscript text.

**SI.** The print version of the paper must stand on its own without the SI. Refer to SI in the manuscript at an appropriate point in the text. Number supporting figures and tables starting with S1, S2, etc. Authors are limited to no more than 10 SI files, not including movie files.

Authors who place detailed materials and methods in SI must provide sufficient detail in the print edition methods to enable a reader to follow the logic of the procedures and results and also must reference the online methods. If a paper is fundamentally a study of a new method or technique, then the methods must be described completely in the print edition.

Because PNAS edits SI and composes it into a single PDF, authors must provide the following file formats only.
- *Text:* Supply Word, RTF, or LaTeX files (LaTeX files must be accompanied by a PDF with the same file name for visual reference).
- *Figures:* Provide a brief legend for each figure in a Word or RTF file. Provide figure images in TIFF, EPS, high-resolution PDF, JPEG, or GIF format; figures may not be embedded in manuscript text. When saving TIFF files, use only LZW compression; do not use JPEG compression. Do not save figure numbers, legends, or author names as part of the image. Composite figures must be preassembled. Images should not exceed

500 pixels per inch in width or height.
- *3D figures:* Supply a composable U3D file so that it may be edited and composed. Authors may submit a PDF file but please note it will be published in raw format and will not be edited or composed.
- *Tables:* Supply Word, RTF, or LaTeX files (LaTeX files must be accompanied by a PDF with the same file name for visual reference); include only one table per file. Do not use tabs or spaces to separate columns in Word tables.
- *Datasets:* Supply Excel (.xls), RTF, or PDF files. This file type will be published in raw format and will not be edited or composed.
- *Movies:* Supply Audio Video Interleave (avi), Quicktime (mov), Windows Media (wmv), Animated GIF (gif), or MPEG files and submit a brief legend for each movie in a Word or RTF file. All movies should be submitted at the desired reproduction size and length. Movies should be no more than 10 MB in size.
- *Still images:* Authors must provide a still image from each video file. Supply TIFF, EPS, high-resolution PDF, JPEG, or GIF files.
- *Appendices:* PNAS prefers that authors submit individual source files to ensure readability. If this is not possible, supply a single PDF file that contains all of the SI associated with the paper. This file type will be published in raw format and will not be edited or composed.

**Use of URLs in Text.** As a publisher, PNAS must be able to archive the data essential to a published article. Where such archiving is not possible, deposition of data in public databases, such as GenBank, ArrayExpress, Protein Data Bank, Unidata, and others outlined in the Information for Authors, is acceptable.

Only links to Web sites that are permanent public repositories, such as self-perpetuating online resources funded by government, academia, and industry, are permitted. Links to an author's personal Web page are not acceptable. PNAS allows authors to post their PNAS paper on their home page after the paper is published in PNAS.

**Journal Cover Figures.** Authors are invited to submit scientifically interesting and visually arresting cover images. To view examples of cover art, see www.pnas.org/coverarchive. Illustrations need not be reprinted in the article but should be representative of the work. Images should be original, and authors grant PNAS the exclusive license to publish. Include a brief lay-language caption (50–60 words) and credit information (e.g., Photograph courtesy of ...). Images should be 21 cm wide by 22.5 cm high. Files should be EPS or TIFF and should be in RGB (red, green, blue) color mode. Cover figure files may be submitted online when the paper is submitted or may be sent by e-mail to PNAScovers@nas.edu. Send large files on CD-ROM by courier to the PNAS Office or contact PNAS for FTP instructions. Submissions provided outside of the online submission system should include manuscript number, author name, phone, and e-mail. Illustrations will not be returned unless requested.

**Manuscript Length.** PNAS generally uses a two-column format averaging 67 characters, including spaces, per line. The maximum length of a research article is six printed pages, including all text, spaces, and the number of characters displaced by figures, tables, and equations.

An online submission tool provides authors with an estimation of whether their manuscript fits within the PNAS length requirements. (See www.PNAScentral.org/html/pnas_length_estimate_instructions.html Length Estimate FAQ.) Use the following guidelines to determine whether your manuscript exceeds the page-length requirements presubmission:
- *Text:* When submitting tables, figures, and/or equations in addition to text, keep the text for your manuscript under 39,000

characters (including spaces).

- *Figures:* Calculated at 180 characters per cm in height for one column and 360 characters per cm in height for two columns; a figure wider than 8.7 cm is two printed columns wide.
- *Tables and equations:* Calculated at 60 characters per line for one column and 120 characters per line for two columns; a table with more than 60 characters per line is two printed columns wide.

If the word processing program character count excludes spaces, add the word count to the character count to obtain a character count that includes spaces.

Authors will be responsible for additional charges incurred due to shortening overlong papers in proof.

## Manuscript Format

**Manuscript Order.** The standard order of sections in the manuscript file is: title page, abstract, introduction, results, discussion, materials and methods, acknowledgments, references, figure legends, and table legends. Variations to this format may be allowed. Number all manuscript pages starting with the title page as page 1. A single PDF file is permitted for initial submissions, but figures and tables are uploaded separately for revisions and resubmissions. For initial submissions, authors are encouraged to place figures and legends with their callout in text.

**Title Page.** Please note that information entered in the online submission form will be used for publication purposes (e.g., author contact information and affiliations). Please also include the following information on the title page:

*Classification:* Select a major (Physical, Social, or Biological Sciences) and a minor category from the following. Dual classifications are permitted between major categories and in exceptional cases, subject to Editorial Board approval, within a major category.

PHYSICAL SCIENCES: Applied Mathematics; Applied Physical Sciences; Astronomy; Chemistry; Computer Sciences; Earth, Atmospheric, and Planetary Sciences; Engineering; Environmental Sciences; Mathematics; Physics; Statistics; and Sustainability Science*.

SOCIAL SCIENCES: Anthropology; Economic Sciences; Environmental Sciences; Political Sciences; Psychological and Cognitive Sciences; Social Sciences; and Sustainability Science*.

BIOLOGICAL SCIENCES: Agricultural Sciences; Anthropology; Applied Biological Sciences; Biochemistry; Biophysics and Computational Biology; Cell Biology; Developmental Biology; Ecology; Environmental Sciences; Evolution; Genetics; Immunology; Medical Sciences; Microbiology; Neuroscience; Pharmacology; Physiology; Plant Biology; Population Biology; Psychological and Cognitive Sciences; Sustainability Science*; and Systems Biology.

*For questions regarding Sustainability Science, please see www.pnas.org/content/104/6/1737.full.a

*Title:* Titles should be no more than three typeset lines (generally 135 characters including spaces) and should be comprehensible to a broad scientific audience. Statements of priority and the use of colons are discouraged.

*Author affiliation:* Include department, institution, and complete address, with the ZIP/postal code, for each author. Use superscripts to match authors with institutions.

*Corresponding author:* The name, complete address, telephone number, and e-mail address of the author to whom correspondence and proofs should be sent. Mailing and e-mail addresses will appear in print and online.

**Abstract.** Provide an abstract of no more than 250 words on page 2 of the manuscript. Abstracts should explain to the general reader the major contributions of the article. References in the abstract must be cited in full within the abstract itself and cited in the text.

**Text.** Describe procedures in sufficient detail so that the work can be repeated. Methods must be presented after Results and Discussion. Follow the spelling and usage given in *Webster's Third New International Dictionary* or the *Random House Dictionary of the English Language.* Avoid laboratory jargon. Correct chemical names should be given, and strains of organisms should be specified. Trade names should be identified by an initial capital letter with the remainder of the name lowercase. Names of suppliers of uncommon reagents or instruments should be provided. Use Système International units and symbols whenever possible. Statements of novelty and priority are not permitted in the text.

**Footnotes.** PNAS distinguishes author affiliations and footnotes from in-text footnotes by assigning a different set of footnote symbols to each type. Superscript lowercase letters separated by commas (no spaces) are used for author affiliations. Superscript numerals separated by commas (no spaces) are used for author footnotes. In-text footnotes should be preceded by a footnote symbol, used in the order *, †, ‡, §, ¶, ||, **, ††, ‡‡, §§, ¶¶.

**Acknowledgments.** List acknowledgments and funding sources. Dedications are rarely allowed.

**References.** References must be in PNAS style. Only published or in-press papers and books may be cited in the reference list. Unpublished abstracts of papers presented at meetings or references to "data not shown" are not permitted. References should be cited in numerical order as they appear in text. Because tables and figures will be inserted in the text where first cited, references in these sections should be numbered accordingly. **Include the full title for each cited article.** All authors (unless there are more than five) should be named in the citation. If there are more than five, list the first author's name followed by et al. Provide inclusive page ranges for journal articles and book chapters. Cite databases in the text or as footnotes.

Journal articles are cited as follows:

10. Neuhaus J-M, Sticher L, Meins F, Jr, Boller T (1991) A short C-terminal sequence is necessary and sufficient for the targeting of chitinases to the plant vacuole. *Proc Natl Acad Sci USA* 88:10362–10366.

Use MEDLINE/PubMed abbreviations of journal titles or use the full journal title for any journals not indexed in MEDLINE.

Articles or chapters in books are cited as follows:

14. Hill AVS (1991) in *Molecular Evolution of the Major Histocompatibility Complex,* eds Klein J, Klein D (Springer, Heidelberg), pp 403–420.

**Figure Legends.** Provide these separately from figures, after the references in the manuscript. For figures with multiple panels, the first sentence of the legend should be a brief overview of the entire figure. Graphs should include clearly labeled error bars described in the figure legend. Authors must state whether a number that follows the ± sign is a standard error (SEM) or a standard deviation (SD). The number of independent data points (N) represented in a graph must be indicated in the legend. Numerical axes on graphs should go to 0, except for log axes. Statistical analyses should be done on all available data and not just on data from a "representative experiment." Statistics and error bars should only be shown for independent experiments and not for replicates within a single experiment.

**Nomenclature and Style.** Use international standards on nomenclature. For approved abbreviations and symbols, see www.pnas.org/site/misc/iforc.shtml#abbreviations. PNAS uses *Scientific Style and Format: The CSE Manual for Authors, Editors, and Publishers* (7th edition, 2006) as the primary style guide.

## Updates

The Information for Authors is published in the first print issue of the year. See www.pnas.org/site/misc/iforc.shtml for the latest version.

# ATTACHMENT J

# Department of the Interior
# Departmental Manual

**Effective Date**: 1/28/11
**Series**: Departmental Management
**Part 305**: Departmental Science Efforts
**Chapter 3**: Integrity of Scientific and Scholarly Activities

**Originating Office**: Office of the Deputy Secretary

**305 DM 3**

3.1    **Purpose**.

A.    This chapter establishes Departmental policy on the integrity of scientific and scholarly activities the Department conducts and science and scholarship it uses to inform management and public policy decisions**.** Scientific and scholarly information considered in Departmental decision making must be robust, of the highest quality, and the result of as rigorous scientific and scholarly processes as can be achieved.  Most importantly, it must be trustworthy.  It is essential that the Department establish and maintain integrity in its scientific and scholarly activities because information from such activities is a critical factor that informs decision making on public policies. Other factors that inform decision making may include economic, budget, institutional, social, cultural, legal and environmental considerations.

B.    This chapter also establishes scientific and scholarly ethical standards, including codes of conduct, and a process for the initial handling of alleged violations. This chapter is not intended to, and does not create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees or agents, or any other person.

3.2    **Background**.  The Presidential Memorandum on Scientific Integrity dated March 9, 2009, and the Office of Science and Technology Policy (OSTP) 2010 guidance memorandum on scientific integrity call for ensuring the highest level of integrity in all aspects of the executive branch's involvement with scientific and technological processes.  The 2002 Office of Management and Budget (OMB) Information Quality Guidelines, and the 2005 OMB Information Quality Bulletin for Peer Review provide additional guidance for ensuring information quality.  The Secretary issued Order No. 3305, *Ensuring Scientific Integrity within the Department of the Interior,* on September 29, 2010, directing the establishment of a Departmental Manual Chapter that sets forth principles of scientific and scholarly integrity and clarifies the roles and responsibilities of all Department of the Interior (DOI) employees in upholding these principles.

3.3    **Scope**.  This chapter establishes requirements for the professional conduct and management of scientific and scholarly activities, and the use of scientific and scholarly

information, by and on behalf of the Department. The requirements contained in this chapter are in addition to and do not supersede the Standards of Ethical Conduct for Employees of the Executive Branch, DOI Supplemental Standards, any of the Criminal Conflict of Interest Statutes (18 U.S.C. §§ 201-209), or law enforcement actions and/or investigations and inspections for regulatory compliance. As of the effective date, this policy applies to:

A.     All DOI employees, including political appointees, (hereafter employees) when they engage in, supervise, manage, or influence scientific and scholarly activities, or communicate information about the Department's scientific and scholarly activities, or utilize scientific and scholarly information in making agency policy, management or regulatory decisions.

B.     All contractors, cooperators, partners, permittees, leasees, and grantees who assist with developing or applying the results of scientific and scholarly activities.

C.     All volunteers who assist with developing or applying the results of scientific and scholarly activities.

3.4     **Policy.** The Department supports a culture of scientific and scholarly integrity. Science and scholarship play a vital role in the Department's mission, providing one of several critical inputs to decision making on conservation and responsible development of natural resources, preservation of cultural resources, and responsibilities to tribal communities.  The Department recognizes the importance of scientific and scholarly information and science and scholarship as methods for maintaining and enhancing our effectiveness and establishing credibility and value with all sectors of the public, both nationally and internationally.  The Department is dedicated to preserving the integrity of the scientific and scholarly activities it conducts, and activities that are conducted on its behalf.  It will not tolerate loss of integrity in the performance of scientific and scholarly activities or in the application of science and scholarship in decision making.  The Department will:

A.     Use clear and unambiguous codes of conduct for scientific and scholarly activities to define expectations for those covered by this policy.

B.     Facilitate the free flow of scientific and scholarly information, consistent with privacy and classification standards, and in keeping with the Department's Open Government Plan.

C.     Document the scientific and scholarly findings considered in decision making and ensure public access to that information and supporting data through established Departmental and Bureau procedures—except for information and data that are restricted from disclosure under procedures established in accordance with statute, regulation, Executive Order, or Presidential Memorandum.

D.     Ensure that the selection and retention of employees in scientific and scholarly positions or in positions that rely on the results of scientific and scholarly activities are based on the candidate's integrity, knowledge, credentials, and experience relevant to the responsibility of the position.

E.      Ensure that public communications policies provide procedures by which scientists and scholars may speak to the media and the public about scientific and scholarly matters based on their official work and areas of expertise.  In no circumstance may public affairs officers ask or direct Federal scientists to alter scientific findings.

F.      Provide information to employees on whistleblower protections.

G.      Communicate this policy and all related responsibilities to contractors, cooperators, partners, permittees, leasees, grantees, and volunteers who assist with developing or applying the results of scientific and scholarly activities on behalf of the Department, as appropriate.

H.      Encourage the enhancement of scientific and scholarly integrity through appropriate, cooperative engagement with the communities of practice represented by professional societies and organizations.

I.      Examine, track, and resolve all reasonable allegations of scientific and scholarly misconduct while ensuring the rights and privacy of those covered by this policy and ensuring that unwarranted allegations do not result in slander, libel, or other damage to them.

J.      Facilitate the sharing of best administrative and management practices that promote the integrity of the Department's scientific and scholarly activities.


3.5     **Definitions**.

A.      Conflict of Interest.  Any personal, professional, financial, or other interests that conflict with the actions or judgments of those covered by this policy when conducting scientific and scholarly activities or using scientific and scholarly data and information because those interests may:

        (1)     Significantly impair objectivity; or

        (2)     Create an unfair competitive advantage for any person or organization, or

        (3)     Create the appearance of either (1) or (2).

B.      Contractors, Cooperators, Partners, Permittees, Leasees, and Grantees.  Groups, organizations, or individuals who provide goods or services to, or otherwise interact with the Department under terms specified in a written agreement (such as a cooperative agreement, grant, or memorandum of understanding), contract, lease, or permit.

C.      Decision Makers.  Departmental employees who may:

        (1)     Develop policies or make determinations about policy or management;

        (2)     Make determinations about expenditures of Departmental funds;

(3)      Implement or manage activities that involve, or rely on, scientific and scholarly activities; or

(4)      Supervise employees who engage in scientific and scholarly activities.

D.      Employees Who Engage in Scientific and Scholarly Activities.

(1)      Individuals who conduct or directly supervise scientific and/or scholarly activities, including but not limited to proposing, performing, or reviewing inventory, monitoring, research, and assessment, or in reporting results of these activities; and

(2)      Individuals who directly supervise or personally perform work involving the compilation and translation of scientific and scholarly data or information into formats used by the Department's decision makers and other non-scientist or non-scholar personnel.

E.      Fabrication.  Making up data or results and recording or reporting them.   (Federal Policy on Research Misconduct, 65 FR 76260-76264, December 6, 2000.)  Fabrication does not include documented use of modeling or statistical techniques.

F.      Falsification.  Manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record. (Federal Policy on Research Misconduct, 65 FR 76260-76264, December 6, 2000.)

G.      Plagiarism.  The appropriation of another person's ideas, processes, results, or words without giving appropriate credit.  (Federal Policy on Research Misconduct, 65 FR 76260-76264, December 6, 2000.)

H.      Reporting.   Dissemination of scientific and scholarly activities and results.

I.      Scientific Method.  A method of research in which a problem is identified, relevant data are gathered, a hypothesis is formulated from these data, and the hypothesis is empirically tested.

J.      Scientific and Scholarly Activities.  Activities involving inventorying, monitoring, experimentation, study, research, modeling, and scientific and scholarly assessments are scientific and scholarly activities.  These activities are conducted in a manner specified by documented protocols and procedures and include any of the physical, biological, cultural, or social sciences as well as landscape architecture, engineering, mathematics, and statistics that employ the scientific method.

K.      Scientific and Scholarly Assessment.  Scientific and scholarly information constructed to evaluate a body of scientific and scholarly knowledge, typically by analyzing and synthesizing multiple factual inputs, data, models, assumptions, and/or by applying best professional judgment to bridge and/or characterize uncertainties in the available information.

L.    Scientific and Scholarly Integrity. The condition resulting from adherence to professional values and practices, when conducting and applying the results of science and scholarship, that ensures objectivity, clarity, reproducibility, and utility and that provides insulation from bias, fabrication, falsification, plagiarism, outside interference, censorship, and inadequate procedural and information security.

M.    Scientific and Scholarly Misconduct.

(1)    Fabrication, falsification, or plagiarism in proposing, performing, or reviewing scientific and scholarly activities, or in the products or reporting of the results of these activities. (Federal Policy on Research Misconduct, 65 FR 76260-76264, December 6, 2000.) Misconduct also includes: (a) intentionally circumventing policy that ensures the integrity of science and scholarship, and (b) actions that compromise scientific and scholarly integrity. Scientific and scholarly misconduct does not include honest error or differences of opinion.

(2)    Fabrication, falsification, or plagiarism in the application of scientific and scholarly information to decision making, policy formulation, or preparation of materials for public information activities.

(3)    A finding of scientific and scholarly misconduct requires that:

(a)    There be a significant departure from accepted practices of the relevant scientific and scholarly community.

(b)    The misconduct be committed intentionally, knowingly, or recklessly.

(c)    The allegation be proven by a preponderance of evidence.

N.    Scientific and Scholarly Product.  The results of scientific and scholarly activities including the analysis, synthesis, compilation, or translation of scientific and scholarly information and data into formats used in the Department's decision-making processes or publications.

O.    Professional Judgment.  An authoritative evaluation that is characterized by or conforms to the technical and ethical standards of a discipline, and requires specialized knowledge or applicable academic preparation.

P.    Volunteer.   A person who provides, under the terms of a Volunteer Agreement, uncompensated hours of service to the Department for civic, charitable, or humanitarian reasons. A volunteer is not subject to the wage, hour, and compensation provisions of the Fair Labor Standards Act.

Q.    Volunteer Agreement.  The official Department document that must be reviewed and signed by the volunteer or volunteer group leader and the appropriate agency representative, before work can begin.  The agreement statement of work will include the requirements of this

chapter and describes the activity(ies) and circumstances under which the volunteer work is performed.

      R.    <u>Supervisors and Managers</u>.  Employees who manage the people, funds and resources of the Department.

## 3.6    **Responsibilities**.

      A.    <u>Deputy Secretary</u> is responsible for:

          (1)    Providing leadership for the Department on scientific and scholarly integrity.

          (2)    Ensuring Departmental compliance with this policy.

          (3)    Designating the duties of Departmental Scientific Integrity Officer (DSIO) to a senior career staff person with scientific and/or scholarly credentials.

          (4)    Serving as the "Office of Primary Responsibility" for revisions to the policy in this chapter.

      B.    <u>Office of the Executive Secretariat and Regulatory Affairs</u>:

          (1)    Serving as the neutral point of contact for receiving allegations of misconduct against DOI employees.

          (2)    Referring allegations to the DSIO or appropriate Bureau Scientific Integrity Officer (BSIO).

      C.    <u>Departmental Scientific Integrity Officer</u> is responsible for:

          (1)    Providing Department-wide leadership for implementing this chapter.

          (2)    Serving as Scientific Integrity Officer for the Office of the Secretary.

          (3)    Implementing this chapter as it pertains to bureaus and offices of the Department.

          (4)    Reviewing bureau implementation procedures for consistency with this policy.

          (5)    Ensuring the integrity and consistency of the process across the Department.

          (6)    Coordinating with the appropriate Human Resources Offices.

(7)     Providing additional guidance for implementing and updating this chapter, as needed.

(8)     Conducting a review of allegations and submitted materials received from the Office of the Executive Secretariat and Regulatory Affairs (OES) to determine whether an inquiry is warranted and appropriate next steps, following the procedures described in Section 3.8 below.

(9)     Keeping the Deputy Secretary informed on the status of the implementation of this chapter.

D.     <u>Assistant Secretaries</u> are responsible for:

(1)     Providing leadership for their bureaus/offices on scientific and scholarly integrity.

(2)     Ensuring their bureaus and offices comply with this policy.

(3)     Reviewing bureau/office-specific guidance, as appropriate.

E.     <u>Heads of Bureaus</u> are responsible for:

(1)     Providing leadership for the bureau on scientific and scholarly integrity.

(2)     Designating a BSIO who will report to the Bureau Head or appropriate senior executive and will coordinate bureau level allegations of scientific and scholarly misconduct with the DSIO.

(3)     Ensuring bureau compliance with this policy.

(4)     Developing bureau-specific guidance, as appropriate.

(5)     Providing bureau employees with the policy and guidance.

(6)     Ensuring employees and volunteers are aware of their responsibilities and comply with the policy and any bureau-specific guidance.

(7)     Ensuring that contractors, cooperators, partners, permittees, leasees, and grantees covered under the scope of this chapter are aware of their responsibilities for complying with the principles of this policy and any bureau-specific guidance.

F.     <u>Bureau Scientific Integrity Officers</u> are responsible for:

(1)     Implementing this chapter as it pertains to the bureau.

(2)     Keeping the bureau head or appropriate senior executive informed on the status of the implementation of this chapter.

(3)     Coordinating with the appropriate servicing human resources officer.

(4)     Conducting a review of allegations and submitted materials received from the Office of the Executive Secretariat and Regulatory Affairs to determine whether an inquiry is warranted and appropriate next steps, following the procedures described in Section 3.8 below.

(5)     Coordinating with the DSIO on all submitted allegations and subsequent actions to ensure integrity and consistency of the process across the Department.

G.     <u>Managers and Supervisors</u> are responsible for:

(1)     Implementing this chapter as it pertains to their area of management or supervision.

(2)     Taking appropriate administrative and disciplinary action.

(3)     Consulting, as appropriate, with the DSIO, BSIO, Servicing Human Resources Officer (SHRO), Ethics Officer, Administrative Office or Contracting Office, Office of Inspector General (OIG), Office of the Solicitor (SOL) and Office of Collaborative Action and Dispute Resolution (CADR).

(4)     Complying with this chapter, 370 DM 752 on Discipline and Adverse Actions, and established collective bargaining agreements.

(5)     Ensuring that all contracts, written agreements, cooperative agreements, grants, permits, and leases, covered under the scope of this chapter and under their purview include the requirements of this policy in their performance work statement.

H.     <u>Employees and Volunteers</u> are responsible for:

(1)     Being aware of and upholding the principles contained in the Code of Scientific and Scholarly Conduct contained in this chapter, as well as principles of ethical conduct set forth in the Standards of Ethical Conduct for Employees of the Executive Branch (5 CFR 2635).

(2)     Complying with the policy and any additional bureau/office-specific guidance.

(3)     Reporting to the appropriate officials, as described in Section 3.8 of this chapter, knowledge of scientific misconduct that is planned, is imminent, or has occurred.

(4)     Ensuring that any contractors, cooperators, partners, permittees, leasees, and grantees covered under the scope of this chapter with whom they are executing contracts,

written agreements cooperative agreements, grants, leases or permits are aware of their responsibilities for complying with this policy and bureau/office-specific guidance.

      (5)    Upholding the employee responsibilities and conduct contained in Part 370 DM.

    I.    <u>Contractors, Cooperators, Partners, Permittees, Leasees, and Grantees</u> are responsible for abiding by the principles contained in this policy regarding the integrity of the Department's scientific and scholarly activities, as specified in written agreements or statements of work.

    J.    <u>Scientific and Scholarly Misconduct Review Panel members</u> are responsible for:

      (1)    Impartially examining allegations of scientific and scholarly misconduct, as requested.

      (2)    Preparing and submitting a report of findings to DSIO/ BSIO and responsible manager/supervisor.

      (3)    Complying with personnel requirements including established collective bargaining agreements and/or representational rights.

## 3.7    Code of Scientific and Scholarly Conduct.

    A.    <u>All Departmental Employees, and all Volunteers, Contractors, Cooperators, Partners, Permittees, Leasees, and Grantees</u> as described in section 3.3 (Scope) of this chapter, will abide by the following code of scientific and scholarly conduct to the best of their ability.

      (1)    I will act in the interest of the advancement of science and scholarship for sound decision making, by using the most appropriate, best available, high quality scientific and scholarly data and information to support the mission of the Department.

      (2)    I will communicate the results of scientific and scholarly activities clearly, honestly, objectively, thoroughly, accurately, and in a timely manner.

      (3)    I will be responsible for the resources entrusted to me, including equipment, funds, my time, and the employees I supervise.

      (4)    I will adhere to the laws and policies related to protection of natural and cultural resources and to research animals and human subjects while conducting science and scholarship activities.

      (5)    I will not engage in activities that put others or myself in an actual or apparent conflict of interest.

(6)     I will not intentionally hinder the scientific and scholarly activities of others or engage in scientific and scholarly misconduct.

(7)     I will clearly differentiate among facts, personal opinions, assumptions, hypotheses, and professional judgment in reporting the results of scientific and scholarly activities and characterizing associated uncertainties in using those results for decision making, and in representing those results to other scientists, decision makers, and the public.

(8)     I will protect, to the fullest extent allowed by law, the confidential and proprietary information provided by individuals, communities, and entities whose interests and resources are studied or affected by scientific and scholarly activities.

(9)     I will be responsible for the quality of the data I use or create and the integrity of the conclusions, interpretations, and applications I make.  I will adhere to appropriate quality assurance and quality control standards, and not withhold information that might not support the conclusions, interpretations, and applications I make.

(10)     I will be diligent in creating, using, preserving, documenting, and maintaining scientific and scholarly collections, records, methodologies, information, and data in accordance with federal and Departmental policy and procedures.

B.     In addition, for Scientists and Scholars:

(1)     I will place quality and objectivity of scientific and scholarly activities and reporting of results ahead of personal gain or allegiance to individuals or organizations.

(2)     I will maintain scientific and scholarly integrity and will not engage in fabrication, falsification, or plagiarism in proposing, performing, reviewing, or reporting scientific and scholarly activities and their products.

(3)     I will fully disclose methodologies used, all relevant data, and the procedures for identifying and excluding faulty data.

(4)     I will adhere to appropriate professional standards for authoring and responsibly publishing the results of scientific and scholarly activities and will respect the intellectual property rights of others.

(5)     I will welcome constructive criticism of my scientific and scholarly activities and will be responsive to their peer review.

(6)     I will provide constructive, objective, and professionally valid peer review of the work of others, free of any personal or professional jealousy, competition, non-scientific disagreement, or conflict of interest.  I will substantiate comments that I make with the same care with which I report my own work.

C.     In Addition, for Decision Makers:

1/28/11 #3889
New

(1)     I will do my best to support the scientific and scholarly activities of others and will not engage in dishonesty, fraud, misrepresentation, coercive manipulation, censorship, or other misconduct that alters the content, veracity, or meaning or that may affect the planning, conduct, reporting, or application of scientific and scholarly activities.

(2)     I will offer respectful, constructive, and objective review of my employees' scientific and scholarly activities and will encourage their obtaining appropriate peer reviews of their work.  I will respect the intellectual property rights of others and will substantiate comments that I make about their work with the same care with which I carry out and report the results of my own activities.

(3)     I will adhere to appropriate standards for reporting, documenting and applying results of scientific and scholarly activities used in decision making and ensure public access to those results in accordance with Departmental policy and established laws.

## 3.8     Procedures for Reporting and Resolving Allegations Regarding Loss of Scientific and Scholarly Integrity.

The Department is dedicated to preserving the integrity of the scientific and scholarly activities it conducts, and are conducted on its behalf.  It will not tolerate loss of integrity in the performance of scientific and scholarly activities or in the application of science and scholarship in decision making. This section outlines procedures for reporting and resolving allegations in a timely and fair manner (see Appendices A-1 and A-2).

A.     Reporting an Allegation.  Allegations of scientific and scholarly misconduct with respect to DOI employees, volunteers, contractors, cooperators, partners, permittees, leasees, and grantees must be submitted in writing.  The Department will consider allegations submitted within 60 days of discovery of alleged misconduct. Allegations may be submitted by individuals or entities, internal or external to the Department. Misconduct includes intentional fabrication, falsification, or plagiarism and is not the result of honest error or difference of opinion, such as with a scientific and scholarly process or a management decision. Cases of fraud, waste, and abuse should be directly referred to the Office of Inspector General.

An initial notice of an allegation of scientific and scholarly misconduct should be submitted to the OES and contain the following information:

(1)     The name, affiliation, and signature of the person(s) submitting the allegation and the name and organization of the person(s) alleged to have committed the misconduct.

(2)     Upon receipt of the above information, OES will open a file to track the allegation.  The following additional information is required within 10 days of submission of the information in paragraph (1).

(3)     A description of the allegation that includes the date, circumstances, and location of the alleged misconduct.

(4)     Any documents or other relevant items (such as data, scientific papers, memos, etc.) with annotation showing specifically how the item relates to the allegation.

(5)     An explanation of how the allegation relates to scientific and scholarly misconduct and demonstrating the impact of the alleged misconduct.

(6)     A statement explaining any conflict(s) of interest the person making the allegation has with the subject(s), entity(ies), or situation(s), named in the allegation.

Allegations may be returned if they do not contain the above information.

B.     <u>Inquiry into an allegation of scientific and scholarly misconduct</u>.  The OES will refer allegations to the DSIO or the appropriate BSIO.  Allegations related to bureau heads or offices within the Office of the Secretary will be referred to the DSIO.  Allegations related to the bureaus will be referred to the appropriate BSIO.

(1)     Where a union holds an exclusive recognition, managers and supervisor are reminded to fulfill their labor-management obligations, as appropriate, prior to implementing this policy.

(2)     Particular attention should be given to any applicable collective bargaining agreement containing language which conflicts with this policy.

(3)     Such language prevails over this policy until the contract is renegotiated or unless otherwise agreed to by the parties. The bureau Human Resources Office should be contacted for assistance.

C.     The DSIO or BSIO will conduct a review of the allegations and submitted materials to determine whether an inquiry is warranted.  Allegations that have been previously resolved will not be reopened unless substantial new information is submitted.  If the DSIO or BSIO determines that the allegation does not warrant investigation, or that the allegation was previously investigated, the DSIO or BSIO will dismiss the allegation and inform the submitter.

D.     <u>If the DSIO or BSIO determines that an inquiry is warranted</u>:

(1)     If Employees and/or Volunteers are the Subject of the Allegation:

(a)     The DSIO or BSIO will contact the responsible manager(s) of the subject of the allegation (henceforth referred to as the "subject") to inform the manager (s) that an allegation of scientific and scholarly misconduct has been filed.  For employees and volunteers, the responsible manager will normally be the supervisor, except when it is ascertained that the supervisor may have a conflict of interest, in which case an appropriate responsible manager will be assigned.

(b)     The DSIO or BSIO working with the responsible manager and an assigned Servicing Human Resources Officer (SHRO), will conduct an inquiry to determine if the allegation is covered under the provisions of this chapter and will provide consistency, oversight, and guidance throughout the entire process.

(c)     The subject will be notified in writing (Appendix B - Sample Notification of Allegation of Scientific Misconduct) that an allegation of scientific and scholarly misconduct has been filed against them. The notification shall be conducted privately and preferably in person. At the time of notification, the manager will ensure that all original records and materials relevant to the allegation are immediately secured.

(d)     Throughout the inquiry and fact finding, confidentiality must be maintained and identities of the subject of the allegation and person submitting the allegation will be protected.

(2)     If Contractors, Cooperators, Partners, Permittees, Leasees, or Grantees are the Subject of the Allegation:

(a)     The DSIO or BSIO will contact the appropriate federal official responsible for the activities of the contractors, cooperators, partners, permittees, leasees, or grantees that are the subject of the inquiry to inform the official that an allegation of scientific and scholarly misconduct has been filed. The appropriate official could be the Contracting Officer or Financial Assistance official (CO/FA) or permit/lease manager.  The DSIO or BSIO working with the appropriate official shall notify the subject's organization (or the subject in the case of a single independent contractor, cooperator, partner, permittee, lease, or grantee) of the allegation to request investigation and remedy.

(b)     Throughout the inquiry and fact finding, confidentiality must be maintained and identities of the subject of the allegation, their organization, and person submitting the allegation will be protected.

E.     Potential outcomes of inquiry into an allegation of scientific and scholarly misconduct.

(1)     Employees and Volunteers:

(a)     If the DSIO or BSIO working with the manager establishes through the inquiry that no misconduct has occurred, the case will be dismissed and closed.  The DSIO or BSIO working with the manager will issue a memorandum to the subject with a copy to the DSIO (if from the BSIO) explaining that the case is dismissed (Sample Closure Memorandum - Appendix C).

(b)     If during the inquiry the DSIO or BSIO working with the manager determines that an incident occurred but (1) was not intentional or reckless and therefore not misconduct, or (2) that misconduct occurred, however there is no need for further fact finding;

the DSIO or BSIO will work with the manager and SHRO to determine appropriate corrective action, as necessary. The DSIO or BSIO and manager will meet with the subject to explain any actions that will be taken concerning this incident, close the case, and report resolution of the case to the DSIO (if from the BSIO).

(c)      If the DSIO or BSIO working with the manager determines that there appears to be merit to the allegation, and that a formal review and further fact finding by a panel of experts is required to determine the validity of the allegation and the extent and nature of the alleged misconduct, then the DSIO or BSIO will notify the manager and the subject(s) and a panel will be established as follows.

(i)      In the case of an allegation against a bureau employee, the bureau head will then establish a Scientific and Scholarly Integrity Review Panel (SIRP). The bureau head may not influence the panel process or results.  The BSIO will have oversight over the panel and inform the DSIO of the resolution.

(ii)      In the case of an allegation against a bureau head or an Office of the Secretary employee, the DSIO will inform the relevant Assistant Secretary or the Deputy Secretary, as appropriate. Either the Assistant Secretary or the Deputy Secretary, or designee, will establish a SIRP.  The DSIO will have oversight over the panel.

(2)      Contractors, Cooperators, Partners, Permittees, Leasees, and Grantees:

(a)      If the DSIO or BSIO working with the appropriate CO/FA official establishes that no misconduct has occurred then no further action will be taken against the subject's organization.  The appropriate CO/FA official will issue a memorandum to the subject's organization with a copy to the BSIO and DSIO explaining that no further action will be taken, and that the case will be closed.

(b)      If the DSIO or BSIO working with the appropriate CO/FA official determines that there appears to be merit to the allegation, the subject's organization will be requested to investigate the matter and provide the results to the government, certifying that the results of the investigation are true and accurate to the best knowledge of the organization. Penalties for falsifying results of an investigation may include, but not be limited to, termination of the contract or agreement or suspension and/or debarment from future federal awards.

(c)      If no misconduct is reported by the subject's organization and the DSIO or BSIO working with the appropriate CO/FA official accepts this report, no further action will be taken against the subject's organization.  Working with the appropriate CO/FA official, a memorandum will be issued to the subject's organization with a copy to the BSIO and DSIO explaining that no further action will be taken concerning this allegation, and that the case will be closed. The DSIO or BSIO working with the appropriate CO/FA official has the authority to question the organization's report until all issues have been satisfactorily addressed, after which the DSIO or BSIO will close the case.

(d)     If misconduct is reported by the subject's organization, the DSIO or BSIO, working with the appropriate CO/FA official will decide the course of action with regard to the organization to include, but not be limited to, acceptance of the organization's resolution of the misconduct, issuing a poor performance review, termination of the contract/agreement or initiation of debarment procedures. The BSIO will report resolution of the case to the DSIO.

    F.     Formal Review and Fact Finding by Scientific and Scholarly Integrity Review Panel (Employees and Volunteers Only).

        (1)     Guidance for establishment and operations of the Scientific and Scholarly Integrity Review Panel (SIRP) are provided in Appendix D.

        (2)     The SIRP Chair will notify the subject that a SIRP will be convened to conduct fact finding related to the allegation of scientific and scholarly misconduct; advise the subject on his/her rights and responsibilities during this process, and ask the subject to sign an Employee/Volunteer Information and Acknowledgement Form - Appendix E.  The subject will be entitled to have a representative if desired; however legal fees are the responsibility of the subject.

        (3)     The SIRP will provide a report as outlined in Appendix D.  The report produced by this panel falls under the Privacy Act, and will constitute pre-decisional, deliberative material containing analysis and recommendations related to Agency policy. These reports are intended to provide advice, recommendations, and opinions which are part of the deliberative, consultative, decision-making processes of the Department.

        (4)     Within 30 calendar days of the completion of the fact finding report, the Chair of the SIRP shall forward the report to the appropriate bureau head(s), BSIO(s), and the DSIO.  The DSIO or BSIO, as appropriate, will work with the responsible manager and SHRO to determine corrective or disciplinary action.  If the SIRP determines there is no misconduct, the manager will issue a memorandum to the subject with a copy to the DSIO or BSIO explaining that no further action will be taken concerning this allegation and that the case will be closed (Appendix C).

    G.     Corrective and Disciplinary Actions (Employees and Volunteers Only).

        (1)     If the incident that led to the allegation of misconduct is determined to have resulted in an impact to the integrity of the science or scholarship, the manager will take steps to correct the loss of integrity and to prevent future occurrences of the sequence of events that led to the impact to integrity.

        (2)     For employees, if the allegation is determined to have merit either as a result of the inquiry led by the DSIO or BSIO or as a result of further fact finding by an SIRP, the responsible manager and SHRO will work together to determine the appropriate action to be taken using the Departmental Manual chapter 370 DM 752 - Discipline and Adverse Actions, and any union contracts, as applicable.

1/28/11 #3889
New

(3)      For volunteers, if the allegation is determined to have merit either as a result of the inquiry led by the DSIO or BSIO or as a result of further fact finding by an SIRP, the manager will determine appropriate action which may include loss of privileges or termination of their volunteer service agreement.

H.      Appeal Rights (Employees and Volunteers Only).  If disciplinary action is taken against an employee, they may have appeal rights under Departmental Manual chapter 370 DM 752 - Discipline and Adverse Actions, and any union contracts, as applicable.  Employees should contact their SHRO for additional information.

I.      Resources for Federal Employees and Volunteers.

(1)      The Department's COnflict REsolution PLUS (CORE PLUS) system for managing conflict in the workplace, jointly managed by the Office of Collaborative Action and Dispute Resolution and its counterparts in the bureaus, provides managers and employees with tools and assistance to address science and scholarship integrity issues and concerns. CORE PLUS assistance may include, but is not limited to, facilitating consultation to help define issues or specific concerns, providing training on effective communication and conflict management, coaching parties in their attempts to resolve conflicts on their own, facilitating meetings, mediating (when it is appropriate and the parties are willing to participate), or securing the services of other alternative dispute resolution practitioners, such as ombudsman assistance, acceptable to all parties.

(2)      The informal conflict management and alternative dispute resolution processes available through CORE PLUS do not take the place of any other avenue of redress available to managers and employees.  See 370 DM 770.

**3.9      Participation as an Officer or Member on the Board of Directors of Professional Societies or other non-Federal Organizations.**

The Department encourages the enhancement of scientific and scholarly integrity through engagement with the communities of practice represented by professional societies.  The Department encourages employees to participate in outside professional organizations in order to enhance their professional development, especially when that participation advances the Department's mission, programs, and operations.  Department scientists, scholars, and other professionals should engage in scientific, scholarly, and other activities with these professional networks in accordance with the following guidelines.

A.      An employee's service as an officer or as a member on the board of directors (or in any position that creates a fiduciary duty under State or other applicable law) of a non-Federal organization may create an actual or apparent conflict of interest or may affect the employee's ability to act impartially.  Employees in these positions must avoid any activity that may create the potential for preferential treatment, improper official endorsement, inappropriate use of official time, actual or apparent loss of impartiality, disclosure of non-public information, or any situation that would adversely affect the public's confidence in the Department. Employees

wishing to serve in an official capacity in any position that creates a fiduciary duty to a non-Federal organization are required to complete, prior to serving in such a role, the waiver, memorandum of understanding (MOU), and recusal memorandum described below.

      B.     Employees serving in their official capacity on advisory committees, working groups, or other positions that do not create a fiduciary duty to a non-Federal organization must comply with all applicable ethics statutes and regulations during the period of their service. Employees should consult with an ethics counselor to ensure compliance with these statutes and regulations and should obtain supervisory approval to ensure bureau or Departmental interest in the employee's participation. They are not, however, required to complete the waiver, MOU, and recusal memorandum described below.

      (1)    <u>Service in a Personal Capacity as an Officer or Member of a Board of Directors or in any Position that Creates a Fiduciary Duty</u>.  Employees serving in their personal capacity as an officer or member on the board of directors of a non-Federal organization or in any position that creates a fiduciary duty must adhere to all applicable ethics statutes and regulations and should consult with their Bureau's Deputy Ethics Counselor or the Departmental Ethics Office to ensure their compliance. Failure to comply could result in violation of the Federal criminal conflicts of interest statute (18 U.S.C. § 208) or violation of the Standards of Ethical Conduct for Executive Branch Employees (5 C.F.R. 2635).

      (2)    <u>Service in an Official Capacity as an Officer or Member of a Board of Directors or in any Position that Creates a Fiduciary Duty</u>.  Departmental employees may participate in their official capacity as an officer or member on the board of directors of non-Federal organizations or in any position that creates a fiduciary duty when the Department or their Bureau has determined that such participation is in the best interest of the Federal Government.  In order to avoid any actual or apparent conflicts of interest, employees could, in an alternative, serve as a designated non-voting liaison, representing the Department or their bureau. When serving in their official capacity as an officer or on the board of directors of a non-Federal organization or in any position that creates a fiduciary duty to that organization, Department employees must adhere to the following requirements:

      (a)    Prior to service as an officer or member of the board of directors of a non-Federal organization or in any position that creates a fiduciary duty, employees must receive a Conflicts of Interest Waiver (Appendix F).  Waivers shall only be granted by the Designated Agency Ethics Official or a bureau head and will not be granted retroactively. To initiate the waiver process, Departmental employees should contact the Departmental Ethics Office or their Deputy Ethics Counselor.

      (b)    Employees must execute a written MOU (Appendix G), acknowledging that their primary duty of loyalty is to the U.S. Government should the interests of the Government conflict with the interests of the non-Federal organization. The MOU must be signed by the executive director or an officer of the non-Federal organization and by the Designated Agency Ethics Official or Bureau Head.

(c)      Employees must execute a Recusal Memorandum (Appendix H) in which they acknowledge that they may not be involved in any official government matter that would affect the financial interest of the non-Federal organization, including the following: decisions or discussions pertaining to grants, contracts, cooperative research and development agreements (CRADAs), or other support; the preparation of requests from the non-Federal organization to obtain Federal funds or manpower to support its activities; approval of Federal travel authorizations to travel on behalf of the non-Federal organization; or fundraising and lobbying on behalf of the non-Federal organization.

3.10   **Authorities**.

A.      <u>Statutes and Regulations</u>.

(1)      5 U.S.C. 301 allows the head of an executive department to prescribe regulations for the conduct of its employees.

(2)      43 CFR 20.501 requires employees of the Department to comply with all Federal statutes, Executive Orders, Office of Government Ethics and Office of Personnel Management regulations, and Departmental regulations.

(3)      43 CFR 20.502 states that employees are required to carry out the announced policies and programs of the Department.

(4)      56 FR 28012-28018 is the Federal Policy for the Protection of Human Subjects,  which provides guidelines for all research involving human subjects conducted, supported or otherwise subject to regulation by any federal department or agency.

(5)      7 USC, 2131-2159 is the Animal Welfare Act as Amended, which requires that minimum standards of care and treatment be provided for certain animals bred for commercial sale, used in research, transported commercially, or exhibited to the public.

(6)      43 CFR 20.502(a) states that an employee is subject to appropriate disciplinary action if he or she fails to comply with any lawful regulations, orders, or policies.

(7)      18 U.S.C. 208 and 5 CFR 2635 Subparts D and E state that department scientists and scholars are subject to requirements pertaining to conflict of interest and appearance of a lack of impartiality.

B.      Departmental Manual - 370 DM 752.

C.      <u>Standards of Ethical Conduct for Employees of the Executive Branch, 5 CFR 2635</u>.

D.      <u>Federal Policy on Research Misconduct, 65 FR 76260-76264, December 6, 2000.</u>

E.      <u>Whistleblower Protection Act, 5 USC, 2302(b)(8).</u>

Appendix B

## *Sample Notifications of Allegation of Scientific Misconduct*

TO: Subject

FROM: DSIO or BSIO

CC: DSIO and Manager

SUBJECT: Allegation of Scientific Misconduct

An allegation of scientific misconduct has been filed with the Department of the Interior regarding the following: *Insert as specific and detailed a description of the allegation as possible here, but do not disclose the name of the person who filed the allegation.*

This allegation has not yet been investigated or determined to have merit. However, pursuant to the Department of the Interior's scientific integrity policy, I will be conducting an inquiry to determine its merits. Under the Department's procedures, you must preserve and provide to my office all original research records and materials relevant to the above allegation.

An interview will be scheduled with you to discuss the allegation and will be part of the official record. You may also provide for the record a written response to the allegation.

Once an inquiry into this matter is concluded, I will inform you in writing that: (1) a review of this matter has dismissed the allegation and the matter is closed; (2) a review of this matter has verified that scientific misconduct has taken place and you will be contacted about possible additional action; or (3) the allegation has been referred to a Scientific Integrity Review Panel (SIRP) for further fact-finding. If the matter is referred to an SIRP, the Chairperson of the Panel will notify you of your rights concerning their review, your obligations during their investigation, and your opportunity to respond to the allegation.

*For Volunteers:*
If a Panel conducts fact-finding into this allegation, I will review their findings to determine the appropriate action necessary to resolve this matter. You will be advised of the action to be taken.

If conflict arises as this process proceeds or if the action was not deliberate and was more about a disagreement or difference of opinion, I may utilize the Department's CORE PLUS system for managing conflict in the workplace. The CORE PLUS system is jointly managed by the Office of Collaborative Action and Dispute Resolution and its counterparts in the bureaus, and provides managers and employees with tools and assistance to address science and scholarship integrity issues and concerns. CORE PLUS assistance may include, but is not limited to, consultation to help define issues or specific concerns, providing training on effective communication and conflict management, coaching parties in their attempts to resolve conflicts on their own,

1/28/11 #3889
New

facilitating meetings, mediating (when it is appropriate and the parties are willing to participate), or securing the services of other alternative dispute resolution practitioners, such as ombuds assistance, acceptable to all parties.

I have attached a copy of the DOI Manual chapter xxxxx on Scientific Integrity. Please review it carefully and let me know if you have any questions about this process.

Appendix C

## *Sample Closure Memorandum*

TO:          Subject

FROM:      DSIO or BSIO

CC:          DSIO and Manager

SUBJECT:  Resolution of Allegation of Scientific Misconduct

I am pleased to inform you that**,** after an inquiry into the allegation of scientific misconduct that was filed against you, I have found no merit in the charge. (*Insert as specific and detailed a description of the allegation as possible but do not disclose the name of the person who filed the allegation*). As a result, the concerns of this allegation are considered closed. I appreciate your cooperation in this important process.

1/28/11 #3889
New

Appendix D

# Scientific and Scholarly Misconduct Review Panel

**PURPOSE**

A Scientific Integrity Review Panel (SIRP) will be established by the Head(s) of a Bureau(s) for Bureau related allegations of misconduct or by the DSIO for allegations of misconduct against the Bureau Head or Office of the Secretary. The SIRP will conduct fact finding and review allegations of misconduct reported against DOI employees and volunteers. The panel shall address the materiality or significance of the alleged misconduct and explain why the conduct does or does not constitute a serious deviation from accepted practices under institutional or general scientific and scholarly standards. To fully understand the severity of alleged misconduct, an effort to determine deliberate intent should be included in the investigation. Scientific and scholarly misconduct is the result of a deliberate action by an employee or volunteer that compromises the scientific integrity of the conduct, production, or use of scientific and scholarly activities and assessments. Misconduct includes intentional fabrication, falsification, or plagiarism and is not the result of honest error or difference of opinion with a scientific and scholarly process or a management decision.

Three criteria are necessary to establish research misconduct (Federal Policy on Research Misconduct):
    (1)   There is a significant departure from accepted practices of the relevant research community, and
    (2)   The misconduct is committed intentionally or knowingly or recklessly, and
    (3)   The allegation is proven by a majority of evidence.

**COMPOSITION OF THE PANEL**

The SIRP shall consist of a Chairperson and at least three subject matter experts that may come from any part of the Department as appropriate. The Bureau Head(s) or DSIO, or a designee in consultation with the BISO and appropriate senior management as needed shall appoint the panel members based on the specific discipline or a specific area of expertise that is required to understand the probable nature of the alleged misconduct. The Chairperson, with the concurrence of the Bureau Head (s) or DSIO, will select additional panel members as needed. The Bureau Head (s) or DSIO may replace any panel member at any time. Depending on the Bureau's needs, this may be a standing committee.

Panel members shall have appropriate expertise to evaluate the allegations of scientific misconduct. The integrity and fairness of the peer-evaluation process is paramount, every effort will be made to maintain a balance of subject matter expertise at, appropriate grade levels among panel members.

## SERVICING HUMAN RESOURCES OFFICE, ETHICS OFFICE, OR ADMINISTRATIVE ASSISTANCE

The Chairperson of the Panel will set the specific dates, time, and place for the panel to meet. The servicing human resources officer will serve as an ad hoc member of the panel and along with the, BSIO or DSIO, and the Bureau or Department Ethics office, will provide support or advice to the panel as necessary.

## PANEL OPERATIONS AND RESPONSIBILITIES

The Chairperson of the Panel will ensure that information concerning the case is distributed to panel members at least two weeks prior to the meeting date.

The Panel, at its discretion, will conduct fact-finding and may utilize one or both of the following methods: (1) Securing and reviewing documentary evidence including all original experimental records, protocols, and data; (2) Interviewing relevant persons, whether in person, or by telephone; and securing written statements from the interested parties, as necessary.

The Chairperson of the Panel shall advise panel members of the extreme importance of confidentiality of materials and discussions relating to the alleged scientific misconduct. There is to be no release of information by panel members pertaining to any allegation. All discussions by the panel shall be safeguarded and not shared outside of the Scientific Integrity Review Panel.

The Scientific Integrity Review Panel will arrive at a consensus decision, if possible, about whether or not misconduct has occurred. Consensus decision means that all panel members, including the Chairperson, agree in general with a decision; this is distinct from a majority-rule decision. In the consensus-based process, panel members work together to develop a finding with which all of the members of the panel can agree. The Chairperson will determine if consensus has been reached by asking all panel members if they agree with the finding. If consensus is reached, then the Panel shall write a report of their findings that contains: a summary of the findings, the basis for determining whether or not scientific misconduct occurred, and an assessment of the seriousness and extent of any misconduct found that is in violation of the DOI Policy on Integrity of Scientific and Scholarly Activities.

The Panel will take the time necessary to address all of the relevant issues associated with the allegation in order to reach a consensus finding. If after all efforts are exhausted, the Panel is still unable to reach consensus about whether or not misconduct has occurred, then a majority decision will be made. In this case, the panel report will include majority and minority findings.

The report produced by this panel will constitute pre-decisional, deliberative material containing analysis and recommendations related to Agency policy. These reports are intended to provide advice, recommendations, and opinions which are part of the deliberative, consultative, decision-making processes of the Department of the Interior. At a minimum the report will include: (1) Summary of the alleged misconduct, (2) Summary of the fact finding activities of the panel, (3) Discussion and conclusion as a result of the fact finding and (4) Appendices as needed containing supporting documents and written statements.  The report and supporting documents

1/28/11 #3889
New

constitute the record of the panel activities and will be kept according to the appropriate records disposition schedule by the appropriate DSIO or BSIO.

Within 30 calendar days of the completion of the review and fact finding, the Chairperson of the Panel shall forward the completed report to the BISO, DSIO, and responsible manager.

Appendix E

## *Employee and Volunteer Information and Acknowledgement Forms*

**EMPLOYEE INFORMATION AND ACKNOWLEDGMENT FORM**

The Chairperson of the Scientific Integrity Review Panel will ensure that the subject of the allegation initials each statement below and returns the original signed/dated form to the Chairperson. A copy of the completed form will be provided to the subject of the allegation. The employee acknowledges that:

I have been informed and I understand this is a formal review and fact-finding process involving matters relating to my official duties as a Federal employee.

I have been informed and I understand that, as a Federal employee, I am required to cooperate with this formal process and provide truthful answers.

I have been informed and I understand that if I refuse to cooperate and answer questions during this formal process, my refusal to cooperate can be a basis for disciplinary action, which may result in my removal from Federal service.

I have been informed and I understand that if I provide information during this formal process that I know to be false at the time I provided the information, my providing false information can be a basis for disciplinary action that may result in my removal from Federal service and also can be a basis for criminal prosecution.

I understand that I will have the opportunity to respond to the allegation and to present evidence to the Scientific Misconduct Review Panel orally and/or in writing and that I may have representation at my own expense.

I understand that I may have rights as an employee during this process, and that my servicing Human Resources Office can inform me of these rights.

Signature: _____ Date: _____
Name (please print): _____
Position Title, Series and Grade: _____
Duty Station: _____

**PRIVACY ACT NOTICE.**  Pursuant to the Privacy Act of 1974, as amended, 5 U.S.C. § 552a, you are advised of the following:

1. Authority.  Solicitation of this information is authorized by 5 U.S.C. 301 that allows the head of an executive department to prescribe regulations for the conduct of its employees and other authorities cited at 305 DM 3.10.

2. Principal Purpose.  The principal purpose for soliciting the information is to implement the Policy on Integrity of Scientific and Scholarly Activities of the Department of the Interior at 305 DM 3.

3. Routine Uses.  Routine uses of the solicited information are the same as those listed in the system notice OPM/GOVT-1.

4. Effect of Noncompliance. Failure to provide the solicited information may result in disciplinary action, including the removal from Federal service.

1/28/11 #3889
New

## VOLUNTEER INFORMATION AND ACKNOWLEDGMENT FORM

The Chairperson of the Scientific Integrity Review Panel will ensure that the subject of the allegation initials each statement below and returns the original signed/dated form to the Chairperson. A copy of the completed form will be provided to the subject of the allegation.

The Volunteer acknowledges that:

I have been informed and I understand this is a formal review and fact-finding process involving matters relating to my official duties as a DOI volunteer.

I have been informed and I understand that if I refuse to cooperate and answer questions during this formal process, my refusal to cooperate may result in termination of my volunteer agreement.

I have been informed and I understand that if I provide information during this formal process that I know to be false at the time I provide the information; my providing false information can be a basis for termination of my volunteer agreement.

I understand that I will have the opportunity to respond to the allegation and to present evidence to the Scientific Integrity Review Panel orally and/or in writing and that I may have representation at my own expense.

Signature: _____ Date: _____

Name (please print): _____

Office: _____

**PRIVACY ACT NOTICE.** Pursuant to the Privacy Act of 1974, as amended, 5 U.S.C. § 552a, you are advised of the following:

1. Authority. Solicitation of this information is authorized by 5 U.S.C. 301 that allows the head of an executive department to prescribe regulations for the conduct of its employees and other authorities cited at 305 DM 3.10.

2. Principal Purpose. The principal purpose for soliciting the information is to implement the Policy on Integrity of Scientific and Scholarly Activities of the Department of the Interior at 305 DM 3.

3. Routine Uses. Routine uses of the solicited information are the same as those listed in the system notice INTERIOR/DOI-05.

1/28/11 #3889
New

4. Effect of Noncompliance. Failure to provide the solicited information may result in termination of your volunteer agreement.

Appendix F

# Conflict of Interest Waiver Request Template

Memorandum

To:            [Name of Bureau Ethics Counselor]

From:          [Deputy Ethics Counselor]

Subject:       Conflict of Interest Waiver for [Employee Name]

The purpose of this memorandum is to request that you grant [Employee Name] a waiver of the criminal conflict of interest provisions that may apply to [his or her] service in an official capacity as [an officer or a member of the board of directors, or other position] of the [name of outside non-profit organization] [abbreviation]. [Employee Name]'s official [Department or bureau] duty is to serve as the [title]. As such, [he or she] [explain the employee's duties, including information that shows how they relate to service in the outside organization (may require more than one sentence)].

The criminal conflict of interest statute, 18 U.S.C. § 208(a), requires that an employee refrain from participating personally and substantially in an official capacity in any particular matter that will have an effect on the financial interests of any organization in which the individual serves as an officer, director, trustee, or employee.

In the absence of:  (1) specific statutory authority placing a federal employee in an officer or director position in an ex officio capacity; (2) a release of fiduciary obligations by the organization (if permitted by state law); or (3) a waiver of the requirements of 18 U.S.C. § 208(a), the statute effectively would preclude [Employee Name]'s service, as an official duty activity, as [officer, director or other position] with the [name of outside non-profit organization].

[Describe the position in the outside organization and the outside organization].  [Describe the relationship of the outside organization to [Department or bureau] programs and operations.]

A memorandum of understanding between the [Department or bureau] and the [name of outside non- profit organization] concerning the service of [Employee Name] is attached.

Inasmuch as [Employee Name]'s appointment with the [name of outside non-profit organization] is not pursuant to a statute or release of fiduciary obligations, [he or she] has requested that you, as the official to whom waiver authority is delegated, authorize [his or her] participation in certain particular matters that may affect the financial interests of the [name of outside non-profit organization].  Under 18 U.S.C. § 208(b)(1), a waiver may be granted if the official to whom waiver authority is delegated determines that the disclosed financial interest is "not so substantial as to be deemed likely to affect the integrity of the employee's services to the Government."

In the course of [his or her] assigned duties, the following types of particular matters potentially could come before [Employee Name] for [his or her] personal and substantial participation:

(1) particular matters of general applicability, such as legislation, regulation, or policy that may affect the financial interests of the [name of outside non-profit organization] as a member of a class of similarly situated entities;

(2) matters that affect the financial interests of the [name of outside non-profit organization] through investigation or regulation of the [name of outside non-profit organization];

(3) particular matters involving specific parties, such as grants, contracts, or application approvals that specifically involve the [name of outside non-profit organization] or otherwise affect its financial interests; or

(4) other miscellaneous matters involving the conduct of the [name of outside non-profit organization] and [Department or bureau] support.

While performing the usual and customary duties of the position of [officer, director or other position] with an outside organization as an official [Department or bureau] activity, any actions taken either in the Federal workplace or at the organization that affect the financial interests of the outside organization are deemed official matters to which 18 U.S.C. § 208(a) applies.  For example, such actions may include:

(a) requesting that official travel funds be spent or other government resources be utilized for the employee to conduct the affairs of the organization;

(b) signing a training authorization to use [Department or bureau] funds to pay for an employee to attend a conference or other meeting of the organization;

(c) speaking as an official duty activity at a conference or other meeting of the organization;

(d) providing advice and consultation with respect to, or otherwise conducting, the business affairs of the organization including voting on matters that come before the [name of outside non-profit organization] officers and board members.

While the financial impact may be insignificant, under well-settled precedent, 18 U.S.C. § 208(a) has no de minimis aspect.

I believe that a waiver under 18 U.S.C. § 208(b)(1) to allow [Employee Name] to serve as an [officer or a member of the board of directors, or other position] for [name of outside non-profit organization] in [his or her] official capacity is justified for the following reasons:

First, because [Employee Name] will serve as [position with the outside non-profit organization] as an official duty activity, and [Employee Name]'s position in the outside organization is fully known to the [Department or bureau], the risk that the integrity of the services that the government expects from [Employee Name] would be affected by [his or her] service is greatly diminished.  Moreover, the

[Department or bureau] has already determined that, to a significant degree, the interests of the [Department or bureau] and the interests of the [name of outside non-profit organization] are consonant.  The [Department or bureau] expects that the interests of the [Department or bureau] and the interests of the [name of outside non-profit organization] can both be furthered through the performance of [Employee Name]'s official duties and service with the [name of outside non-profit organization].

Second, most, if not all, of the particular matters in which [Employee Name] would participate would not have a significant effect on the financial interest of the [name of outside non-profit organization] because of the limits in this request set forth below.  [Employee Name] will have no involvement in any [Department or bureau] grants, contracts, cooperative agreements, or other Federal support (financial or otherwise) to the [name of outside non-profit organization] other than the use of travel or training funds solely for [Employee Name]'s service with the [name of outside non-profit organization].  [Employee Name] will not participate in investigations of the activities of the [name of outside non-profit organization], other than as a provider of information or testimony.  [Employee Name] will not participate in developing regulations that would impact the [name of outside non-profit organization] or be involved in enforcing regulations pertaining to the [name of outside non-profit organization].

Contradictory with Limitations 1
Accordingly, if approved, the requested waiver will permit [Employee Name] to serve as an [officer or a member of the board of directors, or other position] in [name of outside non-profit organization] and permit participation in [his or her] capacity with the [name of outside non-profit organization] in particular matters that will affect the financial interests of the [name of outside non-profit organization], EXCEPT the particular matters listed below that might have a direct and predictable effect on the financial interests of the [name of outside non-profit organization] as to which [Employee Name] has committed to recuse [himself or herself].

LIMITATIONS:

[Employee Name] may not participate in any of the following particular matters because they may affect the financial interests of the [Department or bureau] and the [name of outside non-profit organization] or otherwise violate Federal laws or regulations:

   1.  Any involvement or participation in decisions pertaining to [Department or bureau] grants, contracts, cooperative agreements [list any other types of agreements that the [Department or bureau] might have with the outside non-profit organization], or other support to include personnel and equipment to the [name of outside non-profit organization], except the actions specifically permitted above, that is:

      "(a) requesting that official travel funds be spent or other government resources be utilized for the employee to conduct the affairs of the organization;

      (b) signing a training authorization to use [Department or Bureau] funds to pay for an employee to attend a conference or other meeting of the organization;

(c) speaking as an official duty activity at a conference or other meeting of the organization;

(d) providing advice and consultation with respect to, or otherwise conducting, the business affairs of the organization including voting on matters that come before the [name of outside non-profit organization] officers and board members."

2.  Any involvement or participation in any regulatory or investigatory matters on behalf of any Department or agency of the U.S. Government involving the [name of outside non-profit organization] other than as a provider of information or testimony.

3.  Preparation or presentation of requests from the [name of outside non-profit organization] to obtain any Federal funds, manpower, or any other form of Federal support on its behalf to support [name of outside non-profit organization] activities, except as permitted in 1.(a) through (c) above.

4.  Lobbying on behalf of the [name of outside non-profit organization] in any manner to a Member of Congress, a jurisdiction, or an official of any government as prohibited by 18 U.S.C. § 1913.  This includes the use of money appropriated by any enactment of Congress to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy, or appropriation, at any time unless specifically authorized by Act of Congress.  This does not prevent employees of the United States or of its departments or agencies from communicating to Members of Congress or other officials, at his request, or to Congress or such official, through the proper official channels regarding requests for any legislation, law, ratification, policy, or appropriations which they deem necessary for the efficient conduct of the public business.

5.  Approval of Federal travel authorizations to travel on behalf of the [name of outside non-profit organization].

6.  Participation in fundraising activities of the [name of outside non-profit organization].

A copy of the recusal memorandum is attached.  In this manner, [Employee Name]'s service with the [name of outside non-profit organization] is severed from his service as the [Employee's Department or bureau duty title] on particular matters where both the [name of outside non-profit organization] and the [Department or bureau] may have financial interests, thereby avoiding any potential that [he or she] could act contrary to interests of the [Department or bureau] for the benefit of the [name of outside non-profit organization].

[Employee Name] understands and agrees that, as an official duty activity, no separate compensation or reimbursements may be received from the [name of outside non-profit organization] in connection with his or her service.  Travel, lodging, per diem or other incidental

expenses incurred by [Employee Name] on behalf of the [name of outside non-profit organization], if any, may be accepted by the [Department or bureau] under 31 U.S.C. § 1353 as appropriate.  Acceptance of [Employee Name] travel expenses, if any, from the [name of outside non-profit organization] shall be accomplished via a Form DI-2000 which must be approved by the [Departmental or bureau] Ethics Office prior to the travel, or when circumstances do not permit prior approval, within seven days of conclusion of the travel.

3 Attachments:
1.  MOU between the [Department or bureau] and the [name of outside non-profit organization], dated
2.  [Employee Name] Recusal letter, dated
3.  Form DI-2000, *Acceptance of Travel Expenses from a Non-Federal Source*


DECISION:

_____     Waiver granted, subject to the terms and conditions stated above, based on my determination, made in accordance with 18 U.S.C. § 208(b)(1), that the disclosed financial interests are not so substantial as to be deemed likely to affect the integrity of the service which the government may expect from the employee.

_____     Waiver denied.


_____     Date:
[Name]
[Departmental or Bureau Ethics Counselor]
[Name of Department or bureau]


I have read and fully understand ALL of this 18 U.S.C. § 208(b)(1) waiver decision and its limitations.  I agree to fully comply with its limitations and acknowledge my understanding and compliance by signing below:


_____     Date:
[Employee Name]
[Title]
[Department or bureau]


1/28/11 #3889
New

Appendix G

## *Memorandum of Understanding Template*

Memorandum of Understanding
between the
(U.S. Department of the Interior or bureau)
and the
(Organization name)

1.   This Memorandum of Understanding sets forth the agreement between the (Department or bureau) [abbreviation] and the (organization name) [abbreviation] concerning the service of (employee name) as an [officer or member of a board of directors] of the (organization name) as a part of (his or her) official government duties through [month/year]. (Employee name) will be serving as _____.   It is estimated that the amount of official time (employee name) will spend on this activity will be approximately (number) hours per month.

2.   Before (employee name) performs any duties as an [officer or member of a board of directors] of the (organization name) as part of (his or her) official duties (he or she) must be granted a waiver under the Federal conflict of interest statute, 18 U.S.C. § 208.  Waivers that permit an employee to serve as an officer or a member of a board of directors are limited and enable (employee name) to serve as an [officer or board member] of the (organization name) in (his or her) official capacity as a [Department or bureau] employee without violating 18 U.S.C. § 208.  However, even if an 18 U.S.C. § 208 waiver is granted, (employee name) may not make or participate in any official decisions on behalf of the (Department or bureau) regarding any request from the (organization name) for public funds or support.  (Employee name) may not take any actions that violate Federal, state or local law.  Requests for public funds or support include, but are not limited to grants, cooperative agreements, contracts or any other action where the (organization name) is requesting any form of support from the Department of the Interior or one its bureaus.  To ensure that no conflicts of interest arise, the (organization name) agrees that it will notify the (Department or bureau) Ethics Office if it intends to seek public funds or support from the Department of the Interior or one of its bureaus. Notice will be provided to: [Department or bureau] Ethics Office [address].  The (organization name) also understands that if it elects to request public funds or support from the Department of the Interior or one of its bureaus, (employee name) may be directed to resign as an [officer or board member] in the (organization name) in (his or her) official capacity.

3.   The primary beneficiary of (employee name)'s service as an [officer or board member] in the (organization name) is intended to be the (Department or bureau).  It is expected that the benefits to the (Department or bureau) will include, but not be limited to the following:

    a.    acquisition of state-of-the-art technical information about (name subjects).

    b.    knowledge about organizational arrangements and relationships of organizations with which the (Department or bureau) interacts, in order to enhance the working relationships between the (Department or bureau) and such other organizations;

    c.     improved understanding of current issues in the (name the field of endeavor) that concern (Department or bureau) missions and operations;

    d.     utilization of professional networks and channels to disseminate information relevant to the accomplishment of (Department or bureau) missions; and

    e.     utilization of other mechanisms to facilitate accomplishment of (Department or bureau) missions, functions and processes, such as meetings, conferences, symposia, and publications.

4.   In order to avoid the possibility of an actual or potential use of public office for private gain, when [name of employee] uses official time to serve as an [officer or board member] in the (organization name), the following principles will apply:

    a.    Federal employees may not represent anyone other than the United States before an agency or court in connection with any particular matter in which the United States is a party or has a direct and substantial interest. (18 U.S.C. § 205)

    b.    When serving as an officer or member of a board of directors of a non-Federal organization in an official capacity, Federal employees must refrain from any involvement or participation in or taking any official action on behalf of the Department of the Interior or its bureaus on any application or request for public funds or other support by the (organization name). (18 U.S.C. § 208)

    c.    If a Federal employee's participation in a project undertaken in conjunction with a private organization was done as a part of (his or her) official duties, the Federal employee is prohibited from receiving any supplementation of his/her Federal salary. (18 U.S.C. § 209)

    d.    Federal employees are prohibited from using appropriated funds, official time or Government equipment to instigate or generate lobbying activity on any issue pending before or of interest to the Congress or an official of any government.  (18 U.S.C. § 1913)

    e.    Federal employees are prohibited from being involved in the fundraising activities of the (organization name).

    f.    Federal employees may not utilize official Government postage, stationery, envelopes, or labels for other than official Government business. (18 U.S.C. § 1719)

The relationship between the (organization name) and the (Department or bureau) addressed in this document is intended to enhance service to the American public through more efficient applications of (Department or bureau) programs. All actions should be directed toward attainment of that mutually beneficial goal.

5.  Under Federal law, a Federal employee serving in (his or her) official capacity owes (his or her)

first duty of loyalty to the Government of the United States.  By signing this memorandum of understanding, the (organization name) acknowledges and consents to the fact that since (employee name) is acting as an [officer or a member of a board of directors] in (organization name) in (his or her) official capacity as a (Department or bureau) employee, (employee name) will owe (his or her) first duty of loyalty to the United States Government and specifically the (Department or bureau) before that of the (organization name) if those interests ever conflict.  Consequently, to the fullest extent permitted by state law, the (organization name) agrees to waive any fiduciary duty owed by (employee name) to the (organization name) as an [officer or a member of a board of directors] in the (organization name) when (employee name) acts in the interests of the United States Government. This waiver is limited to actions taken in the interests of the United States Government by (employee name) as an [officer or a member of a board of directors] in the (organization name) while acting in (his or her) official capacity.  (Employee name) retains a fiduciary duty to act in the best interests of the (organization name) except when in conflict with the interests of the United States Government.

6.  The (organization name) agrees to provide (employee name) liability insurance coverage for any acts performed as an [officer or board member] in the (organization name) equivalent to liability coverage provided to other [officers or board members] of the (organization name).  The (organization name) agrees to hold the United States harmless for acts taken by (employee name) in (his or her) official [Department or bureau] capacity as an [officer or board member] in the (organization name).

The foregoing is not intended to impose on the (organization name) any obligations or restrictions other than those set forth above.  The (organization name) has an obligation to respect the limitations described above on the activities and function of (employee name) and benefits which may be received by the (Department or bureau).  This agreement does not constitute a representation or warranty by the (organization name) as to the benefits which the (Department or bureau) will receive in fact from (employee name)'s service as an officer or member of the board of directors in the (organization name). Nor does the (organization name) assume any obligation to inquire into or enforce (employee name)'s compliance with paragraph 4 above.

_____        Date:
[Name]
[Official Department or Bureau Position]
[Departmental or Bureau]

_____        Date:
[Name]
[Position]
[Organization name]

Appendix H

# Recusal Memorandum Template

MEMORANDUM

TO: [Supervisor Name and Title]

Date

FROM:  Name, Title and address [employee signs here]

SUBJECT:  Notice of Recusal by [Employee name]

1) This is to notify you that I have an interest in the [name of outside non-profit organization] [abbreviation] because I have been elected as [officer or board of director position] with the [name of outside non-profit organization] through [end date month/year].  **I will not be serving as [officer or board of director position] in an official [Department or Bureau] capacity unless and until I am granted a waiver of the conflict of interest statute**, 18 U.S.C. § 208(b)(1), by the Director of the [Department or bureau].

2) Even though a waiver granted to me pursuant to 18 U.S.C. § 208(b)(1) by the Director of the [Department or bureau] will allow me to serve as [officer or board of director position] and act on [name of outside non-profit organization] matters utilizing limited Government time and resources, I will not involve myself with the following:
    a. Any [Department or bureau] grants, contracts, cooperative agreements or other agreements with the [name of outside non-profit organization];
    b. Providing support to the [name of outside non-profit organization], including personnel or equipment from or to the [name of outside non-profit organization];
    c. Directing a subordinate to speak at any conference or other meeting of the [name of outside non-profit organization];
    d. Participating in investigations of the activities of the [name of outside non-profit organization], other than as a provider of information or testimony;
    e. Developing regulations that would impact the [name of outside non-profit organization] or enforcing regulations pertaining to the [name of outside non-profit organization];
    f. Preparation or presentation of requests from the [name of outside non-profit organization] to obtain any Federal funds, manpower, or any other form of Federal support to support [name of outside non-profit organization] activities.  A waiver will permit me to request official travel authorizations to attend and/or to be a speaker or presenter at meetings or conferences of the [name of outside non-profit organization] but approval of my travel authorization requests must be based on a determination by my travel approval authority that my attendance or presentation at the meeting or conference of the [name of outside non-profit organization] is in the best interests of the [Department or bureau];
    g. Lobbying on behalf of the [name of outside non-profit organization] in any manner to a Member of Congress, a jurisdiction, or an official of any government as prohibited by 18 U.S.C. § 1913.  This includes the use of money appropriated by any enactment

of Congress to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy, or appropriation, at any time unless specifically authorized by Act of Congress.  This does not prevent employees of the United States or of its departments or agencies from communicating to Members of Congress or other officials, at his request, or to Congress or such official, through the proper official channels regarding requests for any legislation, law, ratification, policy, or appropriations which they deem necessary for the efficient conduct of the public business;

h.   Participation in fundraising activities of the [name of outside non-profit organization]; or

i.   Approval of Federal travel authorizations of [Department or bureau] employees to attend meetings or conferences of the [name of outside non-profit organization].

3.  I have retained a copy of this recusal memorandum for my records and distributed it as listed below.

Copy to: [Departmental or bureau] Ethics Office

1/28/11 #3889
New

# ATTACHMENT K

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:                          (202) 879-5000                                    Facsimile:
(202) 879-5175                                                                                    (202) 879-5200
robert.gasaway@kirkland.com                        www.kirkland.com

March 8, 2012

**By Electronic Mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
Room B345
500 Poydras St.
New Orleans, Louisiana 70130

> Re:    MDL No. 2179 — Subpoena Served on Woods Hole Oceanographic
>         Institution

Dear Judge Shushan:

This letter explains the status of, and seeks the Court's assistance regarding, the subpoena served on Woods Hole Oceanographic Institution ("Woods Hole" or "WHOI") on December 9, 2011 (Attachment A), together with Woods Hole's December 23, 2011, objections to this subpoena (Attachment B).

**Background**

As the Court knows, Woods Hole scientists performed acoustic and other analysis aimed at informing the United States' flow rate estimates.  The work of Woods Hole scientists is cited in multiple sources, including the Flow Rate Technical  Group ("FRTG") Report (Attachment C) as well as a preliminary public flow rate report and two published scientific articles (Attachment D).  Woods Hole has also published on its website a synthesis of some of its research on the *Deepwater Horizon* incident, which is entitled "Science in a Time of Crisis:  WHOI's Response to the *Deepwater Horizon* Oil Spill."  This website publication features video interviews with several WHOI scientists and personnel.

Dr. Marcia McNutt, director of the U.S. Geological Survey and lead author of the FRTG Report, has stated that "the technique that performed the best during the ongoing emergency was the acoustic technique."  *See* Attachment C, at 2.  Dr. McNutt has emphasized the importance she places on the acoustic work in a video presentation given at the Association for the Aquatic Sciences of Limnology and Oceanography's 2011 Aquatic Sciences Meeting.  In the course of this presentation, Dr. McNutt asks the audience to focus on a slide showing the Wood Hole flow

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2012
Page 2

rate estimate, saying "look at how they nailed the flow rate with that acoustic analysis. Beautifully done." *See* http://www.aslo.org/sanjuan2011/plenary5.html (timestamp 41:50).

In light of the significance apparently placed on WHOI's work by the United States, the subpoena served on WHOI requests data and communications reflecting all WHOI work pertaining to the *Deepwater Horizon* incident. Since the date when the subpoena was served (December 9, 2011) and the date when WHOI's objections were served (December 23, 2011), counsel for BP have communicated frequently with counsel for WHOI in an effort to advance the production of subpoenaed documents and resolve disputed issues.

The record of those communications (attached as Attachment E) indicates the following:

- On December 20, 2011, counsel for BP offered counsel for WHOI a ten-day extension to produce documents responsive to the subpoena.

- On December 23, 2011, counsel for WHOI advised that the ten-day extension was not sufficient and objected to the subpoena on four general bases:

    (1)    the subpoena is overbroad and burdensome;

    (2)    the subpoena seeks documents that are subject to confidentiality requirements with the United States and other parties;

    (3)    some information related to WHOI's algorithms, code, and related methodologies is proprietary; and

    (4)    WHOI, as a nonprofit, scholastic organization need not disclose prepublication research pursuant to protection or privileges afforded to academics engaged in pre-publication research.

- In early January 2012, counsel for WHOI, Ms. Dahlia Fetouh, agreed to produce responsive documents not deemed to be subject to any objection, and agreed to contact WHOI to determine a date for production of documents.

- In January 2012, counsel for BP sent to counsel for WHOI Pretrial Order #13 to assist counsel for WHOI in understanding the protocol established by the MDL Court for the protection of confidential documents — including confidential documents of a nonparty.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2012
Page 3

- In late January 2012, counsel for WHOI advised counsel for BP that WHOI would be able to produce raw acoustic data "and the like," and that WHOI was in the process of collecting that data. Counsel for WHOI advised that WHOI objected to production of documents reflecting a deliberative or scholastic process associated with its work and that it also objected to the production of proprietary information (described as the intellectual property of researchers).

- In late January 2012, counsel for WHOI advised counsel for BP that some responsive documents would be sent for privilege review to the Coast Guard that same week and agreed to ask the Coast Guard when those documents would be ready to produce.

- On February 2, 2012, counsel for WHOI advised that documents had been sent to the Coast Guard and that the Coast Guard tentatively estimated one week for document review.

- On February 14, 2012, counsel for WHOI advised that documents had been delayed passing through the Coast Guard's security procedures and that no date certain was set for review and production as the Coast Guard was quite busy.

- On February 14, 2012, counsel for WHOI reiterated that WHOI would not produce certain unspecified documents based on "scholastic privileges," "confidentiality," or "other legal privileges" and did not agree to estimate the number of documents withheld pursuant to these privileges.

- On February 23, 2012, counsel for BP asked counsel for WHOI for a production calendar, including dates certain for an initial and any subsequent document production as well as a date estimate for a privilege log. Counsel for BP also asked for the basis for WHOI's assertion of a "scholastic privilege."

- On February 23, 2012, counsel for WHOI advised that its initial document production could be expected within 7-10 days and would contain documents pertaining to Part II of the subpoena (concerning gas/oil ratio issues) — and not the acoustic data requested in Part I of the subpoena, which was to be the focus of the initial collection as represented by counsel for WHOI in January.

- On February 28, 2012, counsel for WHOI provided to counsel for BP authority which it relied upon for its asserted "scholastic privilege."

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2012
Page 4

- On March 2, 2012, BP responded regarding WHOI's claimed authority for "scholastic privilege."

- On March 6, 2012 — three months after service of the subpoena — counsel for BP received the first production of any documents, consisting of one small binder of documents — mostly public documents — and no acoustic data or analysis.

In sum, notwithstanding three months of diligent efforts, BP has yet to receive any acoustic data and has received almost none of the data, analyses, and communications the subpoena requests.

## Jurisdiction to Enforce the Subpoena

The multidistrict litigation ("MDL") statute provides that MDL courts have authority to enforce subpoenas issued by other district courts.  That statute reads:  "The judge to whom such [MDL] actions are assigned . . . may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings."  28 U.S.C. § 1407(b) (2006).

Although § 1407 expressly refers only to pretrial depositions, the "overwhelming weight of authority" supports the proposition that MDL courts are also empowered to quash, modify, or enforce extra-district subpoenas duces tecum.  *See In re Clients and Former Clients of Baron & Budd*, *P.C.*, 478 F.3d 670, 671 (5th Cir. 2007); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 468-69 (6th Cir. 2006).  "[T]he rationale underlying the MDL statute of 'just and efficient' resolution of pretrial proceedings requires the conclusion that Section 1407(b)'s grant of authority applies to both deposition subpoenas and documents-only subpoenas."  444 F.3d at 469 n.4.

## WHOI's Privilege Claims

In her letter of February 28, Counsel for WHOI describes the "scholastic privilege" as a "well-established protection" in federal court, but the only case cited for this broad proposition is *Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998).  In fact, neither the First Circuit nor any other federal circuit court has acknowledged the existence of a "scholastic privilege," or has held that academic research is entitled to the protections of such a "privilege."

A fair reading of *Cusumano* indicates that only the highly journalistic nature of the researchers' work in that case would "suggest" affording a "modicum of protection" to certain "confidential" research materials which, in that case, were comprised of interviews with human

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2012
Page 5

sources.  *Id.* at 714-15.  *Cusumano* further indicates that the protection to be provided should be "commensurate to that which the law provides for journalists" so that sources would not hesitate to confide in researchers conducting interviews.  *Id.* at 714.  *Cusumano* then protected some research material, not through an application of a "privilege," but rather through application of Rule 26's balancing test.  That test "contemplates consideration of myriad factors, often uniquely drawn out of the factual circumstances of a particular case."  *Id.* at 716.  The Rule 26 balancing test — not a "privilege" — was also at issue in the only other case cited by counsel for WHOI in support of a "scholastic privilege": *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8 (D. Mass. 2008) (*In re Bextra I*).

Application of the Rule 26 test used in both *Cusumano* and *In re Bextra I* weighs strongly in BP's favor here.  BP cannot obtain the subpoenaed documents elsewhere, even were it to "expend substantially more effort," because Woods Hole has sole possession of the responsive documents.  *See* 249 F.R.D. at 12; 162 F.3d at 712.  Further, the data and communications requested by BP may be characterized as being of "limited probative value."  249 F.R.D. at 12.  On the contrary, the requested data and communications are central to the scientific articles referenced in the subpoena and allegedly inform the United States' flow rate estimates released to the public and now at issue in litigation.  Unlike in *Cusumano*, BP's need for the subpoenaed material cannot be described as "not great," and BP's use of the material is not solely "for purposes akin to impeachment."  162 F.3d at 712.  Rather, BP seeks the subpoenaed documents in order to fully understand both the analysis and conclusions of WHOI scientists and others in order to inform its work on subjects in litigation.

## WHOI's Other Confidentiality Claims

WHOI's objections with respect to "confidentiality" of information can easily be addressed by the process established in PTO 13.  That Order was sent to counsel for WHOI many weeks ago.

\* \* \* \* \*

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2012
Page 6


    In light of the above, BP respectfully requests the Court's assistance in managing and advancing the time for the production of documents by Woods Hole.  BP has patiently but unsuccessfully worked with Woods Hole to resolve outstanding issues for three months.  Now, however, given the meager initial production of WHOI documents received this week and the compelling need for obtaining the requested data, BP requests that the Court work with counsel for BP, counsel for WHOI, and (to the extent production timing is being affected by Coast Guard document reviews) counsel for the United States to enforce the subpoena and resolve any disputed claims of privilege.

                    Respectfully submitted,

                    Robert R. Gasaway

Attachments

cc (via electronic mail):

| | |
|---|---|
| Dahlia S. Fetouh | Joel M. Gross |
| R. Michael Underhill | Allison B. Rumsey |
| Steven O'Rourke | Don K. Haycraft |
| Sarah D. Himmelhoch | Plaintiffs' Liaison Counsel |
| Robin L. Hanger | Defense Liaison Counsel |
| A. Nathaniel Chakeres | |

# KIRKLAND & ELLIS LLP

#### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:                                      (202) 879-5000                                      Facsimile:
(202) 879-5175                                                                                                      (202) 879-5200
robert.gasaway@kirkland.com                          www.kirkland.com

March 15, 2012

**<u>By Electronic Mail</u>**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
Room B345
500 Poydras St.
New Orleans, Louisiana 70130

Re:    MDL No. 2179 — Subpoena Served on Woods Hole Oceanographic
         Institution

Dear Judge Shushan:

We write to respond briefly to the letter sent earlier today by counsel for Woods Hole
Oceanographic Institution ("WHOI").  We respectfully request that the Court take note of the
following responses to points made in that letter.

#### 1.  <u>BP Has Not Been Dilatory</u>

After referencing publication of the institution's research in scientific journals, WHOI's
counsel remarks that "over two years after the first of these papers was published" BP "suddenly
discovered a need for the immediate production of all records …."  *See* Letter from Counsel for
WHOI to the Court, at 2 (March 15, 2012) ("Letter").

But in making this statement, counsel overlooks two basic facts that should be well
known to persons familiar with civil litigation and this litigation in particular.  *First*, a mere
passage of time is no defense to complying with a valid subpoena.  *Second*, discovery in this
MDL is being conducted in phases — and WHOI's research happens to fall within the scope of
Phase Two discovery.  As this Court is well aware, BP began focusing on WHOI soon after
Phase Two discovery began and has remained focused on WHOI ever since.

Equally important, counsel also fails to fully and fairly explain the relevant scientific
publication dates in this suggestion of some dilatory lapse by BP.  In fact, the reports and papers
referenced in the subpoena were published on the following approximate dates: June 2010

Chicago        Hong Kong        London        Los Angeles        Munich        New York        Palo Alto        San Francisco        Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 15, 2012
Page 2

(WHOI's preliminary, one-page flow rate report); March 2011 (Flow Rate Technical Group report); July 2011 (WHOI's gas-oil fraction report); and September 2011 (WHOI's revised flow rate report).  As a result, the papers at issue were released over a fifteen-month period beginning less than two years ago, with the latest published only three months before service of BP's subpoena in December 2011.  BP's subpoena was not "inexplicably delayed" in any relevant sense.  *Cf.* Letter, at 2.

## 2.   There's No Such Thing as "Scholastic Privilege"

With respect to WHOI's assertion of a "scholastic privilege," counsel misinterprets the caselaw.  There is simply no law anywhere supporting a protection for discussions between researchers.  Those discussions are not akin to a journalist's conversations with confidential sources, and only the latter have warranted limited protection in the First Circuit.  *See Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714-15 (1st Cir. 1998).  Moreover, as BP has explained, even this "modicum of protection" was provided via application of Rule 26's balancing test and not by invocation of a privilege.  *See id.* at 715-17.  As noted in our recent letter to the Court, any balancing of the Rule 26 factors here tips heavily in BP's favor.  *See* Letter from Counsel for BP to the Court, at 5 (March 8, 2012).

Furthermore, given the significance apparently placed on WHOI's work by the United States — including its assertions regarding the importance and reliability of the acoustic technique — BP is entitled to review all data and communications that raise questions concerning this methodology's purported reliability.  It is thus critical that BP be permitted to review, *inter alia*, WHOI's communications regarding the techniques or methodologies used (or considered for use but rejected), communications assessing methodological and data reliability issues, and communications otherwise bearing on the validity and reliability of WHOI's work. This cannot be accomplished solely from reviewing raw data.  Whereas counsel for WHOI suggests that it is in the "public interest" to shield these communications from analysis, *see* Letter, at 6, the true public interest involved here counsels strongly in favor of WHOI's disclosing and subjecting to analysis all of WHOI's data, analysis, and communications pertaining to the DWH incident.

Lastly on this point, it is interesting to note that the contract under which WHOI apparently performed the relevant work for the United States, *see* Letter, at Exhibit 1, does not state or even suggest that WHOI was performing the work as a scholarly endeavor.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 15, 2012
Page 3

### 3.  BP Did Not Rush into Court

Counsel for WHOI suggests, erroneously, that counsel for BP was overly hasty in involving this Court in this subpoena dispute.  In fact, while counsel for BP was told that counsel for WHOI had sent an unspecified number of additional documents to the U.S. Coast Guard for review, at the time of our initial letter to the Court, we had received only one small binder of responsive documents.  Significantly, approximately 475 pages out of 631 pages in this binder (roughly 75%) consisted of documents already available to BP through public sources.  Accordingly, the potentially new and useful universe of documents consisted solely of approximately 150 pages of the total initial production, and even this comparative handful of documents was responsive only to one section of the subpoena concerning analysis of gas-oil fraction issues.  None of the acoustic or sonar data requested has yet been produced.  Accordingly, as of today, March 15, 2012, this small binder of documents is still the only set of documents produced in response to BP's subpoena.  Throughout the past three months, BP has waited patiently for production of responsive documents.

### 4.  If Any Compensation Were Owed, It Should Come from the United States

While BP recognizes that WHOI is a nonprofit institution, this does not mean that BP is obliged under the law to compensate WHOI for time and effort spent responding to this subpoena.  It is well established that "[u]sually, absent an order compelling document production, a non-party bears its own production cost."  *See Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008) (citing *Boston Children's Heart Found., Inc. v. Nadal-Ginard*, No. 93-12539, 1995 WL 17015062, at *2 (D. Mass. Aug. 23, 1995)).  Moreover, even in context of orders compelling production, courts look at several factors before requiring reimbursement, and in this case those factors weigh against shifting costs to BP.  *See* Letter from counsel for BP to counsel for WHOI, at 3 (March 2, 2012).

In light of WHOI's cost concerns, BP suggests that counsel for WHOI consider requesting compensation from the United States for time and effort spent responding to the subpoena.  The facts adduced to date clearly indicate that WHOI performed the work that prompted the subpoena under contract with the United States Coast Guard.

### 5.  WHOI Has Presented No Specific Offers to Narrow the Subpoena

Although counsel for WHOI indicates that BP has declined requests to limit the scope of the subpoena or to ease the compilation of privilege logs, we note that counsel for WHOI has never made a specific request for either type of accommodation.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 15, 2012
Page 4


To be sure, counsel has served general objections to the subpoena and has indicated that WHOI will not provide certain communications deemed to be covered by privilege(s).  But at no time has counsel specified how certain requests for data and communications might be specifically modified to ease the burdens that WHOI now alleges.

*       *       *

In closing, we would draw the Court's attention to the Letter's Exhibit 1.  This exhibit specifies a number of "deliverables" that WHOI was to provide to the Coast Guard's technical representative as part of a specified work order.  For instance, the contract required WHOI to "provide an electronic archive of all reports, test data, and other information gathered during the contract as Deliverable 5."  Presumably, it would be a simple and efficient matter for counsel for either WHOI or the United States to procure and produce those deliverables to BP — for surely both WHOI and the Coast Guard have long been, and remain today, in possession of these important "reports," "test data," and related materials.

Respectfully submitted,

Robert R. Gasaway

cc (via electronic mail):

| | |
|---|---|
| Dahlia S. Fetouh | Don K. Haycraft |
| R. Michael Underhill | Plaintiffs' Liaison Counsel |
| Steven O'Rourke | Defense Liaison Counsel |
| Sarah D. Himmelhoch | |
| Robin L. Hanger | |
| A. Nathaniel Chakeres | |
| Barry E. Fields | |