# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Houston)
## CIVIL DOCKET FOR CASE #: 4:12-cv-01164

Sirmons v. BP p.l.c. et al
Assigned to:
Cause: 28:1331 Fed. Question

Date Filed: 04/17/2012
Jury Demand: Both
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**
**George R Sirmons**

represented by **Bradley Wayne Hoover**
The Mills Law Firm
11000 Brittmoore Park Dr.
Suite 200
Houston, TX 77041
713-893-4581
Fax: 888-313-1507
Email: bhoover@themillslawfirm.us
*ATTORNEY TO BE NOTICED*

V.

**Defendant**
**BP p.l.c.**

**Defendant**
**BP Exploration and Production Inc.**

**Defendant**
**BP America Production Company**

**Defendant**
**Transocean Ltd.**

**Defendant**
**Transocean Holdings, LLC**

**Defendant**
**Transocean Offshore Deepwater Drilling, Inc.**

**Defendant**
**Transocean Deepwater, Inc.**

**Defendant**
**Triton Asset Leasing GmbH**

**Defendant**
**Anadarko Petroleum Corporation Co**

**Defendant**
**Anadarko E & P Company L.P.**

Exhibit C

**Defendant**

**MOEX Offshore 2007 LLC**

**Defendant**

**M-I, L.L.C.**

**Defendant**

**Halliburton Energy Services, Inc.**

**Defendant**

**Cameron International Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/17/2012 | 1 | COMPLAINT against All Defendants (Filing fee $ 350 receipt number 0541-9597924) filed by George R Sirmons. (Attachments: # 1 Exhibit, # 2 Civil Cover Sheet)(Hoover, Bradley) (Entered: 04/17/2012) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/18/2012 10:14:40 | | | |
| **PACER Login:** | fr2366 | **Client Code:** | 1869-200344 |
| **Description:** | Docket Report | **Search Criteria:** | 4:12-cv-01164 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| GEORGE "RAY" SIRMONS AND EACH OF THE INDIVIDUALS AND ENTITIES LISTED ON EXHIBIT A,<br><br>Plaintiffs,<br><br>VS.<br><br>BP p.l.c.; BP EXPLORATION AND PRODUCTION, INC.; BP AMERICA PRODUCTION COMPANY; TRANSOCEAN LTD.; TRANSOCEAN HOLDINGS, LLC; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; TRITON ASSET LEASING GmbH; ANADARKO PETROLEUM CORPORATION CO.; ANADARKO E&P COMPANY LP; MOEX OFFSHORE 2007 LLC; M-I, L.L.C.; HALLIBURTON ENERGY SERVICES, INC.; and CAMERON INTERNATIONAL CORPORATION a/k/a CAMERON SYSTEMS CORPORATION<br><br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. _____ |

**COMPLAINT**

Plaintiff George "Ray" Sirmons, and all individuals and entities named in Exhibit A attached hereto, file this Complaint against Defendants BP p.l.c. ("BP p.l.c."), BP EXPLORATION AND PRODUCTION, INC. ("BP Exploration"), BP AMERICA PRODUCTION COMPANY ("BP America"), TRANSOCEAN LTD. ("Transocean Ltd."), TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings"), TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("Transocean Offshore"), TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater"), TRITON ASSET LEASING GmbH ("Triton"), ANADARKO

PETROLEUM CORPORATION CO. ("Anadarko"), ANADARKO E&P COMPANY LP ("Anadarko E&P") and MOEX OFFSHORE 2007 LLC ("MOEX Offshore"), M-I, L.L.C, ("M-I"), HALLIBURTON ENERGY SERVICES, INC., ("Halliburton") and CAMERON INTERNATIONAL CORPORATION a/k/a CAMERON SYSTEMS CORPORATION ("Cameron"). BP Exploration, BP America, and BP p.l.c. are collectively referred to herein as "BP." Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are collectively referred to herein as "Transocean." Defendants Anadarko and Anadarko E&P are collectively referred to herein as the "Anadarko Defendants."

## INTRODUCTION

1.      On April 20, 2010, a well blowout on the vessel Deepwater Horizon ("Deepwater Horizon") in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The blowout and subsequent explosions, fire and sinking of the vessel resulted in an oil spill of unprecedented proportions that damaged, depleted and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, including those along the Gulf coast areas of Louisiana, Mississippi, Alabama, Texas, and Florida (the "Spill"). Although the blown out well is now capped, the disastrous environmental and economic effects of the Spill are widespread and will likely remain so for decades.

2.      Each day during the Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser. Some of that oil found its way to the surface and formed a visible oil slick, while other oil spread out below the water's surface. At times, the surface oil slick covered tens of thousands of square miles, spreading towards and along the coastlines of the Gulf coast states. The oil that stayed below the surface – combined with chemical dispersants – worked its way through the entire water column and came to rest on the

seafloor at many different depths, damaging ecosystems throughout the Gulf of Mexico. Both the surface and subsurface oil, and the chemical dispersants used to break up spilled oil, damaged marine life in the Gulf of Mexico itself (the "Gulf of Mexico"), as well as in salt water bays, estuaries, other types of inlets and other bodies of water that extend to or mix with the Gulf of Mexico along the coasts of Louisiana, Mississippi, Alabama and Texas ("Coastal Zone").

3.      Defendants could have prevented this catastrophe by (1) using the best deep water drilling practices then available, (2) following required safety protocols and precautionary procedures, (3) properly maintaining equipment, and (4) using widely available emergency safety technology. But, with little regard for safety and the risk to the environment, Defendants chose to repeatedly ignore critical and widely accepted operational disciplines to save money and time. Defendants' cost-cutting measures are properly described as outrageous -- consistent with their long corporate histories of flagrant disregard for safety – and taken with willful, wanton, and reckless indifference to the disastrous results to the environment and Plaintiffs.

4.      The Spill caused, and continues to cause, devastating environmental and economic damage. For example, thousands of square miles of waters were closed to fishing, swimming and/or boating, and thousands of square miles of coastal marshes, delicate estuaries, cypress forests, barrier islands, and white sand beaches were compromised. Fishermen and others, who then relied on and continue to rely on seafood from the Gulf of Mexico for subsistence, have – throughout the Gulf Coast – suffered losses and damages.

5.      Plaintiffs bring this action to recover for subsistence losses, lost profits and/or lost wages and other damages pursuant to the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701-2719 (the "OPA"), as well as actual and punitive damages that arose out of the spill under general maritime law or other common law or statutory rights.

6.      Both BP Exploration and Transocean Holdings have been determined to be "responsible parties" under the OPA by the United States Coast Guard. Anadarko was designated as a "responsible party" under the OPA by the United States District Court for the Eastern District of Louisiana on February 22, 2012. Therefore, defendants BP Exploration, Transocean Holdings and Anadarko, if not all defendants, are strictly liable for Plaintiffs' damages. Moreover, the OPA liability limits do not apply to this lawsuit because, among other reasons: (1) Plaintiffs' damages were proximately caused by the gross negligence or willful misconduct of defendants, (2) Plaintiffs' damages were proximately caused by defendants' violation of an applicable Federal safety, construction, or operation regulation, and (3) BP failed to accurately or timely report the incident or provide reasonable, timely and accurate cooperation and assistance.

7.      This Complaint does not constitute a waiver of Plaintiffs' rights to add or assert, or seek leave to add or assert, additional claims, or name additional party defendants, depending on further information learned through discovery or investigation.

8.      Plaintiffs believe that this action is subject to the August 10, 2010 order of the Multi-district Litigation Panel (the "MDL Panel") which transfers actions such as this on to the United States District Court for the Eastern District of Louisiana. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 731 F. Supp. 2d 1352, 2010 WL 3166434 (JPML, August 10, 2010) (the "Transfer Order").

## PARTIES

9.      Plaintiff George "Ray" Sirmons is a resident citizen of Texas. At the time of the Spill, Plaintiff regularly harvested natural resources for subsistence from the Gulf of Mexico off the shore of the State of Texas, as well as salt water bodies that connect to the Gulf of Mexico that were also affected by the Spill. In addition, Plaintiff George "Ray" Sirmons is --

4

and was at all relevant times -- a commercial fisherman that caught and sold seafood from the Gulf of Mexico off the shore of the State of Texas, as well as salt water bodies that connect to the Gulf of Mexico that were affected by the Spill. Mr. Sirmons also owned a restaurant and bar in Liberty County, Texas that served (1) fish that he acquired through his commercial fishing catches and (2) shrimp that he purchased from local suppliers. For over a year following the oil spill, a substantial number of Mr. Sirmons' restaurant customers refused to eat seafood because of fear over seafood safety, causing a substantial decline in restaurant sales. Mr. Sirmons' commercial fishing business suffered as well because local fish markets that typically purchased part of his catch refused to do so. Finally, Mr. Sirmons' ability to harvest natural resources for subsistence was substantially harmed as a result of the Spill. Mr. Sirmons' harm is continuing.

10.     The Plaintiffs listed in Exhibit A reside in Alabama, Louisiana, Mississippi or Texas. Each of the Plaintiffs listed in Exhibit A falls into one or more of the following categories:

(a)     Commercial fishermen, shrimpers, crabbers, oystermen, the owners and operators of businesses involving commercial fishing, shrimping, crabbing and oystering (the "Commercial Fishermen Plaintiffs").

(b)     Seafood processors, distributors, retail and seafood markets, and restaurant owners and operators, and all those employed by seafood processors, distributors, retail and seafood markets, and restaurants (the "Processing and Distributing Plaintiffs").

(c)     Recreational business owners, operators, and/or workers, including recreational fishing businesses, commercial guides, and charter fishing businesses who earn their living through the use of the Gulf of Mexico for businesses (the "Recreational Business Plaintiffs").

(d)     Commercial businesses, business owners, operators, and/or workers, including commercial divers, offshore oilfield service, repair, and supply, real estate agents, and supply companies and their employees (the "Commercial Business Plaintiffs").

(e)     Recreational sport fishermen, recreational divers, beachgoers, and recreational boaters (the "Recreation Plaintiffs").

(f)     Plant and dock workers, including commercial seafood plant workers, longshoremen, and ferry operators (the "Plant and Dock Worker Plaintiffs").

5

(g)   Retail businesses that suffered losses as a result of the Spill (the "Retail Business Plaintiffs").

(h)   Oil service, exploration and/or drilling service companies, workers, providers, or suppliers who have lost income, profits and/or earning capacity as a direct result of the adverse effects of the Deepwater Horizon explosion, blow-out, and spill on deep water exploration and/or drilling in the Gulf of Mexico (including, but not limited to the Moratorium issued by the United States Department of Interior) (the "Moratorium Plaintiffs").

(i)   Subsistence claimants that regularly harvested natural resources, including, but not limited to, fish, crabs, shrimp and oysters, for subsistence from (1) the Gulf of Mexico, (2) in and around the Coastal Zone and/or (3) other salt water bodies that connect to the Gulf of Mexico that were also affected by the Spill.

11.   Defendant BP p.l.c. is a publicly traded company, incorporated under the laws of England and Wales.  BP common shares are listed on the London Stock Exchange and BP American Depository Shares are listed on the New York Stock Exchange.  Investors in the U.S. own about 40% of BP's outstanding common stock (as do investors in the U.K., with the remainder spread out in other countries).  BP files consolidated financial statements which include BP's operating subsidiaries.  BP's largest operations, through its wholly-owned and controlled operating subsidiary BP America, Inc., are in the U.S.  During the past ten years, BP's Board had at least fourteen meetings in the U.S.  BP is the largest oil and gas producer in the U.S. and the nation's second largest gasoline retailer (through 11,500 service stations throughout the U.S.).  BP has approximately 23,000 employees in the U.S., with the majority located in Texas.  Defendant BP p.l.c. has done and is doing business in the State of Texas, and throughout the United States.  Defendant BP p.l.c. does business in this judicial district, directly and/or indirectly.  Defendant BP p.l.c. maintains a corporate office in the United States at 501 Westlake Park Boulevard in Houston, Texas.  Defendant BP p.l.c., may be served with citation by serving any of its directors or officers, at 1 St. James's Square, London, United Kingdom SW1 4PD.

12.     Defendant BP Exploration & Production, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") – which is now known as the Bureau of Ocean Energy Management – allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo," where the Deepwater Horizon Oil Spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Texas, does business in Texas and has a registered agent in Texas. BP Exploration can be served process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201-4234.

13.     Defendant BP America Production Company is a Delaware corporation with its principal place of business in Houston, Texas. BP America was a party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. This court has personal jurisdiction over BP America, because BP America is registered to do business in Texas, does business in Texas and has a registered agent in Texas. BP America can be served process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201-4234.

14.     BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

15.     Defendant Transocean Ltd. is a Swiss Corporation. Defendant Transocean Ltd. is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*

and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect where the Oil Spill originated. This Defendant has done and is doing business in the State of Texas and throughout the United States. This Defendant does business in this judicial district, directly and/or indirectly. Defendant Transocean Ltd. may be served with citation by serving any of its officers or directors at 4 Greenway Plaza, Houston, Texas 77046.

16.     Defendant Transocean Holdings, LLC is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Deepwater Horizon Oil Spill originated. Indeed, Transocean Holdings is a party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon. Transocean Holdings does business in Texas and can be served process by serving its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, Texas 78701.

17.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon. This court has personal jurisdiction over Transocean Offshore, because Transocean Offshore is registered to do business in Texas, does business in Texas and has a registered agent in Texas. Transocean Offshore can be served process by serving its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, Texas 78701

18.     Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. At all pertinent times, Transocean Deepwater

8

was doing business in the State of Texas and within this district. This court has personal

jurisdiction over Transocean Deepwater, because Transocean Deepwater is registered to do

business in Texas, does business in Texas and has a registered agent in Texas. Transocean

Deepwater can be served process by serving its registered agent, Capitol Corporate

Services, Inc., 800 Brazos, Suite 400, Austin, Texas 78701

19.      Defendant Triton Asset Leasing GmbH is a Swiss limited liability company with

its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd.

and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater

Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the

Macondo prospect where the Oil Spill originated. Triton has done and is doing business in the

State of Texas and throughout the United States. Triton does business in this judicial district,

directly and/or indirectly. Triton may be served with citation by serving any of its officers or

directors at Turmstrasse 30, Zug, 6300, Switzerland.

20.      Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore,

Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the

Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate

it. At all times relevant to the Spill, Transocean – subject to BP's inspection and approval –

was responsible for maintaining well control equipment, such as the blowout preventer and its

control systems. Transocean also provided operational support for drilling-related activities on

board the Deepwater Horizon, as well as onshore supervision and support for those drilling

activities, at all times relevant to the Spill.

21.      Defendant Anadarko Petroleum Corporation Co. is a Delaware corporation

with its principal place of business in The Woodlands, Texas. Anadarko is registered to do and

does business in the State of Texas. Anadarko is an oil and gas exploration and production

company. At all relevant times, Anadarko was a party to the Macondo Prospect Offshore

Deepwater Operating Agreement ("Operating Agreement"), and held a 2.5% ownership

interest in the lease of the Macondo Prospect site in Mississippi Canyon Block 252 in the Gulf of Mexico. This court has personal jurisdiction over Anadarko, because Anadarko is registered to do business in Texas, does business in Texas and has a registered agent in Texas. Anadarko can be served process by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

22.     Defendant Anadarko E&P Company LP is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is registered to do and does business in the State of Texas. Anadarko E&P is an oil and gas exploration and production company. At all relevant times, Anadarko E&P was a party to the Operating Agreement, and held a 22.5% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico. This court has personal jurisdiction over Anadarko E&P, because Anadarko E&P is registered to do business in Texas, does business in Texas and has a registered agent in Texas. Anadarko E&P can be served process by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

23.     Defendants Anadarko and Anadarko E&P are collectively referred to herein as the "Anadarko Defendants."

24.     Defendant M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and at all relevant times was registered to do, and was doing, business in Texas and within this district. M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies in Texas and elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well. M-I employees planned and/or supervised key fluid-related activities at Macondo,

such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.

M-I can be served process by serving its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Ste. 400, Austin, Texas 78701.

25.     Defendant MOEX Offshore 2007 LLC is a Delaware corporation with its principal place of business in Houston, Texas. At all relevant times, MOEX Offshore was a party to the Operating Agreement, and held a 10% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico. This court has personal jurisdiction over MOEX Offshore, because MOEX Offshore is registered to do business in Texas, does business in Texas and has a registered agent in Texas. MOEX Offshore can be served process by serving its registered agent, Naoki Ishii, 9 Greenway Plaza, Suite 1220, Houston, Texas 77046.

26.     Defendant MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. This court has personal jurisdiction over MOEX Offshore, because MOEX Offshore is registered to do business in Texas, does business in Texas and has a registered agent in Texas. MOEX Offshore can be served process by serving its registered agent, Naoki Ishii, 9 Greenway Plaza, Suite 1220, Houston, Texas 77046.

27.     Defendant Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan. MOECO wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. As alleged more fully below, MOECO is named as a defendant herein because at all relevant times it dominated and controlled the activities of MOEX Offshore and MOEX USA, such that it is the alter ego of its subsidiaries, MOEX Offshore and MOEX USA, thus requiring that the liability of MOEX Offshore and/or MOEX USA be imputed to MOECO. Alternatively, as also alleged below, MOEX Offshore and MOEX USA acted at all relevant times as agents of MOECO, and the liability of those entities should therefore be imputed to MOECO.

28.     MOECO's activities in the United States, including in this and all relevant jurisdictions, have been continuous and systematic.  MOECO has purposely availed itself of the protections, benefits, and privileges of American law and should have reasonably anticipated being involved in this litigation in the United States.  Moreover, because at all relevant times MOECO asserted domination and control over the business, operations and policy decisions of MOEX Offshore and MOEX USA, those U.S. companies were merely the alter egos and/or agents of MOECO.  Thus, MOECO is subject to the exercise of both general and specific jurisdiction by this Court, an exercise of jurisdiction that will not offend traditional notions of fair play and substantial justice.

29.     MOECO is a majority-owned subsidiary of Mitsui & Co., Ltd. ("Mitsui"). Mitsui is a publicly traded company, whose American depository shares are traded on the NASDAQ Global Select Market.  MOECO is listed in Mitsui's consolidated financial statements and submits filings with the U.S. Securities and Exchange Commission as a "major" subsidiary of Mitsui.  MOECO is engaged in the business of "exploration, development, production and sales of crude oil, natural gas and other mineral resources and investment in companies engaged in these activities."

30.     MOECO operates through its own activities and those of its subsidiaries and affiliates located throughout the world, including in the United States.  Since MOECO opened its office in Houston, Texas, in February 2002, "we have been expanding our business in the USA," and are "striving to acquire assets with high potential" in the United States. MOECO identifies the United States as a "Focus Area" that it seeks to continue to "develop into [a] Core Area[.]" MOECO has identified itself as having at least the following subsidiaries or affiliates in the United States: MOEX USA, MOEX Offshore, MitEnergy Upstream LLC ("MitEnergy"), Mitsui E&P USA LLC, MOEX Gulf of Mexico Corporation, and MOEX Oil

& Gas Texas LLC. Each of these subsidiaries of MOECO shares the same Houston, Texas, address, and many of the same directors and managers as each other and MOECO.

31.      MOECO's expansion of its United States business ventures has included numerous oil and gas exploration and investment activities in the Gulf of Mexico. For example, in May 2006, MOECO and Mitsui acquired a 50% interest in an oil and gas leasehold in the Gulf of Mexico. The Japanese companies established MitEnergy for the purpose of holding that interest. In November 2009, MOECO and Mitsui arranged for that company to sell their Gulf of Mexico oil and gas assets to a third party, the proceeds of which sale solely benefited MOECO.

32.      In July 2007, MOECO entered into an agreement with BP E&P for a partial interest in an ultra-deep gas exploration project at the Gouda Prospect site in the Gulf of Mexico, noting in a press release that its participation in this project "provides an excellent opportunity to further expand its business in the U.S." As alleged more fully below, MOECO later orchestrated a transaction in which it used MOEX Offshore to obtain a 10% working interest in the Macondo Prospect site through an exchange with BP E&P, swapping MOECO's interest in the Gouda Prospect for the 10% interest in the Macondo Prospect.

33.      More recently, in February 2010, MOECO reported that it had entered into yet another new business in the United States when "we [MOECO and Mitsui] entered into a definitive agreement with a partner to participate in the development and production of the Marcellus Shale Gas Project in the State of Pennsylvania."

34.      Although MOEX Offshore was the entity identified as the owner of the 10% leasehold interest in the Macondo Prospect – a 10% interest in the hydrocarbons extracted from that location – it was MOECO that was responsible for creating MOEX Offshore and its immediate holding company, MOEX USA, and for orchestrating the acquisition of the

ownership interest in the Macondo Prospect.  As alleged above, in July 2007, MOECO announced it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. ... on the 29th of June, 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico ... which is being actively pursued by BP."  That gas exploration project was the exploratory drilling exercise at the Gouda Prospect site in the Garden Banks Block 997 in the Gulf of Mexico. MOECO announced that it would own a 15% leasehold interest in the Gouda Prospect site (an interest apparently later reduced to 10%).

35.     In September 2007, MOECO, through its agent/alter ego MOEX USA, established MOEX Offshore for the purpose of holding MOECO's interests in various Gulf of Mexico projects, including the Gouda Prospect, and later, the Macondo Prospect.

36.     In November 2009, BP E&P and MOEX Offshore entered into a Lease Exchange Agreement (effective October 1, 2009), pursuant to which MOEX Offshore conveyed to BP E&P its interest in the Gouda Prospect site, and BP E&P, in exchange, conveyed to MOEX Offshore a 10% interest in the Macondo Prospect site.  A condition of the Lease Exchange Agreement was that MOEX Offshore pay BP E&P "cash consideration of 1.92 million dollars," to be "allocated" to the Macondo Prospect lease.  The Lease Exchange Agreement also refers to a February 15, 2008, operating agreement between BP E&P, as operator, and the MOECO subsidiary, MitEnergy, as non-operator, concerning the Gouda Prospect lease.  Upon information and belief, Plaintiffs allege that it was in fact MOECO that caused and directed MOEX Offshore to enter into the Lease Exchange Agreement for the purpose of obtaining a leasehold interest in the Macondo Prospect.

37.     On or about October 1, 2009, BP E&P, as the Operating Party, and MOEX Offshore, as a Non-Operating Party, entered into the Operating Agreement.  On or about December 17, 2009, BP E&P, MOEX Offshore, Anadarko, and Anadarko E&P executed a "Joinder" of the Operating Agreement.  Subsequently, the parties to the Operating

Agreement held the following working interest ownership percentages in the lease of the

Macondo Prospect: BP E&P, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and

Anadarko, 2.5%.

38.    At all times relevant herein, MOECO has dominated and controlled the

business, operations, policies, and actions of MOEX Offshore and MOEX USA to the extent

that there is no meaningful distinction between them and MOECO, and they are more

accurately described as agents and/or alter egos of MOECO, rather than simply its subsidiaries.

MOECO dominates and controls MOEX Offshore and MOEX USA through, inter alia:

financial, operational, and policy control; a lack of corporate formalities at MOEX Offshore and

MOEX USA; and nearly identical directors, managers, and/or executive officers.  For example,

the same six individuals are directors, managers, and/or officers of both MOEX Offshore and

MOEX USA; four of them are also MOECO directors and executive officers, and the Texas

Secretary of State lists MOECO's Tokyo address for all of the overlapping directors/officers.

MOEX USA and MOEX Offshore also share the same Houston, Texas, office and have a

common president, Naoki Ishii.    Upon information and belief, Mr. Ishii is the only

management-level employee of MOEX Offshore and MOEX USA, and he reports directly to

MOECO directors and/or executive officers.

39.    Although Mr. Ishii has issued public statements with regard to the Deepwater

Horizon disaster and the ensuing Spill, it has been MOECO, speaking on behalf of MOEX

Offshore and itself, that has been the primary source of public statements concerning the

Spill and its aftermath.  MOECO's parent, Mitsui, has also made numerous public statements

about the potential impact of the Spill on its financial condition.  Upon information and belief,

Plaintiffs allege that all public statements about the Spill and its aftermath by or on behalf

of MOEX Offshore, as well as all operational and financial decision-making concerning the

Spill and its aftermath (including the payment, or non-payment, of response and clean-up

15

expense invoices from BP E&P), have been made and directed by MOECO (and in some instances, Mitsui).

40.     Thus, neither MOEX Offshore nor MOEX USA are operated as corporations distinct from each other or from MOECO – rather, MOECO conducts its U.S. activities through these agent/alter ego entities, and all activities of MOEX Offshore and MOEX USA should be imputed to MOECO, subjecting MOECO to the exercise of general and/or specific personal jurisdiction in the United States and by this Court.

41.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on the Deepwater Horizon, as well as onshore engineering support for those operations.  Halliburton was responsible for the provision of technical advice about the design, modeling, placement and testing of the cement that was used in the Macondo well.  At and before the time of the blowout, Halliburton was engaged in cementing operations to seal the bottom of the well against the influx of hydrocarbons like gas and oil.  Halliburton division Sperry Drilling Services was responsible for mud logging personnel and equipment and partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  As used herein, "Halliburton" shall refer to both Halliburton Energy Services and Sperry Drilling Services.  This court has personal jurisdiction over Halliburton, because Halliburton is registered to do business in Texas, does business in Texas and has a registered agent in Texas.  Halliburton can be served process by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

42.     Defendant  Cameron  International  Corporation  f/k/a  Cooper  Cameron

Corporation ("Cameron") is a Delaware Corporation with its principal place of business in

Houston, Texas.  Cameron is a global provider of pressure control, processing, flow control

and compression systems as well as project management and aftermarket services for the

oil and gas and process industries.  Cameron manufactured and/or supplied the Deepwater

Horizon's blowout preventer valves that failed to activate at the time of the explosion.  The

blowout preventer valves were defective because they failed to operate as intended.  Cameron

can be served through its registered agent: CT Corporation System, 350 North St. Paul Street,

Dallas, Texas 75201.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over this matter pursuant to 43 U.S.C. §§ 1333(a)(1)

and 1349 of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1301, *et seq.*,

because "(1) the activities causing the injuries in question could be classified as an operation on

the OCS involving exploration or production of minerals, and (2) because the case arises in

connection with the operation." *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of

Mexico, on April 20, 2010*, 747 F. Supp.2d 704 (E.D. La. 2010).  Jurisdiction further exists

before this Court pursuant to Article III, Section 2 of the United States Constitution, which

empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

44.     The claims presented herein are admiralty or maritime claims within the meaning

of Rule 9(h) of the Federal Rules of Civil Procedure.  Plaintiffs hereby designate this case as an

admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h).

45.     In addition, this Court has jurisdiction over this action pursuant to the Oil

Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA").

46.     Venue in this Court is proper under the OPA, 33 U.S.C. §2717(b).  Venue in

this Court is also proper under 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### A.   The Overview

47.     On April 20, 2010, highly pressurized hydrocarbons leaked into the Deepwater Horizon subsea oil well.  The Deepwater Horizon's emergency equipment failed to stop the oil and gas from blowing out of the well.  The blow out caused an explosion that led to a fire and the eventual sinking of the Deepwater Horizon vessel.  A massive oil spill resulted that has damaged Plaintiffs.

48.     The blowout was due, in part, to the failure of mechanical and cement barriers to seal off the well against the influx of highly pressurized hydrocarbons.  The numerous indications that hydrocarbons were leaking into the well were apparently misinterpreted or overlooked by Deepwater Horizon workers for a significant period of time prior to the blowout. Once the hydrocarbons reached the vessel's deck, the fire and gas prevention and alarm systems on the Deepwater Horizon failed to warn the crew and prevent a fire.  The Deepwater Horizon's blow out preventer ("BOP") also failed to seal the well and stop the flow of hydrocarbons exacerbating the disaster.

49.     Millions of barrels of oil and gas leaked into the Gulf of Mexico from the damaged well over the following three months doing immense and long-lasting damage to the environment in and around the Gulf of Mexico, and to the Plaintiffs.  Meanwhile, BP downplayed the severity of the Spill.  BP was unprepared for the massive clean-up effort required.

### B.   How Deepwater Offshore Drilling Works

50.     Deepwater offshore drilling for oil and natural gas is a complex, technical process.  The first challenge is to find geological formations that likely contain trapped hydrocarbons.  Once a promising trap is located, drilling vessels such as the Deepwater Horizon are positioned on the sea surface to drill an exploratory well.  If the exploratory well

18

successfully taps into a worthwhile source of hydrocarbons, the drilling vessel is transformed

into a production well that will extract oil or gas from the trap. Before a production well is set

up, successful exploratory wells are sometimes sealed with cement and temporarily

abandoned in a fashion that allows them to be reopened by a production vessel at a later date

when the well owner is ready to begin extracting hydrocarbons for production. At the time of

the April 20, 2010 blowout, the Deepwater Horizon crew was in the process of preparing the

Macondo well for temporary abandonment.

51.     An exploratory well begins with a pilot hole drilled into the seabed. The

pilot hole is then lined with pipe or "cased." The first section of casing pipe lowered into the

pilot hole anchors a safety device known as a blowout preventer ("BOP"). The BOP is an

assembly of hydraulically-operated rams that can be used to partially or totally seal the well

during both routine drilling activities and well control emergencies. For example, the BOP can

prevent a "kick" – which is a small leak of hydrocarbons into the well – from escalating into

an uncontrolled release of hydrocarbons into the surrounding environment. The BOP can be

activated manually from the drilling vessel, or automatically through an automatic mode

function ("AMF") known as a "deadman switch." The deadman switch closes the BOP's most

secure rams when both the electrical and hydraulic connections from the drilling vessel are

severed.

52.     A blowout risk is one of the most dangerous and common deep water drilling

risks. The reservoirs of hydrocarbons trapped in the rock formations beneath the sea floor are

often highly pressurized, and managing the pressures is a vital task during drilling operations.

Proper well monitoring typically catches small hydrocarbon influxes early, so a kick can be

contained and a leak repaired before well control is jeopardized.

53.     Once the BOP is properly positioned and secured over the pilot hole, the

drilling apparatus and additional casing sections are lowered down through the BOP into the

well. A pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

54.     As the drilling apparatus moves downward drilling out the well bore hole, drilling fluid called "mud" is pumped down the center of the drill pipe. Drilling mud is a thick mixture of barite, water, clay, and chemicals that cools and lubricates the drill bit and suspends and carries rock fragments and other drilling debris to the surface as the mud circulates.

55.     Drilling mud is carefully formulated so that its hydrostatic pressure slightly exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process. The weight of the mud pushes back against the pressure of the hydrocarbons in those formations helping to control against the ever-present risk of kicks and blowouts in the well.

56.     As the well bore is drilled, additional sections of casing are added to line each newly-drilled open section with pipe. Each casing section is secured with a cement plug. When temporary well abandonment is planned, a contractor seals the well off before the drilling reaches the hydrocarbon reservoir to isolate the oil and gas and to prevent it from leaking into the well. A cement plug is then placed below the BOP at the top of the well. The drilling vessel can then disconnect from a stabilized well until a permanent oil production platform is put into place to begin extracting oil or gas.

C.      **The Macondo Lease, BP's Exploration Plan and the Operating Agreement**

57.     On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and extract hydrocarbons from the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana. Before BP began operations at the Macondo site, federal regulations required BP to submit an Exploration Plan ("EP") showing that (1) it planned and prepared to conduct its activities in a safe manner, (2) its plan conformed to applicable regulations and sound conservation practices, and (3) it would not cause undue or serious harm

or damage to human or marine health, or the coastal environment. 30 C.F.R. §§ 250.201, 250.202.

58.     Federal regulations required that the EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information." 30 C.F.R. §§ 250.212, 250.219, 250.227.

59.     Among other things, the EP was required to contain a "blowout scenario," that met the following:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons. Include the estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well.

30 C.F.R. § 250.213 (g).

60.     The oil and hazardous spills information accompanying the EP was required to include an oil spill response plan providing the calculated volume of BP's:

> worst case discharge scenario (see 30 C.F.R. 254.26(a)), and a comparison of the appropriate worst case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst case discharge scenario that could result from [its] proposed exploration activities (see 30 C.F.R. 254.26(b), (c), (d), and (e)).

30 C.F.R. § 250.219.

61.     Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

62.     In February 2009, BP filed its initial EP for the Macondo prospect site with the MMS. In the EP, BP repeatedly asserted that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities." BP predicted that – in the unlikely event that a spill did occur – a worst case discharge scenario of 162,000 gallons of oil per day would occur – an amount it claimed it was prepared to handle. BP also claimed the

21

well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

63.     In response to these assurances, the MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.  As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical exclusion from environmental analysis were predicated on BP's flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill.  BP then obtained a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

64.     Once the EP and drilling permits for Macondo were approved, BP entered into the Operating Agreement with the Anadarko Defendants and MOEX Offshore.  The Operating Agreement defined the roles and responsibilities of the three joint Lease holders and provided that the Anadarko Defendants and MOEX Offshore were to receive significant information from BP and that the Anadarko Defendants and MOEX Offshore had the right to demand information, meetings and conduct its own inspections of the Deepwater Horizon vessel.

65.     As a condition to acquiring their leasehold interests in the Macondo prospect, the Anadarko Defendants and MOEX Offshore executed BP's well plan and Authorizations for Expenditure (AFEs) for Macondo putting the Anadarko Defendants and MOEX Offshore on notice of: (1) the well location; (2) the anticipated time necessary to conclude the operation; (3) total depth and target zones; (4) the proposed drilling and completion plans, including the casing program and directional details; (5) details of all coring, logging, and other evaluation operations conducted; and (6) information about the drilling rig to be used.  The AFEs also

informed the Anadarko Defendants and MOEX Offshore about the financial aspects of the well plan.

66.     The Operating Agreement granted the Anadarko Defendants and MOEX Offshore (1) the right to suggest its own proposed well plan for drilling exploratory and appraisal wells within the Macondo prospect, (2) to place their own personnel on key drilling and well development teams, (3) to receive substantial information and data about operations (including real-time well data) on an ongoing basis, (4) to call meetings with BP and other parties regarding any aspect of the Macondo prospect, and (5) the right of unanimous approval of all press releases regarding the prospect.

67.     Moreover, a November 2009 amendment to the Operating Agreement gave the Anadarko Defendants and MOEX Offshore the right to conduct "health, safety, and environmental inspection[s]" with a "right of access to activities and operations" on the rig, as well as to access BP's files, audits, and statistics on health, safety, and environmental issues.

**D.      The Deepwater Horizon's Poor Safety and Maintenance Record**

68.     The Deepwater Horizon – which was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site – was initially put into service in February 2001.    Prior to the Spill, BP and Transocean had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor.    Also prior to the Spill, BP, Transocean, Halliburton and M-I (the "Drilling Defendants") had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies.

**E.     The Troublesome Nature Of The Macondo Well**

69.     The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak and brittle rock formations.  At the Macondo site, the Deepwater Horizon was conducting drilling operations in excess of 18,000 feet.   The Drilling Defendants knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

70.     The Drilling Defendants had already had significant problems with the Macondo well before April 20, 2010.  Well before the blowout, BP employees had referred to Macondo as a "crazy," "nightmare" well.  At depths almost 3.5 miles below the sea floor, the pressures and strengths of the various formation layers the Deepwater Horizon was drilling through varied widely and changed often, requiring constant adjustments to drilling fluid density and other factors.  In some places the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock around the drill.

71.     Deepwater Horizon workers reported that since drilling began on October 7, 2009, they had struggled to control the problematic well, as kicks of natural gas regularly burst into the well, halting the drilling progress.  According to a NOAA Flow Rate Technical Group report, the hydrocarbon reservoirs the Macondo well drilled through have high ratios of gas to oil.  The MMS had even warned BP that the gas build-up in this well was a concern and that BP should "exercise caution."

72.     As the drilling schedule fell behind due to these and other problems, the Drilling Defendants increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo.  The pressure continued even after the Drilling Defendants experienced serious problems with the well on March 8, 2010, including a hydrocarbon

influx into the well and loss of well control. The hydrocarbons leaking into the well went

unnoticed for over 30 minutes, allowing 40 barrels of hydrocarbons to flow into the well

before it was shut-in to restore well control. This near miss could have been a lethal blowout.

73.    A BP analysis of the March 8, 2010 near miss deemed the drilling vessel team's

30-plus minute response time to the hydrocarbon influx as too slow. A "lessons learned"

document was distributed to BP employees, and both BP and Transocean leaders on the

Deepwater Horizon were given verbal feedback about the handling of the event. Several key

individuals who were present during the March 8, 2010 incident were also working on the

Deepwater Horizon at the time of the April 20, 2010 blowout.

74.    The damage from the March 8, 2010, incident was so severe that the

Drilling Defendants were forced to abandon the lower part of the well bore, plug it with cement,

and begin drilling in a different direction, setting them back several days and $25 million. The

delay caused the Drilling Defendants to intensify their demands that the drilling operations be

completed at a dangerously increased pace.

75.    Pursuant to their drilling contract, BP was paying Transocean approximately

$500,000 per day to lease the Deepwater Horizon, not including contractors' fees. BP had

planned for the drilling work at Macondo to take 51 days, at a cost of approximately

$96,000,000. At the time of the blowout, drilling at Macondo was months behind schedule,

costing BP over $1 million per day in vessel lease and contractor fees and putting BP

increasingly over budget. During that period, the Drilling Defendants made many decisions

about the drilling plan for economic reasons, despite those decisions increasing the risk of the

catastrophic failure of the Deepwater Horizon well. Also, during that process, the Drilling

Defendants repeatedly chose to violate industry guidelines and government regulations, and

ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce

costs and save time on the behind-schedule and over-budget Macondo well. The emphasis on

speed and thrift over safety led to errors and omissions by Drilling Defendants which, in turn, caused and/or contributed to the blowout and the subsequent Spill.

## F.    Reckless Decision-Making In The Rush To Complete The Well

76.    By April 9, 2010, the Drilling Defendants had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained. In their rush to complete the well, the Drilling Defendants made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

77.    After the Spill, a series of governmental investigations and hearings uncovered evidence and testimony about the bad decisions, tradeoffs, actions, and inactions that led to this disaster, revealing a "ghastly" story of the Drilling Defendants making one bad call after another. Stated another way, critical things were compromised for the wrong reasons in the wrong ways at the wrong times.

78.    Each company is responsible for one or more egregiously bad decision involving tests that were poorly run, alarming results that were ignored, proper warning systems that were disabled and safety barriers that were removed prematurely at the high-pressure well. Taken together, these actions constituted a cascade of deeply flawed failure and signal analysis, decision-making, communication, and organizational-managerial processes that led to the blowout.

79.    BP has admitted that no one company's single action or inaction caused this disaster, but rather "a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interfaces" by "multiple companies, work teams and circumstances" came together to cause the blowout and the Spill. Deepwater Horizon Accident Investigation Report, BP (September 8, 2010).

### 1. Cutting Corners On Well Design

80.     For the behind-schedule and over-budget Macondo well, Drilling Defendants chose a vulnerable well design with relatively few barriers against the ever-present risk of hydrocarbon blowouts because the safer option — which had been part of their original well design and was recommended by their contractors — would have taken longer to complete and would have cost up to an additional $10 million.

81.     In keeping with Macondo's intractable nature, the last section of the well had been difficult to drill because of the narrow margin between the minimum pressure needed to keep the hydrocarbons in the surrounding reservoirs from leaking into the well, and the maximum pressure the rock formations themselves could take before fracturing and causing damage, delay, or loss of well control. The limited range of safe operating pressures in this last open-hole section of the well required careful choices to maintain well integrity and safety during the drilling and cementing processes.

82.     In order to strengthen the well design and provide multiple barriers against blowouts, drilling companies often use a redundant casing design called a "liner/tieback," which provides four barriers against blowouts, while the "long string" casing design chosen by BP only provided two: the cement sealing off the hydrocarbons in the reservoirs from entering the well and, more than 18,000 feet above that, the seal assembly at the top of the well.

83.     Although the liner/tieback design is more expensive and takes more time to install, it provides four barriers against hydrocarbons leaking into the well and causing blowouts: (1) the cement at the bottom of the well; (2) the hanger that attaches the liner pipe to the existing casing in the well; (3) the cement that secures the tieback pipe on top of the liner; and (4) the seal assembly at the wellhead.

84.     Drilling Defendants were aware that the long string design was the riskier option. An undated BP "Forward Review Plan" recommended against the long string option because of the risks: "Long string of casing *was* the primary option" but a "Liner[/Tieback] … is now the recommended option."

85.     The BP Forward Review Plan identified several arguments against using the long string casing design, including the high risk of a failed cement job, the inability to comply with MMS regulations, and the need to verify the cement job with a cement bond log test and most likely perform remedial cement job(s).

86.     The BP Forward Review Plan also noted a number of advantages to using the liner/tieback design, including the liner hanger acting as an additional barrier against influxes, a higher chance for a successful cement job on the first try, and the flexibility to postpone a remedial cement job, if it was found that one was required.

87.     The long string casing design was especially inappropriate for a difficult and kick-prone well like Macondo. Documents show that BP had originally planned to use the safer liner/tieback design, but rewrote the drilling plan just weeks before the disaster — against the advice of its contractors and its own employees — because the project was behind schedule and over budget. Internal BP emails from late March 2010 acknowledged the risks of the long string design but chose it as the primary option because it "saves a lot of time…at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case."

88.     Despite the known and documented operational risks and advantages to the respective well design options, one or more of the Drilling Defendants chose (or acquiesced to the choice) to install the long string casing instead of the safer liner/tieback design. There is no evidence that there was any motivation behind that decision other than the desire to save time and cut costs on the behind-schedule and over-budget well.

89.     Drilling Defendants also made a risky choice for the casing pipe material itself, using metal well casings that raised concerns from their own engineers. Federal investigators cited internal documents showing that as early as 11 months prior to the blowout, BP engineers worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well. Senior drilling engineer Mark E. Hafle warned other BP employees that "I have seen it happen so know it can occur." Using the metal casings also violated BP's own safety policies and design standards. Nevertheless, the riskier metal casings were used after special permission was granted by BP supervisors. The internal reports do not explain why BP allowed for such a risky departure from its own safety standards, nor why the other Drilling Defendants allowed BP to use unsafe casings inappropriate for use in the highly pressurized environment in the Macondo well bore.

90.     In addition to the casing-related problems, the Weatherford-manufactured float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20,2010 blowout.

91.     A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job. A check-valve assembly fixed within the float collar works like a one-way valve, allowing drilling fluids or cement to be pumped in one direction through the valve, but preventing backflow of the fluids or cement when pumping is stopped, and preventing any influx of hydrocarbons below the float collar from rising farther up the casing. Failure of the Macondo well's float collar would have allowed hydrocarbons to flow up through the casing, towards the riser and the Deepwater Horizon at the surface, contributing to the blowout and the subsequent explosions, fire, sinking, and Spill.

92.     To properly prevent against backflow of fluids or hydrocarbons into the casing, a float collar must be "converted," or closed after installation. Prior to conversion, an "auto-fill tube" holds the float collar's one-way check valves open so that mud can flow through

without having to be pumped through with high force that could damage the formation – especially important when working in brittle formations like those at the bottom of the Macondo well. A float collar is converted by partially blocking the bottom of the autofill tube, which essentially pops the autofill tube out of the check valves, allowing them to close.

93.     Drilling Defendants installed the Macondo well's float collar after the final casing was installed in the well. When they attempted to convert the float collar, however, there seemed to be some blockage preventing the mud circulation that would have completed the conversion. The drilling vessel crew made nine attempts to re-establish circulation by increasing pressure in the casing, eventually succeeding with a pressure of 3142 psi — six times higher than the normal pressure needed to convert a float collar. In their report, BP's disaster investigation team questioned whether this burst of high pressure actually converted the float collar, or just cleared the blockage that had been preventing circulation in the first place.

94.     Later, vessel workers had to use another burst of abnormally high pressure to rupture a "burst disk" in one of the well's Weatherford-manufactured wiper plugs. The burst disk did not rupture until 2900 psi was applied — three times the amount of pressure usually required. The various post-Spill investigations have been unable to explain the need for such atypically high pressures to convert the float collar (if it even converted at all) and to rupture the burst disk. At the time they occurred, these anomalies should certainly have raised concern in the minds of Drilling Defendants' and Weatherford's personnel.

### 2. Using Too Few Centralizers

95.     Drilling Defendants also cut corners — again despite multiple warnings from their employees and contractors — with the number of centralizers used on the last piece of casing pipe. Centralizers ensure that the casing pipe is centered in the well bore; if the pipe is not centered, the cement placed around it often fails to create a secure seal against

the highly- pressurized hydrocarbons surrounding the well. The cement around the casing is intended to seal the space (the "annulus") between the rock walls of the drilled out well bore hole and the casing that runs through the well bore. If the casing is not centered within the wellbore, the pipe can lay near or against the sides of the bore hole, creating too narrow of a space for the cement to set properly and leaving "channels" of empty space or weak areas in the cement. Those channels and imperfections can allow hydrocarbons to escape out of the formations and into the well, causing a kick or a blowout. An email from shore-based BP Operations Vice President Brett Cocales to rig-based BP drilling engineer Brian Morel acknowledged the importance of centralizers, noting that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."

96.     The American Petroleum Institute ("API") Recommended Practice 65 explains: "If casing is not centralized, it may lay [sic] near or against the borehole wall....It is difficult if not impossible to displace mud effectively from the narrow side of the annulus if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation."

97.     On or about April 5, 2010, BP notified one or more of the other Drilling Defendants that it was planning to use only six centralizers on the final casing section at the Macondo well. Halliburton engineer Jesse Gagliano spent a day running models to determine if six centralizers would be enough to prevent channeling that gaseous hydrocarbons could seep through. Halliburton's analysis concluded that 21 centralizers was the recommended number to ensure a secure cement job; using ten would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem. This information was provided to BP. Additional centralizers were available on the Deepwater Horizon, but BP well site leaders erroneously believed they were the wrong type, and did not

31

want to wait for more. In the same email that had recognized the risks of proceeding with insufficient centralizers, BP official Brett Cocales shrugged off using only six, flippantly concluding, "who cares, it's done, end of story, will probably be fine."

98.      Halliburton, hired for its cementing expertise, was fully aware that the number of centralizers BP chose to use was unsafe. Halliburton employee Marvin Volek had warned the BP well site team that BP's cementing plan "was against our best practices." Yet even after running the models that made it clear proceeding with only six centralizers would lead to "failure of the cement job," Halliburton did not stop work or insist that BP use additional centralizers, instead recklessly proceeding with the cement job it knew was destined to fail.

### 3.  Skipping Critical "Bottoms Up" Mud Circulation

99.      Another questionable decision made by one or more of the Drilling Defendants was the failure to fully circulate the drilling mud through the entire length of the well before beginning the cementing job. This procedure, known as "bottoms up," cleans the well bore and prepares the annular space for cementing by completely circulating the drilling fluids from the bottom of the well all the way to the surface. A bottoms up circulation also ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement, permits a controlled release of gas pockets that may have entered the mud during the drilling process, and allows workers on the drilling vessel to test the mud for influxes of gas. Given that gaseous hydrocarbons leaking into the well was what ultimately caused the blowout, a bottoms up circulation could have revealed the severity of the situation at Macondo before it was too late.

100.    The API guidelines recommend a full bottoms up circulation between installing the casing and beginning a cementing job. The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility. The drilling fluid should be

conditioned until equilibrium is achieved. At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."

101. Halliburton technical advisor Jesse Gagliano told BP that Halliburton's "recommendation and best practice was to at least circulate one bottoms up on the well before doing a cement job." Yet again, Halliburton knew of the risk but did not insist that BP follow safe and recommended practices.

102. Even BP's own April 15, 2010 operations plan for the Deepwater Horizon called for a full "bottoms up" procedure to "circulate at least one (1) casing and drill pipe capacity, if hole conditions allow."

103. But a full bottoms up circulation would have taken up to 12 hours on the deep Macondo well, so against the recommendations of the API and Halliburton, and against industry standards and its own operations plan, BP chose to save time and money at the expense of safety by circulating only a small fraction of the drilling mud before beginning cementing. This too put the cement job further at risk.

104. Notwithstanding all of Drilling Defendants' risky choices and skipped safety precautions up to this point, and despite knowing the risks of using insufficient centralizers and skipping the bottoms up circulation, Halliburton began the cementing job on the Macondo well.

### 4. Cementing: the Incorrect Cement Mixture and a Failed Seal

105. Creating solid cement seals on a well is delicate, precise work, and among the most critical tasks to ensure the integrity and safety of the well. Nevertheless, after cutting corners on well design and the number of centralizers, and incomprehensibly skipping the bottoms up circulation, Drilling Defendants made even more cost-cutting, careless decisions about the crucial cementing work in the Macondo well.

106. Drilling Defendants knew or should have known that poor cementing increases the risk of a blowout. In a 2007 study, the MMS expressed concerns about drilling

vessel blowouts caused by ineffective and/or improper cementing work. Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continue with some regularity, and most frequently in the Gulf of Mexico.

107.    The study found that cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991. Nearly all of the blowouts examined occurred in the Gulf of Mexico.

108.    Drilling Defendants also knew or should have known that careless, ineffective, negligent, or reckless cementing work by Halliburton caused an August 2009 blowout at the Montara well in the Timor Sea off the coast of Australia. During that incident, a sequence of events almost identical to those at Macondo led to a similarly disastrous blowout, and a spill that gushed oil for ten weeks, causing environmental damage across a 200-mile radius.

109.    Prior to beginning cementing operations on the last section of the Macondo well, Halliburton had to make decisions about the type, volume, placement, and pumping of the cement, while taking into account the narrow range of safe operating pressures at the bottom of the well, in addition to the gaseous nature of the hydrocarbon reservoirs surrounding the well.

110.    Halliburton also knew that BP had not properly prepared the annulus for the cement job by performing a bottoms up circulation, and that BP was not planning to use the recommended number of centralizers on the casing pipe.

111.    This cementing job was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the casing pipe to prevent an influx. The composition of the cement mixture ("slurry") that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well.

During placement, the slurry would have to be light enough to avoid fracturing the brittle formations surrounding the well, but once set, the slurry would have to be strong enough to resist the intense, nearly 12,000 psi pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well.   Despite these challenges, Drilling Defendants, including BP and Halliburton, improperly designed the cement slurry and failed to thoroughly conduct and/or review the results of laboratory testing of the cement slurry stability under conditions that would be found in the Macondo well.

112.   Halliburton ultimately recommended a foamed cement mixture to seal the bottom of the Macondo well. Foam cement is cement that has been injected with nitrogen gas to lower its density. But high temperatures and pressures in wells like Macondo can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

113.   On October 28, 2010, Fred Bartlitt, Jr., the lead investigator for the presidential commission investigating the Spill, reported that tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo well.

114.   Halliburton and BP already knew the Macondo well was located in brittle, variable, challenging rock formations laced with volatile high temperature, high pressure, gaseous hydrocarbon reservoirs that had plagued drilling operations in the past.   Using Halliburton's recommended cement mixture in Macondo's rock formations was "a recipe for disaster," Robert Bea told the *Washington Post*.

115.   The presidential commission's investigators asked Halliburton to provide them with samples of materials like those used at the Macondo well; independent testing of

those samples could not generate stable foam cement in the laboratory using the materials provided by Halliburton, which, according to Bartlitt, strongly suggests that the foam cement used at Macondo was unstable during that cement job as well.

116.    Independent tests conducted for BP's investigation of the disaster were also unable to generate a stable slurry using a mixture as similar as possible to Halliburton's slurry in conditions like Macondo's.

117.    Prior to using its slurry mixture in the Macondo well, Halliburton conducted at least four foam stability tests on it, or on similar formulations, but the tests were incomplete and substandard, and mostly indicated the slurry would not be stable in the Macondo well.

118.    In February 2010, Halliburton conducted the first two tests on a cement slurry that was slightly different than that ultimately used; both tests indicated that this foam slurry design was unstable if used in Macondo conditions.  According to Bartlitt's report, Halliburton provided the results of the February testing to BP by e-mail on March 8, 2010.

119.    Halliburton conducted two other foam stability tests in April 2010, this time using the actual slurry mixture and design ultimately used in the Macondo well.  On April 13, seven days before the blowout, testing indicated the foam slurry design was unstable.  Bartlitt reports that the results of this test were reported internally within Halliburton by at least April 17, 2010.  In a second April test, Halliburton modified the testing procedure and the data indicated, for the first time, that the foam slurry mixture would be stable if used at Macondo.  It is not clear if BP received the results of either of the April tests from Halliburton before it allowed Halliburton to begin cementing.

120.    Oil industry expert Robert Bea told the Washington Post that drillers will often run one test on a proposed cement mixture, then a second test as a backup.  Bea considered Halliburton's four tests "unusual... [T]hat's telling me they were having trouble getting to a stable design."

36

121.    Despite the four tests Halliburton did run on the slurry mixture, the testing was not comprehensive, thorough, or consistent with industry standards. For example, as BP's investigation team noted, Halliburton did not provide results for such commonly tested cement slurry parameters as fluid loss, free water, foam/spacer/mud compatibility, static gel strength transition time, zero gel time, or settlement.

122.    Bartlitt reported to the presidential commission that, taken together, the Halliburton documents indicated that:

(a)    Only one of the four tests .... that Halliburton ran on the various slurry designs for the final cement job at the Macondo well indicated that the slurry design would be stable;

(b)    Halliburton may not have had — and BP did not have — the results of that test [showing stable results] before the evening of April 20, meaning that the cement job may have been pumped without any lab results indicating that the foam cement slurry would be stable;

(c)    Halliburton and BP both had results in March showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data; and

(d)    Halliburton (and perhaps BP) should have considered redesigning the foam slurry before pumping it at the Macondo well.

123.    In addition to having seen slurry test results showing the instability of Halliburton's proposed cement mixture, BP was also aware of the incomplete, substandard nature of Halliburton's tests, which failed to provide results for several commonly tested parameters. Nevertheless, BP did not insist that Halliburton reformulate its cement slurry or perform the missing standard tests before proceeding with this tricky and important final cement job. Indeed, in its rush to complete the well, BP likely charged ahead having only ever seen Halliburton's first three slurry test reports – all of which indicated the cement would be unstable in the well.

124.    Unstable foam cement slurry can result in nitrogen breakout, when bubbles of nitrogen create tiny holes in the cement as it is setting, leaving the cement porous and unable to

37

form a seal against the hydrocarbon pressure. Nitrogen breakout not only jeopardizes the foam cement itself, but can also contaminate the other types of cement it is pumped with, interfering with their proper placement and/or degrading their ability to form a secure seal. Nitrogen breakout in the unstable foam slurry used at Macondo could have weakened the denser, non-foamed cement used to plug the very bottom of the last casing pipe, leaving it also unable to withstand the pressure of the hydrocarbons surrounding the well.

125.    In addition to the formulation of the cement mixture, the volume of cement used is another factor in ensuring a successful cement job.  Halliburton used a small volume of cement for this last section of the Macondo well.  According to the interim report by the National Academy of Engineering ("NAE") scientists investigating the Spill, the concern with using a small volume of cement is "the potential for contamination of the entire slurry volume simply because less cement is present." This was especially relevant at Macondo, where the high gas-to-oil ratio in the hydrocarbon reservoirs surrounding the well presented a risk of gas contaminating the cement during the setting process.

126.    The NAE panel also expressed concern that the flow rate Halliburton chose to use when pumping the cement into the well was too low to achieve "turbulent flow," a condition that helps push the mud out of the annulus during the cement placement.

127.    Given the extremely narrow range of safe operating pressures Drilling Defendants were faced with in this last section of the well, it was all the more important to monitor well flow during the cementing process, to ensure there were no indications of fluid loss or fracturing of the formations around the bottom of the well.  By monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that every barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well.  These "full returns" indicate that the cement is displacing mud from the annulus as planned.  If less

mud flows out of a well than the amount of cement that is pumped in, fluid is being lost, most likely into fractures in the brittle formations.

128. Although BP claimed there were full returns during the last cementing job at Macondo, Halliburton cementer Nathaniel Chaisson testified that there was no monitoring system in place that could have confirmed full returns during cementing operations. Moreover, data presented to the congressional investigators by Halliburton cementer Vincent Tabler indicated that about 80 more barrels of cement were pumped into the well than barrels of mud that flowed out. This fluid loss would indicate that the brittle formations at the bottom of the well had fractured during the cementing process, allowing fluids and cement to escape into the fissures in the rock, and ruining the cement job. During its congressional testimony in September 2010, BP suggested that 50 barrels of the apparent fluid loss were due to compression of nitrogen in the cement. Nevertheless, BP should have had a flow monitoring system in place during the cementing process, and any losses due to nitrogen compression should have been anticipated and compensated for during the interpretation of the flow monitoring data.

### 5. Despite Red Flags, Drilling Defendants Skip Crucial "Bond Log" Test Of Cement Integrity

129. After having made risky choices on well design, casing choice, the number of centralizers, skipping the bottoms up circulation, and using an unstable cement slurry, all of which sharply increased the risk that the cement job would fail, BP then made the unfathomable decision to cancel the "cement bond log" test, which would have checked the integrity of the completed cement job by using an imaging tool to gauge the thickness of the cement, and to determine if the cement was properly bonded to the casing and the rock formations surrounding the well.

130. This decision was again contrary to BP's own original drilling plan, which included the cement bond log test. Skipping the cement bond log was also contrary to BP's

own internal standards, which do not consider full fluid returns a "proven cement evaluation technique," and furthermore require a cement bond log test if a well's cement design provides for less than 1000 feet of cement above the highest hydrocarbon layer — BP's Macondo plan only provided for 500 feet.

131.     But despite its own drilling plan, internal standards, and the simulations predicting cement failure, and despite warnings from its contractors and its employees regarding the risk of cement failure due to well design and insufficient centralizers, BP again rewrote its drilling plan on the fly, cancelling the cement bond log test and turning back the team from Schlumberger Ltd. that had arrived on the drilling vessel specifically and solely to perform the test.

132.     BP's only reasoning for skipping this absolutely critical and required test seems to have been a savings of approximately $128,000 and less than 12 hours of work.

133.     Gordon Aaker, Jr., an engineering consultant hired by the Congressional committee investigating the disaster, testified that it was "unheard of" and "horribly negligent" not to perform a cement bond log test on a well using a single casing design like the Macondo's.

134.     Moreover, skipping the test was a violation of MMS regulations, which require that a cement bond log test be conducted if there are indications of an inadequate cement job. 30 C.F.R. § 250.428.

135.     Tommy Roth, a Halliburton Vice President of Cementing, also said BP should have conducted a cement bond log: "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test." Yet on board the Deepwater Horizon, neither Halliburton nor any of the other Drilling Defendants called to stop work or otherwise insisted that BP run the cement bond log test before proceeding.

### 6.  The Casing Hanger Lockdown Sleeve: Another Skipped Safety Precaution

136.    As discussed above, the riskier long string well design Drilling Defendants chose for Macondo meant that there were only two barriers to a hydrocarbon blowout: Halliburton's cement job isolating the hydrocarbon reservoirs from the well and the seal assembly at the wellhead on the sea floor.  Given the insufficient number of centralizers, the failure to run a bottoms up mud circulation prior to cementing, and the results of Halliburton's and BP's own simulations, the risk of a failed cement job at Macondo was already high, making the strength and integrity of the seal assembly at the wellhead - the second and final barrier against a blowout - paramount.  Yet here again BP made a decision based on time and money rather than well, worker, and environmental safety: it did not deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below, as it likely was on April 20, 2010.

137.    A casing hanger lockdown sleeve ties down the seal assembly at the top of a well, providing an extra layer of protection against a blowout, much like the wire cage over the cork on a champagne bottle.  During drilling, heavy mud counters the pressure from the hydrocarbons around the well, preventing their influx into the annulus and the casing. Once the well is properly sealed, with the cement isolating the pressurized hydrocarbons from the well, the heavy mud is pumped out and replaced by less dense seawater.  Usually the casing hanger lockdown sleeve is deployed before the heavy drilling mud is pumped out of the well, so that it can offer an extra shield against any problems during and after the mud displacement process.

138.    Contrary to industry standard, BP's plan was to deploy the casing hanger lockdown sleeve *after* the heavy mud had been displaced with seawater.  A well design expert at another major oil company expressed surprise at BP's choice to displace the mud before deploying the casing hanger lockdown sleeve, saying it was "not the norm."  BP had chosen to

shake the champagne bottle with only a faulty cork - Halliburton's unsound cement job - standing in the way of disaster.

## G.    The Displacement Procedure Was Premature And Nonstandard

139.    The Drilling Defendants were so focused on speed that they could not even wait the 72 hours required for the proper setting of the cement job – installed for temporary abandonment – before pressing forward with the mud displacement.  Without the heavy drilling mud to counter the reservoir pressure, any hydrocarbon influx into the well could turn dangerous very quickly, with only comparatively light seawater blocking the path up through the well and the riser to the surface.  Given the danger of hydrocarbons springing through a faulty, unset cement job, Halliburton should not have permitted BP to begin mud displacement unless it was absolutely certain that its cement job had successfully isolated the hydrocarbon reservoirs and sealed the well, yet there is no evidence that Halliburton ever protested BP's premature mud displacement.

140.    Unlike Halliburton, Transocean officials initially protested BP's mud displacement plan, but Transocean never exercised its right to stop work on the well.  Instead, Transocean acquiesced to BP's desire to rush the mud displacement at Macondo.

141.    On the morning of April 20, 2010, the day of the blowout, BP informed M-I drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet.

142.    Lindner calculated the atypical mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job.  Lindner testified that he distributed copies of his mud displacement plan to BP, Transocean and others on the drilling vessel; thus some, if not all, of the Drilling Defendants were aware of and complicit in

BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

## H.   Abandonment Continued Despite The Failure Of Key Pressure Tests

143.   Two types of pressure tests are used to confirm the integrity of a well. The integrity of the casing pipes and assembly is assessed with a "positive pressure" test, which involves increasing pressure in the casing string and observing the pressure response. If the increase in pressure bleeds off, it indicates a problem with the pressure integrity of the casing: the pumped-in pressure is escaping through a leak somewhere along the line. However, if the increased pressure stays constant, it does not necessarily mean the casing assembly is secure – the external pressure from the hydrocarbons around the well can be sufficient to maintain the increased pressure reading in the casing string even if there is a breach. Thus, a negative result (where the pressure leaks off) is useful because it is clear evidence of a leaky casing string. But a positive result (where the pressure remains constant), does not prove a secure casing string.

144.   On April 20, 2010, the Macondo well had a positive result to its positive pressure test, which neither confirmed nor denied the integrity of its casing string. At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process. According to M-I's mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

145.   The BOP's annular preventer was closed to seal the casing string for the negative test. However, for some reason it did not form a secure seal. Instead, about 50 barrels of spacer fluid was allowed to leak through the BOP and into the well. Accordingly, dense, viscous spacer fluid was allowed into the inlets to several small-bore pipes that were to be used for

the negative pressure test, rather than the plain seawater that should have been across the pipe inlets. The Drilling Defendants were aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet they took no steps to remedy the situation.

146.   The negative pressure tests were intended to assess the security of the cement job at the bottom of the Macondo well. With the casing string sealed, pressure was bled off from inside the well, "under balancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself. If the cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flowing out of the well and the pressure in the casing would remain at the reduced, underbalanced level. An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and re-pressurize the casing string.

147.   The Drilling Defendants' two negative pressure tests on the Macondo well both yielded abnormal results. In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state. In the other test, the pressure in the well increased from 50 psi to 1,400 psi -- a highly diagnostic "red flag" result indicating that the cement job had failed to seal off the well from the surrounding hydrocarbon reservoirs. The 1,400 psi pressure response and the excess fluid returns were indications that hydrocarbons were flowing into the well and re-pressurizing it after it had been underbalanced for the negative pressure test. The pressure tests themselves may have further damaged and weakened the cement in the well. Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests

148.   BP's interpretation of the pressure tests was also not industry standard.  BP admitted to Congressional investigators that continuing work on the well after such alarming test results may have been a fundamental mistake.  In May 2010, BP admitted that these pressure test results were clear warning signs of a big abnormality in the well.

149.   Later, in its September 8, 2010, disaster investigation report, BP concluded that the negative pressure test result of 1,400 psi was misinterpreted by Transocean and BP employees on the Deepwater Horizon, leading the vessel crew to the erroneous view that the test was a success and well integrity had been established.  Moreover, BP's investigation found no evidence that the drilling vessel's workers consulted anyone outside their teams on the vessel or onshore about the abnormal pressure reading, as they should have, before coming to their incorrect conclusion that the well was secure.  The well site leader should have called experts on the drilling vessel or on shore to discuss the results.

150.   Halliburton was also grossly negligent in ignoring the pressure test results and not insisting that a remedial cement job be done right away to correct the imperfections in the cement.  Given its experience and expertise with cementing wells, and the recent disaster its poor cementing work had caused at the Montara well off Australia, Halliburton was certainly aware of the environmental and safety risks of a failed cement job, yet it did not insist that the appropriate action be taken to correct the Macondo well's cement seal.

151.   In its November 16, 2010 interim report, the NAE panel wrote that "it is clear that pressure build-up or flow out of a well is an irrefutable sign that the cement did not establish a flow barrier" against the entry of hydrocarbons into the well.  At Macondo, there was both pressure build-up to 1400 psi and unexpected flow out of the well during the negative pressure tests.

152.   There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct the obviously-flawed cement job and shore up the

seal against the highly pressurized hydrocarbon reservoirs. The Drilling Defendants, however, elected to ignore the red flag results of the only cement integrity tests they had performed, and continued instead with their well completion plan as if the cement job had been a success.

## I.   An Unorthodox Spacer Fluid Process Interfered With Pressure Tests and BOP Functionality

153.   During the mud displacement process, the Drilling Defendants used an unconventional fluid mixture – and an unusually large volume of it – as "spacer" fluid. This novel composition and amount of fluid may have interfered with the negative pressure test results and/or caused damage or clogging in the BOP.

154.   In oil wells, a "spacer" is a fluid used to create a division between two other fluids, with the spacer fluid physically preventing the two other fluids from coming into contact and mixing with or contaminating one another. In the mud displacement process at Macondo, the spacer was intended to separate the synthetic drilling mud from the seawater displacing it.

155.   Spacer fluid is usually water-based mud, but according to testimony from M-I drilling fluid specialist Leo Lindner, an uncommon mixture of fluids was used as spacer during the Macondo well's mud displacement process. Instead of mixing a batch of the usual water-based mud spacer fluid, Lindner combined two "pills" of lost circulation material ("LCM") that had been previously prepared for use in the event of any fluid loss during the cementing job. Unlike the water-based mud typically used as spacer, LCM pills are highly viscous fluid that coagulates to create an extremely thick, stringy mass intended to fill the lost circulation zone, clogging fractures in the rock so that other drilling fluids can no longer escape into the formation. Lindner testified that it was "not common" to use LCM as a spacer, and that he had never done so before, but that BP, Transocean and MI employees on the

Deepwater Horizon were aware of the unorthodox LCM-based spacer and both had either approved the use or allowed it to occur without comment.

156.   In addition to the atypical composition of spacer used in the Macondo well, the volume of the fluid used was also nonstandard.  Lindner testified that normally a spacer is around 200 barrels of fluid, but in the Macondo well, the two LCM pills that were used as spacer had a combined volume of 450 barrels – over twice as large.

157.   Upon information and belief, the Drilling Defendants used this aberrant fluid composition and volume as spacer in the Macondo well solely to skirt environmental regulations that would have required more costly and time-consuming hazardous waste disposal procedures for the two unused LCM pills.

158.   As discussed above, the LCM used as a spacer leaked past the annular preventer through the BOP and into the well before the negative pressure test was run.  BP's and Transocean's unusual use of LCM as spacer fluid could have confounded the negative pressure test results by blocking the small-bore pipes used for the tests, and could have negatively affected the functionality and effectiveness of the BOP itself.

## J.   BP And Transocean Ignored Or Overlooked Warning Signs

159.   Constantly monitoring a well for signs of hydrocarbon influx is vital for well safety.  It is common practice in the industry for employees of several companies on a drilling vessel – the mud-logging company, the drilling contractor, and the lease operator – to focus on it and be ready to take immediate remedial action.

160.   After the litany of short-cut operational decisions the Drilling Defendants made to save time and money completing the Macondo well, they should have been especially tuned into any signs of trouble.  But instead of the requisite vigilance, the Drilling Defendants had become complacent in their haste to complete operations at Macondo.  As a result, the Drilling

Defendants failed to properly monitor the well and ignored or missed an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

161. Pressure and flow data from the well in the two hours before the blowout should have put the Drilling Defendants on notice that there was a problem and that hydrocarbons were leaking into the well. Post-spill review of the real-time data available on the Deepwater Horizon on April 20, 2010, showed that the first indications of hydrocarbons flowing into the well started at 8:52 p.m., and went unnoticed by the Drilling Defendants. Post-spill modeling indicated that by 9:08 p.m., 39 barrels of hydrocarbons had leaked into the well, but the Drilling Defendants still had not noticed the pressure and flow indications of the influx. It was not until 9:41 p.m. – four minutes before the blowout – that the Drilling Defendants finally noticed that the well was rapidly filling with hydrocarbons and that immediate well control action was needed.

162. At 8:52 p.m., the pumps displacing the heavy mud with seawater were slowed, but instead of flow out of the well decreasing accordingly, as it should have, flow increased – a clear "red flag" indicating that hydrocarbon pressure from the reservoir below was pushing the mud out of the well faster than the seawater that was supposed to be displacing the mud was being pumped in. Yet the Drilling Defendants appear to have completely ignored this first red flag and simply carried on with the mud displacement process.

163. From 9:08 p.m. to 9:30 p.m. on the night of the blowout, when the mud displacement pump was either running at constant flow or was shut off, pressure in the well steadily increased. Modeling data from BP's investigation of the disaster showed that at this point, hydrocarbons were flowing into the well at about nine barrels per minute. This pressure data also should have caused the Drilling Defendants to start well-kill operations to restore control over the pressure. Instead, the increasing pressure was ignored or overlooked.

164.   The mud displacement pumps were shut-down completely at around 9:30 p.m. By then, hydrocarbons had been continuously flowing into the well for 38 minutes. Modeling data from BP's disaster investigation showed that about 300 barrels of hydrocarbons had flowed into the well by this time. A few minutes later, at 9:38 p.m., the steadily increasing level of hydrocarbons passed through the wide-open BOP into the riser.

165.   Although there may have been some discussion of "differential pressure" in the well once the mud displacement pumps were turned off, there is no other evidence that Drilling Defendants noticed or properly interpreted the many warning signs of the imminent blowout until drilling mud began to spill out of the riser onto the vessel deck at 9:41 p.m., just four minutes before the blowout.

166.   Inexperience may also have affected the choices and competency of the Deepwater Horizon workers during these critical hours. In BP's chain of command for Macondo operations, five employees had less than five months in their respective positions. BP's well site leader had mostly land-based drilling experience, and admitted he was working on the Deepwater Horizon to learn about deep water. BP also complained to Transocean that turnover on the drilling vessel had been high, including the replacement of experienced drillers with new hires. BP understood that further dilution of experienced personnel may be detrimental to the performance of the rig.

167.   Investigators for the safety review commissioned by Transocean prior to the Spill found that a lack of hands-on experience for Transocean workers and managers contributed to safety concerns. Transocean recognized that many workers were readily promoted without sufficient on-the-job experience to fully appreciate the risks. Moreover, the Deepwater Horizon Study Group found no evidence that any of the drilling vessel workers or onshore employees directly involved with the Macondo well had formal training or

49

qualifications in risk assessment and management of complex systems such as were found aboard the Deepwater Horizon.

168.   In addition to carelessness, nonchalance, or inexperience causing them to ignore or overlook the warning signs of a blowout, it is also possible that drilling vessel workers, pushed by the Drilling Defendants to work faster and combine multiple tasks during these final completion operations, were too distracted to properly monitor the well and to notice the alarming signs of imbalance.

169.   As hydrocarbons were steadily filling the well and mounting towards the riser, vessel workers' attention was split between mud displacement and other simultaneous tasks such as (1) the sheen test, (2) preparations for the upcoming cement plug insertion, (3) the investigation of a problem that had arisen with one of the mud pumps, and (4) the entertainment of BP and Transocean executives ironically onboard to celebrate the Deepwater Horizon's supposedly spotless safety record.

170.   Several of these simultaneously occurring activities distracted vessel workers from responsibly monitoring pit fluid levels, eliminating that important source of well flow monitoring information. A few hours after the mud displacement process began at noon, the Drilling Defendants began a four-hour offload of mud to the nearby supply vessel M/V Damon Bankston. In addition, some of the mud pits and the trip tanks were being cleaned and emptied during the course of the afternoon. Each of these activities affected the pit fluid levels, compromising their usefulness as indications of well flow. There is no evidence that the Drilling Defendants had any reason to perform these activities during the mud displacement process other than time savings.

171.   Even if there had been a compelling reason to perform the mud offload and pit cleaning activities simultaneously with the mud displacement process, the Drilling Defendants could have preserved the useful monitoring function of pit fluid level information

by isolating one or more of the pits for well flow monitoring. At the very least, the Drilling Defendants could have begun monitoring pit fluid levels again at 5:17 p.m., once the mud offload task was complete. There is no evidence that pit fluid levels were ever monitored again that afternoon or evening.

172.   The multiple distractions and interference with well data caused by the drilling vessel crew's multitasking left them unable to "detect, analyze, and effectively react to the developing blowout," according to the Deepwater Horizon Study Group. The Group also noted that "perils of parallel processing" have contributed to past oil and gas disasters such as the Piper Alpha blowout in the North Sea, and the Exxon Valdez crash. The Deepwater Horizon's crew performance of simultaneous tasks fractured their attention at critical times, with catastrophic results.

### K.   Attempts At Well Control Were Too Late

173.   While the Deepwater Horizon's crew was inattentively working, hydrocarbons flowed into the well through the bottom of the last section of casing pipe, flowing up the casing string, and through the BOP and riser to the surface. Because of their inattention to proper well monitoring during the mud displacement process, the first sign of this hydrocarbon influx BP and Transocean seemed to notice was the mud that began spilling out of the riser onto the vessel deck at about 9:41 p.m., 49 minutes after the leak had started at the bottom of the well.

174.   For emergencies like this one, the Drilling Defendants' policies and instructions regarding well control procedures for their vessel workers were woefully inadequate. The procedures only contemplated relatively small influxes into the well, and did not provide guidance on what to do if the initial procedures failed to stop the influx, or whether and when to activate emergency BOP functions such as the emergency disconnect system.

175.   In response to the mud spurting out of the riser at 9:41 p.m., the drilling vessel crew diverted flow from the well into the mud-gas separator, a device used to separate

gas out of the drilling fluid and vent it safely into the air. This diversion would have been the correct protocol if this incident had been a mere kick. But for a blowout caused by hundreds of barrels of hydrocarbons blasting out of the well, the decision to divert well flow through the mud-gas separator only exacerbated the disaster.

176.   Diversion to the mud-gas separator not only contributed to the explosions on the Deepwater Horizon, but it likely caused them to happen sooner than they might have if well flow had been directed overboard instead. The gas venting pipes on the Deepwater Horizon's mud-gas separator were goose-necked, which meant they directed the vented gas downwards towards the vessel. When large volumes of gas began to escape out of the Macondo well, the goose necked vents in turn spread gas all over the vessel's decks, increasing the likelihood that the gas would find an ignition source.

177.   The volume and pressure of the gas rushing out of the well eventually overwhelmed the mud-gas separator entirely, bursting its seals, and allowing the gas to spread directly under the vessel deck as well, enveloping the Deepwater Horizon in a highly flammable cloud of gas.

178.   The blowout became worse as the high pressure gas flow caused the failure of surface equipment on the drilling vessel, most of which was rated to withstand only 60 – 100 psi. As each of these seals and systems gave way under the immense pressure, additional flow paths were opened and the blowout gained strength.

179.   The drilling vessel workers, following Transocean's insufficient well shut-in protocol, closed two of the BOP's non-shearing rams, which eventually sealed around the drill pipe at 9:47 p.m. At this point, all flow paths from the well to the drilling vessel were sealed off except for the drill pipe. Flow up the drill pipe was prevented by pressure in that pipe. With the BOP rams now blocking hydrocarbons from entering the riser along the sides of the drill

pipe, the blowout could have been contained at this point, had the gas on the drilling vessel not exploded.

## L.     Faulty Vessel Safety Equipment Exacerbated The Blowout

180.    The initial explosion on the Deepwater Horizon on the night of April 20, 2010, was likely caused by an engine on the vessel deck that sucked in the gas blasting down on the decks from the mud-gas separator vents.  Gas sensors, designed to shut-down vessel engines when dangerous vapors are present, are critical to preventing explosions in such situations.  Yet the gas sensors -- and the emergency engine shutdown systems connected to them -- were apparently not operational aboard the Deepwater Horizon on the night of the blowout. Moreover, the automated feature that should have closed the engine's air intake valves upon sensing gas entering the engine room also failed.  Moreover, the Deepwater Horizon's engine room was not equipped with a gas alarm system that could have shut off the power.  The installation and maintenance of these sensors, alarms, and emergency shutdown systems on the Deepwater Horizon were the responsibility of Transocean, the vessel's owner.

181.    At approximately 9:48 p.m., the gas sucked into one of the Deepwater Horizon's engines caused it to begin to over-speed.  The vessel lost power less than a minute later, almost immediately followed by two explosions, which ignited the gas enveloping the vessel. The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well.  BP's investigators found potential flow paths through the mud pumps and through the top of the drill string, as well as the possibility that movement of the drill pipe broke the seal that the BOP rams had made around the drill pipe, reopening the direct flow path from the casing into the riser.  Through all or some of these flow paths, gaseous hydrocarbons poured onto the vessel, fueling fire that engulfed the Deepwater Horizon and ultimately killed 11 crew members, injured 17 others, and destroyed the vessel.

### 1. The Failure of the BOP

182.    Immediately after the explosion, vessel workers tried in vain to activate the emergency disconnect sequence on the Deepwater Horizon's BOP.  Problems and failures with each of the BOP's emergency activation methods prevented the use of the Deepwater Horizon's BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and squelching the blowout.

183.    The BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence ("EDS"), the automatic mode function ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab" or auto-shear functions.  None of these were able to activate the BOP to seal the well.

184.    The explosions and fire on the Deepwater Horizon disabled the only two emergency activation methods available to workers on the vessel: the high-pressure closure of the blind shear ram and the EDS.  From the BOP control panels on the vessel, workers could push buttons for either of these functions, but both required communication with the BOP itself via multiplex cables running from the vessel to the BOP on the seafloor.  On the vessel, these multiplex cables were not protected against explosions or fire.  It is likely that these cables were damaged during or immediately after the first explosion, effectively disabling the vessel workers' ability to communicate with the BOP.

185.    The AMF sequence initiates when electrical power, communications, and hydraulic pressure are lost to both control pods on the BOP, circumstances that were certainly satisfied once the multiplex cables and the also-unprotected hydraulic conduit hose on the

Deepwater Horizon were damaged by the explosions and/or fire. But poor maintenance of the BOP itself prevented the completion of the AMF sequence to close the blind shear ram.

186.    The Deepwater Horizon's BOP had two independent control pods, a redundancy intended to reduce the risk that control pod failure would jeopardize BOP functionality, but Transocean's shoddy BOP maintenance prevented either of the two pods from completing the AMF sequence on the night of the blowout. Examination and tests performed on the control pods after the disaster found a faulty solenoid valve and one battery with low charge in one pod, and two dead batteries in the other pod. These problems apparently existed prior to April 20, 2010, and were significant enough to prevent either control pod from completing the AMF sequence to close the BOP's blind shear ram.

187.    BOP maintenance was Transocean's responsibility, but BP and the other Drilling Defendants were aware of Transocean's infrequent and inadequate maintenance of the device. The faulty solenoid valve on one of the control pods would have shown up on the BOP control diagnostic system on board the drilling vessel, which was accessible to all and should have alerted the Drilling Defendants to the problem.

188.    Transocean's BOP maintenance records from 2001 to 2010, which were also available to the other Drilling Defendants at all times, indicate that the control pod batteries were changed far less frequently than the manufacturer's recommended annual replacement. Unlike the solenoid valve failure, the BOP's diagnostic function would not have shown a low battery charge, all the more reason for Transocean to proactively change the batteries frequently to avoid failure. But, as the other Drilling Defendants knew, Transocean had neglected the BOP batteries before. For example, a November 2007 activity report recorded that when the BOP was brought to the surface, all of the batteries in one of the pods were dead.

189.   Beyond these specific BOP maintenance issues, the Drilling Defendants were also aware that during the entire duration of operations at Macondo, the Deepwater Horizon's BOP was out of certification and long overdue for extensive maintenance and repair. Although the BOP's manufacturer required manufacturer testing of the device every five years, the Deepwater Horizon's BOP had not been sent to the manufacturer for inspection since 2000.

190.   The BOP had not undergone a thorough series of maintenance checks since 2005, despite the significant problems uncovered within the device during that inspection. According to Transocean maintenance documents from the 2005 inspection, the BOP's control panels gave unusual pressure readings and flashed inexplicable alarm signals, while a "hot line" connecting the vessel to the BOP was leaking fluid. An independent engineering company was hired to assess the BOP, but could not perform all of its examinations – including verification that the Deepwater Horizon's BOP could effectively shear drill pipe and seal off wells in high pressure, deep water conditions – because the BOP was in use and inaccessible on the sea floor, and BP and Transocean would not stop work to bring it up.

191.   A Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, again revealed a range of problems with the Deepwater Horizon's BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves. In keeping with its lax approach to BOP maintenance, Transocean also failed to recertify the Deepwater Horizon's BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime.

192.   BP later noted that Transocean did not record well control related equipment maintenance – including that of the BOP – accurately or completely in its regular maintenance management system. BP also recognized that some alleged work that was

56

recorded as performed on the BOP could not possibly have taken place since the BOP was in use on the seafloor at the time of the supposed repair.

193.    After the explosions, as the Deepwater Horizon was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or auto-shear functions.  Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure.  Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket modifications to the BOP.

194.    Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP.  The Drilling Defendants were aware of at least two, and maybe all, of these leaks prior to April 20, 2010.  One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by the Drilling Defendants.  In any event, the weekly BOP function tests should have made the Drilling Defendants aware of the other hydraulic system leaks identified during the ROV intervention.

195.    The Drilling Defendants were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures.  In addition to incorrectly installed aftermarket hydraulic plumbing, the Drilling Defendants had switched out one of the Deepwater Horizon's variable bore rams with a non-functional test ram. After the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because the Drilling Defendants had not updated the BOP's schematic diagram to reflect the aftermarket changes.  The Drilling Defendants' failure violated 29 C.F.R. § 1910.119, which required up-to-date process and safety system equipment drawings as a part of basic process safety management.

196. The Drilling Defendants were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010; however, no action was ever taken to address the problems, perhaps because additional delays and costs would accrue as all well work would stop while the BOP was raised from the sea floor for repairs. In addition to posing a significant safety risk, the Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

197. Despite vessel workers' efforts just after the blowout, and emergency engineers' efforts in the weeks after the blowout and sinking, the Deepwater Horizon's blind shear ram never successfully sealed the well. Although tests determined that the ROVs had activated the high-pressure blind shear ram close function by cutting the auto-shear rod, the well continued to spew oil into the Gulf of Mexico.

198. At the time of the disaster, the Drilling Defendants were certainly aware that in addition to increasing the risk of blowouts, deep-sea drilling also increases the risk of BOP failure. The Drilling Defendants were also aware that the industry and government had significant concerns about the reliability of BOPs like the one installed on the Deepwater Horizon. A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 74 vessels studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. Moreover, the study singled out Defendant Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the necessary strength for its BOP equipment to function properly at ultra-deep water depths.

199.   Despite being aware of the risk of the BOP failing at greater depths, the Drilling Defendants did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Plaintiffs, and the environment from the catastrophic results of a well blowout.

200.   The Deepwater Horizon's BOP was outfitted with only one blind shear ram. But blind shear rams are vulnerable to a "single-point failure" – if just one of the small shuttle valves that carry hydraulic fluid to the ram malfunctions, the BOP cannot seal the well. A 2000 report on the Deepwater Horizon's BOP concluded that the shuttle valve was the BOP's weak spot. Consultants attributed 56 percent of the BOP's "failure likelihood" to this one small valve. Indeed, evidence suggests that when the Deepwater Horizon crew attempted to activate the BOP's blind shear ram, the ram's blades could not cut through the drill pipe because one or more of the shuttle valves leaked hydraulic fluid.

201.   Vulnerabilities like the BOP blind shear ram's single-point failure risk were well understood by the Drilling Defendants and the rest of the oil industry. In fact, offshore drillers now commonly add an extra layer of protection against this single-point failure risk by equipping their BOPs with two blind shear rams. In 2001, when the Deepwater Horizon went into service, Transocean was already equipping its newer drilling vessels with BOPs that could accommodate two blind shear rams, and today 11 of Transocean's 14 Gulf of Mexico vessels have two blind shear rams. The three that do not were built before the Deepwater Horizon. Nevertheless, neither Transocean nor BP retrofitted the Deepwater Horizon's BOP with two blind shear rams. BP's explanation was that the drilling vessel needed to carry the BOP from well to well and there were space limitations. However, oil industry experts have dismissed that explanation, saying an additional blind shear ram on the BOP would not necessarily have taken up any more space on the vessel.

202.    The Drilling Defendants were also well aware of the benefits of redundant blind shear rams. In May 2003 the Discoverer Enterprise – a Transocean vessel operated by BP, just like the Deepwater Horizon – was rocked when the riser pipe connecting the vessel to the wellhead cracked open in two places. The BOP was activated and the first blind shear ram closed. After robots checking the integrity of the BOP noticed damage, the second blind shear ram was also closed to provide an extra layer of protection against a blowout. Despite this firsthand experience of the necessity of redundant blind shear rams, BP and Transocean used one of the slots on the BOP for the non-functional test ram, which would save them money by reducing the time it took to conduct certain well tests, instead of installing a second blind shear ram there. BP and Transocean have acknowledged their awareness that installing the test ram instead of a functional ram would reduce the built-in redundancy and raise the risk profile of the Deepwater Horizon.

203.    If the BOP on the Macondo wellhead had been functional and properly manufactured by Cameron and/or maintained by Transocean, it could have been manually or automatically activated right after the explosion, stopping the blowout at the wellhead, limiting the Spill to a minute fraction of its ultimate severity, and thereby sparing Plaintiffs millions of dollars in losses and damage.

204.    BP, Transocean and one or more of the other Drilling Defendants failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

205.    Cameron, BP, Transocean and one or more of the other Drilling Defendants also failed to ensure that the Deepwater Horizon's BOP had sufficient, functional, built in redundancy to eliminate single-point failure modes.

206.    Cameron, BP, Transocean and one or more of the other Drilling Defendants also failed to ensure that all foreseeable repairs, if any, and foreseeable modifications, if any, to the

Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut-down and the well secured.

207.   Cameron, BP, Transocean and one or more of the other Drilling Defendants also failed to ensure that the testing, if any, of the Deepwater Horizon's BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV connection points, and verifying the functionality of the AMF and/or auto-shear.

208.   Cameron failed to ensure and verify that the BOP it designed, manufactured, marketed, and sold, and which was appurtenant to the Deepwater Horizon drilling vessel, was suitable for the types of drilling conditions, drill pipes, and casing assembly designs that would foreseeably be used during the Deepwater Horizon's drilling and exploration operations.

209.   BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deep water drilling was present and available on the Deepwater Horizon, but did not do so.

210.   BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have installed a back-up acoustic trigger to activate the Deepwater Horizon's BOP in the event that the main trigger failed to activate.   In fact, federal regulators at the MMS communicated to one or more of the Drilling Defendants in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deep water drilling system."

211.   Despite this notice, and although the back-up acoustic BOP trigger is a common drilling vessel requirement in other oil-producing nations, including other areas where Drilling Defendants operate, the Deepwater Horizon was not equipped with this back-up acoustic BOP trigger.

212.   Defendant Cameron designed and manufactured the Deepwater Horizon's BOP device.   Defendant Cameron failed to effectively design the BOP, install sufficiently

independent and redundant emergency activation systems on the BOP, or provide adequate warnings, instructions, and guidelines on permissible uses, modifications, and applications of the BOP. The failure of Defendant Cameron's BOP was a cause or contributing factor to the Spill.

## 2. Poor Vessel Maintenance And Reckless Bypass Of Safety Systems

213.    Unfortunately, the BOP was not the only part of the Deepwater Horizon that was poorly maintained and in disrepair at the time of the blowout. Transocean had a history of postponing and ignoring needed maintenance on the Deepwater Horizon, despite concerns raised by its own employees and other vessel workers. In the weeks before the blowout, the Deepwater Horizon suffered power outages, computer glitches, and a failed or failing propulsion system. In some cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. When the Macondo well blew out, the Deepwater Horizon's shoddy maintenance facilitated a cascade of failures of multiple emergency systems, exacerbating the disaster.

214.    The Deepwater Horizon had a number of ongoing equipment problems at the time of the blowout, some of which contributed to the failure of backup generators that should have powered safety and shutdown devices immediately after the blowout. Vessel-wide electrical failures had occurred two or three times before April 20, 2010, and the driller's control chair had lost power just a few days prior to the blowout. The primary computer used to control all vessel drilling functions routinely crashed and had to be restarted, interfering with vessel workers' ability to monitor well data. One of the vessel's thrusters, an underwater propeller that helps the floating vessel move and stabilize itself in the water, had been having problems for eight months prior to the blowout.

215.    Moreover, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system

migration had not yet been resolved.  Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel and in need of maintenance were not registered by the computer.

216.   Even worse, some key safety systems and alarms on the Deepwater Horizon had been intentionally bypassed or disabled by Transocean.  For example, on the night of the blowout, a pressure regulator valve, which automatically cuts off gas flow at a certain pressure point and could have helped stop the blowout, was in bypass mode when the gaseous hydrocarbons blew out of the Macondo well.  A fire alarm system on the vessel was also partially disabled at the time of the blowout, and had been for at least a year.  The system was set to "inhibited" mode, meaning that the control panel would indicate a problem, but a general alarm would not sound throughout the vessel unless manually activated.  These problems had been brought to the attention of BP, Transocean and other Drilling Defendants numerous times, including complaints made just days prior to the blowout.

217.   Upon information and belief, had Transocean not disabled the alarm systems, the system would have sounded alarms immediately after the blowout, shut-down all potential ignition sources, and activated the drilling vessel's EDS, which would have prevented the explosion.

218.   When the Deepwater Horizon lost power during the blowout, none of the backup or emergency generators were working – equipment that was on board for the very purpose of providing power to alarm and safety systems in just such an emergency.  There was no general alarm, no internal communications, and no power to the vessel's engines.  Moreover, without power, the crew was also unable to engage the EDS that would have stopped the flow of gas fueling the fire on the vessel, and many other alarm and safety systems were rendered silent and useless.

219. An equipment assessment commissioned by Transocean in April 2010, just before the blowout, revealed many key components on the Deepwater had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The assessment found a malfunctioning pressure gauge and multiple leaking parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

220. The findings of the Transocean-commissioned equipment assessment echoed a similar BP-commissioned audit that had been conducted in September 2009. The BP audit found that Transocean had excessive overdue planned maintenance, consisting of 390 jobs amounting to 3,545 man hours of needed maintenance work.

221. In a confidential worker survey conducted on the Deepwater Horizon just weeks before the blowout, Transocean employees voiced concerns about poor equipment reliability. One worker noted that the drilling vessel had not once in its nine-year career been taken to dry dock for necessary repairs. Another worker described Transocean's policy of running equipment to failure before making just the bare minimum repairs.

222. The other Drilling Defendants were aware of Transocean's poor maintenance of the Deepwater Horizon and its practice of disabling or bypassing vital safety systems, and alarms, yet it never called for work to stop until vessel safety was improved, and it never reported Transocean's actions and inactions to the MMS.

## M. BP's And Transocean's Culture Of Complacency

223. All the evidence of Drilling Defendants' misguided priorities and imprudent decisions regarding the Macondo well and the Deepwater Horizon described above is part of a

culture of complacency. The Drilling Defendants did not take the serious risks seriously, and failed to identify or respond to the risks that proved to be fatal. The complacency was especially deplorable considering that – on March 8, 2010 – the Deepwater Horizon had just survived a near miss, an influx that went unnoticed for over 30 minutes. That brush with disaster should have been a lesson learned for the Drilling Defendants, but to the contrary, just six weeks later, their haste and carelessness again led them to miss signs of an influx for 49 minutes, and to not notice the breach until it was too late.

224. An independent group of scientists singled out BP in particular for its "lack of discipline" in its operations at Macondo, in an interim report released November 17, 2010. "Numerous decisions to proceed toward abandonment [well completion] despite indications of hazard, such as the results of repeated negative pressure tests, suggest an insufficient consideration of risk and a lack of operating discipline," according to the 15-member panel of National Academy of Engineering scientists.

225. Moreover, the panel found that BP suffered from a lack of "management discipline" and problems with "delegation of decision making" on board the Deepwater Horizon. Workers aboard the drilling vessel were often unsure about who was actually in charge, and there was a "lack of on board expertise and of clearly defined responsibilities," the NAE report said. Poor communication between employees of various Drilling Defendants also contributed to the confusion on the vessel.

226. As the Deepwater Horizon Study Group put it: "[i]t is the underlying 'unconscious mind' that governs the actions of an organization and its personnel." In the case of the Deepwater Horizon, the cultural influences permeating the Macondo teams – both on the vessel and on the beach – reflected "gross imbalances between production and protection incentives" and manifested in "actions reflective of complacency, excessive risk-taking, and a loss of situational awareness."

227.    The Drilling Defendants' complacent approach to their respective responsibilities regarding the Deepwater Horizon Macondo well was in direct violation of federal regulations intended to maintain public safety. Pursuant to 33 C.F.R. 250.107, the Drilling Defendants were required to protect health, safety, property, and the environment by (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe condition. They were further required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the "best available and safest technology" whenever practical on all exploration, development, and production operations.   The Drilling Defendants' violation of these regulatory mandates caused and/or contributed to the Macondo well blowout and the subsequent explosions, fire, sinking, and Spill.

228.    This culture of carelessness and impudence was not limited to the Drilling Defendants' actions and decisions on the Deepwater Horizon at the Macondo well. In fact, the Drilling Defendants have a history of foolhardy, irresponsible behavior across their operations on land and at sea – a record littered with accidents, spills, regulatory violations, fines, and lawsuits.

229.    Workers on the Deepwater Horizon also described "a corporate culture of …ignoring warning signs ahead of the [April 20th] blast," saying that "BP routinely cut corners and pushed ahead despite concerns about safety." Prior incidents, investigations and testimony from Congressional hearings show that BP actively discourages workers from reporting safety and environmental problems.  Reports from multiple investigations of the Texas City and Alaska disasters all indicate a pattern of intimidating – and sometimes firing – workers who raise safety or environmental concerns.  In Alaska, pressure for increased production with fewer safety reports created "an environment where fear of retaliation [for reporting problems] and intimidation did occur." Also in Alaska, a pipeline safety technician

working for a BP contractor was scolded, harassed, and ultimately fired for reporting a crack in a pipe that was dangerously close to an ignition source, despite that other reports indicated he was one of the top-performing employees in his position. "They say it's your duty to come forward," he said of BP's official corporate policies, "but then when you do come forward, they screw you." In a more extreme example, in the 1990s a BP executive was involved in a scandalous scheme involving spies hired to track down a whistleblower who had leaked information about BP spills to the press.

230.    When Tony Hayward took office as CEO of BP p.l.c. in 2007, he pledged to change BP's culture with a renewed commitment to safety. Yet according to the Occupational Safety and Health Administration ("OSHA"), over the past three years – during which time BP was under Mr. Hayward's leadership – BP has committed 872 safety violations – most categorized by OSHA as "egregious willful" – a number made even more shocking when compared to BP's competitors, who average about five violations each. Two refineries owned by BP account for 97 percent of all "flagrant" violations found in the refining industry by government safety inspectors over the last three years. According to a former EPA lawyer involved in the Spill investigations, "none of the other super majors have an environmental criminal record like they do." BP's marginal ethics are well known to its competitors and others in the oil and gas industry, yet other companies – including Transocean – continue to work with BP closely and frequently.

231.    Like BP, Transocean's corporate culture is also skewed towards profits at the expense of safety, according to the results of the broad review of its North American operations made before the blowout. Transocean's system for tracking health and safety issues on the Deepwater Horizon was "counter-productive," according to nearly all the workers surveyed. Fake data entered into the program in order to circumvent it distorted the perception it gave of

safety on the vessel. Moreover, Transocean's entire fleet of drilling vessels bypassed certain vital safety systems as a matter of practice.

232.   Investigators also found that a stifling bureaucracy imposed by onshore management bred resentment among Transocean vessel workers. Workers complained that past problems were only investigated by the company in order to place blame, rather than to learn from the mistakes. Although workers often saw unsafe behavior at the rig many expressed fears of reprisals for reporting problems, especially to supervisors based in Houston. This tension between the vessel and the beach likely played a role in discouraging workers on Deepwater Horizon from reporting problems or anomalies like the abnormal negative pressure results to their supervisors onshore.

233.   As the Drilling Defendants internally prioritize profits over safety at every level of their companies, they continue to resist and evade regulation of the oil exploration and production industry. For example, despite the known vulnerabilities and shortcomings of BOPs in deep water drilling, this year BP helped finance a study to support their argument that BOP pressure tests should be required with less frequency – every 35 days rather than the current frequency of every 14 days. This change would save the industry $193 million per year in "lost productivity." BP has also actively opposed MMS rules requiring drilling vessel lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon disaster is a tragic example to the contrary.

234.   Decisions tradeoffs, actions, and inactions by the Drilling Defendants, including the risky well design, inadequately tested cement, tests that were skipped or misinterpreted, and procedures that deviated from industry norms, all contributed to the blowout of the Macondo well. At no time did any of the Drilling Defendants report regulatory violations to the authorities, or call to stop work because of unsafe decisions,

plans, actions, or conditions in the well or on the vessel. The carelessness, nonchalance, inexperience, and distraction of the Drilling Defendants resulted in insufficient well monitoring and overlooking the signs of an influx for 49 minutes prior to the blowout. Once the well blew out, the Drilling Defendants' poor vessel maintenance and intentional bypass of alarms and emergency systems contributed to the failure of safety mechanisms, exacerbated the disaster, and likely caused the unnecessary deaths and injuries of vessel workers, the destruction of the Deepwater Horizon and the Spill that damaged Plaintiffs. Underlying it all, the Drilling Defendants' corporate cultures of trading safety for speed, production, and profit, and encouraging their employees to do the same, sped the inevitable approach of catastrophe.

**N.    The Drilling Defendants Misrepresented The Severity Of The Spill And Its Response Capabilities**

235.   On the night of April 20, after the explosions ignited the vessel, the resulting fire on the Deepwater Horizon raged for two days before the vessel finally sank on April 22, 2010. On the sea surface, the Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot marine riser pipe. As the vessel sank to the seafloor, it dragged the riser down with it, bending and breaking the pipe before finally tearing away from it completely. Immediately, oil and natural gas began to escape from the open end of the riser and from at least two places along its twisted length.

236.   For 87 days, the surge of oil and gas from the gushing well continued unabated, and the Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Coastal Zone as it was driven landward by currents and winds. Once the oil reached the coasts, it damaged the pristine beaches and delicate wetlands, marshes, and estuaries that line the coasts of the Gulf States, destroying the habitats and spawning sites of marine life, as well as the tourism industry and property values in the Coastal Zone.

237.   From the outset, BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators

to be a fraction of its actual measured leakage amount of 50,000 barrels per day. An internal BP document release later showed that the company's analysis at that time actually determined that the rate of oil spillage could be as high as 100,000 barrels – or 4,200,000 gallons – per day. BP may have understated the Spill size because certain pollution-related fines against BP will ultimately be calculated based on the volume of oil and other pollutants spilled.

238.   BP's obstructionist behavior regarding accurate data continued as the Spill progressed; BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Spill, and resisted scientists' efforts to gauge the scope of the disaster on land and at sea.

239.   While BP was understating the severity of the Spill, it became clear that BP had previously overstated its ability to respond to a spill. In its initial EP, submitted prior to beginning work at Macondo, BP had assured the MMS that it could effectively contain any spill of up to 250,000 barrels of oil per day, using proven equipment and technology. In reality, BP was not prepared for an oil spill of any size. The spill-prevention plan BP had submitted to the MMS was an obvious cut-and-paste job that had not been updated to current conditions – not only did it reference Arctic wildlife not indigenous to the Gulf of Mexico, such as walrus, it also listed incorrect and out-of-date contact information for oil spill engineers and experts, including one wildlife expert who died in 2006.

240.   BP has now admitted that it did not actually have a response plan with proven equipment and technology in place to contain the Deepwater Horizon Spill and that its contingency plans were inadequate. Despite the constant risk of a spill at any one of its many Gulf of Mexico wells, BP did not have a realistic response plan, a containment barge, skimming vessels, a response crew, or recovery material like containment boom ready and available to deploy immediately in an emergency. On the contrary, the Spill response could

not begin until the U.S. Government, including the Coast Guard and the Navy, brought in skimmers, booms, and other materials, and volunteers were found to assist with the clean-up.

241.    On May 17, 2010, several U.S. Senators contacted U.S. Attorney General Eric Holder to request that the U.S. Department of Justice "open an inquiry into whether British Petroleum (BP) made false and misleading statements to the federal government regarding its ability to respond to oil spills in the Gulf of Mexico," noting:

> In the wake of the Deepwater Horizon oil spill, it does not in any way appear that there was "proven equipment and technology" to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico. Much of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis.

242.    Upon information and belief, BP also hindered efforts to kill the Macondo well and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP, after conferring with its Macondo lease partners – the Anadarko Defendants and MOEX Offshore – chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP, along with its lease partners, hoped to retap the Macondo well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier.

**O.    The Spill's Impact On Plaintiffs**

243.    All of the Plaintiffs have lost business income or lost jobs and/or wages as a proximate result of the Spill.

244.    Because of the Spill, roughly 6.9 million barrels of oil were discharged into the Gulf of Mexico, plus millions of gallons of chemical dispersants and other toxic pollutants. The oil, natural gas, chemical dispersants and other toxic pollutants have contaminated and continue to contaminate the Gulf of Mexico and the Coastal Zone.

245.    The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens.  Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life.  Upon information and belief, BP has analyzed and knows the exact concentrations of each of the toxic pollutants present in the oil coming from its wells.

246.    Moreover, the chemical dispersants used by BP during the Spill response may be harmful to the health of humans and marine life.  Over two million gallons of chemical dispersants were released into Gulf waters to disperse the oil coming from the damaged well.  According to environmental experts in the Deepwater Horizon Study Group, oil recovery (such as skimming) is preferable to chemical dispersion because recovery actually removes the oil from the environment, rather than simply spreading it through the water column and sinking it to the sea floor, where it can continue to cause environmental damage to the Gulf ecosystem – even if it is no longer causing public relations damage to BP.  The environmental effects of using chemical dispersants in such magnitude and at such depths have never been tested.

247.    The Spill and the resulting contamination of the Gulf of Mexico and the Coastal Zone impacted and continues to impact some Plaintiffs' abilities to collect and consume natural resources from the Gulf of Mexico and from the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and other waters of the Coastal Zone.  Among other damage, the Spill and the resulting contamination of the Gulf of Mexico and the Coastal Zone caused and

continues to cause subsistence losses to some Plaintiffs in that they rely on the marine life in the Gulf of Mexico and the Coastal Zone for food and bait to catch food. The marine life relied on by the Plaintiffs for food include, but may not be limited to, a wide variety of various types and species of fish, crabs, oysters and/or shrimp.

248.    The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico -- up to 88,552 square miles at the restriction's greatest extent. According to NOAA, surface-oriented marine life was most harmed by the early stages of the Spill, especially near-shore species and/or species that were spawning when the oil reached the shore. But as the crude oil weathered, sank, or was dispersed throughout the water column, reef and bottom-oriented fish (such as snappers and groupers) were also threatened. In November and December 2010, scientists found evidence that thick swaths of sunken oil bearing the unique hydrocarbon signature of the Macondo well are covering large areas of the seafloor in the Gulf, killing deep water coral reefs and sediment-dwelling organisms that play major roles at the base of the Gulf food chain. Moreover, as sunken and dispersed oil resurfaces, additional harm to marine ecosystems will occur and continue. As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

249.    Because of the size and nature of the surface oil slick, the subsurface oil plumes, and weathered oil on shorelines, and the toxic effects of the oil and other substances released during the Spill on humans, marine life, and the Coastal Zone environment, there have been and will continue to be further economic losses and diminution of property values to individuals and entities owning and/or leasing residential or investment properties in the Coastal Zone.

250.   Because investigations are ongoing, there are many other potential effects from the Spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint after additional information becomes available.

## CLAIMS FOR RELIEF

### I.   The Oil Pollution Act
### (Against BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO)

251.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

252.   The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

253.   The Coast Guard has named BP as the responsible party for the subsurface release of oil resulting from the Spill and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

254.   The United States District Court for the Southern District of Texas named Anadarko as a responsible party for the subsurface release of oil resulting from the Spill. Therefore, Anadarko is strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

255.   The Anadarko E&P and MOEX Offshore held a leasehold interest in the Macondo lease before and/or at the time of the Spill. Therefore, Anadarko E&P and MOEX Offshore are also responsible parties pursuant to Section 2701 (16) and (32) of the OPA. As such, they are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

256.   MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO.  Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the Macondo Prospect in the Mississippi Canyon Block 252, where the Macondo well is located, should be imputed to MOECO. MOECO is therefore a "responsible party" under OPA and liable to Plaintiffs for damages available under that statute.

257.   Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

258.   Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

259.   As a result of the Spill, Plaintiffs have not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below.

260.   As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of

earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

261.   As a result of the Spill, some Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[D]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

262.   Plaintiffs understand that filing a claim with the Gulf Coast Claims Facility (the "GCCF"), the Transition Coordinator or another person or entity as ordered by the United States District Court for the Eastern District of Louisiana and having that claim determined before filing their OPA claim may be a prerequisite to filing an OPA claim.   Plaintiffs that have not yet filed a claim with the GCCF (or other Court ordered administrator) or that have a claim pending with the GCCF (or other Court ordered administrator) are not asserting an OPA claim in this lawsuit at this time.   However, each such Plaintiff reserves the right to amend this Complaint to be included as part of this OPA cause of action if their currently pending (or soon to be filed) claim before the GCCF (or other Court ordered administrator)  is not satisfactorily resolved.   All other Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by having submitted their claims to the GCCF and/or BP and/or its agents or designees and/or some other Court ordered administrator more than 90 days prior to filing this lawsuit.

## II. Claims Under General Maritime Law

### A.   Negligence against all Defendants

263.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

264.   At all times material hereto, Drilling Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

265.   At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

266.   In addition, Cameron - as a designer, manufacturer, and/or supplier of the Deepwater Horizon's BOP and float collar - owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the design, manufacture and supply of the BOP and float collar.

267.   Anadarko, Anadarko E&P, and MOEX Offshore had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the Deepwater Horizon on April 20, 2010.  As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it.  Anadarko, Anadarko E&P, and MOEX Offshore breached their duties to Plaintiffs by failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action.

268.   Anadarko, Anadarko E&P, and MOEX Offshore were not the passive and unknowing investors that they have portrayed themselves to be in the worldwide media.  The Operating Agreement gave Anadarko, Anadarko E&P, and MOEX Offshore rights and information regarding the Macondo well that put them on actual or constructive notice of the potentially disastrous conditions at the well site.  Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to HSE information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko,

Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement. Failure to exercise this role given the known history of specific problems at the wellsite was negligence.

269. MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. Thus, all activities of MOEX Offshore and MOEX USA, including activities surrounding the leasehold interest in the Macondo Prospect, should be imputed to MOECO, rendering MOECO liable to Plaintiffs for negligence.

270. The existence and breach of these legal duties are established under the general maritime law.

271. Plaintiffs, as businesses or employees of businesses that are dependent upon the Gulf of Mexico's marine and coastal environments for their livelihood and income, were within an appreciable zone of risk and, as such, were obligated to protect them.

272. The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to Plaintiffs.

273. Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs and the Gulf of Mexico's marine and coastal environments and estuarine areas.

274.   Defendants were under a duty to exercise reasonable care while participating in drilling operations on the Deepwater Horizon to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

275.   Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Deepwater Horizon in an expeditious manner.

276.   Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs.

277.   Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiffs.

278.   Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout, and thereby breached duties owed to Plaintiffs.

279.   Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiffs.

280.   The conduct of the Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the Deepwater Horizon and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs. One or more of the Drilling Defendants violated these statutory standards.

281.   The violations of these statutory standards constitute negligence per se under Louisiana, Texas, Mississippi, Alabama, and the general maritime law.

282.   At all times material hereto the Deepwater Horizon was owned, navigated, manned, possessed, managed, and controlled by Transocean.

283.   As the owner and manager of the Deepwater Horizon, Transocean owed duties of care to Plaintiffs to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

284.   Transocean breached its duties to Plaintiffs by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shut-down systems, and BOP, and in disabling vital alarm systems on the Deepwater Horizon before the blowout.

285.   Transocean also breached its duties to Plaintiffs by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

286.   Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

287.   At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between Transocean and BP.  Together, Transocean and BP and other Drilling Defendants were responsible for design and well control.

288.   BP owed duties to Plaintiffs to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

289.   BP breached its duties to Plaintiffs by, *inter alia*:

(a)   choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

(b)   using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

(c)   using too few centralizers to ensure that the casing was centered into the wellbore;

(d)   failing to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

(e)   failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

(f)   cancelling the cement bond log test that would have determined the integrity of the cement job;

(g)   failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

(h)   using an abnormally large quantity of mixed and untested spacer fluid;

(i)   failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon;

(j)   requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore; and,

290.   All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiffs' injuries and damages.

291.    At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

292.    At all times material hereto, Halliburton owed duties to Plaintiffs to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well.

293.    Halliburton breached its duties to Plaintiffs by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Deepwater Horizon's well.  Halliburton was negligent by, *inter alia*, failing to use a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective; cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to Plaintiffs' injuries and damages.

294.    At all times material hereto, M-I was providing the drilling fluids or "mud" for the drilling operations onboard the Deepwater Horizon and was responsible for mud drilling, composition and monitoring, and for the provision of "spacer" solution.

295.    At all times material hereto, M-I owed duties of care to Plaintiffs to, *inter alia*, exercise reasonable care in providing, controlling and monitoring the mud and spacer solutions used on the Deepwater Horizon.

296.   M-I breached its duties to Plaintiffs by, *inter alia*, failing to provide, control, and monitor the mud and spacer solutions used on the Deepwater Horizon in a reasonably safe manner, proximately causing and/or contributing to Plaintiffs' injuries and damages.

297.   At all times relevant hereto, Cameron designed, manufactured and supplied the BOP that was, at all times relevant herein, appurtenant to and a part of the vessel's equipment.

298.   Cameron owed duties to Plaintiffs to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture and supply of the BOP for the Deepwater Horizon.

299.   Cameron breached its duties to Plaintiffs by failing to exercise reasonable care in the design, manufacture and supply of the BOP such that it failed to operate to prevent the blowout, thereby proximately causing and/or contributing to Plaintiffs' injuries and damages.

300.   Cameron breached its duties to Plaintiffs by, *inter alia*, failing to ensure and verify that the BOP it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would foreseeably be used during the Deepwater Horizon's drilling and exploration operations; designing the BOP such that it was vulnerable to a single-point failure; failing to install a backup activation system for the BOP; and failing to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

301.   In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiffs were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the

Defendants satisfied the duty of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

302.   In addition to the foregoing acts of negligence, Plaintiffs aver that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

(a)   Failing to properly operate the Deepwater Horizon;

(b)   Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

(c)   Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

(d)   Acting in a careless and negligent manner without due regard for the safety of others;

(e)   Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

(f)   Operating the Deepwater Horizon with untrained and unlicensed personnel;

(g)   Negligently hiring, retaining and/or training personnel;

(h)   Failing to take appropriate action to avoid or mitigate the accident;

(i)   Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(j)   Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

(k)   Failing to warn in a timely manner;

(l)   Failing to timely bring the oil release under control;

(m)   Failing to provide appropriate accident prevention equipment;

(n)   Failing to observe and read gauges that would have indicated excessive pressures in the well;

(o)   Failing to react to danger signs; and

(p)  Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

303.  Plaintiffs are entitled to a judgment finding Defendants liable, jointly, severally, and solidarily, to Plaintiffs for damages suffered as a result of Defendants' negligence and awarding Plaintiffs adequate compensation therefor in amounts determined by the trier of fact.

304.  The injuries to Plaintiffs were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

305.  As a direct and proximate result of Defendants' acts and/or omissions, the Commercial Fishermen Plaintiffs have suffered , *inter alia*, damages resulting from the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including the loss of their livelihoods which directly depend upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico, loss of income, loss of the right of use of the Gulf of Mexico, and Louisiana, Texas, Mississippi and Alabama saltwater areas, and costs associated and inconvenience sustained as a result of the closure and pollution of the Gulf water areas.

306.  As a direct and proximate result of Defendants' acts and/or omissions, the Processing and Distributing Plaintiffs have suffered, *inter alia*, damages associated and inconvenience sustained by the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways including loss of their livelihood which directly depend upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico.

307.  As a direct and proximate result of Defendants' acts and/or omissions, the Commercial Business Plaintiffs have suffered, *inter alia*, damages associated with a loss of income and inconvenience due to the inability to conduct offshore oil exploration and other activities.

308.   As a direct and proximate result of Defendants' acts and/or omissions, the Recreational Business Plaintiffs have suffered, *inter alia*, damages associated with a loss of income and inconvenience due to their inability, and the inability of their customers and clients, to use the Gulf of Mexico and the Coastal Zone for recreational purposes.

309.   As a direct and proximate result of Defendants' acts and/or omissions, the Recreation Plaintiffs have suffered, *inter alia*, damages associated with loss of deposits for vacation rentals, and loss of enjoyment of life from the inability to use the Gulf of Mexico and the Coastal Zone for recreation and amusement purposes.

310.   As a direct and proximate result of Defendants' acts and/or omissions, the Plant and Dock Worker Plaintiffs have suffered, *inter alia*, damages associated with loss of income due to the inability of fishermen and other seamen to use the Gulf of Mexico for commercial purposes, and inconvenience caused by the closure of the Gulf water areas, harbors, marinas, boat launches and waterways.

311.   As a direct and proximate result of the Defendants' acts and/or omissions, the Retail Business Plaintiffs have suffered damages including, *inter alia,* loss of income, loss of profits and loss of business resulting from the Spill.

312.   As a direct and proximate result of Defendants' acts and/or omissions, the Subsistence Plaintiffs have suffered damages including, *inter alia,* loss of income, loss of profits, and loss of use, due to the inability to use the natural resources of the Gulf of Mexico for their income and subsistence.

313.   As a direct and proximate result of Defendants' acts and/or omissions, the Moratorium Plaintiffs have suffered damages, including *inter alia,* the loss of their livelihoods, business, income, and profits caused by the moratorium placed on deep water drilling in the Gulf of Mexico by the Department of Interior on May 28, 2010 in response to the Spill.

**B.     Gross Negligence And Willful Misconduct Against The Drilling Defendants And Cameron**

314.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

315.    Drilling Defendants and Cameron owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Spill.  The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

316.    Drilling Defendants and Cameron breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

317.    Drilling Defendants and Cameron knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

318.    Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, disabling the gas alarm system aboard the Deepwater Horizon.

319.    BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources

would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

320.   BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

321.   BP, Transocean, and M-I acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

322.   BP, Transocean, and Cameron acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the Deepwater Horizon.

C.     **Strict Liability For Manufacturing And/Or Design Defect Against Cameron**

323.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

324.   Plaintiffs are entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the Deepwater Horizon, pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

325.   At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the Deepwater Horizon.

326.   If operating as intended on the night of the disaster, the BOP could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity and thereby sparing Plaintiffs millions of dollars in losses and damage.

327.   Cameron sold and delivered the BOP at the Deepwater Horizon to Defendant Transocean in 2001.

328.   Cameron's BOP failed to operate properly or at all, at the time of or following the blowout, and this failure caused and/or contributed to the Spill.

329.   Cameron failed to effectively design the BOP with a backup activation system, or provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP.

330.   The BOP was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the BOP, which rendered the BOP abnormally dangerous. For instance, all of the emergency methods for closing the BOP provide different ways of closing a single blind shear ram, which must seal to isolate the wellbore. As such, if the blind shear ram fails to operate for any reason, there is nothing the BOP can do to seal the well. In addition, all emergency methods of operating the BOP, other than the auto-shear and ROV hot stab, rely on an operational control pod which, if not functioning, renders those methods useless.

331.   In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that

if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with the BOP.

332.   Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades.  If the shuttle valve fails, the blind shear ram will be unable to seal the well.

333.   Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

334.   Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

335.   Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when it left Cameron's control.

336.   At all times, Cameron's BOP was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

337.   At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to Plaintiffs in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

   (a)   Inadequate, faulty, nonfunctioning and defective battery systems;

   (b)   Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

   (c)   The absence of acoustic triggers;

   (d)   Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

   (e)   Improperly sealed, leaky hydraulic systems;

(f)   Improperly designed, manufactured, and installed annular seals;

(g)   Insufficiently robust blind shear rams;

(h)   Insufficient warnings, instructions, and guidelines on permissible,
      foreseeable uses and modifications to the BOP and its component parts;

(i)   Insufficient testing and design verification of the BOP and its component
      parts to ensure the shearing capability of the ram and other functioning of the
      BOP during reasonably foreseeable uses; and

(j)   In such other particulars as the evidence may show.

338.   At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

339.   At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the BOP.

340.   At all relevant times, the BOP appurtenant to the Deepwater Horizon was used in an intended and/or reasonably foreseeable manner.

341.   Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's BOP.

342.   Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and/or inactions were grossly negligent, reckless, willful, and/or wanton.

343.   As a result of the defective design and/or manufacture of the BOP, Plaintiffs have suffered damage to or diminution of the value of their property, loss of income, loss of

business, inconvenience and/or loss of valuable resources, for which they are entitled to actual and compensatory damages.

344.    In the alternative to the foregoing claim arising under the general maritime law against Cameron for its defective design and/or manufacture of the BOP, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine.

### III. Punitive Damages Under All Claims
### (Against BP, Transocean, and Halliburton)

345.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

346.    Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

347.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

348.   BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

349.   Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

350.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

351.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

352.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

353.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

354.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly

dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

355.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

356.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

357.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

358.   BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

359.   BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

360.   BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

361.   BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

362.   BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

363.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

364.   Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

    (a)  failed to properly maintain and/or operate the Deepwater Horizon;

    (b)  operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

    (c)  ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

    (d)  failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

    (e)  violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

    (f)  failed to take appropriate action to avoid or mitigate the accident;

(g)  failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)  failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

(i)  failed to provide appropriate disaster prevention equipment;

(j)  failed to have an appropriate emergency spill response plan or readily available spill response equipment.

365.  Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

366.  Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally for the following:

(a)  economic and compensatory damages in amounts to be determined at trial;

(b)  punitive damages;

(c)  pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d)    attorneys' fees and costs of litigation;

(e)    Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Dated: April 17, 2012

Respectfully submitted,

THE MILLS LAW FIRM,

By: _____

Bradley W. Hoover
State Bar No. 09965700
11000 Brittmoore Park Dr., Ste 200
Houston, TX 77041
(713) 893-4581
(888) 313-1507 (Fax)

ATTORNEY-IN-CHARGE
FOR PLAINTIFF

OF COUNSEL:

THE MILLS LAW FIRM
Michael A. ("Mickey") Mills
11000 Brittmoore Park Dr., Ste 200
Houston, TX 77041
(713) 893-4581
(888) 313-1507 (Fax)

EXHIBIT  A

1.  Jeffery Alan Bilquist – Louisiana
2.  Vongkhamchanh K. Phrasavath – Alabama
3.  Dam Neel Saythongkham – Alabama
4.  Manthong Southammavong – Alabama
5.  Donald Bench – Texas
6.  Ronald Waltman – Mississippi
7.  Rodney Durden – Mississippi
8.  Joseph Nelson Henry, Jr. – Texas
9.  Stephen J. Simmerly – Louisiana
10. Gary Trice – Alabama
11. Horizon Developments of Kenner LLC – Louisiana
12. Lawnscapes Horticultural Services Inc. – Louisiana
13. Linda M. Lewis, individually, and as the sole heir to the Estate of Victor A. Lewis - Texas
14. Darrell Jones – Texas
15. Lai Tran Robinson – Alabama
16. Tucker Charter, Inc. - Texas
17. James Tucker - Texas
18. Roy Thomas Waldon, Jr. – Texas
19. David Boriboon – Alabama
20. Tommy Lee Harris – Texas
21. Tony Nguyen – Louisiana
22. George Powe, Jr. – Mississippi
23. Irving Sanders, Jr. – Alabama
24. Peter Sisounthone – Alabama
25. James A. Carter, individually and d/b/a Carter's Freight & Delivery Service – Texas
26. Lawrence S. Ferree – Texas
27. David Gaston, individually and d/b/a/ Peninsula Charter – Texas
28. George E. Sims, III – Texas
29. Jason T. Reuter d/b/a/ Aunt Margies Bait Camp - Texas
30. Daryl W. Doty - Texas
31. David W. Jones – Mississippi
32. Sayanh Luang Phaphakdy – Alabama
33. Travis Tucker d/b/a/ Tucker & Son Bait & Fishing Tackle – Texas
34. Gerald T. Blair, individually and d/b/a/ Smith Point Guide Service – Texas
35. Claude W. Phillips, individually and d/b/a/ Hook and Reel Guide Service – Texas
36. Phone Phommalinh - Alabama
37. Aaron M. Keller – Louisiana
38. Phu N. Ngoc Nguyen – Mississippi
39. Pattanapong Nola - Alabama
40. Keith Eugene Phillips – Texas
41. Mickey Lee Roberts – Texas
42. James Rusk – Texas
43. William Eugene Schottelkotte – Texas
44. Alvin L. Babcock, III, individually and d/b/a/ Galveston Boat Service - Texas

45. Gordon R. Hinds – Texas
46. Sarah Davis – Mississippi
47. Jon Sirmons  - Texas
48. Ernest L. Sirmons – Texas
49. Linda Linkinhoker – Texas
50. Gary Gibson – Texas
51. Kenneth F. Demoran – Louisiana
52. Keith Demoran – Louisiana
53. Sabrey Boudreaux – Texas
54. James Michael Blevins – Texas
55. Linda D. Witt – Texas
56. Gerritt Kendall Klay – Texas
57. Gary W. Grant – Texas
58. Chad Buckley, individually and d/b/a Buckley's Home Improvement – Louisiana
59. Pamela Buckley - Louisiana
60. James Robert Bates d/b/a/ American Seafood - Texas
61. Raymond Charles Whitehead – Texas
62. Bobby Bruce Henry – Texas
63. Montra R. Moore – Texas
64. Chad W. Campbell – Texas
65. Frederic A. Frere, IV – Texas
66. Derrick Greene – Texas
67. Elbert Sirmons – Texas
68. Andy D. McGallion - Texas

Case 4:12-cv-01164   Document 1-2   Filed in TXSD on 04/17/12   Page 1 of 1

%JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
George "Ray" Simmons, et al.

**DEFENDANTS**
BP p.l.c.

(b) County of Residence of First Listed Plaintiff   Liberty County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Foreign
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Bradley W. Hoover, The Mills Law Firm, 11000 Brittmoore Park Drive, Suite 200, Houston, TX  77041 (713)893-4581

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
33 U.S.C. 2702, et seq.
Brief description of cause:
Damages for a claim under the Oil Pollution Act of 1990

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  Carl J. Barbier
DOCKET NUMBER  MDL 2017 (E. . LA)

DATE
04/17/2012

SIGNATURE OF ATTORNEY OF RECORD
/s/ Bradley W. Hoover

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE