UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

.

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * MDL NO. 2179 <br> * <br> * SECTION J <br> * <br> * <br> * JUDGE BARBIER |
| **THIS PLEADING APPLIES TO:** <br> No. 12-311 | * MAG. JUDGE SHUSHAN <br> * <br> * **JURY TRIAL DEMANDED** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AMENDED COMPLAINT
## OF CAMERON INTERNATIONAL CORPORATION

Cameron International Corporation (hereinafter "Plaintiff" or "Cameron"), by its undersigned attorneys, hereby brings this action against Liberty Insurance Underwriters Inc. (hereinafter "Defendant" or "Liberty") to recover damages and other appropriate relief for Liberty's bad faith breach of its contract to provide insurance to Cameron following the Gulf oil spill disaster.  Cameron alleges, upon knowledge as to its own actions and otherwise upon information and belief, as follows:

### NATURE OF THE ACTION

1.      This action arises from Liberty's calculated decision to disregard its obligations to provide insurance to Cameron in connection with hundreds of lawsuits arising from the Gulf oil spill.

2.      On December 12, 2011, Cameron reached a favorable tentative settlement with BP that would largely eliminate Cameron's exposure and make an additional $250 million available to the victims of the disaster.  Cameron relied upon its insurers, including Liberty, to

1091252v1

pay their shares of insurance Cameron bought from them.  All of Cameron's other insurers paid, but not Liberty.  When Cameron needed it the most, Liberty refused to provide Cameron the $50 million in insurance limits it sold Cameron.  Instead, Liberty offered Cameron a choice: either continue the Gulf oil spill litigation and face potentially crippling liability, or agree to accept tens of millions of dollars less than what Liberty was contractually obligated to pay under its insurance policy.  Liberty's manifest objective was to put Cameron between a rock and a hard place, holding a hugely important settlement with BP hostage for its own financial gain.

3.     Cameron rejected this dangerous game and reached into its own pocket to settle because it was the right thing to do for its shareholders and the victims of the Gulf disaster. Cameron now brings this action to seek redress for Liberty's blatant and bad faith breach of its contractual obligations to pay Cameron $50 million in insurance limits, and for a declaration that Liberty's policy obligates Liberty to pay for Cameron's defense expenses going forward in addition to those insurance limits.

## PARTIES

4.     Cameron International Corporation is a corporation organized under the laws of the State of Delaware.  Cameron's principal place of business is located at 1333 West Loop South, Suite 1700, Houston, Texas 77027.

5.     Liberty Insurance Underwriters Inc. is a corporation organized under the laws of the State of Illinois.  Liberty is also known as Liberty International Underwriters. Liberty's principal place of business is in Boston, Massachusetts.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that plaintiff and defendant are citizens of different states and the amount in

1091252v1

controversy exceeds $75,000, exclusive of interest and costs.  Plaintiff is a citizen of Delaware and Texas, and Defendant is a citizen of Illinois and Massachusetts.

7.    Venue is proper in this District because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.  This action arises from losses incurred in connection with In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 10-2179 (the "Oil Spill MDL"), which is currently pending in this District, and settlement negotiations relating to the Oil Spill MDL, which were conducted in this District.  Upon information and belief, Defendant also conducts business in this District and is licensed to do business in this State.

8.    On February 22, 2012, Liberty waived service of process and accepted service of the Complaint.

## FACTUAL ALLEGATIONS

### The Liberty Insurance Policy

9.    Cameron supplies equipment, systems and services to the worldwide oil, gas and process industries.  Among other things, Cameron works with drilling contractors, oil and gas producers, pipeline operators, refiners and other process owners to control, direct, adjust, process, measure and compress oil and gas pressures and flows.

10.    Due to the nature of Cameron's business, Cameron faces many significant risks.  Oil and gas exploration can be dangerous, and blowouts or other accidents can result in lawsuits and potential liability.  To protect against such liability, Cameron, like most responsible companies, purchases insurance from the world's largest insurance companies.

11.    Liberty is one such insurance company.  On its website, Liberty holds itself out as an insurance company willing to provide "tailor-made coverage" capable of meeting

1091252v1

"virtually any underwriting need you have."  Liberty also touts its "risk management and loss prevention expertise" and its "world-renowned skillfulness in claims management."

12.     From July 2006 through the present, Cameron purchased from Liberty excess liability insurance – that is, insurance coverage that is available for large losses once the limits of underlying insurance policies have been reached.  For the policy period from July 1, 2009 to July 1, 2010, Cameron purchased Policy Number LQ1B71198583046 (the "Liberty Insurance Policy") from Liberty.

13.     Under the Liberty Insurance Policy, Liberty agreed to provide excess casualty insurance coverage to Cameron in the amount of $50 million if Cameron suffered a "Loss," which was defined as "those sums which you are legally obligated to pay as damages, after making proper deductions for all recoveries and salvage, which damages are covered by the First Underlying Insurance Policy."  Liberty further promised Cameron that, "[w]hen the amount of 'loss' has finally been determined, we will promptly pay on your behalf the amount of 'loss' covered under this policy."

14.     The Liberty Insurance Policy was part of a "tower" of insurance that Cameron had purchased to protect against loss.  The tower of insurance below the Liberty Insurance Policy consisted of (i) a primary insurance policy in the amount of $3 million issued by Liberty Mutual (an affiliate of Liberty), and (ii) $100 million in excess casualty insurance provided in three "layers" by Illinois National Insurance Company ("INIC") ($25 million), ACE American Insurance Company ("ACE American") ($25 million), and XL Insurance Company Limited ("XL Insurance") ($50 million).  In the "Limits of Liability" section of the Liberty Insurance Policy, the Policy states that it applies "excess of the Underlying Insurance," which is defined to include only the INIC, ACE American, and XL Insurance policies.

15.     In addition to promising to provide $50 million in insurance coverage for losses in excess of $103 million, Liberty also promised to cover any defense expenses that Cameron incurred after the three layers of insurance below it were exhausted until the Liberty Insurance Policy was exhausted.  By its terms, the coverage afforded by the Liberty Insurance Policy is subject to the same "terms and conditions" as the first underlying INIC policy referenced above, which expressly states that "Defense Expenses will be in addition to the applicable Limits of Insurance of this policy."  Therefore, until Liberty has paid its full $50 million in indemnity payments, the Liberty Insurance Policy covers Cameron's defense expenses, and those defense expenses are in addition to, and do not erode, the $50 million in insurance limits promised by Liberty.

16.     Cameron also purchased insurance from other carriers to provide additional insurance in the event that Liberty's insurance policy limits were exhausted.  Those carriers include Chubb Atlantic Indemnity Limited, XL Insurance (Bermuda) Ltd., AIG Excess Liability Insurance International Limited, Iron-Starr Excess Agency Ltd., Argo Re Ltd., and ACE Bermuda Insurance Ltd.  The policies of some of those insurers contained provisions pursuant to which they would be entitled to any limitations on coverage contained in policies that were "lower" in the insurance tower, including the Liberty Insurance Policy.

**The Deepwater Horizon Incident**

17.     In March 2008, BP acquired a lease from the Minerals Management Service of the U.S. Department of Interior to drill a well in the subsea of the Outer Continental Shelf in Mississippi Canyon Block 252, thousands of feet below the surface of the water in the Gulf of Mexico.  In October 2009, BP began drilling what it named the Macondo Prospect with a Transocean drilling unit, the *Marianas*.  The *Marianas* was subsequently damaged in a storm and

had to cease drilling operations for repairs.  (As used herein, "BP" shall refer to BP America Company, BP Production & Exploration, Inc. and their affiliates or predecessors, and "Transocean" shall refer to Transocean Holdings LLC and its affiliates or predecessors.)

18.    On January 31, 2010, the *Deepwater Horizon* Mobile Offshore Drilling Unit ("Deepwater Horizon") arrived at the site to conduct further drilling of the Macondo Prospect pursuant to the terms of a Drilling Contract between BP and Transocean (the "Drilling Contract").   Pursuant to the Drilling Contract, BP leased the Deepwater Horizon from Transocean, the Deepwater Horizon's owner and operator, and hired Transocean to drill the well.

19.    The Drilling Contract also specified that the Deepwater Horizon was to employ a device commonly referred to as a blowout preventer.  Cameron manufactures blowout preventers and, in 1999, entered into an agreement to sell blowout preventer equipment to Transocean.  That sale and Cameron's subsequent service for the blowout preventer equipment are governed by the written Terms and Conditions of two equipment purchase orders ("T&C") and a written Master Service Agreement between Cameron and Transocean ("MSA").   A Cameron-manufactured blowout preventer was installed on the Deepwater Horizon oil rig and was owned and used by Transocean in the drilling operations at the Macondo Prospect.

20.    On April 20, 2010, while BP and Transocean neared completion of one of the final stages of operations before moving the Deepwater Horizon to another location, hydrocarbons rose through the well into the riser and to the surface.  Explosions followed, igniting the Deepwater Horizon, which ultimately sank.  Eleven people were killed in the incident and others were injured.

1091252v1

21.     By September 19, 2010, when final relief well "kill" operations were complete, the well had released millions of barrels of oil into the Gulf.  The consequences of the oil spill are far reaching, affecting millions of people and costing billions of dollars to clean up.

**The Deepwater Horizon Incident Exposed Cameron To Potentially Crippling Liability Covered By The Liberty Insurance Policy**

22.     Shortly after the Deepwater Horizon incident, a tidal wave of lawsuits was filed against Cameron (among others) and ultimately consolidated before Judge Carl J. Barbier in the Eastern District of Louisiana.  The Oil Spill MDL, which involves over 100,000 individual claimants, names as defendants Cameron, BP, Transocean, Halliburton Energy Services, Inc., and other Deepwater Horizon contractors.  Plaintiffs seek, among other things, recovery of lost revenue and wrongful death, environmental, personal, and property damages.

23.     The lawsuits against Cameron generally fall into four categories: (1) personal injury and wrongful death actions brought by Deepwater Horizon crewmembers and their survivors; (2) individual and class action suits seeking to recover economic, compensatory, and natural resource damages allegedly caused by the release of oil into the Gulf; (3) shareholder derivative lawsuits; and (4) cross-claims by other defendants, including BP, asserting claims, among other things, for damages and contribution.

24.     By all accounts, the damages arising from the Deepwater Horizon incident total in the tens of billions of dollars.  If Cameron were held responsible for even a small fraction of that amount, its liability could have run into the billions of dollars.

25.     Cameron's potential liability arising from the Deepwater Horizon incident is covered by the insurance policies that constitute the insurance "tower" described above, including the Liberty Insurance Policy.  Cameron purchased insurance from Liberty to cover exactly the type of liability arising from the Deepwater Horizon incident and expected that

Liberty would honor its contractual obligations under the Liberty Insurance Policy.  As discussed below, however, even though Cameron took care to satisfy fully all of its contractual duties, Liberty has denied coverage in callous disregard for Cameron and bad faith breach of its obligations under the Liberty Insurance Policy.

**Cameron Diligently Performed All Its Obligations
Under The Liberty Insurance Policy**

26.    On or about April 23, 2010, Cameron gave notice to Liberty that it had incurred potential liability arising from the Deepwater Horizon incident that could result in a "loss" under the Liberty Insurance Policy.

27.    At all relevant times, Cameron fully complied with all of its obligations under the Liberty Insurance Policy, including by assisting Liberty with its investigation of the potential exposure and by keeping Liberty apprised of developments in the Oil Spill MDL.

28.    As an initial matter, to aid in Liberty's investigation, Cameron supplied Liberty with information about the blowout preventer that gave rise to its potential liability. Cameron provided various documents and other materials relating to the blowout preventer, sent the relevant contractual agreements governing its use in connection with the Deepwater Horizon, and made itself available to answer numerous queries from Liberty.

29.    For example, on or about July 13, 2010, Cameron met with Jeffrey Roberts, the member of Liberty's claims department handling Cameron's claim, to discuss the blowout preventer and the facts giving rise to the claims against Cameron.  During that meeting, Cameron covered a variety of topics at Liberty's request, including whether the blowout preventer was pressure tested for the depths at which it was used, what maintenance had been performed on the blowout preventer used on the Deepwater Horizon, what modifications were

1091252v1

made by BP and/or Transocean to the blowout preventer, and who requested and made any such design changes.  Mr. Roberts thanked Cameron for its cooperation.

30.     Cameron also kept Liberty apprised of all relevant aspects of the litigation. Liberty was sent copies of pleadings, given regular reports, and consulted on strategic decisions. For example, as recently as December 9, 2011, Cameron provided Liberty's counsel with drafts of Cameron's reply briefs in connection with motions for summary judgment.  Liberty's counsel provided Cameron with detailed comments, which Cameron carefully considered and, where possible, incorporated into the briefs that were filed.

31.     Moreover, when it was time to discuss the possibility of settlement with BP, Liberty's counsel was intimately involved in the process.  Cameron sent Liberty's counsel draft settlement agreements and requested comments before transmitting them to BP.  Cameron provided regular reports on the progress of negotiations.   Cameron took suggestions from Liberty's counsel, such as what arguments to raise with BP during negotiations.  Cameron even took Liberty's counsel's recommendation that Cameron ask Magistrate Judge Shushan, who had been assigned by Judge Barbier as a court-ordered mediator of disputes arising out of the Oil Spill MDL, to mediate the dispute with BP.

32.     Based on this seemingly cooperative relationship, which Cameron devoted substantial time and energy to cultivate over the previous 18 months, Cameron was led to believe that it and Liberty were on the same side and that Liberty would actually provide the coverage that was clearly owed under the Liberty Insurance Policy.

**Cameron's Contractual Indemnification Claim**
**Against Transocean**

33.     The T&C and MSA contain indemnification provisions pursuant to which Transocean was to indemnify Cameron for certain liabilities in certain circumstances.  After the

1091252v1

Gulf oil spill, however, Transocean refused to indemnify Cameron for pollution and other related liabilities.   When BP and Cameron settled their lawsuit on December 16, 2011, no such indemnification was provided to Cameron.

34.   The T&C between Cameron and Transocean contains two indemnities. First, the T&C contains a reciprocal or "knock for knock" indemnity pursuant to which, per industry custom, Cameron and Transocean agreed to indemnify each other for claims brought against the other by their own employees for personal injury, death and property damage:

> The Purchaser [Transocean] shall be liable and shall defend, release, indemnify and hold harmless . . . Seller [Cameron] Group . . . from and against any and all claims . . . for injury to or death of any member of the Purchaser Group or for damage to or loss of property owned or leased by the Purchaser Group which injury, illness, damage or loss arises out of or is incident to the Operations REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, SELLER'S SOLE, JOINT AND/OR SEVERAL NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY, UNSEAWORTHINESS OR ANY VESSEL, OR OTHER LEGAL RESPONSIBILITY OF SELLER.

Second, the T&C provides the following clause with respect to liabilities arising from pollution and other damages associated with a blowout:

> In the event that Purchaser [Transocean] is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Purchaser will provide Seller [Cameron] with the benefit of such indemnity to the fullest extent possible.

35.   Cameron's MSA with Transocean also contains knock-for-knock indemnities similar to those in the T&C.  The MSA, like the T&C, further provides:

> Transocean agrees that if Transocean is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Transocean will provide Contractor with the benefit of such indemnity to the fullest extent possible.

1091252v1

36.     In the Oil Spill MDL, Cameron sought to enforce both of the above indemnities against Transocean.   Under the "knock-for-knock" provisions, Cameron sought indemnity for claims brought against Cameron by Transocean employees for personal injury, death and property damage.  Transocean honored this clear indemnity.

37.     Transocean has vigorously denied and continues to deny that it has any obligation to indemnify Cameron for pollution and related claims.  Not only did Transocean dispute that it owed Cameron any indemnity, but Transocean also sued Cameron for damages and a declaration that it owed no indemnity.  On April 20, 2011, Cameron counterclaimed for indemnification.

38.     Because Transocean rejected Cameron's requests for indemnity and challenged them in court, Cameron had no indemnity from Transocean at the time of its settlement with BP.  Cameron's only protection for the Deepwater Horizon incident was the tower of insurance that it had purchased, including the Liberty Insurance Policy.

**Liberty Denied Insurance Coverage To Cameron In Bad Faith**
**And In Clear Violation Of Liberty's Contractual Obligations**

39.     Cameron vigorously defended the Oil Spill MDL for over a year, but in the end knew that a settlement was the best option.  If Cameron were assigned even ten percent of the blame for the incident, it could be liable for billions of dollars.  As a result, Cameron, with the knowledge and consent of its insurers, including Liberty, began negotiating with BP to try to reach a settlement pursuant to which BP would provide Cameron a near-global release and indemnification for any future losses arising out of the Deepwater Horizon incident.

40.     Cameron depended on its insurers, including Liberty, to fund any potential settlement with BP.  Having kept its insurers informed and involved throughout the litigation and

1091252v1

settlement process, Cameron expected its insurers to honor their obligations and provide the required insurance coverage.

41.     In utter disregard of the substantial danger Cameron faced if it did not settle with BP, Liberty, through its counsel, insisted that Cameron make low-ball offers to BP. Notwithstanding that it became obvious that it could take tens, if not hundreds, of millions of dollars to settle with BP, Liberty, through its counsel, told Cameron it should not settle for more than $10 million.  Liberty's counsel took this position because he knew that Liberty and other insurers in the tower whom he represented would have to pay if Cameron settled for a larger amount.  Liberty, for example, would have to pay if the settlement exceeded $103 million. Accordingly, at the risk of scuttling Cameron's negotiations with BP, Liberty, through its counsel, urged Cameron to keep its offers to BP impossibly low.

42.     BP also made clear that it would not settle with Cameron unless (i) Cameron agreed to a complete waiver of any contractual indemnification claims Cameron might have against Transocean that might flow to BP, and (ii) Cameron's insurers agreed to waive their subrogation rights.  Those terms were essential to any settlement because BP would not settle if there were a possibility that BP would be responsible either to Transocean for a judgment obtained by Cameron, or to Cameron's insurers as subrogees of Cameron, for the very amount paid to settle the action.  If that were the case, the settlement would have little value to BP.  This was a distinct possibility because Transocean was entitled to look to BP under indemnification provisions in the contracts between those parties.  Accordingly, absent a waiver of Cameron's and its insurers' potential claims against Transocean, the settlement payment could be circular, as depicted by the following:

1091252v1



(1) BP receives a settlement payment from Cameron

(2) Cameron/Insurer Subrogee seeks indemnity from Transocean pursuant to the MSA and/or T&C

(3) Transocean than seeks Indemnity from BP pursuant to the Drilling Contract

43.     Notwithstanding Liberty's knowledge that BP would not settle with Cameron unless claims against Transocean were waived, Liberty refused to agree that Cameron could waive them, thereby placing negotiations with BP at great risk.

44.     BP and Cameron held several rounds of settlement negotiations, most recently on Monday, December 12, 2011.  As noted above, at Liberty's counsel's request, Cameron suggested that the parties enlist the assistance of Magistrate Judge Shushan for that meeting.

45.     The week of December 12 was significant because Judge Barbier had scheduled oral argument for Friday, December 16, on the parties' cross-motions for summary

judgment on their indemnification claims.  As the parties recognized and Cameron's insurers, including Liberty, were told, a ruling from the bench, or even comments made by the Court during argument concerning the validity of the Transocean indemnity, could easily tip the precarious balance that BP and Cameron were trying to strike and eliminate any chance of settlement or result in substantially higher settlement demands on Cameron – an outcome that would have been potentially disastrous for Cameron.

46.     The mediation before Magistrate Shushan resulted in an agreement in principle between Cameron and BP.  On December 12, 2011, Cameron reported to its insurers that it had reached a tentative agreement with BP to settle the case for $250 million, well within its total insurance coverage and at a small fraction of its potential liability, in exchange for a full release and an agreement by BP to indemnify Cameron against future losses arising from the Deepwater Horizon incident (except for fines, penalties, and punitive damages directly imposed on Cameron).  As a condition of the settlement, and for the reasons discussed above, BP insisted that Cameron's insurers waive any subrogation rights and that Cameron waive any indemnification rights it might have against Transocean.

47.     Over the next few days, Cameron secured the approval to those conditions of all of its insurers except Liberty.  Liberty, which only weeks earlier told Cameron it should not settle for more than $10 million, conceded that the $250 million settlement amount was reasonable.  Nevertheless, Liberty told Cameron it would not pay any money under the Liberty Insurance Policy.

48.     On December 14, 2011, BP, growing increasingly impatient, told Cameron that its settlement demand might increase significantly in the event a settlement could not be reached by the end of that day.  Even then Liberty would not relent.  Knowing full well

-14-

that BP would not settle with Cameron unless Cameron and its insurers waived their rights against Transocean, Liberty refused to consent to those terms unless Cameron agreed to a steep discount off Liberty's $50 million obligation to Cameron.   In short, Liberty held the entire settlement – and Cameron's future – as hostage for a ransom in the form of a big discount off its $50 million limit.

49.     Liberty also concocted another purported justification for refusing to pay Cameron.  In a letter dated November 7, 2011, over eighteen months after Cameron provided Liberty with notice of the Deepwater Horizon claim, Liberty's counsel informed Cameron that pursuant to an "Other Insurance" provision in the Liberty Insurance Policy, "[Liberty] has no obligation to indemnify unless both underlying limits and Transocean's contractual indemnity to Cameron have been exhausted.  At the present time, such exhaustion never happened."

50.     The "Other Insurance" provision states:  "If other insurance applies to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance."  The Liberty Insurance Policy defines "Other Insurance" to include "any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities."  "Other insurance" clauses define methods of contribution among insurers and are irrelevant to a policy's attachment point, which is defined by the Schedule of Underlying Insurance and Limits of Liability provisions, neither of which includes contractual indemnities.

51.     Liberty's reliance on the "Other Insurance" provision is plainly pretextual.  No other insurance, even broadly defined, was available to cover the loss that Cameron had incurred.   While Cameron had a claim against Transocean for contractual indemnification, serious issues had been raised as to whether Cameron would actually receive indemnification.  Indeed, Transocean had already refused to fund Cameron's legal liabilities, rejected Cameron's

-15-

indemnification claims, and vigorously contested them in court.  Importantly, as Liberty knew, BP made the release of that claim part of its settlement expressly because BP might ultimately be responsible to Transocean, dollar for dollar, for the very same indemnification claim.

52.     Nevertheless, Liberty took the unreasonable and baseless position that the Liberty Insurance Policy did not attach because Cameron had not exhausted the purported Transocean contractual indemnity and that the Liberty Insurance Policy was only in "excess of that indemnity."  Liberty thus demanded, as a precondition to paying its insurance coverage, that Cameron forgo an extremely favorable settlement, continue to litigate, and bet the company's future and all its employees' jobs to test the validity of an indemnification claim that had been steadfastly rejected by Transocean – that is, unless Cameron agreed to accept tens of millions of dollars less than Liberty owed Cameron.

53.     Liberty's approach failed to recognize that BP – the very party with whom Cameron wished to settle – may be ultimately responsible for the indemnification claim (assuming it had any merit) that Liberty insisted Cameron continue to litigate.  Cameron's release of its indemnification claims was thus a crucial part of the settlement consideration that BP was seeking as part of the settlement.  Liberty's denial of coverage for a settlement on the basis that Cameron would be giving up the ability to sue the settling party to recover the settlement payment was unreasonable, based on false pretenses, and patently unfair.

54.     Had Cameron known that Liberty would take the position that it would only pay claims after contested third-party indemnities were unsuccessfully litigated to conclusion, it would never have purchased insurance from Liberty.   Indemnities are commonplace in the oil and gas industry, and Liberty's interpretation would effectively eviscerate any real protection afforded by the Liberty Insurance Policy.  Moreover, as Judge

-16-

Barbier recognized in a decision that Liberty's counsel himself cited to Cameron, the court "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." That is the case here. At best, the "other insurance" provision is ambiguous, and any such ambiguity must be resolved in Cameron's favor.

55.     Liberty's position was not only absurd, but dangerous. The result could have been financial ruin for Cameron and demonstrates just how willing Liberty is to sacrifice its customers' best interests to advance its own. Cameron had cooperated for months with Liberty and its counsel – sharing information, discussing litigation and settlement strategy, and embracing its insurer. While Liberty played the part and acted like it was Cameron's insurer, it waited until Cameron was most vulnerable to lower the boom: either agree to a deep discount on policy limits, or risk disaster. Liberty thereby put Cameron at risk intentionally to try to advance its own financial interests.

56.     It is therefore not surprising that some of Cameron's insurers openly criticized Liberty's recalcitrance. For example, on December 14, 2011, counsel for two of Cameron's insurers wrote to counsel for Liberty that Liberty's position was "an unreasonable and prejudicial impediment to settlement." As they explained, "[b]ecause the indemnification rights against Transocean are contingent and merely pass through rights against BP, the waiver and transfer is little more than a customary agreement by one settling party not to pursue the other settling party to recover the settlement sum." They further stated: "The position of [Liberty] that its Other Insurance condition renders the policy excess of indemnification rights against third parties is hard to grasp in general, but particularly so in the context of a pass through indemnification against a settling party." Finally, given that Liberty's position exposed

-17-

Cameron's other insurers to potential liability for damages if the settlement fell through due to Liberty's intransigence, they reserved their rights against Liberty to seek recovery of any such damages.

57.     At least two other insurers wrote similar letters to Liberty on December 14, 2011, "taking issue with [Liberty's] refusal to grant consent to both financial and non-financial terms."  By contrast, none of Cameron's other insurers followed Liberty's approach and denied coverage, even though Chubb and AIG – both of which agreed to fund the settlement – had policies that incorporated Liberty's "other insurance" provision by reference.

58.     Despite Liberty's bad faith, Cameron was able to move forward with the BP settlement based on all the other insurers' agreement to fund the deal and waive their subrogation rights.  And, to avoid a potentially catastrophic result for Cameron's shareholders and employees, Cameron paid the $50 million gap left by Liberty.

59.     Cameron and many of its insurers have now paid $250 million to BP.  The settlement proceeds are to be contributed by BP into a fund for the victims of the Deepwater Horizon incident.  Liberty paid nothing.

60.     Cameron's settlement payment constitutes a loss under the terms of the Liberty Insurance Policy.  Because Liberty has not remitted to Cameron the insurance proceeds it owes, Liberty has breached the Policy – and has done so in bad faith.

61.     On January 31, 2012, pursuant to Texas Insurance Code § 541.154, Cameron sent to Liberty, via certified mail, a letter asking Liberty to honor its contractual obligations and putting Liberty on notice that the failure to do so constitutes a bad-faith breach of the Liberty Insurance Policy.  Liberty rejected that demand in a letter dated March 29, 2012.

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT

62.     Cameron repeats and realleges the allegations contained in the foregoing Paragraphs 1 through 61 as if fully set forth herein.

63.     The Liberty Insurance Policy is a valid and enforceable contract between Cameron and Liberty.

64.     Cameron fully performed its obligations under the Liberty Insurance Policy and all conditions precedent have occurred.

65.     Liberty breached its obligations under the Liberty Insurance Policy.

66.     As a direct and proximate result of such breaches, Liberty damaged Cameron.

### SECOND CAUSE OF ACTION – DECLARATORY JUDGMENT FOR INDEMNITY, 28 U.S.C. §§ 2201-2202

67.     Cameron repeats and realleges the allegations contained in the foregoing Paragraphs 1 through 61 as if fully set forth herein.

68.     The insurance policies underlying the Liberty Insurance Policy have been exhausted by payments to settle the BP claims.

69.     Under the Liberty Insurance Policy, Liberty must indemnify Cameron for its losses in connection with the Oil Spill MDL and related proceedings until Liberty has exhausted its $50 million limit.

70.     Liberty has not paid any of its $50 million limit in connection with the settlement of the BP claim and therefore has not exhausted that limit.

71.     A real, substantial, and justiciable controversy exists between Cameron and Liberty which is subject to resolution by the Court.

72.     Cameron is entitled to a declaratory judgment that Liberty must indemnify Cameron in the amount of $50 million for its losses in connection with the Oil Spill MDL and related proceedings.

**THIRD CAUSE OF ACTION – DECLARATORY JUDGMENT FOR DEFENSE EXPENSES, 28 U.S.C. §§ 2201-2202**

73.     Cameron repeats and realleges the allegations contained in the foregoing Paragraphs 1 through 61 as if fully set forth herein.

74.     The insurance policies underlying the Liberty Insurance Policy have been exhausted by payments to settle the BP claims.

75.     Under the Liberty Insurance Policy, Cameron is entitled to reimbursement of its defense costs from Liberty in connection with the claims asserted in the Oil Spill MDL and related proceedings on an unlimited basis until Liberty exhausts its $50 million limit by indemnifying Cameron for its settlement of the BP claim.

76.     Liberty has not paid any of its $50 million limit in connection with the settlement of the BP claim and therefore has not exhausted that limit.

77.     Liberty has stated to Cameron that it is not liable for Cameron's defense costs in the Oil Spill MDL and related proceedings under the Liberty Insurance Policy.

78.     A real, substantial, and justiciable controversy exists between Cameron and Liberty which is subject to resolution by the Court.

79.     Cameron is entitled to a declaratory judgment that Liberty must reimburse Cameron for its defense costs in connection with the Oil Spill MDL and related proceedings on an unlimited basis until Liberty exhausts its $50 million limit by fulfilling its indemnification obligation to Cameron.

1091252v1

## FOURTH CAUSE OF ACTION – VIOLATION OF LOUISIANA RS 22:1892

80.     Cameron repeats and realleges the allegations contained in the foregoing Paragraphs 1 through 61 as if fully set forth herein.

81.     Cameron submitted written proof of loss in the amount of $250 million to Liberty on December 15, 2011 and reiterated its demand for payment under the Liberty Insurance Policy on January 31, 2012.

82.     Liberty failed to pay the amount of the claim due to Cameron within thirty days after receipt of satisfactory proof of loss under the Liberty Insurance Policy.

83.     Liberty's failure to pay Cameron's claim was arbitrary, capricious and without probable cause in violation of RS 22:1892.

84.     Liberty should be required to pay a penalty in the amount of fifty percent of the $50 million due under the Liberty Insurance Policy, or $25 million, to Cameron.


## FIFTH CAUSE OF ACTION –VIOLATION OF TEXAS INSURANCE CODE § 541 – UNFAIR TRADE PRACTICES IN THE BUSINESS OF INSURANCE

85.     Cameron repeats and realleges the allegations contained in the foregoing Paragraphs 1 through 61 as if fully set forth herein.

86.     In violation of Texas Insurance Code § 541, Liberty engaged in unfair claim settlement practices by, among other things:

(a)     knowingly misrepresenting when Liberty's limit attached and whether Cameron is entitled to indemnity for its losses associated with the Deepwater Horizon incident;

(b)     knowingly failing to effect a prompt, fair, and equitable settlement of a claim where Liberty's liability is reasonably clear;

1091252v1

(c)     irresponsibly and unjustifiably holding Cameron's settlement with BP

hostage in order to avoid or reduce Liberty's payment obligations;

(d)     taking advantage of Cameron's precarious situation in the Oil Spill MDL

by unscrupulously offering Cameron a mere fraction of its full policy; and

(e)     intentionally forcing Cameron to institute suit to recover the $50 million

Cameron was forced to pay to BP due to Liberty's breach.

87.     Liberty did not have any reasonable basis to deny coverage to Cameron

under the Liberty Insurance Policy.

88.     As a direct and proximate result of such wrongful conduct, Cameron has

sustained substantial damages and is entitled to an award of treble damages and attorneys' fees

against Liberty.

### SIXTH CAUSE OF ACTION – VIOLATION OF TEXAS INSURANCE CODE § 542 – FAILURE TO PROMPTLY PAY DEFENSE COSTS

89.     Cameron repeats and realleges the allegations contained in the foregoing

Paragraphs 1 through 61 as if fully set forth herein.

90.     Liberty is required to reimburse Cameron for its defense costs in

connection with the Oil Spill MDL and related proceedings on an unlimited basis until Liberty

exhausts its $50 million limit by fulfilling its indemnification obligation to Cameron

91.     Cameron has demanded that Liberty pay its defense costs on an ongoing

basis.

92.     Liberty has not agreed to pay Cameron's defense costs on an ongoing

basis and has thus delayed payment in violation of Texas Insurance Code § 542.

93.     As a direct and proximate cause of such wrongful conduct, Cameron has

sustained and continues to sustain substantial damages and is entitled to an award of interest at

-22-

18 percent a year in addition to the amount of such damages, as well as the recovery of attorneys' fees.

## DEMAND FOR RELIEF

WHEREFORE, Cameron respectfully prays that the Court:

A.  Find that Liberty is liable under all claims asserted herein;

B.  Award Cameron damages in an amount to be determined at trial;

C.  Declare that Liberty must indemnify Cameron in the amount of $50 million for its losses in connection with the Oil Spill MDL and related proceedings;

D.  Declare that Liberty must reimburse Cameron for its defense costs at the full rate, expenses, and costs incurred in connection with the Oil Spill MDL and related proceedings on an unlimited basis until Liberty exhausts its $50 million limit by fulfilling its indemnification obligation to Cameron;

E.  Award Cameron an amount equal to 50% of Cameron's actual damages for Liberty's bad faith breach of the Liberty Insurance Policy under RS 22:1892.

F.  Award Cameron an amount equal to triple the amount of Cameron's actual damages for Liberty's bad faith breach of the Liberty Insurance Policy under Texas Insurance Code § 541.

G.  Award Cameron interest of 18 percent per year on Cameron's defense expenses under Texas Insurance Code § 542.

H.  Award Cameron equitable relief in the nature deemed appropriate by the court;

I.  Award Cameron the costs of suit, including reasonable attorneys' fees as provided by law;

J.  Award Cameron pre-judgment and post-judgment interest as provided by law; and

K.   Grant any such other and further relief to which Cameron may be entitled or is necessary

to remedy the damages caused by the unlawful conduct of Liberty and as the Court

deems just and/or equitable.

Dated:        April 19, 2012                           _ /s/ Phillip A. Wittmann_____
                                                       Phillip A. Wittmann, 13625
                                                              pwittmann@stonepigman.com
                                                       Carmelite M. Bertaut, 3054
                                                              cbertaut@stonepigman.com
                                                       Keith B. Hall, 24444
                                                              khall@stonepigman.com
                                                       Jared Davidson, 32419
                                                              jdavidson@stonepigman.com

                                                       STONE PIGMAN WALTHER WITTMANN L.L.C.
                                                       546 Carondelet Street
                                                       New Orleans, Louisiana  70130
                                                       504-581-3200
                                                       504-581-3361 (fax)

                                                       *Attorneys for Cameron International
                                                       Corporation*

                                                               Of Counsel:

                                                       WILLKIE FARR & GALLAGHER LLP
                                                       Mitchell J. Auslander
                                                       Jeffrey B. Korn
                                                       787 Seventh Avenue
                                                       New York, NY  10019
                                                       (212) 728-8000
                                                       mauslander@willkie.com

-24-

1091252v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Amended Complaint of Cameron International Corporation has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of April, 2012.

*/s/     Phillip A. Wittmann*

1091252v1