# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 <br><br> SECTION J |
| Applies to: *All Cases* | JUDGE BARBIER <br> MAGISTRATE JUDGE SHUSHAN |

## ORDER

### [Regarding BP's Subpoena for Woods Hole's Analysis Documents]

BP seeks discovery from Woods Hole Oceanographic Institution ("WHOI").

## Background

On December 8, 2011, WHOI was served with a subpoena duces tecum issued by the United States District Court for Massachusetts requiring it to produce documents to BP's counsel. WHOI objects to producing what are referred to as "analysis documents."[1]

WHOI raised the issue of this Court's jurisdiction to hear this dispute. It acknowledged that the Court had the authority under the MDL statute to exercise jurisdiction over this dispute, but asked that the Court refrain from doing so and permit the dispute to be resolved by the federal court in Massachusetts. Rec. doc. 6105 at 5, n. 2. The Court has been working on the discovery issues in the Deepwater Horizon MDL for more than eighteen months. Because of the Court's familiarity with the context in which the discovery is sought from WHOI, it will exercise jurisdiction over the subpoena served on WHOI and the dispute between it and BP.

---

[1] Pursuant to the Court's instructions, the parties prepared proposed notices to non-parties for Phase Two of the MDL trial. An issue arose between BP and the PSC regarding one of the topics for the WHOI deposition. Rec. docs. 4882 and 4883. This issue was resolved. Rec. docs. 4980 at 44 and 4966 at 7. The Rule 30(b)(6) notice and subpoena for the deposition have not been served on WHOI, so it has not had an opportunity to object to the topics included in the notice. Its right to do so is reserved to it until after it is served with the Rule 30(b)(6) notice for its deposition.

The following is a timeline of pertinent events:

| | |
|---|---|
| April 20, 2010 | The Macondo Well blows out in the Gulf of Mexico. |
| Unreported | Coast Guard contracts with WHOI.[2] |
| June 10, 2010 | Preliminary report by the WHOI Flow Rate Measurement Group. |
| July 15, 2010 | Oil stopped flowing from the Well into the Gulf. |
| August 10, 2010 | Final Oil Spill Flow Rate Report and Characterization Analysis - WHOI report to the Coast Guard.[3] |
| September 19, 2010 | Admiral Allen announced that with the completion of the relief wells, the Well was effectively dead. |
| March 10, 2011 | Assessment of Flow Rate Estimates for Deepwater Horizon/Macondo Well Oil Spill - U.S. Department of Interior.[4] |
| June 10, 2011 | Article on the composition of oil and gas released during the spill.[5] |
| August 11, 2011 | Article on acoustic measurement of the well flow rate.[6] |
| October 28, 2011 | Review of flow rate estimates of the spill.[7] |

Pursuant to the contract with the Coast Guard, WHOI agreed to provide a comprehensive

---

[2]  WHOI states that following the explosion, it was contacted by the Coast Guard.  Rec. doc. 6105 at 1.  The contract between the Coast Guard and WHOI is not dated.  Rec. doc. 6105(Exhibit 1).

[3]  Marcia McNutt, Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill (March 10, 2011).  See Rec. doc. 6104 (Attachment C).  This document was prepared by the Flow Rate Technical Group ("FRTG").  The document is referred to as the FRTG Assessment.  Appendix C to the FRTG Assessment is Richard Camilli, Final Oil Spill Flow Rate Report and Characterization Analysis Deepwater Horizon well Mississippi Canyon Block 252 (August 10, 2010) ("WHOI Final Report").

[4]  FRTG Assessment.

[5]  Christopher M. Reddy, Composition and fate of gas and oil released to the water column during the Deepwater Horizon oil spill, PNAS.  The article was approved for publication on June 10, 2011.  Rec. doc. 6104 (Attachment D).

[6]  Richard Camilli, Acoustic Measurement of the Deepwater Horizon Macondo well flow rate, PNAS Early Edition.  See Rec. doc. 6104 (Attachment D).  This article was approved for publication on August 11, 2011.

[7]  Marcia McNutt, Review of flow rate estimates of the Deepwater Horizon oil spill, PNAS.  The article was approved for publication on October 28, 2011.  Rec. doc. 6270 (Attachment C).

analysis of the oil flow release at the site.  Rec. doc. 6105 (Exhibit 1).  In describing the reason and

purpose for the contract, the U.S. stated:

> BP is the responsible party for the stoppage and cleanup of the spill.  BP has
> provided flow rate estimates but they are not consistent with other estimations.  The
> Government seeks to provide accurate assessments of the oil flow characteristics and
> hydrocarbon releases into the water column.

Id.  WHOI was required to deliver to the Coast Guard:  (1) a data collection test plan; (2) daily

reports, including a field analysis of the data collected; (3) trip report; (4) a final oil spill flow rate

report and characterization analysis report; and (5) an electronic archive of all reports, test data, and

other information gathered during the contract (the "deliverables").  They were to be provided to the

U.S. at various stages of the contract with number five, the electronic archive, delivered at the

conclusion of the period of performance.  Id.  WHOI was paid approximately $95,000 for its work

for the U.S. with all but about $4,000 was for reimbursement of its expenses.

The Coast Guard agreed to produce the first three deliverables and any drafts of the fourth

deliverable to BP.  The fourth deliverable in its final form is publicly available.  The Coast Guard

reports that it may not have received the fifth deliverable.  It is reviewing its files to determine

whether it has the electronic archive or anything similar to it.[8]

WHOI objects to the production of information concerning any internal debates, drafts and

discussions which took place prior to release of its reports.  Rec. doc. 6105 at 5.  BP refers to the

documents at issue as WHOI's:  (1) communications regarding the techniques or methodologies

used; (2) communications regarding techniques that were considered for use but rejected; (3)

communications assessing methodological and data reliability issues; and (4) communications

---

[8] Before producing other documents to BP, WHOI submitted them to the Coast Guard for review.  The U.S. reports that no documents were withheld from BP as a result of this review.  As of this date, it is not clear that all deliverables have been produced to BP.  That is not, however, the subject of this ruling.

otherwise bearing on the validity and reliability of WHOI's work.  Rec. doc. 6106 at 2.  The

documents at issue are collectively referred to as the "analysis documents."

The executive summary of the FRTG Assessment states:

Based on attributes such as timeliness of the information and accuracy of the
estimation, the technique that performed the best during the ongoing emergency was
the acoustic technique (combining sonar to image plume size with acoustic Doppler
to measure plume velocity).[9]

The Coast Guard supported the work of the WHOI researchers to generate a flow rate analysis by

deploying a multi-beam imaging sonar and an acoustic Doppler Current Profiler.[10]  The executive

summary of the WHOI Final Report states that "[f]low rate estimates for the riser and BOP were

constructed from acoustic Doppler velocity and sonar multibeam cross sectional estimates of each

plume."[11]  Thus, the FRTG described the WHOI flow rate analysis as providing the best technique

for timeliness and accuracy.  WHOI contributed to three articles concerning its flow rate work, dated

June 10, 2011, August 11, 2011 and October 28, 2011.

### Applicable Law

WHOI contends that the analysis documents are protected from disclosure by a scholastic

privilege, citing Cusumano v. Microsoft Corporation, 162 F.3d 708 (1ˢᵗ Cir. 1998), and In re Bextra

and Celebrex Marketing Sales Practices and Product Liability Litigation, 249 F.R.D. 8 (D. Mass.

2008).  In Cusumano, Microsoft sought to compel production of research materials by two academic

investigators.  Microsoft was a defendant in a civil antitrust case brought by the United States.  The

United States alleged that Microsoft illegally tied the Explorer browser to its Windows operating

---

[9] See Rec. doc. 6104 (Attachment C)(Executive Summary at 2).

[10] FRTG Assessment at 10.

[11] WHOI Final Report at 2.

4

system to the detriment of the Netscape browser, Navigator, and other browsers.  Microsoft's primary defense was that Netscape suffered a series of self-inflicted wounds that dissipated its dominant position in the browser market.  162 F.3d at 716.

During the course of pretrial discovery Microsoft learned of a forthcoming book dealing extensively with the browser war between Microsoft and Netscape.  The two authors were professors at MIT's Sloan School of Management and the Harvard Business School.   The professors interviewed over 40 Netscape employees.  The protocols for the interviews provided that: (1) proprietary information would not be disclosed except by court order; and (2) the interviewees possessed the right to examine quotations from the interviews to correct errors before they were used in the publication.  Id. at 711.  Microsoft subpoenaed the professors' notes, tape recordings, and transcripts of interviews and the professors objected.

The First Circuit held that, "[a]cademicians engaged in pre-publication research should be accorded protection commensurate to that which the law provides for journalists."  Id. at 714.  The interviews were confidential and entitled to significant protection.  Id. at 715.  It held that:

> [W]hen a subpoena seeks divulgement of confidential information compiled by a journalist or academic researcher in anticipation of publication, courts must apply a balancing test.  This test contemplates consideration of a myriad of factors, often uniquely drawn out of the factual circumstances of the particular case.  Each party comes to this test holding a burden.  Initially, the movant must make a prima facie showing that his claim of need and relevance is not frivolous.  Upon such a showing, the burden shifts to the objector to demonstrate the basis for withholding the information.  The court then must place those factors that relate to the movant's need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan.

Id. at 716.  The court found that: (1) Microsoft had a substantial need for the information; (2) notwithstanding the accelerated discovery, the same information was otherwise available to

Microsoft through direct discovery; (3) the professors' interviews of the Netscape employees were carefully bargained for communications which deserved significant protection; (4) allowing Microsoft to obtain the information would hamstring the professors' future research efforts as well as those of similarly situated scholars; and (5) the professors were strangers to the antitrust litigation. The court concluded that the scales tipped in favor of preserving confidentiality and against the wholesale disclosure of investigative materials gleaned in the course of pre-publication academic research. Id. at 716-717.

In In re Bextra, Pfizer was a defendant in litigation concerning its prescription arthritis medications, Bextra and Celebrex.  Pfizer sought documents related to articles concerning the medications published in two medical journals and articles which were considered by the journals for publication but rejected.  The issue was whether Pfizer could compel the medical journals to produce the substance of their communications with the authors of articles concerning the medications.  In re Bextra, 249 F.R.D. at 11.  The Cusumano balancing test was applied and the court found that: (1) more convenient, less burdensome or less expensive sources were not available; (2) the materials sought by Pfizer were relevant but were of limited probative value; and (3) the medical journals were entitled to a level of protection commensurate with that afforded journalists. The court held that disclosure of the information would be harmful to the ability of the medical journals "to fulfill their journalistic and scholarly missions, and by extension harmful to the medical and scientific communities, and to the public interest."  Id. at 14.[12]

---

[12]   WHOI also cites Plough Incorporated v. National Academy Sciences, 530 A.2d 1152 (D.C. 1987); Dow Chemical Company v. Allen, 672 F.2d 1262 (7th Cir. 1982); In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 269 F.R.D. 360 (S.D.N.Y. 2010); and In re Yasmin and Yaz (Dropsperenone) Marketing, Sales Practices and Products Liability Litigation, 2011 WL 5547133 (S.D.Ill. 2011).  These cases raise issues similar to the issues raised in Cusumano and In re Bextra, they employed similar considerations as to whether the information sought should be produced.  In Cusumano, the court balanced the need for disclosure against the desirability of confidentiality.

## Analysis

**A.      Necessity.**

BP contends that the analysis documents are:  (1) central to, the scientific articles referenced in the subpoena and allegedly inform the United States' (U.S.) flow rate estimates released to the public; (2) needed to fully understand both the analysis and conclusions of WHOI scientists and others and to inform BP's work on the quantification issue; and (3) needed to permit resolution of any questions concerning the reliability of the acoustic technique, particularly because of the significance apparently placed by the U.S. on WHOI's work.  BP contends that it is particularly entitled to understand the adjustments and revisions by WHOI to its estimates.  It cites the reports and articles published between June 2010 and September 2011, where the methodology, analysis and flow rate estimates were revised.

WHOI responds that: (1) the documents produced to BP, including the deliverables, provide it with all data recorded, as well as the mathematical equations, offset points, and assumptions used by WHOI scientists in writing the analytical papers; (2) with this data, any marine scientist can recreate and analyze WHOI's results; and (3) BP's own experts are equally able to review and analyze the articles for flaws in methodology.  In Plough, the mover had direct access to the raw data from the study.  The court stated that "[t]here is no lack of cases holding that were a party is furnished with raw factual data in a civil case, no prejudice can result to the party who can have his or her own experts assess that factual information."  530 A.2d at 1160 (quotation marks and brackets omitted).

Notwithstanding the availability of the raw data, the revision of the WHOI flow rate

---

162 F.3d at 713.  In Plough, it was necessary to "balance the need for the information against the injury that would result from disclosure."  530 A.2d at 1156.  Cusumano includes a complete list of the factors which must be considered.

estimates over time demonstrates a substantial need for the analysis documents, because there is no other source for these documents.

**B.      Impeachment.**

WHOI contends that the only reason for BP's need for any pre-publication deliberations by WHOI is to attempt to find some basis to impeach WHOI's results.  It argues that if impeachment is the only purpose for the production of the analysis documents, BP cannot demonstrate a substantial need for them.  In <u>Cusumano</u>, the district court found that Microsoft's need for the professors' notes, tape recordings and transcripts of interviews was not great because its main thrust was for the purpose of impeachment.  162 F.3d at 712.  Before the First Circuit, Microsoft argued that the information was useful not only for impeachment but also as independent evidence of Netscape's miscalculations.  <u>Id</u>.  In <u>In re Bextra</u>, the documents sought by Pfizer from the medical journals were relevant to its claims and defenses because the materials were likely to contain comments which could be the basis for the impeachment of the authors.  Although the documents were relevant, the court found that their probative value was limited because their primary use was for impeachment.  249 F.R.D. at 12.

In the Deepwater Horizon MDL, the quantity of oil released from the well is a central fact in support of the claims of the U.S. and the States.  WHOI's flow rate analysis and its analysis documents address this issue.  The chair of the FRTG believed the WHOI acoustic technique provided the best information in terms of accuracy.  In the circumstance of the quantification issue, even if the only purpose for the analysis documents is impeachment, the WHOI analysis documents have significant probative value and BP has a substantial need for them.

C.      **Confidentiality.**

The confidentiality issue will be considered for three periods.  The first is up to August 10, 2010, the date of the WHOI Final Report to the Coast Guard.  Unlike the interviews of the Netscape employees, the confidentiality of the analysis documents was not part of the bargain between WHOI and the Coast Guard.  The only provision of the contract related to this question stated that "[t]his project is unclassified."  Rec. doc. 6105(Exhibit 1 at 2).

In Cusumano, the First Circuit found that allowing Microsoft to obtain the information would hamstring the professors' future research efforts as well as those of similarly situated scholars. There is a fundamental distinction between the work undertaken by WHOI on the flow rate analysis up to August 10, 2010 and the work performed by the two professors on the controversy concerning the browsers.  In the Microsoft antitrust litigation, the two professors conducted their research and published their book independently of the United States and Microsoft, the parties to the litigation. After the Macondo well blew out and before it was capped, the U.S. contracted with WHOI to conduct the flow rate analysis.  Within months of the receipt of the WHOI report, the U.S. sued BP for penalties based in part on the quantity of oil released by the well.  If BP gains access to the analysis documents, it will not hamper WHOI's future research efforts or that of similarly situated scholars where the work is not performed pursuant to a contract with one of the parties to the litigation.

WHOI did not stop working on the flow rate analysis when it submitted its final report to the Coast Guard on August 10, 2010.  On March 10, 2011 the FRTG Assessment was published having been prepared by Marcia McNutt of the U.S. Geological Survey, Richard Camilli of Woods Hole

and others.  Camilli was the only author who was not employed by an agency of the U.S.[13]  By that time the U.S. had sued BP.  WHOI's participation in the preparation of the FRTG Assessment demonstrates a close association with one of the main claimants against BP.  If BP gains access to the analysis documents associated with WHOI's work on the FRTG Assessment, it will not hamper WHOI's future research efforts or that of similarly situated scholars.

The third period is for the time after the completion of the FRTG Assessment.  Articles were published on June 10, 2011, August 11, 2011, and October 28, 2011.  The June 10, 2011 article was authored by persons from WHOI and academic institutions, for example the University of Oxford. The August 11, 2011 article was authored by persons from WHOI and academic institutions and was edited by Marcia McNutt of the U.S. Geological Survey.  The October 28, 2011 review of flow rate estimates was prepared by persons employed by WHOI, agencies of the U.S. and representatives from Columbia University and the University of California at Berkeley.  Although the work associated with the articles followed from the WHOI work conducted for the Coast Guard, it is much closer to the kind of academic work described in Cusumano.  If BP gains access to the analysis documents for these article, that could hamper future research efforts.  If the analysis documents for these articles are produced, the co-authors from other academic institutions may be subjected to discovery and the scrutiny of the litigation process which may discourage such persons from participating in the authorship of articles relating to matters in litigation.

---

[13]  In addition to McNutt, there were three other persons from the U.S. Geological Survey and representatives from the Department of Energy, the National Oceanic and Atmospheric Administration and the Bureau of Ocean Energy Management.

**D.      Balancing.**

After weighing the factors described in <u>Cusumano</u>, the Court finds that for the period up through the publication of the March 10, 2011 FRTG Assessment, the WHOI analysis documents must be produced.  WHOI is not required to produce the analysis documents generated after March 10, 2011 or prepare a privilege log for them.

**E.      Costs.**

The remaining issue is the cost to WHOI of complying with BP's subpoena for production of documents.  It is not reasonable for WHOI to bear them.  The U.S. and BP will be required to divide these costs equally between themselves.

IT IS ORDERED that: (1) WHOI shall produce the analysis documents generated through March 10, 2011 **within fourteen (14) calendar days of the entry of this order**; (2) the U.S. and BP shall divide WHOI's reasonable costs for complying with the subpoena equally between themselves; and (3) the **deadline for the appeal of this order is April 30, 2012.**

New Orleans, Louisiana, this 20th day of April, 2012.

**SALLY SHUSHAN**
**United States Magistrate Judge**

11