UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>Section J |
| This document relates to all actions | * * * | Honorable Carl J. Barbier<br><br>Magistrate Judge Shushan |

### RESPONSE OF AMICUS CURIAE THE AMERICAN SHRIMP PROCESSORS ASSOCIATION TO THE PLAINTIFFS' STEERING COMMITTEE'S AND BP DEFENDANTS' JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

The American Shrimp Processors Association ("ASPA") respectfully appears herein as Amicus Curiae and submits this Memorandum in Response to the Plaintiffs' Steering Committee and BP Defendants' Joint Motion for Preliminary Approval of Class Action Settlement[1] and in Opposition to certain parts of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement.[2]  For the reasons more fully set forth herein, ASPA respectfully submits that preliminary approval of the Seafood Program and the Business Compensation Framework is not warranted until relevant revisions and modifications are made to address the fairness, reasonableness and adequacy issues raised herein.

---

[1] Rec. Doc. 6266
[2] *See* Rec. Doc. 6276.10 & 6276.22 (Exs. 4C & 10 respectively).

I.      **INTRODUCTION & SUMMARY OF ARGUMENT**

ASPA is a non-profit association of approximately 42 U.S. domestic shrimp docks, processors, brokers/wholesalers, packaging, and related companies dedicated exclusively to the promotion and preservation of the U.S. domestic shrimp industry. ASPA members are located throughout the Gulf South from Texas across to Florida, with the majority of its members located in Louisiana, Mississippi and Alabama. ASPA represents the vast majority of dockside domestic shrimp sales and processing, accounting for 87% of shrimp landings in 2008.[3] Twenty-eight (28) ASPA members filed limited appearances in this MDL through claims in Transocean's limitation proceeding.[4] ASPA members suffered significant business interruption and equity loss as a result of the Deepwater Horizon oil spill and have a direct economic stake in the outcome of the proposed Class Settlement and Joint Motion for Preliminary Approval. Counsel for ASPA has significant experience in the negotiation and resolution of shrimp business economic loss claims resulting from the Deepwater Horizon oil spill through extensive participation in the original BP compensation program and the subsequent Gulf Coast Claims Facility compensation program.

The proposed Seafood Compensation Program ("Seafood Program")[5] and the Compensation Framework for Business Economic Loss Claims ("Business Compensation Framework")[6] are deficient and inadequate on their face, and contain inconsistencies that improperly grant preferential treatment to certain members of the same class. Specifically, the proposed Seafood Program provides preferential and discriminatory treatment to certain limited members of the shrimp industry in a number of ways (i.e. elevated Risk Transfer Premium(s),

---

[3] *See* Changed Circumstances Review Covering Certain Frozen Warmwater Shrimp from Thailand, § 751(b), Case No. A-549-822 (Thailand), Opposition on behalf of the American Shrimp Processors Association (Jan. 5, 2010).
[4] Rec. Doc. 273
[5] Rec. Doc. 6276.22 (Ex. 10).
[6] Rec. Doc. 6276.10 (Ex. 4C).

assets based compensation schedule[7], etc). Shrimp class members inside the Seafood Program unjustifiably receive greater future risk compensation than similarly situated shrimp class members outside the Seafood Program, but who share similar future risk. Moreover, the Business Compensation Framework contains an unworkable compensation formula for the vast majority of affected shrimp businesses. The 2010 income statement based formula does not fairly and accurately adjust for past or future losses suffered by certain segments of the domestic shrimp industry.

All of the above deficiencies and errors could have been avoided and can be remedied with input and direction from ASPA and other interested parties. The Seafood Program should either be broadened to include all members of the shrimp seafood class that share similar post-settlement future economic risk or the Class Settlement should otherwise provide no less favorable treatment to the same shrimp seafood class members. The income statement formula contained in the Business Compensation Framework has been proven insufficient and incapable, through both the original BP compensation program and the subsequent Gulf Coast Claims Facility program. Both facilities eventually adopted a seasonal production/volume based methodology to calculate losses. Changes to the Business Compensation Framework formula to properly account for the commoditized nature of the seafood industry will allow a fair adjustment of, and compensation for, past and future economic losses.

## II.   LAW & ARGUMENT

This Court must make a preliminary determination that the proposed settlement is fair, reasonable, and adequate. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498 at *7 (E.D. La. Jan. 10, 2012). The moving parties must demonstrate that

---

[7] Rec. Doc 6276.22, at Table 2 (Ex. 10).

the "proposed settlement (i) appears to be the product of serious, informed, non-collusive negotiations, (ii) has no obvious deficiencies, (iii) does not improperly grant preferential treatment to class representatives or segments of the class, and (iv) falls within the range of possible approval. *In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008). Where the Court finds portions of the proposed settlement problematic, it may "indicate preliminary disapproval of the agreement and recommend that the parties make certain revisions or modifications." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498 at *19-21 (E.D. La. Jan. 10, 2012).

The proposed Seafood Program and Business Compensation Framework are unfair and inadequate insofar as they contain obvious deficiencies, inconsistencies and provide preferential treatment to certain shrimp seafood class members. ASPA respectfully recommends that the Court deny preliminary approval of those portions of the proposed Class Settlement until revisions and modifications are made that remedy the deficiencies.

### (A) The Seafood Shrimp Program Discriminates Among Similarly Situated Shrimp Class Members

A major component of the proposed Class Settlement is the Risk Transfer Premium (RTP).[8] The RTP represents a multiplier to compensate for damages, including "potential future injuries, damages or losses not currently known, which may later manifest themselves or develop, arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon incident, . . ."[9] Different class members receive different RTPs based primarily upon the type of business and their associated future risk. For example, certain eligible Festival Vendors receive a

---

[8] Rec. Doc. 6276.33 (Ex. 15).
[9] *Id.* at p. 1.

RTP of 1, while certain eligible tourism businesses receive a RTP of 2.[10]  Application of different RTPs to different business classes is appropriate insofar as they have varying degrees of future economic loss risk. Unfortunately, the proposed Class Settlement goes further and actually applies widely disparate RTPs to similarly situated members of the same business class that share similar future economic loss risk.

The proposed Class Settlement contains a $2.3 billion Seafood Program for certain limited seafood categories and claimants. The shrimp industry category of the Seafood Program is narrowly limited by definition to shrimp fishermen, vessel owners, vessel lessees and boat captains.[11]  The domestic shrimp industry is actually much broader than the limited members of the shrimp Seafood Program, and includes shrimp docks, processors, packaging suppliers, and brokers/wholesalers. In fact, the vast majority of revenue, capital and added value in the shrimp industry occurs in businesses falling outside of the shrimp Seafood Program, including ASPA's membership. In line with the shrimp class members inside the Seafood Program, ASPA membership cannot mitigate their losses going forward as their assets, both tangible and intangible, are dedicated to domestic shrimp.

The proposed Class Settlement does not treat the various key segments of the shrimp supply and distribution chain similarly or equitably. The shrimp class members falling inside the Seafood Compensation Program definition receive compensation based on a RTP range of 7.25 to 8.25, whereas the excluded shrimp businesses (i.e. the seafood docks, processors, packagers, and wholesalers/brokers) receive compensation based on a RTP range of 2.25 to 3.0.[12]  Problems with the RTP are compounded by the fact that, in many cases, financial losses did not manifest until 2011 & 2012, thus making the financial base period flawed.

---

[10] *Id*. at p. 1 & 4.
[11] Rec. Doc. 6276.22, at p. 1 (Ex. 10).
[12] Rec. Doc. 6276.22 , at p. 24 (Ex. 10) & Rec. Doc. 6276.33, at p. 1 (Ex. 15).

The more favorable treatment provided to the shrimp class members inside the Seafood Compensation Program is unjustifiable. All of the relevant segments of the shrimp harvesting, processing and distribution chain face similar future economic loss risks resulting from the oil spill, such as decreased and/or inconsistent quality, lower consumer demand, diminished brand value, depressed market share, increased import competition, etc. While justification may exist for slight segmented variations in risk within the shrimp industry, the current chasm between the RTP applied to those shrimp class members inside and outside of the Seafood Compensation Program is unjustifiable and biased.

The inappropriate disparity in treatment is more evident when you compare the RTP applied to shrimp businesses outside of the Seafood Program to the RTP applied to non-seafood businesses. For example, the proposed Class Settlement applies virtually the same RTP to a shrimp dock or processor as that applied to a shoe store or beach shop relying upon tourism.[13] The future economic loss risks between the two businesses are entirely dissimilar and no one can reasonably contend that a shoe store bears the same future risk, and should receive the same or similar RTP, as that of a shrimp dock or processor.

The Seafood Compensation Program should either include the remaining members of the shrimp industry or the proposed Class Settlement should otherwise provide a different compensation framework for the remaining members of the shrimp industry that ensures no less favorable treatment to similarly situated class members.

---

[13] *See* Rec. Doc. 6276.33, at p. 1 (Ex. 15). For example, a men's or women's clothing store located in Zone A that meets the Tourism definition of Exhibit 2 (Rec. Doc. 6276.6) receives a RTP of 2.5. Similarly, a Primary Seafood Processor that processes shrimp as defined in Exhibit 3 (Rec. Doc. 6276.7) receives a RTP of 3.0.

### (B) The Business Compensation Framework Contains an Inadequate Compensation Calculation Formula

ASPA's members currently fall outside of the Seafood Program. Accordingly, their compensation under the proposed Class Settlement is governed by the Business Compensation Framework.[14] The Business Compensation Framework utilizes an income statement based calculation that compares "the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010."[15] The *actual profit period* of the formula is selected by the claimant to include "three or more consecutive months between May and December 2010."[16] The *benchmark profit period* is selected by the claimant to include "2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all [b]enchmark [p]eriod purposes."[17] In short, you compare revenue (or modified gross profit) from the months immediately following the spill with a representative benchmark period to arrive at a compensation number.[18]

The proposed income statement calculation contained in the Business Compensation Framework represents the third iteration of a similar methodology that does not adequately adjust seafood dock, processing and other claims.[19] This accounting approach is inappropriate as

---

[14] *See supra*, note 6.
[15] *Id.* at p. 1.
[16] *Id.*
[17] *Id.* at p. 1-2.
[18] The formula contains other factors, including a claimant-specific factor to gauge trending, a general adjustment factor and reductions for numerous fixed and variable expenses.
[19] The inaugural BP claims process implemented in the wake of the spill initially utilized a very similar calculation. ASPA worked closely with BP's third party accountants in adjusting emergency claims for its members. BP's accountants modified the original formula to apply a production/volume based formula that more accurately accounts for the economic reality of the shrimp industry. In the midst of those talks the entire claims process was transferred to the Gulf Coast Claims Facility ("GCCF"). At the outset the GCCF also applied a modified income statement formula. After approximately one year of discussions with the GCCF experts (i.e. PWC) and Ken Feinberg, the GCCF began utilizing a production/volume based formula to adjust these losses.

it does not recognize or account for the commodity nature of the shrimp industry. For example, the majority of the shrimp processing industry had greater post-spill revenue from May through December 2010 than in the recent past as the price of shrimp spiked because of the spill and anticipated Gulf closure and lack of supply. Revenue and profit generally increased during that time frame due to sales of lower priced, pre-spill inventory at elevated post-spill prices (earned pre-spill profits that are applied to the 2010 P&L statement). Many of these shrimp businesses will not reflect a true reduction in profit or sales revenues when compared to a period or average of periods preceding the oil spill (the so called "benchmark period"). Losses for those businesses do not hit the books until 2011 when they are unable to make sales or derive normal profits from inventory that they could not replace at similar pre-spill prices.

The proposed Compensation Framework is simply misaligned as it does not account for pricing fluctuations, volume, production capacity, recovered sales, import penetration, and other business issues unique to the domestic shrimp industry. A reasonable alternative to the proposed framework is to (1) place all similarly situated members of the shrimp class within the Seafood Program or (2) implement a production based calculation into the Business Compensation Framework that accurately adjusts losses in the commoditized shrimp industry.

### III.     CONCLUSION

The Seafood Compensation Program within the proposed Class Settlement is deficient and unfair insofar as it provides disparate and more favorable treatment to certain shrimp class members. The Court should require no less favorable treatment to all of the key segments of the shrimp industry when applying a compensation framework.  Any misguided or inequitable compensation, on a relative basis, of certain segments of the domestic shrimp supply chain will have lasting negative effects far beyond the actual *Deepwater Horizon* oil spill.

The Business Compensation Program within the proposed Class Settlement is likewise unfair and unreasonable because it does not contain an appropriate calculation formula for adjusting and compensating shrimp industry claims. The 2010 income statement based compensation framework inaccurately undervalues the claims of certain shrimp sectors by improperly accounting for the unique dynamics of the seafood industry, some of which were aforementioned in this document.

For all of the above and foregoing reasons, ASPA respectfully requests that the Court either refuse preliminary approval of the referenced parts of the proposed Class Settlement or delay preliminary approval until such time as the issues raised herein are addressed and accounted for in the Class Settlement.

Respectfully submitted,

/s/ Edward T. Hayes
**EDWARD T. HAYES (25700)**
**W. PAUL ANDERSSON (2474)**
**JERRY L. SAPORITO (11717)**
Leake & Andersson, LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 70163
Telephone: 504-585-7500
Email:ehayes@leakeandersson.com

*Counsel to Amicus Curiae American Shrimp Processors Association*

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 23rd day of April, 2012 the above and foregoing pleading has been served on All Counsel by electronically uploading same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

            /s/ Edward T. Hayes
            **Edward T. Hayes**