# Attachment 1

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:                    (202) 879-5000                              Facsimile:
(202) 879-5175                                                                      (202) 879-5200
robert.gasaway@kirkland.com               www.kirkland.com

March 15, 2012

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Room B345
500 Poydras Street
New Orleans, LA  70130

Re:     Draft PSC Phase 2 30(b)(6) Notice to BP Defendants

Dear Judge Shushan:

I write to address some issues raised by the Court's interest, expressed at the discovery conference on March 9, 2012, in prioritizing quantification topics in the parties' Phase 2 Rule 30(b)(6) deposition notices.

With respect to the PSC's Draft Rule 30(b)(6) Notice for Phase 2, while the meet and confer process produced good progress, the parties still had not reached agreement on final language for many topics at the time when Phase 2 status conferences recently resumed.  Many of BP's objections remained unaddressed by the PSC's last draft.

Accordingly, in the interests of moving things forward, I am attaching a revised version of the PSC's notice, which we have edited to address objectionable vagueness, overbreadth, duplication, or other problems with the current draft Quantification topics.  (*See* Attachment A). Because of the Court's immediate focus on Quantification topics, this revision does not attempt to resolve outstanding issues relating to Source Control and Spill Preparedness topics, and we wish to reserve further comment and preserve objections to those topics at this time.

As for the Notice prepared by BP for deposition of the United States, we can report that all drafting issues between BP and the United States have been resolved.  (*See* Attachment B).

There remains, however, the question of scheduling topics for Rule 30(b)(6) depositions of United States witnesses in light of the status of the United States' document productions and the time required to review the millions of United States documents recently produced or yet to be produced.  BP addressed those issues in separate correspondence sent earlier today.

Chicago        Hong Kong        London        Los Angeles        Munich        New York        Palo Alto        San Francisco        Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 15, 2012
Page 2

Sincerely,

Robert R. Gasaway

Attachments

cc (via electronic mail):

R. Michael Underhill
Steven O'Rourke
Sarah D. Himmelhoch
Robin L. Hanger
A. Nathaniel Chakeres
Brian H. Barr
Joel M. Gross
Allison B. Rumsey
Don K. Haycraft
Plaintiffs' Liaison Counsel
Defense Liaison Counsel

# Attachment A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON: IN THE | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | * | |
| *ALL CASES* | * | MAG. JUDGE SHUSHAN |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**AGREED 30(b)(6) DEPOSITION NOTICE OF BP DEFENDANTS**</u>
~~**(WITH 30(b)(2) DOCUMENT REQUESTS)**~~

By agreement of Plaintiffs' Liaison Counsel, Defense Liaison Counsel,

Coordinating Counsel for the States, Coordinating Counsel for the U.S., and Counsel for

Defendants BP Exploration & Production, Inc., BP p.l.c., BP America Production

Company, and BP North America Products, Inc., (collectively the "BP Defendants"), the

BP Defendants shall—pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure

and PRE-TRIAL ORDER NO. 17 (as supplemented and amended by PRE-TRIAL ORDER 27)—

designate and produce one or more officers, managers, agents, employees, or other

representatives of the BP Defendants to discuss the Areas of Inquiry identified below.

<u>The Parties agree that in identifying each of the Areas of Inquiry below they are not</u>

<u>seeking to discover privileged or work product information, waiving any applicable</u>

<u>privilege or work product claim, or making any representation as to the existence or</u>

<u>scope of responsive, non-privileged information with respect to any particular Area of</u>

<u>Inquiry.</u>  The times and locations of the depositions will be scheduled in conjunction with

1

the designees' fact depositions in their individual capacities, or otherwise as may be

scheduled with Judge Shushan and the parties.

<u>**Areas of Inquiry**</u>

1. {Relates to Source Control}For any and all attempts after April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well by each of the following methods and any other method(s) used but not listed here: Actuation of the Deepwater Horizon BOP, Riser Insertion Tube Tool ("RITT"), Top Hat, Top Kill, Junk Shot, Cofferdam, Capping Stack, BOP on BOP strategies, Macondo Relief Well No. 1 and Macondo Relief Well No. 2 (hereinafter, collectively referred to as "Methods"):

   a. The total cost that BP incurred on each attempt and/or Method, including, but not limited to, labor, payments made to contractors and/or other entities working under BP's direction, materials, overhead and the cost of removal of any replaced components, parts, equipment, material, and/or supplies;

   b. The process of approval to fund and/or implement each attempt and/or Method, including the responsibility and identity of each person involved;

   c. A description of the manner and methodology, including computer models, used to assess each attempt and/or Method;

   d. A description of the rationale for each attempt and/or Method made or prepared for approval within BP;

   e. Dates when planning began for each attempt and/or Method, including the length of time used to plan and budget;

   f. An explanation of and timeline for the steps involved in planning and/or implementing each attempt and/or Method, including both the design of any equipment and the steps involved in the Method;

   g. The identity of BP employees and contractors who planned, managed, and/or supervised the implementation of each attempt and/or Method;

   h. A general description of each office, department, or other organization at BP that participated in the planning, budgeting, engineering, approval, supervision, coordination, or implementation of each attempt and/or Method; and

   i. For work actually attempted or performed by BP, BP's contractors and/or any other entity working under the direction of BP, an explanation of and timeline for the steps involved in performing the work, the identity of BP employees

**Comment [JL1]:** A number of questions subsumed in these topics (*e.g.*, questions about dates) can and should be addressed by stipulation. Requiring live testimony on matters that can and should be addressed by stipulation will be objectionable as unduly burdensome.

Moreover, none of the topics is limited to non-privileged work or communications and all topics are objectionable to that extent, and to the extent that they purport to call for the premature disclosure of expert analysis or opinion, as noted in the recitals.

and contractors who performed each the work, and the identity of custodians (with documents) recording the performance of the work.

2. {Relates to Source Control}For any and all efforts considered, but not used, to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well after April 20, 2010.

    a. The total cost anticipated and/or actually incurred to research/investigate the effort including, but not limited to, labor, payments made to contractors and/or other entities working under the direction of BP, materials, overhead and the cost of removal of any replaced components, parts, equipment, material and/or supplies.

    b. The process of approval to fund and/or implement each attempt and/or Method, including the responsibility and identity of each person involved and the reasons why approval was not given and/or the attempt was not funded or implemented;

    c. A description of the manner and/or methodology, including computer models, used to assess each effort;

    d. A description of the rationale for each effort, including the reasons for not implementing each effort, made or prepared for approval within BP;

    e. Dates when planning or consideration for each such effort began, including the length of time used to plan and budget;

    f. An explanation of and timeline for the steps involved in planning and/or implementing each effort, including both the design of any equipment and the steps involved in the Method;

    g. The identity of BP employees and contractors who researched, investigated, planned, managed, and/or supervised the evaluation of each effort;

    h. A description of each office, department, or other organization at BP that participated in the planning, budgeting, engineering, evaluation, supervision, approval, and/or coordination of each effort; and

    i. For each effort evaluation, BP's contractors and/or any other entity working under BP's direction, an explanation of the timeline for the steps involved in evaluating the effort, the identity of the BP employees and contractors who performed the evaluation, and the identity of custodians (with documents) recording the evaluation.

3. {Relates to Source Control}For any and all attempts between January 1, 20010 (for the Deepwater Horizon rig) or January 1, 2004 (for all other BP contracted

3

~~rigs) and April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill a flowing subsea Gulf of Mexico well (with a release of greater than or equal to 50 BBOE or where hydrocarbons reached the rig floor) in which BP has either an operational or other interest by any of the Methods and any other method(s) used but not listed above:~~

a. ~~The total cost that BP incurred to complete each attempt and/or Method, including, but not limited to, labor, payments made to contractors and/or other entities working under the direction of BP, materials, overhead and the cost of removal of any replaced components, parts, equipment, material, and/or supplies;~~

b. ~~The process of approval to fund and/or implement each attempt and/or Method, including the responsibility and identity of each person involved;~~

c. ~~A description of the manner and methodology, including computer models, used to assess each attempt and/or Method;~~

d. ~~A description of the rationale for each attempt and/or Method made or prepared for approval within BP;~~

e. ~~Dates when planning began for each attempt and/or Method, including the length of time used to plan and budget;~~

f. ~~An explanation of and timeline for the steps involved in planning and/or implementing each attempt and/or Method, including both the design of any equipment and the steps involved in the Method;~~

g. ~~The identity of BP employees and contractors who planned, managed, and/or supervised the implementation of each attempt and/or Method;~~

h. ~~A description of each office, department, or other organization at BP that participated in the planning, budgeting, engineering, approval, supervision, coordination, and/or implementation of each attempt and/or Method; and~~

i. ~~For each work actually performed by BP, BP's contractors and/or any other entity working under BP's direction, an explanation of and timeline for the steps involved in performing the work, the identity of BP employees and contractors who performed the work, and the identity of custodians (with documents) recording the performance of each effort.~~

4. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction, used to predict, estimate, characterize and/or measure the daily amount of hydrocarbons flowing from the Macondo Well from:

a. April 20, 2010 through July 15, 2010;

4

b.  July 16, 2010 through September 19, 2010; and

c.  September 20, 2010 through the present,

Including:  the results of such efforts~~, the identity of individuals who directed, performed, or assisted in performing  each prediction, estimate, characterization and/or measurement; and the identity of all documents, data, observations, calculations and/or measurements that were taken, used, relied upon or considered in the preparation of such predictions, estimates, characterizations and/or measurements of the daily amount of discharge from the Macondo Well~~.

**Comment [j2]:** Unduly burdensome.

5.  The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure the physical or chemical properties of any substance contained in the daily discharge from the Macondo Well <u>before any release into the environment </u>from:

a.  April 20, 2010 through July 15, 2010;

b.  July 16, 2010 through September 19, 2010; and

c.  September 20, 2010 through the present,

Including:  the results of such efforts~~, the identity of individuals who directed, performed, or assisted in performing each prediction, estimate, characterization and/or measurement; and the identity of all documents, data, observations, calculations and/or measurements that were taken, used, relied upon or considered in the preparation of such predictions, estimates, characterizations and/or measurements of the physical or chemical properties of any substance contained in the daily discharge from the Macondo Well~~.

**Comment [j3]:** Unduly burdensome.

6.  The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure ~~the potential or actual daily~~pressure depletion of the hydrocarbon reservoir tapped by the Macondo Well from:

**Comment [JL4]:** The topic appears to duplicate or overlap some or all of Topics 4 and 7 and requires clarification.

a.  April 20, 2010 through July 15, 2010;

b.  July 16, 2010 through September 19, 2010; and

c.  September 20, 2010 through the present,

Including:  the results of such efforts~~, the identity of individuals who directed, performed, or assisted in performing each prediction, estimate, characterization and/or measurement; and the identity of all documents, data, observations,~~

5

~~calculations and/or measurements that were taken, used, relied upon or considered in the preparation of such predictions, estimates, characterizations and/or measurements of the potential or actual depletion of the hydrocarbon reservoir tapped by the Macondo Well.~~

> **Comment [j5]:** Unduly burdensome.

7. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure the pressure inside the Macondo Well (-including but not limited to the reservoir pressure),pressures at the BOP, pressures through the capping stack, and pressures at whatever points hydrocarbons were being released into the Gulf of Mexico for every day from:

   a. April 20, 2010 through July 15, 2010;

   b. July 16, 2010 through September 19, 2010; and

   c. September 20, 2010 through the present,

   Including:  the results of such efforts~~, the identity of individuals who directed, performed, or assisted in performing each prediction, estimate, characterization and/or measurement; and the identity of all documents, data, observations, calculations and/or measurements that were taken, used, relied upon or considered in the preparation of such predictions, estimates, characterizations and/or measurements of pressures.~~

> **Comment [j6]:** Unduly burdensome.

8. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure the temperature of the discharge from the Macondo Well, including but not limited to the reservoir temperature, temperatures inside the wellbore, the temperature at the BOP, and the temperature at the point where hydrocarbons were being released into the GoM for every day from:

   a. April 20, 2010 through July 15, 2010;

   b. July 16, 2010 through September 19, 2010; and

   c. September 20, 2010 through the present,

   Including:  the results of such efforts~~, the identity of individuals who directed, performed, or assisted in performing each prediction, estimate, characterization and/or measurement; and the identity of all documents, data, observations, calculations and/or measurements that were taken, used, relied upon or considered in the preparation of such predictions, estimates, characterizations and/or measurements of temperatures.~~

> **Comment [j7]:** Unduly burdensome.

9. Knowledge of the identity, role and/or communications by all person(s) and/or entities responsible for communicating information to the public, media and/or shareholders of BP, pertaining to predicting, calculating, analyzing, determining, estimating, reporting, modeling and/or simulating (including the identity of person(s) and/or entities responsible for gathering, collecting and/or interpreting such information), the amount of hydrocarbons released from the Macondo Well into the atmosphere, ocean, and/or environment for every day from:

> **Comment [j8]:** This topic is overbroad, unreasonable, unduly burdensome, and in any event, is not appropriate for a deposition.

   a. April 20, 2010 through July 15, 2010;

   b. July 16, 2010 through September 19, 2010; and

   c. September 20, 2010 to the present.

10. [Relates to Source Control].~~All planning, preparations, discussions, evaluations and/or training with regard to a "Worst Case Discharge Scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan)well control / hydrocarbon discharge event, or an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico prior to April 20, 2010.~~

11. [Relates to Spill Preparedness]~~Costs, expenses, or expenditures incurred — including both out-of-pocket costs and/or internal costs—in association with the planning, preparations, discussions, evaluations and/or training for a) a "Worst Case Scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan)well control/hydrocarbon discharge event or b) an uncontrolled subsea release of hydrocarbons into the Gulf of Mexico prior to April 20, 2010.~~

12. [Relates to Source Control]~~All planning, preparations, discussions, evaluations and/or training for a) a "Worst Case Discharge Scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan) well control/hydrocarbon discharge event, or b) an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico after April 20, 2010, excluding the efforts of BP, BP's contractors and/or entities under the direction of BP in the effort to cap, contain, shut-in, limit flow from and/or kill the Macondo Well.~~

13. [Relates to Spill Preparedness]~~Costs, expenses, or expenditures incurred, including both out-of-pocket costs and/or internal costs, associated with the planning, preparations, discussions, evaluations and/or training for a) a "Worst Case Discharge Scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan)well control / hydrocarbon discharge event or b) an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico after April 20, 2010, excluding the costs, expenses or expenditures incurred by BP, BP's contractors and/or entities under the direction of BP in the effort to cap, contain, shut-in, limit flow from and/or kill the Macondo Well.~~

14. Knowledge of all non-privileged communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged with the public, press, third parties (except BP's contractors and/or entities working under BP's direction in the Macondo response), including, without limitation, scientists, engineers, educators, reporters, spokespersons, shareholders and/or representatives, officials, and/or designees of the United States, Louisiana, Mississippi, Alabama, Florida, and/or Texas regarding the amounts of hydrocarbons released from the Macondo Well from April 20, 2010 through the present including, without limitation, any communications criticizing, qualifying, discrediting, refuting, rejecting, and or denying the validity calculations  or analysis by other person(s) and/or entities regarding quantification of hydrocarbons being released from the Macondo Well.

> **Comment [JL9]:** This topic is overbroad, unreasonable, unduly burdensome, and in any event, is not appropriate for a deposition.

15. [Relates to Source Control] ~~All Source Control equipment, products, and/or materials presently identified, reserved, set aside, under construction / development, purchased, and/or developed by, or at the request of, BP for use in a subsea release of hydrocarbons in the Gulf of Mexico.~~

16. [Relates to Spill Preparedness] ~~Calculations, models, programs, data, discussion, analyses, and/or communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged both internally and with third parties regarding BP's determination of what the "Worst Case Discharge Scenario" (as defined in BP's Initial Exploration Plan) was for the Macondo Well.~~

17. [Relates to Spill Preparedness] ~~Calculations, models, programs, data, discussion, analyses, and/or communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged both internally and with third parties regarding the creation of BP's "Regional Oil Spill Response Plan" for the Gulf of Mexico as such document pertains to Source Control and the determination of Worst Case Scenario Discharge Scenario for an exploration well.~~

18. All analyses, calculations, assumptions, and data cited and/or relied upon in "BP's Preliminary Response to the Flow Rate and Volume Estimates Contained in Staff Working Paper No. 3" submitted by BP to the National Oil Spill Commission on or about October 21, 2010.

19. All calculations and analyses performed by BP, BP's contractors and/or any other entity working under the direction of BP, to quantify the amount of oil flowing through the capping stack of the Macondo Well at any time between July 12, 2010 and July 15, 2010 ~~, and the identity of all persons/entities performing and/or providing same.~~

> **Comment [j10]:** Unduly burdensome.

20. The configuration of the capping stack (including ram position at all times) and all pressure measurements (including calibration measurements) and temperature

measurements taken from the capping stack from July 12, 2010 and August 3, 2010.

21. All attempts by BP, BP's contractors and/or any other entity working under the direction of BP, made to measure the pressure and/or temperature of any portion of the Macondo Well or its discharge—either above or below the BOP—between April 20, 2010 and August 3, 2010.

22. All attempts by BP, BP's contractors and/or any other entity working under the direction of BP, made to measure the size of the apertures through which hydrocarbons were being released into the environment at the Macondo Well — either above or below the BOP — between April 20, 2010 and August 3, 2010.

23. The type and methodology of all analysis performed after April 11, 2010 by BP, BP's contractors and/or any entity under the direction of BP of the M56 reservoir's geological, geochemical, geophysical, and/or petrophysical characteristics, including but not limited to the analysis performed in the various drafts of BP's "Post-Well Subsurface Description of Macondo well (MC 252)" Technical Memorandum.

24. All efforts by BP, BP's contractors and/or any other entity working on BP's behalf to calculate, estimate, predict, and/or model the shut-in wellhead pressure of the Macondo Well after April 20, 2010.

25. All analysis, calculations, modeling, or estimates by BP, BP's contractors or any other entity working under the direction of BP relating to the effect of obstructions in the wellbore, the BOP, and/or the riser on the rate of flow from the Macondo Well.

**Comment [j11]:** Revised to eliminate overlap with Topic 4.

26. The manner and methodology BP, BP's contractors, and/or any other entity working under BP's direction, used to predict, calculate, analyze, determine, estimate, model, simulate, report, and/or interpret the Macondo Well's geophysical, geological, petrophysical, and reservoir engineering characteristics, including the size of the reservoir, prior to April 20, 2010.

**Document Requests**

The BP Defendants are further requested, in accordance with Rule 30(b)(2) of the Federal Rules of Civil Procedure, as well as Rule 26, Rule 34, and PRE-TRIAL ORDERS NOS. 16, 17 and 27, to produce, or identify by specific Bates Number(s) (if already produced), the following documents, at least ten (10) days prior to the time of the

relevant designee's deposition:

**First Set of Requests**

For each Area of Inquiry identified above, please produce all documents provided to, reviewed with, utilized by, and/or relied upon by the deponent to prepare for his or her deposition testimony.

> **Comment [JL12]:** BP objects to this request for the reasons stated in its Fourth Amended Response and Objections to Plaintiff's Agreed 30(b)(6) Deposition Notice.

**Second Set of Requests**

For each Area of Inquiry identified above, please produce all documents which relate, pertain, evidence and/or reflect the issues, topics and/or events described therein or associated therewith.

> **Comment [JL13]:** This request is inconsistent with the negotiated and agreed procedures for production of documents from custodians pursuant to search terms and is therefore overly broad and unduly burdensome.  BP further objects to this request for the reasons stated in its Fourth Amended Response and Objections to Plaintiff's Agreed 30(b)(6) Deposition Notice.

**Third Set of Requests**

For each corporate designee, please produce a copy of his or her custodial file, current resume or CV, and a copy of any and all prior testimony, whether provided in an individual or representative capacity, including any and all deposition testimony, trial testimony, sworn statements, affidavits, declarations, expert reports, and/or testimony before a legislative, regulatory or investigative body or agency.

> **Comment [JL14]:** This request is inconsistent with the Court's Pre-Trial Orders, which do not require the production of custodial document files by corporate representative witnesses. Moreover, the request is overly broad and unduly burdensome, as it calls for the production of documents without regard to their probative value to any matter in this case.  BP further objects to this request for the reasons stated in its Fourth Amended Response and Objections to Plaintiff's Agreed 30(b)(6) Deposition Notice.

This _____ day of _____, 2011.

Respectfully submitted,

_____        _____

Stephen J. Herman, La. Bar No. 23129
Herman Herman Katz & Cotlar LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: Sherman@hhkc.com

James Parkerson Roy, La. Bar No. 11511
Domengeaux Wright Roy & Edwards LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com

*Plaintiffs Liaison Counsel*

*Plaintiffs Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing Motion will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

_____
James Parkerson Roy and Stephen J. Herman

# Attachment B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAGISTRATE JUDGE |
| …………………………………………….... | : | SHUSHAN |

**AGREED 30(b)(6) DEPOSITION NOTICE OF THE UNITED STATES**

By agreement of Plaintiffs' Liaison Counsel, Defense Liaison Counsel, Coordinating Counsel for the States, and Coordinating Counsel for the U.S., the U.S. shall, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and Pre-Trial Order No. 17 (as supplemented and amended by Pre-Trial Order 27), designate and produce one or more officers, managers, agents, employees, or other representatives of the U.S. to discuss the Areas of Inquiry identified below.  The times and locations of the depositions will be scheduled in conjunction with the designees' fact depositions in their individual capacities, or otherwise as may be scheduled with Judge Shushan and the parties.

**DEFINITIONS**

As used in the list of topics contained in this notice, the following terms are defined as set forth below:

1.      "Source Control Efforts" has the same meaning as "Source Control" in the Definitions contained in the United States' Initial Response to BP Exploration and Production Company's First Set of Discovery Requests served on May 19, 2011.

2.      "Unified Command" means all personnel and functions of the "Unified Area Command" and the "Incident Command Post" at Houston, Texas, as the terms "Unified Area Command" and "Incident Command Post" are used in the report to the National Response Team entitled, "On Scene Coordinator Report -- *Deepwater Horizon* Oil Spill" and dated September 2011 (the "OSC Report").

3.      "National Incident Commander" has the same meaning as when used in the OSC Report.

4.      "MC 252 Well" means the exploratory well drilled in Block 252 of the Mississippi Canyon.

5.      "Junk Shot" means the operation by which bridging material was injected into the Deepwater Horizon blow-out preventer either from the surface or through a subsea manifold as part of the Top Kill operations.

6.      "Top Hat" means the mechanical device used to collect hydrocarbons from the top of the Lower Marine Riser Package up to the *Discover Enterprise* after the riser was cut off in June 2010.

7.      "Top Kill" means the operations comprised of the Momentum Kill and Junk Shot attempted in May 2010 as a means to kill the MC 252 Well.

8.      "Momentum Kill" means the operation by which drilling fluid was pumped into the Deepwater Horizon blow-out preventer at a high rate of speed in an attempt to overcome the flow of hydrocarbons as part of the Top Kill operations.

9.      Static Kill" means the operation by which drilling fluid was pumped into the *Deepwater Horizon* blow-out preventer after the well had been closed in.

10.     "Erosion" means the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, for example, the flow of fluids and/or other materials, including but not limited to hydrocarbons.


## AREAS OF INQUIRY

**A. Source Control**

1.  Your review and approval of BP's 2009 Regional Oil Spill Response Plan -- Gulf of Mexico.

2.      Your knowledge on or before April 20, 2010, of any requirements that Oil Spill Response Plans, Exploration Plans, or any other regulatory submittal include provisions regarding how to respond to subsea oil well blow-outs (including deepwater oil well blow-outs) on the Outer Continental Shelf, by containing, capturing, controlling, capping or stopping the flow of oil and gas from the well.

3.      Other than blow-out preventers, your knowledge of the state of the art within the industry as to any device, system, assembly, procedure or technology for response to subsea oil well blow-outs (including deepwater oil well blow-outs) by containing, capturing, controlling, capping or stopping the flow of oil and gas from the well.

4.      The training of United States personnel, including but not limited to personnel of the United States Coast Guard prior to April 20, 2010, to respond to, or to participate in a response to, an offshore oil well blow-out relating to Source Control Efforts.

5.      Your knowledge of the Source Control elements of BP's offshore oil spill response programs, or emergency management training programs, for responses to offshore oil well blowouts, between January 1, 2005 and April 20, 2010, including any audits or approvals of such training programs.

6.      Your knowledge of the role of and categories and types of actions taken by the Unified Command, as created and implemented pursuant to the National Incident Management System, in Source Control Efforts

7.      Your knowledge of the role of and categories and types of actions taken by the office of the National Incident Commander in Source Control Efforts, including, but not limited to, the acquisition and distribution of information or data related to the Source Control efforts.

8.      Your knowledge of the role and actions of any United States personnel or United States contractors in Source Control Efforts that were not undertaken under the scope and authority of the Unified Command or the National Incident Commander, e.g., as reflected on such entity's formal organizational chart.

9.      Your knowledge of BP's efforts to engage or include United States personnel or United States contractors in Source Control Efforts.

10.     Your knowledge of any omissions by BP to engage or include United State personnel or United States contractors in Source Control Efforts.

11.     Your knowledge of BP's efforts to provide information to United States personnel or United States contractors in connection with Source Control Efforts.

12.     Your knowledge of any failure by BP to provide information to United States personnel or United States contractors in connection with Source Control Efforts.

13.     To the extent not otherwise addressed by these topics, your knowledge of and involvement in the decision regarding whether or not to undertake a specific Source Control Effort for which a proposal, evaluation or analysis had been developed

14.     Your knowledge of and involvement in the sequencing of Source Control Efforts, including the considerations or factors that accounted for the sequence of Source Control Efforts.

15.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the efforts used to activate the *Deepwater Horizon* blow-out preventer on or after April 20, 2010, through the use of remotely operated vehicles ("ROVs").

16.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a pollution dome or cofferdam as a means to capture oil and gas from the MC252 Well.

17.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a riser insertion tube tool as a means to capture oil and gas from the MC252 Well.

18.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a second blowout preventer as a means to control or cease the flow of oil and gas from the MC252 Well.

19.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a capping stack as a means to control or cease the flow of oil and gas from the MC252 Well.

20.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Junk Shot(s) as a means to stop the flow of oil and gas from the MC252 Well.

21.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Momentum Kill(s) as a means to stop the flow of oil and gas from the MC252 Well.

22.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Top Kill as a means to stop the flow of oil and gas from the MC252 Well.

23.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a Top Hat as a means to capture oil and gas from the MC252 Well.

24.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of the choke or kill line of the *Deepwater Horizon* blow-out preventer as a means to capture oil and gas from the MC252 Well.

25.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of free standing risers and floating production, storage and offloading vessels as a means to capture oil and gas from the MC252 Well.

26.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a Static Kill as a means to kill the MC252 Well.

27.     Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of relief wells as a means to stop the flow of oil and gas from the MC252 Well.

28.     Your understanding of the path (or paths) through which hydrocarbons flowed from the MC252 reservoir through and out of the MC252 Well between April 20, 2010, and July 15, 2010, including any information supporting that understanding.

29.     Your knowledge of and involvement with the selection, testing, monitoring, approval, and use of subsea or surface dispersants at or in the area immediately above the MC252 Well as those matters affected or relate to Source Control Efforts and any effort to quantify the flow of hydrocarbons from the MC 252 Well.

30.     Your knowledge of and involvement in the development and implementation of simultaneous operations procedures or plans for vessels working in the immediate vicinity of the MC 252 Well.

31.     Your knowledge of any suggestion or proposal to utilize the Macondo wellbore or either relief well for future production from MC 252.

32.     Your knowledge of any delay in the drilling or either relief well due to the taking of samples in the wellbore.

33.     Your knowledge of the financial support, labor, equipment, facilities and other resources devoted by BP to Source Control Efforts.

34.     ~~The amount you billed or invoiced to BP in connection with your involvement in Source Control Efforts. [By agreement of BP and the United States, this topic shall be withdrawn after the US serves its response to BP Interrogatory 23, provided that BP notifies the US in writing that BP will not move to compel a further response to that interrogatory].~~

> **Comment [j1]:** Topic replaced by interrogatory pursuant to agreement between BP and the US.

**B. Quantification**

**Unified Command/Unified Area Command/Houston Incident Command**

35.     Your efforts (including all communications, modeling, calculations and analysis of any kind) leading to the flow rate estimate of 1,000 bopd announced by Admiral Landry on April 24, 2010.

36.     Your efforts (including all communications, modeling, calculations and analysis of any kind) leading to the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010.

37.     Your efforts (including all communications, modeling, calculations and analysis of any kind) relating to all attempts to quantify the release of hydrocarbons from the Macondo MC252 well after April 20, 2010, whether or not those efforts resulted in a finalized or public estimate.

38.     All communications, data, modeling, calculations and analysis relating to the effect of restrictions on flow from the MC252 well, including flow path within the well, cement, riser geometry, the BOP, or any other restriction, including the effect of removing or mitigating any restriction (*e.g.*, by erosion) or the development or existence of leak points.

39.     All communications, data, modeling, calculations and analysis of the MC252 reservoir, including its geological formation, integrity, pressure, and composition (including the

composition of oil, natural gas and any other constituents or components of the reservoir) and the effect of reservoir depletion on the flow of hydrocarbons from the MC252 well.

40.     All communications, data, modeling, calculations and analysis relating to "skin" within the MC252 reservoir.

41.     All communications, data, modeling, calculations and analysis relating to the collection of hydrocarbons from the MC 252 well using the Riser Insertion Tool, including any effect such information had on any estimate of flow rates.

42.     All communications, data, modeling, calculations and analysis relating to the effect of the flow of hydrocarbons from the MC252 well on any attempt or technique considered to stop the flow of hydrocarbons from the well.

43.     All communications, data, modeling, calculations and analysis identifying or relating to factors affecting the ability to estimate the flow of hydrocarbons from the MC252 well or the accuracy of any such estimate.

**Flow Rate Technical Group (FRTG):**

44.     The organization and operation of the Flow Rate Technical Group ("FRTG") and all of its sub-teams, and the selection of their members and staff.

45.     Any communications constituting directions, guidance, analysis, commentary or influence) relating to the work of the FRTG or to flow, between the FRTG or any of its members and any person in the Federal Interagency Solutions Group (FISG), Executive Office of the President (EoP), Department of Energy (DoE), Department of the Interior (DoI), Environmental Protection Agency (EPA), Department of Homeland Security (DHS) or Department of Commerce (DoC), or anyone acting on their behalf.

46.     The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the FRTG, any of its members, any of its sub-teams, or any of their members, during the course of any work performed by the FRTG or any sub-team to quantify or estimate the flow of hydrocarbons from the MC252 well, including velocimetry, nodal analysis, reservoir analysis, hydraulics, acoustics, surface expression, mass balance, multiphase flow, and gas/oil ratio ("GOR").

47.     All communications within or among the FRTG and its sub-teams regarding the difficulty, quality, accuracy or uncertainties associated with its work to quantify or estimate the flow of hydrocarbons from the MC252 well.

48.     All communications involving the FRTG or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

49.     Your efforts (including all communications, modeling, calculations and analysis of any kind) leading to the May 27, 2010 flow rate estimate of 12,000 to 19,000 bopd.

50.     Your efforts (including all communications, modeling, calculations and analysis of any kind) relating to all attempts to quantify the release of hydrocarbons from the MC252 well after April 20, 2010, whether or not those efforts resulted in a finalized or public estimate.

51.     Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

52.     The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

**Department of Energy "Science Team":**

53.     The organization and operation of the Department of Energy Science Team, including the selection of its members and staff.

54.     The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the Science Team or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

55.     All communications involving the Science Team or any of its members regarding the difficulty, quality, accuracy or uncertainty associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

56.     All communications involving the Science Team or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

57.     Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

58.     The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

59.     Your knowledge, consideration or analysis of the National Commission Chief Counsel's conclusion (2011 Report at 45) that "the interior of the BOP (through which hydrocarbons definitely flowed) showed serious erosion, as did the interior of the casing hanger."

60.     Your knowledge, consideration or analysis of the National Commission Chief Counsel's conclusion (2011 Report at 212) that "initial photos from the recovered BOP show erosion in the side of the blowout preventer around the ram, which was a possible flow path for hydrocarbons."

**Los Alamos National Lab (LANL):**

61.     The organization and operation of the LANL team, including the selection of its members and staff.

62.     The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the LANL team or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

63.     All communications involving the LANL team or any of its members regarding the difficulty, quality, accuracy or uncertainty associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

64.     All communications between the LANL team or any of its members and any other person regarding the flow rate work being undertaken by any other national laboratory or agency of the Federal Government.

65.     All communications involving the LANL team or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

66.     Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

67.     The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

**Lawrence Livermore National Lab (LLNL):**

68.     The organization and operation of the LLNL team, including the selection of its members and staff.

69.     The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the LLNL team or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

70.     All communications involving the LLNL team or any of its members regarding the difficulty, quality, accuracy or uncertainty associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

71.     All communications between the LLNL team or any of its members and any other person regarding the flow rate work being undertaken by any other national laboratory or agency of the Federal Government.

72.     All communications involving the LLNL team or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

73.     Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

74.     The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

**Lawrence Berkeley National Lab (LBNL):**

75.     The organization and operation of the LBNL team, including the selection of its members and staff.

76.     The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the LBNL team or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

77.     All communications involving the LBNL team or any of its members regarding the difficulty, quality, accuracy or uncertainties associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

78.     All communications between the LBNL team or any of its members and any other person regarding the flow rate work being undertaken by any other national laboratory or agency of the Federal Government.

79.     All communications involving the LBNL team or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

80.     Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including

erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

81. The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

**Sandia National Lab (SNL):**

82. The organization and operation of the SNL team, including the selection of its members and staff.

83. The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the SNL team or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

84. All communications involving the SNL team or any of its members regarding the difficulty, quality, accuracy or uncertainty associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

85. All communications between the SNL team or any of its members and any other person regarding the flow rate work being undertaken by any other national laboratory or agency of the Federal Government.

86. All communications involving the SNL team or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

87. Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

88. The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

89. Preparation of the report "DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident, SAND2010-XXXX, Arthur C. Ratzel III, Team Lead, Sandia National Laboratories, December 2010.

**Federal Interagency Solutions Group (FISG):**

90. Preparation of the reports "McNutt, M, R. Camilli, G. Guthrie, P. Hsieh, V. Labson, B. Lehr, D. Maclay, A. Ratzel, and M. Sogge. 2011; Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill, Flow Rate Technical Group report to the

National Incident Command, Interagency Solutions Group, March 10, 2011" and "Oil Budget Calculator, Deepwater Horizon, Technical Documentation, November 2010, A Report by the Federal Interagency Solutions Group, Oil Budget Calculator Science and Engineering Team."

91.     All communication between the FISG or any of its members and any other person regarding the flow rate work being undertaken by any national laboratory or agency of the Federal Government.

92.     The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the FISG or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

93.     All communications involving the FISG or any of its members regarding the difficulty, quality, accuracy or uncertainties associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

94.     All communications involving the FISG or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

95.     Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

96.     The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

**Environmental Protection Agency (EPA):**

97.     Any communications constituting directions, guidance, analysis, review, commentary or influence between the EPA and any person in the FRTG, FISG, Executive Office of the President, Department of Energy, Department of the Interior, Department of Homeland Security or Department of Commerce, or anyone acting on their behalf, regarding Source Control Efforts or the quantification or estimation of hydrocarbons escaping from the MC252 well.

98.     The EPA's role and participation in the process of considering or determining the amount or type of dispersants to be applied in connection with the release of hydrocarbons from the MC252 Well, and the methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the EPA in connection with that role.

99.     All communications involving the EPA regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

**National Institute of Standards and Technology (NIST):**

100.   Any communications constituting directions, guidance, analysis, review, commentary or influence) between the NIST and any person in the FRTG, FISG, Executive Office of the President, Environmental Protection Agency, Department of Energy, Department of the Interior, Department of Homeland Security or Department of Commerce, or anyone acting on their behalf, regarding the quantification or estimation of hydrocarbons escaping from the MC252 well.

101.   The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the NIST in performing or reviewing any work to quantify or estimate the flow of hydrocarbons from the MC252 well, including velocimetry, nodal analysis, reservoir analysis, hydraulics, acoustics, surface expression, mass balance, multiphase flow, and gas/oil ratio ("GOR").

102.   All communications within or among the NIST regarding the difficulty, quality, accuracy or uncertainties associated with efforts to quantify or estimate the flow of hydrocarbons from the MC252 well.

103.   All communications involving the NIST regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

104.   Your knowledge of any documents, analysis or discussion relating to erosion (the gradual degradation, deterioration, or destruction of surface material  caused by the mechanical action of, e.g., the flow of fluids and/or other materials, including but not limited to hydrocarbons) occurring within the MC252 well and any of its constituent elements, including erosion of the bottomhole, annular cement, casing hanger interior, blind shear ram, riser, any drill pipe remaining in the riser, or any other section or portion of the flow path of hydrocarbons from the MC252 well, on and after April 20, 2010.

105.   The effect of erosion on the flow rate of hydrocarbons from the MC252 well on and after April 20, 2010.

Dated:  November __, 2011                 Respectfully submitted,

                                          By:  /s/ J. Andrew Langan, P.C.

                                          Richard C. Godfrey, P.C.
                                          J. Andrew Langan, P.C.
                                          Timothy A. Duffy, P.C.
                                          Kirkland & Ellis LLP
                                          300 North LaSalle Street
                                          Chicago, IL 60654
                                          Telephone: (312) 862-2000

Facsimile:  (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this __th day of November, 2011.

/s/  J. Andrew Langan, P.C.

14

Attachment 2

March 22, 2012

***Via Email to Judge Shushan, Mike O'Keefe, and Liaison Counsel***

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court, Eastern District of Louisiana

   Re:  <u>Finality of Language in Rule 30(b)(6) Notice to BP</u>

Dear Judge Shushan:

   As both Alabama and the PSC argued at last Friday's conference, the language in the 30(b)(6) Notice to BP was final; BP agreed it was final (before last week); and the Parties and your Honor had accordingly moved on to scheduling dates and topic witnesses.

   We believe that the following communications, among others, show that the Notice to BP was settled on every issue except the now-decided Topic 1 "overlap" issue several weeks before last week's conference:

- December 7, 2011:  Counsel for BP wrote in an email to all counsel that "[t]he only remaining notice is to BP.  We will be sending the PSC some additional feedback on one issue shortly."

  - That "one issue" was the now laid-to-rest "look back" issue, which the PSC informed the Court of in a letter the next day (December 8, 2011).

- January 12, 2012:  In a letter to the Court, BP stated that it and the PSC had "reached an impasse that requires the court's attention"—*i.e.* the "overlap" with Phase I issue.

  - In the letter, BP laid out its "overlap" objection to Topic 1 and raised no objection to any other Topic.

- January 26, 2012:  The PSC reported to the Court that the Phase II 30(b)(6) Notice to BP was final other than (a) the Topic 1 overlap issue and (b) the PSC's request for a document custodian.

- January 26, 2012:  BP responded later that day via the attached letter from Mr. Gasaway to the Court that "**BP had thought this Notice had been agreed to**.  Earlier today, however, the PSC requested 'adding a topic for a records custodian.'  BP is evaluating this late arriving request."  *See* Attachment at 2 (emphasis added).

- February 3, 2012:  BP submitted a chart regarding the "Status of Phase 2 30(b)(6) notices."  BP's chart stated that, with regard to the Notice to itself, "BP provided the PSC its last set of comments.  PSC has since requested 'adding a topic for records custodian,' which will be resolved when the issue of records custodian topics is resolved for Phase 1.  BP has raised with the Court the PSC's duplication of its Phase 1 30(b)(6) source control topics in its Phase 2 notice."

- February 26, 2012:  Responding to a PSC proposal of 30(b)(6) scheduling, BP stated that it was prepared "to put forward witnesses on certain source control topics—specifically, spill preparedness and response planning costs; or in other words, Topics 10, 11, 12, 13, and 15."  The only outstanding issue BP raised with the Notice was its inability to put forward a witness for Topic 1 until the Court ruled on the overlap issue.

As we read it, and we don't think it can be read any other way, BP agreed that the topics were final—before last week.  BP told the Court two months ago that "BP thought the notice had been agreed to." Attachment at 2.  And BP certainly believed the notice was final enough that BP was ready to put forward source control and spill preparedness witnesses three weeks ago.  Only the "overlap" issue was not final at that time, but now it is.  That BP has settled with the PSC changes nothing with regard to the finality of BP's 30(b)(6).

The 30(b)(6) Notice to BP was and is the Collective Parties' notice, not the PSC's notice.  Thus, the non-settling Parties need not start from square one, thereby grinding the Court's deposition scheduling progress to a halt.

Because these are the topics Alabama has been tasked to (re)consider, Alabama asks the Court to treat the spill preparedness and source control language contained in Topics 1-3, 10-13, and 15-17 of the 30(b)(6) Notice to BP as final so that the Parties and this Court may begin scheduling depositions, should Alabama and its sister Plaintiffs chose to press on with these topics.

Respectfully,

__/s/ Corey L. Maze_____
COREY L. MAZE
*Deputy Attorney General, State of Alabama*