# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

April 11, 2012

**By Electronic Mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
Room B345
500 Poydras St.
New Orleans, Louisiana 70130

      Re: *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (MDL No. 2179) — Subpoena Served on Woods Hole Oceanographic Institution

Dear Judge Shushan:

  We write to respond to the letter of April 5, 2012 ("Letter") sent by counsel for Woods Hole Oceanographic Institution ("Woods Hole" or "WHOI") (**Attachment A**) and to provide a brief summary and update on important facts and law relevant to the subpoena served on Woods Hole.

  As described below, BP has a compelling need for all subpoenaed documents, and there is no legal basis for Woods Hole declining to produce the subpoenaed data and communications. Nonetheless, to date, Woods Hole has disclosed only a handful of e-mails, and no other communications or analysis, regarding its flow rate work. Moreover, even if the Court were to find that some of Woods Hole's documents may be protected under a claim of privilege (although BP cannot envision such a circumstance), BP and other parties would still be entitled to privilege logs and time to review and challenge entries appearing on those logs. Despite its limited production of documents to date, Woods Hole has not complied with the requirement that it provide such privilege logs.

        \*   \*   \*   \*

Chicago  Hong Kong  London  Los Angeles  Munich  New York  Palo Alto  San Francisco  Shanghai

K&E 22297363.1

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 2

### BACKGROUND

BP has a compelling need for the subpoenaed documents that Woods Hole has thus far withheld, including for contract "deliverables" that this Court has expressly directed be produced.

**1.   WHOI's Work Is Critical to Phase Two Litigation**

The United States has portrayed Woods Hole's work as critical to the flow estimations and conclusions of the federal government entities tasked with developing an official flow rate number, the Flow Rate Technical Group ("FRTG"), and the U.S. Science Team under the direction of Secretary Chu. Indeed, Dr. Richard Camilli, the lead Woods Hole scientist performing the flow rate work, participated in key meetings leading to the government's development and initial announcement of the government flow rate estimates on August 2, 2010. Woods Hole's work and analysis, therefore, is undoubtedly central to issues being contested in Phase Two of this litigation.

The FRTG's final report openly praised the supposed accuracy of Woods Hole's acoustics technique in calculating flow rate. In fact, the FRTG report claims that "the technique that performed the best during the ongoing emergency was the acoustic technique." *See* **Attachment B**, at 2. As described in previous letters to the Court, Dr. Marcia McNutt, Director of the United States Geological Survey and lead author of the FRTG report, has publicly championed the acoustics method and, in a publication coauthored by Woods Hole and other FRTG scientists, cited Woods Hole's acoustics-based flow rate analysis as "exceptionally strong evidence" supporting the government's publicly announced flow estimates. *See* **Attachment C**, at 5.

Perhaps most importantly, the government's emphasis on the "convergence of results" from various methodologies, which it asserts confirms its "ground truth" flow rate estimate, apparently hinges on the accuracy and reliability of the estimate of the flow on May 31, 2010—a flow estimate that was provided by Woods Hole. *See* **Attachment B**. at 2, 8. BP therefore has an obvious and compelling need for analysis, communications, and e-mails pertaining to Woods Hole's development of flow rate estimates. These materials are an essential part of Woods Hole's work and are likely critical to understanding how Woods Hole reached its various conclusions.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 3

2.  **WHOI's Document Production Is Deficient**

Counsel for BP was advised by counsel for WHOI by e-mail dated April 6, 2012, that WHOI's production of documents responsive to the subpoena is complete. *See* **Attachment D**. Nonetheless, substantial subpoenaed scientific data is missing, and essentially all subpoenaed communications have not yet been produced.

In response to its subpoena to date, BP has received two production sets of documents from Woods Hole. The first production, received on March 6, 2012, consisted of a small binder of documents. Of the 631 pages of documents in that production, approximately 475 pages were publicly available and already accessible to BP. The remaining documents were limited to the compositional analysis of hydrocarbon sampling by WHOI that occurred several weeks after Woods Hole's acoustics measurements were taken.

On March 31, 2012, BP received Woods Hole's second production. This production consisted of twenty-five hard-copy documents (roughly 500 pages total) and thirteen CDs/DVDs. Twenty-four of the twenty-five hard-copy documents were versions of Woods Hole articles, publicly available references cited in published Woods Hole articles, or other publicly available documents, all of which were already accessible to BP. Ten DVDs contained raw video data; the remaining three CDs contained acoustic and remotely operated vehicle ("ROV") data.

But even this data, without more, is of little value to BP. Notably omitted from Woods Hole's productions to date is certain data and information fundamental and indispensable to acoustic processing, such as instrument settings and algorithms for translating acoustic returns to an estimate of the level of effluent being discharged into the Gulf. Moreover, much of the data Woods Hole has provided thus far is unreadable and unusable, given Woods Hole's failure to specify the format of data files, as was specifically requested in BP's subpoena. Moreover, as noted above, the production omits all communications that explain how and by whom the technical analysis was conducted.

In sum, contrary to what Woods Hole says in the Letter, the materials produced to date do not remotely provide all of the information "that BP needs to test and replicate WHOI's work." *See* **Attachment A**, at 2.

3.  **The Contract "Deliverables" Have Not Been Produced**

Also absent from Woods Hole's document productions to date are any of the "deliverables" under Woods Hole's contract with the United States Coast Guard. (As we discuss below, one of the deliverables was previously made publicly available.) During the March 30

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 4

Working Group Conference, the Court expressed its understanding that WHOI had produced all deliverables (and counsel for the United States did not disagree). *See* **Attachment E**, at 10. As the Court then noted in its April 2 Order from the March 30 Working Group Conference, WHOI's most recent production was to include "all of the 'deliverables' under the contract between the Coast Guard and WHOI." *See* **Attachment F**, at 2.

In fact, these deliverables still have not been produced. Rather, in its April 5 Letter, WHOI suggested that BP's "need" for contract deliverables was "satisfied"—not by actual production of the deliverables—but by other materials, including certain e-mails produced from the files of United States government custodians and by Woods Hole's (clearly inadequate) production of raw data, documents, and files. *See* **Attachment A**, at 2.

The "Statement of Work" in Woods Hole's government contract (**Attachment G**) makes clear, however, that the contract deliverables go beyond raw data and e-mails. Specifically, the contract called for the following deliverables:

- **Deliverable 1 – Data Collection Test Plan.** The contract states that WHOI was to provide a data collection test plan prior to departure for on-site data collection. This plan was to include "the description and sequence of operations." WHOI has not produced this plan to BP.

- **Deliverable 2 – Daily Reports.** These reports were to include, but were not limited to, "personnel involvement, equipment status, and a field analysis of data collected." WHOI has not produced these reports to BP.

- **Deliverable 3 – Trip Report.** This report was to include "a summary of significant events during the deployment; equipment and sensor performance assessment, and a preliminary analysis of data collected." WHOI has not produced a trip report to BP.

- **Deliverable 4 – Final Oil Spill Flow Rate Report and Characterization Analysis Report.** WHOI was to analyze the data collected from on-site research to provide a Final Oil Spill Flow Rate Report and Characterization Analysis Report. This report was to be submitted within five business days after the conclusion of data collection period. Only because this deliverable was publicly released as Appendix C to the FRTG final report was it available to BP prior to issuance of the subpoena.

- **Deliverable 5 – Contract Archive.** WHOI was to provide "an electronic archive of all reports, test data, and other information gathered during the contract." WHOI has not

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
April 11, 2012
Page 5

produced this archive to BP. WHOI has produced some electronic data, but not the comprehensive archive contemplated here.

In summary, BP has reviewed WHOI's production and believes all non-public deliverables have yet to be produced, notwithstanding this Court's directives. Importantly, Woods Hole's April 5 Letter expressly indicates that it has not produced the deliverables. And Woods Hole asserts no privilege over these deliverables.

### ARGUMENT

As described below, there is no legal basis for Woods Hole's failure to produce subpoenaed information and communications. Moreover, even if the Court should find (contrary to what BP expects) that some Woods Hole's documents may be protected under claims of privilege, BP would still be entitled to a privilege log and time to review and challenge the entries appearing on the log.

**1.     WHOI's Work Is Neither "Academic" nor Immune from Scientific Scrutiny**

Contrary to Woods Hole's claim that its flow rate work was undertaken simply "in its capacity as a non-profit oceanographic research institution," *see* **Attachment A**, at 1, it was clear to Woods Hole—from the beginning and throughout—that its *Deepwater Horizon* flow estimation work was of public interest and pertinent to issues in the litigation that was sure to arise from the incident. The Statement of Work in WHOI's contract with the Coast Guard expressly states that "[t]he Government seeks to provide accurate assessments of the oil flow characteristics and hydrocarbon releases into the water column," in the context of BP's potential liability under federal law. *See* **Attachment G**, at 1.

Woods Hole's continuous coordination and collaboration with the United States and FRTG scientists on flow estimation in the months following publication of the FRTG report shows Woods Hole's attempts to distinguish "government" from "academic" flow rate work to be insupportable. In fact, Woods Hole's involvement and interaction with the FRTG did not end on the contract's termination date or with the publication of the FRTG report in March 2011, as Woods Hole now suggests.

For example, in September 2011, several months after publication of the FRTG report, Woods Hole published in *Proceedings of the National Academy of Sciences* ("*PNAS*") a revised acoustics flow rate paper with a more detailed description of its acoustics measurements and a new flow rate estimate. *See* **Attachment H**. FRTG leader and USGS director Dr. McNutt was the sole, "prearranged editor" for WHOI's *PNAS* article. *See id.* at 1 n.*. The acknowledgments

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 6

to this article state that the work "was supported through US Coast Guard Contract HSCG32-10-CR00020." *Id.* at 5.  Those acknowledgements further recognize "Flow Rate Technical Group leader Dr. Marcia McNutt, as well as the many other individuals within National Incident Command for their valuable assistance." *Id.*

Additionally, in December 2011, Dr. Camilli coauthored another article about the government's flow rate estimates with, among others, Dr. McNutt, Dr. Crone, Dr. Hsieh, Dr. Savas, and Dr. Shaffer, all of whom were members of the FRTG.  In this article, several estimates, including Woods Hole's September 2011 revised estimate, were cited by Dr. McNutt as "sound evidence" of the accuracy of the government's final flow theory.  *See* **Attachment C**, at 6.

Interestingly, throughout its work seeking to estimate the flow from the *Deepwater Horizon*, Woods Hole voluntarily submitted itself to public and academic guidelines promoting the values of openness and accessibility of scientific analysis conducted pursuant to government funding and published in scholarly journals.  Yet now, in litigation, Woods Hole seeks to evade the full and fair disclosure of its work that these guidelines promote.

For example, the *PNAS* journal policies, in a section entitled "Materials and Data Availability," clearly state that "authors *must* make *materials, data, and associated protocols* available to readers."  *See* **Attachment I**, at ii.  Additionally, given the close association between Woods Hole researchers and United States government researchers, it is perhaps significant that a Department of the Interior policy on "integrity of scientific and scholarly activities" is particularly relevant because its aim is to "[f]acilitate the free flow of scientific and scholarly information."  *See* **Attachment J**, at 2.  The policy states that it applies to all "contractors, cooperators, partners," and others "who assist in developing or applying the results of scientific and scholarly activities." *Id.*

The interests in openness and accessibility of scientific analysis reflected in these scholarly and government guidelines surely are only magnified, not diminished, where, as here, the science at issue is of central relevance to litigation of nearly unprecedented scale and public interest.

**2.      BP Has Reasonably Requested the Subpoenaed Documents**

BP's request for information from Woods Hole is not, as counsel inappropriately suggests, an "aggressive pursuit of WHOI's scientists."  *See* **Attachment A**, at 1.  It is instead a reasonable and well-directed request intended to advance BP's and other parties' understanding

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 7

of scientific work commissioned by and performed in collaboration with the United States in order to defend against allegations put forward by the United States in litigation.

BP and other parties to this litigation are particularly entitled to understand, for example, the analysis and decision-making process accounting for adjustments to, or revisions of, the Woods Hole's scientific analysis and estimates. As noted, Woods Hole published several reports of their findings between June 2010 and September 2011, and their methodology, analysis, and flow rate estimates were revised over this time period.

Of course, the raw acoustic measurements and data gathered on May 31, 2010, remains fixed and static. This raw data therefore cannot elucidate or account for the development of multiple flow rate estimates over the course of WHOI's work; only analysis and communications can shed light on these notable and remarkable variations over time.

While the Woods Hole productions to date include a handful of e-mail chains relating to the logistics of access to the ROVs used to support the acoustics equipment, they include no communications of any kind that post-date WHOI's initial report of its findings, or that might explain the important changes made to Woods Hole's analysis over time. Given the government's reference to and reliance on Woods Hole's later and revised estimates, communications from the period following the first publication of the Woods Hole results in the FRTG report—as well as the additional data (if any) supporting the revised estimates—are critical to providing BP and other parties with a full understanding of Woods Hole's final flow estimation work.

Woods Hole has further acknowledged that its research comprises a novel application of acoustic science that suffers from a high degree of uncertainty. As a result, the Woods Hole researchers had to make certain judgment calls and discretionary decisions that ultimately may well have made a tremendous difference to their end results. For example, discretionary decisions regarding how to calibrate the instruments and assess acoustic returns will have a significant impact on the magnitude of oil and gas flow as calculated by Woods Hole. In order to "fill in the blanks," BP is entitled to understand what judgment calls were made by the Woods Hole researchers and why.

### 3.     No "Scholastic Privilege" or Other Protection Applies

BP has already submitted letter briefs to the Court refuting Woods Hole's claims to a "scholastic privilege" allegedly protecting its scientific analysis and communications. *See* **Attachment K**. As those prior letters make clear, no court has ever recognized such a privilege, and this Court should not become the first one to do so.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 8

To review, some limited caselaw has supported the application of a two-part analysis in instances where a party resists a Rule 45 subpoena by asserting privilege or protection over academic research materials that resemble information received from a journalist's confidential sources. The First Circuit has described this two-part inquiry as follows:

> Initially, [the court] must determine whether the [subpoenaed party's] academic research is protected in a manner similar to the work product of journalists. This inquiry entails two aspects: (1) whether the respondents' positions warrant conferral of any special consideration, and (2) whether their research comprises confidential information. If these hurdles are cleared, [the court] next must determine the type and kind of protection that the law affords.

*Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998). Under this test, it is the proponent of the privilege that bears the burden of establishing the existence of the privilege. *See FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000) ("In a discovery dispute, the burden to establish an applicable privilege rests with the party resisting discovery.").

But even assuming that this two-part test applies here, the threshold question asks whether the researchers are "sufficiently like journalists for the protection afforded to journalists' materials to be applied." *Cusumano*, 162 F.3d at 713. In this case, however, it is apparent that Woods Hole's research is directed to scientifically estimating the magnitude of an effluence of hydrocarbons into the Gulf of Mexico. As such, it is as far afield as one can imagine from the work product of journalists interviewing confidential sources, and therefore does not warrant any special consideration or protection.

Simply put, the First Circuit provides only a "modicum of protection" to journalists' conversations with confidential sources in order to ensure a free flow of information to journalists and eventually to the public. *See id.* at 714-15; *id.* at 714 ("If [scholar's] research materials were freely subject to subpoena, their sources likely would refuse to confide in them. . . . Such similarities of concern and function militate in favor of a similar level of protection for journalists and academic researchers."). Those concerns simply do not apply to a scientific analysis of hydrocarbon flows.

Under the second prong of the First Circuit test (assuming the subpoenaed party can satisfy the first prong) the court applies Federal Rule of Civil Procedure 26's balancing test to weigh the needs of the case and the parties against the asserted interest in confidentiality. *See id.* at 716 ("[I]t suffices to say that, when a subpoena seeks divulgement of confidential information compiled by a journalist or academic researcher in anticipation of publication, courts must apply a balancing test."). This Rule 26 balancing "prevents compulsory disclosure of a reporter's

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 9

confidential sources unless it is directly relevant to a nonfrivolous claim or inquiry undertaken in good faith; and . . . where the same information is readily available from a less sensitive source." *United States v. Trs. of Bos. Coll.*, No. 11-91078-WGY, 2011 WL 6287967, at *14 (D. Mass. Dec. 16, 2011) (internal quotation marks omitted).

Woods Hole also cannot meet its heavy burden under the balancing test. As noted above and in previous correspondence with the Court, BP has a compelling and urgent "need for the information sought by the subpoenas." *Cusumano*, 162 F.3d at 711-12. BP has demonstrated the "relevance and probative value" of the subpoenaed communications and scientific analysis. *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8, 12 (D. Mass. 2008). BP also cannot "secure the same data through other, less intrusive avenues"—in fact, there is truly "no other feasible way to obtain the information." *Cusumano*, 162 F.3d at 712-13. But on the other hand confidentiality concerns have no purchase as regards the disclosure of scientific assessments and debates over hydrocarbon flows. Accordingly, each factor that is critical to any balancing weighs heavily in favor of BP under a Rule 26 analysis.

Against this backdrop, WHOI's April 5 Letter adds nothing that would favor protecting the communications subpoenaed from WHOI:

- Woods Hole cites *Plough Inc. v. Nat'l Academy of Sci.*, 530 A.2d 1152 (D.C. 1987), as precedent affirming protection from disclosure of internal documents, preliminary drafts, and "confidential internal deliberations" of NAS scientists regarding an aspirin study. *Id.* at 1154-56. In *Plough*, however, plaintiffs had "no intention of relying on these reports at trial for any reason," so there was no reason to order production of notes and communications regarding the reports. *Id.* at 1155, 59. Here, in contrast, the work of the FRTG and Woods Hole is central to core issues being contested in Phase Two of this litigation.

- Woods Hole also cites *Dow Chemical Co. v. Allen*, 672 F.2d 1262 (7th Cir. 1982), where the court found that the subpoenaed documents carried "little probative value" and that there was "no convincing showing of need." *Id.* at 1272-73. The court further determined that compelling production of the requested information would impose a "substantial burden" because the studies at issue were "nowhere near completion" and "[had] not been subjected to peer review," *id.* at 1268; in any case, the court found that there was "no prejudice to the rights of" the subpoenaing party by declining to order the production of the subpoenaed documents.; *id.* at 1270. Here, in contrast, there is a compelling need for documents central to the government's flow estimations; there is no burden because the final studies are complete and published; and BP would be prejudiced without access to the subpoenaed information and

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 10

communications.  Tellingly, *Dow* itself makes clear that considerations of "academic freedom" constitute one factor among many that "figure into the legal calculation" in an overall balancing, but is not, standing alone, a basis for requiring absolute protection of research materials.  *Id.* at 1276; *see also id.* at 1275 ("[A]cademic freedom, like other constitutional rights, is not absolute, and must on occasion be balanced against important competing interests.").

Moreover, other authority cited by Woods Hole weighs affirmatively in favor of a complete production of subpoenaed documents here.  For instance, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 269 FR.D. 360 (S.D.N.Y. 2010), involves facts somewhat similar to those at issue in the MDL, and affirmatively supports BP's efforts to obtain the subpoenaed communications.

In *MTBE*, a third-party subpoena was served on a research institution for documents regarding an MTBE commissioned study funded by ExxonMobil, and ExxonMobil engaged in extensive communication and collaboration with the research institution.  *Id.* at 362-63, 365.  The court recognized the value of "academic freedom" in the abstract, but cautioned about its application to this particular case: "While it is necessary to ensure that the values of academic freedom are protected, the [research institution], by virtue of its connection to ExxonMobil, is not entitled to the same level of protection ordinarily accorded to non-party research institutions.  *The* [*research institution*] *commenced its MTBE study with the knowledge that ExxonMobil was a defendant in this MDL and that the study was likely to play a role in this litigation.  It cannot therefore claim that it was unaware that its results would be scrutinized by the plaintiffs who are now seeking information relating to the study.*"  *Id.* at 365 (emphasis added).

Additionally, the concurring opinion in *Dow Chemical Co. v. Allen*, 672 F.2d 1262 (1982), suggests that although "academic freedom" can be considered in a balancing test, perhaps an equally important factor weighing in favor of "public disclosure" of academic research is whether the research is done under contract with the government or financed by a government grant.  *Id.* at 1279 (Pell, J., concurring).  As previously noted, the Woods Hole work subpoenaed here was done at the request of and under contract with the Coast Guard and was funded by federal grant money from the National Science Foundation, as Woods Hole notes in its *PNAS* article.  *See* **Attachment H**, at 5.

**4.**     **BP Is Willing to Share Reasonable Costs of a Responsive and Complete Production**

As BP has previously noted, it is well established that "[u]sually, absent an order compelling document production, a non-party bears its own production cost."  *See Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008) (citing *Boston Children's Heart Found., Inc.*

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 11


*v. Nadal-Ginard*, No. 93-12539, 1995 WL 17015062, at *2 (D. Mass. Aug. 23, 1995)). Courts routinely look at several factors before requiring reimbursement, and in this case, as briefed in prior letters to the Court, those factors weigh against shifting costs to BP.

Nonetheless, even absent a legal obligation to do so, BP is willing to share costs on a 50/50 basis with the United States for time and effort spent by Woods Hole in producing documents responsive to requests in the subpoena. The need for these documents is urgent, and the production delay is inexcusable. To break this logjam, BP is willing to pay one-half the costs, provided that this expenditure by BP results in a rapid, full, and fair production of responsive documents.

**5.      Even if Some of WHOI's Documents Were Legitimately Entitled to a Privilege Claim, BP Would Be Entitled to a Privilege Log and to Challenge Log Entries**

Despite Woods Hole's assertion of "privilege" over subpoenaed materials, and despite BP's requests for a privilege log, Woods Hole has not produced any privilege log(s) at any time during the past four months. This failure disregards Woods Hole's obligations to submit a privilege log when it refuses to produce materials responsive to a Rule 45 subpoena. *See In re Grand Jury Subpoena*, 274 F.3d 563, 575 (1st Cir. 2001) ("The operative language [of Rule 45(d)(2)] is mandatory . . . . [T]he rule requires a party resisting disclosure to produce a document index or privilege log.") (citing Fed. R. Civ. P. 45(d)(2)). Moreover, the law also indicates that failure to submit a privilege log constitutes waiver of any privilege claim. *See id.* at 576 ("A party that fails to submit a privilege log is deemed to waive the underlying privilege claim.").

In light of the above, BP respectfully asks the Court to find that Woods Hole's failure to submit a privilege log during the past four months constitutes a waiver of any "privilege." Should this Court determine, however, that certain WHOI documents may be withheld on the basis of privilege, BP asks that the Court insist that Woods Hole promptly submit complete privilege logs and provide a full and fair opportunity for BP to review and challenge entries on those logs.

*       *       *       *

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
April 11, 2012
Page 12

As described above, BP has a compelling need for all subpoenaed documents, and there is no legal basis for Woods Hole declining to produce the subpoenaed data and communications, or for failing to abide by this Court's directive requiring production of the contract "deliverables." Accordingly, BP respectfully requests that Woods Hole be directed to comply fully and promptly with the outstanding subpoena.

Respectfully submitted,

Robert R. Gasaway

Attachments

cc (via electronic mail):

Dahlia S. Fetouh
R. Michael Underhill
Steven O'Rourke
Sarah D. Himmelhoch
Robin L. Hanger
A. Nathaniel Chakeres
Barry E. Fields
Don K. Haycraft
Plaintiffs' Liaison Counsel
Defense Liaison Counsel