**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUSIANA**

| | |
|---|---|
| _____ ) | |
| ) | |
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER ) | |
| HORIZON IN THE GULF OF MEXICO, ON ) | MDL No. 2179 |
| APRIL 20, 2010 ) | |
| ) | Section:  J |
| IN RE THE COMPLAINT AND PETITION OF ) | |
| TRITON ASSET LEASING GmbH, ET AL., IN A ) | Judge:  Barbier |
| CAUSE OF EXONERATION FROM OR ) | |
| LIMITATION OF LIABILITY ) | Magistrate:  Shushan |
| ) | |
| This Document Relates To: ) | |
| 2:10-CV-02771 ) | |
| _____ ) | |

## COMMENTS AND OBJECTIONS OF
## GO FISH (Gulf Organized Fisheries in Solidarity & Hope)
## REGARDING THE DEEPWATER HORIZON ECONOMIC AND PROPERTY
## DAMAGE SETTLEMENT AGREEMENT

**Clint Guidry**, Chairman
Louisiana Shrimp Association

**Byron Encalade**, Treasurer
Louisiana Oysterman Association

**Tracy Kuhns**, President
Louisiana BayouKeeper

**Teresa Dardar**, Board Member
Pointe-Au-Chien Indian Tribe

**Thiện Dương Nguyễn**, Vice-President
Southeastern Asian Fisherfolks Association

**George Barisich**, Board Member
United Commercial Fishermen's Association

**Mike Roberts**, Secretary
Association of Family Fishermen

Member Organizations in:
**LOUISIANA**
**MISSISSIPPI**
**ALABAMA**
**FLORIDA**

1

# I.     Introduction

GO FISH is a public interest coalition comprised of individual commercial fishermen and commercial fishing industry groups which was organized in the aftermath of the *Deepwater Horizon* Oil Spill to address the impacts of the spill and the continuing needs of its affected fishermen members.  In the summer of 2010, our gulf fishing community leaders representing fishermen, oystermen, shrimpers, crabbers and community members came together from across the five Gulf States to form a unique, multi-cultural organization bound together by determination and passion to restore our fisheries habitat, livelihoods and fishing culture. In some ways, we have already beaten the odds by not allowing this disaster to pit us against one other and trivialize our loss. Following the spill, the associational activities of our member groups and members have ranged from working to inform and improve the GCCF's methodologies to testifying before Congress and working with Senators Landrieu and Vitter on potential amendments to the Oil Pollution Act.

The *Deepwater Horizon* Economic and Property Damage Settlement directly impacts GO FISH's organizational purpose, its members, and the purposes of its member organizations. GO FISH believes a proper (even if imperfect) agreement that avoids prolonged litigation is in the best interest of the fishing families now.  However, given the future risks explained below, GO FISH must measure success by this substantive standard:  the agreement must protect fishermen against all reasonable worst case scenarios, in this case, a prolonged biological impact.

Like the rest of the public, GO FISH has only recently received the Seafood Compensation program.  However, based on its review of the program in this short time GO

FISH does not believe that the Settlement Agreement's Seafood Compensation Program adequately protects most fishermen against future risks to fisheries, for the following reasons:

1. For many fishermen, the proposed program compensation awards are insufficient to provide adequate long-term protection against future risk of fisheries damage.

2. The proposed program, which is capped at $2.3 billion, diverts substantial funds to pay oyster leaseholder property claims, as opposed to seafood revenue claims. Non-revenue based oyster lease damages should be re-allocated to the uncapped portion of the settlement.

3. The "expedited" methods of compensating fishermen will reward only those fishermen with access to good records who are in the top bracket of income earners.

GO FISH's comments and objections below were necessarily prepared in a short time, and do not contain citation to some of the underlying materials.   GO FISH asks that the Court not approve the Seafood Compensation Program or permit payments from the capped Seafood Compensation Program until a full hearing has been held, with the opportunity for fishermen to participate, present information, and tell their stories.

## II.      Background

During the active period of the *Deepwater Horizon* spill large areas of federal and state waters in or adjacent to the spill area were closed to fishing to ensure the safety of seafood. By June 2, 2010, the area of federal waters closed to fishing had grown to its maximum of 88,522 square miles, nearly 37% of federal waters in the Gulf of Mexico.   The maximum portions of

state waters closed to fishing during the spill were Alabama (40%), Florida (2%), Louisiana (55%), and Mississippi (95%).   The fisheries closures led to an immediate loss of income, and markets for Gulf seafood were devastated by fears of contamination.

An even greater concern, however, is the risk of intermediate and long-term harm to the marketplace and to the Gulf of Mexico ecosystems.  These risks have not been fully assessed, and may not be fully assessed for many years.  These risks are the ones that must be fully addressed by any settlement process.

In the long run, seafood production is dependent on Gulf ecosystems for spawning areas, nurseries, and growth. Many uncertainties exist because of the complexity and scale of Gulf fisheries and ecosystems that have been affected by the oil spill.  The presence of oil in the environment may alter migration patterns, decrease food availability, and disrupt life cycles.  According to a study of oil impacts on Louisiana fisheries, populations of white shrimp, crab, and menhaden are species most likely to be harmed by the effects of oil on their eggs and larvae.

Direct and indirect damages to fisheries and the Gulf environment are still being assessed, an effort likely to continue for years to come.  However, there are reasons for concern. 2011 Louisiana landings data demonstrate significant reductions in harvest, concentrated in coastal waters that received the most severe oiling and to species that were spawning at the time of the spill.  For instance, 2011 Barataria white shrimp harvests were down 40%, nearly six times the normal seasonal variation.  Oyster harvests in beds east of the Mississippi River and crab production west, in Barataria and Terrebonne Basins, had similar biological declines.  In areas offshore, particularly southwest of the rig, deepwater seafloors have shown substantial damage.

The potential for continuing biological impacts from the Gulf oil spill acts together with other factors to increase the threat to the viability of Gulf fishing businesses.  In recent years,

particularly since 2007, the prices of fuel have spiked while the prices received for product at the docks have fallen.  Fishermen's profit margins shrank as a result.  As a result even modest reductions in difficult years means a fishing business will simply not be economically viable. Across the fisheries, if yields remain suppressed by significant amounts – for example, the 35% which is assumed as a future loss in the Seafood Program, as discussed below - many if not most fishermen will not be able to cover the cost of their loan payments, maintenance, repairs, fuel and ice, let alone share with crew and feed their families.

In the end, the risk of even modest reductions in fisheries yields has the potential to alter the nature of our coastal communities and profoundly affect fishing men and women and their families.  As a consequence any settlement for fishing men and women must provide adequate protection against this risk.

### III.    COMMENTS AND OBJECTIONS

Unlike all of the other claims addressed in the settlement proposal, the preliminary approval requested for the Seafood Program will open a claims process whereby money will be withdrawn from a limited fund available for commercial fishermen. Because of potential inequities in the allocation of funds among the various commercial fishing groups outlined below, favored groups will most naturally be the ones to file claims and accept their favorable offers, while disfavored groups review their inadequate offers and methodologies, and prepare objections and suggestions for the fairness hearing.  This raises the potential outcome that by the time of the fairness hearing, those groups who will benefit most from the settlement will already have taken the lion's share of the pot and after-the-fact corrections to the methodologies will not refill it.   Therefore, the preliminary approval of the capped Seafood Compensation Program must receive a high level of scrutiny.

1. <u>The Seafood Program Methodologies</u>

The Seafood Program has two basic types of method for calculating a fisherman's loss, and consequent settlement payment. The "Expedited Method" and "Reduced Expedited Method" allow a shrimp fisherman who can prove a specified level of revenues to accept a lump sum payment, scaled to the size of the vessel.

The "Historic Method" uses documentation such as trip tickets, tax returns or other information to prove a fisherman's actual catch and revenue history, and then uses this information to calculate the settlement offered based on a formula which contains multiple steps.

As explained below, the "historic" method places too much risk on the fisherman, for multiple reasons. The "expedited" methods reduce the risk transfer, but are available only to a limited number of fishermen, and do not perform the necessary function of providing an alternative means of calculating loss for fishermen with poor access to records.

a. <u>In the "Historic Method" the "Future Loss" Percentage Ignores the Reality of the Risk Facing Fishermen</u>

Commercial fishermen fish for extended periods of time, return to dock, pay back the trip expenses such as fuel, ice and food, and split the remaining cash into shares: for owner, captain, and deckhands. The Seafood Program follows the same practice, dividing the net value of the catch after deduction of expenses into shares. This aspect of the Seafood Program methodology closely follows industry practices concerning prices, costs and revenue sharing among owner, captain and crew.

However, under the Seafood Program's formula, to form a fisherman's "base loss", the fisherman's share of net revenues is reduced to a "future loss" percentage, which is then multiplied by a "Risk Transfer Premium." In the case of shrimpers, the future loss percentage is

6

35%.  For vessel owners, for example, the Risk Transfer Premium is 8.75; for captains the Risk Transfer Premium is 7.5. The product of these two figures results in a multiplier of 3, below the amount last offered by the Gulf Coast Compensation Fund ("GCCF").

No explanation is given as to how the "future loss" percentage is determined nor has GO FISH been privy to the natural resource assessment data undertaken by BP and the governments. However, the Seafood Model's "future loss" percentage appears at or below the current level of fisheries recovery in more hard hit areas.  According to LWF data, some fisheries in hard hit areas, such as white shrimp, crab and, in places, oysters, are not recovering as predicted. Fishermen leaving those areas are moving into adjoining basins already traditionally fished by other fishermen.  As a result, while total landing numbers may not immediately show severe impact, the resources in producing areas may be overfished, causing a downward spiral of fewer resources being chased by more fisherman.  These secondary effects are difficult to predict with certainty, but it is clear that the fishermen in hard hit areas face a risky gamble when accepting the terms of this offer in its current state.

When measured against the cash generated by trips and shared amongst the owner, captain and crew, Seafood Program estimated recoveries pay for approximately three to four years of lost net revenue, minus what the GCCF has already advanced.  This appears to be basically the same measure of protection the GCCF offered without any class wide settlement and release of claims and without considering the risk of litigation or punitive damages at all.

This proposal may be marginally sufficient for those fishermen who fish in areas only lightly brushed. But for those who traditionally fish in areas that were heavily oiled, such as basins both east and west of the Mississippi River, the risk is very substantial.  Again, deducting any portion of the future catch because the resource may recover transfers that proportion of risk

to the fishermen.  To the extent that is at all appropriate, such deductions must be modest, not sixty five to seventy five percent.   The Seafood Program as currently structured simply places too much risk on the fisherman.

     b.    <u>The "Expedited" Models Leave Out Many Deserving Fishermen</u>

GO FISH believes that the purpose of any "expedited" model in a settlement framework should be to provide a method of recovery for those fishermen who for one reason or another do not have access to good records on their catch and revenues, by allowing those fishermen to use information about the performance of the fishery as a whole.  (As noted below, catch records such as trip tickets are often flawed).  However, the expedited models now found in the shrimp portion of the Seafood Program only apply to those fishermen with good data from previous years and high revenues.  To qualify for the expedited treatment and value, a fisherman must add up documentation of past revenues, and be in the upper tier in terms of fishing income.  Thus, it is not clear how the "expedited" methods save the owner or captain any time or provides a "floor" for recovery.

Instead, in nearly all cases an eligible vessel will recover more from the expedited methods as compared to the historic method.  Through applying the method to a sample of captain owned vessel revenues, GO FISH estimates that using the expedited or reduced expedited method increases recovery by fifty thousand per vessel to an average $180,000 recovery in the 30-45 foot category, sixty thousand in the 45-75 foot category to an average recovery of $360,000, and ninety thousand per vessel in the over 75 foot freezer boat category to nearly $800,000.

While the result of the increase is good, since it lengthens the term of protection the Seafood Program affords those vessels, in some cases doubling the historic method's

compensation, this method would again be available only to those fishermen in the top tier of income producers with access to very good documentation.   For example, GO FISH estimates that in the category of vessels under 45 feet only a very few fishermen would be eligible for the expedited methods.

For Louisiana, an essential problem with the historic method as well as proving eligibility for the "expedited" methods is that trip tickets are associated with the fishing license holder, not the captain, owner, or vessel.  The Louisiana Wildlife and Fisheries has stated that the database was not designed to track vessel identity, often does not contain the vessel name or size, or the name or size was either wrongly entered or not entered at all. Over the course of the last month, of 250 collections of LWF trip ticket data reviewed, only 130 individual trip tickets could be matched to vessels. There are numerous reasons for the difficulty. Vessel owners may have had captains work on their vessels under the captain's license, and may not have access to that trip ticket data. Captains on some vessels work under the vessel owner's license and use his license to report catch at the docks.  Finally, LWF trip ticket data often contain typographical errors.

      c.    <u>Crab and Finfish Fishermen Are Not Adequately Protection Under the Proposal</u>

GO FISH is concerned that the "expedited" and "reduced expedited" methods discussed above are not available to other fisheries. For crabbers, long-line and other finfish fishermen, and oystermen, the inability to use this method is compounded by formulaic differences in the "historic" methods such as lower Risk Transfer Premiums and lack of revenue premiums.  The result is a far smaller level of protection afforded those fisheries.  Finfish recover 1.3 years of gross margin (annual catch less trip expenses), while crabbers recover 1.7 years. This is inappropriately short for either fishery.  For crabs, 2011 basin by basin data shows that in Barataria and Terrebonne, crab harvest is at historic lows, off almost three times the average

variability from year to year.  That is a statistically significant deviation.  Finfish vessels such as pelagic tuna boats in fact suffered the greatest losses of any fisheries in 2010, almost the entire year of revenues as these highly migratory fish were simply not there when the boats finally got out to fish.  For these boats, offering 1.3 times annual revenue does not cover past losses, let alone protect against future unknown consequences.

Finally, for oystermen, while their revenue "loss percentage" is higher than most (40%), given the three year period oysters take to recover, being paid less than three years of their trip gross margin (landings less trip expenses) assumes they can find oysters elsewhere.  While total landings of oysters may remain stable for a year or two, the facts of oyster loss belie the result of the Seafood Program.

First, oyster harvesters look to harvest on public seed grounds, reefs that are held in full title by the state.  Harvesters almost universally dredge these reefs first as they do not have to pay a 33% dividend to oyster leaseholders for the right to work on reefs owned by the public yet leased by private individuals.

Louisiana Wildlife and Fisheries data shows that the spill and efforts to prevent the oil from hitting the coast affected many of the public reefs preferred by these oystermen, reefs on which they could make a decent living.  Rather than quit working, many of these harvesters crossed the river to the west side and worked private leases, where they will likely stay until the public seed grounds recover.  For these reasons, Barataria Basin, particularly in the south (and subject of the highest multipliers for a leaseholder's latent loss) is not experiencing dramatic decreases in the production of oysters.  The increased revenue is flowing to these private leaseholders, but the harvesters are making less money as the spill has caused them to incur new

costs.  The oyster historic method, the only method available, does not compensate oyster

fishermen for their increased costs of production caused by having to fish private leases.

       d.     <u>The Eligibility Year, 2009, and Years to Measure Basis Punish Many Fishermen</u>

Fishing is a highly variable job.  Individual success is dependent on many factors not in

the control of boat captains, owners and deckhands.  In 2008, Gustav and Ike disrupted fishing

during the height of white shrimp season for Terrebonne and Barataria Basins.  A failed engine,

an injured deckhand, lost gear, and family illness are but a few of the many situations that can

cause a fisherman to tie up his or her boat through an entire season.  The Seafood Program uses

2009 as the year of eligibility and an unavoidable base year on which losses are valued.  For

those with a bad 2009, the result will be amplified throughout these methods.  The one

unexplained exception is the oyster method, which allows some flexibility to drop an

unrepresentative bad year.  All fishery groups need greater flexibility in selecting baseline loss

periods to account for the nature of the industry.

2.     The Disproportionate Share of the Seafood Program Allocated to Oyster Leaseholders
Should Be Reconsidered To Ensure Fairness Throughout the Entire Seafood Program

Oyster leaseholders properly are awarded compensation for lost revenues derived from

others working on their oyster leases.  Unlike other fisheries however, oyster leaseholders have

no line item deduction for costs.  While the lease itself costs little, leaseholders claim that

purchasing and applying cultch adds to their revenue.  To be fair, the cost of cultch should be

deducted from their award, just as costs are for other fishermen, and because cultching forms a

vital part of other portions of their claim regarding oyster leases.

The oyster zone maps found in Exhibit 10, Seafood Program, infer all acreage found in

Zone A was heavily oiled and impacted, including some areas actually harvested in 2011 and

other acreage that likely had no marketable oysters at all prior to the spill. A similar disconnect occurs because acreage in portions of Zone B and C were directly smeared by oil. There should be a tighter fit between oil impact as shown on the SCAT maps and the zones of recovery on the oyster maps.

Further, based on these maps, the Seafood Program under this Court's consideration provides oyster leaseholders with another element of damage coming from the shared fund, a flat sum recovery of $2000 to $400 per acre for the leaseholders' "latent loss". The levels of compensation awarded for this latent loss exceed the per acre value that the State of Louisiana has determined for all oysters in the state. This very substantial amount of money should be removed entirely from the capped Seafood Program fund as it is not a Seafood claim; it is a property damage claim. In addition, the entitlement to "latent loss" is the subject of serious legal dispute. Indeed, the State of Louisiana has asserted a NRDA claim for these same damages and has spent and will spend significant money to reseed and restore these same areas.

The point of this explanation is not to denigrate or attempt to reduce the leaseholders' recovery. The point is that latent loss claims consume an estimated $500,000,000 of the Seafood Program fund's $1.83 billion dollar fund allocated for payment. Latent loss should be removed and the funds reallocated to fairly protect the working commercial fishermen from the risk of future loss.

3.      A Multitude Of Other Potential Problems Are Present And Must Be Addressed.

The unacceptable shifting of risk onto the fishermen and the potentially inequitable allocation of a limited fund are of the utmost concern and require immediate correction. However the proposed settlement agreement has a host of other problems both procedural and substantive that must be addressed before the limited fund is diminished. Each of these issues

requires close scrutiny, but the limited time and space available do not allow these issues to be addressed here.  GO FISH requests that the Court permit the public sufficient time to bring these issues to the attention of the Court, before the Court grants preliminary approval.

Some of the most important of these issues include the following.

a.   The Risk Transfer Premium of 2.25 for Subsistence Loss Is Too Low.

The seafood that is sold commercially is the same seafood that fishermen bring home to feed their families and communities. The impact to the resource is the same regardless of its use. The recovery from litigation is potentially greater for subsistence use than for the same quantities of commercially used resources. Yet subsistence use of the resource receives roughly a quarter of the multiplier applied to commercial use. Disfavoring subsistence use disparately impacts minority communities and low income claimants and constitutes unequal treatment with commercial use for the same seafood loss.

b.   The Agreement Requires Release Of Claims, Even In The Case Of Fraud.

The Agreement, in the Section named "Released Claims", improperly removes remedies for BP's fraudulent or negligent misrepresentation of the underlying facts relied upon by Economic Class Members in deciding whether to accept the Settlement Offer.  Paragraph 10.5 defines "Unknown Claims" released in Paragraph 10.2, including "future claims" and damages arising out  of facts "now believed to be true" or of which Claimants do not "know or suspect to exist and which if known by them might have affected their decision to provide such Release." Paragraph 10.6 waives the benefit of laws that limit the effect of releases predicated upon undiscovered future information.  Both of these provisions apply regardless of whether the Released Parties withheld the information from the public and/or intentionally misled claimants

and the public.  Obviously, if the Released Parties misrepresent the facts in order to obtain a release, that release should not stand.

      c.   Those Who Accepted Transition Interim Payments Are Improperly Prejudiced.

The motion for preliminary approval emphasizes the need for transparency and fairness. The transition process requested by BP and the PSC led claimants to believe that they could request and accept 60% of their offer under the GCCF methodology without release or waiving rights to litigate.  The 60% transitional payment is referred to as an "interim payment", which has a specific meaning under OPA. Accepting an interim payment cannot release rights, except the right to recover the money a second time. However, the proposed settlement agreement as filed contains a significant restriction on those who accepted the 60% interim payment. All claimants who did <u>not</u> accept a transitional interim payment have the unrestricted right to opt out before the deadline, provided they do not sign a release. They can file a claim in the settlement program, review the offer, then make an informed decision whether to opt out. However, if those claimants who accepted 60% transitional offers file a claim form in the settlement program, they are automatically prohibited from opting out, and must after that point take either the remaining 40% of the GCCF offer or the settlement program's offer. Settlement Agreement Sections 4.2.3.1 – 4.3.2.2. Thus, the proposed settlement agreement extracts a significant release of rights from those who accepted a transition interim payment. They are retroactively deemed to have released the right to participate in the settlement program while preserving the ability to opt out. Unlike all other claimants they must either opt out or accept the settlement blind folded.

      d.   The Release May Infringe On Constitutionally Protected Associational Rights.

Under Section 10.2 of the agreement, the "Released Claims" section, a member cannot assert claims or seek remedies related to the *Deepwater Horizon* incident (which itself includes the

cleanup or restoration, Section 38.43).   This prohibition applies whether such a claim is asserted "indirectly, derivatively, representatively, or in any other capacity, "regardless of whether such claims were or could have been raised or asserted before the court".  A "Released Claim" includes any claim pursuant to statutory law, adjudication, quasi-adjudication, regulation,  or ordinance, breaches of contract, breach of any covenant of good faith, fraud, misrepresentation, fraudulent concealment, deception, … injunctive relief, declaratory judgment, the OPA or other statutory claims…" Further, the broad definition of Released Claims expands in Section 10.11's prohibition against "instituting federal or state regulatory proceedings concerning cleanup, removal, spill response or remediation as a means to seek redress of Released Claims."  A third party, such as GO FISH, acting on behalf of a Class Member would be forever barred and enjoined from instituting any judicial or regulatory action with respect to Released Claims; effectively, anything concerning the *Deepwater Horizon*.

   Many members of the Putative Class are likely members of public interest industry and environmental associations that have already expressed an interest in the outcome matters relating to the *Deepwater Horizon* spill.  The covenants contained in the settlement provision would prohibit such associations from exercising their statutory rights under the Clean Water Act and other environmental laws, to redress newly discovered oil deposits, to comment upon and challenge future NRDA settlement agreements, and a host of other possible interests.  Indeed, any interested association would now proceed at its own risk, subjecting itself to BP's challenge that it must examine the organization's membership lists, to ascertain whether any individual (not known to the organization) participated in the class settlement, with the threat of payment of BP's costs and attorney's fees.

These provisions create constitutional issues.  First, Class Members cannot be forced to dissociate with environmental, conservation or industry organizations that simply share the Class Member's interests and who may in the future engage in these public interests matters.  Second, the membership lists of such organizations are constitutionally protected under *NAACP v. Button*, 371 U.S. 415 (1963).  Third, all persons have the right to seek redress from government for grievances.  The Court has jurisdiction and responsibility to assure that these results will not follow.  As badly as BP wishes to foreclose future regulatory action, such actions may in fact be the only redress available to the citizens of Louisiana and other Gulf States.

### IV.    Conclusion

GO FISH submits that although a fair settlement is in the best interest of its members and the fishing community, significant flaws in the proposed Seafood Compensation Program make it objectionable. Because the "loss percentage" ignores the reality of the fishery impacts in the most affected areas and the reality of commercial fishing as a business venture, the Risk Transfer Premium multipliers actually leave the risk of future failure squarely on the injured fishermen. The "loss percentage" should be adjusted. The fishermen are the only claimants who are subject to zero-sum allocation of a limited fund, and that fund is allocated inequitably in favor of leasehold interests to the detriment of working fishermen. Fishermen need to be protected from future risk to the same extent as oyster leaseholders. A host of other issues need to be revisited or clarified before this program begins to reduce the limited Seafood Compensation Program fund.

Respectfully submitted,

 /s/
**Tracy Kuhns**, President, GO FISH
P.O. Box 207
Barataria, LA  70036