

Home | How Do I? | Site Map | Help

Congressional Publications | **Congressional Record**

**Search Terms: S.1730, interim - Edit Search**    FOCUS™ Search [       ] Go

Result List | Expanded List | KWIC | Full Document



**Document 12 of 25.**

Copyright 1996 FDCHeMedia, Inc. All Rights Reserved.
Federal Document Clearing House Congressional Testimony

June 4, 1996, Tuesday

**SECTION:** CAPITOL HILL HEARING TESTIMONY

**LENGTH:** 2725 words

**HEADLINE:** TESTIMONY June 04, 1996 RICHARD H. HOBBIE, III PRESIDENT WATER QUALITY INSURANCE SYNDICATE SENATE ENVIRONMENT OIL POLLUTION ACT REVISION

**BODY:**
STATEMENT OF

THE AMERICAN INSTITUTE OF MARINE UNDERWRITERS

AND

THE WATER QUALITY INSURANCE SYNDICATE

On S.1730, The Oil Spill Prevention

And Response Improvement Act

before

The United States Senate

Committee on Environment and Public Works

Presented by

Richard H. Hobbie, III

President, Water Quality Insurance Syndicate



EXHIBIT 2

June 4, 1996

STATEMENT OF THE AMERICAN INSTITUTE OF MARINE UNDERWRITERS AND

THE WATER QUALITY INSURANCE SYNDICATE BEFORE THE SENATE

ENVIRONMENT AND PUBLIC WORKS COMMITTEE

The American Institute of Marine Underwriters ("AIMU") is a non- profit trade association representing 100 marine insurers in the United States. AIMU members underwrite about 90% of the commercial marine insurance done in the United States. The American Marine Insurance Industry has insured federal statutory pollution liabilities for vessels for nearly a quarter of a century. I appear here today on behalf of AIMU and the Water Quality Insurance Syndicate ("WQIS"), where I serve as President. We are honored to have this opportunity to address the Committee on S.1730 and our experiences under the Oil Pollution Act of 1990 ("OPA '90"), particularly with respect to the NORTH CAPE oil spill.

The Water Quality Insurance Syndicate was founded in 1971 by members of the domestic marine insurance industry in order to provide a mechanism to insure liabilities under federal pollution statutes. Today, WQIS is a pool of 17 marine insurers from the American market. WQIS insures liabilities imposed on vessel owners and operators by OPA '90, as well as the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). We insure liabilities arising from oil or hazardous substance spills for over 39.000 vessels operating primarily in the inland and coastal waterways of the United States. As the largest domestic insurer of such marine pollution liabilities, WQIS provides about one third of the guarantees required for Certificates of Financial Responsibility issued by the Coast Guard under OPA '90 and under CERCLA. American marine insurers applaud the provisions in S. 1730 which would provide incentives to owners of single-hull barges to convert to double-hulls. The bill would award statutory incentives to encourage owners to replace single-hull vessels in their fleets with double-hull vessels. If the owner replaced a double-hull vessel at least five years prior to its required replacement date, he will be entitled to assert his OPA limit of liability even if a violation of an applicable federal safety, construction, or operating regulations has occurred. We commend the authors of the bill on this incentive approach. However, the incentives would be more effective if applied more broadly. The proposal does not address the situation where an owner wishes to expand his fleet. If the incentives were to become law as drafted, some owners might see an advantage to first buying single- hull barges which are scheduled to be scrapped and then replacing them with double-hulls. Such maneuvering would not result in an early, net reduction in the number of single hull vessels. As a practical matter, all new builds should be eligible for these special incentives.

The domestic marine insurance market supports safety and prevention measures which will contribute to the reduction in the severity and frequency of oil-spill incidents. As a practical matter, such measures must be commercially sound and technologically feasible. Any other approach would simply add more confusion to an already difficult situation. The requirement, proposed in S. 1730, that single-hull barges over 5,000 gross tons operating in open ocean or coastal waters have a crew member on board and an operable anchor is not a workable solution. It will not be possible for most tank barges to implement the crew provisions. In fact, implementation may put individual crew members' lives at risk. Crew quarters may not be placed safely above a tank filled with petroleum products. Most tank barges have no space which could be used for crew quarters because virtually all of the deck space on existing barges is above tank space. Failing to fill some of the tanks so as to provide such void space would not be a satisfactory solution. Empty tanks could result in serious stability problems and more casualties.

We are unaware of any proven emergency system for retrieval of a break-away barge, as provided for 101(b) of the bill, which is effective in all circumstances. We urge the Committee to continue to study this issue and adopt only those provisions which are both feasible and consistent with protecting the safety of the lives of those who go to sea, as well as with preventing oil spills and other casualties.

Dredging is a major issue in many U.S. ports today, including New York. The bill as drafted is too limited in this regard. Rhode Island is not the only state to have problems with dredging. The need for dredging is a national problem which can be addressed, in part, by assuring that navigational charts are accurate and up-to-date.

The same can be said of the provisions on under-keel clearances. Normally, the establishment of minimum under-keel clearances is based on local conditions. A federal attempt to regulate this issue would be far too unwieldy and costly. What agency on the federal level has the resources to undertake this responsibility effectively? We know of none. We suggest that a far better use of federal efforts to improve navigational safety will be to provide the National Oceanic and Atmospheric Administration ("NOAA") with sufficient staffing and funding so as to bring U.S. navigational charts up-to-date. This would contribute far more to the oil spill prevention effort.

We are very troubled by the drafting of 203(b), which gives the federal government the right to seek "any monies" paid out. This would appear to permit recoveries for any expenditures whatsoever, regardless of whether they are for damages as defined in 1002 of OPA. The provisions would promote irresponsible and unrelated expenditures and must be changed to require that only OPA defined damages may be recovered. The purpose of proposed 205 is unclear. Near-term ecological injury is not defined in OPA. We believe the existing statute and regulations address these issues and that this section is unnecessary.

Section 206 would impose unworkable restrictions on the cleanup process. A response plan can never anticipate every action which should be taken in every ecosystem. Experience has shown that each incident and spill response is unique. The On Scene Coordinator must retain the flexibility to direct the clean-up based on the needs in the local area. No response plan can foresee every eventuality. We urge that 1321 of the Federal Water Pollution Control Act not be amended as proposed. Spill response is certain to go awry if blind adherence to a pre-established plan is mandated. The flexibility permitted under current law is more likely to permit environmentally sound spill response activities.

In its 25 years of existence, WQIS has handled thousands of oil spills. The January spill in Rhode Island was our first experience with an extended closure of fishing grounds. Accordingly, it was the first time that a need for partial or **interim** claims payments arose. In the past, in the few spills where there has been closure of the fishing grounds, it was only for a day or two in order to allow free access for response vessels. As soon as it became apparent that Rhode Island lobstermen and fishermen would suffer ongoing loss of income due to the closing of the fishing grounds, a specialized team of adjusters was flown into Narragansett and Point Judith to respond to their needs. Over $178,000 was paid out in claims payments during the first week alone. As a result of the program established voluntarily by WQIS, over 855 **interim** or partial payments now have been made.

In our experience, the NORTH CAPE spill was unique because of the number of affected lobstermen and fishermen. Underwriters are pleased to report again on the partial claims settlement process established in Rhode Island. Immediately following the incident, our Oil Spill Claims Center was set up along with our toll free telephone number (1- 800-995-4045). Over I 100 claims have been filed since then. Well over half of the claims are for fish catch loss or for loss of income. A specialized team of adjusters experienced in handling oil spill claims was flown into Rhode Island in order to respond immediately. Six to eight adjusters have been available on a daily basis to respond to citizens' needs and to assist them in getting together the documentation needed for their claims.

WQIS was particularly concerned about the needs of lobstermen and fishermen in view of the closure of the fishing grounds. Claims settling offices were opened at convenient locations throughout the affected area. In addition to the 800 number, notices were published in the local newspapers and posted in strategic locations. Claims adjusters have conducted an extensive outreach program, visiting lobstermen

and fishermen on the docks, as well as talking to wholesalers and others who can assist in getting the word out that partial payments are available to alleviate problems suffered by those who have been unable to work during the closure of the fishing grounds. Civic organizations have also been contacted and are cooperating with us in our efforts to reach all legitimate claimants.

Because of the special needs of those directly affected by the spill and the closure, the adjusters provided guidance on putting together documentation. A list of the kinds of documents which assist the claims adjusters in providing a basis for payment of a claim has been widely circulated. The National Pollution Funds Center, in testimony before this Committee, supported our approach. We made it clear that anyone who had trouble coming up with documents should not hesitate to call. Our adjusters are prepared to work with any and all claimants in an effort to put together a foundation for a claim. Our efforts to reach out and establish communication with the lobstermen and fishermen have resulted in a substantial number of partial claims being paid. Once a claim is documented, checks are handed to the fishermen and lobstermen, often on the same day.

As of May 30, 1996, 855 partial or **interim** claims have been paid. The vast majority of these have been partial payments to lobstermen and fishermen. Many of the claimants received their third and fourth checks as the closure of the fishing grounds continued. Underwriters have paid over $2,500,000 in such third-party claims. This is a remarkable achievement for a field claims adjusting office. Attorneys representing claimants worked with our adjusters to devise a partial settlement form which met the needs of both sides. Unfortunately, there was one out-of-state plaintiffs' attorney who waged a campaign against the **interim** payments program. We believe that was an effort to increase the number of claimants they represented. The problem was laid to rest as the success of the claims office became apparent.

The experience in Rhode Island shows that the massive overhaul of OPA claims provisions is not appropriate. The system worked in Rhode Island, but if the amendments proposed had been in effect it is unlikely the system would have worked. The proposal would make claims handling far more unwieldy. It is unnecessary and ill-advised to amend 1013 to require advertising about partial claims. The vast majority of spills do not give rise to a need for partial payments. The Coast Guard has the authority to require advertising regarding partial payments when appropriate.

We are particularly concerned about proposed new 1015(c)(2) (Final Damages) which would make virtually every claims payment **interim**. Insurers would never be able to close the books on a spill. This approach is counterproductive and will impede participation of guarantors in OPA financial responsibility programs.

As drafted, the provisions regarding partial payments in S. 1730 would throw the claims process under OPA into disarray. It is proposed that 1002(f) should be amended to define loss of profits and earning capacity to include specifically partial claims. In our view, if any amendment is made, this section should suffice. The proposed amendments to 1013, 1014 and 1015 are wholly unnecessary and create confusion. They appear to permit partial claims in any category of damage claims under OPA. If enacted, the claims settlement process would become a nightmare. Claims could never be settled. The proposed revisions to 1015 (Subrogation) appear to prohibit final settlements altogether. One of the purposes of OPA '90 was to encourage prompt settlement and payment of claims. The net effect of the proposal would make no settlement final, a situation no insurer can live with. The transactional costs will skyrocket and as a consequence the cost of providing financial security will inflate. Guarantors under OPA will be precluded from recovering for some partial claims in actions against negligent third parties.

The program developed in Rhode Island to meet the special needs of lobstermen and fishermen could serve as a guide in a future oil spill where the fishing grounds are closed. We believe that the NORTH CAPE claims experience proves that the process under OPA '90 is working well. In fact, we understand that the partial claims settlement procedures established in Rhode Island are being used as a model for

the claims process in connection with the SEA EMPRESS spill in Wales. The unnecessary amendments proposed would be counter- productive. The provision has been drafted without a clear understanding of the claims process and of subrogation requirements. The "overkill" approach adopted in S.1730 could put the entire process at risk.

The response to the need for a partial claims settlement program in Rhode Island is an example of how industry and government can find workable solutions to new problems through cooperation. Unfortunately, not every problem that has arisen in connection with the implementation of OPA '90 at the NORTH CAPE spill has been resolved so successfully. American marine insurers were particularly concerned about the delay in reopening the fishing grounds. Unnecessarily prolonging the closure of the fishing areas imposes undue economic burdens on the lobstermen, fishermen and related industries and added costs, borne by maritime commercial interests. Some estimated that each day of unnecessary closure costs as much as $100,000 or more. The delay in reopening the fishing grounds was due to the inability of the various trustees, federal and state agencies, and other bureaucracies to agree on a protocol for testing.

Underwriters were frustrated by the bureaucratic morass we have encountered in trying to open even some of the fishing grounds. The various state and federal agencies are unable to agree on what the acceptable criteria should be for testing to permit the reopening of the fishing grounds. Even the recent partial reopening of the fishing grounds for fin fishing took far too long. The data showing the fishing grounds could be reopened for fin fishing was given to state officials on February 10, who acted on February 13. The federal government received the data on February 16, but it was not until over a month later that the area was reopened. When potentially grave financial damages are threatened, responsible officials should act expeditiously, but a response from federal officials on an expedited basis takes from, at a minimum, 10 days to 4 weeks. This is unacceptable. All of those involved on the federal and state levels must work cooperatively to expedite the reopening of a fishery when the financial implications are so substantial. We support the changes proposed in Section 202.

AIMU and WQIS are grateful for this opportunity to present their views on S. 1730. We would be pleased to provide any additional information which might be helpful to the Committee.

**LOAD-DATE:** June 4, 1996

Document 12 of 25.


About ProQuest LLC | Terms and Conditions

Copyright © 2011 ProQuest LLC. All Rights Reserved.