**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**IN RE: OIL SPILL by the OIL RIG**                   **MDL-2179**
**"DEEPWATER HORIZON" in the GULF**
**OF MEXICO, on APRIL 20, 2010**

**THIS DOCUMENT RELATES TO:**               **SECTION J**

**ALL ACTIONS**                                **JUDGE BARBIER**
                                            **MAG. JUDGE SHUSHAN**

**MEMORANDUM OF LAW AND ARGUMENT IN SUPPORT OF THE**
**STATEMENT OF INTEREST AND REQUEST FOR RELIEF**
**FILED BY THE STATE OF MISSISSIPPI**
**PURSUANT TO § 1715 OF THE CLASS ACTION FAIRNESS ACT OF 2005**

Mississippi Attorney General Jim Hood files the following Memorandum of Law and Argument in support of his Statement of Interest, filed pursuant to his *parens patriae* authority and Section 1715 of the Class Action Fairness Act of 2005, objecting to the use of illegal and illegally-obtained GCCF Releases as a Criteria to exclude 200,000 individuals and entities from the "Economic and Property Damages Settlement Class" definition ("Class Definition") and from the benefits of the proposed "*Deepwater Horizon* Economic and Property Damages Settlement" ("proposed Settlement"), and in support of his renewed request to nullify the illegal, illegally-obtained and unconscionable GCCF Releases.

**I. FEDERAL QUESTION JURISDICTION:**
**The Court has Jurisdiction to Remedy**
**Violations of OPA and State Law Contract Principles.**

Predictably, in their prior briefs relating to the propriety of the GCCF claims process and the GCCF Releases, BP and Mr. Feinberg have asserted that the Court *lacked jurisdiction* to compel compliance with OPA mandates.  (MDL Docs. 1330, pp. 3 and 11; 1332, p. 6; 3735-1). However, this Court has subject matter jurisdiction to resolve the federal question of whether the GCCF Releases violate the 1996 Amendments to OPA, codified in Section 2715(b)(2), and to

determine whether BP, through its agents Kenneth Feinberg and the GCCF, violated OPA mandates in the manner in which they conducted the claims process to coerce claimants into signing the GCCF Releases.  See, 28 U.S.C. § 1331.  More importantly, this Court has jurisdiction to *remedy* such violations of federal law, once identified.  "[A]s long as a plaintiff's claim involves a material and non-frivolous question of federal law, federal courts have jurisdiction over it under section 1331.  *See, e.g., Planned Parenthood of Cent. Tex. v. Sanchez,* 280 F.Supp.2d 590, 600 (W.D.Tex. 2003), *citing, Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 122 S.Ct. 1753, 1758-59, 152 L.Ed.2d 871 (2002)*, quoting, Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998):

> "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for Better Environment.*  "[T]he district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another,' unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.' "

*Ibid.* (citation omitted) (emphasis supplied).

In opposing the exercise of federal court jurisdiction, BP and Mr. Feinberg asked the *wrong question*.  The question is *not* whether OPA creates a *private right of action* to dictate the parameters of the claims process used by a Responsible Party, as BP and Mr. Feinberg posit.  Rather, the jurisdictional question presented here is, and always has been:

> *Whether the Court has jurisdiction to resolve the federal question of whether BP and its agents violated federal law mandates contained in OPA, as amended in 1996, and, if so, can the Court act to remedy BP's violations of express provisions of federal law?*

Obviously, Article III of the Constitution vests this Court with jurisdiction to resolve such federal questions and to require compliance with federal law.

Likewise, as discussed more fully below, this Court, in exercising its authority to review and approve the Class Definition and the proposed Settlement, has jurisdiction to remedy violations of State contract law principles.  Further, this Court has the subject matter jurisdiction to nullify and sever provisions of the proposed Settlement and Class Definition that violate federal and State law, including provisions of the Class Definition and the proposed Settlement that propose to use the illegal and illegally-obtained GCCF Releases to exclude 200,000 individuals and entities from the Class Definition and Settlement benefits.  *See, e.g.* Section 2.2.6 of the proposed Settlement and Class Definition.

## II.  RELEVANT OPA PROVISIONS:
## The Congressional Intent Behind and Affect of the 1996 OPA Amendments
## A.  OPA 1990

After a series of high-profile oil spills in the late 1980s, including the Exxon Valdez in Alaska, Congress enacted the Oil Pollution Act of 1990.  Because Congress recognized that the ripple effects of an oil spill can continue to cause damages to the environment and the economy of the impacted area for years, *if not decades*, after the flow of oil is terminated, OPA imposes on-going, strict liability on Responsible Parties for the economic damages that "result from" "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge *or substantial threat of discharge* of oil."  *See* 33 U.S.C.A. §§ 2701(14) ("incident") and 2702(a) (emphasis supplied).

In enacting OPA, Congress also included an alternative dispute resolution mechanism and the corollary "presentation" or "presentment" requirement in 33 U.S.C. § 2713.  The OPA claims process as initially conceived was intended to provide claimants that incur damages and removal costs resulting from the discharge, *or substantial threat of discharge,* of oil, with an expeditious means to obtain compensation after such an incident, without the necessity of representation by counsel or protracted litigation.  To this end, OPA Section 2713(a) provides that "all claims for

3

removal costs or damages *shall be presented first to the responsible party* or guarantor of the source designated under section 2714(a) of this title." (emphasis supplied).[1]

As noted by this Court in its August 26, 2011 Order and Reasons, the initial underlying congressional intent in creating the OPA-mandated claims process was to encourage settlement and avoid litigation.  (MDL Doc. 3830, pp. 21-22, 30).  *See, e.g. Boca Ciega Hotel, Inc. v. Bouchard Trans. Co.,* 51 F.3d 235, 238-239, 240 (11th Cir. 1995).[2]

This alternative dispute resolution mechanism benefits both the polluter and those injured by an oil spill by providing a way to resolve damage claims without the necessity of retaining legal counsel or enduring the uncertainties, time and costs that litigation inevitably entails.  However, for these benefits to be realized, the "responsible party" must act in good faith and *pay all legitimate claims*.  In other words, the "responsible party" must act *responsibly*.

---

[1] Contrary to BP's assertions that the OPA presentment requirement is "jurisdictional," the exhaustion requirement of presentment is a *jurisprudential* condition precedent to filing suit, which could be waived if demonstrated to be a futility.  *See, Transitional Hospitals Corp. of Louisiana, Inc. v. DBL North American, Inc.,* 2002 WL 31819159 *3 (E.D.La. 2002) (Barbier, J.) ("However, a court, in its discretion, may find that an exception to the exhaustion requirement applies where exhaustion in the particular case could be futile.")  See also, *Leboeuf v. Texaco,* 9 F.Supp.2d 661, 665 (E.D.La. 1998), in which Judge Porteous expressly concludes that the Presentment or Presentation requirement in Section 2713 is "*not jurisdictional*."  In interpreting the meaning of the holding in *Boca Ciega,* the District Court for the Eastern District of Louisiana (Porteous, J.), held that:

> Nowhere in the *Boca Ciega* opinion does this Court find the Eleventh Circuit concluding the requirements of § 2713 as being *jurisdictional*.  Rather, the Eleventh Circuit found the presentment requirements a mandatory condition precedent.  The reasoning of the Eleventh Circuit is more in accord with an exhaustion of administrative process.

*Leboeuf v. Texaco,* 9 F.Supp.2d at 665 (E.D.La. 1998) (bold in original)(footnote omitted).  In rendering his decision in *Leboeuf v. Texaco,* Judge Porteous expressly rejected the earlier contrary decision from Judge Clement of the Eastern District of Louisiana, in *Marathon Pipe Line Co., et al. v. LaRoche Industries, Inc., et al.,* 944 F.Supp. 476, 477 (E.D.La. 1996), in which Judge Clement interpreted the "mandatory condition precedent" holding of the Eleventh Circuit in *Boca Ciega* as *jurisdictional*.  Judge Porteous concluded that:  "This Court respectfully disagrees with Judge Clement's conclusion that compliance with § 2713 is jurisdictional."  BP has repeatedly asserted in this Court that the "presentation" requirement in OPA is "*jurisdictional*," citing *Marathon;* however, BP consistently failed to provide the Court with the benefit of a cite to the later, *contrary,* holding by Judge Porteous, in *Leboeuf v. Texaco, supra.*  See, e.g. Doc. 1330, p. 7, f.n. 3.

[2] The Court, in its August 26, 2011 Order and Reasons, cites to *Boca Ciega* and its explanation of the congressional intent behind OPA's presentment requirement, as a "mandatory condition precedent" to suit.  However, it should be emphasized that *Boca Ciega* was decided *before* the 1996 amendments to OPA.  To fully understand the congressional intent underlying the OPA claims process *as it now exists,* it is imperative to analyze the statements of congressional intent relating to the 1996 amendments to OPA, that specifically and profoundly altered the nature of the OPA claims process, and not refer to the 1989 congressional record that predates those fundamental changes.

## B.  The 1996 Amendments to OPA

Unfortunately, if misused, the OPA-mandated claims process, as initially conceived, can be used as a mechanism for exploiting the economic duress of the victims of an oil spill to extract releases of future liability.  The potential for abuse of the OPA-mandated claims process, as originally enacted in 1990, was exposed in 1996, after an oil spill from a tanker off the coast of Rhode Island.  Bob Smith, President of the Rhode Island Lobstermen's Association, outlined a litany of abuses that the guarantor for the responsible party engaged in, through the guise of the OPA claims process allegedly established to compensate fishermen and other claimants that suffered economic losses that resulted from the spill.

The abuses included: demands for releases in exchange for inadequate consideration; denials of legitimate claims based on allegations of "inadequate documentation;" and refusal by the responsible party or its agents to compensate claimants for the costs of assessing damages.[3] Senator Chafee observed that "[a]fter the North Cape spill, some lobstermen and fishermen were reluctant to pursue compensation for short-term damages for fear of waiving any rights to future compensation.  This reluctance at times led to significant hardship, as most fishermen and lobstermen are self-employed, and thus, do not qualify for unemployment benefits."  Senate Conference Report on the Coast Guard Authorization Act of 1996 (dated September 28, 1996).

As a result of these abuses, Congress amended OPA in 1996 to provide claimants with protections against the potential for abuse by Responsible Parties through the claims process.  The 1996 Amendments to OPA substantially amended the provisions of this Act relating to the claims process.  As a result of these amendments, virtually all claims under the OPA claims process were made *interim* claims.  *The net effect of the proposal was to make no settlement made through the OPA claims process final.*

---

[3]  The full text of Mr. Smith's testimony is attached as Exhibit 1 to this Motion.

The claims process, after the 1996 amendments, is designed to only "look back" and compensate actual economic damages that have already been incurred, without the release of any future damage claims under any theory of law or equity. [4]  The OPA claims process, as amended in 1996, is not a vehicle for claimants to seek, nor Responsible Parties to settle, future damages. Rather, "a claimant may present a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled and payment of such a claim shall not preclude recovery for damages not reflected in the paid or settled partial claim." 33 U.S.C.A. § 2705(a) and § 2714(b)(2).  Indeed, after the 1996 amendments, Section 2715(b)(2) of OPA expressly states that: "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] shall not foreclose claimant's right to recovery of all damages to which a claimant otherwise is entitled under this title or any other law.''  33 U.S.C.A. §§ 2715(b)(1) and (2).

The Congressional intent for these amendments, as stated in the Senate Conference Report on the Coast Guard Authorization Act of 1996 (dated September 28, 1996) is to ensure that: "*a person injured by a spill may bring a claim for less than the full amount of damages to which he may be entitled, without waiving the right to future compensation.*"[5]

More revealing in explaining the congressional intent *and effect* of the 1996 OPA amendments is the testimony of the insurance industry officials who *opposed* these amendments to OPA.  In the June 4, 1996, testimony of Richard H. Hobbie, III, President, Water Quality Insurance Syndicate, of the American Institute of Marine Underwriters ("AIMU"), to the United States Senate Committee on Environment and Public Works, the basis for industry opposition to

---

[4]  The relevant text of the 1996 amendments to OPA is attached as Attachment A to this filing.

[5]  The full text of the relevant Report excerpt is attached as Attachment B to this filing.

the 1996 amendments to OPA was explained in vivid detail.  Mr. Hobbie acknowledged the

significant and profound changes to the parameters for a permissible claims process under OPA

that would result from enactment of the 1996 amendments.  Specifically, he argued in relevant

part that:

> The experience in Rhode Island shows that the massive overhaul of OPA claims provisions is not appropriate. The system worked in Rhode Island, but if the amendments proposed had been in effect it is unlikely the system would have worked. The proposal would make claims handling far more unwieldy. *It is unnecessary and ill-advised to amend 1013 to require advertising about partial claims.  The vast majority of spills do not give rise to a need for partial payments.* The Coast Guard has the authority to require advertising regarding partial payments when appropriate.

> *We are particularly concerned about proposed new 1015(c)(2) (Final Damages) which would make virtually every claims payment interim. Insurers would never be able to close the books on a spill.* This approach is counterproductive and will impede participation of guarantors in OPA financial responsibility programs.

> As drafted, the provisions regarding partial payments in S. 1730 would throw the claims process under OPA into disarray. It is proposed that 1002(f) should be amended to define loss of profits and earning capacity to include specifically partial claims.  In our view, if any amendment is made, this section should suffice. *The proposed amendments to 1013, 1014 and 1015 are wholly unnecessary and create confusion.  They appear to permit partial claims in any category of damage claims under OPA.  If enacted, the claims settlement process would become a nightmare.  Claims could never be settled.  The proposed revisions to 1015 (Subrogation) appear to prohibit final settlements altogether.  One of the purposes of OPA '90 was to encourage prompt settlement and payment of claims.  The net effect of the proposal would make no settlement final, a situation no insurer can live with.*  The transactional costs will skyrocket and as a consequence the cost of providing financial security will inflate. Guarantors under OPA will be precluded from recovering for some partial claims in actions against negligent third parties.[6]

(emphasis supplied).

Despite Mr. Hobbie's objections, the amendments to OPA that he so vehemently opposed

were enacted by Congress in 1996, *verbatim*.  Thus, Mr. Hobbie's testimony is particularly useful

in deciphering the Congressional intent and the actual scope and effect of the 1996 OPA

amendments.

---

[6]  June 4, 1996 Hobbie Testimony attached as Ex. 2, p. 4 (emphasis supplied).

### III.  THE ROLE OF THE COURT:

**Under the Controlling Law in this Circuit, the Court has the Duty and the Power to Declare "Null," "Void" and "Unenforceable" Any Provisions of a Proposed Settlement or Class Definition that Violate Federal law or Principles of State Contract Law**

Releases, compromises and settlement agreements are *contracts* and the rules of construction applicable to *all* contracts are used in the interpretation of such agreements.  *Dore Energy Corp. v. Prospective Inv. & Trading Co. Ltd.*, 570 F.3d 219, 225 (5th Cir. 2009); *Trahan v. Coca Cola Bottling Co. United, Inc.*, 894 So.2d 1096, 1106 (La. 2005); *Silva v. State Farm Mut. Auto. Ins. Co.*, 38 So.3d 934, 937 (La.App. 5th Cir. 2010); *see also* La. Civ. Code Ann. Art. 3071.[7]  "In general, a release surrenders legal rights or obligations between the parties to an agreement . . . " ).  *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010,*___ F.Supp.2d ___, 2012 WL 246455 *6 (E.D.La. 2012) (Barbier, J.), *citing, Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507-08 (Tex. 1993) (Texas law) (citation omitted)).  A settlement agreement is a contract, but, when incorporated into a judgment, becomes a court decree.

Whether a compromise, settlement or release is a *valid* contract between the parties is determined by reference to State substantive law governing contracts generally.  *White Farm Equipment Co. v. Kupcho*, 792 F.2d 526, 529 (5th Cir. 1986).  Whether a contract or contractual provision is unconscionable or unenforceable on grounds of illegality or public policy is a question of law.  *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005); *see also, MacPhail v. Oceaneering Int'l, Inc.,* 301 F.3d 274, 278 (5th Cir. 2002), *cert. denied,* 537 U.S. 1110, 123 S.Ct. 891, 154 L.Ed.2d 782 (2003).

---

[7]  La. Civ. Code Ann. Art. 3071 provides that:
> A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship.

In examining whether a contract is unconscionable, the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party. *Booker v. Robert Half Intern., Inc.*, 315 F.Supp.2d 94, 102 (D.C.Cir. 2004). A contract is one of "adhesion" when either its form, print, or unequal terms call into question the consent of the non-drafting party and it is demonstrated that the contract is unenforceable, due to lack of consent or error, which vitiates consent. *Velazquez v. Brand Energy & Infrastructure Services, Inc.,* 781 F.Supp.2d 370, 376-377 (W.D. La. 2011).

Duress which would vitiate consent -- *legal duress* -- is determined by applying subjective as well as objective standards; the subjective element is a party's personal reaction to circumstances, and the objective elements are the reasonableness of the fear and unjustness of the injury based on how reasonable persons would react to the circumstances. *Averette v. Industrial Concepts, Inc.* 673 So.2d 642, 644 (La. App. 1st Cir. 1996), *citing,* LSA-C.C. art. 1959. Circumstances to be considered in determining whether consent to contract was freely given is assistance of legal counsel in evaluation of the contract and determination of options available. *Id.* at 645-646. A contract may be invalid or unenforceable by reason of economic duress if undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him into making the agreement. *Brown v. Cain Chemical, Inc.,* 837 S.W.2d 239, 244 (Tex. App.-Hous. 1st Dist. 1992).

In *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 167-168 (5th Cir. 2004), the Fifth Circuit noted that:

> …Louisiana jurisprudence does recognize that certain contractual terms, especially when contained in *dense standard forms that are not negotiated*, can be too harsh to justly enforce. The theory of such decisions, often, is that an unconscionable contract or term can be thought of as lacking the free consent that the Code requires of all contracts. *See generally* Ronald L. Hersbergen, *Unconscionability: The Approach of the Louisiana Civil Code,* 43 LA. L. REV. 1315 (1983). In order to be invalidated, a provision must possess features of both adhesionary formation

and unduly harsh substance. *See Andry v. New Orleans Saints,* 820 So.2d 602, 603-04 (La.App 5th Cir. 2002) ("[A]dhesion contracts are not *per se* unenforceable, but rather lend themselves to an inquiry as to whether the weaker party consented to the fine print, and if so whether the adhesionary clause is unduly burdensome or extremely harsh."); Saúl Litvinoff, *Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations,* 47 LA. L. REV. 699, 758 (1987) *("[W]here a party had no power to negotiate a contract, [the Louisiana courts] may disregard a particular clause in the contract when that clause is unduly burdensome or extremely harsh.").*

(emphasis supplied).

Further, as this Court previously noted in its response to a request by BP to nullify an indemnification clause in its contract with Transocean on public policy grounds (MDL Doc. 4287-1, pp. 35-36): "…gross negligence will invalidate a *release***, …**" citing *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001) (noting that a waiver of liability for gross negligence is void); *Sevarg Co., Inc. v. Energy Drilling Co.,* 591 So.2d 1278 (La.App. 3d Cir. 1991); La. Civ. Code Ann. Art. 2004.[8] *See also, Royal Ins. Co. of Am. V. Southwest Marine;* 194 F.3d 1009, 1016 (9th Cir. 1999) (holding a release is invalid as to gross negligence, reckless conduct, and intentional acts); *La Esperanza de P.R., Inc. v. Perez y Cia de Puerto Rico, Inc.,* 124 F.3d 10, 19 (1st Cir. 1997) (same); *Energy XXI, LLC v. New Tech Eng'g,* 787 F.Supp.2d 590, 611 (S.D. Tex. 2011) (same); *Restatement (Second) of Contracts* § 195(1), cmt. (b) (updated 2011) (A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy). *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010,*--- F.Supp.2d ----, 2012 WL 246455 at *7, *8 and *9 (E.D.La. 2012) (Barbier, J.) (emphasis supplied). (MDL Doc. 5446, pp. 11, 13-16).

---

[8] La. Civ. Code Ann. Art. 2004 states, in pertinent part: "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party**.**"

In *Morse*, the Louisiana Supreme Court held that:

As Planiol notes, laws of 'public order' (see Article 11, footnote [below]) include laws which, in the interest of the public, prohibit private persons from entering into certain contracts. Planiol, Civil Law Treatise, Vol. I, Section 292 (LSLI translation, 1959):

> The modern law-maker, considering that the two parties to a certain juridical act are not equally able to defend their interests, prohibits them from departing from certain rules which he has laid down for their protection.

*Morse v. J. Ray McDermott & Co., Inc.,* 344 So.2d at 1359. [9]

A contract that violates or contravenes a federal or state constitution, statute, or regulation is illegal, invalid, unenforceable, and void. *Davis v. Parker*, 58 F.3d 183, 189 (5th Cir. 1995) (an agreement is a nullity where it derogates from laws enacted for the protection of the public interest, violates a rule of public order, or produces a result prohibited by law or public policy.). Under the law in this Circuit, if a contract has as its cause or its object the violation or circumvention of a statute, it is an absolute nullity in contravention of public order. *U.S. v. Fontenot*, 665 F.3d at 646; *Bach Inv. Co. v. Philip*, 722 So.2d 1222, 1223 (La.Ct.App. 5th Cir. 1998). See e.g., La. Code Civil Ann. arts. 1892, 1895 and 2031. [10] An absolutely null contract "is deemed *never to have existed.*" *U.S. v. Fontenot,* 665 F.3d at 646, *citing,* La.Civ.Code Ann. art. 2033 (2009) (emphasis added).

---

[9]  La. Civ. Code Ann. Art. 11 states, in relevant part, that:
> Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals.
>
> But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good.

[10]  La. Civ. Code Ann. Art. 1892 provides: "That is considered as morally impossible, which is forbidden by law, or contrary to morals. All contracts having such an object are void."

La. Civ. Code Ann. Art. 1895 provides that: "The cause is unlawful, when it is forbidden by law, when it is Contra bonos mores (contrary to moral conduct) or to public order."

La. Civ. Code Ann. Art. 2031 provides that: "Every condition of a thing impossible, or *contra bonos mores* (repugnant to moral conduct) or prohibited by law, is null, and renders void the agreement which depends on it."

As a general rule, a district court's authority to administer a class-action settlement derives from Rule 23 and the Court cannot modify the bargained-for terms of the settlement agreement.[11] However, "[t]here is no doubt that the courts have the duty and the power to declare void and unenforceable contracts made in violation of law or in contravention of the public policy of the state…." *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005), *citing, Smith v. Simon,* 224 So.2d 565, 566 (Miss. 1969) (citation omitted).

Further, an illegal condition *within a contract* annuls the entire agreement "*only to the extent to which the agreement depends on it*." *Lebouef v. Liner,* 396 So.2d 376, 378 (La.App. 1st Cir. 1981) (emphasis supplied); La. Civil Code Ann. Art. 1893.[12]  The entire agreement containing a stipulation against public order or public policy *need not be declared null*, but rather a Court is free to recognize, by interpretation of the will of the parties, that the illegal or unconscionable condition inserted in the contract is only an accessory clause to which the contract was not subject for its existence, and, in that event, the illegal, immoral, or impossible condition is effaced.  *Morse v. J. Ray McDermott & Co., Inc.,* 344 So.2d at1358.  *Accord*, *Wilson Warehouse Co. of Texas, Inc. v. Maryland Cas. Co.,* 269 So.2d 562 (La.App 1st Cir. 1972); *Starke Taylor & Sons, Inc. v. Riverside Plantation,* 301 So.2d 676 (La.App. 3d Cir. 1974) (In order to avoid inequities, courts sever the illegal and unenforceable provisions of a contract from the remainder of the contract rather than declare the entire contract void.).  *See also, City of Del Rio v. Ulen Contracting Corp.,* 94 F.2d 701 (5th Cir. 1938) (Where the invalid portion of a contract can be severed from the remainder without impairing the valid part, the valid part will be sustained and the contract *pro tanto* enforced).

---

[11]  *Klier v. Elf Atochem North America, Inc.,* 658 F.3d 468, 475 (5th Cir. 2011), *citing, Evans v. Jeff D.,* 475 U.S. 717, 726-727, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986).

[12]  La. Civ. Code Ann. Art. 1893 provides that:
     "An obligation without a cause, or with a false or unlawful cause, can have no effect."

Thus, where the subject matter of a contract is legal, but the contract contains an illegal provision that is not an essential feature of the agreement,[13] the illegal provision may be *severed* and the valid portion of contract enforced; in determining whether a particular provision is severable, the issue is whether the parties would have entered into the agreement absent the illegal parts. *Panasonic Co., Div. of Matsushita Elec. Corp. of America v. Zinn,* 903 F.2d 1039 (5th Cir. 1990). The equity served by severing only the illegal provision and enforcing the valid portion is especially true when the contract itself expressly contemplates and provides for severance of an illegal provision. *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715 (5th Cir. 1995). *See also, Cavalier Manufacturing, Inc. v. Jackson,* 823 So.2d 1237, 1245 (Ala. 2001) (striking only that portion of an arbitration clause that prohibited the arbitrator from awarding punitive damages because such a provision is void; enforcing remainder of arbitration provision consistent with severability clause in contract).

## IV. THE GCCF RELEASES VIOLATE THE 1996 AMENDMENTS TO OPA:

### A. BP and its Agents, Kenneth Feinberg and the GCCF, Violated the 1996 Amendments to OPA in the Implementation of the Deepwater Horizon Claims Process

The abuse of claimants throughout the aftermath of the Deepwater Horizon Incident (both in the scope and nature of that abuse) can be directly traced to the abject refusal of BP and its agents to conform their claims process to OPA mandates, *as amended in 1996*, including the prohibition against use of over-broad Releases of future damage claims in exchange for less than full compensation for losses incurred.

The abuses detailed in Bob Smith's 1996 testimony *mirror* the abuses that BP and its agents, Kenneth Feinberg and the GCCF, have inflicted upon claimants that suffered damages

---

[13] An "essential" promise, necessary for enforcement of a contract, denotes one that the parties to a contract reasonably regarded, at the time of contracting, as a vitally important ingredient in their bargain. *Neeley v. Bankers Trust Co. of Texas,* 757 F.2d 621, 628 (5th Cir. 1985).

resulting from the Deepwater Horizon incident.  All of these abuses are a direct and proximate result of BP's and its agents' refusal to abide by the federal law, *as amended in 1996*, as though BP was immune from the limitations imposed by Congress when it chose to expressly amend OPA's mandates relating to the payment of claims.  Contrary to Mr. Feinberg's interpretation of OPA, (MDL Doc. 3733-3, p. 55, ¶ 40), OPA does *not* contemplate a claims process in which "finality" for the responsible party is *the goal* or, after the 1996 amendments, even *a* goal.  Indeed, as Mr. Hobbie's contemporaneous testimony confirms, "finality" for the responsible party was *rejected* as *a permissible* goal, as a consequence of the enactment of the 1996 amendments to OPA.

Indeed, the *only* purpose for these 1996 amendments to OPA's claims process provisions was to prohibit the use of the type of general Releases that Mr. Feinberg, acting on BP's behalf, has implemented here.  *See, e.g.* 33 U.S.C.A. § 2715(b)(2).

From the outset of the GCCF claims process, BP and its agent, Kenneth Feinberg, implemented protocols and standards that deviated from the requirements of State and federal law and violated the express provisions of the Oil Pollution Act of 1990, *as amended in 1996*.  The Gulf State Attorneys General and the Governor of Louisiana through his counsel expended significant time and resources attempting to get BP and its agents to bring the GCCF claims process into compliance with their legal obligations – generally with only limited success.

The GCCF claims process was a confusing morass of ever-changing standards and procedures and, ultimately, it evolved into little more than a scheme to extract illegal, sweeping general Releases from claimants, through the use of economic duress and delay, often in exchange for inadequate consideration.  In direct contravention of the 1996 amendments to OPA, particularly Sections 2705(a), 2714(b)(2) and 2715(b)(2) of that Act, the OPA presentment requirement was exploited to coerce financially desperate victims of the Deepwater Horizon oil

14

spill into relinquishing their federally-protected right to future damages, in exchange for compensation now.  In direct contravention of public policy and the law of this Circuit, the GCCF Releases even purport to waive, discharge and *release* the liability of BP and other listed individuals and entities for future, unknown, unaccrued and unmatured damages, including damages which have not yet arisen, damages resulting from gross negligence, and punitive damages.

The GCCF created a false limit on the opportunity to file the interim claims mandated by OPA – establishing a three (3) month limit for filing "Emergency Advance Payment" claims[14] – the GCCF's name for the interim claims process mandated by OPA.[15]  Despite vociferous objections by Gulf State officials, BP through the GCCF, essentially stopped processing or paying interim claims from individuals and businesses suffering OPA damages on November 23, 2010.  *Ending this interim claims program was in direct contravention of OPA's mandates, as that Act only envisions a claims process for presentment of interim claims.*

Further, contrary to commitments by BP and Mr. Feinberg that Emergency Advance Payments would be expeditiously processed and paid,[16] the vast majority of these claims

---

[14]  Section III.F.2. of the August 23, 2010, GCCF Protocol for Emergency Advance Payments states:

2. Emergency Advance Payment applications may be submitted during the period August 23 - November 23, 2010.  After that date, applications for Emergency Advance Payments will no longer be accepted.  Applications for Final Claims, and *in appropriate circumstances applications for interim claims,* will continue to be accepted pursuant to the Protocol for Final Claims.
(emphasis supplied).

[15]  Footnote 1 of the August 23, 2010, GCCF Protocol for Emergency Advance Payments states:

A claim for an Emergency Advance Payment is an interim claim under OPA.  To the extent that the claimant incurs additional compensable damages that are not reflected in the Emergency Advance Payment, receipt of an Emergency Advance Payment shall not preclude a claimant from seeking additional damages not reflected in the Emergency Advance Payment.

[16]  As promised by Section III.E.2 and 3 of the August 23, 2010, Protocol for Emergency Advance Payments:

2. *Each Emergency Advance Payment application will be evaluated preliminarily within 24 hours of receipt* of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant. *Complex business claims submitted for an Emergency Advance Payment will be evaluated preliminarily within 7 days of receipt* of the completed form and supporting documentation to

languished for months before processing.  Most interim claims that were filed were never paid and about a quarter of all Emergency Advance Payment claims filed were summarily dismissed or denied without any real processing.[17]

Throughout the Gulf region, claimants made frequent public pleas for faster processing and payment of their claims.  Claimants uniformly argued that the financial hardships caused by the spill were greatly exacerbated by the long delays in the GCCF process.[18]  In response to the delays in processing and paying claims by the GCCF, on November 19, 2010, DOJ's Associate Attorney General Thomas J. Perrelli sent a letter to Mr. Feinberg demanding that the large backlog of unprocessed and unpaid interim clams filed during the  "Emergency Advance Payment" phase be processed *and legitimate claims be paid* by December 15, 2010.[19]  The GCCF

---

determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant.

3.  *Upon a determination that the Claimant is eligible for an Emergency Advance Payment, a payment will be authorized within 24 hours.*

(emphasis supplied).

[17]  Of the 449,794 interim claims filed from August 23, 2010, through November 23, 2010, during the Phase I Emergency Advance Payment period, almost two-thirds were denied *any* payments and the remaining third (169,201 claimants paid) received on average $8,378 for individuals and $32,676 for businesses to compensate them for their losses from the spill.  *See, e.g.* Exhibit 3, GCCF Overall Program Statistics, dated 4/11/2012.  *See also,* Footnote 22 below.

[18]  According to the GCCF Overall Program Statistics Report for April 11, 2012, as of the date of that report, 77 Emergency Advance Payment claims *remain under review.*  Considering that the "Emergency Advance" payment process was terminated and no EAP claims accepted since November 23, 2010**,** that means that these 77 claims have been "under review" for *at least 17 months*.  This pace hardly achieves the goals of the EAP Protocol, which promised processing and payment decisions "within 24 hours" of a determination that the Claimant is eligible for an Emergency Advance Payment.  *See, e.g.* Section III.E.3 of the August 23, 2010, EAP Protocol, referenced in Footnote 18 above.

[19]  Specifically, Associate Attorney General Perrelli stated in his November 19, 2010, letter that:

…There are a number of issues that I believe must be addressed.

First, I continue to have concerns about the pace of the claims process, particularly given the resources available for this claims process.  Many of the individuals and businesses whose claims are under review do not have the means to get by while they await GCCF processing.  While you have indicated poor documentation has made it difficult to address some claims quickly, over the past two weeks, the number of claims requiring additional documentation has actually gone down – while the number of claims under review has increased significantly.

As you move from the initial emergency phase to the final protocol governing claims administration, it is critical that you pay the remaining legitimate and documented emergency

obliged by simply and summarily denying more than 100,000 interim claims in a ten (10) day period in early December, 2010.[20]

### B.  BP HAD NOTICE OF THE ILLEGALITY OF THE RELEASE BEFORE IT WAS USED, BUT BP IGNORED THE LAW AND CONTINUED TO USE ITS IMPROPER RELEASE WITH IMPUNITY

Although initially after his appointment as GCCF Administrator, BP's agent Kenneth Feinberg stated that, consistent with OPA, no waiver of the right to sue would be required in order for claimants to receive "Emergency Advance payments" (his name for "interim payments" required by OPA), he soon made clear his intention to deviate from OPA (as amended in 1996), stating that: "…the fund he'll be administering won't be dispensing any relief for losses already incurred unless the victim also consents to accept an estimate of his future damages, too, *and then releases BP from future claims*.  'My goal is to settle then and there,' Feinberg says. 'Why bother coming back?  Let's resolve it right now.'" (emphasis supplied)[21]

Such a scheme is in direct contravention to the letter and intent of the 1996 amendments enacted to OPA.  However, Mr. Feinberg has consistently and repeatedly asserted that he was not obligated to comply with OPA mandates in the administration of the GCCF.[22]  Mr. Feinberg even

---

claims quickly.  *I request that you complete processing and payment of such claims by December 15, 2010, which will be roughly 3 weeks after receipt of the last emergency claims.*

(emphasis supplied).  Exhibit 4.

[20]  http://blog.al.com/live/2010/12/more_than_100000_emergency_oil.html

*"More than 100,000 emergency oil spill claims denied in 10 days,"* (Published: Tuesday, December 07, 2010), by Dan Murtaugh, Press-Register:

> Ken Feinberg's operation has denied more than 100,000 emergency spill claims in the past 10 days as it nears a Dec. 15 deadline to process all 455,000 such claims.
>
> As of Saturday night, the Gulf Coast Claims Facility had denied more than 173,000 claims from businesses and individuals, including 24,000 from Mississippi and 22,000 from Alabama.  Only 67,000 claimants had been turned down as of Nov. 24.

[21]  http://money.cnn.com/2010/07/12/news/companies/feinberg_BP_claims.fortune/

[22]  http://www.instituteforlegalreform.com/unique-responses-to-unprecedented-disasters-how-the-law-copes.html
At the U.S. Chamber Institute for Legal Reform's 11th Annual Legal Reform Summit on October 27, 2010, Gulf oil spill claims administrator Kenneth R. Feinberg, Feinberg Rozen, LLP, delivered the keynote address on "Unique Responses to Unprecedented Disasters: How the Law Copes."  At minute 59 of that videotaped presentation, Mr. Feinberg indicates the extent to which he believes that OPA is relevant to his administration of the GCCF.

operated under the belief that he had no obligation to provide the ability to file "interim claims" after November 23, 2010, and only ultimately provided the ability to file interim, short-term claims as an "*option,*" within Mr. Feinberg's *discretion* to offer, after repeated demands by the Gulf State Attorneys General and others.[23]   Significantly, BP did nothing to compel their agent to comply with federal law.

Even before BP, through its agents, began using the GCCF Release, they were advised that the Release violated existing federal and State laws.[24]   DOJ objected to the form of the Release.[25]   The Gulf State Attorneys General and the Louisiana Governor through his counsel advised BP and its agent, Kenneth Feinberg, that the GCCF Release violated the federal and State law.  Despite the clear notice that the Release, as drafted, violated federal and State law, BP and its agents refused to cure the legal defects in the Release and implemented its use by the GCCF in December, 2010.  (Exhibits 6 and 7).

---

[23] See, e.g., October 25, 2010 Letter from Kenneth Feinberg to the Honorable George Sheldon, then Secretary of the Florida Department of Children and Families and Chair of the Claims Subcommittee of the Governor's Deepwater Horizon Economic Recovery Task Force, pp. 4-5, ¶ 10 ("No Interim Claims Process per the Oil Pollution Act""). Attached as Exhibit 9.  *See,* Final version of EAP Protocol, Section I.B, p. 2 ("Under the Final Protocol, interim claims will be considered *where appropriate*." (emphasis supplied).)  *See also,* Footnote 16, above.

[24]   A copy of the sample form Release provided to claimants is attached as Exhibit 5.

[25]   In his November 19, 2010 letter, Associate Attorney General Thomas J. Perrelli advised Mr. Feinberg as follows:

- The proposed release for final claims remains overbroad in multiple ways.  As noted above, if individuals wish to receive lump sum for all past and future damages, in exchange for a release, they should have the option of doing so.  But as currently drafted, the release would appear to require claimants to release even claims for types of damages, such as behavioral health claims, that could not have been presented to the GCCF.  The release is also sufficiently vague that it suggests that claimants have to release claims of spouses and business partners, even in situations where such a release is unfair and nonsensical.  We think these and other problems of overbreadth can and must be addressed in the final version.

Exhibit 4, p. 2.

The Mississippi Attorney General disagrees with the suggestion that *any release of future claims* is appropriate through the OPA claims process, after the 1996 OPA amendments, but concurs in the other observations contained in Assoc. Attorney General Perrelli's letter regarding the overbreadth of the release.  The lack of equal bargaining power of claimants and Responsible Parties makes the ability for types of entering a release through the claims process inherently coercive and subject to the use of economic duress and an exchange of inadequate consideration – this fact, is what led Congress to enact the 1996 Amendments to OPA, prohibiting the release of future damages through the mechanism of the claims process.

## C.  THE GCCF RELEASES SHOULD BE NULLIFIED BECAUSE THEY ARE ILLEGAL

After the GCCF process for filing interim claims (a/k/a "the Emergency Advance Payment" Phase) was unilaterally terminated by BP's agents, on November 23, 2010, the "choice" presented to most claimants was between financial ruin and accepting *any* payment, no matter how meager, in exchange for a full, sweeping release of all claims (including gross negligence), and future damages (including punitive damages).  Indeed, after the purge of more than 100,000 pending interim claims during early December of 2010, the only *payment* opportunity provided by BP, through the GCCF claims process, from mid-December 2010, through at least February 16, 2011, was to seek a "Quick Pay" Final payment that required claimants to relinquish their rights – *and the rights of spouses, business partners, heirs and others* -- to obtain future damages from BP and a 2-page list of other individuals and entities.  In exchange, claimants were paid the arbitrary sum of $5,000 for individuals (the spouses, partners and heirs still received no consideration) and $25,000 for businesses.

At the time the Quick Pay process was unveiled, just before Christmas in 2010, Mr. Feinberg described claimants' "choice" as follows:

> Claimants will have a choice.  They can accept a lump sum final payment for all present and future damage and surrender their right to sue by signing a full release, or they can continue to receive quarterly interim payments based upon documented past damage for that three-month period; however, there is no guarantee that, in the future, a lump sum final payment will be as generous as it will be currently.[26]

After February 16, 2011, the GCCF began accepting "interim" and "final" claims. However, a review of the GCCF's Reports on Overall Program Statistics during that time period reveals that only Quick Pay Final claims were expeditiously processed and paid even after February 16, 2011.  Further, after February 16, 2011, even claimants who *chose* to pursue *Interim*

---

[26] http://www.fox10tv.com/dpp/news/gulf_oil_spill/final-protocol-for-claims-payments-released

claims, as guaranteed by OPA, were required to go to the expense and burden of submitting documentation needed for the GCCF to calculate and offer a speculative Full Final payment. This process violated OPA's mandates, and increased the delays in and costs of processing Interim claims.  Further, many claims were denied strictly based on a claim of "inadequate documentation."

In a curious number of instances that were brought to the attention of the Mississippi Attorney General's Office, claimants' who chose to file Interim claim requests, rather than seek a final payment requiring a release, had their claims processed and calculated as ***due $0*** for their Interim Quarterly claim, but then were provided "Full Final" offers for the Quick Pay amount of $5,000 to individuals and $25,000 to businesses.  Thus, in each of these disparate individual and business claims, the GCCF reached exactly the same conclusion every time – the claimant was due *nothing* for their quarterly Interim claim, but could receive cash now in the Quick Pay amount, *if they just signed a Release relinquishing all of their future litigation rights*.  Thus, again, BP's agent, the GCCF, linked compensation through the claims process to the relinquishment of the right to obtain all future damages, in direct contravention of federal law (Section 2715(b)(2) of OPA) and State law (prohibitions against the use of economic duress to extract a release, the payment of inadequate consideration to obtain a release, and the release of future gross negligence and punitive damage claims).  Coincidentally, the exact result Mr. Feinberg promised when he described his vision for the GCCF claims process.

A statistical review of the GCCF's own reported data indicates that the curious trend in the sample cases the Mississippi Attorney General's Office found does not appear to be a mere anomaly common to only a few random cases.  Rather, according to the GCCF's own statistics, BP paid $5,000 or less to individuals and $25,000 or less to businesses *for most claims that received any payment*, regardless of how the claims were filed (Interim, Full Final Review or

Quick Pay).  According to the GCCF's Overall Program Statistics, of all claims that were paid by the GCCF through April 11, 2012, approximately 64% of individual claims were paid $5,000 or less and almost 80% of business claims were paid $25,000 or less, regardless of the nature of the type of claims filed (Interim, Full Final or Quick Pay).  Exhibit 3, pp 3-4.  All roads seem to coincidentally lead the GCCF claims adjusters to offer $5,000 for individual claims and $25,000 for business claims for *every claim* – an amount the claimant can get if they just sign a Release of all claims.[27]

This payment and release scheme is *precisely* the type of abuse of the OPA claims process that the 1996 amendments to OPA were enacted to prohibit and prevent.  *See, e.g.* 33 U.S.C.A. § 2715(b)(2) and the congressional record excerpts attached to this filing as Attachments A and B. Because of the inherently unequal bargaining positions of Responsible Parties and claimants, Congress imposed the protections and limitations in the 1996 amendments to OPA.

Accordingly, all provisions contained in the GCCF Releases that purport to relinquish future damages or rights not compensable under OPA are void, as contrary to federal statutory law and public policy, and should be nullified, to the extent these releases relinquish future and other legal damage claims protected from release by Section 2715(b)(2).  Claimants who signed such Releases should have the option of presenting their claims to the Settlement Fund for re-evaluation by Special Master Juneau, if they so choose, and to present any damage claims they may incur in the future as OPA permits.

---

[27]   Of 133,589 *interim* claims filed during Phase II of GCCF operations (after February 18, 2011) only 35,917 were paid any interim payment (less than 27%).  Exhibit 6, p. 1.  The average received by these interim claimants was $7,515 for individual claims and $24,603 for business claims.  *Id.*

### D.  THE GCCF RELEASES SHOULD BE NULLIFIED BECAUSE THEY WERE ILLEGALLY-OBTAINED
#### i. Economic Duress

Mr. Feinberg has publicly acknowledged that from November 23, 2010, through *at least* February 16, 2011, there was *no process* for evaluating or *paying* any *interim* claims.[28]  Thus, for months after the Emergency Advance Payment program was unilaterally terminated by Mr. Feinberg acting on BP's behalf, BP provided no mechanism for processing and paying *Interim* claims, *in direct contravention to the express requirements of OPA.  See, e.g.* 33 U.S.C. §§ 2705(a) and 2714(b)(2).  The GCCF's own statistics confirm that *no interim claims were paid during that period.*  (Exhibit 8).

During this period, the *only option* provided to claimants to obtain compensation for their spill related losses from BP, was to take a so-called Quick Pay Final Payment, which required a release of all of the claimant's (and their spouse's, business partners' and heirs') future litigation rights in exchange for the arbitrary sum of $5,000 for individual claimants (spouses, business partners and heirs received no consideration at all), and $25,000 for businesses.

Thus, at the height of the economic impact of the spill, seven months after the spill began and less than three months after the flow of oil was stopped, BP and its agents preyed on the financial desperation of claimants who were in dire straights and needed money *immediately* and presented them with *only one option* to obtain any immediate financial relief – sign the GCCF Release of all claims in exchange for the paltry, arbitrary Quick Pay sum of $5,000 for individuals and $25,000 for businesses.  Ironically, those claimants who likely suffered the greatest financial losses in terms of the percentage of their incomes from the spill and had the greatest need for prompt compensation through the claims process, were the *most vulnerable* to

---

[28]  http://www.bloomberg.com/video/65253264/

being coerced into signing a release in exchange for a Quick Pay during this period where *no other payment option was available to any claimant.*  Consequently, claimants who accepted Quick Pay Final Payments during this period *did not do so by choice* – because *no choice other than a Quick Pay was offered* during this period.

Issuance of the threat of less "generous" payments in the Feinberg press release (quoted above) accompanying the Interim and Final Claims Protocol and Release was a wrongful act.  Mr. Feinberg's expressions in that press release were intended to overcome the will of claimants by using their economic distress (caused by BP in creating the oil spill disaster and failing to uphold its obligations to fairly and adequately pay claimants) to compel compliance with the final payment scheme and relinquishment of their rights.  This coercion of claimants, already in significant financial distress, provides strong evidence that the GCCF Releases are illegally-obtained, void and unenforceable, because the claimants who executed them, many of whom were of limited means and most of whom were unrepresented by counsel, were subjected to improper economic duress from BP's agent, Mr. Feinberg.  Mr. Feinberg controlled *what* compensation a claimant received for his damages, *when* he received it, and *if* he received it; and the claimant had no real ability to challenge the compensation paid, or not paid, without litigation.[29]

Moreover, these claimants had no adequate legal remedy to protect their interests.  The Interim and Final Claims Protocol effectively stripped them of their right to compensation without a release, by giving the GCCF sole discretion over the amount claimants will receive, with no viable or timely opportunity to challenge those decisions.  As a result, the GCCF Releases are invalid and unenforceable by reason of economic duress and lack of consent.

---

[29]   The USCG Oil Spill Liability Trust Fund was not a viable alternative since the $1 billion per Incident cap was almost reached in 2010, making the funds available to claimants almost nonexistent.  Indeed, not a single claims filed with the USCG Fund was paid a penny – a point Mr. Feinberg frequently and very publicly repeated.

Accordingly, GCCF Releases signed during the Quick Pay Only window (November 23, 2010 through at least February 16, 2011) should be nullified and declared void because they were obtained without free consent, through violation of the mandates of OPA (§§ 2705(a) and 2714(b)) and the use of economic duress.[30]  These claimants should all have the right to present their claims to the Settlement Fund and Special Master Juneau for re-evaluation, if they so choose, and should have the right to submit future claims to the Fund if additional damages resulting from the Deepwater Horizon Incident are incurred.

### ii.  Lack of Consideration – Quick Pays

Further, BP and the GCCF cannot justify the decision to limit payments under the Quick Pay Final Payment program to just $5,000 for individuals and $25,000 for businesses.  There is no evidence to demonstrate that these amounts represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the Deepwater Horizon Incident.  According to Mr. Feinberg, the Quick Pay amounts were determined by reference to the amount that most claimants were paid by the GCCF during the Emergency Advance Payment process.[31]  However, BP cannot demonstrate that (a) claimants were *adequately* compensated during the Emergency Advance Payment process; or (b) that the damages for which compensation was paid from August 23 through November 23, 2010, bear any correlation to the *total* damages any claimant will suffer resulting from the Deepwater Horizon Incident.  In other words, there is no empirical evidence that these Quick Pay sums bear any relation to a proper measure of damages incurred by individuals or businesses in the Gulf region as a result of the Deepwater Horizon Incident.

---

[30]  More than 92,000 claimants, most of whom were not represented by independent counsel, signed GCCF Releases under the Quick Pay process during the period of time that no interim claims process was offered, from November 23, 2010, to at least February 16, 2011.  *See, e.g.* Exhibit 8, p. 1.

[31]  http://www.bloomberg.com/video/65253264/

It appears that the Quick Pay amounts were merely chosen, arbitrarily and unilaterally, by BP or its agent Kenneth Feinberg, as a sum BP was willing to pay to terminate a potential legitimate claim and what amount, when offered after long delays and denials of other requested damages claims, BP or Mr. Feinberg thought the majority of financially desperate claimants would take to end their immediate suffering.  Indeed, as noted in the PSC's motion challenging the GCCF Releases, (MDL Docs. 3423-0, p. 3; 3423-1, Exs. B and C), a consent order was entered in 2010, preventing BP from requiring fishermen seeking clean-up work to waive future damage claims in exchange for $5,000 payments.  So it is not surprising that, in spite of this prior federal consent order, BP's agent happened to implement a program to extract sweeping general releases again – coincidentally for the same $5,000.[32]

Accordingly, releases signed in exchange for a Quick Pay Final Payment should be nullified because they were likely obtained in exchange for inadequate consideration.  If any claimants who signed a GCCF Release during this period believe that the Quick Pay sum inadequately compensated them for all damages incurred, these claimants should have the right to present their claims to the Settlement Fund and Special Master Juneau for re-evaluation and payment and have the right to submit future claims to the Fund if additional damages resulting from the Deepwater Horizon Incident are incurred.

### iii.  Lack of Consideration - Oystermen

On February 16, 2011, Mr. Feinberg announced that Oystermen would be offered a final settlement payment using a formula of 2010 damages times four (4), contained in a Methodology issued by the GCCF after a cursory, token comment period.  Even the GCCF's own expert report, released with the Methodology, prepared by John W. "Wes" Tunnell, Jr., of the Harte Research

---

[32] *See* Mobile Press-Register, *BP Told to Stop Circulating Settlement Agreements With Coastal Alabamians* (May 2, 2010) at:  http://blog.al.com/live/2010/05/bp_told_to_stop_circulating_se.html; cbsnews.com, *BP Told to Stop Distributing Oil Spill Settlement Agreements* (March 3, 2010) at: http://www.cbsnews.com/8301-503544_162-20003978-503544.html

Institute for Gulf of Mexico Studies, from Texas A&M University-Corpus Christi ("the Tunnell Report") (available at http://www.gulfcoastclaimsfacility.com/exhibit_d.pdf), established that the multiplier of "4 times 2010 losses" used to pay these claims was much too low and, thus, grossly inadequate consideration for the release demanded.  The Tunnell report specifically concluded that: "**In areas where oyster reefs were heavily oiled, oyster reefs may not recover for 6-8, or even 10 years."**  Tunnell Report, p. 33 (bold in original report).

The Attorney General of Mississippi included specific reference to the inadequacy of this consideration in his Statement of Interest filed on February 18, 2011, in this Court.  (MDL Doc. 1327, pp. 12-17).  Subsequently, on August 16, 2011, the GCCF adjusted the multiplier applicable to leaseholders of oyster bed leases in Louisiana, Mississippi and Alabama to up to 7 times 2010 damages, but Mr. Feinberg and the GCCF refused to adjust the payments of claimants who met this criteria already paid between February 16, 2011, and the date of that adjustment.[33] However, the GCCF did "voluntarily" retroactively adjust the payments made to shrimpers and crabbers when it similarly amended the Methodology applicable to those claimants on November 30, 2011.[34]

---

[33] http://www.gulfcoastclaimsfacility.com/methodology

[34] The GCCF posted the following statement under "important Notices" on its website:

- **Notice Regarding Retroactive Application of the November 30, 2011 Second Modification to the Final Payment Methodology Regarding Shrimp and Crab Harvesters and Processors**

  Shrimp and Crab Harvester and Processor Claimants who have signed a Release and Covenant not to Sue are not legally entitled to any further payments. The GCCF, however, will voluntarily true-up payments to four times 2010 losses for those Shrimp and Crab Harvester and Processor Claimants who signed a Release and Covenant not to Sue for a **Full Review Final Payment** prior to the November 30, 2011 Second Modification to the Final Payment Methodology.  Claimants who filed Quick Payment Final Claims will not be eligible for true-up payments.

  The GCCF will review all claims subject to the above modification.  Claimants will not be required to submit a supplemental claim form. All claimants who are eligible to receive this additional payment will receive notification from the GCCF.

http://www.gulfcoastclaimsfacility.com/important  (bold in original).

The proposed Settlement contains a much more generous formula for compensating oystermen who might choose to settle all future damages than any of the GCCF's various Methodologies.  (MDL Doc. 6276-22, pp. 27-41).  However, as currently proposed, oystermen who signed the GCCF Releases would not be eligible for the benefits of the proposed Settlement and recalculation of their damages by Special Master Juneau under the proposed Settlement's more-generous formula.  There can be no legitimate justification for denying all oyster leaseholders and oystermen the same opportunity to have the proposed Settlement's more generous formula applied to their future loss calculations if they choose to accept a final claims offer.

Further, the plight of oystermen, as a consequence of the application of arbitrary estimates of future damages, in contravention of OPA's 1996 mandates, illustrates the wisdom of Congress is enacting the 1996 amendments to OPA rendering *all claims interim* and prohibiting the use of the claims process to extract releases of future damage claims.

Section 2715(b)(2) of OPA made it improper for any Responsible Party to convert the OPA claims process into a game of chance where claimants are required to gamble on estimating the amount of damages they will incur in the future from an oil spill.  The fact that the GCCF Methodology has been amended three (3) times since February 16, 2011, to adjust these arbitrary multipliers demonstrates what a fool's game making such estimates inevitably is.

OPA imposes strict liability for *all losses* that result from an oil spill (or threat of discharge of oil) and requires BP to fully compensate these claimants for their losses.  A claims process that would use releases of future damages as a tool to reduce the legal liability of the Responsible Party, like that illegally employed by the GCCF, acting on BP's behalf, will always inure to the detriment of claimants and allow the Responsible Party to evade the liability Congress strictly imposed upon them when it enacted the 1996 amendments to OPA.  The harm

the contrary system has inflicted on the oystermen of the Gulf is precisely the reason that Congress enacted the 1996 amendments to that Act.

Accordingly, releases signed by oystermen and oyster leaseholders during the period February 16, 2011, through the end of the GCCF process should be nullified because they were obtained in exchange for inadequate consideration.  These claimants should have the right and option to present their claims to the Settlement Fund and Special Master Juneau for re-evaluation and adjustment according to the formulas contained in the proposed Settlement and must have the right and option to choose to make and receive interim claims for actual damages, rather than accepting a final payment based on any formula.

### V.  SEVERABILITY OF EXCLUSION PROVISIONS RELATING TO THE GCCF RELEASES:

**The Court has the Duty and the Power to Declare Null, Void and Unenforceable the Exclusions in Sections 2.2.6 of the Proposed Settlement and Class Definition that Incorporate the Unconscionable, Illegal and Illegally-Obtained GCCF Releases and Sever these Provisions from the Proposed Settlement**

Because BP has long been on notice that the Releases they have extracted from claimants violate federal law, principles of State contract law and public policy, it is not surprising that they have included a Severability Clause in the proposed Settlement that *specifically* references the unconscionable releases used by the GCCF and the similarly over-broad Release proposed for use in the proposed Settlement's claims process.

The applicable Severability Clause states:

21. **ILLEGALITY OR UNENFORCEABILITY OF PROVISIONS.**

21.1  In the event that the Release contained in Section 10 above, or the Individual Releases as to all Economic Class Members contained in Section 4 above, or any portion or provision thereof, shall for any reason be held in whole or in part to be invalid, illegal, or unenforceable in any respect, *such invalidity, illegality, or unenforceability shall not affect any other provision, or portion thereof*, if the BP Parties elect in their sole discretion in writing to proceed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been included in this Agreement.  Alternatively, the BP Parties, in these circumstances, may elect in

writing that the entire Agreement be rendered null and void consistent with the terms described in Section 21.3 below.

Doc. 6276-1, pp. 81 (emphasis supplied).

BP *knows* that the GCCF Releases are "invalid, illegal or unenforceable." They were provided notice by a myriad of State and federal officials of the breadth of the federal and State law violations contained in the GCCF Releases long before these illegal instruments were first used. BP's own argument in support of nullification of the indemnification clause in their contract with Transocean (MDL Doc. 4287-1, pp 35-36) and this Court's prior Order disposing of that issue (MDL Doc. 5446), demonstrate that BP is aware that, pursuant to public policy, the controlling law in this Circuit and the statutory law of the State of Louisiana, contract provisions to release future damages for gross negligence and punitive damages, like the provisions contained in the GCCF and proposed Settlement Release, violate public policy[35] and are void and unenforceable.

In determining whether Sections 2.2.6 of the Class Definition and the proposed Settlement are severable, the issue is whether the parties would have entered into the agreement absent the illegal parts. Put another way: *In the absence of Section 2.2.6, would BP have refused to settle and would BP choose to go to trial now, in the event that the Court nullified the GCCF Releases, pursuant to the pending requests, federal and state law and public policy?*

The inclusion of this Severability Clause, preserving the remainder of the settlement in the event the GCCF and/or proposed Settlement Releases are nullified as "invalid, illegal or unenforceable," demonstrates that the exclusion provision in Section 2.2.6 of the Settlement

---

[35] BP argued that even if Transocean's interpretation of the contract is correct, public policy prohibits and invalidates a contractual indemnity that purports to include gross negligence, punitive damages, or Clean Water Act civil penalties.

relating to these Releases is ancillary and not essential to the bargain.[36]  If BP chooses to terminate the settlement after nullification of its illegal and illegally-obtained GCCF Releases – so be it.  However, the Court should not sanction a flagrant violation of public policy or federal and State law in the name of approving a settlement of this case.  As the United States Supreme Court noted in *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 447, 118 S.Ct. 838, 841 (1998), "Courts cannot with ease presume ratification of that which Congress forbids."

Here, as noted above, the GCCF Releases are illegal, invalid, unenforceable, and void because they violate or contravene federal and state law.  The GCCF Releases are nullities, which should be deemed to have never existed.  In enacting the 1996 amendments to OPA, Congress expressly considered that Responsible Parties and claimants are *not equally able to defend their interests*, and, as a result, Congress prohibited Responsible Parties, like BP or its agents, from requiring the release of future damages in exchange for payments from the OPA claims process.  Congress laid down these limitations for the protection of claimants and in the interest of the public.  *See,* 33 U.S.C.A. § 2715(b)(2); *accord, Morse v. J. Ray McDermott & Co., Inc.,* 344 So.2d at 1359.

Further, to the extent to which provisions in the Settlement Release require class members to discharge, waive and release future damages claims, that have not yet accrued or arisen, for gross negligence, and punitive damages, they are contrary to public policy, the law of the State of

---

[36] *See e.g., Booker v. Robert Half Int'l, Inc.,* 413 F.3d 77 (D.C.Cir. 2005) (district court properly severed invalid punitive damages bar and enforced remainder of arbitration clause when contract contained severability clause and only one discrete illegal provision); *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 (5th Cir. 2003) (Unenforceable provision of arbitration clause barring any award of punitive damages did not render entire arbitration provision void, and was required to be severed from agreement, for purpose of employee's Title VII racial discrimination claim, where remainder of arbitration clause authorized arbitration of any and all disputes arising out of employment relationship.).

Louisiana and this Circuit, and therefore unenforceable.  As a result, these provisions should be nullified and severed from the Settlement Release now.[37]

Significantly, here, the entire proposed Settlement *need not be declared null* just because the exclusions in Sections 2.2.6 of the Class Definition and the proposed Settlement and at least some provisions in the Settlement Release violate federal law, principles of State contract law, and are against public policy.  The Court is free to recognize, by interpretation of the will of the parties, that the illegal, unconscionable condition inserted in Section 2.2.6 of the Settlement contract is only an accessory clause to which the contract is not subject for its existence, and, in that event, the illegal, immoral, or impossible condition (Section 2.2.6) can and should be effaced. *Morse v. J. Ray McDermott & Co., Inc.,* 344 So.2d at 1358.

Accordingly, the Court should: *nullify* the GCCF Releases; *nullify* provisions of the Settlement Release that purport to release future damages resulting from gross negligence and punitive damages; and *sever* the exclusions in Sections 2.2.6 of the proposed Settlement and the Class Definition.

## VI. ERRORS

On April 19, 2012, BDO released the Executive Summary for its "Independent Evaluation of the Gulf Coast Claims Facility."  (Exhibit 10).  Although the full Report of findings from that audit, overseen by the Department of Justice, is not yet available, the Executive Summary reveals a troublingly large number of errors – considering the expedited and cursory review conducted during this accelerated audit process (that did not even include interviews of any claimants). During the course of this independent evaluation, BDO's auditors identified errors in claims processing that negatively affected almost 10,000 claimants.  As a result, the GCCF has made (or

---

[37]   The Mississippi Attorney General reserves the right to submit additional objections regarding the proposed Settlement Release after he has had adequate time to assess this instrument in detail.

will shortly make) first-time and additional payments and/or offers for payment to 7,300

claimants, including claimants who had signed GCCF Releases, in an estimated total amount of

more than $64 million, *including claimants who had signed GCCF Releases*.

> Even more disturbing is the revelation in the Executive Summary that there are:

> …2,600 claimants whose claims were erroneously denied to whom payments or offers were not issued because their claims files did not contain information needed to determine whether the claimant sustained a financial loss.4 [[38]]  [And that i]n light of Judge Barbier's March 8, 2012 First Amended Order Creating Transition Process in the multi-district class action lawsuit (the "MDL"), In Re: Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010, *the GCCF has determined that it cannot contact those claimants*.

BDO Executive Summary, Exhibit 10, p. 7 (emphasis supplied).

> The Court's March 8, 2012 Order (MDL Doc. 5995) contains a provision specifically

reserving the right of the GCCF to correct errors found during the BDO audit; thus, the

justification for doing nothing to correct the errors associated with these 2,600 claims identified

as erroneously denied eligibility and payment by the GCCF during the BDO audit is

incomprehensible and inexcusable.  Specifically, ¶24 of the Court's March 8, 2012, First

Amended Order, states:

> 24.     In the event that the federal audit of the GCCF currently being performed by BDO Consulting identifies one or more errors in the application of the GCCF rules and methodologies to specific claims, the GCCF retains the right to correct the error(s) and to issue payments to the claimant(s) at issue in an amount necessary such that the Claimant(s) will have received from the GCCF the same amount as if the error had not occurred.  Within 24 hours of the GCCF making such a payment, the GCCF shall provide written notice of the fact and amount of

---

[38]  Footnote 4 of the Executive Summary states that:

> The GCCF noted that the denial letters it initially sent to these claimants contained language instructing them that, if they disagreed with the GCCF's denial, claimants could submit their claims to the U.S. Coast Guard's National Pollution Funds Center or could file claims in court, including in the MDL. Those claimants who are members of the class in the proposed MDL settlement will have the opportunity to submit their claims to the court-supervised claims process if the proposed settlement receives preliminary approval.  Those claimants who are not members of the class in the proposed MDL settlement will be able to submit their claims to a new claims processing facility that BP will be operating pursuant to OPA.

BDO Executive Summary, p. 7.

> the payment to the Claims Administrator.  Any amounts paid pursuant to this
> provision shall be offset against any payments made by the Transition Facility and
> the Court Supervised Claims Program, if such payments are made prior to final
> payment by the Court Supervised Claims Program.

This language would clearly permit the Transition Coordinator and the GCCF to take steps
necessary to correct the errors made with respect to these 2,600 claims.  These claimants should
be notified of their right to payments under OPA and about the determination by the BDO
auditors that their claims were improperly denied by the GCCF.

Frustrated by the GCCF's decision to use this Court's May 8th Transition Order as a
justification for failing to advise these 2,600 claimants of their rights to compensation and the
prior improper denial of their claims, the Mississippi Attorney General's Office contacted Special
Master Juneau directly with their concerns about the need to provide assistance and notice to
these 2,600 claimants.  Reassuringly and to his credit, Special Master Juneau has already
undertaken steps to rectify this problem and the Mississippi Attorney General's Office looks
forward to working with him in the future to follow-up on matters relating to these claimants.

However, a specific Court Order guaranteeing these claimants the right to receive *interim,
short term payments through the Court Supervised Claims Process* is needed to protect the rights
of these claimants, including their right to interim, short-term damages and interest on their
claims under OPA.  Since ¶15 of the Transition Order currently prevents the Court-supervised
Claims Process, administered by Special Master Juneau, from paying interim claims, that Order
should be amended to permit payment of interim claims.  Otherwise, these 2,600 claimants will
be denied the right to obtain interim, short-term damages, guaranteed by OPA, if their claims are
merely transferred to the Court-supervised claims process.  The GCCF's errors, confirmed by
BDO's audit, should not prejudice the right of these 2,600 claimants to retain the right to receive
interim, short-term damages, without relinquishing future damage claims.

The claims evaluation errors identified by BDO also underscores the need for every claimant to be given an opportunity to participate in the Court Supervised Claims Process.  The plight of the nearly 10,000 claimants who are or should be receiving additional benefits as a result of the BDO audit, including the 7,300 claimants BDO identified who are having their payments adjusted whether or not a GCCF Release was previously executed and the 2,600 who were erroneously denied eligibility discussed above, provides further support for nullification of the GCCF Releases.

Under the Final Protocol adopted by the GCCF, over the objections of the Gulf State Attorneys General and other officials, Mr. Feinberg, acting on BP's behalf, refused to implement the appeals process that BP had committed to President Obama to provide to *all GCCF claimants*. Rather, Mr. Feinberg limited the right to appeal to only those claimants who received payments in excess of $250,000, unless the claimant could demonstrate that his claim fell within a "pattern" of claims (the data for which no individual or business claimant would have access – making this alternative appellate avenue a sham for claimants, only truly available to BP who, by its contract with Mr. Feinberg did have access to the information required to demonstrate a "pattern"). Because of the failure of the GCCF to provide any legitimate appeals process to all GCCF claimants, the process lacked the proper measure of due process to identify and correct errors in claims determinations.  It would not be just to permit an adjustment of the GCCF's errors for *only* those few claimants who had the good fortune to have had their files audited by BDO.  But/for the failure of BP's agents to implement the appeals process they committed to provide, when they entered the June 16, 2010 Agreement with the President, all claimants could have had a proper opportunity to have errors timely corrected without forfeiting the federal right to only pursue and take interim, short-term payments.

Accordingly, all claimants, even those who signed GCCF Releases, should have the right and option to present their claims to the Settlement Fund and Special Master Juneau for re-evaluation and adjustment according to the formulas contained in the proposed Settlement and, consistent with OPA, must have the right and option to choose to make and receive interim claims for actual damages, rather then accepting a final payment based on any formula. The 2,600 claimants for whom the Transition Coordinator has determined he can do nothing, should be able to present their claims to Special Master Juneau for payment through the Court Supervised Claims Process – but they should be provided the right to submit and receive payment for interim claims through this process, pursuant to OPA.

## **CONCLUSION**

For the foregoing reasons, the Court should:

- nullify all of the GCCF Releases to the extent they purport to waive future legal rights, for which no compensation was paid, in violation of Section 2715(b)(2);

- nullify all GCCF Releases, signed between November 23, 2010 and (at least) February 16, 2011, because such Releases were obtained as a result of economic duress and through violation of the OPA-mandated obligation to provide a claims process for the payment of short-term, interim claims;

- nullify all GCCF Releases signed in exchange for the arbitrary Quick Pay sum of $5,000 for individuals and $25,000 for businesses, because such releases were likely obtained through payment of inadequate consideration, as this "Quick Pay" sum bears no relation to the true measure of damages resulting from the Deepwater Horizon Incident.

- permit claimants who believe that the Quick Pay sum inadequately compensated them for all damages incurred, the right to present their claims to the Settlement Fund and Special Master Juneau for re-evaluation and payment from the Settlement Fund, if appropriate, and grant them the right to submit future claims to the Fund if additional damages resulting from the Deepwater Horizon Incident are incurred;

- nullify releases signed by oystermen during the period February 16, 2011 through the end of the GCCF process because they were obtained in exchange for inadequate consideration;

- permit oystermen who signed GCCF Releases after February 16, 2011 the right to present their claims to the Settlement Fund and Special Master Juneau for re-

evaluation and adjustment according to the formulas contained in the proposed Settlement or permit them to seek interim damages in accordance with OPA;

- permit all claimants, especially the 2,600 claimants with errors identified by the BDO audit, the right and option to present their claims to the Settlement Fund and Special Master Juneau for re-evaluation and adjustment to correct errors in calculation and eligibility determinations by the GCCF

- permit all claimants who submit claims to the Settlement Fund and Special Master Juneau for re-evaluation and adjustment to detect and correct errors, especially the 2,600 claimants with errors identified by the BDO audit, the right and option to choose to receive interim claims for actual damages, rather than accepting a final payment based on any Settlement formula.

- sever the provisions in the Settlement Release that purport to release future damages resulting from gross negligence and punitive damages; and

- sever the exclusions in Sections 2.2.6 of the Class Definition and in the proposed Settlement.  (Docs. 6269-2, p. 9; 6276-1, p. 11).

Respectfully submitted this 25th day of April, 2012.

JIM HOOD, ATTORNEY GENERAL
STATE OF MISSISSIPPI

BY: s/ Mary Jo Woods_____
MARY JO WOODS, MS BAR NO. 10468
SPECIAL ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone No. (601) 359-3680
Facsimile No. (601) 359-2003
Email: mwood@ago.state.ms.us

## ATTACHMENT A

The relevant text of the 1996 amendments to OPA, provides in relevant part as follows:

### TITLE II—IMPROVEMENT OF RESPONSES TO OIL SPILLS

### SEC. 201. ACCESS TO TIMELY SHORT-TERM FINANCIAL ASSISTANCE FOR PERSONS INJURED BY OIL SPILLS.

(a) DAMAGES FOR LOSS OF PROFITS OR IMPAIRMENT OF EARNING CAPACITY.—Section 1002(b)(2)(E) of the Oil Pollution Act of 1990 (33 U.S.C. 2702(b)(2)(E)) is amended by striking the period at the end and inserting the following: '', in part or in full.  Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled under this subparagraph shall not preclude recovery by the claimant for damages not reflected in the paid or settled partial claim.''.

(b) CLAIMS PROCEDURE.—Section 1013(d) of the Oil Pollution Act of 1990 (33 U.S.C. 2713(d)) is amended by inserting after ''unavailable'' the following: ''including a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled,''.

(c) ADVERTISEMENT.—Section 1014(b) of the Oil Pollution Act of 1990 (33 U.S.C. 2714(b)) is amended—

(1) by striking ''If a responsible party'' and inserting the following:

''(1) IN GENERAL.—If a responsible party''; and

(2) by adding at the end the following:

''(2) CLAIM FOR INTERIM DAMAGES.—An advertisement under paragraph (1) shall state that a claimant may present a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled and payment of such a claim shall not preclude recovery for damages not reflected in the paid or settled partial claim.''.

(d) SUBROGATION.—Section 1015(a) of the Oil Pollution Act of 1990 (33 U.S.C. 2715(a)) is amended—

(1) by redesignating subsection (b) as subsection 6(c); and

(2) by inserting after subsection (a) the following:

''(b) INTERIM DAMAGES.—

''(1) IN GENERAL.—If a responsible party, a guarantor, or the Fund has made payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled, subrogation under subsection (a) shall apply only with respect to the portion of the claim reflected in the paid interim claim.

''(2) FINAL DAMAGES.—Payment of such a claim shall not foreclose claimant's right to recovery of all damages to which a claimant otherwise is entitled under this title or any other law.''.

## ATTACHMENT B

The full text of the relevant Report excerpt states as follows:

### IMPROVING OIL SPILL RESPONSE MEASURES

Notwithstanding the best efforts of those of us in Government and in the industry, a certain number of oil spills probably are inevitable. Consequently, the conference report contains important advances that will improve our ability to respond more effectively to spills that still occur.

It does so by reducing and redressing the economic hardship and environmental damage that is caused once a spill has taken place.

On the economic side, the conference report *includes a key provision* of the bill I introduced in the spring, S. 1730, *which will ensure that injured parties are able to obtain financial relief in the immediate aftermath of a spill.* After the North Cape spill, some lobstermen and fishermen were reluctant to pursue compensation for short-term damages for fear of waiving any rights to future compensation. This reluctance at times led to significant hardship, as most fishermen and lobstermen are self-employed, and thus, do not qualify for unemployment benefits.

To address this troubling situation, the conference report makes clear that *a person injured by a spill may bring a claim for less than the full amount of damages to which he may be entitled, without waiving the right to future compensation. Thanks to this clarification, fishermen put out of work will no longer have to wait while their rent and grocery bills pile up before pursuing a claim. And small businesses such as fish markets that depend on the marine environment will not be forced out of business while awaiting compensation for their injuries.*

The responsible party may establish reasonable parameters within which claims for partial, interim damages may be presented to avoid undue transaction costs, consistent with avoiding financial hardship to parties injured by a spill.

(emphasis supplied).

## <u>CERTIFICATE OF SERVICE</u>

I, Mary Jo Woods, Special Assistant Attorney General of the State of Mississippi, do hereby certify that on this date, I filed the foregoing document using the Court's ECF system which will send notification of such filing to all counsel of record in this proceeding.

THIS the 25th day of April, 2012.


s/ Mary Jo Woods_____
MARY JO WOODS, MS BAR NO. 10468
SPECIAL ASSISTANT ATTORNEY GENERAL


Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone No. (601) 359-3680
Facsimile No. (601) 359-2003
Email: mwood@ago.state.ms.us