ProQuest® Congressional Document 5/18/11 3:11 PM

◀Return to Full

## ProQuest® Congressional

Copyright 1996 Federal Information Systems Corporation
Federal News Service

MARCH 27, 1996, WEDNESDAY

**SECTION:** IN THE NEWS

**LENGTH:** 5623 words

**HEADLINE:** PREPARED TESTIMONY OF
BOB SMITH,
PRESIDENT,
RILA
BEFORE THE SENATE ENVIRONMENT AND PUBLIC WORKS COMMITTEE
RE: THE RHODE ISLAND OIL SPILL AND
IMPLEMENTATION OF THE OPA 90

**BODY:**
Mr. Chairman and Members of the Committee:
Good morning. The Rhode Island Lobstermen's Association
thanks you conducting this hearing, inviting us to testify, and for demonstrating your concern over how small businesses and
individuals are faring after the devastating oil spill off Point Judith, Rhode Island, on January 19, 1996.
Today's testimony is presented by Bob Smith, who has been a lobsterman in and around Point Judith for 49 years and is privilegedto be President of the Rhode Island Lobstermen's Association
(RILA), and by Barry M. Hartman, with the law firm of Kirkpatrick
& Lockhart in Washington, and Counsel to RILA. Our association
and over 100 businesses damaged by the spill have retained Mr.
Hartman and his firm to make sure that our rights are protected and
that we are properly compensated for our losses. Mr. Hartman
served as Acting Assistant Attorney General for the Environment and
Natural Resources Division at the United States Department of Justice
during the Bush Administration, and is experienced in the legal
consequences of oil spills, having prosecuted the Exxon Valdez case, and having participated in enforcement efforts in a number of other
spills. He also was the Justice Department's representative in connection with the development of the Oil Pollution Act, which
President Bush signed in 1990.Senator Chafee, you in particular have been quite helpful to us. and we know the personal anguish you must be going through after this spill, which occurred not only in our places of business, but in both of our back yards.
For years you have been a champion for the environment. We know how important this issue is to you. You have spent a great deal of time at the site of the spill and we just want to take this opportunity to personally thank you for your countless hours of attention to this tragic and important issue. You certainly have been a good friend to Rhode Island's fishermen. And now, in your position as Chairman of the Committee on

**EXHIBIT 1**

Environment and Public Works, we are confident you will again take the lead in breaking through the bureaucracy of the Federal Government to see that Rhode Island's fishermen are compensated for their losses as guaranteed under the law. RILA believes that it is both necessary and appropriate that the Committee not only consider, but propose, certain changes in the Oil Pollution Act, so that issues that exist today with respect to the damage compensation system, are not repeated the next time there is an oil spill.

The problems we are outlining have been discovered through actual experience, and might not have been anticipated when this law was considered. By convening this hearing, you demonstrate your commitment that we all learn from our experience. Our concerns may be summarized as follows. We are pleased that OPA exists, however:

(1) it is being used by the barge owner's insurer to pay off claims at minimal rates and to effectively discourage claimants from seeking legitimate, long-term claims for damages; (2) the barge owner's insurer, under the guise of OPA, is demanding inappropriate releases from claimants, does not explain what is being demanded, and instead waves a few dollars in front of people to force them to agree to limitations on their rights;
(3) claimants are not being allowed meaningful participation in the Natural Resource Damage Assessment process even though it could directly affect their rights; and
(4) it appears that the barge owner's insurer and the Coast Guard are setting up road blocks that prevent claimants from obtaining full recovery for their losses.

Our testimony today will describe our Association, discuss how we have fared since the spill, and outline some of the problems and suggestions for improvement of OPA.

The Rhode Island Lobstermen's Association (RILA) is a non-profit association of people who are engaged primarily in the business of fishing for lobsters. We have almost 100 members, and our businesses represents a large portion of the lobstering industry off Point Judith, Rhode Island. Through the association, we have put together a group of over 100 businesses that are jointly developing their damage claims. These are not only lobster boat owners, but on-shore processing facilities, and other businesses that are part of the fishing industry in the Port of Galilee.

As you know, Point Judith is the third largest fishing port on the East Coast. Until January 19, 1996, we were proud to say that our lobsters are world renowned for their quality o in fact - we think they were the best quality lobsters caught in this country. In fact the fishing industry has contributed greatly to the local and statewide economy. Millions of dollars have been pumped back into the economy by way of direct and indirect business resulting from the successful harvesting of Rhode Island's pristine seafood beds. Many lobstermen have been fishing in this area for years. In Bob Smith's case, his father started over a half century ago, and he has continued in his father's wake. Lobstermen are mostly small businesses - each owns a boat or two and each hires a couple of crewmen to help. They love what we do. They are independent, self-sufficient and our own bosses. They are successful because of

their willingness to put in an honest day's hard work.
On January 19, 1996 the unthinkable happened - a barge spilled over 800,000 gallons of home heating oil after running aground off of Moonstone Beach.

The place where Bob Smith has been catching lobsters was directly under the barge and the spill.
We say this was unthinkable, since no one expected it to happen at all. But here is what made it even more shocking. We are sure you remember the World Prodigy spill of 1989, in Narragansett Bay, which is just a few miles from Point Judith. None of us thought this could ever happen again, at least not in our neighborhood. But it did. It's sort of like witnessing a horrible accident. Most of us never see one. But to be witness to two just outside our window is simply not something anyone expects.
We are not here today to talk about whose fault this was, or
how efficient and effective the response to the spill was, although quite frankly, the response teams basically shut out local efforts to help the cleanup. Our interest is simple: we want to get back to
work, and we want to make sure we are compensated for the losses
that we have suffered, are suffering, and sadly, are likely to suffer in
the future because of this spill.
The immediate impacts of this spill were incredible. Bob Smith walked on the beach where it happened, and saw literally hundreds of thousands of dead lobsters. Most were small - 2, 3, or 4 years old. They were everywhere. At one point in a three square-foot area, he counted 730 dead lobsters. Some observers say that there were over a million lobsters killed.
As a result of the spill, a 250 square-mile area has been closed off to fishing and lobstering since January 19. That included the entire area leading into the Port of Galilee, where many seafood processors are located. A map illustrating the closed-off area is provided as Attachment A to this testimony.
Not only could we not catch lobsters in a prime area, but most shellfish catches upon which many on-shore facilities rely could not be brought into Point Judith to be sold. The buyers, processors, wholesalers and others were shut down because they use the waters that were closed down to supply feed tanks used to hold the lobsters. And the businesses that serve the industry - divers, electricians, plumbers, restaurants, operators, suppliers, and repairmen, were in turn shut down. In short, Point Judith, which is usually a hub of business activity, was turned into a ghost town.
Fortunately, fishing areas are gradually being reopened. Fin
fishing is now allowed in all areas. The shoreside facilities may
again use the water of Point Judith Pond to handle the delivered
catches. A very limited amount of lobster fishing is allowed off of
Newport. But the main area off Point Judith remains closed.
Please understand, we are not necessarily criticizing the decision
to keep the area closed. We, like everyone, want to make sure that
when it is opened, the lobsters are safe for eating. Sooner or later we expect lobster fishing to be permitted again. But what about long term effects? The hundreds of thousands of
lobsters that were washed up dead on the beach were young - 1, 2, 3,
and 4 years old. We are not permitted to catch lobsters until they
reach their legal size, which occurs around age 7. That means these
million or more dead lobsters will not be available to be caught in
1999, 2000, and 2001, or 2002.
In addition, many of the dead lobsters were or would have been egg bearing. It could be eight to ten years from the time a lobster bears eggs until those eggs hatch and grow to the legal size permitted to be caught. So there are more years in the future when we will be impacted.
Further, the death of younger female lobsters, which will never reproduce, will reduce populations generally,

which is very likely toimpact lobstering in the future. And, that's where the real economic impact will be felt by future generations of Rhode Islanders. Unfortunately, we still do not know just how severe the damage has been because of the immense devastation of the egg bearing lobsters.

And we can't just go somewhere else to fish, for a couple of reasons. First, in this area, most of the legal size population of lobsters are caught every year. The pie is only so big and now it is smaller. That is true even outside the closed area. So to move elsewhere would not eliminate our losses, it would just spread them around.

Second, many of us can't just go somewhere else. Fishing in different and deeper waters requires different boats, additional and more expensive equipment, is much costlier in terms of fuel and insurance, and involves more significant risks. Many lobstermencan't afford it, or don't want to put themselves at greater personal risk, even if it might mean a greater price for our catch. We are just plain shut down, with no alternatives.

As you consider this issue, remember that there are three very distinct types of harms that we are suffering: (1) actual damage to our property caused by the spill; (2) actual losses we suffer because we cannot engage in our livelihood today; and (3) losses we are likely to suffer in the future because of the long term impact that this spill is likely to have on the lobster population. All three types of damages are supposed to be fully compensated under OPA. Unfortunately, problems exist with compensation for all three.

Now to the question at hand: is the Oil Pollution Act helping us get compensated for our losses? Yes and no. On the one hand, it might be better than what would be the case if there were no law.On the other, there are problems - serious problems - that you need to know about. Some you may be able to address. Others may be unavoidable because of the attitude that the barge owner and its insurer take. In some respects the law could result in damaged parties getting less than what they would be entitled to if they simply went to court.

The Insurer Has Been Making Unreasonable Demands as a Condition of Making **Interim** Payments

First, it must be understood that just because the law creates liability for the responsible party, it does not necessarily follow that Eklof Marine or its insurer is willing to accept that responsibility. Here is the attitude that the insurer has, as reflected in a statement apparently made by one of its adjusters: "They charge you for every little dinky lobster and the fish that could have eaten them."The Providence Sunday Journal, March 24, 1996.

With due respect, anyone who knows about the lobster industry knows that every so-called "dinky" lobster that we are allowed to catch puts food on our tables. To trivialize our claims in this way demonstrates the insensitivity of the insurer for our plight.

The insurer's insensitive attitude is also shown by how it has treated claims. When this first happened, and claims started being filed, the insurer tried to use the claims payment process to minimize what it had to pay not only now, but in the future. For example, one person who allowed his boat to be used in the clean up was required to sign a release of all claims he might ever have as a result of the spill. A copy of that release is attached to this testimony as Attachment B.Others were required to sign releases that contained technical legal language limiting their rights, but which was not explained to them at all. The claims adjuster's answer? "We're not your lawyer." A copy of this language that is being forced on us is provided as Attachment C.

In other instances, the claims examiners may have actually suggested to claimants that they are on our side. Nothing could be farther from the truth. Their duty is to the insurer, to pay only what they think they

absolutely must pay. To suggest to claimants that they are on the claimant's side is incorrect, and failing to make their positions clear to people having no experience in this process is disingenuous at best.

Regarding actual damages suffered by us, consider the following. Many of our members lost equipment such as lobster pots, because they were in the area where the spill occurred, and for weeks
we could not remove them. The insurer is willing to pay something
for these, and that something is generally the insurer's depreciated
value of the pot, not its really value - or cost - to us.
For example, assume a pot is 5 years old, and according to the insurer it has a life of 8 to 10 years. A new pot costs $40.00 to $55.00. The insurer offers $15.00 per pot. That means if a lobsterman lost 500 pots, he gets $7,500 to cover an actual replacement cost to him of $20,000.
In the real world, lobstermen not only cannot afford to replace
pots every 5 years, but using their own skill and time, often repair
pots that have no "useful life" so that they last well beyond ten years.
The insurer apparently gives no value for this skill and time. We can't repair pots that are lost in the ocean
because we aren't permitted to recover them, since the area is closed.
Now the insurer will probably say that we didn't have new pots
in the first place, so giving us new pots now puts us in a "better"
position that we were in before the spill. To that we say the
following: Which is fair? Making an injured party pay to put
himself in the actual position he was in before he was injured, or
making the responsible party pay a little more so that the injured party is in the actual position he was in before the injury occurred?
In addition to not being fully compensated for actual losses, the insurer's efforts to make **interim** payments for lost income, 1/ creates a more serious problem. Most of the claimants in our group have been completely out of work since January 19, 1996. The insurer has
offered to pay some lost profits based on a calculation it developed.
But to take this money, we must sign a release that could jeopardize
our future claims. What's more, a provision of OPA could result in
our being denied the right to recover for future losses, even if a
release tries to preserve those rights.
Specifically, section 1015 of OPA provides:
Any person, including the Fund, who pays compensation pursuant to this chapter to any claimant for removal costs or damages shall be subrogated to all rights, claims and causes of action that the claimant has under any other law.
33 U.S.C. 2715.
For example, if I as a claimant accept an **interim** payment from the insurer under this law, this provision could be construed to
require that I give the insurer all my rights to claim damages under any other law, even if I was not yet compensated for all my losses. That could mean that once I accept money from the insurer, I might lose my rights under state law to sue the insurer if I am unhappy with the payment I received under OPA, even though OPA would otherwise protect my ability to pursue such a claim.
We don't think this section was intended to create a mandatory
subrogation of rights by virtue of the words "shall be subrogated."
We don't think this section was intended to require subrogation of all
rights under all other laws except OPA, regardless of whether compensation was paid for the loss of that right.

We think it was intended to make sure that only rights to claims that have been compensated are subrogated to whoever pays. That is fair, and that makes sense. But the language of the statute is less than artfully drafted.

That leaves our members with three choices. First, we can take an **interim** payment without any protection from this section of the law, and hope that the insurer, who says "trust me, that is not what the section means," keeps its word and does not try to bar a future claim. And we have to hope that the Coast Guard, which administers the OPA Trust Fund when the insurer stops paying, agrees to do the same.

Second, we can delay filing claims for **interim** payments now, and instead wait until we know whether long term claims exist, and file all claims at one time. The problem is, many lobstermen cannot afford to wait.

Third, we can insist on written assurances from the Coast Guard and the insurer that they would never assert this subrogation provision as a defense to an uncompensated claim. We chose the third route, but getting those written assurances was not easy. The Coast Guard, after a number of meetings. recently agreed in writing that it would not raise the subrogation as a defense except as to rights for which compensation is actually paid (Attachment D). The insurer says it will agree to language that recognizes that this section is not a bar to a future uncompensated claim.-2/

To prevent this from happening in the future, Congress should simply add a phrase to section 1015 of the law, so that the section reads as follows:

Any person, including the Fund, who pays compensation pursuant to this chapter to any claimant for removal costs or damages shall be subrogated to all rights, claims and causes of action that the claimant has under any other law, with respect to which compensation has been paid 3/

Access to Information in File Claims

In times like these, the federal government needs to partner with the RILA and help rebuild what was destroyed. We are talking about hundreds of Rhode Island families being dramatically affected not over just the past two months, but well into the future. Lobstermen and their families are not looking for handouts. We are look for what is provided to us under the law of this country. We are reaching out to our government to work with us and not shy away from a very traumatic event.

As the Committee knows, thankfully there have been only three major spills since OPA was enacted - one in Tampa Bay, one in San Juan, and the one in Rhode Island. Because of where the North Cape spill occurred, it is likely to have the most devastating impact on natural resources and the economic well being of the area.

As we understand it, although many small claims were processed immediately in Tampa Bay and San Juan, there were, and may still be, delays in determining claims for lost profits and impairment of income.

To help our members understand what is expected when these claims are filed, and what kind of documentation is needed - particularly for impairment of income claims - we wanted to review past claims under OPA. Of course, the insurer does not make these available at all.

Our counsel filed a Freedom of Information Act request with the
Coast Guard to review their claims files. Again, the purpose was to have a full understanding of exactly what type of information is
provided, and what will be accepted as sufficient.
The Coast Guard, citing privacy concerns of claimants in other
spills, has effectively denied our request, except for producing a
single claim that it chose as "representative." It gave us only its final
decision, and declined to provide any of the foot thick stack of information that apparently led up to its decision, again claiming that
to do so would be too burdensome for it, since it would have to
redact confidential information. We did not seek any confidential
information.
It also told us that if we wanted this information, we would have
to pay thousands of dollars, and wait several months while it reviewed the information. Apparently there is not a single claims file anywhere that it would not take months and thousands of our dollars to screen and provide to us. Again, we are not seeking any private or confidential information, just data that will give us insight into how
the Coast Guard evaluates these claims, and how it reacts to
information provided it.4/
Withholding important information from claimants benefits the Coast Guard, and the insurer, and again undermines the ability of
claimants to obtain a full recovery. So the Coast Guard won't give us
important information without us paying for it, and no doubt will
suggest that if we do pay it to give us this information, that payment
will not be considered by it to be "reasonable costs incurred by the
claimant in assessing the damages," within the meaning of its regulations. The result: the Trust Fund - administered by the Coast Guard- is faced with lower claims.
To our knowledge, no claimant has ever recovered lost future profits or impairment of income under OPA, even though section 1002(2)(E) of OPA clearly authorizes such recoveries. Withholding this information from claimants will only serve to perpetuate that denial, except for those claimants willing to hire - and pay for experts to fight for them.
Participating in the Natural Resource Damage Assessment Process
In January of this year, just weeks before the spill, final regulations governing Natural Resource Damage Assessments (NRDA) were promulgated. See 61 Fed. Reg. 4 (Friday, January 5, 1996)(to be codified at 15 C.F.R. 990). They were to become effective on February 5, 1996, after the spill occurred. It is our understanding that the Federal Government contends that these
regulations will govern NRDA process arising from this spill.
Under OPA, the public is given the opportunity to comment on
plans developed for NRDA process. Under the regulations, a similar
opportunity for consultation exists.
Our concern is a practical one. If there is a long term adverse
impact on the lobster population, it could translate directly into an
economic impact on the lobster industry. The natural resource
damage assessment process will inevitably include studies that should
demonstrate the extent of that impact. The methodology used for these studies will significantly influence the results, and it is crucially important that sound science be used. The long-term impact of this spill could mean

the loss of scores of jobs and millions of dollars to the local and statewide economy. Job loss in this area could be permanent and that would be devastating to Rhode Island.

We have retained an expert, and have requested the opportunity to participate in the development of the plans that will form the
foundation for the NRDA process.
both the federal and state trustees.
We have made this request to
So far we have not been permitted
to participate in this process (it is claimed that the process has not yet started), but everyone is "thinking" about it.

We have contacted some of the scientists at the University of Rhode Island who are supposed to conduct surveys, but so far none of these surveys have been shared with us. The point is, while the law currently calls for notice and opportunity to comment on NRDA plans, and the regulations do so as well, that opportunity must come at a meaningful time - before the plans are selected. In fact, to be
meaningful, we should be permitted to attend all the meetings that are held about that planning process, to provide input and insights that
might not otherwise be appreciated or known. Quite frankly, we
think we are being stonewalled by the trustees who do not want to be
"burdened" with claimants' concerns.
The trustees have many interests that will or could influence the
NRDA planning process.
interest is sound science.
We want to make sure that the paramount
Taking the federal trustees' word for it,
"Trust us, we're the government," is not something that our members
are comfortable doing, particularly when the Federal Trust Fund pays
if lost income claims based on the NRDA process are filed. It would be expensive, unfair, unnecessary, and perhaps impossible to expect our members to conduct their own surveys and planning when a perfect opportunity exists for them to be involved in this process. We hope the Committee will not let this slip by.

The Coast Guard is Creating Road Blocks to Claimants' Ability to be Fully Compensated by Trying to Deny Them Costs Necessary to Prove Their Claim

You have asked us to comment on how certain policy issues
relating to compensation for losses are addressed under OPA. One such issue is whether OPA should give everyone the ability to recover the costs of proving a claim for damages so that they are made whole. Unfortunately, the Coast Guard seems to think that everyone except the claimants should recover these costs. This makes no sense.

OPA does not prohibit the payment of the claimant's costs of determining damages. The state and federal government can recover these costs, including attorneys' fees. The responsible party gets them because its insurers' pays. And as explained below, the only way claimants can be assured that they at least have a fighting chance to be fully compensated, is if they hire competent experts to help them prepare and pursue their claim. Yet the Coast Guard and insurer apparently do not want to pay these costs.

We believe the law clearly does not prohibit, and indeed
permits, the payment of claimants' costs and fees needed to prove
their claim for claimants. However, the Coast Guard in its
regulations may be arbitrarily and illegally trying to exclude these
costs and fees from the kinds of damages that a claimant may recover in connection with preparing a claim.5/
In order to avoid the fight that we are likely to have, OPA should be amended, or the Coast

Guard regulations corrected to address this inequity.

The fact is, if those sections of the Act authorizing claims for impairment of income and lost profits are to have any real meaning, that claimants must be permitted, and indeed encouraged, to get expert help to ensure that they receive what they are entitled to by law. They are entitled to be and on an level playing field with the insurer and the Coast Guard, both of which have boatloads of lawyers and experts. And the responsible party's insurer, or the Trust Fund, should pay for it.

There are several reasons why these costs should be covered as damages. First, claims for lost future income require some consideration of long term effects on the lobster population. No single lobsterman can afford to undertake such studies, and the insurer knows it. But without that backup, claims for lost income would be difficult to prove. Instead, the claimants must band together, and counsel and experts helps this happen. The governmenthas attorneys and other experts develop its claims for natural resource damages, and those costs are paid by the insurer. Why shouldn't a small business person have the same benefit for its claims?

Second, proving lost profits, and particularly proving impairment of future income, can be complicated. By way of example, we reviewed one lost profit claim processed by the Coast Guard in another spill. The Coast Guard tells us that there is over a foot of documentation to support a claim for about $40,000. If this section of the law is to have any meaning, a claimant must be encouraged to hire competent experts to help him navigate through this morass and properly prepare a claim.

Third, while the law suggests that claims are to be processed within 90 days by the insurer, and within 6 months by the Coast Guard, that time period can be delayed indefinitely by insurance andCoast Guard lawyers who will say that the time period does not run
until the claim is fully documented. We think that is exactly what has
happened in other spills. Claimants need help to fight such abuses.

Finally, claimants must be advised of how this law works, so
they do not unwittingly waive their rights. Few know that if you file
a suit in court, you cannot pursue a claim with the Fund. More
importantly, it was through counsel that our members were able to get written confirmation that they won't be waiving our rights if they
accept **interim** payments. Until we hired counsel, no one advised us of the consequences of these releases. While promises were made, no
one would put it in writing.

Notwithstanding the policy reasons supporting the payment of
claimants' costs of proving his damages, and the fact that law does not prohibit it, the Coast Guard regulations governing the claimsprocess try to severely limit recovery of such costs. The regulations
provide:
(e)ach claim must include at least the following, as applicable: . . . (8) The reasonable costs incurred by the claimant in assessing the damages claimed. This includes the reasonable costs of estimating the damages claimed, but not attorney's fees or other administrative costs associated with preparation of the claim.
33 C.F.R. 136.105(e).-6/

There is no explanation for allowing one kind of cost, but not
another, and no justification either, except the desire to discourage
use of experts to document a claim. It is ironic that the Coast Guard
?

It is particularly disconcerting that these regulations are so vague
Do

Of course if and when an injured party seeks to challenge these regulations, the Coast Guard will no doubt say that such challenges are barred by section 1017 of OPA, which states that regulations must be challenged within 90 days of promulgation. Of course, until a spill occurs, no claimant would have a reason to challenge the regulations. appears to take this position that its own costs and attorneys' fees are
recoverable, as are those of every other state and federal agency
"damaged" as a result of the spill. See 61 Fed. Reg. 4 (Friday. January 5, 1996) (to be codified at 15 C.F.R. 990).7-/And the responsible party's costs are paid for by the insurer.
Without qualified experts studying the long-term effects of a
spill, any claim might well be reduced below its true value. Not
surprisingly, insurers who want to limit their payouts for claims in
order to preserve their profits, and the Coast Guard, which wants to
preserve the Trust Fund for future claims, have no problem with this.
In sum, while we believe law and policy clearly support the
payment of costs needed to prove a claim, and the insurer and Coast
Guard have the ability to make such payments, we frankly expect both it and the Coast Guard to fight us as part of their broader
strategy to limit claims in general.

Conclusion

In summary, we offer the following observations about the OPA
claims process.
(1) OPA is being used by insurer to pay off claims at minimal rates and to effectively discourage claimants from seeking legitimate long term claims for damages.
(2) The insurer, under the guise of OPA, is demanding inappropriate releases from claimants, does not explain what is being demanded, and instead waves a few dollars in front of people to force them to agree to limitations on their rights.
(3) Claimants are not being allowed meaningful participation in the Natural Resource Damage Assessment process.(4) It appears that the barge owner's insurer and the Coast Guard are setting up road blocks that prevent claimants from obtaining full recovery for their losses.
We appreciate and thank you for the opportunity to testify
before the Committee, and stand ready to answer any questions that
you might have.

--------------------

1/For example, lost profits from January 19 through today.
2/ See Attachment E. Curiously, the insurer seems to have agreed to this language, but claims it does not understand it.
3/
Other related and proposed changes are included as Attachment
4/ There are a variety of theories and approaches that may be used to determine lost future profits and impairment of income. The OPA is silent regarding which may apply. Reviewing state common law with respect to those possible theories is helpful, but claimants can hardly be expected to do so without the benefit of counsel, a benefit that the Coast Guard apparently wants to deny.
5_/ The insurer, who is plainly not bound by this arbitrary position of the Coast Guard, is free to pay costs as well.
6/
regarding the kinds of costs of assessment of damages that are recoverable. They say costs are recoverable, but don't say what those costs are. This leaves a claimant in an untenable situation. I hire an expert? An accountant? An attorney

7-/ In the single reported decision under OPA, a court allowed the Coast Guard and even private claimants to recover attorneys fees associated with removal costs, but with respect to damages, did not allow attorneys' fees to be recovered. This distinction, applicable to claimants but not to federal or state agencies, or to the insurer for that matter, is of questionable legal soundness. Avitts v. Amoco Production Co., 840 F.Supp. 1116, 1118 (S.D. Tex. 1994).
END

**LOAD-DATE:** March 28, 1996