Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to all actions. | * * * * * * * | HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., ~~individually and~~ on behalf of themselves and all others similarly situated, <br><br>    Plaintiffs, <br><br> v. <br><br> BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., <br><br>    Defendants. | * * * * * * * * * | Civil Action No. 12-970 <br><br> SECTION J <br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012

## ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT

### (Subject to Court Approval)

This **AGREEMENT**,[1] dated as of April 18, 2012, is made and entered into by and among (i) defendants BP Exploration & Production Inc. and BP America Production Company (hereinafter the "**BP PARTIES**"), by and through their attorneys, and (ii) **PLAINTIFFS**, on behalf of the **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS**, by and through the **INTERIM CLASS COUNSEL**, in the **DEEPWATER HORIZON ECONOMIC LITIGATION**.  The purpose of this Agreement is to settle all and only the **RELEASED CLAIMS** of the Economic Class, **PLAINTIFFS,** and **ECONOMIC CLASS MEMBERS** against all and only the **RELEASED PARTIES.**

### RECITALS

A.      BP Exploration & Production Inc. and BP America Production Company are corporations organized under the laws of the State of Delaware, engaged in the business of oil and gas production, exploration and/or development.

B.      **ECONOMIC CLASS REPRESENTATIVES** are the named plaintiffs in the Amended Economic and Property Damage Class Complaint (the "**ACTION**") entitled *Bon Secour Fisheries, Inc., et al.* v. BP *Exploration & Production Inc., et al.*, No. 12-970, filed April 16May 2, 2012 in the **COURT.**

C.      The Action alleges federal statutory and maritime claims, including violations of the Oil Pollution Act, negligence, gross negligence, willful misconduct, strict liability, negligence *per se*, nuisance, and other claims.  Plaintiffs in the Action seek compensatory damages, punitive damages, other damages and declaratory relief on behalf of themselves and the Economic Class Members, and all such claims, damages and theories of liability, unless expressly reserved, are extinguished, discharged and released by the terms of this Agreement.

---

[1] The first time defined terms appear in this Agreement, they are set forth in bold and all capital letters for emphasis. Thereafter, they are set forth with initial capital letters only.

concerning the interpretation or enforceability of the Individual Release, shall be filed in the United States District Court for the Eastern District of Louisiana accompanied by a legal request for such dispute to be made part of MDL 2179 (if it is still pending).  No actions to enforce the Individual Release shall be filed in state courts, provided, that nothing herein shall preclude the assertion in a state court action of a defense based on the existence of the Individual Release.  Claimants and the Released Parties agree not to contest the existence of federal jurisdiction in MDL 2179 (if it still exists).

4.4.12.   The Individual Release shall provide that payments made to Class Members are made without any admission of liability or wrongdoing by BP or any other Released Party and are made purely by way of compromise and settlement.

4.4.13.   Claimant Accounting Support.  The BP Parties will reimburse reasonable and necessary accounting fees related to Claims preparation, either directly to the Claimant, or counsel if individually represented (and/or his or her or its accountant) and/or through services made available by and through Class Counsel.  Accounting support reimbursement paid to a Claimant in the Seafood Compensation Program shall be paid out of the **SEAFOOD COMPENSATION FUND**.  The terms conditions, guidelines and restrictions of this accounting services program are as follows:

4.4.13.1.   Subject to the terms of Section 4.4.13, all Claimants who receive Settlement Payments for Economic Damage Compensation Amounts are eligible for reimbursement of accounting services.

4.4.13.2.   All reimbursable accounting fees under this Section, whether paid directly to the Claimant or counsel if individually represented (and/or his or her or its accountant) and/or through services made available by and through Class Counsel must adhere to this reimbursement framework.

4.4.13.3.  Only services provided by a Certified Public Accountant, an enrolled agent or an individual with an IRS Preparer Tax Identification Number (PTIN), or under their direct supervision, are eligible for reimbursement. While registration and licensing requirements vary by state, any retained professional must have all required state professional licenses and be active and held in good standing by those state regulatory bodies.

4.4.13.4.  Retained professionals must ~~sign and attest~~ verify that to the best of their knowledge they have submitted information provided to them by the claimant ~~in compliance with generally accepted accounting principles applied~~ on a consistent basis and have not ignored the implications of information known or reasonably suspected to be untrue, incomplete, inconsistent or inaccurate.

4.4.13.5.  Reimbursement will be limited to the accounting services necessary to complete the claim form or prepare documentation.

4.4.13.6.  All reasonable and necessary hours will be reimbursed up to the following standard hourly rates.  Review and supervision hours may not exceed 25% of total time spent.

|  | Individual Claim | Business Claim |
|---|---|---|
| Preparation | $85 | $110 |
| Supervision & Review | $130 | $160 |

4.4.13.7.  **INDIVIDUAL CLAIMANTS** shall be reimbursed for accounting fees based on actual fees incurred. The total fee may not exceed 2% of the total Economic Damage Compensation Amount (excluding **RTP**) for individual Claims over $10,000 with all other Claims limited to $200.  All Claims (regardless of final Claim amount) will be subject to an overall accounting support reimbursement  limit of $6,000.

26

4.4.13.8.  **BUSINESS CLAIMANTS** shall be reimbursed for accounting fees based on actual fees incurred.  The total fee may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000.  All Claims (regardless of final Claim amount) will be subject to an overall accounting support reimbursement limit of $50,000.

4.4.13.9.  Reimbursement requests must be itemized by date and person, and will specify the work being performed on behalf of the Claimant.

4.4.13.10.  The Settlement Program shall have the right to request and review any work papers (whether historical or specific to the Claim), time sheets or other supporting documentation related to the Claim or request for accounting support reimbursement and the reasonableness of the fees pursuant to Section 4.4.13.5.

4.4.13.11.  Accounting support reimbursement will not be included in the base compensation, including for purposes of applying any RTP, but shall be paid over and above any compensation due under the Agreement.

4.4.14.  The Claimant may request and receive reasonable access to his, her, or its Settlement Program and/or Transition Process Claim File and supporting information, but only after issuance of a Final Determination of the Claim in part or in whole.  Access by a Claimant to his, her, or its GCCF Claim File may be granted at the discretion of the Settlement Program Administrator. Claimants shall be provided reasonable access to all materials submitted by or on behalf of such Claimant to the GCCF, Transition Process, and/or Settlement Program.  BP and Class Counsel shall have access to all Claim Files and Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose including, without limitation, the operation of BP's separate OPA facility, prosecuting and defending appeals, reviewing and auditing the Settlement Program, reporting financial results, and pursuing indemnification, contribution, subrogation, insurance and other

timely submitted Claim Forms.

5.11.9.    The deadline for submission of Seafood Program Compensation Claim Forms to the Settlement Program shall be 30 days after the date of entry of the Final Order and Judgment by the Court.

5.11.10.   Subject to the provisions of Section 4.4.5, Claim Forms must be signed under penalty of perjury and individually signed by the Natural Person or Entity who suffered damages, and subject to the provisions of Section 4.4.10, Claims and Claim Forms may not be submitted en masse with the Claims and Claim Forms of other Natural Persons or Entities.

5.12.    Funding of Payments.

5.12.1.    A Settlement Trust (the "Settlement Trust") shall be established for the purpose of paying Settlement Payments and the costs of administering the Settlement Program.  The Settlement Trust shall be established pursuant to the order of the Court.  The Settlement Trust shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under section 468B(d)(2) of the Internal Revenue Code and Treasury Regulation §1.468B-1.  The Settlement Trust shall be created and governed by a Trust Agreement in form and substance reasonably satisfactory to the Claims Administrator, Lead Class Counsel and the BP Parties (the "Economic Settlement Trust Agreement").  The Claims Administrator shall serve as Trustee of the Settlement Trust, and J. P. Morgan Trust Company of Delaware shall serve as the "Directed Trustee" with limited authority as set forth in the Economic Settlement Trust Agreement.   Should the Court determine at any time that the Trustee or the Directed Trustee needs to be replaced, Lead Class Counsel or their designee and BP will agree to make a joint recommendation of one or more candidates for appointment by the Court, as Trustee or Directed Trustee, as the case may be.  They shall continue the process of joint recommendation as necessary until Court approval is obtained. The Economic Settlement Trust Agreement shall be

subject to approval by the Court.  The Settlement Trust, subject to the requirements of Section 4.3.5 and Section 4.3.6.1, may hire Claims Administration Staff or Claims Administration Vendors as necessary for the Settlement Program.   The Settlement Trust shall be initially comprised of the following separate funds, which shall together constitute a single qualified settlement fund:

5.12.1.1.1.   Seafood Compensation Program Settlement Fund (the "Seafood Compensation Fund"), which shall be used by the Claims Administrator to make payments under the Seafood Program;

5.12.1.1.2.   General Claims Settlement Fund (the "General Claims Fund" and together with the Seafood Compensation Fund, the "Claims Funds"), which shall be used by the Claims Administrator to make payments under all Claims programs other than the Seafood Program;

5.12.1.1.3.   Administrative Expense Fund (the "Administrative Fund" and together with the Claims Funds, the "Funds"), which shall be used by the Claims Administrator to pay all reasonable and necessary expenses incurred in connection with the operation of the Settlement Program, except for the payment of Claims or as otherwise provided in this Agreement (the "Administrative Expenses").

5.12.1.1.4.   Gulf Tourism and Seafood Promotional Fund, as described in Section 5.13.

5.12.1.1.5.   Supplemental Information Program Fund, as described in Section 4.4.15.

5.12.1.1.6.   Economic Settlement Trust Account, into which the BP Parties shall pay, or cause to be paid, all amounts required to be paid to the Settlement Trust and from which the Trustee and/or the Directed

43

Trustee shall transfer into the Funds listed in Section 5.12.1 such amounts as required under Section 5.12

5.12.1.1.6.5.12.1.1.7.  With consent of the Parties and consistent with the terms of the Settlement Agreement, the Claims Administrator, as T~~t~~rustee, may establish, or cause to be established, one or more additional funds for the payment of resolved Claims.  Such additional funds shall be considered "Funds" for purposes of this Settlement Agreement, and, together with the Funds ~~Listed~~ listed in Section 5.12.1, shall constitute a single qualified settlement fund.

5.12.1.1.7.5.12.1.1.8.  The Claims Administrator is authorized and directed to establish, or cause to be established, and operate a ~~fund~~ Reserve Fund in the event the Economic Class receives any monies due pursuant to Section 5.15.  Notwithstanding the preceding sentence, in the event that there are monies remaining in this Reserve ~~f~~Fund, and the Agreement is terminated pursuant to Section 21, any remaining unspent funds in this Reserve Fund shall revert as determined by BP and Lead Class Counsel at the time such Reserve Fund is established. ~~to the BP Parties~~ However, nothing herein shall prevent the expenditure of any such funds prior to Final Approval.

5.12.1.2.  The Settlement Trust and each of the Funds shall be managed by the Trustee and the Directed Trustee ~~Claims Administrator~~ and shall be subject to the continuing jurisdiction and supervision of the Court.  The Claims Administrator shall serve as the ~~trustee ("~~Trustee~~") of the Settlement Trust~~ and as the administrator of the qualified settlement fund for purposes of Treasury Regulation §1.468B-2(k)(3) and shall be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Settlement Trust and responding to any questions from, or audits

regarding such taxes by, the Internal Revenue Service or any state or local tax authority, as well as questions from the Department of Labor.  The Trustee shall also be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Settlement Trust, as well as paying any associated interest and penalties. Any such tax, interest and penalty payments shall be paid from the Administrative Fund. The Trustee may delegate any of his responsibilities as trustee to the Directed Trustee as set forth in the Economic Settlement Trust Agreement.

5.12.1.3.   The BP Parties shall pay or cause to be paid, within 10 days of Preliminary Approval, an initial amount of $1 billion to the Settlement Trust.  Of this initial $1 billion, $500 million shall be ~~paid~~ transferred to the Seafood Compensation Fund, and $500 million shall be ~~paid~~ transferred to the General Claims Fund.  Thereafter, the BP Parties shall pay or cause to be paid, within 10 days of the commencement of each calendar quarter, beginning with the third quarter of 2012, six additional quarterly payments as follows:

(i) $500 million per quarter to the Settlement Trust for three quarters (of which additional $500 million payments, $300 million shall ~~be~~ transferred paid to the Seafood Compensation Fund, and $200 million shall be ~~paid~~ transferred to the General Claims Fund);

(ii) then, $400 million per quarter to the Settlement Trust for one quarter (of which additional $400 million payment, $300 million shall be ~~paid~~ transferred to the Seafood Compensation Fund, and $100 million shall be ~~paid~~ transferred to the General Claims Fund); and

(iii) then, $300 million per quarter to the Settlement Trust for two quarters (of which additional $300 million payments, all $300 million shall be ~~paid~~ transferred to the Seafood Compensation Fund).

The initial $1 billion payment and the six subsequent quarterly payments described in clauses (i) through (iii) above shall be irrevocable payments by the BP Parties.  If at any time the balance in the Seafood Compensation Fund falls below $300 million and/or the balance in the General Claims Fund falls below $200 million, the Claims Administrator shall provide a written notice to the BP Parties and Lead Class Counsel specifying the balance in the Settlement Trust and each of the Claims Funds.  The BP Parties will promptly pay or cause to be paid additional amounts to the Settlement Trust, from time to time upon receipt of such notice, sufficient to restore the balance of the General Claims fund to at least $200 million and the balance of the Seafood Compensation Fund to at least $300 million; provided that in no event will the sum of all amounts allocated and paid into the Seafood Compensation Fund under all provisions of this Agreement, in the aggregate, exceed the Seafood Compensation Program Amount (and if it is determined that any amounts were contributed to the Seafood Compensation Fund in excess of the Seafood Compensation Program Amount, the amount of such excess shall be repaid from the Seafood Compensation Fund to the BP Parties).  The Claims Administrator will provide the BP Parties and Lead Class Counsel with periodic reports relating to the Claims or other amounts paid from the Seafood Compensation Fund and the General Claims Fund and projections of Claims or other payments that are in process, in each case in such detail and with such frequency as the BP Parties may reasonably request.

5.12.1.4.   The BP Parties shall pay or cause to be paid to the Settlement Trust for transfer to the Administrative Fund (i) an initial amount equal to $50 million to be paid by no later than 10 days after Preliminary Approval, and (ii) additional amounts as may be required on a monthly basis thereafter during the administration of the Settlement Program in accordance with an administrative expense budget to be developed by the Claims Administrator, subject to the reasonable approval of the BP Parties and Lead Class Counsel (the "Administrative Budget").  Contracts entered into

46

with Claims Administration Vendors and their subcontractors shall provide the BP Parties and Lead Class Counsel with a right to receive invoices submitted by Claims Administration Vendors and their subcontractors and a reasonable amount of time to raise concerns or objections to such invoices prior to their payment.  The Claims Administrator shall provide the BP Parties and Lead Class Counsel on a monthly basis with a report of Administrative Expenses paid in connection with the Settlement Program in such detail as the BP Parties may reasonably request and a reconciliation of such payments in comparison to the Administrative Budget.  The BP Parties and the Claims Administrator shall adjust the monthly payment amounts accordingly to assure that sufficient funds are on deposit in the Administrative Fund to cover the Administrative Expenses on a timely basis.  Payment of administrative expenses by the Claims Administrator shall be subject to oversight by the District Court.

5.12.1.5.   The BP Parties shall have the right (but not the obligation) to prepay, or cause to be prepaid, any of their  payment obligations to the Funds under the Settlement Agreement.  In connection with any such prepayment, the BP Parties shall designate in writing the payment obligation that is being prepaid and how such prepayment should effect the BP Parties' remaining payment obligations (*i.e.*, whether the amount prepaid should be credited against the next payment obligation or to one or more subsequent payment obligations or a combination thereof).  No such prepayment or designation shall otherwise limit the BP Parties' obligations under the Settlement Agreement.

5.12.1.5.1.   The BP Parties have established the Deepwater Horizon Oil Spill Trust pursuant to a Trust Agreement dated as of August 6, 2010 (the "Deepwater Horizon Trust Agreement") for the purpose of providing funds to be used to satisfy damage claims, as more particularly described in the Deepwater Horizon Trust Agreement,

arising from or related to the DWH Oil Spill.  The BP Parties may satisfy each of its payment obligations under this Section 5.12.1 by arranging for the Deepwater Horizon Oil Spill Trust  to make such payment.  It is contemplated by the BP Parties that such payments generally will be made by the Deepwater Horizon Oil Spill Trust. Nothing contained herein in any way limits or impairs the duties and obligations of the BP Parties under this Agreement or the Guarantees of payment obligations under this Agreement provided by BPCNA and BP p.l.c. set forth in Exhibit 24.

5.12.1.5.2.   The Claims Administrator, as Ttrustee of the Settlement Trust, and/or the Directed Trustee, shall establish an escrow account (each a "Fund Account") for each Fund with the Lead Paying Agent (as defined below) as escrow agent.  Each payment specified in this Section 5.12.1 shall be made into the principal Fund Account established for the applicable Fund, as designated in writing by the Claims Administrator.

5.12.1.5.3.   Upon closure of the Settlement Program under 4.4.16, any funds remaining in the General Claims Fund, or Administrative Fund, beyond the initial $1 billion and the subsequent six quarterly payments referenced in clauses (i) – (iii) of Section 5.12.1.3 shall revert to the BP Parties.

5.12.1.6.   Amounts deposited in the Settlement Trust and each Fund Account shall be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk, only in the following types of investments:

- United States government money market funds having a AAA/Aaa rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's or Fitch); or

- Short-dated United States treasury bills and/or interest bearing deposits at federally insured depository institutions

that are at all times rated A+/A1 or higher by Standard & Poor's and Moody's provided such depository institution rated A+/A1 or higher at all times holds a stable or positive outlook.

5.12.1.6.1.   The total amount of cash invested in any single United States government money market fund by the Funds in the aggregate shall not exceed $200 million and the total amount invested in deposits at federally insured depository institutions by the Funds in the aggregate shall not exceed $40 million per depository institution.

5.12.1.6.2.   To provide liquidity, the Lead Paying Agent, in its capacity as escrow agent for the Claims Funds, shall also be permitted to deposit funds in a federally insured depository account with the Gulf Region Bank (as defined below) in such amount as may be specified in the Lead Payment Agent Agreement.

5.12.1.6.3.   Any earnings attributable to the Economic Settlement Trust Account and the General Claims Funds shall be transferred to the Administrative Fund and any earnings on the Administrative Fund shall be retained in the Administrative Fund.  Any earnings attributable to the Seafood Compensation Fund shall be retained in the Seafood Compensation Fund.  Any earnings attributable to the Gulf Tourism and Seafood Promotional Fund shall be retained in the Gulf Tourism and Seafood Promotional Fund.  Any earnings attributable to the Supplemental Information Program Fund shall be retained in the Supplemental Information Program Fund.

5.12.1.7.   The Claims Administrator, the Trustee and the Directed Trustee shall enter into a Paying Agent Agreement, in form and substance reasonably satisfactory to the BP Parties and Lead Class Counsel and approved by the Court, pursuant to which a federally insured depository institution approved by the BP Parties and Lead Class Counsel and the Court will

49

serve as the lead paying agent and escrow agent for the Claims Funds (the "Lead Paying Agent"), and Garden City Group, Inc. (or another entity agreed to by the BP Parties and Lead Class Counsel, with approval of the Court) will serve as the claims payment agent for the Claims Funds (the "Claims Payment Agent").  In addition, the Lead Paying Agent may enter into an arrangement with one or more other federally insured depository institutions with branch locations in the Gulf Region (collectively, the "Gulf Region Bank") and/or another check cashing facility agreed to by BP and Lead Class Counsel, and approved by the Court that provides that checks drawn on the Fund Accounts of the Claims Funds will be eligible to be cashed or deposited in branches of the Gulf Region Bank in a manner that will expedite the recipients' access to such funds (the "Check Cashing Arrangement").

5.12.1.7.1.    The Paying Agent Agreement and the Check Cashing Arrangement collectively shall provide for the following actions in connection with the payment of claims by the Claims Funds:

- The Claims Payment Agent shall be provided with checks that reflect the name of the Gulf Region Bank, the Gulf Region Bank's New Orleans, Louisiana address, and are drawn on the applicable Fund Account maintained by the Lead Paying Agent.

- The Claims Payment Agent, at the direction of the Claims Administrator (or its authorized designee), shall write checks in payment of Claims from the applicable Claims Fund.  The Claims Payment Agent shall provide to the Lead Paying Agent (or its affiliate) a nightly, system-generated notification of all check issuances, through an electronic file.  This notification report shall be used by the Lead Paying Agent in connection with its operation of the encashment program described below.

- The Gulf Region Bank will accept such checks for cashing without the requirement that the holder open or maintain an account at the Gulf Region Bank.

- The Lead Paying Agent and the Gulf Region Bank (and, if appropriate, the Court-appointed check cashing facility) will maintain an encashment program in a form acceptable to BP

designed to prevent fraud or other improper payments of checks drawn on the Fund Accounts of the Claims Funds.

5.12.1.7.2.    Payments from the Administrative Fund shall be made by the Lead Paying Agent in its capacity as escrow agent for the Administrative Fund Account, at the instruction of the Claims Administrator.

5.12.1.7.3.    The Paying Agent Agreement will also provide standard indemnification by the Settlement Trust and the BP Parties of the Lead Paying Agent (in its capacity as such and as escrow agent for the Fund Accounts) and the Claims Payment Agent.  Such indemnification shall exclude negligence and willful misconduct. The Paying Agent Agreement shall be governed as stipulated in the Paying Agent Agreement.

5.12.1.7.4.    In the event the Claims Administrator is unable to enter into any of the arrangements specified in this Section 5.12.1 or any of such arrangements thereafter terminate, the Claims Administrator and the BP Parties and Lead Class Counsel shall cooperate to develop and implement (subject to Court approval) an alternative program that, to the extent practicable, provides for the ability of Claimants to cash checks drawn on either of the Claims Funds at branches located in the Gulf Region of one or more depository institutions without the requirement that the holder open or maintain an account at such depository institution and provides for an encashment program designed to detect and eliminate fraud or other improper application of funds.

5.12.2.    Notwithstanding any other provision of this Agreement, the BP Parties may enter into an arrangement with the Claims Administrator and the Corporate Trustee and/or Lead Paying Agent (as such terms are defined in the Deepwater Horizon ~~Oil Spill~~ Trust Agreement) of the Deepwater Horizon Oil Spill Trust with respect to Settlement Payments as directed by the

Claims Administrator in accordance with the Deepwater Horizon ~~Oil Spill~~ Trust Agreement.

5.12.3.   Pursuant to Section 21.3.9, upon any termination of the Agreement under Section 21, any unspent funds under this Section 5.12 shall revert to BP.

5.13.   Gulf Tourism and Seafood Promotional Fund ("Promotional Fund").  The BP Parties will fund, within 10 days after Preliminary Approval, $57 million ($57,000,000) to promote the Gulf Coast Areas and waters.  The Promotional Fund will be administered by the Claims Administrator.

5.13.1.   The purpose of the $57 million Promotional Fund is to promote tourism and the seafood industry in Gulf Coast areas impacted by the Deepwater Horizon Incident.  In particular, one of the primary purposes of this Promotional Fund shall be for the support of programs directed to advertising, promotion and/or marketing which supports Gulf tourism and the seafood industries.

5.13.2.   The Promotional Fund shall be administered and directed by the Claims Administrator.

5.13.3.   In administration of this Promotional Fund, the Administrator may solicit proposals and applications from public, quasi-public and/or non-profit entities or organizations located within the Gulf States for support of programs directed to advertising, promotion and/or marketing of the Gulf tourism and seafood industries.  The public, quasi-public and/or non-profit entities or organizations seeking Promotional Fund Awards shall apply to a three-person panel, consisting of a Lead Class Counsel designee, the Claims Administrator or his designee, and a BP Parties designee (hereinafter "Panel"), as follows:

5.13.3.1.   Applications for such awards shall be in writing, addressed to the Claims Administrator.  The application shall contain:  (1) a budget for the specific

Kirkland & Ellis LLP, 300 North LaSalle Blvd, Chicago, IL 60654, rgodfrey@kirkland.com, and R. Keith Jarrett, Liskow & Lewis, Suite 5000, One Shell Square, 701 Poydras Street, New Orleans, LA 70139, rkjarrett@liskow.com. All notices required by the Agreement shall be sent by overnight delivery and electronic mail.

## 35. WAIVER

35.1.    The waiver by any Party of any breach of this Agreement by another Party shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, to this Agreement.

## 36. APPLICABLE LAW

36.1.    Notwithstanding the law applicable to the underlying claims, which the Parties dispute, this Agreement and the Release and Individual Releases hereunder shall be interpreted in accordance with General Maritime Law as well as in a manner intended to comply with OPA.

## 37. GUARANTOR

37.1.    BPCNA shall not be a Party to this Agreement, but shall serve as Guarantor of the BP Parties' payment obligations under this Agreement as set forth in the Guarantee attached hereto as Exhibit 24A.  BP p.l.c. shall not be a Party to this Agreement, but shall serve as a Back-Up Guarantor as set forth in the Guarantee attached hereto as Exhibit 24B.

## 38. DEFINITIONS.[6]

38.1.    For purposes of this Agreement, the following terms (designated by capitalization throughout this Agreement) shall have the following meanings.  Terms used in the singular shall be deemed to include the plural and vice versa.  In addition, many

---

[6] These definitions are of key terms used in the Agreement.  Additional definitions may be found in the Exhibits hereto, and shall not be repeated herein.

of the Exhibits to this Agreement contain Definitions, which shall be applicable to any and all provisions applying, referencing or incorporating such Exhibit.[7]

38.2.   Action shall mean the Complaint filed in *Bon Secour Fisheries, Inc. v. BP* on or about April 16, 2012, Civil Action No. 12-970, and any amendments thereto.

38.3.   Affiliate means with respect to any Natural Person or Entity, any other Natural Person or Entity that directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Natural Person or Entity.

38.4.   Agreement shall mean this Economic and Property Damages Settlement Agreement.

38.5.   Appeal Panel shall mean the panel appointed pursuant to the Appeal Process.

38.6.   Appeal Panelist shall mean an individual serving on the Appeal Panel pursuant to the Appeal Process.

38.7.   Appeal Process shall mean the process through which an Economic Class Member may appeal a decision by the Settlement Program regarding the payment of compensation pursuant to one or more of the Claims Processes under this Agreement as set forth in Section 6 above and presented more fully in Exhibit 25.

38.8.   Assigned Claims shall mean the claims defined in Exhibit 21.

38.9.   Back-Up Guarantor shall mean BP p.l.c.

38.10.   Benchmark Period shall have the meaning set forth in the Definitions section of the relevant framework (*e.g.*, Business Economic Loss, Individual Economic Loss) applicable to a Claim.

38.11.   Bodily Injury Claims shall mean claims and damages, including lost wages, for or resulting from personal injury, latent injury, future injury, progression of existing

---

[7] For example, Exhibit 3 contains Seafood Distribution Chain definitions.

injury, damage, disease, death, fear of disease or injury or death, mental or physical pain or suffering, or emotional or mental harm, anguish or loss of enjoyment of life, including any claim for mental health injury, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.12.    BP shall mean BP Exploration & Production Inc., BP America Production Company, BP America Inc., BP Company North America Inc., BP Corporation North America Inc., BP Corporation North America Inc. Savings Plan Investment Oversight Committee, BP Energy Company, BP Exploration (Alaska) Inc., BP Global Special Products (America) Inc., BP Holdings North America Limited, BP p.l.c., BP Products North America Inc., and each of their respective direct or indirect parents, subsidiaries and subsidiary undertakings (as those terms are defined in the U.K. Companies Act 2006), Affiliates, divisions, and business units.

38.13.    BP's Counsel shall mean Kirkland & Ellis LLP and Liskow & Lewis.

38.14.    BP Parties shall mean BP Exploration & Production Inc. and BP America Production Company.

38.15.    Business Claimant or Business Economic Loss Claimant shall mean an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member claiming Economic Damage allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.16.    Business Economic Loss Claims shall mean the Claims brought by the Business Economic Loss Claimants described in Exhibits 4A-7.

38.17.    Charterer shall mean BP, Lawson, USMS, USES, DRC, or any other BP subcontractor utilized by BP to implement the VoO Program.

38.18.   Charter Fishing shall mean owners, captains and deckhands that carry Passenger(s) for Hire to engage in Recreational Fishing.

38.19.   Claim shall mean any demand or request for compensation (other than Bodily Injury Claims or Expressly Reserved Claims), together with any properly completed form and accompanying required documentation, submitted by a Claimant to the Settlement Program.

38.20.   Claimant shall mean any Natural Person or Entity that submits a Claim to the Settlement Program seeking compensation as a member of the Economic Class.

38.21.   Claims Administrator shall mean that person or entity selected and appointed or designated by the Court who shall administer this Economic and Property Damages Settlement under the supervision of the Court in accordance with the terms set forth in Section 4.

38.22.   Claims Administration Panel shall mean the panel consisting of the Claims Administrator, one representative designated by BP and one representative designated by Lead Class Counsel.

38.23.   Claims Administration Staff shall mean the individuals employed by the Claims Administrator and or Claims Administration Vendors.

38.24.   Claims Administration Vendor.  The initial Claims Administration Vendors have been selected by the Parties and approved by the Court.  Subsequently, Claims Administration Vendors shall mean an Entity or Entities selected by the Parties and approved by the Court.

38.25.   Claim Forms shall mean all forms and materials required under this Agreement or by the Settlement Program to support a Claim, including all supporting documentation required by any such Claim Form.

38.26.   Claim Processes shall mean the Seafood Compensation Program Claim Process, Coastal Real Property Claim Process, Economic Damage Claim Process, Real Property Sales Claim Process, Subsistence Claim Process, VoO Claim Process,

Vessel Physical Damage Claim Process and Wetlands Real Property Claim Process.

38.27.   Class Notice Administrator shall mean the entity selected and appointed or designated by the Court who shall administer the Class Notice and Class Notice Plan.

38.28.   Class Period shall mean April 20, 2010 until the date of the filing of the Action, which is April 16, 2012.

38.29.   Coastal Real Property shall mean the property in the Coastal Real Property Claim Zone.

38.30.   Coastal Real Property Claim Process shall mean that process described in the Compensation Framework for Coastal Real Property Claims, attached as Exhibit 11A.

38.31.   Coastal Real Property Claim Zone shall mean the areas identified on the Coastal Real Property Compensation Zone Map included with the Coastal Real Property Claim Framework.

38.32.   Coastal Real Property Claimant shall mean an Economic Class Member claiming to have suffered Coastal Real Property Damage.

38.33.   Coastal Real Property Compensation Amount shall mean the Compensation Amount calculated for an eligible Coastal Real Property Claimant for Coastal Real Property Damage pursuant to the terms of the Agreement including the Coastal Real Property Claim Framework.

38.34.   Coastal Real Property Damage shall mean a loss alleged by a Coastal Real Property Claimant that satisfies the requirements set forth in the Coastal Real Property Claim Framework.

38.35.   Compensation Amount shall mean that amount awarded to a Claimant prior to the addition of any RTP.

38.36.   Compensation Period shall have the meaning set forth in the Definitions section of the relevant framework (*e.g*., Business Economic Loss, Individual Economic Loss) applicable to a Claim.

38.37.   Consumer shall mean a Natural Person or an Entity who or which buys any product for individual use or consumption and not for manufacture or resale.

38.38.   "Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business.  In addition, "contemporaneous" or "contemporaneously" prepared evidence or documentation, even if not proximate in time to the event or occurrence to which it relates, shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question, (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred.

38.39.   Corporate Headquarters or Headquarters shall mean a physical office in which the principal executive offices and direct support staff for senior management functions of a business Entity are located.

38.40.   Court shall mean the United States District Court for the Eastern District of Louisiana, Judge Carl Barbier, presiding, in *In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179.

38.41.   Deepwater Horizon Court Supervised Settlement Program or Settlement Program shall mean all of the activities and obligations of the Claims Administrator or those under his supervision necessary to implement the Deepwater Horizon Economic and Property Damages Settlement Agreement.

38.42.     Deepwater Horizon Economic Litigation shall mean all Claims brought by Plaintiffs or any Economic Class Member for damage covered by the Seafood Compensation Program, Coastal Real Property Damage, Economic Damage, Real Property Sales Damage, Subsistence Damage, VoO Charter Payment, Vessel Physical Damage or Wetlands Real Property Damages allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, in the multidistrict litigation titled *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (MDL No. 2179).

38.43.     Deepwater Horizon Incident shall mean the events, actions, inactions and omissions leading up to and including (i) the blowout of the **MC252 WELL;** (ii) the explosions and fire on board the *Deepwater Horizon* on or about April 20, 2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010; (iv) the release of oil, other hydrocarbons and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances; (v) the efforts to contain the MC252 Well; (vi) **RESPONSE ACTIVITIES**, including the VoO Program; (vii) the operation of the GCCF; and (viii) BP public statements relating to all of the foregoing.

38.44.     Deepwater Horizon Oil Spill Trust shall mean the irrevocable common law trust established under Delaware law in accordance with the trust agreement titled "Deepwater Horizon Oil Spill Trust" dated August 6, 2010, and entered into among BP Exploration & Production Inc.; John S. Martin, Jr. and Kent D. Syverud, as individual trustees; and Citigroup Trust-Delaware, N.A., as corporate trustee.

38.44.38.45.     Directed Trustee shall mean the J. P. Morgan Trust Company of Delaware, exercising the limited authority as set forth in the Economic Settlement Trust Agreement, with the Claims Administrator serving as Trustee of the Settlement Trust.

38.45.38.46.       Economic and Property Damages Settlement Class shall have the meaning set forth in Sections 1 and 2.

38.47.       Economic Settlement Trust Account shall mean the account of the Settlement Trust into which the BP Parties shall pay, or cause to be paid, all amounts required to be paid to the Settlement Trust and from which the Trustee and/or the Directed Trustee shall transfer into the Funds listed in Section 5.12.1 such amounts as required under Section 5.12.

38.46.38.48.       Documentation Reviewer shall be the individual assigned by the Claims Administrator to review Claims denied, in whole or in part, on grounds of insufficient documentation.

38.47.38.49.       Economic and Property Damages Settlement Class Member or Economic Class Member shall mean all such Natural Persons or Entities who or that satisfy the requirements for membership in the Economic Class and do not timely and properly Opt Out of the Economic Class as set forth in Section 8 above.

38.48.38.50.       Economic and Property Damages Settlement Class Member Individual Release or Individual Release shall mean the document attached as Exhibit 26, which is a Release and Covenant not to Sue that must be executed by any Economic Class Member who or that receives compensation for a Claim pursuant to one or more of the Claim Processes prior to the Effective Date.

38.49.38.51.       Economic and Property Damages Settlement Class Notice Plan or Class Notice Plan shall mean that which sets forth the methods, timetable, and responsibilities for providing notice of this Agreement to Economic Class Members.

38.50.38.52.       Economic and Property Damages Settlement Class Representatives or Plaintiffs shall mean the named Plaintiffs in the Action.

38.51.38.53.       Economic Class shall mean the Economic and Property Damages Settlement Class.

38.52.38.54.    Economic Class Counsel shall mean the Economic and Property Damages Settlement Class Counsel appointed by the Court.

38.53.38.55.    Economic Class Release shall mean the Release described in Section 10.

38.54.38.56.    Economic Class Representatives shall mean the named plaintiffs in the Action.

38.55.38.57.    Economic Damage shall mean loss of profits, income and/or earnings arising in the Gulf Coast Areas or Specified Gulf Waters allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; provided, however, that Economic Damage does not include (1) loss of profits or earnings, or damages for injury relating to real property or personal property that constitutes any part of the Seafood Compensation Program, Coastal Real Property Damage, Real Property Sales Damage, Wetlands Real Property Damage, Vessel Physical Damage, or (2) VoO Charter Payment, or (3) damages for loss of Subsistence use of natural resources, which constitutes Subsistence Damage.

38.56.38.58.    Economic Damage Claim Process shall mean that process described in the Economic Damage Claim Frameworks.

38.57.38.59.    Economic Damage Claim Frameworks shall mean the rules described in Exhibits 4A-8E.

38.58.38.60.    Economic Damage Claimant shall mean an Individual Claimant or Business Claimant who or that claims to have suffered Economic Damage.

38.59.38.61.    Economic Damage Compensation Amount shall mean the compensation amount calculated for an Economic Damage Claimant pursuant to the terms of the Agreement and the Economic Damage Claim Frameworks, as applicable.

38.60.38.62.    Effective Date shall mean (1) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment, if no such appeal is filed, or (2) if an appeal of the Final Order and Judgment is

filed, the date upon which all appellate courts with jurisdiction (including the United States Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible, or (3) such date as the Parties otherwise agree in writing.

38.61.38.63.    Eligible Real Property Sales Claimants shall mean those Claimants who were sellers of Residential Parcels within the Real Property Sales Compensation Zone who satisfy the following criteria:

38.61.1.38.63.1.    owned a Residential Parcel in the Real Property Sales Compensation Zone on April 20, 2010; and

38.61.2.38.63.2.    executed a sales contract[8] for the sale of that Residential Parcel that meets the following criteria:

38.61.2.1.38.63.2.1.    the sales contract was executed on or after April 21, 2010 and the sale closed during the time period of April 21, 2010 to December 31, 2010; or

38.61.2.2.38.63.2.2.    the sales contract was executed before April 21, 2010, but the Settlement Program determines pursuant to the Real Property Sales Claim Framework that the contract price was reduced as a result of the Deepwater Horizon Incident.  Additionally, the sale must have closed during the time period April 21, 2010 to December 31, 2010.

38.62.38.64.    End User shall mean a Natural Person or Entity that buys any product for his, her or its individual use or consumption and not for manufacture or resale.

38.63.38.65.    Entity shall mean an organization or entity, other than a **GOVERNMENTAL ORGANIZATION**, operating or having operated for profit or not-for-profit, including a partnership, a corporation, a limited liability

---

[8] Sales do not include transfers from borrowers to lenders that take place as part of the foreclosure process, such as deeds in lieu of foreclosure, foreclosure deeds, or Sheriff's deeds.

company, an association, a joint stock company, a trust, a joint venture or an unincorporated association of any kind or description.

38.64.38.66.   Exclusions shall mean the Natural Persons or Entities excluded from membership in the Economic Class, as set forth in Section 2 above.

38.65.38.67.   Expressly Reserved Claims shall mean the following Claims which are not recognized or released under the Agreement, and are reserved to the Economic Class Members:  (1) Bodily Injury Claims, which are excluded from the Economic Class, but certain of which may be asserted in the Medical Benefits Class Action Settlement as described herein; (2) claims of BP shareholders in any derivative or direct action solely in their capacity as BP shareholders; (3) claims of Natural Persons and Entities for Moratoria Losses; (4) claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting; and (5) claims for Economic Damage suffered by Entities or employees (to the extent they allege Economic Damage based on their employment by such an Entity during the Class Period) in the Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development, and Defense Contractor Industries, as defined in Section 2.2.4.

38.66.38.68.   Failed Business shall mean a business Entity that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

38.67.38.69.   Failed Start Up Business shall mean a business Entity that commenced operations on or after November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

38.68.38.70.          Fairness Hearing shall mean the hearing set and conducted by the Court pursuant to Fed. R. Civ. P. 23(e) to consider and determine whether to grant final approval to this Agreement, as described in Section 8 above.

38.69.38.71.          Festival Vendors shall have the meaning set forth in Exhibit 8D.

38.70.38.72.          Final Order and Judgment shall mean an order entered by the Court, described in Section 15 above.

38.71.38.73.          Finfish shall mean fish other than shellfish and octopuses.

38.72.38.74.          GCCF shall mean the Gulf Coast Claims Facility.

38.73.38.75.          GCCF Release and Covenant Not to Sue shall mean the release executed in exchange for payment of a GCCF claim.

38.74.38.76.          Game shall include nutria, mink, otters, raccoons, muskrats, alligators, and other wildlife.

38.75.38.77.          Governmental Organization shall mean:  (a) the government of the United States of America, (b) any state or local government, (c) any agency, branch, commission, department, or unit of the government of the United States of America or of any state or local government, or (d) any Affiliate of, or any business or organization of any type that is owned in whole or at least 51% in part by the government of the United States of America or any state or local government, or any of their agencies, branches, commissions, departments, or units.

38.76.38.78.          Guarantee shall mean the guarantees attached as Exhibit 24A, 24B.

38.77.38.79.          Guarantor shall mean BPCNA.

38.78.38.80.          Gulf Coast Areas shall mean the States of Louisiana, Mississippi, and Alabama; the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas; and the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie,

102

Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama or those described counties of Texas or Florida.  (Exhibit 22)

38.79.38.81.      Halliburton shall mean Halliburton Energy Services, Inc. and all and any of its Affiliates, other than any Natural Person or Entity that is also an Affiliate of any of the Released Parties.

38.80.38.82.      Home Ported shall mean the home port of a vessel as documented by a 2009 or 2010 government-issued vessel registration.

38.81.38.83.      Incompetent Class Member shall mean a Natural Person who lacks the capacity to enter into a contract on his or her behalf at the time of a Claims Form submission to the Claims Administrator, in accordance with the state laws of that person's domicile as applied to adult capacity issues, whether through power of attorney, agency documents, guardianship, conservatorship, tutorship, or otherwise.

38.82.38.84.      Individual Claimant shall mean a Natural Person who is an Economic Class Member alleging Economic Damage arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident with a Claim in addition to or other than a Claim for Economic Damage related to such Natural Person's sole proprietorship business or other self-employment as reflected on Schedule C, D or E of a federal income tax form.

38.83.38.85.      Individual Economic Loss Claims shall mean the Claims brought by individuals described in Exhibits 8A-8E.

38.84.38.86.      Individual Periodic Vendor shall have the meaning set forth in Exhibit 8D.

38.85.38.87.      Individual Release shall mean the form of release described in Section 4.4.10.2.

38.86.38.88.      Interim Class Counsel shall mean James Parkerson Roy and Stephen J. Herman.

38.87.38.89.      Lead Class Counsel shall mean the Economic and Property Damages Settlement Lead Class Counsel appointed by the Court.

38.88.38.90.      MC252 Well shall mean the exploratory well named "Macondo" that was being drilled by the Transocean *Marianas* and *Deepwater Horizon* rigs in Mississippi Canyon, Block 252 on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

38.89.38.91.      MDL 2179 or MDL shall mean the federal multidistrict litigation titled *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (MDL No.  2179).

38.90.38.92.      Minor Class Member shall mean a Natural Person whose age is below that of the majority rule for the state in which the minor resides at the time of a Claim Form submission to the Claims Administrator.

38.91.38.93.      Moratoria Loss shall mean any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity -- including shallow water and deepwater activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices.

38.92.38.94.      Multi-Facility Business shall have the meaning set forth in Exhibit 5.

38.93.38.95.      Natural Person shall mean a human being, and shall include the estate of a human being who died on or after April 20, 2010.  For purposes of this Agreement, a Natural Person that is the estate of a human being who died on or

after April 20, 2010, a Minor Class Member or Incompetent Class Member, shall be deemed to act through his, her or its Representative.

38.94.38.96.         New Entrant to Employment shall have the meaning set forth in Exhibit 8A.

38.95.38.97.         Non-Working VoO Compensation Amount shall mean the Compensation Amount calculated for a Non-Working VoO Participant pursuant to the Section 5.5.3 of the Agreement.

38.96.38.98.         Non-Working VoO Participant shall mean a vessel owner who executed a VoO Master Vessel Charter Agreement with a Charterer, and completed the initial VoO training program, but was never dispatched, placed on hire or otherwise asked to perform work for a Charterer.

38.97.38.99.         OPA shall mean the Oil Pollution Act of 1990, 33 U.S.C. § 2701, et seq.

38.98.38.100.         OPA Process shall mean the claims presentment procedure pursuant to the OPA, including claims that have been submitted to the BP Parties or claims that have been submitted to the GCCF as part of the OPA Process.

38.99.38.101.         Opt Out shall mean the process by which any Natural Person (acting through such Natural Person's Representative, if applicable) or Entity included in the Economic Class exercises his, her or its right to exclude himself, herself or itself from the Economic Class in accordance with Fed. R. Civ. P. 23(c)(2) and the procedures set forth in the Class Notice.

38.100.38.102.         Opt Outs shall mean those Natural Persons (acting through their Representatives, if applicable) or Entities included in the Economic Class who or which have timely and properly exercised their right to Opt Out and therefore are not Economic Class Members.

38.101.38.103.         Parties shall mean the Plaintiffs and the BP Parties.

38.102.38.104.    Passenger(s) for Hire shall mean a passenger for whom consideration is contributed as a condition of carriage on the vessel, whether directly or indirectly flowing to the owner, operator, agent, deckhand, or any other person having an interest in the vessel.

38.103.38.105.    Pending Unresolved GCCF Claims shall mean all claims in the GCCF except where the GCCF has issued final offers that have neither been accepted nor rejected by the Claimant and have not expired by their own terms.

38.104.38.106.    Plaintiffs shall mean those Natural Persons and Entities appearing as named plaintiffs and proposed class representatives in the Action.

38.104.1.38.106.1.   Plaintiffs' Steering Committee or PSC shall mean those counsel appointed to the Plaintiffs' Steering Committee by the Court, in its Pretrial Order No. 46, dated October 5, 2011 (Doc. 4226) in the MDL.

38.105.38.107.    Proposed Economic Class Counsel shall mean the members of the Plaintiffs Executive Committee and Plaintiffs Steering Committee, who seek to be appointed Economic and Property Damage Settlement Class Counsel by the Court.

38.106.38.108.    PSC shall mean the Plaintiffs' Steering Committee.

38.107.38.109.    Real Property shall mean land, including improvements thereon, and property of any nature appurtenant or affixed thereto.

38.108.38.110.    Real Property Compensation Zone Map(s) shall mean the map(s) attached to the Agreement as Exhibit 13B.

38.109.38.111.    Real Property Sales Claim Process shall mean that process described in the Real Property Sales Claim Framework.

38.110.38.112.    Real Property Sales Damage shall mean a loss alleged by an eligible Claimant that satisfies the requirements set forth in the Real Property Sales Claim Framework.

38.111.38.113.    Real Property Sales Claim Framework shall mean the requirements described in the document captioned Real Property Sales Claim Framework, attached to this Agreement as Exhibits 13A and 13B.

38.112.38.114.    Real Property Sales Claimant shall mean an Economic Class Member claiming to have suffered Real Property Sales Damage.

38.113.38.115.    Real Property Sales Compensation Amount shall mean the Compensation Amount calculated for an Eligible Real Property Sales Claimant for Real Property Sales Damage pursuant to the terms of the Agreement and the Real Property Sales Claim Framework.

38.114.38.116.    Real Property Sales Compensation Zone shall be defined as Residential Parcels identified in the Real Property Compensation Zone Map.

38.115.38.117.    Real Property Sales Damage shall mean a loss alleged by a Real Property Sales Claimant that satisfies the requirements set forth in the Real Property Sales Claim Framework.

38.116.38.118.    Recreational Fishing shall mean fishing for sport or pleasure.

38.117.38.119.    Related Claims shall mean all claims brought by Economic Class Members against any of the Released Parties that are covered by the Release and which are pending in the Court, in any other federal court, in any state court, or in any other tribunal or forum.

38.118.38.120.    Release is defined in Section 10.4 above.

38.119.38.121.    Released Claims is defined in Section 10.2 above.

38.120.38.122.    Released Parties is defined in Section 10.3 above.

38.121.38.123.    Representative shall mean in the context of a Natural Person who is a minor or incapacitated, his legal guardian; or in the case of a deceased Natural Person, the duly authorized legal representative of his estate.

38.122.38.124.    Residential Parcels shall mean those parcels within the Real Property
Sales Compensation Zone for which the county where the parcel is located has
designated the parcel as a residential classification.

38.123.38.125.    Response Activities shall mean the clean up, remediation efforts, and all
other responsive actions (including the use and handling of dispersants)
relating to the releases of oil, other hydrocarbons and other pollutants from the
MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and the
Deepwater Horizon Incident.

38.124.38.126.    RTP (risk transfer premium) shall mean the amount paid to a Claimant for
any and all alleged damage, including potential future injuries, damages or losses
not currently known, which may later manifest themselves or develop, arising out
of, due to, resulting from, or relating in any way to the Deepwater Horizon
Incident, and any other type or category of damages claimed, including claims for
punitive damages.  To the extent that an RTP is to be paid to a Claimant, it shall
be a factor which is multiplied with those Compensation Amounts which the
Exhibits to this Agreement specify are eligible for an RTP to calculate a sum
which is added to the Compensation Amount paid to the Claimant.  For example,
if the Compensation Amount is $1, and the RTP is 2.5, then $1 is multiplied by
2.5, which product is then added to the $1 to reach the total amount of
compensation ($1 + $2.50 = $3.50 in total compensation).  The RTP Chart (Risk
Transfer Premium) is set forth in Exhibit 15.

38.125.38.127.    SCAT shall mean the Deepwater Horizon Unified Command Shoreline
Cleanup Assessment Teams.

38.126.38.128.    Seafood shall mean fish and shellfish, including shrimp, oysters, crab, and
Finfish, caught in the Specified Waters of the Gulf of Mexico.  Seafood shall
exclude menhaden.

38.127.38.129.    Seafood Compensation Program shall mean the program defined in
Section 5.2.

38.128.38.130.    Seafood Compensation Program Amount shall mean $2.3 billion, as such amount is reduced (i) pursuant to Section 4.2.7 for certain transition payments to Commercial Fisherman, Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners, and (ii) for credits, if any, to the BP Parties in respect of certain Opt Outs by Commercial Fisherman, Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners pursuant to the **SEAFOOD PROGRAM OPT OUT TERMS.**

38.129.38.131.    Seafood Compensation Program Settlement Fund shall mean the fund used by the Claims Administrator to make payments under the Seafood Compensation Program.

38.130.38.132.    Seafood Program Opt Out Terms shall mean the terms agreed to by the Parties with respect to Seafood Compensation Program Opt Outs.  The Seafood Program Opt Out Terms will be submitted under seal to the Court.

38.131.38.133.    Settlement shall mean the terms and conditions of the Agreement reached by the Parties.

38.132.38.134.    Settlement Payment shall mean the Total Compensation Amount to be paid to a Claimant for any Claim made pursuant to the terms of the Agreement, including the Frameworks in the exhibits.

38.133.38.135.    Settlement Trust shall have the meaning set forth in Section 5.12.1.

38.134.38.136.    Specified Gulf Waters shall mean the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23.

38.135.38.137.    Start Up Business shall mean a business with less than 18 months of operating history at the time of the Deepwater Horizon Incident, as more fully described in Exhibit 7.

38.136.38.138.    Subsistence shall mean fishing or hunting to harvest, catch, barter, consume or trade Gulf of Mexico natural resources (including Seafood and

Game), in a traditional or customary manner, to sustain basic personal or family dietary, economic security, shelter, tool, or clothing needs.

38.137.38.139.     Subsistence Claim Process shall mean that process for determining eligibility and compensation described in the Subsistence Claim Framework.

38.138.38.140.     Subsistence Claim Framework shall mean the document attached to this Agreement as Exhibit 9.

38.139.38.141.     Subsistence Compensation Amount shall mean the Compensation Amount calculated for an eligible Subsistence Claimant for Subsistence Damage pursuant to this Agreement and the Subsistence Claim Framework.

38.140.38.142.     Subsistence Damage shall mean a loss of value of Subsistence use of natural resources alleged to arise out of, result from or relate in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.141.38.143.     Summary Publication Notice shall mean that notice of Preliminary Approval Order, the Agreement, and the Fairness Hearing as approved by the Court.

38.142.38.144.     Supplemental Information Program shall mean a program developed by the PSC to provide additional information to Economic Class Members regarding the Settlement.

38.143.38.145.     Support Services to Oil and Gas Industry shall mean Entities the Claims Administrator determines fall within the NAICS codes and descriptions marked with an "x" on Exhibit 19.

38.144.38.146.     Sworn Written Statement shall mean a statement provided under penalty of perjury, in support of a Claim.

38.145.38.147.     Total Compensation Amount shall mean the Compensation Amount, plus any RTP and any other amounts due for any Claim less any applicable offsets under this Agreement or its Frameworks.

38.146.38.148.    Tourism shall mean the definition set forth in Exhibit 2.

38.147.38.149.    Transition Claims shall mean those claims, including Pending Unresolved GCCF Claims, submitted as part of the Transition Claims Process described in Section 4.2.

38.148.38.150.    Transition Coordinator shall mean the Claims coordinator described in Section 4.2.

38.149.38.151.    Transition Process shall mean the Claims process described in Section 4.2.

38.152.    Transocean shall mean Transocean Ltd., Transocean, Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH and all and any of their Affiliates, other than any Natural Person or Entity that is also an Affiliate of any of the Released Parties

38.150.38.153.    Trustee shall mean the Claims Administrator when serving as trustee of the Settlement Trust, along with Directed Trustee J. P. Morgan Trust Company of Delaware exercising the limited authority as set forth in the Economic Settlement Trust Agreement.

38.151.38.154.    Unknown Claims is defined in Section 10.5 above.

38.152.38.155.    Vessel Physical Damage shall mean physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program, that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof.

38.153.38.156.    Vessel Physical Damage Claim Framework shall mean the rules described in the document captioned Vessel Physical Damage Framework attached to this Agreement as Exhibit 14.

38.154.38.157.    Vessel Physical Damage Claim Process shall mean that process described in the Vessel Physical Damage Claim Framework.

38.155.38.158.    Vessel Physical Damage Compensation Amount shall mean the Compensation Amount calculated for a Vessel Physical Damage Claimant pursuant to the terms of the Agreement and the Vessel Physical Damage Claim Framework.

38.156.38.159.    VoO shall mean Vessels of Opportunity, the program through which BP, or its contractors, contracted with vessel owners to assist in Deepwater Horizon Incident response efforts.

38.157.38.160.    VoO Agreement shall mean the terms provided in Section 5.5 of the Agreement.

38.158.38.161.    VoO Claim Process shall mean that process described Section 5.5 of the Agreement.

38.159.38.162.    VoO Charter Payment shall mean a loss alleged by a VoO Charter Payment Claimant for any payment or compensation related to participation in the VoO program that satisfies the requirements set forth in Section 5.5 above.

38.160.38.163.    VoO Charter Payment Claimant shall mean an Economic Class Member claiming to have suffered a VoO Charter Payment loss.

38.161.38.164.    VoO Earned Income Offset shall mean the offset whereby, if a VoO Charter Payment Claimant has previously been paid under a VoO Master Vessel Charter Agreement, the Claimant's Compensation Amount for its Claim relating to a non-Seafood-related business directly involving the use of the vessel that performed the VoO services, or employment in such business or service, shall be reduced by 33% of the amount previously paid for services performed under a VoO Master Vessel Charter Agreement.  This reduction shall be applied after the addition of any applicable RTP to the base Economic Damage Compensation Amount, excluding prior income from the VoO Charter Payments.

38.162.38.165.    VoO Master Vessel Charter Agreement shall mean the standard agreements utilized by BP and its agents or subcontractors to charter the vessels available for work or service in connection with the VoO program.

38.163.38.166.    VoO Settlement Payment Offset shall mean the offset whereby the Total Compensation Amount for a Natural Person or Entity relating to a non-Seafood-related business directly involving the use of the vessel that performed the VoO services, or employment in such business or service, shall be reduced by 50% of the amount of the Working VoO Participant Settlement Payment.  The VoO Settlement Payment Offset shall be applied after the addition of any applicable RTP to the base Economic Damage Compensation Amount, excluding prior income from the VoO Charter Payments.

38.164.38.167.    Wetlands Real Property Claimant shall mean an Economic Class Member claiming to have suffered Wetlands Real Property Damage.

38.165.38.168.    Wetlands Real Property Claim Process shall mean that process described in the Wetlands Real Property Claim Framework.

38.166.38.169.    Wetlands Real Property Claim Framework shall mean the requirements described in the document captioned Compensation Framework for Wetlands Real Property Claims, attached to this Agreement as Exhibits 12A-12B.

38.167.38.170.    Wetlands Real Property Compensation Amount shall mean the Compensation Amount calculated for an eligible Wetlands Real Property Claimant for Wetlands Real Property Damage pursuant to the terms of the Agreement and the Wetlands Real Property Claim Framework.

38.168.38.171.    Wetlands Real Property Damage shall mean a loss alleged by a Wetlands Real Property Claimant that satisfies the requirements set forth in the Wetlands Real Property Claim Framework.

38.169.38.172.      Working VoO Compensation Amount shall mean the Compensation Amount calculated for a Working VoO Participant pursuant to Section 5.5.2 of the Settlement Agreement.

38.170.38.173.      Working VoO Participant shall mean a vessel owner who executed a VoO Master Vessel Charter Agreement, completed the initial VoO training program, and was dispatched or placed on-hire (*i.e.*, requested by a Charterer to perform work and such request was accepted) by a Charterer (evidence of which shall include Charterers' dispatch logs).

38.171.38.174.      Zone A shall mean the geographic areas set forth in Exhibits 1A-1C.

38.172.38.175.      Zone B shall mean the geographic areas set forth in Exhibits 1A-1C.

38.173.38.176.      Zone C shall mean the geographic areas set forth in Exhibits 1A-1C.

38.174.38.177.      Zone D shall mean the residual portions of the Gulf Coast Areas outside of Zones A-C.