# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to all actions. | * * * * * | <br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, | * * | Civil Action No. 12-970<br><br>SECTION J |
|    Plaintiffs, | * * | |
| v. | * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * | MAGISTRATE JUDGE SHUSHAN |
|    Defendants. | * | |

## *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................................i

RECITALS .............................................................................................................................. 1

1.   CLASS DEFINITION. .................................................................................................. 3

2.   EXCLUSIONS FROM THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT
     CLASS DEFINITION. ................................................................................................. 8

3.   EXPRESSLY RESERVED CLAIMS. ........................................................................ 12

4.   IMPLEMENTATION OF THE SETTLEMENT. ...................................................... 12

5.   SETTLEMENT BENEFITS. ...................................................................................... 28

     5.2.   SEAFOOD COMPENSATION PROGRAM. .............................................. 29

     5.3.   ECONOMIC DAMAGE COMPENSATION. ............................................. 29

     5.4.   SUBSISTENCE DAMAGE COMPENSATION. ........................................ 31

     5.5.   VoO CHARTER PAYMENT ...................................................................... 32

     5.6.   VESSEL PHYSICAL DAMAGE COMPENSATION. ............................... 33

     5.7.   COASTAL REAL PROPERTY DAMAGE COMPENSATION ................. 33

     5.8.   WETLANDS REAL PROPERTY DAMAGE COMPENSATION ............. 33

     5.9.   REAL PROPERTY SALES DAMAGE COMPENSATION ....................... 34

6.   CLAIMS APPEAL PROCESS ................................................................................... 55

7.   PRELIMINARY APPROVAL BY THE COURT AND CLASS CERTIFICATION. ........ 62

8.   NOTICE AND FAIRNESS HEARING. ..................................................................... 63

9.   COMMUNICATIONS TO THE PUBLIC. ................................................................ 68

10.  RELEASE AND DISMISSAL OF ALL CLAIMS AND OTHER PROTECTIONS. ..... 69

11.  ASSIGNMENT AND PROTECTIONS**.**.................................................................. 76

12.  DENIAL OF WRONGDOING OR LIABILITY. ....................................................... 76

13.  REPRESENTATIONS AND WARRANTIES............................................................ 78

14.  PLAINTIFFS' COUNSEL'S ATTORNEY'S FEES AND COSTS. ............................. 79

15.    FINAL ORDER AND JUDGMENT, DISMISSAL WITH PREJUDICE. ...................... 79

16.    COOPERATION OF PARTIES AS TO CONSUMMATION OF SETTLEMENT........ 81

17.    COOPERATION OF PARTIES AS TO SUPPORT OF SETTLEMENT. ...................... 81

18.    CONTINUING JURISDICTION. ...................................................................................... 81

19.    STAY OR ADJOURNMENT OF ALL PROCEEDINGS. ................................................ 82

20.    DUTIES OF ECONOMIC CLASS COUNSEL. ................................................................ 82

21.    ILLEGALITY OR UNENFORCEABILITY OF PROVISIONS.................................... 83

22.    PRESERVATION OF CONFIDENTIAL DOCUMENTS. ............................................. 85

23.    INTERPRETATION.............................................................................................................. 86

24.    NO PENALTY OR FINE. .................................................................................................... 86

25.    AGREEMENT MUTUALLY PREPARED. .................................................................... 86

26.    BINDING AND ENTIRE AGREEMENT. ....................................................................... 87

27.    RECEIPT OF ADVICE OF COUNSEL. ........................................................................... 87

28.    EXTENSION OF TIME AND MINISTERIAL CHANGES. ........................................... 87

29.    EXECUTION OF AGREEMENT IN COUNTERPARTS. .............................................. 87

30.    DECEASED, DISSOLVED OR BANKRUPT CLASS MEMBERS. ............................. 88

31.    MINOR AND INCOMPETENT CLASS MEMBER SETTLEMENT PROVISION. .... 88

32.    NO TAX ADVICE. ............................................................................................................... 89

33.    NO OTHER RIGHTS OR REMEDIES. ............................................................................ 90

34.    NOTICE .................................................................................................................................. 90

35.    WAIVER.................................................................................................................................. 91

36.    APPLICABLE LAW ............................................................................................................. 91

37.    GUARANTOR ....................................................................................................................... 91

38.    DEFINITIONS........................................................................................................................ 91

## ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT

### (Subject to Court Approval)

This **AGREEMENT**,[1] dated as of April 18, 2012, is made and entered into by and among (i) defendants BP Exploration & Production Inc. and BP America Production Company (hereinafter the "**BP PARTIES**"), by and through their attorneys, and (ii) **PLAINTIFFS**, on behalf of the **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS**, by and through the **INTERIM CLASS COUNSEL**, in the **DEEPWATER HORIZON ECONOMIC LITIGATION**.  The purpose of this Agreement is to settle all and only the **RELEASED CLAIMS** of the Economic Class, **PLAINTIFFS,** and **ECONOMIC CLASS MEMBERS** against all and only the **RELEASED PARTIES.**

### RECITALS

A.     BP Exploration & Production Inc. and BP America Production Company are corporations organized under the laws of the State of Delaware, engaged in the business of oil and gas production, exploration and/or development.

B.     **ECONOMIC CLASS REPRESENTATIVES** are the named plaintiffs in the Amended Economic and Property Damage Class Complaint (the "**ACTION**") entitled *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al.*, No. 12-970, filed May 2, 2012 in the **COURT.**

C.     The Action alleges federal statutory and maritime claims, including violations of the Oil Pollution Act, negligence, gross negligence, willful misconduct, strict liability, negligence *per se*, nuisance, and other claims.  Plaintiffs in the Action seek compensatory damages, punitive damages, other damages and declaratory relief on behalf of themselves and the Economic Class Members, and all such claims, damages and theories of liability, unless expressly reserved, are extinguished, discharged and released by the terms of this Agreement.

---

[1] The first time defined terms appear in this Agreement, they are set forth in bold and all capital letters for emphasis. Thereafter, they are set forth with initial capital letters only.

D.      Plaintiffs contend they would prevail in litigation.  **BP** disputes and denies the Plaintiffs' claims, has raised various affirmative and legal and other defenses, and contends that it would prevail in litigation.

E.      After careful consideration, Plaintiffs, Interim Class Counsel and the **PROPOSED ECONOMIC CLASS COUNSEL** have concluded that it is in the best interests of Plaintiffs and the Economic Class to compromise and settle certain claims asserted by the Economic Class against BP and other Released Parties in the Deepwater Horizon Economic Litigation in consideration of the terms and benefits of the **SETTLEMENT** set forth in this Agreement.  After arm's length negotiations with **BP's COUNSEL**, Plaintiffs and Proposed Economic Class Counsel have considered, among other things,  (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of discovery completed; (3) the potential for Plaintiffs or BP prevailing on the merits; and (4) the range of possible recovery and certainty of damages; and have determined the Agreement is fair, reasonable, adequate and in the best interests of Plaintiffs and the Economic Class Members.

F.      BP has concluded that, in light of the costs, risks, burden, and delay of litigation, Settlement in this complex litigation is appropriate.  In this regard, BP and BP's Counsel agree that this Agreement is fair, reasonable, and an adequate resolution of the Deepwater Horizon Economic Litigation.

G.      The **PARTIES** agree that this Agreement is subject to the **EFFECTIVE DATE**. Nevertheless, to facilitate the expeditious resolution of **CLAIMS** for the benefit of the Economic Class, the Parties have agreed to a **TRANSITION PROCESS**, and for the establishment of a Court-supervised settlement program to take effect within thirty days of the **PRELIMINARY APPROVAL ORDER** (or as otherwise ordered by the Court).

H.      The Parties further agree that an Economic Class Member determined to qualify for one or more **SETTLEMENT PAYMENTS** shall have the option to receive prompt payment of such compensation prior to the Effective Date upon the execution of an **INDIVIDUAL RELEASE**.  The BP Parties' obligation to make Settlement Payments to any qualifying Economic Class Member who signs an Individual Release prior to the Effective Date, and the

terms of every such Individual Release, shall be fully enforceable, binding and irrevocable, regardless of whether the Effective Date occurs.

NOW THEREFORE, it is agreed that the foregoing recitals are hereby expressly incorporated into this Agreement, and made a part hereof, and further, that in consideration of the agreements, promises, and mutual covenants, representations and warranties set forth in this Agreement; the benefits, payments, assignments and **RELEASE** described in this Agreement; the entry by the Court of a **FINAL ORDER AND JUDGMENT** as described below; and for such other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, this Action shall be settled, compromised and resolved as between BP, the Released Parties and the Economic Class under and subject to the following terms and conditions:

1. **CLASS DEFINITION.**

Economic and Property Damages Settlement Class shall mean the **NATURAL PERSONS** and **ENTITIES** defined in this Section 1, subject to the **EXCLUSIONS** in Section 2 below.  If a person or entity is included within the geographical descriptions in Section 1.1 or Section 1.2, and their claims meet the descriptions of one or more of the Damage Categories described in Section 1.3, that person or entity is a member of the Economic and Property Damages Settlement Class, <u>unless</u> the person or entity is excluded under Section 2:

1.1.     **Individuals**.  Unless otherwise specified, all Natural Persons residing in the United States who, at any time between April 20, 2010 and April 16, 2012, lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, or owned or leased or worked on a vessel harbored or **HOME PORTED** in the States of Louisiana, Mississippi, or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of

Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida (the "**GULF COAST AREAS**") (Exhibit 22), or the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23 ("**SPECIFIED GULF WATERS**"), or worked on a vessel in Specified Gulf Waters after April 20, 2009. With respect to **SEAFOOD CREW**[2] Claims, persons must have worked on a vessel that landed **SEAFOOD** in the Gulf Coast Areas after April 20, 2009.

and

1.2.      **Entities.** All Entities doing business or operating in the Gulf Coast Areas or Specified Gulf Waters that:

     1.2.1.      at any time from April 20, 2010 to April 16, 2012, owned, operated, or leased a physical facility in the Gulf Coast Areas or Specified Gulf Waters and (A) sold products in the Gulf Coast Areas or Specified Gulf Waters (1) directly to **CONSUMERS** or **END USERS** of those products or (2) to another Entity that sold those products directly to Consumers or End Users of those products, or (B) regularly purchased Seafood harvested from Specified Gulf Waters in order to produce goods for resale;

     1.2.2.      are service businesses with one or more full-time employees (including owner-operators) who performed their full-time services while physically present in the Gulf Coast Areas or Specified Gulf Waters at any time from April 20, 2010 to April 16, 2012; or

     1.2.3.      owned, operated, or leased a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to

---

[2] See Seafood Distribution Chain Definitions, Exhibit 3. Exhibit 3 contains definitions for a wide variety of participants in the Seafood industry, including Seafood Crew, Commercial Fisherman, Oyster Leaseholders, and Seafood Vessel Owner.

April 16, 2012; or

1.2.4.    owned or leased **REAL PROPERTY** in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012;

1.3.    Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

1.3.1.    The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-15:

1.3.1.1.    **SEAFOOD COMPENSATION PROGRAM.** Damages suffered by a **COMMERCIAL FISHERMAN,** Seafood Crew, or **SEAFOOD VESSEL OWNER** that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, *inter alia,* **OYSTER LEASEHOLDERS** and IFQ Owners. (Exhibit 10). Claims for Economic Damage arising from the fishing, processing, selling, catching, or harvesting of menhaden (or "pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.

1.3.1.2.    Economic Damage Category. Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the **DEEPWATER HORIZON INCIDENT**, subject to certain Exclusions. (Exhibits 16-19)

1.3.1.3.    Subsistence Damage Category. Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and **GAME**, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used

by the **CLAIMANT** due to or resulting from the Deepwater Horizon Incident**.**  (Exhibit 9)

1.3.1.4.  VoO Charter Payment Category.  Damages suffered by Natural Persons or Entities who registered to participate in BP's Vessels of Opportunity ("VoO") program and executed a **VoO MASTER VESSEL CHARTER AGREEMENT** with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as **CHARTERER**, and completed the initial VoO training program.

1.3.1.5.  Vessel Physical Damage Category.  Physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program. (Exhibit 14)

1.3.1.6.  Coastal Real Property Damage Category.  Damages alleged by a Coastal Real Property Claimant that meet the requirements set forth in the Coastal Real Property Claim Framework.

1.3.1.7.  Wetlands Real Property Damage Category.  Damages alleged by a Wetlands Real Property Damage Claimant that meet the requirements set forth in the Wetlands Real Property Claim Framework.

1.3.1.8.  Real Property Sales Damage Category.  Damages alleged by a Real Property Sales Claimant that meet the requirements set forth in the Real Property Sales Framework.

1.3.1.9.  Individuals/Employees in Otherwise Excluded Oil and Gas, Gaming, Banking, Insurance, Funds, Defense Contractors, Developers Industries, and any Entity selling or marketing BP-branded fuel (including jobbers and branded dealers):  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses and employers in these otherwise excluded industries described in Section 2 may submit

6

Claims for Economic Damage outside of these excluded industries, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.10.   Individuals/Employees in Support Services to Oil and Gas Industry:  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses/employers in the **SUPPORT SERVICES TO OIL AND GAS INDUSTRY**, described in Exhibit 16 may submit Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non oil and gas industry Economic Damages due to or resulting from the Deepwater Horizon Incident, except for moratoria claims.  As is also more fully described in Exhibit 16, these individuals and employees may also pursue Claims for other Economic Damage outside the Support Service to Oil and Gas Industry, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.11.   Businesses/Employers in Otherwise Excluded Gaming, Banking, Insurance, Funds, Defense Contractors and Developers Industries:  As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims only for Coastal Real Property Damage and Wetlands Real Property Damage, but are not entitled to recover under any other aspect of the Settlement.

1.3.1.12.   Businesses/Employers in Support Services to Oil and Gas Industry:  As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in the "Support Services to Oil and Gas Industry," described in Exhibit 16, may submit Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non-oil and gas industry Economic Damages arising out of, due to, resulting

from, or relating in any way to, directly or indirectly, the Deepwater
Horizon Incident, except for moratoria claims, and may pursue all other
recovery permitted under other aspects of the Settlement.

2. **EXCLUSIONS FROM THE ECONOMIC AND PROPERTY DAMAGES
SETTLEMENT CLASS DEFINITION.**

2.1.     Notwithstanding the above, the following individuals and Entities, including any
and all of their past and present predecessors, successors, personal
representatives, agents, trustees, insurers, reinsurers, indemnitors, subrogees,
assigns, and any other Natural Person, legal or juridical person or Entity entitled
to assert any Claim on behalf of or in respect of any such individual or Entity in
their respective capacities as such are excluded from the Economic Class.

2.2.     Excluded Individuals or Entities:

2.2.1.     Any Economic Class Member who or which timely elects to be excluded
from the Economic Class under the deadlines and procedures to be set forth
in the **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT
CLASS ACTION SETTLEMENT NOTICE**.

2.2.2.     Defendants in **MDL 2179**, and individuals who are current employees, or
who were employees during the **CLASS PERIOD**, of BP or other
defendants in MDL 2179.

2.2.3.     The Court, including any sitting judges on the United States District Court
for the Eastern District of Louisiana, their law clerks serving during the
pendency of the MDL, and members of any such judge's or current law
clerk's immediate family.

2.2.4.     The following exclusions are based on the substantive nature of the
business, not the legal or juridical form of that business.  Any of the
following types of Entity, or any Natural Person to the extent he or she
alleges Economic Damage based on their employment by such an Entity,

8

during the Class Period are excluded:

2.2.4.1.   Financial Institutions as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, commercial banks; savings institutions; credit card issuers; credit insurers; factors or other sales finance entities; financial or investment advisers or portfolio managers; fund managers; investment banking entities; lending institutions; real estate mortgage or lending entities; brokers or dealers of securities, commodities, commodity contracts or loans; securities or commodities exchanges; entities serving as custodians, fiduciaries or trustees of securities or other financial assets; or entities engaged in other financial transaction intermediation, processing, reserve or clearinghouse activities, *provided*, that the following shall not be excluded solely pursuant to this Section 2.2.4.1 unless they are subject to a different exclusion**:**  stand-alone ATMs, credit unions, pawn shops, businesses engaged predominantly in making payday loans or paycheck advances and businesses that sell goods and services and offer financing on these purchases to their customers.

2.2.4.2.   Funds, Financial Trusts, and Other Financial Vehicles, as identified in the NAICS codes listed on Exhibit 18, after giving effect to the bracketed exceptions contained in NAICS Codes  525920 and 523991, which include by way of example, public-open end investment funds; investment funds; real estate investment trusts; REMICS; mutual funds; money market funds; derivatives; health and welfare funds; insurance funds; pension funds; financial trusts; and special purpose financial vehicles *provided,* that successions, estates, testamentary trusts, trusts of Natural Persons, bankruptcy estates, limited liability companies, corporations, Sub-Chapter "S" corporations, partnerships, limited partnerships, joint ventures, and any other businesses or juridical Entities, shall not be excluded pursuant to this Section 2.2.4.2 solely by reason of their form of legal or juridical structure or organization, except to the extent they are

9

excluded pursuant to another exclusion in Section 2.2 of this Agreement.

2.2.4.3.   Gaming, as identified in the NAICS codes listed on Exhibit 18, which includes, by way of example,  casinos; casino hotels; off-track betting parlors; racetracks and other gambling establishments *provided*, that the following shall not be excluded solely pursuant to this Section 2.2.4.3 unless they are subject to a different exclusion: (a) bingo parlors, and (b) video gaming at bars, bingo parlors, hotels, off-track betting parlors, racetracks, restaurants and truck stops.

2.2.4.4.   Insurance Entities, as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, insurance carriers issuing disability, health, life, medical, property and casualty, title or other insurance; reinsurers; insurance agencies and brokerages; underwriting agencies or organizations; claims adjusters and processors; third-party insurance or fund administrators; or other insurance-related businesses.

2.2.4.5.   Oil and Gas Industry, as identified in the NAICS codes listed on Exhibit 17, which includes by way of example, firms engaged in:  extracting crude petroleum, natural gas or other hydrocarbons; drilling wells; preparing, maintaining or constructing petroleum or natural gas well-sites or other mineral extraction sites; mining; maintaining or constructing petroleum or natural gas pipeline or distribution facilities; pipeline distribution of crude petroleum, refined petroleum, oil or natural gas; petroleum or natural gas refining or other mineral refining and/or manufacturing; manufacturing petroleum lubricating oil and grease, petrochemical products, or other petroleum and coal products or chemical products derived from extracted minerals; merchant wholesaling of construction and mining (except oil well) machinery and equipment; wholesale distribution of oil well machinery, equipment and supplies; wholesale distribution of petroleum, petroleum products, other extracted minerals, chemical products produced from extracted or refined minerals, petroleum bulk stations and terminals,

petroleum and petroleum products merchant wholesalers.

2.2.4.6.   Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor.

2.2.4.7.   Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties.  This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, *provided,* however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9.

2.2.4.8.   Any Entity selling or marketing BP-branded fuel, including jobbers and branded dealers.

2.2.5.   **GOVERNMENTAL ORGANIZATIONS**, as defined in this Agreement, provided that Native American tribal Entities may consent to participate in the Settlement as to otherwise eligible Claims.

2.2.6.   Any Natural Person or Entity who or that made a claim to the **GCCF**, was paid and executed a **GCCF RELEASE AND COVENANT NOT TO SUE**, *provided,* however, that the execution of a GCCF Release and Covenant Not to Sue shall not prevent a Natural Person or Entity from making a VoO Charter Payment Claim or a Vessel Damage Claim, nor shall a release covering only bodily injury prevent a Natural Person from making Claims under this Agreement.

11

3.   **EXPRESSLY RESERVED CLAIMS.**

The following Claims are not recognized or released under the Agreement, and are reserved to the Economic Class Members:

3.1.   **BODILY INJURY CLAIMS**, which are excluded from the Economic Class, but certain of which may be asserted in the Medical Benefits Class Action Settlement referenced herein.

3.2.   Claims of BP shareholders in any derivative or direct action solely in their capacity as a BP shareholder.

3.3.   Claims of Natural Persons and Entities for **MORATORIA LOSSES.**

3.4.   Claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting.

3.5.   Claims for Economic Damage suffered by Entities or employees (to the extent they allege Economic Damage based on their employment by such Entity during the Class Period) in the Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development, Defense Contractor Industries, and Entities selling or marketing BP-branded fuel (including jobbers and branded dealers) as defined in Section 2.2.

3.6.   Claims of the Economic Class, Plaintiffs, and Economic Class Members for punitive damages against **HALLIBURTON** and **TRANSOCEAN** are reserved.

3.7.   The Economic Class, Plaintiffs and Economic Class Members, but only through the Economic Class, specifically reserve its and their rights to assert the Assigned Claims against Transocean and Halliburton subject to Exhibit 21.

4.   **IMPLEMENTATION OF THE SETTLEMENT.**

4.1.   Establishment of **DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT PROGRAM**.  The Parties shall jointly make arrangements to establish the Deepwater Horizon Court Supervised Settlement Program

("**SETTLEMENT PROGRAM**") prior to the Court entering the Preliminary Approval Order.

4.2.      Transition Claims Process.

4.2.1.      In its First Amended Order Creating Transition Process, entered by the Court on March 8, 2012 (Doc. 5995), and clarified in its March 14, 2012 Order (Doc. 6049), the Court appointed Patrick Juneau as the **CLAIMS ADMINISTRATOR** (subject to commercial terms) of the **TRANSITION PROCESS** and the proposed Settlement Program, and Lynn Greer as **TRANSITION COORDINATOR** of the Transition Process.  The processes set forth in this Section 4.2 are based on the transition orders already entered by the Court and will be subject to any further such orders which the Court may enter with regard to the Transition Process.

4.2.2.      In supervising the transition, the Court, in its March 8, 2012 First Amended Order Creating Transition Process, has directed the Claims Administrator and Transition Coordinator to cause the Transition Process to be implemented in an orderly, transparent and timely manner.  The Court has directed the Transition Coordinator to evaluate claims currently pending with the GCCF and evaluate any new claims submitted before the Settlement Program agreed to by the Parties is opened, and, where appropriate under the existing GCCF rules, methodologies, and protocols, to pay the amounts set forth in the Court's March 8, 2012 First Amended Order Creating Transition Process.   The Court has directed that the evaluation and processing of claims during the Transition Process shall be performed by Garden City Group, Inc., BrownGreer PLC, PricewaterhouseCoopers LLP and other service providers as identified by the Claims Administrator and the Transition Coordinator.  The Court has further directed the Claims Administrator to periodically and upon request report to the Court, BP, and Interim Class Counsel regarding all matters relating to the operation of the Transition Process.

4.2.3.     As set forth in the Court's First Amended Order Creating Transition Process, for all Transition Claims where the claimant has not been paid and has not executed a **GCCF RELEASE AND COVENANT NOT TO SUE** that was received by the GCCF as of 11:59 p.m., EST, on February 26, 2012, the following applies:

4.2.3.1.     If a non-expired GCCF offer was pending as of March 8, 2012, and if the claimant elects to accept the offer, then the Transition Process will pay 60% of the offer on an interim basis without requiring a release.  If the claimant receiving the 60% payment is an Economic Class Member, the claimant has a right to additionally recover from the Settlement Program the greater of:  (a) the remaining 40% of the GCCF offer, or (b) the Economic Class Settlement Payment minus any amount previously paid by the Transition Process, in either case in exchange for an Individual Release in the form attached hereto as Exhibit 26, which shall contain terms substantially similar to the Release described in Section 10. However, if the claimant receiving the 60% payment is not an Economic Class Member or **OPTS OUT** of the Economic Class without participating in the Settlement Class **CLAIMS PROCESSES** (*i.e.*, prior to submitting an Economic Class **CLAIM FORM**) then the claimant may (a) request to be paid the remaining 40% of the GCCF offer subject to executing a release, or (b) elect to pursue any and all claims and rights available under applicable law.

4.2.3.2.     If a **PENDING UNRESOLVED GCCF CLAIM** is in process, the Transition Process will continue processing that claim.  If the Transition Process extends an offer by the BP Parties before the Settlement Program is processing Claims, the Transition Process will pay 60% of the offer without requiring a release.  If the claimant receiving the 60% payment is an Economic Class Member, the claimant has a right to additionally recover from the Settlement Program the greater of:  (a) the remaining 40% of the GCCF offer, or (b) the Class Settlement Payment minus any

14

amount previously paid by the Transition Process, in either case in exchange for an Individual Release.  However, if no GCCF offer has been extended by the Transition Process to the Economic Class Member by the time the Settlement Program starts processing Claims, then, if the claimant completes a Claim Form the Claim shall be processed under the terms of the Class Settlement by the Settlement Program.  However, if the claimant receiving the 60% payment is not an Economic Class Member or Opts Out of the Economic Class without participating in the Settlement Class Claims Processes (i.e., prior to submitting an Economic Class Claim Form) then the claimant may (a) request to be paid the remaining 40% of the GCCF offer subject to executing a release, or (b) elect to pursue any and all claims and rights available under applicable law.

4.2.4.    For claims eligible for the GCCF quick pay program, the Court has directed that:  A. The Transition Coordinator shall issue a letter to all claimants eligible to  participate in the GCCF quick pay program who have not previously executed a GCCF Release and Covenant Not to Sue notifying them that the quick pay program shall terminate on May 7, 2012.  The letter shall further advise of the option to either submit a claim under the applicable Transition Claims Process set forth above, or accept the quick pay in exchange for a release.  The letter shall be clear that the claimant has the right to choose the greater offer if a payment under the Transition Process is offered before May 7, 2012; and B.  All claimants eligible to elect a quick pay must do so on or before May 7, 2012.

4.2.5.    Economic Class Members with expired offers from the GCCF are not eligible for transition payments, but can file a Claim in the Settlement Program.  Economic Class Members with expired offers from the GCCF who Opt Out of the Economic Class shall be deemed to have satisfied the presentment requirements under the Oil Pollution Act of 1990 ("**OPA**").

4.2.6.    The Transition Coordinator shall process and issue interim payments

pursuant to the current GCCF rules as amended by the Court's March 8, 2012 Order until the date on which the Settlement Program commences processing Claims.  Economic Class Member recipients of interim payments during this period shall also have the right to submit a Claim to the Settlement Program.  Any Claimant who is an Economic Class Member and who has a Transition Claim for interim payment that is in process at the time the Settlement Program is processing Claims shall have the right to submit a Claim to the Settlement Program, but shall not receive any interim payment from the Transition Process.  Any interim payments made by the Transition Process to a Claimant shall reduce the amount of that Claimant's Settlement Payment from the Settlement Program.  When the Settlement Program begins processing Claims, there will be no right to request or receive interim payments from the Transition Process or the Settlement Program.

4.2.7.    Transition payments made by the Transition Process during the Transition Process and transition payments made by the Settlement Program to Economic Class Members that are Commercial Fishermen, Seafood Crew, **SEAFOOD BOAT CAPTAINS, SEAFOOD DECKHANDS**, Oyster Leaseholders, and **SEAFOOD VESSEL OWNERS** shall reduce, dollar for dollar, the $2.3 billion amount for the Seafood Compensation Program.

4.2.8.    Transition Claims paid in connection with the Transition Process shall be paid from the **DEEPWATER HORIZON OIL SPILL TRUST**.  BP is hereby authorized to take any necessary actions with regard to the Deepwater Horizon Oil Spill Trust to permit the payment of claims in connection with the Transition Process.

4.2.9.    In its March 14, 2012 Order clarifying the Court's First Amended Order of March 8, 2012, the Court clarified that nothing in that Order shall prevent any defendant from settling a "Bundle A" personal injury and/or wrongful death case.

4.3.      Claims Administrator.

16

4.3.1.    The Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement, according  to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court.

4.3.2.    The Claims Administrator shall head the Settlement Program, oversee and supervise the **CLAIMS ADMINISTRATION VENDORS** (including any subcontractors) and staff in the processing and payment of Claims, report and provide information to the Court, BP, and/or **LEAD CLASS COUNSEL** (or their designee) as may be requested on an ongoing basis and/or as the Court directs, and participate on the Claims Administration Panel. The Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court.

4.3.3.    Should the Court determine at any time that the Claims Administrator needs to be replaced, Lead Class Counsel or their designee and BP will agree to make a joint recommendation of one or more candidates for appointment by the Court, as Claims Administrator.  They shall continue the process of joint recommendation as necessary until Court approval is obtained.

4.3.4.    A  three-person Claims Administration Panel shall be established consisting of the Claims Administrator, one representative designated by Lead Class Counsel and one representative designated by BP.  Upon the request of any member of the Claims Administration Panel, it shall address and attempt to resolve unanimously any issues or disagreements that arise regarding the Claims Administrator's oversight responsibilities, Settlement administration, or any other issue involving the Settlement Program.  Issues or disagreements that cannot be unanimously resolved by the Claims Administration Panel will be referred to the Court for resolution.

4.3.5.    The initial Claims Administration Vendors agreed to by the Parties (including Garden City Group, BrownGreer, PWC, and Postlewaite) have been appointed by the Court and are subject to the supervision and direction of the Claims Administrator.  Subsequently, if the Claims Administrator ever wishes to replace (in part or in whole) any such Claims Administration Vendor (or subcontractor thereof) he shall seek unanimous agreement of the Claims Administration Panel.  If unanimous agreement is not forthcoming, the Court shall resolve the issue.

4.3.6.    Claims Administration Vendors.

4.3.6.1.    As to any Claims Administration Vendors proposed by the Claims Administrator and not identified in Section 4.3.5 and the **CLAIMS ADMINISTRATION STAFF**, BP and Lead Class Counsel (or their designee) shall meet and confer and attempt to approve such Claims Administration Vendors and the Claims Administrator's senior staff proposed by the Claims Administrator.  If BP and Lead Class Counsel cannot agree, the Claims Administrator will present such candidates to the Court for proposed appointment and retention.

4.3.7.    The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes.  The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

4.3.8.    The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest **ECONOMIC DAMAGE COMPENSATION AMOUNT** that such information and supporting documentation allows under the terms of the **ECONOMIC DAMAGE CLAIM FRAMEWORK**. By way of example, but not to be exclusive, if the Claimant selected a **COMPENSATION PERIOD** or **BENCHMARK PERIOD** based on information in a completed Claim Form and all supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied.

4.3.9.    Subject to Section 4.3.5 above, the Claims Administrator may hire staff with the approval of BP and Lead Class Counsel, which consent shall not be unreasonably withheld.

4.3.10.    The Settlement Program, under the supervision and direction of the Claims Administrator,  shall implement the terms of the Agreement.  The Claims Administrator may engage in supervision and oversight activities designed to ensure the implementation and integrity of the overall Settlement Program.

4.3.11.    Subject to certain indemnities that the BP Parties will provide to the Claims Administrator and the Claims Administration Vendors in connection with their respective contracts to undertake the Claims administration set forth in this Agreement, neither the Parties (including their Affiliates, and their and their Affiliates' respective heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, partners,

19

limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, trustees, servants, past, present or future officers, directors, agents, employees and/or independent contractors, and/or any other successors, assigns, or legal representatives thereof), nor any of the Parties' Counsel, nor the Plaintiffs' Steering Committee, Co-Liaison Counsel, or any Class Counsel or Interim Class Counsel  (including their respective heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, partners, limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, trustees, servants, past, present or future officers, directors, agents, employees and/or independent contractors, and/or any other successors, assigns, or legal representatives thereof), shall be liable for any act, or failure to act, of the Claims Administrator and/or the Claims Administration Vendors.

4.3.12.    Administration Costs.  As set forth in Section 5.12.1, the BP Parties will be responsible for paying any and all of the reasonable compensation and out-of-pocket costs and expenses of the Settlement Program.

4.4.    Process for Making Claims.

4.4.1.    The Parties shall jointly request that the Court issue an order directing that all claims-related information files and data previously submitted to the GCCF and/or that has been submitted to the Transition Process shall be transferred to the Settlement Program.  This order shall include a provision that: (a) authorizes the Settlement Program to maintain such claims-related information and data for the duration of the Claims administration process; and (b) authorizes the Claims Administrator to release copies of such information or data to any claimant that submitted that information or data upon the written request of the claimant or the claimant's authorized representative. All such information and data shall be treated by the Settlement Program and the Parties and counsel as "confidential" under Pre-

Trial Order No. 13.  The Claims Administrator shall issue a status report to the Court documenting the transfer of claims and claims-related information, files and data and thereafter issue a final report to the Court after the transfer of the Transition Claims, claims-related information, files and data is complete.

4.4.2.    The Settlement Program shall as soon as practicable, but on a schedule to be established by the Claims Administrator, issue a notice to all claimants who (a) received and/or accepted a 60% offer pursuant to Paragraph 12 of the Transition Order; or (b) whose claim is still being processed at the time that the Transition Process terminates pursuant to Paragraph 20 of the Transition Order (collectively, "Pending Transition Claimants").  This notice shall advise the claimant of the right to participate in the Settlement Program if the claimant is an Economic Class Member.  The Settlement Program shall as soon as practicable after the Claim frameworks are finalized, but on a schedule to be established by the Claims Administrator, review the claims-related information and data submitted to the GCCF and/or Transition Process for each Pending Transition Claimant to determine what, if any, additional information may be necessary or desirable for such claimants to pursue that claim under this Agreement.  The Settlement Program shall then notify each such Pending Transition Claimant of what, if any, additional information may be necessary or desirable to pursue such claim(s) under the terms of the Settlement Agreement.

4.4.3.    In the event that during the course of evaluating a Claim filed pursuant to Section 4.4.2, the Settlement Program determines that additional information is required or may be desirable to properly evaluate a Claim pursuant to this Settlement Agreement, nothing in Section 4.4.2 precludes the Settlement Program from requesting such additional information.

4.4.4.    The deadline for submitting Claim Forms shall be April 22, 2014 or six (6) months after the Effective Date, whichever occurs later, other than Claims

under the Seafood Compensation Program, as set forth in Sections 5.11.8 and 5.11.9.

4.4.5.  Economic Class Members must submit Claim Forms to participate in the Settlement Program.  Each Claim Form must be signed under penalty of perjury and individually signed by the Natural Person or Entity who or which suffered damages.  Regardless of whether Claim Forms are submitted individually or in a group, each Claim Form must independently satisfy the relevant requirements.

4.4.6.  The Parties shall request the Court to enter a standing order expressly providing that the signature on a Claim Form or **SWORN WRITTEN STATEMENT** supporting a Claim can be electronic so long as the electronic signature is an individual, unique signature, and that such electronic signature shall have the same legal effect for all purposes in connection with the Settlement as, and be deemed the equivalent of, a handwritten signature.  The Claims Administrator shall adopt appropriate Claim procedures agreed to by the Parties, which may include acceptance of electronically-filed documents, use of electronic signatures and/or Adobe EchoSign, electronic funds transfer capabilities, and payment directly to counsel for those Claimants who are represented by counsel and provide appropriate authorization.

4.4.7.  The Settlement Program and its Claims procedures shall be subject to the ongoing supervision of the Court.  The criteria, documentation, proof, and **COMPENSATION AMOUNT** provisions of each of the Claims categories shall apply equally to all Claimants regardless whether they are proceeding individually, represented by others, or proceeding as an assignee of an individual Claim.  The Claims Administrator shall explore and consider the utilization of streamlined procedures to improve the efficiency of the Claims process, without changing Claims criteria.

4.4.7.1.  With respect to Claims by any Entity, or by a Natural Person related to his

or her employment by an Entity, the Settlement Program shall determine the appropriate NAICS code for the Entity based on its review of (a) the NAICS code shown on an Entity Claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the Entity's activities necessary for the Settlement Program to determine the appropriate NAICS code.

4.4.8.     Subject to the limitations in Section 5.11.9, Claimants shall have six (6) months from the date of initial payment by the Settlement Program of the Claimant's first paid Claim to file all additional Claims, provided that (1) upon payment of the first paid Claim and execution of an Individual Release, the Economic Class Member may not Opt Out of the Economic Class; (2) the Individual Release executed upon payment of the first paid Claim shall release all Claims within the Economic Class, subject only to allowing submission of subsequent timely-filed Claims within the Economic Class and reservation of all rights within the **APPEAL PROCESS**, or rights reserved within the Release and (3) nothing in this Section 4.4.8 serves to extend the otherwise-applicable deadline for submitting all Claim Forms.

4.4.9.     An Economic Class Member who had a claim with the GCCF that was rejected or denied by the GCCF for any reason shall be treated like any other Economic Class Member submitting a Claim to the Settlement Program.  Specifically, there shall be no negative inference or presumption of any kind as to the eligibility or right of any Economic Class Member to receive a Settlement Payment under the terms of the Settlement Agreement.

4.4.10.    Individual Releases.

4.4.10.1.   If an Economic Class Member submits one or more Claim Forms and qualifies for a Settlement Payment under the terms of the Agreement (as modified or amended) as described in Section 5 below, then, prior to, and as a precondition to, receiving any Settlement Payment on a Claim, the Economic Class Member shall execute an Individual Release.

4.4.10.2.   The Individual Release, which is set forth in Exhibit 26, shall provide that the Individual Release constitutes the final, complete, and exclusive agreement and understanding between BP and Claimant and supersedes any and all other agreements, written or oral, between BP and Claimant with respect to such subject matter of the Individual Release in settlement of Claims arising out of or related to the Deepwater Horizon Incident.  The Individual Release shall incorporate the protections from Exhibit 21.  The Individual Release shall remain effective regardless of any appeals or court decisions relating in any way to the liability of the Released Parties and regardless of whether the Effective Date occurs.

4.4.10.3.   Subject to Economic Class Members' rights under Section 4.4.8, and in accordance with the terms of the Individual Release, Economic Class Members who receive Settlement Payments shall acknowledge that the Settlement Payments are in full, complete, and total satisfaction of all of the Released Claims against the Released Parties, that the Settlement Payments are sufficient and adequate consideration for each and every term of the Individual Releases, and that those Individual Releases shall be binding whether or not the Claimant receives any benefits in addition to the Settlement Payments, including benefits resulting from the Assigned Claims.  In addition, Economic Class Members will agree that the Settlement Payments are made in full, complete, and total satisfaction of all of their compensatory damage claims against the **TRANSOCEAN PARTIES** and the **HALLIBURTON PARTIES**, as defined in Exhibit 21.

4.4.10.4.   An Individual Release may not be signed by any form of electronic signature, but must be signed by a handwritten signature.  An electronic signature is insufficient.

4.4.11.    The Individual Release shall provide that any and all disputes, cases, or controversies concerning the Individual Release, including disputes

concerning the interpretation or enforceability of the Individual Release, shall be filed in the United States District Court for the Eastern District of Louisiana accompanied by a legal request for such dispute to be made part of MDL 2179 (if it is still pending).  No actions to enforce the Individual Release shall be filed in state courts, provided, that nothing herein shall preclude the assertion in a state court action of a defense based on the existence of the Individual Release.  Claimants and the Released Parties agree not to contest the existence of federal jurisdiction in MDL 2179 (if it still exists).

4.4.12.    The Individual Release shall provide that payments made to Class Members are made without any admission of liability or wrongdoing by BP or any other Released Party and are made purely by way of compromise and settlement.

4.4.13.    Claimant Accounting Support.  The BP Parties will reimburse reasonable and necessary accounting fees related to Claims preparation, either directly to the Claimant, or counsel if individually represented (and/or his or her or its accountant) and/or through services made available by and through Class Counsel.  Accounting support reimbursement paid to a Claimant in the Seafood Compensation Program shall be paid out of the **SEAFOOD COMPENSATION FUND**.  The terms conditions, guidelines and restrictions of this accounting services program are as follows:

4.4.13.1.    Subject to the terms of Section 4.4.13, all Claimants who receive Settlement Payments for Economic Damage Compensation Amounts are eligible for reimbursement of accounting services.

4.4.13.2.    All reimbursable accounting fees under this Section, whether paid directly to the Claimant or counsel if individually represented (and/or his or her or its accountant) and/or through services made available by and through Class Counsel must adhere to this reimbursement framework.

4.4.13.3.   Only services provided by a Certified Public Accountant, an enrolled agent or an individual with an IRS Preparer Tax Identification Number (PTIN), or under their direct supervision, are eligible for reimbursement. While registration and licensing requirements vary by state, any retained professional must have all required state professional licenses and be active and held in good standing by those state regulatory bodies.

4.4.13.4.   Retained professionals must verify that to the best of their knowledge they have submitted information provided to them by the claimant on a consistent basis and have not ignored the implications of information known or reasonably suspected to be untrue, incomplete, inconsistent or inaccurate.

4.4.13.5.   Reimbursement will be limited to the accounting services necessary to complete the claim form or prepare documentation.

4.4.13.6.   All reasonable and necessary hours will be reimbursed up to the following standard hourly rates.  Review and supervision hours may not exceed 25% of total time spent.

|  | Individual Claim | Business Claim |
|---|---|---|
| Preparation | $85 | $110 |
| Supervision & Review | $130 | $160 |

4.4.13.7.   **INDIVIDUAL CLAIMANTS** shall be reimbursed for accounting fees based on actual fees incurred. The total fee may not exceed 2% of the total Economic Damage Compensation Amount (excluding **RTP**) for individual Claims over $10,000 with all other Claims limited to $200.  All Claims (regardless of final Claim amount) will be subject to an overall accounting support reimbursement  limit of $6,000.

26

4.4.13.8.   **BUSINESS CLAIMANTS** shall be reimbursed for accounting fees based on actual fees incurred.  The total fee may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000.  All Claims (regardless of final Claim amount) will be subject to an overall accounting support reimbursement limit of $50,000.

4.4.13.9.   Reimbursement requests must be itemized by date and person, and will specify the work being performed on behalf of the Claimant.

4.4.13.10.  The Settlement Program shall have the right to request and review any work papers (whether historical or specific to the Claim), time sheets or other supporting documentation related to the Claim or request for accounting support reimbursement and the reasonableness of the fees pursuant to Section 4.4.13.5.

4.4.13.11.  Accounting support reimbursement will not be included in the base compensation, including for purposes of applying any RTP, but shall be paid over and above any compensation due under the Agreement.

4.4.14.   The Claimant may request and receive reasonable access to his, her, or its Settlement Program and/or Transition Process Claim File and supporting information, but only after issuance of a Final Determination of the Claim in part or in whole.  Access by a Claimant to his, her, or its GCCF Claim File may be granted at the discretion of the Settlement Program Administrator. Claimants shall be provided reasonable access to all materials submitted by or on behalf of such Claimant to the GCCF, Transition Process, and/or Settlement Program.  BP and Class Counsel shall have access to all Claim Files and Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose including, without limitation, the operation of BP's separate OPA facility, prosecuting and defending appeals, reviewing and auditing the Settlement Program, reporting financial results, and pursuing indemnification, contribution, subrogation, insurance and other

claims from third parties.  However, BP and Class Counsel shall not have access to any Claim Files for Claims that are being processed and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal.

4.4.15.    Supplemental Information Program.   The Settlement will also include a Supplemental Information Program, subject to approval by the Court.  The BP Parties will bear the expenses of the Supplemental Information Program, in the amount of $5 million, which it will fund within 10 days of the Preliminary Approval Order, provided the Supplemental Information Program:  (i) is consistent with the goals of the Economic Class Action Settlement Notice Program; (ii) is approved by the Court; and (iii) its content is submitted in advance for review and comment by BP.  If any amount of the $5 million remains unspent, that amount will revert to the Promotional Fund.

4.4.16.    The Settlement Program and its Claims procedures shall terminate upon issuance of an order of the Court determining that the last Claim eligible for payment has been paid and the last appeal pursuant to the Appeal Process has been completed and that the Settlement Program is closed.

5.  **SETTLEMENT BENEFITS.**

5.1.    Plaintiffs, by and through the Interim Class Counsel, and the BP Parties agree that, in consideration for the Release described in Section 10 below, and the Individual Releases described in Section 4.4.10, and subject to the terms of this Agreement, including all Exhibits hereto, the BP Parties will make Settlement Payments to Economic Class Members or, in the event that an Economic Class Member is represented by counsel, then payment will be made jointly to the Economic Class Member and his or her counsel, unless otherwise instructed by the Economic Class Member and his or her counsel.  (In this Section 5 and the Economic Damage Claim Frameworks references to payments received by the

Claimant from the BP Parties or the GCCF pursuant to OPA's claims process shall include, but not be limited to, payments received by a Claimant from the Transition Process).

5.2.  SEAFOOD COMPENSATION PROGRAM.

5.2.1.  The Seafood Compensation Program shall cover and compensate the Economic Damage Claims not otherwise excluded for Commercial Fishermen, Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners, as defined in Exhibit 3, for individual or business Economic Damage Claims arising out of their commercial fishing related activities. The Seafood Compensation Program shall be funded with the **SEAFOOD COMPENSATION PROGRAM AMOUNT** and operated under a process approved by the Court-appointed Neutral, John W. Perry, Jr. and implemented by the Settlement Program.

5.2.2.  Within the Seafood Compensation Program, no previous compensation paid to the Claimant by the BP Parties or another Charterer in connection with the VoO Program shall be considered, and neither the VoO Settlement Payment Offset nor the VoO Earned Income Offset shall apply.

5.2.3.  The terms of the Seafood Compensation Program are set forth in Exhibit 10 to this Agreement.

5.3.  ECONOMIC DAMAGE COMPENSATION.

5.3.1.  The **ECONOMIC DAMAGE CLAIM PROCESS**, **ECONOMIC DAMAGE CLAIM FRAMEWORKS**, and other details for determining the **ECONOMIC DAMAGE COMPENSATION AMOUNTS** are set forth in the Exhibits to the Agreement, which are incorporated herein by reference.  All exhibits to this Agreement shall be read together with this Agreement.

5.3.2.  BUSINESS ECONOMIC LOSS.

29

5.3.2.1.   Overview.  The frameworks setting forth the documentation requirements governing **BUSINESS ECONOMIC LOSS CLAIMS**, and the standards for evaluating such Claims and determining compensation for such Claims, are set forth in Exhibits 4A-7 to the Agreement.  To account for specific circumstances of particular types of business Claims, the frameworks include separate specialized frameworks addressing Business Economic Loss Claims by **MULTI-FACILITY BUSINESSES** (Exhibit 5)**, FAILED BUSINESSES** (Exhibit 6), and **START-UP BUSINESSES** (Exhibit 7).  Sections 5.3.2, 5.3.3, 5.3.4 and 5.3.5 identify the exhibits containing those frameworks, which apply to businesses, or to self-employed individuals filing IRS Form 1040 Schedules C, E, or F for the 2010 calendar year or any part of a fiscal year in 2010, except for (i) those covered under the Seafood Compensation Program, (ii) VoO Claims, or (iii) Subsistence Claims.

5.3.2.2.   Documentation Requirements For Business Economic Loss Claims Generally are set forth in Exhibit 4A.

5.3.2.3.   Causation Requirements For Business Economic Loss Claims Generally. Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon Incident.  The causation requirements for such Claims are set forth in Exhibit 4B.

5.3.2.4.   The compensation methodology for Business Economic Loss Claims generally is set forth in Exhibits 4C-4E.

5.3.3.   Multi-Facility Businesses.  The Claim options for Multi-Facility Businesses, are set forth in Exhibit 5.

5.3.4.   Failed Businesses. The framework governing Claims of Failed Businesses is set forth in Exhibit 6.  That framework also applies to **FAILED START-UP BUSINESSES.**

5.3.5.  Start-Up Businesses.  The framework governing  Claims by Start-Up Businesses (other than property development, construction or real estate development businesses) is set forth in Exhibit 7.

5.3.6.  INDIVIDUAL ECONOMIC LOSS.

5.3.6.1.  The framework setting forth the documentation, causation and compensation requirements governing **INDIVIDUAL ECONOMIC LOSS CLAIMS**, and the standards for evaluating such Claims and determining compensation for such Claims, are set forth in Exhibit 8A-8E to the Agreement.  The framework addresses Claims by individuals with varying employment circumstances and amounts of documentation, and includes specialized provisions governing Claims by individuals who changed jobs or careers, individuals who held multiple jobs, **NEW ENTRANTS TO EMPLOYMENT**, **INDIVIDUAL PERIODIC VENDORS** and **FESTIVAL VENDORS**, and Claims including loss of employment benefits.

5.3.6.2.  Applicability.  The framework governing Individual Economic Loss Claims shall apply to Claims by all Natural Persons within the Economic Class Definition for Economic Damage due to or resulting from the Deepwater Horizon Incident, except for:  (i) self-employed individuals filing IRS Form 1040 Schedules C, E, or F for the 2010 calendar year or any part of a fiscal year in 2010, who are covered under the Business Economic Loss methodology; (ii) Seafood Vessel Owners, Commercial Fishermen, Seafood Crew or Oyster Leaseholders, who are covered under the Seafood Compensation Program, (iii) VoO Claims, or (iv) Subsistence Claims.  In addition, Section 5.10 of this Agreement summarizes certain additional limitations on Claims by Natural Persons.

5.4.  SUBSISTENCE DAMAGE COMPENSATION.

5.4.1.  The framework governing Claims by Subsistence Claimants who fish or

hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources (including Seafood and Game), in a traditional or customary manner, to sustain his or her basic personal or family dietary, economic security, shelter, tool, or clothing needs and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by the Claimant due to or resulting from the Deepwater Horizon Incident is set forth in Exhibit 9 to the Agreement.  The time period of loss of Subsistence use must be consistent with the closure or impairment of geographic areas relied upon by the Claimant between April 20, 2010 and December 31, 2011.

5.5.     VoO CHARTER PAYMENT

5.5.1.   The **VoO CLAIM PROCESS, VoO AGREEMENT**, and other details for determining the **WORKING VoO** and **NON-WORKING VoO COMPENSATION AMOUNTS** are summarized below.  VoO Claimants may recover either Working or Non-Working VoO Benefits.

5.5.2.   **WORKING VoO PARTICIPANTS** are entitled to the following payments, based on boat size, representing pay for 26 days' work under the **VoO MASTER VESSEL CHARTER AGREEMENT**:

CHART A

| Boat Size | Amount of Compensation |
|---|---|
| Less than 30 feet | $41,600 |
| 30 feet-45 feet | $49,400 |
| 46 feet-65 feet | $62,400 |
| Greater than 65 feet | $88,400 |

5.5.2.1.   Economic Damage payments to any Working VoO Participants who are

not participants in the Seafood Compensation Program will be reduced by any VoO Settlement Payment Offset and VoO Earned Income Offset.  No other claims are subject to this reduction.

5.5.3.      **NON-WORKING VoO PARTICIPANTS** are entitled to the following payments without any offset:

CHART B

| Boat Size | Amount of Compensation |
|---|---|
| Less than 30 feet | $4,800 |
| 30 feet-45 feet | $5,700 |
| 46 feet-65 feet | $7,200 |
| Greater than 65 feet | $10,200 |

5.6.      VESSEL PHYSICAL DAMAGE COMPENSATION.

5.6.1.      The **VESSEL PHYSICAL DAMAGE CLAIM PROCESS, VESSEL PHYSICAL DAMAGE CLAIM FRAMEWORK**, and other details for determining the **VESSEL PHYSICAL DAMAGE COMPENSATION AMOUNT** are set forth in Exhibit 14 to the Agreement.

5.7.      COASTAL REAL PROPERTY DAMAGE COMPENSATION

5.7.1.      The **COASTAL REAL PROPERTY CLAIM PROCESS, COASTAL REAL PROPERTY CLAIM FRAMEWORK**, and other details for determining the **COASTAL REAL PROPERTY COMPENSATION AMOUNTS** are set forth in Exhibits 11A-11C to the Agreement.

5.8.      WETLANDS REAL PROPERTY DAMAGE COMPENSATION

5.8.1.      The **WETLANDS REAL PROPERTY CLAIM PROCESS,**

**WETLANDS REAL PROPERTY CLAIM FRAMEWORK**, and other details for determining the **WETLANDS REAL PROPERTY DAMAGE COMPENSATION AMOUNTS** are set forth in Exhibits 12A-12D to the Agreement.

5.9.    REAL PROPERTY SALES DAMAGE COMPENSATION

5.9.1.    The **REAL PROPERTY SALES CLAIM PROCESS, REAL PROPERTY SALES CLAIM FRAMEWORK**, and other details for determining the **REAL PROPERTY SALES COMPENSATION AMOUNTS** are set forth in Exhibits 13A-13B to the Agreement.

5.9.2.    **ELIGIBLE REAL PROPERTY SALES CLAIMANTS** include Individuals and Entities who sold **RESIDENTIAL PARCELS** located in the **REAL PROPERTY SALES COMPENSATION ZONE** identified on the map attached as Exhibit 13B from April 21, 2010 to December 31, 2010. The sales contract must have been (1) executed on or after April 21, 2010, or (2) executed prior to April 21, 2010 but subjected to a price reduction due to the Deepwater Horizon Incident.  In addition, sales shall not include transfers from borrowers to lenders that take place as part of the foreclosure process, such as deeds in lieu of foreclosure, foreclosure deeds, or sheriff's deeds.

5.9.3.    Other than as set forth in Section 5.7, Section 5.8 or this Section 5.9, (including Exhibits 13A and 13B to this Agreement), a Natural Person or Entity may not recover under this Agreement, including any Exhibit thereto, for Economic Damage based on a reduction in sale price, or an alleged reduction in market value, of real estate they owned or in which they had an ownership interest.  Other than as set forth in this Section 5.9 (including Exhibit 13A) a claim by a Natural Person or Entity that he or she or it would have sold real estate owned by that Natural Person or Entity earlier, or at a higher price, in the absence of the Deepwater Horizon Incident, is not a Claim that is eligible under this Settlement Agreement.

5.10.    ADDITIONAL CLAIMS CRITERIA RELATED TO EXCLUDED INDUSTRIES AND MORATORIA LOSSES.

5.10.1.    Notwithstanding the foregoing, additional criteria set forth in Exhibit 16 apply with respect to excluded industries.  The following is a summary.

5.10.2.    Oil and Gas Industry.

5.10.2.1.    Business/employers.

5.10.2.1.1.    Businesses and employers identified on the NAICS codes listed on Exhibit 17 are excluded from the Economic Class.

5.10.2.2.    Individuals/employees.

5.10.2.2.1.    Individuals /employees employed by businesses or employers in the oil and gas industry are barred from recovery for any type of Individual Economic Loss Claim arising out of any employment or former employment within that industry.  However, such individuals/employees are permitted to pursue Individual Economic Loss Claims for other jobs outside of excluded industries.  If any of the Claimant's other jobs is for a business/employer in the Support Services to Oil and Gas Industry, evaluation of the Claimant's Individual Economic Loss Claim shall proceed pursuant to requirements specified in the Support Services to Oil and Gas Industry column set forth in Exhibit 16.  If all the Claimant's other jobs are for a business/employer other than an excluded industry, business/employer in the oil and gas industry, or Support Services to Oil and Gas Industry, then the Claimant's Individual Economic Loss Claim shall be evaluated under the standard Economic Damage Claim Frameworks.  Such individuals/employees are permitted to pursue all other

recovery permitted under other aspects of the Economic
Class.

5.10.2.2.2.   All individuals/employees in this category are barred from
recovering moratoria damages and do not release moratoria claims.

5.10.3.   Support Services to Oil and Gas Industry.

5.10.3.1.   Businesses/employers.

5.10.3.1.1.   Business Employers the Claims Administrator determines fall
within the NAICS codes and descriptions marked with an "x" in
Section I of "Industry Types Subject to Review by Claims
Administrator for Potential Moratoria Losses," Exhibit 19,
shall be subject to automatic review to determine whether their
losses, or any portion thereof, constitute Moratoria Losses.  The
Claimant shall be required to provide supplemental
information in order for the Settlement Program to conduct this
review.  The Settlement Program shall create a dedicated team
to evaluate such Claims.

5.10.3.1.2.   Businesses / employers that the Claims Administrator determines
to fall within the NAICS codes and descriptions marked with an
"x" in Section II of "Industry Types Subject to Review by
Claims Administrator for Potential Moratoria Losses,"
Exhibit 19, shall be subject to the following question:  "In
2009, did your business provide significant services, goods,
and/or supplies to businesses in the offshore oil & gas
industry in the Gulf of Mexico?"  If the Claimant responds
affirmatively, its Claim shall be routed by the Settlement
Program to a team dedicated to the evaluation of Business
Economic Loss Claims for Moratoria Losses.  The Claimant
shall be required to provide supplemental information in

36

order for the Settlement Program to conduct this review.  If the Claimant responds negatively, its Claim shall proceed under the Economic Damage Claim Process.

5.10.3.1.3.  All businesses/employers in this category are barred from recovery for Moratoria Losses.  However, no businesses/employers in this category release moratoria claims.

5.10.3.1.4.  All businesses/employers in this category are permitted to pursue Business Economic Loss Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non-oil and gas industry Economic Damages that are not otherwise excluded, but the Claimant must establish (i) and (ii) above were in the judgment of the Settlement Program due to or resulting from the Deepwater Horizon Incident.

5.10.3.1.5.  Such Claims and Claimants are subject to the additional provisions discussed in detail in Exhibit 16, 19.

5.10.3.2.  Individuals/employees

5.10.3.2.1.  An individual/employee Claimant's application shall include sufficient evidence of their employer's business activities to allow the Settlement Program to determine whether the business/employer falls under the Support Services to Oil and Gas Industry, described in Exhibit 19 of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses."

5.10.3.2.2.  Individuals/employees of businesses or employers that the Claims Administrator determines fall within the NAICS codes and descriptions marked with an "x" in Section I of "Industry Types Subject to Review by Claims Administrator for Potential

37

Moratoria Losses," Exhibit 19, are subject to automatic review for Moratoria Losses and shall be routed by the Settlement Program to a dedicated team for evaluation. Claimants shall be required to provide supplemental information in order for the Settlement Program to conduct this review.

5.10.3.2.3.   Individuals/employees of businesses/employers that the Claims Administrator determines fall within the NAICS codes and descriptions marked with an "x" in Section II of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses," Exhibit 19, and whose business/employer affirms that in 2009 the business/employer provided significant services, goods, and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico, shall be subject to review for potential Moratoria Losses and shall be routed by the Settlement Program to a dedicated team for evaluation.  Claimants shall be required to provide supplemental information in order for the Settlement Program to conduct this review.

5.10.3.2.4.   But an individual/employee Claimant will not be subject to automatic review for potential Moratoria Losses if, before the individual/employee's Economic Damage claim is approved for payment, his business/employer already has been approved for claims compensation by the Settlement Program with no Moratoria Losses deducted.

5.10.3.2.5.   All individuals/employees in this category are barred from recovering Moratoria Losses, but do not release moratoria claims.

5.10.3.2.6.   All individuals/employees in this category are permitted to pursue Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for

38

(i) non-moratoria business interruption from oil and gas industry support service activities and (ii) non Oil and Gas Industry Economic Damages that are not otherwise excluded.  A Claimant must establish (i) and (ii) above were due to or resulting from the Deepwater Horizon Incident.

5.10.3.2.7.   Such Claims and Claimants are subject to the additional provisions discussed in detail in Exhibit 16, 19.

5.10.4.   Gaming, Banking, Insurance, Funds, Defense Contractors and Developers

5.10.4.1.   Businesses/employers

5.10.4.1.1.   Businesses/employers in these categories of excluded industries are barred from recovery in the Settlement for any type of Business Economic Losses, but are permitted to pursue Coastal Real Property Damage and Wetlands Real Property Damage Claims.

5.10.4.1.2.   No recovery is permitted for businesses and employers in these categories under any other aspect of the Economic Class.

5.10.4.2.   Individuals/employees

5.10.4.2.1.   Individuals/employees employed by businesses or employers in these categories (and any Entity selling or marketing BP-branded fuel, including jobbers and branded-dealers) are barred from recovery for any type of Individual Economic Loss Claim for work performed for an excluded employer.  However, such individuals/employees are permitted to pursue Individual Economic Loss Claims for other jobs outside of excluded industries.  If any of the Claimant's other jobs is for a business/employer in the Support Services to Oil and Gas Industry, evaluation of the Claimant's Individual Economic Loss Claim shall proceed pursuant to requirements specified

39

in Support Services to Oil and Gas Industry column set forth in Exhibit 16.  If all the Claimant's other jobs are for a business/employer other than an employer in the Oil and Gas Industry, or Support Services to Oil and Gas Industry, then the Claimant's claim shall be evaluated under the standard Economic Loss Claim Frameworks.  Such individuals/employees are permitted to pursue all other recovery permitted under other aspects of the Economic Class.

5.10.4.2.2.   All individuals/employees in this category are barred from recovering Moratoria Losses, but do not release moratoria claims.

5.11.   GENERAL PROVISIONS APPLICABLE TO PAYMENT OF ALL COMPENSATION AMOUNTS.

5.11.1.   Total Compensation Amounts shall be paid  to qualifying Claimants on a claims made basis only (*i.e.*, with payments made only to those who submit a Claim determined to be valid).  Total Compensation Amounts will be paid from the qualified settlement fund described below on a rolling basis, as Claim Forms have been submitted and evaluated in accordance with the Claim Processes.

5.11.2.   The Claims Administrator will submit a list, on a weekly basis for the first year, and thereafter on a monthly basis, to Lead Class Counsel and BP's Counsel, identifying the Claims that have been paid and the amounts of the payments, as well as those that are pending.

5.11.3.   Any amount paid pursuant to any of the above Damage Categories will be the only payment Class Members are entitled to receive for that category pursuant to this Agreement, provided that Class Members are additionally entitled to reimbursement for reasonable and necessary accounting fees

relating to Claims preparation, subject to the guidelines and restrictions set forth in Section 4.4.13.

5.11.4.    Claimants shall have the right to appeal the determination related to the denial or award of a Total Compensation Amount pursuant to the Appeal Process as more fully set forth in Section 6 below.

5.11.5.    The Claims Administrator shall also submit a list, on a weekly basis for the first year, and thereafter on a monthly basis, to the Lead Class Counsel and BP's Counsel identifying any Claims that have been appealed pursuant to the Appeal Process.

5.11.6.    Claimants entitled to receive Total Compensation Amounts pursuant to more than one of the Seafood Compensation Program, Coastal Real Property Claim Process, Economic Damage Claim Process, Real Property Sales Claim Process, Subsistence Claim Process, VoO Claim Process, Vessel Physical Damage or Wetlands Real Property Claim Process may submit Claims for a single Damage Category and accept payment, but must then effectuate an Individual Release for all Damage Categories.  However, subject to Section 5.11.9, the Individual Release shall allow the Claimant up to six (6) months from the date of initial payment by the Settlement Program of the Claimant's first paid Claim for submitting further Claims in other Damage Categories as provided in Section 4.4.8.

5.11.7.    The Total Compensation Amount a qualifying Claimant receives for any of the above categories shall be in addition to the Total Compensation Amount the Claimant is entitled to receive under any other category.

5.11.8.    For all Claims other than those made under the Seafood Compensation Program, the deadline for submission of Claim Forms to the Settlement Program shall be April 22, 2014 or 6 (six) months after the Effective Date, whichever occurs later, and the Settlement Program shall remain open through the determination, appeals, and where applicable, payment of all

timely submitted Claim Forms.

5.11.9.   The deadline for submission of Seafood Program Compensation Claim Forms to the Settlement Program shall be 30 days after the date of entry of the Final Order and Judgment by the Court.

5.11.10.   Subject to the provisions of Section 4.4.5, Claim Forms must be signed under penalty of perjury and individually signed by the Natural Person or Entity who suffered damages, and subject to the provisions of Section 4.4.10, Claims and Claim Forms may not be submitted en masse with the Claims and Claim Forms of other Natural Persons or Entities.

5.12.   Funding of Payments.

5.12.1.   A Settlement Trust (the "Settlement Trust") shall be established for the purpose of paying Settlement Payments and the costs of administering the Settlement Program.  The Settlement Trust shall be established pursuant to the order of the Court.  The Settlement Trust shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under section 468B(d)(2) of the Internal Revenue Code and Treasury Regulation §1.468B-1.  The Settlement Trust shall be created and governed by a Trust Agreement in form and substance reasonably satisfactory to the Claims Administrator, Lead Class Counsel and the BP Parties (the "Economic Settlement Trust Agreement").  The Claims Administrator shall serve as Trustee of the Settlement Trust, and J. P. Morgan Trust Company of Delaware shall serve as the "Directed Trustee" with limited authority as set forth in the Economic Settlement Trust Agreement.   Should the Court determine at any time that the Trustee or the Directed Trustee needs to be replaced, Lead Class Counsel or their designee and BP will agree to make a joint recommendation of one or more candidates for appointment by the Court, as Trustee or Directed Trustee, as the case may be.  They shall continue the process of joint recommendation as necessary until Court approval is obtained. The Economic Settlement Trust Agreement shall be

subject to approval by the Court.  The Settlement Trust, subject to the requirements of Section 4.3.5 and Section 4.3.6.1, may hire Claims Administration Staff or Claims Administration Vendors as necessary for the Settlement Program.   The Settlement Trust shall be initially comprised of the following separate funds, which shall together constitute a single qualified settlement fund:

5.12.1.1.1.    Seafood Compensation Program Settlement Fund (the "Seafood Compensation Fund"), which shall be used by the Claims Administrator to make payments under the Seafood Program;

5.12.1.1.2.    General Claims Settlement Fund (the "General Claims Fund" and together with the Seafood Compensation Fund, the "Claims Funds"), which shall be used by the Claims Administrator to make payments under all Claims programs other than the Seafood Program;

5.12.1.1.3.    Administrative Expense Fund (the "Administrative Fund" and together with the Claims Funds, the "Funds"), which shall be used by the Claims Administrator to pay all reasonable and necessary expenses incurred in connection with the operation of the Settlement Program, except for the payment of Claims or as otherwise provided in this Agreement (the "Administrative Expenses").

5.12.1.1.4.    Gulf Tourism and Seafood Promotional Fund, as described in Section 5.13.

5.12.1.1.5.    Supplemental Information Program Fund, as described in Section 4.4.15.

5.12.1.1.6.    Economic Settlement Trust Account, into which the BP Parties shall pay, or cause to be paid, all amounts required to be paid to the Settlement Trust and from which the Trustee and/or the Directed

43

Trustee shall transfer into the Funds listed in Section 5.12.1 such amounts as required under Section 5.12

5.12.1.1.7.   With consent of the Parties and consistent with the terms of the Settlement Agreement, the Claims Administrator, as Trustee, may establish, or cause to be established, one or more additional funds for the payment of resolved Claims.  Such additional funds shall be considered "Funds" for purposes of this Settlement Agreement, and, together with the Funds listed in Section 5.12.1, shall constitute a single qualified settlement fund.

5.12.1.1.8.   The Claims Administrator is authorized and directed to establish, or cause to be established, and operate a Reserve Fund in the event the Economic Class receives any monies due pursuant to Section 5.15.  Notwithstanding the preceding sentence, in the event that there are monies remaining in this Reserve Fund, and the Agreement is terminated pursuant to Section 21, any remaining unspent funds in this Reserve Fund shall revert as determined by BP and Lead Class Counsel at the time such Reserve Fund is established. However, nothing herein shall prevent the expenditure of any such funds prior to Final Approval.

5.12.1.2.   The Settlement Trust and each of the Funds shall be managed by the Trustee and the Directed Trustee  and shall be subject to the continuing jurisdiction and supervision of the Court.  The Claims Administrator shall serve as the Trustee and as the administrator of the qualified settlement fund for purposes of Treasury Regulation §1.468B-2(k)(3) and shall be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Settlement Trust and responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority, as well as questions from the Department of Labor.  The

44

Trustee shall also be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Settlement Trust, as well as paying any associated interest and penalties. Any such tax, interest and penalty payments shall be paid from the Administrative Fund. The Trustee may delegate any of his responsibilities as trustee to the Directed Trustee as set forth in the Economic Settlement Trust Agreement.

5.12.1.3.   The BP Parties shall pay or cause to be paid, within 10 days of Preliminary Approval, an initial amount of $1 billion to the Settlement Trust.  Of this initial $1 billion, $500 million shall be transferred to the Seafood Compensation Fund, and $500 million shall be transferred to the General Claims Fund.  Thereafter, the BP Parties shall pay or cause to be paid, within 10 days of the commencement of each calendar quarter, beginning with the third quarter of 2012, six additional quarterly payments as follows:

(i) $500 million per quarter to the Settlement Trust for three quarters (of which additional $500 million payments, $300 million shall transferred paid to the Seafood Compensation Fund, and $200 million shall be transferred to the General Claims Fund);

(ii) then, $400 million per quarter to the Settlement Trust for one quarter (of which additional $400 million payment, $300 million shall be transferred to the Seafood Compensation Fund, and $100 million shall be transferred to the General Claims Fund); and

(iii) then, $300 million per quarter to the Settlement Trust for two quarters (of which additional $300 million payments, all $300 million shall be transferred to the Seafood Compensation Fund).

The initial $1 billion payment and the six subsequent quarterly payments described in clauses (i) through (iii) above shall be irrevocable payments

by the BP Parties.  If at any time the balance in the Seafood Compensation Fund falls below $300 million and/or the balance in the General Claims Fund falls below $200 million, the Claims Administrator shall provide a written notice to the BP Parties and Lead Class Counsel specifying the balance in the Settlement Trust and each of the Claims Funds.  The BP Parties will promptly pay or cause to be paid additional amounts to the Settlement Trust, from time to time upon receipt of such notice, sufficient to restore the balance of the General Claims fund to at least $200 million and the balance of the Seafood Compensation Fund to at least $300 million; provided that in no event will the sum of all amounts allocated and paid into the Seafood Compensation Fund under all provisions of this Agreement, in the aggregate, exceed the Seafood Compensation Program Amount (and if it is determined that any amounts were contributed to the Seafood Compensation Fund in excess of the Seafood Compensation Program Amount, the amount of such excess shall be repaid from the Seafood Compensation Fund to the BP Parties).  The Claims Administrator will provide the BP Parties and Lead Class Counsel with periodic reports relating to the Claims or other amounts paid from the Seafood Compensation Fund and the General Claims Fund and projections of Claims or other payments that are in process, in each case in such detail and with such frequency as the BP Parties may reasonably request.

5.12.1.4.   The BP Parties shall pay or cause to be paid to the Settlement Trust for transfer to the Administrative Fund (i) an initial amount equal to $50 million to be paid by no later than 10 days after Preliminary Approval, and (ii) additional amounts as may be required on a monthly basis thereafter during the administration of the Settlement Program in accordance with an administrative expense budget to be developed by the Claims Administrator, subject to the reasonable approval of the BP Parties and Lead Class Counsel (the "Administrative Budget").  Contracts entered into with Claims Administration Vendors and their subcontractors shall provide the BP Parties and Lead Class Counsel with a right to receive

invoices submitted by Claims Administration Vendors and their subcontractors and a reasonable amount of time to raise concerns or objections to such invoices prior to their payment. The Claims Administrator shall provide the BP Parties and Lead Class Counsel on a monthly basis with a report of Administrative Expenses paid in connection with the Settlement Program in such detail as the BP Parties may reasonably request and a reconciliation of such payments in comparison to the Administrative Budget. The BP Parties and the Claims Administrator shall adjust the monthly payment amounts accordingly to assure that sufficient funds are on deposit in the Administrative Fund to cover the Administrative Expenses on a timely basis. Payment of administrative expenses by the Claims Administrator shall be subject to oversight by the District Court.

5.12.1.5.   The BP Parties shall have the right (but not the obligation) to prepay, or cause to be prepaid, any of their payment obligations to the Funds under the Settlement Agreement. In connection with any such prepayment, the BP Parties shall designate in writing the payment obligation that is being prepaid and how such prepayment should effect the BP Parties' remaining payment obligations (*i.e.*, whether the amount prepaid should be credited against the next payment obligation or to one or more subsequent payment obligations or a combination thereof). No such prepayment or designation shall otherwise limit the BP Parties' obligations under the Settlement Agreement.

5.12.1.5.1.   The BP Parties have established the Deepwater Horizon Oil Spill Trust pursuant to a Trust Agreement dated as of August 6, 2010 (the "Deepwater Horizon Trust Agreement") for the purpose of providing funds to be used to satisfy damage claims, as more particularly described in the Deepwater Horizon Trust Agreement, arising from or related to the DWH Oil Spill. The BP Parties may satisfy each of its payment obligations under this Section 5.12.1 by

47

arranging for the Deepwater Horizon Oil Spill Trust to make such payment. It is contemplated by the BP Parties that such payments generally will be made by the Deepwater Horizon Oil Spill Trust. Nothing contained herein in any way limits or impairs the duties and obligations of the BP Parties under this Agreement or the Guarantees of payment obligations under this Agreement provided by BPCNA and BP p.l.c. set forth in Exhibit 24.

5.12.1.5.2.  The Claims Administrator, as Trustee, and/or the Directed Trustee shall establish an escrow account (each a "Fund Account") for each Fund with the Lead Paying Agent (as defined below) as escrow agent. Each payment specified in this Section 5.12.1 shall be made into the principal Fund Account established for the applicable Fund, as designated in writing by the Claims Administrator.

5.12.1.5.3.  Upon closure of the Settlement Program under 4.4.16, any funds remaining in the General Claims Fund, or Administrative Fund, beyond the initial $1 billion and the subsequent six quarterly payments referenced in clauses (i) – (iii) of Section 5.12.1.3 shall revert to the BP Parties.

5.12.1.6.  Amounts deposited in the Settlement Trust and each Fund Account shall be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk, only in the following types of investments:

- United States government money market funds having a AAA/Aaa rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's or Fitch); or

- Short-dated United States treasury bills and/or interest bearing deposits at federally insured depository institutions that are at all times rated A+/A1 or higher by Standard & Poor's and Moody's provided such depository institution

rated A+/A1 or higher at all times holds a stable or positive outlook.

5.12.1.6.1.   The total amount of cash invested in any single United States government money market fund by the Funds in the aggregate shall not exceed $200 million and the total amount invested in deposits at federally insured depository institutions by the Funds in the aggregate shall not exceed $40 million per depository institution.

5.12.1.6.2.   To provide liquidity, the Lead Paying Agent, in its capacity as escrow agent for the Claims Funds, shall also be permitted to deposit funds in a federally insured depository account with the Gulf Region Bank (as defined below) in such amount as may be specified in the Lead Payment Agent Agreement.

5.12.1.6.3.   Any earnings attributable to the Economic Settlement Trust Account and the General Claims Funds shall be transferred to the Administrative Fund and any earnings on the Administrative Fund shall be retained in the Administrative Fund.  Any earnings attributable to the Seafood Compensation Fund shall be retained in the Seafood Compensation Fund.  Any earnings attributable to the Gulf Tourism and Seafood Promotional Fund shall be retained in the Gulf Tourism and Seafood Promotional Fund.  Any earnings attributable to the Supplemental Information Program Fund shall be retained in the Supplemental Information Program Fund.

5.12.1.7.   The Claims Administrator, the Trustee and the Directed Trustee shall enter into a Paying Agent Agreement, in form and substance reasonably satisfactory to the BP Parties and Lead Class Counsel and approved by the Court, pursuant to which a federally insured depository institution approved by the BP Parties and Lead Class Counsel and the Court will serve as the lead paying agent and escrow agent for the Claims Funds (the

"Lead Paying Agent"), and Garden City Group, Inc. (or another entity agreed to by the BP Parties and Lead Class Counsel, with approval of the Court) will serve as the claims payment agent for the Claims Funds (the "Claims Payment Agent"). In addition, the Lead Paying Agent may enter into an arrangement with one or more other federally insured depository institutions with branch locations in the Gulf Region (collectively, the "Gulf Region Bank") and/or another check cashing facility agreed to by BP and Lead Class Counsel, and approved by the Court that provides that checks drawn on the Fund Accounts of the Claims Funds will be eligible to be cashed or deposited in branches of the Gulf Region Bank in a manner that will expedite the recipients' access to such funds (the "Check Cashing Arrangement").

5.12.1.7.1.   The Paying Agent Agreement and the Check Cashing Arrangement collectively shall provide for the following actions in connection with the payment of claims by the Claims Funds:

- The Claims Payment Agent shall be provided with checks that reflect the name of the Gulf Region Bank, the Gulf Region Bank's New Orleans, Louisiana address, and are drawn on the applicable Fund Account maintained by the Lead Paying Agent.

- The Claims Payment Agent, at the direction of the Claims Administrator (or its authorized designee), shall write checks in payment of Claims from the applicable Claims Fund. The Claims Payment Agent shall provide to the Lead Paying Agent (or its affiliate) a nightly, system-generated notification of all check issuances, through an electronic file. This notification report shall be used by the Lead Paying Agent in connection with its operation of the encashment program described below.

- The Gulf Region Bank will accept such checks for cashing without the requirement that the holder open or maintain an account at the Gulf Region Bank.

- The Lead Paying Agent and the Gulf Region Bank (and, if appropriate, the Court-appointed check cashing facility) will maintain an encashment program in a form acceptable to BP designed to prevent fraud or other improper payments of checks drawn on the Fund Accounts of the Claims Funds.

5.12.1.7.2.    Payments from the Administrative Fund shall be made by the Lead Paying Agent in its capacity as escrow agent for the Administrative Fund Account, at the instruction of the Claims Administrator.

5.12.1.7.3.    The Paying Agent Agreement will also provide standard indemnification by the Settlement Trust and the BP Parties of the Lead Paying Agent (in its capacity as such and as escrow agent for the Fund Accounts) and the Claims Payment Agent.  Such indemnification shall exclude negligence and willful misconduct. The Paying Agent Agreement shall be governed as stipulated in the Paying Agent Agreement.

5.12.1.7.4.    In the event the Claims Administrator is unable to enter into any of the arrangements specified in this Section 5.12.1 or any of such arrangements thereafter terminate, the Claims Administrator and the BP Parties and Lead Class Counsel shall cooperate to develop and implement (subject to Court approval) an alternative program that, to the extent practicable, provides for the ability of Claimants to cash checks drawn on either of the Claims Funds at branches located in the Gulf Region of one or more depository institutions without the requirement that the holder open or maintain an account at such depository institution and provides for an encashment program designed to detect and eliminate fraud or other improper application of funds.

5.12.2.    Notwithstanding any other provision of this Agreement, the BP Parties may enter into an arrangement with the Claims Administrator and the Corporate Trustee and/or Lead Paying Agent (as such terms are defined in the Deepwater Horizon Trust Agreement) of the Deepwater Horizon Oil Spill Trust with respect to Settlement Payments as directed by the Claims Administrator in accordance with the Deepwater Horizon Trust Agreement.

5.12.3.    Pursuant to Section 21.3.9, upon any termination of the Agreement under

51

Section 21, any unspent funds under this Section 5.12 shall revert to BP.

5.13.    Gulf Tourism and Seafood Promotional Fund ("Promotional Fund").  The BP
Parties will fund, within 10 days after Preliminary Approval, $57 million
($57,000,000) to promote the Gulf Coast Areas and waters.  The Promotional
Fund will be administered by the Claims Administrator.

5.13.1.    The purpose of the $57 million Promotional Fund is to promote tourism and
the seafood industry in Gulf Coast areas impacted by the Deepwater
Horizon Incident.  In particular, one of the primary purposes of this
Promotional Fund shall be for the support of programs directed to
advertising, promotion and/or marketing which supports Gulf tourism and
the seafood industries.

5.13.2.    The Promotional Fund shall be administered and directed by the Claims
Administrator.

5.13.3.    In administration of this Promotional Fund, the Administrator may solicit
proposals and applications from public, quasi-public and/or non-profit
entities or organizations located within the Gulf States for support of
programs directed to advertising, promotion and/or marketing of the Gulf
tourism and seafood industries.  The public, quasi-public and/or non-profit
entities or organizations seeking Promotional Fund Awards shall apply to a
three-person panel, consisting of a Lead Class Counsel designee, the Claims
Administrator or his designee, and a BP Parties designee (hereinafter
"Panel"), as follows:

5.13.3.1.    Applications for such awards shall be in writing, addressed to the Claims
Administrator.  The application shall contain:  (1) a budget for the specific
activities proposed ("Budget Narrative"[3]) and (2) a description of the

[3]Budget Narrative: Relevant documents for a budget narrative include, for example: 1) IRS letter documenting filing
status/tax ID number, 2) most recent audited financial statement (if the most recent audited financial statement is
not available, submit most recent IRS Form 990); 3) Current Operating Budget; 4) copies of an itemized project budget
with description of how funds will be spent.

52

content of the activities or projects which are being proposed, and identification of the particular channels or media where the project will be utilized ("Project Narrative").[4]

5.13.3.2.   Each application should outline the financial stability of the Applicant by providing, among other relevant items, tax returns, past grant awards received, financial statements of the organization, annual reports and other such materials.[5]

5.13.3.3.   In selection of recipients, special attention will be paid to the diversity, geographic and otherwise, of Applicants.  Multiple Promotional Fund Awards may be awarded to the same applicant; however no more than $500,000 per year combined may be disbursed *in toto* to any one applicant.  Furthermore, each award shall be subject to periodic and/or final reporting to and auditing/or review by the Claims Administrator, as deemed appropriate by the Claims Administrator.

5.13.4.   The Panel may also receive and consider requests from others, in addition to those seeking grants as described above, which requests must receive the unanimous approval of the Panel in keeping with the primary purpose of the Promotional Fund.

5.13.5.   Upon receiving requests, the Claims Administrator shall consult with the Panel jointly to determine the most effective methods to satisfy the purposes of this Promotional Fund.  Either the Claims Administrator or the Panel may retain an independent expert or consultant to advise the Claims Administrator and/or the Panel with respect to the propriety or effectiveness of any award.

---

[4] Project Narrative: A successful award Applicant's project narrative should describe, *inter alia*, the organization's history and mission; the specific problem or challenge to be addressed; how the proposed project will address this issue; how funds will be used and how Fund's financial support will be leveraged by support from the organization or other sources; the physical location (if any) of project; the audience served, anticipated outcomes, and any needs assessment that has been done; how to evaluate the project's success; and plans for long-term sustainability of the program.

5.14.    As additional consideration to the Economic Class, the BP Parties agree to use
         due diligence to prosecute the reserved claims for Insurance Proceeds for
         Transocean Personnel described in Section 1.1.4.2 of Exhibit 21, and, if
         successful in obtaining a recovery or judgment, to pay an amount equal to the
         amount of such recovery to the Economic Class, only as a juridical entity and not
         to Economic Class Members individually.  Because any such funds are for the
         benefit of the Economic Class as a whole, these funds will be held in reserve by
         the Trustee in a qualified settlement fund authorized by the Court pending an
         equitable and appropriate allocation or use of such funds, to be approved by the
         Court, which may include:  (a) pro rata distribution to Economic Class Members;
         (b) to augment the Seafood Compensation Program; or (c) to address
         extraordinary needs or circumstances as agreed to by the BP Parties, which
         agreement shall not be unreasonably withheld.  In any event, the Court will decide
         and direct any allocation, and may appoint a special master or other neutral party
         to create any allocation or for other appropriate purposes.  If the Agreement is
         terminated pursuant to Section 21, any of these funds that have not been disbursed
         shall revert to the BP Parties.

5.15.    Additional Reserve Funds.  With Court approval, Lead Class Counsel or their
         designee may create one or more Reserve Funds with any Settlement proceeds
         from third or other parties, provided, however, that the Reserve Fund must not
         affect the approval or operation of the Economic Class, and may not increase the
         BP Parties' costs of administration or any other costs.

5.16.    Unless the Court directs otherwise, a separate fund (intended to qualify as a
         "qualified settlement fund," under § 468(d)(2) of the Internal Revenue Code and
         Treasury Regulation § 1.468B.1) will be established out of which common benefit
         attorneys' fees and costs to the Economic Class Counsel and/or other common
         benefit attorneys who have submitted time and costs in compliance with Pretrial
         Order 9, will be paid by Order of the Court.  This separate qualified settlement
         fund will be established pursuant to Order of the Court, and operated under Court
         supervision and control.  This separate qualified settlement fund shall be separate

from any of the funds described in Section 5.12, and will not be administered by the Claims Administrator.  BP's discharge from liability regarding payment of these attorneys' fees and costs into the Fund described in Section 5.16 shall be determined in conjunction with the negotiation of attorneys' fees to be conducted and shall be set forth in Exhibit 27 and as approved by the Court.  The Court shall determine the form and manner of administering this fund, in which BP will have no reversionary interest.

6.  **CLAIMS APPEAL PROCESS**

6.1.     Subject to and in accordance with Sections 4.3.7 and 4.3.8, Economic Class Members will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of this Agreement.

6.1.1.     Appeal for Insufficient Documentation.

6.1.1.1.     In the event a Claim is denied because it cannot be fully processed, in whole or in part, on grounds of insufficient documentation, the Claimant has the option to seek a review by a separate **DOCUMENTATION REVIEWER** assigned by the Claim Administrator.  Such appeal shall be filed within 20 days of issuance of written notice to the Claimant from the Settlement Program of insufficient documentation.  If the Documentation Reviewer finds error in the denial for insufficient documentation, the Claimant's Claim will be referred back to the Settlement Program which will then process the Claim.  Any decision of the Documentation Reviewer with respect to the documentation issue discussed in this Section shall be without prejudice to the Claimant's right at any time prior to termination of the Settlement Agreement to resubmit the Claim.

6.1.2.     Appeal of Final Determination of Settlement Program.

6.1.2.1.     Reconsideration.

6.1.2.1.1.    Within 30 days of issuance of notice in writing to the Claimant of a final determination of a Claim by the Settlement Program, a Claimant may request in writing reconsideration by the Settlement Program of that determination on the grounds that the Settlement Program committed a calculation error, failed to take into account relevant information or data or otherwise failed to follow the standards governing the determination.  The Settlement Program will also maintain a website where a form of request for reconsideration may be filed.  The Settlement Program shall provide access to the Claimant and the BP Parties of all forms, calculations and worksheets relied upon by the Settlement Program in reaching the final determination.

6.1.2.2.    Appeals to Panel

6.1.2.2.1.    Appeals shall be heard by either a single-member **APPEAL PANEL** or a three-member Appeal Panel depending on the value of the Claim being appealed.

6.1.2.2.2.    **APPEAL PANELIST** pool:  The roster of Appeal Panelists eligible to sit on an Appeal Panel shall consist of between 10 and 20 Appeal Panelists.

6.1.2.2.3.    Nomination of the Appeal Panelist pool:  Within 21 days of Preliminary Approval, the Parties shall agree on a list of at least 30 individuals as potential Appeal Panelists and jointly submit that list of nominees to the Court, who will select the Appeal Panelists.

6.1.2.2.4.    Selection of the Appeal Panelist pool:  The Parties shall agree to the joint recommendation of at least 30 candidates possessing the relevant experience and qualifications for appointment by the Court, in the exercise of its independent discretion, to serve as the Appeal Panelists.  The Parties shall continue this process of joint

56

selection, as necessary, to accomplish the Court's approval and appointment of a full panel of Appeal Panelists. The Parties shall indicate along with the submission whether the potential Appeal Panelist is qualified to hear appeals on Claims of $1,000,000 or more. From the joint list of nominees, the Court may select some or all of the nominees for inclusion in the Appeal Panelist pool. In the event the Court's selection does not fill the Appeal Panel, or in the event of a vacancy on the Appeal Panel, the Parties shall nominate additional candidates, in accordance with this Section, for the Court's consideration for appointment to the Appeal Panel.

6.1.2.2.5.    Selection of the Appeal Panel: The appointment to and service on the Appeal Panels is subject to the oversight of the Court, which shall retain jurisdiction over the Appeal Panels.

6.1.2.2.5.1.    Appeals of Claims Under $1,000,000: Appeals taken by either Party on claims less than $1,000,000 shall be decided by a single-member Appeal Panel. The Appeal Panelists shall be randomly selected by the Claims Administrator from the Appeal Panelist pool.

6.1.2.2.5.2.    Appeals of Claims of $1,000,000 or more: Appeals taken by either Party on Compensation Amounts for $1,000,000 or more shall be decided by a three-member Appeal Panel. If the appeal is being taken by a Claimant, the three-member Appeal Panel shall have at least one Appeal Panelist from the Claimant's home state. Only Appeal Panelists approved by the Court to hear claims for Compensation Amounts of $1,000,000 or more shall be eligible to sit on a three-member Appeal Panel. The Appeal Panelists shall be randomly selected by the Claims Administrator from the approved Appeal Panelists in the Appeal Panelist pool who are eligible to hear claims for Compensation Amounts of $1,000,000 or more. In the event

57

that the Appeal is being taken by a Claimant, the home-state Appeal Panelists shall be randomly selected from the sub-list of Appeal Panelists from that state; the remaining two Appeal Panelists shall be randomly selected from the entire Appeal Panelists pool approved by the Court to hear claims for Compensation Amounts of $1,000,000 or more.

6.1.2.2.5.3.   The continued service on the Appeal Panels is within the sole discretion of the Court which shall retain jurisdiction over the Appeal Panels.

6.1.2.2.5.4.   The Appeal Panel shall have the right to establish its own procedural rules regarding the review of appeals.

6.1.2.3.   Claimant Appeal.  A Claimant may Appeal within 30 days of the issuance of final written notice from the Settlement Program of a determination of final compensation award.  For purposes of determining a filing fee and the type of Appeal Panel or Panelists, the amount of compensation sought by the Claimant shall be treated as the Compensation Amount.  A Claimant that exercises the right to Appeal shall elect at the time of filing, to either:

6.1.2.3.1.   Pay a filing fee that shall be refunded if the Claimant prevails. ("Prevails" means that the Claimant is awarded an increase in the Compensation Amount).  The amount of the filing fee shall be as follows:

| **Compensation Amount** | **Fee** |
|---|---|
| Up to $10,000 | $100 |
| $10,001 to $25,000 | $150 |
| $25,001 to $50,000 | $200 |
| $50,001 to $100,000 | $250 |

| | |
|---|---|
| $100,001 to $250,000 | $500 |
| $250,001 to $500,000 | $1,000 |
| $500,001 or more | $2,500 |

or

6.1.2.3.2.    Agree in writing that, if the Claimant does not prevail, any
Compensation Amount (exclusive of any RTP) that had been
determined by the Settlement Program shall be reduced by 5%.

6.1.2.4.    BP Appeal.  The BP Parties may Appeal a final compensation award
determination only where the Compensation Amount determined by the
Settlement Program is in excess of $25,000.  The BP Parties shall receive
notice of an award on the same date that notice is provided to the
Economic Class Member and shall have the following time periods within
which to exercise their Appeal right for Claims in the following monetary
ranges: (a) for awards of $25,000 to $250,000 the BP Parties shall have
ten days from the date of notice of the award to Appeal; (b) for awards of
$250,001 to $500,000 the BP Parties shall have fifteen days from the date
of notice of the award to Appeal; and (c) for awards of greater than
$500,001 the BP Parties shall have twenty days from the date of the notice
of the award to Appeal.  The BP Parties shall pay the following filing fees
to exercise their right to Appeal:

| **Compensation Amount** | **Fee** |
|---|---|
| $25,001 to $50,000 | $400 |
| $50,001 to $100,000 | $500 |
| $100,001 to $250,000 | $1,000 |
| $250,001 to $500,000 | $2,000 |

| | |
|---|---|
| $500,001 to $1,000,000 | $4,000 |
| More than $1,000,000 | $5,000 |

6.1.3.    Filing fees for Appeals shall be added to the Promotional Fund referred to in Section 5.13.

6.2.    Appeals Compensation Method.  All Appeals where the issue is the Compensation Amount shall be conducted using a baseball process in which the Claimant and the BP Parties exchange and submit in writing to the Appeal Panelist or Appeal Panel their respective proposals ("Initial Proposal") for the base  Compensation  Amount they propose the Claimant should receive. The Appeal Panelists or Appeal Panel may consider only the following documentation:  the Initial and Final Proposal and any memorandum in support thereof; the complete record of the Claimant in the Settlement Program; the Agreement and all of its attachments; Court rulings on similar issues; and prior Appeal rulings on similar issues.  The Claimant and the BP Parties must exchange and submit a final proposed base compensation amount ("Final Proposal") to the Appeal Panelist or Appeal Panel.  Either Party shall have five (5) days to accept the other Party's Final Proposal and end the Appeal.  Without an agreed resolution, the Appeal Panelist or Appeal Panel must choose to award the Claimant either the Final Proposal by the Claimant or the Final Proposal by the BP Parties but no other amount.  The Claimant and the BP Parties may choose to reach a compromise at any point up to the time the Appeal Panelist or Appeal Panel issues its decision.  Once the Appeal Panelist or Appeal Panel issues a decision, it shall be final.  The base compensation amount will then be presented to the Claims Administrator to further process the Claim as appropriate.

6.3.    The procedures attached as Exhibit 25 hereto shall apply to Appeals pursuant to this Section 6.  The Settlement Program may establish additional procedures for the Appeal Process not inconsistent with Exhibit 25.

6.4.     Appeal Review Standards.  The Standard of Review by the Appeal Panelist or Appeal Panel shall be a de novo review of the complete record of that Claimant in the Settlement Program to enforce compliance with this Agreement as approved by the Court.

6.5.     Review Costs.   In the event that a Claimant prevails in an Appeal the Claimant shall be entitled to an additional 5% added to the total pre-RTP amount of the final award.  If the Claimant is being compensated by the Seafood Compensation Fund, any additional compensation awarded as part of the 5% additional payment shall not be paid by the Seafood Compensation Fund but shall be paid separately by BP.

6.6.     Court Inherent Jurisdiction.  The Court maintains the discretionary right to review any Appeal determination to consider whether the determination was in compliance with the Agreement.  Upon reviewing such a determination, the Court shall treat the Appeal determination as if it were a recommendation by a Magistrate Judge.

6.7.     Written Appeal Compensation Determination.  For every Appeal, the Appeal Panelist or Appeal Panel shall issue a written determination.  For all Appeals in which the Appeal Panel determines the Claimant should receive a Compensation Amount of $1,000,000 or more, the Appeal Panel shall issue a written opinion describing the basis for its determination.

6.8.     Immediately upon issuance of final written notice from the Claims Administrator of a determination of a Claim, the Settlement Program shall provide BP, Lead Class Counsel, Claimant and Claimant's counsel (if Claimant is represented) with electronic access to the full record of the Claim at issue.

6.9.     Compensation for Appeal Panelists.   The Claims Administrator shall devise a uniform compensation program for Appeal Panelists as to which he shall seek input from the Claims Administration Panel.  Such compensation program shall be subject to the approval of the Court.

7.  **PRELIMINARY APPROVAL BY THE COURT AND CLASS CERTIFICATION.**

7.1.      Economic Class Counsel and BP's Counsel agree to take all actions and steps reasonably necessary to obtain a Preliminary Approval Order from the Court.

7.2.      CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ONLY. The Parties agree to jointly seek class certification of the Economic Class under Fed. R. Civ. P. 23(a) and 23(b)(3) for the sole purpose of effectuating this Agreement under its terms and conditions.  The Parties do not waive or concede any position or argument they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered under this Agreement shall not constitute evidence, an admission, or a finding that the Economic Class or any class proposed by an Economic Class Member for any other purpose is appropriate for class certification.  To the extent the Court enters the proposed form of Preliminary Approval Order and Final Judgment without material alteration, the Final Order will provide for vacation of the Preliminary Approval Order in the event the Agreement does not become effective.  In the event that the Court certifies the proposed Economic Class in connection with this Agreement, BP will not oppose the motion brought by Interim Class Counsel or Lead Class Counsel (or their designee) seeking to certify a litigation class against Transocean or Halliburton, but limited to the recovery of punitive damages and/or assigned rights from the BP Parties.

7.3.      Tolling of Statute of Limitations and Presentment.

7.3.1.      Upon entry of the Preliminary Approval Order, the statutes of limitation applicable to any and all claims or causes of action that have been or could be asserted by or on behalf of any Economic Class Member are hereby tolled and stayed. The limitations period shall not begin to run again for any Economic Class Member unless and until (a) they Opt Out of the Economic Class, or (b) they execute an Individual Release (the Individual Release will contain a provision that further Claims can be made under this Agreement, as allowed by this Agreement, regardless of any statute of limitations) or (c)

the Agreement is terminated pursuant to Court Order.  In the event the Agreement is terminated pursuant to Court Order, the limitations period for each Economic Class Member as to whom the limitations period had not expired as of the date of the Preliminary Approval Order shall extend for the longer of 90 days from the last required issuance of notice of termination or the period otherwise remaining before expiration.  Notwithstanding the temporary tolling agreement herein, the Parties recognize that any time already elapsed for any Plaintiffs or Economic Class Members on any applicable statutes of limitations shall not be reset, and no expired claims shall be revived, by virtue of this temporary tolling agreement.  Plaintiffs and Class Members do not admit, by entering into this Agreement, that they have waived any applicable tolling protections available as a matter of law or equity.  Nothing in this Agreement shall constitute an admission in any manner that the statute of limitations has been tolled for anyone outside the Economic Class, nor does it constitute a waiver of legal positions regarding tolling.

7.3.2.    Regardless of whether the Agreement becomes effective, Claims with a sum certain and some documentation and/or other proof that are submitted to the Settlement Program shall be deemed to satisfy presentment and all requirements of 33 U.S.C. § 2713.

## 8.  NOTICE AND FAIRNESS HEARING.

### 8.1.    CLASS NOTICE

8.1.1.    As part of their Joint Motion for Preliminary Approval, the Parties shall submit to the Court an agreed upon **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS NOTICE PLAN**.

8.1.2.    The Class Notice Plan, to be implemented at the BP Parties' expense in accordance with the terms of the Class Notice Plan, shall be designed to meet the requirements of Fed. R. Civ. P. 23 (c)(2)(B) and shall include:

8.1.2.1.    A multi-media notice effort covering the entire United States with a focus on the Gulf Coast Areas.

8.1.2.1.1.    The media notice effort will include publication in over 1,100 local newspapers and nationwide publication in leading national consumer magazines, trade, business and specialty publications, local television, radio and newspapers in the Gulf Coast Areas, appropriate foreign language and African-American publications and online banner advertising.

8.1.2.2.    Individual mailed notification to those Class Members who can practicably be identified from Court filings and records, GCCF records, and otherwise, pursuant to the Court approved Class Notice Plan.

8.1.2.2.1.    The Economic Class Action Settlement Notice shall be mailed to identifiable potential Class Members in the Economic Class, plaintiffs in the MDL, including Natural Persons and Entities who filed short form joinders in the MDL.  To the extent BP or Economic Class Counsel is aware that any of these Economic Class Members are represented by counsel other than Economic Class Counsel, the Economic Class Action Settlement Notice shall also be mailed to their attorney.

8.1.2.3.    Prior to mailing, all addresses will be checked against the National Change of Address database managed by the **CLASS NOTICE ADMINISTRATOR**.  If a record is returned as invalid, the Class Notice Administrator will update the address through third-party address search services and re-mail as appropriate.

8.1.2.4.    A case website where potential Economic Class Members can obtain additional information and documents, including the Economic Class Action Settlement Notice, **SUMMARY PUBLICATION NOTICE**, Agreement, Claim Form, relevant orders of the Court and any other

information the Parties may agree to provide or that the Court may require.

8.1.2.5.   A toll-free telephone system through which potential Economic Class Members can obtain additional information, and the Economic Class Action Settlement Notice and Claim Form.

8.1.3.   In addition to the foregoing, a Court-approved notice will be given if the Settlement terminates, and a Court-approved reminder notice will be given in advance of the Claim filing deadline at BP's expense.

## 8.2.   OPT OUTS

8.2.1.   The Economic Class Action Settlement Notice shall provide instructions regarding the procedures that must be followed for Economic Class Members to exclude themselves ("Opt Out") from the Economic Class pursuant to Fed. R. Civ. P. 23(c)(2)(B).  The Parties agree that, to validly exclude themselves from the Economic Class, Economic Class Members must submit a written request to Opt Out, which must be received by the Entity identified in the Class Notice Plan for that purpose, properly addressed, and postmarked no later than October 1, 2012, or such later date as the Court orders in the Preliminary Approval Order.  A written request to Opt Out may not be signed by any form of electronic signature, but must be signed by a handwritten signature.  Economic Class Counsel will be provided with identifying information on **OPT OUTS** on a weekly basis, under a confidentiality Order of the Court, to enable them to determine the validity of Opt Outs and assist those who wish to revoke an Opt Out.  All requests to Opt Out must be signed by the Natural Person or Entity seeking to exclude himself, herself or itself from the Economic Class.  Attorneys for such Natural Persons or Entities may submit a written request to Opt Out, but they must still be signed by the Natural Person or Entity.

8.2.2.   An Economic Class Member has the right to Opt Out of the Economic

Class.  An Economic Class Member may make one or more Claims for Seafood Compensation Program, Economic Damage, Subsistence Damage, VoO Charter Payment, Vessel Physical Damage, Coastal Real Property Damage, Wetlands Real Property Damage and/or Real Property Sales Damage.  However, Economic Class Members who exercise the right to Opt Out of the Economic Class must do so for all included Claims that the Economic Class Member possesses.

8.2.3.    Pursuit of Excluded and Reserved Claims. Class Members are not required to Opt Out in order to pursue Expressly Reserved Claims, and may make included Claims without releasing the foregoing Expressly Reserved Claims. BP agrees not to raise any defense of "claim splitting" it otherwise might have raised with respect to such prosecution of the foregoing Expressly Reserved Claims.  BP also agrees not to raise any defense of "claim splitting" it otherwise might have raised with respect to prosecution of Claims brought by employees in the otherwise excluded Gaming, Oil and Gas, Banking, Insurance, Funds, Defense Contractors and Developers Industries referred to in Section 1.3.1.9, but only regarding their lost earnings from employment in those industries.

8.2.4.    All Economic Class Members who do not timely and properly Opt Out shall in all respects be bound by all terms of this Agreement and the Final Order and Judgment, shall be entitled to all procedural opportunities and protections described herein and provided by the Court, and all compensation for which they qualify under its terms, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal or administrative or other forum.

8.2.5.    Any Economic Class Member may revoke his, her or its Opt Out from the Economic Class and thereby receive the benefit of this Economic and

Property Damage Settlement up until three (3) days prior to the Fairness Hearing; or later, if the BP Parties consent in their sole and unilateral discretion as provided in Section 8.2.6 below; or otherwise, if the Court so orders on good cause shown.

8.2.6.    After the Fairness Hearing and in addition to the provisions of Section 8.2.5 of this Agreement, the BP Parties shall have the discretion, but not the obligation, to provide a new Economic Class Action Settlement Notice to Economic Class Members who have timely and properly opted out from the Economic Class allowing them the option, upon such conditions reasonably imposed by the BP Parties, to rescind or withdraw their Opt Out and to participate in the Economic Class.  This provision does not apply to Economic Class Members who have gone through the **OPA PROCESS** and provided a release as part of that OPA Process.  Any such new Economic Class Action Settlement Notice that the BP Parties decide to send out, if they so decide, must be approved by Economic Class Counsel and the Court before it is sent.

8.3.    **REQUIREMENTS FOR OBJECTIONS AND APPEARANCES.**

8.3.1.    Subject to Court approval, any Economic Class Member may present written objections, if he, she or it has any, explaining why the Agreement should not be approved as fair, reasonable and adequate, or why attorneys' fees and expenses to Economic Class Counsel should not be awarded in the amounts requested.  Any Economic Class Member who or that wishes to object to any aspect of the Agreement must file with the Court, and serve on Economic Class Counsel and BP's Counsel, by first-class mail, no later than August 31, 2012, a written statement of the objection(s).  The written statement of the objection(s) must include (a) a detailed statement of the Economic Class Member's objection(s); (b) the Economic Class Member's name, address and telephone number; (c) written proof that the individual or Entity is in fact an Economic Class Member, such as proof of residency,

67

ownership of property and the location thereof, and/or business operation and the location thereof; and (d) any other supporting papers, materials or briefs the Economic Class Member wishes the Court to consider when reviewing the objection.

8.3.2.    Economic Class Members may raise an objection either on their own or through an attorney hired at their own expense. If an Economic Class Member hires an attorney to represent him, her or it, the attorney must (a) file a notice of appearance with the Clerk of the Court no later than August 31, 2012; and (b) comply with the procedures described in Section 8.3.1 above.

8.3.3.    An Economic Class Member who files an objection, but then submits and releases a Claim before the Fairness Hearing shall lose the right to object. Economic Class Members, or their attorneys, who intend to make an appearance at the Fairness Hearing must serve on Economic Class Counsel and BP's Counsel, by first-class mail, and file with the Court, no later than August 31, 2012, or as the Court otherwise may direct, a notice of their intention to appear at the Fairness Hearing.

8.3.4.    Any Economic Class Member, and/or their attorney(s), who fails to comply with the provisions of the preceding subsections shall waive and forfeit any and all rights they may have to object to the Agreement, and shall be bound by all the terms of the Agreement and by all proceedings, orders and judgments in the Deepwater Horizon Economic Litigation.

## 9. COMMUNICATIONS TO THE PUBLIC.

9.1.    The Parties, BP's Counsel and Economic Class Counsel may jointly or separately issue press releases announcing and describing this Agreement upon filing. The form, content, and timing of such press releases relating to this Agreement shall be subject to mutual agreement of the Parties, which shall not be unreasonably withheld, and in addition, the BP Parties shall, in their sole discretion, be entitled

to include such information as required by law or regulation.  Lead Class Counsel (or their designee) and the BP Parties will consult regarding press releases. Communications by or on behalf of the Parties and their respective Counsel regarding this Agreement with the public and media shall be made in good faith, shall be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of the Settlement, and the information contained in such communications shall be consistent with the content of the Notice approved by the Court.  Nothing herein is intended to or shall be interpreted to inhibit or interfere with Economic Class Counsel's ability to communicate with the Court, Economic Class Members, potential Economic Class Members, or their counsel.

10. **RELEASE AND DISMISSAL OF ALL CLAIMS AND OTHER PROTECTIONS.**

10.1.     The Economic Class, Plaintiffs and all Economic Class Members, on behalf of themselves and their heirs, beneficiaries, estates, executors, administrators, personal representatives, agents, trustees, insurers, reinsurers, subsidiaries, corporate parents, predecessors, successors, indemnitors, subrogees, assigns, and any natural, legal or juridical person or Entity entitled to assert any claim on behalf of or in respect of the Economic Class or any Plaintiff or Economic Class Member, hereby release and forever discharge with prejudice, and covenant not to sue, the Released Parties for any and all Released Claims; provided however that this Release does not apply to, and the term Released Claims does not include, Expressly Reserved Claims.  In the event a Released Party is sold or otherwise transferred to, or purchases or otherwise acquires, or enters into a partnership or joint venture with, a Natural Person or Entity that is not otherwise a Released Party immediately prior to giving effect to such transaction, then the non-Released Party shall as a result of such transaction obtain a benefit under this Release only with respect to any liability of the Released Party that it, or any such partnership or joint venture, has acquired or assumed or otherwise become liable for, and not in its own right.

10.2.    Released Claims shall include all claims arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, including any and all actions, claims, costs, expenses, taxes, rents, fees, profit shares, liens, remedies, debts, demands, liabilities, obligations, or promises of any kind or nature whatsoever, in both law or in equity, past or present, whether known or unknown, including claims for any and all Unknown Claims or damages, future injuries, damages or losses not currently known, but which may later develop, provided they arise out of, are due to, result from, or relate in any way to, directly or indirectly, in whole or in part, the Deepwater Horizon Incident, whether possessed or asserted directly, indirectly, derivatively, representatively or in any other capacity, and whether or not such clams were or could have been raised or asserted before the Court, and regardless of whether pursuant to statutory law, codal law, adjudication, quasi-adjudication, regulation, or ordinance, including common law, maritime or admiralty, statutory and non-statutory attorneys' fees, breach of contract, breach of any covenant of good faith and/or fair dealing, fraud, misrepresentation, fraudulent concealment, deception, consumer fraud, antitrust, defamation, tortious interference with contract or business expectations, loss of business expectations or opportunities, loss of employment or earning capacity, diminution of property value, violation of the federal Racketeer Influenced and Corrupt Organizations Act or any similar state law, violations of any consumer protection act, punitive damages, exemplary damages, multiple damages, non-compensatory damages, compensatory damages, pain and suffering, interest, injunctive relief, declaratory judgment, costs, deceptive practices, unfair business practices, regulation, strict liability, negligence, gross negligence, willful misconduct, nuisance, trespass, fraudulent concealment, statutory violations, including the Oil Pollution Act of 1990 or other statutory claims, unfair business practices, breach of fiduciary duty, and all other theories, whether existing now or arising in the future, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.  Released Claims shall not include Expressly Reserved Claims, which means the following Claims that are not recognized or released under the

Agreement, and are reserved to the Economic Class Members:  (1) Bodily Injury
Claims, which are excluded from the Economic Class, but certain of which may
be asserted in the Medical Benefits Class Action Settlement as described therein;
(2) claims of BP shareholders in any derivative or direct action solely in their
capacity as BP shareholders; (3) claims of Natural Persons and Entities for
Moratoria Losses; (4) claims relating to menhaden (or "pogy") fishing,
processing, selling, catching, or harvesting; and (5) claims for Economic Damage
suffered by Entities or employees (to the extent they allege Economic Damage
based on their employment by such an Entity during the Class Period) in the
Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development,
Defense Contractor Industries, and Entities selling or marketing BP-branded fuel
(including jobbers and branded dealers) as defined in Section 2.2.4.  In addition,
the Economic Class, Plaintiffs' and Economic Class Members' Claims for
punitive or exemplary damages against Halliburton and Transocean are reserved.

10.3.     Released Parties, for purposes of the Released Claims means (i) BP (including all
persons, entities, subsidiaries, divisions and business units comprised thereby),
together with (ii) the Deepwater Horizon Oil Spill Trust; (iii) the persons, entities,
divisions, and business units listed on Exhibit 20 ("Other Released Parties"); (iv)
each of BP's and the Other Released Parties' respective past, present and future
directors, officers, employees, general or limited partners, members, joint
venturers, and shareholders, and their past, present and future spouses, heirs,
beneficiaries, estates, executors, administrators, personal representatives,
attorneys, agents, trustees, insurers, reinsurers, predecessors, successors,
indemnitees, assigns; (v) any natural, legal or juridical person or Entity acting on
behalf of or having liability in respect of BP or the Other Released Parties, in their
respective capacities as such; and (vi) the federal Oil Spill Liability Trust Fund
and any state or local fund, and, as to i-vi above, each of their respective
Affiliates, including their Affiliates' officers, directors, shareholders, employees,
and agents.  Released Parties will also include any vessels owned or chartered by
any Released Party (except for the Deepwater Horizon itself).  Notwithstanding
anything herein to the contrary, in no event shall any of the following be deemed

to be a Released Party:  Transocean or Halliburton.  The Economic Class, Plaintiffs and Economic Class Members specifically reserve its and their rights for punitive and exemplary damages against Transocean and Halliburton.  In addition, the Economic Class specifically reserves its rights under the Assigned Claims.

10.4.    Release shall mean those Releases set forth in this Section 10.

10.5.    Unknown Claims and damages or not currently known claims and damages (whether or not capitalized) shall mean all past, present and future claims and damages arising out of facts, including new facts or facts found hereafter to be other than or different from the facts now believed to be true, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident covered by the Release in Section 10 that any Natural Person or Entity providing a Release, including the Plaintiffs and Economic Class Members, do not, in whole or in part, know or suspect to exist and which, if known by them, might have affected their decision to provide such Release, including all claims arising out of new facts or facts found hereafter to be other than or different from the facts now believed to be true.

10.6.    The Economic Class, Plaintiffs and the Economic Class Members expressly waive and release with prejudice, and shall be deemed to have waived and released with prejudice, any and all rights that they may have under any law, codal law, statute, regulation, adjudication, quasi-adjudication, decision, administrative decision, or common law principle that would otherwise limit the effect of the Release to those claims or matters actually known or suspected to exist at the time of execution of the Release.  California law is not applicable to this Agreement, but purely for illustrative purposes the Released Claims include, but are not limited to the release of claims provided for in Section 1542 of the California Civil Code, which provides as follows:  **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or**

**her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

10.7.     The Release is not intended to prevent BP from exercising its rights of contribution, subrogation, or indemnity under the OPA or any other law, including its rights of assignment regarding Assigned Claims as set forth in Exhibit 21.  BP is hereby subrogated to any and all rights that the Economic Class Members, or any of them, may have had or have arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident under the OPA.  All such rights of BP to contribution, indemnity, and subrogation, and BP's subrogation to the rights of Economic Class Members, are subject to the provisions regarding Assigned Claims in Exhibit 21.

10.8.     The Economic Class Members shall be required to provide the following certifications:

10.8.1.     For business or property claims:  "I certify that either: (1) I have not made an insurance claim or received any insurance proceeds for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; or (2) if I have made or do make an insurance claim and/or receive or have received insurance proceeds for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, I will indemnify BP for any liability and defense costs it incurs for a subrogation claim made against BP arising out of (a) such insurance proceeds provided that the subrogation claim is brought by an entity seeking payment of insurance proceeds to me for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; and (b) the amount that I indemnify BP shall not exceed the amount of insurance proceeds that I received for the business or property claim at issue."

10.8.2.     For individual claims:  "I certify that either (1) I have not made a claim for

unemployment insurance benefits arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; <u>or</u> (2) if I have made or do make a claim for unemployment insurance benefits arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, I will indemnify BP for any liability and defense costs it incurs for a subrogation claim made against BP arising out of such insurance proceeds provided that the subrogation claim is brought by an entity seeking payment of insurance proceeds to me for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; and the amount that I indemnify BP shall not exceed the amount of insurance proceeds that I received for the unemployment insurance benefits claim at issue."

10.9.     As a condition precedent to receiving a Settlement Payment, including after the Effective Date, a Claimant must sign an Individual Release.

10.10.    The Parties agree that this Agreement and Release is entered into in consideration of the agreements, promises, and mutual covenants set forth in this Agreement, the Release, the entry of the Final Order and Judgment dismissing all Released Claims against all Released Parties with prejudice and approving the terms and conditions of the Settlement as set forth in this Agreement, and for such other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, subject to the Parties' ongoing performance of this Agreement and the **GUARANTOR'S** and **BACK-UP GUARANTOR'S** respective Guarantees of the BP Parties' payment obligations hereunder in accordance with the terms of the Guarantees.

10.11.    Consistent with the Claim Frameworks for Coastal Real Property Claims and Wetlands Real Property Claims, the Economic Class, Plaintiffs and the Economic Class Members agree not to institute federal or state regulatory proceedings concerning cleanup, removal, spill response or remediation of Real Property as a

74

means to seek the redress of Released Claims.  Other provisions concerning regulatory proceedings in the Claim Framework for Coastal Real Property Claims and Wetlands Real Property Claims are incorporated herein by reference.

10.12.    Dismissal of All Claims

10.12.1.    In consideration of the benefits provided under this Agreement, upon the Effective Date, all Released Claims by or on behalf of the Economic Class, Plaintiffs or any and all Economic Class Members against any and all Released Parties shall be dismissed with prejudice.

10.12.2.    From and after the Effective Date for the consideration provided for herein and by operation of the Final Order and Judgment, this Agreement shall be the exclusive remedy for any and all Released Claims by or on behalf of the Economic Class, Plaintiffs or any and all Economic Class Members against any and all Released Parties, and the Economic Class, Plaintiffs and Economic Class Members shall not recover, directly or indirectly, any sums from any Released Parties for any Released Claims other than those received for the Released Claims under the terms of this Agreement.

10.12.3.    From and after the Effective Date, the Parties agree that the Economic Class, Plaintiffs and each and every Economic Class Member, and all other persons and Entities claiming by, through, or on behalf of, them will be forever barred and enjoined from commencing, filing, initiating, instituting, prosecuting, maintaining, or consenting to any judicial, arbitral, or regulatory action against the Released Parties with respect to the Released Claims.

10.12.4.    From and after the Effective Date, if the Economic Class, Plaintiffs or any Economic Class Member commences, files, initiates, or institutes any new action or other proceeding for any Released Claims against the Released Parties in any federal or state court, arbitration tribunal, or administrative or other forum, such action or other proceeding shall be dismissed with

prejudice and at the cost of (a) the Economic Class if the Economic Class brings such action or proceeding, or (b) the Plaintiffs and/or Economic Class Members who bring such action or proceeding provided, however, before any costs may be assessed, counsel for such Economic Class Member, or, if not represented, such Class Member shall be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice. Furthermore, if any Released Party brings any legal action before any Court or arbitration, regulatory agency, or other tribunal to enforce its rights under this Agreement, such Released Party shall be entitled to recover any and all related costs and expenses (including attorneys' fees) from (a) the Economic Class if the Economic Class brings such action, or (b) the Plaintiffs and/or Economic Class Members who bring such action; in violation or breach of its obligations under this Section 10.

## 11. ASSIGNMENT AND PROTECTIONS.

11.1.    The Parties have agreed to the terms of an assignment and certain protections for Released Parties as set forth in Exhibit 21.

## 12. DENIAL OF WRONGDOING OR LIABILITY.

12.1.    This Agreement constitutes the resolution of disputed claims and is for settlement purposes only. BP expressly denies that it has committed all of the alleged wrongdoing in the Action, or is liable for all of the wrongs and theories alleged therein. Nevertheless, BP has concluded that it is in BP's best interest that the Action be settled on the terms and conditions set forth in this Agreement. BP reached this conclusion after considering the factual and legal issues in the Action, the substantial benefits of a final resolution of the Action, the expense that would be necessary to defend the Action through trial and any appeals that might be taken, the benefits of disposing of protracted and complex litigation, and the desire of BP to conduct its business unhampered by the distractions of continued litigation over the Released Claims. Plaintiffs and BP agree that neither this Agreement, nor any actions undertaken by the BP Parties in the negotiation, execution or satisfaction of this Agreement shall constitute, or be construed as, an

admission of any liability or wrongdoing, or recognition of the validity of any allegation of fact or law made by the Plaintiffs, the Economic Class or by any Economic Class Member in this Action or in any other action or proceeding.

12.2.   This Agreement, any statements or negotiations made in connection with this Agreement, and any actions undertaken by BP under this Agreement, shall not be offered or be admissible as evidence or used in any other fashion against BP in any lawsuit, action, hearing or proceeding for any purpose, including the existence, certification or maintenance of any purported class, except (i) in any action or proceeding brought to enforce the terms of this Agreement by the Economic Class, or by any Economic Class Member, against the BP Parties, or (ii) by BP in defense of any claims against it brought by Plaintiffs, the Economic Class, or by any Economic Class Member in any other action.  Nor shall this Agreement serve as precedent in any manner, because the Agreement is based on the specific facts of this matter and is for settlement purposes only.

12.3.   The use of environmental data (including **SCAT** and NRDA data) as part of this Agreement shall not constitute an admission or judicial determination related to the admissibility or interpretation of such data for any other purpose, and, further, the use of such data shall have no effect on, and shall be without prejudice to, the use, admissibility and interpretation of such data for any other purpose, including any claims for natural resource damages.  The fact that the Claims Administrator or the Court accepts or relies upon any evidence of loss submitted by the Economic Class or any Economic Class Member shall not constitute a finding or determination of loss or damage for any purpose including, but not limited to, in any proceedings related to claims for natural resource damages; further the Parties agree that the use, submission, interpretation or acceptance (including non-objection) of such evidence shall not constitute an admission or determination that such evidence is relevant or admissible for any purpose other than the Settlement Program under this Agreement.

13. **REPRESENTATIONS AND WARRANTIES.**

13.1.     Interim Class Counsel and Proposed Economic Class Counsel represent and warrant that they have authority to enter into this Agreement on behalf of the Economic Class Representatives.

13.2.     The BP Parties represent and warrant that they have all requisite corporate power and authority to execute, deliver and perform this Agreement.  The execution, delivery, and performance by the BP Parties of this Agreement has been duly authorized by all necessary corporate action.  This Agreement has been duly and validly executed and delivered by the BP Parties, and constitutes their legal, valid and binding obligation.

13.3.     The Parties warrant and represent that no promise or inducement has been offered or made for the Release contained in Section 10, except as set forth expressly herein, and that this Agreement, including its Release, is executed without reliance on any statements or any representations not contained herein, and that this Agreement and its Release reflect the entire Agreement between the Parties. The warranties and representations made throughout the Agreement shall survive the execution and delivery of this Release and shall be binding upon the respective heirs, representatives, successors and assigns of each of the Parties.

13.4.     Plaintiffs and Proposed Economic Class Counsel expressly acknowledge and represent that they (a) have performed an independent investigation of the allegations of fact and law made in connection with the Deepwater Horizon Economic Litigation; and (b) may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of this Agreement and/or the actions or matters covered by the Release.  Nevertheless, the Parties intend to resolve their disputes pursuant to the terms of this Agreement and thus, in furtherance of their intentions, the Agreement shall remain in full force and effect notwithstanding the discovery after the date of this Agreement or at any other time of any additional facts or law,

or changes in law, and this Agreement shall not be subject to rescission or modification by reason of any change or difference in facts or law.

13.5.     The Parties specifically understand that there may be further pleadings, discovery responses, documents, testimony, or other matters or materials owed by the Parties to each other, pursuant to existing pleading requirements, discovery requests, pretrial rules, procedures, orders, decisions, or otherwise, and that, as of the date of this Agreement, each Party expressly waives any right to receive, inspect, or hear such pleadings, discovery, testimony, or other matters or materials during the pendency of the Settlement proceedings contemplated by this Agreement and subject to further order of the Court.

## 14. PLAINTIFFS' COUNSEL'S ATTORNEY'S FEES AND COSTS.

14.1.     As a material term and condition precedent to a Settlement Agreement, the BP Parties and the PSC must reach agreement regarding the amount of attorneys' fees and costs for the common benefits to the putative Economic Class, which will be subject to final determination and approval by the Court.  In no event will the BP Parties be obligated to pay more in fees and costs in connection with the putative Economic Class than the amount to be agreed to with the PSC.  The Parties have not had any fees discussion to date, and will not have such a discussion until the Court has first authorized such discussions.  Details regarding this provision shall be negotiated and attached as Exhibit 27.

## 15. FINAL ORDER AND JUDGMENT, DISMISSAL WITH PREJUDICE.

15.1.     The Parties shall jointly seek a Final Order and Judgment that:

15.1.1.     approves the Settlement in its entirety pursuant to Fed. R. Civ. P. 23(e) as fair, reasonable, and adequate;

15.1.2.     finds that this Agreement, with respect to Economic Class Members who are minors, lack capacity, or are incompetent, is fair, reasonable and adequate;

15.1.3.   confirms the certification of the Economic Class, for settlement purposes only;

15.1.4.   confirms the appointment of the Economic Class Representatives;

15.1.5.   confirms the appointment of the Economic Class Counsel and Lead Class Counsel;

15.1.6.   finds that the Class Notice and Class Notice Plan satisfied and satisfy the requirements set forth in Fed. R. Civ. P. 23(c)(2)(B);

15.1.7.   permanently bars and enjoins each Economic Class Member from commencing, asserting, and/or prosecuting any and all Released Claims against any Released Party;

15.1.8.   dismisses with prejudice the Action without further costs, including claims for interest, penalties, costs and attorneys' fees;

15.1.9.   dismisses with prejudice all the Released Claims by the Releasing Parties against the Released Parties without further costs, including claims for interest, penalties, costs and attorneys' fees;

15.1.10.   orders the dismissal with prejudice of all **RELATED CLAIMS** pending in the Court, and without further costs, including claims for interest, penalties, costs, and attorneys' fees;

15.1.11.   orders all Economic Class Members with Related Claims pending in any federal or state court, forum, or tribunal other than the Court to dismiss with prejudice such Related Claims, and without further costs, including claims for interest, penalties, costs, and attorneys' fees;

15.1.12.   confirms the appointment of the Claims Administrator and Claims Administration Vendors;

15.1.13.   expressly incorporates the terms of this Agreement and provides that the

Court retains continuing and exclusive jurisdiction over the Parties, the Economic Class Members and this Agreement, to interpret, implement, administer and enforce the Agreement, in accordance with its terms;

15.1.14.   orders all Economic Class Members to comply with the Assignment and Protections provisions of Section 11 and Exhibit 21.

## 16. COOPERATION OF PARTIES AS TO CONSUMMATION OF SETTLEMENT.

16.1.   The Parties agree to take all actions necessary to obtain final approval of this Agreement and entry of a Final Order and Judgment, including the terms and provisions described in this Agreement, and dismissing all Released Claims against all Released Parties with prejudice.  Upon the Effective Date, the Parties also agree to take all actions and steps necessary to obtain dismissal of all other lawsuits that are pending and/or may be filed against BP, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the subject matter of the Deepwater Horizon Economic Litigation, to the extent of Released Claims against Released Parties.

## 17. COOPERATION OF PARTIES AS TO SUPPORT OF SETTLEMENT.

17.1.   The Parties agree to support the final approval and implementation of this Agreement and defend it against objections, appeal, or collateral attack.  Neither the Parties nor their Counsel, directly or indirectly, will encourage any person to object to the Economic and Property Damages Settlement.  Nothing in this Agreement shall impair BP's right to take any action to defend itself in any trial where BP is a party.

## 18. CONTINUING JURISDICTION.

18.1.   Pursuant to the Final Order and Judgment, the Court shall retain continuing and exclusive jurisdiction over the Parties and their Counsel for the purpose of enforcing, implementing and interpreting this Agreement, including all issues relating to the scope, application and/or operation of the Release in Section 10 above, including jurisdiction over all Economic Class Members, and over the

administration and enforcement of the Agreement and the distribution of its benefits to Economic Class Members, and any dispute arising as to the action or election of any Party under Section 21 below regarding the enforceability or illegality of any provisions of this Agreement.  Any disputes or controversies arising out of or related to the interpretation, enforcement or implementation of the Agreement and the Release shall be made by motion to the Court.  In addition, the Parties, including each member of the Economic Class as defined in the Final Order and Judgment, and their Counsel are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to this Agreement.  The terms of the Agreement shall be incorporated into the Final Order and Judgment of the Court dismissing with prejudice all Released Claims by the Economic Class, Plaintiffs, and Economic Class Members against all Released Parties, which shall allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Agreement.

18.2.    Before filing any motion or petition in the Court raising a dispute arising out of or related to this Agreement, counsel for the Parties shall consult with each other and certify to the Court that they have consulted.

19. **STAY OR ADJOURNMENT OF ALL PROCEEDINGS.**

19.1.    BP's position is that a stay or adjournment of any trial proceeding (including the previously set Phase I trial) that would or might determine BP's liability to the Economic Class is a material term and condition precedent to the Settlement from the date of the Parties' execution of this Agreement through the Court's determination of the fairness of the Settlement.  Plaintiffs and Proposed Economic Class Counsel shall not oppose BP's position.

20. **DUTIES OF ECONOMIC CLASS COUNSEL.**

20.1.    Interim Class Counsel and Proposed Economic Class Counsel acknowledge that under applicable law their duty is to the entire Economic Class, to act in the best interest of the Economic Class as a whole, with respect to promoting, supporting,

and effectuating, as fair, adequate and reasonable, the approval, implementation, and administration of the Settlement embodied in this Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the Economic Class.

21. **ILLEGALITY OR UNENFORCEABILITY OF PROVISIONS.**

21.1.    In the event that the Release contained in Section 10 above, or the Individual Releases as to all Economic Class Members contained in Section 4 above, or any portion or provision thereof, shall for any reason be held in whole or in part to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision, or portion thereof, if the BP Parties elect in their sole discretion in writing to proceed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been included in this Agreement.  Alternatively, the BP Parties, in these circumstances, may elect in writing that the entire Agreement be rendered null and void consistent with the terms described in Section 21.3 below.

21.2.    In the event that any other material provision of this Agreement, with materiality to be determined jointly by the Parties in their sole but good faith discretion, shall for any reason be held in whole or in part to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision, or portion thereof, of this Agreement if either Party elects in writing to proceed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been included in this Agreement.  Alternatively, either Party may, in these circumstances, elect in writing that the entire Agreement be rendered null and void consistent with the terms described in Section 21.3 below. Such election shall be prospective from the date of the election.

21.3.    This Agreement shall, at the written election of the BP Parties filed in the MDL 2179 (E.D. La.), become null and void and shall have no further effect with respect to any Party to the Deepwater Horizon Economic Litigation if any of the

events or actions in Sections 21.3.1 to 21.3.4 occur.  If this Agreement for any reason terminates and becomes null and void, the Claims Administrator will continue to process Claims that have been submitted but as to which the Claimant has not executed an Individual Release.  However, each such Claimant must agree to be individually represented by an attorney of the Claimant's choice (if not already represented) or by one or more of the attorneys who served as Economic Class Counsel, who must agree in writing to accept such representation, as a precondition for payment.  There shall be no payment until an Individual Release has been executed.  Claimants who have already received an initial payment on one or more of their Claims and executed an Individual Release shall still receive the full six months from the initial payment to make another Claim, as provided in Section 4.4.8, notwithstanding any termination of the Agreement.

21.3.1.   the Preliminary or Final Approval of the Settlement described in this Agreement is not obtained or is reversed on appeal by a court of last resort; or

21.3.2.   the Effective Date does not occur for any reason; or

21.3.3.   entry of the Final Order and Judgment is finally reversed; or

21.3.4.   the Final Order and Judgment is materially modified by the Court or on appeal by a court of last resort.

21.3.5.   Such written election must be made within thirty (30) days of the BP Parties receiving written notice of any of the events described in Sections 21.3.1 through 21.3.4 above.

21.3.6.   In addition, the BP Parties have the absolute and unconditional right, before the date of the Final Approval Hearing, solely at their option, to terminate this Agreement in the event the number of potential Economic Class Members who have filed valid and timely requests for exclusion (Opt Out) exceeds a number agreed to by the Parties and to be filed with the Court in a sealed envelope or in the event the Court permits or allows a certified class

of Natural Persons or Entities who are also members of the Economic Class
to Opt Out of the Settlement after the BP Parties and/or Plaintiffs challenge
such Opt Out by a certified class.

21.3.7.    In the event this Agreement is terminated, this Agreement shall not be
offered into evidence or used in this or any other action for any purpose,
including in support or opposition to the existence, certification or
maintenance of any purported class.  In such event, this Agreement, and all
negotiations, proceedings, documents prepared and statements made in
connection with this Agreement, shall be without prejudice to any Party and
shall not be admissible into evidence and shall not be deemed or construed
to be an admission or concession by any Party of any fact, matter or
proposition of law and shall not be used in any manner for any purpose, and
all Parties shall stand in the same position as if this Agreement had not been
negotiated, made, entered into or filed with the Court.

21.3.8.    If this Agreement for any reason terminates and becomes null and void, the
Parties shall jointly move the Court to vacate the Preliminary Approval
Order and any other orders certifying a class in the Action.  However, as set
forth more fully in Section 10 above, any Economic Class Member who or
that received a Settlement Payment and executed an Individual Release is
fully bound and shall continue to be bound by the Individual Release.

21.3.9.    If the Agreement terminates for any of the reasons in this Section, any
unspent funds shall revert to BP, including any funds described in Section
5.12.

## 22. PRESERVATION OF CONFIDENTIAL DOCUMENTS.

22.1.    In the event any confidential documentation is provided by or on behalf of the
Parties in the course of the Settlement process, the Parties and  their Counsel
agree that all such documentation shall be preserved until after performance of all
terms of the Agreement is completed, and the use of such documentation shall be

governed by the following pretrial orders entered in the MDL:   Pretrial Order No. 13, Order Protecting Confidentiality; Pretrial Order No. 29, Regarding Documents Produced by BP in the Texas City Litigation; Pretrial Order No. 38, Order Relating to Confidentiality of Settlement Communications; and Pretrial Order No. 47, Order Regarding Designation of Documents as "Confidential" or "Highly Confidential."   The Parties shall continue to treat documents in conformity with the requirements of the confidentiality requirements of the foregoing pretrial orders.

23. **INTERPRETATION.**

23.1.     All references in this Agreement to a section, article, exhibit or schedule are to a section, article, exhibit or schedule of this Agreement, unless otherwise indicated. Whenever the context may require, any pronoun will include the corresponding masculine, feminine, and neuter forms.  The words "includes" and "including" will be deemed to be followed by the words "without limitation" whenever used. Any definition of or reference to any agreement, instrument or other document will be construed as from time to time amended, supplemented or otherwise modified.  Any definition of or reference to any law will be construed as referring to such law as from time to time amended and any successor to such law and to the rules and regulations issued from time to time under such law.

23.2.     The titles in this Agreement are for convenience only and shall not be used to interpret the provisions of the Agreement.

24. **NO PENALTY OR FINE.**

24.1.     The Parties agree and acknowledge that no consideration, amount or sum paid, credited, offered, or extended, or to be paid, credited, offered, or extended, by any of the Defendants in the performance of this Agreement constitutes a penalty, fine, or any other form of assessment for any alleged claim or offense.

25. **AGREEMENT MUTUALLY PREPARED.**

25.1.     This Agreement shall be deemed to have been mutually prepared by the Parties and shall not be construed against any of them by reason of authorship.

26. **BINDING AND ENTIRE AGREEMENT.**

    26.1.    Plaintiffs, the Economic Class, and each Economic Class Member and the BP Parties expressly and each agree that the terms of this Agreement, and all provisions hereof, including all representations, promises, agreements, covenants and warranties, and including the Exhibits thereto, are contractual and not a mere recital and shall survive the execution of this Agreement.  This Agreement and its exhibits, attachments, and appendices shall constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, agreements, and understandings relating to the subject matter of this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their representatives, heirs, successors and assigns.

27. **RECEIPT OF ADVICE OF COUNSEL.**

    27.1.    Plaintiffs acknowledge, agree and specifically warrant and represent that they have discussed with a representative of Interim Class Counsel the terms of this Agreement relevant to them, and the Release contained in Section 10 above, have received legal advice with respect to the advisability of entering into this Agreement and the Release, and the legal effect of this Agreement and the Release.

28. **EXTENSION OF TIME AND MINISTERIAL CHANGES.**

    28.1.    The Parties may agree, subject to approval of the Court where required, to reasonable extensions of time to carry out and/or implement the terms and provisions of this Agreement and to make necessary ministerial changes to this Agreement.

29. **EXECUTION OF AGREEMENT IN COUNTERPARTS.**

    29.1.    This Agreement may be executed in counterparts, and a facsimile signature shall be deemed an original signature for purposes of this Agreement.

30. **DECEASED, DISSOLVED OR BANKRUPT CLASS MEMBERS.**

    30.1.    Where an Economic Class Member is deceased and a payment is due to that Economic Class Member, upon receipt of proper notification and documentation the Settlement Payment will be made to such Economic Class Member's personal representative.  Where an Economic Class Member is no longer in business or dissolved and a Settlement Payment is due to that Economic Class Member, upon receipt of proper notification and documentation the Settlement Payment will be made to such Economic Class Member or its creditors (including governmental taxing authorities) as the Claims Administrator shall reasonably determine. Where an Economic Class Member has been declared bankrupt, or is the subject of an open and ongoing bankruptcy proceeding, and a Settlement Payment is due to that Economic Class Member, upon receipt of proper notification and documentation the Settlement Payment shall be made to such Economic Class Member in accordance with the applicable United States Bankruptcy Code provisions.

31. **MINOR AND INCOMPETENT CLASS MEMBER SETTLEMENT PROVISION.**

    31.1.    A Guardian Ad Litem shall be nominated by the Parties and approved by the Court under Fed. R. Civ. P. 17(c) to examine this Agreement and make a recommendation to the Court regarding the fairness, reasonableness and adequacy of this Agreement to determine whether the Settlement is in the best interest of such Economic Class Members who are **MINOR CLASS MEMBERS** or **INCOMPETENT CLASS MEMBERS**.  The Guardian Ad Litem shall investigate the potential claims for all persons who are minors or incompetent adults, who, but for their lack of capacity, may otherwise participate as Economic Class Members, and shall, following such investigation, report the results of his or her independent investigation to the Parties, and make a recommendation to the Court as to the fairness, reasonableness and adequacy of this Agreement to determine whether the Settlement is in the best interest of such Economic Class Members.

31.2.    In processing a Minor Class Member's claim, to promote judicial efficiency, the Claims Administrator may review all relevant laws relating to distribution of a Minor Class Member's benefits under this Agreement, such that where streamlined procedures exist not requiring domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of a claims administration protocol applicable to Minor Class Members.  The Claims Administrator is also authorized to exercise reasonable discretion in delaying payment to a Minor Class Member where, through a reasonable period of time, such person will reach age of majority; thereby rendering moot any minor settlement or similar proceedings following the law of that Minor Class Member's domicile.

31.3.    Minor or Incompetent Class Members who are otherwise represented by another adult Natural Person, as tutor, guardian, conservator or similar fiduciary at the time of submission of a Claim Form, need not have their rights protected under this Agreement through the Guardian Ad Litem.

31.4.    The Guardian Ad Litem shall work with the Claims Administrator to identify those persons in need of representation before the Court to promote the interests of judicial efficiency through application of federal procedural law, taking into account any relevant state laws that impact distribution to such Minor Class Members and Incompetent Class Members, to ensure that the rights of those persons are fully exercised under the terms of this Agreement.

31.5.    Where a Minor Class Member or Incompetent Class Member is also legally represented in accordance with the law of domicile of such person, the Guardian Ad Litem shall have no standing or power on behalf of such Minor Class Member or Incompetent Class Member

## 32. NO TAX ADVICE.

32.1.    No opinion regarding the tax consequences of this Settlement to any individual Economic Class Member is being given or will be given by BP or its counsel,

Interim Class Counsel or Proposed Economic Class Counsel, nor is any representation or warranty in this regard made by virtue of this Agreement. Plaintiffs must consult their own tax advisors regarding the tax consequences of the Settlement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto. Each Economic Class Member's tax obligations, and the determination thereof, are his, her, or its sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Economic Class Member. The BP Parties shall have no liability or responsibility whatsoever for any such tax consequences resulting from payments under this Settlement. To the extent required by law, the BP Parties will report payments made under the Agreement to the appropriate authorities.

## 33. **NO OTHER RIGHTS OR REMEDIES.**

33.1.    Nothing expressed or implied in this Agreement is intended to or shall be construed to confer upon or give any Natural Person or Entity other than Economic Class Members, Plaintiffs, the BP Parties and the Released Parties any right, benefit, entitlement, claim, cause of action or remedy under or by reason of this Settlement.

## 34. **NOTICE**

34.1.    Written Notice to the Plaintiffs or Economic Class Counsel must be given to Stephen J. Herman, Herman Herman Katz & Cotlar, 820 O'Keefe Avenue, New Orleans, LA 70113, Sherman@hhkc.com, and James P. Roy, Domengeaux Wright Roy & Edwards, 556 Jefferson Street, Lafayette, LA 70502, jimr@wrightroy.com. Written notice to BP must be given to Richard C. Godfrey, Kirkland & Ellis LLP, 300 North LaSalle Blvd, Chicago, IL 60654, rgodfrey@kirkland.com, and R. Keith Jarrett, Liskow & Lewis, Suite 5000, One Shell Square, 701 Poydras Street, New Orleans, LA 70139, rkjarrett@liskow.com. All notices required by the Agreement shall be sent by overnight delivery and electronic mail.

35. **WAIVER**

    35.1.      The waiver by any Party of any breach of this Agreement by another Party shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, to this Agreement.

36. **APPLICABLE LAW**

    36.1.      Notwithstanding the law applicable to the underlying claims, which the Parties dispute, this Agreement and the Release and Individual Releases hereunder shall be interpreted in accordance with General Maritime Law as well as in a manner intended to comply with OPA.

37. **GUARANTOR**

    37.1.      BPCNA shall not be a Party to this Agreement, but shall serve as Guarantor of the BP Parties' payment obligations under this Agreement as set forth in the Guarantee attached hereto as Exhibit 24A.  BP p.l.c. shall not be a Party to this Agreement, but shall serve as a Back-Up Guarantor as set forth in the Guarantee attached hereto as Exhibit 24B.

38. **DEFINITIONS.**[6]

    38.1.      For purposes of this Agreement, the following terms (designated by capitalization throughout this Agreement) shall have the following meanings.  Terms used in the singular shall be deemed to include the plural and vice versa.  In addition, many of the Exhibits to this Agreement contain Definitions, which shall be applicable to any and all provisions applying, referencing or incorporating such Exhibit.[7]

    38.2.      Action shall mean the Complaint filed in *Bon Secour Fisheries, Inc. v. BP* on or about April 16, 2012, Civil Action No. 12-970, and any amendments thereto.

    38.3.      Affiliate means with respect to any Natural Person or Entity, any other Natural Person or Entity that directly, or indirectly, through one or more intermediaries,

---

[6] These definitions are of key terms used in the Agreement.  Additional definitions may be found in the Exhibits hereto, and shall not be repeated herein.

[7] For example, Exhibit 3 contains Seafood Distribution Chain definitions.

controls, or is controlled by, or is under common control with, such Natural Person or Entity.

38.4.    Agreement shall mean this Economic and Property Damages Settlement Agreement.

38.5.    Appeal Panel shall mean the panel appointed pursuant to the Appeal Process.

38.6.    Appeal Panelist shall mean an individual serving on the Appeal Panel pursuant to the Appeal Process.

38.7.    Appeal Process shall mean the process through which an Economic Class Member may appeal a decision by the Settlement Program regarding the payment of compensation pursuant to one or more of the Claims Processes under this Agreement as set forth in Section 6 above and presented more fully in Exhibit 25.

38.8.    Assigned Claims shall mean the claims defined in Exhibit 21.

38.9.    Back-Up Guarantor shall mean BP p.l.c.

38.10.    Benchmark Period shall have the meaning set forth in the Definitions section of the relevant framework (*e.g.*, Business Economic Loss, Individual Economic Loss) applicable to a Claim.

38.11.    Bodily Injury Claims shall mean claims and damages, including lost wages, for or resulting from personal injury, latent injury, future injury, progression of existing injury, damage, disease, death, fear of disease or injury or death, mental or physical pain or suffering, or emotional or mental harm, anguish or loss of enjoyment of life, including any claim for mental health injury, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.12.    BP shall mean BP Exploration & Production Inc., BP America Production Company, BP America Inc., BP Company North America Inc., BP Corporation North America Inc., BP Corporation North America Inc. Savings Plan

Investment Oversight Committee, BP Energy Company, BP Exploration (Alaska) Inc., BP Global Special Products (America) Inc., BP Holdings North America Limited, BP p.l.c., BP Products North America Inc., and each of their respective direct or indirect parents, subsidiaries and subsidiary undertakings (as those terms are defined in the U.K. Companies Act 2006), Affiliates, divisions, and business units.

38.13.   BP's Counsel shall mean Kirkland & Ellis LLP and Liskow & Lewis.

38.14.   BP Parties shall mean BP Exploration & Production Inc. and BP America Production Company.

38.15.   Business Claimant or Business Economic Loss Claimant shall mean an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member claiming Economic Damage allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.16.   Business Economic Loss Claims shall mean the Claims brought by the Business Economic Loss Claimants described in Exhibits 4A-7.

38.17.   Charterer shall mean BP, Lawson, USMS, USES, DRC, or any other BP subcontractor utilized by BP to implement the VoO Program.

38.18.   Charter Fishing shall mean owners, captains and deckhands that carry Passenger(s) for Hire to engage in Recreational Fishing.

38.19.   Claim shall mean any demand or request for compensation (other than Bodily Injury Claims or Expressly Reserved Claims), together with any properly completed form and accompanying required documentation, submitted by a Claimant to the Settlement Program.

38.20.   Claimant shall mean any Natural Person or Entity that submits a Claim to the Settlement Program seeking compensation as a member of the Economic Class.

38.21.    Claims Administrator shall mean that person or entity selected and appointed or designated by the Court who shall administer this Economic and Property Damages Settlement under the supervision of the Court in accordance with the terms set forth in Section 4.

38.22.    Claims Administration Panel shall mean the panel consisting of the Claims Administrator, one representative designated by BP and one representative designated by Lead Class Counsel.

38.23.    Claims Administration Staff shall mean the individuals employed by the Claims Administrator and or Claims Administration Vendors.

38.24.    Claims Administration Vendor.  The initial Claims Administration Vendors have been selected by the Parties and approved by the Court.  Subsequently, Claims Administration Vendors shall mean an Entity or Entities selected by the Parties and approved by the Court.

38.25.    Claim Forms shall mean all forms and materials required under this Agreement or by the Settlement Program to support a Claim, including all supporting documentation required by any such Claim Form.

38.26.    Claim Processes shall mean the Seafood Compensation Program Claim Process, Coastal Real Property Claim Process, Economic Damage Claim Process, Real Property Sales Claim Process, Subsistence Claim Process, VoO Claim Process, Vessel Physical Damage Claim Process and Wetlands Real Property Claim Process.

38.27.    Class Notice Administrator shall mean the entity selected and appointed or designated by the Court who shall administer the Class Notice and Class Notice Plan.

38.28.    Class Period shall mean April 20, 2010 until the date of the filing of the Action, which is April 16, 2012.

38.29.    Coastal Real Property shall mean the property in the Coastal Real Property Claim Zone.

38.30.    Coastal Real Property Claim Process shall mean that process described in the Compensation Framework for Coastal Real Property Claims, attached as Exhibit 11A.

38.31.    Coastal Real Property Claim Zone shall mean the areas identified on the Coastal Real Property Compensation Zone Map included with the Coastal Real Property Claim Framework.

38.32.    Coastal Real Property Claimant shall mean an Economic Class Member claiming to have suffered Coastal Real Property Damage.

38.33.    Coastal Real Property Compensation Amount shall mean the Compensation Amount calculated for an eligible Coastal Real Property Claimant for Coastal Real Property Damage pursuant to the terms of the Agreement including the Coastal Real Property Claim Framework.

38.34.    Coastal Real Property Damage shall mean a loss alleged by a Coastal Real Property Claimant that satisfies the requirements set forth in the Coastal Real Property Claim Framework.

38.35.    Compensation Amount shall mean that amount awarded to a Claimant prior to the addition of any RTP.

38.36.    Compensation Period shall have the meaning set forth in the Definitions section of the relevant framework (*e.g.*, Business Economic Loss, Individual Economic Loss) applicable to a Claim.

38.37.    Consumer shall mean a Natural Person or an Entity who or which buys any product for individual use or consumption and not for manufacture or resale.

38.38.    "Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary

course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business.  In addition, "contemporaneous" or "contemporaneously" prepared evidence or documentation, even if not proximate in time to the event or occurrence to which it relates, shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question, (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred.

38.39.   Corporate Headquarters or Headquarters shall mean a physical office in which the principal executive offices and direct support staff for senior management functions of a business Entity are located.

38.40.   Court shall mean the United States District Court for the Eastern District of Louisiana, Judge Carl Barbier, presiding, in *In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179.

38.41.   Deepwater Horizon Court Supervised Settlement Program or Settlement Program shall mean all of the activities and obligations of the Claims Administrator or those under his supervision necessary to implement the Deepwater Horizon Economic and Property Damages Settlement Agreement.

38.42.   Deepwater Horizon Economic Litigation shall mean all Claims brought by Plaintiffs or any Economic Class Member for damage covered by the Seafood Compensation Program, Coastal Real Property Damage, Economic Damage, Real Property Sales Damage, Subsistence Damage, VoO Charter Payment, Vessel Physical Damage or Wetlands Real Property Damages allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, in the multidistrict litigation titled *In re Oil Spill by*

*the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (MDL No. 2179).

38.43.  Deepwater Horizon Incident shall mean the events, actions, inactions and omissions leading up to and including (i) the blowout of the **MC252 WELL;** (ii) the explosions and fire on board the *Deepwater Horizon* on or about April 20, 2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010; (iv) the release of oil, other hydrocarbons and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances; (v) the efforts to contain the MC252 Well; (vi) **RESPONSE ACTIVITIES**, including the VoO Program; (vii) the operation of the GCCF; and (viii) BP public statements relating to all of the foregoing.

38.44.  Deepwater Horizon Oil Spill Trust shall mean the irrevocable common law trust established under Delaware law in accordance with the trust agreement titled "Deepwater Horizon Oil Spill Trust" dated August 6, 2010, and entered into among BP Exploration & Production Inc.; John S. Martin, Jr. and Kent D. Syverud, as individual trustees; and Citigroup Trust-Delaware, N.A., as corporate trustee.

38.45.  Directed Trustee shall mean the J. P. Morgan Trust Company of Delaware, exercising the limited authority as set forth in the Economic Settlement Trust Agreement, with the Claims Administrator serving as Trustee of the Settlement Trust.

38.46.  Economic and Property Damages Settlement Class shall have the meaning set forth in Sections 1 and 2.

38.47.  Economic Settlement Trust Account shall mean the account of the Settlement Trust into which the BP Parties shall pay, or cause to be paid, all amounts required to be paid to the Settlement Trust and from which the Trustee and/or the Directed Trustee shall transfer into the Funds listed in Section 5.12.1 such amounts as required under Section 5.12.

38.48.      Documentation Reviewer shall be the individual assigned by the Claims
            Administrator to review Claims denied, in whole or in part, on grounds of
            insufficient documentation.

38.49.      Economic and Property Damages Settlement Class Member or Economic Class
            Member shall mean all such Natural Persons or Entities who or that satisfy the
            requirements for membership in the Economic Class and do not timely and
            properly Opt Out of the Economic Class as set forth in Section 8 above.

38.50.      Economic and Property Damages Settlement Class Member Individual Release or
            Individual Release shall mean the document attached as Exhibit 26, which is a
            Release and Covenant not to Sue that must be executed by any Economic Class
            Member who or that receives compensation for a Claim pursuant to one or more
            of the Claim Processes prior to the Effective Date.

38.51.      Economic and Property Damages Settlement Class Notice Plan or Class Notice
            Plan shall mean that which sets forth the methods, timetable, and responsibilities
            for providing notice of this Agreement to Economic Class Members.

38.52.      Economic and Property Damages Settlement Class Representatives or Plaintiffs
            shall mean the named Plaintiffs in the Action.

38.53.      Economic Class shall mean the Economic and Property Damages Settlement
            Class.

38.54.      Economic Class Counsel shall mean the Economic and Property Damages
            Settlement Class Counsel appointed by the Court.

38.55.      Economic Class Release shall mean the Release described in Section 10.

38.56.      Economic Class Representatives shall mean the named plaintiffs in the Action.

38.57.      Economic Damage shall mean loss of profits, income and/or earnings arising in
            the Gulf Coast Areas or Specified Gulf Waters allegedly arising out of, due to,
            resulting from, or relating in any way to, directly or indirectly, the Deepwater

Horizon Incident; provided, however, that Economic Damage does not include (1) loss of profits or earnings, or damages for injury relating to real property or personal property that constitutes any part of the Seafood Compensation Program, Coastal Real Property Damage, Real Property Sales Damage, Wetlands Real Property Damage, Vessel Physical Damage, or (2) VoO Charter Payment, or (3) damages for loss of Subsistence use of natural resources, which constitutes Subsistence Damage.

38.58.   Economic Damage Claim Process shall mean that process described in the Economic Damage Claim Frameworks.

38.59.   Economic Damage Claim Frameworks shall mean the rules described in Exhibits 4A-8E.

38.60.   Economic Damage Claimant shall mean an Individual Claimant or Business Claimant who or that claims to have suffered Economic Damage.

38.61.   Economic Damage Compensation Amount shall mean the compensation amount calculated for an Economic Damage Claimant pursuant to the terms of the Agreement and the Economic Damage Claim Frameworks, as applicable.

38.62.   Effective Date shall mean (1) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment, if no such appeal is filed, or (2) if an appeal of the Final Order and Judgment is filed, the date upon which all appellate courts with jurisdiction (including the United States Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible, or (3) such date as the Parties otherwise agree in writing.

38.63.   Eligible Real Property Sales Claimants shall mean those Claimants who were sellers of Residential Parcels within the Real Property Sales Compensation Zone who satisfy the following criteria:

38.63.1.   owned a Residential Parcel in the Real Property Sales Compensation Zone

on April 20, 2010; and

38.63.2.    executed a sales contract[8]  for the sale of that Residential Parcel that meets the following criteria:

38.63.2.1.  the sales contract was executed on or after April 21, 2010 and the sale closed during the time period of April 21, 2010 to December 31, 2010; or

38.63.2.2.  the sales contract was executed before April 21, 2010, but the Settlement Program determines pursuant to the Real Property Sales Claim Framework that the contract price was reduced as a result of the Deepwater Horizon Incident.  Additionally, the sale must have closed during the time period April 21, 2010 to December 31, 2010.

38.64.    End User shall mean a Natural Person or Entity that buys any product for his, her or its individual use or consumption and not for manufacture or resale.

38.65.    Entity shall mean an organization or entity, other than a **GOVERNMENTAL ORGANIZATION**, operating or having operated for profit or not-for-profit, including a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture or an unincorporated association of any kind or description.

38.66.    Exclusions shall mean the Natural Persons or Entities excluded from membership in the Economic Class, as set forth in Section 2 above.

38.67.    Expressly Reserved Claims shall mean the following Claims which are not recognized or released under the Agreement, and are reserved to the Economic Class Members:  (1) Bodily Injury Claims, which are excluded from the Economic Class, but certain of which may be asserted in the Medical Benefits Class Action Settlement as described herein; (2) claims of BP shareholders in any derivative or direct action solely in their capacity as BP shareholders; (3) claims

---

[8] Sales do not include transfers from borrowers to lenders that take place as part of the foreclosure process, such as deeds in lieu of foreclosure, foreclosure deeds, or Sheriff's deeds.

of Natural Persons and Entities for Moratoria Losses; (4) claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting; and (5) claims for Economic Damage suffered by Entities or employees (to the extent they allege Economic Damage based on their employment by such an Entity during the Class Period) in the Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development, and Defense Contractor Industries, as defined in Section 2.2.4.

38.68.    Failed Business shall mean a business Entity that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

38.69.    Failed Start Up Business shall mean a business Entity that commenced operations on or after November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

38.70.    Fairness Hearing shall mean the hearing set and conducted by the Court pursuant to Fed. R. Civ. P. 23(e) to consider and determine whether to grant final approval to this Agreement, as described in Section 8 above.

38.71.    Festival Vendors shall have the meaning set forth in Exhibit 8D.

38.72.    Final Order and Judgment shall mean an order entered by the Court, described in Section 15 above.

38.73.    Finfish shall mean fish other than shellfish and octopuses.

38.74.    GCCF shall mean the Gulf Coast Claims Facility.

38.75.    GCCF Release and Covenant Not to Sue shall mean the release executed in exchange for payment of a GCCF claim.

38.76.   Game shall include nutria, mink, otters, raccoons, muskrats, alligators, and other wildlife.

38.77.   Governmental Organization shall mean:  (a) the government of the United States of America, (b) any state or local government, (c) any agency, branch, commission, department, or unit of the government of the United States of America or of any state or local government, or (d) any Affiliate of, or any business or organization of any type that is owned in whole or at least 51% in part by the government of the United States of America or any state or local government, or any of their agencies, branches, commissions, departments, or units.

38.78.   Guarantee shall mean the guarantees attached as Exhibit 24A, 24B.

38.79.   Guarantor shall mean BPCNA.

38.80.   Gulf Coast Areas shall mean the States of Louisiana, Mississippi, and Alabama; the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas; and the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama or those described counties of Texas or Florida.  (Exhibit 22)

38.81.   Halliburton shall mean Halliburton Energy Services, Inc. and all and any of its Affiliates, other than any Natural Person or Entity that is also an Affiliate of any of the Released Parties.

38.82.   Home Ported shall mean the home port of a vessel as documented by a 2009 or 2010 government-issued vessel registration.

38.83.   Incompetent Class Member shall mean a Natural Person who lacks the capacity to enter into a contract on his or her behalf at the time of a Claims Form submission to the Claims Administrator, in accordance with the state laws of that person's domicile as applied to adult capacity issues, whether through power of attorney, agency documents, guardianship, conservatorship, tutorship, or otherwise.

38.84.   Individual Claimant shall mean a Natural Person who is an Economic Class Member alleging Economic Damage arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident with a Claim in addition to or other than a Claim for Economic Damage related to such Natural Person's sole proprietorship business or other self-employment as reflected on Schedule C, D or E of a federal income tax form.

38.85.   Individual Economic Loss Claims shall mean the Claims brought by individuals described in Exhibits 8A-8E.

38.86.   Individual Periodic Vendor shall have the meaning set forth in Exhibit 8D.

38.87.   Individual Release shall mean the form of release described in Section 4.4.10.2.

38.88.   Interim Class Counsel shall mean James Parkerson Roy and Stephen J. Herman.

38.89.   Lead Class Counsel shall mean the Economic and Property Damages Settlement Lead Class Counsel appointed by the Court.

38.90.   MC252 Well shall mean the exploratory well named "Macondo" that was being drilled by the Transocean *Marianas* and *Deepwater Horizon* rigs in Mississippi Canyon, Block 252 on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

38.91.   MDL 2179 or MDL shall mean the federal multidistrict litigation titled *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (MDL No. 2179).

38.92.   Minor Class Member shall mean a Natural Person whose age is below that of the majority rule for the state in which the minor resides at the time of a Claim Form submission to the Claims Administrator.

38.93.   Moratoria Loss shall mean any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity -- including shallow water and deepwater activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices.

38.94.   Multi-Facility Business shall have the meaning set forth in Exhibit 5.

38.95.   Natural Person shall mean a human being, and shall include the estate of a human being who died on or after April 20, 2010.  For purposes of this Agreement, a Natural Person that is the estate of a human being who died on or after April 20, 2010, a Minor Class Member or Incompetent Class Member, shall be deemed to act through his, her or its Representative.

38.96.   New Entrant to Employment shall have the meaning set forth in Exhibit 8A.

38.97.   Non-Working VoO Compensation Amount shall mean the Compensation Amount calculated for a Non-Working VoO Participant pursuant to the Section 5.5.3 of the Agreement.

38.98.   Non-Working VoO Participant shall mean a vessel owner who executed a VoO Master Vessel Charter Agreement with a Charterer, and completed the initial VoO training program, but was never dispatched, placed on hire or otherwise asked to perform work for a Charterer.

38.99.   OPA shall mean the Oil Pollution Act of 1990, 33 U.S.C. § 2701, et seq.

38.100.   OPA Process shall mean the claims presentment procedure pursuant to the OPA, including claims that have been submitted to the BP Parties or claims that have been submitted to the GCCF as part of the OPA Process.

38.101.    Opt Out shall mean the process by which any Natural Person (acting through such Natural Person's Representative, if applicable) or Entity included in the Economic Class exercises his, her or its right to exclude himself, herself or itself from the Economic Class in accordance with Fed. R. Civ. P. 23(c)(2) and the procedures set forth in the Class Notice.

38.102.    Opt Outs shall mean those Natural Persons (acting through their Representatives, if applicable) or Entities included in the Economic Class who or which have timely and properly exercised their right to Opt Out and therefore are not Economic Class Members.

38.103.    Parties shall mean the Plaintiffs and the BP Parties.

38.104.    Passenger(s) for Hire shall mean a passenger for whom consideration is contributed as a condition of carriage on the vessel, whether directly or indirectly flowing to the owner, operator, agent, deckhand, or any other person having an interest in the vessel.

38.105.    Pending Unresolved GCCF Claims shall mean all claims in the GCCF except where the GCCF has issued final offers that have neither been accepted nor rejected by the Claimant and have not expired by their own terms.

38.106.    Plaintiffs shall mean those Natural Persons and Entities appearing as named plaintiffs and proposed class representatives in the Action.

    38.106.1.    Plaintiffs' Steering Committee or PSC shall mean those counsel appointed to the Plaintiffs' Steering Committee by the Court, in its Pretrial Order No. 46, dated October 5, 2011 (Doc. 4226) in the MDL.

38.107.    Proposed Economic Class Counsel shall mean the members of the Plaintiffs Executive Committee and Plaintiffs Steering Committee, who seek to be appointed Economic and Property Damage Settlement Class Counsel by the Court.

38.108.    PSC shall mean the Plaintiffs' Steering Committee.

38.109.    Real Property shall mean land, including improvements thereon, and property of any nature appurtenant or affixed thereto.

38.110.    Real Property Compensation Zone Map(s) shall mean the map(s) attached to the Agreement as Exhibit 13B.

38.111.    Real Property Sales Claim Process shall mean that process described in the Real Property Sales Claim Framework.

38.112.    Real Property Sales Damage shall mean a loss alleged by an eligible Claimant that satisfies the requirements set forth in the Real Property Sales Claim Framework.

38.113.    Real Property Sales Claim Framework shall mean the requirements described in the document captioned Real Property Sales Claim Framework, attached to this Agreement as Exhibits 13A and 13B.

38.114.    Real Property Sales Claimant shall mean an Economic Class Member claiming to have suffered Real Property Sales Damage.

38.115.    Real Property Sales Compensation Amount shall mean the Compensation Amount calculated for an Eligible Real Property Sales Claimant for Real Property Sales Damage pursuant to the terms of the Agreement and the Real Property Sales Claim Framework.

38.116.    Real Property Sales Compensation Zone shall be defined as Residential Parcels identified in the Real Property Compensation Zone Map.

38.117.    Real Property Sales Damage shall mean a loss alleged by a Real Property Sales Claimant that satisfies the requirements set forth in the Real Property Sales Claim Framework.

38.118.    Recreational Fishing shall mean fishing for sport or pleasure.

38.119.   Related Claims shall mean all claims brought by Economic Class Members against any of the Released Parties that are covered by the Release and which are pending in the Court, in any other federal court, in any state court, or in any other tribunal or forum.

38.120.   Release is defined in Section 10.4 above.

38.121.   Released Claims is defined in Section 10.2 above.

38.122.   Released Parties is defined in Section 10.3 above.

38.123.   Representative shall mean in the context of a Natural Person who is a minor or incapacitated, his legal guardian; or in the case of a deceased Natural Person, the duly authorized legal representative of his estate.

38.124.   Residential Parcels shall mean those parcels within the Real Property Sales Compensation Zone for which the county where the parcel is located has designated the parcel as a residential classification.

38.125.   Response Activities shall mean the clean up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the releases of oil, other hydrocarbons and other pollutants from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and the Deepwater Horizon Incident.

38.126.   RTP (risk transfer premium) shall mean the amount paid to a Claimant for any and all alleged damage, including potential future injuries, damages or losses not currently known, which may later manifest themselves or develop, arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon Incident, and any other type or category of damages claimed, including claims for punitive damages. To the extent that an RTP is to be paid to a Claimant, it shall be a factor which is multiplied with those Compensation Amounts which the Exhibits to this Agreement specify are eligible for an RTP to calculate a sum which is added to the Compensation Amount paid to the Claimant. For example, if the

Compensation Amount is $1, and the RTP is 2.5, then $1 is multiplied by 2.5, which product is then added to the $1 to reach the total amount of compensation ($1 + $2.50 = $3.50 in total compensation). The RTP Chart (Risk Transfer Premium) is set forth in Exhibit 15.

38.127.  SCAT shall mean the Deepwater Horizon Unified Command Shoreline Cleanup Assessment Teams.

38.128.  Seafood shall mean fish and shellfish, including shrimp, oysters, crab, and Finfish, caught in the Specified Waters of the Gulf of Mexico. Seafood shall exclude menhaden.

38.129.  Seafood Compensation Program shall mean the program defined in Section 5.2.

38.130.  Seafood Compensation Program Amount shall mean $2.3 billion, as such amount is reduced (i) pursuant to Section 4.2.7 for certain transition payments to Commercial Fisherman, Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners, and (ii) for credits, if any, to the BP Parties in respect of certain Opt Outs by Commercial Fisherman, Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners pursuant to the **SEAFOOD PROGRAM OPT OUT TERMS.**

38.131.  Seafood Compensation Program Settlement Fund shall mean the fund used by the Claims Administrator to make payments under the Seafood Compensation Program.

38.132.  Seafood Program Opt Out Terms shall mean the terms agreed to by the Parties with respect to Seafood Compensation Program Opt Outs. The Seafood Program Opt Out Terms will be submitted under seal to the Court.

38.133.  Settlement shall mean the terms and conditions of the Agreement reached by the Parties.

38.134.  Settlement Payment shall mean the Total Compensation Amount to be paid to a Claimant for any Claim made pursuant to the terms of the Agreement, including the Frameworks in the exhibits.

38.135.   Settlement Trust shall have the meaning set forth in Section 5.12.1.

38.136.   Specified Gulf Waters shall mean the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23.

38.137.   Start Up Business shall mean a business with less than 18 months of operating history at the time of the Deepwater Horizon Incident, as more fully described in Exhibit 7.

38.138.   Subsistence shall mean fishing or hunting to harvest, catch, barter, consume or trade Gulf of Mexico natural resources (including Seafood and Game), in a traditional or customary manner, to sustain basic personal or family dietary, economic security, shelter, tool, or clothing needs.

38.139.   Subsistence Claim Process shall mean that process for determining eligibility and compensation described in the Subsistence Claim Framework.

38.140.   Subsistence Claim Framework shall mean the document attached to this Agreement as Exhibit 9.

38.141.   Subsistence Compensation Amount shall mean the Compensation Amount calculated for an eligible Subsistence Claimant for Subsistence Damage pursuant to this Agreement and the Subsistence Claim Framework.

38.142.   Subsistence Damage shall mean a loss of value of Subsistence use of natural resources alleged to arise out of, result from or relate in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.143.   Summary Publication Notice shall mean that notice of Preliminary Approval Order, the Agreement, and the Fairness Hearing as approved by the Court.

38.144.   Supplemental Information Program shall mean a program developed by the PSC to provide additional information to Economic Class Members regarding the Settlement.

38.145.   Support Services to Oil and Gas Industry shall mean Entities the Claims
Administrator determines fall within the NAICS codes and descriptions marked
with an "x" on Exhibit 19.

38.146.   Sworn Written Statement shall mean a statement provided under penalty of
perjury, in support of a Claim.

38.147.   Total Compensation Amount shall mean the Compensation Amount, plus any
RTP and any other amounts due for any Claim less any applicable offsets under
this Agreement or its Frameworks.

38.148.   Tourism shall mean the definition set forth in Exhibit 2.

38.149.   Transition Claims shall mean those claims, including Pending Unresolved GCCF
Claims, submitted as part of the Transition Claims Process described in Section
4.2.

38.150.   Transition Coordinator shall mean the Claims coordinator described in Section
4.2.

38.151.   Transition Process shall mean the Claims process described in Section 4.2.

38.152.   Transocean shall mean Transocean Ltd., Transocean, Inc., Transocean Offshore
Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC,
and Triton Asset Leasing GmbH and all and any of their Affiliates, other than any
Natural Person or Entity that is also an Affiliate of any of the Released Parties

38.153.   Trustee shall mean the Claims Administrator when serving as trustee of the
Settlement Trust, with Directed Trustee J. P. Morgan Trust Company of Delaware
exercising the limited authority as set forth in the Economic Settlement Trust
Agreement.

38.154.   Unknown Claims is defined in Section 10.5 above.

38.155.    Vessel Physical Damage shall mean physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program, that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof.

38.156.    Vessel Physical Damage Claim Framework shall mean the rules described in the document captioned Vessel Physical Damage Framework attached to this Agreement as Exhibit 14.

38.157.    Vessel Physical Damage Claim Process shall mean that process described in the Vessel Physical Damage Claim Framework.

38.158.    Vessel Physical Damage Compensation Amount shall mean the Compensation Amount calculated for a Vessel Physical Damage Claimant pursuant to the terms of the Agreement and the Vessel Physical Damage Claim Framework.

38.159.    VoO shall mean Vessels of Opportunity, the program through which BP, or its contractors, contracted with vessel owners to assist in Deepwater Horizon Incident response efforts.

38.160.    VoO Agreement shall mean the terms provided in Section 5.5 of the Agreement.

38.161.    VoO Claim Process shall mean that process described Section 5.5 of the Agreement.

38.162.    VoO Charter Payment shall mean a loss alleged by a VoO Charter Payment Claimant for any payment or compensation related to participation in the VoO program that satisfies the requirements set forth in Section 5.5 above.

38.163.    VoO Charter Payment Claimant shall mean an Economic Class Member claiming to have suffered a VoO Charter Payment loss.

38.164.   VoO Earned Income Offset shall mean the offset whereby, if a VoO Charter Payment Claimant has previously been paid under a VoO Master Vessel Charter Agreement, the Claimant's Compensation Amount for its Claim relating to a non-Seafood-related business directly involving the use of the vessel that performed the VoO services, or employment in such business or service, shall be reduced by 33% of the amount previously paid for services performed under a VoO Master Vessel Charter Agreement.  This reduction shall be applied after the addition of any applicable RTP to the base Economic Damage Compensation Amount, excluding prior income from the VoO Charter Payments.

38.165.   VoO Master Vessel Charter Agreement shall mean the standard agreements utilized by BP and its agents or subcontractors to charter the vessels available for work or service in connection with the VoO program.

38.166.   VoO Settlement Payment Offset shall mean the offset whereby the Total Compensation Amount for a Natural Person or Entity relating to a non-Seafood-related business directly involving the use of the vessel that performed the VoO services, or employment in such business or service, shall be reduced by 50% of the amount of the Working VoO Participant Settlement Payment.  The VoO Settlement Payment Offset shall be applied after the addition of any applicable RTP to the base Economic Damage Compensation Amount, excluding prior income from the VoO Charter Payments.

38.167.   Wetlands Real Property Claimant shall mean an Economic Class Member claiming to have suffered Wetlands Real Property Damage.

38.168.   Wetlands Real Property Claim Process shall mean that process described in the Wetlands Real Property Claim Framework.

38.169.   Wetlands Real Property Claim Framework shall mean the requirements described in the document captioned Compensation Framework for Wetlands Real Property Claims, attached to this Agreement as Exhibits 12A-12B.

38.170.   Wetlands Real Property Compensation Amount shall mean the Compensation Amount calculated for an eligible Wetlands Real Property Claimant for Wetlands Real Property Damage pursuant to the terms of the Agreement and the Wetlands Real Property Claim Framework.

38.171.   Wetlands Real Property Damage shall mean a loss alleged by a Wetlands Real Property Claimant that satisfies the requirements set forth in the Wetlands Real Property Claim Framework.

38.172.   Working VoO Compensation Amount shall mean the Compensation Amount calculated for a Working VoO Participant pursuant to Section 5.5.2 of the Settlement Agreement.

38.173.   Working VoO Participant shall mean a vessel owner who executed a VoO Master Vessel Charter Agreement, completed the initial VoO training program, and was dispatched or placed on-hire (*i.e.*, requested by a Charterer to perform work and such request was accepted) by a Charterer (evidence of which shall include Charterers' dispatch logs).

38.174.   Zone A shall mean the geographic areas set forth in Exhibits 1A-1C.

38.175.   Zone B shall mean the geographic areas set forth in Exhibits 1A-1C.

38.176.   Zone C shall mean the geographic areas set forth in Exhibits 1A-1C.

38.177.   Zone D shall mean the residual portions of the Gulf Coast Areas outside of Zones A-C.

**ORIGINAL SIGNATURE PAGES FOR *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT DATED APRIL 18, 2012**

Executed this 18th day of April, 2012.

BP EXPLORATION & PRODUCTION INC.


By: _____
Name: James J. Neath
Title: Associate General Counsel



By: _____

Name: Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP Exploration & Production Inc.



BP AMERICA PRODUCTION COMPANY


By: _____
Name: James J. Neath
Title: Associate General Counsel



By: _____

Name: Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP America Production Company

113

PLAINTIFFS' INTERIM CLASS COUNSEL

By: _____

Name: James Parkerson Roy

By: _____

Name: Stephen J. Herman

**SIGNATURE PAGES FOR FIRST AMENDMENT TO *DEEPWATER HORIZON*
ECONOMIC AND PROPERTY DAMAGES
SETTLEMENT AGREEMENT DATED MAY 2, 2012**

BP EXPLORATION & PRODUCTION INC.

By: _____
Name:  James J. Neath
Title:  Associate General Counsel

By: _____

Name:  Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP Exploration & Production Inc.

BP AMERICA PRODUCTION COMPANY

By: _____
Name:  James J. Neath
Title:  Associate General Counsel

By: _____

Name:  Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP America Production Company

BP EXPLORATION & PRODUCTION INC.

By: _____
Name:  James J. Neath
Title:  Associate General Counsel

By: _____
Name:  Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP Exploration & Production Inc.

BP AMERICA PRODUCTION COMPANY

By: _____
Name:  James J. Neath
Title:  Associate General Counsel

By: _____
Name:  Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP America Production Company

PLAINTIFFS' INTERIM CLASS COUNSEL

By: _____

Name: James Parkerson Roy

By: _____

Name: Stephen J. Herman

amend. No. 1 (ECON.)