UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |

......................................................................................................................................

## MEMORANDUM IN SUPPORT OF

## UNITED STATES' UNOPPOSED MOTION
## FOR ENTRY OF CONSENT DECREE

TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Procedural History, and Status of the Case against MOEX . . . . . . . . . . . . . . . . . . 4

II.   The Terms of the Consent Decree  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  Legal Standard for Entry of a Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   Argument:  The Proposed Consent Decree Meets the Standard for Entry and
      Should Be Entered as a Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    The Settlement is Fair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    The Settlement is Reasonable, Adequate, and Consistent with the
            Purposes of the CWA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    The Comments on the Consent Decree Do Not Provide a Basis for Rejection of
      the Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.    Comments from Environmental Groups  . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.    Comments from Private Attorneys with Filed Civil Actions  . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

FEDERAL CASES

*Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128
  (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 11

*Ho v. Martin Marietta Corp.*, 845 F.2d 545 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 9

*In re: Tutu Water Wells CERCLA Litig.*, 326 F.3d 201 (3rd Cir. 2003) . . . . . . . . . . . . . . 9

*Ruiz v. McKaskle*, 724 F.2d 1149 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546
  (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409 (6th Cir. 1991) . . . . . . 9

*United States v. Browning-Ferris Indus. Chem. Servs., Inc.,* 704 F. Supp. 1355
  (M.D. La. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1ˢᵗ Cir. 1990) . . . . . . . . . . . 9, 10, 11

*United States v. City of Alexandria*, 614 F.2d 1358 (5th Cir. 1980) . . . . . . . . . . . . . . . . 9

*United States v. City of Jackson*, 519 F.2d 1147 (5th Cir. 1975.) . . . . . . . . . . . . . . . . . . 9

*United States v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . 4, 8

*United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854 (S.D. Miss. 1998) . . . . . . . . 12

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) . . . . . . . . . . . 12

*United States v. Scruggs*, No. G-06-776, 2009 WL 500608 (S.D. Tex. Feb. 26, 2009) . 12

*United States v. Texas Educ. Agency*, 679 F.2d 1104 (5th Cir. 1982) . . . . . . . . . . . . . . 9

*United States v. Wallace*, 893 F. Supp. 627 (N.D. Tex. 1995) . . . . . . . . . . . . . . . 8, 10, 11

STATE CASES

*Spectra-Physics, Inc. v. Superior Court*, 198 Cal.App.3d 1487, 244 Cal.Rptr. 258 (Cal. App. 6 Dist. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

FEDERAL STATUTES

16 U.S.C. § 1375(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1436(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1540(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

30 U.S.C. § 1719(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

33 U.S.C. § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 1321(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1321(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

33 U.S.C. § 1321(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15

33 U.S.C. § 1321(b)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

33 U.S.C. § 1321(b)(7)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

33 U.S.C. § 1321(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 23

33 U.S.C. § 1321(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

33 U.S.C. § 2701 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

43 U.S.C. § 1350(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FEDERAL REGULATIONS

63 Fed. Reg. 24796 (May 5, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

77 Fed. Reg. 11158 (Feb. 24, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 C.F.R. § 50.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

TABLE OF EXHIBITS

Exhibit #                 Description

1.                        Written Comments on the Consent Decree received by the
                          Department of Justice

        Exh. 1-A          Comment from Ocean Conservancy dated March 19, 2012
                          ("Comment # 1")

        Exh. 1-B          Comment from Gulf Restoration Network dated March 22, 2012
                          ("Comment # 2")

        Exh. 1-C          Comment from Mobile Baykeeper dated March 26, 2012 ("Comment
                          # 3")

        Exh. 1-D          Comment from Sierra Club dated March 26, 2012 ("Comment # 4")

        Exh. 1-E          Comment from Daniel E. Becnel, Jr. dated March 19, 2012
                          ("Comment # 5")

        Exh. 1-F          Comment from Camilo K. Salas III dated March 22, 2012
                          ("Comment # 6")

2.                        Excerpts from MOEX Offshore 2007 LLC's Corrected Responses to
                          United States' June 10, 2011 First Set of Interrogatories, Requests
                          for Production of Documents, and Requests For Admissions, dated
                          August 1, 2011 (Responses to RFA Nos. 9-10, 14-17 and 25)
                          ("MOEX RFA Responses")

3.                        Excerpts from Deposition of Naoki Ishii, Volumes 1 and 2, dated
                          June 29-30, 2011 (pp. 95, 101-102, 118-124, 139-143, 145-147, 172,
                          243-246).

4.                        April 20, 2010 Letter Agreement authorizing temporary
                          abandonment of the Macondo Well (Deposition Exhibit 2856)

## INTRODUCTION

The United States of America, plaintiff, hereby respectfully moves this Court to enter as a final judgment the proposed Consent Decree that was lodged with the Court on February 17, 2012.  [Doc. 5743].  The proposed $90 million Consent Decree requires MOEX[1] to: pay $70 million in civil penalties to the United States and the five Gulf Coast States and perform $20 million in "Supplemental Environmental Projects" ("SEPs") that will directly benefit the Gulf Coast environment.  Notably, the settlement does not resolve claims for damages for injuries to natural resources (commonly called "NRD").

In keeping with the magnitude of the oil spill at issue in this case, this settlement will be the largest civil penalty ever recovered under the Clean Water Act ("CWA").   On the other hand, the $90 million settlement amount is a rather modest sum compared to the magnitude of the civil penalties that the United States will seek from the other parties. MOEX was a "relatively minor" player at Macondo, and the MOEX Consent Decree should not be seen as a template for potential settlements with BP, Anadarko, or Transocean.  The United States intends to seek vastly higher penalties from these other defendants, and future settlements are more likely to include resolution of claims for damages for injuries to natural resources.  The United States anticipates that – within limits of law and policy – any future settlements will be used to restore resources and address injuries in the Gulf of Mexico.

---

[1] As used herein, "MOEX" means Defendant MOEX Offshore 2007 LLC, and MOEX USA, the sole shareholder of MOEX, and at times, the Mitsui Oil Exploration Company, Ltd. ("MOECO"), the corporate parent of MOEX USA.

MOEX has already consented to entry of the Consent Decree without further notice, (Consent Decree ¶ 52). No other party in *United States v. BPXP, et al.*, 10-4536 has opposed or commented on the settlement, but some who are party to other cases also centralized in MDL 2179 have used the public comment process to oppose the settlement proposed here. The United States' consent to the entry of the lodged Consent Decree was conditioned on the United States' review of any public comments on the Consent Decree, and upon this Court's approval. (Consent Decree ¶ 51); 28 C.F.R. § 50.7. The Department of Justice received six substantive comments on the Consent Decree, which are attached as Exhibit 1. The United States summarizes and responds to each of the comments below. None of the comments disclose any facts or conditions which indicate that the proposed Consent Decree is inappropriate, improper, or inadequate. Indeed, many of the comments suggest what potential future settlements with other parties should achieve while supporting the settlement proposed here and thus do not bear on the legal sufficiency of this settlement. The only basis offered for rejection of this proposed settlement is that MOEX should pay a larger civil penalty.

In litigating to judgment, the United States ultimately might secure a larger penalty from MOEX despite: the lack of evidence of gross negligence on MOEX's part, its relatively small ownership interest in Macondo Well, and its status as a first-time violator of the CWA. It also is possible, however, that the United States could secure a smaller civil penalty by litigating to judgment given MOEX's unique argument against any penalty liability under the CWA and the fact that it may be extremely difficult to collect any penalty judgment in excess of assets that can be found in the United States.

Some of these factors, and others, are discussed below; under all the circumstances, however, the civil penalty proposed for MOEX is an appropriate one.

The Court should enter a consent decree if it is fair, adequate, reasonable, and consistent with the objectives of the CWA.[2]  Because the proposed Consent Decree meets the standard for entry, the United States requests that the Court execute page 28 of the Consent Decree, which was attached to the Notice of Lodging of Consent Decree [Doc. 5743-1], and enter the Consent Decree as a final judgment.

I.   **Procedural History, and Status of the Case against MOEX**

On December 15, 2010, the United States filed *United States v. BPXP, et al.*, 10-4536, against four groups of defendants - BP, Transocean,[3] Anadarko,[4] and MOEX Offshore 2007 – for two types of claims:  (1) civil penalties under Section 311(b) of the CWA, 33 U.S.C. § 1321(b); and (2) declaratory judgment of liability under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*  The claims against MOEX were predicated upon MOEX's ownership of a 10% leasehold interest in the Macondo Well, its contractual agreements with BP, its designation of BP as "Operator" of the Macondo Well, and its other involvement with activities associated with the well.  The case was consolidated under PTO # 1 into the MDL 2179.  Several rulings of this Court are relevant to the pending Consent Decree.

---

[2] *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, concurring); *United States v. Browning-Ferris Indus. Chem. Servs., Inc.,*704 F. Supp. 1355, 1356 (M.D. La. 1988).
[3] The four Transocean entities include Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., and are referred to collectively as "Transocean."
[4] Anadarko Petroleum Corporation and Anadarko E&P Company LP.

First, on February 22, 2012, the Court amply described the CWA and OPA statutory schemes, so that no further discussion is needed in this memorandum. *Order and Reasons [As to the United States', Transocean's, and Anadarko's Cross-Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA]* [Doc. 5809]. The Court also described at length the liability of Anadarko, another co-lessee of the Macondo Well, which can be compared to the liability of MOEX. *Id.* at 5, 15, 17-24.

Second, the Court dismissed private party and state negligence claims against MOEX in the MDL. *Order as to Motions to Dismiss the B1 Master Complaint* [Rec. Doc. 3830]; *Order as to Motions to Dismiss the Complaints of the States of Alabama and Louisiana* [Rec. Doc. 4578]; and *Order as to Motions to Dismiss the B3 Master Complaint* [Rec. Doc. 4159]. But, the Court has not dismissed the United States' claims against MOEX or determined MOEX's liability.

Third, the Court ruled that the primary objectives of a civil penalty are to punish and to deter future pollution. *Order and Reasons as to Transocean and BP's Cross-Motions for Partial Summary Judgment regarding Indemnity* [Doc. 5446] at 20 (and citations therein). The Court has ruled that a penalty must be tailored to the specific defendant and its situation, so that an amount appropriate for one defendant might be ineffective or excessive for another. *Id.* at 21.

Fourth, because of various Orders and the Stipulations in this case, the Phase 1 trial in *United States v. BPXP*, No. 10-4536, as to MOEX, now relates only to whether BP engaged in any gross negligence, willful misconduct, or violations of applicable federal safety, construction, or operating regulations (which would therefore, remove

MOEX's limitation of liability under OPA).  If the Court declines to enter the settlement embodied in the Consent Decree, then the Phase 1 trial will also need to address MOEX's CWA liability (unless it is resolved on summary judgment, as happened with Anadarko).

A final matter of factual background bears mention:  MOEX paid BP about $1 billion to cover compensatory damages and costs (including natural resource damages), and in exchange BP indemnified MOEX for all such compensatory damages and costs. However, consistent with the Court's Indemnity Order [Doc. 5446], the BP settlement does not cover MOEX's liability for civil penalties under the CWA.

## II.     The Terms of the Consent Decree

The Consent Decree requires MOEX to pay civil penalties and perform SEPs (Supplemental Environmental Projects).[5]

MOEX agrees to pay civil penalties in the following amounts with interest to the United States and to each State that has provided to MOEX an executed State Covenant Not to Sue:

|     |                |              |
|-----|----------------|--------------|
| a.  | United States: | $45,000,000  |
| b.  | Alabama:       | $ 5,000,000  |
| c.  | Florida:       | $ 5,000,000  |
| d.  | Louisiana:     | $ 6,750,000  |
| e.  | Mississippi:   | $ 5,000,000  |
| f.  | Texas:         | $ 3,250,000  |

(Consent Decree ¶ 8).

---

[5] As noted above, prior to and at the time of the incident, MOEX held a 10% investment interest in the lease of the Macondo Well site.  MOEX contends that it no longer has any interest in the lease. (Consent Decree ¶ I.)   Since MOEX is no longer an owner or operator of the Macondo Well, the Consent Decree does not include injunctive relief to prevent future violations at the well site.

MOEX has also agreed to perform land acquisition SEPs in Florida, Mississippi, Louisiana, and Texas valued at $20 million.  (Consent Decree ¶ 16).  The purpose of the SEPs is to preserve and protect the SEP properties in their natural state, thus providing environmental benefits to the ecological resources of the SEP properties.  It is anticipated that the SEP properties will contain habitat and natural resources worthy of conservation in perpetuity, and/or will protect water quality in the Gulf of Mexico region.[6]  (Consent Decree ¶ 18).

MOEX also covenants not to sue the United States for any costs or damages relating to the Deepwater Horizon Incident[7], including but not limited to any action under OPA.  (Consent Decree ¶ 43).   In exchange, the United States covenants not to sue MOEX for civil or administrative penalties for the Deepwater Horizon Incident under: (a) the CWA, 33 U.S.C. §§1321(b)(6) or (7); (b) the Outer Continental Shelf Lands Act, 43 U.S.C. § 1350(b) (including the regulations at issue in Phase 1); (c) Endangered Species Act § 11(a)(1), 16 U.S.C. § 1540(a)(1); (d) Marine Mammal Protection Act § 105(a)(1), 16 U.S.C. § 1375(a)(1); (e) National Marine Sanctuaries Act § 306(1), 16 U.S.C. § 1436(1); and (f) the federal Oil and Gas Royalty Management Act, 30 U.S.C. § 1719(a).  (Consent Decree ¶ 42).

---

[6] The Consent Decree also establishes procedures for resolving disputes about these SEPs, if any arise, (Consent Decree § VII), as well as stipulated penalties if MOEX fails to meet a SEP requirement. (Consent Decree ¶ 35.)  The Court retains jurisdiction to enforce the Consent Decree and to resolve disputes that arise.  (Consent Decree ¶1.)

[7] The "Deepwater Horizon Incident" means through the date of lodging of the Consent Decree: all discharges of hydrocarbons or other substances from the Deepwater Horizon mobile offshore drilling unit and/or Macondo Well occurring on or after April 20, 2010, the explosion and fire on the Deepwater Horizon, the loss of the Deepwater Horizon, containment efforts related to the Macondo Well, construction of the relief wells within the meaning of the Macondo Well, and clean-up and remediation efforts, and all other responsive actions in connection with the foregoing events.  (Consent Decree ¶ 4.f.)

However, the Consent Decree does not limit the rights of the United States against MOEX with respect to all matters other than those set forth in the Covenant Not to Sue, and expressly reserves a number of claims, including future claims for natural resource damages.  (Consent Decree ¶ 49).  Moreover, the Consent Decree does not alter the ability of the United States to pursue anyone other than MOEX, for civil penalties under the CWA or otherwise, nor does it affect, limit, or increase the rights of MOEX or the United States or anyone who is not a party to the Consent Decree.  (Consent Decree ¶¶ 44 and 46).

## III.    Legal Standard for Entry of a Consent Decree

In reviewing a proposed consent decree, the Court is to ascertain whether the decree is fair, adequate, and reasonable, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977), and consistent with the objectives of the statute under which the action was brought, *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, concurring).  *See also United States v. Browning-Ferris Indus. Chem. Servs., Inc.,* 704 F. Supp. 1355, 1356 (M.D. La. 1988) (consent decree under several environmental statutes approved as "fair, adequate and reasonable.")  "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy."  *City of Miami*, 664 F.2d at 441, n.13 (Rubin concurring).  The court does not "substitute its judgment for that of the parties to the decree."  *United States v. Wallace*, 893 F. Supp. 627, 631 (N.D. Tex. 1995).[8]

---

[8] *See also Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (quoting *Cotton v. Hinton*, 559 F.2d at 1330) (in the absence of fraud or collusion, the "court 'should be hesitant to substitute its own judgment

A consent decree "is a highly useful tool for government agencies, since it maximizes the effectiveness of limited law enforcement resources." *United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir. 1975).  In addition, "[p]ublic policy strongly encourages the settlement of cases." *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547, n.2 (5th Cir. 1988).  The presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d at 84); *accord, United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980) (" a consent decree proposed by a private defendant and government agency . . . carries with it a presumption of validity").  In short, when:

> [t]he Justice Department and the [defendant] have been in a genuinely adversary posture[,] . . . there is no hint that the settlement has been motivated by any improper considerations[,]    . . . it appears to have been arrived at after mature, deliberate and informed consideration on both sides[,] [and] [i]t has been approved by the Department of Justice and the [defendant,] . . . [s]uch a settlement is entitled to a presumption of validity, which ordinarily may be overcome only if its provisions are not within reasonable bounds or are illegal, unconstitutional or against public policy.

*United States v. Texas Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982).

---

for that of counsel'"); *In re: Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 209 (3rd Cir. 2003) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("relevant standard . . . is not whether settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute").

IV.    **Argument:  The Proposed Consent Decree Meets the Standard for Entry and Should Be Entered as a Final Judgment**

The proposed Consent Decree is fair, reasonable, adequate, and consistent with the purposes of the CWA.  The "presumption of validity" remains and the Consent Decree should be entered as a final order of the Court.

A.    **The Settlement is Fair.**

Procedural fairness requires consideration of the "candor, openness, and bargaining balance" of the negotiation process.  *See, e.g., Wallace*, 893 F. Supp. at 632.[9] The negotiations leading up to the instant proposed Consent Decree were undoubtedly adversarial, arms-length negotiations.  The Department of Justice represented the United States, in consultation with EPA and the Coast Guard.  In addition, it should be noted that the United States worked closely with its state partners during the negotiations, and conducted many meetings with the Gulf State Attorneys General and their staffs as part of the settlement process.  MOEX was represented by the law firm of Pillsbury Winthrop, and specifically, by outside counsel who has more than 30 years of environmental law experience and was supported by a staff of other competent and experienced attorneys as well as MOEX's own legal staff and management.  If the test for procedural fairness is whether there were "arms length settlement negotiations conducted in good faith by

---

[9] Some opinions also address "substantive" fairness, which requires that a consent decree apportion liability fairly across multiple defendants.  *See, e.g., Wallace*, 893 F. Supp. at 632 (citing *Cannons*).  Substantive fairness comes into play in multiple-defendant environmental matters when non-settlors object that a settlement leaves them too large a share of liability.  Here, however, the settlement does not allocate proportionate liability for response costs or damages, but rather targets a specific penalty to a specific defendant.  Thus, the substantive fairness factor is not applicable.  In this settlement, the controlling factors will be whether the settlement is consistent with the CWA.

experienced legal counsel," *Wallace*, 893 F.Supp. at 632, this settlement certainly meets the test.[10]

**B.      The Settlement is Reasonable, Adequate and Consistent with the Purposes of the CWA.**

The proposed Consent Decree is reasonable, adequate and consistent with the purposes of the CWA, which are to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  As a significant deterrent, the proposed Consent Decree imposes $70 million in civil penalties.  The Consent Decree also requires MOEX to perform $20 million of land acquisition SEPs in Florida, Mississippi, Louisiana, and Texas to preserve and protect Gulf State properties in their natural state, thus providing environmental benefits to the ecological resources in the Gulf region and improving water quality.

The civil penalty in the settlement is reasonable and consistent with the CWA and the state law counterparts.  The civil penalty is the largest ever recovered under the CWA.  To arrive at the penalty amount, the United States thoroughly weighed the statutory penalty factors set forth in Section 311(b)(8) against the litigation risks and evidence unique to MOEX.

---

[10] In stating that a court should attempt to assess the fairness of the negotiation process, the Northern District's *Wallace* opinion and other district court opinions within the Fifth Circuit follow the First Circuit's *Cannons* opinion. *See, e.g., Wallace*, 893 F. Supp. at 632 (citing *Cannons*, 899 F.2d at 86).  Not all courts, however, agree that inquiry into the negotiation process is necessary or advisable.  Under an alternative view, the nature of the bargaining process normally would be irrelevant because the essential question before the court is the *objective* reasonableness of the terms of the proposed decree.  *See, e.g., Spectra-Physics, Inc. v. Superior Court*, 198 Cal.App.3d 1487, 1494, 244 Cal.Rptr. 258,  261 (Cal. App. 6 Dist. 1988) ("objective reasonableness of the settlement is the matter in issue"). We are aware of no opinion in which the Fifth Circuit itself adopts *Cannons*' holding regarding procedural fairness. In addition, there is at least a suggestion in Fifth Circuit precedent that the Fifth Circuit might *not* follow *Cannons* on the procedural-fairness issue.  *See, e.g., Cotton v. Hinton*, 559 F.2d at 1330 ("the inquiry should focus upon the terms of the settlement").  If the *Cannons* test applies, however, it was certainly met here, as explained above.

As a starting point, if this matter were to proceed to trial, the Court would calculate the likely statutory maximum penalty.  The Fifth Circuit has used a "top-down" approach to determine the amount of civil penalties, under which courts "begin by calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist."  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1337 (5th Cir. 1996) (citing *Atlantic States Legal Found. Inc. v. Tysons Food, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990)).[11]  The CWA imposes a penalty based on the number of barrels of oil discharged.  33 U.S.C. § 1321(b)(7)(A).  Here, the number of barrels is disputed and will not be determined until Phase 2 (Quantification Track) of the trial.  Federal agencies publicly announced in 2010 that an estimated 4.9 million barrels were released from Macondo (of which approximately 800,000 barrels were captured).  BP and others dispute the total volume of oil discharged from the Macondo Well, so, for settlement purposes, a nominal deduction for that uncertainty can be assumed.  Using the publicly-announced federal estimate, and multiplying by $1,100 per barrel[12] yields a maximum penalty in the many billions of dollars.

In assessing the amount of a civil penalty, courts are directed to consider:

- the seriousness of the violation or violations;

---

[11] *See also, Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 573 (5th Cir. 1996) (affirming district court's judgment using *Tyson Foods'* top-down penalty approach); *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 858 (S.D. Miss. 1998) (reviewing Fifth Circuit practice and applying the top-down approach); *United States v. Scruggs*, No. G-06-776, 2009 WL 500608, at *3 (S.D. Tex. Feb. 26, 2009) ("The Fifth Circuit endorsed the 'top-down' methodology for calculating the appropriate penalty.").

[12] In cases of gross negligence or willful misconduct, the maximum amount increases to $4,300 per barrel, 33 U.S.C. § 1321(b)(7)(D).  However, this Court has already dismissed all negligence-based claims against MOEX.  See Section I discussion above.  Moreover, the United States is not aware of evidence that MOEX was grossly negligent, nor did any commenter identify such evidence.  It is thus unlikely that the Court would find gross negligence or willful misconduct on the part of MOEX.

- the economic benefit to the violator, if any, resulting from the violation;
- the degree of culpability involved;
- any other penalty for the same incident;
- any history of prior violations;
- the nature, extent, and degree of success of any efforts of the violator to minimize; or mitigate the effects of the discharge;
- the economic impact of the penalty on the violator; and
- any other matters as justice may require.

33 U.S.C. § 1321(b)(8).  In the case of MOEX, some of these statutory penalty factors call for a reduced penalty, while other factors did not favor any deduction.[13]

Several facts weigh heavily in favor of keeping MOEX's penalty high.   For example, due to MOEX's status as a lessee and owner of the Macondo Well at the time of the April 20, 2010 incident,[14] MOEX stood to make substantial profits if Macondo had been a success.  Pursuant to its agreements with BP, MOEX designated BP as Operator of the well and repeatedly authorized its expenditures and activities.[15]  As a party in privity with BP, MOEX enjoyed access to information and data concerning the activities at the well, and employees of its parent company in Japan regularly tracked the progress of the well.[16]  As the Court has found, Congress intended that the cost of pollution would be borne by the parties directly engaged in the enterprise which caused the spill.[17]  And, of course, this is the largest oil spill in history, so the "seriousness" of the violation

---

[13] EPA's 1998 policy for establishing appropriate penalties in settlement of Section 311 penalty claims follows the same statutory factors.

[14]  MOEX admits its status as lessee, *see* MOEX Responses to United States' Requests for Admissions ("MOEX RFA Responses"), No.9 (Exhibit 2) (see also, Consent Decree, Paragraph I), but disputes its ownership status. MOEX RFA Responses No. 25 (Exhibit 2).

[15]  *See,* Deposition of Naoki Ishii ("Ishii Tr.") at 95, 118–124, 172.  (Exhibit 3).  Indeed, on April 20, 2010, MOEX executed a letter authorizing BP to temporarily abandon the well.  *See,* Deposition Exhibit 2856 (Exhibit 4).

[16]  MOEX RFA Responses, Nos. 14-17 (Exhibit 2); Ishii Tr. at 101-102, 139-143, 145-147 (Exhibit 3).

[17]  "[BP and Anadarko] were the mineral lessees, they owned the well, and they stood to profit directly from the oil it produced."  Partial Summary Judgment Order, p. 20 [Rec. Doc. 5809].

cannot be ignored.  For these reasons, the $70 million penalty is the largest civil penalty ever recovered under the CWA.

On the other hand, the following facts and factors favor a substantial reduction from the statutory maximum penalty for MOEX:

- The United States is unaware of other incidents where MOEX has been subject to government-imposed penalties, fines, or sanctions for any violations of the CWA, or other federal statutes, based on activities in the Gulf of Mexico or elsewhere.

- Evidence of MOEX's culpability is mixed and warrants some deduction from the statutory maximum.  MOEX did not have day-to-day control over activities at the well.[18]  There is no evidence that any MOEX employee worked on the cement job or the negative pressure test.  MOEX contends that it did not have knowledge of or play a direct role in other events at the well that contributed to the blow-out and explosion at Macondo, and that it was merely an investor.[19]  MOEX's degree of involvement with day-to-day activities in connection with drilling the Macondo Well stands in stark contrast to the direct operational control of daily activities exercised by BP or Transocean.  Thus, it is clear that some deduction based on this factor is appropriate.

- The United States specifically considered the payments to the various states, as well as the obligation to conduct the SEPs, when agreeing to accept $45 million for its part.

---

[18] *See*, Ishii Tr. at 243-46 (Exhibit 3).
[19] *See, e.g.,* Consent Decree Paragraph F.

- MOEX held a 10% interest in the Macondo Well, the smallest interest held by any leaseholder.[20] That fact does not dictate any particular reduction but the Company's minority status should certainly be considered in deciding how to tailor a penalty for this particular defendant.

- MOEX disputes its status as an owner of the Macondo Well within the meaning of Section 311(b)(7) – and does so on a basis not available to any other defendant in this case.[21]

- MOEX has never been an operator in any oil exploration or production project in the Gulf of Mexico.[22] In this regard, MOEX stands in contrast to BP and Anadarko, who are experienced operators of deepwater and other wells in the Gulf of Mexico.

- MOEX's willingness to come forward to engage in early settlement discussions also warrants a discount.

The discussion above demonstrates that the penalty is tailored to MOEX and the evidence adduced in discovery. The civil penalty is reasonable, given the evidence, and consistent with the CWA and Fifth Circuit precedent. The Consent Decree, designed to deter future violations, and thereby preserve and protect natural resources and protect and improve water quality, is reasonable, adequate, and consistent with the purposes of the CWA.

---

[20] MOEX RFA Responses No. 9 (Exhibit 2).
[21] MOEX RFA Responses No. 10 (Exhibit 2).
[22] Consent Decree, Paragraph J.

**V.     The Comments on the Consent Decree Do Not Provide a Basis for Rejection of the Consent Decree**

Pursuant to 28 C.F.R. § 50.7, the public was invited to submit comments on the Consent Decree to the United States during the 30 days that followed publication of a notice of the Consent Decree in the Federal Register.  The notice was published, 77 Fed. Reg. 11158 (February 24, 2012), and the public comment period ended on March 26, 2012.  The United States received six substantive written comments during the public comment period, attached to this motion as Exhibit 1.  A summary of the specific comments and the United States' responses to the comments are included below.  None of the comments disclose any facts or conditions which indicate that the proposed Consent Decree is inappropriate, improper, or inadequate.  After reviewing the comments, the United States remains convinced that the settlement is fair, adequate, reasonable, and consistent with the goals of the CWA.  The comments generally fall into two categories: [23]

(A)     Four comments from four separate environmental groups (non-profit organizations):  These comments largely address potential future settlements with BP, Transocean, or Anadarko (*e.g.,* suggestions on how to spend funds that might be recovered) rather than commenting specifically on the MOEX settlement.

---

[23]  A third non-substantive category were requests for copies of the other comments:  1) request by Will Percy for copies of comments; and 2) after the close of the comment period, a telephone request by Sandra Franco of Bingham McCutchen LLP (Anadarko's lawyers) for copies of the comments. The Department of Justice generally treated these as FOIA requests and provided copies as requested, and so will not address these comments further.

(B)     Two comments from private attorneys with claims filed in the MDL (Mr. Bechnel and Mr. Salas).   These comments generally state that the dollar amount to be paid by MOEX is too low.

## A.     Comments from Environmental Groups.

Described generally, the four comments from environmental groups largely focus on how settlement monies from various potential settlements should be used, or state that the MOEX structure is not an appropriate structure for potential future settlements with BP.  The United States largely agrees with these comments:  MOEX was a relatively minor player at Macondo, and this settlement does not resolve claims for natural resource damages; thus, the MOEX Consent Decree is not likely to be used as a template for settling with BP, Anadarko, or Transocean.  Some of the Environmental Group Comments also argue that the amount to be paid by MOEX is too low.

**Comment # 1**:  (**Ocean Conservancy**).  The Comment is attached as Exhibit 1-A but is briefly summarized as follows:

> *The consent decree is an initial step and one small piece of the larger resolution of a wide array of claims that the federal and state governments have against BP and other responsible parties.  In that larger context, the consent decree is appropriate, workable, and justified under the law for this situation and responsible party.  The Ocean Conservancy supports the consent decree between the United States and MOEX Offshore.  We support SEPs for land acquisition in this particular situation, but in and of themselves SEPs for land acquisition are not an appropriate means of making the public whole in the larger context of the case and potential settlement.  We urge the Department of Justice to ensure that future consent decrees are aligned with a comprehensive strategic vision designed to achieve meaningful restoration for the Gulf region.*

**Response to Comment # 1:**  The comment supports entry of the Consent Decree,

so no further response is necessary.

**Comment # 2: (Gulf Restoration Network)**. The Comment is attached as Exhibit

1-B but is briefly summarized as follows:

> *Although we understand that MOEX is considered a rather small player in the disaster, we are disappointed by the total amount of penalties set forth in the consent decree, feeling that the amount is too low.  Fines totaling 10 percent of the currently estimated $20 billion in penalties justified under the Clean Water Act, Oil Pollution Act, Endangered Species Act, and other applicable and other natural resource laws would be more appropriate.*
>
> *In all other respects, however, we feel that the current consent decree is appropriate under the law for this particular party.  However, we do not believe that the approach adopted within the consent decree should serve as a model for future consent decrees, as it is not adequate to make whole the communities or the environment of the Gulf of Mexico.*
>
> 1.  *Although we support SEPs for conservation and restoration, such an approach would not be appropriate as the only tool for compensatory action in future settlements/consent decrees.  We believe that there are several better approaches to settlement of claims for penalties under the Clean Water Act, Oil Pollution Act, and other natural resource statutes that would contribute more too (sic) addressing injuries to natural resource and services resulting from the BP oil drilling disaster. (see Ocean Conservancy comments adopted as our comments incorporated herein by reference).*
>
> 2.  *GRN believes that [it] is important that all settlement agreements/consent decrees be used to ensure enhancement of the coastal and marine environments impacted by the BP oil drilling disaster. Under the law, NRDA damages can only be used to restore impacted resources or loss of use of those resources. Yet, many of the Gulf's natural resources were already degraded by years of misuse by industry.  Funding that will flow through settlement of non-NRDA claims is needed to fund projects and programs that provide meaningful restoration that supports ecosystem resilience.*
>
> 3.  *Finally, although possibly not appropriate as the focus of this consent decree, future settlement agreements/consent decrees should require industry establishment and funding of an independent Gulf of Mexico Regional Citizens' Advisory Council.  Also, to ensure that a Gulf of Mexico Regional*

> *Citizens' Advisory Council does not become a financial burden on the U.S. Treasury, any consent decree/settlement with BP and other Responsible parties should require establishment of a trust fund of at least $100 million dollars for operation of the Council.*

**Response To Comment # 2**:  The Comment generally makes two points.

First, the commenter states that the penalty amount is too low.  However, the commenter provides no support for its statement that a $20 billion estimated penalty could be imposed on MOEX.  As explained above, the United States believes that a more realistic statutory maximum penalty is $1,100 per barrel (rather than $4,300 per barrel). Moreover, the commenter does not provide any support for its statement that 10% of the statutory maximum is justified and appropriate under the CWA, OPA, Endangered Species Act, and other applicable and other natural resource laws.  Since the commenter notes that, "[i]n all other respects, we feel that the current consent decree is appropriate under the law for this particular party," the United States agrees and has no further response regarding the amount of the penalty.

Second, the commenter posits ideas that should be included in any future settlements (*e.g.*, citizen advisory committees, enhancing coastal wetlands).  But, as this settlement resolves only civil penalties for MOEX under the CWA (and some other penalty statutes with smaller dollar amounts) and similar state claims for civil penalties, and specifically reserves all claims under OPA, including claims for natural resource damages, these other options are not foreclosed by the MOEX Consent Decree.

**Comment # 3: (Mobile Baykeeper**). The Comment is attached as Exhibit 1-C but is briefly summarized as follows:

*We are obligated to comment in that this order may be seen as a model for future consent decree in ongoing actions related to the Deepwater Horizon event in the Gulf of Mexico. Of great concern is the lack of oversight for expenditure of funds allocated to the Gulf States, specifically that there is no guarantee funds will be utilized in programs and projects that are consistent with Gulf-wide restoration and long-term recovery of coastal habitat. We also have reservations over the lack of language regarding coordination and cooperation of stakeholders to ensure comprehensive, sustainable Gulf-wide restoration in the implementation of SEPS. Lastly, we must advocate for transparency in all response and restoration activities to take place along the Gulf Coast related to the Deepwater Horizon event.*

1. *We strongly encourage a permanent federal-state decision making body be established to focus on the implementation of restoration projects as suggested in this consent decree.*

2. *We also recommend the use of a coordinated and integrated framework for selection of SEPS.*

3. *Furthermore, scientific expertise should inform restoration decision, project selection and funding allocations made by the governing body in order to create an effective region-wide restoration strategy.*

4. *Better still, a requirement that all SEPS be subject to independent scientific review before approval. Specifically, a science advisory committee could provide independent input on restoration project selection, implementation, and monitoring processes.*

5. *Any decision-making body established to administer SEPS should have a formal process to engage the public and stakeholders in various forms, such as open meetings and advisory groups culled from stakeholders representing the states.*

**Response To Comment # 3:** As discussed above in response to other comments, the instant Consent Decree resolves federal and state claims for civil penalties under the CWA (and some other statutes). The purpose of civil penalties is to punish the violator and to deter future violations by the violator and others. All federal penalties recovered under the CWA are required by law to be deposited in the Oil Spill Liability Trust Fund to be used to pay for oil spill response costs in this and other oil spills. 33 U.S.C. §

1321(s).  All penalties recovered by the States are subject to each state's own legislative requirements.

The United States has broad discretion to settle cases, including the discretion to include SEPs (Supplemental Environmental Projects) as part of a settlement.  However, SEPs are not a recovery of natural resource damages; rather, SEPs are environmental projects that a defendant agrees to undertake in settlement of an enforcement action, but which the defendant is not otherwise legally required to perform.  The United States does not play a role in managing or controlling funds necessary to perform SEPs, nor retain authority to manage or administer the SEPs.  *See, e.g.,* Supplemental Environmental Projects Policy, Section C, May 1, 1998, 63 Fed. Reg. 24796, 24798 (May 5, 1998).  The proposed MOEX Consent Decree does not resolve and specifically reserves all claims for natural resource damages under OPA.  Thus, comments relating to proposals for Gulf-wide restoration are not applicable to the instant Consent Decree, though they may provide relevant suggestions for future settlements of federal and state claims for natural resource damages.

**Comment # 4: (Sierra Club)** The Comment is attached as Exhibit 1-D but is briefly summarized as follows:

> *The consent decree between the United States and MOEX is an initial step towards recovery, and one small piece of the larger resolution of a wide array of claims that the federal and state governments have against BP and other responsible parties. Standing alone, the approach in the MOEX consent decree is not adequate to make the people or the environment of the Gulf whole; nor can it be used as a model for any potential settlements.  Allocation of penalty funds to the Gulf states without stipulating any direction, restriction, or mechanism for accountability as to how those funds may be spent could result in those funds being used for purposes that do not advance or are inconsistent with restoring*

*environmental injuries resulting from the Deepwater Horizon oil blowout or the long-term recovery of the Gulf's ecosystem and its affected communities.*

*While the use of SEPs for land acquisition in this instance is appropriate as one type of compensatory action or mitigation, this approach would not, by itself, be sufficient if it were proposed as the primary tool for future consent decrees arising out of the Deepwater Horizon disaster. Moreover, this consent decree, which requires a total payout of $90 million, does not reflect the total damages – both known and unknown – incurred by the Gulf's waters and resources. Although the consent decree between the United States and MOEX does not resolve natural resource damages claims under the Oil Pollution Act, any potential settlement with those claims must require the responsible parties to pay damages that ensure comprehensive restoration of the Gulf of Mexico's ecosystem.*

**Response To Comment # 4:** This comment is similar to comments 1 – 3 (*See* Responses to Comments 1 - 3 above), so no further response is given here.

### B.    Comments from Private Attorneys with Filed Civil Actions.

The comments submitted by Mr. Salas and by Mr. Bechnel each cite to two cases in the MDL: case 10-1482 (for Louisiana residents) and case 10- 3273 (for Mississippi residents). Mr. Salas and Mr. Bechnel both appear as counsel in the same two matters, and both cases are based on a "Class Action Complaint for Damages and Injunctive Relief." We believe that the claim for injunctive relief was disposed of by the Court's Order on the D.1 Bundle. *Order and Reasons [As to D1 Master Complaint]* [Doc 2784]. Case 10-1482 does not include a prayer for civil penalties, but Case 10-3273 does. Both cases seek damages. The substance of the comments appears similar, and both generally state that the amount of the penalty is too low.

**Comment # 5: (Daniel E. Becnel, Jr.)** The Comment is attached as Exhibit 1-E but is briefly summarized as follows:

> *I request that the Department of Justice withdraw and withhold its consent to the proposed judgment because it is inappropriate, improper and/or inadequate for the following reasons:*
>
> 1. *Penalty inadequate at even the $1,100/barrel rate.*
> 2. *Evidence indicates incident was an act of gross negligence, triggering $4,300/Barrel rate.*
> 3. *Penalty even more inadequate at $4,300/barrel rate.*
> 4. *Settlement does not adequately consider penalty factors of CWA.*
> 5. *MOEX's lack of active participation in the drilling operation should not mitigate its liability.*
> 6. *MOEX's settlement with BP was at a much higher rate than the U.S.'s proposed settlement.*

**<u>Response to Comment # 5</u>:**

The adequacy of the MOEX settlement penalty is based on a number of factors including those listed in the CWA.  The analysis of those factors regarding the proposed settlement with MOEX is fully discussed above.  A few points bear further discussion.

*As to the comment's points 1, 4, and 5*:  The United States agrees that the 10% leasehold interest accounts for a significant deduction from the potential statutory maximum penalty.  MOEX's "lack of active participation" in the drilling operation is certainly relevant (*e.g.*, MOEX's degree of culpability) and should be evaluated under the Section 311(b)(8) factors as part of the penalty assessment.  MOEX did not physically operate any part of the well or the rig and was not experienced in drilling operations in the Gulf of Mexico.  Moreover, BP completed significant design and some construction work before MOEX executed its agreement with BP to become a leaseholder.

*As to the comment's points 2 and 3*:  The U.S. agrees that there is evidence indicating gross negligence on the part of BP and Transocean; however, all general maritime law negligence claims against MOEX were dismissed, and there does not

appear to be evidence of MOEX's gross negligence.  In the absence of gross negligence or willful misconduct, MOEX cannot be liable for a penalty greater than $1,100 per barrel.

*As to Point 6:*  MOEX has settled with BP for approximately $1 billion.  But that settlement includes all claims against MOEX for economic losses, damages including natural resource damages, and all other claims in the litigation, except penalties.  There is no basis to compare the MOEX settlement with BP (for all claims except for civil penalties), with the instant proposed Consent Decree that resolves only civil penalties but reserves all other claims.

**Comment # 6:**  (**Camilo Salas**) The Comment is attached as Exhibit 1-F but is briefly summarized as follows:

> [W]e object to the Consent Decree because the proposed civil penalties are inadequate.  Plaintiffs brought a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure . . . . Plaintiffs have requested that the Court issue an order compelling the Defendants to comply with, and to enjoin the Defendants from violating the requirements of the OCSLA, the implementing regulations enacted thereunder, the Lease, the Offshore Final Rule, Final General Permit and the BP Exploration Plan.  Plaintiffs also requested that the Court issue an order declaring the Lease forfeited and cancelled because of the ongoing violations.
>
> The Consent Decree fails to address the remedies Plaintiffs have requested.  The discharges, which exceed the discharge limits of the Offshore Final Rule and the Final NPDES General Permit, were caused by Defendants' actions and inactions in violation of the CWA, its implementing regulations, the Lease, the Offshore Final Rule and the Final NPDES General Permit. Therefore, the maximum penalties authorized by applicable statutes and regulations should be assessed against all Defendants for each day . . . and for each separate violation.
>
> If the fine were assessed at $1,100/barrel, the total fine would be $4.51 billion. Moex's 10% share would therefore be $451 million. The $45 million

*proposed settlement, however, would be only 1% of a $4.51 billion penalty against BP.  If the fine were assessed at $4,300/barrel, as they should be assessed, the total fine would be $17.63 billion. Moex's 10% share would therefore be $1.763 billion. The $45 million proposed settlement, however, would be only 0.26% of a $17.63 billion penalty against BP.*

*Although this is a proposed settlement and not an assessment, there is insufficient discussion of CWA's penalty factors. Without such, it is not possible to determine if the Proposed Settlement amount may be adequate. Therefore, the Consent Decree should be withdrawn and revised also to include a discussion of how the amount relates to the penalty factors.  For the reasons stated above, I request that the Department of Justice withdraw the Consent Decree.*

**Response to Comment # 6:**

This Comment itself largely seems to take the form of a complaint for a class action.  The proposed Consent Decree does not resolve the claims in the commenters' class action; those claims are specifically reserved in the proposed Consent Decree: "[e]xcept as expressly set forth herein, this Consent Decree does not affect, limit, or increase the rights of . . . anyone who is not a Party to this Consent Decree."  (Consent Decree ¶ 46).  Otherwise, the response to Mr. Salas' comment is the same as the response to Mr. Bechnel's letter, which raises the same points.

## CONCLUSION

The proposed Consent Decree is the result of an arms-length negotiation and contains significant beneficial environmental projects and a stiff deterrent civil penalty. It is fair, reasonable, adequate, and consistent with the purposes of the CWA.  The United States respectfully requests that the Court execute page 28 of the lodged Consent Decree [Doc. 5743-1] and enter the Consent Decree as a final judgment.

25

Dated:  May 3, 2012                    Respectfully Submitted,

BRIAN HAUCK                            IGNACIA S. MORENO
Deputy Assistant Attorney General      Assistant Attorney General
Civil Division                         Environment & Natural Resources
                                       Division

PETER F. FROST                         PATRICK CASEY
Director, Torts Branch, Civil Division JAMES NICOLL
Aviation & Admiralty Litigation        Senior Counsel
STEPHEN G. FLYNN                       NANCY FLICKINGER
Assistant Director                     Senior Attorney
MICHELLE T. DELEMARRE                  SARAH HIMMELHOCH
SHARON K. SHUTLER                      Senior Attorney
JILL DAHLMANN ROSA                     DEANNA CHANG
JESSICA SULLIVAN                       SCOTT CERNICH
JESSICA L. MCCLELLAN                   A. NATHANIEL CHAKERES
MALINDA LAWRENCE                       JUDY HARVEY
DAVID J. PREFFER                       MATT LEOPOLD
ROBIN HANGER                           GORDON YOUNG
LAURA MAYBERRY                         JEFFREY PRIETO
BRIENA STRIPPOLI                       ABIGAIL ANDRE
Trial Attorneys                        Trial Attorneys
U.S. Department of Justice
Torts Branch, Civil Division
P.O. Box 14271
Washington, D.C. 20044
(202) 616-4100
(202) 616-4002 fax

/s/ R. Michael Underhill               /s/ Steven O'Rourke
R. MICHAEL UNDERHILL, T.A.             STEVEN O'ROURKE
Attorney in Charge, West Coast Office  Senior Attorney
Torts Branch, Civil Division           U.S. Department of Justice
7-5395 Federal Bldg., Box 36028        Environmental Enforcement Section
450 Golden Gate Avenue                 P.O. Box 7611
San Francisco, CA 94102-3463           Washington, D.C. 20044
(415) 436-6648                         (202) 514-2779
(415) 436-6632 fax                     steve.o'rourke@usdoj.gov
mike.underhill@usdoj.gov

26

JIM LETTEN
United States Attorney

SHARON SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras St., Ste 1600
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of May, 2012.

/s/ Steve O'Rourke
U.S. Department of Justice