**EXHIBIT 1 IN SUPPORT OF**

**MEMORANDUM IN SUPPORT OF**
**UNITED STATES' UNOPPOSED MOTION**
**FOR ENTRY OF CONSENT DECREE**

**PUBLIC COMMENTS**

**EXHIBIT 1-A**



Gulf Restoration Center
400 Poydras Street
Suite 1990
New Orleans, LA 70130

504.208.5813 Telephone
504.267.8541 Facsimilie
www.oceanconservancy.org

March 19, 2012

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

> RE: <u>In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20,</u>
> <u>2010, MDL 2179, D.J. Ref. 90-5-1-1-10026</u>

Dear Assistant Attorney General Moreno:

Ocean Conservancy[1] appreciates this opportunity to provide comments on the consent decree between
the United States and MOEX Offshore 2007 LLC, resolving a portion of claims in the MDL No. 2179
case, as published in the *Federal Register* on February 24, 2012.[2]  The consent decree provides for:

- Deposit of $45 million in the federal Oil Spill Liability Trust;
- Distribution of $25 million among the five Gulf states; and
- Allocation of $20 million for land acquisition through Supplemental Environmental Projects
  (SEPs).

The consent decree is an initial step and one small piece of the larger resolution of a wide array of
claims that the federal and state governments have against BP and other responsible parties. In that
larger context, the consent decree is appropriate, workable, and justified under the law for this situation
and responsible party. However, if this consent decree was to stand alone or was used as a model for
future consent decrees relating to the Deepwater Horizon (DWH) oil spill, the approach in the MOEX
consent decree would not be adequate to make the people or the environment of the Gulf whole. Our
concerns are two-fold:

- First, we understand that this MOEX consent decree does not address natural resource damage
  claims, but allocation of funds to the Gulf states without any direction or restriction as to how
  those funds may be spent could result in those funds being used for purposes that do not advance
  or are inconsistent with restoration of  DWH oil spill injuries or the long-term recovery of the
  ecosystem.
- Second, SEPs are useful tools, and the use of SEPs for land acquisition in this instance is
  appropriate as one type of compensatory action or mitigation. However, use of SEPs for land

---

[1] Ocean Conservancy is a non-profit organization with more than 150,000 members committed to protecting ocean
environments and conserving the global abundance and diversity of marine life. Through science-based advocacy, research
and public education, Ocean Conservancy informs, inspires and empowers people to speak and act for wild, healthy oceans.
[2] 77 Fed. Reg. 11158 (Feb. 24, 2012).

acquisition would not, by itself, be sufficient if proposed as the primary tool for future consent decrees related to the DWH oil spill.

The following comments propose an appropriate approach to overall resolution of the ongoing case against BP and other responsible parties going forward. Therefore, our comments pertain to the issue of penalties under the Clean Water Act, Oil Pollution Act, and other natural resource statutes and to the goal of making the environment and public whole for injuries to natural resources and services resulting from the DWH oil spill.

### 1. Endowed Permanent Research and Monitoring Program

We urge establishment and endowment of a permanent monitoring, research and observation program for the Gulf of Mexico. This program would ensure a solid foundation of science supporting not only long-term ecosystem restoration but also the management and conservation of natural resources in the Gulf. Specifically, such a program would provide scientific data and information that would facilitate:

- Identification and testing of restoration strategies and projects,
- Evaluation and adaptive management of restoration strategies and projects,
- Monitoring the status, health and trends of the Gulf of Mexico ecosystem,
- Building a better baseline for damage assessments in response to future oil spills,
- Early detection of problems and harmful trends, and
- Adaptive management and conservation of natural resources.

An endowment of approximately $2 billion would be appropriate to initiate the program. Scientifically and structurally, the endowed science program could be modeled after the Gulf Ecosystem Monitoring (GEM) program following the *Exxon Valdez* oil spill, or the North Pacific Research Board, which followed resolution of the Dinkum Sands case in Alaska.[3]

One possible vehicle for establishing and endowing a permanent monitoring, research, and observing program would be to use a SEP to transfer funding to the Gulf of Mexico Alliance[4] or other appropriate institution in the Gulf region, which could then administrator and carry out the program.

### 2. Joint Trust Fund

As was done following the *Exxon Valdez* settlement,[5] we encourage creation of a joint federal-state trust fund into which funds allocated for purposes of natural resources or ecosystem restoration are deposited. Establishing a trust administered jointly by the federal government and Gulf states would help ensure

---

[3] *See* Gulf of Alaska Ecosystem Monitoring and Research Program, the GEM Program Document (July 9, 2002), *available at* http://www.evostc.state.ak.us/Universal/Documents/Monitoring/GEM_Program_Document_.pdf. *See also* North Pacific Research Board, *available at* http://www.nprb.org/about/legislation.html.

[4] The Gulf of Mexico Alliance is a non-profit public charity, established in 2004 by the governors of the five Gulf states and formalized as a 501(c)(3) organization in 2010.  The Alliance's mission is to enhance the ecological and economic health of the Gulf region by encouraging collaboration among government agencies, businesses, academia, and other non-governmental organizations.

[5] Memorandum of Agreement and Consent Decree between the United States and the State of Alaska ("MOA"), entered on August 28, 1991, in *United States v. State of Alaska*, Civil Action No. A910-081 CV. *See also* United States v. State of Alaska, 531 U.S. 1, 117 S. Ct. 1888 (1997).

that there is a comprehensive, integrated program for restoration of the Gulf of Mexico ecosystem. A joint trust fund would encourage coordination and facilitate funding choices that are linked to oil-related injuries and other environmental degradation, are science-based, and are beneficial to the natural resources and ecosystem in need of restoration while providing individual trustees with opportunities to advocate for projects that are of benefit to the trustee and the larger Gulf of Mexico ecosystem.

### 3.  Governance Structure

We recommend the establishment of a single federal-state decision-making body to administer the trust fund. This body could take the form of a hybrid between the current DWH Oil Spill Trustee Council and the Gulf Coast Ecosystem Restoration Task Force. Further, the governing body should be staffed with independent professionals who work for the Trustees as a group, and who are not employed by any government agency. Regardless of how it is structured and staffed, the governing body must operate so as to provide efficient, transparent, responsive, science-based management that is accountable to the public.

The governing body must have a formal and recognized process that engages the public, including broad representation from the region's communities and stakeholders. Meetings must be open to the public with advance written notice. The governing body must provide opportunities for meaningful public participation, including, but not limited to, formation of a public advisory group with stakeholder and geographic representation. Executive sessions should only be used on a limited basis (e.g., to evaluate the performance of the executive director or to develop negotiating positions for acquisition of goods or property).

The fund accounts managed by this governing body must be subject to annual fiscal audits. The National Research Council should be invited to conduct periodic reviews of the restoration program and its scientific underpinnings. The results of all such audits and reviews must be public information. The costs of the administrative and professional staff and scientific support for the governance structure, including research, monitoring and external peer review, should be covered by settlement funds.

The *Exxon Valdez* Oil Spill Trustee Council offers a good model for establishing a system for engaging the public in restoration planning. The GAO stated in a 1998 report to Congress "that the [*Exxon Valdez* Oil Spill Trustee] council's processes for both habitat acquisition and other restoration activities appear to provide ample opportunities for the public to review information and comment."[6]

### 4.  Going Beyond Baseline

The funds received via consent decree should be allocated in a manner that will allow enhancement of the ecosystem, as opposed to merely restoring it to baseline condition. The use of these funds should have no fixed duration. The resulting projects and programs must be sustained as long as necessary to provide meaningful restoration that supports ecosystem resilience.

Much of the cultural identity, heritage and economy of the Gulf region depend on the health of the Gulf ecosystem, as does the wildlife that live there. The region faces significant challenges from not only the

---

[6] United States General Accounting Office, Natural Resource Restoration: Status of Payments and Use of Exxon Valdez Oil Spill Settlement Funds, GAO-RCED-98-236 (August 1998), *available at* http://www.gao.gov/archive/1998/rc98236.pdf.

recent DWH oil spill, but from decades of degradation from coastal erosion, overfishing, and pollution, including excessive nutrient runoff, which results in a large seasonal "dead zone" of depleted oxygen at the mouth of the Mississippi River. These problems threaten fish and wildlife, their habitat and the people who depend on a healthy Gulf for their jobs and businesses. The resolution of this case is an opportunity to not only to address injuries from the DWH oil spill, but also to address long-term environmental degradation and ensure economic sustainability aided by fully functional ecosystem services for generations to come.

## 5.  Coordination

Regardless of what vehicle is chosen to allocate funds or designate projects, there must be active, strategic coordination between the phases of the NRDA conducted in response to the DWH oil spill and the broader restoration planning and implementation functions resulting from any and all settlements. Future consent decrees must ensure coordination of projects supported by funds allocated from various funding sources to ensure that projects are consistent, complementary and not duplicative. If SEPs are among the vehicles chosen for future settlements, the SEPs must be crafted to provide predictable funding streams, consistent from year-to-year, and sustained over the long term. Funding levels must be commensurate with the magnitude of restoration goals.

Rather than focusing on individual SEPs and creating stand-alone projects, future settlement negotiations must focus on a comprehensive, science-based, ecosystem-focused restoration strategy, resting on a clear vision for a healthy Gulf ecosystem and supplemented by annual work plans, progress reports and periodic requests for project proposals. Each project must have established criteria clearly linking the project to specific, measurable, feasible objectives.  Projects must be subject to independent scientific peer review in selection and evaluation processes. Projects must be coordinated and integrated within the framework of a comprehensive ecosystem restoration strategy. Future consent decrees must provide for adaptive management—i.e., re-evaluation of restoration priorities and activities as information on the extent and significance of injury to natural resources is obtained from the NRDA as well as other scientific sources.

Finally, Gulf communities and workforces were severely impacted by the disaster. For certain marine sectors like commercial and recreational fishing, natural resource recovery may take years to achieve. Restoration strategies must include the impacted parties in the Gulf and be proactive in training and hiring the next generation of workforce that will enact long-term restoration. A restoration strategy that is well designed and effectively managed using the approaches we have described above will help revitalize coastal communities and create new jobs and business opportunities. A strategic restoration program will make the greatest contribution to the future of the Gulf region if it utilizes local businesses that train and employ local labor. Incorporation of an agreement on targeted hiring preferences and training of impacted local and disadvantaged individuals for jobs created by project funded under these or other SEPs could be a substantial step toward such an objective.

In summary, Ocean Conservancy supports the consent decree between the United States and MOEX Offshore. We support SEPs for land acquisition in this particular situation, but in and of themselves SEPs for land acquisition are not an appropriate means of making the public whole in the larger context of the case and potential settlement. We urge the Department of Justice to ensure that future consent

decrees are aligned with a comprehensive strategic vision designed to achieve meaningful restoration for the Gulf region.

Thank you for your consideration. We look forward to working with the Department of Justice, as well as the Federal and State Trustees, in the future.

Sincerely,

Chris Dorsett
Director, Fish Conservation & Gulf Restoration Program
Ocean Conservancy

**EXHIBIT 1-B**

GULF
RESTORATION
NETWORK

healthygulf.org

UNITED FOR A HEALTHY GULF

338 Baronne Street, Suite 200 New Orleans, LA 70112
Phone: 504.525.1528 Fax: 504.525.0833

March 22, 2012

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

> **RE:**    *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,*
> *on April 20, 2010, MDL 2179, D.J. Ref. 90-5-1-1-10026*

Dear Assistant Attorney General Moreno:

I write on behalf of the Gulf Restoration Network (GRN)[1] to provide our comments and
concerns regarding the consent decree between the United States and MOEX Offshore 2007
LLC (MOEX), as published in the *Federal Register [FR Doc. 2012-4368]* on February 24, 2012.

This consent decree is an important first step in holding those responsible, including BP and
other Responsible Parties, accountable for the BP oil drilling disaster of 2010.  Although we
understand that MOEX is considered a rather small player in the disaster, we are disappointed by
the total amount of penalties set forth in the consent decree, feeling that the amount is too low.
Fines totaling 10 percent of the currently estimated $20 billion in penalties justified under the
Clean Water Act, Oil Pollution Act, Endangered Species Act, and other applicable and other
natural resource laws would be more appropriate.

In all other respects, however, we feel that the current consent decree is appropriate under the
law for this particular party. However, we are concerned that this settlement indicates the
approach that may be adopted by the U.S. for a larger resolution of a wide array of claims that
the federal and state governments have against all of the responsible parties. We do not believe
that the approach adopted within the consent decree should serve as a model for future consent
decrees, as it is not adequate to make whole the communities or the environment of the Gulf of
Mexico.

 First, although we support Supplement Environmental Projects (*SEP*) for conservation and
restoration, particularly when the funds are used for land acquisition, such an approach would
not be appropriate as the only tool for compensatory action in future settlements/consent decrees.

---

[1] The Gulf Restoration Network (GRN) is a network of individuals and local, regional, and national
environmental, social justice, and public interest groups dedicated to empowering people to protect and
restore the natural resources of the Gulf of Mexico.  Network members hail from each of the Gulf States
and beyond.

We believe that there are several better approaches to settlement of claims for penalties under the Clean Water Act, Oil Pollution Act, and other natural resource statutes that would contribute more too addressing injuries to natural resources and services resulting from the BP oil drilling disaster.  All of these approaches were fully described in comments filed in response to the above referenced Federal Register Notice by the Ocean Conservancy on March 19, 2012, which the GRN adopted as our comments and have incorporated herein by reference.

Second, the GRN believes that is important that all settlement agreements/consent decrees be used to ensure enhancement of the coastal and marine environments impacted by the BP oil drilling disaster. Under the law, NRDA damages can only be used to restore impacted resources or loss of use of those resources. Yet, many of the Gulf's natural resources were already degraded by years of misuse by industry.  This is particularly true in Louisiana, which is currently facing a coastal crisis largely attributable to the construction of canals either for inshore and nearshore oil and gas development or for navigation associated with that development. Restoring Louisiana's coastal wetlands to baseline conditions is not enough.  Funding that will flow through settlement of non-NRDA claims is needed to fund projects and programs that provide meaningful restoration that supports ecosystem resilience. The resolution of the claims against the Responsible Parties in this case is an opportunity to address long-term environmental degradation and ensure economic sustainability aided by fully functional ecosystem services for generations to come.

Finally, although possibly not appropriate as the focus of this consent decree, future settlement agreements/consent decrees should require industry establishment and funding of an independent Gulf of Mexico Regional Citizens' Advisory Council, similar to the Prince William Sound Regional Citizens' Advisory Council established in response to the Exxon Valdez spill by agreement and later incorporated in to the Oil Pollution Act (OPA) of 1990.  Also, to ensure that a Gulf of Mexico Regional Citizens' Advisory Council does not become a financial burden on the U. S. Treasury, any consent decree/settlement with BP and other Responsible parties should require establishment of a trust fund of at least $100 million dollars for operation of the Council. Such an endowment would allow the Council to hire staff technically qualified to monitor the operations of the oil and gas industry, the development of Department of Interior regulations and its permitting process, development of oil spill response technologies, and the ability of the oil and gas industries and the Coast Guard to effectively respond to any spill of significant magnitude.

In conclusion, although the GRN's sole objection to this settlement relates to the amount MOEX Offshore is required to pay, we generally support the terms of the consent decree between the United States and MOEX Offshore.   We do not, however, believe that SEPs for land acquisition in and of themselves are an appropriate means of making the public whole in the larger context of the remaining claims against the Responsible Parties to the BP oil drilling disaster.  We urge that in future consent decrees the Department of Justice consider a more comprehensive strategic approach designed to achieve meaningful restoration for the Gulf region.

We appreciate your consideration of our comments and look forward to working with the Department of Justice and the Trustees in the future.

Respectfully submitted,

Cynthia M. Sarthou
Executive Director

**EXHIBIT 1-C**

*Providing citizens a means to protect the beauty, health and heritage of the Mobile Bay Watershed.*

## MOBILE BAYKEEPER®

OFFICERS:

C. Ray Mayhall, Jr.
*President*

John C. Bell
*Vice President*

Maria Gwynn
*Secretary*

J. Benson O'Connor, III
*Treasurer*

Casi (kc) Callaway
*Executive Director & Baykeeper*

BOARD MEMBERS:
bj Cooper
Ellen H. Dyas
Chris Fuchs
Veronica Herndon
Sallye English Irvine
Thomas Lightcap
W. Bryan Pape, Jr.
Robert C. Prater, Jr.
B. Greer Radcliff
Max L. Reed
Frank H. Summersell, Jr.
John McDermott Thompson
Steve Willard

HONORARY MEMBERS:
Jimmy Buffett
Robert Evans, MD
Jack V. Greer
Terry Hartley
Frederick T. Kuykendall, III
E. Rob Leatherbury
Gregory S. McGee, MD
James "Jimbo" Meador
Michael Meshad, MD
Edward N. Morris, Jr.
Henry R. Seawell, III
L. Page Stalcup, III
Stewart Thames

450 - C Government Street
Mobile, Alabama 36602
(251) 433-4229
Fax: (251) 432-8197
Website: www.mobilebaykeeper.org
Email: info@mobilebaykeeper.org



WATERKEEPER® ALLIANCE
**MEMBER**

March 26, 2012

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

*Submitted via email to pubcomment-ees.enrd@usdoj.gov*

RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL 2179, D.J. Ref. 90-5-1-1-10026

Dear Assistant Attorney General Moreno:

We are Mobile Baykeeper, a 15-year-old nonprofit organization with the mission of providing citizens a means to protect the beauty, health and heritage of the Mobile Bay watershed, Alabama's waterways and coastal communities. We are writing on behalf our Board, Officers and more than 4,000 members to provide comments on the consent decree between the United Sates and MOEX Offshore 2007 LLC, concerning claims in the MDL No. 2179 case, as published in the *Federal Register* on February 24, 2012.

While our organization's home state, Alabama, is not expected to agree to the terms of settlement outlined in this consent decree, we are obligated to comment in that this order may be seen as a model for future consent decrees in ongoing actions related to the Deepwater Horizon event in the Gulf of Mexico and as such we have serious concerns regarding the provisions therein. Of great concern is the lack of oversight for expenditure of funds allocated to the Gulf States, specifically that there is no guarantee funds will be utilized in programs and projects that are consistent with Gulf-wide restoration and long-term recovery of coastal habitat. We also have reservations over the lack of language regarding coordination and cooperation of stakeholders to ensure comprehensive, sustainable Gulf-wide restoration in the implementation of Supplemental Environmental Projects (SEPs). Lastly, we must advocate for transparency in all response and restoration activities to take place along the Gulf Coast related to the Deepwater Horizon event.

We strongly encourage a permanent federal-state decision making body be established to focus on the implementation of restoration projects as suggested in this consent order. Ensuring a collective restoration agenda is implemented throughout the Gulf and funds are directed to identify

March 26, 2011

Page 2 of 2

priorities and effective programs and projects is crucial for long-term recovery. Whether an existing or new governing body is established, such as the Oil Spill Trustee Council or the Gulf Coast Ecosystem Restoration Task Force, it should be empowered and given adequate structure in order to provide a sound management structure.  Such a governing body should be held highly accountable for dispensing funds and as such should be subject to annual fiscal audits, which would be public information.

We also recommend the use of a coordinated and integrated framework for selection of SEPs. The need for cooperation and coordination among state and federal agencies in restoration efforts cannot be emphasized enough, in order to enact Gulf-wide restoration and ensure that projects and restoration efforts are sustainable and not duplicative. Furthermore, scientific expertise should inform restoration decisions, project selection and funding allocations made by the governing body in order to create an effective region-wide restoration strategy. It will also advance transparency in decision-making and enhance credibility with the public. Better still, a requirement that all SEPs be subject to independent scientific review before approval and should state a clear, measurable and achievable outcome. Specifically, a science advisory committee could provide independent input on restoration project selection, implementation, and monitoring processes.

Public Participation has been a critical issue for the great majority of the affected  communities located on the Gulf Coast, and it is of great importance to those groups that there continue to be avenues for well-defined public participation in restoration efforts.  Any decision-making body established to administer SEPs should have a formal process to engage the public and stakeholders in various forms, such as open meetings and advisory groups culled from stakeholders representing the states.

In closing, we greatly appreciate the opportunity to comment on this action and thank you for consideration of these comments. If you have any questions or need additional information, please do not hesitate to contact Casi Callaway at 251-433-4229 or callaway@mobilebaykeeper.org.

Respectfully submitted,

Casi (kc) Callaway
Executive Director & Baykeeper

Donna Jordan
Program Director

**EXHIBIT 1-D**



March 26, 2012

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov


      RE: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL 2179, D.J. Ref. 90-5-1-1-10026


Dear Assistant Attorney General Moreno:

The Sierra Club appreciates the opportunity to provide comments on the consent decree between the United States and MOEX Offshore 2007 LLC, resolving a portion of claims in the MDL No. 2179 case, as published in the *Federal Register* on February 24, 2012.

Sierra Club represents tens of thousands of members and supporters along the Gulf Coast whose lives, communities, and, in some cases, livelihoods, have been adversely impacted by the Deepwater Horizon oil disaster. It is of paramount importance to our members and supporters that any settlement between the United States, MOEX, BP and the other responsible parties, serve as both a mechanism for comprehensive restoration of the region's natural resources, and as a deterrent to prevent future oil spill disasters in the Gulf of Mexico and off our nation's coasts.

The consent decree between the United States and MOEX requires MOEX to pay $70 million in civil penalties, of which $45 million will be deposited into the federal Oil Spill Liability Trust Fund and $25 million will be distributed to the five Gulf of Mexico states. The consent decree also establishes Supplemental Environmental Projects (SEPs) totaling $20 million for the purposes of land acquisition and habitat protection also distributed among Gulf of Mexico states.

For Sierra Club members and communities across the Gulf of Mexico, the consent decree between the United States and MOEX is an initial step towards recovery, and one small piece of the larger resolution of a wide array of claims that the federal and state governments have against BP and other responsible parties. Standing alone, the approach in the MOEX consent decree is not adequate to make the people or the environment of the Gulf whole; nor can it be used as a model for any potential settlements that may occur between the United States and BP or any other responsible party.

Importantly, allocation of penalty funds to the Gulf states without stipulating any direction, restriction, or mechanism for accountability as to how those funds may be spent could result in those funds being used for purposes that do not advance or are inconsistent with restoring environmental injuries resulting from the Deepwater Horizon oil blowout or the long-term recovery of the Gulf's ecosystem and its affected communities. As described in more detail below, we urge the Department of Justice to resolve these concerns in the final consent decree. In addition, while the use of SEPs for land acquisition in this instance is appropriate as one type of compensatory action or mitigation, this approach would not, by itself, be sufficient if it were proposed as the primary tool for future consent decrees arising out of the Deepwater Horizon disaster.

Moreover, this consent decree, which requires a total payout of $90 million, does not reflect the total damages – both known and unknown – incurred by the Gulf's waters and resources. Nor does this figure reflect even 10% of potential damages – the proportion of interest that MOEX held in the Macondo well. Indeed, any future settlement with BP and the other Defendants must reflect the magnitude of the responsible parties' egregious behavior that led to the disaster and must be commensurate with the extent of the injuries to the Gulf of Mexico. As such, any future consent decree must require the responsible parties to pay maximum civil and criminal fines under the Clean Water Act and other statutes, including the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Outer Continental Shelf Lands Act, and Alternative Fines Act to deter reckless behavior that could lead to another disaster.

Although the consent decree between the United States and MOEX does not resolve natural resource damages claims under the Oil Pollution Act, any potential settlement with those claims must require the responsible parties to pay damages that ensure comprehensive restoration of the Gulf of Mexico's ecosystem. Any potential settlement between the United States and the other responsible parties also presents a key opportunity to implement the recommendations of the President's Oil Spill Commission and the Gulf Coast Ecosystem Restoration Task Force as well as the lessons learned from other oil spill settlements such as the 1991 Exxon Valdez consent decree.[1]

---

[1] The Federal Bureau of Ocean Energy Management, Regulation and Enforcement and the Coast Guard Joint Investigation Team report was released in fall 2011. The report discloses the "gross negligence" of

We urge the parties to take the following approach to overall resolution of the ongoing case against BP and other responsible parties. The following key actions must be incorporated and implemented into any potential settlement of the Deepwater Horizon litigation, all of which are discussed in greater detail below.

- Establish a Natural Resource Damages Fund in an amount assessed by the Natural Resource Trustees for comprehensive, long-term ecosystem restoration and monitoring that satisfies NRDA regulations and prioritizes the public interest;
- Create a Fund of no less than $10 billion to execute the Gulf Coast Ecosystem Restoration Task Force Early Restoration Strategy with $500 million dedicated to long-term monitoring;
- Assess maximum civil and criminal penalties against the responsible parties, of which a large portion are designated to a Fund for Supplemental Environmental Projects that enhance NRDA restoration, including long-term monitoring and independent scientific studies;
- Include a broad re-opener provision that allows the government to re-open the settlement indefinitely or for at least 30 years and requires the responsible parties to reimburse the United States for latent, unforeseen damages;
- Establish and fund the operation of a Gulf of Mexico Regional Citizen's Advisory Council to ensure formal public oversight and industry accountability of offshore drilling activities in the region; and
- Ensure that all activities executed under a settlement comply with Executive Order 12898 on Environmental Justice.

First, a settlement must require BP and the responsible parties to pay for comprehensive, long-term restoration of the natural resource damages in accordance with a Final Restoration Plan that satisfies the goals of the Oil Pollution Act. As prescribed in the Natural Resource Damages Assessment ("NRDA") regulations, these monies must be dedicated to projects that "restore, replace, rehabilitate, or acquire the equivalent of the injured natural resources and services." 15 C.F.R. § 990.25. All restoration projects must have clear objectives, performance criteria and measures for long-term monitoring. 15 C.F.R. § 990.55 (b)(2),(3). Importantly, the law recognizes that all restoration must be in the public interest. As such, a NRDA Restoration Plan within or associated with a potential settlement must be created by the Natural Resource Trustees and undergo formal public review pursuant to the National Environmental Policy Act ("NEPA").

Indeed, all ecosystem restoration and enhancement projects executed under the NRDA Restoration Plan or through a separate Fund described below must prioritize ecosystem restoration over economic development. Specifically, projects funded through a potential

---

the responsible parties and concludes that the main catalyst of the catastrophe was BP's failure to assess the well's risks and the company's relentless drive to cut corners at the expense of safety.

settlement shall not be used for activities that destroy or degrade the health, diversity, or viability of coastal or marine ecosystems. A potential settlement must _limit the funds received by any state or local entity for expenditure on projects primarily intended for economic development rather than restoration of coastal or marine ecosystems._

Second, a potential settlement must establish a Fund of no less than $10 billion dedicated to implementing the Early Restoration Strategy released by the Gulf Coast Ecosystem Restoration Task Force in December 2011. Full implementation of the Task Force's strategy is a critical component to addressing the magnitude of this unprecedented disaster and will help to address immediate restoration needs while a Restoration Plan is created and implemented under the NRDA process.  In addition, $500 million of the Fund should be placed in a separate interest-bearing account for the sole purpose of monitoring the long-term effectiveness of restoration projects implemented under the Task Force Strategy.

Third, a settlement must assess maximum civil and criminal penalties against the responsible parties. The magnitude of penalties must carry out the punitive function of the Clean Water Act and other statutes[2] to deter irresponsible, reckless oil and gas industry behavior that could lead to another oil spill disaster. As such, a settlement must include a civil penalty assessment of at least $20 billion, which is on par with Clean Water Act penalties that would be assessed for a responsible party's "gross negligence" that contributed to the Deepwater Horizon oil disaster.[3] A settlement also must assess maximum criminal fines, which, under the Alternative Fines Act, are twice the damages caused by a responsible party's actions.[4] Estimates of approximately $22.7 billion in tourist revenue losses[5] alone would result in criminal fines greater than $45 billion; this does not include other economic and environmental damages. Importantly, any potential settlement that allocates penalty monies to Gulf States must provide direction and/or restriction as to how those funds may be spent. Penalty expenditures must be directed to activities that advance and are consistent with restoration of Deepwater Horizon oil spill injuries or the long-term recovery of the ecosystem and affected communities.

---

[2] Endangered Species Act , 16 U.S.C. § 1540(a)(1),(b)(1); Marine Mammal Protection Act, 5  16 U.S.C. § 1375(a)(1), (b); Migratory Bird Treaty Act, 16 U.S.C. § 707(a); Outer Continental Shelf Lands Act, 43 U.S.C. § 1350(b)(1),(2).

[3] Under 33 U.S.C. § 1321(b)(7)(A) the maximum civil penalties are $25,000 per day or $1,000 per barrel of oil discharged. Under § 1321(b)(7)(D) in any case where the discharge "was the result of gross negligence or willful misconduct" the civil penalty shall be "not more than $3,000 barrel of oil" discharged. Under 40 C.F.R. § 19.4, that maximum has been adjusted to $4,300 per barrel. A barrel of oil is 42 United States gallons at 60 degrees Fahrenheit. 33 U.S.C. § 1321(a)(13). Based on estimates of 4.9 million barrels discharged, "U.S. Scientific Teams Refine Estimates of Oil Flow from BP's Well Prior to Capping," August 2, 2010, found at http://www.restorethegulf.gov/release/2010/08/02/, the potential maximum penalty in this case is $21.07 billion.

[4] Alternative Fines Act, 18 U.S.C. § 3571(c)((2),(d).

[5] H. Martin and R. White, Spill May Cost Gulf Coast $22.7 Billion in Tourism, Study Estimates, L.A. TIMES, July 23, 2010, available at http://articles.latimes.com/2010/jul/23/business/la-fi-oilspill-business-20100723.

A settlement must designate a large portion of penalties to a separate Fund established for Supplemental Environmental Projects ("SEPs") to "enhance" the Gulf of Mexico's natural resources. As stated above, land acquisition is appropriate as one type of compensatory action or mitigation, but would not, by itself, be sufficient as the primary tool for SEPs. Enhancement projects should focus on the long-term resiliency of the Gulf Coast's ecosystems and communities and should be separate from and build on ecosystem restoration executed under the NRDA Restoration Plan. No less than $600 million, should be set aside to pay for future monitoring and independent scientific studies (i.e. third-party, peer reviewed research that is not performed by the responsible parties or the oil and gas industry) to ensure that long-term or delayed impacts are well understood and addressed for generations to come. A Fund dedicated to enhancement and monitoring projects is fully in-line with consent agreements entered into by the United States with the State of Alaska and Exxon Corporation in the aftermath of the 1989 Exxon Valdez spill.[6] A joint federal-state governing body should be established to provide oversight to state-allocated penalty and SEP fund distribution to ensure expenditures are consistent with long-term Deepwater Horizon ecosystem restoration and recovery efforts. This entity should provide opportunities for formal public engagement and independent expert participation in the fund distribution process.

Fourth, any settlement must include a provision that permits the federal government to re-open the agreement under the broadest of circumstances. A re-opener provision should reserve the right of the government to institute proceedings in the current action or in a new action, or to issue an administrative order seeking to compel the responsible parties to reimburse the United States for additional natural resource damages previously unknown to the NRDA Trustees that would render a Final Restoration Plan insufficient for protecting public health or the environment.

Importantly, a re-opener provision should avoid using language that refers to latent injuries that "could not reasonably have been known" or "reasonably have been anticipated" by the Trustees. Instead, a re-opener provision should establish that the administrative record that supports the Final Restoration Plan comprises the universe of information and conditions, i.e., damages, known to the NRDA Trustees. Indeed, the administrative record provides a clear baseline of knowledge from which to assess whether information on environmental injuries is newly obtained. As such, any unforeseen damages that would invoke a reopener are those not included in the record. This would allow the government to pursue new damages that were unknown or not part of the administrative record without having to overcome a heavy causation[7] burden linking the disaster to the newly discovered injury.[8]

---

[6] *See*, Memorandum of Agreement and Consent Decree, *U.S. v. Alaska*, Civil Action No. A91-081 CIV (August 28, 1991); Government's Memorandum in Support of Agreement and Consent Decree, *U.S. v. Exxon Corporation et. al*, Civil Action No. A91-082 CIV at 20-23 (Oct. 8, 1991).
[7] See U.S. v. Equilon Pipeline Co., Civ. No. 99-2961, Consent Decree 55 (E.D. La. Nov. 15, 1999). By contrast, the language of the Exxon Valdez consent decree, requiring the government to establish a high

In addition, a re-opener provision should extend any time limit for identifying additional, latent damages and reopening the process for as long as possible. In light of uncertainties related to spill impacts on future generations of species, we recommend a minimum term of 30 years. Indeed, the collapse of the Pacific herring fishery four years after the Exxon Valdez spill and the population's inability to recover decades later demonstrates the importance of extending this timeframe to ensure meaningful recovery under a settlement.

Fifth, any potential settlement must establish and adequately fund a Gulf of Mexico Regional Citizen's Advisory Council (RCAC). Similar to the Regional Citizen's Advisory Councils established for Cook Inlet and Prince William Sound in response to the Exxon Valdez spill, a Gulf of Mexico RCAC would provide public accountability and oversight of ongoing and future offshore drilling operations in the Gulf of Mexico. The Gulf of Mexico RCAC should be comprised of community leaders and stakeholders who live and work along the Gulf Coast. Adequate resources must be available to allow the RCAC to meet regularly and to hire staff technically qualified to monitor the operations of the oil and gas industry and the Department of Interior's permitting process, to inform Department of Interior efforts to develop and implement regulations, to ensure the development and deployment of appropriate oil spill response technologies, and to monitor the oil and gas industries' and U.S. Coast Guard's ability to effectively and efficiently respond to a spill or industry accident of any size. As such, a potential settlement should set aside resources of no less than $500 million for the effective and long-term operation of a Gulf of Mexico RCAC.

Finally, many Gulf Coast communities impacted by the disaster are low-income and comprised largely of people of color. For example, Vietnamese subsistence fishing communities throughout Louisiana and Mississippi can no longer rely on the Gulf of Mexico fisheries as a primary food source.  It is essential that any Gulf Coast relief and recovery efforts facilitate the recovery of these communities. All activities executed under a settlement must comply with Executive Order 12898 on Environmental Justice.

The parties to this litigation have an opportunity to set a strong precedent that ensures that the Gulf Coast environment and its residents are made whole again, and that no other community is ever faced with a disaster of this kind. On behalf of the communities across the Gulf Coast and beyond, we urge the parties to this action to adopt the measures described above in any potential settlement of the Clean Water Act and Oil Pollution Act claims arising out of the Deepwater Horizon oil disaster. These measures will ensure comprehensive, meaningful

---

degree of certainty that latent injury resulted from the spill or could have reasonably been anticipated, has limited the government's ability to reopen that settlement to ensure recovery of unforeseen damages.

[8] A re-opener provision must avoid language that bars recovery for injuries that could have been "anticipated" or "could have been known;" use of these terms is ambiguous and would unduly restrict reopening of claims.

restoration and recovery of the Gulf of Mexico and its coastal communities now and for future generations. Thank you for the opportunity to submit comments into the record.

Sincerely,

Devorah Ancel                          Jill Mastrototaro
Attorney                               Gulf Coast Campaign Director
Sierra Club                            Sierra Club
85 Second Street, 2nd Floor,           716 Adams Street,
San Francisco, CA 94105                New Orleans, LA 70118
(415) 977-5721                         (504) 861-4835
devorah.ancel@sierraclub.org           jill.mastrototaro@sierraclub.org

cc:

Eric Holder, U.S. Department of Justice
Secretary Ken Salazar, U.S. Department of the Interior
Nancy H. Sutley, Council on Environmental Quality
Lisa P. Jackson, U.S. Environmental Protection Agency
Jane Lubchenco, National Oceanic and Atmospheric Administration
Steven O'Rourke, U.S. Department of Justice
John Hankinson, Gulf Coast Ecosystem Restoration Task Force

**EXHIBIT 1-E**

# BECNEL LAW FIRM, LLC

ATTORNEYS AND COUNSELORS AT LAW

NOTARIES PUBLIC

DANIEL E. BECNEL, JR.*
DARRYL J. BECNEL
MATTHEW B. MORELAND
KEVIN P. KLIBERT
SALVADORE CHRISTINA, JR.
CHRISTOPHER D. BECNEL
KATHRYN W. BECNEL*
TONI S. BECNEL
JENNIFER L. CROSE
MARISHA H. FRAAZA
*Of Counsel:*
BRADLEY D. BECNEL
  *Also Admitted in Colorado*

*Please Reply To:*
☐ 106 WEST SEVENTH STREET
P.O. DRAWER H
RESERVE, LOUISIANA 70084
(985) 536-1186
(985) 536-7904
FAX (985) 536-6445
E-MAIL: dbecnel@becnellaw.com
www.becnellaw.com

☐ 425 WEST AIRLINE HIGHWAY
SUITE B
LAPLACE, LOUISIANA 70068
(985) 651-6101
(985) 652-3643
(985) 652-3668
FAX (985) 651-6104

Kay K. Serven
  *Office Administrator*
Susan B. Williams
  *Nurse*

## Monday, March 19, 2012

## Public Comment On MOEX Proposed Consent Decree

**In Re: - Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010; MDL 2179;**
  **- D.J. Ref. 90–5–1–10026.**
  **- (Proposed Consent Decree with MOEX; Court Pleadings #5743 and 5743-1)**

**Via e-mail:** pubcomment-ees.enrd@usdoj.gov
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044–7611

**Via U.S. Certified First Class Mail, R.R.R.  # 7005-1160-0000-6945-2095**
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044–7611

Dar Sir or Madam,

  I  submit this Comment in response to the "Notice of Lodging of Proposed Consent Decree under the Clean Water",  regarding the above matter, published by the Department of Justice  in the February 24, 2012 Federal Register (Vol. 77, No. 37; FR Doc. 2012-4368). I submit this as a citizen of Louisiana and of the United States; and an attorney of record with

1

thousands of clients in the Deepwater Horizon matter. Further, I filed the first class action suits

in the *Deepwater Horizon* multi-district litigation on behalf of private plaintiffs as private attorneys general that made claims under the "Citizens Suit" provisions of the Clean Water Act (33 U.S.C. Sec 1365) for violations and enforcement of the Clean Water Act by and against BP, plc; BP Exploration and Production, Inc.; BP America, Inc.; Anadarko Petroleum Corporation; Mitsui Oil Exploration Co., Ltd; et al.[1]

As you know, the proposal would settle the civil penalties of defendant MOEX Offshore 2007 LLC ("MOEX") under the Clean Water Act for $45 million[2]. This amount is very inadequate.

I request that the Department of Justice withdraw and withhold its consent to the proposed judgment because it is inappropriate, improper and/or inadequate for the following reasons.

**1. The Proposed Penalty Is Inadequate at Even the $1,100/Barrel Penalty Rate.**

**2. The Evidence Currently Known Indicates That The Incident Was An Act Of "Gross Negligence", Thereby Triggering the $4,300/Barrel Penalty Rate**

**3. The Proposed Settlement is Even More Inadequate at the $4,300/Barrel Penalty Rate.**

**4. The Proposed Settlement Does Not Adequately Consider the "Penalty Factors" Of The Clean Water Act.**

**5. MOEX's Lack Of Active Participation In The Drilling Operation Should Not Mitigate Its Liability.**

**6. MOEX's Settlement With BP In This Matter Was At A Much Higher Rate Than The U.S.'s Proposed Settlement.**

---

[1] Tom Garner v BP, plc; BP Exploration and Production, Inc.; BP America, Inc.; Anadarko Petroleum Corporation; Mitsui Oil Exploration Co. Ltd.; Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; Halliburton Energy Services, Inc.; and Cameron International Corporation f/k/a Cooper Cameron Corporation (E.D.La, Civil Action No.# 10-01482 )(for Louisiana residents); and

Grady Thigpen et al. v BP, plc; BP Exploration and Production, Inc.; BP America, Inc.; Anadarko Petroleum Corporation; Mitsui Oil Exploration Co. Ltd.; Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; Halliburton Energy Services, Inc.; and Cameron International Corporation f/k/a Cooper Cameron Corporation (S.D. Ms., Civil Action # 10-cv-280; and, after transfer to E.D.La., #10-cv-3273)(for Mississippi residents)

[2] The total amount of the Proposed Settlement is $90 million, as follows: $45 million to the United States, $25 million to the Gulf States affected by the spill, and $20 million for coastal environmental projects.

## 7. Conclusion.

### 1. The Proposed Penalty Is Inadequate at Even the $1,100/Barrel Penalty Rate.

The Clean Water Act provides for fines in a situation such as this from $1,100 per barrel spilled to, in the case of "gross negligence", $4,300 per barrel.

The U.S. has estimated the amount spilled to have been 4.1 million barrels[3].

MOEX owned a 10% in interest in the well.

If the fine were assessed at $1,100/barrel, the total fine would be $4.51 billion. Moex's 10% share would therefore be $451 million. The $45 million proposed settlement, however, would be only 1% of a $4.51 billion penalty against BP.

### 2. The Evidence Currently Known Indicates That The Incident Was An Act Of "Gross Negligence", Thereby Triggering the $4,300/Barrel Penalty Rate.

The Chief Counsel's Report of the Presidential Commission made several findings that could reasonably lead one to determine that the spill was the result of gross negligence:

> The Chief Counsel's team concluded that all of the technical failures at Macondo can be traced back to management errors by the companies involved in the incident. BP did not fully appreciate all of the risks that Macondo presented. It did not adequately supervise the work of its contractors, who in turn did not deliver to BP all of the benefits of their expertise. BP   personnel on the rig were not properly trained and supported, and all three companies failed to communicate key information to people who could have made a difference.
>
> Among other things:
>
> ☐ BP did not adequately identify or address risks created by last-minute changes to well design and procedures. BP changed its plans repeatedly and up to the very last minute, sometimes causing confusion and frustration among BP employees and rig personnel.

---

[3] On 2 August 2010, the United States Department of Energy and the Flow Rate Technical Group issued an estimate that 4.9 million barrels of oil had flowed from the Macondo well, and 4.05 million barrels had been discharged into the Gulf (the difference being the amount of oil captured by vessels on the surface as part of the well containment efforts). Its "Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill is available at: http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=237763 .

⊏ When BP did send instructions and procedures to rig personnel, it often provided inadequate detail and guidance.

⊏ It is common in the offshore oil industry to focus on increasing efficiency to save rig time and associated costs. But management processes must ensure that measures taken to save time and reduce costs do not adversely affect overall risk. BP's management processes did not do so.[4] (Emphasis added).

Further, the Chief Counsel's Final Report was but one of numerous reports, studies, and hearings that came to similar findings, including those by:

- the U.S. Coast Guard;
- the U.S. Mineral Management Service (now the Bureau of Ocean Energy, Management, Regulation and Enforcement);
- the Deepwater Horizon Study Group;
- the Final Report of the National Commission on BP Deepwater Horizon and Offshore Drilling; and
- numerous Congressional Committees.

Accordingly, in light of these factors, combined with MOEX's knowledge of BP's history of violations, it is very likely that a trial would result in a determination of "gross negligence" against MOEX as well as BP, thereby resulting in the increased fine of up to $4,300/barrel.

## 3. The Proposed Settlement is Even More Inadequate at the $4,300/Barrel Penalty Rate For Acts of "Gross Negligence".

If the fine were assessed at $4,300/barrel, and the total fine would be $17.63 billion. Moex's 10% share would therefore be $1.763 billion. The $45 million proposed settlement, however, would be only 0.26% of a $17.63 billion penalty against BP.

## 4. The Proposed Settlement Does Not Adequately Consider the "Penalty Factors" Of The Clean Water Act.

The Clean Water Act specifies several explicit factors that are to be considered when

---

[4] Executive Summary of Findings; Chief Counsels Report; National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, p. xi. Available at: http://www.oilspillcommission.gov/final-report

assessing a penalty[5]. Although this is a proposed settlement and not an assessment, there is

insufficient discussion of CWA's penalty factors. Without such, it is not possible to determine if the Proposed Settlement amount may be adequate.  Therefore, the Proposed Settlement should be withdrawn and revised also to include a discussion of how the amount relates to the penalty factors.

## 5. MOEX's Lack of Active Participation in the Drilling Operation Should Not Mitigate Its Liability.

In the years immediately preceding the Deepwater Horizon incident, BP had accumulated by far the worst safety record of any major oil company. As noted in a study discussed on National Public Radio in the immediate aftermath of the explosion:

> BP's safety record has come under intense scrutiny ever since the blowout and resulting explosion at its Deepwater Horizon offshore oil rig led to the deaths of 11 workers, injuries to others, and the still uncontrolled spewing of tens of thousands of barrels of crude oil into the Gulf of Mexico.

> On Monday, the Center for Public Integrity reported that its analysis of Occupational   Safety and Health Administration records for the energy giant revealed that it has racked up far more serious safety violations at its refineries than its competitors.

> In a report with the unambiguous title "Renegade Refiner: OSHA Says BP Has Systemic Safety Problem" the CPI, a Washington, D.C.-based watchdog group writes that 97 percent of the worst violations were found at BP refineries.

> An excerpt from its report:

>> BP is battling a massive oil well spill in the Gulf of Mexico after an April 20 platform blast that killed 11 workers. But the firm has been under intense OSHA scrutiny since its refinery in Texas City, Texas, exploded in March 2005, killing 15 workers. While continuing its probe in Texas City, OSHA launched a nationwide refinery inspection program in June 2007 in

---

[5] "In determining the amount of a civil penalty under paragraphs (6) and (7), the Administrator, Secretary, or the court, as the case may be, shall consider the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require."
33 U.S.C. § 1321(b)(8); ("Clean Water Act; Determination of Amount")

response to a series of fires, explosions and chemical releases throughout the industry.

Refinery inspection data obtained by the Center under the Freedom of Information Act for OSHA's nationwide program and for the parallel Texas City inspection show that BP received a total of 862 citations between June 2007 and February 2010 for alleged violations at its refineries in Texas City and Toledo, Ohio.

Of those, 760 were classified as "egregious willful" and 69 were classified as "willful." Thirty of the BP citations were deemed "serious" and three were unclassified. Virtually all of the citations were for alleged violations of OSHA's process safety management standard, a sweeping rule governing everything from storage of flammable liquids to emergency shutdown systems. BP accounted for 829 of the 851 willful violations among all refiners cited by OSHA during the period analyzed by the Center.

Top OSHA officials told the Center in an interview that BP was cited for more egregious willful violations than other refiners because it failed to correct the types of problems that led to the 2005 Texas City accident even after OSHA pointed them out. In Toledo, problems were corrected in one part of the refinery but went unaddressed in another. Jordan Barab, deputy assistant secretary of labor for occupational safety and health, said it was clear that BP "didn't go nearly far enough" to correct deficiencies after the 2005 blast.

"The only thing you can conclude is that BP has a serious, systemic safety problem in their company," Barab said.[6]


Aside from the Texas City explosion, for which BP pleaded guilty to felony violations of the Clean Air Act and a $50 million fine following the Texas City incident, other major   recent major safety violations by BP include a series of accidents in 2000 at BP's Grangenouth, Scotland petrochemical facility and a 2006 rupture of a corroded pipeline at Prudhoe Bay, Alaska.[7],[8],[9]

---

[6] "BP Refinery Safety Record Industry's Worst: Watchdog", National Public Radio, by Frank James, May 17, 2010. Available at: http://www.npr.org/blogs/thetwo-way/2010/05/bp_refinery_safety_record_indu.html

[7] "BP's blemished safety record is off-limits in trial, judge rules", Times Picayune, by Mark Schleifstein, February 9, 2012. Available at: http://www.nola.com/news/gulf-oil-spill/index.ssf/2012/02/judge_rules_bps_blemished_safe.html

MOEX was obviously willing to risk investing in a venture with BP while fully aware of BP's notorious and outstanding record of safety violations. It was a business decision MOEX considered and was willing to take. Accordingly, the fact that MOEX was not an active partner in the actual drilling of the well should not act as a factor to mitigate its culpability.

**6. MOEX's Settlement with BP in This Matter Was at a Much Higher Rate than the U.S.'s Proposed Settlement.**

MOEX settled BP's claims against it in this litigation for $1.065 billion (and MOEX's transfer of its leasehold interest, the worth of which is now highly questionable as a result of the explosion and the sealing of the well.[10]

BP has stated that its best estimate for its total cost for the spill is $37.2 billion.[11]

MOEX therefore has assumed responsibility with BP for 2.9% of BP's anticipated liability.

As noted above, however, the U.S. Proposed Settlement assesses MOEX for only (a) 1% of BP's fine (if fined at $1,100/barrel), or (b) 0.26% (at $4,300/barrel). Even using the lower $1,100/barrel formula, in other words, the U.S. Proposed Settlement assesses MOEX at only one-third the rate (1%) that MOEX settled with BP itself (2.9%)

---

[8] "Major incident investigation report BP Grangemouth Scotland: 29th May - 10th June 2000". Available at: http://www.hse.gov.uk/comah/bpgrange/index.htm

[9] "Biggest Oil Field in U.S. Is Forced to Stop Pumping", New York Times: August 8, 2010. Available at: http://www.nytimes.com/2006/08/08/business/08oil.html?pagewanted=print

[10] "Order and Reasons" (Regarding Motion in Limine to Exclude Settlement Evidence)", p. 2; February 7, 2012. Doc # 5603. As this Court noted: "The BP-MOEX settlement obligates MOEX to pay BP the sum of $1,065,000,000, transfer its 10% leasehold interest in MC252 to BP, and release BP from all claims related to the Deepwater Horizon incident. In turn, BP released MOEX from all of its potential claims against MOEX related to the incident and agreed to indemnify MOEX for any liability for numerous civil claims in this MDL. MOEX also agreed to release all of its claims against Anadarko and transfer to BP all of its third-party claims other than its claims against Anadarko or any claims under MOEX's offshore insurance policies. Additionally, the BP-MOEX settlement provides that BP will reimburse MOEX 5% of any recoveries in excess of $25 billion from third parties such as Transocean and Halliburton, up to the amount of $500 million."

[11] "BP Reaches Estimated $7.8 Billion Deal With Spill Victims", Bloomberg News, March 14, 2012... Available at: http: //www.businessweek.com/news/2012-03-14/bp-reaches-estimated-7-dot-8-billion-deal-with-spill-victims

## 7. Conclusion:

As Professor David Uhlmann of the University of Michigan Law School and the former chief of the Justice Department's environmental crime section judiciously stated, this was only a "modest settlement". [12]

Accordingly, I request that the Department of Justice withhold and withdraw its Consent to the proposed Settlement and Judgment.

Sincerely,

Daniel E. Becnel, Jr.

---

[12] (See "U.S Files Motion Seeking Moex Accord in BP Spill Case"; Bloomberg News; February 17, 2012;     Available at:  http://www.bloomberg.com/news/2012-02-17/u-s-files-motion-seeking-moex-settlement-in-bp-gulf-of-mexico-spill-case.html

**EXHIBIT 1-F**

# SALAS & Co., L.C.

ATTORNEYS & COUNSELORS AT LAW

Camilo K. Salas III
csalas@salaslaw.com

650 Poydras Street
Suite 2000
New Orleans, Louisiana 70130
Telephone: 504-799-3080
Facsimile: 504-799-3085

March 22, 2012

### Public Comment On MOEX Proposed Consent Decree

**In Re: -Oil Spill by the Oil Rig ''Deepwater Horizon'' in the Gulf of Mexico,
on April 20, 2010; MDL 2179;
-D.J. Ref. 90–5–1–1–10026.
-(Proposed Consent Decree with MOEX; Court Pleadings #5743 and 5743-1)**

**Via e-mail:** pubcomment-ees.enrd@usdoj.gov
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 2004467611

**Via U.S. Certified First Class Mail**
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 2004467611

Dear Sir or Madam:

I submit this Comment in response to the Notice of Lodging of Proposed Consent Decree

under the Clean Water Act (ōNoticeö) regarding the above matter, published by the Department

of Justice  in the February 24, 2012 Federal Register (Vol. 77, No. 37; FR Doc. 2012-4368).  I

submit this Comment on my own behalf as a citizen of Louisiana and the United States; and on

behalf of my clients, Tom Garner, Grady Thigpen, Chris M. McCraney and John Michael Donkas (ôPlaintiffsö).[1]

The Notice indicates that the Government will covenant not to sue (under the Complaint or any other instrument) the MOEX Entities and MOECO (as defined in the Proposed Partial Consent Decree; hereafter ôConsent Decreeö), which includes those companiesø officers, directors, shareholders, employees, and agents (all in their official capacities as such), for civil or administrative penalties for the Deepwater Horizon Incident under: (a) CWA §§ 31(b)(6) or (7). 33 U.S.C. §§ 1321(b)(6) or (7); (b) the Outer Continental Shelf Lands Act, 43 U.S.C. § 1350(b), including without limitation, ôOil and Gas and Sulphur Operation in the Outer Continental Shelf,ö Title 30 C.F.R. Subparts A, B, C, D, and E of Part 250; (c) Endangered Species Act § 11(a)(1), 16 U.S.C. § 1540(a)(1); (d) Marine Mammal Protection Act § 105(a)(1), 16 U.S.C. § 1375(a)(1); (e) National Marine Sanctuaries Act § 306(1), 16 U.S.C. § 1436(1); and (f) the federal Oil and Gas Royalty Management Act, 30 U.S.C. § 1719(a).  This covenant shall take effect upon timely payment of all sums due under Article V of the Consent Decree.

We object to the Consent Decree because the proposed civil penalties are inadequate for the reasons set forth below.

## I.   NATURE OF RELIEF SOUGHT BY PLAINTIFFS.

1.  Plaintiffs brought a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure (1) to enjoin Defendantsø violations of, and compel compliance with the Outer

---

[1] Tom Garner v BP, plc; BP Exploration and Production, Inc.; BP America, Inc.; Anadarko Petroleum Corporation; Mitsui Oil Exploration Co. Ltd.; Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; Halliburton Energy Services, Inc.; and Cameron International Corporation f/k/a Cooper Cameron Corporation (E.D.La, Civil Action No.# 10-01482)(for Louisiana residents); and Grady Thigpen et al. v BP, plc; BP Exploration and Production, Inc.; BP America, Inc.; Anadarko Petroleum Corporation; Mitsui Oil Exploration Co. Ltd.; Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; Halliburton Energy Services, Inc.; and Cameron International Corporation f/k/a Cooper Cameron Corporation (S.D. Ms., Civil Action # 10-cv-280; and, after transfer to E.D.La., #10-cv-3273)(for Mississippi residents).

Continental Shelf Lands Act (ōOCSLAö), 43 U.S.C. §§ 1331 *et. seq*., the Clean Water Act (ōCWAö), 33 U.S.C. §§ 1251 *et. seq.*, and implementing regulations enacted thereunder, which are applicable to the operations conducted on the Outer Continental Shelf (ōOCSö) by all Defendants; (2) to enjoin Defendantsø violations of, and compel compliance  with the lease for the exploration of the Macondo prospect site in Mississippi Canyon Block 252 (the ōLeaseö); the Final Rule issued by the Environmental Protection Agency (ōEPAö) establishing effluent limitations and standards of performance for the Offshore Subcategory of the Oil and Gas Extraction Point Source Category (the ōOffshore Final Ruleö); the effluent limitations and other conditions of General Permit GMG290000 issued by the EPA (the ōFinal NPDES General Permitö), which is applicable to all oil and gas exploration and production activities conducted in the western part of the Gulf of Mexico; and the Initial Exploration Plan for Mississippi Canyon Block 252-OCS-G 32306 (the ōBP Exploration Planö) submitted by BP Exploration and Production, Inc. (ōBP Explorationö) on March 10, 2009 for the Macondo oil well, which was approved by the Mineral Management Service (ōMMSö) of the Department of Interior (ōInteriorö) in the Permit identified with Control No. N-9349; all of which were and are violated by Defendants; (3) for a judgment canceling the Lease; (4) for an order temporarily and permanently enjoining unlawful activities and discharges of Prohibited Contaminants (as that term is defined below) carried out by some of the Defendants in violation of the Lease and the laws, regulations, effluent limitations, standards and permits described above, and enjoining any similar and other unlawful activities and discharges that Defendants may cause to occur in the future; (5) for imposition of civil penalties against Defendants for each past, ongoing and future violations; and (6) to recover damages (including reasonable attorney and expert witness fees) suffered by Plaintiff and the Class Members because of those violations and as a result of the

blow-out of the Macondo oil well; because the explosion and fire aboard, and subsequent sinking of, the oil rig Deepwater Horizon (hereinafter "Deepwater Horizon"or "Oil Rig") on April 20, 2010, at about 10:00 p.m. central time on the OCS, off the Louisiana coast; and because of the unlawful discharge of Prohibited Contaminants into the Gulf of Mexico by some of the Defendants.

2.   It has been estimated that during and after the sinking of the Oil Rig, up to 60,000 barrels per day of oil began to leak from the Macondo well.  In addition, massive amounts of produced water (which contains barium, benzene, zinc, cholorides, sufate, bicarbonate, ammonia, naphthalene, phenolic, radium, oil and grease),[2] radioactive pollutants, drilling fluids (made of barite, which contains mercury and cadmium), drill cuttings, produced sand containing oil and radionuclides or naturally occurring radioactive materials ("NORM"), cement, methane gas (which in high volumes deplete the oxygen in the water) also leaked from the well.  In addition, other contaminants, such as the oil dispersant Corexit and antifreeze were used in the attempts to disperse and/or collect the oil.  All of the substances listed in this paragraph (collectively the "Prohibited Contaminants") were illegally dumped into the navigable waters of the United States by the Defendants.  It was estimated that the total of Prohibited Contaminants spilling from the Macondo well add up to at least 125,000 barrels per day, with oil being up to 60,000  barrels per day and the produced water and other contaminants the balance.

3.   Some of the Prohibited Contaminants had been stored in the Oil Rig and, after the explosion, they began to escape, first from the Oil Rig; then from the Macondo oil well (upon

---

[2] The EPA has defined produced water as "water and particulate matter associated with oil and gas producing formation.  Produced water includes small volumes of source water and treatment chemicals that return to the surface with the produced formation fluids and pass through the produced water treating systems currently used by many oil and gas operators." 57 Fed. Reg. 60,926, 60,951 (1992).  *See, Sierra Club Lone Star Chapter v. Cedar Point Oil Company, Inc.*; 73 F.3d  543 (5th Cir. 1996); *BP Exploration & Oil, Inc. v. U.S.E.P.A.*, 66 F.3d 784, 792 (6th Cir. 1995); *Natural Resources Defense Council v. U.S.E.P.A.*, 863 F.2d 1420, 1425 (9th Cir. 1988); *American Petroleum Inst. v. E.P.A.*, 661 F.2d 340, 343 (5th Cir. 1981).

which the Deepwater Horizon was performing drilling, completion and cementing operations); later from the riser pipe or casing that originally connected the Deepwater Horizon to the well and ultimately came to rest on the ocean floor; and then also from the equipment and vessels that began to recover some of the Prohibited Contaminants as they were being spilled from the well, which were then separated and produced into crude oil.  Since the explosion of the Deepwater Horizon, the Prohibited Contaminants were unlawfully disposed into the navigable waters of the United States in the Gulf of Mexico.

4.   The produced water and the other Prohibited Contaminants escaped unrestrained from the producing formation through the well drilled at the Macondo site.  Several attempts to stop the massive blow-out or to contain the flow of Prohibited Contaminants failed.  One attempt, which involved cutting off the riser pipe at the well-head above the blow out preventer (ōBOPö), increased the flow of the Prohibited Contaminants by twenty percent.

5.   The BP Defendants then started an oil-producing operation, which involved separating the oil from the natural gas, produced water and other Prohibited Contaminants.  The oil-producing operation conducted from and/or aboard two vessels, the Discoverer Enterprise and the Q4000, which were positioned near the Macondo well.  Other production vessels later utilized BP to increased oil production to 58,000 barrels per day.  These oil-production activities, which were conducted without proper permits in violation of law and without having met all legal requirements, caused further discharges of Prohibited Contaminants into the navigable waters of the United States and thus resulted in further and separate damages than the original damages caused by the initial discharges of Prohibited Contaminants from the Oil Rig and the well into the Gulf of Mexico.

6.   The discharges of the Prohibited Contaminants into the navigable waters of the United States by the Defendants, in violation of the Lease, laws, regulations and effluent limitations, standards and permits described above, caused serious and permanent environmental damage to the Louisiana coast, with detrimental effects being inflicted  upon the Plaintiffs and on the Gulf of Mexico's and Louisiana's marine environments, coastal environments and estuarine areas, all of which are used by Plaintiffs for different activities, including recreational fishing, boating and bird watching; commercial fishing; oyster harvesting; to earn a livelihood; and for other recreational and non-recreational purposes.  Louisiana's wetlands are home to over 400 different species of animals, some endangered, and they are also the first line of defense from storms and hurricanes.  The spill of Prohibited Contaminants have damaged the wetlands, thereby injuring those species that inhabit them, and exposing Louisiana residents to increased dangers from hurricanes.

## II.  LEGAL BACKGROUND

### A.  Outer Continental Shelf Lands Act ("OCSLA").

7.   Congress enacted the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331 *et. seq.*, to define a body of law applicable to the seabed, the subsoil and the fixed structures on the OCS and to provide for the expeditious and orderly exploration, development and production of the OCS, subject to environmental safeguards.  43 U.S.C. §§ 1332, 1333.

8.   The OCS includes all submerged lands lying seaward and three miles outside state waters, "and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control."  43 U.S.C. § 1331(a).

9.   The OCSLA allows the Secretary of Interior ("Secretary") to sell leases to develop oil and gas deposits in the OCS. 43 U.S.C. § 1344.  All leases are conditioned on compliance with the regulations issued under OCSLA.  43 U.S.C. § 1334(b); 30 C.F.R. Part 250.

10. Oil and gas operations in the OCS are governed by a five-step process: (1) the Secretary's promulgation of a five-year leasing program, 43 U.S.C. § 1344; (2) lease sales, 43 U.S.C. § 1337; (3) exploration, 43 U.S.C. § 1340; (4) development and production, 43 U.S.C. § 1351; and (5) sale of recovered oil and gas, 43 U.S.C. § 1353.

11. Exploration of the OCS must be conducted so as to avoid unduly harming aquatic life. 43 U.S.C. § 1340(a)(1).  Exploration of the OCS may only be conducted in accordance with the OCSLA and its implementing regulations.  43 U.S.C. § 1340(b); 30 C.F.R. Part 250.

12. Before a lease holder may commence any exploration activities on a lease, that lease holder must submit an exploration plan ("EP") to MMS for approval.  43 U.S.C. § 1340(c)(l).

13. The Secretary may allow exploration to proceed only if he finds that the lessee's EP "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or architectural significance."  43 U.S.C. § 1340(g)(3).

14. The Secretary can approve the EP if it is consistent with the provisions of the OCSLA, regulations prescribed thereunder and the provisions of the lease.  43 U.S.C. § 1340(c)(1).

15. If a significant revision of an approved EP is submitted, the process of approval of the revised EP shall be the same as for the approval of the original EP.  43 U.S.C. § 1340(e)(1);  30 C.F.R. § 250.285.   All exploration activities pursuant to any lease must be conducted in accordance with an approved EP or an approved revision of such plan.  43 U.S.C. § 1340(e)(3).

16. All stages of the OCSLA five-step process are subject to review under the National Environmental Policy Act (ōNEPAö), 42 U.S.C. §§ 4321 *et. seq.*[3/]

**1.  Minerals Management Service ("MMS").**

17. The Minerals Management Service (ōMMSö) was established on January 19, 1982 by Department of the Interior Secretarial Order No. 3071.   *See*, 47 Fed.Reg. 6138 (1982).   The Director of MMS operated under the supervision of the Minerals Management Board, also established by Order No. 3071, which was chaired by the Under-Secretary of Interior.   DOI Secretarial Order No. 3071, Amend. No. 1 (May 10, 1982).   The stated purpose of establishing the Minerals Management Board and MMS was to (1) improve the management of and provide greater management oversight and accountability for the minerals-related activities previously carried out by the Conservation Division of the U.S. Geological Survey; and (2) to eliminate the fragmentation of OCS activities by consolidating the responsibilities for OCS programs.   *Id.*

**2.  OCSLA Implementing Regulations and Cancellation of Leases.**

18. The Secretary authorized the MMS to regulate oil, gas and sulphur exploration, development and production operations on the OCS. 30 C.F.R. § 250.101.

19. 30 C.F.R. Part 250 contains the regulations of the MMS Offshore Program that governed oil, gas and sulphur exploration, development and production on the OCS.   30 C.F.R. §§ 250.101-.1754.

20. These regulations apply to lessees (the BP Defendants); operating rig owners (the BP Defendants, Anadarko and MOECO); operators (the BP Defendants); and their contractors and subcontractors (Transocean, Halliburton and Cameron).   30 C.F.R. § 250.400.

---

[3/]  *Village of False Pass v. Clark*, 733 F.2d 605, 614 (9th Cir. 1984).

21. Under the Secretary's authority, the Director of the MMS required that all operations be conducted according to the provisions of OCSLA, the MMS regulations, MMS orders, the Lease and other applicable laws and regulations.  30 C.F.R. § 250.101; 43 U.S.C. §1334(b).

22. Whenever the owner of a producing lease failed to comply with the provision of OCSLA, the regulations enacted thereunder, or the lease, the lease may be **forfeited and cancelled** by an appropriate court proceeding.  43 U.S.C. § 1334(d).  The Consent Decree fails to impose cancellation of the lease.

23. The Secretary may suspend or temporarily prohibit any operation under any lease, or may cancel any lease or permit.  43 U.S.C. § 1334(a).  Likewise the Consent Decree fails to impose these alternative remedies.

**B.  National Environmental Policy Act ("NEPA").**

24. Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et. seq.* to "promote efforts which will prevent or eliminate damages to the environment . . . ." 42 U.S.C. § 4321.  To achieve this goal, NEPA and its implementing regulations require federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5. Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality."  40 C.F.R. § 1500.1(b).  In addition, federal agencies must notify the public of proposed projects and allow the public the chance to comment on the environmental impacts of their actions.  42 U.S.C. § 1506.6.

25. The cornerstone of NEPA is the environmental impact statement ("EIS").  An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 40 C.F.R. § 4332(2)(C); 40 C.F.R. § 1501.4.  The EIS must provide a "full and

fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.ö  40 C.F.R. § 1502.1.

26. An agency must prepare a supplemental EIS when õ[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.ö 40 C.F.R. § 1502.9(c)(1)(ii).  Whether new circumstances are significant depends on a number of factors, including õ[t]he degree to which the proposed action affects public health or safety,ö  õ[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks,ö and õ[t]he degree to which the action . . .  may cause loss or destruction of significant scientific, cultural, or historical resources.ö  40 C.F.R. § 1508.27(b).

### 1.  Categorical Exclusions Under NEPA.

27. An agency may comply with NEPA for any action by (1) preparing an EIS for actions which significantly affect the quality of the human environment; (2) preparing a less extensive environmental assessment (õEAö) and making a finding of no significant impact on the environment (õFONSIö); or (3) documenting that the action falls within an established categorical exclusion. 40 C.F.R. § 1501.4.

28. A õcategorical exclusionö is defined as a category of actions which õdo not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulationsí .ö  40 C.F.R. § 1508.4.  Thus, a categorical exclusion is only allowed where an agency concludes that there will be no õsignificant effect on the human environmentö from a given course of action.  *Id.*

29. This definition of "categorical exclusion" mandates that an agency make allowances for "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* In such cases, the agency must perform an EA or EIS to ensure that impacts are accounted for.

30. Interior regulations provide that "extraordinary circumstances" may preclude application of a categorical exclusion to actions which:

> (a) Have significant impacts on public health or safety;
>
> (b) Have significant impacts on such natural resources and unique geographic characteristics as . . . parks, recreation or refuge lands; wilderness areas; wild or scenic rivers; . . . wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas;
>
> (c) Have highly controversial environmental effects;
>
> (d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks;
>
> (e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects;
>
> (f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects;
>
> (h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species; and
>
> (i) Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

43 C.F.R. § 46.215.

31. On May 27, 2004, MMS issued rules in Interior's Department Manual ("the Manual") to govern its internal NEPA process.

32. In the Manual, MMS designated certain permitting and regulatory actions for categorical exclusion from NEPA review, including the "[a]pproval of an offshore lease or unit

-11-

exploration[,] development/production plan í   in the central or western Gulf of Mexico.ö Manual at 15.4(C)(10).

33. However, the Manual explained that MMS would **not** apply this categorical exclusion:

(1)        [i]n areas of high seismic risk or seismicity, ***relatively untested deepwater***, or remote areas; or (2) within the boundary of a proposed or established marine sanctuary, and/or within or near the boundary of a proposed or established wildlife refuge or **areas of high biological sensitivity**; or (3) in areas of hazardous natural bottom conditions; or (4) **utilizing new or unusual technology**.

*Id.* (emphasis added).

34. In its Notice to Lessees and Operators of Federal Oil, Gas, and Sulphur Leases in the Outer Continental Shelf, Gulf of Mexico OCS Region No. 2008-G04, MMS defined õdeepwaterö as õthose water depths 400 meters (1,312 feet) or greater.ö  MMS NTL 2008-G04, *available at* http://www.ocsbbs.com/ntls.asp.

### C.  Clean Water Act ("CWA").

35. The Clean Water Act (the Federal Water Pollution Control Act Amendments of 1972, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987), 33 U.S.C. §§ 1251 *et. seq.*  (õthe Actö or õCWAö) establishes a comprehensive program õto restore and maintain the chemical, physical, and biological integrity of the Nationøs waters.ö  33 U.S.C. § 1251.  Congressø original goal was for the discharge of all pollutants into navigable waters to be eliminated by the year 1985.  33 U.S.C. § 1251(a)(1).  Consequently, **the discharge of any pollutant is illegal** unless made in compliance with the provisions of the CWA. Similarly, **any** discharge of **oil** is prohibited.  33 U.S.C. § 1321.

36. The CWA directs EPA to formulate national effluent limitation guidelines for those industries that discharge pollutants into the navigable waters of the United States.  In formulating

-12-

these guidelines, the CWA instructs EPA to institute progressively more stringent effluent discharge guidelines in stages.

37. At the first stage of pollutant reduction, EPA was required to determine the level of effluent reduction achievable within an industry with the implementation of the ōbest practicable control technology currently availableö (ōBPTö). 33 U.S.C. § 1413(b)(1(A). In general, BPT is the average of the best existing performances by industrial plants of various sizes, ages and unit processes within the point source category or subcategory. In arriving at BPT for an industry, EPA had to consider several factors, including the total cost of the application of the technology in relation to the effluent reduction benefit to be achieved from such application.[4/] For the offshore oil and gas subcategory, BPT was to be achieved by July 1, 1977. 33 U.S.C. § 1311(b)(1)(A).

38. At the second stage, EPA had to set generally more stringent standards for toxic and non-conventional pollutants. For toxic pollutants, which are defined at 40 C.F.R. § 401.15, EPA had to set the standard for the ōbest available technology economically achievableö (ōBATö). BAT represents, at a minimum, the best economically achievable performance in the industrial category or subcategory.[5/] Compared to BPT, BAT calls for more stringent control technology that is both technically available and economically achievable. Among the factors that EPA must consider and take into account when setting BAT are the cost of achieving such effluent reduction and the non-water quality environmental impact including the energy requirements of

---

[4/] Other factors EPA had to consider are the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impacts, and such other factors as the Administrator deems appropriate. 33 U.S.C. § 1314(b)(1)(B); *see also Environment Protection Agency v. National Crushed Stone Ass'n.,* 449 U.S. 64, 71 n. 10, 101 S.Ct. 295, 300 n. 10, 66 L.Ed. 2d 268 (1980).

[5/] *NRDC, Inc. v. EPA*, 863 F.2d 1420, 1426 (9th Cir. 1988) (citing *EPA v. National Crushed Stone Assn'n.*, 449 U.S. 64, 74, 101 S.Ct. 295, 302, 66 L.Ed. 268 (1980)).

the technology.[6/]   33 U.S.C. § 1314(b)(2)(B).  For the offshore oil and gas subcategory, BAT was to be achieved by July 1, 1987.[7/]   33 U.S.C. § 1311(b)(2)(A).

39. Conventional pollutants are treated differently from toxics under the CWA. Conventional pollutants include biochemical oxygen demand ("BOD"), total suspended solids ("TSS") (nonfilterable), pH, fecal coliform, **oil** and grease.  40 C.F.R. § 401.16. Pursuant to the 1977 amendments to the Act, a new standard was conceived for conventional pollutants entitled "best conventional pollutants control technology" ("BCT").  This standard is designed to control conventional pollutants about which much is known but for which stringent BAT standards might require unnecessary treatment.  BCT is not an additional level of control, but replaces BAT for conventional pollutants.

40. Finally, the CWA directs EPA to establish a separate standard for new sources of pollutants.  These "new source performance standards" ("NSPS") require application of the technology chosen as BAT to remove **all types** of pollutants from new sources within each category.

### 1.       Regulations for Oil and Gas Extraction.

41. To comply with the CWA, on March 4, 1993 the EPA issued a final regulation (the "Offshore Final Rule") establishing effluent limitations guidelines and standards of performance for the **Offshore** Subcategory of the Oil and Gas Extraction Point Source Category under sections 301, 304, 306, 307, 308 and 501 of the Act, 33 U.S.C. §§ 1311, 1314(b), (c) and (e), 1316, 1317, 1318 and 1361; 86 Stat. 816, Public Law 92-500; 91 Stat. 1567, Public Law 95-217;

---

[6/]   The other factors include:  the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, and such other factors as the Administrator deems appropriate.  33 U.S.C. § 1314(b)(2)(B).

[7/]   The original goal of the CWA of 1972, 86 Stat. 816, requiring compliance for BAT by 1983 was extended by the CWA of 1977, 91 Stat. 1567.  *See also National Crushed Stone*, 449 U.S. at 70 n. 9, 101 S. Ct. at 300 n. 9.

101 Stat 7, Public Law 100-4.  The Offshore Final Rule is set out at 40 CFR § 435, Subpart A and became effective April 5, 1993.[8/]

42. The Offshore Final Rule applies to discharges from offshore oil and gas extraction facilities, including exploration, development and production operations, that are seaward of the inner boundary of the territorial seas.  The inner boundary of the territorial seas is defined in section 502(8) of the CWA as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters" (or, the shore).

43. Before the Offshore Final Rule was issued, BPT for the offshore subcategory prohibited the discharge of free oil; limited the discharge of oil and grease in produced water to a daily maximum of 72 mg/l and a thirty-day average of 48 mg/l; prohibited the discharge of free oil in deck drainage, drilling fluids, drill cuttings, and well treatment fluids; and, for sanitary wastes, required a minimum residual chlorine content of 1 mg/l and prohibited the discharge of floating solids. BPT limitations were not changed by the Final Rule.

44. The Offshore Final Rule established BCT, BAT and NSPS limitations prohibiting the discharge of drilling fluids and drill cuttings from wells located within three miles from shore. For wells located **more than three miles from shore**, drilling muds and drill cuttings may be discharged after meeting the BCT limitation of **no discharge of free oil** measured by the static sheen test.  BAT and NSPS for discharges beyond the three-mile limit are  more stringent than BCT, and impose four basic requirements: (1) a limit on toxicity set at 30,000 ppm in the suspended particulate phase; (2) limitation on cadmium and mercury in barite set at 3 mg/kg and 1 mg/kg, respectively (on a dry weight basis); (3) a prohibition on the discharge of **diesel oil**; and

---

[8/] The Offshore Final Rule was upheld in *BP Exploration & Oil, Inv. v. United States Environmental Protection Agency*, 66 F.3d 784 (6th Cir. 1995).

(4) **no discharge of free oil**, with compliance determined by the static sheen test.[9/] BCT applies

to the control of conventional pollutants (such as **oil**), and in the Offshore Final Rule, BCT

**prohibits the discharge of free oil beyond three miles from shore**.

45. Barite (naturally occurring barium sulfate ore) is a heavy, soft, and chemically inert

mineral, which is widely used to control the density of drilling fluids.  Barite contains heavy

metal contaminants, including mercury and cadmium, and is the primary source of toxic metals

in drilling fluid discharges.  In the Offshore Final Rule, therefore, EPA limited mercury and

cadmium to 1 mg/l and 3 mg/l in barite used in drilling fluid applications.

46. The bulk of produced water is water trapped in underground reservoirs along with oil and

gas that eventually rises to the surface with the produced oil and gas.  Most of the oil and gas in

the produced water is separated as part of the oil and gas extraction process.  The remaining

produced water, still containing some oil and grease, is then discharged overboard or otherwise

disposed of.  Produced water also includes the injection water used for secondary oil recovery

and various well treatment chemicals added during production and oil and gas extraction.

Produced water is the highest volume waste source in the offshore oil and gas industry.

47. Under the BAT and NSPS limitations of the Offshore Final Rule, the discharge of oil and

grease in produced water is set to a maximum for any one-day (referred to as daily maximum) of

42 mg/l and an average of daily values for 30 consecutive days (referred to as monthly average)

of 29 mg/l based on improved operating performance of gas flotation technology.  BCT for

produced water was established equal to the BPT limitations on oil and grease.

48.   Discharges of produced sand are prohibited under BCT, BAT and NSPS.

---

[9/] Fluids fail the static sheen test if a ösheen, iridescence, gloss, or increased reflectanceö appears on the surface of test seawater after drilling fluid samples are introduced into ambient seawater  in a container having an air-to-liquid interface area of 1,000 cm. 50 Fed.Reg. 34,592, 34,627.

49. BCT, BAT and NSPS limitations for deck drainage are set equal to the BPT limitations prohibiting discharges of free oil.  Compliance with the no discharge of free oil limit for deck drainage is to be determined by the visual sheen test.

50. For treatment, completion and workover fluids, the Offshore Final Rule establishes BAT and NSPS limiting the discharge of oil and grease at a daily maximum of 42 mg/l and a monthly average of 29 mg/l.  BCT for well treatment completion and workover fluids is set equal to the BPT prohibition on discharges of free oil, with compliance measured by the static sheen test.

51. EPA also promulgated limitations on domestic wastes which prohibit the discharge of foam (under BAT and NSPS) and floating solids (under BCT and NSPS), and incorporate U.S. Coast Guard regulations (under BCT and NSPS) prohibiting discharges of garbage as required at 33 C.F.R. § 151.  For sanitary wastes, EPA promulgated BCT and NSPS limitations equal to BPT limitations on floating solids and residual chlorine.  EPA did not establish BAT for sanitary wastes because no toxic or nonconventional pollutants of concern were identified in these wastes.

## 2.  NPDES General Permits.

52. The discharge of pollutants, otherwise illegal under section 301(a) of the CWA, can be authorized by compliance with a NPDES permit issued under section 402.

53. Sources operating beyond the territorial seas are not subject to state water quality standards, and environmental quality-based conditions in permits are based on the ocean discharge criteria established under section 403 of the Act.  Ocean discharge criteria applicable to the oil and gas extraction industry subcategory were promulgated on October 3, 1980 (45 FR 65942) under section 403(c) of the Act.  These guidelines are to be used in making **site-specific** assessments of the impacts of discharges.  Section 403 limitations are imposed through NPDES

permits.  Section 403 is intended to prevent unreasonable degradation of the marine environment and to authorize imposition of effluent limitations, including a prohibition of discharge, if necessary, to ensure this goal.

54. In most cases, the owner or operator of a facility applies to either the EPA or a state permitting authority for its own NPDES permit, and the permit writer evaluates facility-specific information to determine the appropriate permit terms and conditions.  But there is another mechanism by which sources of pollution may obtain coverage under an NPDES permit.  Since 1979, EPA and states have had a process of issuing õgeneral permitsö to satisfy the requirements of the Act.[10/]  EPA defines a õgeneral permitö as õan NPDES ÷permitø issued under [40 C.F.R.] § 122.28 authorizing a category of discharges under the CWA within a geographical area.ö  40 C.F.R. § 122.2. EPAøs general permit regulations expressly require the use of general permits for offshore oil and gas facilities except in certain cases.  40 C.F.R. § 122.28(c)(1). These general permits may contain enforceable effluent limitations and other requirements, but, unlike individual permits, they may apply to large numbers of sources discharging into many different bodies of water.

55. Some of the earliest general permits were issued to the large number of offshore oil and gas exploration and production facilities operating in the Gulf of Mexico.  EPA issued several permits applicable to various portions of the Gulf of Mexico in 1981.  *See, e.g.*, Issuance of Final General NPDES Permits for Oil and Gas Operations in Portions of Gulf of Mexico, 46 Fed. Reg. 20,284 (Apr. 3, 1981).  Most oil an gas facilities in the Gulf continue to operate under EPA-issued general permits.  *See, e.g.*, Final NPDES General Permit for the Offshore Subcategory of the Oil and Gas Extractions Located in Eastern Portion of OCS and Gulf of Mexico, 69 Fed.

---

[10/] *See, Sierra Club, Long Star Chapter v. Cedar Point Oil Company, Inc.*, 73 F.3d 543, 553, f.n. 10 (5th Cir. 1996).

-18-

Reg. 76,740 (Dec. 12, 2004); Notice of Final NPDES General Permit for New and Existing Sources and New Discharges in the Offshore Subcategory of the Oil and Gas Extraction for Western OCS and Gulf of Mexico, 69 Fed. Reg. 60,150.

56. The conditions of a general permit are developed through a õnotice and commentö process similar to development of a regulation, but the application of the general permit to an individual source differs dramatically from the process of issuing an individual NPDES permit. Sources seeking coverage under a general permit generally need only submit a õNotice of Intentö to the permit authority, and they are then authorized to discharge under the terms of the general permit without additional government review or public participation.

57. On May 31, 2007 EPA reissued the NPDES general permit for the Western Portion of the Outer Continental Shelf of the Gulf of Mexico (No. GMG290000) for discharges from new sources, existing sources and new dischargers in the Offshore Subcategory of the Oil and Gas Extraction Point Source Category.  This general permit replaced the previous permit issued October 7, 2004 (69 FR 60150).  The general permit authorizes discharges from exploration, development and production facilities located in and discharging to Federal waters of the Gulf of Mexico seaward of the outer boundary of the territorial seas offshore of Louisiana and Texas. The reissued general permit became effective October 1, 2007 and will expire September 30, 2012.  *See, Final NPDES General Permit for New and Existing Sources and New Dischargers in the Offshore Subcategory of the Oil and Gas Extraction Category for the Western Portion of the Outer Continental Shelf of the Gulf of Mexico* (GMG290000) (hereinafter the õFinal NPDES General Permit.ö).

### III.  FACTUAL ALLEGATIONS

A.  **Overview of the Oil and Gas Industry.**

    1.    **Exploration, Development and Production.**

58.  Exploration and development activities for the extraction of oil and gas include work necessary to locate and drill wells.  **Exploration** activities are those operations involving the drilling of wells to determine the potential hydrocarbon reserves.  Exploration activities are usually of short duration at a given site, involve a small number of wells, and are generally conducted from mobile drilling units (öMODUsö).  **Development** activities involve the drilling of production wells once a hydrocarbon reserve has been discovered and delineated.  These operations, in contrast to exploration activities, usually involve a large number of wells which may be drilled from either fixed or floating platforms or MODUs.  **Production** operations include all work necessary to bring hydrocarbon reserves from the production formation and begin with the completion of each well at the end of the development phase.

    2.    **Waste Streams.**

59.  The primary wastewater sources from the **exploration** and development phases of the offshore oil and gas extraction industry include drilling fluids, drill cuttings, sanitary wastes, deck drainage and domestic wastes.

60. The primary wastewater sources from the **production** phase of the industry include produced water, produced sand, sanitary wastes, deck drainage, domestic wastes and well treatment, completion and workover fluids.

61. Drilling fluids (or ödrilling mudsö) and drill cuttings are the most significant waste streams from exploration and development operations in terms both of volume and toxic pollutants.  Produced water is the largest waste stream from production activities based on its

volume of discharge and quantity of pollutants.   Deck drainage, sanitary wastes, domestic wastes, produced sand, and well treatment, completion, and workover fluids are often classified under the term miscellaneous wastes.

62. Drilling fluids are any fluid sent down the drillhole to aid the drilling process.   This includes those materials used to maintain hydrostatic pressure control in the well, lubricate the drill bit, remove drill cuttings from the well, and stabilize the walls of the well during drilling or workover operations.   A water-based drilling fluid is the conventional drilling system in which water is the continuous phase.   Drill cuttings are the solids generated by drilling into subsurface geologic formations and are carried to the surface by the drilling fluid system.

63. Produced water is brought up from the hydrocarbon-bearing strata along with produced oil and gas.   This waste stream can include formation water, injection water and any chemicals (including well treatment, completion or workover fluids) added downhole or during the oil/water separation process.

64. Deck drainage includes all wastewater resulting from platform washings, deck washings, rainwater, and runoff from curbs, gutters and drains, including drip pans and work areas.

65. Well treatment fluids are fluids that resurface from acidizing and/or hydraulic fracturing operations to improve hydrocarbon recovery.   Workover fluids and completion fluids are low solids fluids used to prepare a well for production, provide hydrostatic control and/or prevent formation damage.

66. Produced sand consists of the slurried particles which surface from hydraulic fracturing and the accumulated formation sands and other particles (including scale) generated during production.   This waste stream also includes sludges generated in the produced water treatment system, such as  tank bottoms from oil/water separators and solids removed in filtration.

-21-

67. Sanitary wastes originate from toilets. Domestic wastes originate from skinks, showers, laundries, and galleys.

**B. Multisale EIS for Gulf of Mexico Lease Sales.**

68. In April of 2007, MMS issued its final EIS ("Multisale EIS") for eleven lease sales in the Gulf of Mexico, including Lease Sale 206 which covers Mississippi Canyon Block 252, where the Macondo well site is located.

69. In the Multisale EIS, MMS explained that an oil spill would only be "likely to result in sublethal impacts (e.g., decreased health, reproductive fitness, and longevity; and increased vulnerability to disease) to marine mammals." Multisale EIS at 2-37-38.

70. Likewise, MMS explained that "[i]n most foreseeable cases, exposure to hydrocarbons persisting in the sea following the dispersal of an oil slick will result in sublethal impacts (e.g., decreased health, reproductive fitness, and longevity; and increased vulnerability to disease) to sea turtles." *Id.* at 2-38.

71. Similarly for birds, the MMS concluded that "[t]he majority of effects resulting from a proposed action – on endangered/threatened and nonendangered/nonthreatened coastal and marine birds are expected to be sublethal: behavioral effects, sublethal exposure to or intake of OCS-related contaminants or discarded debris, temporary disturbances, and displacement of localized groups from impacted habitats." *Id.* at 2-39. MMS also noted that "[d]ispersants used in spill cleanup activity can have toxic effects similar to oil on the reproductive success of coastal and marine birds." *Id.*

72. When discussing potential impacts to endangered Gulf sturgeon from an oil spill, MMS noted that "[t]he likelihood of spill occurrence and subsequent contact with, or impact to, Gulf sturgeon and/or designated critical habitat is extremely low." *Id.* at 2-40.

73. MMS also concluded that the effects of an oil spill on fish populations and the commercial fishing industry would be õnegligible and indistinguishable from variations due to natural causes.ö *Id.*  MMS further explained that:

> [a] subsurface blowout would have a negligible effect on GOM [Gulf of Mexico] fish resources or commercial fishing.  If spills due to a proposed action were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be nonfatal and the extent of damage would be reduced due to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  The effect of proposed-action-related oil spills on fish resources and commercial fishing is expected to cause less than a 1 percent decrease in standing stocks of any population, commercial fishing efforts, landings, or value of those landings. Historically, there have been no oil spills of any size that have had a long-term impact on fishery populations.  Any affected commercial fishing activity would recover within 6 months.  There is no evidence at this time that commercial fisheries in the GOM have been adversely affected on a regional population level by spills or chronic contamination.

*Id.*

74.  MMS estimated that over the 40-year life span of the eleven proposed lease sales, the total amount of oil that could spill in the offshore waters of the Central Planning area, which includes the Macondo well site, would be 5,500 to 26,500 barrels of oil.  *Id.* at 4-241.  The maximum **total** amount estimated by the MMS ó 26,500 barrels ó is slightly over 1 million gallons,  an amount that is much less than the current estimate of oil being spilled at the Deepwater Horizon site **each day**.

**C.  MMS' Environmental Assessment on Lease Sale 206.**

75.  In October of 2007, MMS issued an Environmental Assessment (õEAö) and a Finding of No Significant Impact (õFONSIö) for a specific lease sale ó Lease Sale 206 in the Central Planning Area of the Western Gulf of Mexico.  Lease Sale 206 encompasses the Macondo well site.

-23-

76. MMS stated that it had fully analyzed the impacts of all Gulf of Mexico lease sales, including Lease Sale 206, in the Multisale EIS and that no further site-specific review was necessary.   EA at 1.   According to MMS, "[b]ecause the Multisale EIS examined the environmental impacts of a sale similar in size, nature, and potential level of development as proposed lease sale 206, the EA tiers off of the Multisale EIS and incorporates much of the material by reference." *Id.*, FONSI.   MMS concluded that "no new significant impacts were identified for proposed Lease Sale 206 that were not already assessed in the Multisale EIS, nor is it necessary to change the conclusions of the kinds, levels, or locations of impacts described in that document." *Id.*

**D.   <u>Approval of BP's Exploration Plan</u>.**

77. On March 19, 2008, MMS held Lease Sale 206, which included leasing the rights to Mississippi Canyon 252, the site of the Macondo well, to BP, Anadarko and Moeco.

78. Prior to February 23, 2009, BP submitted the Initial Exploration Plan – Mississippi Canyon Block 252-OCS-CO 32306 for the Deepwater Horizon site (the "BP Exploration Plan") to MMS for review.   The BP Exploration Plan was deemed submitted to the MMS on March 10, 2009.   In the BP Exploration Plan, BP disclosed that it planned to drill two exploratory wells at a depth of 4,992 feet approximately fifty miles offshore in the Central Gulf of Mexico.   MMS approved the BP Exploration Plan on April 6, 2009.

79. Although exploration of the OCS is subject to NEPA review, MMS approved the BP Exploration Plan without preparing an EIS or EA for the activities covered by the Plan.   Instead, MMS granted BP a categorical exclusion from NEPA review based on representations made by BP in its BP Exploration Plan.   MMS simply warned BP to "[e]xercise caution while drilling due

to indications of shallow gas and possible water flow." *See* MMS Letter of April 6, 2009 Approving Exploration Plan.

80. MMS did not explain why the BP Exploration Plan qualified for a categorical exclusion from NEPA review, even though, as described above, the Manual makes clear that the categorical exclusion for exploratory drilling in the Gulf of Mexico will not be applied in "relatively untested deepwater," "areas of high biological sensitivity," or for drilling operations "utilizing new or unusual technology." Manual at 15.4(C)(10). The BP Exploration Plan disclosed that the two wells would be drilled in 4,992 feet of water, waters that qualify as "deepwater" under MMS's Notice to Lessees and Operators. *See* NTL2008-G04, Manual at 15.4(C)(10)(1).

81. In the original BP Exploration Plan and in subsequent revised plans (which pursuant to § 250.285 are subject to all the procedures under § 250.231 through § 250.235) submitted by BP to MMS, BP also failed to disclose the **actual** design of the well; changes in the design of the well; and BP's intention and decision not to follow regulations or accepted industry practices. Furthermore, the BP Exploration Plan made misrepresentations about the lack of need for an EIS and misrepresented the worst case scenario that could be expected from a blowout. Based on information and belief, these misrepresentations were made to avoid triggering site-specific NEPA review, which would have delayed the project or may have prevented the project from going forward.

E. **Operations of Deepwater Horizon Prior to the Explosion.**

1. **Background.**

82. BP started drilling the Macondo well on October 7, 2009, using the Marianas rig. This rig was damaged in Hurricane Ida on November 9, 2009. As a result, PB and the rig operator,

Transocean, replaced the Marianas rig with the Deepwater Horizon.  Drilling with the Deepwater Horizon stared on February 6, 2010.

83.    Prior to its destruction, the Deepwater Horizon was an ultra-deepwater dynamic-positioned, semi-submersible oil rig.  The rig was positioned about 50 miles southeast of Venice, Louisiana, in water nearly 5,000 feet deep.  At the time of the explosion, drilling was being conducted at over 22,000 feet ó 2,000 feet deeper than described in the BP Exploration Plan or allowed by any permits issued by the MMS to BP.

84.    The Deepwater Horizon rig was expensive.  Transocean charged BP approximately $500,000 per day to lease the rig, plus contractorsø fees.  BP targeted drilling the well to take 51 days and cost approximately $96 million.

85.    The Deepwater Horizon was supposed to be drilling at a new location as early as March 8, 2010.  In fact, the Macondo well took considerably longer than planned to complete.  By April 20, 2010, the day of the blowout, the rig was 43 days late for its next drilling location, which may have cost BP as much as $21 million in leasing fees alone.  It also set the context for the series of decisions that BP made in the days and hours before the blowout.

## 2.    Well Design.

86.    Deepwater wells are drilled in sections.  The basic process involves drilling through rock, installing and cementing casing to secure the wellbore, and then drilling deeper and repeating the process.  On April 9, 2010, BP finished drilling the last section of the well.  The final section of the wellbore extended to a depth of 18, 360 feet below seal level, which was 1,192 feet below the casing that had previously been inserted into the well.

87.    At this point, BP had to make an important well design decision: how to secure the final 1,192 feet of the well.  There were two primary options available to BP.  The first option

involved hanging a steel tube called a "liner" from a liner hanger on the bottom of the casing already in the well and then inserting another steel liner tube called a "tieback" on top of the liner hanger. The second option involved running a single string of steel casing from the seafloor all the way to the bottom of the well. The "Liner/Tieback Casing" provides advantage over full string casing with redundant barriers to annular flow. With a single string of casing, there are just two barriers to the flow of gas up the annular space that surrounds the casing: the cement at the bottom of the well and the seal at the wellhead. In contrast, the "Liner/Tieback" option provides four barriers to annular flow: (1) the cement at the bottom of the well, (2) the hanger seal that attaches the liner to the existing casing in the well (3) the cement that secures the tieback on top of the liner, and (4) the seal at the wellhead. The Liner/Tieback option also takes more time to install, requiring several additional days to complete.

88.   BP was aware of the risks of the single casing approach. An undated "Forward Plan Review" that appears to be from mid-April recommended against the single string of casing because of the risks. According to this document, "Long string of casing ... *was* the primary option" but a "Liner ... is now the recommended option."

89.   The document gives four reasons **against** using a single string of casing:

- •   "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown."

- •   "Unable to fulfill MMS regulations of 500ø of cement above top HC zone."

- •   "Open annulus to the well head, with ... seal assembly as only barrier."

- •   "Potential need to verify with bond log, and perform remedial cement job(s)."

90.   In contrast, according to the document, there were four advantages to the liner option:

- •   "Less issue with landing it shallow (we can also ream it down)."

- • "Liner hanger acts as second barrier for HC in annulus."

- • "Primary cement job has slightly higher chance for successful cement lift."

- • "Remedial cement job, if required, easier to justify to be left for later."

91. Communications between employees of BP confirm they were evaluating these approaches. On April 14, Brian Morel, a BP Drilling Engineer, e-mailed a colleague, Richard Miller, about the options. His e-mail notes: "this has been [a] nightmare well which has everyone all over the place."

92. Despite the risks, PB chose to install the single string of casing instead of a liner and tieback, applying for an amended permit on April 15. The company's application stated that the full casing string would start at $9^7/_8$ inches diameter at the top of the well and narrow to 7 inches diameter at the bottom. This application was approved on the same day.

93. The decision to run a single string of casing was made, on information and belief, to save time and reduce costs. On March 25, Mr. Morel e-mailed Allison Crane, the Materials Management Coordinator for BP's Gulf of Mexico Deepwater Exploration Unit, that the long casing string "saves a lot of time" at least 3 days." On March 30, he e-mailed Sarah Dobbs, the BP Completions Engineer, and Mark Hafle, another BP Drilling Engineer, that "[n]ot running the tieback" saves a good deal of time/money." On April 15, BP estimated that using a liner instead of the single string of casing "will add additional $7 – 10 MM to the completion cost." The same document calls the single string of casing the "[b]est economic case and well integrity case for future completion operations."

94. Around this time, BP prepared another undated version of its "Forward Plan Review." Notably, this version of the document reaches a different conclusion than the other version, calling the long string of casing "the primary option" and the liner "the contingency option."

-28-

Like the other version of the plan review, this version acknowledges the risks of a single string of casing, but it now describes the option as the "best economic case and well integrity case for future completion operations."

### 3. Centralizers.

95. Centralizers are attachments that go around the casing as it begins lowered into the well to keep the casing in the center of the borehole.  If the well is not properly centered prior to the cementing process, there is increased risk that channels will form in the cement that allow gas to flow up the annular space around the casing.  API Recommended Practice 65 explains:  "If casing is not centralized, it may lay near or against the borehole wall.  …  It is difficult, if not impossible, to displace mud effectively from the narrow side of the annulus if casing is poorly centralized.  This results in bypassed mud channels and inability to achieve zonal isolation.[11/]

96. On April 15, BP informed Halliburton's Account Representative, Jesse Gagliano, that BP was planning to use six centralizers on the final casing string at the Macondo well.  Mr. Gagliano spent that day running a computer analysis of a number of cement design scenarios to determine how many centralizers would be necessary to prevent channeling.  With ten centralizers, the modeling resulted in a "MODERATE" gas flow problem.  Mr. Gagliano's modeling showed that it would require 21 centralizers to achieve only a "MINOR" gas flow problem.

97. Mr. Gagliano informed BP of these results and recommended the use of 21 centralizers.  After running a model with ten centralizers, Mr. Galgiano e-mailed Brian Morel, BP's drilling engineer, and other BP officials, stating that the model "now shows the cement channeling" and

---

[11/]API, Recommended Practice 65-Part 2, *Isolating Potential Flow Zones During Well Construction*, 4.6.5.8., at 28.

that "I am gong to run a few scenarios to see if adding more centralizers will help us or not."

Twenty-five minutes later, Mr. Morel e-mailed back:

> We have 6 centralizers, we can run them in a row, spread out, or any combination of the two.  It's a vertical hole, so hopefully the pipe stays centralized due to gravity.  As far as changes, it's too late to get any more product on the rig, our only option[ ] is to rearrange placement of these centralizers.

98.     The following day, April 16, the issue was elevated to John Guide, BP's Well Team Leader, by Gregory Walz, BP's Drilling Engineering Team Leader.  Mr. Walz informed Mr. Guide:  "We have located 15 Weatherford centralizers with stop collars…  in Houston and worked things out with the rig to be able to fly them out in the morning."  The decision was made because "we need to honor the modeling to be consistent with our previous decisions to go with the long string."  Mr. Walz explained:  "I wanted to make sure that we did not have a repeat of the last Atlantis job with questionable centralizers going into the hole."  MR. Walz added:  "I do not like or want to disrupt your operations.  …  I do not like this and …   I[am] very concerned about using them."

99.     An e-mail from Brett Cocales, BP's Operations Drilling Engineer, indicates that Mr. Guide's perspective prevailed.  On April 16, he e-mailed Mr. Morel:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it.

> But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job.  I would rather have to squeeze than get stuck.  …  So Guide is right on the risk/reward equation.

100.    On April 17, Mr. Gagliano, the Halliburton account representative, was informed that BP had decided to use only six centralizers.  He then ran a model using seven centralizers and found this would likely produce channeling and a failure of the cement job.  His April 18 cementing design report states: "well is considered to have a SEVERE gas flow problem."  Mr.

Gagliano said that BP was aware of the risks and proceeded with knowledge that his report indicated the well would have a severe gas flow problem.

101.  Mr. Gagliano's findings should not have been a surprise to BP.  As noted above, BP's mid-April plan review found that if BP used a single string of casing, as BP had decided to do, "Cement simulations indicate it is unlikely to be a successful cement job."  Nonetheless, BP ran the last casing with only six centralizers.

### 4.     Cement Bond Log.

102.  A cement bond log is an acoustic test that is conducted by running a tool inside the casing after the cementing is completed.  The cement bond log determines whether the cement has bonded to the casing and surrounding formations.  If a channel that would allow gas flow is found, the casing can be perforated and additional cement injected into the annular space to repair the cement job.

103.  Tommy Roth, a Halliburton Vice President of Cementing, has stated that BP should have conducted a cement bond log.  According to Mr. Roth, "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test."

104.  MMS regulations also appear to direct a cement bond log or equivalent test at the Macondo well.  According to the regulations, if there is an indication of an inadequate cement job, the oil company must "(1) Pressure test the casing shoe; (2) Run a temperature survey; (3) Run a cement bond log; or (4) Use a combination of these techniques."  30 CFR § 250.428.  In the case of the Macondo well, the Halliburton and internal BP warnings served as an indication of a potentially inadequate cement job.

105. On April 18, BP flew a crew from Schlumberger to the rig.  As described in a Schlumberger timeline, "BP contracted with Schlumberger to be available to perform a cement bond log … should BP request those services."  But at about 7:00 a.m. on the morning of April 20, BP told the Schlumberger crew that their services would not be required for a cement bond log test.  As a result, the Schlumberger crew departed the Deepwater Horizon at approximately 11:15 a.m. on a regularly scheduled BP helicopter flight.  The Schlumberger crew was scheduled for departure before pressure testing on the well had been completed, indicating that the results of those tests were not a factor in BP's decision to send the crew away without conducting a cement bond log.

106. BP's decision not to conduct the cement bond log test was, on information and belief, driven by concerns about expense and time.  The cement log would have cost the company $128,000 to complete.   In comparison, the cost of canceling the service was just $10,000. Moreover, Mr. Roth of Halliburton estimated that conducting the test would have taken an additional 9 to 12 hours.  Remediating any problems found with the cementing job would have taken still more time.

107. Gordon Aaker, Jr., P.E., a failure analysis consultant with the firm Engineering Services, LLP, retained by the U.S. House of Representatives Subcommittee on Oversight and Investigations, has opined that it was "unheard of" not to perform a cement bond log on a well using a single casing approach, and he described BP's decision not to conduct a cement bond log as "horrible negligence."   Another independent expert consulted by the House of Representatives, John Martinez, P.E., has opined that "cement bond or cement evaluation logs should always be used on the production string."

### 5.    Mud Circulation.

108.  Another questionable decision by BP was the failure to circulate fully the drilling mud in the well before cementing.  This procedure, known as öbottoms up,ö involves circulating drilling mud from the bottom of the well all the way to the surface.  Bottoms up has several purposes:  it allows workers on the rig to test the mud for influxes of gas; it permits a controlled release of gas pockets that may have entered the mud; and it ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement.

109.  APIØs guidelines recommend a full bottoms up circulation between running the casing and beginning a cementing job.  The recommended practice states that öwhen the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility.  The drilling fluid should be conditioned until equilibrium is achieved.  í  At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater.ö

110.  BPØs April 15 operations plan called for a full bottoms up procedure to öcirculate at least one (1) casing and drill pipe capacity, if hole conditions allow.ö  Halliburton Account Representative Jesse Gagliano has said it was also öHalliburtonØs recommendation and best practice to at least circulate one bottoms up on the well before doing a cement job.ö  According to Mr. Gagliano, a Halliburton engineer on the rig raised the bottoms up issue with BP.

111.  Despite the BP operations plan and the Halliburton recommendation, BP did not fully circulate the mud.  Instead, it chose a procedure öwritten on the rigö which Mr. Gagliano ödid not get input in.ö  BPØs final procedure called for circulating just 261 barrels of mud, just a small fraction of the mud in the Macondo well.  Mr. Roth of Halliburton has stated that one reason for the decision not to circulate the mud could have been a desire for speed, as fully circulating the

-33-

mud could have added a much as 12 hours to the operation.  Mr. Galgiano expressed a similar view, saying, õthe well probably would not have handled too high of a rate.  So it would take a little bit í longer than usual to circulate bottoms up in this case.ö

### 6.    Lockdown Sleeve.

112.   When the casing is placed in the wellhead and cemented in place, it is held in place by gravity.  Under certain pressure conditions, however, the casing can become buoyant, rising up in the wellhead and potentially creating an opportunity for hydrocarbons to break through the wellhead seal and enter the riser to the surface.  To prevent this, a casing hanger lockdown sleeve is installed.

113.   In BPøs planned procedure for the well, BP describes two options involving the lockdown sleeve.  BP was seeking permission from MMS to install the final cement plug on the well at a lower depth than previously approved.  If permission was granted, BPøs plan was to displace the drilling mud in the riser with seawater and install the cement plug prior to installation of the casing hanger lockdown sleeve.  BPøs alternative plan, if MMS did not approve the proposed depth of the final cement plug, was to run the lockdown sleeve first, before installing the cement plug at a shallower depth.  On April 16, Brian More, BPøs drilling engineer, e-mailed BP staff that:  õWe are still waiting for approval of the departure to set our surface plug. í If we do not get this approved, the displacement/plug will be completed shallower after running the LDS.ö  The LDS stands for the lockdown sleeve.

### F.   The Explosion at the Deepwater Horizon and Subsequent Spill.

114.   On April 20, 2010, at approximately 9:45 p.m. CST, a mass of oil, natural gas, drilling mud, salt water and other Prohibited Contaminants erupted from the wellhead at the Macondo

prospect site in the Gulf of Mexico off the shores of Louisiana, engulfing the Deepwater Horizon in fire and sinking the rig 36 hours later.

115.  During and after the explosion, oil and other Prohibited Contaminants began to escape, first from the oil rig and then from the Macondo oil well.  The leak is spilling, by conservative estimates, 60,000 barrels of oil each day into the Gulf of Mexico.  Recent reports, based on the amount of spilled oil being recovered, indicate that the magnitude of the spill is even greater.  In order to facilitate the recovery, the BP Defendants have been adding massive amounts of antifreeze at the well head.  Antifreeze has toxic qualities and contaminants.  The amount of other Prohibited Contaminants emanating from the well has been estimated to be 65,000 barrels per day.

116. At the time of the explosion on April 20, 2010, the Deepwater Horizon was not producing any oil.  The rig had drilled a well in the sea floor and was in one of the last phases of the exploratory operations prior to turning the well into a production well.  In this final phase, Halliburton workers on the rig were attempting to create a cement seal to plug off the wellhead.

117.  Cementing a wellhead, particularly in deep water, is delicate work that carries the risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well.  Defendants knew that the work being performed at the Deepwater Horizon rig was especially risky.

118.  The April 20, 2010 explosion and fire led to an uncontrolled oil leak in the Gulf of Mexico, covering thousands of square miles of fragile ocean and wetlands marine life.  The disaster is the worst oil spill in U.S. history ó far worse than the 1989 Exxon Valdez disaster ó and has endangered the coasts of Louisiana, Mississippi, Alabama, and Florida for generations to come, wiping out the habitat of hundreds of species of marine and oceanic life.  More than 400

species, including whales and dolphins, faced a dire threat from the spill, along with the coastlines, islands, and marshlands.

119.  The oil slick created by the spill covered a very large part of the Gulf of Mexico and reached the shores of the Gulf Coast all the way from Louisiana to Florida.  Experts stated that sea currents picked up parts of the spill and transported them into the Loop Current, which could carry the spill around the Florida panhandle, through the Florida Keys, and up the Atlantic seaboard.

120.  Scientists also reported large plumes of oil and methane gas below the sea's surface. Researchers from National Institute for Undersea Science and Technology discovered oil plumes as big as ten miles long, three miles wide, and 300 feet thick.  Plumes of this sort drastically reduce oxygen levels in the Gulf, which will result in the loss of marine wildlife.

121.  Over 1,021,000 gallons of the dispersant Corexit, a chemical that breaks surface oil slicks into microscopic droplets that can sink into the sea, were used at the spill.  Dispersants have known toxic effects for marine life, and Corexit ranks above dispersants made by competitors in toxicity and below them in effectiveness in handling the oil in the Gulf of Mexico.

122.  Efforts to contain the spread of the spill and to stop the leak were largely unsuccessful. Drilling a relief well to seal the leaking was the only viable solution, an option that took about three more months to complete.  During that time BP continued the production of oil from various vessel positioned above the Macondo well.

123. Several hundred species in the Gulf of Mexico were harmed by the oil and other Prohibited Contaminants that were dumped in the waters, including several protected species of endangered and threatened sea turtles, whales, seabirds, and fish.  Oil and other Prohibited Contaminants reached the coastal wetlands used by seabirds and other species, and much of the

-36-

marine life in and around the Gulf Coast were exposed to oil and other Prohibited Contaminants and thus experienced their toxic effects on their bodies and ecosystems.

124. Despite their eagerness and capacity for drilling, Defendants did not take sufficient precautions to prevent the oil spill and thereby violated the OCSLA, CWA, their implementing regulations, the Lease, the Offshore Final Rule, the Final NPDES General Permit and the BP Exploration Plan, all of which must be followed when conducting operations on the OCS.

125. Much of the harm that the spill caused is irreparable.

126. Defendants knew of the dangers associated with deep water drilling and specially in the Macondo well, but failed to take appropriate measures to prevent damage to Plaintiffs and to the Gulf of Mexico's marine and coastal environments, where people work and earn a living.

127. The spilled oil caused, and will continue to cause dangerous environmental contamination of the Gulf of Mexico and its shorelines, substantially damaging the natural resources of the Gulf of Mexico.

128. The oil spill and the contamination have caused and will continue to cause loss of revenue to persons and businesses who are being prevented from using the Gulf of Mexico and its coastline.

129. There are many other potential effects from the oil spill that have not yet become known, such as reduction in property values, and Plaintiff reserves the right to amend this Complaint once additional information becomes available.

## IV.  <u>VIOLATIONS OF OCSLA</u>

130.  Defendants violated the OSCLA and its implementing regulations in many respects. For example:

131.  30 C.F.R. § 250.212 requires that an EP include, among other things (1) general information (which pursuant to § 250.213 includes a blowout scenario); (2) the oil and hazardous substances spill information required by § 250.219; and (3) mitigation measures information required by § 250.227.  BP did not comply with those requirements.

132.  30 C.F.R. § 250.213 required that BP include in the BP Exploration Plan a

> (g)  *Blowout scenario*.  A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hyrocarbons.  Include the estimated flow rate, total volume, and maximum duration of the potential blowout.  Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints.  Estimate the time it would take to drill a relief well.

133.  However, BP did not include the blowout scenario.  Instead, BP stated at ¶ 2.7 of the BP Exploration Plan that õ[a] scenario for a potential blowout of the well from which BP would expect to have the highest volume of liquid hydrocarbons is not required for the operations proposed in their EP.ö

134.  Also, BP did not include in the BP Exploration Plan the site-specific Oil Spill Response Plan (õOSRPö) required by § 250.219.  Instead, BP relied on a regional OSRP that had been previously prepared by BP.  Based on the regional OSRP, BP certified õthat BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.ö

135.  That statement was not accurate when it was made and is not accurate now.  The CEO of BP has even acknowledged that BP was not prepared to respond to a worst-case spill and recent events prove that.

136.  Under § 250.227, the EP must include an environmental impact analysis (ōEIAö) that is detailed and project specific, and assesses the potential environmental impacts of the proposed exploration activities.  The EIA must include õall accurate, applicable and current information available at the time the related exploration plan is submitted.[12/]

137.  However, the EIA submitted by BP (which is part of the BP Exploration Plan), contains statements that are not accurate.  For example, BP stated that it was õ**unlikely** that an accidental oil spill release would occur from the proposed activitiesö and that õin the event of such an accidental release, the water quality would be **temporarily** affected by the dissolved components and small droplets.ö  õCurrents and microbial degradation would remove the oil from the water column or dilute the constituents to background levels.ö  BP Exploration Plan at 14.2.1.5.  Recent events have shown that is not true.

138.  With respect to the risk posed to **fisheries** by activities to be conducted pursuant to the BP Exploration Plan, BP stated:

> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries.  However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  No adverse activities to fisheries are anticipated as a result of the proposed activities.

*Id.* at 14.2.1.6.

139.  With respect to the risk posed to **essential fish habitat** by activities to be conducted pursuant to the BP Exploration Plan, BP stated that no adverse impacts were expected:

> [I]t is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sub-lethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both

---

[12/] *Village of False Pass v. Watt*, 565 F. Supp 1123 (D. Alaska) 1983.

metabolites and parent compounds.  No adverse impacts to essential fish habitat are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.

í   .

In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using **proven equipment** and technology for such responses . . . [and] techniques for containment and recovery and removal of the oil spill.

*Id.* at 14.2.2.1.

140.  With respect to the risk posed to **beaches** by activities to be conducted pursuant to the

BP Exploration Plan, BP stated that no adverse impacts were expected:

> An accidental oil spill from the proposed activities could cause impacts to beaches.  However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.   Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources.  The activities proposed in the plan will be covered by our regional OSRP (refer to information submitted in Section 7.0 of this plan).

*Id.* at 14.2.3.1.

141.  With respect to the risk posed to **wetlands** by activities to be conducted pursuant to the

BP Exploration Plan, BP stated that no adverse impacts were expected:

> An accidental oil spill from the proposed activities could cause impacts to wetlands.  However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.   Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources.  The activities proposed in the plan will be covered by our regional OSRP (refer to information submitted in Section 7.0 of this plan).

*Id.* at 14.2.3.2.

142.  With respect to the risk posed to **sea turtles** by activities to be conducted pursuant to

the BP  Exploration Plan, BP stated that no adverse impacts were expected:

> Oil spills and oil spill response activities are potential threats that could have lethal effects on turtles.  Contact with oil, consumption of oil particles, and oil-contaminated prey could seriously affect individual sea turtles.  Oil-spill-response

planning and the habitat protection requirements of the Oil Pollution Act of 1990 should mitigate the threats.

*Id.* at 14.2.1.8.

143.  With respect to the risk posed to **marine mammals** by activities to be conducted pursuant to the BP Exploration Plan, BP stated that no adverse impacts were expected:

> Few lethal effects are expected from oil spillsí .  Oil spills of any size are estimated to be aper[]iodic events that may contact cetaceansí .  No adverse impacts to endangered or threatened marine mammals are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.

*Id.* at 14.2.1.7.

144.  With respect to the risk posed to **marine and pelagic birds** by activities to be conducted pursuant to the BP Exploration Plan, BP stated that no adverse impacts were expected:

> An accidental oil spill that might occur as a result of the proposed action has the potential to impact marine and pelagic birds ó birds could become oiled.  However, it is unlikely that an accidental oil spill would occur from the proposed activities.  No adverse impacts to marine and pelagic birds are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.

*Id.* at 14.2.2.1.

145.  With respect to the risk posed to **shore and coastal nesting birds** by activities to be conducted pursuant to its Exploration Plan, BP stated that no adverse impacts were expected:

> An accidental oil spill from the proposed activities could cause impacts to shore birds and coastal nesting birds.  However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.  Both the historical spill data and the combined trajectory/risk calculations . . . indicate there is little risk of contact or impact to the coastline and associated environmental resources.

*Id.* at 14.2.3.3.

146.  With respect to the risk posed to **coastal wildlife refuges** by activities to be conducted pursuant to the BP Exploration Plan, BP stated that no adverse impacts were expected:

> An accidental oil spill from the proposed activities could cause impacts to coastal wildlife refuges.  However, due to the distance to shore (48 miles) and the

-41-

> response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations . . . indicate there is little risk of contact or impact to the coastline and associated environmental resources.

*Id.* at 14.2.3.4.

147. BP also stated that no federally-protected species would be harmed or killed during operations conducted pursuant to the BP Exploration Plan. *Id.* at 8-1.

148. All of the foregoing statements were not accurate and BP failed to comply with its duty to provide accurate information.

149. At ¶ 2.3 of the BP Exploration Plan, BP represented that BP õdoes not propose to utilize new techniques or unusual technologies for these operations, however, the best available and safest technology (BAST) as referenced in Title 30 CFR 250 will be incorporated as standard operational procedures.ö

150. õBASTö means the best available and safest technology that the Director determines to be economically feasible whenever failure of equipment would have a significant effect on safety, health, or the environment. 30 C.F.R. § 250.115. BAST must be used in all exploration, development and production operations whenever practical. 30 C.F.R. § 250.107.

151. Defendants failed to use BAST (1) in the design of the well; (2) by failing to use centralizers; (3) by not conducting a cement bond log; (4) by not properly circulating the drilling mud; (5) by not installing a lockdown sleeve; (6) by not installing operational BOPs; and (7) by other failures which will be discovered prior to trial; all in violation of 30 C.F.R. § 250.107. Furthermore, contrary to BPøs representations, the techniques and/or technologies and/or cement used by BP in the well were new or unusual.

152. At ¶ 1.3 of the BP Exploration Plan, BP represented that õ[s]afety features on the MODU will include well control, pollution preventioní . and blowout prevention equipment as described in Title 30 C.F.R. Part 250, Subparts C, D, E, G and Oí  ö

153.  However, Defendants did not have such equipment; or had malfunctioning equipment that did not meet the standards set in those regulations.

154.  To prevent oil pollution from reaching navigable waters and adjoining shorelines, and to contain discharges of oil, 30 C.F.R. Part 254 requires offshore facilities to develop and implement spill prevention, control and detection measures.  *See also*, 40 C.F.R. Part 112.

155.  However, BP did not have such measures in place and did not outline them in the BP Exploration Plan.  Instead, at ¶ 1.6 of the BP Exploration Plan, BP stated that õ[a] discussion of measures to prevent the discharge of oils and greases from drilling rigs during rainfall and routine operations is not required for the operations proposed in this plan.ö

156.  BP is currently engaged in deepwater production operations without having prepared and obtained approval for a Deep Water Operation Plan (õDWOPö), as required by § 250.286.

157.  According to the BP Exploration Plan, all discharges from the Macondo well site would be made in accordance with the Final NPDES General Permit.  However, the discharges of Prohibited Contaminants are being carried out in violation of the Final NPDES General Permit.

158.  Those are only some of the violations of OSCLA and its implementing regulations committed by Defendants.

159.  Section 1349 of the OCSLA, 43 U.S.C. § 1349, provides, in pertinent part:

(a)   Persons who may bring actions; persons against whom action may be brought; time of action; intervention by Attorney General; costs and fees; security

* * * *

(1) Except as provided in this section, any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter.

* * * *

  (b)  Jurisdiction and venue of actions

* * * *

  (2) Any resident of the United States who is injured in any manner through the failure of any operator to comply with any rule, regulation, order, or permit issued pursuant to this subchapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district having jurisdiction under paragraph (1) of this subsection.

160.  Defendants have violated and are continuing to violate the provisions of OCSLA and regulations enacted thereunder, as well as the Lease, the Offshore Final Rule, the Final NPDES General Permit and the BP Exploration Plan.

161.  Pursuant to 43 U.S.C. § 1349(a)(1), Plaintiffs have requested that the Court issue an order compelling the Defendants to comply with, and to enjoin the Defendants from violating the requirements of the OCSLA, the implementing regulations enacted thereunder, the Lease, the Offshore Final Rule, Final General Permit and the BP Exploration Plan.

162.  Pursuant to the provisions of 43 U.S.C. § 1334(d), Plaintiffs also requested that the Court issue an order declaring the Lease forfeited and cancelled because of the ongoing violations.  The Consent Decree fails to address the remedies Plaintiffs have requested.

## V.  <u>VIOLATIONS OF CWA</u>

163.  Section 1311 of the CWA states that õ[e]xcept as in compliance with this Section and Sections 1312, 1316, 1917, 1328, 1342 and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.ö  33 U.S.C. § 1311.

164.  Section 1321 of the CWA prohibits the õdischarge of **oil** or hazardous substances (i) into or upon the navigable waters of the United Statesí . in such quantities as may be harmfulí  ö 33 U.S.C. § 1321(b)(3).  õOilö means õoil of any kind or in any form, including, but

-44-

not limited to petroleum, fuel oil, sludge, oil refuse and oil mixed with waterí  ö  33 U.S.C. § 1321(a)(1).

165.  In the CWA Congress prescribed various remedies and penalties for violations of the CWA, including the civil penalties outlined in 33 U.S.C. §§ 1321 (b)(7) and 1319(d).

166.  The õCitizen Suitsö provisions of the CWA provides that õany citizen may commence a civil action on his own behalf ó ó (1) against any person í . who is alleged to be in violation of (A) an effluent standard or limitationí  ö 33 U.S.C. § 1365.  This provision is intended to allow private attorneys general to fill gaps in public enforcement and are proper if governmental agencies fail to exercise their enforcement responsibility.

167.  The MMS, an agency with control over the Defendantsø operations on the OCS, has failed to exercise its responsibilities to enforce the CWA and its implementing regulations. MMS has abdicated its enforcement role and has allowed the Defendants to violate the CWA, the regulations enacted thereunder, the Lease, the Offshore Final Rule, the Final NPDES General Permit and the approval of the BP Explosion Plan, which may be enforced in this citizen suit by Plaintiff in his capacity as private attorney general.

168.  The BP Exploration Plan states at ¶ 1.3 that õ[s]upervisory and certain designated personnel on board the facility will be familiar with the effluent limitations and guidelines for overboard discharges into the receiving waters, **as outlined in the NPDES [General] Permit GMG290000.**ö

169.  The BP Exploration Plan also states at ¶ 5.2 that õBP has requested coverage under EPA Region VI NPDES General Permit GMG290[00]0 for discharges associated with exploration activities in Mississippi Canyon Block 252, and will take applicable steps to ensure all offshore discharges associated with the proposed operations will be conducted is accordance with the permit.ö

170.  The BP Exploration Plan describes at ¶ 1.4 the following amounts and types of oils and fuels that were to be kept onboard the Deepwater Horizon:

| Type of Storage Tank | Type of Facility | Tank Capacity (bbls) | Number of Tanks | Total Capacity (bbls) | Fluid Gravity (API) |
|---|---|---|---|---|---|
| Fuel Oil | Semi-Submersible | 4794 | 4 | 19176 | 27,489 |
| Waste Oil | Semi-Submersible | 31 | 1 | 31 | 34,971 |
| Fuel Oil | Semi-Submersible | 123 | 2 | 246 | 27,489 |
| Fuel Oil | Semi-Submersible | 137 | 1 | 137 | 27,489 |
| Fuel Oil | Semi-Submersible | 115 | 1 | 115 | 27,489 |
| Fuel Oil | Semi-Submersible | 32 | 1 | 32 | 27,489 |
| Hydraulic | Semi-Submersible | 29 | 3 | 87 | 31,144 |
| Lube Oil | Semi-Submersible | 134 | 1 | 134 | 34,971 |
| Heli-Fuel | Semi-Submersible | 50 | 1 | 50 | 37,961 |

171.  All the oils and fuels kept on the Deepwater Horizon were unlawfully discharged into the navigable waters of the United States during the blow-out of the Macondo well and during the explosion and fire aboard, and subsequent sinking of the Deepwater Horizon.   These discharges, which exceed the discharge limits of the Offshore Final Rule and the Final NPDES General Permit, were caused by Defendants' actions and inactions in violation of the CWA, its implementing regulations, the Lease, the Offshore Final Rule and the Final NPDES General Permit.   Therefore, the maximum penalties authorized by applicable statutes and regulations should be assessed against all Defendants for each day and for each day and for each separate violation.

172.  The BP Exploration Plan also describes at ¶ 2.2, the types (including chemical constituents) and amounts of drilling fluids that were to be used in the drilling operations of the Deepwater Horizon:

| Type of Drilling Fluid | Estimated Volume of Drilling Fluid to be Used per Well |
|---|---|
| Water-based (seawater, freshwater, barite) | 20,000 bbls |
| Synthetic-based (internal olefin, ester) | 10,000 bbls |

173.  All the drilling fluids kept on the Deepwater Horizon and/or placed inside the casing or the well were unlawfully discharged into the navigable waters of the United States during the blow-out of the Macondo well and during the explosion and fire aboard, and subsequent sinking

of the Deepwater Horizon.  These discharges, which exceed the discharge limits of the Offshore Final Rule and the Final NPDES General Permit, were caused by Defendantsø actions and inactions in violation of the CWA, its implementing regulations, the Lease, the Offshore Final Rule and the Final NPDES General Permit.  Therefore, the maximum penalties authorized by applicable statutes and regulations should be assessed against all Defendants for each day and for each day and for each separate violation.

174.  After the explosion and sinking of the Deepwater Horizon, in excess of 60,000 barrels per day of oil mixed with other Prohibited Contaminants were dumped into the Gulf of Mexico.  These discharges, which exceed the discharge limits of the Offshore Final Rule and the Final NPDES General Permit, were caused by Defendantsø actions and inactions in violation of the CWA, its implementing regulations, the Lease, the Offshore Final Rule and the Final NPDES General Permit.  Therefore, the maximum penalties authorized by applicable statutes and regulations should be assessed against all Defendants for each day and for each day and for each separate violation.

175.  Defendants failed to use and in their production operations the proper technologies, BPT, BCT, BAT and/or NSPS, required by the CWA, the Offshore Final Rule and/or the Final NPDES General Permit, for the discharge of oil, produced water, drilling muds, drilling cuttings and other pollutants into the waters of the Gulf of Mexico.  Therefore, because of these violations, the maximum penalties authorized by the applicable statutes and regulations should be assessed against the BP Defendants for each day and for each separate violation.

176.  The violations of the Offshore Final Rule and the Final NPDES General Permit by the Defendants require that the Court (1) enjoin all the Defendants from carrying out further violations, and (2) order all Defendants to pay for ongoing monitoring of the affected environment and the people and the species that live in it, until it can be determined that their

violations have stopped, and until the effects of the contamination caused by them has been remediated at their cost.

177.  The CWA provides for fines of $1,100 per barrel, or in the case of "gross negligence" $4,300 per barrel.  The U.S. has estimated the amount spilled to have been 4.1 million barrels[13].  MOEX owned a 10% in interest in the well.  If the fine were assessed at $1,100/barrel, the total fine would be $4.51 billion.  Moex's 10% share would therefore be $451 million.  <u>The $45 million proposed settlement, however, would be only 1% of a $4.51 billion penalty against BP.</u>

178.  If the fine were assessed at $4, 300/barrel, as they should be assessed, the total fine would be $17.63 billion.  Moex's 10% share would therefore be $1.763 billion.  <u>The $45 million proposed settlement, however, would be only 0.26% of a $17.63 billion penalty against BP.</u>

179.  The CWA specifies several explicit factors that are to be considered when assessing a penalty[14].  Although this is a proposed settlement and not an assessment, there is insufficient discussion of CWA's penalty factors.  Without such, it is not possible to determine if the Proposed Settlement amount may be adequate.   Therefore, the Consent Decree should be withdrawn and revised also to include a discussion of how the amount relates to the penalty factors.

---

[13] On 2 August 2010, the United States Department of Energy and the Flow Rate Technical Group issued an estimate that 4.9 million barrels of oil had flowed from the Macondo well, and 4.05 million barrels had been discharged into the Gulf (the difference being the amount of oil captured by vessels on the surface as part of the well containment efforts). Its "Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill is available at: http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=237763 .

[14] "In determining the amount of a civil penalty under paragraphs (6) and (7), the Administrator, Secretary, or the court, as the case may be, shall consider the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require." 33 U.S.C. § 1321(b)(8); ("Clean Water Act; Determination of Amount")

## VI.  <u>CONCLUSION</u>.

For the reasons stated above, I request that the Department of Justice withdraw the Consent Decree.

Sincerely,

*/s/ Camilo K. Salas III*

Camilo K. Salas III

CKS:dg