**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | **MDL NO. 2179**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |
| Plaisance, et al., individually and on behalf of the Putative Medical Benefits Settlement Class,<br><br>            Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc., et al.,<br><br>            Defendants. | * * * * * * * * * * * | **NO. 12-cv-968**<br><br>**SECTION: J**<br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

### THE BP PARTIES' ANSWER TO PLAINTIFFS' MEDICAL CLASS ACTION COMPLAINT

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the Medical Class Action Complaint as follows:

### INTRODUCTION

On April 20, 2010, an explosion on board the oil vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The explosion resulted in an oil spill of

unprecedented proportions and an oil slick that grew exponentially, depleting and destroying marine and coastal environments and estuarine areas in the Gulf of Mexico, Louisiana, Mississippi, Alabama, and the Florida panhandle. In an ill-conceived effort to contain and to remediate the spill, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water. Beaches, marshes, and wetlands fouled by oil and chemicals have been the focus of a variety of remedial efforts to remove the hazardous materials from these fragile areas. Although the leaking well is now capped, the disastrous effects of the spill on the public health remain and likely will continue for decades.

Accordingly, Plaintiffs, on behalf of themselves and a class of others similarly situated, by and through Interim Class Counsel and Proposed Class Counsel identified herein, respectfully state as follows:

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon* in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the vessel, and a release of oil from the *Deepwater Horizon* or its appurtenances into the Gulf of Mexico, some of which reached the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties further admit that as permitted in the National Contingency Plan and with the approval of the Unified Command, dispersants were applied to mitigate the potential impacts of the oil spill.  The BP Parties further admit that the well was capped.  The BP Parties deny the remaining allegations of these paragraphs.

1.      This Medical Class Action Complaint asserts claims for exposure-related personal injury and/or medical monitoring relief on behalf of the Class defined in the Class Allegations section of this Complaint (the "Class"). As to other claimants and/or claims not included in the

Class, the previously filed First Amended Master Complaint for the B3 Bundle[1] (Rec. Doc. 1812) continues in effect and is not superseded by this Complaint.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

2.      This Medical Class Action Complaint does not constitute a waiver or dismissal of any claims or actions not included in this Complaint. More specifically, this Complaint describes the conduct of, *inter alia,* Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC, Triton Asset Leasing GmbH, Halliburton Energy Services, Inc., and Sperry Drilling Services (formerly Sperry Sun Drilling Services) in connection with the *Deepwater Horizon* incident. These Transocean and Halliburton entities are named Defendants in the First Amended Master Complaint for the B3 Bundle (Rec. Doc. 1812) (hereinafter the "operative B3 Master Complaint"). Plaintiffs and the Class hereby reserve any and all claims they may have against these or any other Transocean and Halliburton entities, including, but not limited to, those asserted in the operative B3 Master Complaint, and reserve the right to amend this or other Complaints to assert such claims or name such entities as defendants.

**ANSWER:**

The BP Parties admit that Transocean and Halliburton entities are named Defendants in

the operative B3 Master Complaint, and that Plaintiffs reserve some but not all claims they may

against these entities.  The BP Parties deny that this Complaint does not constitute a waiver or

dismissal of any claims or actions by the Class and its members against BP entities not included

in this Complaint.  The BP Parties deny the remaining allegations of this paragraph.

3.      This Complaint makes allegations of, and places Defendants on notice that, Plaintiffs seek certification of the Class described and defined herein. Plaintiffs seek to maintain this action as a class action, and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4) and (b)(3).

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

---

[1] Plaintiffs have filed a motion to amend the First Amended Master Complaint for the B3 Bundle (Rec. Doc. 5718). That motion remains pending. If and when the Court grants Plaintiffs' motion, the Second Amended Master Complaint for the B3 Bundle shall become the operative complaint for the B3 Bundle.

4.    This Complaint does not allege, nor is it intended to allege, a cause of action for any claims for non-exposure-based physical or bodily trauma injury (which shall not include any heat-related injury) that arose from, was due to, resulted from or was related to, directly or indirectly, the *Deepwater Horizon* oil spill, or wrongful death and/or survival actions as a result of such non-exposure-based physical or bodily trauma injury.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

**A.    Plaintiffs**

5.    Plaintiffs are individuals who were injured as a result of exposure to oil and/or oil-dispersing chemicals and/or decontaminants by virtue of their employment as workers cleaning the spill or because of their residence in certain coastal areas near the waters affected by the spill. Plaintiffs bring this action as proposed representatives of the Class defined herein.

a.    Kip Plaisance

Kip Plaisance lives in Golden Meadow, Louisiana, and is the owner of a fishing charter boat company called Tidewater Charters. In May 2010, he started working on oil spill clean-up in the Vessels of Opportunity ("VoO") program. Mr. Plaisance worked from June 1, 2010 through August 6, 2010. His job was to, *inter alia,* lay and unload boom and spot for oil and oiled wildlife. During the course of his work, Mr. Plaisance experienced headaches, nausea, vomiting, and respiratory problems. On or about July 29, 2010, Mr. Plaisance had severe vomiting and shortness of breath, and he sought treatment at an onsite BP medical facility. He was treated and sent home the same day.

b.    Jason Perkins

Jason Perkins is a resident of Baton Rouge, Louisiana. He was working for Copeland Electrical as a safety supervisor at the time of the *Deepwater Horizon* oil spill. Mr. Perkins was called up by the Louisiana National Guard to assist with spill response activities and was stationed in Venice, Louisiana. Along with several other Guard members, Mr. Perkins was responsible for constructing oil barriers along the coastline to prevent oil from washing ashore. These duties often required Mr. Perkins to stand waist-deep in oily water. Mr. Perkins worked in Venice for approximately ten days, at which time he began to develop rashes. He sought medical treatment, and the rashes no longer persist.

c.    Camille Warren

Camille Warren is a resident of Gulf Shores, Alabama, and lives within one-half mile from the beach. Ms. Warren developed respiratory problems in the month of May 2010. She was treated by a physician for her condition on several occasions between May and August 2010. These conditions have resolved.

d.    Christian Pizani

Christian Pizani is a resident of Grand Isle, Louisiana, and specifically on the barrier island of Cheniere Caminada. Ms. Pizani has lived in that location from April 20, 2010 to the

4

present. During the summer, she was exposed to, *inter alia,* oil fume odors. She periodically experienced headaches, itchy eyes, and post-nasal drip.

e.      Max Plaisance

Max Plaisance is a resident of Golden Meadow, Louisiana. He was a deckhand on a Vessel of Opportunity vessel from June 22, 2010, to August 5, 2010. The vessel laid boom, collected oily boom, and spotted for oil. Mr. Plaisance began to feel ill almost immediately upon commencing work, experiencing symptoms of nausea, vomiting, and severe respiratory difficulties. Around the 20th of July, 2010, Mr. Plaisance was seen by a medic at the onsite BP medical station because he was vomiting from exposure to oil fumes. Mr. Plaisance also developed asthma, a condition he did not have prior to his

work on the oil spill. Since August 2010, Mr. Plaisance has been under the care of a doctor for his respiratory condition, and he is dependent on an inhaler from time to time. He still suffers from asthma to this day

f.      Benjamin Judah Barbee

Benjamin Judah Barbee is a resident of Valparaiso, Florida. Prior to the oil spill, he was a charter boat captain in and around Destin, Florida. When remediation efforts began, Mr. Barbee commenced work for Windes Brothers & Associates on a spotter boat, and he also collected tar balls on the beach. Mr. Barbee developed headaches and breathing difficulties during his clean-up responsibilities, but he did not seek medical care for his condition.

g.      Cornelius Divinity

Cornelius Divinity lives in Marrerro, Louisiana. In late April 2010, Mr. Divinity was hired by Down South, Inc., and stationed in Venice, Louisiana. His job was to, *inter alia,* unload oily boom from, and load clean boom onto, vessels responding to the spill. As a result of his exposure to oil and/or dispersants, he experienced blurred vision, shortness of breath, and migraine headaches. On May 29, 2010, Mr. Divinity reported his illness to his supervisor, who sent him to the BP onsite medical station. From there, Mr. Divinity was transported to Terrytown, Louisiana, where he was met by his wife, who took him to West Jefferson Medical Center. Mr. Divinity was treated and sent home.

h.      Janice Brown

Janice Brown is a resident of Fort Walton Beach, Florida. She lived along the beach from early April 2010 to December 2010. Following the oil spill, Ms. Brown observed that there was a distinct smell in the air that did not exist prior to the spill. In July 2010, she began to experience, *inter alia,* nosebleeds and headaches. Her symptoms persisted for months before she finally sought treatment from a medical professional. Ms. Brown also volunteered to be part of the Gulf Long Term Follow-Up Study conducted by the National Institutes of Health, and in that connection was subject to blood, urine, and breathing tests.

i.      Carlton Caster

Carlton Caster is a resident of Mobile, Alabama. He took work collecting tar balls along the beach in Gulf Shores, Alabama, on June 19, 2010. Five days later, Mr. Caster became ill with symptoms of heat stroke/heat exhaustion and was taken to the BP medical station onsite. The attending medic sent Mr. Caster by ambulance to South Baldwin Medical Center, where he was released after treatment the same day.

j.      George Baker

George Baker is a resident of Harvey, Louisiana. From late April 2010 through August 2010, he was employed by Southern Environmental, a clean-up company. Mr. Baker was tasked with laying boom in marsh areas, and he would frequently stand waist deep in oily water to collect boom around the barrier island. Mr. Baker began to develop severe bumps and boils on his skin, and he experienced conditions of dizziness and nausea. On August 5, 2010, his skin condition had become so severe that he nearly fainted at work and was taken to a physician provided by the Army Corps of Engineers. He was then treated at Ochsner Medical Center WestBank, where he was diagnosed with, *inter alia,* folliculitis. He remains under the care of a physician for this dermal condition today.

k.      Duffy Hall

Duffy Hall worked for Knights Marine & Industrial Services, Inc. installing barriers to protect the wetlands near Gauthier, Mississippi. Mr. Hall was exposed to oil in the water while he was erecting these barriers. He experienced burning and swelling in his eyes. Mr. Hall was diagnosed with chemical keratitis and remains under the care of a physician for his condition to this day.

**ANSWER:**

The BP Parties admit that information regarding Kip Plaisance appears in certain databases, data files, data collections, or other documentary evidence in the possession, custody, or control of a BP Party, that such information indicates that Mr. Plaisance reported in June and July, 2010 that he lived in Golden Meadow, Louisiana, that Mr. Plaisance attended response worker training on May 10, 2010, and that on or about July 29, 2010, Mr. Plaisance visited a medic station funded by BP.

The BP Parties admit that information regarding Jason Perkins appears in certain databases, data files, data collections, or other documentary evidence in the possession, custody, or control of a BP Party, and that such information indicates that Mr. Perkins reported that his employer was the Louisiana National Guard.

The BP Parties admit that information regarding Max Plaisance appears in certain databases, data files, data collections, or other documentary evidence in the possession, custody, or control of a BP Party, that such information indicates that Mr. Plaisance reported in July 2010 that he lived in Golden Meadow, Louisiana, that Mr. Plaisance attended response worker training on June 8, 2010, that on or about July 29, 2010, Mr. Plaisance visited a medic station funded by BP, and that Mr. Plaisance reported that he had been engaged in the performance of boom maintenance and boat decontamination.

The BP Parties admit that information regarding Benjamin Barbee appears in certain databases, data files, data collections, or other documentary evidence in the possession, custody, or control of a BP Party, and that such information indicates that Mr. Barbee attended response worker training on June 4, 2010.

The BP Parties admit that information regarding Cornelius Divinity appears in certain databases, data files, data collections, or other documentary evidence in the possession, custody, or control of a BP Party, and that such information indicates that on May 29, 2010, Mr. Divinity was amongst eleven persons who made a complaint regarding an odor.

The BP Parties admit that information regarding Carlton Caster appears in certain databases, data files, data collections, or other documentary evidence in the possession, custody, or control of a BP Party, and that such information indicates that Mr. Caster reported in June 2010 that he lived in Mobile, Alabama, and that on or about June 24, 2010, Mr. Caster visited a medic station funded by BP.

The BP Parties admit that information regarding George Baker appears in certain databases, data files, data collections, or other documentary evidence in the possession, custody, or control of a BP Party, and that such information indicates that Mr. Baker reported in July and

August 2010 that he lived in Harvey, Louisiana, that Mr. Baker reported that he deployed boom

off-shore, and that on or about August 5, 2010, Mr. Baker visited a medic station funded by BP.

The BP Parties admit that information regarding Duffy Hall appears in certain databases,

data files, data collections, or other documentary evidence in the possession, custody, or control

of a BP Party.

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the remaining allegations of this paragraph, and therefore deny them.

### B.    Defendants

6.     Defendant BP Exploration & Production Inc. ("BP Exploration") is a Delaware
corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a
leaseholder and the designated operator in the lease granted by the former Minerals Management
Service ("MMS") allowing it to perform oil exploration, drilling, and production-related
operations in Mississippi Canyon Block 252, the location known as "Macondo," where the oil
spill originated.[2]  BP Exploration was designated as a "responsible party" by the U.S. Coast
Guard under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2714.

### ANSWER:

The BP Parties admit that BPXP is a Delaware corporation, that it was a partial lease

holder in the lease granted by the MMS/Bureau of Ocean Energy Management, Regulation, and

Enforcement ("BOEMRE") pursuant to which it was allowed to perform oil exploration, drilling,

and production-related operations in Mississippi Canyon Block 252, the area in which the

Macondo Well was located and in which the Spill originated from the *Deepwater Horizon* and its

appurtenances.  The BP Parties deny the remaining allegations of this paragraph.

7.     Defendant BP America Production Company ("BP America") is a Delaware
corporation with its principal place of business in Houston, Texas. BP America was the party to

---

[2]       The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then
auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean
Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the
MMS throughout this document.

the drilling contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.

**ANSWER:**

The BP Parties admit that BPAP is a Delaware Corporation, and that BPAP, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*. The BP Parties deny the remaining allegations of this paragraph.

8.      Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. is one of the world's largest energy companies, with over 80,000 employees and $239 billion in revenues in 2009. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

**ANSWER:**

The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case. The BP Parties deny the remaining allegations of this paragraph.

9.      BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,000 U.S.-based employees in non-Exploration and Production, non-Refining and Marketing BP entities.

**ANSWER:**

The BP Parties admit that BP p.l.c. lists American Depository Shares on the New York Stock Exchange, that it is the largest non-U.S. company listed on the NYSE, that it files an annual 20-F Report with the U.S. Securities and Exchange Commission, and that it has 2,000 U.S. based employees in non Exploration and Production, non Refining and Marketing positions. The BP Parties deny the remaining allegations of this paragraph.

10.     BP Exploration, BP America and BP p.l.c. are generally referred to herein collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

**ANSWER:**

The BP Parties admit that Plaintiffs refer to BPXP, BPAP, and BP p.l.c. collectively as BP, but deny that this is appropriate.  The BP Parties further admit that BPXP was the lease operator exclusively for purposes of the Outer Continental Shelf Lands Act and its regulations of Mississippi Canyon Block 252, which contains the Macondo Well, and that BPXP had certain responsibilities with regard to assessing the geology of the prospect site, engineering the well design, obtaining appropriate regulatory approvals for well operations, and retaining and overseeing its contractors and working on various aspects of the well and drilling operations. The BP Parties deny the remaining allegations of this paragraph.

### C.     Reservation; Joint, Several, and Solidary Liability

11.     Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC, Triton Asset Leasing GmbH (collectively, "Transocean"), are named Defendants in the operative B3 Master Complaint.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

12.     Halliburton Energy Services, Inc. and its division Sperry Drilling Services (formerly Sperry Sun Drilling Services) (collectively, "Halliburton") are named Defendants in the operative B3 Master Complaint.   Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon,* as well as onshore engineering support for those operations.   Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well.  Sperry Drilling Services was responsible for mudlogging personnel and equipment on the *Deepwater Horizon,* including downhole drilling tools. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil, and Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pits fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

13.     Plaintiffs, on behalf of themselves and the Class defined herein, reserve all rights, claims, and/or causes of action against Transocean and Halliburton.

**ANSWER:**

The BP Parties admit that the plaintiffs, on behalf of themselves and the Class defined herein, reserve some but not all rights, claims, and/or causes of action against Transocean and Halliburton.  The BP Parties deny the remaining allegations of this paragraph.

14.     BP, Transocean, and Halliburton are jointly, severally, and/or solidarily liable under various principles of maritime and/or Federal tort law.

**ANSWER:**

The BP Parties deny liability under some unspecified form of "Federal tort law" because under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) there is no general federal common law.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party

Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny those remaining allegations.

## JURISDICTION AND VENUE

15. Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

16. In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333, and the Admiralty Extension Act, 46 U.S.C. § 30101.

**ANSWER:**

The BP Parties admit that Plaintiffs' claims fall within the jurisdictional grant of 28 U.S.C. §§ 1331 and 1333. The BP Parties deny, however, that in cases where federal statutory law displaces admiralty law the existence of maritime jurisdiction brings with it maritime law. The BP Parties further admit that the Court has jurisdiction over Plaintiffs' claims in this Complaint pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101. The BP Parties deny the remaining allegations of this paragraph.

17.    The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h).

**ANSWER:**

The BP Parties admit that Plaintiffs' claims fall within the jurisdictional grant of 28 U.S.C. § 1333 and that they are subject to the provisions of Rule 9(h) of the Federal Rules of Civil Procedure, and hence would be tried without a jury.  The BP Parties deny, however, that in cases where federal statutory law displaces admiralty law the existence of maritime jurisdiction brings with it maritime law.

18.    This Court has personal jurisdiction over BP Exploration and BP America because each is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

19.    This Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. will be served with a summons and this Complaint and has been served with a summons on the operative B3 Bundle Master Complaint.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

20.    This Court also has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute (La. Rev. Stat. Ann. § 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or omission outside of Louisiana. These acts or omissions took place both before the blowout resulting in the oil spill, which is described more fully below, and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the oil spill. BP p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. BP p.l.c. has had continuous and systematic contacts with Louisiana (and

with the United States more generally) and has been served with a summons on the operative B3 Bundle Master Complaint.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


21.    In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


22.    BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the *Deepwater Horizon* for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


23.    Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multidistrict Litigation, *see In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* 731 F. Supp. 2d 1352 (J.P.M.L. 2010), as well as this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows plaintiffs to directly file complaints arising out of the *Deepwater Horizon* incident in this District.

**ANSWER:**

The BP Parties admit that venue is proper in this district in accordance with the Order of this Court and the JPML, consistent with the limits on what may be properly adjudicated in multidistrict litigation. The BP Parties reserve all of their rights under *Lexecon, Inc. v. Milberg Weiss Bershad Hines & Lerach*, 523 U.S. 26 (1998). The BP Parties deny the remaining allegations of this paragraph.

## FACTUAL ALLEGATIONS

### A.    The *Deepwater Horizon* Catastrophe

24.    The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001. It was one of the largest vessels of its kind.

**ANSWER:**

The BP Parties admit that the *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

25.    BP leased the *Deepwater Horizon* through September 2013 to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

**ANSWER:**

The BP Parties admit that the *Deepwater Horizon* was used to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, which is located on the Outer Continental Shelf off of the coast of Louisiana. The BP Parties deny the remaining allegations of this paragraph.

26.    On April 20, 2010, and as described in greater detail in the First Amended B1 Master Complaint (Rec. Doc. 1128) (whose factual allegations are incorporated fully by

reference herein), workers on the *Deepwater Horizon* oil rig lost control of the Macondo well just after the final cementing work was completed. During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon*, resulting in one or more fires and explosions onboard. The BP Parties adopt and incorporate by reference all pleadings and motions filed in response to any matter that Plaintiffs purport to incorporate by reference, including but not limited to Document 1440, the BP Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) & 12(b)(6) Plaintiffs' First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses Filed in Accordance with PTO No. 11 (CMO No.1), Section III.B1 ("B1 Master Bundle"), served on all counsel on February 28, 2011 (hereafter "BP's Motion to Dismiss B1 Bundle Complaint"), filed and served on all counsel on February 28, 2011, and Document 4130, The BP Parties' Answer to the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No.11 [CMO No. 1] Section III(B1) ["B1 Bundle"], served on all counsel on September 27, 2011 (hereafter "BP's Answer to the B1 Bundle Complaint").  To the extent any more specific response is required to any purportedly incorporated allegations, the BP Parties deny them unless expressly admitted in a pleading responsive to any document from which Plaintiffs have purportedly incorporated allegations.

27.    The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel. After burning for two days, the vessel sank to the ocean floor.

**ANSWER:**

The BP Parties admit that one or more explosions and fires occurred on the *Deepwater Horizon*, resulting in the death of eleven persons and the injury of others.  The BP Parties further

16

admit that the vessel sank on April 22, 2010.  The BP Parties deny the remaining allegations of this paragraph.

28.    The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the *Deepwater Horizon* tipped into the sea, it pulled the riser down with it, bending and breaking the pipe. Oil flowed out from the now-open end of the riser, as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

**ANSWER:**

The BP Parties admit that the riser connected to the *Deepwater Horizon* bent and broke as the vessel sank, resulting at that point in the release of hydrocarbons from the BOP and/or the riser.  The BP Parties deny the remaining allegations of this paragraph.

29.    Crude oil was discharged before the *Deepwater Horizon* finally sank on April 22, 2010, and the rate of discharge increased once the *Deepwater Horizon* sank to the ocean floor.

**ANSWER:**

The BP Parties admit that on April 20, 2010 the Macondo Well experienced a loss of well control and on July 15, 2010, the well was successfully capped.  The BP Parties further admit that hydrocarbons that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through the Transocean-owned vessel appurtenances including the BOP and riser, before discharging at that point into the Gulf of Mexico waters or being captured by various containment methods.  The BP Parties deny the remaining allegations of this paragraph.

30.    After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill. Government investigators have found BP's initial leak estimate of 1,000 barrels per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day. Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

**ANSWER:**

The BP Parties deny any and all allegations of wrongdoing against the BP Parties, including allegations that they downplayed, understated, or concealed the severity of the Spill. The BP Parties deny the remaining allegations of this paragraph.

31.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines.

**ANSWER:**

The BP Parties admit that hydrocarbons in the Macondo Well reservoir entered the water column from appurtenances of the *Deepwater Horizon* and reached the surface of the Gulf of Mexico and that some hydrocarbons reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

32.     Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries. Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that hydrocarbons that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through the Transocean-owned vessel appurtenances including the BOP and riser, before at that point discharging into Gulf of Mexico waters or being captured by various containment methods, and that some hydrocarbons reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties further admit that as permitted in the

18

National Contingency Plan and with the approval of the Unified Command, dispersants were applied to mitigate the potential impacts of the oil spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

33.     The oil spewed from the well for over twelve weeks until BP finally capped the well on July 15, 2010. Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that hydrocarbons that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through the Transocean-owned vessel appurtenances including the BOP and riser, before discharging at that point into Gulf of Mexico waters or being captured by various containment methods, from April 20, 2010 until the well was capped on or around July 15, 2010.  The BP Parties deny the remaining allegations of this paragraph.

*The Crude Oil*

34.     The crude oil carried with it significant public health risks. Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

**ANSWER:**

The BP Parties deny that the crude oil from the Macondo Well carried with it significant public health risks.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

35.     Crude oil contains benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc, all of which can harm human health.

**ANSWER:**

The BP Parties admit that, depending on its chemical state, crude oil can contain benzene and other VOCs, including polycyclic aromatic hydrocarbons.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

36.     Chemicals such as benzene, PAHs and many other chemicals in crude oil are toxic and volatile, moving from the oil into the air. Once airborne, they can blow over the ocean for miles, reaching communities far from the spill. They may be noticed as petroleum odors.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

37.     Dermal exposure to certain VOCs in crude oil can cause, *inter alia,* redness, swelling, irritation, rashes and blisters on the skin and mucous membranes. Inhalation exposure to certain VOCs in crude oil can cause, *inter alia,* ocular redness, soreness, watering and itching. Inhalation exposure to certain other VOCs in crude oil can cause, *inter alia,* coughing, throat irritation, congestion, shortness of breath and wheezing. Inhalation exposure to other VOCs in crude oil can also affect, *inter alia,* the nervous system causing, among other things, nausea, vomiting, dizziness, irritability, confusion, and weakness of extremities. Ingestion of food or water containing VOCs from crude oil can cause, *inter alia,* nausea, vomiting, and diarrhea.

**ANSWER:**

The BP Parties admit that, depending on the route, level and duration of exposure, certain volatile organic compounds in crude oil can cause certain dermal, respiratory, neurological, neurophysiological, and gastrointestinal conditions.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

38.     According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia,

kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

**ANSWER:**

The BP Parties admit that the Agency for Toxic Substances and Disease Registry ("ASTDR") is an agency of the U.S. Department of Health and Human Services and that its pronouncements relating to benzene speak for themselves.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them, including to the extent they are not consistent with the ASTDR's pronouncements.

39.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, aplastic anemia (a precursor of leukemia), chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Longterm low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

40.     As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human Services, in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

**ANSWER:**

The BP Parties admit that Dr. Lisa Kaplowitz stated the above quoted language.[3]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

_____

[3] By referencing the statement of Dr. Lisa Kaplowitz, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**B.     The Response Effort and the Use of Chemical Dispersants**

41.     The OPA imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

**ANSWER:**

The BP Parties admit that 33 U.S.C. § 2702, the text of which speaks for itself, states the above quoted language.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with 33 U.S.C. § 2702.

42.     The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

43.     After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia,* Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

44.     In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States. This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

**ANSWER:**

The BP Parties admit that BPXP participated in the response to the Incident as a responsible party under the direction of Federal On-Scene Commanders, and that BPXP responded to the Incident as part of plans approved by the Unified Command through measures that included containment of discharge from the well and protection of the shoreline.  The BP Parties deny the remaining allegations of this paragraph.

22

45.     As part of its offshore containment response program, BP directed the use of vessels to, *inter alia,* recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that reached the surface of the water. BP also employed vessels to tow and deploy booms—floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

**ANSWER:**

The BP Parties admit that BPXP participated in the response to the Incident as a responsible party under the direction of Federal On-Scene Commanders, and that BPXP responded to the Incident as part of plans approved by the Unified Command through measures that included the use of skimming equipment, controlled in-situ burning and the deployment of boom to support mechanical recovery of oil and other response efforts.  The BP Parties deny the remaining allegations of this paragraph.

46.     In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

**ANSWER:**

The BP Parties admit that BPXP participated in the response to the Incident as a responsible party under the direction of Federal On-Scene Commanders, and that BPXP responded to the Incident as part of plans approved by the Unified Command through measures that included the use of chemical dispersants that were pre-approved for use in oil spill response by the U.S. government.  The BP Parties deny the remaining allegations of this paragraph.

47.     Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

**ANSWER:**

The BP Parties admit that some chemical dispersants that are approved for use in oil spill response by the U.S. government contain solvents and surfactants that are intended to assist in

dispersal of oil.  The BP Parties lack knowledge or information sufficient to admit or deny the remaining allegations of this paragraph, and therefore deny them.

48.     Among other dispersants, BP applied a highly toxic form of chemical dispersant called Corexit. BP used both Corexit® 9500 and Corexit® EC9527A.

**ANSWER:**

The BP Parties admit that the dispersants approved for use in the Response included Corexit® 9500 and Corexit® EC9527A.  The BP Parties deny the remaining allegations of this paragraph.

49.     The Material Safety Data Sheet ("Data Sheet")—a form that sets forth the properties of a particular substance, including its toxicity and health effects—for Corexit® 9500 indicates that it contains hazardous substances, that it is harmful to human health, and that dermal exposure, inhalation, and ingestion should be avoided. The Data Sheet further states that Corexit® 9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled. If ingested, it may cause chemical pneumonia.

**ANSWER:**

The BP Parties admit that a Material Safety Data Sheet exists for Corexit® 9500, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the Material Safety Data Sheet.

50.     The Data Sheet for Corexit® EC9527A also indicates that it contains hazardous substances, it is harmful to human health, and that dermal exposure, inhalation, and ingestion should be avoided. The Data Sheet further states that Corexit® EC9527A is an eye and skin irritant and, if inhaled, may irritate the respiratory tract. If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

**ANSWER:**

The BP Parties admit that a Material Safety Data Sheet exists for Corexit® 9527A, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the Material Safety Data Sheet.

51.    In addition, Corexit® EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to the male and female reproductive systems in animals.

**ANSWER:**

The BP Parties admit that the formulation for Corexit® EC9527A includes 2-butoxyethanol.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

52.    Both of these Corexit® products also contain non-specified organic sulfonic acid salt, which is "moderately toxic," as well as propylene glycol, a chemical with solvent properties. Propylene glycol is a mild irritant, and exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat, and lung irritation. Some individuals are allergic to propylene glycol and those with eczema may be at higher risk. Exposure may cause erythema, edema, induration, and other skin problems.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

53.    Upon information and belief, BP also authorized the application of other chemical dispersants, including PES51™ and OMI-500®, to near-shore and onshore areas, as well as to contaminated vessels and containment equipment, to disperse the oil and clean vessels and equipment.

**ANSWER:**

The BP Parties state that all of their response actions with respect to the use of chemical dispersants were directed by the Unified Command.  The BP Parties deny the remaining allegations of this paragraph.

54.    The Data Sheet for PES51™ indicates that it should be handled with gloves, that it is an irritant, and that dermal exposure and ingestion should be avoided.

**ANSWER:**

The BP Parties admit that a Material Safety Data Sheet exists for PES-51, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the Material Safety Data Sheet.

55.     The Data Sheet for OMI-500® indicates that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided. Among other effects, OMI-500® can be irritating to skin and eyes and may cause irritation of the respiratory tract, typically experienced as nasal discomfort and discharge, possibly with chest pain and coughing. Headache, nausea, vomiting, dizziness, and drowsiness may occur. Exposure may also cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva.

**ANSWER:**

The BP Parties admit that a Material Safety Data Sheet exists for OMI-500, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the Material Safety Data Sheet.

56.     In summary, the dispersants used by BP are known to cause, *inter alia,* headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

57.     Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants to the resulting oil slick and sheens on the surface of the Gulf. Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

26

**ANSWER:**

The BP Parties admit that BPXP participated in the response to the Incident as a responsible party under the direction of Federal On-Scene Commanders, and that BPXP responded to the Incident as part of plans approved by the Unified Command through measures that included the use of chemical dispersants that were pre-approved for use in oil spill response by the U.S. government.  The BP Parties deny the remaining allegations of this paragraph.

58.     BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants on the surface of the Gulf.

**ANSWER:**

The BP Parties admit that BPXP participated in the response to the Incident as a responsible party under the direction of Federal On-Scene Commanders, and that BPXP responded to the Incident as part of plans approved by the Unified Command through measures that included the use of chemical dispersants that were pre-approved for use in oil spill response by the U.S. government, and that included the use of aircraft.  The BP Parties deny the remaining allegations of this paragraph.

59.     According to the Aerial Dispersants Operations -- Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and 8 spotter aircraft. At least four spray planes left from Houma, Louisiana. At least six spray planes left from Stennis International Airport in Mississippi. Upon information and belief, aerial dispersant sorties also would leave from airfields in Florida and were conducted and orchestrated by BP.

**ANSWER:**

The BP Parties admit that BPXP participated in the response to the Incident as a responsible party under the direction of Federal On-Scene Commanders, and that BPXP responded to the Incident as part of plans approved by the Unified Command through measures that included the use of chemical dispersants that were pre-approved for use in oil spill response

by the U.S. government, and that included the use of aircraft.  The BP Parties deny the remaining allegations of this paragraph.

60.     Generally, the United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep. The Coast Guard's Federal On Site Coordinator (the "On Site Coordinator") had to approve BP's requests to use chemical dispersants.

**ANSWER:**

The BP Parties admit that the National Contingency Plan has provisions concerning the use of chemical dispersants in response to oil spills and that the Federal On-Scene Commander directed the Response including the use of chemical dispersants.  The BP Parties deny the remaining allegations of this paragraph.

61.     On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP to identify and begin using chemical dispersants less toxic than Corexit® within the next 24 hours.

**ANSWER:**

The BP Parties admit that the U.S. Government directed and controlled the use of chemical dispersants in the Response, including through written directives, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the written directives.

62.     On May 20, 2010, BP objected to this order and notified the EPA that it would continue using Corexit®.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

63.     BP's use of chemical dispersants then skyrocketed: on May 22, 2010, BP used 45,000 gallons of dispersant and on May 23, 2010, it used 70,000 gallons of dispersant.

**ANSWER:**

The BP Parties admit that the use of dispersants in the Response, including the quantities of dispersants to be used, were directed and controlled by the Unified Command.  The BP Parties deny the remaining allegations of this paragraph.

64.     Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out. It relied on Corexit® 9500 thereafter.

**ANSWER:**

The BP Parties admit that the use of dispersants in the Response, including the quantities of dispersants to be used, were directed and controlled by the Unified Command.  The BP Parties deny the remaining allegations of this paragraph.

65.     On May 26, 2010, the EPA directed BP to reduce overall use of Corexit® by 75% and to stop using chemical dispersants on the water's surface except in rare cases where an exemption was sought in writing from and approved by the On Site Coordinator.

**ANSWER:**

The BP Parties admit that the U.S. Government directed and controlled the use of chemical dispersants in the Response, including through written directives, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the written directives.

66.     BP thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico. According to the Aerial Dispersants Operations – Houma Status Report, by June 26, 2010, BP had applied 933,023 gallons of dispersant by aerial application. As of the same date, BP had ordered the application of dispersant by 386 flights, or sorties, and had covered approximately 291 square miles of the Gulf with dispersant.

**ANSWER:**

The BP Parties admit that the use of dispersants in the Response, including the quantities of dispersants to be used, were directed and controlled by the Unified Command.  The BP Parties deny the remaining allegations of this paragraph.

67.    To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

**ANSWER:**

The BP Parties admit that according to the *Oil Budget Calculator* report prepared by the United States government, approximately 1.8 million gallons of chemical dispersants were used in the Response.  The BP Parties deny the remaining allegations of this paragraph.

C.    **Plaintiff's Exposure to Oil and Harmful Chemicals and their Resulting Injuries and Damages**

68.    Clean-Up Workers, as defined in Paragraph 85, were hired by BP and other BP clean-up and response contractors to clean up beaches, marshes, wetlands and other onshore areas. Many Clean-Up Workers' primary tasks were to, *inter alia,* lay and haul oil containment boom, install other barriers, collect tar balls, remove polluted sand contaminated with oil and/or dispersants, assist with in-*situ* burning, spray and clean vessels that came into contact with oil, dispersants, and other harmful chemicals resulting from the Oil Spill, decontaminate oiled wildlife, and transport contaminated boom and other clean-up equipment and other Clean-Up Workers.

**ANSWER:**

The BP Parties admit that various individuals and entities were hired or contracted to perform clean-up activities, including the deployment of boom, application of dispersants, controlled in-situ burning, and decontamination of vessels utilized in the Response.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

69.    As part of this effort, Clean-Up Workers came into contact with crude oil, chemical dispersants and oil/chemical mixtures. Even more disturbing, BP's aerial spray planes

negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and their crews in the vicinity of the spraying.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

70.    Upon information and belief, many Clean-Up Workers were not outfitted with respirators or equivalent safety devices. Some attempted to use respirators while working, but BP prevented them from doing so and threatened them with loss of their clean-up jobs if they did not abide by the instruction.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

71.    Clean-Up Workers were exposed to oil and dispersants and other harmful chemicals by, *inter alia,* inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist. Many of the chemicals in crude oil and the dispersants to which the Clean-Up Workers were exposed target the same organs in the human body, and this increases the risk and may also increase the severity of harm. The dispersants that were used also can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs. Moreover, the odors emanating from the oil and/or the dispersants are foul, and the fumes are harmful.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

72.    The negative health effects caused by exposure to oil, dispersants, and/or some mixture of the two are varied and can cause a wide range of diseases and conditions. Some of these diseases, conditions, and symptoms may be evident immediately or within several days, and others can appear months or years later.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

73.     Residents of Zones A and B, as defined in Paragraphs 86 and 87, due to the proximity of their homes to the Gulf of Mexico, and the actions and omissions by BP, have been exposed to oil, dispersants, and other harmful chemicals and to fumes and odors from those chemicals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

74.     Many Clean-Up Workers and residents of Zone A and B complained of rashes, lesions and burns resulting from exposure to oil, dispersant, and/or some mixture of the two. Many experienced and/or are continuing to experience, *inter alia,* headaches, nausea, vomiting, respiratory difficulty, rashes and eye irritation.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

75.     Plaintiffs, and the Class described below, have suffered and/or will suffer injuries and damages, including, *inter alia,* exposure to dangerous chemicals, physical injuries and diseases, accompanying physical, mental and emotional pain, suffering and anguish, the need for medical monitoring, costs and inconvenience of obtaining past and future medical treatment for exposure to chemicals, and increased risk and fear of future disease as a result of exposure to oil, dispersants, and/or oil and dispersant mixtures.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

76.     All Plaintiffs, like all members of the Class, have been placed at risk of developing additional diseases over the decades and becoming saddled with the financial burden, inconvenience, and emotional strain of monitoring their compromised health. Plaintiffs, like many members of the Class, have already manifested injuries and illnesses associated with exposure to chemicals in the environment resulting from the Oil Spill.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


**D.      BP's Knowledge of the Risks**

77.     As early as May 2010, federal regulators at the Occupational Safety and Health Administration ("OSHA") repeatedly raised concerns with BP over significant deficiencies in BP's Oil Spill response operations relating to worker safety. OSHA regulators remained frustrated, however, that BP did not address the most serious problems.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


78.     BP, aware of the risks that response vessels would face, failed to provide adequate training and vessel inspections and ignored worker safety concerns, even in the face of OSHA warnings and notification by the U.S. Department of Health and Human Services that vessel workers in its Vessels of Opportunity ("VoO") program, as well as other offshore and onshore Clean-Up Workers, were complaining of illnesses after being exposed to oil and dispersants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


79.     At all times relevant to this litigation, BP knew or should have known that:

a.      crude oil contains chemicals hazardous to human health;

b.      chemical dispersants contain chemicals hazardous to human health;

c.      Plaintiffs were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; and

d.      Plaintiffs should have been provided proper protective clothing and respirators when engaged in Oil Spill clean-up activities.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

### E.     BP's Willful and Wanton Conduct

80.     BP focused primarily on profit and disregarded public and environmental health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon* by, among other things:

a.     performing a critical well pressure test with untrained and unqualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

b.     using a well design with too few barriers to gas flow;

c.     failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

d.     failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

e.     failing to run a cement bond log to evaluate the integrity of the cement job;

f.     failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

g.     using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

h.     grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon;*

i.     failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

j.     failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill; and

k.     failing to use reasonably safe dispersant chemicals in the attempt to respond to the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

81.     BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

82.     In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and the damage caused by, the spill by willfully, wantonly, and/or recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

83.     BP, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, displayed gross negligence, reckless indifference, willfulness, and/or wantonness.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

## CLASS ACTION ALLEGATIONS

84.     Plaintiffs seek certification of the following Class:

All natural persons who reside in the United States as of April 16, 2012, and who:

a.     Worked as "Clean-Up Workers," as defined in paragraph 85, at any time between April 20, 2010, and April 16, 2012;

b.     Resided in "Zone A," as defined in paragraph 86, for some time on each of at least sixty days between April 20, 2010, and September 30, 2010, and who developed a physical symptom or illness between April 20, 2010, and September 30, 2010 that is associated with exposure to oil/or dispersants or decontaminants; or

      c.      Resided in "Zone B," as defined in paragraph 87, for some time on each of at least sixty days between April 20, 2010, and December 31, 2010.

**ANSWER:**

The BP Parties admit that the Plaintiffs seek certification of the MEDICAL BENEFITS SETTLEMENT CLASS defined in the MEDICAL BENEFITS CLASS ACTION SETTLEMENT AGREEMENT, filed with the Court on April 18, 2012 (Rec. Doc. 6273-1) ("MEDICAL SETTLEMENT AGREEMENT"), including any amendments, which speaks for itself.[4]  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the MEDICAL SETTLEMENT AGREEMENT.

      85.     "Clean-up Workers" means all natural persons employed in connection with the clean-up, remediation efforts, and all other responsive actions, including the use and handling of dispersants or decontaminants, relating to the oil spill ("Response Activities"), including but not limited to:

      a.      captains, crews, and other workers employed on VoO who performed Response Activities;

      b.      workers employed to perform the decontamination of vessels involved in Response Activities;

      c.      captains, crew, and other workers on vessels other than VoO that performed Response Activities;

      d.      onshore personnel employed to perform Response Activities; and

      e.      persons involved in the recovery, transport, and decontamination of wildlife affected by the Oil Spill.

**ANSWER:**

The BP Parties admit that "CLEAN-UP WORKERS" are defined in the MEDICAL SETTLEMENT AGREEMENT, which speaks for itself.  The BP Parties deny the remaining

---

[4] Terms fully capitalized used in the Answer have the meanings ascribed to the fully capitalized rendering of such terms in Doc. 6273-1, the MEDICAL BENEFITS CLASS ACTION SETTLEMENT AGREEMENT, filed and served on April 18, 2012, as amended.

allegations of this paragraph to the extent they are not consistent with the MEDICAL SETTLEMENT AGREEMENT.

86.     "Zone A" is the beachfront areas along the Gulf Coast approximately one-half mile inland from the shoreline, from Grand Isle, Louisiana, to Dog Island, Florida.

**ANSWER:**

The BP Parties admit that "ZONE A" is defined in the MEDICAL SETTLEMENT AGREEMENT, which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the MEDICAL SETTLEMENT AGREEMENT.

87.     "Zone B" is the area of wetlands along the Gulf Coast at least one mile inland from the shoreline from Vermilion Parish in Louisiana to Mobile County in Alabama.

**ANSWER:**

The BP Parties admit that "ZONE B" is defined in the MEDICAL SETTLEMENT AGREEMENT, which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the MEDICAL SETTLEMENT AGREEMENT.

88.     Excluded from the Class are:

a.     Class members who request exclusion from the class;

b.     individuals employed by BP at any time between April 20, 2010, and April 16, 2012;

c.     judges on the United States District Court for the Eastern District of Louisiana, and their law clerks serving on or after April 20, 2010 through April 16, 2012; and

d.     individuals who were on the *Deepwater Horizon* on April 20, 2010;

e.     individuals who previously asserted and released their claims against BP relating to any illnesses or injuries suffered as a result of exposure to oil and other

hydrocarbons from the Macondo well and/or dispersants and/or decontaminants used in connection with the Response Activities; and

f.  individuals who are Zone A or B residents, but are not Clean-Up Workers, and who worked in one or more of the following capacities for a cumulative duration of at least five years prior to April 20, 2010:

    i.  cleaning or reconditioning of the tanks or holds of barges, tankers or lighters, tanker trucks, tanker rail cars, or any other tank (stationary or mobile) used to hold hydrocarbons or petrochemicals;

    ii.  storage, handling, or cleaning of naturally occurring radioactive materials ("NORMs"), including radionuclides;

    iii.  storage, transportation, distribution, or dispensing of gasoline, diesel, jet fuel, kerosene, motor fuels, or other hydrocarbon-based fuels at any bulk storage facility (not including gas stations or gas station convenience stores), bulk plant, or bulk terminal facility that stores hydrocarbons or petrochemicals;

    iv.  loading or unloading bulk crude oil or petroleum hydrocarbons onto or from trucks, ships, barges, or other vessels; or

    v.  tar distillation.

**ANSWER:**

The BP Parties admit that persons excluded from the MEDICAL BENEFITS SETTLEMENT CLASS are specified in the MEDICAL SETTLEMENT AGREEMENT, which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with the MEDICAL SETTLEMENT AGREEMENT.

89.  This action is brought and may properly be maintained as a class action on behalf of the proposed Class as described above, and such other additional classes as Plaintiffs may propose and/or the Court may designate, pursuant to the applicable and appropriate provisions of Rule 23(a)(1)-(4) and (b)(3).

**ANSWER:**

The BP Parties admit that Plaintiffs have brought this action as a class action on behalf of the proposed MEDICAL BENEFITS SETTLEMENT CLASS.  The BP Parties admit that this action may be properly maintained as a class action, but only to the extent:  (1) required by the

MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective. The BP Parties deny the remaining allegations of this paragraph.

### A.   Numerosity of the Class - Fed. R. Civ. P.23(a)(1)

90.    On information and belief, the Class consists of over 100,000 individuals. It is so numerous that joinder of all members is impossible. Class members can be informed of the pendency of this action by print, internet, and broadcast notice. Many will also receive notice by U.S. mail.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective. The BP Parties deny the remaining allegations of this paragraph.

**B.      Commonality - Fed. R. Civ. P. 23(a)(2)**

91.      There are numerous questions of law and fact common to all Class members. Because Defendants' conduct here is governed by federal regulations and federal maritime law, the Class members will be subject to common questions of law.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective. The BP Parties deny the remaining allegations of this paragraph.

92.     Furthermore, the factual bases of Defendants' outrageous conduct are common to all Class members and represent a common thread of reckless conduct, gross negligence and willful, wanton, and reckless indifference for the rights of others, resulting in injury to all members of the Class. The Class members' claims arise from the same course of decision-making and events, and each Class member will make similar legal and factual arguments to prove Defendants' outrageous, willful, reckless, wanton, and deplorable conduct and liability.

**ANSWER:**

The BP Parties deny that their conduct was reckless, negligent, willful, wanton, or indifferent to the rights of others.  The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.    Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that

the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this paragraph.

93.    Furthermore, the Class members' claims depend upon a common contention— namely, BP's liability for the *Deepwater Horizon* explosion and the subsequent release of oil. The liability proceeding will generate common answers apt to drive the resolution of Plaintiffs' negligence action. This common issue would therefore resolve a question that is central to the validity of each one of the Class member's claims.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL

AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this paragraph.

94.     Among the common legal and factual questions presented by BP's conduct are:

a.     the facts surrounding the explosion and fire onboard the *Deepwater Horizon* that eventually caused the vessel to sink, and the release of oil and other substances from the Macondo well and/or the *Deepwater Horizon* and its appurtenances;

b.     whether BP owed a duty to Class members in the operation of the *Deepwater Horizon* and Macondo well;

c.     the facts concerning the types of injuries caused by exposure to oil and/or dispersants;

d.     whether BP owed a duty of care to Class members in the use of dispersants and/or other hazardous chemicals and other efforts to respond to the Oil Spill;

e.     whether BP recklessly, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs;

f.     whether BP breached duties of care to Class members by causing and/or allowing the Oil Spill to occur and remain ongoing for months through its actions and omissions in conducting Response Activities; and

g.     whether BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its attempt to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs.

**ANSWER:**

The BP Parties deny that their conduct was reckless, negligent, willful, or wanton.  The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of

a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec.

Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of

the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP

Parties do not waive or concede any position or arguments they have for or against class

certification of any class for any other purpose in any action or proceeding.  Any class

certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT

shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS

CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS

SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS

SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT

enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL

ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL

AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT

AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this

paragraph.

95.    Common questions of law and fact also exist with respect to Defendants' punitive
damages liability to the Class, including Defendants' outrageous, grossly negligent, willful,
reckless, and wanton conduct; the calculation of the amount of punitive damages that may be
imposed upon each of the Defendants consistent with due process; intra-class equity with respect
to the allocation and utilization of punitive damages; and the most practicable and most equitable
allocation, disbursement, and utilization of such damages for punishment of Defendants'
wrongful conduct toward Plaintiffs, the Class, and society, and in fulfillment of the deterrent
policy and purpose of punitive damages.

**ANSWER:**

The BP Parties deny that their conduct was reckless, negligent, willful, or wanton.  The

BP Parties admit the allegations of this paragraph only to the extent: (1) required by the

MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint

Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective. The BP Parties deny the remaining allegations of this paragraph.

### C.      Typicality - Fed. R. Civ. P. 23(a)(3)

96.      The claims in this Medical Class Action Complaint are typical of the claims of the Class in that the representative Plaintiffs are members of the Class and, like all Class members, were placed at risk of adverse health effects and/or other harms caused by exposure to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and suffered injury as a result of BP's tortious conduct.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective. The BP Parties deny the remaining allegations of this paragraph.

97.    Each Class member's claim arises from the same decision-making and events, and each Class member will make similar legal and factual arguments to prove BP's negligent,

outrageous, grossly negligent, willful, reckless, and wanton conduct and liability under the same legal theories asserted in herein.

**ANSWER:**

The BP Parties deny that their conduct was reckless, negligent, willful, or wanton. The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective. The BP Parties deny the remaining allegations of this paragraph.

**D.    Adequacy of Representation - Fed. R. Civ. P. 23(a)(4)**

98.    Plaintiffs will fairly and adequately represent and protect the interest of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort and complex class actions, including actions involving environmental contamination. Among the undersigned counsel for Plaintiffs are counsel who represent claimants from each of the affected Gulf states and counsel with experience in complex class action litigation and trials. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL

AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this paragraph.

E.      **Class Certification under Fed. R. Civ. P. 23(b)(3) - Predominance and Superiority**

99.     Common issues of fact and law predominate concerning the claims of the Class.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL

AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this paragraph.

100.   Defendants' conduct presents predominant common factual questions. Fundamentally, all Plaintiffs' claims arise out of a single course of conduct that caused the Macondo well blowout, the *Deepwater Horizon* explosions, and the subsequent Oil Spill. Although this is a single-event, single-location mass disaster that has affected, and will continue to affect a large geographic area and many individuals for some time to come, its wide-ranging effects can be traced back to a single root: a chain of decisions and actions made jointly, severally, and solidarily by the small group of actors limited to the BP Defendants and the Transocean and Halliburton Defendants identified in the operative B3 Master Complaint. Furthermore, the decisions made during the Response Activities—how to cap the flow of oil from the Madondo well, to apply dispersant, and to widely deploy Clean-Up Workers who were ill-equipped for exposure to oil and harmful chemicals, for example—were centralized and made by BP. Plaintiffs will present common proof with respect to BP's failure to use best practices in responding to the spill; this proof is the same for each member of the Class. What is more, Plaintiffs' proof of Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct will involve the same individuals, events, discovery, documents, fact witnesses, and experts. Common questions of fact also predominate concerning the determination of the aggregate quantum of punitive damages necessary to fulfill the punishment and deterrence goals of such damages.

**ANSWER:**

The BP Parties deny that their conduct was reckless, negligent, willful, or wanton.  The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class

certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.   To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.   The BP Parties deny the remaining allegations of this paragraph.

101.    Because Defendants' behavior here is governed by federal regulations and federal maritime law, the Class members will be subject to common questions of law and such questions will predominate over any individual issues.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272).   The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.   The BP Parties do not waive or concede any position or arguments they have for or against class

certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this paragraph.

102.    A class action is superior to the only other method available for the fair and efficient adjudication of this controversy—litigation via multiple trials. The repetitive individual litigation of Defendants' conduct by all members of the Class is inefficient, impracticable, economically infeasible, and potentially unfair, particularly in light of the unique context of Defendants' course of conduct and its unprecedented impact upon the Class, the environment, economy, and society. Given the compensatory and other damages of each Class member's case, few individual Class members could afford to shoulder the litigation costs of a complex matter such as this, which in turn means that few could likely seek their rightful legal recourse. Absent a class action, Class members would continue to incur harm without remedy.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec.

Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this paragraph.

103.    It would be unduly burdensome on the courts to oversee the individual re-litigation of the same facts and legal issues in thousands of cases. The consideration of common questions of fact and law via this class action will conserve judicial resources and promote a fair and consistent resolution of these claims.

**ANSWER:**

The BP Parties admit the allegations of this paragraph only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec.

Doc. 6272).  The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny the remaining allegations of this paragraph.

## CAUSES OF ACTION

### A. Negligence Under General Maritime Law

104.  Plaintiffs, individually and on behalf of the proposed Class, reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

105.  The existence and breach of Defendants' legal duties are established under general maritime law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

106.     At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiffs and the Class in connection with the drilling operations and maintenance of the *Deepwater Horizon,* including its appurtenances and equipment. BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

107.     Further, BP owed a duty to Plaintiffs and the Class to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

108.     BP had a heightened duty of care to Plaintiffs and the Class because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

109.     The risk of injury and loss to Plaintiffs and the Class was reasonably foreseeable, and BP knew of the dangers associated with deep water drilling.  Specifically, at all times relevant to this litigation, BP knew or should have known that:

a.     crude oil contains chemicals hazardous to human health;

b.     chemical dispersants contain chemicals hazardous to human health;

c.     Plaintiffs and the Class should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances that they contain; and

d.     failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


110.    BP breached its duty of care to the Plaintiffs and the Class in the following non-exclusive respects:

a.      failing to prevent the explosion on board the *Deepwater Horizon;*

b.      failing to cap the Macondo well in a timely manner;

c.      failing to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

d.      failing to properly train and equip Clean-Up Workers to avoid exposure to hazardous substances encountered in connection with relief efforts;

e.      failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

f.      failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

g.      failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


111.    The blowout and explosions on the *Deepwater Horizon,* its sinking and the resulting spill were caused by the joint and concurrent negligence of the BP Defendants and the Transocean and/or Halliburton Defendants named in the operative B3 Master Complaint.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny those remaining allegations.

112.    Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs and the Class.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

113.    Plaintiffs and the Class suffered injury, loss, and damages as a direct and proximate result of Defendants' breach of their aforementioned duties.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

114.    Furthermore, as an element of damages, Plaintiffs and Class members are entitled to medical monitoring relief. Plaintiffs' exposure to oil and harmful chemicals may lead to serious health problems, diseases, and medical conditions that may be prevented or minimized by timely medical diagnosis and treatment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

115.    Monitoring procedures exist that make possible the early detection of any latent disease. Such procedures are reasonably necessary will be of great benefit to Plaintiffs and the Class by preventing or minimizing health problems that Plaintiffs and the Class may encounter as a result of the Oil Spill and related Response Activities.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

116.    In order to reach maximum medical improvement, Plaintiffs and the Class are entitled to a monitoring protocol. Defendants' failure to provide such a protocol is callous, willful, wanton, or otherwise tortious.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

**B.     Gross Negligence Under General Maritime Law**

117.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

118.    Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

119.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to prevent and contain the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

120.     Defendants knew or should have known that their willful, wanton, and reckless conduct would cause injury to Plaintiffs and the Class.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

121.     Defendants' willful, wanton, reckless, and/or grossly negligent conduct is the factual and legal cause of Plaintiffs' and the Class's injuries and damages. Similarly, for the reasons set forth above, Plaintiffs and the Class are entitled to medical monitoring relief as an element of damages for Defendants' gross negligence.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

C.     **Negligence Per Se Under General Maritime Law and Federal Law**

122.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if

fully restated here.

123.     Defendants' conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon,* the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiffs, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.,* 40 C.F.R. § 300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.120. BP therefore breached its responsibilities under this regulatory provision.

**ANSWER:**

The BP Parties admit that 40 C.F.R. § 300.150 speaks for itself.  The BP Parties deny the

allegations of this paragraph to the extent they are inconsistent with 40 C.F.R.  § 300.150.  The

BP Parties deny the remaining allegations of this paragraph.

124. In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

a. BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

b. BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

c. BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. § 250.401(a);

d. BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §§ 250.420(a)(1) and (2);

e. BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

f. BP failed to maintain the *Deepwater Horizon*'s BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

g. BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(a);

h. BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

i. BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427(b).

**ANSWER:**

The BP Parties admit that the text of the Bureau of Safety and Environmental Enforcement ("BSEE") Incident of Non-Compliance ("INC") speaks for itself.[5] The BP Parties deny the remaining allegations of this paragraph.

_____

[5] By referencing BSEE INC, the BP Parties neither admit nor imply that the document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

125.    BP's violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

126.    BP had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiffs' and the Class's injuries, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

127.    As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, the Plaintiffs and the Class have suffered injuries and are entitled to damages, including, *inter alia,* costs of medical monitoring.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

### D.    **Medical Monitoring Claim Under General Maritime Law**

128.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if

fully restated here.

129.    The law governing medical monitoring in a number of jurisdictions is consistent with both the general common law and the remedial purposes underlying the general maritime law. Accordingly, the general maritime law should recognize a cause of action for medical monitoring relief other than lump sum damages, irrespective of whether a particular Plaintiff or Class member has manifested a bodily injury to date.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

130.    Plaintiffs have been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

131.    Plaintiffs' exposures were caused by Defendants' negligence or otherwise tortious conduct.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

132.    As a direct and proximate result of their exposure, many Plaintiffs have manifested a physical injury or illness. All Plaintiffs, however, have developed a significantly increased risk of future injury.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

133.    The method and means for diagnosing Plaintiffs' potential medical problems exist and are well-accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems. Such procedures enable the early detection of any future injury that are different from those normally recommended in the absence of the exposure.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

134.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

135.    Defendants' failure to provide benefits such as those described above has been callous, willful, wanton, or otherwise tortious.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

E.     **Punitive Damages**

136.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if

fully restated here.

137.    Defendants recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

138.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and needlessly caused injury to Gulf residents.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

139.    Defendants' willful, wanton and reckless conduct, as described herein, entitles Plaintiffs to punitive damages. The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of the same sufficient to both punish Defendants and deter similar wrongdoing in the future.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

140.    BP engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in its activities leading up to and/or during the blowout, explosions, fire, and Oil Spill that an award of punitive damages against it at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. BP's actions herein were not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to itself. Plaintiffs, society and the environment cannot afford and

should never be exposed to the risks of another disaster of the magnitude caused by BP's misconduct.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

141.    BP's conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time it:

a.    failed to properly maintain and/or operate the *Deepwater Horizon*;

b.    operated the *Deepwater Horizon* in such a manner that the safety and integrity of the vessel and the well were disregarded to save time and money;

c.    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

d.    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon;*

e.    violated MMS regulations and/or other applicable regulations/standards for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f.    failed to take appropriate action to avoid or mitigate the accident;

g.    failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.    failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

i.    failed to provide appropriate disaster prevention equipment; and

j.    failed to have an appropriate emergency spill response plan or readily available spill response equipment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

142.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Class demand judgment against BP as follows:

1.  certification of the Class under Fed. R. Civ. P. 23 and appointment of Plaintiffs as Class representatives and their counsel as Class Counsel;

2.  compensatory damages in amounts to be determined at trial;

3.  punitive damages;

4.  implementation of a medical screening and monitoring program to be funded by BP;

5.  pre-judgment and post-judgment interest at the maximum rate allowable by law;

6.  attorneys' fees and costs of litigation;

7.  any other and further relief the Court deems just and proper.

## ANSWER:

The BP Parties admit that a Class should be certified, only to the extent:  (1) required by the MEDICAL SETTLEMENT AGREEMENT; (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272).  The BP Parties further state that they do not oppose conditional certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS

REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that Plaintiffs or the proposed Class are entitled to any other or additional relief and deny the remaining allegations of this paragraph.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

The loss of well control, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU Deepwater Horizon, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities.  The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, plaintiffs' claims should be dismissed as to the BP Parties.

### THIRD DEFENSE

Plaintiffs' damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

## FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiffs were not the result of any negligence, fault, or want of due care on the part of BP Parties.  Furthermore, Plaintiffs have the burden of proof on this issue, and Plaintiffs cannot meet that burden.

## FIFTH DEFENSE

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiffs' alleged damages and there is no causal connection between the acts complained of and the damages and injuries alleged.

## SIXTH DEFENSE

Plaintiffs' alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

## SEVENTH DEFENSE

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP Parties.

## EIGHTH DEFENSE

The claims of certain Plaintiffs are barred by the operation and effect of various releases of claims against, and liability on the part of, the BP Parties.

## NINTH DEFENSE

To the extent the BP Parties are found liable to Plaintiffs for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

**TENTH DEFENSE**

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

**ELEVENTH DEFENSE**

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to indemnity from other parties or entities.

**TWELFTH DEFENSE**

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to contribution from other parties or entities.

**THIRTEENTH DEFENSE**

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to subrogation from other parties or entities.

**FOURTEENTH DEFENSE**

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

**FIFTEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are not entitled under the law to the damages that they seek, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

**SIXTEENTH DEFENSE**

Plaintiffs' damages are barred, in whole or in part, by a failure to mitigate damages.

**SEVENTEENTH DEFENSE**

The BP Parties deny that they are liable to any extent as alleged in the Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by

Plaintiffs as a result of the allegations contained in the Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

## EIGHTEENTH DEFENSE

The Oil Pollution Act of 1990 displaces the causes of action under maritime law alleged in this Master Complaint because Plaintiffs are seeking damages potentially recoverable under the Oil Pollution Act against the BP Parties or another responsible party under that statute.

## NINETEENTH DEFENSE

The Outer Continental Shelf Lands Act, the legal nature of the Outer Continental Shelf as a federal enclave, and the Clean Water Act preempt Plaintiffs' state law claims.  If the Oil Pollution Act is held not to displace maritime law causes of action, then maritime law also preempts Plaintiffs' state law claims.

## TWENTIETH DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity.  Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

## TWENTY-FIRST DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

## TWENTY-SECOND DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization. Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

### TWENTY-THIRD DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

### TWENTY-FOURTH DEFENSE

To the extent the BP Parties are found liable to Plaintiffs for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiffs who received funds through the BP claims process, the GCCF, or the claims process to be conducted under any settlement agreement. Furthermore, any settled claims accompanied by any sort of releases of rights against the BP Parties may no longer be maintained and are defined to fall outside of the settlement class.

### TWENTY-FIFTH DEFENSE

State law-based claims asserted in this Complaint are barred, on the basis of the Bundle B1 and C Orders (State) issued by this Court, under the doctrines of claim or issue preclusion (*res judicata* or collateral estoppel) or law of the case.

### TWENTY-SIXTH DEFENSE

To the extent Plaintiffs' claims implicate the decision making of federal agencies, and they are otherwise valid, they are potentially subject to the doctrine of primary jurisdiction.

### TWENTY-SEVENTH DEFENSE

The BP Parties are not liable jointly and severally under OPA to the extent divisibility can be established.

## **TWENTY-EIGHTH DEFENSE**

There is no general federal common law after *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); hence the BP Parties cannot be liable under some unspecified body of "Federal Tort law."

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Dated: May 7, 2012                          Respectfully submitted,

                                            /s/ Don K. Haycraft_____
                                            Don K. Haycraft (Bar #14361)
                                            R. Keith Jarrett (Bar #16984)
                                            LISKOW & LEWIS
                                            701 Poydras Street, Suite 5000
                                            New Orleans, Louisiana 70139-5099
                                            Telephone: (504) 581-7979
                                            Facsimile: (504) 556-4108

                                            and

                                            Richard C. Godfrey, P.C.
                                            J. Andrew Langan, P.C.
                                            Andrew B. Bloomer, P.C.
                                            Timothy A. Duffy, P.C.
                                            Kirkland & Ellis LLP
                                            300 North LaSalle Street
                                            Chicago, IL 60654
                                            Telephone: (312) 862-2000
                                            Facsimile: (312) 862-2200

                                            and

                                            Robert C. "Mike" Brock
                                            Covington & Burling LLP
                                            1201 Pennsylvania Avenue, NW
                                            Washington, DC 20004-2401
                                            Telephone: (202) 662-5985

*Attorneys for the BP Parties*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of May, 2012.

/s/  Don K. Haycraft__