**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | :  MDL NO. 2179<br>:<br>:<br>:<br>:  SECTION: J<br>: |
| THIS DOCUMENT RELATES TO: | :<br>: |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | :  JUDGE BARBIER<br>:  MAG. JUDGE SHUSHAN<br>: |

. . . . . . . . . . . . . . . . . . . . . . .   .   . . . . . . . . . . . . . . . . . .. . . .

**CLEAN-UP RESPONDER DEFENDANTS' JOINT STATEMENT
OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR
INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT ON
<u>DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS</u>**

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1, the Clean-Up Responder Defendants[1] respectfully submit this Joint Statement of Undisputed Material Facts in Support of Their Individual Motions for Summary Judgment on Derivative Immunity and Preemption Grounds.

1.    The Clean Water Act ("CWA"), as amended by the Oil Pollution Act of 1990 ("OPA") following the EXXON VALDEZ spill, reflects the intent of Congress to ensure a rapid response to oil spills and to vest decision-making authority over response efforts in the federal government.  *See* Ex. 1 – Q&A's, U.S. Coast Guard, Containment/Cleanup Changes Since Exxon Valdez (HCG037-010125–010128) (referring to OPA as "a major legislative milestone for improving oil spill preparedness and response" following the EXXON VALDEZ spill).

2.    The National Contingency Plan ("NCP") is the federal government's blueprint for responding to oil spills.  *See* Ex. 2 – PowerPoint Presentation, Scott Lundgren, US Coast Guard, The National Response System (HCG042-009925–009957) (hereinafter "NRS PowerPoint Presentation"), at HCG042-009927–009928 (noting that the NCP "[p]rovided the first comprehensive national system for oil spill reporting and response" and "describes the national preparedness and response system for oil and hazardous materials.").

3.    The NCP establishes a multi-tiered and coordinated national response strategy known as the National Response System.  *See* Ex. 2 – NRS PowerPoint Presentation, *supra* ¶ 2, at HCG042-009931.

4.    Key components of the National Response System include:  (a) the National Response Team, which is comprised of fifteen federal agencies responsible for developing and reconciling

---

[1]  Marine Spill Response Corporation, Airborne Support, Inc., Airborne Support International, Inc., Lynden Incorporated, Dynamic Aviation Group, Inc., International Air Response, Inc., Lane Aviation, Inc., National Response Corporation, O'Brien's Response Management Inc., Tiger Rentals, Ltd., The Modern Group GP-SUB, Inc., The Modern Group, Ltd., and DRC Emergency Services, LLC.

intergovernmental policy issues that surface during an oil spill response; (b) Regional Response Teams ("RRTs"), which are located throughout the country based on Environmental Protection Agency ("EPA") Regions and are responsible for regional planning and coordination of preparedness and response action; and (c) Area Committees, which are usually based on Coast Guard Captain of the Port Zones for coastal areas.  *See* Ex. 2 – NRS PowerPoint Presentation, *supra* ¶ 2, at HCG042-009929, HCG042-009939; Ex. 3 – Excerpts from the On-Scene Coordinator Report—Deepwater Horizon Oil Spill (Sept. 2011), *available at* www.uscg.mil/ foia/docs/DWH/FOSC_DWH_Report.pdf (hereinafter "On-Scene Coordinator Report"), at 10– 11; Ex. 4 – Excerpts from the Coast Guard's Incident Specific Preparedness Review Final Report—BP Deepwater Horizon Oil Spill (Jan. 2011) (HCG042-014781–014944) (hereinafter "ISPR Final Report"), at 12–13 (HCG042-014798–014799).

5.      The purpose of RRT dispersant pre-authorization is to "allow[] the FOSC to quickly arrive at a logical 'GO/NO GO' decision" such that dispersant operations can "begin in a timely manner that is consistent with attempting to maximize the effectiveness of dispersant use as a countermeasure to reduce the impact of oil spills." Ex. 5 – Region VI Regional Response Team, FOSC Dispersant Pre-Approval Guidelines and Checklist, *available at* http://www.losco.state.la.us/pdf_docs/RRT6_Dispersant_Preapproval_2001.pdf (hereinafter "RRT VI Dispersant Pre-Approval Guidelines"), at 1.

6.      Once the use of dispersants is pre-authorized by an RRT, the FOSC may then approve the use of dispersants in response to an oil spill without obtaining specific concurrences from RRT representatives.  *See* Ex. 6 – Region IV Regional Response Team, Ocean and Coastal Waters Dispersant Use Policy, *available at* http://www.nrt.org/production/ NRT/RRTHome.nsf/Resources/DUP/$file/1-RRT4DISP.PDF (hereinafter "RRT IV Dispersant

Use Policy"), at 6; Ex. 5 – RRT VI Dispersant Pre-Approval Guidelines, *supra* ¶ 5, at 1.

7.     RRT pre-authorization plans may include checklists or decision-use elements for the FOSC to review prior to authorizing dispersant use, which are typically based on the application of available science to the specific environments in the region by the federal and state resource trustee agencies that are part of the RRTs.  *See* Ex. 6 – RRT IV Dispersant Use Policy, *supra* ¶ 6, at 113–117; Ex. 5 – RRT VI Dispersant Pre-Approval Guidelines, *supra* ¶ 5, at 5–11.

8.     Prior to the April 20, 2010 explosion and fire on the DEEPWATER HORIZON mobile offshore drilling unit, RRT IV (covering the States of Alabama, Florida, and Mississippi) and RRT VI (covering the States of Louisiana and Texas) pre-authorized the use of dispersants for oil spill response operations in their geographic areas of responsibility.   Ex. 6 – RRT IV Dispersant Use Policy, *supra* ¶ 6, at 3, 8; Ex. 5 – RRT VI Dispersant Pre-Approval Guidelines, *supra* ¶ 5, at iii–iv.

9.     The RRT IV pre-authorization plan approves the use of dispersants in all areas that are located at least three miles seaward of any shoreline, providing the water depth is at least ten meters deep.  *See* Ex. 6 – RRT IV Dispersant Use Policy, *supra* ¶ 6, at 9.

10.   The areas covered by the RRT VI dispersant pre-authorization plan include all off-shore waters that are either outside the ten meter isobath or are greater than three nautical miles from shore, whichever is farthest, out to a distance of two hundred nautical miles from shore. *See* Ex. 5 – RRT VI Dispersant Pre-Approval Guidelines, *supra* ¶ 5, at iii, 1.

11.   Under the RRT IV and RRT VI dispersant pre-authorization plans, dispersant spray operations may only be conducted during daylight hours.  *See* Ex. 6 – RRT IV Dispersant Use Policy, *supra* ¶ 6, at 116; Ex. 5 – RRT VI Dispersant Pre-Approval Guidelines, *supra* ¶ 5, at 1.

12.   Neither the RRT IV nor RRT VI dispersant pre-authorization plans indicate a limit on

the volume of dispersants that may be used to respond to an oil spill.   *See* Ex. 6 – RRT IV Dispersant Use Policy, *supra* ¶ 6; Ex. 5 – RRT VI Dispersant Pre-Approval Guidelines, *supra* ¶ 5.

13.   The RRT IV and RRT VI dispersant pre-authorization plans were "based, in part, on scientific input from EPA, federal and state resource trustee agencies, and applicable state environmental agencies, and address factors such as the potential sources of types of oil that might be spilled, the existence and location of environmentally sensitive resources that might be impacted by spilled oil, available product and storage locations, available equipment and adequately trained operators, and the available means to monitor product application and effectiveness."  Ex. 7 – Joint Stipulations of Fact Between the Clean-Up Responder Defendants and the United States of America (hereinafter "Joint Stipulations"), at ¶ 9.

14.   The RRT IV and RRT VI pre-authorization plans allow for the use of any dispersant on the NCP Product Schedule which the FOSC considers appropriate for the existing environmental and physical conditions.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 10; *see also* Ex. 6 – RRT IV Dispersant Use Policy, *supra* ¶ 6, at 12, Appendix VI; Ex. 5 – RRT VI Dispersant Pre-Approval Guidelines, *supra* ¶ 5, at 1.

15.   The dispersants used during the DEEPWATER HORIZON oil spill response—Corexit EC9500A and Corexit EC9527A, manufactured by Nalco Company—were listed on the NCP Product Schedule as of April 20, 2010, and remain on the NCP Product Schedule to this day. *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶¶ 3–4; *see also* Ex. 8 – EPA, National Contingency Plan Product Schedule (November 2011), *available at* http://www.epa.gov/osweroe1/docs/oil/ncp/schedule.pdf, at 4, 21, 24.

16.   Corexit EC9500A was first added to the NCP Product Schedule on April 13, 1994, and

re-listed on December 18, 1995 due to new federal legislation; at no point was it ever removed from the Schedule. Ex. 8 – EPA, National Contingency Plan Product Schedule, *supra* ¶ 15, at 4.

17.   Corexit EC9527A was first added to the NCP Product Schedule on March 10, 1978, and re-listed on December 18, 1995; at no point was it ever removed from the Schedule.  *See* Ex. 8 – EPA, National Contingency Plan Product Schedule, *supra* ¶ 15, at 4.

18.   Neither PES-51 (manufactured by Tesoro Environmental Products Company) nor OMI 500 (manufactured by JMN Specialties, Inc.) is a chemical dispersant; rather, these are decontamination cleaning chemicals that were approved for use by the Unified Command.  *See* Ex. 9 – ICS 213 – Period 120 (Aug. 18-19, 2010) (NRC023445).

19.   Before Corexit EC9500A and Corexit EC9527A were added to the NCP Product Schedule, the federal government was required to review the chemical composition and toxicity data for each dispersant and concluded that the dispersants could be safely and effectively used to respond to oil spills.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶¶ 5–7.

20.   "Efforts to control the source of the oil and to clean up the spill were governed by the provisions of OPA, the CWA, and the NCP, which together authorize the FOSC to direct and monitor all Federal, State, and private actions."  Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 13.

21.   The Incident Command System ("ICS") was the organizational structure used by the United States Department of Homeland Security to execute the oil spill response efforts.  Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 14.

22.   The Commander of the Coast Guard's Marine Safety Unit at Morgan City, Louisiana was the first FOSC to direct the response to the DEEPWATER HORIZON spill.  Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 17; *see also* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 1.

23.   As the search for missing crew members continued on April 21, it was determined that the response was going to be bigger than anticipated and the Commandant of the Coast Guard, Admiral Thad Allen, re-assigned the FOSC role to Rear Admiral Mary Landry, the Commander of the Eighth Coast Guard District.   Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 19.

24.   Rear Admiral Landry remained the FOSC until the end of May 2010 and was replaced by Rear Admiral James Watson on June 1, 2010.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 23.

25.   On July 12, 2010, Rear Admiral Paul Zukunft assumed the FOSC position from Rear Admiral Watson.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 25.

26.   Rear Admiral Zukunft remained the FOSC until December 17, 2010.  *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 221.

27.   Ultimate decision-making power was held by the FOSC and no action could be taken without his or her approval.  Ex. 10 – Excerpts from the Deposition of Douglas Suttles, May 19-20, 2011 (hereinafter "Suttles Dep."), at 225:8–17, 621:1–20, 628:14–17; Ex. 11 – Excerpts from the Deposition of Richard Morrison, Oct. 18-19, 2011 (hereinafter "Morrison Dep."), at 460:10–13.

28.   On April 23, 2010, Rear Admiral Landry established the Unified Area Command ("UAC") for the DEEPWATER HORIZON response at the Shell Training and Conference Center in Robert, Louisiana.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 19; *see also* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 1, 9.

29.   On June 16, 2010, the UAC headquarters was moved to New Orleans.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 24.

30.   Per NCP requirements, the UAC operated as the headquarters for the response under the leadership and direction of the FOSC.  *See* Ex. 10 – Suttles Dep., *supra* ¶ 27, at 620:20–621:1, 655:2–8, and 665:7–13.

31.   Richard Morrison estimated that there were "about 40" Coast Guard officials present at the UAC headquarters compared to "maybe 12" from BP.  Ex. 11 – Morrison Dep., *supra* ¶ 27, at 505:12–506:13.

32.   Richard Morrison also testified that "NOAA [r]epresentatives and their team" were at the UAC headquarters and, after the spill was declared a Spill of National Significance, "we saw Army, Air Force, Navy, [and] Marines join" the team in Robert.  Ex. 11 – Morrison Dep., *supra* ¶ 27, at 505:12–506:13.

33.   The UAC set the "strategy and direction" for the response operations, "monitor[ed] results," and "intervene[ed] when necessary."  Ex. 10 – Suttles Dep., *supra* ¶ 27, at 628:21–24.

34.   Although the UAC system is "intended to create consensus" among all of the different stakeholders when making decisions, the FOSC has "51 percent of the vote" and the "final word."  Ex. 10 – Suttles Dep., *supra* ¶ 27, at 225:8–17, 620:20–621:3; Ex. 11 – Morrison Dep., *supra* ¶ 27, at 460:6–9.

35.   The Coast Guard established five Incident Command Posts ("ICPs") during the response.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 15.

36.   The first two ICPs were formed on April 23, 2010 in Houma, Louisiana and Houston, Texas in conjunction with the formation of the UAC.  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 1.

37.   A third ICP was formed in Mobile, Alabama three days later.  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 1.

38.   ICPs in Galveston, Texas and Miami, Florida were formed later in the response and "remained relatively small operations."  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at vi.

39.   Each of the ICPs reported to the UAC and served as "operational units" that managed the various response operations.   *See* Ex. 10 – Suttles Dep., *supra* ¶ 27, at 628:21–629:6, 654:22–655:5.

40.   At each ICP, a Coast Guard Captain was appointed to act as a FOSC representative (termed a "FOSCR") and managed the response activities being coordinated out of their respective posts.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 29; *see also* Ex. 10 – Suttles Dep., *supra* ¶ 27, at 629:7–11.

41.   Throughout the DEEPWATER HORIZON spill response efforts, ICP Houston focused its efforts on source control activities and operations.  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 15.

42.   ICP Houston also conducted all of the sub-sea dispersant application operations.  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 15.

43.   Both ICP Miami and ICP Galveston managed near-shore and shoreline response operations for the west coast of Florida and State of Texas, respectively, and therefore were not involved in offshore response activities such as dispersant application or *in-situ* burning.  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 15.

44.   ICP Mobile managed off-shore, near-shore, and shoreline response operations for the States of Alabama and Mississippi, as well as for the Florida panhandle.  Ex. 12 – Excerpts from the Deposition of Robert Pfannstiel, Dec. 2, 2011 (hereinafter "Pfannstiel Dep."), at 86:9–24.

45.   ICP Mobile executed skimming, booming, beach clean-up, and Vessels of Opportunity ("VoO") operations, but did not conduct any dispersant or *in-situ* burning operations.  *See* Ex. 3

– On-Scene Coordinator Report, *supra* ¶ 4, at 14; Ex. 12 – Pfannstiel Dep., *supra* ¶ 44, at 104:11–16.

46.   ICP Houma managed off-shore, near-shore, and shoreline response operations for the State of Louisiana, including all aerial applications of dispersants to the surface of the Gulf of Mexico and all in-situ burning operations conducted during the response.   Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 13, 36, 45; *see also* Ex. 12 – Pfannstiel Dep., *supra* ¶ 44, at 87:22–88:9, 100:6–17.

47.   On April 29, 2010, pursuant to 40 C.F.R. § 300.323, the Secretary of Homeland Security designated the DEEPWATER HORIZON spill a "Spill of National Significance."  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 20; Ex. 13 – Memorandum from the Commandant of the United States Coast Guard (Apr. 29, 2010) (HCG027-000139).

48.   Pursuant to 40 C.F.R. § 300.323(c), the Secretary of Homeland Security then appointed Admiral Thad Allen, the outgoing Commandant of the Coast Guard and its only four-star Admiral at the time, as National Incident Commander ("NIC") for the DEEPWATER HORIZON spill response efforts.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 21; Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 6.

49.   During the DEEPWATER HORIZON spill response, consistent with 40 C.F.R. § 300.323(c), the NIC focused on unifying the government's response, particularly at the inter-departmental level, external communications, and certain technical issues, while the FOSC focused on conducting the response.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 22; Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 4, 6–8; Ex. 11 – Morrison Dep., *supra* ¶ 27, at 461:5–19.

50.   The NIC organization eventually grew to 138 members:  approximately sixty members were active duty and reserve Coast Guard, and the balance were from other federal agencies, including NOAA, DOI, DOE, DOS, and DOD.  *See* Ex. 4 – ISPR Final Report, *supra* ¶ 4, at 81–82.

51.   The NIC organization developed standardized daily reports in order to provide regular updates on spill response activities to senior governmental leadership.  Ex. 4 – ISPR Final Report, *supra* ¶ 4, at 81; *see also, e.g.*, Ex. 14 – National Incident Command – Deepwater Horizon Response (May 21, 2010) (NRC038374–038392).

52.   "The Clean-Up Responder Defendants participated in the DEEPWATER HORIZON spill response efforts in accordance with the roles, if any, assigned to them within the Unified Area Command system and the Incident Command Posts."  Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 28.

53.   Beginning on April 21, 2010 and continuing throughout the DEEPWATER HORIZON spill response, Incident Action Plans were prepared on a daily basis that contained detailed instructions concerning the response activities that were to occur each day, including health and safety instructions.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 26; Ex. 15-A – Excerpts from Incident Action Plan – Period 2 (Apr. 22-23, 2010); Ex. 15-B – Excerpts from Incident Action Plan – Period 5 (Apr. 25-26, 2010); Ex. 15-C – Excerpts from Incident Action Plan – Period 14 (May 4-5, 2010); Ex. 15-D – Excerpts from Incident Action Plan – Period 26 (May 16-17, 2010); Ex. 15-E – Excerpts from Incident Action Plan – Period 40 (May 30-31, 2010); Ex. 15-F – Excerpts from Incident Action Plan – Period 76 (July 5-6, 2010); Ex. 15-G – Excerpts from Incident Action Plan – Period 88 (July 17-18, 2010); *see also* Exhibits S-1 through S-36 to

Nalco's Renewed Motion to Dismiss (Rec. Docs. 5531-21 through 5531-56), which are hereby incorporated in their entirety by reference.

54.   Each Incident Action Plan was reviewed, signed, and approved by the FOSC and/or the FOSC's representative(s) and then delivered to the ICPs for execution by, among others, various Clean-Up Responder Defendants.  Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 26.

55.   The United States authorized and/or directed all spill response activities set forth in the Incident Action Plans as of the time each Incident Action Plan was issued.  Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 26.

56.   Between April 21, 2010 and July 19, 2010, the FOSC and/or the FOSC's representative(s) specifically authorized the use of the dispersants Corexit EC9500A and Corexit EC9527A on the surface of the water in the Gulf of Mexico as part of the DEEPWATER HORIZON spill response activities at various times and in various amounts.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶¶ 30–32.

57.   All aerial dispersant operations were managed by ICP Houma.  *See* Ex. 16 – After Action Report, Houma ICP Aerial Dispersant Group, Deepwater Horizon MC252 Aerial Dispersant Response (Dec. 31, 2010) (N9G001-000241–000320) (hereinafter "Dispersant Group After Action Report"), at 3 (N9G001-000243) ("This report is submitted to meet the requirements of the Regional Response Team 6 . . . for the use of dispersants in accordance with FOSC Dispersant Pre-Approval Guidelines and Checklist version 4.0 dated January 24, 2001, and to meet the post-incident report requirements of RRT 4 document entitled 'Use of Dispersants in Region 4' dated 8 October 1996.").

58. The command structure of ICP Houma was divided into four sections: Operations, Planning, Logistics, and Finance. *See* Ex. 17 – ICS 207 Organizational Chart – Period 25 (May 17-18, 2010) (HCG154-002946–002947).

59. The Operations Section of ICP Houma was further divided into six branches, and the Offshore Branch housed the Dispersant Group and the In Situ Burning Group. *See* Ex. 18 – ICS 207 Organizational Chart – Period 13 (May 3-4, 2010) (OBR046931).

60. Coast Guard personnel were assigned to each section and branch at ICP Houma, and all sections and branches ultimately reported to the FOSCR at ICP Houma and/or his deputies. *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 9, 18.

61. The Dispersant Group at ICP Houma ran its operations out of two airports—Stennis Space Center Airport in Mississippi and Houma-Terrebonne Airport in Houma, Louisiana. *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 36; *see also* Ex. 16 – Dispersant Group After Action Report, *supra* ¶ 57, at 12 (N9G001-000252).

62. Operations at both airports had separate spray aircraft and spotter aircraft, such that all dispersant spray aircraft were accompanied by spotter aircraft to ensure that no boats or platforms were located in the planned dispersant deployment area. *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 47; Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 36.

63. Dispersant Group members plotted and tracked the spray of dispersants and reported all dispersant-related data—including flight paths—up through the Unified Command and ultimately to the FOSC. *See, e.g.*, Ex. 19 – Aerial Dispersants Operations Map – Overview June 26, 2010 (OBR035772).

64. In accordance with RRT VI guidelines, BP submitted its first request to use aerial dispersants to the FOSC at Morgan City, Louisiana shortly after the explosion on the

DEEPWATER HORIZON.  Ex. 16 – Dispersant Group After Action Report, *supra* ¶ 57, at 26 (N9G001-000266).

65.  On April 21, 2010, the FOSC and/or the FOSC's representative(s) completed the "Dispersant Pre-Approval Initial Call Checklist" and "FOSC Dispersant Use Checklist" pursuant to the RRT VI guidelines and specifically authorized the use of dispersants in response to the DEEPWATER HORIZON spill at that time.  Ex. 16 – Dispersant Group After Action Report, *supra* ¶ 57, at 74–80 (N9G001-000314–000319); *see also* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶¶ 34–35; Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 34.

66.  "All surface application of dispersants [were] approved daily by the FOSC and [were] targeted on dispersible oil to minimize surface oil slicks impacting the environmentally sensitive shoreline ecosystem."  Ex. 20 – ICP Houma Aerial Dispersants Operations—Weekly Status Report (May 23-29, 2010) (OBR036351–036357), at OBR036351.

67.  On April 22, 2010, the FOSC authorized and instructed Clean-Up Responder Defendant Airborne Support, Inc. ("ASI") to conduct a trial application of up to 1,880 gallons of dispersants to oil on the surface of the water in the Gulf of Mexico.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 36; Ex. 16 – Dispersant Group After Action Report, *supra* ¶ 57, at 26 (N9G001-000266).

68.  In accordance with the FOSC's instruction, ASI applied 1,880 gallons of dispersants to oil on the surface of the water in the Gulf of Mexico on April 22, 2010.  This was the first instance in which any Clean-Up Responder Defendant applied dispersants to oil on the surface of the water in the Gulf of Mexico during the DEEPWATER HORIZON spill response.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 37; Ex. 16 – Dispersant Group After Action Report, *supra* ¶ 57, at 11 (N9G001-00251), 26 (N9G001-000266).

69.   Throughout the initial period of the response, the pre-designated FOSC in Morgan City—and later the FOSC and/or FOSCR at ICP Houma—approved dispersant operations on a daily basis.  *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 37.

70.   ICP Houma documented its dispersant operations in daily "Aerial Dispersants Operations" status reports, sometimes referred to as "Daily Aerial Dispersant Application Plans." *See, e.g.*, Ex. 21 – ICP Houma Aerial Dispersants Operations—Status Report (May 12, 2010) (OBR013639–013657).

71.   On May 26, 2010, the EPA and the Coast Guard issued Dispersant Monitoring and Assessment Directive – Addendum 3, which directed BP to eliminate the surface application of dispersants and provided that, "[i]n rare cases when there may have to be an exemption, BP must make a request in writing to the FOSC providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application.  The FOSC must approve the request and volume of dispersant prior to initiating surface application." Ex. 22 – Dispersant Monitoring and Assessment Directive, Addendum 3 (May 26, 2010) (HCG037-000238).

72.   Following the issuance of Addendum 3, BP and/or various Clean-Up Responder Defendants periodically submitted written requests to the FOSC and/or the FOSC's representative(s) and received written authorization from the FOSC and/or the FOSC's representative(s) before each and every application of dispersants to the surface of the water in the Gulf of Mexico.  *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶¶ 38–40; *see also* Exhibits V, X, and Y to Nalco's Renewed Motion to Dismiss (Rec. Docs. 5531-59 through 5531-61, 5531-63, and 5531-64), which are hereby incorporated in their entirety by reference.

73. The FOSC dispersant authorizations contained not only maximum volumes, but also restrictions concerning the location and manner of the approved applications of dispersants. *See* Exhibits V, X, and Y to Nalco's Renewed Motion to Dismiss, *supra* ¶ 72.

74. The Clean-Up Responder Defendants complied in full with each and every one of the FOSC dispersant authorizations. *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶¶ 41–46.

75. After the well was capped on July 15, 2010, dispersant staff and equipment began to demobilize, and the last application of dispersants was made on July 19, 2010. Ex. 16 – Dispersant Group After Action Report, *supra* ¶ 57, at 37 (N9G001-000277).

76. In an August 1, 2010 press conference, NIC Admiral Allen made the following statement regarding dispersants: "It's a decision by the [FOSC] whether to approve the incident commander's recommendation to use dispersants . . . . It's a very disciplined doctrinal process on how this works. In the end it may be executed by BP through a contractor. But these decisions are all made by the [FOSC] because that's where the responsibility rests." *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 48; *see also* Ex. 23 – Transcript, Press Briefing by National Incident Commander Thad Allen (Aug. 1, 2010), *available at* http://www.restorethegulf.gov/ release/2010/08/01/transcript-press-briefing-national-incident-commander-admiral-thad-allen-0.

77. NIC Admiral Allen concluded that "I'm satisfied that we only use [dispersants] when they're needed." *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 49.

78. The United States Coast Guard Special Monitoring of Applied Response Technologies ("SMART") protocol was developed by the Coast Guard, the National Oceanic and Atmospheric Administration ("NOAA"), the EPA, Centers for Disease Control and Prevention, and the Minerals Management Service, and has been approved by the National Response Team. *See generally* Ex. 24 – U.S. Coast Guard, et al., Special Monitoring of Applied Response

Technologies (Aug. 2006), *available at* http://docs.lib.noaa.gov/noaa_documents/648_SMART.pdf (hereinafter "SMART Protocol").

79. SMART is a monitoring program "for rapid collection and reporting of real-time, scientifically based information, in order to assist the Unified Command with decision-making during . . . dispersant operations." Ex. 24 – SMART Protocol, *supra* ¶ 78, at 1.

80. In its original Dispersant Directive, the EPA ordered that the SMART protocol be implemented for monitoring of surface dispersant operations during the DEEPWATER HORIZON response. Ex. 25 – Dispersant Monitoring and Assessment Directive for Subsurface Dispersant Application (May 10, 2010) (HCG027-003101–003106), at HCG027-003104.

81. Aerial dispersant operations during the DEEPWATER HORIZON response were monitored by SMART teams of federal officials that conducted multiple monitoring missions (via both vessels and airplanes) in conjunction with such operations and reported data back to the Unified Command. *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 36–37, 44.

82. Separate and apart from the SMART monitoring, "[t]he FOSC's representatives and other federal officials were present in the various Incident Command Posts to monitor the execution of the detailed instructions contained in the Incident Action Plans." *See* Ex. 7 – Joint Stipulations, *supra* ¶ 13, at ¶ 29.

83. As EPA Administrator Lisa Jackson told Congress on July 15, 2010, "EPA is one of many agencies providing support to the USCG-led federal response." Ex. 26 – Statement of Lisa P. Jackson, Legislative Hearing on Use of Dispersants in BP Oil Spill, *available at* http://yosemite.epa.gov/opa/admpress.nsf/0/571400992A5345A58525776100509550.

84. Although the EPA participated in "track[ing] the effectiveness of [the] response," Administrator Jackson acknowledged that the FOSC "of course reserves command control" of

16

the clean-up operations.  Ex. 27 – Transcript of May 24, 2010 Press Conference on Dispersant Use in the Gulf of Mexico with EPA Administrator Lisa Jackson and U.S. Coast Guard Rear Admiral Mary Landry, *available at* http://www.epa.gov/bpspill/dispersants/transcript-may24.pdf, at 4.

85.   After Addendum 3 was issued on May 26, 2010, "daily consultation with the EPA, via a senior representative at the UAC, was part of the required process" for the FOSC's approval of dispersant use.  *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 37.

86.   As EPA Assistant Administrator Paul Anastas said, "[w]hile it may be true that EPA may not have concurred on every decision or waiver of the amounts of dispersants being used, that is . . . a decision of the federal on-scene coordinator [and] [w]e do believe that overall the use of dispersants was one important tool in the overall response to this tragic oil spill."  Ex. 28 – Transcript of August 2, 2010 Conference Call with Paul T. Anastas on EPA's Second Round of Independent Dispersant Testing, *available at* http://www.epa.gov/bpspill/dispersants/conference-call-transcript-08022010.pdf, at 9.

87.   Throughout the course of the DEEPWATER HORIZON response, the FOSC had the "ultimate responsibility for . . . addressing worker health and safety concerns."  *See* Ex. 29 – U.S. Department of Labor, Occupational Health and Safety Administration, Deepwater Horizon Oil Spill:   OSHA's   Role   in   the   Response   (May   2011),   *available   at* http://www.osha.gov/oilspills/dwh_osha_response_0511a.pdf (hereinafter "OSHA's Role in the Response"), at 4.

88.   The NCP dictates that all oil spill response actions comply with the U.S. Occupational Safety and Health Administration's ("OSHA") Hazardous Waste Operations and Emergency Response ("HAZWOPER") Standard, 29 C.F.R. § 1910.120, as well as other relevant OSHA

requirements.  *See* Ex. 30 – Memorandum of Understanding Between the Occupational Safety and Health Administration, Department of Labor and the Federal On Scene Coordinator, Department of Homeland Security Concerning Occupational Safety and Health Issues Related to the Deepwater Horizon Oil Spill Response (HCG037-000249–000251) (hereinafter "OSHA/FOSC MOU"), at HCG037-000249; Ex. 29 – OSHA's Role in the Response, *supra* ¶ 87, at 3–4, 26–30.

89.   OSHA personnel were "quickly deployed" and "fully integrated" into the ICS in order to provide "technical assistance and support to the FOSC."  Ex. 29 – OSHA's Role in the Response, *supra* ¶ 87, at 4.

90.   OSHA and FOSC oversight of worker safety and health standards during the DEEPWATER HORIZON response was memorialized in a Memorandum of Understanding in which both entities agreed to "establish procedures for consultation and coordination . . . with respect to matters affecting the occupational safety and health of workers involved in the response to the Deepwater Horizon oil spill."  *See* Ex. 30 – OSHA/FOSC MOU, *supra* ¶ 88, at HCG037-000249; Ex. 29 – OSHA's Role in the Response, *supra* ¶ 87, at 4.

91.   By way of example, OSHA provided support to the FOSC by reviewing training programs for incoming clean-up workers, helping to determine the appropriate level of personal protective equipment ("PPE") to be worn by clean-up workers, preparing safety and health-related guidance materials for print and electronic distribution, and engaging in daily site visits all over the Gulf Coast.  *See* Ex. 29 – OSHA's Role in the Response, *supra* ¶ 87, at 4, 9–13, 26–30.

92.   Throughout the course of the DEEPWATER HORIZON response, OSHA, the National Institute of Occupational Safety and Heath ("NIOSH"), EPA, NOAA, and other governmental

agencies monitored daily air sample results/reports to ensure that clean-up workers were not exposed to harmful conditions.  *See, e.g.*, Ex. 31 – U.S. Department of Labor, Keeping Workers Safe During Oil Spill Response and Cleanup: Update on OSHA Activities (June 8, 2010), *available at* http://www.hsdl.org/?view&did=22775 (hereinafter "OSHA Keeping Workers Safe Report"); Ex. 32 – Summary of MC252 Crude Oil and Vapor Phase Sampling (May 17, 2010) (EPA010-001521–001528), at EPA010-001526.

93.   Air monitoring data collected by government agencies confirmed that exposure levels for toxic chemicals were generally not high enough to necessitate the use of respirators by clean-up workers.  *See* Ex. 31 – OSHA Keeping Workers Safe Report, *supra* ¶ 92, at 3 ("OSHA has found no exposures to toxic chemicals (including oil and dispersants) that would necessitate the use of respirators for cleanup workers.").

94.   The "Respiratory Protection" policy for the clean-up efforts was developed by the UAC and was based on air sampling results.  The UAC's policy determined the circumstances for which respirator use was required.  *See* Ex. 33 – E-mail from Steve Rupkey to Host of Recipients enclosing ICP Houma Fact Sheet on Respiratory Protection Employed in the MC-252 Response (June 24, 2010) (NRC035064–035069) (hereinafter "ICP Houma Respiratory Protection Fact Sheet"); *see also* Ex. 34 – NIOSH, Health Hazard Evaluation of Deepwater Horizon Response Workers, HETA 2010-0115, Interim Report #2 (July 12, 2010), *available at* http://www.cdc.gov/niosh/hhe/pdfs/interim_report_2.pdf, at 2B-9 (discussing respiratory protection policies with regard to *in-situ* burning).

95.   The UAC concluded that "[e]xtensive air sampling data do not indicate the need for respirator use."  *See* Ex. 33 – ICP Houma Respiratory Protection Fact Sheet, *supra* ¶ 94, at NRC035067.

96.   The UAC recognized that the "use of respirators places an additional load on the respiratory system and would lead to increased vulnerability to heat-related illnesses."  *See* Ex. 33 – ICP Houma Respiratory Protection Fact Sheet, *supra* ¶ 94, at NRC035067; *see also* Ex. 31 – OSHA Keeping Workers Safe Report, *supra* ¶ 92, at 3 ("Because of the potential health problems associated with respirators and the high heat and humidity conditions in the Gulf area, OSHA does not recommend the use of respirators unless a toxic chemical threat is identified.").

97.   OSHA agreed that "respirators should be considered the protection of last resort, as they can be physically taxing on the body, particularly for workers who have not used them before and in conditions of extreme heat."  Ex. 29 – OSHA's Role in the Response, *supra* ¶ 87, at 8.

98.   Results from Phase I of the EPA's testing on dispersants during the DEEPWATER HORIZON response were released on June 30, 2010 and showed that none of the dispersants tested—including Corexit—displayed biologically significant endocrine disrupting activity.  *See* Ex. 35 – E-mail Chain Forwarding EPA Press Release, EPA Releases First Round of Toxicity Testing Data for Eight Oil Dispersants (June 30, 2010) (EPA010-003023–003025).

99.   Results from Phase II of the EPA's testing on dispersants during the DEEPWATER HORIZON response were released on August 2, 2010 and showed that the dispersants tested had similar toxicities when mixed with Louisiana Sweet Crude Oil.  *See* Ex. 36 – Press Release, EPA Releases Second Phase of Toxicity Testing Data for Eight Oil Dispersants (Aug. 2, 2010) (N4Y001-000003–000004) (hereinafter "Aug. 2, 2010 EPA Press Release").

100. Based on its own testing, the EPA concluded that the dispersants used in response to the DEEPWATER HORIZON oil spill, when mixed with oil, were "generally no more or less

toxic than mixtures with other available alternatives."  Ex. 36 – Aug. 2, 2010 EPA Press Release, *supra* ¶ 99.

101. The EPA's dispersant testing results were peer reviewed and eventually published in independent scientific journals.  *See generally* Ex. 37 – Michael J. Hemmer, et al., *Comparative Toxicity of Eight Oil Dispersants, Louisiana Sweet Crude Oil (LSC), and Chemically Dispersed LSC to Two Aquatic Test Species*, 30 J. ENVTL. TOXICOL. & CHEM. 2244 (2011); Ex. 38 – Richard S. Judson, et al., *Analysis of Eight Oil Spill Dispersants Using Rapid, In Vitro Tests for Endocrine and Other Biological Activity*, 44 ENVTL. SCI. & TECH. 5979 (2010).

102. Screening by the EPA found that the potential dioxin exposure levels for clean-up workers and surrounding residents at risk of inhalation exposure or for anyone ingesting fish from waters near the spill were no greater than the risks of dioxin exposure incurred by the general population, despite the fact that the testing aimed to "overestimate the exposure and risks that could reasonably be expected to occur in the impacted populations."  *See generally* Ex. 39 – John Schaum, et al., *Screening Level Assessment of Risks Due to Dioxin Emissions from Burning Oil from the BP Deepwater Horizon Gulf of Mexico Spill*, 44 ENVTL. SCI. & TECH. 9383 (2010).

103. Testing by the Operational Science Advisory Team ("OSAT")—chartered by the FOSC on August 18, 2010—found that any measure of dispersant chemical compounds in the water or sediment near the coasts or wetlands in the Gulf of Mexico did not exceed the EPA's own benchmarks for increased risk and, in fact, in many of the collected samples there were no detectable dispersant compounds at all.  *See generally* Ex. 40 – OSAT, Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring (Dec. 17, 2010), *available at* http://www.restorethegulf.gov/sites/default/files/documents/pdf/OSAT_Report_FINAL_17DEC.pdf; *see also* Ex. 41 – Press Release, Restore The Gulf—Gulf Force Task Force,

Federal Oil Spill Response Transitions to Regional Structures, Releases Scientific Report (Dec. 17, 2010), *available at* http://www.restorethegulf.gov/release/2010/12/17/federal-oil-spill-response-transitions-regional-structure-releases-scientific-rep.

104. "Emergencies that fall under the Stafford Act give state and local governments a lead role in organizing [the] response, paid largely, but not entirely, by the federal government.  The NCP that governs oil spill response, however, gives the federal government [the] lead, impacted states a role in the [U]nified [C]ommand, and the Responsible Party (RP) a role in cleaning up the spill in terms of funding and participation in the [U]nified [C]ommand."  *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at vi.

105. "The role of the federal government is different in an NCP response compared to [a National Response Framework] response [under the Stafford Act].  In the latter, the federal government supports state and local activities.  In an NCP response, the federal government acts as the first responder."  *See* Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 97.

106. Pursuant to the NCP, the FOSC is to serve as "the lead federal official for oil removal and response operations" and is "responsible for directing and coordinating actions to remove the oil from the environment."  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at v–vi.

107. Unlike the "state-centric response organization . . . outlined under the Stafford Act," an NCP response places the federal government in charge, with "[t]he FOSC serv[ing] as the Unified Area Commander in accordance with established incident command doctrine."  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at vi, 4–5.

108. According to Doug Suttles, one of BP's two most senior employees holding a position within the Unified Command, "[T]he structure for Unified Command is set out – I believe it's set out in the National Contingency Plan and through ICS is that the FOSC has the ultimate

authority.  So it's a – Unified Command structure has the key stakeholders.  Those are set out in the plan.  And it – it tries to achieve consensus, but the ultimate decision rights are with the FOSC, which was a Coast Guard admiral. . . .  [T]he phrase being used consistently throughout the response was the FOSC has 51 percent of the vote.  We could not take action in the response without the approval of the FOSC. . . .  We could only use dispersants with the approval of the – of the FOSC and the Government."  Ex. 10 – Suttles Dep., *supra* ¶ 27, at 225:8–17, 620:24–621:3, and 622:2–4.

109. According to Richard Morrison, the other senior BP employee working in the Unified Command, "[w]e tried to collaborate clearly and . . . make joint decisions based on good data.  But if – if there was ever a conflict or if there was ever a disagreement on . . . Option A or Option B, the Federal On-Scene Commander had the final word."  Ex. 11 – Morrison Dep., *supra* ¶ 27, at 460:4–9.

110. The federal government's "decision to use dispersants required a robust assessment of net environmental benefits and monitoring activities at the wellhead, in the benthos, water column, water surface, and along the shoreline," and a "trade-off analysis determined the appropriateness of dispersant use."  Ex. 3 – On-Scene Coordinator Report, *supra* ¶ 4, at 33–34; *see also* Ex. 42 – Letter from NIC Thad Allen to Representative Edward J. Markey (Aug. 20, 2010) (HCG043-014021–014025) (discussing "the facts and considerations that the Federal On-Scene Coordinator (FOSC) weighed in authorizing [the use of dispersants], both before and after issuing Addendum III to the Dispersant Monitoring and Assessment Directive").

Dated: May 18, 2012

/s/ Michael J. Lyle
Michael J. Lyle (DC #475078, IL #6199227)
Eric C. Lyttle (DC #482856)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 682-7157
Facsimile: (202) 857-0940


Theodore E. Tsekerides (NY #2609642)
Jeremy T. Grabill (NY #4501755)
Sylvia E. Simson (NY #4803342)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8218
Facsimile: (212) 310-8007


Patrick E. O'Keefe (LA Bar #10186)
Philip S. Brooks, Jr. (LA Bar #21501)
MONTGOMERY, BARNETT, BROWN, REED,
    HAMMOND & MINTZ LLP
3300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3300
Telephone: (504) 585-3200
Facsimile: (504) 585-7688

Attorneys for O'BRIEN'S RESPONSE
MANAGEMENT INC. and NATIONAL
RESPONSE CORPORATION

/s/ Alan M. Weigel
Alan M. Weigel, Esq.
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone: 212-885-5000
Facsimile: 917-332-3836
E-mail: aweigel@blankrome.com

Attorneys for MARINE SPILL
RESPONSE CORPORATION


/s/ Leo R. McAloon, III
Leo R. McAloon, III (No. 19044)
E-mail: lmcaloon@glllaw.com
Michael D. Cangelosi (No. 30427)
E-mail: mcangelosi@glllaw.com
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011

Attorneys for DYNAMIC AVIATION
GROUP, INC.


/s/ Kevin R. Tully
Kevin R. Tully - #1627
H. Carter Marshall - #28136
Gregory S. LaCour - #23823
CHRISTOVICH & KEARNEY, LLP
601 Poydras Street, Suite 2300
New Orleans, Louisiana 70130-6078
Telephone: (504) 561-5700
E-mail: krtully@christovich.com
E-mail: hcmarshall@christovich.com

Attorneys for INTERNATIONAL
AIR RESPONSE, INC. and
LYNDEN INCORPORATED

/s/ Ben L. Mayeaux
Frank X. Neuner, Jr. (#7674)
Ben L. Mayeaux (#19041)
Jed M. Mestayer (#29345)
LABORDE & NEUNER
One Petroleum Center, Suite 200
1001 W. Pinhook Rd.
Lafayette, Louisiana 70503
Telephone: (337) 237-7000

Attorneys for AIRBORNE SUPPORT, INC. and
AIRBORNE SUPPORT INTERNATIONAL, INC.

/s/ George E. Crow
George E. Crow
LAW OFFICE OF GEORGE E. CROW
P.O. Box 30
Katy, TX 77492
For Overnight Physical Delivery use
1519 Miller Avenue
Katy, TX 77493
Telephone: (281) 391-9275
E-mail: georgecrow@earthlink.net

Attorney for LANE AVIATION, INC.

/s/ John E. Galloway
John E. Galloway (#5892)
Cherrell R. Simms (#28227)
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
701 Poydras Street, Suite 4040
New Orleans, Louisiana 70139
Telephone: (504) 525-6802
Facsimile: (504) 525-2456

Attorneys for TIGER RENTALS, LTD.,
THE MODERN GROUP, LTD., and
THE MODERN GROUP GP-SUB, INC.

/s/ Harold J. Flanagan
Harold J. Flanagan (Bar No. 24091)
Stephen M. Pesce (Bar No. 29380)
Brandon C. Briscoe (Bar No. 29542)
Sean P. Brady (Bar No. 30410)
Andy Dupre (Bar No. 32437)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 2405
New Orleans, Louisiana 70170
Telephone: 504-569-0235
Facsimile: 504-592-0251
hflanagan@flanaganpartners.com
spesce@flanaganpartners.com
sbrady@flanaganpartners.com
adupre@flanaganpartners.com

Attorneys for DRC EMERGENCY SERVICES, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Clean-Up Responder Defendants' Joint Statement of Undisputed Material Facts in Support of Their Individual Motions for Summary Judgment on Derivative Immunity and Preemption Grounds has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of May, 2012.


/s/ Michael J. Lyle
Michael J. Lyle