# EXHIBIT 1

Congressional Staff, DHS, OMB & Other Misc Q&As

#Q&As-03175

| For CG-82 use only | Requestor: Rep. G. Miller | DHS review required? |
|---|---|---|

## CONTAINMENT/CLEANUP CHANGES SINCE EXXON VALDEZ

QUESTION: How has oil spill containment/cleanup changed since the Exxon Valdez? For example, is there any comparison out there of the amount of oil recovered from major spills over the last 20 years? Is there anything that you're aware of comparing cleanup/containment requirements internationally?

ANSWER: Significant improvements have been made in oil spill response preparedness since that incident. The passage of the Oil Pollution Act of 1990 (OPA 90) was a major legislative milestone for improving oil spill preparedness and response. These improvements include:

**Preparedness:**
- OPA provides for a national response organization that brings together response partners at the National, State, Tribal, and local level.
    - National Response System (NRS) was enacted through the National Contingency Plan (40 CFR 300), which includes 16 Federal agencies responsible for nation-wide interagency planning, policy development and coordination.
    - OPA required the Federal On-Scene Coordinator (FOSC) for each area to chair an Area Committee (part of the NRS) consisting of representatives from Federal, State, local, tribal governments and the marine industry.
    - Area Contingency Plans (ACPs) were established to ensure a coordinated response by stakeholders. ACPs include the area covered, responsibilities of stakeholders, including responsible party and a list of available response equipment and capabilities.

- Preparation for a response requires strategic placement of people and equipment to ensure they are ready to respond and minimize the consequences of an event.
- Vessels, both tank and non-tank are required to maintain a Vessel Response Plan (VRP) that details actions to be taken in the event of a spill.
- The multi-agency, National Preparedness for Response Exercise Program (PREP) and Spill of National Significance (SONS) exercises are required to test response for average spill volumes as well as worst case discharges.
- Each year, the Coast Guard Marine Environmental Response program leads or participates in approximately 360 international and domestic exercises, formally trains over 600 personnel, maintains 11 international agreements, and coordinates with 15 federal agencies, 13 Regional Response Teams, 40 Area Committees, and hundreds of state and local agencies to ensure all stakeholders are prepared to respond to a pollution incident and maintain alignment with the National Response Framework.

**Response:**
- Coast Guard led the implementation of the Agency-wide Incident Command System (ICS) for pollution response and initiated required service-wide training.
- Pre-deployed response equipment is now staged throughout the country to allow for quicker response capabilities. Sites include the 19 largest ports.
- The Oil Spill Liability Trust Fund (OSLTF) was established to provide immediate access to funds for a rapid response.

Congressional Staff, DHS, OMB & Other Misc Q&As

#Q&As-03175

- Industry is required to maintain contracts with Oil Spill Response Organizations (OSROs) to ensure quick mobilization of equipment and enactment of trained personnel.
- The Strike Teams of the National Strike Force maintain specialized oil and HAZMAT skills and are available for immediate deployment anywhere in the United States.
- Nationwide, the average annual volume of oil spilled from tank barges has decreased drastically since 1991 (OPA 90) (excluding 2005 Hurricane Katrina data)
    - The five year (2002-2007) annual number of oil and chemical spills greater than 100 gallons per 100 million short tons shipped continues to decline. There were over 25 spills meeting these criteria in 2002, and by 2007 the number had decreased to less than 19.

Nevertheless, recovering spilled oil is an extraordinarily challenging task with historical recovery rates in the range of 15-20% or less. Individual spill recovery rates vary considerably depending on the spill source location, oil characteristics, weather, sun state, current tide, etc.

- The historical recovery rate for oil spills, on average, is 20% or less. Recovery rates above 20% are considered to be excellent by national/historical standards.
- Some spills have had considerably higher rates, but these are generally small spills in locations such as facilities with secondary containment or inside small harbors where the oil is contained by geographic features, and response equipment is readily accessible.
- In any oil spill, depending on the type of oil, significant portions of oil will evaporate, and/or disperse naturally in the water with relatively low environmental impact. For these reasons, a recovery rate of 20% does not mean that 80% of the oil remains in or on the water, beaches, or shorelines.
- Coast Guard vessel and facility response planning requirements (33 CFR Part 154/155) require recovery equipment sufficient to respond to a worst case discharge – defined as the loss of the entire vessel's full cargo in unfavorable weather conditions.
- The percentage of spilled oil actually recovered is one of several performance indicators. Recovery rates are largely dependent on environmental conditions and geographic areas, therefore not solely related to the effectiveness of recovery efforts.

FOSCs account for recovered oil, as well as, oil lost to evaporation, natural dispersion, or treated with an alternate technology such as dispersants or in-situ burning. NOAA Scientific Support Coordinators support FOSCs and inform and assist with verification of spill amounts.

Regional Response Teams (RRTs) and Area Committees are also required to address as part of their planning activities, the desirability of using appropriate dispersants, surface washing agents, surface collecting agents, bioremediation agents or miscellaneous oil spill control agents listed on the NCP Product Schedule, and desirability of using burning agents. RCPs and ACPs are required, as appropriate to include applicable pre-authorization plans that address the specific contexts in which such products should or should not be used. If the RRT representatives from the EPA and the states with jurisdiction over the waters to which the plan applies and the Department or the Interior and Department of Commerce natural resource trustees approve in advance the use of certain products (i.e., dispersants, in-situ burning) under specified circumstances described in the pre-authorization plan, then the On-Scene Coordinator (OSC) may authorize the use of the products without obtaining the specific concurrences required by section 40 CFR 300.910 (b) and (c) of the NCP.

Congressional Staff, DHS, OMB & Other Misc Q&As

#Q&As-03175

The Coast Guard's new response plan regulations contain requirements for on-water oil recovery capacity (referred to as the Caps Rule).  This regulation becomes effective on Feb 22, 2011, and requires all tank vessels to contract in advance for aerial observation and dispersant application capability.  This regulation will enhance the national response posture, enabling aerial tracking and subsequently better oil recovery rates, and the ability to disperse oil before it reaches shorelines.

The Coast Guard is unaware of any international comparison of clean up/containment requirements.

Congressional Staff, DHS, OMB & Other Misc Q&As

#Q&As-03175

| Program Drafter | LCDR Joe Lally, 2-2264, CG-5332 |
|---|---|
| Reviewed by | CDR Ed Bock, 2-2234, CG-533 |
| CG-821 Program Reviewer | LCDR R. Ore, 2-3512, CG-821 |

| NOTES/REFERENCE MATERIALS: Place information below that you wish all levels of review to be aware of. HOWEVER, Information from this point on will not be provided to the Witness. |
|---|

**Directorate/Program Notes:**

**CG-82 Notes (why changes were made to question):**

CLEARANCE SHEET (click to annotate clearance)

**Referenced materials**

|  | Link |
|---|---|
|  | Link |
|  | Link |