# EXHIBIT 3

| U.S. Department of Homeland Security<br><br>United States Coast Guard  | Commandant<br>United States Coast Guard | 2100 Second Street, S.W<br>Washington, DC 20593-0001<br>Staff Symbol: CG-5<br>Phone:  202-372-1001 |

16480

SEP 1 4 2011

# MEMORANDUM

From:



P. F. Zukunft
RADM, U.S. Coast Guard

M. L. Landry
RADM, U.S. Coast Guard

J. A. Watson
RADM, U.S. Coast Guard

R.A. Nash
RADM, U.S. Coast Guard

To:      The National Response Team

Subj:    *DEEPWATER HORIZON* ON-SCENE COORDINATOR'S REPORT

Ref:     (a) National Response Team ltr dtd November 18, 2010

1.  On November 18, 2010 you requested an On Scene Coordinator's Report for the *Deepwater Horizon* oil spill pursuant to 40 CFR 300.165.  The report provides descriptive information on the topics requested in reference (a), and additional focus areas provided by the Federal On-Scene Coordinators.

2.  On behalf of all *Deepwater Horizon* Federal On-Scene Coordinators, thank you for the opportunity to provide this report documenting the largest oil spill response undertaken.

#

Enclosure:   (1)  On-Scene Coordinator Report



# On Scene Coordinator Report *Deepwater Horizon* Oil Spill

Submitted to the
National Response Team
September 2011

The purpose of this report is to document the response to the oil spill that resulted from the explosion on the *Deepwater Horizon* mobile offshore drilling unit on April 20, 2010.

On November 18, 2010, the National Response Team (NRT) requested submission of an On-Scene Coordinator (OSC) Report for the *Deepwater Horizon* spill to the NRT Response Committee, pursuant to the National Contingency Plan (NCP). The NRT's request listed 33 specific topics be addressed in the report. The list of specific topics addressed in the report expanded to 56 to cover additional focus areas of the Federal On-Scene Coordinators (FOSCs).

## Organization of the Report

The NCP directs that OSC Report record the situation as it developed, the actions taken, the resources committed, and the challenges encountered (40 CFR 300.165(b)). This report consists of ten chapters that generally apply these themes to the 56 topics. The first of the NCP requirements is to account for the situation as it developed. Chapter 1 is a brief summary of significant events. At the end of the report is a much more detailed and comprehensive daily chronology of events to address the situation as it developed. Beginning with Chapter 2, the report is organized by the Incident Command System (ICS) structure: Command (Chapter 2), Operations (Chapter 3), Planning (Chapter 5), Logistics (Chapter 6), and Finance (Chapter 7). There is a separate chapter on Health and Safety (Chapter 4) although health and safety is usually within the Command Section under ICS. The Safety program was a significant FOSC focus. Given the scale of the response, and unique public health aspects, it merited a chapter of its own. Three other chapters that could have been included under existing ICS based chapters were covered in separate chapters. Natural Resources and Wildlife (Chapter 8) normally falls within the operations section, yet there was such a significant component of the response dealing with these issues that the subject stands on its own. This chapter also includes a discussion of Section 106 of the National Historic Preservation Act compliance, normally found under the Planning Section, as trustee agencies central to wildlife activities were also critical to historic preservation efforts. Government Personnel staffing is addressed in Chapter 9 to capture the challenges in sustaining the requisite number of trained personnel for a response of this scope and duration. Finally, Communications (Chapter 10) includes knowledge

management and communication with elected officials, the public, and the media, which were a key part of the response given the national and global level of interest in the disaster.

The report relies heavily on the written documentary record and the experiences of subject matter experts directly involved in the response. More than 200 people participating in the response, including Coast Guard members, representatives of other federal and state agencies, and private organizations, provided written input to be used in this report. Where needed, the Report Writing Team, consisting of the Deputy FOSC, four other Coast Guard officers, a petty officer, and three contract technical writers and design specialists, provided research assistance in extracting archived and response generated documents stored on the Homeland Security Information Network, the dedicated response server established by the Coast Guard, and federal government websites such as RestoreTheGulf.gov.

The report covers the period of April 20, 2010, the day the explosion took place on the *Deepwater Horizon* mobile offshore drilling unit, through March 1, 2011. Although the detailed chronology stops at January 31, 2011 and shoreline clean-up operations continue, this report does not capture operations occurring since March 1.

The FOSC is responsible for directing and coordinating actions to remove the oil from the environment. Restoration and recovery action taken to repair damage caused by the spill are outside the scope of the FOSC's responsibility and thus are not covered by this report.

## Chapter 1 and the Chronology: Situation as it Developed

The report addresses the requirement to describe the situation as it developed in two parts. Chapter 1 contains a short timeline of the spill and describes the efforts to contain and finally seal the Macondo well. Appendix I provides a much more detailed chronology, listing major response activities from April 20, 2010 through the end of January 2011. The magnitude of the spill cleanup can be surmised to a certain degree by the number of resources committed, and its impacts. Oil flowed from the well for 87 days. Two drilling ships, numerous oil containment vessels, and a flotilla of support vessels were deployed to control the source of the well, while 835 skimmers and approximately 9000 vessels were involved in

## Executive Summary

the cleanup. On the single most demanding day of the response, over 6000 vessels, 82 helicopters and 20 fixed wing aircraft and over 47,849 personnel/responders were assigned; 88,522 square miles of fisheries were closed; 168 visibly oiled wildlife were collected; 3,795,985 feet of containment boom was deployed; 26 controlled in situ burns were conducted, burning 59,550 barrels of oil; 181 miles of shoreline were heavily to moderately oiled; 68,530 gallons (1632 barrels) of dispersant were applied, and 27,097 barrels of oil were recovered.

### Chapter 2: Command and Control

The states viewed the spill as a disaster, declared states of emergency, and activated their emergency response agencies. Each of the Gulf Coast states and local governments were accustomed to the Stafford Act process. Emergencies that fall under the Stafford Act give state and local governments a lead role in organizing response, paid largely, but not entirely, by the federal government. The NCP that governs oil spill response, however, gives the federal government lead, impacted states a role in the unified command, and the Responsible Party (RP) a role in cleaning up the spill in terms of funding and participation in the unified command. The difference between these two frameworks was not well known or understood outside of the spill response community, and contributed to challenges and delays in the integration between federal, state, and local response efforts.

The FOSC is the lead federal official for oil removal and response operations in accordance with the NCP. The role of the National Incident Commander (NIC) is described from the perspective of the FOSC and the working relationship between the two. The working relationship between the NIC and the FOSC is designed to unburden the FOSC in the event of a Spill of National Significance (SONS). The SONS exercise process prepared the Coast Guard for the establishment of the National Incident Command, provided an understanding of the role of the NIC, and how the NIC supported the FOSC. From the FOSC perspective, the NIC stand up and assumption of responsibilities was very smooth, although there was constant readjustment of roles as the response progressed.

An exercise environment, however, is not the same as a bona fide Spill of National Significance. Actual establishment of an NIC was unprecedented. The exercise process did not emphasize the federal governance structure for oil spill response. The NCP

process was not familiar to the impacted communities. Through repeated natural disasters and emergency declarations, they were accustomed to a state-centric response organization as outlined under the Stafford Act. The NCP also did not address all of the key issues that came to the forefront during the response. The NIC, interacting with cabinet-level officials, was well positioned to adjudicate some of these issues. An example was seafood sampling and testing to ensure the safety of Gulf of Mexico seafood.

The FOSC served as the Unified Area Commander in accordance with established incident command doctrine, and under the Unified Area Command (UAC) eventually there were five Incident Command Posts (ICPs): Houston, Galveston, Houma, Mobile, and Miami. Houston focused on source control, while Galveston and Miami remained relatively small operations as the impact from the spill on their operating areas was limited. Houma and Mobile, however, became very large incident command posts, with many, large geographic branches reporting to them. The branches became so large that they became incident management teams of their own, and the sheer scale of the operation stretched existing ICS doctrine.

The size of the operation, duration of the spill, and public and political interest in the spill impacted the operation of the incident command structure in other ways. Regional Response Teams (RRTs), and the NRT assist the FOSC during the course of large spills. Because of the involvement of senior officials in each participating agency and the state and federal governments the NRT role was effectively subsumed into a NIC staff element called the Interagency Solutions Group. The RRTs also functioned in a manner different from previous spills due to the need to coordinate agency positions with very senior agency officials. State and local participation also differed, with senior state officials rather than the state spill response agencies often participating in the decision making process. The senior state officials and local officials did not fully integrate into the unified command construct in each case.

### Chapter 3: Operations

Response operations took place in four zones: at the source of the spill, offshore, near shore, and in shore. At the source, the drilling rigs and remotely operated vehicles necessary for deep water drilling were the only means of accessing the well. Offshore, as

**Executive Summary**

close to the source as possible, the response focused on removal of the oil. Key to these operations was large skimmers and in situ burn task forces. Skimmers, storage for the oil recovered by the skimmers, and fire boom were key resources. When oil could not be removed through these means due to environmental conditions (such as sea conditions), aerial application of dispersants was used. Near shore operations focused on skimming and the use of boom to protect sensitive areas, and later the protection of as much of the shoreline as possible. Obtaining as much boom as possible was a central concern of near shore operations. In shore operations used barriers such as Hesco Baskets to minimize shoreline impact. Once oil reached the shore, the long, arduous, labor intensive process of shoreline cleanup began. After the well was capped shoreline cleanup became the focus of continued response operations.

A key to effective response was understanding the oil. The Macondo well released Louisiana sweet crude oil. The term "sweet" refers to the low amount of sulfur. "Light" indicates the oil has many lighter ends, which evaporate quickly. Thus the oil was not as persistent as some other forms of crude oil, making it easier to remove.

**Source Control**. In any oil spill response, one of the first priorities is to secure the source. The NIC and FOSC directly participated in the efforts to stop and contain the oil flowing from the Macondo well, ensuring federal government involvement in the decision-making process for source control efforts in Houston. Next, the National Oceanic and Atmospheric Administration (NOAA) and other agencies applied many modeling techniques to provide the FOSC with information on oil spill trajectory to aid in planning response operations, and the flow rate to estimate the amount being spilled. Those agencies also participated in the development of the Oil Budget, to produce a scientific estimate of the fate of the oil spilled. The source control effort was a whole-of-government and industry response. The Department of Energy (DOE), Department of Interior (DOI), U.S. Geological Survey (USGS), and Coast Guard engaged extensively with the RP in these efforts. Other oil companies, including Shell and Exxon-Mobil, assisted with source control strategy discussions.

**Dispersants**. Dispersant was applied during this spill in three ways:

- subsea, at the source of the spill,

- on the surface, by vessels and support ships working at the well site near the drill rigs in order to control Volatile Organic Compounds (VOCs) that posed a health and safety threat to those crews, and

- aerially, to disperse oil slicks more than five nautical miles from the source control effort.

On May 26, 2010, after discussions with the Environmental Protection Agency (EPA), the FOSC issued Addendum III to existing directives on dispersants that required a significant reduction in dispersant use. The FOSC continued to approve the use of dispersants applied sub-sea, and on the surface by vessels for the control of VOCs in the vicinity of vessels at well site. Aerial applications were pre-authorized by the RRT, and approved by the FOSC on days when weather and sea conditions limited the effectiveness of skimming or in situ burns, or when slicks were headed toward land and alternative response methods would not be able to combat the slick in time. Surface application took place well away from shore. Dispersants effectiveness decreases dramatically within hours of the oil being released. Thus dispersant application near shore would have been ineffective, as the oil would then have been on the surface for days. Additionally, no dispersant was applied within 3 miles of shore in accordance with the existing preapproval criteria.

**In Situ Burning**. Significant in situ burning (411) operations were conducted during the course of the response that removed an estimated 250,000 barrels of oil. The in situ burn operation eventually grew to include three task forces each consisting of a three vessel ignition team, two task force vessels, one supply vessel, a safety team, and five fire boom teams. The task forces were directed to targets by spotter aircraft. There was also a complex process to make sure skimming teams, dispersant operations, and in situ burn teams stayed clear of one another. There were no injuries as a result of in situ burns and air quality testing near the burns was conducted to ensure worker safety.

**Skimming**. Skimming operations were divided into several different types:

- Offshore near the spill source (three nautical miles in the vicinity of the source and the leading edge of any observed oil slicks),

- Near shore (within three nautical miles), and

- Inshore at beaches, bays, and marshes.

## Executive Summary

Different types of skimming equipment were needed depending on location, sea conditions, and type of operation. Oil skimmers were the most critical oil removal resource at the peak of the response.

Oil coverage was not uniform. Rather than covering large areas of the open ocean as was perceived, recoverable oil away from surface waters just above the source could be found only in a very small percentage of the impacted northern Gulf of Mexico's surface waters. Offshore skimming required aircraft surveillance support and maneuverable vessels to locate and follow the streamers and tendrils of oil. These streamers were anywhere from a meter to several hundred meters in width.

**Shoreline Protection.** Protecting the shorelines of the impacted states was a critical part of the response operation. Containment boom was another critical resource. The desire of state and local governments to obtain and deploy boom led to negotiation of booming plans in the midst of the response. Generally, Area Contingency Plans identify sensitive areas and habitats for booming. The renegotiation process brought beaches used by the public within the scope of areas that had to be boomed. Many other protection strategies were used, including piling projects, water filled boom lined on the shore, and Hesco Baskets filled with sand. Louisiana also obtained funding from the RP at FOSC direction and permitting approval from the Army Corps of Engineers, to build sand berms along barrier islands, at an estimated cost of $360 million dollars. Alabama also obtained funding for smaller berm projects including a barrier for Katrina Cut.

**Search and Respond Standards and Quick Reaction Forces.** The Unified Incident Command developed a system, modeled after launch times for search and rescue assets, to use Coast Guard Maritime Safety and Security Team resources to do an on-scene assessment of new reports of oiling and allow cleanup assets to be prioritized based on that information. In order to ensure the highest priority impacts could be promptly addressed, Houma created Quick Reaction Forces and assigned response resources to them. These teams, mostly consisting of contract Oil Spill Response Organization personnel, could respond wherever most needed and were not tied to specific jurisdictions. Because of the competition among local governments for response assets, the initial work of these forces was complicated. However, once they proved their effectiveness and demonstrated that they kept response assets in reserve

in staging areas outside impacted jurisdictions, they became less problematic to local officials.

**National Guard and Department of Defense Support.** The National Guard provided support in many ways throughout the response, from helping to place barriers along the shoreline, to transportation, and coordinating emergency response communications. The process of obtaining National Guard and other Department of Defense (DOD) support involved arranging for payment of funding in advance, coordination with the Assistant Secretary of Defense for Homeland and America's Defense, the Joint Staff, NORTHCOM, the National Guard Bureau, and each state's Adjutant General. For the National Guard, Oil Spill Liability Trust Fund (OSLTF) funds were provided to fund activation under Title 32, thus the personnel worked for their respective states. This bifurcated process posed a challenge to the establishment of unity of effort within the federally-led Unified Area Command. Navy Supervisor of Diving and Salvage participated significantly. DOD also provided planners, public affairs support, and transportation resources. Tyndall Air Force Base provided the resources necessary to establish and operate the Aviation Coordination Center to prevent confliction within the airspace above response operations, most particularly near the offshore source control efforts.

**Shoreline Cleanup Assessment Technique and Shoreline Cleanup Operations.** Shoreline Cleanup Assessment Technique (SCAT) is the method for determining the most appropriate shoreline cleanup techniques weighing many variables for any given shoreline segment. These variables included amount of oil, type of shoreline, wildlife habitat, types and numbers of species present, archeological or historic properties concerns, etc. The teams consisted of representatives from the Coast Guard, NOAA, Fish and Wildlife Service (FWS) Section 7, National Park Service Section 106 Archeologists, other natural resource trustees, and state representatives. They ensured appropriate stakeholder review during the assessment process. Tribal liaisons and local government representatives participated whenever possible. SCAT experienced two significant challenges during the response: the amount of shoreline impacted, and the duration of the spill. SCAT was divided into three stages. Stage I covered the period while oil still flowed from the well. The primary focus was initial assessment to determine the scope of impact and review for re-oiling. Stage II focused on initial cleanup of bulk oil impacts. Stage III addressed the

entire shoreline in the fall 2010 after oil flow stopped and after initial cleanup efforts were well under way.

Scale created many challenges for SCAT. First, simply because of the amount of shoreline involved, there was significant demand for appropriately trained team members. Second, the breadth of impacted area led to significant challenges. Garnering consensus across five states on best management practices, shoreline treatment recommendations, and recommendations for no further treatment, which was complex. There were also significant logistics challenges to surveying all of the impacted shoreline. Many areas were remote. Some could only be accessed at certain points in the tide cycle. Some unique SCAT methods were also used. Because of the concerns about oil impacts to beaches used by the public, identification of tar mats just off shore was important as a means of identifying beach areas that needed to be closely watched for recurring tar balls. Snorkel SCAT used swimmers in these near shore locations to identify submerged tar mats and thus target shoreline cleanup resources.

Actual shoreline cleanup was a long, arduous process. The cleanup methods and concerns of the public were very different, depending on the type of shoreline. There were two predominant types of shoreline impacted by the oil, sandy beaches and marshes. Beach cleanup involved work crews sifting sand, removing tar balls, and digging out tar mats. Mechanical cleanup devices such as the Sand Shark, a mechanical digger and sifter that scooped sand, sifted tar balls through screens of different sizes, and put clean sand back on the beach, were also used. In beach areas used by the public, the biggest cleanup concern was to remove as much oil as possible in order to encourage the public to return to the beaches. On beach land managed by federal truste agencies the concern was more to ensure cleanup did not damage sensitive habitat.

Marshes posed different cleanup problems. Some marsh areas were heavily oiled. But many cleanup techniques posed significant risk of killing marsh grasses and thus accelerating shoreline erosion. Several minimally invasive techniques, such as swabbing with sorbents or low pressure flushing, were tried. But in certain areas, the environmentally prudent recommendation was "no further treatment" and to leave an oiled marsh alone.

**Alternative Technologies.** During the response more than 3,900 proposals for means of stopping the spill

or cleaning up the oil were presented to the FOSC, NIC, the RP and state leaders. The NIC assembled the Interagency Technology Assessment Program to evaluate these proposals. Ninety-six percent of the proposals were evaluated. The *A Whale*, a 1,100-foot cargo ship, serves as an example of the challenges posed by the process. The *A Whale* owners modified the ship in an attempt to convert it into a giant weir skimmer. They hired a publicist to help generate interest in their proposal. Despite several modifications and attempts to skim oil offshore with government engineers on board to witness the evolution, the concept proved ineffective.

**Concurrent Response and Natural Resource Damage Assessment.** Federal and state natural resource trustees and wildlife agencies played an important role in the spill response. These personnel aided the FOSC in understanding impacts and helped ensure response actions did not cause further damage to wildlife and their habitats. These agencies were the lead agencies in the Natural Resource Damage Assessment (NRDA), the cost of which is reimbursed by the RP. In this spill the NRDA process functioned in parallel with ongoing on-water and shoreline cleanup activities that stretched the resources of trustee agencies.

## Chapter 4: Health and Safety

Health and Safety was the number one strategic goal throughout this response and was reflected in:

1. Efforts made to address potential public health impacts of the spill, and

2. The remarkably low injury rate for responders across the operation.

Air testing and monitoring were done along the Gulf Coast to address concerns about the fumes from oil on the shore lines and other response activities. Waste and air toxicity testing were performed to monitor the potential impacts of in situ burns. NOAA and the Food and Drug Administration closed much of federal fisheries waters in the Gulf of Mexico during the spill out of concern that oil and dispersants might impact the suitability of fish caught in those areas for human consumption. NOAA and FDA conducted a robust seafood safety analysis program and established rigorous protocols for re-opening closed areas on a grid-by-grid basis.

At the peak, there were 47,000 people working on the response, from those drilling relief wells on ships fifty miles off-shore, to those working on skimming

# Executive Summary

and booming vessels, to work crews cleaning the shoreline. Thousands of personnel also worked to decontaminate oiled boom, vessels, and equipment. A significant safety organization staffed by federal agencies including the Occupational Safety and Health Administration, Public Health Service, Coast Guard, state, and private safety experts oversaw and examined broad aspects of worker safety. Some were not novel, such as awareness of slips, trips, and falls. These types of basic safety measures took on uncommon importance when, for example, vessels working boom and skimmers had their decks covered in oil for days at a time. Some safety measures were unusual, at least in their scale—air quality monitoring for VOCs for those working to control the well source was vitally important. The EPA worked with the State of Louisiana to increase the frequency of air sampling from the Louisiana shoreline air monitoring stations, and provided a website for citizens to be able to review for full transparency of information. Heat was a significant, overarching concern across the response. While the oil flowed from the well and for the first month after the well was capped, the heat index was frequently over 100 degrees Fahrenheit, which required careful planning to minimize heat related injuries.

## Chapter 5: Planning

There were two significant aspects of planning during the course of the response, beyond the daily ICS planning necessary to run such a large response organization. Existing plans, such as the Area Contingency Plans and the Marine Transportation System Recovery (MTSR) plans, were used. As oil reached the shore, and oil continued to flow from the well, the ACPs were modified and enhanced as the response continued. One new strategic plan was the Gulf-Wide Strategy that sought to enhance and replace the One Gulf Plan. The Gulf-Wide Strategy established ICP Miami consolidating operations from ICP St. Petersburg and ICP Key West into one command center. The Strategy also established the large equipment staging sites such as Theodore, Ala., and Gonzales, La. Not all the booming strategies in existing ACPs had been tested and not all plans identified sensitive areas. Containment boom and oil skimmers were critical resources in high demand, and became areas of particular concern. Boom amounts had to be brokered between jurisdictions, each wanting as much boom and other response resources as possible. The MTSR plan was activated, and proactive communication with the industry identifying the location of

oil was carried out, along with prompt establishment of stations to decontaminate vessels. These steps ensured the spill did not cause an unnecessary disruption to the movement of commerce in the marine transportation system.

The response also triggered new plans. Acquiring critical resources such as boom, skimmers and personnel started the strategic planning process, beyond the required ICS planning cycle. Severe weather had to be accounted for, as this was critical to personnel safety during this long response. With such a large operation that had grown dramatically just as hurricane season started, the FOSC had to ensure plans for dealing with severe weather were in place. Once the well was capped, planning was required to enable the orderly transition of response operations to a focus on shoreline cleanup, and to gain acceptance of transition plans from the affected states and communities. After such a protracted spill, reduction in the size of the response required careful coordination with state and local leaders. As part of the appropriate scaling of the response, the five incident command posts were consolidated into a single incident management team. As shoreline cleanup progressed into the winter, the stand down of the Unified Area Command required detailed planning and explanation. As the SCAT process determined which shoreline segments required no further treatment for the winter months, a plan was required to continue monitoring those shorelines for signs of oil exposed by winter storms, as well as a plan of action to respond to such reports.

Development of the administrative record of an oil spill response is required by the NCP. The five command posts and multiple branches and staging areas generated more than 27 million documents. Also, because of the potential for litigation surrounding the spill, federal responders saved all electronically stored information for possible electronic discovery.

## Chapter 6: Logistics

Several logistics matters were instrumental to operational success of the response. Given that BP, as RP, accepted responsibility for oil spill removal, significant logistical commitments and challenges were largely addressed by the RP with federal oversight. The FOSC and Unified Area Command (UAC) initially identified boom, skimmers, and personnel as critical resources. Due to a limited supply of the dispersant Corexit, it became a controversial resource. In addition to seeking those resources, the NIC and FOSC also received offers of assistance, many from overseas. As a result, the NIC and FOSC developed

processes for receiving and processing such offers. When assistance involved foreign flagged vessels, potential conflict arose with the Jones Act, which requires trade between U.S. ports be on U.S. flagged vessels. The requirements of the Jones Act can be waived. In the end, only seven Jones Act waivers were issued, primarily for specialized vessels working to contain oil from the well, and the Jones Act was not an impediment to the response.

**Vessels of Opportunity**. Several thousand Vessels of Opportunity (VOOs) and their crews were employed. These were private vessels hired by the RP to assist with the spill response. They performed duties such as placing boom, skimming oil, and on-water transportation and support services. The size of the VOO fleet required extensive coordination at both ICP Houma and ICP Mobile. Concern over equitable opportunities for work, use of commercial vessels only, and efforts to hire those from the local area to assist response efforts, made management of the VOO fleet complicated. This led to development of a VOO policy issued by the FOSC—a policy that standardized VOO usage and organizational structure, and established training and safety measures and contractual and logistical requirements. Despite these efforts, there were communications challenges with VOO, some due to language barriers and others due to the disparity of communication equipment installed in the vessels. As the response operation contracted, the generous day rates paid by the RP complicated efforts to reduce the size of the VOO fleet.

**Aviation Coordination**. At the height of the spill, aircraft shuttled people and supplies to the small city of vessels working to control the source, overflew skimming and in situ burn operations to direct surface assets onto concentrations of oil, applied dispersants where appropriate, surveyed shoreline impacts, and provided public affairs opportunities. All these operations put a large number of aircraft in close proximity and thus created risks. The FOSC worked with the FAA to develop a Temporary Flight Restriction (TFR) over response operations. Enforcing the TFR required visibility of aircraft in the area, to include those out near the source. Working with the UAC and the ICPs Air Operations Branch, Tyndall Air Force Base was able to provide the resources and technical expertise to improve aviation coordination over the operating area. ICP Houma and ICP Mobile established the priorities and aircraft tasking through the aircraft branch of the Operations Sections and set out in the Incident Action Plans (IAPs). By late June, the Aviation Coordination Center used the prioritization

set out in the IAPs to safely manage and prevent confliction within the airspace.

**Vessel Decontamination**. More than 9,000 vessels participated in the response. Some never touched oil and could quickly be released when they were no longer needed. Others spent weeks in the midst of oil. To clean vessels that came in contact with oil, the FOSC and RP set up significant vessel and equipment decontamination operating facilities across the Gulf Coast. Some smaller vessels and equipment could be pulled out of the water and pressure washed in containment pools. Larger vessels involved in oil skimming required dry docking with extensive cleaning of hulls, ballast tanks, and salt water service systems. In order to make the process efficient, the FOSC defined standards for decontamination, and employed Coast Guard marine inspectors and other trained personnel, providing a just-in-time training process to certify completion of the decontamination process.

Other logistics concerns had significant impact on response operations. Most logistics matters, including waste management and boom disposal, were handled by the RP. Sustaining government responders fell partly outside the RP's logistics arrangements. Communications and computer connectivity were limited in many areas impacted by the spill. The response operation also set up incident command posts, branches, and staging areas across five states, which required computer connectivity to operate. Communications had to be established with the thousands of vessels and hundreds of aircraft employed. The Coast Guard procured dedicated servers to fulfill its obligations to preserve electronically stored information.

The FOSC established policies for government specific logistics matters beyond communications. The RP provided lodging, transportation, food, limited medical, and command post facilities; government logistics ensured that the needs of government response personnel were taken into account. With the numbers of personnel cycling through the response, systems had to be established to track people when they checked in and methods to demobilize them. Property acquired by the government for the response had to be accounted for just as any other form of government property.

## Chapter 7: Finance

When the spill began, the Oil Spill Liability Trust Fund (OSLTF) had a response expenditure cap of $100 million per incident. Relatively soon, it

# Executive Summary

became apparent government expenditures would soon exceed that amount, and Congressional action was necessary to increase the per response cap. This was enacted and as of February 2011, the cap for the *Deepwater Horizon* response was $700 million.

It was, however, but a small fraction of the total costs the RP has paid to date. The solvency of the RP was pivotal in sustaining the unprecedented level of response.

The RP reimbursed the OSLTF for expenditures against the fund, although that did not act as a credit against the per incident cap. An RP is also responsible for claims arising from the spill. The National Pollution Funds Center directed the RP to take required steps to advertise the ability to make claims. These advertisements notified the public that if their claim was denied or they were unsatisfied with the RP's offer, injured parties could make a claim to the National Pollution Funds Center (NPFC).

Finance personnel were assigned to the UAC, the ICPs, and the Branches. Decentralized finance sections allowed greater flexibility to the response, but complicated documenting costs. Military Interdepartmental Purchase Requests (MIPRs) and Pollution Removal Funding Authorizations (PRFAs) authorize funding from the OSLTF for federal and state agency participation in a response. The Finance Section negotiated details of the MIPRS and PRFAs during the response, including assessing agency participation when the FOSC so directed. The process of tracking the costs associated with these arrangements required great attention to detail as the daily costs for various categories of government support had to be manually entered into electronic documentation workbooks. Tracking costs associated with credit card expenditures, travel orders, and reserve orders involved development of new, detailed methods and processes to ensure accurate accounting.

## Chapter 8: Natural Resources and Wildlife

**Marine Mammals**. There are 29 species of marine mammals and five species of sea turtles that inhabit the areas impacted by the spill. NOAA and the FWS established the marine Mammal and Sea Turtle Group within the Wildlife Branch of the Operations Section. The group coordinated its activities with existing marine mammal and sea turtle organizations of the Gulf Coast and elsewhere within the United States. Working with these organizations, protocols were developed for handling oiled animals and to

take in reports of marine mammals and sea turtles impacted by oil. In addition, the spill occurred just as the sea turtle nesting season was beginning across the shores of the northern Gulf of Mexico. In order to minimize the threat of losing many nests to oil impacts, sea turtles nests were excavated and relocated to Florida. Although initial observations found few dolphins stranded with externally visible oil, in early 2011 NOAA declared an unusual mortality event (UME) for dolphins in the northern Gulf of Mexico, and they continue to investigate the causes. The role that the spill may have played in the UME is as yet unknown

**Migratory Birds**. Similarly robust operations were established to respond to impacts on migratory birds. The FWS and state agencies coordinated efforts with the Audubon Society and existing networks of organizations working with migratory birds in the region. Coordination of volunteers, and ensuring volunteers had appropriate experience and training to assist with migratory birds eventually was performed by mutual agreement with the Audubon Society. Among the efforts to attempt to lessen the impacts to migratory birds, the Department of Agriculture (USDA) Natural Resource Conservation Service (NRCS) diverted funds for two existing migratory bird habitat initiatives to lease private farmland for flooding and flood appropriate public lands for migratory bird habitat. USDA sought FOSC funding to reimburse the programs for the expenses focused on the Gulf Coast. Ultimately, the FOSC determined not to provide the reimbursement from the OSLTF and the effort was later found to be ineffective in keeping migratory birds from reaching oiled shorelines.

**Endangered Species**. There are 26 endangered or threatened species in the Gulf of Mexico, ranging from sperm whales to the five species of sea turtles. Ensuring compliance with the Endangered Species Act for response operations involved bringing experts from NOAA, FWS, and other sources to develop and disseminate best management practices to adapt response operations, whether in situ burns or cleaning tar balls from beaches, to account for potential endangered species impacts. The work also involved providing trained spotters for skimming and in situ burn operations.

Ensuring adequate numbers of appropriately trained wildlife responders, supplying wildlife teams with necessary logistics support, and communicating wildlife related information across such an enormous organization spread across five states, proved challenging.

**Section 106 Compliance.** Approximately 778 archeological sites, including 113 newly discovered sites, were checked during the course of the response. There are eleven federally recognized tribes with traditional cultural properties and interests in the shorelines impacted by the *Deepwater Horizon* spill. There are also state recognized tribes with interests in the area. Historic preservation and tribal interests were folded into the response from early May, before there were shoreline impacts from the spill. Once the well was capped and the focus of response operations shifted almost exclusively to shoreline cleanup, formal consultations with historic preservation stakeholders took place in August, and the first of several government-to-government consultations took place in September.

## Chapter 9: Government Personnel

Sustaining the number of people required to direct response operations for a spill of this size and long duration, proved difficult for every government agency. Agencies that regularly participate in oil spill response have a cadre of highly trained people experienced in spill response work. The response soon outgrew the number of those people in almost every agency, including the Coast Guard. This posed two interrelated challenges. The first was simply staffing the response itself, given that all the agencies that participated had other missions to fulfill. Finding personnel to support the response effort while still maintaining enough staff to enable agencies to carry out their other missions proved difficult. Second, the number of people required exceeded the number with significant training and experience in spill response. Thus these agencies, including the Coast Guard, had to develop just-in-time training methods to bring in the numbers of personnel required to oversee operations and provide them with the training necessary to perform their functions.

The Coast Guard mobilized 14 percent of its total workforce, active duty and reserve. FWS and NOAA deployed approximately 17 percent of their workforce. For contingencies such as the *Deepwater Horizon* spill, the Coast Guard relies on the Coast Guard Reserve. The Reservists can be, and were, ordered to active duty under Title 14 of the U.S. Code. While this process makes Reservists immediately available, they can only be ordered to active duty in this manner for 60 days at a time. After that period of service, unless the Reservist volunteers for further activation, they cannot be recalled for two years. Due to this limitation, managing the availability of Reservists became a significant challenge; however, the number of Reservists who volunteered to continue to work on the DWH response under different arrangements certainly sustained the effort in a meaningful way.

## Chapter 10: Communications

**Common Operating Picture.** One of the central challenges in communicating about the response was developing a common operating picture that all stakeholders could access. After initially being used to help with oil spill trajectory, on June 5, 2010, the NIC directed that NOAA's Environmental Response Management Application (ERMA) would be the common operating picture (COP) for the Deepwater Horizon response. ERMA provided the ability to use Geographic Information System tools to track every aspect of the response, ultimately growing to thousands of data layers covering a wide array of response operations. It also allowed a scaled version of the COP to be posted on the Internet as GeoPlatform.gov, where the public could view response status information.

**Standard Information Reporting.** As the public and government officials learned of the potential impact of the spill, requests for information about response activities added a requirement for distilled information for distribution and posting. Daily Incident Action Plans, which contained information about response operations, quickly became so large that they were not useful for conveying information to senior officials or to the public. A standard set of measurements of resources and operations was developed, which provided a repeatable set of statistical information reported out from the response organization.

**Interaction with Federal and State Officials and Congressional Affairs.** In April through August 2010, over sixty percent of the Congressional inquiries to the Coast Guard were related to the *Deepwater Horizon*. Seventeen Congressional hearings as well as numerous Congressional Delegation hearings were conducted during the response phase of the incident. To ensure the concerns of local elected officials were accounted for in response operations, DHS hosted a daily call-in for local elected officials, which included a FOSC situation report followed by a question and answer session. In addition, the White House hosted a daily call that included the NIC, the FOSC, and the governors of the five impacted states. The states received the same daily summary as the White House.

## Executive Summary

To improve information flow, Deputy FOSC Representatives (Deputy FOSCRs) were assigned to the governors of Alabama, Mississippi, and Florida, while the Coast Guard sent a liaison to the staff of the Louisiana governor and the FOSC, already located in Louisiana, met with him frequently. FEMA deployed a Governmental Relations Team of 80 people to assist in communications with local government leaders, interested citizens, and businesses.

**Interaction with Local Government and Affected Communities.** Interaction between the response and government leaders did not stop with the governors. An extensive liaison network of approximately 70 officers was established to respond to the needs of local officials. Liaisons, most particularly with the parish presidents of the coastal parishes in Louisiana, improved coordination between the response and local officials. Coast Guard Liaisons were also sent to local and state emergency response operations to improve communications and understanding of response needs. These liaisons filed daily information reports that were communicated to officials in Washington.

The FOSCs and Incident Commanders also reached out to the local communities. They found that expo type meetings, consisting of booths and tables with information and subject matter experts on various issues of concern to the public and specific aspects of response operations, were effective in communicating the status and challenges of the response. This was in contrast to town hall style meetings that were emotionally charged and did not contribute to inspiring public trust.

**Strategic Communications.** Strategic Communications for the response began with the Coast Guard and RP using the Joint Information Center (JIC) model generally used for oil spills. Over time, however, this model became more of a hybrid of the National Response Framework's ESF-15 structure that places media, governmental, and congressional affairs in one federal entity, with a limited JIC embedded.

By June, the NIC took over primary responsibility for addressing the national media on a daily basis about actions and items of interest, while the FOSC remained responsible for dealing with local media and state and local government leaders. The NIC focused on addressing the complexities of the relief well effort and source control. The FOSC addressed oil spill response, removal, and impacts. This large, full service communications structure remained in

place until after the well was capped when media interest diminished and allowed reduction in the communications staff, along with scaling back of the rest of the response organization.

As with many other areas of the response organization, it was difficult to sustain the number of staff required with the appropriate skills to handle both traditional public affairs and community and intergovernmental relations. The willingness of other agencies to provide public affairs specialists to assist was a significant help.

### Conclusion

The *Deepwater Horizon* oil spill response was ultimately successful, due to the unity of effort and perseverance of the more than 1000 organizations that contributed to this unprecedented response. The NCP was proven sound, and the Incident Command System's scalable organizational structure proved critical to multiple agencies working with the RP toward common goals under an effective construct. The division of responsibilities between the NIC and staff working at the National level, and the FOSC serving as Unified Area Commander at the regional level, was effective in managing national, regional and local demands of this first "Spill of National Significance."

The *Deepwater Horizon* incident occurred in spite of the presence of a blowout preventer. The oil spill impacted the marine environment and the lives of so many along the Gulf of Mexico. The mitigation effort to secure the well source was a three-month process (87 days), and the resulting spill response effort became extraordinarily large and complex. Based on these facts, we conclude that significant improvements need to be made in preventative technology and requirements, mitigation technology and required capabilities, and oil spill response methods and readiness.

On April 20, 2010, 126 workers on the mobile offshore drilling unit *Deepwater Horizon* were in the process of temporarily closing the exploratory Macondo oil well. That evening, an explosion aboard the drilling unit set off a chain of events that eventually led to the sinking of the *Deepwater Horizon*. Eleven crewmembers lost their lives and others were seriously injured, as fire engulfed and ultimately destroyed the rig.

At 10 p.m. CST on April 20, watch standers at the U.S. Coast Guard District Eight command center received a report of an explosion and fire aboard the *Deepwater Horizon*, located approximately 42 miles Southeast of Venice, La. A search and rescue effort began soon after, with Coast Guard District Eight as the Search and Rescue Mission Coordinator. Concurrently, Coast Guard Marine Safety Unit Morgan City, La., began a pollution response case and marine casualty investigation. Aircraft involved in the search reported a variably colored sheen on the surface of the water, two miles long by half-mile wide.

By April 21, 115 of the 126 workers were accounted for. The Coast Guard continued to search for survivors, dispatching 28 air and surface sorties, covering approximately 5,375 square miles. At 5 p.m. CST on April 23, the Coast Guard suspended the search. Initial debriefs of the surviving crewmembers placed the 11 missing in the vicinity of the initial explosions.

The Commanding Officer of Marine Safety Unit Morgan City, La., became the first Federal On-Scene Coordinator (FOSC) to direct the oil spill response. As the search and rescue continued, it was determined the response had the potential to eclipse all others and impact a large portion of the Gulf Coast region. Therefore, the Commandant of the Coast Guard re-assigned the FOSC role to the Commander of Eighth Coast Guard District.

On April 22, dispersants were used for the first time.

On April 23, the FOSC established a Unified Area Command (UAC) in Robert, La. The UAC served as headquarters for the regional response and eventually included representatives from the federal government, Alabama, Florida, Louisiana, Mississippi, and the Responsible Party (RP).

The Coast Guard Incident Command Posts (ICPs) in Houma, La., and Houston, Texas, were also established on April 23. These ICPs, along with one in Mobile, Ala. established on April 26, 2010, would become the centers of response operations.

On April 29, the *Deepwater Horizon* incident was declared a Spill of National Significance, the first time the federal government used that designation. The declaration permitted a newly designated National Incident Commander to assume the lead role of communicating with affected parties and the public, and coordinating all federal, state, local, and international resources at the national level.

Between May 6 and May 8, the RP unsuccessfully attempted to place a large containment dome, or cofferdam, over the larger of two leaks from the broken riser at the sea floor.

On May 11, Louisiana applied to the Army Corps of Engineers for an emergency permit to construct six large, linear sand berms along Louisiana's barrier islands to guard the coastline from oil. Two weeks later, the Corps approved an emergency permit for a portion of the berms. Just over one week later, the RP began funding all six Louisiana sand berm reaches. The National Incident Commander had also authorized one of the six as a prototype oil spill response mechanism.

On May 12, the RP released a 30-second video of oil and gas streaming from the end of the broken riser.

By mid-May, the Coast Guard evolved the organizational structure for the response and along with other response agencies, began to move resources into the area from all over the country.

As oil flow rate estimates had gone from 1,000 to 5,000 barrels per day, and the RP was unable to ascertain with any certainty the conditions at the wellhead inside of the blowout preventer (BOP), the federal government became increasingly concerned with flow rate estimates. To determine the flow amount, the National Incident Command created an interagency Flow Rate Technical Group and charged it with generating a preliminary flow rate.

On May 26, the Environmental Protection Agency announced that the government instructed the RP to take immediate steps to scale back the use of dispersants. Also on May 26, the RP began a top kill, a process that involved pumping heavy drilling mud into the top of the well at high pressure. After the third unsuccessful attempt, the RP and the government agreed to discontinue the strategy.

On May 27, the Flow Rate Technical Group estimated the range of oil flow from the source

## 1. Situation as It Developed

between 12,000 to 19,000 barrels per day (flow rates of up to 25,000 barrels per day were also consistent with data). On May 28, the President of the United States directed federal manpower and resources responding to the spill be tripled.

On May 29, the RP announced that it would attempt to cut off the portion of the riser still attached to the top of the BOP on the sea floor and install a collection device—the top hat—that would then be connected via a new riser to the *Discoverer Enterprise*.

On June 1, 2010, Rear Admiral James Watson assumed the role of FOSC.

On June 3, the top hat was in place and functioning at the source. By June 8, the *Discoverer Enterprise* was collecting nearly 15,000 barrels of oil per day.

On June 16, the vessel *Q4000* became operational, and was processing and burning up to 10,000 barrels of oil per day.

On July 9, the National Incident Commander authorized the RP to install a capping stack, but not to close it. The operation began the next day and by July 12, the RP had finished installing the stack. On July 15, the RP closed the stack and a well integrity test commenced.

On July 12, Rear Admiral Paul Zukunft assumed the role of FOSC.

On August 3, the RP began a static kill—an operation that involved pumping heavy drilling mud into the well to push oil and gas back into the reservoir. The static kill succeeded and was followed with cement. On August 8, the National Incident Commander reported that the cement had been pressure tested and was holding.

In mid-September, the first relief well intercepted the Macondo well, allowing the RP to permanently seal the reservoir. On September 19, the National Incident Commander announced the Macondo well was effectively sealed.

On September 20, 2010, the ICPs in Houma, La., and Mobile, Ala., were disestablished, and operations were consolidated under the Gulf Coast Incident Management Team in New Orleans, La.

On October 1, 2010, the National Incident Command was disestablished.

The response to the *Deepwater Horizon* spill continues. As of July 15, 2010—the day the well stopped flowing—the response involved approximately 47,000 responders, more than 6,870 vessels (including skimmers, tugs, barges, and recovery vessels), approximately 4.12 million feet of boom, 17,500 National Guard troops from Gulf Coast states, five states, multiple corporations, and untold hours of work by federal, state, and local officials, employees or contractors of the RP, and private citizens.

# 2. Command and Control

The *Deepwater Horizon* spill was the first Spill of National Significance (SONS) and the first to have a National Incident Command (NIC) designated. At its peak, more than 47,000 people worked on the response in total and more than 6,870 vessels were employed in response efforts. Oil from the spill directly impacted five states. Because of the size and scope of the spill, the response organization required to combat it was unique in many respects.

## 2.1 Setting the response structure of the *Deepwater Horizon* Response

- The size and scope of this incident required significant coordination of public and private resources. The command and control structure maximized the Federal On-Scene Coordinator's (FOSC) work with other federal, state, and local stakeholders to address the highest operational needs.

- One National Incident Command (NIC) was established in Washington, DC, to coordinate the 'whole of government' response to the incident.

- One Unified Area Command (UAC) was established to oversee operational activities across the entire Gulf Region.

- Five Incident Command Posts (ICPs) were established to coordinate operations with local and regional elected officials. ICPs Houma and Mobile were the most robust and active for spill response operations.

- Branches and Staging Areas were established to coordinate the efficient and effective distribution and employment of critical resources across regional boundaries. Figure 2.1 below outlines the location of the UAC, different ICPs, and individual Branches. Branches are annotated as Staging Areas (S) only for the purposes of this graphic.

**Figure 2.1:**



*Deepwater Horizon Response Command Locations*

**Command Locations as of July 16, 2010**

After the *Deepwater Horizon* Mobile Offshore Drilling Unit sank on April 22, 2010, the first FOSC was the Commanding Officer of the Marine Safety Unit (MSU) in Morgan City, La. The MSU Commanding Officer was assigned FOSC responsibility in the Area Contingency Plan, which was developed in accordance with the National Contingency Plan (NCP). From its outset the spill had the potential to impact several states, so the Sector Commander for Sector Mobile, whose area of operating responsibility covered Alabama, the Florida panhandle, and Mississippi, assumed the responsibilities of the FOSC for the Sector Mobile response area.

The process to make the Eighth District Commander the FOSC was not as clear-cut as the pre-designation of the Coast Guard Sector Commanders. While 40 CFR 300.120(a) clearly gave the district commander the authority to designate a FOSC, the regulations did not clearly designate that position

*ROBERT, La. – Rear Admiral Mary Landry (center), the Federal On-Scene Coordinator for the Deepwater Horizon incident, talks with U.S. Coast Guard Commandant Admiral Thad Allen (right) before his speech to the members of the Unified Area Command. Photo courtesy of U.S. Coast Guard*

## 2. Command and Control

as a FOSC, nor was it designated as such within the ACP. To remove any possibility for confusion, and because of the recognized potential for oil to impact several states, the Commandant of the Coast Guard designated the Eighth Coast Guard District Commander Rear Admiral Mary Landry as FOSC on April 23, 2010, without regard to district boundaries. On the same day, the newly named FOSC established the Unified Area Command (UAC) in Robert, La., and became the Unified Area Commander. The practice of having the Commandant designate a *Deepwater Horizon* Response FOSC continued until November 2010, when the authority to designate the FOSC returned to the Eighth District Commander. Following the FOSC designation, the U.S. Department of Homeland Security Secretary Napolitano declared the *Deepwater Horizon* spill a Spill of National Significance and named Admiral Allen, then Commandant of the U.S. Coast Guard, as the National Incident Commander on May 1, 2010.



*GULF OF MEXICO – Department of Homeland Security Secretary Janet Napolitano and Environmental Protection Agency Administrator Lisa Jackson receive a brief from Rear Admiral Mary Landry, Federal On-Scene Coordinator for the Deepwater Horizon incident, as they conduct an aerial survey of the Gulf Coast. Photo courtesy of U.S. Coast Guard*

The FOSC has authority to direct response operations under Section 311(c) of the Clean Water Act. The National Incident Commander did as well, at first due to the authority of the Commandant of the Coast Guard, and after his retirement from the Coast Guard, through express delegation by the Secretary of DHS. Although the two roles had the potential for overlap, in practice a natural division of labor developed between the two. The National Incident Commander focused on unifying the government's response, particularly at the inter-departmental level, external communications, and technical issues such as source control, assessing oil flow, and containing oil from the well, and issues emanating from the response that were outside the NCP. The FOSC focused on conducting the response, addressing the concerns of state and local leaders, and oil removal and mitigation measures across affected areas. In addition, the FOSC was responsible for approving all response related expenditures from the Oil Spill Liability Trust Fund (OSLTF), and also delegated some expenditure authority to the Incident Commanders in Houma and Mobile.

The Coast Guard was also sensitive to the NCP requirement that there be only one FOSC for the spill at any time. This requirement was reflected in the organizational construct depicted in Figure 2.2 below. The construct placed the FOSC in charge of directing response operations within the UAC and designated Incident Commands (ICs) at the ICPs located in Galveston, Texas, Houma, La., Houston, Texas, Miami, Fla., and Mobile, Ala. Each ICP Commander was furthermore designated as a FOSC Representative (FOSCR) with authorities specifically assigned. This designation was consistent with the NCP, and the Coast Guard delegation of authority in 33 CFR 1.01-85.

The National Oil and Hazardous Substances Pollution Contingency Plan, or NCP, is the federal government's blueprint for responding to both oil spills and hazardous substance releases. Specifically, the NCP establishes the National Response System, a multi-tiered and coordinated national response strategy. Key components of the National Response System include the National Response Team (NRT), Regional Response Teams (RRTs) located throughout the country based on Environmental Protection Agency (EPA) Regions, Area Committees usually based on Coast Guard Captain of the Port zones for coastal areas, the FOSC, UAC, and the National Incident Commander.

Congress first established the NCP in 1968 after the 37 million gallon *Torrey Canyon* tanker spill off the coast of England. The Federal Water Quality Act of 1970, which became the Clean Water Act in 1972, required the President to publish a NCP. Although a version of the NCP was in place at the time of the *Exxon Valdez* spill, Congress responded to that spill by passing the Oil Pollution Act of 1990 (OPA 90), which directed the President to expand the NCP. The authority to expand the NCP was later delegated to EPA, which implemented this mandate with amendments to the NCP promulgated in 1994.

The 1994 amendments to the NCP focused on expanding federal authority to coordinate effective communication and deployment of equipment. Specifically, the amendments prescribed additional responsibilities for the FOSC and strengthened their ability to direct the on-scene response. The amendments also called for the creation of Area Committees and Area Contingency Plans under the leadership of the FOSC. To ensure that contingency plans would result in companies and responders undertaking more realistic preparation for future

## 2. Command and Control



**Figure 2.2:**
**Unified Area Command**

spills than they had for the *Exxon Valdez* disaster, the 1994 amendments required contingency plans to consider a worst-case discharge scenario.

### The Role of the Responsible Party under the Oil Pollution Act of 1990

Under the OPA 90 framework, a responsible party (RP) is strictly and jointly liable for removal costs and certain damages in connection with a discharge of oil, or a substantial threat of a discharge of oil, into or upon the navigable waters, adjoining shorelines, or the exclusive economic zone of the United States.

The NCP directs that the RP play a role in the response. One of the principles of the unified command structure directed by the NCP is that the RP must be included in order to "achieve an effective and efficient response."

The NCP provides that "cleanup responsibility for an oil discharge immediately falls on the responsible party," and notes, "in a large percentage of oil discharges, the RP shall conduct the cleanup." Though the NCP directs the FOSC to "monitor or direct all federal, state, local, and private removal actions," the FOSC may "allow the responsible party to voluntarily and promptly perform removal actions" if the FOSC determines that having the responsible party perform such actions will "ensure an effective and immediate removal of the discharge." In this situation, the FOSC supervises the RP's actions. The NCP expresses a preference for setting up the response in this manner—"[w]here practicable,

continuing efforts should be made to encourage response by responsible parties." In a spill that "results in a substantial threat to the public health or welfare of the United States … the [FOSC] must direct all response efforts."

To accomplish its purpose the NCP gave the FOSC and the FOSC's representatives a number of authorities. The response must be a unified effort, coordinated with other federal agencies, state government, local government, any applicable tribal government, and private parties such as the RP as well as land and facility owners impacted by the spill. The FOSC can authorize expenditures from the OSLTF to pay for federal and state expenses stemming from the response. If there is no RP, or the RP proves unable or unwilling to fund cleanup efforts, the FOSC can take over the spill and fund all response efforts from the OSLTF. The FOSC can issue administrative orders to the RP directing specific response actions be taken. And while required to work within a unified command, the NCP gives the FOSC the final say in the response to an oil spill.

For the *Deepwater Horizon* spill, BP accepted its responsibility as an RP under OPA 90 and the NCP to respond to the oil spill. Even though the RP participated in the UAC structure at every level of the response, the FOSC and the FOSC's representatives directed RP actions. This was done daily in the form of Incident Action Plans (IAPs) and also in the form of NIC and FOSC directives to the RP.

5

## 2. Command and Control



ROBERT, La. – U.S. Coast Guard Commandant Admiral Thad Allen meets with Rear Admiral Mary Landry and other local, state, and federal members participating in the Unified Area Command. Photo Courtesy of U.S. Coast Guard

### 2.2 National Incident Command

The *Deepwater Horizon* oil spill was the first incident in U.S. history to be declared a Spill of National Significance, and the first to designate a National Incident Commander. After being named the National Incident Commander by the DHS Secretary following the SONS declaration, Admiral Allen established an NIC in Washington, DC, to coordinate the entire government response to the incident.

The National Incident Commander issued his own report on October 1, 2010. From the perspective of the FOSC, the National Incident Commander performed the duties as defined in 40 CFR 300.323, which states:

*The National Incident Commander will assume the role of the FOSC in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level. This strategic coordination will involve, as appropriate, the NRT, RRT, the Governor(s) of affected state(s), and the mayor(s) or other chief executive(s) of local government(s).*



GULF OF MEXICO-Federal On Scene Coordinator Rear Admiral James Watson meets with the owner of a collection barge regarding oil skimming operations. Photo courtesy of U.S. Coast Guard

The Coast Guard further described the National Incident Commander's responsibilities in a SONS response contained in the draft Commandant Instruction: Spills of National Significance

Response Management System. These responsibilities expand on the NCP guidelines to include leading national level communications and developing strategic objectives, coordinating interagency issues, coordinating federal, state, local, and international resources, and overseeing UAC activities for effective response.

As the National Incident Commander, Admiral Allen followed the doctrine outlined in the NCP and assumed the responsibilities for addressing and coordinating national-level issues. At the same time, Homeland Security Presidential Directive-5 (HSPD-5), signed in 2003, establishes the framework for the federal government's response to national disasters requiring interagency coordination. Under this directive, the Secretary of Homeland Security is designated as the Principal Federal Official for domestic incident management. *Deepwater Horizon*, as the first Spill of National Significance, presented the first occasion to consider how the NCP structure for addressing a SONS would function with the HSPD-5 overarching framework for managing a national disaster. Early in the response, it was determined that the NCP would be executed, and that the National Incident Commander would carry out his role under the NCP. This would take place within an overarching HSPD-5 framework in which the Secretary, as the PFO designated by the President, maintained overarching responsibility for coordinating the whole-of-government response, particularly at the Cabinet level.

### Spill of National Significance

The Spill of National Significance operational doctrine was tested in the exercise environment, but while it developed over multiple SONS exercises, the doctrine also continued to evolve during the course of this response. The NIC's role was strategic and operational, and extended beyond traditional spill response actions to include, for example, resolution of public health and seafood safety concerns, and adjudication of claims. In some cases, the National Incident Commander engaged in operational decision-making, working directly with the FOSC, state and local elected officials, and the RP.

Although this was the first declared SONS event and use of a National Incident Commander, previous experience was gained through regular SONS exercises conducted since the post-*Exxon Valdez* rewrite of the NCP. The experience was essential

## 2. Command and Control

**Figure 2.3: U.S. Government Response**



to the effectiveness of the entire response organization. The Coast Guard and government agencies held a SONS exercise in New England in March 2010. The planning for that exercise did much to define the processes to establish a NIC staff and implement the entire response organization for a SONS event, which included a UAC. Senior DHS officials participated in the SONS exercise. The Assistant Secretary for Intergovernmental Affairs led the DHS contingent at the drill, and was a key advisor to the NIC in working with state and local officials during the *Deepwater Horizon* response. In addition, many of the key planners and participants in the SONS 2010 exercise became part of the *Deepwater Horizon* NIC or UAC staff. Thus, while formal doctrine for SONS events was still under development, there was extensive, and recent, experience with the details of a large scale SONS response.

An exercise environment, however, is not the same as a bona fide Spill of National Significance. Actual establishment of a National Incident Commander was unprecedented. The exercise process did not take into account that the federal governance structure for oil spill response, the NCP, was not familiar to the impacted communities. Because of repeated national disasters and emergency declarations, these communities were accustomed to a state-centric response organization under the Stafford Act.

The SONS designation and the appointment of a National Incident Commander still had many beneficial impacts. The SONS designation assisted with the ability to secure equipment, people, and other resources from throughout the federal government to participate in the response. The National Incident Commander designation emphasized the importance of the national and government effort to respond to this spill.

The NCP states that with a SONS declaration, the National Incident Commander "will assume the role of the On-Scene Coordinator (OSC) in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level." The NCP did not address all of the key issues that came

## 2. Command and Control



ROBERT, La. – U.S. Coast Guard Commandant Admiral Thad Allen speaks with local, state, and federal members at the Unified Area Command during an all-hands meeting. Photo courtesy of U.S. Coast Guard

up in the response. The National Incident Commander, interacting with cabinet level officials, had to adjudicate some of these issues. An example was seafood sampling to ensure the safety of Gulf of Mexico seafood. The National Incident Commander role proved very effective in covering the considerable public relations duties to include explaining the response efforts to the public. As the single, named leader of the federal government's efforts to respond to the spill, the National Incident Commander minimized duplication of effort by giving external stakeholders, including the national media, one individual to address all issues associated with the spill. This aspect of the National Incident Commander role also helped with public concerns regarding who was in charge of the response.

The National Incident Commander directed the RP to take a number of actions. In day-to-day coordination and decision-making, the FOSC issued requirements. The RP complied with direction from both sources. Because the roles of the National Incident Commander and FOSC allowed for the possibility of overlapping direction, daily coordination among the FOSC, the National Incident Commander, and NIC staff occurred through conference calls and prior to daily meetings, governor's calls, press events, and at other times of significant decisionmaking.

### NIC Interagency Solutions Group

The National Incident Commander developed a number of groups that tackled different aspects of the response and policy coordination tasks. Of these groups, one with significant impact on

the FOSC was the Interagency Solutions Group (IASG) that evolved to fill the role of the NRT. When the *Deepwater Horizon* sank on April 22, 2010, Admiral Allen requested a meeting of the NRT as the Commandant. His intent was to employ this long-standing interagency coordinating body in support of the deepening crises and potential for a catastrophic oil release.

The NRT is comprised of 15 federal agencies responsible for developing, de-conflicting, and reconciling intergovernmental policy issues that surface during an oil spill response. During the response, the the Secretary of Homeland Security exercised oversight over the NRT in accordance with guidance developed in the early stages of the response effort, and the Deputy Secretary of Homeland Security presided over NRT meetings and conference calls. When a spill involves a substantial threat to public health and welfare, the NRT may be activated as an emergency response team. The primary role of the NRT is to monitor the response actions and provide counsel and recommendations to the NIC to assist in the response. During activation, the NRT may support RRTs—the regional interagency bodies—with recommended actions to combat the spill, requests of other Federal, state, tribal, and local governments or private agencies to provide resources, and coordination of the supply of equipment, personnel, or technical advice. During the *Deepwater Horizon* incident, the NRT held nearly 50 separate meetings and briefings to coordinate national efforts for the incident.

The primary challenge to the role of the NRT was that, in order to carry out its roles, interagency coordination needed to occur at the Departmental level. This was significantly above the level at which the NRT typically operated and was not the level articulated in the NCP. Direct engagement by Cabinet-level officials from the outset of this response redirected the NRT to the role of support to intra-Cabinet communications and briefings.

To provide the originally intended functions of the NRT, the Coast Guard created a new organization named the Interagency Solutions Group (IASG) within the NIC. The IASG essentially assumed the doctrinal responsibilities of the NRT, and proved adept in promoting interagency unity of effort.

The IASG became a self-contained interagency body, with decision-making authority, capable of resolving time-sensitive policy issues. The group

had representatives from 20 federal agencies and Departments. At the height of the response, there were 25 to 35 experts present each day in the IASG spaces. The rest of the 122 IASG members worked remotely from their own agency locations or on the Gulf Coast at the various command posts or other facilities. Nearly all recommendations that emerged from the IASG were the result of group consensus.

During the course of the response, the IASG teams:

- Finalized flow rate calculations for the Macondo well,
- Published an oil budget model to address the fate of the oil,
- Reviewed physical countermeasure proposals for consideration by the FOSC,
- Reviewed 24 proposals, valued at $500 million, in proposed emergency restoration initiatives; these were of concern to the NIC and other agencies but fell outside the scope of FOSC responsibilities,
- Reviewed more than 3,900 proposals to leverage innovative oil spill response technologies,
- Provided weekly outreach to over 600 environmentally focused non-governmental organizations to explain ongoing response activities and address caller concerns,
- Integrated the federal government response to local and regional government and non-government entities in 21 of the most impacted counties and parishes along the Gulf of Mexico,
- Developed seafood safety protocols regarding closed fisheries, and
- Reviewed an extensive subsurface oil detection program to identify recoverable oil.

In an effort to manage the constantly changing scope of work, the IASG formed teams into the following seven areas of emphasis:

1. Countermeasures and Alternative Technologies;
2. Community Engagement;
3. Flow Rate and Sub-sea Analysis;
4. Economic Solutions;
5. Environmental, Archeological, and Cultural Protection Strategies;
6. Integrated Services; and
7. Public Health and Worker Safety.

## 2.3 Unified Area Command

On April 23, 2010, the UAC was established in Robert, La., with the FOSC assigned as the Unified Area Commander. The UAC's principal focus was directing, supporting, and assisting the ICPs, and coordinating with the RP and each affected state. The FOSC, RP, and state representatives worked together to fill operational resource requests and address state-by-state concerns with the ongoing operation. The FOSC met regularly with key stakeholders, including the governors of each Gulf Coast state, and established critical lines of communication to remove obstacles. Daily conference calls with the impacted states' governors facilitated open and continuous dialogue.

The key role of the UAC was to standardize practices across the response and broker resources, particularly boom, skimmers, and personnel. There was some early confusion outside the UAC and the Coast Guard as to who from the Coast Guard was actually in charge of the response, and who had operational and tactical control of assets in the response. Within the Coast Guard, the question of who was in charge was less ambiguous: the Staging Areas worked for the Branches and the Branches worked for the FOSCR assigned to the ICP, who then worked for the FOSC and UAC. The scope of the FOSCR role and the connection with the FOSC evolved to reflect the growing size and complexity of the response.

The FOSC established a daily battle rhythm for interaction with the response organization and stakeholders early on and these practices continued throughout the response. A snapshot of the daily battle rhythm from key points during the response is included in Figure 2.4 below. The Unified Area Commander and Incident Commands held daily conference calls at 7:00 a.m. and 5:30 p.m. Participating in these discussions were the FOSC, FOSCRs, RP, State On-Scene Coordinators' (SOSC) Representatives or other state representatives, and other senior federal representatives at the UAC and ICPs. The NIC staff was invited to listen to obtain a current operational picture. Safety was the first issue discussed every meeting. Forecasted weather and critical situations on the sea floor that could impact source control were also discussed.

Meetings included a review of strategic objectives and critical spill response resources. Resources were reviewed to evolve business metrics for

# 2. Command and Control

**Table 2.1: Battle Rhythm**

| Time | Battle Rhythm: Monday, May 24, 2010 — Meeting | Battle Rhythm: Tuesday, June 15, 2010 — Meeting | Battle Rhythm: Thursday, July 8, 2010 — Meeting | Battle Rhythm: Thursday, September 9, 2010 — Meeting |
|---|---|---|---|---|
| 6:00 AM | Operations Brief | Shift Change | | |
| 6:30 AM | | | | |
| 7:00 AM | | | NIC Senior Leader Call | |
| | | | Area Command/Incident Command Brief | NIC Senior Leader Call |
| 7:30 AM | | | Area Command/Unified Command Brief | Area Command/Unified Command Brief (Tuesday) |
| 7:45 AM | Incident Command/Unified Command Objectives | | | |
| 8:00 AM | | | DHS Secretary call | DHS Secretary call (M-W-F) |
| 8:00 AM | | | DOI and DOE call | |
| 8:05 AM | | | Daily Coordination Call | Governor's/NIC Conference Call (Thursday) |
| 8:15 AM | | | Daily Governor's/NIC Conference Call | |
| 9:00 AM | Command and General Staff Meeting | Command and General Staff Meeting | | |
| 9:45 AM | ICP Briefing | ICP Briefing | | |
| 10:00 AM | Boom Task Force | Boom Task Force | NRT Conference Call (Tuesday & Friday) | |
| 11:00 AM | Pre Tactics - How to meet next periods objectives | Pre Tactics - How to meet next periods objectives | | |
| 12:00 PM | Joint Operations Brief | | | |
| 01:00 PM | Tactics Meeting - Finalize strategy to meet objectives | | | |
| 01:45 PM | Planning Section Alignment | | | |
| 02:00 PM | | Tactics Meeting - Finalize strategy to meet objectives | | |
| 03:00 PM | | Planning Section Alignment - Strategic | | |
| 03:30 PM | | Branch Planners Meeting | | |
| 04:30 PM | Planning Meeting | Planning Meeting | | |
| 05:30 PM | Shift Change | | | |
| 06:00 PM | Operations Brief | Shift Change & Shift Change Brief | Area Command/Incident Command Brief | |
| 08:00 PM | | Data Integration Meeting | PPLO Call | |
| 09:30 PM | | Planning Section Alignment - Strategic | | |
| 010:20 PM | Data Integration Meeting | | | |
| 011:00 PM | Situation Status | | | |
| 3:30 AM | Command and General Staff Meeting | Command and General Staff Meeting | | |
| 5:30 AM | Shift Change | | | |

*Deepwater Horizon/Mississippi Canyon 252/BP (UAC)—all times are Central Standard Time*

tracking the effectiveness of the response. Metrics were a way of measuring accomplishments and progress, and were designed to motivate responders who were putting forth an extraordinary effort in the response. The ultimate goal was to follow the Best Response Model doctrine outlined in the OSC Crisis Management Course, which was comprehensive in its approach to spill response.

In order to inform, communicate, and establish strategies to improve the response effort, the UAC began regular deep-dives into numerous topics including safety, shoreline cleanup, decontamination, and waste management. These meetings were conducted in conjunction with the daily ICP brief and kept UAC decision makers on current operations, enabling them to direct the response and adjust priorities more effectively. The deep-dives were also utilized in strategic planning.

### Regional Response Team Involvement at the Unified Area Command

The *Deepwater Horizon* spill affected the RRTs for Region IV and Region VI—RRT IV includes the states of Alabama, Florida, and Mississippi, and RRT VI, the states of Louisiana and Texas. Under 40 CFR 300.115, RRTs are responsible for

## 2. Command and Control

**Figure 2.4: Regional Response Team (RRT)**

### RRT Areas



regional planning and coordination of preparedness and response action. The RRT membership includes representatives from each of the 15 NRT agencies, as well as regional representatives from the affected states and tribal governments where appropriate. The EPA and Coast Guard co-chair the RRTs, among other responder stakeholders. There are ten RRTs in the United States. The EPA, affected states, and natural resource trustees on the RRT have specific dispersant and chemical countermeasures decision authority for both pre-authorization plans and incident-specific decisions per 40 CFR 300.910.

During the *Deepwater Horizon* response, RRT VI was closely involved with the FOSC and Unified Area Commander. The RRT advised the UAC regarding in situ burning, chemical dispersants, response techniques, and agency participation.

There were 26 incident-specific RRT VI meetings via teleconference between the start of the incident on April 20, and December. During the early weeks of the spill, RRT VI held incident-specific calls regularly. Topics of discussion included agency participation, use of in situ burns, use of dispersants and surface washing agents and solidifiers, and bioremediation techniques, such as those suggested in the Louisiana marshes and discussed below. RRT IV teleconferences were less frequent,

largely because there were no plans to use dispersants or in situ burning in RRT IV areas. RRT IV engagement generally involved coordination, situational awareness, and the potential for alternate spill response technologies.

Once the sub-sea well was closed, the frequency of RRT calls diminished. With offshore response techniques no longer an issue, the remaining calls focused on dispersants and surface washing agents to issues associated with beach cleanup and bioremediation techniques.

Although both RRTs worked to carry out their assigned role, there were several notable challenges to their efforts. At times, senior officials engaged directly with the FOSC on tactical topics without working through the NIC or RRT. Another RRT challenge involved the states and waste removal. The states—Alabama, Florida, Louisiana, and Mississippi—were already delegated the authority to enforce the Resource Conservation and Recovery Act and coordinate waste management and activities. These responsibilities were clearly outlined in the Area Contingency Plans, and had been approved by FOSCs and District Commanders each year for the previous ten years. The Mobile and Houma ICPs had approved those plans in conjunction with the affected states and EPA personnel on-scene. Separately, however, EPA drafted a waste management directive and requested that the FOSC issue it to the RP.

### Natural Resource Trustees Involvement at the Unified Area Command

Designated Natural Resource Trustees include federal, state, Indian Tribes, or foreign officials who act on behalf of their jurisdiction in the interests of the natural resources, per the NCP, 40 CFR 300.600, and other statutory authorities such as OPA 90, FWPCA, National Marine Sanctuaries Act (16 U.S.C. 1431 et seq.), Park System Resource Protection Act (16 U.S.C. 19 JJ), and applicable state laws. During spill response, natural resource trustees advise the FOSC on means to minimize natural resource injuries; assess natural resource damages that do occur and the public's lost use of damaged natural resources; and to obtain compensation from the RP to (i) restore injured natural resources to baseline conditions and (ii) to account for interim losses of natural resources and services that occur from the date of the incident until recovery. Such advisors worked in the UAC and ICPs throughout the response. The Natural Resource

## 2. Command and Control



NEW ORLEANS – Rear Admiral Paul Zukunft, the Federal On-Scene Coordinator for the Deepwater Horizon response, speaks to governmental members of federally recognized Native American tribes during a government-to-government consultation. Photo courtesy of U.S. Coast Guard

Damage Assessment (NRDA) process, overseen by the Trustees, began shortly after the spill with separately focused teams from trustee agencies. NRDA members were independent of the FOSC response activities, and had segregated spaces provided in the UAC.

### Tribal involvement at the Unified Area Command

Executive Order 13175, Consultation and Coordination with Indian Tribes, requires an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications. The U.S. Government has additional unique legal relationships with Indian Tribes as set forth in the Constitution, executive orders, treaties, statutes, and court decisions. Government-to-government relations with recognized Indian Tribes (as defined in 40 CFR 300.5) were guided not only by 40 CFR 300.180, but also by the Programmatic Agreement for the Protection of Historic Properties During Federal Emergency Response. The FOSC coordinated tribal input into response activities, as outlined in Chapter 8, early in the response, and initiated regular government-to-government consultations with the eleven federally recognized tribes with traditional cultural properties in

impacted areas over the course of the response.

### FOSC Key Points: State Integration into Unified Command

The NCP contemplates a robust role for states in the unified command structure. In the *Deepwater Horizon* response some states essentially did not embrace their role, by either not participating in the unified command, or by not empowering their representatives to make decisions. Because of the high visibility and broad impact of any major spill, it is to be expected that more of state government than the oil spill response specialists will have to be involved. The NCP needs to anticipate such needs and find a way to still integrate state participation in the unified command construct.

**2. Command and Control**

## 2.4 Incident Command Posts

The command staff at both ICP Mobile and Houma did not know the exact size or potential for the spill, but assumed an uncontrolled major ongoing release. Therefore, the UAC planned for a 24-hour, seven-day-a-week, fully staffed ICS organization for an unknown duration. The Coast Guard and the RP began to mobilize personnel immediately. Coast Guard personnel from MSU Morgan City, MSU Houma, Sector Mobile, and a core of RP employees staffed the initial ICS Section Chief and Deputy Section Chief positions as the ICS organizations grew.

Due to proximity to the incident, the operational tempo, the complexity of response and communications challenges, the FOSCRs on occasion had to make decisions and exercise initiatives and authorities traditionally outside those typical of a FOSCR. While normally unnecessary for lesser spills, the ability of the FOSCRs to make these decisions reflected both the trust the UAC had in them and the span of control issues engendered by the size of the response operation.



*HOUMA, La. – U.S. Coast Guard Captain Roger Laferriere, the Incident Command Post Houma Incident Commander, speaks to the public at an open house event. Photo courtesy of U.S. Coast Guard*

### ICP Houma Command Structure

The ICP Houma command staff included the FOSCR and five Deputies. The assignment of Deputies became useful in dividing the substantial tasking originating from the spill, stakeholders, the media, and the chain of command. The Coast Guard assumed responsibilities for external activities such as distinguished visitors, media interviews, consultations with parish presidents, and visiting the field to ensure operations occurred in accordance with the Incident Action Plan (IAP). Senior ranking Coast Guard Deputies assumed responsibilities for ensuring internal operations. One deputy oversaw the Incident Management Team processes for the FOSCR and was designated as a FOSCR by the FOSC. The Deputy was responsible for attending all ICP regularly occurring meetings including the planning process meetings, making decisions based on the UAC objectives, and helping ensure that the ICP activities would not be negatively impacted by the physical absence of the FOSCR. In addition, a Coast Guard Deputy for External Affairs—and initially a Coast Guard Deputy for Coast Guard Resources—was designated. This latter position was only temporary until the Coast Guard forces began to flow predictably into the field. Later in the response, the Coast Guard appointed a Coast Guard Deputy for Operations to assume the operational quality control check duties of the FOSCR. The RP provided representatives to ICP Houma, who were actively involved in day-to-day ICP operations and planning.

### ICP Mobile Command Structure

Approximately one week into the spill response, it became clear the response organization would have to grow to include ICPs in other geographic locations along the Gulf Coast. The span of control, state and local jurisdictional lines, and response demands did not allow for a single organization out of ICP Houma to manage all aspects of the response.

ICP Mobile was established on April 26, 2010, and was initially staffed with Sector Mobile personnel. ICP Mobile grew exponentially in the following days as the UAC dispatched a number of key RP and contractor personnel from Houma to Mobile. The increase in personnel served to reinforce ICP

## 2. Command and Control



*THEODORE, Ala. – U.S. Coast Guard Captain Steven Poulin, the Incident Command Post Mobile, Incident Commander, conducts a media interview at the Theodore Staging Area. Photo courtesy of U.S. Coast Guard*

a single Coast Guard Sector boundary (especially offshore and near-shore skimmers), and avoided trifurcating Captain of the Port responsibilities. With some significant organizational adjustments that improved local ownership and involvement in tactical planning, ICP Mobile retained responsibility for the directing response in the three-state area until efforts were consolidated into the Gulf Coast Incident Management Team (GC–IMT) on September 20, 2011.

The ICP Mobile FOSCR created Deputy Federal On-Scene Coordinator (Deputy FOSCR) positions to respond to the large operational response area. One Coast Guard Deputy remained at ICP Mobile to direct overall response operations. Other Deputies were designated as available to assist with daily ICP functioning. A senior Coast Guard officer, designated as the Chief of Staff for ICP Mobile, managed Coast Guard personnel and overall information flow. Three additional Coast Guard deputies, along with RP deputy counterparts, forward deployed to Alabama, Florida, and Mississippi, in June 2010. Each was deployed with a small Incident Management Team to direct tactical planning and tactical operations. The Deputies worked directly with the staffs of the Alabama, Florida, and Mississippi governors, and provided a direct link to the FOSCR. These Deputies worked for the ICP Mobile FOSCR. As such, ICP Mobile set the daily response priorities and objectives and developed the Incident Action Plan with input from the Branches. Deputies managed resources and logistics, and coordinated overall response operations and outreach, including strategic and public communications. The state deputies were authorized to conduct tactical planning and direct tactical operations through the Branches. The Deputies also performed local outreach to execute the IAP with respect to inshore skimming, booming, beach cleanup, and Vessels of Opportunity (VOO). ICP Mobile retained operational and tactical control of offshore and near-shore skimming because the task forces routinely worked across state boundaries and skimmers were mixed to provide optimum results.

Mobile as oil trajectories projected an increasing threat to the coastlines of Alabama, the Florida panhandle, and Mississippi.

The Coast Guard Sector Commander for Mobile was named the FOSCR of ICP Mobile. The FOSCR expended considerable effort, significantly assisted by existing relationships with the three states in his area of responsibility, to encourage Alabama, Florida, and Mississippi to join a single command post for their region centralized in Mobile rather than a command post in each state. Preserving the unity of command for the three states was essential. The unity helped ensure response agility in the interconnected and integrated waterways in the area, allowed for the shifting of resources throughout



*PENSACOLA, Fla. – Vice Adm. Robert C. Parker (center), Atlantic Area Commander, Rear Adm. Mary Landry (right), and the Coast Guard Atlantic and Pacific Area Command Master Chiefs (left) listen to a briefing at the Bayou Chico Staging Area, Fla. Photo courtesy of U.S. Coast Guard*

## 2. Command and Control



GALVESTON, Texas – Coast Guard Captain Marcus Woodring, Federal On-Scene Coordinator Representative for the Texas portion of the Deepwater Horizon oil spill response, and Rob Hadley, a response officer for the Texas General Land Office, review maps of potential oil slicks off the Texas coast. Photo courtesy of U.S. Coast Guard

### ICP Houston

While the ICPs in Mobile and Houma took shape, the FOSC and FOSCR determined that a technical group currently working in Houston would be organized into an ICP under ICP Houma. At the beginning of the response, Coast Guard members deployed to Houston. ICP Houma implemented a virtual UAC by establishing a video teleconference link with the ICP in Houston. The two ICPs developed separate response plans (known as Incident Action Plans) because of their geographic separation and the differences in the nature of the work conducted at the two ICPs. Over the next several days, the ICS organization in both Houma and Houston filled out and these commands established regular meeting schedules and mechanisms for information and document exchange. Under the new design, ICP Houston would focus on well intervention and source control, while the ICPs in Houma and Mobile would focus on response.

Five ICPs were eventually created. ICPs coordinated operations with local and regional elected officials. ICP Houston coordinated source control activities at the wellhead, engineering discussions, and the potential courses of action to secure the source. Houston, Texas, also led source control planning and operations, including sub-surface dispersant operations, and reported directly to the

UAC. ICP Houma managed offshore response operations surrounding the wellhead, near-shore, and shoreline Louisiana response operations. The ICP in Mobile, Ala., managed offshore, near-shore, and shoreline response operations for Alabama, the Florida panhandle, and Mississippi. The ICP in Miami, Fla., managed near-shore and shoreline response operations the West Coast of Florida, although no oil reached the ICP Miami area. The ICP in Galveston, Texas, managed similar operations for the State of Texas, although a minimal number of tar balls reached the state.



PENSACOLA, Fla. – Vice Admiral Robert C. Parker, Atlantic Area Commander, and Rear Admiral Mary Landry are briefed at the Florida Emergency Management Mobile Command Post at the Bayou Chico Staging Area. Photo courtesy of U.S. Coast Guard

15

# 2. Command and Control

The size and complexity of the spill response presented many organizational challenges. As individual field elements of the response organization were working intensely, it was very difficult to maintain situational awareness across the entire response. Maintaining unity of effort across such a large organization spread and geographic area was difficult. The ICPs held daily all hands meetings. At these meetings there was continuous focus on safety, unity of effort, and discussion about the importance of each aspect of the response organization to the success of the overall response effort.

## Federal Agency involvement at the Incident Command Posts

Federal agency representatives held positions at the ICPs and were actively involved in planning and executing the ICS planning process. A few supporting agencies developed their own ICS organizations outside the UAC. An example is the tactics meeting and incident action plan (IAP) preparation. The tactics meeting for developing the IAP for the *Deepwater Horizon* response required significant investment in time and energy. Some of the supporting agencies found the process too burdensome and time consuming, and decided to conduct their own tactics meetings and develop their own IAPs. Because their plans were more limited, involved fewer stakeholders, and could be completed more quickly, they decided to go outside the UAC process. Initially they did so without consulting the ICP.

By creating their own IAPs, the agencies had to have their own planning and operations sections. Agencies were also bringing in or purchasing their own resources while existing resources were available; this led to duplication of effort. Eventually, the Coast Guard brought these agencies into a single unified command under the single IAP, in part because this was a condition of funding via Pollution Removal Funding Authorizations.

At ICP Mobile, the EPA and National Park Service (NPS) participated as On-Scene Coordinators. This varied from the traditional ICS structure, but was based on existing relationships with regional EPA and NPS staffs. The FOSCR recognized NPS as a significant landholder in the Sector Mobile AOR, thus it was important to have them participate in the incident command.

## State involvement at the Incident Command Posts

The NCP provided that response operations at the state and local levels would require active state involvement at all levels of the organization. The SOSC represented the state's interests in response operations. This is especially the case regarding specific state and local government interests, strategic communications, and community outreach activities. During the *Deepwater Horizon* response, each state governor designated a state office and representative to represent the state at the ICP and UAC levels. This lead state response official was responsible for coordinating and communicating with all other state agencies. State agency representatives did not have decision-making authority for all response-related matters as required by the NCP. When necessary, those representatives would defer to an authority outside the ICPs and UAC. This caused delays in obtaining state concurrence. This also supported public perception that the Coast Guard and the RP were too close and were leaving out the states.

Some problems arose because state and local government officials outside the NCP structure were unfamiliar with the OPA 90 and applying the NCP doctrine to a major oil spill. This was not necessarily true of state agencies regularly involved in spill planning, exercises, and response. However, because of the scope of the spill, agencies that did not regularly work on spill responses and were generally unfamiliar with NCP response guidelines, participated significantly.

## Integration of Local Emergency Entities at the Incident Command Posts

Continuous engagement of parish president's and the Louisiana Governor's Office of Homeland Security and Emergency Preparedness (GOHSEP) into the ICP Houma unified command structure was necessary to ensure local cooperation and coordination.



*NEW ORLEANS, La. – Rear Admiral Zukunft briefs a few parish presidents on the flight plan for a trip to the Deepwater Horizon spill site on a HC-144 Ocean Sentry. Photo courtesy of U.S. Coast Guard*

## 2. Command and Control

**Figure 2.5: Unified Incident Command Structure**



connectivity with all Louisiana EOCs. A portable GOHSEP Command Post stationed in Houma facilitated the program. This improved communications between the Houma ICP and the parish presidents. Reports of new oil sightings were communicated via WEB EOC and allowed the Houma ICP to react quickly and work in unison with parish emergency response forces. The FOSC held weekly meetings with parish presidents and GOHSEP representatives. LNOs were also placed within the GOHSEP EOCs to ensure ICP Houma addressed local needs.

As ICP Mobile was established, the Coast Guard assigned LNOs to the EOCs for the states and some of the larger counties in Alabama, Florida, and Mississippi. Alabama also established a forward EOC in Mobile. Synergy among the state, EOC, and county LNOs improved the span of control. The LNOs provided situational awareness to county emergency managers and responded to queries from local elected officials. As Branches expanded to accommodate local involvement, and the Deputy FOSCRs directed the tactical response through the Branches, the integration of the LNOs within the Branches correspondingly improved.

### 2.5 Branches and Staging Areas

The decision to have one UAC and one FOSC rather than multiple area commands for the Gulf Coast area had down-stream effects. One significant impact was Branch level organization and tasking.

Typically, Branches at the ICS organizational level have functional responsibility for major segments of incident operation. The Branch level is situated organizationally between sections and groups in the Operations Section, and between sections and units in the Logistics Section. For examples, the Air Operations Branch under the Operations Section and the Supply Branch under the Logistics Section are types of functional–oriented Branches designed under ICS. Early in May 2010, the Coast Guard recognized that the ICS organizations operating at the parish level in Louisiana were operating as Incident Management Teams (IMTs). IMTs are part of the incident command system and manage the logistical, fiscal, planning, operational, safety, and community issues related to the incident. As the response organization under ICP Mobile grew, the same issue arose in the individual states.

As more oil impacted the shoreline, the people and government of Louisiana became frustrated. This became evident in the first meetings with GOHSEP representatives and parish presidents. The response organization, from the NIC level to the Branch level, took actions to integrate parish leadership and local emergency response organizations into the response effort. The more closely local government was integrated into the rest of the unified response organization, the more effective and efficient local participation became.

The National Incident Commander implemented the Parish President Liaison Officer (PPLO) Program, which assigned Coast Guard Liaison Officers (LNOs) to parish presidents, governors, and some mayors whose jurisdictions were the most impacted. A Coast Guard member, who was designated as a FOSC Deputy for External Affairs, supervised the LNOs and worked directly for ICP Houma. This member had direct access to the UAC and the authority to make decisions in the field to address a major crisis within each jurisdiction.

ICP Houma installed WEB Emergency Operations Center (WEB EOC), an emergency communications program used by GOHSEP, to ensure

## 2. Command and Control



*SOUTHPORT, Fla. – The Supervisor of Coast Guard Marine Safety Detachment Panama City and the Chief of Emergency Services in Bay County, Fla., answer questions during a press conference at the Bay County Emergency Operations Center. Photo courtesy of the U.S. Coast Guard*

The Coast Guard designated parish and county operations as Branches (or forward operating bases) in Alabama, Florida, Louisiana, and Mississippi. This brought the Coast Guard closer to the front lines of the response without sacrificing operational unity and control or creating demands beyond available personnel resources. It also provided more interaction at the local level. The ICS system is designed to expand and contract as required to manage a response. The use of a large, IMT style Branch structure represented a new level of organizational expansion for the ICS system, which had not been applied in previous responses. Over time, the Coast Guard staffed the Branches to accomplish all ICS functions including planning, operations, and logistics.

### ICP Houma Branch Structure

There was debate as to whether to establish ICPs in each of the likely-affected parishes, complete with a FOSCR and Deputy FOSCRs with a full ICS organization. Due to the demands for a consistent and accurate information flow and the established ICS organization and supply chain, ICP Houma determined that Branches would report to the Operations Section of ICP Houma. Another consideration was that the federal agencies, the RP, and state did not have enough people with requisite ICS training to be able to staff nine ICPs, particularly in logistics and finance. Retaining the Incident Commander position in Houma also insulated the Branch Directors from some of the political pressures involved with dealing with local government officials.

When establishing the Branch structure, the Coast Guard and the RP invited county and parish officials to participate in the process. The level of county or parish involvement was unique to each Branch and this early involvement was essential to the overall operational success. For example, before the Branch in Grand Isle, La. (Jefferson Parish) was established, the local and regional governmental officials operated from a command post vehicle separate from the command post established by the Coast Guard and RP. This made the integration of activities difficult. To improve coordination, a larger command post space was established and all groups were integrated to create one response organization. Similarly, the Branch in Port Fourchon (Lafourche Parish) was well integrated with the Unified Command Branch organization. These integrated Branches proved highly effective, and local officials' satisfaction with their input and knowledge of response operations was highest in those locations.

Oil began to affect the Louisiana shoreline first; resources soon flowed into staging areas along the Louisiana coast. It became apparent that ICP Houma would not be able to maintain effective command and operational control of all deployed personnel and resources from its location. The Coast Guard soon established Branches within each of the state parishes to maintain effective command and control and ensure the adequacy of response and information flow into ICP Houma. Very early the FOSCR authorized these Branches to engage in tactical planning, which greatly



*GRAND ISLE, La. – The Coast Guard Branch Director in Grand Isle gives an operational brief to a group of international observers. Photo courtesy of the U.S. Coast Guard*

## 2. Command and Control



*LAFOURCHE PARISH, La. – Capt. Roger Laferriere (second from right), the Incident Command Post Houma Incident Commander, discusses an oil trajectory chart with two Coast Guard parish president liaison officers and a Coast Guard Branch chief. Photo courtesy of U.S. Coast Guard*

increased the effectiveness of the individual Branches and alleviated span of control problems for the FOSCR charged with leading such large organizations remotely.

The Branches in Louisiana reported to the Deputy Operations Section Chief for ICP Houma. Each Branch under ICP Houma was assigned a Branch Director. Branch Directors had their own deputy and support staff required to meet the objectives established by the ICP and UAC. The Branch Director's primary focus included managing the onshore, inland, and VOO operations.

### ICP Mobile Branch Structure

As it became clear that oil would impact ICP Mobile's response area, planning and establishment of similar county-based Branches began. Mobile Branches worked through the planning, operational direction, and resource processes of ICP Mobile. The designation and location of Branches was driven by geography and potential for oil impacts. Branches were centrally coordinated through ICP Mobile—although as the size of the response organization grew, the branches gained responsibility for tactical planning and direction, consistent with the IAP developed by ICP Mobile. Logistics and resourcing at the Mobile Branches was largely coordinated through ICP Mobile. In some instances, ICP Mobile consolidated several counties under a single Branch that reported to a Deputy FOSCR for each respective state at the ICP. Larger counties had a Branch to themselves.

Because of the remoteness of the barrier islands and the challenges of VOO coordination within Mississippi, the Coast Guard established a separate Branch for VOO command and control in Mississippi with the Mississippi National Guard.

At both ICP Houma and Mobile, the coordination between the geographically separated Branches, staging areas, and ICP was less than optimal. The solution was to physically co-locate the federal, state, and RP commands assigned to a specific Branch. The co-location consisted of a single Branch command post that could accommodate all command personnel and associated functions. Co-location allowed relationships to develop among key individuals, developing a credible team dynamic while building trust through direct interaction. Open and transparent communication was essential to integration and the success of the response.

As an example, the Plaquemines Parish Branch followed the unified command structure, with the Coast Guard as the Branch Director and the RP as the Deputy Branch Director. This proved highly effective in the management of a response structure that ultimately grew to 2,800 people in July. The state was represented at ICP Houma, and periodically provided a Louisiana Department of Environment (LADEP) representative to Plaquemines Parish during which time they would attend the Branch operational planning meetings. The Branch had steady representation from Louisiana Fish and Wildlife representatives, who represented the interests of the State Wildlife Refuge. An Emergency



*MOBILE, Ala. – Capt Steve Poulin, Incident Command Post Mobile Incident Commander, briefs Secretary Napolitano on clean up operations during an overflight. Photo courtesy of U.S. Coast Guard*

## 2. Command and Control



THEODORE, Ala. – A Coast Guard Gulf Strike Team member explains skimming and booming operations to a reporter during a press briefing at the Theodore Staging Area. Photo courtesy of U.S. Coast Guard

Operations Center Manager traveled from Belle Chase and attended meetings at least once a week, participated in the Tactics and Planning Meetings, and signed the IAP in person or by facsimile for each operational period. The UAC also held a weekly briefing for the parish president, during which they provided detailed updates and offered field tours by air and boat of spill cleanup activities, progress, and long-term strategy. These efforts enabled closer coordination with the parish. The Branch also had several members of the Louisiana Army National Guard serving in the Branch. These members successfully kept lines open between the Branch and the governor's office and greatly enhanced information sharing.

Two Area Command Staging Areas in Gonzalez, La., and Theodore, Ala., were established to coordinate the efficient and effective distribution of critical resources across regional boundaries. Protective boom and skimmers were delivered to these areas and then redistributed to those areas most affected by the oil. This arrangement allowed on-scene responders to focus on removing oil. Establishment of additional local staging areas allowed for timely reallocation of regional resources based on the oil spill's trajectory. Additional details are provided in Chapter 6 of this report.

ICP Houma and Mobile also established temporary staging areas where personnel and equipment waited for tactical assignment. This proved effective in ensuring balanced resource distribution across the parishes and counties, as well as between states. These temporary, initial staging areas were established within each impacted parish and at suitable locations at the county level, close to impacted shoreline throughout the coastline.



VENICE, La. – U.S. Coast Guard Commandant Admiral Thad Allen (left) listens in on a conference along with Plaquemines Parish, La., officials. Photo courtesy of U.S. Coast Guard

**3. Operations**

**Figure 3.2:** *Deepwater Horizon* **Oil Budget (August 4, 2010)**



The most definitive information came from data collected after installation of the capping stack on July 12. This structure ultimately stopped oil flowing into the Gulf. Pressure measurements were recorded as the choke valve closed to yield the most precise and accurate estimation of flow: 53,000 BPD just prior to shut in. The teams assigned an uncertainty on that value of ± 10 percent based on their collective experience and judgment. They then combined the final flow rate with a well-calibrated simulation for the rate of depletion of the reservoir to produce an estimate of the flow rate as a function of time throughout the incident. The net result was a flow rate estimate that decreased over the 87 days from an initial 62,000 to a final 53,000 BPD. This put the total amount released at 4.9 million barrels of oil, before accounting for containment. The estimated uncertainty on these flow estimate values was also approximately ± 10 percent.

**The Fate of the Oil**

Part of the National Incident Command Interagency Solutions Group, the Oil Budget Calculator Science and Engineering Team, developed a scientifically valid tool that could be used to calculate the fate of the oil discharged from the Macondo well. That is to say, how much was dispersed, mechanically recovered (through skimming, sorbents, etc.), evaporated, dissolved, or burned.

## 3.2 Dispersant Use and Monitoring

Oil on the surface posed an immediate threat to marine life that live and spawn in the open ocean or live and breathe at the interface of the ocean and atmosphere, such as marine mammals and sea turtles. Unrecovered oil on the ocean's surface was a known threat to marine fisheries and estuarine communities near-shore. The decision to use dispersants required a robust assessment of net environmental benefits and monitoring activities at the wellhead, in the benthos, water column, water surface, and along the shoreline. Despite political concerns and public misperceptions, those assessments and monitoring protocols generally supported continued application of dispersants aerially, on the surface, and sub-sea at the wellhead throughout the incident.

The FOSC and emergency responders clearly understood dispersants do not remove the threat

33

## 3. Operations



*KEY WEST, Fla. – A staff member form the Florida Department of Environmental Protection demonstrates how the Neuston net is one of the mechanisms being used to monitor for oil from the Deepwater Horizon oil spill. Photo courtesy of U.S. Coast Guard*

of oil pollution from the marine environment. Rather, dispersants provide a mechanism to alter the nature of the spilled oil's fate, transport, and potential effects. Natural dispersion was occurring at the surface by physical wave action. A trade-off analysis determined the appropriateness of dispersant use. This analysis studied if a particular mitigation strategy would generate a lesser potential for long-term environmental impact relative to conventional response options. Ideally, the best response options would stop the flow of oil, or contain and remove the oil at the source.

Prior to the *Deepwater Horizon* incident, dispersants were used to combat oil spills in the Gulf of Mexico (GOM) as a response tool to mitigate the effects from offshore oil spills on environmentally sensitive coastal habitats. Regional Response Team (RRT) VI developed a pre-approval plan for dispersants using the tools listed in 40 CFR 300.910, Subpart J, FOSC Dispersant Pre-Approval Guidelines and Checklist (2001), Special Monitoring for Applied Response Technologies V. Operationally, the FOSC followed this pre-approval plan during this incident on a daily basis. The FOSCs assigned to the Eighth Coast Guard District were familiar with this tool and were well-versed in its use for spills in the GOM Coastal Zone. In addition, all RRT VI and many National Response Team (NRT) members received briefings on the past uses of dispersants and were aware of the trade-offs associated with the application of dispersants. NOAA and DOI consulted on the use of dispersants in the GOM and the Endangered Species Act (ESA) in 1995.

RRT VI FOSC Dispersant Pre-approval Guidelines and Checklist provided for meaningful, environmentally beneficial, and effective dispersant operation. Both historically and during the response, the programmed checklist approach allowed the FOSC to arrive quickly at a logical go or no-go decision. This allowed dispersant operations to begin in a timely manner to maximize its effectiveness as a countermeasure. The parties requesting approval for use of a dispersant system underwent evaluation criteria for approval for use. In addition to the checklist, parties had to demonstrate the following to the satisfaction of the FOSC:

- That the application system was specifically designed for its intended purpose, and if not specifically designed for dispersant use, had been used previously and deemed to be effective and appropriate; also that it would be used again in a similar manner or by some other specific means, deemed to be effective and appropriate under the circumstances,

- That the design and operation of the application system could reasonably be expected to apply the chemical dispersant in a manner consistent with the dispersant manufacturer's recommendation, especially with regard to dosage rates, and concentrations, and

- That the operation would be supervised or coordinated by personnel with experience, knowledge, specific training, or recognized competence with chemical dispersants and the type of system used.

The effectiveness of dispersants generally decreases as spilled oil weathers. It is therefore best to apply dispersants when the oil is freshest. The pre-approved dispersant area in the GOM includes offshore waters from the ten-meter isobaths and three nautical miles (nm)—whichever is farthest from the shore—to 200 nm offshore, encompassing the Exclusive Economic Zone boundary. This zone extends from the Texas-Mexico border and continues through the states of Texas and Louisiana to the boundary between federal Regions IV and VI. The requirement for dispersant product selection was that the dispersant must be included on the NCP (National Contingency Plan) Product Schedule and considered appropriate by the FOSC for existing environmental and physical conditions. The EPA product schedule listed and approved both COREXIT 9527A and 9500A for use. The *Deepwater Horizon* response effort used both. After responders exhausted the supply of 9527A, the operation used 9500A throughout. In accordance with RRT VI guidelines, the *Deepwater Horizon* RP submitted its first request to use aerial dispersants to the FOSC at Morgan City, La. The FOSC preauthorized its use at approximately 1 p.m. on April 22, 2010, and the RRT received notification a few hours later. Although there was an active search for the survivors of the MODU *Deepwater Horizon*, the FOSC, in concert with the Search and Rescue effort at the Eighth Coast Guard District, approved aerial dispersant use. There were no active searches in the target area,

**3. Operations**

**Figure 3.3. Diagram of the Aerial Dispersant Operations Group Structure**





**Figure 3.4: Worldwide Dispersant Resource sources for *Deepwater Horizon* spill**



**Figure 3.5: Aerial Dispersant Group Assets**

35

## 3. Operations



HOUMA, La. – The crew of a Basler BT-67 fixed wing aircraft release oil dispersant over an oil slick off the coast of Louisiana. Photo courtesy of U.S. Coast Guard.

and sufficient safety controls were in place (e.g., spotter aircraft with embarked observers) in the event the Search and Rescue Mission Coordinator detected any survivors. The first aerial application began at 1700, using 1,880 gallons of COREXIT 9527. From aerial observations of the treated slick, the application was effective by employment of Tier I Special Monitoring of Applied Response Technologies (SMART) monitoring. The RRT received notification within the 24-hour period via email on April 22, 2010.

### Aerial Application

Aerial dispersant operations were coordinated through the aerial dispersant operations group located at the ICP in Houma, La. Initially, the operations were small, but expanded within one week to a large and comprehensive operation. The operations consisted of searching for slicks appropriate for dispersant application. This was done late in the day prior to the next day's application. On the day of the operation, the slick target would be reacquired. Communication was made back to the ICP for launching dispersant planes. The group consisted of a spray aircraft and spotter aircraft and sometimes on-water SMART Tier II flourometry boats. The spotter plane guided the spray plane over

the slick. After the spray operation, SMART boats would move in to conduct effectiveness monitoring if necessary.

The aerial application bases of operations were situated in the Stennis Space Center Airport in Mississippi and Houma-Terrebonne Airport, Houma, La. The *Deepwater Horizon* response deployed the largest mobilization of aerial dispersant assets and expertise from around the world.

Several types of aircraft conducted the operations, as noted in Figure 3.5.

During the *Deepwater Horizon* response, ninety-eight percent of the total volume aerially sprayed occurred more than 10 nm offshore. The closest area to land sprayed was just outside three nm from shore, in order to reduce the impact of several slicks from reaching Grand Isle and the Chandeleur Islands. There was no dispersant spraying over any land areas. Dispersants' effectiveness decrease dramatically within hours of the oil being released. Thus dispersant application near shore would have been ineffective, as the oil would then have been on the surface for days.

The shaded area on Figure 3.6 shows boundaries of dispersant operations and does not suggest that the entire area was sprayed with dispersants. Each single, discrete operation applied dispersants to a confined and particular target area or slick. Aerial dispersant spraying operations could occur during daylight hours only. Responders made every

**Figure 3.6:
Perimeter of All
Aerial Dispersant
Operations**



**3. Operations**

reasonable effort to make the first dispersant application as soon as possible after the oil reached the surface, in order to achieve intended results.

As the *Deepwater Horizon* response was an ongoing major spill each day, the pre-designated FOSC in Morgan City approved dispersant operations daily. Later, the FOSC Representative (FOSCR) at ICP Houma and the FOSC at the UAC approved those operations jointly. After May 27, 2010, daily consultation with the EPA, via a senior representative at the UAC, was part of the required process as well. Throughout the response, limitations on aerial dispersant operations were as follows:

- Wind criteria for aircraft was less than 35 knots, however the RRT 6 *guidance* plan specified 25 knots; the increase in wind speed limit was only allowed when the aircraft could correct for spray drift.

- A 1,500 foot cloud ceiling was required, with 4 nm visibility for aerial applications to commence.

- No spray areas were permitted within 5 nm of the source, 2 nm of any vessel, 3 nm from shore, or where the water depth was less than 33 feet.

- Additional guidelines were in place for NOAA observers to ensure no dispersant operations within 3 nm of visible marine life.

- Each spray system was designed and built specifically for each aircraft.

- Dispersant application rate was 5 gallons per acre, applying a film of approximately 0.0002 inch at an altitude of approximately 50 to 75 feet, at a speed of approximately 150 knots.

- All spray systems were flight-tested at 300 to 500 micron droplet size at a swath width of approximately 60 to 150 feet.

- Candidate slicks had to be continuous to avoid over spraying.

Aerial application of dispersants continued until sub-surface dispersant testing on April 30, 2010 temporarily halted all use of dispersants. The Deputy Area Commander and the NOAA Scientific Support Coordinator (SSC) in Robert, La., requested an operational pause to review procedures, ensure training of oil target spotters, and ensure documentation of the monitoring data was submitted. After a two-day testing period, the operations continued. Operations resumed, and spotter plane assessments continued daily until aerial dispersant operations

were limited upon receipt of the Dispersant Monitoring and Assessment Directive, Addendum 3 of May 26, 2010. This directive limited the use of surface dispersants to rare and unusual circumstances.

From initial application of dispersant on April 22 to May 26, responders used aerial dispersants 28 of 35 days, with an average application of 24,386 gallons.

On May 26, the FOSC issued further instruction to the RP via written directive to reduce the amount of dispersants used. After negotiations with the EPA representative from Region VI and the EPA NRT chair, the FOSC agreed that:

1. The RP would endeavor to reduce the dispersant loading in the Gulf of Mexico by 75 percent, and

2. The RP would eliminate the use of surface dispersants entirely, unless issued a written exception approved the FOSC. This directive limited the use of surface dispersants to rare and unusual circumstances.

Between May 27 and July 19, aerial dispersants were used 33 of 54 days (61 percent), with an average application of 8,892 gallons, a 24 percent reduction in days used and a 64 percent reduction in the amount of dispersant applied as compared to the previous period of application from April 22 to May 26.

Data from the Environmental Unit, established at the UAC in Robert, La., to assist the FOSC with environmental issues, showed a strong correlation between decreased dispersant use and increased shoreline oiling during the period of reduced application.

## Sub-sea Dispersant Operations and Sub-Sea Monitoring

### Feasibility Testing

Prior to *Deepwater Horizon*, the concept of sub-sea dispersant application had only been tested experimentally in shallow water, less than six times anywhere in the world. In late April 2010, the RP presented the UAC with the novel concept of applying dispersants directly at the source to mitigate oil in the offshore environment. At this point in the response,



*KILN, Miss. – A team of U.S. Air Force aerial spray aircraft maintainers from the 910th Aircraft Maintenance Squadron at Youngstown-Warren Air Reserve Station, Ohio, move a chemical pump into position in order to refill a chemical dispersing C-130 aircraft at Stennis International Airport. Photo courtesy of U.S. Air Force*

## 3. Operations

**Figure 3.7: Shoreline impact Graph – Top graph shows cumulative shoreline impact, the bottom graph depicts aerial dispersant use.**



hopes of a quick intervention and well shut-in had faded. Sub-sea dispersant injection at the source provided two major advantages over aerial application—greater efficiency, and lack of daylight restrictions. The proposed method required less dispersant to oil dose ratios. The FOSC immediately forwarded this plan to the RRT VI for consideration. The plan consisted of a test application at the BOP stack leak, using a coiled tubing supply line from the merchant vessel *Skandi Neptune*, to inject 3,000 gallons of Corexit 9500A at 5,000 feet below the sea surface, using a remotely operated vehicle. During Test 1, one ROV held the injection wand into the plume and injected 9 gallons per minute of dispersants, while a second ROV collected samples and took video of the operation. During this test, the RP used 2,151 gallons of dispersant.

Test No. 1 resulted in a confirmation that dispersant could be injected into the plume at the source

without complication. It also provided qualitative observations of SONAR images taken before and after the dispersant injection, indicating that the density of the plume at depth was diminished. Overall results were difficult to interpret given the unique application of the technology, which was not calibrated. During Test No. 1, samples of the plume prior to and during dispersant application were not collected. Observers could not perform aerial observations of the test dispersed plume at the surface due to weather and visibility problems.

In addition, the captured video of the operation did not demonstrate the effectiveness of the oil dispersion. Observers requested a subsequent test with criteria for monitoring and sampling, which the RRT authorized on May 1, 2010.

The RRT approved a second test that included taking four samples at various depths. The RP did not apply aerial dispersants during the subsurface test. The aerial observation of the spill

area did document oil on the surface before and after the sub-sea dispersant application at depth. The second test used 13,000 gallons of dispersant. The RP collected samples of the non-dispersed oil and the dispersant and oil mixture at depth. Of the four samples, two were fouled and were not collected. The remaining samples had a very small amount of oil and water. Weather conditions offshore hampered aerial observation. Test No.2 proceeded without aerial observation, and intermittent pumping continued until May 3. Aerial over flights resumed on May 4 and 5, but were inconclusive, highlighting the need for additional data. Because of the sampling problem and the lack of aerial visual assessment, EPA requested a meeting with the Environmental Unit located at Robert, La. The meeting was to obtain consensus on the way forward with respect to sub-sea dispersant use.

NOAA and Coast Guard representatives met with EPA representatives on May 7 to discuss the sub-sea dispersant operation. The discussion encompassed concerns, hindrances to the tests, and the monitoring plan.

Both operational tests were conducted during periods of bad weather that hampered the injection of the dispersant at depth and visual monitoring of the results. In addition, there were several delays due to mechanical failures of the wand used to apply the dispersants, and the availability of ROVs to conduct the test. The second test included the injection of 13,000 gallons of dispersant and lasted several hours longer than anticipated. Again, monitoring of the test visually or by SMART was not possible due to adverse weather—all of which contributed to concerns about whether to proceed with sub-sea dispersant application.

The agencies also discussed sub-sea dispersant operations monitoring plan. The parties agreed to work together to ensure that the sub-sea dispersant operation was effective and that robust toxicity testing took place. Additionally, the EPA and Coast Guard issued the RP a directive to construct and establish a monitoring plan for any further application of sub-sea dispersants. EPA, NOAA, and Environment Canada scientists continuously monitored the area in accordance with the dispersant directive, to ensure dissolved oxygen and toxicity tests remained within the defined parameters established by the EPA and NOAA.

### The Dispersant Use Directive and the Decision to Approve Sub-sea Dispersant Application

On May 9, 2010, the FOSC and EPA outlined the initial monitoring requirements for sub-sea use of dispersants and signed their first directive. It paralleled the development of an adaptive monitoring process created within the Environmental Unit, and principally with EPA and NOAA. The directive included requirements for monitoring oceanographic data such as temperature and oxygen concentration, detection of dispersed oil concentration using a fluorometer system, collection of water samples at depth to assess oil concentrations, and biological assessment to rapidly screen observed dispersed oil toxicity. Oil concentration assessments also included tests for volatile organics, such as mono-aromatic hydrocarbons, and semi-volatile organics such as polycyclic aromatic hydrocarbons (PAHs).

On May 10, 2010 a third sub-sea dispersant test was requested and approved after a monitoring plan and shutdown criteria were developed by the RP in concert with the Environmental Unit at the UAC. Test No. 3 included use of a monitoring vessel on site during the test augmented with staff members from NOAA, EPA, and Environment Canada. The test collected samples for evaluation on board ship as well as laboratory analysis. The test demonstrated oil dispersion at depth.

On May 14, 2010, the RP submitted a plan to continue to use sub-sea dispersants. Because of the tests, EPA, Coast Guard, DOI, and NOAA gained concurrence through the RRT VI on May 15. With the consensus of the NRT, the FOSC proceeded with the use of sub-sea dispersants. On May 15, the FOSC approved the RP's plan and issued an addendum to the first dispersant directive requiring additional dispersant monitoring. A total of 771,000 gallons of Corexit 9500A were injected sub-sea during the response.

### Implementing the Decision to Use Sub-sea Dispersants

During the evolution of sub-sea dispersant use, the UAC established an Environmental Unit in Robert, La., to assist the FOSC. It quickly grew to include a wide range of federal, state, and industry scientists and representatives to coordinate elements of the sub-sea dispersant discussion. The Bureau of Ocean Energy Management, Regulation, and Enforcement provided data based on

## 3. Operations

environmental impact studies and reports generated as part of the exploration and permitting process. The NOAA SSC was a member of the Environmental Unit, a leader for these activities, and functioned as a direct environmental consultant to the FOSC.

The Operations Section coordinated the primary responsibility for all sub-sea dispersant implementation and engineering development. The Environmental Unit initially focused on assessing the environmental trade-offs and providing the FOSC with guidance. By default, and given the expertise assembled, the Environmental Unit directly coordinated much of the operational monitoring for sub-sea dispersant use and evaluation. Based on NOAA recommendations, ICP Houma established a separate Sub-surface Monitoring Unit (SMU). However, the two groups maintained strong links throughout the response. EPA was an active participant in all discussions relative to the use of dispersants, and a member of both the Environmental Unit and the SMU. By the end of the summer, the combination of these activities characterized the *Deepwater Horizon* response Sub-surface Monitoring Program.

The Environmental Unit also collaborated with the Operations Section and Source Control on sub-sea dispersant issues in an effort to assess effectiveness and proof of action, especially



*The Chief Scientist on the NOAA research vessel PISCES works as part of the Unified Area Command's Subsurface Monitoring Unit. The PISCES completed a 10-day mission in the northern Gulf as part of the Deepwater Horizon response. Photo courtesy of NOAA*

during the initial trials and sub-sea dispersant tests. If the application of dispersants at the source were not successful or did not result in observable reduction of oil reaching the surface, then the continued trade-off discussions and evaluations are moot. The data gained from the proof-of-concept testing provided valuable information and initial confirmation as to how the dispersants physically changed the transport of the oil. These were important elements in assessing overall trade-off risks and providing the FOSC and the RRT with the best information to proceed with a final discussion about the merits of sub-sea dispersant use.

Command and control of sub-sea application assets for sub-sea dispersants use was accomplished from ICP Houston under the direction of source control via an Offshore Supply Vessel (OSV). When sub-sea application was authorized, an order was issued

from the FOSC directly to the RP source control representative at the UAC and then to Houston. This information was then passed on to the OSV to begin and cease operations. The RP delivered dispersants either via portable tanks by an OSV on site, or by placing dispersants into integrated tanks on board the vessel. Port Fourchon, La. served as the base for monitoring vessels. When monitoring vessels arrived at the site, they always had an EPA or NOAA representative on board for data quality control purposes.

### Impact Assessments and Considerations for Sub-sea Dispersant Application

Possible impacts and benefits to endangered species were included in the evaluation process. The only listed Gulf species known to swim at great depths is the sperm whale in search of giant squid. The Environmental Unit therefore placed particular focus on threats to sperm whales. Discussions included the effects on whales diving through dispersed oil in deep water or consuming squid that may have been exposed to deep water dispersed oil plumes. It was determined that risks to these animals were greatest at the surface, not in deep water.

Trade-off evaluations from an environmental perspective continued throughout the response with new information collected by the monitoring program. Understanding the transport, or movement, of dispersed oil was important in assessing the effects of dispersed oil originating 5,000 feet below the water's surface. The deep waters of *Mississippi Canyon 252* were very much a separate body of water when compared to the surface above. Much less information was readily available to assess possible effects of dispersants and oil in the deep.

The Gulf of Mexico is like two seas, one above the other, and each with its unique currents and ecosystems. The currents, water movement, and physical mixing mechanisms are different between the upper and deep sea. This is also true for temperatures, pressures, ecosystems, and marine life that inhabit the deep-water world. Unlike the warm, well lighted, mixed surface layer between zero to 700 feet, the deep sea is cold and dark, with mixing occurring only where currents intensify due to sub-sea terrain features. A density interface exists between the surface and deep sea. Scientists expected that interface to prevent movement of a dispersed oil plume above this depth, except at locations of upwelling that were much closer to the continental shelf than the wellhead.

Natural oil seeps and methane vents are known processes of the deep-water world. The presence of natural seeps, and the understanding the deep sea had adapted to those oil releases, were factors in environmental trade-off discussions.

Initial trade-off discussions required extrapolation and hypotheses based on the use of dispersants in mixed systems, such as the surface waters in the open and previous laboratory and wave tank studies. These studies were not intended to assess deep-water conditions. There had been only one deep-water controlled release study, which took place off the Norwegian coast and did not include dispersants. The environmental trade-off discussion at the UAC did not have the benefit of examining impacts of dispersant use during deep-water spills. The Norway experiment provided information regarding spill models for deep-water blow-outs; thus the study offered a foundation for the initial transport discussion.

The Environmental Unit contacted the scientists directly involved with the Norway experiment to assist in the *Deepwater Horizon* response. Use of sub-sea dispersants required actual observation monitoring to lessen uncertainties. The entire process was managed by a strategy that continuously looped observations and new information directly into the continued decision-making process. Scientists incorporated the terms 'adaptive management' and 'adaptive monitoring' as requirements for sub-sea dispersant use. Sub-sea dispersant data collected underwent continual evaluation in relation to the trade-off justifications for approval and continued support by the FOSC. Monitoring was adapted to new concerns identified by responders and stakeholders, and to better data collection methods.

## Implementation of Addendum 3 to Reduce Dispersant Application

As noted above, on May 26, 2010 the FOSC and EPA jointly issued Addendum 3 to the May 9 Dispersant Use Directive. This addendum significantly impacted aerial, surface, and sub-sea dispersant operations for the remainder of the response. Addendum 3 was specifically aimed at reducing the amount of dispersants used, and was intended to focus RP efforts on the use of other available response methods, including booming, skimming, and in situ burning, rather than dispersants alone. Addendum 3 placed dispersants in a category for use as a last resort. The directive required the RP

to request an exemption from its general prohibition on dispersant use in order to use dispersants. Addendum 3 achieved the desired effect: the RP focused on all response options and the amount and frequency of dispersant use dropped (see Figure 3.6).

After May 26, the FOSC, in consultation with RRT VI, was empowered to consider granting exemptions from the dispersant use restrictions imposed by Addendum 3 for two reasons. First, the FOSC and RRT VI could permit sub-sea and vessel surface application of dispersants based on a documented need to control Volatile Organic Compounds in the vicinity of the vessels working to control the source at the well site. Second, the FOSC and RRT VI could grant an exemption to allow aerial dispersant application based on a FOSC assessment that, given weather conditions and response resources available, aerial application was the only means to address a significant accumulation of oil on the surface before the oil moved into more highly sensitive environments.

The directive also outlined data collection and documentation requirements that the RP was required to meet for sub-sea dispersant use and approval.

Two elements of the directive were go or no-go indicators, and required daily evaluation for approval of continued dispersant use. The first



GULF OF MEXICO – A U.S. Coast Guard Petty Officer lowers a fluorometer into the Gulf of Mexico. The instrument collects water samples and data to help determine the effectiveness of dispersants in breaking down the oil. Photo courtesy of U.S. Coast Guard

## 3. Operations

element measured oxygen concentration, which could not drop to a hypoxic level, or below two milligrams per liter. The rotifer assay, the second element, could not show significant toxicity relative to background. The intent of the test was to provide a qualitative indicator to the scientists evaluating the field data (80 percent rotifer survival rate). These elements did not fail the criteria at any time during the monitoring. The application of a direct toxicity assay on living organisms provided the FOSC with another source of field data regarding potential threats. For sub-sea monitoring, a standardized rotifer test was used. The test exposed microscopic invertebrates (rotifers) that are sensitive to chemical hazards, to water collected from the dispersed plume. Rotifer survival rates were then compared to those exposed to background water versus impacted water.

### Surface Application of Dispersant After Addendum 3

After adopting Addendum 3 and until the source was secured, the RP was compelled to request the use of surface dispersants due to health and safety concerns of personnel working on board vessels drilling relief wells, and the work that was continuing on the LMRP at the source. Each of these working vessels contained monitors and alarms to stop work when volatile organic compound readings reached above the threshold limit value of benzene (five parts per million (ppm)). Benzene is a known carcinogen. When vessels were close to the source control applied dispersants, the reduction in VOCs was significant. Based on data received from ICP Houston, readings were at times well above 200 ppm.

High levels of VOCs were more than a respiratory hazard, they were also a significant fire hazard. The events that drove increases in VOCs were not simply a result of oil flowing from the well. Even when RRT VI allowed sub-sea dispersants, weather, specifically lightning strikes in the area of the small city of vessels tethered to the well, required cessation of on-deck activities, including those necessary to operate the sub-sea dispersant applicator. Thus, a thunderstorm near the well site could lead to a dramatic increase in VOCs on the surface soon after the storm passed. As a result, in accordance with Addendum 3, the FOSC routinely allowed the RP to use surface dispersants to control VOCs at the source, in order to protect the health

and safety of workers. EPA conducted air monitoring that confirmed that the use of dispersants had lowered VOC levels.

### Aerial Application of Dispersant After Addendum 3

ICP Houma implemented a decision flow process to request the surface application of dispersants only when a slick moved beyond the recovery capacity of skimmers and in situ burn task forces, or when skimmers and in situ burn task forces could not operate due to weather conditions, making shoreline impact of highly sensitive environmental areas inevitable. Dispersing the oil in deeper Gulf of Mexico waters, which are rich with oil-eating bacteria, was determined to be preferable to risking shoreline impact in sensitive environmental areas such as pelican nesting sites.

### Additional Activities of Note Related to Dispersant Operations

Conducting such deep-water oceanographic assessments and monitoring a mile below the ocean surface required highly sophisticated equipment. It also required vessels capable of properly deploying sensor packages and water sampling equipment. Highly trained scientists and technicians were sought to conduct monitoring, maintain equipment, and interpret data collected. The RP selected the merchant vessel *Brooks McCall*, and adapted it as the sampling platform for the initial oceanographic monitoring cruise. Federal employees and contractors integrated with RP scientists and technicians to ensure the process fully incorporated federal oversight and validated all data.

In late May 2010, LSU assembled an external workshop to evaluate the known information and initial monitoring data. With its findings, the workshop would provide the FOSC additional guidance on the role of dispersants specific to the *Deepwater Horizon* response. There was consensus from the LSU meeting that, up to that point, the use of dispersants and the effects of dispersed oil into the water column had generally been less environmentally harmful than allowing the oil to migrate on the surface into the sensitive wetlands and near-shore coastal habitats.

The LSU workshop confirmed that oxygen, a key monitoring criterion, needed continual monitoring. Oxygen is required for microbes to degrade oil and

**3. Operations**

for most marine life to survive via respiration. Scientists initially believed there was sufficient oxygen in these waters. However, the demand on oxygen caused by degradation of dispersed oil at depth was unknown. Biodegradation is slower at cold temperatures, potentially reducing oxygen availability in the deep-water ecosystem. Therefore, what may take days in warm surface water may take weeks, months, or longer in deep cold water. The deep Gulf contains microbes that have the ability to degrade oil, as observed in seep communities. The concern was the possibility of overloading the deep-sea system and dropping oxygen concentrations to levels that created a dead zone like those which naturally occur off the Mississippi Delta. The monitoring and sampling protocols in place throughout the response helped document that these potential risks and concerns would not materialize.

Trade-off discussions throughout the response also included the impact of additional carbon loading. This concern arose from the additional methane entering into the deep-sea system. The deep-sea food web depends on organic carbon that drifts down from the upper sea and surface. This suggested the ecosystem could accommodate and process oil droplets once the oil toxic compounds dissolved out of the oil droplets or degraded. However, larger PAHs that might have persisted for long periods in the colder water environment could adversely affect very early life stages of fish. No mechanism was in place to assess this during operational monitoring. Input from the scientific community, damage assessment process, and long-term studies would be required to fill data gaps. Oil in the sea was an environmental threat, dispersed or not. The goal of the response was to manage the response strategy to reduce the overall impact of the spill.

The FOSC concluded, based on the continued review of guidance, that the potential environmental benefits in this spill justified sub-sea dispersant use within the parameters established. This determination came in part because the long-term environmental impacts to the near-shore and estuarine environments were well known, and other response options were limited at this stage of the response.

*Monitoring for Effects*

The FOSC continually enhanced the monitoring process of the response, which included the number of vessels deployed and addressed new and broadening questions (such as the presence and fate of any additional oil in the offshore environment that might be subject to a removal action). On August 3, 2010, the National Incident Commander issued a directive requiring that *Deepwater Horizon* monitoring and assessment activities be broadened to assess any residual oil pollution that would require removal. This implementation plan required enhanced sampling in three spatial domains, including:



*GRAND ISLE, La. – NOAA personnel collect water and sediment samples off the coast of Grand Isle State Park in the Gulf of Mexico to test for oil and dispersant levels. Photo courtesy of U.S. Coast Guard*

1. Near-shore: from the marshes and beaches to 3 nm offshore,

2. Offshore: from 3 nm to the shelf break, or the 200 meter depth contour, and

3. Deep water: from 200 meter to 2000 meter water depth.

The wellhead was in 5,000 feet of water. Monitoring results and trajectory models for the deepwater layer, where oil and residual oil contamination had previously been detected, guided sampling in deep waters. The directive required enhanced sediment sampling, particularly on the continental shelf and in deep environments. The directive also required the FOSC to expand interactions with the academic community.

To fulfill this requirement, NOAA hosted a series of three listening sessions with the academic community during late August and early September. Each session focused on the sub-surface monitoring plan and collected feedback from the community to ensure the plan did not miss any essential pieces. Many academic vessels on scene participated in the daily mission guidance calls. Engaging the academic community through real-time maximized vessel time and sample location. Some academic vessels accommodated a NRDA sampler, or data processor, which allowed real-time data collected to be added to the sub-surface monitoring data. NOAA also enlisted numerous academics as the Chief Scientists on cruises. The communication allowed for collaboration between the needs of UAC and the ongoing research. The

## 3. Operations

SMU, in coordination with NOAA and National Science Foundation, employed an academic liaison at the UAC.

As a result, the UAC extended and focused monitoring activities to address the specific elements of the directive. The directive in many ways defined and validated activities that had already been expanding in the monitoring program. Eleven ships were directly or indirectly under the FOSC's coordination and control as part of the Sub-surface Monitoring Program, including three NOAA research vessels. In addition, seven university vessels conducted cruises and research associated with the oil spill and coordinated with the submerged monitoring unit (SMU).

The degree to which monitoring was conducted at the direction of the FOSC in the Gulf of Mexico waters was unprecedented. It provided actionable information and documentation to assess and determine the location, fate, transport of oil, and dispersants. The FOSC also instituted a multi-agency Operational Science Advisory Team (OSAT I) at the UAC. The mission of OSAT I was to provide assessment and analysis of the data collected by the Sub-surface Monitoring Program and to inform the FOSC for the need to conduct any additional monitoring or response actions. During the course of the response, over 17,000 samples collected underwent environmental review by OSAT I per the monitoring requirements defined in the May 9 and August 3, 2010 directives. The last samples collected as part of the Sub-surface Monitoring Program occurred on October 23, 2010, nearly two and a half months after the leak had been stopped.

Oceanographers from NOAA provided data they used for oil trajectory and shoreline threat probability modeling. Besides collecting urgently needed information, BOEMRE modified and extended research studies already under way at the time of the spill. The *Lophelia II* expedition, Loop Current monitoring, socioeconomic studies, and others provided data to help evaluate the impacts of the spill.

### Challenges to Dispersant Use

Dispersants are monitored by using the SMART protocol, which measures dispersant effectiveness, not its effects. Before the *Deepwater Horizon* spill, Self-Monitoring, Analysis, and Reporting Technology (SMART) had been effective, and dispersant

use research revealed little or no harmful effect to the environment in the numerous cases where it had been deployed in the United States. Because of the unprecedented volume of dispersants applied to this spill, the SMART protocol was amended to include effects monitoring. The amount of data generated by normal SMART procedures and the new requirement for effects monitoring was enormous, and quickly generated a significant data management requirement. In addition, effects monitoring is not real-time, so there was significant delay in data availability. There was also disagreement on proper monitoring and interpretation of the data. This lack of supporting data fueled uncertainty on the effects to the environment.

### End of Dispersant Use

The well was capped on July 15, 2010. The last use of dispersants took place on July 19. The last sighting of recoverable oil offshore was observed August 1. The volume and duration of dispersant use during this response were unprecedented and included surface and sub-sea applications. The amount used caused public concern and led to the reduction in the frequency and amount of dispersant. However, dispersants were an effective response tool, and prevented millions of gallons of oil from impacting the sensitive shorelines of the GOM states. This response tool made it possible to continue source control efforts by the vessels operating at the well site, and were used when other response options were not suitable.



*GULF OF MEXICO-Dark clouds of smoke and fire emerge during a controlled burn in the Gulf of Mexico. Photo courtesy of U.S. Navy*

**3. Operations**

### 3.3 In Situ Burn Operations

Due to the enormity of the release, initial skimming assets were not sufficient to contain and collect the surface oil. On April 26, 2010, the use of in situ burning in the response was proposed. As part of its laboratory analysis, NOAA tested the combustibility of MC 252 oil, to ensure it was amenable to burning activities and to determine on what scale this technique could be applied. Between April 28 and July 19, 2010, the Controlled In Situ Burn (CISB) Group under the Offshore Operations Branch of ICP Houma conducted 411 burns, removing five percent of the 4.9 million barrels of discharged oil. Burn Task Forces conducted burns within the specified and approved CISB Burn Area, typically within three to eight miles of the *Mississippi Canyon 252* oil spill source.

RRT Region VI published an In Situ Burn Operations Plan in 1994. The plan specified how to determine when to conduct in situ burns, how to conduct them, interaction with other response activities, the ignition process, and residue cleanup procedures. The plan also required safety and health monitoring, operational monitoring, effectiveness monitoring, and guidelines for use of the Vessels of Opportunity (VOO). The One Gulf Plan and ACPs referenced the RRT Plans. In order to fulfill the criteria of the RRT VI Pre-Authorization for in situ burning, the NOAA SSC helped implement the SMART in situ burning monitoring protocols for the first test burns. Coast Guard Strike Team personnel deployed with in situ burning monitoring equipment to an offshore platform approximately 13 miles southwest of the planned burn site. This was the closest location where non-responding personnel were located. SMART in situ burning monitoring protocols are designed to protect the general population and response workers from smoke particulates. SMART sampling revealed no detectable particulates in work zones and population centers.

Additionally, NOAA worked with the National Atmospheric Release Advisory Center (NARAC) to model potential plume releases from in situ burns. It was determined that the offshore location (a great distance from any populated areas) and atmospheric conditions would not pose a problem to the general population from particulates from the burns. SMART monitoring was not required for further burns.

### Overview of Operations

In late April 2010, in accordance with the existing in situ burn plans, the OSC determined in situ burning was a viable response method for several reasons. First, weather and sea-state did not allow continuous skimming and the response needed alternatives to these methods. Second, skimmers and dispersants could not completely remove the oil releasing from the well. The OSC determined in situ burning was a safe and effective way to remove large volumes of oil from the ocean surface, based on in situ burn data from previous spills.

Over the course of the CISB Group's operations, the team grew from five people to a 264-person group. At the peak of operations, the CISB Group had three task forces, utilizing 43 vessels and two twin-engine aircraft. Each task force had a three-vessel ignition team, two task force vessels, one supply vessel, a safety team, and five two-vessel fire boom teams. The fire boom team vessels were VOO from the Houma. Coast Guard personnel, technical advisors, oil spill contractors, commercial fishermen, NOAA, and EPA representatives staffed the CISB Group.

Personnel in each task force underwent training prior to engaging in situ burning operations. The training was a combination of four hours classroom and 12 hours on-water instruction. Some of the teams had underway practice days as well.



*VENICE, La. – An igniter package is being placed in oil contained by fire boom in the Gulf of Mexico in order to ignite an in situ burn near the Deepwater Horizon oil spill site. Photo courtesy of U.S. Air Force*

## 3. Operations

### Offshore Vessel Fleet

Two spotter planes provided continuous air observation for offshore in situ burning operations. To facilitate identification and communications with the spotters, the fire boom teams color-coded vessels using different colored tarps suspended over the back deck of the boats. In addition, the CISB Group used the Automatic Identification System (AIS) to identify the offshore burn vessels from the air and confirm their positions.

Safety and air monitoring personnel manned the lead boat (one of two) for each fire boom team, which included fishing vessels. With the exception of adverse weather days, the in situ burning Task Forces and all support vessels



*GULF OF MEXICO – Two fishing vessels drag an oil boom after trapped oil is set ablaze in the Gulf of Mexico as part of a controlled burn to aid in preventing the spread of oil. Photo courtesy of U.S. Navy*

were available on location by daybreak each day. Throughout each burn day, spotter aircraft guided fire boom teams to the heaviest concentrations of oil. Using two King Air fixed wing spotter planes flying two sorties each, the in situ burning Technical Advisors, Spotters, and Documenters were able to stay on location for approximately two and one-half hours before returning to Houma Airport for fuel. To get more spotting time coverage, the team attempted to fly soon after sunrise and late in the evening. The CISB Group learned from these efforts that the angle of the sunlight determined the effectiveness of spotting and thus flights early in the morning and late in the day proved not as useful.

### Simultaneous Operations

The Offshore Operations Branch of ICP Houma managed an integrated response using mechanical skimming, aerial dispersants, and controlled in situ burning to address approximately 16 percent of the total oil discharged from the Macondo Well. They safely managed high-risk operations to optimize oil removal for more than 40 to 50 miles offshore. In addition, the Operations Branch protected source control efforts at the well site using zone defense and a command and control vessel, merchant vessel *Seacor Lee*, to help coordinate removal operations.

The in situ burning task forces had to perform operations simultaneously with both the mechanical

skimming teams and the dispersant group. The CISB Group originally used a burn box to place a boundary around the burn operations in accordance with the RRT in situ burning plan. Over time, the burn box was replaced by a burn circle. This allowed CISB Task Forces to cover greater areas because their turning radius conformed better to a circular rather than a box pattern.

Once on station, spotters circled the area observing oil concentrations and vectoring fire teams to the oil. A log of events (times of arrival and departure for the spotter aircraft, times of ignition, durations of burn, etc.) was contained in the ICS 214 forms recorded for each burn day. Operations moved through heavy patches or long streamers of oil (without deflection), and then ignited the oil once a sufficient amount of oil was contained within the fire boom. By late July 2010, the oil was more weathered and igniting became more challenging.

### Wildlife Monitoring

Burning effectively removed large amounts of oil, approximately 265,450 barrels, from the sea surface, but had potential trade-offs with air quality and wildlife, most particularly turtles. Beginning July 5, 2010 trained and qualified protected species observers were placed within each in situ burning task force to monitor for any sea turtles present within the fire boom area prior to ignition. The observers did not spot turtles in or near fire boom during the period of time when they were deployed on the burn vessels.

### Safety and Smoke Plumes

Attention to safety was always paramount. There were no injuries or illnesses resulting from the burning operations. Vessels downwind from the plume easily removed themselves from paths of exposure. The SMART monitoring results indicated no health impacts to the burn group members. There were some readings generated by the fire boom pumps used to water-cool the fire boom. This was easily remedied by moving the pumps from the front of the vessel to the rear.

The Coast Guard directed air sampling for dioxin, a known carcinogen by-product of burning operations. With the assistance of the Environmental Protection Agency, extensive sampling was performed. Results indicated no dioxin threat to workers and GOM residents.

## 3. Operations



*GULF OF MEXICO – A controlled burn in the Gulf of Mexico is monitored by members of industry and Coast Guard Gulf Strike Team personnel. Photo courtesy of U.S. Navy*

In the course of the 411 burns at sea, responders only intentionally extinguished two. The first occurred with the longest burn of 11 hours and 48 minutes. Although continuing to catch oil and feed it into the fire boom, crews began to show signs of fatigue. They intentionally extinguished the fire by increasing towing speed, which caused the oil to wash over or entrain under the boom. This thinned out the oil, which caused the fire to extinguish.

The second occurred when a very large area fire spilled out of the containment boom, and continued to grow in size and intensity while moving across the three-mile buffer zone around the source control efforts. The crews of the source control vessels were concerned that the fire was encroaching on the three-mile buffer between the source control vessels and this particular burn. While the CISB determined the burn was still within safe parameters, the crews extinguished the fire. This took approximately 90 seconds to accomplish.

### Mega Volume Burns

The CISB had their best burns on June 18, 2010. A total of 16 different burns were conducted with an estimated 50,000 to 70,000 barrels of oil consumed. The seas were unusually calm, which provided optimal conditions for burning. Some burns extended outside the fire boom containment, but were allowed to continue to burn because they did not spread significantly.

Burns were sustained by using aircraft to direct Task Forces into streamers of oil that could feed the fire. There was concern that the fire could travel up the boom toward the towing vessels. Careful monitoring

and regulation of towing speeds ensured the fire stayed well within the towed boom configurations. Because of the condition of the oil (weathered and emulsified), feeding of oil into an existing burn was safe and effective. The fire remained within the fire boom and downstream of the towed boom configuration. The CISB was able to burn some emulsified oil, which by itself is not burnable, by towing existing oil fires into emulsified oil patches.

The CISB expansion to two task forces with five fire boom teams each required 10,000 feet of fire boom available at all times. To accomplish this, CISB received boom from South America, Alaska, and Algeria. One boom design with continuous inflation chambers sank several times during operations and was therefore determined to be unusable and potentially a safety risk. The three main types of fire boom, water-cooled, stainless float, and ceramic, all lasted well beyond expected service life. The most destructive action related to the boom occurred when crews attempted to remove a used boom from the water, as the stresses of a crane lifting usually resulted in damaging a boom beyond repair. Early burns revealed that in most cases, fire boom lasted longer than expected, even though fires destroyed between 400 and 500 feet daily.

This was the largest in situ burn operation in U.S. history. The burns conducted during this operation dramatically exceeded any previously documented in duration and in magnitude.

### Burn Volume Calculation

Controlled In Situ Burn Summary volume calculations for each burn included a minimum and maximum estimate. The minimum volume estimate was based on the lower of any multiple air and

*GULF OF MEXICO – Vessels of Opportunity pull oil into a fire boom in a controlled burn with a second controlled burn visible in the distance. Photo courtesy of U.S. Coast Guard*



## 3. Operations



*GULF OF MEXICO – Oil is collected in skimming boom attached to the U.S. Coast Guard Cutter Elm operating approximately 21 miles off the coast of Perdido Key, Fla. Photo courtesy of U.S. Coast Guard*

surface estimates of burn size, the duration of burn, and a burn rate of 0.05 gallons per minute (gpm) per square foot—the rate commonly associated with the controlled burning of crude oil that is 25 percent to 40 percent emulsified. The maximum volume estimate was based upon the higher estimates of burn area, the duration of burn for each of those areas, and a burn rate of 0.07 gpm per square foot—the rate commonly associated with the burning of oil that is 10 percent to 20 percent emulsified.

### 3.4 Skimming

During the *Deepwater Horizon* response, skimming was a key measure taken to contain, capture,



**Figure 3.8: Geographic skimming areas**

The UAC through the ICPs employed a layered approach to oil containment and recovery. The most effective response method was containment of the leak at the wellhead and the recovery and flaring of the captured oil and gas. Beyond this, the team employed a combination of sub-surface dispersant use, in situ burning, targeted surface

dispersant application, and skimming to minimize shoreline impacts. The recovery operation of last resort was shoreline cleanup.

A skimmer is defined as any mechanical device specifically designed for the removal of oil (or oil and water mixture) from the surface of water without altering its physical or chemical characteristics. A skimmer's performance is measured by the rate at which the machine recovers pure oil from an oily environment, the recovery efficiency (relation between recovered oil and recovered fluids), the throughput efficiency, and the relation between recovered oil and encountered oil. A skimmer's performance is affected by:

- The type of oil,
- The condition or maturity of the oil,
- Oil viscosity,
- The oil slick thickness, the presence of debris (e.g., driftwood, seaweed), and
- The environmental conditions including wind, wave, current, and the current air and sea temperatures.

Although skimmer effectiveness could vary dramatically based on all of these factors, given the indeterminate nature of the *Deepwater Horizon* spill, aggressive skimming was a key component of the success of this response.

There were several vessels and vessel systems used to skim free floating oil offshore. These included Oil Spill Response Vessels, Coast Guard Buoy Tenders equipped with Spilled Oil Recovery

recover, and remove oil from the environment. Skimming operations covered a wide geographic area. Hence, skimmers were a critical resource that required strategic management to ensure sufficient capability was available at the right time, in the right place, and with the right support to achieve the best effects. Skimmers were employed in three types of geographic zones offshore, near-shore, and beach, bays, and marshes. Skimmers were also placed inshore, in protected waters.



*GULF OF MEXICO – The Coast Guard Cutter Oak skims thick brown oil off the coast of Alabama. Photo courtesy of U.S. Coast Guard*

**3. Operations**



*MOBILE BAY, Ala. – A Vessel of Opportunity sets up its equipment as it prepares for oil-skimming activities in the Gulf of Mexico. Photo courtesy of U.S. Coast Guard*

Systems (SORS), vessels equipped with Vessel of Opportunity Skimming System (VOSS), and fishing vessels equipped with boom and skimmers as part of the VOO fleet. OSRVs are designed and built specifically to recover spilled oil. These vessels have temporary storage for recovered oil and have the ability to separate oil and water aboard ship using oil-water separation systems. To sustain cleanup operations, most OSRVs transfer recovered oil onto other vessels or barges. VOSS are self-contained systems that include booms, skimmers, pumps, and temporary storage devices that are placed on vessels of sufficient size to deploy the equipment safely. SORS equipment includes boom, pumps, skimmers, and storage that are part of a Coast Guard Buoy Tender equipment package, available for use when needed and put away when not in use. Finally, commercial fishing vessels from the VOO fleet were reconfigured to carry boom and skimmers instead of nets. One of the biggest issues faced by the offshore skimming group was the offload of oil and oily water from temporary storage devices. The oil became very viscous, making the offload slow and difficult, and until a good method to offload the devices was found, this affected the ability to keep all assets skimming. It was important to understand the effect weathering and skimming had on the physical characteristics of the oil to determine the best temporary storage devices and ways to offload them in a safe and rapid manner.

By the end of April 2010, the UAC established a structured offshore branch comprised of 26 vessels capable of working in deep water, seven dedicated tugboats, and three offshore oil storage barges, which could collectively support and sustain long-term skimming operations near the source. From early June through mid-July, the number of skimmers fighting oil in the Gulf increased to 593 and the UAC increased skimming and beach cleanup activities, and prepared to move to 24-hour cleanup and skimming operations.

## Offshore

The offshore zone encompassed the area immediately above the source where fresh oil first emerged at the surface and outward to where the slick became broken and discontinuous. The extent of this area varied with wind, current, and wave conditions. The types of vessels sourced to this area were at least 50 feet long and equipped with high volume skimming capabilities, temporary storage, and crew accommodations to remain underway for an extended period. OSRVs and VOO Skimming Systems used in the offshore zone were large and required a lot of sea room to operate. The vessels' advancing speeds averaged one knot due to the limitations of towing boom in dynamic offshore waters. Some skimming systems were able to attain three to five knots due to their unique design and affinity for the type of oil spilled.



*HOUMA, La. – A sweeping arm skimming system fitted on a commercial vessel collects oil in the Gulf of Mexico. Photo courtesy of U.S. Coast Guard*

In the offshore zone, vessels typically encountered fresh oil, which then manifested in large, continuous brown oil slicks, some of which became emulsified. The offshore environment provided the best opportunity for skimming oil where it was abundant, fresh, and far from shore. This was the first line of defense for surface oil recovery. Given favorable skimming conditions—generally seas below six-foot swells and two-foot choppy waves—the number of skimmers in the offshore zone could be increased and directed to the heaviest concentrations of oil with aerial support to optimize recovery.

On April 28, 2010, Marine Safety Unit Morgan City requested immediate assistance from U.S. Navy Supervisor of Salvage and Diving (SUP-SALV). SUPSALV equipment began arriving in theatre on April 29th, and SUPSALV continued to fill requirements offshore, near-shore and on shore until there was no oil their skimmers could recover in those zones.

49

## 3. Operations



GULF OF MEXICO – The Seacor Lee served as one of the command and control centers for the offshore Deepwater Horizon oil spill response. Photo courtesy of U.S. Coast Guard.

By late June, the *Seacor Lee*, a 280-foot Offshore Supply Vessel (OSV), became the command and control vessel for the offshore skimming fleet. The fleet consisted of twelve offshore skimming vessels and numerous small independent one- and two-vessel operators. The RP retained an emergency response management company to provide services via the offshore branch.

The *Seacor Lee* was large, stable work platform. The bridge was large enough to provide a separate work area for response workers and not interfere with the *Seacor Lee* vessel crew. The vessel had satellite Internet connectivity and wireless local area network. The RP contractor also provided four individuals as communications technicians who stood watch on the communications stack twenty-four hours a day. Almost all communication was VHF Marine Band radios and mobile phones using the oil field offshore networks. Email to those vessels was also available.



GULF OF MEXICO – Crew members from U.S. Coast Guard Cutter Harry Claiborne remove an oil covered boom that was part of a Vessel of Opportunity Skimming System. Photo courtesy of the U.S. Navy

Communication with response vessels only using VHF became a problem when they had to operate at distances greater than twelve miles from *Seacor Lee*—this included many of the smaller assets. The offshore fleet had to rely on relaying messages through several other vessels; this resulted in inefficient communications and misinterpreted instructions. The sheer volume of traffic on the VHF radio frequencies made communication difficult and garbled.

Roll call of all vessels was conducted at 7:00 a.m. when vessel assignments were relayed. The representative based assignment decisions on the information available from the aviation assets, observations taken from vessels operating in the area, and the guidance provided by the UAC. Wind direction, sea state, and the movement of the oil due to tides and currents were important factors in the positioning of assets each day. The size and capability of each vessel was also a factor. Another dynamic was the on board storage and processing capability of the vessel. As the oil aged and became more viscous, the number of assets capable of removing that oil became limited. Removing oily water mixture from vessels and returning them to service was time consuming.

New skimming equipment, including the *Big Gulp* weir skimmer, was deployed offshore. Weir skimmers collect oil floating on the water surface via weir technology, a mechanical wall whose top edge is placed at the oil water interface to allow the oil to be separated by the water. Once collected, the oil transferred from the weir central sink by gravity or by pump to storage tanks. The *Big Gulp* was a converted barge that acted as a large-capacity skimmer. A tugboat guided the barge-turned-skimmer into a patch of oil, often near the spill site. Oil entered the skimmer through a big opening in the bow of the barge, gathering against a bulkhead and finally spilling over into a holding tank. From there, oil was pumped into two holding tanks, where gravity separated the oil from the heavier water. Crewmembers opened a valve, sending clean water back into the Gulf, while capturing a mix that was 98 percent oil. Similar barges worked in shallow waters and were called *Little Gulps*.

The Coast Guard owns and maintains pre-positioned VOSS equipment suites throughout the country at three spill response strike teams and at strategic sites within each Coast Guard District. The Coast Guard utilized the equipment suites in support of the response. There are 22 cleanup systems located nationwide to ensure a rapid first response to an oil or chemical spill.

Each Coast Guard VOSS consists of two of the following:

- Outrigger assembly with lifting davit,
- Sweep boom to collect the oil, DESMI 250 floating weir skimmer with diesel-driven hydraulic prime mover and control stand and air compressor to recover the oil,
- Submersible 6-inch off-loading pump, or
- Portable inflatable barges (26,000 gallons) to store the oil.

*A Whale* arrived in the Gulf of Mexico on June

**3. Operations**

30. *A Whale*, a 1,115-foot long supertanker, was retrofitted and converted into a skimmer in Portugal to assist in the *Deepwater Horizon* response. The vessel went through an extensive operational review by a multi agency team under the supervision of the Coast Guard. After an extended trial period during which the supertanker-skimming vessel was given an opportunity to demonstrate its capability to remove oil in open seas of the Gulf of Mexico, the FOSC announced on July 16 that it would not be deployed as a part of the *Deepwater Horizon* oil spill response. (See more detailed discussion in Alternative Technologies section of testing of *A Whale*.)

The crew boats available to the offshore skimming group were strained by the number of crew changes and vessel transfers conducted. These boats were older vessels—built in the 1970s—and generally were 75 to 90 feet long. They proved too small and unstable to provide safe crossing between vessels. This made personnel transfers between vessels challenging and resulted in several aborted transfers for safety reasons. Some smaller vessels and assist boats were also older and not outfitted to sustain operations.



GULF OF MEXICO - The converted tank ship A Whale conducts a test of its oil skimming capabilities on open water as part of the Deepwater Horizon response. Photo courtesy of U.S. Coast Guard

**Near-shore Zone**

The near-shore zone encompassed the geographic area just off the coast and out three miles where surface oil manifested itself in smaller, widely spread patches. The types of vessels sourced to this area were typically less than 50 feet long. Agile skimming platforms were more effective in this area because the vessels could quickly move between patches of oil. The vessels in the near-shore zone were equipped with weir skimmers or other types of skimmers appropriate for the oil encountered.

In the near-shore zone, oil manifested itself in a variety of ways, from bands of emulsion to racks of semi-solid tar balls and mats that combined with debris in bands. Response parties organized near-shore skimming operations into task forces that operated within branches along the impacted coastal areas. In addition, the Coast Guard stationed the task forces in gaps between barrier islands before it entered sounds where it could impact environmentally sensitive areas. Aerial observations provided directional targeting to maximize oil recovery.



GRAND ISLE, La. – Two Vessels of Opportunity converted to oil skimmers conduct skimming operations in the waters near Grand Isle, La. Photo courtesy of U.S. Air Force

In the early stages of the *Deepwater Horizon* incident, near-shore and inland Oil Spill Response Organizations (OSROs) mobilized extensive resources. Resources cascading into the Gulf region supplemented the robust OSRO network already in the region from all areas of the country. The majority of skimming assets owned by the OSRO community are designed for near-shore and inland environments. During the *Deepwater Horizon* response, much of the oil that reached the near-shore environment co-mingled with debris or was tar-like and difficult or impossible to skim. As such, many of the skimmers mobilized to the offshore sites were ineffective in removing this material. To retrieve oil, manual methods such as nets, pool skimmers, and absorbents were more effective for work in this environment.

By June, SUPSALV deployed 18 Marco Class V skimmers to conduct near-shore skimming operations in Pensacola, Fla., Panama City, Fla., Gulfport, Miss., Ship Island, Miss., Bayou LaBatre, Ala., Slidell, La., and Venice, La. Skimmers such as the Marco skimmers proved effective because the viscosity of the oil particularly suits the belt skimmers, and that the mobile skimming system could work both close inshore and offshore.



RIGOLETS, La. – A fishing vessel equipped with skimmers makes its way up and down the Rigolets as a precautionary measure to capture any stray tar balls. Photo courtesy of U.S. Coast Guard

Nearshore and inshore skimming operations led to the design and use of the *Little Gulp*. The efficient design of the *Big Gulp* skimmer for offshore served as the template for design of *Little Gulp* skimmers. Used primarily in shallow water environs, like the *Big Gulp*, *Little Gulp* skimmers employed a barge design that transported oily water on board, and then separated the oil from water.

**5. Planning**

### MTS Recovery Data

Although an actual transportation disruption did not develop, there was significant demand for MTS status information. The prototype CART was successfully used to support documentation and reporting of MTS status. CART was originally developed by Coast Guard Atlantic Area as a software application to support the identification and documentation of Essential Elements of Information (EEI), and automated status reporting. EEI data and status information were entered at the field level and were immediately accessible to the MTSRU staff at all levels. An automated report generation capability acted as the principal resource for sharing MTS recovery status information with the NIC Situation Unit, Homeland Infrastructure Threat and Risk Analysis, Maritime Administration, and the Northern Command. The report also informed strategic-level policy outreach with national-level stakeholders. Participating associations redistributed status reports to their constituents worldwide, which restored confidence in general operating conditions in affected ports.

### 5.4 Plans Developed During the Response: Severe Weather Plan and Planning for Concurrent Activation of the National Contingency Plans and Stafford Act

Each year, an average of eleven tropical storms develop over the Atlantic Ocean, Caribbean Sea, and Gulf of Mexico. Official hurricane season begins June 1st and ends November 30th; however, a severe weather event can occur at any time.

During the 2010 hurricane season, NOAA projected an active to extremely active hurricane season for the Atlantic Basin. According to a seasonal outlook issued May 27, 2010, there was a 70 percent chance of 14 to 23 named storms (top winds of 39 mph or higher) including eight to 14 hurricanes (top winds of 74 mph or higher). Three to seven were slated as major hurricanes (Category 3, 4 or 5, with winds of at least 111 mph). As of September 24, 2010, 12 named storms had occurred, three of which passed through the Gulf of Mexico. Five of the six storms that reached hurricane status became major hurricanes.

The *Deepwater Horizon* operating area was subject to both Atlantic tropical weather systems and locally generated storm systems that originated within the Gulf of Mexico. Storms from either source could impact the UAC AOR with high winds and seas, storm surge, and heavy rainfall.

The National Incident Commander and the UAC were concerned that severe weather would interrupt *Deepwater Horizon* spill response operations.

If this happened, the dynamically positioned relief-drilling rig would need to suspend drilling, disengage, and move off station to prevent damage to the vessel, riser, and drill pipe. Relief well drilling efforts would cease until it was safe to resume drilling operations. All support vessels and equipment used in the surface and sub-sea intervention efforts would likely need to be withdrawn to evade severe weather, which would result in all response operations temporarily coming to a standstill. Even when the impact of a severe weather event did not cause additional damage to vessels and well-control equipment, the pre-storm and post-storm downtime, and resumption efforts could take a week or more. Further, severe weather could potentially push floating oil inland and deeply ashore into sensitive areas. When a storm surge retreated, the oil could remain, potentially contaminating wildlife habitat, as well as public and private property.

As the *Deepwater Horizon* response would likely extend through the entire 2010 hurricane season, the NIC directed the development of severe weather response plans.

### Concurrent Activation of the National Contingency Plan and the Stafford Act

The strength of the NCP is that it directs coordination among federal, state, local, and tribal stakeholders and the oil spill industry in oil spill preparedness and response. Responders are predominately drawn from federal, state, and local environmental management communities, the RPs' contracted Oil Spill Removal Organizations (OSROs), other RP contractors, and RP personnel. Other state and local emergency response personnel are invited to provide support as needed or called upon by the FOSC. While the National Response Framework (NRF) also relies on federal, state, local, and tribal coordination, it is designed to support state and locally led emergency response to natural disasters and other catastrophic events. Pollution response under the NCP is a federally funded effort, while the Stafford Act is based on federal assistance to state and local

**5. Planning**



COCODRIE, La. – Response workers assemble by their boats and wait to see in heavy weather results in the cancellation of oil cleanup operations for the day. Photo courtesy of U.S. Coast Guard

governments. State and local governments did not understand the difference and had no idea about what an RP was or what its role should be. Although the NRF incorporates the NCP by reference under Emergency Support Function 10, the two governance structures are inherently different and the NRF does not explicitly address the role of the RP.

The role of the federal government is different in an NCP response compared to an NRF response. In the latter, the federal government supports state and local activities. In an NCP response, the federal government acts as the first responder.

State and local government emergency response officials apply the bottom-up response constructs defined within the Stafford Act and the NRF. Under these constructs, the state and local governments direct the emergency response, and the federal government assumes a supporting role. Funding and resources are predominantly an intergovernmental responsibility—as opposed to those of a private sector responsible party under the NCP.

This response would have been even more complicated had a severe weather event resulted in a major emergency or disaster declaration under the Robert T. Stafford Disaster Relief and Emergency

Assistance Act (the Stafford Act), discussed in detail below. When severe weather strikes, the primary event (wind, rain, flooding) leaves a path of destruction to public utilities and infrastructure, homes, businesses, and crops, and people suffer injuries or loss of life. Secondary impacts are related to the direct impacts, such as public utilities and infrastructure shutdowns (sewer, water, electricity, air quality, trash, and telecommunication), as well as longer-term impacts associated with economic and environmental impacts. In addition, the more severe the impacts sustained, the higher the recovery costs and the longer the recovery time. To combat these multiple-order impacts, the President of the United States may issue a disaster declaration under the Stafford Act. The Stafford Act authorizes federal agencies to provide assistance to states overwhelmed by a disaster. By order, the President delegates to the Federal Emergency Management Agency (FEMA) the responsibility for taking actions and assisting the affected communities.

The Planning Section at the UAC considered that if severe weather, such as a hurricane, were to hit the Gulf Coast, it could deposit oil or oily debris from the *Deepwater Horizon* well inland. The resulting response would have to include two individual

**Appendix**

## Chronology

On April 20, 2010, at approximately 10 p.m. Central Standard Time (CST), an explosion occurred on the *Deepwater Horizon* oil drilling rig in the Gulf of Mexico, located at 28 degrees 45.23 minutes north of the equator and 088 degrees 18.89 minutes west of the meridian, approximately 42 miles southeast of Venice, La. There were 126 people on board at the time. Fifteen of those people were injured and 11 went missing. Commercial vessel operators and Coast Guard assets rescued 115 crewmen and rig personnel. The *Deepwater Horizon*, owned by Transocean Ltd., was under a contract with Beyond Petroleum (BP) to drill an exploratory well. BP was the lessee of the area in which the rig was operating. At the time of the explosion, BP and Transocean were in the process of temporarily closing the well in anticipation of returning in the future for commercial production. Halliburton had completed some cementing of casings in the well less than 24 hours prior to the accident. The Coast Guard responded to the explosion and subsequent fire, and President Obama was alerted to the unfolding events. The following is a timeline of events as they unfolded.

**April 21, 2010 – DAY 2:** Representatives from the Coast Guard, Department of Homeland Security (DHS), National Oceanic and Atmospheric Administration (NOAA), Department of the Interior (DOI), and the Environmental Protection Agency (EPA), as well as state and local representatives activate the Regional Response Team (RRT). The RRT begins developing plans, providing technical advice, accessing resources and equipment from its member agencies, and overseeing BP's response. The modeling team at NOAA's Office of Response and Restoration begins generating daily trajectories for the *Deepwater Horizon* oil spill. Search efforts continue for the 11 missing rig workers.

**April 22, 2010 – DAY 3:** The *Deepwater Horizon* sinks into the Gulf of Mexico at 10:22 a.m. CST, containing upwards of 700,000 gallons of diesel fuel on board and taking with it the riser pipe that remained attached to the blow-out preventer (BOP). The riser pipe breaks as the *Deepwater Horizon* sinks. The Coast Guard activates the National Response Team (NRT). Air and sea restriction zones are established at the response site for safety. Aircraft apply surface dispersants for the first time.

**April 23, 2010 – DAY 4:** The Commandant of the Coast Guard signs a memorandum naming the Eighth District Commander, Rear Admiral Mary Landry, as the Federal On-Scene Coordinator (FOSC) for the *Deepwater Horizon* spill. The Coast Guard establishes the Unified Area Command (UAC) in Robert, La., and creates a Unified Command (UC), and an Incident Command Post (ICP) in Houma, La. A remotely operated vehicle (ROV) survey locates the sunken rig upside down, approximately 1,500 feet northwest of the BOP. Oil sheen is reported, but no apparent leak is discovered. NOAA's Office of Response and Restoration begins conducting flyovers and modeling the movement of the oil. At 5 p.m. CST, the Coast Guard suspends the search and rescue efforts. An initial debrief of the surviving crew members places the 11 missing in the vicinity of the explosion.

**April 24, 2010 – DAY 5:** ROVs inspect the capsized rig on the sea floor and find two oil leaks from the well pipe along the sea floor (at a depth of approximately 5,000 feet). The Coast Guard establishes the Joint Information Center in Robert, La., and an ICP in Houston, Texas.

**April 25, 2010 – DAY 6:** An attempt is made to activate the BOP rams with the sub-sea accumulator. BP activates a toll-free call center and opens two claims offices to process claims.

**April 26, 2010 – DAY 7:** The Louisiana governor issues an executive order that calls for the flags at all state buildings to be flown at half-staff in honor the of oil rig explosion victims from this date until sunset May 3, 2010. An ICP is established in Mobile, Ala., at the Mobile Convention Center, reporting to the FOSC and handling operations in Alabama, Florida, and Mississippi. Responders attempt to activate the Variable Bore Ram and actuate shear rams on the BOP using ROVs. The Department of Energy (DOE) assembles a scientific oversight team under the direction of the Secretary of DOE to monitor the progress and critically review the Responsible Party's (RP's) efforts to contain and secure the source of the leak from the Macondo well.

# Appendix

**April 27, 2010 – DAY 8**: The Secretary of DHS and the Secretary of the Department of the Interior (DOI) sign an order establishing the next steps for a joint investigation into the causes of the explosion. The joint investigation holds the power to issue subpoenas, hold public hearings, call witnesses, and take other steps needed to determine the cause of the incident. A controlled in situ burn test is conducted. The Operations Branch mobilizes near-shore protective resources to Breton Sound Island, La., to initiate the protective booming of sensitive areas. Protective booming is deployed at Pass a Loutre, La., (approximately 9,000 feet) and Pensacola, Fla. (approximately 2,500 feet).

**April 28, 2010 – DAY 9**: The Louisiana governor visits ICP Houma for a briefing on the oil spill and then joins Coast Guard and BP executives for a flyover of the oil spill area in the Gulf. The Coast Guard and the National Pollution Funds Center (NPFC) designated BP a Responsible Party (RP) under the Oil Pollution Act of 1990 (OPA 90). Responders conduct the first controlled in situ burn. An additional leak is discovered by a ROV. NOAA sampling for seafood safety begins.

**April 29, 2010 – DAY 10**: The Secretary of DHS declares the incident to be a Spill of National Significance (SONS), enabling the appointment of a National Incident Commander to coordinate response resources at the national level. The governor of Louisiana declares a State of Emergency.

**April 30, 2010 – DAY 11**: The Secretary of the Department of Defense (DOD) mobilizes the Louisiana National Guard to assist local communities in the cleanup and removal of oil and to protect critical habitats from contamination. In a precautionary move, the Louisiana Department of Health and Hospitals, and the Louisiana Department of Wildlife and Fisheries announce the closure of select fishing areas and oyster harvesting beds. The governors of Alabama, Florida, and Mississippi declare a State of Emergency. The RP initiates the first test of new sub-sea dispersant techniques in accordance with required testing protocols with the approval of the FOSC and EPA, and with advice from NOAA. The RP dispenses 3,000 gallons sub-sea at rate of nine gallons per minute per the testing procedure. The test appears successful based on sonar data and ROV visual indications.

**May 1, 2010 – DAY 12**: The Secretary of DHS names Coast Guard Commandant Admiral Thad Allen the National Incident Commander. RP contacts scientists at the Woods Hole Oceanographic Institution about measuring the flow of oil from the BOP using a ROV with sonar and acoustic sensors.

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oily liquid recovered: | 20,313 barrels |
| Amount of surface dispersants applied: | 156,012 gallons |
| Amount of sub-sea dispersants applied: | 3,000 gallons |
| Amount of boom deployed: | 420,280 feet |
| Total number of vessels: | 231 |
| Total number of skimmers: | 98 |
| Total wildlife impacts (includes birds): | 1 |
| Total number of responders (does not include Mobile, Ala.): | 1,623 |

**May 2, 2010 – DAY 13**: *Development Driller III (DD III)* arrives at the Macondo well to drill the first deep-water intercept relief well, located one-half mile from the Macondo well, in a water depth of roughly 5,000 feet. This relief well attempts to intercept the existing wellbore at approximately 16,000 feet below the sea floor. The RP estimates this process to take at least 90 days. A second sub-sea dispersant injection test begins with approval to continue injection until Monday, May 3, with approved total volume of 13,000 gallons. The Alabama governor requests to utilize a state defined booming requirement instead of the current Area Contingency Plan. The FOSC approves this request. NOAA closes federal portions of the Gulf of Mexico to fishing based on the trajectory of the spill.

204

**Appendix**

**May 3, 2010 – DAY 14**: Training begins for more than 2,000 volunteers to assist in the response effort. Volunteers include local fishing crews, whose boats can be used as Vessels of Opportunity (VOO) to assist contractors in deploying boom.

**May 4, 2010 – DAY 15**: DOD approves the federal mobilization of up to 17,500 National Guard troops to help various states with the oil spill, assigning up to 3,000 personnel to Alabama, 2,500 to Florida, 6,000 to Louisiana, and 6,000 to Mississippi. The Louisiana Governor sends a letter to the U.S. Small Business Administration requesting that it issue an economic injury disaster declaration for six parishes in Louisiana: Jefferson, Lafourche, Orleans, Plaquemines, St. Bernard, and St. Tammany. This economic injury disaster declaration makes Economic Injury Disaster Loans available to small, private, and non-profit businesses in the parishes and contiguous parishes that are impacted by the oil spill. Dispersant test number two concludes.

**May 5, 2010 – DAY 16**: The RP plans to deploy the cofferdam, a 125-ton, 14x24x40 foot structure to be set over the end of the riser (the pipe that normally goes from the wellhead to the drilling ship). The RP makes $25 million block grants to the states of Alabama, Florida, Louisiana, and Mississippi to help them implement oil spill contingency plans.

**May 6, 2010 – DAY 17**: Oil reaches the shores of Chandeleur Islands, La. The RP cancels the Woods Hole project.

**May 7, 2010 – DAY 18**: NOAA modifies and expands the boundaries of the closed fishing area to reflect the current location of the oil spill. After deploying test applications of sub-sea dispersants, EPA halts sub-sea dispersant operations, awaiting additional test results. Secretary of DOI Salazar announces that no applications for new drilling permits will go forward for any new offshore drilling activity until DOI completes the safety review process requested by President Obama. The RP completes the cofferdam containment dome, a sub-sea oil collection system that is lowered to the sea floor. Sheen and emulsified oil are confirmed at Chandeleur Islands, La. The oil spill volunteer plan is approved.

**May 8, 2010 – DAY 19**: The RP announces that while lowering the cofferdam over the riser, an excess of hydrate crystals formed inside the dome, preventing the successful placement of the dome over the leaking riser. The dome remains on the sea floor while the RP evaluates conditions. The RP begins preparing a smaller containment dome known as the top hat, an eventual component of Lower Marine Riser Package (LMRP) containment system. The motor vessel *Brooks McCall* collects the first water sample. Tar balls are reported on Dauphin Island, Ala.

**May 9, 2010 – DAY 20**: The Coast Guard and EPA sign a Dispersant Monitoring and Assessment Directive. Tar balls are confirmed on Dauphin Island, Ala. Cleanup operations commence.

**Pinnacle for the entire *Deepwater Horizon* incident**: Highest single-day quantity of oily liquids recovered: 33,865 barrels.

**May 10, 2010 – DAY 21**: EPA accepts a testing protocol created by RP scientists with NOAA oversight as its directive regarding sub-sea dispersant use. Response personnel exceed 13,000.

**Pinnacles for the entire *Deepwater Horizon* incident**: Highest single-day quantity of aerial dispersants applied: 56,220 gallons. Highest single-day quantity of aerial, surface, and sub-sea dispersants combined applied: 68,530 gallons.

**May 11, 2010 – DAY 22**: Secretary of DOI Salazar announces that he will restructure the DOI Minerals Management Service (DOI MMS) in order to establish a separate and independent safety and environmental enforcement entity. Secretary Salazar also announces that the administration will seek additional resources for federal inspectors, requests an independent, technical investigation of the causes of the *Deepwater Horizon* spill from the National Academy of Engineers, and requests expanded authority to review explorations plans. The Louisiana Office of Coastal Protection and Restoration applies to the Army Corps of Engineers for an emergency permit to construct berms to help reduce the inland movement of oil.

## Appendix

**May 12, 2010 – DAY 23**: The Secretary of Energy travels to Houston to participate in meetings with DOE and national laboratory staff, industry officials, and other engineers and scientists involved in finding solutions to cap the flow of oil and contain the spill. The Assistant Secretary of Defense authorizes the use of National Guard assets for the *Deepwater Horizon* oil spill response. The RP releases a 30-second video of oil and gas streaming from the end of the broken riser. The RP places the Top Hat on the seabed.

**May 13, 2010 – DAY 24**: First attempt at Operation Riser Insertion Tube Tool (RITT) is conducted. As of this date, 6,700 claims for spill-related losses are filed, and around 1,000 are paid. More than 16,000 people are registered as volunteers and 46,500 calls have been made to RP help lines, around 30 percent offering ideas to help the response or other assistance.

**May 14, 2010 – DAY 25**: President Obama announces that he has ordered Secretary Salazar to conduct a top-to-bottom review of the DOI MMS.

**May 15, 2010 – DAY 26**: The Secretary of DHS and the Secretary of the Interior issue a letter to the BP CEO reiterating that as an RP for this event, BP is accountable to the American public for the full cleanup of this spill and all the economic loss caused by the spill and related events. The Coast Guard and EPA approve the use of sub-sea dispersants. Operation RITT is tested successfully and inserted into the leaking riser, capturing some oil and gas.

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oily liquid recovered: | 151,391 barrels |
| Controlled in situ burns: | 10 burns |
| Amount of surface dispersants applied: | 575,816 gallons |
| Amount of sub-sea dispersants applied | 37,813 gallons |
| Amount of containment boom deployed: | 1,294,910 feet |
| Amount of sorbent boom deployed: | 441,620 feet |
| Total number of vessels: | 656 |
| Total number of skimmers: | 32 |
| Total wildlife impacts (includes birds): | 32 |
| Total number of responders: | 19,163 |

**May 16, 2010 – DAY 27**: A second drill rig, the Transocean *Development Driller II*, begins drilling a second relief well. The RITT is successfully inserted into the end of the broken riser and begins carrying oil and gas up to the *Discoverer Enterprise* on the surface.

**May 17, 2010 – DAY 28**: The RP announces grants to help Gulf Coast states promote tourism: $25 million to Florida and $15 million each to Alabama, Louisiana, and Mississippi.

**May 18, 2010 – DAY 29**: Maintenance is performed on the BOP stack. Drilling and casing operations continue on the *Development Driller II* relief well, whose depth remained at 3,537 feet below sea floor. The RITT is operational, initially collecting an estimated 2,000 barrels of oil a day. Gas brought to the surface by the RITT is flared and burned off.

**May 19, 2010 – DAY 30**: The Secretary of DOI signs a secretarial order leading to the fundamental restructuring of the DOI MMS and the division of its three missions into separate entities for leasing, safety, and revenue collection with independent missions to strengthen oversight of offshore energy operations. In addition, Chairman Markey of the House Energy and Environment Subcommittee requests that the RP immediately make its live video feed from the underwater ROVs of the leak points and undersea activities publicly available. The National Incident Command (NIC) creates the interagency Flow Rate Technical Group to generate a preliminary flow rate as soon as possible.

**Appendix**

**May 20, 2010 – DAY 31**: Secretary of DHS Napolitano announces that Coast Guard Admiral Thad Allen will keep his role as National Incident Commander after stepping down from his post as Coast Guard Commandant. In addition, Secretary Napolitano and EPA Administrator Jackson send a letter to BP CEO Tony Hayward stressing their expectation that the RP conduct all actions in a transparent manner, with all data and information related to the spill readily available to the U.S. government and the American people. The EPA also issues a directive requiring the RP to identify and use a less toxic and more effective dispersant from the list of EPA authorized dispersants. The directive requires the RP to identify this less toxic alternative—to be used both on the surface and under the water at the source of the oil leak—within 24 hours, and to begin using the less toxic dispersant within 72 hours of submitting the alternative. The RP makes available a live feed of the underwater leak at its source that was posted by The Committee on Energy and Commerce. The RP does this following Chairman Markey's request on May 19.

**May 21, 2010 – DAY 32**: The RP launches a second website with a live webcam of the underwater oil leak at its source.

**May 22, 2010 – DAY 33**: President Obama signs an executive order establishing the bipartisan National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling with former Florida Governor and Senator Bob Graham and former EPA Administrator William K. Reilly serving as co-chairs. The Administration tasks the bipartisan National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling with providing recommendations on how to prevent—and mitigate the impact of—any future spills that result from offshore drilling.

**May 23, 2010 – DAY 34**:

**Cumulative statistical snapshot:**

| Amount of containment boom: | 1.75 million feet |
|---|---|
| Amount of sorbent boom: | 997,000 feet |
| Amount of surface dispersants applied: | 704,000 gallons |
| Amount of sub-sea dispersants applied: | 116,000 gallons |

**May 24, 2010 – DAY 35**: Secretary of Commerce Gary Locke declares a fisheries disaster for commercial and recreational fisheries in the Gulf of Mexico as a result of the ongoing impacts from the *Deepwater Horizon* oil spill. The fisheries closure encompasses 19 percent of federal waters in the Gulf of Mexico. The RP commits $500 million to the Gulf of Mexico Research Initiative—a ten-year open research program to study the impact of the spill and response on the environment.

**May 25, 2010 – DAY 36**: Oil spill information websites are established for Alabama, Florida, Louisiana, and Mississippi.

**May 26, 2010 – DAY 37**: The top kill procedure commences in an attempt to stop flow of oil by injecting heavy drilling fluids into the well. The FOSC and EPA issue Dispersant Monitoring and Assessment Directive Addendum III, a directive requiring the RP to significantly scale back the use of dispersants. Coast Guard Parish President Liaison Officers are assigned to the potentially affected parishes in Louisiana.

**May 27, 2010 – DAY 38**: The NIC's Flow Rate Technical Group develops an independent, preliminary estimate of the amount of oil flowing from the RP's leaking oil well. The analysis estimates that 12,000 to 19,000 barrels per day are leaking into the Gulf. The ACOE approves a scaled-back Louisiana sand berms project. The National Incident Commander approves the implementation of a section of Louisiana's Barrier Island berm project proposal that could help stop oil from coming ashore. The Subcommittee on Energy and Environment holds a hearing titled "Combating the BP Oil Spill." The hearing examines the ongoing response to the oil spill at the *Deepwater Horizon* drilling rig site. The first billing for over $1.8 million is sent to the RP for response and recovery operations relating to the *Deepwater Horizon* oil spill.

## Appendix

**May 28, 2010 – DAY 39**: President Obama travels to the Gulf Coast for the second time. The President announces that he directed Secretary of DHS Napolitano and the National Incident Commander to triple the manpower in the places where oil has reached or will reach the shoreline within 24 hours of impact in order to intensify the response effort.

**May 29, 2010 – DAY 40**: The RP announces that the top kill procedure did not overcome the flow of oil, despite 30,000 barrels of heavy mud pumped into the well. Plans begin for deployment of the LMRP containment cap from the *Discoverer Enterprise* to pump oil and gas to the surface.

**May 30, 2010 – DAY 41**: The 100th controlled in situ burn is conducted. Estimates of cumulative total oil burned at the completion of the 100th burn range from approximately 48,185 to 68,947 barrels. The DOI MMS moratorium on deepwater drilling takes effect, halting work on 33 offshore deepwater rigs in the Gulf of Mexico.

**May 31, 2010 – DAY 42**: NOAA extends the northern boundary of the closed federal fishing area in the Gulf of Mexico. The closed area represents 61,854 square miles, slightly less than 26 percent of Gulf of Mexico federal fisheries waters. In addition, the RP issues a statement that it has found no evidence of underwater oil plumes, despite evidence documented by scientists.

**June 1, 2010 – DAY 43**: The U.S. Attorney General visits Louisiana to coordinate the Administration's response to the oil spill. NOAA extends the northern and southern boundaries of the closed federal fishing area in the Gulf of Mexico to include portions of the waters off eastern Alabama and the western tip of the Florida panhandle. The closed area represents 75,920 square miles, which is slightly more than 31 percent of Gulf of Mexico federal fisheries waters. Coast Guard Rear Admiral James A. Watson assumes the FOSC position from Coast Guard Rear Admiral Mary Landry. The 2010 Gulf of Mexico hurricane season officially begins.

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oily liquid recovered: | 338,848 barrels |
| Controlled in situ burns: | 125 burns |
| Amount of surface dispersants applied: | 755,893 gallons |
| Amount of sub-sea dispersants applied: | 238,530 gallons |
| Amount of containment boom deployed: | 2,002,946 feet |
| Amount of sorbent boom deployed: | 2,192,430 feet |
| Total number of vessels: | 1,783 |
| Total number of skimmers: | 120 |
| Total wildlife impacts (includes birds): | 867 |
| Total number of responders: | 18,081 |

**June 2, 2010 – DAY 44**: The Coast Guard directs the RP to pay for five additional barrier island projects, in addition to the one previously approved, attempting to protect coastal communities from oil. A second billing of more than $69 million is sent to the RP for response operations relating to the *Deepwater Horizon* oil spill. The Administration states that it will continue to bill the RP regularly for all associated costs to ensure the Oil Spill Liability Trust Fund (OSLTF) is reimbursed on an ongoing basis.

**June 3, 2010 – DAY 45**: The Secretary of the Department of Commerce declares a fishery disaster in Florida due to the economic impact on commercial and recreational fisheries from the oil spill, increasing the affected area from the May 24 determination, which includes Alabama, Louisiana, and Mississippi. The RP cuts off a portion of the riser and successfully lowers the LMRP containment device over the source area to capture the leaking oil; recovers oil and gas, which begins to be siphoned through riser to the *Discoverer Enterprise*. The RP releases live feeds from all 12 underwater cameras to the public. The cameras are mounted on automated rovers working on the oil spill.

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest number of square miles of fisheries closed: 88,522 square miles.

**Appendix**

**June 4, 2010 – DAY 46**: President Obama makes a third trip to the Gulf Coast. The RP announces advance payments of claims for those losing income or net profit. The RP closes the first valve on the LMRP cap. The Coast Guard establishes the Interagency Alternative Technology Assessment Program to receive, acknowledge, and evaluate response-related product ideas. Tar balls are discovered in Pensacola, Fla.

**Pinnacles for the entire *Deepwater Horizon* incident:** Highest single-day quantity of sub-sea dispersants applied: 20,655 gallons. NOAA opens more than 16,000 square miles of previously closed fishing area off the Florida coast. Additionally, NOAA closes a 2,275-square mile area off the Florida panhandle as a precautionary measure to ensure that seafood from the Gulf will remain safe for consumers. The total closed area represents 33 percent of Gulf of Mexico federal fisheries waters.

**June 5, 2010 – DAY 47**: EPA Administrator and the National Incident Commander convene a meeting of science and technology experts in Houma, La., to explore new ideas and methods for coastal protection and cleanup technologies.

**June 6, 2010 – DAY 48**: Tar balls are sighted at Fort Walton Beach, Fla.

**June 7, 2010 – DAY 49**: The House Subcommittee on Oversight and Investigations holds a field hearing titled, "Local Impact of the *Deepwater Horizon* Oil Spill," in Chalmette, La. The hearing examines the impact of the oil spill at the *Deepwater Horizon* drilling rig site on the Gulf region.

**June 8, 2010 – DAY 50**: The LMRP containment cap collects 15,000 barrels to date. A Memorandum of Understanding is established between the Occupational Safety and Health Administration (OSHA), Department of Labor (DOL), FOSC, DHS concerning OSHA issues related to the *Deepwater Horizon* response.

**June 9, 2010 – DAY 51**: The Secretary of DOL travels to Louisiana to inspect the ongoing efforts to ensure the health, safety, and well-being of workers affected by the oil spill. The House Energy and Environment Subcommittee holds a briefing titled, "Beneath the Surface of the BP Spill: What's Happening Now, What's Needed Next," where witnesses discuss the evidence of underwater plumes and suspended oil pollution in the water column.

**June 10, 2010 – DAY 52**: The House Energy and Environment Subcommittee holds a hearing titled, "The BP Oil Spill: Human Exposure and Environmental Fate." The hearing examines the potential impacts to humans and the environment associated with the spill. The *Discoverer Enterprise* completes its first offload of oil. The RP provides an additional $25 million in grants to Alabama, Florida, and Mississippi for their protection plans. The ICP relocates from St. Petersburg, Fla., to Miami, Fla. A Branch remains in St. Petersburg, Fla.

**June 11, 2010 – DAY 53**: The FOSC, Rear Admiral James Watson, issues a letter to BP Chief Operating Officer Doug Suttles to identify additional leak containment capacity within 48 hours.

**June 12, 2010 – DAY 54**: A 5,000 pound tank from the *Deepwater Horizon* platform washes ashore in Panama City Beach, Fla.

**June 13, 2010 – DAY 55**: The Coast Guard extinguishes the first of two controlled burns that were never purposely extinguished. The extinguished burn is burn number 182. The total duration of the burn is 11 hours and 21 minutes, the second longest burn recorded. The total quantity of oil burned is approximately 4,774 barrels.

**June 14, 2010 – DAY 56**: Version 3 of the Recovered Oil and Waste Management Plan for ICP Houma is approved to cover waste issues in Louisiana.

**June 15, 2010 – DAY 57**: President Obama signs an amendment to OPA 90 that authorizes advances from the OSLTF. More than 40 Shoreline Cleanup Assessment Technique (SCAT) Teams begin assessing shorelines in Alabama, Florida, Louisiana, and Mississippi. Relief well drilling continues, the first relief well at an approximate depth of 15,000 feet and the second at an approximate depth of 9,500 feet. The RP prepares to fast track fund $25 million as part of the Gulf Coast Research Initiative to support environmental studies at Louisiana State University, the Florida Institute of Oceanography, and the Northern Gulf Institute consortium.

## Appendix

Cumulative statistical snapshot:

| | |
|---|---|
| Amount of oily liquid recovered: | 504,590 barrels |
| Controlled in situ burns: | 214 burns |
| Amount of surface dispersants applied: | 885,476 gallons |
| Amount of sub-sea dispersants applied: | 413,735 gallons |
| Amount of containment boom deployed: | 2,543,745 feet |
| Amount of sorbent boom deployed: | 3,479,017 feet |
| Total number of vessels: | 4,323 |
| Total number of skimmers: | 136 |
| Total wildlife impacts (includes birds): | 1,853 |
| Total number of responders: | 31,062 |

**June 16, 2010 – Day 58**: The second containment system attaches to the BOP, which sends recovered oil to the *Q4000* service platform via sub-sea manifold, becomes operational. The RP agrees to create a $20 billion fund over three and a half years to meet obligations arising from the spill. Oil spill claims are to be administered by an independent facility. BP cancels dividend payments for the rest of 2010. The Coast Guard purposely extinguishes burn number 224. The total duration of the burn was 11 hours and 48 minutes. The total quantity of oil burned was approximately 5,956 barrels.

**June 17, 2010 – Day 59**: BP CEO Tony Hayward testifies before the House Energy and Commerce Subcommittee on Oversight and Investigation. The UAC relocates to New Orleans from Robert, La.

**June 18, 2010 – Day 60: Pinnacle for the entire *Deepwater Horizon* incident:** Highest single-day quantity of oil burned: 59,550 barrels.

**June 20, 2010 – Day 62**: The response issues document preservation guidance to all responders.

**June 21, 2010 – Day 63**: The agency formerly known as the MMS is renamed the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE).

**June 22, 2010 – Day 64**: The RP announces that its net revenue from the sale of oil recovered from the Macondo well will be donated to the National Fish and Wildlife Foundation.

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest single-day quantity of oil recovered: 27,097 barrels.

**June 24, 2010 – Day 66**: The Mississippi Department of Environmental Quality issues a revised precautionary closure to an additional area of Mississippi marine waters previously closed to commercial and recreational fishing. The 601st Air and Space Operations Center, located at Tyndall Air Force Base in Panama City, Fla., is established to provide centralized airspace management of resources and aircraft activity supporting the *Deepwater Horizon* response in the Gulf of Mexico area.

**June 25, 2010 – Day 67**: Hurricane Alex enters the Gulf region, heading toward northern Mexico.

**June 28, 2010 – Day 70**: The Coast Guard Commandant and EPA sign the Joint Interim Rule regarding the response time requirement, location requirement, and re-location of Navy Supervisor of Salvage and Diving. Capping stack fabrication completes. NOAA expands the closed federal fishing area in the Gulf of Mexico to 80,228 square miles, which represents 33 percent if the federal fishing waters in the Gulf of Mexico.

**June 29, 2010 – Day 71**: The Coast Guard and EPA issue a directive requiring the RP to test waste for hazardous materials and to publicize the results.

**June 30, 2010 – Day 72: Pinnacle for the entire *Deepwater Horizon* incident:** Highest number of vessels assigned to the incident: 6,050 vessels.

**Appendix**

July 1, 2010 – **Day 73**:

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 557,155 barrels (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Amount of oily liquid recovered: | 671,457 barrels |
| Amount of gas recovered: | 1,243.7 million standard cubic feet (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Controlled in situ burns: | 275 burns per 237,950 barrels |
| Amount of surface dispersants applied: | 1,051,159 gallons |
| Amount of sub-sea dispersants applied: | 600,971 gallons |
| Amount of containment boom deployed: | 3,017,472 feet |
| Amount of sorbent boom deployed: | 4,954,735 feet |
| Total number of vessels: | 6,026 |
| Total number of skimmers: | 550 |
| Total wildlife impacts (includes birds): | 2,781 |
| Total number of responders: | 43,128 |

**July 3, 2010 – Day 75**: Collection of oil from the LMRP containment cap and *Q4000* system continues with 25,000 barrels collected to date. The ACOE denies Jefferson Parish's request to construct rock dike structures for the purpose of reducing oil entering Barataria Basin. A Taiwanese skimming vessel dubbed *A Whale* arrives on-scene.

**July 5, 2010 – Day 77**: Tar balls are reported at the Rigotlets, at the entrance to Lake Pontchartrain, La.

**July 6, 2010 – Day 78**: The 601st Air and Space Operations Center begins centralized airspace management of resources and aircraft activity supporting the *Deepwater Horizon* response in the Gulf of Mexico area.

**Pinnacle for the entire *Deepwater Horizon* incident:** Florida's highest single-day quantity of heavy to moderately oiled shoreline: 18.7 miles.

**July 7, 2010 – Day 79**: **Pinnacles for the entire *Deepwater Horizon* incident**: Highest number of personnel assigned to incident: 47,849. Highest single-day quantity of gas recovered: 58 million standard cubic feet.

**July 8, 2010 – Day 80:** The National Incident Commander issues a letter to the RP requiring a detailed timeline and contingency procedures for the capping stack process to secure the flow of oil from the source.

**July 9, 2010 – Day 81:** An ICP is established in Galveston, Texas

**July 10, 2010 – Day 82**: The *Discover Inspiration* moves off to allow capping stack installation. The LMRP containment cap is removed in preparation for its replacement with a sealing cap assembly capable of increasing containment capacity or potentially shutting in the well, includes a flange transition spool and a three-ram capping stack.

**Pinnacles for the entire *Deepwater Horizon* incident:** Highest number of helicopters assigned to response: 82. Alabama's highest single-day quantity of heavy to moderate oiled shoreline: 24.5 miles. Highest single-day quantity of response wide heavy to moderately oiled shoreline: 180.8 miles. Highest number of VOOs utilized: 3,233.

**July 12, 2010 – Day 84**: Rear Admiral Paul Zukunft relieves Rear Admiral James Watson as the FOSC. The RP installs a three-ram capping stack that put the sealing cap in place by the *Discoverer Inspiration*. The BOEMRE issues a revised moratorium that limits drilling based on the equipment a rig uses instead of the depth of the wellhead.

211

## Appendix

**July 13, 2010 – Day 85**: The *Helix Producer I* starts oil recovery (20 to 25 thousand barrels of oil per day).

**July 14, 2010 – Day 86: Pinnacle for the entire *Deepwater Horizon* incident:** Highest single-day number of controlled burns: 26.

**July 15, 2010 – Day 87**: The RP closes the well capping stack, which successfully stops oil flow, securing the source at 2:22 p.m. Well integrity testing begins.

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 817,739 barrels (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Amount of oily liquid recovered: | 783,490 barrels |
| Amount of gas recovered: | 1,844 million standard cubic feet (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Controlled in situ burns: | 377 burns per 261,400 barrels |
| Amount of surface dispersants applied: | 1,072,314 gallons |
| Amount of sub-sea dispersants applied: | 762,881 gallons |
| Amount of containment boom deployed: | 3,505,921 feet |
| Amount of sorbent boom deployed: | 6,836,224 feet |
| Total number of vessels: | 5,745 |
| Total number of skimmers: | 588 |
| Total wildlife impacts (includes birds): | 3,711 |
| Total number of responders: | 44,264 |

**July 16, 2010 – Day 88**: Following tests, a decision is made that the supertanker skimmer *A Whale* will not be used.

**July 17, 2010 – Day 89**: The vessel *West Sirius* installs the second free standing riser.

**Pinnacles for the entire *Deepwater Horizon* incident:** Louisiana's highest single-day quantity of heavy to moderate oiled shoreline: 153.4 miles. Mississippi's highest single-day quantity of light to trace oiled shoreline: 107.5 miles.

**July 19, 2010 – Day 91**: The 411th and final in situ controlled burn is conducted during *Deepwater Horizon*. Estimated cumulative total volume burned ranged from approximately 219,986 to 309,452 barrels. The last dispersant application is conducted.

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest number of fixed wing aircraft assigned to incident: 20.

**July 21, 2010 – Day 93: Pinnacle for the entire *Deepwater Horizon* incident:** Highest quantity of containment boom deployed: 3,795,985 feet.

**July 22, 2010 – Day 94**: Tropical Storm Bonnie begins, occurring through July 24. All response operations are secured. NOAA opens federal fisheries 190 miles southeast of the *Deepwater Horizon* wellhead along the Florida shelf, which is one third of the previously closed area.

**July 24, 2010 – Day 96**: Tropical Storm Bonnie ends, all response operations are secured. Ships return to the *Deepwater Horizon* wellhead area.

**July 25, 2010 – Day 97**: Parish presidents participate in an overflight of coastal Louisiana following Tropical Storm Bonnie.

**Appendix**

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 827,046 barrels (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Amount of oily liquid recovered: | 827,829 barrels |
| Amount of gas recovered: | 1,866 million standard cubic feet (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Controlled in situ burns: | 411 burns totaling 265,450 barrels |
| Amount of surface dispersants applied: | 1,072,514 gallons |
| Amount of sub-sea dispersants applied: | 771,272 gallons |
| Amount of containment boom deployed: | 3,710,430 feet |
| Amount of sorbent boom deployed: | 7,815,656 feet |
| Total number of vessels: | 1,067 |
| Total number of skimmers: | 794 |
| Total wildlife impacts (includes birds): | 5,173 |
| Total number of responders: | 9,496 |

**July 27, 2010 – Day 99:** The first parish presidents' meeting is held in New Orleans, La.

**Pinnacle for the entire *Deepwater Horizon* incident:** Texas's highest single-day quantity of light to trace oiled shoreline: 1 mile.

**July 29, 2010 – Day 101:** The FOSC issues letters to all parish presidents outlining the creation of parish-specific transition plans utilizing the framework from the UAC's transition plan, while capturing the impacts of the *Deepwater Horizon* spill unique to each parish.

**August 1, 2010 – Day 104:**

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 827,046 barrels (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Amount of oily liquid recovered: | 826,361 barrels |
| Amount of gas recovered: | 1,866 million standard cubic feet (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Controlled in situ burns: | 411 burns total 265,450 barrels |
| Amount of surface dispersants applied: | 1,072,514 gallons |
| Amount of sub-sea dispersants applied: | 771,272 gallons |
| Amount of containment boom deployed: | 3,646,640 feet |
| Amount of sorbent boom deployed: | 8,032,036 feet |
| Total number of vessels: | 4,038 |
| Total number of skimmers: | 831 |
| Total wildlife impacts (includes birds): | 5,675 |
| Total number of responders: | 30,075 |

**August 2, 2010 – Day 105:** The government approves the RP's static well kill plan to inject drilling mud slowly into the well.

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest number of skimmers assigned to incident: 835.

**August 3, 2010 – Day 106:** Operational annex sub-sea water sampling begins. The RP begins the static well kill process.

## Appendix

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest single-day quantity of all wildlife collected: 261.

**August 4, 2010 – Day 107:** Static well kill is determined successful.

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest single-day quantity of non-visibly oiled wildlife collected: 136.

**August 5, 2010 – Day 108:** The RP carries out cementing operations to seal the well. Claims payments top $300 million, with distributions to more than 40,000 individuals and businesses affected by the spill.

**August 6, 2010 – Day 109:** Cement pumping completed at the wellhead.

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest single-day quantity of visibly oiled wildlife collected: 168.

**August 7, 2010 – Day 110:** Well pressure testing begins.

**August 8, 2010 – Day 111:** The National Incident Commander announces the static well kill cementing procedure pressure test is complete and holding. The controlled burn after action report for May 28 to August 3 is released.

**August 9, 2010 – Day 112:** Following the completion of cementing operations on August 5, pressure testing indicates there is an effective cement plug in the casing and successful completion of the static kill and cementing procedures.

**August 10, 2010 – Day 113:** Relief well drilling is delayed due to a tropical storm approaching the Gulf of Mexico. NOAA reopens more than 5,000 square miles of federal fisheries waters for ocean fishing, 52,000 square miles remain closed.

**August 11, 2010 – Day 114: Pinnacle for the entire *Deepwater Horizon* incident:** Alabama's highest single-day quantity of light to trace oiled shoreline: 70.5 miles.

**August 12, 2010 – Day 115:** Relief well work recommences.

**August 13, 2010 – Day 116:** A second parish president meeting is held in Houma, La. Ambient pressure testing on the oil well begins. The National Incident Commander signs the *Sub-sea and Sub-surface Oil and Dispersant Detection Sampling and Monitoring Strategy* Memorandum 16451.

**Pinnacle for the entire *Deepwater Horizon* incident:** Louisiana's highest single-day quantity of light to trace oiled shoreline: 267.4 miles.

**August 14, 2010 – Day 117:** Bottom kill procedure is authorized to begin.

**August 15, 2010 – Day 118:**

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 827,046 barrels (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Amount of oily liquid recovered: | 826,988 barrels |
| Amount of gas recovered: | 1,866 million standard cubic feet (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Controlled in situ burns: | 411 burns total 265,450 barrels |
| Amount of surface dispersants applied: | 1,072,514 gallons |
| Amount of sub-sea dispersants applied: | 771,272 gallons |
| Amount of containment boom deployed: | 2,586,653 feet |
| Amount of sorbent boom deployed: | 8,770,086 feet |
| Total number of vessels: | 2,914 |
| Total number of skimmers: | 835 |
| Total wildlife impacts (includes birds): | 7,175 |
| Total number of responders: | 28,277 |

**Appendix**

**August 16, 2010 – Day 119: Pinnacles for the entire *Deepwater Horizon* incident:** Mississippi's highest single-day quantity of heavy to moderate oiled shoreline: 11.4 miles. Highest single-day quantity of response wide light to trace oiled shoreline: 543.8 miles.

**August 18, 2010 – Day 121:** Rear Admiral Zukunft signs the *Sub-sea and Sub-surface Oil and Dispersant Detection Sampling and Monitoring Strategy* Memorandum 16451. The RP flushes drilling mud and hydrocarbons from the Macondo well in advance of pressure test to ensure the well was secure. Bottom kill process is delayed due to analysis of annulus. Ambient pressure testing is under way. The University of South Florida researchers report oil on ocean floor in Desoto Canyon, a valley in the Gulf of Mexico. Twenty-three Kemp's Ridley Sea Turtles are released into Gulf of Mexico.

**Pinnacle for the entire *Deepwater Horizon* incident:** Florida's highest single-day quantity of light to trace oiled shoreline: 130.4 miles.

**August 20, 2010 – Day 123:** The first formal consultation between the FOSC and stakeholders regarding historic properties occurs.

**August 21, 2010 – Day 124:** The 48-hour ambient pressure test is deemed successful. All states inside and outside territorial waters east of the Mississippi River, north of the northern shore of Pass a Loutre, and 29 degrees 12 minutes 40 seconds north latitude open to the commercial harvest of crabs. The FOSC approves an operational procedure authorizing the removal of drill pipe segments and an inspection of BOP.

**August 23, 2010 – Day 126:** The Operational Science Advisory Team is created. The RP reports that it made claim payments of nearly $400 million during the 16 weeks it managed claims related to the oil spill. The National Incident Commander announces that 90 percent of the containment boom deployed was recovered. The 601st Air Operations Center demobilizes and stops providing centralized airspace management of resources and aircraft activity supporting the *Deepwater Horizon* response in the Gulf of Mexico area. The RP VOO advisor issues a letter to the parish presidents stating that many recreational vessel participants will be removed from the VOO program, and their Master Vessel Charter Agreements with the RP will be terminated.

**August 26, 2010 – Day 129:** All Florida fisheries, with the exception of blue crabs, which were unavailable for testing, are opened for harvesting.

**August 27, 2010 – Day 130:** To date, 978 birds have been treated and released to the Atchafalaya Delta Wildlife Management Area (WMA) in St. Mary Parish La., as part of the wildlife rescue and recovery effort.

**August 29, 2010 – Day 132:** The five-year anniversary of Hurricane Katrina.

**September 1, 2010 – Day 135:** The third parish president meeting is held in Houma, La.

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 827,046 barrels (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Amount of oily liquid recovered: | 827,026 barrels |
| Amount of gas recovered: | 1,866 million cubic standard feet (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Controlled in situ burns: | 411 burns totaling 265,450 barrels |
| Amount of surface dispersants applied: | 1,072,514 gallons |
| Amount of sub-sea dispersants applied: | 771,272 gallons |
| Amount of containment boom deployed: | 1,755,528 feet |
| Amount of sorbent boom deployed: | 9,239,365 feet |
| Total number of vessels: | 3,242 |
| Total number of skimmers: | 835 |
| Total wildlife impacts (includes birds): | 8,602 |
| Total number of responders: | 28,430 |

215

## Appendix

**September 2, 2010 – Day 136**: The capping stack on top of the *Deepwater Horizon*'s BOP is removed by the drillship *Discoverer Enterprise*.

**September 3, 2010 – Day 137**: The *Deepwater Horizon*'s BOP is successfully removed from the *Mississippi Canyon 252* well at 1:20 p.m. CST. A new BOP installed by *Development Driller II*. *Development Driller II* then flushes the stack and pressure tests the connection.

**September 4, 2010 – Day 138**: The *Q4000* raises the *Deepwater Horizon* BOP and secures it on deck to a shipping frame. *DD II* unlatches LMRP and pulls perforated riser to surface. *Discoverer Enterprise* raises capping stack to surface and secures it to the deck.

**September 5, 2010 – Day 139**: The *Q4000* washes the *Deepwater Horizon* BOP stack and preserves it as evidence, as per protocol.

**September 6, 2010 – Day 140**: The *Q4000* completes inspection of hoses and fittings on the *Deepwater Horizon* BOP.

**September 7, 2010 – Day 141**: Aerial observations confirm all containment boom is removed from Alabama, Florida, and Mississippi.

**September 8, 2010 – Day 142**: The *Development Driller II* displaces riser to mud; tests BOP; cleanout commences to 1,500 feet below the wellhead.

**September 9, 2010 – Day 143**: The *Q4000* departs for South Pass 55 at 7:01 p.m. CST for the transfer of BOP and LMRP to a transfer barge.

**September 10, 2010 – Day 144**: The *Q4000* transfers the failed BOP, LMRP, and baskets containing other evidence collected from the sea floor near the Macondo well to transfer barge. The barge is enroute to NASA Michoud facilities in New Orleans, La.

**September 11, 2010 – Day 145**: BOP arrives at the NASA Michoud facility. Aerial observations confirm that only six parishes in Louisiana still have containment boom deployed.

**September 13, 2010 – Day 147**: The *Q4000* rig receives Coast Guard certification to move to dry dock in Galveston, Texas. Relief well drilling operations restart from *DD III*. The UAC Consolidated Decontamination Plan is signed and promulgated.

**September 14, 2010 – Day 148**: The response vessel *Gyre* collects first sediment sample.

**September 15, 2010 – Day 149**: The VOO program demobilizes in the states of Alabama, Florida, and Mississippi.

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 827,046 barrels (*Discovery Enterprise, Q4000, Helix Producer 1*) |
| Amount of oily liquid recovered: | 827,251 barrels |
| Amount of gas recovered: | 1,866 million standard cubic feet (*Discovery Enterprise, Q4000, Helix Producer 1*) |
| Controlled in situ burns: | 411 burns total 265,450 barrels |
| Amount of surface dispersants applied: | 1,072,514 gallons |
| Amount of sub-sea dispersants applied: | 771,272 gallons |
| Amount of containment boom deployed: | 690,638 feet |
| Amount of sorbent boom deployed: | 3,437,885 feet |
| Total number of vessels: | 1,911 |
| Total number of skimmers: | 835 |
| Total wildlife impacts (includes birds): | 9,223 |
| Total number of responders: | 25,800 |

**Appendix**

**September 16, 2010 – Day 150**: The relief well drilled by the *Development Driller III* drilling rig intercepts the annulus of the Macondo well.

**September 17, 2010 – Day 151**: The first government-to-government consultations with the FOSC and 11 federally recognized tribes is held.

**September 19, 2010 – Day 153**: The National Incident Commander confirms that well kill operations on the Macondo well in the Gulf of Mexico are completed, with both the casing and annulus of the well sealed by cement.

**September 20, 2010 – Day 154**: ICPs Houma and Mobile demobilize. Operations are consolidated under the Gulf Coast Incident Management Team (GC-IMT) located in New Orleans, La.

**September 22, 2010 – Day 156**: Operational annex sub-surface sediment sampling begins.

**September 23, 2010 – Day 157**: The Cameron Branch and ICP Houston demobilize and close. Commercial and recreational fishing reopen for the harvest of fish, crabs, and shrimp in all state waters east of the Mississippi River and north of the northern shore of Pass a Loutre.

**September 25, 2010 – Day 159**: Yates decontamination yard closes. *Development Driller III* recovers a 135-by-8-inch casing and sets a third cement plug.

**September 26, 2010 – Day 160**: The *Development Driller III* continues plug and abandonment operations.

**September 28, 2010 – Day 162**: Secretary of the Navy Ray Mabus's report titled *America's Gulf Coast: A Long-Term Recovery Plan After The Deepwater Horizon Oil Spill*, is released.

**September 29, 2010 – Day 163**: Nineteen decontamination sites are operational.

**October 1, 2010 – Day 165**: The NIC demobilizes and the National Incident Commander's personal report is released. The U.S. Department of Health and Human Services (HHS) launches Oil Spill Distress Hotline.

**Cumulative statistical snapshot:**

| | |
|---|---|
| Amount of oil recovered: | 827,046 barrels (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Amount of oily liquid recovered: | 827,829 barrels |
| Amount of gas recovered: | 1,866 million standard cubic feet (*Discovery Enterprise, Q4000, Helix Producer I*) |
| Controlled in situ burns: | 411 burns total 265,450 barrels |
| Amount of surface dispersants applied: | 1,072,514 gallons |
| Amount of sub-sea dispersants applied: | 771,272 gallons |
| Amount of containment boom deployed: | 23,020 feet |
| Amount of sorbent boom deployed: | 389,010 feet |
| Total number of vessels: | 1,329 |
| Total number of skimmers: | 835 |
| Total wildlife impacts (includes birds): | 9,416 |
| Total number of responders: | 19,482 |

**October 4, 2010 – Day 168**: The Gulf-Wide Recovered Oil and Waste Management Plan is signed, and supersedes the previous waste management plans for both the ICPs Mobile and Houma.

**October 6, 2010 – Day 170**: The response returns to standard NRC oil reporting protocols.

**October 8, 2010 – Day 172**: The St. Mary and Iberia Branch demobilizes and closes.

**Pinnacle for the entire *Deepwater Horizon* incident:** Highest amount of sorbent boom deployed: 566,140 feet.

## Appendix

**October 12, 2010 – Day 176**: BOEMRE lifts the moratorium on deepwater drilling. Sixty-nine VOO vessels are taken off hire.

**October 14, 2010 – Day 178**: Approximately 33 HESCO Baskets are installed at Perdido Pass East in Alabama.

**October 15, 2010 – Day 179**: Five helicopters demobilize (one at the Western Branch; one at Lafourche; one at Jefferson and two on standby). Twenty aircraft demobilize over the past 30 days; 16 aircraft remain (including 1 military). Bollinger's site in Texas City, Texas, receives full approval for decontamination safety. The Middle River Decontamination site for Orleans and St. Tammany Parish close with all equipment to be removed by October 18, 2010. A Choctaw Tribe representative and archeologist travels to Sugar Island for a Native American artifact reconnaissance mission. NOAA announces re-opening of 6,879 square miles of oil impacted federal waters for commercial and recreational fishing. The total amount of re-opened waters is 81.4 percent.

**Daily statistical snapshot:**

| Amount of oily liquid recovered: | 68 barrels |
|---|---|
| Total number of vessels: | 1,722 |
| Total number of VOOs: | 319 (on hire); 2,838 (under contract) |
| Total number of skimmers: | 25 |
| Total number of responders: | 15,629 |

**October 16, 2010 – Day 180**: Volunteer Beach Cleanup Day is held in Harrison County, Miss. All Shoreline Treatment Recommendations developed by the SCAT Teams for Orange Beach and Gulf Shores, Ala., are ready for implementation.

**October 17, 2010 – Day 181**: The joint U.S. Geological Survey and the RP near-shore water and sediment sampling operations are complete.

**October 18, 2010 – Day 182**: RP representatives and Tri-State Bird Rescue and Research hold a press update at the Hammond Wildlife Rehabilitation Center, which was the main rehabilitation center in the Gulf during the response. Operation Deep Clean began in Orange Beach, Ala. The Sediment and Water Column Sampling Program completes.

**October 19, 2010 – Day 183**: Coast Guard Rear Admiral Zukunft and media personnel fly over the barrier islands (Chandeleurs, Ship Island, and Grand Isle) to survey the response cleanup work completed.

**October 20, 2010 – Day 184**: The Marine Mammal and Sea Turtle Group ceases operations for sea turtles. Daily reporting of impacted wildlife numbers to UAC discontinues. The Terrebonne Branch receives approval from all agencies to use small walk-behind sand sifters (Sandman 850) on the beaches of Trinity Island and Timbalier Island.

**October 21, 2010 – Day 185**: NOAA representatives perform a turtle release approximately 60 miles south of Grand Isle, La. These are the first turtles to be released off the Louisiana coast since the start of the *Deepwater Horizon* response. The Stage III STR for operational distance of mechanical beach sifters near the dunes and vegetation lines is reduced from 50 feet to 10 feet on Orange Beach, Ala., amenity beaches.

**October 22, 2010 – Day 186**: Vermillion Branch demobilizes and closes. The SCAT Technical Advisor gives a presentation to the Alabama Branches to discuss guidelines and objectives in 2010, and treatment techniques for subsurface oil.

**October 23, 2010 – Day 187**: The last sediment sample is collected by response vessel *Ocean Veritas*, which visited more than 500 stations to create over 2,400 sediment samples and 450 water samples collected for processing and archiving. The Alabama state decontamination site closes. A Strategic Planning and Applied Methods Team forms to facilitate the flow of information and equipment for best methods across the AOR. The Environmental Unit's Rapid Response Environmental Site Support Team (RRESST) program completes, evaluates, and analyzes findings from more than 2,800 site

**Appendix**

inspections. The Shallow Water Submerged Oil (SWSO) program begins a revised sample collection protocol near the Pass a Loutre area, which includes both core soil samples and water samples. Samples are anticipated to be collected at six locations. The Technical Advisory Group is scheduled to meet to discuss next transition milestones. Mississippi completes zero-based inventory analysis. The Florida Branch begins zero-based inventory analysis.

**October 24, 2010 – Day 188**: The Subsurface Monitoring Unit's last remaining active vessel completes the assigned offshore sampling and returns to Morgan City, La., to begin the decontamination process.

**October 26, 2010 – Day 190**: The three-mile decontamination site located near Venice, La., is closed. Special Operations Branch Strike Team No. 3 demobilizes.

**October 27, 2010 – Day 191**: An amendment to the *Gulf Wide Solid Waste Management Plan* is approved and changes weekly waste stream sampling to monthly sampling beginning November 1, 2010.

**October 29, 2010 – Day 193**: The fourth parish president meeting is held in New Orleans.

**October 30, 2010 – Day 194**: A new radio communications repeater is installed on West Point Island in the Mobile Division to improve communications. Approval is received from the National Park Service to use mechanical beach cleaning equipment (Beach Tech) to a depth of six inches on Horn Island, Miss.

**October 31, 2010 – Day 195**: Four archaeologists conduct enhanced archaeological surveys along Navarre Beach, Fla., in segments that have a high probability for yielding subsurface archaeological artifacts. Florida turtle nesting season ends.

**November 1, 2010 – Day 196**: Florida Division A operations personnel complete setting the barge anchors under the supervision of a Natural Resources Advisor and a marine archaeologist. The Cameron Parish, La., Hesco Basket Removal Project begins. Florida Division C completed the Zero Based Audit, which results in the release of the one remaining water operations vessel. An STR revision, approved by Section 106, discontinues all vacuum operations in the Upper Barataria Bay marsh areas. The revision is based on field observations and reports from multiple sources, including the Bay Jimmy marsh treatment tests.

**Daily statistical snapshot:**

| | |
|---|---|
| Total number of vessels: | 932 |
| Total number of skimmers: | 19 |
| Total number of VOOs: | 2,838 (on contract), 135 (on hire) |
| Total number of responders: | 9,758 |

**November 2, 2010 – Day 197**: Plaquemines Branch conducts random drug tests of personnel to continue through November 3. Venice Wildlife Stabilization site, equipment, and personnel demobilize.

**November 3, 2010 – Day 198**: The Terrebonne Branch is demobilized. The Wildlife Group transports the last remaining bird from the Hammond Rehabilitation Center to the Monroe Zoo. The zoo agrees to care for the bird until it molts. Both marine mammal and sea turtle stranding response reverts back to NOAA and the existing stranding network protocols and procedures. The Army Corps of Engineers approves Louisiana's request to modify the emergency berm permit to realign the berm construction closer to the Chandeleur Islands.

**November 4, 2010 – Day 199**: The Subsurface Monitoring Unit meets at the Stennis Space Center in Mississippi to discuss the needs and progress on short-, mid-, and long-term data management and archive issues. The manual removal of Hesco Baskets near the Baldwin County, Ala., Staging Area completes.

**November 5, 2010 – Day 200**: Hesco Basket Removal Project, Cameron Parish Area C, completes. Operations removes 153 Hesco baskets. FOSC issues a letter to Louisiana Governor Jindal outlining the termination of the RP managed Louisiana VOO program, and transitions to Vessel Charter Agreements.

## Appendix

**November 7, 2010 – Day 202**: The Long-Term Monitoring Program, established by the Environmental Unit, sets up one additional phragmites (a perennial grass) reference site at Pass a Loutre, making eight sites in the program. Bird recovery data is uploaded to GeoPlatform.gov, powered by Environmental Response Management Application.

**November 8, 2010 – Day 203**: The Wildlife Branch Technical Advisory Group meets and agrees that the wildlife group is no longer in a reconnaissance and recovery phase but now in a wildlife monitoring phase. A series of five seafood safety forums are scheduled across the Florida Branch, with the initial meeting is set for November 8, in Port St. Joe, Fla., Division C.

**November 9, 2010 – Day 204**: Responders sign the proposed Environmental Unit Plan to remove all sentinel snares by November 24, 2010.

**November 10, 2010 – Day 205**: Strategic Planning and Applied Methods Team and SCAT participate in an alternative cleanup method meeting in New Orleans.

**November 11, 2010 – Day 206**: A UAC SCAT Team participates in a landowner meeting in New Orleans with the Wisner Foundation Representatives to discuss no further treatment guidelines, monitoring, and other cleanup discussion points for property owned by the Foundation.

**November 12, 2010 – Day 207**: The second consultation between the FOSC and eleven federally recognized tribes occurs.

**November 13, 2010 – Day 208**: The first split of the Louisiana Regular Duck Season opens and runs through December 5, 2010.

**November 15, 2010 – Day 210**: The National Marine Fisheries Services and NOAA announce the reopening of approximately 8,400 square miles of commercial and recreational federal fisheries.

**Daily statistical snapshot:**

| | |
|---|---|
| Total number of vessels: | 617 |
| Total number of skimmers: | 7 |
| Total number of VOOs: | 2,838 (on contract), 127 (on hire) |
| Total number of responders: | 6,937 |

**November 17, 2010 – Day 212**: The fifth parish president meeting is held in New Orleans. The EPA and the Office of Inspector General visit the UAC to interview staff about dispersant use.

**November 19, 2010 – Day 214**: GC-IMT Strike Team Chandeleurs recovery and removal operations are secured. St. Bernard Branch decontamination location demobilizes.

**November 20, 2010 – Day 215**: Snare sentinel removal begins.

**November 22, 2010 – Day 217**: St. Bernard Branch demobilizes.

**November 23, 2010 – Day 218**: The Wildlife Branch attempts to install a wailer unit in Bay Jimmy to replace the current air hazing cannons.

**November 28, 2010 – Day 223**: Cameron Parish, La., Hesco Basket Removal Project completes (3,960 baskets or 59,400 feet of shoreline barrier removed). The contractor expects completion of demobilization activities by November 30, 2010.

**November 30, 2010 – Day 225**: The 2010 Gulf of Mexico hurricane season officially ends.

**December 1, 2010 – Day 226**: The UAC dissolves and the GC-IMT remains to lead the response effort. GC-IMT Inclement Weather Policy Version 1.0 completes.

**Daily statistical snapshot:**

| | |
|---|---|
| Total number of vessels: | 427 |
| Total number of skimmers: | 2 |
| Total number of responders: | 6,363 |

**Appendix**

**December 2, 2010 – Day 227**: The Marine Mammal and Sea Turtle Group releases approximately 11 sea turtles offshore of Carrabelle, Fla.

**December 4, 2010 – Day 229**: Snare sentinel removals are 100 percent completed in Caillou Bayou (Terrebonne), Isle Dernieres (Terrebonne), and Lake Barre (Terrebonne). Orleans and St. Tammany Branch demobilize all 11 protection barges. Snorkel SCAT surveys Pelican Island. Nothing significant is found.

**December 5, 2010 – Day 230**: SCAT Team 3 meets with the Louisiana Department of Wildlife and Fisheries and successfully completes Stage III survey of Middle Ground (North Pass). Vessel *Beau Rivage* returns to port. Communications indicate that no oil is noted on its nets and only two tar balls are collected.

**December 8, 2010 – Day 233**: The New Orleans and St. Tammany branches close.

**December 16, 2010 – Day 241**: Orange Beach, Ala., mechanical beach cleaning completes.

**December 17, 2010 – Day 242**: UAC functions transition to the GC-IMT. Coast Guard Captain Stroh relieves Coast Guard Rear Admiral Zukunft as the FOSC. The FOSC for the *Deepwater Horizon* spill returns to reporting to the Eighth Coast Guard District. The OSAT releases the *Summary Report for Sub-sea and Sub-surface Oil and Dispersant Detection: Sampling and Monitoring Report*. The report includes an analysis of water and sediment samples that represent a subset of the data collected by the Sub-surface Monitoring Program that is most relevant to the primary response questions addressed by the OSAT. A National Park Service archaeologist determines that 80 percent of segment 17 (approximately 1,761 feet) in East Ship Island, Miss., should not continue recovery efforts due to artifacts found in the area. At Grand Isle in Jefferson Parish, the mechanical removal of tar mats is suspended by the State Park Manager until further notice.

**December 18, 2010 – Day 243**: Captain James Hanzalik relieves Captain Lincoln Stroh as the FOSC.

**December 20, 2010 – Day 245**: The piling removal subcontractor removes all nine pilings from Bayou Thomas in Orleans Parish. Auguring under the Hesco Baskets in Fourchon Beach completes, with the exception of the sensitive areas identified by archeologists. All carpet boom remaining in St. Tammany (approximately 900 feet) is removed.

**December 21, 2010 – Day 246**:

**Daily statistical snapshot:**

| Total number of vessels: | 260 |
|---|---|
| Total number of responders: | 6,170 |

**January 03, 2011 – Day 259**: Florida organizational restructuring and a safety demobilization is conducted for all response personnel. A Technical Advisory Group meeting is held to discuss recent bird captures.

**January 04, 2011 – Day 260**: Hammond Wildlife Rehabilitation Center temporarily re-opens due to oiled birds recently captured.

**Daily statistical snapshot:**

| Total number of vessels | 345 |
|---|---|
| Total number of responders | 5,428 |

**January 5, 2011 – Day 261**: In Plaquemines, Lafourche, and Jefferson Parish, Natural Resource Advisors begin assignments within the operations section of each branch.

**January 6, 2011 – Day 262**: The FOSC visits the Mississippi Branch and flies over the island operations.

**January 7, 2011 – Day 263**: Louisiana Piling Removal Project: the divers and equipment demobilize after completion of survey and piling recovery and removal activities. The Environmental Unit's sampling team collects a site closure sample at the Hopedale facility.

221

## Appendix

**January 12, 2011 – Day 268**: The Florida Branch location at Mary Esther opens. A consultation meeting between the FOSC and eleven federally recognized tribes occurs.

**January 14, 2011 – Day 270**: The Tampa, Fla., dry dock site closes and demobilizes. Louisiana National Guard barge commences demobilization and is replaced by a commercial barge.

**January 15, 2011 – Day 271**: The sand relocation project completes with 34,000 cubic yards of sand relocated in Grand Isle, La. Four hundred feet of containment boom is deployed in Southwest Pass due to tar mat excavation.

**January 17, 2011 – Day 273**: Alabama Sand Shark operations are suspended due to efficiency of operations. Three helicopters demobilize from Mobile, Ala., and Houma, La.

**January 19, 2011 – Day 275**: Power Sifters CD1 and CD3 are demobilized from Pensacola, Fla.

**January 20, 2011 – Day 276**: The Technical Advisory Group meets to discuss transition of responsibilities from the Wildlife Branch to the Natural Resource Damage Assessment (NRDA). The Hesco Basket Removal Project Plan is signed.

**January 21, 2011 – Day 277**: Marsh Island Refuge in Cypremort Point releases one rehabilitated white pelican and three brown pelicans. The Louisiana National Guard helicopter associated with the Louisiana National Guard barge demobilizes from the response. Dredging begins at Little Lagoon Cut on Dauphin Island, Ala.

**January 22, 2011 – Day 278**: Dauphin Island Sand Berm removal project completes, and equipment demobilization commences. Beach maintenance duties of Harrison County, Miss., beaches are transferred to the county.

**January 23, 2011 – Day 279**: The Orphan Anchor Pilot Program approves one location in Lake Borgne, St. Bernard Parish for use.

**January 29, 2011– Day 285**: Phase one of the Orphan Anchors Retrieval Program begins.

**Sources of data:**

Unified Area Command Executive Summary daily reports from April 25, 2010, to December 14, 2010.

Unified Area Command Executive Summary weekly reports from December 15, 2010, to January 24, 2011.

Presidential Commission Report, January 2011, Chapter 5 "You're in it now, up to your neck!"

BP Gulf of Mexico Response, Response Timeline located at http://www.bp.com/

Daily UAC and NIC reports located in the Homeland Security Information Network (HSIN).

Department of the Interior press releases.

State of Louisiana Office of Governor Press Release located at www.gov.louisiana.gov/

Press releases and official EPA letters contained at the EPA Response to BP Spill in the Gulf of Mexico website http://www.epa.gov/bpspill/index.html.

Department of Health and Human Services Press releases contained at the BP Gulf Spill Response website located at: http://www.hhs.gov/gulfoilspill/index.html.

Controlled Burns After Action Report for Burns for May 28, 2010 to August 3, 2010, dated August 8, 2010.