# EXHIBIT 10

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

     IN RE:  OIL SPILL BY   MDL NO. 2179
3    THE OIL RIG
     "DEEPWATER HORIZON"    SECTION:  J
4    IN THE GULF OF
     MEXICO, ON APRIL 20,   JUDGE BARBIER
5    2010                   MAG. JUDGE SHUSHAN

6



12

13

14                   **VOLUME 1 OF 2**

15       Deposition of **DOUG SUTTLES** taken in the

16   Orleans Room, Pan American Life Center, 601

17   Poydras Street, New Orleans, Louisiana, on

18   Thursday, May 19, 2011.

19

20   **APPEARANCES:**

21   ON BEHALF OF THE PLAINTIFFS STEERING
     COMMITTEE:
22

         WATTS GUERRA CRAFT, LLP
23       (BY:  MIKAL WATTS, ESQUIRE
               DAVID V. McLENDON, ESQUIRE)
24             W.D. DENIS, ESQUIRE)
         Four Dominion Drive, Bldg. 3, Suite 100
25       San Antonio, Texas 78257

```
 1          THE VIDEOGRAPHER:
 2              This is the videotaped
 3   deposition of Doug Suttles.  This deposition
 4   is being held at 601 Poydras Street in New
 5   Orleans Louisiana on May the 19th, 2011, at
 6   the time indicated on the video screen,
 7   8:28 a.m.
 8              This deposition is being taken
 9   in the matter of the oil spill by the
10   DEEPWATER HORIZON in the Gulf of Mexico on
11   April the 20th, 2010, in the United States
12   District Court, Eastern District, State of
13   Louisiana.
14              Would the court reporter please
15   swear in the witness.
16              DOUG SUTTLES,
17   after having been first duly sworn by the
18   above-mentioned court reporter, did testify
19   as follows:
20   EXAMINATION BY MR. WATTS:
21       Q.     What is your name?
22       A.     Douglas James Suttles.
23       Q.     Mr. Suttles, my name is Michael
24   Watts.  I'll be asking you questions first.
25   You graduated from the University of Texas at
```

```
 1   Austin in 1983 and then went to go work for
 2   Exxon; is that right?
 3          A.      That's correct.
 4          Q.      How long did you work for Exxon?
 5          A.      About five and a half years, I
 6   believe.
 7          Q.      That would take us to about '88
 8   or '89?
 9          A.      I left Exxon in the fall of
10   1988.
11          Q.      Okay.  And who did you go to
12   work for at that time?
13          A.      I went to work for a subsidiary
14   of BP called Standard Alaska Production
15   Company, I believe was the company's official
16   name at the time.
17          Q.      How long did you work for
18   Standard Alaska?
19          A.      Well, it eventually became BP or
20   various subsidiaries of BP, and I worked for
21   them about 22-1/2 years.
22          Q.      Okay.  In the meantime did you
23   spend some time in Trinidad as well?
24          A.      Yes, I did.
25          Q.      When were you in Trinidad for
```

1   BP?

2          A.       I was in Trinidad 1999, most

3   of -- I think I -- from January through about

4   September, August, September.

5          Q.       And you were the president of

6   BP's Trinidad oil business?

7          A.       Yes, I was.

8          Q.       You also spent some time in

9   Russia with the Sakhalin; is that right?  I'm

10  probably mispronouncing --

11         A.       Yeah -- well, I had

12  responsibility for BP's business in Sakhalin.

13  I was based in Houston at the time.

14         Q.       But you were the president of BP

15  Sakhalin, Inc.; is that right?

16         A.       Yes, I was.

17         Q.       Okay.  Other than those two of

18  interest to Trinidad and the presidency of

19  the Russian venture, did the rest of your

20  time up through about 2009 get spent in

21  Alaska?

22         A.       No.  I -- I had assignments in

23  Scotland twice and London once.

24         Q.       Okay.  Beginning in January

25  of 2007, were you named the president of BP

```
 1    Exploration Alaska?
 2         A.      Yes, I was at the -- at the
 3    beginning of 2007.
 4         Q.      And did you stay in that
 5    capacity through the end of 2008?
 6         A.      Yes, I did.
 7         Q.      All right.  And then you were
 8    named the chief operating officer of BP
 9    Exploration & Production and moved back to
10    Houston; is that right?
11         A.      That's correct.
12         Q.      Okay.  Who made the decision to
13    make you the chief operating officer?  Was it
14    the board of directors?
15         A.      I was offered the position by
16    Andy Inglis who is the chief executive
17    officer of Exploration & Production.
18         Q.      Okay.  And both of you -- was
19    your direct supervisor when you were the
20    chief operating officer the chief executive
21    officer, Mr. Inglis?
22         A.      Yes, he was my boss.
23         Q.      And from January 1, 2009, up
24    through and including the date of the sinking
25    of the DEEPWATER HORIZON on April the 22nd
```

1   you were the chief operating officer for BP

2   Exploration & Production; is that right?

3          A.      Yes, that was my title, yes.

4          Q.      Now, as I understand it, since

5   then the chief executive officer of BP, PLC,

6   Tony Hayward, has been replaced; is that

7   right?

8          A.      Tony has left the company, yes.

9          Q.      All right.  The chief executive

10  officer of BP Exploration & Production, Andy

11  Inglis, has left the company?

12         A.      That's correct.

13         Q.      And you as the chief operating

14  officer of BP Exploration & Production have

15  left the company?

16         A.      I retired at the end of March,

17  yes.

18         Q.      Okay.  And I just wanted to ask

19  you:  At the time that you retired, you were

20  the ripe old age of 50 years old; is that

21  right?

22         A.      Yes, I was.

23         Q.      Was that a voluntary retirement?

24         A.      Yes, it was.

25         Q.      Did anybody ask you to retire?

```
 1          Q.      Well, who -- who made the final
 2     decisions on -- if you had a dispute over
 3     something that was going to be done or
 4     implemented, did you make that final decision
 5     or did somebody else?
 6          MS. KARIS:
 7                  Object to form.
 8          A.      Well, the structure for Unified
 9     Command is set out -- I believe it's set out
10     in the National Contingency Plan and through
11     ICS is that the FOSC has the ultimate
12     authority.  So it's a -- Unified Command
13     structure has the key stakeholders.  Those
14     are set out in the plan.  And it -- it tries
15     to achieve consensus, but the ultimate
16     decision rights are with the FOSC, which was
17     a Coast Guard admiral.  It changed which one
18     throughout the spill.
19     EXAMINATION BY MR. BARR:
20          Q.      And -- and just for the record,
21     could you state what FO -- FOSC is?
22          A.      Federal on scene coordinator.
23     And I believe on an offshore spill, that's
24     the Coast Guard and an -- and on a offshore
25     spill, it's Coast Guard, and in shore I
```

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

   IN RE:  OIL SPILL BY   MDL NO. 2179
3  THE OIL RIG
   "DEEPWATER HORIZON"    SECTION:  J
4  IN THE GULF OF
   MEXICO, ON APRIL 20,   JUDGE BARBIER
5  2010                   MAG. JUDGE SHUSHAN

6



12

13

14              **VOLUME 2 OF 2**

15    Deposition of **DOUG SUTTLES** taken in the

16  Mardi Gras Room, Pan American Life Center,

17  601 Poydras Street, New Orleans, Louisiana,

18  on Friday, May 20, 2011.

19

20  **APPEARANCES:**

21  ON BEHALF OF THE PLAINTIFFS STEERING
    COMMITTEE:
22       LEVIN, PAPANTONIO, THOMAS, MITCHELL,
         ECHSNER, RAFFERTY & PROCTOR, PA
23       (BY:  BRIAN H. BARR, ESQUIRE)
         316 S. Baylen Street, Suite 600
24       Pensacola, Florida 32502

25

1   the Unified Command and brought to the FOSC?

2          A.      Yes, there were.

3          Q.      Was that often?

4          A.      Yes.  The way the ICS process

5   works, effectively you have a -- a daily plan

6   which describes the actions that would be

7   taken in the response which has to be

8   approved by the UAC, and that comes up for

9   approval every single day during the

10  response.  And that occurs both at Unified

11  Area Command and in the incident command

12  posts.

13         Q.      Did you -- and by you here I

14  think I mean you and -- and BP -- undertake

15  to do anything with the surface burns or the

16  use of booms or the skimming of oil from the

17  surface or the use of dispersants without the

18  approval and direction of the United States

19  Government?

20         A.      Well, the way the Unified Area

21  Command works is, is that's where the

22  authority for action occurs, and it's a

23  process that's intended to create consensus.

24  But as -- the phrase being used consistently

25  throughout the response was the FOSC has

1    51 percent of the vote.  We could not take

2    action in the response without the approval

3    of the FOSC.

4         Q.    Sir, and -- and you say -- you

5    testified that you could not take action

6    without the approval of the FOSC.

7              Sir, is it also true that you

8    did not take those actions without the

9    approval of the FOSC?

10        A.    Not response actions.  But we

11   did take actions such as providing grants to

12   the states to support -- provide them funds

13   to cover their costs to -- to make sure that

14   wasn't inhibiting their ability to support

15   the response.  And we also gave, for

16   instance, financial grants to support tourism

17   to try to mitigate and offset economic

18   impacts.  But response -- direct response

19   activities, I'm not aware of any actions we

20   took without the approval of the FOSC.

21        Q.    And if I could -- if I could

22   narrow your focus even more to dispersants,

23   did the approvals and direction by the United

24   States Government and the FOSC include

25   whether dispersants would be used at all on

1    this spill?

2         A.     We could only use dispersants

3    with the approval of the -- of the FOSC and

4    the Government, yes.

5         Q.     And did those same approvals and

6    directions from the Government and the FOSC

7    also include which dispersants you could use?

8         A.     My understanding of the -- the

9    dispersants we used were we had an oil spill

10   response plan which referenced approved

11   dispersants.  I believe it's from the

12   National Contingency Plan.  And that was

13   the -- so we were using Government-approved

14   dispersants, and we only used those with the

15   Government's approval.

16        Q.     Sir, did the approvals and

17   directions by the United States Government

18   and the FOSC also include in which areas of

19   the Gulf of Mexico dispersants could be used?

20        A.     Yes, yes, sir, they did.

21        Q.     Did the approvals and directions

22   by the United States Government and the FOSC

23   include whether dispersants could be used on

24   the surface of the water?

25        A.     Yes, sir, there were very clear

```
1    guidelines which said where they could and
2    could not use and later in the response the
3    exact locations were -- were -- were having
4    to be formally approved.
5         Q.    And did those same approvals
6    from the Government and the FOSC include
7    whether dispersants could be used -- applied
8    subsurface, that is, below the surface of the
9    Gulf of Mexico?
10        A.    Yes, we -- we only used subsea
11   dispersants with explicit approval from the
12   Government.
13        Q.    Mr. Suttles, did those same
14   series of approvals and directions from the
15   United States Government and the FOSC also
16   include the manner, for instance, by ship or
17   by plane, the manner in which the dispersants
18   could be applied?
19        A.    That's correct.
20        Q.    Did those same approvals or
21   directions by the United States Government
22   and the FOSC also include how much dispersant
23   could be used?
24        A.    Yes, they did, the -- the
25   volumes that could be applied had to be
```

```
 1    approved.
 2         Q.       And were those volumes, as you
 3    recall it, Mr. Suttles, approved daily by the
 4    FOSC and the Government?
 5         A.       At the outset I don't believe
 6    the volumes were reported every day.  I don't
 7    know that there was a -- so at the beginning
 8    it was aerial dispersant used.  The
 9    authorization for aerial dispersant was being
10    used, and the -- the -- the organization, the
11    part of the Unified Command which included BP
12    staff, Government staff, experts from spill
13    response communities, would put forward their
14    plan, and that would be applied.
15              Later on in the spill, the --
16    the daily volumes had to have explicit
17    written approval is my memory.
18         Q.       And, similarly, Mr. Suttles, did
19    those same approvals and directives from the
20    United States Government and the FOSC include
21    how long dispersants could be used?
22         A.       Help me understand what you mean
23    by "how long."
24         Q.       Well, for -- how -- for what
25    period of time in -- in the response to the
```

```
 1   spill that dispersants could be used?

 2         A.      Yes, they did.  They were --

 3   they were explicit on that area, at least to

 4   my knowledge.

 5         Q.      And sitting here today, so far

 6   as you can recall, were any of those things

 7   that you and I just went through done without

 8   the approval and direction of the United

 9   States Government and the FOSC?

10         DEFENSE COUNSEL:

11               Object to form.

12         A.      In relation to dispersant use,

13   not to my knowledge.  This was an area that I

14   would characterize the Government's

15   involvement to be extreme.

16   EXAMINATION BY MR. HEIDEN:

17         Q.      Thank you, sir.

18         MR. HEIDEN:

19               Pass the witness.

20         THE VIDEOGRAPHER:

21               We're going off the record.

22   It's 10:02.  This is Videotape No. 2.

23               (Short recess.)

24         THE VIDEOGRAPHER:

25               Back on the record.  It's 10:02;
```

```
 1    Videotape No. 2.
 2    EXAMINATION BY MR. TSEKERIDES:
 3         Q.    Good morning, Mr. Suttles.  My
 4    name is Ted Tsekerides, and I represent two
 5    of the cleanup responders, O'Brien's Response
 6    Management and National Response Corporation.
 7              You've talked both today and
 8    yesterday about the FOSC.  That's the Federal
 9    On-Scene Coordinator, correct?
10         A.    Yes, that's correct.
11         Q.    Is that a person?
12         A.    It was a named individual, yes.
13         Q.    Okay.  Who was the first FOSC
14    that you recall?
15         A.    Admiral Mary Landry.
16         Q.    Okay.  And is she a Coast Guard
17    official?
18         A.    She's the -- a rear admiral in
19    the Coast Guard and I believe in charge of
20    the 8th district, which here -- is based here
21    in New Orleans.
22         Q.    Okay.  And how long -- for how
23    long was she the FOSC?
24         A.    I believe she was the FOSC from
25    the start of the -- from the -- from the
```

```
1    activation of Unified Area Command, which was
2    a day or two after the accident, up through
3    the end of May is my memory.
4         Q.    And then was somebody else --
5    did somebody else replace her as the FOSC?
6         A.    Admiral Watson was the next FOSC
7    for the Coast Guard.
8         Q.    Okay.  Have you heard of a
9    Admiral Allen?
10        A.    Yes, sir, Admiral Allen.
11        Q.    Was he an FOSC as well?
12        A.    He was a national incident
13   commander.  He was never an FOSC, to my
14   knowledge.
15        Q.    Okay.  Let's -- let's spend a
16   little time going through that.  How would
17   you describe the command structure with
18   respect to the FOSC and this unified
19   commander?  How did -- how did that work?
20        A.    Well, the -- the -- the
21   construct here is laid out in legislation and
22   regulation, and it -- it defines the
23   structure.  So it -- it actually formally
24   lays out what the roles are, the
25   organization, in other words, what teams you
```

```
 1    have.  It even has processes for things like
 2    plannings and approvals and tracking of
 3    activities and costs.  It -- it lays much of
 4    this out in -- in quite a bit of detail.  And
 5    these are things which are drilled upon and
 6    practiced with the Coast Guard and oil and
 7    gas companies including BP.
 8                 So when the accident occurred,
 9    we all knew that that would be the structure
10    that would be used for the response.  We were
11    familiar with that, we had individuals
12    trained in that.  The Coast Guard, other
13    members of government agencies do, too.
14                 And the structure has a Unified
15    Area Command which is the ultimate authority,
16    and the ultimate authority there is held by
17    the FOSC, and then you have incident command
18    posts which essentially mimic that structure.
19    So -- but -- but they're the more operational
20    units.
21                 So the FO -- the Unified Area
22    Command is trying to set strategy and
23    direction.  They're monitoring results,
24    intervening where necessary, playing a large
25    role in -- in external communications.  And
```

```
 1    then the incident command posts are
 2    effectively the operational units.  They're
 3    the units which are actually managing,
 4    skimming vessels, dispersant application
 5    aircraft, shore cleanup crews, all of those
 6    types of activities.
 7                  And you effectively have an
 8    FOSC -- I think it's called an FOSCR -- at
 9    each of the ICPs, which was a -- I think -- I
10    believe in all cases was a captain in the
11    Coast Guard.
12        Q.      Okay.  So is it fair to say the
13    Unified Area Command was the top of the
14    structure?
15        A.      Yes, it was.  It -- it was -- I
16    don't think it was ever completely clear on
17    the relationship between the Area Command and
18    the NIC, and -- and -- and I'm not sure the
19    NIC had ever been used before.
20        Q.      When you say NIC, what do you
21    mean by that?
22        A.      The national incident commander,
23    in this case Admiral Allen.
24        Q.      Was Admiral Allen -- would you
25    say he had a higher authority than the FOSC?
```

```
 1   FOSC had a responsibility for the day-to-day
 2   oversight of the cleanup response?
 3        DEFENSE COUNSEL:
 4             Object to form.
 5        A.     The FOSC as part of Unified Area
 6   Command -- that was one of the roles of the
 7   Unified Area Command was to provide
 8   oversight.  And -- and I saw -- as a Unified
 9   Area commander, that was part of my role.
10   You'd have to ask the FOSC how they viewed
11   their role.
12   EXAMINATION BY MR. TSEKERIDES:
13        Q.     We'll get to that, I'm sure,
14   eventually.  Thank you.
15             I just want to get sort of in
16   one place in the record, if you could -- if
17   you could synthesize for me the distinction
18   between Unified Command and incident command.
19   Those are two different things, right?
20        A.     They're two different elements
21   of the command structure.
22        Q.     Okay.  Is it that Unified
23   Command is sort of at the top and then you
24   have various incident commands below that?
25        A.     Yes, the incident command posts
```

1   report to Unified Area Command.

2       Q.      So all -- all roads lead up to

3   Unified Command?

4       A.      That -- that's my understanding,

5   yes.

6       Q.      Okay.  And then the FO -- FOSC

7   sits on top of the Unified Command?

8       A.      That's correct.

9       Q.      Okay.  I think you were shown a

10  document yesterday and, I apologize, I

11  don't -- I don't have it, but let's see if I

12  can recall.  You sent the letter, I think, in

13  July of 2010 to one of the admirals, and this

14  was in connection with the dispersant use.

15              Was it the case that -- that BP

16  had to get permission -- and you touched upon

17  this a little bit today -- but that you had

18  to get permission from the Government to use

19  the dispersants?

20      A.      Yes, we did.  The -- the --

21  the -- the -- the requirements around

22  dispersant use changed over time and actually

23  became a daily requirement where we had to --

24  to -- and for some applications and for

25  others we could get it for a week or -- we

```
 1    Command reviewed a plan, didn't like it,
 2    and -- and sent it back?
 3          A.      There were elements of the plan
 4    at times which were not approved, and -- and
 5    changes were -- were -- were told to be made
 6    to the plans.
 7          Q.      Okay.  And the decisions
 8    ultimately at the Unified Area Command would
 9    have been by the FOSC to determine at the end
10    of the day?
11          A.      The end -- the end of the day
12    we -- no plan could be approved without the
13    approval of the FOSC.
14          Q.      Okay.  Focusing a little bit on
15    in situ burn -- and I'll apologize in advance
16    if you don't have personal knowledge, but
17    that's fine, just tell me.
18                  Were you ever out when an
19    in situ burn activity was taking place?  And
20    what I mean by that, were you ever out on a
21    vessel watching in situ burn taking place?
22          A.      I -- I observed at a distance
23    in situ burns while in aircraft over the
24    spill site and while on the drilling rigs
25    supporting the relief wells.
```