GOODWIN | PROCTER

Dahlia S. Fetouh
617.570.1263
dfetouh@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

May 7, 2012

**Via Electronic Mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
Room B345
500 Poydras St.
New Orleans, LA 70130

Re: *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (Docket No. MDL 2179); Subpoena Served on Woods Hole Oceanographic Institution

Dear Judge Shushan:

I write on behalf of Woods Hole Oceanographic Institution ("WHOI") and in response to BP's April 30, 2012 letter brief to the Court. In WHOI's April 25, 2012 motion for reconsideration, WHOI did not ask the Court to abandon the reasoning or approach the Court adopted in its April 20, 2012 order (the "Order"). To the contrary, WHOI asked the Court to apply the same reasoning, but simply to adjust the date that the Court selected as a proxy for the beginning of WHOI's academic work in order to reflect the actual date that work began. BP, on the other hand, is now asking the Court to disregard the entirety of the Court's original analysis. There is no reason to do so. Indeed, perhaps unwittingly, BP's letter exemplifies precisely the critical need to protect non-party academic institutions from a public assault in the courtroom.

### Introduction

Based on little more than unsubstantiated suppositions and preordained conclusions, BP uses its motion as an opportunity to attack WHOI's work as "fundamentally flawed" and "suspicious[]." BP's accusation is an affront to WHOI's scientists—one that is only outdone by BP's suggestion that WHOI consciously manipulated its modeling in order to achieve a desired result. These baseless allegations, slung with reckless impunity against a non-party in a public filing, reflect exactly the type of aggressive posturing that will inevitably and significantly chill academic research—particularly in important arenas that might later be subject to litigation—unless courts

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 2

acknowledge and protect such work. Even worse, any inclination of academics to donate time, knowledge, or assistance to entities that might become parties to litigation (whether governmental or private entities) would end. It is difficult to emphasize enough the devastating effect this result could have on the public in times of crisis.

To be clear, BP is now publicly alleging—without evidence—that WHOI and its fellow academic partners[1] altered their analysis and conclusions. Never mind that WHOI's work was independently vetted by a *neutral* peer-review process before publication. By these allegations, BP confirms that its only aim in this dogged discovery chase is to attempt to malign the work done by numerous independent academics and the respected institutions of which they are part simply because other individuals have found WHOI's work to be compelling. Further, BP's description of the normal and required process of scientific analysis is grossly inaccurate. At best, it reveals BP's lack of comprehension of the scientific process, and, at worst, it is dangerously close to a Rule 11(b) violation.

It is apparent from its letter that BP will go to any lengths to gain access to the "analysis documents" of scientists, even to the point of misconstruing facts in order to raise the specter of academic dishonesty. WHOI requests the Court's protection from BP's unfounded attacks. The production WHOI has made to date of the raw materials, data, and articles, combined with the production of responsive documents predating WHOI's submission of its Final Oil Spill Flow Rate Report and Characterization Analysis ("Final Report") to the United States Coast Guard ("USCG") on August 10, 2010, provides BP with more than enough information to independently assess WHOI's analysis, while offering protection for WHOI's academic endeavors. It is time for BP's irrational witch hunt to come to an end.

## Discussion

### 1. BP Has No Compelling Need That Overcomes WHOI's Non-Party Rights.

Although BP continues to claim it has a compelling need for internal documentation from WHOI, its April 30, 2012 letter highlights the incredible amount of

---

[1] In addition to WHOI's faculty members, Dr. Richard Camilli and Dr. Christopher Reddy, the authors of the relevant papers are Dr. G. Todd Ventura of the University of Oxford, Prof. J. Samuel Arey of the Swiss Federal Institute of Technology at Lausanne, Prof. Alexandra Techet of the Massachusetts Institute of Technology ("MIT"), Dr. Daniel Di Iorio of the University of Georgia, and Dr. Louis Whitcomb of Johns Hopkins University.

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 3

WHOI data and documentation—including internal deliberative documents such as manuscript drafts—that it already has in its possession.

To date, WHOI has produced more than 1,110 pages of responsive documents, along with ten DVDs and three CDs containing all the underlying data and video related to the two papers published in the *Proceedings of the National Academy of Sciences* ("PNAS") that are the subject of BP's subpoena.[2] This production amounts to over 31.8 hours of video and 34 GB of data. Further, on May 4, 2012, WHOI began its rolling production of pre-August 10, 2010 documents by submitting an additional 729 pages of emails and attachments, with more to follow shortly. And, as BP notes, it already has *over 2,200 emails* involving WHOI scientists from their work with the Flow Rate Technical Group ("FRTG")—a point BP underscores by freely citing them in its recent submission to the Court.

Put succinctly, BP either has or will soon have in its possession the underlying data used for the studies, instructions for accessing that data, the relevant PNAS papers (which describe the methodology used), emails between members of the FRTG (including emails with WHOI scientists),[3] and responsive documents that pre-date WHOI's submission of its Final Report. With this, BP's legitimate needs—if any—have surely been satisfied. BP has all that it needs to recreate WHOI's work and draw its own conclusions based on the data that was collected.

2. **The Burden On WHOI Is Significant and Is Not Limited To The Financial Cost of Production.**

WHOI greatly appreciates the Court's effort to mitigate the burden of production through its cost-shifting order. WHOI wishes to reiterate to the Court, however, that the indirect costs, even with a scaled-down production, remain substantial. BP seems to think that the balancing test involved here weighs its so-called "compelling need" on one side of the scale against the "comparatively minor burdens" of production on WHOI.

---

[2] *See* Christopher M. Reddy, Ph.D., *Composition and fate of gas and oil released to the water column during the* Deepwater Horizon *oil spill*, PNAS; Richard Camilli, Ph.D., *Acoustic Measurement of the* Deepwater Horizon *Macondo well flow rate*, PNAS Early Edition.

[3] Even though it is apparent that BP has already obtained these documents—including the post-August 10, 2010 emails involving WHOI scientists—from the Government, BP continues to claim that it is "critical" that WHOI itself produce them. WHOI has offered to produce its emails concerning the FRTG in its April 25, 2012 letter, although it would like to note that Rule 45 clearly instructs that non-parties should not be burdened with the task of producing documents that are available from a party.

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 4


BP's April 30, 2012 Letter, at 2. For BP to trivialize the concerns of WHOI in this manner demonstrates that it is turning a blind eye to the true balancing test that the Court has and should apply.

The "costs" to WHOI, and academics more generally, go much deeper than merely the cost of the physical production of documents. Every advance by BP makes WHOI scientists—and scientists worldwide—more reticent to engage in important research. Allowing BP access to the pre-publication notes and discussions related to purely academic endeavors will put the academic community on notice that, should one publish research that is potentially adverse to a party, one may be subject to a scorched-earth campaign by a biased party.

BP, in its April 30 letter, publicly attacked WHOI, as well as the other academics on the papers, by using deliberative emails written before the final papers were even peer reviewed, submitted, and published. This attack using pre-publication notes and discussions is the very danger warned of by the *Cusumano* and *Bextra* courts.[4] As this Court so aptly stated, and BP has proven correct:

> If BP gains access to the analysis documents for these article[s], that could hamper future research efforts. If the analysis documents for these articles are produced, the co-authors from other academic institutions may be subjected to discovery and the scrutiny of the litigation process which may discourage such persons from participating in the authorship of articles relating to matters in litigation.

Order, at 10. It is this cost that must be weighed against BP's so-called need.

Moreover, as a non-profit academic organization, WHOI's single most valuable resource is its professors' and scientists' time. Many of them have already spent countless hours responding to this subpoena, time that should have been spent engaging in oceanographic research and teaching.[5] Application of the Court's current Order (and any expansion of it) would only amplify this cost.

---

[4] See *Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8 (D. Mass. 2008).

[5] Despite BP's assertions to the contrary, WHOI is very much an academic organization. Its researchers have papers to write, science labs to run, and teaching duties to fulfill. Dr. Alex Techet, Dr. Dana Yoerger, and Dr. Richard Camilli, for instance, are faculty for the Applied Ocean Science and Engineering program at MIT-WHOI, and Dr. Christopher Reddy and Dr. Jeffrey Seewald are faculty for the Chemical Oceanography program at the same.

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 5

### 3. WHOI's Analysis Is Not One And The Same With The Government's Analysis.

BP is going to great lengths to undermine WHOI's research despite the fact that the Government has made clear that WHOI's results are *not* the Government's results. Presumably in the course of the litigation, the Government (a party to this litigation, unlike WHOI) will present its own expert analysis. It is that analysis that should be the subject of BP's attack, not WHOI. Yet BP posits that the "striking[] similar[ity]" between the Government's August 2, 2010 flow rate estimate and WHOI's independent estimate conclusively shows that WHOI's work alone is the "foundation for the [G]overnment's final flow theory." BP's April 30, 2012 Letter, at 4. To borrow BP's own phrase, this theory is fundamentally flawed. The fact that the flow rate estimates of the independent researchers at WHOI essentially aligned with the conclusions of *other independent researchers*, including government scientists, does not prove that they shared the same work product, only that they shared the same conclusion. And typically, aligned outcomes—especially when reached using different analytic methods—are considered a reliable indication that the ultimate conclusion is correct. In other words, in the scientific community, multiple independent and peer-reviewed studies all of which come to the same or similar results are usually viewed as evidence of precision, not collusion.

Further, the fact that WHOI's estimates are similar to those of the Government does not prove that WHOI is part of the Government (or even its agent). Nor, for that matter, would evidence that the Government adopted WHOI's analysis *in toto*. And it certainly does not show that WHOI should have "expected" to be treated as a party that had made allegations against BP. WHOI's scientists conducted field research and published their conclusions. That a litigant—in this instance, the Government—may have relied on WHOI's work (a point which WHOI does not concede) does not *ipso facto* make the non-party the accuser, and, despite BP's suggestion to the contrary, it should not be treated as such.[6] BP's attempt to paint all of WHOI's work as non-academic simply because Marcia McNutt thought the work was persuasive should not be adopted and should not serve to deprive WHOI's faculty of the protection to which they are owed.

---

[6] WHOI notes that, by BP's logic, it was also an agent of the oil company itself. It was, after all, BP that first requested WHOI's assistance in assessing the extent of the oil spill. (*See, e.g.*, **Attachment 1** (discussing BP's request for assistance from WHOI).)

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 6

### 4. WHOI's Voluntary Assistance To The FRTG Does Not Change The Fact That WHOI's Primary Purpose Is Conducting Scholarly Research.

BP would have this Court believe that because one WHOI faculty member volunteered some time to the FRTG, no work that anyone at WHOI ever did concerning the *Deepwater Horizon* spill could be academic. This premise ignores the nature of WHOI and its work. For those less familiar with WHOI, it is important to provide some background on WHOI to place this work in context. WHOI is the largest independent oceanographic research institution in the United States and has been in existence since 1930. *See, e.g.*, WOODS HOLE OCEANOGRAPHIC INSTITUTION, http://www.whoi.edu/about (last visited May 7, 2012). It is a fully-accredited, private, nonprofit research and higher education facility dedicated to marine science and engineering, and to the education of marine researchers. *Id.* Further, WHOI, in a joint program with MIT, awards post-graduate degrees in numerous oceanographic programs including marine geology and chemical oceanography. *Id.* Because of this, WHOI's faculty and students annually research and publish countless studies on the ocean and the maritime environment. Here, the *Deepwater Horizon* oil spill was the largest oil spill in United States waters in history. Without surprise, many of WHOI's researchers, scientists, and students have spent (and continue to spend) significant time studying various aspects of this disaster and both the current and potential future implications for the oceans and marine life.

Despite WHOI's status as a research and academic institution that is engaged in a number of academic research endeavors regarding this incident, BP asserts that "in fact there was no such endeavor." BP's April 30, 2012 Letter, at 2. The numerous WHOI scholarly publications on various topics related to the *Deepwater Horizon* incident, however, belie that assertion. For example, PNAS just recently published a WHOI study on the damage caused to coral in the Gulf Coast by the oil spill. *See, e.g.*, White, et al., *Impact of the* Deepwater Horizon *oil spill on a deep-water coral community in the Gulf of Mexico*, PNAS Early Edition (March 27, 2012). BP must then believe that this paper too was not academic, and written at the direction of the Government.

After WHOI submitted its Final Report on August 10, 2010, its official work with government ended. It in unclear what BP believes WHOI is, if not an academic and research institution, when WHOI faculty continued their work, both with these papers at issue and others. BP cannot maintain that the $4,762 WHOI received under the USCG contract kept WHOI connected to the Government. The cost to WHOI for the research that resulted in the PNAS papers, not to mention the numerous other studies WHOI has published, is staggering when you consider the costs of field investigations, research vessels, personnel, and lab costs. WHOI did not do all of that for $4,762. It did it because that is precisely the kind of research and writing that *academic* researchers do.

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 7

And although certain individuals scientists still provided advice to the FRTG after August 10, 2010, this time was their own individual time donated to the government *pro bono*. This donation does not change their basic role as researchers, scientists, and educators when writing their PNAS papers.

### 5. BP's Claim of "Unexplained Revisions" Misconstrues The Scientific Process.

In its letter, BP spends considerable time suggesting that it needs access to the deliberative documents beneath WHOI's academic research because of certain "unexplained revisions" to WHOI's published rate flow estimates. *See* BP's April 30, 2012 Letter, at 7–9. Of course there were revisions. They were the natural result of rigorous scientific examination and review by all of the scientists involved to provide increased accuracy and precession to their analysis and conclusions in the months after the early field estimates. Review and refinement are the very hallmark of good science.[7]

BP's present objections demonstrate that BP does not understand, or will not acknowledge, how scientific discovery works—studies are conducted, a preliminary analysis is made, the analysis is then fine tuned as more data becomes available, and the preliminary conclusion is modified for precision. Revisions in the process do not necessarily indicate error—as BP suggests—but refinement. And the fact that the final result closely approximates the initial estimate only underscores that the initial estimate, which was made without complete information, was nonetheless a good one. It certainly does not indicate that the final result is the product of some sort of nefarious plot to manipulate the outcome, as BP would have this Court believe.

In addition, BP's assertion that neither it nor the "scientific community" can analyze or recreate WHOI's analysis because they lack access to the deliberative emails of WHOI's scientists involved is flatly wrong. Repeating scientific studies, which is a necessary confirmatory process in the scientific method, requires only the original data and method, not internal debate. Pursuant to both PNAS standards and WHOI policy, the underlying data and supporting information remains available to any scientist wishing to review, criticize, or even challenge WHOI's paper. With this information, any qualified

---

[7] BP—at least for its own work—appears to recognize that analyses can change, particularly when new data is presented. *See BP's Deepwater Horizon Accident Investigation Report*, at 2 (**Attachment 2**) ("This report is based on the information available to the investigation team during the investigation; availability of additional information might have led to other conclusions or altered the team's findings and conclusions."). Ironically, these revisions are acceptable when BP is the one making them, but are somehow indicative of a "fundamental[] flaw" when made by another party.

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 8

scientist is capable of recreating WHOI's results. BP already has this same material and more.

### 6. BP Repeatedly Misstates The Record And The Facts In Asserting Its "Need" For Deliberative Documents From WHOI.

In its effort to demonstrate its "need" for access to WHOI's deliberative emails, BP's April 30 submission misrepresents the documents cited and misstates numerous underlying facts. BP's misstatements or lack of comprehension of the debates between the various academics and Ph.Ds. discussing complicated turbulent flow mathematics, while perhaps understandable, only demonstrates how easily these deliberative debates can be misunderstand and misused. But as BP has now begun this argument, WHOI is compelled to address at least some of these misstatements:[8]

- BP states: "In this meeting, Dr. Camilli himself proposed an extrapolation back based entirely on two data points: the final-day estimate of 53,000 barrels and the May 31, 2010, WHOI estimate of 59,000 barrels. (See **Attachment B**, at 11.)" BP's April 30, 2012 Letter, at 4.

This is incorrect. In fact, Dr. Camilli suggested to the Government not to extrapolate total oil release from just two data points (the last day before the leak was capped and the day WHOI measured the flow). In that very same presentation, Dr. Camilli explained that "[a]dditional well flow/pressure data collected between 4/20/10 and 7/14/10 should be examined to ascertain if a ***non-linearly decreasing flow model*** would be more appropriate for estimating initial flow rate and cumulative release from the well." BP's April 30, 2012 Letter, Attachment B, at 11 (emphasis added). In other words, he suggested using multiple data points with a decreasing flow to determine the totals, and not a simple linear average between two measurements.

- 

---

[8] In addition to the comments discussed *infra*, WHOI also takes issue with BP's claim that it has "oft-expressed" a "willingness to provide financial . . . support." BP's April 30, 2012 Letter, at 2. That statement is disingenuous. As recently as March 15, 2012, Mr. Gasaway wrote to the Court repeating BP's position that, "[w]hile BP recognizes that WHOI is a nonprofit institution, this does not mean that BP is obliged under the law to compensate WHOI for time and effort spent responding to this subpoena." See BP's March 15, 2012 Letter, at 3 (**Attachment 3**). It is only recently that BP has finally acknowledged its obligation to provide limited financial support.

GOODWIN | PROCTER

The Honorably Sally Shushan
May 7, 2012
Page 9

BP is elevating a simple professional courtesy to something more extreme. WHOI extended the same offer to coordinate to all members of the Unified Incident Command including BP.

- 

This is factually incorrect. In the email string cited by BP, nowhere does Dr. McNutt describe █████████████████████
Dr. McNutt does not mention the flow-rate PNAS paper because she is not a co-author of it; therefore, she would not be ███████████████████ a paper she was not writing. She was, however, the custodian of the FRTG report, ███████████
████████████████████████████████████████████████ Dr. Ira Leifer also mentions ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████ Nowhere in this email thread is there mention of a PNAS paper.

- BP states: "**January 7, 2011**. In response to the previous "confidential" message, Dr. Camilli emails Dr. McNutt, providing a new analytical approach that Dr. Camilli and Dr. Dana Yoerger (also of WHOI) believe can produce 'another independent flow rate estimate.' Dr. Camilli and Dr. Yoerger's new approach uses the confidential flow rate data provided by Dr. McNutt and solves for fluid flow in the BOP using pressure readings, fluid characteristics, and other assumptions. (**Attachment I**.)" BP's April 30, 2012 Letter, at 6.

This is factually incorrect. Contrary to this claim, the approach discussed did not use the "confidential" flow rate data provided by Dr. McNutt. In the email, Dr. Camilli clearly states that the data comes from "a document on the DoE website" and that "another document" on the same DoE website "lists the 'post kill' BOP pressure (with test ram



Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109

T: 617.570.1000
F: 617.227.8591
goodwinprocter.com

The Honorably Sally Shushan
May 7, 2012
Page 10

open) at 3320 psi (+/-50 psi)." The email even lists the publicly available URLs for this data.[9] *See* BP's April 30, 2012 Letter, Attachment I.

\* \* \*

In light of the above arguments, we reiterate the request that the Court honor the scholastic protections it has already recognized by extending its protection over the post-March 10, 2011 documents to the deliberative documents drafted from August 10, 2010, through March 10, 2011, as well. As the Court noted in protecting documents created after March 10, 2011, numerous respected academics from institutions around the world were involved in these PNAS papers. Those papers, however, were almost entirely written, drafted, and debated during this August 2010 to March 2011 time period. The wholesale release of the documents, as BP requests, will result in scrutiny of academics, as demonstrated by BP in its April 30 submission, that will discourage such persons from participating in research that touches on this incredibly important event, and, even worse, will significantly restrain all scientific research in the future.

Respectfully submitted,

*Dahlia Fetouh /bm*

Dahlia S. Fetouh

cc:     Robert R. Gasaway, Esq.
        Karen McCartan DeSantis, Esq.

---

[9] The examples included above are not here to engage in a substantive debate with BP over the quality of WHOI's work. As BP well knows, WHOI is not on trial here. Rather, these examples are included to illustrate the dangers against which courts such as the *Cusomano* court warned when biased parties in litigation try to play scientist and second-guess the meaning of scientific communications as opposed to relying on the actual methodologies and data employed.