# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION:  J |
| | * | |
| Applies to:  *All Cases in Pleading* | * | JUDGE BARBIER |
| *Bundle Section III.B(3).* | * | |
| | * | MAGISTRATE SHUSHAN |
| * * * * * * * * * * * * * * * * * * | * | |

## NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST ALL CLAIMS IN FIRST AMENDED COMPLAINT "B3 BUNDLE"

Thomas J. Heiden
Mary Rose Alexander
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700


May 18, 2012

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     STANDARD OF REVIEW .........................................................................................4

III.    PLAINTIFFS' CLAIMS ARE PREEMPTED AS A MATTER OF LAW ........................5

        A.      The CWA/NCP Sets Forth A Comprehensive Response Scheme That
                Vests Control Over Oil Spill Responses In The President And His
                Delegates...................................................................................................5

        B.      Under Implied Conflict Preemption Principles, The Mandatory Oil Spill
                Response Scheme Set Forth In The CWA/NCP Preempts Plaintiffs'
                Claims .........................................................................................................8

        C.      The *Boyle* Test For Government Contractor Immunity Does Not Apply To
                Nalco ........................................................................................................11

IV.     THE RECORD FACTS DEMONSTRATE THAT THE GOVERNMENT
        FOLLOWED THE LAW AND MADE THE DECISIONS REGARDING
        DISPERSANT USE THAT GIVE RISE TO PLAINTIFFS' CLAIMS AGAINST
        NALCO.  THUS, PLAINTIFFS' CLAIMS ARE PREEMPTED ....................................14

        A.      COREXIT EC9500A And COREXIT EC9527A Were Pre-Approved By
                The United States For Use During The Response ................................................14

        B.      The Undisputed Facts Show That The FOSC Exercised Final Decision
                Making Authority During The Response, As Required By The CWA/NCP ........15

        C.      The Undisputed Facts Show That The FOSC Approved The Application
                Of COREXIT EC9500A And COREXIT EC9527A Immediately After
                The Explosion Of The *Deepwater Horizon* And Continued To Approve
                Their Use Throughout The Response. ..................................................................18

        D.      The FOSC Acted In Accordance With Each Step Of The CWA/NCP.................20

        E.      Plaintiffs Have No Facts To Suggest That The Use Of COREXIT Was
                Other Than As Directed Pursuant The CWA/NCP.................................................22

V.      PLAINTIFFS' CLAIMS WILL CHILL FUTURE RESPONSE EFFORTS. .................23

VI.     NALCO ADOPTS CLEAN-UP RESPONDER DEFENDANTS' MOTION FOR
        SUMMARY JUDGMENT ........................................................................................24

VII.    CONCLUSION..........................................................................................................25

i

## TABLE OF AUTHORITIES

### CASES

*Al Shimari v. CACI Int'l, Inc.,*
   658 F.3d 413 (4th Cir. 2011) ................................................................................ 11

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ....................................... 9

*Badon v. R J R. Nabisco Inc.,*
   224 F.3d 382 (5th Cir. 2000) .................................................................................. 4

*Black v. N. Panola Sch. Dist.,*
   461 F.3d 584 (5th Cir. 2006) .................................................................................. 1

*Boyle v. United Technologies Corporation,*
   487 U.S. 500 (1988) .............................................................................. 11, 12, 13

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .............................................................................................. 4

*City of New York v. FCC,*
   486 U.S. 57 (1988) ................................................................................................ 8

*David v. Assumption Parish Police Jury,*
   No. Civ. A. 02-765, 2003 WL 57039 (E.D. La. 2003) ........................................... 1

*Edwards v. Your Credit, Inc.,*
   148 F.3d 427 (5th Cir. 1998) .................................................................................. 4

*Fireman's Fund Ins. Co. v. City of Lodi,*
   302 F.3d 928 (9th Cir. 2002) ................................................................................ 23

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
   373 U.S. 132 (1963) .............................................................................................. 8

*Geier v. American Honda Motor Company,*
   529 U.S. 861 (2000) .................................................................................... 8, 9, 10

*Hines v. Davidowitz,*
   312 U.S. 52 (1941) ........................................................................................ 8, 9, 12

*Little v. Liquid Air Corp.,*
   37 F.3d 1069 (5th Cir. 1994) .................................................................................. 4

*Ramsey v. Henderson,*
   286 F.3d 264 (5th Cir. 2002) .................................................................................. 5

*Romero v. Becken*,
  256 F.3d 349 (5th Cir. 2001) ............................................................ 1

*Witty v. Delta Air Lines, Inc.*,
  366 F.3d 380 (5th Cir. 2004) ....................................................... 9, 13

*Yearsley v. W.A. Ross Constr.*,
  309 U.S. 18 (1940) ...................................................................... 24

## STATUTES

33 U.S.C. § 1321(c) ....................................................................... 15

33 U.S.C. § 1321(c)(1) ..................................................................... 5

33 U.S.C. § 1321(c)(2) .................................................................... 23

33 U.S.C. § 1321(c)(2)(A) ................................................................. 5

33 U.S.C. § 1321(c)(3) ................................................................. 5, 23

33 U.S.C. § 1321(c)(4)(A) .............................................................. 2, 3

33 U.S.C. § 1321(c)(4)(B)(i) .............................................................. 3

33 U.S.C. § 1321(c)(4)(B)(iv) ............................................................. 3

33 U.S.C. § 1321(d)(1) ..................................................................... 6

33 U.S.C. § 1321(d)(1)(G)(ii) ............................................................ 21

33 U.S.C. § 1321(d)(1)(G)(iii) ........................................................... 21

33 U.S.C. § 1321(d)(2) .................................................................... 16

33 U.S.C. § 1321(d)(2)(F) ............................................................. 6, 10

33 U.S.C. § 1321(d)(2)(G) ............................................................. 6, 10

33 U.S.C. § 1321(d)(4) ..................................................................... 7

33 U.S.C. § 1321(j)(8) .................................................................... 24

33 U.S.C. § 1321(o)(2) ................................................................... 10

# RULES

Fed. R. Civ. P. 56 ................................................................................................................ 1, 3

Fed. R. Civ. P. 56(a) ................................................................................................................. 4

Local Civ. Rule 56.1 ................................................................................................................ 1

# REGULATIONS

40 C.F.R. § 300 ................................................................................................................. 7, 10

40 C.F.R. § 300.120 ................................................................................................................ 16

40 C.F.R. § 300.135 ................................................................................................................ 16

40 C.F.R. § 300.135(a) ............................................................................................................. 7

40 C.F.R. § 300.135(d) ............................................................................................................. 7

40 C.F.R. § 300.150 .................................................................................................................. 3

40 C.F.R. § 300.305(d)(2) ................................................................................................... 7, 18

40 C.F.R. § 300.310(a) ............................................................................................................. 7

40 C.F.R. § 300.322(b) ..................................................................................................... 7, 18, 23

40 C.F.R. § 300.905(a) ............................................................................................................. 6

40 C.F.R. § 300.910 .......................................................................................................... 16, 17

40 C.F.R. § 300.910(a) ........................................................................................................... 15

40 C.F.R. § 300.910(b) ........................................................................................................... 15

40 C.F.R. § 300.915 ............................................................................................................... 12

40 C.F.R. § 300.915(a) ............................................................................................................. 6

40 C.F.R. § 300.920 ................................................................................................................. 6

40 C.F.R. § 300.920(d) ........................................................................................................... 13

40 C.F.R. §§ 300.900-300.920 .................................................................................................. 7

47 Fed. Reg. 31,180 (1982) ...................................................................................................... 7

58 Fed. Reg. 54,702 (1993) .................................................................................................... 10

59 Fed. Reg. 47,384 (1994) ........................................................................................... 10

## OTHER AUTHORITIES

Viet D. Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085 (2000) ........................... 11

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendants Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company ("Nalco") respectfully state as follows in support of their motion for summary judgment:[1]

## I.    INTRODUCTION

The B3 Plaintiffs assert claims against Nalco arising from the use of COREXIT EC9500A and COREXIT EC9527A during the response to the oil spill resulting from the April 20, 2010 explosion of the *Deepwater Horizon* (the "Response").  As Nalco has previously represented to this Court, Nalco had no role in making any of the decisions that give rise to Plaintiffs' claims.  (*See* Mem. in Supp. of Nalco's Mot. to Dismiss at 2 (Rec. Doc. 1409-1).) Nalco did not decide to use dispersants.  Nalco did not decide which dispersants to use.  Nalco did not decide where to apply dispersants.  Nalco did not decide how to apply dispersants.  Nalco did not decide when to apply dispersants.  Nalco did not decide what quantities of dispersants could be applied ***safely***.  Indeed, Plaintiffs have never asserted that Nalco participated in any of those decisions.  Nor can they, because each of those decisions was made by the Federal On-Scene Coordinator ("FOSC"), acting pursuant to mandated authority under the comprehensive oil spill response scheme set forth in the Clean Water Act ("CWA"), as amended by the Oil Pollution Act ("OPA"), and the National Contingency Plan ("NCP").  Nalco simply acted in "a time of great national need" to supply COREXIT, responding to urgent requests from the United

---

[1]    The original B3 Master Complaint asserted claims against Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company ("the Nalco Entities") (Master Compl. In Accordance With PTO No. 11 [Case Management Order No. 1] Section III.B(3) ["B3 Bundle"] (Rec. Doc. 1812).)  On March 29, 2011, Plaintiffs filed their First Amended B3 Master Complaint, which does not name the Nalco Entities as defendants.  (*See* B3 Master Compl. at *passim* (Rec. Doc. 1805-1).)  Because Plaintiffs no longer seek to recover from these Defendants, the claims against these Defendants should be dismissed.  *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006); *Romero v. Becken*, 256 F.3d 349, 354 n.2 (5th Cir. 2001); *David v. Assumption Parish Police Jury*, No. 02-765, 2003 WL 57039, at *8 (E.D. La. Jan. 6, 2003).

States Coast Guard ("USCG") for as much dispersant as Nalco could supply.  (Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("SUMF") ¶¶ 68-70.)

> The Federal Government asked
>
> Nalco and companies that provide the Nalco Company with surfactant supplies to continue to assist by making available, to the greatest extent possible, dispersant and the surfactant material to this response and clean-up effort. . . .  [W]hatever efforts you are undertaking in this regard are of invaluable benefit to this country.  (SUMF ¶ 70.)

Nalco supplied a product that was and had been listed on the Federal Government's list of approved dispersants for decades and that the Government repeatedly approved for use during the Response.  Because decisions about dispersant use were required to be made and were in fact made by the FOSC, Plaintiffs' claims are barred under the doctrine of implied conflict preemption.

On February 28, 2011, Nalco filed a Motion to Dismiss the First Amended Master Complaint "B3 Bundle" (the "B3 Master Complaint") (Nalco's Mot. to Dismiss (Rec. Doc. 1409).)  On September 30, 2011, this Court issued an order granting in part and denying in part Nalco's motion and those of various other B3 Defendants.  (Order and Reasons (Rec. Doc. 4159) (the "B3 Order").)  In its order, the Court observed that although the preemption argument that Nalco and other Defendants advanced was "certainly plausible," Defendants could "only avail themselves of preemption if they show that the complained-of activity fell within the scope of the CWA/NCP."  (B3 Order at 15.)  The Court also suggested that Defendants could renew their motions to dismiss at a later date.[2]  (*Id.*)

---

[2]     In the B3 Order, the Court held that the responder immunity provision in the CWA, 33 U.S.C. § 1321(c)(4)(A), did not apply to Nalco because it did not apply to personal injury claims, "such as the B3 claims."  (B3 Order at 6 n.8.)  In the B3 Master Complaint, the negligence and strict liability claims

Following the issuance of the B3 Order, the Parties agreed (at the suggestion of the Court) to conduct expedited discovery related to the preemption argument that Nalco and other Defendants raised, as well to the derivative immunity argument advanced by several other defendants involved in the Response (the "Clean-Up Responder Defendants"). The Court issued a Schedule for Limited B3 Discovery (the "B3 Discovery Order"), which included discovery deadlines and a briefing schedule for Nalco's renewed motion to dismiss the B3 Master Complaint. (Rec. Doc. 5000.)[3] Nalco and Plaintiffs completed that specific discovery. On January 31, 2012, Nalco filed a Renewed Motion to Dismiss the B3 Master Complaint. (Rec. Doc. 5531.) Under the B3 Discovery Order, any response to Nalco's renewed motion was to be filed by February 21, 2012. Instead of filing a response to Nalco's renewed motion, Plaintiffs filed a motion for leave to amend the B3 Master Complaint to dismiss without prejudice the claims against Nalco and the Clean-Up Responder Defendants in which they admitted that other actors, not Nalco, were "ultimately responsible for post-spill exposure injuries, whether by virtue of 40 C.F.R. ¶ 300.150, 33 U.S.C. § 1321(c)(4)(B)(i), (iii) and (iv), other applicable law, and/or" various agreements. (Rec. Doc. 5718; SUMF ¶ 75.) On April 16, 2012, the Court issued an order in which it: (i) denied Plaintiffs' motion to amend the B3 Master Complaint; (ii) stated that Nalco's renewed motion shall be treated as a motion for summary judgment under Rule 56; and (iii) set a briefing schedule for Nalco's motion. (Rec. Doc. 6247.) In the order, the Court also stated that Nalco "may submit any additional materials in support of its Motion by May 18, 2012." (*Id.*)

---

against Nalco state that Plaintiffs seek damages for "diminution of the value of their real and/or personal property, loss of income, loss of consortium and/or emotional distress." (B3 Master Compl. ¶¶ 278, 326.) Nalco respectfully requests that the Court clarify that, to the extent Plaintiffs continue to press claims to recover these alleged damages, Nalco has immunity pursuant to § 1321(c)(4)(A).

[3]     Rec. Doc. 5000 amended the Court's original Schedule for Limited B3 Discovery, set forth in Rec. Doc. 4472. While the amended order altered some deadlines, the briefing deadlines for Nalco's renewed motion were not changed.

As set forth in Nalco's original Motion to Dismiss the B3 Master Complaint (Rec. Doc. 1409) and Nalco's Renewed Motion to Dismiss the B3 Master Complaint (Rec. Doc. 5531), Plaintiffs' claims are preempted as a matter of law under well-established principles of conflict preemption, regardless of whether Plaintiffs now purport to create a question of fact on liability or as to whether the Federal Government followed the mandatory oil spill response scheme set forth in the CWA/NCP.  While Plaintiffs' claims are preempted as a matter of law, ***the record facts now indisputably demonstrate that the Federal Government did indeed act pursuant to the CWA/NCP***.  Stipulations of fact from the United States and the sworn testimony of the BP witnesses who were there confirm that the Federal Government complied with this pervasive federal scheme.  Nalco thus respectfully requests that the Court grant summary judgment dismissing all remaining claims against Nalco in the B3 Master Complaint as a matter of law.

## II.     STANDARD OF REVIEW

Summary judgment is proper here if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A party moving for summary judgment "must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)).  "Factual controversies are construed in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists."  *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998).  "[Courts] do not, however, in the absence of any proof, assume that the non-moving party could or would prove the necessary facts."  *Badon v. R J R. Nabisco Inc.*, 224 F.3d 382, 394 (5th Cir. 2000) (citations omitted).  The nonmoving party's burden is not satisfied by creating some metaphysical doubt as to the material facts, or by submitting "conclusory allegations, speculation, [or] unsubstantiated assertions."

*Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).  There is no genuine issue of material

fact here and Nalco is entitled to judgment as a matter of law.

## III.     PLAINTIFFS' CLAIMS ARE PREEMPTED AS A MATTER OF LAW.

### A.     The CWA/NCP Sets Forth A Comprehensive Response Scheme That Vests Control Over Oil Spill Responses In The President And His Delegates.

In the wake of the Exxon Valdez oil spill, Congress enacted the Oil Pollution Act of

1990, amending the CWA and expanding federal authority over oil spill responses in order to

improve the nation's ability to address such disasters.  The CWA and its implementing

regulations, set forth in the NCP, are replete with compulsory language, reflecting Congress'

intent to vest the executive branch with exclusive control over various enumerated decisions

critical to ensuring a rapid and coordinated response to oil spills.  The CWA expressly provides:

> The President ***shall***, in accordance with the National Contingency Plan and any
> appropriate Area Contingency Plan, ***ensure effective and immediate removal of a
> discharge***, and mitigation or prevention of a substantial threat of a discharge, ***of
> oil*** or a hazardous substance . . . .  (33 U.S.C. § 1321(c)(1).)[4]

To promote the President's ability to fulfill his obligation under § 1321(c)(1), Congress gave him

broad and exclusive authority to control responses to oil spills and discharges of hazardous

substances.  When responding to a substantial threat to public health or welfare, "the President

***shall*** direct all Federal, State, and private actions to remove the discharge or to mitigate or

prevent the threat of the discharge."  *Id.* § 1321(c)(2)(A).  Federal and State entities as well as

private persons ***must*** act in accordance with the President's directions.  *Id.* § 1321(c)(3) (such

parties "***shall*** act in accordance with the National Contingency Plan or as directed by the

President").

---

[4]        Unless otherwise stated,  internal citations and quotations are omitted and emphasis is supplied.

To ensure that oil spill response resources can be deployed "effectively and immediately," the CWA mandates that the President "*shall* prepare and publish a National Contingency Plan for removal of oil and hazardous substances." *Id.* § 1321(d)(1). The NCP:

> *[S]hall* provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, *dispersal,* and removal of oil and hazardous substances, and *shall* include, but not be limited to, the following:
> . . . .
>
> (F) *Procedures* and *techniques* to be employed in identifying, containing, *dispersing*, and removing oil and hazardous substances.
>
> (G) A schedule, prepared in cooperation with the States, identifying –
>
> > (i) *dispersants*, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan,
> >
> > (ii) *the waters in which such dispersants*, other chemicals, and other spill mitigating devices and substances *may be used*, and
> >
> > (iii) *the quantities of such dispersant*, other chemicals, or other spill mitigating device or substance which *can be used safely in such waters* . . . .
> > (*Id.* § 1321(d)(2)(F)- (G).)

The NCP requires the Federal Government to identify dispersants that can be used in responding to an oil spill. *See* 40 C.F.R. § 300.905(a) ("EPA *shall* maintain a schedule of dispersants and other chemical or bioremediation products that may be authorized for use on oil discharges... ."). Before adding a dispersant, like COREXIT, to the NCP Product Schedule, the U.S. Environmental Protection Agency (the "USEPA") reviews detailed data submitted by the dispersant manufacturer. *See id.* §§ 300.915(a), 300.920. The data includes worker precautions for storage and field application, toxicity and effectiveness data, and the dispersant's components. *Id.* § 300.915(a).[5] Only after reviewing the required data does the USEPA (under

---

[5]      Pre-listing of dispersants is important to ensure that dispersants are readily available to address an oil spill. In revising the NCP in 1982, the USEPA decided to vest authority regarding dispersant use with the FOSC in order to facilitate prompt decisions as to whether dispersants should be used and if so which

authority delegated by the President) determine whether to list a particular dispersant, like COREXIT, on the NCP Product Schedule.  *Id*. §§ 300.900-300.920.

"After publication of the National Contingency Plan, the removal of oil and hazardous substances and actions to minimize damage from oil and hazardous substance discharges ***shall***, to the greatest extent possible, ***be in accordance with the National Contingency Plan***."  33 U.S.C. § 1321(d)(4).  Under the NCP, "[d]efensive actions ***shall begin as soon as possible*** to prevent, minimize, or mitigate threat(s) to the public health or welfare of the United States or the environment."  40 C.F.R. § 300.310(a).  Importantly, the NCP requires the oil spill response to be coordinated by all interested parties, with ultimate decision making authority vested in the FOSC.  The NCP states:

> ***The basic framework for the response management structure is a system (e.g., a unified command system)***, that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, ***where the [FOSC] maintains authority***. (*Id*. § 300.135(d).)

The FOSC "***shall*** direct response efforts."  *Id.* § 300.135(a).  Where a spill poses a "substantial threat to the public health or welfare of the United States . . ., the [FOSC] ***must*** direct all response efforts, as provided in § 300.322(b) of this part.  The [FOSC] should declare as expeditiously as practicable to spill response participants ***that the federal government will control the response***."  *Id*. § 300.305(d)(2).  Where a spill, such as the *Deepwater Horizon* spill, poses a "substantial threat to the public health or welfare of the United States, the [FOSC] ***shall*** direct all federal, state or private actions to remove the discharge."  *Id*. § 300.322(b).  The CWA/NCP thus requires the President and his delegates to decide whether dispersants can be

---

dispersants should be used.  *See* National Oil and Hazardous Substances Contingency Plan, 47 Fed. Reg. 31,180, 31,201 (July 16, 1982) (noting "[m]ost commenters urged that the decision making authority should not be with the Administrator or a designee in Headquarters but rather should be with the [F]OSC in order to enable rapid decision making") (codified at 40 C.F.R. pt. 300).

used, which dispersants can be used, where they can be used, how they can be used, in what quantities they can be used, in what waters they can be used safely, and to ensure those decisions are implemented by controlling responses to oil spills.

> **B.      Under Implied Conflict Preemption Principles, The Mandatory Oil Spill Response Scheme Set Forth In The CWA/NCP Preempts Plaintiffs' Claims**.

Implied conflict preemption applies where, as here, a party cannot comply with both state/maritime law and federal law or where the application of state/maritime law is an obstacle to the accomplishment and execution of the full purposes and objectives of federal law.  *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also City of New York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof.").  Plaintiffs' claims pose a clear obstacle to the accomplishment of the objectives of the CWA and the NCP.  Plaintiffs challenge the decisions made by the President pursuant to the comprehensive oil spill response scheme set forth in the CWA/NCP.  Plaintiffs further challenge Congress' decision to require the President and/or his delegates to determine whether dispersants should be used, which dispersants should be used, how they should be used, where they should be used, and in what volumes they should be used.

*Geier v. American Honda Motor Company*, 529 U.S. 861 (2000), is instructive.  In *Geier,* the plaintiff alleged that her car, which was equipped with manual shoulder and lap belts, was defective under state law because it was not equipped with airbags.  Honda had complied with the Federal Motor Vehicle Safety Standard promulgated by the Department of Transportation under the authority of the National Traffic and Motor Vehicle Safety Act of 1966 requiring auto manufacturers to equip some but not all of their 1987 vehicles with passive restraints.  The Supreme Court held that the plaintiff's state law claim was preempted because it "stood 'as an

obstacle to the accomplishment and execution of' the important means-related federal objectives [allowing a gradual passive restraint phase-in] that we have just discussed." *Id*. at 881 (quoting *Hines*, 312 U.S. at 67); s*ee also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011) (California rule disfavoring arbitration preempted by Federal Arbitration Act ("FAA") because it "[stood] as an obstacle to the accomplishment and execution of" the FAA's goal of promoting arbitration); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004) (plaintiff brought state law claim based on airline's failure to warn passengers of the risk of developing deep vein thrombosis from remaining seated during long flights; court held claim was preempted by the "pervasive regulatory scheme covering air safety concerns" and because it conflicted with a federal determination that passengers should remain seated).

Plaintiffs' claims – just like the state law claim in *Geier* – are a clear "obstacle" to the implementation of the mandatory requirements of the CWA and the NCP and thus are preempted.  Plaintiffs' claims are founded on the theory that COREXIT is too dangerous to have been used in the Gulf on the spill.  As the record evidence shows, the FOSC decided that it was not.  *See infra* at 14-24.  Moreover Plaintiffs' asserted claims are conflict preempted regardless of whether the Government actually followed the law it was required to follow.  Plaintiffs are not suing the Government for violating its obligations under the CWA/NCP.  Plaintiffs do not purport to stand in the shoes of the Government.  And if Plaintiffs sought to assert claims arising from the Government's alleged failure to follow the CWA/NCP, such a suit could include only federal statutory claims/issues.  Plaintiffs' claims conflict with the mandatory response scheme set forth in the CWA/NCP because Plaintiffs complain about the very decisions Congress has required the President and his delegates to make:

- Plaintiffs complain about the use of dispersants.

- Plaintiffs complain that COREXIT should not have been used.

- Plaintiffs complain that COREXIT was too dangerous to have been used.

- Plaintiffs complain about the volume of COREXIT that was used.

- Plaintiffs complain about the waters in which COREXIT was applied.  (B3 Master Compl. ¶¶ 132-135, 169, 184, 190-191.)

Yet, these are all decisions delegated by Congress **to the President.**  It is not for Plaintiffs to allege that the President's decisions were wrong.  It is not for courts and juries to second guess those decisions.  Private parties – like Nalco – should not be punished by such after-the-fact second guessing of their decision to follow the legal, proper, and required directives of the President.  In short, allowing Plaintiffs to pursue claims against Nalco would frustrate the CWA's purpose of centralizing responsibility with the Federal Government for controlling spill responses, which the CWA achieves by mandating that the President or his designees determine what dispersants are listed on the NCP Product Schedule, whether dispersants may be used, how dispersants may be used, where dispersants may be used, and in what quantities they may be used.  *See* 33 U.S.C. § 1321(d)(2)(F)-(G) .[6]  For these reasons, Plaintiffs' claims are preempted as a matter of law.[7]

---

[6]     *Cf.* National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47,384, 47,399-400 (Sept. 15, 1994) (rejecting "view that a state could initiate more stringent measures than the [F]OSC when the latter is directing the response" and explaining that "all actions would have to be authorized or approved by the [F]OSC") (codified at 40 C.F.R. pt. 300); National Oil and Hazardous Substances Pollution Contingency Plan, 58 Fed. Reg. 54,702, 54,704 (proposed Oct. 22, 1993) (emphasizing the primary role of the FOSC in coordinating national response and explaining that "requiring implementation of the national response system ensures there will be one individual who makes decisions and provides instructions") (to be codified at 40 C.F.R. pt. 300).

[7]     The CWA's savings clause, 33 U.S.C. § 1321(o)(2), does not preclude the application of conflict preemption principles.  *See Geier*, 529 U.S. at 869 (a savings clause does not "foreclose or limit the operation of" implied conflict preemption principles).

C.     **The *Boyle* Test For Government Contractor Immunity Does Not Apply To Nalco**.

In the B3 Order, the Court cited *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1988), in analyzing whether Nalco and other Clean-Up Responder Defendants are entitled to derivative immunity.  (B3 Order at 8-9.)   However, *Boyle* does not apply to the preemption argument that Nalco proffers here.  First, importantly *Boyle* did not involve a conflict between state law and federal law, as exists here.  *See* 487 U.S. at 504.  Rather, in *Boyle*, the Supreme Court held that federal courts have the authority to create a common law defense for government contractors where application of state law would conflict with an area of "uniquely federal interests."  *Id*.  In federal common law cases such as *Boyle*, "the legislative action" that forms the basis for express and implied preemption "has been replaced by a common-law rule, and the reliance on congressional intent has been replaced by a showing of uniquely federal interests." Viet D. Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085, 2109 (2000).  *Boyle* does not apply here because "[w]hile *Boyle*'s preemption holding . . . functions to displace state law to protect 'uniquely federal interests,' ***it did not rely on any act of Congress to animate the preemption***."  *Al Shimari v. CACI Int'l, Inc.*, 658 F.3d 413, 417-18 (4th Cir. 2011).[8]

Conflict preemption based on a Congressional statute and its implementing regulations – like the CWA and NCP – is distinct from the government contractor immunity questions *Boyle* addressed.  Conflict preemption asks whether federal law conflicts with state law and must therefore govern.  In the present case, unlike in *Boyle*, Congress enacted a comprehensive oil spill response scheme that places authority and responsibility for responding to spills squarely

---

[8]     Although *Boyle* references the Federal Tort Claims Act (the "FTCA"), the Court did not apply conflict preemption principles and hold that the FTCA preempted the plaintiffs' state law claims.  Rather, the Court reasoned that the FTCA "suggest[ed] the outlines of 'significant conflict' between federal interests and state law in the context of Government procurement."  487 U.S. at 511.

with the President and his delegates.  Under that Congressionally devised scheme, the decisions about which Plaintiffs now complain – whether to use dispersants, which dispersants to use, where to use them, how to use them, and how much to use – are expressly reserved to the Federal Government.  Nalco's argument relies on federal legislation and its implementing regulations, not on the Court's identification of "uniquely federal interests."  Plaintiffs' claims pose a clear and direct obstacle to the accomplishment of Congress' goals in the CWA/NCP and are thus preempted.  *See Hines*, 312 U.S. at 67.

Plaintiffs claim that COREXIT was unreasonably dangerous and that there is a broad duty to warn which is a precondition to the attaching of a purely legal concept – federal constitutional preemption.  Even assuming the truth of Plaintiffs' allegations, their claims are preempted.  Preemption bars claims that conflict with federal law, regardless of whether or not a plaintiff can adduce evidence to support an element of his claim.  If this were otherwise, it would mean preemption only applies to meritless claims.

Similarly, Plaintiffs cannot defeat preemption by arguing that Nalco somehow failed to satisfy the third prong of *Boyle*.  While the B3 Master Complaint ***does not allege*** that Nalco withheld from the Federal Government any knowledge of risks associated with COREXIT, such a claim, if asserted, would demonstrate why the *Boyle* test is inapplicable to conflict preemption. The NCP sets forth in great detail the information dispersant manufacturers must provide to the Federal Government, including: special handling and worker precautions; recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, and types and ages of the pollutants; results of effectiveness testing; results of toxicity testing; data requirements from the Annual Books of American Society for Testing and Materials Standards; and component information.  40 C.F.R. § 300.915.  The USEPA evaluates

12

this information and decides whether or not to put a product on the list.  After the Federal Government decides to list a dispersant, the product is available as one option for the President and his delegates to consider when responding to a national emergency, and going forward, a manufacturer is only required to inform the USEPA of "changes in the composition, formulation, or application of the dispersant."  40 C.F.R. § 300.920(d).  Like in *Witty*, allowing a plaintiff to impose, through the application of tort law, a broader duty on a manufacturer directly conflicts with the requirements of the NCP.  *See* 366 F.3d at 385.[9]  The record facts demonstrate that the Government followed the law and made the decisions regarding dispersant use that give rise to plaintiffs' claims against Nalco.  Thus, plaintiffs' claims are preempted.

Further, as set forth more fully in the Joint Memorandum in Support of Clean-Up Responder Defendants' Motions for Summary Judgment on Derivative Immunity and Preemption Grounds ("Clean-Up Responder Defendants' Joint Memorandum"), the *Boyle* test is not determinative as to whether Nalco and other Clean-Up Responder Defendants are entitled to derivative immunity.  (*See* Clean-Up Responder Defendants' Joint Mem. at 29-30.)

---

[9]     Moreover, Exxon Chemical Corporation complied with the NCP by providing the United States with information regarding the toxicity and effectiveness of COREXIT EC9500A and COREXIT EC9527A long before the FOSC approved the use of either product in the Response, satisfying the third prong of the *Boyle* test.  Before they were listed on the NCP Product Schedule, the United States required Exxon Chemical, which manufactured the products at the time applications for the NCP Product Schedule were submitted, to perform toxicity and effectiveness testing on each product.  (SUMF ¶ 4.)  In addition, the United States required Exxon Chemical to submit each dispersant's components.  (SUMF ¶ 6.)  Before COREXIT EC9500A or COREXIT EC9527A were listed on the NCP Product Schedule, USEPA was provided with the results of toxicity and effectiveness testing on each product.  (SUMF ¶ 5.)  Thus, the United States knew the components, toxicity, and effectiveness of COREXIT EC9500A and COREXIT EC9527A well before the April 20, 2010 *Deepwater Horizon* explosion and oil spill.

## IV.   THE RECORD FACTS DEMONSTRATE THAT THE GOVERNMENT FOLLOWED THE LAW AND MADE THE DECISIONS REGARDING DISPERSANT USE THAT GIVE RISE TO PLAINTIFFS' CLAIMS AGAINST NALCO.   THUS, PLAINTIFFS' CLAIMS ARE PREEMPTED.

In the B3 Order, this Court held that a ruling on Nalco's preemption argument was premature because the B3 Master Complaint arguably alleges that BP controlled the Response. (B3 Order at 11-12.)  However, after a period of targeted discovery on preemption and ample opportunity for development of the relevant facts, the record facts – including sworn testimony from key BP decision makers who participated in the Unified Area Command ("UAC") and formal admissions of fact from the United States – demonstrate that throughout the Response, the application of COREXIT was authorized and directed by the FOSC, acting pursuant to the CWA/NCP.[10]  Put another way, the extensive and indisputable factual record shows that the Federal Government, as required, fully complied with the CWA/NCP federal scheme in responding to the spill.  As a result, Nalco is entitled to summary judgment because the claims in the B3 Master Complaint are preempted.

### A.   COREXIT EC9500A And COREXIT EC9527A Were Pre-Approved By The United States For Use During The Response.

COREXIT EC9500A and COREXIT EC9527A have been listed on the NCP Product Schedule for decades.  (SUMF ¶¶ 2-3.)  In addition, both products were pre-authorized for use in responding to oil spills under the regional dispersant pre-authorization plans for Regions IV and VI, the regions that comprise the Gulf Coast states.  (SUMF ¶¶ 7-8.)  Under the CWA/NCP, the FOSC had authority to approve the use of COREXIT EC9500A and COREXIT EC9527A in

---

[10]      Four USCG officers served as FOSC during the Response, overseeing Response activities.  The Commander of the USCG Marine Safety Unit at Morgan City, Louisiana, was the first FOSC to direct the Response.  USCG Rear Admiral Mary Landry served as FOSC from April 23, 2010 to June 1, 2010. USCG Rear Admiral James Watson served as FOSC from June 1, 2010 to July 12, 2010.   USCG Rear Admiral Paul Zunkunft served as FOSC from July 12, 2010 through the end of the period in which dispersants were applied.  At all times during the Oils Spill Response, the FOSC was an employee of the United States Department of Homeland Security.  (SUMF ¶¶ 13-14, 18-19, 21, 24.)

accordance with the dispersant pre-authorization plans for Regions IV and VI.  (SUMF ¶ 10); *see also* 40 C.F.R. § 300.910(a).[11]  RRT pre-authorization is consistent with the NCP, which requires RRTs to address the use of dispersants as part of their planning activities in order to effectuate the CWA's goal of an "effective and immediate" response to an oil spill.  *See* 33 U.S.C. § 1321(c); 40 C.F.R. § 300.910(a).  Pre-authorization promotes this goal by allowing the FOSC to make a decision regarding dispersant use soon after being notified of a spill. (SUMF ¶ 9.)   For spill situations that were not addressed by applicable regional dispersant pre-authorization plans, the FOSC had the authority to approve the use of COREXIT EC9500A and COREXIT EC9527A with the concurrence of state and federal agency representatives.  40 C.F.R. § 300.910(b); (SUMF ¶ 11.)

> **B.**     **The Undisputed Facts Show That The FOSC Exercised Final Decision Making Authority During The Response, As Required By The CWA/NCP.**

Shortly after the April 20, 2010 explosion aboard the *Deepwater Horizon*, the USCG established a UAC to oversee the spill response.  (SUMF ¶ 15.) The UAC included representatives from BP, Transocean, the USCG, the USEPA, and other federal agencies, and met daily to manage the Response and to evaluate possible response measures.  (SUMF ¶¶ 29-30.)

Although the UAC comprised individuals from various agencies and entities, the FOSC unquestionably had final authority over the approval or disapproval of response actions.  According to the uncontroverted sworn testimony:

- *Mr. Suttles*:  "We could not take action in the response without the approval of the FOSC." (SUMF ¶ 33.);

---

[11]     Although Plaintiffs have served objections to the United States' stipulations, their objections do not constitute evidence controverting the stipulations' truth.  To do so,  Plaintiffs must adduce evidence tending to contradict their veracity.  They have not done so – nor can they.

- ***Mr. Morrison***:  The FOSC "exercised ultimate authority over the response activities." (*Id*.);

- ***Mr. Rainey***:  "Q:  Were all of the actions, so far as you know, for responding to the oil that was released subject to the approval of the FOSC?  A:  Absolutely." (*Id*.);

- ***Mr. Inglis***:  All decisions related to the Response "came through the unified command structure [and] were signed off by the federal on-scene commander" (*Id*.)

The FOSC's authority over response actions included final approval as to whether or not dispersants could be used.  Indeed, the United States has stipulated that throughout the response the FOSC approved the application of COREXIT EC9500A and COREXIT EC9527A, both to the surface of the Gulf of Mexico and subsea:

> At various times during the Oil Spill Response, the FOSC, with the appropriate concurrence of and/or consultation with other state and federal agency officials pursuant to 40 C.F.R. § 300.910 and the applicable regional dispersant pre-authorization plans, authorized the application of Corexit 9500 and Corexit 9527 [to the surface and below the surface] of the Gulf of Mexico.  (SUMF ¶¶ 34-35.)

In approving the use of COREXIT EC9500A and COREXIT EC9527A, the FOSC also acted pursuant to the CWA/NCP, which require the Federal Government to identify dispersants that may be used in responding to an oil spill, how those dispersants may be used, the waters in which those dispersants may be used, and the quantities of dispersants that may be used safely in those waters.  According to the United States:

> In authorizing the [surface and subsea use of COREXIT 9500 and COREXIT 9527,] the FOSC acted pursuant to the OPA, the CWA, including 33 U.S.C. §1321(d)(2), and the NCP, including 40 C.F.R. §§ 300.120, 300.135 and 300.910.  (SUMF ¶¶ 62-63.)

Sworn testimony from participants in the UAC confirms that the FOSC had final authority to approve or deny requests from BP and/or the UAC to apply dispersant:

- ***Mr. Rainey***:  "Q: Were you required to obtain permission from the FOSC before using any dispersant?  A: Yes."  (SUMF ¶ 56.);

- ***Mr. Suttles***: When it came to deciding whether to employ particular response measures, "the FOSC [had] 51 percent of the vote" and held final authority to approve or reject response measures proposed by the UAC.  (*Id.*);

- ***Mr. Suttles***:  The response "was under the direction of Unified Command where . . . the final authority sat with the FOSC."  (*Id.*);

- ***Mr. Suttles***:  The response structure had "a Unified Area Command which is the ultimate authority, and the ultimate authority there is held by the FOSC."  (*Id.*);

- ***Mr. Suttles***:  The FOSC "[sat] on top of the Unified Command" and BP had to get permission from the FOSC to use dispersants.  (*Id.*);

- ***Mr. Suttles***:  "We could not take action in the response without the approval of the FOSC."  (*Id.*);

- ***Mr. Suttles***:  "We could only use dispersants with the approval of the - - of the FOSC and the Government . . . ."  (*Id.*);

- ***Mr. Morrison***:  Although members of the UAC "tried to collaborate clearly and . . . make joint decisions . . . . if there was ever a conflict or if there was ever a disagreement on to go . . . Option A or Option B, the Federal On-Scene Commander had the final word." (SUMF ¶ 57.)

Contemporaneous statements from high-ranking federal officials involved in the

Response confirm the FOSC's role as final decision maker regarding the use of dispersants:

- ***NIC Commander Admiral Thad Allen***:  "[T]he FOSC assessed the daily conditions and determined . . . the tools to deploy . . . .  All FOSC dispersant use decisions were made with the concurrence of or in consultation with the  EPA, . . . DOI,  . . . DOC and the State of Louisiana as required by 40 C.F.R. § 300.910 and [RRT] VI guidelines." (SUMF ¶¶ 17, 64.);

- ***NIC Commander Admiral Thad Allen***:  "***It's a decision by the [FOSC] whether to approve the incident commander's recommendation to use dispersants*** . . . .  It's a very disciplined doctrinal process on how this works.  In the end it may be executed by BP through a contractor.  ***But these are all decisions made by the [FOSC] because that's where the responsibility rests.***"  (SUMF ¶ 59);

- ***NIC Commander Admiral Thad Allen***:  "I'm satisfied that we only use [dispersants] when they're needed."  (SUMF ¶ 60);

- *Admiral James Watson (FOSC)*: "I have been personally involved with daily dispersant application quantities and locations.  EPA observes and consults, but certainly is not the final approving authority.  That is my responsibility."  (SUMF ¶ 58.)

Of course, deference to the FOSC's decisions was required under the NCP, which provides that the FOSC "*shall* direct all federal, state, or private actions to remove the discharge" when a spill constitutes a substantial threat to the public health or welfare of the United States.  40 C.F.R. § 300.322(b); *see also id.* § 300.305(d)(2) (FOSC "*must* direct all response efforts").

  C. **The Undisputed Facts Show That The FOSC Approved The Application Of COREXIT EC9500A And COREXIT EC9527A Immediately After The Explosion Of The *Deepwater Horizon* And Continued To Approve Their Use Throughout The Response.**

  The Federal Government first authorized the use of dispersants immediately following the explosion aboard the *Deepwater Horizon*.  These are the undisputed facts:

- *When the crisis occurred* the USEPA and the USCG gave BP "immediate authorization to move forward with the use of this approved dispersant on the affected water's surface . . .  This authorization included specific conditions to ensure the protection of the health of residents in the affected areas and the environment."  (SUMF ¶ 39);

- *On April 21, 2010*, the FOSC and/or the FOSC's representatives completed the "Dispersant Pre-Approval Initial Call Checklist" and "FOSC Dispersant Use Checklist" and authorized the use of dispersants in response to the Incident.  (*Id.*);

- *As of April 22, 2010*, the FOSC was directing responders "to conduct dispersant operations as required/approved."  (SUMF ¶ 41.)

COREXIT EC9500A and COREXIT EC9527A were – and still are – on the NCP Product Schedule; thus, in approving the use of dispersants, the FOSC authorized the use of COREXIT.

  After the FOSC's initial authorization of dispersant use, daily approvals came in the form of the FOSC's approval of Incident Action Plans ("IAPs"), which were signed by the FOSC and/or the FOSC's representatives (SUMF ¶¶ 25-26.)

- *The United States* expressly stated "that the Incident Action Plans were reviewed, signed, and approved by the Federal On-Scene Coordinator or his representative."  (SUMF ¶ 26);

18

- ***The United States*** expressly stated that "the United States authorized and/or directed all spill response activities set forth in the [IAPs] as of the time each [IAP] was issued." (SUMF ¶ 27);

- ***Doug Suttles*** testified that, initially, approval to use dispersants came via the daily approval of the IAP.  (SUMF ¶ 43);

- "[N]o plan could be approved without the approval of the FOSC."  (SUMF ¶ 26.)[12]

Each day, the FOSC and other members of the UAC would review reports from the field, review the location of the oil, analyze risks, and determine how to deploy available resources, such as dispersants, in response.  Each day the FOSC considered the risks posed by the spreading oil and the tools available to minimize the damage resulting from the oil and to prevent the oil from reaching shore:

- ***Mr. Morrison***:  "[T]he Area Command, Admiral Landry, and Doug would . . . engage with those Incident Commanders, and . . . see the surveillance of what we had, where the risks were and where the oil was moving, and they would, if we needed to, redirect resources to help mitigate the risk.  And we would do that in skimming, we would do that in aerial dispersants, and what have you."  (SUMF ¶ 32.);

- ***The FOSC*** made daily determinations between April 22 and May 26, 2010 regarding whether to approve continued dispersant application.  (SUMF ¶¶ 43, 46);

- "***[T]he Federal On-Scene Coordinator*** approved application of dispersants as part of the Response Activities in various amounts and at various times between April 22, 2010 to on or about May 26, 2010."  (SUMF ¶ 46.)

On May 26, 2010, the USEPA issued Dispersant Monitoring and Assessment Directive – Addendum 3 ("Addendum 3"), which required each surface application of dispersants to be approved by the FOSC.  In addition, under Addendum 3 the application of dispersants subsea in excess of 15,000 gallons in a single day had to be approved by the FOSC.  (SUMF ¶ 47.)  In

---

[12]     The IAPs specified the overall and strategic objectives for their respective 24-hour response periods.  These objectives included the application of dispersants.  The IAPs, approved by the FOSC and/or the FOSC's representatives, also set forth the operational command's priorities, which included continued dispersant application.  The IAPs, approved by the FOSC and/or the FOSC's representatives, included assignments for groups working with dispersants.  (SUMF ¶ 44-45.)

compliance with Addendum 3, the FOSC approved each specific application of COREXIT from May 27, 2010 through the last application on July 19, 2010.  (SUMF ¶ 49.)  Indeed, the United States has stated repeatedly that the FOSC – not BP, Nalco, or any other Defendant – approved each application of COREXIT that occurred after Addendum 3 was issued:

- ***The United States*** identified numerous specific dates between May 28, 2010 and July 19, 2010 on which the FOSC approved application of specific amounts of dispersants to the surface and below the surface of the Gulf of Mexico.  (*See* SUMF ¶¶ 49, 54);

- ***The United States*** stipulated that throughout the Response, the FOSC approved the application of COREXIT EC9500A and COREXIT EC9527A to the surface of the Gulf of Mexico and approved the application of COREXIT EC9500A subsea.  (*See* SUMF ¶¶ 34-35);

- ***The United States*** stipulated that "[f]ollowing the issuance of . . . Addendum 3, BP and/or various Clean-Up Responder Defendants periodically submitted written requests to the FOSC and/or the FOSC's representative(s) and received written authorization for each aerial application of dispersants to oil slicks on the surface of the Gulf of Mexico." (SUMF ¶ 48.)

The United States' formal admissions of fact are supported by the FOSC's approval of numerous letters from BP and the UAC requesting permission to apply dispersant on various dates between May 27 and July 19, 2010 (the "FOSC Approval Letters").  FOSC approval is documented on the signature page of each letter.  (SUMF ¶ 49.)  Moreover, Nalco played no role in the final decisions over whether, when, where, how, or in what volumes dispersants were applied  (SUMF ¶ 72.)

###### D.     The FOSC Acted In Accordance With Each Step Of The CWA/NCP.

The undisputed facts demonstrate that the FOSC – pursuant to the CWA/NCP – did in fact determine whether dispersants could be applied, where dispersants could be applied, the volumes in which they could be applied safely, when dispersants could be applied, and how dispersants could be applied.  Each action is undisputed.

*Where:*  The FOSC Approval Letters included approval to apply dispersant in particular geographic areas in the Gulf of Mexico.  (SUMF ¶ 50)  Throughout the Response, "there were very clear guidelines which said where they could and could not use [dispersants]."  (SUMF ¶ 36.)  Indeed, the United States has expressly stated that the FOSC – not BP, Nalco, or any other Defendant – determined where COREXIT could be applied.  (SUMF ¶¶ 34-36.)  FOSC approval thus included approval regarding where COREXIT could be applied, in conformity with the NCP.  *See* 33 U.S.C. § 1321(d)(1)(G)(ii) (the NCP "**shall** include . . . **the waters in which such dispersants . . . may be used**").

*Volume/How Much to Apply:*  The FOSC approval letters included approvals to apply dispersants up to a particular maximum volume.  (SUMF ¶ 51.)  FOSC approval thus included approval regarding how much COREXIT could be applied, in conformity with the NCP.  *See* 33 U.S.C. § 1321(d)(1)(G)(iii) (the NCP "**shall** include . . . **the quantities of such dispersant . . . which can be used _safely_ in such waters**").  The United States has expressly stated that the FOSC – not BP, Nalco, or any other Defendant – determined the quantity in which COREXIT could be used **_safely_**.  (SUMF ¶¶ 34-35, 38.)

*When:*  The FOSC Approval Letters also specified particular dates on which dispersants could be applied.  (SUMF ¶ 52.)  Further, the United States has expressly stated that the FOSC – not BP, Nalco, or any other Defendant – determined when dispersants could be used.  (SUMF ¶¶ 34-35, 37.)

*How:*  The FOSC – not BP, Nalco, or any other Defendant – determined how dispersants could be applied.  (SUMF ¶¶ 34-35, 53.)  Indeed, Doug Suttles testified that the "approvals and directions from the United States Government and the FOSC also include[d] . . . the manner in which the dispersants could be applied."  (SUMF ¶ 53.)  The record evidence clearly shows that

the decisions giving rise to Plaintiffs' claims were made by the FOSC, acting pursuant to his/her authority under the CWA/NCP.

### E. Plaintiffs Have No Facts To Suggest That The Use Of COREXIT Was Other Than As Directed Pursuant The CWA/NCP.

Plaintiffs' claims are preempted by the comprehensive oil spill response scheme set forth in the CWA/NCP, regardless of whether or not the Federal Government complied with that scheme.  Further, as set forth above, the record contains ample evidence that the FOSC, acting pursuant to his/her authority under the CWA/NCP, directed and approved the use of COREXIT EC9500A and COREXIT EC9527A during the Response.  BP executives who participated in the UAC testified that the FOSC had final veto authority over proposed response measures, including the use of dispersants.  Plaintiffs' counsel was present at these depositions; Plaintiffs examined each of those witnesses at length; yet Plaintiffs did not challenge that testimony nor did they elicit any testimony showing that the ultimate decision regarding which dispersant to use, where to apply it, how to apply it, when to apply it, and how much to apply were made by anyone other than the FOSC.  Moreover, Plaintiffs' counsel has not elicited such testimony during any of the dozens of depositions that have occurred to date.

In addition to the sworn deposition testimony of UAC participants, the FOSC's approval of dispersant use is further supported by record admissions of the United States.  The United States has repeatedly stated – in formal, voluntary admissions and stipulations – that the FOSC approved the use of Nalco's products during the response, and that the FOSC's approval included approval regarding when, where, and in what volumes dispersant was to be applied.  Although Plaintiffs served "objections" to the United States' stipulations, these objections are not evidence and they do not controvert the United States' express admissions of fact that the FOSC authorized the use of COREXIT and determined where it could be applied, how it could

be applied, when it could be applied, and in what volumes it could be applied.  Moreover,
**Plaintiffs themselves have admitted to the Court and Defense counsel that they have no facts**
**bearing on Nalco's preemption argument**, and thus, no basis for claiming the existence of a
genuine issue of material fact.  (SUMF ¶ 74.)

The record facts are undisputed and uncontroverted.  There can no longer be any question
that the Federal Government followed the CWA/NCP pervasive federal scheme in responding to
the spill.  Thus, under applicable law (which does not even require such evidence), Plaintiffs'
claims are preempted and summary judgment should be granted.

## V.     PLAINTIFFS' CLAIMS WILL CHILL FUTURE RESPONSE EFFORTS.

In addition to conflicting with the comprehensive response scheme set forth in the
CWA/NCP, the claims in the B3 Master Complaint also threaten the effectiveness of responses
to future oil spills.  This is yet another reason why courts enforce the doctrine of conflict
preemption.  Indeed, allowing Plaintiffs to maintain their action against Nalco would create
uncertainty as to the potential liability of individuals and entities that assist NCP response
activities at the direction of the President and his delegates.  *Cf. Fireman's Fund Ins. Co. v. City*
*of Lodi*, 302 F.3d 928, 951 (9th Cir. 2002) (holding provision of municipal ordinance was
preempted to the extent it allowed city to impose more stringent requirements than the NCP
because allowing the provision to stand would foster uncertainty about potential liability and
frustrate the underlying statutory goal of encouraging cleanup of contaminated sites).

The CWA and NCP provide that the President and the FOSC "shall direct . . . private
actions to remove the discharge."  33 U.S.C. § 1321(c)(2); 40 C.F.R. § 300.322(b).  Federal law
commands that each person participating in response efforts "shall act . . . as directed by the
President."  33 U.S.C. § 1321(c)(3).  Permitting Plaintiffs' claims to proceed puts private parties
assisting in future response actions in the position of making an impossible decision: whether to

help respond to national emergencies by complying with federal law and acting "as directed by" the President and his delegates, even if doing so could subject them to liability; or whether to ignore the President's and the Nation's call for help by declining to provide goods or services that the USEPA and the FOSC deem safe and necessary.  Federal law encourages people and companies like Nalco to respond to human and environmental accidents and emergencies – to respond "in a time of great national need."  (SUMF ¶¶ 68-69.)

In this case, the comprehensive oil response scheme worked.  In the aftermath of the spill, the Government concluded that "dispersants were an effective response tool, and prevented millions of gallons of oil from impacting the sensitive shorelines of the GOM states."  (SUMF ¶ 73.)  This Court cannot allow the fear of future state and maritime claims to trump and contradict federal law.

## VI.   NALCO ADOPTS CLEAN-UP RESPONDER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Although the remaining claims against Nalco in the B3 Master Complaint are barred under well-established conflict preemption principles, those claims are also subject to dismissal under the CWA.  Nalco provided COREXIT at the express request of the FOSC, who twice during the Oil Spill Response wrote letters urging that Nalco and its suppliers do whatever possible to provide COREXIT during "a time of great national need."  (SUMF ¶¶ 68-69.)   The FOSC emphasized that during this national emergency, Nalco's dispersants were "***essential*** to the oil spill response and clean-up effort."  (*Id.*) (emphasis added.)  As set forth in the Clean-Up Responder Defendants' Joint Memorandum, the CWA provides the federal government with absolute immunity for actions taken in connection with oil spill response efforts.  (*See* Clean-Up Responder Defendants' Joint Mem. at 25-31 (citing 33 U.S.C. § 1321(j)(8); *see also Yearsley v. W.A. Ross Constr.*, 309 U.S. 18, 20-21 (1940)).  Here, the FOSC expressly requested that Nalco

and its suppliers do whatever they could to supply COREXIT "in a time of great national need." (SUMF ¶¶ 68-69.)  Nalco acted at the direction of the federal government, providing dispersants authorized for use by the FOSC pursuant to the comprehensive oil response scheme set forth in the CWA/NCP. (SUMF ¶ 71.)

## VII.    CONCLUSION

For the foregoing reasons, Nalco respectfully requests that the Court grant Nalco's motion for summary judgment.


Dated:  May 18, 2012                        Respectfully submitted,

                                            By: /s/ Thomas J. Heiden

                                            Thomas J. Heiden (IL # 6281563)
                                            (thomas.heiden@lw.com)
                                            Mary Rose Alexander (IL # 6205313)
                                            (mary.rose.alexander@lw.com)
                                            LATHAM & WATKINS LLP
                                            233 South Wacker Dr.
                                            Suite 5800
                                            Chicago, IL 60606-6401
                                            Phone: (312) 876-7700
                                            Facsimile: (312) 993-9767

                                            *Attorneys for Nalco Company, Nalco Holdings
                                            LLC, Nalco Finance Holdings LLC and Nalco
                                            Holding Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of May, 2012.

<u>/s/ Thomas J. Heiden</u>
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*