UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| Applies to:  All Cases in Pleading | * | JUDGE BARBIER |
| Bundle Section III.B(3). | * | |
| | * | MAGISTRATE SHUSHAN |
| * * * * * * * * * * * * * * * * * | * | |

NALCO COMPANY, NALCO HOLDINGS LLC,
NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING
COMPANY'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendants Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company (collectively, "Nalco"), respectfully submit the following statement of undisputed facts in support of their motion for summary judgment in the above-captioned action.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

    A.    **Undisputed Material Facts Regarding The Listing Of COREXIT EC9500A And COREXIT EC9527A On The National Contingency Plan Product Schedule**

    1.    Nalco Company manufactures the oil dispersants COREXIT EC9500A and COREXIT EC9527A.  (United States Environmental Protection Agency (the "USEPA"), National Contingency Plan ("NCP") Product Schedule, Exh. A hereto.)

    2.    COREXIT EC9527A has been listed on the NCP Product Schedule since 1978, was on the Product Schedule as of April 20, 2010, and remains on the Product Schedule to this

day.  (*Id.*; Joint Stipulations of Fact Between the Clean-Up Responder Defendants and the United States of America ("Joint Stipulations") (Jan. 31, 2012), Joint Stipulation No. 4, Exh. B hereto.)

3. COREXIT EC9500A has been listed on the NCP Product Schedule since 1994, was on the Product Schedule as of April 20, 2010, and remains on the Product Schedule to this day.  (USEPA, NCP Product Schedule, Exh. A hereto; Joint Stipulation No. 4, Exh. B hereto.)

4. Before COREXIT EC9527A and COREXIT EC9500A were listed on the NCP Product Schedule, the United States required that toxicity and effectiveness testing be performed on each product.  (United States' Stipulation Nos. 1-2 (Nov. 18, 2011) ("United States' Stipulations"), Exh. C hereto.)

5. Before COREXIT EC9527A or COREXIT EC9500A were listed on the NCP Product Schedule, the USEPA was provided with the results of toxicity and effectiveness testing on each product.  (*See* Letter fr. Marjorie A. Walsh, Exxon Chemical Company, to John Cunningham, USEPA (Mar. 10, 1994), Exh. D hereto; Annex X Technical Product Bulletin No. 8, Oil & Special Materials Control Division (Sept. 29, 1978),  Exh. E hereto.)

6. Before COREXIT EC9527A and COREXIT EC9500A were listed on the NCP Product Schedule, the United States was informed of each dispersant's components.  (United States' Stipulation No. 3, Exh. C hereto; *see also* Letter fr. Elizabeth Walpac, Nalco Canada, to Leigh DeHaven, USEPA (May 6, 2006), Exh. F hereto.)

**B.     Undisputed Material Facts Regarding Pre-Authorization Of COREXIT 9527A And COREXIT 9500A**

7. Products on the NCP Product Schedule as of April 20, 2010, including COREXIT EC9500A and EC9527A, were pre-authorized for use in responding to oil spills under specified circumstances under the regional dispersant pre-authorization plans for Regions IV and VI.  (United States' Stipulation No. 4), Exh. C hereto; RRT VI FOSC Dispersant Pre-Approval

Guidelines and Checklist (Jan. 24, 2001), Exh. G hereto; RRT IV, Use of Dispersants in Region IV (1996), Exh. H hereto.)

8. The EPA Region IV Regional Response Team ("RRT") Policy for Use of Dispersants in Ocean and Coastal Waters and the EPA RRT-6 FOSC Dispersant Pre-Approval Guidelines and Checklist (the "Regional Dispersant Pre-Authorization Plans") are based, in part, on scientific input from the USEPA, federal and state resource trustee agencies, and applicable state environmental agencies, and address factors such as the potential sources and types of oil that might be spilled, the existence and location of environmentally sensitive resources that might be impacted by spilled oil, available product and storage locations, available equipment and adequately trained operators, and the available means to monitor product application and effectiveness. (Joint Stipulation No. 9, Exh. B hereto.)

9. Pre-authorization of dispersants allows the Federal On-Scene Coordinator ("FOSC") to make a decision regarding dispersant use soon after an oil spill occurs. (See RRT VI FOSC Dispersant Pre-Approval Guidelines and Checklist at 1 (dispersant use preapproved in order to "give[] the dispersant operation the opportunity to begin in a timely manner that is consistent with attempting to maximize the effectiveness of dispersant use as a countermeasure to reduce the impact of oil spills"), Exh. G hereto; *id*. (preapproval "allows the FOSC to quickly arrive at a logical 'GO/NO GO' decision"); Use of Dispersants in Region IV at 33 ("Because effective use of dispersants has a limited and normally small window of opportunity, RRT IV strongly recommends that dispersant application begin as soon as possible following an oil spill when appropriate."), Exh. H hereto.)

10. Under the Clean Water Act ("CWA"), the Oil Pollution Act ("OPA"), and the NCP, the Federal On-Scene Coordinator ("FOSC") had authority to approve the use of

dispersants that were pre-authorized under the Regional Dispersant Pre-Authorization Plans for Regions IV and VI, including COREXIT EC9500A and EC9527A, when the specified circumstances set forth in those plans were present. (United States' Stipulation No. 5, Exh. C hereto.)

11. For spill situations that are not addressed by the applicable regional dispersant pre-authorization plans, the FOSC may approve the use of dispersants listed on the NCP Product Schedule, including COREXIT EC9500A and EC9527A, under specific circumstances set forth in the NCP at 40 C.F.R. § 300.910. (United States' Stipulation No. 6, Exh. C hereto.)

### C. Undisputed Material Facts Regarding Federal Control Over Oil Spill Response

12. On April 20, 2010, at 9:51 p.m. CDT, an explosion occurred on the *Deepwater Horizon* mobile offshore drilling unit located in the Gulf of Mexico approximately 42 miles southeast of Venice, Louisiana. (Joint Stipulation No. 1, Exh. B hereto.)

13. Pursuant to the CWA, OPA, and the NCP, the Commander of the Coast Guard's Marine Safety Unit at Morgan City, Louisiana, was the first FOSC to direct the response to the oil spill that resulted from the April 20, 2010 explosion of the mobile offshore drilling unit *Deepwater Horizon* (the "Oil Spill Response"). (United States' Stipulation No. 7, Exh. C hereto.)

14. On April 23, 2010, United States Coast Guard ("USCG") Rear Admiral Mary Landry was named the FOSC and in that capacity, pursuant to the CWA, OPA and NCP, directed the Oil Spill response. (United States' Stipulation No. 8, Exh. C hereto.)

15. On April 23, 2010, Admiral Landry established the Unified Area Command ("UAC") for the Oil Spill Response at the Shell Training and Conference Center in Robert, Louisiana. (Joint Stipulation No. 19, Exh. B hereto.)

16. On April 29, 2010, pursuant to 40 C.F.R. § 300.323, the Commandant of the USCG classified the *Deepwater Horizon* spill as a "spill of national significance." (Joint Stipulation No. 20, Exh. B hereto.)

17. On May 1, 2010, pursuant to 40 C.F.R. § 300.323(c), the Secretary of Homeland Security named Admiral Thad Allen as "National Incident Commander" for the *Deepwater Horizon* spill response efforts. (Joint Stipulation No. 21, Exh. B hereto.)

18. On June 1, 2010, USCG Rear Admiral James Watson assumed the FOSC position from Rear Admiral Landry and in that capacity, pursuant to the CWA, OPA and NCP, directed the Oil Spill Response. (United States' Stipulation No. 9, Exh. C hereto.)

19. On July 12, 2010, USCG Rear Admiral Paul Zukunft assumed the FOSC position from Rear Admiral Watson and in that capacity, pursuant to the CWA, OPA and NCP, directed the Oil Spill Response. (United States' Stipulation No. 10, Exh. C hereto.)

20. At all times during the Oil Spill Response, the FOSC was an employee of the U.S. Department of Homeland Security. (Joint Stipulation No. 16, Exh. B hereto.)

21. Efforts to control the source of the oil and to clean up the spill were governed by the provisions of the OPA, the CWA, and the NCP, which together authorize the FOSC to direct and monitor all Federal, State, and private actions. Efforts to control the response were also governed by Homeland Security Presidential Directive 5 (HSPD-5), which designates the Secretary of Homeland Security as the Principal Federal Official for domestic incident management. (Joint Stipulation No. 13, Exh. B hereto.)

22. The Incident Command System was the organizational structure used by the Department of Homeland Security to execute the oil spill response efforts. (Joint Stipulation No. 14, Exh. B hereto.)

23. The USCG established five Incident Command Posts in the following locations: Houston, Texas; Galveston, Texas; Houma, Louisiana; Mobile, Alabama; and Miami, Florida. (Joint Stipulation No. 15, Exh. B hereto.)

24. During the Oil Spill Response, consistent with 40 C.F.R. § 300.323(c), the National Incident Commander focused on unifying the government's response, particularly at the inter-departmental level, external communications, and technical issues such as source control, assessing oil flow, and containing oil from the well, and issues emanating from the response that were outside the NCP. The FOSC focused on conducting the response, addressing the concerns of state and local leaders, and oil removal and mitigation measures across affected areas. (Joint Stipulation No. 22, Exh. B hereto.)

25. Beginning on April 21, 2010, and continuing throughout the *Deepwater Horizon* spill response, "Incident Action Plans" ("IAPs") were prepared on a daily basis that contained detailed instructions concerning the response activities that were to occur each day. (Joint Stipulation No. 26, Exh. B hereto.)

26. Each IAP was reviewed, signed, and approved by the FOSC and/or the FOSC's representative(s) and then delivered to the Incident Command Posts for execution. (Joint Stipulation No. 26, Exh. B hereto; United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Response to Request for Admission ("RFA") No. 157 (Aug. 29, 2011) (IAPs "were reviewed, signed, and approved by the Federal On-Scene Coordinator or his representative"), excerpts attached as Exh. I hereto; Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 665:12-13 ("[N]o plan could be approved without the approval of the FOSC.").)

27.     Accordingly, the United States "authorized and/or directed all spill response activities set forth in the [IAPs] as of the time each [IAP] was issued." (Joint Stipulation No. 26, Exh. B hereto.)

28.     The FOSC's representatives and other federal officials were present in the various Incident Command Posts to monitor the execution of the detailed instructions contained in the IAPs. (Joint Stipulation No. 29, Exh. B hereto.)

29.     At 7:00 a.m. and 5:30 p.m. daily, the UAC convened an area command meeting with Incident Commanders from each of the Incident Command Posts. (Joint Stipulation No. 27, Exh. B hereto.)

30.     The UAC included representatives from BP, Transocean, the USCG, the USEPA, and other federal agencies. At their daily meetings, they managed the Response and evaluated possible response measures. (Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 225:8-18 (UAC included "key stakeholders"); *id.* at 619:14-620:2 (UAC met twice daily and considered ways to respond to the oil leaking from the Macondo well).) In performing those duties, the UAC members consulted with the FOSC every day. (*Id.* at 619:6-22.)

31.     Doug Suttles, BP's senior representative to the UAC, consulted the FOSC "[m]any, many times every day . . . to discuss issues, answer questions, [and] understand [the UAC's] requests." (*Id.*)

32.     Each day, the FOSC and other members of the UAC would evaluate the risks posed by the oil spill and the tools available to minimize the damage resulting from the oil spill. (Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 475:10-19 ("[T]he Area Command, Admiral Landry, and Doug [Suttles] would . . . engage with those Incident Commanders, and . . . see the surveillance of what we had, where the risks were and where the

oil was moving, and they would, if we needed to, redirect resources to help mitigate the risk. And we would do that in skimming, we would do that in aerial dispersants, and what have you."))

33. Throughout the Oil Spill Response, the FOSC exercised ultimate decision-making authority over response activities. (Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 620:24-621:3 ("We could not take action in the response without the approval of the FOSC."); Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 460:10-13 (The FOSC "exercised ultimate authority over the response activities."); Dep. Tr. of D. Rainey, excerpts attached as Exh. L hereto, at 379:19-23 ("Q: Were all of the actions, so far as you know, for responding to the oil that was released subject to the approval of the FOSC?  A:  Absolutely."); Dep. Tr. of A. Inglis, excerpts attached as Exh. M hereto, at 417:13-19 (all decisions related to the Response "came through the unified command structure [and] were signed off by the federal on-scene commander").)

### D. Undisputed Material Facts Regarding FOSC Authorization Of Dispersant Application Prior to May 26, 2010

34. At various times during the Oil Spill Response, the FOSC, with the appropriate concurrence of and/or consultation with other state and federal agency officials pursuant to 40 C.F.R. § 300.910 and the applicable regional dispersant pre-authorization plans, authorized the application of COREXIT EC9500A and EC9527A to the surface of the waters of the Gulf of Mexico. (United States' Stipulation No. 11, Exh. C hereto.)

35. At various times during the Oil Spill response, the FOSC, with the appropriate concurrence of and/or consultation with other state and federal agency representatives pursuant to 40 C.F.R. § 300.910, authorized the subsea application of COREXIT EC9500A to the waters of the Gulf of Mexico.  (United States' Stipulation No. 12, Exh. C hereto.)

36. The FOSC's authorizations to apply COREXIT EC9527A and COREXIT EC9500A included limits on where the dispersants could be applied. (United States' Stipulation No. 13, Exh. C hereto; *see also* Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 622:16-623:4 (throughout the Response, "there were very clear guidelines which said where they could and could not use [dispersants])"; *id*. at 623:10-12 (dispersants were applied subsea only with "explicit approval from the Government").)

37. The FOSC's authorizations to apply COREXIT EC9527A and COREXIT EC9500A included limits on when the dispersants could be applied. (United States' Stipulation No. 13, Exh. C hereto); *see also* Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 624:18-625:4 (affirming that approvals and directives from the Federal Government and the FOSC included limitations on how long dispersants could be used).)

38. The FOSC's authorizations to apply COREXIT EC9527A and COREXIT EC9500A included limits on the quantity in which dispersants could be applied safely. (United States' Stipulation No. 13, Exh. C hereto); United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Response to RFA No. 188 ("The Federal On-Scene Coordinator approved the use of dispersants up to a maximum limit per authorization."), excerpts attached as Exh. I hereto; Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto), at 623:20-624:1 ("[T]he volumes that could be applied had to be approved[.]"))

39. On April 21, 2010, pursuant to the RRT VI Pre-Approval Guidelines, the FOSC and/or the FOSC's representative(s) completed the "Dispersant Pre-Approval Initial Call Checklist" and "FOSC Dispersant Use Checklist" and specifically authorized the use of dispersants in response to the *Deepwater Horizon* spill at that time. (Joint Stipulation No. 34 Exh. B hereto; Dispersant Pre-Approval Initial Call Checklist and FOSC Dispersant Use

Checklist, Exh. N hereto; *see also* NIC Deepwater Horizon Response Situation Report at 36 (May 14, 2010), Exh. O hereto (USEPA and the USCG gave BP "immediate authorization to move forward with the use of this approved dispersant on the affected water's surface . . . . This authorization included specific conditions to ensure the protection of the health of residents in the affected areas and the environment."))

40. At the time the FOSC and/or the FOSC's representative(s) completed the RRT VI PreApproval Initial Call and Dispersant Use Checklists, the FOSC and/or the FOSC's representative(s) determined that the use of dispersants in response to the *Deepwater Horizon* spill would likely provide a net environmental benefit if used under the appropriate circumstances as delineated in the Pre-Approval Guidelines and pursuant to any further direction from the FOSC and/or the FOSC's representative(s). (Joint Stipulation No. 35, Exh. B hereto.)

41. On April 22, 2010, the FOSC authorized a trial application of up to 1,880 gallons of dispersants to oil on the surface of the water in the Gulf of Mexico. (Joint Stipulation No. 36, Exh. B hereto; *see also* Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 467:4-470:8) (as of April 22, 2010, the FOSC was directing responders "to conduct dispersant operations as required/approved").)

42. On April 22, 2010, 1,880 gallons of dispersants were applied to oil on the surface of the water in the Gulf of Mexico as authorized and instructed by the FOSC. This was the first instance in which any Clean-Up Responder Defendant applied dispersants to oil on the surface of the water in the Gulf of Mexico during the Oil Spill Response. (Joint Stipulation No. 37, Exh. B hereto.)

43. Between April 22 and May 26, 2010, the FOSC in Morgan City and the FOSC and/or FOSCR at the Houma Incident Command Center approved the application of dispersants

on a daily basis through their approval of daily IAPs.  (*See* Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 658:2-13 (initially, approval to use dispersants came via the daily approval of the IAP); *see also* United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Response to RFA No. 201, excerpts attached as Exh. I hereto ("[T]he Federal On-Scene Coordinator approved application of dispersants as part of the Response Activities in various amounts and at various times between April 22, 2010 to on or about May 26, 2010."); Interim Report: Aerial Dispersant Group – Houma Operations Plan (Aug. 12, 2010) at 8, Exh. P hereto (FOSC made daily determinations regarding whether to approve continued dispersant application).)

44. The IAPs specified the overall and strategic objectives for their respective 24-hour response periods, including the application of dispersants.  (*See, e.g.*, IAP for Period 11 at 18 (May 1-2, 2010), excerpts attached as Exh. Q-2 hereto; IAP for Period 13 at 13 (May 3-4, 2010) (strategic objectives include having the Dispersant Group "[c]ontinue to deploy dispersants as necessary/approved"), excerpts attached as Exh. Q-3 hereto.)

45. The IAPs, approved by the FOSC and/or the FOSC's representatives, also set forth the operational command's priorities, which included continued dispersant application. (*See, e.g*., IAP for Period 10 at 21 (April 30, 2010 to May 01, 2010), excerpts attached as Exh. Q-1 hereto.)  The IAPs, approved by the FOSC and/or the FOSC's representatives, included assignments for groups working with dispersants.  (*See, e.g*., IAP for Period 11 at 31, 34-35 (May 1-2, 2010) (Subsea Dispersant Group "[a]waiting approval to continue dispersant injection"; Aerial Dispersant Group to "[a]pply dispersants as approved and appropriate"), excerpts attached as Exh. Q-2 hereto; IAP for Period 13 at 15 (May 3-4, 2010) (describing subsea dispersant application), excerpts attached as Exh. Q-3 hereto; IAP for Period 14 at 72

(May 4-5, 2010) (setting forth Aerial Dispersant Group resources, including available aircraft, dispersant, and dispersant application systems and directing group to "[a]pply dispersants as approved and appropriate"), excerpts attached as Exh. Q-4 hereto; IAP for Period 34 at 52 (May 24-25, 2010) ("Approval to apply Nalco EC9500A continues."), excerpts attached as Exh. Q-5 hereto.)

46. Accordingly, the United States authorized and/or directed all spill response activities set forth in the IAPs as of the time each IAP was issued. (Joint Stipulation No. 26, Exh. B hereto; Interim Report: Aerial Dispersant Group – Houma Operations Plan (Aug. 12, 2010) at 8, Exh. P hereto (FOSC made daily determinations regarding whether to approve continued dispersant application); United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Response to RFA No. 201, excerpts attached as Exh. I hereto ("[T]he Federal On-Scene Coordinator approved application of dispersants as part of the Response Activities in various amounts and at various times between April 22, 2010 to on or about May 26, 2010."); Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 658:2-13 (initially, approval to use dispersants came via the daily approval of the IAP).)

### E. Undisputed Material Facts Regarding FOSC Authorization Of Dispersant Application From May 26 to July 19, 2010

47. On May 26, 2010, the USEPA issued Dispersant Monitoring and Assessment Directive – Addendum 3 ("Addendum 3"), which required each surface application of dispersants to be approved by the FOSC. In addition, under Addendum 3 the application of dispersants subsea in excess of 15,000 gallons in a single day had to be approved by the FOSC. (USEPA, Dispersant Monitoring and Assessment Directive – Addendum 3 (May 26, 2010), Exh. R hereto.)

48. Following the issuance of Addendum 3, BP, the UAC and/or various Clean-Up Responder Defendants periodically submitted written requests to the FOSC and/or the FOSC's representative(s) for each aerial application of dispersants to oil slicks on the surface of the water in the Gulf of Mexico. (Joint Stipulation No. 38, Exh. B hereto; FOSC Approval Letters, Exh. S hereto at *passim*.)

49. Following the issuance of Addendum 3, the FOSC and/or the FOSC's representative(s) approved the specific use of dispersants in compliance with Addendum 3 for each aerial application of dispersants through July 19, 2010 by signing BP's, the UAC's and/or various Clean-Up Responder Defendants' written requests (the "FOSC Approval Letters"). (United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Responses to RFA Nos. 204-292, 296-298, excerpts attached as Exh. I hereto; Joint Stipulation No. 39, Exh. B hereto; FOSC Approval Letters, Exh. S hereto at *passim*.)

50. The FOSC Approval Letters included approval to apply dispersant in particular geographic areas in the Gulf of Mexico. (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson, FOSC (June 10, 2010) (granting permission to apply COREXIT EC9500A to oil slicks identified on attached maps), Exh. T hereto; *see also* FOSC Approval Letters, Exh. S hereto at *passim*.)

51. The FOSC approval letters included approvals to apply dispersants up to a particular maximum volume. (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson, FOSC (June 10, 2010) (granting permission to apply up to 15,300 gallons of COREXIT EC9500A), Exh. T hereto; *see also* FOSC Approval Letters, Exh. S hereto at *passim*.)

52. The FOSC Approval Letters also specified particular dates on which dispersants could be applied. (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson,

FOSC (June 10, 2010) (granting permission to apply up to 15,300 gallons of COREXIT EC9500A on June 11, 2010 "for a period not to exceed 12 hours"), Exh. T hereto; *see also* FOSC Approval Letters, Exh. S hereto at *passim*.)

53. The FOSC also determined how dispersants could be applied. (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson, FOSC (June 11, 2010) (granting permission for aerial application of dispersants to oil slicks on the surface of the Gulf of Mexico), Exh. U hereto; *see also* FOSC Approval Letters, Exh. S hereto at *passim*; Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 623:13-19 ("[A]pprovals and directions from the United States Government and the FOSC also include[d] . . . the manner in which the dispersants could be applied."))

54. Following the issuance of Addendum 3, on various dates between May 26, 2010 and July 19, 2010, the FOSC and/or the FOSC's representative(s) authorized maximum amounts for the application of dispersants to oil slicks on the surface and below the surface of the water in the Gulf of Mexico. (United States' Stipulation Nos. 11-12, Exh. C hereto; Joint Stipulation No. 40, Exh. B hereto; United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Responses to RFA Nos. 204-292, 296-298, excerpts attached as Exh. I hereto; FOSC Approval Letters, Exh. S hereto.)

55. The last dispersant application occurred on July 19, 2010. (*See* Letter fr. T.W. Allen, Admiral, USCG, to Congressman Edward J. Markey (Aug. 20, 2010) (stating that the Macondo well was capped on July 15, 2010 and dispersants had not been applied since July 19, 2010), Exh. V hereto.)

56. At all times during the Oil Spill Response, the FOSC had final authority to approve or deny requests from BP, the UAC and/or Clean-Up Responder Defendants to apply

dispersant. (Dep. Tr. of D. Rainey, excerpts attached as Exh. L hereto, at 380:11-14 ("Q: Were you required to obtain permission from the FOSC before using any dispersants? A: Yes."; Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 620:24-621:3 (When it came to deciding whether to employ particular response measures, "the FOSC [had] 51 percent of the vote" and held final authority to approve or reject response measures proposed by the UAC.); *id.* at 343:12-17 (the response "was under the direction of Unified Command where . . . the final authority sat with the FOSC" ); *id.* at 628:14-20 (response structure had "a Unified Area Command which is the ultimate authority, and the ultimate authority there is held by the FOSC"); *id.* at 655:6-656:3 (FOSC "[sat] on top of the Unified Command" and BP had to get permission from the FOSC to use dispersants); *id.* at 621:1-3 ("We could not take action in the response without the approval of the FOSC." ); *id*. at 622:2-4 ("We could only use dispersants with the approval of the - - of the FOSC and the Government . . . ."))

57. Although members of the UAC "tried to collaborate clearly and . . . make joint decisions . . . . if there was ever a conflict or if there was ever a disagreement on to go . . . Option A or Option B, the Federal On-Scene Commander had the final word." (Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 460:4-9.)

58. On June 14, 2010, Admiral James Watson, FOSC, stated: "I have been personally involved with daily dispersant application quantities and locations. EPA observes and consults, but certainly is not the final approving authority. That is my responsibility." (Email from James Watson, FOSC, to Richard Brannon and Thad Allen (June 14, 2010), Exh. W hereto.)

59. On August 1, 2010, Admiral Thad Allen made the following statement regarding dispersants: "It's a decision by the [FOSC] whether to approve the incident commander's recommendation to use dispersants . . . . It's a very disciplined doctrinal process on how this

works.  In the end it may be executed by BP through a contractor.  But these are all decisions made by the [FOSC] because that's where the responsibility rests." (Joint Stipulation No. 48, Exh. B hereto.)

60.     On August 1, 2010, Admiral Thad Allen made the following statement regarding dispersants: "I'm satisfied that we only use them when they're needed." (Joint Stipulation No. 49, Exh. B hereto.)

61.     On August 20, 2010, Admiral Thad Allen made the following statement about the Oil Spill Response:  "[T]he FOSC assessed the daily conditions and determined . . . the tools to deploy . . . .  All FOSC dispersant use decisions were made with the concurrence of or in consultation with the  EPA, . . . DOI,  . . . DOC and the State of Louisiana as required by 40 C.F.R. § 300.910 and [RRT] VI guidelines." (Letter fr. T.W. Allen, Admiral, USCG National Incident Commander, to Hon. Chairman Edward J. Markey (Aug. 20, 2010), Exh. V hereto.)

62.     In authorizing the subsea application of COREXIT EC9500A, the FOSC acted pursuant to the OPA, the CWA, including 33 U.S.C. § 1321(d)(2), and the NCP, including 40 C.F.R. §§ 300.120, 300.135, and 300.910.  (United States' Stipulation No. 14, Exh. C hereto.)

63.     In authorizing the application of COREXIT EC9500A and EC9527A to the surface of the Gulf of Mexico, the FOSC acted pursuant to the OPA, the CWA, including 33 U.S.C. § 1321(d)(2), and the NCP, including 40 C.F.R. §§ 300.120, 300.135, and 300.910. (United States' Stipulation No. 15, Exh. C hereto.)

      F.     **Undisputed Material Facts Regarding FOSC's Compliance With Regional Dispersant Pre-Authorization Plans**

64.     During the Oil Spill Response, no dispersant applications were authorized by the FOSC or the FOSC's representative(s) for areas shoreward of the RRT IV and RRT VI pre-

authorization zones, except if such applications were necessary to prevent or substantially reduce a hazard to human life. (Joint Stipulation No. 42, Exh. B hereto.)

65. During the Oil Spill Response, no dispersant operations were authorized by the FOSC or the FOSC's representative(s) outside of daylight hours. (Joint Stipulation No. 44, Exh. B hereto.)

66. During the Oil Spill Response, the FOSC and/or the FOSC's representative(s) prohibited dispersant spraying within two nautical miles from boats and platforms. (Joint Stipulation No. 46, Exh. B hereto.)

67. During the Oil Spill Response, all aerial dispersant spray aircraft were accompanied by a spotter aircraft whose mission was, in part, to ensure that no boats or platforms were located in the planned dispersant deployment area. (Joint Stipulation No. 47, Exh. B hereto.)

### G. Undisputed Material Facts Regarding Nalco's Lack Of Participation In Decisions Regarding Dispersant Use

68. On May 9, 2010, Rear Admiral Mary Landry, USCG, FOSC, wrote to Nalco's suppliers to seek their assistance "in a time of great national need" to provide the materials necessary for Nalco to make dispersants. (Letter from Mary E. Landry, Rear Admiral, U.S. Coast Guard, Commander, Eighth Coast Guard District, to Providers of Surfactant Supplies to the Nalco Company (May 9, 2010), Exh. X hereto.) Rear Admiral Landry asked that they "mak[e] available, to the greatest extent possible, their surfactant material to this response and clean-up effort . . . so that [Nalco] can manufacture dispersant." (*Id*.) She added that "whatever efforts you are undertaking in this regard are of invaluable benefit to this country." (*Id*.)

69. On July 12, 2010, Paul F. Zukunft, Rear Admiral, USCG, FOSC wrote to Nalco and its suppliers. In that letter, he sought their assistance in "a time of great national need."

17

(Letter fr. Paul F. Zukunft, Rear Admiral, USCG, FOSC, to The Nalco Company and Providers of Surfactant Supplies to the Nalco Company (July 12, 2010), Exh. Y hereto.)

70. In his July 12, 2010 letter, Rear Admiral Zukunft also asked "Nalco and companies that provide the Nalco Company with surfactant supplies to continue to assist by making available, to the greatest extent possible, dispersant and the surfactant material to this response and clean-up effort. . . . [W]hatever efforts you are undertaking in this regard are of invaluable benefit to this country." (*Id.*)

71. Nalco supplied dispersants at the express request of the Federal Government. (Letter from Mary E. Landry, Rear Admiral, U.S. Coast Guard, Commander, Eighth Coast Guard District, to Providers of Surfactant Supplies to the Nalco Company (May 9, 2010), Exh. X hereto); Letter fr. Paul F. Zukunft, Rear Admiral, USCG, FOSC, to The Nalco Company and Providers of Surfactant Supplies to the Nalco Company (July 12, 2010), Exh. Y hereto.)

72. Nalco did not decide whether, when, where, how or in what volumes dispersants were applied. (United States' Stipulation Nos. 11-13, Exh. C hereto.)

73. In its September 2011 report to the National Response Team, the FOSC concluded that "dispersants were an effective response tool, and prevented millions of gallons of oil from impacting the sensitive shorelines of the GOM states." (Joint Stipulation No. 50, Exh. B hereto.)

74. On October 21, 2011, Plaintiffs admitted to the Court and Defense counsel that they have no facts bearing on Nalco's preemption argument. (Email from Jim Klick to Magistrate Judge Shushan (Oct. 21, 2011), Exh. Z hereto.)

75. On February 16, 2012, Plaintiffs admitted that other actors, not Nalco, were "ultimately responsible for post-spill exposure injuries, whether by virtue of 40 C.F.R.

¶ 300.150, 33 US.C. § 1321(c)(4)(B)(i), (iii) and (iv), other applicable law, and/or" various agreements.  (Rec. Doc. 5718.)

Dated:  May 18, 2012

Respectfully submitted,

By: /s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr., Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of May, 2012.

    /s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*