## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : : | MDL NO. 2179<br><br>SECTION: J |
| THIS DOCUMENT RELATES TO: | : : | |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | : : : | JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . .  :  . . . . . . . . . . . . . . . . . . . . . .

## CLEAN-UP RESPONDER DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF THEIR INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

PROCEDURAL POSTURE .................................................................................................3

FACTUAL BACKGROUND ...............................................................................................6

    I.     THE NATIONAL RESPONSE SYSTEM .................................................6

         A.    The Clean Water Act and the National Contingency Plan ..............................6

         B.    Dispersant Pre-Approval by Regional Response Teams .................................8

    II.    THE STRUCTURE OF THE DEEPWATER HORIZON OIL SPILL RESPONSE ....................................................................................................10

         A.    The Unified Area Command and Incident Command Posts .........................11

         B.    Spill of National Significance / National Incident Commander ...................14

         C.    Role of Clean-Up Responder Defendants in the Response Efforts ...............14

    III.    USE OF DISPERSANTS DURING THE DEEPWATER HORIZON RESPONSE ....................................................................................................15

         A.    Aerial Dispersant Use Managed from ICP Houma .......................................16

         B.    Aerial Dispersant Use Between April 21 and May 26, 2010 ........................16

         C.    Aerial Dispersant Use Between May 26 and July 15, 2010 ..........................18

         D.    Federal Approval, Oversight, and Monitoring of Dispersant Use ................19

         E.    The EPA's Involvement with Dispersant Use ...............................................20

    IV.    OTHER RESPONSE OPERATIONS WERE ALSO AUTHORIZED AND DIRECTED BY THE FEDERAL GOVERNMENT .................................................21

    V.    HEALTH AND SAFETY ......................................................................22

ARGUMENT .......................................................................................................................24

    I.    THE CLEAN-UP RESPONDER DEFENDANTS HAVE DERIVATIVE CLEAN WATER ACT IMMUNITY ......................................................25

         A.    Authority Was Validly Conferred By The Federal Government .................29

         B.    Clean-Up Responder Defendants Did Not Exceed Their Authority ............31

    II.    ALTERNATIVELY, THE CLEAN-UP RESPONDER DEFENDANTS HAVE DERIVATIVE DISCRETIONARY FUNCTION IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT .....................................................32

    III.    ALTERNATIVELY, THE CLAIMS AGAINST THE CLEAN-UP RESPONDER DEFENDANTS IN THE B3 BUNDLE MASTER COMPLAINT ARE PREEMPTED ..........................................................35

CONCLUSION ....................................................................................................................37

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ackerson v. Bean Dredging, LLC*,
    589 F.3d 196 (5th Cir. 2009) ...................................................................................28, 29, 32

*Badon v. R J R Nabisco Inc.*,
    224 F.3d 382 (5th Cir. 2000) ...................................................................................25

*Berkovitz v. United States*,
    486 U.S. 531 (1988)...................................................................................32, 33

*Boyle v. United Tech. Corp.*,
    487 U.S. 500 (1988)...................................................................................29, 34

*Butters v. Vance Int'l*,
    225 F.3d 462 (4th Cir. 2000) ...................................................................................28

*Carden v. Gen. Motors Corp.*,
    509 F.3d 227 (5th Cir. 2007) ...................................................................................35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................................24

*Chesney v. Tennessee Valley Auth.*,
    782 F. Supp. 2d 570 (E.D. Tenn. 2011)...................................................................................33, 34

*Edwards v. Your Credit, Inc.*,
    148 F.3d 427 (5th Cir. 1998) ...................................................................................25

*Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*,
    458 U.S. 141 (1982)...................................................................................35, 36

*Filarsky v. Delia*,
    132 S. Ct. 1657 (2012)...................................................................................3

*Hagerty v. L & L Marine Services, Inc.*,
    788 F.2d 315 (5th Cir. 1986) ...................................................................................5

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)...................................................................................36

*Hix v. U.S. Army Corps of Eng'rs*,
    155 Fed. App'x 121 (5th Cir. 2005) ...................................................................................32

*In re Agent Orange Prod. Liab. Litig.*,
    517 F.3d 76 (2d Cir. 2008)...................................................................................26

### <u>TABLE OF AUTHORITIES (CONT'D)</u>

**Page(s)**

*In re KBR, Inc., Burn Pit Litig.*,
   736 F. Supp. 2d 954 (D. Md. 2010) ...................................................................................29

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*,
   2011 WL 4575696 (E.D. La. 2011) ............................................................................... passim

*In re Oswego Barge Corp.*,
   664 F.2d 327 (2d Cir. 1981)...........................................................................................35

*In re World Trade Ctr. Disaster Site Litig.*,
   521 F.3d 169 (2d Cir. 2008)....................................................................................27, 34

*Kadan v. Am. Contractors Ins. Co.*,
   No. 08-695, 2008 WL 5137259 (E.D. La. Dec. 5, 2008) .......................................26

*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) ...................................................................................24, 25

*Mays v. Tennessee Valley Auth.*,
   699 F. Supp. 2d 991 (E.D. Tenn. 2010)...................................................................33

*Myslakowski v. United States*,
   806 F.2d 94 (6th Cir. 1986) .....................................................................................33

*Ramsey v. Henderson*,
   286 F.3d 264 (5th Cir. 2002) ...................................................................................25

*Trevino v. Gen. Dynamics Corp.*,
   865 F.2d 1474 (5th Cir. 1989) .................................................................................29

*United States v. Varig Airlines*,
   467 U.S. 797 (1984)..................................................................................................33

*Yearsley v. W.A. Ross Constr.*,
   309 U.S. 18 (1940)............................................................................................... passim

**STATUTES**

33 U.S.C. § 1321(c)(1)(A) ...........................................................................................6, 30

33 U.S.C. § 1321(c)(2)(A) ...............................................................................................30

33 U.S.C. § 1321(c)(3)(A) ............................................................................................7, 36

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

33 U.S.C. § 1321(d)(1)-(2) ...........................................................................................................7

33 U.S.C. § 1321(d)(2)(K) .......................................................................................................6, 30

33 U.S.C. § 1321(j)(8) .............................................................................................................26, 29

28 U.S.C. § 2680(a) .................................................................................................................28, 32

42 U.S.C. § 5148 ...........................................................................................................................28

**OTHER AUTHORITIES**

29 C.F.R. § 1910.120 ....................................................................................................................22

40 C.F.R. § 300.1 ............................................................................................................................7

40 C.F.R. § 300.5 ............................................................................................................................7

40 C.F.R. § 300.100 ........................................................................................................................6

40 C.F.R. § 300.120 .........................................................................................................6, 7, 11, 30

40 C.F.R. § 300.135 ...................................................................................................................7, 30

40 C.F.R. § 300.322(b) ..........................................................................................................7, 30, 36

40 C.F.R. § 300.323(c) .............................................................................................................7, 14

40 C.F.R. § 300.905(a)(2) ..............................................................................................................10

40 C.F.R. § 300.910 .....................................................................................................................8, 9

40 C.F.R. § 300.920(a) ..................................................................................................................10

Fed. R. Civ. P. 56 .......................................................................................................................1, 24

Pursuant to the "Schedule for Limited B3 Discovery" (Rec. Doc. 5000), the Court's subsequent Order re-affirming that schedule (Rec. Doc. 6247), Fed. R. Civ. P. 56, and Local Civil Rule 56.1, the Clean-Up Responder Defendants[1] are each filing separate motions for summary judgment on this date seeking dismissal with prejudice of all remaining claims that have been asserted against them in the First Amended Master Complaint in Accordance with PTO No. 11 Section III.B(3) (Rec. Doc. 1812) (hereinafter the "B3 Bundle Master Complaint"). Those motions are supported by individual memoranda and statements of undisputed material facts detailing each Clean-Up Responder Defendant's individual role in responding to the DEEPWATER HORIZON oil spill.  For purposes of judicial efficiency, however, the Clean-Up Responder Defendants also respectfully submit this Joint Memorandum and accompanying Joint Statement of Undisputed Material Facts and associated Exhibits to present the factual and legal issues common to each motion in one place and avoid unnecessary duplication.

## INTRODUCTION

On September 30, 2011, the Court issued its Order and Reasons (Rec. Doc. 4159)[2] granting in part and denying in part motions filed by various Clean-Up Responder Defendants to dismiss the claims asserted against them in the B3 Bundle Master Complaint.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2011 WL 4575696 (E.D. La. 2011). In their motions to dismiss, the Clean-Up Responder Defendants argued that because the federal government authorized, directed, and ultimately controlled their actions in responding to the DEEPWATER HORIZON oil spill pursuant to the Clean Water Act ("CWA") and the National

---

[1] Marine Spill Response Corporation, Airborne Support, Inc., Airborne Support International, Inc., Lynden Incorporated, Dynamic Aviation Group, Inc., International Air Response, Inc., Lane Aviation, Inc., National Response Corporation, O'Brien's Response Management Inc., Tiger Rentals, Ltd., The Modern Group GP-SUB, Inc., The Modern Group, Ltd., and DRC Emergency Services, LLC.

[2] An Amended Order and Reasons was issued on October 4, 2011 (Rec. Doc. 4209).

Contingency Plan ("NCP"), they have derivative immunity from all claims in the B3 Bundle Master Complaint. Alternatively, the Clean-Up Responder Defendants argued that the claims in the B3 Bundle Master Complaint are barred by the doctrine of implied conflict preemption.[3]

In its Order and Reasons, the Court recognized the availability of derivative immunity and preemption in the context of a Spill of National Significance, but held that "[d]erivative immunity and preemption are not established on the face of the Complaint." *In re Oil Spill*, 2011 WL 4575696, at *12. Indeed, the Court stated that "it seems at this point that if the facts revealed that the Clean-Up Defendants were using dispersants as directed by the federal government, then they would be entitled to derivative governmental immunity." *Id.* at *7. Therefore, the Court held that "[t]hese arguments are preserved and may be re-asserted." *Id.* at *12.

With the benefit of targeted discovery on these key issues, the Clean-Up Responder Defendants have now renewed their derivative immunity and implied preemption arguments via motions for summary judgment in accordance with Magistrate Judge Shushan's Schedule for Limited B3 Discovery (Rec. Doc. 5000) and the Court's recent Order re-affirming its intent to resolve the derivative immunity and implied preemption issues in accordance with the Schedule for Limited B3 Discovery. *See* Order Regarding the PSC's Motion for Leave to Amend Master Complaint (Rec. Doc. 6247).

The indisputable facts demonstrate that the federal government was in charge of and directed the response to the DEEPWATER HORIZON spill, that the federal government validly conferred authority upon various of the Clean-Up Responder Defendants to conduct response operations, and that no Clean-Up Responder Defendant exceeded the scope of that authority

---

[3] The Clean-Up Responder Defendants also made a variety of claim-specific arguments, some of which were granted, but none of which are relevant for purposes of the instant motions.

during the response.  These facts alone compel dismissal.  Moreover, subjecting private entities like the Clean-Up Responder Defendants, that respond to an oil spill of national significance and follow the federal government's directions during clean-up operations, to potential civil liability under maritime and/or state law threatens to undermine the rapid and efficient response structure set forth in the CWA and NCP.  Indeed, that very structure is premised on the availability of private responders.  But allowing plaintiffs to second-guess decisions that were made by the federal government and executed by private responders under federal direction and control may well cause many private responders to think twice before responding to future oil spills.  The United States Supreme Court recognized this reality just last month:

> Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct. Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity.  Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

*Filarsky v. Delia*, 132 S. Ct. 1657, 1666 (2012) (affording qualified immunity to a private attorney that assisted with a governmental investigation).  Accordingly, for all of these reasons, the Clean-Up Responder Defendants are entitled to summary judgment on the remaining claims against them in the B3 Bundle Master Complaint.[4]

## **PROCEDURAL POSTURE**

In Pretrial Order No. 11 (Case Management Order No. 1) (Rec. Doc. 569), the Court established eight separate "pleading bundles" for different categories of cases and claims in this

---

[4] Of course, dismissal of the Clean-Up Responder Defendants will not leave B3 plaintiffs without a remedy for their alleged injuries.  Not only has the Court preliminarily approved the proposed "medical benefits" class action settlement, *see* Rec. Doc. 6419, but to the extent that any B3 plaintiffs are unsatisfied with that settlement they can opt out and continue litigating against BP.

multidistrict litigation.   The Court initially designated the B3 pleading bundle as the "Post-Explosion Clean-Up Claims" bundle in Pretrial Order No. 11, but subsequently renamed the B3 pleading bundle the "Clean-Up, Medical Monitoring, and Post-April 20 Personal Injury Claims" bundle and revised it to include "all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  Pretrial Order No. 25 (Rec. Doc. 983).[5]

Although it does not specifically identify a single plaintiff, the B3 Bundle Master Complaint purports to assert various "claims for relief" on behalf of five categories of plaintiffs: (i) VoO Plaintiffs – boat captains and crew involved in the Vessels of Opportunity program; (ii) Decontamination Plaintiffs – workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants; (iii) Vessel Plaintiffs – vessel captains and crew who were not involved in the Vessels of Opportunity program but who were exposed to allegedly harmful chemicals, odors, and emissions during post-explosion clean-up activities; (iv) Onshore Plaintiffs – clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal and intertidal zones; and (v) Resident Plaintiffs – residents who live and work in close proximity to coastal waters.[6]

With respect to the Clean-Up Responder Defendants, the B3 Bundle Master Complaint generally alleges that such defendants "failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the

---

[5] The B1 pleading bundle includes non-governmental economic loss and property damage claims. Paragraph 18 of Pretrial Order No. 25 also deleted the second sentence of paragraph 18 of the B3 Bundle Master Complaint such that no causes of action from the B1 Bundle Master Complaint are incorporated into the B3 Bundle Master Complaint.   None of the Clean-Up Responder Defendants are named as defendants in the B1 Bundle Master Complaint.

[6] *See* B3 Bundle Master Complaint ¶ 21.

pollution of the Gulf of Mexico and injury to Plaintiffs," and "ignored worker safety concerns."[7] Following the Court's ruling on the motions to dismiss filed by certain of the Clean-Up Responder Defendants, only two causes of action in the B3 Bundle Master Complaint remain: (i) Negligence (Third Claim for Relief - ¶¶ 240-49) and (ii) Gross Negligence (Fourth Claim for Relief - ¶¶ 250-57).[8]

Following the issuance of the Court's Order and Reasons, Magistrate Judge Shushan established a "Schedule for Limited B3 Discovery" (Rec. Doc. 5000) designed to develop "the facts necessary" for the Clean-Up Responder Defendants to "file motions renewing their preemption/derivative immunity arguments." Although the B3 plaintiffs have largely refused to participate meaningfully in the "limited B3 discovery" process, the Clean-Up Responder Defendants have operated in good faith under that schedule by serving and responding to written discovery, producing thousands of documents on a rolling basis, and entering into joint stipulations of fact with the United States of America regarding issues relevant to the derivative immunity and implied preemption arguments.[9]

---

[7] *See* B3 Bundle Master Complaint ¶¶ 184, 189.

[8] The Court also held that non-seamen may seek punitive damages and that "all Plaintiffs that have alleged an 'injury' under general maritime law may seek medical monitoring as an element of their damages." *In re Oil Spill*, 2011 WL 4575696, at *9 (relying on *Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315, 319 (5th Cir. 1986)). If the Court finds that the remaining claims for relief must be dismissed, however, then plaintiffs cannot recover damages of any kind (including punitive damages and medical monitoring damages) from the Clean-Up Responder Defendants.

[9] In several recent filings, the Clean-Up Responder Defendants have chronicled the PSC's increasingly desperate attempts to prolong an inevitable day of reckoning and otherwise frustrate the Court's well-founded desire to resolve the B3 claims against the Clean-Up Responder Defendants in an efficient fashion. *See* Rec. Docs. 5442, 5828, 6163. It must also be noted that the B3 plaintiffs have refused to provide meaningful responses (in the case of B3 plaintiffs represented by the PSC) or simply refused to answer (in the case of all other B3 plaintiffs) the Clean-Up Responder Defendants' interrogatories asking all B3 plaintiffs to: (i) identify any facts supporting the allegations contained in the B3 Bundle Master Complaint that BP (and not the federal government) controlled the clean-up operations, that the federal government did not authorize and direct all of the Clean-Up Responder Defendants' activities, and that the Clean-Up Responder Defendants violated the federal government's directives; and (ii) provide information about any specific B3 plaintiff that alleges to have been injured as a result of any Clean-Up

**FACTUAL BACKGROUND**

## I. THE NATIONAL RESPONSE SYSTEM

### A. The Clean Water Act and the National Contingency Plan

The CWA, as amended by the Oil Pollution Act of 1990 ("OPA") following the EXXON VALDEZ spill, reflects the intent of Congress to ensure a rapid response to oil spills and to vest decision-making authority over response efforts in the federal government.[10]  In the event of an oil spill, the CWA provides that "[t]he President *shall*, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge . . . of oil . . . into or on the navigable waters."  33 U.S.C. § 1321(c)(1)(A) (emphasis added).  The President has delegated this authority to the United States Coast Guard for discharges occurring seaward of the United States coastline, whether the discharge is from a facility, vessel, or offshore platform located on the Outer Continental Shelf.  *See* 40 C.F.R. § 300.100; 40 C.F.R. § 300.120.

To this end, the CWA requires the pre-designation of a federal official for each of various geographical regions "who shall be the Federal On-Scene Coordinator" for those regions in the event of a spill, to avoid the delay that would be associated with selecting an individual to fill this post after a spill occurs.  33 U.S.C. § 1321(d)(2)(K).  Pursuant to this requirement, the Coast Guard has designated Federal On-Scene Coordinators ("FOSCs") by geographic area to coincide with Captain of the Port zones and these FOSCs are charged with directing response efforts and coordinating all other efforts at the scene of a discharge or release.  *See* 40 C.F.R. § 300.120(a)-

---

Responder Defendant violating the federal government's directives.  The B3 plaintiffs' failure to respond to such Court-ordered limited B3 discovery is likely an indication that they have no responsive information to oppose the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments.

[10] *See* Clean-Up Responder Defendants' Joint Statement of Undisputed Material Facts in Support of Their Individual Motions for Summary Judgment (hereinafter "Joint SUMF") at ¶ 1.

(b); 40 C.F.R. § 300.135.  If an oil spill "poses or may present a substantial threat to public health or welfare of the United States," the FOSC "*shall direct all* federal, state, or *private actions* to remove the discharge."  40 C.F.R. § 300.322(b) (emphasis added); *see also* 40 C.F.R. § 300.120; 40 C.F.R. § 300.135.  Indeed, "[e]ach Federal agency, State, owner or operator, *or other person* participating in [oil spill response] efforts . . . shall act in accordance with the National Contingency Plan or as directed by the President."  33 U.S.C. § 1321(c)(3)(A) (emphasis added).

Additionally, an oil spill may be designated a "Spill of National Significance" if, "due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort," the spill is "so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up."  40 C.F.R. § 300.5.  If a spill is designated a Spill of National Significance, the United States may appoint a "National Incident Commander" to "assume the role" of the FOSC in "communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level."  40 C.F.R. § 300.323(c).

To effectuate all of these policies, the CWA mandates that "[t]he President shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances," and that the NCP "shall include . . . [a] schedule . . . identifying dispersants, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan."  33 U.S.C. § 1321(d)(1)-(2).  In short, the NCP is the federal government's blueprint for responding to oil spills—it provides the organizational structure and procedures for preparing for and responding to discharges.  *See* 40 C.F.R. § 300.1.[11]  The NCP establishes a multi-tiered and

---

[11] *See* Joint SUMF ¶ 2.

coordinated national response strategy known as the National Response System.[12]   Key components of the National Response System include:  (a) the National Response Team, which is comprised of fifteen federal agencies responsible for developing and reconciling intergovernmental policy issues that surface during an oil spill response; (b) Regional Response Teams ("RRTs"), which are located throughout the country based on Environmental Protection Agency ("EPA") Regions and are responsible for regional planning and coordination of preparedness and response action; and (c) Area Committees, which are usually based on Coast Guard Captain of the Port Zones for coastal areas.[13]

### B.    Dispersant Pre-Approval by Regional Response Teams

Within the National Response System structure, the RRTs are vested with the authority to pre-approve the use of dispersants for oil spill response operations in their geographic areas of responsibility.  *See* 40 C.F.R. § 300.910(a).  The purpose of RRT dispersant pre-authorization is to "allow[] the FOSC to quickly arrive at a logical 'GO/NO GO' decision" such that dispersant operations can "begin in a timely manner that is consistent with attempting to maximize the effectiveness of dispersant use as a countermeasure to reduce the impact of oil spills."[14]   Once the use of dispersants is pre-authorized by an RRT, the FOSC may then approve the use of dispersants in response to an oil spill without obtaining specific concurrences from RRT

---

[12] *See* Joint SUMF ¶ 3.

[13] *See* Joint SUMF ¶ 4.  Unlike the various investigatory reports of which the Court has previously refused to take judicial notice, the On-Scene Coordinator Report referenced in Joint SUMF ¶ 4 was compiled at the request of the National Response Team pursuant to the NCP and is essentially an "after action" report written by those government officials who served as FOSCs during the response. Moreover, the Clean-Up Responder Defendants are not asking the Court to take judicial notice of anything in the On-Scene Coordinator Report; rather, the report is submitted as evidentiary support for various statements of indisputable facts and the Court may consider it in resolving the instant summary judgment motions.

[14] *See* Joint SUMF ¶ 5.

representatives.  *See* 40 C.F.R. § 300.910.[15]

RRTs are required to develop pre-authorization plans that address, among other things, the specific contexts in which dispersants are to be used, the manner in which they can be applied, and the monitoring of such operations.  *See* 40 C.F.R. § 300.910(a).  RRT pre-authorization plans may also include checklists or decision-use elements for the FOSC to review prior to authorizing dispersant use, which are typically based on the application of available science to the specific environments in the region by the federal and state resource trustee agencies that are part of the RRTs.[16]

Prior to the April 20, 2010 explosion and fire on the DEEPWATER HORIZON mobile offshore drilling unit, RRT IV (covering the States of Alabama, Florida, and Mississippi) and RRT VI (covering the States of Louisiana and Texas) pre-authorized the use of dispersants for oil spill response operations in their geographic areas of responsibility.[17]  The RRT IV and RRT VI dispersant pre-authorization plans were "based, in part, on scientific input from EPA, federal and state resource trustee agencies, and applicable state environmental agencies, and address factors such as the potential sources of types of oil that might be spilled, the existence and location of environmentally sensitive resources that might be impacted by spilled oil, available product and storage locations, available equipment and adequately trained operators, and the

---

[15] *See* Joint SUMF ¶ 6.

[16] *See* Joint SUMF ¶ 7.

[17] *See* Joint SUMF ¶ 8.  The RRT IV pre-authorization plan approves the use of dispersants in all areas that are located at least three miles seaward of any shoreline, providing the water depth is at least ten meters deep.  *See* Joint SUMF ¶ 9.  The areas covered by the RRT VI dispersant pre-authorization plan include all off-shore waters that are either outside the ten meter isobath or are greater than three nautical miles from shore, whichever is farthest, out to a distance of two hundred nautical miles from shore.  *See* Joint SUMF ¶ 10.  Under the RRT IV and RRT VI dispersant pre-authorization plans, dispersant spray operations may only be conducted during daylight hours.  *See* Joint SUMF ¶ 11.  Neither plan indicates a limit on the volume of dispersants that may be used to respond to an oil spill.  *See* Joint SUMF ¶ 12.

available means to monitor product application and effectiveness."[18]

The RRT IV and RRT VI pre-authorization plans allow for the use of any dispersant on the NCP Product Schedule which the FOSC considers appropriate for the existing environmental and physical conditions.[19]   The dispersants used during the DEEPWATER HORIZON oil spill response—Corexit EC9500A and Corexit EC9527A, manufactured by Nalco Company—were listed on the NCP Product Schedule as of April 20, 2010, and remain on the NCP Product Schedule to this day.[20]   Before these dispersants were added to the NCP Product Schedule, the federal government was required to review the chemical composition and toxicity data for each dispersant and concluded that the dispersants could be safely and effectively used to respond to oil spills.  *See* 40 C.F.R. § 300.905(a)(2); 40 C.F.R. § 300.920(a).[21]

## II.   THE STRUCTURE OF THE DEEPWATER HORIZON OIL SPILL RESPONSE

Following the explosion on the DEEPWATER HORIZON, the comprehensive federal response structure described above was immediately put into action and remained in place throughout the response.  As the United States has stipulated, "[e]fforts to control the source of the oil and to clean up the spill were governed by the provisions of OPA, the CWA, and the

---

[18] *See* Joint SUMF ¶ 13.  The extensive Joint Stipulations of Fact referenced in Joint SUMF ¶ 13 have been entered into by the United States of America and the Clean-Up Responder Defendants pursuant to Magistrate Judge Shushan's Schedule for Limited B3 Discovery (Rec. Doc. 5000).  The PSC failed to submit any objections to those joint stipulations as required by Magistrate Judge Shushan's Order.

[19] *See* Joint SUMF ¶ 14.  The NCP Product Schedule is established by the EPA.  *See* 40 C.F.R. § 300.905.

[20] *See* Joint SUMF ¶ 15.  Corexit EC9500A was first added to the NCP Product Schedule on April 13, 1994, and re-listed on December 18, 1995 due to new federal legislation; at no point was it ever removed from the Schedule.  *See* Joint SUMF ¶ 16.  Corexit EC9527A was first added to the NCP Product Schedule on March 10, 1978, and re-listed on December 18, 1995; at no point was it ever removed from the Schedule.  *See* Joint SUMF ¶ 17.  The B3 Bundle Master Complaint references two additional products, PES-51 and OMI 500, and could be read to allege that these products are dispersants.  *See* B3 Bundle Master Complaint ¶¶ 146–147, 178–180.  But neither PES-51 (manufactured by Tesoro Environmental Products Company) nor OMI 500 (manufactured by JMN Specialties, Inc.) is a chemical dispersant; rather, these are decontamination cleaning chemicals that were approved for use by the Unified Command.  *See* Joint SUMF ¶ 18.

[21] *See* Joint SUMF ¶ 19.

NCP, which together authorize the FOSC to direct and monitor all Federal, State, and private actions."[22]  Thus, the Clean-Up Responder Defendants participated in the massive response to the DEEPWATER HORIZON environmental disaster, if at all, as part of the federally controlled clean-up effort led, as mandated by statute, by the FOSC.

### A.    The Unified Area Command and Incident Command Posts

The Incident Command System ("ICS") was the command and control organizational structure and management process used by the United States Department of Homeland Security to execute the oil spill response efforts.[23]  The Commander of the Coast Guard's Marine Safety Unit at Morgan City, Louisiana was the first FOSC to direct the response to the DEEPWATER HORIZON spill.[24]  As the search for missing crew members continued on April 21, it was determined that the response was going to be bigger than anticipated and the Commandant of the Coast Guard, Admiral Thad Allen, re-assigned the FOSC role to Rear Admiral Mary Landry, the Commander of the Eighth Coast Guard District.[25]  In accordance with the NCP, the FOSC was the ultimate decision-making authority for the DEEPWATER HORIZON spill response and determined the appropriate course of action for the response, including whether to use dispersants on the spill.  *See* 40 C.F.R. § 300.120(a).  Accordingly, ultimate decision-making power was held by the FOSC and no action could be taken without his or her approval.[26]

---

[22] *See* Joint SUMF ¶ 20.

[23] *See* Joint SUMF ¶ 21.

[24] *See* Joint SUMF ¶ 22.

[25] *See* Joint SUMF ¶ 23.  Rear Admiral Landry retained this position through the end of May 2010 and was replaced by Rear Admiral James Watson on June 1, 2010.  *See* Joint SUMF ¶ 24.  On July 12, 2010, Rear Admiral Paul Zukunft assumed the FOSC position from Rear Admiral Watson.  *See* Joint SUMF ¶ 25.  Rear Admiral Zukunft retained this position until December 17, 2010.  *See* Joint SUMF ¶ 26.

[26] *See* Joint SUMF ¶ 27.

On April 23, 2010, Rear Admiral Landry established the Unified Area Command ("UAC") for the DEEPWATER HORIZON response at the Shell Training and Conference Center in Robert, Louisiana.[27]  Per NCP requirements, the UAC operated as the headquarters for the response under the leadership and direction of the FOSC.[28]  A senior BP employee holding a position within the Unified Command estimated that there were "about 40" Coast Guard officials present at the UAC headquarters compared to "maybe 12" from BP.[29]  The UAC set the "strategy and direction" for the response operations, "monitor[ed] results," and "intervene[ed] when necessary."[30]  Although the UAC system is "intended to create consensus" among all of the different stakeholders when making decisions, the FOSC has "51 percent of the vote" and the "final word."[31]

The Coast Guard also established five Incident Command Posts ("ICPs") during the response.[32]  The first two ICPs were formed on April 23, 2010 in Houma, Louisiana and Houston, Texas in conjunction with the formation of the UAC.[33]  A third ICP was formed in Mobile, Alabama three days later.[34]  ICPs in Galveston, Texas and Miami, Florida were formed later in the response and "remained relatively small operations."[35]  Each of the ICPs reported to

---

[27] *See* Joint SUMF ¶ 28.  On June 16, 2010, the UAC headquarters was moved to New Orleans.  *See* Joint SUMF ¶ 29.

[28] *See* Joint SUMF ¶ 30.

[29] *See* Joint SUMF ¶ 31.  This BP employee also testified that "NOAA [r]epresentatives and their team" were at the UAC headquarters and, after the spill was declared a Spill of National Significance, "we saw Army, Air Force, Navy, [and] Marines join" the team in Robert.  *See* Joint SUMF ¶ 32.

[30] *See* Joint SUMF ¶ 33.

[31] *See* Joint SUMF ¶ 34.

[32] *See* Joint SUMF ¶ 35.

[33] *See* Joint SUMF ¶ 36.

[34] *See* Joint SUMF ¶ 37.

[35] *See* Joint SUMF ¶ 38.

the UAC and served as "operational units" that managed the various response operations.[36]  At each ICP, a Coast Guard Captain was appointed to act as a FOSC representative (termed a "FOSCR") and managed the response activities being coordinated out of their respective posts.[37]

Throughout the DEEPWATER HORIZON spill response efforts, ICP Houston focused its efforts on source control activities and operations.[38]  Both ICP Miami and ICP Galveston managed near-shore and shoreline response operations for the west coast of Florida and State of Texas, respectively, and therefore were not involved in offshore response activities such as dispersant application or *in-situ* burning.[39]  ICP Mobile managed off-shore, near-shore, and shoreline response operations for the States of Alabama and Mississippi, as well as for the Florida panhandle.[40]  ICP Mobile executed skimming, booming, beach clean-up, and Vessels of Opportunity ("VoO") operations, but did not conduct any dispersant or *in-situ* burning operations.[41]  ICP Houma managed off-shore, near-shore, and shoreline response operations for the State of Louisiana, including all aerial applications of dispersants to the surface of the Gulf of Mexico and all *in-situ* burning operations conducted during the response.[42]

---

[36] *See* Joint SUMF ¶ 39.

[37] *See* Joint SUMF ¶ 40.

[38] *See* Joint SUMF ¶ 41.  ICP Houston also conducted all of the sub-sea dispersant application operations. *See* Joint SUMF ¶ 42.  As explained in the Clean-Up Responder Defendants' individual filings, none of the Clean-Up Responder Defendants were involved in the sub-sea application of dispersants.

[39] *See* Joint SUMF ¶ 43.

[40] *See* Joint SUMF ¶ 44.

[41] *See* Joint SUMF ¶ 45.

[42] *See* Joint SUMF ¶ 46.

**B.      Spill of National Significance / National Incident Commander**

On April 29, 2010, pursuant to 40 C.F.R. § 300.323, the Secretary of Homeland Security designated the DEEPWATER HORIZON spill a "Spill of National Significance."[43]  Pursuant to 40 C.F.R. § 300.323(c), the Secretary of Homeland Security then appointed Admiral Thad Allen, the outgoing Commandant of the Coast Guard and its only four-star Admiral at the time, as National Incident Commander ("NIC") for the DEEPWATER HORIZON spill response efforts.[44]  During the DEEPWATER HORIZON spill response, consistent with 40 C.F.R. § 300.323(c), the NIC focused on unifying the government's response, particularly at the inter-departmental level, external communications, and certain technical issues, while the FOSC focused on conducting the response.[45]  The NIC organization eventually grew to 138 members: approximately sixty members were active duty and reserve Coast Guard, and the balance were from other federal agencies, including NOAA, DOI, DOE, DOS, and DOD.[46]  The NIC organization developed standardized daily reports in order to provide regular updates on spill response activities to senior governmental leadership.[47]

**C.      Role of Clean-Up Responder Defendants in the Response Efforts**

Although each of the Clean-Up Responder Defendants is filing a separate motion for summary judgment that details their specific involvement in the response efforts, "[t]he Clean-Up Responder Defendants participated in the DEEPWATER HORIZON spill response efforts in accordance with the roles, if any, assigned to them within the Unified Area Command system

---

[43] *See* Joint SUMF ¶ 47.

[44] *See* Joint SUMF ¶ 48.

[45] *See* Joint SUMF ¶ 49.

[46] *See* Joint SUMF ¶ 50.

[47] *See* Joint SUMF ¶ 51.

and the Incident Command Posts."[48]  Beginning on April 21, 2010 and continuing throughout the DEEPWATER HORIZON spill response, Incident Action Plans were prepared on a daily basis that contained detailed instructions concerning the response activities that were to occur each day.[49]  Each Incident Action Plan was reviewed, signed, and approved by the FOSC and/or the FOSC's representative(s) and then delivered to the ICPs for execution by, among others, various Clean-Up Responder Defendants.[50]  Accordingly, the United States authorized and/or directed all spill response activities set forth in the Incident Action Plans as of the time each Incident Action Plan was issued.[51]

## III.    USE OF DISPERSANTS DURING THE DEEPWATER HORIZON RESPONSE

Between April 21, 2010 and July 19, 2010, the FOSC and/or the FOSC's representative(s) specifically authorized the use of the dispersants Corexit EC9500A and Corexit EC9527A on the surface of the water in the Gulf of Mexico as part of the DEEPWATER HORIZON spill response activities at various times and in various amounts.[52]  As will be set forth in the Clean-Up Responder Defendants' separate filings, none of the Clean-Up Responder Defendants were involved in any way with the sub-sea application of dispersants.  Rather, as will also be set forth in the separate filings, the only involvement any Clean-Up Responder Defendant had with the use of dispersants during the DEEPWATER HORIZON spill response consisted of the application of dispersants onto the surface of the water in the Gulf of Mexico.

---

[48] *See* Joint SUMF ¶ 52.

[49] *See* Joint SUMF ¶ 53.

[50] *See* Joint SUMF ¶ 54

[51] *See* Joint SUMF ¶ 55

[52] *See* Joint SUMF ¶ 56.

## A.    Aerial Dispersant Use Managed from ICP Houma

All aerial dispersant operations were managed by ICP Houma.[53]  The command structure of ICP Houma was divided into four sections:  Operations, Planning, Logistics, and Finance.[54]  The Operations Section of ICP Houma was further divided into six branches—and it is the Offshore Branch of the Operations Section that housed the Dispersant Group.[55]  Coast Guard personnel were assigned to each section and branch at ICP Houma, and all sections and branches ultimately reported to the FOSCR at ICP Houma and/or his deputies.[56]

The Dispersant Group at ICP Houma ran its operations out of two airports—Stennis Space Center Airport in Mississippi and Houma-Terrebonne Airport in Houma, Louisiana.[57]  Operations at both airports had separate spray aircraft and spotter aircraft, such that all dispersant spray aircraft were accompanied by spotter aircraft to ensure that no boats or platforms were located in the planned dispersant deployment area.[58]  Dispersant Group members plotted and tracked the spray of dispersants and reported all dispersant-related data—including flight paths— up through the Unified Command and ultimately to the FOSC.[59]  Moreover, as discussed below, various federal officials also personally monitored the aerial dispersant operations.

## B.    Aerial Dispersant Use Between April 21 and May 26, 2010

In accordance with RRT VI guidelines, BP submitted its first request to use aerial dispersants to the FOSC at Morgan City, Louisiana shortly after the explosion on the

---

[53] *See* Joint SUMF ¶ 57.

[54] *See* Joint SUMF ¶ 58.

[55] *See* Joint SUMF ¶ 59.  The Offshore Branch of the Operations Section also housed the In Situ Burning Group.  *See id.*

[56] *See* Joint SUMF ¶ 60.

[57] *See* Joint SUMF ¶ 61.

[58] *See* Joint SUMF ¶ 62.

[59] *See* Joint SUMF ¶ 63.

DEEPWATER HORIZON.[60]  On April 21, 2010, the FOSC and/or the FOSC's representative(s) completed the "Dispersant Pre-Approval Initial Call Checklist" and "FOSC Dispersant Use Checklist" pursuant to the RRT VI guidelines and specifically authorized the use of dispersants in response to the DEEPWATER HORIZON spill at that time.[61]  Ultimately, "[a]ll surface application of dispersants [were] approved daily by the FOSC and [were] targeted on dispersible oil to minimize surface oil slicks impacting the environmentally sensitive shoreline ecosystem."[62]

On April 22, 2010, the FOSC authorized and instructed Clean-Up Responder Defendant Airborne Support, Inc. ("ASI") to conduct a trial application of up to 1,880 gallons of dispersants to oil on the surface of the water in the Gulf of Mexico.[63]  In accordance with that instruction, ASI applied 1,880 gallons of dispersants to oil on the surface of the water in the Gulf of Mexico on April 22, 2010.[64]  This was the first instance in which any Clean-Up Responder Defendant applied dispersants to oil on the surface of the water in the Gulf of Mexico during the DEEPWATER HORIZON spill response.[65]  Throughout the initial period of the response, the pre-designated FOSC in Morgan City—and later the FOSC and/or FOSCR at ICP Houma— approved dispersant operations on a daily basis.[66]  ICP Houma documented its dispersant operations in daily "Aerial Dispersants Operations" status reports, sometimes referred to as

---

[60] *See* Joint SUMF ¶ 64.

[61] *See* Joint SUMF ¶ 65.

[62] *See* Joint SUMF ¶ 66.

[63] *See* Joint SUMF ¶ 67.

[64] *See* Joint SUMF ¶ 68.

[65] *See id.*

[66] *See* Joint SUMF ¶ 69.

"Daily Aerial Dispersant Application Plans."[67]  These reports detailed every aspect of the daily dispersant application process and were widely disseminated to the Coast Guard, EPA, United States Air Force, and other government personnel.

### C.    Aerial Dispersant Use Between May 26 and July 15, 2010

On May 26, 2010, the EPA and the Coast Guard issued Dispersant Monitoring and Assessment Directive – Addendum 3, which directed BP to eliminate the surface application of dispersants and provided that, "[i]n rare cases when there may have to be an exemption, BP must make a request in writing to the FOSC providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application.  The FOSC must approve the request and volume of dispersant prior to initiating surface application."[68]

Following the issuance of Addendum 3, BP and/or various Clean-Up Responder Defendants periodically submitted written requests to the FOSC and/or the FOSC's representative(s) and received written authorization from the FOSC and/or the FOSC's representative(s) before each and every application of dispersants to the surface of the water in the Gulf of Mexico.[69]  Those authorizations contained not only maximum volumes, but also restrictions concerning the location and manner of the approved applications of dispersants.[70]

---

[67] *See* Joint SUMF ¶ 70.

[68] *See* Joint SUMF ¶ 71.

[69] *See* Joint SUMF ¶ 72.

[70] *See* Joint SUMF ¶ 73.

The Clean-Up Responder Defendants complied in full with each and every one of the dispersant authorizations.[71]

### D. Federal Approval, Oversight, and Monitoring of Dispersant Use

After the well was capped on July 15, 2010, dispersant staff and equipment began to demobilize, and the last application of dispersants to the surface of the water in the Gulf of Mexico was made on July 19, 2010.[72] In an August 1, 2010 press conference, NIC Admiral Allen made the following statement regarding dispersants: "It's a decision by the [FOSC] whether to approve the incident commander's recommendation to use dispersants . . . . It's a very disciplined doctrinal process on how this works. In the end it may be executed by BP through a contractor. But these decisions are all made by the [FOSC] because that's where the responsibility rests."[73]

But the federal government didn't simply approve the use of dispersants during this unprecedented response effort; it also engaged in extensive monitoring and supervision of all dispersant operations through various channels, including the United States Coast Guard Special Monitoring of Applied Response Technologies ("SMART") program. Such real-time monitoring by the federal government not only ensured that its approvals and directives were being followed by the Clean-Up Responder Defendants, but the data generated also helped the federal government make informed decisions about when, where, and how to utilize dispersants during the response.

---

[71] *See* Joint SUMF ¶ 74.

[72] *See* Joint SUMF ¶ 75.

[73] *See* Joint SUMF ¶ 76. Furthermore, NIC Admiral Allen concluded that "I'm satisfied that we only use [dispersants] when they're needed." *See* Joint SUMF ¶ 77.

The SMART protocol was developed by the Coast Guard, the National Oceanic and Atmospheric Administration ("NOAA"), the EPA, Centers for Disease Control and Prevention, and the Minerals Management Service, and has been approved by the National Response Team.[74]   SMART is a monitoring program "for rapid collection and reporting of real-time, scientifically based information, in order to assist the Unified Command with decision-making during . . . dispersant operations."[75]   In its original Dispersant Directive, the EPA ordered that the SMART protocol be implemented for monitoring of surface dispersant operations during the DEEPWATER HORIZON response.[76]   Accordingly, aerial dispersant operations during the DEEPWATER HORIZON response were monitored by SMART teams of federal officials that conducted multiple monitoring missions (via both vessels and airplanes) in conjunction with such operations and reported data back to the Unified Command.[77]   And, of course, separate and apart from the SMART monitoring, "[t]he FOSC's representatives and other federal officials were present in the various Incident Command Posts to monitor the execution of the detailed instructions contained in the Incident Action Plans."[78]

E.     **The EPA's Involvement with Dispersant Use**

In anticipation of a common refrain from plaintiffs, the Clean-Up Responder Defendants wish to set the record straight regarding the EPA's involvement with dispersant use during the DEEPWATER HORIZON response efforts.  As EPA Administrator Lisa Jackson told Congress on July 15, 2010, "EPA is one of many agencies providing support to the USCG-led federal

---

[74] *See* Joint SUMF ¶ 78.

[75] *See* Joint SUMF ¶ 79.

[76] *See* Joint SUMF ¶ 80.

[77] *See* Joint SUMF ¶ 81.

[78] *See* Joint SUMF ¶ 82.

response."[79]   Indeed, although the EPA participated in "track[ing] the effectiveness of [the] response," Administrator Jackson acknowledged the indisputable reality discussed at length above, namely that the FOSC "of course reserves command control" of the clean-up operations.[80]   Ultimately, as EPA Assistant Administrator Paul Anastas has stated, "[w]hile it may be true that EPA may not have concurred on every decision or waiver of the amounts of dispersants being used, that is . . . a decision of the federal on-scene coordinator [and] [w]e do believe that overall the use of dispersants was one important tool in the overall response to this tragic oil spill."[81]

## IV.   OTHER RESPONSE OPERATIONS WERE ALSO AUTHORIZED AND DIRECTED BY THE FEDERAL GOVERNMENT

Beyond the use of dispersants, and as explained in the Clean-Up Responder Defendants' individual submissions, various of the Clean-Up Responder Defendants were involved in other aspects of the DEEPWATER HORIZON spill response as well, such as *in-situ* burning of oil, skimming of oil, beach clean-up efforts, and the decontamination of vessels.   As the United States has stipulated, however, all such efforts were performed by various of the Clean-Up Responder Defendants "in accordance with the roles, if any, assigned to them within the Unified Area Command system and the Incident Command Posts."[82]   Detailed instructions concerning all of these other response activities were contained in daily Incident Action Plans, which were reviewed, signed, and approved by the FOSC and/or the FOSC's representative(s) and then

---

[79] *See* Joint SUMF ¶ 83.

[80] *See* Joint SUMF ¶ 84.   After Addendum 3 was issued on May 26, 2010, "daily consultation with the EPA, via a senior representative at the UAC, was part of the required process" for the FOSC's approval of dispersant use.   *See* Joint SUMF ¶ 85.

[81] *See* Joint SUMF ¶ 86.

[82] *See* Joint SUMF ¶ 52.

delivered to the ICPs for execution.[83]   As set forth in the Clean-Up Responder Defendants'

individual submissions, the Clean-Up Responder Defendants did not conduct any of these other

operations without the approval or direction of the United States government, and never violated

or exceeded the government's instructions and authorizations.

## V.      HEALTH AND SAFETY

Throughout the course of the DEEPWATER HORIZON response, the FOSC had the

"ultimate responsibility for . . . addressing worker health and safety concerns."[84]   The NCP also

dictates, however, that all oil spill response actions comply with the U.S. Occupational Safety

and Health Administration's ("OSHA") Hazardous Waste Operations and Emergency Response

("HAZWOPER") Standard, 29 C.F.R. § 1910.120, as well as other relevant OSHA

requirements.[85]   Accordingly, OSHA personnel were "quickly deployed" and "fully integrated"

into the ICS in order to provide "technical assistance and support to the FOSC."[86]

OSHA and FOSC oversight of worker safety and health standards during the

DEEPWATER HORIZON response was memorialized in a Memorandum of Understanding in

which both entities agreed to "establish procedures for consultation and coordination . . . with

respect to matters affecting the occupational safety and health of workers involved in the

response to the Deepwater Horizon oil spill."[87]   By way of example, OSHA provided support to

the FOSC by reviewing training programs for incoming clean-up workers, helping to determine

the appropriate level of personal protective equipment ("PPE") to be worn by clean-up workers,

---

[83] *See* Joint SUMF ¶ 53.

[84] *See* Joint SUMF ¶ 87.  The FOSC exercised this responsibility primarily by approving daily Incident Action Plans, which contained detailed health and safety instructions to be adhered to during the response activities that were to occur each day.  *See* Joint SUMF ¶ 53.

[85] *See* Joint SUMF ¶ 88.

[86] *See* Joint SUMF ¶ 89.

[87] *See* Joint SUMF ¶ 90.

preparing safety and health-related guidance materials for print and electronic distribution, and engaging in daily site visits all over the Gulf Coast.[88]

In addition, throughout the course of the DEEPWATER HORIZON response, OSHA, the National Institute of Occupational Safety and Heath ("NIOSH"), EPA, NOAA, and other governmental agencies monitored daily air sample results/reports to ensure that clean-up workers were not exposed to harmful conditions.[89]  Air monitoring data collected by these government agencies confirmed that exposure levels for toxic chemicals were generally not high enough to necessitate the use of respirators by clean-up workers.[90]  Indeed, the UAC's "Respiratory Protection" policy for the clean-up efforts was based on these air sampling results and provided that respirators were generally not required for response operations.[91]  The UAC concluded that "[e]xtensive air sampling data do not indicate the need for respirator use."[92]  In forming its respiratory protection policy, the UAC recognized that the "use of respirators places an additional load on the respiratory system and would lead to increased vulnerability to heat-related illnesses."[93]  OSHA agreed that "respirators should be considered the protection of last resort, as they can be physically taxing on the body, particularly for workers who have not used them before and in conditions of extreme heat."[94]

With respect to dispersants, the EPA conducted its own testing during the DEEPWATER HORIZON response.  Results from Phase I of that testing were released on June 30, 2010 and

---

[88] *See* Joint SUMF ¶ 91.

[89] *See* Joint SUMF ¶ 92.

[90] *See* Joint SUMF ¶ 93.

[91] *See* Joint SUMF ¶ 94.

[92] *See* Joint SUMF ¶ 95.

[93] *See* Joint SUMF ¶ 96.

[94] *See* Joint SUMF ¶ 97.

showed that none of the dispersants tested—including Corexit—displayed biologically significant endocrine disrupting activity.[95]  Results from Phase II of the EPA's testing were released on August 2, 2010 and showed that the dispersants tested had similar toxicities when mixed with Louisiana Sweet Crude Oil.[96]  Thus, the EPA concluded that the dispersants used in response to the DEEPWATER HORIZON oil spill, when mixed with oil, were "generally no more or less toxic than mixtures with other available alternatives."[97]  The EPA's results were peer reviewed and eventually published in independent scientific journals.[98]  Moreover, testing by the Operational Science Advisory Team ("OSAT")—chartered by the FOSC on August 18, 2010—found that any measure of dispersant chemical compounds in the water or sediment near the coasts or wetlands in the Gulf of Mexico did not exceed the EPA's own benchmarks for increased risk and, in fact, in many of the collected samples there were no detectable dispersant compounds at all.[99]

## ARGUMENT

Federal Rule of Civil Procedure 56 provides that summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A party moving for summary judgment "must demonstrate the absence of a genuine issue of material fact, but need not *negate* the elements of the nonmovant's case."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v.*

---

[95] *See* Joint SUMF ¶ 98.

[96] *See* Joint SUMF ¶ 99.

[97] *See* Joint SUMF ¶ 100.

[98] *See* Joint SUMF ¶ 101.  Screening by the EPA also found that the potential dioxin exposure levels for clean-up workers and surrounding residents at risk of inhalation exposure or for anyone ingesting fish from waters near the spill were no greater than the risks of dioxin exposure incurred by the general population, despite the fact that the testing aimed to "overestimate the exposure and risks that could reasonably be expected to occur in the impacted populations."  *See* Joint SUMF ¶ 102.

[99] *See* Joint SUMF ¶ 103.

*Catrett*, 477 U.S. 317, 323-25 (1986)).  "Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). "[Courts] do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  *Badon v. R J R Nabisco Inc*., 224 F.3d 382, 394 (5th Cir. 2000) (quoting *Little*, 37 F.3d at 1075).  The nonmoving party's burden is not satisfied by creating some metaphysical doubt as to the material facts, or by submitting "conclusory allegations, speculation, [or] unsubstantiated assertions."  *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

The indisputable evidence developed during the Court-ordered limited B3 discovery period has confirmed that the Federal On-Scene Coordinator and/or the National Incident Commander and their respective representatives authorized, directed, and ultimately controlled all of the Clean-Up Responder Defendants' activities challenged by the B3 Bundle Master Complaint, as was required by the CWA, OPA, and the NCP for a spill of the magnitude of the DEEPWATER HORIZON spill.  As a result, the Clean-Up Responder Defendants are entitled to summary judgment because they have derivative CWA immunity for such activities. Alternatively, the Clean-Up Responder Defendants are also entitled to summary judgment because they have derivative discretionary function immunity under the Federal Tort Claims Act and/or because the remaining claims in the B3 Bundle Master Complaint are barred by the doctrine of implied conflict preemption.

## I.   THE CLEAN-UP RESPONDER DEFENDANTS HAVE DERIVATIVE CLEAN WATER ACT IMMUNITY

Because the limited B3 discovery has confirmed that the Clean-Up Responder Defendants performed the actions that are the subject of the B3 Bundle Master Complaint

pursuant to the authorization, direction, and ultimate control of the federal government, the Clean-Up Responder Defendants must share in the federal government's broad immunity for such actions under the CWA.  *See* 33 U.S.C. § 1321(j)(8) ("The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section.").  Indeed, the CWA provides absolute immunity to the federal government in connection with oil spill response efforts and, to protect the unique federal interests over this area of significant national concern, the Clean-Up Responder Defendants must share in such immunity.[100]  Consequently, this Court should grant summary judgment to the Clean-Up Responder Defendants and dismiss all remaining claims against them in the B3 Bundle Master Complaint with prejudice.

Over seventy years ago, the United States Supreme Court established the concept of derivative immunity for parties acting under the direction and control of the federal government in the exercise of legitimate federal authority.  *See Yearsley v. W.A. Ross Constr.*, 309 U.S. 18 (1940).  The purpose of such derivative immunity is not to protect private parties *per se*, but "solely as a means of protecting the government's discretionary authority over areas of significant federal interest."  *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 89-90 (2d Cir. 2008); *see also Kadan v. Am. Contractors Ins. Co.*, No. 08-695, 2008 WL 5137259, at *2 (E.D. La. Dec. 5, 2008) (explaining that such immunity is "necessary to preserve a uniquely federal interest") (internal quotations omitted).

In holding that derivative immunity was available for actions taken by private parties in response to the 9/11 terrorist attacks on the World Trade Center, the United States Court of

---

[100] During the November 18, 2011 monthly status conference, in orally explaining its reasons for granting a motion by the United States to dismiss Transocean's claims against the United States, the Court reiterated that the United States has immunity from claims "based on response activities" under 33 U.S.C. § 1321(j)(8).  *See* Nov. 18, 2011 Transcript at 56 (Rec. Doc. 4786).

Appeals for the Second Circuit held that this rationale "would extend to the disaster relief context due to the unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects." *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008). Although the Second Circuit recognized derivative immunity under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, which was invoked in response to the terrorist attacks (just as it was in response to Hurricane Katrina), the court's reasoning applies with even greater force in this case.[101] The federal government plays a fundamentally different role when responding to an oil spill disaster under the CWA and NCP than it does when it responds to a disaster under the Stafford Act: "Emergencies that fall under the Stafford Act give state and local governments a lead role in organizing [the] response, paid largely, but not entirely, by the federal government. The NCP that governs oil spill response, however, gives the federal government [the] lead, impacted states a role in the [U]nified [C]ommand, and the Responsible Party (RP) a role in cleaning up the spill in terms of funding and participation in the [U]nified [C]ommand."[102] Indeed, pursuant to the NCP, the FOSC is to serve as "the lead federal official for oil removal and response operations" and is "responsible for directing and coordinating actions to remove the oil from the environment."[103] Thus, unlike the "state-centric response organization . . . outlined under the Stafford Act," an NCP response places the federal government in charge, with "[t]he FOSC

---

[101] However, as described below, the ultimate "test" adopted by the Second Circuit in evaluating immunity under the Stafford Act—which contains a discretionary function exception like the FTCA—does not govern this Court's analysis of derivative CWA immunity given the broad grant of immunity in the CWA.

[102] *See* Joint SUMF ¶ 104; *see also* Joint SUMF ¶ 105 ("The role of the federal government is different in an NCP response compared to [a National Response Framework] response [under the Stafford Act]. In the latter, the federal government supports state and local activities. In an NCP response, the federal government acts as the first responder.").

[103] *See* Joint SUMF ¶ 106.

serv[ing] as the Unified Area Commander in accordance with established incident command doctrine."[104]   As a result, the need for derivative immunity is even more compelling here than it was in the 9/11 litigation.[105]

Private entities such as the Clean-Up Responder Defendants are entitled to derivative federal immunity when they perform work pursuant to the authorization and direction of the federal government and the acts of which plaintiffs complain fall within the scope of those government directives.   *See Yearsley*, 309 U.S. at 20-21.   In other words, if the federal government "validly conferred" authority upon the Clean-Up Responder Defendants, and the Clean-Up Responder Defendants did not exceed that authority, then they are entitled to derivative immunity. *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 206-07 (5th Cir. 2009).[106]

Unlike the federal government's discretionary function immunity under the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and the Stafford Act, 42 U.S.C. § 5148, the CWA provides

---

[104] *See* Joint SUMF ¶ 107.

[105] The Court has already held that the absence of any contractual relationship between the Clean-Up Responder Defendants and the government is immaterial for purposes of derivative CWA immunity. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2011 WL 4575696, at *6-7 (E.D. La. 2011) (holding that "the rationale underlying derivative immunity does not suggest that only government contractors are entitled to it").

[106] In a footnote of the Court's Order and Reasons resolving the Clean-Up Responder Defendants' motions to dismiss the B3 Bundle Master Complaint, the Court noted that it was not addressing "whether the scope of the Defendant's immunity derived from the CWA is equal to the government's immunity under the CWA." *In re Oil Spill*, 2011 WL 4575696, at *7 n.12.   As an initial matter, "courts define the scope of sovereign immunity by the nature of the function being performed - not by the office or the position of the particular [party] involved." *Butters v. Vance Int'l*, 225 F.3d 462, 466 (4th Cir. 2000) (explaining the rationale behind extending immunity under the Foreign Sovereign Immunities Act beyond government actors to private agents of foreign governments).   Indeed, the Clean-Up Responder Defendants are aware of no cases suggesting that the scope of a private entity's derivative immunity can ever be less than the government's immunity for a given action, assuming of course that the private entity is found to be entitled to derive immunity in the first place pursuant to the principles of *Yearsely* set forth above.   Here, there is no doubt that the United States would be immune if Coast Guard or military personnel had been solely responsible for executing the FOSC's clean-up related orders and directives during the DEEPWATER HORIZON response; thus, because the elements of *Yearsley* are satisfied, the Clean-Up Responder Defendants must also be immune for assisting with the execution of the FOSC's clean-up related orders and directives.

absolute immunity to the federal government in connection with oil spill response efforts: "The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section." 33 U.S.C. § 1321(j)(8). Accordingly, the three-part test established in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), which is designed to "locate the exercise of discretion in the government" to determine whether, as an initial matter, the government enjoys immunity under the "discretionary function" exception, *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1481 (5th Cir. 1989), has no applicability in the context of derivative immunity under the CWA. *See Ackerson*, 589 F.3d at 205 ("The application of the contractor defense in the context of military-equipment manufacturers is an area of law that has since been arguably distinguished . . . in [*Boyle*] and its progeny . . . from the general *Yearsley* defense."); *In re KBR, Inc., Burn Pit Litig.*, 736 F. Supp. 2d 954, 965-66 & n.7 (D. Md. 2010) (distinguishing the "derivative sovereign immunity" of *Yearsley* from the "preemption-based government contractor defense embraced in *Boyle*"). Thus, this Court was correct in stating that "[i]t appears that *Yearsley* might apply when 'discretion' is not at issue." *In re Oil Spill*, 2011 WL 4575696, at *4 (noting that *Ackerson* "made clear that *Yearsley* is still good law").

### A.     Authority Was Validly Conferred By The Federal Government

There can be no doubt that the federal government was exercising legitimate authority in directing the response to the DEEPWATER HORIZON oil spill. As explained in detail above, the CWA, as amended by OPA, reflects the intent of Congress to ensure a rapid response to oil spills and to vest decision-making authority over response efforts in the federal government. In the event of an oil spill, the CWA provides that "[t]he President *shall*, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and

immediate removal of a discharge . . . of oil . . . into or on the navigable waters." 33 U.S.C. § 1321(c)(1)(A) (emphasis added). To this end, the CWA requires the pre-designation of a federal official for each of various geographical regions "who shall be the Federal On-Scene Coordinator" for those regions in the event of a spill. 33 U.S.C. § 1321(d)(2)(K). Moreover, when a discharge (or substantial threat of discharge) of oil "is of such a size or character as to be a substantial threat to the public health or welfare of the United States," as was the DEEPWATER HORIZON spill, the CWA provides that the FOSC "shall" direct all federal, state, and private actions to remove the discharge (or mitigate or prevent the threat of the discharge). 33 U.S.C. § 1321(c)(2)(A); *see also* 40 C.F.R. § 300.322(b); 40 C.F.R. § 300.120; 40 C.F.R. § 300.135. This mandatory provision ensures that there will be no confusion as to who is in charge in the event of such a significant spill. Consistent with this requirement, it is undisputed that the FOSC took charge and directed all response actions relating to the DEEPWATER HORIZON incident.

Indeed, in accordance with these statutory and regulatory mandates, in responding to the DEEPWATER HORIZON spill, the federal government did not assume a passive role and simply monitor the Clean-Up Responder Defendants' actions. To the contrary, federal officials from the FOSC on down were—unlike in *Yearsley*—present in the Gulf region performing the federal government's lead role by actively directing, controlling, managing, and coordinating all aspects of the response in real time and deciding how best to conduct the containment and clean-up efforts. For example, two of the most senior BP employees holding positions within the Unified Command testified as follows:

- <u>Mr. Doug Suttles</u>: "[T]he structure for Unified Command is set out – I believe it's set out in the National Contingency Plan and through ICS is that the FOSC has the ultimate authority. So it's a – Unified Command structure has the key stakeholders. Those are set out in the plan. And it – it tries to

achieve consensus, but the ultimate decision rights are with the FOSC, which was a Coast Guard admiral. . . .   [T]he phrase being used consistently throughout the response was the FOSC has 51 percent of the vote.  We could not take action in the response without the approval of the FOSC. . . .   We could only use dispersants with the approval of the – of the FOSC and the Government."[107]

- Mr. Richard Morrison:  "We tried to collaborate clearly and . . . make joint decisions based on good data.  But if – if there was ever a conflict or if there was ever a disagreement on . . . Option A or Option B, the Federal On-Scene Commander had the final word."[108]

The availability of derivative immunity in this case is reinforced by Congress' desire, reflected in the CWA and OPA, to promote effective and efficient responses to oil spills.  In order for the federal government to achieve these dual goals, private parties that are called upon to implement the directives of the FOSC and/or NIC should not have to evaluate whether it is worth the risk of being subjected to litigation before deciding to faithfully execute such federal directives.  Indeed, denying derivative immunity to entities such as the Clean-Up Responder Defendants in the context of a Spill of National Significance risks undermining the entire federal response structure set forth in the CWA, OPA, and the NCP.

### B.   Clean-Up Responder Defendants Did Not Exceed Their Authority

As set forth in each of the Clean-Up Responder Defendants' separate individual filings, the indisputable evidence shows that, in performing their functions and assisting with the clean up of the DEEPWATER HORIZON oil spill, the Clean-Up Responder Defendants acted pursuant to the authorization, direction, and ultimate control of the federal government and did not exceed or disobey the government's directives.  This is true with respect to dispersant operations, *in-situ* burning of oil, skimming of oil, beach clean-up efforts, and the decontamination of vessels that are the subject of the B3-related claims.

---

[107] *See* Joint SUMF ¶ 108.

[108] *See* Joint SUMF ¶ 109.

In short, the federal government enjoys broad immunity under the CWA for its actions or omissions relating to its response to the DEEPWATER HORIZON spill, regardless of whether or not those actions or omissions were discretionary.  Thus, because the federal government validly conferred authority upon the Clean-Up Responder Defendants and the Clean-Up Responder Defendants did not exceed that authority, the Clean-Up Responder Defendants are entitled to summary judgment dismissing the remaining claims against them in the B3 Bundle Master Complaint because they share derivatively in the federal government's absolute immunity under the CWA.  *See Yearsley*, 309 U.S. at 20-21; *Ackerson*, 589 F.3d at 206-07.

## II.   ALTERNATIVELY, THE CLEAN-UP RESPONDER DEFENDANTS HAVE DERIVATIVE DISCRETIONARY FUNCTION IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT

For essentially the same reasons, though the Court need not reach the issue, the Clean-Up Responder Defendants are also entitled to derivative discretionary function immunity under the Federal Tort Claims Act ("FTCA").  *See* 28 U.S.C. § 2680(a) (barring claims against the federal government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"); *Hix v. U.S. Army Corps of Eng'rs*, 155 Fed. App'x 121, 125 (5th Cir. 2005) (recognizing that discretionary function immunity "also extends to contractors who work to implement programs as agents of the federal government").

As an initial matter, there can be no doubt that employees and/or agencies of the federal government would enjoy discretionary function immunity for their actions in responding to the DEEPWATER HORIZON oil spill.  First, the decisions made by the FOSC and NIC concerning the manner in which the clean-up operations would be conducted clearly "involve[d] an element of judgment or choice."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  Second, as

illustrated by the government's decision to use dispersants, *in-situ* burning, and other response methods, those decisions were "based on considerations of public policy."   *Id.* at 537.   For example, the federal government's "decision to use dispersants required a robust assessment of net environmental benefits and monitoring activities at the wellhead, in the benthos, water column, water surface, and along the shoreline," and a "trade-off analysis determined the appropriateness of dispersant use."[109]

These are precisely the types of governmental decisions that discretionary function immunity is designed to insulate from judicial review:   "The basis for the discretionary function exception was Congress' desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'"   *Id.* at 536-37 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)); *see also Myslakowski v. United States*, 806 F.2d 94, 97 (6th Cir. 1986) ("[E]ven the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made.").

A United States District Court in Tennessee recently addressed this very issue in consolidated litigation arising from, oddly enough, a "blowout" in a coal ash "containment dike" that allowed "approximately 5.4 million cubic yards of coal ash sludge" to spill into adjacent properties. *See Chesney v. Tennessee Valley Auth.*, 782 F. Supp. 2d 570 (E.D. Tenn. 2011).   In a prior opinion, the court there had concluded that the Tennessee Valley Authority ("TVA") was entitled to discretionary function immunity for certain of the plaintiffs' claims.   *See Mays v. Tennessee Valley Auth.*, 699 F. Supp. 2d 991 (E.D. Tenn. 2010).   Subsequently, two professional engineering contractors that had been involved with the drainage system at issue filed a motion

---

[109] *See* Joint SUMF ¶ 110.

arguing that they were entitled to share derivatively in the TVA's discretionary function immunity.  In a well-reasoned decision, the district court agreed.

The *Chesney* court began its analysis by noting that the general principles of *Yearsley* governed the issue of the private entities' entitlement to derivative discretionary function immunity—and that *Boyle* did not apply.  *Chesney*, 782. F. Supp. 2d at 581-82 ("[B]ecause the issues implicated by public works projects are different than the issues implicated by a product or item designed by the government and manufactured by independent contractors, *Yearsley* and *Boyle* necessitate different approaches to contractor immunity, despite the shared federal interests.").  The court then proceeded to apply *Yearsley*'s two-part test to determine whether the defendants were entitled to share derivatively in the TVA's discretionary function immunity— namely, whether the TVA's authority was validly conferred and whether the defendants exceeded that authority.  *Id.* at 582 (noting that the "key premise" of *Yearsley* is whether the defendant "was following the sovereign's directives").[110]

Thus, once the Court determines that the government would be entitled to discretionary function immunity for its actions in connection with the response to the DEEPWATER HORIZON spill—which, as explained above, it clearly would be—the derivative immunity analysis under the FTCA is governed by *Yearsley*.  And, it is indisputable that the federal government validly conferred authority upon the Clean-Up Responder Defendants during the response and that the Clean-Up Responder Defendants did not exceed that authority.

---

[110] In this regard, the Second Circuit went astray in using a modified *Boyle*-type test to determine whether private entities were entitled to derivative discretionary function immunity under the Stafford Act in connection with their work at the World Trade Center site.  *See In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008) (holding that derivative discretionary function immunity is available in the emergency-response context where "(1) the agency, in its discretion, approved reasonably precise specifications regarding the management of a recovery site; (2) the agency supervised and controlled an entity charged with implementing those specifications; and (3) the entity warned the agency about any dangers known to it but not to the agency").  Although this alternative test would still be satisfied in this case, as noted above, *Boyle* has no application in this context.

Accordingly, the Clean-Up Responder Defendants should also be granted summary judgment because they have derivative discretionary function immunity under the FTCA.

## III.   ALTERNATIVELY, THE CLAIMS AGAINST THE CLEAN-UP RESPONDER DEFENDANTS IN THE B3 BUNDLE MASTER COMPLAINT ARE PREEMPTED

Although the Court need not reach this issue to grant the Clean-Up Responder Defendants summary judgment, the remaining claims in the B3 Bundle Master Complaint are also subject to dismissal in accordance with the doctrine of implied conflict preemption under the unique circumstances of this case.  In short, the claims asserted against the Clean-Up Responder Defendants in the B3 Bundle Master Complaint conflict with the comprehensive federal response scheme set forth in the CWA, OPA, and the NCP because the Clean-Up Responder Defendants were compelled by federal law to obey the daily directives issued by the FOSC and/or the FOSC's representative(s) in responding to the DEEPWATER HORIZON spill—the only spill ever to be designated a Spill of National Significance.

Under the Supremacy Clause of the U.S. Constitution, federal law impliedly preempts claims made under state law or the general maritime law when such state or maritime law "conflicts with federal law or its purposes."  *Carden v. Gen. Motors Corp.,* 509 F.3d 227, 230 (5th Cir. 2007) (discussing preemption of state law); *In re Oswego Barge Corp.*, 664 F.2d 327, 337-38 (2d Cir. 1981) ("Though judge-made maritime law has thus been less easily displaced by statutory preemption than non-maritime federal common law, preemption of maritime law has occurred both as to prior judge-made law and the authority to fashion new law.").  Such a conflict exists either "when compliance with both federal and state regulations is a physical impossibility," *Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982), or when a plaintiff's claims "stand[] as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Both circumstances exist in this case.

First, to the extent that the B3 Bundle Master Complaint alleges that the actions of the Clean-Up Responder Defendants in responding to the DEEPWATER HORIZON spill violated state or maritime law, it would have been physically impossible for the Clean-Up Responder Defendants to have complied with such laws without violating the CWA, OPA, and the NCP. *See De la Cuesta*, 458 U.S. at 153.  As explained above, federal law provides that the FOSC "shall direct all federal, state, or private actions to remove the discharge."  40 C.F.R. § 300.322(b).  Moreover, federal law also provides that "[e]ach Federal agency, State, owner or operator, *or other person* participating in [oil spill response] efforts . . . shall act in accordance with the National Contingency Plan or as directed by the President."  33 U.S.C. § 1321(c)(3)(A) (emphasis added).  Thus, federal law imposed a duty on the Clean-Up Responder Defendants to obey the directives of the FOSC, the NIC, and their respective representatives.  If the Clean-Up Responder Defendants had refused to obey such federal directives in order to conform to their purported duties under state or maritime law, they would have been in violation of the CWA, OPA, and the NCP.

Second, the claims against the Clean-Up Responder Defendants in the B3 Bundle Master Complaint  "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in promoting an effective and efficient federal response to significant oil spills.  *Hines*, 312 U.S. at 67.  Indeed, the B3 Bundle Master Complaint seeks to substitute the decision of this Court about appropriate response activities for the expert judgment of the Coast Guard and the other federal agencies that authorized, directed, and controlled the actions of the Clean-Up Responder Defendants in responding to the DEEPWATER HORIZON spill.  As

described in detail above, the CWA, OPA, and the NCP set forth a comprehensive regime which squarely placed the responsibility for the clean-up effort upon the federal government.   By second-guessing the federal government's decisions and careful balancing of the public interest in responding to the DEEPWATER HORIZON spill, the claims asserted against the Clean-Up Responder Defendants in the B3 Bundle Master Complaint are clear "obstacles" to the purposes and objectives of the CWA, OPA, and the NCP.   Accordingly, the Clean-Up Responders are entitled to summary judgment and such claims should be dismissed pursuant to the doctrine of implied conflict preemption.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the Clean-Up Responder Defendants' individual submissions, the Clean-Up Responder Defendants respectfully request that they be granted summary judgment such that the remaining claims against them in the B3 Bundle Master Complaint be dismissed with prejudice.

Dated: May 18, 2012


 /s/ Michael J. Lyle
Michael J. Lyle (DC #475078, IL #6199227)
Eric C. Lyttle (DC #482856)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 682-7157
Facsimile: (202) 857-0940


Theodore E. Tsekerides (NY #2609642)
Jeremy T. Grabill (NY #4501755)
Sylvia E. Simson (NY #4803342)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8218
Facsimile: (212) 310-8007


Patrick E. O'Keefe (LA Bar #10186)
Philip S. Brooks, Jr. (LA Bar #21501)
MONTGOMERY, BARNETT, BROWN, REED,
      HAMMOND & MINTZ LLP
3300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3300
Telephone: (504) 585-3200
Facsimile: (504) 585-7688

Attorneys for O'BRIEN'S RESPONSE
MANAGEMENT INC. and NATIONAL
RESPONSE CORPORATION


 /s/ Alan M. Weigel
Alan M. Weigel, Esq.
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone: 212-885-5000
Facsimile: 917-332-3836
E-mail: aweigel@blankrome.com

Attorneys for MARINE SPILL
RESPONSE CORPORATION


 /s/ Leo R. McAloon, III
Leo R. McAloon, III (No. 19044)
E-mail: lmcaloon@glllaw.com
Michael D. Cangelosi (No. 30427)
E-mail: mcangelosi@glllaw.com
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011

Attorneys for DYNAMIC AVIATION
GROUP, INC.


 /s/ Kevin R. Tully
Kevin R. Tully - #1627
H. Carter Marshall - #28136
Gregory S. LaCour - #23823
CHRISTOVICH & KEARNEY, LLP
601 Poydras Street, Suite 2300
New Orleans, Louisiana 70130-6078
Telephone: (504) 561-5700
E-mail: krtully@christovich.com
E-mail: hcmarshall@christovich.com

Attorneys for INTERNATIONAL
AIR RESPONSE, INC. and
LYNDEN INCORPORATED

 /s/ Ben L. Mayeaux
Frank X. Neuner, Jr. (#7674)
Ben L. Mayeaux (#19041)
Jed M. Mestayer (#29345)
LABORDE & NEUNER
One Petroleum Center, Suite 200
1001 W. Pinhook Rd.
Lafayette, Louisiana 70503
Telephone: (337) 237-7000

Attorneys for AIRBORNE SUPPORT, INC. and
AIRBORNE SUPPORT INTERNATIONAL, INC.


 /s/ George E. Crow
George E. Crow
LAW OFFICE OF GEORGE E. CROW
P.O. Box 30
Katy, TX 77492
For Overnight Physical Delivery use
1519 Miller Avenue
Katy, TX 77493
Telephone: (281) 391-9275
E-mail: georgecrow@earthlink.net

Attorney for LANE AVIATION, INC.


 /s/ John E. Galloway
John E. Galloway (#5892)
Cherrell R. Simms (#28227)
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
701 Poydras Street, Suite 4040
New Orleans, Louisiana 70139
Telephone: (504) 525-6802
Facsimile: (504) 525-2456

Attorneys for TIGER RENTALS, LTD.,
THE MODERN GROUP, LTD., and
THE MODERN GROUP GP-SUB, INC.


 /s/ Harold J. Flanagan
Harold J. Flanagan (Bar No. 24091)
Stephen M. Pesce (Bar No. 29380)
Brandon C. Briscoe (Bar No. 29542)
Sean P. Brady (Bar No. 30410)
Andy Dupre (Bar No. 32437)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 2405
New Orleans, Louisiana 70170
Telephone: 504-569-0235
Facsimile: 504-592-0251
hflanagan@flanaganpartners.com
spesce@flanaganpartners.com
sbrady@flanaganpartners.com
adupre@flanaganpartners.com

Attorneys for DRC EMERGENCY SERVICES, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Clean-Up Responder Defendants' Joint Memorandum in Support of Their Individual Motions for Summary Judgment on Derivative Immunity and Preemption Grounds has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of May, 2012.

/s/ Michael J. Lyle
Michael J. Lyle