# EXHIBIT 4

# BP DEEPWATER HORIZON OIL SPILL

## Incident Specific Preparedness Review (ISPR)






## FINAL REPORT
## January 2011

# PREFACE

On the evening of April 20, 2010, an explosion aboard the Mobile Offshore Drilling Unit Deepwater Horizon set off a chain of events that led to the sinking of the drilling unit and subsequent oil spill. On April 29, 2010, the Secretary of Homeland Security declared the Deepwater Horizon incident a Spill of National Significance (SONS) under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan (NCP) (40 CFR 300.323).

Due to the severity of the spill, the complexity of response efforts, and the potential impact on public health and the environment, this incident required extraordinary coordination among Federal and State agencies, tribal organizations, local governments, and BP, the responsible party. The response was a coordinated effort to secure the well, and contain and clean up the oil. A day after the declaration of the incident as a SONS, Admiral Thad Allen, United States Coast Guard, was designated as the National Incident Commander.

After several attempts, BP was successful in securing the wellhead on July 15, 2010, and sealing the well on September 19, 2010. This incident tested, and in some cases exceeded, the limits of the Nation's oil spill response resources and capabilities developed after the 1989 Exxon Valdez oil spill in Alaska. The scope and duration of the Deepwater Horizon oil spill presented complex challenges to the response community. These challenges provided the catalyst to adapt proven technologies, employ new or innovative technologies, and apply ever-changing response tactics to address a dynamic response environment.

The event provided an excellent opportunity to evaluate the effectiveness of existing oil spill response doctrine, capabilities, and the Nation's state of preparedness in responding to a very large oil spill. It forced the formation of new partnerships, which proved to be essential in collectively responding to a continuing, uncontrolled event. It showed the importance of communication to garner the public's trust. There were many lessons learned from Deepwater Horizon response, which, if institutionalized in program and doctrine, will serve to enhance the Nation's ability to effectively respond to such incidents.

Periodically, the Coast Guard conducts comprehensive reviews to capture lessons learned from major spill response events. The Coast Guard Marine Safety Manual prescribes a process for such review, known as the Incident Specific Preparedness Review (ISPR).[1]

This is the Incident Specific Preparedness Review for the response to the BP Deepwater Horizon oil spill. This report was chartered by the Coast Guard Commandant on June 14, 2010.[2] The Charter provided direction for ISPR team membership, scope of the review, and reporting deadlines. The purpose of this report is to examine the implementation and effectiveness of the preparedness and response to the BP Deepwater Horizon incident as it related to the National Contingency Plan, Area Contingency Plans, and other oil spill response plans.

---

[1] U.S. Coast Guard Marine Safety Manual, COMDTINST M16000.14 (series), Section 4.c
[2] Appendix III: ISPR Charter signed June 14, 2010

HCG042-014787

The ISPR Team is comprised of Federal and State Government representatives. Representatives from the non-governmental organization community, oil exploration and production industry, and the professional oil spill response industry served as technical advisors. This report does not represent the views of any individual or entity other than the ISPR Team.[3]

This report addresses specific areas of the response to the Deepwater Horizon oil spill. It is divided into three main chapters: Planning and Plan Execution, Organization, and Resources and Readiness, with each chapter encompassing several focus areas. Each focus area provides a list of lessons learned and recommendations. This report does not address the causal factors leading up to the explosion and sinking of the Deepwater Horizon, nor does it include topics being addressed by other Federal investigations.

Members of the ISPR Team conducted joint interviews and independent research. Coupled with their professional experience and knowledge of response activities, this report draws upon the members' understanding of the information available to the ISPR Team during the research and fact-finding phase of the review. At times, the information available and relayed to the team was contradictory, unclear, or uncorroborated. The team did not seek to make credibility determinations in such cases, but used best judgment to reconcile those differences.

The ISPR Team, advisors, and support staff were also required to execute a confidentiality agreement. Neither the ISPR Team nor its support staff recorded or produced verbatim transcripts of any interviews, and no deliberations were made available to the U.S. Coast Guard or anyone outside the ISPR Team or support staff prior to the release of this report.

On May 22, 2010, the President, by Executive Order, established the National Commission on the BP Oil Spill and Offshore Drilling. The ISPR Charter required the Chairman to, "…align, facilitate and regularly brief ISPR efforts" to the National Commission. Throughout the ISPR process, National Commission staff participated in interviews and research consistent with this directive. However, National Commission representatives were not part of the ISPR deliberative process.

Finally, readers are cautioned not to use this report beyond the objectives set forth in the Marine Safety Manual.[4] Specifically, the ISPR is not intended to find fault or assign blame. The observations and discussions are meant to document a thorough assessment of the Coast Guard's preparedness process, while the lessons learned and recommendations should be used to initiate appropriate corrective actions.

---

[3] See Appendix IV: ISPR Team Biographies
[4] U.S. Coast Guard Marine Safety Manual, COMDTINST M16000.14 (series), Section 4.c

HCG042-014788

# EXECUTIVE SUMMARY

For the nation, the Deepwater Horizon oil well blowout and release was unprecedented in scope, scale, and duration. While the response system established by the Oil Pollution Act of 1990 (OPA 90) has effectively dealt with approximately 1,500 oil spill incidents per year since its enactment, this incident exposed deficiencies in planning and preparedness for an uncontrolled release of oil from an offshore drilling operation. The incident also highlighted the differences between the system of response for oil spills and that provided for other emergencies such as natural disasters and terrorist incidents.

Over the past decade, both public and private sector investment in planning and preparedness for and response to oil spills has decreased. If the public and Congress expect significant improvements in this Nation's ability to respond to catastrophic oil spills, additional funding will be needed for improvements, which include research and development and increased governmental oversight of private sector preparedness and response capability. To be effective, such oversight should begin at the outset of the offshore drilling permit process. This report urges that planning and preparedness programs be reviewed, and that adequate funding be provided to enhance oil spill preparedness and response programs so they can effectively address an offshore Spill of National Significance.

Additionally, the report recommends a thorough review of the standards used to determine the adequacy of private sector oil spill response capability. Although the approved response plan for the Macondo well was in compliance with Government standards for response capability to address a worst case discharge (WCD), there is a critical need to ensure that oil and gas facility response plans (OSRPs) and existing Area Contingency Plans provide for sufficient trained personnel, equipment, and response resources to address the WCD from any offshore drilling operation.

Beyond the need for sufficient resources for on-water response and shoreline protection, it is evident that more resources need to be dedicated to improve technology and response protocols to adequately address source control and containment objectives arising from an uncontrolled well blowout.

The Deepwater Horizon incident severely tested the Nation's response capability to address an uncontrolled, sustained, deepwater oil spill in the Gulf of Mexico. This report identifies aspects of the response that failed, aspects that did not proceed as previously planned, and areas where new or different response protocols may have provided better results. Through identification of these areas, the Coast Guard, and the entire response community, will be better equipped to address and implement change to improve the Nation's oil spill response capability.

During the field research phase of this report process, the team observed many facets of the response that did work as planned, produced expected results, and were evidence of experience drawn from prior events and exercises.

HCG042-014789

There are three major areas of positive observations that merit mention:

Many of those interviewed specifically stated that the National Incident Management System/Incident Command System (ICS) worked as intended. Because NIMS/ICS is scalable, adaptive, and dynamic, responders were able to tailor the response organization according to need. The ICS organization experienced numerous challenges, such as external communications taking place outside of the ICS hierarchy, and political pressure applied to various levels of the respond organization. Nonetheless, the ICS organization worked well during this event. Recommendations provided in this report relating to NIMS/ICS serve to further enhance its use in future spills.

Media reports often left viewers with the impression that the Coast Guard and the responsible party (RP) were at odds periodically during the response. To the contrary, the team observed that personnel provided by the RP and Coast Guard personnel worked effectively together, and that there was "unity of effort" throughout the response organization. Moreover, BP has been openly cooperative in assisting the Incident Specific Preparedness Review (ISPR) Team in the research for this report.

Ironically, other media reports left the impression that there was collusion between the Coast Guard and BP, and that the Coast Guard was not fulfilling its responsibility to the public. During its research for this report, the ISPR Team found absolutely no evidence to support this impression.

Lastly, the response generally benefited from the ability of the Government and the private sector to rapidly assess and adapt to new or unusual contingencies and develop innovative solutions for problems not previously experienced. The knowledge acquired and capabilities learned from this experience are unprecedented, and should become a basis for significant improvements in planning, preparedness, and response for industry, Government, and the response community.

HCG042-014790

# GENERAL FINDINGS AND RECOMMENDATIONS

The following are general observations from the findings and recommendations of the Incident Specific Preparedness Review (ISPR) Team. A more detailed discussion of these topics, as well as other topics of a specific nature, can be found in focus areas in the report.

### Planning and Preparedness



It appears that the Coast Guard's marine environmental response (MER) preparedness and response programs have atrophied over the past decade, possibly as a result of competition with program development and resourcing challenges to meet the service's enhanced homeland security responsibilities. Additionally, the move to the Coast Guard's current Sector organization displaced the MER function from the legacy marine safety community into a new response community paired with law enforcement and search and rescue activities. This new construct created the unintended consequence of changing the existing MER community and placed many new people with little or no program experience into MER positions. These organizational shifts may have weakened Coast Guard's planning and preparedness in general, and diverted response capabilities away from MER in favor of other missions at all levels of the organization. The end result has had a negative impact on the MER program.

This erosion of organizational focus on the MER mission has been exacerbated, ironically, by the success of Oil Pollution Act of 1990 (OPA 90) driven prevention programs. Spill prevention initiatives for vessels and offshore facilities have been largely successful, resulting in fewer offshore spills and much less frequency between large spill events. This success has resulted in fewer Coast Guard personnel having large spill experience. This success has also resulted in the perception that fewer resources may accomplish spill prevention and response objectives.

As a result, from an enterprise standpoint, the Coast Guard's current spill response capability appears to be broad, but not deep. Many of the ISPR Team members are veterans of large spill events, and have a historical perspective of oil spill preparedness and response. They universally noted that, while there is intense interest programmatically (and politically) following a large spill event, interest quickly wanes as new challenges arise. The Deepwater Horizon incident has provided a lens to examine the Coast Guard's capabilities and has attested to the service's need to renew its emphasis on oil spill planning, preparedness, and response.

The ISPR report is intended to be part of a corrective process. The Coast Guard needs to reassess its readiness programmatically and reinvest to the extent that MER is, once again, firmly established as one of its core competencies.

### Area Contingency Plans

This report devotes a significant amount of attention to the state of Area Contingency Plans (ACPs) in the Gulf of Mexico. Overall, the team found these plans to be inadequate for this incident, and possibly for smaller, more localized incidents. The Coast Guard needs to provide

---

HCG042-014791

service-wide direction to all Area Committees, develop minimum standards for contingency plans, and establish an oversight, review, and compliance program to ensure that minimum standards and consistency among plans are adequately addressed. It does not appear from research conducted by the team that this can be accomplished solely at the local (Sector) level, and may not be appropriate at the District level. The ACP development process has been ongoing for more than a decade. The team can find no reason to have critical gaps in any ACPs where some sections are noted as "To Be Developed."

In the Gulf of Mexico or anywhere offshore oil production occurs, there must be direct linkage between the Oil Spill Response Plan (OSRP) and local ACPs. The ISPR Team found that not including worst case discharge (WCD) scenarios from offshore oil exploration, development, and production activities in ACPs for areas in which such activities are occurring was unacceptable. Both the Coast Guard and the Bureau of Ocean Energy Management, Regulation and Enforcement must be able to verify that those engaged in such activities have the trained personnel, equipment, and other resources to meet WCD plan requirements.

There are very few programs within the Coast Guard that facilitate direct communication and dialogue with State and local officials. The ACP development process is one of them. As evidenced by the last two major spill events, Cosco Busan and Deepwater Horizon, much of the external political pressure exerted upon the response organization was the direct result of not engaging local officials prior to and during the spill response. In the Deepwater Horizon incident, this was further complicated by a misunderstanding, or lack of knowledge of agencies' responsibilities set forth in the National Contingency Plan (NCP). All of this could have been addressed, and possibly avoided, during the ACP development process. Until the Coast Guard takes proactive measures to bring State and local officials into this process, the Coast Guard should expect to have State and local politicians impacting response operations.

### Environmentally Sensitive Areas

Although several hundred miles of shoreline were impacted, only a small percentage of the Gulf shoreline was heavily oiled. There were, however, numerous instances of oiled wildlife and habitat. Efforts to prevent shoreline impact were, in some instances, successful; other efforts totally failed. Attempts to protect environmentally sensitive areas (ESAs) were complicated by many factors. The NCP directs Area Committees to address ESAs and include booming and protection strategies to address a 
WCD. In some planning areas, the ESAs were simply not identified in any plan. In some plans where the areas were listed, they were not prioritized. In few instances, ESAs did have protection strategies for the areas that were most heavily impacted. The equipment, trained personnel, and other response resources needed to implement the protection strategies were not included in many plans. While many responders stated that impact to wildlife and habitat could have been much worse in the Deepwater Horizon incident, there is a consensus among team members that, had ESAs been given appropriate attention during the planning process, the adverse impacts could have been much less. ESAs have been given uneven, and in some cases, inadequate

HCG042-014792

attention in the ACP development process throughout the Gulf of Mexico. There must be a comprehensive national planning process that identifies ESAs and assures that there are trained personnel, equipment, and strategies adequate to protect these resources. The Coast Guard needs to work with Federal, State, local, tribal, and natural resource trustee stakeholders to select an exemplar among those ACPs that adequately addresses ESAs and make that a benchmark for future planning efforts.

## Alternative Response Technologies

During Deepwater Horizon response operations, the use of two alternative response technologies, dispersants and in situ burning (ISB), proved critical to prevent wholesale impacts to ESAs because the characteristics of the spill were favorable to the use of both technologies. However, important concerns and questions remain about their impacts on the environment, and more research is necessary before bringing them into the mainstream of spill response options.



Dispersants were used extensively during the response in unprecedented volumes (1.84 million gallons). They were applied aerially, by surface vessels, and at the wellhead. Dispersants were also used to control hydrocarbon vapors at the surface above the release site to reduce exposure of responders to hazardous compounds. No dispersant applications were conducted in near shore areas. Although pre-authorization of dispersant use was approved by the Regional Response Team (RRT) and implemented by the Federal On-Scene Coordinator (FOSC), significant public concern was expressed over the volume being used and toxicity of the dispersants, causing EPA to develop protocols for dispersant application and monitoring. While the FOSC always has the authority to approve use of dispersants to protect human life, in this case, to control volatile organic compounds in the source area, EPA intervened to address the volume and toxicity issues, as well as subsea application at the source. This resulted in a temporary suspension of dispersant application, which may have resulted in more oil reaching the coastline. While the issue of subsea application may not have been reasonably foreseen, other issues such as toxicity and volumetric limitations should have been foreseen as part of the National Oceanic and Atmospheric Administration/Environmental Protection Agency preparedness programs, and should have been researched and addressed well before this event. The use of dispersants in the Deepwater Horizon incident identified a need for a thorough review of this response option, its efficacy in minimizing environmental impacts, its overall effect on the environment, and conditions under which they are most effective. Dispersant protocols and authorization procedures should be established and articulated in ACPs, and the degree to which dispersants may be used in ESAs should be addressed.

There were a total of 411 ISBs conducted during the Deepwater Horizon incident, of which 376 were determined to have burned a significant quantity of oil. The longest duration burn lasted for more than 11 hours, and there was some limited night burning. On June 18, a total of 16 ISB operations were conducted, accounting for the removal of approximately 2.5 million gallons. Under the right "windows of opportunity," ISB proved to be an effective way to remove significant volumes of oil, and also to address the continual release of fresh oil from the well.

HCG042-014793

The National Response Team should require that all RRTs establish ISB guidelines as a viable response option in their area of responsibility, consistent with public health and safety issues. These guidelines should specify areas in which ISB cannot be used, where it can be used without further consultations (such as incidents occurring farther than a predetermined distance from the nearest land or other ESAs), and provide for expedited review and approval processes in other areas.

### Effective Daily Recovery Capacity



Effective Daily Recovery Capacity (EDRC) is the planning standard used to determine the rate at which an amount of oil can be recovered by mechanical means, such as skimmers. It is based on the "Name Plate Recovery Rate" of the skimmer de-rated to 20 percent of the maximum. EDRC is discussed in several areas of this report. The EDRC on scene for this incident exceeded plan requirements, yet was seemingly ineffective in recovering the amount of oil anticipated by planners. Skimmers of all types were expected to provide the lion's share of oil recovery, yet mechanical recovery accounted for the removal of only 3 or 4 percent of the released oil. The team believes that EDRC requirements should be revised to include a reliable, dynamic efficiency measure. The simple mathematical EDRC formulas should be changed to accurately reflect the limitations of encountering significant oil volumes on the water (encounter rates), not liquid pumping ability. As is, the regulations and the manner in which they are applied do not necessarily encourage companies to include the most efficient oil spill recovery equipment in response plans. Revised EDRC requirements could serve to incentivize companies and oil spill removal organizations to invest in response research and development, with the goal of developing more efficient skimmers and other recovery equipment.

### Funding

The ISPR Team did not focus specifically on funding during the spill response. However, several recommendations within the report have potentially significant funding implications for both preparedness and response. These include additional funding for research and development, particularly as it relates to enhancing the means of locating, measuring, and removing oil, and alternative response technologies; incentives for local official and non-governmental organization participation in the ACP process; and others. Team members, and many people interviewed as part of the ISPR process cited the need to increase appropriations from the Oil Spill Liability Trust Fund or other sources as a means to enhance these programs. There was general consensus that the system established under OPA 90, where the regulated community is principally responsible for the containment and removal of oil from the water, is sound, and that enhancements to that system need to be undertaken by industry with strong oversight by the Coast Guard. Regardless of the funding source, it is imperative to understand that many of the recommendations provided in this report require additional or new funding. The Deepwater Horizon incident showed the response community and the public that a "business as usual" approach will not carry the day in future spill events; neither will "funding as usual."

HCG042-014794

**National Response Framework**

The National Response Framework (NRF) creates the basis for preparedness for State and local officials in planning for Stafford Act disasters. The NRF does not address an oil spill as an initiating event. Environmental incidents, generally, fall outside the ambit of the National Planning Scenarios. As a result, there was extensive confusion between the NRF and the NCP during this incident at all levels of Government, which had a negative impact on the spill response. The emergency management community, comprised of State and local emergency management officials, was unfamiliar with the NCP generally, and oil spill response specifically. There was a natural inclination for local officials to carry out a Stafford Act response under the NRF because they are familiar with it (commonly used in hurricane events), and there is greater control at the local level. Oil spills are generally handled by a National Incident Management System/Incident Command System response organization where State involvement is accomplished through the designated State On-Scene Coordinator. Historically, there has been little local involvement in preparedness activities or familiarity with oil spill response processes. The Coast Guard developed policy in 2009 addressing "connectivity with the NRF," however there is little indication that the implementation of that policy has been effective.

The Coast Guard should fully implement its policy on connectivity with the NRF, including an expansive outreach program to State and local emergency managers through sector participation with Local Emergency Planning Committees, and District participation with Regional Interagency Steering Committees. There is a need to engage national associations of State and local governments in order to educate and inform them of the NCP and find ways to integrate them into oil spill preparedness efforts and the response organization. The Coast Guard should initiate a review of the NCP and NRF structures and revise as necessary to ensure connectivity during a catastrophic event. This includes better defining the roles of the Secretary of Homeland Security (or designated Principal Federal Official), the White House, and other officials within the Administration.

**Crisis Leadership**



The Deepwater Horizon incident provided a living laboratory for observing crisis leadership at all levels of the response organization, from elected officials and agency representatives to the CEO of a multinational corporation. Due largely to their respective positions, they were forced to address a significant and ongoing crisis. Crisis management experience or proven ability as a crisis leader is generally not a required qualification for elected or appointed political leaders, or even corporate executives. The Deepwater Horizon incident placed people into crisis management roles, and not all were able to demonstrate leadership in crisis as a core competency. The performance of crisis leaders during this incident was uneven at best. In some cases, the leadership exhibited undermined public confidence in Government as well as corporate officials.

HCG042-014795

The National Incident Commander concept worked very well in this incident, and provides a model for selecting individuals with the necessary crisis management skills to lead response efforts and to effectively manage future national incidents.

**Lessons Learned**

The ISPR Team decided to add a focus area to the report that discusses lessons learned categorically. While each focus area has its own Lessons Learned section, there were many on the team who felt a need to look back to prior spill events and exercises to see which lessons learned were, in fact, not really learned prior to the Deepwater Horizon incident. This was also done, to a degree, in Phase Two of the Cosco Busan ISPR report, citing lessons learned (but not institutionalized) from the Cape Mohican spill 11 years earlier. It is evident to the team that many critical lessons learned are not addressed programmatically or implemented effectively and, as such, had little role in enhancing the Coast Guard's planning, preparedness, and response programs. The preeminent objective of conducting reviews of large spill events, and the conduct of large spill exercises, is to provide the Coast Guard with road signs that enable the Coast Guard to alter direction and shorten the travel to the desired destination. The Coast Guard needs to formally address lessons learned, institutionalize them through programmatic changes, and in some cases, through cultural changes. The Coast Guard should draw from lessons learned in this report, and institute an autonomous program, not unlike a private sector quality control program to select, implement, and assess the outcome of lessons learned.

HCG042-014796

# FOCUS AREA PART I:   PLANNING AND PLAN EXECUTION

HCG042-014797

## I.1    AREA COMMITTEE ORGANIZATION AND ACTIVITY

**Observations:**

- One of the lessons learned from the response to the Exxon Valdez oil spill was that there needed to be a mechanism for enhanced oil spill response planning that included all parties that would be involved in a response. To that end, Section 4202 of the Oil Pollution Act of 1990 (OPA 90) amended Subsection (j) of Section 311 of the Federal Water Pollution Control Act (FWPCA) (33 U.S.C. 1321 (j) to address the development of a National Planning and Response System. As part of this  system, Area Committees were established for each area designated by the President. These Area Committees are comprised of qualified personnel from Federal, State, and local agencies and make up a spill preparedness and planning body. Area Committees should also have participation from non-governmental agencies (NGOs), industry representatives, academia, and oil spill removal organizations (OSROs).

- Each Area Committee, under the direction of the Federal On-Scene Coordinator (FOSC) for the area, is responsible for developing an Area Contingency Plan (ACP) which, when implemented in conjunction with the National Oil and Hazardous Substance Pollution Contingency Plan (NCP), shall be adequate to remove a worst case discharge of oil or a hazardous substance, and to mitigate or prevent a substantial threat of such a discharge from a vessel, offshore facility, or onshore facility operation in or near the geographic area.

- Each Area Committee is responsible for working with State and local officials to pre-plan for joint response efforts, including appropriate procedures for mechanical recovery, dispersant use, shoreline cleanup methodologies, identification and protection of environmentally sensitive areas (ESAs), and protection, rescue, and rehabilitation in relation to fisheries and wildlife. The Area Committee is required to work with State and local officials to expedite decisions for the use of dispersants, in situ burning, and other response options.

- The NCP describes the Regional Response Team (RRT) as having responsibility to provide guidance to Area Committees, as appropriate, to ensure inter-area consistency and consistency of individual ACPs with Regional Contingency Plans and the NCP.

**Discussion:**

Area Committees represent the core element of oil spill response planning and preparedness for a region. The individuals who attend an Area Committee meeting have the opportunity to meet in a non-emergency setting and learn how best to respond together in the event of a spill. Attendance at Area Committee meetings gives members and their respective organizations the opportunity to assist in the development of the ACP. They participate in the determination of ESAs, geographic response strategies (booming strategies), mitigation methods, and response priorities. Active participation of dedicated members from the entire spectrum of stakeholders is key to a successful Area Committee.

HCG042-014798

The Deepwater Horizon response mainly affected two Coast Guard Sectors—Sector New Orleans, which encompasses Louisiana and a portion of Mississippi, and Sector Mobile, which encompasses the eastern portion of Mississippi, Alabama, and Northwest Florida.

Prior to the Deepwater Horizon incident, the Sector New Orleans Area Committee was scheduled to meet annually. However, over the past 10 years the Committee only met seven times. The Captain of the Port (COTP) for Sector New Orleans chairs the Area Committee meeting. The charter membership, as listed in the ACP, includes: The Coast Guard, the Environmental Protection Agency (EPA), the U.S. Fish and Wildlife Service (USFWS), the National Oceanic and Atmospheric Agency (NOAA), the Louisiana Department of Environmental Quality, the Louisiana Department of Wildlife and Fisheries, the Louisiana State Police's Environmental Safety Section, the Louisiana Oil Spill Coordinator's Office, Mississippi Office of Pollution Control, Mississippi Bureau of Marine Resources, and Mississippi Emergency Management Agency. The attendance records show that, in addition to the charter members, there was consistent attendance from the former U.S. Mineral Management Service (now the Bureau of Ocean Energy Management, Regulation and Enforcement [BOEMRE]), the petroleum industry, and the OSRO community. There is no indication that representatives from any local government or NGOs were ever present. The most recent version of the ACP for this region is dated August 2009. During the interview process for this report, when local NGOs and local government officials were asked if they were aware of the Area Committee and the ACP process, they stated that they were not aware of this planning body and had never been invited to attend or participate in any way. However, when State and Federal officials were asked the same question, they thought invitations had been sent to local government officials and that no one from the local governments had accepted the invitation and attended. One Sector relied on the State representative to provide local input, if any.

Meeting minutes from the Sector New Orleans Area Committee meetings indicate there were a wide variety of topics covered over time, including: Prioritization of ESAs; Geographic Response Plan (GRP) review; lessons learned from local spill events; environmental sensitivity index updates; review of the One Gulf Plan, and the revision of the NCP. There is no mention of any schedule or testing regime for deployment of resources specified in the ACP.

The COTP for Coast Guard Sector Mobile chairs the Sector Mobile Area Committee. The committee generally meets on an annual basis. The charter membership, as listed in the ACP, includes: Coast Guard Sector Mobile, EPA Region IV, NOAA, the Department of the Interior, National Marine Fisheries Service, USFWS, Mississippi Department of Environmental Quality, Alabama Department of Environmental Management, Florida Department of Environmental Protection, as well as 15 Emergency Management Agencies (EMAs) from Mississippi, Alabama and Florida coastal counties. Local OSROs do participate in Area Committee meetings; however, the county EMAs and local NGOs are not regular participants. This committee experienced different levels of activity during the years leading up to the Deepwater Horizon incident.

Prior to the spill, Sector Mobile's Area Committee was scheduled to meet biannually. When asked, Sector Mobile was unable to produce Area Committee meeting minutes or meeting attendance records. From 2006 to 2008, Coast Guard Sector Mobile, with support from EPA Region IV and the State of Florida, led an aggressive effort to develop a digital oil spill ACP. There were six meetings held in various States within the region, many of them convening over several days, to organize the digital ACP. The agendas for these meetings included discussions of Environmentally Sensitive Index data including: Shoreline habitat, sea grass and wetland data,

HCG042-014799

and sensitive biological resources including endangered and protected species. In addition, environmentally sensitive areas were identified, prioritized, and included in site-specific digital ACP maps. These meetings also included discussions regarding staging areas and boom deployment strategies.

During the Deepwater Horizon incident, there was clear indication from individuals in local government that they were not familiar with oil spill response. Participation in the Area Committee planning process would have allowed local agencies to be much better informed about the process, and their presence would have strengthened the planning and preparedness throughout the Gulf region.

**Lessons Learned:**

- Area Committees need to meet regularly and consistently to ensure that ACPs are up-to-date, complete, and reflect current policy and doctrine.
- The lack of local government participation in Area Committees had a negative effect on the Deepwater Horizon response due to limited understanding of the NCP, ACPs, and current response policy and doctrine on the part of representatives from the local government. Similarly, the establishment of an Area Committee outreach program would have enhanced preparedness in the Gulf region prior to the incident.
- The response organization needs to accommodate local government interests in order to maintain unity of effort and ensure a coordinated response.
- Formal minutes of Area Committees meetings will facilitate standardization of Area Committee deliberations and provide a record of Area Committee activities and discussions.

**Recommendations:**

1. The Coast Guard should ensure that guidance to Area Committees requires regular Area Committee meetings and that ACPs are reviewed at least annually or more frequently as determined by the Area Committee.

2. The Coast Guard should undertake an aggressive outreach program to engage State Governors, parish, county, and city officials, tribes, and emergency managers and local NGOs in the ACP planning process. This should be an ongoing process that recognizes changes in administrations and personnel turnover.

3. The Coast Guard should maintain minutes of Area Committee meetings and ensure that they are archived on Coast Guard's Homeport Web site.

4. The Coast Guard should ensure oversight of Area Committees by conducting standardization visits by Districts or other program managers.

5. The Coast Guard should review and evaluate ACPs and Area Committees around the country to determine best practices, including the establishment of subcommittees, executive steering committees, and State co-chairs. Based upon this review, the Coast Guard should develop guidelines and minimum standards for the scope, conduct, and composition of Area Committees nationwide.

6. The Coast Guard should identify innovative ways (such as grants, delegation of certain planning functions, State participation as co-chair, or alignment of State jurisdictional

HCG042-014800

boundaries with ACP boundaries to increase their participation in Area Committees) to include local government officials.

7. The Coast Guard should consider establishing linkages between Facility Response Plan (FRP) approval and OSRO classification (certification) with industry participation in Area Committees. Area Committee membership should include a representative of the plan holder and OSROs for each FRP in the ACP's area of responsibility.

HCG042-014801

## II.6   ROLE OF THE NATIONAL INCIDENT COMMANDER AND THE NATIONAL INCIDENT COMMAND (NIC)

**Observations:**



- An overarching organization was needed to address the intense and rapidly growing demand for information from Federal Government leaders, State/local officials, media, and the public.

- Although the NIC organization had been included conceptually in draft policy and instruction, the Deepwater Horizon incident was the first practicable application of the concept.

- The Deepwater Horizon incident was declared a Spill of National Significance (SONS) event in accordance with provisions of the National Contingency Plan (NCP): "a spill which due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and cleanup the discharge."

- The desired purpose of the NIC was to support the Federal On-Scene Coordinator (FOSC) and others below and provide the executive level oversight.

- The NIC organization was initially envisioned to be a "thin client" with a small footprint, but agile forward leaning, proactive, and not just reactive.

- The NIC would address strategic issues beyond immediate response.

- The NIC would help the FOSC/Unified Area Command (UAC) work with a better span of control, and broker critical resources at the macro level.

- The NIC would deal with external concerns including taking political pressure off the FOSC/UAC.

- The National Incident Commander would be the national spokesman to convey that the Federal Government is in charge and accountable, and be the public face of the Federal response.

- The NIC would provide the bridge between the National Contingency Plan (NCP) response organization and designated agents within the National Response Framework (NRF).

**Discussion:**

On April 21, following the explosion and sinking of the Deepwater Horizon, the Incident Command Post (ICP) in Houma, LA was established, and the Regional Response Team (RRT) was activated. The next day, the National Response Team (NRT) was activated, realizing that the spill had a potential of being catastrophic, and that action or attention was needed at Federal Agency level. Two days later, the ICP in Mobile, AL and the UAC in Robert, LA were established. On April 28, the Deepwater Horizon incident was declared to be a SONS event. Following the release of flow rate information (5,000 barrels per day), several Cabinet Secretaries met with the Coast Guard, and Admiral Thad Allen was designated the National Incident Commander. On May 2, the NIC organization was established. The immediate effect

---

HCG042-014865

helped to streamline information flow, giving the UAC a direct line to the NIC and removing the District, Sector, and Commandant from vertical lines of communication. It helped to establish an effective "battle rhythm," and establish a single source to answer questions from the media, Federal officials, including the White House, and the public.

By taking some of the political pressure off the UAC/FOSC, it allowed responders to do their job more effectively. The National Incident Commander interfaced with senior officials, especially at the Department of Homeland Security (DHS) (e.g., the Secretary of Homeland Security [S1] and the Deputy Secretary of Homeland Security [S2]), as well as select Cabinet-level officials in agencies having jurisdiction or interest in the event.

The NIC served as a broker for critical resources, and addressed issues of foreign vessels or response equipment offered or used in the Deepwater Horizon response.

There were other major events happening nationally during the period of the oil spill response. These included floods in Nashville and planning for the looming hurricane season. The attempted terrorist attack on Times Square required attention by DHS, particularly S1 and S2. The National Incident Commander was able to provide sustained command and control of the Deepwater Horizon response during these periods, allowing S1 to address these other pressing concerns.



The NCP establishes the position of a National Incident Commander for a SONS event. The functions of the National Incident Commander specified in the NCP are to assume the role of FOSC in communicating with affected parties and the public and coordinating Federal, State, local, and international resources at the national level.

A draft "NIC Instruction" had been developed and was circulated within Coast Guard Headquarters and both a SONS exercise and a "Senior Leadership Seminar" had been conducted prior to this incident. However, there was no formal doctrine or established policy describing how the functions of the NIC were to be organized or executed. The Coast Guard's Incident Management Handbook (IMH) provides for a skeletal NIC support organization in the context of the National Incident Management System (NIMS)/Incident Command System (ICS), but it does not provide direction as to its essential components, their function, or their depth.

The urgent demand for real-time information, the lack of connectivity between the NCP and the NRF, and the lack of understanding among executive-level officials of the NCP response organization, required the National Incident Commander to build the NIC organization in response to perceived needs, not necessarily in accordance with pre-established doctrine. Through adaptive management, the National Incident Commander created the Interagency Solutions Group (IASG) that he termed, "an incident-specific NRT". This group had the role of:

- Coordinating and resolving interagency issues (at the appropriate level);
- Brokering interagency resources and expertise;
- Establishing lines of communication to interagency officials, for reach back support;

HCG042-014866

- Providing input to National Incident Commander from other agencies; and
- Acting as a "think tank."

One of the first efforts by the NIC organization was to estimate a worst case discharge. Once this was accomplished, the NIC could develop an appropriate response strategy. Due to the confusion over the amount of oil flowing, uncontrolled, from the well, the National Incident Commander prohibited the public release of any new flow rate estimates until such time that estimates could be scientifically based. He directed the IASG to establish the Flow Rate Technical Group for this purpose (see the chapter on Quantification).

Although the NRT was activated early in the response, the establishment of the NIC precluded NRT participation per se. Initially, the NRT functioned as a means of disseminating information regarding the incident to the participating agencies. It was chaired early on by S1, effectively making it comparable to a Principals Committee. With the establishment of a Principals Committee, and the use of various coordinating bodies within the White House, the NRT quickly became redundant. However, the IASG included many NRT members, and as the response progressed, interagency staffing and participation increased significantly.

The NIC was able to address significant issues appropriate for response decision makers above the FOSC level. These issues included the need to engage Cuba or the Bahamian government if oil impacted their shorelines, the State of Louisiana Berm proposal, offers of international assistance, flow rate determinations, the interagency alternative technology assessment program, health issues, and closure of fisheries.

The NIC Situation Unit was established to collect, distill, and filter all of the requests for information (RFIs) initially directed to the FOSC, but on occasion reaching down to the ICPs or Branches. During interviews of key responders at the Branch, ICP, and FOSC levels, it became apparent that, while well intended, the NIC organization, in its need to provide timely and accurate information to senior officials, became a significant distraction to spill response operations. The demand for information generated by a 24/7 news cycle, the White House, and other Federal officials, dictated a growth of the NIC organization that was not initially envisioned by the National Incident Commander. What was initially established as a "thin client" rapidly expanded to an organization with a staff of 130. By the first month, the NIC Situation Unit had tripled in size, mainly to address the insatiable appetite for information both vertically and horizontally. The National Incident Commander's direction of "Many voices, one message" required staffing beyond initial expectations.

The NIC organization eventually grew to 138. About 60 were active duty and reserve Coast Guard and the balance were from other Federal agencies including:

- National Oceanic and Atmospheric Administration (NOAA)
- Department of the Interior (DOI)—To assist in natural and cultural resource protection, including protection of National Wildlife Refuges and National Parks.
- Department of Energy (DOE)—Called in by the President to oversee source control efforts on the sea floor, eventually helping with quantification.
- Department of State (DOS)—To address international offers of assistance.

HCG042-014867

- Department of Defense (DoD)—Although there was no daily presence of DoD personnel in the NIC, NORTHCOM provided action officers/planners for coordination/logistics issues, and personnel for planning in the UAC and in the NIC for coordination.
- National Geospatial-Intelligence Agency (NGA) and National Reconnaissance Office (NRO)—To help with real-time imagery and integrating satellite imagery into Environmental Response Management Application (ERMA) to help with creating a common operating picture.

Initial reports from the FOSC and ICPs varied widely due to delayed reporting, different reporting times, misunderstanding of report fields (deployed and operational versus available, and equipment available but not suitable for a particular operating environment) resulting in the perception that some of the reports were in error. The NIC support organization expended a significant amount of time and effort to develop standardized daily reports (i.e., "At a Glance" reports) for the daily Governor's call and for providing quality information to senior leadership. These reports listed, among other things, the amount of deployed resources such as boom and skimmers that were capable of being deployed and appropriately utilized. The NIC imposed reporting requirements, which significantly improved daily reports.

While the designated National Incident Commander clearly had the requisite skills, experience, and demeanor to successfully carry out the "whole of government" messaging objective, few others within the response organization shared this ability. While the designation of a National Incident Commander may be a critical step during a SONS event, it is equally important to select the right person with the requisite skills and experience to fill this critically important role.

**Lessons Learned:**

- The organizational relationship of the National Incident Commander to S1 as the Principal Federal Official for domestic incident management needs to be defined prior to an incident and is critical to the successful execution of national-level plans.
- The relationship between the NRF, the NCP, the National Incident Commander and the NIC organization needs to be defined prior to an incident and doing so is critical to the successful execution of national-level plans.
- The ICS organization promotes a scalable approach to building the proper level and size of the response organization, but it needs to provide more detailed guidance for necessary components of a NIC organization.
- The National Incident Commander and the NIC organization are effective in addressing incredible demands for information and the 24/7 involvement of senior Government officials, the public, and the media.
- The National Incident Commander and the NIC organization are an effective way to address brokering of critical resources.
- The National Incident Commander is effective in addressing concerns of, and seeking assistance from, Cabinet-level officials.
- The NIC organization provides operational command and control for the "whole of government" response.
- The NIC organization acted as a central clearinghouse for vetted information.

HCG042-014868

- The NIC organization was initially unprepared to address the information gap that developed early in the spill response, did not anticipate information demand, and was playing "catch up" early in the response.
- The NIC organization was largely successful in invoking unity of messaging as the spill progressed.
- The skills, experience, and "command presence" of the National Incident Commander are vital to an effective response.

**Recommendations:**

1. The Coast Guard should revise the IMH and other spill response doctrine to define the role of the National Incident Commander and the NIC organization.

2. The Coast Guard, through the NRT, should amend the NCP to incorporate the NIC as providing connectivity between elements within the NRF and the roles and responsibilities of the NIC.

3. The Coast Guard should model the NIC Situation Unit for information management on the basis of the information management implemented at the peak of the Deepwater Horizon incident, and provide for it to be scaled back as appropriate.

4. The Coast Guard should provide for systems and processes to ensure that the NIC can immediately attain "information dominance" and maintain it throughout the response.

5. The Coast Guard should develop information management systems that ensure that information requests are triaged so that frivolous or unnecessary RFIs do not get in the way of important information requests. Information chains need to be observed as diligently as reporting chains, and tactical units need to be allowed to carry out tactical operations without direct requests from the NIC.

6. The Coast Guard should ensure that select personnel are trained to fulfill the role of the National Incident Commander, Deputy, and other key NIC organization positions in a SONS event. These personnel need to be pre-identified and trained in future SONS exercises, and billeted to a notional NIC organization that could be activated immediately.

7. The Coast Guard should identify the personal and leadership traits of a National Incident Commander (see the chapter on Crisis Leadership).

8. The Coast Guard should undertake a program to educate senior Government officials at the Federal, State, and local levels on the role of the NIC and oil spill response under the NCP.

9. The Coast Guard should ensure that a system is in place during an incident to gather feedback from ICPs and the FOSC as to the effectiveness of the NIC, areas of assistance, and areas of interference. There should be push-pull communications between NIC and FOSC.

10. The Coast Guard should ensure that NIC doctrine prohibits or discourages the NIC from making tactical decisions. While some decisions are necessarily politically driven (see the chapter on Political Demands), the NIC should strive to assist the UAC and ICPs in dealing with and minimizing the political influence on operational decisionmaking.

11. The Coast Guard should work with the NRT to ensure that NIC doctrine addresses the role of the NRT during a SONS event, even if an IASG is established.

---

HCG042-014869

12. If the NIC is required to handle national media or ensure unity of messaging, the Coast Guard should ensure that NIC doctrine provides for an information center within the NIC organization.

HCG042-014870