# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179 |
| THIS DOCUMENT RELATES TO: | SECTION: J |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | JUDGE BARBIER MAG. JUDGE SHUSHAN |

· · · · · · · · · · · · · · · · · · · · · · · · · · · ·   · · · · · · · · · · · · · · · · · · · · · ·

**DECLARATION OF BRAD BARKER IN SUPPORT OF AIRBORNE SUPPORT, INC.**
**AND AIRBORNE SUPPORT INTERNATIONAL, INC.'S  MOTION FOR SUMMARY**
**JUDGMENT ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS**

1.      My name is Brad Barker.  I am the Vice-President of both Airborne Support, Inc. and Airborne Support International, Inc.  (sometimes collectively referred to herein as "Airborne Support"), and have served in that capacity since before the April 20, 2010 explosion and fire on the *DEEPWATER HORIZON* mobile offshore drilling unit and throughout the ensuing oil spill response and clean-up efforts.

2.      I submit this Declaration in support of Airborne Support's Motion for Summary Judgment on Derivative Immunity and Preemption Grounds.  The facts set forth herein are based on my personal knowledge and/or the books and records of Airborne Support.

3.      Airborne Support, Inc. is a family-owned and operated small business based at the Houma-Terrebonne Airport in Houma, Louisiana which maintains and operates a fleet of specialized aircraft dedicated to emergency oil spill response.  Airborne Support, Inc. has been in operation for over twenty (20) years and is a recognized leader in this unique and vital industry, providing aerial response resources, including aerial dispersant application capability, to virtually

every company involved in the exploration, transportation and production of oil and gas in the Gulf of Mexico.

4.      Prior to April 20, 2010, Airborne Support, Inc. entered into an "Agreement for Provision of Response Resources" (sometimes referred to herein as the "Agreement") with National Response Corporation ("NRC"), a true and correct copy of which is attached hereto as Exhibit "1". NRC was (and is) classified as Oil Spill Removal Organization pursuant to the United States Coast Guard's Oil Spill Removal Organization program. In its capacity as an emergency Oil Spill Removal Organization, NRC "provides personnel, equipment, supplies and other resources for responding to discharges of oil and hazardous substances from vessels and/or facilities and other emergency response situations, which resources NRC owns or procures by subcontract." The Agreement clearly contemplates work to be performed under the National Contingency Plan ("NCP") at the direction of the federal government. Pursuant to the Agreement, Airborne Support, Inc. agreed to maintain its aerial resources and make them available to NRC for deployment if called upon and authorized to respond to a discharge.

5.      Airborne Support International, Inc. had no involvement in any operations conducted during the *DEEPWATER HORIZON* oil spill response.

6.      In the hours immediately following the April 20, 2010 explosion on the *DEEPWATER HORIZON*, NRC and O'Brien's Response Management Inc. ("O'Brien's") contacted Airborne Support, Inc. to provide notice of the incident, advise of the potential for discharge, and to place Airborne Support, Inc.'s aerial resources on stand-by to assist in responding to the unfolding disaster.

7.      On April 22, 2010, the Federal-On Scene Coordinator ("FOSC"), the federal official designated to direct the *DEEPWATER HORIZON* oil spill response, authorized and

instructed Airborne Support, Inc. to conduct a 1,880 gallon aerial application of EPA-approved dispersants to oil on the surface of federal waters in the Gulf of Mexico.  In accordance with such authorization and instruction, the first aerial dispersant sortie originating from the Houma-Terrebonne Airport for the *DEEPWATER HORIZON* oil spill response was successfully completed by Airborne Support, Inc. spray aircraft, N932H, piloted by myself, Brad Barker, and accompanied by an Airborne Support, Inc. spotter aircraft, N38WA, with United States Coast Guard and O'Brien's personnel on board.

8.      In the days immediately following its initial mobilization and aerial dispersant sortie, Airborne Support, Inc. began conducting daily "spotter" or reconnaissance/observation flights over the Gulf of Mexico to assist in gathering information and intelligence on the oil spill for review, analysis and use by federal officials authorized and empowered to make response decisions within the *DEEPWATER HORIZON* Incident Command System ("ICS"), the command and control organizational structure and management process used by the United States Department of Homeland Security to execute the oil spill response effort.  United States Coast Guard and authorized personnel from various other public and private entities involved in the federal *DEEPWATER HORIZON* ICS accompanied Airborne Support, Inc. aircraft to participate in and/or observe assigned missions.

9.      Throughout the *DEEPWATER HORIZON* response efforts, Airborne Support, Inc. was subject to the ultimate direction and authority of the federal government, and all Airborne Support, Inc. response activities were undertaken and executed pursuant to such direction and authority.

10.      During the course of the *DEEPWATER HORIZON* response efforts, the federal government called upon Airborne Support, Inc. to mobilize and deploy its equipment and

personnel to assist with and/or execute specific aspects of the federal response plan requiring and/or warranting the use of such aerial resources, all as determined and directed by the FOSC and/or the FOSC's representatives ("FOSCRs") within Unified Area Command ("UAC") and/or other arms of the ICS.

11.     Airborne Support, Inc.'s equipment and personnel were involved with certain operations conducted out of only one (1) of the five (5) incident command posts ("ICPs") established by the United States Coast Guard during the response.  Specifically, all of Airborne Support, Inc.'s resources were consolidated under the leadership of the Houma Incident Command Post ("ICP Houma"), and all of Airborne Support, Inc.'s *DEEPWATER HORIZON* response activities, including spotter and aerial dispersant application flights, were conducted out of the Houma-Terrebonne Airport as directed and authorized by the federal government.

12.     In connection with the *DEEPWATER HORIZON* oil spill response, all aerial dispersant operations were managed by the Dispersant Group in the Operations Section of ICP Houma.  The Dispersant Group at ICP Houma ran such operations out of two airports — NASA's John C. Stennis Space Center in Mississippi, and the Houma-Terrebonne Airport in Houma, Louisiana.  Each airport had an assigned liaison to the Dispersant Group at ICP Houma, such that the ICP was able to communicate directives, share information, coordinate response activities and remain privy to all details of ongoing operations at both airports.  Airborne Support, Inc. was one of several operators working under the management of the ICP Houma Dispersant Group and stationed at the Houma-Terrebonne Airport during the course of the *DEEPWATER HORIZON* clean-up efforts.  Airborne Support, Inc. did not participate in operations, including aerial spotter and/or aerial dispersant flights, conducted out of NASA's John C. Stennis Space Center.

13.     Airborne Support, Inc.'s *DEEPWATER HORIZON* clean-up response activities were limited to assigned aerial operations authorized, ordered, directed and ultimately controlled by the federal government, including (i) daily spotter/reconnaissance/observation flights; (ii) aerial application of EPA-approved dispersants to oil on the surface of federal waters of the Gulf of Mexico; (iii) spotter flights supporting spray aircraft during aerial application of EPA-approved dispersants to oil on the surface of federal waters of the Gulf of Mexico; (iv) spotter flights supporting United States Coast Guard/NOAA/EPA Special Monitoring of Applied Response Technologies ("SMART") team monitoring missions; and (v) one spotter/reconnaissance/observation flight to gather information and intelligence for use by the United States Coast Guard's Rapid Assessment ("RAT") teams.

14.     With respect to all aerial dispersant operations conducted during the *DEEPWATER HORIZON* clean-up response, federal government approval was necessary and such authorization came exclusively from the FOSC.  The federal government also provided specific instructions with regard to when, where, and how to apply dispersants, including in what quantities and under what conditions.  Throughout the *DEEPWATER HORIZON* response, aerial dispersant operations were monitored by various federal government officials and agencies, including the FOSC, the FOSCRs, those within the Dispersant Group, ICP Houma, UAC, and others such as the United States Coast Guard/NOAA/EPA SMART teams, in order to ensure that the government's response plans were being executed and conducted in a safe and effective manner.

15.     At all times, Airborne Support, Inc. and its employees participating in the *DEEPWATER HORIZON* response efforts followed approved directives, instructions and action plans handed down from the FOSC and/or the FOSCRs at UAC or ICP Houma and reflected in

Incident Action Plans which detailed the authorized response activities to be executed each day.

16.     Airborne Support, Inc. and its employees participating in the *DEEPWATER HORIZON* response efforts took no action independent of the federal government, outside of its assigned role in the federal ICS and/or beyond the scope of federal authorization.

17.     At no time during the *DEEPWATER HORIZON* response efforts was Airborne Support, Inc. involved with any sub-sea dispersant operations.

18.     At no time during the *DEEPWATER HORIZON* response efforts was Airborne Support, Inc. involved with any surface application of dispersants from vessels.

19.     At no time during the *DEEPWATER HORIZON* response efforts was Airborne Support, Inc. involved with shoreline clean-up operations.

20.     At no time during the *DEEPWATER HORIZON* response efforts was Airborne Support, Inc. involved with any *in situ* burning operations.

21.     At no time during the *DEEPWATER HORIZON* response efforts was Airborne Support, Inc. involved with any aerial dispersant operations which may have been conducted in the territorial waters of any State and/or in federal waters less than twelve (12) nautical miles off the coast of any State.

22.     At no time during the *DEEPWATER HORIZON* response efforts was Airborne Support, Inc. involved with any aerial dispersant operations which may have been conducted in federal waters off the coast of Texas, Mississippi, Alabama or Florida.

23.     At no time during the *DEEPWATER HORIZON* response efforts was Airborne Support, Inc. involved with the engagement, training and/or supervision of any "VoO Plaintiffs", "Decontamination Plaintiffs" and/or "Onshore Plaintiffs" defined in Plaintiffs' First Amended Master Complaint in Accordance with PTO No. 11 Section III.B(3) (Rec. Doc. 1812) (the "B3

Bundle Master Complaint"), and did not participate in any determinations made by the UAC with respect to the use of respirators and/or other personal protective equipment by these or any other classification of plaintiffs.

24.     At all times during the *DEEPWATER HORIZON* response efforts, determinations regarding the use of dispersants were made by the FOSC and Airborne Support, Inc. complied with all such determinations.

25.     At all times during the *DEEPWATER HORIZON* response efforts, determinations regarding the type of dispersants to be applied were made by the FOSC, the FOSCRs, and/or other federal officials, and Airborne Support, Inc. complied with all such determinations.

26.     At all times, Airborne Support, Inc. and its employees participating in the *DEEPWATER HORIZON* response efforts were subject to and worked at the direction and under the ultimate authority of the FOSC, the FOSCRs, and/or other federal officials.

27.     At all times during the *DEEPWATER HORIZON* response efforts, Airborne Support, Inc. and its employees acted at the direction of the United States pursuant to authority validly conferred by federal officials within the ICS, faithfully obeyed the directives given and operated within the scope of such authority to execute the will of the federal government.

I declare under the penalties of perjury under the laws of the United States of America that the statements made in this declaration are true and correct.

EXECUTED on the *17th* day of May, 2012

Brad Barker

National Response Corporation
Agreement for Provision of
Response Resources

THIS AGREEMENT FOR PROVISION OF RESPONSE RESOURCES is made as of the date specified on the signature page hereof between:

(1)     NATIONAL RESPONSE CORPORATION, a Delaware corporation ("NRC"); and

(2)     The party described on the signature page hereof (the "Contractor")

WHEREAS:

(A)     NRC as an emergency response spill removal organization provides personnel, equipment, supplies and other resources for responding to discharges of oil and hazardous substances from vessels and/or facilities and other emergency response situations, which resources NRC owns or procures by subcontract;

(B)     NRC has established a network of independent contractors with personnel, equipment, supplies and other resources for responding to discharges of oil and hazardous substances from vessels and/or facilities and other emergency situations;

(C)     The Contractor owns, controls or has contracted for the personnel, equipment, supplies and/or other resources described in Schedule 1 (collectively, the "Specified Resources");

(D)     The Contractor has agreed to make available to NRC the Specified Resources, subject to the terms and conditions of this Agreement.

NOW THEREFORE, THE PARTIES HAVE AGREED AS FOLLOWS:

1.      In this Agreement (including Schedules):

"Force Majeure" means the prevention or delay of performance under this Agreement by a cause or causes beyond the reasonable control of either party and not contemplated as a possible circumstance in which services hereunder are to be performed. Such causes shall include, but not be limited to, acts of God, acts of public enemies, war, rebellion, sabotage, riot, fire, explosion, accident, or flood, Governmental laws, regulations, labor trouble, strike or lockout;

"Network" means collectively NRC and the independent contractors with whom NRC from time to time contracts for the provision of response resources, including the Contractor;

"Specified Resources" means the personnel, equipment, supplies and/or other resources owned, controlled or contracted for by the Contractor and described in Schedule 1.

2.      NRC'S UNDERTAKINGS



National Response Corporation
Agreement for Provision of
Response Resources

2.1    NRC shall obtain and maintain Oil Spill Removal Organization classifications for the different operating environments in all Captain-of-the-Port Zones in which NRC provides response services under U.S. Federal law, and shall exercise due diligence to obtain and maintain any similar classification as may be required and/or available under any relevant state laws.

2.2    The Contractor shall be paid upon payment by NRC's Responsible Party client to NRC. In any event, NRC shall use its best efforts to pay the Contractor in accordance with the Contractor's time and materials rates set out in Schedule 2 during any period the Contractor shall deploy the Specified Resources or any part thereof, or perform other services, pursuant to a request by NRC under Clause 3.3 hereof. In the event that disputes arise, the Contractor's participation may be required to obtain payment and it may result in final payment beyond the above noted terms.

2.3    The Contractor's time and materials rates referred to in Schedule 2 shall be determined annually on February 18 and shall remain in effect until the succeeding February 18. If either party wishes to change any of the Contractor's time and materials rates, such party shall propose the change(s) to the other party ninety (90) days prior to February 18, and both parties shall negotiate in good faith with respect to such proposal. If the parties fail to agree, within forty-five (45) days of such proposal, on any change to the Contractor's time and material rates shall remain in effect for the succeeding year.

3.    **CONTRACTOR'S UNDERTAKINGS**

3.1    The Contractor hereby represents, warrants and covenants that it owns or controls, and shall continue to own and control, by contract or other U.S. Coast Guard approved means, the Specified Resources. The Contractor undertakes, to the extent commercially practicable, to maintain the Specified Resources at the disposal of NRC for use in the Network in accordance with this Agreement.

3.2    The Contractor shall at all times:

    (a)    provide NRC with quarterly updates regarding the status of the Specified Resources, and shall notify NRC promptly of any significant change to the Specified Resources or otherwise which would materially adversely affect the ability of the Contractor to perform its obligations hereunder;

    (b)    ensure that the training of the Contractor's personnel complies with requirements under U.S. Federal law and any applicable State laws, and provide to NRC records, including certifications and licenses, of such training;

    (c)    upon reasonable notice, make the Specified Resources available for inspection by NRC;

National Response Corporation
Agreement for Provision of
Response Resources

    (d)    provide NRC with copies of the Contractor's documentation for reporting and accounting with respect to oil and hazardous substance spill response, including invoices and daily worksheets, contained in Schedule 3, or the NRC Universal Worksheet in Exhibit 1 when requested by NRC;

    (e)    upon reasonable notice, allow NRC to review originals or copies of all records verifying the availability of personnel included in Specified Resources;

    (f)    allow NRC with reasonable notice to conduct field audits of Specified Resources deployed pursuant to this Agreement.

3.3    The Contractor shall at any time upon request of NRC:

    (a)    deploy all or any part of the Specified Resources in accordance with Clause 4.1;

    (b)    provide training of non-Contractor personnel in oil spill response activities and maintain records of such training;

    (c)    deploy Specified Resources in connection with exercises and drills, and provide records of such exercises and drills to NRC;

    (d)    provide information relating to the Specified Resources including any information relevant to any legal encumbrances and local practices.

3.4    The Contractor shall keep proper books, records and accounts relating to the Specified Resources and its performance hereunder in accordance with generally accepted accounting principles and, upon reasonable notice from NRC, the Contractor shall permit NRC or its representatives to review such books, records and accounts relevant to its performance hereunder.

3.5    The Contractor consents to NRC identifying all Specified Resources as resources controlled or contracted for by NRC for purposes of NRC's marketing the Network, classification as an Oil Spill Removal Organization under U.S. Federal law or classification under any similar state or local laws.

4.    **RESPONSE PROCEDURE**

4.1    NRC may, at any time, request the Contractor (orally or otherwise) to deploy all or any part of the Specified Resources for purposes of oil or hazardous substances spill response activities and other emergency situations. Upon receipt of any such request, the Contractor shall deploy such Specified Resources as directed by NRC.

4.2    Any request by NRC to deploy Specified Resources under Clause 4.1 shall include the following information, to the extent available:

National Response Corporation
Agreement for Provision of
Response Resources

    (a)    the name of the relevant owner, operator, charterer by demise, or authorized agent of a vessel or facility with whom NRC has contracted;

    (b)    the name and call sign of the relevant vessel, or the name, address and location of the relevant facility;

    (c)    the location of the spill including geographic coordinates;

    (d)    the nature and estimated quantity of the oil discharged;

    (e)    the approximate time of the incident;

    (f)    the weather conditions on the scene;

    (g)    the condition of vessel or facility;

    (h)    the name of the Clients "Qualified Individual" Spill Manager and "Federal On-Scene Coordinator";

    (i)    the Specified Resources required to be deployed and the location(s) including geographic coordinates for initial deployment;

    (j)    any limitation on charges to be incurred by the Contractor by reason of the request;

    (k)    NRC's incident control number and NRC contact person.

4.3    If, upon receipt of a request by NRC under Clause 4.1 the Contractor shall for any reason be unable to comply with such request, the Contractor shall immediately notify NRC of such inability.

4.4    Subject to prior NRC approval, the Contractor may subcontract with any other party for the provision of Specified Resources, but the Contractor shall remain responsible to NRC hereunder and NRC shall have no obligation to the Contractor's subcontractor.

4.5    The Contractor shall submit daily worksheets to NRC.

4.6    To facilitate payment to the Contractor, the Contractor shall invoice NRC within five (5) days following a request from NRC pursuant to Clause 4.1 and thereafter on such basis as directed by NRC not to exceed thirty (30) days for charges relating to any such request.  The Contractor shall invoice  NRC monthly for any other charges relating to this Agreement.  All invoices shall be in the form provided in Schedule 3 and shall be accompanied by supporting documents in accordance with good business practice.

4.7    Anything herein contained to the contrary notwithstanding, the Contractor shall not be required to comply with any request to deploy Specified Resources upon the occurrence of an event of Force Majeure, or where, in the good faith judgment of the Contractor, circumstances in which the response activities are to be conducted present an unreasonable risk to life or property.

5.    **INSURANCE**

5.1    The Contractor shall, at its own expense, procure and maintain in effect during the term of this Agreement insurances in respect of the Contractor owned Specified Resources in accordance with Schedule 4.

National Response Corporation
Agreement for Provision of
Response Resources

5.2   All such insurance shall be primary insurance without right of contribution against any other insurance maintained by NRC. Each policy of insurance to the extent practicable shall provide that NRC shall be a named insured and shall contain a cross-liability clause with respect to the named insureds thereunder. Each such policy shall provide for not less than thirty (30) days prior written notice to NRC of the cancellation or any material change thereof, and shall contain provisions waiving underwriter's rights of subrogation against any insured named therein. The forms of each such policy and the underwriters thereof shall be approved by NRC.

5.3   Within thirty (30) days of the date hereof, and not later than March 1 of each year hereafter, the Contractor shall furnish NRC certificates evidencing the Contractor's compliance with this Clause.

5.4   NRC shall be responsible for maintaining its own property and liability insurance.

6.   **CONFIDENTIALITY**

The Contractor and NRC (including their respective employees, officers, agents and directors) agree that each and every provision of this Agreement and the other instruments and agreements referred to herein shall be maintained as confidential and will not be disclosed to third parties without the prior written consent of the other party, except for any disclosure necessary for the performance of this Agreement or required by any applicable law or regulation.

7.   **NON-ASSIGNMENT**

**THIS AGREEMENT IS PERSONAL TO THE PARTIES AND MAY NOT BE ASSIGNED BY EITHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY.**

8.   **TERM**

8.1   This Agreement shall continue in full force and effect for a period of five (5) years from the date hereof and for successive periods of one year thereafter (each such period a "Contract Year") unless either party shall notify the other party not less than ninety (90) days prior to the end of the current Contract Year that the notifying party elects not to extend this Agreement in which event this Agreement shall terminate at the end of the current Contract Year.

8.2   NRC shall be entitled to terminate this Agreement forthwith:

5

National Response Corporation
Agreement for Provision of
Response Resources

(a)   if any representation or warranty made by the Contractor hereunder shall be incorrect or misleading in any material respect;

(b)   upon the occurrence of any event relating to the Specified Resources or otherwise which would materially adversely affect the ability of the Contractor to perform its obligations hereunder;

(c)   if Contractor shall propose a change in the current Contractor's time and material rates, and the parties shall not agree to any such change pursuant to Clause 2.3; or

(d)   if the Contractor shall for any reason be unable to comply with (i) any request by NRC under Clause 4.1. or (ii) any request by NRC under Clause 3.3 for other services within thirty (30) days of such request.

8.3    the Contractor shall be entitled to terminate this Agreement for any reason on     ninety (90) days written notice to NRC

9.    LAW, JURISDICTION AND ARBITRATION

The parties shall attempt to resolve any disputes, controversy or differences concerning the meaning, application, performance or breach of this Agreement by negotiation in good faith. If any of the foregoing are not resolved within 30 days, the parties hereto agree that, upon receipt of a written notice of arbitration from either party, any disputes arising under this Agreement shall be arbitrated in the State of New York before three persons, consisting of an arbitrator appointed by NRC, an arbitrator appointed by the Contractor, and a third by the two so chosen; the decision of any two of the arbitrators shall be final and may include an award of attorneys' fees. Judgment may be entered upon any award in any State or Federal court located in the State of New York to the jurisdiction of which the parties hereby submit. Anything herein to the contrary notwithstanding, any dispute arising under this Agreement which gives rise to a claim by either party against the other in excess of           Dollars ($         ) may be decided by any State or Federal court located in the State of New York to the jurisdiction of which the parties hereby submit. This Agreement shall be governed by and construed in all respects in accordance with the law of the State of New York.

10.    MISCELLANEOUS

10.1   This Agreement and Schedules to this Agreement represent the entire understanding and agreement between NRC and the Contractor with respect to the matters provided herein and supersede any and all prior agreements, whether written or oral, that may exist between NRC and the Contractor regarding same. No terms, conditions, prior course of dealings, course of performance, usage or trade, understandings, purchase orders or agreements

6

National Response Corporation
Agreement for Provision of
Response Resources

purporting to modify, vary, supplement or explain a provision of this Agreement shall be effective unless set forth in writing and signed by representative of each party authorized to amend this Agreement.

10.2    The Contractor shall be an independent contractor and shall not be an agent of NRC.

10.3    All notices or other communications under this Agreement shall be addressed as indicated on the signature page hereof, or to such other address as either party shall notify the other from time to time.

IN WITNESS whereof the parties have duly executed this Agreement as of the date specified below:

Date of this Agreement:    _JANUARY 01, 2002_

NATIONAL RESPONSE CORPORATION          CONTRACTOR

By: _Christopher J Ward_                By: _Howard Barker_
Name: Christopher J. Ward               Name: HOWARD BARKER
Position: Vice President                Position: PRESIDENT

Address:                                Address: 3626 THUNDERBIRD RD
National Response Corporation                    HOUMA  LA  70363
3500 Sunrise Hwy (T-103)
Great River, New York 11739

Telephone: (631) 224-9141               Telephone: 985.851.6391
Telefacsimile:  (631) 224-9082          Telefacsimile: 985.851.6392
Telex:                                  Telex:

7