**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : : | MDL NO. 2179 |
| | | SECTION: J |
| THIS DOCUMENT RELATES TO: | : : | |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | : : : : | JUDGE BARBIER MAG. JUDGE SHUSHAN |

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

<u>**MEMORANDUM OF LAW IN SUPPORT OF MARINE SPILL RESPONSE CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF DERIVATIVE IMMUNITY AND PREEMPTION**</u>

BLANK ROME LLP
ATTORNEYS FOR DEFENDANT
MARINE SPILL RESPONSE CORPORATION
ALAN M. WEIGEL
405 LEXINGTON AVENUE
THE CHRYSLER BUILDING
NEW YORK, NY  10174
(212) 885-5000

810517.00025/7127622v.1

# TABLE OF CONTENTS

**Page (s)**

PRELIMINARY STATEMENT ...........................................................................................1

FACTS ...........................................................................................................................2

ARGUMENT ..................................................................................................................7

I.      MSRC HAS DERIVATIVE IMMUNITY UNDER THE CLEAN WATER ACT ...........7

      A.      Authority Was Validly Conferred By The Federal Government............................7

      B.      MSRC Did Not Exceed The Scope Of Its Authority................................................8

II.     MSRC HAS DERIVATIVE DISCRETIONARY FUNCTION IMMUNITY
UNDER THE FEDERAL TORT CLAIMS ACT .............................................................9

      A.      The Federal Government Would Enjoy Discretionary Function Immunity
For Its Actions In Responding To The DEEPWATER HORIZON Oil Spill........10

      B.      The Federal Government Approved Precise Specifications And Controlled
Their Implementation............................................................................................10

      C.      The Federal Government's Specifications Were Not Unsafe Or
Unreasonable..........................................................................................................11

III.    THE CLAIMS AGAINST MSRC IN THE B3 COMPLAINT ARE PREEMPTED........12

      A.      The Claims Against MSRC Are Barred By The Doctrine of Implied
Conflict Preemption ..............................................................................................13

      B.      The Claims Against MSRC Are Barred By The Doctrine of Implied Field
Preemption .............................................................................................................15

CONCLUSION..............................................................................................................17

810517.00025/7127622v.1

## TABLE OF AUTHORITIES

Page(s)

CASES

*Ackerson v. Bean Dredging, LLC*,
  589 F.3d 196 (5th Cir. 2009) ........................................................................7

*Berkovitz v. United States*,
  486 U.S. 531 (1988)...................................................................................9, 10

*Carden v. Gen. Motors Corp.*¸ 509 F. 3d 227 (5th Cir. 2007)......................................12

*English v. General Elec. Co.*,
  496 U.S. 72 (U.S. 1990)................................................................................15

*Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*,
  458 U.S. 141 (1982)......................................................................................13

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)......................................................................................12

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
  471 U.S. 707 (U.S. 1985)..............................................................................15

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)...................................................................................13, 14

*In re World Trade Ctr. Disaster Site Litig.*,
  456 F. Supp. 2d 520 (S.D.N.Y. 2006)...........................................................9

*Katrina Canal Breaches Litig. Steering Comm. v. Washington Group Int'l, Inc.*,
  620 F3d 455 (5th 2010)................................................................................10

*Kerstetter v. Pac. Scientific Co.*,
  210 F.3d 431 (5th Cir. 2000) .........................................................................9

*Matter of Oswego Barge Corp.*,
  664 F.2d 327 (2d Cir. 1981)..........................................................................13

*Ray v. Atlantic Richfield Co.*,
  435 U.S. 151 (1978)......................................................................................16

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947)......................................................................................15

ii

*Trevino v. Gen. Dynamics Corp.*,
   865 F.2d 1474 (5th Cir. 1989) ...................................................................10

*United States v. Locke*,
   529 U.S. 89 (2000) ......................................................................................16

*United States v. Varig Airlines*,
   467 U.S. 797 (1984) ......................................................................................9

*Witty v. Delta Air Lines, Inc.*,
   366 F.3d 380 (5th Cir. 2004) ......................................................................15

*Wyeth v. Levine*,
   555 U.S. 555 - 64 (U.S. 2009) ....................................................................13

*Yearsley v. W.A. Ross Construction*,
   309 U.S. 18 (1940) ........................................................................................7

STATUTES

28 U.S.C. § 2680 .................................................................................................9

33 U.S.C. § 1321 ...........................................................................7, 8, 10, 14, 15

OTHER AUTHORITIES

33 C.F.R. § 155.1035(i)(6) ..................................................................................1

40 C.F.R. Part 300, et seq. ...............................................................8, 10,11, 14, 16

H. R. CONF. REP. No. 101-653, 101 (1990) ......................................................16

National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg.
   47,384, 47,399-400 (Sept. 15, 1994) ..........................................................16

iii

Marine Spill Response Corporation ("MSRC") respectfully submits this Memorandum of Law in Support of its Motion for an order of summary judgment dismissing with prejudice all claims asserted against MSRC in the First Amended Master Complaint in Accordance with PTO No. 11 Section III.B(3) (Rec. Doc. 1812) (hereinafter the "B3 Complaint") on the grounds that MSRC has derivative immunity from such claims, or alternatively, that such claims are barred by the doctrine of preemption.  This Memorandum of Law supplements the Joint Memorandum submitted by the Clean-Up Responder Defendants (which is hereby incorporated in its entirety by reference).

## PRELIMINARY STATEMENT

MSRC is an independent, private, not-for-profit national Oil Spill Removal Organization ("OSRO").  MSRC has been classified as an OSRO pursuant to the Coast Guard's voluntary OSRO classification program in order to assist facility and vessel planholders to meet response planning standards under the Oil Pollution Act of 1990 ("OPA-90").[1]  (Declaration of Donald A. Toenshoff, Jr. dated May 10, 2012 ("Toenshoff Decl.") ¶3.)  MSRC has the largest, most comprehensive dedicated standby oil spill response program in the United States.  MSRC's capabilities include a dedicated fleet of specialized Oil Spill Response Vessels ("OSRVs"), specialized Oil Spill Response Barges ("OSRBs") and dispersant and spotter aircraft, as well as specialized oil spill response equipment, such as containment boom, self-propelled skimming vessels, deployable skimming systems, and trained personnel.  (*Id.* at ¶5.)

Within hours of the explosion on the DEEPWATER HORIZON on April 20, 2010, MSRC's response resources, including dispersant assets, were activated to respond to the oil spill.  (*Id.* at ¶8.)  Throughout its response efforts to this Spill of National Significance

---

[1] *See* 33 C.F.R. § 155.1035(i)(6); Guidelines for the U.S. Coast Guard Oil Spill Removal Organization Classification Program.

("SONS"), MSRC served as a contractor to BP but was subject to the ultimate authority and direction of the federal government, described below. (*Id.*)

In accordance with Magistrate Judge Shushan's Schedule for Limited B3 Discovery (Rec. Doc. 5000), MSRC submits this motion for summary judgment to renew its derivative immunity and implied preemption arguments. As set forth in the Joint Memorandum filed by the Clean-Up Responder Defendants, and as supplemented below, it is indisputable that the federal government was in charge of and directly controlled the response to the DEEPWATER HORIZON oil spill and that the federal government validly conferred authority on MSRC to conduct its response operations. The evidence is also undisputable that MSRC never exceeded the scope of that authority during the oil spill response. Accordingly, MSRC is entitled to derivative immunity from the claims asserted against it in the B3 Complaint under the Clean Water Act ("CWA") and/or the Federal Tort Claims Act ("FTCA"). Alternatively, the claims in the B3 Complaint against MSRC are barred by the doctrines of implied conflict preemption and/or field preemption.

## FACTS

The facts of the Oil Spill are well known to this Court. The fire, explosion, and subsequent sinking of the DEEPWATER HORIZON resulted in the discharge of oil from the well. (B3 Compl. ¶¶ 1 - 2.)[2] Following the explosion, sinking, and discharge of oil from the Macondo well and the DEEPWATER HORIZON, MSRC responded to the Gulf of Mexico incident under the direction and control of the federal government in order to attempt to mitigate the damage caused by the oil spill, along with many other response organizations. MSRC provides herein details regarding its specific roles in the DEEPWATER HORIZON response

---

2 MSRC takes no position in respect of the B3 Complaint's factual allegations concerning the cause of the Oil Spill, as such facts are not relevant to the issues the Court needs to consider on MSRC's motion for summary judgment.

efforts and also incorporates by reference the factual background set forth in the Joint Memorandum filed by the Clean-Up Responder Defendants.

By April 21, 2010, in response to MSRC's call-out, one C-130 dispersant spray aircraft, provided by MSRC's sub-contractor International Air Response ("IAR"), and a King Air spotter/spray aircraft, provided by MSRC's sub-contractor Dynamic Aviation Group ("Dynamic"), were ready for dispersant spray operations at MSRC's facility at Stennis International Airport in Bay St. Louis, Mississippi.  (Toenshoff Decl. ¶9.)  Additional dispersant and spotter aircraft were subsequently activated by BP at Stennis Airport.  Ultimately, aircraft assigned to Stennis Airport for aerial dispersant operations were operated by MSRC's sub-contractors, IAR and Dynamic, and also by the following parties not under contract to MSRC: Lynden Air Cargo; Oil Spill Response, Limited; and the U.S. Air Force Reserve ("USAFR") 910th Airlift Wing/757th Airlift Squadron.  (*Id.* at ¶16.)

In the days immediately following its call-out, MSRC also activated its Gulf Coast and East Coast fleet of OSRVs, support barges and vessels and began skimming oil off the surface of the water in the off-shore areas of the Gulf of Mexico.  MSRC eventually mobilized a total of twelve OSRVs for use in the DEEPWATER HORIZON response efforts.  (*Id.* at ¶10.)  MSRC equipment and personnel were also mobilized to conduct and/or facilitate on-water skimming and boom staging and deployment operations in near-shore areas controlled by the various incident command posts ("ICPs") established by the Coast Guard during the response.  (*Id.* at ¶11.)  All skimming and booming operations conducted and/or facilitated by MSRC were as directed by the Unified Area Command ("UAC").  (*Id.*)

During the course of the DEEPWATER HORIZON response efforts, several MSRC employees also held positions supporting the Federal On-Scene Coordinator ("FOSC") and other

3

federal officials occupying positions in the Incident Command System ("ICS") structure.  In all of these positions, MSRC employees acted under the overall control and at the direction of the FOSC and/or other federal officials.  (*Id.* at ¶12.)

During the DEEPWATER HORIZON response, all aerial dispersant operations were managed by the Dispersant Group in the Operations Section at the ICP in Houma, Louisiana ("ICP Houma").  (Joint Statement of Undisputed Material Facts ("Joint SUMF"), ¶57.)  MSRC's support of the Dispersant Group's operations was organized at the Stennis Space Center Airport in Bay St. Louis, Mississippi.  (Toenshoff Decl. ¶15.)

Daily direction was provided by the federal government with regard to the amounts and location of dispersants to be applied.  Federal government approval was necessary for all aerial dispersant operations and such approval came exclusively from the FOSC.  (*Id.* at ¶17.)  Between April 21 and May 26, 2010, authorization to use dispersants was provided through the daily Incident Action Plans ("IAPs") prepared by the UAC.  (Joint SUMF at ¶¶ 53 – 55.)  From May 26 to July 19, 2010, the FOSC provided specific written authorization before each and every application of dispersants to the surface of the water in the Gulf of Mexico.  (*Id.* at ¶¶ 72 - 73.)

Between April 21 and July 19, 2010, the FOSC specifically authorized the use of the dispersants Corexit EC9500A and Corexit EC9527A on the surface of the water in the Gulf of Mexico as part of the DEEPWATER HORIZON spill response activities.  (*Id.* at ¶56.)  The FOSC dispersant approvals set a total maximum authorized dispersant volume to be used by the various aircraft contractors and the USAFR each day that dispersants were approved for use during the DEEPWATER HORIZON spill response.  (Toenshoff Decl. ¶21.)

The FOSC approvals also contained restrictions concerning the location, time and manner for the applications of dispersants.  For example, during the DEEPWATER HORIZON spill

4

response, no aerial dispersant spray missions were authorized or conducted within 3 nautical miles ("nm") of shore or where the water depth was less than 10 meters. (Joint SUMF at ¶¶ 9 – 10.) The FOSC approvals also established dispersant spray safety set-backs from the spill site, from the location of in-situ burning, and from vessels and platforms. In addition, no aerial dispersant spray operations were authorized or conducted outside of daylight hours. (Toenshoff Decl. ¶¶ 22 - 26.) Aerial dispersant spray aircraft were accompanied by a spotter aircraft whose mission was, in part, to ensure that no vessels or platforms were located in the planned dispersant deployment area and that FOSC directions were followed. (Joint SUMF ¶¶63 – 64.)

There has been no evidence produced during the Limited B3 Discovery period that the aerial application of dispersants by MSRC and is contractors were not fully in compliance with all FOSC approvals and directions. In support of this, Donald Toenshoff, MSRC's Stennis Airport Staging Manager, who directed MSRC's participation in aerial dispersant operations, stated: "I am not aware of any aerial dispersant spray mission conducted from the Stennis Airport that did not fully comply with all FOSC approvals or directions." (Toenshoff Decl. ¶28.)

MSRC's roles in the aerial dispersant operation were to provide dispersants from its inventory, to locate additional dispersant sources, and to provide logistical and other support to the two aviation contractors under contract with MSRC, to the USAFR, and to other aviation operators arranged by BP. (*Id.* at ¶29.) MSRC had no involvement with the FOSC's decision to authorize the use of Corexit. At no time during the DEEPWATER HORIZON response was MSRC materially involved with any sub-sea dispersant operations. MSRC also had no involvement with the application of dispersants onto the surface of the Gulf of Mexico via vessels. (*Id.* at ¶¶ 30 – 31.) MSRC did not apply any dispersant from response resources it directly owned or operated during the response. Dispersant was applied by third party

5

contractors, including the two contractors under contract to MSRC, the USAFR, and organizations directly under contract to BP. (*Id*. at ¶29.)

During the DEEPWATER HORIZON response, MSRC had a limited role in in-situ burning of Macondo 252 Oil. MSRC supplied its inventory of fire boom and provided MSRC personnel to serve as resources regarding instructions for the fire boom's use. Two MSRC employees were assigned to vessels dispatched for burning operations. These employees had no role in deciding where, when or how to conduct in-situ burning operations. (*Id*. at ¶32.)

During the DEEPWATER HORIZON response, MSRC's role in beach and near-shore coastal cleanup operations was limited and involved contracting with subcontractors to provide labor and other services to assist in performing some of this work, and processing invoices from these subcontractors. (*Id*. at ¶33.)

During the DEEPWATER HORIZON response, MSRC received guidelines for the use of respirators and other personal protective equipment ("PPE") for clean-up workers which were formulated by the Safety Department of the UAC. These guidelines were implemented via Safety Plans distributed to field personnel. (*Id*. at ¶34.)

In all of its participation in the DEEPWATER HORIZON response efforts, MSRC and its employees were subject to and acted under the ultimate authority, control and direction of the FOSC. (*Id*. at ¶35.) There has been no evidence produced during the Limited B3 Discovery period that at any time during the DEEPWATER HORIZON response any MSRC employees failed to comply with any governmental directives and authorizations relating to their functions and operations, or that at any time any MSRC employees exceeded those directives and authorizations. (*Id*. at ¶36.)

6

## ARGUMENT

MSRC incorporates by reference the legal arguments set forth in the Joint Memorandum of Law submitted by the Clean-Up Responder Defendants, as well as the general application of those arguments to the claims against the Clean-Up Responder Defendants in the B3 Complaint. MSRC sets out below its specific arguments as to why it is entitled to derivative immunity under the Clean Water Act or the Federal Tort Claims Act, or in the alternative, why the B3 claims against MSRC are preempted, entitling MSRC to the entry of an order of summary judgment dismissing the B3 claims with prejudice.

## I.    MSRC HAS DERIVATIVE IMMUNITY UNDER THE CLEAN WATER ACT

The Clean Water Act ("CWA") provides the federal government with absolute immunity in connection with oil spill response efforts.  *See* 33 U.S.C. § 1321(j)(8) ("The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section.").   As the Court held in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint (Rec. Doc. 4159) and as discussed in the Joint Memorandum of Law filed by the Clean-up Responder Defendants, a private entity participating in the oil spill response is entitled to derivative government immunity if it was acting under authority "validly conferred" by the federal government and it did not exceed the scope of that authority.  *See Yearsley v. W.A. Ross Construction*, 309 U.S. 18, 20-21 (1940); *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 206-07 (5th Cir. 2009).

### A.    Authority Was Validly Conferred By The Federal Government

As explained in the Joint Memorandum filed by the Clean-Up Responder Defendants, there can be no doubt that the federal government was exercising legitimate authority in directing the response to the DEEPWATER HORIZON oil spill.  The CWA provides that "[t]he President

7

shall, in accordance with the National Contingency Plan ["NCP"] and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge . . . of oil . . . into or on the navigable waters."  33 U.S.C. § 1321(c)(1)(A) (emphasis added).  Pursuant to OPA 90 and the NCP, when an oil spill "poses or may present a substantial threat to public health or welfare of the United States," which was clearly the case in the DEEPWATER HORIZON oil spill, federal law requires the FOSC to "direct all federal, state, or private actions to remove the discharge," not just to monitor response actions.  33 U.S.C. §1321(c)(2)(A); *see also* 40 C.F.R. § 300.120; 40 C.F.R. § 300.135.

As set forth herein, throughout the federal government's unprecedented response to this Spill of National Significance, the limited B3 discovery has confirmed that MSRC and its employees performed the actions that are the subject of the B3 Complaint pursuant to the authorization, direction, and ultimate control of federal government officials acting within the ICS.  (*See, e.g.*, Toenshoff Decl. ¶¶12, 17, 35.)  MSRC received that authority and direction by way of the daily IAP's and other written authorizations from the FOSC.  (*Id.* at ¶¶18, 20, 32, 34.) In addition, it is clear that these actions were within the scope of this CWA absolute immunity provision because any actions or omission taken by MSRC related to the NCP which is a required plan under OPA 90.

**B.**     **MSRC Did Not Exceed The Scope Of Its Authority**

There has been no evidence produced during the limited B3 discovery that at any time during the DEEPWATER HORIZON response MSRC or any of its employees failed to comply with any governmental directives and authorizations relating to their functions and operations, or that at any time MSRC or any MSRC employees exceeded those directives and authorizations. (*Id*. at ¶36.)

8

Thus, MSRC is entitled to share in the federal government's broad immunity for all oil spill response actions taken under the CWA.  Accordingly, the Court should enter an order granting summary judgment to MSRC dismissing all remaining claims against MSRC in the B3 Complaint with prejudice.

## II.    MSRC HAS DERIVATIVE DISCRETIONARY FUNCTION IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), bars claims against the federal government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  "The basis for the discretionary function exception was Congress' desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Berkovitz v. United States*, 486 U.S. 531, 537-38 (1988) (*quoting United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

Discretionary derivative immunity extends to private contractors, such as MSRC, the immunity traditionally afforded to the government when the government engages in a discretionary governmental function.  *In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006).  Derivative discretionary function immunity is available in the emergency-response context where:    (i) the government approved reasonably precise specifications; (ii) the government supervised and controlled the implementation of those specifications; and (iii) the contractor was not aware of reasons not known to the government that would make implementation of the specifications unsafe or unreasonable.   *Id.* at 563; *see also Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000).  Specifications are reasonably precise if the government exercised discretion over all significant details and all

9

critical choices.  *Katrina Canal Breaches Litig. Steering Comm. v. Washington Group Int'l, Inc.*, 620 F3d 455, 461 (5th 2010).  The Fifth Circuit has recognized that the purpose of derivative immunity "is to prevent the contractor from being held liable when the government is actually at fault."  *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989).

A.     **The Federal Government Has Discretionary Function Immunity For Its Actions In Responding To The DEEPWATER HORIZON Oil Spill**

There can be no doubt that the federal government would enjoy discretionary function immunity for its actions in responding to the Deepwater Horizon spill.  The decisions made by the FOSC concerning the manner in which the clean-up operations would be conducted clearly "involve[d] an element of judgment or choice," *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), and those decisions were "based on considerations of public policy."  *Id.* at 537.

As the FOSC explained, the federal government's "decision to use dispersants required a robust assessment of net environmental benefits and monitoring activities at the wellhead, in the benthos, water column, water surface, and along the shoreline," and a "trade-off analysis determined the appropriateness of dispersant use."  (Joint SUMF ¶110; *see also* Joint Ex. 42, Aug. 20, 2010 Letter from NIC Thad Allen to Representative Edward J. Markey (discussing "the facts and considerations that the Federal On-Scene Coordinator (FOSC) weighed in authorizing [the use of dispersants], both before and after issuing Addendum III to the Dispersant Monitoring and Assessment Directive").)  These are precisely the types of governmental decisions that discretionary function immunity is designed to insulate from judicial review.

B.     **The Federal Government Approved Precise Specifications And Controlled Their Implementation**

There can be no dispute that the cleanup actions in the Gulf of Mexico were governed by the NCP, 33 U.S.C. §1321(d) and 40 C.F.R. Part 300 Appendix E.  The NCP was prepared by the federal government and provides detailed and comprehensive procedures and standards for

10

the "efficient, coordinated and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances." *Id.* MSRC had no role in preparing the NCP.

Throughout the response to the DEEPWATER HORIZON oil spill, the FOSC, through the exercise of his discretion, specifically authorized the use of the Corexit dispersants on the surface of the water in the Gulf of Mexico. (Joint SUMF at ¶56.) On a daily basis, the FOSC established a total maximum authorized dispersant volume to be used by the various aircraft contractors. (Toenshoff Decl. ¶21.) The FOSC daily approvals also contained precise restrictions concerning the location, time and manner for the applications of dispersants. (*Id.* at ¶¶ 22 – 26.) MSRC had no role in the decision to use Corexit or in establishing the amount, location, time or manner for the application of dispersants, nor did MSRC have discretion in interpreting any of the FOSC's dispersant direction or restrictions. (*Id.* at ¶¶ 19, 28.)

The FOSC controlled implementation of these specifications and restrictions by requiring that spotter aircraft accompany each aerial dispersant spray mission and to report the results of its monitoring to the UAC and the FOSC. (Joint SUMF at ¶¶ 63 – 64.) In addition, "[t]he FOSC's representatives and other federal officials were present in the various Incident Command Posts to monitor the execution of the detailed instructions contained in the Incident Action Plans." (*Id.* at ¶83.)

C.     **The Federal Government's Specifications Were Not Unsafe Or Unreasonable**

The FOSC's decisions concerning dispersant use during the DEEPWATER HORIZON oil spill were based on preauthorization plans developed by the Regional Response Teams for the Gulf of Mexico. (Joint SUMF at ¶¶ 5 – 13.) The pre-authorization plans allow for the use of any dispersant on the NCP Product Schedule which the FOSC considers appropriate for the existing

11

environmental and physical conditions.  (*Id.* at ¶14.)  The Corexit dispersants used for the DEEPWATER HORIZON oil spill were placed on the NCP Product Schedule after the federal government reviewed their chemical composition and toxicity data and concluded that each dispersant could be safely and effectively used to respond to oil spills.  (*Id.* at ¶19.)

Testing conducted during and after the use of dispersants confirmed the safety of the use of Corexit.  Tests conducted by the EPA, which have been peer reviewed, ultimately concluded that Corexit displayed no biologically significant hazards and was no more toxic that the spilled oil itself.  (*Id.* at ¶¶ 98 – 102.)  The FOSC's Operational Science Advisory Team found that dispersant chemical compounds in the water or sediment near the coasts or wetlands in the Gulf of Mexico did not exceed the EPA's own benchmarks for increased risk and, in fact, in many of the collected samples there were no detectable dispersant compounds at all.  (*Id.* at ¶103.)

Thus, MSRC is entitled to share in the federal government's discretionary immunity for all oil spill response actions taken under the CWA.  Accordingly, the Court should enter an order granting summary judgment to MSRC dismissing all remaining claims against MSRC in the B3 Complaint with prejudice.

## III.    THE CLAIMS AGAINST MSRC IN THE B3 COMPLAINT ARE PREEMPTED

"Under the Supremacy Clause, federal law will preempt state law when Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme, or when state law conflicts with federal law or its purpose." *Carden v. Gen. Motors Corp.*¸ 509 F. 3d 227 (5th Cir. 2007).  Preemption applies to lawsuits as well as to state statutes and regulations. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000) (holding tort action brought under state law preempted by federal automobile safety standard).  Preemption also

12

applies to claims made pursuant to maritime law. *See, e.g., Matter of Oswego Barge Corp.*, 664 F.2d 327, 337-38 (2d Cir. 1981) (maritime claims preempted by CWA).

### A. The Claims Against MSRC Are Barred By The Doctrine of Implied Conflict Preemption

Conflict preemption exists when compliance with a "state-law duty" is impossible, *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 (1982), or when a state tort action "creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 563 - 64 (U.S. 2009) (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

As explained in the Joint Memorandum submitted by the Clean-Up Responder Defendants, Plaintiffs' maritime and state law claims asserted against MSRC in the B3 Complaint are preempted by the CWA and the NCP because both conflict circumstances are present: the impossibility of complying with both state and federal statutes and regulations governing how MSRC was to respond to the spill, as well as the obstacles created by Plaintiffs' claims that run counter to the national interest established by Congress in promoting an effective and efficient federal response to oil spills.

First, to the extent that the B3 Complaint alleges that MSRC's actions in responding to the DEEPWATER HORIZON oil spill violated state or maritime law, it would have been physically impossible for MSRC to have complied with such laws without violating the CWA and the NCP. *De la Cuesta*, 458 U.S. at 153. Federal law requires the President to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge of oil" in accordance with the NCP, which includes the "procedures and techniques" for dispersing the oil, and the quantities of such dispersants which can be used safely. Federal law also provides that the FOSC "shall direct all federal, state, or private actions

13

to remove the discharge" in cases of a Substantial Threat discharge. 33 U.S.C. § 1321(c)(2)(A); 40 C.F.R. § 300.322(b). As discussed herein, because of the magnitude of this incident (*i.e.* it was of such a size or character as to be a "Substantial Threat" to the public health or welfare of the United States), the FOSC was required under OPA 90 to direct all federal, state, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge.

MSRC was compelled by federal law to obey the daily directives issued by the FOSC in responding to the DEEPWATER HORIZON spill—the only spill ever to be designated a Spill of National Significance. Thus, federal law imposed a duty on MSRC to obey the directives of the FOSC and NIC, even if those directives were in violation of state or maritime law. If MSRC had refused to obey such federal directives in order to conform to their purported duties under state or maritime law, they would have violated the CWA and the NCP. With this potential conflict and in the face of mandatory federal law, contrary maritime or state law is preempted when MSRC complied with the directions of the FOSC, including the application of dispersants at locations, times, and in quantities deemed safe and directed by the FOSC and federal agencies.

Second, the B3 Complaint's state and maritime claims against MSRC "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in promoting an effective and efficient federal response to significant oil spills. *Hines*, 312 U.S. at 67. By asserting that MSRC's actions in responding to the spill violated various state and general maritime laws, the B3 Complaint suggests that the FOSC should be required to consider the tort law of various states, maritime law and federal common law in deciding how to respond to a spill. Indeed, the B3 Complaint seeks to substitute the after-the-fact judgment of this Court about appropriate response activities for the expert real time judgment of the FOSC and the other

14

federal agencies that authorized, directed, and controlled the actions of MSRC in responding to the DEEPWATER HORIZON spill.  This is a patently improper task for this or any Court.

Accordingly, in the alternative to finding that MSRC shares in the federal government's immunity under the CWA or the FTCA, the Court should enter an order granting summary judgment to MSRC dismissing all remaining claims against MSRC in the B3 Complaint with prejudice on the grounds that such claims are barred by the doctrine of implied conflict preemption.

**B.**   **The Claims Against MSRC Are Barred By The Doctrine of Implied Field Preemption**

In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the "scheme of federal regulation . . . is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *English v. General Elec. Co.*, 496 U.S. 72, 79 (U.S. 1990) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Pre-emption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713 (U.S. 1985).  *See also Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004) (state law claim based on airline's failure to warn passengers about deep vein thrombosis preempted by the "pervasive regulatory scheme covering air safety concerns" and because it conflicted with a federal determination that passengers should remain seated).

Congress' overriding goal in establishing the CWA's spill response requirements was to provide a rapid and effective response to discharges.  *See* 33 U.S.C. § 1321(c)(1)(A) ("The President shall . . . ensure effective and immediate removal of a discharge . . . of oil or a

15

hazardous substance . . . ."). The CWA and the NCP set forth a comprehensive and pervasive regime which squarely placed the responsibility for the clean-up effort upon the federal government, pre-empting the field from other state and local regulation in this area. The state and maritime claims against MSRC undermine the federal government's decisions and its careful balancing of the public interest in responding to the DEEPWATER HORIZON oil spill and directly conflict with Congressional intent that decisions regarding response efforts must be governed by the procedures and criteria set forth in the CWA and NCP. *Cf.* National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47,384, 47,399-400 (Sept. 15, 1994) (rejecting "view that a state could initiate more stringent measures than the [F]OSC when the latter is directing the response" and explaining that the FOSC "has specific legal authority to guide the activities of all parties responding to a discharge, and all actions would have to be authorized or approved by the [F]OSC") (codified at 40 C.F.R. Part 300).

Indeed, despite the fact that OPA 90 provides savings clauses for some state regulation, the preemptive effect of the OPA 90 and NCP response regime mandates uniform federal rules on response requirements applicable to this case similar to that which have been found preemptive in the areas of the design, construction, maintenance, operation and manning of tankers. As the Supreme Court explained field preemption in *United States v. Locke*, 529 U.S. 89, 116 (2000), "Congress has left no room for state regulations of these matters." (*citing Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978) and H. R. Conf. Rep. No. 101-653, 101, p. 122 (1990)).

Accordingly, in the alternative to finding that MSRC shares in the federal government's immunity under the CWA or the FTCA, the Court should enter an order granting summary

16

judgment to MSRC dismissing all remaining claims against MSRC in the B3 Complaint with prejudice on the grounds that such claims are barred by the doctrine of implied field pre-emption.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Joint Memorandum submitted by the Clean-Up Responder Defendants, MSRC respectfully requests that the Court enter an order granting summary judgment dismissing the remaining claims against it in the B3 Complaint with prejudice.

Dated: May 18, 2012

Respectfully submitted,

**BLANK ROME LLP**

By:      /s/ *Alan M. Weigel*
Alan M. Weigel, Esq.
Attorneys for Marine Spill Response Corporation
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone: 212-885-5000
Facsimile: 917-332-3836
E-mail: aweigel@blankrome.com

17

810517.00025/7127622v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum of Law in Support of Marine Spill Response Corporation's Motion for Summary Judgment on Grounds of Derivative Immunity and Preemption has been served on All Counsel by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of May, 2012.

/s/ *Alan M. Weigel*
Alan M. Weigel

18