UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:   OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179 |
| | SECTION: J |
| THIS DOCUMENT RELATES TO: | |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | JUDGE BARBIER MAG. JUDGE SHUSHAN |

## DECLARATION OF DONALD A. TOENSHOFF, JR. IN SUPPORT OF MARINE SPILL RESPONSE CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF DERIVATIVE IMMUNITY AND PREEMPTION

DONALD A. TOENSHOFF, JR., declares under penalty of perjury as follows:

1. I am the Executive Vice President of the Marine Spill Response Corporation ("MSRC"). I have held that position since April 1996.

2. I submit this declaration in support of MSRC's motion for an order of summary judgment dismissing with prejudice all claims asserted against MSRC in the First Amended B(3) Master Complaint on the grounds that MSRC has derivative immunity from such claims, or alternatively, that such claims are preempted. I make this declaration based upon my personal knowledge and based upon documents which are under MSRC's custody and control.

3. MSRC is an independent, private, not-for-profit national Oil Spill Removal Organization ("OSRO"). MSRC has been classified as an OSRO pursuant to the Coast Guard's voluntary OSRO classification program. This classification program allows vessel and facility plan holders to list OSROs in response plans in lieu of

providing extensive detailed lists of response resources if the organization has been classified by the Coast Guard and their capacity has been determined to equal or exceed the response capability needed by the plan holder.

4. MSRC is funded primarily by grants from the Marine Preservation Association ("MPA"). The MPA's membership consists of companies engaged in the business of petroleum exploration, production, refining, marketing, transportation and shipping. The MPA was created by the oil and shipping industries following the enactment of Oil Pollution Act of 1990 ("OPA-90"). The MPA supported the formation of MSRC, in part, to satisfy OPA-90's requirement that those engaged in the handling, storage, and transport of oil and petroleum products "ensure by contract . . . private personnel and equipment necessary to remove to the maximum extent practicable a worst-case discharge."

5. MSRC has the largest, most comprehensive dedicated standby oil spill response program in the United States. MSRC's capabilities include a dedicated fleet of specialized Oil Spill Response Vessels ("OSRVs"), specialized Oil Spill Response Barges ("OSRBs") and dispersant and spotter aircraft. MSRC also maintains certain equipment, such as containment boom, self-propelled skimming vessels, deployable skimming systems, and trained personnel to support and maintain its OSRO classification under the Coast Guard's OSRO classification system.

6. MSRC's resources are cited in MPA members' oil spill response plans to assist the member in meeting its response planning requirements and are mobilized when called out by the member to respond to an incident. MSRC's resources are also available for call-out by non-MPA members and government agencies.

810517.00025/7124990v.1

7. As part of its membership in the MPA, BP America, Inc. ("BP") entered into a Service Agreement with MSRC under which MSRC would provide oil spill response services.

8. At about 1:00 a.m. Central time on April 21, 2010, pursuant to the Service Agreement, BP contacted MSRC and requested activation of its response resources including dispersant assets to respond to the DEEPWATER HORIZON oil spill. Throughout the DEEPWATER HORIZON response efforts, MSRC served as a contractor to BP, but was subject to the ultimate authority and direction of the federal government, as described below.

9. In response to BP's call-out, by 12:00 p.m. Central time on April 21, 2010, one C-130 dispersant spray aircraft, provided by MSRC's sub-contractor International Air Response ("IAR"), and a King Air spotter aircraft, provided by MSRC's sub-contractor Dynamic Aviation Group ("Dynamic"), were ready for dispersant spray operations at MSRC's facility at Stennis International Airport in Bay St. Louis, Mississippi. BP subsequently activated at Stennis Airport an additional C-130 aircraft for dispersant spray operations and seven additional King Air spotter aircraft.

10. In the days immediately following MSRC's call-out by BP, MSRC also activated its Gulf Coast and East Coast fleet of OSRVs, support barges and vessels and began skimming oil off the surface of the water in the off-shore areas of the Gulf of Mexico. MSRC eventually mobilized a total of twelve OSRVs for use in the DEEPWATER HORIZON response efforts, including the later mobilization of two OSRVs from California.

3

11.     During the course of the DEEPWATER HORIZON response efforts, MSRC also was called upon to mobilize other equipment and personnel to assist with response efforts, as directed by the Unified Area Command ("UAC").  MSRC equipment and personnel were involved in on-water skimming and boom staging and deployment operations in near-shore areas controlled by the various incident command posts ("ICPs") established by the Coast Guard during the response, all of which were under the control of the UAC.

12.     During the course of the DEEPWATER HORIZON response efforts, several MSRC employees also held positions supporting the Federal On-Scene Coordinator representatives ("FOSCRs") and other federal officials occupying positions in the Incident Command System ("ICS") structure.  In all of these positions, MSRC employees acted under the overall control and at the direction of the Federal On-Scene Coordinator ("FOSC"), the FOSCRs, and/or other federal officials.

13.     During the DEEPWATER HORIZON response, all aerial dispersant operations were managed by the Dispersant Group in the Operations Section at the ICP in Houma, Louisiana ("ICP Houma").  The Dispersant Group's operations were organized at two airports—the Stennis Space Center Airport in Bay St. Louis, Mississippi, and the Houma-Terrebonne Airport in Houma, Louisiana.  Each airport had a liaison to the Dispersant Group at ICP Houma, such that the ICP was thoroughly knowledgeable of all of the details of the operations going on at the two airports at all times.

14.     The DEEPWATER HORIZON response area was ultimately divided into zones to de-conflict spray operations between Houma and Stennis aircraft.  Stennis

aircraft were only assigned to spray missions east of the dividing line at 089° 30.0' West longitude.

15. During the course of the DEEPWATER HORIZON response efforts, I was assigned as the Stennis Airport Staging Manager. In that role, I provided direct supervision of the MSRC's Stennis aerial dispersant operations. I was assisted by several other MSRC managers and supervised as many as 106 field personnel including sub-contractors and United States Air Force Reserves ("USAFR") personnel. I was on-site at MSRC's Stennis facility starting April 21, 2010, having flown to the Stennis facility on the C-130 based in Coolidge, Arizona.

16. Ultimately, aircraft assigned to Stennis Airport for aerial dispersant operations were operated by MSRC's sub-contractors, IAR and Dynamic, and also by the following parties not under contract to MSRC: Lynden Air Cargo; Oil Spill Response, Limited; and the USAFR 910th Airlift Wing/757th Airlift Squadron.

17. Daily direction was provided by the federal government with regard to the amounts and location of dispersants to be applied. Federal government approval was necessary for all aerial dispersant operations and such approval came exclusively from the FOSC.

18. Beginning on April 21, 2010 and continuing throughout the DEEPWATER HORIZON spill response, daily Incident Action Plans ("IAPs") were prepared by the UAC that contained detailed instructions concerning the response activities that were to occur each day, including the use of dispersants. Each IAP was approved by the FOSC and delivered daily to the Houma ICP for execution.

810517.00025/7124990v.1

19. Between April 21 and July 19, 2010, the FOSC specifically authorized the use of the dispersants Corexit EC9500A and Corexit EC9527A on the surface of the water in the Gulf of Mexico as part of the DEEPWATER HORIZON spill response activities at various times and in various amounts. MSRC had no involvement with the FOSC's decision to authorize use of either Corexit product.

20. Between April 21 and May 26, 2010, authorization to use dispersants was provided through the daily IAP. From May 26 to July 19, 2010, BP periodically submitted written requests to the FOSC and/or FOSCR and received specific written authorization from the FOSC before each and every application of dispersants to the surface of the water in the Gulf of Mexico.

21. The UAC set a total maximum authorized dispersant volume to be used by the various aircraft contractors and the USAFR each day that dispersants were approved for use during the DEEPWATER HORIZON spill response. The Dispersant Group would then allocate this daily total maximum authorized dispersant volume between the Stennis and Houma-Terrebone airports and assign each airport a total daily authorized dispersant volume for the aircraft originating from that airport. At no time during the DEEPWATER HORIZON spill response did any aircraft operating from Stennis Airport individually or collectively load dispersants in an amount exceeding the total maximum authorized dispersant volume assigned by the Dispersant Group for the day in question.

22. The FOSC dispersant approvals contained not only maximum volumes, but also restrictions concerning the location and manner of the approved applications of dispersants. During the DEEPWATER HORIZON spill response, aerial dispersant

application was at the rate of 5 gallons per acre by aircraft flying at an altitude of approximately 50 to 75 feet, at a speed of approximately 150 knots.

23. During the DEEPWATER HORIZON spill response, no aerial dispersant spray missions were authorized or conducted within 3 nautical miles ("nm") of shore or where the water depth was less than 10 meters.

24. During the first few days of dispersant spray operations, no aerial dispersant spray missions were authorized or conducted within 3 nm of the spill site or in-situ burning. The FOSC later increased the spill site and in-situ burning safety setback to 5 nm.

25. During the first few days of aerial dispersant spray operations, the IAPs approved by the FOSC did not specify restrictions regarding how close dispersant spray missions could be conducted in relation to any vessel or platform. During this period of time, dispersant operations were governed by Federal Aviation Administration flight rules which mandated a 500 foot safety setback from any vessel or platform. On April 30, 2010, the IAP approved by the FOSC contained vessel and platform proximity restrictions of 1 nm. On May 6, 2010, the safety setback for vessel and platforms was expanded to 2 nm.

26. During the DEEPWATER HORIZON spill response, no aerial dispersant spray operations were authorized or conducted outside of daylight hours. At times, dispersant aircraft transited to or from the authorized spray site outside of daylight hours, but all dispersant spray operations were conducted during daylight hours.

27. During the DEEPWATER HORIZON spill response, the C-130 aerial dispersant spray aircraft were accompanied by a spotter aircraft whose mission was, in

part, to ensure that no vessels or platforms were located in the planned dispersant deployment area and that FOSC directions were followed.  The Dispersant Group plotted and tracked the spray of dispersants and reported all dispersant-related data—including flight paths—to the UAC and ultimately to the FOSC.

28.     I am not aware of any aerial dispersant spray mission conducted from the Stennis Airport that did not fully comply with all FOSC approvals or directions.

29.     MSRC's roles in the aerial dispersant operation were to provide dispersants from its inventory, to locate additional dispersant sources, and to provide logistical and other support to the two airplane contractors under contract with MSRC, to the USAFR, and to other plane operators arranged by BP.  MSRC did not apply any dispersant from response resources it directly owned or operated during the response. Dispersant was applied by third party contractors, including the two contractors under contract to MSRC, the USAFR, and organizations directly under contract to BP.

30.     At no time during the DEEPWATER HORIZON response was MSRC materially involved with any sub-sea dispersant operations.

31.     At no time during the DEEPWATER HORIZON response was MSRC involved with the application of dispersants onto the surface of the Gulf of Mexico via vessels.

32.     During the DEEPWATER HORIZON response, MSRC had a limited role in in-situ burning of Macondo 252 Oil.  MSRC supplied its inventory of fire boom and provided MSRC personnel to serve as resources regarding instructions for the fire boom's use.  Two MSRC employees were assigned to vessels dispatched for burning operations. These employees had no role in deciding where, when or how to conduct in-situ burning

810517.00025/7124990v.1

operations. At all times, these employees were subject to the ultimate authority and direction of the FOSC and/or other federal officials.

33. During the DEEPWATER HORIZON response, government officials, BP and BP's spill management contractors directed and oversaw any beach and/or coastal cleanup operations. MSRC's role in beach and near-shore coastal cleanup operations was limited and involved contracting with subcontractors to provide labor and other services to assist in performing some of this work, and processing invoices from these subcontractors.

34. During the DEEPWATER HORIZON response, the Safety Department of the UAC formulated guidelines for the use of respirators and other personal protective equipment ("PPE") for clean-up workers. MSRC received such direction from the Safety Department and implemented such direction via Safety Plans distributed to field personnel.

35. At all times, MSRC's employees participating in the DEEPWATER HORIZON spill response efforts were subject to the ultimate authority, control and direction of the FOSC, the FOSCRs, and/or other federal officials.

36. I am not aware of any time during the DEEPWATER HORIZON response when MSRC's employees failed to comply with any governmental directives and authorizations relating to their functions and operations, nor am I aware of any time when MSRC's employees exceeded those directives and authorizations.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Herndon, Virginia, on May 10, 2012.

_____
DONALD A. TOENSHOFF, JR.