UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010<br><br>THIS DOCUMENT RELATES TO:<br><br>*ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MARINE SPILL RESPONSE CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF IMMUNITY AND PREEMPTION**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, Marine Spill Response Corporation respectfully submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment on Grounds of Derivative Immunity and Preemption and to supplement the Joint Statement of Undisputed Facts submitted by the Clean-up Responder Defendants.

1.     MSRC is an independent, private, not-for-profit national Oil Spill Removal Organization ("OSRO"). MSRC has been classified as an OSRO pursuant to the Coast Guard's voluntary OSRO classification program. (Declaration of Donald A. Toenshoff, Jr., dated May 10, 2012 ("Toenshoff Decl.") ¶ 3.)

1

2. MSRC's capabilities include a dedicated fleet of specialized Oil Spill Response Vessels ("OSRVs"), specialized Oil Spill Response Barges ("OSRBs") and dispersant and spotter aircraft.  (*Id.* at ¶5.)

3. MSRC maintains certain equipment, such as containment boom, self-propelled skimming vessels, deployable skimming systems, and trained personnel to support and maintain its OSRO classification under the Coast Guard's OSRO classification system.  (*Id.*)

4. BP America, Inc. ("BP") entered into a Service Agreement with MSRC under which MSRC would provide oil spill response services.  (*Id.* at ¶7.)

5. At about 1:00 a.m. Central time on April 21, 2010, pursuant to the Service Agreement, BP contacted MSRC and requested activation of its response resources including dispersant assets to respond to the DEEPWATER HORIZON oil spill.  (*Id.* at ¶8.)

6. Throughout the DEEPWATER HORIZON response efforts, MSRC served as a contractor to BP, but was subject to the ultimate authority and direction of the federal government.  (*Id.*)

7. In response to BP's call-out, by 12:00 p.m. Central time on April 21, 2010, one C-130 dispersant spray aircraft, provided by MSRC's sub-contractor International Air Response ("IAR"), and a King Air spotter aircraft, provided by MSRC's sub-contractor Dynamic Aviation Group ("Dynamic"), were ready for dispersant spray operations at MSRC's facility at Stennis International Airport in Bay St. Louis, Mississippi.  (*Id.* at ¶9.)

8. Ultimately, aircraft assigned to Stennis Airport for aerial dispersant operations were operated by MSRC's sub-contractors, IAR and Dynamic, and also by the following parties not under contract to MSRC:  Lynden Air Cargo; Oil Spill Response, Limited; and the U.S. Air Force Reserve ("USAFR") 910th Airlift Wing/757th Airlift Squadron.  (*Id.* at ¶16.)

9. In the days immediately following MSRC's call-out by BP, MSRC activated its Gulf Coast and East Coast fleet of OSRVs, support barges and vessels and began skimming oil off the surface of the water in the off-shore areas of the Gulf of Mexico. (*Id.* at ¶10.)

10. During the course of the DEEPWATER HORIZON response efforts, MSRC equipment and personnel were involved in on-water skimming and boom staging and deployment operations in near-shore areas controlled by the various incident command posts ("ICPs") established by the Coast Guard during the response, all of which were under the control of the Unified Area Command ("UAC"). (*Id.* at ¶11.)

11. During the course of the DEEPWATER HORIZON response efforts, several MSRC employees held positions supporting the Federal On-Scene Coordinator representatives ("FOSCRs") and other federal officials occupying positions in the Incident Command System ("ICS") structure. (*Id.* at ¶12.)

12. During the DEEPWATER HORIZON response, all aerial dispersant operations were managed by the Dispersant Group in the Operations Section at the ICP in Houma, Louisiana ("ICP Houma"). (*Id.* at ¶13.)

13. The Dispersant Group's operations were organized at two airports—the Stennis Space Center Airport in Bay St. Louis, Mississippi, and the Houma-Terrebonne Airport in Houma, Louisiana. (*Id.*)

14. The DEEPWATER HORIZON response area was ultimately divided into zones to de-conflict spray operations between Houma and Stennis aircraft. Stennis aircraft were only assigned to spray missions east of the dividing line at 089° 30.0' West longitude. (*Id.* at ¶14.)

810517.00025/7127669v.1

15. Beginning on April 21, 2010 and continuing throughout the DEEPWATER HORIZON spill response, Incident Action Plans ("IAPs") were approved by the Federal On-Scene Coordinator ("FOSC") and delivered daily to the Houma ICP for execution. (*Id.* at ¶18.)

16. MSRC had no involvement with the FOSC's decision to authorize use of the dispersants Corexit EC9500A and Corexit EC9527A on the surface of the water in the Gulf of Mexico as part of the DEEPWATER HORIZON spill response activities. (*Id.* at ¶19.)

17. The UAC set a total maximum authorized dispersant volume to be used by the various aircraft contractors and the USAFR each day that dispersants were approved for use during the DEEPWATER HORIZON spill response. (*Id.* at ¶21.)

18. The Dispersant Group allocated the daily total maximum authorized dispersant volume between the Stennis and Houma-Terrebone airports and assigned each airport a total daily authorized dispersant volume for the aircraft originating from that airport. (*Id.*)

19. At no time during the DEEPWATER HORIZON spill response did any aircraft operating from Stennis Airport individually or collectively load dispersants in an amount exceeding the total maximum authorized dispersant volume assigned by the Dispersant Group for the day in question. (*Id.*)

20. During the DEEPWATER HORIZON spill response, aerial dispersant application was at the rate of 5 gallons per acre by aircraft flying at an altitude of approximately 50 to 75 feet, at a speed of approximately 150 knots. (*Id.* at ¶22.)

21. During the DEEPWATER HORIZON spill response, no aerial dispersant spray missions were authorized or conducted within 3 nautical miles ("nm") of shore or where the water depth was less than 10 meters. (*Id.* at ¶23.)

4

22.     During the first few days of dispersant spray operations, no aerial dispersant spray missions were authorized or conducted within 3 nm of the spill site or in-situ burning. The FOSC later increased the spill site and in-situ burning safety set-back to 5 nm. (*Id.* at ¶24.)

23.     During the first few days of aerial dispersant spray operations, dispersant operations were governed by Federal Aviation Administration flight rules which mandated a 500 foot safety setback from any vessel or platform. (*Id.* at ¶25.)

24.     On April 30, 2010, the IAP approved by the FOSC contained vessel and platform proximity restrictions of 1 nm. On May 6, 2010, the safety setback for vessel and platforms was expanded to 2 nm. (*Id.*)

25.     During the DEEPWATER HORIZON spill response, no aerial dispersant spray operations were authorized or conducted outside of daylight hours. (*Id.* at ¶26.)

26.     MSRC's roles in the aerial dispersant operation were to provide dispersants from its inventory, to locate additional dispersant sources, and to provide logistical and other support to the two airplane contractors under contract with MSRC, to the USAFR, and to other plane operators arranged by BP. (*Id.* at ¶29.)

27.     MSRC did not apply any dispersant from response resources it directly owned or operated during the response. Dispersant was applied by third party contractors, including the two contractors under contract to MSRC, the USAFR, and organizations directly under contract to BP. (*Id.*)

28.     At no time during the DEEPWATER HORIZON response was MSRC materially involved with any sub-sea dispersant operations. (*Id.* at ¶30.)

29. At no time during the DEEPWATER HORIZON response was MSRC involved with the application of dispersants onto the surface of the Gulf of Mexico via vessels. (*Id.* at ¶31.)

30. During the DEEPWATER HORIZON response, MSRC supplied its inventory of fire boom for in-situ burning of Macondo 252 oil and provided MSRC personnel to serve as resources regarding instructions for the fire boom's use. (*Id.* at ¶32.)

31. Two MSRC employees were assigned to vessels dispatched for burning operations. MSRC employees had no role in deciding where, when or how to conduct in-situ burning operations. (*Id.*)

32. During the DEEPWATER HORIZON response, MSRC's role in beach and near-shore coastal cleanup operations was limited and involved contracting with subcontractors to provide labor and other services to assist in performing some of this work, and processing invoices from these subcontractors. (*Id.* at ¶33.)

33. During the DEEPWATER HORIZON response, MSRC received guidelines for the use of respirators and other personal protective equipment ("PPE") for clean-up workers from the Safety Department of the UAC and implemented such direction via Safety Plans distributed to field personnel. (*Id.* at ¶34.)

34. At all times, MSRC and its employees participating in the DEEPWATER HORIZON spill response efforts were subject to the ultimate authority, control and direction of the FOSC and/or other federal officials. (Id. at ¶¶ 12, 32, 35.)

810517.00025/7127669v.1

Dated: May 18, 2012

                            Respectfully submitted,
                            **BLANK ROME LLP**

By:    /s/ *Alan M. Weigel*_____
         Alan M. Weigel, Esq.
         Attorneys for Marine Spill Response Corporation
         The Chrysler Building
         405 Lexington Avenue
         New York, NY 10174
         Telephone: 212-885-5000
         Facsimile: 917-332-3836
         E-mail: aweigel@blankrome.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing Rule 56.1 Statement of Undisputed Material Facts in Support of Marine Spill Response Corporation's Motion for Summary Judgment on Grounds of Derivative Immunity and Preemption has been served on All Counsel by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of May, 2012.

                                          /s/ *Alan M. Weigel*_____
                                          Alan M. Weigel