HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

AGREEMENT FOR THE PROVISION OF

DISPERSANT SERVICES

BY AND BETWEEN

MARINE SPILL RESPONSE CORPORATION

AND

INTERNATIONAL AIR RESPONSE, INC.

Reference for Rex:

1. Specifications pg 1/ #(9) (11)

2. Specifications pg 4/ section b #1

3. Specifications pg 10/ section 2 letter i

4. Schedule 4 compensation

**EXHIBIT**

1

IAR 00152

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

THIS AGREEMENT FOR THE PROVISION OF DISPERSANT SERVICES ("Agreement") is made as of September 1, 2006, by and between Marine Spill Response Corporation, a non-profit corporation organized under the laws of the State of Tennessee ("MSRC"), and International Air Response, Inc., a corporation organized under the laws of the State of Arizona ("Contractor").

### WITNESSETH:

WHEREAS, Contractor operates large aircraft to spray dispersants and provide related services; and

WHEREAS, MSRC desires to enter into an agreement whereby Contractor will provide services using large aircraft to aerially spray dispersants and provide other services in support of MSRC's provision of oil spill response services to its customers.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  **Definitions.**  In this Agreement the following words and expressions shall have the meanings hereby assigned to them except as otherwise defined herein and except where the context otherwise requires:

    1.1    "Agreement" means this Agreement together with the Schedules.

    1.2    "Aircraft" means the aircraft having the capacity and configuration described in Schedule 2 and capable of providing the Services.

    1.3    **"Call-Out Notice"** means a written notice from MSRC to Contractor, substantially in the form of Schedule 3, initiating Services for a potential oil spill event, particular oil spill event, or other use of the Resources.

    1.4    "Personnel" means the flight crew, maintenance personnel and other personnel necessary or desirable to provide the Services and, at a minimum, meeting the requirements set forth in Schedule 2.

    1.5    "Resources" means the resources necessary or appropriate for Contractor to provide the Services described in this Agreement and meeting the technical specifications described in Schedule 2, including the Aircraft.

    1.6    "Service" or the "Services" means the services to be provided by Contractor under this Agreement, as more specifically provided in Schedule 2. Without limitation, the Services shall include the provision by Contractor of the Aircraft and all Personnel, equipment, maintenance, spares and administrative support that are necessary for the safe and satisfactory performance of the Services in accordance with the requirements of MSRC.

IAR 00153

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

2.    **Resources and Services to be Provided by Contractor; Reliance Thereon.**

2.1    Contractor agrees to provide the Resources and perform the Services in accordance with the terms of this Agreement including, without limitation, the requirements set forth in Schedule 2.

2.2    Contractor agrees to provide or procure the provision of all Personnel.   All Personnel shall be skilled and experienced and appropriately licensed in their respective disciplines as necessary to properly operate, fly and maintain the Aircraft and other Resources, and as otherwise necessary to provide the Services.

2.3    Contractor agrees that MSRC may cite the Resources and the Services in MSRC's federal and state "OSRO Applications" (as defined below) or other federal regulatory requirements for the provision of information, and that MSRC's customers may cite the Resources and the Services in their federal and state oil spill response plans.  MSRC's federal and state "OSRO Applications" include (a) the Oil Spill Removal Application submitted to the United States Coast Guard, and (b) similar applications submitted to, or classifications obtained from, states and territories of the United States (including Puerto Rico and the United States Virgin Islands).  Such OSRO Applications contain a listing and/or classification of MSRC's response resources that may be cited by MSRC's customers to meet their vessel and facility response planning requirements under the Oil Pollution Act of 1990, as amended, or applicable state law.  Contractor shall provide acknowledgment of the facts concerning the Resources and the Services to appropriate governmental and regulatory bodies upon MSRC's request.

3.    **Call-Out Process.**

3.1    In the event MSRC desires Contractor to (a) provide Services for a potential oil spill event, particular oil spill event, or other use of the Resources, or (b) perform unscheduled training exercises in accordance with Schedule 2 of this Agreement, in each case MSRC shall notify Contractor of the need for Services or unscheduled training exercises using the contact information for Call Out Notices to Contractor required by Schedule 2.

3.2    Such notice shall initially be either:   → *Needs to match ops plan notify*

(a)    A "Standby Notice," in which case Contractor shall dedicate its resources to MSRC's use in accordance with this Agreement and immediately undertake all necessary actions to prepare itself to initiate performance of Services; or   → *activate*

(b)    A "Mobilization Notice," in which case Contractor shall immediately commence mobilization of its Resources and begin performance and be prepared to respond with Aircraft loaded with dispersant and ready for flight within the time periods specified in Schedule 2.

3

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

3.3   MSRC shall provide Standby and Mobilization Notices orally, provided they are promptly confirmed in writing. The written confirmation shall be in the form of a Call-Out Notice. Contractor shall make a person available 24 hours a day for the purposes of receiving Call-Out Notices, implementing Call-Out Notices and commencing immediate performance of Services or unscheduled training exercises. Oral notice shall at all times be sufficient for Contractor to commence its response to a Call-Out Notice.

3.4   Once Services have commenced for a potential oil spill event, particular oil spill event, or other use of the Resources, MSRC and Contractor shall continue to document the Resources and Services to be provided by Contractor, either by amending the Call-Out Notice or in some other mutually acceptable written documentation.

4.   **Contractor's Representations, Warranties and Covenants.**   Contractor represents, warrants and covenants that, throughout the term of this Agreement:

4.1   Contractor is validly existing and in good standing under the laws of the State of Arizona; its execution of this Agreement is duly authorized; and this Agreement constitutes its valid and binding obligations, enforceable against Contractor in accordance with its terms.

4.2   Contractor shall provide Aircraft and other Resources to provide the Services described in Schedule 2, and such Aircraft and other Resources shall meet or exceed the technical specifications provided in Schedule 2.

4.3   Contractor shall comply with all laws, rules and regulations of government and other relevant bodies (including, without limitation, the FAA and any replacement or similar body), and maintain all necessary permits, that are applicable from time to time to Contractor's business and to the Services and the Resources. Such laws, rules and regulations include, without limitation, the FAA regulations, as the same may be promulgated by the United States Government from time-to-time during the term of this Agreement.

4.4   Contractor shall maintain the Aircraft and other Resources in accordance with best industry practice and in accordance with the maintenance requirements set forth in Schedule 2. Without limitation, Contractor shall follow the FAA-approved maintenance program for aircraft of the same make and model as the Aircraft in use by Contractor and encompassing scheduled maintenance (including block maintenance), condition monitored maintenance and on-condition maintenance of airframe, engines and parts of the Aircraft including, but not limited to, servicing, testing, preventive maintenance, repairs, structural inspections, system checks, overhauls, approved modifications, service bulletins, engineering orders, Airworthiness Notes and Directives, service information letters, corrosion control, inspections and treatments.

4

IAR 00155

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

4.5   Contractor shall maintain an adequate inventory of necessary spare parts for the Aircraft and other Resources so as to ensure the continued availability of the Aircraft and other Resources within the time periods set forth in Schedule 2.

4.6   Should Contractor fail to provide the required Aircraft and other Resources or otherwise fail to provide the Services within the time periods specified in Schedule 2, Contractor agrees to pay, as liquidated damages and not as a penalty, the amount of $5,000.00 for each day that such failure continues provided that in no event shall Contractor be liable for the payment of more than $15,000.00 for anyone failure to provide Services.

Notwithstanding the foregoing, Contractor shall not be obligated to pay such liquidated damages if its failure is due to:

(a)   Weather conditions;

(b)   Action by the FAA not caused by failure on the part of Contractor to observe and comply with published regulations of the FAA or Contractor's obligations under this Agreement;

(c)   Compliance with any Airworthiness Notes and Directives issued by the FAA or any mandatory service bulletin or information letters issued by the manufacturer of the Aircraft, provided that such compliance was not made necessary because of Contractor's failure to observe and comply with published regulations of the FAA, manufacturers bulletins or letters, or Contractor's obligations under this Agreement;

(d)   Crew unavailability due to statutory limitations following operations in response to a previous Call-Out Notice;

(e)   Scheduled or unscheduled maintenance or repair lasting less than three (3) hours or threatening a delay of less than three (3) hours, provided that such maintenance or repair was not made necessary because of Contractor's failure to observe and comply with published regulations of the FAA, manufacturers bulletins or letters, or Contractor's obligations under this Agreement; or *Moved farther out    perceived rush gives us more time    dangerous work cond*

(f)   A "Force Majeure" event, defined for purposes of this Agreement as a delay or non-performance due to or arising from acts of God or public enemy; civil war; insurrection or riot; fire; flood; explosion; earthquake; epidemic; government expropriation or confiscation; inability to procure equipment or materials from suppliers' (provided the same have been ordered in a timely manner) or any other cause to the extent that such cause is beyond the control of Contractor and did not arise due to Contractor's negligence, willful misconduct or breach of this Agreement or any applicable law.  Contractor agrees to take all reasonable steps to minimize the impact of Force Majeure events.

5

IAR 00156

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

5.   **Term and Termination.**

5.1   The initial term of this Agreement shall be for a fixed period of two (2) years, commencing on September 1, 2006 (the Effective Date) and expiring on the second anniversary of the Effective Date (August 31, 2008).

5.2   MSRC shall have the option to extend the initial term for three (3) additional periods of one (1) year each. If, prior to the end of the initial term or the first or second option years, as the case may be, MSRC elects to exercise its option to extend the term of this Agreement, it shall so notify Contractor in writing at least sixty (60) days prior to the end of the initial term or the first or second option year, as the case may be.

5.3   This Agreement may be terminated upon the occurrence of an "Event of Default" in accordance with the provisions of Section 14.

5.4   Notwithstanding anything to the contrary in this Agreement, MSRC shall be entitled to terminate this Agreement for its convenience without cause upon thirty (30) days prior written notice to Contractor and upon payment of a termination fee equal to thirty-three percent (33%) of the remaining contract value as of the effective date of its termination ("Termination Fee").

5.5   MSRC (and, during an "Assignment Period," the "Assignee" (as both terms are defined in Section 16 below)), shall have the right to terminate, in whole or in part, the Services being provided under a Call-Out Notice, without terminating this Agreement as a whole.

6.   **Compensation.**  As full and complete consideration for the performance of Contractor's obligations hereunder, MSRC shall pay Contractor as follows:

6.1   Monthly Charge:  For every month during the initial term or any renewal term MSRC shall pay Contractor the "Monthly Charge" set forth on Schedule 4.  The Monthly Charge shall be prorated for any partial months.

(a)   The Monthly Charge shall compensate Contractor for all costs in obtaining and maintaining the capabilities required hereunder, including, without limitation, making Aircraft and Personnel available within the time periods specified in Schedule 2.

(b)   The Monthly Charge shall also compensate Contractor for all other obligations herein, including, without limitation, maintenance of the quality assurance program set forth in Section 10; provided that Contractor shall be compensated for charges incurred in response to a Call-Out Notice pursuant to the provisions of Section 6.2.

(c)   Reserved

IAR 00157

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

6.2   Charges under a Call-Out Notice:                    *Activation*

   (a)   MSRC shall be charged for Services provided under a Call-Out Notice
         ("Flight Hours") in accordance with the rates set forth in Schedule 4.
         Flight Hours shall commence the moment the Aircraft engines are started
         and as recorded in the Aircraft and Engine Flight Log maintained by the
         Contractor in commencement of the Services, and shall be otherwise
         calculated as specified in Schedule 4. Contractor shall be compensated for
         a minimum of four (4) Flight Hours per day under each Call-Out Notice.

   (b)   Payment for Flight Hours shall compensate Contractor for all costs in
         providing the Resources and Services under a Call-Out Notice, including,
         without limitation, mobilization, operation, spray services and
         demobilization.

   (c)   MSRC shall be charged for Services provided under a Call-Out Notice for
         unscheduled training exercises requested by MSRC or its customers in
         accordance with the rates set forth in Schedule 4.

6.3   Payment Terms:

   (a)   The Monthly Charge shall be payable by MSRC within ten (10) business
         days of MSRC's receipt of the monthly invoice.

   (b)   Flight Hours and all other charges shall be invoiced by Contractor to
         MSRC on a bi-weekly basis, with each such invoice to be supported by
         such supporting documentation as reasonably requested by MSRC. All
         invoices for Flight Hours shall reference the Call-Out Notice pursuant to
         which the Services were performed. Invoices for Flight Hours (net of any
         deductions permitted under this Agreement) shall be payable by MSRC
         within fifteen (15) business days of MSRC's receipt of a properly
         supported invoice.

   (c)   MSRC may withhold payment of any disputed charges provided it notifies
         Contractor in writing of the basis for the dispute, and provided further that,
         should it ultimately be determined that MSRC is responsible for such
         disputed charges, MSRC shall pay interest on the disputed charges at a
         rate of twelve percent (12%) per annum from the due date until paid.

   (d)   MSRC may withhold from payments due Contractor amounts sufficient to
         protect MSRC from and against any lien or claim chargeable to Contractor
         and asserted against MSRC or its property, or any damages suffered by
         MSRC because of a breach of this Agreement by Contractor. MSRC may
         pay any such claim or lien out of monies so withheld or payments
         thereafter due Contractor unless Contractor timely furnishes MSRC with
         an executed release or satisfaction of such lien or claim in recordable
         form.

IAR 00158

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

6.4   Contractor shall pay all taxes and fees levied or assessed against Contractor, the Services, the Resources or any other of Contractor's property, or otherwise imposed on or required of Contractor in respect of its business or its obligations hereunder.   Contractor shall collect and remit all applicable state and local sales taxes.

7.   **General Conditions.**

7.1   It is a condition precedent to the obligations of MSRC under this Agreement that Contractor shall provide Aircraft that (in addition to meeting all other requirements contained herein) are licensed to operate in accordance with applicable FAA requirements for dispersant operations.   Without limitation, Contractor shall obtain the operating licenses or certificates as issued by the FAA for operation of the Aircraft as well as all other necessary licenses, approvals and permits necessary for the operation of the Aircraft.   MSRC shall have the right to inspect Aircraft and other records at any time to ensure they are current.

7.2   Operational control and operational liability shall remain with Contractor at all times during and after the period of this Agreement and are inclusive of the statutory obligations of Contractor.   Without limitation:

   (a)   The Pilot-In-Command of the Aircraft shall have complete discretion concerning (i) the load carried on the Aircraft and its distribution, (ii) as to whether or not any flights shall be undertaken, (iii) as to where landings should be made and (iv) as to all other matters relating to the operation of the Aircraft, and MSRC shall accept all such decisions as final.

   (b)   Contractor hereby acknowledges and agrees that all information given to the Pilot-In-Command of the Aircraft with respect to any dispersant spraying operations shall be solely of an advisory nature (without MSRC having any liability therefor), and the Pilot-In-Command of the Aircraft shall at all times remain solely responsible for all matters relating to such operation of the Aircraft.

7.3   All Personnel shall be deemed to be the employees and servants of Contractor, and Contractor shall be solely responsible for the payment of salaries, workers' compensation costs, and all other expenses incurred in connection with the Personnel.   Without limitation:

   (a)   Contractor shall maintain discipline and good order among the Personnel.

   (b)   Contractor shall maintain Personnel strength in accordance with the provisions of Schedule 2 to this Agreement, and Contractor shall provide suitably qualified and trained replacement Personnel at the Contractor's own expense if any of the Personnel shall be unavailable, unable, or unwilling, to carry out their duties in a safe and satisfactory manner.

8

IAR 00159

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(c)     Contractor shall be solely responsible for providing housing, subsistence and transport for the Personnel.

(d)     Contractor shall ensure that all Personnel have the required permits and licenses including, without limitation, the relevant professional licenses of crew and maintenance personnel. MSRC shall have the right to inspect individual crew and maintenance personnel records and written performance reports at any time to ensure they are current.

7.4     The obligations of the Contractor under this Agreement are the obligations of the Contractor notwithstanding the use of subcontractors by the Contractor. The Contractor shall be responsible for the performance of its subcontractors. Without limitation, any acts, omissions, negligence or willful misconduct on the part of the Contractor's subcontractors shall be deemed to be the acts, omissions, negligence or willful misconduct of the Contractor for all purposes of this Agreement.

7.5     Neither Contractor nor any subcontractor shall pledge the credit of MSRC for any maintenance, service, repairs, overhauls, or modifications to, or changes or alterations in, the Aircraft or for any other purpose whatsoever.

7.6     Contractor and every subcontractor shall ensure that MSRC is not held out as having any operational interest in, or responsibility for, the Aircraft or the operation of the Aircraft, the Personnel, or the carriage of cargo or passengers thereon.

7.7     MSRC shall have the right to require Contractor to replace, at Contractor's cost, any Personnel that are not satisfactory in MSRC's reasonable opinion.

7.8     Contractor shall be responsible for (a) the cleaning of dispersant spray equipment and other Resources, and (b) the disposal of cleaning products, dispersant waste or residues and all other wastes generated by Contractor in performing Services hereunder, all in compliance with applicable laws and regulations at Coolidge, Arizona.

IAR 00160

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

8.   **Insurance.**  At all times during the term of this Agreement, Contractor shall maintain in force at least the types and minimum amounts of insurance set forth in Schedule 5.

9.   **Exclusivity.**  Notwithstanding anything to the contrary herein, Contractor agrees that for the term of this Agreement, Contractor shall sell dispersant application and all other dispersant-related services exclusively to MSRC, and make the Resources available exclusively to MSRC for dispersant application and other dispersant-related services. Contractor further agrees not to quote prices or sell similar services or offer or provide the Resources for dispersant application or other dispersant-related services to any other party during the term of this Agreement, unless authorized to do so in writing by MSRC.

10.  **Quality Assurance.**

10.1   Contractor shall maintain a quality assurance program satisfying the requirements set forth in Schedule 6. Such program shall be established no later than the date set forth in the milestone schedule attached as Schedule 1 to this Agreement, and shall be reasonably satisfactory in form and substance to MSRC. Prior to the establishment of such program, commencing on the Effective Date, the Contractor shall comply with, and cause its Personnel to comply with, its existing quality assurance policies and procedures, which shall be consistent in all material respects with applicable federal and state quality assurance requirements.

10.2   Contractor's affiliates and subcontractors shall be subject to audit by MSRC or its agents or representatives in respect of operational and technical performance. Without .limitation, MSRC may conduct "no-notice" and other drills on Contractor, its affiliates and subcontractors in accordance with the requirements set forth in Schedule 2. In addition, Contractor agrees that it and its affiliates and subcontractors shall submit to inspection by appropriate governmental and regulatory bodies, as well as MSRC and its customers, to verify the condition and availability of the Resources.

11.  **Records**

11.1   Contractor and its affiliates and subcontractors shall maintain true and correct sets of records in connection with the Services and all transactions related thereto and shall retain all such records for a period of not less than three (3) years after expiration or termination of this Agreement for any reason.

11.2   MSRC shall have the right, at its cost, to inspect and audit all such records. This right shall survive the expiration or termination of this Agreement. MSRC shall give Contractor reasonable prior written notice of its intention to conduct an inspection and audit under the provisions of this Section 11.

11.3   If such an audit reveals any errors in charges or other overpayments by MSRC, MSRC may set-off or deduct the amount of any such error or overpayment from sums due to Contractor under this Agreement; in the alternative, MSRC may

IAR 00161

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

demand, and Contractor shall pay to MSRC, the amount of such error or overpayment within fifteen (15) business days of MSRC's demand for payment.

12. **Liability and Indemnity.**

12.1    Subject to the other provisions of this Section 12, Contractor covenants and agrees fully to defend, protect, indemnify and hold harmless MSRC, any "Assignee" named in an "Assignment Notice" (as such terms are defined in Section 16 hereof), and their respective officers, directors, employees, members and agents from and against any and all actions, causes of action, claims, costs, damages, demands, expenses (including but not limited to reasonable legal fees and expenses incurred in defense of MSRC, any Assignee named in an Assignment Notice, and their respective officers, directors, employees, members and agents), liabilities, losses, and/or suits of every kind and nature (collectively, "Losses") directly or indirectly arising out of or resulting from:

(a)    bodily injury, including, without limitation, fatal injury, illness and/or disease to Contractor, MSRC, an Assignee, or their respective employees, subcontractors, representatives, and agents, in connection with the performance of this Agreement;

(b)    loss of or damage to property of third parties, Contractor, MSRC or an Assignee, or their respective employees, subcontractors, representatives, and agents, arising out of the provision of the Aircraft and the Contractor's Personnel, and for the performance of the Services or any part thereof; and/or

(c)    any other claim relating to Contractor's provision of the Services including, without limitation, any claim relating to the timeliness or adequacy of the Services.

The indemnification obligations of Contractor, its affiliates and subcontractors hereunder shall not apply to the extent any Losses arise from the gross negligence or willful misconduct of MSRC, an Assignee, or their respective employees.

12.2    The obligations of this Section 12 shall survive the expiration or other termination of this Agreement.

13. **Environmental, Health & Safety Program; Security Program.** The Contractor shall establish and maintain (a) an environmental, health and safety ("EH&S") program, including an alcohol and drug use policy, and (b) a security program, in each case in accordance with the requirements set forth in Schedule 6. Such programs shall be established no later than the dates set forth in the milestone schedule attached as Schedule 1 to this Agreement, and shall be reasonably satisfactory in form and substance to MSRC. Prior to the establishment of such programs, commencing on the Effective Date, the Contractor shall comply with, and cause its Personnel to comply with, its existing EH&S

IAR 00162

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

and security policies and procedures, which shall be consistent in all material respects with applicable federal and state EH&S and security requirements.

14. **Default; Remedies.**

14.1   MSRC and Contractor agree that the occurrence of any of the following events shall constitute an event of default ("Event of Default") by Contractor:

(a)   In response to a Call-Out Notice by MSRC, Contractor fails to provide Aircraft and other Resources within the time periods specified in Schedule 2, or otherwise fails to provide Services to an oil spill event, potential oil spill event or in connection with other use of the Resources meeting the requirements of this Agreement;

(b)   Contractor fails to maintain the Aircraft and other Resources required hereunder, or fails to maintain the licenses or other authorizations required to operate same, or such Aircraft are damaged or destroyed and Contractor does not procure or arrange for replacement Aircraft or resources within five (5) days;

(c)   A receiver, liquidator, custodian, or trustee of Contractor is appointed by court order, or a petition is filed, a case is commenced, or relief is ordered against Contractor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution, or liquidation law of any jurisdiction, whether now or hereafter in effect; or if Contractor becomes insolvent, makes an assignment for the benefit of creditors, or fails to pay its debts generally as they become due, or consents to the appointment of a receiver, trustee, custodian, or liquidator of all or substantially all of its property; or  Contractor files a petition commencing a case in voluntary bankruptcy or seeking relief under any provision of any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition or the commencement of any case against it under any such law; or any of the Aircraft are arrested, confiscated, seized, taken in execution, impounded, forfeited, detained in exercise or purported exercise of any possessory lien or other claim, or otherwise taken from the possession of the Contractor.

(d)   any representation, warranty or other statement made by Contractor hereunder is or becomes false or misleading, and Contractor fails to correct such representation, warranty or statement within five (5) days of written notice of such failure from MSRC;

(e)   Reserved

IAR 00163

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(f)    Contractor fails to fully and timely perform any of its other obligations hereunder, and fails to cure such failure within five (5) days of written notice of such failure from MSRC; or

(g)    any other event occurs which has a prejudicial effect on Contractor's ability to perform the Services under this Agreement or on MSRC'S rights under this Agreement, and Contractor fails to remedy the prejudicial effect of such event within five (5) days of written notice of such event from MSRC.

14.2    Upon the occurrence of an Event of Default and the expiration of any cure period specified above, MSRC may exercise any right, power, or remedy permitted by law and shall have, in particular, without limiting the generality of the foregoing, the right to immediately terminate this Agreement.  Without limitation, the parties further agree that:

(a)    Without prejudice to the ability of MSRC to terminate this Agreement, MSRC shall have the right (but not the obligation) to effect compliance on Contractor's behalf, and to recover any costs so incurred from Contractor together with interest thereon at a rate equal to twelve percent (12%) from the date on which such expenditure is incurred by MSRC until the date of reimbursement thereof by Contractor (or, in the alternative, MSRC may offset such costs against any amounts owed by MSRC to Contractor); and

(b)    MSRC's damages in the event of termination shall include, without limitation:

(i)    the balance of all money paid in advance for Services due to be performed after the date of the termination event; and

(ii)    all losses, damages, costs and expenses incurred by MSRC in connection with such termination including, without prejudice to the generality of the foregoing, all costs and expenses in placing an alternative Agreement or agreements for the Services.  MSRC agrees to make reasonable efforts to mitigate its loss in respect of such sums referred to in this Section 14.2(b)(ii) and shall use its reasonable endeavors to obtain a substitute aircraft comparable to the Aircraft subject always to such comparable aircraft being readily available at reasonable cost and having regard to the operational requirements of MSRC at such time.

14.3    The rights and remedies of MSRC provided in this Agreement are cumulative and are not exclusive of any rights and remedies provided by law except where specifically provided in this Agreement.

14.4    During any Assignment Period the Assignee my provide notice of default to Contractor and terminate all or a part of the Services for that Oil Spill Event and

IAR 00164

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

pursue other remedies as permitted by law, provided that the Assignee shall have no right to terminate this Agreement as between MSRC and Contractor (such right being reserved to MSRC, in addition to any other remedies available to MSRC hereunder).

15. **Independent Contractor.** The parties intend that an independent contractor relationship between MSRC and Contractor be created by this Agreement, and Contractor is not to be considered an agent or employee of MSRC for any purpose. As an independent contractor, Contractor shall provide all necessary supervision and direction for its employees to perform the Services. However, Contractor shall strictly comply with and follow the overall coordination and directions given to Contractor by MSRC in connection with a potential oil spill event, particular oil spill event, or other use of the Resources, including but not limited to such directions as may be described or referred to in this Agreement. Due to the emergency nature of an oil spill event clean up, these directions may be oral and both parties shall use their best efforts to document all significant directions in writing as soon as practicable given all the circumstances of the oil spill event.

16. **Assignment and Subcontracting.**

16.1 Contractor shall not assign any of its rights or delegate or subcontract any of its duties hereunder without the prior written consent of MSRC.

16.2 There shall be no change in the beneficial ownership or control and management of the Contractor without the written consent of MSRC.

16.3 In the event of an oil spill event requiring the Services, MSRC intends to assign, for purposes of that particular oil spill event (the "Oil Spill Event"), certain of its rights and obligations under this Agreement to the person requesting MSRC response services (the "Assignee") within seven (7) days after MSRC commences such services, provided that both the Assignee and Contractor consent to such assignment. MSRC will deliver written notice of assignment (an "Assignment Notice") to Contractor and the Assignee. Upon the consent of Contractor and the Assignee to such assignment, and as of the effective time of the assignment, the Assignee shall assume responsibility for payment of all Flight Hours and other costs under Section 6.2 (taking into account the payment terms specified in Section 6.3), shall document any additional Resources and Services requested in accordance with Section 3.4, and shall be entitled (along with MSRC) to the benefits of Sections 11 (Records), 12 (Liability and Indemnity), and 17 (Information and Publicity). MSRC will continue to supervise Contractor unless and until Contractor is advised otherwise by the Assignee. During the period of assignment, MSRC shall be acting at the direction and on behalf of the Assignee. An assignment shall not alter or affect any obligations of MSRC or Contractor prior or subsequent to the assignment, and this Agreement otherwise shall remain in effect with MSRC except with regard to the specific rights and obligations assigned to the Assignee for such Oil Spill Event.

IAR 00165

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

17. Information and Publicity.

17.1    Preservation of Confidential Information. Contractor shall not publish or disclose to anyone, except to or at the direction of MSRC, any "Confidential Information" made available, directly or indirectly, to Contractor or its employees by MSRC or MSRC's customers, their contractors, subcontractors, or their respective employees or agents, during the course of the performance of the Services. For the purposes of this Agreement, "Confidential Information" means all information communicated by MSRC to or otherwise obtained by Contractor during the performance of Services hereunder relating to the oil spill event, MSRC's customers or the activities of Contractor, MSRC, MSRC's customers or any other participant in response activities, and any other information provided to Contractor by MSRC during the term of this Agreement.

17.2    Publicity. Contractor shall not permit its employees or subcontractors or their employees and agents to publish or release (orally or in writing) any public relations material or information of any kind concerning or relating to any Confidential Information, the Services under this Agreement, or any activities of MSRC, MSRC's customers or its contractors unless such materials or information have first been reviewed and approved in writing by MSRC.

17.3    Return of Information. Upon the earlier to occur of (a) completion of the Services rendered in connection with any oil spill event or (b) termination of this Agreement, Contractor shall promptly deliver to MSRC all Confidential Information in Contractor's possession and all copies thereof, in whatever form, whether or not furnished to Contractor or produced by Contractor.

17.4    This Section 17 shall remain binding on the parties notwithstanding the expiration or other termination of this Agreement.

18. Notices

18.1    Except as otherwise provided in this Agreement, any notice required or permitted to be delivered hereunder shall be deemed made (a) when delivered in person or by telephonic or other form of electronic communication or (b) 3 business days after mailing if addressed by name and title and sent by United States mail. Except as otherwise provided in this Agreement notices shall be in writing and sent to the address or telex or facsimile number set forth below. MSRC or Contractor may designate additional contacts as necessary. Either party may change the contact information by providing notice to the other as provided herein.

18.2    Notices (other than Call-Out Notices) to Contractor shall be sent to:

IAR 00166

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

International Air Response, Inc.
6100 North Coolidge Airport Road
Coolidge, Arizona 85228
Attn: Travis Grantham and Fritz Wester
Telephone: 520-723-6555
Facsimile: 520-723-6550

18.3    Notices to MSRC shall be sent to:

Marine Spill Response Corporation
220 Spring Street, Ste. 500
Herndon, Virginia 20170
Attn: Scott M. Morris
Telephone: 703-326-5615
Facsimile: 703-326-5660

## 19.    Arbitration; Choice of Law.

19.1    Any disputes between the parties hereto as to matters arising out of or relating to this Agreement which cannot be settled by the parties shall be submitted to binding arbitration under and in accordance with the Rules of the American Arbitration Association, in such location agreed upon by the parties or, absent such agreement, in Herndon, Virginia. The party seeking arbitration shall give written notice thereof to the other party, describing in reasonable detail the nature of the dispute and naming the arbitrator selected by such party. The other party shall, by written notice within five (5) days following receipt of such notice, name its arbitrator. The arbitrators so named shall select a third arbitrator, who shall be independent and unrelated to any of the parties, within five (5) days following the appointment of the last arbitrator by a party hereto. The decision of a majority of the arbitrators shall be final and binding upon the parties and judgment may be entered thereon by any court of competent jurisdiction. To the extent agreed upon by the parties to this Agreement, third parties may be joined in such arbitration and/or this arbitration otherwise may be combined with arbitration proceedings with such third party. The arbitration award shall include the allocation among the parties of the costs and expenses of arbitration.

19.2    This Agreement shall be governed and construed by, and interpreted in accordance with, the laws of the State of Virginia excluding any conflicts or choice of law principles that would direct the substantive law of another jurisdiction to apply. The obligations under this Agreement with respect to the airborne part of the Services (including those safety and regulatory obligations relating to the maintenance and operation of the Aircraft) shall include those under federal aviation law.

IAR 00167

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

20.  **Miscellaneous**

20.1   The terms and provisions contained within this Agreement, together with Schedules 1 to 6 attached hereto, constitute the entire agreement between the parties hereto and shall supersede all previous communications, representations or agreements, either oral or written, between said parties with respect to the subject matter hereof, and no agreement or understanding varying or extending the same shall be binding upon either party unless in writing, signed by a duly authorized officer or representative thereof, in which this Agreement shall be specifically referred to.

20.2   No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement or to exercise any right or remedy arising from the breach thereof, shall constitute a waiver of any such breach of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Agreement shall be performed or complied with by either party and no breach thereof shall be waived, altered or modified except by a written instrument executed by both parties. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach hereof.

20.3   This Agreement does not create a joint venture, partnership or other legal entity between the parties. Neither this Agreement, nor any of the operations or activities hereunder, shall be construed or considered as creating such a relationship or constituting either party as a partner or agent of the other party.

20.4   This Agreement may not be modified or amended except by a writing executed by both parties to this Agreement.

20.5   In this Agreement:

(a)   headings to Sections are for ease of reference only and shall be ignored in the interpretation of this Agreement;

(b)   references to Sections and schedules are to be construed as references to Sections of, and schedules to, this Agreement, as amended or supplemented from time to time, and references to this Agreement shall include the schedules.

(c)   References to any person shall be construed so as to include that person's permitted assignees, transferees or successors in title;

(d)   References to statutes and other legislation shall include all re-enactments, consolidations, substitutions and amendments thereof and regulations made thereunder;

IAR 00168

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(e)    References to any agreement or instrument shall include such agreement or instrument as it may from time to time be varied, amended, supplemented or substituted in accordance with its terms;

(f)    References to the singular shall include the plural and vice versa and references by way of any pronoun shall include references to any other pronoun;

(g)    References to the word "person" or "persons" or to words importing persons include individuals, firms, corporations, limited liability companies, partnerships, government agencies, committees, departments, authorities and other bodies, incorporated or unincorporated, whether having distinct legal personality or not;

(h)    The words "other" and "otherwise" shall not be construed in a limiting fashion ejusdem generis with any foregoing words where a wider construction is possible; and

(i)    The words "include," "including" and "in particular" shall be construed as being by way of illustration or emphasis and shall not limit or prejudice the generality of any foregoing words.

20.6    This Agreement is for the benefit of MSRC and, upon assignment pursuant to Section 16 above, the Assignee named in the Assignment Notice. Other than the Assignee, this Agreement shall not be deemed to be for the benefit of any third party, nor will it give any person not a party to this Agreement any right to enforce any of its provisions.

20.7    If any provision of this Agreement is determined to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions will not in any way be affected or impaired thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

21.    <u>Time is of the Essence.</u>  Time is of the essence of each and every obligation in this Agreement.

22.    <u>Counterparts.</u> This Agreement may be executed and delivered by each party hereto in separate counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same agreement, notwithstanding that all the parties have not signed the same counterpart.

23.    <u>Effective Date of Agreement; Spray System Certification.</u>

23.1    This Agreement is effective on September 1, 2006 the date the Contractor obtained the certification (the "Spray System Certification") from the Federal Aviation Administration (the "FAA") necessary for the operation of the

IAR 00169

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

Contractor's dispersant spray system on the Aircraft (the "Effective Date"). Contractor shall pay all expenses necessary to obtain the Spray System Certification and any approvals, licenses and permits necessary for the installation and operation of the dispersant spray system on the Aircraft.

23.2 Contractor shall be deemed the owner of the dispersant spray system developed for use in connection with the Contractor's provision of Services hereunder and shall be responsible for its operation, testing and maintenance in accordance with Schedule 2. Such system (including all backup systems) shall be ready and available at all times to provide Services hereunder and for unscheduled training exercises, and at no time during the term of this Agreement shall such system (including all backup systems) be made available to any third party without the prior written authorization of MSRC.

23.3 Contractor acknowledges that MSRC has paid to Contractor the sum of $100,000 to fund the development of the dispersant spray system to be used on the Aircraft, which amount shall be deducted from the first six Monthly Charges payable following the Effective Date.

*[Remainder of page intentionally left blank]*

> Bucket testing only

> follow on agmt dated
___ is contradictory
should IAR pay MSRC back?

19

IAR 00170

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first written above by duly authorized representatives of the parties hereto.

Marine Spill Response Corporation                International Air Response, Inc.

By: _____              By: _____
Name: Scott M. Morris                                   Name: Travis Grantham
Title: Vice President — Commercial                Title: Vice President
Services and Projects

20                                                    IAR 00171

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

# SCHEDULE 2
# SPECIFICATIONS

1.    Synopsis of Scope of Work and Services

a.    Aircraft providing offshore dispersant spraying shall be multi-turbine
engine aircraft capable with a full payload to attain prolonged cruise
speeds of more than 280 knots true air speed and to be able to carry an oil
dispersant spray system with a payload of 3,250 U.S. gallons of Corexit    _May_
9500 dispersant or more.  The aircraft's home base will be in Coolidge,
Arizona and the aircraft must depart from its home base within 4 hours of
activation twenty-four hours a day, 365 days a year when activated by the
Marine Spill Response Corporation (MSRC).  The principal focus of the
dispersant operations will be in the Gulf of Mexico (GOM) out to 200 nm
offshore.  Additionally, the aircraft may be required to respond to spills at
other locations and for other purposes in the contiguous 48 states, Alaska,
Hawaii, the U.S. Caribbean, or to international destinations as directed by
MSRC.    → state dep. lic.



b.    Required flight crews and support personnel and equipment to be able to
respond 24 hours per day, 365 days per year to an oil spill and to support
dispersant operations or provide other services on average for 12 hours per
day for at least 6 consecutive days.

c.    Specific tasks to be performed include, but are not limited to the
following:

(1)    Low level (50-100 feet), slow speed (150-200 knots) application of
dispersants in offshore waters out to 200 nm

(2)    Ability to take-off within 4 hours of notification by MSRC

(3)    Maintain the aircraft to fulfill the requirements of the Agreement

(4)    Store dispersant stockpiles of up to 3,500 gallons at the aircraft's
home base

(5)    Transfer and load dispersant into dispersant application aircraft at
aircraft's home base

(6)    Maintain the aircraft and support equipment including the
dispersant transfer and transport equipment at the home base

(7)    Participate in MSRC Quality Assurance (QA) announced and
unannounced drills

(8)    Participate in telephone and table-top exercises with MSRC and/or
MSRC clients and provide documentation of capabilities, as
requested

(9)    Conduct periodic static and flight testing of dispersant spray
equipment including monitor and recording systems

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(10) Conduct field test of the spray system to verify application dosage, droplet size distribution, and swath width → *how often, whopsfs?*

(11) Conduct periodic flight including dispersant operational flight training, training with spotter aircraft, and over water, out-of-sight of-land low level flight training → *Not always*

(12) Provide tours of facilities and operational briefings to MSRC, MSRC clients, and government agency representatives and permit these personnel to ride in aircraft during dispersant operations as approved by the Pilot-In-Command *IAR*

(13) Train, exercise and respond with and under the direction of the spotter/observer aircraft

(14) Provide other aircraft services as requested by MSRC

2.   **General Specification Conditions**

a.   Special use and unique operational considerations are necessary. Operations involving aircraft in support of the MSRC mission may require deviation from normal operating procedures and require special pilot qualifications as well as special aircraft requirements.

b.   The combination of the aircraft and the spray system must meet all U.S. regulatory requirements, authorizations and permits required, e.g., FAA, Customs, Immigrations, etc. and must be FAA approved for operation (including the dispersant spray system) in the U.S.

c.   Contractor shall provide for dispersant spray operations one of the designated C-130A aircraft identified in Enclosure (1), Dispersant Aircraft Designation and Specifications, and any other C130s MSRC and the Contractor mutually agree to use for dispersant spray operations.

d.   Contractor shall maintain for all aircraft providing dispersant services up-to-date Air Worthiness Certificates.

e.   Contractor shall maintain for all aircraft providing dispersant services up-to-date, current FAA Operating Certificates.

f.   Contractor is responsible for the full cost of repairs including the cost for unexpected mechanical or personnel situations, e.g., uncontained engine failure.

g.   To ensure readiness the Contractor shall maintain a single activation phone number that is manned 24 hours a day 365 days per year and each member of the flight crew, support personnel and the Operations Manager shall carry and continuously monitor a cell phone and pager.  These contact numbers will be maintained up-to-date and provided to MSRC.

IAR SPECIFICATIONS - Final - Clean.doc                                    2

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

h.    Contractor, to the extent available and applicable to the services contemplated, may utilize existing policies and procedures to meet specification requirements.

i.    When requested by MSRC, the Contractor will obtain to the best of their ability DSP-73's to permit dispersant operations outside of the United States and its territories.

3.    **Aircraft Specifications**

a.    General Specifications

(1)    The aircraft must have and maintain a current Special Certificate of Airworthiness (Restricted Category). Aircraft with a Special Certificate of Airworthiness in the Limited or Provisional Category are unacceptable for dispersant operations. FAA Special Certificate of Airworthiness (Restricted Category) shall authorize the operation of the aircraft with the dispersant spray system attached.

(2)    Aircraft must be multi-turbine engine aircraft capable when carrying a full payload of a cruise speed of 280 Knots True Air Speed or greater and be capable of applying a minimum of 3,250 gallons of Corexit 9500 dispersant per sortie at locations 200 nautical miles offshore.

(3)    Agreement requirements are that the aircraft will be based in Coolidge, Arizona and be ready to take-off within 4 hours of being activated by MSRC.

(4)    All Aircraft Must comply with:

    i.    FAR 91.23 Truth-In-Leasing Clause Requirements In Leases and Conditional Sales Contracts.

    ii.    The necessary requirements for enroute and terminal IFR operations within U.S. and international airspace.

    iii.    AC 91.70 those provisions covering operations in the Gulf of Mexico (GOM) in both VFR and IFR operation.

    iv.    2 independent Radio Altimeter systems which are functionally or flight checked for accuracy.

    v.    All Airworthiness Directives (AD) notes and Manufacturers Service or equivalent. Bulletins for airframe, engine and individual components must be complied with.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

vi.    Must be approved for aircraft and spray equipment under FAR part 137, or equivalent.

(5)    Aircraft shall, in accordance with the manufacturer's recommended normal take-off configuration, be capable of accelerating on all engines to take-off safety speed and lift-off within 80% of the effective runway.

(6)    C-130A dispersant application aircraft must comply with the wing inspection and testing procedures attached as Enclosure (2) to this Schedule.

b.    Aircraft Operations

(1)    The Contractor shall participate in one dispersant exercise annually as scheduled by MSRC. The exercise shall consist of flying to a staging airport in the Gulf of Mexico, conducting up to 8 hours of dispersant flight operations, and returning to home base.

(2)    The Contractor shall jointly with MSRC identify a preferred main dispersant base in the GOM. Final agreement on the main dispersant base will be reached by the Contractor and MSRC.

(3)    Staging airports will be determined and agreed to by the Contractor and MSRC.

c.    Aircraft Equipment

(1)    Communications Equipment

i.    In addition to FAA required communication equipment MSRC will provide the Contractor with a portable SATCOM unit approved for aircraft use to be installed, tested and maintained by the Contractor.

ii.    One emergency locator transmitter installed and maintained as outlined in FAR 91.207.

(2)    Navigation Equipment

i.    GPS with aviation data base and moving map is required.

(3)    Fly Away Kit (FAK). The Contractor will maintain equipment, and materials in the quantities identified in Enclosure (3) to this Schedule that will accompany the aircraft when deployed for dispersant operations.

IAR SPECIFICATIONS - Final - Clean.doc

4

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(4)     Dispersant Spray System Specifications                    -75

    i.     Aircraft shall apply dispersants at altitudes from 50 to 100
           feet, speeds from 150 to 200 knots, and at a pump rate or
           boom pressure to meet the following requirements.

           -     Dispersant capacity of 3,250 gallons or more per
                 sortie
           -     Apply dispersants on the slick with droplet Volume
                 Median Diameter (VDM) of 300 to 500 microns per
                 ASTM Standard F 1413 or as designated by MSRC.
           -     Apply dispersant on the oil slick at an application
                 dosage of 1 to 10 gallons per acre per pass.
           -     Capability to vary the pump rate or boom pressure
                 while in flight.
           -     Have installed boom pressure gauges or pump rate
                 gauges.
           -     Ability to quickly add or remove nozzles and to
                 adjust nozzles to optimize spray coverage and
                 droplet distribution to attain values stated above.
           -     Spray system shall be capable of being turned on
                 and off by the pilot or co-pilot of the aircraft or by a
                 spray system operator.
           -     System shall be able to operate in temperatures
                 from -20 degrees to 110 degrees Fahrenheit.

    ii.    Other Requirements:

           -     A spray system chart shall be provided upon spray
                 system testing showing the spray system's
                 application dosage, swath width and droplet size
                 distribution for various aircraft application speeds,
                 altitudes and pump rates for applying dispersants to
                 achieve a 1, 2, 3, 4, 5, and 10 gallons per acre
                 application rates to an oil spill on the water's
                 surface.

           -     Aircraft will provide spray test data and aircraft
                 specifications for inclusion in the revised NOAA
                 Dispersant Planner and will calculate the aircraft's
                 capability to apply dispersants to locations 50 nm
                 offshore with the revised NOAA Dispersant Planner
                 when it is made available to the public.

IAR 00176

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

iii.     Dispersant Spray System Testing

– The spray system shall be tested by the Contractor semiannually on the ground (bucket testing) to verify that the system can deliver output rates from 1 to 10 gallons per acre.

– Prior to commencement of dispersant services and every two years thereafter the aircraft and spray system shall complete flight testing with collector cards and/or string system to verify that application dosages, droplet sizes, droplet size distributions, pump rates and swath width accurately reflect the spray system chart values and to make adjustments to optimize spray pattern, droplet size and droplet size distribution.

>who
pays

– The tests in paragraphs above shall be conducted in accordance with American Society of Agricultural Engineers (ASAE) Standard 386.2 FEB04, Calibration and Distribution Pattern Testing of Agricultural Aerial Application Equipment or other procedures acceptable by MSRC.

– The Contractor on or about June 1, 2006, shall conduct flight testing to determine the surface applied droplet size distribution, dosage and swath width using collector card testing and associated software analysis procedures available from WRK, Inc. or other companies using equivalent technology acceptable to MSRC.

– Documentation of test results shall be provided to MSRC upon completion of the tests identified in this section and the documentation retained by the Contractor for a period of five years.

iv.     Spray System Maintenance

– Contractor shall provide dispersant system maintenance, cleaning and testing procedures for the aircraft spray system as part of their Quality Assurance, Health, Safety, Environmental and Security Manual.  Procedures should be based on manufacturer's recommendations, industry standards and practices.

IAR SPECIFICATIONS - Final - Clean.doc                          6

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(5)     Dispersant Spray System Monitor, Recorder, and Documentation
System

i.      The Monitor, Recorder, and Documentation System
consisting of hardware and software will be equivalent to
SATLOC M3 system using Map Star 3.4 software and will
be agreed to by MSRC prior to installation.

ii.     Contractor shall install, test and maintain the Monitor,
Recorder, Documentation System.

### 4.     Aircraft Maintenance Program

a.      Aircraft are to be maintained in strict compliance to applicable FARs and
manufacturer and MSRC requirements.  Aircraft shall be maintained with
applicable FAA airworthiness directives and manufacturer's bulletins, or
equivalent.

b.      Contractor furnished aircraft and equipment shall be operable, free from
defects affecting air worthiness and in good repair.  Aircraft systems and
components shall be free of leaks except when they are within limitations
specified by the manufacturer and they are part of the Contractor
Minimum Equipment List (MEL).

### 5.     Flight Personnel

a.      Initial Qualifications

(1)     Pilot-In-Command

i.      Must possess a valid ATP Certificate and Type Rating or
equivalent, for the aircraft offered
ii.     Minimum of 2500 hours total flight hours
iii.    Minimum of 1000 hours as Pilot-In-Command
iv.     Minimum of 500 hours Multi Engine Turbine flight hours
v.      Minimum of 100 hours in the type aircraft presented
vi.     Minimum of 50 hours Instrument time
vii.    Low level flight experience
viii.   Must meet the recency of experience requirements
specified in FAR 61.57 Recent Flight Experience: Pilot-In-
Command
ix.     First Class Medical Certificate

IAR SPECIFICATIONS - Final - Clean.doc

7

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

    x.    No record of convictions for any felony or drug related offenses

    xi.    No record of DUI convictions

    xii.    No more than one conviction for vehicle moving violations within the previous year, unless approved by MSRC

(2)    Co-Pilot

    i.    Must possess at least a valid Commercial Pilot Certificate (AMEL) or equivalent as specified under the provisions of FAR 61

    ii.    Must possess a valid Instrument Rating or equivalent

    iii.    Minimum of 500 hours total flight hours

    iv.    Minimum of 100 hours Multi-Engine Turbine time

    v.    Minimum of 25 hours Instrument Time

    vi.    Minimum of 50 hours as Second in Command or Pilot-In-Command in the type aircraft presented

    vii.    Low level flight experience desired

    viii.    Must meet the recency of experience requirements specified in FAR 61.55

    ix.    At least a Second Class Medical Certificate

    x.    No record of convictions for any felony or drug related offenses

    xi.    No record of DUI convictions

    xii.    No more than one conviction for vehicle moving violations within the previous year, unless approved by MSRC

(3)    Flight Engineer

    i.    Must possess a valid Flight Engineer Certificate or equivalent

    ii.    Minimum of 200 hours as a Flight Engineer

    iii.    Minimum of 150 hours, of which 5 hours was within the proceeding 90 days, as Flight Engineer in the type aircraft presented

    iv.    At least a Second Class Medical Certificate

    v.    No record of convictions for any felony or drug related offenses

    vi.    No record of DUI convictions

    vii.    No more than one vehicle moving violation within the previous year, unless approved by MSRC

IAR SPECIFICATIONS - Final - Clean.doc

8

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

b.    Security review and background check

    (1)    Aircraft Security

        i.    Contractor will provide prior to commencement of dispersant services implement a Security Plan based on TSA Security Guidelines for General Aviation Airports – Information Publication A-001 (A2004 version 1.0 or later).

        ii.    All flight personnel will have a background check and security review conducted by a third party which shall include, but not limited to, felony convictions or drug and alcohol related convictions.  Security review will be in accordance with Transportation Security Administration regulations, as applicable.

        iii.    Pre-employment and pre-assignment drug testing will be conducted in accordance with this schedule.

c.    Flight Crews Required to Accomplish Mission and Availability

    (1)    Flight Crews must be able to be contacted 24 hours a day 365 days a year and must be able to report to the home base to be ready to take-off within 4 hours of being activated by MSRC.

    (2)    To ensure availability, pilots providing dispersant services will carry pagers so they can be reached at any time and the duty pilot will monitor a cell phone.

    (3)    Flight crews must be able to support spraying operations for an average of 12 hours per day for 6 consecutive days.

    (4)    Maintain a Manning Roster showing names, positions and number of flight crew and support personnel for conducting spray operations for an average of 12 hours per day for 6 consecutive days.

d.    Flight and Duty Time

    (1)    All flight crew members shall be limited to the following duty time and flight time.  Dispersant operations will require multiple flight crews.

        i.    Flight time shall not exceed 10 hours in any duty day.

IAR SPECIFICATIONS - Final - Clean.doc

9

*HIGHLY
CONFIDENTIAL*
Pursuant to CMO 13

   ii.   Flight time includes all revenue producing flying time such as charter, air commerce, aerial work activities and flight instruction whether under this Agreement or not.

   iii.   Assigned duty of any kind shall not exceed 16 hours in any 24 hour period.

   iv.   Duty shall include flight time and ground duty, but does not include normal or reasonable travel time to and from lodging accommodations to the home base, main dispersant base or staging airports

   v.   Flight crew members may be relieved of duty for fatigue or other causes created by unusually strenuous or severe duty before reaching flight or duty limitations.

(2)   Contractor shall maintain the number of flight crews and how they will be provided for dispersant operations while meeting the flight and duty times.  Specifically, include if additional flight crews will transit to the staging airports in the dispersant aircraft.   Contractor shall maintain a flight crew duty roster.

(3)   For flights of 5 hours or more from the home base to a staging airport, additional flight crews are expected to immediately commence dispersant operations upon landing at the staging airport.

e.   Training Programs.   The Contractor shall develop, organize, and conduct the following training programs, as needed and will become part of the QA-HSES Manual.  The training programs must be reviewed by MSRC and will include, but will not be limited to the following:

(1)   Initial
   i.   A/C transition/refresher
   ii.   Oil spill and dispersant oil characteristics
   iii.   Spraying methods
   iv.   Low level flight over water for applying dispersants
   v.   Working with spotter aircraft
   vi.   Dispersant operations documentation
   vii.   Crew Resource Management (CRM)
   viii.   Dispersant Application Operations Plan

(2)   Recurring Minimum Annual Training

   i.   Each flight crew member must conduct low-level simulated or actual dispersant flight operations for two hours every

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

six months, one of which will be conducted over water, out-of-sight of land.

6.     Dispersant Application Operations Plan

    a.     Contractor shall attend a 3-day meeting in Herndon, Virginia, to assist in developing with MSRC and other dispersant contractors a Dispersant Application Operations Plan and will conduct dispersant operations in accordance with the procedures in this Plan. The Dispersant Application Operations Plan covers single and multiple aircraft operations and includes, but is not limited, to the following

      (1)     Safety Issues

          i.     Aircraft in operating area
          ii.     IFR and VFR operating conditions and procedures
          iii.     Boats/people in operating area
          iv.     Whales/mammals and other intrusions that may be harmed by dispersant spraying in the operating area
          v.     VFR Operation
          vi.     Situational awareness
          vii.     FAA Restrictions and enforcement procedures
          viii.     Emergency procedures for defined emergencies and response actions
          ix.     Dispersant stockpile handling, loading, storing, testing

      (2)     Aircraft type, tail number, and tactical call sign of aircraft participating in the dispersant operations

      (3)     Altitude separation for aircraft covering the following
          i.     Application aircraft
          ii.     Spotter/Air Controller aircraft monitoring
          iii.     Observer aircraft
          iv.     Media aircraft
          v.     Remote sensing and surveillance aircraft
          vi.     Logistics aircraft
          vii.     Emergency response aircraft

      (4)     Communications
          i.     Primary Frequency
          ii.     1st Backup Frequency
          iii.     2nd Backup Frequency
          iv.     Safety Frequency



HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(5)   Operational Area for dispersant spray operations
    i.     Dispersant Spray area
    ii.    Holding area for on-scene aircraft
    iii.   Spill Source (Platform/Vessel/Pipeline) area
    iv.   Mechanical recovery area

(6)   Entry/Exit Point
    i.     Onsite check-in procedures with air controller/spotter aircraft
    ii.    Entry/Exit point location
    iii.   Entry/Exit point altitude
    iv.   Aircraft altitude separation in holding area

(7)   Aircraft schedule
    i.     Briefing/debriefing times
    ii.    Depart and arrive on-scene times for each aircraft

(8)   Dispersant Logistics and Loading Procedures

(9)   Fueling Procedures

(10)  Documentation and Reporting Procedures

(11)  De-mobilization Procedures
    i.     Aircraft
    ii.    Dispersant and other hazardous material containers
    iii.   Staging airport
    iv.   Flight and support crews

(12)  Main Dispersant Base Operation Specifics


7.    **Support Personnel**

    a.   Initial Qualifications

       (1)   Mechanics

          i.    These requirements mandate that personnel are qualified, experienced mechanics who can work alone for extended periods of time in field conditions to support the aircraft.

       (2)   Dispersant Loading and Transport Personnel

          i.    Contractor personnel responsible for loading and transporting dispersant at the home base shall be trained in

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

the operation of the transport and transfer systems they will be using, the use of PPE and the MSDSs for the dispersants they will be handling.

(3)     Security Review and Background Check

    i.     Support personnel will have a background check and security review conducted by a third party which shall include, but not limited to, felony convictions or drug and alcohol related convictions. Security review will be in accordance with Transportation Security Administration regulations, as applicable.

    ii.     Pre-employment and pre-assignment drug testing will be conducted in accordance with this schedule.

b.     Duty Limitations

(1)     Within any 24-hour period, mechanics and dispersant handlers shall have a minimum of eight consecutive hours off duty immediately prior to the beginning of any duty day.

(2)     Mechanics and dispersant handlers shall have two full days off during any 14-day period during the performance of this Agreement. Off duty days need not be consecutive.

(3)     MSRC or their representative may further restrict daily duty hours and may remove mechanics and dispersant handlers for fatigue or other causes before reaching their daily duty limitations.

(4)     Mechanics and dispersant handlers shall be responsible for keeping the Contractor informed of his/her duty limitation status.

(5)     All relief or substitute mechanics reporting for duty under the Agreement must meet all of the above requirements.

c.     Mechanics may also serve as dispersant handlers.

d.     Support Personnel Required to Accomplish Mission and Availability

(1)     Support personnel must be able to be contacted 24 hours a day 365 days a year and must be able to report to the home base to be ready to take-off within 4 hours of being activated by MSRC.

(2)     To ensure availability support personnel providing dispersant services will carry pagers so they can be reached at any time.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(3)   Support personnel must be able to support spraying operations for on average 12 hours per day for 6 consecutive days.

(4)   Contractor shall maintain the number of support personnel and how they will be provided for dispersant operations while meeting duty times.  Specifically, include if additional support personnel will transit to the staging airports in the dispersant aircraft. Contractor shall maintain a support personnel duty roster.

e.   Support Personnel Training Program

(1)   Initial
  i.    Dispersant Characteristics and Safety and Health
  ii.   Dispersant Handling, Transportation and Loading onboard the aircraft
  iii.  Protective Equipment Requirements and Use
  iv.   Dispersant and fuel spill response and emergency procedures
  v.    Aircraft ground operations safety
  vi.   Dispersant Application Operations Plan, as applies
  vii.  Storage, waste management, and environmental controls in handling dispersants

(2)   Recurrent

  i.    Annual Training, including exercises, which also will cover the items in the initial training and any changes that have been made.

8.   **Management Personnel**

a.   Operations Manager

(1)   Contractor will designate an Operations Manager to contact at their home base of operations.  The Operations Manager shall be knowledgeable of in flight operations, aircraft maintenance, and oil dispersant operations, plans, and procedures.

(2)   Shall be responsible for the operation of the company on a daily basis and shall be responsible to MSRC for the administration of this Agreement.  Duties will also include scheduling, record keeping, maintaining required qualifications of personnel and equipment.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(3)    Shall be responsible for conducting the dispersant quality assurance program.

(4)    Shall be responsible for executing the Dispersant Application Operations Plan at the aircraft's home base.

9.    **Flight Operations**

    a.    General

        (1)    The Pilot-In-Command shall be responsible for the safe operation of the aircraft and the safety of its occupants and cargo. Safety requirements such as pre-flight, reserve fuel and weight and balance limitations are the responsibility of the Pilot-In-Command and shall be strictly adhered to. The Pilot-In-Command shall refuse any flight or landing which the Pilot-In-Command considers unsafe or may terminate any flight which the Pilot-In-Command considers unsafe.

        (2)    The dispersant spray operations will be conducted under VFR at the spill site from official sun rise to official sunset.

10.    **Quality Assurance Program**

    a    Contractor shall maintain an internal quality assurance program to promote a safety awareness culture and a responsible environmental stewardship program within the Contractors' company that will consist of at least the following functions:

        (1)    Scheduled evaluations of compliance to:
            i.     Regulatory Compliance
            ii.    FAA Guidance and Policy
            iii.   Contractual Compliance
            iv.    Corporate Requirements
            v.     Safety, Health, Environment and Security Policy
            vi.    Quality Assurance Audit
            vii.   Date audit was conducted
            viii.  Person(s) conducting audit
            ix.    Summary of Findings
            x.     Development of corrective action that addresses and corrects any deficiency discovered while conducting the audit.
            xi.    Summary Conclusion

IAR 00186

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

b.      A copy of the Quality Assurance, Health, Safety, Environmental and Security Manual shall be submitted and be attached to this Agreement as Schedule 6 after being reviewed by MSRC.

11.   **Support Operations**

a.      General

(1)     The Contractor shall furnish all personnel, equipment, and services necessary to accomplish all requirements under this Agreement, except as specifically noted below.

b.      Main Dispersant Base Location

(1)     Shall be located near the coast of the GOM as agreed to between the Contractor and MSRC.

c.      Staging Airports

(1)     Additional airports as agreed to between the Contractor and MSRC may be designated as staging airports. An operations plan for operating from the Main Dispersant Base and other selected staging airports will be prepared jointly.

d.      Dispersant Stockpile Requirements

(1)     A dispersant stockpile of approximately 3,500 gallons will be provided by MSRC to be stored at the Contractor's facilities in Coolidge, Arizona. Dispersant, containers, transport equipment and transfer equipment will be provided by MSRC, unless the Contractor already has suitable equipment. Contractor shall provide storage and support personnel to transport and load dispersant at the Contractor's home base.

(2)     Dispersant stockpiles shall be exercised annually by re-storing totes and transporting chassis stored containers over the road.

(3)     The Contractor shall provide personnel, PPE and equipment to transfer dispersants from storage at the aircraft's home base to the application aircraft and load the dispersant aboard the aircraft.

(4)     MSRC will provide dispersant and will load dispersant onto aircraft at staging airports.

IAR 00187

IAR SPECIFICATIONS - Final - Clean.doc

16

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(5)    Contractor shall ensure proper containment and waste management and documentation practices.

e.    Dispersant and Fuel Loading and Unloading

(1)    Contractor will be responsible to load and unload dispersant at its home base and to load fuel at its home base and staging airports onto the aircraft in a timely manner so as not to delay dispersant operations and to maximize dispersant sorties conducted, unless MSRC makes other arrangements.

(2)    Prior to loading dispersant onto the aircraft, the Contractor will follow the tank cleaning and documentation procedures as described in their QAHSES Manual.

(3)    Equipment

    i.    Dispersant loading equipment will be provided by MSRC.

    ii.    Contractor will maintain and operate MSRC provided equipment.

f.    Waste Disposal

(1)    Contractor will be responsible for cleaning of dispersant spray equipment and the disposal of dispersant waste and residues as well as other wastes generated in performing Agreement services in accordance with all laws and regulations.

12.    **Quality Assurance, Health, Safety, Environmental, and Security (QAHSES) Policies and Specifications**

a.    General Requirements.

(1)    Contractor shall prepare and submit a QA-HSES Policies and Program Manual to be attached to this Agreement as Schedule 6 after being reviewed by MSRC.

(2)    The Contractor will observe and comply with all applicable Federal, state and local safety, environmental, health and security laws, FAA regulations, Air Worthiness directives, plus any orders and rules promulgated under the Federal Aviation Act, as amended, and shall assure that no person employed on this Agreement works in surroundings or under conditions that are unsanitary, hazardous, or dangerous to their health or safety.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(3)     Contractor shall ensure all personnel are qualified and trained to perform contracted services.

(4)     Contractor will be solely responsible for notifying its employees and agents of all human and health and safety hazards known to Contractor to which such employees and agents may become exposed, including without limitation any hazardous substance. MSRC will notify Contractor of health and safety hazards known to MSRC of provided materials and equipment to which Contractor's employees and agents may be exposed.   Copies of MSDS's for Corexit 9500 and 9527 are provided as Enclosure (4) to this Schedule.

(5)     Contractor will provide its employees and agents with all protective equipment, clothing, and training necessary for safe work performance.   Contractor will promptly notify MSRC of the existence of any unsafe work environment known to Contractor around the oil spill event site or in connection with the performance of its obligations hereunder, whether or not Contractor has control over such work environment.   Further, Contractor will immediately notify MSRC orally of all deaths and injuries to employees, sub-Contractors, third parties and the public, accidents, spills, waste management issues, property damage, and security incidents that arise in connection with the performance of Contractor's obligations under this Agreement and promptly will follow-up such oral notification in writing.   Any sub-contract entered into by the Contractor will provide that each sub-Contractor will be subject to these same requirements.

(6)     The Contractor shall bear, solely and exclusively, the duty to determine at all times whether operations hereunder can safely be continued or undertaken, including, without limiting the generality of the foregoing, the duty to determine that all cargo and items of equipment are loaded and stored aboard the aircraft in a proper and airworthy manner and that proper precautions are being taken for the safety of MSRC, third party personnel and the public and that the aircraft are in all respects capable of undertaking any contemplated flight under then existing or reasonably foreseeable conditions.

(7)     Each aircraft shall load and take-off from, and transport to and land at, such airports, landing strips and other places as may be requested from time to time by MSRC and apply dispersants to oil spills or perform other operations as requested by MSRC, provided that the pilot of each aircraft shall determine at the time that the

IAR SPECIFICATIONS - Final - Clean.doc                                    18

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

aircraft can takeoff, conduct dispersant or other operations requested, and land such aircraft safely and in accordance with applicable FAA requirements. MSRC does not warrant the safety of any such airport, landing strip or other area.

(8)   Contractor will provide and maintain, to the extent under its control or direction, a safe working environment during the performance of this Agreement, and will take such actions as are reasonably required to protect the health, safety, security of Contractor's personnel and sub-Contractors and their respective employees, the public and other third parties. All tools, equipment, facilities, and other items provided by Contractor and practices employed by Contractor in accomplishing the services are considered to be part of the working environment.

(9)   Contractors are solely responsible to arrange for their employees' first aid and hospital requirements.

(10)   Contractors are to ensure their work area is maintained in a clean and orderly fashion at all times and that all of their personnel are familiar with and understand their compliance obligations to MSRC in accordance with this Agreement.

(11)   Contractors shall ensure their personnel are informed of each individual's obligation to prevent any pollution or unlawful discharge onto land or into the water in accordance with local, state and Federal regulations

(12)   Contractor forklift and crane operators shall maintain current operator certification documents.

(13)   Contractors are responsible for the security of their equipment, tools, material, all sanitary facilities, and for the necessary changing/locker facilities. MSRC assumes no liability for lost or stolen equipment or supplies or personal property of Contractor's employees.

(14)   Contractor's safety program

    i.   The Contractor's safety program will incorporate flight and ground safety to include:

        –   An accident /incident response plan assuring qualified personnel to implement it.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

Maintain an accident/incident reporting and documentation system and comply with MSRC's Incident/Accident and Reporting procedures when

-- responding to an MSRC activation and being directly managed by an MSRC supervisor, or

-- when the accident/incident involves MSRC equipment or personnel.

Emergency Plan – Response to aircraft incident/accident, and reporting procedures.   The plan shall include, but is not limited to, the following:

— The Contractors' procedures to respond, stabilize, and resolve an incident/accident.

— A prioritized contact call list to advise those who need to know that an incident/accident has occurred:  The list shall include the name, telephone numbers (cell phone, pager, office, and home) and e-mail address.  A record of calls must be maintained with the date and time that an individual makes a call and the person contacted.  Include MSRC and its designated representative in the contact process.

— The procedures will be in effect 24 hours a day 365 days a year from standby at the home-base, main dispersant base or staging base location, the mission stages, and until the aircraft returns to its home base.

— Level 1 Incident/Accident:   In flight situations involving mechanical malfunctions such as engine out, hydraulic problems, electrical problems, warning light indications, and loss of pressure or fluids.

— Level 2 Incident/Accident:  A situation where severe damage has been sustained or may be sustained to the aircraft, and injuries/death has occurred or may occur to crew members, passengers, or third parties.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

Advance notice of a situation which may reasonably be expected to lead an accident or will require the help of outside agencies to assist. Examples of a Level 2 Incident/Accident are: wheels-up landing, fire onboard, structural damage, multiple system failures, etc.

ii.   A flight safety program reviewed by MSRC or their designated representative.

iii.  A ground safety program reviewed by MSRC or their designated representative. The ground safety program will include the hazardous materials program, and the necessary training and equipment to ensure;

- Identification and recognition of HAZMAT
- Proper handling and protective clothing required for fuel and dispersants and other hazardous materials
- Proper handling and reporting of HAZMAT incident
- Proper waste management
- Other activities deemed within the dispersant Agreement

iv.   A list of the PPE and safety equipment to be used for the handling, transfer and loading of dispersant and fuel will be provided in the QA-HSES Manual.

b.   Health, Safety, Environmental, and Security Non-Compliance

(1)   If the Contractor fails or refuses to promptly comply with any health, safety, environmental, or security requirement, MSRC will notify the Contractor of any such non-compliance and the Contractor shall take immediate corrective action. Such notice, whether oral or written, when served on the Contractor or any of its employees or sub-contractors at the site of the work, shall be deemed sufficient. If the Contractor fails or refuses to promptly correct the condition, MSRC may, in addition to other actions it may take, stop all or any portion of the work. When satisfactory corrective action has been taken, the Contractor shall request permission to resume work from MSRC. No time extension or additional costs, resulting from the directive to stop work shall be allowed. Failure of MSRC to provide notice of non-compliance or to stop work shall not relieve the Contractor of its responsibility for the safe performance of the work.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

(2)     All fines and penalties resulting from health, safety, environmental, or security non-compliance are solely the responsibility of the Contractor.

c.     Drug and Alcohol Program.

(1)     The complexity of the Federal Regulations does not allow for the inclusion here of every detail of the regulations nor excuse the Contractor from compliance with all applicable rules and regulations.

(2)     Testing Programs

i.     In addition to fulfilling the requirements of the applicable Federal Aviation Regulations, the Contractor will require testing for drugs and alcohol for the following personnel:

- Pilots
- Aircraft Mechanics
- Flight Instructors
- Security Personnel
- Operations Manager
- Dispersant Handlers

ii.     Testing, analysis, and reporting to be conducted and prepared by a laboratory certified by the Department of Health and Human Services under the National Laboratory Certification Program.

iii.     Testing for Drugs
- Pre-employment/Pre-assignment
- Post Accident
- Reasonable suspicion or cause
- Unannounced random testing of personnel to cover at least 25% of the employees annually
- Return to work after extended absence

iv.     Testing for Alcohol
- Post Accident
- Reasonable suspicion or cause
- Annually conduct unannounced random testing of 25% of the employees.  Testing will only occur when employees are on duty.

IAR SPECIFICATIONS - Final - Clean.doc

IAR 00193

22

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

v.  The Contractor will notify MSRC of positive drug and alcohol tests and their disposition

vi.  Refusal to submit to testing must result in the individual being immediately removed from any safety or security sensitive position, and if a violation of a Federal regulation has occurred the Contractor must notify the appropriate Federal Agency and MSRC.

d.  Personal Protective Equipment (PPE)

(1)  General.

i.  The Contractor shall require employees and contract personnel, third parties and the public to wear personal protective equipment when it is necessary because of the hazards on the job and will provide the necessary equipment and regular training on the basic use and proper fitting of respiratory equipment.

ii.  Contractors shall include a clause in all sub-contracts to require sub-contractors to comply with PPE guidance on the applicable MSDSs.

iii.  Personnel working in the dispersant transfer area and onboard the aircraft (except for the pilot and co-pilot) will be fit-tested to wear respirators.

(2)  Personal Protective Equipment (PPE)

i.  Dispersant Transfer Area.  The following materials and equipment shall be available onsite and in sufficient equipment shall be available onsite and in sufficient quantities to support the dispersant operations.

- General Requirements per Transfer Area

  -- MSDS for dispersant products
  -- Medical equipment/supplies to respond to various injuries
  -- Equipment/supplies to respond fires
  -- Equipment and supplies to respond to spills of dispersant, fuel and other materials and for any wastes generated
  -- Overrpack/salvage drums for any waste that is generated.

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

    &mdash; Equipment and supplies to prevent any spills of dispersants or fuel from contaminating other areas

   - Personnel Protection Equipment (PPE) per Person

    &mdash; Contractor shall comply as a minimum with PPE guidance defined on the applicable MSDSs.

  ii. Aircraft

   - General Requirements per Aircraft.  Equipment will meet FAA requirements and comply as a minimum with PPE guidance described in the applicable MSDSs.

   - Personal Protection Equipment per Person Operating the Spray System as a minimum shall comply as a minimum to the guidance described in the applicable MSDSs.

 e. Other safety requirements

  (1) All occupants of the aircraft shall wear or have their personal floatation device immediately available during operations below 3,000 feet while over water.

  (2) All ground transfer couplings for transferring dispersants will use dry-lock valves, where appropriate.

IAR 00195

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

Enclosure (1)

## DISPERSANT AIRCRAFT DESIGNATION AND SPECIFICATIONS

See attached document entitled:

" DISPERSANT AIRCRAFT DESIGNATION AND SPECIFICATIONS"

IAR 00196

IAR SPECIFICATIONS - Final - Clean.doc

Enclosure (1)     Page 1 of 3

## DISPERSANT AIRCRAFT DESIGNATION AND SPECIFICATIONS

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

The following data should indicate the aircraft specifics or the normal operational parameters for each aircraft and substitute aircraft being offered to provide dispersant services. Data will be updated upon completion of field spray testing and annual exercises.

| Aircraft Specifications | | |
|---|---|---|
| | Aircraft Type and Tail Number | C-130A                    N117TG |
| 1. | Aircraft Date of Manufacture | July 1, 1957 |
| 2. | Airframe Total Time | 14453.5          (As of June 1, 2005) |
| 3. | Engine Operating Hours / Time Since Major Overhaul  (Hours) | (As of June 1, 2005) |
| 4. | #1 | 2657.5   TSO |
| | #2 | 2754.5   TSO |
| | #3 | 2844.2   TSO |
| | #4 | 2792.4   TSO |
| 5. | Date and total time since last airframe major overhaul | Last "C" Inspection Complied With: May 12, 2004 @ 14388.0 Aircraft Total Time.   Last "B" Inspection Complied With: May 16, 2005 @ 14443.9 Aircraft Total Time. |
| 6. | Dispersant Application Speed (knots) | 139 KIAS – 150 KIAS |
| 7. | Transit Speed / Altitude  (knots/feet)  Base to Staging Airport (assume no wind) | For Base to Staging airport, distance100 to 200 NM: 230 to 250 TAS/FL 160 to FL 170 |
| 8. | Transit Speed / Altitude  (knots/feet)  Staging Airport to/from spill | For Staging airport to spill, distance 25 to 100 NM: 200 to 240 KIAS (Depends on weather conditions etc.) FL 80 to FL 100 |
| 9. | Number of seats other than required crew | 1 Flight Deck, 5 cargo compartment |
| 10 | Maximum Dispersant Load Time  (min) | |
| 11. | Maximum Fuel Load Time  (min) | 20 minuets |
| 12. | Load Dispersant & Fuel simultaneously (Y/N) | Yes |
| 13. | Dispersant Payload Maximum (gallons) | EC9500A = 3359 gallons  EC9527A = 3182 gallons |
| 14. | Fuel with maximum dispersant payload  (pounds) | 27200 lb |
| 15. | Weight aircraft empty (pounds) | 65849 lb |

| Dispersant Application Specifications | | |
|---|---|---|
| 16. | Dispersant Race Track Reposition Speed (knots) | 139 – 150 KIAS |
| 17. | U-turn time (min) | 3 min |
| 17a | Spray in both directions (Yes/No) | Yes |
| 17b | Time to make turn to spray  (min) | 3 min |

IAR 00197

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

Enclosure (2)

## WING INSPECTION MAINTENANCE PROGRAM

IAR will comply with Air Worthiness Directive 2002-19-14

IAR 00198

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

Enclosure (3)

## FLY AWAY KIT (FAK) EQUIPMENT

### See attached document entitled:

### "MSRC C-130 Mobility Fly-A-Way Kit

IAR 00199

Enclosure (1)                                    Page 2 of 3

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

| 18. | Alignment-Entry Distance (nm) | 1.5 NM |
|---|---|---|
| 19. | Departure Distance (nm) | 1.5 NM |
| 20. | Swath Width to apply 5 gallons/acre          (feet) | @ _____ altitude – feet<br>_____ application speed – knots<br>_____ pump rate (gpm) or<br>_____ boom pressure (psi) |
| 21. | State How Swath Width Determined | |

| **Cascade Parameters** | | |
|---|---|---|
| 22. | Estimated Taxi time to take-off from Main Dispersant Base (min) | 15 minuets |
| 23. | Provide the following information for taking-off with **Maximum Payload and Maximum Take-off Weight** (assume no wind and IFR fuel reserve) | |
| | a. Maximum Flight Time          (hours) | 4.6 hours |
| | b. Maximum Flight Range          (nm) | 1104 NM |
| | c. Optimal altitude          (feet) | FL 160 – FL 190 |
| | d. True Air Speed          (knots) | 230 – 250 TAS |
| | e. Fuel Consumption          (pounds/hour) | 4500 lb/hour |
| 24. | Provide the following information for taking-off with **Maximum Fuel and No Payload** (assume no wind and IFR fuel reserve) | |
| | a. Maximum Flight Time          (hours) | 7.5 hours |
| | b. Maximum Flight Range          (nm) | 1875 NM |
| | c. Optimal altitude          (feet) | FL 180 – FL 250 |
| | d. True Air Speed          (knots) | 250 – 270 |
| | e. Fuel Consumption          (pounds/hour) | 4500 lb/hour |
| 25. | Left Blank | |
| 26. | Left Blank | |

| **Airport Requirements** | | |
|---|---|---|
| 27. | Runway Length          (feet)<br><br>(For take-off at maximum gross weight assuming sea level, 90° F, no wind using a balanced field concept, i.e., go, no | 4800 Feet |

Enclosure (1)    Page 3 of 3

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

| | | | |
|---|---|---|---|
| | go speed) | | |
| 28. | Runway weight restrictions for this aircraft (pounds) | | 124200 Aircraft MGTOW |
| 29. | Home Base Airport | | Chandler Memorial/Coolidge Municipal, AZ |
| | a. | Maximum Weight for Take-Off | 124200 lb |
| | b. | Maximum Landing Weight | 124200 lb |
| | c. | Runway performance limitations (Describe) | |
| **Flight Plan Information from Home Base to New Orleans area (within 100 nm)** | | | |
| 30. | a. | Total time enroute from Home Base to New Orleans area | 4.5 hours |
| | b. | Flight time from Home Base to New Orleans area (if different than above) | |
| | c. | Fuel burned in pounds from Home Base to New Orleans area | 20250 lb |
| | d. | Cruise speed (knots) | 270 |
| | e. | Fuel consumption in pounds per hour at cruise speed | 4500 lb/hour |

IAR 00201

Enclosure (3)

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

## MSRC C-130 Mobility
## Fly-A-Way Kit

| NOMEN | QTY |
|---|---|
| Starter | _____ |
| Starter Control Valve | _____ |
| Ignition Exciter | _____ |
| Ignition Relay | _____ |
| Igniter Plugs | _____ |
| Igniter Lead repair kit | _____ |
| Speed Sensitive Switch | _____ |
| Bleed Valve Control Solenoid | |
| (3-way Hot Air Valve) | _____ |
| AC Engine Driven Generator | _____ |
| AC Generator Control Panel | _____ |
| DC Generator Voltage Regulator | _____ |
| 1 ea. Case Engine Oil | _____ |
| 5 ea. Gallons Hydraulic Oil | _____ |
| Brake Assembly (MLG Wheel) | _____ |
| MLG Main Wheel and Tire | _____ |
| Main Wheel and Tire Change Kit | _____ |
| Standard Assort of Electrical Spares | _____ |
| Gasket Kit (Bleed Duct) | _____ |
| "O"-Ring Kit (Viton) | _____ |
| 1 ea. Spray System Motor | _____ |
| 1 ea. Spray Pump Drive Belt | _____ |
| 5 ea. Spray Nozzle Nipples | _____ |
| 5 ea. Spray Nozzles | _____ |
| 5 ea. 3" Banjo Clamps | _____ |
| 5 ea. 4" Banjo Clamps | _____ |
| A M T Tool Box | _____ |
| Folding "Little Giant Ladder | _____ |

Spray System Item

IAR 00202

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

Enclosure (4)


# MSDSs for COREXIT 9500 AND 9527

## See attached documents entitled:

1) MSDS COREXIT EC 9527A
2) MSDS COREXIT EC 9500A

IAR 00203



*Exhibit ( ) #1*

**NALCO**

### MATERIAL SAFETY DATA SHEET

| PRODUCT | |
|---|---|
| **COREXIT® EC9527A** | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

---

| 1. | CHEMICAL PRODUCT AND COMPANY IDENTIFICATION |
|---|---|

PRODUCT NAME :                       COREXIT® EC9527A

APPLICATION :                        OIL SPILL DISPERSANT

COMPANY IDENTIFICATION :             Nalco Energy Services, L.P.
                                     P.O. Box 87
                                     Sugar Land, Texas
                                     77487-0087

EMERGENCY TELEPHONE NUMBER(S) :      (800) 424-9300 (24 Hours)    CHEMTREC

NFPA 704M/HMIS RATING
HEALTH :   2 / 2    FLAMMABILITY :   2 / 2    INSTABILITY :   0 / 0    OTHER :
0 = Insignificant   1 = Slight   2 = Moderate   3 = High   4 = Extreme

---

| 2. | COMPOSITION/INFORMATION ON INGREDIENTS |
|---|---|

Our hazard evaluation has identified the following chemical substance(s) as hazardous. Consult Section 15 for the nature of the hazard(s).

| Hazardous Substance(s) | CAS NO | % (w/w) |
|---|---|---|
| 2-Butoxyethanol | 111-76-2 | 30.0 – 60.0 |
| Organic sulfonic acid salt | Proprietary | 10.0 – 30.0 |
| Propylene Glycol | 57-55-6 | 1.0 – 5.0 |

---

| 3. | HAZARDS IDENTIFICATION |
|---|---|

### **EMERGENCY OVERVIEW**

**WARNING**
Eye and skin irritant.  Repeated or excessive exposure to butoxyethanol may cause injury to red blood cells (hemolysis), kidney or the liver.  Combustible.
Do not get in eyes, on skin, on clothing.  Do not take internally.  Use with adequate ventilation.  Wear suitable protective clothing.  Keep container tightly closed.  Flush affected area with water.  Keep away from heat.  Keep away from sources of ignition - No smoking.
May evolve oxides of carbon (COx) under fire conditions.

PRIMARY ROUTES OF EXPOSURE :
Eye, Skin

HUMAN HEALTH HAZARDS - ACUTE :

EYE CONTACT :                                                    IAR 00204
Can cause mild to moderate irritation.

---



**NALCO**

MATERIAL SAFETY DATA  HEET

| PRODUCT | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |
|---|---|
| COREXIT® EC9527A | |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

SKIN CONTACT :
Can cause mild to moderate irritation.

INGESTION :
Not a likely route of exposure.  Large quantities may cause kidney and liver damage.

INHALATION :
Not a likely route of exposure.  Aerosols or product mist may irritate the upper respiratory tract.

SYMPTOMS OF EXPOSURE :
Acute :
Excessive exposure may cause central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.
Chronic :
Repeated or excessive exposure to butoxyethanol may cause injury to red blood cells (hemolysis), kidney or the liver.

AGGRAVATION OF EXISTING CONDITIONS :
Skin contact may aggravate an existing dermatitis condition.

| 4. | FIRST AID MEASURES |
|---|---|

EYE CONTACT :
Flush affected area with water.  If symptoms develop, seek medical advice.

SKIN CONTACT :
Flush affected area with water.  If symptoms develop, seek medical advice.

INGESTION :
Do not induce vomiting without medical advice.  If conscious, washout mouth and give water to drink.  If symptoms develop, seek medical advice.

INHALATION :
Remove to fresh air, treat symptomatically.  If symptoms develop, seek medical advice.

NOTE TO PHYSICIAN :
Based on the individual reactions of the patient, the physician's judgement should be used to control symptoms and clinical condition.

| 5. | FIRE FIGHTING MEASURES |
|---|---|

FLASH POINT :                    163 °F / 72.7 °C ( TCC )

EXTINGUISHING MEDIA :
This product would not be expected to burn unless all the water is boiled away.  The remaining organics may be ignitable.  Use extinguishing media appropriate for surrounding fire.

FIRE AND EXPLOSION HAZARD :
May evolve oxides of carbon (COx) under fire conditions.



**MATERIAL SAFETY DATA SHEET**

| PRODUCT | |
|---|---|
| **COREXIT® EC9527A** | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |

**EMERGENCY TELEPHONE NUMBER(S)**
(800) 424-9300 (24 Hours)    CHEMTREC

**SPECIAL PROTECTIVE EQUIPMENT FOR FIRE FIGHTING :**
In case of fire, wear a full face positive-pressure self contained breathing apparatus and protective suit.

| 6. | **ACCIDENTAL RELEASE MEASURES** |
|---|---|

**PERSONAL PRECAUTIONS :**
Restrict access to area as appropriate until clean-up operations are complete.  Stop or reduce any leaks if it is safe to do so.  Do not touch spilled material.  Ventilate spill area if possible.  Use personal protective equipment recommended in Section 8 (Exposure Controls/Personal Protection).

**METHODS FOR CLEANING UP :**
SMALL SPILLS:  Soak up spill with absorbent material.  Place residues in a suitable, covered, properly labeled container.  Wash affected area.  LARGE SPILLS:  Contain liquid using absorbent material, by digging trenches or by diking.  Reclaim into recovery or salvage drums or tank truck for proper disposal.  Contact an approved waste hauler for disposal of contaminated recovered material.  Dispose of material in compliance with regulations indicated in Section 13 (Disposal Considerations).

**ENVIRONMENTAL PRECAUTIONS :**
Do not contaminate surface water.

| 7. | **HANDLING AND STORAGE** |
|---|---|

**HANDLING :**
Avoid eye and skin contact.  Do not take internally.  Ensure all containers are labelled.  Keep the containers closed when not in use.

**STORAGE CONDITIONS :**
Store the containers tightly closed.

**SUITABLE CONSTRUCTION MATERIAL :**
PVC, Stainless Steel 316L, Hastelloy C-276, MDPE (medium density polyethylene), Nitrile, Plexiglass, Kalrez, EPDM, TFE, Alfax, Teflon, HDPE (high density polyethylene), Neoprene, Aluminum, Polypropylene, Polyethylene, Carbon Steel C1018, Stainless Steel 304, Compatibility with Plastic Materials can vary; we therefore recommend that compatibility is tested prior to use.

**UNSUITABLE CONSTRUCTION MATERIAL :**
Copper, Mild steel, Brass, Nylon, Buna-N, Natural rubber, Polyurethane, Hypalon, Viton, Ethylene propylene

| 8. | **EXPOSURE CONTROLS/PERSONAL PROTECTION** |
|---|---|

**OCCUPATIONAL EXPOSURE LIMITS :**
Exposure guidelines have not been established for this product.  Available exposure limits for the substance(s) are shown below.

**ACGIH/TLV :**
Substance(s)
    2-Butoxyethanol          TWA: 20 ppm , 97 mg/m3

IAR 00206



MATERIAL SAFETY DATA SHEET

| PRODUCT | |
|---|---|
| COREXIT® EC9527A | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

Propylene Glycol
OSHA/PEL :
Substance(s)
  2-Butoxyethanol          TWA: 25 ppm , 120 mg/m3  (Skin)

Propylene Glycol
AIHA/WEEL :
Substance(s)
For propylene glycol, an 8 hour TWA of 10 mg/m3 (aerosol) and 50 ppm (total).

ENGINEERING MEASURES :
General ventilation is recommended. .

RESPIRATORY PROTECTION :
Where concentrations in air may exceed the limits given in this section, the use of a half face filter mask or air supplied breathing apparatus is recommended. A suitable filter material depends on the amount and type of chemicals being handled. Consider the use of filter type: Multi-contaminant cartridge (Gold) with a Particulate pre-filter (Purple). In event of emergency or planned entry into unknown concentrations a positive pressure, full-facepiece SCBA should be used. If respiratory protection is required, institute a complete respiratory protection program including selection, fit testing, training, maintenance and inspection.

HAND PROTECTION :
Neoprene gloves, Nitrile gloves, Butyl gloves, PVC gloves

SKIN PROTECTION :
Wear standard protective clothing.

EYE PROTECTION :
Wear chemical splash goggles.

HYGIENE RECOMMENDATIONS :
Keep an eye wash fountain available. Keep a safety shower available. If clothing is contaminated, remove clothing and thoroughly wash the affected area. Launder contaminated clothing before reuse.

HUMAN EXPOSURE CHARACTERIZATION :
Based on our recommended product application and personal protective equipment, the potential human exposure is: Low

## 9.      PHYSICAL AND CHEMICAL PROPERTIES

| PHYSICAL STATE | Liquid |
|---|---|
| APPEARANCE | Clear Amber |
| ODOR | Mild |
| SPECIFIC GRAVITY | 0.98 - 1.02 |
| DENSITY | 8.2 - 8.5 lb/gal |

IAR 00207



MATERIAL SAFETY DATA SHEET

| PRODUCT | |
|---|---|
| **COREXIT® EC9527A** | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)     CHEMTREC

| | |
|---|---|
| SOLUBILITY IN WATER | Complete |
| pH  (100 %) | 6.1 |
| VISCOSITY | 160 cst  @  32 °F / 0 °C |
| POUR POINT | < -40 °F / < -40 °C |
| BOILING POINT | 340 °F / 171 °C |
| VAPOR PRESSURE | < 5 mm Hg  @  100 °F / 38 °C Same as water |
| EVAPORATION RATE | 0.1 |

Note: These physical properties are typical values for this product and are subject to change.

| 10. | STABILITY AND REACTIVITY |
|---|---|

STABILITY :
Stable under normal conditions.

HAZARDOUS POLYMERIZATION :
Hazardous polymerization will not occur.

CONDITIONS TO AVOID :
Freezing temperatures.

MATERIALS TO AVOID :
None known

HAZARDOUS DECOMPOSITION PRODUCTS :
Under fire conditions:        Oxides of carbon

| 11. | TOXICOLOGICAL INFORMATION |
|---|---|

No toxicity studies have been conducted on this product.

SENSITIZATION :
This product is not expected to be a sensitizer.

CARCINOGENICITY :
None of the substances in this product are listed as carcinogens by the International Agency for Research on Cancer (IARC), the National Toxicology Program (NTP) or the American Conference of Governmental Industrial Hygienists (ACGIH).

HUMAN HAZARD CHARACTERIZATION :
Based on our hazard characterization, the potential human hazard is:  High

| 12. | ECOLOGICAL INFORMATION |
|---|---|

ECOTOXICOLOGICAL EFFECTS :

No toxicity studies have been conducted on this product.

IAR 00208



MATERIAL SAFETY DATA SHEET

| PRODUCT | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |
|---|---|
| COREXIT® EC9527A | |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)   CHEMTREC

ACUTE FISH RESULTS :

| Species | Exposure | LC50 | Test Descriptor |
|---|---|---|---|
| Turbot | 96 hrs | 50 mg/l | |

Rating :

MOBILITY :
The environmental fate was estimated using a level III fugacity model embedded in the EPI (estimation program interface) Suite TM , provided by the US EPA. The model assumes a steady state condition between the total input and output. The level III model does not require equilibrium between the defined media. The information provided is intended to give the user a general estimate of the environmental fate of this product under the defined conditions of the models. If released into the environment this material is expected to distribute to the air, water and soil/sediment in the approximate respective percentages:

| Air | Water | Soil/Sediment |
|---|---|---|
| <5% | 10 - 30% | 70 - 90% |

The portion in water is expected to be soluble or dispersible.

BIOACCUMULATION POTENTIAL
Component substances have a low potential to bioconcentrate.

ENVIRONMENTAL HAZARD AND EXPOSURE CHARACTERIZATION
Based on our hazard characterization, the potential environmental hazard is:  Moderate
Based on our recommended product application and the product's characteristics, the potential environmental exposure is:  Low

If released into the environment, see CERCLA/SUPERFUND in Section 15.

| 13. | DISPOSAL CONSIDERATIONS |
|---|---|

If this product becomes a waste, it is not a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261, since it does not have the characteristics of Subpart C, nor is it listed under Subpart D.

As a non-hazardous waste, it is not subject to federal regulation. Consult state or local regulation for any additional handling, treatment or disposal requirements.  For disposal, contact a properly licensed waste treatment, storage, disposal or recycling facility.

| 14. | TRANSPORT INFORMATION |
|---|---|

The information in this section is for reference only and should not take the place of a shipping paper (bill of lading) specific to an order.  Please note that the proper Shipping Name / Hazard Class may vary by packaging, properties, and mode of transportation.  Typical Proper Shipping Names for this product are as follows.

LAND TRANSPORT :

For Packages Less Than Or Equal To 119 Gallons:
Proper Shipping Name :     PRODUCT IS NOT REGULATED DURING TRANSPORTATION

IAR 00209



MATERIAL SAFETY DATA SHEET

| PRODUCT | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |
|---|---|
| COREXIT® EC9527A | |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

For Packages Greater Than 119 Gallons:

| Proper Shipping Name : | COMBUSTIBLE LIQUID, N.O.S. |
|---|---|
| Technical Name(s) : | 2-BUTOXYETHANOL |
| UN/ID No : | NA 1993 |
| Hazard Class - Primary : | COMBUSTIBLE |
| Packing Group : | III |
| | |
| Flash Point : | 72.7 °C / 163 °F |

AIR TRANSPORT (ICAO/IATA) :

Proper Shipping Name :    PRODUCT IS NOT REGULATED DURING TRANSPORTATION

MARINE TRANSPORT (IMDG/IMO) :

Proper Shipping Name :    PRODUCT IS NOT REGULATED DURING TRANSPORTATION

| 15. | REGULATORY INFORMATION |
|---|---|

NATIONAL REGULATIONS; USA :

OSHA HAZARD COMMUNICATION RULE, 29 CFR 1910.1200 :
Based on our hazard evaluation, none of the substances in this product are hazardous.

CERCLA/SUPERFUND, 40 CFR 117, 302 :
Notification of spills of this product is not required.

SARA/SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986 (TITLE III) - SECTIONS 302, 311, 312, AND 313 :

SECTION 302 - EXTREMELY HAZARDOUS SUBSTANCES (40 CFR 355) :
This product does not contain substances listed in Appendix A and B as an Extremely Hazardous Substance.

SECTIONS 311 AND 312 - MATERIAL SAFETY DATA SHEET REQUIREMENTS (40 CFR 370) :
Our hazard evaluation has found this product to be hazardous.  The product should be reported under the following indicated EPA hazard categories:

|   |   |
|---|---|
| X | Immediate (Acute) Health Hazard |
| X | Delayed (Chronic) Health Hazard |
| X | Fire Hazard |
|   | Sudden Release of Pressure Hazard |
|   | Reactive Hazard |

IAR 00210

 **NALCO**

MATERIAL SAFETY DATA SHEET

| PRODUCT | HIGHLY |
|---|---|
| COREXIT® EC9527A | CONFIDENTIAL |
| | Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)   CHEMTREC

Under SARA 311 and 312, the EPA has established threshold quantities for the reporting of hazardous chemicals. The current thresholds are: 500 pounds or the threshold planning quantity (TPQ), whichever is lower, for extremely hazardous substances and 10,000 pounds for all other hazardous chemicals.

SECTION 313 - LIST OF TOXIC CHEMICALS (40 CFR 372) :
This product contains the following substance(s), (with CAS # and % range) which appear(s) on the List of Toxic Chemicals

| Hazardous Substance(s) | CAS NO | % (w/w) |
|---|---|---|
| Glycol Ethers | | 0.0 – 0.0 |

TOXIC SUBSTANCES CONTROL ACT (TSCA) :
The substances in this preparation are included on or exempted from the TSCA 8(b)  Inventory (40 CFR 710)

FEDERAL WATER POLLUTION CONTROL ACT, CLEAN WATER ACT, 40 CFR 401.15 / formerly Sec. 307, 40 CFR 116.4 / formerly Sec. 311 :
None of the substances are specifically listed in the regulation.

CLEAN AIR ACT, Sec. 111 (40 CFR 60, Volatile Organic Compounds), Sec. 112 (40 CFR 61, Hazardous Air Pollutants), Sec. 602 (40 CFR 82, Class I and II Ozone Depleting Substances) :
This product contains the following substances listed in the regulation:

| Substance(s) | Citations |
|---|---|
| • 2-Butoxyethanol<br>• Propylene Glycol | Sec. 111 |

CALIFORNIA PROPOSITION 65 :
This product does not contain substances which require warning under California Proposition 65.

MICHIGAN CRITICAL MATERIALS :
None of the substances are specifically listed in the regulation.

STATE RIGHT TO KNOW LAWS :
The following substances are disclosed for compliance with State Right to Know Laws:

| | |
|---|---|
| 2-Butoxyethanol | 111-76-2 |
| Propylene Glycol | 57-55-6 |

NATIONAL REGULATIONS, CANADA :

WORKPLACE HAZARDOUS MATERIALS INFORMATION SYSTEM (WHMIS) :
This product has been classified in accordance with the hazard criteria of the Controlled Products Regulations (CPR) and the MSDS contains all the information required by the CPR.

WHMIS CLASSIFICATION :
D2B – Materials Causing Other Toxic Effects - Toxic Material

IAR 00211



MATERIAL SAFETY DATA SHEET

| PRODUCT | |
|---|---|
| COREXIT® EC9527A | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

CANADIAN ENVIRONMENTAL PROTECTION ACT (CEPA) :
The substances in this preparation are listed on the Domestic Substances List (DSL), are exempt, or have been reported in accordance with the New Substances Notification Regulations.

| 16. | OTHER INFORMATION |
|---|---|

Due to our commitment to Product Stewardship, we have evaluated the human and environmental hazards and exposures of this product. Based on our recommended use of this product, we have characterized the product's general risk. This information should provide assistance for your own risk management practices. We have evaluated our product's risk as follows:

* The human risk is: Low

* The environmental risk is: Low

Any use inconsistent with our recommendations may affect the risk characterization. Our sales representative will assist you to determine if your product application is consistent with our recommendations. Together we can implement an appropriate risk management process.

This product material safety data sheet provides health and safety information. The product is to be used in applications consistent with our product literature. Individuals handling this product should be informed of the recommended safety precautions and should have access to this information. For any other uses, exposures should be evaluated so that appropriate handling practices and training programs can be established to insure safe workplace operations. Please consult your local sales representative for any further information.

REFERENCES

Threshold Limit Values for Chemical Substances and Physical Agents and Biological Exposure Indices, American Conference of Governmental Industrial Hygienists, OH., (Ariel Insight# CD-ROM Version), Ariel Research Corp., Bethesda, MD.

Hazardous Substances Data Bank, National Library of Medicine, Bethesda, Maryland (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.

IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Man, Geneva: World Health Organization, International Agency for Research on Cancer.

Integrated Risk Information System, U.S. Environmental Protection Agency, Washington, D.C. (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.

Annual Report on Carcinogens, National Toxicology Program, U.S. Department of Health and Human Services, Public Health Service.

Title 29 Code of Federal Regulations, Part 1910, Subpart Z, Toxic and Hazardous Substances, Occupational Safety and Health Administration (OSHA), (Ariel Insight# CD-ROM Version), Ariel Research Corp., Bethesda, MD.

Registry of Toxic Effects of Chemical Substances, National Institute for Occupational Safety and Health, Cincinnati, OH, (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.



MATERIAL SAFETY DATA    SHEET

| PRODUCT | HIGHLY |
|---|---|
| **COREXIT® EC9527A** | CONFIDENTIAL |
| | Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

Ariel Insight# (An integrated guide to industrial chemicals covered under major regulatory and advisory programs), North American Module, Western European Module, Chemical Inventories Module and the Generics Module (Ariel Insight# CD-ROM Version), Ariel Research Corp., Bethesda, MD.

The Teratogen Information System, University of Washington, Seattle, WA (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.

Prepared By : Product Safety Department
Date issued : 02/20/2004
Version Number : 1.6

IAR 00213



*Enclosure ( ) #2*

# NALCO

| MATERIAL SAFETY DATA SHEET | |
|---|---|
| **PRODUCT** | **HIGHLY** |
| **COREXIT® EC9500A** | **CONFIDENTIAL** Pursuant to CMO 13 |
| EMERGENCY TELEPHONE NUMBER(S) | |
| (800) 424-9300 (24 Hours)    CHEMTREC | |

## 1.   CHEMICAL PRODUCT AND COMPANY IDENTIFICATION

PRODUCT NAME :                          COREXIT® EC9500A

APPLICATION :                           OIL SPILL DISPERSANT

COMPANY IDENTIFICATION :                Nalco Energy Services, L.P.
                                        P.O. Box 87
                                        Sugar Land, Texas
                                        77487-0087

EMERGENCY TELEPHONE NUMBER(S) :         (800) 424-9300 (24 Hours)   CHEMTREC

NFPA 704M/HMIS RATING
HEALTH :   1 / 1      FLAMMABILITY :   1 / 1      INSTABILITY :   0 / 0      OTHER :
0 = Insignificant   1 = Slight   2 = Moderate   3 = High   4 = Extreme

## 2.   COMPOSITION/INFORMATION ON INGREDIENTS

Our hazard evaluation has identified the following chemical substance(s) as hazardous. Consult Section 15 for the nature of the hazard(s).

| Hazardous Substance(s) | CAS NO | % (w/w) |
|---|---|---|
| Distillates, petroleum, hydrotreated light | 64742-47-8 | 10.0 – 30.0 |
| Propylene Glycol | 57-55-6 | 1.0 – 5.0 |
| Organic sulfonic acid salt | Proprietary | 10.0 – 30.0 |

## 3.   HAZARDS IDENTIFICATION

### **EMERGENCY OVERVIEW**

**WARNING**
Combustible.
Keep away from heat. Keep away from sources of ignition – No smoking. Keep container tightly closed. Do not get in eyes, on skin, on clothing. Do not take internally. Avoid breathing vapor. Use with adequate ventilation. In case of contact with eyes, rinse immediately with plenty of water and seek medical advice. After contact with skin, wash immediately with plenty of soap and water.
Wear suitable protective clothing.
Low Fire Hazard; liquids may burn upon heating to temperatures at or above the flash point. May evolve oxides of carbon (COx) under fire conditions. May evolve oxides of sulfur (SOx) under fire conditions.

PRIMARY ROUTES OF EXPOSURE :
Eye, Skin

HUMAN HEALTH HAZARDS - ACUTE :                                        IAR 00214

EYE CONTACT :
May cause irritation with prolonged contact.



MATERIAL SAFETY DATA SHEET

| PRODUCT | |
|---|---|
| **COREXIT® EC9500A** | HIGHLY CONFIDENTIAL<br>Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

**SKIN CONTACT :**
May cause irritation with prolonged contact.

**INGESTION :**
Not a likely route of exposure. Can cause chemical pneumonia if aspirated into lungs following ingestion.

**INHALATION :**
Repeated or prolonged exposure may irritate the respiratory tract.

**SYMPTOMS OF EXPOSURE :**
Acute :
A review of available data does not identify any symptoms from exposure not previously mentioned.
Chronic :
Frequent or prolonged contact with product may defat and dry the skin, leading to discomfort and dermatitis.

**AGGRAVATION OF EXISTING CONDITIONS :**
Skin contact may aggravate an existing dermatitis condition.

| 4. | **FIRST AID MEASURES** |
|---|---|

**EYE CONTACT :**
Immediately flush with plenty of water for at least 15 minutes. If symptoms develop, seek medical advice.

**SKIN CONTACT :**
Immediately wash with plenty of soap and water. If symptoms develop, seek medical advice.

**INGESTION :**
Do not induce vomiting: contains petroleum distillates and/or aromatic solvents. If conscious, wash out mouth and give water to drink. Get medical attention.

**INHALATION :**
Remove to fresh air, treat symptomatically. Get medical attention.

**NOTE TO PHYSICIAN :**
Based on the individual reactions of the patient, the physician's judgement should be used to control symptoms and clinical condition.

| 5. | **FIRE FIGHTING MEASURES** |
|---|---|

FLASH POINT :                    181.4 °F / 83 °C ( PMCC )

LOWER EXPLOSION LIMIT :          Not flammable

UPPER EXPLOSION LIMIT :          Not flammable

IAR 00215



**MATERIAL SAFETY DATA SHEET**

| PRODUCT | | |
|---|---|---|
| **COREXIT® EC9500A** | | **HIGHLY CONFIDENTIAL** Pursuant to CMO 13 |

| EMERGENCY TELEPHONE NUMBER(S) | |
|---|---|
| (800) 424-9300 (24 Hours) | CHEMTREC |

**EXTINGUISHING MEDIA :**
Alcohol foam, Carbon dioxide, Foam, Dry powder, Other extinguishing agent suitable for Class B fires, For large fires, use water spray or fog, thoroughly drenching the burning material.
Water mist may be used to cool closed containers.

**UNSUITABLE EXTINGUISHING MEDIA :**
Do not use water unless flooding amounts are available.

**FIRE AND EXPLOSION HAZARD :**
Low Fire Hazard; liquids may burn upon heating to temperatures at or above the flash point. May evolve oxides of carbon (COx) under fire conditions. May evolve oxides of sulfur (SOx) under fire conditions.

**SPECIAL PROTECTIVE EQUIPMENT FOR FIRE FIGHTING :**
In case of fire, wear a full face positive-pressure self contained breathing apparatus and protective suit.

| 6. | ACCIDENTAL RELEASE MEASURES |
|---|---|

**PERSONAL PRECAUTIONS :**
Restrict access to area as appropriate until clean-up operations are complete. Stop or reduce any leaks if it is safe to do so. Ventilate spill area if possible. Do not touch spilled material. Remove sources of ignition. Have emergency equipment (for fires, spills, leaks, etc.) readily available. Use personal protective equipment recommended in Section 8 (Exposure Controls/Personal Protection). Notify appropriate government, occupational health and safety and environmental authorities.

**METHODS FOR CLEANING UP :**
SMALL SPILLS: Soak up spill with absorbent material. Place residues in a suitable, covered, properly labeled container. Wash affected area. LARGE SPILLS: Contain liquid using absorbent material, by digging trenches or by diking. Reclaim into recovery or salvage drums or tank truck for proper disposal. Clean contaminated surfaces with water or aqueous cleaning agents. Contact an approved waste hauler for disposal of contaminated recovered material. Dispose of material in compliance with regulations indicated in Section 13 (Disposal Considerations).

**ENVIRONMENTAL PRECAUTIONS :**
Do not contaminate surface water.

| 7. | HANDLING AND STORAGE |
|---|---|

**HANDLING :**
Use with adequate ventilation. Keep the containers closed when not in use. Do not take internally. Do not get in eyes, on skin, on clothing. Have emergency equipment (for fires, spills, leaks, etc.) readily available.

**STORAGE CONDITIONS :**
Store away from heat and sources of ignition. Store separately from oxidizers. Store the containers tightly closed.

**SUITABLE CONSTRUCTION MATERIAL :**
PVC, Kalrez, PTFE, Teflon, HDPE (high density polyethylene), Aluminum, Carbon Steel C1018, Stainless Steel 304, Stainless Steel 316L, Hastelloy C-276, Plexiglass, Compatibility with Plastic Materials can vary; we therefore recommend that compatibility is tested prior to use.



| MATERIAL SAFETY DATA SHEET | |
|---|---|
| PRODUCT | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |
| COREXIT® EC9500A | |

**EMERGENCY TELEPHONE NUMBER(S)**
(800) 424-9300 (24 Hours)     CHEMTREC

UNSUITABLE CONSTRUCTION MATERIAL :
Copper, Mild steel, Polypropylene, Polyethylene, EPDM, Alfax, Brass, Buna-N, Natural rubber, Polyurethane, Hypalon, Viton, Neoprene, Ethylene propylene

| 8. | EXPOSURE CONTROLS/PERSONAL PROTECTION |
|---|---|

OCCUPATIONAL EXPOSURE LIMITS :
Exposure guidelines have not been established for this product.  Available exposure limits for the substance(s) are shown below.

ACGIH/TLV :
Substance(s)
        Oil Mist                              TWA: 5 mg/m3
                                              STEL: 10 mg/m3

        Propylene Glycol
OSHA/PEL :
Substance(s)
        Oil Mist                              TWA: 5 mg/m3
                                              STEL: 10 mg/m3

        Propylene Glycol
AIHA/WEEL :
Substance(s)

ENGINEERING MEASURES :
General ventilation is recommended.

RESPIRATORY PROTECTION :
Where concentrations in air may exceed the limits given in this section, the use of a half face filter mask or air supplied breathing apparatus is recommended.  A suitable filter material depends on the amount and type of chemicals being handled.  Consider the use of filter type:  Multi-contaminant cartridge (Gold)  with a Particulate pre-filter (Purple).  In event of emergency or planned entry into unknown concentrations a positive pressure, full-facepiece SCBA should be used.  If respiratory protection is required, institute a complete respiratory protection program including selection, fit testing, training, maintenance and inspection.

HAND PROTECTION :
Nitrile gloves, PVC gloves

SKIN PROTECTION :
Wear standard protective clothing.

EYE PROTECTION :
Wear chemical splash goggles.

HYGIENE RECOMMENDATIONS :
Keep an eye wash fountain available.  Keep a safety shower available.  If clothing is contaminated, remove clothing and thoroughly wash the affected area.  Launder contaminated clothing before reuse.

IAR 00217



MATERIAL SAFETY DATA SHEET

| PRODUCT | |
|---|---|
| **COREXIT® EC9500A** | HIGHLY CONFIDENTIAL<br>Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)

(800) 424-9300 (24 Hours)    CHEMTREC

**HUMAN EXPOSURE CHARACTERIZATION :**
Based on our recommended product application and personal protective equipment, the potential human exposure is:  Low

---

| 9. | PHYSICAL AND CHEMICAL PROPERTIES |
|---|---|

PHYSICAL STATE         Liquid

APPEARANCE             Clear Hazy Amber

ODOR                   Hydrocarbon

SPECIFIC GRAVITY       0.95 @ 60 °F / 15.6 °C
DENSITY                7.91 lb/gal
SOLUBILITY IN WATER    Miscible
pH  (100 %)            6.2
VISCOSITY              177 cps @ 32 °F / 0 °C 70 cps @ 60 °F / 15.6 °C  @ 104 °F / 40 °C
VISCOSITY               @ 32 °F / 0 °C   @ 60 °F / 15.6 °C 22.5 cst  @ 104 °F / 40 °C
POUR POINT             < -71 °F / < -57 °C
BOILING POINT          296 °F / 147 °C
VAPOR PRESSURE         15.5 mm Hg  @ 100 °F / 37.8 °C

Note: These physical properties are typical values for this product and are subject to change.

---

| 10. | STABILITY AND REACTIVITY |
|---|---|

**STABILITY :**
Stable under normal conditions.

**HAZARDOUS POLYMERIZATION :**
Hazardous polymerization will not occur.

**CONDITIONS TO AVOID :**
Heat

**MATERIALS TO AVOID :**
Contact with strong oxidizers (e.g. chlorine, peroxides, chromates, nitric acid, perchlorate, concentrated oxygen, permanganate) may generate heat, fires, explosions and/or toxic vapors.

**HAZARDOUS DECOMPOSITION PRODUCTS :**
Under fire conditions:          Oxides of carbon, Oxides of sulfur

---

| 11. | TOXICOLOGICAL INFORMATION |
|---|---|

No toxicity studies have been conducted on this product.

**SENSITIZATION :**
This product is not expected to be a sensitizer.

---



**MATERIAL SAFETY DATA SHEET**

| PRODUCT | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |
|---|---|
| **COREXIT® EC9500A** | |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

CARCINOGENICITY :
None of the substances in this product are listed as carcinogens by the International Agency for Research on Cancer (IARC), the National Toxicology Program (NTP) or the American Conference of Governmental Industrial Hygienists (ACGIH).

HUMAN HAZARD CHARACTERIZATION :
Based on our hazard characterization, the potential human hazard is:  Moderate

| 12. | ECOLOGICAL INFORMATION |
|---|---|

ECOTOXICOLOGICAL EFFECTS :

The following results are for the product. .

ACUTE INVERTEBRATE RESULTS :

| Species | Exposure | LC50 | EC50 | Test Descriptor |
|---|---|---|---|---|
| Acartia tonsa | 48 hrs | 34 mg/l | | Product |
| Artemia | 48 hrs | 20.7 mg/l | | Product |

Rating : Slightly toxic

MOBILITY :
The environmental fate was estimated using a level III fugacity model embedded in the EPI (estimation program interface) Suite TM , provided by the US EPA. The model assumes a steady state condition between the total input and output. The level III model does not require equilibrium between the defined media. The information provided is intended to give the user a general estimate of the environmental fate of this product under the defined conditions of the models. If released into the environment this material is expected to distribute to the air, water and soil/sediment in the approximate respective percentages;

| Air | Water | Soil/Sediment |
|---|---|---|
| <5% | 10 – 30% | 50 – 70% |

The portion in water is expected to float on the surface.

BIOACCUMULATION POTENTIAL
Component substances have a potential to bioconcentrate.

ENVIRONMENTAL HAZARD AND EXPOSURE CHARACTERIZATION
Based on our hazard characterization, the potential environmental hazard is:  Low
Based on our recommended product application and the product's characteristics, the potential environmental exposure is:  Low

If released into the environment, see CERCLA/SUPERFUND in Section 15.



MATERIAL SAFETY DATA SHEET

| PRODUCT | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |
|---|---|
| COREXIT® EC9500A | |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)   CHEMTREC

---

| 13. | DISPOSAL CONSIDERATIONS |
|---|---|

If this product becomes a waste, it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261. Before disposal, it should be determined if the waste meets the criteria of a hazardous waste.

Hazardous Waste: D018

Hazardous wastes must be transported by a licensed hazardous waste transporter and disposed of or treated in a properly licensed hazardous waste treatment, storage, disposal or recycling facility. Consult local, state, and federal regulations for specific requirements.

| 14. | TRANSPORT INFORMATION |
|---|---|

The information in this section is for reference only and should not take the place of a shipping paper (bill of lading) specific to an order. Please note that the proper Shipping Name / Hazard Class may vary by packaging, properties, and mode of transportation. Typical Proper Shipping Names for this product are as follows.

LAND TRANSPORT :

For Packages Less Than Or Equal To 119 Gallons:
    Proper Shipping Name :        PRODUCT IS NOT REGULATED DURING TRANSPORTATION

For Packages Greater Than 119 Gallons:
    Proper Shipping Name :        COMBUSTIBLE LIQUID, N.O.S.
    Technical Name(s) :            PETROLEUM DISTILLATES
    UN/ID No :                NA 1993
    Hazard Class – Primary :       COMBUSTIBLE
    Packing Group :             III

    Flash Point :              83 °C / 181.4 °F

AIR TRANSPORT (ICAO/IATA) :

    Proper Shipping Name :        PRODUCT IS NOT REGULATED DURING TRANSPORTATION

MARINE TRANSPORT (IMDG/IMO) :

    Proper Shipping Name :        PRODUCT IS NOT REGULATED DURING TRANSPORTATION

| 15. | REGULATORY INFORMATION |
|---|---|

NATIONAL REGULATIONS, USA :

---

IAR 00220



MATERIAL SAFETY DATA SHEET

| PRODUCT | HIGHLY CONFIDENTIAL Pursuant to CMO 13 |
|---|---|
| COREXIT® EC9500A | |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

OSHA HAZARD COMMUNICATION RULE, 29 CFR 1910.1200 :
Based on our hazard evaluation, the following substance(s) in this product is/are hazardous and the reason(s) is/are shown below.

Distillates, petroleum, hydrotreated light : Irritant
Propylene Glycol : Exposure Limit, Eye Irritant
Organic sulfonic acid salt : Irritant

CERCLA/SUPERFUND, 40 CFR 117, 302 :
Notification of spills of this product is not required.

SARA/SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986 (TITLE III) - SECTIONS 302, 311, 312, AND 313 :

SECTION 302 - EXTREMELY HAZARDOUS SUBSTANCES (40 CFR 355) :
This product does not contain substances listed in Appendix A and B as an Extremely Hazardous Substance.

SECTIONS 311 AND 312 - MATERIAL SAFETY DATA SHEET REQUIREMENTS (40 CFR 370) :
Our hazard evaluation has found this product to be hazardous.  The product should be reported under the following indicated EPA hazard categories:

| | |
|---|---|
| X | Immediate (Acute) Health Hazard |
| -- | Delayed (Chronic) Health Hazard |
| -- | Fire Hazard |
| -- | Sudden Release of Pressure Hazard |
| -- | Reactive Hazard |

Under SARA 311 and 312, the EPA has established threshold quantities for the reporting of hazardous chemicals. The current thresholds are: 500 pounds or the threshold planning quantity (TPQ), whichever is lower, for extremely hazardous substances and 10,000 pounds for all other hazardous chemicals.

SECTION 313 - LIST OF TOXIC CHEMICALS (40 CFR 372) :
This product does not contain substances on the List of Toxic Chemicals.

TOXIC SUBSTANCES CONTROL ACT (TSCA) :
The substances in this preparation are included on or exempted from the TSCA 8(b) Inventory (40 CFR 710)

FEDERAL WATER POLLUTION CONTROL ACT, CLEAN WATER ACT, 40 CFR 401.15 / formerly Sec. 307, 40 CFR 116.4 / formerly Sec. 311 :
None of the substances are specifically listed in the regulation.

CLEAN AIR ACT, Sec. 111 (40 CFR 60, Volatile Organic Compounds), Sec. 112 (40 CFR 61, Hazardous Air Pollutants), Sec. 602 (40 CFR 82, Class I and II Ozone Depleting Substances) :
None of the substances are specifically listed in the regulation.

| Substance(s) | Citations |
|---|---|
| • Propylene Glycol | Sec. 111 |



**MATERIAL SAFETY DATA SHEET**

| PRODUCT | HIGHLY |
| --- | --- |
| COREXIT® EC9500A | CONFIDENTIAL |
| | Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

CALIFORNIA PROPOSITION 65 :
This product does not contain substances which require warning under California Proposition 65.

MICHIGAN CRITICAL MATERIALS :
None of the substances are specifically listed in the regulation.

STATE RIGHT TO KNOW LAWS :
The following substances are disclosed for compliance with State Right to Know Laws:

Propylene Glycol                        57-55-6

NATIONAL REGULATIONS, CANADA :

WORKPLACE HAZARDOUS MATERIALS INFORMATION SYSTEM (WHMIS) :
This product has been classified in accordance with the hazard criteria of the Controlled Products Regulations
(CPR) and the MSDS contains all the information required by the CPR.

WHMIS CLASSIFICATION :
Not considered a WHMIS controlled product.

CANADIAN ENVIRONMENTAL PROTECTION ACT (CEPA) :
The substances in this preparation are listed on the Domestic Substances  List (DSL), are exempt, or have been
reported in accordance with the  New Substances Notification Regulations.

| 16. | OTHER INFORMATION |
| --- | --- |

Due to our commitment to Product Stewardship, we have evaluated the human and environmental hazards and
exposures of this product. Based on our recommended use of this product, we have characterized the product's
general risk. This information should provide assistance for your own risk management practices. We have
evaluated our product's risk as follows:

* The human risk is: Low

* The environmental risk is:  Low

Any use inconsistent with our recommendations may affect the risk characterization. Our sales representative will
assist you to determine if your product application is consistent with our recommendations. Together we can
implement an appropriate risk management process.

This product material safety data sheet provides health and safety information. The product is to be used in
applications consistent with our product literature. Individuals handling this product should be informed of the
recommended safety precautions and should have access to this information. For any other uses, exposures should
be evaluated so that appropriate handling practices and training programs can be established to insure safe
workplace operations. Please consult your local sales representative for any further information.

REFERENCES



MATERIAL SAFETY DATA SHEET

| PRODUCT | |
|---|---|
| **COREXIT® EC9500A** | **HIGHLY CONFIDENTIAL**<br>Pursuant to CMO 13 |

EMERGENCY TELEPHONE NUMBER(S)
(800) 424-9300 (24 Hours)    CHEMTREC

Threshold Limit Values for Chemical Substances and Physical Agents and Biological Exposure Indices, American Conference of Governmental Industrial Hygienists, OH., (Ariel Insight# CD-ROM Version), Ariel Research Corp., Bethesda, MD.

Hazardous Substances Data Bank, National Library of Medicine, Bethesda, Maryland (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.

IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Man, Geneva:  World Health Organization, International Agency for Research on Cancer.

Integrated Risk Information System, U.S. Environmental Protection Agency, Washington, D.C. (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.

Annual Report on Carcinogens, National Toxicology Program, U.S. Department of Health and Human Services, Public Health Service.

Title 29 Code of Federal Regulations, Part 1910, Subpart Z, Toxic and Hazardous Substances, Occupational Safety and Health Administration (OSHA), (Ariel Insight# CD-ROM Version), Ariel Research Corp., Bethesda, MD.

Registry of Toxic Effects of Chemical Substances, National Institute for Occupational Safety and Health, Cincinnati, OH, (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.

Ariel Insight# (An integrated guide to industrial chemicals covered under major regulatory and advisory programs), North American Module, Western European Module, Chemical Inventories Module and the Generics Module (Ariel Insight# CD-ROM Version), Ariel Research Corp., Bethesda, MD.

The Teratogen Information System, University of Washington, Seattle, WA (TOMES CPS# CD-ROM Version), Micromedex, Inc., Englewood, CO.

Prepared By :  Product Safety Department
Date Issued :  02/20/2004
Version Number :  1.10

IAR 00223

## SCHEDULE 3

## FORM OF CALL-OUT NOTICE

### See Attached

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

HAR 00224

```
┌─────────────────────────────────┐
│    FORM OF CALL-OUT NOTICE       │
│                                  │
│  _____ (Date/Time)    │
└─────────────────────────────────┘
```

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

## Contact Information

1. Contractor Aerial Application
   Dynamic Aviation, Inc   Duty Pilot _____ (Name)
   Duty Phone   540-383-7225
   Duty Pager   540-332-0011

   Int'l Air Response        Duty Pilot _____ (Name)
   Duty Phone   800-381-0476
   Duty Phone   520-723-6555          Office
   Email:          5203163550@archwireless.net

2. MSRC Contact: _____   (Name)

   _____   (Phone # Primary)

   _____   (Phone # Backup)

3. USCG FOSC Contact/Position   _____   (Name/Title)

   _____   (Phone # Primary)

   _____   (Phone # Backup)

4. RP Contact Information   _____   (Name/ICS Position)

   _____   (Phone # Primary)

   _____   (Phone # Backup)

## Contractor Services  (Circle those activated)

5. Equipment: Aircraft Type BE90      Tail Number:        N7198Y
              Phone Numbers:          Satellite #         480-768-2500
                                                          then 881-641-462-203
                                      Primary Frequency   VHF 122.85 MHz
                                      Secondary           _____
                                      Marine Frequency    Ch 16 shift to working freq

              Aircraft Type C130      Tail Number:        N117TG
              Phone Numbers:          Satellite #         480-768-2500
                                                          then 881 641 427 448
                                      Primary Frequency   VHF 122.85 MHz
                                      Secondary           _____
                                      Marine Frequency    Ch 16 shift to working freq

1

IAR 00225

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

6. Dispersant:

    a. Dispersant Name: _____

    b. Amount Available: _____ gallons

    b. Location: _____ (Address, City, State)

7. Services Requested:

    **STANDBY**

    _____ Responders standby at their current location in expectation that they may be called to respond in the near future.

    _____ Responders to standby at Home Base and prepare aircraft to depart

    _____ Load dispersant onto aircraft at the Home Base

    _____ Configure aircraft to seat 4 passengers. Standard configuration is with dispersant tanks which does not allow for passengers

    **MOBILIZATION**

    _____ Dispatch aircraft from Home Base to spray dispersant according to instructions from the FOSC

    _____ Mobilize aircraft to designated staging airport at _____ and standby

    _____ Load dispersant onto the aircraft at the staging airport

    _____ Dispatch aircraft to spray dispersants according to instructions from the FOSC

    _____ Dispatch aircraft to provide other services as described below:

_____

_____

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

8.   Incident description:

Location:   Latitude: _____   Longitude: _____

OR

_____ Miles _____ (direction) from
_____ (geographical reference point)

Oil: Type & Amount spilled _____

API _____   Pour Point _____

Source:  Type & Name   _____

Instantaneous Spill _____   Continuous Spill _____   Flow rate _____

Current Situation:

9.   FOSC _____ (name) in RRT _____ has approved the following
described operations and procedures:

Dispersant type:   _____

Dispersant amount:   _____

Dispersant dosage:   _____

Other:

IAR 00227

3

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

## SCHEDULE 2

## SPECIFICATIONS

### See Attached

IAR 00228

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

## SCHEDULE 1

## MILESTONES

## Quality Assurance, Health, Safety, Environmental and Security Manual - TBD

IAR 00229

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

SCHEDULE 4

COMPENSATION

| | Monthly Charge | Hourly Flight Rate |
|---|---|---|
| Initial Term | | |
| Year 1 | | |
| Year 2 | | |
| Option Years | | |
| Year 1 | | |
| Year 2 | | |
| Year 3 | | |

Notes to Pricing

1. Pricing provided is for a FAA-certified aircraft equipped with a 3,250 gallon spray tank.

2. Pricing quoted includes twelve (12) hours of training annually.

3. Any/all costs for additional training required by MSRC, and provided by a third party, will be directly passed through MSRC with no mark-up by Contractor.

4. Pricing includes the storage of 3,300 gallons of dispersant in an ISO tank/trailer.

5. Refer to Section 23.3 regarding a reduction in the Monthly Charge for the first six payments made during Year 1.

6. Approximately one (1) hour will be required to install the boom arms if the aircraft transited with the boom arms inside the aircraft.

7. Pricing provided does not include Jet-A fuel. MSRC shall provide all aircraft fuel. Approximate fuel burn for the C-130 is 700 gal/hr.

IAR 00230

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

10.    Weather On-scene of the Oil Spill

Sun rise: _____        Sun set: _____

Wind:   Direction/Speed _____

Ceiling (feet): _____

Visibility (statute miles): _____

Precipitation (Type-inches): _____

Water Temperature: _____

Currents: (Direction and Speed) _____

Wave Height and Direction: _____

Tides:  Time Ebb _____   Time  Flood _____

11.    Weather Forecast:  (24 – 48 hours)  and source

12.    Attach oil spill site chart or diagram

IAR 00231

4

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13



## MARINE SPILL RESPONSE CORPORATION

### AMENDMENT OF CONTRACT

1. Amendment No.: M002

2. Effective Date: January 15, 2009   3. Page 1 of 1

4. Issued By:

Marine Spill Response Corporation
220 Spring Street
Suite 500
Herndon, VA 20170

5. Contractor: Name and Address:

International Air Response, Inc.
P.O. Box 67
Coolidge, Arizona 85228

6. Modification of Contract: Dispersant Services, dated: September 1, 2006

7. Description of Amendment:

(a) Section 5.2 of the contract is amended as follows:
"5.2 MSRC shall have the option to extend the initial term for seven (7) additional periods of one (1) year each. If, prior to the end of the initial term or the end of the then-current option year, as the case may be, MSRC elects to exercise its option to extend the term of this Agreement for another year, it shall so notify Contractor in writing at least sixty (60) days prior to the end of the initial term or the end of the then-current option year."

(b) Schedule 4 – Compensation of the Contract is amended as follows:

Four additional Option years from September 1, 2011 thru August 31, 2015, with accompanying Monthly Charges and Hourly Flight Rates are added as follows:

| Option Years | Monthly Fee | Hourly Flight Rate |
|---|---|---|
| Sep 1, 2011 thru Aug 31, 2012 | | |
| Sep 1, 2012 thru Aug 31, 2013 | | |
| Sep 1, 2013 thru Aug 31, 2014 | | |
| Sep 1, 2014 thru Aug 31, 2015 | | |

(c) Except as provided herein all terms and conditions of the document referenced in block 6 as heretofore changed remain changed and in full force and effect.

8. Contractor is required to sign this Amendment and return one (1) copy to MSRC.

9. International Air Response, Inc.:

_____
(Signature of person authorized to sign)


_____
Name and Title of Signatory

10. Marine Spill Response Corporation:

_____
(Signature of person authorized to sign)

Jennie Hamm
Contracts and Tax Manager

IAR 00232

(Redacted)

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

## SCHEDULE 6

## QUALITY ASSURANCE/ENVIRONMENTAL, HEALTH & SAFETY/ SECURITY PROGRAM REQUIREMENTS

Refer to Schedule 1

IAR 00233

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

## SCHEDULE 5

## INSURANCE

The Contractor shall obtain and maintain in full force and effect throughout the terms of this Agreement, liability insurance for the Aircraft and for the Services.  All insurers shall be approved by MSRC.  At minimum, the liability insurance shall be in an amount not less than $5,000,000.00.

In addition and in lieu of hull insurance, Contractor agrees to replace the Aircraft (Tail # N117 TG) with another aircraft (Tail # N118TG) in the event Aircraft Tail # N117TG is damaged beyond repair.

In addition, Contractor shall obtain and maintain in full force and effect, throughout the term of this Agreement, worker's compensation as required by the laws of any state where any Services are to be performed.

Prior to the Effective Date (and not later than one week prior to the renewal date of any insurance required hereunder), Contractor shall supply to MSRC a certificate of insurance evidencing the required insurance.

MSRC shall be named as an additional insured party on all insurance policies, and all insurers shall waive any rights of subrogation in favor of MSRC.

Contractor acknowledges that, as between it and MSRC, deductibles remain Contractor's sole responsibility.

All insurance policies shall provide that there shall be no cancellation thereof by the insurer without 30 days' written notice to the named and additional insureds (10 days' notice in the event of nonpayment of premium).  Contractor shall notify MSRC promptly of any subsequent material changes or updates in such policies.

IAR 00234

HIGHLY CONFIDENTIAL
PURSUANT TO CMO 13



# MARINE SPILL RESPONSE CORPORATION

## AMENDMENT OF CONTRACT

1. Amendment No.: M003        2. Effective Date: April 20, 2010   3. Page 1 of 1

4. Issued By:

Marine Spill Response Corporation
220 Spring Street
Suite 500
Herndon, VA 20170

5. Contractor: Name and Address:

International Air Response, Inc.
P.O. Box 67
Coolidge, Arizona 85228

6. Modification of Contract: Dispersant Services, dated: September 1, 2006

7. Description of Amendment:

(a) Section 6.2 (a) of the contract is amended as follows:

"6.2 (a) MSRC shall be charged for services provided under a Call-Out Notice for each "Flight Hour." Hourly Flight Rates for Flight Hours are as set forth in Schedule 4. Flight Hours shall be as calculated in Schedule 4, and as follows:

(i) No-Notice Call-Out (actual oil spill events, quality assurance drills with no prior notice given to Contractor, etc.); Flight Hours shall commence at the moment the Aircraft engines are started (as recorded in the Aircraft and flight Engine Log maintained by the Contractor). Flight hours shall end at the moment the Aircraft engines are stopped (as recorded in the Aircraft and flight Engine Log maintained by the Contractor). For the purpose of determining if the four hour daily minimum charge applies (see section 6.2(a)(iii) below), the calendar day on which the call-out notice is received by the Contractor, based on local time at the Contractor's base of operations, shall be deemed as the first calendar day of the Call-out. Provided, however, that for the first day of a no-notice call-out only, Flight Hours shall commence at the time of the call-out (e.g., if a call-out occurs at 2200 hours, but Aircraft engines are not started until the following calendar day, Flight Hours shall commence at 2200 hours and Contractor shall receive the four hour minimum for that day). Time of the call-out shall be determined based on Arizona time.

(ii) Pre-planned Call-Out (planned training event or quality assurance drill in which the Contractor has been notified in advance of their participation): Flight Hours shall commence at the moment the Aircraft engines are started (as recorded in the Aircraft and flight Engine Log maintained by the Contractor). Flight hours shall end each day at the time the Aircraft engines are stopped (as recorded in the Aircraft and flight Engine Log maintained by the Contractor).

(iii) In all cases, Contractor will be compensated for a minimum of four (4) Flight Hours per day per aircraft. The minimum four (4) hour charge is calculated on a calendar day basis."

(b) A new Section 6.2 (d) is added as follows:

"6.2 (d) Actual travel expenses incurred by employees of Contractor shall be reimbursed by MSRC, provided that Contractor furnishes copies of receipts or other supporting documents for all such expenses. MSRC will not reimburse Contractor for burdens or fees on travel or travel-related expenses. In some cases, MSRC and Contractor may agree to use U.S. Government Per Diem rates for hotel and meals in lieu of actual expenses. "

(c) Except as provided herein all terms and conditions of the document referenced in block 6 as heretofore changed remain changed and in full force and effect.

IAR 00235

HIGHLY CONFIDENTIAL
PURSUANT TO CMO 13

8.   Contractor is required to sign this Amendment and return one (1) copy to MSRC.

9.   International Air Response, Inc.:

_____
(Signature of person authorized to sign)

_WILLIAM D. GRANTHAM VP IAR_
Name and Title of Signatory

10.   Marine Spill Response Corporation:

_____
(Signature of person authorized to sign)

Jennie Hamm
Contracts and Tax Manager

IAR 00236

HIGHLY
CONFIDENTIAL
Pursuant to CMO 13

 **MARINE SPILL RESPONSE CORPORATION**

## AMENDMENT OF CONTRACT

1. Amendment No.: M004          2. Effective Date: June 24, 2010   3. Page 1 of 1

4. Issued By:                                    5. Contractor: Name and Address:

   Marine Spill Response Corporation               International Air Response, Inc.
   220 Spring Street                               P.O. Box 67
   Suite 500                                       Coolidge, Arizona 85228
   Herndon, VA 20170

6. Modification of Contract: Dispersant Services, dated: September 1, 2006

7. Description of Amendment:

In accordance with Section 5.2 of the Agreement, MSRC is notifying Contractor of it's intent to extend the term of this Agreement, and hereby does extend the term, for another option year beginning September 1, 2010 and ending August 31, 2011.

(e) Except as provided herein all terms and conditions of the document referenced in block 6 as heretofore changed remain changed and in full force and effect.

8. Contractor is required to sign this Amendment and return one (1) copy to MSRC.

9. International Air Response, Inc.:          10. Marine Spill Response Corporation:

_____              _____
(Signature of person authorized to sign)     (Signature of person authorized to sign)

_____              Jennie Hamm
Name and Title of Signatory                  Contracts and Tax Manager

IAR 00237