UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * * | MDL NO. 2179<br><br>CIVIL ACTION NO. 2:10-CV-02771 |
| IN RE:  THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL., IN A CAUSE FOR EXONERATION FROM OR LIMITATION OF LIABILITY | * * * * * * * | JUDGE BARBIER<br><br>SECTION J<br><br>MAGISTRATE JUDGE SHUSHAN<br><br>MAG. DIV. 1 |
| THIS DOCUMENT RELATES TO:<br>All Cases in Pleading Bundle Section III.B(3) | * * * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DRC EMERGENCY SERVICES, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS

Defendant, DRC Emergency Services, LLC ("DRC"), provides this memorandum in support of its motion for partial summary judgment on derivative immunity and preemption grounds.  For the reasons set forth herein, as well as those in the joint memorandum in support of clean-up/responder defendants' motions for summary judgment on derivative immunity and preemption grounds[1] (incorporated herein in its entirety pursuant to Fed. R. Civ. P. 10(C)), the Court should dismiss, with prejudice, all claims asserted against DRC in the First Amended Master Complaint (Rec. Doc. 1812) (hereinafter, the "B3 Master Complaint") other than any VoO breach-of-contract claims.

---

[1]  Rec. Doc. 6535-2.

1

## I.     INTRODUCTION

Under the Clean Water Act, the United States enjoys absolute immunity for its oil spill response activities. That law also grants the United States the power to direct all federal, state, and private actors responding to the spill. DRC is one such private actor who participated in spill cleanup activities. Under a contract with BP, and under the direction of the federal government, DRC contracted with and mobilized local vessel owners to perform oil spill response activities, employed larger vessels to collect and contain spilled oil, and conducted beach and marsh clean-up operations.

Simply put, the federal government had the final word in the direction of oil spill response activities. And the evidence is undisputed that DRC complied with the directives issued by the government in performing its spill response work. Therefore, the doctrine of derivative immunity protects DRC. This doctrine bars all claims in the B3 Master Complaint against DRC other than any VoO breach-of-contract claims. Partial summary judgment dismissing these barred claims should be granted.

## II.    FACTUAL BACKGROUND

DRC provides disaster response and recovery services to federal, parish, and local government clients across the southeastern United States.[2] Shortly after the Deepwater Horizon oil spill, BP contracted with DRC to conduct oil spill response activities.[3] Although DRC was a contractor of BP, DRC was subject at all times to the ultimate authority and direction of the federal government.[4] In this capacity, DRC was called upon to mobilize its equipment,

---

[2]   Ex. A, declaration of Mark Stafford, ¶ 2.

[3]   *Id.* at ¶ 3. DRC obtained oil spill response organization status in order to perform its operations during the Deepwater Horizon response.

[4]   *Id.*

2

resources, employees, and contractors, under the ultimate direction of the Unified Area Command ("UAC") and its representatives.[5]  DRC was not involved in the application of dispersants during the response.[6]  It also was not involved in the *in situ* burning of oil, and did not conduct vessel decontaminations.[7]

The federal government's organizational structure for the response effort was known as the Incident Command System ("ICS").[8]  The UAC, originally centered in Robert, Louisiana, was central to this effort and is outlined in detail in the clean-up responder defendants' joint memorandum.[9]  As directed by the National Contingency Plan, the UAC operated as the headquarters for the Federal On-Scene Coordinator's ("FOSC") response efforts,[10] a government official appointed under the National Contingency Plan.  Present at the UAC facility were some 40 Coast Guard officials (compared to only 12 from BP), as well as Army, Navy, and Marine Corps representatives.[11]  Although "intended to create consensus" among all stakeholders in making decisions, the UAC's ultimate power rested with the FOSC who had "51 percent of the vote" and the "final word."[12]  The UAC set the "strategy and direction" for the response

---

[5]   *Id*. at ¶ 5.

[6]   *Id*. at ¶ 9.

[7]   *Id*. at ¶¶ 10-11,

[8]   Rec. Doc. 6535-3, joint statement of undisputed material facts in support of clean-up/responder defendants' motions for summary judgment on derivative immunity and preemption grounds, ¶ 21.

[9]   Rec. Doc. 6535-2, joint memorandum in support of clean-up/responder defendants' motions for summary judgment on grounds of derivative immunity and preemption grounds, pp. 11-12.

[10]  Rec. Doc. 6535-3, joint statement of undisputed material facts in support of clean-up/responder defendants' motions for summary judgment on derivative immunity and preemption grounds, ¶ 30.

[11]  *Id*. at ¶¶ 31-32.

[12]  *Id*. at ¶ 34.

operations, "monitor[ed] results," and "intervene[d] when necessary."[13] Reporting to the UAC, the government established five Incident Command Posts ("ICP") to aid in the response.[14] At each, a Coast Guard captain was appointed to act on behalf of the FOSC to help manage the response efforts coordinated from that ICP.[15] The ICPs thus served as "operational units" that managed various response efforts.[16]

DRC honored and adhered to the UAC and ICP's superior authority: "the Clean-up Responder Defendants participated in the DEEPWATER HORIZON oil spill response efforts in accordance with the roles, if any, assigned to them within the United Area Command system and the Incident Command Posts."[17] Specifically, under the direction of the UAC, DRC (i) contracted with and mobilized local vessel owners to perform oil spill response activities, (ii) employed vessels to collect and contain spilled oil, and (iii) conducted beach and marsh clean-up operations.[18] DRC personnel filled roles within the ICS in some areas where DRC operated.[19] DRC employees also served as liaisons to local command posts supporting Coast Guard officials who were directing response efforts.[20] Consistent with their duties, "DRC personnel acted under the ultimate leadership and direction of the UAC and its representatives."[21]

The Coast Guard, as part of the UAC, provided direction to DRC regarding what personal protective equipment ("PPE") DRC's contractors and employees should wear while performing

---

[13] *Id*. at ¶ 33.

[14] *Id*. at ¶ 35.

[15] *Id*. at ¶ 40.

[16] *Id*. at ¶ 39.

[17] *Id*. at ¶ 52.

[18] Ex. A, declaration of Mark Stafford, ¶ 5.

[19] *Id*. at ¶ 6.

[20] *Id*.

[21] *Id*.

their tasks.[22]  DRC complied with these directions.[23]  DRC trained its employees and contractors to perform oil spill response activities based on directives from the UAC, including the Coast Guard.[24]

Beginning on April 21, 2010 and continuing through the response efforts, Incident Action Plans were prepared on a daily basis containing detailed instructions on the response efforts to occur each day.[25]  Each of these plans was reviewed, signed, and approved by the FOSC or his representative and delivered to the ICPs for execution by the various clean-up/responder defendants.[26]  The United States authorized and/or directed all oil spill response activities as set forth in the Incident Action Plans when each was issued.[27]  And DRC complied with all of the UAC's directives, instructions, and authorizations issued during DRC's Deepwater Horizon response efforts.[28]

Because DRC acted at the direction of the federal government to combat the oil spill, and complied with all governmental directives, DRC is entitled to derivative immunity and/or the claims against DRC are federally preempted.  DRC moves for summary judgment on that basis.

---

[22]   *Id*. at ¶ 7.

[23]   *Id*.

[24]   *Id*. at ¶ 8.

[25]   Rec. Doc. 6535-3, joint statement of undisputed material facts in support of clean-up/responder defendants' motions for summary judgment on derivative immunity and preemption grounds, ¶ 53.

[26]   *Id*. at ¶ 54.

[27]   *Id*. at ¶ 55.

[28]   Ex. A, declaration of Mark Stafford, ¶ 12.

5

## II.     LAW AND ARGUMENT

### A.     Summary judgment should be granted if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.

The Court is familiar with the rules governing summary judgment: Federal Rule of Civil Procedure 56 provides that summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[29] A party moving for summary judgment "must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case."[30] "Factual controversies are construed in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists."[31] "[Courts] do not, however, in the absence of proof, assume that the non-moving party could or would prove the necessary facts."[32] The nonmoving party's burden is not satisfied by creating some metaphysical doubt as to the material facts, or by submitting "conclusory allegations, speculation, [or] unsubstantiated assertions."[33]

### B.     As a matter of law, DRC is entitled to derivative immunity when it performs work pursuant to the authorization and direction of the federal government.

Under the Clean Water Act, the United States possesses absolute immunity from liability for any actions or omissions relating to its oil spill response efforts,[34] which the Court has already noted in this case.[35] The Supreme Court has held that the United States' immunity flows

---

[29]   Fed. R. Civ. P. 56(a).

[30]   *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

[31]   *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998).

[32]   *Badon v. R. J. R. Nabisco Inc.*, 224 F.3d 382, 394 (5th Cir. 2000) (citations omitted).

[33]   *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

[34]   33 U.S.C. § 1321(j)(8) ("The United States Government is not liable for any damages arising from its actions or missions relating to any response plan required by this section.").

[35]   During the November 18, 2011 monthly status conference, in orally explaining its reasons for granting a motion by the United States to dismiss Transocean's claims against the United States,

to those who act at its direction and control,[36] like DRC and the other clean-up/responder defendants. The purpose of this derivative immunity is not to protect private parties *per se*, but "solely as a means of protecting the government's discretionary authority over areas of significant federal interest."[37]

To that end, the Second Circuit Court of Appeals held that derivative immunity was available for actions taken by private parties in response to the 9/11 terrorist attacks on the World Trade Center, and noted that this rationale "would extend to the disaster relief context due to the unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects."[38] Although the Second Circuit recognized derivative immunity under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, which was invoked in response to the terrorist attacks (just as it was in response to Hurricane Katrina), the court's reasoning applies with even greater force in this case.[39] The federal government plays a fundamentally different role when responding to an oil spill disaster under the Clean Water Act and the National Contingency Plan than it does when it responds to a disaster under the Stafford Act: "Emergencies that fall under the Stafford Act give state and local governments a lead role in organizing [the] response, paid largely, but not entirely, by the

---

    the Court reiterated that the United States has immunity from claims "based on response activities" under 33 U.S.C. § 1321(j)(8). *See* Nov. 18, 2011 Transcript at 56 (Rec. Doc. 4786).

[36]   *Yearsley v. W.A. Ross Construction*, 309 U.S. 18 (1940).

[37]   *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 89-90 (2d Cir. 2008); *see also Kadan v. Am. Contractors Ins. Co.*, No. 08-695, 2008 WL 5137259 at *2 (E.D. La. Dec. 5, 2008) (explaining that such immunity is "necessary to preserve a uniquely federal interest") (internal quotations omitted).

[38]   *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008).

[39]   However, as described below, the ultimate "test" adopted by the Second Circuit in evaluating immunity under the Stafford Act—which contains a discretionary function exception like the FTCA—does not govern this Court's analysis of derivative CWA immunity given the broad grant of immunity in the CWA.

federal government. The National Contingency Plan governing oil spill response, however, gives the federal government [the] lead, impacted states a role in the [U]nified [C]ommand, and the Responsible Party (RP) a role in cleaning up the spill in terms of funding and participation in the [U]nified [C]ommand."[40] Indeed, pursuant to the National Contingency Plan, the FOSC is to serve as "the lead federal official for oil removal and response operations" and is "responsible for directing and coordinating actions to remove the oil from the environment."[41] Thus, unlike the "state-centric response organization . . . outlined under the Stafford Act," the National Contingency Plan response places the federal government in charge, with "[t]he FOSC serv[ing] as the Unified Area Commander in accordance with established incident command doctrine."[42] As a result, the need for derivative immunity is even more compelling here than it was in the 9/11 litigation.[43]

Private entities such as DRC are entitled to derivative federal immunity when they perform work pursuant to the authorization and direction of the federal government and the acts of which plaintiffs complain fall within the scope of those government directives.[44] In other

---

[40] Rec. Doc. 6535-3, joint statement of undisputed material facts in support of clean-up/responder defendants' motions for summary judgment on derivative immunity and preemption grounds, ¶ 104; *see also Id.* at ¶ 105 ("The role of the federal government is different in an NCP response compared to [a National Response Framework] response [under the Stafford Act]. In the latter, the federal government supports state and local activities. In an NCP response, the federal government acts as the first responder.").

[41] *Id.* at ¶ 106.

[42] *Id.* at ¶ 107.

[43] The Court has already held that the absence of any contractual relationship between the Clean-Up Responder Defendants and the government is immaterial for purposes of derivative CWA immunity. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2011 WL 4575696, at *6-7 (E.D. La. 2011) (holding that "the rationale underlying derivative immunity does not suggest that only government contractors are entitled to it").

[44] *Yearsley*, 309 U.S. at 20-21.

words, if the federal government "validly conferred" authority upon DRC and DRC did not exceed that authority, then it is entitled to derivative immunity.[45]

### C.  The federal government validly conferred authority upon DRC, which DRC did not exceed – DRC is thus entitled to derivative immunity.

#### 1.  The Clean Water Act expressly empowers the federal government to direct private actors like DRC in the oil spill response.

The Clean Water Act provides expressly provides the federal government with the power to direct private actors, like DRC, to aid in the oil spill response.  It declares that "[t]he President *shall*, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge . . . of oil . . . into or on the navigable waters."[46]  It requires the pre-designation of a federal official "who shall be the Federal On-Scene Coordinator" in the event of a spill.[47]  And if an oil spill "poses or may present a substantial threat to public health or welfare of the United States," the FOSC "*shall direct all* federal, state, or *private actions* to remove the discharge."[48]

#### 2.  There is no genuine issue that DRC did not exceed its authority; DRC is thus entitled to derivative immunity.

As outlined in factual background above, DRC followed the federal government's directives in combating the oil spill, and it did not exceed its authority.  To summarize the facts established in the background (through the joint memorandum of law filed by the clean-up/responder defendants and Exhibit A, the affidavit of Mark Stafford of DRC), DRC now lists the undisputed facts before the Court on this issue:

---

[45]  *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 206-07 (5th Cir. 2009).

[46]  33 U.S.C. § 1321(c)(1)(A) (emphasis added).

[47]  33 U.S.C. § 1322(d)(2)(K).

[48]  40 C.F.R. § 300.322(b) (emphasis added); *see also* 40 C.F.R. § 300.120; 40 C.F.R. § 300.135.

1. [T]he Clean-up Responder Defendants participated in the DEEPWATER HORIZON oil spill response efforts in accordance with the roles, if any, assigned to them within the Unified Area Command system and the Incident Command posts.[49]

2. During the Deepwater Horizon response, DRC was called upon to mobilize its equipment, resources, employees, and contractors under the ultimate direction of the Unified Area Command ("UAC") and its representatives. The operations DRC performed under the direction of the UAC during the Deepwater Horizon response included (1) contracting with and mobilizing local vessel owners to perform oil spill response activities; (2) employing vessels to collect and contain spilled oil; and (3) beach and marsh clean-up operations.[50]

3. DRC personnel filled various roles within the Incident Command Structure ("ICS") in some of the areas in which DRC operated. DRC personnel also served in liaison posts to provide support to the Coast Guard officers directing the response efforts. In each capacity, DRC personnel acted under the ultimate leadership and direction of the UAC and its representatives.[51]

4. The Coast Guard, as part of the UAC, also provided direction to DRC regarding what personal protective equipment ("PPE") DRC contractors and employees were to wear while performing their tasks. DRC complied with this direction.[52]

5. DRC employees and contractors were trained to perform oil spill response activities based on directives from the UAC, including the Coast Guard.[53]

6. Beginning on April 21, 2010 and continuing throughout the DEEPWATER HORIZON spill response, Incident Action Plans were prepared on a daily basis that contained detailed instructions concerning the response activities that were to occur each day.[54]

---

[49] Rec. Doc. 6535-3, joint statement of undisputed material facts in support of clean-up/responder defendants' motions for summary judgment on derivative immunity and preemption grounds, ¶ 52.

[50] Ex. A, declaration of Mark Stafford, ¶ 5.

[51] *Id*. at ¶ 6.

[52] *Id*. at ¶ 7.

[53] *Id*. at ¶ 8.

[54] Rec. Doc. 6535-3, joint statement of undisputed material facts in support of clean-up/responder defendants' motions for summary judgment on derivative immunity and preemption grounds, ¶ 53.

7. Each Incident Action Plan was reviewed, signed, and approved by the FOSC and/or the FOSC's representative(s) and then delivered to the ICPs for execution by, among others, various Clean-Up Responder Defendants.[55]

8. The United States authorized and/or directed all spill response activities set forth in the Incident Action Plans as of the time each Incident Action Plan was issued.[56]

10. During the Deepwater Horizon response, DRC complied with the directives, instructions, and authorizations of the UAC and its representatives relating to DRC's spill response operations.[57]

Thus, there is no genuine issue of material fact that DRC obeyed the orders of the United States, who is absolutely immune under the Clean Water Act. Therefore, that absolute immunity flows derivatively to DRC as a matter of law.[58]

### D. Alternatively, the claims at issue against DRC are preempted.

Although the Court need not reach this issue to grant DRC's motion for partial summary judgment, the claims at issue in the B3 Master Complaint are subject to dismissal under the doctrine of implied conflict preemption. In short, the claims asserted against DRC conflict with

---

[55] *Id*. at ¶ 54.

[56] *Id*. at ¶ 55.

[57] Ex. A, declaration of Mark Stafford, ¶ 12.

[58] Although the Court need not reach the issue because the Clean Water Act resolves the issue more broadly under absolute immunity, DRC is also entitled to derivative discretionary function immunity under the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2680(a) (barring claims against the federal government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"); *Hix v. United States Army Corp of Engineers*, 155 Fed. App'x 121, 125 (5th Cir. 2005) (recognizing that discretionary function immunity "also extends to contractors who work to implement programs as agents of the federal government"). As explained in the Joint Memorandum filed by the Clean-Up Responders, the general principles of *Yearsley* govern the issue of private entities' entitlement to derivative discretionary function immunity. *See Chesney v. Tennessee Valley Authority*, 782 F. Supp. 2d 570, 581-82 (E.D. Tenn. 2011). Moreover, as further explained in the joint memorandum filed by the clean-up/responder defendants, there can be no doubt that the federal government would enjoy discretionary function immunity for its actions in responding to the Deepwater Horizon oil spill. Thus, because it is indisputable that the federal government validly conferred authority upon DRC during the response and that DRC did not exceed that authority, DRC is also entitled to derivative discretionary function immunity under the FTCA.

11

the comprehensive federal response scheme set forth in the Clean Water Act, Oil Pollution Act, and the National Contingency Plan because DRC was required by federal law to obey the directives issued by the FOSC in responding to the Deepwater Horizon spill.[59]  Summary judgment is therefore appropriate.

## IV. CONCLUSION

The United States government is absolutely immune for its efforts to fight the Deepwater Horizon oil spill.  And that effort required the assistance of private parties like DRC.  DRC complied with the United States' directives, instructions, and authorizations in performing its oil spill response activities.  As a matter of law, the United States' immunity flows to DRC under the doctrine of derivative immunity.  The Court should thus grant partial summary judgment in DRC's favor and dismiss all claims in the B3 Master Complaint against it, other than any VoO breach-of-contract claims.

Respectfully submitted,

/s/    Harold J. Flanagan
Harold J. Flanagan (Bar No. 24091)
Stephen M. Pesce (Bar No. 29380)
Sean P. Brady (Bar No. 30410)
Andy Dupre (Bar No. 32437)
**FLANAGAN PARTNERS LLP**
201 St. Charles Avenue, Suite 2405
New Orleans, Louisiana 70170
Telephone:  504-569-0235
Facsimile:  504-592-0251
hflanagan@flanaganpartners.com
spesce@flanaganpartners.com
sbrady@flanaganpartners.com
adupre@flanaganpartners.com

*Attorneys for DRC Emergency Services, LLC*

---

[59]   The issue is briefed more extensively in the joint memorandum filed by the clean-up/responder defendants.

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that he foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of May, 2012.

                                              /s/     Harold J. Flanagan