```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   IN RE:  OIL SPILL BY THE OIL RIG    *   10-MD-2179-CJB-SS
                 DEEPWATER HORIZON IN THE    *
 6           GULF OF MEXICO ON              *
             APRIL 20, 2010                 *   May 18, 2012
 7                                          *
                                            *
 8   Applies to:  All Cases                 *   9:30 a.m.
     * * * * * * * * * * * * * * * * * *

 9

10

11                    DISCOVERY STATUS CONFERENCE
               BEFORE THE HONORABLE SALLY SHUSHAN
12                 UNITED STATES MAGISTRATE JUDGE

13

14   Appearances:

15
     For the Plaintiffs:          Williamson & Rusnak
16                                BY:  JIMMY WILLIAMSON, ESQ.
                                  4310 Yoakum Boulevard
17                                Houston, Texas 77006

18
     For the Plaintiffs:          Levin Papantonio Thomas Mitchell
19                                   Rafferty & Proctor, PA
                                  BY:  BRIAN H. BARR, ESQ.
20                                316 South Baylen Street, Suite 600
                                  Post Office Box 12308
21                                Pensacola, Florida 32591

22
     For the Plaintiffs:          Lewis Kullman Sterbcow & Abramson
23                                BY:  PAUL M. STERBCOW, ESQ.
                                  601 Poydras Street, Suite 2615
24                                New Orleans, Louisiana 70130

25
```

1    <u>Appearances</u>:

2

3    For the United States          U.S. Department of Justice
     of America:                    Environmental Enforcement Section
                                    BY:   STEVEN O'ROURKE, ESQ.
4                                         SCOTT CERNICH, ESQ.
                                          A. NATHANIEL CHAKERES, ESQ.
5                                   Post Office Box 7611
                                    Washington, DC 20044
6

7    For the United States:         U.S. Department of Justice
     of America:                    Torts Branch, Civil Division
                                    BY:   STEPHEN G. FLYNN, ESQ.
8                                   Post Office Box 14271
                                    Washington, DC 20044
9

10
     For the State of               Attorney General of Alabama
11   Alabama:                       BY:   COREY L. MAZE, ESQ.
                                    500 Dexter Avenue
12                                  Montgomery, Alabama 36130

13
     For the State of               Kanner & Whiteley, LLC
14   Louisiana:                     BY:   DOUGLAS R. KRAUS, ESQ.
                                    701 Camp Street
15                                  New Orleans, Louisiana 70130

16
     For Transocean Holdings        Frilot, LLC
17   LLC, Transocean Offshore       BY:   KERRY J. MILLER, ESQ.
     Deepwater Drilling Inc.,       1100 Poydras Street, Suite 3700
18   Transocean Deepwater Inc.:     New Orleans, Louisiana 70163

19
     For Transocean Holdings        Sutherland Asbill & Brennan, LLP
20   LLC, Transocean Offshore       BY:   STEVEN L. ROBERTS, ESQ.
     Deepwater Drilling Inc.,       1001 Fannin Street, Suite 3700
21   Transocean Deepwater Inc.:     Houston, Texas 77002

22
     For Cameron International      Beck Redden & Secrest, LLP
23   Corporation:                   BY:   DAVID W. JONES, ESQ.
                                    1221 McKinney Street, Suite 4500
24                                  Houston, Texas 77010

25

1   Appearances:

2

3   For BP America Inc.,          Kirkland & Ellis, LLP
    BP America Production         BY:  ROBERT R. GASAWAY, ESQ.
    Company, BP Company           655 Fifteenth Street, NW
4   North America Inc.,           Washington, DC 20005
    BP Exploration &
5   Production Inc., BP
    Holdings North America
6   Limited, BP Products
    North America Inc.:

7

8   For BP America Inc.,          Kirkland & Ellis, LLP
    BP America Production         BY:  J. ANDREW LANGAN, ESQ.
    Company, BP Company           300 N. Lasalle
9   North America Inc.,           Chicago, Illinois 60654
    BP Exploration &
10  Production Inc., BP
    Holdings North America
11  Limited, BP Products
    North America Inc.:

12  For Halliburton Energy        Godwin Ronquillo, PC
13  Services, Inc.:               BY:  DONALD E. GODWIN, ESQ.
                                  1201 Elm Street, Suite 1700
14                                Dallas, Texas 75270

15  For Halliburton Energy:       Godwin Ronquillo, PC
    Services, Inc.:               BY:  R. ALAN YORK, ESQ.
16                                1331 Lamar, Suite 1665
                                  Houston, Texas 77010

17

18  For Anadarko Petroleum        Bingham McCutchen, LLP
    Corporation, Anadarko         BY:  WARREN A. FITCH, ESQ.
    E&P Company LP:               2020 K Street, NW
19                                Washington, DC 20006

20  Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room HB-406
21                                New Orleans, Louisiana 70130
                                  (504) 589-7778
22                                Toni_Tusa@laed.uscourts.gov

23

24
    Proceedings recorded by mechanical stenography using
25  computer-aided transcription software.

1            **I N D E X**

2                                                                PAGE

3
    BOP & CAPPING STACK                                           7
4
    PHASE ONE CLEAN-UP                                           10
5
    CLASS SETTLEMENT APPROVAL ISSUES                             13
6
    PHASE TWO STIPULATIONS                                       14
7
    BP AND U.S. DISCOVERY ISSUES                                 25
8
    DOCUMENT PRODUCTION BY PARTIES OTHER THAN U.S. AND BP        33
9
    RULE 30(B)(6) NOTICE FOR THE DEPOSITION OF BP               35
10
    RULE 30(B)(6) NOTICES FOR ALL PARTIES OTHER THAN BP         36
11
    HALLIBURTON ROLE IN SOURCE CONTROL AND QUANTIFICATION       38
12
    COURTESY COPIES                                             38
13
    30(B)(6) NOTICES FOR DEPOSITIONS OF NONPARTIES             39
14
    OTHER MATTERS                                              42
15

16

17

18

19

20

21

22

23

24

25

**<u>PROCEEDINGS</u>**

**(May 18, 2012)**

1     (The following proceedings were held in open court.)

2     **THE COURT:**  Good morning everybody.  Have a seat.

3          So we have two things that we want to look at

4     today, if you will give that to Corey to put up on the --

5     **MR. MAZE:**  Wait.  What?  Put that one up?

6     **THE COURT:**  Well, Michael will put it up.

7          Telephone participants, we are doing our

8     show-and-tell and I'm sorry you can't see it.  This is, if you

9     will notice -- Don Godwin, I want you to pay particular

10    attention, please.

11    **MR. GODWIN:**  I'm looking.  I'm watching.

12    **THE COURT:**  These are the Alabama attorneys waiting

13    for the Megabus in what appears to be an asphalt parking lot.

14    **MR. MAZE:**  It used to be Sam's and now it's not.

15    **THE COURT:**  In the old Sam's parking lot.  I asked

16    them to take a picture of them working up on the second deck,

17    but the bus was too crowded and they couldn't get a good shot,

18    so I got this instead.  Please note that Corey is working on

19    his iPad.  Win has got business on the telephone.  The bus stop

20    sign is hysterical.  Those are true public servants.

21          Then, if you wouldn't mind, put this over here.

22    This is our second picture, telephone participants.  Now, this

23    is a picture of what we want to avoid during Phase Two.  This

1   is a friend of mine, whose name shall remain secret, who during

2   the final negotiations of the class action settlement at about

3   10:30 on a Saturday night --

4            MR. BARR:  It was later than that.

5            THE COURT:  I thought it was about 10:30?

6            MR. BARR:  It was about 12:30.

7            THE COURT:  It was about 20 minutes after I left, so

8   maybe I was there later than I recall -- who passed out and had

9   to be taken to the emergency room.

10            MR. BARR:  It's not me.

11            THE COURT:  And it's not Brian Barr.  So what we want

12   to do during the planning stages for Phase Two is avoid this

13   kind of thing.  Pay attention, Don Godwin.

14            MR. GODWIN:  I am.  I hope he is okay, Judge.

15            THE COURT:  He is fine.

16            MR. GODWIN:  Good.

17            THE COURT:  Otherwise, I wouldn't be putting it up.

18            MR. O'KEEFE:  For Steve Roberts' benefit, it's only a

19   flesh wound.

20            THE COURT:  That's right.  We can take that one down

21   now.  Corey, why don't you leave the other one up for the

22   remainder of the conference.

23            MR. GODWIN:  That one was duly noted, Your Honor.

24            THE COURT:  That's right.  That looks like where you

25   wait for the plane, huh?

1          **MR. GODWIN:**  Here we go again.

2          **THE COURT:**  Okay.  Let's get going.  We heard from

3    Captain Englebert that the cleaning of the BOP parts that are

4    going to be scanned next week went fine.  She took pictures

5    before the cleaning, and she will provide copies of all of the

6    photographs when she reports at the end of May.  So that's all

7    done and she's ready to roll next week.

8              If there is any further testing or inspections

9    that anybody wants of the BOP or its miscellaneous parts, would

10   you all try to give all counsel at least two weeks notice of

11   your intent so we don't have the final scramble about what's

12   going on and why.  That would be very helpful.

13             Let's get a report from Halliburton.  Oh, I'm

14   sorry.  Could we get our report from BP and Transocean.

15   Anything on the ownership issue, Rob?

16         **MR. GASAWAY:**  Good morning, Your Honor.

17         **THE COURT:**  Good morning.

18         **MR. GASAWAY:**  Rob Gasaway for BP.  We did locate some

19   of our documents that we have been talking about.  We produced

20   them first to Transocean and then we produced them generally in

21   the MDL.  I think that was in the last week or so.

22         **THE COURT:**  Right.

23         **MR. GASAWAY:**  So those documents are out there.  I

24   think the truth of the matter is that there's some documents

25   that clearly support ownership by BP.  Transocean would

1   probably tell you that there's some documents that support
2   ownership by Transocean.  So I think where we are is we just
3   have to figure out where we want to go from here.

4          THE COURT:  Well, we could negotiate a sales price at
5   a reduced rate, somebody pay somebody else.  If you all want to
6   talk about that, let me know.  Otherwise, I assume you all are
7   continuing to work.

8          MR. GASAWAY:  Well, I think the larger point,
9   Your Honor, is it may be a moot point for the time being.  As
10  you know, there's a lot of interest in the capping stack just
11  now, a lot of continuing interest in perhaps inspecting the
12  capping stack, etc.  We have had some feelers from other
13  parties saying they would like to do that.

14          As we have said from the start with respect to
15  the BOP, we think the best way to handle that, candidly, is
16  just to keep it at Michoud under the auspices of the Court and
17  Captain Englebert.  For now, I think BP is content to keep it
18  where it is.

19          THE COURT:  Transocean, do you all agree with that?
20          MR. ROBERTS:  Yes, Your Honor.  I'm sorry.
21          THE COURT:  I think if all it's going to be, Steve,
22  is, "Yes, that's correct," you don't need the mic.
23          MR. ROBERTS:  Okay.
24          THE COURT:  But you might want to bring it because
25  Kerry may want to chime in at some point.

1      **MR. MILLER:**  I don't want it.

2      **THE COURT:**  You usually do.

3      **MR. MILLER:**  I mean I don't want the capping stack.

4   It won't fit in my yard.

5      **THE COURT:**  The kids would like it.

6      **MR. ROBERTS:**  Judge, I do have one other issue.

7      **THE COURT:**  Turn your mic on if that's the case.

8      **MR. ROBERTS:**  I'm trying to.  Steve Roberts for

9   Transocean.

10      One other related issue is that Transocean has a

11   significant amount of spare parts for the *Deepwater Horizon*

12   that were not on the *Deepwater Horizon*, that were in storage,

13   just routine maintenance parts.  I don't believe that they fall

14   under any order requiring us to keep them or hold them hostage,

15   but if anybody else believes otherwise, please let me know.

16   That would primarily be, I guess, BP and DOJ.  I'm talking

17   about pipe, pumps, things of that sort, just stuff that's been

18   in storage.  Thank you.

19      **THE COURT:**  Okay.  So you all will think about that

20   or you want to do more than think about that, Rob?

21      **MR. GASAWAY:**  Your Honor, what I would suggest is

22   just that they send perhaps a letter to the Court and the

23   parties the way BP has in the past where we have stuff within

24   our possession that's kind of on the borderline.  It may be

25   within the preservation auspices of PTO 1.  So if you could

1    just send a letter outlining what it is, we could take a look

2    at that.

3             **THE COURT:**  Good enough.  Thank you.

4                    Let's hear from Halliburton on how we are doing

5    with the 3D modeling.

6             **MR. GODWIN:**  Good morning, Your Honor.  Don Godwin

7    for Halliburton.

8             **THE COURT:**  Good morning, Don.

9             **MR. GODWIN:**  Judge, this past week Bruce Bowman, from

10   my firm, and I continued to have regular discussions by phone

11   with Captain Englebert, who's really being of great assistance

12   to, I think, everybody involved in this process as well as --

13            **THE COURT:**  She's a real find, huh?

14            **MR. GODWIN:**  She is a real find.  You picked a good

15   one.  She's a real professional.  We enjoy working with her.

16   She's been very helpful.

17                   Anyway, we are working primarily with Philip

18   Chen from BP and then with Jonathan Redgrave -- he is another

19   lawyer representing BP but with another firm -- and making a

20   lot of progress.  We did submit to Captain Englebert and all

21   the other lawyers -- I think it was on Thursday we submitted

22   our proposed protocol agreement of how we would propose the D3

23   modeling progress.

24                   We heard back last evening from Mr. Redgrave and

25   he said that they had some questions, and he suggested a

1  follow-up phone call this coming Tuesday.  We have gotten back

2  and said we would be available any time Tuesday afternoon.  We

3  are waiting to hear from Captain Englebert when that will be

4  convenient for her.  We anticipate having that call Tuesday and

5  working through whatever issues there are.

6         The goal is this week.  What we have told

7  Captain Englebert we are going to be prepared to do is

8  hopefully reach an agreement this coming week on the protocol

9  agreement, get all of that done, everybody signed off.  Then

10 the following week, the inputs will be provided by Halliburton

11 to BP and others, and Elysium.  That week they have the inputs,

12 then we understand from Captain Englebert she wants the model

13 to be run that second week, which is two weeks from now,

14 approximately.

15         We will have on the phone one of our employees

16 who will be there that was involved in the running of the D3

17 model back in the May-June 2010 time frame, Mark Savery.  He

18 will be on the phone to answer any technical questions.  He is

19 not going to be examined by BP lawyers.  We will be on the

20 phone with him.  We are not going to examine the Elysium folks

21 as to how they are going to do it or what they are doing.  They

22 will just be asking questions of him.

23         According to Captain Englebert, she is very

24 convinced that Elysium has the ability and the knowledge to do

25 what they need to do with the technical input from Mark only

1   and probably from no one else.  That's what we are doing,

2   that's where we are, and we think within two weeks it ought to

3   be completed.

4           THE COURT:  Good.  Thank you.  I notice you have your

5   seersucker on.  You are looking good.

6           MR. GODWIN:  In New Orleans, Your Honor, you have to

7   have it.

8           THE COURT:  That's it.  You're looking good.

9           MR. GODWIN:  Thank you, Judge.

10           THE COURT:  The first seersucker of the season,

11   that's good.

12           MR. GODWIN:  What do you mean the first of the

13   season?  We have been wearing it three weeks.

14           THE COURT:  Have you?

15           MR. GODWIN:  I hope so.

16           THE COURT:  Then I'm behind the curve.

17           MR. GODWIN:  You need yours.

18           THE COURT:  Maybe next week.

19           MR. GODWIN:  I wish you would tell everybody that

20   where I do go out and wait on an airplane is Shushan Field.

21           THE COURT:  That is correct, Shushan Airport.  That

22   is correct.  That's a lot nicer than the bus stop.

23           MR. ROBERTS:  He has a tie on, though, Judge.

24           THE COURT:  I was going to mention that.  Didn't we

25   all agree that every Friday was "No Tie Friday" except when we

1   go to see Judge Barbier?  Is that correct?

2          **UNIDENTIFIED SPEAKER:**  Yes, Your Honor.

3          **THE COURT:**  So Mr. Barr is not in compliance with the

4   rule.

5          **UNIDENTIFIED SPEAKER:**  That's right.

6          **THE COURT:**  Okay.  I just wanted to make sure, but

7   that is the rule.  I know that Andy, who is sitting here not

8   saying a word today, is going to civilly disobey the order.  So

9   you need not say anything, but we do note it for the record.

10         **MR. LANGAN:**  Fair enough, Your Honor.

11         **THE COURT:**  On the class action approval issues, we

12  noted last week that we are starting to get a few little

13  objections in.  We will probably set up a docket for objections

14  to be filed in separately so that we don't clog our general

15  docket with that.  I would like you all to think about whether

16  we need yet another docket for opt-outs, a general question.

17         **MR. LANGAN:**  Yes, Your Honor.  Andy Langan for BP.  I

18  think we find ourselves, obviously, agreeing on both.  We have

19  reached out to Mr. Herman, one I want to have a conversation

20  with him off line about and then come to the Court with, but I

21  think in general we share both, that there ought to be a docket

22  for objections and a docket for opt-outs.

23         **THE COURT:**  I guess the subset of that question,

24  Andy, is it occurred to me that we might want to do a docket

25  for objections to medical and objections to economic, but then

1    I thought, no, that's way too complicated.  So I think just an

2    objections docket; and if everybody wants a separate one, then

3    a opt-out docket.

4            **MR. LANGAN:**  Very good.  Anyway, so I guess as to the

5    way forward, we have reached out to Mr. Herman.  When he gets a

6    chance, I'm sure we will talk to him and be back to the Court,

7    hopefully before we meet again on June 1, with a proposal.

8            **THE COURT:**  Perfect.  Thanks a lot, Andy.  I

9    appreciate it.

10            **MR. LANGAN:**  Thank you.

11            **THE COURT:**  So now let's talk about Phase Two.  We

12   have got the draft stipulations out there.  The last version

13   that was circulated was a February 21 counterproposal from BP

14   to the U.S.  We have got that, and I think everybody is

15   currently taking a look at those stipulations.

16            Let's see what we have got here.  Halliburton

17   reports that as of now they have no additional stipulations.

18   The PSC has submitted seven new proposed stipulations.  Somehow

19   I have a feeling that some parties may not agree with those,

20   but go figure.

21            **MR. LANGAN:**  Your Honor, I would like to be heard at

22   some point, either now or later, about the PSC and also what

23   Transocean has done.  I don't know what the right time to do

24   that is.

25            **THE COURT:**  Well, stand there for a second and let's

1    talk about it.  You know, they are not stipulations unless we

2    all agree to them.

3          **MR. LANGAN:**  Right.  I have a more fundamental

4    process point on both.

5          **THE COURT:**  Go ahead.

6          **MR. LANGAN:**  So on the PSC, on March 16 Mr. Barr told

7    the Court that the PSC essentially had all the source control

8    discovery they needed and they were done and they weren't going

9    to pursue any more.  He sat here and read that statement into

10   the record.  There's only seven of them, and we probably don't

11   have to agree anyway, but I have a fundamental process point

12   about that.

13         Then with respect to Transocean, I guess I need

14   to make a couple comments.  You know, going back to last

15   December and January, if you look at the working group orders,

16   we are going to see a number of occasions in which -- you know,

17   the United States and BP worked through, over a long period of

18   time, on source control stipulations.  Then Your Honor brought

19   the other parties in, gave an opportunity to comment on them,

20   and there were comments made and we worked through that.

21         By sometime in January or early February, I

22   think we were basically done with that.  Then yesterday or the

23   day before, we got 115 or something from Transocean, many of

24   which I should note are about Phase One, many of which were not

25   an operator issue and don't have anything to do with Phase Two.

1           I understand that on May 4 Your Honor sent an

2    e-mail out that sort of invited, you know, kind of last call.

3    Respectfully, I don't think you had in mind 120 new

4    stipulations when you asked for last call.  So why should BP

5    waste our time going through 120 new -- we are way beyond that.

6    So I, frankly, think they should be sent back to the drawing

7    board.

8           **THE COURT:**  I think I sent an e-mail saying that we

9    are not reinventing the stipulations that we have.

10          **MR. LANGAN:**  Correct.

11          **THE COURT:**  I think I was real clear about that.  If

12   I wasn't clear, I want to be very clear that we are not

13   backtracking.  Everybody has had an opportunity.  Now, some of

14   them there are still a few remaining comments on, as I saw it,

15   in the tracking chart.

16          **MR. LANGAN:**  Right.

17          **THE COURT:**  What I would like to do is put a schedule

18   together where we make those final tweaks and those are done.

19          **MR. LANGAN:**  Right.

20          **THE COURT:**  I have not seen Transocean's.

21              Have we seen it?

22          **MR. O'KEEFE:**  I haven't seen it.

23          **THE COURT:**  I don't think we got a copy of

24   Transocean's.

25          **MR. LANGAN:**  I will say this.  With due respect to

1  Counsel, I understand that they may want to pursue a legal

2  motion vis-à-vis operator status.  They were in discussions, I

3  thought, with the United States about that.  We don't really

4  have such a dog in that fight.  There may be room for a Rule 56

5  process, but I don't think we should be throwing out and

6  starting over on source control stipulations.

7          **THE COURT:**  Stay there, Andy, and let's talk about

8  the final tweak to the set of Phase Two stipulations that we

9  have.  Let's talk about trying to get those done and put those

10 in the can.

11                  Brian, I saw you, so I will get to you.

12         **MR. LANGAN:**  I'm sorry.  I was just going to note

13 Mr. Miller, I believe, sent the letter I'm talking about on

14 May 16, and it looks like the Court was copied.  I believe, but

15 I could be wrong.

16         **MR. MILLER:**  I'm checking right now.  If not, I will

17 send you a copy right now.

18         **THE COURT:**  If so, Mike and I haven't seen them.  It

19 could be our fault.

20         **MR. LANGAN:**  I'm sorry to interrupt.  Your question

21 for me was?

22         **THE COURT:**  Let's talk about how we are going to get

23 the final tweaks done.  I would like to put it on a schedule so

24 that we either agree to those final tweaks -- and the final

25 tweaks being those that are on the tracking chart that Michael

1  sent around on May 18.  Those are just the only outstanding

2  comments that I think we have.

3       **MR. LANGAN:**  May 18?

4       **THE COURT:**  Michael sent out a May 18 e-mail.  He

5  circulated with that e-mail the last version of the Phase Two

6  stipulations, a tracking chart showing the parties' positions

7  regarding those stipulations, and a February 21 counterproposal

8  from BP.  So that's where I think we are.  I looked at the

9  tracking chart.  It was very modest as far as disagreements.

10 Brian is nodding his head in agreement.

11      **MR. LANGAN:**  May 18, that's today.  Was his e-mail

12 really today?

13      **THE COURT:**  I'm sorry.  April 18.

14      **MR. LANGAN:**  April 18.  I'm sorry.  Okay.  That's

15 certainly our position, Your Honor, yes.

16      **THE COURT:**  They were very minor tweaks that we were

17 going to work out.  Now, if you all want to have a Court

18 supervised meeting to work it out, we can do that, if you all

19 want to have a telephone meet-and-confer; but as far as I'm

20 concerned, that set will be the set that we put in the can.  If

21 we can reach any further stipulations during the course of

22 discovery, people want to propose further stipulations, we can

23 add them, but we are not subtracting.

24      **MR. LANGAN:**  Okay.

25      **THE COURT:**  So how do you all want to handle it?

1    Mr. Roberts.

2              **MR. ROBERTS:**  Judge, Steve Roberts for Transocean.

3    The stipulations that Andy is referring to were attached to the

4    letter that we had for the additional witnesses.

5              **THE COURT:**  I did receive that.

6              **MR. ROBERTS:**  As the Court will recall, Transocean,

7    in Judge Barbier's last conference, we raised the operator

8    issue, and we discussed at length the operator person-in-charge

9    issue.

10             **THE COURT:**  I hear you.

11             **MR. ROBERTS:**  Judge Barbier, from discussions with

12   both him and you, wanted to see if we could streamline

13   discovery, minimize depositions, and reach stipulations so we

14   could move forward on the operator issue, the operator

15   person-in-charge issue.

16             Andy is right.  He is very right when he says it

17   has overlapped, and I'm sorry that this brings BP into play.

18   It is a DOJ/Transocean issue, but the facts of who the operator

19   was and the person in charge was involves BP.

20             Now, you will see from the stipulation that I

21   don't think it was 100-something; I think it was 81.  What we

22   tried to do was to cite to the record where we got the

23   stipulation of facts.

24             I'm willing to sit down with Andy or his

25   designee and go through them all and pick out the ones we can.

1    I'm willing to just take them along and see what we can get out
2    of the depositions that the Court is going to schedule for
3    Phase Two and go that way.

4            The problem with stipulations is that while we
5    get the information out of a deposition, a party may not
6    necessarily accept that as the party's position.  So I don't
7    know that Andy will accept what his witnesses have said and
8    where we have quoted it as the position of BP.  I may file a
9    motion for summary judgment on the operator issue that involves
10   primarily Transocean and the DOJ, but Andy may disagree with
11   what we put in as a statement of facts.

12           I can't get to where the Court wants us to go in
13   a summary judgment style without forgetting stipulations.  I'm
14   willing to do it either way.  We can carry them, we can work
15   with Andy in the interim, we can go through the deposition
16   process and see what we have got at the end of it all, however
17   the Court wants to do it.

18           **THE COURT:**  Okay.  Andy, do you want to comment?

19           **MR. LANGAN:**  Well, just a couple thoughts on this.
20   Number one, I hear Mr. Roberts about the issue about what if a
21   witness says it.  Mr. Occhuizzo can talk about this better than
22   I, but in the original process that led to the April 18 final
23   thing, I believe that we had extensive discussions with both
24   the Department as well as Transocean and other parties.  I
25   think that one of the biggest resisters to admitting to a

stipulated fact just based on a witness' testimony was
Transocean.

So when the shoe was on the other foot, we got a
lot of resistance as opposed to an absolute document that says
X, Y, and Z in no uncertain terms that would lead to a
stipulation.  But simply a witness saying it, no dice, and I
believe that was their position.  So I guess the shoe is on the
other foot now.

Secondly, I do think the issue of the operator
status is primarily between the United States and Transocean
and is more of a motion between the two of them.  If they can
reach an agreement with the United States about a stipulated
set of facts that's not binding on us, I guess so be it.  I
think we need to think about whether we are even at that table.
Maybe we have to be, but I think that's a fundamental issue.
It's really in the case *U.S. v. Transocean*, I think.

**THE COURT:**  I agree with that, and I apologize for
not having looked at your stipulations.

**MR. LANGAN:**  By the way, there's exactly 100.

**THE COURT:**  Exactly 100.

**MR. LANGAN:**  Right.

**MR. ROBERTS:**  One, I was feeling the love with Andy a
minute ago when I said he is absolutely right, but I have to
say he is absolutely wrong.  The problem with the stipulations
that BP was presenting to us and where the shoe fell is we

 1   simply didn't agree with the position that they were taking.

 2   The requested stipulation was simply wrong.

 3            Now, other than to simply cite to what the

 4   witnesses say from BP and to put where we got it from so they

 5   can go back and cite check it without any problem whatsoever, I

 6   don't know what else to do.  I really don't.

 7            **THE COURT:**  Well, we are going to put that down as an

 8   item for next week.  I'm going to take a look at them and be

 9   prepared to discuss it more fully, but come on, let's hear what

10   the United States has to say.

11            **MR. FLYNN:**  Good morning, Your Honor.  Steven Flynn

12   for the United States.

13            We just wanted to put out we really think the

14   operator issue and the facts that may be pertinent to that

15   really probably is a separate matter.  We really think the

16   parties worked hard to get where we were with the original

17   stips, and we really would like to see those finished, for what

18   they are worth.  The irony is that while a lot of people

19   dispute them still, everybody uses them now to prepare for

20   Phase Two discovery.

21            **THE COURT:**  Amazing, isn't it?

22            **MR. LANGAN:**  Isn't that wild?

23            **THE COURT:**  Isn't that wild?

24            **MR. FLYNN:**  So we would like to see them go as far as

25   they can go.  We think probably a conference monitored by you,

1  maybe after one of the working group conferences, to see where

2  we -- in other words, maybe have a couple of weeks to still go

3  back and forth if there's something, but then have sort of a

4  final meeting to get them put to rest would be great.

5      **THE COURT:**  We can do that.  Let's do this, guys.

6  Today is the 18th.  I would like you all to go back to

7  Michael's e-mail of April 18 and look at the tracking chart.

8  That will tell you where there are some very modest areas of

9  disagreement.  We are not backing up.  Those are the items of

10  disagreement.  Let's see if you all can work those out.  Those

11  that cannot be worked out we will take up on June 1.  Okay?

12  That will be in the can.

13      Hello, Mr. Barr.

14     **MR. BARR:**  Good morning, Your Honor.  Brian Barr for

15  the PSC.  I want to put one thing in a little bit of context

16  that I think will help frame the issue.

17      When we were talking about these stipulations,

18  the intent behind these were time line events, what happened

19  from April 20 forward and establishing a time line that we then

20  wouldn't have to go through and establish in discovery.

21      **THE COURT:**  Exactly.

22     **MR. BARR:**  During that process, we put forward

23  basically these same stipulations on preparation.  BP objected.

24  The United States objected.  Everybody said that's not

25  consistent with what we are trying to do with the time line.

1    So I think that kind of explains a little bit of why we are

2    getting new stipulations.  Because at the time you said, "Hey,

3    let's try and get these time line stipulations done, and then

4    at the appropriate time we can come back and do preparation

5    stipulations, any of those."  That's what we were trying to do

6    here.

7            **THE COURT:**  I have not looked at them in detail, and

8    I have no problem with that, but I want to get the time line

9    stipulations in the can and we can move from there.  I'm going

10   to look at your stipulations this week, too, so I will be

11   better prepared to talk to you next week.

12           **MR. BARR:**  We are okay with that process.  It's just,

13   you know, when Andy stood up and he said that we said we didn't

14   need anything else, well, the way a stipulation usually works

15   is you have the evidence and then you work out the stipulations

16   to ease the trial.  So that's kind of what our mind-set was in

17   how we were doing these.

18           Then we also wanted to try to narrow to some

19   degree, if we could, Phase Two discovery, but it's still going

20   forward.  I don't think we have any intention of just sitting

21   back and watching.  If we have opportunities where we need to

22   develop a record, I think we plan on doing that.

23           **THE COURT:**  Okay.

24           **MR. MILLER:**  I know Steve said it already, but I

25   agree with Brian.  Our impression was we were taking them to

the next level, beyond time line into the substance.  It would
be in lieu of questions at a deposition.  If we have to ask
questions at a deposition, we will ask the questions at a
deposition instead.

          **THE COURT:**  I will look at them.  Brian, I just
glanced at yours, but I will look at them in detail.

          Yours are shorter, so I will probably get to
yours soon.

          Okay.  BP and the United States, on production
of documents, are continuing to confer on technical issues.  We
had a good call on yesterday, and we are going to have another
conference call Tuesday and probably Thursday of next week.  I
think we are making progress.  Rob thinks we are too.

          The issues, guys -- and I don't know if you all
need to know all this -- involves the laptops and what we have
referred to as the "loose media," which I think is a fun term,
that the Coast Guard used immediately after the incident and
trying to get the information off of that.

          We are going to do a sampling to see if much of
that information is duplicative of other documents that have
been previously produced.  It doesn't sound like there's a lot
of data, or at least that's our hope.

          So we are going to get ready to hear what the
process is for challenging the deliberative process privilege
and we are working on a schedule for that.  That will include

1  everybody, although remember that when the deliberative process
2  and all the other challenges come up, the U.S. will be looking
3  very carefully at BP and BP will be looking very carefully at
4  the U.S.  I'm not sure that anybody else, frankly, is going to
5  have a lot to add to those letter briefs.  But if you see
6  something that you want to raise, go ahead and raise it.  I
7  have a feeling those two parties are going to be pretty full on
8  their review of each other's privilege log.
9          **MR. MILLER:**  Your Honor, let me reflect on that --
10         **THE COURT:**  Sure.
11         **MR. MILLER:**  -- and that relates to the order you
12  entered Monday and yesterday, and maybe we are missing
13  something.  To the extent the identity involves source control
14  documents in addition to quantification, if the U.S. and BP
15  have identified those, can they let us know if they have been
16  identified?
17         **THE COURT:**  Hasn't that been done?  I thought with
18  privilege logs that are still coming out, they were being
19  identified as they came out.
20              Is that right, Rob?
21         **MR. GASAWAY:**  Your Honor, we had the large
22  identification of quantification documents, but the problem
23  with that is you can't assume that all the other ones are
24  source control because, of course, there's a lot of Phase One
25  documents or what we loosely call Phase Three documents.  So we

1   have not put together sort of a separate listing on universal
2   source control documents.
3         **MR. MILLER:**  So they really haven't been specially
4   identified?
5         **THE COURT:**  No.  What we were doing, we were in the
6   process of prioritizing, if you will recall, quantification, so
7   that's why we asked them to identify quantification.  Then
8   mainly at Transocean's request, we decided to put source
9   control in.  So we didn't see any real reason to make them
10  continue that process.
11        **MR. MILLER:**  But in terms of the Monday deadline,
12  does that go beyond just the ones that have been identified
13  quantification into the other ones, which would include source
14  control, Phase One, Phase Three?
15        **THE COURT:**  It includes all Phase Two documents.
16        **MR. GASAWAY:**  Yes.  It's just governed by the May 11
17  order that was issued last week, so we are just working off
18  that order.  There's no other order or understanding that we
19  had.  We are just cranking through that process.  As you know,
20  it's a two-stage process, so we are in the first stage of that
21  two-stage process.
22        **MR. MILLER:**  Okay.  This may be a very dumb question.
23  How do we know what to challenge, then?  I think Alan has the
24  same question.  Maybe it needs to be phased where the U.S. and
25  BP finish their work and then the other parties take up from

1  it, but we really don't know --

2  　　　　THE COURT:  We don't have time for that.

3  　　　　MR. MILLER:  We really don't know how to challenge at

4  this point.

5  　　　　THE COURT:  Well, I hear you.  As I said, I think

6  this is going to be mainly a fight between BP and the

7  United States.  If you all want a couple of days to look at the

8  United States' challenges to BP and BP's challenges to the

9  United States', I might be willing to consider that.  But

10  beyond that, guys, I have to get this done so that we can have

11  full resolution of privilege challenges, have full production

12  of documents, and commence depositions in August possibly of

13  nonparties and September of parties.  So I hear you, but --

14  　　　　MR. MILLER:  Not knowing what the volume is, can we

15  have an additional week?  If the volume is not so bad, we will

16  do it as fast as we can.

17  　　　　MR. GASAWAY:  The order you issued on the 11th was

18  specifically framed to include challenges by all parties --

19  　　　　THE COURT:  It was.

20  　　　　MR. GASAWAY:  -- to BP's and the United States'

21  privilege log.  Obviously, there's a stage process and a tier

22  process, what's due when there, but there's no agreements or

23  side information that BP or the United States has regarding

24  that that Halliburton, Transocean, and everybody else has.  We

25  did exchange lists of quantification documents.  From BP's

 1   standpoint, I certainly think that that list was delivered to

 2   all parties at the same time that it was delivered to the

 3   United States.

 4          **THE COURT:**  It was.

 5          **MR. GASAWAY:**  I'm fairly certain that's the same

 6   thing with the United States.  BP has the United States' one.

 7   So I don't think that Transocean or Halliburton are any

 8   differently situated as to what documents are in play or what

 9   the deadlines are.

10          **MR. MILLER:**  One comment to that.  The problem is

11   then we would be forced to be over-inclusive in our letter, and

12   then we are going to have to go back and deal with it all over

13   again.  Look, they have had a benefit over us just because they

14   have had all these meetings and time and familiarity, so on and

15   so forth.  So the concern may be if we have to file a challenge

16   letter on Monday, it's going to be broader than if we had the

17   benefit of an additional week to be more precise and get up to

18   speed.

19          **MR. YORK:**  Alan York for Halliburton.  Your Honor,

20   just to throw our two cents in here, what we have done in this

21   process, because we did face the same issue that Transocean is

22   raising, we took the post, whatever the date was, privilege

23   logs that would have likely included any Phase Two documents,

24   backed out the ones that have been identified as quantification

25   documents, which still leaves us with a universe that, as BP

 1   has recognized, may be some source control, some Phase One,
 2   some Phase Three.  But then we took, for example, the names of
 3   key Phase Two players and took out ones that didn't apply to
 4   those people so that we would at least know what the universe
 5   was.
 6          Let me be clear.  Our goal is to have as few
 7   challenges as we could possibly have.  I think that the way we
 8   are at least contemplating doing it -- and I would like to get
 9   the Court's sort of blessing on this -- is that as we get that
10   universe narrowed, what we may do is provide a challenge of
11   categories of documents because the order builds in a week for
12   meet-and-confers.
13          THE COURT:  Right.
14          MR. YORK:  So that we do it a little broad on
15   categories of documents, then have the opportunity to discuss
16   those categories with BP to have a better understanding that's
17   a Phase One, that's a Phase Three, narrow it even further, and
18   then decide if we need to brief it to the Court.  I think
19   that's a way for us not to waive any challenges but to at least
20   engage directly with BP.
21          THE COURT:  I think that makes sense.  In addition,
22   remember that the challenges have to be consolidated into the
23   samplings so that Mike and I are not overburdened with
24   thousands of documents to review *in camera*.  So your
25   meet-and-confer process will also winnow down the sample so

1   that it's manageable for us, our ruling can then be taken and

2   extrapolated to the bigger universe, and hopefully that's how

3   we get through it.

4           MR. YORK:  As I said, our goal is to get it -- we

5   hope to have zero, but we are going to try to use the

6   meet-and-confer period to winnow it down even further, if

7   that's okay with the Court.

8           THE COURT:  Perfect.  I like it.  Thank you, Alan.

9               Anything else, Rob?

10          MR. GASAWAY:  Your Honor, I was just going to make

11  the same point that you did.  Remember, the order does provide

12  for the parties getting together.  So to the extent that

13  Transocean and Halliburton are challenging BP logs, presumably

14  they would go back and coordinate with the United States.  If

15  they were challenging United States logs, presumably they would

16  coordinate with us, and therefore they would get all the

17  benefit of whatever thinking that we have done.

18          THE COURT:  Right.  Okay.  All right.

19              Scott.

20          MR. CERNICH:  Yes, Your Honor.  Scott Cernich for the

21  United States.  I just wanted to confirm that we had

22  distributed our quantification list to all the parties.

23          THE COURT:  I didn't think to the contrary.

24          MR. MILLER:  Your Honor, back to me, can we have some

25  additional time and maybe we can follow Alan's technique of

1    reverse engineering to skip an overbroad challenge?

2              THE COURT:  Mr. Gasaway.

3              MR. GASAWAY:  Your Honor, we have been talking about

4    this for so long.  I would suggest that Transocean and

5    Halliburton collaborate.  Halliburton has reversed engineered

6    based on the exact same information that Transocean has.

7    Halliburton hasn't had any more information.  So I would just

8    suggest that they talk, put it out there, and then coordinate

9    with both of the parties.  We can regroup once --

10             THE COURT:  Can you work with Transocean on your

11   reverse engineering?

12                  Alan says he will work with you on the reverse

13   engineering.  If you need a couple of days, take a couple of

14   days, but he will give you the reverse engineering.  Don't

15   reinvent the wheel.

16             MR. MILLER:  Thank you.

17             MR. CERNICH:  Your Honor, one more thing on that.

18   Scott Cernich for the United States.  I just want to confirm

19   that as much as we enjoy working with our colleagues

20   representing TO and Halliburton, the United States isn't going

21   to be expected to share its 50 challenge documents with

22   defendants prior to our briefing.

23             THE COURT:  I thought you were.  I think that we were

24   going to have a consolidated list of 50 for each category of

25   challenge.  So that if you all are challenging BP on

1    attorney-client, anyone who is challenging BP on that privilege

2    will submit a consolidated list of documents for us to review

3    *in camera*.

4            MR. CERNICH:  Respectfully, Your Honor, given our

5    divergent interests and the fact that we are on different sides

6    of the V here, I would request that on the plaintiffs' side we

7    have our 50 challenges to those documents independent of the

8    defendants on the other side.

9            THE COURT:  I'm going to have to think about that,

10   Scott, because you are looking at the review team.  This is the

11   review team.  I know that you think we are working you guys

12   hard; but on the other side of the V, you're working us hard.

13              Let me think about that.  Maybe I will increase

14   the number that the United States can make by itself.  Let me

15   think about it.  Okay?

16           MR. CERNICH:  Thank you, Your Honor.

17           THE COURT:  I hear what you are saying.  I was hoping

18   that Halliburton and Transocean wouldn't have any challenges,

19   but it doesn't look like it's working out that way.  I'm glad

20   you enjoy working with your colleagues.  That's good.  I will

21   give you an answer hopefully this afternoon on that, Scott.

22           MR. CERNICH:  Thank you.

23           THE COURT:  So now we are talking about document

24   production by parties other than BP and the United States.  We

25   have gotten reports this past week from Anadarko, Transocean,

1  Cameron, State of Louisiana, and Halliburton.  All of them say
2  that they are either complete or will be complete pretty soon.
3  They are doing the final checking if they are not complete.
4          If you all will let us know when you have
5  completed, if there are privilege logs -- many of you indicate
6  there may not be privilege logs.  But if there are privilege
7  logs, we want to go ahead and set deadlines for challenges to
8  those logs so we can get that taken care of as well.  Please
9  let us know.  We need to have that process concluded by
10 mid-August, so let's make sure you all complete it.  If there
11 are privilege logs, let Mike and me know, and we will go ahead
12 and put those on a schedule as well.
13          Scott.
14      MR. CERNICH:  Scott Cernich.  We wanted to raise the
15 question of Anadarko's document production.  I believe the
16 document total they quoted to the Court was 75,000 documents.
17 We think that the July 1 deadline is too late considering how
18 long these document requests have been outstanding.
19      THE COURT:  Tony, do you want to come up and talk
20 about your July 1 production.
21          I did not, Scott, I have to admit, see the
22 projection of 75,000.
23      MR. FITCH:  Well, that's the best estimate that, as
24 Brian would say, "my people" have come up with.  One of the
25 concerns is that there was a meet-and-confer between Anadarko

 1   and the United States sometime ago.  We, frankly, have been

 2   waiting to hear back from the United States on that.  I did not

 3   mention that before, but it does seem a little strange that

 4   there's some issues affecting production that are still

 5   outstanding.  So as soon as we hear back from them -- we will

 6   meet whatever deadline you set, but it seems to me --

 7              THE COURT:  Let's try to move it up a couple of

 8   weeks, if we can, to June 15.  Would you get an e-mail out to

 9   Scott, let him know what's outstanding, and he will follow up

10   on that for you.

11              MR. FITCH:  That's easy enough.  There was an

12   exchange and then a meeting, and we are waiting to hear back

13   from them.  We will push for June 15.  That is only three weeks

14   away.

15              THE COURT:  Yep.  Can you send Scott that exchange so

16   that he can catch up on what you think is outstanding?

17              MR. FITCH:  Sure.  Of course.

18              MR. CERNICH:  (Nods head.)

19              THE COURT:  Thank you.

20              Let's get an update on where we stand with

21   finalizing and resolving issues on the BP 30(b)(6) notice.

22              MR. GASAWAY:  Your Honor, Rob Gasaway.  We recently

23   received a letter from the United States that I think

24   represented some progress.  There's still some outstanding

25   issues.  I think that came in the day before yesterday.

1           What we would suggest to the Court and the

2    United States at this point is that we sort of ratchet up the

3    turn-around time on both sides, try to really work hard between

4    now and the Court's next conference on June 1, with a goal

5    potentially to try to eliminate all the remaining gaps or at

6    least tee them up for the Court's decision by June 1 when we

7    are going to reconvene.

8           **THE COURT:**  Okay.  So by the 1st we will have

9    narrowed it, and we are at this point doing quantification and

10   source control issues.

11          **MR. GASAWAY:**  Correct.  The source control are back

12   in the mix, and that will be one thing that we are going to

13   have to focus on in the next two weeks.

14          **THE COURT:**  Good.  I thank you for that.  Let's

15   ratchet it up.

16          **MR. CHAKERES:**  Your Honor, this is Nat Chakeres, and

17   we agree with Mr. Gasaway's assessment of the situation.  We

18   agree it's time to ratchet it up, and we and the states will

19   work to see what we can get by June 1, hopefully everything

20   complete.

21          **THE COURT:**  Terrific.  Thank you.

22          Okay.  We have a very limited notice for

23   Weatherford's deposition.  Does anybody see any reason why we

24   shouldn't go ahead and look for dates in August for

25   Weatherford?

1          **MR. CERNICH:**  Your Honor, Scott Cernich.  We think

2     August would be great with one caveat, though.  It's our

3     understanding that one of the additional parties that we had

4     discussed issuing a 30(b)(6) notice to, they're not on the list

5     my colleague Nat Chakers had e-mailed you back in March, I

6     believe, with a few proposed 30(b)(6) notices for Isotech,

7     Intertek, and World Oil Field Machine.

8               It's our understanding, I believe, that Isotech

9     has been acquired by Weatherford.  So if that was going to be

10    all part of one deposition, we might need to think whether

11    Weatherford would prefer to do it all at one time and do one

12    document production or do it in two stages.

13         **THE COURT:**  Okay.  Do you have an Isotech 30(b)(6)

14    notice?

15         **MR. CERNICH:**  We do.  We have a draft notice.

16         **THE COURT:**  Why don't you circulate that to

17    Weatherford and ask that question.  If they prefer to combine

18    it, we can certainly do that.

19               The other one was Intertek, and what was the

20    third one?

21         **MR. CERNICH:**  World Oil Field Machine.

22         **THE COURT:**  I don't know how we dropped that.  Okay.

23         **MR. CERNICH:**  And then also the BP Institute was not

24    on the list in the order from the May 11 working group

25    conference.  My colleague, Mr. Chakers, had a discussion with

1    them, I believe this morning or yesterday, and we have made

2    progress there regarding the scope and the document production

3    as well.

4            **THE COURT:**  Good.  Perfect.  Okay.  Thank you.

5            **MR. CERNICH:**  Thank you.

6            **THE COURT:**  Now let's talk about the Halliburton role

7    on source control and quantification.  I know we have finished

8    the 30(b)(6) notice.

9            Alan, do you all think we can take your

10   deposition is August?  Is it a limited deposition like

11   Weatherford's?

12           **MR. YORK:**  The short answer is yes, Your Honor.  We

13   are working toward the Court's deadline of, I think, mid-June

14   to identify the parties that would be associated with the

15   topics now that we have the final notice --

16           **THE COURT:**  Terrific.

17           **MR. YORK:**  -- but we think that's fine.

18           **THE COURT:**  We may ask you to start looking at

19   designees and dates in August.  No hurry, but if it's as

20   limited as I think it is going to be, we might as well put

21   those under our belt.

22           As the deposition notices of the parties and

23   third parties are completed, don't forget that we want to go

24   ahead and serve courtesy copies on the deponent to consider who

25   they are going to designate to testify on the areas designated

1    and for third parties courtesy copies of the subpoenas for

2    documents so that we can get production in advance of the

3    scheduled depositions.

4              Rob, come on up.

5              MR. GASAWAY:  Thank you, Your Honor.  Just an update

6    and then a notation along these lines.  First of all, we did

7    formally serve Woods Hole this week and they accepted service.

8    Dahlia, who you know from our conference, wouldn't agree to

9    accept service.  That's been filed in the docket.  So that's

10   all ready to go, however you want to follow up on that.

11             THE COURT:  Good.  Do we know whether there are going

12   to be objections to the 30(b)(6)?  Has she indicated?

13             MR. GASAWAY:  She hasn't indicated one way or another

14   to us, but it's fully ripe now.  So however the Court wants to

15   proceed with that, we are ready to go.

16             THE COURT:  Let me ask you this.  When you

17   transmitted the 30(b)(6) notice, did you ask her to look for

18   designees and dates that might be available in August?

19             MR. GASAWAY:  We did not specifically mention August.

20             THE COURT:  August sounds good.  Don't you think we

21   should go ahead and --

22             MR. GASAWAY:  Well, it does.  Remember the

23   conversation that we had is she owes us documents on June 1

24   that we have had a lot of discussion about.  We certainly want

25   to look at what we get on June 1 and have a little bit of time

1    to provide constructive feedback from that production on

2    June 1, so I think August would be good.

3           **THE COURT:**  You have appealed the ruling, so we need

4    to get that taken care of, but August should give us time.

5           **MR. GASAWAY:**  Right.  To be honest, Your Honor, if

6    the production were all in order on June 1 and we had

7    everything we needed, we might be able to even move that up.

8    So what I would suggest is shortly after June 1, after we have

9    a chance to kind of thumb through the production, that we come

10   back with some scheduling suggestions for her and for the

11   Court.  In the meantime, we could probably mention to Dahlia

12   that the Court is looking at August pending developments.

13          **THE COURT:**  What you can do is just tell her that if

14   she wants to start looking at the notice to think about who the

15   designee or designees will be and dates that are good for them,

16   hopefully contiguous, you will be heading to Boston.

17          **MR. GASAWAY:**  We will, Your Honor.

18          **THE COURT:**  Thank you for the update.

19          **MR. GASAWAY:**  Could I mention one other thing?  This

20   is along the lines of what the United States was saying about

21   potentially additional 30(b)(6)s.  We have been talking with

22   the Court and others about some of the parties that were

23   working closely with the United States that they have, like

24   Woods Hole, said may be considered third parties.  I just want

25   to throw out some names and some categories here.

1           We are going to be looking to circulate draft

2  notices to the parties next week so any follow-up that they

3  want can happen on June 1, but just to -- as Mr. Cernich did,

4  we are looking at Kelkar and Associates, Gemini Solutions,

5  R.G. Hughes and Associates, and then perhaps some people that

6  they have taken the position are third parties with respect to

7  some of those appendices to the Flow Rate Technical Group

8  report.

9           Just like they said Woods Hole is a third party,

10  there are other participants in Appendix B and D, which were

11  the Clean Team and the Mass Balance Team.  We may circulate a

12  couple of third-party notices to the United States and others

13  next week with regard to those.

14          **THE COURT:**  Okay.  The sooner the better because it

15  will give us time to, one, work through any issues we have, and

16  then serve it courtesy copy and get them working on it.  Are

17  you going to want production of documents from the third

18  parties?

19          **MR. GASAWAY:**  We are, Your Honor.

20          **THE COURT:**  We need to get going.

21          **MR. GASAWAY:**  Thank you, Your Honor.

22          **MR. MILLER:**  Your Honor and Rob, on that issue, and I

23  guess back to the U.S., these notices are going to be

24  circulated in drafts so other interested parties can give input

25  between now and the 1st?  Is that the game plan?

1          **MR. GASAWAY:**  Yes.

2          **MR. MILLER:**  Okay.  Great.  Just going back up on the

3   BP 30(b)(6), if there is a near final meet-and-confer, can we

4   be included in the loop?

5          **THE COURT:**  You're so pushy.

6          **MR. MILLER:**  I just want to be in the loop.

7          **THE COURT:**  Would you all remember to involve

8   Mr. Miller in your final conferences.

9          **MR. MILLER:**  I don't know if it's the U.S. or

10  Louisiana initiating that, but if they could include us in the

11  loop so we don't have to do it after the fact.

12         **THE COURT:**  Okay.  Fair enough.  Anything else on

13  that issue, guys?

14              Let's open it up to other matters.  Corey,

15  what's on your mind today?

16         **MR. MAZE:**  I'm good.

17         **THE COURT:**  You're good?

18         **MR. MAZE:**  I'm good.

19         **THE COURT:**  Good.  Good.  What time is your bus back?

20         **MR. MAZE:**  Not until, what, 9:00 tonight?

21         **MR. SINCLAIR:**  8:30.  It arrives, like, 3:00 in the

22  morning.

23         **THE COURT:**  No morning, mid afternoon?

24         **MR. MAZE:**  The 10:00 bus, as long as we keep meeting

25  as 9:30, we can't make it, but I didn't want to open up having

1    8:00 a.m. meetings because everybody else in the room would
2    throw things at me.
3             THE COURT:  Well, but I asked the question, didn't I?
4             MR. MAZE:  You did.  We are okay with it, Judge.
5             THE COURT:  Anything else on anybody else's
6    pea-picking brain?  Uh-oh.  Mr. Sterbcow.
7             MR. STERBCOW:  Good morning, Your Honor.  Paul
8    Sterbcow for the PSC.
9             THE COURT:  Hello, Paul.
10            MR. STERBCOW:  I just want to put something on the
11   radar screen.  The PSC has received documents directly relevant
12   and only relevant to Phase One since February 27.  We are going
13   through those as quickly as we can.  We may be facing a
14   situation, the order notwithstanding, that we have to come back
15   to you to alert the Court of some documents that may be highly
16   relevant.  I don't know.  There may be none.  I just wanted to
17   let you know where we stand on that.  We are working as hard as
18   we can and as quickly as we can to get through those.
19            THE COURT:  We'll keep that on the agenda.  When you
20   are ready to give us an update --
21            MR. STERBCOW:  We will let you know ahead of time so
22   it's on the agenda.
23            THE COURT:  As Andy would say, it's a place marker.
24            MR. STERBCOW:  Very good.
25            THE COURT:  Thank you.

1          **MR. STERBCOW:**  Thank you.

2          **THE COURT:**  Good morning.

3          **MR. KRAUS:**  Good morning, Your Honor.  Doug Kraus on

4    behalf of Louisiana.  I was going through your order and the

5    third-party 30(b)(6)s that have previously been mentioned.  I

6    don't know the answer to the question, but I noticed that

7    ADD Energy was not on the list and needed to be included on the

8    list.  It wasn't on the previous list, and I don't have any

9    idea what the status of it is, but I just wanted to draw it to

10   the Court's attention that it needs to be added.

11         **THE COURT:**  Thank you.  Does anybody know the status

12   of ADD Energy or are we just going to --

13         **MR. CHAKERES:**  Your Honor, Nat Chakeres for the

14   United States.  I don't know if Scott was standing up to speak.

15         **THE COURT:**  He was.

16         **MR. CHAKERES:**  They should be still on the list.  We

17   have agreed to scope.  BP recently asked for some language in

18   the final notice to clarify that this will not be overlapping

19   with the first 30(b)(6) deposition of ADD Energy.  We have

20   agreed to that language.  We have been in contact with counsel

21   for the presumptive deponent for ADD Energy for Phase Two.  So

22   that one is on track to be going forward.

23         **THE COURT:**  Thank you.

24         **MR. CHAKERES:**  Our understanding is the documents

25   from ADD Energy were all produced in one production, so I think

1  we are a little ahead of the game with them in terms of the
2  documents.
3        THE COURT:  That's good.
4              Scott, anything else to add?
5        MR. CERNICH:  Yes.  Just following up on the Anadarko
6  documents, I learned that we are going to get a letter out in
7  response to the meet-and-confer either today or Monday, so Tony
8  doesn't need to send us the e-mail you requested.  We will have
9  the response out shortly.
10        THE COURT:  Tony, you need not send the e-mail out
11  because obviously Scott got an e-mail message saying they are
12  working on the response for you.
13              Is that correct, Scott?
14        MR. CERNICH:  Yes, that is correct.
15        MR. FITCH:  I suppose, Judge, I should address one
16  other matter that you may have overlooked, but you did order on
17  your last order that at the May 18 conference the parties will
18  suggest a schedule for the resolution of Anadarko's noticed
19  30(b)(6).
20        THE COURT:  Let's discuss that.
21        MR. FITCH:  Brian and I have chatted, of course,
22  about a schedule, and we have proposed to get it all resolved,
23  including resolution by you, no later than June 30.  In fact,
24  again, a little bit of it is contingent upon the June 1
25  resolution of BP in case anything there would change the

1  corresponding items in our notice.

2           Basically, I think we know where we have

3  information and we know who our witnesses are.  We know where

4  we don't have information and where there will be a stipulation

5  or whatever.  Then there is one area, the preparedness topics,

6  10 through 13, 15, 17, whatever they are, I think the parties

7  will not reach agreement.

8           I'll get a letter to Brian laying out our

9  position on that in writing.  I'll elaborate a little bit on

10  the background so when that letter comes to you, you will have

11  the full background.  He will lend me a letter back basically

12  telling me to take a leap.  We will then submit that package to

13  you in the next couple of weeks for your ruling.

14           **THE COURT:**  Good.  That sounds fine.

15           **MR. CHAKERES:**  Your Honor, this is Nat Chakeres with

16  the United States.  I just have one quick thing to follow up on

17  what Mr. Fitch just said.

18           In the course of the negotiations with BP, they

19  have requested some, I'll call it, prefatory language stating

20  that the deposition is not seeking privileged information from

21  BP.  I don't think any of us disagree with that, but we

22  expressed our concern with BP that some of the notices have

23  already gone out without that language.

24           We would prefer some uniformity there.  Instead

25  of having everybody re-notice the parties who have already been

1   noticed, we discussed asking liaison counsel and the rest of

2   the parties if sort of on the record we can all agree that

3   despite if there's some small changes in the language in the

4   notices, nobody is seeking privileged information, and no party

5   is waiving any privilege they may have if they didn't insist on

6   such language in the notice that was served on them.

7          **THE COURT:**   Is there any disagreement with that

8   statement?

9          We also forgot to ask Cameron about their

10  30(b)(6), and I see Mr. Jones is with us today.  How are you?

11         **MR. JONES:**   I'm fine, Your Honor.

12         **THE COURT:**   Good.

13         **MR. JONES:**   Good morning.

14         **THE COURT:**   Good to see you.

15         **MR. JONES:**   After last week's status conference, I

16  went back to look where the back-and-forth was, and the parties

17  were fairly close at the end of last year.  I have since this

18  morning spoke with Jimmy Williamson about figuring out, in

19  light of the various settlements, other issues that can be

20  narrowed further.  So we will be working on that this coming

21  week.

22         **MR. WILLIAMSON:**   We are confident we can work out the

23  issues.

24         **THE COURT:**   Thank you, Jimmy.  I appreciate it.

25  Thank you David.

1          Anything else?  We are not having a conference

2   next week.  I know you all are delighted.  We will see you,

3   then, on June 1.  Thanks and have a good week and a good

4   Memorial Day.

5          (Proceedings adjourned.)

6                          * * *

7                        **CERTIFICATE**

8          I, Toni Doyle Tusa, CCR, FCRR, Official Court

9   Reporter for the United States District Court, Eastern District

10  of Louisiana, do hereby certify that the foregoing is a true

11  and correct transcript, to the best of my ability and

12  understanding, from the record of the proceedings in the

13  above-entitled matter.

14

15

16                        s/ Toni Doyle Tusa

                          Toni Doyle Tusa, CCR, FCRR
17                        Official Court Reporter

18

19

20

21

22

23

24

25