UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | CIVIL ACTION NO. 2:10-MD-02179 |
| | | SECTION:  J |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | | MAG. JUDGE SHUSHAN |

All cases
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF MOTION FOR COURT TO APPOINT A PLAINTIFFS STEERING COMMITTEE FOR PERSONS AND ENTITIES EXCLUDED FROM THE PROPOSED ECONOMIC SETTLEMENT**

It is respectfully requested that this Honorable Court, in the event of approval of the proposed settlement regarding the Plaintiff Steering Committee's Amended Class Action Complaint For Private Economic Losses and Property Damages (Doc. #6412), appoint a second Plaintiffs Steering Committee in this litigation, whose purpose will be to manage matters pertaining to those persons and entities who will have been excluded from the class definition, as has been more narrowly redefined by the PSC in its Amended Complaint, yet still have economic claims against BP.[1]

**1. BACKGROUND**
**2. FACTS**
**3. LAW**
**4. CONCLSUION**

---

[1] The first Plaintiffs Steering Committee was appointed pursuant to Pre-Trail Order #1 (Doc. #2; August 10, 2010), for the purposes discussed Manual For Complex Litigation, (4th ), Sec. 10.22 ("Role of Counsel; Coordination in Multiparty Litigation – Lead/Liaison Counsel and Committees)

1

## 1. BACKGROUND:

On May 2, 2012, in conjunction with its proposed settlement with BP in this case, the Plaintiffs Steering Committee, after months of negotiating with BP, significantly shrunk the size of the economic loss class when it announced that it had reached a settlement with BP, through the filing its Amended Class Action Complaint For Private Economic Losses and Property Damages" (Doc # 6412)[2],[3]. In it the PSC, in concert with BP, narrowed its definition follows:

>   **Paragraph 306:**
>
>   1.  **CLASS DEFINITION.**
>   Economic and Property Damages Settlement Class shall mean the **NATURAL PERSONS** and **ENTITIES** defined in this Section 1, subject to the **EXCLUSIONS** in Section 2 below.  If a person or entity is included within the geographical descriptions in Section 1.1 or Section 1.2, and their claims meet the descriptions of one or more of the Damage Categories described in Section 1.3, that person or entity is a member of the Economic and Property Damages Settlement Class, <u>unless</u> the person or entity is excluded under Section 2:
>
>   **1.1.   Individuals**.   Unless otherwise specified, all Natural Persons residing in the United States who, at any time between April 20, 2010 and April 16, 2012, lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, or owned or leased or worked on a vessel harbored  or **HOME PORTED** in the States of Louisiana, Mississippi,  or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty,

---

[2]     The PSC had originally defined the economic loss class as:

"All individuals and entities residing or owning property in the United States who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill." *(Master Complaint For Private Economic Losses, B1 Bundle, Par. 476; Doc # 879; December 15, 2010)*

[3]     Requests for certification of all class actions were stayed pursuant to Paragraph VII, Case Management Order No. 1 [Doc. # 569; PTO No. 11; October 19, 2010]).

Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida (the "**GULF COAST AREAS**") (EXHIBIT A), or the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in EXHIBIT B ("**SPECIFIED GULF WATERS**"), or worked on a vessel in Specified Gulf Waters after April 20, 2009. With respect to Seafood Crew Claims, persons must have worked on a vessel that landed **SEAFOOD** in the Gulf Coast Areas after April 20, 2009.
and

**1.2. Entities.** All Entities doing business or operating in the Gulf Coast Areas or

Specified Gulf Waters that:

- 1.2.1.  owned, operated, or leased a physical facility in the Gulf Coast Areas or Specified Gulf Waters and (A) sold products in the Gulf Coast Areas or Specified Gulf Waters (1) directly to **CONSUMERS** or **END USERS** of those products or (2) to another Entity that sold those products directly to Consumers or End Users of those products, or (B) regularly purchased **SEAFOOD** harvested from Specified Gulf Waters in order to produce goods for resale at any time from April 20, 2010 to April 16, 2012;
- 1.2.2.  are service businesses with one or more full-time employees (including owner-operators) who performed their full-time services while physically present in the Gulf Coast Areas or Specified Gulf Waters at any time from April 20, 2010 to April 16, 2012; or
- 1.2.3.  owned, operated, or leased a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; or
- 1.2.4.  owned or leased **REAL PROPERTY** in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012;

**1.3.** Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

- 1.3.1.  The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-14:

### 1.3.1.1. Seafood Compensation Program.
Damages suffered by Commercial Fisherman and **SEAFOOD CREW** that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas from April 20, 2009 to April 16, 2012; and damages suffered by, *inter alia,* Oyster Leaseholders and IFQ Owners. (Exhibit 10). Claims for Economic Damage arising from the fishing, processing, selling, catching, or harvesting of menhaden (or "pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.

### 1.3.1.2. Economic Damage Category.
Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the **DEEPWATER HORIZON INCIDENT**, subject to certain Exclusions. (Exhibits 16-19)

### 1.3.1.3. Subsistence Damage Category.
Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and **GAME**, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon subsistence resources that were diminished or restricted in the geographic region used by the **CLAIMANT** due to or resulting from the **DEEPWATER HORIZON INCIDENT.** (Exhibit 9)

### 1.3.1.4. VoO Charter Payment Category.
Damages suffered by Natural Persons or Entities who registered to participate in BP's Vessels of Opportunity ("VoO") program and executed a **VoO MASTER VESSEL CHARTER AGREEMENT** with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as **CHARTERER**, and completed the initial VoO training program.

### 1.3.1.5. Vessel Physical Damage Category.
Physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program. (Exhibit 14)

### 1.3.1.6. Coastal Real Property Damage Category.
Damages suffered by owners and lessees of **COASTAL REAL PROPERTY** and boat slips or damage to their Real Property located in specified geographical areas described in Exhibits 11A-11C who owned or leased that Real Property during the time period April 20, 2010 to

December 31, 2010.

### 1.3.1.7. Wetlands Real Property Damage Category.

Damages suffered by owners of wetlands Real Property or damage to their Real Property located in specified geographical areas described in Exhibits 12A-12C, who owned that Real Property during the time period April 20,

### 1.3.1.8. Real Property Sales Damage Category.

Damages suffered by sellers of residential property located in a specified geographic area described in Exhibits 13A-13B if the seller owned the property on April 20, 2010 and the sale of the property closed at any time from April 21, 2010 to December 31, 2010. The sales contract must have been (1) executed on or after April 21, 2010, or (2) executed prior to April 21, 2010 but subjected to a price reduction due to the Deepwater Horizon Incident.

### 1.3.1.9. Individuals/Employees in Otherwise Excluded Oil and Gas, Gaming, Banking, Insurance, Funds, Defense Contractors, Developers Industries, and any entity selling or marketing BP-branded fuel (including jobbers and branded dealers):

As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims for Economic Damage outside of these excluded industries, and may pursue all other recovery permitted under other aspects of the Settlement.

### 1.3.1.10. Individuals/Employees in Support Services to Oil and Gas Industry:

As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses/employers in the **SUPPORT SERVICES TO OIL AND GAS INDUSTRY**, described in Exhibit 16 may submit Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non oil and gas industry economic damages due to or resulting from the Deepwater Horizon Incident, except for moratoria claims. As is also more fully described in Exhibit 16, these individuals and employees may also pursue Claims for other Economic Damage outside the Support Service to Oil and Gas Industry, and may pursue all other recovery permitted under other aspects of the Settlement.

### 1.3.1.11. Businesses/Employers in Otherwise Excluded Gaming, Banking, Insurance, Funds, Defense Contractors and

5

**Developers Industries:**

As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims only for Coastal Real Property Damage and Wetlands Real Property Damage, but are not entitled to recover under any other aspect of the Settlement.

**1.3.1.12. Businesses/Employers in Support Services to Oil and Gas Industry:**

As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in the "Support Services to Oil and Gas Industry," described in Exhibit 16, may submit Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non- oil and gas industry Economic Damages arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, except for moratoria claims, and may

2. **EXCLUSIONS FROM THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS DEFINITION.**

   **2.1.** Notwithstanding the above, the following individuals and Entities, including any and all of their past and present predecessors, successors, personal representatives, agents, trustees, insurers, reinsurers, indemnitors, subrogees, assigns, and any other Natural Person, legal or juridical person or Entity entitled to assert any claim on behalf of or in respect of any such individual or Entity in their respective capacities as such are excluded from the Economic Class.

   **2.2.  Excluded Individuals or Entities:**

   **2.2.1.** Any Economic Class Member who or which timely elects to be excluded from the Economic Class under the deadlines and procedures to be set forth in the **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS ACTION SETTLEMENT NOTICE**.

   **2.2.2.** Defendants in **MDL 2179**, and individuals who are current employees, or who were employees during the **CLASS PERIOD**, of BP or other defendants in MDL 2179.

   **2.2.3.** The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of the MDL, and members of any such judge's or current law clerk's immediate family.

   **2.2.4.** The following exclusions are based on the substantive nature of

the business, not the legal or juridical form of that business. Any of the following types of Entity, or any Natural Person to the extent he or she alleges Economic Damage based on their employment by such an Entity, during the Class Period are excluded:

### 2.2.4.1.

Financial Institutions as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, commercial banks; savings institutions; credit card issuers; credit insurers; factors or other sales finance entities; financial or investment advisers or portfolio managers; fund managers; investment banking entities; lending institutions; real estate mortgage or lending entities; brokers or dealers of securities, commodities, commodity contracts or loans; securities or commodities exchanges; entities serving as custodians, fiduciaries or trustees of securities or other financial assets; or entities engaged in other financial transaction intermediation, processing, reserve or clearinghouse activities, *provided*, that the following shall not be excluded solely pursuant to this Section 2.2.5.1 unless they are subject to a different exclusion**:**  stand- alone ATMs, credit unions, pawn shops, businesses engaged predominantly in making payday loans or paycheck advances and businesses that sell goods and services and offer financing on these purchases to their customers.

### 2.2.4.2.

Funds, Financial Trusts, and Other Financial Vehicles, as identified in the NAICS codes listed on Exhibit 18, after giving effect to the bracketed exceptions contained in NAICS Codes 525920 and 523991, which include by way of example, public-open end investment funds; investment funds; real estate investment trusts; REMICS; mutual funds; money market funds; derivatives; health and welfare funds; insurance funds; pension funds; financial trusts; and special purpose financial vehicles *provided,* that successions, estates, testamentary trusts, trusts of Natural Persons, bankruptcy estates, limited liability companies, corporations, Sub-Chapter "S" corporations, partnerships, limited partnerships, joint ventures, and any other businesses or juridical Entities, shall not be excluded pursuant to this Section 2.2.5.2 solely by reason of their form of legal or juridical structure or organization, except to the extent they are excluded pursuant to another exclusion in Section 2.2 of this Agreement.

### 2.2.4.3.

Gaming, as identified in the NAICS codes listed on Exhibit 18, which includes, by way of example, casinos; casino hotels; off-track betting parlors; racetracks and other gambling establishments *provided*, that the following shall not be excluded solely pursuant to this Section 2.2.5.3 unless they are subject to a different exclusion: (a)

bingo parlors, and (b) video gaming at bars, bingo parlors, hotels, off-track betting parlors, racetracks, restaurants and truck stops.

**2.2.4.4.**
Insurance Entities, as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, insurance carriers issuing disability, health, life, medical, property and casualty, title or other insurance; reinsurers; insurance agencies and brokerages; underwriting agencies or organizations; claims adjusters and processors; third-party insurance or fund administrators; or other insurance-related businesses.

**2.2.4.5.**
Oil and Gas Industry, as identified in the NAICS codes listed on Exhibit 17, which includes by way of example, firms engaged in: extracting crude petroleum, natural gas or other hydrocarbons; drilling wells; preparing, maintaining or constructing petroleum or natural gas well-sites or other mineral extraction sites; mining; maintaining or constructing petroleum or natural gas pipeline or distribution facilities; pipeline distribution of crude petroleum, refined petroleum, oil or natural gas; petroleum or natural gas refining or other mineral refining and/or manufacturing; manufacturing petroleum lubricating oil and grease, petrochemical products, or other petroleum and coal products or chemical products derived from extracted minerals; merchant wholesaling of construction and mining (except oil well) machinery and equipment; wholesale distribution of oil well machinery, equipment and supplies; wholesale distribution of petroleum, petroleum products, other extracted minerals, chemical products produced from extracted or refined minerals, petroleum bulk stations and terminals, petroleum and petroleum products merchant wholesalers.

**2.2.4.6.**
Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor.

**2.2.4.7.**
Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties. This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of real property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, *provided,* however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9

> **2.2.4.8.**
> Any Entity selling or marketing BP-branded fuel, including jobbers and branded dealers.
>
> **2.2.5.** **GOVERNMENTAL ORGANIZATIONS**, as defined in this Agreement, provided that Native American tribal Entities may consent to participate in the Settlement as to otherwise eligible Claims.
>
> **2.2.6.** Any Natural Person or Entity who or that made a claim to the **GCCF**, was paid and executed a **GCCF RELEASE AND COVENANT NOT TO SUE**, *provided,* however, that the execution of a GCCF Release and Covenant Not to Sue shall not prevent a Natural Person or Entity from making a VoO Charter Payment Claim or a Vessel Damage Claim, nor shall a release covering only bodily injury prevent a Natural Person from making claims under this Agreement.

## 2. FACTS:

Those persons and entities who will be excluded from the settlement through this narrowing will number in the hundreds if not thousands and will be of such size that their interests will be better managed through the appointment of a Plaintiffs Steering Committee for them.

These will include:

(a) Economic class members who elect to be excluded from the class (See Par. 306 of Amended Complaint; Sec. 2.2.1, above)

(b) Certain financial institutions (Sec. 2.2.4.1);

(c) Certain funds, financial trusts and other financial vehicles (Sec. 2.2.4.2) ;

(d) Gaming entities (such as casinos and casino hotels) (Sec 2.2.4.3);

(e) Insurance entities (Sec. 2.2.4.4)

(f) Oil and gas industry (such as moratorium claims) (Sec. 2.2.4.5);

(g) Defense contractors/subcontractors (Sec. 2.2.4.6);

    (h)  Real estate developers (Sec. 2.2.4.7);

    (i) Any entity selling or marketing BP-branded fuel (Sec. 2.2.4.8);

    (j) Certain governmental organizations (Sec. 2.2.4.9)

    (k) Entities with property, businesses or damage outside of geographic boundaries established in the proposed settlement (Sec. 1.1);

    (l) menhaden/pogy fishermen/processors (Sec. 1.3.1)

    (m) Recreational fishermen; and

    (n) Vessel of Opportunity owners with claims of amounts greater than established in the proposed settlement.

## 3. LAW:

In moving for approval of their settlement, he PSC and BP incorrectly state that "the settlement's most salient feature is that it makes whole the myriad of plaintiffs asserting that they have suffered economic loss or property damage as a result of the *Deepwater Horizon* Incident". (PSC's and BP's Memorandum in Support of Joint Motion for (1) Approval of Class Action Settlement, (2) Scheduling a Fairness Hearing, (3) Approving and Issuing Proposed Class Action Settlement Notice, and (4) BP's Motion for Adjourning the Limitation of liability Trial" (Doc. #6266-1, p. 7; April 18, 2012) (emphasis added).

Proof of the contrary comes from even just a cursory comparison of the differences between the PSC's first definition of the economic class ("all individuals and entities...who claim economic losses...as a result of the April 20, 2010 explosions..."; "Master Complaint for Private Economic Losses", Doc. #879, Par. 476) and the PSC's new and substantially narrower definition of the economic class  (which contains twelve pages and dozens of exhibits narrowing the class) ("Amended Class Action Complaint For Private Economic Losses and Property Damages"; "Class Definition"; Doc. #6412, pgs. 97 – 108).

By removing a yet untold number of plaintiffs from the settlement, the PSC apparently violated Louisiana Rule of Professional Conduct 1.7, which states:

**RULE 1.7. CONFLICT OF INTEREST: CURRENT CLIENTS**

(a) Except as provided in paragraph (b), <u>**a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:**</u>

<u>**(1) the representation of one client will be directly adverse to another client**</u>; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing. (emphasis added)

After upward or more than a year of negotiating the settlement (and agreeing with BP to narrow the class definition), the PSC has now, with no advance notice to them whatsoever, completely dropped the claims of hundreds if not thousands of the class members it had previously been representing and may have breached the fiduciary duties it owed to them.  As stated in <u>In re General Motors Pick-Up Truck Fuel Tanks</u>, 55 F.3d 768 (3d Cir., 1995):

Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed. See 2 NEWBERG & CONTE Sec. 11.65, at 11-

183; Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 (3d.Cir.1973). The large fees garnered by some class lawyers can create the impression of an ethical violation since it may appear that the lawyer has an economic stake in their clients' case.
 (*In re GM*, 55 F.3d at 801)

In re GM involved the trial court's approval of settlement of a large multi-district class action following the certification of a so-called settlement class. As is occurring in the present case, certification of the class definition did not take place until after until the parties agreed to their settlement. The Third Circuit, in vacating the trial court's order approving the settlement noted the problems often associated with the use of a "settlement class", much of which is instructive to how BP negotiated its settlement in this by narrowing its class definition to BP's satisfaction:

>    A settlement class is a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification....
> (55 F.3d at 786)
>
>    In effect, settlement classes can, depending how they are used, evade the processes intended to protect the rights of absentees. Indeed, the draft of the MCL (Third), although considerably more receptive to settlement classes than the earlier editions of the Manual, explains that "[t]he problem presented by these requests is not the lack of sufficient information and scrutiny, but rather the possibility that fiduciary responsibilities of class counsel or class representatives may have been compromised." MCL (Third) (draft) at 193....
>
>    In particular, settlement classes create especially lucrative opportunities for putative class attorneys to generate fees for themselves without any effective monitoring by class members who have not yet been apprised of the pendency of the action. Moreover, because the court does not appoint a class counsel until the case is certified, attorneys jockeying for position might attempt to cut a deal with the defendants by underselling the plaintiffs' claims relative to other attorneys. (footnote omitted) Unauthorized settlement negotiations occurring before the certification determination thus "create the possibility of negotiation from a position of weakness by the attorney who purports to represent the class." GM Interchange Litig., 594 F.2d 1106, 1125 (7th Cir.1979). Pre-certification negotiations also hamper a court's ability to review the true

value of the settlement or the legal services after the fact. See supra at 787. In addition, unauthorized negotiations also result in denying other plaintiffs' counsel information that is necessary for them to make an effective evaluation of the fairness of any settlement that results. See GM Interchange Litig., 594 F.2d at 1125.

Framed as an issue of Rule 23(a) requisites, these considerations implicate adequacy of representation concerns: "[a]rguments in opposition to settlement classes have merit when they are addressed to the problem of inadequate representation or possible collusion among the named plaintiffs and some or all defendants." In re Baldwin-United Corp., 105 F.R.D. at 480. Another court has warned that the "danger of a premature, even a collusive, settlement [is] increased when as in this case the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates...." Mars Steel, 834 F.2d at 680; see also Malchman, 706 F.2d at 433 (recognizing special potential for collusion or undue pressure by defendants in settlement negotiations); Weinberger, 698 F.2d at 73 (requiring a higher showing of fairness to accommodate greater potential for improper settlement). Settlement classes, which constitute ad hoc adjustments to the carefully designed class action framework constructed by Rule 23, lack the regulatory mechanisms that ordinarily check this improper behavior: "There is in fact little or no individual client consultation and no judicial oversight of a hidden process of wheeling and dealing to maximize overall recovery and fees for hundreds and thousands of massed cases." In re Joint Eastern & Southern District Asbestos Litig., 129 B.R. 710, 802 (E. & S.D.N.Y.1991) (discussing the ramifications of class treatment of mass torts).
(*In re GM*, 55 F.3d at 788)


All those who had been in the economic class as first defined by the PSC and abandoned by the PSC now need protection in the proceedings to follow.


**4. CONCLUSION**:

For the foregoing reasons, it is respectfully requested that this Honorable Court appoint a Plaintiffs Steering Committee to protect the interests of those persons and entities who had economic loss or damages as a result of the April 20, 2010 explosion on the Deepwater Horizon and resulting spill but have been excluded from the class definition in the PSC's Amended Class Action Complaint For Private Economic Losses and Property Damages.

Respectfully submitted,
/s/ Daniel E. Becnel, Jr.
Daniel E. Becnel, Jr. (2926)
BECNEL LAW FIRM, LLC
106 W. SEVENTH ST.
P.O. DRAWER H
RESERVE, LA 70084
(985) 536-1186
Attorney for Plaintiffs in:

| | |
|---|---|
| *Bill's Oyster House, et al. v BP, et al.* | 10-cv-1308 |
| *Rodrigue, et al* | 10-cv-1325 |
| *Gautreaux, et al* | 10-cv-1539 |
| *Harris* | 10-cv-2078 |
| *Loup* | 10-cv-2764 |
| *Key West Tiki Charters* | 10-cv-2976 |
| *Buras* | 10-cv-2994 |
| *Thigpen et al.* | 10-cv-3273 |

CERTIFICATE OF SERVICE

    I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of May, 2012.

                                                             /s/ Daniel E. Becnel, Jr.