# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * * | MDL NO. 2179 SECTION J |
| Relates to: No. 10-8888 Doc. Ref. No. 63576 | * * | JUDGE BARBIER |
| Vessel of Opportunity (VoO) Contract Disputes | * * * | MAG. JUDGE SHUSHAN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DECLARATION OF MATTHEW KISSINGER

I, Matthew Kissinger, declare that:

1. I am over the age of twenty-one (21) and not under any disability that would preclude my making this declaration.

2. I am employed by BP Exploration Operating Company Ltd.

3. During the response to the oil spill from the MC 252 #1 Macondo Well ("Incident"), I served as a Vessels of Opportunity ("VoO") Branch Director in the Logistics Section at the Mobile Incident Command Post ("ICP") in Mobile, Alabama. The ICP was part of the Unified Command structure. As a VoO Branch Director, I led the logistics component of the VoO program for the Mobile ICP and was responsible for, among other things, recruiting vessels for the VoO program and delivering the appropriate vessels to meet the operational needs for oil spill response activities.

4. Having acted as a VoO Branch Director, I am fully knowledgeable of the facts stated herein. I am competent to testify about the facts in this Declaration, if called on by the Court to do so.

5. To manage the response to the Incident, which originated on the Outer Continental Shelf ("Shelf") in connection with the sinking of the *Deepwater Horizon* mobile offshore drilling unit, the federal government established a Unified Command structure pursuant to the National Contingency Plan ("NCP"), 40 C.F.R. Part 300. While the Unified Command structure brought together the functions of the federal and state governments, as well as BP, to respond to the Incident consistent with the NCP, the designated Federal On-Scene Coordinator from the United States Coast Guard retained ultimate decision-making authority at all times.

6. The National Contingency Plan—and thus the Unified Command structure—was established pursuant to the Oil Pollution Act of 1990, including its amendments to the Clean Water Act, and other provisions of those statutes. The Oil Pollution Act of 1990 also imposes obligations on lessees or permittees like BP in connection with spill incidents on the Shelf.

7. The VoO program was part of the Unified Command's integrated response to the Incident. The VoO program, as established during the response to the Incident, was not part of BP's Gulf of Mexico Oil Spill Response Plan.

8. Under the VoO program, BP America Production Company and BP Exploration & Production Inc., as participants in the Unified Command structure, entered into Master Vessel Charter Agreements ("MVCAs") directly with vessel owners. MVCAs were established exclusively to allow for the use of the underlying vessels in connection with the Unified Command's coordinated response to the Incident.

9. Under the direction of the Unified Command, vessels in the VoO program performed a variety of response, recovery and containment activities directly related to the Incident,

2

including towing and deploying boom, skimming oil, locating and recovering tar balls, transporting supplies and personnel, and supporting *in situ* controlled burning operations.

10. The activities in which vessels in the VoO program engaged and the areas in which they operated were demand-driven and based on operational directives issued within the Unified Command structure.

11. Shortly after the Incident, informational meetings were held throughout Gulf Coast communities in order to raise awareness of the VoO program and to distribute MVCAs to local mariners who were considering taking part in the program. Vessel owners seeking to participate in the VoO program could, if they chose to, sign and return an executed MVCA to BP. BP assigned a unique "MVCA Number" to each vessel covered by an executed MVCA.

12. The purpose of the MVCA was to provide the terms that would govern the relationship between BP and the vessel owner if and when the vessel was requested to perform VoO-related "Services" as described in Article 2.A of the MVCA.

13. The MVCA created a mechanism for BP to contact a vessel owner to "request" that a vessel begin a charter term. If the vessel owner agreed to BP's request, that "Charter Term" commenced when the vessel owner delivered his or her vessel into BP's service at a "mutually agreed" place and time. In practice, to commence a charter term, a BP employee or representative would call a selected vessel owner and request that the vessel owner or captain bring the vessel to an appointed place at a specified time. At that point, the vessel owner could accept or reject BP's request. If the vessel owner accepted BP's request and there was "mutual agreement" as to the place and time that the vessel owner was to deliver his or her vessel, a charter term would commence as of the date that the vessel arrived at the

mutually agreed delivery point (and, at times, a vessel owner would be paid for travel time to the agreed delivery point).

14. The safety of VoO participants was one of BP's top priorities throughout the response to the Incident. In line with this priority, BP, in conjunction with the United States Coast Guard and the Occupational Safety and Health Administration, developed a safety program that included, among other things, the provision of training to VoO workers in order to ensure those workers were aware of the hazards they might encounter and the procedures to control such hazards.

15. For any vessel to be eligible to begin a charter term under an MVCA, the vessel owner or vessel captain and the vessel's crew were required to participate in safety training. This training generally consisted of a four-hour module. Pursuant to the terms of the MVCA, BP would compensate those in the VoO program $200.00 for attending such training.

16. To terminate a vessel's charter term, BP or a BP representative informed the vessel owner or vessel captain—typically over the phone or the vessel's radio system or in person—that the vessel was being placed off-hire.

17. If a vessel had become contaminated while performing VoO activities: (1) the vessel was directed to a BP-provided decontamination facility for decontamination; or (2) the vessel owner could "promptly" take the vessel to a private decontamination facility. Under the MVCA, if the vessel owner chose to decontaminate the vessel at a private facility, BP would reimburse the vessel owner for the "actual cost of hull and gear cleaning and decontamination." A vessel's charter term would then terminate either once the vessel returned to its original point of dispatch or when the vessel owner elected not to return directly to the point of original dispatch.

## CERTIFICATE

Pursuant to the provisions of 28 U.S.C. § 1746, I declare, certify, verify and state under penalty of perjury that the foregoing is true and correct. Executed on this 26 day of October, 2011, at 5:00 p.m.

*[signature]*