

SUTHERLAND ASBILL &  BRENNAN LLP

1001 Fannin, Suite 3700

Houston, Texas 77002

713.470.6100  Fax 713.654.1301

www.sutherland.com

**DAVID A. BAAY**
DIRECT LINE: 713.470.6112
E-mail:david.baay@sutherland.com

June 16, 2012

The Honorable Sally Shushan
United States Magistrate Judge
U.S. District Court for the Eastern
   District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re:     **MDL 2179:  Transocean's Schedule 1 Challenges to BP's Privilege Logs**

Dear Judge Shushan:

Pursuant to this Court's orders of May 11, 2012 (Rec. Doc. 6510) and May 21, 2012 (Rec. Doc. 6561), Transocean submits this brief setting forth its challenges to BP's Schedule 1 privilege logs.  The attached spreadsheets list the representative BP documents that Transocean, Halliburton, and Louisiana designate for *in camera* review.  Based on the limited information in BP's privilege logs and a review of redacted documents that BP claims are partially privileged, it appears that many documents on BP's logs are not in fact entitled to the privilege protections BP asserts.

## I.     The Meet & Confer Process

On May 23, 2012, Transocean joined the United States' challenge to 8,281 quantification documents on BP's logs and also challenged BP's privilege claims for 3,350 documents that are or appear to be related to source control.  In response to challenges by the various parties, BP has released or agreed to release approximately 3,000 documents.  BP has further determined that another estimated 3,000 documents are not related to Phase 2 of this litigation.  However, BP continues to assert privilege over nearly 5,000 challenged Phase 2 documents.  BP asserts the attorney-client privilege with respect to some of those documents and asserts both the attorney-client and work product privileges with respect to others.[1]

Transocean continues to object to the remaining privilege claims that BP has not agreed to withdraw or otherwise limit.  As the party withholding documents behind a claim of privilege, BP bears the burden of showing that the privilege applies.  *See King v. University Healthcare Systems, L.C.*, 645 F.3d 713, 720-21 (5th Cir. 2011).  Transocean asked BP to provide additional descriptive information for privilege log entries that appeared questionable.  BP, however,

---

[1] BP asserts that the attorney-client privilege applies to *all but three* of the approximately 3,500 documents for which BP also continues to assert work product protection.  That claim is unreasonable on its face and casts serious doubt on BP's exercise of good faith in making its privilege determinations.

The Honorable Sally Shushan
June 16, 2012
Page 2

refused to supplement its privilege logs with additional information regarding its Phase 2 privilege claims.  BP's position has hampered efforts to determine whether its privilege assertions have merit.  Nevertheless, for the reasons set forth below and based on the representative documents submitted to this Court for *in camera* review, Transocean believes that many, if not most, of BP's Phase 2 documents are neither work product nor attorney-client privileged.

## II.     Attorney-Client Privilege

The attorney-client privilege is limited to communications made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding."  *United States v. Harrelson*, 754 F.2d 1153, 1167 (5th Cir. 1985) (citation omitted).  As we explain below, BP has marked thousands of Phase 2 documents as protected by the attorney-client privilege despite the fact that no attorney was included in the communications.

> ### A.     The attorney-client privilege does not protect information and documents that were not prepared for the purpose of seeking legal advice simply because they later may have been given to an attorney.

BP has withheld documents generally described as "[i]nformation and documents prepared for the purpose of seeking legal advice from [an] attorney."  But an examination of BP's log entry numbers 26, 574, and 609 suggests that BP may have claimed privilege over documents that were not prepared for the purpose of seeking legal advice.

Entry 26 (PRIV-BP-HZN-2179MDL00000941) claims privilege over a report that was authored by a Vice President at a company called Mercury Public Affairs and that was sent to entire departments within BP, including its press office and investor relations department, as well as 24 individual recipients.  The nature of the document (a report), its author (a third-party public affairs consultant), and its widespread distribution each casts doubt on the assertion that this document was prepared for the purpose of seeking legal advice.

Entry 574 (PRIV-BP-HZN-2179MDL00007438) claims privilege over a redacted set of handwritten notes by Doug Suttles dated May 2, 2010.  The unredacted portions of the document reflect Suttles's mental processes and include factual information such as weather conditions, scheduling, and source control operations.  There is no indication that Suttles wrote these notes for the purpose of seeking legal advice.

Entry 609 (PRIV-BP-HZN-2179MDL00007683) asserts privilege over "Plans/Schedules" that are dated April 22, 2010.  It appears that these plans and/or schedules were prepared by a BP press relations employee and there is no indication that they were even

The Honorable Sally Shushan
June 16, 2012
Page 3

provided to an attorney.  Regardless, the nature of the document and the identity of its drafter cast doubt on whether this document was prepared for the purpose of seeking legal advice.

In short, BP appears to have improperly claimed privilege over documents that were not prepared for the purpose of seeking legal advice.

### B.    The attorney-client privilege does not protect communications among non-attorney client representatives that merely "reflect" legal advice.

BP has also asserted privilege over documents that it describes as "discussion[s] among client representatives reflecting attorney's legal advice."

Non-attorney communications are only privileged if the document was created for the primary purpose of seeking legal advice or to aid in litigation.  *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982).

BP's logs do not provide sufficient detail for us to evaluate whether the withheld non-attorney communications supposedly "reflecting" legal advice were in fact part of BP's efforts to procure legal advice.  Of concern, however, BP has used this privilege description for a wide variety of documents on such generalized topics as the "Deepwater Horizon incident," "deepwater operations," and "media relations."

BP's broad use of this basis for withholding documents, combined with BP's stilted descriptions of these documents' subject matters, raises significant questions about whether these communications were made for the purpose of seeking legal advice.  As the party bearing the burden of proof to show that these documents are privileged, BP should be required to demonstrate that these non-attorney communications were indeed made for such a purpose.  We have designated for *in camera* review entries 6 (PRIV-BP-HZN-2179MDL00005431), 211 (PRIV-BP-HZN-2179MDL00007588), 421 (PRIV-BP-HZN-2179MDL00014160), 426 (PRIV-BP-HZN-2179MDL00015946), and 712 (PRIV-BP-HZN-2179MDL00002689) as illustrative examples of these privilege claims.

### III.    Work Product Doctrine

BP asserts work product protection over thousands of Phase 2 documents for which the assertion of privilege appears suspect.[2]  In particular, Transocean believes that documents on the work product *in camera* designation spreadsheet (as well as similar privilege log entries to which Transocean has objected) do not qualify for work product protection because the documents

---

[2] BP also maintains that these documents are protected by attorney-client privilege.  Transocean disputes the application of attorney-client privilege to these documents for the same reasons expressed in Section II, above. Transocean expects that BP will apply the Court's ruling on the attorney-client privilege challenges to all challenged documents, including these.

The Honorable Sally Shushan
June 16, 2012
Page 4

were not prepared in anticipation of litigation.  The challenged documents are related to source control[3] and were authored or sent to individuals involved in responding to the blowout, measuring the flow rate, or attempting to cap the well.  Moreover, all of the documents on the designation spreadsheet were created while the well was still flowing.  Considering the ongoing, immediate need to cap the well and make any flow rate calculations necessary to do so, it is highly unlikely that these documents were prepared for the *primary* purpose of aiding in future litigation.  As such, they do not qualify for work product protection.  *See United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982) (stating that a document is only protected work product if "the primary motivating purpose behind the creation of the document was to aid in possible future litigation" (internal quotation marks omitted)).

The first two documents on the work product *in camera* designation spreadsheet were prepared within four days of the blowout, making it particularly unlikely that the work product doctrine applies.

Entry 110 (PRIV-BP-HZN-2179MDL00022278) is an April 23, 2010 Report drafted by Ryan Malone and transmitted to Doug Suttles, Bruce Price, and James Dupree.  Suttles, Dupree, and Malone were all BP employees involved in responding to the blowout, and a report distributed to them only four days after the blowout and only one day after the Deepwater Horizon sank was likely created to assist in responding to the immediate emergency at hand and not for the *primary* purpose of aiding in possible future litigation.

Entry 686, PRIV-BP-HZN-2179MDL00014425, a redacted April 24, 2010 Email from Cindi Skelton to Charles Holt, copying Richard Morrison, was almost certainly not prepared for the primary purpose of aiding in possible future litigation.  Skelton was BP's Vice President of Safety and Operational Risk for the Gulf of Mexico, and Holt was a BP employee involved in responding to the blowout.  The unredacted portions of this email chain indicate that the purpose of the document was to provide instruction on responding to Exxon-Mobil's request for information about the condition of the well and whether it was safe to return to Exxon-Mobil's nearby drilling operation.

Entries 2549 (PRIV-BP-HZN-2179MDL00018772), 1567 (PRIV-BP-HZN-2179MDL00012508), 410 (PRIV-BP-HZN-2179MDL00002387), 73 (PRIV-BP-HZN-2179MDL00001744), and 146 (PRIV-BP-HZN-2179MDL00008297) are additional examples of email communications sent to or from employees involved in source control and quantification operations during a period when the well was still flowing and capping it was the highest priority.  All of the individuals communicating in Entry 2549 were high-level BP executives who directed the response efforts in the immediate aftermath of the blowout.  The recipient of Entry 1567, Michael Mason, is believed to have been a BP employee involved in reservoir modeling

---

[3] BP does not dispute that these documents are related to Phase 2, but did not include the documents on its identification of quantification documents.  Thus, by default, the challenged documents must relate to source control.

The Honorable Sally Shushan
June 16, 2012
Page 5

and flow-rate calculations around the date of the email.  Doug Suttles, the author of <u>Entry 410</u>, was BP's senior representative at Unified Area Command (UAC) and was involved in transmitting flow rate calculations to the United States around the date the letter was drafted; Gordon Birrell, the letter's recipient, was BP's Vice President of Operations and worked on the flow rate modeling team.  David Rainey, the author of <u>Entry 73</u> was also a high level executive, serving as Deputy Incident Commander at UAC; Elizabeth Reicherts, the email's recipient is believed to have worked in BP's government affairs division.  <u>Entry 146</u> is a redacted email from David Rich, a drilling team leader and wells manager, to Gary Imm, an Incident Commander stationed in Houston to lead source control efforts in the wake of the blowout.  It strains credibility to argue that any of these documents were created for the *primary* purpose of aiding in possible future litigation.

Finally, <u>Entry 195</u> (PRIV-BP-HZN-2179MDL00013934) is a June 11, 2010 "Hard Copy" drafted by Tony Hayward, BP's then-CEO.  BP's limited description does not give Transocean enough information to determine the type of "hard copy" document this is; the recipients, if any, to whom the document was transmitted; and the subject matter to which the document refers. Based on the date of this document (while the well was still flowing) and its author, it appears unlikely that Document 195 was created for the *primary* purpose of aiding in possible future litigation.

## IV.    Conclusion

Transocean respectfully requests that this Court inspect *in camera* the designated documents on the attached spreadsheets to determine whether the asserted attorney-client communications were in fact prepared for the purpose of seeking legal advice and whether the claimed work product documents were indeed prepared for the primary purpose of aiding in litigation.

Sincerely,

_____/s/___ _____
David A. Baay