**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | **MDL No. 2179** |
| **This Document Relates to:** | **SECTION: J** |
| *All Cases in Pleading Bundle B3* | **JUDGE BARBIER** |
| | **MAGISTRATE SHUSHAN** |

**PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT ON DERIVATIVE IMMUNITY
AND PREEMPTION GROUNDS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

BACKGROUND ........................................................................................................... 5

I.     THE RELEVANT STATUTORY AND REGULATORY FRAMEWORK ........................... 5

     A.     The Oil Pollution Act and Clean Water Act ..................................... 5

     B.     The National Contingency Plan ....................................................... 8

           1.    Inclusion of a Dispersant Chemical ..................................... 8

           2.    Provisions Governing Clean-Up and Removal Activities ............ 10

II.     THE *DEEPWATER HORIZON* SPILL RESPONSE ........................................ 13

PROCEDURAL POSTURE .......................................................................................... 21

ARGUMENT ............................................................................................................... 23

I.     CLEAN-UP RESPONDER DEFENDANTS ARE NOT ENTITLED TO DERIVATIVE IMMUNITY UNDER *YEARSLEY* ............................................................... 27

II.     CLEAN-UP RESPONDER DEFENDANTS ARE NOT ENTITLED TO DERIVATIVE DISCRETIONARY FUNCTION IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT ............ 32

III.     DEFENDANTS ARE NOT ENTITLED TO A PREEMPTION DEFENSE .......................... 33

     A.     Plaintiffs' Claims Are Not Barred By Principles of Field Preemption ............ 35

     B.     Neither Clean-Up Responder Defendants Nor Nalco Are Entitled to the Defense of Implied Conflict Preemption ............................... 36

IV.     THE COURT SHOULD PERMIT PLAINTIFFS LEAVE TO AMEND IN ORDER TO NAME LYNDEN AIR CARGO, LLC AS A DEFENDANT IN THIS MATTER ............................ 42

V.     CONCLUSION ........................................................................................ 43

i

# TABLE OF AUTHORITIES

**Cases**

*Ackerson v. Bean Dredging LLC*,
589 F.3d 196 (5th Cir. 2009)................................................................30

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................23, 24

*Chamber of Commerce v. Whiting*,
--- U.S. ---, 131 S. Ct. 1968 (2011)................................................36, 37

*Cipollone v. Liggett Group, Inc.*,
505 U.S. 504 (1992)................................................................33, 34

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990)................................................................36, 37

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963)................................................................34

*Foman v. Davis*,
371 U.S. 178 (1962)................................................................43

*In re Durability Inc. v. Sovereign Life Ins. Co. of Cal.*,
212 F.3d 551 (10th Cir. 2000)................................................26

*In re FEMA Trailer Formaldehyde Prods. Liability Litig.*,
620 F. Supp. 2d 755 (E.D. La. 2009) ................................35

*In re KBR, Inc.*,
736 F. Supp. 2d 954 (D. Md. 2010) ................................27, 30, 32

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*,
175 F. Supp. 2d 593 (S.D.N.Y. 2001)................................39, 40, 41

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,
on April 20, 2010*,
808 F. Supp. 2d 943 (E.D. La. 2011) ................................5, 7, 35

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,
on April 20, 2010*,
MDL No. 2179, 2011 WL 4575696 (E.D. La. Sept. 30, 2011) ................22, 33, 42

*International Paper v. Oulette*,

479 U.S. 481 (1987) ..................................................................................................35, 36

*Kunin v. Feofanov*,
69 F.3d 59 (5th Cir. 1995) (per curiam) ...........................................................24

*Lind v. United Parcel Serv., Inc.*,
254 F.3d 1281 (11th Cir. 2001) ........................................................................25

*Little Six, Inc. v. United States*,
280 F.3d 1371 (Fed. Cir. 2002) ........................................................................25

*Loper v. Rapp*,
No. 1:09CV692, 2010 WL 4063486 (S.D. Miss. Oct. 15, 2010) ......................30

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ..........................................................................................33

*Mangold v. Analytic Services, Inc.*,
77 F.3d 1442 (4th Cir. 1996) ...............................................................28, 29, 31

*Marcus v. St. Paul Fire & Marine Ins. Co.*,
65 F.2d 379 (5th Cir. 1981) ..............................................................................25

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ..........................................................................................37

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ..........................................................................................33

*New York State Dept. of Social Servs. v. Dublino*,
413 U.S. 405 ......................................................................................................37

*O'Hara v. Gen. Motors Corp.*,
508 F.3d 753 (5t1h Cir. 2007) ..........................................................................40

*Sprietsma v. Mercury Marine*,
537 U.S. 51 (2002) ......................................................................................34, 37

*St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*,
774 F. Supp. 2d 596 (D. Del. 2011) ..................................................................34

*Trevino v. General Dynamics Corp.*,
865 F.2d 1474 (5th Cir. 1989) ..........................................................................30

*Veillon v. Exploration Servs., Inc.*,
876 F.2d 1197 (5th Cir. 1989) ..........................................................................24

*United Fire & Cas. Co. v. Hixson Bros., Inc.,*
   453 F.3d 283 (5th Cir. 2006)..............................................................24

*United States v. Bodenger,*
   No. 03-272, 2003 WL 22228517 (E.D. La. Sept. 25, 2003)............................7

*United States v. Locke,*
   529 U.S. 89 (2000)........................................................................33

*United States v. Texas,* 507 U.S. 529 (1993) ...........................................39

*Williamson v. Mazda Motor of America, Inc.,*
   --- U.S. ---, 131 S. Ct. 1131 (2011)..............................................8, 40

*Wyeth v. Levine,*
   555 U.S. 555 (2008)......................................................................34

*Yearsley v. W.A. Ross Construction Co.,*
   309 U.S. 18 (1940)..............................................................27, 28, 30

**Constitution, Statutes, and Regulations**

U.S. Const. art. VI, cl. 2 ................................................................33

28 U.S.C. § 2674 .........................................................................32

28 U.S.C. § 2680(a) ......................................................................32

33 U.S.C. § 1321(c) ...................................................5, 10, 31, 32, 38

33 U.S.C. § 1321(d) ...................................................8, 9, 10, 13, 39

33 U.S.C. § 1321(j) ......................................................................27

33 U.S.C. § 1321(o) ............................................................7, 35, 36

33 U.S.C. § 2718(a) ..............................................................6, 35, 37

33 U.S.C. § 2718(c) ........................................................................6

33 U.S.C. § 2751(e) ..............................................................6, 37

40 C.F.R. § 300.100 ......................................................................10

40 C.F.R. § 300.105 ......................................................................12

40 C.F.R. § 300.105(d) ........................................................................................11

40 C.F.R. § 300.115(b) ........................................................................................12

40 C.F.R. § 300.120(a) ........................................................................................10

40 C.F.R. § 300.135 ............................................................................................10

40 C.F.R. § 300.150(a) ........................................................................................12

40 C.F.R. § 300.150(c) ........................................................................................12

40 C.F.R. § 300.150(e)

40 C.F.R. § 300.175 ............................................................................................10

40 C.F.R. § 300.322(b) ........................................................................................11

40 C.F.R. § 300.323(c) ........................................................................................11

40 C.F.R. § 300.910(a) ........................................................................................12

40 C.F.R. § 300.915(a) .....................................................................................9, 41

40 C.F.R. § 300.920(a) ..........................................................................................9

40 C.F.R. § 300.920(d) ..........................................................................................9

40 C.F.R. § 300.920(e) ...............................................................................9, 10, 40

40 C.F.R. Pt. 300, App. E § 2.3(b) ......................................................................11

**Legislative Materials**

H.R. Rep. No. 101-242, pt: Committee on Merchant Marine Fisheries (Sept. 18, 1989) .....7, 8, 34

**Federal Register Authorities**

Executive Order No. 12777,
   56 Fed. Reg. 54757 (Oct. 18, 1991) .................................................................9, 10

National Oil and Hazardous Substances Pollution Contingency Plan,
   59 Fed. Reg. 47384-01 (Sept. 15, 1994) ..........................................................10, 11

**Federal Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................23

Fed. R. Civ. P. 56(c) ...............................................................................................25

Fed. R. Civ. P. 56(d) ...............................................................................................26

**Other Authorities**

Kenneth M. Murchison,
   *Liability Under the Oil Pollution Act: Current Law and Needed Revisions*,
   71 La. L. Rev. 917 (2011) ....................................................................................6

Catherine M. Sharkey, *Inside Agency Preemption*,
   110 Mich. L. Rev. 521 (2012) ..........................................................................7, 40

Plaintiffs respectfully submit the following Memorandum of Law in Opposition to the Motions for Summary Judgment on Derivative Immunity and Preemption Grounds filed by Defendants O'Brien's Response Management, Inc. ("O'Brien's") and National Response Corporation ("NRC") [Doc. 6536], Tiger Rentals, Ltd. and the Modern Group, Ltd. ("Tiger Rentals") [Doc. 6538], Airborne Support International, Inc. ("Airborne") [Doc. 6546], Marine Spill Response Corporation ("MSRC") [Doc. 6547], Dynamic Aviation Group, Inc. ("Dynamic") [Doc. 6551], Lynden, Inc. ("Lynden") [Doc. 6553], International Air Response, Inc. ("International Air") [Doc. 6557], and DRC Emergency Services, LLC ("DRC") [Doc. 6559] (collectively, "Clean-Up Responder Defendants"), and Defendant Nalco Company ("Nalco") [Doc. 6541]:

**MAY IT PLEASE THE COURT:**

On April 20, 2010, an explosion on board the oil vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in United States history.  The oil that spilled from the Macondo well quickly spread, threatening the shoreline of each of the Gulf states.  To combat this unprecedented event, the governments of the affected states teamed with the federal government and the party responsible for the spill—BP Exploration & Production, Inc. ("BP")—to mount an unprecedented response.  Tens of thousands took part.  The efforts continued for months.

The B3 Bundle Plaintiffs (hereinafter, "Plaintiffs") are largely those that risked their health and welfare in this response effort.  Many had no training and no experience fighting an oil spill.  Yet they accepted responsibilities staging and collecting boom, skimming the water's surface for oil, cleaning the beaches, staffing in-situ burn sites, and participating in BP's Vessels of Opportunity program ("VoO").  Other Plaintiffs are residents who simply lived in close

proximity to the Gulf shoreline. Thousands of these individuals became ill after they were exposed to oil or the dispersant chemicals that were being applied to the Gulf waters in unparalleled quantities.  Many remain ill to this day.

The federal government, through the Unified Command structure, technically oversaw the spill response.   The government had veto power over any decision and, of course, government officials made many important decisions along the way.  Indeed, as the Defendants emphasize throughout their briefing, the government maintained ultimate decision-making authority over any response activity.  But this simply does not capture the reality on the ground, which was quite different than the top-down, orderly narrative depicted by Defendants.  The spill response was massive and diffuse.  Many of the most important tasks—collecting tar balls from beaches, skimming oil from the water's surface, staging boom along the shoreline, or applying oil-dispersing chemicals for instance—were coordinated and overseen by BP's contractors and sub-contractors of BP's contractors.  None of these entities contracted with the government.  Nor could the government monitor the myriad response tasks that simultaneously occurred for months across five states and out in the Gulf waters.  The response was too big and required too much manpower.  As a result, private contractors conducted operations and made decisions in the field that often diverged from the protocols set forth in the Unified Command offices.  And when private contractors diverged from these protocols, clean-up workers and Gulf residents were exposed to oil and chemical dispersant and became sick or were personally injured.

To illustrate: BP hired dozens of contractors, including several of the named Clean-Up Responder Defendants, to aerially apply the chemical dispersant Corexit from the air.  In fact, Corexit, manufactured by Defendant Nalco, was applied to the water's surface in unparalleled quantities.  It is perhaps unsurprising, then, given the frequency and quantity of use, that the

application of dispersant was not always completed in the manner that the United States Coast Guard envisioned.  For example, although government protocol prohibited dispersant from being sprayed within three miles of the shore, many individuals were sprayed by an overhead plane as they stood on the beach.  Government protocol also prohibited aerial application over top an in-situ burn site.  Individuals were nonetheless sprayed as they staffed such sites.  Dispersant was applied at night when only daytime sprays were authorized.  Dispersant planes conducted solo operations when an accompanying spotter aircraft was required.

A similar pattern emerged in other areas of the spill response.  Government protocol demanded safety training that met with standards promulgated by the Occupational Safety and Health Administration.  Workers nevertheless were inadequately trained, not trained at all, or received training that was subsequently ignored by site supervisors in the field.  What is more, contractors, including Clean-Up Responder Defendants, failed to properly outfit employees tasked with oil removal and boom staging.  Protective suits, gloves, and boots were either not provided or in short supply.  Equipment was distributed on a first-come, first-serve basis. Workers that requested protective gear or respirator masks were fired or told to go without. Inadequate training and protective gear, in turn, caused many clean-up workers to be exposed to hazardous chemicals and became ill.  Some have never recovered.

The Clean-Up Responder Defendants and Nalco seek summary judgment on derivative immunity and preemption grounds.  Neither defense has merit.  Nor are the issues ripe for resolution.  Defendants contend that the whole of their conduct was dictated by government officials in the Unified Command.  Yet Plaintiffs have had no opportunity to depose any of these officials to contest the assertion.  Defendants contend that their dispersant planes never exceeded government authorization, but Plaintiffs have not been permitted to question a single pilot that

3

actually flew one of these missions.   Defendants contend that proper protective gear was provided to clean-up workers *one hundred percent of the time*.   Yet Plaintiffs have not been permitted to depose a site supervisor employed by one of the Clean-Up Responder Defendants to test whether this was, in fact, his or her recollection.   By contrast, discovery in Phase I of this MDL required several hundred depositions and months of rolling production.   Defendants' tactic here is clear enough: they wish to have the response stage of the litigation dismissed before the facts regarding their negligence are fully exposed.   Plaintiffs respectfully submit that a more complete discovery period is necessary to uproot these facts and prove their case.[1]

The Clean-Up Responder Defendants had the duty, means, ability, and opportunity to protect shoreline residents and those who participated in the response effort from toxic exposure. Instead, Defendants acted negligently. Contractors ignored and exceeded government regulations and placed workers and residents in harm's way.   Nalco, likewise, had the duty, means, and ability to manufacture a product that was not dangerous to the environment and human health.   It made no attempt to do so, however, and now seeks to foreclose Plaintiffs from the opportunity to establish liability on the merits.   Defendants are not entitled to preemption and none have

---

[1] Plaintiffs acknowledge that the Court's Limited B3 Discovery Order set forth an April 30, 2010 deadline to conduct "limited" depositions relevant to Defendants' preemption and derivative immunity defense.  On February 16, 2012, however, Plaintiffs made a strategic decision to move for the effective dismissal, without prejudice, of Nalco and the Clean-Up Responders. [*See* Doc 5718]  Accordingly, once that motion was filed, Plaintiffs' discontinued further discovery efforts and focused resources on the fast-impending Limitation and Liability Trial and the concurrent settlement discussions with BP.  Two months later, the Court denied Plaintiffs' motion.  At that point, however, the limited discovery period was essentially closed.  Plaintiffs therefore request permission to conduct additional discovery before the liability of Nalco and the Clean-Up Responders is resolved.  In addition, Plaintiffs request an opportunity to depose—for the first time—government officials who allegedly authorized Defendants' conduct.  This is especially critical in light of Defendants' proffer of joint stipulations entered with the government.  To sufficiently contest these stipulations, it is only equitable that Plaintiffs be permitted the opportunity to depose the relevant government decision-makers.

established an entitlement to the seldom-applied defense of derivative immunity.  The Court should therefore deny Defendants' motions and allow merits discovery to proceed.

## BACKGROUND

I.   **THE RELEVANT STATUTORY AND REGULATORY FRAMEWORK**

A.     **The Oil Pollution Act and Clean Water Act**

The Oil Pollution Act ("OPA"), which amended the oil spill and removal provisions of the Clean Water Act ("CWA"), establishes the principal legal framework governing an oil spill response.  Indeed, as this Court has recognized, "OPA is a comprehensive statute addressing responsibility for oil spills, including the cost of clean up, . . . ."  *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 960 (E.D. La. 2011).  Enactment of the OPA, however, was also the result of a careful legislative compromise, intended to consolidate federal authority while preserving remedies available under both state and general maritime law.

The federal government's authority to address and remediate an oil spill is found in § 1321(c)(1) of the CWA, a provision amended by passage of the OPA.[2]  That section, entitled "Federal removal authority," states that "[t]he President shall, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance."  33 U.S.C. § 1321(c)(1)(A).  A subsequent provision equips the Executive with a range of options to address a spill, instructing that he or she may—but need not—"direct or monitor all Federal, State, and private actions to remove a discharge."  *Id.* § 1321(c)(1)(B).

---

[2] *See* Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 § 4201 (1990) (codified as amended at 33 U.S.C. § 1321(c)).

Although these provisions consolidated *federal* removal authority, the OPA, by its terms, "does not provide an exclusive basis for imposing liability for an oil spill."  Kenneth M. Murchison, *Liability Under the Oil Pollution Act: Current Law and Needed Revisions*, 71 La. L. Rev. 917, 932 (2011).  The plain language of the statute is unambiguous in this regard; section 2718(a) of Title 33, labeled "Preservation of State authorities," explains:

> Nothing in this Act . . . shall—
> (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to
>
> (A) the discharge of oil or other pollution by oil within such State; or
>
> (B) any removal activities in connection with such a discharge; or
>
> (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under . . . State law, including common law.

In addition to the above, § 2718(c) further preserves non-federal authority to impose liability, stating:

> Nothing in this Act . . . shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—
>
> (1) to impose additional liability or additional requirements; or
>
> (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of the law; relating to the discharge, or substantial threat of a discharge, of oil.

33 U.S.C. § 2718(c).  A later section of the OPA, entitled "Savings provisions," pronounces that "admiralty and maritime law" are not affected by the act unless so noted, *id.* § 2751(e)(1), and "sav[es] to suitors in all cases all other remedies to which they are otherwise entitled," *id.* §

2751(e)(2).  Accordingly, the plain language of the OPA is unambiguous: non-federal liability is preserved by the statutory scheme.  Indeed, because of its multiple savings clauses, this Court has already recognized that by enacting the OPA, "it does not appear that Congress intended to occupy the entire field governing liability for oil spills."  *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 808 F. Supp. 2d at 961 (interpreting preemptive scope of the OPA).

Such an approach to preemption is consistent with the approach adopted by the CWA, which operates in conjunction with the OPA and continues to provide the liability standard for spills of hazardous substances.  *See United States v. Bodenger*, No. 03-272, 2003 WL 22228517, at *2 (E.D. La. Sept. 25, 2003) (explaining that the OPA relies upon § 311 of the CWA for its strict liability standard).  Prior to the OPA's enactment, § 1321(o) of the CWA—a sub-section captioned, *inter alia*, "local authority not preempted,"—read: "Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State."  The OPA amended this sub-section to make clear that not only were non-federal laws governing oil spills preserved, but so too was any requirement or liability "with respect to any removal activities related to such discharge."[3]  In other words, the CWA, pre-OPA, did not preempt non-federal liability regimes; passage of the OPA did nothing to alter this aspect of the spill liability regime.[4]

---

[3] Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 § 4202(c) (1990) (codified as amended at 33 U.S.C. § 1321(o)).

[4] By the Environmental Protection Agency's own account, there is but one rule promulgated pursuant to the CWA that has the effect of preempting state law: the Uniform National Discharge Standards for Vessels of the Armed Forces, 64 Fed. Reg. 25,126 (May 10, 1999) (to be codified at 40 C.F.R. pt. 69 & Ch. VII).  *See* Catherine M. Sharkey, *Inside Agency Preemption*, 110 Mich. L. Rev. 521, 569 (2012).  This makes sense, for federal environmental laws have not traditionally served to preempt non-federal law.  *See* H.R. Rep. No. 101-242, pt. 2: Committee on Merchant Marine and Fisheries, at 150 (Sept. 18, 1989) (discussing "longstanding tradition that Federal

B.      The National Contingency Plan

The federal removal framework set forth in 33 U.S.C. § 1321(d) requires the Executive to

"prepare and publish a National Contingency Plan for removal of oil and hazardous substances."

This section, also amended as part of the OPA reforms,[5] instructs that the National Contingency

Plan ("NCP") "shall provide for efficient, coordinated, and effective action to minimize damage

from oil and hazardous substance discharges." 33 U.S.C. § 1321(d)(2). Accordingly, the NCP

sets forth a detailed federal response protocol that, pursuant to statute, includes, *inter alia*, the

establishment of a national surveillance system and national coordination center; procedures by

which to identify, contain, disperse, and remove oil and other hazardous substances; and the

designation of a federal official to serve as the Federal On-Scene Coordinator for designated

disaster areas. *See id.* Section 1321(d)(4) also requires that, subsequent to the NCP's

publication, government removal activities "shall, to the greatest extent possible, be in

accordance with" the NCP.

1.      Inclusion of a Dispersant Chemical

Section 1321(d)(2)(G) of Title 33 establishes that certain dispersants or other spill-

mitigating chemicals may be designated as acceptable for use during a spill response.

Specifically, the NCP must contain:

> (G) A schedule, prepared in cooperation with the States,
> identifying—

---

environmental laws should not preempt state laws," and stating, "For this reason, the Clean
Water Act does not preempt; the Superfund law does not preempt; and Federal oil pollution
laws—including those governing outer Continental Shelf, the trans-Alaska pipeline and
deepwater ports do not preempt"). Furthermore, as discussed in more detail below, the Court
should afford deference to the agency's interpretation of the preemptive scope of a statute it
administers. *See Williamson v. Mazda Motor of Am., Inc.*, --- U.S. ---, 131 S. Ct. 1131, 1139-40
(2011).

[5] *See* Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 § 4201(b) (1990) (codified as
amended at 33 U.S.C. § 1321(d)).

(i) dispersants, other chemicals, and other spill mitigating devices and substances, if any, that ***may*** be used in carrying out the Plan,

(ii) the waters in which such dispersants, other chemicals, and other spill mitigating devices and substances ***may*** be used, and

(iii) the quantities of such dispersant, other chemicals, or other spill mitigating device or substance which ***can*** be used safely in such waters[.]

*Id.* § 1321(d)(2)(G)(i)-(iii) (emphasis added).

To be listed on the NCP product schedule, a dispersant manufacturer must submit specified toxicity data and lab testing results to the Environmental Protection Agency ("EPA"), the regulatory body tasked with promulgating rules governing the NCP.[6]   40 C.F.R. § 300.920(a).   In addition, the applicant must include recommended dispersant "application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of pollutants, and any other application restrictions."   *Id.* § 300.915(a)(6).   If the dispersant chemical is added to the NCP schedule, the manufacturer maintains a continuing obligation to "notify EPA of any changes in the composition, formulation, or application of the dispersant."   *Id.* § 300.920(d).

Finally, the NCP rules make clear that a product's inclusion on the schedule means only that the manufacturer submitted data meeting the requirements set forth in § 300.920.   Indeed, the relevant regulatory provision states, "The listing of a product on the NCP Product Schedule does not constitute approval of the product."   *Id.* § 300.920(e).   Furthermore, where a manufacturer notes in its advertising or technical literature that its product is included on the NCP schedule, it must also print the following disclaimer underscoring the EPA's non-approval

---

[6] Pursuant to Executive Order, the EPA is responsible for revision of the NCP.  *See* Exec. Order No. 12777, 56 Fed. Reg. 54757, 54758 (Oct. 18, 1991).

of the product: "This listing does NOT mean that EPA approves, recommends, licenses, certifies, or authorizes the use of [PRODUCT NAME] on an oil discharge." *Id.* (emphasis in original); *see also* National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47384-01, 47407 (Sept. 15, 1994) ("The listing of a product on the Product Schedule does not mean that EPA approves, authorizes, or encourages the use of that product on an oil spill; rather, the listing of the product means only that data have been submitted to EPA as required by Subpart J of the NCP.").

### 2. Provisions Governing Clean-Up and Removal Activities

In the event of an oil spill posing a substantial threat to the public health or welfare, such as the *Deepwater Horizon* incident, the OPA amendments to the CWA state that "the President shall direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge." 33 U.S.C. § 1321(c)(2)(A). The President has delegated this authority to multiple federal agencies, but most prominently the EPA and the United States Coast Guard ("Coast Guard"). *See* 40 C.F.R. § 300.100. Together, the responsible agencies make up a National Response Team. *Id.* §§ 300.110, 300.175. Where a National Response Team ("NRT") is activated to respond to a spill in a coastal zone, the Coast Guard assumes the lead role in the response. *See* Exec. Order No. 12777, 56 Fed. Reg. 54757, 54757 (Oct. 18, 1991).

The Coast Guard must pre-designate a Federal On-Scene Coordinate ("FOSC") for discharges within or threatening a coastal zone. 33 U.S.C. § 1321(d)(2)(K); 40 C.F.R. § 300.120(a)(1). The FOSC, in turn, is responsible for "direct[ing] response efforts and coordinat[ing] all other efforts at the scene of a discharge or release." 40 C.F.R. § 300.135; *see also id.* § 300.120(a).

The Federal Code allows the Coast Guard to designate a discharge a "Spill of National Significance" and to appoint a National Incident Commander to lead the federal response. 40 C.F.R. § 300.323. In such an event, the National Incident Commander assumes the role of the FOSC, *id.* § 300.323(c), and is instructed to direct all federal, state, or private actions to remove and/or mitigate the spill's effects, *id.* § 300.322(b). In so doing, the regulations expressly permit the National Incident Commander to "act without regard to any other provision of law governing contracting procedures or employment of personnel by the federal government." *Id.* Authority under these provisions does not, however, grant a license to override any otherwise applicable federal, state, and local requirements aside from those referenced (*i.e.*, those governing contracting or employment); as the EPA has explained, such a delegation—"essentially preempting all Federal and State law when the OSC directs response to a discharge—is [not] authorized by the OPA." National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47384-01, 47390 (Sept. 15, 1994). This is, of course, only consistent with the larger framework underpinning the OPA and CWA, which preserves non-federal liabilities within the federal regulatory scheme.

According to the NCP, the party responsible for the spill shall play a role in the response action in order to "achieve an effective and efficient response." 40 C.F.R. § 300.105(d). Indeed, in the typical spill response, "[c]leanup responsibility for an oil discharge immediately falls on the responsible party," who "shall conduct the cleanup." 40 C.F.R. Pt. 300, App. E § 2.3(b). When the responsible party conducts the cleanup, the federal government "shall ensure adequate surveillance over whatever actions are initiated." *Id.* The NCP, in fact, evinces a preference for structuring the spill response in this manner, stating that "[w]here practicable, continuing efforts should be made to encourage response by responsible parties." *Id.* § 2.3(b)(1).

11

The NCP regulations require that entities responding to a spill take care to respect and abide by workplace safety provisions promulgated by the Occupational Safety and Health Administration ("OSHA").  Spill removal activities must comply with OSHA regulations for hazardous waste operations and emergency response.  *Id.* § 300.150(a) (referencing OSHA regulations set forth at 29 C.F.R. § 1910.120).  When a spill response is led by the government, OSHA-compliant safety programs should be made available to workers reporting to response sites.  *Id.* § 300.150(c).  Furthermore, contracts with entities administering such sites "should contain assurances that the contractor at the response site will comply with this program and with any applicable provisions of the Occupational Safety and Health Act of 1970 and [approved] state laws."  *Id.*  Finally, the regulations make clear that all private employers remain "directly responsible for the health and safety of their own employees."  *Id.* § 300.150(e).

In the event that a response situation necessitates application of dispersant chemicals, the NCP requires that Regional Response Teams[7] ("RRT") develop protocols, in advance of a spill, to guide dispersant use.  *See id.* § 300.910(a).  Prior to the *Deepwater Horizon* spill, two RRTs developed such protocols in the Gulf region.   RRT IV, covering the states of Alabama, Mississippi, and Florida, and RRT VI, covering Louisiana and Texas, issued dispersant application guidelines in advance of April 20, 2010.  Both protocols required that aerial spraying be conducted during daylight hours, at least three nautical miles off the shoreline, and in water depth of at least ten meters.  [Clean-Up Responder Defendants' Joint Local Rule 56.1 Statement ¶¶ 9-11 (hereinafter "Joint SUMF").]  The protocol for RRT VI included added restrictions: a spotter aircraft was required to accompany each spray plane, and planes were instructed to avoid

---

[7]  Regional Response Teams are "responsible for regional planning and preparedness activities before response actions."  40 C.F.R. § 300.105.  The Team's membership consists of representatives from federal agencies, state governments, and local governments.  *Id.* § 300.115(b).

spraying birds, marine mammals, and sea turtles.  [*See* Joint SUMF, Ex. 5 at 2.]  Neither protocol provided guidance regarding the appropriate quantity of dispersant to be applied.[8]  [Joint SUMF ¶ 12.]  Nor did either protocol approve the subsea application of dispersant.  Finally, aerial sprays were not permitted over top in-situ burn sites.  [*See* Defendant MSRC's Local Rule 56.1 Statement ¶ 22.]

## II.   THE *DEEPWATER HORIZON* SPILL RESPONSE

Within days of the *Deepwater Horizon* spill, Coast Guard Rear Admiral Mary Landry was named the FOSC and established a Unified Area Command ("UAC") in Robert, Louisiana.  [Joint SUMF, Ex. 3 at 1, 9.]  The Coast Guard thereafter established five Incident Command Posts ("ICPs") throughout the Gulf to oversee regional response issues.  The Coast Guard named an ICP Commander to oversee each of these posts.  [*Id.* at 4.]  On April 29, 2010, the Secretary of Homeland Security declared the *Deepwater Horizon* incident a "Spill of National Significance" and appointed Admiral Thad Allen as National Incident Commander.  Admiral Allen's role was "strategic and operational," and as National Incident Commander, he "coordinat[ed] national-level issues."  [*Id.* at 6.]  Admiral Landry, the FOSC, "focused on conducting the [spill] response, addressing the concerns of state and local leaders, and oil removal and mitigation measures across affected areas."  [*Id.* at 4.]

BP, designated by the government as the "responsible party" for the spill, participated in the "UAC structure at every level of the response."  [*Id.* at 5.]  In the Houma ICP, for example, "most Coast Guard responder positions had a BP counterpart, and Coast Guard members and BP

---

[8] Under § 1321(d) of the CWA, products schedules are to identify the quantity of dispersant that may be safely applied.  *See* 33 U.S.C. § 1321(d)(2)(G)(iii).

employees worked side by side." [Pl. Ex. 1 at 12.[9]]   Rear Admiral James Watson, who succeeded Admiral Landry as FOSC in June 2010, told the presidentially-appointed National Commission investigators that he viewed BP executive Doug Suttles "as his counterpart" in Houma.[10] [*Id.*]  The National Commission reported that "organizational charts from the Unified Area Command and the Incident Command Posts show BP employees scattered through the command structure . . . . In some command chains, a BP employee was at the top and a Coast Guard member would report up to the BP employee." [*Id.*]  Indeed, BP's Operations Chief for the Mobile ICP oversaw 27,000 personnel alone.  [Pl. Ex. 2 at 86:3-4.]  What is more, BP maintained primary responsibility for daily briefings distributed throughout the UAC; as one Deputy Incident Commander testified, "BP played the—the main role in generating most of the work, and . . . . did the lion's share of the work." [Pl. Ex. 3 at 100:22-101:8.]

BP did not conduct the clean-up operations by itself; rather, it contracted directly with third-party response contractors such as Clean-Up Responder Defendants MSRC, Lynden, O'Brien's, Tiger Rentals, and DRC.  Most of the remaining Clean-Up Responder Defendants named in the B3 Bundle Complaint—those that did not contract directly with BP—were subcontractors of MSRC; one named Defendant, NRC, was a subcontractor of O'Brien's.  Another Defendant, Airborne, was a contractor of NRC (meaning Airborne was a sub-sub-contractor of BP).  *None of the Clean-Up Responder Defendants named in the B3 Bundle Complaint contracted with the Federal or State Governments.*  In all, BP or the response

---

[9] References to "Pl. Ex. ___" are to the exhibits filed along with Plaintiffs' Memorandum and Local Rule 56.2 statement.

[10] Defendants make much of Suttles' assertions that the government was in complete control of all aspects of the spill response.  The Court should afford this entirely self-serving testimony little weight; Suttles was, obviously, attempting to pass the buck from his employer, BP, to the government.  Defendants' use of this deposition further highlights Plaintiffs' need to depose relevant government decision-makers—to rebut testimony like Suttles'—before the Court conclusively decides the issue of Defendants' liability.

companies under its employ contracted with over 45,000 individuals to facilitate the clean-up response.  [Pl. Ex. 4 at 224:20-25.]

This sprawling response operation extended from Miami to Houston.  In a loose sense, the FOSC and National Incident Commander "directed" the massive, months-long operation. But in reality, much of the decision-making occurred on the ground, under the direction of BP and the private contractors hired by BP, and the subcontractors hired by BP's private contractors. As decision-makers became further removed from Incident Command, they inevitably exercised a certain level of discretion, which did not always comport with practices as neatly envisioned at the top.  For example, BP Deputy Incident Commander Ed Thompson testified that when he hired private contractor Parsons Corporation ("Parsons") to administer VoO deployment sites in the Mobile ICP, he neither imposed nor recommended any safety protocols to guide deployment of the boats.[11]  [Pl. Ex. 5 at 80:19-87:13.]  Thus, Mr. Thompson explained, although he personally hired Parsons, he never advised that it was Parsons' responsibility to ensure that deploying vessels met safety requirements imposed by the Unified Command and OSHA.  Nor did he know whether anyone provided such instruction.  What is more, in the limited B3 discovery conducted to date, there is evidence that clean-up workers complained that deployment site contractors such as Parsons were unsupervised, failed to provide adequate training and safety equipment, and were "not dealing above board" with the workers who reported for spill response duty.  [Pl Ex. 6.]  Incidents such as these epitomize the breakdown in regulatory compliance as

---

[11] Parsons Corporation is not named as a defendant in the First Amended B3 Bundle Complaint, but the PSC has preserved its claims against Parsons by naming "Unknown Defendants"—in other words, those that discovery had not exposed at the time the Complaint was filed in March 2011.  [See Rec. Doc. 1812 ¶¶ 77-78.  Furthermore, the relationship between BP and Parsons is illustrative of the manner in which response activities actually occurred in the field.  Given the opportunity to conduct discovery on the B3 claims, it is believed that more such evidence—of contractors exercising discretion, sometimes to the detriment of clean-up workers—would be unearthed.

response activities moved away from the ICPs and into the field.  Moreover, given the systemic safety lapses evident throughout the spill response, it is safe to assume that Parsons was not a complete outlier.

A central component of the spill response centered upon the application of dispersant chemicals.  Unified Command relied upon private contractors during the spill response to apply unprecedented quantities of chemical dispersants.   In the six days after the spill, contractors applied 14,654 gallons of Corexit EC9500 and Corexit EC9527A (collectively, "Corexit") to the surface of the Gulf.  [Pl. Ex. 7 at 144.]  By mid-May, contractors applied an additional 300,000 gallons.  [Id.]  Nearly all of the named Clean-Up Responder Defendants participated in aerial spraying missions.

Use of chemical dispersants in the Gulf was controversial.  As Defendants have pointed out, dispersants use drew the attention of the Unified Command in a way that other response activities did not.  For example, Defendants have produced evidence to suggest that the Unified Command approved each application of dispersant chemicals.[12]  None of this evidence, however, authorized Defendants to spray dispersant within three miles of the shore or in waters less than ten meters deep; to apply dispersant during non-daylight hours; to conduct missions without the aid of a spotter aircraft; or to apply dispersants over top an in-situ burning site.

Yet, even with the limited discovery conducted to date, it is at least disputable whether Defendants contravened the government's authorization to apply dispersant.  Three plaintiffs testified that they either observed dispersant planes spraying chemicals along the shore or were

---

[12] The PSC does not concede that this was, in fact, true.  Thus far, the record contains only a small number of Unified Command authorizations, all of which are hearsay.  Before the Court conclusively decides issues of liability related to dispersant application, however, the PSC respectfully requests the opportunity to depose those Unified Command personnel that allegedly approved each chemical spray.

themselves physically sprayed while standing on shore.  Dwayne Hawkins-Lodge was sprayed on two separate occasions on Fourchon Beach and once on Elmer Island.  [Hawkins Decl. ¶¶ 5-7.]  Similarly, Warren Jones was sprayed on two occasions as he collected tar balls along Fourchon Beach.  [Jones Decl. ¶ 4.]  Terry Carter, though he was not actually sprayed, testified that he observed planes applying dispersant one-half mile off the shore of Grand Isle "just about every other day" beginning in May 2010.  [Carter Decl. ¶ 4.]  None of these dispersant applications were authorized by the government and each, in fact, runs afoul of the RRTs developed pursuant to the NCP.

These plaintiffs were not alone in their observations of non-compliant aerial spraying conduct.  Ronnie Anderson and John Wunstell, both of whom were assigned to an in-situ burn area near the Macondo well site, testified that they heard dispersant planes flying overhead at night, applying dispersant.  [Anderson Aff. ¶ 2; Wunstell Aff. ¶ 1.]  Anderson further testified that a plane flew over the burn site while he was working, applying dispersant atop the area of the site.  [Anderson Aff. ¶ 2.]  Again, this testimony suggests, at the very least, that Defendants applied dispersant in a manner that deviated from the authorization promulgated by the government.

In addition, the sprawling response saw numerous shortages of safety equipment, as well as the failure to properly train clean-up workers for the hazardous activity they were about to undertake.  Clean-Up Responder Defendants MSRC, DRC, and NRC conducted beach clean-up and oversaw the collection of oil skimmed from the water's surface.  MSRC and NRC staged and laid absorbent boom while MSRC and O'Brien's assisted with the in-situ burn sites.  Each of these activities was potentially hazardous; the NCP required compliance with OSHA workplace safety standards each step of the way.

17

To comply with this requirement, OSHA and BP developed a matrix outlining the personal protective equipment ("PPE") that should have been supplied to workers engaged in each category of clean-up work.  [Joint SUMF, Ex. 29 at 9 (explaining matrix).]  For those manually handling boom and boom materials, for example, a sun hat, safety glasses, work gloves, and steel-toe boots were always required, while barrier aprons, sleeves, and protective suits were required when chemical hazards were present.  [Pl Ex. 8.]  Multiple plaintiffs testified that when they were handling boom, they did not receive the required PPE.  [Scott Decl. ¶ 4.]  One clean-up worker testified that site managers assured him that "there was no need for rubber gloves or hazmat suits," and that to the extent PPE was available, "it was a 'first come, first serve' system."  [Lide Decl. ¶ 4.]  Another worker, Terrence Carroll, echoed this sentiment, stating, "Some of us were provided with tyvex suits, but others were not.  This is because the safety equipment was given out on a first come first serve basis."  [Carroll Decl. ¶ 3.]

Roy Mackie, a clean-up worker employed by DRC to remove oil from the beach and water, explained that barrier suits were often unavailable.  To obtain sufficient equipment for the day's work, Mackie stated that "you had to walk the beach to different supply stations to find the full gear."  [Mackie Decl. ¶ 4.]  DRC site supervisors acknowledged that PPE supplies were insufficient, but told Mackie, "If you don't like it, don't come back [to work]."  [*Id.*]  This on-the-ground reality diverged sharply from the directive produced by OSHA, to wit: those engaged in oil removal, such as Mackie, should have been given a sun hat, gloves, and barrier apron each time they reported for that type of oil removal work.  [*See* Pl. Ex. 8.]  Depending on conditions, OSHA also recommended goggles, a face shield, and an impervious suit.  [*Id.*]

Another clean-up worker, Victor Carias, testified that he worked as a site supervisor for a subcontractor of O'Brien's.  [Carias Decl. ¶ 3.]  Carias testified that PPE was typically

unavailable to his crew, at times forcing clean-up workers to go without. [*Id.*] On one particular occasion, Carias' crew was awaiting protective gloves and boots in order to clean oil from the shoreline when an O'Brien's supervisor instructed Carias to force his "people to work without the PPEs." Carias refused. He was fired two days later. [*Id.* ¶ 5.]

Despite the near-constant presence of chemical dispersants in the air, numerous clean-up workers reported that respirators were never made available to them, even when the air reeked of oil or gas. [*See, e.g.*, Gill Decl. ¶ 4; Scott Decl. ¶ 4; Edwards Decl. ¶ 5.] This practice was contrary to the dispersant use requirements developed by Corexit's manufacturer, Nalco, which "require[] . . . personal protection equipment usage," including respirator masks. [Pl. Ex. 9 at 34:25-35:5; 105:11-17.] Respirator masks were neither provided to workers near the shoreline nor were they even supplied at the in-situ burn sites near the Macondo well. Ronnie Anderson was stationed at such a site in late May 2010 and he testified that he was not provided an "air protection device." [Anderson Aff. ¶ 3.] Another burn site worker, John Wunstell, testified that he was never provided "personal respiratory or closed air systems aboard the vessels." [Wunstell ¶ 4.] Wunstell became so ill during his employ at the burn site that he was airlifted to West Jefferson Medical Center for emergency treatment. [*Id.* ¶ 3.] He has never recovered from this illness.[13]

Not only was protective equipment in short supply or not provided, but, contrary to NCP requirements, proper safety training was also not always administered before clean-up workers commenced their hazardous duties. BP Deputy Incident Commander Ed Thompson explained

---

[13] OSHA guidelines state that respiratory protection "may be required if identified in a site-specific task hazard analysis." [Pl. Ex. 8 at 2.] Wunstell and Anderson were working on burn sites in close proximity to the Macondo well, where conditions were undoubtedly hazardous. That said, it is not known at this juncture whether a OSHA performed a site-specific analysis and, if it did, the results of that analysis. Plaintiffs respectfully request the opportunity to depose a knowledgeable OSHA employee in order to discover this relevant information.

that shortly after the spill, O'Brien's employee Vince Mitchell established the VoO program in the Houma ICP.  [Pl. Ex. 3 at 45:17-47:3.]  Mitchell failed to obtain OSHA approval for the program and, weeks later, was forced to modify the program based on OSHA concerns.  [*Id.* at 94:8-12, 148:5-11.]  As late as June of 2010, OSHA observed—and admonished response providers—for providing inadequate training; it subsequently ordered providers to double the standard training requirement.  [*See* Pl. Ex. 10.]  Other clean-up workers in south Louisiana independently testified that safety training either was not administered or that deployment site operators simply failed to adhere to the safety protocols set forth during training sessions.  [*See, e.g.*, Jackson Decl. ¶ 4; Lide Decl. ¶ 4.]

Finally, the record indicates that oversight problems arose with vessel decontamination sites, which were at times administered by private contractors such as Defendants O'Brien's and NRC.  BP's Operations Chief, Bob Pfannstiel, explained that if a vessel contacted oil on the water, decontaminated was required.  [Pl. Ex. 2 at 184:15-21.]  The evidence shows that there were times when this did not happen.  VoO participant Hoi Nguyen testified that his boat was washed when he finished skimming duty, but oil remained; he was nonetheless instructed to return to moorings.  [Pl. Ex. 11 at 68:13-69:16.]  Matthew Kissinger, BP's Branch Director of Logistics for the VoO program in Mobile, testified that he knew of instances in which vessels were not decontaminated promptly.  [Pl. Ex. 12 at 244:9-22.]  Operations summaries from as late as mid-June continued to remark that "[d]econ[tamination] remains a problem at every location" in Florida.  [Pl. Ex. 13 at BP-HZN-2179VOO00106079.]  Such evidence suggests that oiled vessels were not cleaned and were instead likely returned to "clean" waters.  The consequences to human health and the environment are obvious.

The reality is that although the FOSC and the National Incident Commander had ultimate, final decision-making authority, the spill response was nothing like the top-down, rigid hierarchy depicted in Defendants' briefing.  Rather, it was diffuse and involved thousands of decision-makers spread across several states.  This is not to say that the government lacked the power to make a particular decision, but simply to explain that the government did not, in fact, make many of the day-to-day decisions that private contractors were forced to make in order to combat the spill.  As BP's Operations Section Chief for the Mobile ICP acknowledged, "there were probably times that [responders] became overzealous or under-zealous, one of the two, and didn't do exactly what we'd ask them to do."  [Pl. Ex. 2 at 268:20-23.]

With limited discovery, Plaintiffs have already unearthed numerous instances of on-the-ground divergence from NCP protocol.  There is every reason to believe that a full discovery period will reveal more such evidence.

## PROCEDURAL POSTURE

Pursuant to Pretrial Order No. 25, Pleading Bundle B3 includes "all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  [Doc. 983 ¶ 1.]  Accordingly, the First Amended B3 Bundle Complaint asserts personal injury claims on behalf of the following individuals, all of whom allege exposure to harmful chemicals, odors, and emissions during the post-explosion remediation period: (1) vessel captains and crew that participated in BP's VoO program; (2) workers assigned to decontaminate oiled vessels; (3) vessel captains and crew that did not participate in the VoO program; (4) clean-up workers and beach personnel assigned to clean-up duties along the shoreline and intercoastal and intertidal

waters; and (5) Gulf residents who lived and/or worked in close proximity to coastal waters. [*See* First Amended B3 Bundle Complaint, Doc. 1812 ¶¶ 21-22.]  Plaintiffs asserted claims for negligence, negligence per se, products liability, nuisance, and battery.  Nalco and Clean-Up Responder Defendants moved to dismiss each of these claims.

On September 30, 2011, the Court issued an Order and Reasons on several motions to dismiss Plaintiffs' B3 Bundle Complaint.  *See In re Oil Spill by the "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2011 WL 4575696 (E.D. La. Sept. 30, 2011) (hereinafter "B3 Order").  The Court held that maritime law preempted state law and governed Plaintiffs' claims for negligence, negligence per se, products liability, nuisance, and battery.  *Id.* at *3.  Further, the Court ruled that Plaintiffs stated viable claims for relief for negligence, products liability, and gross negligence.  *Id.* at *9-10.  The Court also recognized the availability of medical monitoring relief as an element of damages.  *Id.* at *8-9.  The Order dismissed Plaintiffs' claims, however, for negligence per se, nuisance, and battery, but specifically afforded Plaintiffs the opportunity to amend their negligence per se claim.[14]  *Id.* at *10-11.

The B3 Order rejected without prejudice two defenses raised by Clean-Up Responder Defendants in their motions to dismiss—derivative immunity and preemption.  The Court also denied without prejudice Nalco's preemption defense.[15]  *Id.* at *3-8.  Defendants thereafter requested the opportunity to conduct limited discovery related to these defenses and Magistrate

---

[14] Plaintiffs' negligence per se claim is not directed against any of the Clean-Up Responder Defendants.  Nonetheless, Plaintiffs attempted to amend the negligence per se claim in the proposed Second Amended B3 Bundle Complaint, [*see* Doc. 5718-1 ¶¶ 206-212], but the motion to amend was denied for reasons discussed below.  Plaintiffs respectfully request the opportunity to amend this claim pursuant to the guidance set forth in the Court's B3 Order.

[15] Nalco did not raise an immunity defense to Plaintiffs' negligence and gross negligence claims.  [*See* Doc. 1409 ¶ 2.]  For this reason, the Court's limited discovery Order did not permit Nalco to conduct discovery or brief any defense other than its preemption defense.  [*See* Doc. 5000.]  Further, because Nalco did not raise this defense, it is waived.

Judge Shushan issued an Order providing for such discovery. [Doc 5000]  The discovery Order permitted written discovery to "develop[] facts necessary for Nalco and the Clean-Up Responders to file motions renewing their preemption/derivative immunity arguments." [*Id.*]  It also provided for limited Rule 30(b)(6) depositions and permitted Defendants to enter into stipulations with the government.  It was not contemplated, however, that Plaintiffs would be permitted to test the veracity of the stipulations by deposing any government officials.

The discovery Order set a briefing schedule that stretched into the spring of 2012.  On February 16, 2012, however, Plaintiffs filed a motion to amend the First Amended B3 Bundle Complaint. [Doc 5718]  Plaintiffs moved to, *inter alia*, dismiss Nalco and the Clean-Up Responder Defendants without prejudice and proceed solely against Drilling Defendants.  [*Id.*]  Based on this strategic decision, and in the interest of judicial economy, Plaintiffs did not continue to pursue discovery against either Nalco or the Clean-Up Responder Defendants.

Nalco and the Clean-Up Responder Defendants opposed Plaintiffs' motion to amend and requested either (1) the right to brief their defenses on the merits, or (2) dismissal with prejudice.  On April 16, 2012, the Court issued an order denying Plaintiffs' motion to amend and setting a schedule to brief Defendants' derivative immunity and preemption defenses. [Doc 6247]  The instant motion practice followed.

## **ARGUMENT**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When the court evaluates the summary judgment record, "all evidence and facts must be viewed must be viewed in the light

23

most favorable to to the non-movant." *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir. 2006).

Two additional points concerning review of the summary judgment record bear emphasizing in this case:

**The Court has discretion to deny summary judgment where there are sound reasons to permit further development of the factual record.** The Supreme Court has counseled that "trial courts should act with . . . caution in granting summary judgment," and has advised that summary judgment may be denied, even on a properly supported motion, "where there is reason to believe that the better course would be to proceed to a full trial." *Liberty Lobby*, 477 U.S. at 255 (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948)). Plaintiffs by no means concede that Defendants' motions are properly supported, but the word of caution is applicable here. Motion practice is proceeding on an incomplete summary judgment record. Defendants expressly rely on "facts" concerning the government's conduct when Plaintiffs have had no opportunity to contest those "facts" by deposing the government decision-makers. The massive undertaking that was the *Deepwater Horizon* spill response deserves a more complete discovery period before the spill responders' liability is determined on the merits.

The Fifth Circuit has recognized that in certain instances—where the judge has doubts regarding a premature summary judgment grant, for instance—it is appropriate to deny a motion for summary judgment even where the movant has carried its burden. *See Veillon v. Exploration Servs., Inc.*, 876 F.2d 1197, 1200 (5th Cir. 1989) (affirming summary judgment grant and stating that "[a] district judge has discretion to deny a Rule 56 motion even if the movant otherwise successfully carries its burden of proof if the judge has doubt as to the wisdom of terminating the case before trial"); *see also Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (per curiam)

24

(affirming trial court and attaching its opinion, which held that "even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial'" (quoting *Liberty Lobby*, 477 U.S. at 255-56)).  This is particularly true where there is good reason to allow the parties to fully develop the record. *Marcus v. St. Paul Fire & Marine Ins. Co.*, 651 F.2d 379, 382 (5th Cir. 1981) ("Even if St. Paul were entitled to summary judgment, the sound exercise of judicial discretion dictates that the motion should be denied to give the parties an opportunity to fully develop the case.").

Other circuit courts of appeal echo the Fifth Circuit's sentiment.  *See, e.g., Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285-86 (11th Cir. 2001) (explaining that "'even in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial'" (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)); *Little Six, Inc. v. United States*, 280 F.3d 1371, 1373 (Fed. Cir. 2002) (stating that "the trial court has discretion to deny a motion for summary judgment").

In sum, the district court has discretion to proceed carefully on an incomplete summary judgment record.  Even if the Court finds that Defendants carried their burden on the limited record before it, the Court should nonetheless exercise its discretion in such a complex matter and allow Plaintiffs the opportunity to develop the facts necessary to sufficiently defend their position.

**The Court has discretion not to consider the stipulations entered between the government and Defendants, and should exercise this discretion when deciding the instant motion.**  Stipulations typically may be regarded as admissions by a court deciding a summary judgment motion.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Adherence to stipulated facts, however, "is

not categorical." *In re Durability Inc. v. Sovereign Life Ins. Co. of Cal.*, 212 F.3d 551, 555 (10th Cir. 2000).  As the Tenth Circuit Court of Appeals has explained,

> Stipulations are entered into in order to dispense with proof over matters not in issue, thereby promoting judicial economy at the convenience of the parties. Courts thus enforce stipulations as a general rule, absent circumstances tending to negate a finding of informed and voluntary assent of a party to the agreement.

*Id.* (citing *United States v. Montgomery,* 620 F.2d 753, 757 (10th Cir. 1980)).

Here, Defendants use of stipulations entered with the government is manifestly unfair. Plaintiffs were not a party to the stipulations, did not assent to them, and, indeed, objected to the proposed stipulations during the limited discovery period.  More importantly, Plaintiffs have not been permitted to test the veracity of the stipulations through deposition testimony.[16]  Thus, the stipulations rely upon "factual" assertions that are not available to Plaintiffs.  *See* Fed. R. Civ. P. 56(d) (explaining that the court may permit further discovery when a motion for summary judgment relies upon facts not available to the non-movant).  In the interest of fairness, the Court should not consider the joint stipulations on this motion, *see In re Durability, Inc.*, 212 F.3d at 556 (explaining that courts should exercise discretion to ensure that admission of stipulated facts does not promote injustice).

Clean-Up Responder Defendants move for summary judgment on three grounds: absolute immunity, discretionary function immunity, and preemption.  Nalco moves for

---

[16] Defendants cite to no case law that would permit a defendant to stipulate to otherwise discoverable facts with a third party and thereby satisfy its summary judgment burden.  This Court should be wary of rendering conclusive findings of liability under such circumstances, especially given the magnitude and complexity of the instant MDL.

summary judgment solely on preemption grounds.[17]   Plaintiffs will address each of these

defenses in turn

## I.   CLEAN-UP RESPONDER DEFENDANTS ARE NOT ENTITLED TO DERIVATIVE IMMUNITY UNDER *YEARSLEY*

The CWA, as amended by the OPA revisions, provides the federal government immunity

for its conduct during an oil spill response.  33 U.S.C. § 1321(j)(8).  Such immunity does not

extend to Clean-Up Responder Defendants, especially where, as here, the summary judgment

record contains evidence of widespread contractor negligence and conduct that contravened

government authorizations.   In short, the Court should reject the Clean-Up Responder

Defendants' attempt to avail themselves of the government's immunity.

In *Yearsley v. W.A. Ross Construction Co.*, the Supreme Court conferred immunity on a

government contractor hired to build dikes in the Missouri River pursuant to an Act of Congress.

309 U.S. 18 (1940).   The Court held that where the government authorized and directed the

---

[17] At the conclusion of its summary judgment brief, Nalco also moves for summary judgment based on derivative immunity under *Yearsley*.  It does so by adopting Clean-Up Responder Defendants' arguments and contending that it acted within the scope of authority conferred by the federal government.  As explained above, Nalco waived this defense by neglecting to raise it on motion to dismiss.  Furthermore, the Court did not permit Nalco the opportunity, in its limited discovery order, to brief this defense.  Therefore, the Court should reject Nalco's attempt to piggyback off of Clean-Up Responder Defendants' immunity defense.  Moreover, during the limited discovery period, Plaintiffs propounded interrogatories and requests for admission that sought to discover evidence relevant to a potential Nalco derivative immunity defense.  Counsel for Nalco, however, actively rejected Plaintiffs' effort to conduct such discovery, explaining that Nalco had not asserted an immunity defense on motion to dismiss and would not be doing so on motion for summary judgment.  Plaintiffs took Nalco at its word and withdrew requests directed at immunity considerations.  Nalco continued to impede any attempt to discover evidence related to an immunity defense during the Rule 30(b)(6) deposition of Manian Ramesh.  Counsel for Nalco repeatedly lodged scope objections and emphasized that Mr. Ramesh's deposition was limited to preemption issues.  [*See* Pl. Ex. 9 at 24:6-10, 55:22-56:11; *see also* 56:19-24 (acknowledging that deposition is limited to preemption defense by Court order).]  Because it willingly limited its defenses—and obstructed Plaintiffs attempts to discover evidence unrelated to a preemption defense—the Court should not permit Nalco to raise an immunity defense at this time.  Instead, it should deny Nalco's motion for summary judgment on derivative immunity grounds.

activity in question, plaintiffs' suit was functionally one asserting government fault. *Id.* at 20-21. *Yearsley* thus provides absolute immunity to a contractor when its acts are, essentially, those of the government. *Id.*; *see also In re KBR, Inc.*, 736 F. Supp. 2d 954, 966 (D. Md. 2010) (interpreting *Yearsley*). To qualify for such immunity, a contractor defendant must demonstrate that (1) it did not exceed the scope of its government-conferred authority, and (2) its authority was validly conferred by the government. *Yearsley*, 309 U.S. at 20-21.

In the seventy-plus years since the *Yearsley* decision, it has not been often invoked successfully to shield private parties from fault. Indeed, extending immunity to private parties poses significant societal risk; those that need not worry about the ramifications of their conduct are less likely to conform it to a reasonable standard of care. As the Fourth Circuit has aptly explained, protecting government contractors with absolute immunity "has its costs, since illegal and even offensive conduct may go unredressed." *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1446-47 (4th Cir. 1996). "Such immunity also tends to undermine the basic tenet of our legal system that individuals be held accountable for their wrongful conduct." *Id.* Any court should accordingly tread carefully before extending absolute immunity to non-governmental entities.

*Yearsley* first requires that the contractor defendant did not exceed the scope of its government-conferred authority. Clean-Up Responder Defendants argue that they "acted pursuant to the authorization, direction, and ultimate control of the federal government and did not exceed or disobey the government's directives." [Doc. 6545 at 31.] But even the limited summary judgment record demonstrates that this is not indisputably true. The government did not authorize application of dispersant spraying within three miles of the Gulf shoreline; indeed, it explicitly forbade it. Yet multiple plaintiffs provided testimony asserting that they were

standing on or near the shoreline when they were sprayed with dispersant by an airplane passing overhead.   Any such conduct by definition exceeded the scope of Clean-Up Responder Defendants' authority.[18]

Plaintiffs' evidence does not end here.   Clean-Up Responder Defendants were not permitted to apply dispersant aerially at night.   There is testimony that they did so.   Dispersant was not to be sprayed over top an in-situ burn site.   There is testimony that it was.   Clean-Up Responder Defendants were required to outfit clean-up workers with protective gear that met OSHA protocols.   There is evidence that clean-up workers went unequipped, even at the burn sites in close proximity to the still-gushing Macondo well.   Decontamination sites failed to properly decontaminate oiled vessels.   And finally, safety training courses were to meet standards imposed by OSHA.   There is evidence that at least one Defendant, O'Brien's, provided a course for weeks that did not do so.   The sum of this evidence not only suggests that there were instances in which Clean-Up Responder Defendants exceeded the scope of authority or acted negligently; but it also suggests that such behavior was commonplace among the private contractors participating in the massive spill response.   And it is precisely because of such commonplace misbehavior that the Court should refrain from extending absolute immunity to Clean-Up Responder Defendants for spill response activities.   In light of the limited record evidence produced thus far, it is apparent that a broad immunity grant runs the significant risk that "offensive conduct may go unredressed."   *Mangold*, 77 F.3d at 1446-47.

---

[18] Defendants may contend in reply that plaintiffs' testimony does not specify which contractor was at fault for each incident of unauthorized dispersant application.   But such a contention merely highlights the need for a more complete discovery period to fill these gaps in the record. As it now stands, the evidence shows that unauthorized spraying occurred on multiple occasions. Plaintiffs respectfully suggest that an appeal to the doctrine of *res ipsa loquitur* should satisfy the Court until a more thorough account is possible.

Even if the Court finds that Clean-Up Responder Defendants did not exceed the scope of their authority, however, they have failed to come forth with indisputable evidence that the government's authority was validly conferred.  In *Yearsley*, the defendant seeking immunity was a government contractor performing contract work that was clearly defined by an Act of Congress.  *Yearsley*, 309 U.S. at 20.  Similarly, in the Fifth Circuit's recent decision in *Ackerson v. Bean Dredging LLC*, the immunized defendants contracted with the government to dredge the Mississippi River Gulf Outlet.  589 F.3d 196, 202 (5th Cir. 2009).  In both instances—and, indeed, in nearly every decision applying *Yearsley* to immunize a private entity—the defendant-contractor acted pursuant to a contractual relationship entered with the government that clearly delineated the action to be performed.  *See also, e.g.*, *In re KBR*, 736 F. Supp. 2d at 956.

Here, none of the Clean-Up Responder Defendants contracted with the government. Several contracted directly with BP; others were sub-contractors of BP's contractors. Furthermore, the contracts do not set forth specific duties or projects, as did those in *Yearsley* and *Ackerson*.  They are, rather, general services contracts.  Therefore, while it is true that the contractors' relationship need not meet the definition of legal agency, *see Ackerson*, 589 F.3d at 205, a contractor must perform duties pursuant to a precise government directive in order to obtain the absolute immunity that *Yearsley* provides.  *See Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989) (explaining that where the contractor's actions are not specifically approved by the government, the immunity defense does not apply); *Loper v. Rapp Hydema U.S., Inc.*, No. 1:09CV692, 2010 WL 4063486, at *3 (S.D. Miss. Oct. 15, 2010) (holding that contract setting forth general product specifications and requiring product delivery did not immunize contractor decision to ship product in specific, contractor-selected manner).

30

Respectfully, no court has issued a *Yearsley* decision in which the parties seeking immunity are as attenuated from the government as the Clean-Up Responder Defendants, most of whom were acting pursuant to a general services contract with a private oil company. Yet Defendants claim to have satisfied *Yearsley*'s requirement based on the fact that the FOSC legally "directs" the spill response under the NCP. That response was massive and diffuse. The FOSC did not, in reality, "direct" every Responder action. BP "directed" many. Simply put, it is not enough under current case law to extend a rarely-applied immunity defense to a diffuse collection of contractors based on the truism that the FOSC legally "directed" the response. Defendants must show that the government validly conferred response authority to each Clean-Up Responder Defendant in a precise manner. Otherwise, the risk that "offensive conduct may go unredressed," is simply too significant.[19] *See Mangold*, 77 F.3d at 1446-47.

Finally, the text of the CWA itself suggests that the Clean-Up Responder Defendants are not legally entitled to immunity. Specifically, § 1321(c)(4)(A) of Title 33 shields spill responders from certain liability for defined clean-up costs under specific circumstances:

> A person is not liable for removal costs or damages which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice consistent with the National Contingency Plan or as otherwise directed by the President relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance.

The exemption, however, contains carve-outs under which it is inapplicable. Notably, the liability exemption is not available to, *inter alia*, personal injury or wrongful death claims, or to

---

[19] It is debatable whether Clean-Up Responder Defendants even fall within the class of contractors capable of reasonably invoking the *Yearsley* defense. Defendants are clearly not government contractors; some are not even BP contractors. As a defense available to contractors of the government, it seems bizarre to extend derivative immunity to entities so far removed from the contractual relationship. Such an extension is likely to invite abuse—parties may contract with entities known to be careless but cheap. The Court should hesitate to test these waters, especially on an incomplete factual record.

instances where the responder is grossly negligent or engages in willful misconduct.  33 U.S.C. § 1321(c)(4)(B).  Nearly all of the B3 Plaintiffs contend that they were personally injured by Clean-Up Responder Defendants' negligence and gross negligence; such claims squarely fall within the statutory carve-out at § 1321(c)(4)(B).  A holding that the Clean-Up Responder Defendants are immune as a matter of law would nullify the liability exemption carve-outs that Congress carefully placed within the statute.  This cannot be what Congress intended.  Instead, it intended for responders to stand to account for the injuries caused by their negligence causes. The Court should not nullify this intention by immunizing the Clean-Up Responder Defendants' injury-causing conduct.

## II.   CLEAN-UP RESPONDER DEFENDANTS ARE NOT ENTITLED TO DERIVATIVE DISCRETIONARY FUNCTION IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT

Under the Federal Tort Claims Act ("FTCA"), the government has waived its sovereign immunity for torts committed by its employees.  28 U.S.C. § 2674.  There are a number of exceptions to this rule, including what is called the "discretionary function exception."  *Id.* § 2680(a).  The discretionary function exception bars tort claims against the federal government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  *Id.*

By its very nature, the discretionary function exception protects only government actors exercising discretion to perform government activity.  Indeed, the FTCA excludes independent contractors from its scope.  *See In re KBR*, 736 F. Supp. 2d at 963-64.  Here, the private contractors and sub-contractors that contracted with BP are not, by definition, government actors.  They are simply excluded from the FTCA's protective umbrella.

More importantly, however, Defendants cannot avail themselves of the discretionary function exception because their entitlement to *Yearsley* immunity has not been established. [*See* Clean-Up Responder Defendants' Joint Memorandum in Support of Motions for Summary Judgment, Doc. 6545 at 33-34 (acknowledging that derivative immunity analysis under the FTCA is ultimately governed by *Yearsley*).]   And, as explained in the Court's B3 Order, evidence that Defendants exceeded the scope of their conferred authority is fatal to this defense. *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 2011 WL 4575696, at *6.   Accordingly, because Clean-Up Responder Defendants have not met the requirements for absolute immunity under *Yearsley*; their claim for derivative immunity under the FTCA, which subsumes the *Yearsley* analysis and requires more, necessarily fails as a matter of law.

## III.   DEFENDANTS ARE NOT ENTITLED TO A PREEMPTION DEFENSE

The Constitution's Supremacy Clause elevates federal law above that of the states, U.S. Const. art. VI, cl. 2, providing Congress with the power to preempt state legislation if it so intends.  At all times, preemption turns congressional intent.  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

Preemption may be express or implied.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).  Express preemption occurs when a federal enactment contains an express preemption provision.  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001).  An enactment without an express preemption provision may nonetheless override non-federal law by implication.  Congress may pass a statutory regime so pervasive that it intends federal law to "occupy the field," leaving no room for non-federal regulation.  *United States v. Locke*, 529 U.S. 89, 111 (2000).  This is called 'field preemption.'  Implied conflict preemption occurs when Congress enacts legislation that conflicts with non-federal law in a fundamental way.  Thus,

33

courts have found implied conflict preemption where the existence of a federal law makes it impossible to comply with both state and federal requirements, or where a state law's conflict with federal law makes the state law an obstacle to the achievement of the federal law's purposes and objectives. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *see also Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002).

None of the moving Defendants raise an express preemption defense. Rather, Defendants contend that non-federal tort liability is preempted by implication under the OPA/CWA statutory spill response scheme. If Defendants are correct, it means that states are powerless to vindicate the rights of citizens injured because of a private contractor's negligence during an oil spill response. Such a finding would represent a significant intrusion upon the police powers traditionally reserved to states. As the Supreme Court has advised, however, a state's police powers are "not to be superseded by [] Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2008) (internal quotations omitted). Indeed, courts have consistently held that in areas of traditional state authority, there is a "presumption against preemption." *Cipollone*, 505 U.S. at 516. Sea-to-shore pollution response is an area that has historically fallen within the police powers of the state and, as a result, the presumption against preemption must be overcome before Defendants may prevail on their instant defenses. *See, e.g.*, *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 605 (D. Del. 2011) (citing cases).

There is an additional reason for the Court to view the defense skeptically: Defendants contend that the CWA and the OPA, two federal environmental statutes, have preemptive effect—by implication—over non-federal tort liability. But environmental laws have typically been construed as non-preemptive in nature. *See* H.R. Rep. No. 101-242, pt. 2, Committee on

Merchant Marine and Fisheries, at 150 (Sept. 18, 1989) (detailing the "longstanding tradition that Federal environmental laws should not preempt state laws" and surveying federal environmental laws that lack preemptive effect).

In short, Defendants must meet a significant two-fold burden to overcome both the presumption against preemption and the traditional respect for state law in the environmental arena.  On the record before the Court, Defendants cannot do so.

### A.    Plaintiffs' Claims Are Not Barred By Principles of Field Preemption

Defendants, particularly MSRC, contend that the OPA/CWA and NCP "set forth a comprehensive and pervasive regime which squarely placed the responsibility for the clean-up effort upon the federal government, pre-empting the field from other state and local regulations in this area."  [Doc. 6547-1 at 16.]  This Court has already held the opposite.  In its Order resolving the motions to dismiss the B1 Bundle, the Court explained that "it does not appear that Congress intended to occupy the entire field governing liability for oil spills."  *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 808 F. Supp. 2d at 961 (interpreting preemptive scope of the OPA).  The law of the case therefore dictates that Defendants' field preemption claims be rejected.

Furthermore, the fact that Congress included multiple savings clauses in both the OPA and the CWA is strong evidence it did not intend to occupy the field.  *See In re FEMA Trailer Formaldehyde Prods. Liability Litig.*, 620 F. Supp. 2d 755, 762 (E.D. La. 2009) (Engelhardt, J.) (finding no field preemption under Manufactured Home Construction and Safety Standards Act when statute contained a savings clause, and explaining, "[t]he presence of a savings clause suggests that the legislature did not intend to occupy the field"); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987) (holding that a savings clause "negates the inference" that

Congress intended to occupy the relevant field).   As explained above, the OPA expressly preserves both state and maritime law, *see* 33 U.S.C. § 2718(a), (c); the CWA contains its own savings clause, explicitly emphasizing that "local authority is not preempted," 33 U.S.C. § 1321(o).   Congress could not have been more clear: it did not intend to displace the traditional police power of the states and preempt non-federal law.

> ### B.     Neither Clean-Up Responder Defendants Nor Nalco Are Entitled to the Defense of Implied Conflict Preemption

Implied conflict preemption serves as a defense to non-federal liability where it is impossible to comply simultaneously with federal and non-federal law, or where the non-federal requirement conflicts with the goals of a federal enactment.   *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).   Courts have recognized that implied conflict preemption carries inherent interpretive risks for a judicial decision-maker, risks that therefore necessitate a cautionary, text-based approach.   Indeed, the Supreme Court has warned that "courts should not lightly infer pre-emption," *Oulette*, 479 U.S. at 491, and emphasized just last Term that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'"   *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (opinion of Roberts, C.J., and three other Justices).

In other words, the goals and policies of the federal enactment, though important, cannot be divorced from text of the statute in an implied conflict preemption analysis.   Defendants' briefing, however, is long on the policy objectives underlying the NCP and the general proposition that the FOSC "directed" and "oversaw" the massive spill response; Defendants give short shrift to the text of the OPA and CWA, and the preeminence of that text in any preemption analysis.   Several sections of Defendants' collective briefing, in fact, read as if the mere

36

existence of a comprehensive federal spill response scheme *necessarily* displaces state remedies. The Supreme Court has rejected such a perspective and this Court accordingly should not afford undue weight to the existence of a comprehensive federal spill response framework. *English*, 496 U.S. at 87 ("[T]he mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies"); *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 415 (1973) (refusing to accept the contention that "pre-emption is to be inferred merely from the comprehensive character of the federal [program]").

Plaintiffs have set forth the OPA and CWA savings clauses above, but they bear repeating because the statutory text, ultimately, is "the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Section 2718(a) of Title 33, clearly entitled "*Preservation of State authorities*," explains that nothing in the OPA shall be "construed or interpreted as preempting, the authority of a State" to impose additional liability for oil spill response activities. 33 U.S.C. § 2718(a) (emphasis added). Section 2751(e)(1) of the same Act, entitled "*Savings Provisions*," plainly states that admiralty and maritime law are unaffected by the passage of the OPA and its amendments. 33 U.S.C. § 2751(e)(1) (emphasis added). Finally, § 1321(o) of Title 33 of the CWA is clear: "Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substances into any waters within such State, or with respect to any removal activities related to such discharge." The statutory text, as well as the presence of multiple savings clauses, is unmistakable: Congress intended to preserve non-federal spill response liabilities. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002) (stating that a "savings clause assumes that there are some significant number of common-law

liability cases to save" (internal quotations omitted).  The Court need go no further than the text to reject Defendants' claims.[20]

With respect to the Clean-Up Responder Defendants, the statutory text of the CWA goes even further.   Section 1321(c)(4) exempts responders from certain specified response costs related to oil removal activities.   33 U.S.C. § 1321(c)(4).   Subsection (B)(iii)-(iv) of that provision, however, explains that this statutory exemption does not apply to "personal injury or wrongful death" claims, or "if the person [responder] is grossly negligent or engages in willful misconduct."   *Id.* § 1321(c)(4)(B)(iii)-(iv).   These are precisely the types of claims pressed by Plaintiffs in the instant matter.   The claims are expressly preserved by § 1321(c)(4) and, as such, the Court should reject Clean-Up Responder Defendants' preemption claims.

Clean-Up Responder Defendants largely ignore the statutory text, relying instead on the general assertion that it would have been impossible to comport with the standard of care demanded by tort law while simultaneously complying with the dictates of the CWA, the OPA, and the NCP.   Such a contention is without merit.   No federal regime directed Defendants to negligently spray dispersant across the shoreline or atop burn sites, to improperly equip workers likely to be exposed to hazardous oil and chemicals, or to haphazardly administer

---

[20] When interpreting the preemptive scope, if any, of a federal statute, "Congress's 'authoritative statement is the statutory text, not the legislative history.'"   *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1980 (2011) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)).   But in this case, the legislative history underlying passage of the OPA—and amendment of the relevant portions of the CWA—bolsters Plaintiffs' arguments and reinforces what the text lays bare.   Passage of comprehensive oil spill liability reform was delayed over a decade by legislative disagreement on the scope of preemption.   When Congress finally enacted the OPA in response to the *Exxon Valdez* spill, it rejected the language favored by pro-preemption legislators and, instead adopted the language supplied by those who wished to preserve non-federal tort liabilities.   This legislative history is set forth in more detail in Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss Bundle B1 First Amended Master Complaint, Cross-Claim, and Third-Party Complaint [*See* Doc. 1821]   Plaintiffs incorporate that portion of the Memorandum by reference and adopt its arguments counseling against preemption.

decontamination sites.  What Clean-Up Responder Defendants seem to be requesting is carte blanche to ignore the standard of care simply because they are responding to a spill event.  This is a novel concept, but one not adopted by Congress.   Further, were the Court to countenance this position, the incentives for private contractors to provide ever poorer service at cheaper cost would inevitably result.  Negligence for personal injury, in other words, would be completely immunized simply because the government, at some level of generality, "directs" the spill response.  This cannot be—and is not—what Congress intended.  And it is a thin reed indeed, utterly divorced from the statutory text, to displace the presumption against preemption.

Nalco, unlike the Responder Defendants, did not actively participate in the spill response. Rather, it supplied its chemical dispersant product, Corexit, for use therein.  Plaintiffs contend that the dispersant chemical was defective and Nalco should be held to account for the harmful effects its product caused.  Nalco attempts to shield itself from tort liability by pointing to the fact that Corexit was pre-approved for use under 33 U.S.C. § 1321(d)(1), a provision that requires the NCP to include a schedule of "dispersants, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan."  Nalco, like the Clean-Up Responder Defendants, ignores the savings provisions located in the CWA and the OPA that expressly preserve non-federal tort liability; indeed, nowhere in its brief does it even acknowledge these provisions, as if they were inconvenient truths.

Even so, the statutory and regulatory framework fails to demonstrate clearly that Congress sought to displace the presumption against preemption by enacting this provision.  *See United States v. Texas*, 507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law").  First, the text of § 1321(d)(1) is flexible and permissive: it *permits* pre-approval of dispersants that "*may* be used

in carrying out the Plan."   33 U.S.C. § 1321(d)(1)(emphasis added).   This language requires nothing of any relevant actor.   It certainly does not require the use of *Nalco*'s dispersant.   It simply preserves a list of options for later use.   *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001) (finding no preemption where defendant could have used one of several federally approved products, and chose a dangerous product, but was not *required* to do so).

The regulations promulgated pursuant to the CWA, however, are clearer still, explaining that "[t]he listing of a product on the NCP Product Schedule does not constitute approval of the product."[21]   *Id.* § 300.920(e); *see also O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 758 (5th Cir. 2007) (explaining that "[f]ederal regulations can have a preemptive effect equal to that of federal laws").   The EPA, unlike Nalco, apparently accepts the words of the NCP regulation at face value and does not itself contend that the CWA (or regulations promulgated thereto) preempts non-federal tort liabilities.[22]   This is important, for "the agency's own views should make a difference" in these inquiries.[23]   *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1139 (2011) (internal quotation omitted) (affording deference to agency view that regulation did not preempt state law).   The Court should hold that this regulatory language, coupled with that in the CWA and the OPA, is dispositive of the inquiry.

---

[21] This is another inconvenient provision that receives no mention or acknowledgement in Nalco's brief.

[22] *See* Sharkey, *Inside Agency Preemption*, *supra* note 4, at 566-570 (surveying EPA views on preemption under the CWA and explaining that according to the EPA, only one rule promulgated pursuant to the CWA has the effect of preempting state law—the Uniform National Discharge Standards for Vessels of the Armed Forces).

[23] The EPA has also not expressed the view, before this Court, that the CWA preempts non-federal products liability regimes.   In *Williamson v. Mazda Motor of America, Inc.*, the Justices found an agency's litigation position to be telling.   *Williamson*, 131 S. Ct. at 1139.   It is at least instructive here, especially in light of the additional evidence supporting a non-preemptive scope.

Furthermore, in light of a regulatory provision expressly disavowing agency approval, it is difficult to argue, as Nalco does, that non-federal products liability law stands as an obstacle to operation of the federal regime.  It is, after all, the federal regulator that has expressly stated that products listed on the NCP are not approved by the agency.  Neither does implied conflict preemption shield Nalco's product, for it is not impossible to comply with a non-federal duty of care and the CWA.  Rather, to comply, Nalco need only refrain from submitting dangerous or defective products for pre-approval.

In many ways, Nalco's proposed defense is similar to that raised by defendants in the "MTBE" litigation in the Southern District of New York.  *See In re MTBE*, 175 F. Supp. 2d 593. There, defendants chose to oxygenate gasoline products using MTBE, one of a small number of federally approved oxygenates.  *Id.* at 614.  Defendants similarly raised an implied conflict preemption defense, contending that because the government had approved its product, a state-law products liability remedy would, if successful, pose an intractable obstacle to achievement of federal purposes.  *Id.*  The court rejected defendants' argument, holding that government "approval" of MTBE did not end the preemption inquiry.  Rather, the court emphasized that defendants' use of MTBE was permissive, not mandatory, and that alternatives to MTBE existed and could have been utilized.  *Id.* at 615-16.  In much the same way, Nalco's decision to list its dispersant chemical was entirely permissive; safer alternatives to Corexit existed; and here, unlike *In re MTBE*, the regulatory provision governing Corexit's inclusion on the NCP expressly disavows agency approval.  This final point arguably provides greater justification to reject the preemption defense here than in *In re MTBE*.  The pertinent takeaway, however, is that the mere fact of federal approval does not logically lead to implied preemption.

41

Finally, as a matter of fact, it is clear that Nalco did not fulfill its obligations under the NCP and, as a result, it should not be protected from liability. The NCP requires a dispersant manufacturer to submit recommended dispersant "application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of pollutants, and any other application restrictions." *Id.* § 300.915(a)(6). In the limited discovery conducted thus far, there is evidence that Nalco determined that some level of respiratory protection was necessary for application of Corexit. [*See* Pl. Ex. 9 at 46:17-52:20.] Nalco's 30(b)(6) deponent acknowledged, however, that the company never transmitted this information to the government. [*Id.* at 52:17-52:20.] As a matter of fact, therefore, Nalco did not submit recommended "conditions for [Corexit] use," as required by § 300.915(a)(6). Alternatively, this concession by Nalco's agent creates a dispute of fact for which full discovery should be permitted. Because Nalco failed to comply with the applicable regulations, and because the regulations explicitly disavow any preemptive effect, Nalco is not entitled to a preemption defense as a matter of law.

## IV.  THE COURT SHOULD PERMIT PLAINTIFFS LEAVE TO AMEND IN ORDER TO NAME LYNDEN AIR CARGO, LLC AS A DEFENDANT IN THIS MATTER

Defendant Lynden, Inc. moves for dismissal on the ground that the Court lacks personal jurisdiction. The First Amended B3 Bundle Complaint names Lynden and alleges that Lynden participated in the spill response. According to Lynden's motion for summary judgment, this assertion is factually erroneous. Lynden, Inc. took no part in the spill response, though Lynden's subsidiary, Lynden Air Cargo, LLC, was involved in the application of dispersant. During briefing on Clean-Up Responder Defendants' motions to dismiss, Plaintiffs requested—and were granted—the opportunity to conduct limited discovery to determine whether Lynden Air Cargo, LLC is an alter ego of Lynden, Inc. *See In re Oil Spill by the Oil Rig "Deepwater Horizon,"*

2011 WL 4575696, at *12.  Plaintiffs acknowledge that they never conducted such discovery—in part because they made the strategic decision in February 2012 to dismiss Lynden, Inc. from the case without prejudice.  Because Plaintiffs' motion to amend was denied, Plaintiffs respectfully request an extension of time within which to conduct jurisdictional discovery on the alter ego claim.

In the alternative, Plaintiffs request the opportunity to amend the First Amended B3 Bundle Complaint in order to name the proper defendant—Lynden Air Cargo, LLC.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that leave to amend should "be freely given when justice so requires").  If Lynden's factual allegations are correct, Plaintiffs simply named the improper defendant.  Lynden Air Cargo, LLC has not been prejudiced and, indeed, Plaintiffs presented their claims against Lynden Air Cargo by naming "Defendants A-Z" in the First Amended B3 Bundle Complaint.  Accordingly, Plaintiffs respectfully request permission to conduct jurisdictional discovery or amend the B3 Complaint.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions for summary judgment.

This 17th day of June, 2012.


Respectfully Submitted,


| | |
|---|---|
| */s/ Stephen J. Herman* | */s/ James Parkerson Roy* |
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN & KATZ LLC | DOMENGEAUX WRIGHT ROY & |
| 820 O'Keefe Avenue | EDWARDS LLC |
| New Orleans, Louisiana 70113 | 556 Jefferson Street, Suite 500 |
| Telephone: (504) 581-4892 | Lafayette, Louisiana 70501 |

Fax No. (504) 569-6024                      Telephone: (337) 233-3033
E-Mail: sherman@hhkc.com                    Fax No. (337) 233-2796
                                            E-Mail: jimr@wrightroy.com

*Co-Liaison Counsel*                        *Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Joseph F. Rice                              Conrad S.P. "Duke" Williams
MOTLEY RICE LLC                             WILLIAMS LAW GROUP
28 Bridgeside Blvd.                         435 Corporate Drive, Suite 101
Mount Pleasant, SC 29464                    Maison Grand Caillou
Office:  (843) 216-9159                     Houma, LA 70360
Telefax: (843) 216-9290                     Office:  (985) 876-7595
E-Mail:  jrice@motleyrice.com               Telefax: (985) 876-7594
                                            E-Mail:  duke@williamslawgroup.org

Brian H. Barr                               Robin L. Greenwald
LEVIN, PAPANTONIO, THOMAS,                  WEITZ & LUXENBERG, PC
MITCHELL, ECHSNER & PROCTOR, PA             700 Broadway
316 South Baylen St., Suite 600             New York, NY  10003
Pensacola, FL 32502-5996                    Office:  (212) 558-5802
Office:  (850) 435-7045                     Telefax: (212) 344-5461
Telefax: (850) 436-6187                     E-Mail:  rgreenwald@weitzlux.com
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit                            Rhon E. Jones
BREIT DRESCHER IMPREVENTO &                 BEASLEY, ALLEN, CROW, METHVIN,
WALKER, P.C.                                PORTIS & MILES, P. C.
999 Waterside Drive, Suite 1000            218 Commerce St., P.O. Box 4160
Norfolk, VA 23510                           Montgomery, AL 36104
Office:  (757) 670-3888                     Office:  (334) 269-2343
Telefax: (757) 670-3895                     Telefax: (334) 954-7555
E-Mail: jbreit@bdbmail.com                  E-Mail:  rhon.jones@beasleyallen.com

Elizabeth J. Cabraser                       Matthew E. Lundy
LIEFF, CABRASER, HEIMANN &                  LUNDY, LUNDY, SOILEAU & SOUTH,
BERNSTEIN, LLP                              LLP
275 Battery Street, 29th Floor             501 Broad Street
San Francisco, CA  94111-3339               Lake Charles, LA  70601
Office:  (415) 956-1000                     Office:  (337) 439-0707
Telefax: (415) 956-1008                     Telefax: (337) 439-1029
E-Mail:  ecabraser@lchb.com                 E-Mail:  mlundy@lundylawllp.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this <u>17th</u> day of <u>June</u>, <u>2012</u>.


<u>s/  James Parkerson Roy and Stephen J. Herman</u>