## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

) MDL NO. 2179
IN RE: OIL SPILL ) SECTION "J"
by the OIL RIG, )
DEEPWATER HORIZON in ) JUDGE BARBIER
the GULF OF MEXICO, )
April 20, 2010 )
) MAG. JUDGE SHUSHAN

Deposition of ROBERT PFANNSTIEL, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on December 2, 2011.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:

Ms. Robin Greenwald
Mr. James J. Bilsborrow
WEITZ & LUXENBERG
700 Broadway
New York, New York 10003

APPEARING FOR BP, INC.:

Mr. Ryan Babiuch
Mr. Christopher J. Esbrook
KIRKLAND & ELLIS, LLP
300 North LaSalle
Chicago, Illinois 60654

Mr. Matthew C. Thuesen
KIRKLAND & ELLIS, LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005-5793
barbara.harding@kirkland.com
lee.rudofsky@kirkland.com

Mr. Philip C. Brickman
FOWLER, RODRIGUEZ, VALDES-FAULI
400 Poydras Street, 30th Floor
New Orleans, Louisiana 70130

APPEARING FOR O'BRIEN'S RESPONSE MANAGEMENT AND NATIONAL RESPONSE CORPORATION:
Mr. Patrick O'Keefe
MONTGOMERY BARNETT
1100 Poydras, Suite 3300
New Orleans, Louisiana 70163

## Page 3

APPEARING FOR DYNAMIC AVIATION:
Mr. Michael Cangelosi
GIEGER, LABORDE & LAPEROUSE LLC
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139

FOR MARINE SPILL RESPONSE CORPORATION:
Mr. Alan M. Weigel
BLANK ROME, LLP
405 Lexington Avenue
New York, New York 10174

ALSO PRESENT:

Ms. Mary Elizabeth Gaasch - The Videographer

REPORTED BY:

Tamara Chapman, CSR
Certified Shorthand Reporter
State of Texas
Certified Court Reporter
State of Louisiana

## Page 4

EXAMINATION INDEX

Page
EXAMINATION BY MS. GREENWALD.......... 8
EXAMINATION BY MR. BILSBORROW......... 34
FURTHER EXAMINATION BY MS. GREENWALD . 75
EXAMINATION BY MR. WEIGEL............. 238
EXAMINATION BY MR. O'KEEFE............ 263
EXAMINATION BY MR. WEIGEL............. 269

INDEX OF EXHIBITS

Page
Exhibit No. 120...................... 38
  E-mail from Dennis Johnson to
  Robert Pfannstiel dated 9/23/10
  (BP-HZN-2179VOO00107314 -
  BP-HZN-2179VOO107431)
Exhibit No. 121...................... 49
  DEEPWATER HORIZON Incident
  Situation Executive Summary, dated
  5/15/2010 (BP-HZN-2179VOO00105400 -
  BP-HZN-2179VOO00105406)
Exhibit No. 122...................... 58
  Invoice for MY ANGEL II dated
  7/20/2010 (BP-HZN-2179VOO00002365 -
  BP-HZN-2179VOO00002367)

**PURSUANT TO CONFIDENTIALITY ORDER**

Page 85

```
 1  day-to-day planning cycle component of the
 2  planning section to be?
 3     A. Well, part of the ICS process is what we
 4  call a Planning P, and there's different meetings
 5  and different processes that are put in place
 6  that allow you to do a step-by-step -- I guess
 7  more of a controlled step-by-step process to have
 8  all the entities that need to be involved in the
 9  different meetings to do the different planning
10  for the next day's work activities. It was a
11  constant -- every day it was a -- constant
12  rigorous activities.
13     Q. Okay. What did you -- now, let's go to
14  the logistics section. What did you understand
15  the logistics section's role to be in this
16  response -- overall response effort?
17     A. The logistics section's responsibility is
18  to find and procure all the pieces of equipment
19  and backup equipment and fuel and housing and
20  whatever it takes to sustain the spill.
21     Q. Okay. So let's do operations now. I
22  want to break it down into its component parts.
23     I understand you had 127 -- if my notes
24  are right, approximately 127,000 people reporting
25  to you?
```

Page 86

```
 1     A. No.
 2     Q. Did I have that wrong?
 3     A. My understanding it was approximately
 4  27,000.
 5     Q. 27. I added a hundred to that. 27's
 6  quite a lot. I don't know how I added a hundred.
 7  Oh, well, got you a raise.
 8     You're right. 27,000.
 9     Okay. Can you sort of break down the
10  component parts of operation, the sections within
11  operations? I know you've already talked about
12  the VoO.
13     A. For this particular spill?
14     Q. Yes. For this part -- all my questions
15  now are going to be related to the -- your
16  response efforts for the Macondo oil spill.
17     A. We had an offshore group which was
18  anywhere between 20 to 50 miles offshore. We had
19  what we called a near-shore group, which was 20
20  miles and inland. We had branch directors set up
21  for each state, Mississippi, Alabama, and
22  Florida, or the Florida Panhandle at the time.
23  And within those groups, we had branches that
24  were onshore and near-shore activities.
25     We had staging area was a group. We had
```

Page 87

```
 1  one of those. We had an overall staging area
 2  manager, deputy ops chief, and he -- he or she
 3  was responsible for the multiple staging areas we
 4  had across the AOR.
 5     I had an air boss or an air ops group
 6  which consisted of a deputy chief who was
 7  responsible for seeing that we had all the -- you
 8  know, we did all the flights and the stuff, and
 9  all the scheduling came through our -- our air
10  boss or our air ops folks.
11     Q. Can I stop you there for a minute? I'll
12  go back to where we were, but I'm trying to
13  understand.
14     So you're -- part of your group was the
15  air ops, and those are the planes that both --
16  well, let me ask you.
17     What -- what type of airplane work are
18  you referring to when you have the air ops work?
19     A. The majority -- for the Mobile sector for
20  an operations, the air ops were mostly
21  observation helicopters.
22     Q. Do you know where the airplanes that
23  sprayed dispersants, what group they were part
24  of?
25     A. They were part of the Houma incident
```

Page 88

```
 1  command system.
 2     Q. Were they were part of your group --
 3     A. No.
 4     Q. -- or were they part of logistics?
 5     A. They were not.
 6     Q. Or another --
 7     A. I don't know what -- under the ICS
 8  system, the air ops would have been part of the
 9  operations group in Houma.
10     Q. So they didn't come out of Mobile, out of
11  your section at all?
12     A. Not the dispersant group, no, ma'am.
13     Q. Okay. I didn't realize. Okay. So
14  now -- I'm sorry -- you've gone through offshore
15  group, near-shore group, branch director for each
16  state and then the subparts of that, staging
17  area, an air ops group, which I understand to be
18  the observation planes?
19     A. Yes.
20     Q. Okay. What other groups were there under
21  your operations umbrella?
22     A. There was the VoOs.
23     Q. Uh-huh.
24     A. I'm sure there is some I'm forgetting.
25     Q. Okay. So where would -- would reporting
```

22 (Pages 85 to 88)

**PURSUANT TO CONFIDENTIALITY ORDER**

Page 181

1:39

1  the processes that it was made clear through maps
2  and distributions of where all the -- the DECON
3  stations, both on water and near shore were, and
4  the folks that were affected by that were given
5  that information.
6      Q. They weren't given an appointment by BP?
7  BP didn't say: Go get your vessel decontaminated
8  there tomorrow, there will be an appointment for
9  you?
10     A. I don't know the answer to that question.
11     Q. If not, how would anybody know whether a
12  location they go to is going to be busy or not?
13  You wouldn't know until you get there, right?
14         MR. ESBROOK: Objection; form.
15     A. I don't know how the actual process
16  worked.
17     Q. (BY MS. GREENWALD) Do you know whether
18  there were would be any list available to vessel
19  workers whose vessels might have been oiled, what
20  stations would have open positions so that they
21  could get their vessel decontaminated in a timely
22  fashion?
23     A. I know from an operations standpoint we
24  had communications, marine-type radio
25  communications with vessels that were on the

Page 182

1  water. If I'm not mistaken, part of our
2  communication plan established a way to discuss
3  those type of things amongst the task forces.
4      Q. So your operation group would tell one of
5  the -- one of your task forces out on the water
6  to tell one of the oiled vessels to go to a
7  particular decontamination station?
8      A. No, ma'am. It was between the captains
9  of the vessels and the task force leaders to work
10 amongst themselves to be able to determine where
11 the nearest DECON station was, and then they
12 would have to work through those issues. And if
13 they arrived at a decon station that was backed
14 up, then the folks there would be able to tell
15 them where to go or -- not where to go --
16     Q. I know what you meant.
17     A. Where to go or what the next step should
18 be.
19     Q. How many decontamination stations were
20 there, do you know?
21     A. I don't remember right off the top of my
22 head.
23     Q. Do you know how close they were to one
24 another by nautical miles?
25     A. This time last year I did. I don't now.

Page 183

1      Q. Was there a map available of where
2  decontamination stations would -- or were
3  located?
4      A. There should be a map available within
5  the documentation section, yes.
6      Q. Were they given to the VoO workers?
7      A. I know that they were distributed out
8  amongst the task forces. I don't know that they
9  were given to an individual captain of the vessel
10 or anything like that.
11     Q. So if a vessel owner was sent to a
12 decontamination station that happened to be full;
13 in other words, no available slots, if they
14 didn't have a map of another decontamination
15 site, they wouldn't know where to go to get their
16 vessel decontaminated; isn't that right?
17        MR. ESBROOK: Objection to form.
18     A. The folks at the decon station would have
19 had that information had the captain not.
20     Q. (BY MS. GREENWALD) They would know of
21 the other location and whether there were open
22 spaces to go and get DECONNED?
23     A. They would know where the other locations
24 were. I don't know if they would know how many
25 people were there or not.

Page 184

1      Q. So back to the activation and
2  deactivation. If I'm one of these vessels that's
3  looking to find a decontamination site, and I go
4  to decontamination site A, and it's full, and
5  it's late in the day, and the person at that
6  decontamination site says to me, "I can give you
7  another location, but they're not available for
8  two days, but I can get you a slot in two days,"
9  and go to this location, do you consider me
10 activated from the time I stop doing my work of
11 collecting booms up until the time that I've
12 gotten decontaminated.
13        MR. ESBROOK: Objection; form. You
14 can answer.
15     A. Part of our agreement was that if you had
16 reached into oil, you must be deconned. So if
17 you have not been deconned, you were instructed
18 to -- you can't go into clean water, basically,
19 without being deconned, as part of the overall
20 instructions that were given to each individual
21 that ran machinery, boom, vessels, whatever.
22     Q. (BY MS. GREENWALD) Okay. So then the
23 answer to my question is, yes, I would still be
24 under -- I would still be activated by BP until
25 such time as my vessel is decontaminated?

**PURSUANT TO CONFIDENTIALITY ORDER**

265

1  Q. All right. Did you in your function
2  receive daily incident action plans?
3  A. Yes.
4  Q. And from whom did you get them?
5  A. At the end of the day, I would get them
6  from the planning section.
7  Q. Okay. And how were they presented to
8  you? On paper, or electronically, or how did you
9  actually get physical possession?
10 A. If I remember, they were paper about that
11 thick (demonstrating).
12 Q. All right. Would somebody from the
13 planning section walk that over to you?
14 A. Yes, they would.
15 Q. Okay. Were there Coast Guard personnel
16 in the planning section as these IAPs were
17 prepared?
18 A. Yes, there was.
19 Q. Okay. Was there a group that you can
20 think of, of Coast Guard, or other federal
21 officials, who monitored the operations conducted
22 out of the Mobile office to make sure that things
23 were going as planned and as anticipated and
24 instructed?
25 A. People from other agencies?

266

1  Q. The Coast Guard or some other federal
2  agency?
3  A. Oh, absolutely.
4  Q. Okay. So there were folks that were
5  there to make sure that things were going as they
6  wanted it to go?
7  A. They were there to help, yes.
8  Q. Okay. Who did you report to?
9  A. I reported to the Unified Command.
10 Q. And who by name is the Unified Command?
11 Who was your immediate supervisor?
12 A. The BP representative on the Unified
13 Command at the initial was Keith Seilhan, the
14 Coast Guard FOSC was Captain Poulen.
15 Q. Did you report to Captain Poulen
16 yourself?
17 A. Technically, yes, sir.
18 Q. Okay. Did you ever order any operations
19 or activities that did not have the approval of
20 the -- the federal on-scene coordinator or the
21 Coast Guard?
22    Do you want me to ask that again?
23 A. Yeah.
24 Q. Sure. Did you ever order any operations
25 or activities that did not have the approval of

267

1  the FOSC or someone in the Coast Guard?
2  A. As far as prior approval?
3  Q. Yes, sir.
4  A. I'm sure at some point early on I did.
5  Q. As the -- as the response developed, did
6  you find that the Coast Guard required you to get
7  their approval more often or less often?
8  A. Well, as the -- as the spill progressed,
9  it became -- the Coast Guard took a more lead
10 role in the overall Unified Command structure.
11 Q. Okay. Did you ever hear any reports of
12 anyone who exceeded or violated your
13 instructions?
14    MR. ESBROOK: Object to the form.
15    If you -- if you know.
16 Q. (BY MR. O'KEEFE) I'm just asking if you
17 have any errant recollection of such an incident.
18 A. I'm sure at the time there was something
19 one way or another, but I don't -- it was nothing
20 that would stick in my mind, no.
21 Q. Well, let me ask the question
22 differently. Do you have any recollection of any
23 reports or any -- anything that came to your
24 attention, which it was a material deviation, an
25 important deviation, which exceeded or violated

268

1  your instructions?
2     MR. ESBROOK: Objection; form.
3     If you know.
4  A. I do remember an instance -- and I don't
5  remember the exact instance -- but I remember
6  instances where people would push back and say,
7  "Are you sure that's what you want to do?" But
8  after a conversation, either I changed my mind,
9  or I instructed them to do whatever we'd ask them
10 to do.
11 Q. And they did?
12 A. Yes.
13 Q. Okay. How about do you know of, or did
14 you hear any reports of, or actually see yourself
15 any instances in which any responders violated or
16 exceeded the instructions of the Coast Guard or
17 any other federal official, or is it your
18 recollection that such instructions were
19 routinely followed?
20 A. To the best of my memory, there were
21 probably times that people became overzealous or
22 under-zealous, one of the two, and didn't do
23 exactly what we'd ask them to do.
24 Q. All right. Thank you.
25    MR. O'KEEFE: I have no further

67 (Pages 265 to 268)

PURSUANT TO CONFIDENTIALITY ORDER