## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL           ) MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     ) SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             ) JUDGE BARBIER
                           ) MAG. JUDGE SHUSHAN

30(b)(6) deposition of DEFENDANT NALCO COMPANY REGARDING LIMITED B3 DISCOVERY PERMITTED PURSUANT TO ORDER [REC.DOC.5000] BY AND THROUGH MANIAN RAMESH, Ph.D., taken at The Hilton Chicago O'Hare Airport, O'Hare International Airport, Terminal 2, Room 2042, Chicago, Illinois, 60666, on the 30th day of January, 2012.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
Mr. Jim Klick
Mr. Craig M. Robinson
HERMAN, HERMAN, KATZ & COTLAR
820 O'Keefe Avenue
New Orleans, Louisiana 70113

APPEARING FOR BP, INC.:
Mr. Christopher V. Coulston
KIRKLAND & ELLIS
601 Lexington Avenue
New York, New York 10022

APPEARING FOR TRANSOCEAN:
Mr. Ryan D. King
GOFORTH, GEREN, EASTERLING
4900 Woodway, Suite 750
Houston, Texas 77056

APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
Mr. David W. Jones (Telephonically)
BECK, REDDEN & SECREST
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010

APPEARING FOR AIRBORNE SUPPORT, INC., and AIRBORNE SUPPORT INTERNATIONAL:
Mr. Jed M. Mestayer (Telephonically)
LABORDE & NEUNER
One Petroleum Center
2001 West Pinhook Road, Suite 200
Lafayette, Louisiana 70505-2828

## Page 3

A P P E A R A N C E S (Continued)

APPEARING FOR M-I SWACO:
Mr. R. Sean Brennan, Sr.
MORGAN, LEWIS & BOCKIUS, LLP
1000 Louisiana Street, Suite 4200
Houston, Texas 77002-5006

APPEARING FOR HALLIBURTON:
Ms. Gwen Richard
Mr. Sean W. Fleming
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

APPEARING FOR NALCO CO.:
Mr. Thomas J. Heiden
Ms. Johanna Spillman
LATHAM & WATKINS
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606

APPEARING FOR DEFENDANT DRC ENERGY SERVICES:
Mr. Andy Dupre (Telephonically)
FLANAGAN PARTNERS, L.L.P.
201 St. Charles Avenue, Suite 2405
New Orleans, Louisiana 70170

APPEARING FOR DEFENDANT O'BRIEN'S RESPONSE MANAGEMENT and NATIONAL RESPONSE CORP.:
Ms. Sylvia E. Simson
WEIL
767 Fifth Avenue
New York, New York 10153-0119

APPEARING FOR DEFENDANT MARINE SPILL RESPONSE CORP.:
Mr. Alan Weigel
BLANK ROME, L.L.P.
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

## Page 4

A P P E A R A N C E S (Continued)

APPEARING FOR DYNAMIC AVIATION, INC.:
Ms. Simone Manuel
GEIGER LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139

ALSO PRESENT:
Mr. Peter Jennings, Videographer
Mr. Bryan Sill, Nalco Company

PURSUANT TO CONFIDENTIALITY ORDER

### Page 21

1  Q. (BY MR. KLICK) Do you see that,
2  sir?
3  A. Correct, I do, I do see.
4  Q. All right. And it further goes
5  on to say, Since some of the mail and
6  documents transmitted through the e-mail
7  system should be retained for longer periods,
8  it is the duty of each employee to regularly
9  review and archive or otherwise save such
10 documents in compliance with the retention
11 Guidelines.
12      Do you understand that, sir?
13 A. Yes, I do.
14 Q. Okay. Is that something you do
15 in the regular course of your business?
16 A. I do.
17 Q. Okay. And it's something that
18 you train -- been trained to do at Nalco?
19 MR. HEIDEN: Objection; foundation,
20 scope.
21 A. Yes, we do.
22 Q. (BY MR. KLICK) Okay. Would you
23 turn to tab No. 11, please, sir. Are you
24 familiar with this document?
25 A. Yes, I have seen this.

### Page 22

1  Q. Pardon me?
2  A. I have seen this document.
3  Q. Okay. And let's go ahead and
4  mark it as Exhibit No. 8206. This document
5  is concerning the health hazes of Corexit
6  9527 oil dispersant, correct, sir?
7  A. That's correct.
8  Q. And one of the things the
9  document indicates is that one of the main
10 oil spill dispersants used by the company,
11 Corexit 9527, contains a solvent. Can you
12 pronounce the name of that solvent for me,
13 sir?
14 A. The solvent is called
15 2-butoxyethanol.
16 Q. Okay. It is well known that
17 this material is hazardous to health via both
18 inhalation and vapour and skin absorption
19 following contact with the liquid. The
20 attached paper, however, indicates that the
21 health risks associated with the use of this
22 product may be greater than anticipated due
23 to dermal absorption of that particular
24 solvent, correct?
25 A. I will need a minute to go

### Page 23

1  through this. I have seen a lot of
2  documents --
3  Q. Okay.
4  A. -- in two days.
5  Q. Go ahead.
6  A. Yeah, this document states the
7  properties of the butoxyethanol in -- in the
8  conditions that they held steady.
9  Q. Okay. But in the first page of
10 the document it indicates --
11 MR. ROBINSON: You're on the first page
12 already.
13 Q. (BY MR. KLICK) -- that
14 absorption of this hazardous chemical may be
15 greater than anticipated due to dermal
16 absorption of the vapor of the chemical, that
17 chemical, correct?
18 A. That's what this document says,
19 that's correct.
20 Q. Yes. Is that your understanding
21 as a chemist, sir?
22 MR. HEIDEN: Object --
23 MR. KLICK: I'll rephrase that
24 question.
25 Q. (BY MR. KLICK) Is that your

### Page 24

1  under- --
2  MR. HEIDEN: Wait -- go ahead.
3  Q. (BY MR. KLICK) Is that your
4  under- -- Nalco's understanding of the
5  chemical properties?
6  MR. HEIDEN: Objection; scope. This is
7  not a general discovery or a merits discovery
8  or even B3 discovery. This is discovery
9  deposition which is limited by the Court's
10 order to preemption.
11 MR. KLICK: Well, the areas of inquiry
12 included the results of toxicity, chemical
13 effectiveness, testing performed, methods of
14 dispersants that Nalco performed, their
15 knowledge, the effectiveness, and the
16 chemical hazards of the chemical, and then
17 Nalco's communications with any agencies,
18 government bodies, cleanup responders, so
19 forth, third parties with regard to those
20 hazards. And so what I'm trying to find out
21 is whether this was something that was
22 communicated. I'm going into topic No. 6.
23 I'm first finding out whether this is
24 something that -- that Nalco believes was a
25 hazard and whether it's something that was

```
                                                       33
 1   documents with the terminology, but I don't
 2   know what your question implies.
 3       Q.   (BY MR. KLICK) Okay.
 4       A.   If you will clarify that, sir,
 5   that will be useful to me.
 6       Q.   Have you seen Nalco documents
 7   where they, in fact, specifically will say
 8   something to the effect that the mere fact
 9   that the Corexit is listed as a NCP schedule
10   does not constitute approval, nor compliance
11   with any critical or minimal standards?
12       A.   Nalco documents will say these
13   products comply with the NCP criteria
14   prescribed by U.S. EPA.
15       Q.   I'm going to go ahead and mark
16   this document as 8208.
17            Turning to the third page of
18   that document. With regard to the technical
19   product bulletin and at the bottom there
20   where it talks about ventilation it indicates
21   that with regard to Corexit 9527 you are to
22   avoid prolonged breathing of vapors, use a
23   ventilation equal to unobstructed outdoors in
24   moderate breeze.
25            Do you see that there, sir?
```

```
                                                       34
 1       A.   Yes, I do.
 2       Q.   Is that something that you are
 3   familiar with as a safety requirement with
 4   regard to application of Corexit?
 5       A.   This document looks to me
 6   from -- from Exxon, and it -- it's a best
 7   practice to use protect -- personal
 8   protective equipment, PPEs, when handle any
 9   products any chemicals -- sorry, any
10   materials. So it looks to me it's the best
11   practice recommended by the Exxon who was the
12   manufacturer at the time.
13       Q.   Okay. And the best practice in
14   terms of the -- what you call -- you called
15   it PPE?
16       A.   Personal protective equipment,
17   yeah, PPE.
18       Q.   Okay. And as part of the
19   ventilation issue, the biggest issue there
20   would be with respect to having air monitors
21   to monitor Corexit exposure; is that correct?
22            MR. HEIDEN: Objection; scope.
23       Q.   (BY MR. KLICK) You can go
24   ahead.
25       A.   Yeah. All -- all products
```

```
                                                       35
 1   related to Corexit requires the personal
 2   protection equipment usage. The volatility
 3   of -- of the Corexit products are not -- not
 4   that -- they are not any volatile hazard
 5   materials.
 6       Q.   Should you have air monitoring
 7   when you're applying Corexit to determine
 8   whether exposure limits are excessive?
 9            MR. HEIDEN: Object -- objection; vague
10   and ambiguous.
11       A.   In my view, it should be -- it
12   should be left for the end users.
13       Q.   (BY MR. KLICK) The end users
14   should decide whether there should be air
15   monitors?
16       A.   Correct. We prescribe the use
17   of personal protective gear.
18       Q.   Would you turn to tab No. 21,
19   please. Mark this document as Exhibit
20   No. 8209. Are you familiar with this
21   document?
22       A.   Please give me a minute, let me
23   go through this.
24            I understand the material in
25   this document, but I have not -- I cannot say
```

```
                                                       36
 1   that I helped send this.
 2       Q.   Are you familiar with the --
 3   with the task specific hazards evaluation
 4   form for dispersant boat spraying
 5   applications?
 6       A.   Yes, I am.
 7       Q.   Okay. Does this form appear to
 8   be the type of requirements that would be
 9   required for safety in using dispersant boat
10   spraying applications?
11       A.   Yes, I think so.
12       Q.   Okay. And it has several areas
13   there where they check mark things that
14   you're supposed to have, safety equipment
15   you're supposed to have when involved in
16   dispersant boat spraying application; do you
17   see that, sir?
18            MR. HEIDEN: Objection; scope and vague
19   and ambiguous. "They," could you help us,
20   Counsel? Who is "they"?
21       Q.   (BY MR. KLICK) Okay. Do you
22   see on the document, sir, where there are
23   several areas that are check marked as
24   mandatory protective equipment and safety
25   equipment? Do you see that, sir?
```

9 (Pages 33 to 36)

PURSUANT TO CONFIDENTIALITY ORDER

PURSUANT TO CONFIDENTIALITY ORDER

**Page 45**

1 correct.
2 Q. And he's sending this e-mail to
3 Kathryn A. Preston. Who is Ms. Preston?
4 A. Ms. Preston was the marketing
5 manager responsible for Corexit.
6 Q. Okay. And then it's cc'd -- I'm
7 going to -- a Mr. Rahman?
8 A. Rahman, uh-huh.
9 Q. And I can't pronounce his first
10 name. How is --
11 A. Asirur, Asirur.
12 Q. Asirur?
13 A. Yeah.
14 Q. Okay. And who is he?
15 A. Mr. -- Dr. Rahman is the manager
16 for our product registration group.
17 Q. Okay. And then there is a David
18 Horsup. Who is he?
19 A. Dr. Horsup is the vice president
20 for Research and Development for our energy
21 services.
22 Q. Okay. And then the topic of it
23 is: "To Kathy Preston - PPE Equipment used
24 on boats spraying dispersant on surface."
25 And he goes on to indicate that

**Page 46**

1 he thanks her for providing to him a copy of
2 the BP Source Control Air Monitoring Plan,
3 the BP Plan.
4 And am I correct that Mr. Wolff
5 indicates that: The BP plan specifies air
6 monitoring for hazardous contaminants from
7 crude oil, that's VOCs, benzene, carbon
8 monoxide, hydrogen sulfide, sulfur dioxide,
9 and particulate matter? The BP plan does not
10 specify air monitoring for air contaminants
11 from Corexit 9500 or Corexit 9527. The
12 hazardous ingredients that have occupational
13 exposure limits, OELs, specified in the
14 MSDSs.
15 Do you see that there, sir?
16 A. Yes, I do.
17 Q. "Even if all of the Corexit OEL
18 ingredients could be considered VOCs (which
19 The BP Plan monitors), some of the OEL action
20 levels are lower than the VOC action levels
21 (specified in the BP Plan), so the BP Plan
22 alone would not ensure proper Respiratory
23 Protection from Corexit exposure."
24 Do you see that, sir?
25 A. Yes, I do.

**Page 47**

1 Q. Okay. Now, would this e-mail
2 have been made in the course and scope of
3 business, as far as you can tell?
4 A. Say your question one more time,
5 please.
6 Q. Is this kind of an e-mail that
7 would be made as part of the course and scope
8 of business of Nalco?
9 A. This is a communication between
10 two employees asking questions about the --
11 the personal protective gear used in the
12 field.
13 Q. Uh-huh.
14 A. Any conclusion drawn from --
15 from such communication, any activity
16 pursuant to that communication would become
17 part of the process, business process.
18 Q. Would become part of what?
19 A. Part of the business process.
20 Q. Okay. So it appears to me that
21 Mr. Wolff was indicating that the BP plan for
22 respiratory protection was inadequate with
23 regard to identifying potential hazardous
24 exposures for Corexit; is that correct?
25 MR. HEIDEN: Objection; calls for

**Page 48**

1 speculation.
2 A. The e-mail from Mr. Wolff states
3 that.
4 Q. (BY MR. KLICK) Okay. Okay.
5 We're going to go ahead and mark these whole
6 series of e-mails as Exhibit 8213.
7 Now, I note that that particular
8 e-mail is directed solely to other employees
9 at Nalco, correct, that -- that particular
10 e-mail?
11 A. That particular e-mail, yes,
12 correct, it's only to the employees.
13 Q. In other words, the recipient is
14 a Nalco employee, Ms. Preston, and all the
15 people that are cc'd on the e-mail are also
16 Nalco employees, correct?
17 A. That's correct.
18 Q. And the person making the e-mail
19 is a Nalco employee, correct?
20 A. That's correct.
21 Q. All right. And if we go to
22 the -- the previous page, 2248, there seems
23 to be a e-mail from Ms. Preston to Mr. Wolff
24 where it says, "Stephen, what is the deadline
25 for this?"

**Page 49**

1  A.  Uh-huh.
2  Q.  And then there is a, Jim, is
3  this something your team can assist with?
4      Do you know -- she's referring,
5  I guess, to James Rushing, correct?
6  A.  Uh-huh.
7  Q.  Who is Mr. Rushing?
8  A.  Mr. Rushing is a Nalco employee.
9  He is in our Sugar Land facility.
10 Q.  He's what?
11 A.  In the Sugar Land facility,
12 Sugar Land, Texas, facility.
13 Q.  And what does he deal with?
14 A.  And he -- he's responsible for
15 Safety, Health, Environment for the Sugar
16 Land site.
17 Q.  I got you.  And what about Gary
18 Cooper, what is he?
19 A.  Gary Cooper is our general
20 marketing manager for the -- for Nalco's
21 upstream business.
22 Q.  Okay.  Is Mr. Rushing a
23 occupational hygienist?
24 A.  I do not know his technical
25 background.  In his responsibility, he

**Page 50**

1  oversees Safety, Health, Environment, which
2  would be part of your question, occupational
3  and hazards.
4  Q.  And Mr. Wolff is also involved
5  in Safety, Health, and Environment, too?
6  A.  That is correct.
7  Q.  Is he an industrial hygienist?
8  A.  His current responsibility is
9  not being an industrial hygienist.
10 Q.  Okay.  Now, all of the
11 individuals on this e-mail that comes after
12 Mr. Wolff's --
13 A.  Uh-huh.
14 Q.  -- e-mail, everybody on that
15 e-mail is a Nalco employee, correct?
16 A.  Okay.  You are referring to the
17 tab -- Page 48?
18 Q.  The -- yeah.
19 A.  Okay.
20 Q.  The -- the e-mail from Kathryn
21 Preston, dated June 25th, 2010, at 4:35 p.m.
22 A.  Correct, all of them are Nalco
23 employees.
24 Q.  Okay.  Then if we go up above
25 there, that e-mail is redacted, correct?

**Page 51**

1  A.  Appears so.
2  Q.  And the e-mail after that, above
3  that, that's redacted?
4  A.  Correct.
5  Q.  And then if we go to the
6  previous page, 2247, each of those e- --
7  e-mails are redacted, correct --
8  A.  That's correct.
9  Q.  -- on that page?
10 A.  Correct.
11 Q.  And if we go to 2246, all the
12 e-mails on that page are redacted, correct?
13 A.  Correct.
14 Q.  And then if we go to Page 2245,
15 all the e-mails there are redacted, correct?
16 A.  That's correct.
17 Q.  All right.  In looking at the
18 documents that we've examined, sir, we have
19 not seen a document where anyone from Nalco
20 informed any government, federal government
21 official, involved in this cleanup of the
22 concerns raised by Mr. Wolff about the
23 adequacy of the BP plan for air monitoring.
24     Have you seen any such
25 communication, sir?

**Page 52**

1  A.  Let me form my understanding.
2  The communication between Nalco and BP on air
3  monitoring; am I -- am I correct, that's what
4  you're asking?
5  Q.  You saw communication --
6  A.  No, I'm asking, are you asking
7  me whether I have seen any communication
8  between Nalco and BP?
9  Q.  No.
10 A.  Okay.
11 Q.  I'm asking you whether you've
12 seen any communication between Nalco and any
13 governmental official involved in the BP
14 cleanup about the concerns raised by
15 Mr. Wolff as to the inadequacies of the BP
16 air-monitoring program?
17 A.  I have not seen any
18 communication between a Nalco and any
19 government official on the air monitoring or
20 on Mr. Wolff's comments --
21 Q.  Okay.  All right.  Now --
22 A.  -- to the best of my knowledge.
23 Sorry.
24 Q.  Okay.  Who is Mr. Hasana Sisco?
25 A.  Ms. Sisco.  Hasana is the vice

**Page 53**

1 president for our Safety, Health, and
2 Environment for the company.
3     Q.   Okay.
4     A.   Mr. Wolff --
5     Q.   Do you know what her background
6 is?
7     A.   She started in Research and
8 Development and then moved on to Safety,
9 Health, Environment; but I do not know what
10 her background is. I think she's a chemist.
11 I may be wrong.
12    Q.   Okay. What about Kevin Friar?
13    A.   Kevin Friar is the vice
14 president for our upstream business. He
15 leads our upstream business globally.
16    Q.   Okay.
17    A.   Upstream business involves oil
18 and gas production.
19    Q.   All right. Is he primarily a
20 product salesperson or product -- product
21 person?
22    A.   He's a -- he grew through -- he
23 grew up through the sales organization. He's
24 a chemist.
25    Q.   Okay. And what about Stephen

**Page 54**

1 Landsman, who is he?
2     A.   Stephen Landsman is our general
3 counsel. He was Nalco's general counsel.
4     Q.   Okay. Did those e-mails dealing
5 with the air-monitoring system have anything
6 to do with the change in the Material Data
7 Sheet that you talked about in late June of
8 2010?
9     A.   You are referring to the e-mails
10 we just discussed?
11    Q.   Yeah.
12    A.   To the best of my knowledge,
13 they don't have any connection.
14    Q.   Would you go to tab No. 103.
15        Okay. You reviewed those
16 e-mails, sir?
17    A.   Yes.
18    Q.   Okay. Let's go ahead and mark
19 this -- this document as 8214.
20    MR. HEIDEN: And "this document,"
21 Counsel, is tab 103?
22    MR. KLICK: Yeah.
23    Q.   (BY MR. KLICK) Will you start,
24 sir, at Page 3 of this e-mail string, which
25 is Bates-stamped number NALCO 24502.

**Page 55**

1     A.   Okay.
2     Q.   And there, again, you see the --
3 that e-mail that we previously discussed from
4 Stephen Wolff dated 6/25/2010 at 3:51 p.m.,
5 again, to Kathryn Preston, dealing with the
6 inadequacies of the BP air-monitoring plan.
7         And then if we go to the
8 previous page, NALCO 24501, we, again, see
9 the e-mail from Kathryn Preston dated
10 6/25/2010 at 4:35 p.m. to Stephen Wolff and
11 James Rushing, but now we see an e-mail from
12 James Rushing on top of that dated June 29th,
13 2010, 3:47 p.m., where she says -- where he
14 says, Kathy, corporate SH&E team are handling
15 this request by request from Nalco board of
16 directors. The leads are Hasana Sisco, and
17 the SH&E director and Steve Wolff and SHE
18 staff member. Regards, Jim.
19        Do you have any knowledge as to
20 why the Nalco board of directors got involved
21 in this issue?
22    MR. HEIDEN: Objection; scope. This
23 wit- -- this -- these questions have nothing
24 to do with preemption, and these questions
25 have nothing to do with anything that he was

**Page 56**

1 tendered at.
2     MR. KLICK: I beg to differ. They have
3 everything to do with preemption.
4     MR. HEIDEN: Excuse me. We've given
5 you a lot of leeway here already this
6 morning. None of your questions so far have
7 anything to do with Nalco's preemption
8 defense, which this deposition is limited to,
9 sir. If you can explain to us what these
10 questions have to do with preemption, we're
11 certainly willing to listen.
12    MR. KLICK: Well, I think they have
13 everything to do with the preemption issues.
14 You're going to -- are you going to instruct
15 the witness not to answer?
16    MR. HEIDEN: I want to know what the
17 basis is --
18    MR. KLICK: The basis is --
19    MR. HEIDEN: -- because this dep- --
20 this deposition, sir, by order of this
21 Court --
22    MR. KLICK: Right.
23    MR. HEIDEN: -- is limited to Nalco's
24 preemption issue.
25    MR. KLICK: Right.

## Page 105

1  A.  Am I right?
2  Q.  Right.
3  A.  Our MSD sheet explains that --
4  our MSD sheet recommends the use of PPEs.
5  Q.  Recommend what?
6  A.  Use -- use of the personal
7  protective equipment list.
8  Q.  Okay. And would a respirator be
9  part of that?
10  A.  Correct.
11  Q.  So anytime you're spraying
12  Corexit, you should be wearing a respirator?
13  A.  Our PPE guidelines are to use
14  right -- best -- to use the best practices.
15  One of the best practice is using the E
16  operator -- respirators mask.
17  MR. KLICK: I think that's all the
18  questions I have.
19  THE WITNESS: Okay.
20  THE VIDEOGRAPHER: Time is 1:40 p.m.
21  We're off the record.
22  (The deposition concluded at 1:40 p.m.)
23
24
25

## Page 106

1    WITNESS CORRECTIONS AND SIGNATURE
2    30(b)(6) DEPOSITION OF    JANUARY 30, 2012
     NALCO COMPANY REGARDING
3    LIMITED B3 DISCOVERY
     PERMITTED PURSUANT TO
4    ORDER [REC.DOC.5000] BY
     AND THROUGH MANIAN RAMESH, Ph.D.
5
     Please indicate changes on this sheet of
6    paper, giving the change, page number, line
     number and reason for the change. Please
7    sign each page of changes.
8    PAGE/LINE    CORRECTION    REASON FOR CHANGE
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   
              MANIAN RAMESH, Ph.D.
25

## Page 107

1   I, MANIAN RAMESH, Ph.D., have
    read the foregoing deposition and hereby
2   affix my signature that same is true and
    correct, except as noted above.
3
4   _____
5        MANIAN RAMESH, Ph.D.
6
    STATE OF LOUISIANA    )
7   PARISH OF _____  )
8
          Before me, _____,
9   on this day personally appeared 30(b)(6)
    DEPOSITION OF
10  NALCO COMPANY REGARDING LIMITED B3 DISCOVERY
    PERMITTED PURSUANT TO ORDER [REC.DOC.5000] BY
11  AND THROUGH MANIAN RAMESH, Ph.D., known to
    me, or proved to me under oath or through
12  _____) (description of
    identity card or other document)), to be the
13  person whose name is subscribed to the
    foregoing instrument and acknowledged to me
14  that they executed the same for the purposes
    and consideration therein expressed.
15
          Given under my hand and seal of
16  office on this, the ____ day of _____,
17  _____.
18
19  _____
    NOTARY PUBLIC IN AND FOR THE
20  STATE OF LOUISIANA
21  My Commission Expires: _____
22
23
24
25

## Page 108

1   THE STATE OF LOUISIANA :
    PARISH  OF  ORLEANS :
2
    I, PHYLLIS WALTZ, a Certified Court Reporter,
3   Registered Professional Reporter, and
    Certified Realtime Reporter in and for the
4   State of Louisiana, do hereby certify that
    the facts as stated by me in the caption
5   hereto are true; that the above and foregoing
    answers of the witness, MANIAN RAMESH, Ph.D.,
6   to the interrogatories as indicated were made
    before me by the said witness after being
7   first duly sworn to testify the truth, and
    same were reduced to typewriting under my
8   direction; that the above and foregoing
    deposition as set forth in typewriting is a
9   full, true, and correct transcript of the
    proceedings had at the time of taking of said
10  deposition.
11  I further certify that I am not, in any
    capacity, a regular employee of the party in
12  whose behalf this deposition is taken, nor in
    the regular employ of his attorney; and I
13  certify that I am not interested in the
    cause, nor of kin or counsel to either of the
14  parties.
15  GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
    this, the 30TH day of JANUARY, 2012.
16
17
18        Phyllis Waltz
          PHYLLIS WALTZ, RPR, CRR
19        TEXAS CSR, TCRR NO. 6813
          Expiration Date: 12/31/13
20        LOUISIANA CCR NO. 2011010
          Expiration Date: 12/31/12
21        NEW MEXICO CCR NO. 610
          Expiration Date: 12/31/12
22
23  Worldwide Court Reporters, Inc.
    Firm Certification No. 223
24  3000 Weslayan, Suite 235
    Houston, Texas 77027
25  (713) 572-2000