UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * | MDL NO. 2179 |
| | * | |
| | * | SECTION J |
| | * | |
| | * | JUDGE BARBIER |
| **THIS PLEADING APPLIES TO:** | * | MAG. JUDGE SHUSHAN |
| No. 12-311 | * | |
| | * | **JURY TRIAL DEMANDED** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


**PLAINTIFF CAMERON INTERNATIONAL CORPORATION'S
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
LIBERTY INSURANCE UNDERWRITERS INC.'S
<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

1096676v1

TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................4

BACKGROUND FACTS......................................................................6

ARGUMENT .................................................................................10

I.  CAMERON HAS PROPERLY ALLEGED THAT LIBERTY BREACHED THE
    LIBERTY POLICY. .....................................................................10

    A.  Liberty Has Not Established As A Matter Of Law That The "Other
        Insurance" Provision Excused Its Coverage Obligation. .....................12

        1.  Liberty Improperly Seeks To Shift The Burden To Cameron To
            Demonstrate That "Other Insurance" Does Not Exist As A
            Prerequisite To Coverage.........................................................12

        2.  Liberty's Motion Is Based On A Misinterpretation Of The "Other
            Insurance" Clause. .................................................................15

        3.  Liberty Cannot Demonstrate As A Matter Of Law Based On The
            Pleadings That Cameron Had Other Insurance That "Applied" To
            Cameron's Loss When It Settled With BP. ..................................19

        4.  Cameron Is Not Judicially Estopped From Arguing That Cameron
            Did Not Have "Other Insurance" When It Settled With BP. .................22

    B.  Cameron Did Not Extinguish Liberty's Subrogation Rights In The
        BP Settlement........................................................................23

    C.  Liberty Expressly Waived Its Right To Invoke The Consent Requirements
        Of The Liberty Policy. ............................................................24

II. CAMERON HAS PROPERLY ALLEGED THAT LIBERTY VIOLATED
    LOUISIANA AND TEXAS STATUTES PENALIZING INSURERS FOR
    BREACHING THEIR CONTRACTS IN BAD FAITH. ..................................25

    A.  Cameron Has Properly Alleged That Liberty Violated RS 22:1892. ...........25

    B.  Cameron Has Properly Alleged That Liberty Violated Section 541 Of The
        Texas Insurance Code. .............................................................27

III. CAMERON HAS PROPERLY ALLEGED THAT LIBERTY BREACHED ITS
     OBLIGATION TO PAY CAMERON'S ONGOING DEFENSE COSTS.................29

    A.  The Liberty Policy Covers Defense Costs. ........................................29

1096676v1

B.      Cameron Has Properly Alleged That Liberty Violated Section 542 Of The
        Texas Insurance Code By Failing To Pay Cameron's Defense Costs...................31

CONCLUSION.......................................................................................................................28

1096676v1

Plaintiff Cameron International Corporation ("Cameron") respectfully submits this memorandum of law in opposition to Defendant Liberty Insurance Underwriters Inc.'s ("Liberty") motion for judgment on the pleadings.[1]

## PRELIMINARY STATEMENT

On December 16, 2011, Cameron and BP announced that they had entered into a settlement in which, in exchange for a payment of $250 million to BP, Cameron received a full release and an agreement by BP to indemnify Cameron against most of its future losses arising from the Deepwater Horizon incident.  That announcement marked the culmination of months of negotiations and a mediation conducted by Magistrate Judge Shushan.

Having settled with BP, Cameron turned to its insurers to cover Cameron's $250 million loss.  All of Cameron's insurers agreed to pay, but not Liberty.  Instead, Liberty offered Cameron a choice:  either continue the Deepwater Horizon litigation and face potentially crippling liability, or agree to accept tens of millions of dollars less than what Liberty was contractually obligated to pay under its insurance policy.  Cameron rejected that dangerous game, reached into its own pocket to fill the hole left in its insurance tower by Liberty, and then filed this lawsuit to recover the $50 million Liberty owes plus penalties for Liberty's bad faith.

Remarkably, Liberty now seeks judgment on the pleadings in this insurance coverage dispute.  Liberty's principal argument for dismissal is that Cameron had "other insurance" – in the form of a contractual indemnity from Transocean – that Cameron supposedly is required to exhaust before Liberty's coverage obligations are triggered.  That is utter fiction.  As Liberty is well aware, Transocean had consistently denied owing any indemnity to Cameron

---

[1] Cameron's Amended Complaint, filed on April 19, 2012, Dkt. 6287, is cited herein as "Am. Compl."  Liberty's Memorandum in Support of Motion for Judgment on the Pleadings, filed on May 4, 2012, Dkt. 6438-3, is cited herein as "Liberty Mem."  Attached to the Declaration of Phillip A. Wittmann ("Wittmann Decl.") ("Exhibit A") are the exhibits individually identified herein as "Ex. A-1 through A-5."

1096676v1

and Cameron had no money available from Transocean that it could apply to the covered loss. When Cameron settled with BP, Cameron at best had a *claim* for contractual indemnification against Transocean.  The only insurance available to Cameron to pay BP was thus the insurance that it had purchased from its insurers, including Liberty.

Nothing in the Liberty Policy permitted Liberty to leave its insured without coverage based on the possibility that Cameron might ultimately have obtained a final judgment affirmed on appeal against Transocean and that Cameron would have been able to collect on that judgment following years of litigation.  Only by pretending that it is Cameron's duty to prove the absence of other insurance as a prerequisite to coverage, misconstruing the terms of its own policy, and relying on several other agreements that are outside the pleadings (and do not support Liberty's position in any event) can Liberty even assert otherwise.  At most, Liberty has an affirmative defense – one that should be tested through the crucible of summary judgment or trial, not on a Rule 12 motion.  Indeed, Liberty does not cite a single case resolving a coverage dispute such as this on a Rule 12 motion.

Liberty's motion also ignores another crucial fact.  While Liberty claims that its policy was "unique" in Cameron's tower of insurance, two of Cameron's other insurers could have relied on the exact same "Other Insurance" provision as Liberty, but instead satisfied their coverage obligations.  Not only did those insurers not adopt Liberty's position, one of them openly criticized it as "unreasonable."  That two insurers with every incentive to avoid paying tens of millions of dollars rejected Liberty's position is especially telling.

Liberty's other arguments serve only to confirm that Liberty's Rule 12 motion is as baseless as is its denial of coverage.  First, Liberty asserts that Cameron breached its policy by extinguishing Liberty's subrogation rights.  Cameron, however, expressly preserved those rights

- 5 -

with a carve-out for Liberty in the BP settlement itself – and Liberty does not and cannot identify a single provision in the BP Settlement Agreement to the contrary.  Second, Liberty claims that Cameron breached the consent-to-settle requirements of its policy.  Conspicuously absent from Liberty's brief is any mention that its own counsel had represented to Cameron that Liberty would not assert that Cameron breached the consent requirements of the policy.

In addition, Liberty not only breached its policy, but it did so in bad faith to try to extort a financial benefit for itself.  Knowing that a critically important settlement and perhaps Cameron's future was on the line, Liberty denied coverage and refused to participate – unless Cameron agreed to accept tens of millions of dollars less than Liberty owed.  Liberty had no good faith basis to refuse coverage and, as discussed below, its conduct violates both Louisiana's and Texas's bad faith statutes.  Although Liberty asserts that its conduct was reasonable, that is a question for the jury to decide under well-settled Louisiana and Texas precedent.

Finally, Cameron's defense expenses are covered by the first underlying policy in Cameron's tower and the Liberty policy expressly incorporates its terms.  Because Liberty's policy disavows only its duty to defend, but not its obligation to indemnify defense expenses, Liberty must pay those expenses.  And, given that Liberty has failed to do so despite Cameron's demands, it should be assessed a penalty of 18% per year under Texas law.

Accordingly, for the reasons detailed below, Liberty's motion should be denied.

## BACKGROUND FACTS

For a detailed recitation of the facts and circumstances relating to Liberty's bad faith breach of its contractual obligations to Cameron, Cameron respectfully refers the Court to its Amended Complaint, the allegations of which must be accepted as true for purposes of this motion.  *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009).  To avoid repetition, Cameron focuses below on the facts relevant to Liberty's motion.

**The Liberty Insurance Policy**

Cameron purchased excess casualty insurance from Liberty for the period from July 1, 2009 to July 1, 2010 (the "Liberty Policy" or "Policy").  (Am. Compl. ¶ 12.)  Under the Policy, Liberty agreed to provide $50 million in coverage if Cameron suffered a "Loss" in excess of $103 million.  (*Id.* ¶¶ 13-14.)  If Cameron incurred such a loss, Liberty promised to "promptly pay on [Cameron's] behalf the amount of 'loss' covered under this policy."  (*Id.*)

The Liberty Policy was one layer in a "tower" of excess casualty insurance that Cameron purchased to cover the 2009-2010 policy year.  (*Id.* ¶ 14; *see also* Insurance Tower Diagram (Ex. A-1).)  The Policy expressly applied "excess of the Underlying Insurance," which included only the insurance policies issued by Illinois National Insurance Company ("INIC"), ACE American Insurance Company, and XL Insurance Company Limited.  (Am. Compl. ¶ 14.)

Liberty's motion focuses on the "Other Insurance" provision in its Policy.  That provision provides in pertinent part:  "If other insurance applies to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance."  (Liberty Policy, Art. V.F. (Ex. A-2).)  "Other Insurance" is defined to include "any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities."  (*Id.*)

Contrary to Liberty's repeated assertion that its "Other Insurance" provision was "unlike any other policy in Cameron's insurance tower" (Liberty Mem. at 1), two insurers in Cameron's tower – Chubb Atlantic Indemnity Limited ("Chubb") and AIG Excess Liability Insurance International Limited ("AIG Excess") – also had the right to invoke the same "Other Insurance" provision.  Their policies contained "Restrictive as Underlying" clauses adopting the same terms and conditions of any underlying policy – including the Liberty Policy – to the extent such terms and conditions were more restrictive than their own.  (Am. Compl. ¶ 57.)

1096676v1

In addition, the Liberty Policy is a "follow form" policy that is subject to the same "terms and conditions" as the INIC policy.  (*Id.* ¶ 15.)  The INIC policy expressly states that "Defense Expenses will be in addition to the applicable Limits of Insurance of this policy."  (*Id.*)  Nothing in the Liberty Policy derogates from this express contractual commitment.  The Liberty Policy thus covers defense expenses in addition to Liberty's $50 million in limits.  (*Id.*)

On or about April 23, 2010, Cameron gave notice to Liberty and its other insurers that it had incurred potential liability arising from the Deepwater Horizon incident.  (*Id.* ¶ 26.)

**Cameron's Contractual Indemnity Claims Against Transocean**

In connection with its sale of equipment for the Deepwater Horizon, Cameron entered into a Master Service Agreement and Purchase Orders with Transocean.  (Am. Compl. ¶ 19.)  Those agreements contain an indemnification provision pursuant to which, "if Transocean is entitled to indemnity under any contract with its customers" for pollution liability, Transocean would provide Cameron "with the benefit of such indemnity to the fullest extent possible."  (*Id.*)

Following the Deepwater Horizon incident, Cameron sought indemnity from Transocean under that provision.  (*Id.* ¶ 36.)  Although Transocean honored other indemnification obligations to Cameron, it strenuously denied that it had any obligation to indemnify Cameron for pollution liability and even sued Cameron for damages and a declaration that it owed no such indemnity.  (*Id.* ¶ 37.)

Because Transocean rejected Cameron's requests for pollution indemnity and challenged them in court, Cameron had no indemnity from Transocean at the time of its settlement with BP.  (*Id.* ¶ 38.)  Cameron's only protection for the Deepwater Horizon incident was the tower of insurance that it had purchased, including the Liberty Policy.  (*Id.*)

**Liberty Breached The Liberty Policy By Failing To Pay A Covered Loss That Cameron Incurred When It Settled With BP For $250 Million.**

After vigorously defending the Oil Spill MDL for over a year, Cameron determined that a settlement was its best option.  (Am. Compl. ¶ 39.)  On December 12, 2011, with the assistance of Magistrate Judge Shushan, Cameron reached a tentative agreement with BP to settle the case for $250 million, well within its total insurance coverage and at a small fraction of its potential liability (the "BP Settlement").  (*Id.* ¶ 46.)  In exchange for that payment, Cameron was to receive a full release and an agreement by BP to indemnify Cameron against future losses arising from the Deepwater Horizon incident (except for fines, penalties, and punitive damages directly imposed on Cameron and continuing defense expenses).  (*Id.*)

Shortly after reaching the tentative agreement with BP, Cameron secured the approval to the settlement of all of its insurers, except Liberty.  (*Id.* ¶ 47.)  Although Liberty conceded that the $250 million settlement amount was reasonable, it refused to pay unless Cameron agreed to a steep discount off Liberty's $50 million obligation.  (*Id.* ¶¶ 47-48.)

As its purported justification for refusing to pay Cameron, Liberty invoked the "Other Insurance" provision in its Policy – a provision that it did not raise until after settlement negotiations with BP commenced, some eighteen months after Cameron gave Liberty notice of its claim.  (*Id.* ¶ 49.)  Given that Cameron had no other insurance, and Transocean had denied indemnity, Liberty's refusal to pay was plainly pretextual.  (*Id.* ¶ 51.)  Liberty's approach also failed to recognize that BP – the very party with whom Cameron wished to settle – could have been ultimately responsible for the purported Transocean indemnity.  (*Id.* ¶ 53.)  Cameron's release of its indemnification claims (and Liberty's release of its subrogation rights) was thus a crucial part of the settlement consideration that BP was seeking as part of the settlement.  (*Id.*)  Indeed, BP made clear that it would not settle with Cameron absent such releases.  (*Id.* ¶ 42.)

1096676v1

Even without Liberty's support, Cameron was able to move forward with the BP Settlement based on all the other insurers' agreement to fund the deal and waive their subrogation rights. (*Id.* ¶ 58.) But, because of Liberty's recalcitrance, Cameron had to negotiate a carve-out to preserve Liberty's subrogation rights. (BP Settlement Agreement ¶ 4.4 (Ex. A-3) ("Cameron is not releasing any subrogation or other rights of Liberty Insurance Underwriters Inc.").)

To avoid a potentially catastrophic result for Cameron's shareholders and employees, and eliminate billions of dollars of potential liability, Cameron itself filled the $50 million gap left by Liberty. (Am. Compl. ¶ 58.) Cameron demanded that Liberty indemnify it for this loss and pay its ongoing defense expenses, but Liberty refused. (*Id.* ¶ 61.)

## ARGUMENT

## I.    CAMERON HAS PROPERLY ALLEGED THAT LIBERTY BREACHED THE LIBERTY POLICY.

As the insured, Cameron must plead that its loss is covered by the Liberty Policy. *See Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 295 (5th Cir. 2009) (applying Louisiana law); *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 188 (Tex. App. 2003).[2] The burden then shifts to Liberty to show that it is excused from paying based on a limitation of liability, exclusion, or for some other reason. *See Dickerson*, 556 F.3d at 295; Tex. Ins. Code § 554.002. That is, if the Policy covers the loss, Liberty may assert – and has the burden to prove – affirmative defenses to try to avoid liability. *See Dallas Nat. Ins. Co. v. Sabic Americas, Inc.*, 355 S.W.3d 111, 118 (Tex. App. 2011) ("insurer has the burden of proving that a policy limitation or exclusion constitutes an avoidance or an affirmative defense"); *Beauregard*

---

[2] Liberty's motion assumes that Texas law applies. That is far from clear, given that Louisiana is the situs of the lawsuits underlying Cameron's insurance claim, Louisiana property was impacted the most, and both Cameron and Liberty conduct business in Louisiana. *See Boutte v. Fireman's Fund Cnty. Mut. Ins. Co.*, 930 So.2d 305 (La. App. 2006); *In re Combustion, Inc.*, 960 F. Supp. 1056 (W.D. La. 1997). In any event, the Court need not resolve the choice of law issue at this early stage because, as demonstrated herein, no conflict exists between Louisiana and Texas law and Liberty's motion should be denied whichever law applies.

*v. Salmon*, 205 So.2d 634, 639 (La. App. 1967) ("the burden of establishing the existence of other collectible, primary insurance . . . in support of its affirmative defense was upon [the] insurer").  And, on a Rule 12 motion, Liberty must meet this burden by demonstrating that under no circumstances can Cameron recover based on the allegations in the Amended Complaint.  *See Raytheon Co. v. Cont'l Cas. Co.*, 123 F. Supp. 2d 22, 28-29 & n.4 (D. Mass. 2000) (denying insurer's motion to dismiss because it "has the burden of proving its affirmative defenses.").

        In connection with the BP Settlement, Cameron incurred a "loss" of $250 million stemming from the Deepwater Horizon incident that is covered by the Liberty Policy.  (Am. Compl. ¶ 2.)  That loss is in excess of the $103 million in "Underlying Insurance" above which Liberty must pay Cameron up to its policy limits of $50 million.  (*Id.* ¶ 14; *see* Liberty Policy, Art. I (Ex. A-2).)  When that loss was incurred, the Policy required Liberty to "promptly pay [Cameron] the amount of 'loss' covered under this policy."  (Liberty Policy Art. V.H (Ex. A-2).) Because Liberty failed to pay, it has breached the Liberty Policy.  Nothing more is required to plead a cause of action for breach of contract.  *See SMG Foods, LLC v. Delek Capital*, 2010 WL 103873, at *1-2 (E.D. La. Jan. 7, 2010) (denying insurer's motion to dismiss where insured alleged coverage under contract and insurer's failure to meet payment obligations); *Nguyen v. St. Paul Travelers Ins. Co.*, 2008 WL 4534395, at *6 (E.D. La. Oct. 6, 2008) (same).

        Liberty does not and cannot deny that Cameron's loss is covered by the Liberty Policy and that it failed to pay.  (Liberty Mem. at 2 (conceding that Cameron's loss "would be covered" by the Liberty Policy).)  Instead, Liberty offers three excuses for not fulfilling its contractual obligations:  (i) that an "Other Insurance" clause in the Policy precludes recovery because Cameron had not obtained a judicial determination as to "the amount of the indemnity owing Cameron from Transocean" (*id.* at 16); (ii) Cameron allegedly breached the Policy when it

supposedly "extinguished Liberty's subrogation rights" in the BP Settlement (*id.* at 19); and (iii) Liberty did not consent to the settlement (*id.* at 18).  But those are affirmative defenses for which Liberty has the burden of proof – as Liberty conceded by pleading them as such in its Answer to Cameron's original complaint.  (*See* Liberty Answer ¶¶ 78-81, 85-86.)  Dkt. 6147. They are not grounds for dismissal without the benefit of a factual record.  *See, e.g.*, *Raytheon*, 123 F. Supp. 2d at 29 & n.4 (stating that "the coverage determination will depend on the facts of the case" and such "issues are more appropriately determined by way of summary judgment or trial").

We address each of Liberty's baseless reasons for denying coverage below.

**A.    Liberty Has Not Established As A Matter Of Law That The "Other Insurance" Provision Excused Its Coverage Obligation**

**1.    Liberty Improperly Seeks To Shift The Burden To Cameron To Demonstrate That "Other Insurance" Does Not Exist As A Prerequisite To Coverage.**

The Liberty Policy contains an "Other Insurance" provision that provides:  "***If*** other insurance ***applies*** to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance."  (Liberty Policy, Art. V.F (Ex. A-2) (emphasis added).)  "Other Insurance," in turn, is defined to include "any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities."  (*Id.*)

When Cameron settled with BP, Cameron did not have any "other insurance" that "applied" to the covered loss.  While Cameron had a *claim* against Transocean for contractual indemnification, Transocean refused to fund Cameron's legal liabilities and rejected Cameron's request for indemnification.  (Am. Compl. ¶ 51.)  The only insurance available to Cameron to pay BP was the insurance that it had purchased from its insurers, including Liberty.  (*Id.* ¶ 33.)

- 12 -

No money was available from Transocean to "apply" to the loss, all Underlying Insurance was exhausted, and Liberty was required to pay its limits at that time.  (*Id.* ¶¶ 33, 68.)

Nevertheless, Liberty asserts that the possibility that Cameron might ultimately have obtained a final judgment affirmed on appeal against Transocean and collected on it relieves Liberty of its contractual obligations.  (Liberty Mem. at 15-16, 19.)  Liberty thus puts the burden on Cameron to prove that no "other insurance" "applies" to its loss before Liberty pays a dime.  That is not how "other insurance" provisions are supposed to work and cannot support a Rule 12 motion.  *See Raytheon*, 123 F. Supp. 2d at 28 ("[An insured] is not required to plead that other insurance is not available to state a claim for breach of contract.").

The purpose of "other insurance" clauses is to specify the manner in which each insurer contributes to or shares a covered loss, thereby avoiding double recovery by the insured or the disproportionate allocation of responsibility for loss to one insurer.  *See St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206 (5th Cir. 1996) (observing that other insurance clauses are designed to "avoid an insured's temptation or fraud of over-insuring property or inflicting self-injury").  When "other insurance" situations arise, one insurer indemnifies the insured and then seeks contribution from the other.  *See* 4-24 DOUGLAS R. RICHMOND, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 24.07[3][a] (2011) (stating that, after "one insurer is compelled to pay an entire loss, the paying insurer may be entitled to recover some portion of its expenditure from the other insurers").  The insured is therefore not left in the lurch while its insurers sort out who pays what.  *See* LEE R. RUSS, COUCH ON INSURANCE § 219:1 (3d ed. 2007) ("'Other insurance' clauses govern the relationship between insurers[;] they do not affect the right of the insured to recover under each concurrent policy.").

Liberty's breach did exactly that to Cameron, opening a gaping hole in its insurance tower.   That Cameron had an unproven contractual indemnity claim – one that Transocean steadfastly denied – is no excuse.  *See Rhone-Poulenc v. Int'l Ins. Co.*, 1996 WL 328011, at *13 (N.D. Ill. June 11, 1996) (holding that other insurance clause did not "shield" insurer from paying claim where other insurers did not acknowledge coverage); *Ins. Co. of N. Am. v. Kayser-Roth Corp.*, 1999 WL 813661, at *23-25 (R.I. Super. July 29, 1999) (holding that other insurance clause "is not a condition of coverage"), *aff'd in relevant part*, 770 A.2d 403 (R.I. 2001).[3]

A virtually identical attempt by an insurer to evade its payment obligation by requiring an insured to establish the absence of other insurance was rejected in *Insurance Co. of North America v. Kayser-Roth Corp.*, 1999 WL 813661 (R.I. Super. July 29, 1999).  In that case, another insurance clause made the insurer's obligation excess of "valid and collectible insurance available to [the insured]" and "applicable" to the loss.  *Id.* at *23.  The insurer identified dozens of other policies as potential "other insurance," but "all of the carriers denied coverage under their policies."  *Id.* at *24.  The insurer took the position, as Liberty does here, that "as part of [the insured's] burden of proving it was entitled to coverage, [the insured] must prove what other of its insurance policies covered" the loss.  *Id.* at *24.  The court rejected that approach, concluding that another insurance clause "is not a condition of coverage" but, rather, "a limitation on liability for which the carrier has the burden of proof."  *Id.* at *25.  Because the insured had no available other insurance, the insurer was ordered to pay its limits based on a full factual record.  *Id.* at *49.  The result here should be the same.

---

[3] The fact that Liberty placed its "Other Insurance" provision in the "Conditions" section of its policy is of no moment.  *See Andover Newton Theological School, Inc. v. Cont'l Cas. Co.*, 964 F.2d 1237, 1243 (1st Cir. 1992) ("If an insurer were able to distribute provisions limiting liability throughout a policy, with the expectation that its shouldering the burden of proof would be limited to the single section entitled, 'Exclusions,' this would create considerable incentive to obfuscation and subterfuge."); *Raytheon*, 123 F. Supp. 2d at 28 & n.3 (same); *Kayser-Roth*, 1999 WL 813661, at *25 (calling other insurance clause a "condition" was not "not dispositive of its effect").

1096676v1

Similarly, in *Rhone-Poulenc v. International Insurance Co.*, 1996 WL 328011 (N.D. Ill. June 11, 1996), the court held based on the factual record that "the only reasonable construction of [an "Other Insurance" provision] is that it may be applied by [defendant] as a shield against [plaintiff's] claim, *but only if other carriers have acknowledged coverage*." 1996 WL 328011, at *13 (emphasis added). Notably, the court relied in part on expert testimony that, "when no insurer has paid a claim, it is not customary for an insurer to refuse to pay an otherwise valid claim on the basis of an 'other insurance' clause, on an assumption or prediction that another carrier will or may pay the insured's claim when such carrier has not expressly acknowledged an obligation to provide coverage." *Id.* But that is exactly what Liberty has done here. Liberty's motion seeks to deprive Cameron of the opportunity to make the same factual record as in *Rhone-Poulenc* and should be denied.

2. **Liberty's Motion Is Based On A Misinterpretation Of The "Other Insurance" Clause.**

Liberty's interpretation of the "Other Insurance" provision also violates three basic canons of insurance contract construction.

*First*, Liberty's reading excises key language from the "Other Insurance" provision. As noted above, Liberty is excused from paying "if" – and only "if" – other insurance "applies" to the covered loss. (Liberty Policy, Art. V.F (Ex. A-2).) Liberty's motion ignores this contractual language, asserting that Cameron's unproven contractual indemnification claim triggers the "Other Insurance" provision – even though Transocean made perfectly clear that it would not provide any funding that Cameron could "apply" to the covered loss. Because Liberty's interpretation reads out the first clause of the "Other Insurance" provision, it must be rejected. *See Lambert v. Md. Cas. Co.*, 418 So.2d 553, 559 (La. 1982) (courts must "avoid

neutralizing or ignoring any [contractual terms] or treating them as surplusage."); *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 753 (Tex. App. 1999) (same).

*Second*, Liberty's interpretation should be rejected because it purports to read into the "Other Insurance" clause a requirement that Cameron must establish through litigation the *non-existence* of potentially applicable contractual indemnities. The "Other Insurance" provision says no such thing. Liberty's interpretation thus runs afoul of the well-settled rule of contractual interpretation that courts may not "rewrite the contract or add to its language under the guise of interpretation." *Mendoza v. Grey Wolf Drilling Co.*, 77 So.3d 18, 22 (La. App. 2011); *accord Gamma Grp., Inc. v. Transatlantic Reinsurance Co.*, 242 S.W.3d 203, 212 (Tex. App. 2007).

*Third*, Liberty's reading would lead to an absurd result. Under Liberty's interpretation, the only time when Liberty would be called on to pay a claim is *after* Cameron litigates with Transocean to judgment, loses, and then exhausts all appeals (or wins but fails to collect on the judgment). That process could take years. A reading of an excess policy where the insurer is required to pay only after the insured engages in years of unsuccessful litigation over an indemnity that has been denied makes no sense. *See Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003) (insurance policies "should not be interpreted in an unreasonable or strained manner" or to "achieve an absurd conclusion"); *Progressive Cnty. Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003) (same). If Cameron had known that Liberty would take this senseless position, it would never have purchased the Policy in the first place. (Am. Compl. ¶ 54.)

Liberty's position that Cameron was required to litigate the indemnity issue with Transocean to the bitter end is not only wrong, but accepting it could have been fatal to Cameron. Under Liberty's theory, Liberty is only obliged to pay its $50 million in limits if

1096676v1

Cameron incurs a loss that a court holds Transocean is *not* required to indemnify.  Had Cameron forgone the BP Settlement, however, it would have faced *billions* of dollars in potential liability. (Am. Compl. ¶ 24.)   Liberty thus demanded that Cameron bet the company on an uncertain indemnity claim that, even if established, Transocean might not have been able to satisfy in order to obtain $50 million in coverage.  Nothing in the Policy even hints at such a foolish obligation.

The absurdity of Liberty's position is confirmed by Chubb and AIG Excess – two of Cameron's other insurers that could have taken the exact same approach as Liberty but did not. As discussed above, Chubb and AIG Excess both had policies that incorporated the same terms and conditions, including the "Other Insurance" provision, as the Liberty Policy.  (*Id.* ¶¶ 56-57.) Chubb and AIG Excess, however, declined to adopt Liberty's baseless interpretation and instead honored their obligations to fund the BP Settlement.  Indeed, counsel for AIG Excess rebuked Liberty for taking an "unreasonable" position that was a "prejudicial impediment to settlement." (Am. Compl. ¶ 52; Ex. A-5.)   If the "Other Insurance" provision was as foolproof a defense as Liberty contends, one would not expect similarly situated insurers to take a contrary position and pay tens of millions of dollars to satisfy Cameron's claim, as Chubb and AIG Excess did here.

At a minimum, Chubb and AIG Excess's disagreement with Liberty's interpretation of the "Other Insurance" clause demonstrates that the Liberty Policy's "Other Insurance" provision is at least ambiguous.  *See Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2012) ("[I]f the agreement is susceptible to more than one reasonable interpretation, the agreement is ambiguous.");  *Cadwallader*, 848 So.2d at 580 (same).   If the provision is ambiguous, Cameron should be permitted discovery to demonstrate the parties' intent and that its interpretation is reasonable.  *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987) (courts "must adopt the construction of an exclusionary clause urged by the insured as long as

1096676v1

that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."); *Cadwallader*, 848 So.2d at 580 (ambiguous provisions are strictly construed against insurers).[4]

For example, the evidence will show that the parties never intended the Liberty Policy to leave a hole in an otherwise cohesive insurance tower based on untested contractual indemnities.   Rather, Cameron purchased a "follow form" insurance tower in which each successive layer provided similar and consistent coverage as the layer below it.   That fact is further supported by the premium Cameron paid to Liberty, which, as expected in a "follow form" tower, is lower than that charged by lower layers and higher than that charged by higher layers.   (Wittmann Decl. ¶ 2.)   If Liberty's position that it had a unique policy provision that could only be triggered following unsuccessful litigation with Transocean were correct, one would have expected that Liberty's premium would have been far less than the premiums charged by the other insurers.

Tellingly, Liberty does not cite a single case endorsing its interpretation – much less a case resolving a coverage dispute on a Rule 12 motion.   The two "other insurance" cases on which Liberty relies, *Warren Hosp. v. Am. Cas. Co. of Reading, Pa.*, 2009 WL 3074611 (D.N.J. Sept. 23, 2009), and *NME Hosp., Inc. v. Am. Cas. Co. of Reading Pa.*, 1996 WL 599468 (E.D. La. Oct. 17, 1996), are not to the contrary.   Both cases addressed – in the context of a summary judgment motion – whether a *self-insured retention* qualified as "other insurance" under the terms of the policies at issue.   *See Warren*, 2009 WL 3074611, at *5; *NME*, 1996 WL 599468, at *2.   No dispute existed in those cases over whether "other insurance" was actually available and applicable to the covered loss.   Thus, as Liberty itself puts it, those cases hold only

---

[4] The Other Insurance provision is also ambiguous as applied by Liberty, whose position is that an indemnification provision contained in a separate contract constitutes other insurance.  The term "indemnification" is not defined in the Liberty Policy.

1096676v1

that an "other insurance" provision may be triggered "*if there are funds available* from an indemnification obligation."  (Liberty Mem. at 12 (emphasis added).)[5]

Here, by contrast, Transocean denied owing any indemnity to Cameron, Cameron had no funds available from Transocean to "apply" to the covered loss under the "Other Insurance" provision, and Cameron was entitled to look next to Liberty for payment pursuant to the plain terms of the Liberty Policy.  Liberty had no basis to refuse prompt payment at that time and, accordingly, Cameron is entitled to damages and a declaration that Liberty owes indemnity to Cameron.  *See Raytheon*, 123 F. Supp. 2d at 22 (denying motion to dismiss breach of contract claim based on existence of other insurance provision); *see also Kayser-Roth Corp.*, 1999 WL 813661, at *25; *Rhone-Poulenc*, 1996 WL 328011, at *13.

> **3.      Liberty Cannot Demonstrate As A Matter Of Law Based On The Pleadings That Cameron Had Other Insurance That "Applied" To Cameron's Loss When It Settled With BP.**

Liberty identifies "two contractual sources of indemnity" that it claims show that Cameron had "indemnification in place to fund legal liabilities" when it settled with BP. (Liberty Mem. at 12.)  Those two "sources of indemnity" are Cameron's Purchase Order and Master Services Agreement with Transocean, which in turn depend on the interpretation of yet another agreement, Transocean's Drilling Contract with BP.  (*Id.* at 13-15.)  Based on those three agreements – from which Liberty only excerpts a total of four paragraphs – Liberty asserts that it is entitled to judgment on the pleadings in this action.  (*Id.* at 15-16.)  That is wrong.

As a threshold matter, the Court cannot and should not entertain Liberty's request to interpret the Cameron-Transocean and Transocean-BP agreements on this motion.  Those documents are outside the pleadings, not central to Cameron's claims against Liberty, and should

---

[5] *Data Specialties, Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909 (5th Cir. 1997), is likewise inapposite.  That case stands for the unremarkable proposition that an insurer has no obligation to indemnify an insured that has not incurred liability covered by its policy.

not be considered at this stage of the case. *See QuarterHoldings, LLC v. Axis Surplus Ins. Co.*, 2012 WL 1090135, at *2 (E.D. La. Mar. 30, 2012) (stating that courts "may not consider" documents "indirectly referenced in Plaintiffs' complaint" that are "not central to the Plaintiff's claims"); *accord St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of the Port of New Orleans*, 2012 WL 1118419, at *2 (E.D. La. Apr. 2, 2012); *Blanchard & Co. v. Contursi*, 2000 WL 574590, at *3 (E.D. La. May 11, 2000).[6] Liberty appears to recognize this problem and has not sought to introduce the full agreements into the record, relying instead on snippets quoted in its brief – snippets on which the interpretation of such complex agreements should not be based. *See Bodin v. Butler*, 2008 WL 5122354, at *2 (E.D. La. Dec. 4, 2008) (courts should "constru[e] the entirety of the document"). That alone is sufficient to deny Liberty's motion.

Even if the Court does consider the Cameron-Transocean and Transocean-BP agreements, they do not rescue Liberty. No matter how those agreements are interpreted, they cannot change the fact that Cameron did not have any indemnity available from Transocean to apply to its loss when it settled with BP. (Am. Compl. ¶ 33.) Rather, Cameron had a breach of contract *claim* against Transocean – and one that Transocean vigorously disputed. (*Id.* ¶ 37.)

It makes no difference that Cameron might have prevailed on that claim. When Cameron incurred the covered loss, it was not going to receive any cash from Transocean to pay to BP under the purported indemnity. Under the Liberty Policy, Cameron was entitled to look to Liberty – like all of Cameron's other insurers – to satisfy its payment obligation promptly. *See* Liberty Policy Art. V.H (Ex. A-2); *Rhone-Poulenc*, 1996 WL 328011, at *13 (holding that other insurance provision may excuse insurer's payment obligation "only if other carriers have acknowledged coverage"). If Liberty believed that Cameron's contractual claim had merit,

---

[6] Neither the Cameron-Transocean nor Transocean-BP agreement is integral to the Amended Complaint. Although the Amended Complaint mentions both agreements by way of background for the BP Settlement, none of Cameron's affirmative claims that Liberty breached the Liberty Policy depends on either agreement.

1096676v1

instead of engaging in self-help, it should have sought contribution from Transocean after satisfying its insurance obligations to Cameron.  (*See supra* Part I.A.1.)

In any event, Liberty has not established as a matter of law that Cameron had a right to contractual indemnification based on the limited provisions quoted in its brief.  (Liberty Mem. at 12-16.)   In Cameron's contracts with Transocean, Transocean agreed that, "if Transocean is entitled to indemnity under any contract with its customers" for pollution liability, Transocean will provide Cameron "with the benefit of such indemnity to the fullest extent possible."  (*Id.* at 13.)   Accordingly, two conditions had to be satisfied for Cameron to obtain indemnification:  (1) BP must be required to indemnify Transocean for pollution liability; and (2) Transocean must be permitted to provide Cameron "with the benefit of such indemnity."

Liberty focuses on the first condition – which is the subject of a Court order that was issued *after* Cameron settled with BP – and assumes the second without any support or analysis.  (Liberty Mem. at 12-16.)   According to Liberty, the Court's "recent ruling confirms" that "Cameron had available indemnification rights."   (*Id.* at 13.)   That decision, however, "addresses only whether and to what extent Transocean has an enforceable claim to contractual indemnity and defense from pollution liabilities."  (Order and Reasons, dated Jan. 26, 2012, at 5 (Dkt. 5446).)  It says nothing about whether Transocean was required to indemnify Cameron.

Moreover, even BP's indemnity to Transocean remains an open issue because BP contends that Transocean nullified the indemnity by breaching the Drilling Contract and/or committing an act that materially increased BP's risk or prejudiced its rights.   The Court has deferred ruling on those issues.  (*Id.* at 29.)

Liberty's reliance on Articles 24.2 and 25.1 of the Transocean-BP Drilling Contract (Liberty Mem. at 14-15) is equally misplaced.  Those provisions, again, relate to *BP*'s

1096676v1

duty to indemnify Transocean for pollution liability; they do not speak to whether Transocean may provide "the benefit of such indemnity" to Cameron.  Liberty also ignores other provisions of the Drilling Contract – such as Article 25.2, entitled "BENEFIT OF INDEMNITIES," and Article 25.3, entitled "EXTENDED BENEFICIARIES OF INDEMNIFICATION" – that cast doubt on whether Transocean may pass through any applicable BP indemnity to Cameron. Those provisions state that any such indemnity may extend only to "extended beneficiaries of indemnification," and Cameron never claimed to be one.   (Memorandum in Support of Cameron's Motion for Summary Judgment at 15 (Dkt. 4524-1).)  Liberty's omission of such provisions – which were the focus of Transocean's opposition to summary judgment (Dkt. 4478 at 8-10) – shows just how dangerous it would be for the Court to construe the operative agreements and enter judgment on an incomplete record.

Simply put, Liberty offers no basis – textual or otherwise – for the Court to conclude on the pleadings in this case that Cameron had an indemnity from Transocean it could use to pay the BP Settlement.  If anything, Liberty's motion demonstrates that the proper course for resolving this dispute is through summary judgment or trial, when the Court or a jury may make an informed decision based on a full record developed through discovery.  *See, e.g.*, *Lee v. Entergy Operations, Inc.*, 1993 WL 165751, at *4 (E.D. La. May 11, 1993) ("Questions as to the existence, terms, and conditions of a contract . . . are fact questions inappropriate for determination on a motion to dismiss.").

### 4.      Cameron Is Not Judicially Estopped From Arguing That Cameron Did Not Have "Other Insurance" When It Settled With BP.

As discussed above, when Cameron settled with BP, Cameron had at most a contested litigation *claim* for indemnification against Transocean.  (Am. Compl. ¶ 33.)  Because BP might have been responsible to Transocean if Cameron were to prevail, Cameron was

1096676v1

required to drop that claim as part of the BP Settlement.  (*Id.* ¶ 42.)  Consequently, Cameron's indemnification claim was never adjudicated.  No basis for judicial estoppel exists on those facts.

      *First*, judicial estoppel applies only where "the position of the party to be estopped is clearly inconsistent with its previous one." *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000).  That is not the case here.  In the litigation between Cameron and Transocean, Cameron argued that Transocean *was required to* indemnify Cameron.  Here, Cameron is saying that Transocean *did not* indemnify Cameron at the time Cameron settled with BP.  Whether or not Transocean would have been ordered to indemnify Cameron, and whether or not Transocean would have been financially able to indemnify Cameron even if so ordered, were unknown and unknowable at the time of the BP Settlement.

      *Second*, a party cannot be judicially estopped unless that party "convinced the court to accept [its] previous position." *Ahrens*, 205 F.3d at 833.  As noted above, Cameron's claim was never resolved, and the judicial estoppel doctrine is inapplicable.  Liberty ignores this element of judicial estoppel, even though one of the cases on which Liberty principally relies rested its decision denying estoppel on that basis. *See USLIFE Corp. v. U.S. Life Ins. Co.*, 560 F. Supp. 1302, 1305-06 (N.D. Tex. 1983).

## B.    Cameron Did Not Extinguish Liberty's Subrogation Rights In The BP Settlement.

      Without a single citation to the terms of the Cameron-BP Settlement Agreement, Liberty asks this Court to enter judgment against Cameron based solely on its unsupported statement that Cameron extinguished Liberty's subrogation rights.  (Liberty Mem. at 2, 17-18.) Leaving aside that this is not a basis to grant a Rule 12 motion, it is demonstrably untrue.

      In the BP Settlement Agreement, mindful of the position that Liberty might take, Cameron expressly excepted Liberty's subrogation rights from the scope of the waiver of

Cameron's rights against Transocean.   Section 4.4 of the Settlement Agreement states: "Notwithstanding any other provision of this Agreement, including paragraphs 4.2 and 4.3 [which contained the Transocean waiver], *Cameron is not releasing any subrogation or other rights of Liberty Insurance Underwriters Inc.*"   (BP Settlement Agreement ¶ 4.4 (Ex. A-3) (emphasis added).)   Liberty's subrogation rights thus remain intact.[7]

In short, Cameron honored its contractual obligations.   Liberty did not.

**C.     Liberty Expressly Waived Its Right To Invoke The Consent Requirements Of The Liberty Policy.**

Liberty contends that Cameron violated the terms of the Liberty Policy by not obtaining Liberty's consent to the BP Settlement.   (Liberty Mem. at 5, 18-20.)   Far from it.   On December 14, 2011, Liberty's counsel stated expressly and in writing:   "[I]f Cameron chooses to settle LIU will not assert that Cameron breached the consent requirements of the policy."   (Ltr. from P. Koepff to M. Auslander, dated Dec. 14, 2011 (Ex. A-4).)   Liberty does not mention this written waiver anywhere in its brief and that is yet further evidence of its bad faith in this case.

In light of Liberty's promise *not* to assert that "Cameron breached the consent requirements of the policy," it is frankly astonishing that Liberty is now doing just that.   (Liberty Mem. at 5, 18-20.)   Having expressly waived its consent-to-settle rights, Liberty should not now be heard to assert them.   *See Sosebee v. Steadfast Ins. Co.*, 2011 WL 5878055, at *4 (E.D. La. Nov. 23, 2011); *Swiderski v. Prudential Prop. & Cas. Ins. Co.*, 672 S.W.2d 264, 268 (Tex. App. 1984).   At a minimum, these and other facts, such as whether any purported failure to consent was reasonable, are outside the pleadings and cannot support a Rule 12 motion.   *See St. Paul*, 2012 WL 1118419, at *2; *Blanchard*, 2000 WL 574590, at *3.

---

[7] Even if Cameron had extinguished Liberty's subrogation rights, that would only give rise to a question of fact that cannot be resolved on this motion – namely, whether those rights had any value because Cameron was not entitled to indemnification or Liberty was not able to pay.  *See Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994) (where extinguished subrogation right has no value, insurer is not prejudiced and may not deny coverage).

1096676v1

## II.   CAMERON HAS PROPERLY ALLEGED THAT LIBERTY VIOLATED LOUISIANA AND TEXAS STATUTES PENALIZING INSURERS FOR BREACHING THEIR CONTRACTS IN BAD FAITH.

Liberty's conduct is the epitome of insurer bad faith.  Despite its clear obligation to indemnify Cameron, Liberty demanded, as a precondition to paying its insurance coverage, that Cameron forgo an extremely favorable settlement with BP, continue to litigate, and bet the company and all its employees' jobs to test a litigation claim for indemnification that had been rejected by Transocean – that is, unless Cameron agreed to accept tens of millions of dollars less than Liberty owed Cameron.  (Am. Compl. ¶ 52.)  That is not how insurers – which insureds like Cameron trust to support them in their hour of need – are supposed to treat their clients.

As discussed below, Cameron has properly alleged bad faith claims under both Louisiana and Texas law.  To resolve those claims will require a fact-laden inquiry into the reasonableness of Liberty's conduct under the circumstances.  That question ultimately will be for a jury to decide and cannot be resolved on a Rule 12 motion.  *See N.Y. Marine & Gen. Ins. Co. v. McDermott Int'l., Inc.*, 2005 WL 1400450, at *5 n.13 (E.D. La. June 1, 2005) (whether denial of coverage is "arbitrary, capricious or without probable cause" requires "a factual finding"); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997) ("reject[ing] the suggestion that whether an insurer's liability has become reasonably clear presents a question of law for the court rather than a fact issue for the jury.").

### A.   Cameron Has Properly Alleged That Liberty Violated RS 22:1892.

RS 22:1892(A)(1) provides that "[a]ll insurers issuing any type of contract . . . shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss."  RS 22:1892(A)(2) similarly provides that insurers must pay "any third party property damage claim . . . within thirty days after written agreement of settlement of the claim from any third party claimant."  Where an insurer's failure to pay is "arbitrary, capricious, or

without probable cause," the insured is entitled to recover statutory penalties in addition to the amount due under the policy.  RS 22:1892(B)(1).  A failure to pay is "arbitrary, capricious or without probable cause" when the insurer's "willful refusal of a claim is not based on a good-faith defense."  *See La. Bag Co. v. Audubon Indem. Co.*, 999 So.2d 1104, 1114 (La. 2008).

Cameron alleges each of the elements of a claim under RS 22:1892.  (Am. Compl. ¶¶ 81-83.)  Cameron provided "satisfactory proof of loss" to Liberty in the amount of $250 million and Liberty did not pay within thirty days – and still refuses to pay.  (*Id.* ¶¶ 81-82.) In addition, as discussed above and alleged in the Amended Complaint, Liberty's refusal was "arbitrary, capricious, or without probable cause."  (*Id.* ¶ 83.)  Nothing more is required to state a claim.  RS 22:1892(A)(1), (A)(2), (B)(1).  None of Liberty's reasons for dismissal has any merit.

*First*, Liberty asserts that Cameron's claim under RS 22:1892 is barred by Texas Insurance Code § 541.453, which prohibits double recovery, because Cameron has also asserted a Texas bad faith claim.  (Liberty Mem. at 22-23.)  That is an issue of remedies, not a basis for dismissal.  *County of El Paso, Tex. v. Jones*, 2009 WL 4730237, at *11 (W.D. Tex. Dec. 4, 2009) ("any concerns about double recovery at [motion to dismiss] stage are premature").

*Second*, Liberty asserts that RS 22:1892(A)(1) and (2) are inapplicable to Cameron's claim.  That is wrong.  As the Fifth Circuit observed in the very case on which Liberty relies, the statute penalizes "arbitrary or capricious failures either to pay (1) a claim due the insured 'within thirty days after receipt of satisfactory proofs of loss,' or (2) a third-party claim 'within thirty days after written agreement of settlement.'"  *Louque v. Allstate Ins. Co.*, 314 F.3d 776, 780-81 (5th Cir. 2002).  The statute therefore penalizes Liberty's bad faith, whether

Cameron's claim is construed as a first-party or third-party claim.  Liberty can only assert otherwise by misreading *Louque*.[8]

Third, Liberty claims that Cameron has not alleged the elements of RS 22:1892 because Liberty has not been "fully apprise[d]" of Cameron's claim and thus has not received "satisfactory proof of loss."  (Liberty Mem. at 24.)  That is disingenuous.  The evidence will show that Liberty's counsel was integrally involved in the claim and was sent a copy of the Settlement Agreement immediately after it was executed.  That Liberty might have an excuse for its nonpayment has nothing to do with whether Liberty was provided "satisfactory proof of loss."

At most, the "Other Insurance" provision on which Liberty relies is relevant to whether Liberty's failure to pay was "arbitrary, capricious, or without probable cause."  It is not a basis for dismissal.  *See N.Y. Marine*, 2005 WL 1400450, at *5 n.13.  And, for the reasons discussed above, Liberty's reliance on the "Other Insurance" provision during settlement negotiations with BP to try to extort concessions from Cameron is totally inappropriate, was not in good faith, and subjects Liberty to penalties under RS 22:1892.  Indeed, Liberty did not even invoke that provision until settlement discussions commenced with BP in the Fall of 2011 – a year and a half after Cameron initially notified Liberty of its claim (Am. Comp. ¶ 49).  *See La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1253 (La. 1993) ("One indicia of bad faith is an insurer's belated change in defenses.").

## B.    Cameron Has Properly Alleged That Liberty Violated Section 541 Of The Texas Insurance Code.

Under Texas law, an insurer may not engage in bad faith and unfair trade practices in the business of insurance.  *See* Tex. Ins. Code § 541.060.  Such practices include

---

[8] *Louque* states only that Section (A)(1) "does not squarely cover" a claim for an insurer's "excessive, injurious delay in litigating and paying off a claim after judgment."  *Louque*, 314 F.3d at 780.  That is a very different claim from what Cameron has asserted here.  In any event, two sentences later, the Fifth Circuit stated that the "Louisiana courts have for two decades allowed an award of attorney's fees in cases where an insurer's bad faith refusal to settle led to an excess judgment."  *Id.* at 781.

knowingly misrepresenting to a claimant a material fact or policy provision relating to coverage, Tex. Ins. Code § 541.060(1), and failing to attempt in good faith to effectuate "a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear," *id.* 541.060(2).   Liberty engaged in such unfair trade practices when it breached its obligations under the Liberty Policy.  (Am. Compl. ¶¶ 85-88.)

The facts will show, but more importantly for purposes of this motion, Cameron has alleged that Liberty knowingly misrepresented a material policy provision – namely, the Policy's attachment point.  (*Id.* ¶ 86.)  Liberty's interpretation of the "Other Insurance" provision is both absurd and, especially considering Liberty's 18-month delay in even raising it, plainly a pretext to force Cameron to accept a steep discount when it was most vulnerable.  (*Id.* ¶ 55.) Liberty does not even attempt to address that violation in its motion.  (Liberty Mem. at 24-27.)

In addition, Liberty failed, despite its reasonably clear liability, to "attempt in good faith to effectuate a prompt, fair, and equitable settlement."  Tex. Ins. Code § 541.060(2). Instead, Liberty attempted to obstruct Cameron's settlement with BP to avoid (or significantly reduce) its own payment obligations.  (Am. Compl. ¶ 86.)  In short, Liberty denied payment to Cameron despite the fact that it knew or should have known that liability was reasonably clear – and did so for its own financial gain.  (Am. Compl. ¶¶ 86-87.)  That is sufficient to state a bad-faith claim under Texas law.  *See Giles*, 950 S.W.2d at 56; Tex. Ins. Code § 541.060.

Liberty's responses ring hollow.  *First*, Liberty asserts, without any authority, that the elements of Cameron's Texas bad-faith statute are not satisfied because Liberty has not "denied" Cameron's claim.  (Liberty Mem. at 25.)  Rather, according to Liberty, until the amount of the purported Transocean indemnity is determined, its policy has not attached and its liability

1096676v1

is not "reasonably clear."  (*Id.*)  Liberty is mincing words.  Cameron demanded payment and Liberty did not pay.  (Am. Compl. ¶ 61.)  That is a *denial* under any definition of the term.

No matter how Liberty may slice the issue, it is simply asking the Court to hold as a matter of law that its liability is not reasonably clear based on its Other Insurance defense. However, the Texas Supreme Court has squarely held that this issue may not be resolved as a matter of law.  *See Giles*, 950 S.W.2d at 56 ("reject[ing] the suggestion that whether an insurer's liability has become reasonably clear presents a question of law for the court rather than a fact issue for the jury."); *Spicewood Summit Office Condos. Ass'n v. Am. First Lloyd's Ins. Co.*, 287 S.W.3d 461, 468 (Tex. App. 2009) ("This inquiry is a fact issue.").

*Second*, Liberty says that Cameron's claim under Section 541 should be dismissed because the *Stowers* elements, as articulated in *Rocor*, are not met.  (Liberty Mem. at 26-27.) But the BP Settlement did not arise in the *Stowers* context, where the insurer assumes the defense of the claims against the insured.  *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 77 S.W.3d 253, 256 (Tex. 2002) ("it [was] undisputed that [the insurer] assumed exclusive control over settlement negotiations.").  Here, Cameron had control over the settlement and its claim under Section 541 arises because Liberty unjustifiably denied payment after it knew or should have known that liability under the Policy was reasonably clear.

Accordingly, Cameron has stated a claim for bad-faith breach under Texas law, and Liberty's motion to dismiss that claim should be denied.  *See Giles*, 950 S.W.2d at 56.

## III.  CAMERON HAS PROPERLY ALLEGED THAT LIBERTY BREACHED ITS OBLIGATION TO PAY CAMERON'S ONGOING DEFENSE COSTS.

### A.  The Liberty Policy Covers Defense Costs.

The Liberty Policy expressly provides that "[e]xcept for any definitions, terms, conditions and exclusions of this policy, the coverage provided by this policy is subject to the

terms and conditions of the [INIC policy.]"  (Liberty Policy, Art. I (Ex. A-2).)  Under the INIC

policy, INIC had (i) a duty to defend any suit (INIC Policy, Endorsement 29, ¶ 3 (Liberty Mem.

Ex. B)) *and* (ii) a duty to pay "defense expenses," which include "attorney's fees and all other

investigation, loss adjustment and litigation expenses" (*id.* ¶ 6.1; *see id.* ¶ 2.H).  Cameron was

entitled to such defense expenses "in addition to the applicable Limits of Insurance."  (*Id.* ¶ 2.H.)

Although the Liberty Policy disclaims a duty *to defend*, it says nothing about the

obligation *to pay* Cameron's defense costs, which is a distinct obligation.  A "duty to defend," as

the Liberty Policy itself indicates, would require Liberty to "assume charge of the investigation

of any claim or defense of any suit."  (Liberty Policy Art. III.A (Ex. A-2).)  A "duty to

indemnify" defense expenses, on the other hand, requires the insurer to cover the costs of

litigation, even where the insurer has not assumed the defense.  3 PAUL E.B. GLAD, WILLIAM T.

BARKER, MICHAEL BARNES, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION §

16.06[3][a] (2011).

If Liberty in fact intended to exclude its duty to pay defense costs – coverage

expressly provided by the underlying INIC policy – the Liberty Policy would have had to do so

clearly and unequivocally.  *See Geary v. CNA Ins. Co.*, 2003 WL 21920902, at *4 (E.D. La. Aug.

7, 2003) ("Exclusions from coverage must be unambiguous, and any ambiguity in an insurance

contract will be construed against the drafter."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v.*

*Hudson Energy Co., Inc.*, 811 S.W.2d 552, 555 (Tex. 1991) (same).  It does not.

Accordingly, Liberty has a duty to indemnify Cameron's defense expenses and

such expenses are in addition to, and do not erode, Liberty's policy limits.  If there are any doubts

about the parties' intentions regarding defense expenses, such doubts should be resolved only on

a full factual record.

1096676v1

**B.      Cameron Has Properly Alleged That Liberty Violated Section 542 Of The Texas Insurance Code By Failing To Pay Cameron's Defense Costs.**

Following the BP Settlement, Cameron has incurred defense expenses on an ongoing basis for which Liberty is responsible under the Liberty Policy, as discussed above. (*See supra* Part III.A.)   Liberty has refused to pay those expenses and is therefore liable for penalties of 18% per year under Sections 542.058 and 542. 060 of the Texas Insurance Code.

Aside from repeating its argument that it is not required to pay Cameron's defense expenses, Liberty's sole ground for dismissal of this claim is that Section 542 applies only to "first-party insurance claims" and "Cameron's claim is a third-party claim."   (Liberty Mem. at 28.)   Texas law, however, is clear that a claim for defense expenses is a first-party claim because "the insured is the only party who will suffer the loss or benefit from the claim."   *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 17 (Tex. 2007).

## CONCLUSION

For the reasons discussed above, Liberty's motion for judgment on the pleadings should be denied in its entirety.[9]

Dated:  June 18, 2012

---

[9] On a final note, although Liberty's motion is styled as a motion for judgment on the pleadings pursuant to Rule 12(c), Liberty's motion is procedurally improper because the pleadings in this action are not "closed."  Fed. R. Civ. P. 12(c).  Liberty never filed an Answer to Cameron's Amended Complaint.

1096676v1

Mitchell J. Auslander
    mauslander@willkie.com
Jeffrey B. Korn
    jkorn@willkie.com

WILLKIE FARR & GALLAGHER LLC
787 Seventh Avenue
New York, NY  10019
212-728-8000

    */s/ Phillip A. Wittmann*
Phillip A. Wittmann, 13625
    pwittmann@stonepigman.com
Carmelite M. Bertaut, 3054
    cbertaut@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff Cameron International Corporation's Memorandum of Law in Opposition to Defendant Liberty Insurance Underwriters Inc.'s Motion for Judgment on the Pleadings has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of June, 2012.

    */s/ Phillip A. Wittmann*