UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG     *   MDL NO. 2179
      "DEEPWATER HORIZON" in the   *
      GULF OF MEXICO, on          *   SECTION J
      APRIL 20, 2010             *
                                *   JUDGE BARBIER
**THIS PLEADING APPLIES TO:**    *   MAG. JUDGE SHUSHAN
No. 12-311                       *
                                *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### DECLARATION OF PHILLIP A. WITTMANN

I, Phillip A. Wittmann, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am a member of the law firm Stone Pigman Walther Wittmann L.L.C., counsel for Plaintiff Cameron International Corporation ("Cameron") in the above-captioned action.  I submit this declaration in support of Cameron's Memorandum of Law in Opposition to Defendant Liberty Insurance Underwriters Inc.'s Motion for Judgment on the Pleadings.

2.    Annexed hereto as Exhibit 1 is true and correct copy of a diagram entitled "Cameron International Corporation Excess Liability July 1, 2009 – 2010" that was provided to Cameron in connection with the placement of its insurance program for the policy period July 1, 2009 to July 1, 2010.



3.    The following chart identifies the carrier, layer, premium, and corresponding premium per million dollars of coverage for each layer in Cameron's insurance tower for the policy period July 1, 2009 to July 1, 2010:

| Carrier | Layer | Premium | Premium Per Million |
|---|---|---|---|
| Chartis | $25M x Primary | $1,226,000 | $49,040 |
| ACE | $25M x $25M | $343,004 | $13,720 |
| XL | $50M x $50M | $308,000 | $6,160 |
| Liberty | $50M x $100M | $210,000 | $4,200 |
| Chubb | $25M x $150M | $104,625 | $4,185 |
| XL Europe | $50M x $175M | $144,045 | $2,881 |
| AIG Excess | $150M x $225M | $360,000 | $2,400 |
| Iron Starr | $25M x $375M | $50,000 | $2,000 |
| Argo Re | $25M x $400M | $50,000 | $2,000 |
| ACE Bermuda | $75M x $425M | $150,000 | $2,000 |

4.    Annexed hereto as Exhibit 2 is a true and correct copy of the Excess Insurance Policy for the period July 1, 2009 to July 1, 2010, issued by Liberty Insurance Underwriters Inc. ("Liberty") to Cameron.

5.    Annexed hereto as Exhibit 3 is a true and correct copy of the Confidential Settlement Agreement, Mutual Releases and Agreement to Indemnify, dated December 15, 2011, entered into by BP Exploration & Production Inc. and Cameron, as filed with the Securities and Exchange Commission by Cameron as an exhibit to a Form 8-K on December 19, 2011.

6.    Annexed hereto as Exhibit 4 is a true and correct copy of a letter sent from Paul Koepff, counsel for Liberty, to Mitchell Auslander, counsel for Cameron, dated December 14, 2011.

1096575v1

7.      Annexed hereto as Exhibit 5 is a true and correct copy of a letter sent from Richard Bryan, counsel for AIG, to Paul Koepff, counsel for Liberty, dated December 14, 2011.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 18, 2012.

Phillip A. Wittmann

1096575v1

## Cameron International Corporation
## Excess Liability
## July 1, 2009 – 2010

| | |
|---|---|
| **Occ** — ACE Bermuda $75 MM x $425 MM | $500 MM |
| **Occ** — Argo Re $25 MM x $400 MM | $425 MM |
| **Occ** — Iron - Starr $25 MM x $375 MM | $400 MM |
| **Occ** — AIG Cat Excess Bermuda $150 MM x $225 MM | $375 MM |
| **Occ** — XL Bermuda $50MM x $175MM | $225 MM |
| **Occ** — Chubb Atlantic Bermuda $25MM x $150MM | $175 MM |
| **Occ** — Liberty International $50MM x $100MM | $150 MM |
| **Occ** — XL Europe $50MM x $50MM | $100 MM |
| **Occ** — ACE USA $25MM x $25MM / Punitive Damages ACE Bermuda | $50 MM |
| **Occ** — Chartis $25MM x Primary / Punitive Damages AIG Cat Bermuda | $25 MM |
| Primary | |



EXHIBIT
tabbies
1

LIBERTY INTERNATIONAL UNDERWRITERS

**EXCESS INSURANCE POLICY**



Liberty
**International
Underwriters.**
Member of Liberty Mutual Group

**EXHIBIT**

**2**

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.

(A New York Stock Insurance Company, hereinafter the "Insurer")
55 Water Street, 18th Floor, New York, NY 10041
Toll-free number: 1-800-677-9163

### EXCESS LIABILITY POLICY DECLARATIONS

| | |
|---|---|
| **Policy Number:** | LQ1B71198583046 |
| **Renewal of:** | LQ1B71198583036 |
| **Broker:** | Marsh, USA Inc. |
| | 1000 Main Street- Suite 300 |
| | Houston, Texas 77002 |

**Item 1:** **NAMED INSURED AND MAILING ADDRESS**
CAMERON INTERNATIONAL CORPORATION
1333 WEST LOOP SOUTH
Suite 1700
Houston, TX 77027-9118

(as Per First Underlying Insurance Policy)

**Item 2:** **POLICY PERIOD**
From: July 1, 2009        To: July 1, 2010
12:01 AM Standard Time at the mailing address of the Named Insured shown.

**Item 3:** **POLICY PREMIUM: $210,000.00**    **POLICY MINIMUM PREMIUM: $0.00**

TRIA Premium:                        Rejected

**Total Annual Premium:**           **$210,000.00**

Premium Basis:  (x) Flat ()Auditable

**Item 4:** **LIMITS OF LIABILITY**
Our liability under this policy will not exceed the following limit: 100.00% percent of "loss" excess of the
Underlying Insurance stated in Item 5 of the Declarations, but for no greater than:

$50,000,000.00 -Each Occurrence

$50,000,000.00 -Aggregate Limit (where applicable)

# Excess Insurance Policy

Item 5:   **SCHEDULE OF UNDERLYING INSURANCE**

First Underlying Insurance Policy

Insurer:  Illinois National Insurance Company          Applicable Limit(s)
Policy Number: 27471353                                          $25,000,000.00    -Each Occurrence
Policy Period: 7/1/2009 to 7/1/2010                         $25,000,000.00    -Aggregate Limit(where applicable)

Other Underlying Insurance-
(Excess of First Underlying Insurance Policy)
Insurer:  Various Companies                                      Applicable Limit(s)
Policy Number: As per on file with company         $75,000,000.00    -Each Occurrence
Policy Period: 7/1/2009 to 7/1/2010                         $75,000,000.00    -Aggregate Limit(where
                                                                                                 applicable)

Item 6:   **FORMS AND ENDORSEMENTS** attached hereto:

See Forms and Endorsement Schedule – 0104-XS (Ed. 03/00)


IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS IN THE
DECLARATIONS, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE
COVERAGE AS STATED IN THIS POLICY.


PRESIDENT                                   VICE PRESIDENT and SECRETARY
David A. Cohen                              Dexter R. Legg

0100-XS (03 00)

## Excess Insurance Policy

### LIBERTY INSURANCE UNDERWRITERS INC.

(A New York Stock Insurance Company, hereinafter the "Insurer")
55 Water Street, 18th Floor, New York, NY 10041
Toll-free number: 1-800-677-9163

### EXCESS FORMS AND ENDORSEMENTS SCHEDULE

| | | |
|---|---|---|
| **Effective Date:** July 1, 2009 | | **Expiration Date:** July 1, 2010 |
| **Policy Number:** LQ1B71198583046 | | |
| **Issued To:** CAMERON INTERNATIONAL CORPORATION | | |

It is hereby understood and agreed the following forms and endorsements are attached to and are a part of this policy:

| Form Number | Form Name | Endorsement No. |
|---|---|---|
| 0100-XS (03/00) | Excess Policy Liability Declarations | |
| 0104-XS (Ed. 03/00) | Excess Forms and Endorsements Schedule | |
| 0188-XS (Ed. 03/00) | Asbestos Exclusion | 1 |
| 0200-XS (04 07) | Crisis Communication Management Insurance Endorsement | 2 |
| 0102-XS (Ed. 03/00) | Nuclear Energy Liability Exclusion Endorsement | 3 |
| 0160-XS (Ed. 03/00) | Pollution Limitation Endorsement Follow Form | 4 |
| Excess 4011 (05/06) | War Liability Exclusion | 5 |
| E-TX-XS (Ed. 03 02) | Texas Amendatory Endorsement | 6 |
| TRIA-EX-E001-0208 | Exclusion of Certified Acts of Terrorism | 7 |
| LJUNOTICE-TX-002-0209 | Texas Notice | |
| 0101-XS (Ed. 03 00) | Excess Liability Policy | |



0104-XS (03 00)

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.

(A New York Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO.     1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| | |
|---|---|
| Named Insured: | CAMERON INTERNATIONAL CORPORATION |
| Policy Number: | LQ1B71198583046 |
| Effective Date: | July 1, 2009 |

### ASBESTOS EXCLUSION

This policy does not apply to:

Any "loss", including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations or the fees of attorneys, experts, or consultants arising out of or related in any way, whether directly or indirectly to:

    (1)   asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust, including, but not limited to, manufacture, mining, use, sale, installation, removal, or distribution activities;

    (2)   exposure to testing for, monitoring of, cleaning up, removing, containing or treating of asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust; or

    (3)   any obligation to investigate, settle or defend, or indemnify any person against any claim or suit arising out of, or related in any way, either directly or indirectly, to asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust.

This endorsement does not change any other provision of the policy.

1

0188-XS (Ed. 03/00)

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.
(A New York Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO.    2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| | |
|---|---|
| **Named Insured:** | CAMERON INTERNATIONAL CORPORATION |
| **Policy Number:** | LQ1B71198583046 |
| **Effective Date:** | July 1, 2009 |

### CRISIS COMMUNICATIONS MANAGEMENT INSURANCE ENDORSEMENT

It is understood and agreed that this policy shall not be subject to the terms and conditions of Endorsement Form Number, As per on file with company, (Crisis Communications Management Insurance) of Policy Number: 27471353, issued by Illinois National Insurance Company, and under no circumstances shall this Policy provide coverage for Crisis Management Loss as defined herein.

All other terms, conditions and exclusions of the Policy remain unchanged.



0200-XS (04 07)

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.
### (A New York Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO.   3

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| | |
|---|---|
| **Named Insured:** | CAMERON INTERNATIONAL CORPORATION |
| **Policy Number:** | LQ1B71198583046 |
| **Effective Date:** | July 1, 2009 |

### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

This endorsement changes the policy as follows:

This policy does not apply to:

A. Any "loss":

   1. with respect to which any Insured under this policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic, Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an Insured under any such policy but for its Limit of Insurance: or

   2. resulting from the "hazardous properties" of "nuclear material" and with respect to which:

      a) a person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

      b) any Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Any injury or "nuclear property damage" resulting from the "hazardous properties" of "nuclear material," if:

   1. The "nuclear material,"

      a) is at any "nuclear facility" owned by, or operated by or on behalf of, any insured; or

      b) has been discharged or dispersed therefrom;

   2. the "nuclear material" is contained in "spent fuel" or "nuclear waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any Insured; or

| i | 3 |
|---|---|

0102-XS (Ed. 03/00)

# Excess Insurance Policy

3. the injury or "nuclear property damage" arises out of the furnishing by any Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion B.3 applies only to "nuclear property damage" to such "nuclear facility" and any property therein.

As used in this Exclusion:

1. "Hazardous properties" include radio-active, toxic or explosive properties.

2. "Nuclear facility" means:

   a) any "nuclear reactor."

   b) any equipment or device designed or used for:

      (1) separating the isotopes of uranium or plutonium,

      (2) processing or utilizing "spent fuel," or

      (3) handling, processing or packaging "nuclear waste";

   c) any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "nuclear waste," and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

3. "Nuclear material" means "source material," special nuclear material" or "by-product material," "special nuclear material" or "by-product material".

4. "Nuclear property damage" includes all forms of radioactive contamination of property.

5. "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

6. "Nuclear Waste" means any "nuclear waste" material:

   a) containing "by-product material" other than the tailings of "nuclear wastes" produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and

   b) resulting from the operation by any person or organization of any "nuclear facility" included within the definition of "nuclear facility" under Paragraph 2(a) or 2(b).

7. "Source material," "special nuclear material," and by-product material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

# Excess Insurance Policy

8.  "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

This endorsement does not change any other provisions of the policy.

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.
(A New York Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO.   4

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| | |
|---|---|
| **Named Insured:** | CAMERON INTERNATIONAL CORPORATION |
| **Policy Number:** | LQ1B71198583046 |
| **Effective Date:** | July 1, 2009 |

### POLLUTION LIMITATION ENDORSEMENT-FOLLOW FORM

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

This insurance does not apply to:

Any "loss," including but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants, arising out of or in anyway related to:

1. The actual, alleged, or threatened presence, discharge, dispersal, seepage, migration, release, or escape of "pollutants," however caused.

2. Any request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in anyway respond to or assess the effects of "pollutants." This includes demands, directives, complaints, suits, orders or requests brought by any governmental entity or by any person or group of persons.

3. Steps taken or amounts incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or assess the effects of "pollutants."

This exclusion will apply to any "loss," costs, charges, or expenses, or any judgments or settlements, arising directly or indirectly out of pollution whether or not the pollution was sudden, accidental, gradual, intended, expected, unexpected, preventable or not preventable.

As used in this exclusion "pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials, which are intended to be or have been recycled, reconditioned or reclaimed.

However, it is agreed that this exclusion does not apply to any "loss" described above for which coverage is afforded under Illinois National Insurance Company Policy Number: 27471353, Form Number: As per on file with company, and then for no broader coverage than is afforded by such insurance (hereafter referred to as "Underlying Pollution Coverage").

1  2

0160-XS (Ed 03/00)

# Excess Insurance Policy

In the event that the "Underlying Pollution Coverage is amended or deleted after the inception date of this policy the Company must be so advised in writing within fourteen (14) days after the effective date of such amendment or deletion. Any amendment which broadens coverage under the "Underlying Pollution Coverage" shall not be binding upon the Company unless its agreement is acknowledged in writing by an authorized representative of the Company.

All other terms and conditions of this policy remain unchanged.

2

0160-XS (Ed 03/00)

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.
(A New York Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| | |
|---|---|
| **Named Insured:** | CAMERON INTERNATIONAL CORPORATION |
| **Policy Number:** | LQ1B71198583046 |
| **Effective Date:** | July 1, 2009 |

### WAR LIABILITY EXCLUSION ENDORSEMENT

It is hereby agreed that the Policy shall be amended as follows:

This Policy does not apply to any "loss", however caused, arising, directly or indirectly, out of:

    (1)  War, including undeclared or civil war; or

    (2)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    (3)  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms, conditions, and exclusions of this policy remain unchanged.

Excess 4011 (05/06)

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.
(A New York Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO.     6

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| | |
|---|---|
| **Named Insured:** | CAMERON INTERNATIONAL CORPORATION |
| **Policy Number:** | LQ1B71198583046 |
| **Effective Date:** | July 1, 2009 |

### TEXAS AMENDATORY ENDORSEMENT

It is agreed that Section V., Condition C., is amended by adding the following to paragraph 2:

Any written notice of cancellation will state the reasons therefore.

It is further agreed that Section V., Condition C., is amended by adding the following:

9.   If this is a policy that is in its initial policy period and has been in effect for more than sixty (60) days following the date on which the policy was issued, or if this is a renewal or continuation of a policy we issued, we may not cancel this policy except for one or more of the following reasons:

a)   Nonpayment of premium;

b)   Fraud in obtaining the policy;

c)   An increase in hazard within the control of the Insured which would produce an increase in rate;

d)   Our placement into supervision, conservatorship, or receivership, if the cancellation or nonrenewal is approved or directed by the supervisor, conservator, or receiver; or

e)   Loss of our reinsurance covering all or part of the risk covered by the policy.

**Nonrenewal**

10.   We may choose not to renew this policy by delivering written notice to the Named Insured at the last address shown in the Declarations.  We will provide written notice of nonrenewal at least sixty (60) days prior to the expiration of the policy, except that if we have been placed in supervision, conservatorship or receivership and we choose not to renew this policy with the approval or at the direction of the supervisor, conservator or receiver only, we will only be required to provide notice of nonrenewal at least ten (10) days prior to expiration of the policy.  Any notice of nonrenewal shall state the reasons for the nonrenewal.  A transfer of coverage for the Named Insured within the same insurance group will not be considered a refusal to renew.

11.   If we fail to provide notice of nonrenewal at least sixty (60) days before the expiration of the policy, the policy will remain in effect until the sixty-first (61st) day after we have provided the Named Insured with such notice.  Earned premium for any such continuation of coverage beyond the expiration date of the policy will be calculated pro rata based on the previous year's rates.

12.   We may not cancel or refuse to renew this policy based solely on the fact you are an elected official.



E-TX-XS (Ed. 03 02)

# Excess Insurance Policy

It is further agreed that Section V., Condition E., is amended by adding the following:

5.   We will provide written notice to the Named Insured of our receipt of an initial offer to compromise or settle a claim made against you under this policy. We will provide such notice within ten (10) days after we receive the offer to compromise or settle.

6.   Within thirty (30) days after the date of any settlement of a claim under this policy, we will notify the Named Insured in writing of such settlement.

This endorsement does not change any other provision of the policy.

E-TX-XS (Ed. 03 02)

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.

(A New York Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 7

| | |
|---|---|
| **Named Insured:** | CAMERON INTERNATIONAL CORPORATION |
| **Policy Number:** | LQ1B71198583046 |
| **Effective Date:** | July 1, 2009 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

Excess Insurance Policy

A. The following exclusion is added:

This insurance does not apply to any "loss" arising out of or related in any way, whether directly or indirectly to:

**TERRORISM**

B. The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or underlying insurance.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



TRIA-EX-E001-0208          Includes copyrighted material of Insurance Services Office, Inc., used with its permission

# Excess Insurance Policy

### TEXAS NOTICE

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| To obtain information or make a complaint: | Para obtener informacion o para someter una queja: |
| You may call Liberty International Underwriters' toll-free telephone number for information or to make a complaint at: | Usted puede llamar al numero de telefono gratis de Liberty International Underwriters' para informacion o para someter una queja al: |
| **1-800-344-0197** | **1-800-344-0197** |
| You may also write to Liberty International Underwriters at:<br><br>Presidential Service Team<br>Liberty International Underwriters<br>175 Berkeley St. MS 10B<br>Boston, MA 02116 | Usted tambien puede escribir a Liberty International Underwriters:<br><br>Presidential Service Team<br>Liberty International Underwriters<br>175 Berkeley St. MS 10B<br>Boston, MA 02116 |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at: | Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companies, coberturas, derechos o quejas al: |
| **1-800-252-3439** | **1-800-252-3439** |
| You may write the Texas Department of Insurance:<br>P. O. Box 149104<br>Austin, TX 78714-9104<br>FAX # (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: consumerprotection@tdi.state.tx.us | Puede escribir al Departamento de Seguros de Texas:<br>P. O. Box 149104<br>Austin, TX 78714-9104<br>FAX # (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: consumerprotection@tdi.state.tx.us |
| **PREMIUM OR CLAIM DISPUTES:**<br>Should you have a dispute concerning your premium or about a claim you should contact the (agent) (company) (agent or the company) first. If the dispute is not resolved, you may contact the Texas Department of Insurance | **DISPUTAS SOBRE PRIMAS O RECLAMOS:**<br>Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el (agente) (la compania) (agente o la compania) primero. Si no se resuelve la disputa, puede entonces comunicarse con el Departamento de Seguros de Texas. |
| **ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document. | **UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto. |



LIUNOTICE-TX-002-0209

# Excess Insurance Policy

## LIBERTY INSURANCE UNDERWRITERS INC.
(A New York Stock Insurance Company, hereinafter the "Insurer")
55 Water Street, 18th Floor; New York, NY 10041
Toll-free number: 1-800-677-9163

### EXCESS LIABILITY POLICY

There are provisions in this policy that restrict coverage.  Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Words and phrases in quotation marks have special meaning and can be found in the Definitions or the specific policy provision where they appear.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations, and subject to all terms of this policy, we agree with you to provide coverage as follows:

INSURING AGREEMENTS

### I.   COVERAGE

We will pay on behalf of the Insured "loss" that results from an occurrence during the "policy period."  We will pay "loss" in excess of the Underlying Insurance shown in Item 5. of the Declarations, but only up to an amount not exceeding our Limits of Liability as shown in Item 4. of the Declarations.  Except for any definitions, terms, conditions and exclusions of this policy, the coverage provided by this policy is subject to the terms and conditions of the First Underlying Insurance Policy, as shown in Item 5. of the Declarations.

The inclusion or addition hereunder of more than one Insured shall not operate to increase our Limits of Liability beyond that shown in Item 4. of the Declarations.

We will be furnished a complete copy of the First Underlying Insurance Policy described in Item 5. of the Declarations.

### II.   LIMITS OF LIABILITY

A.   The Limits of Liability shown in Item 4. of the Declarations and the rules below describe the most we will pay regardless of the number of:

   1.   Insureds;

   2.   claims made or suits brought; or

   3.   persons or organizations making claims or bringing suits.

B.   The Limits of Liability of this policy will apply as follows:

   1.   This policy applies only in excess of the Underlying Insurance shown in Item 5. of the Declarations.

   2.   The aggregate limit shown in Item 4. of the Declarations is the most we will pay for all "loss" that is subject to an aggregate limit provided by the First Underlying Insurance Policy.  The aggregate limit applies separately and in the same manner as the aggregate limits provided by the First Underlying Insurance Policy.

   3.   Subject to Paragraph B.2. above, the occurrence limit shown in Item 4. of the Declarations is the most we will pay for all "loss" arising out of any one occurrence to which this policy applies.

**1   4**

0101-XS (Ed. 03 00)

# Excess Insurance Policy

4. Subject to Paragraphs B.2. and B.3. above, if the limits of liability of the Underlying Insurance shown in Item 5. of the Declarations are reduced or exhausted solely by payment of "loss", such insurance provided by this policy will apply in excess of the reduced Underlying Insurance or, if all such coverage is exhausted, will apply as underlying insurance subject to the same terms, conditions, definitions and exclusions of the First Underlying Insurance Policy, except for any definitions, terms, conditions and exclusions of this policy.

5. The Limits of Liability of this policy apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Liability.

## III. DEFENSE

A. We will not be required to assume charge of the investigation of any claim or defense of any suit against you.

B. We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss" under this policy. If we exercise such right, we will do so at our own expense.

C. If the limits of liability of the Underlying Insurance shown in Item 5. of the Declarations are exhausted solely by payment of "loss", we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit which, in our opinion, may give rise to a "loss" under this policy. Such investigation or defense shall be at our own expense. We may, however, withdraw from the defense of such suit and tender the continued defense to you if our applicable Limits of Liability shown in Item 4. of the Declarations are exhausted by payment of "loss."

## IV. DEFINITIONS

"Loss" means those sums which you are legally obligated to pay as damages, after making proper deductions for all recoveries and salvage, which damages are covered by the First Underlying Insurance Policy.

"Policy period" means the period from the inception date of this policy to the expiration date stated in the Declarations, or any earlier date of cancellation or termination.

## V. CONDITIONS

A. **Appeals**

In the event you or the insurer(s) of the Underlying Insurance shown in Item 5. of the Declarations elects not to appeal a judgment in excess of the amount of the Underlying Insurance, we may elect to appeal at our expense. If we do so elect, we will be liable for the costs and additional interest accruing during this appeal. In no event will this provision increase our liability beyond the applicable Limits of Liability as set forth in Section II. of this policy and as shown in Item 4. of the Declarations.

B. **Bankruptcy or Insolvency**

The bankruptcy, insolvency or inability to pay of any Insured will not relieve us from our obligation to pay "loss" covered by this policy.

In the event of bankruptcy, insolvency or refusal or inability to pay, of the insurer(s) of the Underlying Insurance shown in Item 5. of the Declarations, the insurance afforded by this policy will not replace such Underlying Insurance, but will apply as if the Underlying Insurance was fully available and collectible.

C. **Cancellation**

3    4

0101-XS (Ed. 03 00)

# Excess Insurance Policy

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect

2. We may cancel this policy. If we cancel because of non-payment of premium, we will mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we will mail or deliver to you not less than thirty (30) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1. of the Declarations will be sufficient to prove notice.

3. The "policy period" will end on the day and hour stated in the cancellation notice.

4. If we cancel, final premium will be calculated pro rata based on the time this policy was in force.

5. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure.

6. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter, but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, will be sufficient tender of any refund due you.

7. The Named Insured shown in Item 1. of the Declarations will act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

8. Any of these provision that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with the law.

**D. Maintenance of Underlying Insurance**

During the "policy period", you agree:

1. To keep the policies listed in the Schedule of Underlying Insurance as shown in Item 5. of the Declarations in full force and effect;

2. That the Limits of Liability of the policies listed in the Schedule of Underlying Insurance as shown in Item 5. of the Declarations will be maintained except for any reduction or exhaustion of aggregate limits by payment of "loss" in claims or suits covered by the Underlying Insurance.

If you fail to comply with these requirements, we will only be liable to the same extent that we would have been had you fully complied with these requirements.

**E. Notice of Occurrence**

1. You must see to it that we are notified as soon as practicable of an occurrence which may result in a "loss" covered under this policy. To the extent possible, notice will include:

   a) how, when and where the occurrence took place;

   b) the names and addresses of any injured persons and witnesses;

   c) the nature and location of any injury or damage arising out of the occurrence.

2. If a claim or suit against any Insured is reasonably likely to involve this policy, you must notify us in writing as soon as practicable.

3. You and any other involved Insured must:

# Excess Insurance Policy

a) immediately send us copies of any demands, notices, summonses or legal documentation received in connection with a claim or suit;

b) authorize us to obtain records and other information;

c) cooperate with us in the investigation, settlement or defense of the claim or suit; and

d) assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

4. The Insureds will not, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**F. Other Insurance**

If other insurance applies to a "loss" that is also covered by this policy, this policy will apply excess of such other insurance. Nothing herein will be construed to make this policy subject to the definitions, terms, conditions and exclusions of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

Other insurance includes any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities.

**G. Terms Conformed to Statute**

The terms of this policy which are in conflict with the statutes of the state where this policy is issued are amended to conform to such statutes. If we are prevented by law or statute from paying on behalf of the Insured, then we will, where permitted by law or statute, indemnify the Insured.

**H. When "Loss" is Payable**

Coverage under this policy will not apply unless and until you or the insurer(s) of the Underlying Insurance shown in Item 5. of the Declarations has paid or is obligated to pay the full amount of such Limits of Liability.

When the amount of "loss" has finally been determined, we will promptly pay on your behalf the amount of "loss" covered under this policy.

**In Witness Whereof, the Insurer has caused this policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.**

PRESIDENT
David A. Cohen

VICE PRESIDENT and SECRETARY
Dexter R. Legg

EXHIBIT 10.1

### CONFIDENTIAL SETTLEMENT AGREEMENT, MUTUAL RELEASES

### AND AGREEMENT TO INDEMNIFY

This Confidential Settlement Agreement, Mutual Releases and Agreement to Indemnify ("Agreement") is entered into this 15th day of December 2011 (the "Effective Date"), by BP Exploration & Production Inc. ("BPXP") and Cameron International Corporation ("Cameron"). Where applicable, BPXP and Cameron will be referred to collectively as the "Parties" and individually as a "Party." BP Corporation North America Inc. ("BPCNA") shall be a party to this Agreement solely for the purposes of paragraph 5.5 and Article VII.

For and in consideration of the mutual promises and releases set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties stipulate and agree as set forth herein below.

### I.  RECITALS AND ACKNOWLEDGEMENTS

1.1 BPXP and Cameron are defendants in lawsuits in state and federal courts arising out of or related to the *Deepwater Horizon* Incident, including lawsuits that have been consolidated in the multidistrict litigation pending before Judge Carl J. Barbier in the United States District Court for the Eastern District of Louisiana ("MDL 2179"). BPXP and Cameron may also be sued, have Claims made against them, or be subject to investigation in future lawsuits, administrative or regulatory proceedings, or government investigations or prosecutions related to and arising out of the *Deepwater Horizon* Incident. The present and future Claims, administrative and/or regulatory proceedings, or investigations related to and arising out of the *Deepwater Horizon* Incident in which BPXP and Cameron are or become parties or are otherwise involved shall be referred to collectively and individually as "the Litigation."

1.2 BPXP and Cameron each acknowledge that the *Deepwater Horizon* Incident was the product of complex and interlinked causes involving multiple parties from which the entire industry can and should learn in order to improve safety in the drilling industry, including standard specifications for blowout preventers and other drill through equipment. Accordingly, BPXP and Cameron commit to working together to improve processes and procedures, managerial systems, specifications, and safety and best practices in offshore drilling operations. BPXP and Cameron will encourage other companies in the drilling industry to join them in this improvement and reform effort.

1.3 BPXP and Cameron desire to resolve the disputes between them related to and arising out of the *Deepwater Horizon* Incident. BPXP and Cameron desire to resolve any and all disputes between them as to any alleged liability to the other related to or arising out of the *Deepwater Horizon* Incident, whether such disputes sound in contract or tort or otherwise, as and to the extent provided herein.

1.4 BPXP and Cameron each have determined independently that it is in their best interests to reach a global settlement regarding the Litigation. This Agreement is not an admission of any liability by any party regarding the *Deepwater Horizon* Incident. The Parties agree and acknowledge that this Agreement has been reached after arm's length negotiations, with each Party compromising its Claims and defenses for value that it considers to be fair and reasonable in view of the risks and costs associated with litigation.



## II.  DEFINITIONS

In addition to the terms defined elsewhere in the Agreement, the following terms shall be defined as follows for the purposes of this Agreement, including all of its exhibits:

2.1 The "BP Released Parties" shall mean BPXP and each of its past and present Affiliates (including BP p.l.c. and its subsidiaries and subsidiary undertakings (as those terms are defined in the U.K. Companies Act 2006)), and each of their respective business units, predecessors, and successors, and each of their respective agents, servants, representatives, officers, directors (or Persons performing similar functions), employees, attorneys and administrators, all and only in their capacities as such.

2.2 The "BP Releasing Parties," shall mean BPXP and each of its past and present Affiliates (including BP p.l.c. and its subsidiaries and subsidiary undertakings (as those terms are defined in the U.K. Companies Act 2006)), and each of their respective business units, predecessors, and successors.

2.3 The "Cameron Released Parties" shall mean Cameron and each of its past and present Affiliates, and each of their respective business units, predecessors, and successors, and each of their respective agents, servants, representatives, officers, directors (or Persons performing similar functions), employees, attorneys and administrators, all and only in their capacities as such.

2.4 The "Cameron Releasing Parties" shall mean Cameron and each of its past and present Affiliates, and each of their respective business units, predecessors, and successors.

2.5 "Claims" shall mean any claim, counterclaim, cross-claim, demand, charge, dispute, controversy, action, cause of action, suit, proceeding, arbitration, alternative dispute resolution, inquiry, investigation or notice, whether of a civil, criminal, administrative, investigative, private or other nature, and whether pending, threatened, present or initiated in the future and whether known or unknown, suspected or unsuspected, under any current or future local, state, federal, foreign, tribal, supranational or international law, regulation, equitable principle, contract or otherwise for any damage of any kind or nature whatsoever, including but not limited to personal injury, bodily injury, death, special and general damages, property damage, economic loss, business interruption, damage to natural resources, medical or environmental monitoring or testing, special, consequential, general, and any compensatory damages under federal, state or local laws related to pollution, and damages related to any offshore drilling moratorium, whether brought directly, by subrogation, assignment or otherwise.

2.6 The "MC252 Well" shall refer to the exploratory well that was being drilled on and before April 20, 2010 in block 252 of the Mississippi Canyon protraction area of the Gulf of Mexico, commonly called the Macondo Prospect.

2.7 The *"Deepwater Horizon* Incident" shall, for purposes of this Agreement, refer to the design, planning, preparation or drilling of the MC252 Well; the services, products, equipment, spare parts, and modifications contracted for or provided by Cameron, its Affiliates or by any other Person with respect to the MC252 Well, the *Deepwater Horizon* rig, and any appurtenances or drilling equipment on the rig, including the BOP and its associated controls equipment, whether deployed subsea or on the rig; the blowout and explosion on the *Deepwater Horizon* mobile offshore drilling unit or rig that occurred on April 20, 2010; the ensuing fire and loss of life, personal injury, and bodily injury; the sinking of the rig and the resulting release of hydrocarbons and other pollutants from the MC252 Well site and the *Deepwater Horizon* rig; any damages to any reservoir, aquifer, geological formation or underground strata; the relief well efforts; the subsequent clean up and remediation efforts and all other responsive actions taken in connection with the blowout of the MC252 Well.

2

2.8 "Transocean" refers to Transocean Ltd. and each of its past and present Affiliates, and each of their respective business units, predecessors, and successors, and each of their respective agents, servants, representatives, officers, directors (or Persons performing similar functions), employees, attorneys and administrators, all and only in their capacities as such

2.9 "Transocean Contracts" shall refer to all contracts between any Cameron Releasing Party and Transocean, including (i) the "Master Service Agreement" between Transocean Offshore Deepwater Drilling Inc. and Cameron Division and Cameron Controls Division, Cooper Cameron Corporation with an effective date of September 28, 2000; (ii) the "Master Services Agreement - Worldwide Operations" between Applied Drilling Technology Inc. and Cameron Division, Cooper Cameron Corporation" with an effective date of March 29, 2006; (iii) all purchase orders and related terms and conditions between R&B Falcon Drilling Co. and a Cameron Affiliate related to the blowout preventer for the *Deepwater Horizon*; and (iv) repair quotes between Transocean and any Cameron Releasing Party.

2.10 "Person" shall mean any individual, estate, bank, corporation, company, general or limited partnership, association, limited liability company, body corporate, business trust, unincorporated organization or similar organization or other entity, whether domestic or foreign, or any Governmental Entity.

2.11 "Affiliate" of a Person shall mean a Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, the first Person. "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor, or otherwise.

2.12 "Working Interest Owners" refers to MOEX Offshore 2007 LLC and Anadarko Petroleum Corporation, and their Affiliates, and each of their officers, directors (or Persons performing similar functions), employees, agents and representatives, all and only in their capacities as such.

2.13 "Cameron Insurers" shall mean any and all primary, umbrella, and excess insurers, subscribing insurers, and reinsurers that issued or subscribed to any insurance policy that was in effect on April 20, 2010, all and only as listed in Exhibit A to this Agreement (collectively, "Cameron Policies"), but only in such insurers', subscribing insurers', and reinsurers' respective capacities as insurers, subscribing insurers, or reinsurers of Cameron Released Parties under such Cameron Policies. Cameron represents and warrants that the Cameron Policies are the only insurance policies that provide insurance to the Cameron Releasing Parties that are potentially applicable to Claims relating to or arising out of the *Deepwater Horizon* Incident.

2.14 "Consenting Cameron Insurers" shall mean all of, and only, the specific Cameron Insurers identified as Consenting Cameron Insurers on Exhibit A to this Agreement, all of which insurers have expressly consented to this Agreement.

2.15 "Third Party" shall mean any Person other than Cameron Released Parties, BP Released Parties, or Cameron Insurers.

2.16 The term "including" means "including without limitation" and the term "includes" means "includes without limitation."

2.17 The term "approval" means a written approval.

### III.  CASH PAYMENT

3.1 Within 30 days of the Effective Date, Cameron and/or its Affiliates shall pay in cash to BPXP, or one of BPXP's Affiliates nominated by BPXP, the total sum of two-hundred-fifty million dollars ($250,000,000) in cash (the "Cash Payment") by wire transfer of same day funds to one or more accounts designated by BPXP.

3.2 BPXP will use the Cash Payment to pay the claims of Persons whose injuries and damages are alleged to arise out of or relate to the *Deepwater Horizon* Incident.

3.3 If (i) the Cash Payment is not timely made in full, without set-off, deduction or withholding or (ii) if any portion of the Cash Payment is avoided, set aside, or recovered for any reason whatsoever from BPXP or one of its Affiliates by any Person; then at BPXP's election this Agreement, including Articles IV and V, shall be null and void, and all or any part of the Cash Payment in the possession, custody, or control of BPXP or any of its Affiliates shall be returned to Cameron.  This Paragraph does not limit BPXP's remedies, and BPXP also may alternatively sue to enforce this Agreement and its promise of payment and other terms.

3.4 Cameron hereby represents and warrants that it shall be solely responsible for any portion of the Cash Payment specified in Article III of this Agreement that is not funded or reimbursed by any Cameron Policy triggered by or answerable to this Agreement.

### IV.  RELEASES

4.1 In consideration of and for the promises identified herein, the Parties make the following releases with respect to the *Deepwater Horizon* Incident:

4

(a) The BP Releasing Parties hereby release and forever discharge the Cameron Released Parties from any and all past, present or future Claims, demands, lawsuits, damages, obligations, promises, losses, liabilities or costs of any kind, nature or description whatsoever, including tort claims, contract claims, warranty claims, statutory claims, declaratory judgment actions, counterclaims, cross-claims, demands and claims for damages, including Claims for or based on payments made to or by the Gulf Coast Claims Facility ("GCCF"), or Claims for fines, penalties, sanctions or punitive or exemplary damages, that the BP Releasing Parties have, ever had, hereafter may have, or have acquired or may hereafter acquire by assignment or operation of law, against Cameron Released Parties, including all Claims for subrogation, contribution or indemnity and all Claims arising under any other theory of recovery, whether known or unknown, suspected or claimed, whether or not yet asserted or accrued, arising out of or related to the *Deepwater Horizon* Incident, including any and all Claims in the Litigation.  The BP Releasing Parties agree and covenant not to assert any Claim against the Cameron Released Parties, whether by complaint, cross-claim, counterclaim or other type of demand, for any loss, injury or damage arising out of in any way or related to the *Deepwater Horizon* Incident, including any and all Claims in the Litigation.

(b) The BP Releasing Parties hereby release and forever discharge the Consenting Cameron Insurers from any and all past, present or future Claims, demands, lawsuits, damages, obligations, promises, losses, liabilities or costs of any kind, nature or description whatsoever under or related to the Cameron Policies issued or subscribed to by Consenting Cameron Insurers, including tort claims, contract claims and any claims that the BP Releasing Parties have or allegedly have under the Cameron Policies issued or subscribed to by Consenting Cameron Insurers (including any claims as "additional insureds"), extra-contractual claims, warranty claims, statutory claims, declaratory judgment actions, counterclaims, cross-claims, demands, and claims for damages, including Claims for or based on payments made to or by the GCCF, or Claims for fines, penalties, sanctions or punitive or exemplary damages, that the BP Releasing Parties have, ever had, hereafter may have, or have acquired or may hereafter acquire by assignment or operation of law, against the Consenting Cameron Insurers under or related to the Cameron Policies issued or subscribed to by Consenting Cameron Insurers, whether known or unknown, suspected or claimed, including all Claims for subrogation, contribution or indemnity and all Claims arising under any other theory of recovery, whether or not yet asserted or accrued, arising out of or related to the *Deepwater Horizon* Incident, including any and all Claims in the Litigation.  The BP Releasing Parties agree and covenant not to assert any Claim against the Consenting Cameron Insurers under or related to the Cameron Policies issued or subscribed to by Consenting Cameron Insurers, whether by complaint, cross-claim, counterclaim or other type of demand, for any loss, injury or damage arising out of in any way or related to the *Deepwater Horizon* Incident, including any and all Claims in the Litigation.

5

(c) The Cameron Releasing Parties hereby release and forever discharge the BP Released Parties from any and all past, present or future Claims, demands, lawsuits, damages, obligations, promises, losses, liabilities or costs of any kind, nature or description whatsoever, including tort claims, contract claims, warranty claims, statutory claims, declaratory judgment actions, counterclaims, cross-claims, demands and claims for damages, including Claims for fines, penalties, sanctions or punitive or exemplary damages, that the Cameron Releasing Parties have, ever had, hereafter may have, or have acquired or may hereafter acquire by assignment or operation of law, against the BP Released Parties, whether known or unknown, suspected or claimed, including all Claims for subrogation, contribution or indemnity and all Claims arising under any other theory of recovery, whether or not yet asserted or accrued, arising out of or related to the *Deepwater Horizon* Incident, including any and all Claims in the Litigation.  The Cameron Releasing Parties agree and covenant not to assert any Claim against the BP Released Parties, whether by complaint, cross-claim, counterclaim or other type of demand, for any loss, injury or damage arising out of in any way or related to the *Deepwater Horizon* Incident, including any and all Claims in the Litigation.  For the avoidance of doubt, the scope of this release and waiver does not include any rights to insurance coverage of the Cameron Releasing Parties under any Cameron Polices.

4.2 Cameron, on behalf of itself, the Cameron Releasing Parties, the Consenting Cameron Insurers, and any and all insurers, reinsurers, indemnitors, subrogees, or assignees of any Cameron Releasing Parties or Consenting Cameron Insurers, releases the BP Released Parties, to the fullest extent allowed by law and to the same extent as the Cameron Releasing Parties are releasing the BP Released Parties pursuant to Paragraph 4.1(c), from and against any and all Claims that any of them have, ever had, hereafter may have, or have acquired or may hereafter acquire against the BP Released Parties, whether known or unknown, suspected or claimed, including all Claims for subrogation, contribution or indemnity and all Claims arising under any other theory of recovery, whether or not yet asserted or accrued, in relation to all or any portion of any payment or other obligation arising out of or related to the *Deepwater Horizon* Incident, including any and all Claims in the Litigation.  For avoidance of doubt, it is the intention of Cameron, on behalf of itself, the Consenting Cameron Insurers, and the Cameron Releasing Parties, by this paragraph 4.2, to release and waive, to the fullest extent allowed by law, any and all subrogation, contribution, and indemnification rights or Claims against any BP Released Parties that might be asserted by any insurer or reinsurer or indemnitor of any Cameron Releasing Parties (but solely in its capacity as such), or any subrogee or assignee of any Cameron Releasing Parties or any such indemnitor, insurer or reinsurer (but again, solely in its capacity as such), such that the Cameron Releasing Parties and any such insurers, reinsurers, indemnitors, subrogees and assignees shall have no right or Claim to recover against any BP Released Party in regard to all or any portion of any payment made or rights assigned hereunder, at any time or under any theory whatsoever, whether legal, equitable, or otherwise.  Cameron represents and warrants that it is authorized by the Consenting Cameron Insurers to enter into the release and waiver in this paragraph on their behalf.

6

4.3 Cameron, on behalf of itself, the Cameron Releasing Parties, the Consenting Cameron Insurers, and any and all insurers, reinsurers, indemnitors, subrogees, or assignees of any Cameron Releasing Parties or Consenting Cameron Insurers, agrees not to pursue, demand, litigate, or otherwise seek any Claims for contribution, subrogation, indemnity, or Claims arising under any other theory of recovery, including Claims for fines, penalties, sanctions or punitive or exemplary damages, arising out of or related to the *Deepwater Horizon* Incident that any of them have, ever had, hereafter may have, or have acquired or may hereafter acquire against any Third Party, including against Transocean under the Transocean Contracts and against any insurer of Transocean (acting in its capacity as such); provided that the scope of this paragraph does not include any rights to insurance coverage that the Cameron Releasing Parties may have under the Cameron Policies. Cameron represents and warrants that it is authorized by the Consenting Cameron Insurers to enter into this paragraph on their behalf. Without limiting the remedies for any portion of this Agreement, the Parties agree that the BP Released Parties may enforce specific performance of this Paragraph.

4.4 Notwithstanding paragraphs 4.1 through 4.3, each Party may enforce its rights under this Agreement. In addition, notwithstanding any other provision of this Agreement, including paragraphs 4.2 and 4.3, Cameron is not releasing any subrogation or other rights of Liberty Insurance Underwriters Inc. ("Liberty"), which issued policy number LQ1B71198583046 to Cameron for the policy year July 1, 2009 to July 1, 2010. BPXP and Cameron reserve all rights and claims that either may have against Liberty.

4.5 To the fullest extent allowed by law, Cameron hereby assigns all right, title, and interest to all Claims that the Cameron Releasing Parties have asserted or could assert against any Third Parties, including any indemnification claims against Transocean under the Transocean Contracts and further including Claims for fines, penalties, sanctions or punitive or exemplary damages, arising out of or relating to the *Deepwater Horizon* Incident (the "Cameron Third Party Claims") to BPXP, and BPXP accepts all right, title, and interest to all Cameron Third Party Claims. To the extent that assignment of any Cameron Third Party Claims is deemed invalid by a court or arbitration panel of competent jurisdiction, Cameron agrees on behalf of the Cameron Releasing Parties to release, and covenants not to sue for, each and every such Cameron Third Party Claim for which the assignment has been deemed invalid.

4.6 To the fullest extent allowed by law, Cameron, on behalf of itself and the Cameron Releasing Parties, hereby waives, releases and forever discharges any and all Claims for insurance coverage that any of them might have relating in any way to the Cash Payment specified in Article III of this Agreement against any of the Consenting Cameron Insurers. For the avoidance of doubt, Cameron reserves any rights it may have to insurance coverage under any Cameron Policies to the extent such Policies are not exhausted by the Cash Payment. Cameron, on behalf of itself and the Cameron Releasing Parties, further represents and warrants that, in the event that any of them pursue any insurance coverage Claim against any Cameron Insurer in respect to all or any portion of the Cash Payment specified in Article III of this Agreement, Cameron and the Cameron Releasing Parties (a) shall only settle such insurance coverage Claim if the settlement includes an express waiver of any such Cameron Insurer's rights of contribution, subrogation, indemnity, and rights to bring Claims arising under any other theory of recovery, including Claims for fines, penalties, sanctions or punitive or exemplary damages, against the BP Released Parties or Third Parties, including Transocean; or (b) if such insurance coverage Claim does not settle, shall use their reasonable best efforts to litigate or arbitrate any such insurance coverage Claim so that any judgment, decision, or award expressly provides that any such Cameron Insurer has waived any right of contribution, subrogation, indemnity, and rights to bring Claims arising under any other theory of recovery, including Claims for fines, penalties, sanctions or punitive or exemplary damages, against the BP Released Parties or Third Parties, including Transocean; and (c) shall not seek enforcement of any favorable judgment, decision, or award without the consent of BPXP, which shall not be unreasonably withheld, with the understanding that the absence of the express waiver described in 4.6(b) shall be reasonable grounds for BPXP to withhold consent.

7

## V.  INDEMNITIES

5.1 **BPXP's Indemnities To The Cameron Released Parties.**  Subject in all respects to paragraph 5.3, and subject to timely receipt of the Cash Payment in full, without set-off, deduction or withholding, BPXP agrees to indemnify, but not defend, the Cameron Released Parties for any and all Claims in any way relating to or arising out of the *Deepwater Horizon* Incident, including the following Claims against the Cameron Released Parties to the extent resulting from the *Deepwater Horizon* Incident:

    (a)  Claims for pollution, contamination or damage to natural resources;

    (b)  Claims for losses of or damages to (i) the MC252 Well; (ii) the reservoir at the Macondo Prospect, and (iii) any property right in or to oil, gas, or other mineral substances at the Macondo Prospect;

    (c)  Claims for personal injury (including bodily injury), illness, or death, except for such Claims brought by or on behalf of individuals within the definition of Cameron Released Parties incurred during the course of performing their responsibilities for Cameron;

    (d)  Claims for damages to or losses of equipment and property belonging to the BP Released Parties or Working Interest Owners and located at the Macondo Prospect;

    (e)  Claims for killing the MC252 Well or otherwise bringing the MC252 Well under control; and

    (f)  Claims for compensatory damages (but not fines, penalties and sanctions), brought by federal, foreign, state or local governments and their subdivisions, agencies, and trustees.

5.2 **Cameron's Indemnities to the BP Released Parties.**  Notwithstanding anything contained in any other provision of this Agreement, including this paragraph 5.2, Cameron shall have no obligation to indemnify the BP Released Parties for any punitive, exemplary, multiple, or other non-compensatory damages and any civil, criminal or administrative fines or penalties or sanctions, including any monies associated with a deferred or non-prosecution agreement, or a civil judgment or settlement that adjudicates or resolves a Claim or Claims for fines, penalties, or sanctions.  Otherwise, Cameron agrees to indemnify, but not defend, the BP Released Parties for the following Claims in any way relating to or arising out of the *Deepwater Horizon* Incident:

8

(a) Claims for personal injury (including bodily injury), illness, or death, brought by or on behalf of individuals within the definition of Cameron Released Parties incurred during the course of performing their responsibilities for Cameron, provided that for the avoidance of doubt this subparagraph is not intended to apply to Claims by individuals within the definition of Cameron Released Parties that arise outside of the course of performing their responsibilities for Cameron;

(b) Claims for damages to or losses of equipment and property belonging to the Cameron Released Parties, provided that for the avoidance of doubt this subparagraph is not intended to apply to Claims by individuals within the definition of Cameron Released Parties for losses of their personal property or equipment that arise outside of the course of performing their responsibilities for Cameron; and

(c) All amounts that are paid by the GCCF for any Claims for which Cameron is responsible for indemnifying the BP Released Parties under this paragraph 5.2, which Cameron shall reimburse to BPXP.

5.3 **Scope of BPXP's Indemnities.** Notwithstanding anything contained in any other provision of this Agreement, including paragraphs 2.5 and 5.1, BPXP's indemnification obligations pursuant to this Agreement do not include:

(a) Claims for which Cameron is indemnifying the BP Released Parties;

(b) Any civil, criminal or administrative fines or penalties or sanctions, including any monies associated with a deferred or non-prosecution agreement, or a civil judgment or settlement that adjudicates or resolves a Claim or Claims for fines, penalties, or sanctions;

(c) Any punitive, exemplary, multiple or other non-compensatory damages;

(d) Any Claims for any Cameron Released Party's lost profits, lost revenues, lost business opportunities, or business interruption, provided that for the avoidance of doubt this subparagraph is not intended to apply to Claims by individuals within the definition of Cameron Released Parties for such Claims for lost profits, lost revenues, lost business opportunities, or business interruption that arise outside of the course of performing their responsibilities for Cameron;

(e) Claims for indemnification that any Cameron Releasing Party, or its insurers, reinsurers, indemnitors, subrogees, or assignees, has, ever had, hereafter may have, or has acquired or may hereafter acquire against any Third Party, including under the Transocean Contracts;

9

(f) Litigation costs, including attorneys' fees, incurred by the Cameron Released Parties or Cameron Insurers related to any and all Claims by or against any of them in any form, including Claims for which BPXP is obligated to indemnify the Cameron Released Parties pursuant to paragraph 5.1; and

(g) Claims, damages, losses, liabilities, fees, settlements, judgments, costs, or other expenses or obligations arising from or related to: derivative Claims brought by shareholders or members of a corporation or an unincorporated association purportedly on behalf of any Cameron Released Parties; securities Claims brought against any Cameron Released Parties; shareholders' Claims brought against any Cameron Released Parties; Claims for fraudulent conveyance and similar creditors' remedies brought against or on behalf of any Cameron Released Parties; pension plan or employee benefit plan Claims brought against any Cameron Released Parties; Employee Retirement Income Security Act ("ERISA") Claims brought against Cameron Released Parties; Fair Labor Standards Act Claims brought against any Cameron Released Parties; or Racketeer Influenced and Corrupt Organizations Act ("RICO") Claims brought against any Cameron Released Parties.

**5.4 BPXP's Indemnities to Cameron Insurers.** Notwithstanding paragraph 4.2, BPXP shall indemnify, but not defend, Consenting Cameron Insurers for any "direct action" Claims under the Cameron Policies issued or subscribed to by Consenting Cameron Insurers made by any Third Parties directly against Cameron Insurers under L.S.-R.S. 22:1269 or any similar applicable direct action statute, provided that such Claims in any way relate to or arise out of the *Deepwater Horizon* Incident and only to the extent, and under the same terms, that BPXP would be obligated to indemnify Cameron under this Agreement if the damages or any other relief or recovery sought in such Claims were sought by such Third Parties directly against Cameron. For the avoidance of doubt, in no event shall BPXP be obligated to defend or indemnify Cameron Insurers for (a) any defense costs of any nature or kind whatsoever, (b) any costs incurred in connection with any counterclaims or Claims for affirmative relief by Cameron Insurers, or (c) any damages or other relief for which BPXP would not be obligated to indemnify Cameron pursuant to the indemnities provided in paragraph 5.1 if such damages or other relief had been sought from Cameron.

**5.5 BPXP's Rights And Responsibilities As Indemnitor.**

(a) In addition to any rights afforded by applicable law, BPXP as indemnitor shall have the following rights:

(i) The right, at its election, to conduct or control any settlement negotiations that are reasonably expected to trigger Claims under or pursuant to the indemnities in paragraph 5.1 of this Agreement. In the event BPXP exercises this right, BPXP shall keep Cameron reasonably informed of the progress of any settlement negotiations.

10

(ii) The final authority to approve any settlement that may give rise to a Claim under or pursuant to the indemnities contained in paragraph 5.1 of this Agreement, which settlement shall not be entered into without BPXP's approval. BPXP's approval of any settlement that is covered by the indemnities contained in paragraph 5.1 of this Agreement shall not be unreasonably withheld.

(iii) In the event that, subject to Cameron's rights in paragraph 5.7, any BP Released Party enters into a settlement agreement that relates to a Claim which may be the subject of the indemnities contained in paragraph 5.2 of this Agreement, such BP Released Parties shall obtain releases broad enough to release the Cameron Released Parties and all Third Parties from any further or future liability for the *Deepwater Horizon* Incident, and the terms of which shall be subject to Cameron's prior approval, which will not be unreasonably withheld.

(b) Cameron agrees on behalf of the Cameron Released Parties that to the extent that BPXP or BPCNA makes any payment in connection with its indemnification of the Cameron Released Parties for Claims, BPXP or BPCNA shall be subrogated to the extent of such payment to all of the rights of the Cameron Released Parties, and, at the request of BPXP or BPCNA, Cameron shall cause the Cameron Released Parties to take all reasonable action necessary to secure such rights, including the execution of such documents as are necessary to enable BPXP or BPCNA to bring suit to enforce such rights.

(c) Unless the Parties agree that BPXP shall assume the defense of the Cameron Released Parties in any lawsuit or other proceeding covered by its obligation to indemnify under this Agreement, the Cameron Released Parties shall use their reasonable best efforts to assume the defense in and defend such lawsuit or other proceeding. BPXP shall have no right to assume the defense of any Cameron Released Party in any lawsuit or other proceeding covered by the indemnity in paragraph 5.1 without the approval of such Cameron Released Party.

(d) For any payments for which the Cameron Released Parties seek indemnification, Cameron shall submit a written demand therefor accompanied by reasonable proof of a judgment, settlement, or other indemnifiable costs incurred or owed, subject to the defense obligations of paragraph 5.5(c) (for purposes of this paragraph, the "Indemnification Demand"). Unless otherwise agreed by the Parties, BPXP shall make any indemnification payments due to the Cameron Released Parties within thirty (30) business days of receiving a proper Indemnification Demand. In the event that BPXP decides to appeal such judgment, BPXP shall be responsible for the securing, posting or payment of any bond or any obligation required in lieu of payment pending the resolution of such appeal or for other costs of perfecting the appeal.

**5.6 The Cameron Released Parties' Rights And Responsibilities As Indemnitees.**

    (a) In addition to any rights afforded by applicable law, any Cameron Released Parties indemnified pursuant to this Article V, as the indemnitee, shall have the following responsibilities:

        (i) To promptly notify BPXP in writing and in reasonable detail of any Claim that may give rise to a Claim under or pursuant to the indemnities contained in paragraph 5.1 of this Agreement.

        (ii) To keep BPXP reasonably informed and to reasonably consult BPXP with respect to the progress of any Claim, or any settlement negotiations that any Cameron Released Party is responsible for relating to a Claim, covered by any of the indemnities contained in paragraph 5.1 of this Agreement.

        (iii) In the event that, subject to BPXP's rights in paragraph 5.5, any Cameron Released Party enters into a settlement agreement that relates to a Claim which may be the subject of the indemnities contained in paragraph 5.1 of this Agreement, such Cameron Released Parties shall obtain releases broad enough to release the BP Released Parties and all Third Parties from any further or future liability for the *Deepwater Horizon* Incident, and the terms of which shall be subject to BPXP's prior approval, which will not be unreasonably withheld.

**5.7 Cameron's Rights And Responsibilities As Indemnitor.**

    (a) In addition to any rights afforded by applicable law, Cameron as indemnitor shall have the following rights:

        (i) The right, at its election, to conduct or control any settlement negotiations that are reasonably expected to trigger Claims under or pursuant to the indemnities in paragraph 5.2 of this Agreement.

        (ii) The final authority to approve any settlement that may give rise to a Claim under or pursuant to the indemnities contained in paragraph 5.2 of this Agreement, which settlement shall not be entered into without Cameron's approval. Cameron's approval of any settlement that is covered by the indemnities contained in paragraph 5.2 of this Agreement shall not be unreasonably withheld.

        (iii) In the event Cameron elects to conduct or control any settlement negotiations that are reasonably expected to give rise to a Claim under or pursuant to the indemnities contained in paragraph 5.2 of this Agreement, Cameron shall keep BPXP reasonably informed of the progress of any settlement negotiations.

(iv) Payments by the GCCF shall not be considered settlements, but instead shall be treated the same as court judgments for purposes of Cameron's indemnification obligations to the BP Released Parties.

(b) Unless the Parties agree that Cameron shall assume the defense of the BP Released Parties in any lawsuit or other proceeding covered by its obligation to indemnify under this Agreement, the BP Released Parties shall use their reasonable best efforts to assume the defense in and defend such lawsuit or other proceeding. Cameron shall have no right to assume the defense of any BP Released Party in any lawsuit or other proceeding covered by the indemnity in paragraphs 5.2 or 5.7(c) through (e) without the approval of such BP Released Party.

(c) Notwithstanding any provision in this Agreement to the contrary (including anything stated in Article IV), Cameron agrees to indemnify the BP Released Parties for and against any Claims of any kind or nature whatsoever, in law or in equity, asserted against any of the BP Released Parties by or on behalf of any party seeking to recover (i) all or any amount of any payment made by or due from Cameron to BPXP under this Agreement or (ii) all or any amount of any payment for loss relating to the *Deepwater Horizon* Incident made by, or at any time committed to by, any Cameron Releasing Parties (or any insurer under the Cameron Policies, or any subrogee or assignee of Cameron or of any such Cameron Policies) to any Third Party, provided that such payment or commitment is not the subject of the indemnities provided by BPXP to the Cameron Released Parties in this Agreement.

(d) Notwithstanding any provision in this Agreement to the contrary (including anything stated in Article IV), Cameron agrees to indemnify the BP Released Parties for and against any Claims of any kind or nature whatsoever arising out of or relating to the *Deepwater Horizon* Incident asserted against any of the BP Released Parties by or on behalf of (i) any Cameron Released Party incurred during the course of performing their responsibilities for Cameron, provided that for the avoidance of doubt this subparagraph is not intended to apply to Claims by individuals within the definition of Cameron Released Parties that arise outside of the course of performing their responsibilities for Cameron; (ii) any Cameron Insurer; or (iii) any and all reinsurers, indemnitors, subrogees, or assignees of any Cameron Released Party or Cameron Insurer.  Without limitation, this indemnity includes any Claim made in breach of paragraph 4.2.

13

(e) Notwithstanding any provision in this Agreement to the contrary (including anything stated in Article IV), in the event any Cameron Releasing Party, any Cameron Insurer, or any and all insurers, reinsurers, indemnitors, subrogees, or assignees of any Cameron Releasing Party or Cameron Insurer, seeks to recover on any Cameron Third Party Claims, including against Transocean under the Transocean Contracts, Cameron agrees to indemnify the BP Released Parties for and against any Claims of any kind or nature whatsoever, in law or in equity, asserted against any BP Released Parties by or on behalf of any Third Party, including Transocean, seeking to recover from the BP Released Parties all or any amount of any payment made by the Third Party as a result of a Claim made by any Cameron Releasing Party, any Cameron Insurer, or any and all insurers, reinsurers, indemnitors, subrogees, or assignees of any Cameron Releasing Party or Cameron Insurer for any Cameron Third Party Claim, including Claims for indemnification or contribution including such Claims by Transocean. Without limitation, this indemnity includes any Claim made in breach of paragraphs 4.3 or 4.5.

(f) The indemnities described in paragraphs 5.7(c) through (e) shall include the payment of the BP Released Parties' costs, attorneys' fees, and expenses in any lawsuit or other proceeding, and in the event of any Claim by or on behalf of any Cameron Insurer or any reinsurer, indemnitor, subrogee, or assignee of any Cameron Insurer, the indemnities described by paragraphs 5.7(c) through (e) shall obligate Cameron to pay any and all reasonable defense costs, expenses, and other losses incurred by any BP Released Parties on a current basis and throughout the pendency of any such Claim, subject in all respects to the BP Released Parties' rights to control the defense and settlement of any such Claim. It is the express intent of the Parties that unless otherwise agreed to by the Parties, the BP Released Parties shall retain and be represented by their own counsel in any matter to which the indemnities in paragraphs 5.7(c) through (e) may apply.

(g) In addition to any rights afforded by applicable law, any BP Released Party indemnified pursuant to this Article V, as the indemnitee, shall have the following responsibilities:

    (i) To promptly notify Cameron in writing and in reasonable detail of any Claim that may give rise to a Claim under or pursuant to the indemnities contained in paragraph 5.2 or 5.7(c) through (e) of this Agreement.

    (ii) To keep Cameron reasonably informed and to reasonably consult Cameron with respect to the progress of any Claim, or any settlement negotiations that any BP Released Party is responsible for relating to a Claim, covered by any of the indemnities contained in paragraph 5.2 or 5.7(c) through (e) of this Agreement.

14

(h) For any payments for which the BP Released seek indemnification, BPXP shall submit a written demand therefor accompanied by reasonable proof of a judgment, settlement, or other indemnifiable costs incurred or owed, subject to the defense obligations of paragraph 5.7(b) (for purposes of this paragraph, the "Indemnification Demand"). Unless otherwise agreed to by the Parties, Cameron shall make any indemnification payments due to the BP Released Parties within thirty (30) business days of receiving a proper Indemnification Demand. In the event Cameron decides to appeal such judgment, Cameron shall be responsible for the securing, posting or payment of any bond or any obligation required in lieu of payment pending the resolution of such appeal or for other costs of perfecting the appeal.

**5.8 SUBJECT TO THE LIMITATIONS ON INDEMNITIES IN ARTICLE V, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE INDEMNITIES AND RELEASES OF LIABILITY CONTAINED IN THIS AGREEMENT SHALL APPLY REGARDLESS OF WHETHER THE CLAIM OR LIABILITY IS PREDICATED ON THE SOLE, JOINT OR CONCURRENT FAULT, NEGLIGENCE, GROSS NEGLIGENCE, OR STRICT LIABILITY OF THE BP RELEASED PARTIES OR THE CAMERON RELEASED PARTIES, AND ACKNOWLEDGE THAT ARTICLE V (INDEMNITIES) COMPLIES WITH ANY REQUIREMENT THAT SUCH INDEMNITIES BE EXPRESS, CONSPICUOUS, AND AFFORD FAIR AND ADEQUATE NOTICE.**

5.9 Except for the Cameron Policies, this Agreement is not intended to, and shall not, prejudice any rights to insurance coverage that the BP Releasing Parties may have had as of the Effective Date or may have in the future under any insurance or reinsurance policy that may apply to the *Deepwater Horizon* Incident.

## VI.  COOPERATION

6.1 BPXP and Cameron agree to cooperate, and shall each cause their respective Affiliates, personnel, employees, attorneys, agents and representatives to cooperate, in the Litigation, to the extent consistent with all applicable laws, including the following:

(a) Subject to and pursuant to whatever court or body of law has jurisdiction over this Agreement, the Parties agree to cooperate fully and truthfully in the defense of any and all Claims relating to the *Deepwater Horizon* Incident, including in the Litigation, where BPXP and/or Cameron or their respective Affiliates are parties. The Parties further agree that they will continue to truthfully present the evidence and facts in any litigation, arbitration, governmental or regulatory proceeding or other Claim arising out of or related to the *Deepwater Horizon* Incident. Nothing in this Agreement prevents or restricts in any way any Person from fully and truthfully cooperating with, or from truthfully and completely testifying before, any federal, state, local or foreign government entity, including any federal, state or local governmental, regulatory or self-regulatory agency, body, committee (Congressional or otherwise), commission, or authority (including any governmental department, division, agency, bureau, office, branch, court, arbitrator, commission, tribunal, or other governmental instrumentality) ("Governmental Entity"), with respect to any investigation or inquiry concerning the *Deepwater Horizon* Incident. Further, nothing in this Agreement limits any Party's ability to assert any and all matters of law or fact, including any assertion by Cameron of any rights under the Transocean Contracts, as a defense (and solely as a defense) to any Claim brought against it.

15

(b) The Parties agree, to the extent practicable, consistent with applicable laws, and subject to any confidentiality limitations or restrictions, and also subject to attorney-client or other legal privilege, and further recognizing that some individuals are represented by independent counsel, to provide each other, upon formal or informal request from their respective counsel, with reasonable and direct access to their respective personnel, employees, documents, business records and all other evidence in their possession, custody or control, including physical evidence, samples, additives, and other materials. The Parties agree to consult with one another before noticing or otherwise seeking the deposition of an employee of the other Party to discuss alternative ways to obtain information or evidence. Such access to Cameron's personnel, employees, documents, records and other evidence in their possession, custody or control is intended to allow BPXP to better understand the causes of the *Deepwater Horizon* Incident and what was known by Cameron before and at the time of the *Deepwater Horizon* Incident, and thus allow for improved safety in drilling operations.

## VII.  GUARANTEE

7.1 BPCNA shall execute a Guarantee in the form attached hereto as Exhibit B.

## VIII.  CONFIDENTIALITY

8.1 Subject to paragraphs 8.2 and 8.3, the Parties and their respective attorneys agree to keep the terms and conditions of this Agreement confidential and shall not disclose this Agreement to any other Person. Nothing in this paragraph shall preclude disclosure of this Agreement before or after the date of this Agreement:  (i) to the Parties' employees, parents, or Affiliates who agree to keep the information confidential; (ii) to the Parties' attorneys who agree to keep the information confidential; (iii) to the Parties' accountants, tax preparers, advisors, insurers, debt rating agencies or auditors for limited and legitimate purposes or to conduct financial affairs and who agree to keep the information confidential; (iv) to the Consenting Cameron Insurers' tax preparers, advisors, auditors, accountants, reinsurers and retrocessionnaires for limited and legitimate purposes or to conduct financial affairs and who agree to keep the information confidential; (iv) as necessary to preserve or assert the Parties' rights under this Agreement; or (v) as required by law, regulation, stock exchange rule, subpoena and/or a court order or arbitral award.  Each Party reserves the right to file or have its Affiliates file this Agreement as an exhibit to filings with the Securities and Exchange Commission if that Party or its Affiliates determine, in their sole discretion, that such filing is required by the regulations of the Securities and Exchange Commission or necessary to make any registration statement filed with the Securities and Exchange Commission effective or otherwise continue its effectiveness.

16

8.2 If any Party is served with a subpoena or other form of discovery request that would call for disclosure of this Agreement, it shall, to the extent permissible, give prompt written notice to the other Party and oppose disclosure to the extent practicable unless this provision is waived in writing by the other Parties.  Except as provided in the last sentence of 8.1, if any Party is required by law, regulation, stock exchange rule, court order or subpoena to disclose this Agreement, it shall, to the extent permissible, give notice to the other Party prior to such disclosure and use reasonable best efforts to ensure that such disclosure is made pursuant to an applicable confidentiality or protective order, to the extent available.

8.3 Notwithstanding paragraph 8.1, the fact that BPXP and Cameron have reached a settlement on issues related to the *Deepwater Horizon* Incident shall not be confidential and may be publicly disclosed.  The form, content, and timing of any press release relating to this settlement shall be subject to mutual agreement of the Parties, which shall not be unreasonably withheld.

## IX.  MISCELLANEOUS PROVISIONS

9.1 **Notice.**  Notice to BPXP pursuant to this Agreement shall be sent by electronic mail, certified mail or overnight delivery to:

John E. (Jack) Lynch Jr.

Deputy Group General Counsel

Chief Counsel Gulf Coast Restoration

U.S. General Counsel

BP America Inc.

501 WestLake Park Boulevard

Houston, TX  77079

Tel: (281) 366-1500

Fax: (713) 375-2808

E-mail: john.lynch@uk.bp.com

and

James J. Neath

Associate General Counsel

BP America Inc.

501 Westlake Park Boulevard

Houston, TX 77079

Tel: (281) 366-5815

Fax: (281) 366-5901

E-mail: James.Neath@bp.com

17

Notice to Cameron pursuant to this Agreement shall be sent by electronic mail, certified mail or overnight delivery to:

William C. Lemmer

Senior Vice President and General Counsel

Cameron International Corporation

1333 West Loop South, Suite 1700

Houston, TX 77027

Tel: (713) 513-3360

Fax: (713) 513-3499

E-mail: William.Lemmer@c-a-m.com

9.2 **Unknown Facts.** The Parties acknowledge that they may hereafter discover facts different from or in addition to those that they now know to be or believe to be true with respect to the Claims being made in the Litigation and agree that this Agreement and the releases and indemnities contained herein shall be and remain effective in all respects, notwithstanding such different or additional facts and subsequent discovery thereof.

9.3 **Representations And Warranties.**

(a) Each Party represents and warrants that: (i) it is a corporation or limited liability company, as the case may be, duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or formation; (ii) it has all requisite corporate or limited liability company, as the case may be, power and authority to enter into this Agreement; (iii) the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or limited liability company action, does not violate any applicable law or regulation to which either Party is subject, and does not conflict with, or result in a breach of, any provision of the organizational documents of such Party; (iv) this Agreement has been duly executed and delivered by such Party and (assuming due authorization and delivery by the other Party) constitutes a valid and binding agreement of such Party, enforceable in accordance with its terms; and (v) it has not assigned, transferred, or conveyed, or purported to have assigned, transferred or conveyed, to any Person or entity any property, interest, claim, demand, debt, liability, account, obligation, or cause of action herein transferred, released or assigned.

(b) BPXP represents and warrants that it is authorized to act on behalf of the BP Releasing Parties in all respects pertinent to this Agreement. BPXP shall defend and indemnify the Cameron Released Parties for any breach of this representation and warranty.

(c) Cameron represents and warrants that it is authorized to act on behalf of the Cameron Releasing Parties in all respects pertinent to this Agreement. Cameron shall defend and indemnify the BP Released Parties for any breach of this representation and warranty, including, consistent with paragraph 5.7(c) through (e), any breach of paragraph 4.2 or 4.3 by the Consenting Cameron Insurers.

18

(d) EXCEPT FOR THE EXPRESS WARRANTIES IN THIS AGREEMENT, EACH PARTY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED.

**9.4 Assignment; Binding On Successors And Assigns.** Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by Cameron without the prior written consent of BPXP. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by BPXP without the prior written consent of Cameron. Any attempt to make an assignment hereunder without the approval of the other Party shall be null and void with no force or effect. No assignment by any Party shall relieve such Party of any of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties, their respective successors, permitted assigns, predecessors, insurers or reinsurers of any type or degree, subrogees of any type, parents and Affiliates, and legal representatives.

**9.5 Taxes.** Each Party to this Agreement shall separately and independently bear responsibility to report any payment specified in this Agreement to the proper Governmental Entities, as necessary. The Parties acknowledge and agree that the amount of any payment specified in this Agreement shall not be reduced on account of any withholding tax. The Parties further acknowledge and agree that they each are relying upon their own counsel and/or tax advisors for any tax matters or advice.

**9.6 Construction.** This Agreement shall be interpreted as if jointly written by all Parties, and the rule of construction providing that any ambiguities are to be resolved against the drafting party shall not be used in interpreting this Agreement. Prior drafts of this Agreement may not be used to construe this Agreement. No term of this Agreement may be released, discharged, abandoned, changed, or modified in any manner, oral or otherwise, except by a written instrument duly signed by each Party. With respect to corporate Parties, such signature must be by an authorized officer of such Party.

**9.7 Independent Investigation.** The Parties acknowledge, represent and warrant that, in entering this Agreement, each Party has made an independent investigation of the facts and is not relying upon any statements or representations, other than those contained herein, made by the other Party, its agents, employees, attorneys or representatives, and that no one, including any of the Parties' agents, employees, attorneys or representatives, has made any promise, representation or warranty relating to this Agreement, or offered any further consideration to enter into this Agreement, except as recited herein.

**9.8 Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof and supersedes and cancels all previous agreements, negotiations, and commitments, whether oral or in writing, with respect to the subject matter of this Agreement.

19

9.9 **Enforceability.** Other than the assignment of Cameron Third Party Claims provided for in the first sentence in paragraph 4.5, if any portion of Articles III, IV, or V of this Agreement is held to be illegal, invalid, or unenforceable, then this entire Agreement shall be null and void and all monies paid hereunder shall be returned to the paying Party. If the Guarantee in Exhibit B is held by a court or other tribunal in a final judgment or award not subject to further review to be illegal, invalid or unenforceable, then Cameron, in its sole discretion, may declare this entire Agreement null and void and all monies paid hereunder shall be returned to the paying Party. Subject to the preceding two sentences, the illegality, invalidity or unenforceability of any other provision of this Agreement shall not operate to invalidate the whole Agreement and shall not affect the validity or enforceability of any other provisions of this Agreement.

9.10 **No Waiver of Privileges.** Nothing in this Agreement shall be deemed a waiver by BPXP or Cameron or any of their respective Affiliates of any privilege (including attorney-client-privilege) or protection (including the work product doctrine). Similarly, nothing in this Agreement shall require BPXP or Cameron or any of their respective Affiliates to violate the terms of any applicable joint defense agreement, confidentiality agreement or protective order.

9.11 **No Agency Or Joint Venture.** Nothing in this Agreement shall make BPXP or Cameron (or any of their respective past or present predecessors, successors, agents, servants, representatives, officers, directors, employees, stockholders, attorneys, administrators, or Affiliates) the fiduciary or agent of the other, nor will anything in this Agreement constitute a joint venture, agency, partnership or similar relationship.

9.12 **Dispute Resolution.** It is the intent of the Parties to use their respective commercially reasonable efforts to resolve expeditiously any dispute between them with respect to the matters covered by this Agreement that may arise from time to time on a mutually acceptable negotiated basis. In furtherance of the foregoing, any Party involved in a dispute, controversy or Claim may deliver a notice (an "Escalation Notice") demanding an in-person meeting involving representatives of the Parties at a senior level of management (or if the Parties agree, of the appropriate business function or division within such entity). Any agenda, location or procedure for such discussions or negotiations between the Parties may be established by agreement of the Parties from time to time; provided, however, that the Parties shall use their commercially reasonable efforts to meet within twenty (20) days of the Escalation Notice. Following delivery of an Escalation Notice, the Parties shall undertake good faith, diligent efforts to negotiate a commercially reasonable resolution of the dispute. The Parties may, by mutual consent, retain a mediator to aid the Parties in their discussions and negotiations. Any opinion expressed by the mediator shall be strictly advisory and shall not be binding on the Parties, nor shall any opinion expressed by the mediator be admissible in any Forum. The mediator may be chosen from a list of mediators selected by the Parties or by other agreement of the Parties. All third-party costs of the mediation shall be borne equally by the Parties involved in the matter, and each Party shall be responsible for its own expenses. Any dispute arising from or related to this agreement, if not otherwise resolved under this paragraph, shall be fully and finally resolved by binding arbitration in Houston, Texas, before a panel of three arbitrators, pursuant to the commercial arbitration rules of the American Arbitration Association in effect at the time a written demand for arbitration is first made. The award rendered by the arbitrators shall be final and binding, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

20

**9.13 Choice of Law.** The Parties agree that general maritime law shall control the construction, interpretation, enforcement or validity of this Agreement, without regard to any conflicts-of-law rules.

**9.14 No Third Party Beneficiaries.** This Agreement shall not confer any rights or remedies upon any entity other than BPXP and Cameron, except as expressly provided herein (including Articles IV and V, and including the Consenting Cameron Insurers to the extent expressly provided herein), and specifically shall not provide any rights or remedies upon Transocean.  Without limitation and for the avoidance of doubt, Cameron Released Parties and BP Released Parties shall be entitled to the benefit of releases and indemnities as set forth herein, even if they are not signatories to this Agreement.

**9.15 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall have the same force and effect as an original.  The Parties hereto also agree that facsimile or email signatures are effective as original signatures.

**9.16 Headings.** The section captions contained in this Agreement are provided only as matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision, and shall not affect the construction, interpretation, performance or validity of this Agreement.

21

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed in their representative corporate capacity by their duly authorized officers, as of the day and year first written above.

BP EXPLORATION & PRODUCTION INC.

By:      /s/ James H. Dupree _____
Name: James H. Dupree
Title:   Chairman and President

BP CORPORATION NORTH AMERICA INC.

By:      /s/ James H. Dupree _____
Name: James H. Dupree
Title:   Chairman and President

CAMERON INTERNATIONAL CORPORATION

By:      /s/ William C. Lemmer _____
Name: William C. Lemmer
Title:   Senior Vice President and General Counsel

22

EXHIBIT A

Cameron Policies

Primary and Excess Liability Insurers of Cameron International Corporation
Policy Period: July 1 2009 – July 1, 2010

| Insurance Carrier: | Policy #: | Limits in US $: |
|---|---|---|
| Liberty Mutual Insurance Company | EB1-691-004103-279 | $3,000,000 (including $500,000 self-insured retention, $2,500,000 deductible) |
| Illinois National Insurance Company* | 27471353 | $25,000,000 xs $3,000,000 |
| AIG Cat Bermuda* | 13519148 | $25,000,000 xs $3,000,000 |
| Ace American Insurance Company* | XCP G24898878 | $25,000,000 xs $25,000,000 |
| ACE Bermuda* | CAM-PD/09 | $25,000,000 xs $25,000,000 |
| XL Insurance Company Limited* | 509/DL397209 | $50,000,000 xs $50,000,000 |
| Liberty Insurance Underwriters Inc. | LQ1B71198583046 | $50,000,000 xs $100,000,000 |
| Chubb Atlantic Indemnity Ltd.* | 3310-02-62 | $25,000,000 xs $150,000,000 |
| XL Insurance (Bermuda) Ltd* | BM00024374LI09A | $50,000,000 xs $175,000,000 |
| AIG Excess Liability Insurance International Limited* | 21472624 | $150,000,000 xs $225,000,000 |
| Iron-Starr Excess Agency Ltd.* | 0000036-00 | $25,000,000 xs $375,000,000 |
| Argo Re Ltd.* | ARGO-CAS-OCC-000094.1 | $25,000,000 xs $400,000,000 |
| Ace Bermuda Insurance Ltd.* | CIC-1422/OCC01 | $75,000,000 xs $425,000,000 |

* Insurers denoted with an asterisk are "Consenting Cameron Insurers" as defined in paragraph 2.14 of the Agreement.

EXHIBIT B

GUARANTEE

1. BP Corporation North America Inc. (the "Guarantor"), absolutely, unconditionally and irrevocably guarantees to Cameron International Corporation (the "Beneficiary") that BP Exploration and Production Inc. ("BPXP") will duly and punctually perform, comply with, and observe all of BPXP's obligations (the "Obligations") under that certain Confidential Settlement Agreement, Mutual Releases and Agreement to Indemnify dated December 15, 2011 (the "Agreement"), including all of its payment obligations, as and when required in accordance with the terms thereof, in each case, without regard to whether such obligation is direct or indirect, now or hereafter existing or owing, or incurred or payable before or after commencement of any proceedings by or against BPXP under any applicable bankruptcy or insolvency law. Notwithstanding anything to the contrary in this Guarantee, the commencement of any proceedings by or against BPXP under any applicable bankruptcy or insolvency law shall not relieve the Guarantor of its obligations under this Guarantee or impair the enforcement thereof by the Beneficiary.

2. This Guarantee is an absolute and continuing guarantee of performance and payment (and not of collection) of the Obligations. This Guarantee is in no way conditioned upon any attempt to collect any payment from, or enforce any Obligation upon, BPXP or upon any other event or contingency, and shall be binding upon and enforceable against the Guarantor.

3. The obligations of the Guarantor set forth herein constitute the full recourse obligations of the Guarantor enforceable against it to the full extent of all its assets and properties.

4. The obligations of the Guarantor hereunder shall not be subject to any counterclaim, setoff, deduction, diminution, abatement, stay, recoupment, suspension, deferment, reduction or defense (other than full and strict payment or other satisfaction of the Obligations) based upon any claim the Guarantor may have against the Beneficiary or any other obligor. The obligations of the Guarantor hereunder shall remain in full force and effect without regard to, and shall not be released, discharged or reduced (except to the extent of any defenses to payment or performance to which BPXP is entitled under the Agreement) for any reason, including (a) any amendment or waiver of any term of the Agreement, whether or not the Beneficiary, BPXP or the Guarantor has notice or knowledge of any of the foregoing; or (b) any bankruptcy, insolvency or similar proceeding with respect to the Guarantor or BPXP or their respective properties, or any action taken by any trustee or receiver or by any court in any such proceeding.

5. The Guarantor unconditionally waives all notices which may be required by statute, rule of law or otherwise to preserve any rights against the Guarantor hereunder, including (a) notice of the acceptance of this Guarantee by the Beneficiary or any assignee thereof, or the modification of the Obligations or notice of any other matters relating thereto; (b) any presentment, demand, notice of dishonor, protest or nonpayment of any damages or other amounts payable under the Agreement; (c) any requirement for the enforcement, assertion or exercise of any right or remedy under the Agreement; (d) any requirement of diligence; (e) the right to require the Beneficiary to proceed against BPXP or any other person liable on the Obligations, and the Guarantor waives the right to have the property of BPXP first applied to discharge the Obligations.

6. Representations and Warranties

(i) The Guarantor is an Indiana corporation duly formed and validly existing under the laws of its jurisdiction of formation.

(ii) The Guarantor has the power and authority to execute, deliver and perform its obligations under this Guarantee and has taken all necessary action to authorize the execution, delivery and performance of this Guarantee. No consent is required for the due execution, delivery and performance by the Guarantor of this Guarantee, except those that have been obtained and are in full force and effect.

(iii) The authorization, execution, delivery and performance of this Guarantee by the Guarantor will not result in any breach of or default under (or any condition which with the giving of notice or lapse of time or both would constitute a breach or default under) (i) the constituent documents of the Guarantor, or (ii) any contract, indenture, mortgage, security agreement or other document, instrument or agreement or any judgment, order or decree to which the Guarantor is a party or to which the Guarantor or any of its property is subject.

7. Miscellaneous

(i) The Guarantor shall not assign any of its rights or delegate any of its duties under this Guarantee to any Person without the prior written consent of the Beneficiary.

(ii) This Guarantee shall remain in full force and effect until such time all the Obligations have been performed in full or are no longer in effect.

(iii) Any notice to BPXP and Guarantor pursuant to this Guarantee shall be sent by electronic mail and overnight mail to the following individuals:

John E. (Jack) Lynch Jr.                         James J. Neath
Deputy Group General Counsel                     Associate General Counsel
U.S. General Counsel                             BP America Inc.
BP America Inc.                                  501 Westlake Park Boulevard
501 Westlake Park Boulevard                      Houston, TX 77079
Houston, TX  77079                               E-mail: James.Neath@bp.com
E-mail: John.Lynch@uk.bp.com

Any notice to Beneficiary pursuant to this Guarantee shall be sent by electronic mail and overnight mail to the following individuals:

William C. Lemmer
Senior Vice President and General Counsel
Cameron International Corporation
1333 West Loop South, Suite 1700
Houston, TX 77027
Tel: (713) 513-3360
Fax: (713) 513-3499
E-mail: William.Lemmer@c-a-m.com

2

(iv) This Guarantee shall not be amended without the written consent of the Guarantor and the Beneficiary.

(v) Upon written demand, the Guarantor shall pay all reasonably incurred and properly documented out-of-pocket expenses incurred by the Beneficiary, including fees and disbursements of counsel, in connection with the enforcement of the obligations of the Guarantor under this Guarantee.  Any amount owed to the Beneficiary under this Guarantee shall earn interest accruing daily from the deadline for payment thereof until paid at the lesser of (i) an annual rate equal to LIBOR plus three (3) percentage points, or (ii) the maximum rate allowed by applicable Law.

(vi) THIS GUARANTEE SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING AS TO VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS, TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

(vii) This Guarantee is subject to the dispute resolution procedures set forth in paragraph 9.12 of the Agreement.

3

BP CORPORATION NORTH AMERICA INC.

By:    /s/ James H. Dupree
Name: James H. Dupree
Title:  Authorized Signatory

4



CLYDE&CO

US LLP

The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: 212 710 3900
Facsimile: 212 710 3950
www.clydeco.us

December 14, 2011

Mitchell J. Auslander
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
mauslander@willkie.com

       Re:  **Response to your e-mail of today**

Dear Mitch:

        On behalf of Liberty International Underwriters, Inc. ("LIU"), I am responding to your email of today regarding the continuing demands of Cameron.

        Initially, LIU reiterates its position set forth in my letter of yesterday regarding its non-objection to the settlement amount.  LIU is not seeking to stop or interfere with any business decision that Cameron believes it needs to make regarding settlement.  Furthermore, if Cameron chooses to settle LIU will not assert that Cameron breached the consent requirements of the policy. Cameron's defense of this litigation and its right to settle has been and remains in Cameron's exclusive control.

        Most importantly, LIU has requested repeatedly today that additional time be obtained to further discuss the settlement terms and it also requested the opportunity to have a dialog with Cameron regarding the settlement parameters.  LIU desires to negotiate a settlement with Cameron which recognizes the unique coverage issues which you and I have previously discussed and which are set forth in my prior letters on behalf of LIU, including my letter to you of yesterday.  The non-economic aspects of the proposed settlement remain problematic for LIU.  If Cameron's settlement extinguishes LIU's rights, including subrogation rights, such action will jeopardize any coverage which Cameron might otherwise have under the LIU policy.   It is important to note, however, that this is the precise issue which we have sought to discuss with you and/or your clients yesterday and today.  Sadly, Cameron has refused and instead has indicated that it will accept nothing short of a complete capitulation on all issues and a tender of all policy limits.  We reiterate our prior offer to negotiate a resolution of this dispute with Cameron immediately either through counsel-to-counsel discussions or through principal-to-principal discussions.

        Clyde & Co US LLP is a Delaware limited liability partnership with offices in New Jersey, New York and San Francisco.
        Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.
622765v1



EXHIBIT
4



CLYDE&CO
US LLP

Mitch Auslander
December 14, 2011
Page 2

Given Cameron's unwillingness to discuss these issues, LIU must reiterate the positions it has previously taken regarding its other insurance clause. The LIU policy has not yet attached to this loss for the reasons set forth in the other insurance clause. Despite this situation, LIU remains willing to discuss appropriate settlement parameters with Cameron as quickly as it needs to do so. The proverbial ball remains in Cameron's court.

LIU continues to reserve all of its rights under the policy, in law and in equity.

Very truly yours,

Paul R. Koepff

cc:      Cameron's Insurers



# J&C

JACKSON & CAMPBELL, P.C.

*Attorneys and Counselors at Law*

December 14, 2011

**VIA ELECTRONIC MAIL**

Paul R. Koepff, Esquire
Clyde & Co. US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

        Re:    Cameron International Corporation
                    Deepwater Horizon Incident
                    Cameron-BP Settlement In Principle
                    Our File No. 279211.03373

Dear Paul:

We are writing to you on behalf of our clients Illinois National Insurance Company and AIG Excess Liability Insurance International Limited ("CAT Excess"). As you are aware, we were a carbon copy recipient of your various letters sent earlier today to counsel for Cameron, Mitch Auslander, on behalf of XL, ACE, and Liberty respectively, in response to Cameron's settlement agreement in principle with BP. As we understand your various correspondences to Cameron, XL, ACE and Liberty agree that the settlement amount ($250 million) agreed in principle between Cameron and BP is reasonable, but object to the terms and provisions in the agreement in which Cameron releases and waives its rights to seek pass through indemnification against BP (through Transocean) and transfers such rights to BP with regard to the *Deepwater Horizon* incident. Because the indemnification rights against Transocean are contingent and merely pass through rights against BP, the waiver and transfer is little more than a customary agreement by one settling party not to pursue the other settling party to recover the settlement sum.

Successful prosecution of the indemnification rights against Transocean is by no means a certainty. First, the indemnification is only as good as the ability of Transocean to "pass it through" to Cameron. If Transocean files for bankruptcy, a bankruptcy court would be empowered to compromise or nullify the obligation. Second, Transocean itself has opposed



Mr. Paul R. Koepff, Esq.
December 14, 2011
Page 2

Cameron's motion for summary judgment seeking confirmation of the indemnity obligations of
Transocean. Of course, BP has vigorously opposed Cameron and Transocean's motions for
summary judgment. Indeed, the U.S. Government has also opposed Transocean's motion.
These oppositions are not limited to the gross negligence issue, but attack the validity of the
indemnifications more broadly.

        We understand from Cameron that both the Cameron and Transocean motions for
summary judgment will be heard on Friday, December 16, 2011, and the court may make
comments or a ruling from the bench. If the comments or ruling are adverse to Transocean
and/or Cameron, we are told that BP will rescind its willingness to settle with Cameron for $250
million.

        In light of the magnitude of the risks to Cameron and the uncertainties of the
enforceability of the indemnification rights, the willingness of BP to settle for $250 million and
provide financially secure, unconditional indemnification can fairly be viewed as substantial
consideration for the alleged waiver of your client's so-called subrogation rights. The position of
LIU that its Other Insurance condition renders the policy excess of indemnification rights against
third parties is hard to grasp in general, but particularly so in the context of a pass through
indemnification against a settling party. Of course, we are not informed as to the negotiations or
mutual intent of Cameron and LIU in this regard. In any event, CAT Excess and other overlying
insurers are entitled to the benefit of any more restrictive terms in an underlying policy, such as
LIU's interpretation of its other insurance clause. Yet, each of those insurers is willing to
embrace the settlement. In the context of this particular loss and the opportunity to settle with
BP, the actions of your clients are an unreasonable and prejudicial impediment to settlement. If
this settlement is not concluded due to the actions, omissions, or positions of one or more of your
clients, our clients reserve the right to seek recovery of all financial losses and damages incurred
as a result thereof.

                                Sincerely yours,

                                JACKSON & CAMPBELL, P.C.

                                        /s/

                                Richard W. Bryan