UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * | MDL NO. 2179 CIVIL ACTION NO. 2:10-MD-02179 SECTION: J |
| THIS DOCUMENT RELATES TO: | * * | JUDGE BARBIER MAG. JUDGE SHUSHAN |

Applies to: All cases in B3 Pleading Bundle
*****************************************************************

**PLAINTIFF MALCOLM COCO'S OPPOSITION TO NALCO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST ALL CLAIMS IN FIRST AMENDED MASTER COMPLAINT "B3 BUNDLE"**

NOW INTO COURT, through undersigned counsel, comes Plaintiff Malcolm Alphonse Coco to object to the Motion For Summary Judgment filed by the NALCO Defendants. (Doc # 6541; filed May 18, 2012).[1] This Opposition is being filed in accordance with this Court's April 16, 2012 Order (Doc. # 6247) which said that oppositions to NALCO's Motion are due by June 18, 2012.

## I. BACKGROUND:

Mr. Coco was injured by Corexit while he worked as a Boat Igniter Operator on the *Deepwater Horizon* cleanup on a Vessel of Opportunity from May through September 2010. As he worked (which included lighting surface oil for *in situ* burnings) he saw Corexit (referring collectively to Corexit EC9527A and/or Corexit 9500A) being released in his vicinity to disperse the oil and he came into contact and inhaled it, both

---

[1] Mr. Coco is the Plaintiff in *Malcolm Alphonse Coco, III v. BP, Nalco Company, et al.* (11-cv-946).

1

before and after the Corexit came into contact with the oil and ignited.

Despite working in the same area where Corexit was being used, Mr. Coco had not been given anything to protect him from the Corexit:

> 3.
> I and the other workers on the boat I worked on were exposed to Corexit used to disperse/clean up the spill (as well as the crude oil itself) both when it was dropped directly on us and after if fell in the water and was burned along with crude oil.
>
> 4.
> Neither I nor the other workers on the boat I worked on were provided any respiratory or hazardous materials, clothing or protection for use while cleaning up the spill and burning theoil and Corexit which we inhaled.
> -(April 5, 2012 Affidavit of Mr. Coco, originally used as an exhibit to his Opposition to the Proposed Dismissal With Prejudice of Claims Against the NALCO Entities; Doc. #6184-4)

As a result of this exposure, Mr. Coco experienced:

> headaches and nausea while working on the burn unit. In early June, he experienced severe pain in his abdomen between the chest and the stomach. He experienced an episode of pain every week in June and was dizzy during these episodes. He describes the pain as a 10 or 11 on a pain chart. During a pain episode of February 24. He had a severe pain episode and sought medical attention. He had blood in his urine. Subsequent to this episode he saw an urologist and does not have kidney stones or prostate trouble. He also has experienced memory loss. He still has nausea and headaches intermittently and pain episodes about once a week. He experiences muscle pain in both arms and his feet. He experiences tingling of the toes on his left foot.
> -(Report of Dr. Patricia Williams; Ex. A to Mr. Coco's Opposition to the Proposed Dismissal With Prejudice of Claims Against the NALCO Entities; Doc. # 6184-A; filed April 5, 2012)

Dr. Williams concluded from her examination of Mr. Coco that the Corexit could have caused and/or contributed to Mr. Coco's injuries:

> The acute symptoms experienced by Malcolm Coco while on the burn unit and the actual pictures of the crude oil fires that were lit by Mr. Coco and his team, reflect that there were completed exposure pathways for crude oil components and burn particulates to enter his body. Headaches and nausea are consistent with the known health effects of crude oil components and particulates.
> -(Report of Dr. Patricia Williams, above)

## 2. FACTS:

NALCO does not deny here that its Corexit injured Mr. Coco or anybody else. Rather, it claims it does not matter if it did, because it is allegedly immune from all liability because it *supposedly* provided the E.P.A. with all the information about its Corexit required by law for the pre-approval of Corexit for use in such a spill, thereby getting that immunity.

Although federal law requires detailed information that NALCO had to provide to the E.P.A. to get and maintain proper pre-approval of Corexit on the E.P.A.'s "National Contingency Plan Product List" (as discussed in the "Law" section below), NALCO not only did not provide this information with its Motion For Summary Judgment, but carefully glossed over any mention at all of that data completely except for only two meager allegations in its "Uncontested Facts":

> 5.
> Before COREXIT EC9527A or COREXIT EC9500A were listed on the NCP Product Schedule, **the USEPA was provided with the results of toxicity and effectiveness testing on each product**.
> (See Letter fr. Marjorie A. Walsh, Exxon Chemical Company, to John Cunningham, USEPA (Mar. 10, 1994), Exh. D hereto;

Annex X Technical Product Bulletin No. 8, Oil & Special Materials Control Division (Sept. 29, 1978), Exh. E hereto.) **(emphasis added)**

6.
Before COREXIT EC9527A and COREXIT EC9500A were listed on the NCP Product Schedule, **the United States was informed of each dispersant's components**.
(United States' Stipulation No. 3, Exh. C hereto; *see also* Letter fr. Elizabeth Walpac, Nalco Canada, to Leigh DeHaven, USEPA (May 6, 2006), Exh. F hereto.)
**(emphasis added)**
**(NALCO Statement of Undisputed Material Facts(#s 5 and 6)(Doc. 6541-2)**

Not only are these this woefully inadequate alleagtions, but NALCO does not even offer any proof to support either of them. Rather than the obvious thing to do - simply provide a copy of the information it provided to the E.P.A. - it cites as 'evidence' two (apparently innocuous cover) letters, from EXXON and NALCO to E.P.A. Finally, even if these "exhibits" were evidence there is no way to question them because NALCO filed them under seal.

Further, the accuracy of NALCO's statement to this Court that "Before COREXIT EC9527A and COREXIT EC9500A were listed on the NCP Product Schedule, the United States was informed of each dispersant's component" is questionable. (Nalco's "Uncontested Fact #6, quoted above) At the very least NALCO is wrong telling this Court that The United States's Stipulation #3 is proof of this. Stipulation #3 states "the United States required the submission of each dispersants components" – not that NALCO fully complied with this requirement.

Among the information that NALCO had to supply the E.P.A. was all information for *"special handling and worker precautions for storage and field application"* for Corexit (40 C.F.R. Sec. 915(a)(4)) , but NALCO offers no proof that it provided this information to E.P.A.

The human dangers of Corexit have become much more well known ever since the controversial decision of BP to choose Corexit (particularly Corext EC9527A, which contained the highly toxic 2-Butoxyethanol) as its disperant[2], and NALCO has elsewhere provided information showing its awareness of the need for *"special handling and worker precautions for storage and field application"* for its Corexit, as shown in its O.S.H.A.-required Material Data Safety sheets for Corexit.

NALCO's Material Data Safety Sheet for Corexit EC9527A states:

<u>1. CHEMICAL PRODUCT AND COMPANY IDENTIFICATION:</u>
PRODUCT NAME : **COREXIT(R) EC9527A**
APPLICATION : OIL SPILL DISPERSANT
COMPANY IDENTIFICATION : Nalco Company
...
<u>2. COMPOSITION/INFORMATION ON INGREDIENTS:</u>
*Our hazard evaluation has identified the following chemical substance(s) as hazardous. Consult Section 15 for the nature of the hazard(s).*
**Hazardous Substance(s) CAS NO % (w/w)**
**2-Butoxyethanol 111-76-2 30.0 - 60.0 (emphasis added)**
*Organic sulfonic acid salt Proprietary 10.0 - 30.0*
*Propylene Glycol 57-55-6 1.0 - 5.0*

<u>3. HAZARDS IDENTIFICATION \*\*EMERGENCY OVERVIEW\*\* WARNING:</u>
*Eye and skin irritant.*
**Repeated or excessive exposure to butoxyethanol may cause injury to red blood cells (hemolysis), kidney or the liver. Harmful by inhalation, in contact with skin and if swallowed. (emphasis added.)**

---

[2] "BP PLC continues to stockpile and deploy oil-dispersing chemicals manufactured by a company with which it shares close ties, even though other U.S. EPA-approved alternatives have been shown to be far less toxic and, in some cases, nearly twice as effective....

"...According to EPA data, Corexit ranks far above dispersants made by competitors in toxicity and far below them in effectiveness in handling southern Louisiana crude....

"EPA has not taken a stance on whether one dispersant should be used over another, leaving that up to BP....

**"Nalco's connections** - Critics say Nalco, which formed a joint venture company with Exxon Chemical in 1994, boasts oil-industry insiders on its board of directors and among its executives, including an 11-year board member at BP and a top Exxon executive who spent 43 years with the oil giant."
- *"Less Toxic Dispersants Lose Out In BP Oil Spill Cleanup"*, New York Times; *May 13, 2010. Available online at:* http://www.nytimes.com/2010/05/13/business/energy-environment/13greenwire-less-toxic-dispersants-lose-out-in-bp-oil-spil-81183.html?_r=1

5

*Do not get in eyes, on skin, on clothing. Do not take internally. Use with adequate ventilation. Wear suitable protective clothing. Keep container tightly closed. Flush affected area with water. Keep away from heat. Keep away from sources of ignition - No smoking.*
*May evolve oxides of carbon (COx) under fire conditions.*
*PRIMARY ROUTES OF EXPOSURE :*
*Eye, Skin*
*HUMAN HEALTH HAZARDS - ACUTE :*
*EYE CONTACT :*
*Can cause moderate irritation.*

*SKIN CONTACT :*
*Can cause moderate irritation. Harmful if absorbed through skin.*
*INGESTION :*
*May be harmful if swallowed.* **May cause liver and kidney effects and/or damage**. *There may be irritation to the gastro-intestinal tract.* **(Emphasis added.)**
*INHALATION :*
*Harmful by inhalation. Repeated or prolonged exposure may irritate the respiratory tract.*
*SYMPTOMS OF EXPOSURE :*
*Acute :*
*Excessive exposure may cause central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.*
*Chronic :*
**Repeated or excessive exposure to butoxyethanol may cause injury to red blood cells (hemolysis), kidney or the liver. (emphasis added)**
*AGGRAVATION OF EXISTING CONDITIONS :*
*Skin contact may aggravate an existing dermatitis condition.*
*HUMAN HEALTH HAZARDS - CHRONIC :*
**Contains ethylene glycol monobutyl ether (butoxyethanol). Prolonged and/or repeated exposure through inhalation or extensive skin contact with EGBE may result in damage to the blood and kidneys.**
**(emphasis added.)**

*4. FIRST AID MEASURES:*
*EYE CONTACT :*
*Flush affected area with water. Get medical attention.*
*SKIN CONTACT :*
*Flush affected area with water. Get medical attention.*
*INGESTION :*
*Do not induce vomiting without medical advice. If conscious, washout mouth and give water to drink. Get medical attention.*
*INHALATION :*
*Remove to fresh air, treat symptomatically. If symptoms develop, seek medical advice.*
*NOTE TO PHYSICIAN :*
*Based on the individual reactions of the patient, the physician's judgement should be used to control symptoms and clinical condition.*

*5. FIRE FIGHTING MEASURES:*
*FLASH POINT : 163 °F / 72.7 °C ( TCC )*

6

*This product does not sustain combustion per the method outlined in 49 CFR Appendix H.*

*EXTINGUISHING MEDIA :*

*This product would not be expected to burn unless all the water is boiled away. The remaining organics may be ignitable. Use extinguishing media appropriate for surrounding fire.*
*FIRE AND EXPLOSION HAZARD :*
*May evolve oxides of carbon (COx) under fire conditions.*
*SPECIAL PROTECTIVE EQUIPMENT FOR FIRE FIGHTING :*
*In case of fire, wear a full face positive-pressure self contained breathing apparatus and protective suit.*

*6. ACCIDENTAL RELEASE MEASURES:*
*PERSONAL PRECAUTIONS :*
*Restrict access to area as appropriate until clean-up operations are complete. Stop or reduce any leaks if it is safe to do so. Do not touch spilled material. Ventilate spill area if possible. Use personal protective equipment recommended in Section 8 (Exposure Controls/Personal Protection).*
*METHODS FOR CLEANING UP :*
*SMALL SPILLS: Soak up spill with absorbent material. Place residues in a suitable, covered, properly labeled container. Wash affected area. LARGE SPILLS: Contain liquid using absorbent material, by digging trenches or by diking. Reclaim into recovery or salvage drums or tank truck for proper disposal. Contact an approved waste hauler for disposal of contaminated recovered material. Dispose of material in compliance with regulations indicated in Section 13 (Disposal Considerations).*
*ENVIRONMENTAL PRECAUTIONS :*
*Do not contaminate surface water.*

*7. HANDLING AND STORAGE:*
*HANDLING :*
*Avoid eye and skin contact. Do not take internally. Ensure all containers are labeled. Keep the containers closed when not in use.*
*STORAGE CONDITIONS :*
*Store the containers tightly closed.*
*SUITABLE CONSTRUCTION MATERIAL :*
*Stainless Steel 316L, Hastelloy C-276, MDPE (medium density polyethylene), Nitrile, Plexiglass, Kalrez, TFE, Alfax,Teflon, HDPE (high density polyethylene), Neoprene, Aluminum, Polypropylene, Polyethylene, Carbon Steel C1018,Stainless Steel 304, Compatibility with Plastic Materials can vary; we therefore recommend that compatibility is tested prior to use., FEP (encapsulated), Perfluoroelastomer, PVC*
*UNSUITABLE CONSTRUCTION MATERIAL :*
*Copper, Mild steel, Brass, Nylon, Buna-N, Natural rubber, Polyurethane, Hypalon, Viton Ethylene propylene, EPDM*

*8. EXPOSURE CONTROLS/PERSONAL PROTECTION*
*OCCUPATIONAL EXPOSURE LIMITS :*
*Exposure guidelines have not been established for this product. Available exposure limits for the substance(s) are*
*shown below.*
*ACGIH/TLV :*

**Substance(s) 2-Butoxyethanol TWA: 20 ppm , 97 mg/m3 (emphasis added.)**
*Propylene Glycol*
*OSHA/PEL :*
**Substance(s): 2-Butoxyethanol TWA: 50 ppm , 240 mg/m3 (Skin)(emphasis added)**
*Propylene Glycol*
*AIHA/WEEL :*
*Substance(s)*
*For propylene glycol, an 8 hour TWA of 10 mg/m3 (aerosol) and 50 ppm (total).*
*ENGINEERING MEASURES :*
*General ventilation is recommended.*
*RESPIRATORY PROTECTION :*
*Where concentrations in air may exceed the limits given in this section, the use of a half face filter mask or air supplied breathing apparatus is recommended. A suitable filter material depends on the amount and type of chemicals being handled. Consider the use of filter type: Multi-contaminant cartridge. with a Particulate pre-filter. In event of emergency or planned entry into unknown concentrations a positive pressure, full-facepiece SCBA should be used. If respiratory protection is required, institute a complete respiratory protection program including selection, fit testing, training, maintenance and inspection.*
*HAND PROTECTION :*
*Neoprene gloves, Nitrile gloves, Butyl gloves, PVC gloves*
*SKIN PROTECTION :*
*Wear standard protective clothing.*
*EYE PROTECTION :*
*Wear chemical splash goggles.*
*HYGIENE RECOMMENDATIONS :*
*Keep an eye wash fountain available. Keep a safety shower available. If clothing is contaminated, remove clothing and thoroughly wash the affected area. Launder contaminated clothing before reuse.*
*HUMAN EXPOSURE CHARACTERIZATION :*
*Based on our recommended product application and personal protective equipment, the potential human exposure*
*is: Low*

*...*

*10. STABILITY AND REACTIVITY:*
*STABILITY :*
*Stable under normal conditions.*
*HAZARDOUS POLYMERIZATION :*
*Hazardous polymerization will not occur.*
*CONDITIONS TO AVOID :*
*Extremes of temperature*
*MATERIALS TO AVOID :*
*Contact with strong oxidizers (e.g. chlorine, peroxides, chromates, nitric acid, perchlorate, concentrated oxygen,*
*permanganate) may generate heat, fires, explosions and/or toxic vapors.*
*HAZARDOUS DECOMPOSITION PRODUCTS :*
*Under fire conditions: Oxides of carbon*

(The complete MSDSs for EC9500A and EC9527A are attached as **Exhibits "A" and "B".**)

NALCO offers no proof that it provided this information to E.P.A.

### 3. LAW:

The requirements of what NALCO had to submit to the E.P.A. are contained in 40 C.F.R.. Part 300 ("Environmental Protection Agency; National Oil And Hazardous Substances Pollution Contingency Plan"); Sections 915 ("Data Requirements") and 920 ("Addition of Products to Schedule").

Section 920 ("Data Requirements") states:

(a) *Dispersants.* To add a dispersant to the NCP Product Schedule, submit the product data specified in Sec. 300.915(a).

Section 915(a) sates:

#### § 300.915(a)  Data requirements;  Dispersants:

*(1) Name, brand, or trademark, if any, under which the dispersant is sold.*

*(2) Name, address, and telephone number of the manufacturer, importer, or vendor.*

*(3) Name, address, and telephone number of primary distributors or sales outlets.*

**(4) Special handling and worker precautions for storage and field application.**
*Maximum and minimum storage temperatures, to include optimum ranges as well as temperatures that will cause phase separations, chemical changes, or other alterations to the effectiveness of the product.* (**emphasis added.**)

*(5) Shelf life.*

*(6) Recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of the pollutants, and any other application restrictions.*

9

*(7) Effectiveness.* Use the Swirling Flask effectiveness test methods described in appendix C to part 300. Manufacturers shall submit test results and supporting data, along with a certification signed by responsible corporate officials of the manufacturer and laboratory stating that the test was conducted on a representative product sample, the testing was conducted using generally accepted laboratory practices, and they believe the results to be accurate. A dispersant must attain an effectiveness value of 45 percent or greater to be added to the NCP Product Schedule. Manufacturers are encouraged to provide data on product performance under conditions other than those captured by these tests.

*(8) Dispersant Toxicity.* For those dispersants that meet the effectiveness threshold described in paragraph (a)(7) above, use the standard toxicity test methods described in appendix C to part 300. Manufacturers shall submit test results and supporting data, along with a certification signed by responsible corporate officials of the manufacturer and laboratory stating that the test was conducted on a representative product sample, the testing was conducted using generally accepted laboratory practices, and they believe the results to be accurate.

*(9)* The following data requirements incorporate by reference standards from the 1991 or 1992 Annual Books of ASTM Standards. American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.

  *(i) Flash Point*—Select appropriate method from the following:

    *(A) ASTM—D 56–87, "Standard Test Method for Flash Point by Tag Closed Tester;"*

    *(B) ASTM—D 92–90, "Standard Test Method for Flash and Fire Points by Cleveland Open Cup;"*

    *(C) ASTM—D 93–90, "Standard Test Methods for Flash Point by Pensky-Martens Closed Tester;"*

    *(D) ASTM—D 1310–86, "Standard Test Method for Flash Point and Fire Point of Liquids by Tag Open-Cup Apparatus;" or*

    *(E) ASTM—D 3278–89, "Standard Test Methods for Flash Point of Liquids by Setaflash Closed-Cup Apparatus."*

  *(ii) Pour Point*—Use ASTM—D 97–87, "Standard Test Method for Pour Point of Petroleum Oils."

10

*(iii) Viscosity—Use ASTM—D 445-88, "Standard Test Method for Kinematic Viscosity of Transparent and Opaque Liquids (and the Calculation of Dynamic Viscosity)."*

*(iv) Specific Gravity—Use ASTM—D 1298-85(90), "Standard Test Method for Density, Relative Density (Specific Gravity), or API Gravity of Crude Petroleum and Liquid Petroleum Products by Hydrometer Method."*

*(v) pH—Use ASTM—D 1293-84(90), "Standard Test Methods for pH of Water."*

*(10) Dispersing Agent Components. Itemize by chemical name and percentage by weight each component of the total formulation. The percentages will include maximum, minimum, and average weights in order to reflect quality control variations in manufacture or formulation. In addition to the chemical information provided in response to the first two sentences, identify the major components in at least the following categories: surface active agents, solvents, and additives.*

*(11) Heavy Metals, Cyanide, and Chlorinated Hydrocarbons. Using standard test procedures, state the concentrations or upper limits of the following materials:*

*(i) Arsenic, cadmium, chromium, copper, lead, mercury, nickel, zinc, plus any other metals that may be reasonably expected to be in the sample. Atomic absorption methods should be used and the detailed analytical methods and sample preparation shall be fully described.*

*(ii) Cyanide. Standard calorimetric procedures should be used.*

*(iii) Chlorinated hydrocarbons. Gas chromatography should be used and the detailed analytical methods and sample preparation shall be fully described. At a minimum, the following test methods shall be used for chlorinated hydrocarbon analyses: EPA Method 601—Purgeable halocarbons (Standard Method 6230 B) and EPA Method 608—Organochlorine pesticides and PCBs (Standard Method 6630 C).*

*(12) The technical product data submission shall include the identity of the laboratory that performed the required tests, the qualifications of the laboratory staff, including professional biographical information for individuals responsible for any tests, and laboratory experience with similar tests. Laboratories performing toxicity tests for dispersant toxicity must demonstrate previous toxicity test experience in order for their results to be accepted. It is the responsibility of the submitter to select competent analytical laboratories based on the guidelines contained herein. EPA reserves the right to refuse to accept a submission of technical product data because of lack of qualification of the analytical laboratory, significant variance between submitted data and any laboratory confirmation performed by EPA, or other circumstances that would result in inadequate or inaccurate information on the dispersing agent.*

11

NALCO has not even tried to show that it properly complied any of these requirements, especially, in the cases of those working with and handling Corexit as well as those exposed to Corexit such as Mr. Coco, , i.e. Sec. 915(a)(4), requiring information on:

*Special handling and worker precautions for storage and field application.*
***(40 C.F.R. Sec. 915(a)(4))***

Finally, along with Subsection "a"(above) of Section 915, other sections of 40 C.F.R. Sec. 300.915 that NALCO has not provided any proof of complying with include "c", "d", and "e":

> (c) The submitter may assert that certain information in the technical product data submissions, including technical product data submissions for sorbents pursuant to § 300.915(g)(3), is confidential business information. EPA will handle such claims pursuant to the provisions in 40 CFR part 2, subpart B. Such information must be submitted separately from non-confidential information, clearly identified, and clearly marked "Confidential Business Information." If the submitter fails to make such a claim at the time of submittal, EPA may make the information available to the public without further notice;
>
> (d) The submitter must notify EPA of any changes in the composition, formulation, or application of the dispersant, surface washing agent, surface collecting agent, bioremediation agent, or miscellaneous oil spill control agent. On the basis of this data, EPA may require retesting of the product if the change is likely to affect the effectiveness or toxicity of the product; and
>
> (e) The listing of a product on the NCP Product Schedule does not constitute approval of the product. To avoid possible misinterpretation or misrepresentation, any label, advertisement, or technical literature that refers to the placement of the product on the NCP Product Schedule must either reproduce in its entirety EPA's written statement that it will add the product to the NCP Product Schedule under § 300.920(a)(2) or (b)(2), or include the disclaimer shown below. If the disclaimer is used, it must be conspicuous and must be fully reproduced. Failure to comply with these restrictions or any other improper attempt to demonstrate the approval of the product by

12

any NRT or other U.S. Government agency shall constitute grounds for removing the product from the NCP Product Schedule.

## 4. CONCLUSION:

NALCO should not be entitled to immunity and its Motion For Summary Judgment should be denied because it has not shown that it fully and accurately complied with E.P.A.'s requirements regarding the pre-addition of Corexit to the NCP Product Schedule.

Further, in light of the well-known record of deception to the federal government by the owners of Corexit[3], it is respectfully submitted that NALCO be ordered to submit to this Court and undersigned counsel copies of all its records and communications to and from E.P.A. related to the pre-approval of Corexit upon which it bases its claim of immunity.

Respectfully submitted,

*/s/ Daniel E. Becnel, Jr.*
Daniel E. Becnel, Jr. (2926)
BECNEL LAW FIRM, LLC
106 W. SEVENTH ST.
P.O. DRAWER H
RESERVE, LA 70084
(985) 536-1186
dbecnel@becnellaw.com

---

[3] EXXON, who filed the applications with E.P.A. for the pre-approval of Corexit (See NALCO's Uncontested Fact #5; Doc. #6541-2) and previously owned NALCO and has had directors with cross board membership with NALCO (as well as had BP), filed the well known Gulf Of Mexcio Oil Spill Response Plan with the Mineral Management Service that warned of protecting walruses in the Gulf of Mexico in the event of a spill and assured the federal government that it would rely on an expert who had been deceased for many years. (See "BP, Oil Industry Take Fire At Hearing"; Wall Street Journal; June 16, 2010; avaliable at:
http://online.wsj.com/article/SB10001424052748704009804575308552817952036.html). Also, see "Maker of Controversial Disperants Used in Gulf Oil Spill Hires Top Lobbyists"; New York Times; June 25, 2010. Available at:
http://www.nytimes.com/gwire/2010/06/25/25greenwire-maker-of-controversial-dispersant-used-in-gulf-94328.html

        Attorney for Plaintiff in:
        <u>Malcolm Alphonse Coco v BP, NALCO et al.</u>
        (10-cv-946)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of June, 2012.

                                                                       <u>/s/ Daniel E. Becnel, Jr.</u>