

**U.S. Department of Justice**
Environment and Natural Resource Division

---

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0056*
*Scott.Cernich@usdoj.gov*

June 16, 2012

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

     Re:    MDL 2179: United States' Challenges to BP Privilege Claims

Dear Judge Shushan:

     BP relies on overbroad and improper assertions of the attorney-client privilege and work product doctrine to hide critical information from the United States, other parties in this case, and the public, including flow rate estimates and calculations dating from the earliest days of the spill through the final killing of BP's well on September 19, 2010.  The information and calculations BP seeks to withhold are critical to: 1) quantify the oil discharged from the Macondo well to properly assess damage to the Gulf ecosystem and assess a civil penalty, 2) determine whether BP's actions in responding to the well were sufficient and appropriate, 3) and establish whether the flow rate estimates and calculations BP provided to the United States were accurate and consistent with BP's internal work.  The credibility of BP's flow rate estimates are at issue in this case.  The fact that many of these documents may be embarrassing or contradict BP's public statements regarding flow rate and source control efforts does not entitle BP to hide them under the cloak of privilege.[1]

     BP seeks to withhold hundreds of documents created *before* the Macondo well was killed that were authored by core members of BP's response team, such as: Flow Engineers Trevor Hill, Farah Saidi, and Tim Lockett; Reservoir Engineer Robert Merrill; Science Lead David

---

[1] The State of Louisiana and the United States have coordinated efforts to submit this combined brief.  The State of Louisiana has informed the United States that it is joining in and adopting this brief as it did with the United States' initial challenges.

1

Rainey; and Vice-President ("VP") of Engineering for Exploration and Production ("E&P") Paul Tooms. Those documents include, according to BP's descriptions, "Operational Data," "Engin. Drawings/Schematics," "Spreadsheets," and "Reports." In seeking discovery of the United States' documents, BP has vigorously argued to this Court that efforts to quantify the flow of oil are factual and are not privileged. This also applies to BP's efforts.

While the Macondo well was shut in with the Capping Stack on July 15, 2010, the well was not killed until September 19, 2010. Even after July 15, 2010, flow rate remained a critical issue in assessing well integrity, *i.e.*, whether shutting in the well would result in an underground blowout that would be all but impossible to stop. It appears that BP is contending that the very BP engineers responsible for trying to stop the flow from the Macondo well were concurrently engaged in litigation-related Quantification work *during the spill*. The idea that "attorney work product related to flow rate" generated before the well was sealed did not also inform the response is dubious.[2] As courts have found in similar circumstances, it is impossible for a person to build a mental firewall between discoverable information and privileged information on the same topic. *See Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 83 CIV. 8898 (MEL), 1989 WL 31514, at *4 (S.D.N.Y. Mar. 28, 1989) (expert "cannot possibly create separate spaces within his memory" for public information and for privileged information). BP engineers putting all their efforts to killing the well cannot be imagined to have built such a firewall.[3]

Accordingly, the Court should subject BP technical documents and discussions dated prior to September 19, 2010 to heightened scrutiny with a special emphasis on documents created prior to July 19, 2010.[4]

BP has (1) failed to meet its burden of proving that the documents listed on its privilege logs are protected by the attorney-client privilege or the attorney work product doctrine, (2) improperly withheld third-party communications and factual information, and (3) waived attorney-client privilege and work product protection for communications and documents related to its public statements regarding flow rate. Further, the United States can demonstrate that it has substantial need for certain documents over which BP has asserted qualified work product protection.

**1. BP Has Failed to Demonstrate that its Attorney-Client Privilege Claims are Valid**

BP bears the burden of proving each and every element of the attorney-client privilege. *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997), *cert. denied*, 522 U.S. 1065 (1998); *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982), *cert. denied*, 466 U.S. 944 (1984). The elements of the attorney-client privilege are: (1) the asserted holder of the

---

[2] BP told the United States that BP's counsel-directed workstream on flow rate was "formally constituted in an email distribution dated July 19, 2010," although this date is two months prior to the final well kill and during the well integrity test. *See* Attachment B, Letter from Rob Gasaway to Steve O'Rourke, *et al.* (Oct. 17, 2011).

[3] *See, e.g.*, Attachment N, BP-HZN-2179MDL04791976-978 (redacted Doug Suttles hand written notes from April 30, 2010) and BP-HZN-2179MDL05034128 (redacted BP email regarding discussions with National Labs personnel (Tatro, Tieszen, Havstad) on well shut-in). Both documents are included on the United States' *In Camera* List. *See* Attachment A.

[4] *See id.*

privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *Gabarick v. Laurin Mar. (America), Inc.*, No. 08-4007, 2011 WL 2838226, *4 (E.D. La. July 15, 2011) (quoting *In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir.1975)).

In the case of corporate communications among non-attorneys, this Court has limited the applicability of the attorney-client privilege to those situations where "it was clear that legal advice previously obtained was being circulated to those within the corporate structure who needed the advice in order to fulfill their corporate responsibilities" or where attorney communications were forwarded "for the purpose of acquiring more information upon which more informed legal advice or assistance could be rendered." *In re Vioxx Prod. Liab. Litig.*, 501 F. Supp. 2d 789, 811-12 (E.D. La. 2007). All of BP's attorney-client privilege claims – over 4,000 entries in BP's latest response to privilege challenges – involve communications among *non-attorneys* as Pretrial Order ("PTO") No. 14 (Rec. doc. 655) did not require logs of communications with counsel. Discussions among BP employees or with media consultants regarding BP, United States Government, or independent flow rate estimates are not even remotely related to communication of legal advice and are not shielded by the privilege. The bald assertions contained in BP's privilege logs do not establish the privilege. BP has not met its burden.

Further, BP has claimed the attorney-client privilege for hundreds of documents that are factual in nature – described by BP as "Engin. Drawings/Schematics," "Photo/Video/Image," or "Spreadsheet." The attorney-client privilege does not apply to BP's factual documents. The Supreme Court, in *Upjohn Co. v. U.S.*, held that the attorney-client privilege does not prevent discovery of underlying facts. 449 U.S. 383, 395 (1981). BP also asserts privilege over 20 documents on the United States' challenge list described by BP as "Operational Data."[5] Webster's Ninth New Collegiate Dictionary defines "data" as "*factual information* (as measurements or statistics) used as a basis for reasoning, discussion, or calculation" (emphasis added). BP simply has no basis to withhold such facts or data as privileged. In fact, Paragraph 4 of PTO No. 14 (Rec. doc. 655) requires the parties to redact documents and produce facts where possible.

As BP already argued to the Court – technical analyses estimating the flow from the well are factual in nature. Neither the attorney-client privilege nor the work product doctrine protects them unless they qualify for protection pursuant to Federal Rule of Civil Procedure 26(b)(4). *See United States v. Edwards*, 39 F. Supp.2d 716, 736 (M.D. La. 1999) ("Pre-existing facts that underlie the client's confidential communications, whether oral or written, are not privileged simply because the client disclosed them to an attorney for the purpose of obtaining legal services"); *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982).

---

[5] The very term "Operational Data" suggests that the information was compiled for the purposes of response operations, rather than litigation.

Indeed, this Court held that damages calculations – even when made at the request of counsel – are *not privileged but are factual information*. *Lenihan v. Stewart Enterp., Inc.*, No. 01-2895, 2002 WL 31001842, at *3 (E.D. La. 2002) (emphasis added). The United States responded to BP's deliberative process challenges by releasing thousands of documents. It is fundamentally unfair for BP to turn around now and claim that its own factual materials are privileged.[6]

2. **BP has Failed to Prove that Litigation was the Primary Motivating Purpose for the Documents BP Claims are Work Product**

For each document that BP seeks to shield from disclosure under the work product rule, BP bears the burden to show that the document was prepared in anticipation of litigation. *See Poseidon Oil Pipeline Co., L.L.C. v. Transocean Sedco Forex, Inc.*, Nos. 00-760, 00-2154, 2001 WL 1360434, at *3 (E.D. La. Oct. 30, 2001) (citing *Guzzino v. Felterman*, 174 F.R.D. 59, 63 (W.D. La. 1997); *St. James Stevedoring Co. v. Femco Mach. Co.*, 173 F.R.D. 431, 432 (E.D. La. 1997). The doctrine, however, does not extend to the underlying facts relevant to the litigation. *See, generally*, *Upjohn*, 449 U.S. at 395-96; *see also Southern Scrap Material Co., v. Fleming*, No. 01-2554, 2003 WL 21474516, at *15-20 (E.D. La. Jul. 18, 2003) (ordering production of factual data including sampling data, maps of sampling locations, lab results, survey results, data charts, photographs, and videos).

The Fifth Circuit applies a restrictive "primary purpose" test – a document is prepared in anticipation of litigation only when "the primary motivating purpose behind the creation of the document [i]s to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir.1981). The doctrine excludes "materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation." *Poseidon Oil*, 2001 WL 1360434, at *3 (quoting *United States v. El Paso Co.*, 682 F.3d at 542).

BP has not demonstrated that the flow rate materials at issue in the United States' privilege challengers were prepared primarily for the purposes of litigation. These documents were created at a time when BP, as a responsible party, was obligated to undertake response actions such as calculating or estimating flow rates,[7] calculating shut-in well head pressure, and attempting to determine whether the burst disks in the casing had failed. Indeed, BP's own "Regional Oil Spill Response Plan" for the Gulf of Mexico required BP to calculate spill volume and provides that determining size and volume of the spill is "critical to initiating and sustaining an effective response."[8] BP expert and response contractor ADD Energy testified during its 30(b)(6) deposition that its standard practice is to calculate flow rates in order to design a kill operation to stop the flow.[9] In other words, while everyone knew litigation was a likelihood, the purpose of these calculations was not primarily for litigation but, rather, primarily to stop BP's well from spewing more oil into the Gulf.

---

[6] *See* United States' Letter Brief on Phase 2 Deliberative Process Privilege Claims (May 15, 2012) (Rec. doc. 6618). The United States recognized that the deliberative process privilege is a qualified privilege than can be overcome in certain circumstances. BP argues that the United States is comparing "apples to oranges," but the case law makes clear that factual information cannot be withheld under attorney client or work product privilege.

[7] It is standard practice for the responsible party in an oil spill to provide discharge volume estimates to the United States Coast Guard or other responsible federal agency.

[8] *See* Attachment C, Deposition Exh. 769, "BP Regional Oil Response Plan – Gulf of Mexico," Sec. 1, p. 2.

[9] *See* Attachment D, 30(b)(6) Deposition of ADD Energy, June 23, 2011 (308:11-309:6).

Since the vast majority of the documents at issue relate to BP's "response to the spill, the clean-up efforts, the preparation of regulatory responses and reports, and numerous other activities whose primary purpose was business in nature and not necessarily in anticipation of litigation … the documents are not protected and should be produced." *See Barker v. Kinder Morgan South-East Terminals, L.L.C.*, No. 2:07cv48-KS-MTP, 2007 WL 4333843 (S.D. Miss. Dec. 6, 2007) (ordering production of documents relating to discharge of petroleum) (citing *El Paso Co*., 682 F.2d at 542). In many cases, this Court has ruled that documents created in the course of investigating an accident are not protected by the work-product doctrine. *See, e.g., Poseidon Oil*, 2001 WL 1360434, at *3; *Holton v. S&W Marine, Inc.*, No. 00-1427, 2000 WL 1693667 (E.D. La. Nov. 9, 2000). Surely, documents created in response to an ongoing incident must be produced. Similarly, in *Lenihan*, this Court found that the work product doctrine did not protect factual information – including damage calculations, in part, because there were "nonlitigation purposes for such material." 2002 WL 31001842, at *6.

### 3. The Parties have a Substantial Need for BP's Data and Flow Rate Calculations During the Response

The work product doctrine is not a privilege but a qualified immunity, which permits discovery of work product when another party has "a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(B). The other parties in this case need the relevant facts and data for the Macondo blowout. BP owned and operated the well. No one has more information about the well than BP. All of the raw data underlying the United States Flow Rate Technical Group/DOE Science Team's ("FRTG/DOE") work was provided by BP.

On October 21, 2010, BP submitted its Comment to the National Oil Spill Commission ("BP Flow Rate Comment") critiquing United States government flow estimates as well as estimates of independent researchers.[10] That Flow Rate Comment states BP's belief that the accuracy of the data underlying the FRTG/DOE work is relevant to the quantification inquiry.[11] Accordingly, (1) if BP has information that the data it provided to the United States to calculate flow is inaccurate or unreliable, BP should disclose it; and (2) if BP has data that it used but did not share with the United States, that fact is relevant because it goes to culpability and an informed resolution of the claims.

The parties in this case have a substantial need for BP's factual materials and data, such as "Operational Data," "Engin. Drawings/Schematics," and "Spreadsheets" because the material cannot be obtained by other means. *See In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d at 1240. The parties are unable to recreate or otherwise obtain the data collections and materials BP seeks to shield without undue hardship. *See, e.g., Smith v. Texaco*, 186 F.R.D. 354, 357-58 (E.D. Tex. 1999). This information is not amenable to discovery by deposition.

Further, to the extent BP is claiming work product protection over the documents containing its internal flow rate calculations during the spill, they "are essential to the

---

[10] *See* Attachment E, BP Flow Rate Comment (BP-HZN-2179MDL06148979). BP's Flow Rate Comment contains numerous attacks on the data relied upon by the FRTG and DOE Science Team. This is surprising, because the FRTG/DOE relied entirely upon BP for their data.

[11] *See id.*, at 1.

5

preparation and prosecution of the [Parties'] case and are not available from any other source." *Adams v. Teck Cominco Alaska, Inc.*, 232 F.R.D. 341, 346 (D. Alaska 2005) (ordering production of defendant's internal compilation of Clean Water Act permit violations). BP's credibility regarding flow rates are at issue in this case. BP's flow rate calculations are critical to the parties because those internal documents may contradict BP's statements to the public or the United States. *See id.* In fact, BP's own witnesses have given conflicting testimony on BP's flow rate calculations at the time the capping stack was placed on the well. Richard Lynch, who led BP's Macondo source control efforts, testified that BP calculated a flow rate of 56,000 barrels per day – a flow rate he testified he had no reason to doubt because "it was a pretty straight calculation,"[12] but Paul Tooms, BP's VP of E&P and leader of BP's Flow Assessment Technical Team, testified that the rate calculated at shut-in was "35- to 40- something-thousand barrels per day."[13] Further, on July 6, 2010, BP executive Doug Suttles, BP's top representative in the Unified Area Command, submitted a letter to the U.S. Coast Guard seeking approval for dispersant application assuming a 53,000 barrel per day flow rate, but Mr. Suttles testified that he could not recall the basis for that number.[14] These inconsistencies and lack of recollection demonstrate the parties' substantial need for BP's technical documents related to flow rate. *See Eckstein Marine Serv. Inc. v. Crescent Marine Towing, Inc.,* No. 98-1467, 1998 WL 850523, at *1 (E.D. La. Dec. 8, 1998) ("Plaintiff may demonstrate undue hardship if witness cannot recall the events in question or is unavailable").

### 4. BP Must Produce Communications with Third Parties

BP also has asserted the attorney-client privilege and/or work product protection over a wide variety of communications with, or documents authored by, third-parties, including, without limitation, United States employees and contractors, Wild Well Control, Ole Rygg of ADD Energy, General Electric, Florida State Professor Ian MacDonald, Worldwide Oilfield Machine, Inc., Weatherford Laboratories, ExxonMobil, INTEC Engineering, Welaptega Marine, and Liquid Robotics. BP should produce all such documents immediately, identify all non-BP employees on its privilege logs, and explain the basis for claiming privilege over communications with, or documents prepared by, those individuals or entities. For example, BP has asserted privilege over communications with employees of the National Oceanic and Atmospheric Administration and Sandia National Laboratories.[15]

Other categories of documents on BP's logs raise similar concerns. For example, BP has asserted that "Regulatory Filings" are protected by the attorney-client privilege or the work product doctrine. Since "Regulatory Filings" are presumably filed with regulatory bodies, the United States cannot understand the basis for BP's privilege claim on such documents.[16]

---

[12] *See* Attachment F, Deposition of Richard Lynch, May 19, 2011 (371:15-372:21).

[13] *See* Attachment G, Deposition of Paul Tooms, June 16, 2011 (238:18-240:12).

[14] *See* Attachment H, Deposition of Doug Suttles, May 19, 2011 (460:15-464:2); *see also* Attachment I, Doug Suttles July Letters to Adm. Watson, USCG, Deposition Exh. 2420.

[15] *See* BP Privilege Log Entries PRIV-BP-HZN-2179MDL00012906 and PRIV-BP-HZN-2179MDL00017038.

[16] BP has also potentially waived privileges over documents uploaded to its Macondo Tactical Response SharePoint by sharing access to the site with third parties. *See, e.g*. BP-HZN-2179MDL05114726 (email granting WildWell Control employees access to a BP SharePoint); BP-HZN-2179MDL04479719 (printout from the Macondo Tactical Response SharePoint including a list of users, some of whom work for third parties). Discussions between the

5. **Independent of the Failures of BP's Attorney-Client Privilege and Work Product Claims, BP Has Waived Attorney-Client Privilege and Work Product Protection for Communications and Documents Related to Certain Submissions to the United States Government and the Public**

BP submitted its October 2010 Flow Rate Comment to the Oil Spill Commission and directly to the Department of Justice. That Comment, publicly available on the Oil Spill Commission's website, requested "that the information provided [in the Comment] be shared with the many technical personnel interested in this topic and that there be open, constructive, and collaborative scientific discussion about these issues."[17] BP did not intend to shield its flow rate investigation behind a veil of privilege. To the contrary, BP asserted the need for experts analyzing flow to "have both (i) access to all relevant data and information, and (ii) the time to analyze that data and information, to consult and collaborate with their colleagues in the scientific community, and to develop a well-founded, strongly defensible estimate of the flow rate."[18]

In discovery thus far, BP has asserted work product protection over its internal analysis of the flow rate, and refused to allow deponents to answer questions about this investigation on the grounds that it was directed by counsel.[19] At the same time, however, BP has sought the assistance of this Court to ensure that it received the factual basis for the United States estimates as well as for estimates conducted by non-parties to this litigation, including wholly independent researchers. Now, BP refuses to share its own information. BP cannot have it both ways.

BP engineering technical authority Paul Tooms testified that the Comment was prepared by members of BP's internal "Flow Assessment Team,"[20] of which he is the leader,[21] but BP contends that the work of the Flow Assessment Team is protected work product because the work was conducted at the direction of counsel in anticipation of litigation.[22] BP Counsel refused to allow Mr. Tooms to testify regarding the BP Flow Paper, including the underlying calculations, during his deposition last June.[23]

Qualified work product protection requires a subjective intent of confidentiality because the doctrine is designed to protect "a lawyer's need for a sphere of privacy in preparing a lawsuit." *United States v. El Paso Co.*, 682 F.2d at 542. The Fifth Circuit standard is strict. Internal documents, even those created at the direction of a lawyer, are not protected unless the "***primary motivating force***" behind their creation was to aid in future litigation. *Id.* (emphasis added). Materials that a party pledges to disseminate to the public are not entitled to such protection. *See id.*

---

United States and BP on this topic have been productive, but the United States reserves its right to raise objections to privileges asserted over documents included in the Macondo Tactical Response SharePoint at a later date.

[17] *See* Attachment E, BP Flow Rate Comment, at 2–3.

[18] *Id.* at 9.

[19] *See, e.g.,* Attachment G, Deposition of Paul Tooms, June 16, 2011 (237:21–238:1, 267:3–13, 273:22–281:9, 289:11–290.8), June 17, 2011, (336:21–346:15, 358:4–11, 360:4–25).

[20] *See id.* (266:18–267:13).

[21] *See id.* (231:3–10).

[22] *See id.* (232:22–233:18).

[23] *See id.*

Further, even if BP initially intended that the Flow Assessment Team work be confidential, BP waived both the attorney-client privilege and work product protection by sharing that work with its adversary and the public. *See Kintera, Inc. v. Conivio, Inc.,* 219 F.R.D. 503 (S.D. Ca. 2003) (disclosure on business's public web site of particular facts and specific reference to competitor's former employees' signed written affidavits waived work product protection); *Krenning v. Hunter Health Clinic*, 166 F.R.D. 33, 35 (D. Kan. 1996) (party's voluntary disclosure of portions of a privileged document in a press release and newspaper article served to waive attorney client and work product privileges); *see also* 8 C.A. Wright, A.R. Miller, & R.L. Marcus, *Federal Practice & Procedure*, § 2016.4 (3d. ed. 2010) (disclosure of privileged material to a nonparty outside the discovery context "justify discovery of formerly privileged materials by current litigants unless the disclosure was itself privileged"); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, 1048 (5th ed. 2007) ("Any general public disclosure in contexts such as Internet websites or newspaper advertisements where such announcements have a commercial or competitive purpose will effect a waiver of otherwise work-product-protected materials."); *Id*. at 1053 ("Voluntary disclosure [of work product] to a government agency to effect a goal by the disclosing party . . . generally constitutes waiver."). As early as July 20, 2010, BP was planning to share its flow rate work in presentations to BP's "core universities," including materials prepared by Trevor Hill, a member of BP's Flow Assessment Team.[24]

Here, BP has issued what amounts to a 10-page press release disclosing technical flow rate work conducted by BP engineers and scientists. BP cannot strategically show its hand, whether for public relations or litigation purposes, and then seek to hide the underlying materials even if BP contends that those materials were prepared in anticipation of litigation. *See In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 306-07 (6th Cir. 2002) ("Even more than attorney-client privilege waiver, waiver of the protections afforded by the work product doctrine is a tactical litigation decision. Attorney and client both know the material in question was prepared in anticipation of litigation; the subsequent decision on whether or not to 'show your hand' is quintessential litigation strategy. Like attorney-client privilege, there is no reason to transform the work product doctrine into another 'brush on the attorney's palette,' used as a sword rather than a shield").[25]

It is also worth noting that in the days leading up to submission of BP's Flow Comment, BP Flow Engineer Trevor Hill, under direction from BP in-house and outside counsel, inquired directly of Sandia National Laboratories scientist Arthur Ratzel regarding issues explicitly raised in BP's comment:

> May I ask if you have now seen inside the bottom of the Horizon BOP stack? I am interested in knowing what you found and also whether your are conducting

---

[24] *See* Attachment O, BP-HZN-2179MDL06149010 (July-August Email Correspondence between Trevor Hill and Steve Shaw).

[25] To be clear, the United States herein does not contend a general waiver for all of BP's quantification-related documents, *e.g*., we are not currently contending that BP has waived privilege on expert work performed after BP's Flow Comment was released. Rather, we contend that BP has waived privilege for the work underlying these specific submissions to the United States.

any experimental investigation of the two phase and K factor uncertainties in the July 15 capping stack tests.[26]

Also in October 2010, Mr. Hill was engaging in technical discussions with Dr. Timothy Crone of Columbia University (whom BP sought to depose as an individual and 30(b)(6) witness) regarding Mr. Crone's flow rate research, again orchestrated by counsel.[27]

Likewise, BP has waived any privilege or protection over documents and communications related to a memo prepared by BP executive David Rainey titled "Mississippi Canyon #252 Flow Rate Calculations" and submitted to Admiral Thad Allen, USCG (Ret.) and Admiral Mary Landry, USCG (Ret.) on May 19, 2010.[28] Rainey testified that he prepared the memo in response to a request from BP counsel and that BP counsel reviewed and edited the memo, and that the memo was "a summary of a lot of work [he] was aware of that was going on around flow rate and worst case discharge potential."[29] In addition to comments from BP attorneys, BP Chief Operating Officer Doug Suttles also contributed to the memo.[30] BP demonstrated that it had no intent to keep the work confidential and has waived any protection for the work, calculations, communications, estimates, etc. that contributed to or related to preparation of Rainey's memo when it shared the flow rate calculations with the United States. Accordingly, to the extent BP is claiming attorney-client privilege or work product protection over such documents and communications, BP's claims must fail.

### 6. The United States *In Camera* List

As the Court is aware, BP bristled at the United States 8,271 privilege challenges, but as a result of those challenges, *less than half* of the documents challenged by the United States remain on BP's Phase 2 privilege logs. BP validated the United States' challenges by releasing 2,480 previously privileged documents, and changing the privilege determination from "Priv Withhold" to "Priv Redact," or editing the redaction for 40 other documents (over 30% of the documents challenged by the United States).[31]

The United States' list of documents for in camera review is included as Attachment A. This list is a sampling as per the Court's order and is not intended to limit in any way the scope

---

[26] *See* Attachment J, October e-mail correspondence between Trevor Hill and Arthur Ratzel and between Trevor Hill and BP counsel (BP-HZN-2179MDL07110896-898, BP-HZN-2179MDL07204190-191, BP-HZN-2179MDL07164626-629).

[27] *See* Attachment K, October e-mail correspondence between Trevor Hill and Timothy Crone and between Trevor Hill and BP counsel (BP-HZN-2179MDL07110896-898, BP-HZN-2179MDL07204190-192, BP-HZN-2179MDL07164626-629). BP informed the United States on Friday June 15, 2012 that it does not intend to serve a subpoena on Columbia University "at this time."

[28] *See* Attachment L, May 19, 2010 Submission by Doug Suttles to Adm. Mary Landry and Adm. Thad Allen, Deposition Exh. 3218.

[29] *See* Attachment M, Deposition of David Rainey, June 2, 2011 (181:25 – 185:15).

[30] *See id*. (183:8-10).

[31] BP removed another 285 documents from its privilege log on May 20, 2011, the day before the United States' privilege challenges were due. BP also reclassified 1,434 documents as relating to "Other Phases" despite the fact that most of them appeared on BP's Good Faith Quantification list, and labeled over 100 documents prepared by Trevor Hill and Farah Saidi (BP Flow Engineers whom were members of BP's Flow Assessment Team), between July and October 2010 as "Non-Responsive." The United States understands that challenges to those determinations are on an alternate schedule and reserves its right to challenge them.

of the United States' challenges to BP's privilege claims.  The United States expects that BP will extrapolate the Court's ruling on these challenges to the remainder of the challenged documents.  We appreciate the Court's willingness to undertake this review.

### 7. Conclusion

BP performed secret calculations of flow rate.  It trumpeted the results, but has steadfastly refused to provide the details of how its estimates were calculated. Meanwhile, at BP's urging, every other entity that made flow estimates – party and non-party alike – has produced the basis of those estimates.  BP should not be allowed to live by this double standard.  The estimates are critical to this phase of the case.  Either BP's secret calculations will confirm what the company said publicly during the spill – or they will not.  If BP's internal calculations showed higher flow rates than what the company told the public and the United States in the midst of an environmental disaster, the parties have a right to know.  The public has a right to know.

              Respectfully submitted,

              /s/ Scott M. Cernich
              Scott M. Cernich

cc:  Liaison & Coordinating Counsel
    Robert Gasaway