Filed **12 May 02 P3:35**
Chris Daniel - District Clerk
Harris County
ED101J016859388
By: irma medina

Trace Number - ED101J016859388

Certified Document Number: 52098850 - Page 1 of 39

## 2012-22995 / Court: 295

CAUSE NO. _____

| | | |
|---|---|---|
| DAVID HOGAN and PATRICIA FAJKUS-HOGAN, | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| vs. | § § | HARRIS COUNTY, T E X A S |
| BRITISH PETROLEUM EXPLORATION & PRODUCTION, INC.; BP AMERICA, INC.; BP AMERICA PRODUCTION COMPANY; BP PRODUCTS NORTH AMERICA, INC.; BP plc; HALLIBURTON ENERGY SERVICES, INC.; TRANSOCEAN, LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN HOLDINGS, LLC; NALCO COMPANY; SPECIALTY OFFSHORE, INC.; CONOCOPHILLIPS; XPLORE OIL & GAS, L.L.C.; STUYVESANT DREDGING COMPANY; STUYVESANT DREDGING, INC., | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, DAVID HOGAN and PATRICIA FAJKUS-HOGAN, hereinafter sometimes referred to as "Plaintiffs," and file this their Original Petition, complaining of BRITISH PETROLEUM EXPLORATION & PRODUCTION, INC.; BP AMERICA, INC.; BP AMERICA PRODUCTION COMPANY; BP PRODUCTS NORTH AMERICA, INC.; BP plc; HALLIBURTON ENERGY SERVICES, INC.; TRANSOCEAN, LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN HOLDINGS, LLC; NALCO COMPANY; SPECIALTY OFFSHORE, INC.; CONOCOPHILLIPS; XPLORE OIL & GAS, L.L.C.; STUYVESANT DREDGING COMPANY; and

# EXHIBIT A

STUYVESANT DREDGING, INC., and for cause of action would respectfully show unto the Court and Jury as follows:

## I.
### JURISDICTION

1.     This case is maintained under the Jones Act (46 U.S.C. §§ 30104, *et seq.*) and/or under the general maritime law of the United States.

2.     This claim is filed in state court pursuant to the "Savings to Suitors" clause. It is well-settled that Jones Act cases are not removable to federal court. Moreover, several defendants herein are Texas residents. As such, this case cannot be removed on the basis of diversity jurisdiction. As will be further set forth in detail hereinafter in this pleading, the undisputed facts with respect to David Hogan and the work he was performing at all times material to this case is that this case is governed by maritime law; this claim is originally brought in state court pursuant to the "Savings to Suitors" clause; and one or more of the Defendants is a citizen of the State of Texas where this case is filed. Further, as is set forth hereinafter in this pleading, the law is clear that when a tort occurs on navigable waters, as opposed to a stationary platform, maritime law applies to the ensuing tort action by workers, such as the Plaintiff herein, against third parties. As further set forth in detail in these pleadings, it is undisputed that the injuries for which Plaintiff David Hogan seeks recovery in this case, occurred in navigable waters, and none of the injuries occurred on a fixed platform. The undisputed facts of this case, as set forth herein, also demonstrate that, at all times material to this claim, Plaintiff David Hogan was diving off vessels, as opposed to a fixed platform, in navigable waters, and performing duties and responsibilities that were in furtherance of activities bearing a significant relationship to traditional maritime activities.

2

Certified Document Number: 52098850 - Page 2 of 39

It is settled law that maritime cases do not "arise under" federal law for purposes of federal removal jurisdiction. Further, it is settled law that statutes such as the Outer Continental Shelf Lands Act ("OCSLA") do not displace general maritime law if general maritime law is also applicable. It is likewise settled law that removal under OCSLA is not proper when maritime law governs the plaintiff's claim, and one of the defendants is from the state of suit. The undisputed facts in this case are that the Plaintiff's injuries occurred on navigable waters in the Gulf of Mexico; one or more of the incidents giving rise to this claim has had a significant disruptive impact on maritime commerce, and both the *Deepwater Horizon* disaster and resulting oil spill and the Plaintiff's activities giving rise to this claim have a substantial relationship to traditional maritime activity.

## II.
### VENUE

3.      Venue is proper in Harris County, Texas, pursuant to Tex. Civ. & Rem. Code, Sec. 15.0181 and 15.002, because it is a suit brought pursuant to the Jones Act and one or more of the Defendants reside and have their principal office in Harris County, Texas. Further, Harris County, Texas, is the county where all or a substantial part of the omissions giving rise to the claim occurred. Further, Harris County is the county of one or more of the Defendants' residence at the time the cause of action accrued. Further, Harris County is the county of one or more of the Defendants' principal office in Texas. Further, venue is proper in Harris County, Texas, pursuant to Section 15.005, in view of the fact that Harris County is proper venue against one or more of the Defendants; therefore, this Court also has venue over all defendants in all claims arising out of the same transaction, occurrence, or series of transactions or occurrences.

Certified 1...ment Number: 52098850 - Page 3 of 39

3

## III.
### DISCOVERY LEVEL

4.     Discovery in this matter may be conducted under Level 3 of the Texas Rules of Civil Procedure.

## IV.
### PARTIES

5.     Plaintiffs David Hogan and Patricia Fajkus-Hogan are residents of Texas. Mr. Hogan worked for and/or was employed by Specialty Offshore, Inc. He has suffered severe and permanent injuries rendering him essentially a paraplegic by virtue of his commercial diving activities in diving into waters contaminated by the oil spill which was proximately caused by the acts and omissions of one or more of the Defendants, and by virtue of considerable exposure and contact with dispersants which were used in connection with the oil spill – dispersants that were authorized by and/or released by one or more of the Defendants.

6.     Defendant BP EXPLORATION & PRODUCTION, INC. ("BP Exploration"), is a Delaware corporation with its principal place of business in Houston, Harris County, Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, C.T. Corporation System, 350 North St. Paul St., Suite 2900, Dallas, TX 75201.

7.     Defendant BP AMERICA, INC., is a foreign corporation with its principal place of business in Houston, Harris County, Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, C.T. Corporation System, 350 North St. Paul St., Suite 2900, Dallas, TX 75201.

Certified Document Number: 52098850 - Page 4 of 39

4

8.     Defendant BP AMERICA PRODUCTION COMPANY is a foreign corporation with its principal place of business in Houston, Harris County, Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, C.T. Corporation System, 350 North St. Paul St., Suite 2900, Dallas, TX 75201.

9.     Defendant BP PRODUCTS NORTH AMERICA, INC., is a foreign corporation with its principal place of business in Houston, Harris County, Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, C.T. Corporation System, 350 North St. Paul St., Suite 2900, Dallas, TX 75201.

10.     Defendant BP plc, is a British public limited company. BP plc is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009. BP plc operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration, BP America, BP America Production Company, and BP Products North America, Inc. fall, through vertical business arrangements, aligned by product or service groups. BP plc's operations are worldwide, including the State of Texas, and particularly, Houston, Harris County, Texas. Defendants BP Exploration & Production, Inc., BP America, Inc., BP America Production Company, and BP Products North America, Inc., are wholly-owned subsidiaries of BP plc, and are sufficiently controlled by BP plc so as to be BP plc's agents in Texas, including but not limited to Houston, Harris County, Texas. Defendant BP plc may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, C.T. Corporation System, 350 North St. Paul St., Suite 2900, Dallas, TX 75201.

5

In addition, this Court has personal jurisdiction over BP plc under agency and alter ego principles, because BP plc's agents, BP Exploration & Production, Inc., BP America, Inc., BP America Production Company, and BP Products North America, Inc. are wholly-owned subsidiaries of BP plc.  In BP plc's Annual Report for 2009, in which is presents a consolidated financial statement that includes BP Exploration & Production, Inc., BP America, Inc., BP America Production Company, and BP Products North America, Inc., BP plc states that it "controls" BP Exploration & Production, Inc., BP America, Inc., BP America Production Company, and BP Products North America, Inc., among other subsidiaries, meaning that it has "the power to govern the financial and operating of the [subsidiary] so as to obtain benefit from its activities . . . ." Moreover, BP plc undertook the duty to pay and/or gratuitously clean-up the oil spill made the basis of this claim, and as a result is liable for its acts and omissions in the attempt to clean-up the oil spill in question.

BP Exploration & Production, Inc., BP America, Inc., BP America Production Company, BP Products North America, Inc., and BP plc are generally referred to in this pleading, collectively, as "BP." As lease-operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, retaining and overseeing the contractors working on the various aspects of the well, and the response efforts and operations to the oil spill in question, including but not limited to the selection of the contractors and the nature and extent of the use of various chemicals and dispersants during the response efforts.

11.     Defendant HALLIBURTON ENERGY SERVICES, INC., is a foreign corporation, with its principal place of business in Houston, Harris County, Texas.  It may be served by the Clerk of this

Certified D.    nent Number: 52098850 - Page 6 of 39

Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition

attached, to its registered agent, C.T. Corporation System, 350 North St. Paul St., Suite 2900, Dallas,

TX 75201.

12.     Defendant TRANSOCEAN, LTD., is a foreign entity, duly organized and existing pursuant

to law. Its principal place of business is in Houston, Harris County, Texas. According to pleadings

filed by TRANSOCEAN, LTD. in litigation involving the oil spill in question, TRANSOCEAN,

LTD. was the owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater

Horizon. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt

Requested, a copy of the citation with the petition attached, to its registered agent, Capital Corporate

Services, Inc., 800 Brazos St., Suite 400, Austin, Texas 78701.

13.     Defendant TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., is a foreign

entity, duly organized and existing pursuant to law. Its principal place of business is in Houston,

Harris County, Texas. TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. is affiliated

with TRANSOCEAN, LTD. and was an owner, managing owner, owner *pro hac vice*, and/or

operator of the Deepwater Horizon. It may be served by the Clerk of this Court mailing, by Certified

Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered

agent, Capital Corporate Services, Inc., 800 Brazos St., Suite 400, Austin, Texas 78701.

14.     Defendant TRANSOCEAN DEEPWATER, INC., is a foreign corporation with its principal

place of business in Houston, Harris County, Texas. TRANSOCEAN DEEPWATER, INC. is

affiliated with TRANSOCEAN, LTD. and was an owner, managing owner, owner *pro hac vice*,

and/or operator of the Deepwater Horizon. It may be served by the Clerk of this Court mailing, by

Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its

7

Certified Document Number: 52098850 - Page 7 of 39

registered agent, Capital Corporate Services, Inc., 800 Brazos St., Suite 400, Austin, Texas 78701.

15.     Defendant TRANSOCEAN HOLDINGS, LLC, is a foreign corporation with its principal place of business in Houston, Harris County, Texas. TRANSOCEAN HOLDINGS, LLC is affiliated with TRANSOCEAN, LTD., and is a wholly-owned subsidiary of TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.  TRANSOCEAN HOLDINGS, LLC is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore drilling operations at the Macondo Prospect, where the oil spill in question originated. More specifically, TRANSOCEAN HOLDINGS is a party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, Capital Corporate Services, Inc., 800 Brazos St., Suite 400, Austin, Texas 78701.

Defendants TRANSOCEAN LTD., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER INC., and TRANSOCEAN HOLDINGS, LLC are hereinafter referred to, collectively, as "TRANSOCEAN."  At the Macondo site, TRANSOCEAN provided the Deepwater Horizon vessel and personnel to operate it.  At all times relevant to the oil spill in question, TRANSOCEAN, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventor and its control systems. TRANSOCEAN also provided operational support for drilling-related activities onboard the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the oil spill incident in question.

8

16.     Defendant NALCO COMPANY is a foreign corporation duly organized and existing pursuant to law. It conducts business in the State of Texas, including but not limited to, its division NALCO ENERGY SERVICES, whose headquarters are located at 7705 Highway 90A, Sugar Land, Fort Bend County, Texas 77478. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, CT Corporation System, 350 North St. Paul St., Suite 2900, Dallas, Texas 75201.

17.     Defendant SPECIALTY OFFSHORE, INC., is a foreign corporation duly organized and existing pursuant to law. It conducts business in the State of Texas, including Harris County, Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, CT Corporation System, 1021 Main St., Suite 1150, Houston, Texas 77002-6508. SPECIALTY OFFSHORE, INC. (hereafter sometimes referred to as "Specialty Offshore") contracted with the Plaintiff, David Hogan, in Texas, to perform diving services. At all times material to this cause, in entering into a contract with David Hogan in Texas, David Hogan was and continues to be a resident of the State of Texas. Further, Specialty Offshore entered into contracts with CONOCOPHILLIPS in Houston, Harris County, Texas, XPLORE OIL & GAS in Fort Worth, Texas, and with STUYVESANT DREDGING, INC. and/or STUYVESANT DREDGING COMPANY (hereafter sometimes collectively referred to as "Stuyvesant" or "Stuyvesant Defendants"), with respect to providing divers, including the Plaintiff David Hogan, for diving operations which ConocoPhillips, Xplore Oil & Gas and Stuyvesant wanted to be performed in waters of the Gulf of Mexico that had been contaminated with the oil spill in question and the Corexit® dispersants that Defendant NALCO had supplied and sold to BP. Further, in connection with BP's response to the oil spill in question, Specialty Offshore entered into one or

Certified Document Number: 52098850 - Page 9 of 39

more contracts with BP in Houston, Texas, whereby Specialty Offshore leased two or more of its boats to BP to be used in BP's response efforts.

Further, Specialty Offshore purposely availed itself of the privilege of conducting business activities within the State of Texas with the Plaintiff, David Hogan, as well as Defendants BP, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant. Specialty Offshore purposely directed its activities toward the State of Texas in connection with the contracts with Plaintiff David Hogan and Defendants BP, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant whereby Specialty Offshore would provide commercial diving services and/or vessels which it owned to one or more of those Defendants. Specialty Offshore's acts were voluntary and substantial, as those terms are defined and applied under the laws and statutes of the State of Texas, and the acts and omissions on the part of Specialty Offshore were neither remote nor immaterial. "But for" Specialty Offshore's voluntary actions in connection with the contract it entered into with Plaintiff David Hogan and Defendants BP, the causes of action made the basis of this lawsuit, as set forth in this Original Petition, would not have arisen. Therefore, Specialty Offshore has substantial contacts with the State of Texas in connection with the afore-described contracts and business transactions with the Plaintiff and Defendants BP, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant, and Specialty Offshore reasonably could anticipate being hailed into the courts of the State of Texas. Further, Specialty Offshore purposely established contacts in the State of Texas in connection with its transactions with the Plaintiff David Hogan and Defendants BP, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant, taking into consideration the negotiations which the parties entered into, the contemplated future consequences of the transactions and contractual agreements to which they agreed, the terms of the contracts to which they entered into, and the actual course of dealing which Specialty Offshore

Certified D___ _ent Number: 52098850 - Page 10 of 39

performed in connection with the negotiation and anticipated performance of the contracts and business transactions they entered into with the Plaintiff and the above-named Defendants in this case.

Further, by virtue of the contractual agreements and arrangements entered into between Specialty Offshore and Defendants BP, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant, in connection with BP's response and remedial actions to the oil spill in question and in connection with the commercial diving services Specialty Offshore contracted to perform for BP, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant, Specialty Offshore therefore agreed to and thereafter performed as the authorized agent of BP, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant of those Defendants – one or more of which were Texas residents and/or whose principal place of business and/or headquarters was located in the State of Texas (i.e. acting as the authorized agent of a Texas resident, as that term is defined and applied under the laws and statutes of the State of Texas and/or under general maritime law).

18.     Defendant CONOCOPHILLIPS is a foreign corporation duly organized and existing pursuant to law. Its corporate headquarters is Houston, Harris County, Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, United States Corporation Co., 211 E. 7th Street, Suite 620, Austin, Texas 78701.

19.     Defendant XPLORE OIL & GAS, L.L.C. is a Texas limited liability company duly organized and existing pursuant to law. It conducts business in the State of Texas, including Harris County, Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, Phillip H. Carlisle,

11

Certified L    nent Number: 52098850 - Page 11 of 39

801 Cherry St., Suite 2355, Fort Worth, Texas 76102.

20.     Defendant STUYVESANT DREDGING COMPANY is a foreign entity, duly organized and existing pursuant to law. It conducts business in the State of Texas, including Harris County and Galveston County, including but not limited to performing dredging operations in the Houston-Galveston Navigation Channel Project as well as many other projects in Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, C.T. Corporation System, 5615 Corporate Blvd., Suite 400-B, Baton Rouge, Louisiana 70808.

21.     Defendant STUYVESANT DREDGING, INC. is a foreign corporation, duly organized and existing pursuant to law. It conducts business in the State of Texas, including Harris County and Galveston County, including but not limited to performing dredging operations in the Houston-Galveston Navigation Channel Project as well as many other projects in Texas. It may be served by the Clerk of this Court mailing, by Certified Mail, Return Receipt Requested, a copy of the citation with the petition attached, to its registered agent, C.T. Corporation System, 5615 Corporate Blvd., Suite 400-B, Baton Rouge, Louisiana 70808.

## V.
### BACKGROUND FACTS

22.     On April 20, 2010, an explosion onboard the vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The explosion resulted in an oil spill of unprecedented proportions and an oil slick that grew exponentially. The *Deepwater Horizon* was a floating, semi-submersible drilling rig owned by Transocean. It was built in 2001, utilized dynamic positioning technology, and was designed to move from location to location as necessary.

12

Certified Document Number: 52098850 - Page 12 of 39

BP leased the drilling rig from Transocean for $500,000 per day. The total lease contract was worth more than $544 million. Prior to the April 20 explosion, the *Deepwater Horizon* had suffered other fires, collisions and oil spills.

23.     As a result of the tragedy, U.S. Attorney General Eric Holder is considering bringing criminal charges against BP. This would not be the first time BP has faced criminal charges in relation to its activities in and around the Gulf of Mexico. In 2007, BP pled guilty to felony charges arising out of the March 2005 explosion at its Texas City refinery which killed 15 workers and injured hundreds more. After that explosion, BP was fined more than $21 million by OSHA – the largest penalty ever issued at that time. BP was also required to fix the deficiencies which led to the Texas City disaster. However, BP refused to comply with its obligations and failed to make the required safety upgrades. As a result, in 2009, BP was fined an additional $87 million by OSHA – by far the largest fine in OSHA history. BP's reckless safety culture is systemic.

24.     At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it. At all times relevant to this cause, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventor and its control systems. Transocean also provided operational support for drilling-related activities onboard the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to this cause.

25.     Halliburton was in charge of cementing the well. Post-accident investigations into the *Deepwater Horizon's* explosions and failures have revealed a number of issues and questions with respect to the nature and extent of the cementing job performed by Halliburton that are causally related to this explosive tragedy. When this case is tried, the evidence will show that Halliburton's

13

Certified Document Number: 52098850 - Page 13 of 39

acts and omissions contributed to the explosion, the oil spill in question, and the injuries and damages suffered by the Plaintiffs. Moreover, Sperry-Son Drilling Services, which is a division of Halliburton, was charged with realtime gas monitoring, and again, post-accident investigations have revealed a number of issues with respect to Halliburton's gas monitoring which also contributed to the explosion, the oil spill in question, and the injuries and damages suffered by the Plaintiffs.

26.     The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001. It was leased to BP through September 2013. It was one of the largest vessels of its kind.

27.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site. On April 20, 2010, workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well just after the final cementing work was completed. During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

28.     The explosion and fire caused the death of 11 people and injuries of many others on the vessel. The fire burned for two days, and the vessel began to list progressively more until it finally sank on April 22, 2010.

29.     The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-ft pipe called a riser. As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape under water, extended from the well to 1,500 feet above the sea bed and then buckled back down. Oil flowed out from the open end of the riser and from at least two places along its length.

30.     While crude oil was believed to be discharged before the *Deepwater Horizon* finally sank

14

on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

31.     After the explosions, BP attempted to downplay and conceal the severity of the oil spill. Its initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its measured leakage amount of 50,000 barrels per day. Moreover, following the oil spill, BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the oil spill.

32.     On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had actually revealed that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

33.     The flow of oil continued unabated, and the ever-expanding oil slick made landfall on April 30, 2010.

34.     After the oil spill, an oil slick with a range of thousands of miles had formed and could be seen from outer space. In addition, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico. The oil spill caused this slick and these plumes to form.

35.     For 86 days, oil spewed into the Gulf of Mexico from the damaged well, dumping an estimated 200,000,000 gallons of crude oil.

36.     On July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon*, BP finally capped the well.

37.     After the disaster, BP began implementing a disaster response plan to prevent oil from escaping the blown-out well, to manually contain the oil, and to disperse oil in the water using chemical dispersants designed, produced, supplied, and marketed by Defendant NALCO.

15

38.     As part of its offshore containment and response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct *in situ* burning of oil that reached the surface of the water; and the use of "the Vessels of Opportunity." In the course of its leasing program to lease vessels from others, when this case is tried, the evidence will show that BP entered into one or more contracts with Specialty Offshore in Houston, Texas, whereby BP leased two vessels from Specialty Offshore.

39.     Vessel owners who participated in the leasing program entered into Master Vessel Charter Agreements (the "Charter Agreements") under which Defendant BP chartered their vessels.

40.     Pursuant to the Charter Agreements, BP agreed that the General Maritime laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreements, and that only in the event that the General Maritime laws of the United States do not apply, the laws of the State of Louisiana should govern.

41.     The Charter Agreements were subsequently amended by letter agreement, stipulation, and per court order, and the amendments apply retroactively to the date of the initial signing of the Charter Agreements.

42.     In addition to directing vessels at sea to spray Defendant NALCO's Corexit® dispersants onto and into the oil spill, BP coordinated and directed aircraft owned and/or operated by various other companies, to fly over the Gulf to spot oil slicks and spray chemical dispersants to the oil on the surface of the Gulf. Dispersants designed, manufactured, supplied, distributed, and marketed by Defendant NALCO to BP were used in this "aerial" dispersant operation. In addition, BP had Defendant NALCO's Corexit® dispersants "introduced" beneath the immediate surface of the oil

16

Certified I... ment Number: 52098850 · Page 16 of 39

spill, whereby the crude oil and Defendant NALCO's Corexit® dispersants would sink below the

immediate surface water of the Gulf, as opposed to the oil slick remaining relatively close to the

surface of the Gulf's surface waters.

43.     Immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began

surface, sub-sea, and aerial application of Corexit® dispersants manufactured by Defendant NALCO

to oil slicks and sheens on the surface and sub-surface of the Gulf.

44.     Prior to the Plaintiff commencing his diving in the Gulf in early June, 2010, BP used

Corexit® dispersants manufactured, processed, distributed, supplied, and marketed by Defendant

NALCO to try to disperse the oil spill.  The NALCO  Corexit® dispersants have been banned for

over a decade in the United Kingdom for use in oil spills.  Specifically, the United Kingdom's

Marine Management Organization has banned Corexit®.  Moreover, the Defendant NALCO's

Corexit® products that were used by BP for this oil spill were removed from a list of approved

treatments for oil spills in the United Kingdom more than a decade ago.  Further, because of its

highly toxic effects to both humans and marine life, the Swedish Environmental Institute, at the

request of the Swedish Environmental Protection Agency, evaluated Corexit® extensively and

recommended that it not be used in Swedish waters for any purpose, including oil spills.

45.     The Material Safety Data Sheet ("Data Sheet") for Defendant NALCO's Corexit® EC9527A

indicates that it contains the following hazardous substances: 2-butoxyethanol, organic sulfonic acid

salt and propylene glycol.  Other constituents include surfactants, which are known to chemically

breakdown and destroy cell membranes.  The Data Sheet further states that it is harmful to human

health and that dermal exposure, inhalation, and ingestion should be avoided.

17

46.     The Data Sheet for Defendant NALCO's Corexit® 9500 indicates that it contains the following hazardous substances: petroleum distillates, propylene glycol and organic sulfonic acid salt. Other constituents include surfactants, which are known to chemically breakdown and destroy cell membranes. The Data Sheet for Defendant NALCO's Corexit® 9500 states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

47.     Defendant NALCO's Corexit® dispersants are many times more toxic than oil. Further, tests to observe Corexit® dispersants' toxicity under natural light has demonstrated that Corexit® dispersants are much more toxic under natural light than the toxicity seen in a laboratory. In a report written by Anita George-Ares and James R. Clark for Exxon Biomedical Services, Inc., titled "Acute Aquatic Toxicity of T3 Corexit® Products: An Overview," Corexit® dispersants were found to be one of the most toxic dispersal agents ever developed. Further, according to the Clark and George-Ares' report, Corexit® mixed with the higher Gulf Coast water temperatures becomes even more toxic. Therefore, laboratory experiments allegedly reporting the Corexit® dispersants' toxicity, substantially underestimate dispersed oil's toxicity, especially when commingled with one or more of Defendant NALCO's Corexit® dispersants. The totality of the chemical composition of the NALCO Corexit® dispersants is not known since Defendant NALCO has refused to divulge all of the constituents of its Corexit® dispersants, citing that they constitute "trade secrets." However, Defendant NALCO also sets forth in its Data Sheets for its Corexit® dispersants that: "No toxicity studies have been conducted on this product."

48.     An analysis of 57 chemicals found in Corexit® formulas 9500 and 9527 was conducted by Earthjustice and Toxipedia Consulting Services, in the summer of 2011. Results showed that the dispersants could contain cancer-causing agents, hazardous toxants, and endocrine-disrupting

Certified L      nent Number: 52098850 - Page 18 of 39

chemicals. Corexit® 9527, considered by the EPA to be an acute health hazard, is stated by its

manufacturer to be potentially harmful to red blood cells, the kidneys, and the liver, and an irritant

to eyes and skin. The chemical 2-butoxyethanol found in Corexit® 9527, has been identified as

having caused lasting health problems in workers involved in the clean-up of the *Exxon-Valdez* oil

spill. According to the Alaska Community Action on Toxics, the use of Corexit® during the *Exxon-*

*Valdez* oil spill caused people "respiratory, nervous system, liver, kidney, and blood disorders." Like

Corexit® 9527, Corexit® 9500 can also cause hemolysos (rupture of blood cells) and may also cause

internal bleeding.

49. According to the EPA, Defendant NALCO's Corexit® dispersants are more toxic than

dispersants made by a number of other competitors and less effective in handling Southern Louisiana

crude oil.

50. According to its Data Sheet, Corexit® may also bioaccumulate, remaining in the flesh and

building up over time.

51. On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA")

Administrator directed BP, within 24 hours of issuance, to identify and to change to chemical

dispersants that are less toxic than Defendant NALCO's Corexit® dispersants that BP had been

using. On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would

continue using Defendant NALCO's Corexit®.

52. BP's use of chemical dispersants skyrocketed: On May 22, 2010, BP used 45,000 gallons,

and on May 23, 2010, it used 70,000 gallons.

53. On May 26, 2010, the EPA directed BP to reduce overall use of Defendant NALCO's

Corexit® by 75%. The May 26, 2010 EPA directive also required BP to eliminate most of the

Certified Document Number: 52098850 - Page 19 of 39

chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On-Site Coordinator.

54.     According to the *Aerial Dispersants Operations - Houma Status Report*, as of June 26, 2010, BP had applied 933,023 gallons by aerial application. BP ordered the application by 386 flights, or sorties, as of that same date. Pursuant to BP's direction and authorization, Corexit® dispersants have covered approximately 291 square miles of the Gulf, and as of June 26, 2010, BP reported that 718,454 gallons of Defendant NALCO's Corexit® 9500 had been sprayed on the Gulf and that 214,569 gallons of Defendant NALCO's Corexit® 9527 had been sprayed on the Gulf. To date, BP and its contractors have used more than 1.8 million gallons of NALCO's Corexit® dispersants in the Gulf of Mexico in connection with the oil spill in question and its recovery efforts.

55.     Prior to the *Deepwater Horizon* disaster and oil spill, BP and NALCO had actual knowledge and were subjectively aware of the hazardous and toxic effects that Defendant NALCO's Corexit® 9500 and 9527 dispersants had on not only human health but also marine life. Moreover, prior to the *Deepwater Horizon* disaster or oil spill, BP and NALCO had actual knowledge and subjective awareness that when Defendant NALCO's Corexit® dispersants were applied to a crude oil spill, it would cause much of the oil spill to sink beneath the surface water of the Gulf, thereby decreasing the need for shoreline clean-up and thereby hiding the massive amounts of oil and dead marine life at the bottom of the Gulf. Notwithstanding such actual knowledge and subjective awareness of the toxicity of Defendant NALCO's Corexit® dispersants and the effect that Defendant NALCO's Corexit® dispersants had on sinking crude oil, BP wilfully, intentionally, and deliberately chose Defendant NALCO's Corexit® dispersants for use with respect to the oil spill resulting from the *Deepwater Horizon* disaster, and NALCO wilfully, intentionally, and deliberately promoted and

encouraged BP to use its Corexit® dispersants for BP's purposes in connection with the *Deepwater Horizon* disaster and resulting oil spill.

56.    BP and NALCO were well aware of the Corexit® dispersants' toxicity and hazards to human health even before the *Deepwater Horizon* disaster. Likewise, Specialty Offshore, ConocoPhillips, Xplore Oil, and the Stuyvesant Defendants were aware of the toxicity and hazard to human health of the Corexit® dispersants prior to the *Deepwater Horizon* disaster and/or knew, or by the exercise of ordinary care should have known, and should have become familiar with the toxic and hazardous nature of the Corexit® dispersants being used by BP before the Plaintiff David Hogan began performing diving work for them.

57.    Between June 1, 2010 and the end of November, 2010, David Hogan performed commercial diving work from boats and vessels that were owned, leased, chartered, contracted for, and/or under the direction and control of Specialty Offshore, ConocoPhillips, Xplore Oil, and the Stuyvesant Defendants in the navigable waters of the Gulf of Mexico. On every one of those dives during that period of time, David Hogan dove into waters that were contaminated with both the crude oil and the Corexit® dispersants.

58.    Prior to June 2010, Specialty Offshore entered into one or more contracts with ConocoPhillips in Houston, Harris County, Texas, in connection with providing commercial diving services to ConocoPhillips for one or more of its drilling operations in the Gulf of Mexico. The subject matter of the contracts primarily dealt with Specialty Offshore providing commercial divers to ConocoPhillips for the purpose of the divers repairing gas leaks and gas lines that were used in connection with ConocoPhillips' operations, together with other underwater work which ConocoPhillips needed in connection with repairs and maintenance of its facilities in the Gulf of

Certified D... ..ient Number: 52098850 - Page 21 of 39

Mexico.   In furtherance of those contractual arrangements between Specialty Offshore and

ConocoPhillips, Plaintiff David Hogan and his dive team were transported to a ConocoPhillips

facility in the Gulf of Mexico, by boat, to a location that was a number of miles from where the

*Deepwater Horizon* had exploded, and a location that was surrounded by the oil spill from the

*Deepwater Horizon* explosion.   When David Hogan made his first dive in early June 2010, he

immediately noticed that something was different from his prior diving experiences. Mr. Hogan had

performed commercial diving work into oil spills prior to this date; however, on his first dive in early

June, 2010, the oil seemed to have sunk considerably deeper into the depths of the Gulf waters than

he had ever seen or experienced before.   He immediately terminated his dive and returned to the

surface, only to find that his wetsuit looked entirely different than it had ever looked before when

he had dived into waters with an oil spill.   Neither Specialty Offshore nor ConocoPhillips had

provided David Hogan and his dive team any information concerning the NALCO Corexit®

dispersants that had been applied throughout the oil spill and that was mixed with the crude oil from

the *Deepwater Horizon* prior to the dive team's first dive, *or at any other time thereafter.*

Expressing concern for the safety of himself and his dive team, he contacted the ConocoPhillips

onsite supervisor, who gave him a "BP Hotline" to call if people had any concerns with respect to

health and safety.   Upon calling that number, a person answered, identifying themselves as being

with BP.   After expressing his concern with respect to what he had seen and experienced during his

brief dive, that BP spokesperson told Mr. Hogan that there was nothing for him to be concerned

about, but that he would have one of BP's health and safety people come out to the ConocoPhillips

platform to talk to Mr. Hogan and his dive team.   Within the hour, a helicopter landed on the

platform and a man who introduced himself as being a BP representative got out of the helicopter

. 22

Certified I ᵃ   nent Number: 52098850 - Page 23 of 39

and came over and talked to Mr. Hogan. BP's "health and safety man" represented and assured Mr. Hogan and his dive team that, notwithstanding the fact that they would be diving and spending a considerable amount of time in the *Deepwater Horizon's* oil spill, there was absolutely nothing harmful or hazardous to their safety or health in the oil, in the water, or whatever was causing the oil to sink so deep beneath the surface. In fact, when this case is tried, the evidence will show that this BP "health and safety man" made Mr. Hogan feel as though it was foolish for Mr. Hogan to have called at all, and it seemed as if the BP "health and safety man" had wasted his time in flying all the way out to where Mr. Hogan and his dive team were located, for such a trivial matter. Mr. Hogan and the BP "health and safety man" specifically talked about whether Mr. Hogan and his dive team would need to change to "haz-mat" dive gear if there was a concern for safety and health in what was in the water and oil spill; however, the BP "health and safety man" reassured Mr. Hogan that "haz-mat" diving gear was not necessary since there was absolutely nothing in the oil or anything mixed with the oil that was hazardous or of any concern, from a health standpoint to Mr. Hogan and his dive crew.

59.    Based on that information, and the fact that neither Specialty Offshore nor ConocoPhillips had provided him and his dive team any warnings or other information concerning any potential health problems associated with the waters into which they would be diving and working, Mr. Hogan and his dive team resumed their work and continued diving continuously at that site, working 18-20 hour days, for the next 1-1/2 to 2 weeks. During that entire diving operation for ConocoPhillips, Mr. Hogan and his dive team worked off a floating barge-type vessel, and during that entire diving operation, the water was consistently contaminated with oil for a considerable distance below the surface. When this case is tried, the evidence will show that the waters into which Mr. Hogan and

his dive team performed their commercial diving activities for ConocoPhillips not only was contaminated with crude oil for the *Deepwater Horizon*, but also had been contaminated with NALCO's Corexit® dispersants; however, none of that information and absolutely no warnings with respect to that information was ever communicated to Mr. Hogan by Specialty Offshore or by ConocoPhillips. In performing their diving activities for ConocoPhillips from a floating barge-type vessel, Mr. Hogan and his dive crew repaired underwater gas lines that were used in connection with ConocoPhillips' operations at that location and other inspection and repair work underwater, as directed by ConocoPhillips. At all times material to this cause and during the time they were at the ConocoPhillips location, the floating barge-type vessel from which they conducted their commercial diving activities was owned, provided, supplied, leased, and/or chartered by ConocoPhillips for Mr. Hogan and his dive team's use. Likewise, during the diving operations which ConocoPhillips directed Mr. Hogan and his dive team to perform, Mr. Hogan and his dive team stayed ashore to sleep, and were transported to and from the ConocoPhillips location by a vessel owned, provided, supplied, leased, and/or chartered by ConocoPhillips.

60.     Mr. Hogan and his dive team next performed commercial diving operations for Defendant Xplore Oil & Gas, and the location of those diving operations was also within the oil spill caused from the *Deepwater Horizon* disaster in the Gulf of Mexico. Again, the oil had sunk a considerable distance beneath the surface, similar to that encountered at the initial ConocoPhillips site. Again, Mr. Hogan and his dive team's wetsuits did not look like anything they had ever seen, when they emerged from their diving operations each day. For the Xplore Oil & Gas commercial diving operation, Xplore provided them a floating barge-type vessel from which they dove during this project that lasted four to five weeks. Again, Mr. Hogan and his dive team received no information

24

Certified D___ent Number: 52098850 - Page 24 of 39

or warnings from Specialty Offshore or from Xplore Oil & Gas concerning their knowledge about the Corexit® dispersants and the serious health hazards posed by the Corexit® dispersants. The work which Mr. Hogan and his dive team performed at the direction of Xplore Oil & Gas consisted of underwater inspection, maintenance and repair of a number of projects in connection with Xplore Oil & Gas's operations at that location – as those projects and the details of those projects were explained and directed by Xplore Oil & Gas personnel to Mr. Hogan and his dive team. The work which Mr. Hogan and his dive team performed for Xplore Oil & Gas resulted form one or more contracts entered into between Specialty Offshore and Xplore Oil & Gas where such contracts and agreements were entered into and finalized at Xplore Oil & Gas's offices in Fort Worth, Texas. The floating barge-type vessel which Xplore Oil & Gas provided to Mr. Hogan and his dive team was owned, provided, supplied, leased, and/or chartered by Xplore Oil & Gas.

61.     The next diving project was for the Stuyvesant Defendants, and this diving operation lasted for approximately three months. The Stuyvesant Defendants provided a vessel for this diving project, and Mr. Hogan believes the name of the dredge vessel was the "Dredge Stuyvesant." The "Dredge" vessel provided by Stuyvesant was owned, provided, supplied, leased, and/or chartered by Stuyvesant. Again, the waters where they conducted this diving operation were contaminated by the *Deepwater Horizon* oil spill, and again, the oil had sunk a considerable distance beneath the surface of the Gulf waters where they were diving. Again, at the end of each diving day, Mr. Hogan and his dive team's wetsuits would look like something that they had never seen before prior to starting these diving operations back in early June, 2010. The primary work which the Plaintiff and the dive team performed for Stuyvesant consisted of welding and securing a number of underwater intake and output portals, together with other inspections, repairs and maintenance in connection

25

Certified Document Number: 52098850 - Page 25 of 39

with the anticipated moving and transportation of the "Dredge Stuyvesant" at some time following the completion of the work being performed by Mr. Hogan and his dive team. Again, Mr. Hogan and his dive team received no information or warnings from Specialty Offshore or from Stuyvesant concerning the Corexit® dispersants and/or the serious health hazards posed by the Corexit® dispersants that had been mixed into the oil spill and the waters where Mr. Hogan and his dive team continuously dived for approximately three months at Stuyvesant's location in the Gulf of Mexico.

62.     At least one member of the dive team started having health issues even before the diving operations for the Stuyvesant Defendants had been completed. Eventually all of the dive team members developed significant health concerns. Two of the dive team members have since committed suicide. In light of the assurances and representations that they had received from BP and the "BP health and safety man," Mr. Hogan and his dive team members did not initially attribute the myriad of health problems and progressing health concerns to the waters and the constituents of the waters where they had been conducting their diving operations from June through November, 2010. However, as Mr. Hogan's health problems progressed and did not abate, he ultimately contacted a physician in Louisiana who had been treating hundreds of patients who had come into contact with the oil and the Corexit® dispersants. By August, 2011, medical testing and medical evaluation by one or more physicians familiar with exposure to the oil spill and, particularly, exposure to the Corexit® dispersants, led physicians to inform Mr. Hogan that his progressing medical problems were caused by the contact with the oil spill during his diving operations between June and November, 2010. Through additional testing and medical evaluation, by November 16, 2011, Mr. Hogan had been diagnosed as suffering from neurotoxicity "related to chronic and cumulative exposure to chemicals and heavy metals associated with the Gulf oil spill and dispersant." At this

26

Certified D   ment Number: 52098850 - Page 26 of 39

time, Mr. Hogan is suffering from a myriad of health issues related to his exposure to the oil spill and the NALCO Corexit® dispersants, including but not limited to the fact that he cannot walk, his vision has progressed to being legally blind in his left eye and his most recent eye examination shows that he continues to lose sight in his right eye, and for all intents and purposes, is a paraplegic.

63.     Prior to his exposure to this oil spill and NALCO's Corexit® dispersants, David Hogan was a very gregarious, healthy man.  For instance, in May, 2010, before any of these diving operations, David Hogan scaled Mount Ranier, making it to the top and returning in four days (elevation 14,400 ft.).  Since November 2010, he has lost 60 pounds and is wheelchair-bound.  If that were not enough, David has also suffered cognitive problems, seizures, vertigo, and more recently his vision has progressed to the extent that he has been determined to be legally blind in his left eye and his right eye is also rapidly losing sight.

## VI.
## COUNT ONE
### GENERAL MARITIME LAW AND JONES ACT

64.     Plaintiffs incorporate under Count One, paragraphs 1 through 63, as hereinabove alleged.

65.     Plaintiff David Hogan was injured while acting as a seaman in the service of one or more vessels owned, operated and/or chartered by Specialty Offshore, ConocoPhillips, Xplore Oil & Gas and/or Stuyvesant at the above-referenced locations in the Gulf of Mexico and on the above-cited occasions in question between June 1 and November 30, 2010.  Between June 2010 and the end of November 2010, David Hogan was employed by Specialty Offshore and/or was acting as a "borrowed" employee of ConocoPhillips, Xplore Oil & Gas, and Stuyvesant when he was performing diving work under the direction and control of those companies and during the time

27

Certified D____ent Number: 52098850 - Page 27 of 39

when he was performing that work at their respective locations in the Gulf of Mexico. At all times material to this cause, Plaintiff David Hogan was a "seaman," as that term is defined and applied under the laws and statutes, and as the term "seaman" has been interpreted and applied by state and federal courts. Specifically, in connection with the commercial diving services he performed for ConocoPhillips, Xplore Oil & Gas, and Stuyvesant, Mr. Hogan had a more or less permanent connection with the vessels from which he worked that were furnished to him by the Defendants; those vessels were engaged in navigation in navigable waters of the United States; and the capacity in which Mr. Hogan was employed and the duties which he performed for those three companies contributed to the function of the vessels and the maritime operations of those companies, the accomplishment of the vessel's mission or their operation or welfare in terms of their maintenance during their movement or during anchorage for future trips. Further, at all times material to this cause, the vessels which ConocoPhillips, Xplore Oil & Gas, and Stuyvesant provided to Mr. Hogan were used to transport Mr. Hogan and his dive team to their offshore work areas; were used to carry all tools and equipment necessary for Mr. Hogan and his dive team's work; were used to assist in ConocoPhillips', Xplore Oil & Gas's, and Stuyvesant's operations at those locations; and were the vessels actually used as the point of entry into the navigable waters and the point of exit from the navigable waters.

In the unlikely event that Mr. Hogan is not considered to be a "seaman" in connection with the work he performed for one or more of the Defendants, the evidence will nevertheless show that it is undisputed that at all times material to his general maritime claims, Mr. Hogan performed his work in navigable waters of the United States; Mr. Hogan's diving activities and exposure to the oil spill and the Corexit® dispersants has a substantial relationship to traditional maritime activity; and

28

Certified Document Number: 52098850 - Page 28 of 39

the *Deepwater Horizon* incident and the resulting significant health problems suffered by Mr. Hogan and his dive crew have a potentially disruptive impact on maritime commerce – further substantiating that general maritime law applies to the Plaintiffs' claims in this cause.

66.     Defendants BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* and during the subsequent attempts to clean-up and disperse the oil spill. As demonstrated by the examples below, and by the foregoing factual allegations, these Defendants' conduct not only demonstrated negligence, as that term is defined and applied under general maritime law, but also constituted such a willful, intentional and reckless disregard of the rights and safety of others so as to constitute gross negligence, as that term is defined and applied under general maritime law. These Defendants' conduct evinced an ongoing willful, wanton, or reckless disregard for and indifference toward the safety of the environment and of people, such as David Hogan, who regularly work in the waters of the Gulf of Mexico.

67.     Defendants BP, Transocean, and Halliburton were negligent and grossly negligent in one or more of the following particulars:

    a.     the manner in which the *Deepwater Horizon* well was drilled;

    b.     the manner in which the *Deepwater Horizon* well was attempting to be completed;

    c.     the design of the cementing of the *Deepwater Horizon* well;

    d.     the cementing operation for the *Deepwater Horizon* well;

    e.     the monitoring and supervision for the cementing for the *Deepwater Horizon* well;

    f.     failure to adequately or properly supervise their crews;

29

Certified D... ...ent Number: 52098850 - Page 29 of 39

g.    failure to adequately or properly train their employees;

h.    failure to provide and adequate safety equipment;

i.    operating the *Deepwater Horizon* with an inadequate crew;

j.    failure to maintain the *Deepwater Horizon*;

k.    failure to implement proper and adequate safety procedures;

l.    failure to implement a proper and adequate safety program;

m.    failure to provide sufficient personnel to perform operations aboard the vessel;

n.    failure to properly and adequately test equipment prior to putting it in service;

o.    failure to engage and make operational safety equipment and components that were provided in conjunction to equipment that was used in the drilling, monitoring, and/or blowout prevention for the well;

p.    taking shortcuts that compromised safety;

q.    failure to take reasonable and necessary efforts and precautions to prevent the disaster which ultimately occurred on the *Deepwater Horizon*;

Each of the foregoing acts of negligence and gross negligence was a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages. At all relevant times, the *Deepwater Horizon* was unseaworthy.

68.    Defendants BP and Transocean were negligent and grossly negligent in failing to ensure that oil would be expeditiously and adequately contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

30

Certified L    ment Number: 52098850 - Page 30 of 39

69.    Defendants BP and Transocean were negligent and grossly negligent in failing to ensure that adequate safeguards, protocols, procedures, and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

70.    Defendants BP and NALCO were negligent and grossly negligent in failing to use safe dispersant chemicals in BP's attempt to respond to the oil spill, and in failing to provide warnings and/or adequate warnings in connection with NALCO's Corexit® dispersants. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

71.    Defendants BP and NALCO were negligent and grossly negligent in selecting NALCO's Corexit® dispersants for use in the *Deep Horizon* oil spill and thereafter failing to inform persons, such as the Plaintiff David Hogan, who would come into contact with the oil spill and Corexit® dispersants of the potential health hazards associated with exposure to and/or contact with the unreasonably dangerous Corexit® dispersants which BP and NALCO intentionally and wilfully chose for use for the *Deepwater Horizon* oil spill. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

72.    Defendants BP and NALCO were negligent and grossly negligent in intentionally and wilfully misrepresenting that the Corexit® dispersants were safe for human health and that there were no health hazards associated with contact with or exposure to the Corexit® dispersants. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in

31

Certified Document Number: 52098850 - Page 31 of 39

question and the Plaintiffs' resulting injuries and damages.

73.     Defendant BP was negligent and grossly negligent with respect to its response actions in attempting to recover oil and in attempting to contain the oil spill resulting from the *Deepwater Horizon* disaster. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

74.     Defendant BP was negligent and grossly negligent in the choice and use of dispersants that were used in connection with the oil spill, including but not limited to NALCO's Corexit® dispersants. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

75.     Defendant BP was negligent and grossly negligent in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures that it instituted following the *Deepwater Horizon* disaster. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

76.     When David Hogan had specific questions and specific concerns with the potential health hazards of the waters into which he and his dive team would be diving, Defendant BP was negligent and grossly negligent in telling Mr. Hogan that the waters were safe for human health; that he and his dive team should have no health concerns and need not use "haz-mat" diving gear, and in failing to inform and/or warn Mr. Hogan and his dive crew of the potential and known health hazards associated with the NALCO Corexit® dispersants that had mixed with the oil and were in the water where Mr. Hogan and his dive team would be spending considerable time over the following months. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

Certified Document Number: 52098850 - Page 32 of 39

77.    Defendant NALCO was negligent and grossly negligent with respect to its design, manufacture, marketing, sale and/or distribution of its Corexit® dispersants for use in oil spills. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

78..    Defendant NALCO was negligent and grossly negligent in failing to provide adequate warnings and instructions for safe use of its Corexit® dispersants that were used in the oil spill in question. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

79.    Defendants Specialty Offshore, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant were negligent in failing to provide a safe place for the Plaintiff to work on navigable waters and in connection with vessels which they owned, leased, chartered, and/or otherwise provided to the Plaintiff for the commercial diving operations which the Plaintiff was engaged in while performing work for them in connection with their respective operations. Such failures rendered the vessels, which these Defendants provided to the Plaintiff, unseaworthy, as that term is defined and applied under general maritime law. Such negligence and unseaworthy conditions were also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

80.    Defendants Specialty Offshore, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant, in the exercise of ordinary care, knew or should have known, that NALCO's Corexit® dispersants had been intermixed into the oil spill in question, and knew, or should have known, of the harmful toxicity and dangerous constituents of the Corexit® dispersants. Should Defendants Specialty Offshore, ConocoPhillips, Xplore Oil & Gas, and/or Stuyvesant claim that they were unaware that

33

Corexit® had been used as a dispersant in the oil spill and/or were unaware of the toxic and harmful properties of the Corexit® dispersants, then these Defendants were negligent in failing to know those facts about the Corexit® dispersants prior to the Plaintiff performing diving services for them. Such negligence and gross negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

81.     Defendants Specialty Offshore, ConocoPhillips, Xplore Oil & Gas, and Stuyvesant were negligent in failing to provide adequate warnings to the Plaintiff . Such negligence was also a proximate and/or contributing cause of the incidents in question and the Plaintiffs' resulting injuries and damages.

## VII.

## COUNT TWO

### STRICT LIABILITY UNDER GENERAL MARITIME LAW

82.     Plaintiffs incorporate under Count Two, paragraphs 1 through 81, as hereinabove alleged.

83.     Plaintiff is entitled to recover from Defendant NALCO for its defective design and marketing of its Corexit® dispersants that were used in connection with the oil spill from the *Deepwater Horizon* disaster.

84.     At all times material to this cause, NALCO was in the business of designing, manufacturing, marketing, selling and/or distributing the Corexit® dispersants used in response to the oil spill in question.

85.     Defendant NALCO sold, marketed, and delivered the Corexit® dispersants to BP following the oil spill in question, and placed the Corexit® dispersants in the stream of commerce.

86.     Defendant NALCO knew that its Corexit® dispersants would be used without inspection for

34

Certified Document Number: 52098850 - Page 34 of 39

defects by consumers.

87.    Defendant NALCO's Corexit®. dispersants were unreasonably dangerous to the Plaintiff for its intended purpose when it left NALCO's control.

88.    When BP used NALCO's Corexit® dispersants, the dispersants were in substantially the same condition when they were sold.

89.    At all times NALCO's Corexit® dispersants were used in a manner consistent with the uses intended by, or known to, Defendant NALCO and in accordance with Defendant NALCO's directions and instructions.

90.    At all relevant times, the Corexit® dispersants were used in an intended, or in a manner reasonably foreseeable, and/or actually disclosed to BP prior to sale of the Corexit® dispersants.

91.    At the time the dispersants left Defendant NALCO's control, NALCO knew, or in light of reasonably available knowledge, or in the exercise of reasonable care, should have known, about the unreasonably dangerous conditions that Corexit® dispersants would present to the Plaintiff, without properly equipped protective gear.

92.    At the time the Corexit® dispersants used in response to the *Deepwater Horizon* disaster left NALCO's control, reasonable design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Plaintiff David Hogan, without impairing the utility, usefulness, practicality, or desirability of the dispersants.

93.    At all relevant times, the Corexit® dispersants were used in an intended and/or reasonably foreseeable manner.

94.    Plaintiff David Hogan was a foreseeable bystander and victim of the manifestation of the defects in the Corexit® dispersants.

95.    The design defect in the Defendant NALCO's Corexit® dispersants is its toxicity to humans and its ability to cause health hazards and physical injuries to persons who are exposed and/or come into contact with it in environmental conditions and marine conditions such as those that existed in the Gulf of Mexico following the *Deepwater Horizon* disaster.

96.    Defendant NALCO's Corexit® dispersants were not misused or altered by any third parties or by Plaintiff David Hogan.

97.    Defendant NALCO failed to provide adequate warnings and instructions for safe use of its Corexit® dispersants.   Such marketing failure rendered its Corexit® dispersants unreasonably dangerous for use.

98.    The defective condition of Defendant NALCO's Corexit® dispersants and/or Defendant NALCO's defective marketing rendered its Corexit® dispersants unreasonably dangerous, and such defects and defective marketing was a producing cause and/or contributing cause of Plaintiffs' resulting injuries and damages.

99.    Defendant NALCO is liable to Plaintiffs under the doctrine known as strict liability, as that term is defined and applied under general maritime law.

100.    Defendant NALCO had actual and/or constructive knowledge of the facts and circumstances relative to the unreasonably dangerous and toxic constituents of its Corexit® dispersants, and of the intended use of its Corexit® dispersants in connection with the oil spill from the *Deepwater Horizon* disaster, and how exposure and contact from its Corexit® dispersants could foreseeably cause serious and permanent injuries.

101.    By reason of Defendant NALCO's intentional and willful acts and omissions, as set forth above in this pleading, Plaintiffs are entitled to have the jury in this case consider and award punitive

36

damages against Defendant NALCO.

## VIII.
## Damages

102.    Plaintiffs incorporate under Damages, paragraphs 1 through 101, as hereinabove alleged.

103.    As a proximate cause and/or contributing cause of the acts and omissions, negligence, gross negligence, and strict liability of the Defendants, as hereinabove set forth, Plaintiff David Hogan seeks recovery for the following elements of damage:

    a.    past and future physical pain and suffering;

    b.    past and future mental pain, suffering, and anguish;

    c.    past and future medical expenses;

    d.    past lost wages and/or earnings;

    e.    loss of future earning capacity;

    f.    loss of past and future fringe benefits;

    g.    past and future disfigurement and disability;

    h.    past and future loss of enjoyment of life;

    i.    all other damages recoverable under law, including economic and compensatory damages in amounts to be determined at trial;

    j.    past and future maintenance and cure;

    k.    medical monitoring;

    l.    punitive damages;

    m.    pre-judgment and post-judgment interest at the maximum rate allowable by law.

Certified Document Number: 52098850 - Page 37 of 39

104.     In connection with punitive damages which are sought, the Plaintiffs are also entitled to punitive damages because the aforementioned actions of some of the Defendants (as set forth previously in this pleading) were grossly negligent and reckless. Those Defendants' conduct was wilful, wanton, arbitrary, and capricious. They acted with flagrant and malicious disregard of the Plaintiff's health and safety, and the health and safety of the Plaintiff's co-workers. Those Defendants were subjectively aware of the extreme risk posed by the conditions which caused the Plaintiff's injuries. Those Defendants' acts and omissions involve an extreme degree of risk, considering the probability and magnitude of potential harm to the Plaintiff and to others. Moreover, Plaintiffs may recover punitive damages under the general maritime law following the U.S. Supreme Court's ruling in *Atlantic Sounding* and *Exxon Shipping Co.*

105.     As a proximate cause and/or contributing cause of the acts and omissions, negligence, gross negligence, and strict liability of the Defendants, as hereinabove set forth, Plaintiff Patricia Fajkus-Hogan seeks recovery for the following elements of damage:

   a.     past and future impairment of consortium;

   b.     past and future value of nursing services provided by Patricia Fajkus-Hogan to David Hogan; and

   c.     all other economic and compensatory damages to which she is entitled, in amounts to be determined at trial.

106.     Because of the above and forgoing, Plaintiffs have been damaged, and will be damaged, in a sum far in excess of this Court's minimum jurisdictional limits, for which they bring suit.

## IX.

### DISCOVERY RULE

107.     Plaintiffs incorporate paragraphs 1 through 106, as hereinabove alleged.

Certified L    ment Number: 52098850 - Page 38 of 39

108.    Plaintiffs plead the discovery rule, as that term is defined and applied under applicable law, including general maritime law.

## X.

### JURY TRIAL

The Plaintiffs hereby request a trial by jury on all claims and the jury fee has been paid concurrently with the filing of this petition.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Defendants be cited to appear and answer herein, and that upon a final trial of this case, the Plaintiffs have judgment against the Defendants, jointly and severally, for their damages, in a total sum far in excess of the minimum jurisdictional limits of this Court, for which they bring suit, pre-judgment interest and post-judgment interest at the maximum legal rate, punitive damages, costs of court, and for such further relief, both in law and in equity, to which the Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

THE LEWIS LAW FIRM

Craig Lewis
State Bar No. 12283500
John J. Brothers
State Bar No. 24064955
2905 Sackett Street
Houston, Texas  77098
Telephone: (713) 222-8080
Facsimile:  (713) 238-7888
Email: johnb@LLF7.com

**ATTORNEYS FOR PLAINTIFFS**

39

Certified Document Number: 52098850 - Page 39 of 39



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 25, 2012

Certified Document Number:          52098850

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**