# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:                                                (202) 879-5000                                                Facsimile:
(202) 879-5175
robert.gasaway@kirkland.com                          www.kirkland.com                                          (202) 879-5200

June 22, 2012

**BY ELECTRONIC MAIL**
The Honorable Sally Shushan
United States District Court
Room B345
500 Poydras Street
New Orleans, LA 70130

   Re:  MDL No. 2179—BP's Brief in Opposition to the United States'
       Objections to Six Non-Party Subpoenas

Dear Judge Shushan:

   I am writing to respond to the United States' objections to six subpoenas circulated to the Court and parties by BP and directed to entities that worked closely with the United States Government's official Flow Rate Technical Group ("FRTG").

   The United States' objection is somewhat diffuse, as it raises four distinct categories of objection to the subpoenas. The United States contends that (1) the subpoenas are untimely; (2) the subpoenas are directed improperly to individuals as opposed to entities; (3) the subpoenas duplicate the Phase 2 Rule 30(b)(6) deposition notice to the United States; and (4) the subpoenas are improperly directed to researchers.

   As discussed below, the United States lacks standing to raise these asserted objections and, in any event, none of the objections is valid.

## I.  BACKGROUND.

   Before drafting and circulating these six subpoenas, BP closely examined the United States' document productions and winnowed its subpoena list to key entities working with the United States' official Flow Rate Technical Group.

   Three of the entities now at issue, Kelkar and Associates, R.G. Hughes and Associates, and Gemini Solutions, were, according to the United States, responsible for the FRTG's work related to modeling most-likely and worst-case discharge scenarios. The other three entities at issue, the University of California at San Diego (including the work of Juan Lasheras and perhaps others), the University of California, Santa Barbara (including the work of Ira Leifer and

Chicago  Hong Kong  London  Los Angeles  Munich  New York  Palo Alto  San Francisco  Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 2

perhaps others), and Purdue University (including the work of Steve Wereley and perhaps others) have been identified by the United States as contributing key research and researchers to the FRTG's Plume Team.

As part of its review and winnowing, BP has withdrawn its initial (and well-grounded) proposal for a seventh subpoena to Columbia University. The available documents indicate Columbia's Timothy Crone, together with his Columbia colleague, Maya Tolstoy, analyzed video footage of the spill and sought to estimate the amount of oil being discharged into the Gulf of Mexico. An article describing this flow-estimation work was published in the October 2010 edition of *Science* magazine. A second article discussing the work was co-authored by Professor Crone, Marcia McNutt, the head of the United States Flow Rate Technical Group, and others, and appeared in the *Proceedings of the National Academy of Sciences*. *See* "Review of flow rate estimate of the Deepwater Horizon oil spill," Marcia K. McNutt, Richard Camilli, Timothy J. Crone, *et al.*, PNAS, December 20, 2011. Nonetheless, as a cooperative gesture, BP is not pursuing a Columbia subpoena at this time.

As for the six entities from which BP *does* continue to seek discovery, there can be no doubt all six contributed key elements of the United States' official FRTG report—which concluded that approximately 4.9 million barrels of oil were discharged in the Gulf of Mexico and has been publically characterized by the Government as "ground truth."

Moreover, each of the subpoenas is tailored to elicit important testimony relevant to how the United States arrived at its highly publicized flow rate estimates. *See Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 820 (5th Cir. 2004) ("Under the federal discovery rules, any party to a civil action is entitled to all information relevant to the subject matter of the action before the court unless such information is privileged. Discovery requests are relevant when they seek admissible evidence or evidence that is reasonably calculated to lead to the discovery of admissible evidence.") (internal citations and quotation marks omitted). All six subpoenas thus seek relevant information falling well within the ordinary scope of third-party document and deposition discovery. *See id.* (discussing Fifth Circuit standards for such discovery). Significantly, the United States does *not* contend that the subpoenas, as framed by BP, seek testimony that lacks significance to the issues being contested in this case.

## II.    UNITED STATES LACKS STANDING TO BRING ITS ASSERTED OBJECTIONS.

As an initial matter, the issues the United States' briefing urges are not the United States' issues to raise. The United States acknowledges that the employees of the subpoenaed entities are not Government employees. (*See* June 18, 2012 United States Br. at 4.) And the law is clear

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 3

that parties who "are not in possession of the materials subpoenaed and have not alleged any personal right or privilege with respect to the materials subpoenaed" do not have standing to challenge subpoenas issued to third parties. *See Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979); *Weatherly v. State Farm Fire & Cas. Ins. Co.*, No. 07-4371, 2009 WL 1507353 at *2 (E.D. La. May 28, 2009) (denying a motion to quash a third-party subpoena and concluding that the moving party "is required to demonstrate some personal right or privilege in the documents" to have standing to challenge subpoenas); *Adams v. Dolgencorp, LLC*, No. 11-784, 2012 WL 1867123, at *1 (M.D. La. May 22, 2012) (M.D. La. 2012) ("Under Federal Rule of Civil Procedure 45(c)(3), the subpoenaed entity is the only one entitled to challenge the subpoena unless a showing is made that [a party] has a personal right to be protected or that the documents are subject to privilege.") (quotation marks omitted).

As the Court is aware based on other subpoena disputes in this case, concerns regarding the possibility of undue burdens are issues that a subpoenaed entity—not a party litigant like the United States—should assert. The sole question at this point is whether these subpoenas properly seek relevant information, and the answer to that question is an undoubted "yes." Even apart from the merits of the particular objections discussed below, the United States' objections should be rejected.

## III.   UNITED STATES' OBJECTIONS LACK MERIT.

In any event, and as discussed below, the six subpoenas are timely, well framed, non-duplicative, and properly directed.

### A.   The Subpoenas Are Timely.

BP's proposed third-party subpoenas directed to entities that worked especially closely with the United States' official Flow Rate Technical Group are timely.

*First*, these subpoenas were brought forward within the time when the Court and parties were discussing and resolving disputes over third-party discovery to other entities. The Court has not set a cutoff for such third-party discovery, and hence by definition the subpoenas do not violate such a deadline.

*Second*, neither the United States nor any other party will suffer prejudice (nor does the United States claim prejudice) from BP obtaining the testimony the subpoenas seek to elicit. Depositions of United States and BP witnesses will start September 10—more than two months from now. One other third-party deposition of an entity that worked closely with the United States on quantifying the spill (Statoil) is scheduled for the first week of October—more than

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 4

three months from now. Ample time remains for these six subpoenas to be served and for witnesses to be prepared and offer testimony according to the current schedule for Phase 2 depositions.

*Third*, these third-party subpoenas are particularly timely in light of BP's and the United States' unsuccessful efforts to secure document productions without a subpoena from these very witnesses. In fact, BP has been diligently attempting to obtain document discovery from these same entities since the fall of 2011. Initially, the United States promised to collect and produce relevant documents from representatives at R.G. Hughes and Associates, the University of California at San Diego, the University of California, Santa Barbara, and Purdue University by September 16, 2011. (Dkt. 3928-4 at 9, 11, 21; United States' Br. at 3-4.) And, after further discussion, the Government agreed to produce documents from Kelkar & Associates and Gemini.

Ultimately, however, the United States was able to produce only a handful of documents from these custodians (months after the relevant deadline). For example, the United States produced only 266 documents from UC-Santa Barbara (beginning in December 2011); only 298 documents from Purdue (the majority in January 2012); only 3 documents from Gemini (in January 2012); only 23 documents from Kelkar and Associates (in February 2012); only 87 documents from R.G. Hughes and Associates (in April 2012); and no documents at all from Juan Lasheras of the University of California at San Diego. Indeed, BP understands that Professor Lasheras may have told counsel for the United States that he would not cooperate unless directed to do so—thus practically inviting the service of the present subpoena.

This Court has often emphasized that the production of documents is a necessary precursor to effective deposition testimony. (*See* June 1, 2012 Tr. of Working Group Status Proceedings at 15:1–3 (Ex. 1) ("Importantly, guys, we need to finish up the Phase Two document production so we can start rolling into our depositions in August and September.").) BP should not be penalized for waiting to serve subpoenas until after it had become clear that other methods for obtaining needed documents were not going to succeed.

*Finally*, the United States' timeliness objections stand in marked contrast to the United States' own position with respect to its recently proposed subpoenas to Intertek, Isotech, and World Oilfield Machines. Sensing this discrepancy, the United States attempts to distinguish its own proposed subpoenas on grounds that the entities the United States is targeting had numerous individuals involved. But this is irrelevant to timeliness considerations and unpersuasive. (*See infra* Part III.B.)

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 5

Tellingly, the United States contends—incorrectly—that it only recently learned about the roles of the three companies from which it recently decided to seek deposition testimony. In fact, the United States has known about the roles of Intertek, Isotech, and World Oilfield Machines for well over a year. (*See, e.g.*, July 26, 2010 BP Technical Memorandum: Post-Well Subsurface Description of Macondo Well, BP-HZN-BLY00197147, produced March 1, 2011 (Ex. 2 at 41) (indicating the activities of Intertek); Investigation of Acoustic Anomalies chart, BP-HZN-2179MDL01597164, produced May 15, 2011 (Ex. 3 at 1) (indicating the activities of Isotech); June 27, 2010 Cap Stack Design Report, PCG013-016295, produced by the United States (Ex. 4 at 7) (indicating the activities of World Oilfield Machines).) Nonetheless, the United States did not propose subpoenas for these entities until March 30, 2012.

Consistent with its position here, BP has not advanced timeliness objections to the United States' most recent subpoenas. Those three subpoenas, however, should be viewed comparably to BP's own recently proposed subpoenas. Accordingly, in the event that BP's request for discovery from the six entities that worked with the Flow Rate Technical Group is denied, so should the United States' bid for discovery from Intertek, Isotech, and World Oilfield Machines.

In the end, the United States' timeliness objection is a make-weight. BP missed no third-party discovery cutoff and has been far more diligent in pursuing written discovery from entities it is subpoenaing than the United States has been in pursuing discovery from Intertek, Isotech, and World Oilfield Machines. The United States contends without support that BP may seek *other* third-party depositions. The issue for today, however, is whether *these* subpoenas should be allowed as timely. The considerations discussed above show clearly that they should be.

## B.     The Subpoenas Are Properly Directed to Entities.

The United States' next claims that BP has attempted to circumvent the Court's order regarding the number of fact witnesses by sometimes choosing to identify in these subpoenas a particular individual whose work is of interest. This contention, too, is without merit.

*First*, the fact that BP has helpfully identified certain scientists by name in the "Definitions" sections of subpoenas is entirely unobjectionable. The particular scientists identified are known to have been involved in work performed at the relevant universities. These individuals have thus been identified to help establish the scope of the subpoenas' subject matter, not for purposes of confining an institution's discretion in selecting its corporate representative. Since entities must necessarily perform their research and analysis through people, listing the names of known participants in the research at issue can help define the scope of a Rule 30(b)(6) topic.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 6

But, of course, BP is interested more broadly in *Deepwater Horizon*-related work done by *anyone* associated with a subpoenaed entity, regardless of whether the person is the same as, or someone different from, a person the subpoena identifies. Indeed, precisely for this reason, the same "Definitions" section that mentions specific scientists also includes university "employees, staff, assistants, research assistants, [and] colleagues," to account for all university personnel involved in the relevant work of interest. (*See* United States Attachs. A–C (Draft subpoenas to Purdue, UC-San Diego, and UC-Santa Barbara).)

**Second**, as noted above, the subpoenaed entities remain free to designate and prepare whomever they choose as their Rule 30(b)(6) corporate representative, so long as that person is prepared to speak to relevant topics. The three subpoenaed universities—each of which is prominently named in the Acknowledgements section of the Flow Rate Technical Group report and thus associated with work of the FRTG—are thus unconstrained as to who may offer testimony on their behalf.

**Finally,** while BP may also have indicated a desire to depose various researchers working with FRTG in their personal capacity, this certainly does not preclude BP from properly issuing Rule 30(b)(6) notices to universities in a corporate capacity. Now is the time for Rule 30(b)(6) depositions; accordingly it is Rule 30(b)(6) testimony that BP now seeks.

## C.    <u>The Testimony Sought by the Subpoenas Is Not Duplicative.</u>

The United States next contends that BP's proposed subpoenas are duplicative of BP's 30(b)(6) notice to the United States. This too is incorrect.

Contrary to implications in the United States' briefing, the issue here is whether these third parties have information that is relevant and different from information possessed by the United States. The issue is *not* whether "the work of the individual professors differs from how this work was presented in the FRTG Report." (*Cf.* United States Br. at 4.) In setting up this straw man, the Government misses the point: Because of the centrality of these entities' participation and contribution to the United States' own official work, discovery from both the United States *and* these entities is necessary. Discovery from either the United States alone or the six entities alone would leave holes in the factual record.

Nor are these subpoenas made somehow "duplicative" by the United States' assertion that it "has produced to BP the files of Kelkar, Gemini, Hughes and the Plume sub-team professors" and stands ready to testify regarding the noticed topics. (United States' Brief at 4.) As discussed in detail above, these individuals are not Government employees (*id*. at 4.); the United States does not directly control their files; and the United States' previous efforts to

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 7

secure document productions have been woefully insufficient, and in some cases completely unsuccessful. (*See supra* Part III.A.)

BP directed subpoenas to each of the six subpoenaed entities precisely because it believes, in all good faith, that these entities will furnish important documentary and testimonial evidence that supplements, confirms, and/or contradicts related information expected to be provided by the United States' own witnesses. Crucially, counsel for the United States has indicated to BP that the United States is unable to offer a witness who has all the knowledge of the third parties at issue here. Nor does the case law cited by the United States render this acknowledgment any less decisive.[1] Simply put, the information BP seeks is related to—but certainly not the same as—testimony that BP expects to elicit from United States deponents.

## D. The Subpoenas Are Properly Directed To Entities with Knowledge.

The United States' final argument is that the "responder" status of third parties exempts them from the Court's subpoena power. The United States has not cited, and BP has been unable to identify, legal authority forbidding the service of a subpoena simply because a subpoenaed entity responded to an indentified need for a specialized expertise.

Nor does the Government provide support for its purported concerns about a "chilling effect." To the contrary, the Government's hypothetical concern about a "chilling effect" appears less likely than a more plausible hypothesis that future "responders" could well be attracted by the prestige, visibility, and potential future consulting work to be derived from performing highly public technical work in close collaboration with the United States Government.

Indeed, the discovery record indicates that, as early as June 2010, FRTG members were informed of both the potential for litigation *and* the potential for additional employment.

<div style="border-top: 1px solid black; width: 30%;"></div>

[1]     In *Tri-State Hospital Supply Corp. v. United States*, the case underlying that in which the United States rests the entirety of its argument, the court refused to preclude the plaintiff from asking the noticed 30(b)(6) witnesses about certain topics simply because those topics were the subject of previous discovery requests. Instead, the court elected to await the conclusion of the 30(b)(6) depositions and entertain, if necessary, any claim the depositions were duplicative of the discovery already provided. *See Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 126 (D.D.C. 2005). Moreover, that court makes clear that a court should not "review every 30(b)(6) deposition notice on a topic-by-topic basis to entertain objections that certain categories cover information that has already been provided in response to other discovery devices. Such a time-consuming intrusion by the court in a process that should be managed by counsel should, if it is ever to occur, be limited to extreme situations where the right to take such a deposition is being abused." *See id.* That is not the case here, nor does the Government claim it to be so.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 8



(*See* June 16, 2010 email chain between the Government and FRTG members, IGS606-014508 at 2 (Ex. 5).)

(*See id.*)

The FRTG members were thus aware of the prospects for litigation and advised about potential future employment benefits. They nevertheless undertook the work that is the subject of these subpoenas.

The United States' final and most unlikely characterization of these subpoenas as inflicting "punishment" perhaps requires no response, especially where, as here, numerous other individuals and entities have stepped forward and provided testimony to assist this Court's search for truth.

Nonetheless, the Government might be asked to explain in light of such statements how the interests of these third parties is insufficiently protected by the indemnity agreements that the Government provided to at least some of the researchers working on its behalf. (*See* July 4, 2010 T. Hunter email to R. O'Connor, SNL095-019366 (Ex. 6).) Any professor or investigator who might feel "punished" by providing testimony on behalf of a university or other employer, moreover, can easily ask his or her employer to prepare another individual to provide the requested testimony.

\*      \*      \*      \*

In sum, none of the Government's arguments are persuasive. All six of these subpoenas are timely; all six are well crafted to yield important evidence; and all six relate directly to the United States Government's official flow rate work.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 22, 2012
Page 9

Sincerely,

Robert R. Gasaway

Attachments

cc (via electronic mail)

Michael O'Keefe
R. Michael Underhill
Steven O'Rourke
Scott M. Cernich
Sarah D. Himmelhoch
A. Nathaniel Chakeres
J. Andrew Langan
Karen McCartan DeSantis
Joel M. Gross
Allison Rumsey

# EXHIBIT 1

```
1                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
2

        ***********************************************************
3


4       IN RE:  OIL SPILL BY THE          Docket No. MDL-2179
        OIL RIG DEEPWATER HORIZON         New Orleans, Louisiana
5       IN THE GULF OF MEXICO ON          Friday, June 1, 2012
        APRIL 20, 2010
6       CIVIL


7
        ***********************************************************
8

9           TRANSCRIPT OF WORKING GROUP STATUS CONFERENCE PROCEEDINGS
              HEARD BEFORE THE HONORABLE SALLY SHUSHAN
10                 UNITED STATES MAGISTRATE JUDGE


11      APPEARANCES:

12      FOR THE PLAINTIFFS:               HERMAN, HERMAN, KATZ & COTLAR, LLP
                                          BY:  STEPHEN J. HERMAN, ESQ.
13                                        820 O'Keefe Avenue
                                          New Orleans, LA 70113
14

15                                        LEVIN PAPANTONIO THOMAS MITCHELL
                                          RAFFERTY & PROCTOR
16                                        BY:  BRIAN H. BARR, ESQ.
                                          316 South Baylen Street, Suite 600
17                                        Pensacola, FL 32502

18

19                                        LEWIS KULLMAN STERBCOW & ABRAMSON
                                          BY:  PAUL M. STERBCOW, ESQ.
20                                        601 POYDRAS STREET, SUITE 2615
                                          NEW ORLEANS, LA 70130

21

22                                        WILLIAMSON & RUSNAK
                                          BY:  JIMMY WILLIAMSON, ESQ.
23                                        4310 Yoakum Blvd.
                                          Houston, TX 77006

24

25
```

```
 1    we could have a conference to discuss what you have proposed.  And
 2    I think, correct me if I'm wrong, that -- well, I'll let anybody
 3    that wants to participate participate, but I think frankly it's the
 4    PSC and BP and the United States, huh?
 5              UNIDENTIFIED SPEAKER:  Probably, I would guess, your
 6    Honor.
 7              THE COURT:  I also looked at Transocean's proposed
 8    stipulations, which is a little more complicated because they're
 9    longer and more detailed.  Maybe what we can do, David, is you and
10    I can have a call sometime this week and talk about how we want to
11    approach it from there.
12              MR. BAAY:  That would be great.
13              THE COURT:  So why don't you just call me and we will
14    talk.
15              MR. BAAY:  Okay.
16              THE COURT:  And that will be in the next few weeks maybe
17    we can do a meet and confer on those.
18              MR. BAAY:  Sounds good.
19              THE COURT:  Okay.  That was on my list of "to do," so.
20              All right.  We have been having continuing meetings
21    between BP and the United States with regard to finishing up the
22    Phase Two document production.  Every time I think we've kind of
23    nailed it down it seems to pop out somewhere else.  We're going to
24    have a meeting on Tuesday with them and other parties, so we'll see
25    how that goes.
```

 1          Importantly, guys, we need to finish up the Phase Two

 2    document production so we can start rolling into our depositions in

 3    August and September.  So I know that there are some new objections

 4    that have been posed by Transocean and Haliburton, which came as

 5    somewhat of a surprise to me, but I would like to start tackling

 6    those if we can so that everything is wrapped up by the end of July

 7    and ready to roll for depositions in August.

 8          Anything you want to add to that, David?

 9          MR. BAAY:  I just say I think we may get into it a little

10    bit later, but we have been working this week with Haliburton

11    closely and meeting and conferring with BP and the United States to

12    narrow those down.  Maybe when we get to it it will be moot, but we

13    are working on it.

14          THE COURT:  Good.  Glad to hear it.

15          MS. HIMMELHOCH:  Your Honor, this is Sarah Himmelhoch.  I

16    just wanted to report to you that we got out all but one subset of

17    Coast Guard documents that wouldn't export in time for the Fed-Ex

18    deadline, but the parties should all have all of the Coast Guard

19    documents, except for those exceptions listed in my e-mail, by

20    close of business tomorrow.  Most of them have them today and some

21    will have them by tomorrow.

22          THE COURT:  Good.  Thank you, Sarah, that's an

23    encouraging report.  Thanks a bunch.

24          Any other reports on Phase Two documents?

25          MS. HIMMELHOCH:  Your Honor, I think Rob sent you a

# EXHIBIT 2

**REDACTED**

# EXHIBIT 3

**REDACTED**

# EXHIBIT 4

**REDACTED**

# EXHIBIT 5

**REDACTED**

# EXHIBIT 6

**REDACTED**