# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 26, 2012

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, Louisiana  70130

Re:  MDL No. 2179 — United States' Challenges to BP Privilege Claims

Dear Judge Shushan:

As the United States correctly states in its recent letter challenging various BP legal privilege claims, "everyone knew" following the *Deepwater Horizon* accident on April 20, 2010, that "litigation was a likelihood."  Letter from Scott M. Cernich to Magistrate Judge Shushan (June 16, 2012) at 4 (hereafter, "U.S. Letter").  In fact, everyone also knew that this highly likely litigation would very likely involve, among other issues, a contest over the question of how many barrels of oil had been discharged to the Gulf of Mexico.

Further focusing the litigation picture, just eight days after the accident, on April 28, 2010, the United States Coast Guard asserted that BP was a "responsible party" under the Oil Pollution Act, a statute related in various ways to the Clean Water Act.  And, on June 1, 2010, Attorney General Holder announced that the Department of Justice had launched civil and criminal investigations under the Clean Water Act and other statutes.  Statement of Attorney General Holder, *available at* http://www.justice.gov/ag/speeches/2010/ag-speech-100601.html (June 1, 2010).

It should come as no surprise that, by the time the oil spill was stopped on July 15, 2010, BP's legal department and outside counsel fully anticipated that the expected United States Clean Water Act action, as well as other pending and anticipated cases, would involve disputes about the size of the recent oil spill.  Against this backdrop, BP counsel stepped up efforts to prepare to defend such litigation.  In particular, BP's internal legal department, working with outside counsel, formally established a legally privileged workstream encompassing the efforts of a team of internal and external attorneys and internal and external technical experts in July 2010.  The creation of this legally privileged team and workstream was memorialized in an email memorandum dated July 19, 2010, from BP attorney Karen Westall.  The function and

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 2

operations of this legally privileged team and workstream were further defined several weeks later in a follow-on email memorandum dated August 13, 2010, from James Neath, BP's Associate General Counsel in charge of *Deepwater Horizon* litigation.

The Neath and Westall memoranda are being submitted with this letter brief for *in camera* review.  As the Court will see, these documents clearly demonstrate an intention to undertake a privileged analysis of the amount of oil spilled — an analysis expressly undertaken for purposes of advising the company in view of pending and anticipated litigation and to be carried out under the ultimate supervision of attorneys.  Obviously, it would have been difficult to prepare the corporation's best defense to a potential multi-billion dollar lawsuit brought by the United States if key elements of the company's analysis of the United States' legal claims were not being directed by BP defense counsel.  If the Westall and Neath memoranda are not sufficient to establish the legally protected nature of the future flow rate work those memoranda contemplate, it would mark a sea change in the law of legal privilege claims.

In view of the well-known circumstances surrounding BP's decision to undertake a privileged flow rate analysis, it is baffling that the United States should profess shock at BP's assertion of work-product protection over this privileged workstream of analysis related to the claims that the United States was expected to — and eventually did — assert against BP.  The United States contends, in essence, that (1) *no* technical or analytical flow rate materials created before the Macondo well was finally killed in September 2010 are subject to the work product protection; and (2) BP waived its right to assert *any* privileges of attorney-client privilege or work-product protection by submitting a document on flow rate to the Presidential Commission.

Both of these sweeping claims lack merit.  It was obvious long before September 2010 that litigation over the size of the spill was a near-certainty and nothing in law or logic compelled BP's attorneys to wait two months after the discharges had stopped to begin preparing their defense or to undertake a privileged technical analysis as part of this defense.  Likewise, the fact that BP submitted a flow rate document to the Presidential Commission does not amount to a privilege waiver over *other* documents *not* submitted to the Commission that may somehow have informed the thinking of the submission's authors.  The filing of a brief does not waive protection over the privileged documents and discussions that informed the framing of the brief — and so too with BP's October 22, 2010 Presidential Commission submission.

Indeed, to order the disclosure of such privileged and work-product-protected material, especially in a high-profile case like this one, would profoundly chill responsible parties in future spills from cooperating with federal inquiries for fear that communications with government institutions, such as the Presidential Commission (which sought to improve understanding of accidental spills and develop pragmatic spill-avoidance action plans), would be construed as a

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 3

broad waiver of all privileges and used by the government as little more than a device designed to gain tactical advantage in future enforcement actions.  *Cf.* 46 U.S.C. § 6308(a) (barring both admissibility *and discoverability* of Coast Guard investigatory reports precisely to avoid such chilling effects); 46 C.F.R. § 4.07-1(b) ("The investigations of marine casualties and accidents and the determinations made are for the purpose of taking appropriate measures for promoting safety of life and property at sea, and are not intended to fix civil or criminal responsibility.").

As the documents submitted *in camera* make clear, under the direction of counsel and in anticipation of litigation, BP carefully and gradually assembled a group of scientists and technical specialists, some within BP and some outside, to analyze flow rate issues.  The work done as part of this effort is classic work product protected from disclosure.  The Court should deny the United States' attempt to gain tactical advantage by rummaging through BP's privileged analyses.

## BACKGROUND

As the Court can see from BP's *in camera* submission of documents, BP's privileged flow rate analysis began at the very latest on July 19, 2010, after the well was shut in and the oil flow stopped.  This privileged analysis was undertaken under the direction of attorneys and order to advise the company in light of pending and anticipated litigation.  *See* Exhibit A attached to Nomellini Declaration (submitted *in camera*).

On July 19, 2010, shortly after the well was capped, BP's Legal Department, which was responsible for the defense of litigation arising out of the *Deepwater Horizon* incident, requested that BP's outside counsel direct a scientific and engineering analysis of the variable flow rate and total volume of oil discharged as a result of the Incident ("the Privileged Workstream").  Discussions focusing on how the work would be carried out began almost immediately with certain BP technical experts.  At the time this privileged project was commenced, BP was a defendant in numerous existing lawsuits related to the Incident and was anticipating litigation by the United States that would directly present the flow rate issue.

Among other things, the Privileged Workstream was established following a June 1 speech by United States Attorney General Holder stating that the Department of Justice was conducting a civil and criminal investigation into the spill.  According to Attorney General Holder, the United States intended to "prosecute to the full extent any violations of the law." Statement of Attorney General Holder, *available at* http://www.justice.gov/ag/speeches/2010/ag-speech-100601.html (June 1, 2010).  Of course, BP expected that the United States would bring a civil action for penalties under Clean Water Act Section 311, which permits the maximum civil penalty to be based, in part, on the volume of oil discharged to water.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 4


The establishment of the Privileged Workstream was documented in two separate memoranda. *First*, on July 19, 2010, Karen Westall, an attorney within BP's Legal Department, acted at the request of outside counsel and sent an email to an initial technical team comprised of BP employees Paul Tooms, Cindy Yeilding, and Cheryl Grounds, with copies to six other attorneys. This Westall email requested that this technical team undertake a privileged analysis and, as part of this privileged effort, that the team identify other persons with relevant expertise who might be helpful in completing the analysis. *See* Exhibit A attached to Nomellini Declaration (submitted *in camera*).

*Second*, on August 13, 2010, a memorandum from James Neath, BP's Associate General Counsel who was in charge of *Deepwater Horizon* litigation, established more specific legal Terms of Reference under which the Privileged Workstream was initially led by Paul Tooms, BP Vice President, Engineering. This memorandum gave detailed instructions to members of this Privileged Workstream on how to maintain the confidentiality of their work. See Exhibit D attached to Nomellini Declaration (submitted *in camera*).

Under these two memoranda, a group of inside and outside attorneys representing BP met frequently with members of the Privileged Workstream and directed their analysis. And BP's outside counsel responsible for formulating BP's litigation strategies were informed of, and in turn relied upon, the work of this Privileged Workstream.

## ANALYSIS

### I.   BP Has Properly Asserted The Attorney-Client Privilege Over The Challenged Documents.

The United States misunderstands the scope of the attorney-client privilege in four fundamental ways. First, the United States cites no relevant case law for its claim that a corporation's employee who engages in some work on unprivileged subjects may not also engage in attorney-client privileged work that is somehow related to the same general subject matter. Second, the United States mistakenly claims that the attorney-client privilege protects solely communications made to an attorney. Third, the United States erroneously argues that "factual documents" necessarily fall outside of the scope of the attorney-client and work-product privileges. Finally, the United States posits two alternative starting points (either the date the well was capped or the date it was killed), after which it says privilege claims can properly begin, but before which privilege claims are supposedly subject to "heightened scrutiny"—a concept without legal support. Each of these flawed arguments is discussed in turn below.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 5

> *First*, the United States hinges much of its argument on the proposition that "the very BP engineers responsible for trying to stop the flow from the Macondo well" could not have been "concurrently engaged in litigation-related Quantification work *during the spill*." U.S. Letter at 2 (emphasis in original); *see also id.* at 2 & n.2. That claim is contradicted by case law. *See, e.g.*, *Phillip M. Adams & Assocs., L.L.C. v. Fujitsu Ltd.*, No. 1:05–CV–64 TS, 2010 WL 1064141, at *4 (D. Utah Mar. 22, 2010) (explaining that one person could be both an employee and an expert at the same time).

> The only authority that the United States cites for the proposition is *Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 83 CIV 8898 (MEL), 1989 WL 31514 (S.D.N.Y. Mar. 28, 1989). *Michelson*, however, is plainly inapposite. Indeed, it is not even a case about an in-house consulting expert also engaged in business activities. Rather, *Michelson* is a case where a retained expert possessed confidential information from a prior case in which he was retained by opposing parties and on that basis was disqualified on conflict-of-interest grounds. *See id.* at *3-4. *Michelson* certainly does not stand for the claimed rule that "it is impossible for a person to build a mental firewall between discoverable information and privileged information on the same topic." U.S. Letter at 2. Indeed, the Southern District of New York—the very court that decided *Michelson* and surely knows best what its own cases mean—has squarely recognized that a single employee can take part both in a privileged workstream and in the ordinary business of his or her employer. *See B.C.F. Oil Ref., Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 171 F.R.D. 57, 61 (S.D.N.Y. 1997) ("an expert could be retained to testify and in addition to advise counsel outside of the subject of his testimony" at the same time, without compromising a claim of privilege so long as the "delineation [is] clearly made") (quotation omitted). Any other approach would effectively bar the use of in-house experts or require them to be completely (albeit temporarily) segregated from their employer's ordinary course of business while engaged in a privileged workstream.

> There is no reason in law or logic why BP could not use certain employees to respond in a non-privileged fashion to the spill while at the same time using those same employees to conduct separate privileged flow rate analysis in consultation with counsel. Indeed, had BP interrupted response activities for management to put in place a body of outside consulting experts or had it diverted expert manpower within the company away from response activities by walling them off entirely, the United States would instead argue at trial that BP had improperly deprioritized spill response. It is unreasonable and unjust for the United States to seek to put the corporation to this Hobson's choice.

> *Second*, the United States is flat-out wrong that only communications made to an attorney from an employee can be privileged. As a general matter "[a] corporate client has a privilege to refuse to disclose, and prevent its attorneys from disclosing, confidential

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 6

communications between its representatives and its attorneys when the communications were made to obtain legal services." *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999). But that is not the only instance in which the privilege applies. Instead, the privilege is to be construed "broadly" in order to "encourage full and frank communication between a corporation and its attorneys." *Rush v. Columbus Mun. Sch. Dist.*, 234 F.3d 706 (5th Cir. 2000) (table) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389-94 (1981)). The privilege thus also protects communications made between individuals seeking legal advice even if the recipient is not an attorney. *See id.* ("[T]he attorney-client privilege protects all communications during a meeting between a school board and its attorney for the purpose of obtaining legal advice, *even those communications not addressed directly to the attorney*.") (emphasis added). Similarly, communications made to non-lawyers who are assisting lawyers are also privileged, *see, e.g., United States v. Pipkins*, 528 F.2d 559, 562 (5th Cir. 1976), just as are communications with public relations firms, *see, e.g., In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 325-26 (S.D.N.Y. 2003); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 219-20 (S.D.N.Y. 2001).

*Third*, the United States also errs in arguing that just because a document is partly factual or analytic in nature, it cannot be privileged as a matter of law. U.S. Letter at 3. Granted, "'[*p*]re-existing facts* that underlie the client's confidential communications, whether oral or written, are not privileged simply because the client disclosed them to an attorney for the purpose of obtaining legal services.'" *Id.* (quoting *United States v. Edwards*, 39 F. Supp. 2d 716, 736 (M.D. La. 1999)) (emphasis added). But documents containing "information"—including factual information—created for the purpose of seeking legal advice from counsel are privileged. *See, e.g., In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 811-12 (E.D. La. 2007) (explaining that attorney-client privilege applies if a counsel communication is forwarded "for the purpose of acquiring more information upon which more informed legal advice or assistance could be rendered"); *United States v. Rakes*, 136 F.3d 1, 3-4 & n.4 (1st Cir. 1998) (explaining that it is an over-"generalization" to say that the privilege never applies to facts). The United States' letter cites both *Edwards* and *In re Vioxx*, yet misses these points.

*Fourth and finally*, the United States attempts to engraft a new, timing-based test into the law of privilege. *See* U.S. Letter at 2 (Court should subject material dated "prior to September 19, 2010 to heightened scrutiny" while sometimes admitting that documents created after July 15, 2010, when the well was capped, could also be privileged). There is no support for such a concept in the law and the United States cites no cases whatsoever to support its call for "heightened scrutiny." Nor would such a test make any practical sense in this case. Litigation here was imminent from at least April 22, 2010 when the rig sank. Indeed, a Coast Guard letter carrying enforcement consequences under OPA issued a mere six days later to BP and Transocean. And just over 30 days after the rig sank, the State of Louisiana commenced an administrative enforcement proceeding on May 31, 2010 against BP. To argue that preparations

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 7

for litigation that could be encompassed within attorney-client or work-product protections could not conceivably have commenced earlier than July 15, 2010 or September 19, 2010 is simply untenable.

In short, each document must be evaluated on its own.  As BP's *in camera* submission shows, viewed in the light of the principles set forth above, each of the challenged documents over which BP asserts privilege falls within the scope of the attorney-client privilege.

## II.     BP Has Properly Asserted Work-Product Protection Over The Challenged Documents.

### A.     The Documents Are Within The Scope Of Work-Product Protection.

In the case of the challenged documents, all of the indicia of work product are present: (i) BP had retained litigation counsel; (ii) litigation generally and enforcement litigation in particular was not just imminent, it had already been filed and remained ongoing; and (iii) the reason that BP sought, in a retrospective manner, to estimate the total discharge from the *Deepwater Horizon* oil spill after the well was shut-in was to defend this pending and anticipated litigation.  Given these facts, the Court should conclude that the challenged documents were created primarily for the purpose of litigation and therefore are protected by the work-product doctrine.  *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *see also id.* at 516 (Jackson, J., concurring); *S. Scrap Material Co. v. Fleming*, No. CIV.A.01-2554, 2003 WL 21474516, at *6 (E.D. La. June 18, 2003).

#### 1.     Well-Settled Law Supports BP's Invocation Of The Work-Product Doctrine.

The United States' brief is long on rhetoric, but short on analysis of the relevant legal principles regarding the work-product doctrine in the context of internal consulting experts.  It is therefore necessary to set forth some of the black-letter law that applies to the United States' challenge to BP's assertions of the work-product protection.

***First***, as the Fifth Circuit has stated in no uncertain terms, the work-product privilege "unquestionably" includes reports that are "prepared in anticipation of litigation by a consulting expert who was specially employed by . . . attorneys in preparation for trial and who was not expected to be called as a witness."  *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989).

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 8


*Second*, it is well-established that a corporation may have its own employees serve as consulting experts.  For instance, in *In re Shell Oil Refinery*, 132 F.R.D. 437 (E.D. La. 1990), the court considered whether a party could discover internal expert materials in the context of a refinery explosion.  The court distinguished between internal experts who "bec[a]me retained or specially employed" to work on the litigation and those who were merely "general employee[s]" of the corporation.  *Id.* at 442.  The court explained that, where work was conducted at the direction of outside litigation counsel, "a regular employee may become specially employed when he is designated and assigned by a party to apply his expertise to a particular matter in anticipation of litigation or for trial."  *Id.* (quotation omitted); *see also, e.g.*, *Coburn Group, LLC v. Whitecap Advisors LLC*, 640 F. Supp. 2d 1032, 1037 (N.D. Ill. 2009); *Dartmouth Hitchcock Med. Ctr. v. Cross Country Travcorps, Inc.*, No. 09-cv-160, 2011 WL 940042, at *1 (D.N.H. Mar. 16, 2011) (extending work-product privilege to employee-expert as long as he was retained for that purpose under Fed. R. Civ. P. 26(a)(2)); *Planalto v. Ohio Cas. Ins. Co.*, 256 F.R.D. 16, 21-22 (D. Maine 2009); *cf. Bagwell Coatings, Inc. v. Middle S. Energy, Inc.*, 797 F.2d 1298, 1307-08 (5th Cir. 1986) (citing the testimony of "employee-expert" in affirming damages calculation).

*Third*, it is equally well-established that employees may serve as internal consulting experts even where they otherwise do work in a non-privileged capacity.  *See, e.g.*, *Oklahoma v. Tyson Foods, Inc.*, No. 05-cv-329, 2009 WL 1578937, at *5 (N.D. Okla. June 2, 2009); *see also id.* at *4 ("an expert alternately dons and doffs the 'privileged hat.'") (quoting *Employees Committed for Justice v. Eastman Kodak Co.*, 251 F.R.D. 101, 104 (W.D.N.Y. 2008)).

*Fourth*, an expert may retain assistants to help him with his privileged work.  In such a scenario, any communications between "counsel and [the expert], *and/or his assistants*, concerning [the expert's] expert opinions are protected work product . . . ."  *In re Application of the Republic of Ecuador*, — F.R.D. —, 2012 WL 821714, at *4 (N.D. Cal. Mar. 9, 2012) (emphasis added); *see also id.* at *7 ("the term 'expert' includes assistants of the expert"); *cf. Upjohn*, 449 U.S. at 392 ("The narrow scope given the attorney-client privilege by the court below not only makes it difficult for corporate attorneys to formulate sound advice when their client is faced with a specific legal problem but also threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law.").

*Fifth*, the scope of the attorney work product is not altered merely because a third party may have been involved in the creation of a document.  "[M]ore than once, the Fifth Circuit has held that the mere voluntary disclosure of work-product to a third person is insufficient in itself to waive the work product privilege."  *PBC Mgmt., Inc. v. Roberson*, No. 10-798, 2010 WL 4553507, at *2 n.2 (E.D. La. Oct. 28, 2010) (citing *In re Grand Jury Proceedings*, 43 F.3d 966, 970 (5th Cir. 1994); and *Shields*, 864 F.2d at 382).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 9

*Sixth*, where such relationships have been established under Rule 26, any communications between non-attorney employees are covered work product if created at the direction of counsel. For example, in *Alexander v. Carnival Corp.*, 238 F.R.D. 318, 319 (S.D. Fla. 2006), the court extended work-product protection to an accident-reporting form based on the affidavit of a manager within the defendant corporation. The manager did not address whether the cruise line requesting that its employees complete the questionnaire considered litigation imminent but only that "[i]t is the policy of Carnival Cruise Lines to investigate all claims of passenger injuries in anticipation of the litigation described above." *Id.*

The United States does not dispute a single one of these black-letter propositions — it simply ignores them, assuming (without support) that BP did not establish the Privileged Workstream.

No less importantly, even where the United States proffers a legal standard for the Court to apply, it misstates that standard. The United States asserts that documents potentially produced for multiple purposes must have been produced for the "primary purpose" of aiding litigation. *See* U.S. Letter at 4. But this misconstrues the Fifth Circuit's work-product test. The primary-purpose test is applicable to assessing the status of documents over which work-product protection is claimed when litigation *is not imminent*. *See, e.g.*, *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981) ("We conclude that litigation need not necessarily be imminent, as some courts have suggested … as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."). By contrast, documents created for protected purposes when litigation is imminent are clearly protected. *See Dawson v. Jantran, Inc.*, No. 2:09-CV-60-P-A, 2010 WL 1956892, *1 (N.D. Miss. May 13, 2010).

Significantly, *Davis* involved the work-product status papers designed "to aid in preparing tax returns" when no litigation was in sight, 636 F.2d at 1040, and "not [papers created] primarily to help litigate over those returns." The purpose of the *Davis* test is to allow even some documents prepared long in advance of litigation to come within work-product protection if they were truly prepared to assist in future litigation. But once litigation appears on the horizon, or has already arrived, as was the case here, documents prepared with reference to that litigation are plainly protected and the primary purpose test is inapplicable. Indeed, while it may be the case that "individual cases turn on their particular circumstance," 8 Wright & Miller, *et al.*, FEDERAL PRACTICE & PROCEDURE § 2024 (3d ed. 2012), it is well-settled that "dual purpose' documents may be protected even though a nonlitigation purpose can also be ascertained." *Id.*

Under this well-settled rubric, there is simply no question that BP established a privileged workstream in anticipation of litigation. The July 19, 2010 Westall and August 13, 2010 Neath

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 10

memoranda are clear on this point.  The documents created by individuals working within the Privileged Workstream were created pursuant to the direction of counsel under the Westall and Neath memoranda.

Moreover, the plain terms of the Neath and Westall memoranda would readily satisfy the primary-purpose test even if that test were applicable, which it is not.  The work-product protection, therefore, has clearly attached.

### 2.     The United States' Arguments To The Contrary Lack Merit.

In the face of well-established law, the United States asserts that the challenged documents were not created for litigation, but rather as part of the effort to stop the oil flow from the *Deepwater Horizon*.  *See* U.S. Letter at 4.  But there is no grounding for this argument in the facts of this case or in law.

*First*, the United States cites BP's standard protocols for responding to an oil spill, which recommend estimating flow rate as part of the response.   But even if those protocols mandated calculation of a flow rate, protocols governing how to stop the flow of oil do not determine the purpose of BP's flow estimation work, especially *after* the flow has been stopped, as is the case here.  The United States has no support for the proposition that flow estimation work performed by a team of BP engineers that were specifically assigned to estimate flow rate for BP's outside litigation counsel were actually doing that work for some non-litigation purpose.

*Second*, the United States argues that, because the response to the *Deepwater Horizon* oil spill did not end until September 19, 2010 (when the relief well was completed), all work on flow rate necessarily was done as part of the response efforts and not in anticipation of litigation. Just as this same argument was illogical when advanced in an attempt to defeat attorney-client privilege, it also fails to vitiate work product protections, for several reasons.

For one thing, September 19 was not the end of the response.  In fact, the United States has yet to formally end the Response.  *See, e.g.*, http://www.restorethegulf.gov/sites/default/files/u361/GCIMT%20Phase%20III%20Response%20Activities%20Completion%20Plan.pdf. Accordingly, under the United States' theory, no technical work on flow rate created by the parties following the oil spill—including technical work created after the commencement of litigation—could be privileged.  That proposition, needless to say, is absurd.

For another, there is no legal basis to support the United States' assertion that all efforts to quantify the oil spilled were necessarily part of the oil spill response so long as the oil spill remained in progress.  To the contrary, the case law makes clear that a defendant may prepare for

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 11

litigation even when such litigation is merely anticipated.  Most crucially, as described above and in the Westall and Neath memoranda, the record unequivocally demonstrates that the challenged documents were created to render legal advice in anticipation of litigation under the direction of an attorney.  The United States' conceptual arguments are dashed on the ground truth of the memoranda establishing the privileged workstream.

At the end of the day, the United States' assertions misstate the law and simply fail to recognize that the company established a privileged workstream.

> **B.     The United States Does Not Have A Need, Much Less A " Substantial" One, For BP's Privileged Analysis And Interpretation Of Already Produced Flow Rate Data.**

The United States has no "substantial need" for the BP's privileged analysis, and it certainly cannot meet its "burden of showing that the materials that constitute work product should nonetheless be disclosed."  *Hodges, Grant & Kaufman v. IRS*, 768 F.2d 719, 721 (5th Cir. 1985); *see* FED. R. CIV. P. 26(b)(3)(A)(ii); *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240-41 (5th Cir. 1982) ("broad unsubstantiated assertions" cannot thwart the work product doctrine); *Smith v. Texaco, Inc.*, 186 F.R.D. 354, 357 (E.D. Tex. 1999) (explaining that unlike underlying preexisting facts, "interpretive material comprised of tables, lists, statistical analyses, and graphical representations of the data" are privileged).

At the outset, the Court must not lose sight of the fact that the United States already possesses all of BP's underlying factual material and data and that BP has never disputed that other parties have a right to the underlying "facts and data" regarding the Macondo well.  BP has already provided the government with such data.  Before the Macondo well was capped and killed, BP's technical instruments monitored and recorded information bearing on the amount of oil that was being released.  The United States has already received that data and information regarding BP's technical instruments.  What the United States now seeks is BP's technical *interpretation and analysis* of those facts, as conducted under the direction of attorneys.

The United States' argument that it has a "substantial need" for BP's internal analysis and interpretation lacks merit.  After all, even leaving aside the obvious fact that BP's interpretative analysis inextricably reflects counsel's "legal theories" and so is not discoverable, FED. R. CIV. P. 26(b)(3)(B), BP simply is not possessed of some unique ability to analyze flow rate data.  To the contrary, the United States has a veritable army of researchers at its disposal, and thus has developed its own flow rate estimates using teams of scientists drawn from the U.S. Geological Survey, three national laboratories, the Woods Hole Oceanographic Institute, and a host of other government agencies and non-government entities.  Despite having substantial resources to

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 12

analyze the data—which, to repeat, has already been provided—the United States protests that it is "unable to recreate or otherwise obtain the data collections and materials" at issue "without undue hardship." U.S. Letter at 5. Such a claim cannot remotely be supported.

*First*, it is important to note that a moving party must identify a specific need for more information than it already possesses. General curiosity or strong desire do not suffice. Rather, a litigant seeking discovery of privileged documents must "demonstrate to the court with some specificity just why they expect the [work product] to supply information that their depositions did not." *American River Transp. Co. v. M/V BOW LION*, No. Civ. A. 03-1306, 2005 WL 144777, at *2 (E.D. La. Jan. 19, 2005); *see also Barton v. Zimmer, Inc.*, No. 06-CV-208, 2008 WL 80647, at *13 (N.D. Ind. Jan. 7, 2008) (refusing to intrude upon the work product privilege when the movant "makes absolutely no attempt to identify specifically what information he seeks").

The United States' assertion that "internal documents *may* contradict BP's statements to the public or the United States" is therefore woefully inadequate. U.S. Letter at 6 (emphasis added). It is always the case that documents protected by the work product doctrine *may* contradict statements in the record, but if the United States' "mere possibility" formulation were the legal test, then there would be no work product protection at all.

*Second*, the United States argues that it needs BP's confidential documents because different executives, speaking at different times, gave different estimates of flow rate. U.S. Letter at 6. But as Your Honor has previously explained in rejecting pleas of "substantial need" purporting to seek only factual material, "'if the witnesses can readily enough be found and interviewed or deposed, generally the work-product protection will not be stripped.'" *Cashman Equip. Corp. v. Rozel Operating Co.*, No. 08-CV-0363, 2012 WL 2054318, at *4-5 (M.D. La. June 6, 2012) (Shushan, M.J.) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)) (denying movant's effort to get production of memoranda that "reflect[ed] facts related to the survey and condition of the wing walls at issue in the suit"). If the United States desires an explanation of these differences, it can ask the witnesses. The possibility of inconsistent testimony does not come close to justifying the United States' request to penetrate the work product doctrine. *See, e.g., Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307-08 (D.C. Cir. 1997) (rejecting government's argument that it can overcome the work product doctrine "to reinforce supposed inconsistencies about which OTS already knows"). Nor does the inability to recall the answer to a single question, because imperfect memory alone is not enough to overcome privilege. *See King v. Odeco, Inc.*, 106 F.3d 396, 1997 WL 33367, at *2-3 (5th Cir. 1997) (table) (witness's faulty memory "may" be a basis for inspecting privileged documents, that conclusion requires that the information "can only be found in the [privileged] material

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 13

itself"). The United States has not shown why it has a "substantial need" to inspect the withheld documents to fill in any purported testimonial gaps.

*Third*, the United States complains that it is "fundamentally unfair" for BP to withhold factual materials as privileged or protected by work product because the United States was forced to produce factual materials it sought to withhold under the deliberative process privilege. But in conflating the deliberative process privilege with the work product doctrine, the United States is comparing apples to oranges.

Courts have recognized that factual material is rarely protected by the deliberative process privilege, whereas factual material frequently is held to be work product. "It is clear that the [deliberative process] privilege and the [work product] doctrine are not coterminous in their sweep. Factual material is not protected under the deliberative process privilege unless it is 'inextricably intertwined' with the deliberative material, whereas no such showing is required under the attorney work-product doctrine." *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 372 (D.C. Cir. 2005) (internal citations omitted); *see also id.* at 371 (holding that DOJ need not produce the factual component of documents prepared in anticipation of litigation because "the work-product doctrine simply does not distinguish between factual and deliberative material"). Indeed, the United States has itself recognized "analyses [including technical analyses] performed by testifying or consulting experts specifically retained or engaged by the United States (or any other party) for purposes of litigation [ ] are protected pursuant to the attorney work product doctrine and Fed. R. Civ. P. 26(b)(4)." (Doc. No. 6212, at 1 n.1.)

Related to its "substantial need" argument, the US argues that much of the material BP asserts work-product protection over is factual and therefore not protected from discovery. But Fifth Circuit trial courts have recognized that objective data collected or otherwise utilized in the course of preparing for litigation is prototypical protected work product. *See e.g.*, *Robinson v. Tex. Auto. Dealers Ass'n,* 214 F.R.D. 432, 441 (E.D. Tex. 2003) ("[o]rdinary work-product generally consists of primary information, such as verbatim witness testimony or objective data collected by or for a party or a party's representative" (internal quotation omitted)), *vacated in part by In re Tex. Auto. Dealers Ass'n*, No. 03-40860, 2003 WL 21911333 (5th Cir. 2003) (granting mandamus to deny portions of motion to compel that the District Court had granted).

Significantly, selected sets of documents that have been assembled in anticipation of litigation, including documents originally created for a non-litigation purpose, may be entitled to the heightened protection afforded opinion work product. *SEC v. Brady*, 238 F.R.D. 429, 442 (N.D. Tex. 2006) ("documents, including business records, that were specifically selected and compiled by a party or its representative in preparation for litigation are opinion work product because the mere acknowledgment of their selection would reveal mental impressions

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 14

concerning the potential litigation").  Here, the documents over which BP claims privilege were part of the privileged flow rate work performed in anticipation of litigation.  To reveal them would be to give the United States an improper tactical edge and thereby trench upon a core guarantor of a fair adversary litigation process.

In addition, the work of BP's non-testifying experts on flow rate also is protected from discovery by Rule 26(b)(4)(D), which immunizes from discovery facts known by a non-testifying expert retained by a party.  *See* FRCP 26(b)(4)(D) ("Ordinarily, a party may not, by interrogatories or deposition, discover *facts known* or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial") (emphasis added).  The Rule is not limited to outside retained experts; it applies to the work of corporate employees serving as consulting experts.  *See In re Shell Oil Refinery*, 132 F.R.D. at 440; *Kiser v. GM Corp.*, No. Civ. A. 98-3669, 2000 WL 1006239, at *2 (E.D. La. July 19, 2000).  (employee qualified as an expert because he had "specialized knowledge" and used his "technical background" for the inspection of evidence; fact that the employee had not been assigned to work exclusively on this litigation or that he did not receive additional compensation for work on this case, it was "of no moment").

In short, BP has no quarrel with the proposition that preexisting factual materials must be produced.  It has done so and will continue to do so.  But material such as newly generated factual analyses and graphics, created at the direction of counsel, are protected as work product.  Given the United States' full and complete access to the underlying data and scientific resources to conduct its own investigation, it is contrary to law for the United States to claim it truly "needs" BP's analysis and assemblages of facts within the privileged workstream to mount its CWA Section 311 case.

## III.   The United States' Argument That BP Waived Its Legal Privileges Is Meritless.

Nor is there any basis for the United States' assertion that BP has somehow waived its privileges by filing a comment with the Presidential Commission and offering a memorandum to Admirals Thad Allen and Mary Landry to assist in the United States' response efforts.

Again, the United States obscures what the dispute is really about.  The relevant legal questions have nothing to do with whether the United States may obtain BP's written submission to the Presidential Commission or the Unified Command or any other materials actually provided to federal officials.  *The United States already has those materials*.  What the United States is actually arguing is that by cooperating with government officials, BP has waived its

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 15

privilege regarding flow rate even for materials that were *not* provided to United States officials at all.  Suffice it to say, that remarkably aggressive position is not the law.

President Obama established the Presidential Commission to investigate the *Deepwater Horizon* incident, and BP voluntarily cooperated with multiple aspects of the Commission's work.  In early October 2010, the Commission released a draft working paper entitled *The Amount and Fate of the Oil*, which addressed, among other things, the Commission's consideration of various estimates of the amount of oil released during the *Deepwater Horizon* spill.  Thereafter, on October 22, *BP's Preliminary Response to the Flow Rate and Volume Estimates Contained in Staff Working Paper No. 3* ("Comment") was transmitted to the Commission's staff.  A few days later, a courtesy copy of the Comment was sent to (i) John Cruden, Deputy Assistant Attorney General, Environment and Natural Resources Division of the Department of Justice, (ii) Scott Harris, General Counsel, Department of Energy  and (iii) Lois Schiffer, General Counsel of NOAA.  Contrary to the United States' assertion, BP has *never* made the Comment available to the public.  Hence, the United States' claims that BP engaged in a strategy of selective disclosure for tactical advantage is demonstrably incorrect.

As the United States knows, BP's submission to the Presidential Commission raised a number of questions about the Commission' draft document and emphasized the need for more work related to quantification of flow rates and spill volumes.  The Comment did not, however, offer an affirmative estimate of flow rate.  To the contrary, BP's position was that it was not possible at that time to reliably estimate flow rate given the number of facts and amount of information that was still unknown.  Counsel for BP, together with one BP non-attorney employee (Trevor Hill), also met with Commission staff to explain and answer questions with respect to BP's written submission.  BP did this as part of its overall effort to be as cooperative as possible with the Commission.

Nor did BP "attack" the Commission for relying on BP's own "data."  U.S. Letter at 5 n.10.  Rather, BP merely urged the Commission to create a "reliable estimate" by using additional data "*currently in the Government's possession*."  U.S. Letter, Attachment E at 1-2 (emphasis added).  Likewise, BP explained why the Commission's *analysis* of the available facts was incomplete.  *See, e.g.*, *id.* at 3-4.  Analysis of a fact is not the same as the fact itself.

Based on BP's efforts to cooperate with the Presidential Commission, the United States now argues that BP has waived its "quantification-related documents … performed [before] BP's Flow Comment was released."  U.S. Letter at 8 n.25.  (Note that the United States concedes that it would be improper to seek flow-rate documents created *after* that time).  None of the United States' arguments withstands careful scrutiny.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 16

*First*, the United States claims that BP has waived any privilege by "pledg[ing] to disseminate [the privileged analysis] to the public." U.S. Letter at 7.   But BP has never made such a pledge.  To be sure, BP stated that it "fully intend[ed] to present its own estimates as soon as the information is available to get the science right," and "[o]nce BP's technical team has access to the necessary data and information and has developed a flow estimate of its own, [BP] will share it with the Commission."  U.S. Letter, Attachment E at 2, 9.  Likewise, BP explained that it is important for "experts analyzing flow to 'have both (i) access to all relevant data and information, and (ii) the time to analyze that data and information, to consult and collaborate with their colleagues in the scientific community, and to develop a well-founded, strongly defensible estimate of the flow rate."  U.S. Letter at 7 (quoting Attachment E at 2-3).  But from those commonsense observations, the United States leaps to the conclusion that any work-product protections have been waived because "the 'primary motivating force' behind [the privileged material's] creation was [not] to aid in future litigation."  U.S. Letter at 7 (quoting *United States v. El Paso Co.*, 682 F.2d 530, 542 (1982)).

As an initial matter, this argument suffers from the same defects identified above because it applies the primary-purpose test to situations in which litigation is imminent or already extant.

More fundamentally, the United States profoundly over-reads BP's "pledge."  BP expects to produce a flow rate analysis in this MDL litigation.  But to say that BP has promised to release all documents relating to its internal analysis of the flow rate—including specifically all *privileged* or protected analysis—goes beyond a fair reading of BP's submission.  Similarly, BP wholeheartedly agrees that pure facts in the possession of any party, including BP or the United States (unconnected to attorney work product because they would not tend to reveal attorney mental impressions) should be shared.  But that basic principle of law has nothing to do with whether BP also must surrender its privileged analysis of those underlying facts to the prying eyes of government attorneys.

This case thus plainly differs from *El Paso*.  There, the question was whether routine "tax pool analysis" is attorney work product.  The Fifth Circuit explained that it was not because "[b]usiness imperatives, not the press of litigation, call[ed] these documents into being." 682 F.2d at 543.  Here, however, both pending and impending cases were obviously driving BP's flow-rate analysis and retrospective data-collection efforts.  Indeed, the logic of the United States' argument depends on the entirely implausible notion that it was unforeseeable to BP's counsel from the earliest days of the *Deepwater Horizon* incident that the United States would eventually institute this litigation.  This is contrary to the government's own concession that "everyone knew litigation was a likelihood."  U.S. Letter at 4.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 17

***Second***, the United States repurposes its misleading claim that it only requests discoverable "factual" information when it asserts that BP has waived any privilege or protections by seeking "the assistance of this Court to ensure that it received the factual basis for the United States estimates . . . ."  U.S. Letter at 7.  But the United States does not want discoverable facts at all—it wants privileged analysis or information tending to reveal which facts BP's attorneys deem important.  There is no inconsistency on BP's part when it explains that the United States, like any other party, has a duty to provide all the facts in its possession, while at the same time explaining that no party, including BP, has a duty to share privileged analysis or assemblages of those facts.  By any measure, it is not BP that wants to "have it both ways."  *Id.*

***Third***, the United States claims that BP has waived its privilege "by sharing that work [product] with its adversary and the public."  U.S. Letter at 8.  But that is simply not true, and the multiple authorities cited by the United States are thus irrelevant.  BP has *never* voluntarily made public the details of its internal, privileged interpretative work on flow rate quantification.  The best the United States can muster to support its claim that BP has shared privileged information is a stray comment that "BP was *planning* to share its flow rate work in presentations to BP's 'core universities,' including materials prepared by Trevor Hill."  *Id.* (quoting Attachment O) (emphasis added).  To say that the United States' argument rests on a thin reed is too generous. As set forth above, BP had multiple workstreams.  That Mr. Hill was asked to potentially put together "a few slides, diagrams, and/or bullet points about plumes and flow rates (probably just the factors that make it difficult to accurately estimate them)," U.S. Letter at 7, Attachment O, says *nothing* about whether BP's privileged work streams would be opened to public view.  But even leaving that aside, the fact remains that the privilege belongs to BP itself, not Mr. Hill or any other BP employee, and BP certainly intended to preserve all of its privileges.

***Fourth***, the United States' letter also wrongly asserts that BP's submission to the Commission—which it misleadingly dubs a "10-page press release" even though BP never released the document to the public at all—fails under the "sword"/"shield" exception to attorney work product.  U.S. Letter at 8.  As noted above, BP's Comment was prompted by the Presidential Commission's decision to circulate for comment in early October 2010, a draft working paper discussing flow rate issues, coupled with the Commission's willingness to consider BP's views on that draft.  In the resulting Presidential Commission submission, BP merely (and tentatively) explained the flaws in the United States' own draft analysis and suggested where additional research would be helpful.  BP's Comment did not offer an affirmative case and so was hardly a "sword."

Nor will BP in any way seek now to use its Presidential Commission Comment as a "sword" in this MDL.  Instead, BP will present its final positions on flow rate and discharge

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 18

volume through well-qualified expert witnesses.  The Comment itself therefore has not been part of BP's evidentiary showing — except perhaps if a need arises to rebut possible mischaracterizations by the United States.  *Compare In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 292-93 (6th Cir. 2002) (after disclosing privileged materials to government to help settle a fraud investigation, the defendant argued the same materials were privileged as to other parties).  Accordingly, the present facts simply do not present a "sword" situation.

Furthermore, the implications of accepting the United States' argument would be far reaching and unfavorable.  To say that BP's attempt to clarify issues can constitute waiver of not just the submission itself but all documents in any way "underlying" the submission, U.S. Letter at 8, would dramatically chill parties' willingness to cooperate with official investigatory bodies and other future commissions.  The work-product privilege "is an intensely practical one, grounded in the realities of litigation in our adversary system."  *United States v. Nobles*, 422 U.S. 225, 239 (1975).  Against this backdrop, it upends common sense to find waiver where a party responds to an investigatory body's request for information by pointing out issues where additional research is necessary.

In any event, the general rule is that disclosure of a document does not result in waiver of the work-product doctrine as to the subject matter of that document.  *See, e.g.*, *Varel v. Banc One Capital Partners, Inc.*, No. CA3:93-CV-1614-R, 1997 WL 86457, at *2 (N.D. Tex. Feb. 25, 1997); *Hollinger Int'l, Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 518 (N.D. Ill. 2005); *In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 389-90 (E.D. Pa. 2006).  Moreover, this Rule is especially appropriate where, as here, the relevant document is "opinion work product" that reflects the views and expert analysis of the BP representatives who prepared it, *see, e.g.*, *Brady*, 238 F.R.D. at 444 (waiver of opinion work product is "limited to the documents actually disclosed").  Simply put, BP was entitled to share the specific and limited opinions in the Comment without running a risk of a broad subject matter waiver.

Of equal importance, "considerations of fairness do not dictate that the work-product protection be vitiated in this case." *In re Vioxx Prods. Liab. Litig.*, No. MDL 1657, 2007 WL 854251, at *5 (E.D. La. Mar. 6, 2007).  Typically, courts employ waiver to correct some abuse of privilege or work product, such as when a litigant discloses some otherwise protected material in order to gain litigation advantages.  *See, e.g.*, *Nobles*, 422 U.S. at 231-32 (attorney sought to use testimony of investigator and select portions of investigator's report as evidence without disclosing report itself).  Here, the only unfairness would be to punish BP for cooperating with the Presidential Commission.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 19


Also noteworthy, perhaps, is that the United States itself has withheld documents related to the work of the Presidential Commission on grounds that those documents were provided based on promises of confidentiality by the Commission. BP has not challenged those decisions. Instead, BP's own privilege challenges have respected the practical reality that cooperation with the Commission's work means not attacking the Commission's efforts in a way that would undermine its ability to function. The same should apply to the Comment. That document was submitted to the Commission as part of the laudable effort by BP to cooperate with the Commission; it begins as opinion work product, the disclosure of which can never lead to a broader waiver, and it has not been used (and will not be) at all in this case, much less used in a way that prejudices the United States.

*Fifth and finally*, the United States also suggests that there has been waiver because Mr. Hill asked questions of a government scientist and a university professor. *See* U.S. Letter at 8-9. But the United States offers no theory (much less precedent), explaining how this conclusion could be correct. A threshold requirement for any privilege waiver is actually divulging privileged materials. Merely asking questions that could provide ingredients for a later privileged analysis does not suffice. The United States nowhere suggests that this obvious threshold requirement for finding waiver was satisfied in Mr. Hill's conversations with the outside scientists.

Relatedly and for similar reasons, the United States also suggests waiver, albeit over a different set of documents, because BP executive David Rainey drafted a memorandum discussing flow rate issues that was provided on May 19, 2010, to certain government officials, including Admirals Allen and Landry. *See* U.S. Letter at 9. This contention, too, is utterly incorrect. As discussed at length above, the fact that BP submitted a flow rate document to certain government officials does not amount to a privilege waiver over *other* documents *not* submitted to those officials — any more than BP's submission to the Presidential Commission waived privilege over *other* documents *not* submitted to the Commission, or a party's submission of briefing to this Court waives protection over *other* documents that were *not* submitted to the Court.

## CONCLUSION

The United States' attempts to pierce both attorney-client privilege and work-product protections over the flow rate workstream, as established by expressly memorialized and repeated attorney directives, should be rejected.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 26, 2012
Page 20

Sincerely,

Robert R. Gasaway

Attachments

cc (via electronic mail):

R. Michael Underhill
Steven O'Rourke
Scott M. Cernich
Sarah D. Himmelhoch
A. Nathaniel Chakeres
Bethany Engel
Thomas A. Benson
Joel M. Gross
Allison B. Rumsey
Plaintiffs' Liaison Counsel
Defense Liaison Counsel (dsc2179@liskow.com)