UNITED STATES DISTRCIT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico on April 20, 2010 | * | Section:  J |
| | * | |
| This pleading applies to: | * | JUDGE:  BARBIER |
| Guy Adams v. Louisiana Dept. of | * | |
| Natural Resources, et al (Bundle B1) | * | MAGISTRATE |
| No. 2:11-cv-01051 | * | SHUSHAN |

**********************************

## MEMORANDUM IN SUPPORT OF MOTION TO PARTIALLY LIFT STAY ORDER

Defendant, Penetone Corporation (hereinafter "Penetone"), through undersigned counsel, submits this Memorandum of Law in Support of its Motion to Partially Lift Stay Order.  For the reasons set forth herein, Penetone seeks a partial lifting of the stay order in effect under Pre-Trial Order number 25 [Rec. Document 4-3] for matters classified as either B1 or B3, so as to conduct limited discovery into the facts and evidence which led plaintiff Guy Adams to name Penetone as a defendant in this litigation.

### I.     FACTUAL BACKGROUND

Penetone is a manufacturer of degreasing products, including Citrikleen, Pensolv, Penblitz and Penair.  Penetone does not manufacture "dispersants."  Penetone's products are not available for purchase by the public, and are sold only to wholesale distributors. The products are

typically only available in industrial settings, and Penetone does not have any Louisiana distributors.  The closest distributor to Louisiana is in Midland, Texas.

More importantly, Penetone's products are not listed on the United States' National Contingency Plan Schedule of Approved products to be used in emergency response situations. Penetone chose specifically to not have its products included on this listing, and thus at the time of this disaster its products would not have been included on the listing for utilization by the Coast Guard and other first-responders to the disaster.

Despite this backdrop, one single plaintiff, Guy Adams, has named Penetone in his lawsuit as a manufacturer of products used in the clean-up of this disaster.  This is the only lawsuit, of the hundreds consolidated in this MDL, in which Penetone is named. Guy Adams alleges that Penetone's chemicals were used in the clean-up of the oil spill and that the Penetone chemicals caused damage to the oyster beds owned/leased by the *Adams*.  The Plaintiffs do not specify which Penetone chemicals were allegedly used in the clean-up and they do not specify how the Penetone chemicals were allegedly used in the clean-up.  Specifically, the Plaintiffs allege the following:

> 9.     In order to combat the spreading oil, millions of gallons of chemical dispersants were sprayed over the Gulf of Mexico and the Coastal zones.  **Upon information and belief, the chemical dispersants were manufactured by** NALCO COMPANY, **PENETON CORPORATION**, and JMN SPECIALTIES, INC., **(collectively, the "Dispersant Defendants")**.  Upon information and belief, the environmental effects of using the chemical dispersants in great magnitude and at depths was never tested, nor were all the dangers know (sic).
>
> . . .
> 14.    The State of Louisiana's strategy to combat the amount of oil, dispersants, and other pollutants that entered the Coastal zones

where oysters grow resulted in the influx of freshwater which killed and/or damaged thousands of acres of private and public oyster beds because water salinity levels plummeted to levels that oysters cannot survive.

15    In essence, the oysters were under attack from both sides with the oil, dispersants, and other pollutants coming from one side, and fresh water coming from the other.

. . .

18    According to environmental experts, the use of these chemical dispersants have only exacerbated the environmental effects of the oil spill by simply spreading the oil through the water column and sinking it to the sea floor, where it can continue to cause environmental damage to the coastal wetlands, estuaries, and marine ecosystem for years to come.

19.    Recent reports have indicated oil and chemical dispersants have continued to form into massive underwater plumes that will continue to threaten the Louisiana coastline, further damaging the Coastal Zones of Louisiana and destroying the habitats where fish, shellfish and crustaceans breed, spawn and nature.

. . .

21.    The oil spill, **use of chemical dispersants**, and diversion of fresh water **has caused and will continue to cause damages to individuals and entities that rely on the exclusive use of leased water bottoms and/or oyster beds for commercial or recreational benefit**.

22.    As these and many other damaging effects from the oil spill, the use of chemical dispersants and/or the diversion of fresh water that have not yet become known are discovered, Plaintiffs reserve the right to amend this Petition once additional information becomes available.

. . .

## CAUSES OF ACTION

34.    The release of oil, spraying of chemical dispersants, and/or diversion of fresh water by Defendants in response to the blowout explosion fire and resulting oil spill was unnecessary, unneeded, negligent, and in violation of Louisiana law, including La.C.C. Art. 2315 and La-R.S. 56:423 et seq., in the following regard:

        a.    Spraying and allowing the spraying of a chemical into the Gulf of Mexico and distributed into the Coastal Zones of Louisiana before its use at volume and depth had been tested;

     b.     Diverting fresh water into the Coastal Zones of Louisiana that caused thousands of acres of leased water bottoms and oyster beds to be devastated;

     c.     Introducing oil, chemical dispersants, and/or fresh water into the Coastal Zones and permanently altering the marine ecosystem therein;

     d.     Failing to exhaust all non-evasive and/or non-toxic safety measures to prevent oil, chemical dispersants, and/or fresh water from entering the Coastal Zone of Louisiana;

     e.     Failing to prevent physical and economic damages to all persons who lease water bottoms and oyster beds for commercial or recreational benefit;

     f.     Such other acts and omissions as will be shown at the trial of this matter.

35.     The injuries to Plaintiffs and the Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations following the oil spill.

36.     Defendants at all times material herein either owned the contents of the oil spill, owned the chemical dispersants used to contain the oil spill, and/or caused the oil spill, chemical dispersants, or diversion of fresh water which continues to date to inflict death and injury to the Plaintiff's leased property.

37.     As a direct and proximate result of the Defendants' negligent actions described above, the oyster beds that are the leased property of Plaintiffs have been contaminated and such contamination has interfered with Plaintiffs' ability to use their leased property as intended, damaging Plaintiffs' livelihoods as well as the value of their leased oyster bed properties.

At this juncture, pursuant to Pre-Trial Order No. 25 [Rec. Document 4-3], the Pleading Bundles collectively known as B1 and B3, which include all "Clean-Up Defendants" are stayed until further order:

**PRETRIAL ORDER NO. 25**
**[Clarifying the Pleading bundles, Responsive Pleadings, and the Master Complaints]**

. . . . .

**IT IS ORDERED** THAT THE SCOPE AND EFFECT OF THE "B1" BUNDLE MASTER COMPLAINT [Doc 879], the "B3" BUNDLE MASTER COMPLAINT [Doc 881], and the "D1" BUNDLE MASTER COMPLAINT [Doc 880], (collectively referred to herein as "Master Complaint"), are hereby clarified as follows:

1.      Pleading Bundle B3, as described in Section III(B) of CMO No. 1 [PTO 11], is clarified as follows: **"Clean-Up, Medical Monitoring, and Post-April 20 personal Injury Claims.** This pleading bundle will include all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010. The Pleading Bundles described in the CMO and further herein have been created for administrative purposes, and a plaintiff is accordingly permitted to assert claims within both Pleading Bundle B1 and Pleading Bundle B3 without being deemed to have "split" his or her cause of action.

. . . . .

4.      Any individual plaintiff who is named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s). Plaintiffs Liaison Counsel shall provide to Defense Liaison Counsel a list of plaintiffs included in these bundles within a time period to be agreed to between Liaison Counsel.

5.      For the procedural and administrative purpose of answering or otherwise responding to the complaints in Pleading Bundles B1, B3 and D1, (and subject to the provisions of Paragraph 8), as to any Defendant named in one or more Master Complaint(s), the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective Master Complaint(s) in which the Defendant is named that apply to the pre-existing petition or complaint.

. . . . .

8.      All individual petitions or complaints that fall within Pleading Bundles B1, B3... whether pre-existing or filed hereafter, are stayed until further order of the Court.

. . . . .