# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL by the OIL RIG      :      MDL NO. 2179
        *"DEEPWATER HORIZON"* in the    :
        GULF OF MEXICO, on          :
        APRIL 20, 2010           :      SECTION: J
                                 :
THIS DOCUMENT RELATES TO:    :
                                 :
*ALL CASES IN PLEADING BUNDLE*    :      JUDGE BARBIER
*SECTION III.B(3)*                 :      MAG. JUDGE SHUSHAN
                                 :

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  .. ..  ..

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF
## LANE AVIATION, INC'S MOTION FOR SUMMARY JUDGMENT
## ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Lane Aviation, Inc. ("Lane

Aviation") respectfully submits the following Statement of Undisputed Material Facts in Support

of its Motion for Summary Judgment on Derivative Immunity and Preemption Grounds to

supplement [Doc 6597] and to supplement and to incorporate fully the Joint Statement of

Undisputed Material Facts filed on behalf of the Clean-Up Responder Defendants which are

specifically adopted and incorporated herein by reference pursuant to Rule 10 of the Federal

Rules of Civil Procedure.

      1.      Lane Aviation is a family-owned and operated small business based in Richmond,

Texas. Lane Aviation was founded in 1945 by WWII veteran Marine Pilot George Lane.

Today, Lane Aviation is the oldest and one of the most successful dealers of the world's leading

agricultural aircraft, the Air Tractor. Today's Air Tractor is a highly sophisticated,

Turbo-Propeller, GPS equipped and remarkably safe aircraft. Grant Lane continues his father's

legacy and was on scene during Lane Aviation's flight operations relevant to this lawsuit. *See*

Exhibit "A"  - Declaration of Grant Lane in Support of Lane Aviation, Inc's Motion for Summary Judgment on Derivative Immunity and Preemption Grounds (hereinafter "Grant Lane Decl.") at ¶ 3.

2.      On May 6, 2010, Lane Aviation entered into an "Agreement for Provision of Response Resources"  ("Agreement") with National Response Corporation ("NRC").  *See* Exhibit "A" - Grant Lane Decl. at ¶ 4.

3.      A true and correct copy of "Agreement for Provision of Response Resources" between Lane Aviation and NRC is attached as Exhibit "1" to the Declaration of Grant Lane. *See* Exhibit "A" - Grant Lane Decl. at ¶ 4.

4.      NRC at all times relevant to this lawsuit was classified as an Oil Spill Removal Organization pursuant to the United States Coast Guard's Oil Spill Removal Organization program. *See* Exhibit "A" - Grant Lane Decl. at ¶ 5.

5.      In its capacity as an emergency Oil Spill Removal Organization, NRC "provides personnel, equipment, supplies and other resources for responding to discharges of oil and hazardous substances from vessels and/or facilities and other emergency response situations, which resources NRC owns or procures by subcontract." *See* Exhibit "A" - Grant Lane Decl. at ¶ 5, and Exhibit "1" attached thereto — Agreement at p.2 ¶ 2(A).

6.      The Agreement describes work to be performed under the National Contingency Plan ("NCP") at the direction of the federal government.   See Exhibit "A" - Grant Lane Decl. at ¶ 5, and Exhibit "1" attached thereto  — Agreement at  ¶¶ 2.1, 3.5, and 4.1.

7.      Pursuant to the Agreement, Lane Aviation agreed to maintain its aerial resources and make them available to NRC for deployment if called upon and authorized to respond to a discharge. *See* Exhibit "A" - Grant Lane Decl. at ¶ 6, and Exhibit "1" attached thereto —

Agreement at ¶¶ 1(D), 3.1, and 4.1.

8.    Around May 5, 2010, NRC and O'Brien's Response Management Inc. ("O'Brien's") contacted Lane Aviation to provide notice of the incident, advise of the potential for discharge, and to place Lane Aviation aerial resources on stand-by to assist in responding to the situation. *See* Exhibit "A" - Grant Lane Decl. at ¶ 7.

9.    On May 18, 2010, the Federal On-Scene Coordinator ("FOSC"), the federal official designated to direct the *DEEPWATER HORIZON* oil spill response, authorized and instructed Lane Aviation to conduct a 204 gallon aerial application flight to apply EPA-approved dispersants to oil on the surface of federal waters in the Gulf of Mexico. *See* Exhibit "A" - Grant Lane Decl. at ¶ 8.

10.    In accordance with such authorization and instruction, Pilot Aldo Leonardi, in aircraft N9002K, conducted Lane Aviation's first aerial dispersant flight from the Houma-Terrebonne Airport in Houma, Louisiana ("KHUM") for the *DEEP WATER HORIZON* oil spill response. Said flight was accompanied by a spotter aircraft with United States Coast Guard and O'Brien's personnel on board. *See* Exhibit "A" - Grant Lane Decl. at ¶ 8.

11.    Lane Aviation subsequently made 21 additional aerial application flights as authorized and directed. The last such flight made by Lane Aviation was on July 2, 2010. *See* Exhibit "A" - Grant Lane Decl. at ¶ 9.

12.    On May 28, 2010, Lane Aviation was authorized and instructed to make its first reconnaissance - observation flight over the Gulf of Mexico to assist in gathering information and intelligence on the oil spill. This and subsequent ("spotter") flights were authorized and instructed to be made by Lane Aviation to assist the  decision making within *DEEPWATER HORIZON* Incident Command System ("ICS"). United States Coast Guard and other authorized

personnel from various other public and private entities accompanied Lane Aviation aircraft to participate in and observe every spotter flight conducted by Lane Aviation.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 10.

13.     Lane Aviation subsequently made 82 additional spotter flights as authorized and directed.  The last such spotter flight made by Lane Aviation was on July 17, 2012. *See* Exhibit "A" - Grant Lane Decl. at ¶ 11.

14.     During the *DEEPWATER HORIZON* response efforts, Lane Aviation was subject to the ultimate direction and authority of the federal government, and all of Lane Aviation's response activities and flights were conducted and executed pursuant to the direction and authority of the federal government. *See* Exhibit "A" - Grant Lane Decl. at ¶ 12.

15.     During the *DEEPWATER HORIZON* response efforts, the federal government called upon Lane Aviation to mobilize and deploy its equipment and personnel to assist with and execute specific aspects of the federal response plan requiring and warranting the use of such aerial resources, all as determined and directed by the FOSC and the FOSC's representatives ("FOSCRs") within Unified Area Command ("UAC") and or other elements of the ICS.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 13.

16.     Lane Aviation's equipment and personnel were utilized and dispatched from operations conducted out of only one (1) of the five (5) incident command posts ("ICPs") established by the United States Coast Guard during the response.   Lane Aviation's resources were consolidated under the leadership of the Houma Incident Command Post ("ICP Houma"), and all of Lane Aviation's *DEEPWATER HORIZON* response activities, spotter and aerial dispersant application flights, were conducted out of KHUM Airport as directed and authorized by the federal government.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 14.

17.     All DEEPWATER HORIZON oil spill response aerial operations were managed by the Dispersant Group in the Operations Section of ICP Houma.  The Dispersant Group at ICP Houma ran flight operations out of two airports, NASA's John C. Stennis Space Center in Mississippi ("KHSA") and the Houma-Terrebonne Airport in Houma, Louisiana ("KHUM"). Each airport had an assigned liaison to the Dispersant Group at ICP Houma so that ICP could communicate directives, share information, coordinate response activities and remain informed of all details concerning operations at both airports.  *See* Exhibit "A" - Grant Lane Decl. at ¶ 15.

18.     Lane Aviation was one of several aerial application operators working under the direction of ICP Houma Dispersant Group and stationed at the KHUM during the *DEEPWATER HORIZON* clean-up efforts.  However, Lane Aviation did not participate in any operations, including aerial spotter and/or aerial dispersant flights, conducted out of  KHSA.  *See* Exhibit "A" - Grant Lane Decl. at ¶ 16.

19.     Lane Aviation's DEEPWATER HORIZON clean-up response activities were limited to assigned aerial operations authorized, ordered, directed and ultimately controlled by the federal government, including (i) spotter/reconnaissance/observation flights; (ii) aerial application of EPA-approved dispersants to oil on the surface of federal waters of the Gulf of Mexico; and (iii) spotter flights supporting spray aircraft during aerial application of EPA approved dispersants to oil on the surface of federal waters of the Gulf of Mexico.  *See* Exhibit "A" - Grant Lane Decl. at ¶ 17.

20.     For each and every aerial dispersant flight conducted during the *DEEPWATER HORIZON* clean-up response, federal government approval was necessary and such authorization came exclusively from the FOSC. The federal government also provided specific instructions with regard to when, where, and how to apply dispersants, including in what quantities and under

what conditions.   For each and every aerial dispersant flight conducted during the *DEEPWATER HORIZON* clean-up response, federal government officials and agencies, including the FOSC, the FOSCRs, those within the Dispersant Group, ICP Houma, UAC, and others such as the United States Coast Guard/NOAA/EPA SMART teams, monitored the operation in order to ensure that the government's response plans were being executed and conducted in a safe and effective manner.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 18.

21.   At all times, Lane Aviation, its pilots and all other employees participating in the DEEPWATER HORIZON response efforts followed approved directives, instructions and action plans issued from the FOSC and/or the FOSCRs at UAC or ICP Houma and set forth in Incident Action Plans which detailed the authorized response activities to be executed each day.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 19.

22.   Lane Aviation and its employees participating in the *DEEPWATER HORIZON* response efforts took no action independent of the federal government, outside of its assigned role in the federal ICS and/or beyond the scope of federal authorization.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 20.

23.   At no time during the DEEPWATER HORIZON response efforts was Lane Aviation involved with any sub-sea dispersant operations.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 21.

24.   At no time during the DEEPWATER HORIZON response efforts was Lane Aviation involved with any surface application of dispersants from vessels.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 22.

25.   At no time during the DEEPWATER HORIZON response efforts was Lane Aviation involved with shoreline clean-up operations.   *See* Exhibit "A" - Grant Lane Decl. at ¶

23.

26.     At no time during the DEEPWATER HORIZON response efforts was Lane

Aviation involved with any in situ burning operations.      *See* Exhibit "A" - Grant Lane Decl. at

¶ 24.

27.     At no time during the DEEPWATER HORIZON response efforts was Lane

Aviation involved with any aerial dispersant operations which may have been conducted in

the territorial waters of any State and/or in federal waters less than at least three (3) nautical

miles off the shoreline of any State.  *See* Exhibit "A" - Grant Lane Decl. at ¶ 25.

28.     At no time during the DEEPWATER HORIZON response efforts was Lane

Aviation involved with any aerial dispersant operations which may have been conducted in

federal waters off the coast of Texas, Mississippi, Alabama or Florida.  *See* Exhibit "A" - Grant

Lane Decl. at ¶ 26.

29.     At no time during the DEEPWATER HORIZON response efforts was Lane

Aviation involved with the engagement, training and/or supervision of any "VoO Plaintiffs,"

"Decontamination Plaintiffs" and/or "Onshore Plaintiffs" defined in Plaintiffs' First Amended

Master Complaint in Accordance with PTO No. 11 Section III.B(3) (Rec. Doc. 1812) (the "B3

Bundle Master Complaint"), and did not participate in any determinations made by the UAC

with respect to the use of respirators and/or other personal protective equipment by these or any

other classification of plaintiffs. *See* Exhibit "A" - Grant Lane Decl. at ¶ 27.

30.     At all times during the DEEPWATER HORIZON response efforts,

determinations regarding the use of dispersants were made by the FOSC, and Lane Aviation

complied with all such determinations.   *See* Exhibit "A" - Grant Lane Decl. at ¶ 28.

31.     At all times during the DEEPWATER HORIZON response efforts,

determinations regarding the type of dispersants to be applied were made by the FOSC, the FOSCRs, and/or other federal officials, and Lane Aviation complied with all such determinations.  *See* Exhibit "A" - Grant Lane Decl. at ¶ 29.

32.    At all times, Lane Aviation, its pilots and its other employees participating in the DEEPWATER HORIZON response efforts were subject to and worked at the direction of and under the authority of the FOSC, the FOSCRs, and/or other federal officials.  *See* Exhibit "A" - Grant Lane Decl. at ¶ 30.

33.    At all times during the DEEPWATER HORIZON response efforts, Lane Aviation, its pilots and its other employees acted at the direction of the United States pursuant to authority validly conferred by federal officials within ICS faithfully obeyed directives  given and within the scope of such authority to execute the will of the federal government.  *See* Exhibit "A" - Grant Lane Decl. at ¶ 31.

RESPECTFULLY SUBMITTED

LAW OFFICE OF GEORGE E. CROW


/s/ George E.  Crow
George E. Crow
TSBN 05151900
P.O. Box 30
Katy, TX  77492
For Overnight Physical Delivery use
1519 Miller Avenue
Katy, TX 77493
Telephone:  (281) 391-9275
Email:  georgecrow@earthlink.net

ATTORNEY FOR DEFENDANT LANE AVIATION, INC.


**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Statement of Undisputed Material Facts in Support of Lane Aviation, Inc.'s Motion for Summary Judgment on Derivative Immunity and Preemption Grounds has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this July 5, 2012.

/s/  George E. Crow

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "*DEEPWATER HORIZON*" in the | : | |
| GULF OF MEXICO, on | : | |
| APRIL 20,  2010 | : | SECTION: J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| *ALL CASES IN PLEADING BUNDLE* | : | JUDGE BARBIER |
| *SECTION III.B(3)* | : | MAG. JUDGE SHUSHAN |
| | : | |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

# Exhibit "A"

**DECLARATION OF GRANT LANE IN SUPPORT OF
LANE AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "*DEEPWATER HORIZON*" in the | : | |
| GULF OF MEXICO, on | : | |
| APRIL 20,  2010 | : | SECTION: J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| *ALL CASES IN PLEADING BUNDLE* | : | JUDGE BARBIER |
| *SECTION III.B(3)* | : | MAG. JUDGE SHUSHAN |
| | : | |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

## DECLARATION OF GRANT LANE IN SUPPORT OF
## LANE AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
## ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS

1.      My name is Grant Lane.  I am the President of Lane Aviation, Inc. ("Lane

Aviation").  I have served as President of Lane Aviation since before the April 20, 2010

explosion and fire on the *DEEPWATER HORIZON* mobile offshore drilling unit and throughout

the ensuing oil spill response and clean-up efforts.   I continue to serve in that capacity as of July

3, 2012.

2.      I submit this Declaration in support of Lane Aviation's Motion for Summary

Judgment on Derivative Immunity and Preemption Grounds. The facts set forth herein are based

on my personal knowledge and/or the books and records of Lane Aviation.

3.      Lane Aviation is a family-owned and operated small business based in Richmond,

Texas.  Lane Aviation was founded in 1945 by WWII veteran Marine Pilot George Lane.

Today, Lane Aviation is the oldest and one of the most successful dealers of the world's leading

agricultural aircraft, the Air Tractor.  Today's Air Tractor is a highly sophisticated,

Turbo-Propellor, GPS equipped and remarkably safe aircraft.   I was on the scene during Lane

Aviation's flight operations relevant to this lawsuit.

      4.      On May 6, 2010, Lane Aviation entered into an Agreement for Provision of Response Resources" ("Agreement") with National Response Corporation ("NRC").   A true and correct copy of which is attached hereto as Exhibit "1."   *See* Exhibit 1.

      5.      NRC at all times relevant to this lawsuit was classified as an Oil Spill Removal Organization pursuant to the United States Coast Guard's Oil Spill Removal Organization program.   In its capacity as an emergency Oil Spill Removal Organization, NRC "provides personnel, equipment, supplies and other resources for responding to discharges of oil and hazardous substances from vessels and/or facilities and other emergency response situations, which resources NRC owns or procures by subcontract." The Agreement describes work to be performed under the National Contingency Plan ("NCP") at the direction of the federal government.

      6.      Pursuant to the Agreement, Lane Aviation agreed to maintain its aerial resources and make them available to NRC for deployment if called upon and authorized to respond to a discharge.

      7.      Around May 5, 2010, NRC and O'Brien's Response Management Inc. ("O'Brien's") contacted Lane Aviation to provide notice of the incident, advise of the potential for discharge, and to place Lane Aviation aerial resources on stand-by to assist in responding to the situation.

      8.      On May 18, 2010, the Federal On-Scene Coordinator ("FOSC"), the federal official designated to direct the *DEEPWATER HORIZON* oil spill response, authorized and instructed Lane Aviation to conduct a 204 gallon aerial application flight to apply EPA-approved dispersants to oil on the surface of federal waters in the Gulf of Mexico.   In accordance with

such authorization and instruction, Pilot Aldo Leonardi, in aircraft N9002K, conducted Lane

Aviation's first aerial dispersant flight from the Houma-Terrebonne Airport in Houma, Louisiana

("KHUM") for the *DEEP WATER HORIZON* oil spill response. Said flight was accompanied

by a spotter aircraft with United States Coast Guard and O'Brien's personnel on board.

9.      Lane Aviation subsequently made 21 additional aerial application flights as

authorized and directed. The last such flight made by Lane Aviation was on July 2, 2010.

10.     On May 28, 2010, Lane Aviation was authorized and instructed to make its first

reconnaissance - observation flight over the Gulf of Mexico to assist in gathering information

and intelligence on the oil spill. This and subsequent ("spotter") flights were authorized and

instructed to be made by Lane Aviation to assist the decision making within *DEEPWATER*

*HORIZON* Incident Command System ("ICS"). United States Coast Guard and other authorized

personnel from various other public and private entities accompanied Lane Aviation aircraft to

participate in and observe every spotter flight conducted by Lane Aviation.

11.     Lane Aviation subsequently made 82 additional spotter flights as authorized and

directed. The last such spotter flight made by Lane Aviation was on July 17, 2012.

12.     During the *DEEPWATER HORIZON* response efforts, Lane Aviation was subject

to the ultimate direction and authority of the federal government, and all of Lane Aviation's

response activities and flights were conducted and executed pursuant to the direction and

authority of the federal government.

13.     During the *DEEPWATER HORIZON* response efforts, the federal government

called upon Lane Aviation to mobilize and deploy its equipment and personnel to assist with and

execute specific aspects of the federal response plan requiring and warranting the use of such

aerial resources, all as determined and directed by the FOSC and the FOSC's representatives

("FOSCRs") within Unified Area Command ("UAC") and or other elements of the ICS.

14.     Lane Aviation's equipment and personnel were utilized and dispatched from operations conducted out of only one (1) of the five (5) incident command posts ("ICPs") established by the United States Coast Guard during the response.   Lane Aviation's resources were consolidated under the leadership of the Houma Incident Command Post ("ICP Houma"), and all of Lane Aviation's *DEEPWATER HORIZON* response activities, spotter and aerial dispersant application flights, were conducted out of KHUM Airport as directed and authorized by the federal government.

15.     All *DEEPWATER HORIZON* oil spill response aerial operations were managed by the Dispersant Group in the Operations Section of ICP Houma.   The Dispersant Group at ICP Houma ran flight operations out of two airports, NASA's John C. Stennis Space Center in Mississippi ("KHSA") and the Houma-Terrebonne Airport in Houma, Louisiana ("KHUM").   Each airport had an assigned liaison to the Dispersant Group at ICP Houma so that ICP could communicate directives, share information, coordinate response activities and remain informed of all details concerning operations at both airports.

16.     Lane Aviation was one of several aerial application operators working under the direction of ICP Houma Dispersant Group and stationed at the KHUM during the *DEEPWATER HORIZON* clean-up efforts.   However, Lane Aviation did not participate in any operations, including aerial spotter and/or aerial dispersant flights, conducted out of KHSA.

17.     Lane Aviation's *DEEPWATER HORIZON* clean-up response activities were limited to assigned aerial operations authorized, ordered, directed and ultimately controlled by the federal government, including (i) spotter/reconnaissance/observation flights; (ii) aerial application of EPA-approved dispersants to oil on the surface of federal waters of the Gulf

of Mexico; and (iii) spotter flights supporting spray aircraft during aerial application of EPA approved dispersants to oil on the surface of federal waters of the Gulf of Mexico.

18.     For each and every aerial dispersant flight conducted during the *DEEPWATER HORIZON* clean-up response, federal government approval was necessary and such authorization came exclusively from the FOSC. The federal government also provided specific instructions with regard to when, where, and how to apply dispersants, including in what quantities and under what conditions.   For each and every aerial dispersant flight conducted during the *DEEPWATER HORIZON* clean-up response, federal government officials and agencies, including the FOSC, the FOSCRs, those within the Dispersant Group, ICP Houma, UAC, and others such as the United States Coast Guard/NOAA/EPA SMART teams, monitored the operation in order to ensure that the government's response plans were being executed and conducted in a safe and effective manner.

19.     At all times, Lane Aviation, it pilots and all other employees participating in the *DEEPWATER HORIZON* response efforts followed approved directives, instructions and action plans issued from the FOSC and/or the FOSCRs at UAC or ICP Houma and set forth in Incident Action Plans which detailed the authorized response activities to be executed each day.

20.     Lane Aviation and its employees participating in the *DEEPWATER HORIZON* response efforts took no action independent of the federal government, outside of its assigned role in the federal ICS and/or beyond the scope of federal authorization.

21.     At no time during the *DEEPWATER HORIZON* response efforts was Lane Aviation involved with any sub-sea dispersant operations.

22.     At no time during the *DEEPWATER HORIZON* response efforts was Lane Aviation involved with any surface application of dispersants from vessels.

23.     At no time during the *DEEPWATER HORIZON* response efforts was Lane Aviation involved with shoreline clean-up operations.

24.     At no time during the *DEEPWATER HORIZON* response efforts was Lane Aviation involved with any *in situ* burning operations.

25.     At no time during the *DEEPWATER HORIZON* response efforts was Lane Aviation involved with any aerial dispersant operations which may have been conducted in the territorial waters of any State and/or in federal waters less than at least three (3) nautical miles off the shoreline of any State.

26.     At no time during the *DEEPWATER HORIZON* response efforts was Lane Aviation involved with any aerial dispersant operations which may have been conducted in federal waters off the coast of Texas, Mississippi, Alabama or Florida.

27.     At no time during the *DEEPWATER HORIZON* response efforts was Lane Aviation involved with the engagement, training and/or supervision of any "VoO Plaintiffs," "Decontamination Plaintiffs" and/or "Onshore Plaintiffs" defined in Plaintiffs' First Amended Master Complaint in Accordance with PTO No. 11 Section III.B(3) (Rec. Doc. 1812) (the "B3 Bundle Master Complaint"), and did not participate in any determinations made by the UAC with respect to the use of respirators and/or other personal protective equipment by these or any other classification of plaintiffs.

28.     At all times during the *DEEPWATER HORIZON* response efforts, determinations regarding the use of dispersants were made by the FOSC, and Lane Aviation complied with all such determinations.

29.     At all times during the *DEEPWATER HORIZON* response efforts, determinations regarding the type of dispersants to be applied were made by the FOSC, the FOSCRs, and/or

other federal officials, and Lane Aviation complied with all such determinations.

30.     At all times, Lane Aviation, its pilots and its other employees participating in the *DEEPWATER HORIZON* response efforts were subject to and worked at the direction of and under the authority of the FOSC, the FOSCRs, and/or other federal officials.

31.     At all times during the *DEEPWATER HORIZON* response efforts, Lane Aviation, its pilots and its other employees acted at the direction of the United States pursuant to authority validly conferred by federal officials within ICS faithfully obeyed directives  given and within the scope of such authority to execute the will of the federal government.

I declare under the penalty of perjury under the laws of the United States of America that the statements made in this declaration are true and correct.

EXECUTED on July 3, 2012.

Grant Lane

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  OIL SPILL by the OIL RIG      :      MDL NO. 2179
        "*DEEPWATER HORIZON*" in the   :
        GULF OF MEXICO, on        :
        APRIL 20,  2010          :      SECTION: J
                                  :
THIS DOCUMENT RELATES TO:      :
                                  :
*ALL CASES IN PLEADING BUNDLE*   :      JUDGE BARBIER
*SECTION III.B(3)*                :      MAG. JUDGE SHUSHAN
                                  :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**DECLARATION OF GRANT LANE IN SUPPORT OF**
**LANE AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT**
**ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS**

# Exhibit "1"

# Agreement for Provision of Response Resources

**National Response Corporation**
**Agreement for Provision of**
**Response Resources**

**THIS AGREEMENT FOR PROVISION OF RESPONSE RESOURCES** is made as
of the date specified on the signature page hereof between:

1

**National Response Corporation**
**Agreement for Provision of**
**Response Resources**

(1)   **NATIONAL RESPONSE CORPORATION**, a Delaware corporation ("NRC"); and

(2)   The party described on the signature page hereof (the "Contractor").

**WHEREAS:**

(A)   NRC as an emergency response spill removal organization provides personnel, equipment, supplies and other resources for responding to discharges of oil and hazardous substances from vessels and/or facilities and other emergency response situations, which resources NRC owns or procures by subcontract;

(B)   NRC has established a network of independent contractors with personnel, equipment, supplies and other resources for responding to discharges of oil and hazardous substances from vessels and/or facilities and other emergency situations;

(C)   The Contractor owns, controls or has contracted for the personnel, equipment, supplies and/or other resources described in Schedule 1 (collectively, the "Specified Resources");

(D)   The Contractor has agreed to make available to NRC the Specified Resources, subject to the terms and conditions of this Agreement.

**NOW THEREFORE, THE PARTIES HAVE AGREED AS FOLLOWS:**

1.   In this Agreement (including Schedules):

"Force Majeure" means the prevention or delay of performance under this Agreement by a cause or causes beyond the reasonable control of either party and not contemplated as a possible circumstance in which services hereunder are to be performed.  Such causes shall include, but not be limited to, acts of God, acts of public enemies, war, rebellion, sabotage, riot, fire, explosion, accident, or flood, Governmental laws, regulations, labor trouble, strike or lockout;

"Network" means collectively NRC and the independent contractors with whom NRC from time to time contracts for the provision of response resources, including the Contractor;

"Specified Resources" means the personnel, equipment, supplies and/or other resources owned, controlled or contracted for by the Contractor and described in Schedule 1.

2.   **NRC'S UNDERTAKINGS**

2.1   NRC shall obtain and maintain Oil Spill Removal Organization classifications for the different operating environments in all Captain-of-the-Port Zones in which NRC provides response services under U.S. Federal law, and shall exercise due diligence to obtain and maintain any similar classification as may be required and/or available under any relevant state laws.

2.2   The Contractor shall be paid upon payment by NRC's Responsible Party client to NRC.  In any event, NRC shall use its best efforts to pay the Contractor in accordance with the Contractor's time and materials rates set out in Schedule 2 during any period the Contractor shall deploy the Specified Resources or any part thereof, or perform other services, pursuant to a request by NRC under Clause 3.3 hereof.  In the event that disputes arise, the

2

**National Response Corporation**
**Agreement for Provision of**
**Response Resources**

Contractor's participation may be required to obtain payment and it may result in final payment beyond the above noted terms.

2.3 The Contractor's time and materials rates referred to in Schedule 2 shall be determined annually on February 18 and shall remain in effect until the succeeding February 18. If either party wishes to change any of the Contractor's time and materials rates, such party shall propose the change(s) to the other party ninety (90) days prior to February 18, and both parties shall negotiate in good faith with respect to such proposal. If the parties fail to agree, within forty-five (45) days of such proposal, on any change to the Contractor's time and material rates shall remain in effect for the succeeding year.

3.   **CONTRACTOR'S UNDERTAKINGS**

3.1 The Contractor hereby represents, warrants and covenants that it owns or controls, and shall continue to own and control, by contract or other U.S. Coast Guard approved means, the Specified Resources. The Contractor undertakes, to the extent commercially practicable, to maintain the Specified Resources at the disposal of NRC for use in the Network in accordance with this Agreement.

3.2 The Contractor shall at all times:

(a)   provide NRC with quarterly updates regarding the status of the Specified Resources, and shall notify NRC promptly of any significant change to the Specified Resources or otherwise which would materially adversely affect the ability of the Contractor to perform its obligations hereunder;

(b)   ensure that the training of the Contractor's personnel complies with requirements under U.S. Federal law and any applicable State laws, and provide to NRC records, including certifications and licenses, of such training;

(c)   upon reasonable notice, make the Specified Resources available for inspection by NRC;

(d)   provide NRC with copies of the Contractor's documentation for reporting and accounting with respect to oil and hazardous substance spill response, including invoices and daily worksheets, contained in Schedule 3, or the NRC Universal Worksheet in Exhibit 1 when requested by NRC;

(e)   upon reasonable notice, allow NRC to review originals or copies of all records verifying the availability of personnel included in Specified Resources;

(f)   allow NRC with reasonable notice to conduct field audits of Specified Resources deployed pursuant to this Agreement.

3.3 The Contractor shall at any time upon request of NRC:

(a)   deploy all or any part of the Specified Resources in accordance with Clause 4.1;

(b)   provide training of non-Contractor personnel in oil spill response activities and maintain records of such training;

3

**National Response Corporation**
**Agreement for Provision of**
**Response Resources**

(c)    deploy Specified Resources in connection with exercises and drills, and provide records of such exercises and drills to NRC;

(d)    provide information relating to the Specified Resources including any information relevant to any legal encumbrances and local practices.

3.4    The Contractor shall keep proper books, records and accounts relating to the Specified Resources and its performance hereunder in accordance with generally accepted accounting principles and, upon reasonable notice from NRC, the Contractor shall permit NRC or its representatives to review such books, records and accounts relevant to its performance hereunder.

3.5    The Contractor consents to NRC identifying all Specified Resources as resources controlled or contracted for by NRC for purposes of NRC's marketing the Network, classification as an Oil Spill Removal Organization under U.S. Federal law or classification under any similar state or local laws.

4.    **RESPONSE PROCEDURE**

4.1    NRC may, at any time, request the Contractor (orally or otherwise) to deploy all or any part of the Specified Resources for purposes of oil or hazardous substances spill response activities and other emergency situations. Upon receipt of any such request, the Contractor shall deploy such Specified Resources as directed by NRC.

4.2    Any request by NRC to deploy Specified Resources under Clause 4.1 shall include the following information, to the extent available:

(a)    the name of the relevant owner, operator, charterer by demise, or authorized agent of a vessel or facility with whom NRC has contracted;
(b)    the name and call sign of the relevant vessel, or the name, address and location of the relevant facility;
(c)    the location of the spill including geographic coordinates;
(d)    the nature and estimated quantity of the oil discharged;
(e)    the approximate time of the incident;
(f)    the weather conditions on the scene;
(g)    the condition of vessel or facility;
(h)    the name of the Clients "Qualified Individual" Spill Manager and "Federal OnScene Coordinator";
(i)    the Specified Resources required to be deployed and the location(s) including geographic coordinates for initial deployment;
(j)    any limitation on charges to be incurred by the Contractor by reason of the request;
(k)    NRC's incident control number and NRC contact person.

4.3    If, upon receipt of a request by NRC under Clause 4.1 the Contractor shall for any reason be unable to comply with such request, the Contractor shall immediately notify NRC of such inability.

4.4    Subject to prior NRC approval, the Contractor may subcontract with any other party for the provision of Specified Resources, but the Contractor shall remain responsible to NRC hereunder and NRC shall have no obligation to the Contractor's subcontractor.

4.5    The Contractor shall submit daily worksheets to NRC.

4

National Response Corporation
Agreement for Provision of
Response Resources

4.6    To facilitate payment to the Contractor, the Contractor shall invoice NRC within five (5) days following a request from NRC pursuant to Clause 4.1 and thereafter on such basis as directed by NRC not to exceed thirty (30) days for charges relating to any such request.  The Contractor shall invoice  NRC monthly for any other charges relating to this Agreement.  All invoices shall be in the form provided in Schedule 3 and shall be accompanied by supporting documents in accordance with good business practice.

.7Anything herein contained to the contrary notwithstanding, the Contractor shall not be required to comply with any request to deploy Specified Resources upon the occurrence of an event of Force Majeure, or where, in the good faith judgment of the Contractor, circumstances in which the response activities are to be conducted present an unreasonable risk to life or property.

5.    **LIABILITY AND INDEMNITY**

.1 Allocation of Liabilities.
    (a)    Contractor.  Contractor shall be responsible for all loss, damage, expense, liability, claim and/or suit applicable to the Specified Resources, howsoever caused and even if resulting from the negligence or other legal fault of NRC, except for those matters specifically allocated to NRC.
    (b)    NRC.  NRC shall be responsible for all loss, damage, expense, liability, claim and/or suit applicable to its (leased or owned) equipment.
    (c)    Both.  As to any matter not specifically addressed in this agreement, each party shall be responsible for loss, damage, expense, liability, claim and/or suit to the extent of its proportionate degree of fault or legal liability.

.2 Indemnity.  Each party agrees to indemnify and hold harmless the other party (including costs and legal fees) of and from any loss, damage, claim, liability and/or suit allocated to it pursuant to subsection 5.1, above, and/or elsewhere in this agreement.  In furtherance of the foregoing, each party shall waive any immunity from suit and/or exclusivity of remedy afforded by any workers compensation act or similar law.

6. **INSURANCE**

6.1    The Contractor shall, at its own expense, procure and maintain in effect during the term of this Agreement insurances in respect of the Contractor owned Specified Resources in accordance with Schedule 4.

6.2    All such insurance shall be primary insurance without right of contribution against any other insurance maintained by NRC.  Each policy of insurance to the extent practicable shall provide that NRC shall be a named insured and shall contain a cross-liability clause with respect to the named insureds thereunder.  Each such policy shall provide for not less than thirty (30) days prior written notice to NRC of the cancellation or any material change thereof, and shall contain provisions waiving underwriter's rights of subrogation against any insured named therein. The forms of each such policy and the underwriters thereof shall be approved by NRC.

6.3    Within thirty (30) days of the date hereof, and not later than March 1 of each year hereafter, the Contractor shall furnish NRC certificates evidencing the Contractor's compliance with this Clause.

6.4    NRC shall be responsible for maintaining its own property and liability insurance.

7.    **CONFIDENTIALITY**

National Response Corporation
Agreement for Provision of
Response Resources

The Contractor and NRC (including their respective employees, officers, agents and directors) agree that each and every provision of this Agreement and the other instruments and agreements referred to herein shall be maintained as confidential and will not be disclosed to third parties without the prior written consent of the other party, except for any disclosure necessary for the performance of this Agreement or required by any applicable law or regulation.

8. **NON-ASSIGNMENT**

   **THIS AGREEMENT IS PERSONAL TO THE PARTIES AND MAY NOT BE ASSIGNED BY EITHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY.**

9. **TERM**

   9.1    This Agreement shall continue in full force and effect for a period of five (5) years from the date hereof and for successive periods of one year thereafter (each such period a "Contract Year") unless either party shall notify the other party not less than ninety (90) days prior to the end of the current Contract Year that the notifying party elects not to extend this Agreement in which event this Agreement shall terminate at the end of the current Contract Year.

   9.2    NRC shall be entitled to terminate this Agreement forthwith:

   (a)    if any representation or warranty made by the Contractor hereunder shall be incorrect or misleading in any material respect;

   (b)    upon the occurrence of any event relating to the Specified Resources or otherwise which would materially adversely affect the ability of the Contractor to perform its obligations hereunder;

   (c)    if Contractor shall propose a change in the current Contractor's time and material rates, and the parties shall not agree to any such change pursuant to Clause 2.3; or

   (d)    if the Contractor shall for any reason be unable to comply with (i) any request by NRC under Clause 4.1, or (ii) any request by NRC under Clause 3.3 for other services within thirty (30) days of such request.

   9.3    the Contractor shall be entitled to terminate this Agreement for any reason on    ninety (90) days written notice to NRC

10. **LAW, JURISDICTION AND ARBITRATION**

   The parties shall attempt to resolve any disputes, controversy or differences concerning the meaning, application, performance or breach of this Agreement by negotiation in good faith. If any of the foregoing are not resolved within 30 days, the parties hereto agree that, upon receipt of a written notice of arbitration from either party, any disputes arising under this Agreement shall be arbitrated in the State of New York before three persons, consisting of an arbitrator appointed by NRC, an arbitrator appointed by the Contractor, and a third by the two so chosen; the decision of any two of the arbitrators shall be final and may include an award of attorneys' fees. Judgment may be entered upon any award in any State or Federal court located in the State of New York to the jurisdiction of which the parties hereby submit. Anything herein to the contrary notwithstanding, any dispute arising under this Agreement which gives rise to a claim by

National Response Corporation
Agreement for Provision of
Response Resources

either party against the other in excess of _____ Dollars ($ ____ ) may be decided by any State or Federal court located in the State of New York to the jurisdiction of which the parties hereby submit. This Agreement shall be governed by and construed in all respects in accordance with the law of the State of New York.

11.  **MISCELLANEOUS**

11.1   This Agreement and Schedules to this Agreement represent the entire understanding and agreement between NRC and the Contractor with respect to the matters provided herein and supersede any and all prior agreements, whether written or oral, that may exist between NRC and the Contractor regarding same. No terms, conditions, prior course of dealings, course of performance, usage or trade, understandings, purchase orders or agreements purporting to modify, vary, supplement or explain a provision of this Agreement shall be effective unless set forth in writing and signed by representative of each party authorized to amend this Agreement.

11.2   The Contractor shall be an independent contractor and shall not be an agent of NRC.

11.3   All notices or other communications under this Agreement shall be addressed as indicated on the signature page hereof, or to such other address as either party shall notify the other from time to time.

**IN WITNESS** whereof the parties have duly executed this Agreement as of the date specified below:

Date of this Agreement: _____6 MAY 2010_____

NATIONAL RESPONSE CORPORATION               CONTRACTOR

By: _____          By: _____

Name: Steven Candito                    Name: Grant Lane
Position: President                     Position: President

Address:                                Address:
National Response Corporation           Lane Aviation, Inc.
3500 Sunrise Hwy                        PO Box 432
Great River, NY 11739                   Rosenberg, TX 77471

Telephone: (631) 224-9141               Telephone: 281-342-5451
Telefacsimile: (516) 224-9082           Telefacsimile 281-232-5401
                                        Telex:

7