**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179 |
| THIS DOCUMENT RELATES TO: | SECTION: J |
| *ALL CASES IN PLEADING BUNDLE SECTION III.B(3)* | JUDGE BARBIER MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . .  . . . . . .    . . . . . . . . . . . . . . . . . . . . . . . .

**CLEAN-UP RESPONDER DEFENDANTS' JOINT REPLY MEMORANDUM
IN SUPPORT OF THEIR INDIVIDUAL MOTIONS FOR SUMMARY
JUDGMENT ON DERIVATIVE IMMUNITY AND PREEMPTION GROUNDS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 6

I.     THE COURT HAS ALREADY CORRECTLY HELD THAT
DERIVATIVE IMMUNITY AND IMPLIED PREEMPTION ARE
AVAILABLE IN THE CONTEXT OF AN OIL SPILL OF NATIONAL
SIGNIFICANCE ...................................................................................... 6

      A.   Derivative Immunity Is Available In This Context ........................................ 6

      B.   The PSC's Implied Preemption Arguments Are Misguided ......................... 9

II.    THE PSC FAILS TO RAISE A GENUINE ISSUE OF FACT
MATERIAL TO THE CLEAN-UP RESPONDER DEFENDANTS'
ENTITLEMENT TO DERIVATIVE IMMUNITY OR A FINDING OF
IMPLIED PREEMPTION .................................................................................. 11

      A.   Eleven of the PSC's Thirteen Affidavits and Declarations Fail to
Implicate Any Clean-Up Responder Defendant ........................................... 14

      B.   The Only Two Declarations That Reference Any Clean-Up Responder
Defendant Fail to Raise a Genuine Issue of Material Fact ........................... 18

      C.   The PSC's Other Allegations Regarding Safety Also Fail to Create a
Genuine Issue of Material Fact .................................................................... 20

III.   THE PSC'S REQUEST FOR FURTHER DISCOVERY IS BASELESS
GIVEN ITS CONSCIOUS AND DELIBERATE REFUSAL TO
PARTICIPATE IN THE COURT-ORDERED LIMITED B3
DISCOVERY PROCESS .................................................................................. 22

CONCLUSION .................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arizona v. United States*,
 __ S. Ct. __, 2012 WL 2368661 (June 25, 2012) ...................................................................10

*Beattie v. Madison Cnty. Sch. Dist.*,
 254 F.3d 595 (5th Cir. 2001) ................................................................................................5, 28

*Brown v. Olin Chem. Corp.*,
 231 F.3d 197 (5th Cir. 2000) .......................................................................................................4

*Coleman v. Omega Protein, Inc.*,
 No. 10-1977, 2011 WL 976543 (E.D. La. Mar. 15, 2011) ................................................23, 29

*Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*,
 671 F.3d 512 (5th Cir. 2012) .....................................................................................................12

*Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*,
 458 U.S. 141 (1982) .............................................................................................................10, 11

*Filarsky v. Delia*,
 132 S. Ct. 1657 (2012) .................................................................................................................9

*Geier v. Am. Honda Motor Co.*,
 529 U.S. 861 (2000) ...................................................................................................................10

*Hines v. Davidowitz*,
 312 U.S. 52 (1941) ...............................................................................................................10, 11

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*,
 2011 WL 4575696 (E.D. La. 2011) .................................................................................... passim

*In re World Trade Ctr. Disaster Site Litig.*,
 521 F.3d 169 (2d Cir. 2008) .....................................................................................................7, 9

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
 939 F.2d 1257 (5th Cir. 1991) ...................................................................................................28

*Jones v. State Farm Fire & Cas. Co.*,
 677 F. Supp. 2d 923 (E.D. La. 2009) ........................................................................................12

*Little v. Liquid Air Corp.*,
 37 F.3d 1069 (5th Cir. 1994) .....................................................................................................13

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Orthopedic & Sports Injury Clinic v. Wang Labs, Inc.*,
  922 F.2d 220 (5th Cir. 1991) .......................................................................................4

*Pfeil v. Rogers*,
  757 F.2d 850 (7th Cir. 1985) .....................................................................................28

*SEC v. Spence & Green Chem. Co.*,
  612 F.2d 896 (5th Cir. 1980) .....................................................................................23

*Travelers Ins. Co. v. St. Jude Med. Office Bldg., Ltd. P'ship*,
  843 F. Supp. 138 (E.D. La. 1994) ..............................................................................13

*Truck Treads, Inc. v. Armstrong Rubber Co.*,
  818 F.2d 427 (5th Cir. 1987) .....................................................................................13

*Wells v. SmithKline Beecham Corp.*,
  601 F.3d 375 (5th Cir. 2010) .....................................................................................24

**STATUTES**

33 U.S.C. § 1321(c)(4)...........................................................................................7, 8

33 U.S.C. § 1321(j)(8) ...............................................................................................8

**OTHER AUTHORITIES**

FED. R. CIV. P. 37(b)(2)(A) ......................................................................................12

FED. R. CIV. P. 56(d) ................................................................................................22

The Clean-Up Responder Defendants[1] respectfully submit this Joint Reply Memorandum in further support of their individual motions for summary judgment.  Although some of the Clean-Up Responder Defendants are filing short individual reply memoranda detailing the plaintiffs' utter failure to offer any evidence vis-à-vis specific defendants, for purposes of judicial efficiency the Clean-Up Responder Defendants also submit this joint reply to present certain common responses to the arguments made by the Plaintiffs' Steering Committee ("PSC") in its Omnibus Memorandum in Opposition (Rec. Doc. 6696) (hereinafter "PSC Opp.").[2] Because the PSC has failed to raise a genuine issue of fact material to the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments, the Court should grant the Clean-Up Responder Defendants' motions and dismiss all remaining claims against them with prejudice.

## INTRODUCTION

The overriding theme of the PSC's omnibus opposition is that more discovery is necessary before the Court can resolve the Clean-Up Responder Defendants' immunity and preemption arguments.  *See* PSC Opp. at 3 (arguing that these issues are not "ripe for resolution").  But this is nothing more than the PSC's latest effort to delay indefinitely the resolution of these motions for summary judgment.  Indeed, the PSC readily concedes in footnote 1 of its brief that it <u>already</u> had an opportunity pursuant to Magistrate Judge Shushan's

---

[1]  Marine Spill Response Corporation, Airborne Support, Inc., Airborne Support International, Inc., Lynden Incorporated, Dynamic Aviation Group, Inc., International Air Response, Inc., Lane Aviation, Inc., National Response Corporation, O'Brien's Response Management Inc., Tiger Rentals, Ltd., The Modern Group GP-SUB, Inc., The Modern Group, Ltd., and DRC Emergency Services, LLC.

[2]  The PSC also filed a separate opposition to Lane Aviation's motion for summary judgment.  *See* Rec. Doc. 6803.  Beyond the two filings by the PSC, no other oppositions were filed to the Clean-Up Responder Defendants' motions for summary judgment.  Although Plaintiff Malcolm Coco filed an opposition to Nalco's summary judgment motion, *see* Rec. Doc. 6705, Plaintiff Coco has not opposed the Clean-Up Responder Defendants' motions.

Schedule for Limited B3 Discovery to conduct the discovery it now claims it needs to oppose the instant motions, but that it made a "strategic" decision not to engage in such discovery in lieu of a desperate and, as this Court found (*see* Rec. Doc. 6247), ill-conceived eleventh-hour effort to dismiss the Clean-Up Responder Defendants from the B3 Bundle Master Complaint without prejudice.  *See* PSC Opp. at 4 n.1; *see also* Schedule for Limited B3 Discovery (Rec. Doc. 5000) (giving the PSC until April 30, 2012 to take "limited 30(b)(6) depositions of United States and Clean-Up Responder witnesses, and limited depositions of other witnesses, relevant to [the] Clean-Up Responders' preemption/derivative immunity defenses").  Thus, the PSC's statements that it "had no opportunity to depose any [government officials or] a single pilot . . . [or] a site supervisor employed by one of the Clean-Up Responder Defendants" are plainly false.  *See* PSC Opp. at 3-4.  The PSC never requested any such depositions during the limited B3 discovery period and did not ask the Court to extend that discovery period after its motion to dismiss the Clean-Up Responder Defendants without prejudice was denied.

Notwithstanding its request for further discovery, the PSC has submitted thirteen affidavits and declarations from individuals that complain about various aspects of the response operations.  Notably, as further described below, the Clean-Up Responder Defendants requested information like this in written discovery served on the PSC during the limited B3 discovery period, but the PSC refused to provide any responsive information at that time.  As a result, the Court should disregard all of these affidavits and declarations given the PSC's improper manipulation of the discovery process.  Regardless, even if the PSC's affidavits and declarations are considered, the PSC has failed to raise any genuine issues of fact material to the issues of derivative immunity and implied preemption.

The United States of America has stipulated that it authorized, directed, and controlled all of the Clean-Up Responder Defendants' actions during the response.  *See generally* Joint Stipulations of Fact Between the Clean-Up Responder Defendants and the United States of America, previously filed as Ex. 7 to Clean-Up Responder Defendants' Original Joint Memorandum (Rec. Doc. 6545-7) (hereinafter "Joint Stipulations").  In response, the plaintiffs have failed to offer any competent evidence to refute the federal government's stipulations or the overwhelming documentary and deposition evidence submitted by the Clean-Up Responder Defendants that independently confirm those stipulations.[3]  Indeed, the bulk of the PSC's "evidence" fails to even identify any alleged wrongdoing by any Clean-Up Responder Defendant—rather, most of the complaints lodged by the PSC and the individuals that have filed affidavits and declarations concern conduct by BP or other non-parties, calling into question the PSC's basis for naming the Clean-Up Responder Defendants in the B3 Bundle Master Complaint in the first place.  The PSC recognizes this fatal flaw in its "evidence," but again unconvincingly argues that this shortcoming demonstrates the need for further discovery.  *See* PSC Opp. at 29 n.18.  The PSC has had ample opportunity to conduct discovery, but made a "strategic" decision not to do so.  Accordingly, the PSC's failure to offer any evidence refuting the facts to which the

---

[3] The PSC argues that the Court should not consider the stipulations entered into by the United States and the Clean-Up Responder Defendants because they "have not been permitted to test the veracity of the stipulations through deposition testimony."  *See* PSC Opp. at 25-26.  As noted above, however, the PSC had a full and fair opportunity to "test the veracity" of those stipulations but made the "strategic" decision not to do so.  Thus, the PSC's statements that "[i]t was not contemplated . . . that Plaintiffs would be permitted to test the veracity of the stipulations by deposing any government officials," *see* PSC Opp. at 23, and that "Defendants expressly rely on 'facts' concerning the government's conduct when Plaintiffs have had no opportunity to contest those 'facts' by deposing the government decision-makers," *see* PSC Opp. at 24, are simply false and flatly contradicted by the text of Magistrate Judge Shushan's Order. Accordingly, the PSC's plea for the Court to ignore the stipulations rings hollow and should be rejected.

government has stipulated (and which are independently confirmed by other evidence submitted by the Clean-Up Responder Defendants) is fatal to its effort to oppose the instant motions.[4]

The PSC also re-hashes several legal arguments that the Court has already rejected, and offers several others that can be turned aside in short order, to contend that derivative immunity is not even available to the Clean-Up Responder Defendants. None of those arguments, however, call into question the Court's previous holding that the Clean-Up Responder Defendants would be entitled to derivative immunity if they establish the necessary factual predicate for such immunity. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2011 WL 4575696 (E.D. La. 2011). Ultimately, the essential function of derivative immunity is to shield the Clean-Up Responder Defendants when there might otherwise be a basis for liability for the types of harms/wrongs alleged by the PSC—indeed, if no one claimed to have been injured as a result of the Clean-Up Responder Defendants executing the federal government's directives during the response, the Clean-Up Responder Defendants would have no need for the protection that derivative immunity affords. It is simply not the case that the Clean-Up Responder Defendants must demonstrate that they acted non-negligently during the response; rather, for purposes of the instant motions, they must show—as they have—that the

---

[4] In this regard, the PSC's suggestion that "an appeal to the doctrine of *res ipsa loquitur* should satisfy the Court until a more thorough account is possible" is woefully misplaced. *See* PSC Opp. at 29 n.18. As the Fifth Circuit has held, "[w]hen, as here, the source of the harm is not apparent on the face of the facts alleged, the plaintiff must put forth expert testimony to show that the harm could only have been caused by the negligence of the defendant" in order to rely on the doctrine of *res ipsa loquitur*. *See Brown v. Olin Chem. Corp.*, 231 F.3d 197, 201 (5th Cir. 2000) (affirming summary judgment in a chemical exposure case). Moreover, plaintiffs have not established—and cannot establish—that the Clean-Up Responder Defendants had "exclusive control" of the Gulf of Mexico during the response operations and this too precludes the application of the *res ipsa* doctrine. *See, e.g., Orthopedic & Sports Injury Clinic v. Wang Labs, Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) (noting that "*res ipsa loquitur* does not apply" because the plaintiff "has not shown that [the defendant] had exclusive control of the computer and the damaged disk at all times during which the data might have been lost").

federal government validly conferred authority upon them to execute their response operations and that they did not violate the federal government's instructions and directives.

Similarly, with respect to the Clean-Up Responder Defendants' implied preemption argument, the PSC responds with various authorities suggesting that courts should hesitate before finding *state law* preempted in this context. But this Court has already held that the B3 claims are governed by the general maritime law (not state law), such that the PSC's preemption arguments are largely inapposite. *Id.* at *3. The B3 claims are impliedly preempted because, as the United States has stipulated, the federal government authorized and directed the Clean-Up Responder Defendants' actions during the DEEPWATER HORIZON response and the Clean-Up Responder Defendants were compelled by law to obey the federal government's directives.

It is abundantly clear that the PSC made the calculated decision not to expend time and resources conducting the discovery it now claims it needs because it wanted to focus on settlement discussions with BP that would eventually provide relief to the B3 claimants. The PSC made this strategic decision knowing full well that this Court had issued Orders requiring it to engage in limited B3 discovery related to the issues of derivative immunity and implied preemption. The PSC's request for yet further B3 discovery is therefore baseless and should be rejected outright or else the Court risks creating an expectation that its Orders can be ignored without consequences. *See, e.g., Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001) (affirming denial of request for further discovery and rejecting plaintiff's excuse that she did not conduct the requested depositions earlier "because the parties were in settlement negotiations" because "a party suspends discovery at his own risk"). Of course, the fact remains that dismissal of the Clean-Up Responder Defendants will not leave B3 plaintiffs without a remedy for their alleged injuries—not only has the Court preliminarily approved the proposed

"medical benefits" class action settlement, but to the extent that any B3 plaintiffs are unsatisfied with that settlement they can opt out and continue litigating against BP.

For all of these reasons, as well as those set forth in the Clean-Up Responder Defendants' original joint brief and various individual submissions, the Court should grant the Clean-Up Responder Defendants' motions for summary judgment and dismiss all remaining claims against them with prejudice, thereby putting an end to what has become an unnecessarily protracted phase of this multidistrict litigation.

## ARGUMENT

## I.   THE COURT HAS ALREADY CORRECTLY HELD THAT DERIVATIVE IMMUNITY AND IMPLIED PREEMPTION ARE AVAILABLE IN THE CONTEXT OF AN OIL SPILL OF NATIONAL SIGNIFICANCE

In attempting to argue that derivative immunity and implied preemption are not available to the Clean-Up Responder Defendants as a legal matter, the PSC re-hashes several arguments that the Court has already rejected and asserts several others that can be turned aside in short order.  Indeed, in its decision resolving the B3 motions to dismiss, the Court correctly recognized the legal viability of the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments in the context of responding to the first oil spill ever designated a Spill of National Significance, but simply held that "[d]erivative immunity and preemption are not established on the face of the Complaint."  *In re Oil Spill*, 2011 WL 4575696, at *12.  None of the PSC's legal arguments call that holding into question.

### A.   Derivative Immunity Is Available In This Context

First, the PSC argues that the first prong of *Yearsley*—that the government validly conferred authority upon the Clean-Up Responder Defendants—has not been satisfied because

the Clean-Up Responder Defendants were not government contractors.  *See* PSC Opp. at 30-31.[5] But the Court has already correctly held that the absence of any contractual relationship between the Clean-Up Responder Defendants and the government is immaterial for purposes of derivative immunity in this context.  *See In re Oil Spill*, 2011 WL 4575696, at *6-7 (holding that "the rationale underlying derivative immunity does not suggest that only government contractors are entitled to it").  That holding is consistent with the Second Circuit's decision in the World Trade Center litigation, where the availability of derivative immunity was recognized despite the lack of a contractual relationship between the private contractors and the federal government.  *See In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008) (holding that derivative immunity "would extend to the disaster relief context due to the unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects").  Moreover, the PSC's argument that the lack of government contracts resulted in a lack of precise governmental directives ignores the undisputed fact that Incident Action Plans "were prepared on a daily basis that contained detailed instructions concerning the response activities that were to occur each day [and were] reviewed, signed, and approved by the FOSC and/or the FOSC's representative(s) and then delivered to the Incident Command Posts for execution by, among others, various Clean-Up Responder Defendants."  *See* Joint Stipulations ¶ 26.

Second, the PSC again argues that the existence of a limited responder immunity provision in 33 U.S.C. § 1321(c)(4) somehow precludes the Clean-Up Responder Defendants

---

[5] As the Clean-Up Responder Defendants explained in their original joint brief, once it is determined that the federal government would enjoy immunity, the principles of *Yearsley* govern the derivative immunity analysis (under the Clean Water Act ("CWA") and the Federal Tort Claims Act ("FTCA")).  The PSC does not dispute that the federal government would enjoy immunity under both the CWA and FTCA.  Rather, its various arguments are directed at the application of *Yearsley*.  As set forth above, because those arguments are unavailing, the Clean-Up Responder Defendants are entitled to derivative immunity under both the CWA and FTCA.

from deriving broad immunity under 33 U.S.C. § 1321(j)(8) of the Clean Water Act.  *See* PSC Opp. at 31-32.  But this Court has already ruled that § 1321(c)(4) "is not at issue" here.  *In re Oil Spill*, 2011 WL 4575696, at *3.  Indeed, the responder immunity provision in § 1321(c)(4) is designed to apply in the case of smaller or more routine oil spills, where derivative federal immunity under § 1321(j)(8) may not be applicable as a result of the less pervasive federal role in responding to such mundane spills.  However, in the case of the DEEPWATER HORIZON spill—which, as noted above, was the first oil spill ever to be designated a Spill of National Significance—the unprecedented involvement of the federal government in authorizing, directing, and controlling the response results in the availability of broad derivative immunity protection for responders under § 1321(j)(8) for all claims related to the response.

Finally, the PSC's policy argument that extending immunity to private parties "poses significant societal risk" because "those that need not worry about the ramifications of their conduct are less likely to conform it to a reasonable standard of care" is nonsensical and fails to recognize the underlying purpose of derivative immunity.  *See* PSC Opp. at 28-29.  In order to be entitled to derivative immunity in the first place, private entities such as the Clean-Up Responder Defendants must conform their conduct to instructions and directives received from the federal government—so they will clearly have an incentive to conform their conduct to an appropriate standard of care.  The fact that private entities like the Clean-Up Responder Defendants retain some discretion with respect to the precise manner in which the government's instructions and directives are implemented and/or executed should not be surprising, for if the government were to dictate every last trivial detail it would have no need for private responders in the first place. The key facts—which, as described below, the PSC has failed to refute—are that the Clean-Up Responder Defendants' discretion in this regard was at all times cabined by the federal

government's instructions and directives and that the Clean-Up Responder Defendants did not violate any instructions or directives from the federal government during the DEEPWATER HORIZON response operations.

Moreover, as this Court has already recognized, the purpose of derivative immunity is not to protect private parties, but "solely as a means of protecting the government['s] discretionary authority over areas of significant federal interest." *In re Oil Spill*, 2011 WL 4575696, at *6 (quoting *In re World Trade Center*, 521 F.3d at 194). In light of the applicable statutory and regulatory schemes discussed at length in both the Clean-Up Responder Defendants' original joint brief and the PSC's omnibus opposition, there can be no doubt that the federal government had a significant interest in directing and controlling the response to this unprecedented Spill of National Significance. *See id.* at *7 ("[I]t is plain from the face of the Act that the government has a strong federal interest in responding to water pollution."). Thus, as far as policy arguments go, the Clean-Up Responder Defendants submit that the Supreme Court's recent statements about the risks of <u>not</u> affording derivative immunity to private entities that "work in close coordination with public employees" are directly on point in this litigation and significantly outweigh the PSC's proffered policy considerations. *See Filarsky v. Delia*, 132 S. Ct. 1657, 1666 (2012) (noting that "any private individual with a choice might think twice before accepting a government assignment" if they can "be left holding the bag . . . for actions taken in conjunction with government employees who enjoy immunity for the same activity").

### B.      The PSC's Implied Preemption Arguments Are Misguided

In its decision resolving the B3 motions to dismiss, the Court noted that the Clean-Up Responder Defendants' preemption arguments were "certainly plausible" and that they would be able to "avail themselves of preemption if they show that the complained-of-activity fell within

the scope of the CWA/NCP." *In re Oil Spill*, 2011 WL 4575696, at *8. The PSC does not

quarrel with the basic legal concepts of implied preemption and agrees that plaintiffs' claims

against the Clean-Up Responder Defendants are barred if compliance with both the extensive

federal statutory/regulatory response structure and the PSC's view of the general maritime law

would have been "a physical impossibility," *Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458

U.S. 141, 153 (1982), or if the plaintiffs' claims "stand[] as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S.

52, 67 (1941). *See* PSC Opp. at 33-34.[6] But instead of analyzing either variety of implied

preemption, the PSC argues that "environmental laws have typically been construed as non-

preemptive in nature" and that "the mere existence of a comprehensive federal spill response

scheme" does not result in preemption due to various statutory "savings" clauses. *See* PSC Opp.

at 34-39.

The PSC's concern for the Gulf States' police powers is curious given this Court's

holding that the general maritime law—not state law—governs the plaintiffs' claims against the

Clean-Up Responder Defendants. Thus, the bulk of the PSC's arguments are simply inapposite

because whether or not a presumption against the preemption of *state law* would exist in this

context is irrelevant. Moreover, the PSC seems to ignore the fact that the "savings" clauses it

relies upon "do[] not bar the ordinary working of conflict pre-emption principles." *Geier v. Am.

Honda Motor Co.*, 529 U.S. 861, 869 (2000).

As the Clean-Up Responder Defendants explained in their original joint brief, and as the

PSC fails to refute, because the B3 Bundle Master Complaint alleges that the actions of the

---

[6] The Supreme Court reaffirmed the continued viability of these two varieties of implied conflict
preemption less than two weeks ago. *See Arizona v. United States*, __ S. Ct. __, 2012 WL 2368661, at *8
(June 25, 2012) (finding several provisions of Arizona's controversial immigration law impliedly
preempted).

Clean-Up Responder Defendants in responding to the DEEPWATER HORIZON spill at the direction of the federal government violated maritime law, it would have been physically impossible for the Clean-Up Responder Defendants to have complied with such law without violating the CWA, OPA, and/or the NCP, which demand that private responders follow the government's instructions. *See De la Cuesta*, 458 U.S. at 153. Additionally, the claims against the Clean-Up Responder Defendants in the B3 Bundle Master Complaint "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in promoting an effective and efficient federal response to significant oil spills. *Hines*, 312 U.S. at 67. Indeed, the B3 Bundle Master Complaint seeks to substitute the decision of this Court about appropriate response activities for the expert judgment of the Coast Guard and the other federal agencies that authorized, directed, and controlled the actions of the Clean-Up Responder Defendants in responding to the DEEPWATER HORIZON spill in accordance with federal statutory and regulatory law. Thus, the Clean-Up Responder Defendants are entitled to summary judgment under the doctrine of implied conflict preemption.

## II. THE PSC FAILS TO RAISE A GENUINE ISSUE OF FACT MATERIAL TO THE CLEAN-UP RESPONDER DEFENDANTS' ENTITLEMENT TO DERIVATIVE IMMUNITY OR A FINDING OF IMPLIED PREEMPTION

The PSC concedes that "[t]he federal government, through the Unified Command structure . . . oversaw the spill response." PSC Opp. at 2. Moreover, the PSC does not dispute that "[t]he government had veto power over any decision and, of course, government officials made many important decisions along the way." *Id.* The PSC even admits that "the government maintained ultimate decision-making authority over any response activity." *Id.* Based on these concessions alone, the Clean-Up Responder Defendants should be entitled to summary judgment.

The PSC argues, however, that "[t]he response was too big and required too much manpower" for the government to "monitor the myriad response tasks." *Id.* The PSC contends that, "[a]s a result, private contractors conducted operations and made decisions in the field that often diverged from the protocols set forth in the Unified Command offices." *Id.* But this is nothing more than the argument of counsel and it is insufficient to survive summary judgment; the PSC has offered no competent proof to dispute the facts to which the United States has stipulated (and which are independently confirmed by the overwhelming documentary and deposition evidence submitted by the Clean-Up Responder Defendants) demonstrating that the federal government did in fact authorize, direct, and monitor all response operations conducted by the Clean-Up Responder Defendants and that the Clean-Up Responder Defendants did not violate any instructions or directives from the federal government. *See, e.g., Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) ("The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."); *Jones v. State Farm Fire & Cas. Co.*, 677 F. Supp. 2d 923, 926 (E.D. La. 2009) (Feldman, J.) ("The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.").

As detailed below, the PSC's brief, affidavits, and declarations are replete with conclusory allegations, rank speculation, and unsubstantiated assertions of purported wrongdoing—none of which are sufficient to refute the Clean-Up Responder Defendants' prima facie showing of entitlement to summary judgment.[7] As an initial matter, the bulk of the PSC's

---

[7] For the reasons discussed in greater detail in Section III below, the Court should disregard all thirteen of the affidavits and declarations submitted by the PSC and not consider them in resolving the Clean-Up Responder Defendants' motions for summary judgment due to the PSC's failure to provide any information about any of these individuals in response to written interrogatories served by the Clean-Up Responder Defendants pursuant to Magistrate Judge Shushan's Schedule for Limited B3 Discovery. *See* FED. R. CIV. P. 37(b)(2)(A) (authorizing courts to impose various sanctions upon a party that "fails to

"evidence" concerns actions of BP or other non-parties and does not implicate the Clean-Up Responder Defendants. Moreover, the PSC fails to offer any proof that any of the allegedly wrongful conduct was unauthorized by the federal government. The most that can be said of the PSC's "where there's smoke there must be fire" approach is that it may create some "metaphysical doubt," but it is well settled that such a response is insufficient to defeat well-founded motions for summary judgment. *See, e.g., Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (explaining that the nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence") (internal quotations and citations omitted).

Even assuming that "thousands" of individuals "became ill after they were exposed to oil or the dispersant chemicals" as the PSC argues, *see* PSC Opp. at 2, that fact would have no bearing on the issues of derivative immunity and implied preemption. In short, because the PSC has failed to present competent summary judgment evidence that any specific Clean-Up Responder Defendant violated any instruction or directive from the federal government during the DEEPWATER HORIZON response operations, let alone that any such violation resulted in any injury to a B3 plaintiff, the Clean-Up Responder Defendants' motions should be granted.

---

obey an order to provide or permit discovery," including "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence"); *see also Truck Treads, Inc. v. Armstrong Rubber Co.*, 818 F.2d 427, 429-30 (5th Cir. 1987) (affirming district court's decision to dismiss action with prejudice as sanction due to plaintiffs' "grossly inadequate" interrogatory answers and the fact that the plaintiffs' "evasive response left the defendants in complete ignorance of the substance of their contentions almost one year after the case was filed"). Notably, under very similar circumstances, Judge Mentz refused to consider an affidavit submitted in opposition to a summary judgment motion because the affidavit sought to introduce evidence that should have been produced in discovery in a prior related case. *See Travelers Ins. Co. v. St. Jude Med. Office Bldg., Ltd. P'ship*, 843 F. Supp. 138, 146-48 (E.D. La. 1994) ("[I]n light of their failure to produce these documents as requested in the earlier related case and the indisputable ongoing knowledge of their existence, the Court finds defendants to have presented [the] affidavit in bad faith and sanctions defendants accordingly.").

### A.    Eleven of the PSC's Thirteen Affidavits and Declarations Fail to Implicate Any Clean-Up Responder Defendant

Eleven of the thirteen affidavits and declarations submitted by the PSC fail to discuss <u>any</u> conduct by any of the Clean-Up Responder Defendants.[8]  For this reason alone, those eleven submissions are irrelevant to the instant motions and need not detain the Court.  Regardless, as described below, even if they did implicate the Clean-Up Responder Defendants, the conclusory and unsubstantiated allegations concerning the use of dispersants and the provision of safety gear contained in those eleven affidavits and declarations would fail to raise a genuine issue of material fact regarding the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments.

### 1.    *Allegations Regarding the Use of Dispersants*

Of the eleven affidavits and declarations that do not reference any Clean-Up Responder Defendant, six of them contain allegations regarding the use of dispersants.  None of these allegations, however, implicate any specific Clean-Up Responder Defendant.  And the vague and conclusory statements made in those affidavits and declarations fail to raise a genuine issue of material fact with respect to the federal government's direction and control over all aerial dispersant operations:

- <u>Affidavit of Ronnie Anderson (Rec. Doc. 6696-15):</u>  Mr. Anderson alleges that he was told by the Coast Guard that dispersants should not be sprayed within 5 miles of a boat, but that he once observed an unidentified plane spraying dispersant above his crew's *in situ* burn vessel "within the 5 mile limit."  ¶ 2.  Anderson further alleges that he heard unidentified planes flying above his worksite at night and "believe[s] that the spraying of dispersants continue[d] at night." ¶ 2.

- <u>Declaration of Terry Joe Carter (Rec. Doc. 6696-18):</u>  Mr. Carter alleges that he repeatedly saw unidentified planes spray dispersant "about one-half mile off the

---

[8] The eleven referenced submissions are those by Anderson, Carroll, Carter, Edwards, Gill, Hawkins-Lodge, Jackson, Jones, Lide, Scott, and Wunstell.

shore" and that sometime in the June – July 2010 time period dispersant was sprayed close to a stationary barge on which he was working.  ¶ 4.

- <u>Declaration of Dwayne Hawkins-Lodge (Rec. Doc. 6696-21):</u>  Mr. Hawkins-Lodge alleges that he was sprayed with dispersant three times during the response.  ¶ 5.  In two of those alleged instances, Mr. Hawkins-Lodge was purportedly on the beach, and in the third instance, he was in an airboat laying boom.  ¶¶ 5-7.

- <u>Declaration of Warren Jones (Rec. Doc. 6696-23):</u>  Mr. Jones alleges that he was sprayed with dispersant as he was conducting beach clean-up activities on two separate occasions and that, on one occasion, he heard unidentified planes fly over his crew's lunch tent and saw a "mist" fall upon exiting the tent.  ¶¶ 3-4.

- <u>Declaration of John Lide (Rec. Doc. 6696-24):</u>  Mr. Lide alleges that on July 20, 2010, his face came into contact with dispersant in a splashing incident as he was cleaning a boom.  ¶¶ 2-3.  On that same day, Mr. Lide also allegedly drank dispersant, and he was brought to Slidell Memorial Hospital for examination.  ¶ 3.

- <u>Affidavit of John M. Wunstell, Jr. (Rec. Doc. 6696-27):</u>  Mr. Wunstell alleges that he heard unidentified planes flying at night, spraying what he believed to be dispersant, near vessels stationed at his *in situ* burn worksite.  ¶ 1.  Mr. Wunstell does not state that he ever actually saw dispersants being applied at night.

Messrs. Anderson's and Wunstell's assumption that dispersants were sprayed at night because they heard airplanes flying above their worksites during nighttime hours are speculative, unsupported, and frankly, operationally unsound (given that it would be essentially impossible to see the oil sheens to be dispersed from the air at night).  While responding to the first ever Spill of National Significance was surely not a "9 to 5" job, the Clean-Up Responder Defendants have unequivocally established that authorization was required and obtained from the FOSC and/or the FOSC's representative(s) before any Clean-Up Responder Defendant engaged in any dispersant application efforts, and that no dispersant operations were ever authorized or conducted outside of daylight hours.  *See* Joint Stipulations ¶¶ 26, 30-31, 33, 44-45.  The speculative allegations by Messrs. Anderson and Wunstell fail to rebut such evidence and do not create a genuine issue of material fact.

With respect to the affidavits and declarations that allege that dispersant spray missions

were conducted close to shore, vessels, and/or platforms and resulted in exposure incidents, those accounts do not contain any evidence that such operations, even assuming they occurred, were not approved by the federal government.  Moreover, the accounts prove nothing because they lack necessary supportive details such as the date(s), time(s), and location(s) of the alleged incident(s) or any identifiable characteristics about the plane(s) that conducted the spray(s). While it is true that the RRT IV and RRT VI dispersant pre-approval plans contained various geographic restrictions, the United States has stipulated that it authorized dispersant applications shoreward of the pre-authorization zones "if such applications were necessary to prevent or substantially reduce a hazard to human life."  *See* Joint Stipulations ¶ 42.  Additionally, the United States has stipulated that all dispersant-related activities were conducted pursuant to the authorization, direction, and/or control of the FOSC and/or the FOSC's representative(s) under the authority of the Incident Command system, *see* Joint Stipulations ¶ 33, and that "the FOSC and/or the FOSC's representative(s) approved the specific use of dispersants . . . for each aerial application of dispersants," *see* Joint Stipulations ¶ 39.  Here again, the plaintiffs' vague and speculative allegations fall far short of creating a genuine issue of material fact.

## 2.   *Allegations Regarding the Safety of Clean-Up Workers*

Of the eleven affidavits and declarations that do not reference any Clean-Up Responder Defendant, nine of them contain allegations regarding the provision of safety gear to clean-up workers.  Again, because not one of those affidavits or declarations implicates any Clean-Up Responder Defendant, the Court's inquiry should end there.  Moreover, none of these individuals substantiate their allegations by providing any evidence that the personal protective equipment ("PPE") they were allegedly missing was required by the federal government for their specific activities and, thus, their affidavits and declarations fail to raise a genuine issue of material fact

regarding whether any Clean-Up Responder Defendant violated any safety-related instructions from the federal government:

- Affidavit of Ronnie Anderson (Rec. Doc. 6696-15):  Mr. Anderson alleges that his employer (BP) did not supply his *in situ* burn crew with air protection devices, only provided his crew with paper suits, and did not decontaminate his vessel.  ¶ 4.

- Declaration of Terrence Carroll (Rec. Doc. 6696-17):  Mr. Carroll alleges that his employer (Global Environmental) did not supply him with a safety mask and that other clean-up workers did not receive "Tyvex suits."  ¶ 2.

- Declaration of Terry Joe Carter (Rec. Doc. 6696-18):  Mr. Carter alleges that when he laid boom and removed tar balls from the beaches for his employer (Shoreline), he noted that the "detox spray" was not properly decontaminating his apparel.  ¶ 4.  He further alleges that when he confronted his supervisor about not undergoing proper detox procedures, his supervisor allegedly tried to "cover up" the situation and terminated Carter when he did not stop complaining.  ¶ 4.

- Declaration of Kirk Edwards (Rec. Doc. 6696-19):  Mr. Edwards alleges that despite his contact with oil and dispersants during boom laying efforts, his employer (Tamara Group) did not provide him with a respirator or similar device.  ¶ 5.

- Declaration of William Gill (Rec. Doc. 6696-20):  Mr. Gill alleges that his employer (Ashland Services, LLC / Land & Marine Contractors, Inc.) told him that some forms of PPE were not required for his tasks, those being beach and marshland clean up.  ¶¶ 2-3.  Mr. Gill further opines that his employer should have provided him with a respirator or mask.  ¶ 4.

- Declaration of Rendell Jackson (Rec. Doc. 6696-22):  Mr. Jackson, who worked on the boom laying and tar bar removal efforts, alleges that his employer (Buras Oil Services) only provided him with gloves and "chicken feet" as PPE.  ¶¶ 3-4.

- Declaration of John Lide (Rec. Doc. 6696-24):  Mr. Lide alleges that his employer (Construct Corps) did not provide him and the rest of the boom cleaning crew with respirators, rubber gloves, or hazmat suits.  ¶ 4.

- Declaration of Brandon Scott (Rec. Doc. 6696-26):  Mr. Scott, who worked on the boom laying efforts, alleges that one of his employers (CCI) did not provide him and his crew with masks or suits, and that his second employer (C&G (Triple C Enterprises)) did not provide him or his crew with gloves or masks.  ¶ 4.

- Affidavit of John M. Wunstell, Jr. (Rec. Doc. 6696-27):  Mr. Wunstell alleges that his employer (BP) did not supply his *in situ* burn crew with personal respiratory or closed air systems aboard the vessels, and only provided him with paper "Tyvec" suits.  ¶ 4.

With respect to the allegations that concern the provision of respirators, these affidavits and declarations offer nothing more than layperson opinion concerning the need for respirators during the response.  As the Clean-Up Responder Defendants set forth in their Joint Statement of Undisputed Material Facts (Rec. Doc. 6545-49) (hereinafter "Joint SUMF"), however, the U.S. Occupational Safety and Health Administration ("OSHA") and Unified Area Command agreed to and implemented a very limited respirator use policy based on air monitoring data collected by government agencies that demonstrated that exposure levels for toxic chemicals were generally not high enough to necessitate the use of respirators by clean-up workers.  *See* Joint SUMF ¶¶ 93-97.  In addition, OSHA's Final Report on its role in the DEEPWATER HORIZON spill response highlights that OSHA, at the FOSC's request and direction, "ensured that respirators were used wherever the data indicated that they were necessary to protect workers."  *See* Ex. 29 to the Clean-Up Responder Defendants' Original Joint Memorandum (Rec. Doc. 6545-35) at 4, 8.  The PSC has submitted no competent evidence that the federal government required respirators for the activities in which the above individuals were allegedly engaged.  Accordingly, the PSC has failed to raise a genuine issue of material fact with respect to whether any Clean-Up Responder Defendant violated respirator use directives issued by the federal government.[9]

### B.   The Only Two Declarations That Reference Any Clean-Up Responder Defendant Fail to Raise a Genuine Issue of Material Fact

Only two of the declarations submitted by the PSC make any allegations that specifically reference a Clean-Up Responder Defendant.  *See* Declaration of Victor Anibal Carias (Rec. Doc.

---

[9] The PSC also argues in its brief that Nalco's dispersant use requirements for Corexit called for the use of respirators and that the Clean-Up Responder Defendants diverged from such requirements.  *See* PSC Opp. at 19.  Even if this is true, it is irrelevant to the immunity and preemption issues because, as noted above, the PSC has failed to offer any evidence that the *federal government* issued dispersant use directives that required the broad use of respirators during the DEEPWATER HORIZON response.

6696-16) & Declaration of Roy Mackie (Rec. Doc. 6696-25).  Neither declaration, however, raises a genuine issue of fact material to the Clean-Up Responder Defendants' arguments.

Mr. Carias was employed by Tamara's Group from May to November of 2010 and supervised a beach clean-up crew.  ¶ 3.  He alleges in conclusory fashion that "there were many different times" when PPE was not made available to his crew, but only provides one specific example of such a time when he was purportedly instructed by an O'Brien's supervisor to force his crew to engage in clean-up activities without gloves and disposable rubber "chicken feet" shoe covers.  ¶¶ 4-5.  But nothing in Mr. Carias's declaration states that gloves and "chicken feet" were required for his crew's activities by a federal government directive.  In any event, Mr. Carias further alleges that he refused to follow this "order" and did not allow his crew to work without such PPE.  ¶ 5.  Thus, the Carias declaration fails to raise a genuine issue of fact material to any of the Clean-Up Responder Defendants' motions.

Mr. Mackie alleges that, beginning in August of 2010, he was employed by "The DRC Group" in the Vessels of Opportunity program.  ¶¶ 2-3.[10]  Mr. Mackie contends that DRC initially supplied him with rubber gloves, boots, and a white suit, but that "as the summer wore on[,] the white suits were no longer available."  ¶ 3.  But his declaration is internally inconsistent and fails to establish that he was not provided with the proper PPE.  Indeed, Mr. Mackie specifically states that in order to find the "full gear," he only "had to walk the beach to different supply stations" to get the equipment.  ¶ 4.  In addition, Mr. Mackie alleges that he was not afforded the opportunity to acquire a respirator or similar mask to avoid dispersant exposure.  ¶ 4.  What Mr. Mackie fails to set forth, however, is any competent evidence suggesting that any

---

[10] As set forth in the individual reply memorandum filed by DRC, although Mr. Mackie states that he was *employed* by "The DRC Group," he actually entered into a form Master Vessel Charter Agreement ("MVCA") with DRC Emergency Services, LLC.  Mr. Mackie's MVCA provided that BP—not any of the Clean-Up Responder Defendants—was to ensure that he received the necessary PPE.

of this PPE was required by the federal government for his activities or that DRC or any other Clean-Up Responder Defendant violated such a requirement.  Finally, Mr. Mackie alleges that "[t]he conditions [he] worked under were worsened by the fact that dispersant was constantly sprayed."  ¶ 4.  It is not surprising that Mr. Mackie can provide no further details about this "constant spraying," however, because it is uncontroverted that no dispersant was sprayed during Mr. Mackie's tenure on the DEEPWATER HORIZON spill response.  Indeed, the last dispersant application was conducted on July 19, 2010, several weeks before Mr. Mackie allegedly began his work.  *See* Joint SUMF ¶ 75; *see also* Joint Stipulations ¶¶ 40-41.  For all of these reasons, the Mackie declaration fails to raise a genuine issue of fact material to any of the Clean-Up Responder Defendants' motions.

### C.    The PSC's Other Allegations Regarding Safety Also Fail to Create a Genuine Issue of Material Fact

In addition to the allegations contained in the affidavits and declarations above, the PSC also makes several other safety-related arguments in its brief.  None of those additional arguments, however, raise a genuine issue of fact material to the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments.

First, after conceding that the Parsons Corporation ("Parsons") is not a Clean-Up Responder Defendant, the PSC nevertheless argues that Parsons' alleged failure to adhere to safety requirements imposed by the federal government "epitomize[s] the breakdown in regulatory compliance" during the response.  PSC Opp. at 15-16 & n.11.  Because Parsons is a non-party, its conduct is irrelevant to the Clean-Up Responder Defendants' entitlement to derivative immunity and a finding of implied preemption.  And even if the allegations with respect to Parsons are true, the PSC's contention that Parsons' safety lapses somehow reflect similar conduct on behalf of the Clean-Up Responder Defendants is nonsense and insufficient to

defeat summary judgment.[11]

Second, the PSC's allegations with respect to the establishment of the Vessels of Opportunity ("VoO") program and its corresponding safety training are misguided.  *See* PSC Opp. at 19-20, 29.  Even if Vince Mitchell launched the VoO program's initial safety training in the immediate aftermath of the spill without OSHA's approval as the PSC alleges,[12] the evidence put forth by the PSC fails to establish that pre-approval from OSHA was required for this program or that the FOSC or FOSC's representative(s) did not authorize or direct the implementation of the program.  Indeed, the evidence submitted by the Clean-Up Responder Defendants illustrates that the FOSC had the "ultimate responsibility" for addressing worker safety and that OSHA merely served a supporting role to the FOSC by reviewing the training programs being implemented and identifying deficiencies as they arose.  *See* Joint SUMF ¶¶ 87-89, 91.  Consequently, that OSHA identified room for improvement in the VoO safety program and instructed that modifications be made does not suggest that any Clean-Up Responder Defendant violated any federal instructions, but rather that OSHA was closely monitoring the response operations and that when OSHA made recommendations, those recommendations were implemented.

Third, the PSC contends that "vessel decontamination sites" were "at times administered by private contractors such as Defendants O'Brien's and NRC" and "there were times when [vessel decontamination] did not happen" properly.  *See* PSC Opp. at 20.  But once again, these

---

[11] The same goes for the PSC's reliance on testimony by the ICP Mobile Operations Section Chief that "there were probably times" when "people . . . didn't do exactly what we'd ask them to do."  *See* PSC Opp. at 21.  This testimony is not only speculative, but it also fails to identify any specific Clean-Up Responder Defendant.

[12] Contrary to the PSC's suggestion, Vince Mitchell was employed by Lamor Corporation, not O'Brien's. Regardless, for the reasons discussed in the text above, his employment status is irrelevant to the instant motions.

vague allegations fail to establish that any Clean-Up Responder Defendant violated a federal government directive in administering the decontamination operations.  Rather, the PSC argues that the connection between the return of some oil to "clean waters" and "the consequences to human health and the environment" is "obvious."  PSC Opp. at 20.  This is nothing more than the argument of counsel, and it is both insufficient to survive summary judgment and irrelevant to the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments. And even if "oversight problems" resulted in vessels not being decontaminated as thoroughly or as quickly as the PSC desires—such that "little specks here and there" remained on a vessel, *see* PSC Ex. 11 (Rec. Doc. 6696-12) at 69:4-9, or that a vessel had to wait its turn to undergo decontamination, s*ee* PSC Ex. 12 (Rec. Doc. 6696-13) at 244:9-22—these are precisely the instances in which private responders acting under federal direction and control should be shielded from liability via derivative governmental immunity.

## III.   THE PSC'S REQUEST FOR FURTHER DISCOVERY IS BASELESS GIVEN ITS CONSCIOUS AND DELIBERATE REFUSAL TO PARTICIPATE IN THE COURT-ORDERED LIMITED B3 DISCOVERY PROCESS

The PSC implicitly acknowledges that the above "evidence" it has submitted in response to the Clean-Up Responder Defendants' motions for summary judgment is insufficient to create a genuine issue of material fact because it attempts to hedge its bets by also arguing that the Court should allow further discovery before resolving the derivative immunity and implied preemption issues.  The PSC's request for further discovery does not comply with Rule 56(d) of the Federal Rules of Civil Procedure, however, which provides that "[i]f a non-movant *shows by affidavit or declaration* that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it."  FED. R. CIV. P. 56(d)

(emphasis added).[13]

Regardless, the PSC's request for further discovery on the issues of derivative immunity and implied preemption must be evaluated in light of the history of this litigation. And that history reveals that at every available opportunity the PSC has sought to avoid and otherwise frustrate this Court's well-founded desire to resolve the Clean-Up Responder Defendants' threshold legal arguments in an efficient manner. Upon considering the PSC's long record of evasion, delay, and disregard for this Court's Orders, the Clean-Up Responder Defendants submit that the Court should enforce its prior Orders, make clear that compliance with its Orders is not optional as the PSC appears to assume, reject the PSC's request for yet another period of B3 discovery, and grant the Clean-Up Responder Defendants' motions for summary judgment. *See, e.g., SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980) ("The nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts, particularly where, as here, ample time and opportunities for discovery have already lapsed.") (internal citations omitted).

The PSC first revealed its desire to stay indefinitely any and all discovery and/or litigation of the B3 claims in a submission concerning the trial plan a little more than one year ago in which it asked the Court to "consider deferring the Phase Three issues . . . until some of the science on medical monitoring . . . has a little more time to mature." *See* PSC's Trial Plan Brief (June 4, 2011) (Rec. Doc. 2658), at pg. 11. Of course, as the Clean-Up Responder Defendants pointed out in response, the admission implicit in that request was that the PSC did not have sufficient evidence to support its claims against the Clean-Up Responder Defendants.

---

[13] As Judge Fallon recently explained, "[p]rior to December 1, 2010, this rule appeared as Rule 56(f) in the Federal Rules of Civil Procedure" and, thus, "the decisions of the Fifth Circuit that explain the scope of former Rule 56(f) are equally applicable to what is now Rule 56(d)." *Coleman v. Omega Protein, Inc.*, No. 10-1977, 2011 WL 976543, at *3 n.2 (E.D. La. Mar. 15, 2011).

*See* Trial Plan Memorandum Submitted by Certain Clean-Up Responder Defendants (June 6, 2011) (Rec. Doc. 2668), at pg. 2.  And as the Fifth Circuit recently noted, this state of affairs does not justify delay or leniency, but rather compels dismissal with prejudice.  *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 381 (5th Cir. 2010) ("Perhaps [the pharmaceutical drug at issue] is a cause of problem gambling, but the scientific knowledge is not yet there. [Plaintiff] urges the law to lead science–a sequence not countenanced by *Daubert*.  And while the possibilities of their relationship properly spark concerns sufficient to warrant caution, the courts must await its result.").  For good reason, the Court ignored the PSC's request and scheduled the B3 claims for adjudication in Phase Three of its original Trial Plan (Rec. Doc. 4033).

On September 30, 2011, the Court issued its Order and Reasons (Rec. Doc. 4159)[14] granting in part and denying in part various motions filed by the Clean-Up Responder Defendants to dismiss the claims asserted against them in the B3 Bundle Master Complaint.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2011 WL 4575696 (E.D. La. 2011).  In that decision, the Court recognized the viability of the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments in the context of responding to a Spill of National Significance, but held that "[d]erivative immunity and preemption are not established on the face of the Complaint."  *Id.* at *12.  The Court noted, however, that the Clean-Up Responder Defendants' derivative immunity and implied preemption arguments "are preserved and may be re-asserted," *id.*, and set forth a clear roadmap for the Clean-Up Responder Defendants to follow in this regard:  "[I]t seems at this point that if the facts revealed that the

---

[14] An Amended Order and Reasons was issued on October 4, 2011 (Rec. Doc. 4209).

Clean-Up Defendants were using dispersants as directed by the federal government, then they would be entitled to derivative governmental immunity." *Id.* at *7.

Shortly after the Court issued its decision, Magistrate Judge Shushan contacted the parties and directed them to put together a schedule for "limited B3 discovery" so that facts pertaining to the key issues that the Court identified could be developed, thereby allowing the Clean-Up Responder Defendants to renew their derivative immunity and implied preemption arguments in an expeditious manner. Without objection from the PSC or anyone else, Magistrate Judge Shushan approved and entered an agreed schedule for such limited B3 discovery on November 3, 2011 (Rec. Doc. 4472), and that schedule was amended on December 23, 2011 (Rec. Doc. 5000).

Pursuant to Magistrate Judge Shushan's Schedule for Limited B3 Discovery, the Clean-Up Responder Defendants served Joint Requests for Admissions, Interrogatories, and Requests for Production of Documents to the B3 Plaintiffs Regarding Preemption and Immunity Issues on November 18, 2011. The PSC also served written discovery on each of the Clean-Up Responder Defendants—as well as Nalco and BP—and the Clean-Up Responder Defendants responded to that written discovery in good faith and produced thousands of pages of responsive documents.[15] In responding to the Clean-Up Responder Defendants' written discovery, however, the PSC refused to provide any substantive responses and made it clear through its laundry list of objections that it had no intention of producing any documents or information relevant to the limited B3 discovery issues concerning immunity and preemption.[16]

---

[15] The Clean-Up Responder Defendants also served written discovery on the United States, and the United States responded to that discovery. Even though it was expressly permitted, the PSC did not serve any written discovery on the United States in connection with the limited B3 discovery process.

[16] The PSC's discovery responses have been previously filed into the record as Exhibit 1 to the Clean-Up Responder Defendants' Response to the PSC's Motion for Leave to Amend Master Complaint. *See* Rec. Doc. 5828-1.

For example, in response to Interrogatories #2-4, which asked all B3 plaintiffs to identify any facts supporting the allegations contained in the B3 Bundle Master Complaint that BP (and not the federal government) controlled the clean-up operations, that the federal government did not authorize and direct all of the Clean-Up Responder Defendants' activities, and that the Clean-Up Responder Defendants violated the federal government's directives, the PSC simply answered by incorporating various general objections.  Similarly, in response to Interrogatories #5-18, which sought information about any specific B3 plaintiff that alleged to have been injured as a result of any Clean-Up Responder Defendant violating the federal government's directives, the PSC responded with boilerplate objections and language directing the Clean-Up Responder Defendants to every single plaintiff profile form, short-form joinder, and plaintiff fact sheet that had been served to date in the broader multidistrict litigation.

Instead of speaking with their clients and other plaintiffs' attorneys and responding to the Clean-Up Responder Defendants' written discovery in good faith, the PSC chose to essentially ignore it.  Moreover, in the case of the affidavits that have been submitted by Ronnie Anderson (Rec. Doc. 6696-15) and John M. Wunstell, Jr. (Rec. Doc. 6696-27)—which were both executed on May 29, 2010, over a year and a half before the PSC failed to provide them in response to the Clean-Up Responder Defendants' written discovery requests—it would appear that the PSC affirmatively concealed responsive information in an effort to prevent potentially relevant facts from being developed during the limited B3 discovery period.

The Clean-Up Responder Defendants raised the PSC's discovery deficiencies with Magistrate Judge Shushan, but preparation for the Phase One trial understandably prevented the Court from taking up the matter for several weeks.  *See* Letter from Michael J. Lyle to Magistrate Judge Shushan (Jan. 26, 2012) (Rec. Doc. 5442).  Then at 8:48 p.m. on February 12,

2012 (a Sunday night), with the noted discovery disputes still outstanding, the PSC e-mailed Magistrate Judge Shushan to suggest that "the existing B3 schedule be pushed back, if not vacated altogether." *See* Exhibit 2 to Clean-Up Responder Defendants' Response to PSC's Motion for Leave to Amend Master Complaint (Rec. Doc. 5828-2). Facing various upcoming deadlines in the Schedule for Limited B3 Discovery, four days later the PSC filed its motion for leave to amend the B3 Bundle Master Complaint and dismiss the Clean-Up Responder Defendants without prejudice. *See* Rec. Doc. 5718. The PSC subsequently admitted that it had filed its motion "based solely on strategic grounds." *See* Rec. Doc. 6192. The PSC's motion effectively preempted any consideration of the PSC's conduct by Magistrate Judge Shushan, who understandably decided not to take up these matters until the Court resolved the PSC's motion.

After filing its motion seeking leave to dismiss the Clean-Up Responder Defendants without prejudice, the PSC made the unilateral decision to refuse to comply with the Schedule for Limited B3 Discovery. The PSC simply failed to respond to Nalco's original renewed motion on February 21, 2012 as required, and the PSC did not provide any objections to the joint stipulations between the Clean-Up Responder Defendants and the United States on February 29, 2012 as required. Most notably, although the Schedule for Limited B3 Discovery gave the PSC until April 30, 2012 to take "limited 30(b)(6) depositions of United States and Clean-Up Responder witnesses, and limited depositions of other witnesses, relevant to [the] Clean-Up Responders' preemption/derivative immunity defenses," the PSC failed to request or notice any such depositions.[17]

---

[17] It is telling that the PSC did, however, seek and take a 30(b)(6) deposition of Nalco right before the January 31, 2012 deadline imposed by the Schedule for Limited B3 Discovery.

On April 16, 2012, the Court issued an Order denying the PSC's motion for leave to amend the B3 Bundle Master Complaint and dismiss the Clean-Up Responder Defendants without prejudice.  *See* Rec. Doc. 6247.  In that Order, the Court also re-set Nalco's renewed motion and gave the PSC a second opportunity to oppose it.  Beyond that accommodation, the Court's Order provided that all "other deadlines in Magistrate Judge Shushan's Scheduling Order (Rec. Doc. 5000) are unchanged."  Following the Court's ruling, the PSC did not notice any depositions or seek any extension of the limited B3 discovery period—despite the fact that approximately two weeks still remained in that period.  The Clean-Up Responder Defendants subsequently filed the instant motions for summary judgment on May 18, 2012, as contemplated by Magistrate Judge Shushan's Scheduling Order.

This history demonstrates that the PSC has had a full and fair opportunity to conduct the discovery it now claims it needs to oppose the instant motions.  Of course, the chronology of events also clearly demonstrates that, notwithstanding the Court's Orders, the PSC has sought at every turn to avoid the burdens associated with the discovery and adjudication of the Clean-Up Responder Defendants' immunity and preemption arguments.  In light of the PSC's dilatory tactics, the Court should reject the PSC's request for yet more B3 discovery and instead proceed to resolve the instant motions on the merits at this time.  *See Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) ("If . . . the nonmoving party has not diligently pursued discovery of [the] evidence, the court need not accommodate the nonmoving party's . . . request."); *see also Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001) (affirming denial of a Rule 56(f) request because the plaintiff "had several months" to take depositions, but provided no adequate justification for her failure to do so and did not seek an extension of the discovery period until after the defendants filed for summary judgment); *Pfeil v.*

*Rogers*, 757 F.2d 850, 857 (7th Cir. 1985) ("When a party fails to secure discoverable evidence due to his own lack of diligence, it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information."); *Coleman v. Omega Protein, Inc.*, No. 10-1977, 2011 WL 976543, at *4 (E.D. La. Mar. 15, 2011) (Fallon, J.) (rejecting plaintiff's request for further discovery in response to a motion for summary judgment due to his lack of diligence).

## CONCLUSION

For the foregoing reasons, and those set forth in the Clean-Up Responder Defendants' original joint brief and various individual submissions, the Clean-Up Responder Defendants respectfully request that they be granted summary judgment such that the remaining claims against them in the B3 Bundle Master Complaint be dismissed with prejudice.

Dated: July 6, 2012


 /s/ Michael J. Lyle
Michael J. Lyle (DC #475078, IL #6199227)
Eric C. Lyttle (DC #482856)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 682-7157
Facsimile: (202) 857-0940


Theodore E. Tsekerides (NY #2609642)
Jeremy T. Grabill (NY #4501755)
Sylvia E. Simson (NY #4803342)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8218
Facsimile: (212) 310-8007


Patrick E. O'Keefe (LA Bar #10186)
Philip S. Brooks, Jr. (LA Bar #21501)
MONTGOMERY, BARNETT, BROWN, REED,
        HAMMOND & MINTZ LLP
3300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3300
Telephone: (504) 585-3200
Facsimile: (504) 585-7688

Attorneys for O'BRIEN'S RESPONSE
MANAGEMENT INC. and NATIONAL
RESPONSE CORPORATION


 /s/ Alan M. Weigel
Alan M. Weigel, Esq.
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone: 212-885-5000
Facsimile: 917-332-3836
E-mail: aweigel@blankrome.com

Attorneys for MARINE SPILL
RESPONSE CORPORATION


 /s/ Leo R. McAloon, III
Leo R. McAloon, III (No. 19044)
E-mail: lmcaloon@glllaw.com
Michael D. Cangelosi (No. 30427)
E-mail: mcangelosi@glllaw.com
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011

Attorneys for DYNAMIC AVIATION
GROUP, INC.


 /s/ Kevin R. Tully
Kevin R. Tully - #1627
H. Carter Marshall - #28136
Gregory S. LaCour - #23823
CHRISTOVICH & KEARNEY, LLP
601 Poydras Street, Suite 2300
New Orleans, Louisiana 70130-6078
Telephone: (504) 561-5700
E-mail: krtully@christovich.com
E-mail: hcmarshall@christovich.com

Attorneys for INTERNATIONAL
AIR RESPONSE, INC. and
LYNDEN INCORPORATED

/s/ Ben L. Mayeaux
Frank X. Neuner, Jr. (#7674)
Ben L. Mayeaux (#19041)
Jed M. Mestayer (#29345)
LABORDE & NEUNER
One Petroleum Center, Suite 200
1001 W. Pinhook Rd.
Lafayette, Louisiana 70503
Telephone: (337) 237-7000

Attorneys for AIRBORNE SUPPORT, INC. and
AIRBORNE SUPPORT INTERNATIONAL, INC.

/s/ John E. Galloway
John E. Galloway (#5892)
Cherrell R. Simms (#28227)
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
701 Poydras Street, Suite 4040
New Orleans, Louisiana 70139
Telephone: (504) 525-6802
Facsimile: (504) 525-2456

Attorneys for TIGER RENTALS, LTD.,
THE MODERN GROUP, LTD., and
THE MODERN GROUP GP-SUB, INC.

/s/ Harold J. Flanagan
Harold J. Flanagan (Bar No. 24091)
Stephen M. Pesce (Bar No. 29380)
Brandon C. Briscoe (Bar No. 29542)
Sean P. Brady (Bar No. 30410)
Andy Dupre (Bar No. 32437)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 2405
New Orleans, Louisiana 70170
Telephone: 504-569-0235
Facsimile: 504-592-0251
hflanagan@flanaganpartners.com
spesce@flanaganpartners.com
sbrady@flanaganpartners.com
adupre@flanaganpartners.com

Attorneys for DRC EMERGENCY SERVICES, LLC

/s/ George E. Crow
George E. Crow
LAW OFFICE OF GEORGE E. CROW
P.O. Box 30
Katy, TX 77492
For Overnight Physical Delivery use
1519 Miller Avenue
Katy, TX 77493
Telephone: (281) 391-9275
E-mail: georgecrow@earthlink.net

Attorney for LANE AVIATION, INC.

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Clean-Up Responder Defendants' Joint Reply Memorandum in Support of Their Individual Motions for Summary Judgment on Derivative Immunity and Preemption Grounds has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 6th day of July, 2012.


/s/ Michael J. Lyle
Michael J. Lyle