# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  **Oil Spill by the Oil Rig** | * | **MDL No. 2179** |
| **"Deepwater Horizon" in the** | * | |
| **Gulf of Mexico, on April 20, 2010** | * | **SECTION:  J** |
| | * | |
| **Applies to:**  *All Cases in Pleading* | * | **JUDGE BARBIER** |
| *Bundle Section III.B(3).* | * | |
| | * | **MAGISTRATE SHUSHAN** |
| * * * * * * * * * * * * * * * * * * | * | |

### NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST ALL CLAIMS IN FIRST AMENDED COMPLAINT "B3 BUNDLE"

Thomas J. Heiden
Mary Rose Alexander
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700

*Attorneys for Nalco Company, Nalco Holdings*
*LLC, Nalco Finance Holdings LLC and*
*Nalco Holding Company*

# TABLE OF CONTENTS

**Page**

I.  Introduction...............................................................................................................1

II.  Argument .................................................................................................................4

  A.  Plaintiffs' Claims Directly Conflict With The Federal Government's
       Decision To Approve COREXIT Use. ...................................................................4

  B.  The Record Facts Show That Plaintiffs' Claims Are Preempted And The
       Record Is Properly Closed For Summary Judgment................................................8

  C.  The Savings Provisions Plaintiffs Cite Do Not Preserve Claims That
       Conflict With The Mandatory Decisions Made By The Federal
       Government..............................................................................................................11

  D.  Plaintiffs Misrepresent USEPA's Position On The Preemptive Effect Of
       CWA Regulations. ................................................................................................12

  E.  Plaintiff Coco's Arguments Are Meritless. .........................................................13

  F.  In the Alternative, Nalco Is Entitled To Derivative Immunity. ............................15

III.  Conclusion ...............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arizona v. United States*,
__ S. Ct. ___, 2012 WL 2368661 (U.S. June 25, 2012) ............................................................ 6

*AT&T Mobility LLC v. Concepcion*,
131 S. Ct. 1740 (2011) ............................................................................................................ 11

*BCCA Appeal Grp. v. United States Envtl. Prot. Agency*,
355 F.3d 817 (5th Cir. 2003) .................................................................................................. 14

*Bowen v. Am. Hosp. Ass'n.*,
476 U.S. 610 (1986) ................................................................................................................ 14

*Boyle v. United Technologies Corporation*,
487 U.S. 500 (1988) .................................................................................................................. 8

*Campbell v. Supervalu, Inc.*,
565 F. Supp. 2d 969 (N.D. Ind. 2008) .................................................................................... 15

*Cent. Elec. Power Co-op v. Se. Power*,
338 F.3d 333 (4th Cir. 2003) .................................................................................................. 14

*Chamber of Commerce v. Whiting*,
131 S. Ct. 1968 (2011) .............................................................................................................. 6

*Dardar v. Lafourche Realty Co.*,
639 F. Supp. 1525 (E.D. La. 1986) ......................................................................................... 14

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) .................................................................................................................... 6

*Fla. Lime & Avocado Growers' Ass'n v. Paul*,
373 U.S. 132 (1963) .................................................................................................................. 7

*Geier v. Am. Honda Co.*,
529 U.S. 861 (2000) ............................................................................................................. 6, 11

*In re Complaint of Oswego Barge Corp.*,
664 F.2d 327 (2d Cir. 1981) ..................................................................................................... 4

*In re: Methyl Tertiary Butyl Ether  Prods. Liab. Litig.*,
457 F. Supp. 2d 324 (S.D.N.Y. 2006) ...................................................................................... 8

*In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   175 F. Supp. 2d 593 (S.D.N.Y. 2001) ........................................................... 8

*Munoz v. Int'l Alliance of Theatrical Stage Emps. & Moving Picture*
   *Mach. Operators*,
   563 F.2d 205 (5th Cir. 1977) ...................................................................... 9

*New York State Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) ................................................................................... 6

*Union of Flight Attendants, Local No. 1 v. Air Micronesia, Inc.*,
   684 F. Supp. 1520 (D. Haw. 1988) ........................................................... 15

*United States Postal Serv. v. Gregory*,
   534 U.S. 1 (2001) ..................................................................................... 14

*United States v. Locke*,
   529 U.S. 89 (2000) ................................................................................... 12

*Witty v. Delta Air Lines, Inc.*,
   366 F.3d 380 (5th Cir. 2004) ...................................................................... 6

## STATUTES

33 U.S.C. § 1321 .......................................................................................... 12

33 U.S.C. § 1321(c)(2)(A) ............................................................................. 5

33 U.S.C. § 1321(c)(4) ................................................................................. 12

33 U.S.C. § 1321(d)(1) ................................................................................... 5

33 U.S.C. § 1321(d)(2)(F) ............................................................................. 5

33 U.S.C. § 1321(d)(2)(G)(i) ........................................................................ 5

33 U.S.C. § 1321(d)(2)(G)(ii) ....................................................................... 5

33 U.S.C. § 1321(d)(2)(G)(iii) ...................................................................... 5

33 U.S.C. § 2718(a) .................................................................................... 12

Oil Pollution Act of 1990, P.L. 101-380 (codified as amended at 33 U.S.C. § 2701 et seq.) ...... 12

## RULES

Fed. R. Evid. 801 .......................................................................................... 2

# REGULATIONS

40 C.F.R. § 300.135(a) .................................................................................................. 5

40 C.F.R. § 300.915 .................................................................................................... 13

40 C.F.R. § 300.915(a)(7) ........................................................................................... 14

40 C.F.R. § 300.915(a)(8) ........................................................................................... 14

40 C.F.R. § 300.915(a)(10) ......................................................................................... 14

40 C.F.R. § 300.915(a)(11) ......................................................................................... 14

Preemption: Memorandum for the Heads of Executive Departments and Agencies,
     74 Fed. Reg. 24,693 (May 22, 2009) ..................................................................... 13

# OTHER AUTHORITIES

Catherine M. Sharkey, *Inside Agency Preemption*, 110 Mich. L. Rev. 521 (2012) ..................... 13

Defendants Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company (collectively, "Nalco") respectfully state as follows in further support of their Motion for Summary Judgment Against All Claims in First Amended Master Complaint "B3 Bundle" (the "B3 Master Complaint"):

## I.    INTRODUCTION

Plaintiffs explicitly or implicitly admit the essential elements of Nalco's motion for summary judgment.  Plaintiffs admit that:

- "The Oil Pollution Act ('OPA'), which amended the oil spill and removal provisions of the Clean Water Act ('CWA'), establishes the principal legal framework governing an oil spill response."  (Pls.' Omnibus Mem. in Opp. at 5 (Rec. Doc. 6696.))

- The *Deepwater Horizon* oil spill was an "unprecedented event" which required the federal government to "mount an unprecedented response."  (*Id.* at 1.)

- "The government had veto power over any decision and, of course, governmental officials made many important decisions along the way.  Indeed . . . ***the government maintained ultimate decision-making authority over any response activity***."[1]  (*Id.*)

- "Nalco did not decide whether, when, where, how or in what volumes dispersants were applied."  (Nalco's  Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("SUMF") ¶ 72 (Rec. Doc. 6541-2), (uncontested by Plaintiffs.))

Unable to assert that the United States government did not follow the law in responding to this unprecedented event, Plaintiffs resort to attacking the "reality on the ground."  They criticize those who responded to this unprecedented emergency with unprecedented action.  But, importantly, even in 43 pages of accusations, Plaintiffs do not and cannot challenge that as to Nalco (1) the federal government had and exercised sole and full authority over the ***decisions*** on which Plaintiffs base their claims against Nalco and (2) Nalco did nothing more than supply the product it was asked by the United States Coast Guard ("USCG") to supply.  Specifically:

---

[1]        Unless otherwise indicated, all emphasis is supplied by Nalco.

- Plaintiffs do not and cannot challenge that the federal government, as required under the CWA/National Contingency Plan ("NCP"), had and exercised its exclusive authority over **whether** to use dispersant, **which** dispersant to use, in what **quantities** and **in what waters** dispersants should be used **safely.**

- Plaintiffs do not and cannot challenge that the federal government, as required under the CWA/NCP, decided to approve the use of COREXIT, decided to approve its application to the surface and below the surface of the Gulf of Mexico, decided to approve the quantities in which it was applied and decided to approve the means by which it was applied. And the Federal On Scene Coordinator ("FOSC"), under the powers delegated by the President, made these decisions daily during the unprecedented response.

- Plaintiffs do not and cannot challenge that Nalco had absolutely nothing to do with causing the explosion or the blow-out or the release of even one drop of oil.

- Plaintiffs do not and cannot challenge that Nalco did nothing more than supply a product listed on the NCP Product Schedule, pre-approved by the relevant Regional Response Teams and approved by the FOSC for this exact use.

- Plaintiffs do not and cannot challenge that twice the USCG wrote Nalco and its suppliers asking that they respond "in a time of great national need" to do everything necessary to help fight the spill. (Nalco's SUMF ¶¶ 68-69.)[2]

Rather than refute the only facts relevant to this motion, Plaintiffs instead argue that Nalco **should have** manufactured a different product – one that "was not dangerous." (Pls.' Omnibus Mem. in Opp. at 4.) Of course, Nalco denies that its product was "dangerous," but the point is that Plaintiffs' allegations against Nalco are in direct conflict with the decisions delegated to and actually made by the President's delegates under the CWA/NCP. Whether or not another dispersant alternative was or should have been available misses the point. The federal government was charged under the CWA/NCP to choose among the available products listed on the NCP Product Schedule. What Plaintiffs accuse Nalco of not doing (*i.e.*, not developing and manufacturing a different dispersant during an emergency) directly conflicts with

---

[2] While Plaintiffs assert that the USCG letters, attached as Exhibits X and Y to Nalco's SUMF, are inadmissible hearsay, the letters are not being offered for the truth of the matter asserted and thus are not hearsay. *See* Fed. R. Evid. 801.

what Nalco was asked to do by the USCG – to supply the only pre-approved dispersant they had. This is exactly why Plaintiffs' claims against Nalco are preempted as a matter of law.

Had Nalco refused the request for COREXIT, it would have left the FOSC without a supply of the dispersants that the United States determined were necessary to respond to this national emergency.  Instead, Nalco did exactly what it was asked to do by the USCG.  And, even according to Plaintiffs, the USCG made this request in the course of exercising its exclusive authority under the CWA/NCP to decide *whether* to use dispersant, *which* dispersant to use, in what *quantities* and *in what waters* dispersants should be used *safely.*  Thus, in answer to the Court's question of whether the "complained of activity fell within the scope of the CWA/NCP," (Order and Reasons at 15 (Sept. 30, 2011) (Rec. Doc. 4159) (the "B3 Order")), Plaintiffs necessarily admit the answer is "yes."  Plaintiffs complain that Nalco did exactly what it was asked to do by the federal government and nothing more.  An "ask" fully within the decisions the federal government is mandated to make under the CWA/NCP.

A ruling leaving responders with the choice between answering our country's calls for help in a national emergency or risking potentially unsustainable liabilities under state or maritime tort law, jeopardizes the government's ability to enlist the help of private responders during future emergencies – help which may be necessary to the government's legal obligation to fully respond to a Spill Of National Significance.  Again, this is exactly why Plaintiffs' claims against Nalco are preempted as a matter of law.  Accordingly, for the reasons set forth in Nalco's previous briefing, in the Clean-Up Responders' briefing, and below, this Court should grant Nalco judgment as a matter of law.

## II. ARGUMENT

### A. Plaintiffs' Claims Directly Conflict With The Federal Government's Decision To Approve COREXIT Use.

This Court ruled that "Defendants can only avail themselves of preemption if they show that the complained of activities fell within the scope of the CWA/NCP." (*Id*.) Nalco has so demonstrated and Plaintiffs have not and cannot rebut the record facts. There is no material dispute that the complained of activities fell within the scope of the CWA/NCP. These are Plaintiffs' allegations:

- The B3 Master Complaint alleges that: "Nalco's chemical dispersants were unreasonably dangerous to Plaintiffs for their intended purpose when the dispersants left Nalco's control." (B3 Master Complaint ¶ 269.)

- The B3 Master Complaint alleges that: "the design defect in Corexit is its toxicity to humans and its ability to cause physical injury, health hazards, and damages to property because of its toxicity." [3] (*Id*. ¶ 276.)

- Plaintiffs complain in the B3 Master Complaint that "[i]n an ill-conceived effort to contain and to clean up the spill, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water." (*Id*. at p.2.)

- Plaintiffs say in their brief that "Nalco [ ] had the duty, means, and ability to manufacture a product that was not dangerous to the environment and human health." (Pls.' Omnibus Mem. in Opp. at 4.)

- According to Plaintiffs, Nalco's dispersants were simply too "toxic," too "dangerous," in the manner they were used, in the waters in which they were used and in the amounts in which they were used in the Gulf. "[S]afer alternatives to Corexit existed." (*Id*. at 41.)

Thus, according to Plaintiffs, COREXIT should not have been used in the Gulf at all. COREXIT should not have been used in the Gulf in the manner in which it was applied, in the waters in

---

[3]     Pursuant to the Court's September 30, 2011 ruling granting in part and denying in part Nalco's motion to dismiss the B3 Master Complaint, the only remaining claims against Nalco are negligence and strict liability claims under maritime law, which, as set forth below, conflict with the President's decisions regarding dispersant use and are preempted. (B3 Order at 5, 21, 24.) Preemption applies to claims made pursuant to maritime law. *See, e.g.*, *In re Complaint of Oswego Barge Corp.*, 664 F.2d 327, 337-38 (2d Cir. 1981) (maritime claims preempted by the CWA).

which it was applied, in the amounts in which it was applied.  Yet, ***all of these complaints fall***

***squarely within the CWA/NCP's mandatory federal scheme***:

- "The President ***shall*** prepare and publish a National Contingency Plan for removal of oil and hazardous substances. . . ."  33 U.S.C. § 1321(d)(1).  *The President did so.*

- The President ***shall*** include in the NCP "[p]rocedures and techniques to be employed in identifying, containing, ***dispersing***, and removing oil."  *Id.* §1321(d)(2)(F).  *The President included use of dispersants among the techniques to be used in responding to an oil spill.*

- The President ***shall*** identify "***dispersants***, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan."  *Id.* § 1321(d)(2)(G)(i).  *The President listed COREXIT on the NCP Product Schedule among dispersants that may be used in carrying out the NCP.  The listing required submission of toxicity testing, efficacy testing and component information.  The FOSCs decided that COREXIT should be used during the response.*

- The President ***shall*** identify "***the waters in which such dispersants*** . . . ***may be used***."  *Id.* § 1321(d)(2)(G)(ii).  *The President's delegates decided where COREXIT should be used.*

- The President ***shall*** identify "***the quantities of such dispersant***, other chemicals, or other spill mitigating device or substance which ***can be used safely in such waters***."  *Id.* § 1321(d)(2)(G)(iii).  *The President's delegates decided the waters in which COREXIT should be used and the volumes in which COREXIT could be used safely.*

- When responding to a substantial threat to public health or welfare, "the President ***shall*** direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge."  *Id.* § 1321(c)(2)(A).  *The President's delegates directed the response and had ultimate decision making authority over dispersant use.*

- The FOSC "***shall*** direct response efforts."  40 C.F.R. § 300.135(a).  *The FOSC did so and decided COREXIT should be used.*

Plaintiffs' claims directly conflict with the federal government's decisions regarding

dispersant use and are barred by the application of impossibility and obstacle preemption.

Plaintiffs say COREXIT was "unreasonably dangerous" (B3 Master Complaint ¶ 272) and

"toxic" (*id.* ¶ 276), but the federal government made the decision to address this emergency by

authorizing application of COREXIT safely in the Gulf – in certain quantities, in certain

manners, in certain locations – each and every day it was actually used.  Plaintiffs' claims

directly conflict with the federal government's decision making authority – and actual decisions

– under the CWA and NCP.[4]  As such, Plaintiffs' claims pose a clear obstacle to the

accomplishment of the objectives of the CWA and the NCP.  *See  Arizona v. United States*, __ S.

Ct. __, 2012 WL 2368661, at **12-14 (June 25, 2012) (striking down state law immigration

provisions where they stood as obstacles to Congress' objectives in passing federal immigration

laws); *Geier v. Am. Honda Co.*, 529 U.S. 861, 881 (2000) (applying conflict preemption where

allowing lawsuit to proceed would undermine federal goal of encouraging car manufacturers to

develop a variety of passive restraint systems); *see also Witty v. Delta Air Lines, Inc.*, 366 F.3d

380, 385 (5th Cir. 2004) (holding plaintiff's claim was preempted by the "pervasive regulatory

scheme covering air safety concerns" and because it conflicted with a federal determination that

passengers should remain seated).[5]

---

[4]    While Plaintiffs are careful to avoid directly attacking the federal government's decisions to use dispersants safely in the specific quantities, manner and locations it so decided, the direct implication of Plaintiffs' accusations is exactly that.  Nalco did not make any of the decisions about which Plaintiffs complain because those decisions are delegated to the federal government who made them in response to this emergency.  Indeed, the FOSC concluded in its September 2011 report to the National Response Team that "dispersants were an effective response tool, and prevented millions of gallons of oil from impacting the sensitive shorelines of the GOM states."  (Clean-Up Responder Defendants' Joint SUMF, ¶ 50 (Rec. Doc. 6535-3.))

[5]    This clear conflict distinguishes this case from those cited in Plaintiffs' brief.  *See Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1980-1986 (2011) (state law providing that licenses of state employers that intentionally employ unauthorized aliens may be suspended or revoked did not conflict with federal immigration law where federal statute expressly "preserv[ed] to the States the authority to impose sanctions through licensing laws"; state law requiring employers to use federally maintained electronic database to verify employees' immigration status did not conflict with federal immigration scheme where federal government "has consistently expanded and encouraged the use of" the database); *English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) (state law claim against employer for infliction of emotional distress did not conflict with provision in Energy Reorganization Act of 1974 preventing employer from retaliating against employee for reporting nuclear safety violations); *New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973) (holding Congress did not intend to preempt the field of employment and training for welfare recipients, and remanding for consideration of whether state welfare rules conflicted with specific provisions of federal law).

Indeed, it would be impossible for Nalco to do as Plaintiffs wish and also comply with the decisions lawfully made by the federal government.  The federal government decided that COREXIT should be used safely in the Gulf in the quantities, manners and locations in which it was used – even if it was "unreasonably dangerous" or "toxic" (which Nalco flatly denies).  The USCG implored Nalco to provide as much COREXIT as it could during the response.  It would have been impossible for Nalco to provide a different, less "dangerous" or less "toxic" product while complying with the USGC's request.  To be used during an oil spill response, a dispersant must already be on the NCP Product Schedule.  Nalco had no other dispersants listed on the NCP.  It would have been impossible for Nalco to have provided an alternative, as Plaintiffs suggest.  Where a party cannot comply with both federal and state law, the doctrine of implied conflict preemption applies.  *See, e.g., Fla. Lime & Avocado Growers' Ass'n v. Paul*, 373 U.S. 132, 142-43 (1963) (conflict preemption exists where a party cannot comply with both state and federal law).  Here Nalco was asked to provide COREXIT  – a product on the NCP Product Schedule.[6]  If such product was too "dangerous" and too "toxic" under maritime law as Plaintiffs allege, then it was impossible for Nalco to comply with both federal and maritime law.  Those decisions about the product are precisely what the CWA requires the government to decide.  Plaintiffs' claims are preempted.  The "complained of activities [fall] within the scope of the CWA/NCP."  (B3 Order  at 15.)

---

[6]     Plaintiffs mischaracterize Nalco's argument, stating that Nalco concludes that NCP pre-approval of COREXIT alone preempts Plaintiffs' claims.  (Pls.' Omnibus Mem. in Opp. at 39-40.)  Nalco has never argued that the simple act of listing a product on the NCP Product Schedule preempts common law claims.  Rather, as is clear from Nalco's submissions to the Court, it is the mandatory, comprehensive response scheme and the federal government's decisions regarding dispersants, made pursuant to that scheme, from NCP approval to the full authority to decide which dispersants and whether, how, when and where dispersants will be used, that have preemptive effect.  Here the President decided to use dispersants and under the CWA/NCP, the only dispersants approved for use are those dispersants on the NCP Product List.  Listing a dispersant on the NCP Product List is just one step – of many – that the President must follow under the CWA/NCP in order to decide to use dispersants.

Plaintiffs' reliance on the *In re MTBE* cases is misplaced.  In those cases, the courts emphasized that the Clean Air Act did not dictate the selection of MTBE as an oxygenate in gasoline and therefore tort claims arising from the selection of MTBE were not an obstacle to the implementation of the Clean Air Act.  *See In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 327, 337 (S.D.N.Y. 2006) (noting that USEPA "did not mandate the use of any one oxygenate" in reformulated gasoline and that the Clean Air Act "contains no language mandating that defendants have a choice among oxygenates"); *In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001) (explaining that the reformulated gasoline program set forth in the Clean Air Act "does not mandate the use of MTBE"). While in the *In re MTBE* cases, manufacturers decided to use MTBE, in what quantities, locations and manners, in this case, the federal government, under the CWA/NCP, made all of the decisions regarding the use of dispersants in response to the spill – including whether to use them at all.

### B.     The Record Facts Show That Plaintiffs' Claims Are Preempted And The Record Is Properly Closed For Summary Judgment.

While Nalco's preemption defense can be decided as a matter of law, the record facts submitted by Nalco do indeed demonstrate that the "complained of activity fell within the scope of the CWA/NCP."  (B3 Order at 15; Nalco's Mem. in Supp. of Mot. for Summ. J. at 14-23 (hereinafter "Nalco's Mem. in Supp."))[7]  Plaintiffs have failed to come forward with ***any*** facts creating a genuine dispute over whether the FOSC, in compliance with the CWA/NCP, decided to use COREXIT, decided where COREXIT should be applied, decided in what quantities

---

[7]     As Nalco set forth in its memorandum in support of its motion for summary judgment, the *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1988) test for derivative immunity does not apply to the conflict preemption argument that Nalco proffers here.  (Nalco's Mem. in Supp. at 11-13.)  Plaintiffs do not contest that point in their opposition to Nalco's motion and concede that the *Boyle* test is inapplicable.

COREXIT should be applied, decided how COREXIT should be applied, and decided in what

waters COREXIT should be applied safely.  Moreover, *none* of the affidavits or declarations

Plaintiffs submitted with their Omnibus Memorandum have anything to do with Nalco.  Unable

to dispute any material facts, Plaintiffs attempt instead to raise baseless objections to Nalco's

evidence.  Plaintiffs are wrong:

- *Plaintiffs wrongly urge the Court to disregard sworn deposition testimony of Douglas Suttles.*  (Pls.' Omnibus Mem. in Opp. at 14 n.10.)  Plaintiffs were present at Mr. Suttles' deposition and had ample opportunity to question him about the federal government's control over the response.  They examined Mr. Suttles first and last for over six hours.  They did not and they have no basis now to question the credibility of his sworn statements.

- *Plaintiffs wrongly urge the Court to disregard the United States' stipulations*.  The Court can and should consider the stipulations.  These are the formal admissions of the United States.  The United States, the party that has the knowledge of the facts asserted in the stipulations, signed the stipulations.  It is well-established that "[s]tipulations are a proper evidentiary basis for a summary judgment."  *Munoz v. Int'l Alliance of Theatrical Stage Emps. & Moving Picture Mach. Operators*, 563 F.2d 205, 213 (5th Cir. 1977).  Although Plaintiffs complain that they "have not been permitted to test the veracity of the stipulations through deposition testimony," (Pls.' Omnibus Mem. in Opp. at 26), in fact the order setting forth the limited discovery schedule (the "B3 Discovery Order") provided them with ample time in which to depose United States witnesses.  (Rec. Doc. 5000) (April 30, 2012 deadline for limited 30(b)(6) depositions of the United States and Clean-Up Responder witnesses.)

- *Plaintiffs are wrongly dismissive of the authorizations in the record that show the federal government's approval of dispersant use.*  Far from "a small number of Unified Command authorizations," (Pls.' Omnibus Mem. in Opp. at 16 n.12), Nalco submitted authorizations for virtually all dispersant applications after May 26, 2010.  (*See* Exh. S to Nalco's SUMF.)  Further, Plaintiffs do not contest that throughout the response, the FOSC approved each application of dispersants and that the FOSC's authorizations included limits on where, when and the quantities in which dispersants could be applied safely.  (Pls.' Local Rule 56.2 Resp. to Defs.' Statements of Fact (hereinafter "Pls.' Resp. to Defs.' SUMF"), Pls.' Local Rule 56.2 Counter-Statement of Facts in Resp. to Nalco's SUMF ¶¶ 36-39, 41-45, 47-57 (Rec. Doc. 6696-1.))

- *Plaintiffs wrongly complain that they need more discovery*.  For the reasons set forth in the Clean-Up Responder Defendants' Joint Reply Memorandum, this complaint should fall on deaf ears.  Plaintiffs had every opportunity to engage in the discovery they now claim to need.  Nalco worked diligently and in good faith to abide by the limited B3 discovery schedule.  Nalco produced over 27,000 pages of documents to

Plaintiffs.  Nalco produced a Rule 30(b)(6) witness, who the PSC deposed for three hours on the eve of discovery closing.  Then, Nalco filed a Renewed Motion to Dismiss the B3 Master Complaint.  (Rec. Doc. 5531.)  Plaintiffs, in turn, defaulted on their right to file a response.  Nevertheless, despite their failure to respond as required by the B3 Discovery Order, Plaintiffs received a second opportunity to oppose Nalco's motion under the Court's April 16, 2012 order.  (Rec. Doc. 6247.)  Plaintiffs have had every opportunity to take all the discovery they wanted.

Plaintiffs do suggest in their brief (although not in the B3 Master Complaint) that Nalco somehow failed to comply with the NCP because it did not inform the government that respiratory protection was needed for the application of COREXIT.  (Pls.' Omnibus Mem. in Opp. at 42.)  Yet, Nalco or its predecessor complied with the NCP's listing requirements, including submitting recommended conditions for use (*see infra* at 13-15), and as Plaintiffs themselves admit, the MSDS for COREXIT did require the use of respiratory protection.  (Pls.' Omnibus Mem. in Opp. at 19.)  Moreover, Plaintiffs admit that "OSHA and BP developed a matrix outlining the personal protective equipment ('PPE') that should have been supplied to workers engaged in each category of clean-up work."  (*Id.* at 18.)[8]  And, they concede that the federal government monitored daily air sample results and reports to ensure that clean-up workers were not exposed to harmful conditions, and that air monitoring data confirmed that exposure levels for chemicals were not high enough to require the use of respirators for clean-up workers.  (Pls.' Resp. to Defs.' SUMF, Pls.' Local Rule 56.2 Counter-Statement of Facts in Resp. to Clean-Up Responder Defs.' Joint SUMF ¶¶ 92-96.)  Notably, USEPA conducted its own battery of tests and determined that COREXIT was no more toxic than other available alternatives, a fact that Plaintiffs do not contest.  (*Id.* ¶¶ 98-103.)

---

[8]     The testimony Plaintiffs cite simply notes that a BP air monitoring plan was designed to monitor for volatile compounds in crude oil and not for COREXIT.  (Ramesh Dep. Tr. at 46:4-25 (Ex. 9 to Pls.' Omnibus Mem. in Opp.))  This is a red herring – the unrebutted testimony of Nalco's representative clearly indicates that Nalco recommended the use of personal protective gear and that  air monitoring was not necessary because COREXIT is not volatile.  (*Id.* at 34:25-35:17.)

### C.     The Savings Provisions Plaintiffs Cite Do Not Preserve Claims That Conflict With The Mandatory Decisions Made By The Federal Government.

Plaintiffs incorrectly assert that three savings clauses bar preemption.  Plaintiffs are wrong for multiple independent reasons.  *First,* the Supreme Court has clearly held that savings clauses like those cited by Plaintiffs do not bar the application of conflict preemption.  *See Geier* 529 U.S. at 870 ("[T]his Court has repeatedly 'declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'") (quoting *Locke*, 529 U.S. at 106-07); *see also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011) (holding that federal law's saving clause did not "suggest[] an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the [federal law's] objectives").[9]  As in *Geier* and *Concepcion*, Plaintiffs' claims stand as an "obstacle to the accomplishment and execution of" the CWA and NCP.  *Concepcion*, 131 S. Ct. at 1748.  Thus, according to the Supreme Court, only state or maritime claims that do not conflict with or pose an obstacle to the accomplishment of federal law are "saved" by the provisions upon which Plaintiffs mistakenly rely.

*Second,* two of the provisions Plaintiffs proffer – sections 2718(a) and 1321(o) – save non-conflicting *state* law claims.  This Court has already previously held that state law claims are preempted and that maritime law applies.  (B3 Order at 5, 21.)  Thus, these savings provisions are inapposite.  Only section 2751(e)(1) saves "admiralty and maritime law" but only "[e]xept as otherwise provided in this Act" making the reasoning of *Geier* and *Concepcion* directly applicable. 33 U.S.C. § 2751(e).

---

[9]     Contrary to Plaintiffs' assertion, Nalco noted in each of its previously filed briefs that the existence of a savings clause in the CWA does not bar application of conflict preemption principles. (Rec. Doc. 1409 at 21 n.9; Rec. Doc. 2206 at 10; Rec. Doc. 5531-1 at 9 n.7; Rec. Doc. 6541-1 at 10 n7.)

*Third*, Plaintiffs' citation to the OPA savings clause in 33 U.S.C. §§2718(a) is puzzling. 33 U.S.C. § 2718(a) is found in Title I of the OPA.  *See* Oil Pollution Act of 1990, P.L. 101-380, Title I, section 1018 (codified as amended at 33 U.S.C. § 2701 *et seq*.).  As the Supreme Court has noted, section 2718 "may preserve a State's ability to enact laws of a scope similar to Title I, but [does] not extend to subjects addressed in the other titles of the Act or other acts."  *United States v. Locke*, 529 U.S. 89, 105-06 (2000).  The comprehensive oil spill response scheme on which Nalco relies is set forth in 33 U.S.C. § 1321, which is found in the CWA as amended by Title IV of OPA.  *See* Oil Pollution Act of 1990, P.L. 101-380, Title IV, section 4201 (codified as amended at 33 U.S.C. § 2701 *et seq*.).  Section 2718(a) does not apply for this independent reason.

*Finally*, Plaintiffs' reliance on the CWA's responder immunity provision in 33 U.S.C. § 1321(c)(4) is unavailing.  Section 1321(c)(4) shields responders from liability, but excludes from that immunity provision claims for personal injury and gross negligence.  Plaintiffs assert that accepting Nalco's preemption argument would bar the kinds of claims expressly carved out from section 1321(c)(4)'s responder immunity provision.  Plaintiffs are wrong.  Dismissing the B3 claims against Nalco based on conflict preemption principles would not mean that ***every*** personal injury or gross negligence claim for damages resulting from response actions would be preempted because such claims do not in all cases create a true conflict with the President's decision.

### D.   Plaintiffs Misrepresent USEPA's Position On The Preemptive Effect Of CWA Regulations.

Plaintiffs assert that USEPA has taken a position on the preemptive effect of the NCP regulations on which Nalco relies.  Plaintiffs are wrong.  In their brief, Plaintiffs cite a law review article for the proposition that "according to the EPA, only one rule promulgated pursuant

to the CWA has the effect of preempting state law – the Uniform National Discharge Standards for Vessels of the Armed Forces." (Pls.' Omnibus Mem. in Opp. at 40 n.22.) The article on which they rely cites a 2009 USEPA memorandum listing nine rules USEPA determined preempt state law. *See* Catherine M. Sharkey, *Inside Agency Preemption*, 110 Mich. L. Rev. 521, 528, 567-69 (2012). Plaintiffs completely fail to mention that in its memorandum, USEPA was responding to a 2009 Presidential request in which the President directed heads of agencies to "review regulations ***issued within the past 10 years*** that contain statements in regulatory preambles or codified provisions intended by the department or agency to preempt State law, in order to decide whether such statements or provisions are justified under applicable legal principles governing preemption." Preemption: Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 24,693, 24,693-94 (May 22, 2009). That is, agencies were to review regulations promulgated since 1999. The NCP regulations on which Nalco relies were promulgated between 1990 and 1994. Thus, they were ***not*** part of USEPA's review and USEPA's 2009 memorandum has absolutely no implication for their preemptive effect. USEPA has not taken a position on the preemptive effect of the NCP regulations.

## E.    Plaintiff Coco's Arguments Are Meritless.

Plaintiff Malcolm Coco ("Plaintiff Coco") argues that Nalco cannot prevail because it did not prove it complied with the regulations for listing products on the NCP Product Schedule. (Pl. Malcolm Coco's Opp. to Nalco Defs.' Mot. for Summ. J. (Rec. Doc. 6705.)) Plaintiff Coco seeks to reverse his own burden of proof to adduce admissible evidence creating an issue of fact – and moreover is simply wrong. Plaintiff Coco concedes that COREXIT was listed on the NCP Product Schedule. USEPA could only list COREXIT on the NCP Product Schedule after ensuring that its manufacturer had submitted the information in 40 C.F.R. § 300.915. As the United States so stipulated

Before COREXIT EC9500A and EC9527A were added to the National Contingency Plan ("NCP") Product Schedule, the United States required effectiveness testing to be conducted on these dispersants as specified in 40 C.F.R. § 300.915(a)(7).

Before COREXIT EC9500A and EC9527A were added to the NCP Product Schedule, the United States required toxicity testing to be conducted on these dispersants as specified in 40 C.F.R. § 300.915(a)(8).

Before COREXIT EC9500A and EC9527A were added to the NCP Product Schedule, the United States required the submission of each dispersant's components as specified in 40 C.F.R. § 300.915(a)(10)-(11).

(Nalco's SUMF ¶¶ 4-6.) It is well-established that administrative agencies are afforded a presumption of regularity in regard to adherence to their own regulations. *See United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *Bowen v. Am. Hosp. Ass'n.*, 476 U.S. 610, 626–27 (1986); *BCCA Appeal Grp. v. United States Envtl. Prot. Agency*, 355 F.3d 817, 832 (5th Cir. 2003) ("[T]here is a presumption of regularity to the EPA's choice of analytical methodology, so challenging parties must overcome a 'considerable burden.'") (citation omitted); *Dardar v. Lafourche Realty Co.*, 639 F. Supp. 1525, 1530 (E.D. La. 1986); *see also Cent. Elec. Power Co-op v. Se. Power*, 338 F.3d 333, 337 (4th Cir. 2003) ("Given the expertise of agencies in the fields they regulate, a presumption of regularity attaches to administrative actions.").

Unable to address any of Nalco's arguments on the applicability of preemption, Plaintiff Coco shifts to the red herring tactic of arguing that Nalco somehow failed to provide information to the government. But this claim is not even at issue in this litigation. Nowhere in the B3 Master Complaint do Plaintiffs allege that Nalco failed to provide sufficient information on its products. In fact, both in their complaint and in this briefing, Plaintiffs cite to Nalco's own published MSDS product warnings in arguing that the product is "too dangerous." Moreover, Plaintiffs obtained full discovery from Nalco on this issue (over 27,000 pages of documents), yet Plaintiff Coco cannot point to a shred of evidence that Nalco withheld information or that

USEPA illegally listed COREXIT on the NCP Product Schedule, and thus there can be no genuine fact issue as to whether or not COREXIT complied with the NCP regulations.

### F.      In the Alternative, Nalco Is Entitled To Derivative Immunity.

In its Order granting in part and denying in part Nalco's motion to dismiss and those of various other B3 Defendants, this Court noted the similar policy reasons underlying the doctrines of implied conflict preemption and derivative immunity.  (B3 Order at 13-14.)  In its Motion for Summary Judgment, Nalco merely provided the Court with an alternative theory on which to base dismissal of the B3 claims.  Plaintiffs cite no authority for the proposition that Nalco waived this argument, and the law is to the contrary.  *See, e.g., Campbell v. Supervalu, Inc.*, 565 F. Supp. 2d 969, 974-75 (N.D. Ind. 2008) (holding party moving for summary judgment did not waive statute of repose defense by failing to include it in prior motion to dismiss); *Union of Flight Attendants, Local No. 1 v. Air Micronesia, Inc.*, 684 F. Supp. 1520, 1530 (D. Haw. 1988) (summary judgment movant did not waive statute of limitations defense by raising for first time in summary judgment motion).  The sound policy reasons for dismissing the B3 Master Complaint are the same whether based on preemption or immunity.[10]

## III.     CONCLUSION

This first Spill of National Significance was an unprecedented national emergency.  The United States' response, and the legal precedents that will follow from it, will impact the government's ability to enlist the assistance it may require in responding to future emergencies. Congress has tasked the President with responding to Spills of National Significance, and the President must be able to enlist private assistance in doing so.  The inescapable implication of

---

[10]      Plaintiffs complain that discovery against Nalco did not include discovery as to the derivative immunity theory, given that Nalco had not previously moved for dismissal on this theory. (Pls.' Omnibus Mem. in Opp. at 27 n.17.)  The Court can rule on this legal theory without further discovery.  Moreover, Nalco believes that its preemption argument alone is grounds for dismissal without need for reaching the immunity argument – as Nalco argued in its original motion to dismiss.  (Rec. Doc. 1409.)

15

Plaintiffs' arguments is that when asked by the USCG to supply COREXIT in response to a national emergency, Nalco should have said no.  No private citizen should refuse the government's call for help for fear of conflicting state or maritime law.  The doctrine of conflict preemption requires dismissal of Plaintiffs' claims, an outcome that is not only legally required but will assure that the President can continue to rely on private entities in responding to future Spills of National Significance.  For all of these reasons, the B3 Master Complaint should be dismissed in its entirety as to Nalco as a matter of law.

Dated:  July 6, 2012                          Respectfully submitted,

                                              By: /s/ Thomas J. Heiden
                                              Thomas J. Heiden (IL # 6281563)
                                              (thomas.heiden@lw.com)
                                              Mary Rose Alexander (IL # 6205313)
                                              (mary.rose.alexander@lw.com)
                                              LATHAM & WATKINS LLP
                                              233 South Wacker Dr.
                                              Suite 5800
                                              Chicago, IL 60606-6401
                                              Phone: (312) 876-7700
                                              Facsimile: (312) 993-9767

                                              *Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 6th day of July, 2012.

/s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*

17