

**U.S. Department of Justice**
Environment and Natural Resource Division

---

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0056*
*Scott.Cernich@usdoj.gov*

July 3, 2012

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, Louisiana 70130

   Re: MDL 2179: United States' Challenges to BP Privilege Claims

Dear Judge Shushan:

  BP has not met its burden to establish the elements of the attorney-client privilege or the attorney work-product doctrine. Instead of directly addressing any of the United States' privilege challenges head on, BP used its 19-page response to construct a series of straw men to knock down. *See* BP June 26, 2012 Letter ("BP Response") (Rec. doc. 6810). BP's Response conflates and mischaracterizes the United States' arguments in an attempt to distract from their strength. The United States respectfully requests the Court refer to the United States' June 16, 2012 Letter (Rec. doc. 6718) ("U.S. Challenge Brief") and not rely on BP's mischaracterizations.[1]

  Revealingly, when *seeking* documents, BP relied on the same legal principles the United States recites here. *See, e.g*., BP Parties' Mem. in Support of Their Motion to Compel Against Transocean (Aug. 22, 2011) (Rec. doc. 3788-1) ("BP Motion to Compel TO") (Attachment 1 to this Reply); BP Parties' Reply in Support of Their Motion to Compel Against Transocean (Aug. 29, 2011) (Rec. doc. 3842) ("BP Reply on Motion to Compel TO"); BP Motion to Compel Halliburton (Aug. 29, 2011) (Rec. doc. 3919). Now that the shoe is on the other foot, BP argues that different standards apply. This cannot be the case. BP must live by the same rules that it applied to other Parties.

---

[1] BP's Response also implies that the United States' *in camera* list is the universe of the United States' privilege challenges. This is incorrect. As the Court ordered, this *in camera* list is a "representative" list for the Court's consideration. *See* Order re: Completion of Phase Two Document Production (Rec. doc. 6510). The Court will note that BP has agreed to release 35 of the 81 document submitted by the United States. The United States expects that BP will extrapolate these new "de-privilege" determinations, as well as the Court's ruling on BP's privilege claims, throughout its logs just as the Court has required the United States to do for the Deliberative Process documents.

**BP Still Has Not Demonstrated the Validity of its Attorney-Client Privilege Claims**

BP agrees that, "[t]o be protected by attorney-client privilege, a document must embody communications made to attorneys solely for the purpose of seeking legal advice or received from counsel rendering such legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 394–95 (1981)." *See* BP Reply on Motion to Compel TO at 5.

BP further agrees that the attorney-client privilege does not protect factual material. As BP previously told this Court in seeking drafts of, and documents related to, Transocean's investigation report, there is a "distinction between *communication* and *information*. Only the former is protected by the attorney-client privilege. *In re Grand Jury Subpoena*, 731 F.2d at 1037 (the privilege does not impede the disclosure of information), *United States v. Cunningham*, 672 F.2d 1064, 1073 (2d Cir. 1982) (same). The privilege protects only the communication itself which is rendered by or between counsel and clients, not the facts which are communicated. *Andritz*, 174 F.R.D. at 633 (facts gathered by counsel in the course of investigating are not privileged)." BP Reply on Motion to Compel TO at 7.

BP also told the Court that technical analyses estimating the flow from the well are factual in nature. *See generally* BP's Initial Deliberative Process Privilege Brief (Mar. 29, 2012) (Rec. doc. 6148) ("BP DPP Brief"). Now, BP contends they are not, but fails to explain why flow rate calculations by government scientists and engineers are factual, but calculations performed by BP engineers trying to stop the blowout are not. In analogous circumstances, this Court held that damages calculations – even when made at the request of counsel – are not privileged *but are factual information*. *Lenihan v. Stewart Enterp., Inc.*, No. 01-2895, 2002 WL 31001842, at *3 (E.D. La. Sept. 4, 2002) (emphasis added). Factual information, including flow rate calculations, is not protected by the attorney-client privilege and must be produced – just as BP argues when seeking documents from other Parties.[2]

**BP's Misstates the 5th Circuit's Restrictive "Primary Purpose" Work-Product Test**

BP erroneously argues that the Fifth Circuit's "primary purpose" work-product test only applies when litigation is not imminent. *See* BP Response at 9. The courts make no such distinction. Under BP's novel take on the work-product doctrine, every document created by a company when litigation is "imminent," whether for litigation or other business purposes, is protected from discovery.[3] BP's specious argument highlights the weakness of its work-product claims.

"Where the primary purpose for preparing a document is not litigation but some other business purpose [*e.g.*, responding to a blowout], work-product protection is not accorded." Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, 868 (5th ed. 2007) (hereinafter "Epstein"). This Court has consistently ruled that reports and materials

---

[2] BP now contends that the United States already possesses all of BP's "underlying factual material and data." BP Response at 11. The United States disagrees.

[3] The single case BP cites for its creative interpretation of the "primary purpose" test, *Dawson v. Jantran, Inc.*, No. 2:09-CV-60-P-A, 2010 WL 1956982 (N.D. Miss. May 13, 2010) simply does not stand for that proposition. Further, unlike here, where BP is withholding documents created by BP engineers for the purposes of attempting to stop and quantify the flow of oil from BP's well, in that case the Court refused to order production of an attorney's file containing "information gathered by the defendant's attorney[.]"

prepared when a party anticipates litigation resulting from an industrial accident – even when litigation is imminent – are not protected unless the primary motivating purpose for the document was to aid in possible future litigation.  *See, e.g.*, *Foret v. Transocean Offshore (USA), Inc.*, No. 09-4567, 2010 WL 2732332, at *4–5 (E.D. La. July 6, 2010) ("*Determining the driving force behind the preparation of each document* is therefore required in resolving a work product immunity question" (emphasis added)); *Poseidon Oil Pipeline Co., L.L.C. v. Transocean Sedco Forex, Inc.*, Nos. 00-760, 00-2154, 2001 WL 1360434, at *3 (E.D. La. Oct. 30, 2001).

Since the vast majority of the documents at issue relate to BP's  "response to the spill . . . and numerous other activities whose primary purpose was business in nature and not necessarily in anticipation of litigation . . . the documents are not protected and should be produced."  *See Barker v. Kinder Morgan South-East Terminals, L.L.C.*, No. 2:07cv48-KS-MTP, 2007 WL 4333843 (S.D. Miss. Dec. 6, 2007) (ordering production of documents relating to spill response). It does not take an engineer to imagine the non-litigation purposes for flow rate calculations *during* a blowout.  BP's own Oil Spill Response Plan provides that determining size and volume of the spill is "critical to initiating and sustaining an effective response."  *See* U.S. Challenge Brief at 4.

BP argues that efforts to quantify flow during the response were not necessarily part of the oil spill response, BP Response at 10, and admits that it was using "certain employees to respond in a non-privileged fashion to the spill while at the same time using those same employees to conduct separate privileged flow rate analysis in consultation with counsel."  BP Response at 5.  This is particularly troubling because those same employees whom BP contends were under direction of BP counsel were working shoulder to shoulder on a daily basis with United States engineers and scientists working to stop BP's blowout.  Nonetheless, if BP's assertion is accurate, then BP must prove that the "*driving force behind the preparation of each document*" was anticipated litigation.  *Foret*, 2010 WL 2732332, at *4 (emphasis added).

Further, the case law BP cites regarding purported dual purpose employees is inapposite. The personnel in question here were not called in to serve as litigation experts.[4]  They were called in by BP to respond to a disaster and now BP seeks to hide their work in response to that disaster.  Those same BP engineers are listed as the authors or recipients of hundreds of documents on BP's Quantification privilege list.  The Court would have to suspend common-sense to believe that those BP engineers' flow rate calculations did not also serve another more important purpose – informing BP's response to the well.  Indeed, it would reprehensible if BP failed to apply the very best information and analysis available to stop the blowout because the materials were part of a "legally privileged workstream."  If BP did so, the company should say so clearly, and the Court should take that fact into account in determining the appropriate relief in this case.

If the Court takes anything away from the BP Response, it should be BP's admission that it did not "formally establish[] a legally privileged workstream" on flow rate until July 19, 2010. *See* BP Response at 1.  Therefore, BP has no basis to claim work-product protection over Quantification documents created before that date.

---

[4] It appears now that BP is claiming its employees responding to the spill were or are now in-house experts.  Perhaps that information is contained in BP's ex parte submission.  Such facts are not privileged.  *See* Epstein at 803, 1123.

**The United States has Demonstrated a Substantial Need for BP's Information**

If, despite BP's admission, the Court determines that flow rate calculations BP performed prior to establishment of BP's privileged work stream are protected work-product, the United States has demonstrated a substantial need for them because: (1) BP called into question the very data it provided to the United States during the spill; (2) BP witnesses contradicted each other, lacked recollection, or refused to testify, on BP's flow rate calculations, U.S. Challenge Brief at 5–6; and (3) the Parties need to know whether the flow rate calculations BP prepared during the spill confirm or contradict the company's public statements because BP's credibility on flow rate is at issue in this case.  *See Adams v. Teck Cominco Alaska, Inc.*, 232 F.R.D. 341, 346 (D. Alaska 2005) (ordering production of defendant's internal compilation of Clean Water Act permit violations).

BP says, "[i]f the United States desires an explanation of these differences, it can ask the witnesses."  BP Response at 12.  Indeed, the United States *did* ask the witnesses and submitted the transcripts to this Court to prove it.[5]  Two witnesses in the best position to know BP's July 15, 2010 shut-in calculations (in their personal capacities and as 30(b)(6) witnesses) contradicted each other on flow rate ("56,000" v. "35- to 40- something-thousand" barrels per day ("bpd")).  U.S. Challenge Brief at 6.  The United States also *asked* BP officer Doug Suttles, who testified he could not recall the basis of the 53,000 bpd flow rate he submitted to the U.S. Coast Guard in July 2010.  *See id.*  The United States also *asked* BP officer Paul Tooms, but BP counsel instructed him not to answer questions regarding the information underlying the flow rate report BP submitted to the Oil Spill Commission and the Department of Justice in October 2010 ("Flow Rate Comment"),[6] *see id.*, even though the work-product doctrine applies to "documents and tangible things" and deposition questions regarding the basis of a calculation can never be subject to a work-product objection.  *See* Epstein at 1123.  BP's witnesses cannot or will not answer the questions.  The Court should order BP to produce the information.  As BP argued to this Court when seeking the United States' flow estimates, "[t]o the extent that the challenged documents reflect raw data, or internal assessments and calculations stemming from such data, they are highly material to the defense of this case and could not be obtained otherwise.  As a result, this factor also tilts heavily in favor of disclosure of the challenged documents."  *See* BP DPP Brief at 13.  BP's documents reflecting raw data, internal assessments, and calculations stemming such data should be disclosed because they are highly relevant to the prosecution of this case and the United States cannot obtain the information otherwise.

**BP Has Waived Protection on the Materials Underlying Two BP Reports**

BP has waived work-product protection on the facts, documents, and analyses underlying two discrete documents: (1) BP's Flow Rate Comment, and (2) the memo prepared by BP executive David Rainey and submitted to Admirals Landry and Allen on May 19, 2010.[7]  The United States does not argue that BP has waived *proper* claims of work-product protection

---

[5] BP designated Lynch to testify regarding the Capping Stack and Tooms to testify regarding the Well Integrity Analysis for 30(b)(6) topic nos. 4 and 5.  *See* Attachment 2, The BP Parties' Third Amended Responses and Objections to Plaintiffs' Agreed 30(b)(6) Deposition Notice with 30(b)(5) Document Requests.
[6] Attachment E to the U.S. Challenge Brief.
[7] Attachment L to the U.S. Challenge Brief.

unrelated to these documents.  *See* U.S. Challenge Brief at 7–10.[8]

First, it is important to point out that, while BP states it has never made the Flow Rate Comment available to the public, BP Response at 15, BP asked the Oil Spill Commission to share the information widely: "*BP requests that the information provided below be shared with the many technical personnel interested in this topic* and that there be open, constructive, and collaborative scientific discussion about these issues." Flow Rate Comment at 2–3 (emphasis added).  The Commission posted the report online and BP has offered no evidence that it asked the Commission to remove it.  In fact, it remains there today.[9]  BP also produced it in the MDL.

Second, BP's current arguments against waiver directly contradict its prior arguments to this Court on Transocean's investigation report.  *See* BP Motion to Compel TO (Rec. doc. 3788-1) at 6–11 (Attachment 1 to this Reply).  As BP persuasively argued to the Court in August 2011,

Consistent with governing case law, the Federal Rules of Evidence, and the principles of the work product doctrine, courts have held that when a party discloses a report which presents the findings of an internal investigation, the underlying investigative materials lose work product protection.

*See id.* at 8 (BP string cite omitted).  The Court agreed with BP and ordered Transocean to produce the requested documents.  *See* Order Regarding BP's Motion to Compel Discovery from Transocean (Rec. doc. 3894) ("Order re BP Motion to Compel TO") at 2.  The Court likewise should order BP to produce the documents underlying these two BP reports.

To the extent the Court finds the offensive or defensive use of BP's Flow Rate Comment by BP or other Parties relevant to its analysis, any other party in this case to which the quantity of oil released is relevant, (*e.g.*, those subject to civil penalties under the Clean Water Act, including Transocean and Anadarko), may make offensive or defensive use of the report, as it also is in their interests to minimize the quantity of oil released from the Macondo Well.  Even though BP contends that it will not "in any way seek now" to use the report as a "sword" in the MDL, BP Response at 17, BP already gained the advantage from this document.  It has provided a "sword" to the Defendants in the MDL to use against the United States and other Plaintiffs, just as the Court ruled Transocean did with its report.  *See* Order re Motion to Compel TO at 2.

## The Court Should Strike BP's Improper Ex Parte Declaration

The United States requests that the Court strike BP's improper ex parte declaration by Mark Nomellini of the Kirkland & Ellis law firm ("Nomellini Declaration").[10]  As a general rule substantive ex parte communications with the Court are prohibited.  *See, e.g.*, *Ohio Willow Wood Co. v. Thermo-Ply, Inc.*, No. 9:07-CV-274, 2010 WL 518243, at *3 (E.D. Tex. Feb. 4, 2010) (citing *F.T.C. v. Namer*, 2007 WL 2974059, at *5 (5th Cir. Oct. 12, 2007); *United States v. Thompson*, 827 F.2d 1254, 1258–59 (9th Cir. 1987).  "It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court

---

[8] If BP had truly intended the report to remain confidential it could have requested a promise of confidentiality from the Oil Spill Commission as many other parties did.

[9] http://www.oilspillcommission.gov/sites/default/files/documents/BP%20comments%20re%20Working%20Paper%20No%203.pdf

[10] Only two attachments to the Nomellini Declaration, A and D, are referenced in the BP Response.

judgment" and "a firmly held main rule that a court may not dispose of the merits of a case on the basis of ex parte, in camera submissions." *Abourezk v. Reagan*, 785 F.2d 1043, 1060–61 (D.C. Cir. 1986), *aff'd by an equally divided Court*, 484 U.S. 1 (1987).  Exceptions to the rule are few and tightly contained.  *See id.* at 1061.  While the *Abourezk* court recognized that at times a Court "may inspect the *evidence* in camera and alone for the limited purpose of determining whether the asserted privilege is genuinely applicable,"  it was quick to note that "no party will be faced … with a decision against him based on evidence *he was never permitted to see and to rebut*." *Id.* (emphasis added).  In stark contrast, the United States submitted all declarations in support of its privilege claims publicly.  BP is not entitled to special treatment.

If BP's ex parte filing argues that BP engineers were performing secret flow rate calculations at behest of counsel during the spill, BP should state so publicly.  Those facts are not protected and are relevant to this case where BP's credibility is a central issue.  "[F]oundational questions which seek to determine who was present or who authored a document or to whom it was sent are simply not encompassed within the [attorney-client] privilege."  Epstein at 1123.  Likewise, BP cannot hide foundational information necessary to test the validity of its work-product claims.  *See id.* at 803 (citing *Casson Constr. Co. v. Armco Steel Corp.*, 91 F.R.D. 376 (D. Kan. 1980) (work-product protection no shield to facts the attorney learned, persons from whom the facts have been learned, or the existence of documents).[11]

## Conclusion

Transocean released an investigation report on the Macondo blowout.  BP successfully argued that Transocean waived work-product protections on documents related to the report.  The United States performed extensive flow analysis, and agreed to produce internal discussions of that analysis in the face of a motion from BP.  Having received the internal analyses performed by these Parties, BP now claims that its own internal work related to stopping the blowout is sacrosanct.  This is neither fair nor countenanced by the case law.  BP must live by the rules it has applied to the others.

Respectfully submitted,

/s/ Scott M. Cernich
Scott M. Cernich

cc:    Liaison & Coordinating Counsel
       Robert Gasaway

---

[11] The United States reserves the right to respond to BP's ex parte filing when it is shared with the Parties.

# Attachment 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | **MDL NO. 2179** |
| | * | |
| | * | **SECTION J** |
| | * | |
| | * | |
| **This document relates to:** | * | **Judge Barbier** |
| | * | |
| *All cases* | * | **Magistrate Judge Shushan** |
| | * | |

## THE BP PARTIES' MEMORANDUM IN SUPPORT
## OF THEIR MOTION TO COMPEL AGAINST TRANSOCEAN

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

# TABLE OF CONTENTS

                                                                                                    Page

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.    Transocean's Attempt To Obstruct The BP Parties' Discovery. ............................ 2

    B.    Transocean's Improper Claims Of Privilege Over Documents Related To Its Internal Investigation. .................................................................................. 3

    C.    Transocean's Failure To Properly Answer Requests for Admission Related To Its Responsibilities. .............................................................................. 5

ARGUMENT .......................................................................................................... 6

I.    TRANSOCEAN IS IMPROPERLY SHIELDING NON-PRIVILEGED DOCUMENTS RELATED TO ITS INVESTIGATION. ...................................... 6

    A.    Transocean Has Waived The Work Product Privilege That Might Have Applied To Documents Related To Its Investigation. ............................................ 6

        1.    Transocean's Public Disclosure Of Its Report Waives The Work Product Privilege Over Related Documents. ............................................... 7

        2.    Transocean Should Not Be Allowed To Selectively Disclose The Results Of Its Investigation. ....................................................................... 9

    B.    Transocean Has Not Established Any Privilege For Entries Assigning Authorship to the "DWH Investigation Team" Or Listing No Author At All. ................................................................................................................ 12

II.    THE BP PARTIES' REQUESTS FOR ADMISSION 45-67 AND 282 SHOULD BE DEEMED ADMITTED BY TRANSOCEAN. .......................................... 15

CONCLUSION ...................................................................................................... 17

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. F.B.I.*,
    192 F.R.D. 42 (D.D.C. 2000) .................................................................13

*Ameripride Servs, Inc. v. Valley Indus. Servs., Inc.*,
    No. CIV 2:00-cv-0113-LKK-JFM, 2011 WL 1321873 (E.D. Cal. Apr. 1, 2011) ...................15

*Argus and Assocs., Inc. v. Prof'l Benefits Servs., Inc.*,
    2008 WL 5447738 (E.D. Mich. Dec. 31, 2008) ........................................16

*Asea, Inc. v. Southern Pac. Transp. Co.*,
    669 F.2d 1242 (9th Cir. 1981) .......................................................15

*Booth Oil Site Admin. Grp. v. Safety-Kleen Corp.*,
    194 F.R.D. 76 (W.D.N.Y. 2000) .....................................................16

*Ecuadorian Plaintiffs v. Chevron Corp.*,
    619 F.3d 373 (5th Cir. 2010) .........................................................7

*Fox v. Taylor Diving & Salvage Co.*,
    694 F.2d 1349 (5th Cir. 1983) .......................................................7

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    184 F.R.D. 49 (S.D.N.Y. 1999) ......................................................8

*Hodges, Grant & Kaufmann v. United States Gov't, Dept. of the Treasury, I.R.S.*,
    768 F.2d 719 (5th Cir. 1985) .......................................................12

*In re Kidder, Peabody Secs. Litig.*,
    168 F.R.D. 459 (S.D.N.Y. 1996) ...................................................9

*In re Leslie Fay Cos. Sec. Litig.*,
    161 F.R.D. 274 (S.D.N.Y. 1995) ...................................................8

*In Re Royal Ahold N.V. Secs. & ERISA Litig.*,
    230 F.R.D. 433 (D. Md. 2005) ......................................................8

*In re Vioxx Prods. Liab. Litig.*,
    No. MDL 1657, 2007 WL 854251 (E.D. La. Mar. 6, 2007) .....................................11

*Lerman v. Turner*,
    No. 10 C 2169, 2011 WL 62124 (N.D. Ill. 2011) ......................................8, 9

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*NXIVM Corp. v. O'Hara*,
   241 F.R.D. 109 (N.D.N.Y. 2007)............................................................................................10

*Pacific Gas & Electric Co. v. United States*,
   69 Fed. Cl. 784 (Fed. Cl. 2006) .......................................................................................12, 13

*Ross v. Abercrombie & Fitch Co.*,
   Nos. 2:05-cv-0819, 2:05-cv-0848, 2:05-cv-0879, 2:05-cv-0893, 2:05-cv-0913, 2:05-cv-0959,
   2010 WL 419947 (S.D. Ohio Jan. 28, 2010) ...........................................................................8

*S.A. Healy Co./Lodigiani USA, Ltd. v. United States*,
   37 Fed. Cl. 204 (1997) ............................................................................................................16

*Shields v. Sturm, Ruger & Co.*,
   864 F.2d 379 (5th Cir. 1989) ....................................................................................................7

*Sigmund v. Starwood Urban Retail VI, LLC*,
   236 F.R.D. 43 (D.D.C. 2006)..................................................................................................16

*Smithkline Beecham Corp. v. Apotex Corp.*,
   193 F.R.D. 530 (N.D. Ill. 2000)........................................................................................12, 13

*SmithKline Beecham Corp. v. Apotex Corp.*,
   232 F.R.D. 467 (E.D. Pa. 2005)........................................................................................12, 13

*Tribune v. Purcigliotti*,
   No. 93CIV7222LAPTHK 1997 WL 10924 (S.D.N.Y. Jan. 10, 1997).......................................9

*U.S. Airline Pilots Ass'n v. Pension Ben. Guar. Corp.*,
   274 F.R.D. 28 (D.D.C. 2011).....................................................................................................8

*United States v. Nobles*,
   422 U.S. 225 (1975)...................................................................................................................7

*Westmoreland v. CBS, Inc.*,
   97 F.R.D. 703 (S.D.N.Y. 1983) ...............................................................................................10

*Wilderness Soc'y v. United States Dep't of Interior*,
   344 F. Supp. 2d 1 (D.D.C.2004) ..............................................................................................13

### STATUTES

Fed. R. Civ. P. 26 ...........................................................................................1, 11, 12, 15

Fed. R. Civ. P. 36 ......................................................................................................passim

Fed. R. Evid. 502 ..............................................................................................................9

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

## OTHER AUTHORITIES

8 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2024 (3d ed. 2010) ....................................................................................................................................7

## INTRODUCTION

With expert deadlines looming and trial only months away, Transocean continues to withhold key information necessary to fully investigate the causes of – and responsibility for – the *Deepwater Horizon* incident. Transocean claims that hundreds of documents underlying its public investigation are privileged, even where it fails to identify any attorney involved. It also has refused to properly answer requests for admission concerning Transocean's duties regarding the *Deepwater Horizon* and Macondo well. For these reasons, BP America Production Company and BP Exploration & Production Inc. (collectively, the "BP Parties") move to compel Transocean to provide these documents and answers.

*First*, Transocean waived the work product privilege applying to its investigation documents when it published its investigation report to the general public and the parties in this litigation. Because the purpose of the work product privilege is to protect information from litigation adversaries, courts have held that publicly disclosing the results of an investigation waives any work product protection over related documents. Accordingly, this Court should require Transocean to produce the documents on its privilege log related to its investigation where the only asserted basis for privilege is work product.

Moreover, for several hundred documents on its privilege log Transocean attributes authorship solely to the "DWH Investigation Team" without a recipient and for hundreds more lists no author or recipient at all. Failing to list individual authors and recipients in a privilege log violates this Court's orders as well as Federal Rule of Civil Procedure 26. Transocean has not carried its burden of showing that these documents are privileged, and they should be produced as well.

*Second*, to understand Transocean's contentions, narrow the disputed issues at trial, and reduce the need for in-court evidence, the BP Parties served Transocean with requests for

admissions on various topics.  One category of requests sought to confirm Transocean's duties and responsibilities by asking Transocean to admit that, for example, it was "responsible for detecting and preventing blowouts," "required to use all reasonable means to control and prevent fire and blowouts," and was "responsible for taking all measures necessary or proper to protect the *Deepwater Horizon*'s personnel and facilities."  Transocean has refused to properly answer these requests, asserting that they ask for interpretation of the drilling contract between BP America Production Company and Transocean Holdings LLC relating to the *Deepwater Horizon* (the "Drilling Contract") and so are pure questions of law.  This argument fails because case law holds that requests for admission concerning the interpretation of a contract are permissible, and in fact Transocean's own requests in the insurance actions expressly ask the BP Parties for their interpretation of the Drilling Contract.

## BACKGROUND

### A.    The BP Parties' Discovery Of Transocean.

In accord with the Court's discovery deadlines, the BP Parties served a first set of document requests on Transocean on March 11, 2011 and a second set on April 29, 2011. Transocean claimed the arbitration provision in the Drilling Contract precluded discovery and objected to every single request, even though Transocean filed multiple complaints against the BP Parties.  On May 5, 2011, Transocean relied on the arbitration argument in filing a motion for a protective order against the BP Parties' written discovery.  Dkt. No. 2261.  This motion was fully briefed and pending until June 21, 2011, when this Court denied it.  Dkt. No. 2963.

Because of Transocean's tactics, the BP Parties were not able to effectively conduct written discovery against Transocean until June 21, 2011.  Since that time, the BP Parties have diligently pursued discovery.  Transocean served revised document request responses on July 1, 2011 and responses to the BP Parties' interrogatories and requests-for-admission on July 15,

2011. At this late stage in the discovery schedule, Transocean also began producing the substantial majority of its documents. Since June 11, 2011, Transocean has produced approximately 280,841 documents and 4,193,310 pages, approximately 80% of its total document production. In multiple letters, the BP Parties have followed up on various deficiencies in Transocean's privilege log, discovery responses, and document production to resolve disagreements in good faith and avoid seeking relief from this Court.

**B.      Transocean's Improper Claims Of Privilege Over Documents Related To Its Internal Investigation.**

On June 22, 2011, Transocean released to the general public[1] and produced to all parties in MDL No. 2179 its Transocean Investigation Report, "Macondo Well Incident" (the "Report"). (Ex. A, Excerpts from Transocean Investigation Report, "Macondo Well Incident") The Report claims to be the culmination of Transocean's investigation into the causes of the Macondo blowout and contains several supposed "key findings." (*Id.* at 10-11, 212-16)

At the time Transocean released its Report, Transocean's operative privilege log was its sixth supplemental privilege log.[2] This log identified a total of 1,155 withheld documents. Several hundred of these documents appeared to be related to Transocean's internal investigation and were being withheld on the basis of work product protection only, with no indication that an attorney was involved in preparing the document. *See id*. Moreover, approximately 676 document entries listed only the "DWH Investigation Team" as the author. *See id*.

---

[1]   The Report has been posted on the internet by Transocean and is available at http://deepwater.com/fw/main/Public-Report-1076.html

[2]   Although described as "supplemental," Transocean's sixth privilege log contained a list of all the documents over which it claimed privilege and superseded its previous logs. Similarly, Transocean's seventh privilege log superseded its sixth one.

On July 6, 2011, the BP Parties wrote to Transocean explaining that the public release of the Report waived any work product privilege applying to documents related to the investigation. (Ex. G, 7/6/11 Letter from C. Heck to S. Roberts)  The letter also noted that listing an author as "DWH Investigation Team," rather than the actual individual authors of the document, is improper.  This initial letter concluded by requesting a meet-and-confer.  Transocean sent the BP Parties correspondence on these privilege log issues on July 15 and July 20, to which the BP Parties responded on July 15 and 21.  (Ex. H, 7/15/11 Letter from C. Williams to C. Heck; Ex. I, 7/15/11 Letter from C. Heck to C. Williams; Ex. J, 7/20/11 Letter from C. Williams to C. Heck; Ex. K, 7/21/11 Letter from C. Heck to C. Williams).  Transocean's July 20 letter advised BP that it would produce a yet-to-be-determined number of contested documents from its prior privilege logs, and revise its privilege log to reflect only "narrowly defined claims of work product where appropriate." (Ex. J)  But this letter did not indicate when Transocean would provide this revised privilege log, and so the BP Parties requested that the Court set an appropriate due date.  On July 22, 2011, this Court ordered Transocean to serve a revised privilege log, and to produce the documents removed from its sixth supplemental privilege log, by July 28, 2011.  Dkt. No. 3457.

Transocean served its seventh "supplemental" privilege log on July 28, 2011, which like previous logs superseded its predecessors.  (Ex. B, Transocean's Seventh Supplemental Privilege Log)  This log identified a total of 2,544 withheld or redacted documents.  Many of these entries contain the same defects as those in the sixth privilege log.  Approximately 349 of these documents, apparently generated during the course of Transocean's internal investigation, were still being withheld on the basis of work product protection only, with no indication that an attorney was involved in preparing the document.  *See id*.  Approximately 636 documents listed only the "DWH Investigation Team" as the author, while another 206 list no author at all.  *See*

*id.* On August 8, 2011, the BP Parties sent a letter to Transocean explaining that these documents could not be properly withheld, and requesting that they be produced. (Ex. L, 8/8/11 Letter from C. Heck to C. Williams)

      **C.    Transocean's Failure To Properly Answer Requests for Admission Related To Its Responsibilities.**

The BP Parties served Transocean with requests for admission ("RFAs") on June 3, 2011. Transocean served its responses to the BP Parties' requests for admission on July 15, 2011. (Ex. C, Excerpts from Transocean's Response to BP Parties' First Set of Requests for Admission) For its responses to each of requests Nos. 45 through 67 and 282, Transocean did not directly admit or deny the substance of the RFA, but rather referred to provisions of the Drilling Contract, admitting only that the Drilling Contract contained language similar to that contained in the requests. For example, in response to RFA 47 -- seeking an admission that "in drilling the MC252 Well, the Transocean *Deepwater Horizon* Companies were responsible for detecting and preventing blowouts," Transocean responded by "admit[ting] that Article 15.2 of the Drilling Contract states, in part: 'Contractor shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts ... '" Transocean further qualified each response with the language: "Respondents further state that they express no position regarding the interpretation of" the cited contract provision, and that "such questions will be determined by [the] appropriate tribunal at an appropriate time." Transocean failed to admit, deny, or state that it lacks knowledge to be able to admit or deny the substance of RFAs 45-67 and 282.

In correspondence to Transocean on July 27, 2011, the BP Parties informed Transocean that these responses did not comply with Federal Rule of Civil Procedure 36 because they merely recited provisions of the Drilling Contract without actually admitting, denying, or stating that

Transocean lacks sufficient knowledge to admit or deny each such RFA. (Ex. M, 7/27/11 Letter from C. Heck to C. Williams). Transocean responded in correspondence on August 10, defending its refusal to admit or deny these RFA by asserting that "RFAs 45-67 and 282 improperly request the admission of a purely legal contention." (Ex. N, 8/10/11 Letter from C. Williams to C. Heck) The BP Parties responded to Transocean's correspondence on August 11. (Ex. O, 8/11/11 Letter from C. Heck to C. Williams) In that correspondence, the BP Parties explained that these requests were entirely proper under FRCP 36 as RFAs concerning "the application of law to fact," and cited several decisions upholding the propriety of requests for admission concerning contract interpretation. *Id.* at 2. Nevertheless, Transocean continued to refuse to provide proper responses to those RFAs. (Ex. P, 8/19/11 Letter from C. Williams to C. Heck)

**ARGUMENT**

## I.   TRANSOCEAN IS IMPROPERLY SHIELDING NON-PRIVILEGED DOCUMENTS RELATED TO ITS INVESTIGATION.

Transocean's privilege log contains several hundred entries over which Transocean has waived privilege. *First*, by publicly disclosing the Report on its investigation into the *Deepwater Horizon* incident, Transocean waived work product protection over the documents relating to that investigation. *Second*, for hundreds of entries Transocean lists the only author as "DWH Investigation Team" or leaves the author blank and also does not list any recipients. Such entries are improper as they do not allow the Court or other parties to evaluate whether a privilege applies, and thus Transocean has failed to establish that these documents are privileged.

### A.   Transocean Has Waived The Work Product Privilege That Might Have Applied To Documents Related To Its Investigation.

The work product doctrine exists to "promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent" and

provides a "privileged area within which he can analyze and prepare his client's case." *Shields v. Sturm, Ruger & Co.,* 864 F.2d 379, 382 (5th Cir. 1989), *United States v. Nobles*, 422 U.S. 225, 238-239 (1975). As with other qualified privileges, the protection afforded work product is not absolute and may be waived. *Nobles*, 422 U.S. at 239 (by eliciting the testimony of witness investigator, counsel waived privilege with respect to matters covered by witness's testimony); *Fox v. Taylor Diving & Salvage Co.,* 694 F.2d 1349, 1356 (5th Cir. 1983) (work product immunity is lost by voluntary disclosure of the information by counsel to the court). Although disclosing otherwise-protected work product to a third party does not automatically constitute a waiver of that protection, disclosure which "substantially increase[s] the opportunities for potential adversaries to obtain the information" does. 8 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2024 (3d ed. 2010); *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) (counsel's voluntary disclosure of work product to a testifying expert waived immunity of that material from discovery).

### 1. Transocean's Public Disclosure Of Its Report Waives The Work Product Privilege Over Related Documents.

Transocean's selective public disclosure of its investigation's findings and conclusions, to both the general public and its adversaries in the MDL No. 2179 proceedings, has waived work product protection for the documents related to its investigation. On June 22, 2011, Transocean released the Report as the culmination of its internal investigation into the causes of the Macondo well blowout. (Ex. A) The Report was not only disclosed to the general public, it was produced to all parties in MDL No. 2179 including the BP Parties, Halliburton, Anadarko and others who are adverse to Transocean in the pending litigation. *Id.* (produced at TRN-INV-01747442 to TRN-INV-01748295).

Consistent with governing case law, the Federal Rules of Evidence, and the principles of the work product doctrine, courts have held that when a party discloses a report which presents the findings of an internal investigation, the underlying investigative materials lose work product protection.[3] *E.g.*, *Granite Partners, L.P. v. Bear, Stearns & Co.*, 184 F.R.D. 49 (S.D.N.Y. 1999) (rejecting claims of work product protection and compelling disclosure of "notes of witness interviews, valuations and analyses of securities owned by the Funds, and documents collected from third parties" relating to a voluntarily disclosed report of an investigation conducted to prepare for litigation); *In re Leslie Fay Cos. Sec. Litig.*, 161 F.R.D. 274 (S.D.N.Y. 1995) (rejecting work product protection for documents underlying and connected to report of investigation into accounting irregularities where that report was provided to various government agencies); *In Re Royal Ahold N.V. Secs. & ERISA Litig.*, 230 F.R.D. 433 (D. Md. 2005) (same); *Ross v. Abercrombie & Fitch Co.*, Nos. 2:05-cv-0819, 2:05-cv-0848, 2:05-cv-0879, 2:05-cv-0893, 2:05-cv-0913, 2:05-cv-0959, 2010 WL 419947 (S.D. Ohio Jan. 28, 2010) (requiring disclosure of internal report regarding potential derivative action as well as underlying documents); *see also U.S. Airline Pilots Ass'n v. Pension Ben. Guar. Corp.*, 274 F.R.D. 28, 30-33 (D.D.C. 2011) (by conducting an investigation into the allegations made by plaintiff, issuing resulting report to plaintiff, and attaching it to a motion filed with the court, defendants waived work product protection of the report and underlying materials); *Lerman v. Turner,* No. 10 C 2169, 2011 WL 62124, at *3 (N.D. Ill. 2011) (in employment discrimination lawsuit, by releasing report of investigation that led to plaintiff's termination, defendant waived work product protection for the report's underlying investigation documents sought by plaintiff).  In

---

[3]   To be clear, the BP Parties do not claim that Transocean waived the attorney-client privilege by publicly disclosing the Report of its investigation.

8

accord with this authority, Transocean cannot use the work product doctrine to shield documents related to its public investigation.

2.      **Transocean Should Not Be Allowed To Selectively Disclose The Results Of Its Investigation.**

Transocean's actions exemplify the reasons for applying waiver to the materials underlying a publicly disclosed investigation report. The waiver rule prevents a party from using work product protection to selectively disclose the favorable results of its investigation while withholding the full evidence from its adversaries. *See* Fed. R. Evid. 502, Advisory Committee's note (subject matter waiver applies where fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary); *Lerman,* 2011 WL 62124, at *9 (same); *In re Kidder, Peabody Secs. Litig.,* 168 F.R.D. 459, 469 (S.D.N.Y. 1996) (doctrine aims to prevent prejudice and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information); *Tribune v. Purcigliotti,* No. 93CIV7222LAPTHK 1997 WL 10924, at *5 (S.D.N.Y. Jan. 10, 1997) (releasing only those portions of information that are favorable to litigant's position is an example of a selective and misleading presentation of evidence).

Such disfavored selective disclosure is apparent here, as the Report is almost wholly favorable to Transocean. None of the Report's "key findings" places responsibility on Transocean for any of the claimed causes of the blowout. (Ex. A at 212-16)

Instead, Transocean's Report attempts to blame BP and Halliburton for the incident. For example, in the Report's executive summary, Transocean asserts that "BP failed to properly assess, manage, and communicate risk"; "BP also failed to assess the risk of the temporary abandonment procedure used at Macondo"; and "Halliburton and BP did not adequately test the

9

cement slurry and program … ."  (*Id.* at 10)   Indeed, even for the negative pressure tests conducted by Transocean's employees, who also were involved in interpreting the results, Transocean's Report purports to shift all blame to BP: "BP approved the negative pressure test results and decided to move forward with temporary abandonment."  (*Id.* at 11)  The rest of the Report, including its "key findings," expands on this theme of purporting to absolve Transocean from responsibility while pointing the finger at BP and Halliburton.

Moreover, the purported findings of Transocean's Report have been used against BP in this litigation.  The Report has been introduced in depositions as Exhibit 4248.  (Ex. A)  Attorneys for the Plaintiffs' Steering Committee ("PSC") have extensively questioned witnesses from the Transocean investigation team to elicit testimony that Transocean's investigation places the blame on BP for the events leading to the incident.  (*E.g.*, Ex. D, B. Ambrose Dep. at 58:5-129:9; 753:19-760:24)  Indeed, PSC counsel relied on Transocean's Report to ask questions attempting to put the entire responsibility for the incident on BP.  (*Id.* at 759:19-760:3, 760:16-24)

Therefore, both case law and fundamental fairness dictate that the BP Parties have access to the documents underlying Transocean's Report to confront the serious – and untrue – allegations Transocean makes.  Transocean cannot use its investigation as both a sword and a shield to blame BP for the incident (both in public and in this litigation) while withholding the work product that went into the investigation.  *See NXIVM Corp. v. O'Hara,* 241 F.R.D. 109, 142 (N.D.N.Y. 2007) (party cannot selectively share work product and then expect the privilege to remain as a shield); *Westmoreland v. CBS, Inc.,* 97 F.R.D. 703, 706 (S.D.N.Y. 1983) (defendant cannot hold out the findings and conclusions of its report to the public as substantiating its accusations, but, when challenged, decline to reveal the report on the basis of

its internal, confidential nature). Having chosen to publicly release the Report and allow its use in litigation against BP, Transocean should be required to disclose the work product underlying and related to the Report and its investigation.[4]

Specifically, the BP Parties request that the Court order Transocean to produce all documents on its privilege log (i) related to Transocean's internal investigation, (ii) where the only claim of privilege is work product, and (iii) whose description does not assert that they were prepared at the direction of counsel. (This last condition is included because the BP Parties do not seek documents that fall within FRCP 26(b)(3)(B).) The BP Parties have identified approximately 349 entries on Transocean's privilege log falling within these parameters, including 48, 66-66b, 67, 71-75, 77, 79, 79a, 81, 90, 92, 96-101a, 107-108a, 115, 116, 119-122, 131-135, 139-142, 147, 148, 150, 154, 161, 165, 173-175, 192, 201, 215, 221-24, 226, 231, 234, 241, 243, 244, 319, 320, 327-329, 331-416, 419, 423-426, 445, 493-511, 523-525, 532, 537, 551, 552, 554-557, 576-578, 585-587, 589-591, 594, 598-613, 622, 623, 758-776, 796-817, 1040-1042, 1044-1050, 1051, 1054, 1055, 1058-1062, 1069-1072, 1075, 1076, 1078, 1080, 1082, 1084-1092, 1096, 1099-1104, 1107-1112, 1114, 1126, 1128, 1136, 1137, 1139, 1140, 1143, 1144, 1146-1149, 1207, 1379, 1593, 1985, 1986, 1988-1990, 1992, 1994, 1995, 1997, 2172, 2183, 2231, 2233, 2236, 2237, 2300, 2490, 2491, 2578, 2585, 2586, 2625, 2732.

---

[4]     The facts of this case distinguish it from *In re Vioxx Prods. Liab. Litig.,* No. MDL 1657, 2007 WL 854251 (E.D. La. Mar. 6, 2007). The report in *Vioxx* was ancillary to the main issues in the *Vioxx* litigation. Specifically, the report dealt with whether Merck's senior management acted appropriately in developing and marketing Vioxx, while the litigation concerned whether Vioxx was a defective product. *Id.* at *1. By contrast, here Transocean's Report concerns the exact issues to be litigated, namely, the causes of and fault for the *Deepwater Horizon* incident. Moreover, the *Vioxx* report was not used offensively. *Id.* at *5. In this litigation, however, the PSC already has used Transocean's investigation and Report offensively against BP. Notably, the *Vioxx* court stated that it would reconsider its order if the report had been used offensively, as the Transocean Report has here. *Id.* Finally, in *Vioxx*, Merck represented that it would not cite, rely upon, or use the report offensively in that litigation. *Id.* No such representation has been made by the parties opposing BP in this case.

**B.** **Transocean Has Not Established Any Privilege For Entries Assigning Authorship to the "DWH Investigation Team" Or Listing No Author At All.**

FRCP 26 requires that all documents that a party withholds on the basis of privilege be described in such a manner that would enable other parties to assess the applicability of the privilege. Fed. R. Civ. P. 26(b)(5)(A)(i)-(ii). PTO No. 14 further identifies what information is to be included in the log, and specifically requires that all attorneys who are authors, signatories, or recipients of withheld documents be identified. PTO No. 14 ¶ 3(e). As the party claiming privilege, Transocean bears the burden of sufficiently describing the documents in a manner that enables the Court, the BP Parties, and other litigants to assess its claims of privilege. *Hodges, Grant & Kaufmann v. United States Gov't, Dept. of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985); Fed R. Civ. P. 26(b)(5)(A)(ii).

Hundreds of entries on Transocean's privilege log violate these plain rules. Specifically, for approximately 636 entries, Transocean lists only the "DWH Investigation Team" as the author. These entries do not identify any individual as the author, nor do they identify any recipients. Moreover, for another approximately 206 entries, Transocean simply leaves the author and recipient blank.

Courts "scrutinize[] closely any privilege claim where a party is unable to identify the author or has provided only a general group-wide description for the recipients." *Pacific Gas & Electric Co. v. United States*, 69 Fed. Cl. 784, 812 (Fed. Cl. 2006); *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476 (E.D. Pa. 2005); *see also Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 538-39 (N.D. Ill. 2000) ("General, group-wide descriptions such as 'management' do not allow for the court to assess whether the recipients require, or have the capacity to act upon, the information distributed."). Such group descriptions prevent the parties from determining the privilege claim's validity and thus are insufficient to preserve a claim of

privilege. As one court explained in requiring production of documents where only the company name (Pacific Gas & Electric Company) was listed as the author, "plaintiff's statement that '[w]here other documents are a collaborative effort among or within PG & E departments, the company itself may be noted as the author' [], belies the notion that the court or defendant can adequately 'assess the applicability of the privilege or protection.'" *Pacific Gas*, 69 Fed. Cl. at 813. Therefore, privilege entries without individualized authors are regularly deemed invalid, and the underlying documents ordered to be produced. *E.g.*, *Pacific Gas*, 69 Fed. Cl. at 813; *SmithKline*, 232 F.R.D. at 476; *Smithkline*, 193 F.R.D. at 539; *Wilderness Soc'y v. United States Dep't of Interior*, 344 F. Supp. 2d 1, 17 (D.D.C.2004) (denying privilege where "defendants fail to identify the author ... and in some cases do not even identify the recipient"); *Alexander v. F.B.I.*, 192 F.R.D. 42, 45 (D.D.C. 2000) (finding privilege log insufficient where "for most of the relevant documents, the log fails to identify the date prepared, the author or the recipient").

Under this established case law, Transocean should be required to produce all documents for which the author is listed as "DWH Investigation Team" or left blank on the privilege log entry. These entries cannot identify all attorneys who are authors or recipients of the documents as required by PTO No. 14, because they do not identify any individuals at all. Likewise, by failing to provide individual authors, Transocean's privilege log prevents the BP Parties from assessing whether the claimed privileges apply. The BP Parties cannot determine, for example, whether an attorney was involved with a document when the author is listed only as "DWH Investigation Team."

Therefore, the BP Parties request that the Court order Transocean to produce the several hundred documents on its privilege log where the author is listed only as "DWH Investigation Team," including 122, 154, 161, 165, 192, 201, 215, 221-224, 226, 231, 234, 241, 243, 244, 319,

320, 423, 425, 426, 445, 479, 480, 486, 487, 489, 492, 493, 495-511, 519, 523-527, 532, 537, 558-560, 562, 563, 565-568, 585-587, 589-591, 594, 615, 622, 623, 628, 629, 633-635, 637- 647, 653, 655-658, 660, 661, 663-678, 681, 682, 753-767, 769, 770, 772-776, 779-789, 796-817, 907- 913, 933, 934, 938, 939, 943-945, 947, 949, 972-979, 981, 985-987, 989-1021, 1024-1026, 1028- 1031, 1036-1039, 1041, 1042, 1091, 1092, 1192, 1205, 1211, 1229, 1231, 1274-1281, 1285, 1289, 1290, 1292, 1302, 1303, 1305, 1309, 1313-1315, 1319, 1325, 1326, 1330, 1347-1349, 1353, 1354, 1359, 1362, 1363, 1366, 1369, 1370, 1375-1378, 1380-1395, 1398, 1400-1409, 1418, 1433, 1435, 1463, 1464, 1470, 1473, 1474, 1494-1496, 1498, 1542, 1545, 1548, 1566- 1578, 1581-1587, 1589-1591, 1593-1595, 1597, 1601, 1602, 1613-1618, 1623-1625, 1627, 1628, 1646, 1655-1657, 1659, 1661-1670, 1673, 1674, 1676-1679, 1682, 1683, 1690-1703, 1710, 1714-1717, 1719, 1720-1741, 1764, 1769, 1771, 1773-1775, 1777-1783, 1786-1793, 1795-1798, 1801, 1802, 1809-1817, 1820, 1821, 1825, 1826, 1828-1841, 1845, 1847, 1853, 1856, 1859, 1860, 1867, 1868, 1878-1883, 1886-1889, 1891, 1892, 1896, 1897, 1899-1926, 1928, 1929, 1931-1933, 1936, 1947-1949, 1952-1954, 1962, 1966-1973, 1975, 1976, 1980-1990, 1992-1997, 2000, 2001, 2005-2015, 2020, 2022-2024, 2025-2042, 2046, 2047, 2102-2115, 2352, 2400, 2401, 2888, 2973.  Similarly, documents for which Transocean has failed to identify any author should also be produced, including those listed in entries 2117, 2120, 2122, 2137, 2138, 2149, 2150, 2152, 2154, 2156, 2158, 2161-2163, 2166, 2168, 2169, 2171, 2175, 2177, 2179, 2181, 2189-2191, 2193, 2195, 2197, 2199, 2201-2230, 2244, 2246, 2249, 2251, 2255, 2257, 2262, 2265, 2269, 2271, 2275, 2277, 2278, 2283, 2286, 2288, 2290, 2292, 2297, 2299, 2315, 2318- 2320, 2323, 2328, 2334, 2337, 2340, 2342, 2345, 2348, 2349, 2356, 2358, 2359, 2362, 2364, 2365, 2367, 2368, 2371, 2372, 2374, 2378, 2380, 2384, 2389, 2391, 2392, 2394, 2397, 2399, 2417, 2426, 2428, 2430, 2432, 2437, 2443, 2447, 2450, 2480, 2489, 2513, 2540, 2546, 2550,

2551, 2558, 2559, 2561, 2562, 2565, 2571, 2575, 2606, 2609, 2623, 2624, 2648, 2655, 2656, 2661, 2674, 2685-2720, 2731, 2739-2741, 2745, 2750, 2761, 2763, 2779, 2785, 2788, 2789, 2793, 2794, 2798, 2800, 2806, 2809, 2811, 2813, 2939, 2944, 2946, 2957, 2964, 2970.

## II. THE BP PARTIES' REQUESTS FOR ADMISSION 45-67 AND 282 SHOULD BE DEEMED ADMITTED BY TRANSOCEAN.

Under Federal Rule of Civil Procedure 36, a party may serve requests to admit "the truth of any matters within the scope of Rule 26(b)(1) relating to" "facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a). A responding party must either admit the matter or "specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4); *see also Ameripride Servs, Inc. v. Valley Indus. Servs., Inc.*, No. CIV 2:00-cv-0113-LKK-JFM, 2011 WL 1321873 at *2 (E.D. Cal. Apr. 1, 2011) ("Generally, Rule 36(a) requires one of three answers: (1) an admission, (2) a denial; or (3) a statement detailing why the answering party is unable to admit or deny the matter." (citing *Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242 (9th Cir. 1981))).

The requesting party "may move to determine the sufficiency of an answer or objection" and "[u]nless the court finds an objection justified, it must order that an answer be served." Fed. R. Civ. P. 36(a)(6). Moreover, "[o]n finding that an answer does not comply with this rule, the court may order either that the matter is admitted or that an amended answer be served." *Id.*; *see also Asea*, 669 F.2d at 1245 (If "a response does not comply with the literal requirements of Rule 36(a), the district court may, in its discretion, deem the matter admitted").

Each of Transocean's responses to the BP Parties' RFAs 45-67 and 282 fails to state whether Transocean admits, denies, or lacks knowledge sufficient to admit or deny the subject of the request as required by FRCP 36(a). Instead, Transocean evades these RFAs by "admitting" the contents of certain provisions of the Drilling Contract, and otherwise objects that they call for

improper conclusions of law as matters of contractual interpretation that are not permitted under FRCP 36.

Transocean's objections are not well taken as these RFAs seek the application of law to fact, rather than pure legal conclusions. Numerous federal courts have held that RFAs concerning the interpretation of contractual provisions are precisely the sort of "application of law to fact" expressly permitted by FRCP 36. *E.g.*, *Argus and Assocs., Inc. v. Prof'l Benefits Servs., Inc.*, 2008 WL 5447738, at *3 (E.D. Mich. Dec. 31, 2008) ("Other examples of proper requests for admission involving the application of law to fact are (1) a request for admission that relates to the interpretation of a contract at issue in the case, . . . and (3) a request to admit what a party's obligations were under a contract." (citations omitted)); *Sigmund v. Starwood Urban Retail VI, LLC*, 236 F.R.D. 43, 46 (D.D.C. 2006) ("A request for admission that relates to the interpretation of a contract at issue in a case involves the application of law to the unique facts of that case and, therefore, would be permissible under the amended Rule 36"); *Booth Oil Site Admin. Grp. v. Safety-Kleen Corp.*, 194 F.R.D. 76, 80 (W.D.N.Y. 2000) ("[W]here the question of the meaning of [a] document is at issue in the case, a request directed to another party seeking an admission or denial of a document's meaning or intent by that party as stated in the request relates to a statement [of] fact, and is authorized by Rule 36 . . . . Nor are such requests objectionable because the request may call for an admission as to an interpretation of a contractual provision which could otherwise require a judicial determination." (citations omitted)); *S.A. Healy Co./Lodigiani USA, Ltd. v. United States*, 37 Fed. Cl. 204, 205 (1997) ("Admissions of the contents or interpretation of a contract at most involve the application of law to facts").

Moreover, Transocean's actions demonstrate that it believes requests for admission concerning contract interpretation are proper. Transocean's RFAs in the insurance actions – specifically Transocean RFAs 3, 4, and 6 – expressly seek admissions about the interpretation of the Drilling Contract:

- 3. Admit that the BP/Transocean Drilling Contract does not require Transocean to contractually indemnify BP for liability arising from environmental pollution originating underwater.

- 4. Admit that the BP/Transocean Drilling Contract required BP to contractually indemnify Transocean for environmental pollution originating underwater.

- 6. Admit that, pursuant to the terms of the BP/Transocean Drilling Contract, BP has agreed to indemnify Transocean for its gross negligence.

(Ex. E, Transocean's First Requests for Admission to BP Defendants Regarding Insurance Actions) Transocean also has questioned BP's fact witnesses concerning the meaning of terms and provisions of the Drilling Contract and its amendments. (Ex. F, D. Suttles Dep. at 797:10-805:22)

In light of this precedent and Transocean's own discovery, Transocean's contention that matters of contractual interpretation are improper topics of request for admission is meritless. Transocean's citations of the Drilling Contract do not suffice as a proper response to the RFAs. This Court should therefore deem RFAs 45-67 and 282 admitted, or in the alternative, direct Transocean pursuant to FRCP 36(a)(6) to amend its responses to either admit, deny, or specifically state why it cannot admit or deny each of these RFAs.

## CONCLUSION

Transocean should not be allowed to improperly hide information regarding its investigation and contentions. Therefore, the BP Parties request that this Court order Transocean to (1) produce all documents on its privilege log related to its investigation and Report where the only privilege asserted is work product and Transocean has not claimed that attorneys were

involved; (2) produce all documents on its privilege log where Transocean has listed the author as the "DWH Investigation Team" or has not identified an author; (3) be deemed to have admitted the BP Parties' RFAs 45-67 and 282, or in the alternative provide proper responses to such RFAs.

Date:  August 22, 2011                                    Respectfully submitted,


                                                          /s/ Don K. Haycraft
                                                          Don K. Haycraft (Bar #14361)
                                                          R. Keith Jarrett (Bar #16984)
                                                          Liskow & Lewis
                                                          701 Poydras Street, Suite 5000
                                                          New Orleans, Louisiana 70139-5099
                                                          Telephone: (504) 581-7979
                                                          Facsimile: (504) 556-4108

                                                          and

                                                          Richard C. Godfrey, P.C.
                                                          J. Andrew Langan, P.C.
                                                          Kirkland & Ellis LLP
                                                          300 North LaSalle Street
                                                          Chicago, IL 60654
                                                          Telephone: (312) 862-2000
                                                          Facsimile: (312) 862-2200

                                                          Robert C. "Mike" Brock
                                                          Covington & Burling LLP
                                                          1201 Pennsylvania Avenue, NW
                                                          Washington, DC 20004-2401
                                                          Telephone: (202) 662-5985

                                                          *Attorneys for BP Exploration & Production*
                                                          *Inc. and BP America Production Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of August, 2011.

/s/ Don K. Haycraft
Don K. Haycraft

# Attachment 2



37458738

May  6 2011
6:30PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| …………………………………………….... | : | |

**THE BP PARTIES' THIRD AMENDED RESPONSES**
**AND OBJECTIONS TO PLAINTIFFS' AGREED 30(b)(6)**
**DEPOSITION NOTICE WITH 30(b)(5) DOCUMENT REQUESTS**

BP Exploration & Production Inc. ("BPXP"), BP p.l.c., BP America Production Company ("BPAP"), and BP Products North America Products Inc. ("BPPNA") (collectively, the "BP Parties") by their undersigned Counsel, and, pursuant to Rules 26, 30 and 34 of the Federal Rules of Civil Procedure, hereby submit the following amended responses and objections to Plaintiffs' Rule 30(b)(5)-(6) requests contained in their Agreed 30(b)(6) Deposition Notice of BP Defendants (With 30(b)(5) Document Requests).

**SPECIFIC RESPONSES AND OBJECTIONS**

The BP Parties respond as follows to Plaintiffs' Requests, subject to and without waiving their general objections, each and every one of which are specifically incorporated into each individual response below.[1]

**Areas of Inquiry**

1.   All Cost Benefit and/or Risk Assessments regarding the drilling, exploration, completion and/or production of the Macondo Prospect (including any Risk Assessments related to deepwater drilling in the Gulf of Mexico applicable to, even if not specific to, the Macondo Prospect).   The term "Risk Assessment" shall be deemed to include any Quantified Risk Assessments ("QRA"), Major Accident Risk ("MAR") analyses, Safety or Risk analysis, Job Safety Analysis (JSA), HAZOP, HAZID, Failure Mode & Effect Analysis (FMEA), Cost Benefit Analysis, or similar report or analysis, that address the

---

[1] The BP Parties' general objections are set forth at pages 11 - 16.

potential risks or costs of injury or damage to human life, the environment, or property associated with such drilling operations.

**RESPONSE:**

The BP Parties designate Kal Jassal to testify on this topic.

2.    Potential income, revenue and/or profit anticipated or expected to be realized from the Macondo Prospect (Mississippi Canyon Block 252).

**RESPONSE:**

The BP Parties designate Xuemei Liu to testify on this topic.

3.    Data, whether real time or otherwise, accumulated or collected by BP relating to the Deepwater Horizon and/or its appurtenances during its time at the Macondo Well.

**RESPONSE:**

The BP Parties designate John Sprague to testify on this topic.

4.    Potential costs, risks, benefits and other analyses or evaluations of potential methods to cap, control, contain, shut-in and/or kill the Macondo Well after April 20, 2010.

**RESPONSE:**

The BP Parties designate the following individuals to testify on the indicated aspects of this topic.

- Richard Lynch – near-term containment (*e.g.*, cofferdam, top hats, etc.) and the capping stack

- Paul Tooms – well-integrity analysis

- Kevin Kennelly – the containment and disposal project (*e.g.*, the free-standing riser systems)

- Mark Mazzella – kill operations (*e.g.*, top kill and static kill) and relief wells

- Henry Thierens – BOP intervention

5.    Evaluation, study and/or analysis of any potential method or technique to cap, control, contain, shut-in, temporarily abandon, and/or kill the Macondo Well after April 20, 2010, including the possible risks, benefits or other consequences thereof.

**RESPONSE:**

The BP Parties designate the following individuals to testify on the indicated aspects of this topic.

- Richard Lynch – near-term containment (*e.g.*, cofferdam, top hats, etc.) and the capping stack

- Paul Tooms – well-integrity analysis

- Kevin Kennelly – the containment and disposal project (*e.g.*, the free-standing riser systems)

- Mark Mazzella – kill operations (*e.g.*, top kill and static kill) and relief wells

- Henry Thierens – BOP intervention

6.    With respect to the Macondo Well, communications, evaluations, testing, training, policies and/or analyses, within BP and/or with any other party, relating to foam stability, cement testing, float collar conversion, use or non-use of centralizers, the decision not to displace seawater and set the cement plug at approximately 3,300' below the mud line, and or the decision not to conduct or prepare cement bond logs, and or not to do  negative pressure tests, on or before April 20, 2010.

**RESPONSE:**

The BP Parties designate Jim Cowie to testify on this topic.

7.    The background, basis (or bases), intent, preparation, drafting, submission and approval of BP's Application for Permit to Modify the temporary abandonment procedure on or around April 16, 2010, including the deviations, if any, between that procedure and the

procedure(s) described in (a) the April 12, 2010 Drilling Plan, (b) the April 14, 2010 Morel "Forward Ops" E-Mail, or (c) the April 20, 2010 "Ops Note".

**RESPONSE:**

The BP Parties designate Dennis Sustala to testify on this topic.

8.    The estimated, budgeted, expected and/or actual time and/or cost savings realized by:

    1.    Number and Nature of Centralizers Utilized
    2.    Foregoing Substantiated Foam Stability Test Results
    3.    Not Running Cement Bond or Other Evaluation Log
    4.    Using Spacer Made from Combined Lost Circulation Materials to Avoid Disposal Issues
    5.    Displacing Mud from Riser Before Setting Surface Cement Plug
    6.    Setting Surface Cement Plug 3,000 Feet Below Mud Line in Seawater
    7.    Not Installing Additional Barriers During Temporary Abandonment Procedure
    8.    Not Performing Further Well Integrity Diagnostics in Light of Troubling and Unexpected Negative Pressure Test Results
    9.    Bypassing Pits and Conducting Other Simultaneous Operations During Displacement

**RESPONSE:**

The BP Parties designate Jim Cowie to testify on this topic.

9.    The presence, participation, supervision or other involvement of officers, directors or other employees of BP plc: in any aspect of the planning, funding, drilling, completion, temporary abandonment, capping and/or control of the Macondo Well.,

**RESPONSE:**

The BP Parties designee(s) for this topic have not yet been determined.  The BP Parties are undertaking good faith efforts to identify an appropriate designee (or designees) in light of the practical circumstances involved in designating multiple individuals to testify on multiple topics and at the same time coordinating a number of individual depositions.

10.    N/A

11.   Implementation in the Gulf of Mexico of the safety management recommendations of the UK HSE report of the Grangemouth Scotland incidents in 2000, the Baker Commission Report of the Texas City explosion and fire in 2005, and the Booz Allen Hamilton Report on the BP Alaska pipeline leak in 2006.

**RESPONSE:**

The BP Parties designee(s) for this topic have not yet been determined. The BP Parties are undertaking good faith efforts to identify an appropriate designee (or designees) in light of the practical circumstances involved in designating multiple individuals to testify on multiple topics and at the same time coordinating a number of individual depositions.

12.   Your policies, practices, requirements, standards, training, maintenance, testing and/or procedure of personnel regarding well control training and training for potential catastrophic events.

**RESPONSE:**

The BP Parties designate Mark Mazzella to testify on this topic.

13.   BP's efforts to ensure the suitability and proper design, manufacture, testing, maintenance, operation and utilization of the BOP utilized in the drilling operations at the Macondo well.

**RESPONSE:**

The BP Parties designate Mike Byrd to testify on this topic.

14.   BP's evaluations of, and/or reservoir assessment, drill plan, operations plan, and or well or reservoir engineering and/or temporary abandonment plan (and all changes or amendments thereto) for the Macondo Well in response to, well control events (including but not limited to the March 8 "kick") between February 1, 2010 and April 20, 2010;

**RESPONSE:**

The BP Parties designate Jim Cowie to testify on this topic.

15.   Communications between BP employees on the rig and any BP personnel on the mainland (or United Kingdom) on April 20 and 21;

**RESPONSE:**

The BP Parties designate Jim Cowie to testify on this topic.

16.     BP plans for using the Deepwater Horizon at, and timing of transit to, the Nile and/or Kaskida sites after April 19, 2010;

**RESPONSE:**

The BP Parties designate Jim Cowie to testify on this topic.

17.     The determination of the well design for the Macondo Well;

**RESPONSE:**

The BP Parties designate the following individuals to testify on the indicated aspects of this topic:

- John Sprague – Casing Design

- Ian Little – Centralizers, Cement Design and Evaluation, Temporary Abandonment Procedure, and Float Collar

18.     Analysis or evaluation of risks associated with design and operational decisions made by BP personnel concerning operations and activities performed at the Macondo well during the period from February 1 through April 20, 2010, including but not limited to the creation, entry of data into and completion of a "risk register" or risk assessment tool ("RAT").

**RESPONSE:**

The BP Parties designate Jim Cowie to testify on this topic.

19.     Any financial incentives for BP personnel working on the Deepwater Horizon &/or the Macondo Well.

**RESPONSE:**

The BP Parties designate Ian Little for this topic.

20.     BP's adherence to or departure from Investigation Group defined Practice 4.4 regarding the incident.

6

**RESPONSE:**

 The BP Parties designate John Baxter to testify on this topic.

21. Any estimates, predictions, and/or analyses of anticipated pressures – both static pressure and/or dynamic pressure – within the formations of the Macondo Prospect and/or the Macondo Well, including, but not limited to, the information provided to Transocean and the manner in which such information was utilized in selection of or approval of the BOP assembly used by the Deepwater Horizon for the Macondo Well.

**RESPONSE:**

 The BP Parties designate Graham Vinson to testify on this topic.

22. Nature, type, model, adequacy and/or configuration of the BOP assembly to be utilized for the drilling of the Macondo Well by the Deepwater Horizon.

**RESPONSE:**

 The BP Parties designate Mike Byrd to testify on this topic.

23. Considerations going into any decision to utilize (or allow the utilization of) the particular BOP stack design/configuration and equipment utilized during the drilling and/or temporary abandonment of the Macondo Well.

**RESPONSE:**

 The BP Parties designate Mike Byrd to testify on this topic.

24. Any knowledge of the Pressure Rating for each component of the Macondo BOP assembly, as manufactured, and/or as such existed on April 20, 2010.

**RESPONSE:**

 The BP Parties designate Mike Byrd to testify on this topic.

25. Any knowledge of any testing or other analysis or evaluation that went into determination as to the pressure rating or capacity rating  for each BOP component on the Macondo well, and what each such pressure rating meant.

**RESPONSE:**

The BP Parties designate Mike Byrd to testify on this topic.

26.    BP's knowledge, prior to April 20, 2010, of the potential for difficulties with the BOP or its key components performing as designed with dynamic flow pressures less than, equal to, or higher than, the rated pressure of the BOP or its key components and any knowledge of any other device, equipment, or design that may have avoided any of said potential difficulties.

**RESPONSE:**

The BP Parties designate Mike Byrd to testify on this topic.

27.    N/A

28.    The funding and staffing of Emergency Response Division from 2000 to the present.

**RESPONSE:**

The BP Parties designate Dennis Johnson to testify on this topic.

29.    N/A

30.    All discussions during Macondo leasehold negotiations between BP and Anadarko or MOEX concerning the nature and scope of information to be made available by or to be provided by BP to Anadarko or MOEX regarding the design of and operations at the Macondo Well, and BP's understanding of its obligations and Anadarko's and MOEX's rights under the Operating Agreements with regard to the parties' ability to receive and respond to information received about planning with respect to and operations at the Macondo Well.

**RESPONSE:**

The BP Parties designate Kirk Wardlaw to testify on this topic.

31.    The chain of command in connection with the Macondo Well, including decision making systems and authority, as well as the reorganization of BP personnel at the Macondo Well in early April 2010.

**RESPONSE:**

The BP Parties designate Dave Rich to testify on this topic.

32.    BP risk management, risk mitigation, safety, and catastrophe response and well control rules, regulations, plans, policies, requirements, standards and training applicable directly or indirectly to the Macondo Well.

**RESPONSE:**

The BP Parties designate Mark Mazzella to testify on this topic.

33.    The 2009 DWH rig audit/inspection by BP, including the contents of the written reports and any follow-up efforts relating to the audits/inspections.

**RESPONSE:**

The BP Parties designate Norman Wong to testify on this topic.

34.    The existence, nature, scope and contents of any BP guidelines or policies relating to mudlogging activities.

**RESPONSE:**

The BP Parties designate Jonathan Bellow to testify on this topic.

35.    The existence, nature, scope and contents of any BP guidelines, policies or practices relating to locating and determining pay zones or potential pay zones in a well.

**RESPONSE:**

The BP Parties designate Graham Vinson to testify on this topic.

## RESPONSES TO DOCUMENT REQUESTS

The BP Defendants are further requested, in accordance with Rule 30(b)(5) of the Federal Rules of Civil Procedure, as well as Rule 26, Rule 34, and PRE-TRIAL ORDERS NOS. 16, 17 and 27, to produce, or identify by specific Bates Number(s) (if already produced), the following documents, at least ten (10) days prior to the time of the relevant designee's deposition:

**FIRST SET OF REQUESTS:**

For each Area of Inquiry identified above, please produce all documents provided to, reviewed with, utilized by, and/or relied upon by the deponent to prepare for his or her deposition testimony.

**RESPONSE TO FIRST SET OF REQUESTS:**

Subject to their general and specific objections, the BP Parties will make a good faith effort to produce any documents identified as relevant to the topic at issue and reviewed by the designees in advance of their testimony that have not previously been produced in this litigation.

The BP Parties object to this request as unreasonable, duplicative, cumulative, unduly burdensome and outside the contemplated scope of the 30(b)(6) deposition process. The BP Parties further state that: Each of the topics identified above is the subject of prior discovery requests, and, by its very nature, the 30(b)(6) process often requires that designees review documents relating to the topics at issue that would not be shown to the designee if he or she were testifying in his or her capacity as an individual. Production of these materials is particularly unreasonable insofar as documents have been requested 10 days prior to the depositions. The protocol for production of documents in advance of individual depositions does not apply to corporate designees. Identification and production of these documents also improperly seeks the disclosure of attorney work product in that it would reveal the preparing attorneys' assessment of potentially relevant documents regardless of whether such documents are relevant or otherwise appropriate for production.

**SECOND SET OF REQUESTS:**

For each Area of Inquiry identified above, please produce all documents which relate, pertain, evidence and/or reflect the issues, topics and/or events described therein or associated therewith.

**RESPONSE TO SECOND SET OF REQUESTS:**

In addition to their general objections, the BP Parties object to this request on the grounds stated above in response to plaintiffs' First Set of Requests.

**THIRD SET OF REQUESTS:**

For each corporate designee, a copy of his or her current resume or CV, as well as a copy of any and all prior testimony, whether provided in an individual or representative capacity, including any and all deposition testimony, trial testimony, sworn statements, affidavits, declarations, expert reports, and/or testimony before a legislative, regulatory or investigative body or agency.

**RESPONSE TO THIRD SET OF REQUESTS:**

In addition to their general objections, the BP Parties object to this request on the grounds stated above in response to plaintiffs' First Set of Requests. The BP Parties further state that this request is unreasonable and inappropriate on the grounds that the designees are not testifying in their capacity as individuals, and thus their prior testimony and related materials are not necessarily relevant to their testimony, particularly given that all prior testimony related to this case has been made available to plaintiffs.

**GENERAL OBJECTIONS**

The BP Parties assert the following objections to each and every one of plaintiffs' requests, including any definitions or instructions associated therewith (collectively, "Plaintiffs' Discovery Requests"). These general objections are incorporated by reference into each specific response set forth by the BP Parties and are neither waived nor limited by any specific responses.

1.      The BP Parties expressly reserve the right to substitute or supplement the designations set forth above for any reason, including, but not limited to, disputes as to the scope of the topics, unanticipated questions of the designees, or a designees potential inability to provide accurate information as to any aspect the relevant corporate entity's knowledge of the

topic.  The BP Parties will work with plaintiffs to address any practical concerns that may arise from any such changes, and they fully anticipate that plaintiffs will do so as well given the breadth and complexity of the issues on which the BP Parties have been asked to designate corporate representative witnesses.

2.      BP p.l.c. and BPPNA object to all of Plaintiff's Discovery Requests.  These entities have relatively little knowledge with regard to the topics set forth above that is not derivative of the knowledge of BPXP and BPAP; therefore, except as expressly provided in the context of corporate representative testimony on any such areas, the designations and testimony of the foregoing individuals is on behalf of BP p.l.c. and BPPNA only to the extent these corporate entities may be deemed to have knowledge of facts known to BPXP and BPPNA.  As the BP parties have repeatedly stated, BP p.l.c. is a corporation organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England.  BP p.l.c. did not own the MC 252 leasehold, had no employees on the *Deepwater Horizon*, and was not a party to the drilling rig contract with Transocean.  BP p.l.c. does not directly conduct exploration and production activities and was not directly involved in the events involving the Macondo Well or the incident.  BPPNA is an entity primarily involved in downstream operations such as crude oil refineries, and transportation and marketing of refined products such as gasoline, and had no employees on the *Deepwater Horizon,* was not a party to the drilling rig contract with Transocean, and had nothing to do with exploration activity involving the Macondo Well or the April 20, 2010 incident or resulting oil spill.  Accordingly, to the best of their knowledge, with regard to almost all of Plaintiff's Discovery Requests, BP p.l.c. and BPPNA do not have any meaningful set of information or documents responsive to Plaintiff's requests not derivative and duplicative of that of BPAP and/or BPXP, therefore BP p.l.c. and BPPNA direct Plaintiffs to the

responses provided by those defendants except as expressly stated otherwise in the course of the testimony of the corporate representatives designated above.

3.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

4.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they call for the production of electronically stored information in any manner other than required under Federal Rule of Civil Procedure 34, the Rules and Orders of the Court, and ongoing negotiations and discussions among counsel.

5.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.  The BP Parties will identify specific documents withheld on these grounds in accordance with the schedule set forth in, and provide the information required by, the Court's Pretrial Order #14, and such further Orders of the Court and ongoing negotiations and discussions among counsel.  The BP Parties incorporate their forthcoming privilege logs and all related information into this general objection to the extent necessary to preserve against any waiver of any applicable privilege or immunity from discovery.

6.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of

13

such information would be prejudicial to the efforts of the BP Parties and any opposing parties to resolve their disputes in a fair and efficient manner.

7.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they call for information or documents not within the BP Parties' possession, custody, or control.   All responses are made on behalf of the BP Parties only, are limited to information and documents within the BP Parties' possession, custody, or control.

8.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

9.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

10.     The BP Parties object to Plaintiffs' Discovery Requests to the extent that they seek information regarding expert(s) retained by the BP Parties in connection with pending litigation.  The BP Parties will disclose its experts in accordance with the schedule established by the court and in the manner proscribed by the Federal Rules of Civil Procedure.

11.     The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary

information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

12.     The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

13.     The BP Parties object to the requests to the extent they seek documents already in the possession of plaintiffs or equally available to plaintiffs from sources other than the BP Parties, including publicly available sources.

14.     These responses are made without waiving, in any manner, the BP Parties' right to object to the use of any information or documents provided in response to these requests at any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

15.     To the extent the BP Parties state they will produce documents in response to the requests, the BP Parties will produce such documents on a rolling basis with such reasonable speed as the BP Parties can locate and process them, without sacrificing a meaningful review for responsiveness, privilege, and confidentiality, as this is the only feasible and physically possible method given the scope and breadth of the requests.

16.     To the extent that the BP Parties respond that they will search for and produce responsive documents, the BP Parties are only undertaking to make a good faith effort to conduct

15

a reasonable search of non-privileged documents of the files and records of those individuals likely to have meaningful information responsive to a requests as maintained in the ordinary course of business, and/or to apply a reasonable set of search terms to similar available collections of electronically stored information as maintained in the ordinary course of business reasonably likely to yield a meaningful amount of information responsive to a request. The BP Parties are not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of BP's tens of thousands of employees and agents where any such items are not included within the results of a reasonable search as described above.

17.    The BP Parties' decision, now or in the future, to provide information or documents should not be construed as:   (a) a stipulation that the material is relevant or admissible, (b) a waiver of the BP Parties' general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

18.    The BP Parties reserve the right to modify, amend, or supplement its responses, which are made based on the current status of its knowledge, understanding, belief, and searches for documents.   The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.


Dated:  May 6, 2011                                    Respectfully submitted,

                                                       By:  /s/ J. Andrew Langan, P.C.

                                                       Richard C. Godfrey, P.C.
                                                       J. Andrew Langan, P.C.

16

Timothy A. Duffy, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 6th day of May, 2011.

/s/   J. Andrew Langan, P.C.