**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

In re: Oil Spill by the Oil Rig         MDL NO. 2179
     "Deepwater Horizon" in the Gulf
     of Mexico, on April 20, 2010        SECTION J

Applies to: *All Cases*               JUDGE BARBIER
                                    MAGISTRATE JUDGE SHUSHAN

<u>ORDER</u>

**[Regarding *In Camera* Inspection of BP's Claimed Privilege in Scheduled I]**

**I. <u>INTRODUCTION</u>**

On June 26, 2010, BP provided an *in camera* submission in response to Schedule I privilege challenges by the U.S., Louisiana, Transocean and Halliburton.  The submission includes:

1.      46 documents (Documents 1-46) challenged by the U.S. and Louisiana for *in camera* review.

2.      11 documents (Documents 47-57) challenged by Halliburton and Transocean for *in camera* review.

3.      A June 26, 2010 declaration from Mark Nomellini supporting BP's contention that the fifty-seven documents are protected from disclosure.

4.      Exhibits A though G attached to the Nomellini declaration plus other documents to support the contention that the 57 documents are protected from disclosure.

The fifty-seven documents may be placed in the following categories:

A.      The Flow Rate Team (Documents 1, 7-9, 11-13, 15, 16, 19, 20, 22, 29, 32-36, 38, 39, 41-44, 56 and 57).

B.      Congress (Representative Markey) Questions (Documents 25-28, 30, 45 and 46).

C.      Scripts/Drafts (Documents 4, 14, 17, 49, 51, and 54).

D.      Redactions (Documents 2, 3, 5, 6, 10, 23, 31, 37, 47, 48, 52 and 53).

E.      Miscellaneous (Documents 18, 21, 24, 40, 50 and 55).

The Flow Rate Team and the Congress Questions documents are referred to in chronological order rather than numerical order.

## II.  ATTORNEY-CLIENT PRIVILEGE

### A.    Preliminary Comments.

Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, A.B.A., Sec. of Lit. (5th Ed. 2007) ("Epstein") and In re Vioxx Products Liability Litigation, 501 F.Supp.2d 789 (E.D.La. 2007)(Fallon, J.) are useful sources.  What distinguishes MDL 2179 from Vioxx is work-product.  As soon as the reports of the explosion and the deaths of the crew members reached BP's executives and counsel and before there were any reports of an oil spill, litigation of personal injury and wrongful death claims was anticipated.  After the reports of an uncontrolled oil spill, OPA litigation was anticipated.  The work-product doctrine is much more significant to the resolution of the issues in MDL 2179 than it was in Vioxx which raised almost exclusively attorney-client issues.

Is the attorney-client privilege subject to a rule of strict construction or broad construction?

In U.S. v. Pipkins, 528 F.2d 559, 562 -563 (5th Cir. 1976), the Fifth Circuit stated:

> The attorney-client privilege, however, is not a broad rule of law which interposes a blanket ban on the testimony of an attorney.  To the contrary,

>> . . . the privilege stands in derogation of the public's 'right to every man's evidence', and as 'an obstacle to the investigation of the truth,' thus, as Wigmore has said, 'It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'

Id. at 562-63 (citations omitted).  Vioxx, 501 F.Supp.2d at 795 ("[t]he attorney-client privilege is

an exception to the general rule that the law is entitled to every man's evidence.").[1]

In Rush v. Columbus Municipal School District, 234 F.3d 706 (unpublished), 2000 WL 1598021 (5th Cir. 2000), the Fifth Circuit stated:

> In Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677 (1981), the Court recognized that the corporate attorney-client privilege is designed to encourage full and frank communication between a corporation and its attorneys to facilitate fully informed legal advice and that the only way to ensure such communication is to construe the privilege broadly.

Id. at *2.  In Upjohn, the control group test was rejected in favor of a broader privilege covering all communications between employees and corporate counsel for purposes of rendering legal advice. The Supreme Court concluded that the control group test frustrated the purpose of the attorney-client privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation.  Id. at 684.  In Rush, the Fifth Circuit held that the attorney-client privilege protects all communications made during a meeting between a school board and its attorney for the purpose of obtaining legal advice, even those communications not addressed directly to the attorney.

The statements in Pipkins and Rush can be reconciled by recognition that the control group test was not consistent with the logic of the attorney-client privilege.  In Upjohn the principle of the attorney-client privilege required a broader reading than provided for with the application of the control group test.  This does not alter Wigmore's statement that the attorney-client privilege ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.

---

[1]  In Vioxx, Judge Fallon reproduced the report of the Special Master, Professor Paul Rice of American University's Washington College of Law.  501 F.Supp.2d at 791 and 794.  The citations in this memorandum come from Professor Rice's report.

Four elements are required to establish the existence of the attorney-client privilege: (1) a communication; (2) made between privileged persons; (3) in confidence; and (4) for the purpose of seeking, obtaining, or providing legal assistance to the client. Epstein at 65. Vioxx finds five elements: (1) an attorney; (2) a client; (3) a communication; (4) confidentiality anticipated and preserved; and (5) legal advice or assistance being the purpose of the communication. Vioxx, 501 F.Supp.2d at 795.

**B.      Summary of the arguments of the U.S.[2]**

The U.S. argues that BP has not sustained its burden. Rec. doc. 6718. It contends that:

1.      BP's engineers were working on stopping the oil spill at the same time as they were working on the Flow Rate Team. It is not possible for a person to build a "mental firewall" between discoverable information and privileged information on the same topic.

2.      BP's technical documents and discussions for the period prior to September 19, 2010[3] should be subjected to heightened scrutiny with special emphasis on documents created prior to July 15, 2010.[4]

3.      Discussions among BP employees or with media consultants regarding BP, U.S. or independent flow rate estimates are not even remotely related to communication of legal advice and are not shielded by the privilege.

4.      BP has claimed the attorney-privilege for hundreds of documents that are factual in

---

[2] Transocean also briefed the attorney-client and work-product issues (Rec. docs. 6690 and 6866). Transocean's arguments are substantially the same as the arguments made by the U.S.

[3] The day the well was "killed" by completion of the relief well.

[4] The date that the flow from the well was stopped when the well was capped.

nature.  The privilege does not apply to BP's factual documents.

## C.   Analysis.

On the first ("mental firewall") issue, the parties cite three cases:   Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc., 1989 WL 31514 (S.D.N.Y. Mar. 28, 1989); Phillip M. Adams & Assocs., L.L.C. v. Fujitsu Ltd., 2010 WL 1064141 (D. Utah Mar. 22, 2010); and B.C.F. Oil Ref., Inc. v. Consolidated Edison Co. of N.Y., Inc., 171 F.R.D. 57 (S.D.N.Y. 1997).

The U.S. urges that Michelson demonstrates the impossibility of the mental firewall.  BP correctly notes that it is a case where a retained expert possessed confidential information from a prior case in which he was retained by opposing parties and on that basis was disqualified on conflict-of-interest grounds.  1989 WL 31514, at *3-4.

BP argues that Adams v. Fujitsu holds that one person can be both an employee and expert at the same time.  Dr. Adams was the inventor, owner, and the person in his company most knowledgeable about his technology.  2010 WL 1064141, at *3.  The defendants' request to take Dr. Adams' deposition as an expert was granted, but he was not required to produce the documents  he considered in forming his expert opinions.  "Since he is the Plaintiff's principal, it would likely be impossible for him to segregate information he has considered in forming his opinions from all the information he has received in the case, including privileged communications."  Id. at *4.  The circumstances in Adams are unique and not applicable to BP.

In B.C.F. Oil Ref., Inc. v. Consolidated Edison Co. of N.Y., Inc., 171 F.R.D. 57, 61 (S.D.N.Y. 1997), the court concluded that an expert could be retained to testify and advise counsel outside of the subject of his testimony at the same time, without compromising a claim of privilege so long as the delineation is clearly made.  The testifying expert was also hired as a technical

consultant whom plaintiff used in order to conduct depositions.  The defendant sought production of the documents relating to the expert's role as consultant.  The plaintiff was not required to produce 10 documents which dealt with document requests or preparations for depositions.  All other documents were to be produced since it was not clear whether the expert reviewed them solely as a consultant or whether they informed his expert opinion as well.  BP contends that the Southern District of New York has squarely recognized that a single employee can take part both in a privileged workstream and in the ordinary business of his or her employer.  BP further argues that:

> There is no reason in law or logic why BP could not use certain employees to respond in a non-privileged fashion to the spill while at the same time using those same employees to conduct separate privileged flow rate analysis in consultation with counsel.

Rec. doc. 6810 at 5.  While this is persuasive, the *in camera* review presents questions as to whether BP has carried its burden for documents dated after July 15, 2010.

The well was capped on July 15.  The preliminary meeting of the Flow Rate Team was on July 18.  Admiral Allen declared the well dead on September 19.  The U.S. emphasizes that between July 15 and September 19, flow rate remained critical to well integrity.  There are Flow Rate Team documents within the July 15 to September 19 period.  The U.S. argues, without citation to authority, that BP's technical documents and discussions for the period prior to September 19, 2010 should be subjected to heightened scrutiny with special emphasis on documents created prior to July 18, 2010.      There are no Flow Rate Team documents for the period when the well was flowing, so heightened scrutiny is not an issue for pre-July 15 documents.  Because the well stopped flowing, there is no basis for subjecting Flow Rate Team documents dated after July 15 and before September 19 to heightened scrutiny.

The U.S. states that:

> All of BP's attorney-client privilege claims . . . involve communications among <u>non-attorneys</u> . . . . Discussions among BP employees or with media consultants regarding BP, United States Government, or independent flow rate estimates are not even remotely related to communication of legal advice and are not shielded by the privilege.

Rec. doc. 6718 at 3. BP responds that the U.S. is wrong that only communications made to an attorney from an employee can be privileged. "It goes without saying that management-level employees within a complex organization must be permitted to discuss legal advice sought and given without thereby losing the privilege." Epstein at 86. In <u>Vioxx</u>, Professor Rice states:

> [I]t protects communications between those employees and corporate legal counsel on matters within the scope of their corporate responsibilities, as well as communications between corporate employees in which prior advice received is being transmitted to those who have a need to know in the scope of their corporate responsibilities.

501 F.Supp.2d at 796. Thus, in some circumstances communications among non-attorneys are protected under the attorney-client privilege.

The last argument made by the U.S. is that BP is asserting the privilege for hundreds of documents that are factual in nature. It contends that the privilege does not apply to BP's factual documents. BP responds with a distinction. It agrees that pre-existing facts that underlie the client's confidential communications are not privileged. "Facts remain discoverable regardless of to whom they have been conveyed." Epstein at 88. BP contends, however, that documents containing information, including factual information, created for the purpose of seeking legal advice from counsel are privileged. In <u>Vioxx</u>, Professor Rice stated:

> When the conveyance was by the lawyer and it appeared that it was for the purpose of acquiring more information upon which more informed legal advice or assistance could be rendered, the additional conveyance and response were also found to be privileged.

501 F.Supp.2d at 811-812. In <u>Upjohn</u>, the Supreme Court stated that "[t]he first step in the

resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant. 101 S.Ct. at 683.  This argument raised by the U.S. can only be resolved by reference to the documents submitted for *in camera* review.

## III.  <u>WORK-PRODUCT PROTECTION</u>

The U.S. contends that: (1) BP has failed to prove that litigation was the primary motivating purpose for documents it claims are work-product; (2) the U.S. and other parties have substantial need for BP's data and flow rate calculations during the response; and (3) BP must produce communications with third parties.

**A.     <u>Primary Motivating Purpose</u>.**

The U.S. argues, relying on <u>United States v. Davis</u>, 636 F.2d 1028, 1040 (5th Cir.1981), that the Fifth Circuit applies a restrictive "primary purpose" test – a document is prepared in anticipation of litigation only when the primary motivating purpose behind the creation of the document is to aid in possible future litigation.  The doctrine excludes materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation.  It cites Epstein at 868 ("Where the primary purpose for preparing a document is not litigation but some other business purpose, work-product protection is not accorded.").

The U.S. argues that: (1) BP has not demonstrated that the flow rate materials at issue were prepared primarily for the purposes of litigation; (2) the documents were created at a time when BP was obligated to undertake response actions such as calculating or estimating flow rates; (3) BP's contractor, ADD Energy, testified that its standard practice is to calculate flow rates in order to design a kill operation to stop the flow; and (4) the purpose of these calculations was not primarily for litigation but, rather, primarily to stop BP's well from spewing more oil into the Gulf.

8

BP responds that the U.S. misconstrues <u>Davis</u>.  It contends that: (1) the primary-purpose test is applicable to assessing the status of documents over which work-product protection is claimed when litigation is not imminent; and (2) by contrast, documents created for protected purposes when litigation is imminent are clearly protected.

In referring to <u>Davis</u>, Epstein states that: "[s]ome courts have indicated that litigation need not be 'imminent' as long as the prospect of litigation motivated the creation of the material being sought."  Epstein at 847.  In <u>Davis</u>, attorneys appealed from judgments enforcing summonses issued by the IRS that required them to produce documents and give testimony relating to the income tax liability of their client.  They made objections based on work-product protection.  The Fifth Circuit stated:

> [I]t is plain here that none of the summoned documents were materials prepared by an attorney acting for his client in anticipation of litigation.  A large proportion of the summoned documents are business records prepared by the client . . . .  Of the documents prepared by the attorneys themselves, none were . . . prepared in anticipation of this or any other litigation except for the workpapers created . . . in the course of preparing . . . tax returns for the years 1974 through 1978.  But papers generated by an attorney who prepares a tax return are not within the work-product privilege simply because there is always a possibility that the IRS might challenge a given return.  It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work-product doctrine.  <u>We conclude that litigation need not necessarily be imminent, as some courts have suggested, as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation</u>.  But there is no evidence that . . . [the attorney] had reason to expect future trouble with the IRS.  [The] . . . workpapers were to aid in preparing tax returns, not primarily to help litigate over those returns.  They are therefore outside the scope of the work-product doctrine.

<u>Id</u>. at 1039-40 (emphasis added).  <u>Dawson v. Jantran, Inc</u>., 2010 WL 1956892, *1 (N.D. Miss. 2010) ("In the Fifth Circuit, the doctrine can apply where litigation is not imminent, as long as the primary motivating purpose behind the creation of the documents is to aid in possible future litigation.").

BP is incorrect in arguing that if litigation is imminent, it is relieved of the need to demonstrate that the primary purpose test is inapplicable. However, BP has demonstrated that the Flow Rate Team, which began work on July 18, 2010, was formed primarily for the purpose of aiding in litigation.

**B.     Substantial Need.**

The U.S. argues that it has a substantial need for the documents[5] because: (1) no one has more information about the well than BP; (2) all of the raw data underlying the Flow Rate Technical Group ("FRTG") for the U.S. was provided by BP; (3) BP's Flow Rate Comment, dated October 21, 2010 (Attachment E to June 16 letter) ("October 2010 Comment") states BP's belief that the accuracy of the data underlying the FRTG work was relevant to the quantification inquiry; (4) the parties are unable to recreate or otherwise obtain the data collections and materials without undue hardship; (5) BP's credibility regarding flow rates are at issue in this case as BP's internal documents may contradict BP's statements to the U.S.; and (6) BP witnesses have given conflicting testimony on BP's flow rate calculations at the time the capping stack was placed on the well.

BP responds that: (1) the U.S. already possesses all of BP's underlying factual material and data; (2) it is not entitled to BP's technical interpretation and analysis of those facts, as conducted under the direction of attorneys; (3) BP's interpretative analysis inextricably reflects counsel's legal theories and so is not discoverable; (4) the U.S. has the scientists to recreate or otherwise obtain the data collections and materials; (5) the U.S. has not identified a specific need for more information than it already possesses; (6) the mere possibility that the documents may contradict statements to

---

[5]  It is useful to remember that "[w]ork-product protection does not shield information from disclosure; it only protects a party against having to turn over particular documents containing the information.  Interrogatories can be addressed to obtain the sought-after information.  Once witnesses are located, their depositions can be taken."  Epstein at 821.

the public is insufficient; (7) any conflicts among the BP witnesses can be resolved through depositions; (8) the results under the deliberative process privilege and the work-product protection are not comparable (factual material is not protected under the deliberative process privilege unless it is inextricably intertwined with the deliberative material, whereas no such showing is required under the work-product doctrine); and (9) the work of BP's non-testifying experts on flow rate also is protected from discovery.

The issue is whether the U.S. has demonstrated a substantial need for the Flow Rate Team work.  BP represents and it is assumed that the U.S. has all of the raw data.  What the U.S. seeks are analysis documents.[6]  The U.S. has not demonstrated a substantial need for the analysis documents prepared by the Flow Rate Team or any other documents found by the undersigned to be work-product.

## C.     **Communications With Third Parties**.

The U.S. argues that BP should be required to produce documents which were communications with third parties.  BP does not respond to this argument.

## D.     **Waiver**.

The U.S. combines its argument on waiver of the attorney-client privilege and work-product protection into one argument on waiver.  This presents some problems in the analysis of the waiver issue.

---

[6]  In the WHOI order, the analysis documents were:  (1) communications regarding the techniques or methodologies used; (2) communications regarding techniques that were considered for use but rejected; (3) communications assessing methodological and data reliability issues; and (4) communications otherwise bearing on the validity and reliability of WHOI's work.  Rec. doc. 6394 at 3-4.  The U.S. does not argue that because BP obtained the WHOI analysis documents, the U.S. has a substantial need for the analysis documents from the Flow Rate Team.

> The waiver of the attorney-client privilege for a communication does not automatically waive whatever work-product immunity that communication may also enjoy, as the two are independent and grounded on different policies. Waiver of the privilege should <u>always</u> be analyzed distinctly from waiver of work-product, since the privilege is that of the client and the work-product essentially protects the attorney's work and mental impressions from adversaries and third parties even when communicated to the client.

Epstein at 1027 (emphasis added).

What is the scope of waiver? Waiver of the attorney-client privilege with regard to some communications waives the privilege as to all other communications relating to the same subject matter only. Epstein at 584. Where the disclosure of the attorney-client communication was purposeful, generally all documents on the same subject matter will and should be ordered disclosed lest the disclosing party manipulate the disclosure unfairly to its own advantage. <u>Id</u>. at 586.

The work-product protection is not susceptible to the same policy concerns as the attorney-client privilege. <u>Id</u>. at 1114. Disclosure of some work-product materials does not thereby necessarily constitute a waiver permitting discovery of all work-product prepared in the same litigation. <u>Id</u>. at 1116.

> And disclosure of some investigative report for instance to an adversary during the course of discovery, will not necessarily entrain access to all the work-product, memos, notes of interviews and such that went into the production of the investigative report.

<u>Id</u>. at 1118. "A partial waiver of the work-product protection, as in the settlement context, may often be limited to only the document disclosed." <u>Id</u>.

The waiver argument is presented in more general terms in the U.S. letter brief of June 16. Rec. doc. 6718. In its July 3 reply, the U.S. urges that BP waived work-product protection on the facts, documents, and analyses underlying two documents: (1) BP's Flow Rate Comment dated October 21, 2010 (Attachment E to June 16 letter) ("October 2010 Comment"); and (2) memo

prepared by David Rainey of BP and submitted to Admirals Landry and Allen on May 19, 2010

(Attachment L to June 16 letter) ("Admirals letter").  Rec. doc. 6867.  These documents raise

different issues as one was submitted after the start of the Flow Rate Team work, whereas the other

was submitted before the start of the work.[7]

The Admirals letter did not waive the work-product of the Flow Rate Team because the

Team did not come into existence until July 18, 2010.  Pre-July 18, 2010 analysis documents relating

to flow rate are discoverable.

The October 2010 Comment was prepared after the start of the work by the Flow Rate Team.

There is evidence that the Flow Rate Team prepared the Comment.  It is noted that the Comment

contains the statement that "a reliable estimate cannot yet be developed because several key pieces

of information have been and remain unavailable. . . ."  Rec. doc. 6718 (Attachment E at 1).  BP

states that the U.S. concedes that it would be improper to seek flow-rate documents created after the

October 2010 Comment.  This limits the issue to Flow Rate Team work-product created between

July 18 and October 21, 2010.

Because the scope of waiver is limited in the work-product protection context, BP did not

waive the protection for the Flow Rate Team's work-product from July 18 through October 21,

2010.

## IV.  DOCUMENT CATEGORIES

### A.   Flow Rate Team Documents.

Nomellini's declaration refers to seven documents (Exhibits A through G) as demonstrating

---

[7] The issue of whether BP waived work-product protection for the Flow Rate Team when it released
the Admirals letter and the October 2010 Comment is not an issue of waiver of the attorney-client privilege.

that after the well was capped on July 15, 2010, BP undertook attorney-directed work to be performed by internal personnel and external experts to estimate the rate and amount of oil that flowed from the well.  Exhibits A through G demonstrate that this was an attorney-directed project. In this order the group is referred to as the "Flow Rate Team."  The exhibits demonstrate that the work began on July 18, 2010.

The initial non-lawyer members of the team were included:

| | |
|---|---|
| Paul Tooms | Robert Merrill |
| Cindy Yeilding | Farah Saidi |
| Andrew Hill | Tom Knox |
| Trevor Hill | |

Additional non-lawyers were added to the team.  For example, Tim Lockett was added to the team. There were detailed and specific instructions to the non-lawyer members from BP counsel regarding the attorney-client privileged investigation.

BP contends that the Flow Rate Team documents are protected from disclosure on the basis of the attorney-client privilege and/or the work-product doctrine.

Document No. 12.

Nomellini's declaration demonstrates that: (1) Document 12 is dated July 26, 2010; (2) it came from the computer of Farah Saidi; and (3) it is listed on the attorney-client privilege challenges.  Nomellini provided Document 12A, an email from Saidi to Hill (both Flow Rate Team members) with Document 12 attached.

Document 12 relates to a July 15 test choke rate.  It is factual information.  It is not a communication between an attorney and a representative of the client.  The issue is whether

Document 12 is protected from disclosure as information gathered and/or developed pursuant to the attorney-directed Flow Rate Team. BP has not presented anything that demonstrates Document 12 was prepared for the Flow Rate Team as opposed to some other purpose. BP has not sustained its burden of demonstrating that the document is protected from disclosure by the attorney-client privilege.

The remaining issue is whether it is protected from disclosure by the work-product doctrine. BP has not made a sufficient demonstration that Document 12 is part of the work-product of the Flow Rate Team.[8]

Document No. 19.

Document 19 is a tabulation of data. Nomellini's declaration states that: (1) it is listed on the attorney-client privilege challenges; and (2) its file path includes "Macondo\Confidential\July 14-15 flow rate\P loss in the choke line-updated July 26.xls." No other documentation, for example an email transmittal, is submitted to support the assertion of attorney-client privilege. The file path could be read as indicating that the tabulation of data is related to the July 14-15 flow rate and the data was updated on July 26, 2010. The fact that the file path includes "Macondo\Confidential" is insufficient to demonstrate that it is protected by the attorney-client privilege.

The remaining issue is whether it is protected from disclosure by the work-product doctrine. BP has not made a sufficient demonstration that Document 12 is part of the work-product of the Flow Rate Team.

---

[8] For example, no information regarding the computer file path information reflecting it was generated as part of the Flow Rate Team's work was provided.

Document No. 13.

Nomellini's declaration states that Document 13 is listed on the attorney-client privilege challenges. It is an email chain (August 9 to 11, 2010) with two redactions. Document 13A is the unredacted version. The email chain concerns communications between Trevor Hill and Paul Tooms, two members of the Flow Rate Team. Others are copied on some of the email.[9]

There are two redactions. The redaction in the August 9, 2010 email (5:25 a.m.) only contains the fact that there was a meeting with a lawyer and the availability of Hill to work on the flow rate issue. This is not protected from disclosure. Epstein at 91 ("the very fact that legal advice was either sought or given is not in itself privilege protected."). The work-product doctrine does not alter this result.

The second email was sent on August 9 at 20:10 (8:10 p.m.). This redaction reflects advice and instructions given by the BP lawyers to the Flow Rate Team. The redaction is protected from disclosure by the attorney-client privilege.

Document No. 36.

Document 36A is an email dated August 16, 2010, from Tim Lockett to Trevor Hill. The email does not refer to itself as privileged or confidential. Document 36 is the template referred to in the August 16, 2010 email. The Nomellini declaration identifies it as listed on the work-product protection challenges. It is not necessary to consider whether it is protected from disclosure as attorney-client.

It is protected from disclosure by the work-product doctrine.

---

[9] Cindy Yeilding is a member of the Flow Rate Team. There is no identification of David Brookes.

Document No. 56.

Documents 56 and 56A are the same as Documents 36 and 36A.

Document No. 29.

Document 29A is an August 22, 2010 email from Trevor Hill to Paul Tooms, the leader of the Flow Rate Team, concerning an update to the work program and attaching Document 29.  The Nomellini declaration identifies Document 29 as listed on the work-product protection challenges. It is not necessary to consider whether it is protected from disclosure as attorney-client.

It is protected from disclosure by the work-product doctrine.

Document No. 16.

Document 16 is a work plan for the flow rate.  Nomellini's declaration states that it came from the electronic files of Bob Merrill, a member of the Flow Rate Team.  Document 16A is very similar to Document 16.  Document 16B is an August 26, 2010 email from Merrill to Cindy Yeilding, a member of the Flow Rate Team, with a copy to a BP attorney, in which Merrill asks Yeilding to review the work plan.

Document 16 is the same as Document 44A with one exception.  The exception is the note on page 1 of Document 16, where Merrill flags a section of the plan that Yeilding needed to work on.

Document 16 is listed as an attorney-client privilege challenge.  The Flow Rate Team was organized at the request of BP legal counsel for the purpose of rendering legal advice to the company.  The document, standing alone, is not protected as a privileged document.  Forwarding a copy to a BP attorney does not change this status.  It is not information gathered by BP so that its counsel could provide legal advice.

It is, however, protected from disclosure as work-product.

Document No. 44.

Document 44A is a work plan.  With the exception noted above, it is the same as Document 16.  The Nomellini declaration describes Document 44A, the work plan, as the parent for Document 44.  The Nomellini declaration demonstrates that Document 44 is listed on the work-product protection challenges.  Although its parent was listed as attorney-client (see Document 16), the "child," like its parent, only merits work-product protection.  BP called Document 16 attorney-client because a copy was sent to a BP lawyer, whereas there is no evidence that Document 44 was sent to a BP attorney.

Document 44 is protected from disclosure as work-product.

Document No. 22.

Document 22B is dated September 2, 2010.  It is from Trevor Hill, a member of the Flow Rate Team, to other members of the Flow Rate Team and BP external counsel.  It is concerned with information to be obtained from inspection of the BOP when it is recovered from the sea floor. Document 22A, dated September 1, 2010, is concerned with flow paths.  It was attached to Document 22B.  Document 22, dated September 16, 2010, is a near duplicate of Document 22A.

The Nomellini declaration reports that Document 22 is on the attorney-client privilege challenge list.  The document is of the same nature as the work plan (Document 16).  For the reasons stated with Document 16, it is not protected by the attorney-client privilege.

Document 22 is protected from disclosure as work-product.

Document No. 42.

Nomellini's declaration states that Document 42 is listed on the work-product protection challenges.  It is a September 11, 2010 email reporting acceptance to attend a Flow Rate Team meeting.  The fact that there was a meeting does not protect the document from disclosure as work-product just as a communication scheduling a meeting with an attorney would not make the communication subject to the attorney-client privilege.  Epstein at 88-89.

Document 42 is not protected from disclosure.

Document No. 32.

Document 32 was prepared on September 15, 2010.  It is from Trevor Hill's file and is captioned as being prepared at the direction of counsel.  It is a timeline.  Nomellini's declaration demonstrates that it was listed on work-product protection challenges.

It was prepared under the direction of counsel and is protected from disclosure as work-product.

Document No. 33.

The Nomellini declaration demonstrates that Document 33 is listed on the work-product protection challenges.  It is an email string (September 15 to 20, 2010).  The September 20 email is redacted.

The redactions contain analysis and are therefore work-product.

Document No. 7.

Nomellini's declaration states that: (1) Document 7 is listed on the attorney-client privilege challenges; (2) it is dated September 23, 2010; (3) it came from the computer of Farah Saidi, a member of the Flow Rate team; and (4) the file path includes Macondo/Confidential.  This is the

first document dated after the completion of the relief wells.  The file path information is insufficient to establish that it is protected by the attorney-client privilege or as work-product (although it is not challenged as work-product).  BP has not carried its burden.

It is required to produce Document 7.

Document No. 20.

Nomellini's declaration reports that Document 20 is listed on the attorney-client privilege challenges.  On September 23, 2010, an external law firm retained an individual as an expert for BP.  Document 20B.  On October 20, 2010, that person communicated with Farah Saidi of the Flow Rate Team concerning the scope of work for a capping stack test.  Document 20 is the attachment referred to in Document 20B.

Document 20 is not protected by the attorney-client privilege.  It is protected as work-product.

Document No. 38.

Nomellini's declaration states that Document 38 is listed on the work-product protection challenges.  It is not necessary to consider whether it is attorney-client protected.  Document 38A is a September 23, 2010 email from Farah Saida to Robert Merrill, both members of the Flow Rate Team.  Document 38 was transmitted with the September 23, 2010 email.

Document 38 is protected from disclosure as part of the work-product of the Flow Rate Team.

Document No. 57.

Nomellini's declaration states that Document 57 is listed on the work-product protection challenges.  It is not necessary to consider whether it is attorney-client protected.  It is a short email

string (September 23, 2010).  The email chain begins with an email from Sammye Berryhill to Cindy Yeilding, a Flow Rate Team member.  She responds to Berryhill and Trevor Hill.  The email only discloses the existence of a meeting.  The fact of a meeting is not protected as work-product.

The document must be produced.

Document No. 34.

Nomellini's declaration states that Document 34 is listed on the work-product protection challenges.  It is not necessary to consider whether it is attorney-client protected.  Document 34A is a September 28, 2010 email from Tim Locket to members of the Flow Rate Team including Trevor Hill.  Document 34 was attached to the September 28, 2010 email.

It is part of the work-product of the Flow Rate Team and is protected from disclosure.

Document No. 8.

Nomellini's declaration demonstrates that: (1) Document 8 is listed on the attorney-client privilege challenges; (2) it is dated September 28, 2010; (3) it came from Farah Saidi's computer; and (4) its file path includes Macondo\Confidential.  The document is similar to Document 7 in that both relate to a "PIPESIM Project."  For Document 7, it was concluded that the file path information is insufficient to establish that it is protected by the attorney-client privilege or work-product.  BP has not carried its burden.  The result is not any different for Document 8.

The document must be produced.

Document No. 41.

Nomellini's declaration states that: (1) Document 41 is listed on the work-product protection challenges; (2) it is dated October 13, 2010; and (3) it was an attachment to an October 13, 2010 email from Trevor Hill to Farah Saidi and Tim Lockett (Document 41A), members of the Flow Rate

Team.

Document No. 41 is protected from disclosure as part of the work-product of the Flow Rate Team.

Document No. 39.

Nomellini's declaration states that: (1) Document 39 is listed on the work-product protection challenges; (2) it is dated October 16, 2010; and (3) it was attached to an October 16, 2010 email from Farah Saidi to Trevor Hill (Document 39A), both members of the Flow Rate Team. It is not necessary to consider whether Document 39 is protected by the attorney-client privilege.

It is protected from disclosure as part of the work-product of the Flow Rate Team.

Document No. 43.

Nomellini's declaration reports that: (1) Document 43 is listed on the work-product protection challenges; (2) it is dated October 17, 2010; (3) it comes from Bob Merrill's electronic files;(4) the file path includes "Privileged Legal Communications;" and (5) the document is marked "privileged and confidential - prepared at request of counsel."

The document is protected from disclosure as work-product of the Flow Rate Team.

Document No. 11.

Nomellini's declaration states that Document 11 is listed on the attorney-client privilege challenges. It begins with an October 18 email from Lockett to Mix concerning Top Kill mud. Steve Palmer, a BP attorney, is copied. On October 18, 2010, Mix emails Ole B. Rygg of Add Energy (a third-party contractor for BP in the effort to control the well). On October 20, there is a reply. Document 11 is not protected by the attorney-client privilege. A third party, Add Energy, was included on the email string and therefore the document is not confidential.

BP is required to produce the document.

Document No. 9.

Nomellini's declaration demonstrates that: (1) Document 9 was listed on the attorney-client privilege challenges; (2) it is dated November 9, 2010; (3) it came from the computer of Tim Lockett; and (4) the file path includes "MC252-Confidential and Privileged\Flowrate and produced volume." The path information is insufficient to establish that it is protected by the attorney-client privilege. BP has not carried its burden.

The document is work-product for the Flow Rate Team and is protected from disclosure.

Document No. 35.

Nomellini's declaration states that: (1) Document 35 was listed on the work-product challenges; (2) the date shown on the document is June 18, 2010; (3) the metadata reveal that it was created on September 28, 2010; (4) it came from Tim Lockett's computer; and (5) the file path includes MC252-Confidential and Privileged\Flowrate and produced volume.

The document is work-product for the Flow Rate Team and is protected from disclosure.

Document No. 1.

Nomellini's declaration states that: (1) Document 1 is listed on the attorney-client privilege challenges; and (2) it is dated November 8, 2010. Document 1A is a November 25, 2010 email from Trevor Hill, one of the original members of the Flow Rate Team (see Exhibit A) sending Knox a copy of a draft history of a piece of equipment. Document 1 is not protected by the attorney-client privilege.

However, based on Documents 1A through C, the history found in Document 1 was prepared by or for the Flow Rate Team and is protected from disclosure as work-product.

<u>Document No. 15</u>.

Nomellini's declaration states that Document 15 is listed on the attorney-client privilege challenges.  Document 15A is a December 2, 2010 email string concerning a problem that Bob Merrill, one of the Flow Rate Team members, was having.  On a confidential basis, he sought help from a few others.  Document 15 relates to his inquiry.  Although the document was sent to lawyers, the primary addressees were not lawyers.  The document is not protected by the attorney-client privilege.

It is protected from disclosure as part of the work-product of the Flow Rate Team.

**B.      <u>Congress (Congressman Markey) Questions</u>.**

On May 21, 2010, Jeffrey Morgheim, who is not identified as a lawyer, sought from David Rainey answers to questions posed by Representative Markey.  The questions concerned BP's estimates of potential flow from the well, methods of estimating the flow rate and modeling the spill event.  Responses to the questions were prepared and released to Representative Markey.  In June, Representative Markey released two pages that described a "worst case" flow rate of 100,000 barrels of oil per day.  An external lawyer prepared a letter that she proposed be sent on June 23.  The lawyer sought comment from BP personnel before sending the letter.

There are 7 documents relating to the question responses and "worst case" letter. Nomellini's declaration reports that the 7 documents were listed on the work-product protection challenges.[10]  The attorney-client privilege is not an issue.

"Voluntary disclosure to a government agency to effect a goal by the disclosing party other than assistance in prospective or ongoing litigation . . . constitutes waiver [of work-product

---

[10] All of these documents pre-dated the creation of the Flow Rate Team.

protection]." Id. at 1053.

Document No. 25.

Document 25 is an April 26, 2010 estimation of the oil released.  Handwritten arrows and underlining appear on the document, but no notes.

Document No. 25A is a May 21 through 23, 2010 email string.  It begins with a request from Jeffrey Morgheim to David Rainey, who reports that his request is made at the direction of counsel for BP.  The request is for data related to BP estimates of potential flow from the well.  On May 21, Rainey provides Morgheim with a first pass on some of the answers.  On May 23, Morgheim passes Rainey's work to Max Easley with the comment that Rainey's paper was cleared by a BP lawyer.

Nomellini's declaration reports that Document 25 was attached to Document 25A for use in responding to Representative Markey.  Document 25 is relevant to quantification and it is discoverable.  The mere fact that it was used in preparing answers to the questions and that attorneys participated in the drafting of the answers does not change the nature of Document 25.

It is not protected by the work-product doctrine.

Document No. 26.

Document 26 is redacted.  Document 26A is the unredacted version.  The redaction is an answer to question no. 4 which contains the source of an estimate of the barrels per day.  A May 14, 2010 response to a question concerning the basis for a BP estimate of flow rate is not protected by the work-product doctrine.  It was not prepared in anticipation of litigation.

The document must be produced.

Document No. 30.

Document No. 30 is redacted.  Document 30A is unredacted.  It is a May 22, 2010 email from Morgheim to Trevor Hill with a request for any reports that he produced on estimates of spill flow rate.  Morgheim was prompted to do this at the request of counsel for BP.

The sequence is that: (1) Representative Markey prepared questions for BP; (2) the responses require technical information which are pertinent to the anticipated litigation as well as the fact that on May 22 oil continued to flow from the well; (3) BP's counsel direct Morgheim to obtain information from persons within BP for the response; and (4) presumably the lawyers put the responses in final form.  An email seeking the information which refers to the fact that BP's attorneys wanted the information does not make the email work-product.  Litigation was not the primary motivating purpose for the email.

The document must be produced.

Document No. 46.

Document 46 contains an email exchange between Morgheim and Trevor Hill.  Hill later became a member of the Flow Rate Team.  The U.S. describes Hill as a flow engineer.  Morgheim asks Hill for any reports he produced regarding estimates of flow rate.  Hill responds with a report. In it Hill states that he believes that the estimates by Professor Wereley were flawed.  On May 23, Morgheim requests that Hill provide any documents which relate to his assessment of Wereley's estimate.  Document No. 46A.

For the reasons discussed with Document 25, Document 46 is not protected as work-product.

Document No. 45.

Document No. 45 is a May 25 email from Morgheim to Mike Mason seeking information

on the diameter of the openings of the leaks in and around the BOP.  Mason forwards the request to Trevor Hill.  Mark Nomellini is copied on the Morgheim to Mason email.

The document is not protected as work-product.  BP is required to produce it.

Document No. 27.

Document No. 27 is a meeting request from Morgheim dated June 7, to schedule a call to discuss a response to a note from Markey.  Apparently the email was a distributed to a list of people, including two external lawyers for BP (see Document No. 27A).

The document is not protected by the work-product doctrine.

Document No. 28.

Document No. 28 is a June 21-22, 2010 email string.  Representative Markey released a worst case flow rate.  An external BP lawyer prepared a letter response.  The letter was sent by the lawyer to Morgheim and others for comment.  Morgheim requested that Rainey review the letter. BP does not argue that the document is protected by the attorney-client privilege.  The issue is whether it is work-product.  Litigation was not the primary motivating purpose for the preparation of the letter.

It is not protected from disclosure.

**C.**     **Scripts/Drafts.**

Nomellini's declaration reports that Documents 51 and 54 are on the list for work-product protection challenges.  The remaining documents in this category are listed for attorney-client privilege.  "[O]ften drafts of documents intended for eventual public disclosure are not privilege protected."  Epstein at 132.  An attorney's editorial changes to such documents should be privilege protected. Id. at 133.

<u>Document 4</u>.

Document 4 is a draft of an investor script.  It indicates that it was prepared at the request of counsel.  It is assumed that once it was in final form, it was released to the public.  There are no marginal notes or redlining on the document.   Document 4A demonstrates that the draft was circulated to counsel, including external counsel, who made changes.

Document 4 is not protected by the attorney-client privilege or the work-product doctrine.

<u>Document No. 14</u>.

Document 14 is a draft of an employee note from Tony Hayward.  It is assumed that once it was in final form, it was publicly released.  Document 14A includes a June 17, 2010 email from a BP lawyer seeking comments on the employee note.  Comments were provided by lawyers.

It is not clear who made the notes on Document 14.  The document is not protected by the attorney-client privilege.  BP did not demonstrate who made the marginal notes on the document, so the document should be produced without redaction of the margin notes.  It is not protected by the work-product doctrine.

The document must be produced.

<u>Document No. 17</u>.

Document No. 17 was attached to an email from internal BP counsel dated July 17, 2010, to the Legal Steering Committee, including external and internal counsel, concerning the Second Quarter Legal Provisions/Disclosures with estimates of various fines.

Document No. 17 is protected from disclosure by the attorney-client privilege.

<u>Document No. 49</u>.

Document No. 49 contains talking points for fluids planned for use in the top kill.  The points

had not been cleared by Legal.  There are no marginal notes or redlining on the document.

Document 49A contains an email reporting that a BP employee was helping a BP attorney who was

working with the Press Office on Talking Points.  The points were sent to a BP employee for review.

Document 49 is not protected by the attorney-client privilege or the work-product doctrine.

Document No. 51.

Document No. 51 is draft of a presentation by Doug Suttles to the National Commission.

The draft includes redlining by lawyers.  The presentation was not prepared in anticipation of

litigation and therefore is not work-product.

Document 51 is not protected from disclosure.

Document No. 54.

BP required approval from the Coast Guard for the Top Hat procedure and another option.

A letter was prepared for signature by Doug Suttles.  Document No. 54 is a draft of the letter which

was prepared by a BP attorney.

Document 54 is not protected from disclosure by the work-product doctrine.

**D.**    **Redactions**.

Nomellini's declaration states that some of the following documents were listed on attorney-

client privilege challenges while others are listed on work-product protection challenges.

Document No. 2.

Nomellini's declaration states that Document 2 is listed on the attorney-client privilege

challenges.  It is a hard copy of a handwritten note.  Part of the note was redacted.  An unredacted

copy of the note is document no. 2A.

It appears that BP contends that if a document refers to a lawyer, then the reference in the

document is protected from disclosure.  BP has not demonstrated that the redacted language is protected from disclosure by the attorney-client privilege.  BP has not carried its burden to demonstrate that it was prepared in anticipation of litigation.

Document 2 is not protected from disclosure.

Document No. 3.

Nomellini's declaration states that redacted Document 3 is listed on the attorney-client privilege challenges.  Document 3A is unredacted.  BP redacted handwritten notes from Doug Suttles' file.  The unredacted document should be produced.

Document 3 is not protected from disclosure as work-product.

Document No. 5.

Nomellini's declaration states that redacted Document 5 is listed on the attorney-client privilege challenges.  Document 5A is unredacted.  Document 5 is dated August 11, 2010.  The information provided is insufficient to demonstrate that the document is protected from disclosure as attorney-client or work-product.

The unredacted copy shall be produced.

Document No. 6.

Nomellini's declaration states that redacted Document 6 is listed on the attorney-client privilege challenges.  Document 6A is unredacted.  It is a May 1, 2010 email exchange.  The unredacted document reveals an instruction that a draft should be run past lawyers.  This is insufficient to demonstrate that the document is protected from disclosure as attorney-client or work-product.

The unredacted copy should be produced.

Document No. 10.

Nomellini's declaration states that redacted Document 10 is listed on the attorney-client privilege challenges. Document 10A is unredacted. It is a May 3, 2010 email exchange from Niall Maguie to Tony Hayward and others. The fact that there was a privileged communication with a BP lawyer is not protected from disclosure under the attorney-client privilege or work-product doctrine.

The unredacted document must be produced.

Document No. 23.

Nomellini's declaration states that redacted Document 23 is listed on the attorney-client privilege challenges. Document 23A is unredacted. It is an updated operations action plan. The redaction is not protected from disclosure by the attorney-client privilege or the work-product doctrine.

BP must produce the unredacted copy of Document 23.

Document No. 31.

Nomellini's declaration states that redacted Document 31 is listed on the work-product protection challenges. Document 31 is a June 23, 2010 email concerning an inspection. BP redacted language concerning a subpoena. The redacted information is not protected from disclosure.

BP is required to produce an unredacted copy of Document No. 31.

Document No. 37.

Nomellini's declaration states that redacted Document 37 is listed on the work-product protection challenges. Document 37A is unredacted and contains an exchange of emails on August 16 and 17, 2010. The emails are concerned with a Gulf of Mexico outreach program for "core"

universities.  The redaction is not protected from disclosure.  It merely references the fact that the content of the presentation would be presented to BP lawyers.  In the second redaction Trevor Hill reports that he will ask BP Legal whether it is  appropriate to make any comments for the proposed presentation about flowrate estimation.  The document was prepared after creation of the Flow Rate Team.  Although Trevor Hill was a member of the team, the redaction in the August 17 email is not part of the work-product of the Flow Rate Team.

BP is required to produce an unredacted version of Document 37.

Document No. 47.

Nomellini's declaration states that redacted Document 47 is listed on the attorney-client privilege challenges.  Document 47 is an email string (April 24 to April 25, 2010).  The email at issue contains notes and action items from a meeting earlier in the day.  BP redacted a comment concerning attorneys.

BP must produce an unredacted copy of Document 47.

Document No. 48.

Nomellini's declaration states that redacted Document 48 is listed on the attorney-client privilege challenges.  Document 48 contains handwritten notes dated May 2, 2010.

BP redacted comments on legal issues relating to the Oil Pollution Act of 1990.  The author of the notes is not identified.  The notes appear to be someone's summary understanding of the rights and responsibilities under OPA.  It is not clear that this was based on the advice of an attorney.  BP has not sustained its burden to demonstrate that the document is protected from disclosure under the attorney-client privilege or work-product.

BP is required to produce an unredacted copy of Document No. 48.

Document No. 52.

Nomellini's declaration states that redacted Document 52 is listed on the work-product protection challenges. Document 52 is an email string (April 23 through 24, 2010) in which legal advice/instructions are communicated. BP's redaction of Document No. 52 was proper as attorney-client privileged.

BP is not required to produce the unredacted copy of Document 52.

Document No. 53.

Nomellini's declaration states that redacted Document 53 is listed on the work-product protection challenges. Document 53 is redacted in two places. It is an email string (April 30 through May 4, 2010) referring to a report that someone named Mark has been asked by Legal to review a patent issue. This is like a report on the existence of an attorney-client relationship and it is not protected from disclosure. The second redaction contains Mark's comments after review. That redaction is protected.

BP must produce Document No. 53 as set forth above.

**E.      Miscellaneous.**

Document Nos. 18 and 21.

The documents concern legal advice for visa arrangements. They are privileged. BP is not required to produce them.

Document No. 24.

Nomellini's declaration states that Document 24 is listed on the attorney-client privilege challenges. It is a graphic or slide revealing well bore details. The graphic was considered for possible presentation to and use in a presentation to a Presidential Commission.

BP contends that the graphic is protected by the attorney-client privilege.  Other than the fact that BP lawyers were assisting BP's preparation for the presentation to the Presidential Commission, there is no basis for the attorney-client privilege.  The graphic does not reflect legal advice.

The graphic was prepared after the creation of the Flow Rate Team, but BP has not demonstrated that the graphic was prepared in anticipation of litigation.  The instructions for the preservation of confidentiality were not followed.

BP is required to produce Document 24.

<u>Document No. 40</u>.

The Nomellini declaration states that Document 40 is listed on the work-product protection challenges.  It is a blank ROV Video Request Form.  The ROV Video Request Form is not work-product.

BP is required to produce Document 40.

<u>Document No. 50</u>.

Nomellini's declaration states that Document 50 was listed on the attorney-client privilege challenges.  Nomellini refers to the parts of Document No. 50A which are highlighted.  In August 2010, the U.S. (Director Bromwich) requested a "Lessons Learned" report from BP.  A BP counsel describes how this would be done with the statement that "[t]he work will continue to be done under privilege as this portion of the project has."  Document Nos. 50B-D.  Document No. 50 relates to the effort to respond to Director Bromwich's request for a "Lessons Learned" report.

Document 50 is not protected from disclosure by attorney-client privilege.  It is not a confidential communication seeking advice or providing advice.  It was not prepared in anticipation of litigation.

BP must produce Document No. 50.

Document No. 55.

Nomellini's declaration states that Document 55 is listed on work-product protection challenges.  It is headed "Summary of OSHA's 2009 Notification of Failure to Abate and Wilful Citation Issue to the Texas City Refinery."  It is dated June 10, 2011.  It is labeled privileged, confidential, attorney-client communication and attorney work-product.

The document will be protected as work-product.

## V.  HALLIBURTON ISSUES

Halliburton raises two issues: (1) MC252_Email_Retention Documents; and (2) BP Manuals Rec. docs. 6717 and 6863.

Documents 56 and 57 were submitted by BP for *in camera* review regarding the MC252_Email_Retention Documents.  The review demonstrates that Document 56 was protected from disclosure, but Document 57 was not protected from disclosure.  The *in-camera* review, however, confirms BP's position that the MC252_Email_Retention is not a distribution list, but is instead a retention address.

In connection with Halliburton's challenge of "BP Manuals," BP released some but continued to maintain that "Reports" were protected from disclosure.  Halliburton contends that the re-characterization of the manuals as reports does not support the claim that the documents are protected from disclosure.  Document 50 was submitted by BP for *in camera* review on this issue. The review reflects that the document was not protected from disclosure by the attorney-client privilege or as work-product.

**Any appeal of this order must be filed by close of business on Friday, July 20, 2012.**

New Orleans, Louisiana, this 13th day of July , 2012.

**SALLY SHUSHAN**
**United States Magistrate Judge**