UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:   Oil Spill by the Oil Rig            ]         MDL No. 2179
         "Deepwater Horizon" in the          ]
         Gulf of Mexico, on April 20, 2010   ]         SECTION: J
                                             ]
                                             ]         Judge Barbier
This Document Relates to: 2:12-cv-1045-CJB-JCW ]       Mag. Judge Wilkinson
                                             ]

**SWORN DECLARATION OF DENNIS PREJEAN**

Pursuant to 28 U. S. C. § 1746 Dennis Prejean declares the following:

1.  "My name is Dennis Prejean.  The facts contained in this declaration are within my personal knowledge and are true and correct.

2.  I worked for O'Brien's Response Management, Inc. (O'Brien's) from July 21, 2010 to March 21, 2011.  O'Brien's assigned me to work in Venice, Louisiana at the staging yard, the demobilization yard and the VRV facility.  My duties were to assist O'Brien's in tracking equipment and supplies used in the cleanup response to BP's Deepwater Horizon oil spill in April 2010.

3.  Supplies and equipment needed to clean the spill were kept at the staging yard where I worked.  It was my job to inventory all items, track where they were deployed, track when they returned to the decontamination facility, and track when they were returned to staging for redeployment or demobilization.

4.  When I worked in the decontamination yard, my job was to make sure equipment returning from deployment was cleaned, inventoried and returned to the staging yard or demobilized and returned to the owner.  I also kept track of what equipment was to be redeployed after decontamination or returned to the owner.

**Ex. 5**

5.      My last position with O'Brien's was STR Manager.  I supervised a beach cleanup crew.  It was my job to fill out daily reports and keep a crew count.  I also attended daily meetings to explain what we picked up or deployed each day and the equipment we needed.

6.      O'Brien's treated me as an independent contractor from the beginning of my employment until January 1, 2011, when O'Brien's reclassified me as an employee.

7.      Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors.  I refer to these other workers as "Spill Workers."

8.      Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

### Hours Worked

9.      During my employment, the other Spill Workers and I typically worked seven days per week.  I went months without a day off.

10.     The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's.  However, our actual shifts were often longer than the regularly scheduled twelve hours.

11.     Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week.  Exhibit 1 is an example of one of my time sheets from October 1, 2011 to October 10, 2011.  I worked over twelve hours each of these days.  *See* Exhibit 1.

### Pay

12.     When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day.  My agreement with O'Brien's states I

would be paid "$500 per day." A true and correct copy of the agreement I signed with O'Brien's is attached as Exhibit 2.

13. Throughout my employment with O'Brien's, I was paid $500 per day. This amount did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

15. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because John McKue, an O'Brien's employee, hired me over the phone. Just before reporting to work in Venice, another O'Brien's employee named Hope Annunciacion sent me O'Brien's hiring documents and employment policies.

16. When I was hired, my supervisor, John Sawicki, who was also employed by O'Brien's, told me how to do my job.

17. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings with Sawicki. In these meetings, Sawicki gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems in staging, I went to Sawicki for help. When there were problems in decontamination, I went to Pete Parker, who also worked for O'Brien's.

18. Sawicki required me to deliver my inventory report and boom count twice daily, by 5 a.m. and 3:30 p.m. O'Brien's used these reports to monitor our work and plan our assignments for the next day.

19.     O'Brien's directed the information I was to track and how I was to report it. O'Brien's also provided instruction on how to fill out the report forms I completed. When my forms were not filled out properly, or there was some other problem with my work, Sawicki required me to make corrections according to his instructions.

20.     O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to wear them around our necks so they would always be visible to the guards at the facilities.

21.     O'Brien's required me and the other Spill Workers to obtain approval for time off. I requested a total of about fourteen days off during my employment with O'Brien's. I made these requests to Sawicki, who approved them.

22.     O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

23.     O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

24.     O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

25.     The Spill Workers and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment. *See* Exhibit 2.

27. Around January 1, 2011, a woman from HR met with us. She explained O'Brien's was going to make us employees. From that point on, O'Brien's classified me as an employee.

28. Just before I was let go, or "demobilized," Sawicki told me that I was to report to demobilization. In demobilization, my O'Brien's electronic access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Venice.

## Investment

29. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, O'Brien's provided us with the equipment we used, including printers, scanners, hard hats, safety vests, safety glasses, shirts and hats. O'Brien's typically reimbursed us for travel expenses and mileage. O'Brien's also provided facilities, including offices and lodging.

## Special Skill or Expertise

30. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and I received no formal training after being hired. I found out about employment with O'Brien's through my brother. Based on his recommendation, I contacted O'Brien's. John McKue from O'Brien's called me, and after a short phone interview, offered me a job with O'Brien's. Less than a week later, I was in Venice receiving instructions from Sawicki.

31. The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action, including Sawicki and Rocky Martinez. Furthermore, every Spill Worker with whom I have discussed this case has expressed a desire to join.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 6, 2012.

_____
Dennis Prejean



| | BP RESPONSE TIME SHEET |
|---|---|

**Name:** Dennis Prejean                               **Billing Period:** 9/21/10 - 9-30-10

**Paykey Code:** ZKRAUMD252                           **Response:** Deepwater Horizon

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| | | | | |
| Oct 1, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 2, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 3, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 4, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 5, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 6, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 7, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 8, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 9, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |
| Oct 10, 2010 | 530 | 1800 | 12.5 | Venice staging / Operations / Yard Supervisor |

Signature:                                                Date: 9-30-10

Exhibit 1

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien'sRM) (referred to collectively as Company), and <u>Dennis Prejean</u>(referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of <u>$ TBD</u> per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or <u>$ 500</u> per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:                                             CONTRACTOR:

By: _____                          By: _Dennis Prejean_____

Name:   K. Tim Perkins                               Name:  _Dennis Prejean_

Title:    C.E.O.                                     Title:  _____

Company: O'Brien's Response Management Inc.          Company: _____

Date: _____                        Date:  _7-20-10_

Exhibit 2