UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 ] ] ] ] ] This Document Relates to: 2:12-cv-1045-CJB-JCW ] ] | | MDL No. 2179 SECTION: J Judge Barbier Mag. Judge Wilkinson |

**SWORN DECLARATION OF DARREN BENSON**

Pursuant to 28 U. S. C. § 1746 Darren Benson declares the following:

1. "My name is Darren Benson. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from April 25, 2010 to August 14, 2011. O'Brien's initially assigned me to work as a staging or logistics manager in Houma, Louisiana. I was later transferred to Biloxi and then Gulfport, Mississippi. My last posting with O'Brien's was in Pensacola, Florida. My initial duties were to assist O'Brien's in supervising deployment and staging sites used in the cleanup response to BP's Deepwater Horizon oil spill in April 2010.

3. Supplies and equipment needed to clean the spill were kept at the staging yard where I worked. It was my job to inventory all items, track where they were deployed, track when they returned to the decontamination facility, and track when they were returned to staging for redeployment or demobilization.

4. My responsibilities also included working with vendors to initially set up their contracts, manage their supplies, monitor their inventory levels and other logistical duties.

5. My last position with O'Brien's was Assistant Division Supervisor in Pensacola, Florida. My duties included setting contractor schedules on a daily basis, supervising beach

**Ex. 6**

cleanup crews, and tracking and reporting crew locations, equipment and supplies being used in the cleanup effort. It was my job to fill out daily reports. I also attended daily meetings to explain what we picked up or deployed each day, the equipment and personnel currently being used and what would be needed in the future.

6. O'Brien's treated me as an independent contractor throughout my entire employment with O'Brien's.

7. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

8. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

## Hours Worked

9. During my employment, the other Spill Workers and I typically worked seven days per week. I went months without a day off.

10. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

11. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from August 1, 2010 to August 8, 2010. I worked twelve or more hours each of these days. *See* Exhibit 1.

## Pay

12. Prior to the Deepwater Horizon oil spill I had previously worked for O'Brien's under a contract known as a "Teaming Agreement." When O'Brien's rehired me, they used the

same Teaming Agreement that was on file. The Teaming Agreement stated that we would be paid by the day. My agreement with O'Brien's states I would be paid "$500 per day." A true and correct copy of the agreement I signed with O'Brien's is attached as Exhibit 2.

13. During my employment with O'Brien's in connection with the Deepwater Horizon oil spill response, my daily rate began at $500.00 per day and was later increased to $550.00 per day. These amounts did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

15. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because I had worked for O'Brien's prior to the Deepwater Horizon oil spill and an O'Brien's employee, rehired me over the phone and instructed me to report to work in Houma.

16. When I was first hired, Paul Richey was my initial dispatcher who was also employed by O'Brien's and he gave me my first direction on how to do my job. Later my supervisors included O'Brien's employees, Steve Brown, Peter Benson, Jerry Smith, Duane Miller and Donald Murphy.

17. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings with command staff comprised of O'Brien's personnel, BP personnel and various local, state and federal officials including the Coast Guard. In these meetings, myself and other Spill Workers were given instructions regarding our daily tasks and job performance. When there were problems in

staging, deployment or demobilization, I went to O'Brien's employees, Steve Brown, Peter Benson, Jerry Smith, Duane Miller or Donald Murphy, for help.

18. O'Brien's required me to generate written reports to include daily schedules, the quantity of personnel, supplies and equipment on hand and being used, where it is being deployed, the material being picked up and the progress of the cleanup. O'Brien's used these reports to monitor our work.

19. O'Brien's directed the information I was to track and how I was to report it. O'Brien's also provided instruction on how to fill out the report forms I completed. For example, while deployed in Pensacola if my forms were not filled out properly or there was some other problem with my work, Peter Benson required me to make corrections according to his instructions.

20. O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to wear them around our necks so they would always be visible to the guards at the facilities.

21. O'Brien's required me and the other Spill Workers to obtain approval for time off. I requested a total of about two days off during the first four months of my employment with O'Brien's on the Deepwater Horizon oil spill response. I made the request to an O'Brien's supervisor, who approved them.

22. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

23. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our

time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

24. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

25. The Spill Workers and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment. *See* Exhibit 2.

27. At all times while I was employed by O'Brien's, I was classified as an independent contractor.

28. Just before I was let go, or "demobilized," an O'Brien's employee told me that I was to report to demobilization. In demobilization, my O'Brien's electronic access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Pensacola.

**Investment**

29. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, O'Brien's provided us with the equipment we used, including printers, scanners, hard hats, safety vests, safety glasses, shirts and hats. O'Brien's typically reimbursed us for travel expenses and mileage. O'Brien's also provided facilities, including offices and lodging.

### Special Skill or Expertise

30. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties, however, I had worked for O'Brien's in the past. I had worked for O'Brien's before I was rehired for the Deepwater Horizon oil spill response but I received virtually no formal training after being rehired. I contacted O'Brien's after the oil spill to inquire as to whether they would be involved in the cleanup response. I was quickly contacted by an O'Brien's employee and after a short phone interview, I was told to report to Houma. Less than a week later, I was in Houma receiving initial instructions from Paul Richey and Steve Brown.

31. The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action, including Donald Pearson. Furthermore, many Spill Workers with whom I have discussed this case has expressed a desire to join.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 13, 2012.

DARREN BENSON

_____
Darren Benson

-6-



| | BP RESPONSE TIME SHEET |
|---|---|

**Name: Darren Benson**  **Billing Period: 8/01/10-8/08/10**

**Paykey Code: ZKRAUMD252**  **Response: Deepwater Horizon**

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 8/01 | 0545 | 1800 | 12.15 | Deputy Director of Operations Pensacola, Fl |
| 8/02 | 0545 | 1800 | 12.15 | Deputy Director of Operations Pensacola, Fl |
| 8/03 | 0545 | 1800 | 12.15 | Deputy Director of Operations Pensacola, Fl |
| 8/04 | 1145 | 2345 | 12 | Deputy Director of Operations Pensacola, Fl |
| 8/05 | 0800 | 1900 | 12.15 | Deputy Director of Operations Pensacola, Fl |
| 8/06 | 0600 | 1800 | 12.15 | Deputy Director of Operations Pensacola, Fl |
| 8/07 | 0545 | 1800 | 12.5 | Deputy Director of Operations Pensacola, Fl |
| 8/08 | 0545 | 1800 | 12.5 | Deputy Director of Operations Pensacola, Fl |

Signature: Darren Benson   Date: 8/08/10

**Exhibit 1**

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien Oil Pollution Service, Inc.** (OOPS) and its parent, **The O'BRIEN'S Group, Inc.**, (referred to collectively as Company), and **Darren Benson** (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of **$350.00** per day for **consulting** plus reasonable out-of-pocket expenses, and/or **$500.00** per day for **responses** plus reasonable out of pocket expenses, **$250.00** per mms announced drill. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for all expenses in excess of $25.00. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

| COMPANY: | CONTRACTOR: |
|---|---|
| By: _K. Tim Perkins_ (signed) | By: _(signed)_ |
| Name: K. Tim Perkins | Name: DARREN BENSON |
| Title: CEO | Title: Spill Response Mgr. |
| Company: The O'BRIEN'S Group Inc. | Company: MAREN, INC |
| Date: 10/9/08 | Date: 10/9/08 |

Teaming Agreement                                                                                                   May 2004

**Exhibit 2**