UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 ] ] ] ] | ] | MDL No. 2179 SECTION: J Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW ] ] | | Mag. Judge Wilkinson |

**SWORN DECLARATION OF EMILE P. DIGIOVANNI**

Pursuant to 28 U. S. C. § 1746 Emile P. DiGiovanni declares the following:

1. "My name is Emile P. DiGiovanni. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from July, 2010 to December 1, 2010. O'Brien's initially assigned me to work in Mobile, Alabama and later in Pascagoula, Mississippi and Pensacola, Florida. My duties were to assist O'Brien's in monitoring personnel, equipment and supplies used in the cleanup response to BP's Deepwater Horizon oil spill in April 2010.

3. Supplies and equipment needed to clean the spill were kept at staging yards. It was one of my responsibilities to track where they were deployed, when they were returned to the decontamination facility, and track when they were returned to staging for redeployment or demobilization.

4. In the decontamination yard, equipment returning from deployment was cleaned, inventoried and returned to the staging yard or demobilized and returned to the owner. I also kept track of what equipment was to be redeployed after decontamination or returned to the owner. I tracked vessels, containers, contaminated and clean boom, cleanup equipment and supplies.

**Ex. 7**

5. My last position with O'Brien's was Night Supervisor. I supervised a large number of cleanup personnel. It was my job to fill out daily reports and keep a crew count. I also attended daily meetings to explain what we picked up or deployed each day and the equipment we needed.

6. O'Brien's treated me as an independent contractor from the time I began work in July, 2010 until I was demobilized on December 1, 2010.

7. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

8. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

### Hours Worked

9. During my employment, the other Spill Workers and I typically worked seven days per week. I went months without a day off.

10. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

11. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from 9/13/2010 to 9/19/2010. I worked twelve hours each of these days. *See* Exhibit 1.

### Pay

12. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day. My agreement with O'Brien's states I would be paid "$500 per day."

13. Throughout my employment with O'Brien's, I was paid $500 per day. This amount did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

15. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because an O'Brien's employee, hired me over the phone. Just before reporting to work in Mobile, another O'Brien's employee sent me O'Brien's hiring documents and employment policies in the form of their Teaming Agreement.

16. When I was hired my supervisor was Darren Benson who was also employed by O'Brien's. I was trained by an O'Brien's employee named Phil Solamon.

17. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory meetings with Benson and Solamon. In these meetings, Benson and Solamon gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems, I went to Benson for direction.

18. Benson required me to deliver daily reports detailing equipment, supplies and personnel being used and progress being made picking up oil, tar and sand.  O'Brien's used these reports to monitor our work and plan our assignments for the next day.

19. O'Brien's directed the information I was to track and how I was to report it.  O'Brien's also provided instruction on how to fill out the report forms I completed.  When my forms were not filled out properly, or there was some other problem with my work, Benson required me to make corrections according to his instructions.

20. O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats.  These badges said "O'Brien's" on them.  We were required to wear them around our necks so they would always be visible to the guards at the facilities.

21. O'Brien's required me and the other Spill Workers to obtain approval for time off.  I initially worked months with no time off.  Later when I requested time off, the requests would have been approved by Benson.

22. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

23. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

24. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

25. The Spill Workers and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment.

27. I was let go or "demobilized" on December 1, 2010 and up until that time, I was always treated as an independent contractor.

28. Just before I was let go, or "demobilized," I was to report to demobilization. After being demobilized, I returned home because I no longer had work or lodging in Pensacola where I last worked for O'Brien's.

## Investment

29. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, O'Brien's provided us with the equipment we used, including printers, scanners, hard hats, safety vests, safety glasses, shirts and hats. O'Brien's typically reimbursed us for our personal cell phones, travel expenses and mileage. O'Brien's also provided facilities, including offices and lodging.

## Special Skill or Expertise

30. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and I received no formal training with the exception of

a brief hazardous material training after being hired. I found out about employment with O'Brien's through a friend's daughter who was an O'Brien's employee. Based on her recommendation, I contacted O'Brien's. I was called back by another O'Brien's employee and after a short phone interview, I was offered a job. Less than a week later, I was in Mobile receiving instructions from Benson and Solamon.

31. The other Spill Workers and I did not receive significant official or formal training to perform our jobs with the exception of the hazardous material training. Instead, we learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action. Furthermore, every Spill Worker with whom I have discussed this case has expressed a desire to join.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July _6_, 2012.

_____
Emile P. DiGiovanni



# BP RESPONSE TIME SHEET

**Name:** EMILE DIGIOVANNI

**Billing Period:** 9/13/2010 THRU 9/19/2010

**Paykey Code:** ZKRAUMD252

**Response:** Deepwater Horizon

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 9/13/2010 | 1200 HRS | 2400 HRS | 12 | MOSS POINT, MISS. |
| 9/14/2010 | 1200 HRS. | 2400 HRS. | 12 | MOSS POINT, MISS. |
| 9/15/2010 | 1200 HRS. | 2400 HRS. | 12 | MOSS POINT, MISS. |
| 9/16/2010 | 1200 HRS. | 2400 HRS. | 12 | MOSS POINT, MISS. |
| 9/17/2010 | 1200 HRS. | 2400 HRS. | 12 | MOSS POINT, MISS. |
| 9/18/2010 | 1200 HRS. | 2400 HRS. | 12 | MOSS POINT, MISS. |
| 9/19/2010. | 1200 HRS. | 2400 HRS. | 12 | MOSS POINT, MISS. |

Signature: *[signature]*

Date: 9/19/2010

**Exhibit 1**