UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ] ] ] ] ] | MDL No. 2179<br><br>SECTION: J<br><br>Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW | ] ] | Mag. Judge Wilkinson |

**SWORN DECLARATION OF PAUL RANDALL HAMILTON**

Pursuant to 28 U. S. C. § 1746 Paul Randall Hamilton declares the following:

1. "My name is Paul Randall Hamilton. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from June 28, 2010 to August 26, 2011. I originally reported to work for O'Brien's in Mobile, Alabama as a field supervisor. After two days, I was then deployed to Orange Beach and Gulf Shores, Alabama to supervise the night crews.

3. As a field supervisor, it was my job to monitor contractors who were cleaning the beaches. I made sure they were working in the areas to which they were assigned, that they were working when they were supposed to and not taking too many breaks and monitored the beach to assess the progress of the cleanup effort.

4. I was in charge of the night shift while deployed to Alabama and it was among my duties to assign various segments of the beach to be cleaned by the contractors, and then monitor their progress.

5. My last position with O'Brien's was day shift field supervisor. It was my job to oversee and report on the progress being made with the beach cleanup and when necessary scheduled "strike teams" to be mobilized to areas affected most by the oil coming ashore.

**Ex. 8**

6. O'Brien's always treated me as an independent contractor.

7. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

8. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

## Hours Worked

9. During my employment, the other Spill Workers and I typically worked seven days per week. I went a month before receiving a day off.

10. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

11. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from February 20, 2011 to February 26, 2011. I worked twelve hours each of these days. *See* Exhibit 1.

## Pay

12. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that stated we would be paid by the day. My agreement with O'Brien's said I would be paid $500 per day. A true and correct copy of the agreement I signed with O'Brien's is attached as Exhibit 2.

13. Throughout my employment with O'Brien's, I was paid $500 per day. This amount did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours.

**Control**

15. O'Brien's had the authority to hire and fire me and other Spill Workers. For example, Dwayne Miller, an O'Brien's employee, hired me over the phone shortly after I submitted my resume to O'Brien's on the recommendation of a friend.

16. When I was hired, Miller sent me to a basic, two-day training course about safety requirements and how to handle hazardous materials. On my third day on the job, I was on the beach working as a field supervisor. In Orange Beach, my O'Brien's supervisors were Duane Miller and Jerry Smith. I don't recall the name of my supervisor in Gulf Shores.

17. O'Brien's and the incident command system controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings with my supervisors. In these meetings, my supervisors gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems, I went to my supervisors for help including Miller and Smith.

18. O'Brien's and the incident command system directed the information I was to collect on the beach and how I was to report it. I was provided instruction on how to fill out the report forms I completed. When my forms were not filled out properly, or there was some other problem with my work, my supervisors required me to make corrections according to their instructions.

19. O'Brien's initially instructed me on the information I was to track and how I was to report it. Sometimes the reports were verbal and made over the phone only and other times they were written.

20. O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to display them so they would always be visible to the guards at the facilities.

21. O'Brien's required me and the other Spill Workers to obtain approval for time off. This approval was sought from O'Brien's or scheduled myself through the incident command system.

22. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

23. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we were subject to random drug and alcohol testing.

24. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

25. The Spill Workers and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment.

27. In late August, 2011, I requested to be let go and was contacted by John Maynard with O'Brien's about demobilization. Up until that time, I was always treated as in independent contractor.

28. In demobilization, my O'Brien's electronic access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Alabama where I last worked for O'Brien's.

### Investment

29. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, we were provided with all the equipment and tools we used, including office facilities, printers, scanners, hard hats, safety vests, safety glasses, gloves. O'Brien's typically reimbursed us for travel expenses, lodging, mileage and use of our personal cell phones.

### Special Skill or Expertise

30. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and with the exception of some brief hazardous materials training, I received no significant formal training after being hired.

31. The other spill workers and I did not receive significant official or formal training to perform our jobs. Instead, we essentially learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about cleanup crews, the material being removed and the condition of the beaches.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I believe other spill workers are interested in joining a collective action to recover their unpaid overtime.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 14, 2012.

Paul Randall Hamilton



# BP RESPONSE TIME SHEET

**Name:** PCMN Enterprises, Inc (Paul Hamilton)     **Weekly Period:** 02/20/11 thru 02/26/11

**Response:** Deepwater Horizon

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 2/20/11 | 6:30am | 6:30pm | 12 | Gulf Shores, AL – Field Supervisor |
| 2/21/11 | 6:30am | 6:30pm | 12 | Gulf Shores, AL – Field Supervisor |
| 2/22/11 | 6:30am | 6:30pm | 12 | Gulf Shores, AL – Field Supervisor |
| 2/23/11 | 6:30am | 6:30pm | 12 | Gulf Shores, Al – Field Supervisor |
| 2/24/11 | 6:30am | 6:30pm | 12 | Gulf Shores, Al – Field Supervisor |
| 2/25/11 | 6:30am | 6:30pm | 12 | Gulf Shores, Al – Field Supervisor |
| 2/26/11 | 6:30am | 6:30pm | 12 | Gulf Shores, Al – Field Supervisor |

O'Brien's Personnel Signature: _____     Date: _____

BP Approval Name: _ME TUCKER_     Title: _DIVISION SUPV_

BP Approval Signature: _ME Tum_     Date: _2·27·11_

**Exhibit 1**

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien's RM) (referred to collectively as Company), and Paul Hamilton (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ TBD per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or $500.00 per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

| COMPANY: | CONTRACTOR: |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Company: O'Brien's Response Management Inc. | Company: _____ |
| Date: _____ | Date: _____ |