UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ] ] ] ] ] | MDL No. 2179 SECTION: J Judge Barbier Mag. Judge Wilkinson |
| This Document Relates to: 2:12-cv-1045-CJB-JCW | ] ] | |

## SWORN DECLARATION OF MICHAEL KEATING

Pursuant to 28 U. S. C. § 1746 Michael Keating declares the following:

1. "My name is Michael Keating. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from June 23, 2010 to Janaury 28, 2011. O'Brien's assigned me to work in Mobile, Alabama. My initial duties were to assist O'Brien's by providing onshore and near-shore quality control for the cleanup response to BP's Deepwater Horizon oil spill in April 2010.

3. Supplies and equipment needed to clean the spill were kept at staging yards. It was my responsibility to observe cleanup efforts on the beaches and report my findings along with recommended changes. After supplies and equipment had been deployed they were returned to the decontamination facility, and after decontamination were returned to staging for redeployment or demobilization from the decontamination facility.

4. In the decontamination yard, I observed equipment returning from deployment. This equipment was cleaned, inventoried and returned to the staging yard or demobilized and returned to the owner. It was my job to fill out daily reports detailing what I had observed regarding the cleanup effort.

-1-

Ex. 9

5. My last position with O'Brien's was Contract Manager. I was responsible for the administration of contracts, negotiating addendums to contracts, hourly and daily rates for labor and equipment. My duties also included analyzing, projecting and comparing rates for onshore and near-shore activities.

6. O'Brien's treated me as an independent contractor throughout my entire employment when I was ultimately demobilized on January 28, 2011.

7. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

8. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

### Hours Worked

9. During my employment, the other Spill Workers and I typically worked six or seven days per week.

10. The other Spill Workers and I were regularly scheduled to work ten to twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled shifts.

11. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from July 1, 2010 to July 11, 2010. I worked over eleven hours each of these days. *See* Exhibit 1.

### Pay

12. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day. My agreement with O'Brien's states I

would be paid "$500 per day." A true and correct copy of the agreement I signed with O'Brien's is attached as Exhibit 2.

13. Throughout my employment with O'Brien's, I was paid $500 per day. This amount did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

### Control

15. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because, an O'Brien's employee, hired me over the phone. Just before reporting to work in Mobile, another O'Brien's employee sent me O'Brien's hiring documents and Teaming Agreement.

16. When I was hired, my initial supervisor Chris Gregory, who was also employed by O'Brien's, told me how to do my job.

17. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings with environmental firms. In these meetings Calvin Kline and/or Bob Anderson, both O'Brien's employees and my supervisors, gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems, I went to Kline or Anderson for help.

18. Kline required me to deliver my reports daily. O'Brien's used these reports to monitor our work and plan our assignments.

19. O'Brien's directed the information I was to track and how I was to report it. When my forms were not filled out properly, or there was some other problem with my work, Kline required me to make corrections according to his instructions.

20. O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to wear them around our necks so they would always be visible to the guards at the facilities.

21. As Contract Manager, I typically worked 6 days a week with one day off. O'Brien's required me and the other Spill Workers to obtain approval for additional time off. These requests would have been approved by Kline, Anderson or Duane Miller.

22. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

23. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

24. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 10 hours or longer. We were not allowed to set our own schedules.

25. The Spill Workers and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment. *See* Exhibit 2.

27. I was always classified as an independent contractor by O'Brien's from the day I was hired until I was ultimately demobilized.

28. Just before I was let go, or "demobilized," Miller told me that I was to report to demobilization. In demobilization, my O'Brien's electronic access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Mobile.

## Investment

29. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, O'Brien's provided us with the equipment we used, including printers, scanners, hard hats, safety vests, safety glasses, shirts and hats. O'Brien's typically reimbursed us for travel expenses and mileage. O'Brien's also provided facilities, including offices and lodging.

## Special Skill or Expertise

30. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and I received no formal training after being hired with the exception of hazardous material training. I found out about employment with O'Brien's through a friend and O'Brien's employee, Duane Miller. Based on his recommendation, I was contacted by O'Brien's. After a short phone interview, I was offered a job with O'Brien's. Less than a week later, and after the brief hazardous material training I was in Mobile receiving instructions from Chris Gregory.

31. The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we were given hazardous material training and learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action, including Donald Pearson and Ebbie Thigpen. Furthermore, every Spill Worker with whom I have discussed this case has expressed a desire to join.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 10, 2012.

_____
Michael Keating



# BP RESPONSE TIME SHEET

**Name:** Keating & Assoc., LLC (Michael Keating)   **Billing Period:** 7/1/10 - 7/11/10

**Paykey Code:** ZKRAUMD252   **Response:** Deepwater Horizon

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 7/01 | 6:00A | 5:30P | 11:30 | Gulfport, MS/ QC - Contractor Eval. |
| 7/02 | 6:00A | 6:00P | 12:00 | Office / Meetings |
| 7/03 | 6:30A | 6:00P | 11:30 | Pensacola / QC – Contractor Eval. |
| 7/04 | 5:30A | 5:30P | 12:00 | Gulf Shores / QC – Contractor Eval. |
| 7/05 | 5:15A | 5:00P | 11:45 | Ops. Ctr. / Meetings |
| 7/06 | 5:30A | 6:00P | 12:30 | Pascagoula, Bayou Caddy / QC – Contractor Eval. |
| 7/07 | 5:00A | 5:00P | 12:00 | Pascagoula, Canal Rd. / QC – Contractor Eval. |
| 7/08 | 6:00A | 6:00P | 12:00 | Pascagoula, Canal Rd., Beach / QC – Contr. Eval. |
| 7/09 | 6:00A | 6:00P | 12:00 | Pass Christian, Beach / QC – Contr. Eval. |
| 7/10 | 7:00A | 6:30P | 11:30 | Canal Rd., Beaches / QC – Contr. Eval. |
| 7/11 | 6:00A | 6:00P | 12:00 | Home Base / QC – Contr. Eval. |

Signature: *[signed]*   Date: 7/11/10

EXHIBIT 1

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien'sRM) (referred to collectively as Company), and _Michael Keating_ (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ __TBD__ per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or $_500.00_ per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:

By: _____

Name: _____

Title: _____

Company: O'Brien's Response Management Inc.

Date: _____

CONTRACTOR:

By: _[signature]_

Name: __MICHAEL KEATING__

Title: __PRESIDENT__

Company: __KEATING & ASSOC., LLC__

Date: __6/22/10__

Teaming Agreement

March 2009

**EXHIBIT 2**