UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In Re: | Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ] ] ] ] ] | MDL No. 2179 SECTION: J Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW | | ] ] | Mag. Judge Wilkinson |

**SWORN DECLARATION OF DONALD PEARSON**

Pursuant to 28 U. S. C. § 1746 Donald Pearson declares the following:

1. "My name is Donald Pearson. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from June 28, 2010 to December 22, 2010. O'Brien's initially assigned me to work in Fairhope, Alabama and later in the command center in Mobile, Alabama and Pensacola, Florida. My duties were to assist O'Brien's in monitoring personnel, equipment and supplies used in the cleanup response to BP's Deepwater Horizon oil spill in April 2010.

3. I supervised cleanup personnel and cleanup activities at onshore beach sites and near-shore sites. It was one of my responsibilities to ensure cleanup was being done in a safe manor at these sites and track where personnel and equipment were being deployed.

4. It was also my responsibility to determine and report progress being made in the cleanup effort including where, when and how much oil, tar and sand was being removed from the sites under my supervision.

5. My last position with O'Brien's was Operations Manager. I supervised a heavy equipment beach cleanup crew. It was my job to fill out daily reports and keep a crew count. I

**Ex. 10**

also attended daily meetings to explain what we picked up or deployed each day and the equipment we needed.

6. O'Brien's treated me as an independent contractor from the time I began work on June 28, 2010 until I was demobilized on December 24, 2010.

7. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

8. O'Brien's established my and the other Spill Workers' compensation and initially instructed me as to my daily duties. Later, under O'Brien's direction, my daily duties were dictated by senior command staff and the incident command system.

## Hours Worked

9. During my employment, the other Spill Workers and I typically worked seven days per week. I initially worked more than a month without a day off.

10. The other Spill Workers and I regularly worked 12 hour shifts.

11. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from August 2, 2010 to August 8, 2010. I worked twelve hours each of these days. *See* Exhibit 1.

## Pay

12. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day. My agreement with O'Brien's states I would be paid "$500 per day." A true and correct copy of the agreement I signed with O'Brien's is attached as Exhibit 2.

-3-

13.     Throughout my employment with O'Brien's, I was paid $500 per day.  This amount did not increase if I worked more than my scheduled hours.

14.     O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

15.     O'Brien's had the authority to hire and fire me and other Spill Workers.  I know this because an O'Brien's employee, hired me over the phone.  Just before reporting to work in Fairhope, another O'Brien's employee sent me O'Brien's hiring documents and employment policies.

16.     When I was hired, my supervisor, Bud Klein who was also employed by O'Brien's, told me how to do my job.

17.     O'Brien's controlled the performance of our work in all the locations to which I was assigned.  For example, I had regular meetings with O'Brien's personnel, BP personnel, and local, state and federal officials including Coast Guard personnel .  In these meetings, the other Spill Workers and I were given instructions regarding our daily tasks and job performance from the command staff and the incident command system.

18.     Initially, Klein  required  me to deliver daily reports detailing equipment, supplies and personnel being used and progress being made picking up oil, tar and sand.  I later submitted these reports to the incident command system.

19.     O'Brien's, through its own supervisors initially and later through the incident command system and senior command staff,  directed the information I was to track and how I was to report it.  They provided instruction on how to fill out the report forms I completed.

20. The other Spill Workers and I were required to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to wear them around our necks so they would always be visible to the guards at the facilities.

21. O'Brien's required me and the other Spill Workers to obtain approval for time off. I initially worked a month with no time off. Later when I requested time off, the requests would have been approved by Jerry Smith or scheduled after consultations between myself and other O'Brien's employees.

22. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

23. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we were subject to possible random drug and alcohol testing.

24. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

25. The Spill Workers and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment. *See* Exhibit 2.

27.     I was let go or "demobilized" on December 22, 2010 and up until that time, I was always treated as an independent contractor.

28.     Just before I was let go, or "demobilized," I was to report to demobilization. After being demobilized, I returned home because I no longer had work or lodging in Pensacola where I last worked for O'Brien's.

### Investment

29.     The other Spill Workers and I made little or no investment in working for O'Brien's.  For example, we were provided with the equipment we used, including printers, scanners, hard hats, safety vests, safety glasses, shirts and hats.  O'Brien's typically reimbursed us for our personal cell phones, travel expenses, mileage and lodging.

### Special Skill or Expertise

30.     O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or formal training prior to hire in order to perform our job duties.  I never had contact with O'Brien's before I was hired and I received no formal training after being hired.  I found out about employment with O'Brien's through my friend, Duane Miller who is an O'Brien's employee.  Based on his recommendation, I was contacted by O'Brien's and after a short phone interview, I was offered a job.  Less than a week later, I was in Fairhope receiving instructions from Klein.

31.     The other Spill Workers and I did not receive significant official or formal training to perform our jobs with the exception of brief hazardous material training.  Instead, we learned how to perform our duties on the job.  For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action, including David Barnes and Vincent Soderland. Furthermore, every Spill Worker with whom I have discussed this case has expressed a desire to join.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July __11__, 2012.

/s/ *Donald R Pearson*
_____
Donald Pearson



# BP RESPONSE TIME SHEET

**Name:** Donald R. Pearson  **Billing Period:** 08/02 – 08/08

**Paykey Code: ZKRAUMD252**  **Response: Deepwater Horizon**

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 08/02 | 6:00am | 6:00pm | 12 | HOME TO PENSACOLA BRANCH 1    118 MILES |
| 08/03 | 6:00am | 6:00pm | 12 | HOME TO PERDIDO KEY    124 MILES |
| 08/04 | 6:00am | 6:00pm | 12 | MOBILE COMMAND CENTER    46 MILES |
| 08/05 | 6:00AM | 6:00PM | 12 | MOBILE COMMAND CENTER    46 MILES |
| 08/06 | 6:00am | 6:00pm | 12 | HOME TO DESTIN TRAVELING |
| 08/07 | 6:00am | 6:00pm | 12 | FLORIDA OKALOOSA AND WALTON COUNTIES |
| 08/08 | 6:00am | 6:00pm | 12 | DESTIN TO PENSACOLA BEACH    382 MILES |
| | | | | |
| | | | | TOTAL MILES = 716 |

Signature:                                                                Date:

EXHIBIT 1

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien's RM) (referred to collectively as Company), and <u>Paul Hamilton</u> (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of <u>$ TBD</u> per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or <u>$500.00</u> per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

| COMPANY: | CONTRACTOR: |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Company: O'Brien's Response Management Inc. | Company: _____ |
| Date: _____ | Date: _____ |

EXHIBIT 2