UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ] ] ] ] ] | MDL No. 2179 SECTION: J Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW | ] ] | Mag. Judge Wilkinson |

**SWORN DECLARATION OF JOHN SAWICKI**

Pursuant to 28 U. S. C. § 1746 John Sawicki declares the following:

1. "My name is John Sawicki. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from May 14, 2010 to April 12, 2011. O'Brien's assigned me to work in Venice, Louisiana at the incident command post, staging yard and the demobilization yard. I was hired by O'Brien's to assist the branch operations section chief and deputy branch director of operations in staging personnel, equipment and supplies used in the cleanup response to BP's Deepwater Horizon oil spill in April 2010.

3. I met daily with senior command staff including, BP personnel, Coast Guard officials, State and local officials and O'Brien's staff to track and report on personnel, supplies and equipment needed to clean the spill. It was my job to supervise the inventory of items, the deployment of personnel and equipment, demobilization and decontamination of supplies and equipment, and tracking of when supplies and equipment were returned to staging for redeployment or demobilization.

4. It was also my job to supervise returning equipment and supplies that had been deployed, inventoried and returned to the staging yard or demobilized and returned to the owner.

**Ex. 11**

5. My last position with O'Brien's was Staging Manager. I was responsible for having personnel, supplies and equipment ready daily to support the cleanup effort. I also attended daily meetings with senior command staff to explain what we picked up or deployed each day and the equipment and personnel being utilized.

6. O'Brien's treated me as an independent contractor from the beginning of my employment until January 1, 2011, when O'Brien's reclassified me as an employee.

7. Many other workers worked for O'Brien's and were also treated as independent contractors. I refer to these other workers as "Responders."

8. Throughout my employment with O'Brien's, O'Brien's established my and the other Responders' compensation. When I arrived in Venice, Louisiana I initially reported to Mark Macintyre, an O'Brien's employee, but later reported directly to the deputy branch director of operations and branch operations section chief.

**Hours Worked**

9. During my employment, the other Responders and I typically worked seven days per week. I went months without a day off.

10. The other O'Brien's Responders and I were regularly scheduled to work twelve hour shifts. However, our actual shifts were often longer than the regularly scheduled twelve hours. My schedule was dictated by the operations section chief.

11. Accordingly, the other Responders and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from October 16, 2010 to October 31, 2010. I worked over twelve hours each of these days. *See* Exhibit 1.

**Pay**

12. When O'Brien's hired me and the other Responders, we signed "Teaming Agreements" that stated we would be paid by the day. My agreement with O'Brien's states I would be paid "$600 per day." A true and correct copy of the agreement I signed with O'Brien's is attached as Exhibit 2.

13. Throughout my employment with O'Brien's, I was paid $600.00 per day. This amount did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Responders overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

15. O'Brien's had the authority to hire and fire me and other O'Brien's Responders. I know this because John McHugh, an O'Brien's employee, hired me over the phone. Just before reporting to work in Venice, McHugh sent me O'Brien's hiring documents and employment policies in the form of a Teaming Agreement.

16. When I was hired, I initially reported to Mark Macintyre in Venice, who was also employed by O'Brien's as a logistics manager. I then reported to the operations section chief.

17. My work for O'Brien's was directed by the branch operations section chief and deputy branch director of operations. I had mandatory daily meetings with them, senior Coast Guard, local, state and federal officials and O'Brien's staff. The incident command system and senior command staff gave me and other Responders direction regarding our daily tasks and job performance.

18. Command staff including the branch operations section chief required me to attend a daily command meeting at 8:00 a.m. Senior command staff used these meetings to monitor our work and plan our assignments for the next day.

19. The deputy branch director of operations and branch operations section chief directed the information I was to track, how I was to report it and also provided instruction on how to fill out the report forms I completed. When my forms were not filled out properly, or there was some other problem with my work, they required me to make corrections according to their instructions.

20. The other Responders and I were required to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to wear them around our necks so they would always be visible to the guards at the facilities.

21. The other Responders and I were required to obtain approval for time off. I requested a total of five days off during my employment with O'Brien's. The approval was sought through command staff and then an electronic mail message was sent to O'Brien's notifying them of the schedule.

22. O'Brien's required me and other Responders to fill out time sheets reflecting hours worked and submit them to O'Brien's for processing.

23. Other Responders and I were required by command staff to follow policies and procedures that dictated who we reported to in the chain of command, what we were permitted to wear, how we performed our work, how we handled documents, and that we submit to random drug and alcohol testing.

24. Command staff, including the deputy branch director of operations and branch operations section chief set my schedule and other Responders' working schedules which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

25. The Responders and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Responders from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment. *See* Exhibit 2.

27. Around January 1, 2011, a woman from O'Brien's human resources department named Christine Royer met with us. She explained O'Brien's was going to make us employees. From that point on, O'Brien's classified me as an employee.

28. Just before I was let go, I was told to report to demobilization. In demobilization, my O'Brien's electronic access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Venice.

**Investment**

29. The other Responders and I made little or no investment in working for O'Brien's. I was told only to bring a hard hat and steel toe boots and that everything else needed would be supplied to us through BP.

**Special Skill or Expertise**

30. O'Brien's did not require me and the Responders to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and I received no formal training after being hired. I

found out about employment with O'Brien's when I was contacted by Eric Polite of O'Brien's who discussed the position with me over the telephone. After a short phone interview, I was offered a job with O'Brien's. Another O'Brien's employee named John McHugh sent me the Teaming Agreement via electronic mail and less than a week later, I was in Venice.

31. The other Responders and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment and personnel.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Responders, I know other Responders were similarly classified as independent contractors prior to January 1, 2011 when Responders were made employees.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July _10_, 2012.

_____
John Sawicki



# BP RESPONSE TIME SHEET

**Name: John G. Sawicki**    **Billing Period: 10/16-10/31/10**    **Time Sheet 1013**

**Paykey Code: ZKRAUMD252**    **Response: BP MISS. Canyon Block 252**

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 10/16/10 | 0500 | 1830 | 13.5 | Site Logistics/Staging Manager |
| 10/17/10 | 0500 | 1830 | 13.5 | Site Logistics/Staging Manager |
| 10/18/10 | 0500 | 1730 | 12.5 | Site Logistics/Staging Manager |
| 1019/10 | 0500 | 1800 | 13.0 | Site Logistics/Staging Manage |
| 10/20/10 | 0500 | 1900 | 14.0 | Site Logistics/Staging Manager |
| 10/21/10 | 0500 | 1830 | 13.5 | Site Logistics/Staging Manager |
| 10/22/10 | 0500 | 1830 | 13.5 | Site Logistics/Staging Manager |
| 10/23/10 | 0500 | 1800 | 13.0 | Site Logistics/Staging Manager |
| 10/24/10 | 0500 | 1830 | 13.5 | Site Logistics/Staging Manager |
| 10/25/10 | 0500 | 1730 | 12.5 | Site Logistics/Staging Manager |
| 10/26/10 | 0500 | 1830 | 13.5 | Site Logistics/Staging Manager |
| 10/27/10 | 0500 | 1830 | 13.5 | Site Logistics/Staging Manager |
| 10/28/10 | 0500 | 1730 | 12.5 | Site Logistics/Staging Manager |
| 10/29/10 | 0500 | 1800 | 13.0 | Site Logistics/Staging Manager |
| 10/30/10 | 0500 | 1800 | 13.0 | Site Logistics/Staging Manager |
| 10/31/10 | 0500 | 1800 | 13.0 | Site Logistics/Staging Manager |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Days 16 | Total Hr | | 211 | |
| | | | | |

Signature: John G. Sawicki    Date: 11/01/10

EXHIBIT 1

# RESPONSE MANAGEMENT
## TEAMING AGREEMENT

This Agreement is between O'Brien's Response Management Inc. (O'Brien'sRM) (referred to collectively as Company), and __John Sawicki__ (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ __250.00__ per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or $ __600.00__ per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for all expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:

By: _Keith R. Forster_

Name: _KEITH R. FORSTER_

Title: _CFO_

Company: O'Brien's Response Management Inc.

Date: _5/13/10_

CONTRACTOR:

By: _[signature]_

Name: _John G. Sawicki_

Title: _____

Company: _____

Date: _05 | 12 | 10_

Teaming Agreement                                                                                                March 2009

**EXHIBIT 2**