UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig<br>"Deepwater Horizon" in the<br>Gulf of Mexico, on April 20, 2010 | ]<br>]<br>]<br>]<br>] | MDL No. 2179<br><br>SECTION: J<br><br>Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW | ]<br>] | Mag. Judge Wilkinson |

**SWORN DECLARATION OF THOMAS PHILIP WRIGHT**

Pursuant to 28 U. S. C. § 1746 Thomas Philip Wright declares the following:

1. "My name is Thomas Philip Wright. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from June 29, 2010 to May 13, 2011. O'Brien's initially assigned me to work in Division 5, an area near the end of the Mississippi River Southwest Pass, as a division supervisor. I traveled to this location daily to direct cleanup operations for this area and assess the progress of the cleanup response to BP's Deepwater Horizon oil spill in April 2010. I was later promoted to deputy operations section chief in Venice, Louisiana.

3. As a deputy operations section chief in Venice I was the direct supervisor for all other division supervisors working in Venice for O'Brien's. I made frequent trips to the field to observe the operations of these divisions and support the division supervisors.

4. I also observed beach cleanup and generated reports detailing what areas were being cleaned daily, the personnel and equipment being used and the progress being made.

5. My last position with O'Brien's was Operations Section Chief. I supervised and provided operational direction for cleanup personnel. It was my job to fill out daily reports and

**Ex. 13**

make trips to field sites to assess the cleanup situation. I also attended daily meetings to explain what we picked up or deployed each day and the equipment and personnel being utilized.

6. O'Brien's treated me as an independent contractor while working on the response to the spill until January 2011, when I was reclassified as a full-time, temporary employee.

7. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

8. Throughout the response to the spill, any field break was scheduled through O'Brien's for myself and other O'Brien's Spill Workers. Regarding my schedule, I communicated with O'Brien's human resources manager in Spring, Texas.

**Hours Worked**

9. During my employment, the other Spill Workers and I typically worked seven days per week. I frequently went more than a month without a day off.

10. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

11. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from November 29, 2010 to December 5, 2010. I worked over twelve hours each of these days. *See* Exhibit 1.

**Pay**

12. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day. My agreement with O'Brien's states I

would be paid "$450 per day." A true and correct copy of the agreement I signed with O'Brien's is attached as Exhibit 2.

13. When I began my employment with O'Brien's, I was paid $450.00 per day and my day rate was later increased to $600.00 per day as of November 3, 2010 based upon an agreement with O'Brien's for increased responsibility. These amounts did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

15. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because John McHugh, an O'Brien's employee, hired me over the phone. Just before reporting to work in Venice, another O'Brien's employee sent me O'Brien's hiring documents and employment policies via electronic mail.

16. When I was hired, Rod Dillon with O'Brien's told me what my role and responsibility was and provided feedback on my performance.

17. O'Brien's controlled the performance of our work in all the locations to which I was assigned. For example, I had regular meetings with O'Brien's personnel, BP personnel, and local, state and federal officials including Coast Guard personnel . In these meetings, the other Spill Workers and I were given instructions regarding our daily tasks and job performance from the command staff and the incident command system.

18. I generated a daily report after being promoted to Operations Section Chief in Venice, Louisiana. These reports were sent to Trent Sehlinger, an O'Brien's employee located in New Orleans, Louisiana.

19. O'Brien's, through its own supervisors initially and later through the incident command system and senior command staff, directed the information I was to track and how I was to report it. These individuals provided instruction on how to fill out the report forms I completed.

20. Other O'Brien's spill workers and I were directed to scan our badges at the gate in Venice to gain entry to the work locations and vessels. Our badges identified us as "O'Briens" and we wore them at all times at work in the office and in the field.

21. I coordinated field breaks for the operations supervisors for O'Brien's and communicated them to O'Brien's human resources in Spring, Texas.

22. O'Brien's directed me and other Spill Workers filling out timesheets and expense reports.

23. O'Brien's required me and the other Spill Workers through command staff, and local, state and federal officials including the Coast Guard to follow policies and procedures that dictated who we reported to in the chain of command, how we behaved on job sites, what we were permitted/required to wear and how we performed our work. O'Brien's dictated what expenses we were allowed to claim for reimbursement, how we filled out timesheets, and that we were subject to possible random drug and alcohol testing according to our teaming agreements.

24. O'Brien's controlled my and other Spill Workers' working schedules that were determined on a daily basis by command staff and the incident command system. Our daily shifts were typically a minimum of 12 hours. We were not allowed to set our own schedules.

25.    The Spill Workers and I were not allowed to hire employees to help us with our work.

26.    O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment.  *See* Exhibit 2.

27.    Around January 1, 2011, a woman from HR met with us.  She explained O'Brien's was going to make us employees.  From that point on, O'Brien's classified me as an employee.

28.    Just before I was let go, or "demobilized," Duane Miller told me that I was to report to demobilization.  In demobilization, my O'Brien's electronic access badge was deactivated.  After being demobilized, I returned home because I no longer had work or lodging in Venice.

## Investment

29.    The other Spill Workers and I made little or no investment in working for O'Brien's.  For example, I was provided with the equipment we used, including printers, scanners, hard hats, safety vests, safety glasses, shirts and hats.  O'Brien's typically reimbursed us for travel expenses and provided me with a rental car and lodging when needed.

## Special Skill or Expertise

30.    O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties.  I never had contact with O'Brien's before I was hired and I received no formal training after being hired.  I found out about employment with O'Brien's through a friend.  Based on his recommendation, I

contacted John McHugh with O'Brien's. McHugh returned my call, and after a short phone interview, offered me a job with O'Brien's. Two days later, I was in Venice reporting to Rod Dillon.

31. The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup vessels, equipment and personnel.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action. Furthermore, every Spill Worker with whom I have discussed this case has expressed a desire to join.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July _13_, 2012.

Thomas Philip Wright



# BP RESPONSE TIME SHEET

**Name:** Tom Wright                                                              **Billing Period:** 11/29/10 to 12/5/10

**Paykey Code: ZKRAUMD252**                                                **Response: Deepwater Horizon – Venice**

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 11/29/10 | 0545 | 1850 | 13 | Recon Supervisor, DOSC |
| 11/30/10 | 0550 | 1850 | 13 | Recon Supervisor, DOSC |
| 12/1/10 | 0545 | 1830 | 12.75 | Recon Supervisor, DOSC |
| 12/2/10 | 0540 | 1920 | 13.5 | Recon Supervisor, DOSC |
| 12/3/10 | 0540 | 1850 | 13 | Recon Supervisor, DOSC |
| 12/4/10 | 0545 | 1900 | 13.25 | Recon Supervisor, DOSC |
| 12/5/10 | 0540 | 1800 | 12.3 | Recon Supervisor, DOSC |

**Signature:** *Tom Wright*                                                                           **Date:** 12/5/10

EXHIBIT 1

# RESPONSE MANAGEMENT TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien'sRM) (referred to collectively as Company), and Thomas Wright (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ TBD per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or $450 per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:

By: _____

Name:   K. Tim Perkins

Title:      C.E.O.

Company: O'Brien's Response Management Inc.

Date:_____

CONTRACTOR:

By: _Thomas P. Wright_

Name: _THOMAS P. WRIGHT_

Title: _CONTRACTOR_

Company: _____

Date: _JUNE 29, 2010_

EXHIBIT 2