UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ] ] ] ] ] | MDL No. 2179<br><br>SECTION: J<br><br>Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW | ] ] | Mag. Judge Wilkinson |

## SWORN DECLARATION OF THOMAS MICHAEL PFISTER

Pursuant to 28 U. S. C. § 1746 Thomas Michael Pfister declares the following:

1. "My name is Thomas Michael Pfister. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from June 13, 2010 to October 1, 2010. O'Brien's initially assigned me to work in Pensacola, Florida and later I was transferred to Gulfport, Mississippi. My duties were to assist O'Brien's in tracking the progress of the beach cleanup in response to BP's Deepwater Horizon oil spill in April 2010.

3. Contractors provided crews for beach cleanup. It was my job to supervise these contractors and track where they were deployed and the progress that was being made in the cleanup effort.

4. When I worked in Gulfport, Mississippi, my job was to train beach cleanup crews in the proper use of cleanup equipment and then to supervise them in the onshore cleanup effort.

5. My last position with O'Brien's was as a beach shoreline operations supervisor. I supervised beach cleanup crews for the Gulfport, Mississippi area. It was my job to fill out daily reports detailing the location of cleanup personnel, equipment and supplies being used and oil, tar and sand being removed and/or cleaned. I also attended daily meetings to explain what we picked up or deployed.

Ex. 16

6. O'Brien's treated me as an independent contractor throughout my entire deployment on the Deepwater Horizon oil spill response.

7. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

8. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

### Hours Worked

9. During my employment, the other Spill Workers and I typically worked seven days per week. I went months without a day off.

10. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

11. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an example of one of my time sheets from July 1, 2010 to July 11, 2010. I worked over twelve hours each of these days. *See* Exhibit 1.

### Pay

12. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day. My agreement with O'Brien's states I would be paid "$500 per day."

13. Throughout my employment with O'Brien's, I was paid $500 per day. This amount did not increase if I worked more than my scheduled hours.

14. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours.

### Control

15. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because I had previously been hired by O'Brien's for another project prior to the Deepwater Horizon oil spill, and Peter Benson, an O'Brien's employee, rehired me over the phone to work on the oil spill response.

16. When I was hired, my supervisor in Pensacola, Peter Benson, who was also employed by O'Brien's, initially told me how to do my job. Later when I was transferred to Gulfport, Mississippi I was supervised by Larry Smith of O'Brien's.

17. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings with Benson in Pensacola and later with Smith in Gulfport. In these meetings, Benson and Smith gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems in Pensacola, I went to Benson for help. When there were problems in Gulfport, I went to Smith.

18. Both Benson and Smith required me to attend daily briefings and file daily reports. O'Brien's used these reports to monitor our work and plan our assignments for the next day.

19. O'Brien's directed the information I was to track and how I was to report it. O'Brien's also provided instruction on how to fill out the report forms I completed. When my forms were not filled out properly, or there was some other problem with my work, Benson and/or Smith would require me to make corrections according to their instructions.

20. O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to wear them around our necks so they would always be visible to the guards at the facilities.

21. O'Brien's required me and the other Spill Workers to obtain approval for time off. I worked 7 days a week for greater than 4 months before requesting time off. I made these requests for time off to Benson and Smith, who approved them.

22. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

23. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

24. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

25. The Spill Workers and I were not allowed to hire employees to help us with our work.

26. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment.

27. I was at all times classified as an independent contractor by O'Brien's from the time of my rehire in June of 2010 until I was demobilized on October 1, 2010.

28. Just before I was let go, or "demobilized," I was told to report to demobilization. In demobilization, my O'Brien's electronic access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Gulfport.

### Investment

29. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, O'Brien's provided us with the equipment we used, including printers, scanners, hard hats, safety vests, safety glasses, shirts and hats. O'Brien's typically reimbursed us for travel expenses and mileage. O'Brien's also provided facilities, including offices and lodging.

### Special Skill or Expertise

30. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties, however, I had worked for O'Brien's in the past. I had worked for O'Brien's before I was rehired for the Deepwater Horizon oil spill response but I received virtually no formal training after being rehired. I was contacted by Peter Benson of O'Brien's after the oil spill to inquire as to whether I would be interested in going back to work for O'Brien's. After a short phone interview, I was told to report to Pensacola. Less than a week later, I was in Pensacola receiving initial instructions from Benson.

31. The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job. For

example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment.

### Interest in a Collective Action

32. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action. Furthermore, virtually every Spill Worker with whom I have discussed this case has expressed a desire to join.

33. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 10, 2012.

_____
Thomas Michael Pfister



# BP RESPONSE TIME SHEET

**Name:** Tom Pfister
**Paykey Code:** ZKRAUMD252
**Billing Period:** July 1 thru July 11, 2010
**Response:** Deepwater Horizon

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 7-1-10 | 0530 | 1930 | 14 | Pensacola - West Morgan |
| 7-2-10 | 0530 | 1830 | 13 | " " |
| 7-3-10 | 0600 | 1800 | 12 | " " |
| 7-4-10 | 0530 | 1830 | 13 | " " |
| 7-5-10 | 0530 | 1930 | 14 | " " |
| 7-6-10 | 0600 | 1800 | 12 | " " |
| 7-7-10 | 0600 | 1800 | 12 | " " |
| 7-8-10 | 0530 | 1830 | 13 | " " |
| 7-9-10 | 0530 | 1930 | 14 | " " |
| 7-10-10 | 0530 | 1830 | 13 | " " |
| 7-11-10 | 0600 | 1800 | 12 | " " |

142

**Signature:** [signed]
**Date:** 7-12-10

EXHIBIT 1