UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ] ] ] ] ] | MDL No. 2179 SECTION: J Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW | ] ] | Mag. Judge Wilkinson |

**SWORN DECLARATION OF DENNIS BURNETT.**

Pursuant to 28 U. S. C. § 1746 Dennis Burnett declares the following:

1. "My name is Dennis Burnett. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from August 4, 2010 to December 23, 2010 as a decontamination assessment team manager in Port Fourchon, Louisiana.

3. It was my job to coordinate the docking of cleanup vessels returning to the port for decontamination. We documented the entire process of inspection, decontamination and demobilization of all vessels.

4. O'Brien's treated me as an independent contractor throughout my employment.

5. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

6. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

-1-

**Ex. 19**

**Hours Worked**

7. During my employment, the other Spill Workers and I typically worked seven days per week. I went weeks without a day off.

8. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

9. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week.

**Pay**

10. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid $500 per day. A true and correct copy of the teaming agreement I signed is attached as Exhibit 1

11. Throughout my employment with O'Brien's, I was paid $500 per day. My pay did not increase if I worked more than my scheduled hours.

12. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

13. O'Brien's had the authority to hire and fire me and other Spill Workers. I was recruited by John McHugh with O'Brien's shortly after sending in my resume. He emailed me the hiring paperwork, which I returned to him and Hope Anunciacion. In my first phone conversation with McHugh, he hired me and told me to report for duty in two days. On the first

day, O'Brien's trained me to use a MC-75 trimble unit, which is a small hand-held computer we used to make reports and take pictures.

14. Robert Fisher was my supervisor during my employment with O'Brien's.

15. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, Fisher gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems I could not resolve on my own, I went to Fisher for help.

16. O'Brien's assigned us our work tasks. When there was a problem with my work, Fisher required me to make corrections according to his instructions.

17. The other Spill Workers and I were required to scan electronic badges we were issued upon each entry and departure from certain staging areas and other work sites. We were required to always display them in these areas so they would be visible to the guards.

18. O'Brien's required me and the other Spill Workers to obtain approval for time off.

19. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

20. O'Brien's required me and the other Spill Workers to follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

21. O'Brien's set my and other Spill Workers' working schedules, which typically required minimum shifts of 12 hours or longer.

22. The Spill Workers and I were not allowed to hire employees to help us with our work.

23. O'Brien's agreement prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment. *See* Exhibit 1.

24. O'Brien's demobilized me, or let me go, in December 2010. As part of the demobilization process, my access badge was deactivated and I was required to surrender it. This effectively denied me access to work sites.

### Investment

25. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, we were provided all the significant tools and equipment we used, including office supplies, scanners, laptops, trimbles, ATVs, hats, slicker suits, goggles and safety glasses. O'Brien's typically reimbursed us for travel expenses and mileage. We were also provided facilities, including offices and lodging.

### Special Skill or Expertise

26. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired. I found out about employment with O'Brien's through a friend. Based on his recommendation, I sent my resume to O'Brien's. I was hired by McHugh during a short phone interview. When I first reported to work, O'Brien's provided a one-day training session on how to use the trimble. After the training, O'Brien's sent me to the port to start working.

27.     The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job.

### Interest in a Collective Action

28.     Based on my experience working with O'Brien's and my communications with other Spill Workers, I believe other spill workers are interested in joining a collective action to recover their unpaid overtime.

29.     I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 12, 2012.

*[signature]*
Dennis Burnett

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien'sRM) (referred to collectively as Company), and <u>Dennis Burnett</u> (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of <u>$ TBD</u> per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or <u>$ 500</u> per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:

By: _____

Name:   K. Tim Perkins

Title:   C.E.O.

Company: O'Brien's Response Management Inc.

Date: _____

CONTRACTOR:

By: _Dennis Burnett_

Name: _Dennis Burnett_

Title: _Contractor_

Company: _____

Date: _8/2/10_

Teaming Agreement                                                                                                                                                         March 2009

Exhibit 1