UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 ] ] ] ] | ] | MDL No. 2179<br><br>SECTION: J<br><br>Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW ] ] | | Mag. Judge Wilkinson |

**SWORN DECLARATION OF GREGORY WEAVER**

Pursuant to 28 U. S. C. § 1746 Gregory Weaver declares the following:

1. "My name is Gregory Weaver. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from August 2010 to April 2012. I worked as an environmental observer in Port Fourchon from August 2010 until late December 2010 or early January 2011. For the remainder of my employment, I worked in field documentation.

3. As an environmental observer, it was my job to make sure cleanup crews followed environmental protection guidelines that were required by O'Brien's. I also operated a trimble device, which is a rugged hand-held field computer that we used to photograph and document what was happening at the cleanup sites.

4. O'Brien's treated me as an independent contractor from the beginning of my employment until the first week of January, 2011, when O'Brien's reclassified me as an employee.

5. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

-1-

**Ex. 21**

6. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

### Hours Worked

7. During my employment, the other Spill Workers and I typically worked seven days per week. I went months without a day off.

8. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

9. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week.

### Pay

10. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day. The agreement I signed when I was hired states I would be paid "$500 per day."

11. From the beginning of my employment with O'Brien's until I was reclassified as an employee, I was paid $500 per day. My pay did not increase if I worked more than my scheduled hours.

12. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

### Control

13. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because Jennifer Henderson, my supervisor, could hire and fire employees. I was hired by

O'Brien's during a short phone interview with John McKue on a Friday. He told me to report to work at 7 a.m. on Monday morning. When I arrived, O'Brien's provided me with hiring documents and employment policies.

14. Henderson was my supervisor during the time I worked as an environmental observer .

15. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings or phone conferences with Henderson. In these meetings, Henderson gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems I could not resolve on my own, I went to Henderson for help.

16. O'Brien's required me to deliver daily reports to Henderson every evening. O'Brien's used our reports to monitor the beach cleanup work and plan our assignments for the next day.

17. O'Brien's gave daily task lists to me and the Spill Workers. These tasks were usually communicated verbally and through email by Henderson. When there was a problem with my work, Henderson required me to make corrections according to her instructions.

18. O'Brien's required me and the other Spill Workers to scan or hand over our badges upon each entry and departure from certain staging areas and other work sites and boats. These badges said "O'Brien's" on them. We were required to always display them in restricted areas so they would always be visible to the guards at the facilities.

19. O'Brien's required me and the other Spill Workers to obtain approval for time off.

20. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

21. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

22. O'Brien's set my and other Spill Workers' working schedules, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

23. The Spill Workers and I were not allowed to hire employees to help us with our work.

24. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment.

24. Around December 2010 or January 2011, I received a letter from O'Brien's stating I and the other Spill Workers were going to be reclassified as employees. From that point on, O'Brien's classified us as employees.

25. Towards the end of my employment, Rodney Verret, an O'Brien's manager, told me I was being let go. In demobilization, my O'Brien's access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Port Fourchon.

**Investment**

26. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, O'Brien's provided us with the equipment we used, including tools, ATVs, office equipment, trimbles, hard hats, safety glasses, gloves, rubber boots, tyvek suits, T-

-4-

shirts and hats. O'Brien's typically reimbursed us for travel expenses and mileage. O'Brien's also provided facilities, including offices and lodging.

### Special Skill or Expertise

27. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and I received no formal training after being hired. I found out about employment with O'Brien's through a friend. Based on his recommendation, I sent my resume to O'Brien's. During a short phone interview with McKue, he offered me a job. Two days later, I reported to work to receiving some basic instruction from O'Brien's. After two days of training, I was on the beaches doing my job as an environmental observer.

28. The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job.

### Interest in a Collective Action

29. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, every Spill Worker with whom I discussed this case expressed a desire to join. In fact, Dale Croy and Morgan Clark, two of the Spill Workers I spoke to, have since joined this collective action.

30. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 10, 2012.

_Gregory Weaver_
Gregory Weaver