UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:   Oil Spill by the Oil Rig ] | MDL No. 2179 |
| "Deepwater Horizon" in the ] | |
| Gulf of Mexico, on April 20, 2010 ] | SECTION: J |
| ] | |
| ] | Judge Barbier |
| This Document Relates to: 2:12-cv-1045-CJB-JCW ] | Mag. Judge Wilkinson |
| ] | |

**SWORN DECLARATION OF BRUCE RIDPATH**

Pursuant to 28 U. S. C. § 1746 Bruce Ridpath declares the following:

1. "My name is Bruce Ridpath. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from May 6, 2010 to early January 2011. O'Brien's assigned me to work in Venice, Louisiana at the staging yard. My duties were to assist O'Brien's in tracking equipment and supplies used in the cleanup response to BP's Deepwater Horizon oil spill in April 2010.

3. O'Brien's treated me as an independent contractor from the beginning of my employment until January 1, 2011, when O'Brien's reclassified me as an employee.

4. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

5. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

**Hours Worked**

6. During my employment, the other Spill Workers and I typically worked seven days per week. I went months without a day off.

**Ex. 23**

7. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

8. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week. Exhibit 1 is an For example of one of my time sheets from August 1 to August 7, 2010. I worked over 93 hours during this period. *See* Exhibit 1.

**Pay**

9. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that state we would be paid by the day. The agreement I signed when I was hired states I would be paid "$350 per day." *See* Exhibit 2. I signed a new agreement with O'Brien's that states I would be paid $500 per day in July 2010. *See* Exhibit 3.

10. Throughout my employment with O'Brien's, I was paid by the day. Initially, I was paid $350 per day. From July 14, 2010 on, I was paid $500 per day. My pay did not increase if I worked more than my scheduled hours.

11. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours during the time O'Brien's classified us as independent contractors.

**Control**

12. O'Brien's had the authority to hire and fire me and other Spill Workers. I know this because Keith Towler, an O'Brien's employee, hired me over the phone. He told me to report to Venice for work the next day. When I arrived, O'Brien's provided me with hiring documents and employment policies.

-2-

13. I was supervised initially by Mark McIntire with O'Brien's. After about two weeks, my new supervisor, John Sawicki, trained and instructed me regarding what information I was to track in the staging yard for O'Brien's.

14. O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings with Sawicki. I usually met with Sawicki twice daily, shortly after arriving to work each night and shortly before leaving each morning. In these meetings, Sawicki gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems in staging, I went to Sawicki for help.

15. Sawicki required me to deliver my inventory report and boom count every morning by 6 a.m. O'Brien's used these reports to monitor our work and plan our assignments for the next day.

16. O'Brien's directed the information I was to track and how I was to report it. O'Brien's also provided instruction on how to fill out the report forms I completed. When my forms were not filled out properly, or there was some other problem with my work, Sawicki required me to make corrections according to his instructions.

17. O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said "O'Brien's" on them. We were required to wear them around our necks so they would always be visible to the guards at the facilities.

18. O'Brien's required me and the other Spill Workers to obtain approval for time off. I requested a total of about twenty days off during my employment with O'Brien's. I made these requests to Sawicki, who approved them.

19. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

20. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

21. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

22. The Spill Workers and I were not allowed to hire employees to help us with our work.

23. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment. *See* Exhibits 2, 3.

24. Around January 1, 2011, I learned from Sawicki that O'Brien's was going to reclassify us as employees. From that point on, O'Brien's classified me as an employee.

25. Just before I was let go, or "demobilized," Sawicki told me that I was to report to demobilization. In demobilization, my O'Brien's electronic access badge was deactivated. After being demobilized, I returned home because I no longer had work or lodging in Venice.

**Investment**

26. The other Spill Workers and I made little or no investment in working for O'Brien's. For example, O'Brien's provided us with the equipment we used, including printers,

scanners, hard hats, gloves, tyvek suits, rubber boots, rain gear, safety glasses and T-shirts. O'Brien's typically reimbursed us for travel expenses and mileage. O'Brien's also provided facilities, including offices and lodging.

### Special Skill or Expertise

27. O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and I received no formal training after being hired. I found out about employment with O'Brien's through John McHugh. Based on his recommendation, I contacted O'Brien's. Towler returned my call, and after a short phone interview, offered me a job with O'Brien's. The next day, I was in Venice receiving instructions from McIntire.

28. The other Spill Workers and I did not receive significant official or formal training to perform our jobs. Instead, we learned how to perform our duties on the job. For example, I learned on the job how to fill out report forms and what information I was required to track about the cleanup equipment.

### Interest in a Collective Action

29. Based on my experience working with O'Brien's and my communications with other Spill Workers, I know other spill workers are interested in joining a collective action to recover their unpaid overtime. In fact, some of the Spill Workers I spoke to have since joined this collective action, including Sawicki and Dennis Prejean. .

30. I declare under penalty of perjury that the foregoing is true and correct."

Signed on July 7, 2012.

Bruce Ridpath



# BP RESPONSE TIME SHEET

**Name:** Bruce Ridpath     **Billing Period:** 8/1/10 – 8/07/10

**Paykey Code:** ZKRAUMD252     **Response:** Deepwater

| Date | Start Time | End Time | Total Hours | Location/Activity |
|---|---|---|---|---|
| 8/01 | 0000 | 0530 | 5.5 | Venice staging, Operations, Yard supervisor |
| 8/01 | 1630 | 2400 | 7.5 | Venice staging, Operations, Yard supervisor |
| 8/02 | 0000 | 0530 | 5.5 | Venice staging, Operations, Yard supervisor |
| 8/02 | 1630 | 2400 | 7.5 | Venice staging, Operations, Yard supervisor |
| 8/03 | 0000 | 0630 | 6.5 | Venice staging, Operations, Yard supervisor |
| 8/03 | 1630 | 2400 | 7.5 | Venice staging, Operations, Yard supervisor |
| 8/04 | 0000 | 0600 | 6 | Venice staging, Operations, Yard supervisor |
| 8/04 | 1630 | 2400 | 7.5 | Venice staging, Operations, Yard supervisor |
| 8/05 | 0000 | 0530 | 5.5 | Venice staging, Operations, Yard supervisor |
| 8/05 | 1630 | 2400 | 7.5 | Venice staging, Operations, Yard supervisor |
| 8/06 | 0000 | 0600 | 6 | Venice staging, Operations, Yard supervisor |
| 8/06 | 1645 | 2400 | 7.25 | Venice staging, Operations, Yard supervisor |
| 8/07 | 0000 | 0600 | 6 | Venice staging, Operations, Yard supervisor |
| 8/07 | 1630 | 2400 | 7.5 | Venice staging, Operations, Yard supervisor |
|  |  |  |  |  |
|  |  | Total Hours | 93.25 |  |

Signature:     Date:

Exhibit 1

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien'sRM) (referred to collectively as Company), and __Bruce Ridpath__ (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ __TBD__ per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or $ __500.00__ per day, **effective 14 July 2010**, for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

| COMPANY: | CONTRACTOR: |
|---|---|
| By: _____ | By: __BRUCE RIDPATH__ |
| Name: _____ | Name: _[signature]_ |
| Title: _____ | Title: _____ |
| Company: O'Brien's Response Management Inc. | Company: _____ |
| Date: _____ | Date: __7/14/10__ |

Teaming Agreement    March 2009

Exhibit 2

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien'sRM) (referred to collectively as Company), and  Bruce Ridpath   (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ 250.00  per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or $ 350.00  per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for **all** expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:                                          CONTRACTOR:

By: _____                       By: BRUCE RIDPATH

Name: _____                       Name: [signature]

Title: _____                     Title: _____

Company: O'Brien's Response Management Inc.       Company: _____

Date: _____                      Date: 5/5/2010