UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  Oil Spill by the Oil Rig          ]     MDL No. 2179
        "Deepwater Horizon" in the        ]
        Gulf of Mexico, on April 20, 2010 ]     SECTION: J
                                          ]
                                          ]     Judge Barbier
This Document Relates to: 2:12-cv-1045-CJB-JCW ] Mag. Judge Wilkinson
                                          ]

**SWORN DECLARATION OF DAVID HAMILTON**

Pursuant to 28 U. S. C. § 1746 David Hamilton declares the following:

1. "My name is David Hamilton. The facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for O'Brien's Response Management, Inc. (O'Brien's) from June 30, 2010 to November 18, 2010. O'Brien's assigned me to work at the command center in Dauphin Island, Alabama as a beach supervisor until about September 1, 2010. O'Brien's assigned me to work in Amelia, Louisiana as a decontamination site shift supervisor for the remainder of my employment.

3. As a beach supervisor, it was my job to monitor contractors who were cleaning the beaches. I made sure they were not hauling off too much sand with the oil, that they were working when they were supposed to and not taking too many breaks. During the time I was a beach supervisor, I floated around in various positions depending on where I was needed due to absences of other employees. This meant that I sometimes lent a hand in the command center or wherever else I was needed.

4. When I worked in the decontamination site, I was in charge of the night shift. I scheduled what needed to be cleaned, wrote reports of what was cleaned, coordinated with the safety people and generally worked out any problems that arose.

**Ex. 24**

5. O'Brien's always treated me as an independent contractor.

6. Many other workers worked for O'Brien's performing the same duties I performed and were also treated as independent contractors. I refer to these other workers as "Spill Workers."

7. Throughout my employment with O'Brien's, O'Brien's established my and the other Spill Workers' compensation, set our schedules, and directed our work on a daily basis.

## Hours Worked

8. During my employment, the other Spill Workers and I typically worked seven days per week. I went months without a day off.

9. The other Spill Workers and I were regularly scheduled to work twelve hour shifts for O'Brien's. However, our actual shifts were often longer than the regularly scheduled twelve hours.

10. Accordingly, the other Spill Workers and I routinely worked many hours in excess of forty in a week.

## Pay

11. When O'Brien's hired me and the other Spill Workers, we signed "Teaming Agreements" that stated we would be paid by the day. My agreement with O'Brien's said I would be paid $500 per day.

12. Throughout my employment with O'Brien's, I was paid $500 per day. This amount did not increase if I worked more than my scheduled hours.

13. O'Brien's did not pay me or the other Spill Workers overtime compensation for hours we worked in excess of forty hours.

**Control**

14.     O'Brien's had the authority to hire and fire me and other Spill Workers. For example, Dwayne Miller, an O'Brien's employee, hired me over the phone shortly after I submitted my resume to O'Brien's on the recommendation of a friend. Miller told me to report for duty within a few days.

15.     When I was hired, Miller sent me to a basic, two-day training course about safety requirements and how to handle hazardous materials. On my third day on the job, I was on the beach working as a beach supervisor. I don't recall the name of my supervisor in Dauphin Island, but he was with O'Brien's. When I worked in Louisiana, my supervisor was Russ Mackey, also with O'Brien's

16.     O'Brien's supervised and controlled the performance of our work in all the locations to which I was assigned. For example, I had mandatory daily meetings with my supervisors. In these meetings, my supervisors gave me and other Spill Workers instructions regarding our daily tasks and job performance. When there were problems, I went to my supervisors for help.

17.     O'Brien's directed the information I was to collect on the beach and the decontamination site and how I was to report it. O'Brien's also provided instruction on how to fill out the report forms I completed. When my forms were not filled out properly, or there was some other problem with my work, my supervisors required me to make corrections according to their instructions.

18.     O'Brien's required me and the other Spill Workers to scan our electronic badges in and out upon each entry and departure from work sites and boats. These badges said

"O'Brien's" on them. We were required to display them so they would always be visible to the guards at the facilities.

19. O'Brien's required me and the other Spill Workers to obtain approval for time off.

20. O'Brien's required me and other Spill Workers to fill out time sheets reflecting hours worked.

21. O'Brien's required me and the other Spill Workers follow policies and procedures that dictated who we reported to in the chain of command, how we recorded and reported our time worked, how we behaved on job sites, what we were permitted to wear, how we performed our work, what expenses we were allowed to claim for reimbursement, how we handled documents, and that we submit to random drug and alcohol testing.

22. O'Brien's set my and other Spill Workers' working schedules on a weekly basis, which typically required minimum shifts of 12 hours or longer. We were not allowed to set our own schedules.

23. The Spill Workers and I were not allowed to hire employees to help us with our work.

24. O'Brien's prohibited me and the other Spill Workers from working with any other oil spill contractor while we were employed by O'Brien's and for one year after our employment.

25. Mackey informed me I was to be demobilized. In demobilization, my O'Brien's electronic access badge was deactivated and my computer was backed up. After being demobilized, I returned home because I no longer had work or lodging Louisiana.

### Investment

26.     The other Spill Workers and I made little or no investment in working for O'Brien's. For example, we were provided with all the equipment and tools we used, including office facilities, printers, scanners, hard hats, safety vests, safety glasses, gloves and VHF radios. O'Brien's typically reimbursed us for travel expenses, lodging and mileage.

### Special Skill or Expertise

27.     O'Brien's did not require me and the other Spill Workers to possess specialized qualifications, skill or former training prior to hire in order to perform our job duties. I never had contact with O'Brien's before I was hired and I received no significant formal training after being hired. Instead, we learned how to perform our duties on the job

### Interest in a Collective Action

28.     Based on my experience working with O'Brien's and my communications with other Spill Workers, I believe other spill workers are interested in joining a collective action to recover their unpaid overtime.

29.     I declare under penalty of perjury that the foregoing is true and correct."

Signed on July _11_, 2012.

_____
David Hamilton