1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3
    ****************************************************************
4
    IN RE:  OIL SPILL BY THE
5   OIL RIG *DEEPWATER HORIZON*
    IN THE GULF OF MEXICO ON
6   APRIL 20, 2010

7                                   CIVIL ACTION NO. 10-MD-2179 "J"
                                    NEW ORLEANS, LOUISIANA
8                                   FRIDAY, JULY 13, 2012, 9:30 A.M.

9
    THIS DOCUMENT RELATES TO
10  ALL CASES

11  ****************************************************************

12
          TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
13           HEARD BEFORE THE HONORABLE CARL J. BARBIER
                    UNITED STATES DISTRICT JUDGE
14


15
    APPEARANCES:
16

17

    FOR THE PLAINTIFFS'
18  LIAISON COUNSEL:        DOMENGEAUX WRIGHT ROY & EDWARDS
                            BY:  JAMES P. ROY, ESQUIRE
19                          P. O. BOX 3668
                            556 JEFFERSON STREET
20                          LAFAYETTE, LA  70502

21
                            HERMAN HERMAN KATZ & COTLAR
22                          BY:  STEPHEN J. HERMAN, ESQUIRE
                                 SOREN GISLESON, ESQUIRE
23                          820 O'KEEFE AVENUE
                            NEW ORLEANS, LA  70113
24

25

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE PLAINTIFFS:     BREIT DRESCHER IMPREVENTO & WALKER
                              BY:  JEFFREY A. BREIT, ESQUIRE
 4                            1000 DOMINION TOWER
                              999 WATERSIDE DRIVE
 5                            NORFOLK, VA  23510

 6

 7                            CUNNINGHAM BOUNDS
                              BY:  ROBERT T. CUNNINGHAM, ESQUIRE
 8                            1601 DAUPHIN STREET
                              MOBILE, AL  36604
 9

10
                              LEWIS, KULLMAN, STERBCOW & ABRAMSON
11                            BY:  PAUL M. STERBCOW, ESQUIRE
                              PAN AMERICAN LIFE BUILDING
12                            601 POYDRAS STREET, SUITE 2615
                              NEW ORLEANS, LA  70130
13

14
                              LIEFF CABRASER HEIMANN & BERNSTEIN
15                            BY:  ELIZABETH J. CABRASER, ESQUIRE
                              275 BATTERY STREET, 29TH FLOOR
16                            SAN FRANCISCO, CA  94111

17

18                            WILLIAMSON & RUSNAK
                              BY:  JIMMY WILLIAMSON, ESQUIRE
19                            4310 YOAKUM BOULEVARD
                              HOUSTON, TX  77006
20

21
                              WEITZ & LUXENBERG
22                            BY:  ROBIN L. GREENWALD, ESQUIRE
                              700 BROADWAY
23                            NEW YORK CITY, NY  10003

24

25
```

1   APPEARANCES CONTINUED:

2

3                        MORGAN & MORGAN
                         BY:  ALPHONSO M. ESPY, ESQUIRE
4                             FRANK M. PETOSA, ESQUIRE
                         188 EAST CAPITOL STREET, SUITE 777
5                        JACKSON, MS   39201

6

7                        MARTÍNEZ, GONZALES, KALBAC & KANE
                         BY:  ERVIN A. GONZALEZ, ESQUIRE
8                        255 ALHAMBRA CIRCLE, PENTHOUSE
                         CORAL GABLES, FL   33134
9

10
                         COSSICH SUMICH PARSIOLA & TAYLOR
11                       BY:  PHILIP F. COSSICH, JR., ESQUIRE
                         8397 HIGHWAY 23, SUITE 100
12                       BELLE CHASSE, LA   70037

13

14                       BEASLEY ALLEN CROW METHVIN
                         PORTIS & MILES
15                       BY:  RHON E. JONES, ESQUIRE
                         POST OFFICE BOX 4160
16                       MONTGOMERY, AL   36013

17

18                       LUNDY, LUNDY, SOILEAU & SOUTH
                         BY:  MATTHEW E. LUNDY, ESQUIRE
19                       501 BROAD STREET
                         LAKE CHARLES, LA   70601
20

21
                         WILLIAMS LAW GROUP
22                       BY:  CONRAD S. P. WILLIAMS, ESQUIRE
                         435 CORPORATE DRIVE, SUITE 101
23                       HOUMA, LA   70360

24

25

```
1    APPEARANCES CONTINUED:

2

3                              BARON & BUDD
                              BY:  SCOTT SUMMY, ESQUIRE
4                              3102 OAK LAWN AVENUE, SUITE 1100
                              DALLAS, TX  75219
5

6
                              MOTLEY RICE
7                              BY:  JOSEPH F. RICE, ESQUIRE
                                   JOHN A. BADEN, IV, ESQUIRE
8                              28 BRIDGESIDE BOULEVARD
                              MOUNT PLEASANT, SC 29464
9

10
                              LAW OFFICES OF DANIEL E. BECNEL, JR.
11                             BY:  DANIEL E. BECNEL, JR., ESQUIRE
                              106 W. SEVENTH STREET
12                             P. O. DRAWER H
                              RESERVE, LA 70084
13

14

15   FOR THE SIERRA CLUB
     AND GULF RESTORATION
16   NETWORK:                  WALTZER & WIYGUL
                              BY:  CLAY J. GARSIDE, ESQUIRE
17                             3715 WESTBANK EXPRESSWAY, SUITE 13
                              HARVEY, LA  70058
18

19

20   FOR STATE INTERESTS:      ALABAMA ATTORNEY GENERAL'S OFFICE
                              BY:  LUTHER STRANGE, ESQUIRE
21                                  COREY L. MAZE, ESQUIRE
                                   WINFIELD J. SINCLAIR, ESQUIRE
22                             500 DEXTER AVENUE
                              MONTGOMERY, AL  36130
23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE STATE OF
      LOUISIANA:              STATE OF LOUISIANA
 4                            BY:  JAMES D.  CALDWELL, ATTORNEY GENERAL
                                   DOUGLAS R. KRAUS, ESQUIRE
 5                                 MEGAN TERRELL, ESQUIRE
                            POST OFFICE BOX 94005
 6                          BATON ROUGE, LA  70804

 7

 8
                            KANNER & WHITELEY
 9                          BY:  ALLAN KANNER, ESQUIRE
                            701 CAMP STREET
10                          NEW ORLEANS, LA  70130

11

12    FOR THE FEDERAL
      GOVERNMENT INTERESTS: U.S. DEPARTMENT OF JUSTICE
13                          TORTS BRANCH, CIVIL DIVISION
                            BY:  R. MICHAEL UNDERHILL, ESQUIRE
14                          450 GOLDEN GATE AVENUE
                            7TH FLOOR, ROOM 5395
15                          SAN FRANCISCO, CA  94102

16

17                          U.S. DEPARTMENT OF JUSTICE
                            TORTS BRANCH, CIVIL DIVISION
18                          BY:  STEPHEN G. FLYNN, ESQUIRE
                            POST OFFICE BOX 14271
19                          WASHINGTON, DC  20044

20

21    FOR THE UNITED STATES
      OF AMERICA:             ENVIRONMENTAL ENFORCEMENT SECTION
22                            U.S. DEPARTMENT OF JUSTICE
                            BY:  STEVEN O'ROURKE, ESQUIRE
23                          P.O. BOX 7611
                            WASHINGTON, DC  20044
24

25
```

```
1    APPEARANCES CONTINUED:

2


3    FOR BP AMERICA INC.,
     BP AMERICA PRODUCTION
4    COMPANY, BP COMPANY
     NORTH AMERICA INC.,
5    BP CORPORATION NORTH
     AMERICA INC.,
6    BP EXPLORATION &
     PRODUCTION INC.,
7    BP HOLDINGS NORTH
     AMERICA LIMITED,
8    BP PRODUCTS NORTH
     AMERICA INC.:          LISKOW & LEWIS
9                           BY:  DON K. HAYCRAFT, ESQUIRE
                            ONE SHELL SQUARE
10                          701 POYDRAS STREET
                            SUITE 5000
11                          NEW ORLEANS, LA  70139

12


13                          KIRKLAND & ELLIS
                            BY:   J. ANDREW LANGAN, ESQUIRE
14                                RICHARD C. GODFREY, ESQUIRE
                                  RYAN S. BABIUCH, ESQUIRE
15                          300 N. LASALLE
                            CHICAGO, IL  60654
16


17

18                          KIRKLAND & ELLIS
                            BY:  ROBERT R. GASAWAY, ESQUIRE
19                          655 FIFTEENTH STREET, N.W.
                            WASHINGTON, DC  20005

20


21
                            COVINGTON & BURLING
22                          BY:  ROBERT C. "MIKE" BROCK, ESQUIRE
                            1201 PENNSYLVANIA AVENUE, NW
23                          WASHINGTON, DC  20004

24


25
```

1    APPEARANCES CONTINUED:

2

3    FOR TRANSOCEAN HOLDINGS
     LLC, TRANSOCEAN
4    OFFSHORE DEEPWATER
     DRILLING INC., AND
5    TRANSOCEAN DEEPWATER
     INC.:                   FRILOT
6                            BY:  KERRY J. MILLER, ESQUIRE
                             ENERGY CENTRE, 36TH FLOOR
7                            1100 POYDRAS STREET
                             NEW ORLEANS, LA  70163
8

9
                             SUTHERLAND ASBILL & BRENNAN
10                           BY:  STEVEN L. ROBERTS, ESQUIRE
                             1001 FANNIN STREET, SUITE 3700
11                           HOUSTON, TX  77002

12

13                           MUNGER TOLLES & OLSON
                             BY:  BRAD D. BRIAN, ESQUIRE
14                                ALLEN M. KATZ, ESQUIRE
                             355 SOUTH GRAND AVENUE, 35TH FLOOR
15                           LOS ANGELES, CA  90071

16

17   FOR CAMERON INTERNATIONAL
     CORPORATION:            STONE PIGMAN WALTHER WITTMANN
18                           BY:  PHILLIP A. WITTMANN, ESQUIRE
                                  CARMELITE M. BERTAUT, ESQUIRE
19                           546 CARONDELET STREET
                             NEW ORLEANS, LA 70130
20

21
                             BECK REDDEN & SECREST
22                           BY:  DAVID W. JONES, ESQUIRE
                             ONE HOUSTON CENTER
23                           1221 MCKINNEY STREET, SUITE 4500
                             HOUSTON, TX  77010
24

25

1    APPEARANCES CONTINUED:

2

3                           WILLKIE FARR & GALLAGHER
                            BY:  MITCHELL J. AUSLANDER, ESQUIRE
4                                DOUGLAS MISHKIN, ESQUIRE
                            787 SEVENTH AVENUE
5                           NEW YORK, NY  10019

6

7    FOR HALLIBURTON
     ENERGY SERVICES, INC.:  GODWIN RONQUILLO
8                            BY:  DONALD E. GODWIN, ESQUIRE
                                 JENNY L. MARTINEZ, ESQUIRE
9                                ALISON BATTISTE, ESQUIRE
                                 BRUCE W. BOWMAN, JR., ESQUIRE
10                           1201 ELM STREET, SUITE 1700
                             DALLAS, TX  75270

11

12                           GODWIN RONQUILLO
13                           BY:  R. ALAN YORK, ESQUIRE
                             1331 LAMAR, SUITE 1665
14                           HOUSTON, TX  77010

15

16   FOR ANADARKO
     PETROLEUM CORPORATION,
17   ANADARKO E&P COMPANY
     LP:                     KUCHLER POLK SCHELL
18                           WEINER & RICHESON
                             BY:  DEBORAH D. KUCHLER, ESQUIRE
19                           1615 POYDRAS STREET, SUITE 1300
                             NEW ORLEANS, LA  70112

20

21                           BINGHAM MCCUTCHEN
22                           BY:  KY E. KIRBY, ESQUIRE
                             2020 K STREET, NW
23                           WASHINGTON, DC  20006

24

25

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR M-I L.L.C.:        MORGAN, LEWIS & BOCKIUS
                             BY:   HUGH E. TANNER, ESQUIRE
 4                                 JOHN C. FUNDERBURK, ESQUIRE
                             1000 LOUISIANA STREET, SUITE 4000
 5                           HOUSTON, TX  77002

 6

 7    FOR TRANSOCEAN
      EXCESS UNDERWRITERS:   PHELPS DUNBAR
 8                           BY:  EVANS M. MCLEOD, ESQUIRE
                             CANAL PLACE
 9                           365 CANAL STREET, SUITE 2000
                             NEW ORLEANS, LA  70130
10

11
      FOR O'BRIEN'S RESPONSE
12    MANAGEMENT, INC.,
      SEACOR HOLDINGS, INC.,
13    SEACOR OFFSHORE LLC,
      SEACOR MARINE, LLC,
14    SEACOR WORLDWIDE, INC.,
      SEACOR MARINE, INC.,
15    SEACOR MARINE
      INTERNATIONAL, INC.,
16    AND SIEMENS FINANCIAL,
      INC.:                  WEIL GOTSHAL & MANGES
17                           BY:  MICHAEL J. LYLE, ESQUIRE
                             1300 I ST., NW, SUITE 900
18                           WASHINGTON, DC  20005

19

20                           WEIL GOTSHAL & MANGES
                             BY:   THEODORE E. TSEKERIDES, ESQUIRE
21                                 JEREMY T. GRABILL, ESQUIRE
                             767 FIFTH AVENUE
22                           NEW YORK, NY  10153

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2


 3    FOR NATIONAL RESPONSE
      CORPORATION:           MONTGOMERY BARNETT
 4                           BY:  PATRICK E. O'KEEFE, ESQUIRE
                             ENTERGY CENTRE
 5                           1100 POYDRAS STREET, SUITE 3300
                             NEW ORLEANS, LA  70163
 6


 7
      FOR NALCO COMPANY:     LATHAM & WATKINS
 8                           BY:  MARY ROSE ALEXANDER, ESQUIRE
                                  THOMAS J. HEIDEN, ESQUIRE
 9                           233 SOUTH WACKER DRIVE, SUITE 5800
                             CHICAGO, IL  60606
10


11
                             NALCO COMPANY
12                           BY:  BRYAN W. SILL, ESQUIRE
                             ONE NALCO CENTER
13                           NAPERVILLE, IL 60563


14

15    FOR AIRBORNE SUPPORT
      INTERNATIONAL, INC.:   LABORDE & NEUNER
16                           BY:  JED M. MESTAYER, ESQUIRE
                             ONE PETROLEUM CENTER
17                           1001 W. PINHOOK ROAD, SUITE 200
                             LAFAYETTE, LA 70505
18


19
      FOR INTERNATIONAL
20    AIR RESPONSE, INC:     CHRISTOVICH & KEARNEY
                             BY:  KEVIN R. TULLY, ESQUIRE
21                           PAN AMERICAN LIFE CENTER
                             601 POYDRAS STREET, SUITE 2300
22                           NEW ORLEANS, LA  70130

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR LYNDEN INC.:        CHRISTOVICH & KEARNEY
                             BY:  H. CARTER MARSHALL, ESQUIRE
 4                           PAN AMERICAN LIFE CENTER
                             601 POYDRAS STREET, SUITE 2300
 5                           NEW ORLEANS, LA  70130

 6

 7    FOR LIBERTY INSURANCE
      UNDERWRITERS, INC.:    BARRASSO USDIN KUPPERMAN FREEMAN & SARVER
 8                           BY:  JUDY Y. BARRASSO, ESQUIRE
                                  CATHERINE FORNIAS GIARRUSSO, ESQUIRE
 9                           909 POYDRAS, SUITE 2400
                             NEW ORLEANS, LA  70112
10

11
                             MARTIN DISIERE JEFFERSON & WISDOM
12                           BY:  CHRISTOPHER W. MARTIN, ESQUIRE
                             808 TRAVIS, SUITE 1800
13                           HOUSTON, TX  77002

14

15    FOR DRC EMERGENCY
      SERVICES, LLC:         FLANAGAN PARTNERS
16                           BY:  SEAN P. BRADY, ESQUIRE
                             201 ST. CHARLES AVENUE, SUITE 2405
17                           NEW ORLEANS, LA  70170

18

19    FOR MARINE SPILL
      RESPONSE CORPORATION: BLANK ROME
20                           BY:  ALAN M. WEIGEL, ESQUIRE
                             THE CHRYSLER BUILDING
21                           405 LEXINGTON AVENUE
                             NEW YORK, NY  10174
22

23

24

25
```

1    APPEARANCES CONTINUED:

2

3    DYNAMIC AVIATION
     GROUP, INC:              GEIGER LABORDE & LAPEROUSE
4                             BY:  MICHAEL D. CANGELOSI, ESQUIRE
                              ONE SHELL SQUARE
5                             701 POYDRAS STREET, SUITE 4800
                              NEW ORLEANS, LA  70139
6

7

8    ALSO PRESENT:           [PLEASE SEE SIGN-IN SHEETS FILED IN THE
                              RECORD]
9

10

11   OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
12                              REGISTERED MERIT REPORTER
                                500 POYDRAS STREET, ROOM HB406
13                              NEW ORLEANS, LA  70130
                                (504) 589-7779
14                              Cathy_Pepper@laed.uscourts.gov

15
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
16   PRODUCED BY COMPUTER.

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3       AGENDA ITEMS                                    PAGE

4

5       SECOND AMENDED PRETRIAL ORDER NUMBER 41..............  19

6       REVISED TRIAL PLAN FOR THE LIMITATION TRIAL NOW

7       SCHEDULED FOR JANUARY 14, 2013......................  19

8       SPECIAL DOCKET FOR THE FILING OF ANY OBJECTIONS TO

9       THE PROPOSED SETTLEMENTS............................  19

10      ORDER ON JUNE 12TH CALLING FOR MOTIONS AND BRIEFS ON

11      CERTAIN PENDING ISSUES..............................  19

12      SCHEDULING ORDER FOR SOME LIMITED DISCOVERY ON THE

13      CLAIMS BY THE MEXICAN STATES........................  19

14      JUNE 15 ISSUED AN ORDER SETTING CAPS ON INDIVIDUAL

15      ATTORNEY'S FEES.....................................  19

16      JUNE 26TH APPOINTED AN APPELLATE PANEL TO HANDLE ANY

17      APPEALS FROM THE CLAIMS ADMINISTRATOR DECISIONS......  19

18      CONDITIONAL TRANSFER ORDERS.........................  20

19      FEW REMAINING ISSUES TO BE DECIDED BY THE PANEL......  20

20      NEXT HEARING IS JULY 26.............................  21

21      STATE COURT CASES...................................  23

22      STATUS OF MDL 2185..................................  24

23      WRITTEN AND DEPOSITION DISCOVERY STATUS.............  26

24      INSURANCE COVERAGE CASES............................  27

25      BOP TESTING.........................................  28

1    PSC/BP SETTLEMENTS.................................  29

2    UPCOMING DEADLINES................................  31

3    OBJECTIONS ARE TO BE FILED BY AUGUST 31ST, OPT-OUT

4    DATE IS OCTOBER 1ST, AND THE COURT WILL CONDUCT ITS

5    FINAL FAIRNESS HEARING ON NOVEMBER 8TH..............  32

6    POTENTIAL CONSIDERATION OF MOTIONS TO REMAND.........  32

7    MANAGEMENT OF CLAIMS NOT RESOLVED BY SETTLEMENT,

8    SUMMARY JUDGMENT, OR STIPULATION....................  41

9    MEXICAN STATES.....................................  42

10   PENDING MOTIONS....................................  43

11   GRANT THOSE MOTIONS THAT ARE LISTED, MULTIPLE

12   MOTIONS TO FILE SHORT FORM JOINDERS AFTER THE

13   MONITION DATE, LISTED ON THE AGENDA AS 10(A).........  43

14   NEXT STATUS CONFERENCE IS FRIDAY, AUGUST 17TH, 2012,

15   AT 9:30 A.M.......................................  121

16

17

18

19

20

21

22

23

24

25

1              **P-R-O-C-E-E-D-I-N-G-S**

2              FRIDAY, JULY 13, 2012

3         M O R N I N G   S E S S I O N

4              (COURT CALLED TO ORDER)

5

6

7         THE DEPUTY CLERK:  All rise.

8         THE COURT:  All right.  Good morning, everyone.

9         VOICES:  Good morning, Your Honor.

10         THE COURT:  Be seated.

11              Stephanie, call the case.

12         THE DEPUTY CLERK:  MDL 10-2179, In re:  Oil Spill By

13    the Oil Rig *Deepwater Horizon* in the Gulf of Mexico on

14    April 20, 2010.

15         THE COURT:  All right, counsel.  If liaison counsel

16    would introduce themselves and PSC and DSC members would

17    introduce themselves, please.

18         MR. HERMAN:  Good morning, Your Honor.  Steve Herman

19    for the plaintiffs.

20         MR. ROY:  Good morning, Your Honor.  Jim Roy for the

21    PSC.

22         MR. STERBCOW:  Good morning, Your Honor.

23    Paul Sterbcow, PSC.

24         MR. CUNNINGHAM:  Good morning, Judge.

25    Robert Cunningham, PSC.

 1          MR. BREIT:  Good morning, Your Honor.  Jeffrey Breit,
 2     PSC.
 3          THE COURT:  Mr. Breit, I'm glad you're no longer
 4     sitting behind General Strange.  Did he move you to that side
 5     of the table?
 6          MR. BREIT:  They tried to move me to the hall, Judge.
 7          MR. WILLIAMS:  Good morning, Judge.  Duke Williams,
 8     PSC.
 9          MR. O'ROURKE:  Good morning, Your Honor.
10     Steve O'Rourke for the United States.
11          MR. UNDERHILL:  Good morning, Your Honor.
12     Mike Underhill, U.S.
13          MR. STRANGE:  Good morning, Your Honor.
14     Luther Strange, Alabama and coordinating counsel for the
15     states.
16          MR. CALDWELL:  Good morning, Your Honor.
17     Buddy Caldwell, State of Louisiana.
18          MS. GREENWALD:  Good morning, Your Honor.
19     Robin Greenwald for the PSC.
20          MS. CABRASER:  Good morning, Your Honor.
21     Elizabeth Cabraser, PSC.
22          MR. FLYNN:  Good morning.  Stephen Flynn,
23     United States.
24          MR. TULLY:  Good morning, Your Honor.  Kevin Tully for
25     IAR.

1          MR. MARSHALL:  Good morning, Judge.  Carter Marshall on
2     behalf of Lynden, Incorporated.
3          MS. TERRELL:  Morning.  Megan Terrell, State of
4     Louisiana, with the Attorney General's Office.
5          MR. KANNER:  Allan Kanner with the State of Louisiana,
6     Attorney General's Office.
7          MR. SUMMY:  Good morning, Your Honor.  Scott Summy,
8     PSC.
9          MR. COSSICH:  Good morning, Your Honor.  Phil Cossich
10    PSC.
11         MR. LUNDY:  Good morning, Your Honor.  Matt Lundy, PSC.
12         MR. ESPY:  Mike Espy, PSC.  Good morning, Your Honor.
13         MR. JONES:  Good morning, Judge.  Rhon Jones, PSC.
14         MR. GONZALEZ:  Good morning, Judge.  Ervin Gonzalez,
15    PSC.
16         MR. RICE:  Your Honor, Joe Rice, PSC.
17         MR. WITTMANN:  Good morning, Judge.  Phil Wittmann,
18    Cameron.
19         MR. BROCK:  Good morning, Your Honor.  Mike Brock for
20    BP.
21         MR. HAYCRAFT:  Good morning, Judge.  Don Haycraft, BP.
22         MR. LANGAN:  Andy Langan for BP, Your Honor.
23         MR. GODWIN:  Good morning, Your Honor.  Don Godwin,
24    Halliburton.
25         MR. YORK:  Good morning, Your Honor.  Alan York, also

1    for Halliburton.

2           MR. ROBERTS:  Good morning, Judge.  Steve Roberts,

3    Transocean.

4           MR. MILLER:  Good morning.  Kerry Miller, Transocean.

5           MR. BRIAN:  Good morning.  Brad Brian, Transocean.

6           MR. BOWMAN:  Good morning.  Bruce Bowman, Halliburton.

7           MR. MESTAYER:  Good morning.  Jed Mestayer,

8    Airborne Support.

9           MR. TSEKERIDES:  Good morning.  Ted Tsekerides, liaison

10   for cleanup responder defendants.

11          MR. LYLE:  Good morning, Your Honor.  Michael Lyle for

12   NRC and O'Brien's.

13          MR. GODFREY:  Good morning, Your Honor.  Rick Godfrey,

14   BP.

15          MR. WEIGEL:  Good morning, Your Honor.  Alan Weigel for

16   Marine Spill Response Corporation.

17          MS. ALEXANDER:  Good morning, Your Honor.

18   Mary Rose Alexander for Nalco.

19          MR. HEIDEN:  Good morning, Judge.  Tom Heiden for

20   Nalco.

21          MS. KUCHLER:  Deb Kuchler, Anadarko.

22          MS. KIRBY:  Ky Kirby, Anadarko.

23          MR. TANNER:  Good morning, Your Honor.  Hugh Tanner for

24   M-I.

25          MR. FUNDERBURK:  Good morning, Your Honor.

1    John Funderburk for M-I.

2         MR. GASAWAY:  Good morning, Your Honor.  Rob Gasaway

3    for BP.

4         THE COURT:  All right.  Did I get everyone?

5              All right.  Since we were here last time, which

6    has been a few months now, the Court has issued a number of

7    orders.  Of course, we have a so-called Second Amended Pretrial

8    Order Number 41, which is Case Management Order Number 4, which

9    outlines the revised trial plan for the limitation trial now

10   scheduled for January 14, 2013.

11             We've also established a special docket for the

12   filing of any objections to the proposed settlements.

13             We've issued an Order on June 12th calling for

14   motions and briefs on certain pending issues, particularly the

15   so-called stigma claims, the BP dealer claims, recreation

16   claims.

17             At my request, Judge Shushan has put in place a

18   scheduling order for some limited discovery on the claims by

19   the Mexican States, so we can hopefully tee those claims up

20   soon, also.

21             The Court, on June 15, issued an Order Setting

22   Caps on Individual Attorney's Fees in connection with the class

23   action settlements.

24             On June 26th, we appointed an appellate panel

25   to handle any appeals from the claims administrator decisions

1   with respect to the two settlements.

2              We do have our phone conference working.  I

3   forgot to mention that we do have people, again, who are

4   listening by phone.  They can't speak.  It's on listen-only

5   mode.  So those of you, whoever wants to speak, you need to get

6   up to a microphone so whoever is on the phone can hear.

7              At this time, I would like to go through the

8   status report, first of all, on the Conditional Transfer

9   Orders.

10             Mr. Langan, is that you?

11       MR. LANGAN:  Your Honor, on the JPML status, since the

12  last time we were before you, 15 more Conditional Transfer

13  Orders have been entered by the Panel covering 44 cases.

14             By our count, there are now about 733 cases

15  that have either been filed here originally or transferred here

16  by the Panel.  Taking account of dismissals, we think there are

17  about 614 active cases.

18             Of course, separate and apart from the

19  individual case filings, there are about 118,000 short form

20  joinders that have been filed here.

21             The Panel has recently issued several orders,

22  almost all of which reject objection to transfer and confirm

23  the sending of cases here.

24             As detailed in the written status report that

25  liaison counsel filed, there are a few remaining issues to be

1  decided by the Panel.  Their next hearing is July 26.

2              I think we have some more detail in our written

3  report.  I'm happy to take any questions as well.

4         THE COURT:  Refresh my recollection.  There are one or

5  two types of cases that the Panel has decided not to send here?

6         MR. LANGAN:  Yes.

7         THE COURT:  What are those, again?

8         MR. LANGAN:  Going on recollection here, there are some

9  disputes, for instance, about intellectual property claims.

10  There have been a handful of cases around the country where

11  people made claims that they had an idea about capping the well

12  or whatever.  The Panel has tended not to send those cases

13  here.

14         THE COURT:  I think we had one or two of those actually

15  filed here.

16         MR. LANGAN:  Yes.

17         THE COURT:  In fact, I think I dismissed one.

18         MR. LANGAN:  Yes.

19         THE COURT:  It's on appeal.

20              But those that are filed elsewhere are not

21  being transferred?

22         MR. LANGAN:  Correct.  I believe we have some

23  employment-type disputes, overtime-type disputes for response

24  workers and stuff, that have not tended to be transferred.

25              I think there are some miscellaneous vendor

1  disputes, people that claim there is a breach of contract

2  relating to purchasing boom or selling boom.  A handful of

3  those cases have not been transferred as well.

4         THE COURT:  To the extent we had a number of those

5  cases like that filed here, those are the types of cases, I

6  believe, that I have sent over to Judge Wilkinson.

7         MR. LANGAN:  You severed a few of those and sent them.

8  There are some pending in other districts, as well.

9         THE COURT:  Yes.  But he reported to me recently that

10  he has been very successful in getting a number of those

11  resolved.

12         MR. LANGAN:  Yes.

13         THE COURT:  Those are miscellaneous contract cases.  I

14  think those are the primary ones that he's been able to

15  resolve.

16              I know he has some of these FLSA cases, too.

17         MR. LANGAN:  Correct.

18         THE COURT:  I'm not sure of the status of those, but

19  I've allowed him to take those and run with them.  The parties

20  in those have generally consented to allow him to handle the

21  case all way through it.

22         MR. LANGAN:  Yes.

23         THE COURT:  Good.  Thank you.

24              Does anybody have anything else to comment with

25  respect to that issue?

1           The next issue is the MDL 2185 -- no, I'm

2   sorry, State Court Cases.

3           MR. LANGAN:  Your Honor, we think there are about 47 of

4   those in various state courts, primarily Texas and Louisiana.

5   Again, these are approximate counts.

6           Of those 47, about 21 are personal injury

7   cases, of which 20 involve alleged injuries to response

8   workers, 19 of which involve claims of loss of revenue, loss of

9   income, that kind of thing.

10          As I mentioned earlier to you today, Your

11  Honor, we had four settings in Texas state court, primarily

12  Harris and Galveston Counties, that had been set for trial in

13  2012.  Happy to report that four of those cases have been

14  resolved, and they are in the process of being dismissed.

15          We do have one 2012 trial setting in

16  Harris County in a case called *McCormick*, which is set for a

17  December 23rd trial; but, again, it involves a response worker.

18  It doesn't really involve issues about responsibility for loss

19  of well control and that sort of thing.

20          THE COURT:  All right.  Very well.  Are there any other

21  issues that we need to be concerned about at this time with

22  regard to coordinating discovery with the state court cases?

23          MR. LANGAN:  No issues, Your Honor.  I think that's

24  gone pretty well.

25          We generally make our discovery available when

1    it's asked for.  No issues have really percolated up and need

2    court intervention at this point.

3              THE COURT:  Great.

4                   Anybody else need to comment on anything

5    regarding the state cases?

6                   If not, we'll move on to the status of MDL

7    2185.

8              MR. LANGAN:  Yes, Your Honor.

9                   In addition to the written report, I just

10   wanted to hit a couple of highlights here.  As you know, this

11   is in the Southern District of Texas.  Judge Ellison is

12   managing 2185.  There are a couple of different pieces to it,

13   you will recall.

14                   In the securities litigation, Judge Ellison

15   issued a motion to dismiss a ruling earlier this year

16   dismissing in part and denying in part the motion to dismiss --

17   granting in part and denying in part.  That was followed by the

18   filing of a second amended consolidated complaint.

19                   There is a renewed motion to dismiss that's

20   been filed by the defendants, including BP, in that matter.  I

21   don't know if there will be argument or not, but that's now

22   fully briefed.

23                   In addition, since April of this year, six

24   additional securities cases have been filed, which are

25   generally in the process of being transferred to Judge Ellison.

1    He'll deal with them when they get there.

2              I guess there are also some remand motions that

3    have been contested, remand to state court, as well.

4              In the derivative case, that part of 2185,

5    you'll recall that, I think, in 2011, Judge Ellison dismissed

6    it for forum non conveniens.  That dismissal of the case is

7    being appealed to the Fifth Circuit, and that's being briefed

8    now.  So there is an appeal going on about the dismissal of the

9    derivative case.

10             In the case involving claims about breach of

11   the ERISA statute, Judge Ellison issued an order on March 30th

12   dismissing those claims, and the plaintiffs are seeking to file

13   an amended complaint.  Their motion for leave to file the

14   amended complaint is currently being briefed.

15             Then, last, there was a case about BP PLC's

16   failure to pay a dividend back in June of 2010 and a challenge

17   to that.  Judge Ellison recently issued an order dismissing the

18   case against BP PLC for lack of jurisdiction in Oregon about

19   that.

20             So that's basically where things stand in 2185.

21        THE COURT:  To the extent there has been discovery

22   relating to those cases, you all have continued to coordinate

23   with them?

24        MR. LANGAN:  Yes, Your Honor, we have, where it's

25   appropriate.  Primarily, in the securities case, it's an issue.

1    The other cases, it's really not.

2              THE COURT:  Right.  Okay, good.  Thank you.

3                   Anybody here have anything else to add with

4    respect to the MDL 2185 before Judge Ellison?

5                   The next matter is discovery, written and

6    deposition discovery status.

7              MR. HAYCRAFT:  Yes, Your Honor.

8                   As the Court knows, discovery in Phase One is

9    essentially closed, with a few limited exceptions.  The effort

10   this summer --

11             THE COURT:  You'd better identify yourself for the

12   record.

13             MR. HAYCRAFT:  Don Haycraft with BP.

14             THE COURT:  Thank you.

15             MR. HAYCRAFT:  With certain limited exceptions.

16                  What this summer has been spent doing is

17   Phase Two written discovery, resolution by Magistrate

18   Judge Shushan of numerous privilege issues, mostly between the

19   United States and BP.

20                  The deposition schedule is being filled in at

21   recent status conferences, with a series of 30(b)(6) deposition

22   notices being negotiated by the parties, and will be submitted

23   to the Court.  Then, deposition discovery will largely start on

24   September 10th and go through the fall.

25                  So, with the help of Magistrate Judge Shushan,

1     Phase Two discovery is well in hand.

2         THE COURT: She told me -- in fact, that's why she's

3     not here, but I know she's listening, so she said I shouldn't

4     say anything bad about her. I said, unless it's the truth, I

5     won't say anything bad about you.

6         But she has been hold up, I know, almost

7     incommunicado there, dealing with a mountain of privilege

8     issues. I think that's primarily between BP and the

9     government, right?

10         MR. HAYCRAFT: That's right, Judge.

11         THE COURT: So even though she's not here, she's

12     working.

13         MR. HAYCRAFT: We certainly know that.

14         THE COURT: So we said something good about her.

15         Does anyone else have anything to say about

16     discovery depositions? If not, we'll move on to the status of

17     the insurance coverage cases.

18         MR. LANGAN: Your Honor, just briefly, in the

19     declaratory judgment actions back in March, you entered

20     a 54(b) order resolving partial final judgment on the scope of

21     BP's pollution coverage rights.

22         BP is appealing that judgment. We filed our

23     brief before the Fifth Circuit on May 7th. The carriers and TO

24     filed their briefs on July 11th, so I guess the briefing

25     process is going to continue.

1           Then, in the meantime, you'll recall the

2    interpleader actions.  After a lot of work by Judge Shushan,

3    there was a resolution reached about access to funds there.

4           An agreement was reached.  There are still some

5    disputes that Judge Shushan has to resolve, and I believe those

6    are fully briefed and pending before her.

7           THE COURT:  Very well.  Thank you.

8           Anybody else here to say anything on the

9    insurance issues?

10          BOP testing must be exhausted by now, right?

11   There can't possibly be anything more you guys can do with this

12   BOP, right?

13          MR. GASAWAY:  Your Honor, the BOP, I'm happy to report,

14   is continuing to be an item of interest, along with the capping

15   stack and the riser and various other items of equipment that

16   are out there at Michoud.

17          THE COURT:  Identify yourself.

18          MR. GASAWAY:  This is Rob Gasaway for BP, Your Honor.

19          Testing of the physical evidence has continued

20   on throughout the summer, again, not just the BOP, looking back

21   into the wellbore cavity of the BOP, but also the capping stack

22   and other components.

23          It's focused mainly on getting precise laser

24   scans and measurements using an instrument called a

25   profilometer.

1            I'm happy to report that all of that work is

2   being undertaken on government property at Michoud under the

3   supervision of the Court's Special Master, Captain Englebert,

4   and according to protocols that have been approved by

5   Judge Shushan, with results that are being shared by all

6   parties.

7            So we continue to go forward and test physical

8   evidence in a very cooperative and collaborative way under the

9   supervision of the Court.

10           THE COURT:  Well, I understand you all are just going

11  out there and having barbecues.

12           MR. GASAWAY:  We did have a barbecue or two.

13           THE COURT:  But you really are still doing some work?

14           MR. GASAWAY:  We are, in addition to our barbecues.

15           THE COURT:  Captain Englebert is still in charge of

16  that, in charge of the custody of the BOP?

17           MR. GASAWAY:  That's correct, Your Honor.

18           THE COURT:  Very well.

19           Does anyone else have anything to say about the

20  BOP?

21           We're on status of the settlements, the PSC/BP

22  settlements.

23           MR. ROY:  Your Honor, Jim Roy for the PSC.

24           The settlement continues to be implemented.

25  BP's teams of lawyers and the PSC's settlement teams are

1    meeting virtually daily, interfacing with Mr. Juneau's claims

2    administrator office and the claims vendors to hopefully

3    implement what will continue to be a largely seamless operation

4    as it gets up and running.

5              Mr. Juneau has advised that the first checks

6    will likely start being issued by the end of this month.  The

7    technical side is onstream.  The personnel are trained.

8              As a collateral issue, the PSC has notified

9    tens of thousands of lawyers and CPA's across the entire

10   Gulf South of free lawyer and CPA seminars, which the PSC

11   sponsored and conducted in eight different locations, which,

12   together with its initial -- the ninth seminar, which was the

13   initial one for common benefit lawyers, we've actually

14   conducted a seminar for close to two thousand CPAs and lawyers

15   to actually give them a detailed orientation of the settlement

16   agreement and whatnot.

17             So things are progressing.  The settlement

18   agreement, while several inches thick and contemplating great

19   detail and precision so it could be transparent and objective

20   as possible, nevertheless could not contemplate all issues.

21   There are some things that have to get worked out as these

22   issues come up.  So that pretty much deals with it.

23             Mr. Juneau's operation is running on several

24   floors, with the vendors at the Exchange Place building, corner

25   of O'Keefe and Gravier.  Class counsel has relocated its

 1    operation there.  Things are going well.

 2         THE COURT:  Yes, I had the opportunity to meet with

 3    Mr. Juneau the other day, and he sort of brought me up to date.

 4              I frankly was not aware of the full scope of

 5    what's in place there.  I haven't visited his operation, nor do

 6    I intend to do that; but, he tells me that they are spread over

 7    four different floors in that building with hundreds, I think,

 8    three hundred people or something like that.

 9         MR. ROY:  It's a massive operation.

10         THE COURT:  Yes.  So they've consolidated a lot of what

11    was spread out in different places.  Most of it is all here in

12    New Orleans now.  I know there is a -- what's the facility, an

13    intake facility in Hammond?

14         MR. ROY:  Yes, sir.

15         THE COURT:  That's up and running, also.

16         MR. ROY:  Then he's got satellite offices all across

17    the Gulf that he just got back from a tour, if you will, going

18    to orient the staff at each of those facilities, as well as

19    speak with local civic leaders and whatnot.

20              He reports to us and to BP that response has

21    been absolutely incredible.  They like the theme of

22    independence.  They like the theme of objectivity.  They like

23    the theme of transparency.

24         THE COURT:  We're still on track.  As I recall, and I'm

25    looking at my notes here, the upcoming deadlines that are in

1    place are any objections are to be filed by August 31st,

2    opt-out date is October 1st, and the Court will conduct its

3    final fairness hearing on November 8th.

4           MR. ROY:  Correct, Your Honor.

5           THE COURT:  Very well.  Thank you.

6                  Anybody else have anything to say with regard

7    to those matters?

8                  The next matter on the agenda is Potential

9    Consideration of Motions to Remand.

10                 Mr. Herman.

11          MR. HERMAN:  Yes, Your Honor, Steve Herman for the

12   plaintiffs.

13                 I'm not sure if they are in the courtroom, but

14   Mr. Lubel had asked us to put this on the Court's agenda.  I'll

15   let him speak for himself.

16          MR. LUBEL:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. LUBEL:  I represent Buddy Trahan.

19          THE COURT:  Identify yourself.

20          MR. LUBEL:  Lance Lubel, L-U-B-E-L.

21                 Judge, Mr. Trahan's reported to be the most

22   seriously injured victim aboard the *Deepwater Horizon* that

23   survived the accident.

24          THE COURT:  Who was he employed by?

25          MR. LUBEL:  One of the Transocean entities.

 1                   He has not made any claim in limitation, unlike

 2     many of the other survivors and personal injury victims.  His

 3     Motion to Remand has been pending for in excess of a year.

 4          THE COURT:  What are you trying to accomplish with your

 5     Motion to Remand?

 6          MR. LUBEL:  We're just trying to get back to state

 7     court.

 8          THE COURT:  You realize your claim would be stayed

 9     there; you couldn't pursue it?

10          MR. LUBEL:  We don't have any stay, Judge, against the

11     entities that we've sued.  We have not sued any of the

12     Transocean entities.

13          THE COURT:  He was employed by Transocean, but you

14     haven't sued Transocean?

15          MR. LUBEL:  That's correct.  He's making general

16     maritime claims.

17          THE COURT:  That's pretty interesting, Mr. Lubel.  I

18     have got a feeling that if you try to pursue that, Transocean

19     is going to be wrapped up into that by the other parties you

20     have sued.

21                   It can't be that Transocean is not involved in

22     your case.

23          MR. LUBEL:  They are not a party to our case, Judge.

24          THE COURT:  They will be a party, I can promise you.

25     He's a Jones Act seaman?

1      MR. LUBEL:  I don't believe he is under the current

2  state of the law.  He's making general maritime claims.

3      THE COURT:  What was his job?

4      MR. LUBEL:  Was the operations asset manager for

5  Transocean.  He was not --

6      THE COURT:  He wasn't a regular crew member?

7      MR. LUBEL:  That's correct.

8      THE COURT:  He just happened to be out on the rig?

9      MR. LUBEL:  Pretty much.  He accompanied the two BP

10  executives on the helicopter that day.  He's unique compared to

11  the rest of the plaintiffs.

12      THE COURT:  So what would you plan to do when you got

13  back to state court?

14      MR. LUBEL:  Hopefully get a trial setting and get the

15  case resolved, like the other victims.

16      THE COURT:  You're going to try the same case we're

17  going to be trying here in January?

18      MR. LUBEL:  I don't believe so.

19      THE COURT:  Who have you sued?

20      MR. LUBEL:  We've sued several BP entities.

21      THE COURT:  They're a part of the trial in January.

22      MR. LUBEL:  Halliburton.

23      THE COURT:  They're part of the trial in January.

24      MR. LUBEL:  Cameron.

25      THE COURT:  They're part of the trial in January.

1          MR. LUBEL:  Pretty much, the typical --

2          THE COURT:  It's going to be the same issues.  It's

3     going to be the same evidence, same issues.

4          MR. LUBEL:  I think the case will be more about

5     Buddy Trahan.

6          THE COURT:  Have you taken discovery in state court?

7          MR. LUBEL:  We have been improperly removed to your

8     Court.

9          THE COURT:  What are you going to use for the discovery

10    and evidence?

11         MR. LUBEL:  Well, there has been a plethora of

12    discovery done.

13         THE COURT:  In this case, in this Court.

14         MR. LUBEL:  That's right.

15         THE COURT:  So you're planning on using that?

16         MR. LUBEL:  We'd prefer to do our own discovery.

17         THE COURT:  So you want to repeat all the discovery

18    that's been done?

19         MR. LUBEL:  I don't think we want to repeat it all.  I

20    think you've actually had discussions with the judges in

21    Harris County, Texas, and they've been able to work out --

22         THE COURT:  I certainly have.  Who is the judge in your

23    case there?

24         MR. LUBEL:  Judge Gamble.

25         THE COURT:  Gamble.

 1          MR. LUBEL:  I think we occupy a unique position.

 2          THE COURT:  It doesn't sound that unique to me.

 3                   I'm not trying to make light of your case.

 4   Your client apparently has a very serious injury.  I'm not

 5   making light of that at all.

 6                   It seems to me, as a very practical matter,

 7   your motion is not going to gain you anything.  That's the main

 8   point.  You're going to be stayed when you go back to state

 9   court, so.

10          MR. LUBEL:  We don't think the stay applies,

11   Your Honor.

12          THE COURT:  Well, I'm the one that has to decide that,

13   not you.

14          MR. LUBEL:  Nobody has moved to stay the case.  If we

15   could get the remand --

16          THE COURT:  There is a stay order in place staying any

17   litigation against Transocean for sure.

18          MR. LUBEL:  But we're not suing Transocean.  We don't

19   intend to.

20          THE COURT:  But if they end up being a third party,

21   cross-defendant, anything, your case is stayed.

22          MR. LUBEL:  Actually, I think, Judge, that the recent

23   cases that I've seen suggest that the stay is not going to

24   apply to the non-ship owners.

25                   There is clearly a body of law or cases that

1    suggest that it will be applicable to insurers in a direct

2    action state; but, we're not suing insurers, and so our

3    defendants will not be, we do not believe, defendants subject

4    to the stay.

5            THE COURT:  All right.

6            MR. LUBEL:  If we could get the Motion to Remand ruled

7    on, and they seek to broaden the stay to encompass that claim,

8    we can ride that horse when we get there.  That's our position.

9            THE COURT:  Have you tried to settle Mr. Trahan's case?

10           MR. LUBEL:  We have.

11           THE COURT:  There have been a lot of settlement

12   opportunities.  In fact, most of the personal injury claims

13   have been settled, as I understand.

14           MR. LUBEL:  We have tried and --

15           THE COURT:  You had opportunities with the GCCF, with

16   Mr. Feinberg, with BP, mediation.  Have you asked for a

17   mediation with our Court?

18           MR. LUBEL:  We have not, Your Honor, but we do have a

19   mediation scheduled.

20           THE COURT:  We could help you with a mediation, if you

21   want that.

22           MR. LUBEL:  We believe that if we could actually get

23   back to state court, if the Court would rule on the remand,

24   that our case has the potential to reach full value, much like

25   the economic and property damage claims you settled.  They

1    settled right on the heels of a trial.

2                  So we feel like we'd benefit from the same

3    position, that is, if we get back to state court, we'll get it

4    set for trial.  I believe the trial will be after your January

5    trial.

6              THE COURT:  Okay.  I understand.

7              MR. LUBEL:  We appreciate your consideration.

8              THE COURT:  Thank you.

9              MR. LUBEL:  Thank you.

10             THE COURT:  Thank you very much.

11                  Does anyone else have anything to say on

12   remand?

13             MR. LANGAN:  Your Honor, just briefly.

14                  I understand what Mr. Lubel is saying, but I

15   think it's really a broader issue than that.  He's focused,

16   naturally, for his client, on the unique facts about Mr. Trahan

17   and his situation, and the fact that he wants leverage as

18   quickly as possible or whatever.

19                  The fact of the matter is, it is set for

20   mediation, at Judge Shushan's request.  But putting that aside,

21   if we go down the row of listening to individual pleas about

22   how their case is unique and different, and if you'll just

23   consider their motion to remand, there is no end to that.

24                  I, frankly, think Your Honor had the right

25   architecture in place early on, to put the remand motions

1    aside, and let the case mature and develop; let's get the

2    limitation trial behind us, and then we can take up these

3    individual questions.

4              Mr. Lubel and his client are not unique.  There

5    are other people similarly situated.  There will be no end, and

6    we'll, frankly, end up being mischievous and sort of unwind the

7    case management that Your Honor has worked so hard to preserve.

8    So that's why we're a little bit resistant to what he's

9    suggesting.

10             In the meantime, we're happy to engage, and I'm

11   sure Transocean is too, in court ordered mediation or court

12   supervised mediation.

13        THE COURT:  All right.  Thank you.

14        MR. ITKIN:  Your Honor, may I approach?

15        THE COURT:  Come forward.

16        MR. ITKIN:  Thank you.

17             Cory Itkin, on behalf of the Burkeen family.

18   He's one of the wrongful death cases.

19        THE COURT:  I'm familiar with the case.

20        MR. ITKIN:  I appreciate everything you just said and

21   have an idea of what your thought is.

22             I was wondering, though --

23        THE COURT:  Your client has sued Transocean?

24        MR. ITKIN:  Has sued Transocean, both in limitation --

25        THE COURT:  Right.

1          MR. ITKIN:  -- and in state court prior to the
2     limitation stay.
3                The state court case, which was removed, which
4     is obviously a different civil action than the limitation
5     cases, has remand pending.  Obviously, if it is remanded prior
6     to the limitation trial, the case against Transocean would be
7     stayed.  We would expect it to be severed out and try to
8     proceed, if possible, against the other third parties.
9                I understand what you're saying about you don't
10    seem likely to do that at any time in the near future; but, my
11    real question is, do you have any sense of when you may ever
12    rule on those motions to remand?  Would it be after the
13    limitation trial, before?
14         THE COURT:  It will certainly have to be after the
15    limitation trial.
16         MR. ITKIN:  After the limitation trial?
17         THE COURT:  That's all I can tell you right now.  Yes.
18    I haven't thought beyond that right now, Mr. Itkin.
19                I understand your situation.  I'm sympathetic
20    to it.  But I have to agree with Mr. Langan that, in the
21    current posture of this case, it just doesn't make sense for me
22    to do what you're asking me to do at this time.
23         MR. ITKIN:  Sure.  I understand.  Respectfully, we
24    obviously --
25         THE COURT:  Right.

1        MR. ITKIN:  -- are going to do what the Court tells us

2   to.

3            I was thinking, though, about Mr. Lubel's

4   client.  I obviously don't speak on behalf of him.  I don't

5   know how anyone can crossclaim against them -- against

6   Transocean while your injunction is in place or Judge Ellison's

7   injunction is in place.  It may not make a difference in your

8   analysis, but it was just something I was thinking back there.

9            Thank you, Your Honor.

10       THE COURT:  Thank you.

11       MR. ITKIN:  May I be excused?

12       THE COURT:  Sure.  Thank you.

13            Anybody else?

14            Number 9 on the agenda this morning is

15  Management of Claims Not Resolved by Settlement, Summary

16  Judgment or Stipulation.  Who is going to speak to that?

17            Mr. Langan.

18       MR. LANGAN:  Your Honor, I believe it was June 11th,

19  you issued an order to start addressing and having the parties

20  address unresolved claims that would be unresolved by the

21  settlement between BP and PSC, if and when it's approved.

22            This was following briefing by the parties.

23  Then, I think you've outlined some legal issues you want

24  briefed.

25            The parties are in the process of complying

1   with that order.  We filed some briefs on July 11th.  I know

2   Transocean, Halliburton and Cameron have also filed briefs.

3                    The three issues that are currently briefed

4   have to do with claims by BP branded dealers who are alleging

5   sort of loss of value following the spill, claims by so-called

6   recreational plaintiffs who are claiming the loss of the

7   opportunity to hunt and fish in the wake of the spill, and

8   then, finally, so-called pure stigma real estate claims.

9                    So we think each of those claims ought to be

10  dismissed as a matter of law.  I'm sure the PSC and the

11  plaintiffs have a different view.  They'll be briefed, and

12  Your Honor will decide them.

13                   So we have those three sets of briefs.

14                   In addition, Your Honor has set up a mechanism

15  for Judge Shushan to manage limited discovery related to the

16  three Mexican States that have claims pending in this MDL.

17                   There will be limited discovery about whether

18  or not their claims are legally cognizable, whether or not oil

19  touched their proprietary interest.

20                   After that limited discovery, presumably there

21  will be motion practice related to that.  That will be decided,

22  I think, sometime this fall, as well.  So I think that's what

23  the nature of this agenda item relates to.

24        THE COURT:  My notes here say that tentatively, at

25  least, if the Court entertains oral argument on these, the

1    first three categories you talked about, we've tentatively

2    scheduled that for the September status conference.

3            MR. LANGAN:  Right.  It should be fully briefed well in

4    advance of that.

5            THE COURT:  Great.  Thank you very much.

6                  Anyone else need to speak to any of those

7    issues?

8                  I guess we are down to the pending motions that

9    are on the agenda.

10                 The first group we don't need oral argument on.

11    There are multiple pending motions to file late short form

12    joinders in the limitation.

13                 Mr. Miller, am I correct that there is no

14    opposition from Transocean to those?

15            MR. MILLER:  Kerry Miller on behalf of Transocean.

16                 Yes, Your Honor, with respect to the motions to

17    file short form joinders after monition date set forth under

18    Item 10 on your agenda, Transocean does not oppose the Court

19    granting those motions.

20            THE COURT:  Is there any opposition by any other party?

21                 All right.  Hearing none, I will grant those

22    motions that are listed, multiple motions to file short form

23    joinders after the monition date, listed on the agenda as 10a.

24                 Does anybody have anything else before we move

25    on to the two oral arguments?

1                  Let's take up the Liberty Mutual motion,

2     Liberty Mutual versus Cameron.

3                  MS. BARRASSO:  Good morning, Judge, Judy Barrasso for

4     Liberty Mutual.

5                  THE COURT:  Good morning.

6                  MS. BARRASSO:  Chris Martin is going to argue the

7     motion on behalf of Liberty.

8                  THE COURT:  Okay.  Very well.

9                  MR. WITTMANN:  Good morning, Your Honor.  Phil Wittmann

10    on behalf of Cameron.

11                 Mitchell Auslander will be arguing for us this

12    morning.

13                 THE COURT:  Very well.

14                 This is, as I said, Liberty Insurance Underwriters

15    Inc.'s Rule 12(c) Motion for Judgment on the Pleadings.  It's

16    Record Document 6531.  This is in Member Case 12-311.

17                 All right, Mr. Martin.

18                 MR. MARTIN:  Thank you, Your Honor.  We've moved for

19    judgment on the pleadings because the unique language of

20    Liberty's policy has not been triggered, it has not attached,

21    because of the other insurance clause in the policy with

22    respect to Cameron's indemnities.

23                 We've moved for judgment on the pleadings

24    because Cameron's waiver of its claims against third parties

25    barred our subrogation rights.

1           We've moved for judgment on the pleadings

2   because our policy specifically precludes any defense

3   obligation for Cameron's defense costs or legal fees.

4           Fourth, we've moved for judgment on the

5   pleadings because the bad faith claims under either Texas law

6   or Louisiana law don't exist as a matter of law.

7           With respect to the unique policy language on

8   what I call the trigger or the attachment issue, our policy

9   language is very, very, very unique.  It's unlike any other

10   insurance company in the Cameron tower.

11           As we indicated in the briefing, as I've got up

12   on the screen, it indicates, "If other insurance applies to a

13   loss that is covered by the policy, this policy will apply in

14   excess of such other insurance," meaning it does not attach.

15           The key language is down below it, and I've

16   highlighted it, and we indicate in our briefing that, "Other

17   insurance includes any other type of indemnification or other

18   mechanism by which any other insured arranges for the funding

19   of legal liabilities."

20           That's significant because the Fifth Circuit in

21   the *RSR* case indicated that other insurance only has to exist.

22   It doesn't have to be actually collected.  They don't have to

23   have some kind of affirmative finding or legal motion.  It just

24   simply has to exist.

25           Our policy language that I just showed you on

1    the screen indicates that if other insurance applies, then we

2    don't attach.  We don't trigger.  So it's very, very

3    significant.

4         THE COURT:  Is there definition in the policy of

5    "applies"?

6         MR. MARTIN:  There is not, but the standard definition

7    of "applies" is, as we've indicated here in our briefing,

8    consistent with *RSR*'s definition of "existence."

9         THE COURT:  What are you suggesting, that there would

10   have to be a final judicial determination that Cameron was or

11   was not entitled to indemnity from Transocean?

12        MR. MARTIN:  Possibly, but not necessarily.  The only

13   thing that's required is that Cameron take a position, a

14   consistent position, and stick with it; because if,

15   hypothetically, they had told us they don't have indemnities or

16   don't have valid indemnities, then my client could have done

17   what the Texas Supreme Court has encouraged them to do and file

18   a declaratory judgment action to do what you just indicated.

19             Here, Cameron did the exact opposite.  They

20   came to you and filed legal motions in November saying they had

21   valid indemnities.  So my client agreed with them and assumed

22   they were going to pursue that.

23             But then, on December 16th, when that motion

24   was set for hearing, they came to you and withdrew and

25   dismissed that motion.  What killed my client was, the prior

1    day, they waived their claims against Transocean and BP, so my

2    client couldn't settle, couldn't fund, couldn't do anything but

3    then step into their shoes and pursue their subrogation rights

4    against third parties.

5                So the existence of that other insurance clause

6    is critical, and it was devastating to my client's exercise of

7    its rights when their settlement agreement barred my client's

8    ability to go get the legal question answered that you just

9    identified.

10               So, for that reason, the Fifth Circuit has said

11   it's an attachment issue.  It's a question of trigger, and it's

12   a condition precedent.  The *RSR* said it's a condition

13   precedent.  It's not an exclusion that we've raised; it's not a

14   limitation; it's a condition precedent to coverage, which is

15   why we filed this as a 12(c) motion.

16               So, as a condition precedent to coverage, they

17   have the obligation to show exhaustion.  They had the

18   obligation to pursue the indemnity argument.  When they chose

19   to waive that motion, when they chose to dismiss and release

20   their claims against third parties, it extinguished my client's

21   insurance obligations.

22               The second thing that's related to that is,

23   independently, that waiver of subrogation constitutes a

24   forfeiture under the policy.  As a result, we don't think our

25   client, once again, has been triggered because the underlying

1    policy to which it follows form says that they cannot impair

2    rights of subrogation.

3              My client's policy specifically indicates that

4    they have to assist with the enforcement of any rights against

5    third parties, which include indemnity.

6         THE COURT:  The right of subrogation assumes that they

7    had a valid, a viable indemnity claim against Transocean?

8         MR. MARTIN:  Absolutely.  But my point is that my

9    client lost the ability to pursue that because my client could

10   have pursued it; and, if, in fact, it lost that, then the

11   attachment would have been clear.  But because it lost the

12   ability to preserve that, there was no attachment, and there

13   can be no attachment now because they made the business

14   decision at that point in time not to pursue those motions, but

15   instead to settle.

16        THE COURT:  So here is the practical problem, as I see

17   it.  What you're suggesting would put Cameron in quite a

18   quandary there, because it seems to me that they made a

19   decision, as you say, a business decision before I ruled on

20   their pending motion on the indemnity issue, that it was in

21   their best interest to strike what they considered a better

22   deal at that point on the settlement with BP, rather than

23   pursue that all the way, and, if they lost on that indemnity

24   issue, the cost to them would have apparently been

25   substantially higher, and it would have weakened their

1      bargaining position in a settlement with BP.

2                      So what is your insured supposed to do in this

3      situation here?

4              MR. MARTIN:  It's very simple.  Number one --

5              THE COURT:  I'm trying to understand, putting aside

6      your legal argument, the practical effect of what you're

7      suggesting.

8              MR. MARTIN:  Very simple, Your Honor.  Number one, let

9      Cameron or any other insured take a position and stick with it.

10     If they had told my client at any point prior to the

11     settlement --

12             THE COURT:  Wait, people take positions and change

13     positions all the time, or take a position and find out maybe

14     their position isn't as strong as they thought it might be or

15     wished it was, and they resolve in compromise settlement.  That

16     happens all the time.

17             MR. MARTIN:  Sure, but my point is the timing precluded

18     my client from filing a declaratory judgment action to have

19     those legal issues resolved that wouldn't have hurt Cameron,

20     wouldn't have been prejudicial to Cameron, but would have

21     helped us resolve the insurance issue.

22                     But, second, and more importantly, is the

23     waiver of the subrogation rights.  Because even if they, as you

24     say, had the right to change position and flip-flop, that may

25     be fine as long as my client could then say, fine, let us

1    pursue those rights, let us pay your settlement, let us exhaust

2    our insurance limits; but, then my client could have pursued

3    that money back from the entities through the indemnity

4    agreements.

5         THE COURT:  What would be the effect if I, as part of

6    my ruling in this case -- would I not have to decide whether,

7    in fact, there was a valid indemnity obligation, whether

8    Transocean owed Cameron indemnity under their contract?

9         MR. MARTIN:  Well, you don't now because of their

10   withdrawal of the motion and their settlement of the case.

11        THE COURT:  So, as part of your case, it seems like I

12   would have to decide that.

13        MR. MARTIN:  Well, we've not briefed those arguments

14   because the resolution of those issues is now moot.  Because of

15   the waiver of subrogation, there is no reason to resolve those

16   issues because my client can no longer pursue those rights.

17        THE COURT:  What would be the next step if I don't

18   agree with your primary argument here, and I deny your motion

19   for judgment on the pleadings; where would we go with this

20   case?

21        MR. MARTIN:  Well, we think we're still entitled to

22   judgment on the defense costs and the bad faith issue.

23        THE COURT:  Put that aside for now.  Just the primary

24   coverage.

25        MR. MARTIN:  On that issue, then we would presumably

1    evaluate whether or not a Rule 56 motion would be appropriate.

2         THE COURT:  Wouldn't either a motion for summary

3    judgment or a trial of some sort involve the Court, me, having

4    to decide what I would have had to decide when Cameron was

5    pursuing their indemnity issue, that is, whether their contract

6    really allowed them to get indemnity?

7         MR. MARTIN:  I don't believe so, Your Honor, because

8    the Fifth Circuit said the standard is existence.  If other

9    insurance exists --

10        THE COURT:  But it wouldn't exist if there was no

11   valid -- that's the whole point.  It seems like you're begging

12   the question there.  If there was no valid indemnity

13   obligation, then it didn't exist.

14        MR. MARTIN:  Your Honor, the key is whether or not,

15   using your language, the other insurance clause requires valid

16   collectable insurance.

17        THE COURT:  No.

18        MR. MARTIN:  A lot of the case law uses that language.

19   Ours doesn't.  The case law merely indicates that it has to

20   exist.

21        THE COURT:  It seems to me, for something to apply, it

22   has to exist, it has to be valid.  If it doesn't apply -- if

23   it's not an enforceable, valid indemnity agreement, then it

24   doesn't apply.

25        MR. MARTIN:  We totally agree that should have been

1    pursued either in our declaratory judgment action, if we could

2    have brought it, or by way of subrogation if they hadn't

3    released it; but, because of the choices they've made, that

4    door is closed.  It's not a necessary inquiry because of the

5    choices they made.

6              When they closed that door, it only requires

7    you to ask, has our policy attached.  Our policy, as an excess

8    insurance company on top of $103 million worth of insurance,

9    has simply not attached.

10             So you don't have to go through that exercise

11   to ask the question, have you attached?  It's their burden of

12   proof.  They have to show exhaustion, and they haven't shown

13   it.

14             The independent arguments we've raised separate

15   and apart from that, Your Honor, are also significant.  They

16   have sued us for defense costs.  Our policy specifically

17   defines loss as damages that they are legally obligated to pay.

18   It specifically excludes -- or says it does not apply to a

19   defense obligation, and the bad faith claims, as a matter of

20   law, don't exist.

21             Under Texas law, which we think clearly applies

22   here under this policy, our liability has to be reasonably

23   clear.  The fact we're arguing over this, and the fact that all

24   of these things took place with the indemnities means our

25   liability is not clear.  The statute they've sued us --

1          THE COURT:  Well, the fact that you're here arguing

2     over it doesn't mean it wasn't clear.  We get that all the

3     time.

4          MR. MARTIN:  Sure, but my point is --

5          THE COURT:  Otherwise, we would never have any bad

6     faith claims.

7          MR. MARTIN:  My point is, the unresolved nature of the

8     legal issues because of their settlement means our liability

9     has not become reasonably clear.

10          THE COURT:  I understand.

11          MR. MARTIN:  That statute also only applies to

12     third-party claims.  It does not apply to a first-party claim

13     for which they can sue us.

14               The Louisiana statute simply does not apply.

15     Even if they could argue Louisiana law applies, the statute

16     itself indicates that it's only ripe for third parties.

17               So, for those reasons, we've asked for judgment

18     on the pleadings.  I would ask if I could reserve three minutes

19     of my time for rebuttal.

20          THE COURT:  Sure.  Thank you very much.

21          MR. AUSLANDER:  May it please the Court,

22     Mitch Auslander for Cameron.

23               I can tell from the time we just spent that

24     Your Honor is very familiar with the issues in the brief, and

25     so I don't intend to go through all of that.

1          I do want to address myself primarily to the

2     issues raised in the reply brief, for which you don't have a

3     writing from us; but, I do want to preface it by saying that

4     this a breach of contract and a bad faith case, and it's a

5     Rule 12 motion.

6          We've pled the existence of a contract.  We've

7     pled that they breached the contract.  We've pled damages

8     resulting from that breach of the contract.  We've pled the

9     elements of a bad faith cause of action.  We've done that in

10    great detail.  That's all we need to do on the Rule 12 motion.

11         The arguments that we see in the papers from

12    Liberty and that we just heard, if anything -- although we

13    would say on a Rule 56 motion, that they are without merit and

14    there is no issue of fact, we ought to win on that, and we will

15    be back here on our own motion for summary judgment -- it's

16    just not for Rule 12.

17         That takes me right into their reply brief.

18    They spend a lot of time talking about who has the burden of

19    proving whether the other insurance attached or not.  The point

20    is they were arguing who has the burden of proof.  That is not

21    for a Rule 12 consideration here.

22         The case that Mr. Martin kept referring to,

23    *RSR*, which is distinguishable on other grounds, is a summary

24    judgment motion.  It is not a Rule 12 motion.

25         THE COURT:  Putting aside who has the burden of proof,

1    or who has the burden of persuasion or whatever, I would like

2    you to speak to his argument.

3              The primary argument and primary issue here is

4    the interpretation of this other insurance language --

5         MR. AUSLANDER:  Yes.

6         THE COURT:  -- which your opponent says is much broader

7    than most policies or many other policies.  It refers not just

8    to insurance policies, but indemnity claims.

9         MR. AUSLANDER:  Sure.

10        THE COURT:  And his argument that, subject to your

11   settlement and release of these claims, that you have

12   prejudiced their ability to pursue their claims for indemnity.

13        MR. AUSLANDER:  Sure, sure.

14             On the first point, first of all, in terms of

15   the interpretation of the word "applied," application, as

16   Your Honor, I think, used it, I start from the proposition that

17   that is not for a Rule 12 motion either.  That is something

18   that is normally resolved on Rule 56.

19             However, having said that, and when we're back

20   here, as I'm sure we will be on Rule 56 motion, I would say to

21   you that your interpretation that you were suggesting a few

22   moments ago is the correct one, that is, other insurance

23   doesn't apply if you don't have it.

24             In this case, it's not as though Cameron

25   ignored its obligations.  It certainly sought indemnification

1    from TO and fought for it pretty hard.  TO refused.

2              The fact of the matter is, other insurance did

3    not apply, and I think that is the only way that that word can

4    be reasonably interpreted.

5         THE COURT:  If I deny the Rule 12 motion, would I have

6    to decide the indemnity question, either by a Rule 56 motion or

7    by trial of some sort?

8         MR. AUSLANDER:  You would have to decide it only if you

9    were giving consideration to granting Liberty's summary

10   judgment.

11             We will be moving for summary judgment, and we

12   will tell you, you don't have to decide that because there is

13   an ambiguity in the term; and, under Texas law, that ambiguity

14   has to be resolved in our favor.  So to grant us summary

15   judgment, you would not have to make that determination.

16        THE COURT:  The ambiguity in the language as to what is

17   meant by "apply"?

18        MR. AUSLANDER:  Correct.  Correct.

19             In addition, you would not be able to determine

20   on a record that they could present whether TO would have been

21   able to pay under the indemnity if, in fact, Cameron were

22   forced to litigate it to the bitter end, as I think Liberty is

23   suggesting we had to do; and, even if Cameron won at the bitter

24   end and everything fell apart for TO -- and I'm not saying that

25   it will -- there is no assurance whatsoever that they would be

1    able to pay.

2                    They could be bankrupt.  In which case, Cameron

3    will have gone through years of litigation, maybe even won on

4    the indemnity, only to find out that TO can't pay, in which

5    case we're back to square one going back to Liberty.  That just

6    doesn't make any sense.

7         THE COURT:  Well, he says his policy doesn't include, I

8    think it's commonly called, valid and collectable insurance, or

9    something like that.

10        MR. AUSLANDER:  I understand that there are other forms

11   of words that can be used to accomplish what we consider to be

12   the same thing.

13                   That takes me back to the same point.  I think

14   "applied," if other insurance applies, it really has to be

15   there.  That is an ambiguity; but, not only does ambiguity have

16   to be resolved in our favor, Liberty put Cameron in an

17   unbelievably hard place, and Your Honor recognized that.

18                   This is not a situation where Cameron decided,

19   okay, we'll take a flyer at the TO indemnity, but, you know,

20   it's a good day to settle with BP, so we'll give that up.

21                   There was a decision that Cameron had to make

22   that the settlement had to be made, or Cameron could have been

23   liable for a great deal more money, I mean, potentially in the

24   billions of dollars.

25                   We did not exclude Liberty from that discussion

1    whatsoever, as I think was being suggested.  Their counsel was

2    the most active of all of the lawyers representing any of the

3    insurers in discussing what was going on with the BP settlement

4    and what could be agreed and what couldn't be agreed.

5            So this isn't like all of the cases where

6    somebody gets in a car accident, they make a settlement with

7    somebody and waive their subrogation rights, and they turn to

8    the insurance company and they say, we would like to have money

9    from you, and the insurance company says, well, you've waived

10   our subrogation rights.  That didn't happen here.

11           In this case, Liberty was directly involved,

12   there was no sneak attack on Liberty, and they chose to put

13   Cameron into this impossible position.

14           On a fuller record, I think that would

15   demonstrate, to the extent that you were resolving any

16   ambiguities and were taking into account facts relating to the

17   intent of the coverage and what happened in these particular

18   circumstances, would make it extremely difficult to say that

19   somehow Cameron has waived its rights.

20           Which brings me to the second point Your Honor

21   asked me about, which is they say that, well, sorry, by making

22   the deal with BP, you have given up your rights, you have

23   somehow forfeited our rights, and that's just too bad on you

24   now.

25           One, for the reasons I've said, for equitable

1   considerations and others, that just seems like an impossible

2   result.

3           But, more importantly, there are legal

4   principles that come into play here.  The Fifth Circuit, just

5   last May, in a case called -- excuse me one second --

6   *Continental Casualty v. North American*, 2012 WL 1941842,

7   Fifth Circuit, May 30, 2012, dealt with a situation where an

8   insured assigned its rights to insurance to somebody else; in

9   that case, to the plaintiff.

10           There was a partial settlement between the

11   plaintiff and the insured.  As part of that, the insured

12   assigned its rights to the plaintiff.

13           The plaintiff, nevertheless, sued the insured.

14   The insured had several insurance companies who defended it.

15   Then, once the underlying case was resolved, one of the

16   insurers sought to enforce its subrogation rights against the

17   others saying, we overpaid.

18           The argument came back, sorry, the insured has

19   assigned its rights away; therefore, the insurer who overpaid

20   is out of luck.

21           In this case, Liberty would say they overpaid,

22   and they were out of luck.

23           The Fifth Circuit said, "That the shoes of the

24   insured are purportedly empty of rights against the primary

25   carrier does not necessarily bar an excess insurer from

1    recovering under a theory of subrogation from the primary

2    carrier who should have paid its share of indemnity of defense.

3    The facts of each case must be considered."

4              So it is certainly not the case that in every

5    circumstance where a release is given of rights that could

6    therefore impact subrogation rights, that the insured loses.

7    The Fifth Circuit has said that just a couple of months ago.

8              I would suggest to you, Your Honor, that given

9    the rock and the hard place that Cameron was in because of

10   Liberty's behavior, it should not be the case, under the law or

11   in equity, that we cannot recover under our insurance policy.

12   We would still remain out $50 million.

13             In terms of the subrogation rights, there is

14   another legal concept that gets us there.  The issue of whether

15   subrogation rights are waived turns, in part, on the law of

16   whether those subrogation rights had any value whatsoever.

17   That's an issue that can't be resolved on a Rule 12 motion.

18             In the *Hernandez v. Gulf* case, 875 S.W.2d 691,

19   Texas Supreme Court, the Court specifically -- which is cited

20   in our brief, but not in response to this particular point,

21   because it was in the reply -- but the Court said that

22   subrogation rights -- it's not a material breach of a contract

23   to give up subrogation rights if the subrogation rights aren't

24   worth anything.

25             In this case, at the moment the subrogation

1    rights aren't worth anything because TO hasn't paid on the

2    indemnity; and, if TO ever does pay on the indemnity or is

3    ordered to pay on the indemnity, there is no way to tell

4    whether they will be able to do that.  So it is at least an

5    issue of fact as to whether the subrogation rights that they

6    say they can no longer enforce are worth anything.

7              So, one, under the *Continental* case, they have

8    subrogation rights, notwithstanding what Cameron did in its

9    agreement with BP; and, two, even if they didn't have

10   subrogation rights, they would still have to show that those

11   subrogation rights had some value.

12             Now, if I could just -- I know I'm going

13   long -- just address myself to the defense argument and the bad

14   faith argument.

15             Let me take the defense first.  It is certainly

16   true that Liberty's excess policy does not specifically include

17   defense costs in what they will pay for in terms of their

18   liability.  However, what Liberty has not pointed out is that

19   Liberty was part of a program of insurance, a tower of

20   insurance, in which they sat pretty much smack in the middle.

21             The policy wording that controls the tower is

22   written by a company called INIC, an old AIG company.  That

23   policy did provide for defense costs.

24             Now, it is true, also, that Liberty has a

25   separate policy; and, to the extent that the terms of that

1   policy are inconsistent with the underlying policy, they are

2   right when they say their policy language controls.  However --

3        THE COURT:  It seems inconsistent, doesn't it, because

4   your policy says they are not required to assume -- to defend

5   you; they may choose to at their expense, right?

6        MR. AUSLANDER:  They may choose to at their expense,

7   but, when you look down at the INIC policy -- the point I'm

8   trying to make is they don't exclude defense expenses.

9             That matters here because they are part of a

10  program.  Their policy must be read as part of a tower of

11  insurance.  If they had said, as they could have, that our

12  definition of loss excludes defense expenses, we might have a

13  different case, but it doesn't.

14       THE COURT:  Does it define loss as damages covered by

15  the first underlying policy?

16       MR. AUSLANDER:  No, but it covers whatever the first

17  underlying policy does to the extent that they are not

18  inconsistent with that.

19            What I'm saying is, while their definition of

20  loss doesn't include defense expenses, the underlying does, and

21  they didn't specifically exclude it.  Therefore, it's a

22  question of fact that can't be resolved on a Rule 12 motion as

23  to how those policy provisions interrelate.

24            They can't just point to their policy and say,

25  we're out on that, when they are part of a larger program that

1    is called an INIC following form program.

2          THE COURT:  I understand that, but, again, that depends

3    on whether there is anything that is inconsistent in their

4    policy as compared to the underlying policy.

5          MR. AUSLANDER:  I agree.  I would say to you on that,

6    Your Honor, if the underlying had said, we include it, and they

7    had said they exclude it, that would be inconsistent.

8               The underlying included it.  They said, our

9    definition lists X, Y and Z, and not A, which is defense

10   expenses.

11              They should have, since they were part of a

12   following form program, if they really wanted to exclude

13   defense expenses, excluded it.

14              Let me take that one step further, if I may.  I

15   know I'm going over, and I apologize for that.  This is why

16   it's not appropriate to decide this issue either on Rule 12.

17   This would emerge in discovery.

18              The way this program worked -- and this is,

19   obviously, just me speaking here because it is a Rule 12

20   motion -- the way this program worked is that there was what

21   they call a self-insured program which had policy language.

22   That provided for unlimited defense until that carrier paid its

23   full limit.  Then the obligation moved up to the next level.

24              The intent was whoever is the working layer may

25   not have a duty to defend the case, but it's not as though

1    Cameron should be left in the dark with no defense expenses.

2              As it moved up the tower, the working layer,

3    which is now Liberty, because everybody below paid, Liberty is

4    now responsible for the defense expenses, whether or not they

5    have a duty to defend, not based specifically on the wording of

6    their excess policy -- I agree with Mr. Martin on that -- but

7    because it's ambiguous as a result of it applying to the rest

8    of the program, we're entitled to show that as part of a

9    Rule 56.

10             THE COURT:  I understand your argument.  Thank you very

11   much.

12             MR. AUSLANDER:  Thank you, Your Honor.

13             THE COURT:  Mr. Martin, you have about one minute left.

14             MR. MARTIN:  Thank you, Your Honor.

15             Very, very briefly, the Fifth Circuit and the

16   Texas Supreme Court have held for 80 years that every term in a

17   policy has to have some meaning.  His interpretation completely

18   writes out our "other insurance" clause because if his position

19   is they said they wouldn't pay it, therefore it doesn't apply,

20   would mean the term could never apply in any situation if any

21   indemnitor objected or any other insurance company said, we're

22   not going to pay your claim.

23             The second point is that's why it's not

24   ambiguous.  I'm not aware of a court in the United States that

25   has ever held the term "applies" in an insurance policy,

1    particularly in another insurance policy, to be ambiguous.

2    They've never done it because it's not ambiguous.

3             Their interpretation is unreasonable because

4    that would mean if one of the underlying insurance companies

5    said, for whatever reason, they are not paying the claim, then

6    suddenly my other insurance clause has no meaning.  That cannot

7    be the proper rule of construction.

8             The third point is that, despite this

9    settlement and the apparent need they had to settle, that's

10   fine; just don't bar my client's subrogation rights which could

11   have stepped right in and picked up the argument set before you

12   on December 16th, and could have resolved these issues, and

13   could have determined whether or not there was an attachment at

14   that point in time.

15            They closed that door, so there is no need to

16   resolve it.

17            The last point I have is the policy could --

18            THE COURT:  Why didn't Liberty intervene or something

19   in this?  I mean, your lawyer -- I don't know if it was you or

20   some other lawyer -- for Liberty was apparently well involved,

21   it's represented, in all these ongoing settlement discussions.

22            MR. MARTIN:  Absolutely.

23            THE COURT:  So it wasn't like you were in the dark as

24   to what was happening.  So why didn't Liberty take some action

25   at that time to assert its, quote, subrogation rights, object,

1    do something?

2         MR. MARTIN:  Because our interests were completely

3    aligned because they had asserted a valid indemnity agreement.

4    It was only after they settled and waived subrogation, they

5    came to you on December 16th and said, we withdraw --

6         THE COURT:  You're saying Liberty had no warning or

7    knowledge that that was going to occur?

8         MR. MARTIN:  They told us they were contemplating

9    settling and barring subrogation.  We said, if you do, you're

10   jeopardizing coverage.

11        THE COURT:  Why didn't you take some action at that

12   time if you were concerned about that?

13        MR. MARTIN:  Because we didn't think they would want to

14   bar coverage.  We thought they would cut a deal and allow us to

15   pursue that, or at least allow us to fund the settlement and

16   then pursue that.

17        THE COURT:  Is Liberty's language different from all of

18   these other policies that were below you?

19        MR. MARTIN:  Every one of them.  It's different from

20   every single one of them.  That's why we're the only one here

21   because our language is totally different.  Every other one has

22   different language, and that's why they settled.

23        THE COURT:  Thank you very much.

24        MR. AUSLANDER:  Your Honor, may I have one minute?

25        THE COURT:  No, we need to move on.

1        MR. AUSLANDER:  All right.  Thank you.

2        MR. MARTIN:  Thank you, Your Honor.

3        THE COURT:  Thank you.

4            All right.  Let's take up the other motions.

5            I'll take that under advisement.

6        MR. LYLE:  Good morning, Your Honor.

7        THE COURT:  Good morning.

8        MR. LYLE:  Michael Lyle on behalf of NRC, O'Brien's,

9   and defense liaison counsel for the cleanup responder

10   defendants.

11            Your Honor, we have divided up our time for

12   oral argument.  I will be arguing for 10 minutes, and would

13   like to reserve, with the Court's permission, two minutes for

14   rebuttal.

15        THE COURT:  Okay.

16        MR. LYLE:  Counsel for MSRC would like two minutes.

17        THE COURT:  Who is going to argue for them?

18        MR. LYLE:  Mr. Weigel.

19        MR. WEIGEL:  Your Honor, I'll be arguing for MSRC.

20        MR. LYLE:  Counsel for Lynden, Incorporated would like

21   three minutes.  I'm not sure who is arguing that, Your Honor.

22        MR. MARSHALL:  Judge, that's me, Carter Marshall, on

23   behalf of Lynden, Incorporated.

24        MR. LYLE:  Then, Nalco would like 15 minutes of time to

25   argue.  Mary Rose Alexander will be arguing.

1          THE COURT:  All right, go ahead.

2          MR. LYLE:  Thank you, Your Honor.

3                Your Honor, these are the cleanup responders'

4    motions for summary judgment on the grounds of derivative

5    governmental immunity and implied conflict of preemption.

6                The bases of our motions, Your Honor, are laid

7    out in our papers; but, in the highlights, the bases of our

8    motion are the undisputed material facts show that the

9    United States Government directed and controlled our response,

10   and that we acted in conformity with the direction and control

11   of the government.

12         THE COURT:  It seems likes that's the real issue here

13   is whether the plaintiffs have created a genuine issue of

14   material fact as to whether your clients, the cleanup responder

15   defendants, complied with the government's directives.

16         MR. LYLE:  That's correct, Your Honor.

17         THE COURT:  That seems to be the main issue here.

18         MR. LYLE:  That is the main issue.

19         THE COURT:  Yes.  Because they make a number of

20   allegations that one or more of the responder defendants

21   sprayed in places they were not supposed to spray, they sprayed

22   at times they weren't supposed to spray, didn't provide

23   protective equipment that they should have provided and those

24   sorts of things.

25         MR. LYLE:  That's what they try to raise in their

1   13 affidavits that they've submitted, Judge, yes.

2           What we have laid out, Your Honor -- the

3   critical flaw -- and we'll get into the details of it -- the

4   critical flaw in all of the affidavits that they have submitted

5   is that they do not question the point that the federal

6   government was in charge and that the cleanup responders acted

7   in conformity with their instructions from the federal

8   government.  Not one of those affidavits addresses that issue,

9   and that's a critical flaw in all of their affidavits.

10          When you dig deeper into the affidavits, what

11  you'll see, also, Your Honor, is that they are completely

12  filled with conjecture, speculation and conclusions.

13          There are some affidavits that talk about some

14  of the plaintiffs hearing aircraft flying at night, so that

15  must mean that somehow that they are applying dispersants

16  through those aircraft.  They can't identify the aircraft, and

17  they have no basis to say that they were actually applying any

18  dispersants is all.

19          That's an example of the kind of conjecture

20  that you see in the affidavits.  They simply do not create any

21  genuine issue of material fact.

22          But when you look them, if you set aside the

23  infirmities in all of them and the problems with them in terms

24  of their complete lack of basis, when you look at them, none of

25  them address the issue, which we have laid out specifically in

1   our papers and through the stipulations, with the United States

2   Government.

3           After the Court ruled on our motion to dismiss,

4   you put in place a process through Judge Shushan that allowed

5   for discovery on the factual questions.  The legal issues, this

6   Court has already ruled on.  If the facts bear it out, the

7   cleanup responder defendants are entitled to immunity and

8   preemption.

9           So the factual questions that we addressed

10  through the discovery process were through stipulations with

11  the federal government.  What you'll see in those stipulations,

12  which we've attached to our papers, Your Honor, at

13  Exhibit Number 7, is that the Federal On-Scene Coordinator, or

14  the FOSC, was in charge; and, that that FOSC, through the

15  Unified Area Command, directed the entire cleanup response.

16          That Unified Area Command was broken down into

17  some smaller branches, which were called the Incident Command

18  Post.  Every day, before any cleanup responder did anything,

19  they received from the government the daily incident action

20  plans through this management chain that I just described.

21          Those Incident Action Plans are hundreds of

22  pages long.  What they have in there are the details of where

23  they are supposed to apply dispersants, where the cleanup

24  responders are supposed to go and conduct in situ burning,

25  where they are supposed to lay boom, where they are supposed to

1    clean up the oil, every single day.

2              Then, at the end of the day, there was a

3    debriefing.  Then, the next day, the same process was followed,

4    day after day, during the entire response.  During that whole

5    process, the federal government was in charge.

6              What you see in the stipulations, Judge, if you

7    go to page 5 and, as an example, paragraph number 26 of

8    Exhibit Number 7, which is the stipulations from the federal

9    government -- remember, we worked these stipulations out with

10   the federal government, which is no simple task, as you can

11   imagine, Judge.  The government doesn't like to stipulate to

12   things.

13             They stipulate to certain things, like that

14   there is 24 hours in a day, and that, like, LSU is going to

15   beat Alabama next year.  Those are certain things that they are

16   certainties for.

17        THE COURT:  You mean Mr. Underhill is difficult to deal

18   with?  I can't believe that.

19        MR. LYLE:  But we hammered them out, anyway, Judge.

20             What we ended up with is this:  Beginning on

21   April 21, 2010, and continuing throughout the *Deepwater Horizon*

22   spill response, Incident Action Plans, which I just referred

23   to --

24             I've got an excerpt of one, Judge.  You can

25   see, it lays out the map.  This is Exhibit Number 15F.  There

1   is a map here.  I can stick it in front of you.  Then, each

2   day, there are details, page after page, of instructions.

3                Then, if you get to an excerpt that -- I've

4   excerpted one here for you -- here is a section where it tells

5   you where the dispersants are to be applied, where they are not

6   to be applied.  You have to watch out for wildlife, etcetera,

7   etcetera.  Very detailed instructions, daily instructions from

8   the federal government through this process.

9                What they say is that they were prepared on a

10  daily basis and contained the detailed instructions concerning

11  the response activities that were to occur each day.  Each

12  Incident Action Plan was reviewed, signed, and approved by the

13  FOSC -- that's the Federal On-Site Coordinator, Your Honor.

14  That's the boss -- and/or the FOSC representatives.

15                THE COURT:  Was that a Coast Guard person?

16                MR. LYLE:  Yes, Your Honor.  The FOSC was

17  Admiral Mary Landry with the Coast Guard.

18                THE COURT:  Some of these terminologies get confusing,

19  but I thought there were several people across the Gulf that

20  occupied similar stations, similar positions --

21                MR. LYLE:  Yes.

22                THE COURT:  -- like five different areas.

23                MR. LYLE:  So at the top was the FOSC, the

24  Federal On-Scene Coordinator.

25                THE COURT:  Up at the top was Admiral Allen, right?

1           MR. LYLE:  Well, that's correct.  He was the National

2   Incident Commander.  His job, he handled sort of unifying the

3   response.  The day-to-day activities, though, were handled by

4   the FOSC, and that's where we, the cleanup responders, reported

5   in to the command.

6           But the National Incident Coordinator, because

7   this was a spill of national significance, which meant that the

8   NIC was appointed, and that meant that we had an elaborate

9   structure in place for all of the response activities.

10          Through the FOSC and the Unified Command,

11  underneath, you have the Incident Command Posts which we're

12  talking about, those five areas.  There was one in Houma; there

13  was one in Houston, Texas; there was one in Mobile, Alabama;

14  there was one in Galveston, Texas; and, there was one in Miami.

15  They divided up their various responsibilities.

16          The aerial response, that came through Houma.

17  Many of the activities that we're talking about here were

18  directed through Houma and through Houston.

19          Every day, the cleanup responders, through that

20  chain of command, received the instructions about where they

21  were supposed to go and what they were supposed to do.  Then,

22  at the end of the day, there was a debriefing, where were we.

23  Then, the next day, more orders were issued through that

24  command, all throughout the process.

25          What the government has stipulated to is that

1    not only was that process in place, but that we followed that

2    process.  We adhered to that process.

3              THE COURT:  Your client is who, exactly, again?

4              MR. LYLE:  My clients are NRC and O'Brien's.

5                   There are other cleanup responder defendants

6    also, Your Honor, who have joined in this motion.

7              THE COURT:  Is it your position or those defendants'

8    positions that they never -- for example, there are at least a

9    few people that say they were standing or working on a beach,

10   and they got sprayed by a plane passing overhead.  Are you

11   saying that could not or did not happen; or, what is your

12   position on that?  What are the defendants' positions on that?

13                  I got the impression from reading the

14   stipulations -- well, first of all, the protocol said,

15   generally, you're not supposed to, I think, spray dispersants

16   within, what, three miles of the beach; but, that, on

17   occasions, you all were given permission or authority to

18   spray --

19             MR. LYLE:  Yes.

20             THE COURT:  -- closer to shore.

21             MR. LYLE:  Yes.

22             THE COURT:  Did I understand that right?

23             MR. LYLE:  You are correct.

24                  So what you're referring to, Your Honor, is

25   there is something called an RRT, which was a Regional Response

1    Team.  That's referred to in the plaintiffs' papers, and in

2    ours, as well.

3              What those were is, beforehand, there was a set

4    of procedures that were accepted in advance, so that we didn't

5    have to start figuring out what to do.  There was a process all

6    in place.  It's called the National Contingency Plan, so that

7    in the event of an oil spill, there was already a process set

8    up as a starting point.

9              So the RRT, or those Regional Response Teams,

10   had some directives which said that you shouldn't spray within

11   three miles of the shore; except, the National Contingency Plan

12   also provides the FOSC, the Federal On-Scene Coordinator,

13   authority and discretion to make determinations that would

14   alter what was originally started from the beginning in the

15   RRT.

16             You know, you start with a starting point;

17   that, the FOSC is in charge and has to have discretion to make

18   decisions.  If, under certain circumstances, the FOSC

19   determined, in their discretion, that you should spray within

20   three miles of the shore, it could take place.  That's all

21   allayed for in the contingency plan.

22             THE COURT:  Is there evidence in the record that you

23   all have submitted that shows that, from time to time, the

24   FOSC, as you call it, him or her, FOSC --

25             MR. LYLE:  Yes.

1          THE COURT:  -- Federal On-Scene Coordinator, that that

2     person did, in fact, give such authorizations?

3          MR. LYLE:  There are, Your Honor, in the stipulations.

4     At paragraphs 42 and 43, those are addressed.

5               What it says in the stipulations is, during the

6     *Deepwater Horizon* spill response, no dispersant applications

7     were authorized by the FOSC or the FOSC's representatives for

8     areas shoreward of the RRT 4 and RRT 6 preauthorization zones,

9     except if such applications were necessary to prevent or

10    substantially reduce a hazard to human life.

11              That exception, the basis for that, the legal

12    basis for that, is contained at 40 CFR 300.910(d), which is

13    part of the National Contingency Plan.

14              The next paragraph:  "During the

15    *Deepwater Horizon* spill response, no cleanup responder

16    defendant conducted any unauthorized dispersant spray missions

17    in areas shoreward of the RRT 4 and RRT 6 preauthorization

18    zones."

19              So, what the government has stipulated to is,

20    in those instances where that was to take place, it was

21    consistent with the idea that you needed to do so in the

22    interest of reducing the hazard to human life; and, that any

23    time that that took place, it was authorized by the federal

24    government.

25              THE COURT:  So you're not -- just so I understand, the

1    defendants, the cleanup responder defendants, are not denying

2    that there were times when dispersants could have been sprayed

3    or were, in fact, sprayed closer to shore than three miles;

4    but, in every instance, you're saying it was authorized?

5             MR. LYLE:  Correct.

6             Same thing -- if you go on, Your Honor, in

7    paragraphs 44 and 45, it talks about operations occurring

8    during daylight hours.  There was some discussion about that in

9    the plaintiffs' response papers.

10            If you'll look at 44 and 45, here is what the

11   government says:  "During the *Deepwater Horizon* spill response,

12   no dispersant operations were authorized by the FOSC or the

13   FOSC's representatives outside of daylight hours.  During the

14   *Deepwater Horizon* spill response, no cleanup responder

15   defendant conducted any dispersant spray missions outside of

16   daylight hours."

17            Now, what do the plaintiffs have for you on

18   that, Judge?  What are they trying to argue?  They have

19   somebody who says they heard a plane overhead at night.  They

20   can't tell you what plane it was.  They can't identify the

21   aircraft.  They can't tell you who was flying it.  They say

22   they heard somebody flying a plane overnight; and, that,

23   therefore, it must be a dispersant.

24            Your Honor, that is a ridiculous argument.

25   That does not create a genuine issue of fact at all.  Any plane

1   can be flying at night, Your Honor.  Just because you hear it

2   overhead at night doesn't mean it's applying dispersants.

3   That's what they've offered in their affidavits.  That does not

4   create a general issue of material fact.  It can't.  It's

5   deficient, Your Honor.

6            So what you're seeing and what we've

7   established through the process of the stipulations and the

8   documents that we've provided in the Incident Action Plans,

9   etcetera, is that we conducted all of our operations in

10  conformity with the government's directives, and we didn't

11  deviate from those directives, Your Honor.

12           The other point I want to make, Judge -- I know

13  I'm getting close to my time -- is that if you think about this

14  in terms of preemption -- set aside the immunity argument and

15  focus on the preemption for a moment -- all the Court needs to

16  determine in that instance is whether or not there is, in fact,

17  preemption, that is, were we following directives from the

18  government; and, if we were, were we in the position of what

19  the plaintiffs are alleging and saying we should have done.

20           If those are in conflict, federal instructions

21  prevail.  In that instance, Judge, as long as those directives

22  exist, whether or not we complied is irrelevant because the

23  plaintiffs can't have a basis for bringing a claim under the

24  maritime law.  The only people who could have a beef with us

25  would be the federal government; and, clearly, we don't have a

1    dispute with them.

2                   So, if you think about it in terms of immunity,

3    you don't even have to get to the question of whether or not we

4    complied, just that the government had issued these

5    instructions as part of its authority, which is under -- there

6    is no question about that, and they don't dispute that the FOSC

7    was in charge and had that authority.

8                   THE COURT:  Thank you very much.

9                   MR. LYLE:  Thank you, Your Honor.

10                  THE COURT:  Who is up next?

11                  MR. WEIGEL:  May it please the Court, Your Honor.  I'm

12   Alan Weigel.  I'm representing Marine Spill Response

13   Corporation, and I have a very brief argument.  I just want to

14   follow up on a couple of things that Mr. Lyle said.

15                  Now, I don't intend, separate from Mr. Lyle, to

16   argue any of the legal issues that we provided in our moving

17   papers or our reply.  If the Court has any questions, I'm happy

18   to answer those.

19                  Instead, I want to focus only on, as the Court

20   has focused on, the factual allegations in the plaintiffs'

21   opposition.

22                  We want to make it clear at the outset that,

23   for the purposes of the motion, we don't dispute what has been

24   said in the affidavits and declarations that were filed in the

25   opposition.

1              We're not here to say that they are not telling

2     the truth because, obviously, we can't have a credibility

3     determination on a summary judgment motion.  We're only saying

4     that all of the allegations are really irrelevant to

5     Marine Spill Response Corporation's summary judgment motion

6     because we, meaning Marine Spill Response Corporation, didn't

7     have anything to do with any of the activities that are alleged

8     in those declarations --

9              THE COURT:  What was your client's role in this

10    response?

11             MR. WEIGEL:  We had two subcontractors who operated

12    dispersant aircraft.  We operated only from the Stennis

13    airport.  Again, we followed the government's directives as to

14    where and when and how dispersants were sprayed.

15             THE COURT:  You had a geographical line in the Gulf?

16             MR. WEIGEL:  That's correct, Your Honor.

17             THE COURT:  So according to what you said in your

18    memorandum, as I recall, your clients only sprayed dispersants

19    in, I'll call it, the eastern half of the Gulf?

20             MR. WEIGEL:  That's correct, Your Honor.

21             If you think about the map of the southern part

22    of the United States, and if you're familiar with where Stennis

23    is, and I'm sure you are, if you just draw a line due south

24    from Stennis, that is essentially the dividing line.

25             THE COURT:  Well, more or less, the line between

1    Mississippi and Louisiana.

2         MR. WEIGEL:  That's correct, Your Honor.

3              Marine Spill Response Corporation's two

4    subcontractors, International Air Response, Dynamic Aviation,

5    they only sprayed to the east of that line.

6              Now, there are two groups of these declarations

7    and affidavits that we've addressed.  The first are all these

8    near shore, what we call near shore activities.  The one that

9    you focused on so far is the one where the people say they were

10   on Fourchon beach, and they were sprayed.

11             Well, we don't really have a position with

12   respect to whether that happened or not because --

13        THE COURT:  You're saying that couldn't have been

14   your client.

15        MR. WEIGEL:  Couldn't have been us because we weren't

16   tasked to go over there.  We were only tasked to go east, and

17   the plaintiffs don't dispute that tasking that we were given.

18             The other group of near shore activities, as

19   we'll call them, are the people who say that they were cleanup

20   workers, some cleanup role, and they weren't given proper

21   personal protective gear.

22             The plaintiffs don't dispute our statement of

23   fact that Marine Spill Response Corporation's only role was to

24   process invoices for all those beach cleanup workers.  We

25   basically took the invoices from their employers, processed

1    them, gave them to BP, and told BP how much should be paid for

2    that work.

3                They don't allege that we had any role in

4    supervising those beach cleanup workers.  So, again, we

5    couldn't have violated -- Marine Spill Response Corporation

6    couldn't have violated any directives that the government was

7    issuing with respect to the personal protective equipment for

8    those cleanup workers.

9                Then we have, as Mr. Lyle was talking about,

10   the people who are claiming that they were sprayed either

11   during in situ burning or that they heard planes operating at

12   night.

13               Again, those two affidavits, Mr. Wunstell and

14   Mr. Anderson, they do not mention Marine Spill Response

15   Corporation or either one of MSRC's aviation subcontractors.

16               Basically, we produced thousands and thousands

17   of pages of documents --

18         THE COURT:  Would that have been within your geographic

19   area?

20         MR. WEIGEL:  It could have been; but, again, it was

21   outside of the area where we were told -- we sprayed outside of

22   the area where they were located.

23               The government produced records that show where

24   the in situ burning was taking place.  They also produced

25   records that show where the spraying took place on those days

1    that they say they were participating in in situ burning.  The

2    two are, in some cases, miles and miles away.  The closest we

3    ever came was 15 miles to where the in situ burning was taking

4    place.

5              Again, it wasn't Marine Spill Response

6    Corporation's aircraft.  Whether they were sprayed or not, for

7    the purposes of this motion, we're not disputing; but, it

8    certainly wasn't the aircraft that were being operated by

9    MSRC's subcontractors.

10              That's all I have, Your Honor.  Thank you.

11         THE COURT:  Thank you very much, Mr. Weigel.

12              Who is next?  Mr. Marshall, is it?

13         MR. MARSHALL:  Yes, sir.

14              Good morning, Judge.  Carter Marshall on behalf

15    of Lynden, Incorporated.  I only have a few seconds, Judge, so

16    I'll make this very brief.

17         THE COURT:  Tell me briefly, what was your client's

18    role?

19         MR. MARSHALL:  That's the point of this argument,

20    Judge.  We had no role.

21         THE COURT:  You had no role?

22         MR. MARSHALL:  Yes, sir.

23         THE COURT:  I guess you can leave.  You won.

24         MR. MARSHALL:  I asked for this time, Judge, because

25    besides immunity and preemption, my client, Lynden,

1    Incorporated, has a separate pending jurisdiction motion.

2                     Lynden, Incorporated, who is the named

3    defendant in the action, had absolutely no role in the oil

4    spill response effort.  Didn't provide any planes, didn't

5    provide any --

6            THE COURT:  But it's an affiliated company; they just

7    named the wrong company?

8            MR. MARSHALL:  Yes, sir.  Lynden, Incorporated's wholly

9    owned and separate subsidiary, Lynden Air Cargo, L.L.C., did

10   participate in the response effort.

11           THE COURT:  Well, then, why don't you talk about them?

12           MR. MARSHALL:  Well, I am, Judge.

13           THE COURT:  It's not as easy as you just -- we can just

14   substitute the right company, right?

15           MR. MARSHALL:  That's my point, Judge.  They've asked

16   to substitute them in.  The reason --

17           THE COURT:  I think the question is whether we just add

18   them or whether we substitute them.  It seems like I read

19   something.  Is there a pending motion or something by the

20   plaintiffs to that effect?

21           MR. MARSHALL:  They asked for leave in their response

22   to add Lynden Cargo, L.L.C. into this.

23           THE COURT:  Do you have any objection to that?

24           MR. MARSHALL:  We do, Your Honor.

25           THE COURT:  What's the objection?

1       MR. MARSHALL:   The objection is twofold.

2              Number one, without presupposing what you're

3    your Honor is going to do with the immunity arguments here

4    today, if you're inclined to go along with my fellow

5    responders, then we think that that amendment would be

6    unnecessary.

7              Number two, they haven't showed the required

8    good cause to make such a late amendment required under Rule

9    16.  Rather, they've briefed to you the Rule 15 standard, not

10   the Rule 16 standard.

11      THE COURT:  I would allow the substitution for you to

12   add them.  There is no way your client can be prejudiced by

13   this, so assume that you're in, one way or the other.

14      MR. MARSHALL:  If that is the case, Judge, I would

15   still restate my immunity.  Also, I would ask that the Judge

16   dismiss Lynden, Incorporated.

17      THE COURT:  The Lynden entity that actually was

18   involved, what did they do in the response?

19      MR. MARSHALL:  They applied dispersant, Judge.  They

20   are an aircraft company.

21      THE COURT:  From planes?

22      MR. MARSHALL:  Yes, sir.

23      THE COURT:  The opposite side of the Gulf from where

24   Mr. Weigel's client was?

25      MR. MARSHALL:  No, sir.  I think it was the same side.

1          THE COURT:  Sounds like he was trying to blame it on

2     you.

3          MR. MARSHALL:  No, no.  He didn't say Lynden, Judge.

4     He did not bring Lynden up.

5          THE COURT:  No, he didn't bring in Lynden, but he

6     inferred it was somebody else's planes spraying over there.

7          MR. MARSHALL:  Judge, Lynden Air Cargo --

8          UNIDENTIFIED SPEAKER:  Your Honor, the United States

9     Air Force also sprayed.  So, you know, maybe Mr. Underhill

10    should be sitting on this side of the table for this motion.

11         MR. MARSHALL:  Judge, one last point, to be clear.

12    When Lynden, Incorporated filed their papers, we made two

13    assumptions:  Number one, that there was personal jurisdiction

14    over us, and, number two, that they could hold us liable for

15    the acts of our subsidiary, Lynden Air Cargo, L.L.C.

16              We submitted affidavits on behalf of Lynden Air

17    Cargo, L.L.C., joining with our fellow responders.  The facts

18    are there for Your Honor to review.

19         THE COURT:  Obviously, the same legal arguments would

20    apply to you, too.  There is no question about that.  So we

21    will straighten all of that out.

22         THE MARSHAL:  Yes, sir.  Thank you, Judge.

23         THE COURT:  Thank you.

24              Now, we are moving on to Nalco, right?

25         MS. ALEXANDER:  Saving the best for last, Your Honor.

1          This is Mary Rose Alexander on behalf of

2     Nalco Company.

3          Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MS. ALEXANDER:  Your Honor ruled in October why

6     plaintiffs' claims against Nalco should fail.  "This unique

7     federal interest means the Clean Water Act and the National

8     Contingency Plan would be directly affected if private parties

9     refused to follow federal directives for fear of liability."

10    That's at page 14 of your decision.

11          When the call went out to the world in April of

12    2010, in response to what the plaintiffs now call an

13    unprecedented event, Nalco didn't refuse the U.S. call for help

14    for fear of liability.  It said yes.  The U.S. Coast Guard

15    asked Nalco, in a time of great national need --

16          THE COURT:  Let me ask you this:  The request came from

17    who?  From the Coast Guard, the EPA; who requested that?

18          MS. ALEXANDER:  Several people, Your Honor.

19          Most directly, the U.S. Coast Guard wrote a

20    letter to Nalco, that's Exhibit Y to our brief, asking Nalco to

21    provide dispersants, stating that chemical dispersants are

22    essential to the oil spill response and cleanup efforts;

23    telling Nalco that if the dispersants were exhausted, the

24    consequences would be widespread; and, asking Nalco to provide

25    dispersants because it would be of an invaluable benefit to our

1    country.

2          THE COURT:  Did they specifically request or designate

3    COREXIT?

4          MS. ALEXANDER:  Yes, Your Honor.

5                The plaintiffs now admit on page 39 of their

6    brief that quote, Nalco, unlike the responder defendants, did

7    not actively participate in the spill.  Did not actively

8    participate in the spill.  43 pages of briefs, 13 affidavits,

9    no allegations, none, that Nalco did anything else.

10         THE COURT:  You mean you supplied the product, but you

11   didn't have the planes out there dispersing it, is what you're

12   saying, right?

13         MS. ALEXANDER:  That's exactly right.  Nalco did

14   nothing other than supply the dispersants that were requested

15   of it by the United States Government.

16               Your Honor asked in your last ruling, you said,

17   "preemption arguments, the arguments Nalco are making, are

18   certainly plausible, but defendants can only avail themselves

19   of preemption if they show that the complained of activities

20   fell within the scope of the Clean Water Act and the National

21   Contingency Plan."

22               The answer to that question, Your Honor, is

23   indisputably yes.  I've prepared a chart demonstrating how each

24   of plaintiffs' allegations fall squarely within the scope of

25   the Clean Water Act and the National Contingency Plan.

1              If I may approach.

2              Your Honor, each of plaintiffs' allegations

3    fall squarely within the scope of the Clean Water Act and the

4    National Contingency Plan.  There are no issues of material

5    fact on this record because plaintiffs have either admitted the

6    essential facts or the United States has admitted and

7    stipulated to the essential facts.

8              The plaintiffs say, for example, "in an

9    ill-conceived effort to contain and to clean up the spill,

10   massive amounts of chemical dispersants were sprayed from the

11   air."  They say it was reckless, willful, or wanton refusal to

12   use safe dispersants.

13             Whose ill-conceived effort?  Not Nalco's

14   ill-conceived effort.  The ill-conceived effort of the

15   United States Government under the authority delegated by

16   Congress under the Clean Water Act and the National Contingency

17   Plan.

18             On the right side of the page, the President

19   shall ensure effective and immediate removal of a discharge of

20   oil.  The Federal On-Scene Coordinator, the FOSC, as Mr. Lyle

21   called him, shall direct response efforts.

22             Plaintiffs now admit, in fact, on page 2 of

23   their brief, the FOSC had final decision-making authority over

24   the response actions.  The government has stipulated and

25   testified that they, indeed, exercised that authority under the

1    Clean Water Act.  An ill-conceived effort directly conflicted

2    by the Clean Water Act.

3                 They say --

4         THE COURT:  Let me ask you this.  You had this product

5    that's been, I guess, around for many years, right?  COREXIT?

6         MS. ALEXANDER:  Yes, Your Honor.

7         THE COURT:  There are two versions of COREXIT?

8         MS. ALEXANDER:  There are.

9         THE COURT:  I don't know if it matters.  There must be

10   some difference between the chemical formulas or something;

11   but, there are two versions of COREXIT.

12                 Nalco had its chemical, COREXIT, listed on this

13   National Contingency Plan, the list maintained by the EPA --

14        MS. ALEXANDER:  Yes, that's correct.

15        THE COURT:  -- right?

16                 To do that, the process was that you submitted

17   information to the EPA about your product, and they decide

18   whether to allow you to list it, to put it on the list of

19   available dispersants, correct?

20        MS. ALEXANDER:  Yes, Your Honor.

21                 Under the Clean Water Act, the President and

22   his delegates are required to set forth a National Contingency

23   Plan that will include a schedule of dispersants.  The schedule

24   of dispersants is the National Contingency Plan product list.

25                 Both COREXIT products have been listed for

1  decades.  I quote from the National Contingency Plan:  "Before

2  adding a dispersant to the NCP product schedule, U.S. EPA

3  reviews detailed data submitted by the dispersant manufacturer,

4  including the dispersant's components, toxicity and efficacy."

5              That's 300.915(a) of the National Contingency

6  Plan, Your Honor.

7              That is exactly what happened.  The

8  United States has stipulated in Stipulation Numbers 1, 2 and 3

9  that are attached as Exhibit 3 to our brief, that Nalco did,

10  indeed, comply with the National Contingency Plan, provided the

11  information requested --

12        THE COURT:  Is there any factual dispute in the record

13  about that at all?

14        MS. ALEXANDER:  There is no factual dispute at all,

15  Your Honor, in the record as to whether or not Nalco provided

16  the efficacy, the toxicity information and the component

17  information, which is all that was required by the National

18  Contingency Plan.

19        THE COURT:  Is that what's part of Exhibit D, I think

20  it is?

21        MS. ALEXANDER:  Yes, Exhibit D -- no.  Exhibit C to our

22  motion are the stipulations of the United States.

23  Stipulations 1, 2 and 3 address this fact.

24              Exhibit A --

25        THE COURT:  What's Exhibit D?

 1          MS. ALEXANDER:  Well, Exhibit A is the National

 2   Contingency Plan.

 3          THE COURT:  But I'm asking you about Exhibit D?

 4          MS. ALEXANDER:  Exhibit D.

 5          THE COURT:  What is Exhibit D?

 6          MS. ALEXANDER:  Oh, Exhibit D, excuse me, Your Honor,

 7   is the letter from 1994, in which Nalco's predecessor provided

 8   the necessary information for listing of COREXIT 9500 on the

 9   National Contingency Plan.

10          THE COURT:  I'm just trying to understand how all of

11   this works.  This is the information that was provided to the

12   government, to the EPA, that got Nalco on this list --

13          MS. ALEXANDER:  Correct.

14          THE COURT:  -- got COREXIT on the list?

15          MS. ALEXANDER:  That's right.  The Clean Water Act sets

16   forth what must be provided.  The National Contingency Plan has

17   those regulations.

18              Nalco complied with those regulations pursuant

19   to the stipulations of the United States, provided information

20   in 1994, updated information as required or requested by the

21   EPA over the years.

22              That's so that products can be available to the

23   Federal On-Scene Coordinator to decide to use dispersants if,

24   in fact, that decision is appropriate to respond, which is

25   exactly what happened here, Your Honor.

1           Indeed, the regulations also say that only a

2    product listed on the U.S. National Contingency Plan's product

3    schedule can be used for dispersant application.

4           The plaintiffs say in their briefs that we

5    should have used a less dangerous or a less toxic product, but

6    we certainly couldn't say, time out, stop the emergency, stop

7    the response, we need to develop a different product.

8          THE COURT:  The EPA or somebody with the government

9    would have had to accept the submission of this information

10   about the product before they listed it?  Is that how it works?

11         MS. ALEXANDER:  Yes, that is how it works.  That is

12   exactly what happened.  That's what the United States has

13   stipulated to did happen with respect to COREXIT 9500 and 9527

14   many, many decades ago, such that when this unprecedented event

15   took place, that product and others were available for

16   selection and use if the federal government decided to use

17   dispersants in response to the spill.

18         THE COURT:  So COREXIT is on this list; and, after this

19   spill, somebody with the government, I don't need a particular

20   name, but somebody -- I'm assuming it wasn't President Obama

21   personally, but somebody under his direction, you say

22   specifically selected COREXIT and gave authorization for the

23   people down the chain, so to speak, to use COREXIT and apply

24   COREXIT?

25         MS. ALEXANDER:  The President's delegates have the

1    final decision-making as to whether or not to apply dispersants

2    at all, where to apply dispersants, when to apply dispersants,

3    the quantities to apply dispersants, and the manner in which

4    they can be supplied -- or used, excuse me, safely in these

5    waters.  That's exactly what happened.

6                 Admiral Allen has been quoted as saying, "It's

7    a decision by the FOSC whether to approve the

8    Incident Commander's recommendation to use dispersants.  It's a

9    very disciplined doctrinal process how this works.  In the end,

10   it may be executed by BP through a contractor, but these are

11   all decisions made by the FOSC because that's where the

12   responsibility rests."

13                So the ultimate selection of the product may be

14   delegated down the chain, may be made by others, but no drop of

15   COREXIT could be put into the Gulf of Mexico unless it was

16   decided under the authority delegated by the Clean Water Act

17   and the National Contingency Plan by the President's delegate,

18   here, the FOSC, to use dispersants, to apply dispersants to the

19   Gulf in the quantities and the amounts and the locations that

20   could be done safely.

21                THE COURT:  Is COREXIT still on that list?

22                MS. ALEXANDER:  Yes, it is.

23                If I may make one final point, Your Honor, with

24   respect to the law, which I agree Your Honor has already

25   concluded that plaintiffs' allegations do stand as an obstacle

1    to the accomplishment and execution of the full purpose of the

2    objectives of Congress here.

3                I think it is clear that there is an inevitable

4    collision between the allegations of the plaintiff on the one

5    hand, supply a different product, a less dangerous product, a

6    less toxic product, and the authority delegated by Congress

7    under the Clean Water Act.

8         THE COURT:  Whether manufactured by Nalco or someone

9    else, do you know whether there were other types of

10   dispersants, other dispersants on that list that the government

11   could have elected to use?

12        MS. ALEXANDER:  There are other dispersants on the

13   list, and the government's delegatees or BP could have selected

14   to use a different COREXIT product.

15               The fact of the matter is that this was the

16   product that was available to use -- or that Nalco could

17   manufacture around the clock in response to the Coast Guard in

18   the volumes that were necessary to be used in the Gulf at the

19   direction of the Federal On-Scene Coordinator.

20               The point I was going to add to this, Your

21   Honor, is that what's different between now and when we were

22   here last and Your Honor's decision in October, is that the

23   only claims remaining against Nalco and the rest of the cleanup

24   responders are maritime claims.

25               The United States Supreme Court held in *City of*

1    *Milwaukee versus Illinois and Michigan* that federal common law

2    is subject to the paramount authority of Congress.

3              So here, we aren't looking at a question

4    between federal law for preemption and the state rights and

5    state police powers.  Here, according to the Supreme Court, we

6    start with the assumption that it's for Congress, not federal

7    courts, to articulate the appropriate standard to be applied as

8    a matter of law.  That, as I said, is the *Milwaukee versus*

9    *Illinois and Michigan* case, 451 U.S. 304 (1981).

10             Here, we have allegations that we violated

11   maritime law, were grossly negligent, negligent, the product

12   was too toxic, it was dangerous; yet, we have a mandate from

13   Congress to the President to make all of these decisions, to

14   use COREXIT -- I'm sorry, to use dispersants, where to use

15   dispersants, how to use dispersants, how they can be applied

16   safely in the Gulf of Mexico.  There are no disputed issues of

17   material fact on this record as to Nalco.

18             THE COURT:  Thank you very much.

19             MS. ALEXANDER:  Thank you, Your Honor.

20             THE COURT:  PSC.

21             MS. GREENWALD:  Good morning, Your Honor.

22   Robin Greenwald for the PSC.

23             THE COURT:  Good morning.

24             MS. GREENWALD:  I was going to do Nalco last, but

25   perhaps I'll start with Nalco first, since we just addressed

1    that.

2              Then, in fact, I would like to just address the

3    fact that in advance of court today, there was a motion made

4    that suggested that we didn't address the issues of products

5    liability in our motion.  I just wanted to bring it to the

6    Court's attention that, in fact, we did address not just the

7    general services contract, but we actually did address this in

8    part 3(b) of our brief.

9              Also, that we also addressed -- and I'll get to

10   that in a minute -- in responding to Nalco's arguments, that

11   Nalco's 30(b)(6) deponent actually did acknowledge in his

12   testimony that Nalco did not submit certain recommended

13   conditions for COREXIT use to the government, as required by

14   regulation.

15             THE COURT:  For example?  For example?

16             MS. GREENWALD:  Apparently, in his deposition, the

17   30(b)(6) deponent said that respirators were required under

18   certain conditions for application of COREXIT and COREXIT use.

19             THE COURT:  I think part of the allegations against the

20   cleanup responder defendants is that the government did, in

21   fact -- the government, the Unified Command and on down -- did

22   put certain protocols in place about when and where and under

23   what circumstances respirators were necessary or not necessary

24   and, as we talked about earlier, where these chemicals could

25   and could not be sprayed and under what circumstances.

1              So it seems like the government put the

2    protocol in place.  The argument on the other issue, not Nalco,

3    is whether those directions were followed or not.

4         MS. GREENWALD:  Right.

5         THE COURT:  It doesn't strike me as the government

6    lacked information, that Nalco didn't disclose something to

7    them that would be relevant in any way in this case.

8         MS. GREENWALD:  Well, actually, in the record here,

9    which is not before Your Honor on this summary judgment motion,

10   but there are documents in this case that show that the

11   government did not think respirators were necessary, in part

12   because Nalco never told the government.

13             According to the 30(b)(6) deponent that we did

14   take during the limited discovery, they never told the

15   government, as they were required by regulation to do, that one

16   of the conditions for use of Nalco product was respirators.

17             Your Honor, what I would like to do is bring

18   this Nalco issue back to our lawsuit against Nalco.

19        THE COURT:  You don't contest that the EPA allowed them

20   to list this chemical -- I mean, I've gotten pretty voluminous

21   documentation as to what they submitted to get it on a list.

22        MS. GREENWALD:  Correct.

23        THE COURT:  The EPA had to make the decision whether

24   they had sufficient information in the first place to put

25   COREXIT on the list, right?

1              MS. GREENWALD:  Correct.

2              THE COURT:  They wouldn't just let anybody put anything

3      on the list.

4              MS. GREENWALD:  The manufacturer has to present certain

5      information to the government.

6              THE COURT:  That's a discretionary call, obviously,

7      that somebody in the government makes.

8                      Then, when this oil spill happens, somebody

9      with the government goes and looks at the list and says, we

10     need dispersants, we want COREXIT, and they authorized COREXIT

11     to be applied, correct?

12             MS. GREENWALD:  That is correct, Your Honor.

13                     But our lawsuit is not that the United States

14     improperly selected COREXIT for this response activity.  It's a

15     product liability action against Nalco for creating a defective

16     product.

17                     Nalco, rather than bringing a motion before

18     Your Honor that either we can't prove this is a defective

19     product under --

20             THE COURT:  What was defective about it?

21             MS. GREENWALD:  That it's unsafe for its intended use,

22     and they failed to warn about certain conditions of use when

23     you're using COREXIT, that there weren't adequate warnings.

24     That's in our complaint.

25                     But what they've done is they've tried to take

1    our allegation, which is a pure products liability action, and

2    they have used, quite frankly, some very powerful rhetorical

3    comments that, well, because the government chose to use

4    COREXIT, there's preemption.

5              They are trying to change our lawsuit.  They

6    are trying to take our allegations and make them something that

7    they are not.

8              We are not alleging that the government was

9    wrong or that the liability here rests in the decision to use

10   COREXIT.  The gravamen of our complaint is that COREXIT is a

11   defective product.

12             If Nalco wants to come back at some point in

13   time and argue to Your Honor that this is not a defective

14   product under the law, then they have the right to do that;

15   but, what they can't do is change the dialogue to suit them and

16   to say, well, because the government used this, because the

17   government asked them to provide this, there is preemption,

18   because that is not our lawsuit.

19        THE COURT:  I'm trying to understand, again, where this

20   argument goes.

21             It sounds like your argument is that Nalco just

22   should not have ever put COREXIT on the market, or they should

23   have refused the government's request to allow it to be used,

24   or they should have said, no, we won't sell it to you because

25   it's not safe for what you want to use it for.  What should

1     they have done?

2          MS. GREENWALD:  What they should have done was they put

3     this product on the market, I believe it was 1979, sometime in

4     the '70s, and then they just stopped trying to improve the

5     product.

6               I have to think to myself about meat slicers.

7     I remember when I was in law school, I read cases about meat

8     slicers.  When they first came out, there was no safety device

9     on the meat slicer; but, as technology evolved, at some point

10    in time, there was an ability to put a locking mechanism on a

11    meat slicer.  So products that were made at that point that

12    didn't have a lock, a locking device on a meat slicer, were

13    found to be defective.

14               Now, maybe when they were made in 1970, they

15    weren't defective because the state of the art at that time was

16    a meat slicer that didn't have a locking mechanism.  But you

17    get to the 1990's or 2000's, and, lo and behold, now you have a

18    mechanism in place, in the market, it's state of the art, that

19    that keeps it safe.

20               What Nalco wants you to do here is change the

21    dialogue so that Your Honor doesn't address the gravamen of our

22    complaint, which is in 1979 -- someone else made this product,

23    by the way.  It wasn't Nalco.  Nalco bought this product.  I

24    believe it was Exxon-Mobil or even a predecessor to them --

25    they make this product, they put it on the market, and they

 1    stop doing anything.

 2              They don't try to improve it.  They don't test

 3    it.  They don't do anything.  They just let it sit there.

 4              The regulations make it clear that EPA isn't

 5    approving any chemical when it puts it on the list.  It is

 6    merely saying -- and the regulations are eminently clear on

 7    this -- it is merely saying that COREXIT, at the time in the

 8    '70s, met the testing to allow them to put it on as a

 9    dispersant.  It doesn't say that it approves the product for

10    any particular use.

11              If you take Nalco's argument --

12         THE COURT:  What's the purpose of putting it on the

13    list?

14         MS. GREENWALD:  That it's a dispersant that an entity

15    makes, and they say that it has this constituent.  The EPA then

16    will make sure that they follow the regs to do the testing that

17    EPA requires.  As long as that testing is complied with, it

18    goes on the list as an available dispersant.

19              It's really no different than the MTBE

20    litigation, where Congress -- actually, that's much more

21    specific to what a preemption argument could have been in MTBE,

22    because in that case --

23         THE COURT:  That's an additive to gasoline, right?

24         MS. GREENWALD:  Right.  There is a case in the

25    Southern District, MTBE Multi-District Litigation.  In that

1    case, Congress actually passed a law that said oil companies

2    must oxygenate fuel, they had to take lead out, and they had to

3    replace lead as an oxygenate during certain months of the year.

4              In that case, EPA went out to the industry and

5    said, okay, what's out there that could oxygenate fuel?

6              There were six oxygenates that were put on the

7    list of approved oxygenates.  In fact, in that case, they were

8    actually EPA-approved oxygenates.

9              The oil companies decided to use the MTBE, even

10   though they knew it was very, very, very hydrophilic; that when

11   you put it in an underground storage tank, it was going to leak

12   through the water system, and it was going to end up in the

13   drinking water supplies.  It was on the approved list, and it

14   was pursuant to an act of Congress that they had to oxygenate

15   fuel.

16             Nevertheless, the Court held there was no

17   preemption there because there was no mandate from any

18   Congressional authority that you had to use MTBE.

19             Similarly, here, there was no mandate that

20   Nalco had to have this product on the market in the particular

21   way it was on the market.

22             A ruling the other way would allow industry to

23   make a COREXIT or any other product in 1970 and make no effort

24   over time to improve that product.

25             THE COURT:  Here is the issue as I see it.  I mean,

1    this is obviously a judgment call that the government makes in

2    response to a massive catastrophe like this.  You're spraying

3    chemicals in water, which is generally, we'd say, not a good

4    thing to do.

5         MS. GREENWALD:  Right.

6         THE COURT:  But you're doing it for what they believe

7    apparently was a greater purpose, that is, because apparently

8    if they had not done that, the oil would have been much more up

9    in our marshes in Louisiana and on the beaches in Florida and

10   Alabama.  Where is the greater harm?  They are trying to

11   prevent a greater harm is what I'm saying.

12            In an ideal world, there wouldn't be a need to

13   spray these chemicals in the Gulf of Mexico; but, the point is,

14   the government made those decisions, apparently, not Nalco.

15            Nalco made the product, and it was out there

16   for somebody to use --

17        MS. GREENWALD:  Right.

18        THE COURT:  -- but, the government made the decisions

19   to use dispersants in the first place, which, as you said, they

20   didn't have to do.

21        MS. GREENWALD:  Correct.

22        THE COURT:  They could have let the oil go up into the

23   marshes and beaches and everything else and then have been

24   criticized for not using dispersants.  I'm sure we would be

25   here arguing about why didn't you use the dispersants.

1        MS. GREENWALD:  Potentially.

2        THE COURT:  So you've got these policy arguments that I
3   don't know that a court is the right place to decide.  In other
4   words, am I supposed to second guess those types of decisions?

5        MS. GREENWALD:  No, and I don't believe our lawsuit is
6   asking you to do that because they're saying that they should
7   be dismissed from this case on preemption grounds.  There is
8   actually no legal basis under which they could establish that
9   because --

10        THE COURT:  We talk about preemption and derivative
11   immunity.  It seems like it's pretty much the same --

12        MS. GREENWALD:  It's very similar.

13        THE COURT:  -- the same analysis that, the government
14   made me do it.

15        MS. GREENWALD:  Right.  And it's a very similar
16   argument.

17             The argument of preemption and immunity, if you
18   want to fold them together, in some ways -- although, for
19   preemption, it's a very different standard -- but, it's
20   essentially that the government makes a decision to do X; then,
21   instead of doing X itself, it says to somebody else, you go do
22   it.

23             If that person does exactly what the government
24   says, because the government asks them to do it, the law says
25   it's not fair to hold that other entity liable when they did

1    exactly what the government said.

2              But that's not what happened here on any level.

3    So the case against Nalco --

4         THE COURT:  Are we still talking about Nalco, or have

5    we moved on to the responder defendants?  I thought you were

6    moving on to the responder defendants.

7         MS. GREENWALD:  Let me stay with Nalco for two minutes,

8    and then I'll move to the responder defendants.

9              For Nalco, again, because the allegation

10   against it is products liability, it's critically important to

11   recognize that there is nothing in the legislative history, the

12   legislative language or any regulation that in any way preempts

13   a products liability state law and/or maritime law claim.

14             I won't go through it.  It's in our brief,

15   Your Honor.  In the interest of time, I will not go through

16   some of the things that are in our brief.

17             But, actually, it deserves mention that the

18   Oil Pollution Act was sort of held up for almost 15 years

19   because Congress was duking out preemption.  Half of

20   Congress -- or, I guess, whatever -- whether it was half or

21   not, I don't know, but there were a lot of people in Congress

22   that wanted OPA to be preemptive.  There was a big part of

23   Congress that didn't want it to.

24             Ultimately, when it was finally passed after

25   the *Exxon Valdez*, it was passed specifically rejecting

1    preemption under OPA.  As you know, Your Honor, from prior

2    briefings, the statute has multiple provisions in which it

3    makes it clear that there is no preemptive effect of state law

4    and maritime law under the Oil Pollution Act.

5                    Interestingly, the only thing I wanted to

6    mention -- and I guess this really goes to both arguments --

7    is --

8              THE COURT:  Are there any factual issues in dispute as

9    far as Nalco's motion is concerned?

10             MS. GREENWALD:  Not in respect to the preemption

11   because, as to preemption, they don't really address our cause

12   of action.  They try to make our cause of action something it's

13   not and try to fit it into preemption.

14                   Frankly, if our lawsuit was against Nalco for

15   the United States having selected to use COREXIT instead of

16   some other dispersant, then they may be right, and it may be

17   preemption.  I haven't thought about it enough to actually say

18   for certain; but, under that circumstance, potentially, it

19   would be a valid argument that the government decided to use

20   COREXIT; and, instead of doing it itself, it had someone else

21   do it.  It still wouldn't totally fit because it wasn't

22   actually Nalco that applied it.  So the preemption argument or

23   the immunity still wouldn't fit exactly, but that's not our

24   case.

25                   So I want to make sure that Your Honor

1    understands.  Even when you look at the sheet that Nalco's

2    attorney brought to you today, you'll see on the left side when

3    it talks about plaintiffs' allegations, some of them were

4    general allegations, but it's pretty clear, Nalco's dispersant

5    chemical was defective.  The design defect in COREXIT is its

6    toxicity to humans and its ability to cause physical injury,

7    etcetera.

8              Our case is a products liability case, and

9    there's nothing in the statute that preempts that.

10            THE COURT:  Does it make a difference that the

11   government was apparently well aware that this was a chemical,

12   and, as with many chemicals, if you ingest it or it gets in

13   your eyes or whatever, it can harm you?

14            MS. GREENWALD:  Right.

15            THE COURT:  The government seems to have been well

16   aware of that because they put these protocols into place.

17            Again, I'm getting back to the other motion;

18   but, the argument against the responder defendants is that the

19   government did put protective measures and protocols in place,

20   but you all didn't follow it.

21            MS. GREENWALD:  So yes, except, again, going back -- I

22   won't repeat myself on this again, but Nalco didn't notify the

23   government about its knowledge of needing respiratory equipment

24   for a condition of its use.  So they didn't even fully inform

25   the government of all the conditions of its use.

1          THE COURT:  But didn't the protocol that the government

2     put in place, in fact, speak to the need for respiratory

3     equipment in certain instances?

4               Again, this is almost like the issue, do we use

5     dispersants to break up the oil, or do we let it go into the

6     beaches and marshes.  Because my understanding is these

7     respirators, you know -- is it your position that everybody

8     working on the beach all day long in hundred degree weather

9     should have been wearing a respirator?

10         MS. GREENWALD:  No, no, not at all.

11         THE COURT:  There is danger in that.

12         MS. GREENWALD:  No, that's not our position at all,

13    Your Honor.

14              Turning to the responder defendants, because

15    the argument is very different because they were on the ground,

16    they were the ones who were doing the work.

17              But I guess what I would like to do for just a

18    moment -- I'm probably running out of time, but if Your Honor

19    will indulge me to just step back a little bit to give you the

20    historical setting of why we find ourselves where we are right

21    now.

22              Back in December 2010, Your Honor ordered the

23    Plaintiffs' Steering Committee to write bundled complaints.  I

24    was one of the people who worked on the B3 bundle, and we had

25    discussion at length about whether to include the responder

1    defendants, in part because in the context of a bundle our

2    thought was, well, we should look at what other parties have

3    done, what other parties plaintiffs have brought in, so that we

4    can represent the whole of those who have tried to bring

5    lawsuits in connection with the *Deepwater Horizon* explosion and

6    the resulting oil spill.

7              There were people who really did not think it

8    belonged in the bundled complaint; and, they were right, and I

9    was wrong.

10             The reason they were right is not as a matter

11   of law.  As a matter of law, these are all good claims.  They

12   are not entitled under the law to absolute immunity.  Under any

13   circumstance, they're not.  I think that's pretty well briefed

14   in our brief, but I do want to raise a couple of points.

15             The reason we shouldn't have put it in the

16   bundle, in hindsight, is how the litigation has proceeded.

17   Because the allegations against the individual responder

18   defendants, there are 600 of them.

19             I certainly didn't appreciate that in December

20   of 2010.  I had no idea there were 600 of them.  I've learned

21   that in the course of discovery and, frankly, in the course of

22   settlement discussions.

23             But the reason we shouldn't have put them in

24   the bundle is, in discovery, it is impossible for us, as a

25   Plaintiffs' Steering Committee, to respond to the

1    individualized nature of an individual who is on a beach who
2    gets sprayed.  There is no way to do that.
3                We don't represent all hundred thousand cleanup
4    workers.  Many of them are unrepresented, and many of them are
5    represented by lawyers who we don't know.
6                You can't look at a short form, because the
7    short form doesn't say, I was cleanup worker Joe Smith, and I
8    worked for O'Brien's.  It doesn't say that.
9                So there is really no mechanism for us, as a
10   Plaintiffs' Steering Committee, to contest the kind of facts
11   that O'Brien's brings up today.
12               For example, they say, well, you didn't bring
13   an affidavit that said this person worked for O'Brien's.  I'm
14   sure there is somebody out there, I'm sure there is more than
15   one person out there who may have had a similar situation to
16   what we have in these 13 affidavits; but, frankly, we went to
17   one lawyer who was very willing to help us, who represents
18   quite a few cleanup workers, and we looked at them to try to
19   get a smattering, a group of examples for Your Honor to see
20   what kind of things were happening to people who were working
21   there.
22               This is what we fear.  If they are dismissed on
23   absolute immunity -- first of all, there is six hundred of
24   these, not just the eight that are named; but, secondly, what
25   about the person who was working for -- pick any company,

1    Company A -- and BP told that company, by the way, when you

2    have that person go pick up oily boom, you better make sure you

3    give them physical protective gear, which they call PPE in a

4    lot of the documents.  There is even a contract that says, you

5    must, Company A, make sure that that person has PPE.

6              Now, the litigation, the person goes back to

7    the home jurisdiction, and because this defendant A, the

8    cleanup responder, is no longer in the case because of some

9    immunity argument -- which, again, I think is legally flawed --

10   BP goes to court, and the defense is saying, it's not my fault,

11   I told that cleanup company to make sure they were given PPE.

12   It's not my fault that happened.  We did everything we could.

13   We weren't there on that day.

14             The other thing that's really important to

15   recognize as far as the absolute immunity goes, because they

16   are looking for this under *Yearsley*, there have been less than

17   10 cases since 1940 that have applied *Yearsley* for absolute

18   immunity in any context at all.  Those are usually cases where

19   there is a contract -- there is an act of Congress to dredge

20   the Mississippi River for example, after Katrina.  The

21   government says, I want you to go dredge at this particular

22   coordinate, I want you to go this far deep, and I want you to

23   go do this, dredging company.  So the dredging companies go and

24   do that; and, lo and behold, it causes some damage to a

25   neighboring property.

 1                    In those cases, the government really doesn't

 2      direct every activity.  It is not at all possible -- and there

 3      is no way anyone could possibly really argue this -- that the

 4      government gave daily direction to 600 cleanup workers.  It

 5      just didn't happen.

 6                THE COURT:  You said there were 600 cleanup workers --

 7                MS. GREENWALD:  I'm sorry.

 8                THE COURT:  -- or 600 cleanup companies?

 9                MS. GREENWALD:  Companies.  I apologize.  There were a

10      hundred thousand cleanup workers.

11                THE COURT:  How many of these companies are in this

12      litigation?

13                MS. GREENWALD:  Well, there are eight or nine that are

14      named, but then there is the unnamed cleanup workers in our

15      bundled complaint, the John Does and the Jane Does, or the

16      Company A Does.

17                    So, in fact --

18                THE COURT:  We can't do discovery or rule on these

19      unknown people that are in the Ethernet out there somewhere.

20      There is only a relatively small, manageable number of

21      defendants in this category that are presently in this

22      litigation.

23                MS. GREENWALD:  That's exactly right.

24                THE COURT:  Here is one of your problems, as I see it.

25      We haven't talked about this, but the defendants say that you

1    refused -- you, I mean your side -- refused or failed to

2    participate in the discovery that I had allowed on these

3    issues.

4              Judge Shushan had set up, when she issued her

5    order back last November, a schedule allowing you all to

6    conduct targeted discovery on these issues, factual discovery,

7    take depositions and so forth; and, for what you say were

8    strategic reasons, you or you all decided not to conduct that

9    discovery.

10             Now, you're saying, we didn't get a chance to

11   conduct discovery.  What am I supposed to do with that?

12        MS. GREENWALD:  I would like to explain maybe more

13   specifically where we found ourselves.

14             So, we found ourselves faced with discovery

15   that was asking about individual people's exposure to

16   individual cleanup company's acts that were outside of the

17   orders and which they were doing, so the people who were on the

18   beach, the people who weren't given physical protective

19   equipment.

20             We don't represent them.  We're the Plaintiffs'

21   Steering Committee.  We're doing a bundled complaint.  We

22   recognized that there was really not an avenue for us to be

23   able to get that at the same time we're preparing for Phase One

24   trial, settlement discussions; and, at the same time,

25   Your Honor, there were over 330 depositions for just Phase One,

1   with 600 cleanup workers.  You're talking about -- I don't even

2   know.  I can't even make a guess because they are all subs of

3   subs.

4           So when you depose O'Brien, you have to deal

5   with all of the sub's sub's subs of O'Brien.  It wasn't just

6   O'Brien.  O'Brien then hires somebody else, and then that sub

7   hires someone else.

8           So what we did, Your Honor, is we made a motion

9   to dismiss the case without prejudice because it was our belief

10  at that time that it was better not to have these responder

11  defendants in a bundled complaint.

12          We recognized that we bit off more than we

13  could chew because we didn't represent the plaintiffs --

14  forward.

15          We filed that motion very shortly after

16  Magistrate Judge Shushan entered the order because we

17  recognized, for example, they would ask us an interrogatory or

18  a document request, name all the people who -- all the

19  companies for whom the plaintiffs worked that violated an order

20  of the government, we couldn't answer that, we don't know.

21          So we made a motion to dismiss without

22  prejudice; but, frankly, I don't think we fully explained to

23  Your Honor the real difficulty in what we were facing.  I

24  think, had we done that, we may have found ourselves in a

25  different situation.

1           Your Honor ruled against us and denied our

2     Motion to Dismiss without prejudice four days before discovery

3     closed and three days before we finalized the settlement.

4           I think, in our mind, because all cleanup

5     workers are class members in the settlement, and if Your Honor

6     grants class certification, all of these defendants, by the

7     way, all of them are released parties.

8           So our settlement with BP, again, if Your Honor

9     grants class certification, our settlement in large measure

10    resolves a lot of the concerns they have of litigating a case

11    that they shouldn't be in because all cleanup workers are class

12    members; so, unless they opt out, they will be part of the

13    class, and all of these defendants will be released by

14    operation of the release and the settlement.

15          So we found ourselves with four days left, and

16    you can't do depositions of 600-plus people in four days.  So

17    that's why we didn't do what we did -- that's why we did what

18    we did.

19          In hindsight, I wish we had thought about

20    explaining it a little better to Your Honor; but, for us,

21    dismissing the parties without prejudice -- the defendants

22    without prejudice made sense because they are uniquely

23    individual to an individual plaintiff, and they didn't lend

24    themselves, it turns out after the fact, very well to a bundled

25    pleading where we don't represent each individual person.

1          So that's why, in some respects, we would love

2     to renew our Motion to Dismiss these entities without prejudice

3     or stay this part of the case pending the class certification

4     hearing; but, to rule as a matter of law that 600 -- or that

5     these defendants are entitled to absolute immunity, when there

6     are -- even the government acknowledges in its statement of

7     interest that it appears that we have disputed facts; that,

8     only because we could find these 13 people who could come

9     forward right away, in a very short period of time, to write

10    affidavits, there might be hundreds or thousands of more people

11    out there, because there are over 20,000 short forms of cleanup

12    workers who have personal injury claims.  They presumably were

13    put in a situation that they shouldn't have been put in to make

14    them sick.  They got rashes because they didn't have PPE.

15    Maybe they were sprayed with dispersant on the beach.

16          But to dismiss them without a factual record to

17    who each person worked for and what that entity did or didn't

18    do to them would be -- just, there is no legal principle for

19    doing that.

20          Last, but not least, the statute even

21    recognizes that there is no immunity for personal injury under

22    the National Contingency Plan regulation.  There is a specific

23    provision that says that the employer of the cleanup company is

24    responsible for taking care of the health and safety of its

25    workers.  The National Contingency Plan that applies to oil

1    spill cleanups clearly states, it's in our brief, that you have

2    to take care of your own workers.

3              So we find ourselves in this situation -- and I

4    know, Your Honor, I've taken up way too much time, but I wanted

5    to explain to you sort of the totality of the circumstances of

6    where we find ourselves, and what we can produce to you and

7    what we just haven't been able to get because we don't

8    represent all 100,000 cleanup workers.  So we can't really

9    develop that factual record as we stand here now.

10             THE COURT:  Thank you very much, Ms. Greenwald.

11             MS. GREENWALD:  Thank you.

12             MR. BECNEL:  May it please the Court --

13             THE COURT:  You've got, what did you say, about two

14   minutes?

15             MR. LYLE:  Yes, Your Honor.

16             THE COURT:  Mr. Becnel, please be seated.  We're still

17   in this oral argument.

18             Go ahead.

19             MR. LYLE:  Your Honor, just briefly, in response to the

20   Court's -- to follow up on the questioning and the answers as

21   it related to the discovery opportunity that was afforded to

22   the plaintiff, and that they admit in their own papers that

23   they made a strategic decision not to conduct, the discovery

24   schedule was entered into with the plaintiffs right on board.

25   Judge Shushan contacted all parties consistent with this

1  Court's Order on the motion to dismiss to set up a discovery

2  schedule.

3            Judge Shushan entered an Order on November 3,

4  2011.  Plaintiffs were privy to that and had opportunity to

5  comment on that and participate in the process.

6            Later, Your Honor, Judge Shushan amended that

7  order, on December 23, 2011, and continued the discovery

8  process in place.  Plaintiffs once again had an opportunity to

9  participate in discovery and made a strategic decision, as they

10 say in their own papers, not to do so.

11           It was in mid-February of 2012 when they

12 finally made their motion to dismiss, and they decided not to

13 conduct discovery while the motion was pending.

14      THE COURT:  I would like to hear your response.

15 Ms. Greenwald suggested that maybe, in light of her explanation

16 of how this all unfolded, that perhaps it would make sense for

17 me to just stay this motion until we see -- we're not that far

18 away from the final fairness hearing on the settlement, which

19 could make a lot of this go away, as she said.  Wouldn't that

20 make some sense to do that?

21      MR. LYLE:  No, Your Honor, for the same reasons it made

22 sense to continue to pursue these motions, even in light of the

23 negotiations that were taking place and the Court's -- when

24 they asked to make a voluntary motion to dismiss.

25           There will be plaintiffs that we will have to

1    confront.  We have the issues before us.  The discovery

2    opportunity was provided, full opportunity for discovery.  They

3    made a decision not to conduct that discovery.

4         THE COURT:  Well, it may narrow the focus down quite a

5    bit, though.  I don't know, we'll see how many people opt out;

6    but, it may allow everybody to focus on who these people are --

7    see who is left, who they are and who they worked for and what

8    the circumstances were.

9              Anyway, I'm just thinking out loud here.

10        MR. LYLE:  Your Honor, the fact of the matter is legal

11   points, the legal issues that we're talking about, the immunity

12   issues, the questions that we're confronting right now, those

13   are not going to change.

14             The other point I want to make, Your Honor, is,

15   is that they talk about this idea that there is all these

16   plaintiffs out there.

17             Mr. Wunstell, who is one of the affiants that

18   they listed, is represented by Mr. Herman.  They have a

19   two-year-old affidavit that they submitted to the Court.

20             They have this information, Judge.  They just

21   didn't give it to us.  This affidavit is dated May 29, 2010,

22   from Mr. Wunstell, one of the affidavits.

23        THE COURT:  A couple of the affidavits I've seen

24   before.  They were submitted, as I recall -- in fact, before

25   the MDL was created, we had some kind of hearing or hearings on

1    the issue of trying to put some protections in place for the

2    cleanup workers, and that's what those were.  I was familiar

3    with those affidavits once I saw them.

4         MR. LYLE:  Final point, Your Honor, our derivative

5    immunity arguments are raised under (j)(8), not the sections

6    that she was citing in terms of the code.  So our arguments for

7    derivative immunity are pursuant to 33 USC Section 1321(j)(8).

8              Thank you, Your Honor.

9         THE COURT:  Thank you very much.

10              I'm going to take this under advisement.

11              Our next status conference is going to be on

12    Friday, August 17th, at 9:30 a.m.

13              I appreciate counsels' continued cooperation

14    with the Court and with each other and with Judge Shushan.

15    Everybody have a good weekend.

16         THE DEPUTY CLERK:  All rise.

17         (WHEREUPON, the proceedings were concluded at

18    11:50 a.m.)

19                        *    *    *

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4     Merit Reporter, Certified Court Reporter of the State of

5     Louisiana, Official Court Reporter for the United States

6     District Court, Eastern District of Louisiana, do hereby

7     certify that the foregoing is a true and correct transcript to

8     the best of my ability and understanding from the record of the

9     proceedings in the above-entitled and numbered matter.

10

11

12                          *s/Cathy Pepper*                          
                            _____

13                          Cathy Pepper, CRR, RMR, CCR
                            Certified Realtime Reporter
14                          Registered Merit Reporter
                            Official Court Reporter
15                          United States District Court
                            Cathy_Pepper@laed.uscourts.gov
16

17

18

19

20

21

22

23

24

25

## $

**$103** [1] - 52:8
**$50** [1] - 60:12

## '

**'70s** [2] - 101:4, 102:8

## 1

**1** [2] - 91:8, 91:23
**10** [3] - 43:18, 67:12, 112:17
**10(A)........** [1] - 14:13
**10-2179** [1] - 15:12
**10-MD-2179** [1] - 1:7
**100** [1] - 3:11
**100,000** [1] - 118:8
**1000** [2] - 2:4, 9:4
**10003** [1] - 2:23
**1001** [2] - 7:10, 10:17
**10019** [1] - 8:5
**101** [1] - 3:22
**10153** [1] - 9:22
**10174** [1] - 11:21
**106** [1] - 4:11
**10a** [1] - 43:23
**10th** [1] - 26:24
**1100** [3] - 4:4, 7:7, 10:5
**118,000** [1] - 20:19
**11:50** [1] - 121:18
**11th** [3] - 27:24, 41:18, 42:1
**12** [11] - 54:5, 54:10, 54:16, 54:21, 54:24, 55:17, 56:5, 60:17, 62:22, 63:16, 63:19
**12(c** [2] - 44:15, 47:15
**12-311** [1] - 44:16
**1201** [2] - 6:22, 8:10
**121** [1] - 14:15
**1221** [1] - 7:23
**12TH** [1] - 13:10
**12th** [1] - 19:13
**13** [7] - 1:8, 4:17, 15:2, 69:1, 88:8, 111:16, 117:8
**1300** [2] - 8:19, 9:17
**1321(j)(8)** [1] - 121:7
**1331** [1] - 8:13
**14** [3] - 13:7, 19:10, 87:10
**14271** [1] - 5:18
**15** [7] - 13:14, 19:21, 20:12, 67:24, 83:3,

85:9, 106:18
**15F** [1] - 71:25
**16** [2] - 85:9, 85:10
**1601** [1] - 2:8
**1615** [1] - 8:19
**1665** [1] - 8:13
**16th** [3] - 46:23, 65:12, 66:5
**1700** [1] - 8:10
**17TH** [1] - 14:14
**17th** [1] - 121:12
**1800** [1] - 11:12
**188** [1] - 3:4
**19** [8] - 13:5, 13:7, 13:9, 13:11, 13:13, 13:15, 13:17, 23:8
**1940** [1] - 112:17
**1941842** [1] - 59:6
**1970** [2] - 101:14, 103:23
**1979** [2] - 101:3, 101:22
**1981)** [1] - 96:9
**1990's** [1] - 101:17
**1994** [2] - 92:7, 92:20
**1ST** [1] - 14:4
**1st** [1] - 32:2

## 2

**2** [3] - 89:22, 91:8, 91:23
**20** [5] - 1:6, 13:18, 13:19, 15:14, 23:7
**20,000** [1] - 117:11
**200** [1] - 10:17
**2000** [1] - 9:9
**2000's** [1] - 101:17
**20004** [1] - 6:23
**20005** [2] - 6:19, 9:18
**20006** [1] - 8:23
**20044** [2] - 5:19, 5:23
**201** [1] - 11:16
**2010** [8] - 1:6, 15:14, 25:16, 71:21, 87:12, 109:22, 110:20, 120:21
**2011** [3] - 25:5, 119:4, 119:7
**2012** [8] - 1:8, 14:14, 15:2, 23:13, 23:15, 59:6, 59:7, 119:11
**2013** [1] - 19:10
**2013......................** [1] - 13:7
**2020** [1] - 8:22
**21** [3] - 13:20, 23:6, 71:21
**2185** [6] - 23:1, 24:7,

24:12, 25:4, 25:20, 26:4
**2185...........................
........** [1] - 13:22
**23** [3] - 3:11, 13:21, 119:7
**2300** [2] - 10:21, 11:4
**233** [1] - 10:9
**23510** [1] - 2:5
**23rd** [1] - 23:17
**24** [2] - 13:22, 71:14
**2400** [1] - 11:9
**2405** [1] - 11:16
**255** [1] - 3:8
**26** [3] - 13:23, 21:1, 71:7
**26.............................
....** [1] - 13:20
**2615** [1] - 2:12
**26th** [1] - 19:24
**26TH** [1] - 13:16
**27** [1] - 13:24
**275** [1] - 2:15
**28** [2] - 4:8, 13:25
**29** [2] - 14:1, 120:21
**29464** [1] - 4:8
**29TH** [1] - 2:15

## 3

**3** [4] - 91:8, 91:9, 91:23, 119:3
**3(b** [1] - 97:8
**30** [1] - 59:7
**30(b)(6** [4] - 26:21, 97:11, 97:17, 98:13
**300** [1] - 6:15
**300.910(d** [1] - 76:12
**300.915(a** [1] - 91:5
**304** [1] - 96:9
**30th** [1] - 25:11
**31** [1] - 14:2
**3102** [1] - 4:4
**31st** [1] - 32:1
**31ST** [1] - 14:3
**32** [2] - 14:5, 14:6
**33** [1] - 121:7
**330** [1] - 114:25
**3300** [1] - 10:5
**33134** [1] - 3:8
**355** [1] - 7:14
**35TH** [1] - 7:14
**36013** [1] - 3:16
**36130** [1] - 4:22
**365** [1] - 9:9
**36604** [1] - 2:8
**3668** [1] - 1:19
**36TH** [1] - 7:6
**3700** [1] - 7:10

**3715** [1] - 4:17
**39** [1] - 88:5
**39201** [1] - 3:5

## 4

**4** [3] - 19:8, 76:8, 76:17
**40** [1] - 76:12
**4000** [1] - 9:4
**405** [1] - 11:21
**41** [2] - 14:8, 19:8
**41.............** [1] - 13:5
**4160** [1] - 3:15
**42** [2] - 14:9, 76:4
**43** [4] - 14:10, 14:13, 76:4, 88:8
**4310** [1] - 2:19
**435** [1] - 3:22
**44** [3] - 20:13, 77:7, 77:10
**45** [2] - 77:7, 77:10
**450** [1] - 5:14
**4500** [1] - 7:23
**451** [1] - 96:9
**47** [2] - 23:3, 23:6
**4800** [1] - 12:5

## 5

**5** [1] - 71:7
**500** [2] - 4:22, 12:12
**5000** [1] - 6:10
**501** [1] - 3:19
**504** [1] - 12:13
**5395** [1] - 5:14
**54(b** [1] - 27:20
**546** [1] - 7:19
**556** [1] - 1:19
**56** [6] - 51:1, 54:13, 55:18, 55:20, 56:6, 64:9
**5800** [1] - 10:9
**589-7779** [1] - 12:13

## 6

**6** [2] - 76:8, 76:17
**600** [7] - 110:18, 110:20, 113:4, 113:6, 113:8, 115:1, 117:4
**600-plus** [1] - 116:16
**601** [3] - 2:12, 10:21, 11:4
**60563** [1] - 10:13
**60606** [1] - 10:9

**60654** [1] - 6:15
**614** [1] - 20:17
**6531** [1] - 44:16
**655** [1] - 6:18
**691** [1] - 60:18

## 7

**7** [2] - 70:13, 71:8
**700** [1] - 2:22
**70037** [1] - 3:12
**70058** [1] - 4:17
**70084** [1] - 4:12
**701** [3] - 5:9, 6:10, 12:5
**70112** [2] - 8:19, 11:9
**70113** [1] - 1:23
**70130** [7] - 2:12, 5:10, 7:19, 9:9, 10:22, 11:5, 12:13
**70139** [2] - 6:11, 12:5
**70163** [2] - 7:7, 10:5
**70170** [1] - 11:17
**70360** [1] - 3:23
**70502** [1] - 1:20
**70505** [1] - 10:17
**70601** [1] - 3:19
**70804** [1] - 5:6
**733** [1] - 20:14
**75219** [1] - 4:4
**75270** [1] - 8:10
**7611** [1] - 5:23
**767** [1] - 9:21
**77002** [3] - 7:11, 9:5, 11:13
**77006** [1] - 2:19
**77010** [2] - 7:23, 8:14
**777** [1] - 3:4
**787** [1] - 8:4
**7th** [1] - 27:23
**7TH** [1] - 5:14

## 8

**80** [1] - 64:16
**808** [1] - 11:12
**820** [1] - 1:23
**8397** [1] - 3:11
**875** [1] - 60:18
**8th** [1] - 32:3
**8TH..............** [1] - 14:5

## 9

**9** [1] - 41:14
**900** [1] - 9:17
**90071** [1] - 7:15

**909** [1] - 11:9
**94005** [1] - 5:5
**94102** [1] - 5:15
**94111** [1] - 2:16
**9500** [2] - 92:8, 93:13
**9527** [1] - 93:13
**999** [1] - 2:4
**9:30** [3] - 1:8, 14:15, 121:12

## A

**a.m** [2] - 121:12, 121:18
**A.M** [1] - 1:8
**A.M............................
.............** [1] - 14:15
**ability** [7] - 47:8, 48:9, 48:12, 55:12, 101:10, 108:6, 122:8
**able** [8] - 22:14, 35:21, 56:19, 56:21, 57:1, 61:4, 114:23, 118:7
**aboard** [1] - 32:22
**above-entitled** [1] - 122:9
**ABRAMSON** [1] - 2:10
**absolute** [5] - 110:12, 111:23, 112:15, 112:17, 117:5
**absolutely** [4] - 31:21, 48:8, 65:22, 84:3
**accept** [1] - 93:9
**accepted** [1] - 75:4
**access** [1] - 28:3
**accident** [2] - 32:23, 58:6
**accompanied** [1] - 34:9
**accomplish** [2] - 33:4, 57:11
**accomplishment** [1] - 95:1
**according** [4] - 29:4, 80:17, 96:5, 98:13
**account** [2] - 20:16, 58:16
**acknowledge** [1] - 97:11
**acknowledges** [1] - 117:6
**Act** [14] - 33:25, 87:7, 88:20, 88:25, 89:3, 89:16, 90:1, 90:2, 90:21, 92:15, 94:16, 95:7, 106:18, 107:4
**act** [2] - 103:14, 112:19
**acted** [2] - 68:10, 69:6

**Action** [4] - 70:21, 71:22, 72:12, 78:8
**action** [15] - 19:23, 37:2, 40:4, 46:18, 49:18, 52:1, 54:9, 65:24, 66:11, 70:19, 84:3, 99:15, 100:1, 107:12
**ACTION** [1] - 1:7
**actions** [3] - 27:19, 28:2, 89:24
**active** [2] - 20:17, 58:2
**actively** [2] - 88:7
**activities** [8] - 72:11, 73:3, 73:9, 73:17, 80:7, 81:8, 81:18, 88:19
**activity** [2] - 99:14, 113:2
**acts** [2] - 86:15, 114:16
**add** [5] - 26:3, 84:17, 84:22, 85:12, 95:20
**adding** [1] - 91:2
**addition** [5] - 24:9, 24:23, 29:14, 42:14, 56:19
**additional** [1] - 24:24
**additive** [1] - 102:23
**address** [11] - 41:20, 54:1, 61:13, 69:25, 91:23, 97:2, 97:4, 97:6, 97:7, 101:21, 107:11
**addressed** [5] - 70:9, 76:4, 81:7, 96:25, 97:9
**addresses** [1] - 69:8
**addressing** [1] - 41:19
**adequate** [1] - 99:23
**adhered** [1] - 74:2
**administrator** [2] - 19:25, 30:2
**ADMINISTRATOR** [1] - 13:17
**Admiral** [3] - 72:17, 72:25, 94:6
**admit** [3] - 88:5, 89:22, 118:22
**admitted** [2] - 89:5, 89:6
**advance** [3] - 43:4, 75:4, 97:3
**advised** [1] - 30:5
**advisement** [2] - 67:5, 121:10
**aerial** [1] - 73:16
**affected** [1] - 87:8
**affiants** [1] - 120:17
**affidavit** [3] - 111:13,

120:19, 120:21
**affidavits** [18] - 69:1, 69:4, 69:8, 69:9, 69:10, 69:13, 69:20, 78:3, 79:24, 81:7, 82:13, 86:16, 88:8, 111:16, 117:10, 120:22, 120:23, 121:3
**affiliated** [1] - 84:6
**afforded** [1] - 118:21
**AFTER** [1] - 14:12
**AGENDA** [2] - 13:3, 14:13
**agenda** [7] - 32:8, 32:14, 41:14, 42:23, 43:9, 43:18, 43:23
**ago** [3] - 55:22, 60:7, 93:14
**agree** [6] - 40:20, 50:18, 51:25, 63:5, 64:6, 94:24
**agreed** [3] - 46:21, 58:4
**agreement** [7] - 28:4, 30:16, 30:18, 47:7, 51:23, 61:9, 66:3
**agreements** [1] - 50:4
**ahead** [2] - 68:1, 118:18
**AIG** [1] - 61:22
**Air** [6] - 81:4, 84:9, 86:7, 86:9, 86:15, 86:16
**AIR** [1] - 10:20
**air** [1] - 89:11
**AIRBORNE** [1] - 10:15
**Airborne** [1] - 18:8
**aircraft** [8] - 69:14, 69:16, 77:21, 80:12, 83:6, 83:8, 85:20
**airport** [1] - 80:13
**AL** [3] - 2:8, 3:16, 4:22
**ALABAMA** [1] - 4:20
**Alabama** [4] - 16:14, 71:15, 73:13, 104:10
**ALAN** [2] - 8:13, 11:20
**Alan** [3] - 17:25, 18:15, 79:12
**ALEXANDER** [23] - 10:8, 18:17, 86:25, 87:5, 87:18, 88:4, 88:13, 90:6, 90:8, 90:14, 90:20, 91:14, 91:21, 92:1, 92:4, 92:6, 92:13, 92:15, 93:11, 93:25, 94:22, 95:12, 96:19
**Alexander** [3] - 18:18, 67:25, 87:1

**ALHAMBRA** [1] - 3:8
**aligned** [1] - 66:3
**ALISON** [1] - 8:9
**ALL** [1] - 1:10
**Allan** [1] - 17:5
**ALLAN** [1] - 5:9
**allayed** [1] - 75:21
**allegation** [2] - 100:1, 106:9
**allegations** [14] - 68:20, 79:20, 80:4, 88:9, 88:24, 89:2, 94:25, 95:4, 96:10, 97:19, 100:6, 108:3, 108:4, 110:17
**allege** [1] - 82:3
**alleged** [2] - 23:7, 80:7
**alleging** [3] - 42:4, 78:19, 100:8
**ALLEN** [2] - 3:14, 7:14
**Allen** [2] - 72:25, 94:6
**allow** [9] - 22:20, 66:14, 66:15, 85:11, 90:18, 100:23, 102:8, 103:22, 120:6
**allowed** [5] - 22:19, 51:6, 70:4, 98:19, 114:2
**allowing** [1] - 114:5
**almost** [4] - 20:22, 27:6, 106:18, 109:4
**ALPHONSO** [1] - 3:3
**ALSO** [1] - 12:8
**alter** [1] - 75:14
**ambiguities** [1] - 58:16
**ambiguity** [5] - 56:13, 56:16, 57:15
**ambiguous** [4] - 64:7, 64:24, 65:1, 65:2
**amended** [4] - 24:18, 25:13, 25:14, 119:6
**Amended** [1] - 19:7
**AMENDED** [1] - 13:5
**amendment** [2] - 85:5, 85:8
**AMERICA** [7] - 5:21, 6:3, 6:3, 6:4, 6:5, 6:7, 6:8
**American** [1] - 59:6
**AMERICAN** [3] - 2:11, 10:21, 11:4
**amounts** [2] - 89:10, 94:19
**AN** [2] - 13:14, 13:16
**ANADARKO** [2] - 8:16, 8:17
**Anadarko** [2] - 18:21, 18:22
**analysis** [2] - 41:8,

105:13
**AND** [6] - 4:15, 7:4, 9:16, 13:10, 13:23, 14:4
**Anderson** [1] - 82:14
**ANDREW** [1] - 6:13
**Andy** [1] - 17:22
**ANGELES** [1] - 7:15
**answer** [3] - 79:18, 88:22, 115:20
**answered** [1] - 47:8
**answers** [1] - 118:20
**ANY** [2] - 13:8, 13:16
**anyway** [2] - 71:19, 120:9
**apart** [3] - 20:18, 52:15, 56:24
**apologize** [2] - 63:15, 113:9
**apparent** [1] - 65:9
**appeal** [2] - 21:19, 25:8
**appealed** [1] - 25:7
**appealing** [1] - 27:22
**appeals** [1] - 19:25
**APPEALS** [1] - 13:17
**APPEARANCES** [12] - 1:15, 2:1, 3:1, 4:1, 5:1, 6:1, 7:1, 8:1, 9:1, 10:1, 11:1, 12:1
**appellate** [1] - 19:24
**APPELLATE** [1] - 13:16
**applicable** [1] - 37:1
**application** [3] - 55:15, 93:3, 97:18
**applications** [2] - 76:6, 76:9
**applied** [10] - 55:15, 57:14, 72:5, 72:6, 85:19, 96:7, 96:15, 99:11, 107:22, 112:17
**applies** [11] - 36:10, 45:12, 46:1, 46:5, 46:7, 52:21, 53:11, 53:15, 57:14, 64:25, 117:25
**apply** [21] - 36:24, 45:13, 51:21, 51:22, 51:24, 52:18, 53:12, 53:14, 55:23, 56:3, 56:17, 64:19, 64:20, 70:23, 86:20, 93:23, 94:1, 94:2, 94:3, 94:18
**applying** [4] - 64:7, 69:15, 69:17, 78:2
**appointed** [2] - 19:24, 73:8

**APPOINTED** [1] - 13:16
**appreciate** [4] - 38:7, 39:20, 110:19, 121:13
**approach** [2] - 39:14, 89:1
**appropriate** [5] - 25:25, 51:1, 63:16, 92:24, 96:7
**approve** [1] - 94:7
**approved** [6] - 29:4, 41:21, 72:12, 103:7, 103:8, 103:13
**approves** [1] - 102:9
**approving** [1] - 102:5
**approximate** [1] - 23:5
**APRIL** [1] - 1:6
**April** [4] - 15:14, 24:23, 71:21, 87:11
**architecture** [1] - 38:25
**ARE** [2] - 14:3, 14:11
**Area** [2] - 70:15, 70:16
**area** [3] - 82:19, 82:21, 82:22
**areas** [4] - 72:22, 73:12, 76:8, 76:17
**argue** [8] - 44:6, 53:15, 67:17, 67:25, 77:18, 79:16, 100:13, 113:3
**arguing** [9] - 44:11, 52:23, 53:1, 54:20, 67:12, 67:19, 67:21, 67:25, 104:25
**argument** [32] - 24:21, 42:25, 43:10, 47:18, 49:6, 50:18, 55:2, 55:3, 55:10, 59:18, 61:13, 61:14, 64:10, 65:11, 67:12, 77:24, 78:14, 79:13, 83:19, 98:2, 100:20, 100:21, 102:11, 102:21, 105:16, 105:17, 107:19, 107:22, 108:18, 109:15, 112:9, 118:17
**arguments** [13] - 43:25, 50:13, 52:14, 54:11, 85:3, 86:19, 88:17, 97:10, 105:2, 107:6, 121:5, 121:6
**arranges** [1] - 45:18
**art** [2] - 101:15, 101:18
**articulate** [1] - 96:7
**AS** [1] - 14:13
**ASBILL** [1] - 7:9

**aside** [7] - 38:20, 39:1, 49:5, 50:23, 54:25, 69:22, 78:14
**assert** [1] - 65:25
**asserted** [1] - 66:3
**asset** [1] - 34:4
**assigned** [3] - 59:8, 59:12, 59:19
**assist** [1] - 48:4
**assume** [2] - 62:4, 85:13
**assumed** [1] - 46:21
**assumes** [1] - 48:6
**assuming** [1] - 93:20
**assumption** [1] - 96:6
**assumptions** [1] - 86:13
**assurance** [1] - 56:25
**AT** [1] - 14:15
**attach** [2] - 45:14, 46:2
**attached** [7] - 44:20, 52:7, 52:9, 52:11, 54:19, 70:12, 91:9
**attachment** [6] - 45:8, 47:11, 48:11, 48:12, 48:13, 65:13
**attack** [1] - 58:12
**attention** [1] - 97:6
**attorney** [1] - 108:2
**ATTORNEY** [2] - 4:20, 5:4
**Attorney** [2] - 17:4, 17:6
**ATTORNEY'S** [1] - 13:15
**Attorney's** [1] - 19:22
**August** [2] - 32:1, 121:12
**AUGUST** [2] - 14:3, 14:14
**Auslander** [2] - 44:11, 53:22
**AUSLANDER** [14] - 8:3, 53:21, 55:5, 55:9, 55:13, 56:8, 56:18, 57:10, 62:6, 62:16, 63:5, 64:12, 66:24, 67:1
**authority** [11] - 74:17, 75:13, 79:5, 79:7, 89:15, 89:23, 89:25, 94:16, 95:6, 96:2, 103:18
**authorization** [1] - 93:22
**authorizations** [1] - 76:2
**authorized** [5] - 76:7, 76:23, 77:4, 77:12,

99:10
**avail** [1] - 88:18
**available** [6] - 23:25, 90:19, 92:22, 93:15, 95:16, 102:18
**AVENUE** [10] - 1:23, 4:4, 4:22, 5:14, 6:22, 7:14, 8:4, 9:21, 11:16, 11:21
**avenue** [1] - 114:22
**Aviation** [1] - 81:4
**AVIATION** [1] - 12:3
**aviation** [1] - 82:15
**aware** [4] - 31:4, 64:24, 108:11, 108:16

**B**

**B3** [1] - 109:24
**BABIUCH** [1] - 6:14
**bad** [10] - 27:4, 27:5, 45:5, 50:22, 52:19, 53:5, 54:4, 54:9, 58:23, 61:13
**BADEN** [1] - 4:7
**bankrupt** [1] - 57:2
**bar** [3] - 59:25, 65:10, 66:14
**barbecue** [1] - 29:12
**barbecues** [2] - 29:11, 29:14
**BARBIER** [1] - 1:13
**bargaining** [1] - 49:1
**BARNETT** [1] - 10:3
**BARON** [1] - 4:3
**Barrasso** [1] - 44:3
**BARRASSO** [4] - 11:7, 11:8, 44:3, 44:6
**barred** [2] - 44:25, 47:7
**barring** [1] - 66:9
**based** [1] - 64:5
**bases** [2] - 68:6, 68:7
**basis** [7] - 69:17, 69:24, 72:10, 76:11, 76:12, 78:23, 105:8
**BATON** [1] - 5:6
**BATTERY** [1] - 2:15
**BATTISTE** [1] - 8:9
**BE** [2] - 13:19, 14:3
**beach** [9] - 74:9, 74:16, 81:10, 81:24, 82:4, 109:8, 111:1, 114:18, 117:15
**beaches** [3] - 104:9, 104:23, 109:6
**bear** [1] - 70:6
**BEASLEY** [1] - 3:14

**beat** [1] - 71:15
**BECK** [1] - 7:21
**BECNEL** [3] - 4:10, 4:11, 118:12
**Becnel** [1] - 118:16
**become** [1] - 53:9
**beef** [1] - 78:24
**BEFORE** [1] - 1:13
**beforehand** [1] - 75:3
**begging** [1] - 51:11
**beginning** [2] - 71:20, 75:14
**behalf** [11] - 17:2, 39:17, 41:4, 43:15, 44:7, 44:10, 67:8, 67:23, 83:14, 86:16, 87:1
**behavior** [1] - 60:10
**behind** [2] - 16:4, 39:2
**behold** [2] - 101:17, 112:24
**belief** [1] - 115:9
**BELLE** [1] - 3:12
**belonged** [1] - 110:8
**below** [3] - 45:15, 64:3, 66:18
**benefit** [3] - 30:13, 38:2, 87:25
**BERNSTEIN** [1] - 2:14
**BERTAUT** [1] - 7:18
**best** [3] - 48:21, 86:25, 122:8
**better** [5] - 26:11, 48:21, 112:2, 115:10, 116:20
**between** [9] - 26:18, 27:8, 41:21, 59:10, 80:25, 90:10, 95:4, 95:21, 96:4
**beyond** [1] - 40:18
**big** [1] - 106:22
**billions** [1] - 57:24
**BINGHAM** [1] - 8:21
**bit** [4] - 39:8, 109:19, 115:12, 120:5
**bitter** [2] - 56:22, 56:23
**blame** [1] - 86:1
**BLANK** [1] - 11:19
**board** [1] - 118:24
**BOCKIUS** [1] - 9:3
**body** [1] - 36:25
**boom** [4] - 22:2, 70:25, 112:2
**BOP** [8] - 13:25, 28:10, 28:12, 28:13, 28:20, 28:21, 29:16, 29:20
**boss** [1] - 72:14
**bought** [1] - 101:23

**BOULEVARD** [2] - 2:19, 4:8
**BOUNDS** [1] - 2:7
**Bowman** [1] - 18:6
**BOWMAN** [2] - 8:9, 18:6
**BOX** [5] - 1:19, 3:15, 5:5, 5:18, 5:23
**BP** [41] - 6:3, 6:3, 6:4, 6:5, 6:6, 6:7, 6:8, 17:20, 17:21, 17:22, 18:14, 19:3, 19:15, 24:20, 25:15, 25:18, 26:13, 26:19, 27:8, 27:22, 28:18, 31:20, 34:9, 34:20, 37:16, 41:21, 42:4, 47:1, 48:22, 49:1, 57:20, 58:3, 58:22, 61:9, 82:1, 94:10, 95:13, 112:1, 112:10, 116:8
**BP's** [2] - 27:21, 29:25
**BRAD** [1] - 7:13
**Brad** [1] - 18:5
**BRADY** [1] - 11:16
**BRANCH** [2] - 5:13, 5:17
**branches** [1] - 70:17
**branded** [1] - 42:4
**breach** [5] - 22:1, 25:10, 54:4, 54:8, 60:22
**breached** [1] - 54:7
**break** [1] - 109:5
**BREIT** [4] - 2:3, 2:3, 16:1, 16:6
**Breit** [2] - 16:1, 16:3
**BRENNAN** [1] - 7:9
**BRIAN** [2] - 7:13, 18:5
**Brian** [1] - 18:5
**BRIDGESIDE** [1] - 4:8
**brief** [16] - 27:23, 53:24, 54:2, 54:17, 60:20, 79:13, 83:16, 87:20, 88:6, 89:23, 91:9, 97:8, 106:14, 106:16, 110:14, 118:1
**briefed** [11] - 24:22, 25:7, 25:14, 28:6, 41:24, 42:3, 42:11, 43:3, 50:13, 85:9, 110:13
**briefing** [5] - 27:24, 41:22, 45:11, 45:16, 46:7
**briefings** [1] - 107:2
**briefly** [5] - 27:18, 38:13, 64:15, 83:17, 118:19

**BRIEFS** [1] - 13:10
**briefs** [7] - 19:14, 27:24, 42:1, 42:2, 42:13, 88:8, 93:4
**bring** [6] - 86:4, 86:5, 97:5, 98:17, 110:4, 111:12
**bringing** [2] - 78:23, 99:17
**brings** [2] - 58:20, 111:11
**BROAD** [1] - 3:19
**broaden** [1] - 37:7
**broader** [2] - 38:15, 55:6
**BROADWAY** [1] - 2:22
**BROCK** [2] - 6:22, 17:19
**Brock** [1] - 17:19
**broken** [1] - 70:16
**brought** [4] - 31:3, 52:2, 108:2, 110:3
**BRUCE** [1] - 8:9
**Bruce** [1] - 18:6
**BRYAN** [1] - 10:12
**BUDD** [1] - 4:3
**Buddy** [3] - 16:17, 32:18, 35:5
**BUILDING** [2] - 2:11, 11:20
**building** [2] - 30:24, 31:7
**bundle** [4] - 109:24, 110:1, 110:16, 110:24
**bundled** [6] - 109:23, 110:8, 113:15, 114:21, 115:11, 116:24
**burden** [5] - 52:11, 54:18, 54:20, 54:25, 55:1
**Burkeen** [1] - 39:17
**BURLING** [1] - 6:21
**burning** [5] - 70:24, 82:11, 82:24, 83:1, 83:3
**business** [2] - 48:13, 48:19
**BY** [60] - 1:4, 1:18, 1:22, 2:3, 2:7, 2:11, 2:15, 2:18, 2:22, 3:3, 3:7, 3:11, 3:15, 3:18, 3:22, 4:3, 4:7, 4:11, 4:16, 4:20, 5:4, 5:9, 5:13, 5:18, 5:22, 6:9, 6:13, 6:18, 6:22, 7:6, 7:10, 7:13, 7:18, 7:22, 8:3, 8:8, 8:13, 8:18, 8:22, 9:3, 9:8,

9:17, 9:20, 10:4, 10:8, 10:12, 10:16, 10:20, 11:3, 11:8, 11:12, 11:16, 11:20, 12:4, 12:15, 12:16, 13:13, 13:19, 14:3, 14:7

# C

**CA** [3] - 2:16, 5:15, 7:15
**Cabraser** [1] - 16:21
**CABRASER** [3] - 2:14, 2:15, 16:20
**CALDWELL** [2] - 5:4, 16:16
**Caldwell** [1] - 16:17
**CALLED** [1] - 15:4
**CALLING** [1] - 13:10
**Cameron** [29] - 17:18, 34:24, 42:2, 44:2, 44:10, 45:10, 46:10, 46:13, 46:19, 48:17, 49:9, 49:19, 49:20, 50:8, 51:4, 53:22, 55:24, 56:21, 56:23, 57:2, 57:16, 57:18, 57:21, 57:22, 58:13, 58:19, 60:9, 61:8, 64:1
**CAMERON** [1] - 7:17
**Cameron's** [3] - 44:22, 44:24, 45:3
**CAMP** [1] - 5:9
**CANAL** [2] - 9:8, 9:9
**CANGELOSI** [1] - 12:4
**cannot** [2] - 48:1, 60:11, 65:6
**CAPITOL** [1] - 3:4
**capping** [3] - 21:11, 28:14, 28:21
**Caps** [1] - 19:22
**CAPS** [1] - 13:14
**Captain** [2] - 29:3, 29:15
**car** [1] - 58:6
**care** [2] - 117:24, 118:2
**Cargo** [5] - 84:9, 84:22, 86:7, 86:15, 86:17
**CARL** [1] - 1:13
**CARMELITE** [1] - 7:18
**CARONDELET** [1] - 7:19
**carrier** [3] - 59:25, 60:2, 63:22
**carriers** [1] - 27:23

**Carter** [3] - 17:1, 67:22, 83:14
**CARTER** [1] - 11:3
**case** [73] - 15:11, 20:19, 22:21, 23:16, 25:4, 25:6, 25:9, 25:10, 25:15, 25:18, 25:25, 33:22, 33:23, 34:15, 34:16, 35:4, 35:13, 35:23, 36:3, 36:14, 36:21, 37:9, 37:24, 38:22, 39:1, 39:7, 39:19, 40:3, 40:6, 40:21, 45:21, 50:6, 50:10, 50:11, 50:20, 51:18, 51:19, 54:4, 54:22, 55:24, 57:2, 57:5, 58:11, 59:5, 59:9, 59:15, 59:21, 60:3, 60:4, 60:10, 60:18, 60:25, 61:7, 62:13, 63:25, 85:14, 96:9, 98:7, 98:10, 102:22, 102:24, 103:1, 103:4, 103:7, 105:7, 106:3, 107:24, 108:8, 112:8, 115:9, 116:10, 117:3
**Case** [2] - 19:8, 44:16
**Cases** [1] - 23:2
**CASES** [1] - 1:10
**cases** [30] - 20:13, 20:14, 20:17, 20:23, 21:5, 21:10, 21:12, 22:3, 22:5, 22:13, 22:16, 23:7, 23:13, 23:22, 24:5, 24:24, 25:22, 26:1, 27:17, 36:23, 36:25, 39:18, 40:5, 58:5, 83:2, 101:7, 112:17, 112:18, 113:1
**CASES.................. ......** [1] - 13:24
**CASES.................. ..............** [1] - 13:21
**Casualty** [1] - 59:6
**catastrophe** [1] - 104:2
**categories** [1] - 43:1
**category** [1] - 113:21
**CATHERINE** [1] - 11:8
**CATHY** [1] - 12:11
**Cathy** [2] - 122:3, 122:13
**cathy_Pepper@laed. uscourts.gov** [1] - 12:14
**Cathy_Pepper@laed**

**.uscourts.gov** [1] - 122:15
**causes** [1] - 112:24
**cavity** [1] - 28:21
**CCR** [2] - 12:11, 122:13
**CENTER** [5] - 7:22, 10:12, 10:16, 10:21, 11:4
**CENTRE** [2] - 7:6, 10:4
**certain** [13] - 19:14, 26:15, 71:13, 71:15, 75:18, 97:12, 97:18, 97:22, 99:4, 99:22, 103:3, 107:18, 109:3
**CERTAIN** [1] - 13:11
**certainly** [10] - 27:13, 35:22, 40:14, 55:25, 60:4, 61:15, 83:8, 88:18, 93:6, 110:19
**certainties** [1] - 71:16
**CERTIFICATE** [1] - 122:1
**certification** [3] - 116:6, 116:9, 117:3
**Certified** [2] - 122:3, 122:4, 122:13
**CERTIFIED** [1] - 12:11
**certify** [1] - 122:7
**CFR** [1] - 76:12
**chain** [4] - 70:20, 73:20, 93:23, 94:14
**challenge** [1] - 25:16
**chance** [1] - 114:10
**change** [9] - 49:12, 49:24, 100:5, 100:15, 101:20, 120:13
**charge** [7] - 29:15, 29:16, 69:6, 70:14, 71:5, 75:17, 79:7
**CHARLES** [2] - 3:19, 11:16
**chart** [1] - 88:23
**CHASSE** [1] - 3:12
**checks** [1] - 30:5
**chemical** [8] - 87:21, 89:10, 90:10, 90:12, 98:20, 102:5, 108:5, 108:11
**chemicals** [4] - 97:24, 104:3, 104:13, 108:12
**chew** [1] - 115:13
**CHICAGO** [2] - 6:15, 10:9
**choices** [2] - 52:3, 52:5
**choose** [2] - 62:5,

62:6
**chose** [4] - 47:18, 47:19, 58:12, 100:3
**Chris** [1] - 44:6
**CHRISTOPHER** [1] - 11:12
**CHRISTOVICH** [2] - 10:20, 11:3
**CHRYSLER** [1] - 11:20
**CIRCLE** [1] - 3:8
**Circuit** [10] - 25:7, 27:23, 45:20, 47:10, 51:8, 59:4, 59:7, 59:23, 60:7, 64:15
**circumstance** [3] - 60:5, 107:18, 110:13
**circumstances** [6] - 58:18, 75:18, 97:23, 97:25, 118:5, 120:8
**cited** [1] - 60:19
**citing** [1] - 121:6
**City** [1] - 95:25
**CITY** [1] - 2:23
**civic** [1] - 31:19
**CIVIL** [3] - 1:7, 5:13, 5:17
**civil** [1] - 40:4
**claim** [10] - 22:1, 33:1, 33:8, 37:7, 48:7, 53:12, 64:22, 65:5, 78:23, 106:13
**claiming** [2] - 42:6, 82:10
**claims** [39] - 19:15, 19:16, 19:18, 19:19, 19:25, 21:9, 21:11, 23:8, 25:10, 25:12, 30:1, 30:2, 33:16, 34:2, 37:12, 37:25, 41:20, 42:4, 42:5, 42:8, 42:9, 42:16, 42:18, 44:24, 45:5, 47:1, 47:20, 52:19, 53:6, 53:12, 55:8, 55:11, 55:12, 87:6, 95:23, 95:24, 110:11, 117:12
**CLAIMS** [3] - 13:13, 13:17, 14:7
**Claims** [1] - 41:15
**class** [8] - 19:22, 30:25, 116:5, 116:6, 116:9, 116:11, 116:13, 117:3
**clause** [4] - 44:21, 47:5, 51:15, 64:18, 65:6
**CLAY** [1] - 4:16
**Clean** [11] - 87:7,

88:20, 88:25, 89:3, 89:16, 90:1, 90:2, 90:21, 92:15, 94:16, 95:7

**clean** [2] - 71:1, 89:9

**cleanup** [41] - 18:10, 67:9, 68:3, 68:14, 69:6, 70:7, 70:15, 70:18, 70:23, 73:4, 73:19, 74:5, 76:15, 77:1, 77:14, 81:19, 81:20, 81:24, 82:4, 82:8, 87:22, 95:23, 97:20, 111:3, 111:7, 111:18, 112:8, 112:11, 113:4, 113:6, 113:8, 113:10, 113:14, 114:16, 115:1, 116:4, 116:11, 117:11, 117:23, 118:8, 121:2

**cleanups** [1] - 118:1

**clear** [12] - 48:11, 52:23, 52:25, 53:2, 53:9, 79:22, 86:11, 95:3, 102:4, 102:6, 107:3, 108:4

**clearly** [4] - 36:25, 52:21, 78:25, 118:1

**CLERK** [3] - 15:7, 15:12, 121:16

**client** [22] - 36:4, 38:16, 39:4, 39:23, 41:4, 46:16, 46:21, 46:25, 47:2, 47:25, 48:9, 49:10, 49:18, 49:25, 50:2, 50:16, 74:3, 81:14, 83:25, 85:12, 85:24

**client's** [7] - 47:6, 47:7, 47:20, 48:3, 65:10, 80:9, 83:17

**clients** [3] - 68:14, 74:4, 80:18

**clock** [1] - 95:17

**close** [2] - 30:14, 78:13

**closed** [5] - 26:9, 52:4, 52:6, 65:15, 116:3

**closer** [2] - 74:20, 77:3

**closest** [1] - 83:2

**CLUB** [1] - 4:15

**Coast** [6] - 72:15, 72:17, 87:14, 87:17, 87:19, 95:17

**code** [1] - 121:6

**cognizable** [1] - 42:18

**collaborative** [1] -

29:8

**collateral** [1] - 30:8

**collectable** [2] - 51:16, 57:8

**collected** [1] - 45:22

**collision** [1] - 95:4

**command** [3] - 73:5, 73:20, 73:24

**Command** [6] - 70:15, 70:16, 70:17, 73:10, 73:11, 97:21

**Commander** [1] - 73:2

**Commander's** [1] - 94:8

**comment** [3] - 22:24, 24:4, 119:5

**comments** [1] - 100:3

**Committee** [4] - 109:23, 110:25, 111:10, 114:21

**common** [2] - 30:13, 96:1

**commonly** [1] - 57:8

**companies** [9] - 59:14, 65:4, 103:1, 103:9, 112:23, 113:8, 113:9, 113:11, 115:19

**COMPANY** [5] - 6:4, 8:17, 10:7, 10:11

**Company** [4] - 87:2, 112:1, 112:5, 113:16

**company** [1] - 45:10, 52:8, 58:8, 58:9, 61:22, 64:21, 84:6, 84:7, 84:14, 85:20, 111:25, 112:1, 112:11, 112:23, 117:23

**company's** [1] - 114:16

**compared** [2] - 34:10, 63:4

**complained** [1] - 88:19

**complaint** [10] - 24:18, 25:13, 25:14, 99:24, 100:10, 101:22, 110:8, 113:15, 114:21, 115:11

**complaints** [1] - 109:23

**complete** [1] - 69:24

**completely** [3] - 64:17, 66:2, 69:11

**complied** [5] - 68:15, 78:22, 79:4, 92:18, 102:17

**comply** [1] - 91:10

**complying** [1] - 41:25

**component** [1] - 91:16

**components** [2] - 28:22, 91:4

**compromise** [1] - 49:15

**COMPUTER** [1] - 12:16

**conceived** [5] - 89:9, 89:13, 89:14, 90:1

**concept** [1] - 60:14

**concerned** [3] - 23:21, 66:12, 107:9

**concerning** [1] - 72:10

**concerns** [1] - 116:10

**concluded** [2] - 94:25, 121:17

**conclusions** [1] - 69:12

**condition** [5] - 47:12, 47:14, 47:16, 108:24

**Conditional** [2] - 20:8, 20:12

**CONDITIONAL** [1] - 13:18

**conditions** [5] - 97:13, 97:18, 98:16, 99:22, 108:25

**conduct** [8] - 32:2, 70:24, 114:6, 114:8, 114:11, 118:23, 119:13, 120:3

**CONDUCT** [1] - 14:4

**conducted** [5] - 30:11, 30:14, 76:16, 77:15, 78:9

**CONFERENCE** [2] - 1:12, 14:14

**conference** [3] - 20:2, 43:2, 121:11

**conferences** [1] - 26:21

**confirm** [1] - 20:22

**conflict** [2] - 68:5, 78:20

**conflicted** [1] - 90:1

**conformity** [3] - 68:10, 69:7, 78:10

**confront** [1] - 120:1

**confronting** [1] - 120:12

**confusing** [1] - 72:18

**Congress** [14] - 89:16, 95:2, 95:6, 96:2, 96:6, 96:13, 102:20, 103:1, 103:14, 106:19, 106:20, 106:21, 106:23, 112:19

**Congressional** [1] - 103:18

**conjecture** [2] - 69:12, 69:19

**connection** [2] - 19:22, 110:5

**CONRAD** [1] - 3:22

**consented** [1] - 22:20

**consequences** [1] - 87:24

**consider** [2] - 38:23, 57:11

**consideration** [3] - 38:7, 54:21, 56:9

**Consideration** [1] - 32:9

**CONSIDERATION** [1] - 14:6

**considerations** [1] - 59:1

**considered** [2] - 48:21, 60:3

**consistent** [4] - 46:8, 46:14, 76:21, 118:25

**consolidated** [2] - 24:18, 31:10

**constituent** [1] - 102:15

**constitutes** [1] - 47:23

**construction** [1] - 65:7

**contacted** [1] - 118:25

**contain** [1] - 89:9

**contained** [2] - 72:10, 76:12

**contemplate** [1] - 30:20

**contemplating** [2] - 30:18, 66:8

**contest** [2] - 98:19, 111:10

**contested** [1] - 25:3

**context** [2] - 110:1, 112:18

**Continental** [2] - 59:6, 61:7

**Contingency** [22] - 75:6, 75:11, 76:13, 87:8, 88:21, 88:25, 89:4, 89:16, 90:13, 90:22, 90:24, 91:1, 91:5, 91:10, 91:18, 92:2, 92:9, 92:16, 93:2, 94:17, 117:22, 117:25

**contingency** [1] - 75:21

**continue** [4] - 27:25, 29:7, 30:3, 119:22

**continued** [4] - 25:22, 28:19, 119:7, 121:13

**CONTINUED** [11] -

2:1, 3:1, 4:1, 5:1, 6:1, 7:1, 8:1, 9:1, 10:1, 11:1, 11:2, 12:1

**continues** [1] - 29:24

**continuing** [2] - 28:14, 71:21

**contract** [12] - 22:1, 22:13, 50:8, 51:5, 54:4, 54:6, 54:7, 54:8, 60:22, 97:7, 112:4, 112:19

**contractor** [1] - 94:10

**control** [2] - 23:19, 68:10

**controlled** [1] - 68:9

**controls** [2] - 61:21, 62:2

**convenies** [1] - 25:6

**cooperation** [1] - 121:13

**cooperative** [1] - 29:8

**coordinate** [2] - 25:22, 112:22

**coordinating** [2] - 16:14, 23:22

**Coordinator** [9] - 70:13, 72:13, 72:24, 73:6, 75:12, 76:1, 89:20, 92:23, 95:19

**CORAL** [1] - 3:8

**COREXIT** [34] - 88:3, 90:5, 90:7, 90:11, 90:12, 90:25, 92:8, 92:14, 93:13, 93:18, 93:22, 93:23, 93:24, 94:15, 94:21, 95:14, 96:14, 97:13, 97:18, 98:25, 99:10, 99:14, 99:23, 100:4, 100:10, 100:22, 102:7, 103:23, 107:15, 107:20, 108:5

**COREY** [1] - 4:21

**corner** [1] - 30:24

**CORPORATE** [1] - 3:22

**Corporation** [5] - 18:16, 79:13, 80:6, 82:5, 82:15

**CORPORATION** [5] - 6:5, 7:17, 8:16, 10:3, 11:19

**Corporation's** [4] - 80:5, 81:3, 81:23, 83:6

**correct** [26] - 21:22, 22:17, 29:17, 32:4, 33:15, 34:7, 43:13, 55:22, 56:18, 68:16,

73:1, 74:23, 77:5, 80:16, 80:20, 81:2, 90:14, 90:19, 92:13, 98:22, 99:1, 99:11, 99:12, 104:21, 122:7
**Cory** [1] - 39:17
**Cossich** [1] - 17:9
**COSSICH** [3] - 3:10, 3:11, 17:9
**cost** [1] - 48:24
**costs** [5] - 45:3, 50:22, 52:16, 61:17, 61:23
**COTLAR** [1] - 1:21
**COUNSEL** [1] - 1:18
**counsel** [9] - 15:15, 16:14, 20:25, 30:25, 58:1, 67:9, 67:16, 67:20
**counsels'** [1] - 121:13
**count** [1] - 20:14
**Counties** [1] - 23:12
**country** [2] - 21:10, 88:1
**counts** [1] - 23:5
**County** [2] - 23:16, 35:21
**couple** [6] - 24:10, 24:12, 60:7, 79:14, 110:14, 120:23
**course** [4] - 19:7, 20:18, 110:21
**court** [18] - 23:11, 23:22, 24:2, 25:3, 33:7, 34:13, 35:6, 36:9, 37:23, 38:3, 39:11, 40:1, 40:3, 64:24, 97:3, 105:3, 112:10
**Court** [38] - 19:6, 19:21, 23:2, 26:8, 26:23, 29:9, 32:2, 35:8, 35:13, 37:17, 37:23, 41:1, 42:25, 43:18, 46:17, 51:3, 53:21, 60:19, 60:21, 64:16, 70:3, 70:6, 78:15, 79:11, 79:17, 79:19, 95:25, 96:5, 103:16, 118:12, 120:19, 121:14, 122:4, 122:5, 122:6, 122:14, 122:15
**COURT** [233] - 1:1, 12:11, 13:21, 14:4, 15:4, 15:8, 15:10, 15:15, 16:3, 19:4, 21:4, 21:7, 21:14, 21:17, 21:19, 22:4, 22:9, 22:13, 22:18, 22:23, 23:20, 24:3,

25:21, 26:2, 26:11, 26:14, 27:2, 27:11, 27:14, 28:7, 28:17, 29:10, 29:13, 29:15, 29:18, 31:2, 31:10, 31:15, 31:24, 32:5, 32:17, 32:19, 32:24, 33:4, 33:8, 33:13, 33:17, 33:24, 34:3, 34:6, 34:8, 34:12, 34:16, 34:19, 34:21, 34:23, 34:25, 35:2, 35:6, 35:9, 35:13, 35:15, 35:17, 35:22, 35:25, 36:2, 36:12, 36:16, 36:20, 37:5, 37:9, 37:11, 37:15, 37:20, 38:6, 38:8, 38:10, 39:13, 39:15, 39:19, 39:23, 39:25, 40:14, 40:17, 40:25, 41:10, 41:12, 42:24, 43:5, 43:20, 44:5, 44:8, 44:13, 46:4, 46:9, 48:6, 48:16, 49:5, 49:12, 50:5, 50:11, 50:17, 50:23, 51:2, 51:10, 51:17, 51:21, 53:1, 53:5, 53:10, 53:20, 54:25, 55:6, 55:10, 56:5, 56:16, 57:7, 62:3, 62:14, 63:2, 64:10, 64:13, 65:18, 65:23, 66:6, 66:11, 66:17, 66:23, 66:25, 67:3, 67:7, 67:15, 67:17, 68:1, 68:12, 68:17, 68:19, 71:17, 72:15, 72:18, 72:22, 72:25, 74:3, 74:7, 74:20, 74:22, 75:22, 76:1, 76:25, 79:8, 79:10, 80:9, 80:15, 80:17, 80:25, 81:13, 82:18, 83:11, 83:17, 83:21, 83:23, 84:6, 84:11, 84:13, 84:17, 84:23, 84:25, 85:11, 85:17, 85:21, 85:23, 86:1, 86:5, 86:19, 86:23, 87:4, 87:16, 88:2, 88:10, 90:4, 90:7, 90:9, 90:15, 91:12, 91:19, 91:25, 92:3, 92:5, 92:10, 92:14, 93:8, 93:18, 94:21, 95:8, 96:18, 96:20, 96:23, 97:15, 97:19, 98:5, 98:19, 98:23, 99:2, 99:6, 99:20,

100:19, 102:12, 102:23, 103:25, 104:6, 104:18, 104:22, 105:2, 105:10, 105:13, 106:4, 107:8, 108:10, 108:15, 109:1, 109:11, 113:6, 113:8, 113:11, 113:18, 113:24, 118:10, 118:13, 118:16, 119:14, 120:4, 120:23, 121:9
**Court's** [7] - 29:3, 32:14, 67:13, 97:6, 118:20, 119:1, 119:23
**courtroom** [2] - 32:13
**courts** [2] - 23:4, 96:7
**coverage** [8] - 27:17, 27:21, 47:14, 47:16, 50:24, 58:17, 66:10, 66:14
**COVERAGE** [1] - 13:24
**covered** [2] - 45:13, 62:14
**covering** [1] - 20:13
**covers** [1] - 62:16
**COVINGTON** [1] - 6:21
**CPA** [1] - 30:10
**CPA's** [1] - 30:9
**CPAs** [1] - 30:14
**create** [2] - 69:20, 77:25, 78:4
**created** [2] - 68:13, 120:25
**creating** [1] - 99:15
**credibility** [1] - 80:2
**crew** [1] - 34:6
**critical** [4] - 47:6, 69:3, 69:4, 69:9
**critically** [1] - 106:10
**criticized** [1] - 104:24
**cross** [1] - 36:21
**cross-defendant** [1] - 36:21
**crossclaim** [1] - 41:5
**CROW** [1] - 3:14
**CRR** [2] - 12:11, 122:13
**Cunningham** [1] - 15:25
**CUNNINGHAM** [3] - 2:7, 2:7, 15:24
**current** [2] - 34:1, 40:21
**custody** [1] - 29:16

**cut** [1] - 66:14

# D

**daily** [5] - 30:1, 70:19, 72:7, 72:10, 113:4
**DALLAS** [2] - 4:4, 8:10
**damage** [2] - 37:25, 112:24
**damages** [3] - 52:17, 54:7, 62:14
**danger** [1] - 109:11
**dangerous** [2] - 93:5, 95:5, 96:12
**DANIEL** [2] - 4:10, 4:11
**dark** [2] - 64:1, 65:23
**data** [1] - 91:3
**DATE** [2] - 14:4, 14:13
**date** [4] - 31:3, 32:2, 43:17, 43:23
**dated** [1] - 120:21
**DAUPHIN** [1] - 2:8
**DAVID** [1] - 7:22
**day-to-day** [1] - 73:3
**daylight** [3] - 77:8, 77:13, 77:16
**days** [5] - 82:25, 116:2, 116:3, 116:15, 116:16
**DC** [6] - 5:19, 5:23, 6:19, 6:23, 8:23, 9:18
**deadlines** [1] - 31:25
**DEADLINES..............
...................** [1] - 14:2
**deal** [7] - 25:1, 48:22, 57:23, 58:22, 66:14, 71:17, 115:4
**dealer** [1] - 19:15
**dealers** [1] - 42:4
**dealing** [1] - 27:7
**deals** [1] - 30:22
**dealt** [1] - 59:7
**death** [1] - 39:18
**Deb** [1] - 18:21
**DEBORAH** [1] - 8:18
**debriefing** [2] - 71:3, 73:22
**decades** [2] - 91:1, 93:14
**December** [7] - 23:17, 46:23, 65:12, 66:5, 109:22, 110:19, 119:7
**decide** [13] - 36:12, 42:12, 50:6, 50:12, 51:4, 56:6, 56:8,

56:12, 63:16, 90:17, 92:23, 105:3
**decided** [10] - 21:1, 21:5, 42:21, 57:18, 93:16, 94:16, 103:9, 107:19, 114:8, 119:12
**DECIDED** [1] - 13:19
**decision** [16] - 48:14, 48:19, 57:21, 87:10, 89:23, 92:24, 94:1, 94:7, 95:22, 98:23, 100:9, 105:20, 118:23, 119:9, 120:3
**decision-making** [2] - 89:23, 94:1
**decisions** [7] - 19:25, 75:18, 94:11, 96:13, 104:14, 104:18, 105:4
**DECISIONS.....** [1] - 13:17
**declarations** [3] - 79:24, 80:8, 81:6
**declaratory** [4] - 27:19, 46:18, 49:18, 52:1
**deep** [1] - 112:22
**deeper** [1] - 69:10
**Deepwater** [8] - 15:13, 32:22, 71:21, 76:6, 76:15, 77:11, 77:14, 110:5
**DEEPWATER** [3] - 1:5, 7:4, 7:5
**defect** [1] - 108:5
**defective** [8] - 99:15, 99:18, 99:20, 100:11, 100:13, 101:13, 101:15, 108:5
**defend** [3] - 62:4, 63:25, 64:5
**defendant** [5] - 36:21, 76:16, 77:15, 84:3, 112:7
**defendants** [28] - 18:10, 24:20, 37:3, 67:10, 68:15, 68:20, 70:7, 74:5, 77:1, 88:6, 88:18, 97:20, 106:5, 106:6, 106:8, 108:18, 109:14, 110:1, 110:18, 113:21, 113:25, 115:11, 116:6, 116:13, 116:21, 117:5
**defendants'** [2] - 74:7, 74:12

**defended** [1] - 59:14
**defense** [20] - 45:2, 45:3, 50:22, 52:16, 52:19, 60:2, 61:13, 61:15, 61:17, 61:23, 62:8, 62:12, 62:20, 63:9, 63:13, 63:22, 64:1, 64:4, 67:9, 112:10
**deficient** [1] - 78:5
**define** [1] - 62:14
**defines** [1] - 52:17
**definition** [6] - 46:4, 46:6, 46:8, 62:12, 62:19, 63:9
**degree** [1] - 109:8
**delegate** [1] - 94:17
**delegated** [4] - 89:15, 94:14, 94:16, 95:6
**delegatees** [1] - 95:13
**delegates** [2] - 90:22, 93:25
**demonstrate** [1] - 58:15
**demonstrating** [1] - 88:23
**denied** [1] - 116:1
**deny** [2] - 50:18, 56:5
**denying** [3] - 24:16, 24:17, 77:1
**DEPARTMENT** [3] - 5:12, 5:17, 5:22
**deponent** [3] - 97:11, 97:17, 98:13
**depose** [1] - 115:4
**DEPOSITION** [1] - 13:23
**deposition** [5] - 26:6, 26:20, 26:21, 26:23, 97:16
**depositions** [4] - 27:16, 114:7, 114:25, 116:16
**DEPUTY** [3] - 15:7, 15:12, 121:16
**derivative** [6] - 25:4, 25:9, 68:4, 105:10, 121:4, 121:7
**described** [1] - 70:20
**deserves** [1] - 106:17
**design** [1] - 108:5
**designate** [1] - 88:2
**despite** [1] - 65:8
**detail** [3] - 21:2, 30:19, 54:10
**detailed** [5] - 20:24, 30:15, 72:7, 72:10, 91:3
**details** [3] - 69:3, 70:22, 72:2

**determination** [3] - 46:10, 56:15, 80:3
**determinations** [1] - 75:13
**determine** [2] - 56:19, 78:16
**determined** [2] - 65:13, 75:19
**devastating** [1] - 47:6
**develop** [3] - 39:1, 93:7, 118:9
**deviate** [1] - 78:11
**device** [2] - 101:8, 101:12
**DEXTER** [1] - 4:22
**dialogue** [2] - 100:15, 101:21
**difference** [3] - 41:7, 90:10, 108:10
**different** [21] - 24:12, 30:11, 31:7, 31:11, 38:22, 40:4, 42:11, 62:13, 66:17, 66:19, 66:21, 66:22, 72:22, 93:7, 95:5, 95:14, 95:21, 102:19, 105:19, 109:15, 115:25
**difficult** [2] - 58:18, 71:17
**difficulty** [1] - 115:23
**dig** [1] - 69:10
**direct** [3] - 37:1, 89:21, 113:2
**directed** [3] - 68:9, 70:15, 73:18
**direction** [4] - 68:10, 93:21, 95:19, 113:4
**directions** [1] - 98:3
**directives** [9] - 68:15, 75:10, 78:10, 78:11, 78:17, 78:21, 80:13, 82:6, 87:9
**directly** [4] - 58:11, 87:8, 87:19, 90:1
**discharge** [1] - 89:19
**disciplined** [1] - 94:9
**disclose** [1] - 98:6
**DISCOVERY** [2] - 13:12, 13:23
**discovery** [42] - 19:18, 23:22, 23:25, 25:21, 26:5, 26:6, 26:8, 26:17, 26:23, 27:1, 27:16, 35:6, 35:9, 35:12, 35:16, 35:17, 42:15, 42:17, 42:20, 63:17, 70:5, 70:10, 98:14, 110:21, 110:24, 113:18,

114:2, 114:6, 114:9, 114:11, 114:14, 116:2, 118:21, 118:23, 119:1, 119:7, 119:9, 119:13, 120:1, 120:2, 120:3
**discretion** [3] - 75:13, 75:17, 75:19
**discretionary** [1] - 99:6
**discussing** [1] - 58:3
**discussion** [3] - 57:25, 77:8, 109:25
**discussions** [4] - 35:20, 65:21, 110:22, 114:24
**DISIERE** [1] - 11:11
**Dismiss** [2] - 116:2, 117:2
**dismiss** [13] - 24:15, 24:16, 24:19, 47:19, 70:3, 85:16, 115:9, 115:21, 117:16, 119:1, 119:12, 119:24
**dismissal** [2] - 25:6, 25:8
**dismissals** [1] - 20:16
**dismissed** [7] - 21:17, 23:14, 25:5, 42:10, 46:25, 105:7, 111:22
**dismissing** [4] - 24:16, 25:12, 25:17, 116:21
**dispersant** [16] - 76:6, 76:16, 77:12, 77:15, 77:23, 80:12, 85:19, 91:2, 91:3, 93:3, 102:9, 102:14, 102:18, 107:16, 108:4, 117:15
**dispersant's** [1] - 91:4
**dispersants** [39] - 69:15, 69:18, 70:23, 72:5, 74:15, 77:2, 78:2, 80:14, 80:18, 87:21, 87:23, 87:25, 88:14, 89:10, 89:12, 90:19, 90:23, 90:24, 92:23, 93:17, 94:1, 94:2, 94:3, 94:8, 94:18, 95:10, 95:12, 96:14, 96:15, 99:10, 104:19, 104:24, 104:25, 109:5
**dispersing** [1] - 88:11
**dispute** [8] - 79:1, 79:6, 79:23, 81:17, 81:22, 91:12, 91:14,

107:8
**disputed** [2] - 96:16, 117:7
**disputes** [5] - 21:9, 21:23, 22:1, 28:5
**disputing** [1] - 83:7
**distinguishable** [1] - 54:23
**DISTRICT** [3] - 1:1, 1:2, 1:13
**District** [6] - 24:11, 102:25, 122:6, 122:15
**districts** [1] - 22:8
**divided** [2] - 67:11, 73:15
**dividend** [1] - 25:16
**dividing** [1] - 80:24
**DIVISION** [2] - 5:13, 5:17
**docket** [1] - 19:11
**DOCKET** [1] - 13:8
**doctrinal** [1] - 94:9
**document** [1] - 115:18
**Document** [1] - 44:16
**DOCUMENT** [1] - 1:9
**documentation** [1] - 98:21
**documents** [4] - 78:8, 82:17, 98:10, 112:4
**dollars** [1] - 57:24
**DOMENGEAUX** [1] - 1:18
**DOMINION** [1] - 2:4
**Don** [3] - 17:21, 17:23, 26:13
**DON** [1] - 6:9
**DONALD** [1] - 8:8
**done** [13] - 35:12, 35:18, 46:16, 54:9, 65:2, 78:19, 94:20, 99:25, 101:1, 101:2, 104:8, 110:3, 115:24
**door** [3] - 52:4, 52:6, 65:15
**DOUGLAS** [2] - 5:4, 8:4
**down** [9] - 38:21, 43:8, 45:15, 62:7, 70:16, 93:23, 94:14, 97:21, 120:4
**draw** [1] - 80:23
**DRAWER** [1] - 4:12
**DRC** [1] - 11:15
**dredge** [2] - 112:19, 112:21
**dredging** [2] - 112:23
**DRESCHER** [1] - 2:3
**DRILLING** [1] - 7:4
**drinking** [1] - 103:13

**DRIVE** [3] - 2:4, 3:22, 10:9
**drop** [1] - 94:14
**DSC** [1] - 15:16
**due** [1] - 80:23
**Duke** [1] - 16:7
**duking** [1] - 106:19
**DUNBAR** [1] - 9:7
**during** [10] - 71:4, 76:5, 76:14, 77:8, 77:11, 77:13, 82:11, 98:14, 103:3
**duty** [2] - 63:25, 64:5
**DYNAMIC** [1] - 12:3
**Dynamic** [1] - 81:4

**E**

**E&P** [1] - 8:17
**early** [1] - 38:25
**east** [2] - 81:5, 81:16
**EAST** [1] - 3:4
**EASTERN** [1] - 1:2
**Eastern** [1] - 122:6
**eastern** [1] - 80:19
**easy** [1] - 84:13
**economic** [1] - 37:25
**EDWARDS** [1] - 1:18
**effect** [4] - 49:6, 50:5, 84:20, 107:3
**effective** [1] - 89:19
**efficacy** [2] - 91:4, 91:16
**effort** [9] - 26:9, 84:4, 84:10, 89:9, 89:13, 89:14, 90:1, 103:23
**efforts** [2] - 87:22, 89:21
**eight** [3] - 30:11, 111:24, 113:13
**either** [11] - 20:15, 45:5, 51:2, 52:1, 55:17, 56:6, 63:16, 82:10, 82:15, 89:5, 99:18
**elaborate** [1] - 73:8
**elected** [1] - 95:11
**elements** [1] - 54:9
**Elizabeth** [1] - 16:21
**ELIZABETH** [1] - 2:15
**ELLIS** [2] - 6:13, 6:17
**Ellison** [7] - 24:11, 24:14, 24:25, 25:5, 25:11, 25:17, 26:4
**Ellison's** [1] - 41:6
**ELM** [1] - 8:10
**elsewhere** [1] - 21:20
**emerge** [1] - 63:17
**emergency** [1] - 93:6

**EMERGENCY** [1] - 11:15
**eminently** [1] - 102:6
**employed** [2] - 32:24, 33:13
**employer** [1] - 117:23
**employers** [1] - 81:25
**employment** [1] - 21:23
**employment-type** [1] - 21:23
**empty** [1] - 59:24
**encompass** [1] - 37:7
**encouraged** [1] - 46:17
**end** [1] - 30:6, 36:20, 38:23, 39:5, 39:6, 56:22, 56:24, 71:2, 73:22, 94:9, 103:12
**ended** [1] - 71:20
**ENERGY** [2] - 7:6, 8:7
**enforce** [2] - 59:16, 61:6
**enforceable** [1] - 51:23
**enforcement** [1] - 48:4
**ENFORCEMENT** [1] - 5:21
**engage** [1] - 39:10
**Englebert** [2] - 29:3, 29:15
**ensure** [1] - 89:19
**entered** [5] - 20:13, 27:19, 115:16, 118:24, 119:3
**ENTERGY** [1] - 10:4
**entertains** [1] - 42:25
**entire** [3] - 30:9, 70:15, 71:4
**entities** [6] - 32:25, 33:11, 33:12, 34:20, 50:3, 117:2
**entitled** [7] - 46:11, 50:21, 64:8, 70:7, 110:12, 117:5, 122:9
**entity** [4] - 85:17, 102:14, 105:25, 117:17
**ENVIRONMENTAL** [1] - 5:21
**EPA** [14] - 87:17, 90:13, 90:17, 91:2, 92:12, 92:21, 93:8, 98:19, 98:23, 102:4, 102:15, 102:17, 103:4, 103:8
**EPA-approved** [1] - 103:8
**equipment** [6] - 28:15, 68:23, 82:7, 108:23,

109:3, 114:19
**equitable** [1] - 58:25
**equity** [1] - 60:11
**ERISA** [1] - 25:11
**ERVIN** [1] - 3:7
**Ervin** [1] - 17:14
**ESPY** [2] - 3:3, 17:12
**Espy** [1] - 17:12
**ESQUIRE** [71] - 1:18, 1:22, 1:22, 2:3, 2:7, 2:11, 2:15, 2:18, 2:22, 3:3, 3:4, 3:7, 3:11, 3:15, 3:18, 3:22, 4:3, 4:7, 4:7, 4:11, 4:16, 4:20, 4:21, 4:21, 5:4, 5:5, 5:9, 5:13, 5:18, 5:22, 6:9, 6:13, 6:14, 6:14, 6:18, 6:22, 7:6, 7:10, 7:13, 7:14, 7:18, 7:18, 7:22, 8:3, 8:4, 8:8, 8:8, 8:9, 8:9, 8:13, 8:18, 8:22, 9:3, 9:4, 9:8, 9:17, 9:20, 9:21, 10:4, 10:8, 10:8, 10:12, 10:16, 10:20, 11:3, 11:8, 11:12, 11:16, 11:20, 12:4
**essential** [3] - 87:22, 89:6, 89:7
**essentially** [3] - 26:9, 80:24, 105:20
**establish** [1] - 105:8
**established** [2] - 19:11, 78:7
**estate** [1] - 42:8
**etcetera** [4] - 72:6, 72:7, 78:9, 108:7
**Ethernet** [1] - 113:19
**evaluate** [1] - 51:1
**EVANS** [1] - 9:8
**event** [3] - 75:7, 87:13, 93:14
**evidence** [5] - 28:19, 29:8, 35:3, 35:10, 75:22
**evolved** [1] - 101:9
**exact** [1] - 46:19
**exactly** [10] - 74:3, 88:13, 91:7, 92:25, 93:12, 94:5, 105:23, 106:1, 107:23, 113:23
**example** [9] - 69:19, 71:7, 74:8, 89:8, 97:15, 111:12, 112:20, 115:17
**examples** [1] - 111:19
**except** [3] - 75:11,

76:9, 108:21
**exception** [1] - 76:11
**exceptions** [2] - 26:9, 26:15
**excerpt** [2] - 71:24, 72:3
**excerpted** [1] - 72:4
**excess** [6] - 33:3, 45:14, 52:7, 59:25, 61:16, 64:6
**EXCESS** [1] - 9:7
**Exchange** [1] - 30:24
**exclude** [5] - 57:25, 62:8, 62:21, 63:7, 63:12
**excluded** [1] - 63:13
**excludes** [2] - 52:18, 62:12
**exclusion** [1] - 47:13
**excuse** [3] - 59:5, 92:6, 94:4
**excused** [1] - 41:11
**executed** [1] - 94:10
**execution** [1] - 95:1
**executives** [1] - 34:10
**exercise** [2] - 47:6, 52:10
**exercised** [1] - 89:25
**exhaust** [1] - 50:1
**exhausted** [2] - 28:10, 87:23
**exhaustion** [2] - 47:17, 52:12
**Exhibit** [15] - 70:13, 71:8, 71:25, 87:20, 91:9, 91:19, 91:21, 91:24, 91:25, 92:1, 92:3, 92:4, 92:5, 92:6
**exist** [9] - 45:6, 45:21, 45:24, 51:10, 51:13, 51:20, 51:22, 52:20, 78:22
**existence** [4] - 46:8, 47:5, 51:8, 54:6
**exists** [1] - 51:9
**expect** [1] - 40:7
**expense** [2] - 62:5, 62:6
**expenses** [7] - 62:8, 62:12, 62:20, 63:10, 63:13, 64:1, 64:4
**explain** [2] - 114:12, 118:5
**explained** [1] - 115:22
**explaining** [1] - 116:20
**explanation** [1] - 119:15
**EXPLORATION** [1] -

6:6
**explosion** [1] - 110:5
**exposure** [1] - 114:15
**EXPRESSWAY** [1] - 4:17
**extent** [5] - 22:4, 25:21, 58:15, 61:25, 62:17
**extinguished** [1] - 47:20
**extremely** [1] - 58:18
**Exxon** [2] - 101:24, 106:25
**Exxon-Mobil** [1] - 101:24
**eyes** [1] - 108:13

# F

**faced** [1] - 114:14
**facilities** [1] - 31:18
**facility** [2] - 31:12, 31:13
**facing** [1] - 115:23
**fact** [39] - 21:17, 27:2, 37:12, 38:17, 38:19, 48:10, 50:7, 52:23, 53:1, 54:14, 56:2, 56:21, 61:5, 62:22, 68:14, 69:21, 76:2, 77:3, 77:25, 78:4, 78:16, 81:23, 89:5, 89:22, 91:23, 92:24, 95:15, 96:17, 97:2, 97:3, 97:6, 97:21, 103:7, 109:2, 113:17, 116:24, 120:10, 120:24
**facts** [10] - 38:16, 58:16, 60:3, 68:8, 70:6, 86:17, 89:6, 89:7, 111:10, 117:7
**factual** [9] - 70:5, 70:9, 79:20, 91:12, 91:14, 107:8, 114:6, 117:16, 118:9
**fail** [1] - 87:6
**failed** [2] - 99:22, 114:1
**failure** [1] - 25:16
**fair** [1] - 105:25
**FAIRNESS** [1] - 14:5
**fairness** [2] - 32:3, 119:18
**faith** [7] - 45:5, 50:22, 52:19, 53:6, 54:4, 54:9, 61:14
**fall** [4] - 26:24, 42:22, 88:24, 89:3

**familiar** [4] - 39:19, 53:24, 80:22, 121:2
**family** [1] - 39:17
**FANNIN** [1] - 7:10
**far** [5] - 81:9, 107:9, 112:15, 112:22, 119:17
**FARR** [1] - 8:3
**fault** [2] - 112:10, 112:12
**favor** [2] - 56:14, 57:16
**fear** [3] - 87:9, 87:14, 111:22
**February** [1] - 119:11
**FEDERAL** [1] - 5:12
**federal** [16] - 69:5, 69:7, 70:11, 71:5, 71:8, 71:10, 72:8, 76:23, 78:20, 78:25, 87:7, 87:9, 93:16, 96:1, 96:4, 96:6
**Federal** [8] - 70:13, 72:13, 72:24, 75:12, 76:1, 89:20, 92:23, 95:19
**fees** [1] - 45:3
**Fees** [1] - 19:22
**FEES.......................... .............** [1] - 13:15
**Feinberg** [1] - 37:16
**fell** [2] - 56:24, 88:20
**fellow** [2] - 85:4, 86:17
**few** [8] - 19:6, 20:25, 22:7, 26:9, 55:21, 74:9, 83:15, 111:18
**FEW** [1] - 13:19
**FIFTEENTH** [1] - 6:18
**FIFTH** [1] - 9:21
**Fifth** [10] - 25:7, 27:23, 45:20, 47:10, 51:8, 59:4, 59:7, 59:23, 60:7, 64:15
**figuring** [1] - 75:5
**FILE** [1] - 14:12
**file** [6] - 25:12, 25:13, 43:11, 43:17, 43:22, 46:17
**FILED** [2] - 12:8, 14:3
**filed** [18] - 20:15, 20:20, 20:25, 21:15, 21:20, 22:5, 24:20, 24:24, 27:22, 27:24, 32:1, 42:1, 42:2, 46:20, 47:15, 79:24, 86:12, 115:15
**filing** [3] - 19:12, 24:18, 49:18
**FILING** [1] - 13:8
**filings** [1] - 20:19

**filled** [2] - 26:20, 69:12
**FINAL** [1] - 14:5
**final** [8] - 27:20, 32:3, 46:10, 89:23, 94:1, 94:23, 119:18, 121:4
**finalized** [1] - 116:3
**finally** [3] - 42:8, 106:24, 119:12
**FINANCIAL** [1] - 9:16
**fine** [3] - 49:25, 65:10
**first** [17] - 20:8, 30:5, 43:1, 43:10, 53:12, 55:14, 61:15, 62:15, 62:16, 74:14, 81:7, 96:25, 98:24, 101:8, 104:19, 111:23
**first-party** [1] - 53:12
**fish** [1] - 42:7
**fit** [3] - 107:13, 107:21, 107:23
**five** [2] - 72:22, 73:12
**FL** [1] - 3:8
**FLANAGAN** [1] - 11:15
**flaw** [3] - 69:3, 69:4, 69:9
**flawed** [1] - 112:9
**flip** [1] - 49:24
**flip-flop** [1] - 49:24
**FLOOR** [4] - 2:15, 5:14, 7:6, 7:14
**floors** [2] - 30:24, 31:7
**flop** [1] - 49:24
**Florida** [1] - 104:9
**FLSA** [1] - 22:16
**flyer** [1] - 57:19
**flying** [4] - 69:14, 77:21, 77:22, 78:1
**Flynn** [1] - 16:22
**FLYNN** [2] - 5:18, 16:22
**focus** [4] - 78:15, 79:19, 120:4, 120:6
**focused** [4] - 28:23, 38:15, 79:20, 81:9
**fold** [1] - 105:18
**follow** [5] - 79:14, 87:9, 102:16, 108:20, 118:20
**followed** [5] - 24:17, 71:3, 74:1, 80:13, 98:3
**following** [5] - 41:22, 42:5, 63:1, 63:12, 78:17
**follows** [1] - 48:1
**FOR** [28] - 1:17, 2:3, 4:15, 4:20, 5:3, 5:12, 5:21, 6:3, 7:3, 7:17, 8:7, 8:16, 9:3, 9:7,

9:11, 10:3, 10:7, 10:15, 10:19, 11:3, 11:7, 11:15, 11:19, 13:6, 13:7, 13:8, 13:10, 13:12
**Force** [1] - 86:9
**forced** [1] - 56:22
**foregoing** [1] - 122:7
**forfeited** [1] - 58:23
**forfeiture** [1] - 47:24
**forgot** [1] - 20:3
**FORM** [1] - 14:12
**form** [9] - 20:19, 43:11, 43:17, 43:22, 48:1, 63:1, 63:12, 114:6, 111:7
**forms** [2] - 57:10, 117:11
**formulas** [1] - 90:10
**FORNIAS** [1] - 11:8
**forth** [4] - 43:17, 90:22, 92:16, 114:7
**forum** [1] - 25:6
**forward** [4] - 29:7, 39:15, 115:14, 117:9
**FOSC** [21] - 70:14, 72:13, 72:14, 72:16, 72:23, 73:4, 73:10, 75:12, 75:17, 75:18, 75:24, 76:7, 77:12, 79:6, 89:20, 89:23, 94:7, 94:11, 94:18
**FOSC's** [2] - 76:7, 77:13
**fought** [1] - 56:1
**four** [6] - 23:11, 23:13, 31:7, 116:2, 116:15, 116:16
**Fourchon** [1] - 81:10
**fourth** [1] - 45:4
**FRANCISCO** [2] - 2:16, 5:15
**FRANK** [1] - 3:4
**frankly** [8] - 31:4, 38:24, 39:6, 100:2, 107:14, 110:21, 111:16, 115:22
**free** [1] - 30:10
**FREEMAN** [1] - 11:7
**FRIDAY** [3] - 1:8, 14:14, 15:2
**Friday** [1] - 121:12
**FRILOT** [1] - 7:5
**FROM** [1] - 13:17
**front** [1] - 72:1
**fuel** [3] - 103:2, 103:5, 103:15
**full** [5] - 31:4, 37:24, 63:23, 95:1, 120:2
**fuller** [1] - 58:14

**fully** [5] - 44:22, 28:6, 43:3, 108:24, 115:22
**fund** [2] - 47:2, 66:15
**FUNDERBURK** [2] - 9:4, 18:25
**Funderburk** [1] - 19:1
**funding** [1] - 45:18
**funds** [1] - 28:3
**future** [1] - 40:10

**G**

**GABLES** [1] - 3:8
**gain** [1] - 36:7
**GALLAGHER** [1] - 8:3
**Galveston** [2] - 23:12, 73:14
**Gamble** [2] - 35:24, 35:25
**GARSIDE** [1] - 4:16
**GASAWAY** [7] - 6:18, 19:2, 28:13, 28:18, 29:12, 29:14, 29:17
**Gasaway** [2] - 19:2, 28:18
**gasoline** [1] - 102:23
**GATE** [1] - 5:14
**GCCF** [1] - 37:15
**gear** [2] - 81:21, 112:3
**GEIGER** [1] - 12:3
**general** [5] - 33:15, 34:2, 78:4, 97:7, 108:4
**GENERAL** [1] - 5:4
**General** [1] - 16:4
**General's** [2] - 17:4, 17:6
**GENERAL'S** [1] - 4:20
**generally** [5] - 22:20, 23:25, 24:25, 74:15, 104:3
**genuine** [3] - 68:13, 69:21, 77:25
**geographic** [1] - 82:18
**geographical** [1] - 80:15
**GIARRUSSO** [1] - 11:8
**GISLESON** [1] - 1:22
**given** [8] - 58:22, 60:5, 60:8, 74:17, 81:17, 81:20, 112:11, 114:18
**glad** [1] - 16:3
**Godfrey** [1] - 18:13
**GODFREY** [2] - 6:14, 18:13
**GODWIN** [4] - 8:7, 8:8, 8:12, 17:23

**Godwin** [1] - 17:23
**GOLDEN** [1] - 5:14
**GONZALES** [1] - 3:7
**Gonzalez** [1] - 17:14
**GONZALEZ** [2] - 3:7, 17:14
**GOTSHAL** [2] - 9:16, 9:20
**Government** [4] - 68:9, 70:2, 88:15, 89:15
**GOVERNMENT** [1] - 5:12
**government** [62] - 27:9, 29:2, 68:11, 69:6, 69:8, 70:11, 70:19, 71:5, 71:9, 71:10, 71:11, 72:8, 73:25, 76:19, 76:24, 77:11, 78:18, 78:25, 79:4, 82:6, 82:23, 89:24, 92:12, 93:8, 93:16, 93:19, 95:10, 97:13, 97:20, 97:21, 98:1, 98:5, 98:11, 98:12, 98:15, 99:5, 99:7, 99:9, 100:3, 100:8, 100:16, 100:17, 104:1, 104:14, 104:18, 105:13, 105:20, 105:23, 105:24, 106:1, 107:19, 108:11, 108:15, 108:19, 108:23, 108:25, 109:1, 112:21, 113:1, 113:4, 115:20, 117:6
**government's** [5] - 68:15, 78:10, 80:13, 95:13, 100:23
**governmental** [1] - 68:5
**GRABILL** [1] - 9:21
**GRAND** [1] - 7:14
**grant** [2] - 43:21, 56:14
**GRANT** [1] - 14:11
**granting** [3] - 24:17, 43:19, 56:9
**grants** [2] - 116:6, 116:9
**gravamen** [2] - 100:10, 101:21
**Gravier** [1] - 30:25
**great** [6] - 24:3, 30:18, 43:5, 54:10, 57:23, 87:15
**greater** [3] - 104:7, 104:10, 104:11

**GREENWALD** [34] - 2:22, 16:18, 96:21, 96:24, 97:16, 98:4, 98:8, 98:22, 99:1, 99:4, 99:12, 99:21, 101:2, 102:14, 102:24, 104:5, 104:17, 104:21, 105:1, 105:5, 105:12, 105:15, 106:7, 107:10, 108:14, 108:21, 109:10, 109:12, 113:7, 113:9, 113:13, 113:23, 114:12, 118:11
**Greenwald** [4] - 16:19, 96:22, 118:10, 119:15
**grossly** [1] - 96:11
**ground** [1] - 109:15
**grounds** [3] - 54:23, 68:4, 105:7
**GROUP** [2] - 3:21, 12:3
**group** [3] - 43:10, 81:18, 111:19
**groups** [1] - 81:6
**Guard** [6] - 72:15, 72:17, 87:14, 87:17, 87:19, 95:17
**guess** [10] - 25:2, 27:24, 43:8, 83:23, 90:5, 105:4, 106:20, 107:6, 109:17, 115:2
**Gulf** [13] - 15:13, 30:10, 31:17, 60:18, 72:19, 80:15, 80:19, 85:23, 94:15, 94:19, 95:18, 96:16, 104:13
**GULF** [2] - 1:5, 4:15
**guys** [1] - 28:11

**H**

**half** [3] - 80:19, 106:19, 106:20
**hall** [1] - 16:6
**HALLIBURTON** [1] - 8:7
**Halliburton** [5] - 17:24, 18:1, 18:6, 34:22, 42:2
**hammered** [1] - 71:19
**Hammond** [1] - 31:13
**hand** [2] - 27:1, 95:5
**handful** [2] - 21:10, 22:2
**handle** [2] - 19:25,

22:20
**HANDLE** [1] - 13:16
**handled** [2] - 73:2,
   73:3
**happy** [6] - 21:3,
   23:13, 28:13, 29:1,
   39:10, 79:17
**hard** [4] - 39:7, 56:1,
   57:17, 60:9
**harm** [3] - 104:10,
   104:11, 108:13
**Harris** [3] - 23:12,
   23:16, 35:21
**HARVEY** [1] - 4:17
**Haycraft** [2] - 17:21,
   26:13
**HAYCRAFT** [7] - 6:9,
   17:21, 26:7, 26:13,
   26:15, 27:10, 27:13
**hazard** [2] - 76:10,
   76:22
**HB406** [1] - 12:12
**health** [1] - 117:24
**hear** [3] - 20:6, 78:1,
   119:14
**HEARD** [1] - 1:13
**heard** [4] - 54:12,
   77:19, 77:22, 82:11
**hearing** [8] - 21:1,
   32:3, 43:21, 46:24,
   69:14, 117:4,
   119:18, 120:25
**HEARING** [2] - 13:20,
   14:5
**hearings** [1] - 120:25
**heels** [1] - 38:1
**HEIDEN** [2] - 10:8,
   18:19
**Heiden** [1] - 18:19
**HEIMANN** [1] - 2:14
**held** [5] - 64:16, 64:25,
   95:25, 103:16,
   106:18
**helicopter** [1] - 34:10
**help** [4] - 26:25, 37:20,
   87:13, 111:17
**helped** [1] - 49:21
**hereby** [1] - 122:6
**Herman** [4] - 15:18,
   32:10, 32:11, 120:18
**HERMAN** [5] - 1:21,
   1:22, 15:18, 32:11
**Hernandez** [1] - 60:18
**higher** [1] - 48:25
**highlighted** [1] - 45:16
**highlights** [2] - 24:10,
   68:7
**HIGHWAY** [1] - 3:11
**himself** [1] - 32:15
**hindsight** [2] - 110:16,

116:19
**hires** [2] - 115:6,
   115:7
**historical** [1] - 109:20
**history** [1] - 106:11
**hit** [1] - 24:10
**hold** [3] - 27:6, 86:14,
   105:25
**HOLDINGS** [3] - 6:7,
   7:3, 9:12
**home** [1] - 112:7
**Honor** [149] - 15:9,
   15:18, 15:20, 15:22,
   16:1, 16:9, 16:11,
   16:13, 16:16, 16:18,
   16:20, 16:24, 17:7,
   17:9, 17:11, 17:12,
   17:16, 17:19, 17:22,
   17:23, 17:25, 18:11,
   18:13, 18:15, 18:17,
   18:23, 18:25, 19:2,
   20:11, 23:3, 23:11,
   23:23, 24:8, 25:24,
   26:7, 27:18, 28:13,
   28:18, 29:17, 29:23,
   32:4, 32:11, 32:16,
   36:11, 37:18, 38:13,
   38:24, 39:7, 39:14,
   41:9, 41:18, 42:12,
   42:14, 43:16, 44:9,
   44:18, 49:8, 51:7,
   51:14, 52:15, 53:24,
   55:16, 57:17, 58:20,
   60:8, 63:6, 64:12,
   64:14, 66:24, 67:2,
   67:6, 67:11, 67:19,
   67:21, 68:2, 68:3,
   68:6, 68:16, 69:2,
   69:11, 70:12, 72:13,
   72:16, 74:6, 74:24,
   76:3, 77:6, 77:24,
   78:1, 78:5, 78:11,
   79:9, 79:11, 80:16,
   80:20, 81:2, 83:10,
   84:24, 85:3, 86:8,
   86:18, 86:25, 87:3,
   87:5, 87:18, 88:4,
   88:16, 88:22, 89:2,
   90:6, 90:20, 91:6,
   91:15, 92:6, 92:25,
   94:23, 94:24, 95:21,
   96:19, 96:21, 98:9,
   98:17, 99:12, 99:18,
   100:13, 101:21,
   106:15, 107:1,
   107:25, 109:13,
   109:18, 109:22,
   111:19, 114:25,
   115:8, 115:23,
   116:1, 116:5, 116:8,

116:20, 118:4,
   118:15, 118:19,
   119:6, 119:21,
   120:10, 120:14,
   121:4, 121:8
**Honor's** [1] - 95:22
**HONORABLE** [1] -
   1:13
**hopefully** [3] - 19:19,
   30:2, 34:14
**HORIZON** [1] - 1:5
**Horizon** [8] - 15:13,
   32:22, 71:21, 76:6,
   76:15, 77:11, 77:14,
   110:5
**horse** [1] - 37:8
**Houma** [3] - 73:12,
   73:16, 73:18
**HOUMA** [1] - 3:23
**hours** [4] - 71:14,
   77:8, 77:13, 77:16
**HOUSTON** [7] - 2:19,
   7:11, 7:22, 7:23,
   8:14, 9:5, 11:13
**Houston** [2] - 73:13,
   73:18
**Hugh** [1] - 18:23
**HUGH** [1] - 9:3
**human** [2] - 76:10,
   76:22
**humans** [1] - 108:6
**hundred** [5] - 31:8,
   109:8, 111:3,
   111:23, 113:10
**hundreds** [3] - 31:7,
   70:21, 117:10
**hunt** [1] - 42:7
**hurt** [1] - 49:19
**hydrophilic** [1] -
   103:10
**hypothetically** [1] -
   46:15

---

**I**

---

**IAR** [1] - 16:25
**idea** [5] - 21:11, 39:21,
   76:21, 110:20,
   120:15
**ideal** [1] - 104:12
**identified** [1] - 47:9
**identify** [5] - 26:11,
   28:17, 32:19, 69:16,
   77:20
**ignored** [1] - 55:25
**IL** [3] - 6:15, 10:9,
   10:13
**ill** [5] - 89:9, 89:13,
   89:14, 90:1

**ill-conceived** [5] -
   89:9, 89:13, 89:14,
   90:1
**Illinois** [2] - 96:1, 96:9
**imagine** [1] - 71:11
**immediate** [1] - 70:19
**immunity** [20] - 68:5,
   70:7, 78:14, 79:2,
   83:25, 85:3, 85:15,
   105:11, 105:17,
   107:23, 110:12,
   111:23, 112:9,
   112:15, 112:18,
   117:5, 117:21,
   120:11, 121:5, 121:7
**impact** [1] - 60:6
**impair** [1] - 48:1
**implement** [1] - 30:3
**implemented** [1] -
   29:24
**implied** [1] - 68:5
**important** [2] -
   106:10, 112:14
**importantly** [2] -
   49:22, 59:3
**impossible** [3] -
   58:13, 59:1, 110:24
**impression** [1] - 74:13
**IMPREVENTO** [1] -
   2:3
**improperly** [2] - 35:7,
   99:14
**improve** [3] - 101:4,
   102:2, 103:24
**IN** [4] - 1:4, 1:5, 12:8
**INC** [19] - 6:3, 6:4, 6:5,
   6:6, 6:8, 7:4, 7:5,
   8:7, 9:12, 9:12, 9:14,
   9:14, 9:15, 9:16,
   10:15, 10:20, 11:3,
   11:7, 12:3
**Inc.'s** [1] - 44:15
**inches** [1] - 30:18
**Incident** [9] - 70:17,
   70:21, 71:22, 72:12,
   73:2, 73:6, 73:11,
   78:8, 94:8
**incident** [1] - 70:19
**inclined** [1] - 85:4
**include** [7] - 48:5,
   57:7, 61:16, 62:20,
   63:6, 90:23, 109:25
**included** [1] - 63:8
**includes** [1] - 45:17
**including** [2] - 24:20,
   91:4
**income** [1] - 23:9
**incommunicado** [1] -
   27:7
**inconsistent** [5] -

62:1, 62:3, 62:18,
   63:3, 63:7
**Incorporated** [8] -
   17:2, 67:20, 67:23,
   83:15, 84:1, 84:2,
   85:16, 86:12
**Incorporated's** [1] -
   84:8
**incredible** [1] - 31:21
**indeed** [3] - 89:25,
   91:10, 93:1
**indemnification** [2] -
   45:17, 55:25
**indemnities** [5] -
   44:22, 46:15, 46:16,
   46:21, 52:24
**indemnitor** [1] - 64:21
**indemnity** [24] - 46:11,
   47:18, 48:5, 48:7,
   48:20, 48:23, 50:3,
   50:7, 50:8, 51:5,
   51:6, 51:12, 51:23,
   55:8, 55:12, 56:6,
   56:21, 57:4, 57:19,
   60:2, 61:2, 61:3,
   66:3
**independence** [1] -
   31:22
**independent** [1] -
   52:14
**independently** [1] -
   47:23
**indicate** [1] - 45:16
**indicated** [4] - 45:11,
   45:21, 46:7, 46:18
**indicates** [5] - 45:12,
   46:1, 48:3, 51:19,
   53:16
**indisputably** [1] -
   88:23
**Individual** [1] - 19:22
**INDIVIDUAL** [1] -
   13:14
**individual** [10] - 20:19,
   38:21, 39:3, 110:17,
   111:1, 114:15,
   114:16, 116:23,
   116:25
**individualized** [1] -
   111:1
**indulge** [1] - 109:19
**industry** [2] - 103:4,
   103:22
**inevitable** [1] - 95:3
**inferred** [1] - 86:6
**infirmities** [1] - 69:23
**inform** [1] - 108:24
**information** [13] -
   90:17, 91:11, 91:16,
   91:17, 92:8, 92:11,

92:19, 92:20, 93:9, 98:6, 98:24, 99:5, 120:20
**ingest** [1] - 108:12
**INIC** [3] - 61:22, 62:7, 63:1
**initial** [2] - 30:12, 30:13
**injunction** [2] - 41:6, 41:7
**injured** [1] - 32:22
**injuries** [1] - 23:7
**injury** [7] - 23:6, 33:2, 36:4, 37:12, 108:6, 117:12, 117:21
**inquiry** [1] - 52:4
**instance** [4] - 21:9, 77:4, 78:16, 78:21
**instances** [2] - 76:20, 109:3
**instead** [5] - 48:15, 79:19, 105:21, 107:15, 107:20
**instructions** [8] - 69:7, 72:2, 72:7, 72:10, 73:20, 78:20, 79:5
**instrument** [1] - 28:24
**Insurance** [1] - 44:14
**insurance** [39] - 27:17, 28:9, 44:21, 45:10, 45:12, 45:14, 45:17, 45:21, 46:1, 47:5, 47:21, 49:21, 50:2, 51:9, 51:15, 51:16, 52:8, 54:19, 55:4, 55:8, 55:22, 56:2, 57:8, 57:14, 58:8, 58:9, 59:8, 59:14, 60:11, 61:19, 61:20, 62:11, 64:18, 64:21, 64:25, 65:1, 65:4, 65:6
**INSURANCE** [2] - 11:7, 13:24
**insured** [12] - 45:18, 49:2, 49:9, 59:8, 59:11, 59:13, 59:14, 59:18, 59:24, 60:6, 63:21
**insurer** [2] - 59:19, 59:25
**insurers** [4] - 37:1, 37:2, 58:3, 59:16
**intake** [1] - 31:13
**intellectual** [1] - 21:9
**intend** [4] - 31:6, 36:19, 53:25, 79:15
**intended** [1] - 99:21
**intent** [2] - 58:17,

63:24
**interest** [7] - 28:14, 42:19, 48:21, 76:22, 87:7, 106:15, 117:7
**interesting** [1] - 33:17
**interestingly** [1] - 107:5
**INTERESTS** [2] - 4:20, 5:12
**interests** [1] - 66:2
**interfacing** [1] - 30:1
**International** [1] - 81:4
**INTERNATIONAL** [4] - 7:17, 9:15, 10:15, 10:19
**interpleader** [1] - 28:2
**interpretation** [5] - 55:4, 55:15, 55:21, 64:17, 65:3
**interpreted** [1] - 56:4
**interrelate** [1] - 62:23
**interrogatory** [1] - 115:17
**intervene** [1] - 65:18
**intervention** [1] - 24:2
**introduce** [2] - 15:16, 15:17
**invaluable** [1] - 87:25
**invoices** [2] - 81:24, 81:25
**involve** [4] - 23:7, 23:8, 23:18, 51:3
**involved** [4] - 33:21, 58:11, 65:20, 85:18
**involves** [1] - 23:17
**involving** [1] - 25:10
**irrelevant** [2] - 78:22, 80:4
**IS** [3] - 13:20, 14:4, 14:14
**issue** [33] - 22:25, 23:1, 25:25, 30:8, 38:15, 45:8, 47:11, 48:20, 48:24, 49:21, 50:22, 50:25, 51:5, 54:14, 55:3, 60:14, 60:17, 61:5, 63:16, 68:12, 68:13, 68:17, 68:18, 69:8, 69:21, 69:25, 77:25, 78:4, 98:2, 98:18, 103:25, 109:4, 121:1
**ISSUED** [1] - 13:14
**issued** [12] - 19:6, 19:13, 19:21, 20:21, 24:15, 25:11, 25:17, 30:6, 41:19, 73:23, 79:4, 114:4
**ISSUES** [1] - 13:19

**issues** [34] - 19:14, 20:25, 23:18, 23:21, 23:23, 24:1, 26:18, 27:8, 28:9, 30:20, 30:22, 35:2, 35:3, 41:23, 42:3, 43:7, 49:19, 50:14, 50:16, 53:8, 53:24, 54:2, 65:12, 70:5, 79:16, 89:4, 96:16, 97:4, 107:8, 114:3, 114:6, 120:1, 120:11, 120:12
**ISSUES.....................**
**.........** [1] - 13:11
**issuing** [1] - 82:17
**item** [2] - 28:14, 42:23
**Item** [1] - 43:18
**ITEMS** [1] - 13:3
**items** [1] - 28:15
**ITKIN** [9] - 39:14, 39:16, 39:20, 39:24, 40:1, 40:16, 40:23, 41:1, 41:11
**Itkin** [2] - 39:17, 40:18
**ITS** [1] - 14:4
**itself** [3] - 53:16, 105:21, 107:20
**IV** [1] - 4:7

**J**

**j)(8** [1] - 121:5
**JACKSON** [1] - 3:5
**JAMES** [2] - 1:18, 5:4
**Jane** [1] - 113:15
**JANUARY** [1] - 13:7
**January** [6] - 19:10, 34:17, 34:21, 34:23, 34:25, 38:4
**Jed** [1] - 18:7
**JED** [1] - 10:16
**JEFFERSON** [2] - 1:19, 11:11
**Jeffrey** [1] - 16:1
**JEFFREY** [1] - 2:3
**JENNY** [1] - 8:8
**jeopardizing** [1] - 66:10
**JEREMY** [1] - 9:21
**Jim** [2] - 15:20, 29:23
**JIMMY** [1] - 2:18
**job** [2] - 34:3, 73:2
**Joe** [2] - 17:16, 111:7
**JOHN** [2] - 4:7, 9:4
**John** [2] - 19:1, 113:15
**joinders** [4] - 20:20, 43:12, 43:17, 43:23

**JOINDERS** [1] - 14:12
**joined** [1] - 74:6
**joining** [1] - 86:17
**Jones** [2] - 17:13, 33:25
**JONES** [3] - 3:15, 7:22, 17:13
**JOSEPH** [1] - 4:7
**JPML** [1] - 20:11
**JR** [4] - 3:11, 4:10, 4:11, 8:9
**JUDGE** [1] - 1:13
**judge** [3] - 35:22, 67:22, 86:11
**Judge** [62] - 15:24, 16:6, 16:7, 17:1, 17:13, 17:14, 17:17, 17:21, 18:2, 18:19, 19:17, 22:6, 24:11, 24:14, 24:25, 25:5, 25:11, 25:17, 26:4, 26:18, 26:25, 27:10, 28:2, 28:5, 29:5, 32:21, 33:10, 33:23, 35:24, 36:22, 38:20, 41:6, 42:15, 44:3, 69:1, 70:4, 71:6, 71:11, 71:19, 71:24, 77:18, 78:12, 78:21, 83:14, 83:15, 83:20, 83:24, 84:12, 84:15, 85:14, 85:15, 85:19, 86:3, 86:7, 86:22, 114:4, 115:16, 118:25, 119:3, 119:6, 120:20, 121:14
**judges** [1] - 35:20
**judgment** [24] - 27:19, 27:20, 27:22, 44:19, 44:23, 45:1, 45:4, 46:18, 49:18, 50:19, 50:22, 51:3, 52:1, 53:17, 54:15, 54:24, 56:10, 56:11, 56:15, 68:4, 80:3, 80:5, 98:9, 104:1
**JUDGMENT** [1] - 14:8
**Judgment** [2] - 41:16, 44:15
**judicial** [1] - 46:10
**Judy** [1] - 44:3
**JUDY** [1] - 11:8
**JULY** [3] - 1:8, 13:20, 15:2
**July** [3] - 21:1, 27:24, 42:1
**June** [5] - 19:13, 19:21, 19:24, 25:16, 41:18

**JUNE** [3] - 13:10, 13:14, 13:16
**Juneau** [2] - 30:5, 31:3
**Juneau's** [2] - 30:1, 30:23
**jurisdiction** [4] - 25:18, 84:1, 86:13, 112:7
**JUSTICE** [3] - 5:12, 5:17, 5:22

**K**

**KALBAC** [1] - 3:7
**KANE** [1] - 3:7
**KANNER** [3] - 5:8, 5:9, 17:5
**Kanner** [1] - 17:5
**Katrina** [1] - 112:20
**KATZ** [2] - 1:21, 7:14
**KEARNEY** [2] - 10:20, 11:3
**keeps** [1] - 101:19
**kept** [1] - 54:22
**KERRY** [1] - 7:6
**Kerry** [2] - 18:4, 43:15
**KEVIN** [1] - 10:20
**Kevin** [1] - 16:24
**key** [2] - 45:15, 51:14
**killed** [1] - 46:25
**kind** [6] - 23:9, 45:23, 69:19, 110:10, 111:20, 120:25
**KIRBY** [2] - 8:22, 18:22
**Kirby** [1] - 18:22
**KIRKLAND** [2] - 6:13, 6:17
**knowledge** [2] - 66:7, 108:23
**knows** [1] - 26:8
**KRAUS** [1] - 5:4
**Kuchler** [1] - 18:21
**KUCHLER** [3] - 8:17, 8:18, 18:21
**KULLMAN** [1] - 2:10
**KUPPERMAN** [1] - 11:7
**Ky** [1] - 18:22
**KY** [1] - 8:22

**L**

**L-U-B-E-L** [1] - 32:20
**L.L.C** [5] - 9:3, 84:9, 84:22, 86:15, 86:17
**LA** [23] - 1:20, 1:23,

2:12, 3:12, 3:19,
3:23, 4:12, 4:17, 5:6,
5:10, 6:11, 7:7, 7:19,
8:19, 9:9, 10:5,
10:17, 10:22, 11:5,
11:9, 11:17, 12:5,
12:13
**LABORDE** [2] - 10:15,
12:3
**lack** [2] - 25:18, 69:24
**lacked** [1] - 98:6
**LAFAYETTE** [2] -
1:20, 10:17
**laid** [3] - 68:6, 69:2,
69:25
**LAKE** [1] - 3:19
**LAMAR** [1] - 8:13
**lance** [1] - 32:20
**Landry** [1] - 72:17
**LANGAN** [20] - 6:13,
17:22, 20:11, 21:6,
21:8, 21:16, 21:18,
21:22, 22:7, 22:12,
22:17, 22:22, 23:3,
23:23, 24:8, 25:24,
27:18, 38:13, 41:18,
43:3
**Langan** [1] - 17:22,
20:10, 40:20, 41:17
**language** [15] - 44:19,
45:7, 45:9, 45:15,
45:25, 51:15, 51:18,
55:4, 56:16, 62:2,
63:21, 66:17, 66:21,
66:22, 106:12
**LAPEROUSE** [1] -
12:3
**large** [1] - 116:9
**largely** [2] - 26:23,
30:3
**larger** [1] - 62:25
**LASALLE** [1] - 6:15
**laser** [1] - 28:23
**last** [12] - 19:5, 20:12,
25:15, 59:5, 65:17,
86:11, 86:25, 88:16,
95:22, 96:24, 114:5,
117:20
**late** [2] - 43:11, 85:8
**LATHAM** [1] - 10:7
**LAW** [2] - 3:21, 4:10
**law** [32] - 34:2, 36:25,
42:10, 45:5, 45:6,
51:18, 51:19, 52:20,
52:21, 53:15, 56:13,
60:10, 60:15, 78:24,
94:24, 96:1, 96:4,
96:8, 96:11, 100:14,
101:7, 103:1,
105:24, 106:13,

107:3, 107:4,
110:11, 110:12,
117:4
**LAWN** [1] - 4:4
**lawsuit** [6] - 98:18,
99:13, 100:5,
100:18, 105:5,
107:14
**lawsuits** [1] - 110:5
**lawyer** [4] - 30:10,
65:19, 65:20, 111:17
**lawyers** [4] - 29:25,
30:9, 30:13, 30:14,
58:2, 111:5
**lay** [1] - 70:25
**layer** [2] - 63:24, 64:2
**lays** [1] - 71:25
**lead** [2] - 103:2, 103:3
**leaders** [1] - 31:19
**leak** [1] - 103:11
**learned** [1] - 110:20
**least** [5] - 42:25, 61:4,
66:15, 74:8, 117:20
**leave** [1] - 25:13,
83:23, 84:21
**left** [5] - 64:1, 64:13,
108:2, 116:15, 120:7
**legal** [19] - 41:23,
45:3, 45:19, 45:23,
46:20, 47:8, 49:6,
49:19, 53:8, 59:3,
60:14, 70:5, 76:11,
79:16, 86:19, 105:8,
117:18, 120:10,
120:11
**legally** [3] - 42:18,
52:17, 112:9
**legislative** [2] -
106:11, 106:12
**lend** [1] - 116:23
**length** [1] - 109:25
**less** [6] - 80:25, 93:5,
95:5, 95:6, 112:16
**letter** [2] - 87:20, 92:7
**level** [2] - 63:23, 106:2
**leverage** [1] - 38:17
**LEWIS** [3] - 2:10, 6:8,
9:3
**LEXINGTON** [1] -
11:21
**liabilities** [1] - 45:19
**liability** [13] - 52:22,
52:25, 53:8, 61:18,
87:9, 87:14, 97:5,
99:15, 100:1, 100:9,
106:10, 106:13,
108:8
**liable** [3] - 57:23,
86:14, 105:25
**liaison** [4] - 15:15,

18:9, 20:25, 67:9
**LIAISON** [1] - 1:18
**LIBERTY** [1] - 11:7
**Liberty** [22] - 44:1,
44:2, 44:4, 44:7,
44:14, 54:12, 56:22,
57:5, 57:16, 57:25,
58:11, 58:12, 59:21,
61:18, 61:19, 61:24,
64:3, 65:18, 65:20,
65:24, 66:6
**Liberty's** [5] - 44:20,
56:9, 60:10, 61:16,
66:17
**LIEFF** [1] - 2:14
**life** [2] - 76:10, 76:22
**LIFE** [3] - 2:11, 10:21,
11:4
**light** [4] - 36:3, 36:5,
119:15, 119:22
**likely** [2] - 30:6, 40:10
**limit** [1] - 63:23
**limitation** [12] - 19:9,
33:1, 39:2, 39:24,
40:2, 40:4, 40:6,
40:13, 40:15, 40:16,
43:12, 47:14
**LIMITATION** [1] - 13:6
**LIMITED** [2] - 6:7,
13:12
**limited** [7] - 19:18,
26:9, 26:15, 42:15,
42:17, 42:20, 98:14
**limits** [1] - 50:2
**line** [5] - 80:15, 80:23,
80:24, 80:25, 81:5
**LISKOW** [1] - 6:8
**list** [20] - 90:13, 90:18,
90:24, 92:12, 92:14,
93:18, 94:21, 95:10,
95:13, 98:20, 98:21,
98:25, 99:3, 99:9,
102:5, 102:13,
102:18, 103:7,
103:13
**listed** [7] - 43:22,
43:23, 90:12, 90:25,
93:2, 93:10, 120:18
**LISTED** [2] - 14:11,
14:13
**listen** [1] - 20:4
**listen-only** [1] - 20:4
**listening** [3] - 20:4,
27:3, 38:21
**listing** [1] - 92:8
**lists** [1] - 63:9
**litigate** [1] - 56:22
**litigating** [1] - 116:10
**litigation** [8] - 24:14,
36:17, 57:3, 102:20,

110:16, 112:6,
113:12, 113:22
**Litigation** [1] - 102:25
**LLC** [4] - 7:3, 9:13,
9:13, 11:15
**lo** [2] - 101:17, 112:24
**local** [1] - 31:19
**located** [1] - 82:22
**locations** [2] - 30:11,
94:19
**lock** [1] - 101:12
**locking** [3] - 101:10,
101:12, 101:16
**look** [7] - 62:7, 69:22,
69:24, 77:10, 108:1,
110:2, 111:6
**looked** [1] - 111:18
**looking** [4] - 28:20,
31:25, 96:3, 112:16
**looks** [1] - 99:9
**LOS** [1] - 7:15
**loses** [1] - 60:6
**loss** [10] - 23:8, 23:18,
42:5, 42:6, 45:13,
52:17, 62:12, 62:14,
62:20
**lost** [4] - 48:9, 48:10,
48:11, 48:23
**loud** [1] - 120:9
**LOUISIANA** [5] - 1:2,
1:7, 5:3, 9:4
**Louisiana** [11] - 16:17,
17:4, 17:5, 23:4,
45:6, 53:14, 53:15,
81:1, 104:9, 122:5,
122:6
**love** [1] - 117:1
**LP** [1] - 8:17
**LSU** [1] - 71:14
**LUBEL** [37] - 32:16,
32:18, 32:20, 32:25,
33:6, 33:10, 33:15,
33:23, 34:1, 34:4,
34:7, 34:9, 34:14,
34:18, 34:20, 34:22,
34:24, 35:1, 35:4,
35:7, 35:11, 35:14,
35:16, 35:19, 35:24,
36:1, 36:10, 36:14,
36:18, 36:22, 37:6,
37:10, 37:14, 37:18,
37:22, 38:7, 38:9
**Lubel** [5] - 32:14,
32:20, 33:17, 38:14,
39:4
**Lubel's** [1] - 41:3
**luck** [2] - 59:20, 59:22
**LUNDY** [4] - 3:18,
3:18, 17:11
**Lundy** [1] - 17:11

**LUTHER** [1] - 4:20
**Luther** [1] - 16:14
**LUXENBERG** [1] -
2:21
**Lyle** [6] - 18:11, 67:8,
79:14, 79:15, 82:9,
89:20
**LYLE** [30] - 9:17,
18:11, 67:6, 67:8,
67:16, 67:18, 67:20,
67:24, 68:2, 68:16,
68:18, 68:25, 71:19,
72:16, 72:21, 72:23,
73:1, 74:4, 74:19,
74:21, 74:23, 75:25,
76:3, 77:5, 79:9,
118:15, 118:19,
119:21, 120:10,
121:4
**LYNDEN** [1] - 11:3
**Lynden** [18] - 17:2,
67:20, 67:23, 83:15,
83:25, 84:2, 84:8,
84:9, 84:22, 85:16,
85:17, 86:3, 86:4,
86:5, 86:7, 86:12,
86:15, 86:16

## M

**M-I** [2] - 18:24, 19:1
**Magistrate** [3] - 26:17,
26:25, 115:16
**main** [3] - 36:7, 68:17,
68:18
**maintained** [1] - 90:13
**manage** [1] - 42:15
**manageable** [1] -
113:20
**MANAGEMENT** [2] -
9:12, 14:7
**management** [2] -
39:7, 70:20
**Management** [2] -
19:8, 41:15
**manager** [1] - 34:4
**managing** [1] - 24:12
**mandate** [3] - 96:12,
103:17, 103:19
**MANGES** [2] - 9:16,
9:20
**manner** [1] - 94:3
**manufacture** [1] -
95:17
**manufactured** [1] -
95:8
**manufacturer** [2] -
91:3, 99:4
**map** [3] - 71:25, 72:1,

80:21
**March** [2] - 25:11, 27:19
**MARINE** [4] - 9:13, 9:14, 9:15, 11:19
**Marine** [9] - 18:16, 79:12, 80:5, 80:6, 81:3, 81:23, 82:5, 82:14, 83:5
maritime [7] - 33:16, 34:2, 78:24, 95:24, 96:11, 106:13, 107:4
market [6] - 100:22, 101:3, 101:18, 101:25, 103:20, 103:21
**MARSHAL** [1] - 86:22
**Marshall** [4] - 17:1, 67:22, 83:12, 83:14
**MARSHALL** [20] - 11:3, 17:1, 67:22, 83:13, 83:19, 83:22, 83:24, 84:8, 84:12, 84:15, 84:21, 84:24, 85:1, 85:14, 85:19, 85:22, 85:25, 86:3, 86:7, 86:11
marshes [3] - 104:9, 104:23, 109:6
**MARTIN** [27] - 11:11, 11:12, 44:18, 46:6, 46:12, 48:8, 49:4, 49:8, 49:17, 50:9, 50:13, 50:21, 50:25, 51:7, 51:14, 51:18, 51:25, 53:4, 53:7, 53:11, 64:14, 65:22, 66:2, 66:8, 66:13, 66:19, 67:2
**Martin** [5] - 44:6, 44:17, 54:22, 64:6, 64:13
**MARTINEZ** [1] - 8:8
**MARTÍNEZ** [1] - 3:7
**MARY** [1] - 10:8
**Mary** [4] - 18:18, 67:25, 72:17, 87:1
massive [3] - 31:9, 89:10, 104:2
**Master** [1] - 29:3
material [7] - 60:22, 68:8, 68:14, 69:21, 78:4, 89:4, 96:17
**Matt** [1] - 17:11
matter [16] - 24:20, 26:5, 32:8, 36:6, 38:19, 42:10, 45:6, 52:19, 56:2, 95:15, 96:8, 110:10, 110:11, 117:4,

120:10, 122:9
matters [3] - 32:7, 62:9, 90:9
**MATTHEW** [1] - 3:18
mature [1] - 39:1
**MAZE** [1] - 4:21
McCormick [1] - 23:16
**MCCUTCHEN** [1] - 8:21
**MCKINNEY** [1] - 7:23
**MCLEOD** [1] - 9:8
**MDL** [7] - 13:22, 15:12, 23:1, 24:6, 26:4, 42:16, 120:25
mean [12] - 53:2, 57:23, 64:20, 65:4, 65:19, 69:15, 71:17, 78:2, 88:10, 98:20, 103:25, 114:1
meaning [4] - 45:14, 64:17, 65:6, 80:6
means [3] - 52:24, 53:8, 87:7
meant [3] - 56:17, 73:7, 73:8
meantime [2] - 28:1, 39:10
measure [1] - 116:9
measurements [1] - 28:24
measures [1] - 108:19
meat [6] - 101:6, 101:7, 101:9, 101:11, 101:12, 101:16
**MECHANICAL** [1] - 12:15
mechanism [6] - 42:14, 45:18, 101:10, 101:16, 101:18, 111:9
mediation [7] - 37:16, 37:17, 37:19, 37:20, 38:20, 39:11, 39:12
meet [1] - 31:2
meeting [1] - 30:1
**MEGAN** [1] - 5:5
**Megan** [1] - 17:3
**Member** [1] - 44:16
member [1] - 34:6
members [3] - 15:16, 116:5, 116:12
memorandum [1] - 80:18
mention [4] - 20:3, 82:14, 106:17, 107:6
mentioned [2] - 23:10
merely [3] - 51:19, 102:6, 102:7
merit [1] - 54:13

Merit [2] - 122:4, 122:14
**MERIT** [1] - 12:12
Mestayer [1] - 18:7
**MESTAYER** [2] - 10:16, 18:7
met [1] - 102:8
**METHVIN** [1] - 3:14
Mexican [2] - 19:19, 42:16
**MEXICAN** [2] - 13:13, 14:9
Mexico [4] - 15:13, 94:15, 96:16, 104:13
**MEXICO** [1] - 1:5
**MI** [1] - 9:3
Miami [1] - 73:14
**MICHAEL** [3] - 5:13, 9:17, 12:4
Michael [2] - 18:11, 67:8
Michigan [2] - 96:1, 96:9
Michoud [2] - 28:16, 29:2
microphone [1] - 20:6
mid [1] - 119:11
mid-February [1] - 119:11
middle [1] - 61:20
might [3] - 49:14, 62:12, 117:10
Mike [3] - 16:12, 17:12, 17:19
miles [7] - 74:16, 75:11, 75:20, 77:3, 83:2, 83:3
**MILES** [1] - 9:14
**MILLER** [3] - 7:6, 18:4, 43:15
Miller [3] - 18:4, 43:13, 43:15
million [2] - 52:8, 60:12
Milwaukee [2] - 96:1, 96:8
mind [1] - 116:4
minute [3] - 64:13, 66:24, 97:10
minutes [8] - 53:18, 67:12, 67:13, 67:16, 67:21, 67:24, 106:7, 118:14
miscellaneous [2] - 21:25, 22:13
mischievous [1] - 39:6
**MISHKIN** [1] - 8:4
missions [2] - 76:16, 77:15

Mississippi [2] - 81:1, 112:20
Mitch [1] - 53:22
Mitchell [1] - 44:11
**MITCHELL** [1] - 8:3
Mobil [1] - 101:24
Mobile [1] - 73:13
**MOBILE** [1] - 2:8
mode [1] - 20:5
moment [3] - 60:25, 78:15, 109:18
moments [1] - 55:22
money [3] - 50:3, 57:23, 58:8
**MONITION** [1] - 14:13
monition [2] - 43:17, 43:23
**MONTGOMERY** [3] - 3:16, 4:22, 10:3
month [1] - 30:6
**MONTHLY** [1] - 1:12
months [3] - 19:6, 60:7, 103:3
moot [1] - 50:14
**MORGAN** [3] - 3:3, 9:3
morning [57] - 15:8, 15:9, 15:18, 15:20, 15:22, 15:24, 16:1, 16:7, 16:9, 16:11, 16:13, 16:16, 16:18, 16:20, 16:22, 16:24, 17:1, 17:3, 17:7, 17:9, 17:11, 17:12, 17:13, 17:14, 17:17, 17:19, 17:21, 17:23, 17:25, 18:2, 18:4, 18:5, 18:6, 18:7, 18:9, 18:11, 18:13, 18:15, 18:17, 18:19, 18:23, 18:25, 19:2, 32:16, 32:17, 41:14, 44:3, 44:5, 44:9, 44:12, 67:6, 67:7, 83:14, 87:3, 87:4, 96:21, 96:23
most [6] - 31:11, 32:21, 37:12, 55:7, 58:2, 87:19
mostly [1] - 26:18
motion [57] - 24:15, 24:16, 24:19, 25:13, 36:7, 38:23, 42:21, 44:1, 44:7, 45:23, 46:23, 46:25, 47:15, 47:19, 48:20, 50:10, 50:18, 51:1, 51:2, 54:5, 54:10, 54:13, 54:15, 54:24, 55:17, 55:20, 56:5, 56:6, 60:17, 62:22, 63:20,

68:8, 70:3, 74:6, 79:23, 80:3, 80:5, 83:7, 84:1, 84:19, 86:10, 91:22, 97:3, 97:5, 98:9, 99:17, 107:9, 108:17, 115:8, 115:15, 115:21, 119:1, 119:12, 119:13, 119:17, 119:24
Motion [6] - 33:3, 33:5, 37:6, 44:15, 116:2, 117:2
Motions [1] - 32:9
**MOTIONS** [4] - 13:10, 14:6, 14:11, 14:12
motions [16] - 19:14, 25:2, 38:25, 40:12, 43:8, 43:11, 43:16, 43:19, 43:22, 46:20, 48:14, 67:4, 68:4, 68:6, 119:22
**MOTIONS**.................
...................... [1] - 14:10
**MOTLEY** [1] - 4:6
**MOUNT** [1] - 4:8
mountain [1] - 27:7
move [7] - 16:4, 16:6, 24:6, 27:16, 43:24, 66:25, 106:8
moved [8] - 36:14, 44:18, 44:23, 45:1, 45:4, 63:23, 64:2, 106:5
moving [4] - 56:11, 79:16, 86:24, 106:6
**MR** [210] - 15:18, 15:20, 15:22, 15:24, 16:1, 16:6, 16:7, 16:9, 16:11, 16:13, 16:16, 16:22, 16:24, 17:1, 17:5, 17:7, 17:9, 17:11, 17:12, 17:13, 17:14, 17:16, 17:17, 17:19, 17:21, 17:22, 17:23, 17:25, 18:2, 18:4, 18:5, 18:6, 18:7, 18:9, 18:11, 18:13, 18:15, 18:19, 18:23, 18:25, 19:2, 20:11, 21:6, 21:8, 21:16, 21:18, 21:22, 22:7, 22:12, 22:17, 22:22, 23:3, 23:23, 24:8, 25:24, 26:7, 26:13, 26:15, 27:10, 27:13, 27:18, 28:13, 28:18, 29:12, 29:14, 29:17, 29:23,

31:9, 31:14, 31:16, 32:4, 32:11, 32:16, 32:18, 32:20, 32:25, 33:6, 33:10, 33:15, 33:23, 34:1, 34:4, 34:7, 34:9, 34:14, 34:18, 34:20, 34:22, 34:24, 35:1, 35:4, 35:7, 35:11, 35:16, 35:19, 35:24, 36:1, 36:10, 36:14, 36:18, 36:22, 37:10, 37:14, 37:22, 38:7, 38:9, 38:13, 39:14, 39:16, 39:20, 39:24, 40:1, 40:16, 40:23, 41:1, 41:11, 41:18, 43:3, 43:15, 44:9, 44:18, 46:6, 46:12, 48:8, 49:4, 49:8, 49:17, 50:9, 50:13, 50:21, 50:25, 51:7, 51:14, 51:25, 53:4, 53:7, 53:11, 53:21, 55:5, 55:9, 55:13, 56:8, 56:18, 57:10, 62:6, 62:16, 63:5, 64:12, 64:14, 65:22, 66:2, 66:8, 66:13, 66:19, 66:24, 67:1, 67:2, 67:6, 67:8, 67:16, 67:18, 67:19, 67:20, 67:22, 67:24, 68:2, 68:16, 68:18, 68:25, 71:19, 72:16, 72:21, 72:23, 74:4, 74:19, 74:21, 74:23, 75:25, 76:3, 77:5, 79:9, 79:11, 80:11, 80:16, 80:20, 81:2, 81:15, 82:20, 83:13, 83:19, 83:22, 83:24, 84:8, 84:12, 84:15, 84:21, 84:24, 85:1, 85:14, 85:19, 85:22, 85:25, 86:3, 86:7, 118:12, 118:15, 118:19, 119:21, 120:10, 121:4

**MS** [62] - 3:5, 16:18, 16:20, 17:3, 18:17, 18:21, 18:22, 44:3, 44:6, 86:25, 87:5, 87:18, 88:4, 88:13, 90:6, 90:8, 90:14, 90:20, 91:14, 91:21, 92:1, 92:4, 92:6, 92:13, 92:15, 93:11, 93:25, 94:22, 95:12, 96:19, 96:21, 96:24, 97:16, 98:4, 98:8,

98:22, 99:1, 99:4, 99:12, 99:21, 101:2, 102:14, 102:24, 104:5, 104:17, 104:21, 105:1, 105:5, 105:12, 105:15, 106:7, 107:10, 108:14, 108:21, 109:10, 109:12, 113:7, 113:9, 113:13, 113:23, 114:12, 118:11

**MSRC** [2] - 67:16, 67:19

**MSRC's** [2] - 82:15, 83:9

**MTBE** [5] - 102:19, 102:21, 102:25, 103:9, 103:18

**Multi** [1] - 102:25

**Multi-District** [1] - 102:25

**multiple** [3] - 43:11, 43:22, 107:2

**MULTIPLE** [1] - 14:11

**MUNGER** [1] - 7:13

**must** [9] - 28:10, 60:3, 62:10, 69:15, 77:23, 90:9, 92:16, 103:2, 112:5

**Mutual** [3] - 44:1, 44:2, 44:4

## N

**N.W** [1] - 6:18

**NALCO** [3] - 10:7, 10:11, 10:12

**Nalco** [51] - 18:18, 18:20, 67:24, 86:24, 87:2, 87:6, 87:13, 87:15, 87:20, 87:23, 87:24, 88:6, 88:9, 88:13, 88:17, 90:12, 91:9, 91:15, 92:12, 92:18, 95:8, 95:16, 95:23, 96:17, 96:24, 96:25, 97:12, 98:2, 98:6, 98:12, 98:16, 98:18, 99:15, 99:17, 100:12, 100:21, 101:20, 101:23, 103:20, 104:14, 104:15, 106:3, 106:4, 106:7, 106:9, 107:14, 107:22, 108:22

**Nalco's** [8] - 89:13, 92:7, 97:10, 97:11,

102:11, 107:9, 108:1, 108:4

**name** [2] - 93:20, 115:18

**named** [4] - 84:2, 84:7, 111:24, 113:14

**NAPERVILLE** [1] - 10:13

**narrow** [1] - 120:4

**National** [24] - 73:1, 73:6, 75:6, 75:11, 76:13, 87:7, 88:20, 88:25, 89:4, 89:16, 90:13, 90:22, 90:24, 91:1, 91:5, 91:10, 91:17, 92:1, 92:9, 92:16, 93:2, 94:17, 117:22, 117:25

**NATIONAL** [1] - 10:3

**national** [2] - 73:7, 87:15

**naturally** [1] - 38:16

**nature** [3] - 42:23, 53:7, 111:1

**NCP** [1] - 91:2

**near** [4] - 40:10, 81:8, 81:18

**necessarily** [2] - 46:12, 59:25

**necessary** [7] - 52:4, 76:9, 92:8, 95:18, 97:23, 98:11

**need** [16] - 20:5, 23:21, 24:1, 24:4, 43:6, 43:10, 54:10, 65:9, 65:15, 66:25, 87:15, 93:7, 93:19, 99:10, 104:12, 109:2

**needed** [1] - 76:21

**needing** [1] - 108:23

**needs** [1] - 78:15

**negligent** [2] - 96:11

**negotiated** [1] - 26:22

**negotiations** [1] - 119:23

**neighboring** [1] - 112:25

**NETWORK** [1] - 4:16

**NEUNER** [1] - 10:15

**never** [6] - 53:5, 64:20, 65:2, 74:8, 98:12, 98:14

**nevertheless** [3] - 30:20, 59:13, 103:16

**NEW** [20] - 1:7, 1:23, 2:12, 2:23, 5:10, 6:11, 7:7, 7:19, 8:5, 8:19, 9:9, 9:22, 10:5, 10:22, 11:5, 11:9, 11:17, 11:21, 12:5,

12:13

**New** [1] - 31:12

**next** [13] - 21:1, 23:1, 26:5, 32:8, 50:17, 63:23, 71:3, 71:15, 73:23, 76:14, 79:10, 83:12, 121:11

**NEXT** [2] - 13:20, 14:14

**NIC** [1] - 73:8

**night** [5] - 69:14, 77:19, 78:1, 78:2, 82:12

**nine** [1] - 113:13

**ninth** [1] - 30:12

**NO** [1] - 1:7

**nobody** [1] - 36:14

**non** [2] - 25:6, 36:24

**non-ship** [1] - 36:24

**none** [3] - 43:21, 69:24, 88:9

**NORFOLK** [1] - 2:5

**normally** [1] - 55:18

**North** [1] - 59:6

**NORTH** [4] - 6:4, 6:5, 6:7, 6:8

**NOT** [1] - 14:7

**notes** [2] - 31:25, 42:24

**nothing** [3] - 88:14, 106:11, 108:9

**notices** [1] - 26:22

**notified** [1] - 84:9

**notify** [1] - 108:22

**notwithstanding** [1] - 61:8

**NOVEMBER** [1] - 14:5

**November** [4] - 32:3, 46:20, 114:5, 119:3

**NOW** [1] - 13:6

**NRC** [3] - 18:12, 67:8, 74:4

**number** [8] - 19:6, 22:4, 22:10, 68:19, 71:7, 85:7, 86:14, 113:20

**NUMBER** [1] - 13:5

**Number** [10] - 19:8, 41:14, 49:4, 49:8, 70:13, 71:8, 71:25, 85:2, 86:13

**numbered** [1] - 122:9

**Numbers** [1] - 91:8

**numerous** [1] - 26:18

**NW** [3] - 6:22, 8:22, 9:17

**NY** [4] - 2:23, 8:5, 9:22, 11:21

## O

**O'Brien** [4] - 115:4, 115:5, 115:6

**O'Brien's** [6] - 18:12, 67:8, 74:4, 111:8, 111:11, 111:13

**O'BRIEN'S** [1] - 9:11

**O'Keefe** [1] - 30:25

**O'KEEFE** [2] - 1:23, 10:4

**O'ROURKE** [2] - 5:22, 16:9

**O'Rourke** [1] - 16:10

**OAK** [1] - 4:4

**Obama** [1] - 93:20

**object** [1] - 65:25

**objected** [1] - 64:21

**objection** [4] - 20:22, 84:23, 84:25, 85:1

**OBJECTIONS** [2] - 13:8, 14:3

**objections** [2] - 19:12, 32:1

**objective** [1] - 30:19

**objectives** [1] - 95:2

**objectivity** [1] - 31:22

**obligated** [1] - 52:17

**obligation** [7] - 45:3, 47:17, 47:18, 50:7, 51:13, 52:19, 63:23

**obligations** [2] - 47:21, 55:25

**obstacle** [1] - 94:25

**obviously** [9] - 40:4, 40:5, 40:24, 41:4, 63:19, 80:2, 86:19, 99:6, 104:1

**occasions** [1] - 74:17

**occupied** [1] - 72:20

**occupy** [1] - 36:1

**occur** [2] - 66:7, 72:11

**occurring** [1] - 77:7

**October** [3] - 32:2, 87:5, 95:22

**OCTOBER** [1] - 14:4

**OF** [14] - 1:2, 1:5, 1:12, 4:10, 5:3, 5:3, 5:12, 5:17, 5:21, 5:22, 13:8, 13:22, 14:6, 14:7

**offered** [1] - 78:3

**office** [1] - 30:2

**OFFICE** [4] - 3:15, 4:20, 5:5, 5:18

**Office** [2] - 17:4, 17:6

**offices** [1] - 31:16

**OFFICES** [1] - 4:10

**Official** [2] - 122:5,

122:14
**OFFICIAL** [1] - 12:11
**OFFSHORE** [2] - 7:4, 9:13
**OIL** [2] - 1:4, 1:5
**oil** [15] - 15:12, 42:18, 71:1, 75:7, 84:3, 87:22, 89:20, 99:8, 103:1, 103:9, 104:8, 104:22, 109:5, 110:6, 117:25
**Oil** [3] - 15:13, 106:18, 107:4
**oily** [1] - 112:2
**old** [2] - 61:22, 120:19
**OLSON** [1] - 7:13
**ON** [7] - 1:5, 13:10, 13:12, 13:14, 14:5, 14:13
**On-Scene** [7] - 70:13, 72:24, 75:12, 76:1, 89:20, 92:23, 95:19
**On-Site** [1] - 72:13
**once** [4] - 47:25, 59:15, 119:8, 121:3
**one** [49] - 21:4, 21:14, 21:17, 23:15, 30:13, 32:25, 36:12, 39:18, 49:4, 49:8, 55:22, 57:5, 58:25, 59:5, 59:15, 61:7, 63:14, 64:13, 65:4, 66:19, 66:20, 66:21, 66:24, 68:20, 69:8, 71:24, 72:4, 73:12, 73:13, 73:14, 81:8, 81:9, 82:15, 85:2, 85:13, 86:11, 86:13, 94:23, 95:4, 98:15, 109:24, 111:15, 111:17, 113:24, 120:17, 120:22
**ONE** [5] - 6:9, 7:22, 10:12, 10:16, 12:4
**One** [3] - 26:8, 114:23, 114:25
**ones** [2] - 22:14, 109:16
**ongoing** [1] - 65:21
**onstream** [1] - 30:7
**OPA** [2] - 106:22, 107:1
**operated** [3] - 80:11, 80:12, 83:8
**operating** [1] - 82:11
**operation** [6] - 30:3, 30:23, 31:1, 31:5, 31:9, 116:14
**operations** [4] - 34:4, 77:7, 77:12, 78:9

**opponent** [1] - 55:6
**opportunities** [2] - 37:12, 37:15
**opportunity** [7] - 31:2, 42:7, 118:21, 119:4, 119:8, 120:2
**oppose** [1] - 43:18
**opposite** [2] - 46:19, 85:23
**opposition** [4] - 43:14, 43:20, 79:21, 79:25
**OPT** [1] - 14:3
**opt** [3] - 32:2, 116:12, 120:5
**OPT-OUT** [1] - 14:3
**opt-out** [1] - 32:2
**OR** [1] - 14:8
**oral** [5] - 42:25, 43:10, 43:25, 67:12, 118:17
**Order** [6] - 19:8, 19:13, 19:21, 119:1, 119:3
**ORDER** [3] - 13:5, 13:10, 13:12, 13:14, 15:4
**order** [11] - 19:18, 25:11, 25:17, 27:20, 36:16, 41:19, 42:1, 114:5, 115:16, 115:19, 119:7
**ordered** [3] - 39:11, 61:3, 109:22
**Orders** [2] - 20:9, 20:13
**orders** [4] - 19:7, 20:21, 73:23, 114:17
**ORDERS.................
...... [1] - 13:18
**Oregon** [1] - 25:18
**orient** [1] - 31:18
**orientation** [1] - 30:15
**originally** [2] - 20:15, 75:14
**ORLEANS** [16] - 1:7, 1:23, 2:12, 5:10, 6:11, 7:7, 7:19, 8:19, 9:9, 10:5, 10:22, 11:5, 11:9, 11:17, 12:5, 12:13
**Orleans** [1] - 31:12
**otherwise** [1] - 53:5
**ought** [2] - 42:9, 54:14
**ourselves** [7] - 109:20, 114:13, 114:14, 115:24, 116:15, 118:3, 118:6
**OUT** [1] - 14:3
**outlined** [1] - 41:23
**outlines** [1] - 19:9
**outset** [1] - 79:22

**outside** [5] - 77:13, 77:15, 82:21, 114:16
**overhead** [3] - 74:10, 77:19, 78:2
**overnight** [1] - 77:22
**overpaid** [2] - 59:17, 59:19, 59:21
**overtime** [1] - 21:23
**overtime-type** [1] - 21:23
**owed** [1] - 50:8
**own** [5] - 35:16, 54:15, 118:2, 118:22, 119:10
**owned** [1] - 84:9
**owners** [1] - 36:24
**oxygenate** [4] - 103:2, 103:3, 103:5, 103:14
**oxygenates** [3] - 103:6, 103:7, 103:8

## P

**P.O** [1] - 5:23
**page** [7] - 71:7, 72:2, 87:10, 88:5, 89:18, 89:22
**PAGE** [1] - 13:3
**pages** [3] - 70:22, 82:17, 88:8
**paid** [5] - 60:2, 61:1, 63:22, 64:3, 82:1
**PAN** [3] - 2:11, 10:21, 11:4
**PANEL** [1] - 13:16
**panel** [1] - 19:24
**Panel** [6] - 20:13, 20:16, 20:21, 21:1, 21:5, 21:12
**PANEL.....** [1] - 13:19
**papers** [10] - 54:11, 68:7, 70:1, 70:12, 75:1, 77:9, 79:17, 86:12, 118:22, 119:10
**paragraph** [2] - 71:7, 76:14
**paragraphs** [2] - 76:4, 77:7
**paramount** [1] - 96:2
**PARSIOLA** [1] - 3:10
**part** [29] - 24:16, 24:17, 25:4, 34:21, 34:23, 34:25, 50:5, 50:11, 59:11, 60:15, 61:19, 62:9, 62:10, 62:25, 63:11, 64:8, 76:13, 79:5, 80:21, 91:19, 97:8, 97:19,

98:11, 106:22, 110:1, 116:12, 117:3
**partial** [2] - 27:20, 59:10
**participate** [6] - 84:10, 88:7, 88:8, 114:2, 119:5, 119:9
**participating** [1] - 83:1
**particular** [6] - 58:17, 60:20, 93:19, 102:10, 103:20, 112:21
**particularly** [2] - 19:14, 65:1
**parties** [19] - 22:19, 26:22, 29:6, 33:19, 40:8, 41:19, 41:22, 41:25, 44:24, 47:4, 47:20, 48:5, 53:16, 87:8, 110:2, 110:3, 116:7, 116:21, 118:25
**PARTNERS** [1] - 11:15
**party** [6] - 33:23, 33:24, 36:20, 43:20, 53:12
**passed** [3] - 103:1, 106:24, 106:25
**passing** [1] - 74:10
**PATRICK** [1] - 10:4
**PAUL** [1] - 2:11
**Paul** [1] - 15:23
**pay** [11] - 25:16, 50:1, 52:17, 56:21, 57:1, 57:4, 61:2, 61:3, 61:17, 64:19, 64:22
**paying** [1] - 65:5
**PENDING** [2] - 13:11, 14:10
**pending** [1] - 19:14, 22:8, 28:6, 33:3, 40:5, 42:16, 43:8, 43:11, 48:20, 84:1, 84:19, 117:3, 119:13
**PENNSYLVANIA** [1] - 6:22
**PENTHOUSE** [1] - 3:8
**people** [27] - 20:3, 21:11, 22:1, 31:8, 39:5, 49:12, 72:19, 74:9, 78:24, 81:9, 81:19, 82:10, 87:18, 93:23, 106:21, 109:24, 110:7, 111:20, 113:19, 114:17, 114:18, 115:18, 116:16, 117:8, 117:10,

120:5, 120:6
**people's** [1] - 114:15
**Pepper** [3] - 122:3, 122:12, 122:13
**PEPPER** [1] - 12:11
**percolated** [1] - 24:1
**perhaps** [2] - 96:25, 119:16
**period** [1] - 117:9
**permission** [2] - 67:13, 74:17
**person** [1] - 72:15, 76:2, 105:23, 111:13, 111:15, 111:25, 112:2, 112:5, 112:6, 116:25, 117:17
**personal** [6] - 23:6, 33:2, 37:12, 81:21, 82:7, 86:13, 117:12, 117:21
**personally** [1] - 93:21
**personnel** [1] - 30:7
**persuasion** [1] - 55:1
**PETOSA** [1] - 3:4
**PETROLEUM** [2] - 8:16, 10:16
**Phase** [5] - 26:8, 26:17, 27:1, 114:23, 114:25
**PHELPS** [1] - 9:7
**Phil** [3] - 17:9, 17:17, 44:9
**PHILIP** [1] - 3:11
**PHILLIP** [1] - 7:18
**phone** [3] - 20:2, 20:4, 20:6
**physical** [5] - 28:19, 29:7, 108:6, 112:3, 114:18
**pick** [2] - 111:25, 112:2
**picked** [1] - 65:11
**pieces** [1] - 24:12
**PIGMAN** [1] - 7:17
**PINHOOK** [1] - 10:17
**PLACE** [1] - 9:8
**place** [33] - 19:17, 31:5, 32:1, 36:16, 38:25, 41:6, 41:7, 52:24, 57:17, 60:9, 70:4, 73:9, 74:1, 75:6, 75:20, 76:20, 76:23, 82:24, 82:25, 83:4, 93:15, 97:22, 98:2, 98:24, 101:18, 104:19, 105:3, 108:16, 108:19, 109:2, 119:8, 119:23, 121:1

**Place** - 30:24
**places** [2] - 31:11, 68:21
**plaintiff** [7] - 59:9, 59:11, 59:12, 59:13, 95:4, 116:23, 118:22
**plaintiffs** [28] - 15:19, 25:12, 32:12, 34:11, 42:6, 42:11, 68:13, 69:14, 77:17, 78:19, 78:23, 81:17, 81:22, 84:20, 87:12, 88:5, 89:5, 89:8, 89:22, 93:4, 110:3, 115:13, 115:19, 118:24, 119:4, 119:8, 119:25, 120:16
**PLAINTIFFS** [1] - 2:3
**plaintiffs'** [8] - 75:1, 77:9, 79:20, 87:6, 88:24, 89:2, 94:25, 108:3
**PLAINTIFFS'** [1] - 1:17
**Plaintiffs'** [4] - 109:23, 110:25, 111:10, 114:20
**plan** [3] - 19:9, 34:12, 75:21
**Plan** [22] - 72:12, 75:6, 75:11, 76:13, 87:8, 88:21, 88:25, 89:4, 89:17, 90:13, 90:23, 90:24, 91:1, 91:6, 91:10, 91:18, 92:2, 92:9, 92:16, 94:17, 117:22, 117:25
**PLAN** [1] - 13:6
**Plan's** [1] - 93:2
**plane** [5] - 74:10, 77:19, 77:20, 77:22, 77:25
**planes** [5] - 82:11, 84:4, 85:21, 86:6, 88:11
**planning** [1] - 35:15
**plans** [1] - 70:20
**Plans** [3] - 70:21, 71:22, 78:8
**plausible** [1] - 88:18
**play** [1] - 59:4
**PLC** [1] - 25:18
**PLC's** [1] - 25:15
**pleading** [1] - 116:25
**Pleadings** [1] - 44:15
**pleadings** [6] - 44:19, 44:23, 45:1, 45:5, 50:19, 53:18
**pleas** [1] - 38:21
**PLEASANT** [1] - 4:8

**PLEASE** [1] - 12:8
**pled** [4] - 54:6, 54:7, 54:8
**plethora** [1] - 35:11
**point** [36] - 24:2, 36:8, 48:8, 48:14, 48:22, 49:10, 49:17, 51:11, 53:4, 53:7, 54:19, 55:14, 57:13, 58:20, 60:20, 62:7, 62:24, 64:23, 65:8, 65:14, 65:17, 69:5, 75:8, 75:16, 78:12, 83:19, 84:15, 86:11, 94:23, 95:20, 100:12, 101:9, 101:11, 104:13, 120:14, 121:4
**pointed** [1] - 61:18
**points** [2] - 110:14, 120:11
**police** [1] - 96:5
**policies** [1] - 55:7, 55:8, 66:18
**policy** [41] - 44:20, 44:21, 45:2, 45:7, 45:8, 45:13, 45:25, 46:4, 47:24, 48:1, 48:3, 52:7, 52:16, 52:22, 57:7, 60:11, 61:16, 61:21, 61:23, 61:25, 62:1, 62:2, 62:4, 62:7, 62:10, 62:15, 62:17, 62:23, 62:24, 63:4, 63:21, 64:6, 64:17, 64:25, 65:1, 65:17, 105:2
**POLK** [1] - 8:17
**Pollution** [2] - 106:18, 107:4
**pollution** [1] - 27:21
**PORTIS** [1] - 3:14
**position** [16] - 36:1, 37:8, 38:3, 46:13, 46:14, 49:1, 49:9, 49:13, 49:14, 49:24, 58:13, 64:18, 74:7, 74:12, 78:18, 81:11, 109:7, 109:12
**positions** [5] - 49:12, 49:13, 72:20, 74:8, 74:12
**possible** [4] - 30:20, 38:18, 40:8, 113:2
**possibly** [3] - 28:11, 46:12, 113:3
**Post** [1] - 70:18
**POST** [3] - 3:15, 5:5, 5:18
**Posts** [1] - 73:11

**posture** [1] - 40:21
**POTENTIAL** [1] - 14:6
**potential** [1] - 37:24
**Potential** [1] - 32:8
**potentially** [3] - 57:23, 105:1, 107:18
**powerful** [1] - 100:2
**powers** [1] - 96:5
**POYDRAS** [10] - 2:12, 6:10, 7:7, 8:19, 10:5, 10:21, 11:4, 11:9, 12:5, 12:12
**PPE** [4] - 112:3, 112:5, 112:11, 117:14
**practical** [3] - 36:6, 48:16, 49:6
**practice** [1] - 42:21
**preauthorization** [2] - 76:8, 76:17
**precedent** [4] - 47:12, 47:13, 47:14, 47:16
**precise** [1] - 28:23
**precision** [1] - 30:19
**precluded** [1] - 49:17
**precludes** [1] - 45:2
**predecessor** [2] - 92:7, 101:24
**preemption** [24] - 68:5, 70:8, 78:14, 78:15, 78:17, 83:25, 88:17, 88:19, 96:4, 100:4, 100:17, 102:21, 103:17, 105:7, 105:10, 105:17, 105:19, 106:19, 107:1, 107:10, 107:11, 107:13, 107:17, 107:22
**preemptive** [2] - 106:22, 107:3
**preempts** [2] - 106:12, 108:9
**preface** [1] - 54:3
**prefer** [1] - 35:16
**prejudice** [6] - 115:9, 115:22, 116:2, 116:21, 116:22, 117:2
**prejudiced** [2] - 55:12, 85:12
**prejudicial** [1] - 49:20
**prepared** [2] - 72:9, 88:23
**preparing** [1] - 114:23
**present** [2] - 56:20, 99:4
**PRESENT** [1] - 12:8
**presently** [1] - 113:21
**preserve** [2] - 39:7,

48:12
**President** [4] - 89:18, 90:21, 93:20, 96:13
**President's** [2] - 93:25, 94:17
**presumably** [3] - 42:20, 50:25, 117:12
**presupposing** [1] - 85:2
**PRETRIAL** [1] - 13:5
**Pretrial** [1] - 19:7
**pretty** [11] - 23:24, 30:22, 33:17, 34:9, 35:1, 56:1, 61:20, 98:20, 105:11, 108:4, 110:13
**prevail** [1] - 78:21
**prevent** [2] - 76:9, 104:11
**primarily** [5] - 23:4, 23:11, 25:25, 27:8, 54:1
**primary** [7] - 22:14, 50:18, 50:23, 55:3, 59:24, 60:1
**principle** [1] - 117:18
**principles** [1] - 59:4
**private** [1] - 87:8
**privilege** [2] - 26:18, 27:7
**privy** [1] - 119:4
**problem** [1] - 48:16
**problems** [2] - 69:23, 113:24
**procedures** [1] - 75:4
**proceed** [1] - 40:8
**proceeded** [1] - 110:16
**PROCEEDINGS** [3] - 1:12, 12:15, 15:1
**proceedings** [2] - 121:17, 122:9
**process** [21] - 23:14, 24:25, 27:25, 41:25, 70:4, 70:10, 71:3, 71:5, 72:8, 73:24, 74:1, 74:2, 75:5, 75:7, 78:7, 81:24, 90:16, 94:9, 119:5, 119:8
**processed** [1] - 81:25
**produce** [1] - 118:6
**produced** [3] - 82:16, 82:23, 82:24
**PRODUCED** [1] - 12:16
**product** [34] - 88:10, 90:4, 90:17, 90:24, 91:2, 93:2, 93:5, 93:7, 93:10, 93:15,

94:13, 95:5, 95:6, 95:14, 95:16, 96:11, 98:16, 99:15, 99:16, 99:19, 100:11, 100:14, 101:3, 101:5, 101:22, 101:23, 101:25, 102:9, 103:20, 103:23, 103:24, 104:15
**PRODUCTION** [2] - 6:3, 6:6
**products** [8] - 90:25, 92:22, 97:4, 100:1, 101:11, 106:10, 106:13, 108:8
**PRODUCTS** [1] - 6:8
**profilometer** [1] - 28:25
**program** [9] - 61:19, 62:10, 62:25, 63:1, 63:12, 63:18, 63:20, 63:21, 64:8
**progressing** [1] - 30:17
**promise** [1] - 33:24
**proof** [3] - 52:12, 54:20, 54:25
**proper** [2] - 65:7, 81:20
**property** [4] - 21:9, 29:2, 37:25, 112:25
**proposed** [1] - 19:12
**PROPOSED** [1] - 13:9
**proposition** [1] - 55:16
**proprietary** [1] - 42:19
**protections** [1] - 121:1
**protective** [6] - 68:23, 81:21, 82:7, 108:19, 112:3, 114:18
**protocol** [3] - 74:14, 98:2, 109:1
**protocols** [4] - 29:4, 97:22, 108:16, 108:19
**prove** [1] - 99:18
**provide** [7] - 61:23, 68:22, 84:4, 84:5, 87:21, 87:24, 100:17
**provided** [11] - 63:22, 68:23, 78:8, 79:16, 91:10, 91:15, 92:7, 92:11, 92:16, 92:19, 120:2
**provides** [1] - 75:12
**proving** [1] - 54:19
**provision** [1] - 117:23
**provisions** [2] - 62:23,

107:2
**PSC** [22] - 15:16, 15:21, 15:23, 15:25, 16:2, 16:8, 16:19, 16:21, 17:8, 17:10, 17:11, 17:12, 17:13, 17:15, 17:16, 29:23, 30:8, 30:10, 41:21, 42:10, 96:20, 96:22
**PSC's** [1] - 29:25
**PSC/BP** [2] - 14:1, 29:21
**purchasing** [1] - 22:2
**pure** [2] - 42:8, 100:1
**purportedly** [1] - 59:24
**purpose** [3] - 95:1, 102:12, 104:7
**purposes** [2] - 79:23, 83:7
**pursuant** [3] - 92:18, 103:14, 121:7
**pursue** [14] - 33:9, 33:18, 46:22, 47:3, 47:18, 48:9, 48:14, 48:23, 50:1, 50:16, 55:12, 66:15, 66:16, 119:22
**pursued** [3] - 48:10, 50:2, 52:1
**pursuing** [1] - 51:5
**put** [29] - 19:17, 32:14, 38:25, 48:17, 50:23, 57:16, 58:12, 70:4, 90:18, 94:15, 97:22, 98:1, 98:24, 99:2, 100:22, 101:2, 101:10, 101:25, 102:8, 103:6, 103:11, 108:16, 108:19, 109:2, 110:15, 110:23, 117:13, 121:1
**puts** [1] - 102:5
**putting** [4] - 38:20, 49:5, 54:25, 102:12

**Q**

**quandary** [1] - 48:18
**quantities** [2] - 94:3, 94:19
**questioning** [1] - 118:20
**questions** [6] - 21:3, 39:3, 70:5, 70:9, 79:17, 120:12
**quickly** [1] - 38:18
**quite** [4] - 48:17,

100:2, 111:18, 120:4
**quote** [3] - 65:25, 88:6, 91:1
**quoted** [1] - 94:6

**R**

**raise** [2] - 68:25, 110:14
**raised** [4] - 47:13, 52:14, 54:2, 121:5
**rashes** [1] - 117:14
**rather** [3] - 48:22, 85:9, 99:17
**re** [1] - 15:12
**RE** [1] - 1:4
**reach** [1] - 37:24
**reached** [2] - 28:3, 28:4
**read** [3] - 62:10, 84:18, 101:7
**reading** [1] - 74:13
**real** [4] - 40:11, 42:8, 68:12, 115:23
**realize** [1] - 33:8
**really** [20] - 23:18, 24:1, 26:1, 29:13, 38:15, 51:6, 57:14, 63:12, 80:4, 81:11, 102:19, 107:6, 107:11, 110:7, 111:9, 112:14, 113:1, 113:3, 114:22, 118:8
**Realtime** [2] - 122:3, 122:13
**REALTIME** [1] - 12:11
**reason** [7] - 47:10, 50:15, 65:5, 84:16, 110:10, 110:15, 110:23
**reasonably** [3] - 52:22, 53:9, 56:4
**reasons** [4] - 53:17, 58:25, 114:8, 119:21
**rebuttal** [2] - 53:19, 67:14
**received** [2] - 70:19, 73:20
**recent** [2] - 26:21, 36:22
**recently** [3] - 20:21, 22:9, 25:17
**reckless** [1] - 89:11
**recognize** [2] - 106:11, 112:15
**recognized** [4] - 57:17, 114:22, 115:12, 115:17

**recognizes** [1] - 117:21
**recollection** [2] - 21:4, 21:8
**recommendation** [1] - 94:8
**recommended** [1] - 97:12
**record** [12] - 26:12, 56:20, 58:14, 75:22, 89:5, 91:12, 91:15, 96:17, 98:8, 117:16, 118:9, 122:8
**RECORD** [1] - 12:8
**Record** [1] - 44:16
**RECORDED** [1] - 12:15
**records** [2] - 82:23, 82:25
**recover** [1] - 60:11
**recovering** [1] - 60:1
**recreation** [1] - 19:15
**recreational** [1] - 42:6
**REDDEN** [1] - 7:21
**reduce** [1] - 76:10
**reducing** [1] - 76:22
**referred** [2] - 71:22, 75:1
**referring** [1] - 54:22, 74:24
**refers** [1] - 55:7
**refresh** [1] - 21:4
**refusal** [1] - 89:11
**refuse** [1] - 87:13
**refused** [5] - 56:1, 87:9, 100:23, 114:1
**regard** [2] - 23:22, 32:6
**regarding** [1] - 24:5
**Regional** [2] - 74:25, 75:9
**Registered** [1] - 122:3
**REGISTERED** [1] - 12:12
**registered** [1] - 122:14
**regs** [1] - 102:16
**regular** [1] - 34:6
**regulation** [1] - 97:14, 98:15, 106:12, 117:22
**regulations** [5] - 92:17, 92:18, 93:1, 102:4, 102:6
**reject** [1] - 20:22
**rejecting** [1] - 106:25
**related** [4] - 42:15, 42:21, 47:22, 118:21
**RELATES** [1] - 1:9
**relates** [1] - 42:23
**relating** [1] - 22:2,

25:22, 58:16
**relatively** [1] - 113:20
**release** [4] - 47:19, 55:11, 60:5, 116:14
**released** [3] - 52:3, 116:7, 116:13
**relevant** [1] - 98:7
**relocated** [1] - 30:25
**remain** [1] - 60:12
**REMAINING** [1] - 13:19
**remaining** [2] - 20:25, 95:23
**remand** [9] - 25:2, 25:3, 36:15, 37:23, 38:12, 38:23, 38:25, 40:5, 40:12
**Remand** [2] - 32:9, 33:3, 33:5, 37:6
**REMAND........** [1] - 14:6
**remanded** [1] - 40:5
**remember** [2] - 71:9, 101:7
**removal** [1] - 89:19
**removed** [2] - 35:7, 40:3
**renew** [1] - 117:2
**renewed** [1] - 24:19
**repeat** [3] - 35:17, 35:19, 108:22
**replace** [1] - 103:3
**reply** [4] - 54:2, 54:17, 60:21, 79:17
**report** [7] - 20:8, 20:24, 21:3, 23:13, 24:9, 28:13, 29:1
**reported** [2] - 22:9, 32:21, 73:4
**Reporter** [7] - 122:3, 122:4, 122:5, 122:13, 122:14, 122:14
**REPORTER** [3] - 12:11, 12:11, 12:12
**REPORTER'S** [1] - 122:1
**reports** [1] - 31:20
**represent** [7] - 32:18, 110:4, 111:3, 114:20, 115:13, 116:25, 118:8
**representatives** [3] - 72:14, 76:7, 77:13
**represented** [3] - 65:21, 111:5, 120:18
**representing** [2] - 58:2, 79:12
**represents** [1] - 111:17

**request** [6] - 19:17, 38:20, 87:16, 88:2, 100:23, 115:18
**requested** [4] - 87:17, 88:14, 91:11, 92:20
**required** [10] - 46:13, 62:4, 85:7, 85:8, 90:22, 91:17, 92:20, 97:13, 97:17, 98:15
**requires** [3] - 51:15, 52:6, 102:17
**reserve** [2] - 53:18, 67:13
**RESERVE** [1] - 4:12
**resistant** [1] - 39:8
**resolution** [3] - 26:17, 28:3, 50:14
**resolve** [6] - 22:15, 28:5, 49:15, 49:21, 50:15, 65:16
**RESOLVED** [1] - 14:7
**resolved** [11] - 22:11, 23:14, 34:15, 49:19, 55:18, 56:14, 57:16, 59:15, 60:17, 62:22, 65:12
**Resolved** [1] - 41:15
**resolves** [1] - 116:10
**resolving** [1] - 27:20, 58:15
**respect** [11] - 20:1, 22:25, 26:4, 43:16, 44:22, 45:7, 81:12, 82:7, 93:13, 94:24, 107:10
**respectfully** [1] - 40:23
**respects** [1] - 117:1
**respirator** [1] - 109:9
**respirators** [5] - 97:17, 97:23, 98:11, 98:16, 109:7
**respiratory** [2] - 108:23, 109:2
**respond** [2] - 92:24, 110:25
**responder** [21] - 18:10, 67:9, 68:14, 68:20, 70:7, 70:18, 74:5, 76:15, 77:1, 77:14, 88:6, 97:20, 106:5, 106:6, 106:8, 108:18, 109:14, 109:25, 110:17, 112:8, 115:10
**responders** [7] - 69:6, 70:24, 73:4, 73:19, 85:5, 86:17, 95:24
**responders'** [1] - 68:3
**responding** [1] -

**Response** [12] - 18:16, 74:25, 75:9, 79:12, 80:5, 80:6, 81:3, 81:4, 81:23, 82:5, 82:14, 83:5
**response** [34] - 21:23, 23:7, 23:17, 31:20, 60:20, 68:9, 70:15, 71:4, 71:22, 72:11, 73:3, 73:9, 73:16, 76:6, 76:15, 77:9, 77:11, 77:14, 80:10, 84:4, 84:10, 84:21, 85:18, 87:12, 87:22, 89:21, 89:24, 93:7, 93:17, 95:17, 99:14, 104:2, 118:19, 119:14
**RESPONSE** [4] - 9:11, 10:3, 10:20, 11:19
**responsibilities** [1] - 73:15
**responsibility** [2] - 23:18, 94:12
**responsible** [2] - 64:4, 117:24
**rest** [3] - 34:11, 64:7, 95:23
**restate** [1] - 85:15
**RESTORATION** [1] - 4:15
**rests** [2] - 94:12, 100:9
**result** [3] - 47:24, 59:2, 64:7
**resulting** [2] - 54:8, 110:6
**results** [1] - 29:5
**revenue** [1] - 23:8
**review** [1] - 86:18
**reviewed** [1] - 72:12
**reviews** [1] - 91:3
**revised** [1] - 19:9
**REVISED** [1] - 13:6
**rhetorical** [1] - 100:2
**RHON** [1] - 3:15
**Rhon** [1] - 17:13
**RICE** [3] - 4:6, 4:7, 17:16
**Rice** [1] - 17:16
**RICHARD** [1] - 6:14
**RICHESON** [1] - 8:18
**Rick** [1] - 18:13
**ride** [1] - 37:8
**ridiculous** [1] - 77:24
**RIG** [1] - 1:5
**rig** [1] - 34:8
**Rig** [1] - 15:13
**rights** [35] - 27:21, 44:25, 47:3, 47:7,

48:2, 48:4, 49:23, 50:1, 50:16, 58:7, 58:10, 58:19, 58:22, 58:23, 59:8, 59:12, 59:16, 59:19, 59:24, 60:5, 60:6, 60:13, 60:15, 60:16, 60:22, 60:23, 61:1, 61:5, 61:8, 61:10, 61:11, 65:10, 65:25, 96:4
**ripe** [1] - 53:16
**rise** [2] - 15:7, 121:16
**riser** [1] - 28:15
**River** [1] - 112:20
**RMR** [2] - 12:11, 122:13
**ROAD** [1] - 10:17
**Rob** [2] - 19:2, 28:18
**Robert** [1] - 15:25
**ROBERT** [3] - 2:7, 6:18, 6:22
**Roberts** [1] - 18:2
**ROBERTS** [2] - 7:10, 18:2
**ROBIN** [1] - 2:22
**Robin** [2] - 16:19, 96:22
**rock** [1] - 60:9
**role** [8] - 80:9, 81:20, 81:23, 82:3, 83:18, 83:20, 83:21, 84:3
**ROME** [1] - 11:19
**RONQUILLO** [2] - 8:7, 8:12
**ROOM** [2] - 5:14, 12:12
**Rose** [3] - 18:18, 67:25, 87:1
**ROSE** [1] - 10:8
**ROUGE** [1] - 5:6
**row** [1] - 38:21
**ROY** [8] - 1:18, 1:18, 15:20, 29:23, 31:9, 31:14, 31:16, 32:4
**Roy** [2] - 15:20, 29:23
**RRT** [7] - 74:25, 75:9, 75:15, 76:8, 76:17
**RSR** [3] - 42:15, 47:12, 54:23
**RSR's** [1] - 46:8
**rule** [5] - 37:23, 40:12, 65:7, 113:18, 117:4
**Rule** [21] - 44:15, 51:1, 54:5, 54:10, 54:13, 54:16, 54:21, 54:24, 55:17, 55:18, 55:20, 56:5, 56:6, 60:17, 62:22, 63:16, 63:19, 64:9, 85:8, 85:9, 85:10

**ruled** [6] - 37:6, 48:19, 70:3, 70:6, 87:5, 116:1
**ruling** [4] - 24:15, 50:6, 88:16, 103:22
**run** [1] - 22:19
**running** [4] - 30:4, 30:23, 31:15, 109:18
**RUSNAK** [1] - 2:18
**RYAN** [1] - 6:14

### S

**S.W.2d** [1] - 60:18
**s/Cathy** [1] - 122:12
**safe** [3] - 89:12, 100:25, 101:19
**safely** [3] - 94:4, 94:20, 96:16
**safety** [2] - 101:8, 117:24
**SAN** [2] - 2:16, 5:15
**SARVER** [1] - 11:7
**sat** [1] - 61:20
**satellite** [1] - 31:16
**saving** [1] - 86:25
**saw** [1] - 121:3
**SC** [1] - 4:8
**scans** [1] - 28:24
**Scene** [7] - 70:13, 72:24, 75:12, 76:1, 89:20, 92:23, 95:19
**schedule** [8] - 26:20, 90:23, 91:2, 93:3, 114:5, 118:24, 119:2
**scheduled** [3] - 19:10, 37:19, 43:2
**SCHEDULED** [1] - 13:7
**SCHEDULING** [1] - 13:12
**scheduling** [1] - 19:18
**SCHELL** [1] - 8:17
**school** [1] - 101:7
**scope** [5] - 27:20, 31:4, 88:20, 88:24, 89:3
**SCOTT** [1] - 4:3
**Scott** [1] - 17:7
**screen** [2] - 45:12, 46:1
**SEACOR** [6] - 9:12, 9:13, 9:13, 9:14, 9:14, 9:15
**seaman** [1] - 33:25
**seamless** [1] - 30:3
**SEAN** [1] - 11:16
**seated** [2] - 15:10, 118:16

**SECOND** [1] - 13:5
**second** [7] - 24:18, 47:22, 49:22, 58:20, 59:5, 64:23, 105:4
**Second** [1] - 19:7
**secondly** [1] - 111:24
**seconds** [1] - 83:15
**SECREST** [1] - 7:21
**section** [1] - 72:4
**SECTION** [1] - 5:21
**Section** [1] - 121:7
**sections** [1] - 121:5
**securities** [3] - 24:14, 24:24, 25:25
**SEE** [1] - 12:8
**see** [14] - 48:16, 54:11, 69:11, 69:20, 70:11, 71:6, 71:25, 103:25, 108:2, 111:19, 113:24, 119:17, 120:5, 120:7
**seeing** [1] - 78:6
**seek** [1] - 37:7
**seeking** [1] - 25:12
**seem** [1] - 40:10
**selected** [4] - 93:22, 95:13, 99:14, 107:15
**selection** [2] - 93:16, 94:13
**self** [1] - 63:21
**self-insured** [1] - 63:21
**sell** [1] - 100:24
**selling** [1] - 22:2
**seminar** [2] - 30:12, 30:14
**seminars** [1] - 30:10
**send** [2] - 21:5, 21:12
**sending** [1] - 20:23
**sense** [7] - 40:11, 40:21, 57:6, 116:22, 119:16, 119:20, 119:22
**sent** [2] - 22:6, 22:7
**separate** [6] - 20:18, 52:14, 61:25, 79:15, 84:1, 84:9
**September** [2] - 26:24, 43:2
**series** [1] - 26:21
**serious** [1] - 36:4
**seriously** [1] - 33:22
**services** [1] - 97:7
**SERVICES** [2] - 8:7, 11:15
**set** [15] - 23:12, 23:16, 38:4, 38:19, 42:14, 43:17, 46:24, 65:11, 69:22, 75:3, 75:7, 78:14, 90:22, 114:4,

119:1
**sets** [2] - 42:13, 92:15
**SETTING** [1] - 13:14
**Setting** [1] - 19:21
**setting** [3] - 23:15, 34:14, 109:20
**settings** [1] - 23:11
**settle** [5] - 37:9, 47:2, 48:15, 57:20, 65:9
**settled** [5] - 37:13, 37:25, 38:1, 66:4, 66:22
**settlement** [30] - 29:24, 29:25, 30:15, 30:17, 37:11, 41:21, 47:7, 48:22, 49:1, 49:11, 49:15, 50:1, 50:10, 53:8, 55:11, 57:22, 58:3, 58:6, 59:10, 65:9, 65:21, 66:15, 110:22, 114:24, 116:3, 116:5, 116:8, 116:9, 116:14, 119:18
**Settlement** [1] - 41:15
**SETTLEMENT** [1] - 14:7
**settlements** [5] - 19:12, 19:23, 20:1, 29:21, 29:22
**SETTLEMENTS.........**
**....................** [1] - 13:9
**SETTLEMENTS.........**
**.........................** [1] - 14:1
**settling** [1] - 66:9
**SEVENTH** [2] - 4:11, 8:4
**several** [7] - 20:21, 30:18, 30:23, 34:20, 59:14, 72:19, 87:18
**severed** [2] - 22:7, 40:7
**shall** [2] - 89:19, 89:21
**share** [1] - 60:2
**shared** [1] - 29:5
**sheet** [1] - 108:1
**SHEETS** [1] - 12:8
**SHELL** [2] - 6:9, 12:4
**ship** [1] - 36:24
**shoes** [2] - 47:3, 59:23
**shore** [7] - 74:20, 75:11, 75:20, 77:3, 81:8, 81:18
**shoreward** [2] - 76:8, 76:17
**SHORT** [1] - 14:12
**short** [8] - 20:19, 43:11, 43:17, 43:22,

111:6, 111:7, 117:9,
117:11
**shortly** [1] - 115:15
**show** [9] - 47:17,
52:12, 61:10, 64:8,
68:8, 82:23, 82:25,
88:19, 98:10
**showed** [2] - 45:25,
85:7
**shown** [1] - 52:12
**shows** [1] - 75:23
**Shushan** [14] - 19:17,
26:18, 26:25, 28:2,
28:5, 29:5, 42:15,
70:4, 114:4, 115:16,
118:25, 119:3,
119:6, 121:14
**Shushan's** [1] - 38:20
**sick** [1] - 117:14
**side** [8] - 16:4, 30:7,
85:23, 85:25, 86:10,
89:18, 108:2, 114:1
**SIEMENS** [1] - 9:16
**SIERRA** [1] - 4:15
**SIGN** [1] - 12:8
**SIGN-IN** [1] - 12:8
**signed** [1] - 72:12
**significance** [1] - 73:7
**significant** [3] - 45:20,
46:3, 52:15
**SILL** [1] - 10:12
**similar** [5] - 72:20,
105:12, 105:15,
111:15
**similarly** [2] - 39:5,
103:19
**simple** [3] - 49:4, 49:8,
71:10
**simply** [4] - 45:24,
52:9, 53:14, 69:20
**SINCLAIR** [1] - 4:21
**single** [2] - 66:20, 71:1
**sit** [1] - 102:3
**Site** [1] - 72:13
**sitting** [2] - 16:4,
86:10
**situ** [5] - 70:24, 82:11,
82:24, 83:1, 83:3
**situated** [1] - 39:5
**situation** [10] - 38:17,
40:19, 49:3, 57:18,
59:7, 64:20, 111:15,
115:25, 117:13,
118:3
**six** [3] - 24:23, 103:6,
111:23
**slicer** [4] - 101:9,
101:11, 101:12,
101:16
**slicers** [2] - 101:6,

101:8
**smack** [1] - 61:20
**small** [1] - 113:20
**smaller** [1] - 70:17
**smattering** [1] -
111:19
**Smith** [1] - 111:7
**sneak** [1] - 58:12
**so-called** [4] - 19:7,
19:15, 42:5, 42:8
**SOILEAU** [1] - 3:18
**SOME** [1] - 13:12
**someone** [4] - 95:8,
101:22, 107:20,
115:7
**sometime** [2] - 42:22,
101:3
**somewhere** [1] -
113:19
**soon** [1] - 19:20
**SOREN** [1] - 1:22
**sorry** [5] - 23:2, 58:21,
59:18, 96:14, 113:7
**sort** [9] - 23:19, 31:3,
39:6, 42:5, 51:3,
56:7, 73:2, 106:18,
118:5
**sorts** [1] - 68:24
**sought** [2] - 55:25,
59:16
**sound** [1] - 36:2
**sounds** [2] - 86:1,
100:21
**South** [1] - 30:10
**south** [1] - 80:23
**SOUTH** [3] - 3:18,
7:14, 10:9
**Southern** [2] - 24:11,
102:25
**southern** [1] - 80:21
**SPEAKER** [1] - 86:8
**speaking** [1] - 63:19
**special** [1] - 19:11
**Special** [1] - 29:3
**SPECIAL** [1] - 13:8
**specific** [2] - 102:21,
117:22
**specifically** [13] -
45:2, 48:3, 52:16,
52:18, 60:19, 61:16,
62:21, 64:5, 69:25,
88:2, 93:22, 106:25,
114:13
**speculation** [1] -
69:12
**spend** [1] - 54:18
**spent** [2] - 26:16,
53:23
**SPILL** [2] - 1:4, 11:19
**Spill** [10] - 15:12,

18:16, 79:12, 80:5,
80:6, 81:3, 81:23,
82:5, 82:14, 83:5
**spill** [19] - 42:5, 42:7,
71:22, 73:7, 75:7,
76:6, 76:15, 77:11,
77:14, 84:4, 87:22,
88:7, 88:8, 89:9,
93:17, 93:19, 99:8,
110:6, 118:1
**sponsored** [1] - 30:11
**spray** [9] - 68:21,
68:22, 74:15, 74:18,
75:10, 75:19, 76:16,
77:15, 104:13
**sprayed** [17] - 68:21,
74:10, 77:2, 77:3,
80:14, 80:18, 81:5,
81:10, 82:10, 82:21,
83:6, 86:9, 89:10,
97:25, 111:2, 117:15
**spraying** [3] - 82:25,
86:6, 104:2
**spread** [2] - 31:6,
31:11
**SQUARE** [2] - 6:9,
12:4
**square** [1] - 57:5
**squarely** [2] - 88:24,
89:3
**ST** [2] - 9:17, 11:16
**stack** [2] - 28:15,
28:21
**staff** [1] - 31:18
**stand** [3] - 25:20,
94:25, 118:9
**standard** [6] - 46:6,
51:8, 85:9, 85:10,
96:7, 105:19
**standing** [1] - 74:9
**start** [8] - 26:23, 30:6,
41:19, 55:16, 75:5,
75:16, 96:6, 96:25
**started** [1] - 75:14
**starting** [2] - 75:8,
75:16
**state** [21] - 23:4,
23:11, 23:22, 24:5,
25:3, 33:6, 34:2,
34:13, 35:6, 36:8,
37:2, 37:23, 38:3,
40:1, 40:3, 96:4,
96:5, 101:15,
101:18, 106:13,
107:3
**STATE** [4] - 4:20, 5:3,
5:3, 13:21
**State** [5] - 16:17, 17:3,
17:5, 23:2, 122:4
**statement** [2] - 81:22,

117:6
**STATES** [3] - 1:1,
1:13, 5:21
**States** [22] - 16:10,
16:23, 19:19, 26:19,
42:16, 64:24, 68:9,
70:1, 80:22, 86:8,
88:15, 89:6, 89:15,
91:8, 91:22, 92:19,
93:12, 95:25, 99:13,
107:15, 122:5,
122:15
**states** [2] - 16:15,
118:1
**STATES....................
... [1] - 13:13
**STATES....................
................** [1] - 14:9
**stating** [1] - 87:21
**stations** [1] - 72:20
**status** [11] - 20:8,
20:11, 20:24, 22:18,
24:6, 26:6, 26:21,
27:16, 29:21, 43:2,
121:11
**STATUS** [3] - 1:12,
13:22, 14:14
**STATUS.............** [1] -
13:23
**statute** [8] - 25:11,
52:25, 53:11, 53:14,
53:15, 107:2, 108:9,
117:20
**stay** [11] - 33:10,
36:10, 36:14, 36:16,
36:23, 37:4, 37:7,
40:2, 106:7, 117:3,
119:17
**stayed** [4] - 33:8, 36:8,
36:21, 40:7
**staying** [1] - 36:16
**Steering** [4] - 109:23,
110:25, 111:10,
114:21
**Stennis** [3] - 80:12,
80:22, 80:24
**STENOGRAPHY** [1] -
12:15
**step** [4] - 47:3, 50:17,
63:14, 109:19
**Stephanie** [1] - 15:11
**Stephen** [1] - 16:22
**STEPHEN** [2] - 1:22,
5:18
**stepped** [1] - 65:11
**STERBCOW** [3] -
2:10, 2:11, 15:22
**Sterbcow** [1] - 15:23
**Steve** [4] - 15:18,
16:10, 18:2, 32:11

**STEVEN** [2] - 5:22,
7:10
**stick** [3] - 46:14, 49:9,
72:1
**stigma** [2] - 19:15,
42:8
**still** [13] - 28:4, 29:13,
29:15, 31:24, 50:21,
60:12, 61:10, 85:15,
94:21, 104:4,
107:21, 107:23,
118:16
**stipulate** [2] - 71:11,
71:13
**stipulated** [6] - 73:25,
76:19, 89:7, 89:24,
91:8, 93:13
**Stipulation** [2] -
41:16, 91:8
**STIPULATION...........
......... [1] - 14:8
**stipulations** [13] -
70:1, 70:10, 70:11,
71:6, 71:8, 71:9,
74:14, 76:3, 76:5,
78:7, 91:22, 91:23,
92:19
**STONE** [1] - 7:17
**stop** [3] - 93:6, 102:1
**stopped** [1] - 101:4
**storage** [1] - 103:11
**straighten** [1] - 86:21
**STRANGE** [2] - 4:20,
16:13
**Strange** [2] - 16:4,
16:14
**strategic** [3] - 114:8,
118:23, 119:9
**STREET** [24] - 1:19,
2:8, 2:12, 2:15, 3:4,
3:19, 4:11, 5:9, 6:10,
6:18, 7:7, 7:10, 7:19,
7:23, 8:10, 8:19,
8:22, 9:4, 9:9, 10:5,
10:21, 11:4, 12:5,
12:12
**strike** [2] - 48:21, 98:5
**strong** [1] - 49:14
**structure** [1] - 73:9
**stuff** [1] - 21:24
**sub** [1] - 115:6
**sub's** [2] - 115:5
**subcontractors** [4] -
80:11, 81:4, 82:15,
83:9
**subject** [3] - 37:3,
55:10, 96:2
**submission** [1] - 93:9
**submit** [1] - 97:12
**submitted** [10] -

26:22, 69:1, 69:4, 75:23, 86:16, 90:16, 91:3, 98:21, 120:19, 120:24

**subrogation** [28] – 44:25, 47:3, 47:23, 48:2, 48:6, 49:23, 50:15, 52:2, 58:7, 58:10, 59:16, 60:1, 60:6, 60:13, 60:15, 60:16, 60:22, 60:23, 60:25, 61:5, 61:8, 61:10, 61:11, 65:10, 65:25, 66:4, 66:9

**subs** [3] – 115:2, 115:3, 115:5

**subsidiary** [2] – 84:9, 86:15

**substantially** [2] – 48:25, 76:10

**substitute** [3] – 84:14, 84:16, 84:18

**substitution** [1] – 85:11

**successful** [1] – 22:10

**suddenly** [1] – 65:6

**sue** [1] – 53:13

**sued** [11] – 33:11, 33:14, 33:20, 34:19, 34:20, 39:23, 39:24, 52:16, 52:25, 59:13

**sufficient** [1] – 98:24

**suggest** [3] – 36:23, 37:1, 60:8

**suggested** [3] – 58:1, 97:4, 119:15

**suggesting** [6] – 39:9, 46:9, 48:17, 49:7, 55:21, 56:23

**suing** [2] – 36:18, 37:2

**suit** [1] – 100:15

**SUITE** [24] – 2:12, 3:4, 3:11, 3:22, 4:4, 4:17, 6:10, 7:10, 7:23, 8:10, 8:13, 8:19, 9:4, 9:9, 9:17, 10:5, 10:9, 10:17, 10:21, 11:4, 11:9, 11:12, 11:16, 12:5

**SUMICH** [1] – 3:10

**Summary** [1] – 41:15

**summary** [10] – 51:2, 54:15, 54:23, 56:9, 56:11, 56:14, 68:4, 80:3, 80:5, 98:9

**SUMMARY** [1] – 14:8

**summer** [3] – 26:10, 26:16, 28:20

**SUMMY** [2] – 4:3, 17:7

**Summy** [1] – 17:7

**supervised** [1] – 39:12

**supervising** [1] – 82:4

**supervision** [2] – 29:3, 29:9

**supplied** [2] – 88:10, 94:4

**supplies** [1] – 103:13

**supply** [2] – 88:14, 95:5

**SUPPORT** [1] – 10:15

**Support** [1] – 18:8

**supposed** [12] – 49:2, 68:21, 68:22, 70:23, 70:24, 70:25, 73:21, 74:15, 105:4, 114:11

**Supreme** [5] – 46:17, 60:19, 64:16, 95:25, 96:5

**survived** [1] – 32:23

**survivors** [1] – 33:2

**SUTHERLAND** [1] – 7:9

**sympathetic** [1] – 40:19

**system** [1] – 103:12

## T

**table** [2] – 16:5, 86:10

**talks** [2] – 77:7, 108:3

**tank** [1] – 103:11

**Tanner** [1] – 18:23

**TANNER** [2] – 9:3, 18:23

**targeted** [1] – 114:6

**task** [1] – 71:10

**tasked** [2] – 81:16

**tasking** [1] – 81:17

**TAYLOR** [1] – 3:10

**Team** [1] – 75:1

**teams** [2] – 29:25

**Teams** [1] – 75:9

**technical** [1] – 30:7

**technology** [1] – 101:9

**Ted** [1] – 18:9

**tee** [1] – 19:19

**tended** [2] – 21:12, 21:24

**tens** [1] – 30:9

**tentatively** [2] – 42:24, 43:1

**term** [4] – 56:13, 64:16, 64:20, 64:25

**terminologies** [1] – 72:18

**terms** [8] – 55:14, 60:13, 61:17, 61:25, 69:23, 78:14, 79:2, 121:6

**Terrell** [1] – 17:3

**TERRELL** [2] – 5:5, 17:3

**test** [2] – 29:7, 102:2

**testified** [1] – 89:25

**testimony** [1] – 97:12

**testing** [5] – 28:10, 28:19, 102:8, 102:16, 102:17

**TESTING...................**
**........................** [1] –
13:25

**Texas** [12] – 23:4, 23:11, 24:11, 35:21, 45:5, 46:17, 52:21, 56:13, 60:19, 64:16, 73:13, 73:14

**THAT** [1] – 14:11

**THE** [253] – 1:4, 1:5, 1:13, 1:17, 2:3, 4:15, 5:3, 5:12, 5:21, 11:20, 12:8, 13:6, 13:8, 13:9, 13:12, 13:13, 13:17, 13:19, 14:4, 14:12, 14:13, 15:7, 15:8, 15:10, 15:12, 15:15, 16:3, 19:4, 21:4, 21:7, 21:14, 21:17, 21:19, 22:4, 22:9, 22:13, 22:18, 22:23, 23:20, 24:3, 25:21, 26:2, 26:11, 26:14, 27:2, 27:11, 27:14, 28:7, 28:17, 29:10, 29:13, 29:15, 29:18, 31:2, 31:10, 31:15, 31:24, 32:5, 32:17, 32:19, 32:24, 33:4, 33:8, 33:13, 33:17, 33:24, 34:3, 34:6, 34:8, 34:12, 34:16, 34:19, 34:21, 34:23, 34:25, 35:2, 35:6, 35:9, 35:13, 35:15, 35:17, 35:22, 35:25, 36:2, 36:12, 36:16, 36:20, 37:5, 37:9, 37:11, 37:15, 37:20, 38:6, 38:8, 38:10, 39:13, 39:15, 39:19, 39:23, 39:25, 40:14, 40:17, 40:25, 41:10, 41:12, 42:24, 43:5, 43:20, 44:5, 44:8, 44:13, 46:4, 46:9, 48:6, 48:16, 49:5, 49:12, 50:5, 50:11, 50:17, 50:23, 51:2, 51:10, 51:17, 51:21, 53:1,

53:5, 53:10, 53:20, 54:25, 55:6, 55:10, 56:5, 56:16, 57:7, 62:3, 62:14, 63:2, 64:10, 64:13, 65:18, 65:23, 66:6, 66:11, 66:17, 66:23, 66:25, 67:3, 67:7, 67:15, 67:17, 68:1, 68:12, 68:17, 68:19, 71:17, 72:15, 72:18, 72:22, 72:25, 74:3, 74:7, 74:20, 74:22, 75:22, 76:1, 76:25, 79:8, 79:10, 80:9, 80:15, 80:17, 80:25, 81:13, 82:18, 83:11, 83:17, 83:21, 83:23, 84:6, 84:11, 84:13, 84:17, 84:23, 84:25, 85:11, 85:17, 85:21, 85:23, 86:1, 86:5, 86:19, 86:22, 86:23, 87:4, 87:16, 88:2, 88:10, 90:4, 90:7, 90:9, 90:15, 91:12, 91:19, 91:25, 92:3, 92:5, 92:10, 92:14, 93:8, 93:18, 94:21, 95:8, 96:18, 96:20, 96:23, 97:15, 97:19, 98:5, 98:19, 98:23, 99:2, 99:6, 99:20, 100:19, 102:12, 102:23, 103:25, 104:6, 104:18, 104:22, 105:2, 105:10, 105:13, 106:4, 107:8, 108:10, 108:15, 109:1, 109:11, 113:6, 113:8, 113:11, 113:18, 113:24, 118:10, 118:13, 118:16, 119:14, 120:4, 120:23, 121:9, 121:16

**theme** [3] – 31:21, 31:22, 31:23

**themselves** [4] – 15:16, 15:17, 88:18, 116:24

**THEODORE** [1] – 9:20

**theory** [1] – 60:1

**therefore** [5] – 59:19, 60:6, 62:21, 64:19, 77:23

**they've** [11] – 31:10, 35:21, 52:3, 52:25, 65:2, 69:1, 78:3,

84:15, 85:9, 99:25

**thick** [1] – 30:18

**thinking** [3] – 41:3, 41:8, 120:9

**third** [9] – 36:20, 40:8, 44:24, 47:4, 47:20, 48:5, 53:12, 53:16, 65:8

**third-party** [1] – 53:12

**THIS** [1] – 1:9

**THOMAS** [1] – 10:8

**THOSE** [1] – 14:11

**thousand** [2] – 30:14, 111:3, 113:10

**thousands** [4] – 30:9, 82:16, 117:10

**three** [12] – 31:8, 42:3, 42:13, 42:16, 43:1, 53:18, 67:21, 74:16, 75:11, 75:20, 77:3, 116:3

**throughout** [3] – 28:20, 71:21, 73:24

**timing** [1] – 49:17

**TO** [17] – 1:9, 13:8, 13:16, 13:19, 14:3, 14:6, 14:12, 15:4, 27:23, 56:1, 56:20, 56:24, 57:4, 57:19, 61:1, 61:2

**today** [5] – 23:10, 85:4, 97:3, 108:2, 111:11

**together** [2] – 30:12, 105:18

**TOLLES** [1] – 7:13

**Tom** [1] – 18:19

**took** [5] – 52:24, 76:23, 81:25, 82:25, 93:15

**top** [5] – 52:8, 72:23, 72:25

**TORTS** [2] – 5:13, 5:17

**totality** [1] – 118:5

**totally** [3] – 51:25, 66:21, 107:21

**touched** [1] – 42:19

**tour** [1] – 31:17

**tower** [5] – 45:10, 61:19, 61:21, 62:10, 64:2

**TOWER** [1] – 2:4

**toxic** [3] – 93:5, 95:6, 96:12

**toxicity** [1] – 91:4, 91:16, 108:6

**track** [1] – 31:24

**Trahan** [3] – 32:18, 35:5, 38:16

**Trahan's** [2] – 32:21, 37:9

**trained** [1] - 30:7
**transcript** [1] - 122:7
**TRANSCRIPT** [2] -
1:12, 12:15
**Transfer** [2] - 20:8,
20:12
**transfer** [1] - 20:22
**TRANSFER** [1] - 13:18
**transferred** [5] -
20:15, 21:21, 21:24,
22:3, 24:25
**TRANSOCEAN** [4] -
7:3, 7:3, 7:5, 9:7
**Transocean** [25] -
18:3, 18:4, 18:5,
32:25, 33:12, 33:13,
33:14, 33:18, 33:21,
34:5, 36:17, 36:18,
39:11, 39:23, 39:24,
40:6, 41:6, 42:2,
43:14, 43:15, 43:18,
46:11, 47:1, 48:7,
50:8
**transparency** [1] -
31:23
**transparent** [1] -
30:19
**TRAVIS** [1] - 11:12
**TRIAL** [2] - 13:6
**trial** [21] - 19:9, 23:12,
23:15, 23:17, 34:14,
34:21, 34:23, 34:25,
38:1, 38:4, 38:5,
39:2, 40:6, 40:13,
40:15, 40:16, 51:3,
56:7, 114:24
**tried** [5] - 16:6, 37:9,
37:14, 99:25, 110:4
**trigger** [3] - 45:8, 46:2,
47:11
**triggered** [2] - 44:20,
47:25
**true** [3] - 61:16, 61:24,
122:7
**truth** [2] - 27:4, 80:2
**try** [8] - 33:18, 34:16,
40:7, 68:25, 102:2,
107:12, 107:13,
111:18
**trying** [15] - 33:4, 33:6,
34:17, 36:3, 49:5,
62:8, 77:18, 86:1,
92:10, 100:5, 100:6,
100:19, 101:4,
104:10, 121:1
**Tsekerides** [1] - 18:9
**TSEKERIDES** [2] -
9:20, 18:9
**TULLY** [2] - 10:20,
16:24

**Tully** [1] - 16:24
**turn** [1] - 58:7
**turning** [1] - 109:14
**turns** [2] - 60:15,
116:24
**two** [23] - 20:1, 21:5,
21:14, 29:12, 30:14,
34:9, 43:25, 61:9,
67:13, 67:16, 80:11,
81:3, 81:6, 82:13,
83:2, 85:7, 86:12,
86:14, 90:7, 90:11,
106:7, 118:13,
120:19
**Two** [2] - 26:17, 27:1
**two-year-old** [1] -
120:19
**twofold** [1] - 85:1
**TX** [8] - 2:19, 4:4,
7:11, 7:23, 8:10,
8:14, 9:5, 11:13
**type** [3] - 21:23, 45:17
**types** [4] - 21:5, 22:5,
95:9, 105:4
**typical** [1] - 35:1

# U

**U.S** [10] - 5:12, 5:17,
5:22, 16:12, 87:13,
87:14, 87:19, 91:2,
93:2, 96:9
**ultimate** [1] - 94:13
**ultimately** [1] - 106:24
**unauthorized** [1] -
76:16
**unbelievably** [1] -
57:17
**under** [42] - 29:2, 29:8,
34:1, 43:17, 45:5,
47:24, 50:8, 52:21,
52:22, 56:13, 56:21,
60:1, 60:10, 60:11,
61:7, 67:5, 75:18,
78:23, 79:5, 85:8,
89:15, 89:16, 89:25,
90:21, 93:21, 94:16,
95:7, 97:17, 97:22,
97:25, 99:19,
100:14, 105:8,
107:1, 107:4,
107:18, 110:12,
112:16, 117:21,
121:5, 121:10
**underground** [1] -
103:11
**UNDERHILL** [2] -
5:13, 16:11
**Underhill** [3] - 16:12,

71:17, 86:9
**underlying** [10] -
47:25, 59:15, 62:1,
62:15, 62:17, 62:20,
63:4, 63:6, 63:8,
65:4
**underneath** [1] -
73:11
**undertaken** [1] - 29:2
**Underwriters** [1] -
44:14
**UNDERWRITERS** [2] -
9:7, 11:7
**undisputed** [1] - 68:8
**unfolded** [1] - 119:16
**UNIDENTIFIED** [1] -
86:8
**Unified** [4] - 70:15,
70:16, 73:10, 97:21
**unifying** [1] - 73:2
**unique** [10] - 34:10,
36:1, 36:2, 38:16,
38:22, 39:4, 44:19,
45:7, 45:9, 87:6
**uniquely** [1] - 116:22
**United** [20] - 16:10,
16:23, 26:19, 64:24,
68:9, 70:1, 80:22,
86:8, 88:15, 89:6,
89:15, 91:8, 91:22,
92:19, 93:12, 95:25,
99:13, 107:15,
122:5, 122:15
**UNITED** [3] - 1:1, 1:13,
5:21
**unknown** [1] - 113:19
**unless** [3] - 27:4,
94:15, 116:12
**unlike** [3] - 33:1, 45:9,
88:6
**unlimited** [1] - 63:22
**unnamed** [1] - 113:14
**unnecessary** [1] -
85:6
**unprecedented** [2] -
87:13, 93:14
**unreasonable** [1] -
65:3
**unrepresented** [1] -
111:4
**unresolved** [3] -
41:20, 53:7
**unsafe** [1] - 99:21
**unwind** [1] - 39:6
**up** [43] - 19:19, 20:6,
24:1, 27:6, 30:4,
30:22, 31:3, 31:15,
33:19, 36:20, 39:2,
39:6, 42:14, 44:1,
45:11, 57:20, 58:22,

60:23, 63:23, 64:2,
65:11, 67:4, 67:11,
71:1, 71:20, 72:25,
73:15, 75:8, 79:10,
79:14, 86:4, 89:9,
103:12, 104:8,
104:22, 106:18,
109:5, 111:11,
112:2, 114:4, 118:4,
118:20, 119:1
**UPCOMING** [1] - 14:2
**upcoming** [1] - 31:25
**updated** [1] - 92:20
**USC** [1] - 121:7
**USDIN** [1] - 11:7
**uses** [1] - 51:18

# V

**VA** [1] - 2:5
**Valdez** [1] - 106:25
**valid** [12] - 46:16,
46:21, 48:7, 50:7,
51:11, 51:12, 51:15,
51:22, 51:23, 57:8,
66:3, 107:19
**value** [4] - 37:24, 42:5,
60:16, 61:11
**various** [3] - 23:4,
28:15, 73:15
**vendor** [1] - 21:25
**vendors** [2] - 30:2,
30:24
**versions** [2] - 90:7,
90:11
**versus** [3] - 44:2, 96:1,
96:8
**viable** [1] - 48:7
**victim** [1] - 32:22
**victims** [2] - 33:2,
34:15
**view** [1] - 42:11
**violated** [4] - 82:5,
82:6, 96:10, 115:19
**virtually** [1] - 30:1
**visited** [1] - 31:5
**VOICES** [1] - 15:9
**volumes** [1] - 95:18
**voluminous** [1] -
98:20
**voluntary** [1] - 119:24

# W

**WACKER** [1] - 10:9
**wait** [1] - 49:12
**waive** [2] - 47:19, 58:7
**waived** [5] - 47:1,

58:9, 58:19, 60:15,
66:4
**waiver** [4] - 44:24,
47:23, 49:23, 50:15
**wake** [1] - 42:7
**WALKER** [1] - 2:3
**WALTHER** [1] - 7:17
**WALTZER** [1] - 4:16
**wanton** [1] - 89:11
**wants** [4] - 20:5,
38:17, 100:12,
101:20
**warn** [1] - 99:22
**warning** [1] - 66:6
**warnings** [1] - 99:23
**WASHINGTON** [6] -
5:19, 5:23, 6:19,
6:23, 8:23, 9:18
**watch** [1] - 72:6
**water** [3] - 103:12,
103:13, 104:3
**Water** [11] - 87:7,
88:20, 88:25, 89:3,
89:16, 90:1, 90:2,
90:21, 92:15, 94:16,
95:7
**waters** [1] - 94:5
**WATERSIDE** [1] - 2:4
**WATKINS** [1] - 10:7
**ways** [1] - 105:18
**weakened** [1] - 48:25
**wearing** [1] - 109:9
**weather** [1] - 109:8
**weekend** [1] - 121:15
**WEIGEL** [10] - 11:20,
18:15, 67:19, 79:11,
80:11, 80:16, 80:20,
81:2, 81:15, 82:20
**Weigel** [4] - 18:15,
67:18, 79:12, 83:11
**Weigel's** [1] - 85:24
**WEIL** [2] - 9:16, 9:20
**WEINER** [1] - 8:18
**WEITZ** [1] - 2:21
**wellbore** [1] - 28:21
**WESTBANK** [1] - 4:17
**whatnot** [2] - 30:16,
31:19
**whatsoever** [3] -
56:25, 58:1, 60:16
**WHEREUPON** [1] -
121:17
**WHITELEY** [1] - 5:8
**whole** [3] - 51:11,
71:4, 110:4
**wholly** [1] - 84:8
**widespread** [1] -
87:24
**wildlife** [1] - 72:6
**Wilkinson** [1] - 22:6

**WILL** [1] - 14:4
**willful** [1] - 89:11
**Williams** [1] - 16:7
**WILLIAMS** [3] - 3:21, 3:22, 16:7
**WILLIAMSON** [2] - 2:18, 2:18
**willing** [1] - 111:17
**WILLKIE** [1] - 8:3
**win** [1] - 54:14
**WINFIELD** [1] - 4:21
**WISDOM** [1] - 11:11
**wish** [1] - 116:19
**wished** [1] - 49:15
**withdraw** [1] - 66:5
**withdrawal** [1] - 50:10
**withdrew** [1] - 46:24
**WITTMANN** [4] - 7:17, 7:18, 17:17, 44:9
**Wittmann** [2] - 17:17, 44:9
**WIYGUL** [1] - 4:16
**WL** [1] - 59:6
**won** [3] - 56:23, 57:3, 83:23
**wondering** [1] - 39:22
**word** [2] - 55:15, 56:3
**wording** [2] - 61:21, 64:5
**words** [2] - 57:11, 105:4
**worker** [2] - 23:17, 111:7
**workers** [20] - 21:24, 23:8, 81:20, 81:24, 82:4, 82:8, 111:4, 111:18, 113:4, 113:6, 113:10, 113:14, 115:1, 116:5, 116:11, 117:12, 117:25, 118:2, 118:8, 121:2
**works** [4] - 92:11, 93:10, 93:11, 94:9
**world** [2] - 87:11, 104:12
**WORLDWIDE** [1] - 9:14
**worth** [4] - 52:8, 60:24, 61:1, 61:6
**wrapped** [1] - 33:19
**WRIGHT** [1] - 1:18
**write** [2] - 109:23, 117:9
**writes** [1] - 64:18
**writing** [1] - 54:3
**written** [6] - 20:24, 21:2, 24:9, 26:5, 26:17, 61:22
**WRITTEN** [1] - 13:23

**wrongful** [1] - 39:18
**wrote** [1] - 87:19
**Wunstell** [3] - 82:13, 120:17, 120:22

## Y

**year** [6] - 24:15, 24:23, 33:3, 71:15, 103:3, 120:19
**years** [5] - 57:3, 64:16, 90:5, 92:21, 106:18
**Yearsley** [2] - 112:16, 112:17
**YOAKUM** [1] - 2:19
**York** [1] - 17:25
**YORK** [6] - 2:23, 8:5, 8:13, 9:22, 11:21, 17:25
**yourself** [3] - 26:11, 28:17, 32:19

## Z

**zones** [2] - 76:8, 76:18

## "

**"MIKE"** [1] - 6:22