1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  OIL SPILL BY THE OIL RIG      *    10-MD-2179-CJB-SS
              *DEEPWATER HORIZON* IN THE    *
6             GULF OF MEXICO ON             *
              APRIL 20, 2010                *    July 20, 2012
7                                           *
                                            *
8    Applies to:  All Cases                 *    9:30 a.m.
     * * * * * * * * * * * * * * * * * *

9

10

11                     WORKING GROUP CONFERENCE
             BEFORE THE HONORABLE SALLY SHUSHAN
12               UNITED STATES MAGISTRATE JUDGE

13

14   Appearances:

15

16   For the Plaintiffs:         Domengeaux Wright Roy
                                    & Edwards, LLC
17                               BY:  JAMES P. ROY, ESQ.
                                 Post Office Box 3668
18                               556 Jefferson Street, Suite 500
                                 Lafayette, Louisiana 70502

19

20   For the Plaintiffs:         Herman Herman Katz & Cotlar, LLP
                                 BY:  STEPHEN J. HERMAN, ESQ.
21                               820 O'Keefe Avenue
                                 New Orleans, Louisiana 70113

22

23   For the Plaintiffs:         Levin Papantonio Thomas Mitchell
                                   Rafferty & Proctor, PA
24                               BY:  BRIAN H. BARR, ESQ.
                                 Post Office Box 12308
25                               316 South Baylen Street, Suite 600
                                 Pensacola, Florida 32591

1   Appearances:

2

3   For the Plaintiffs:          Williams Law Group, LLC
                                  BY:  CONRAD "DUKE" WILLIAMS, ESQ.
4                                 435 Corporate Drive, Suite 101
                                  Houma, Louisiana 70360

5

6   For the Plaintiffs:          Williamson & Rusnak
                                  BY:  JIMMY WILLIAMSON, ESQ.
7                                 4310 Yoakum Boulevard
                                  Houston, Texas 77006

8

9   For the United States        U.S. Department of Justice
    of America:                  Environmental Enforcement Section
                                  BY:  SCOTT CERNICH, ESQ.
10                                     A. NATHANIEL CHAKERES, ESQ.
                                       STEVE FLYNN, ESQ.
11                                     SARAH D. HIMMELHOCH, ESQ.
                                       GORDON YOUNG, ESQ.
12                                Post Office Box 7611
                                  Washington, DC 20044

13

14  For the State of             Attorney General of Alabama
    Alabama:                     BY:  COREY L. MAZE, ESQ.
15                                500 Dexter Avenue
                                  Montgomery, Alabama 36130

16

17  For the State of             HENRY T. DART, ESQ.
    Louisiana:                   510 North Jefferson Street
18                                Covington, Louisiana 70433

19

20  For the State of             Kanner & Whiteley, LLC
    Louisiana:                   BY:  DOUGLAS R. KRAUS, ESQ.
21                                701 Camp Street
                                  New Orleans, Louisiana 70130

22

23  For Transocean Holdings      Sutherland Asbill & Brennan, LLP
    LLC, Transocean Offshore     BY:  DAVID A. BAAY, ESQ.
    Deepwater Drilling Inc.,     1001 Fannin Street, Suite 3700
24  Transocean Deepwater Inc.:   Houston, Texas 77002

25

1 | Appearances:

2

3 | For Transocean Holdings        Frilot, LLC
  | LLC, Transocean Offshore       BY:  KERRY J. MILLER, ESQ.
  | Deepwater Drilling Inc.,       1100 Poydras Street, Suite 3700
4 | Transocean Deepwater Inc.:     New Orleans, Louisiana 70162

5

6 | For BP America Inc.,           Kirkland & Ellis, LLP
  | BP America Production          BY:  ROBERT R. GASAWAY, ESQ.
  | Company, BP Company            655 Fifteenth Street, NW
7 | North America Inc.,            Washington, DC 20005
  | BP Exploration &
8 | Production Inc., BP
  | Holdings North America
9 | Limited, BP Products
  | North America Inc.:

10

11 | For BP America Inc.,           Liskow & Lewis, APLC
   | BP America Production         BY:  DON K. HAYCRAFT, ESQ.
12 | Company, BP Company           701 Poydras Street, Suite 5000
   | North America Inc.,           New Orleans, Louisiana 70139
13 | BP Exploration &
   | Production Inc., BP
14 | Holdings North America
   | Limited, BP Products
15 | North America Inc.:

16

17 | For Cameron International      Stone Pigman Walther Wittmann, LLC
   | Corporation:                  BY:  CARMELITE M. BERTAUT, ESQ.
   |                               546 Carondelet Street
18 |                               New Orleans, Louisiana 70130

19

20 | For Halliburton Energy        Godwin Ronquillo, PC
   | Services, Inc.:               BY:  DONALD E. GODWIN, ESQ.
   |                               1201 Elm Street, Suite 1700
21 |                               Dallas, Texas 75270

22

23 | For Halliburton Energy:       Godwin Ronquillo, PC
   | Services, Inc.:               BY:  R. ALAN YORK, ESQ.
   |                               1331 Lamar, Suite 1665
24 |                               Houston, Texas 77010

25

1    <u>Appearances</u>:

2

3    For Anadarko Petroleum          Bingham McCutchen, LLP
     Corporation, Anadarko           BY:  WARREN A. FITCH, ESQ.
     E&P Company LP:                  2020 K Street, NW

4                                     Washington, DC 20006

5

     Also Participating:             Denise Scofield, ESQ.

6

7    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                      500 Poydras Street, Room HB-406

8                                     New Orleans, Louisiana 70130
                                      (504) 589-7778

9                                     Toni_Tusa@laed.uscourts.gov

10

11

12

13   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.

14

15

16

17

18

19

20

21

22

23

24

25

1 **I N D E X**

2                                                    PAGE

3
  SHOW AND TELL                                       6
4
  BOP & CAPPING STACK                                 8
5
  HALLIBURTON MODELING                                9
6
  PSC REQUEST FOR TRANSOCEAN DEPOSITIONS             12
7
  CLASS ACTION SETTLEMENTS                           15
8
  PHASE TWO STIPULATIONS                             25
9
  BP CHALLENGES TO DELIBERATIVE PROCESS              27
10 PRIVILEGE CLAIMS

11 SCHEDULE I                                         29

12 SCHEDULE II                                        29

13 SCHEDULE III                                       30

14 U.S. CHALLENGES TO ANADARKO'S PRIVILEGE ASSERTIONS 32

15 SHAREPOINT DISPUTE BETWEEN U.S. AND BP             32

16 LATER PHASES                                       33

17 RULE 30(B)(6) NOTICE FOR THE DEPOSITION OF BP      37

18 COST OF COMPLIANCE WITH THIRD-PARTY SUBPOENAS      51

19 DEPOSITION LOGISTICS                               54

20 SCHEDULING DEPOSITIONS                             55

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(July 20, 2012)**

          (The following proceedings were held in open court.)

          **THE COURT:**  Good morning, everyone.  Have a seat.  We
have all kinds of things to cover today.  Do we have the
telephone on?

          **THE DEPUTY CLERK:**  Yes, ma'am.

          **THE COURT:**  Good morning, phone participants.

          Now, first up, Duke, you can lead us through
this.  And, Don, you can lead us through this.  I don't know
how this is going to show on the viewer.

          It shows beautifully.  Okay.  Can you all see
that?  That's the front page of the *Times-Picayune* today.
Wait.  You're blocking my shot.  What happened?  Oh, I'm
blocking my shot.

          Lionel Batiste, who was a local bon vivant and a
member for probably 50 years of the Treme Brass Band here in
New Orleans, he died last week.  This is Mr. Batiste standing
in state.  Not lying in state.  Standing.  So when you went to
the memorial service yesterday, Mr. Batiste was there to greet
you.  Okay?  Nobody thinks that's interesting?

          **MR. HAYCRAFT:**  Did you go to the wake?

          **THE COURT:**  I did not go.  I was a little busy
yesterday.

          **MR. GODWIN:**  Only in New Orleans, Your Honor, would

1  that happen.

2          THE COURT:  That is a picture at the funeral home.

3  Okay?

4          MR. GODWIN:  Standing in state.

5          THE COURT:  Standing in state.

6          MR. HAYCRAFT:  And he is propped up.

7          THE COURT:  He is leaning against a lamppost is what

8  he is doing.

9             Okay.  Next up for your viewing pleasure, can

10  anybody identify that man?

11          MR. HAYCRAFT:  Don Godwin.

12          THE COURT:  Don Godwin in a golf shirt and outfit on

13  what appears to me to be not a horse --

14          MR. HAYCRAFT:  A pony.

15          THE COURT:  -- but a pony.

16          MR. GODWIN:  But he moves like a horse, Your Honor.

17          THE COURT:  Okay.  So any comments on that picture?

18  Enough said.  That's good.

19             Now the real interesting one.

20          (Applause.)

21          THE COURT:  Telephone participants, so you know, we

22  have got a picture of Corey Maze presumably following his

23  wedding with his bride, and it is some beautiful picture.  So,

24  Corey --

25          MR. MAZE:  It's called marrying up, Judge.

1          THE COURT:  Yes.  Boy, did you ever.  Boy, did you
2     ever.
3          MR. HAYCRAFT:  Did they take the bus on their
4     honeymoon?
5          THE COURT:  They took the Megabus to the honeymoon,
6     right.
7               So let's get going.  Corey, you looked mighty
8     happy there.
9          MR. MAZE:  I was mighty happy.
10          THE COURT:  That's good.
11               So let's get going on the BOP and capping stack.
12     Rob, thank you for sending out the allocation.  Do you want to
13     give us an update on what happened last week?  Or this week.
14          MR. GASAWAY:  Good morning, Your Honor.  Rob Gasaway
15     for BP.  A couple of items of interest.  There will be some
16     continuing testing sponsored by BP coming up shortly.  I also
17     wanted to put all parties on notice that our lease for this
18     space at Michoud is coming up.  NASA has proposed a new lease
19     at the same cost.  We are in discussions with that.  We think
20     it probably makes sense to extend the lease for another year.
21     They do this on a government fiscal year basis, which I believe
22     goes from October 1 to October 1.
23          THE COURT:  Right.
24          MR. GASAWAY:  Obviously, we have got some activity
25     scheduled for the next fiscal year, including a Phase One

1    trial, etc.  So I think where we are leaning right now is

2    toward extending the lease at the same price for another year

3    to make that more tangible for the Court and all the parties.

4                    We are planning to send a letter to you,

5    Your Honor, sort of describing the lease terms of what it would

6    be, our proposal for how we would handle it.  We will copy all

7    parties on that letter.  Maybe we will get that letter out this

8    week.  If anybody has any thoughts on that, we can discuss it

9    next week, but then otherwise we will go forward with that

10   extension of the lease and keep the equipment that we have at

11   Michoud.

12           THE COURT:  Okay.  Any comments on that?  Do you want

13   to talk about how we did this week on the BOP scan?  Anything

14   to report?

15           MR. GASAWAY:  It's proceeding well.  We are executing

16   the protocol, so I don't think there's any update there.

17           THE COURT:  Good.  Thank you.

18                    Don, I heard from Captain Englebert that the

19   computer modeling is completed, and it looks like we are going

20   to get a final report this coming week.

21           MR. GODWIN:  That's my understanding, Judge.  That's

22   what the captain told us yesterday.

23           THE COURT:  Good.  Anything else to report on that?

24           MR. GODWIN:  It seems like it's going fine.  There

25   are some questions about the exhibits.  We talked to the

1  captain yesterday.  She was going to take a look at them, visit

2  with Elysium.  She is doing a great job with it.  It looks like

3  next week we will bring it to closure, and then we will see

4  where we will go from there.

5          **THE COURT:**  Good.  I understand that she went to the

6  Ogden Museum after-hours concert with some of the people who

7  were out at Michoud this week, and the report was everybody had

8  a great time and several beers.  Things spread, you know.

9  Okay.

10          **MR. YOUNG:**  Your Honor, my name is Gordon Young with

11  the United States.

12          **THE COURT:**  Come on up, Gordon Young.

13          **MR. YOUNG:**  I would just like to report that the

14  scanners, Hi-Cad, actually enriched the BOP by dropping a

15  magnet down to the center of it this week.

16          **THE COURT:**  Whoops.

17          **MR. YOUNG:**  What was amazing, it didn't stick.  We

18  don't know where it went.  How, in all that metal, a magnet

19  wouldn't stick to the side --

20          **THE COURT:**  It just dropped straight down?

21          **MR. YOUNG:**  It was a clear shot.

22          **THE COURT:**  You're kidding.

23          **MR. YOUNG:**  No.

24          **THE COURT:**  Nobody had their head at the bottom at

25  the time, huh?

1          **MR. YOUNG:**  Not at this point.

2          **THE COURT:**  That's interesting.  Now, did you go to

3    the Ogden last night?

4          **MR. YOUNG:**  I did.

5          **THE COURT:**  Give us a report.

6          **MR. YOUNG:**  Well, it was very interesting.  It's

7    quite an interesting museum.

8          **THE COURT:**  It is.

9          **MR. YOUNG:**  The entertainment was nice.  On the fifth

10   floor, there's a series of photographs of the Gulf, including

11   controlled burns of the oil and a couple of areas where Pelican

12   nests or rookeries were infested with oil.  It's an impressive

13   museum and quite an impressive exhibit.

14         **THE COURT:**  It is.  Just so all of our other visitors

15   know, the Ogden Museum every Thursday, from 6:00 to 8:00, has

16   live music and some kind of alcoholic beverage.  You can listen

17   to the music and then also see some of the galleries while

18   you're there, so it's a good evening.

19         **MR. YOUNG:**  It was an excellent evening.  I would

20   highly recommend people doing that.

21         **THE COURT:**  Good.  Good.  Thank you for the report.

22         **MR. YOUNG:**  Thank you.

23         **MR. GODWIN:**  Where is it located, Judge?

24         **THE COURT:**  Do you know where the World War II Museum

25   is on Camp?  It is catty-corner from that on Camp Street.

1          **MR. GODWIN:**  Okay.

2          **THE COURT:**  Right at the World War II Museum, across

3     the street and catty-corner.

4          **MR. GODWIN:**  Not too far behind the Loews, then.

5          **THE COURT:**  That's right.  Straight back.

6               Rob.

7          **MR. GASAWAY:**  Your Honor, I had one other item that I

8     wanted to mention with regard to the BOP that I should have

9     mentioned before.  Captain Englebert took time off from her

10    vacation to come and execute this protocol, the laser scans and

11    now what they call the dental molds we are doing.  We just

12    wanted to say, on behalf of all the parties that are

13    participating, we appreciate that.

14         **THE COURT:**  Yes.  I agree.  She was supposed to be

15    out the whole month and came home for this.  I have expressed

16    my thanks to her as well.  I will make sure that she knows you

17    all have expressed it.

18         **MR. GASAWAY:**  Thank you.

19         **THE COURT:**  Next up, we are still on Phase One

20    cleanup kind of things.  We have received a letter from the PSC

21    relative to a request to take four depositions of Transocean

22    and to serve a request for admissions.

23               Is that right, Duke?

24         **MR. WILLIAMS:**  Yes, Your Honor.  I don't know about

25    the request for admissions.

1           **THE COURT:**  You don't?

2           **MR. HERMAN:**  Yes.

3           **MR. WILLIAMS:**  Duke Williams for the PSC.  That's

4    correct, Your Honor.  You got the letter, the July 11 letter.

5    We do need to take four depositions.  All of the documents we

6    are talking about are referenced in Exhibit B in that letter,

7    and they are cross-referenced relating to the witnesses in

8    Exhibit A.

9           We got thousands and thousands of documents

10   produced -- I'm not criticizing, it's been a tremendous task --

11   after the exhibit list was due and, in fact, within 30 days and

12   after the originally scheduled trial date.

13          A lot of us spent a lot of time going through

14   those documents, and the ones we have listed are in Exhibit B.

15   They are exceedingly important.  If we had them before, we

16   would have handled depositions differently, and we may have

17   deposed one or two extra folks.  Then we moved the discussion

18   to the witnesses who we really needed to redepose.  That's set

19   forth in the letter as well.

20          Basically, what we are looking for, not just

21   from Transocean but from the parties, is a bringing forward of

22   the status quo that existed just before trial.  All the prior

23   agreements, the subpoenas that were issued for trial, the

24   agreements to produce witnesses, all that stays in effect.  We

25   don't need to fool with that or argue about that.

1          We would ask Transocean to stipulate to the
2     admissibility of these documents we list in Exhibit B.  Failing
3     that, I guess we will go the request for admissions route and
4     clean up whatever else we can using that method or whatever,
5     but we really need to get these four depositions taken.
6          We have agreed to limit them to eight hours.  Of
7     that eight hours, we have asked for 300 minutes for the PSC.
8     We prefer to do the depositions here; but if it will
9     accommodate one or more of those witnesses, we will go to
10    Houston to take these four depositions.
11              **THE COURT:**  Okay.  Thanks.
12              Any response?
13          **MR. MILLER:**  Your Honor, Kerry Miller for Transocean.
14    I corresponded with Jim Roy.  I think it was last night by
15    e-mail.  He asked if Transocean was going to be submitting a
16    written response to his letter.  I informed him that we would
17    probably today, certainly by Monday, but we will lay out our
18    position with respect to the documents and other requests by
19    the PSC.
20          So I would ask the Court to let us get the
21    letter out to the PSC and to the others who were copied on the
22    letter so they can see what our position is with respect to the
23    Exhibit A and Exhibit B documents and then take this issue up
24    next week if we have to.
25              **THE COURT:**  That will be fine.

1      **MR. WILLIAMS:**  Your Honor, just one other thing.  If
2  it would be helpful to you -- Duke Williams for the PSC --
3  those exhibits that we list in Exhibit B to that letter, if we
4  can give those to you Monday on a CD?  If you want to take a
5  look at them in advance of --
6      **THE COURT:**  That would be fine.  I think that would
7  be fine.  Then I will be up to snuff with it.
8      **MR. MILLER:**  I think the focus of the letter is going
9  to be for a lot of the documents --
10     Duke, we don't oppose that.  I think the focus
11  of our letter for a lot of the documents is going to be that
12  they were produced in some production earlier on than they were
13  represented by the PSC.  But the letter will lay all of that
14  out, what documents were duplicates of other documents and the
15  dates in which they were produced, and that will form the basis
16  for our response.
17     **THE COURT:**  Good.  Thank you, Kerry.
18     Next up, we received -- and this is also related
19  to Phase One, this went to the class action settlements -- a
20  request by Halliburton to depose class representatives and
21  experts and to start those depositions on August 6.
22     **MR. GODWIN:**  Or as soon thereafter, Your Honor, as
23  the Court would deem appropriate we are allowed to do so.  But
24  we were trying to get them concluded before the end of August
25  before we start Phase Two depos.

1          **THE COURT:**  Correct.  I understood that.

2          **MR. GODWIN:**  Thank you, Judge.

3          **THE COURT:**  BP has raised and I believe the PSC has

4    raised the issue of Halliburton's standing to conduct this

5    discovery or, indeed, object in any way to the settlement.  So

6    I thought what we better do is go ahead and put you all on an

7    expedited briefing schedule on standing.  If you don't have

8    standing, we don't need to worry.  If you do have standing, I

9    have to worry.  Right.

10         Hank, I'm sorry.  I didn't mention Louisiana,

11   but you have also chimed in on that.

12         **MR. DART:**  Yes, Your Honor, and we don't have a

13   standing issue.

14         **MR. HERMAN:**  Steve Herman for the plaintiffs.  I

15   think we will probably disagree with him on that.

16         **THE COURT:**  I'm not sure about that.  I think that

17   you might have the same problem that Halliburton has, which is

18   that the state is not a party to the proposed class

19   settlements.

20         **MR. DART:**  May I address that?

21         **THE COURT:**  Certainly.  Well, I'm not taking oral

22   argument on it.

23         **MR. HERMAN:**  I would think in Louisiana they would be

24   interested to know that their AG is trying to prevent them from

25   getting settlement payments from BP, but they can address that

```
 1    politically, I guess.
 2            MR. DART:  Your Honor, under CAFA, which I mentioned
 3    in my e-mail --
 4            THE COURT:  Speak up a little bit, Hank.
 5            MR. DART:  Hank Dart for the State of Louisiana.
 6    Under CAFA, the Class Action Fairness Act, the attorney general
 7    was notified properly and has an obligation to see to it that
 8    the settlement is fair and adequate for the people of the state
 9    and also to see that the Rule 23 requirements have been met for
10    class certification.
11            We are not attacking anything.  This is
12    discovery.  In order to comply with the attorney general's
13    obligations, he wants to join with Halliburton and take these
14    depositions.  I think he has a right to under CAFA.  As far as
15    being a party to these proceedings --
16            THE COURT:  Not to these proceedings; to the
17    settlement.
18            MR. DART:  Well, to the settlement.  The state has a
19    statutory lien, for one thing, for Medicaid reimbursements out
20    of this settlement, so to that extent the state does have a
21    monetary interest in the settlement.
22            THE COURT:  That's for the medical class, huh?  Your
23    lien would go to the medical class, which no payments will be
24    made on until after the final fairness hearing in November.  I
25    think what Don is interested is in the economic settlement.
```

1            Is that correct, Don?

2        **MR. GODWIN:**  That's correct Judge.

3        **MR. DART:**  I didn't quite understand that.  I thought

4    he wanted to take the depositions for both.

5        **THE COURT:**  No.  He is only interested in the

6    economic settlement.

7        **MR. DART:**  Well, we are interested in both.  So to

8    that extent, we would like to broaden our request for all class

9    representatives and all experts who would be testifying at the

10   fairness hearing.

11           I might mention, Your Honor, just as a practical

12   matter, taking these depositions would probably shorten the

13   fairness hearing.  It would reduce the questioning

14   considerably.  Perhaps the depositions could be offered into

15   evidence in lieu of testimony of the class reps.  So just to

16   save a week of testimony time, it seems practical to allow

17   these depositions.

18       **THE COURT:**  So let me tell you what I think.

19           Steve, anything further on that you want to say?

20       **MR. HERMAN:**  Well, I just think there's a number of

21   issues, Your Honor.  You have a fundamental standing issue,

22   which I think we probably can address, but in addition to that

23   there are timing issues.  There are issues of scope.  Maybe

24   there's arguably, quote/unquote, standing for some issues but

25   not others, or for some depositions but not others.

1          I think probably it might make sense, although

2     Don wants to do it before the deadline.  What we don't want to

3     have happen, certainly, is for people that file objections -- I

4     think the deadline is August 31 -- to say, "Okay.  Well, I

5     filed my objection August 31.  I didn't get to participate in

6     this deposition that Halliburton took on August 6, so now I get

7     to redepose the people."

8          So we need to have some kind of -- if there's

9     going to be depositions, there needs to be some kind of a

10    streamlined process so that they are only taken once and so

11    that whoever has standing and wants to participate can

12    participate in them.  But I think it does make sense to have

13    some type of briefing schedule on the standing issues.

14         The other thing is our submission isn't even due

15    until August 13.  So to schedule depositions of people who

16    won't even be filing their declarations, if any, until the 13th

17    doesn't make any sense.  I think there's a lot of issues, and

18    we are happy to deal with the standing issue first.

19         **THE COURT:**  Yes.

20         **MR. HERMAN:**  Or standing issues, plural, first, but

21    we still want to reserve our rights to everything else.

22         **THE COURT:**  Okay.  Good enough.

23         **MR. HAYCRAFT:**  Just for BP's sake -- Don Haycraft --

24    we obviously object and, as you proposed, wish to participate

25    in briefing.

1          THE COURT:  Okay, Don.

2          MR. ROY:  Judge, this is Jim Roy.  Can I make one

3    observation?

4          THE COURT:  You certainly may.

5          MR. ROY:  Steve is absolutely right on the timing

6    issue, but there's another nuance to that that is part and

7    parcel of it; and that is if history is any precedent, there

8    are going to be a number of people who for whatever reason,

9    whatever motivation, want to take discovery of the BP PSC class

10   counsel, settlement development and implementation, in advance

11   of the fairness hearing.

12          It is customary for courts to put limits in

13   advance of said discovery and to require justification of

14   discovery with certain initial threshold showings.  To allow

15   any kind of initial discovery to go forward before the

16   objection deadline passes and before the whole lineup, if you

17   will, of people wanting to take depositions, it seems that it

18   is premature for the Court to jump to that issue.

19          Number two, as far as the failure to immediately

20   fix or to allow it to begin with, as far as whether that is

21   going to impact the length of the fairness hearing as Mr. Dart

22   suggests and make it into a week long or more thing, I would

23   suggest to you that the Court controls its own docket and the

24   timing of its own trials and the presentation of evidence

25   within its own court, and that it can solve that problem with

1  very strict limits on what's going to happen during that time

2  frame.  But once again, we submit, Your Honor, it's premature.

3  Both BP and class counsel will thoroughly brief the issue when

4  you give us the opportunity to do so.

5          **THE COURT:**  Right.  Thanks, Jim.  I'm not thinking

6  about scheduling anything today other than an expedited

7  briefing schedule on the standing issue.

8          Don, did you have something else you wanted to

9  say?

10          **MR. GODWIN:**  Yes, just briefly, Your Honor.  We, of

11  course, throughout the last two years have cooperated and tried

12  to assist any way we can in discovery and in depositions.  I

13  don't believe there's a lawyer involved in this litigation that

14  would suggest that we wasted any time in depositions, in a

15  single one, regardless of who was taking the depositions for

16  HESI.

17          **THE COURT:**  I think that's true other than every

18  question that you asked being followed by a "thank you."

19          **MR. GODWIN:**  I picked that up in New Orleans,

20  Your Honor.  They say being polite is something that will

21  probably take you down the road a little further rather than

22  being rude.  It's just the way my mother raised me, but

23  anyway -- one of the ways.

24          Judge, without arguing it here, just as with Jim

25  and Steve, we are going to comply and we are going to meet the

1    expedited briefing schedule.  We understand very well the state

2    of the law with respect to nonsettling defendants.  We also

3    understand very well there are exceptions to that where a

4    substantive right can be affected, a claimed legal prejudice

5    can result as a result of not being allowed to participate in a

6    settlement.

7                I will suggest to you this.  In all the class

8    actions I have been involved in over 39 years of practicing

9    law, I have never seen one where a party who was a target

10   defendant has not been allowed to participate in discovery of

11   the experts.

12               I would go to only one point here and that is,

13   Judge, we know in the settlement agreements that the PSC has

14   agreed that they will not go after Halliburton for contribution

15   for actual damages so long as that indemnity order is in place

16   that Judge Barbier entered.  I have no reason to believe it's

17   going to be set aside, but there's always that risk out there

18   that somebody might try or that the Fifth Circuit could reverse

19   it.

20               So if the punitive damages under the *Baker/Exxon*

21   case are going to be based in part at all on any part of the

22   actual damages that would be constructed by the settlement

23   payments, if they are going to seek punitive damages from us

24   basing it on that, then we ought to be allowed to take a look

25   at the settlements to determine if, in fact, they are fair.

1   I'm not here today to tell you that we are going

2   to try to torpedo any settlement or that we are trying to

3   undermine all of the good work that was done by BP and the PSC

4   in resolving.  But where my client could be held liable for

5   what some have said are billions of dollars of potential

6   liability in punitive damages, where my client could be exposed

7   for that, we feel it would only be fair we be allowed to

8   participate in some discovery.  That's where we are coming

9   from.

10   BP and the PSC, if they will say that "We are

11   not going to use any part of the settlement amounts that are

12   going to be paid as a result of these settlements as a basis

13   for formulating punitive damages" that they will seek from

14   Halliburton, if they will tell me that, I will have no need to

15   take these depositions and pursue further discovery.  But short

16   of that, Judge, we are going to in our papers -- at the

17   appropriate time, as dictated by you, we will respond and will

18   ask for the discovery.

19   I'll assure you that if you say, "I'm going to

20   limit it, Don," to whatever you think is appropriate, we are

21   going to do everything we can to get it done well in advance of

22   the end of the month.  Because I would also add, in response to

23   what Jim said, that if we are to file papers, make our

24   objections, we think we need to know what some of these people

25   are going to be saying that would be class representatives,

1   potential experts that BP and the PSC might have, so we can

2   also make objections to that.

3            Now, if Your Honor wants to, in consulting with

4   Judge Barbier, extend that deadline out by which we can respond

5   and others can respond, then that's something to consider, but

6   otherwise we just don't have a choice.

7            **THE COURT:**  You're talking about the objection

8   deadline?

9            **MR. GODWIN:**  Yes, Your Honor.  Then we don't feel

10  like we have a choice but to push forward and get it done.  But

11  if the Court wanted to push that out to a later date, then

12  certainly we would be willing to entertain pushing off our

13  request for the depositions until some other time.

14           **THE COURT:**  Okay.  Good, good, good.

15           **MR. GODWIN:**  Thank you, Judge.

16           **THE COURT:**  What I had on my notes was that BP has

17  offered to file its brief on July 25.  PSC, can you do

18  likewise?

19           **MR. HERMAN:**  I think we can.  I thought we were going

20  to respond to whatever Don's --

21           **THE COURT:**  We can do it the other way around.  I

22  just went with the fact that BP said they could get a brief in

23  on this.  Why don't we do it this way.  Why doesn't BP go on

24  the 25th.

25           **MR. HERMAN:**  We can do that too.  We'll just do the

1    same time BP does.  I think that makes sense.

2              THE COURT:  Halliburton and Louisiana, July 30, and

3    briefs limited to 10 pages.

4              MR. HAYCRAFT:  Ten?

5              THE COURT:  And 12-point font.

6              MR. HAYCRAFT:  I'll be sure to make that clear.

7              MR. HERMAN:  You just want letter briefs submitted to

8    Your Honor?

9              THE COURT:  Just letter briefs is fine.

10                 Okay.  Let's see.  Mr. Barr, how are you today?

11             MR. BARR:  Doing great, Your Honor.

12             THE COURT:  Good.  Do you want to give us an update

13   on the nine proposed stipulations that you sent out?  What was

14   it, probably two weeks ago now, huh?

15             MR. BARR:  Yes, Your Honor.  Brian Barr for the PSC.

16   I wish I had an update, but I haven't heard back from BP on

17   that issue.

18             THE COURT:  Okay.

19             MR. BARR:  So I'm anxiously awaiting.

20             THE COURT:  Anybody with BP want to give us an

21   update?

22             MR. GASAWAY:  Your Honor, I think we continue to feel

23   like it's probably not productive to go down this additional

24   stipulation path.  I know there was a lot of talk about that.

25   I think we have previously voiced that position.  I wasn't

1    aware that he had sent something out that we owe a response to,

2    so we will come back.  We will look at the most recent thing

3    that Brian said.

4               In general, I know we thought that we had a good

5    group of stipulations, we should go with that; in terms of

6    additional stipulations, it probably wasn't worth it because we

7    are now rolling into deposition discovery and the last few

8    parts of written discovery.

9         THE COURT:  Okay.  Let's look at those last nine.  If

10   we can't reach agreement on including them, then let's go ahead

11   and finalize what we have, and we can go into discovery with

12   those done and the right to add to them as we go through

13   discovery.

14        MR. GASAWAY:  That makes sense, Your Honor.  Thank

15   you.

16        THE COURT:  Brian.

17        MR. BARR:  I want to make sure Rob and I are talking

18   about the same thing because these weren't in addition to the

19   ones that were already on the table.  These were the edits for

20   the reviewed and recommended ones that we had disagreement on.

21   We had just taken them and turned them into basic facts, which

22   was on this day a procedure was -- I don't remember if it was

23   approved, but it didn't add by who and through what process.

24   It was just a real basic statement.  So I had sent those out a

25   couple weeks ago.  I'm not talking about the new ones we added

1    on preparedness.  I don't care one way or the other, but --

2              **THE COURT:**  Let's take one last look at those nine.

3    What they were were the nine originals that the PSC couldn't

4    reach agreement with the United States and BP on, and so what

5    they did was they bare-boned it and basically just said on this

6    date this procedure was approved.

7              **MR. GASAWAY:**  Right.  I know the general discussion

8    back and forth in terms of whether or not that was really

9    accurate.  I didn't know there was something in our in-box with

10   a most recent proposal.  Let me make sure we get back to Brian

11   promptly on that.

12             **THE COURT:**  Good.  Thank you.

13             The United States has notified us that it has

14   completed the extrapolation of its review of the deliberative

15   process privilege assertions, and the ball is in my court to

16   verify that.  I'm going to get those documents *in camera* for

17   review today.  So that's where we stand on that.

18             Question of the United States:  Did we, meaning

19   Mike and I, get a list of U.S. privilege logs served after

20   May 31?  If we did, we can't find them.

21             **MS. HIMMELHOCH:**  Your Honor, this is Sarah

22   Himmelhoch.  I did not serve that because I kept meaning to ask

23   you about it in our calls with BP and failed to do so.

24             My understanding was that applied to logs that

25   included Phase Two DPP claims.  But if you just want a weekly

1  update of where we are on privilege logs, I can send you the
2  cumulative list as of today with the documents and the
3  explanation of what we released in completing the extrapolation
4  process.

5          THE COURT:  Okay.  That sounds good.

6          MS. HIMMELHOCH:  Okay.  So I will send that to you
7  every Friday unless there's been no additional log, in which
8  case you won't get any list.

9          THE COURT:  Okay.  Let's see.  Do the parties have a
10 schedule for privilege logs that were served after May 31,
11 Sarah?

12         MS. HIMMELHOCH:  There's a schedule for -- no.  I
13 guess technically, no, there is not one.

14         THE COURT:  So that's something we need to work on,
15 huh?

16         MS. HIMMELHOCH:  I think so, yes, although my
17 recommendation -- and I'm just speaking off the cuff here, but
18 my recommendation would be that there be some recognition of
19 the fact that there's a time for extrapolation, and privilege
20 logs served after this should be challenged in a slightly
21 different way.  In other words, the challenge should be have
22 you extrapolated the rulings from the three schedules and the
23 DPP schedule we have already been through rather than sort of
24 an *ab initio* "fair game on everything" kind of approach.

25         THE COURT:  You heard that, everybody?  *Ab initio*.

 1                    I think that's right, Sarah.  We probably just
 2      need to focus on that on our next Tuesday call.
 3                **MS. HIMMELHOCH:**  I'll be prepared with more cogent
 4      thoughts at that time, Your Honor.
 5                **THE COURT:**  Good.  I appreciate that.
 6                    Okay.  As to Schedule I, I need to extend
 7      formally the deadline for appeal.  We had a conference
 8      yesterday between BP and the United States at which time I
 9      agreed that the appeal period would be extended, just so
10      everybody will be up to snuff with us, and then following a
11      re-review by me of those documents we'll set an appeal time,
12      and we'll move on to the extrapolation and verification phase.
13                    Anything we need to add to that, U.S. or BP?
14                **MS. HIMMELHOCH:**  I don't have anything to add,
15      Your Honor.
16                **MR. GASAWAY:**  Nothing from BP, Your Honor.  Thank
17      you.
18                **THE COURT:**  So everybody else knows, and I might as
19      well state it for the record, BP believes that the review of
20      the documents which were claimed as privileged may not have
21      been as complete as they would have liked, so back to the salt
22      mine for Mike and me.
23                    As to Schedule II, BP had asserted a conditional
24      challenge which has now been withdrawn, so it looks to me like
25      we don't have anything else to do on Schedule II.  Does anybody

1   disagree with that?  Bingo.  Isn't that nice?

2              On Schedule III, yesterday was the deadline for

3   challenging Schedule III claims.  I have not kept up.  Can

4   anybody update me on whether we have Schedule III challenges

5   and who made them?

6          **MR. CERNICH:**  Your Honor, Scott Cernich for the

7   United States.  The United States challenged eight documents --

8          **THE COURT:**  Oh, that's right.  I did see that.

9          **MR. CERNICH:**  -- on BP's Schedule III log.  I see

10  Tony Fitch was about to stand up as well.  We corresponded with

11  you regarding Anadarko and the United States' ongoing

12  discussions and we proposed a modified schedule for that.  I

13  think we are continuing to work cooperatively and make progress

14  here and will meet the deadline that we presented to you in the

15  e-mail, if that's okay with the Court.

16         **THE COURT:**  Yes.  I thought that looked fine.  That's

17  it for Schedule III, huh?

18         **MR. GASAWAY:**  Your Honor, Rob Gasaway for BP.  Just

19  so you know, at the hour of 11:19 last night, we did just make

20  a conditional submission on Schedule III having to do with some

21  things with Transocean.  When you read that, you will just see

22  that all we are saying is that some of the issues that have

23  been raised with respect to the Schedule I discussion that we

24  are having between the United States and BP transfer over to

25  some of the Schedule III documents that we have been having a

1    discussion with with Transocean.

2                    So you know our story here.  We take one

3    position.  But if we are wrong on that position, we just want

4    to make sure it applies equally to all parties and all

5    documents.  Again, we sent that to you at about 11:00 p.m. last

6    night.

7            **THE COURT:**  Well, I missed it.  I saw the other two,

8    but I must have missed that one.

9            **MR. GASAWAY:**  So look for that.

10           **THE COURT:**  What time was it?

11           **MR. GASAWAY:**  11:19, I believe, Your Honor.

12           **THE COURT:**  I had gone to bed.

13           **MR. GASAWAY:**  That's from Mr. Pixton.

14           **THE COURT:**  From Pixton?  Okay.  Thank you.

15                    Good morning.

16           **MR. KRAUS:**  Good morning, Your Honor.  Doug Kraus on

17   behalf of the State of Louisiana.  BP and Louisiana have agreed

18   to a schedule related to Schedule III privilege challenges of

19   BP.  Louisiana has agreed to provide declarations by July 27.

20   BP is going to file its initial brief on August 3, and

21   Louisiana will respond by August 10, with BP's reply due on

22   August 17.  That was sent to you by e-mail.

23           **THE COURT:**  I saw that and I have a note of that.  My

24   only question is:  Could we speed up the reply date by a couple

25   days?  I don't think that seven days is necessary for a reply.

1          **MR. KRAUS:**  It's not my reply, so I'm agreeable to
2    whatever.
3          **THE COURT:**  So you're okay with that.
4          **MR. KRAUS:**  Absolutely.  I'll let Rob respond.
5          **THE COURT:**  Rob, do you think we could speed that up?
6    We are getting into mid-August at that point.  I don't want to
7    jam you too badly, but seven days for a reply seems like a lot.
8          **MR. GASAWAY:**  Five days?  Four days?
9          **THE COURT:**  Let's go for four days.
10         **MR. GASAWAY:**  Sold to the lowest bidder.  Thank you,
11   Your Honor.
12         **THE COURT:**  I did agree with the Anadarko suggested
13   dates.  But again, for the U.S., could we shorten the reply
14   time from a week to maybe four days?
15         **MR. CERNICH:**  Certainly, Your Honor.  We can do that.
16         **THE COURT:**  Great.  We have got a briefing schedule
17   on the SharePoint dispute, which is going to be U.S. July 26,
18   BP August 2, and the United States reply August 6.
19              Question:  On privilege logs served after
20   June 22, have we had any to anyone's knowledge?
21              Sarah, you probably know better than anyone,
22   huh?
23         **MS. HIMMELHOCH:**  Yes, Your Honor.  We have served two
24   short clawback privilege logs and the first of the DOE
25   re-collection privilege logs.  I'm not aware, off the top of my

1    head, of anyone else having served -- oh, no, I think we did

2    get another BP log, although I'm not sure.

3        THE COURT:  Let's make sure we talk about that on

4    Tuesday as well, Sarah, because we need to set up a resolution

5    schedule for those.

6        MS. HIMMELHOCH:  Yes, indeed.

7        THE COURT:  Indeed.  We have the issue of setting a

8    schedule for challenging privilege documents that relate to

9    later phases, documents that are irrelevant, and documents that

10   were allegedly not properly redacted.  Monday, any party

11   wishing to challenge designations for those three categories

12   needs to let us know and challenge it, and then a week later

13   the asserting party needs to provide the written response to

14   those challenges.

15             Other than the United States, are there any

16   other parties that are going to be making those challenges?

17   Here comes Rob.

18        MR. GASAWAY:  Your Honor, BP is reviewing whether we

19   would or not.  We did serve a revised what we call "other

20   phases" list to the United States earlier this week, and that

21   will be the ones in play for whatever they do on Monday.

22        THE COURT:  Okay.  Good.  Thank you.

23             Alan.

24        MR. YORK:  Good morning, Your Honor.  Alan York for

25   Halliburton.  As you know, we have been able to work out almost

1    everything, but we are still looking at this issue.  There may

2    be a couple, but we are trying to get those worked out before

3    we file anything.

4            THE COURT:  Good.  Thank you, Alan.

5            MS. HIMMELHOCH:  Your Honor, I think the order goes

6    that first they notify us on Monday, but I don't think we are

7    filing on Monday.

8            THE COURT:  The challenging party files on Monday.

9            MS. HIMMELHOCH:  Yes.  There's one open question that

10   I think we will work out or talk with you about on Tuesday

11   about whether we can challenge whether a document has properly

12   been designated as Phase One or only challenge designations of

13   later phases.  That's just an open question between us and BP

14   that we have agreed to discuss.  There may be a little bit of a

15   scuffle there that we will bring up with you on Tuesday.

16           THE COURT:  Nat.

17           MR CHAKERES:  Your Honor, Nat Chakeres for the

18   United States.  Just to follow up on Sarah's comment, we are

19   reviewing the possible challenges.  We just received a

20   significantly revamped BP "other phases" designation list, so

21   we are reviewing that.  We will reserve the time for argument

22   over the issue Sarah just raised if we still need to, but it is

23   our understanding if BP were to move everything into Phase One,

24   there would be absolutely zero process right now for addressing

25   those documents and whether they are properly withheld as

1   privilege.

2           We don't know that they are necessarily

3   documents that are labeled as Phase One.  We are still

4   reviewing BP's submission.  At this point, before we know if we

5   are going to challenge anything, we are just putting it out

6   there that we think we might challenge some.

7           **THE COURT:**  Okay.  I guess my question is this.  Rob,

8   if they are Phase One, have they previously been produced in

9   connection with Phase One?

10          **MR. GASAWAY:**  Yes.  The log has been.

11          **THE COURT:**  Yes.

12          **MR. GASAWAY:**  Yes.

13          **THE COURT:**  So they were previously designated on

14   logs in Phase One.

15          **MR. GASAWAY:**  Well, remember that the logs themselves

16   don't say "Phase One," "Phase Two" but were produced what we

17   will call on Phase One -- most of them were produced on the

18   Phase One time frame and on a log.  It wouldn't have said this

19   is a Phase One document, but it would just have identified it

20   as a claimed privilege.

21          **THE COURT:**  I understand.  Thank you.

22          **MR. CERNICH:**  Your Honor, Scott Cernich for the

23   United States.

24          **THE COURT:**  Yes, Scott.

25          **MR. CERNICH:**  Just to provide a little additional

1    context, the United States challenged a number of BP's

2    privilege log entries.  BP sent back spreadsheets deciding that

3    a few thousand entries were other phases without saying whether

4    they were later phases or Phase One.  So by moving them to

5    other phases, they removed them from the challenge list, the

6    documents that we could potentially challenge under the

7    Schedule I privilege challenges.

8             We recently, as Mr. Chakeres explained, received

9    a revised list from BP where they have moved a number of those

10   documents, well over a thousand of those documents back from

11   other phases to Phase Two and then made determinations that

12   some of them are Phase Three or later phases and other ones are

13   Phase One documents.

14            So our concern is whether moving a document to a

15   Phase One designation means that we are precluded from any

16   challenge as to whether or not that document may be a Phase One

17   document or a Phase Two document, so that we are not missing

18   the opportunity to challenge what should be Phase Two entries.

19        **THE COURT:**  I don't particularly see a problem with

20   making that challenge to make sure that we have got things

21   straight.

22            Rob, do you agree with that?

23        **MR. GASAWAY:**  Just some context here.  Obviously,

24   they have many thousands of documents that they have designated

25   as other phases for the United States as well, and our point is

1　　just that the Phase One document privilege challenge period is
2　　old and dead.  So we just don't want to go back and be
3　　revisiting that issue.
4　　　　　　　　**THE COURT:**  I'm not suggesting that the privilege can
5　　be challenged.  I am suggesting that the categorization as
6　　Phase One could be challenged.
7　　　　　　　　**MR. GASAWAY:**  Okay.  Well, let's see.  They just got
8　　our revised breakdown.  We did take a hard look at it.  We did
9　　move some in the direction where they are subject to
10　　extrapolation and challenge, so let's see what they have to
11　　say.
12　　　　　　　　**THE COURT:**  I'm not saying we have a problem.
13　　Theoretically, if they wanted to say, "We don't think this is
14　　Phase One," I think that that probably would be okay.  I agree
15　　with you that the privilege issue is probably gone.  Good
16　　enough.
17　　　　　　　　　So we have a final 30(b)(6) notice for BP's
18　　deposition?
19　　　　　　　　**MR. BARR:**  No, Your Honor.
20　　　　　　　　**THE COURT:**  We don't?
21　　　　　　　　**MR. BARR:**  We have a dispute on the Topic 1(c).  Rob
22　　and I have been exchanging e-mails on that.  I don't know
23　　whether he had an agreement with the United States on 1(c), but
24　　1(c) is the one where it talks about the rationale for
25　　particular methods that were implemented.  BP's draft limits it

1    to rationale to the UAC.  When the PSC originally drafted these

2    30(b)(6)s, it was the rationale amongst BP, the rationale

3    amongst the teams.  It wasn't limited to just the UAC.

4              Then you go down to Topic 3(c) and it is wide

5    open, stuff they did prior to April 20, 2010.  That really

6    makes no sense if you can have it wide open for pre-April 20,

7    2010 efforts and limited just to the UAC for the events that

8    occurred after April 20.

9         THE COURT:  Let's see if we are understanding each

10   other.  Area of inquiry No. 1 says "for any and all attempts

11   after April 20, 2010, to cap, control, contain, shut in, limit

12   flow from and/or kill the Macondo well."  Then Part C provides

13   "a description of the rationale for each attempt and/or method

14   made by BP to the UAC."

15        MR. GASAWAY:  Your Honor, let me --

16        THE COURT:  Now I'm going to No. 3, which is in part

17   for "all attempts between January 2001 for the *Deepwater*

18   *Horizon* rig and April 20, 2010, to cap, control, contain, shut

19   in, limit flow from and/or kill the subsea well."

20              Part C, "a description of the rationale for each

21   attempt and/or method made or prepared for approval within BP."

22        MR. GASAWAY:  Now, let me see if I can tell you the

23   rationale here, Your Honor, and why it makes sense.  If you

24   look at that, Topic 3 is a subtopic.  What that is talking

25   about is other incidents.  You will see there where it says 50

1    barrels of oil equivalent.

2              So what they are trying to do is look at other

3    incidents that happened in that earlier time frame that are of

4    the 50 barrels of oil equivalent or not; so when those other

5    incidents occurred, if they occurred, what were the methods of

6    addressing those incidents that were addressed within BP or the

7    rationale discussed within BP.  We have agreed to that.  There

8    is no disagreement on that.

9              Now move back over to Topic 1, if you would, the

10   first page.  That is very different.  That is this incident

11   here.  For this incident, unlike any other incident, we had a

12   Unified Command.  For this incident, unlike every other

13   incident, we had CNN coverage.  For this incident, unlike any

14   other incident, we had video streaming on the Internet of oil

15   flowing out in the Gulf.

16             What that means is that BP was getting a

17   constant flood of suggestions from all quarters about you

18   should do this, you should do that, some of them very, very

19   farfetched, but many of them were taken in, were kicked around

20   in e-mails and such.

21             The other big distinction we have here is we

22   have a Unified Command.  That Unified Command was established

23   very early on, as Your Honor knows.  There was a command

24   structure:  Admiral Landry, Admiral Allen, etc.  So anything of

25   any seriousness for this incident, unlike for those other

1    incidents that we are using for purposes of comparison, had two
2    important distinctions.
3                Number one, there was a Unified Command in place
4    to sort of tell us what the sheep and the goats were, the
5    methods that were really going to be under consideration and
6    not consideration, because obviously we could not actually
7    attempt to cap the well without going through the Unified
8    Command.
9                Second, unlike every other incident which might
10   have exceeded the 50-barrel threshold, where we would have been
11   addressing it as a business or perhaps with some business
12   partners and so forth, this was a media event, much to our
13   chagrin, so there was any number of wacky ideas that came in.
14               I think the parties rightly agree on 1(c) that,
15   look, there's a very easy dividing line between the wacky ideas
16   that we don't need to spend time on and the nonwacky ideas.
17   The question is:  Was it discussed with the Unified Command?
18   If it was never discussed with the Unified Command, it never
19   really got anywhere.
20               Obviously, the Unified Command brought in
21   multiple parties, multiple stakeholders.  They were in constant
22   contact with states, not only with BP but with the other
23   companies, so if there was some method out there or attempt out
24   there that was not discussed with the Unified Command -- and
25   there were -- we really don't need to focus on that.  So what

1  we would ask you to do is just approve the 1(c) topic.  I know

2  the PSC may register a dissenting opinion here.

3          **THE COURT:**  May?

4          **MR. GASAWAY:**  Or have.  May not be convinced by my

5  logic here and may continue to maintain its dissenting opinion,

6  but really we think that this last issue on 1(c) should just go

7  out as it is and we should get on with it.  Thank you.

8          **MS. HIMMELHOCH:**  Your Honor, if I could just

9  interrupt.  I hate to interrupt the flow, but there's someone

10  who is a phone participant who is having a separate

11  conversation that makes it difficult for us to hear what's

12  going on in the courtroom.  So could you ask us all to put

13  ourselves on mute when we are not speaking?

14          **THE COURT:**  We don't hear it, Sarah, but thank you.

15          Phone participants, if you are typing, having a

16  conversation with someone in your office or otherwise, please

17  place your phone on mute so our friend Sarah can participate

18  with us.  Thank you.

19          **MR. BARR:**  Let me follow up on a couple things,

20  Your Honor.  One, all of the stuff Rob just said about CNN

21  coverage and wacky ideas I don't think has anything to do with

22  Topic 1.

23          Topic 1 is for any and all attempts after

24  April 20, 2010, to cap, control, shut in, etc.  It's stuff

25  actually done.  So it's not the wacky ideas that were

1   considered and never talked about.  You can take that off the
2   table.
3            THE COURT:  Well, maybe there is a problem here with
4   the wording of Part C.  I think Rob is interpreting what you
5   would like would be to incorporate anything that BP considered
6   or was proposed to BP as opposed to what they actually did.
7            MR. BARR:  That's never been the intention of the
8   parties.
9            THE COURT:  Well, let's talk it through.  If that's
10  the case, if indeed you are saying you want it to be "method
11  prepared for approval within BP and made to the UAC," can
12  you --
13           MR. BARR:  Well, the discussion has always been clear
14  to me.  This is the first time I have heard it phrased this
15  way.  We defined *methods* in the interrogatory itself as that
16  whole preamble of things that were actually implemented.  So it
17  says "attempts and/or methods."  So that, by definition, is
18  stuff that was actually done.
19               So I think the language itself is clear as to
20  what it is we are going for.  Then you add on top of that --
21  the bigger concern that we have -- and we went through this
22  with all of the stipulations.  It's always been our position
23  that BP recommended all of these attempts.  They recommended
24  internally.  They took it to the teams that were put together.
25  They discussed it within the teams, and then the teams put

1    together documents and went to the UAC with it.  If we just

2    limit this to the rationale to the UAC, we are missing a huge

3    part of the process on how this got to the UAC, and that's what

4    we want to make sure that we are covering.

5            **THE COURT:**  I'm not sure I'm following you.  I am

6    seeing the disconnect, but I'm not seeing how we got there.

7    If, indeed, what we are talking about are actual attempts --

8    actual attempts -- then the wacko suggestions that came through

9    would not be part of it.

10           **MR. GASAWAY:**  Correct.  Okay.  But what we want to

11   make sure is, look, for every attempt or method that was

12   actually attempted or -- and I think *methods* is defined to

13   include maybe BOP-on-BOP, which was not an attempt.

14           **MR. BARR:**  That's correct.

15           **MR. GASAWAY:**  So the combination of attempts and

16   methods, for every one of those, those were discussed within

17   the Unified Command and there was a rationale that was

18   presented to the Unified Command.  So the question is:  What

19   was that rationale and how did BP develop it?

20               We think that ultimately, in order to sort of

21   tether this both to the attempts and to the Unified Command,

22   the easiest thing to say is, look, for all of the attempts and

23   all of the methods, there was a rationale that was presented to

24   the Unified Command.  I appreciate Brian saying that we are

25   restricting it, but once you see that Unified Command

1    rationale, how was that developed?  Why did we say either you

2    should do it or you shouldn't do it depending on what we said

3    with respect to --

4            **THE COURT:**  So are you limiting the questioning to

5    the actual rationale that was presented to the UAC rather than

6    the internal communications of BP that led to the

7    recommendation to the UAC?

8            **MR. GASAWAY:**  Well, they will testify on the

9    development of the rationale.  If the rationale was, you know,

10   we should do it or not do it for these reasons, obviously they

11   will testify as to why the rationale for doing it or not doing

12   it was what it was.

13           **MR. BARR:**  Your Honor, I think the answer to your

14   question was just "yes."  We want the rationales that were

15   discussed outside of Unified Command.  There may have been

16   rationales that they discussed that weren't presented to the

17   Unified Command.  We are entitled to that.

18           **MR. GASAWAY:**  Your Honor, there is no such thing as a

19   rationale outside of the Unified Command.  Each of these things

20   that was either attempted or not attempted was discussed

21   extensively within the Unified Command, and there was a

22   rationale that was presented to the Unified Command.  I don't

23   know what a rationale outside the Unified Command would have

24   been.

25                   Now, obviously, you know, it's like the

1    discussion we have had on other documents.  If we say to the

2    Unified Command do this or don't do this, there's obviously --

3    there's more than just that document with that ultimate

4    procedure the Unified Command represented, but I don't know if

5    there is anything about a rationale other than the rationale

6    that was presented to the Unified Command.

7              So the question is when you developed the

8    rationale to the Unified Command and you said to the Unified

9    Command go forward or don't go forward, somebody should come

10   forward and say, "Here was our rationale, and this was what was

11   behind the rationale."

12             **MR. BARR:**  Your Honor, we want somebody that has the

13   ability to speak about the internal discussions within BP on

14   the rationales for these methods.  I don't know if those

15   rationales were conveyed to the UAC or not.  I wasn't in the

16   room.  We need to have somebody there that can speak about that

17   because what we don't want to have is they put up somebody that

18   says, "Well, I can only talk about what we said to the Unified

19   Command.  I can't talk about what was said within the teams.  I

20   can't talk about what was said amongst BP.  I don't know

21   anything about that."  We have to have somebody that can

22   discuss the entire range of rationales for each one of these

23   attempts and methods.

24             **MR. GASAWAY:**  I would just say, Your Honor, the only

25   rationale that was ever developed -- if we are probing into

1    rationale, the only entity to which we rationalized anything

2    was the Unified Command, and that's our problem.

3              **THE COURT:**  Look, I see the distinction.  They want

4    to inquire as to how you got to the rationale that was

5    ultimately recommended to the UAC.

6              **MR. GASAWAY:**  Well, that would be a different topic.

7    This was focusing on the rationale to the UAC, and what we were

8    trying to do is for attempts and methods.  The rationale to the

9    UAC obviously includes more than the communication of the

10   rationale to the UAC.  It includes the discussions that led up

11   to it.  As long as what we are talking about is the rationale

12   to somebody, it is only to the UAC.

13             **THE COURT:**  Well, why don't we do this, and can you

14   all agree to this:  A description of the rationale for each

15   attempt and/or method made.

16             **MR. BARR:**  That's what we want, and I think that's

17   how it was originally written.

18             **THE COURT:**  The UAC made the method or attempt.

19             **MR. GASAWAY:**  But I'm just not sure what that means.

20   What I think Brian wants is BP's internal discussion.  I think

21   that you're never going to get anything that's clear that uses

22   the word *rationale* without tying it to the Unified Command.  I

23   think what Brian would like to do is take it from the idea of

24   the rationale -- again, the only entity we rationalized it to,

25   Your Honor, was the UAC.

1            So if you are going to key off the idea we are

2    talking about rationales, if it's going to be clear, it has to

3    be tied to somebody we are rationalizing to, and that's the

4    UAC.  I understand what Brian is saying.  He is saying, "I want

5    the internal discussions leading to that."  That's a

6    potentially different and dangerous breadth, in our view,

7    because what we don't want is to say, well, you know --

8            We presented certain methods and certain

9    attempts.  But if the internal discussions were saying, Should

10   we do Wacky Theory A or should we do Top Kill?  Should we do

11   Wacky Theory B or should we do a RITT tool?  Should we do Wacky

12   Theory C or should we do a Top Hat?  Should we do Wacky Theory

13   D or should we do BOP-on-BOP?  Should we do Wacky Theory E or

14   should we do a capping stack, that's what we don't want.

15          **THE COURT:**  Brian, are you not covered by E, which is

16   "an explanation of and time line for the steps involved in

17   planning and/or implementing each attempt and/or method,

18   including both the design of any equipment and the steps

19   involved in the method"?

20          **MR. BARR:**  I don't think so because there needs to be

21   a justification or rationale for each one of these -- there was

22   some thought that went into how this is done, why we are doing

23   it, what are the risks and benefits, how is this going to go

24   forward.  There has to have been a thought process on that that

25   was discussed amongst people that weren't UAC.  That's what we

1  want to get into.

2          **MR. GASAWAY:**  Right.

3          **MR. BARR:**  We don't have to do it as part of the

4  30(b)(6), but what we are going to end up with is individual

5  depositions on this.

6          **THE COURT:**  Rob, as long as it's limited to actual

7  attempt, I'm not hearing that you object to questions about how

8  you all made the proposal.

9          **MR. GASAWAY:**  Right.  We are not objecting to

10  questions as to how we developed the proposals, as you have

11  said.  What I hear Brian saying is he wants to inquire into the

12  rationale for the rationale, and that's where we can't go.  We

13  can't go to the point where we say, "Look, we have got methods

14  and attempts.  There was a whole universe of wacky ideas out

15  there.  What was the rationale for focusing on these methods

16  and attempts?"  It's the exact same story like Brian said that

17  we have with the stipulations, where they think that BP was the

18  driver of this process and was coming up with all the ideas and

19  just feeding specific information to the Unified Command.

20          So what he is really looking for is the

21  rationale for choosing to make rationales for the methods and

22  attempts, and that's what we can't have.  We have gone many,

23  many rounds on this.  We resolved the last issue on

24  capitalization -- thank you, Halliburton -- for Topic 1.  I

25  think he is going to get everything that he wants as to these

1    attempts and methods through 1(c) and 1(e), as you said.  What

2    he is not going to get is what he wants, is to open up how did

3    you focus on these attempts and these methods.

4             **MR. BARR:**  Your Honor, I think it's highly relevant

5    why they focused on particular attempts and methods.  I don't

6    understand why that's dangerous.  I don't get that.  That

7    doesn't make sense.

8             **MR. GASAWAY:**  That's the concession.  He is really

9    trying to open this up beyond attempts and methods.

10            **MR. BARR:**  No.  I will stipulate I'm not going to

11   talk about wacky ideas.  I don't even know what the wacky ideas

12   were.

13            **THE COURT:**  There were a lot of them.

14            **MR. BARR:**  I want to ask about the attempts that were

15   done.  I want to know, with the Top Kill, did they talk about

16   all the risks of the Top Kill and the potential rupturing of

17   the casing and all these types of things.  I don't know if they

18   talked about that with the UAC.  They may have talked about

19   that internally and not disclosed it to somebody.  I don't know

20   that.  So we have got to have that full range of things open to

21   be able to talk about it.

22            **MR. GASAWAY:**  Again, to the extent they are talking

23   about the rationale, they can talk about what the rationale did

24   and did not include.  Obviously, if they are talking about the

25   rationale to the UAC, the witness is going to come prepared to

1    talk about the rationale for doing Top Kill.  Brian will say,
2    "Did the rationale include a discussion of X or Y or Z?"  The
3    witness will come prepared to say "yes" or "no."
4                So, again, I don't want to say he is conceding
5    this point, but I think so long as he is focusing on the
6    rationale that was made and its robustness, we will come
7    prepared to talk about this.
8                THE COURT:  Let me float this one as far as how I
9    think we can skin the cat.  How about "a description of the
10   rationale and factors considered for each attempt and/or method
11   made by BP to the UAC"?
12               MR. BARR:  I don't think it gets it because where I
13   think we end up is we end up with a witness sworn in, now
14   testifying and saying, "I can't talk to you about what BP
15   discussed internally.  That's not the topic.  The topic is what
16   did we propose to the UAC and our rationale for that proposal.
17   I'm not prepared to talk to you about this other thing."  If we
18   word it that way, though, the witness is going to be able to
19   limit their testimony.
20               MR. GASAWAY:  Your Honor, again, I think that's a
21   very reasonable proposal you have put forward.  I think BP is
22   happy for that.  I think that anything else threatens to open
23   up a can of worms.
24               THE COURT:  I'm going to add one other thing, "And
25   factors considered by BP for each attempt and/or method made by

1    BP to the UAC," so you get to talk about all factors considered
2    by BP.
3            **MR. BARR:**  Just so this is clear, we know the
4    processes went through -- I shouldn't say "know."  We think.
5                    There were internal BP discussions.  It then
6    went to the teams.  You had all that discussion in the
7    stipulations.  The teams did whatever they did.  Then it went
8    to the UAC.  Is all of that, that entire context, included
9    within this topic?  If it is, I'm fine.
10           **THE COURT:**  All factors considered by BP.
11           **MR. GASAWAY:**  The topic speaks for itself,
12   Your Honor.  Exactly.  Thank you very much.
13           **THE COURT:**  Now we have a final 30(b)(6).  May I
14   presume, Mr. Barr, that we finished our cost topics?
15           **MR. BARR:**  In an unusual situation for me, I can say
16   that we have agreed.
17           **THE COURT:**  Could I please have a round of applause
18   for Mr. Barr.
19           (Applause.)
20           **THE COURT:**  Does anybody want a quick break, like
21   five minutes?  Let's do that.  We are going to start scheduling
22   depositions.
23           (Recess.)
24           **THE COURT:**  Before we get to scheduling depos, we did
25   have an issue that has come up that probably will come up more

1    times, which is the cost of compliance by third parties with

2    subpoenas.  The issue has come up as to whether or not

3    reasonable attorneys' fees are included in costs.  We have had

4    that issue raised by Woods Hole and who else?

5            Nat, do you want to yell it out.

6            MR. CHAKERES:  Your Honor, I don't believe another

7    party has raised that specific issue, but the word *costs* has

8    started to come up in discussions.

9            THE COURT:  We are anticipating it.  How about that?

10   So I would like you all to think about that.

11           I do think that attorneys' fees always have to

12   be reasonable, number one.  Often I see what I believe are not

13   reasonable fees.  I think that BP and the United States are

14   considering whether or not fees can rightly be included in a

15   request for costs.  So if anybody else wants to chime in on

16   that topic, we are discussing it now, and I anticipate reaching

17   a resolution of that fairly soon.

18           Did I miss anything, Rob?

19           MS. HIMMELHOCH:  Your Honor, this is Sarah

20   Himmelhoch.  There is a related issue that perhaps we can ask

21   the parties to think about and be prepared to discuss next

22   week.

23           THE COURT:  Okay.

24           MS. HIMMELHOCH:  And that is so far the question of

25   who pays the costs for the third-party subpoenas has been

1   fairly simple because the third-party subpoenas served so far

2   have been at the instigation of a single party; for instance,

3   BP's service on Woods Hole or the FRTG members or the U.S. and

4   the BP Institute.  There are, however, a group of third-party

5   notices that were at the instigation of several parties, and

6   then one party took on the responsibility for service and

7   completion of document production with that third party.  But

8   it would not be fair to say that it was only, for instance, the

9   United States that wanted that third party to produce or BP

10  that wanted that third party to produce.

11          So the question is:  If and when a third party

12  that is one of these ones that was at the instigation of a

13  number of parties asks for costs, how are we going to address

14  who is responsible for paying the reasonable costs of

15  responding to the subpoena?  I don't have a practical

16  suggestion at this point, but I do have to look out for the

17  public fisc and say we shouldn't be bearing the full cost.  It

18  wasn't just us who wanted it.

19          **THE COURT:**  Fair enough.  I tend to agree with you,

20  Sarah, that if more than one party took the lead and wants the

21  deposition, it probably should be a sharing arrangement kind of

22  like we do with the --

23          **MR. GASAWAY:**  Your Honor, this is Rob Gasaway for BP.

24  I agree with Sarah.  I will give you a specific example:  DNV.

25  We took the lead on coordinating with DNV because we know Mark

1  Cohen well.  We have worked a lot with DNV.  The ultimate scope

2  of the DNV examination is going to be much broader than what BP

3  would have ever wanted, and we were just kind of doing that as

4  our bid to kind of grease the wheels of the MDL.  I agree with

5  Sarah.  The DNV type of situation where we are coordinating is

6  much different from, let's say, the Woods Hole type of

7  situation where we were really the instigator.  I would second

8  what Sarah said.

9         THE COURT:  I would like the parties to think about

10  that.  My inclination is that I will probably ask for a

11  suggested allocation of costs in those instances.

12         MR. GASAWAY:  Thank you, Your Honor.

13         THE COURT:  Does anybody, before we get to scheduling

14  depositions, want to talk about where we stand on logistics?

15  Rooms, reporters, anybody taking the lead on that?  It will be

16  great to have the depositions scheduled but not have a place or

17  a reporter.

18         MR. BARR:  Your Honor, I don't mind taking the lead

19  on that.  My suggestion is we can use Worldwide, do it in the

20  same location, just follow the same that we did in the past.

21         MR. FLYNN:  Your Honor, Steve Flynn for the

22  United States.

23         THE COURT:  Good morning.

24         MR. FLYNN:  My paralegal spoke with Paul Sterbcow's

25  paralegal, and she was supposedly already starting it up and

1    wanted to use the same setup we used before.  I was hoping Paul
2    was going to be here today and we could talk about it and then,
3    of course, how we are going to split the costs up, but I will
4    give him a call next week.  Duke said he would probably see him
5    this weekend.  So we will just see where that's at, but I think
6    that was --
7              MR. WILLIAMS:  Absolutely.
8              THE COURT:  I bet he will see him this weekend.
9    Good.  You all have started thinking about that.  If everybody
10   agrees, let's do the same setup as last time.  We will have to
11   talk about payment.  Start thinking about that as well, but at
12   least we will have a place and a reporter.
13              Let's get to the actual scheduling.  I guess
14   what I'm going to need for that is someone from the
15   United States and someone from BP, huh?  And your calendar.
16   And, of course, Corey.  Who wants to go first?
17              MR. GASAWAY:  Your Honor, this is Rob Gasaway for BP.
18   We would be happy to go down the roster of what we submitted.
19              THE COURT:  Okay.  That will be good.
20              MR. CERNICH:  Your Honor, Scott Cernich for the
21   United States.  As you know from the submissions yesterday, the
22   United States and BP both submitted lists of witnesses and
23   topics and dates.  The United States' submission was nearly a
24   hundred percent comprehensive on topics, dates, and witnesses.
25   BP's was still lacking.  As you know, the United States came

1   prepared in March.  We rolled out topics and dates and we had

2   witnesses ready to go.  BP wasn't ready.  We have had that

3   happen a couple of other times since then.

4            Your Honor required us this week to submit those

5   lists yesterday.  BP's list was lacking any witnesses for 7 out

6   of the 24 topics, and other topics were only partially covered

7   by the witness list.  We are still concerned by that.  We think

8   that BP should be providing the names of the witnesses for all

9   of the topics at this time.

10            If there were any issues regarding them being

11   able to do that by yesterday, we believe that BP should have

12   raised those issues long ago because none of those issues

13   should be surprises to anyone here.  So I just wanted to make

14   that clear on the record.  Thank you.

15        **THE COURT:**  Thank you.

16            Rob, let's see.  Do you want to comment on that,

17   and let's go through your schedule.

18        **MR. GASAWAY:**  I'll just say in terms of the

19   completeness of what we sent to the Court and parties

20   yesterday, I agree with Mr. Cernich.  We do need to fill out

21   the rosters.  We said in our cover letter there are instances

22   in which BP has not yet identified a witness.  Mr. Cernich is

23   right.  There are seven topics where we haven't identified a

24   witness and there are three partial topics, so he is correct on

25   that as well.  What we also said is we will follow up promptly

1    with the Court and parties to complete the roster, and we are

2    fully committed to doing that.

3              THE COURT:  Okay.  So Corey stands ready.

4         MR. MAZE:  Except I have no calendar yet.

5              THE COURT:  You all don't have an extra calendar,

6    huh?

7         MR. MAZE:  Can it be a paper one, Your Honor?

8              THE COURT:  It could be.  We could use a blank one.

9    I was going to go ahead and work off the one you all had

10   prepared.  I thought I had mine with me, but I left it in my

11   office.  Do we have September, October --

12        MR. MAZE:  August, September, October.

13        THE COURT:  Rob.

14        MR. GASAWAY:  Your Honor, let me say as a prefatory

15   matter, obviously when we were putting dates out there and

16   asking witnesses for available dates, we had not yet seen what

17   we have seen now from the United States.  So a lot of times

18   where there were blocks of times that the witness would be

19   available, instead of sort of arbitrarily picking a date within

20   that block of time, we sort of wanted to see what the

21   United States was going to say because we would want to pick a

22   time within the window depending on the United States.  Some of

23   these will be dates.  Some of them will be date ranges.

24             THE COURT:  I've got a grand jury coming in, which is

25   not a big deal.  It's only the foreperson these days.  Do you

 1  all mind if we just broke momentarily and let me take the

 2  return?  It takes about three minutes, two minutes.  You don't

 3  need to leave.  Oh, I guess you do.  It's secret.

 4              Rob, let's get rolling.

 5          **MR. GASAWAY:**  Let's start with Topic 1.  We have a

 6  number of witnesses here depending on the specific type of

 7  intervention that we were talking about with Mr. Barr.  First

 8  of all, for BOP intervention, our witness will be Mr. John

 9  Hughes.  He is available the last week of October and the first

10  two weeks of November.  Our second witness --

11          **THE COURT:**  Let's go one by one.  Does the U.S.A.

12  have any preference, October or November?

13          **MR. FITCH:**  The U.S. has precise dates.  Would it

14  make more sense to get their dates on a piece of paper first?

15          **THE COURT:**  We have their calendar.  Let me go get it

16  off my desk.

17          **MR. FITCH:**  You and Rob work around that with the

18  rest of us chirping in about certain concerns.

19          **THE COURT:**  The U.S. didn't bring their own calendar,

20  huh?

21          **MR. CHAKERES:**  We have since scribbled on it.

22          **MR. MAZE:**  Do you mind printing the November as well?

23          **THE COURT:**  They didn't go into November.  We were

24  looking at October, November, huh, Rob?

25          **MR. GASAWAY:**  That's correct, Your Honor.  I thought

1  Tony's suggestion was, though, that I yield place to Nat and go

2  through the United States' first, or if it's all on the

3  calendar --

4          **THE COURT:**  It's there.  It's there.

5          **MR. GASAWAY:**  Great.  Let me just say here,

6  obviously, when I'm identifying a date range, everybody knows

7  we are not expecting the deposition to last that whole range.

8  So, for example, Mr. Hughes will not be deposed for three

9  weeks.

10          **THE COURT:**  Brian Barr is going to object again.

11          **MR. GASAWAY:**  I was afraid.  So Mr. Hughes will be

12  covering the BOP intervention part of this topic, and he is

13  available the last week of October and the first two weeks of

14  November.

15          **THE COURT:**  So it looks to me like the first two

16  weeks of November are better.  So Nat agrees.  Why don't you

17  pick two days for him.

18          **MR. GASAWAY:**  I think BOP intervention would just be

19  a one-day.

20          **THE COURT:**  Why don't we pick two days to be safe.

21  We will start hassling that out next.  Some of these witnesses

22  may well be one day and some of them may well be two.  I just

23  don't know yet.

24          **MR. GASAWAY:**  I guess Election Day is the first

25  Tuesday in November.

1    **THE COURT:**  Uh-huh.

2    **MR. GASAWAY:**  Maybe we would go to Wednesday and

3 Thursday for him, then.

4    **THE COURT:**  Okay.

5    **MS. BERTAUT:**  Judge, I don't know that anybody is

6 interested, but November 8 is the settlement and fairness

7 hearing before Judge Barbier that Friday.

8    **THE COURT:**  Well, I think the deposition teams are

9 going to be taking the depositions, and we are going to make

10 sure Brian Barr is not at the fairness hearing.

11    **MR. BARR:**  I won't be objecting.

12    **THE COURT:**  Thank you, Carmelite.  That's a good

13 point.

14        Next up.

15    **MR. GASAWAY:**  Next up is Mr. Kevin Devers,

16 D-E-V-E-R-S.  He will be covering the cofferdam, RITT, and

17 Top Hat aspects of Topic 1.  He is available also the first two

18 weeks of November.  I don't know, if we are going to pick two

19 days for him, if it makes sense to go earlier the following

20 week.

21    **THE COURT:**  Pick a couple days.

22    **MR. GASAWAY:**  The Monday and Tuesday of the following

23 week.

24    **THE COURT:**  Okay.

25    **MR. GASAWAY:**  Next, Your Honor, is our first

1  placeholder.  We do need to identify a witness who will talk

2  about the Top Kill method that we just discussed with Brian, so

3  we'll have to follow up with the Court on that.

4           Your Honor, our witness for the BOP-on-BOP

5  method and the capping stack method will be Mr. Trevor Smith,

6  and he is available on October 25.

7           **MR. BARR:**  I suggest we need two days.

8           **THE COURT:**  Two days?

9           **MR. GASAWAY:**  I don't know if he is available on the

10  26th, and I don't know if we would agree that he needs two

11  days.  Let's put him down for the 25th and the 26th with a

12  question mark.

13           **THE COURT:**  Yes.  Okay.

14           **MR. GASAWAY:**  Your Honor, there's another aspect of

15  our response to this topic that's relief wells.  That will be

16  Mr. Gavin Kidd.  I don't have a date for Mr. Kidd, so we will

17  have to follow up with the Court for that.

18           **THE COURT:**  Okay.

19           **MR. GASAWAY:**  Moving to Topic 2, I think we have a

20  head start with Mr. Devers.  He is going to cover the

21  collection to *Clear Leader* from the kill line capping stack

22  aspect of that topic and the collection of the *Enterprise* from

23  the capping stack.  We already have him down for the first two

24  weeks of November.

25           **THE COURT:**  Why don't you all keep going.  I'm going

```
 1   to go take the grand jury return, but there's no reason you all
 2   can't keep going.
 3            MR. GASAWAY:   Okay.   The next aspect of Topic 2 will
 4   be the pipeline tieback aspect.   That will be covered by
 5   Mr. Hugh Banon, B-A-N-O-N, and I'm going to have to get back on
 6   dates for Mr. Banon.
 7                 The next topic is No. 3.   I'm going to have to
 8   get back on our witness for Topic 3.
 9                 Next is No. 4.   We have Mr. Adam Ballard,
10   B-A-L-L-A-R-D, covering the estimated discharge, the modeling
11   based on subsea temperature and pressure measurements.
12   Mr. Ballard is available October 16 and October 17.
13                 Ms. Ellen Williams will be covering the
14   observational aspects of flow rate analysis on that, and we are
15   going to have to get back on Ms. Williams' availability.
16                 Topic 5, we are going to have to get back on the
17   witness and the availability.
18                 Topic 6 will be covered by Mr. Simon Bishop, and
19   Mr. Bishop is available September 27 and September 28.
20                 Topic 7 will be covered by three BP witnesses.
21   Mr. Graham "Pinky" Vinson will cover the measurement of the
22   initial reservoir pressure aspect of that on September 18.
23   Mr. Simon Bishop will cover the post-incident estimates of
24   reservoir pressure and shut-in wellhead pressure.   As I
25   mentioned before, he is available on the 27th and 28th of
```

1  September.  Matt Gochnour, G-O-C-H-N-O-U-R, will cover the

2  aspect involving post-incident pressure measurements from

3  pressure gauges.  Mr. Gochnour is available September 13.

4                Topic 8, again multiple designees:  Adam Ballard

5  will cover the temperature measurements of discharge fluids.

6  Again, Mr. Ballard is available on the 16th and 17th of

7  October.  Mr. Gochnour will cover the aspects involving

8  attempts to obtain pressure measurements from gauges.  Again,

9  Mr. Gochnour is available on September 13.

10                Topic 9.  BP is going to have to get back to the

11  Court on Topic 9.

12         **MR. CERNICH:**  On Matt Gochnour, we are not certain we

13  will need two days, but he is available on the 14th as well?

14         **MR. GASAWAY:**  I can check.

15         **MR. CERNICH:**  We would appreciate that.  We could put

16  that in as a question mark.

17         **MR. GASAWAY:**  Okay.  We are pretty confident this can

18  be covered in one day, what he is covering, if you look through

19  this.

20                I think we are on Topic 10.  Topic 10 will be

21  covered by Mr. Greg Rohloff, R-O-H-L-O-F-F, and Mr. Rohloff is

22  available on October 17 and October 18.

23                Topic 11 again will be covered by Mr. Greg

24  Rohloff.  Again, he is available on the 17th and the 18th of

25  October.

 1                    Topic 12.  BP is going to have to get back to
 2      the Court on Topic 12.
 3                    Topic 13 will be covered by Mr. Greg Rohloff as
 4      well.  Again, he is available on the 17th and 18th of October.
 5                    Topic 14 will be covered by Mr. Tanner Gansert,
 6      G-A-N-S-E-R-T, and we will have to get back on available dates
 7      for Mr. Gansert.
 8                    Topic 15 will be covered by two witnesses.
 9      Tanner Gansert will take part of this.  He will take the
10      Oil Spill Response Plan and the exploratory well worst case
11      discharge aspects of this.  We will get back with a date for
12      Mr. Gansert.
13                    Earnest Bush will take the 2009 Oil Spill
14      Response Plan, Section 6.C.  Mr. Bush is available November 12,
15      2012.
16                **MR. CERNICH:**  In the submission it says he is
17      available during the week of November 12.
18                **MR. GASAWAY:**  Okay.  Would the parties prefer a
19      different day than November 12?
20                **MR. CHAKERES:**  To avoid needless double-tracking, I
21      think the 14th, 15th.
22                **MR. GASAWAY:**  Okay.  The 14th and again maybe 15th if
23      it goes another day.  I think our thought would be that one day
24      should be sufficient for Mr. Bush.
25                    Topic 16.  We will be getting back to the Court

1   on Topic 16.

2           Topic 17 will be covered by Mr. Adam Ballard.

3   As we discussed before, he is available on October 16 and 17.

4           Topic 18 will be covered by three witnesses.  We

5   have talked about each of them before.  Mr. Trevor Smith will

6   be talking about the configuration of the capping stack from

7   July 12 to August 3.  He is available October 25.  Mr. Gochnour

8   will be talking about capping stack pressure measurements from

9   pressure gauges, including calibration, from July 12 to

10  August 3.  He is available, as we discussed, September 13.

11  Adam Ballard will be talking about capping stack temperature

12  measurements from July 12 to August 3.  He is available, as we

13  discussed, October 16 and 17.

14          Topic 19 again involves multiple witnesses.

15  Matt Gochnour will be talking about post-incident pressure

16  measurements from pressure gauges and attempts to obtain

17  temperature measurements from those gauges.  Again, he is

18  available September 13.  Adam Ballard will be talking about

19  attempted temperature measurements and discharge fluid.  Again,

20  he is available October 16 and 17.

21          Topic 20.  We will be getting back to the Court

22  on Topic 20.

23          Topic 21, two witnesses:  Mr. Brian Ritchie with

24  be talking about geological and geophysical reservoir

25  properties, and the reservoir properties would be after

1    January 1, 2009.  Mr. Ritchie is available October 4, 2012.

2    The other part of that topic will be covered by Mr. Graham

3    "Pinky" Vinson, the petrophysical reservoir properties after

4    April 1, 2010.  Again, we have discussed Mr. Vinson is

5    available September 18.

6            Topic 22 will be covered by one witness.  This

7    is Simon Bishop.  We discussed before he is available

8    September 27 and 28.

9            Topic 23 will be covered by two witnesses, one

10    of which is known, one of which is to be determined.  Simon

11    Bishop will be talking about obstructions in the wellbore.  We

12    still need to identify a witness for obstructions in the BOP

13    and in the riser.  We have talked before about Mr. Bishop's

14    availability on September 27 and 28.

15            Finally, Topic 24, we need to get back to the

16    Court on a witness and dates for Topic 24.

17            Your Honor, that's where we are in terms of BP

18    depositions scheduled.

19        **THE COURT:**  As you plug the holes, why don't you

20    circulate to everyone dates that are available, and then we

21    will let the U.S. tell us what their preference is.

22        **MR. CHAKERES:**  Thank you, Your Honor.  We will do

23    that.

24        **THE COURT:**  Thanks, Rob.

25        **MR. GASAWAY:**  Thank you, Your Honor.

1        **THE COURT:**  So now the U.S. has everything on its
2  calendar; is that correct?
3        **MR. CHAKERES:**  Your Honor, it is.  It's come to our
4  attention that there was one topic that on one of our
5  submissions there's no witness for.  That topic was listed on
6  the list of topics by witness, but that's not an efficient way
7  of getting that.  I believe it's Topic 28, and the witness is
8  Tom Hunter.  Just so the parties see that, on one of our tables
9  there's no Topic 28.  That's where we are going with that one.
10        **THE COURT:**  Okay.  Good.
11             Then, Rob, you had some issues, perhaps
12  inconsistencies you wanted to point out in the U.S.'s
13  submission, didn't you?
14        **MR. GASAWAY:**  Yes.  That's correct, Your Honor.  I
15  can go through these briefly here.  That was one of them, where
16  we wanted to confirm Topic 28.  All of these are of the same
17  nature.  The United States has been very helpful, obviously, in
18  terms of doing a listing by topics, a listing by witnesses, and
19  then the calendar.  As we looked through those last night, we
20  saw some instances like Topic 28 where we saw one set of
21  information and then the other.  So I will just go down those
22  as briefly as I can.  Let me spell it out for the first couple
23  of ones, and then I will just say the ultimate question for the
24  last ones.
25             Topic 9, it looked like to us that the document

1   that listed 30(b)(6) topics and witnesses listed Tom Hunter as
2   covering one portion of Topic 9.  It looked to us like the
3   document called "30(b)(6) Witnesses by Witnesses" did not
4   reflect Mr. Hunter.  So just for clarity, is Mr. Hunter serving
5   as a deponent or not for Topic 9?
6            On Topic 20, similarly the document where they
7   had 30(b)(6) topics and witnesses, it looked to us like it
8   listed Herbst and Cook as witnesses for topic witness in the
9   witness column, but the topic subpart it looked to us like it
10  said Herbst and Hunter.
11          **MR. CHAKERES:**  Which topic is that?
12          **MR. GASAWAY:**  This is Topic 20.  Again, the document
13  called "30(b)(6) Witnesses by Witnesses" looked like it listed
14  Herbst and Hunter.  Just again seeking clarity, will Admiral
15  Cook be taking any part of Topic 20?
16           So now I will just ask the eventual questions.
17  All these, Nat, are just these types of things where we are
18  trying to kind of reconcile documents.
19           On Document 24, just for purposes of clarity, we
20  had the question who, if anyone, in addition to Admiral Cook
21  would be a witness for any part of Topic 24, again from that
22  sort of ambiguity as we read it.
23           On Topic 25, for purposes of clarity, we wanted
24  to know who, if anyone, in addition to Tom Hunter would be a
25  witness as to Topic 25.

```
 1                    Topic 28, we had the issue that Mr. Chakeres has
 2      just addressed.
 3                    Topic 38, again for purposes of clarity, will
 4      Paul Hsieh -- if I'm pronouncing Mr. Hsieh's name correctly.
 5      It's H-S-I-E-H.  Will he be the sole witness for Topic 38 or
 6      are there others?
 7                    Topic 39.  Will Tom Hunter be the sole witness
 8      for Topic 39 or will there be others?
 9                    Topic 50.  Will Mark Soggee be deposed as to
10      Topic 50?  Soggee is S-O-G-G-E-E.
11                    Again, on Topic 50, will Marcia McNutt be
12      deposed for Topic 50?
13                    Topic 51.  Again for purposes of clarity, will
14      Mark Soggee be deposed for Topic 51?
15                    Again, Topic 51.  For purposes of clarity, will
16      Marcia McNutt be deposed as to Topic 51?
17                    Topic 96, for purposes of clarity, just again
18      who the correct witness is for Topic 96.  As stated in the
19      deposition notice, we had some ambiguity there.
20                    Topic 97, same thing, just some ambiguity as to
21      the correct topic for 97.  I would invite Nat or others to call
22      us, and we can kind of walk through the underlying documents
23      and what we are seeing in terms of ambiguity.  We just want to
24      get this clarified, so I put those questions out there.
25                    THE COURT:  I do want to compliment Nat and the
```

1  United States.  Y'all did a really good job of pulling it

2  together by name and topics and then cross-referencing it to

3  topics and names, so thank you.

4          **MR. GASAWAY:**  Again, we are not putting Nat on the

5  spot here.  We will follow up with him.  We will probably talk

6  about putting this all down in a letter and stuff like that.  I

7  just wanted to throw those out as placeholders for the parties,

8  not to put anybody on the spot.

9          **THE COURT:**  I think that's right.

10          **MR. CERNICH:**  Your Honor, Scott Cernich for the

11  United States.  Do we really need a letter?

12          **THE COURT:**  Well, I think we just need to confirm --

13          **MR. CERNICH:**  I understand.

14          **THE COURT:**  -- what your intent is, but certainly we

15  don't need it today.

16                  Nat.

17          **MR. CHAKERES:**  Your Honor, I think it would probably

18  be easiest -- I think I understand everything that Rob just

19  pointed out.  I have answers for nearly every single one of the

20  issues, but I think that for all the participants, trying to

21  keep names and numbers straight and keep them written down

22  correctly, it would be easiest if I just send a revised

23  document.

24                  I have to confirm with my colleagues on a couple

25  of these.  For 96 and 97, I don't understand what the ambiguity

1    is, but I will follow up with Rob on those after the

2    conference.  As we pointed out and as BP pointed out in their

3    submission, it's a difficult enterprise to find the people on

4    all of these.  My first guess as to who the right person was on

5    some of these, I got educated that that was not the right

6    person.  There may, in fact, during the course of deposition

7    preparation be a further change.

8              There's another placeholder we want to put down.

9    In the Phase One depositions, there were instances where at the

10   last minute 30(b)(6) deponents were changed, and we did feel

11   the parties were prejudiced by that.  We don't want that to

12   happen in this phase.  While I think there probably will be

13   some changes to this list, we would propose a cutoff of maybe

14   two weeks before the deposition for parties to make any changes

15   to the 30(b)(6) designations.  That's just something we put out

16   there for the other parties to chew on.

17             **THE COURT:**  Okay.  I think that sounds reasonable to

18   me.  Why don't you all think about that, and we can cover it

19   next week.

20             So that's a good running start.  Now, let's talk

21   about third parties.  Have we had any further communications --

22             **MR. FITCH:**  Judge, before we move to that --

23             **THE COURT:**  Yes, Tony.

24             **MR. FITCH:**  -- Tony Fitch for Anadarko.  As a party,

25   I can give a couple of dates.

1      THE COURT:  Oh, good.  Let's go ahead and do that.

2      MR. FITCH:  I have a couple of people who would like

3   to get themselves locked in.

4      THE COURT:  Okay.  That's fine, Tony.  I like that.

5      MR. FITCH:  I know the parties here probably don't

6   have the notice that's going to be issued, served on Anadarko,

7   but I will go ahead and run through a couple of numbers.

8          With respect to Anadarko Topics 5, 6, and 22,

9   Alan O'Donnell is available on either September 18 or

10  September 19.  I'm telling everybody we are not talking two

11  days.  We are talking two or three hours for these people given

12  Anadarko's limited knowledge.

13     THE COURT:  So you say.

14     MR. FITCH:  So I say.  So I predict.

15     THE COURT:  So you want to put him down for --

16          Yes.  Go ahead, Corey.

17     MR. FITCH:  Wherever Corey puts him.

18     THE COURT:  That's the 19th for the phone

19  participants, Alan O'Donnell.

20     MR. FITCH:  I might mention, Judge, that in an order

21  you issued, you had addressed a deposition Topic 21.  In fact,

22  if I might respectfully note, that is a mistake on your part

23  because the topics had switched a little bit.  That's Topic 22

24  now, for everybody's information.

25     THE COURT:  Whoops.

1          **MR. FITCH:**  O'Donnell is on the geological and

2    geophysical aspects of Topic 22, which is analysis of the

3    reservoir.  Brian O'Neill, O-N-E-I-L-L, is available on the

4    same topics on September 12 or 13.

5          **THE COURT:**  We are going to put him down on the 12th.

6          **MR. FITCH:**  Topics 6 and 7 -- I said a minute ago 5

7    and 6, but both of these fellows are 6, 7, and 22.

8          Ms. Harvey and I are still discussing one or two

9    more topics as to whether the United States is going to pursue

10   those topics.  Either I or Ms. Iiams will try to get back to

11   you with the rest of our dates next week, hopefully.

12         **THE COURT:**  Good.  Thank you, Tony.  I appreciate it.

13         Mr. Williamson.

14         **MR. WILLIAMSON:**  Yes, Your Honor.  I didn't know if

15   this is the appropriate time.  Jimmy Williamson for the PSC.  I

16   need to follow up on Wild Well.

17         **THE COURT:**  Yes.

18         **MR. WILLIAMSON:**  Number one, on Cudd -- well, just as

19   an aside on Cudd, they provided me with an affidavit.  I will

20   get it circulated this week.  That should take care of Cudd.

21         On Wild Well, Wild Well has agreed to a

22   deposition on the 24th.

23         **THE COURT:**  Of August?

24         **MR. WILLIAMSON:**  August.

25         **THE COURT:**  Good.

1     **MR. WILLIAMSON:**  They have agreed to produce
2  apparently about 900 more e-mails that Mr. Campbell had.
3  Mr. Campbell is technically, apparently, an employee of
4  Superior.  They believe that most of those will be things they
5  have already produced.

6          The tentative agreement we had announced earlier
7  in court here a few weeks ago was they wouldn't produce any
8  more documents, we would re-issue them the notice, they would
9  designate a representative, and we all agreed no one would
10  depose more people with Wild Well.  I announced that a few
11  weeks ago.  It was fine.  Mr. Cernich wanted to make sure we
12  got Mr. Campbell's e-mails.  Ms. Mince has agreed to that.

13          She has agreed also to give those e-mails to
14  us -- she is doing a privilege review right now.  She agrees
15  she will get them to us by August 10.  So with that in mind, I
16  propose August 24 for Wild Well, with the Court's permission.
17  She wanted me to request of the Court that she would prefer it
18  to be in Houston, although she, I think, gave me permission to
19  say she would defer to Your Honor on that issue.

20          **THE COURT:**  I think I would prefer it to be in
21  New Orleans.  We are going to be set up and ready to roll here
22  and will be taking other depos.

23          **MR. WILLIAMSON:**  I'll communicate that.  Thank you.
24          **THE COURT:**  Thank you.  I appreciate it.
25              Rob.

1        **MR. GASAWAY:**  Your Honor, just as long as we are

2   getting a master calendar here, I think I wanted to reiterate

3   what we have told people before.  Woods Hole is on for the 28th

4   and 29th, and it should go on this same calendar.

5        **THE COURT:**  Yes, it should.  Woods Hole, 28th and

6   29th.  They want that up in Boston, huh?

7        **MR. GASAWAY:**  That's correct.

8        **MR. MAZE:**  Go ahead and write that down?

9        **THE COURT:**  Yes.  Boston.

10        **MR. GASAWAY:**  Then, Your Honor, as the Court knows,

11   we had had DNV down for August 1 and 2.  I believe there's been

12   an exchange of correspondence with the United States.  Maybe we

13   could have Mr. Cernich talk about his understanding of that.  I

14   think we agreed to take it off of August 1 and 2 for DNV.

15        Is that right, Scott?

16        **MR. CERNICH:**  Yes.  That was my understanding.

17        **THE COURT:**  We don't have alternative dates yet?

18        **MR. CERNICH:**  No.  It depended on the document

19   production.  We requested and I believe Transocean requested,

20   as well, that the documents be at least 30 days prior to the

21   deposition.

22        **THE COURT:**  Fair enough.

23        **MR. GASAWAY:**  So I just wanted to say I had been here

24   before saying August 1 and 2.  I'm not putting that on the

25   calendar today not as an oversight but because the parties had

1   further discussions and we took those dates off.

2           **THE COURT:**  Any other third parties that have been

3   contacted that we can slide in?

4           **MR. BAAY:**  Your Honor, David Baay for Transocean.  We

5   have been in contact with RRB Energy.

6           **THE COURT:**  RRB Energy.  Okay.

7           **MR. BAAY:**  Their principal is a man by the name of

8   Richard Brainard.  He has requested August 7 and has promised

9   to produce documents by today.  Today was the date he promised

10  me the documents.

11          **THE COURT:**  August 7, RRB, and his name is --

12          **MR. BAAY:**  Richard Brainard, B-R-A-I-N-A-R-D.

13          **THE COURT:**  Brainard, B-R-A-I-N-A-R-D.

14          **MR. BAAY:**  He also made the request for a Houston

15  deposition, claiming that he is not getting reimbursed for

16  costs, but I can tell him the Court has ordered a New Orleans

17  deposition.  He is separated in time, I guess, from the others.

18  That's the only reason I mentioned it.

19          **THE COURT:**  Well, let's talk about that, as far as

20  costs.  It seems to me that part of costs, it's a lot cheaper

21  to bring one person in from Houston than it is to send 15

22  people over there.  So maybe reasonable travel costs should be

23  part of what we are thinking about on allocation of expenses.

24  Don't tell him we are going to do it, but it seems to me that

25  would be nice.

1          **MR. BAAY:**  Okay.

2          **THE COURT:**  Next up.

3          **MR. CERNICH:**  Your Honor, Scott Cernich for the

4     United States.  I have some additional dates for Intertek.  We

5     have that for September 12.  I believe all of these parties

6     have agreed to come to New Orleans for the deposition.  Then

7     for Oceaneering we have October 10.  Then going back to

8     September, we have PENCOR on September 10, on September 14

9     Isotek, and on September 20 Weatherford.

10          **MR. MAZE:**  September 20?

11          **MR. CERNICH:**  September 20, that's correct.  That's

12    specific to Weatherford Labs.  Those are what we have at the

13    moment.

14          We are following up with Stress Engineering

15    regarding a date.  We hope to have that very soon.  We have

16    made progress with Schlumberger regarding document production.

17    As you probably saw, they filed their formal objections this

18    week and we are moving forward there.

19          Then with Cameron, we have agreed on topics.

20    You may recall a number of weeks ago an e-mail came from

21    Cameron that excluded certain topics.  Those topics have been

22    added back in.  Once that's finalized, we will circulate it to

23    the parties.  We are working on documents with Cameron as well.

24          **THE COURT:**  Good.  That's a good running start for

25    the day, wouldn't you say?  Have we missed anybody?

1      **MR. CERNICH:**  Then I will mention also, Your Honor,

2   on Worldwide Oilfield Machine, we believe we should be getting

3   documents from them maybe even today, and then we will update

4   the Court as to whether a deposition is even necessary for that

5   one.

6      **THE COURT:**  Perfect.  I'm going to ask the U.S., if

7   you all don't mind, to update the calendar as we go since it

8   started as your calendar.  So if you will take the raw,

9   handwritten Corey version and update it when you get back, that

10  would be great.

11     **MR. CHAKERES:**  We would be happy to do that.  I think

12  there's two others that I don't have in front of me that were

13  both the first week of October, ADD Energy and Statoil.

14          There's one other outstanding party we are still

15  working with, the BP Institute.  They said that their probable

16  witness is unavailable at least through the first week of

17  September.  So it's not going to happen before then, but we are

18  still working on an exact date.  That's the one where it's a

19  university professor.  He would prefer to have that one happen

20  in the U.K.

21     **THE COURT:**  Okay.  Nat, if you get confirmation from

22  the third parties that you all are working with, you can just

23  go ahead and add them to your calendar, and then we can just

24  report to the parties when we get together at the next

25  conference.

1              **MR. CERNICH:**  Actually, I do have the dates for

2     ADD Energy and Statoil.  Those are both in October.

3              **THE COURT:**  Uh-huh.

4              **MR. CERNICH:**  October 2 for ADD Energy and October 4

5     for Statoil.

6              **THE COURT:**  Good.  Thank you.

7              **MR. BAAY:**  One more date, Your Honor.  We have a

8     Transocean 30(b)(6) representative.  I believe we are going to

9     have one witness for all topics.

10             **THE COURT:**  One witness for Transocean, all topics.

11             **MR. BAAY:**  We are looking at November 5 and 6.

12             **THE COURT:**  So, phone participants, November 5 and 6,

13    that will be on the updated calendar.

14             **MR. BAAY:**  That hits Election Day.  I don't know if

15    we are trying to avoid that or not.

16             **THE COURT:**  Just tell your witness to vote before

17    coming.

18             **MR. HAYCRAFT:**  Absentee.

19             **MR. BAAY:**  Rob Turlak.

20             **THE COURT:**  Rob Turlak.

21             **MR. BARR:**  I just want to note for the record that

22    it's my suspicion that two days for all topics may not be

23    enough.  It's all topics.

24             **THE COURT:**  Okay.  David, I haven't looked at the

25    notice recently.  Why don't you look at the notice and see if

1   Mr. Turlak might be able to extend his stay to the 7th as a

2   question mark.

3        **MR. BAAY:**  Okay.  I would just add there are a large

4   number of flow rate topics on our notice about which he is not

5   going to know anything.

6        **MR. BARR:**  I'm just flagging the issue.

7        **THE COURT:**  We do need to start focusing on the

8   lengths of these depositions.  If you all would start looking

9   at the scope of the topics and seeing if you really need two

10  days, if you really need three days, or whether maybe we can

11  get these done in one day, that would be very helpful.

12            We also have to start talking about the sequence

13  of questioning, so start thinking about that, and allocation of

14  time.  We have lots left to go on that.

15            Okay.  Anything else that we need to talk about

16  today?

17       **MR. BARR:**  One issue, but it's not really an issue.

18  It's just that, in our class counsel role, we have been getting

19  questions, and I just want you to be aware this could be

20  happening.  A bunch of subpoenas are going to go out to

21  nonparties, credit card companies, trying to obtain

22  information.  I suspect that there might be some motions to

23  quash from that.

24            We are getting questions from people that

25  represent class members but they aren't members of the bar of

1  this Court.  They are wondering, on their subpoenas, if they

2  can sign those subpoenas given the rules that have been put in

3  place in this litigation, or if they need to come to the clerk.

4          **THE COURT:**  Meaning *pro hac vice*?

5          **MR. BARR:**  Uh-huh.

6          **THE COURT:**  They will be coming on motions to quash?

7  How are they coming in?

8          **MR. BARR:**  Well, I would hope that we can get it

9  worked out with them once they start getting served with

10  subpoenas and it won't get there, but I just wanted to flag

11  that as something that may come up.  The primary issue right

12  now is the people that aren't attorneys of record in this

13  litigation but they are representing class members, they are

14  wanting to know, "Can I do a typical Rule 45 subpoena and sign

15  it or do I have to come to the clerk and get some sort of an

16  order to do it given that I'm not attorney of record?"

17          **THE COURT:**  I'll put that down, and we'll have an

18  answer for you next week.

19              Don.

20          **MR. HAYCRAFT:**  Andy reminded me by e-mail, on the

21  briefing schedule for the Halliburton and Louisiana desire to

22  take discovery, that BP would like and I assume the PSC would

23  like a reply date opportunity.

24          **THE COURT:**  Hello, Andy.

25              I wasn't going to allow a reply.

1          **MR. HAYCRAFT:**  I know that we would desperately want
2     one.
3          **THE COURT:**  Desperately.  Okay.  Three days.
4          **MR. HAYCRAFT:**  Three days?  Okay.
5          **THE COURT:**  Three days.
6          **MR. GODWIN:**  Judge, if they are going to have an
7     opportunity to reply --
8          **THE COURT:**  No.  No.
9          **MR. GODWIN:**  Then why give them an opportunity?  Why
10    don't we just all submit?  They do it on the 25th, we do it on
11    the 30th, and that's it.
12         **MR. HAYCRAFT:**  And we have a reply on the 2nd.
13         **THE COURT:**  On the 2nd.  There you go.
14              What other things?  Mr. Irpino, how are you
15    today?
16         **MR. IRPINO:**  Good, Judge.  How are you?
17         **THE COURT:**  Good.  Thank you.
18         **MR. IRPINO:**  Anthony Irpino for the PSC.  There are a
19    couple things I want to bring to the Court's attention, one of
20    which actually I can talk to you informally about after.
21              Second, with all of these depos starting to get
22    ramped up again and because of the fact the vast majority of
23    the first ones are going to be third-party depos, if not all, I
24    don't know how that will affect potential confidentiality
25    claims.  I could see a situation where maybe some of these

1   third parties might be wanting to make them.  It might be worth

2   discussing at some point because I can see where there may be

3   some tweaks that need to get made to, potentially, PTO 13

4   relative to any claims they may have and how they would go

5   about bringing them or notifying the parties.

6           **THE COURT:**  I assume they would have brought them as

7   objections to the subpoenas.  No?

8           **MR. IRPINO:**  Maybe.  It's fine with me.  If it's not

9   an issue, it's not an issue.

10          **THE COURT:**  No, I don't know.

11          **MR. IRPINO:**  My concern would be if something comes

12  up at a depo --

13          **THE COURT:**  You don't think PTO 13 will cover --

14          **MR. IRPINO:**  I just don't think it tells them -- I

15  guess maybe we should provide them with a copy of PTO 13.

16          **THE COURT:**  I think that's right.

17          **MR. IRPINO:**  Maybe that would be enough, as part and

18  parcel of the 30(b)(6) depo, to say, "Please look at this

19  PTO 13.  If for any reason you believe" --

20          **THE COURT:**  I think that's a good suggestion.  Thank

21  you, Anthony.

22          **MR. IRPINO:**  The second thing I can talk to you about

23  on the side.  It involves sort of what Brian was talking about.

24              Thirdly, do we have a date for our next

25  get-together?

1        **THE COURT:**  We do not?  I thought that was in

2   Transocean's court, but maybe I'm wrong.

3        **MR. BAAY:**  It definitely is.

4        **THE COURT:**  Our next conference with Judge Barbier is

5   August 17, so it seems to me the 16th is probably the most

6   likely date, if you all want to plan toward that.

7        **MR. IRPINO:**  If not, we will move to compel next

8   week.

9        **THE COURT:**  That would be fine.  We'll entertain

10  that.

11        **MS. SCOFIELD:**  Good morning, Your Honor.  Denise

12  Scofield for nonparty Schlumberger.  On the issue of PTO 13, we

13  would like the opportunity to redact price information for

14  nonparty Schlumberger.

15        **THE COURT:**  I don't think anyone is going to have a

16  problem with that.  We have never had a problem with pricing.

17        Does anybody object?  You don't have to say

18  today, but next week let us know.

19        We have not had any problem with that, Denise.

20        **MS. SCOFIELD:**  Thank you.

21        **THE COURT:**  You're welcome.

22        Anything else?  Okay.  Let me tell you that we

23  are not going to have a conference on Friday, August 17.  I'm

24  going to take the day off.  So is Rob.

25        **MR. MAZE:**  We have Judge Barbier that day.

1          **THE COURT:**  You do have Judge Barbier that day, but I

2    don't think Rob has to be there for that.  Friday, December 7,

3    there will not be a conference.

4               **MR. WILLIAMSON:**  What about August 31, Judge?

5               **THE COURT:**  I'm sorry.  Say it again, Jimmy.

6               **MR. WILLIAMSON:**  I thought it was August 31 also in

7    your order.

8               **THE COURT:**  Yes.  That was already no conference.

9    That's Labor Day.  I'm just adding two new "no conferences."

10   I'm not taking them away.

11              **MR. WILLIAMSON:**  I'll miss them every day.

12              **THE COURT:**  That's a good one, Jimmy.

13                   Thanks everybody.  Have a good weekend.  By the

14   way, guys, flash flood warning until 2:30.  It is raining cats

15   and dogs out there.

16              (Proceedings adjourned.)

17                              * * *

18                        <u>**CERTIFICATE**</u>

19        I, Toni Doyle Tusa, CCR, FCRR, Official Court
     Reporter for the United States District Court, Eastern District
20   of Louisiana, do hereby certify that the foregoing is a true
     and correct transcript, to the best of my ability and
21   understanding, from the record of the proceedings in the
     above-entitled matter.

22

23

24                        <u>s/ Toni Doyle Tusa</u>
                          Toni Doyle Tusa, CCR, FCRR
25                        Official Court Reporter