

Attorneys at Law
A Professional Corporation

510 North Jefferson Street
Covington, Louisiana 70433
Tel: (985) 809-8093
Fax: (985) 809-8094
Email: hdart@dartlaw.com

July 30, 2012

Via: Email: Sally_Shushan@laed.uscourts.gov

The Honorable Sally Shushan
United States Magistrate Judge
500 Poydras Street, Room B345
New Orleans, Louisiana 70130

Re: The State of Louisiana's Request to Conduct Limited Discovery and to Participate at the Fairness and Class Certification Hearings

Dear Judge Shushan:

The State of Louisiana ("State" or "Louisiana") has requested that this Court permit it to conduct limited discovery regarding the purported fairness of the proposed Economic and Property Damage ("E&PD") Settlement as well as the Medical Benefits ("Medical") Settlement (collectively "Settlements"), which have been preliminarily approved by the Court. The State is in a unique position with respect to the proposed class Settlements both under the Class Action Fairness Act ("CAFA") and given the potential for the Settlements to impact the State's and its citizens' rights. Granting the State the relief requested—limited discovery to allow meaningful review of the terms and implications of the proposed Settlements—will not open the door to non-parties who lack standing. Nor will it result in burdensome and overbroad discovery. Given the extraordinary and complex nature of this case and the proposed Settlements, such limited inquiry is reasonable and will not interfere with continuing payments under the Settlements.

The Court has before it Settlements of historic scope and magnitude, which will have enormous consequences to the welfare of the State and its citizens for decades to come. There are fundamental questions that simply cannot be answered on the face of the proposed Settlements or the disclosures made thus far. Simply put, it is impossible for the Attorney General to fulfill his obligations to the State and its citizens without additional information. For instance:

**E&PD Settlement:**

- How, if at all, is the Settlement different from what the GCCF was already doing which was substantially criticized by several attorneys general as well as the PSC?
- How are the Risk Transfer Premiums ("RTPs") calculated and what is the rationale for certain claimants being treated differently than others?
- Why do RTPs allow the transfer of ecological risk to class members and the State?
- Why does the Settlement require final releases when the Oil Pollution Act ("OPA") does not allow this?
- Why is there a cap on the Seafood Compensation Program and how was it calculated (especially given that BP has waived the only cap available under OPA)?
- What are the undisclosed "Seafood Program Opt Out Terms" that reduce the amount of the cap on the Seafood Compensation Program?
- Why is the claim filing deadline for Seafood Compensation Program class members so much shorter than the claim filing deadline for all other class members?
- How is the compelling risk of a punitive damage award factored into the value of the settlement for the class?
- Why are the parties to the Settlements claiming that emotional distress damages are covered by the RTP contrary to the terms of the E&PD Settlement?

**Medical Benefits Settlement:**

- Are claimants required to forego economic claims to receive damages to participate in the Medical Settlement?
- What are the bases for the qualifying conditions for medical benefits claims?
- What are the bases for limiting compensation to certain medical services and not others?

Two primary issues are currently presented: (1) the State's standing to conduct limited discovery in both class actions and (2) whether to permit limited discovery regarding the proposed class settlements.[1]

---

[1] As is outlined herein, the State believes it has standing to seek limited discovery regarding the proposed Settlements. However, in the event the Court does not recognize the State's interests, the State reserves its right to file a Motion for Leave to Intervene. At this time, based on the Court's previously broad interpretation of this MDL, the State does not think that Intervention should be required. During a dispute between BP and the State regarding the State's responses to discovery within the context of the Limitation action, the State argued that some delay should be allowed as the State's Motion for Leave to Intervene in the Limitation Action was not granted until September 2011. The Court found that the State's filing in MDL 2179 was sufficient, even though not a party to the Limitation Action, to obligate the State to answer discovery therein:

> [MR. LANGAN] . . . I want to focus for a second on one of the issues Your Honor asked us about, which is the argument that the State was, quote, unquote, recently added to the limitation action and should that make any difference. With all due respect to the State, I

For the reasons set forth below, the State has standing to take limited necessary discovery to evaluate the historic Settlements. The Court deserves the benefit of receiving real and substantive information from third parties (and parties) after they have been given the opportunity to take reasonable discovery. A "rigorous analysis" is required of these class actions and their Settlements.

I.   **The State of Louisiana has Standing to Participate in the Approval Process of Class Action Settlements.**

The State has standing to conduct limited discovery and to participate in the class certification and fairness hearings for both the E&PD and Medical Benefits Class Actions. As discussed below, the State has (1) a direct interest in these actions under CAFA in enforcing its notice provisions; (2) a non-sovereign, proprietary interest in protecting State resources; and (3) a quasi-sovereign interest in protecting the health and well-being of its citizens.

Nearly two years ago, the United States Judicial Panel on Multidistrict Litigation ("JPML") found it appropriate to transfer all *Deepwater Horizon*-related civil actions to this Court for coordinated or consolidated pretrial proceedings, reasoning as follows:

> Centralization under Section 1407 will eliminate duplicative discovery, prevent inconsistent pretrial rulings, including rulings on class certification and other issues, and conserve the resources of the parties, their counsel, and the judiciary. Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund. In all these respects, centralization will serve the convenience of the parties and witnesses and promote the more just and efficient conduct of these cases, taken as a whole.[2]

Two years later, certification of two settlement classes is now before the Court and Mr. Feinberg's GCCF has been replaced with Settlement Administrators. Rather than seeking to promote the "just and efficient conduct of these cases" as directed by the JPML, the settling parties are challenging the State's right to participate in these proceedings and to conduct good faith discovery into the fairness and certification of the Settlements.

---

respectfully suggest that just doesn't wash for a couple of reasons here. . . Furthermore, and this is—I want to supplement a point we made in a brief, they separately sued BP back on March 3rd of 2011. They filed an action against BP on March 3rd, and other parties, and they amended that complaint on April 19th. So they were a litigant against us back in April. With the Magistrate Judge's permission, we served discovery on the State way back in April and have been pursuing it ever since. So the fact that they didn't technically become a party to the limitation action until September is not really relevant. They were in MDL 2179 suing us, and we sought discovery against them.
[COURT: Well, in fact, they had been a party in MDL 2179 long before that because they had filed a dec action back in 2010. September 14, 2010. . . . They filed a complaint for declaratory judgment against Transocean, which became part of this MDL, so obviously they have been a party to the MDL for over a year.

Hr'g Tr. 12:11-13:16 (Nov. 4, 2011).

[2] Transfer Order of the United States Judicial Panel on Multidistrict Litigation, August 10, 2010, at ¶ II (emphasis added).

3

### a. The State has a Direct Interest in Enforcing CAFA's Notice Requirement.

CAFA was signed into law in February, 2005. Among other objectives, CAFA encourages official scrutiny of class action settlements. One of its most significant provisions requires settling defendants to serve state officials in each state in which a class member resides, with notice of the proposed settlement.[3]

In this case, CAFA requires that "notice of the proposed settlement" be sent to the Attorney General. That notice must include the following documents:

(4) any proposed or final class action settlement;
(5) any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants; . . .
(7)(A) if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or
(B) if the provision of information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement.[4]

Failure to give proper notice has serious consequences. For instance, "[a]n order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b)."[5] If proper notice under subsection (b) has not been provided, "[a] class member may refuse to comply with and may choose not to be bound by a settlement agreement or consent decree in a class action."[6] In other words, improper notice eliminates the binding effect of a final order.

BP sent notices regarding the E&PD and Medical Settlements to the Louisiana Attorney General's office, which were received on April 27, 2012. However, these notices did not satisfy CAFA. Regarding the E&PD Settlement, a document filed under seal, the Seafood Program Opt Out Terms, constituting a critical part of the settlement terms and agreements made between the PSC and BP, was not disclosed to the Attorney General.[7] The E&PD Settlement imposes a cap of $2.3 billion on the Seafood Compensation Program segment of the Settlement. The Settlement further states that this cap will be reduced (thereby lowering the funds available to pay Seafood Claims) pursuant to the terms of this secret agreement. The withholding of this document prevents the State and any class member from calculating the amount available to pay seafood claims. By the terms of their own Settlement, the PSC and BP will not disclose the

---

[3] 28 U.S.C. §1715(b).
[4] Id.
[5] Id. §1715(d).
[6] Id. §1715(e)(1).
[7] The E&PD Settlement states: "Seafood Program Opt Out Terms shall mean the terms agreed to by the Parties with respect to Seafood Compensation Program Opt Outs. The Seafood Program Opt Out Terms will be submitted under seal to the Court." [Rec. Doc. 6430-1, at ¶38.132].

4

"Seafood Program Opt Out Terms," a critical part of the E&PD Settlement. It is a direct violation of federal law not to provide this document to the Attorney General.

Regarding the Medical Settlement, the notice stated: "It is not feasible at this time to provide the names of class members, a list of class members by state of residence." It is clear from the Settlement, however, that BP has databases containing the very information required to be given to the State via CAFA notice.[8] The failure of BP to provide the identity of the class members whom they fully expect to participate in the Medical Settlement, and instead provide the State with generalized census data, is a violation of CAFA's notice requirement.

### b. The State Suffers an Injury-in-Fact to its Own Proprietary Interests Under the Terms of the Proposed Settlements.

OPA was passed by Congress to provide recovery of all economic damages suffered by oil spill victims. The right to recover currently undiscovered economic damages when they are discovered in the future is specifically allowed by OPA. On the other hand, BP does not want to be saddled with the risk of unknown future damages for an indeterminate time. BP accomplishes that goal by means of the RTP and placing a cap on the Seafood Compensation Program. This passes that risk onto the victims, who can least afford to take it on.

Should that risk turn into reality in two, five or fifteen years, the ultimate safety net for the victims of the oil spill is the State. If an economically critical seafood fishery collapses in the future from the oil spill, putting hundreds or thousands of Louisiana citizens out of work, the State will be obliged to pay them unemployment compensation benefits and engage in job retraining services. Long after the RTPs have been spent, the State stands as the only insurance against an economic aftershock of the 2010 oil spill, rather than the party who actually caused the harm, as expressly required by OPA.

### c. The State has a Quasi-Sovereign Interest in Ensuring the Settlement is Fair and Adequate For Its Citizens.

A State's quasi-sovereign interest in protecting the health and well-being of its citizens was best described in *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982):

> Quasi-sovereign interests stand apart from all three of the above: They are not sovereign interests, proprietary interest, or private interest pursued by the State as a nominal party. They consist of a set of interests that the State has in the well-being of its populace.

Action on behalf of a state in protecting its quasi-sovereign interest is "necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." *Id.* at 600, (quoting *Mormon Church v. United States*, 136 U.S. 1, 57 (1890).

---

[8] These databases and other information have been provided by BP to the Claims Administrator for the express purpose of identifying claimants and processing claims. *See* Section XXI(B) of the Medical Settlement ]Rec. Doc. 6427-1].

As set forth in the Senate Judiciary Committee's report on CAFA,[9] the law is meant to provide "an additional mechanism to safeguard plaintiff class members' rights by requiring that notice of class action settlements be sent to appropriate state and federal officials, <u>so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.</u>"[10] The Committee further said, "federal and state officials will be notified about proposed settlements <u>and have an opportunity to get involved if they think it is appropriate</u>."[11]

In this case, the Attorney General "thinks it is appropriate" to get involved. A meaningful CAFA-sanctioned review of these Settlements cannot be completed without more information. Further, S. Rep. 109-14 provides that §1715 was included to combat the "clientless litigation" problem that arises in class actions by "adding a layer of independent oversight to prohibit inequitable settlements."[12] "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement,[13] CAFA presumes that once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedure. *Garner v. State Farm Mutual Auto. Ins. Co.*, 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010).[14]

As the chief legal officer of the State of Louisiana, the Attorney General is charged with a *parens patriae* duty of protecting the rights of the State and its citizens. One of the stated purposes of CAFA is to "assure fair and prompt recoveries for class members with legitimate claims." In the context of class action settlements, official scrutiny by Federal and state authorities is a key component for accomplishment of that goal. By BP's own estimate, over 600,000 Louisiana businesses and 4.5 million individual Louisiana class members will be affected by the E&PD Settlement, and over 45,000 Louisiana citizens are affected by the Medical Settlement.[15]

II.     **Discovery is Needed to Remedy the Lack of Evidence in the Record to Enable the State to Conduct a Meaningful Evaluation of the Settlements.**

---

[9] S. REP. 109-14, 109th Cong., 1st Sess. 2005, *as reprinted in* 2005 U.S.C.C.A.N. 3 (2005).
[10] *Id.* at 5 (emphasis added).
[11] *Id.* at 33 (emphasis added).
[12] *See also* Sharkey, C., *CAFA Settlement Notice Provision: Optimal Regulatory Policy*, 156 U. PA. L. REV. 1971, 1973 (2008) (asserting that the basic intent of the notice requirement is to ensure "that a responsible state and/or federal official receives information about proposed class action settlements and is in a position to react if the settlement appears unfair to some or all class members or inconsistent with applicable regulatory policies").
[13] *See* 28 U.S.C. §1715(f) ("Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials.").
[14] Courts have routinely given substantial weight to the positions of attorneys general when considering the fairness of a proposed settlement. *See, e.g., Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1302 (S.D. Fla. 2007) ("Attorneys General have objected at every turn to each version of the parties' proposed coupon settlement. . . . The vigor and substance of the objections presented counsels against a finding favorable to the parties."); *True v. Am. Honda Motor Co.*, 749 F.Supp.2d 1052 ("Twenty-six states have filed an amicus brief urging the Court to reject the proposed settlement as unfair. . . . This factor thus weighs against approval of the settlement."); *Wilson v. Directbuy, Inc.*, 2011 WL 205037 (D.Conn. 2011) (finding that where thirty-nine attorneys general filed an opposition to the proposed settlement, the filing was "especially helpful" and was a "placeholder for many absent class members' objections").
[15] These numbers are based on the CAFA notices received by the Attorney General's office from BP regarding the Settlements.

The State has legitimate concerns that these Settlements will adversely affect both the economic well-being of Louisiana's citizens and the long-term financial health of the State. To fulfill his obligations to the State and its citizens, the Attorney General needs more information.

The State of Louisiana cannot be compared to the State of Texas in *Paterson v. Texas*, 308 F.3d 448 (5th Cir. 2002), a pre-CAFA case. There, after considering Texas' claim to unclaimed settlement proceeds, the Fifth Circuit concluded that since there were not yet any unclaimed funds arising from the settlement, Texas had "not itself suffered an actual or imminent injury and can demonstrate no present interest in settlement funds."[16] Furthermore, the Fifth Circuit found that class members were "represented by class representatives, who satisfied the district court that they met the representation requirements of federal law and that the settlement was fair."[17]

Here, the Settlements have not yet been approved and relevant evidence of the fairness or adequacy of the Settlements is noticeably missing. In *Paterson*, the State of Texas failed to make any colorable claims regarding a real proprietary or quasi-sovereign interest, injured as a result of the settlement. On the contrary, Louisiana has established its interests, as set forth herein. Additionally, "[t]he criteria relevant to the court's decision of whether or not to permit discovery are (a) the nature and amount of previous discovery, (b) reasonable basis for the evidentiary requests, and (c) the number and interests of objectors." 4 Conte & Newberg, Newberg on Class Actions §11:57, at 184 (4th ed.2002) (hereinafter "NEWBERG"). As described below, these factors have also been satisfied here.

### a. Nature and Amount of Previous Discovery

Where "no documentation has apparently been made available with respect to most of the areas about which object[ors] have expressed an interest in pursuing discovery," limited discovery as to those issues should be allowed.[18] BP points to the extensive amount of discovery done in the MDL in the past year. True enough, but that discovery related exclusively to liability issues (Phase I). To date, *no formal discovery* has been conducted as to the past and future damages of putative class members, class representatives, or regarding the long-term impact of the oil spill on those from whom BP expects to receive absolution through the form of final releases. This was admitted by the PSC in its letter brief (Letter brief dated July 25, 2012, at p.1; "To this point, there has been absolutely no discovery related to the question of damages.") Nor has any discovery been conducted on class certification issues, which BP most certainly would have attacked with a vengeance had the PSC moved for certification of a litigation class a year or two ago. The State should be allowed the opportunity to evaluate the details of the proposed Settlements, which necessarily involves providing answers to questions raised by the Settlements as drafted.[19]

---

[16] *Paterson v. Texas*, 308 F.3d 448, 451 (5th Cir. 2002).
[17] *Id.*
[18] *In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 1994 WL 593998 (E.D. La. Oct. 28, 1994).
[19] For example, recently, in the context of oral argument for the PSC's Motion to Dismiss certain plaintiff cleanup workers claims against Responder-Defendants, counsel for the PSC acknowledged that the substance of the claims was somewhat unknown, largely individualized and unsuitable for aggregate treatment in the bundle Complaint. Such statements raise questions as to both the sufficiency of class representation as well as the propriety of certification.

Any evidence of fraud or collusion in the negotiation process is not relevant to the State's current request before the Court. The PSC misconstrues case law to assert its own conclusion that no settlement discovery is permissible without a showing of fraud or collusion. Looking closely at relevant authorities, a showing of collusion is only required when seeking discovery related to settlement *negotiations*.[20] Simply put, answers to the questions posed in the State's proposed discovery cannot be found anywhere in the record of these proceedings.[21] This information is critical not only to this Court's ultimate determination of the fairness of the proposed Settlements but also to the Attorney General's ability to fulfill his obligations to the citizens of Louisiana. The limited discovery requested on these issues is therefore warranted.[22]

### b. Reasonable Basis for the Discovery Requests

If, as the settling parties propose, a primary goal of the RTP concept is to transfer the risk of future damages from BP to the class members, then there must be some calculation or assessment of that risk upon which the settling parties have relied to arrive at their RTP numbers. By the same token, the cap on the Seafood Compensation Program must be justified. No expert reports have been filed and no suggestion has been made in any of the pleadings as to how that assessment was made. The citizens of Louisiana, and ultimately potentially the State, is being handed BP's risk. As a result the State, along with its citizens, is entitled to find out if these RTPs are valid and if any basis exists for placing a cap on the Seafood Compensation Program.

---

[W]e had discussions at length about whether to include the responder defendants. . . . There were people who really did not think it belonged in the bundle complaint; and, they were right, and I was wrong. . . . [T]he reason we shouldn't have put them in the bundle is, in discovery, it is impossible for us, as a Plaintiffs' Steering Committee, to respond to the individualized nature of an individual who is on a beach who gets sprayed. There is no way to do that. We don't represent all hundred thousand cleanup workers. Many of them are unrepresented, and many of them are represented by lawyers who we don't know.

* * *

[W]e found ourselves faced with discovery that was asking about individual people's exposure to individual cleanup company's acts that were outside of the orders and which they were doing. . . . We don't represent them. . . . So our settlement with BP, again, if Your Honor grants class certification, our settlement in large measure resolves a lot of the concerns they have of litigating a case that they shouldn't be in because all cleanup workers are class members; so, unless they opt out, they will be part of the class, and all of these defendants will be released by operation of the release and the settlement."

Status Conf. (7/13/12) Tr. 109:24-111:5 & 114:14-116:14 (R. Greenwald, PSC).
[20] *See* MANUAL FOR COMPLEX LITIGATION 4th §21.643 ("A court should not allow discovery into the *settlement-negotiation process* unless the objector makes a preliminary showing of collusion or other improper behavior.") (emphasis added); *In re Lupron Mktg. & Sales Practices Litig.*, 2005 U.S. Dist. LEXIS 4039, 6-7 (D. Mass. Mar. 16, 2005) ("In exceptional cases, circumstantial evidence may demonstrate collusion between class counsel and defendants to a degree sufficient to warrant discovery into *settlement negotiations*.") (emphasis added); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F.R.D. 24 (D.C.C. 2001) ("[O]bjectors are not entitled to discovery concerning *settlement negotiations* between parties in the absence of evidence indicating that there was collusion between plaintiffs and defendants in the negotiating process.") (emphasis added).
[21] *See* NEWBERG, *supra*, at 186.
[22] *See In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 1994 WL 593998, at *4 (E.D. La. 1994).

The E&PD Settlement documents afford no explanation at all for how RTPs were derived or why there is a cap on the Seafood Program. At a minimum, the Class must know what portion of their respective RTPs is compensation for future OPA economic damages, punitive damages, and other damage.[23] The RTPs should be broken down so that individual claimants can appropriately consider the "risk" being transferred to them. Otherwise, class members will not be able to ascertain the value of the future economic damages they are giving up, making a fairness determination impossible for them and the Court.

No element of damages for which compensation is being paid in the E&PD Settlement has a monetary ceiling or cap, except for the Seafood Compensation Program. No other element of damages in this MDL has as much potential for future catastrophic economic loss resulting from the collapse, or severe long-term impairment, of an economically critical seafood species. No other element of damages is more critical to the State and its citizens to be fully compensated for past and future damages than the seafood industry. The E&PD Settlement documents afford no explanation at all for how the cap was derived or why there is a cap at all.

Fundamental questions also remain unanswered with regard to the proposed Medical Settlement. For instance, in order to qualify for payments, one must find his way through the "Matrix" attached as Exhibit 8 to the Medical Settlement Agreement. [Rec. Doc. 6427-10] In turn, in order to qualify for different levels of benefits under the Settlement, the Matrix requires that claimants prove (1) that they suffered from one or more of the specified Acute or Chronic Conditions set forth in Tables 1 and 3 of the Matrix; and (2) that the condition manifested itself within a certain time (usually between 24-72 hrs depending on the symptom) after exposure. If a claimant is making a claim for medical bills, the Matrix entertains only bills associated with "hospitalization" and further restricts such billing to hospitalization occurring within certain timeframes after the claimant's "first presentment" of their condition. What are the bases for these restrictions? What research did BP or the PSC perform before restricting claims to certain "specified" conditions and certain timeframes of manifestation? Why are claimants not compensated for medical bills outside of a "hospitalization"?

### c. Relevance and Burden on Parties

"The Court's ruling on discovery should permit objectors' meaningful participation in the fairness hearing without unduly burdening the parties or causing delay." *In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 425 (N.D. GA 1992). The depositions of class representatives and experts will answer most of the questions unanswered by these Settlements.

The preliminary approval of the E&PD and Medical Settlements is subject to further and final consideration at a Fairness Hearing to be held on November 8, 2012.[24] Objections to the

---

[23] The E&PD Settlement [Rec. Doc. 6430-1, §38.126] defines an RTP as "the amount paid to a Claimant for any and all alleged damage, including potential future injuries, damages or losses not currently known, which may later manifest themselves or develop, arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon Incident, and any other type or category of damages claimed, including claims for punitive damages. (See also the RTP Chart, included as Exhibit 15 to the Settlement Agreement [Rec. Doc. 6430-33]).

[24] *See* Preliminary Approval Order as to Proposed Economic and Property Damages Class Action Settlement [Rec. Doc. 6418].

Settlements must be filed by August 31, 2012.[25] The State does not request continuation of that hearing in order to conduct discovery. Rather, the discovery sought by the State should be easily completed far in advance of the November 8th hearing. No delay will result.

### III. Conclusion

No discovery has been taken on the quantum of damages suffered by the purported classes. CAFA prohibits a final settlement judgment no sooner than 90 days after notice to the Attorney General. BP's counsel proudly tells the Court that it took 25 or 50 lawyers, working 24/7 for almost a year to put together two massive sets of documents. To accuse the State of dragging its feet in processing only some of the information provided to the public to understand what it took them a year to put together is disingenuous at best. The settling parties are understandably interested in securing final approval of the Settlements that they have prepared. The Attorney General's role in the oversight of fairness of the Settlements which will impact the citizens of Louisiana, as well as the potential adverse impact upon the State's coffers (also ultimately impacting the State's citizens), should not be ignored.

Under these circumstances, the use of affidavits and/or declarations alone, without the opportunity for anyone, including the Court, to traverse these documents, does not foster transparency or promote justice for the millions of individuals and businesses affected by the Settlements. The State favors fair, adequate and timely settlements from BP and the PSC for Louisiana's citizens. However, on this record, there are significant unanswered questions about the Settlements presently before the Court that may affect a determination of their fairness and adequacy. Answers to these questions will allow for the transparency necessary for all concerned to make an informed judgment about the Settlements.

Very truly yours,

*[signature]*

HENRY T. DART
**Special Counsel for Plaintiff,
Attorney General, State of Louisiana**

cc: **Plaintiff Liaison Counsel
Defense Liaison Counsel
Coordinating Counsel**

---

[25] *Id.*