**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | § | |
| GULF OF MEXICO, | § | |
| ON APRIL 20, 2010 | § | SECTION: J |
| | § | |
| | § | |
| This filing relates to: | § | JUDGE BARBIER |
| | § | |
| *B1 Master Complaint* | § | |
| | § | MAGISTRATE SHUSHAN |

<u>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS MOTION TO DISMISS "PURE STIGMA" CLAIMS**</u>

On June 12, 2012, this Court ordered the parties to brief whether the Oil Pollution Act of 1990 ("OPA") supported recovery for "Pure Stigma Claims" alleged under the B1 Master Complaint [Doc 6657 at ¶1].[1]  Accordingly, this brief answers the following question in the affirmative:

> Whether the Oil Pollution Act of 1990 ("OPA") permits claims by or on behalf of owners, lessors, and lessees of real property that have suffered damages resulting from the taint of their property caused by the oil spill although no oil or other contaminant physically touched the property.

<u>**OVERVIEW**</u>

Under a common-sense reading of its plain language, OPA permits a claim for the provable loss in value to real property, even absent contact with a physical contaminant.  Subject to strict proof of causation and damages, there is no justification for treating a real-property stakeholder differently from a business stakeholder.  While common-law trespass claims and the *Robins Dry Dock* rule may require physical contamination of the claimant's business or property,

---

[1] The FIRST AMENDED B1 MASTER COMPLAINT can be found in the record as Doc. 1128.  BP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PURE STIGMA CLAIMS can be found at Doc. 6895-1.  *See also*, MOTION BY HALLIBURTON, TRANSOCEAN AND M1 [Doc. 6891-1], and Cameron's Joinder.

no such requirement appears anywhere in the OPA.   Regardless, the Rule 12 stage is too early to determine that there is no set of facts falling into this category cognizable under OPA.

This Court has dismissed state-law claims (as "preempted by maritime law") as well as general maritime law claims "that do not allege physical damage to a proprietary interest." *In re Oil Spill by the Oil Rig Deepwater Horizon*, 808 F. Supp. 2d 943, 968 (E.D. La. 2011) [Doc. 3830] ("*B1 Order*").   Accordingly, OPA provides the only potential cause of action for such claims.  (The briefs of all defendants, except BP, argue that OPA does not apply to them.[2])

Policy concerns that allowing "stigma" recovery will open the floodgate to untold numbers of speculative claims by landowners are theoretical.   Accordingly, writing a "contact" element into OPA would be inappropriate.   Beyond OPA's procedural requirements, the elements of (a) causation and (b) reasonably certain – not speculative – damages will limit recovery of diminished-value real-estate claims to those with provable losses.   No artificial bar to recovery should be constructed solely on the ground that the damaged asset is real property, rather than a business.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, the complaint must state only "a plausible claim for relief." *B1 Order,* 808 F.Supp.2d at 966. A claim is facially plausible when the facts alleged in the complaint allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   The motion should be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

---

[2] The plaintiffs agree with Halliburton, M1 and Cameron that, under OPA, they are not liable for the damages specified in §2702(b)(2)(B) (or §2702(b)(2)(E)) as they have not been deemed a "responsible party".  Plaintiffs understand that Transocean is a "responsible party" only with respect to the diesel fuel emanating from the vessel.

*Id.* "A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).   Motions to dismiss under Rule 12(b)(6) are "disfavored and rarely granted." *Barasich v. Shell Pipeline Co., LP*, CIV.A. 05-4180, 2006 WL 3913403 at *2 (E.D. La. Nov. 20, 2006) (Barbier, J.).

## <u>ARGUMENT</u>

### THE OPA CREATES A CAUSE OF ACTION FOR DIMINUTION-IN-VALUE TO REAL PROPERTY – WITH NO REQUIREMENT OF PHYSICAL CONTACT.

**I.      Section 2702(b)(2)(B) of OPA Creates a Statutory Claim for "Economic Losses" to "Real Property" Without Requiring Physical Contact.**

Under a new cause of action that OPA created, a "responsible party" is liable for "damages for injury to, or economic losses resulting from destruction of real property" to "a claimant who owns or leases that property"  33 U.S.C. §2702(b)(2)(B) (1990).  The pertinent language from the statute is as follows:

> (a) In general
>
> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.
>
> (b) Covered removal costs and damages

* * *

(2) Damages

The damages referred to in subsection (a) of this section are the following:

* * *

(B) Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

33 U.S.C. § 2701(b)(2)(B) [herein, "Subsection (B)"].[3]

The plain language of Subsection (B) appears to permit a real-property claimant to recover not just "economic losses resulting from destruction of real property," but also "damages for *injury*" only. Although Congress could easily have inserted a physical-contact element into this statutory cause of action, there is none.  Rather, the text indicates that damages are recoverable upon sufficient proof of "injury to real property."  Indeed, the statute provides for damages not only when "oil is discharged," but also when any vessel or facility merely "poses the substantial threat of a discharge." 33 U.S.C. §2701(a).  Physical contact with discharged oil is not required.

The statute does not define the word "injury."  Accordingly, courts should begin by "assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose … and must enforce the plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*,130 S. Ct. 2149, 2156 (2010) (internal quotation marks and citations omitted).  We do not usually associate the word "injury" with land.  The

---

[3] BP is correct [Doc 6895 at 10] that the B1 Master Complaint inadvertently misplaced a quotation mark in citing to this provision.  The provision is quoted accurately in the text accompanying this footnote.

word "injury" must have meaning, however, since Congress used it.  Congress is presumed not
to put meaningless words into a statute.  *United States v. Vargas-Duran*, 356 F.3d 598, 602 (5th
Cir. 2004) (noting that "[i]t is an elementary rule of statutory construction that 'the words of a
statute will be given their plain meaning absent ambiguity.' Similarly, a statute should be
construed such that no word is left without operative effect").  Likewise, courts should avoid
readings that add words into laws.  *Birdwell v. Skeen*, 983 F.2d 1332, 1339 (5th Cir. 1993)
("Where the language of a statute is clear and unambiguous, courts should not undertake to add
to or detract from its provisions . . . [a]ny such revision should be effected by legislative, not
juridical, powers").  Further, Congress took care to single out owners and lessors of real
property, granting them a new federal statutory cause of action when they could prove "injury"
to their land.  Since land does not usually undergo physical change, "injury" to land must mean
measurable loss of value.

Despite the plain language, BP argues that "injury" to land means "physical injury." [Doc
6985, at 7-8][4]  Inserting the word "physical" would limit the class of claimants to owners and
lessors of property "physically" touching the "navigable waters" or "adjoining shorelines." 33
U.S.C. §2702(a).   On BP's reading, a cognizable class would include only owners of property
(a) located on "navigable waters" (*e.g.*, drill platforms) or (b) extending down to the shoreline.
In some states, however, the shoreline is not privately held and, even then, its definition varies
according to state law.  *See, e.g., Riceland Petroleum Co. v. N. Am. Land Co., Inc.*, 869 So.2d

---

[4] The argument is somewhat inconsistent with BP's support of the proposed economic and
property damages settlement, which contemplates payouts for unrealized losses to business and property
owners in claim zones, solely upon proof of location and prior earnings or assessed value, regardless of
physical contact. *See* Joint Motion for Preliminary Approval of Economic and Property Damages
Settlement Agreement, §§ IV(C)(1)(b)(economic loss to business) and IV(C)(2)(b)(real property damage)
[Doc 6266 at 19-22.]  Likewise, the proposed settlement contemplates payouts for realized sales losses to
property owners, based on geographic location and a percentage of the selling price – regardless of actual
physical contact.  *Id.* at 22 (§IV(C)(2)(c) (realized sales losses)).

894, 896 (La. App. 3d Cir. 2004) ("the State owns the seashore"); *Kruse v. Grokap, Inc.* 349 So. 2d 788, 789 (Fla. App. 1977) (noting that "[p]rivate ownership of land in Florida bordering on navigable waters extends to the ordinary high water mark … deemed synonymous with mean high tide"); Tex. Nat. Res. Code §11.012(c) (providing that "[t]he State of Texas owns the water and the beds and shores of the Gulf of Mexico and the arms of the Gulf of Mexico within the boundaries provided in this section, including all land which is covered by the Gulf of Mexico and the arms of the Gulf of Mexico either at low tide or high tide").  Aside from drastically limiting the availability of this cause of action, it would be contrary to OPA's broad remedial purpose to accord disparate treatment to claimants based solely on differences among state real-property laws.[5]

BP's primary authority for inserting the word "physical" into the statute to modify Congress' word "injury" is *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008 (E.D. La. 1993) (Livaudais, J.) *overruled on other grounds by Reserve Mooring, Inc. v. Am. Commercial Barge Line, LLC*, 251 F.3d 1069 (5th Cir. 2001).  In that case, a division of this Court reviewed claims for business interruption caused to a drill platform when a boat crashed into it, halting drilling operations during the cleanup. The court dismissed claims for damages under Subsection (B), but allowed them under Subsection (E) (discussed below, Section III).  *Id.* at 1015 (holding that "plaintiff can recover for loss of profits . . . [g]iven the language of subsection (E)").  The court reasoned that "injury" requires something "physical." *Id.* at 1015.

---

[5] Additionally, BP's memorandum attempts to interject a "sampling" of Short Form Joinders filed with the Court.  While such examples can be cited for "illustrative" purposes (PTO 25, ¶6), these individual claims are not subject to formal Rule 12(b)(6) consideration. *See* PTO 25, §§ 5, 8 and 15. Further, this (non-random) "sampling" was hand-selected by BP's counsel. Were it appropriate to do so at this procedural stage, the plaintiffs could likewise produce Short Form Joinders buttressing our position.

The opinion then strictly interpreted the plain language of the phrasing in subsection (B) to allow economic losses to be recovered only when they "resulted from destruction." *Id*.

    The *Sekco* court wrote as follows:

> [P]laintiff has not alleged injury to personal or real property. The Court reads "injury" to mean physical injury; "injury" does not encompass economic loss because where Congress intended recovery for "loss," it specifically used that word.

*Id*.

    *Sekco*, respectfully, is not binding on this Court and should not determine this issue. To begin with, *Sekco*'s actual holding was to **grant** plaintiff's cross-motion for summary judgment "insofar as it seeks approval for maintaining a cause of action" under OPA and to deny defendants' motion for summary judgment, upon a finding that Subsection (E) – which we discuss below -- supported the OPA claim. *Id*. at 1015. Therefore, the district court's comment about Subsection (B) is *dictum*. Second, even that *dictum* is, most respectfully, brief and otherwise unsupported. Third, the court's grafting of the word "injury" into the statute is, respectfully, not consistent with maxims of statutory interpretation and subverts Congress' legislative intent that OPA be broadly remedial. *See* discussion *infra*, at 9-10. "Where the language of a statute is clear and unambiguous, courts should not undertake to add to or detract from its provisions." *Birdwell v. Skeen*, 983 F.2d 1332, 1339 (5th Cir. 1993).

    BP's citation to *Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc.*, 444 F.3d 371 (5th Cir. 2006) is likewise unpersuasive. BP cites to that decision for the parenthetical proposition that without "physical damage" Subsection (B) claims are "not cognizable." [Doc 6895 at 8.] That was not *Taira Lynn*'s holding. The cargo in *Taira Lynn* discharged into the air, not the water. In *Dunham-Price Group v. Citgo Petroleum Corp.*, 2010 WL 1285446 at *2 n.6

(W.D. La. Mar. 31, 2010), Judge Minaldi commented that "[a]though OPA did not apply to the discharge of gaseous cargo, the [*Taira Lynn*] court considered it applicable for the sake of argument."  In that "sake of argument" discussion, the *Taira Lynn* court concluded, in that case, on those facts, that no physical property had actually been injured or damaged. *See Taira Lynn,* 444 F.3d at 380-81.[6]  Accordingly, *Taira Lynn* does not apply to the issue presented.

Next, claiming an "analogous statutory context," BP relies on a footnote to a Tenth Circuit decision, *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1141 n. 12 (10th Cir. 2010), involving plutonium contamination under the Price-Anderson Act (PAA).  First, that case did not construe the phrase "***injury*** to … property;" rather, it interpreted the phase "***damage*** to property."  *Id*. at 111.  (Indeed, the footnote to which BP cites attaches to the following text:  "In order to prove plutonium-related 'damage to property,' Plaintiffs must necessarily establish that plutonium particles released from Rocky Flats caused a detectable level of ***actual damage*** to the class properties."  *Id*. (emphasis added).  Different word, different context, different meaning. Second, the Price-Anderson Act arises under a radically different historical background and is borne of a completely different expressed legislative intent.  Indeed, the Tenth Circuit took great pains to explain the PAA's historical background.  *Id*. at 1135-37, 1143-44.  Third, the Tenth Circuit (like the Fifth in *Taira Lynn*), allowed the claims to survive under a different clause of the statute ("loss of use of property").  *Id*. at 1141-42.  Under that clause, *Cook* permitted the claims for "loss" of an "otherwise appropriate use" upon a showing that the property was merely "affected" – without any physical contact or invasion whatsoever.  *Id.* ("In short, where the evidence indicates that the property has been affected by the radioactive material to such an

_____

[6] The Court does not seem to have addressed in *Taira Lynn* the viability of a claim under 33 U.S.C. §2702(b)(2)(E).

8

extent that an otherwise appropriate use of the property is lost, a plaintiff has established the threshold injury element of his PAA claim").  *Cook* hardly supports BP's argument.

BP's invitation to review cases arising in an "analogous statutory context" would necessarily include those arising in the more closely analogous statutory context of *Slaven v. BP America, Inc*., 786 F. Supp. 853, 858 (C.D. Cal. 1992), a case interpreting the Trans-Alaska Pipeline Authorization Act (TAPAA), 43 U.S.C. §§1651-1655.  *See generally, B1 Order,* 808 F.Supp.2d at 958 (noting, in interpreting the OPA, that "Congress was apparently moved by the experience of the Alaskan claimants whose actual losses were not recoverable under existing law").  In *BP America*, the district court found that TAPAA allowed recovery of purely economic losses, rejecting BP's argument that "economic damages without physical injury are too remote to be considered proximately caused by the defendant's actions."  *Id*. (holding that "the bright-line rule of *Robins* is not a necessary component of the proximate cause concept"). The court concluded that "[t]he plain language … indicates that it was intended to set aside, for the purposes of liability and recovery [under TAPAA] all other laws limiting liability or recovery." *Id*. The court dismissed BP's argument that increasing the pool of claimants would frustrate Congress' intent since the funds available to compensate victims would be quickly depleted.  *Id*.  Relying on legislative history very closely analogous to OPA's, the court explained:

> Both the text of the statute and the legislative history suggest that Congress wanted to provide for better relief for those who suffer as a consequence of oil spills. There is no indication that the improvements were intended to benefit only those who were currently entitled to some relief and not to provide relief to additional parties. Rather, the huge increase in the size of the pool over what was available before suggests that Congress may well have been intending to increase both the number of claimants and the recovery of each.

*Id.* (citations omitted). *See also, In re Glacier Bay*, 746 F. Supp. 1379, 1382 (D. Alaska 1990) (holding that physical harm was not a prerequisite for recovery of economic losses under TAPAA).

BP's consideration of the "statutory context" would be incomplete without consideration of the legislative history. OPA's legislative history supports the common-sense reading of "injury" that this memorandum advocates. Congress expressly intended OPA as a broad remedial law creating uniform causes of action for recovery of economic damages. Specifically, Congress sought to "address[] the concerns of the States to protect their shores, to clean up spill and compensate citizens for any economic damage." 135 Cong. Rec. H7892-04 (daily ed. Nov. 1, 1989) (comments of Rep. Quillen) (emphasis added). Its aim was to "ensure[] that residents of States will be fully compensated for all economic damages much faster than is possible through the State courts." *Id.* at H7894 (emphasis added). OPA's aim was to abrogate, not perpetuate, the *Robins Dry Dock* rule. *Gabarick v. Laurin Mar. Inc.*, 623 F. Supp. 2d 741, 746 (E.D. La. 2009) (Lemelle, J.) (concluding that "the plain language of the statute indicates its mandatory and exclusive nature with respect to its covered damages").

Finally, BP cites to two cases holding that physical contact is required to support state common-law claims sounding in nuisance, trespass and negligence (*Adams* and *Berry*) [Doc 6896 at 8.] The proposition is irrelevant to analysis under OPA.

II.     **Section 2702(b)(2)(E) of OPA Creates a Statutory Claim for "Lost Profits" and "Impairment of Earning Capacity" to "Real Property."**

In another applicable statutory cause of action, the OPA provides that a "responsible party" is liable to "any claimant" for damages, equal to the "loss of profits" or "impairment of earning capacity" due to "the injury . . . or loss of real property."  33 U.S.C. §2702 (b)(2)(E) (1990) ["Subsection (E)"].  The pertinent language from the statute is as follows:

> (a) In general
>
> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.
>
> (b) Covered removal costs and damages
>
> * * *
>
> (2) Damages
>
> The damages referred to in subsection (a) of this section are the following:
>
> * * *
>
> (E) Profits and earning capacity
>
> Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

33 U.S.C. § 2701(b)(2)(E) (herein, "Subsection (E)").

The provision plainly states that "loss of profits" and "impairment of earnings capacity" are damages that "shall be recoverable by any claimant."  The language is broad.

BP makes two arguments against the application of Subsection (E).  First, BP argues that property owners are different from business owners because their asset (land) does not have "earning capacity" or "profits."  Second, BP argues in the alternative that any "loss of profits" or "impairment of earning capacity" that a landholder could claim, was not caused by the oil spill, but by "consumer reaction" to the spill.  As discussed immediately below, both arguments are unavailing.

### A.  Lost Profits and Impaired Earnings Capacity are Recoverable.

Like the word "injury" used in Subsection (B), the plain meaning of "loss of profits" and "impairment of earnings capacity" in the context of land must allow for recovering loss of its value.  The courts have broadly construed Subsection (E) to allow business owners to establish lost profits and impairment of earnings "capacity" – subject to proof of causation and damages.  Property holders should not be held to a higher standard.[7]

---

[7] "Earning capacity" has long been recognized as an inherent characteristic of real property.  *See, e.g.,* Seligman, Edwin R.A., *"The Taxation of Corporations, II",* Political Science Quarterly, Vol. 5 No. 3, 438-467 (Sept. 1890) ("For no one would assert that the original cost of corporate property bears any necessary relation to the present value, much less to its earning capacity. … Clearly a method of taxation which in such large classes of cases bears absolutely no proportion to the earning capacity or productiveness of the property cannot be defended.");  Evers, Cecil Calvert, The Commercial Problem in Buildings, p. vi  (New York, 1914)("[T]he ultimate test of the value of a building is its earning capacity . . .");  Chapman, Herman Haupt, Forest Valuation, p. 44  (New York, 1915)("Sale value depends directly upon the demonstrated ability of property to earn income.");  Pond, Oscar L.,  *"The Taxation of Corporations,"* The Yale Law Journal, Vol. 24 No. 5, 381-390 (March 1915)("With the more complex industrial development of advanced civilization property becomes more varied in form and appearance as well as in its earning capacity . . ."; North Carolina Board of State Tax Commissioner, Report of the Corporation Commission as a Board of State Tax Commissioners: 1918 (Raleigh, 1919)("The general property tax depends first upon an appraisal.  The appraisal of value must be made with respect to its earning capacity" );  Wooley, Cherokee W., *"Regulation of Real Estate Appraisers and Appraisals:  The Effects of FIRREA,"* 43 Emory Law Journal 357 (1994)("This approach is commonly used to value commercial property, the worth of which is based on its earning capacity.");  *Rainbow Apartments v. Illinois Property Tax Appeal Board*, 762 N.E. 2d 534 (Ill. App. 2001) ("A property's income-earning capacity is the most significant element in arriving at its fair cash value for assessment purposes.").  Further, the right to use property to earn income is well recognized as one of many rights. i.e., the "bundle of rights," associated with property.  *See e.g.,* Simons, Robert A., When Bad Things Happen to Good Property (2006) (property rights include the rights to use, enjoy, control, and dispose of the property).

12

Logic compels this result.   A seasonal lessor of a beachfront home, for example, is someone making a business from real property.   She is clearly entitled to compensation for lost rents under the plain language of Subsection (E).   It would be illogical, however, to compensate that person under OPA but deny compensation for provable impairment of earnings "capacity" to her next-door neighbor who lives in, but does not rent out her home.   Also incongruous is a rule that would compensate the homeowner who sold her home for a depressed price after the spill (and lost "profits"), but does not compensate her next-door neighbor who, for whatever reason did not (or could not) sell her home.

The notion that earnings "capacity" attaches only to businesses, but not to property stakeholders likewise makes too fine a distinction.   OPA clearly compensates the sundries shop located across from a contaminated public beach for its lost profits.   The homeowner to the left who rents to tourists, or the homeowner to the right who does not, should not be deprived of the opportunity to plead an OPA claim – as long as each can prove damages to a reasonable certainty.

Because events or actions which impinge upon property rights may make the property less useful to the property's owner, as well as to future owners in a potential sales transaction, appraisers have developed valuation methodologies which take impairments into account. Specifically, the income approach, one of three methods commonly used by appraisers,[8] values property based on its ability to generate profits for its owners, that is, in terms of the property's earning capacity.

The First Circuit recognizes decrease in value of a business to potential buyers as compensable under Subsection (E).   The same logic should apply with equal force to the value of

---

[8] The other two approaches are known as the cost approach and the sales comparison approach.

a piece of land.  In *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 66-67 (1st Cir. 2000) the First Circuit affirmed a jury award for a marina's lost profits under OPA. *Id.* The decision likewise affirmed the district court's vacatur of an award for goodwill, but only because the evidence at trial was insufficient.  *Id.* at 67.  Importantly, the circuit court approved the concept of stigma damages, noting:

> Certainly, a bad reputation which lingers even after South Port repairs its damages could affect its expected earnings.  This loss could be calculated by discounting the estimated loss of future revenues to present value, or, alternatively, by ***assessing the decrease in value of the business to potential buyers*** after the spill repairs.

*Id*. (emphasis added).  The First Circuit made a similar finding with respect to the marina's claim for "business stress."  Although finding insufficient evidence to prove it, the court expressly found the theory "plausible":

> Like goodwill loss, this claim involved a form of the loss in the value of the business:  the reduction in the value of the business due to the bank loan default and the risk that the workout plan may not succeed. Although this is a plausible claim for recovery, [the marina's witness] offered no analysis for quantifying this potential loss at $150,000. . . . A reasonable calculation of loss due to business stress might take into account general data concerning the reduced value of businesses in default or a ***specific showing that this property had declined in market value***.

*Id*. at 67–68 (emphasis added).

BP also relies on a related Coast Guard regulation, 33 C.F.R. §136.217(b), quoting an excerpt stating that "[c]ompensation for loss of use of non-commercial property is not allowable." [Doc 6895, at 13]   To begin with, the diminution-in-value (or "stigma") we have pled is not "loss of use" of the property during a period of time, but rather lower market price.  Regardless, BP omitted the immediately preceding paragraph of that regulation, which

specifically contemplates compensation for diminution in value, without an intervening sale. The full pertinent text of the regulation provides that:

> (a) The amount of compensation allowable for damaged property is the lesser of—
>
> > (1) Actual or estimated net cost of repairs necessary to restore the property to substantially the same condition which existed immediately before the damage;
> >
> > (2) **_The difference between value of the property before and after the damage_**; or
> >
> > (3) The replacement value.
>
> (b) Compensation for economic loss resulting from the destruction of real or personal property may be allowed in an amount equal to the reasonable costs actually incurred for use of substitute commercial property or, if substitute commercial property was not reasonably available, in an amount equal to the net economic loss which resulted from not having use of the property. When substitute commercial property was reasonably available, but not used, allowable compensation for loss of use is limited to the cost of the substitute commercial property, or the property lost, whichever is less. Compensation for loss of use of noncommercial property is not allowable.

33 C.F.R. §136.215 (emphasis added).

BP's dire predictions that allowing diminution-in-value claims will place "society on edge" and cause "endless litigation" [Doc 6895 at 18] are overblown. In the near future, there will be a relatively small number of these property damage claims for the Court to consider. First, the current Economic and Property Damages Settlement Agreement (EPDSA) does in fact address "real property damage" claims. If this settlement class is approved by the Court, the only property damage claims remaining will be those of opt-outs and claimants not covered by the settlement (*e.g.*, those located outside of the proposed geographic zones,

commercial developers).   Second, any such opt-outs and non-included claimants must first

"present" their OPA claims to the Responsible Party, BP, before filing suit under OPA.   33

U.S.C. §2713(a).   The OPA presentment requirement "is a mandatory condition precedent to

filing suit against a Responsible Party." *B1 Order*, 808 F.Supp.2d at 965.   It is reasonable to

believe that some of those additional claims will be resolved through the continuing BP claims

process.   Third, any claims not resolved through the BP claims process must still be filed within

OPA's statute of limitations.    The surviving post-settlement, non-time-barred, unresolved

property-damage claims will be known in the near future and should be greatly reduced from the

current   number,   making   any   analysis   or   handling   of   those   claims   judicially

manageable.   Moreover, these surviving claims should be susceptible to the same type of

categorization contemplated in the EPDSA (*e.g.,* by location, class of property, type of

stakeholder, size/number of parcels, etc.) allowing the Court and the parties to manage the claims

in groups.

### B.  The B1 Master Complaint Sufficiently Alleges Causation.

The B1 Master Complaint alleges a cause of action under Subsection (E), stating that

"[a]s a result of the Spill, Plaintiffs are entitled to damages pursuant to [Subsection (E)]."   B1

Master Complaint, ¶ 688 [Doc 1128.]

BP argues that this allegation fails to state a claim upon which relief can be granted

because any diminution-in-value to property was not a result of the oil spill but, rather, a result of

"consumer reaction."   On its face, this argument bristles against Rule 12.   It is a factual argument

about failure to prove causation, pitched as a truism.   Indeed, the two cases BP cites in support

arose did not arise on Rule 12 motions.   Rather, they were decisions on summary judgment

(*Taira Lynn*, *supra*) and after a bench trial (*Sekco Energy v. Chouest*, Civ. A. No. 92-0420, 1993

WL 322942 (E.D. La. Aug. 13, 1993) (Livaudais, J.) (after denial of summary judgment in *Sekco*, *supra*)).

Beyond being premature, BP's argument goes too far.  It would eliminate virtually any business claims under Subsection (E).  Lost profits and earnings capacity from oil spills are almost always caused by the inevitable and foreseeable "consumer reaction," whether it is consumers' aversion to eating oily fish and oysters, walking on oily beaches, or (as alleged here) purchasing and renting property in the vicinity.  The burden will be on the property holder to establish that the diminution in value (a) exists to a reasonable certainty and (b) was caused by the oil spill (and not the general economy or some other factor).

BP's "consumer reaction" argument is really another way of attempting to graft a physical-damage requirement into Subsection (E).  The courts and Congress are clear, however, that none exists.  *See Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc.*, 444 F.3d 371, 382  (5th Cir. 2006) ("§2702(b)(2)(E) allows a plaintiff to recover for economic losses resulting from damage to ***another's*** property") (emphasis added, citing H.R. Rep. No. 101-653 (1990) (noting that "[t]he House Conference Report makes clear that, under section 2702(b)(2)(E), [t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income")); *FGDI, LLC v. M/V Lorelay*, 193 Fed. Appx. 853 (11th Cir. 2006) (recovery by the owner of a grain elevator that the Coast Guard closed during cleanup of an oil spill from a boat); *Dunham-Price Group, LLC v. Citgo Petroleum Corp.*, No. 2:07 CV 1019, 2010 WL 1285446, *2 (W.D. La. Mar. 31, 2010) (recovery by concrete manufacturing plant several miles upriver from a spill resulting in temporary closure of waterway); *In re Settoon Towing LLC,* 2009 WL 4730969 (E.D. La. Dec. 4, 2009) (Lemmon, J.) (recovery by owner of oil-production platform that could not be accessed during cleanup of non-contiguous spill).

Indeed, the "consumer reaction" argument is the same argument BP raised in moving to dismiss the Vessels of Opportunity and Moratorium Plaintiffs from the B1 Master Complaint. In that motion to dismiss, BP alleged that:

> OPA does not apply to claims alleged by VoO Plaintiffs because their injuries occurred as a result of their participation in the VoO program, not as a result of the spill. Defendants also argue that Moratorium claims must be dismissed for failure to state an OPA claim because the imposition of the Moratorium was an intervening or superseding cause of damage that could not reasonably have been anticipated.

*B1 Order*, 808 F.Supp.2d at 965.  Although the court recognized that the VoO and Moratorium claims "are fact specific and present a more attenuated causation analysis than the other claims for economic loss," it concluded that "the VoO and Moratorium Plaintiffs have alleged sufficient facts to state plausible claims in the B1 bundle." *Id.* In reaching its conclusion this Court rejected a proximate-cause requirement:

> OPA does not expressly require "proximate cause," but rather only that the loss is "due to" or "resulting from" the oil spill. While the Court need not define the precise contours of OPA causation at this time, it is worth noting that during oral argument both counsel for BP and the PSC conceded that OPA causation may lie somewhere between traditional "proximate cause" and simple "but for" causation. *See CSX Transp., Inc. v. McBride,* ⎯⎯ U.S. ⎯⎯, 131 S.Ct. 2630, 2642–43, 180 L.Ed.2d 637 (2011) ("Congress, it is true, has written the words 'proximate cause' into a number of statutes. But when the legislative text uses less legalistic language, e.g., 'caused by,' 'occasioned by,' 'in consequence of,' . . . and the legislative purpose is to loosen constraints on recovery, there is little reason for courts to hark back to stock, judge-made proximate-cause formulations.").

*Id.*

BP's attempt to import into OPA a demanding proximate causation analysis failed in its previous motion to dismiss. Similarly to the VoO and Moratorium claims, establishing that the decline in property values was "due to" the oil spill necessitates a "highly factual analysis." *Id.* Nevertheless, through this "highly factual analysis," certain claimants will be able to establish diminution in value caused by the spill, without an intervening property sale.  Consistent with

this Court's approach to BP's previous motion to dismiss, since at least some of the claimants can establish their properties diminished in value because of the oil spill, the court need not "sort through in excess of 100,000 individual B1 claims to determine which ones should be dismissed at the current time." *B1 Order,* 808 F.Supp.2d at 965.

## Conclusion

This Court should give a common-sense reading of the plain language of OPA's damages provisions.  OPA does not contain any express limitation that any business or real property be physically contaminated as a condition to recovery for injury and lost earnings capacity.  Indeed, it would be incongruous to permit an oiled property to recover but a neighboring unoiled property to suffer without a remedy.  Whether real property not sold after the spill has actually suffered a diminution in value resulting from the spill will be an issue of proof.  There is nothing in the statute, its legislative history, common-sense or case law that completely bars such a claim.

This 10th day of August, 2012.


Respectfully submitted,


_____/s/ Stephen J. Herman_____        _____/s/ James Parkerson Roy_____
Stephen J. Herman, La. Bar No. 23129        James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN & KATZ LLC             DOMENGEAUX WRIGHT ROY
820 O'Keefe Avenue                                     & EDWARDS LLC
New Orleans, Louisiana 70113                     556 Jefferson Street, Suite 500
Telephone: (504) 581-4892                          Lafayette, Louisiana 70501
Fax No. (504) 569-6024                              Telephone: (337) 233-3033
E-Mail: sherman@hhkc.com                         Fax No. (337) 233-2796
*Plaintiffs' Liaison Counsel*                          E-Mail: jimr@wrightroy.com
                                                                    *Plaintiffs' Liaison Counsel*

*On Brief*

MICHAEL TEIN
JIM MCKENZIE
FRANK PETOSA
JEFF FRIEDMAN
ANTHONY IRPINO
MATT CONN
JULIET EDMONSON
GARY DAVIS
GARY MASON
DENNIS REICH
BRUCE KINGSDORF


## PLAINTIFFS' STEERING COMMITTEE

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:  (843) 216-9159
Telefax: (843) 216-9290
E-Mail:  jrice@motleyrice.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA 70360
Office:  (985) 876-7595
Telefax: (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 10th day of August, 2012.

/s/   Stephen J. Herman and James Parkerson Roy