# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re:  Oil Spill by the Oil Rig "Deepwater** | * | |
| **Horizon" in the Gulf of Mexico,** | * | **MDL No. 2179** |
| **on April 20, 2010** | * | |
| | * | **Section: J** |
| This Pleading applies to: | * | |
| | * | **Judge Barbier** |
| *B1 Master Complaint* | * | |
| | * | **Magistrate Judge Shushan** |
| *Tobatex v. BP,* No. 10-4573 | * | |

---------------------------------------------------------------------------------------------------------------

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS BP DEALER CLAIMS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iv

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**LAW AND ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   The BP Dealer Claims State a Claim for Relief Under OPA. . . . . . . . . 4

A.   *OPA Supplants the* Robins Dry Dock *Rule*. . . . . . . . . . . . . . . . . 4

B.   **The OPA causation standard is substantially less than**
**common law proximate cause.**. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C.   *The BP Dealers' claims meet the "result from" and*
*"due to" OPA causation standard.*. . . . . . . . . . . . . . . . . . . . . . 8

1.   *Gulf Coast BP Dealers' and Southeastern U.S. BP*
*Dealers' claims meet the causation standard under*
*subsection 2702(a) and 2702(b)(2)(E).*. . . . . . . . . . . . . . . . 8

2.   *All BP Dealers' claims meet the causation standard*
*under subsection 2702(a) and 2702(b)(2)(B).*. . . . . . . . . . . 11

III.   BP Defendants have introduced facts not in the pleadings,
which entitles plaintiffs to introduce affidavit evidence.. . . . . . . . . . . 13

IV.   The causal issues of the BP Dealers' claims are questions of fact
which preclude disposal by Pre-trial Motion for Dismissal.. . . . . . . .  13

A.   *Gulf Coast BP Dealers Claims*. . . . . . . . . . . . . . . . . . . . . . . . . 15

B.   *Claims of BP Dealers Located in the*
*Southeastern United States*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.   *Claims of All Other BP Dealers*. . . . . . . . . . . . . . . . . . . . . . . . . 18

V.   The BP Dealer Claimants concede that claims against non-responsible
parties are precluded by the *Robins Dry Dock* rule.. . . . . . . . . . . . . . 20

**CONCLUSION** . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

*CSX Transp. Inc. v. McBride,*
    131 S.Ct. 2630 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Matrixx Initiatives, Inc. v. Siracusano,*
    131 S. Ct. 1309 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Robins Dry Dock & Repair Co. v. Flint,*
    275 U.S. 303 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Adkins v. Trans-Alaska Pipeline Liability Fund,*
    101 F.3d 86 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ballard Shipping Co. v. Beach Shellfish,*
    32 F.3d 623 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

*Benefiel v. Exxon Corp.,*
    959 F.2d 805 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12

*Gordon v. Niagara Mach. & Tool Works,*
    574 F.2d 1182 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 20

*Graehling v. Vill. of Lombard, Ill.,*
    58 F.3d 295 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

*In re Exxon Valdez,*
    270 F.3d 1215 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.,*
    847 F.2d 186 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Louisiana ex rel. Guste v. M/V TESTBANK,*
    752 F.2d 1019 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

*Oppenheimer v. Prudential Sec., Inc.*,
    94 F.3d 189 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*,
    975 F.2d 1134 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Test Masters Educ. Services, Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ward v. Hudnell*,
    366 F.2d 247 (5th Cir.1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Barr Laboratories, Inc. v. Quantum Pharmics, Inc.*,
    827 F.Supp. 111 (E.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Contra Sekco Energy, Inc. v. M/V MARGARET CHOUEST*,
    820 F. Supp. 1008 (E.D. La. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Settoon Towing LLC*,
    No. 07-1263, 2009 WL 4730969 (E.D. La. Dec. 4, 2009). . . . . . . . . . . . . . . . . . . 4

*Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*,
    No. 92-2379, 1993 WL 155503 (N.D. Ill. 1993). . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES**

33 U.S.C.A. § 2702    .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

33 U.S.C.A. § 2704    .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FRCP Rule 12(b)(6)    .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

FRCP Rule 56    .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Oil Pollution Act of 1990, 33 U.S.C.A. § 2701 *et. seq*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**OTHER AUTHORITIES**

*BP Moving Brand Forward*, CSP DAILY NEWS (Oct. 29, 2010). . . . . . . . . . . . . . . . . . . . . 19

Carole Donoghue, *Jobbers say BP's Bailout Offer Won't Cover Losses*,
    33 OIL EXPRESS, July 5, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Emerald Coast Convention & Visitors Bureau, Inc.,
    2010 Tourism Statistics 7 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Tom Kloza, *BP Will End Rebate, But Give Some Jobbers* Cash,
33 Oɪʟ Express, Aug. 9, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wᴀʟᴛᴇʀ J. Kʟᴀɢᴇs, Pʜ. D., 2008-2009 Vɪsɪᴛᴏʀ Pʀᴏғɪʟᴇ, Aʟᴀʙᴀᴍᴀ Gᴜʟғ
Cᴏᴀsᴛ Cᴏɴᴠᴇɴᴛɪᴏɴ & Vɪsɪᴛᴏʀs Bᴜʀᴇᴀᴜ 1
(Ala. Gulf Coast Conv. & Vis. Bureau, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wᴀʟᴛᴇʀ J. Kʟᴀɢᴇs, Pʜ. D., 2009-2010 Vɪsɪᴛᴏʀ Pʀᴏғɪʟᴇ, Aʟᴀʙᴀᴍᴀ Gᴜʟғ
Cᴏᴀsᴛ Cᴏɴᴠᴇɴᴛɪᴏɴ & Vɪsɪᴛᴏʀs Bᴜʀᴇᴀᴜ 1
(Ala. Gulf Coast Conv. & Vis. Bureau, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Plaintiffs respectfully submit the following Memorandum in response to Motions to Dismiss filed by BPXP, BP America Production Company, and BP p.l.c. (collectively "BP");[1] Halliburton Energy Services, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., and M-I L.L.C.;[2] and Cameron International Corporation.[3]

**MAY IT PLEASE THE COURT:**

As an initial matter, and with apologizes to the Court, Plaintiffs respectfully suggest that BP's Motion, as framed, is not appropriate for Rule 12 consideration at this time. Undersigned counsel understood, when BP made the suggestion that a motion would be appropriate, that BP sought to assert a contractual defense that was unique to BP dealers, as distinguished from Exxon dealers, or Chevron dealers, or other similarly situated businesses affected by the significant drop in tourism (and/or adverse effects upon the seafood industry and/or the offshore oil and gas industry and/or other industries) as a result of the spill.[4]

The motion filed by BP, however, is premised solely on the argument that there exists no cause of action against BP dealers under OPA (or general maritime law) [Doc 6893-1]. While both BP and the Court have framed the BP Dealers' cause of action in terms of "'animosity, hatred and ill will by the consuming public toward the BP name and logo' allegedly caused by the oil spill and allegedly resulting in a 'decrease in purchases of motor fuel and other consumer products'" [*see* Doc 6657, at 2], a dismissal of all BP dealer claims covered by the B1 Master Complaint would sweep in claims by BP gas stations in, say, Venice, Louisiana, or Gulf Shores, Alabama, or Destin, Florida, that were affected by the spill in the same way as other service stations and convenience stores along

---

[1] Rec. Doc. 6893.

[2] Rec. Doc. 6892.

[3] Rec. Doc. 6899.

[4] Upon closer examination of BP's *in camera* Chambers Submission from May, we now see that BP did refer to "remoteness and lack of causation" as the basis for the proposed motion. We apologize to BP and the Court.

the Gulf Coast.

Plaintiffs do not believe that BP can't "split" the claim for loss of profits as a result of damage to its goodwill and loss of profits as a result of damage to the tourism industry, in a single Rule 12 motion that seeks to dismiss all claims by entities that market BP-branded fuel.  Unlike, for example, a unique contractual defense that would apply across-the-board to all entities that were parties to the contract, this question would be highly fact-intensive and plaintiff-specific.

A Rule 12 motion, in this regard, would not seem to be an appropriate vehicle for making an across-the-board determination as to OPA causation – "necessarily a highly factual analysis" [5] – with respect to the BP jobber in Alaska, the BP wholesaler in Georgia, the BP service station in Biloxi, and the BP dealer in Tampa, all in the same motion, as a mater of law.

Nevertheless, and turning to the merits, the Oil Pollution Act of 1990 ("OPA") allows for the recovery of economic losses resulting from an oil spill incident due to the injury, destruction, or loss of real property, personal property, or natural resources, even where the claimant does not have a proprietary interest in same.  OPA thereby supplants the rule of *Robins Dry Dock*[6] and its progeny.  Further, OPA sets forth a causation standard which is substantially less than that of traditional common law "proximate cause".[7]  The allegations of the First Amended Master Complaint[8] and reasonable inferences arising therefrom satisfy the causation standard set forth in OPA and state a plausible entitlement to relief.

The PSC agrees that general maritime negligence claims against parties that have not been designated as "responsible parties" under OPA are precluded by *Robins Dry Dock* and its progeny.

---

[5] ORDER AND REASONS (8/26/2011) [Doc 3830], p.33.

[6] *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1927).

[7] *See generally* OPPOSITION TO B1 MOTIONS TO DISMISS [Doc 1821], pp.63-74; SUPPLEMENT TO OPPOSITIONS TO B1 MOTIONS TO DISMISS [Doc 2400] (and Exhibit A attached thereto); LETTER TO HON. CARL J. BARBIER, June 23, 2011 (re *CSX v. McBride*); and ORDER AND REASONS (8/26/2011) [Doc 3830], pp.32-33.

[8] Rec. Doc. 1128.

## LAW AND ARGUMENT

### I.    Legal Standard.

When considering a motion to dismiss, the allegations contained in a plaintiff's complaint are to be taken as true. *Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 194 (5th Cir. 1996).  The court should determine only whether plaintiffs are entitled to offer evidence in support of their claims. *See Bell Atl. corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "A motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'"  *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992) (quoting *Ward v. Hudnell*, 366 F.2d 247, 249 (5th Cir.1966)).  "Motions to dismiss are viewed with disfavor and are rarely granted. In deciding a motion to dismiss under Rule 12(b)(6), the district court accepts as true those well-pleaded factual allegations in the complaint." *Test Masters Educ. Services, Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005) (internal citations omitted).  A "well-pleaded" complaint is one that states a "plausible entitlement to relief" "on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1312 (2011), the Supreme Court applied *Twombly* and *Iqbal*, reaffirming that there are no "bright line" pleading requirements under *Twombly/Iqbal*, and that the functional test is whether the complaint, taken as a whole, raises "a reasonable expectation that discovery will reveal evidence" that could enable the ultimate trier of fact, weighing contested evidence and opinions and making the allowable inferences, to decide the case for plaintiffs.  A question of fact, or mixed question of law and fact, precludes dismissal on a Rule 12(b)(6) Motion for Dismissal for Failure to State a Claim. *See Graehling v. Vill. of Lombard, Ill.*, 58 F.3d 295, 298 (7th Cir. 1995) ("[T]he plaintiff is entitled to the benefit of all inferences . . . at this early stage.").  *Iqbal* qualifies this rule to

"reasonable inferences" arising from well-pleaded allegations. *See Iqbal*, 556 U.S. at 678.

## II.     The BP Dealer Claims State a Claim for Relief Under OPA.

### A.     *OPA Supplants the* Robins Dry Dock *Rule.*

*Robins Dry Dock* precludes recovery for purely economic damages in maritime law cases because it requires physical damage to a proprietary interest of the claimant.  *See Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1022 (5th Cir. 1985). OPA expressly creates a cause of action to recover damages which "result from" discharge of oil into navigable waters, shorelines, or the exclusive economic zone. 33 U.S.C.A. § 2702(a). Specifically:

> [n]otwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C.A. §2702(a).  Recovery is allowed for purely economic damages "due to the injury, destruction, or loss of real property, personal property, or natural resources . . . recoverable by *any claimant*." 33 U.S.C.A. § 2702(b)(2)(E) (emphasis added); *see also Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 630–31 (1st Cir. 1994) ("[W]e think that the [Oil Pollution Act] is compelling evidence that Congress does not view either the expansion of liability to cover purely economic losses or enactment of comparable state pollution regimes as an excessive burden on maritime commerce."); *In re Settoon Towing LLC*, No. 07-1263, 2009 WL 4730969 (E.D. La. Dec. 4, 2009) ("However, the OPA damages provision preempts the general maritime law [of *Robins Dry Dock* and its progeny]").

The extension of a cause of action to "any claimant" negates the application of the *Robins Dry Dock* rule which would require a proprietary interest in physically damaged property as a prerequisite to recovery.  BP Dealer claimants assert causes of action under subsection 2702(b)(2)(E) which makes no requirement of a proprietary interest in the injured or destroyed

property.[9]

Subsection 2702(b)(2)(B) codifies a cause of action to recover damages for injury to or economic loss resulting from destruction of real or personal property owned or leased by the claimants. 33 U.S.C.A. § 2702(b)(2)(B).  BP Dealer claimants also assert causes of action under subsection 2702(b)(2)(B) for injury to personal property to which a proprietary interest is alleged. B1 Complaint, ¶¶ 625, 688; Complaint in No. 2:12-cv-00094 (hereinafter "S. Trout Complaint," attached hereto as Exhibit C), ¶¶ IX, XV–XVI.  Nothing in the text of subsection 2702(b)(2)(B) requires a physical harm to a *tangible* property interest. *See* 33 U.S.C.A. § 2702(b)(2)(B). Instead, the subsection refers to "injury to, or economic losses resulting from destruction of, real or personal property, . . ." *Id.*  The word "physical" or "tangible" is missing. *Contra Sekco Energy, Inc. v. M/V MARGARET CHOUEST*, 820 F. Supp. 1008, 1015 (E.D. La. 1993)  But this Court is obligated to make the reasonable inference that the BP Dealers' property interests in the BP brand are also indelibly tied to the real property which they own, and upon which they operate by means of restrictive covenants. *See* S. Trout Complaint, ¶ IX.  The value of real property arises from the use to which one puts it, and when a plaintiff is restricted to but one use, and the value of that use is injured or destroyed, it is analogous to physical damage to that property; it is useless either way. Here, where the damage was caused by the same person who is responsible for promotion of the value (by way of maintaining the integrity of the brand in the mind of the public) and the restrictions, it is just to make that responsible party compensate the plaintiff for the destruction of the value.  The BP Dealers have a property interest in personal property which was destroyed (or at least damaged) by the oil spill—namely their rights to use and profit from marketing the BP brand and franchises associated therewith.  *See* S. Trout Complaint, ¶ IX.

---

[9] Rec. Doc. 1128 (First Amended B1 Master Complaint (hereinafter "B1 Complaint," attached hereto as Exhibit A)), ¶¶ 104–06, 118–22, 165, 490–91, 535–39, 625, 688; Complaint in No. 2:10-cv-04573 (hereinafter "Tobatex Complaint," attached hereto as Exhibit B), ¶¶ 34–35.

### B.   *The OPA causation standard is substantially less than common law proximate cause.*

In section 1332, Congress used phrases such as "result from,"[10] "resulting from"[11] and "due to"[12] in what appears to be the causation standard under which OPA claimants must prove their claims.  The causation standard is a relaxed proximate cause standard similar to that applied in FELA cases ("that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  *CSX Transp. Inc. v. McBride*, 131 S.Ct. 2630, 2636 (2011)).

Formulations for proximate cause are many, including those that call for a showing that an "injury resulted from the wrongful conduct in a way that was natural, probable and foreseeable," *id.* at 2642, or proof that the conduct was a "substantial factor in bringing about harm[,]" *see Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir. 1992).

> Congress, it is true, has written the words 'proximate cause' into any number of statutes. But when the legislative text uses less legalistic language, *e.g.*, 'caused by,' 'occasioned by,' 'in consequence of,' or as in FELA, 'resulting in whole or in part from,' and the legislative purpose is to loosen constraints on recovery, there is little reason for courts to hark back to stock, judge-made proximate-cause formulations.

*McBride*, 131 S.Ct. at 2642–43. Like FELA, OPA was passed in accord with Congress's wishes to "loosen the constraints on recovery." *See In re Exxon Valdez*, 270 F.3d 1215, 1252 (9th Cir. 2001); *Ballard*, 32 F.3d at 631 (discussing OPA as "compelling evidence that Congress does not view . . . expansion of liability to cover purely economic losses . . . as an excessive burden on maritime commerce."). Also as in FELA, Congress used "less legalistic language," such as "result from," "resulting from," and "due to." 33 U.S.C.A. § 2702.

OPA expressly calls for the application of proximate cause when courts determine whether

---

[10] 33 U.S.C.A. § 2702(a).

[11] 33 U.S.C.A. § 2702(b)(B).

[12] 33 U.S.C.A. § 2702(b)(E).

to apply the statutory cap on claimants' recoveries.[13] "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Subsections 2702 and 2704 are of course necessarily formulaically different—they address different contexts of foreseeability—but they both address foreseeability, the extent of that necessary to establish causation on one hand, or the non-application of a damages cap on the other. These are compatible formulations. Congress knew how to use the words "proximate cause," and under *Russello*, this Court should find that Congress intentionally chose not to apply the standard in subsection 2702(b).

The language expressing the FELA causation standard is "resulting in whole or in part from [carrier] negligence." *McBride*, 131 S.Ct. at 2643. The OPA standard seems to stem from either the "resulting from" language in subsection 2702(a) or the "due to" language in subsection 2702(b)(2)(E), or from both together. Even application of both phrases together (as in "resulting from and due to") suggests something less than the traditional proximate cause framework of "a demonstration that the plaintiff's injury resulted from the wrongful conduct in a way that was natural, probable, and foreseeable." *Id.* At 2642 (quoting from petitioner CSX Transp. Inc.'s formulation of proximate cause, which was rejected by the Court for application in FELA cases).

A looser standard of causation than that of traditional proximate cause would not create the "infinite liability" to which movants allude. *See* Rec. Doc. 6893-1 (BP's Memorandum in Support of Motion to Dismiss BP Dealer Claims (hereinafter "BP Memorandum")), p.10. The pragmatic limitation on recovery applied in *Robins Dry Dock* as recognized in *M/V TESTBANK* was nothing new, but designed to limit the "indirect economic repercussions of negligence [which] may be far wider [than physical consequences], indeed virtually open-ended." *Louisiana ex rel. Guste v. M/V*

---

[13] "Subsection (a) of this section does not apply if the incident was proximately caused by-- . . . " 33 U.S.C.A. § 2704(c)(1).

*TESTBANK*, 752 F.2d 1019, 1022 (5th Cir. 1985).  This concern for open-ended repercussions is limited by the factual circumstances of this case which make the BP Dealers' losses foreseeable.

>    **C.**    ***The BP Dealers' claims meet the "result from" and "due to" OPA causation standard.***

BP argues, incorrectly, that plaintiffs' claims are limited to those asserting loss because consumers chose not to purchase BP gas because of "animosity" toward BP.  This is but part of plaintiffs' argument; in fact, plaintiffs' argument is two-fold.  Plaintiffs' first contention is that BP Dealers in the Gulf and Southeastern States lost revenue as a direct result of the decline in tourism caused by the damage of the oil spill.  This loss is clearly compensable under OPA and, indeed, thousands of non-BP gas stations in and around the Gulf have and will receive financial compensation under the settlement for just such a loss.  Plaintiffs' second contention is that the BP brand (which they have rights to use) was injured by the damage of the oil spill, causing them economic losses.

>    **1.**    ***Gulf Coast BP Dealers' and Southeastern U.S. BP Dealers' claims meet the causation standard under subsection 2702(a) and 2702(b)(2)(E).***

The oil spill resulted in widespread damage to natural resources and property in the Gulf Coast states.  *See generally* B1 Complaint.  As a result of the oil spill and its direct harm to these resources, the Gulf Coast suffered a decline in tourism.  *See, e.g.*: B1 Complaint, ¶¶ 104–06, 118–22, 165, 490–91, 535–39, 625, 688. OPA allows recovery for "loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C.A. §2702(b)(2)(E). The allegations and declarations of the BP Dealers clearly satisfy the "result from" and "due to" causation standard discussed *supra*.

BP Dealers have alleged causation of economic losses arising from the decline in tourism (due to the injury, destruction or loss of real property, personal property, or natural resources). B1

Complaint, ¶¶ 104–06, 118–22, 165, 490–91, 535–39, 625, 688; Tobatex Complaint, ¶¶ 34–35. These are not the type of allegations that have no "reasonably founded hope that the [discovery] process will reveal relevant evidence to support the claim." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). The allegations themselves cite numerous studies and authorities showing the availability of evidence of causation. For example:

> The Spill has not only had a potentially severe impact on fisheries in the Gulf, but it has also dealt a devastating blow to tourism in the region and the individuals and businesses that ordinarily thrive on tourism and tourism-related business, which accounts for about 46 percent of the Gulf Coast economy. The Spill will result in about $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association.

B1 Complaint, ¶118; *see also id.* at ¶¶ 121–22. These allegations clearly show that the discovery process will reveal relevant evidence of causation, and that it will support the Gulf Coast BP Dealers' claims under subsection 2702(b)(2)(E).

The BP defendants have not argued in their Memorandum in Support of their Motion to Dismiss that such economic losses are not "due to the injury, destruction, or loss of real property, personal property, or natural resources." In fact, the BP defendants failed to address the BP Dealers' claims under subsection 2702(b)(2)(E) at all, despite this Court's order to "file any motions and briefs regarding the legal viability (under OPA or any other legal theory) . . . ."

It is only natural and probable that an area dependent on tourism will be shunned by tourists when its natural resources and beach properties are polluted by a devastating oil spill.  Businesses that depend on those tourists will suffer economic losses when the tourist trade dries up.  Surely these economic losses are foreseeable and thus fall within the "result from" and "due to" rubric of 33 U.S.C.A. §2702.

This Court is not dealing here with consumer choices as to where to buy gasoline in Montana—at a BP or a Shell station. The issue here is whether oil washing up on the white sand beaches of Alabama and the marshes of Louisiana led to potential tourists cancelling their trips to

the Gulf Coast . . . stopping for BP gas along the way and buying snacks for their kids at the attached convenience stores.  *See* B1 Complaint, ¶¶ 104–06, 118–22, 165, 490–91, 535–39, 625, 688.

Second, foreseeability is satisfied by the BP Dealers' close contractual relationship with BP, their rights to market and use the BP brand, and dependence on the brand. Many BP Dealer claimants were prevented from rebranding their dealerships to avoid their economic losses by restrictive covenants applicable to the real property upon which their dealerships stand.  *See* S. Trout Complaint, ¶ IX; Tobatex Complaint, ¶¶ 14, 23-26 (and reasonable inferences arising therefrom). The relationship places the BP Dealers' damages squarely in the sights of foreseeability, and should ease any fears of "infinite liability" asserted by the BP Defendants.

*Adkins v. Trans-Alaska Pipeline Liability Fund*, 101 F.3d 86 (9th Cir. 1996), upon which the BP defendants rely, is not dispositive, dealing as it did with the TAPAA and not OPA, and further with review of a case in a different procedural posture (reviewing findings of fact made by the Trans-Alaska Pipeline Liability Fund, rather than consideration of a Motion to Dismiss). *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.*, 827 F.Supp. 111 (E.D.N.Y. 1993) and *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, No. 92-2379, 1993 WL 155503 (N.D. Ill. 1993) (unreported opinion) were RICO cases applying traditional common law proximate cause analysis. *Barr Laboratories* found proximate cause was not established due to the independent decisions of potential customers to buy products belonging to the defendant or other of the plaintiff's competitors. 827 F.Supp. at 116. Here, the losses were caused by harm to natural resources and property and an easily foreseeable decline in tourism. *Israel Travel Advisory Service* based a finding of lack of proximate cause on the idea that to allow recovery for economic damages resulting from third-party customers fraudulently lured to the defendant "would 'go beyond the first step.'" 1993 WL 155503 at *3. But the cause of action based on subsection 2702(b)(2)(E) is not really a question of intervening customer choices between competitors, but whether harm to natural resources and property caused economic damages to an array of commercial businesses in the area, regardless of

whether they are in competition.

> **2.** ***All BP Dealers' claims meet the causation standard under subsection 2702(a) and 2702(b)(2)(B).***

The BP dealer claimants (irrespective of their geographic locations) have also alleged economic losses caused by injury to the BP Brand cognizable under subsection 2702(b)(2)(B) ("Damages for injury to, or economic losses resulting from destruction of real or personal property, which shall be recoverable by a claimant who owns or leases that property"). B1 Complaint, ¶¶ 625, 688; *see also* S. Trout Complaint, ¶¶ IX, XV–XVI. The BP Dealers' damages are both foreseeable and arise as the direct result of the film of the oil spill staining the BP brand, which itself is the direct and foreseeable result of the extensive damage it is liable for as Responsible Party for the oil spill to "the Gulf of Mexico, all marine life therein, the coast line of several states, . . . , and the tourism of the . . . Gulf Coast, including but not limited to the economy of the . . . Gulf Coast and its residents." S. Trout Complaint, ¶ VI.  As franchisors or licensors, BP owed a duty to the BP Dealers under its branding agreements to protect the BP brand. Unlike cases such as *Robins Dry Dock* and *M/V TESTBANK*, which decried holding a tortfeasor liable in the context of a claimant with only a contractual relationship with the victim, *see M/V TESTBANK*, 752 F.2d at 1022, here this Court is faced with circumstances where claimants have a contractual relationship with the *tortfeasor*.  The close contractual relationship and duty between BP and the BP Dealers is especially indicative that the BP Dealers' economic losses are foreseeable, satisfying the "resulting from" and "due to" OPA causation requirement.

"Due to the oil spill and the resulting unacceptable handling of the disastrous situation, public opinion turned against the brand name of BP. Plaintiff lost business, revenue, and income due to the branding of its gas station" S. Trout Complaint, ¶ IX. But for the magnitude of the oil spill and the resulting extensive damage to natural resources and property, the BP Brand would not have been injured. If the oil spill had been only minor and oil not reached the coast or harmed sea life, then a

few protests arranged by environmental activists would have had little effect on the BP brand—it was the massive oil contamination and damage that caused public outrage and harm to the BP brand. The oil spill and its environmental harm was not only a disaster for the environment and the people of the Gulf Coast—it was a foreseeable public relations disaster for BP's brands.

The alleged circumstances are the opposite of those in *Benefiel v. Exxon Corp.*, 959 F.2d 805 (9th Cir. 1992) cited by movants.  In *Benefiel*, plaintiffs sought "to represent a class of those who purchased gasoline in California during a specified period following the [*Exxon Valdez*] spill." *Id.* at 806.  They sought "to recover damages representing what they claim[ed] was the increased price they were required to pay as a result of the spill." *Id.*  *Benefiel* interpreted the causation rule of the Trans-Alaska Pipeline Authorization Act (TAPAA),[14] not that of the Oil Pollution Act.  *Benefiel*, 959 F.2d at 807–08. The court found that the plaintiffs had not established causation due to their allegations of "intervening acts," namely the decisions of oil refiners to raise prices. *Id.* Here, the BP Defendants have a contractual branding relationship with the BP dealers and owed them a duty to protect and promote the brand.  The BP Defendants and the BP Dealers are not remote parties like the parties in *Benefiel*.  Although damage to a brand name necessarily connotes the actions of third parties—consumers—it is the natural and foreseeable result of a massive oil spill causing serious and widespread damage to property and natural resources.  The widespread ecological and property damage of the oil spill was clearly a "substantial factor" in BP's declining sales during the period after the oil spill.

These alleged facts show the probability that discovery will reveal relevant evidence to support a claim. The facts alleged plausibly state an entitlement to relief under the reduced causation standard set forth in OPA; and given the alleged close relationship of the parties and linkage between the BP brand and the magnitude of the oil spill, it also states a plausible claim to relief under traditional proximate cause analysis.

---

[14] 43 U.S.C.A. § 1653.

### III.    BP Defendants have introduced facts not in the pleadings, which entitles plaintiffs to introduce affidavit evidence.

"If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 194 (5th Cir. 1988). Proposing that the cause of the BP Dealers' economic losses were due to the choices of individual consumers amounts to introducing alleged facts not in the pleadings.[15] Therefore, in anticipation of the possibility that this Court should exercise its discretion to treat defendants' motion as one for summary judgment, plaintiffs have attached affidavits based on personal knowledge, containing admissible facts, testified to by a person competent to testify to said facts, to support allegations of the various petitions and the assertion that triable issues of fact are present with respect to the BP Dealers' claims.

### IV.    The causal issues of the BP Dealers' claims are questions of fact which preclude disposal by Pre-trial Motion for Dismissal.

The BP defendants have framed the issue before the Court as one of proximate cause, which is typically an issue for the trier of fact, not to be disposed of as a matter of law in a Motion to Dismiss under Rule 12(b)(6). *See Gordon v. Niagara Mach. & Tool Works*, 574 F.2d 1182, 1192 (5th Cir. 1978); *see also Isquith*, 847 F.2d at 194. This issue presents factual questions which can only be fully examined after discovery has revealed pertinent evidence. Therefore, plaintiffs respectfully suggest that the Court order discovery and set test cases for trial as discussed below.

Further discovery is needed, and likely, to reveal relevant evidence supporting the causal

---

[15] "The economic losses alleged by the BP Dealers, thus, are 'due to' choices made by individual consumers about where to purchase fuel, not the 'injury, destruction, or loss of real property, personal property, or natural resources." BP Memorandum, p.7. The BP Memorandum also refers to "hundreds of thousands of actual or potential transactions at issue[,]" *id.*, while such transactions or lack thereof were not specifically alleged in any Complaint.

links between the oil spill and the BP Dealers' claims for economic damages. "Determination of the issue of superseding cause ordinarily presents factual questions to be answered by the trier of fact, and not disposed of as a matter of law." *Gordon*, 574 F.2d at 1192. Movants have framed the issue here as one of superseding cause, placing this rule squarely in play.[16]

"[W]here the movant attaches summary judgment evidence which supposedly demonstrates that, as a matter of law, the movant must prevail on an element of the nonmovant's claim, the nonmovant should be able to answer the motion by arguing that the evidence raises a fact issue, *which must be resolved at trial*, concerning that element." *Isquith*, 847 F.2d at 199 (emphasis added). This rule is applicable when, in the context of a Motion for Dismissal, defendant movants have asserted alleged facts from beyond the face of the complaint which demonstrate a factual issue exists. Here, the BP defendants have argued that the BP Dealers' losses are (presumably solely) "'due to' choices made by individual consumers about where to purchase fuel[.]"[17] Such an assertion, by definition, relies on facts outside the pleadings—facts that the parties and the Court cannot know absent discovery.

BP Dealers have alleged causation in two distinct ways: economic losses caused by a decline in tourism (due to oil spill damage to property)[18] and economic losses caused by injury to the BP Brand (due to oil spill damage to property).[19] Because plaintiffs have alleged two means of causation, and defendants have failed to address the first, a factual issue exists which must be resolved at trial. Breaking the BP Dealers into geographic categories will facilitate resolution of the factual issue of whether a particular dealer's economic losses were caused by declines in tourism, damage to the BP brand, or some combination of both. The BP Dealers fall into three geographic

---

[16]  BP Memorandum, p.10.

[17]  BP Memorandum, p.7.

[18]  B1 Complaint, ¶¶ 104–06, 118–22, 165, 490–91, 535–39, 625, 688; Tobatex Complaint, ¶¶ 34–35.

[19]  B1 Complaint, ¶¶ 625, 688; S. Trout Complaint, ¶¶ IX, XV–XVI.

categories: Gulf Coast BP Dealers, BP Dealers located in states in the Southeastern United States, and all other BP Dealers. As explained *infra*, the categories are not arbitrary, but are defined by patterns of tourism to the Gulf Coast.  The first two geographic categories assert claims for economic loss due to the decline in tourism *and* economic loss due to injury to the BP brand.

### A.    *Gulf Coast BP Dealers Claims*.

In a discussion of tourism-related economic losses, the Gulf Coast states should be defined to include Florida, Georgia, Alabama, and Mississippi (they should also include Louisiana and Texas if BP dealers are located therein). The list includes Georgia and all of Florida, partly because according to BP's own analysis the two states were among the "most affected" states. *See* affidavit of Thomas L. Bower III at ¶¶ 3–7 (attached hereto as Exhibit D). BP Dealers in Florida, Georgia, Mississippi and Alabama all attested to substantial losses due to lack of tourism resulting from the damage of the oil spill. *Id.* at ¶ 5; affidavit of Wayne Ramsay, ¶¶ 3–7 (attached hereto as Exhibit E); affidavit of Timothy Huff, ¶¶ 2–7 (attached hereto as Exhibit F); affidavit of Elvas Fayard, ¶¶ 5-7 (attached hereto as Exhibit G); declaration of Khosrow Knoshnood, ¶¶ 5–7 (attached hereto as Exhibit H); declaration of Ayad Jaber ¶¶ 5-7 (attached hereto as Exhibit I) .  At least one Georgia BP Dealer suffered a 30% drop in sales as the full extent of the oil spill became known. Affidavit of Timothy Huff, ¶ 6.  These states are not only on the Gulf, but must be traveled through to reach the Gulf—and people from all over Georgia and Florida vacation at the Gulf of Mexico. *See generally* WALTER J. KLAGES, PH. D., 2009-2010 VISITOR PROFILE, ALABAMA GULF COAST CONVENTION & VISITORS BUREAU 1 (Ala. Gulf Coast Conv. & Vis. Bureau, 2011) available at http://www.agccvb.org/stats/ (hereinafter "KLAGES 2010 Report");[20]  affidavit of Wayne Ramsay, ¶ 3. The BP Dealers who strategically positioned their gas stations in order to sell gasoline to tourists driving to the Gulf beaches suffered in the same ways as those located in cities right on the Gulf of Mexico. *Id.* at ¶¶ 2–6.

---

[20] Attached hereto as Exhibit J.

"The Spill has not only had a severe impact on fisheries in the Gulf of Mexico, but it has also dealt a devastating blow to tourism in the Coastal Zone and the individuals and entities that ordinarily rely on tourism for their livelihood. Tourism accounts for about 46 percent of the Gulf Coast economy annually. The Spill will result in at least $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association." B1 Complaint, ¶ 535. The Gulf Coast BP Dealers, who are located in the states suffering most from the damage of the oil spill, experienced the same declines in tourism and related sales as every other merchant and business in the area. "Further, Plaintiff lost business, revenue and income from the loss in tourism the Mississippi Gulf Coast suffered, and continues to suffer, as a result of the oil spill. Additionally, Plaintiff lost business, revenue and income from the loss of marketable seafood available to fulfill its menu. This is . . . due to the loss of marine life to the oil spill . . . ." S. Trout Complaint, ¶ IX; *see also* affidavit of Elvas Fayard, ¶¶ 5-6.

This Court has preliminarily approved the settlement of claims by non-BP gas stations and convenience stores in the Gulf Coast area for their oil-spill related economic damages. It would be unjust to dismiss the claims of BP dealers who suffered very similar damages, solely due the BP brand under which they operate. For example, a hypothetical BP gas station located on Gulf Shores Parkway in Fort Morgan, Alabama should be treated no differently with respect to economic losses due to declines in tourism than a hypothetical Shell station located right across the street. A BP gas station located at a marina in Destin, Florida suffered damages similar to non-BP dealers located at nearby marinas when fishing boats stopped buying fuel because tourists and shrimpers could not fish. Contrary to BP's assertion this is not an argument based on consumer "animosity"—rather, BP Dealers simply seek compensation for economic loss under the same principles that non-BP branded gas retailers have successfully raised.  The claims of the BP Dealers should not be dismissed based solely on their use of the BP brand.

**B.      *Claims of BP Dealers Located in the Southeastern United States*.**

BP Dealers in the Southeastern U.S. form the next category of BP Dealer claimants. Here, the Southeastern states are defined by the states from which most Gulf Coast tourists travel. Tourists who would have filled up at their local BP station and at BP stations along the route to the Gulf Coast did not do so because they did not travel there due to the damage from the oil spill. As discussed more fully *infra*, the Southeastern states include (but should not be limited to) Tennessee, North Carolina, South Carolina, and Kentucky.

The Alabama gulf shore's core tourism markets include (among other cities): Nashville and Memphis, Tennessee; New Orleans and Baton Rouge, Louisiana; Atlanta, Georgia; and Louisville, Kentucky. KLAGES 2010 Report at 1. Visitors from the "Southeast" comprised 45.6% of the visitors in the summer of 2010, 0.5% from the "Northeast," 8.3% from the "Midwest," and 7.0% from the "Southwest." *Id.* A report describing visitors to the "Emerald Coast" of northwest Florida (including Destin) indicated that 18.9% of visitors drove from Georgia, 7.2% from Alabama, 6.9% from North Carolina, 6.6% from South Carolina, and 5.2% from Tennessee. EMERALD COAST CONVENTION & VISITORS BUREAU, INC., 2010 TOURISM STATISTICS 7 (2010).[21]

The inference is clear. BP Dealerships in the originating states and along travel routes to the Gulf Coast in the southeastern United States suffered significant declines in sales and resulting economic losses in the period subsequent to the *Deepwater Horizon* oil spill due to a decline in tourists from the Midwest, Southeast, Northeast, and Southwest. *See* declaration of Khosrow Knoshnood, ¶¶ 3, 6 (who declared that the Tobatex, Inc. BP station was located to benefit from Gulf-bound traffic from "Tennessee, Kentucky, Indiana, Ohio, West Virginia, Virginia, North Carolina, and South Carolina," and based his assertion of drops in Gulf Coast tourism along the "I-75 beach corridor" on his observation of vehicle license plates at the station). This is supported by an earlier report published by the Alabama Gulf Coast Convention & Visitors Bureau, which shows

---

[21] Attached hereto as Exhibit K.

a marked decline in visitors to Gulf Shores, Alabama when the summer of 2009 is compared to the summer of 2010. *Compare* WALTER J. KLAGES, PH. D., 2008-2009 VISITOR PROFILE, ALABAMA GULF COAST CONVENTION & VISITORS BUREAU 1 (Ala. Gulf Coast Conv. & Vis. Bureau, 2009)[22] (showing 574,100 visitors for the summer, 2009 period) *to* KLAGES 2010 Report (showing 346,900 visitors for the summer, 2010 period). BP extended offers of an allowance of 1 cent/gallon purchased by jobbers (wholesale dealers) who "pulled" 85% of their "average liftings," but maintained a lower requirement of 70% for Gulf Coast dealers.  Carole Donoghue, *Jobbers say BP's Bailout Offer Won't Cover Losses*, 33 OIL EXPRESS, July 5, 2010, at 1 (hereinafter "Donoghue").[23] " 'The 1ct/gal is nice, but if your dealers can't sell the fuel, you won't get the money' says a Gulf Coast jobber. 'It's the peak of our season but we barely cleared 70% this month, and we won't make it at all in July,' said another distributor." *Id.* BP was already paying Gulf Coast jobbers a 1 cent/gallon allowance as of late May, and this new allowance, more easily obtained by Gulf Coast jobbers was to be in addition to it. *Id.*; *see also* Tom Kloza, *BP Will End Rebate, But Give Some Jobbers* Cash, 33 OIL Express, Aug. 9, 2010, at 1.[24]  The foregoing evidence of preferential treatment for dealers closer to the Gulf shows that even BP was aware that dealers dependent on Gulf Coast tourism were in trouble.  Again, this is not loss due to consumer "animosity," but loss directly related to the decline in tourism—economic loss squarely compensable under OPA.

### C.    *Claims of All Other BP Dealers.*

BP Dealers outside the geographic area of the Gulf Coast and the Southeastern U.S. also suffered economic damages due to the oil spill and its nationwide effects on the BP brand. BP dealers reported "volume losses of 5% to 30% as a result of public outrage over the Gulf of Mexico oil spill." Donoghue, at 1. "According to BP, marketers were selling 22 billion gals/yr —about 50

---

[22] Attached hereto as Exhibit L.

[23] Attached hereto as Exhibit M.

[24] Attached hereto as Exhibit N.

million gals/day — before the Deepwater Horizon disaster." *Id.* at 2. A jobber outside the Gulf area summed up BP's meager efforts to help its dealers as "a drop in the bucket." *Id.* "Overall, the gesture is nice but come on, do the math on a 20 million gals/yr jobber losing 20% of his business because of their screw up. They need to try again." *Id.*; *see also* B1 Complaint, ¶¶ 625, 688; S. Trout Complaint, ¶¶ IX, XV–XVI.

The BP Dealers operated under franchise agreements with BP which allowed and required them to market BP's branded gasoline and operate as BP branded convenience stores, located on real property subject to restrictive covenants prohibiting fuel or related sales under any other brand. *See, e.g.*: declaration of Khosrow Knoshnood, ¶ 4 (and exhibits attached thereto).

According to BP's own senior vice president for marketing and sales, "BP-branded sales were down between 7% and 10% during the oil spill." *BP Moving Brand Forward*, CSP DAILY NEWS (Oct. 29, 2010), http://www.cspnet.com/news/fuels/articles/bp-moving-brand-forward.[25] BP markets 15 billion gallons of fuel annually to U.S. consumers; a reduction of 7–10% means billions lost for U.S. BP dealers. *See id.*

BP Dealers filed claims (after being instructed to do so by BP) with the Gulf Coast Claims Facility but (at least some) were denied. Declaration of Khosrow Knoshnood, ¶ 9; *see also* affidavit of Thomas L. Bower III, ¶ 6. As part of its response to the spill, BP offered its dealers a temporary gasoline price rebate of one (1) cent per gallon, and temporarily waived credit card fees associated with petroleum sales. Affidavit of Thomas L. Bower III, ¶¶ 6–8. These actions by BP show it was aware of the economic losses its dealers were experiencing, and the fact that they occurred in response to the oil spill raises a reasonable inference that the economic losses were caused by the oil spill and the injury to the BP brand occasioned by the widespread oil pollution and public

---

[25] Attached hereto as Exhibit O.

knowledge of BP's part in the *Deepwater Horizon* oil spill.

The oil spill's damaging effects on the BP brand were experienced as economic losses by Gulf Coast and Southeastern U.S. BP Dealers as well as other dealers. The extent to which each category of dealer's losses sprang from effects on the BP brand, declines in Gulf Coast tourism, or some combination of the two causes can only be revealed by discovery, and as fact questions should be decided at trial, not by a Pre-Trial Motion to Dismiss. *See generally Graehling*, 58 F.3d at 298 & *Gordon*, 574 F.2d at 1192. This Court may efficiently decide whether sufficient causation exists as to the BP Dealers' claims only after allowing discovery and trying test cases, one from each geographic class referred to *supra*.

### V.   The PSC concedes that claims against non-responsible parties are precluded by the *Robins Dry Dock* rule.

The PSC concedes that, under the existing Orders of this Court, non-OPA claims of negligence arising from the *Deepwater Horizon* oil spill against non-responsible parties such as Halliburton Energy Services, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., M-I L.L.C., and Cameron International Corporation are general maritime tort claims for which physical damage to a proprietary interest were not alleged.  Therefore, they are precluded under the rule of *Robins Dry Dock* and its progeny.

## Conclusion

For the above and foregoing reasons, the BP Defendants' Motion to Dismiss should be denied.

This 10th day of August, 2012.

Respectfully submitted,

<table>
<tr><td>

   /s/ Stephen J. Herman<br>
Stephen J. Herman, LA Bar No. 23129<br>
HERMAN HERMAN & KATZ, LLC<br>
828 O'Keefe Avenue<br>
New Orleans, LA 70113<br>
Telephone: (504) 581-4892<br>
Facsimile: (504) 569-6024<br>
Email: sherman@hhklawfirm.com<br>
*Plaintiffs Liaison Counsel*

</td><td>

   /s/ James Parkerson Roy<br>
James Parkerson Roy, LA Bar No. 11511<br>
DOMENGEAUX WRIGHT ROY<br>
   & EDWARDS, LLC<br>
556 Jefferson Street, Suite 500<br>
Lafayette, LA 70501<br>
Telephone: (337) 233-3033<br>
Facsimile: (337) 233-2796<br>
Email: jimr@wrightroy.com<br>
*Plaintiffs Liaison Counsel*

</td></tr>
</table>

### PLAINTIFFS' STEERING COMMITTEE

<table>
<tr><td>

Brian H. Barr<br>
LEVIN, PAPANTONIO, THOMAS,<br>
   MITCHELL, ESHSNER & PROCTOR, PA<br>
316 South Baylen Street, Suite 600<br>
Pensacola, FL 32502-5996<br>
Office: (850) 435-7045<br>
Telefax: (850) 436-6187<br>
Email: bbarr@levinlaw.com

</td><td>

Jeffrey A. Breit<br>
BREIT DRESCHER IMPREVENTO &<br>
   WALKER, P.C.<br>
999 Waterside Drive, Suite 1000<br>
Norfolk, VA 23510<br>
Office: (757) 670-3888<br>
Telefax: (757) 670-3895<br>
Email: jbreit@bdbmail.com

</td></tr>
</table>

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARS lOLA &
    TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: Pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
    PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.iones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU &
    SOUTH, LLP
50 I Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier

deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Joseph F. Rice
MOTTLEY RICE

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
    ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

*On Brief*

HUNTER LUNDY
ED ROWAN
DANIEL KRAMER
SAMUEL T. REES
JAMES BILSBORROW

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 10th day of August, 2012.

    /s/ Stephen J. Herman and James Parkerson Roy