# Exhibit H

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, ON APRIL 20, 2010 | * | Section: J |
| | * | |
| This Pleading applies to: | * | Judge Barbier |
| | * | |
| *MDL 2179 B1 Amended Master Complaint,* | * | Magistrate Judge Shushan |
| *All Cases in Pleading Bundle B1 and 10-CV004573* | * | |

**************************************************************************

## <u>DECLARATION OF KHOSROW KNOSHNOOD</u>

## <u>IN OPPOSITION TO MOTIONS TO DISMISS</u>

## <u>BP DEALER CLAIMS</u>

I, KHOSROW ("JONATHAN") KNOSHNOOD, declare as follows:

1.     I have personal knowledge regarding the economic impact of the oil spill which is the subject of this multidistrict litigation upon the business of Tobatex, Inc. ("**Tobatex**").

2.     Presently and at the time of the events which are the subject of this multidistrict litigation, I was and am the President of Tobatex.  Tobatex is a Georgia corporation which at all times relevant to subject matter of this multidistrict litigation has owned and operated the BP P.L.C. ("**BP**") branded service station located at 4324 Shallowford Road, Marietta, GA 30062.

3.     Tobatex has been a petroleum retailer for BP from December 2007 to the present. Tobatex purchased and operated its location near Interstate 75 in Georgia. Tobatex strategically purchased and operated its facility in this location in order to benefit from the traffic from associated with Gulf Coast beach tourism, from such states as Tennessee, Kentucky, Indiana, Ohio, West Virginia, Virginia, North Carolina, and South Carolina.

4.     Tobatex acquired its station from BP.  Attached hereto is a true and correct copy of relevant portions of the purchase agreement and two of its exhibits, which is marked as Exhibit "A."  Both the Quitclaim Deed and the Option Agreement were completed, signed and recorded.  Pursuant to those documents, Tobatex is precluded for 20 years from selling motor fuel products other than BP branded products at this site and BP is entitled to repurchase the property in the event that Tobatex' Franchase Agreement or Supply Agreement is terminated.  Attached hereto are true and correct copies of Tobatex' Franchise Agreement and Dealer Supply Agreement which are marked as Exhibit "B."

5. Prior to the Deepwater Horizon oil spill, Tobatex's total sales revenue for 2010 met or exceeded total sales revenue for 2008 and 2009.

6. Beginning immediately after the oil spill, many tourists stopped traveling to the Alabama and Florida Gulf Coast. The sudden and precipitous drop in tourism badly damaged Tobatex's Georgia location, as tourists stopped traveling along the I-75 beach corridor. I base this statement on my personal observation of the license plates of vehicles coming to the station.

7. Tobatex saw its total revenues significantly decline across the board. Its Georgia facility suffered precipitous declines in both gallons sold and convenience store sales. Specifically, for the post-spill year 2010 Tobatex saw total revenues drop of roughly 15 percent (15%). Attached hereto are true and correct copies of the "Daily Sales of Station" for the service station located at 4324 Shallowford Road, Marietta, GA, 30062, for the April 20, 2009 to August 20, 2009 and April 20, 2010 to August 20, 2010 marked as Exhibit "C."

8. As part of its response to the spill, BP provided its dealers, including Tobatex, a temporary gasoline price rebate of one (1) cent per gallon, and temporarily waived credit card fees associated with petroleum sales. This compensation was far less than the loss which Tobatex has suffered.

9. On or about August 27, 2010, Tobatex filed a claim for interim payment in accordance with procedures established by the Gulf Coast Claims Facility ("**GCCF**"). On November 2, 2010, GCCF denied Tobatex's claim.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is made pursuant to 28 U.S.C. § 1746. Executed at Marietta, Georgia on August 8, 2012.

Khosrow "Jonathan" Khoshnood

# EXHIBIT A

 A BP Affiliated Company

SS# 16926/SCDB#_____/Group #___
4324 Shallowford Road
Marietta, Georgia

# PURCHASE AND SALE AGREEMENT
## (COCO – DOFO)

THIS PURCHASE AND SALE AGREEMENT (this **"Agreement"**) is entered into by and between Seller and Purchaser (both hereinafter defined), whereby Seller agrees to sell and Purchaser agrees to buy any and all of Seller's right, title and interest in certain real property, together with all buildings and improvements thereon, if any, personal property and inventory, if any, upon the terms, conditions and provisions set forth in this Agreement, and to operate a BP-branded motor fuel sales facility and *ampm* mini market (collectively **"Business Operations"**) at the Property (as hereinafter defined) after consummation of the transaction contemplated in this Agreement.

By signing and submitting this Agreement in connection with a sealed bid sale of properties, including the property described in this Agreement (called the "Transferred Assets" and more particularly described in Section 3 below), Purchaser offers to buy the Transferred Assets from Seller. As part of that bid and sale process, Purchaser has received a Property Specific Package ("PSP") which contained, among other things, a document titled **"Terms and Conditions of Sale and Disclaimer"** (hereinafter called the **"Terms and Conditions"**), this Agreement, and certain materials relating to the Transferred Assets (such as a title commitment and, if applicable, survey relating to the real property). The contemplated transaction shall be on the terms set forth in this Agreement.

## 1.   BASIC PROVISIONS.

This Section 1 sets forth certain basic information concerning the purchase and sale of the Transferred Assets contemplated under this Agreement (the **"Transaction"**). When used in this Agreement, each capitalized term set forth below in this Section 1 has the meaning set forth herein.

**SELLER:**

**BP PRODUCTS NORTH AMERICA INC.**, a Maryland corporation, f/k/a Amoco Oil Company or any such BP heritage company as applicable (**"Seller"**)

Seller's Address:
BP Products North America Inc.
1323 Bond Street, Suite 179

Seller's Counsel:
BP America Inc.
4101 Winfield Road, Mail Code 5 East

1

9.    **PURCHASER'S FINANCING CONDITION**.

Purchaser will not be required to close the Transaction unless, by the 30th day after the Date of Agreement (as hereinafter defined), Purchaser has obtained from an institutional lender ("**Lender**"), a commitment to make a loan in a principal amount not less than 75% of the Purchase Price and on other terms acceptable to Purchaser, in its reasonable discretion (the "**Loan**"). Purchaser shall make diligent application to a Lender for the Loan and shall furnish all documents and information that Lender reasonably requires. If, by the 30th day after the Date of Agreement, Purchaser obtains a commitment reasonably acceptable to Purchaser, then Purchaser shall immediately deliver a copy to Seller. Purchaser acknowledges and agrees that the commitment must be in a form acceptable to Seller, in Seller's sole discretion. If, by the 30th day after the Date of Agreement, Purchaser delivers written notice to Seller that Purchaser has not obtained a commitment, then Purchaser's Deposit will be returned to Purchaser provided that Purchaser has not conducted subsurface tests of the Property. If, by the 30th day after the Date of Agreement, Seller has not received a copy of a commitment from Purchaser or written notice that Purchaser has not obtained such commitment then, at Seller's option, Seller may (i) declare Purchaser's financing condition to be considered satisfied and the Closing shall proceed in accordance with this Agreement or (ii) terminate this Agreement. If Seller so terminates this Agreement, the Deposit will be returned to Purchaser only in the event Purchaser has not conducted subsurface tests of the Property. In the event Purchaser has conducted subsurface tests of the Property and Seller terminates the Agreement, the Deposit, including any accrued interest, shall be paid to Seller. Upon any such termination, Purchaser and Seller shall each pay one-half of all Escrow and title cancellation charges; and neither party will have any further obligation to the other under this Agreement, except obligations that this Agreement states survive, or arise upon, the termination.

10.    **REAL ESTATE COMMISSIONS**.

Purchaser represents that the only broker representing Purchaser in this transaction is identified in Section 1 of this Agreement (the "**Broker**"). Seller agrees to pay a real estate commission to NRC pursuant to the terms and conditions of a separate agreement. Seller shall have no obligation to pay any real estate or other broker commissions due to Broker or any real estate or broker commission claimed to be due by any other person or entity. Broker's commissions shall be paid simultaneously with, or after, the Closing. Purchaser shall provide to Seller executed Broker's lien waiver(s) at Closing. Each party represents and warrants to the other that except for the Broker, it has not used a real estate broker in connection with this transaction. Seller and Purchaser shall each indemnify and hold the other harmless against all brokerage commissions or finder's fees, and claims thereof payable in connection with the sale of the Transferred Assets and resulting out of the acts and omissions of the indemnifying party other than as described in this Section.   This indemnification shall extend to all claims, liabilities, costs and expenses (including reasonable attorney's fees and litigation costs) arising as a result of such claims and shall survive the termination of this Agreement or the Closing hereof.

11.    **CONVEYANCE**.

Seller shall convey the Property to Purchaser by a Quit Claim Deed ("**Deed**") in the form attached hereto as **Exhibit C1**, or in the case of a Prime Lease Seller shall convey Seller's leasehold

interest by Assignment and Assumption Agreement ("**Prime Lease Assignment**") in the form attached hereto as **Exhibit C2**, delivered at Closing upon Seller's receipt of the Purchase Price and Purchaser's compliance with all of the terms and provisions of this Agreement. The conveyance of the Property shall be subject to the following:

(i)     All encroachments, protrusions, easements, changes in street lines, rights-of-way, and other matters that would be disclosed by an accurate survey or other inspection of the Property;

(ii)     Existing and/or recorded leases, (including the Prime Lease, if any, and any rights of fee mortgagees and other parties claiming by, through or under the landlord under any Prime Lease), agreements, easements, rights-of-way, covenants, conditions and restrictions as the same may be in present force and effect, and the terms and conditions thereof;

(iii)     Laws, regulations, ordinances, building restrictions (including, without limitation, zoning regulations), and any violations thereof;

(iv)     The lien for real property taxes and any special assessments which as of the Closing Date are not yet due and payable;

(v)     All restrictions which Seller intends to impose on Purchaser's use of and operations on the Property are set forth in the Deed attached hereto as **Exhibit C1**, or if applicable, in the Prime Lease Assignment attached hereto as **Exhibit C2**. (PURCHASER ACKNOWLEDGES IT HAS READ THE DEED ATTACHED HERETO AS **EXHIBIT C1**, or if applicable, the Prime Lease Assignment attached hereto as **Exhibit C2**, HAS REVIEWED THE USE AND OPERATION RESTRICTIONS AND OTHER COVENANTS CONTAINED THEREIN REGARDING THE PROPERTY AND ACCEPTS THEM);

(vi)     The terms and conditions of the Memorandum of Franchise Agreement and Dealer Supply Agreement in the form attached hereto as **Exhibit J** (the "**Memorandum**"), which Memorandum shall be filed after the Deed or the Memorandum of Prime Lease Assignment as the case may be, but before the Refusal/Option Agreement or the Option Agreement as set forth in subsection (G) below and before any other instrument that will encumber the Transferred Assets and/or benefit any Lender or other third party.

(vii)     The terms and conditions of the Right of First Refusal and Option Agreement ("**Refusal/Option Agreement**") or the Option Agreement ("**Option Agreement**") as is required under Section 19.2 in the form attached as **Exhibits L1** and **L2** respectively, which instrument shall be filed before any other instrument that will encumber the Transferred Assets and/or benefit any Lender or other third party.

(viii)     Any title exceptions, liens, objections and other matters set forth on or disclosed in the Title Commitment, the Survey or any Current Survey, as those terms are defined herein;

**IN WITNESS HEREOF**, Purchaser and Seller agree that the date of this Agreement shall be the date the Seller executes this Agreement.

**SELLER:**

**DATE SELLER EXECUTES THIS AGREEMENT:**

_____Aug 14_____, 2007 ("Date of Agreement")

**BP PRODUCTS NORTH AMERICA INC.**, a Maryland corporation, f/k/a Amoco Oil Company

By: _____

Name: _Leslie Rittenberg_
        _Divestment Director_

Title: _____

**PURCHASER:**

**DATE PURCHASER EXECUTES THIS AGREEMENT:**

_____6/12_____, 2007

KHOSROW KHOSHNOOD , a

By: _____R. Khoshnood_____

Name: KHOSROW KHOSHNOOD

Title: President

Purchaser's FEIN: 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

**EXHIBIT C1**
**FORM OF QUIT CLAIM DEED**



**QUIT CLAIM DEED**
GEORGIA

*Prepared by*:

BP Products North America Inc.
c/o BP America Inc.
4101 Winfield Road
Warrenville, Illinois 60555
Attn: Real Estate Attorney

THE GRANTOR, **BP PRODUCTS NORTH AMERICA INC.**, a Maryland corporation, f/k/a Amoco Oil Company ("**Grantor**") with its principal office address at c/o BP Products North America Inc., 1323 Bond Street, Naperville, Illinois 60563, for the consideration of One Dollar and no/100ths ($1.00) and other good and valuable consideration in hand paid, the receipt whereof is hereby acknowledged, by these presents does hereby REMISE, RELEASE, CONVEY AND QUIT CLAIM (without any covenant, representation or warranty of any kind), TO: [**INSERT GRANTEE NAME AND ADDRESS**] ("**Grantee**") as of _____, 200_ (the "**Transfer Date**") the following described real estate (the "**Property**"), situated in the City of [_____], County of [_____], State of _____, more particularly described as follows, to wit:

**See legal description set forth on Exhibit A, attached hereto and incorporated herein.**

Address of Property:           [_____]

Tax Identification Number(s):   [_____]

Together with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever, of Grantor, either at law or in equity, of, in and to the Property,

**TO HAVE AND TO HOLD** the Property as above described, with the appurtenances, unto Grantee, its successors and assigns forever.

SS #16926

1.     **Use and Operating Restrictions**.

        This conveyance is made by Grantor and accepted by Grantee upon the express condition and subject to the use and operating restrictions, notices, acknowledgements and covenants described on **Exhibit B** attached hereto (collectively "**Use and Operating Restrictions**"). Grantor may, in Grantor's sole and absolute discretion (but shall in no event be obligated to), release and/or waive any or all of the Use and Operating Restrictions at any time, by written instrument duly executed and delivered by Grantor.

2.     **Grantee's Indemnification of Grantor**.

        Grantee, for and on behalf of itself and its successors and assigns (including, without limitation, all successors in title to the Property (or any portion thereof) to Grantee (collectively, the "**Grantee Parties**"), by acceptance of this Deed, hereby agrees, except as may otherwise be provided in the Purchase and Sale Agreement (as defined herein), to assume responsibility for, and shall defend (with counsel reasonably acceptable to the Grantor Parties (as defined herein), indemnify, defend and hold harmless and does hereby waive release and discharge Grantor, its parents, affiliates and subsidiaries, and their respective directors, officers, partners, members, shareholders, employees, contractors, agents, representatives, successors and assigns, (collectively, the "**Grantor Parties**"), from and against (a) any and all actions or causes of action at law or in equity, claims, demands, expenses, obligations, losses, damages liabilities, suits, judgments, fines, penalties, payments, costs and expenses (including reasonable attorneys' fees) ("**Losses**") arising out of or resulting from the use or operation of the Property on and after the Transfer Date including, without limitation, any "Government Required Environmental Work", "Third Party Claims", "Hazardous Materials" occurring on, at or migrating from the Property, or other environmental liabilities of any Grantee Party under the "Environmental Laws" (as those terms are defined in the Purchase and Sale Agreement); (b) any Losses sustained or incurred by any Grantor Party that result from any breach of Grantee's duties, liabilities, obligations or covenants of the Purchase and Sale Agreement; (c) Grantee's failure to discharge, or delay in discharging, any of the "Assumed Environmental Liabilities" (as defined in the Purchase and Sale Agreement); (d) damage to or destruction of Grantor's corrective action equipment caused by any Grantee Party, tenants or other business invitees; (e) any "Development" (as hereinafter defined), including without limitation, Development costs that are increased or unanticipated due to the environmental condition of the Property, delay costs resulting from the environmental condition of the Property, costs and expenses to handle, manage, remediate or dispose of soil or groundwater containing Hydrocarbons or any other Hazardous Materials, and the relocation, replacement, repair or removal of any corrective action equipment; (f) any statutory or equitable claim or cause of action against Grantor arising from or relating to the environmental condition of the Property; and (g) changes in, modifications to or amendments of environmental laws that were in effect prior to the Transfer Date or promulgated, made or enacted on or after the Transfer Date irrespective of whether the events giving rise to such liabilities occurred prior to, on or after the Transfer Date; (h) and any use which is in violation of or inconsistent with the Use and Operating Restrictions.

3.      **Condition of Property**.

Grantee has accepted the Property, including without limitation its environmental condition, in its **"AS-IS, WHERE-IS, AND WITH ALL FAULTS"** condition, subject only to any covenants and obligations of Grantor to Grantee which are expressly set forth in the Purchase and Sale Agreement or any other documents or instruments executed and delivered by Grantor and Grantee pursuant to the Purchase and Sale Agreement (collectively, the **"Contractual Obligations"**). Grantee acknowledges that the purchase price which it has paid for the Property reflects: (a) the fact that all of the Use and Operating Restrictions shall be recorded against the Property and shall be binding on Grantee and the other Grantee Parties, (b) the fact that Grantee has agreed to acquire the Property, including without limitation its environmental condition, in its **"AS-IS, WHERE-IS, AND WITH ALL FAULTS"** condition (subject only to Grantor's Contractual Obligations to Grantee), and (c) the fact that Grantee has agreed to acquire the Property subject to the presence, whether known or unknown, of any environmental contamination which may have occurred during or prior to the period of Grantor's ownership, use and/or operation of the Property (subject only to Grantor's Contractual Obligations to Grantee). Grantee does, by its acceptance of this Deed, represent and warrant that it is familiar with the condition of the Property and that GRANTOR HAS NOT MADE AND MAKES NO WARRANTIES OR REPRESENTATIONS REGARDING THE PROPERTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ITS HABITABILITY, CONDITION OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE. GRANTEE AGREES THAT THE PROPERTY IS HEREBY CONVEYED BY GRANTOR AND ACCEPTED BY GRANTEE IN ITS **"AS-IS, WHERE-IS, WITH ALL FAULTS"** CONDITION EXISTING AS OF THE TRANSFER DATE, SUBJECT ONLY TO THE CONTRACTUAL OBLIGATIONS.

4.      **Grantor's Right of Access and Entry Upon the Property; Cooperation**.

Grantor hereby reserves for itself and the other Grantor Parties the right to enter upon and access the Property (free from any charge or fee) from time to time to remove certain personal property and conduct certain inspections, remediation and other activities, all as more particularly described in the Purchase and Sale Agreement. Such access shall not be interrupted by any transfer, assignment, conveyance, mortgage, lease, hypothecation or pledge by Grantee of the Property or any of Grantee's interests therein. In the event Grantor is involved in any remediation efforts or in obtaining environmental site closure with respect to the Property for any reason whatsoever, Grantee and each of the other Grantee Parties agrees to cooperate with Grantor and with all local, state, and federal environmental agencies having jurisdiction over the Property (the **"Government"**) in obtaining environmental site closure, to commercial standards, for any environmental contamination relating to or arising out of Grantor's prior use of the Property.

5.      **Further Assurances**.

Grantee shall, from time to time, upon request of Grantor, execute and deliver to Grantor, and hereby authorizes Grantor to record in the appropriate governmental or other public records, such further documents and instruments and perform such acts as Grantor may reasonably deem appropriate to perfect, aid or assist in the imposition and/or recording of the Environmental Restrictions as defined in **Exhibit B** hereto, provided that such further documents, instruments or actions are consistent with the terms or intent of the Purchase and Sale Agreement, or other such

SS #16926

documents or forms required or authorized by the Government to obtain environmental site closure to commercial standards or Type 5 risk reduction standards as set forth in Ga. Comp. R. & Regs. 391-3-19.07(10). Grantee shall, at Grantor's request, provide to Grantor evidence of compliance with all Environmental Laws, including, without limitation, the results of tank and line tightness tests, product inventory data, tank gauging data and tank leak detection data.

**6.      Entire Understanding**.

All of the provisions of this Deed, including without limitation, the Use and Operating Restrictions, shall run with the land and each portion thereof, shall bind and restrict the Property and each portion thereof, and shall be binding upon and inure to the benefit of the parties, including without limitation, Grantor, the other Grantor Parties, Grantee, and the other Grantee Parties, as the case may be, and their respective heirs, devisees, representatives, successors and assigns, and any other person or entity expressly noted herein. This Deed, the Exhibits and Schedules annexed hereto and the Purchase and Sale Agreement (as may have been amended) between Grantor and Grantee dated _____ (and attachments) (**"Purchase and Sale Agreement"**) contain the entire understanding and agreement between the parties hereto relative to the subject matter hereof. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Deed. No modification, waiver of, addition to, or deletion from the terms of this Deed shall be effective unless reduced to writing and signed by Grantor and Grantee or their respective successors and assigns, each of whom expressly waives, releases and forever forswears any right under the law in the State in which the Property is located which permits a contract, by its terms amendable only in writing, to be orally amended.

**IN WITNESS WHEREOF,** said Grantor has caused this Quit Claim Deed to be executed by an authorized representative of Grantor and attested to by its Assistant Secretary this _____ day of _____, 200__.

**BP PRODUCTS NORTH AMERICA
INC.,** a Maryland corporation,
f/k/a Amoco Oil Company

By:_____
      Name: _____
      Title:   Vice President

ATTEST:

By:_____
      Name: _____
      Title:   Assistant Secretary

C1-4

**(Attach Notary Acknowledgements)**

SS #16926

## EXHIBIT A
## TO
## QUIT CLAIM DEED

**Legal Description**

See attached.

THE LEGAL DESCRIPTION IS SUBJECT TO
VERIFICATION PRIOR TO CLOSING.

SS #16926

**EXHIBIT B**
**TO**
**QUIT CLAIM DEED**

### Use and Operating Restrictions, Notices, Acknowledgements and Covenants

The Grantee herein covenants and agrees, for and on behalf of itself and the other Grantee Parties that the following use and operating restrictions, notices, acknowledgments and covenants shall run with the land and each portion thereof, shall bind and restrict the Property and each portion thereof, and shall be binding upon and inure to the benefit of the parties, including without limitation, Grantor, the other Grantor Parties, Grantee and other Grantee Parties, as the case may be, and their respective heirs, devisees, representatives, successors and assigns, and any other person or entity expressly noted herein, and shall bind and restrict the Property for the time periods set forth herein:

I.    **Petroleum and Convenience Store Restrictions.**  No part of the Property shall be used by Grantee, subsequent grantees, affiliates, assigns, lessees, occupants, licensees or anyone else using the Property, for an automobile service station, petroleum station, gasoline station, automobile repair shop, convenience store, car wash, or for the purpose of conducting or carrying on the business of selling, offering for sale, storage, handling, distributing or dealing in petroleum, gasoline, motor vehicle fuel, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils, any fuel used for internal combustion engines, lubricants in any form, automobile parts or accessories, tires, batteries, or other petroleum or petroleum-related products or convenience store items, except for the personal use or consumption of such products by Grantee or its lessees of the Property, unless any such use is in connection with the operation of the Property as a Grantor branded service station.  For purposes hereof, **"Grantor branded service station"** shall mean a motor fuel sales facility operating under the brand BP, Amoco, Arco or any other brand of Grantor or any of its affiliates or their respective successors and assigns.  For purposes hereof, **"convenience store"** shall be defined as any retail store or outlet that sells any of the following items:  cigarettes, chewing tobacco, snuff or other tobacco products; prepackaged soda, juice, water or other drinks; prepackaged beer, wine, spirits or other liquor; fountain drinks; coffee; donuts; muffins or other pastries; or candy.

The above covenants and use restrictions bind and restrict the Property as covenants and restrictions running with the land and each portion thereof, and are deemed to benefit Grantor as a direct or indirect user of, operator of, or supplier of Grantor branded fuels to Grantor branded service stations in the County in which the Property is located.  These restrictive covenants will remain in full force and effect for a term of twenty (20) years from the date of this conveyance whereupon these restrictive covenants will automatically lapse and terminate and be of no further force or effect.

In the event that the Grantee shall violate the terms of this restriction, Grantor shall have all the remedies available to Grantor at law or in equity, including, without limitation, injunctive relief and specific performance.  If any violation of the restriction occurs after the Property is sold by the original Grantee named herein (or any affiliate thereof) to a third party, then in addition to Grantor's remedies at law or in equity, upon demand by Grantor, Grantee Parties shall promptly pay to Grantor the Sales Damages (as defined below).  Grantor and Grantee expressly acknowledge that it is impossible to precisely estimate the damages to be suffered by Grantor upon a violation of the terms

of the restriction after the Property is sold, that the Sales Damages would not adequately address or remedy all harm suffered by Grantor, and that the Sales Damages are not intended as a penalty, but as a reasonable estimate of some (but not all) of the damages that would be suffered by Grantor.

For purposes of this Deed, the term "Sales Damages" means the difference between the most recent gross sales price for the Property received by a Grantee Party and any personal property sold in connection therewith (including, the value of all cash and non-cash consideration, without deduction for any credits, prorations, costs or other items), and the Purchase Price received by Grantor for the Property, which difference shall be increased by 5% per annum, compounded annually as of the anniversary of the date of the recording of this instrument.

Notwithstanding the foregoing, the maximum Sales Damages shall be three million dollars ($3,000,000.00), which maximum amount shall increase by 5% per annum, compounded annually as of the anniversary of the date of the recording of this instrument. Grantee and the other Grantee Parties shall be jointly and severally liable for the payment of the Sales Damages to Grantor.

## II.     Environmental Matters.

**A.     Environmental Restrictions.**   To reduce risks to human health and/or the environment and to permit application of environmental corrective action standards or other protective activities that are consistent with applicable law, this conveyance is made by Grantor and accepted by Grantee on the express condition and subject to the following restrictions, notices, acknowledgments and covenants:

**1.     Groundwater Exposure Restriction.**  No water supply wells of any kind (including, without limitation, water wells used for drinking, bathing or other human consumption purposes and water wells used for livestock, farming or irrigation) shall be installed or used on the Property (collectively, the **"Groundwater Exposure Restriction"**); provided, however, that the Groundwater Exposure Restriction does not prohibit the installation or use of any compliance wells or any groundwater monitoring, recovery or extraction wells or similar devices used for or related to the performance of any remediation or environmental corrective action work on the Property now or in the future.

**2.     Residential Use Restriction.**  The Property shall not be used or occupied (if used or occupied at all) for residential purposes, and additionally, no part of the Property shall be used for the purpose of operating a child care or elder care facility, a nursing home facility or hospice, a medical or dental facility, a school, a church or other place of worship, a park or a hospital (collectively, the **"Residential Use Restriction"**).  If applicable state environmental laws and regulations define residential use, any use that is deemed to be a residential use by such laws and regulations will also be a residential use as the terms are used herein.

**3.     Construction and Excavation Restrictions.**

**3.1     Engineered Barriers and Below-grade Restriction.**  Grantee shall place any engineered barrier on the Property as may be required by the Government. Any building or other improvements constructed on the Property shall have a slab-on-grade foundation, with the top of the

slab at or above surface level, except for any building footings and/or underground utilities (the "**Below-grade Restriction**").

   3.2 **Construction Workers' Caution Statement.**  Prior to conducting any intrusive activities with respect to the Property, Grantee and the other Grantee Parties shall cause all construction workers performing or assisting with such activities to be notified of possible petroleum hydrocarbon encounters and appropriately trained and certified in accordance with all environmental, health and safety laws, rules, regulations and ordinances, including, without limitation, any and all Occupational Safety and Health Administration (OSHA) Hazardous Waste Operations and Emergency Response (HAZWOPER) requirements (including, without limitation, those set forth in 29 CFR 1910.120) (collectively, the "**Construction Workers' Caution Restriction**").  Such training shall at a minimum include both an initial 40-hour and future 8 hour refresher training and certifications in compliance with OSHA HAZWOPER requirements and any similar applicable requirements (whether existing as of the date of this conveyance or enacted or promulgated in the future).

*THE FOLLOWING RESTRICTION 3.3 WILL ONLY BE INCLUDED IN DEEDS FOR THOSE PROPERTIES FOR WHICH SELLER HAS <u>NOT</u> LISTED ANY RETAINED ENVIRONMENTAL LIABILITIES ON SCHEDULE II:*

   3.3 **Removal and Disposal of Soil and Groundwater.**  No soils shall be excavated at or removed from any portion of the Property, unless and until representative soil samples from such portion of the Property are first tested to determine whether any actionable levels of petroleum-related or other regulated chemicals are present, and if such levels are present, then (a) the excavation, management, disposal and/or removal of any such soils at or from such portion of the Property shall be governed by a written soil management plan ("**Soil Management Plan**") to be developed by Grantee or any other Grantee Party, as applicable, which shall comply with all applicable laws and regulatory requirements; (b) Grantee, or any other Grantee Party, as applicable, obtains any required government approval of the Soil Management Plan.  Grantee and the other Grantee Parties shall be solely responsible for the proper and lawful performance and payment of (c) any and all soil excavation, hauling, transportation and disposal pursuant to the Soil Management Plan or otherwise and (d) any extraction, dewatering and disposal of any groundwater to be extracted or removed from the Property arising out of or resulting from any development or other construction activities at the Property, including any required testing and treatment of such water (collectively, the "**Soil and Groundwater Removal Restriction**").  Except as may be otherwise expressly provided in the Purchase and Sale Agreement, Grantor shall not be obligated to pay any costs related to such soil excavation or groundwater extraction or any soil or groundwater removal or disposal, and/or any development of the Property.

*THE FOLLOWING RESTRICTIONS 3.3, 3.4 and 3.5 WILL BE INCLUDED ONLY IN DEEDS FOR PROPERTIES FOR WHICH SELLER <u>HAS</u> LISTED RETAINED ENVIRONMENTAL LIABILITIES ON SCHEDULE II:*

   3.3 **Removal and Disposal of Soil and Groundwater.**  No soils shall be excavated at or removed from the Property, unless the soil is excavated and/or removed (as applicable) in a manner and (in the case of removal of soils) to a disposal facility approved in writing

in advance by Grantor, and any management, excavation and removal of soil at or from the Property must be governed by a written soil management plan in form and substance acceptable to Grantor ("**Soil Management Plan**") that will be developed at the time of Grantee's (or any other Grantee Party's) request for removal or excavation of soil.  Grantee and the other Grantee Parties shall be solely responsible for the proper and lawful performance and payment of (a) any and all soil excavation, hauling, transportation and disposal pursuant to the Soil Management Plan and (b) any extraction, dewatering and disposal of any groundwater to be extracted or removed from the Property arising out of or resulting from any development or other construction activities at the Property, including any required testing and treatment of such water (collectively, the "**Soil and Groundwater Removal Restriction**").  Except as may be otherwise expressly provided in the Soil Management Plan that has been approved by Grantor or in the Purchase and Sale Agreement, Grantor shall not be obligated to pay any costs related to such soil excavation or groundwater extraction or any soil or groundwater removal or disposal, and/or any development of the Property.

      3.4    <u>**Relocation of Corrective Action Equipment; Development.**</u>  In the event that monitoring wells or other Corrective Action Equipment and any related improvements (collectively, the "**Corrective Action Equipment**") owned by Grantor are: (a) present at the Property on the date of this conveyance in connection with Grantor's Retained Environmental Liabilities (as defined in the Agreement); (b) subsequently required to be present on the Property after the date of this conveyance by the Government in connection with Grantor's Retained Environmental Liabilities; or (c) otherwise installed at the Property by or on behalf of Grantor in connection with Grantor's Retained Environmental Liabilities or otherwise, no Grantee Party will interfere with the use or operation of the Corrective Action Equipment, or damage or destroy (or permit the damage or destruction of) any Corrective Action Equipment.  In the event Grantee or any other Grantee Party damages or destroys any Corrective Action Equipment, Grantee or such other Grantee Party (as applicable) shall pay, upon demand, Grantor's costs in repairing or replacing it.

      Grantee shall submit to Grantor a copy of plans for any construction or relocation of any improvements on the Property, or any excavation, demolition, re-grading, repaving, landscaping or other development activity performed by any person on the Property (excluding work by Grantor and any renovations solely to the interior of buildings that have no impact on Grantor's Work) ("**Development**") for Grantor's review and consent at least thirty (30) days prior to the commencement by anyone of any Development activities on the Property.  No Grantee Party shall remove or relocate any Corrective Action Equipment without the prior written consent of Grantor.  In the event that Grantor consents to any such removal or relocation, then either (at Grantor's sole election): (y) Grantee (or such other Grantee Party (as applicable)) shall perform such removal and/or relocation at its sole cost and expense, pursuant to plans and specifications which have been approved in writing by Grantor, and using contractors acceptable to Grantor (in which event Grantor and its contractors and consultants shall have the right to be present at, and supervise, such removal or relocation); or (z) Grantor shall perform (or cause to be performed) such removal and/or relocation, but all costs and expenses of such removal or relocation shall be borne solely by Grantee or such other Grantee Party (as applicable), and Grantee or such other Grantee Party (as applicable) shall promptly reimburse Grantor for any such costs or expenses paid, sustained or incurred by Grantor.

     **3.5**    **Cooperation.** Grantee and each of the other Grantee Parties agrees to cooperate with Grantor and with the Government in obtaining a No Further Action Determination, to commercial standards or Type 5 risk reduction standards as set forth in Ga. Comp. R. & Regs. 391-3-19.07(10), for any Hydrocarbon Release relating to or arising out of Grantor's prior use of the Property in connection with the Retained Environmental Liabilities. Said cooperation may include, but not be limited to, the following: (a) execution of any and all documentation, including restrictive covenants, as may be necessary, in Grantor's sole discretion, to obtain a No Further Action Determination for the Property (which documentation may impose further use and operating restrictions similar to those set forth in this **Exhibit B** on the use of the Property by Grantee and the other Grantee Parties); (b) attendance at any meetings requested by Grantor relating to a Hydrocarbon Release and remediation efforts on the Property (and/or any Hydrocarbons that may have migrated from the Property to adjacent properties); and/or (c) such other further acts as may be required in order to obtain a No Further Action Determination for any environmental incident relating to Grantor's prior use, ownership or operation of the Property. Should Grantee or any Grantee Party fail or refuse to sign such documentation, or are unavailable to sign such documentation (after reasonable inquiry by Grantor (such reasonableness to be determined by Grantor in its sole discretion)), Grantee or Grantee Parties hereby irrevocably appoint any Environmental Business Manager of Grantor (or any successor corporation thereto) as its attorney-in-fact to sign and execute such documentation for and on behalf of Grantee or Grantee Parties. Grantee and each of the other Grantee Parties further authorizes Grantor to record one or more "No Further Remediation" or "No Further Action" letters, restrictive covenants related to Hazardous Materials or similar site closure documentation or notices against the Property, if required by the Government or the Laws to obtain environmental site closure to commercial standards or Type 5 risk reduction standards, when the same are obtained by Grantor from the Government.

     **3.6**    **Notice.** Any notices required to be given to Grantor shall be given using the following address:

> BP Products North America Inc.
> Environmental Business Manager
>
> _____
>
> Site SS #:  16926
> Address:   4324 Shallowford Road, Marietta, Georgia

    **B.**    **Duration.** The Groundwater Exposure Restriction, the Residential Use Restriction, the Below-grade Restriction, the Construction Workers' Caution Restriction, and the Soil and Groundwater Removal Restriction, including their related restrictions, notices, acknowledgments and affirmative covenants *[THE FOLLOWING ITALICIZED PHRASE WILL ONLY BE INCLUDED IN THOSE DEEDS FOR PROPERTIES FOR WHICH SELLER HAS LISTED RETAINED ENVIRONMENTAL LIABILITIES IN SCHEDULE II: and those restrictions, notices, acknowledgments and covenants set forth in sections 3.4 and 3.5 above]* (collectively, the "**Environmental Restrictions**"), shall run with land and each portion thereof and shall be binding upon and inure to the benefit of Grantor, the other Grantor Parties, Grantee and the other Grantee Parties, and shall remain in full force and effect and bind and restrict the Property, unless and until the Environmental Restrictions (or any portion thereof) are either: (1) waived in writing by Grantor

under conditions which, in Grantor's sole discretion, demonstrate that specific risks to human health and the environment are, have been, and/or will be appropriately reduced; or (2) released in writing by Grantor. Grantor may, at Grantee's request, release a portion or portions of the Environmental Restrictions from the Property upon Grantor's receipt from Grantee of an acknowledgment from the government, obtained by Grantee at its sole cost and expense, that test results demonstrate that the Property meets the then-current soil and groundwater standards for the Property without that portion or portions of the Environmental Restrictions and that the government approves the releasing of that portion or portions of the Environmental Restrictions.

## III.     Certain Environmental Acknowledgments, Covenants and Notices.

**A.     Prior Use.** Grantee acknowledges that the Property has been used as a service station or for related purposes for the storage, sale, transfer and distribution of motor vehicle fuels, petroleum products or derivatives containing hydrocarbons.

**B.     USTs.** Grantee acknowledges that underground storage tanks and associated product piping systems ("USTs") included in, on or under the Property may contain explosive gases and may have been used for the storage of motor fuels containing tetraethyl lead or other "antiknock" compounds which have made such USTs unfit for the storage of water or any other article or commodity intended for human or animal contact or consumption. Grantee expressly agrees not to use or permit the use of any such USTs for such purposes.

**C.     Notice of Environmental Restrictions upon Conveyance.** Each instrument hereafter conveying any interest in the Property or any portion of the Property shall contain a recital acknowledging the Environmental Restrictions and providing the recording location of this Deed upon such conveyance substantially in the following form: "The real property described herein is subject to the Environmental Restrictions made by BP Products North America Inc., as Grantor, for its benefit and for the benefit of other parties and persons as set forth therein, and recorded with the Office of the Recorder of _____ County on the _____ day of _____, 200___, in _____County Deed Records at Volume ____, Page ___ and having Document No. _____ as if the same were fully set forth herein." Notwithstanding the foregoing, any failure to include such notice shall not, in and of itself, create any right or claim that any of the Environmental Restrictions or this Deed are void, voidable or otherwise unenforceable in accordance with their terms.

## IV.     Defined Terms; Successors; Other. 
All capitalized terms used in this **Exhibit B** shall have the meanings ascribed to such terms as set forth in the Deed to which this **Exhibit B** is attached. By taking title to the Property (or otherwise succeeding, directly or indirectly, to any of Grantee's right, title or interest in or to the Property), each Grantee Party shall be conclusively deemed to have agreed to and accepted each and all of the terms, provisions and conditions of this **Exhibit B**, and to have agreed to be bound thereby. It is the intention of Grantor and Grantee that the terms, provisions, covenants and restrictions set forth in this **Exhibit B** shall be deemed to have vested upon the execution and delivery of this Deed by Grantor. If any of the covenants or restrictions contained herein shall be unlawful, void or voidable for violation of the rule against perpetuities, then any such covenants and restrictions shall continue only until twenty-one (21) years after the death of the survivor of the now living descendants of President George W. Bush. If any of the

covenants or restrictions contained herein shall be unlawful, void or voidable for violation of any other statutory or common law rule(s) or regulation(s) imposing time limits, then any such covenants and restrictions shall continue only for the longest period permitted under such statutory or common law rule(s) or regulation(s). If any term, provision, condition, covenant or restriction in this **Exhibit B** shall, to any extent, be invalid or unenforceable, the remainder of this **Exhibit B** (or the application of such term, provision, condition, covenant or restriction to persons or circumstances other than in respect of which it is invalid or unenforceable) shall not be affected thereby, and each term, provision, condition, covenant and restriction set forth in this **Exhibit B** shall be valid and enforceable to the fullest extent permitted by law. Grantee acknowledges, for itself and the other Grantee Parties, that the breach of any of the covenants or restrictions contained in this **Exhibit B** on the part of Grantee or any other Grantee Party will result in irreparable harm and continuing damages to Grantor and Grantor's business, and that Grantor's remedy at law for any such breach or threatened breach would be inadequate. Accordingly, in addition to such remedies as may be available to Grantor at law or in equity in the event of any such breach, any court of competent jurisdiction may issue an injunction (both preliminary and permanent), without bond, enjoining and restricting the breach or threatened breach of any such covenant or restriction by Grantee or any other Grantee Party. In the event that Grantee or any Grantee Party shall breach any of the covenants or restrictions set forth in this **Exhibit B**, then Grantee or such other Grantee Party (as applicable) shall pay all of Grantor's costs and expenses (including reasonable attorneys' fees) incurred in enforcing such covenants and restrictions.

[End of Exhibit B to Deed]

SS #16926

## EXHIBIT L-2

## OPTION AGREEMENT

This Option Agreement (this **"Agreement"**) dated _____, 200___, is made by and between _____, a(n) _____ _____ (**"Owner"**) and **BP PRODUCTS NORTH AMERICA INC.**, a Maryland corporation (**"Holder"**).

## RECITALS

A.     Holder sold the Real Estate to Owner and Owner owns the fee interest in the real property located at _____, and described in the attached **Exhibit A** (the **"Real Estate"**).

B.     The Quit Claim Deed or the Prime Lease Assignment by which Holder conveyed the Real Estate to Owner and the Memorandum of Franchise Agreement and Dealer Supply Agreement will be recorded in the Official Records of the county in which the Real Estate lies (the **"Official Records"**), immediately before this Agreement is recorded.

C.     By this Agreement, Owner intends to grant to Holder certain rights to reacquire the Real Estate and certain other property upon the terms and conditions set forth therein.

D.     Holder and Owner  have signed a certain Dealer Supply Agreement dated _____ _____, 200___,("the **Supply Agreement"**) and a certain *ampm* Mini Market Franchise Agreement dated _____, 200___ ("the **Franchise Agreement"**) whereby Owner shall operate the Property as a BP-branded motor fuel sales facility and *ampm* mini market (collectively the **"Business Operations"**).

## AGREEMENT

THEREFORE, Owner and Holder agree as follows:

1.     Grant of Purchase Option.  Owner grants to Holder the right to buy (**"Purchase Option"**) the Real Estate, Improvements and any Business Property owned by Owner (collectively the **"Option Property"**), upon the termination of the Lease, the Supply Agreement, or the Franchise Agreement.  The Purchase Option will be in effect during the period beginning on the date this Agreement is recorded (**"Recordation Date"**) in the Official Records of the county in which the Option Property lies and end on the earlier of (i) the 20th anniversary of the Recordation Date or (ii) the Option Early Termination Date (as defined below).

1.1     Option Consideration.  The price that Holder has accepted from Owner for Holder's conveying the Real Estate to Owner is less than the price that Holder would have required if Owner did not grant the Purchase Option to Holder; and the difference between those two prices is the consideration for Owner's granting the Purchase Option.

SS  SS #16926

1.2     Exercise Notice.  If the Supply Agreement or the Franchise Agreement is terminated, Holder shall immediately give Owner written notice of the termination ("**BP Termination Notice**").  Holder may exercise the Purchase Option by giving Owner written notice of Holder's exercise of the Purchase Option (the "**Exercise Notice**") within 60 days ("**Exercise Period**") after the date the termination of the Supply Agreement or Franchise Agreement becomes effective.  During the Exercise Period, Holder and its agents, employees, contractors, and consultants may enter on the Real Estate to conduct reasonable and customary environmental assessments and tests of the Real Estate.

1.3     Early Termination of Option; Termination Document.  If Holder does not exercise the Option within the Exercise Period, the Purchase Option will terminate on the day after the Exercise Period expires ("**Option Early Termination Date**").  Upon Owner's written request made after the Option Early Termination Date, Holder shall sign, acknowledge, and deliver to Owner a recordable document confirming that this Agreement and the Purchase Option have terminated.

1.4     Real Estate Value.  Holder shall have the option to purchase the Real Estate at a price equal to its fair market value as agreed to by Holder and Owner, or failing their agreement, as determined in accordance with Sections 1.6 and 1.7 below (the "**Real Estate Value**").

1.5     Business Property Value.  Holder shall have the option to purchase the Business Property (if any is owned by Owner) at a price equal to its fair market value as agreed to by Holder and Owner, or failing their agreement, as determined in accordance with Sections 1.6 and 1.7 below (the "**Business Property Value**").

1.6     Appointing Appraisers.  If Holder and Owner cannot agree on the Real Estate Value or, if applicable, the Business Property Value, the Real Estate Value and Business Property Value will be determined in accordance with the appraisal procedures contained in this Section 1.  Within fifteen (15) days after Holder or Owner receives a demand from the other for an appraisal in accordance with this Section 1.6, Holder and Owner shall each appoint a "**Qualified Appraiser**", which is defined as a member of the Appraisal Institute who (i) is unaffiliated with Owner, Operator, Holder, and the third party under the Tendered Agreement and (ii) has at least five-years' full-time experience in appraising commercial real property in the area of the Real Estate.  If the Appraisal Institute ceases to exist, a reasonably comparable, nationally recognized organization of real estate appraisers will be substituted in the definition of Qualified Appraiser.  If one of them fails to timely appoint a Qualified Appraiser, the Qualified Appraiser appointed by the other will determine the Real Estate Value and Business Property Value.

1.7     Determination of Values.  If only one appraiser is appointed, the appraiser must deliver a signed report (an "**Appraisal Report**") to Holder and Owner within thirty (30) days after his or her appointment.  An Appraisal Report must set forth the appraiser's determination of the Real Estate Value and Business Property Value and the considerations on which his or her opinion is based.  If two appraisers are appointed and they agree on the Real Estate Value and Business Property Value, they must deliver a signed joint Appraisal Report to Holder and Owner within thirty (30) days after the appointment of the second appraiser.  If two appraisers are appointed and they fail to agree on the Real Estate Value, Business Property Value, or both, each appraiser must deliver his or her signed Appraisal Report to Holder and Owner within 35 days after his or her appointment.  If the lower of either appraiser's determinations as to Real Estate Value and Business Property Value is

SS  SS #16926