at least ninety percent (90%) of the higher, the applicable value will be the average of the two determinations. If not, then within ten (10) days after Holder or Owner requests the two appraisers to do so, they must mutually appoint a third appraiser who is a Qualified Appraiser. Within ten (10) days after his or her appointment, the third appraiser must select one of the two determinations as being the same as or closer to the amount that he or she determines as the Real Estate Value and/or the Business Property Value; and the selected determination will be the value to be used herein.

1.8     Appraisal Fees. Holder and Owner shall each bear the cost of the appraiser that it appoints and one-half of the cost of the third appraiser.

1.9     Excluded Business Property. Holder may elect not to buy all or part of the Business Property. If Holder wishes to exercise this election, Holder must give notice to Owner on or before the fifth day before Escrow closes. Holder's notice must (i) state that it is electing not to buy the Excluded Business Property and (ii) identify the items of the Excluded Business Property with sufficient particularity to allow Owner to remove from the Real Estate the items of the Excluded Business Property that are tangible personal property. Owner shall remove those items of tangible personal property from the Real Estate within two business days before Escrow closes.

1.10    Escrow and Closing Date. The Transaction will occur through an escrow with a title insurance company acceptable to Holder ("**Title Company**"). The escrow will close on or before the later of (i) the 90th day after the date on the Exercise Notice is given ("**Exercise Date**"), (ii) the date on which Holder receives notice from the applicable governmental authority that the authority has transferred to Holder (or an affiliate of Holder) any Alcoholic Beverage License that is included in the Business Property, or (iii) the tenth (10th) business day following the final determination of the Real Estate Value (pursuant to the provisions of Section 1.4).

1.11    Escrow Procedures. If Holder exercises the Purchase Option, Holder and Owner shall promptly sign escrow instructions and open the escrow ("**Escrow**"). Owner shall apply to the Title Company for a preliminary title report on the condition of title of the Real Estate. The following will apply to the consummation of the Transaction through the Escrow:

>   (a)    Deed and Title Insurance. Owner shall provide the Title Company with a deed conveying title to the Real Estate, free of encumbrances, except those that Holder elects to accept. Owner shall provide Holder with an ALTA Standard Coverage Owner's Policy of Title Insurance insuring title, subject only to the printed exceptions of the policy and those encumbrances that Holder elects to accept. The policy must be issued by the Title Company (or another insurer acceptable to Holder) and have a liability amount equal to the portion of the purchase price of the Option Property ("**Purchase Price**") that is attributable to the Real Estate. Closing will be considered effected when the County Recorder accepts the deed for recording.

>   (b)    Bill of Sale. Owner shall provide the Title Company with a bill of sale conveying title to the Business Property (if any) to Holder, free of encumbrances.

(c) <u>Taxes and Rent</u>. Taxes, rentals, and other items of income and expense related to the property that Holder is buying will be prorated as of the date that Escrow closes.

(d) <u>Closing Costs</u>. Owner and Holder shall each pay one half of the Title Company's ("**Escrow Agent**") fee for handling the Escrow. Owner shall pay the premium for Holder's title insurance policy. Owner and Holder shall pay all other closing costs in accordance with the custom in the County. But if there is no custom for a particular closing cost, each shall pay one half of that cost.

(e) <u>Extended Coverage Title Policy; Survey</u>. Notwithstanding the provisions of Section 1.11(a), Holder may require that the title policy be an ALTA extended coverage owner's policy of title insurance ("**Extended Coverage Title Policy**"). In that event, Holder shall (i) obtain and provide to the title insurer any survey that the title insurer might require in order to issue the title policy as an Extended Coverage Title Policy and (ii) pay the increase in the premium attributable to the extended coverage. Within three days after the Escrow opens, Owner shall send to Holder a copy of the most recent survey (if any) of the Real Estate that Owner has in its possession.

(f) <u>Deductions by Holder</u>. Holder may deduct from the Purchase Price or from any other amounts that Holder is required to pay to Owner in connection with the Transaction any or all of the following: (i) Any trade payables or other amounts that an Owner Entity (defined below) owes to Holder or any of its affiliates with respect to (A) the operation of the business conducted at the Real Estate or (B) all or any part of the Real Estate, (ii) any transfer fee that an Owner Entity is required to pay to Holder under any of the Dealer Agreements pertaining to the business conducted at the Real Estate, (iii) the unpaid balance of principal and accrued interest on any loan that is payable to Holder or any of its affiliates and that is secured, wholly or partially, by any property that Holder is buying in the Transaction, whether or not the deducted amounts would otherwise be due when Escrow closes and (iv) the unpaid balance of principal and accrued interest on, and all other amounts due in connection with, any Secured Obligation (as defined in Section 2.1) as of the date that Escrow closes. If Holder elects to buy the Option Property, upon the close of Escrow, the Title Company shall use the funds that Holder deposits into Escrow first to pay in full the Secured Obligation. For purposes of this Agreement an Owner Entity is individually and collectively, (i) each person named as Owner in this Agreement ("**Constituent Owner**") and (ii) each person that controls a Constituent Owner, is controlled by a Constituent Owner, or is under common control with a Constituent Owner, in each case whether the control is direct or indirect.

      1.12 <u>Environmental Indemnification</u>. If Holder acquires the Real Estate in accordance with this Agreement, the person transferring the Real Estate to Holder shall sign and deliver to Holder through the Escrow an indemnification agreement containing the following provision:

SS SS #16926

> *Transferor shall indemnify and defend Holder from all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) that Holder incurs arising from any environmental contamination occurring or hazardous materials existing at the Real Estate, to the extent that the contamination or hazardous materials (i) are present at concentrations that any governmental agency will require to be remediated or otherwise are not in compliance with all applicable statutory and regulatory requirements and (ii) are known or discovered before Holder begins its operations at the Real Estate. This agreement to indemnify and defend will survive the closing of Transferor's transfer of the Real Estate to Holder.*

2.  Default on Obligations Secured by Junior Liens.

    2.1  Definitions for Section 2. When used in this Section 2, each underlined, capitalized term set forth below in this Section 2.1 has the meaning set forth beside it.

    (a)  Accelerated Amount: Any amount that became due on or under the Secured Obligation because Lender exercised an acceleration right arising from the Loan Default.

    (b)  Default Amounts: All amounts that were added to the balance of the Secured Obligation by reason of the Loan Default, whether those amounts have been paid or remain unpaid. "Default Amounts" include, without limitation, (i) late charges, (ii) the excess of any interest that accrued at a default rate over the interest that would have accrued if Lender had not imposed the default rate, (iii) any prepayment penalty, and (iv) any interest that accrued on any of the amounts described in clauses (i) through (iii) of this sentence.

    (c)  Elected Property: The items of real property and personal property that Holder intends to buy from Owner and/or Operator, as appropriate, in accordance with this Section 2 after giving a Foreclosure Exercise Notice.

    (d)  Foreclosure Exercise Notice: A notice from Holder to Owner and/or Operator, as appropriate, and Lender stating that Holder elects to buy the Real Estate in accordance with this Section 2.

    (e)  Foreclosure Purchase Right: The right to buy the Real Estate in accordance with this Section 2.

    (f)  Lender: A person for whose benefit a particular Lien exists. "Lender" includes, without limitation, (i) the beneficiary under a deed of trust, (ii) a mortgagee, and (iii) a judgment lien holder.

L2-5

  (g) <u>Lien</u>. A lien that (i) encumbers an interest in the Real Estate, (ii) secures a monetary obligation, and (iii) is junior to Holder's rights under this Agreement.

  (h) <u>Lien Enforcement Notice</u>: A notice from Lender to Holder notifying Holder of Lender's intent to enforce its Lien. The Lien Enforcement Notice must include (i) a copy of the recorded lien document, (ii) a copy of the promissory note or other document evidencing the Secured Obligation, (iii) a statement of the amount of the unpaid balance of the Secured Obligation, (iv) a description of the Loan Default, (v) an itemization of the portion of the unpaid balance of the Secured Obligation that is' in default, (vi) an itemization of the Default Amounts, and (vii) a statement of any Accelerated Amount.

  (i) <u>Loan Default</u>: The breach for which Lender intends to foreclose its Lien.

  (j) <u>Secured Obligation</u>: The monetary obligation secured by a Lien.

  2.2 <u>Coverage of this Section 2</u>. The provisions of this <u>Section 2</u> will apply with respect to each Lien and to each Lender who holds a Lien.

  2.3 <u>Lender's Lien Enforcement Notice to Holder</u>. Before Lender begins enforcement of its Lien (whether by private power of sale, judicial foreclosure, or otherwise), Lender shall send a Lien Enforcement Notice to Holder.

  2.4 <u>Holder's Right to Buy</u>. Before Lender begins enforcement of its Lien, Holder will have the Foreclosure Purchase Right.

  2.5 <u>Holder's Exercise Notice to Owner and Lender</u>. If Holder wishes to exercise the Foreclosure Purchase Right, Holder must send a Foreclosure Exercise Notice to Owner and Lender within 30 (thirty) days after Holder actually receives the Lien Enforcement Notice.

  2.6 <u>Holder's Purchase of Real Estate</u>. If Holder exercises the Foreclosure Purchase Right, the Foreclosure Purchase Right will include the right to buy the Real Estate and all Improvements, together with any Business Property that Holder wishes to buy and in which Owner as appropriate, holds an interest.

  2.7 <u>Procedures for Holder's Purchase</u>. If Holder exercises the Foreclosure Purchase Right, the purchase and sale transaction will be consummated in accordance with the procedures described in Section 1. Holder will have a period of time to close the purchase that is equal to the longer of (i) 60 days after the opening of Escrow, or (ii) the date on which Holder receives notice from the applicable governmental authority that the authority has transferred to Holder (or an affiliate of Holder) any Alcoholic Beverage License that is included in the purchase, but under no circumstances longer than 120 (one hundred twenty) days following Lender's delivery of the Lien Enforcement Notice.

SS SS #16926

2.8 <u>Purchase Price for the Elected Property Resulting From Holder's Exercise of the Foreclosure Purchase Right; Reduction and Credits</u>. The purchase price for the Elected Property resulting from Holder's exercise of the Foreclosure Purchase Right arising under this Section 2 will be equal to the Purchase Price, reduced by the total costs (including attorneys' fees) that Holder incurs in connection with the purchase and sale of the Elected Property. If Holder elects to buy the Elected Property subject to a lien that secures a monetary obligation other than the Secured Obligation that was the subject of the Lien Enforcement Notice, Holder will receive a credit against the Purchase Price for the unpaid balance of that monetary obligation as of the date that Escrow closes. If Holder elects to buy the Elected Property, upon the close of Escrow, the Title Company shall use the funds that Holder deposits into Escrow first to pay in full the Secured Obligation that was the subject of the Lien Enforcement Notice, including all unpaid Default Amounts.

2.9 <u>No Impairment of Lien</u>. Holder's exercise of the Foreclosure Purchase Right will not defeat, discharge, or impair any Lien or the Secured Obligation. No Lien will be released of record or otherwise extinguished until the Secured Obligation, including all unpaid Default Amounts, is paid in full.

3. <u>Liens</u>.

3.1 <u>Coverage of this Section 3</u>. The provisions of this <u>Section 3</u> will apply with respect to each Lien and to each Lender who holds a Lien.

3.2 <u>No Impairment of Lien</u>. Anything in this Agreement to the contrary notwithstanding, (i) Holder's Right, Lease Option, and Purchase Option (collectively "**Options**") and the exercise thereof shall not defeat, discharge, or impair any Lien or Secured Obligation, and (ii) in the event Holder exercises any of its Options and elects to buy or lease the Real Estate, no Lender shall be obligated to release of record its Lien unless and until the entire Secured Obligation with respect thereto is paid and discharged in full.

3.3 <u>Foreclosure</u>. If an event shall occur entitling Holder to exercise any of the Options and in connection therewith a Lender commences foreclosure of its Lien and for any reason Holder does not pay to such Lender the amount required to terminate the foreclosure within the time and in the manner required thereby, then such Lender may proceed to foreclose its Lien and the Options and all other rights of Holder under this Agreement shall automatically terminate and be of no further force and effect and Holder shall execute and furnish to such Lender within ten (10) days after such Lender's written request therefor, a written release and termination of the Options and all other rights of Holder under this Agreement in recordable form and otherwise in form and substance satisfactory to such Lender, which such Lender may record in the real estate records for the county(ies) where the Real Estate is located to give record notice thereof.

3.4 <u>Effect of Options on Liens</u>. If an event shall occur entitling Holder to exercise any of the Options, and Holder elects to proceed with the exercise of the relevant Option, and the Real Estate is subject to a Lien or Liens for which the Lender(s) does not initiate a foreclosure, Holder may elect to either: (A) direct the Escrow Agent to apply the Purchase Price first to payment in full of any or all Secured Obligations, the Lender(s) of such Secured Obligation(s) shall release of record its Lien(s), and Holder shall acquire fee title to the Real Estate free and clear of all such

SS SS #16926

Secured Obligation(s), or (B) direct the Escrow Agent to apply a portion of the Purchase Price necessary to cure any defaults, if any, under any or all Secured Obligations, and Holder shall assume such Secured Obligations upon Holder's acquisition of the fee title to the Real Estate.

4. Notices. Notices relating to this Agreement must be in writing and sent to the addresses set forth below. But a party may change its address for notices by giving notice as required by this Section 4. A written notice will be considered given (i) when personally delivered, (ii) two business days after deposit in the United States Mail as first class mail, certified or registered, return receipt requested, with postage prepaid, (iii) one business day after deposit with a reputable overnight delivery service for next business day delivery, or (iv) on the business day of successful transmission by electronic facsimile. The parties' addresses for notices are as follows:

To Owner: _____
_____
Attn: _____
_____

Facsimile: _____

To Holder: BP Products North America Inc.
4101 Winfield Road, MC 5E
Warrenville, IL 60555
Attn: Real Estate Legal

Facsimile: _____

5. Entire Agreement; Modification; Waiver. This Agreement (including any attached Exhibits) contains the entire agreement between Owner and Holder with respect to Holder's rights to acquire Offered Parcels. Any modification of this Agreement must be in writing and signed by all the parties to this Agreement. Any waiver of a provision of this Agreement by a party must be in writing.

6. Governing Law. The internal laws of the State where the Land lies govern this Agreement.

7. Interpretation. The captions appearing in this Agreement are for convenience of reference only, and they do not affect the meanings of the provisions of this Agreement. In this Agreement, each gender includes the other gender. Words in the singular include the plural and vice versa, when appropriate. The word "person" includes natural individuals and all other entities. The word "cost" includes any cost or expense. The word "term" includes any covenant, condition, representation, warranty, or other provision that is part of an agreement. Whenever a provision of this Agreement requires a party to this Agreement to perform an act, that person must do so at its sole cost (unless otherwise stated in connection with that provision).

8. <u>Dates</u>. If the date by which an event is to occur under this Agreement falls on a Saturday, Sunday, or other legal holiday under United States or Federal law, the event may occur on the next business day.

9. <u>Successors and Assigns</u>. The rights and obligations under this Agreement bind and benefit the successors and assigns of each party to this Agreement. For example, the covenants and obligations of Owner contained in this Agreement will bind each future owner or tenant of all or part of the Real Estate; and each of those persons will be considered "Owner" under this Agreement with respect to the applicable part of the Real Estate while that person is the owner or tenant.

10. <u>Further Acts</u>. Each party to this Agreement shall do all things that another party reasonably requests to carry out the purpose of this Agreement.

11. <u>Attorneys' Fees</u>. If a dispute arises between Owner and Holder with respect to this Agreement and if Holder prevails in the dispute, then Holder will be entitled to recover from Owner the reasonable costs and expenses that Holder incurred in enforcing its rights under this Agreement, including reasonable attorneys' fees.

12. <u>Counterparts</u>. The parties may sign this Agreement in counterparts. The signature pages from the separately signed counterparts may be attached to one copy of this Agreement to form a single document.

(Signature Page Follows)

**OWNER:**

_____

By: _____
Printed Name: _____
Printed Title: _____


By: _____
Printed Name: _____
Printed Title: _____


Dated: _____, 200___


**HOLDER:**

BP PRODUCTS NORTH AMERICA INC.,
a Maryland corporation

By: _____
Printed Name: _____
Printed Title: _____


Dated: _____, 200___


(ATTACH NOTARY ACKNOWLEDGMENTS)

# EXHIBIT B



Facility Number 16926/50074
Customer Account Number: _____
Category: As Is

## am/pm® MINI MARKET FRANCHISE AGREEMENT
### East of Rockies

THIS **FRANCHISE AGREEMENT** ("Agreement") is made _____, _____ (the "**Effective Date**"), between BP Products North America Inc., a Maryland corporation ("**BP**"), with an office at 4 Centerpointe Drive, La Palma, CA 91789 and <u>TOBATEX INC.</u>, a(n) <u>Georgia Corporation</u> ("Operator"), with an address <u>4324 Shallowford Road NE, Marietta, Georgia 30062</u>

Operator desires to be the franchisee of, and BP is willing to grant to Operator a franchise for, an "am/pm" mini market store located at the Premises on the terms and conditions set forth in **PARTS I and II** of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained in PARTS I and II hereof, each of the parties intending to be legally bound hereby, agrees as follows:

### PART I

**PART I** contains specific terms which relate to the terms and conditions set forth in the corresponding sections - **PART II**, Form No. 1A, attached hereto and incorporated herein.

Section:

| | |
|---|---|
| 4.02 | Entity Designee, if applicable: _____ |
| 4.02 | Store Manager, if applicable: _____ |
| 4.02 | Operational Designee, if applicable: _____ |
| 5.01 | Commencement Date: 10 AM on _____. If no date has been set forth in this paragraph, the Commencement Date shall be established by the Notice of Final Inspection and Readiness. |
| 5.01 | Expiration Date: 10 AM on _____. If no date has been set forth in this paragraph, the Expiration Date shall be 10 am on the first day after the last day of the 240th full calendar month following the Commencement Date. |
| 6.01 | Premises: <u>4324 Shallowford Road NE</u><br>City <u>Marietta</u> State <u>Georgia</u> Zip <u>30062</u><br>(complete address by street number, including, where applicable, designation of corner) |
| 7.01(a) | Franchise Fee: <u>Thirty Thousand Dollars and 00/00</u> <u>($30,000.00)</u>. |
| 7.02 | Minimum Monthly Royalty Fee: <u>One Thousand Dollars and 00/100 ($1,000.00)</u> |
| 21.01 | Date of Purchase and Sale Agreement, if applicable, relating to, among other things, the purchase of the real estate on which the am/pm® mini market store is located: . |

Rev. Dec., 2006
SM01DOCS\613189.12
East of Rockies

OPERATOR ACKNOWLEDGES HAVING READ THIS AGREEMENT, INCLUDING **PART II**, GENERAL TERMS AND CONDITIONS, FORM No. 1A, AND UNDERSTANDS FULLY ALL THE TERMS, PROVISIONS AND CONDITIONS HEREOF. **No representative of BP is authorized by BP to orally modify, amend, add to or waive any provision of this Agreement.**

COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO OPERATOR'S PROFIT OR INCOME TO BE DERIVED FROM THE OPERATION OF THE AM/PM® MINI MARKET STORE CONTEMPLATED HEREUNDER.

IN WITNESS WHEREOF, BP and Operator have executed this Agreement as of the date first above written.

"BP"

BP Products North America Inc.

By _Humberto Marroquin_  _Cheryl Heala_
Name: _____  Witness
Its: _____
Date Signed: 11-7-07

"Operator"

If Operator is an entity, complete and sign below:

TOBATEX INC.,
(print or type name of entity above)

Check one:
☐ a _____ general partnership;    ☐ a _____ limited partnership;
☐ a _____ limited liability company;  ☒ a  GA  corporation

By _Kicho Shrood_   _signature_
Name: Khosrow Khoshnood    Witness
Its: _____
Date Signed: Sep/24/07

If Operator is an individual, print name and sign below:

_____    _____
                           Witness
Print Name: _____
Date Signed: _____

Rev. Dec., 2006
SM01DOCS\613189.12
East of Rockies



Service Station Number
<u>16926/50074</u>

**Dealer Supply Agreement
Franchise**
DSAUSCOF (11-2005LOF)

THIS DEALER SUPPLY AGREEMENT ("Agreement") dated _____,
is made between BP Products North America Inc. (hereinafter "BP") having its place of business at

<u>1323 Bond Street, Naperville, IL. 60804</u>
[Insert Region Address]

and _____<u>TOBATEX INC.</u>_____ (hereinafter "Dealer")
regarding the purchase and sale of branded motor fuel at the motor fuel sales facility ("Facility") located at

<u>4324 Shallowford Road NE, Marietta Georgia 30062</u>

The purpose of this Agreement is for Dealer to act as a reseller of BP's trademarked motor fuels, motor oils and other products to the motoring public. Dealer understands that BP expects a full service facility to be fully stocked with its trademarked products at all times. Dealer recognizes that BP has entered into a dealer relationship only with respect to the particular station subject to this Agreement and that BP will deliver products to the particular station identified in this Agreement and will not be required to deliver products pursuant to this Agreement to any premises other than this Facility.

Now Therefore, BP and Dealer, intending to be legally bound, agree to the following:

**1. Term**

(a) The term covered by this Agreement will be for a period of <u>20</u> years beginning on _____ (the "Commencement Date") and ending on _____, unless terminated earlier by law or by the terms of this Agreement or unless extended by BP upon written notice. If no date has been set forth in this paragraph, the Commencement Date shall be established by the Notice of Final Inspection and Readiness and ends on the first day after the last day of the 240th full calendar month following the Commencement Date, unless terminated earlier by law or by the terms of this Agreement or unless extended by BP upon written notice. If the franchise relationship underlying this Agreement continues for any reason beyond the expiration date indicated above, this Agreement will be extended until terminated or until superseded by a new dealer supply agreement, if offered. This Agreement and any renewal term is offered only in conjunction with a simultaneously executed am/pm mini market franchise agreement for the Facility at the address above on BP's then-current form of franchise agreement.

(b) In the event of a termination for any reason whatsoever of this Agreement from BP to Dealer for the Facility, all associated agreements (except any financial security agreements, mortgages, amortization agreements, notes or guarantees) automatically terminate.

**2. The Facility.**

(a) This Agreement applies only to Facility and is expressly contingent on Dealer providing to BP evidence satisfactory to BP that Dealer holds and will maintain through the term of this Agreement a legally binding and enforceable possessory interest in the Facility.

(b) This Agreement is expressly contingent on Dealer having in place at all times on the Facility a canopy which covers all retail gasoline Fuel Islands and which meets BP's image standards as revised from time to time.

(c) BP will require all facilities branded with its Trade Identities to have retail gasoline fuel dispensers which are enabled to accept card readers in dispensers (CRINDS). Dealer will install such capability at its Facility no more than 6 months after BP requires such dispensers in Dealer's market.

**3. Prices**

(a) The price for motor fuels purchased by Dealer from BP will be BP's dealer buying price for Dealer's brand (plus all taxes, duty, fees or charges levied on the products) for each grade of said products in effect for BP's pricing area in which the above-identified Facility is located at the time when title to said products passes from BP to Dealer or when the product is loaded, at BP's option. BP has the right to change prices for all products at any time. BP will notify Dealer of such changes in the normal course of business.

(b) If this Agreement is assigned by BP to a BP jobber or other party, the prices to be paid by Dealer for motor fuel and other products hereunder will be as established by said jobber or other party.

Page 2
SM01DOCS\613207.6C064648/0205620
Rev. March. 2007

East of Rockies

### 4. Delivery—Motor Fuels

(a) During the term of this Agreement, BP will deliver branded motor fuels to Dealer at the Facility in accordance with the Electronic Dealer Delivery Plan (EDDP) Agreement in effect at the time of delivery. The EDDP Agreement will automatically terminate in the event of the termination or expiration for any reason whatsoever of this Agreement between BP and Dealer for the Facility to which this Agreement pertains. BP has the ability to terminate or change delivery methods with 24 hour notice to Dealer.

(b) BP has the right to specify minimum delivery quantity to be full loads only. BP has the right to impose a surcharge for delivery of less than a full load. Currently, the surcharge is $ __**500.00**__ . BP reserves the right to amend this provision, from time to time, to increase the amount of the surcharge as BP deems appropriate.

(c) The quantities of motor fuels delivered to Dealer hereunder will be determined on the basis of the temperature thereof at 60°F in accordance with "Table No. 6B of API Standard 2540, Manual of Petroleum Measurement Standards, Chapter 11.1- Volume Correction Factors-Volume II" (or any API/ASTM reissue or replacement thereof in effect at the time of measurement), or, on the basis of gross volume, such election as established by BP, or as otherwise required by law.

(d) Measurements of quantities to be delivered will be made by BP at its terminal. In the case of EDDP deliveries, Dealer and BP's driver may jointly take a measurement at the time of delivery in a manner acceptable to BP.

(e) Dealer grants BP or its contract carriers 24 hour-per-day access to Dealer's motor fuel storage for purposes of delivery.

(f) Title to motor fuel shall pass to Dealer in accordance with the terms of the EDDP Agreement. Title to all products other than motor fuels shall pass to Dealer at the time of delivery except as otherwise provided.

(g) Within 24 hours of receipt of product, Dealer must notify BP's regional account executive of any claimed deficiencies in the quantity of any fuel or other products delivered to Dealer. Dealer must notify BP in writing within 10 days of said notification of any claimed deficiencies in the quality or quantity of any fuel or other products delivered to Dealer. Unless Dealer so notifies BP of such deficiencies within 10 days of delivery, the quality and quantity of product will conclusively be presumed to conform to the specifications included in the invoices and delivery documents provided to Dealer and to the terms and conditions of this Agreement.

### 5. Hours of Operation

Dealer agrees that the Facility will be kept open for operation, properly lighted and staffed 7 days a week, 24 hours per day, unless otherwise approved in writing by the Regional Sales Manager and noted below. In seeking such approval, Dealer must provide to BP, in writing, for the Regional Sales Manager's review and approval, the business reasons why the Facility cannot be open 7 days a week, 24 hours a day.

☑ **7 Days per Week /24 Hours per Day**

☐ **Same Hours of Operation All 7 Days per Week**
　　From: _____ A.M.　To: _____ P.M.

☐ **Other hours of operation** (complete the section below)

| Day | Minimum Open Hours | |
|---|---|---|
| | From: | To: |
| Monday | _____ A.M. | _____ P.M. |
| Tuesday | _____ A.M. | _____ P.M. |
| Wednesday | _____ A.M. | _____ P.M. |
| Thursday | _____ A.M. | _____ P.M. |
| Friday | _____ A.M. | _____ P.M. |
| Saturday | _____ A.M. | _____ P.M. |
| Sunday | _____ A.M. | _____ P.M. |

## 6. Credit Terms

(a) BP is not obligated to extend credit to Dealer. If BP does extend credit to Dealer, such extension of credit is subject to the following requirements, including but not limited to: Dealer maintaining with BP a business risk deposit in the minimum amount of $40,000.00; and Dealer paying for all product and open account purchases by electronic funds transfer ("EFT"). BP reserves the right to change its credit terms at any time without notice to the Dealer. Further, during each contract year, BP reserves the right to increase the required amount of the business risk deposit upon 30 days written notice to Dealer. More than 1 incident of failure by Dealer, within a 12 month period, to make payment according to BP's EFT policy causing a draft to be dishonored for nonsufficient or uncollected funds, or failure to supply financial information or documentation as required, entitles BP to suspend deliveries, impose other payment or prepay terms, and/or terminate or nonrenew this Agreement, in addition to exercising any other rights BP may have under this Agreement at law or in equity or under BP's then current Credit Policy. BP reserves the right to change the Credit Policy at any time, without giving notice to Dealer.

(b) Dealer agrees to establish an account with a financial institution on terms acceptable to BP that provides EFT services and to authorize BP to initiate certain transfers of funds between that account and designated accounts of BP for payment of any and all amounts due to BP under this or any other agreement with Dealer. Dealer will provide BP with the information and authorization necessary to debit and credit Dealer's account via EFT transactions. Dealer agrees to provide the necessary authorization and assistance to implement such additional EFT's promptly upon the request of BP.

(c) BP has the right to assess finance charges on all amounts not paid by Dealer on the due date. Finance charges will be assessed at the monthly periodic rate established by BP. BP has the right to impose a service and late payment charge for each check and/or EFT that is dishonored for nonsufficient or uncollected funds, whether or not subsequently paid by Dealer.

(d) Dealer's failure to keep all credit obligations current or one or more incidents of financial distress or anticipated financial distress may result in the Dealer automatically being placed on prepay by wire transfer.

(e) The $40,000 BRD shall be refundable in 2 installments. If BP has received a cash BRD, BP will return an installment of $30,000 (or that amount above $10,000 that has been paid pursuant to payment terms), less any outstanding monies Dealer owes to BP, within 30 days after the cancellation, termination, or nonrenewal of this Agreement. BP will return an installment of the $10,000 remaining BRD within 180 days after the cancellation, termination or nonrenewal of this Agreement.

(f) BP shall pay interest on the business risk deposit only to the extent required by then existing BP Credit Policy applicable to Dealer in the marketing area in which Dealers' Facility is located or applicable state law.

(g) Dealer must notify BP in writing of any questions or disputes regarding any charges or other items included on any invoice or statement issued to Dealer by BP within 60 days after such invoice or statement is received by Dealer (except for disputes regarding the quality or quantity of products delivered, which must be submitted pursuant to paragraph 4(g) above). Unless Dealer provides BP with such written notification, the invoice or statement will be conclusively presumed to be accurate as of the 61st day following its receipt by Dealer.

## 7. Payment Methods including Credit Cards

(a) BP may from time to time endorse and sponsor specific proprietary and third party payment methods including certain credit cards, charge cards, fleet cards, debit cards, pre-paid cards and the like (collectively, "Payment Methods") for use at facilities selling BP's products. BP will not be obligated to sponsor or participate in any specific payment methods program, or may withdraw its sponsorship of, or participation in, any such program at any time, or may condition any sponsorship or participation upon payment of service and equipment fees by Dealer. If BP does sponsor a payment methods program, ("Payment Methods Program") Dealer agrees that BP's proprietary Payment Methods and all BP-approved third party Payment Methods specified by BP will be accepted at each payment point (including card-readers-in-dispensers) at the Facility. Dealer will strictly comply with the operating rules, terms and conditions of any Payment Methods Program that BP may sponsor and distribute, through any manuals, bulletins, or other forms of written or electronic communications, as issued and as amended from time to time. BP has the right to charge back to Dealer sales transaction amounts made by Dealer's customers up to and including 6 months from the date of the transaction. Dealer must maintain all sales drafts for 6 months from the date of transaction.

(b) The Facility will be equipped with electronic point-of-sale ("POS") equipment (including all related hardware and software) approved by BP for processing transactions at the Facility. All BP approved POS equipment will, at all times, be connected to BP's network and will be operated using BP's most current software. Dealer will install BP's most current software at the request of BP. Unless otherwise specified, no right, title or ownership interest in any software will be transferred to Dealer. Dealer acknowledges that the software and the specifications are proprietary products of BP or its vendors. Under no circumstances will Dealer reverse engineer, decompile, disassemble or otherwise attempt to derive the source code for the software or alter its intended functionality. Within 6 months of Company's request, Dealer will pay all costs or fees associated with the operation of the POS equipment, including but not limited to, costs associated with software and hardware maintenance and upgrades, satellite connections, access fees and telecommunications costs.

BP reserves the right to change the fee for the leasing of BP approved POS equipment by giving Dealer 60 days written notice of such fee change.

## 8. Taxes, Fees and Utilities

(a) Dealer will pay all property taxes on the Facility and any tax, excise (manufacturer's or otherwise), inspection fee, duty (import or export), license fee (import or export), tonnage charge, assessment, or other like charge which is levied, assessed or imposed by federal, state or local authority upon the personal property, products and/or transactions contemplated hereunder (including the delivery, sale, use or consumption of the products or privilege of doing any of same), and/or which is imposed on or measured by the price of the products or the proceeds of sale hereunder.

(b) Dealer will pay any license, occupation and inspection fees or charges for Dealer's use or occupancy of the Facility. Dealer will obtain and maintain any licenses and permits in Dealer's name.

(c) Dealer will pay all sewer, water, heat, light and other operating expenses in connection with the use of the Facility.

(d) If Dealer fails to pay any charges which Dealer is obligated to pay under this Agreement, BP may do so and charge the items to Dealer's account.

## 9. Operation and Condition of Facility

Dealer recognizes that BP has developed a favorable reputation for the sale of motor fuel and associated products and the rendering of high quality services and that the BP Trade Identities and facility designs and appearance represent an image distinguished for high standards of product quality, facility appearance (inside and out) and customer service. Therefore, Dealer agrees to manage, operate and maintain the Facility in a manner that will maintain and enhance this image and which in no event will detract from or disparage this image.

(a) In particular, without limiting the foregoing obligation, Dealer (and employees where applicable) agrees to do the following:

(1) Comply with all applicable federal, state, and local laws, ordinances, rules and regulations, pertaining to health and safety, recognizing that clean, sanitary and healthful conditions are essential in the operation of the Facility. Dealer agrees all date-coded consumable products must be within date code.

(2) Keep the premises, buildings (interior and exterior), restroom, sidewalks, approaches, driveways and landscaping in good condition, properly lighted, clean, safe, sanitary and free of trash, rubbish and other debris at Dealer's own cost and expense.

(3) Operate the Facility in a manner that actively promotes the sale of BP branded motor fuels and branded motor oils and other merchandise and services customarily sold at such facilities, keeping the Facility open for operation for the hours stated in paragraph 5, and having available for retail sales all grades of trademarked motor fuels which BP offers to Dealer in amounts sufficient to satisfy the foreseeable customer demand for such fuels.

(4) Sell product only to end users for their personal volumes not exceeding the capacity of each customer's motor vehicle fuel tank, any auxiliary fuel tank directly linked to the customer's motor vehicle engine and any emergency container with a capacity of 10 gallons or less.

(5) Keep the approaches, driveways, entrances, fuel areas, and service areas uncluttered and free at all times of parked vehicles, trailers, and other obstructions, including ice or snow.

(6) Render courteous, prompt, efficient and diligent service to customers. Dealer acknowledges that providing superior customer service is essential to the success of Dealer's business and to the reputation and integrity of BP and therefore agrees to appropriately respond to customers within 72 hours of receipt of an inquiry or complaint and to resolve customer inquiries or complaints within a maximum of 15 business days from notification of said complaint. Dealer will actively work to resolve all customer complaints as quickly as possible. Dealer will keep BP apprised of any delays, and the reason for those delays, in resolving complaints. (This time frame applies both to inquiries and complaints received directly by the Dealer and to those received by BP and directed to the Dealer for response.) In addition, Dealer agrees to monitor the quality of service and cleanliness.

(7) Dress in BP-approved, coordinated uniforms with visible and approved logos used by the BP. Dealer and Dealer's employees must be able to communicate clearly and effectively with customers and to render superior service to customers.

(8) Provide a safe place to work for Dealer's employees, and maintain and operate the Facility in compliance with all applicable laws, regulations and rules concerning safety of the work place and environmental protection and compliance. Dealer will provide all employees with adequate training concerning workplace safety, safe work

practices and environmental protection and compliance; Dealer acknowledges that safety of the workplace and environmental protection and compliance are Dealer's responsibility and not BP's.

(9) Notify BP's regional sales office immediately in the case of an emergency at the Facility or otherwise involving BP branded operations. Emergency events include: death of customers, employees or contractors; injuries of any nature to any person on the Facility including but not limited to customers, employees or contractors; transport or tank truck accidents; product spills or environmental damages from a spill or underground release; any event that may have a negative impact on BP's public image or community relations.

(10) Keep abreast of the changing competitive environment, reacting to such changes in a way to maximize the level of fuel and non-fuel business at the Facility.

(11) Have daily internet access for the purpose of communication with BP within 60 days of signing this Agreement. Dealer will regularly review the dealer internet portal for the purpose of keeping abreast of information that may impact upon the Dealer's business operations.

(12) Provide customer access to compressed air for the purpose of tire inflation.

(13) Keep public restrooms, where available and as approved by BP, clean and adequately stocked with soap and paper products.

(14) Upon the request of BP, operate at least one of the fuel islands (or one of the dispensers if the Facility has only one fuel island) on a self-serve basis if permitted by law.

(15) Comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Facility and the conduct of Dealer's business at the Facility.

(16) Maintain all times for purposes of resale to the public a volume and variety of convenience products if Dealer operates a convenience store operation. Dealer will use best efforts to keep the retail selling space fully stocked at all times.

(17) Display only signs and advertising materials which are in conformity with BP's standards. Dealer agrees not to utilize any of the following at the Facility (unless approved by BP Regional Management or required by law to maintain necessary permits or licenses to conduct business at the Facility): window signs, banners, exterior signs with graphics and colors other than those specified by BP, handwritten signs, neon signs, exit door signs placed in areas other than those designated on the plot plan and interior signs attached to walls, and ceiling or cigarette merchandisers.

(18) Participate in any BP sponsored mystery shop, PRIDE or applicable program. BP will notify Dealer of the specific requirements of any such program. Dealer must score no less than the established retail target as specified by the then current requirements of the mystery shopper, PRIDE or applicable program. Dealer will promptly correct any operations that fail to meet BP's requirements. Failure to do so may result in termination of this Agreement.

(19) Dealer agrees to attend all local business meetings conducted or sponsored by BP for the purposes of the introduction of marketing programs or for the exchange of information that may have an impact upon the business operations of the Dealer, or the flow of information between the Dealer and BP. Attendance at these meetings will be at Dealer expense unless otherwise noted. Failure of Dealer to attend the required BP business meetings may result in the termination of this Agreement. Dealer will attend all training required at Dealer Training School.

 (b) Dealer will not do or allow anything to occur at the Facility that could detract from or disparage the image or reputation of the Facility or the BP Trade Identities. In particular, without limiting the foregoing, Dealer will not do or permit anyone else to do or allow at the Facility any of the following:

(1) Operate any business or engage in any activity other than the sale of motor fuels, motor oils, automotive accessories and services and convenience store merchandise without BP's prior written approval. Prohibited activities include, without limitation, the parking, storage, rental or sale of motor vehicles or trailers, or wrecked or abandoned vehicles. After securing BP's prior written approval, Dealer must further secure any necessary licenses or permits as applicable.

(2) Use the Facility for any additional purposes (including without limitation, parking lot, car rentals or sales, trailer rentals, equipment rentals, or the sale of other goods and services), erect or place on the Facility any permanent or temporary buildings, structures, trailers, signs or pennants, nor make any permanent or temporary alterations in, or additions or attachments to the Facility without first obtaining the written consent of BP. BP may grant or withhold its consent. If such consent is granted, the buildings, structures or trailers must meet BP's approved standards for location and appearance. After securing BP's prior written approval, Dealer must further secure any necessary licenses or permits as applicable.

(3) Operate ATMs, pay phones, vending machines, pinball or amusement games, unless Dealer has received BP's prior written approval on the type and placement of such machines. After securing BP's prior written approval, Dealer must further secure any necessary licenses or permits as applicable.

(4) Store or sell any alcoholic beverage unless Dealer has secured all necessary permits and licenses and liability insurance and Dealer and all Dealers' employees are trained by Dealer in the proper procedures of selling alcoholic beverages. Dealer will not permit alcoholic beverages to be consumed by anyone at the Facility, and will not permit anyone to work at the Facility while under the influence of an alcoholic beverage. If permitted to sell alcoholic beverages, Dealer agrees to strictly adhere to federal, state and local regulations regarding the sale of alcoholic beverages.

(5) Store, sell or consume any illegal drugs, or permit drug paraphernalia for illegal drug use or other products that are used in the preparation or use of illegal drugs, or otherwise promote illegal activity (such products to be specified by BP in its sole judgment), to be present or tolerated on the Facility; and no one shall be permitted to work on the Facility while under the influence of an illegal drug.

(6) Conduct any illegal, immoral, pornographic, sexually explicit, offensive, noisy or dangerous activities, including without limitation, the sale or display of any illegal, immoral, pornographic or sexually explicit materials or items, which in BP's judgment may offend an appreciable segment of the public.

(7) Allow loitering by persons who at the time have no proper business purpose on the Facility.

(8) Maintain or permit to be present on the Facility any item, animal or condition that may endanger the health, safety or well being of persons on the Facility.

(9) Attach or place anything anywhere which could diminish the BP Trade Identities or confuse or deceive the public.)

(c) To the extent any of the above terms of operations and condition of the Facility conflict with requirements established in that certain Franchise Agreement, executed contemporaneously herewith and pertaining to a "BP Connect" or "am/pm" convenience store franchise to be conducted at the Facility (the "Franchise Agreement"), the terms of operation and condition of the Facility outlined in the Franchise Agreement shall control.

10. Training

Dealer must attend and successfully complete all components of BP's current Dealer Training School prior to commencing business operations at the Facility, unless Dealer is already an approved dealer at another BP-branded facility.

Dealer must provide sufficient, trained and qualified employees to operate the Facility during all required hours of operation. Dealer or employees will, at BP's request, participate in BP's training programs as required by BP's Dealer Training School. Dealer shall be responsible for the costs associated with such training, including any mandatory training courses.