11. **Environmental**

(a) Dealer will report any environmental contamination known to Dealer to the proper governmental authorities with jurisdiction (the "Department") in accordance with applicable statutes and regulations, including without limitation, any contamination shown in a report generated by either party in accordance with this Agreement. BP may report the results of any report or any other information BP has about the Facility to the Department if BP believes that BP is legally obligated to do so, or BP is asked by the Department about the presence or possible presence of environmental contamination on the Facility, or BP in its sole judgment deems this reporting prudent.

(b) Dealer will comply with applicable laws and regulations regarding environmental matters. Any past, existing or future contamination on the Facility is Dealer's responsibility and not the responsibility of BP. Dealer assumes all financial and legal responsibility for any and all remediation activities required to be undertaken at the Facility or off site resulting from the past, existing or future contamination and agrees to remove contamination, including without limitation contaminated soils and groundwater, and to restore the Facility in accordance with the rules, orders or other directives of the Department.

(c) Dealer releases and indemnifies BP from and against any and all liabilities, claims, suits, losses, costs, damages, demands, and costs (including without limitation reasonable attorneys' fees, costs of investigation and remediation) of contamination arising out of or resulting from any past, present or future contamination of any nature (including without limitation contamination of air, water, ground water, soil and other environmental media) on the Facility or off site but emanating from the Facility, except those due solely to the gross negligence or willful misconduct of BP. This indemnification includes without limitation, all liabilities that may accrue or be assessed in accordance with all present and future laws, statues, rules, regulations, orders and determinations pertaining to all hazardous materials, pollution or the environment, whether federal, state or local including without limitation the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 *et seq.* (CERCLA), the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.* (RCRA); the Toxic Substances Control Act, 15 U.S.C. Section 2601 *et seq.*; the Clean Air Act, 42 U.S.C. Section 7401 *et seq.*; and the Clean Water Act, 33 U.S.C. Section 1251 *et. seq.*; and any federal or state or local environmental law including those regarding any petroleum product, waste or other material handled, generated, transported, treated, stored or disposed of on or off the Facility by Dealer, its contractors, subcontractors, agents or employees.

(d) For each Facility not already supplied with fuel by BP at the time this Agreement is signed, Dealer will provide BP with environmental test results, including without limitation Phase I and Phase II environmental assessments and soil and groundwater test results as requested by BP. These tests and results must be satisfactory to BP. Dealer will re-test the Facility as required by BP if the manner or extent of testing is not acceptable to BP. Dealer will bring the Facility into compliance before BP's first delivery of gasoline if BP determines that the Facility is not in compliance with any applicable law, code or regulation. The parties recognize that any remediation need not be completed prior to BP's first delivery of gasoline. Dealer must, however, commence and continue with due diligence any required remediation. All tests and compliance activities will be done by Dealer at its cost and expense. BP may terminate this Agreement at any time upon notice to Dealer if the soil or groundwater are contaminated at levels unacceptable to BP.

(e) All underground storage tank systems at the Facility must pass a NFPA #329 precision test or other tests as determined by BP before BP will first deliver gasoline to the Facility. All testing of existing tank systems including all piping will be done at Dealer's expense. Dealer will perform tests no more than 30 days before supply begins and will provide BP with the test results. All underground storage tanks must have overfill protection and meet all applicable governmental codes and regulations and BP specifications. If the tanks or piping do not pass the NFPA #329 precision test or do not meet any applicable governmental codes or regulations or BP's specifications, Dealer will replace and repair the tanks and piping at Dealer's sole cost and expense. If Dealer is unable or unwilling to replace or repair the tanks and piping, BP may terminate the Agreement by written notice to Dealer. If the underground storage tank system is a new installation, BP may accept copies of the installer's certification and warranty in lieu of the test. Any product delivered for testing purposes under this Paragraph will not be deemed "delivery of product" for purposes of this Agreement, unless and until all tests and investigations are completed and results are obtained satisfactory to BP. If the Agreement is terminated for any reason under this Paragraph, Dealer will pay BP the then current dealer buying price for regular unleaded gasoline for all product that cannot be economically reclaimed. In such case, said product may not be sold by Dealer as BP branded product. Dealer will also indemnify and hold BP harmless from any claims or cause of action arising out of any release of product that may occur in connection with the aforesaid testing.

(f) If BP sold the Facility to Dealer, the environmental provisions in the sales contract will control if in conflict with this Section 11.

12. **Daily Inventory**

Dealer must keep daily and monthly inventory reconciliation records of the amount of gasolines an/or diesel fuels in storage at the Facility, and retain them for a one year period or such longer period as required by law or as may be specified by BP, and shall make them available and report them to government enforcement agencies and BP as required by BP. Dealer must cooperate with BP's approved inventory reconciliation program. Dealer understands the importance of inventory reconciliation in preventing product loss, leakage or contamination. Dealer must report any detected or suspected shortage(s) or contamination, abnormal loss or gain not explained by spillage, temperature variations, or other causes immediately to BP's regional account executive, terminal manager or other authorized representative. Nothing in the foregoing shall take away in any manner from any obligation of Dealer, including, but not limited to, any obligation relating to contamination and any

obligation to repair and maintain the tanks and or to prevent leakage therefrom; nor shall it shift any such obligation, in whole or in part to BP.

### 13. Compliance with Laws

(a) Dealer agrees to become informed about and comply fully with all federal, state, and municipal laws, rules, regulations, ordinances, use permits, and all conditions and restrictions with regard to the use and condition of the Facility and with regard to Dealer's activities thereon. Without limiting the foregoing, Dealer must comply with all requirements of federal, state, and local occupational, health and safety agencies, and environmental protection agencies, concerning the receipt, storage, handling, use, sale and dispensing of motor fuels, the disposal of waste materials, and Dealer's other activities on the Facility, including particularly those governing recovery of vapors, and the like.

(b) Without limiting the generality of the foregoing, Dealer must comply with all of the obligations imposed by the federal Clean Air Act and any corresponding state counterparts, as amended, including but not limited to: (1) 40 C.F.R. Part 80, Subpart D, regarding reformulated gasoline; (2) 40 C.F.R. Part 80, Subpart C., regarding oxygenated gasoline; (3) 40 C.F.R. Part 80, Subpart B (specifically 40 C.F.R. sections 80.27 and 80.28), regarding gasoline volatility; (4) 40 C.F.R. Part 80, Subpart B (specifically 40 C.F.R. sections 80.29 and 80.30), regarding sulfur content in diesel fuel; (5) 40 C.F.R. Part 80, Subpart G, regarding deposit control additives in gasoline; (6) 40 C.F.R. Part 80, Subpart H, regarding low sulfur gasoline; (7) the Resource Conservation and Recovery Act, as amended, 42 USC Section 6901 et seq.; (8) The Clean Water Act, as amended, 33 USC Section 1251 et seq.; and (9) the Safe Drinking Water Act, as amended, 42 USC Section 300f et seq.

(c) Dealer agrees to comply with all applicable local, state and federal underground storage tank ("UST") compliance requirements and maintain written records of all maintenance and inspections of UST equipment for as long as required by law.

(d) BP has the right at all times to perform physical measurements and reconciliations, inspect products, books and records in the possession or control of Dealer to determine compliance with this Agreement and all related agreements. In addition, Dealer hereby grants BP the right to copy any such records, inspect any monitoring equipment, or take samples for any products covered by this Agreement. However, BP is not obligated to make any such inspections or tests.

(e) Dealer will maintain accessible features and accessible paths of access on the Facility in compliance with all applicable federal, local and state accessibility laws including, but not limited to, the Americans with Disabilities Act ("ADA").

(f) Dealer will comply with all laws regarding youth access to tobacco. Violation(s) of such laws can constitute grounds for termination or nonrenewal of this Agreement.

### 14. Dealer's Independent Business

It is mutually agreed that the business conducted by Dealer on the Facility is the independent business of Dealer, and this Agreement will not be construed as reserving to or conferring upon BP any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer has no authority to employ any person as an agent or employee of BP for any purpose, and neither Dealer nor any other person performing any act in connection with the operation of Dealer's business at the Facility will be deemed to be an employee or agent of BP. Dealer will not erect or permit any sign or other advertising device on or near the Facility which in any way indicates or represents that BP is the owner or operator of the business conducted by Dealer at the Facility. Dealer agrees to permit BP to erect and maintain a sign identifying Dealer as an independent business person.

### 15. Liability, Indemnity

To the fullest extent permitted by law, Dealer must indemnify, defend and hold harmless BP, its Affiliates, and their respective shareholders, directors, officers, agents and employees (collectively "BP"), from and against any and all losses, suits, claims, demands, causes of action, liabilities, costs or expenses (including reasonable attorneys' fees and costs of defense) of whatever kind or nature including but not limited to those for personal injury, death or property damage to BP or Dealer, their shareholders, directors, officers, employees, agents, contractors, invitees, licensees and any other person(s) entering upon the Facility, directly or indirectly arising in whole or in part from or as a result of:

(a) Any default or breach by Dealer of any obligation contained in this Agreement or any other agreement with BP.

(b) Any act, omission, fault or negligence of Dealer or Dealer's agents, employees, contractors, invitees or licensees, regardless of whether caused by the joint concurrent, contributory or comparative fault, negligence, breach of warranty, strict liability or breach of any legal duty whatsoever by BP, unless due in whole to the sole negligence of BP without any contributory fault on the part of Dealer;

(c) Any allegation of agency or any other relationship by which BP would be held responsible for the acts or omissions of Dealer or Dealer's employees or agents.

(d) Dealer's use of BP's Trade Identities.

(e) The purchase, sale, use or storage of any goods, products, equipment or other items on the Facility, or the repair, maintenance or condition of the Facility and all equipment and fixtures appurtenant thereto, or the purchase or sale of any services from the Facility.

(f) The conduct of any illegal activity conducted on the Facility or from the violation of any federal, state or local law, rule, regulation or court order or governmental or agency directive.

(g) Excluding BP's sole negligence, any and all acts of any nature which result in damage to BP's property.

### 16. Force Majeure and Allocation

(a) BP is excused from delay or nonperformance if BP is unable to meet the demand for its products at BP's normal and usual distribution points for supplying Dealer (regardless of whether or not BP may have diverted certain supplies from such distribution points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of product, or stock or component necessary in the manufacture or production of such products. Either party is excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control, including, without limitation: unavailability, failure, or delay of transportation; Acts of God; labor difficulties; explosions; storms; breakdown of machinery or equipment; fire, riots, war conditions in this or any other country; and compliance with any law or governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary) affecting directly or indirectly said party's ability to perform hereunder.

(b) In the event of any of the contingencies or conditions referred to in the preceding subparagraph, BP has the right to curtail deliveries or allocate its supply of products for sale among its customers in any manner which in its sole discretion is fair and reasonable in the circumstances, and shall not be obligated to obtain or purchase other supplies of product or to in any way make up any product not delivered. BP is not responsible in any manner for any losses or damages which Dealer may claim as a result of any such curtailment or allocation by BP.

### 17. BP's Trade Identities

(a) Dealer may use, on a limited and nonexclusive basis, BP's trade names, trademarks, service marks, logos, brand names, trade dress, design schemes, insignia, color schemes, and the like ("Trade Identities") only in connection with the advertising, distribution, and/or sale of products and services specifically designated by BP. BP's Trade Identities includes those in use at the time this Agreement is entered into by the parties, as well as those Trade Identities that BP may subsequently adopt or are the subject of a license to use as may be acquired by BP.

(b) The permission to use BP's Trade Identities is governed by the terms and conditions of this Agreement and all related agreements. In addition, Dealer will use BP's Trade Identities only in accordance with the guidelines, policies, image programs, procedures, requirements, specifications and standards issued by BP, as amended from time to time, including BP's policy for proper handling of motor fuels and operation of Facility.

(c) BP has exclusive discretion as to whether and in what manner its Trade Identities shall be displayed at the Facility and may enter the Facility, at any time during or after the term hereof to erect or remove said Trade Identities without any liability or obligation to Dealer.

(d) Dealer must not use BP's Trade Identities in connection with the advertising, distribution, or sale of: (1) any mixture, blend, dilution or adulteration of a product selected or supplied by BP; (2) products not sold in BP's original packages and containers or not sold through dispensing equipment approved by BP, or (3) any product not selected or supplied by BP. BP has the right at all times to inspect products, bills of lading, books and records in the possession or control of Dealer to determine compliance with these provisions and quality standards.

(e) Dealer or any Affiliate of Dealer, or agent or representative thereof cannot use BP's Trade Identities as part of Dealer's own trade identities. If Dealer wishes to use BP's Trade Identities in conjunction with Dealer's business forms, advertising materials and the like, Dealer may do so only if the words "Products Dealer" appear adjacent to the Trade Identities so as to read "BP/Amoco Products Dealer".

If Dealer adopts "BP" or "Amoco" or "BP Amoco" or any successor as part of the Dealer's corporate name, then Dealer agrees that, upon the expiration or termination of this Agreement for any reason whatsoever, Dealer will immediately take steps to amend its corporate charter to delete "BP" or "Amoco" or "BP Amoco" or any successor as part of the corporate name, and will take all necessary steps to immediately terminate any further use of the company name.

(f) If Dealer for any reason whatsoever discontinues the sale from the Facility of Representative Amounts of any grade of BP's motor fuels, Dealer, as a step to eliminate possible confusion of the public, shall remove from display on the Facility or conceal in a manner approved by BP, all signs, decals, logos, emblems, and Trade Identities of BP. The provisions in paragraph 32 regarding Franchise Relationship shall also take effect. As used in this Agreement, "Representative Amounts of

BP's trademarked motor fuels" means a sufficient amount of each grade and type of motor fuel offered to Dealer so that Dealer shall at all times have each grade and type available for resale from the Facility in such quantities as are necessary to satisfy customer demand for such grades and types.

(g) Upon the expiration or termination of this Agreement for any reason whatsoever, Dealer must immediately cease using BP's Trade Identities and any marks confusingly similar thereto and return to BP all signs loaned by BP to Dealer, in accordance with the provisions of this Agreement. If Dealer fails to discontinue or cause to be discontinued any and all use and display of BP's Trade Identities after such expiration or termination, BP is hereby expressly given the right to enter upon the premises and remove or obliterate all or any part of any signs, logos, decals, emblems and other materials bearing or displaying Trade Identities at Dealer's expense, without any liability or obligation to Dealer.

(h) BP retains, at all times and for any reason, a sole and unlimited right to make other provisions for the marketing of its motor fuels and any other products and services under its Trade Identities and in the geographic area of the Facility, including but not limited to establishing its own directly operated retail facilities and establishing other dealer and/or jobber supplied retail facilities.

(i) Notwithstanding the foregoing, BP may at any time withdraw the grant to use the Trade Identities and substitute any of its other Trade Identities in their place.

### 18. Grounds for Termination and Nonrenewal

BP has the right at any time to terminate or nonrenew this Agreement, all associated agreements and any applicable franchise relationship for any reason and ground permitted by the PMPA or other applicable federal, state or local law. Without limiting the generality of the foregoing, BP has such right of termination or nonrenewal upon the occurrence of any of the following:

(a) Breach by Dealer of any provision of this Agreement.

(b) Breach by Dealer of any provision of the Franchise Agreement.

(c) Abandonment of the Facility by Dealer or failure by Dealer for any reason to operate the Facility for normal sales of motor fuel during the business hours specified herein for 7 consecutive days or such lesser period which under the facts and circumstances constitutes an unreasonable period of time.

(d) Conviction of Dealer of any felony involving moral turpitude.

(e) Commission by Dealer or any of Dealer's employees or agents of any deceptive, fraudulent, illegal, immoral, or other improper act relevant to the operation of the business on the Facility which is detrimental to BP to any member of the public, including without limitation: (1) participation in any fraudulent or improper use of any credit, debit or pre-paid card or motor club membership card issued or honored by BP; (2) tampering with pump meters, misrepresentation of pump meter readings and/or the reporting thereof, and the like; (3) violation of any consumer protection law or regulation; and (4) purchase by Dealer, without BP's consent, of credit card tickets from other dealers covering sales of BP's products.

(f) Failure by Dealer to pay to BP in full or in a timely manner when due all sums to which BP is legally entitled.

(g) Death of Dealer.

(h) Failure of Dealer to devote Dealer's personal attention at the Facility managing the business activities of said Facility as provided herein, without first securing a written consent from BP, it being the essence of the parties' relationship that Dealer's personal physical presence be upon the Facility for reasonable periods of time during normal business hours.

(i) A continuing severe physical or mental disability or alcohol or substance abuse of Dealer of at least 3 months duration (or such shorter duration which under the facts and circumstances is reasonable) which renders Dealer unable to provide for the continued proper operation of the Facility activities referred to herein.

(j) Removal of, or significant reduction in, Dealer's assets located on the Facility.

(k) Destruction of all or a substantial part of the Facility.

(l) Failure of Dealer to exert good faith efforts to carry out the provisions of this Agreement, and/or the obligations and responsibilities under any applicable franchise relationship.

(m) Condemnation or other taking, in whole or in part, of the Facility pursuant to the power of eminent domain or a conveyance in lieu thereof.

(n) Failure of Dealer to comply with any law or regulation relevant to the operation of Dealer's business on the Facility.

### 19. Procedures for Termination or Nonrenewal

(a) If Dealer fails to perform any of the provisions of this Agreement, or if any other ground permitting BP to terminate or nonrenew occurs, BP has the right to terminate or not renew this Agreement and any applicable franchise relationship upon 90 days (or such lesser period of notice as is reasonable in the circumstances) written notice.

(b) For purposes of the foregoing and any statute governing termination and nonrenewal, all provisions hereof granting rights of termination and nonrenewal to BP will be construed as imposing upon Dealer an affirmative duty to take action to avoid the event which justifies BP's exercise of a right of termination or nonrenewal, regardless of whether or not the provision is expressly stated in terms of such an affirmative duty.

### 20. Remedies

On the termination or expiration of this Agreement or any renewal or extension thereof, BP, at any time thereafter, has the right to sue for and recover all damages accrued or accruing under this Agreement, or arising out of any violation thereof, and BP may so sue and recover without declaring this Agreement void. BP may pursue any other remedies for any violation of this Agreement or any of its covenants by Dealer. The above enumerated remedies are concurrent and are at the option and discretion of BP, and the pursuit of any one shall not amount to an election or bar the pursuit of any other remedies, whether or not listed herein. Termination of this Agreement shall not affect or abridge in any way the rights and obligations of the parties accruing prior to termination.

### 21. Succession In Interest Designation

Dealer designates the following as a Successor in Interest to any franchise relationship between Dealer and BP resulting from this Agreement:

Primary Successor in Interest
Name: VAJIALAH KHOSHNOOD
Address: L.A, CA.
Birth Date: JAN/29/1957
Relationship to Dealer: Brother

Alternate Successor in Interest
Name: FARAHNAZ KHOSHNOOD
Address: LA, CD
Birth Date: MARCH/27/1963
Relationship to Dealer: Sister

Dealer acknowledges that designated successors in interest will be considered for a franchise relationship provided they meet BP's then current standards and qualifications for dealer candidates. BP reserves the right to request additional documentation to verify designees.

### 22. Right of Inspection

At any time during the term of this Agreement and any holdover period, BP has the right, without process of law and without any liability or obligation to the Dealer, to enter upon the Facility at any time, with or without notice, for the purpose of inspection of the Facility, testing and sampling of product, reading meters, measuring product inventory, or installing, removing or obliterating BP's Trade Identities wherever displayed, or exercising any rights that BP may have in this Agreement or in any other contract or agreement between the parties.

### 23. Insurance

(a) Without limiting Dealer's obligations, Dealer agrees to purchase and maintain at all times, at Dealer's expense and in compliance with any requirements of applicable law, insurance as outlined in this section. This insurance must be satisfactory in form and in substance to BP and must be of at least the following minimum kinds and limits:

(1) Commercial general liability insurance, in an amount of at least $1,000,000 per occurrence, covering Dealer's liability for business, operations, use and occupancy of the Facility;

(2) Automobile liability insurance in an amount not less than $1,000,000 combined single limit for any autos used in the Dealer's operations;

(3) Workers compensation insurance as required by statute, unless Dealer qualifies and remains qualified as a self-insurer under applicable federal and state laws;

(4) Employers' liability insurance with limits of not less than $500,000 for each accident, disease - policy limit, and disease - each employee;

(5) If alcoholic beverages will be sold at the Facility, liquor liability insurance in an amount not less than $1,000,000 per occurrence.

(b) The insurance policies required by Subsection 23(a) hereof shall be written by companies satisfactory to BP, and shall be primary and non-contributory to any coverage carried by BP. Insurance policies satisfying the requirements of subsections 23(a)(1),(2) and (5) shall include BP and its Affiliates as additional insureds.

(c) Dealer agrees to increase the amount of any insurance described herein promptly upon execution of this Agreement or upon receiving written notice from BP to do so. In addition, BP reserves the right to require additional types of coverage such as, without limitation, environmental impairment liability insurance to satisfy governmental requirements for financial responsibility. Dealer agrees to obtain such additional insurance promptly upon receiving written notice from BP to do so.

(d) Dealer agrees to provide BP with a certificate of insurance evidencing coverage promptly upon request by BP. If Dealer qualifies as a self insurer for purposes of Subsection 23(a)(3) above, Dealer shall furnish BP with evidence of such qualification and any changes thereto, in lieu of the insurance certificate.

(e) Dealer will not materially change, amend, or cancel any of the insurance policies that Dealer is required to obtain under this Agreement, without first providing BP with 30 days written notice of the intent to do so, and obtaining BP's prior written consent to such change, amendment or cancellation.

(f) The existence or non-existence of any insurance shall not limit Dealer's liability for indemnity and other obligations contained in this Agreement.

## 24. Discontinuance of Product or Services

BP may at any time: (1) discontinue the production or sale of any product covered hereby; (2) change the specifications of any such product; (3) replace any such product with another product; (4) change or withdraw the Trade Identities applicable to any such product; and/or (5) change or withdraw services and facilities offered in connection with any such product. BP shall not be liable to Dealer by reason of any such discontinuance, replacement, change or withdrawal.

## 25. Assignment, Subletting

(a) Dealer acknowledges and understands that Dealer's personal commitment to the operation of Dealer's Facility and Dealer's qualifications and abilities are essential to the operations conducted pursuant to this Agreement. In the absence of Dealer's personal commitment, qualifications and abilities, BP would not have entered into this Agreement. Dealer cannot sublet the Facility or any part thereof without the prior written consent of BP.

(b) Dealer cannot undergo any Change of Control, or make any assignment, including of any interest in this Agreement or any franchise relationship that arises in connection with this Agreement without the prior written consent of BP. BP will not unreasonably withhold its consent to Dealer's assignment of any franchise relationship that arises in connection with this Agreement. But, BP may condition its consent to assignment upon (1) the satisfaction by the proposed assignee of all BP's then current requirements for the qualification of new dealers; (2) the agreement of the proposed assignee to enter into a Trial Franchise or new Dealer Supply Agreement in conformity with the provisions of the PMPA; (3) at least 7 days prior to the effective date of the assignment, the execution by Dealer of a Mutual Cancellation of this Agreement and associated agreements in conformity with the PMPA; and (4) Dealer simultaneously executes an am/pm mini market franchise agreement for the Facility at the above Facility address on BP's then-current form of franchise agreement.. The terms "assign" and "assignment" shall include any Change of Control.

(c) In addition, BP will condition its consent on the satisfaction by Dealer of all indebtedness owed by Dealer to BP and on the express agreement of Dealer to remain liable for the observance by the proposed assignee of all the terms and conditions of this Agreement.

(d) If BP gives its consent to an assignment by Dealer, or if BP agrees to enter into a new Dealer Supply Agreement with Dealer's assignee, Dealer will pay to BP before the Dealer change, BP's administrative cost to effect the Dealer change. This cost is $10,000.00. No administrative fee is due if this Agreement is transferred pursuant to paragraph 21, if BP assigns its rights to a third party, or if BP exercises its right of first refusal pursuant to paragraph 26.

(e) Nothing in the above will constitute a limitation in any manner on BP's right to reasonably withhold its consent to any proposed assignment by Dealer for reasons not mentioned or to impose other qualifications to the giving of consent.

(f) In situations where subparagraph 18(f) or 18(h) are or may be applicable, and "successor in interest" forms have been executed by the dealer, the successor in interest form will supersede the provisions in this paragraph 25.

### 26. Right of First Refusal

(a) If at any time after execution of this Agreement, or during the term of this Agreement or any extension, Dealer either (1) receives an offer to purchase the Facility, or any contiguous premises that include the Facility, and desires to accept the offer, or (2) makes an offer to sell the Facility, or any contiguous premises that include the Facility, or (3) undergoes a Change of Control, Dealer must give BP 60 calendar days written notice of the offer providing the name and address of the proposed purchaser, the amount of the proposed purchase price, and an accurate and complete copy of the offer, including any side agreements or information provided to or by Dealer that may induce the offer or its acceptance. Dealer must also provide BP any additional information, facts, and data, including, but not limited to, profit and loss statements and tax returns, as BP deems necessary for BP to make an informed decision regarding exercising any right of first refusal herein. BP may then purchase the premises that are the subject of the offer by giving written notice to Dealer within the 60 calendar day period at the same price and on the same terms of the offer, and as provided in this Agreement. BP may substitute cash for any non-cash consideration offered by a prospective purchaser.

(b) In addition to the right-of-first refusal specified in 26(a), if the Dealer desires to lease or sublease the Facility or other property owned or leased by Dealer of which the Facility is a part, at any time after execution of this Agreement, or during the term of this Agreement, or any renewal or extension, and Dealer gives or receives a bona fide offer to lease that is acceptable to Dealer, Dealer must submit to BP an accurate and complete copy of the offer, and BP will have 60 calendar days from the date of receipt to elect to lease the premises on the same terms and conditions as contained in the offer, and as provided in this Agreement BP may substitute cash for any non-cash consideration offered by a prospective tenant.

(c) Each option and right is independent of the other, is preemptive and continuing, and is binding on Dealer, Dealer's heirs, devisees, legal representatives, grantees, successors or assigns. An election by BP not to purchase or lease the Facility in case of any particular bona fide offer does not terminate or in any manner affect any option, whether the premises are sold, leased, otherwise conveyed, but each continues unaffected.

(d) If any option or right to buy is exercised by BP, Dealer will convey a merchantable title in fee simple or a valid leasehold interest to the real estate by good and sufficient warranty deed or lease, with release of dower, homestead, courtesy and other rights of the respective spouses, if any, and free from all encumbrances.

(e) Within 60 calendar days of the date of exercise of any of option or right, Dealer will furnish to BP a Commitment for title insurance issued by a title insurance company acceptable to BP, together with legible copies of all documents affecting title to the premises. At closing or lease commencement date, Dealer will furnish to BP the then current ALTA Form Owner's or Leasehold Policy of Title Insurance, in extended coverage form, with Standard Exceptions deleted, brought current to the date of closing or lease commencement date, guaranteeing Lessee against loss or damage to the extent of the purchase price or leasehold value by reason of defects in or liens upon Dealer's title, subject only to exceptions that are permitted or waived in writing by BP. In the case of purchase, settlement of the purchase price and conveyance to the BP will be made within 90 calendar days of date of exercise, but actual tender of the purchase price by BP or tender of deed by Dealer will not be necessary, and neither party will be in default until after written demand for performance been made by the other. Taxes, rent, and other current expenses will be prorated as of the date of settlement.

(f) Non-exercise by BP of its right of first refusal or any other right contained in this Paragraph 26 will not constitute a waiver of any rights BP has under Paragraph 25 or 26.

### 27. Business Name
Dealer must notify BP, in writing, of any decision to change the name of Dealer's business. Dealer is required to use the name designated on the opening paragraph of this Agreement as the name in Dealer's business operations.

### 28. Notices
All notices given pursuant to this Agreement are considered to be properly given if delivered personally or sent by certified mail addressed to Dealer at the Facility address as shown in the introduction to this Agreement and to BP at

<u>4 Centerpointe Drive, La Palma, CA 90623</u>,
(Address)

directed to the attention of the Regional Vice President, or at such other address as BP may from time to time notify Dealer of in writing. Date of service of a notice served by certified mail is the date deposited in the United States Mail.

### 29. Petroleum Marketing Practices Act

(a) Each party hereby expressly reserves all rights under the PMPA. No omission of any reference herein to any specific such right shall constitute a waiver of that right.

(b) Dealer acknowledges receipt of Revised Summary of Title 1 of the Petroleum Marketing Practices Act.

Dealer's signature: _K. Khoshnood_
Khosrow Khoshnood

### 30. Franchise Relationship

If Dealer for any reason whatsoever, at any time, discontinues the sale from the Facility of Representative Amounts of motor fuels chosen by BP to be sold under BP's Trade Identities, BP shall have the right to terminate any franchise relationship between BP and Dealer upon 90 days notice. All other agreements related to the terminated franchise relationship shall automatically terminate except any financial security agreements, mortgages, amortization agreements, notes or guarantees.

### 31. Confidentiality

Dealer acknowledges that the systems, methods, procedures and information provided by BP to its dealers are the confidential and valuable property of BP and Dealer must keep such information in a secure and confidential manner and must not disclose it to third parties or use it or allow others to use it other than for the purposes of and as authorized by this Agreement. Dealer may disclose such information to employees only on a "need to know" basis and only if they undertake to keep such information confidential. Dealer must ensure that such employees observe Dealer confidentiality obligation under this clause.

### 32. No Waiver

No failure to act on an incident of breach, and no course of dealing will be construed as the waiver of the right to act. The waiver of any breach of any covenant, condition or stipulation contained herein shall not be taken to be a waiver of any subsequent breach of the same or any other covenant, condition or stipulation. Any failure of BP to enforce rights or seek remedies upon any default of Dealer with respect to any of the obligations of Dealer hereunder, will not prejudice or affect the rights or remedies of BP in the event of any subsequent default of Dealer.

### 33. Entirety-Known Claims

This Agreement constitutes the entire agreement and understanding between BP and Dealer, canceling and superseding all prior agreements, understandings, warranties and representations, obligations, agreements, whether written or oral, express or implied, relating to the subject matter thereof except those establishing renewal periods or indebtedness of Dealer to BP (or its predecessors) including, but not limited to, previous supply agreement riders and associated agreements, Lease Modifications, Promissory Notes, Personal Guarantees, Unlimited Guarantees, Mortgages, and EOM letters. No obligations, agreements or understandings shall be implied from any course of dealing or from any of the terms and provisions of this Agreement, all obligations, agreements and understandings with respect to the subject matter hereof having been expressly set forth herein, were relied upon by either of the parties in entering into this Agreement. All prior franchise relationships and all prior agreements between BP and Dealer relating to supply of product to the Facility are hereby terminated. Dealer represents that it has no known claims against BP arising from any dealings prior to the date of this Agreement, except as set forth here.

_____

[State claims or put "None"]

### 34. Headings

Paragraph headings are for convenience only and shall not be construed as a part of this Agreement.

### 35. Severability

Should any of the provisions contained in this Agreement become illegal or unenforceable as to Dealer by state or federal statute or otherwise, this Agreement, absent such provision(s) will remain in full force and effect. In the event any provision hereof deemed material by BP is invalidated or voided, BP, at its option, may terminate this Agreement. If subsequent to the date of this Agreement valid state or federal laws or regulations governing the relationship between Dealer and BP take effect, this Agreement will be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provisions of this Agreement in conflict with those laws shall be void.

### 36. Certain Definitions

The following terms shall have the meanings set forth below:

"Affiliate" when used herein in connection with BP or Dealer, includes each person or Entity which directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with BP or Dealer, as applicable. Without limiting the foregoing, the term "Affiliate" when used herein in connection with Dealer includes any Entity 40% or more

of whose Equity or voting control, is held by person(s) or Entities who, jointly or severally, hold 40% or more of the Equity or voting control of Dealer. For purposes of this definition, control of a person or Entity means the power, direct or indirect, to direct or cause the direction of the management and policies of such person or Entity whether by contract or otherwise.

"**Change of Control**" shall mean : (i) the sale, assignment, transfer, conveyance, gift, pledge, mortgage, or other encumbrance of more than 40% in the aggregate, whether in one or more transactions, of the Equity or voting power of Dealer, by operation of law or otherwise or any other event(s) or transaction(s) which, directly or indirectly, effectively changes control of Dealer; (ii) the issuance of any securities by Dealer which itself or in combination with any other transaction(s) results in its Owners, as constituted on the Commencement Date, owning less than 60% of the outstanding Equity or voting power of Dealer; (iii) if Dealer is a Partnership, the resignation, removal, withdrawal, death or legal incapacity of a general partner or of any limited partner owning more than 40% of the Partnership Rights of the Partnership, or the admission of any additional general partner, or the transfer by any general partner of any of its Partnership Rights in the Partnership, or any change in the ownership or control of any general partner; (iv) the death or legal incapacity of any Owner of Dealer owning more than 40% of the Equity or voting power of Dealer; and (v) any merger, stock redemption, consolidation, reorganization, recapitalization or other transfer of control of the Dealer, however effected. "Equity" means capital stock, membership interests, Partnership Rights, or other equity ownership interests of an Entity.

"**Entity**" means any limited liability company, Partnership, corporation or other entity which is not an individual

"**Owner**" means any direct or indirect shareholder, member, general or limited partner, trustee, or other equity owner of any Entity, except, that if BP or any Affiliate of BP has any ownership interest in Dealer, the term "**Owner**" shall not include or refer to BP or that Affiliate or their respective direct and indirect parents and subsidiaries, and no obligation or restriction upon the "Dealer", or its Owners shall bind BP, or said Affiliate or their respective direct and indirect parents and subsidiaries or their respective officers, directors, or managers.

"**Partnership**" means any general partnership, limited partnership, or limited liability partnership.

"**Partnership Rights**" means voting power, property, profits or losses, or partnership interests of a Partnership.

### 37. Execution

Dealer is aware that this Agreement may be signed on behalf of BP only by a regional account executive or one having authority superior to a retail account executive and acknowledges that this Agreement is not executed until so signed. Dealer expressly acknowledges and agrees that no agent or employee of BP below the level of a regional account executive's superior may waive, alter or modify any of the provisions of this Agreement or in any way bind BP to obligations not set forth in this Agreement. The provisions of this Agreement may not be waived, altered or modified except by a written agreement which is executed by Dealer and BP and delivered to Dealer. THIS AGREEMENT SHALL NOT BE BINDING UNLESS FULLY EXECUTED.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed.

TOBATEX INC.
(Name of Dealer)

Dealer's Signature: _K. Khoshnood_
Khosrow Khoshnood

Date: _Sep/24th/07_

BP
By: _Humberto Marroquin_
Humberto Marroquin
Title: Regional Sales Manager

### Owner's Consent

The undersigned owner(s) of the Facility on which the above described equipment is to be or has been installed, consent(s) to the installation of Dealer's retail gasoline service station and its related improvements and equipment, and agree(s) to be bound by the terms and conditions of this Agreement with reference to the equipment of BP and any damages to the Facility.

Land Owner Name

Address:




# bp

**Rider**
**Dealer Supply Agreement**
Business Entity Dealer
28-461-R (10-2003)

The parties execute this Rider simultaneously with and hereby make this Rider a part of the Dealer Supply Agreement dated _____ ("Supply Agreement"), between BP Products North America Inc. (hereinafter "BP")
and _____ **TOBATEX INC.** _____ a _____ **Georgia Corporation** _____ ("Dealer") regarding the Facility located at _____ **4324 Shallowford Road NE, Marietta Georgia 30062** _____

**The parties agree that the Supply Agreement is subject to the following terms and conditions:**

**1. Personal Attention.**
_____ **Khosrow Khoshnood** _____ ("Dealer—Principal"), as an officer or majority stock holder of Dealer if Dealer is a corporation, or as a partner having a majority active interest in Dealer if Dealer is a partnership, or as a member having a majority active interest in Dealer if Dealer is a limited liability company, shall in good faith during the whole of the term of the Supply Agreement, and any renewals or extensions thereof, devote his personal attention, as his principle occupation, to managing the business activities referred to in the Supply Agreement. Violation of this covenant gives BP the immediate right to terminate the Supply Agreement upon notice given in accordance with the provisions of the Supply Agreement.

**2. Bound to Supply Agreement Terms.**
The Dealer—Principal is bound by and subject to all the terms and conditions contained in the Supply Agreement and shall perform all the duties and covenants of Dealer therein.

**3. Guarantee of Debts.**
The Dealer—Principal personally guarantees payment of the debts, if any, owed to BP by the Dealer incident to the Dealer's use of the facility in connection with the Supply Agreement and any dealings with BP relative thereto.

**4. Business Entity Ownership.**
Dealer—Principal represents, warrants, and covenants that Dealer—Principal is the owner of all or a majority of the capital stock of Dealer if Dealer is a corporation, or is a partner having a majority active interest in Dealer if Dealer is a Partnership, or is a member having a majority active interest in Dealer if Dealer is a limited liability company. Violation of this covenant gives BP the immediate right to terminate the Supply Agreement upon notice given in accordance with the provisions of the Supply Agreement.

**5. No Release.**
Nothing in this Rider releases Dealer from any of Dealer's obligations, duties, covenants or conditions of the Supply Agreement.

**6. Miscellaneous.**
(a) In the event of any sale, lease or Change in Control, the Supply Agreement will continue in full force and effect unless terminated by BP upon written notice, or unless assigned by Dealer with BP's written consent. BP's decision not to exercise its right of first refusal will not prevent BP from withholding its consent to assign the Supply Agreement to any third-party purchaser.

(b) BP may assign its Right to Purchase to a third-party of its choosing.

(c) Within 30 days of the date of Company's exercise of any right of first refusal, Dealer will furnish to BP a guaranty policy issued by a title insurance company acceptable to BP, in its usual form, brought down to the date of exercise, guaranteeing BP against loss or damage to the extent of the purchase price or leasehold interest by reason of defects in or liens upon Dealer's title. Dealer will convey to BP the fee or leasehold title within 90 days from the date of BP's exercise of its option. Taxes, water, and other current expenses will be adjusted as of the date of conveyance. Notwithstanding the terms of any offer, BP may substitute cash for any form of payment proposed in any offer and BP's credit is deemed equal to the credit of any proposed purchaser.

(d) Each right of first refusal and other option to purchase, if any, are independent of the others, preemptive, continuing, and binding upon Dealer, Dealer's devisees, legal representatives, grantees, successors and assigns. The election by BP not to exercise its right of first refusal in any instance will not terminate or in any manner affect any of BP's options, in any

subsequent instance, whether the stock or interest is or is not sold, conveyed or changed, but each option will thereafter continue unaffected as set forth in this Rider.

BP:

By: _Humberto Marroqu__ (Signature)

Name and Title: Humberto Marroquin/ Regional Sales Manager

Date: 11-7-07

Dealer: TOBATEX INC.

By: _____ (Signature)

Name and Title: _____

Date: _____

Dealer—Principal: Khosrow Khoshnood

By: _K Khoshnood_ (Signature)

Name and Title: Khosrow Khoshnood

Date: Sep/24/07

Dealer—Principal:

By: _____ (Signature)

Name and Title: _____

Date: _____



Facility No. <u>16926/50074</u>

## "BP"/"BP Connect" to "am/pm" Conversion Addendum to FRANCHISE AGREEMENT

This Addendum to Franchise Agreement (the "**Addendum**") is attached to and made a part of that certain Franchise Agreement dated _____, 20__ (the "**Franchise Agreement**") between BP Products North America Inc. ("**BP**") and <u>TOBATEX INC.</u> ("**Operator**") regarding the franchise located at <u>4324 Shallowford Road NE, Marietta, Georgia 30062</u> ("**Franchise Premises**").

### RECITALS

A. Concurrently herewith, Operator and BP have executed the Franchise Agreement to operate a convenience store franchise at the Franchise Premises. Pursuant to this Addendum, the Franchise Premises will initially be operated under the "BP" or "BP Connect" trademark and service mark, as instructed by BP (the "**BP Marks**") and the operating methods and business practices developed by BP for use in connection with the operation of "BP Connect" convenience stores ("**BP System**"), but Operator will convert the Premises and franchise to the "am/pm" Marks and System. Capitalized terms and Section references used in this Addendum shall have the same meaning as set forth in the Franchise Agreement, unless otherwise expressly provided herein.

B. BP wishes to license Operator, and Operator wishes to be licensed, to use the BP Marks until such time as Operator completes the conversion of the Premises to an "am/pm" convenience store franchise, upon the terms and conditions set forth herein;

Therefore, the parties agree as follows:

1. **Term.** This Addendum shall be effective upon execution of the Franchise Agreement by both parties and shall continue until (a) nine (9) months following the Effective Date of the Franchise Agreement, or (b) the completion of installation of the am/pm® Signage and Equipment (defined below), whichever occurs first (the "**Transition Period**"). For purposes of this Addendum, the Commencement Date shall be the date on which Operator begins operation of the Franchise Premises as a BP or BP Connect, which date shall be in advance of the completion of installation of the am/pm® Signage and Equipment (defined below).

2. **Marks During Transition Period.** During the Transition Period, (a) the definition of "Marks" in Section 21.01 of the Franchise Agreement shall be deemed amended to include the BP Marks, (b) the definition of "System" in Section 21.01 of the Franchise Agreement shall be deemed amended to include the BP System, and (c) Sections 1.01 and 1.02 of the Franchise Agreement shall be deemed amended to delete the words "an 'am/pm'" and substitute "a 'BP'" or "a 'BP Connect'", as applicable, in lieu thereof.

3. **am/pm® Signage and Equipment.** During the Transition Period, Operator shall purchase and install in strict accordance with BP's Standards at the Franchise Premises

all of the equipment listed on Schedule A, and such additional items of which BP may notify Operator in writing, including signs, trade dress and trade indicia required to be installed in connection with the conversion to an am/pm® Store (collectively the "**am/pm® Signage and Equipment**"), and shall remove all signage and equipment designated by BP as applicable only to a "BP Connect" store and shall return to BP, or destroy (at BP's option), all signage and other materials containing the BP Marks at no cost, charge or expense to BP.

4. **Construction and Remodeling.** Operator shall convert the Franchise Premises to an am/pm® Store in accordance with the Retrofit Program requirements set forth in Sections 6.04 and 6.05 and shall commence operations as an am/pm® Store in all respects prior to the end of the Transition Period.

5. **Permits.** If governmental permits are necessary to carry out the installation, removal or movement of any am/pm® Signage and Equipment at the Franchise Premises, or any signage or equipment related to Operator's "BP" or "BP Connect" operations at the Franchise Premises pursuant to this Addendum, Operator will secure such permits at its own expense.

6. **Information.** Operator will provide BP with whatever information BP reasonably requests on a periodic basis concerning Operator's progress in completing the conversion contemplated by this Addendum.

7. **Operations Manuals.** Operator acknowledges that as of January 1, 2007, the Manual contains Standards, methods, procedures, requirements, instructions, food specifications and equipment specifications developed in connection with, and pertaining to, BP's "BP Connect" store operations, and during the Transition Period, Operator shall conduct business in strict accordance with the Manuals. In the event that prior to the end of the Transition Period BP shall have supplied Operator with an update to the Manual specifying the requirements applicable to am/pm® mini market Stores, Operator shall continue to operate the Franchise Premises in accordance with the Manual as in effect immediately prior to such update, until the end of the Transition Period, at which time it shall implement all changes required by the updated Manual as applicable to an am/pm® mini market Store.

8. **Termination and Obligations After Transition Period.**

    a.    Following the Transition period, Operator shall cease using the BP Marks, including all signs, trade dress or trade indicia containing the BP Marks, and shall cease to use the BP System (except to the extent also a part of the am/pm® System).

    b.    Operator's failure for any reason to complete the installation of the am/pm® Signs and Equipment and otherwise to complete the conversion to the am/pm Marks and System in accordance with BP's requirements during the Transition Period, including any extension of time given by BP in writing in its sole discretion, shall be

deemed to be a material breach of the Franchise Agreement and shall entitle BP to terminate the Franchise Agreement in accordance with Section 18.04(a).

9. **Entire Agreement.** This Addendum is the entire agreement between the parties with regard to the conversion of the Franchise Premises to an am/pm® Store and supercedes any prior or contemporaneous agreements. This Addendum may only be amended or supplemented in writing signed by both parties. All terms of the Franchise Agreement and other agreements between the parties except as expressly amended herein, shall remain in full force and effect.

OPERATOR: TOBATEX INC.

By: _____K. Khoshnood_____

Print Name Khosrow Khoshnood

Title President

BP Products North America Inc.

By: _____Humberto Marroquin_____

Print Name _____

Title _____

Attachments:
Schedule A - "am/pm® Signage and Equipment"

# EXHIBIT C

TOBATEX INC                                                                                                  8/2/2012 7:47:11 PM (EST)

## Daily sales of Station(s):

4324 SHALLOWFORD RD - 0011900147 #21147
From 4/20/2009 to 8/20/2009

### Fuel sales — View chart

| Fuel | Sales Qty | Revenue | Profit | Margin |
|---|---|---|---|---|
| **Fuel** | | | | |
| Plus Unleaded | 74,794.974 | $192,011.82 | $23,779.03 | $.318 |
| Regular Unleaded | 718,361.413 | $1,672,833.87 | $117,981.59 | $.164 |
| Super Unleaded | 91,224.434 | $244,794.76 | $24,968.67 | $.274 |
| Sub Total: | 884,380.821 | $2,109,640.45 | $166,729.30 | $.189 |
| **Grand Total:** | 884,380.821 | $2,109,640.45 | $166,729.30 | $.189 |

### Non-Fuel sales — View chart

| Department | Sales Qty | Revenue | Profit | ProfitPercent (%) |
|---|---|---|---|---|
| **C-Store** | | | | |
| Alcohol | 124.000 | $39,053.07 | $4,899.47 | 12.55 % |
| BP Branded Food Service | 124.000 | $10,563.02 | -$2,790.21 | -26.41 % |
| Car Care | 121.000 | $2,670.48 | $1,245.86 | 46.65 % |
| Fresh Foods | 124.000 | $3,036.15 | $1,247.92 | 41.10 % |
| Frozen | 119.000 | $3,339.22 | $1,392.76 | 41.71 % |
| Grocery | 55.000 | $114.14 | $45.05 | 39.47 % |
| Hot & Cold Drinks | 124.000 | $14,585.69 | $14,585.69 | 100.00 % |
| Ice Cream | 124.000 | $1,734.33 | $577.87 | 33.32 % |
| Lottery | 124.000 | $59,408.50 | $59,408.50 | 100.00 % |
| Non Foods | 124.000 | $10,853.61 | $3,708.03 | 34.16 % |
| Printed Materials | 124.000 | $3,490.87 | $534.50 | 15.31 % |
| Salty / Savoury Snacks | 124.000 | $8,181.97 | $3,048.09 | 37.25 % |
| Soft Drinks | 124.000 | $52,841.09 | $17,459.32 | 33.04 % |
| Sweet Snacks & Confectionery | 124.000 | $15,554.77 | $6,546.58 | 42.09 % |
| Tobacco | 124.000 | $202,457.70 | $4,451.36 | 2.20 % |
| Sub Total: | 1,783.000 | $427,884.61 | $116,360.80 | 27.19 % |
| **Tax** | | | | |
| Car Wash Tax | 793.140 | $49.09 | $.00 | 0.00 % |
| High Tax | 297,822.880 | $17,867.79 | $.00 | 0.00 % |
| Low Tax | 66,511.570 | $1,346.33 | $.00 | 0.00 % |
| Sub Total: | 365,127.590 | $19,263.21 | $.00 | 0.00 % |
| **Grand Total:** | 366,910.590 | $447,147.82 | $116,360.80 | 26.02 % |

TOBATEX INC  8/2/2012 7:47:11 PM (EST)



TOBATEX INC                                                                                              8/2/2012 7:47:56 PM (EST)

# Daily sales of Station(s):

4324 SHALLOWFORD RD - 0011900147 #21147
From 4/20/2010 to 8/20/2010

## Fuel sales — View chart

| Fuel | Sales Qty | Revenue | Profit | Margin |
|---|---|---|---|---|
| **Fuel** | | | | |
| Plus Unleaded | 61,154.058 | $173,069.12 | $15,642.54 | $.256 |
| Regular Unleaded | 520,425.957 | $1,394,358.28 | $97,832.21 | $.188 |
| Super Unleaded | 80,837.560 | $240,691.32 | $20,459.81 | $.253 |
| **Sub Total:** | 662,417.575 | $1,808,118.72 | $133,934.56 | $.202 |
| **Grand Total:** | 662,417.575 | $1,808,118.72 | $133,934.56 | $.202 |

## Non-Fuel sales — View chart

| Department | Sales Qty | Revenue | Profit | ProfitPercent (%) |
|---|---|---|---|---|
| **C-Store** | | | | |
| Alcohol | 123.000 | $34,204.97 | $6,679.36 | 19.53 % |
| BP Branded Food Service | 123.000 | $9,421.07 | -$537.82 | -5.71 % |
| Car Care | 119.000 | $2,229.16 | $909.47 | 40.80 % |
| Fresh Foods | 123.000 | $2,674.75 | $786.94 | 29.42 % |
| Frozen | 121.000 | $4,031.74 | $1,639.56 | 40.67 % |
| Grocery | 50.000 | $96.15 | $44.58 | 46.37 % |
| Hot & Cold Drinks | 123.000 | $13,100.29 | $13,100.29 | 100.00 % |
| Ice Cream | 121.000 | $1,428.43 | $543.86 | 38.07 % |
| Lottery | 123.000 | $49,679.50 | $49,679.50 | 100.00 % |
| Non Foods | 123.000 | $11,695.02 | $3,799.70 | 32.49 % |
| Other Branded Food Service | 56.000 | $270.32 | $152.74 | 56.50 % |
| Printed Materials | 123.000 | $2,889.31 | $465.50 | 16.11 % |
| Salty / Savoury Snacks | 123.000 | $8,919.29 | $3,274.49 | 36.71 % |
| Soft Drinks | 123.000 | $49,217.90 | $18,963.47 | 38.53 % |
| Sweet Snacks & Confectionery | 123.000 | $14,697.79 | $4,640.73 | 31.57 % |
| Tobacco | 123.000 | $177,582.08 | $18,229.07 | 10.27 % |
| **Sub Total:** | 1,820.000 | $382,137.77 | $122,371.44 | 32.02 % |
| **Tax** | | | | |
| Car Wash Tax | 658.850 | $40.93 | $.00 | 0.00 % |
| High Tax | 262,256.150 | $15,756.62 | $.00 | 0.00 % |
| Low Tax | 64,510.020 | $1,295.35 | $.00 | 0.00 % |
| **Sub Total:** | 327,425.020 | $17,092.90 | $.00 | 0.00 % |
| **Grand Total:** | 329,245.020 | $399,230.67 | $122,371.44 | 30.65 % |

TOBATEX INC                                                                                                 8/2/2012 7:47:56 PM (EST)

