# Exhibit I

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG     \*    MDL No. 2179
"DEEPWATER HORIZON" IN THE     \*
GULF OF MEXICO, ON APRIL 20, 2010     \*    Section: J
    \*
This Pleading applies to:     \*    Judge Barbier
    \*
*MDL 2179 B1 Amended Master Complaint,*     \*    Magistrate Judge Shushan
*All Cases in Pleading Bundle B1 and 10-CV004573*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DECLARATION OF AYAD JABER

## IN OPPOSITION TO MOTIONS TO DISMISS

## BP DEALER CLAIMS

I, AYAD ("GEORGE") JABER, declare as follows:

1.     I have personal knowledge regarding the economic impact of the oil spill which is the subject of this multidistrict litigation upon the business of M.R.M. Energy, Inc. ("M.R.M.").

2.     Presently and at the time of the events which are the subject of this multidistrict litigation, I was and am the President of M.R.M. M.R.M. is a Georgia corporation which at all times relevant to subject matter of this multidistrict litigation has operated the BP P.L.C. ("BP") branded service station located at 3515 Cascade Road, Atlanta, Georgia 30331.

3.     M.R.M. has been a petroleum retailer for BP from December 2007 to the present. M.R.M. operated its location near Interstate 285 in Georgia. M.R.M. strategically purchased and operated its facility in this location in order to benefit from the traffic associated with Gulf Coast beach tourism from such states as Tennessee, Kentucky, Indiana, Ohio, West Virginia, Virginia, North Carolina, and South Carolina.

4.     M.R.M.'s affiliate, A.N.A. Developments, LLC acquired its station from BP. Attached hereto is a true and correct copy of the form of deed provided in connection with this purchase, which is marked as Exhibit "A." Attached hereto is a true and correct copy of the form of Right of First Refusal and Option Agreement provided in connection with this purchase, which is marked hereto as Exhibit "B." Both the Quitclaim Deed and the Option Agreement were completed, signed and recorded. Pursuant to those documents, M.R.M. is effectively precluded for 20 years from selling motor fuel products other than BP branded products at this site and BP is entitled to repurchase the property in the event that M.R.M.'s Franchise Agreement or Supply Agreement is terminated. Attached hereto are true and correct copies of M.R.M.'s Dealer Supply



Agreement and Franchise Agreement which are marked as Exhibit "C" and "D" respectively.

5.     Beginning immediately after the oil spill, many tourists stopped traveling to the Alabama and Florida Gulf Coast.  The sudden and precipitous drop in tourism badly damaged M.R.M.'s Georgia location, as tourists stopped traveling along the I-285 corridor.  I base this statement on my personal observation of the license plates of vehicles coming to the station.

7.     M.R.M. saw its total revenues significantly decline across the board.  Its Georgia facility suffered precipitous declines in both gallons sold and convenience store sales.  Attached hereto are true and correct copies of the "Daily BOS Sales and Receipts" for the service station located at 3515 Cascade Road, Atlanta, Georgia 30331., for April, 2009 through September, 2009 and April, 2010 through September 2010, which are marked as Exhibit "D."

8.     On or about October 26, 2010, we received an email from our BP rep Daren S. Bryan which contained a speech from Bob Dudley, group chief executive of BP.  In that speech, Mr. Dudley admitted the loss of volume sales as a result of the Deepwater Horizon oil spill. Attached hereto is a true and correct copy of Mr. Bryan's email dated October 26, 2010 and Mr. Dudley's speech, marked as Exhibit "E".

8.     As part of its response to the spill, BP provided its dealers, including M.R.M., a temporary gasoline price rebate of one (1) cent per gallon, and temporarily waived credit card fees associated with petroleum sales.  This compensation was far less than the loss which M.R.M. has suffered.

9.     On or about November 18, 2010, M.R.M. filed a claim for interim payment in accordance with procedures established by the Gulf Coast Claims Facility ("GCCF").  On May 6, 2011, GCCF denied M.R.M.'s claim.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is made pursuant to 28 U.S.C. § 1746. Executed at Atlanta, Georgia on August __, 2012.

Ayad "George" Jaber

# EXHIBIT A

**Upon recording return to:**
Lawrence J. Lehman, Esq.
56 Perimeter Center East
Suite 450
Atlanta, GA 30346

## QUIT CLAIM DEED

**STATE OF GEORGIA**

**COUNTY OF GWINNETT**

     THE GRANTOR, **BP PRODUCTS NORTH AMERICA INC.**, a Maryland corporation, f/k/a Amoco Oil Company, a Maryland corporation ("**Grantor**"), with its principal office address at c/o BP Products North America Inc., 1323 Bond Street, Naperville, Illinois 60563, for the consideration of One Dollar and no/100ths ($1.00) and other good and valuable consideration in hand paid, the receipt whereof is hereby acknowledged, by these presents does hereby REMISE, RELEASE, CONVEY AND QUIT CLAIM (without any covenant, representation or warranty of any kind), TO: **A.N.A. DEVELOPMENTS, LLC,** a Georgia limited liability company ("**Grantee**"), with an office address of 3515 Cascade Road, Atlanta, Georgia 30331, as of this ____ day of _____, 2007 (the "**Transfer Date**") all that tract or parcel of land lying and being in Land Lot 122 of the 7th District, Gwinnett County, Georgia, and being more particularly described on **Exhibit "A"**, attached hereto and made a part hereof (the "Property").

     Together with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever, of Grantor, either at law or in equity, of, in and to the Property,

     **TO HAVE AND TO HOLD** the Property as above described, with the appurtenances, unto Grantee, its successors and assigns forever.

SS #14146 / D-181

1.      **Use and Operating Restrictions**.

This conveyance is made by Grantor and accepted by Grantee upon the express condition and subject to the use and operating restrictions, notices, acknowledgements and covenants described on **Exhibit "B"** attached hereto (collectively "**Use and Operating Restrictions**"). Grantor may, in Grantor's sole and absolute discretion (but shall in no event be obligated to), release and/or waive any or all of the Use and Operating Restrictions at any time, by written instrument duly executed and delivered by Grantor.

2.      **Grantee's Indemnification of Grantor**.

Grantee, for and on behalf of itself and its successors and assigns (including, without limitation, all successors in title to the Property (or any portion thereof) to Grantee (collectively, the "**Grantee Parties**"), by acceptance of this Deed, hereby agrees, except as may otherwise be provided in the Purchase and Sale Agreement (as defined herein), to assume responsibility for, and shall defend (with counsel reasonably acceptable to the Grantor Parties (as defined herein), indemnify, defend and hold harmless and does hereby waive release and discharge Grantor, its parents, affiliates and subsidiaries, and their respective directors, officers, partners, members, shareholders, employees, contractors, agents, representatives, successors and assigns, (collectively, the "**Grantor Parties**"), from and against (a) any and all actions or causes of action at law or in equity, claims, demands, expenses, obligations, losses, damages, liabilities, suits, judgments, fines, penalties, payments, costs and expenses (including reasonable attorneys' fees) ("**Losses**") arising out of or resulting from the use or operation of the Property on and after the Transfer Date including, without limitation, any "Government Required Environmental Work", "Third Party Claims", "Hazardous Materials" occurring on, at or migrating from the Property, or other environmental liabilities of any Grantee Party under the "Environmental Laws" (as those terms are defined in the Purchase and Sale Agreement); (b) any Losses sustained or incurred by any Grantor Party that result from any breach of Grantee's duties, liabilities, obligations or covenants of the Purchase and Sale Agreement; (c) Grantee's failure to discharge, or delay in discharging, any of the "Assumed Environmental Liabilities" (as defined in the Purchase and Sale Agreement); (d) damage to or destruction of Grantor's corrective action equipment caused by any Grantee Party, tenants or other business invitees; (e) any "Development" (as hereinafter defined), including without limitation, Development costs that are increased or unanticipated due to the environmental condition of the Property, delay costs resulting from the environmental condition of the Property, costs and expenses to handle, manage, remediate or dispose of soil or groundwater containing Hydrocarbons or any other Hazardous Materials, and the relocation, replacement, repair or removal of any corrective action equipment; (f) any statutory or equitable claim or cause of action against Grantor arising from or relating to the environmental condition of the Property; and (g) changes in, modifications to or amendments of environmental laws that were in effect prior to the Transfer Date or promulgated, made or enacted on or after the Transfer Date irrespective of whether the events giving rise to such liabilities occurred prior to, on or after the Transfer Date; (h) and any use which is in violation of or inconsistent with the Use and Operating Restrictions.

3.     **Condition of Property**.

Grantee has accepted the Property, including without limitation its environmental condition, in its "**AS-IS, WHERE-IS, AND WITH ALL FAULTS**" condition, subject only to any covenants and obligations of Grantor to Grantee which are expressly set forth in the Purchase and Sale Agreement or any other documents or instruments executed and delivered by Grantor and Grantee pursuant to the Purchase and Sale Agreement (collectively, the "**Contractual Obligations**").  Grantee acknowledges that the purchase price which it has paid for the Property reflects: (a) the fact that all of the Use and Operating Restrictions shall be recorded against the Property and shall be binding on Grantee and the other Grantee Parties, (b) the fact that Grantee has agreed to acquire the Property, including without limitation its environmental condition, in its "**AS-IS, WHERE-IS, AND WITH ALL FAULTS**" condition (subject only to Grantor's Contractual Obligations to Grantee), and (c) the fact that Grantee has agreed to acquire the Property subject to the presence, whether known or unknown, of any environmental contamination which may have occurred during or prior to the period of Grantor's ownership, use and/or operation of the Property (subject only to Grantor's Contractual Obligations to Grantee).  Grantee does, by its acceptance of this Deed, represent and warrant that it is familiar with the condition of the Property and that GRANTOR HAS NOT MADE AND MAKES NO WARRANTIES OR REPRESENTATIONS REGARDING THE PROPERTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ITS HABITABILITY, CONDITION OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE.  GRANTEE AGREES THAT THE PROPERTY IS HEREBY CONVEYED BY GRANTOR AND ACCEPTED BY GRANTEE IN ITS "**AS-IS, WHERE-IS, WITH ALL FAULTS**" CONDITION EXISTING AS OF THE TRANSFER DATE, SUBJECT ONLY TO THE CONTRACTUAL OBLIGATIONS.

4.     **Grantor's Right of Access and Entry Upon the Property; Cooperation**.

Grantor hereby reserves for itself and the other Grantor Parties the right to enter upon and access the Property (free from any charge or fee) from time to time to remove certain personal property and conduct certain inspections, remediation and other activities, all as more particularly described in the Purchase and Sale Agreement.  Such access shall not be interrupted by any transfer, assignment, conveyance, mortgage, lease, hypothecation or pledge by Grantee of the Property or any of Grantee's interests therein.  In the event Grantor is involved in any remediation efforts or in obtaining environmental site closure with respect to the Property for any reason whatsoever, Grantee and each of the other Grantee Parties agrees to cooperate with Grantor and with all local, state, and federal environmental agencies having jurisdiction over the Property (the "**Government**") in obtaining environmental site closure, to commercial standards, for any environmental contamination relating to or arising out of Grantor's prior use of the Property.

5.     **Further Assurances**.

Grantee shall, from time to time, upon request of Grantor, execute and deliver to Grantor, and hereby authorizes Grantor to record in the appropriate governmental or other public records, such further documents and instruments and perform such acts as Grantor may reasonably deem

appropriate to perfect, aid or assist in the imposition and/or recording of the Environmental Restrictions as defined in **Exhibit "B"** hereto, provided that such further documents, instruments or actions are consistent with the terms or intent of the Purchase and Sale Agreement, or other such documents or forms required or authorized by the Government to obtain environmental site closure to commercial standards or Type 5 risk reduction standards as set forth in Ga. Comp. R. & Regs. 391-3-19.07(10). Grantee shall, at Grantor's request, provide to Grantor evidence of compliance with all Environmental Laws, including, without limitation, the results of tank and line tightness tests, product inventory data, tank gauging data and tank leak detection data.

6. **Entire Understanding**.

    All of the provisions of this Deed, including without limitation, the Use and Operating Restrictions, shall run with the land and each portion thereof, shall bind and restrict the Property and each portion thereof, and shall be binding upon and inure to the benefit of the parties, including without limitation, Grantor, the other Grantor Parties, Grantee, and the other Grantee Parties, as the case may be, and their respective heirs, devisees, representatives, successors and assigns, and any other person or entity expressly noted herein. This Deed, the Exhibits and Schedules annexed hereto and the Purchase and Sale Agreement (as may have been amended) between Grantor and Grantee dated this 24th day of July, 2007 (and attachments) ("**Purchase and Sale Agreement**"), contain the entire understanding and agreement between the parties hereto relative to the subject matter hereof. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Deed. No modification, waiver of, addition to, or deletion from the terms of this Deed shall be effective unless reduced to writing and signed by Grantor and Grantee or their respective successors and assigns, each of whom expressly waives, releases and forever forswears any right under the law in the State in which the Property is located which permits a contract, by its terms amendable only in writing, to be orally amended.

7. **Predecessor Disclosures.**

    Grantor hereby disclosed the following name changes and mergers relating to Grantor's predecessors in interest, which predecessors may or may not have appeared in the chain of title for the Property:

    Sohio Transportation Company and BP Oil Inc. merged into Sohio Oil Company on July 31, 1986. Sohio Oil Company changed its name to BP Oil Company by Amendment to its Articles of Incorporation on January 31, 1989.

    On December 31, 1991, BP Exploration Inc. merged into BP Oil Company. As a result of the merger, the name of BP Oil Company was changed to BP Exploration & Oil Inc.

    On October 1, 2001, Amoco Oil Company merged with BP Exploration & Oil Inc. Amoco Oil Company was the surviving Corporation and changed its name to BP Products North America Inc.

**IN WITNESS WHEREOF,** said Grantor has hereunto set its hand and seal the day and year above written.

Sworn to and Subscribed before me:         BP Products North America Inc.,
                                            a Maryland corporation, f/k/a Amoco Oil Company,
                                            a Maryland corporation

_____            By: _____
(Unofficial Witness)                        Name: _____
                                            Title: _____

_____                     **[CORPORATE SEAL]**
Notary Public
My Commission Expires:

This _____ day of _____, 2007.

# EXHIBIT "A"
## Legal Description

All that tract or parcel of land lying and being located in Land Lot 122, 7th District, Gwinnett County, Georgia and being more particularly described as follows:

Beginning at a 1/2" rebar found at the intersection of the Northeast right of way (R/W) line of Sugarloaf Parkway (R/W varies) and the existing Southeast R/W line of Meadow Church Road (80' R/W); thence following the existing R/W line of Meadow Church North 62º51'44" East, a distance of 66.83 feet to a 1/2" rebar set; thence leaving said existing R/W line South 10º30'18" East, a distance of 10.44 feet to a 1/2" rebar set on the proposed R/W line of Meadow Church Road (50' from centerline) and the True Point of Beginning; thence following said proposed R/W line North 62º51'44" East, a distance of 220.56 feet to a 1/2" rebar set; thence leaving said R/W line South 27º08'22" East, a distance of 22.34 feet to a 1/2" rebar set; thence North 62º51'38" East, a distance of 2.00 feet to a 1/2" rebar set; thence South 27º08'22" East, a distance of 200.22 feet to a 1/2" rebar set; thence 30.63 feet along a curve to the right, said curve having a chord of South 17º51'38" West 27.58 feet and a radius of 19.50 feet to a 1/2" rebar set; thence South 62º51'38" West, a distance of 219.95 feet to a 1/2" rebar set; thence North 27º08'22" West, a distance of 5.01 feet to a 1/2" rebar set; thence South 62º51'38" West, a distance of 21.91 feet to a 1/2" rebar set; thence North 23º53'23" West, a distance of 79.88 feet to a point; thence 102.18 feet along a curve to the right, said curve having a chord of North 17º22'27" West 101.94 feet and a radius of 426.15 feet to a point; thence North 10º30'18" West, a distance of 59.33 feet to the True Point of Beginning.

Said tract contains 1.378 acres or 60012 square feet.

Said tract being depicted on th Survey bearing Job No. 96146.03, dated May 27, 1998, prepared by Rochester & Associates, Inc. under seal and certification of James C. Jones, Georgia Registered Land Surveyor No. 2298, which Survey is incorporated herein by reference.

Together with those easement rights arising under that certain Declaration of Covenants, Restrictions and Easements by Sugarloaf Parkway, LLC, a Georgia limited liability company, dated July 14, 1998, filed for record July 15, 1998 at 1:24 p.m., recorded in Deed Book 16379, Page 140, Records of Gwinnett County, Georgia; as amended by that certain First Amendment to the Declaration of Covenants, Restrictions and Easements by Sugarloaf Parkway, LLC, a Georgia limited liability company, dated July 16, 1998, filed for record July 17, 1998 at 12:20 p.m., recorded in Deed Book 16400, Page 226, aforesaid Records; affected by that certain Agreement by and between Sugarloaf Parkway, LLC, a Georgia limited liability company and Amoco Oil Company, a Maryland corporation, dated July 24, 1998, filed for record July 24, 1998 at 12:12 p.m., recorded in Deed Book 16444, Page 1, aforesaid Records.

Also together with those easement rights arising under that certain Easement Agreement by and between Gwinnett County, Georgia and Sugarloaf Parkway, LLC, dated as of February 17, 1998, filed for record February 17, 1998 at 3:46 p.m., recorded in Deed Book 15468, Page 183, aforesaid Records.

Also together with those easement rights arising under that certain Declaration of Covenants, Restrictions and Easements by and between Elrod Development, LLC, a Georgia limited liability company and Sugarloaf Parkway, LLC, a Georgia limited liability company, dated February 17, 1998, filed for record February 18, 1998 at 10:36 a.m., recorded in Deed Book 15475, Page 55, aforesaid Records.

Also together with those easement rights arising under that certain Slope Drainage and Access Easement Agreement by and between Martha E. Trollinger and Sugarloaf Parkway, LLC, dated March 20, 1998, filed for record March 27, 1998 at 2:00 p.m., recorded in Deed Book 15716, Page 177, aforesaid Records.

Also together with those easement rights arising under that certain Fill and Drainage Easement Agreement by and between Martha E. Trollinger and Sugarloaf Parkway, LLC, dated May 22, 1998, filed for record June 1, 1998 at 8:00 a.m., recorded in Deed Book 16100, Page 129, aforesaid Records.

As a matter of information:

Sewer Easement Agreement by and between Georgia Transmission Corporation (An Electric Membership Corporation) and Sugarloaf Parkway, LLC, dated January 15, 1998, filed for record January 23, 1998 at 8:00 a.m., recorded in Deed Book 15351, Page 253, aforesaid Records; as assigned by that certain Assignment Easement from Sugarloaf Parkway, LLC to Gwinnett County Water and Sewerage Authority, a political subdivision of the State of Georgia, dated January 26, 1998, filed for record April 8, 1999 at 8:00 a.m., recorded in Deed Book 18117, Page 233, aforesaid Records.
APN:

**EXHIBIT "B"**
**Use and Operating Restrictions, Notices, Acknowledgements and Covenants**

The Grantee herein covenants and agrees, for and on behalf of itself and the other Grantee Parties that the following use and operating restrictions, notices, acknowledgments and covenants shall run with the land and each portion thereof, shall bind and restrict the Property and each portion thereof, and shall be binding upon and inure to the benefit of the parties, including without limitation, Grantor, the other Grantor Parties, Grantee and other Grantee Parties, as the case may be, and their respective heirs, devisees, representatives, successors and assigns, and any other person or entity expressly noted herein, and shall bind and restrict the Property for the time periods set forth herein:

I.      **Petroleum and Convenience Store Restrictions.**   No part of the Property shall be used by Grantee, subsequent grantees, affiliates, assigns, lessees, occupants, licensees or anyone else using the Property, for an automobile service station, petroleum station, gasoline station, automobile repair shop, convenience store, car wash, or for the purpose of conducting or carrying on the business of selling, offering for sale, storage, handling, distributing or dealing in petroleum, gasoline, motor vehicle fuel, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils, any fuel used for internal combustion engines, lubricants in any form, automobile parts or accessories, tires, batteries, or other petroleum or petroleum-related products or convenience store items, except for the personal use or consumption of such products by Grantee or its lessees of the Property, unless any such use is in connection with the operation of the Property as a Grantor branded service station.  For purposes hereof, "**Grantor branded service station**" shall mean a motor fuel sales facility operating under the brand BP, Amoco, Arco or any other brand of Grantor or any of its affiliates or their respective successors and assigns.  For purposes hereof, "**convenience store**" shall be defined as any retail store or outlet that sells any of the following items:  cigarettes, chewing tobacco, snuff or other tobacco products; prepackaged soda, juice, water or other drinks; prepackaged beer, wine, spirits or other liquor; fountain drinks; coffee; donuts; muffins or other pastries; or candy.

The above covenants and use restrictions bind and restrict the Property as covenants and restrictions running with the land and each portion thereof, and are deemed to benefit Grantor as a direct or indirect user of, operator of, or supplier of Grantor branded fuels to Grantor branded service stations in the County in which the Property is located.  These restrictive covenants will remain in full force and effect for a term of twenty (20) years from the date of this conveyance whereupon these restrictive covenants will automatically lapse and terminate and be of no further force or effect.

In the event that the Grantee shall violate the terms of this restriction, Grantor shall have all the remedies available to Grantor at law or in equity, including, without limitation, injunctive relief and specific performance.  If any violation of the restriction occurs after the Property is sold by the original Grantee named herein (or any affiliate thereof) to a third party, then in addition to Grantor's remedies at law or in equity, upon demand by Grantor, Grantee Parties shall promptly pay to Grantor the Sales Damages (as defined below).  Grantor and Grantee expressly acknowledge that it is impossible to precisely estimate the damages to be suffered by Grantor upon a violation of the terms of the restriction after the Property is sold, that the Sales

Damages would not adequately address or remedy all harm suffered by Grantor, and that the Sales Damages are not intended as a penalty, but as a reasonable estimate of some (but not all) of the damages that would be suffered by Grantor.

For purposes of this Deed, the term "Sales Damages" means the difference between the most recent gross sales price for the Property received by a Grantee Party and any personal property sold in connection therewith (including, the value of all cash and non-cash consideration, without deduction for any credits, prorations, costs or other items), and the Purchase Price received by Grantor for the Property, which difference shall be increased by 5% per annum, compounded annually as of the anniversary of the date of the recording of this instrument.

Notwithstanding the foregoing, the maximum Sales Damages shall be three million dollars ($3,000,000.00), which maximum amount shall increase by 5% per annum, compounded annually as of the anniversary of the date of the recording of this instrument.  Grantee and the other Grantee Parties shall be jointly and severally liable for the payment of the Sales Damages to Grantor.

## II.    **Environmental Matters.**

**A.    Environmental Restrictions.**    To reduce risks to human health and/or the environment and to permit application of environmental corrective action standards or other protective activities that are consistent with applicable law, this conveyance is made by Grantor and accepted by Grantee on the express condition and subject to the following restrictions, notices, acknowledgments and covenants:

**1.    Groundwater Exposure Restriction.**  No water supply wells of any kind (including, without limitation, water wells used for drinking, bathing or other human consumption purposes and water wells used for livestock, farming or irrigation) shall be installed or used on the Property (collectively, the "**Groundwater Exposure Restriction**"); provided, however, that the Groundwater Exposure Restriction does not prohibit the installation or use of any compliance wells or any groundwater monitoring, recovery or extraction wells or similar devices used for or related to the performance of any remediation or environmental corrective action work on the Property now or in the future.

**2.    Residential Use Restriction.**  The Property shall not be used or occupied (if used or occupied at all) for residential purposes, and additionally, no part of the Property shall be used for the purpose of operating a child care or elder care facility, a nursing home facility or hospice, a medical or dental facility, a school, a church or other place of worship, a park or a hospital (collectively, the "**Residential Use Restriction**").  If applicable state environmental laws and regulations define residential use, any use that is deemed to be a residential use by such laws and regulations will also be a residential use as the terms are used herein.

3.      **Construction and Excavation Restrictions.**

3.1      **Engineered Barriers and Below-grade Restriction.**  Grantee shall place any engineered barrier on the Property as may be required by the Government.  Any building or other improvements constructed on the Property shall have a slab-on-grade foundation, with the top of the slab at or above surface level, except for any building footings and/or underground utilities (the "**Below-grade Restriction**").

3.2      **Construction Workers' Caution Statement.**  Prior to conducting any intrusive activities with respect to the Property, Grantee and the other Grantee Parties shall cause all construction workers performing or assisting with such activities to be notified of possible petroleum hydrocarbon encounters and appropriately trained and certified in accordance with all environmental, health and safety laws, rules, regulations and ordinances, including, without limitation, any and all Occupational Safety and Health Administration (OSHA) Hazardous Waste Operations and Emergency Response (HAZWOPER) requirements (including, without limitation, those set forth in 29 CFR 1910.120) (collectively, the "**Construction Workers' Caution Restriction**").  Such training shall at a minimum include both an initial 40-hour and future 8-hour refresher training and certifications in compliance with OSHA HAZWOPER requirements and any similar applicable requirements (whether existing as of the date of this conveyance or enacted or promulgated in the future).

3.3      **Removal and Disposal of Soil and Groundwater.**  No soils shall be excavated at or removed from any portion of the Property, unless and until representative soil samples from such portion of the Property are first tested to determine whether any actionable levels of petroleum-related or other regulated chemicals are present, and if such levels are present, then (a) the excavation, management, disposal and/or removal of any such soils at or from such portion of the Property shall be governed by a written soil management plan ("**Soil Management Plan**") to be developed by Grantee or any other Grantee Party, as applicable, which shall comply with all applicable laws and regulatory requirements; (b) Grantee, or any other Grantee Party, as applicable, obtains any required government approval of the Soil Management Plan.  Grantee and the other Grantee Parties shall be solely responsible for the proper and lawful performance and payment of (c) any and all soil excavation, hauling, transportation and disposal pursuant to the Soil Management Plan or otherwise and (d) any extraction, dewatering and disposal of any groundwater to be extracted or removed from the Property arising out of or resulting from any development or other construction activities at the Property, including any required testing and treatment of such water (collectively, the "**Soil and Groundwater Removal Restriction**").  Except as may be otherwise expressly provided in the Purchase and Sale Agreement, Grantor shall not be obligated to pay any costs related to such soil excavation or groundwater extraction or any soil or groundwater removal or disposal, and/or any development of the Property.

3.4      **Notice**.  Any notices required to be given to Grantor shall be given using the following address:

BP Products North America Inc.
Environmental Business Manager

501 Westlake Park Blvd., Room 20, 109D
Houston, Texas 11019
Site SS #: 14146
Property Address: 2723 Meadow Church Road
Duluth, Georgia

**B.** **Duration.** The Groundwater Exposure Restriction, the Residential Use Restriction, the Below-grade Restriction, the Construction Workers' Caution Restriction, and the Soil and Groundwater Removal Restriction, including their related restrictions, notices, acknowledgments and affirmative covenants (collectively, the "**Environmental Restrictions**"), shall run with land and each portion thereof and shall be binding upon and inure to the benefit of Grantor, the other Grantor Parties, Grantee and the other Grantee Parties, and shall remain in full force and effect and bind and restrict the Property, unless and until the Environmental Restrictions (or any portion thereof) are either: (1) waived in writing by Grantor under conditions which, in Grantor's sole discretion, demonstrate that specific risks to human health and the environment are, have been, and/or will be appropriately reduced; or (2) released in writing by Grantor. Grantor may, at Grantee's request, release a portion or portions of the Environmental Restrictions from the Property upon Grantor's receipt from Grantee of an acknowledgment from the government, obtained by Grantee at its sole cost and expense, that test results demonstrate that the Property meets the then-current soil and groundwater standards for the Property without that portion or portions of the Environmental Restrictions and that the government approves the releasing of that portion or portions of the Environmental Restrictions.

**III.** **Certain Environmental Acknowledgments, Covenants and Notices.**

**A.** **Prior Use.** Grantee acknowledges that the Property has been used as a service station or for related purposes for the storage, sale, transfer and distribution of motor vehicle fuels, petroleum products or derivatives containing hydrocarbons.

**B.** **USTs.** Grantee acknowledges that underground storage tanks and associated product piping systems ("**USTs**") included in, on or under the Property may contain explosive gases and may have been used for the storage of motor fuels containing tetraethyl lead or other "antiknock" compounds which have made such USTs unfit for the storage of water or any other article or commodity intended for human or animal contact or consumption. Grantee expressly agrees not to use or permit the use of any such USTs for such purposes.

**C.** **Notice of Environmental Restrictions upon Conveyance.** Each instrument hereafter conveying any interest in the Property or any portion of the Property shall contain a recital acknowledging the Environmental Restrictions and providing the recording location of this Deed upon such conveyance substantially in the following form: "The real property described herein is subject to the Environmental Restrictions made by BP Products North America Inc., as Grantor, for its benefit and for the benefit of other parties and persons as set forth therein, and recorded with the Office of the Clerk of Gwinnett County Superior Court, at Deed Book_____, Page_____, as if the same were fully set forth herein." Notwithstanding the foregoing, any failure to include such notice shall not, in and of itself, create

any right or claim that any of the Environmental Restrictions or this Deed is void, voidable or otherwise unenforceable in accordance with their terms.

**IV.     Defined Terms; Successors; Other.**  All capitalized terms used in this **Exhibit "B"** shall have the meanings ascribed to such terms as set forth in the Deed to which this **Exhibit "B"** is attached.  By taking title to the Property (or otherwise succeeding, directly or indirectly, to any of Grantee's right, title or interest in or to the Property), each Grantee Party shall be conclusively deemed to have agreed to and accepted each and all of the terms, provisions and conditions of this **Exhibit "B"**, and to have agreed to be bound thereby.  It is the intention of Grantor and Grantee that the terms, provisions, covenants and restrictions set forth in this **Exhibit "B"** shall be deemed to have vested upon the execution and delivery of this Deed by Grantor.  If any of the covenants or restrictions contained herein shall be unlawful, void or voidable for violation of the rule against perpetuities, then any such covenants and restrictions shall continue only until twenty-one (21) years after the death of the survivor of the now living descendants of President George W. Bush.  If any of the covenants or restrictions contained herein shall be unlawful, void or voidable for violation of any other statutory or common law rule(s) or regulation(s) imposing time limits, then any such covenants and restrictions shall continue only for the longest period permitted under such statutory or common law rule(s) or regulation(s).  If any term, provision, condition, covenant or restriction in this **Exhibit "B"** shall, to any extent, be invalid or unenforceable, the remainder of this **Exhibit "B"** (or the application of such term, provision, condition, covenant or restriction to persons or circumstances other than in respect of which it is invalid or unenforceable) shall not be affected thereby, and each term, provision, condition, covenant and restriction set forth in this **Exhibit "B"** shall be valid and enforceable to the fullest extent permitted by law.  Grantee acknowledges, for itself and the other Grantee Parties, that the breach of any of the covenants or restrictions contained in this **Exhibit "B"** on the part of Grantee or any other Grantee Party will result in irreparable harm and continuing damages to Grantor and Grantor's business, and that Grantor's remedy at law for any such breach or threatened breach would be inadequate. Accordingly, in addition to such remedies as may be available to Grantor at law or in equity in the event of any such breach, any court of competent jurisdiction may issue an injunction (both preliminary and permanent), without bond, enjoining and restricting the breach or threatened breach of any such covenant or restriction by Grantee or any other Grantee Party.  In the event that Grantee or any Grantee Party shall breach any of the covenants or restrictions set forth in this **Exhibit "B"**, then Grantee or such other Grantee Party (as applicable) shall pay all of Grantor's costs and expenses (including reasonable attorneys' fees) incurred in enforcing such covenants and restrictions.

EXHIBIT B

**Upon recording return to:**
Lawrence J. Lehman, Esq.
56 Perimeter Center East
Suite 450
Atlanta, GA 30346

## RIGHT OF FIRST REFUSAL AND OPTION AGREEMENT

This Right of First Refusal and Option Agreement (this "**Agreement**") dated _____ _____, 2007, is made by and among **A.N.A. DEVELOPMENTS, LLC,** a Georgia limited liability company ("**Owner**"), **M.R.M. ENERGY, INC.**, a Georgia corporation ("**Operator**") and **BP PRODUCTS NORTH AMERICA INC.**, a Maryland corporation, f/k/a Amoco Oil Company, a Maryland corporation ("**Holder**") for the benefit of Holder.

## <u>RECITALS</u>

A.     Owner owns the fee interest in the real property located on all that tract or parcel of land lying and being in Land Lot 122 of the 7th District, Gwinnett County, Georgia, and being more particularly described on <u>**Exhibit "A"**</u>, attached hereto and made part hereof (the "**Real Estate**").

B.     In connection with signing and recording this Agreement, (i) Holder sold the Real Estate to Owner, and (ii) Owner and Operator entered into that certain Real Estate Lease dated _____, 2007 between Owner, as landlord, and Operator, as tenant (the "**Lease**").  (The leasehold interest created under the Lease is referred to below as the "**Leasehold Interest**.").

C.     The Quit Claim Deed or the Prime Lease Assignment by which Holder conveyed the Real Estate to Owner and a Memorandum of Lease placing the Lease of record and the Memorandum of Franchise Agreement and Dealer Supply Agreement will be recorded in the

Official Records of the county in which the Real Estate lies (the "**Official Records**"), in that order, immediately before this Agreement is recorded.

  D. By this Agreement, Owner intends to grant to Holder certain rights to acquire the Real Estate, the Leasehold Interest, and certain other property.

  E. Holder and Operator have signed a certain Dealer Supply Agreement dated _____ _____, 2007 (the "**Supply Agreement**") and a certain *ampm* Mini Market Franchise Agreement dated _____, 2007 ("**Franchise Agreement**") whereby Operator shall operate the Property as a BP-branded motor fuel sales facility and *ampm* mini market (collectively the "**Business Operations**").

## AGREEMENT

  THEREFORE, Owner, Operator and Holder agree as follows:

  1. <u>Grant of Right of First Refusal</u>.  Owner and Operator each grant to Holder the right of first refusal (the "**Right**") to acquire any Offered Parcel (as defined in <u>Section 3</u>) in which the granting party holds an interest.  The Right is governed by the terms of this Agreement and will continue for twenty (20) years after this Agreement is recorded in the Official Records (the "**Right Duration**").  The Right is superior to any right of first refusal that Operator might hold under the terms of the Lease.  But the Right is subordinate to the right of first refusal of Holder contained in the Supply Agreement.

  2. <u>Procedures for Notice and Exercise</u>.

  2.1 <u>Transfer Notice</u>.  If Owner or Operator enters into a bona fide agreement (a "**Tendered Agreement**") to transfer to a third party an interest in an Offered Parcel, Owner or Operator, as applicable ("**Seller**"), shall promptly notify Holder of the intended transfer.  The notice (the "**Transfer Notice**") must include (i) a copy of the signed Tendered Agreement and (ii) all information in Seller's possession about the ultimate beneficial owner of the third party. No one other than Seller can satisfy the obligation to give the Transfer Notice.  Holder will have the right to acquire the Offered Parcel, instead of the third party.

  2.2 <u>Exercise Notice</u>.  If Holder wishes to exercise the Right for a transaction covered by a Transfer Notice, Holder must notify Seller within thirty (30) days after Holder receives the Transfer Notice.  Holder's notice (the "**Exercise Notice**") must state that Holder elects to acquire the Offered Parcel at the price and on the other terms contained in the Tendered Agreement or at another price and on other terms that are mutually acceptable to Seller and Holder.

  3. <u>Offered Parcel; Improvements; Business Property; Related Property</u>.

  3.1 <u>Offered Parcel</u>.  "**Offered Parcel**" means each of the following:  (i) The Real Estate, (ii) any larger parcel of real property that includes the Real Estate (a "**Larger Parcel**"), or (iii) the Real Estate and any parcel of real property adjacent to the Real Estate, in

each of the cases described in the foregoing clauses (i) through (iii) to the extent that Owner or Operator holds an interest in the subject real property.  A parcel that is separated from the Real Estate only by a driveway, street, or other means of access will nonetheless be considered adjacent to the Real Estate.  The Leasehold Interest is an Offered Parcel with respect to Operator.

      3.2   <u>Lease Termination; Increase in Interest</u>.  If, during the Right Duration, Operator's or Owner's interest in an Offered Parcel is a leasehold interest and that party proposes to enter into an agreement with the landlord of the Offered Parcel terminating the Lease, the proposed termination will be considered a proposed transfer by Operator or Owner (as the case may be) of the leasehold interest to the landlord.  And if, during the Right Duration, Operator's or Owner's interest in an Offered Parcel increases from an interest less than the entire fee interest to a greater interest, the Right will thereafter apply to Operator's or Owner's increased interest in the Offered Parcel.

      3.3   <u>Definition of Land, Improvements, and Business Property</u>.  "**Land**" means the land in which a fee interest, leasehold interest, or any other interest exists, in a case where that interest is part of an Offered Parcel.  "**Improvements**" means all improvements on or under the Land.  "**Business Property**" means all tangible and intangible personal property used in the operation of any business conducted on the Land, including without limitation supplies, resalable inventory, equipment, furniture, trade fixtures, licenses, permits, and goodwill.

      3.4   <u>Right Includes Related Property</u>.  "**Related Property**" means Improvements and Business Property.  If (i) the Tendered Agreement covers both an intended transfer by Seller of the Offered Parcel and an intended transfer by Seller of any Related Property or (ii) in connection with the Tendered Agreement, Seller enters into a separate agreement to transfer any Related Property, the Right will include the right to acquire the Offered Parcel and the Related Property that is to be transferred.  If such a separate agreement exists, it will be considered a Tendered Agreement; and a copy of that signed separate agreement must be included in the Transfer Notice.

     4.   <u>Additional Purchase Terms</u>.  If Holder's exercise of the Right is for the purchase of the Offered Parcel, the purchase will be at the price and on the other terms contained in the Tendered Agreement, but subject to the following:

      (a)   <u>Variation of Terms</u>.  Seller and Holder may vary the price and other terms in any manner that is mutually acceptable to them.

      (b)   <u>Closing Date</u>.  Holder will have a period of time to close the transfer of the Offered Parcel that is equal to the longer of (i) the period of time given to the third party in the Tendered Agreement, but the period will begin on the date of the Exercise Notice, or (ii) 60 days after the opening of the Escrow (as defined in <u>Section 8</u>).

      (c)   <u>Price Allocation When Larger Parcel or Adjacent Parcel Is Offered</u>.  If (i) the Right is for the purchase of a Larger Parcel and (ii) the purchase price in the Tendered Agreement is allocated between Seller's interest in the Real Estate and

Seller's interest in the remainder of the Larger Parcel, Holder may buy Seller's interest in the Real Estate and not Seller's interest in the remainder by paying only the consideration allocated to Seller's interest in the Real Estate.  Or if (i) the Right is for the purchase of a Larger Parcel and (ii) the purchase price is not so allocated, Holder may buy only Seller's interest in the Real Estate by paying consideration that is equitable for only that interest, considering the total purchase price to be paid by the third party for that interest and Seller's interest in the remainder.  If Seller and Holder fail to agree on an equitable amount, that amount will be determined under <u>Section 10</u>.  The above principles of this <u>Section 4(c)</u> will apply in like manner if the Right is for the purchase of Seller's interest in the Real Estate and Seller's interest in a parcel adjacent to the Real Estate.

(d)     <u>Price Allocation When Business Property Is Offered</u>.  If (i) the Right is for the purchase of both the Offered Parcel and any Business Property and (ii) the purchase price in the Tendered Agreement is allocated between the Offered Parcel and the Business Property, Holder may buy the Offered Parcel and not the Business Property by paying only the consideration allocated to the Offered Parcel.  Or if (i) the Right is for the purchase of both the Offered Parcel and any Business Property and (ii) the purchase price is not so allocated, Holder may buy only the Offered Parcel by paying consideration that is equitable for only the Offered Parcel, considering the total purchase price to be paid by the third party for the Offered Parcel and the Business Property.  If Seller and Holder fail to agree on an equitable amount, that amount will be determined under <u>Section 10</u>.

(e)     <u>Cash Instead of Delayed Payment Terms</u>.  If the Tendered Agreement provides for delayed payment terms, Holder may pay the total purchase price in cash at the closing of the purchase.

(f)     <u>Noncash Consideration</u>.  If the Tendered Agreement provides for any noncash consideration, Holder may pay cash equal to the fair market value of the noncash consideration, as agreed to by Seller and Holder or as determined under <u>Section 10</u>.

(g)     <u>Environmental Indemnification</u>.  If Holder acquires an Offered Parcel covered by a Transfer Notice, the person transferring the Offered Parcel to Holder ("**Transferor**") shall sign an indemnification agreement containing the following provision:

> *Transferor shall indemnify and defend Holder from all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) that Holder incurs arising from any environmental contamination occurring or hazardous materials existing at the real property that Transferor is concurrently conveying to Holder (the "**Real Property**"), to the extent that the contamination or hazardous materials (i) are present at concentrations that any governmental agency will require to be*

*remediated or otherwise are not in compliance with all applicable statutory and regulatory requirements and (ii) are known or discovered before Holder begins its operations at the Real Property.  This agreement to indemnify and defend will survive the closing of Transferor's transfer of the Real Property to Holder.*

5.    Offer to Lease or Sublease.  The Right includes the right to match the terms of any lease or sublease that Owner or Operator enters into during the Right Duration covering (i) an Offered Parcel or (ii) part of any Offered Parcel when that part includes all or part of the Real Estate.  The Right will exist whether the leasehold or subleasehold is to begin during or after the Right Duration.

6.    Seller's Transfer Rights.  If Holder does not exercise the Right for a transaction covered by a Transfer Notice, Seller may then transfer the interest in the Offered Parcel and any Related Property to the third party but (i) only for the price and on the other terms contained in the Tendered Agreement; (ii) only to the third party named in the Tendered Agreement; (iii) only within one hundred eighty (180) days after Holder receives the Transfer Notice; and (iv) subject to Holder's rights under this Agreement, which will continue with respect to each future intended transfer of an Offered Parcel by any owner or tenant of the Offered Parcel.  Any change in (i) the identity of the third party or the ultimate beneficial owner of the third party or (ii) in the price or other terms of the Tendered Agreement will give rise to a new Right exercisable by Holder.

7.    Survival of Holder's Rights.  Holder's failure to exercise the Right with respect to a Tendered Agreement covered by a Transfer Notice will not relieve Seller from the obligation to comply with this Agreement in connection with any later Tendered Agreement that Seller enters into during the Right Duration.  Holder may void any transfer that Seller makes without complying with this Agreement or the Franchise Agreement.  To exercise this right to void a transfer, Holder must give an Exercise Notice within thirty (30) days after Holder receives actual notice of the intended or consummated noncomplying transfer and the complete terms of the transfer.

8.    Escrow.  If Holder exercises the Right, Seller shall apply to a title insurance company ("**Escrow Agent**") acceptable to Holder for a preliminary title report on the condition of title of the Offered Parcel and any Improvements that Holder is buying.  Seller and Holder shall promptly sign escrow instructions and open escrow (the "Escrow") with Escrow Agent.  Despite anything to the contrary in the Tendered Agreement or elsewhere:

(a)    Transfer Document and Title Insurance.  Seller shall provide Escrow Agent with a deed, assignment of leasehold interest, or other appropriate document transferring title to the Offered Parcel and any Improvements that Holder is buying, free of encumbrances, except those that Holder elects to accept.  Seller shall provide Holder with an ALTA Standard Coverage Owner's or Leasehold (as appropriate) Policy of Title Insurance insuring title, subject only to the printed exceptions of the policy and those encumbrances that Holder elects to accept.  The policy must be issued by an insurer acceptable to Holder and have a liability amount equal to the purchase price of the Offered Parcel and any

purchased Improvements.  Closing will be considered effected when the county recorder accepts the transfer document for recording.

(b)　　Taxes and Rent.  Taxes, rentals, and other items of income and expense related to the Offered Parcel or any purchased Improvements will be prorated as of the date that the Escrow closes.

(c)　　Closing Costs.  Seller and Holder shall each pay one half of Escrow Agent's fee for handling the Escrow.  Seller shall pay the premium for Holder's title insurance policy.  Seller and Holder shall pay all other closing costs in accordance with the custom in the county where the Real Estate is located.  But if there is no custom for a particular closing cost, each shall pay one half of that cost.

9.　　Entity Changes.

9.1　　Triggering Events.  Each of the following events (each, a "**Triggering Event**") will be considered a transfer of all Offered Parcels and Related Property that Owner or Operator (each, "**Deemed Seller**") owns or leases at the time of the Triggering Event:

(a)　　Change in Ownership Interests.  A sale, assignment, other disposition, hypothecation, encumbrance, or change in vesting of (i) an ownership, voting, or economic interest (including, without limitation, shares of stock in a corporation, a partnership interest in a general or limited partnership, or a membership interest in a limited liability company) in Deemed Seller or in a person that holds, directly or indirectly, an ownership, voting, or economic interest in Deemed Seller (a "**Constituent Owner**") or (ii) a consolidation or merger of Deemed Seller or a Constituent Owner, whether voluntarily, involuntarily, by operation of law, or otherwise;

(b)　　Disposition of Assets.  A sale, lease, assignment, or other disposition of all or substantially all of Deemed Seller's assets; or

(c)　　Signing of Agreement.  The signing of an agreement to enter into a transaction described in Section 9.1(a) or (b).

Deemed Seller shall give written notice to Holder concurrently with the event described in Section 9.1(c), and at least thirty (30) days before the consummation of the events described in Section 9.1(a) or (b).

9.2　　Purchase at Fair Market Value.  Each Triggering Event will give rise to the Right entitling Holder to purchase all the Offered Parcels and Related Property owned by Deemed Seller (i) at a price equal to their fair market value, as agreed to by Deemed Seller and Holder or as determined under Section 10, and (ii) on any other applicable terms contained in any agreement to enter into the Triggering Event.

10.    Valuation Disputes.

10.1    Appointing Appraisers.  If Seller and Holder cannot agree on (i) the equitable amount under Section 4(c) or (d), (ii) the value of the noncash consideration under Section 4(f), or (iii) the fair market value under Section 9.2, the amount or value (the "**Value**") will be determined under this Section 10.  Within fifteen (15) days after Seller or Holder receives a demand from the other for an appraisal under this Section 10, Seller and Holder shall each appoint an appraiser who is a Qualified Appraiser (as defined in Section 10.4).  If one of them fails to appoint an appraiser, the appraiser appointed by the other will determine the Value.  (For purposes of this Section 10, "Seller" includes "Deemed Seller.")

10.2    Determination of Value.  If two appraisers are appointed and they fail to agree on the Value, each appraiser must set forth his or her determination in writing, together with his opinion and the considerations on which his opinion is based; and he or she must deliver a signed copy to Seller and Holder within thirty (30) days after his or her appointment.  If the lower of the two determinations is at least ninety percent (90%) of the higher, the Value will be the average of the two determinations.  If not, then within ten (10) days after Seller or Holder requests the two appraisers to do so, they must nominate a third appraiser who is a Qualified Appraiser.  Within ten (10) days after his or her appointment, the third appraiser must then select one of the two determinations as being the same as or the closer to the amount that he or she determines as the Value; and the selected determination will be the Value.

10.3    Appraisal Fees.  Seller and Holder shall each bear the cost of the appraiser that it appoints and one half of the cost of the third appraiser.

10.4    Qualified Appraiser.  "**Qualified Appraiser**" means a member of the Appraisal Institute who (i) is unaffiliated with Owner, Operator, Holder, and the third party under the Tendered Agreement and (ii) has at least five-years' full-time experience in appraising commercial real property in the area of the Real Estate.  If the Appraisal Institute ceases to exist, a reasonably comparable, nationally recognized organization of real estate appraisers will be substituted in the definition of Qualified Appraiser.

11.    Grant of Purchase Option.  Owner grants to Holder the right to buy ("**Purchase Option**") the Real Estate, Improvements and any Business Property owned by Owner (collectively the "**Option Property**"), upon the termination of the Lease, the Supply Agreement, or the Franchise Agreement.  The Purchase Option will be in effect during the period beginning on the date this Agreement is recorded ("**Recordation Date**") in the Official Records of the county in which the Option Property lies and end on the earlier of (i) the 20th anniversary of the Recordation Date or (ii) the Option Early Termination Date (as defined below).  The Purchase Option is superior to any purchase option that Operator might hold under the terms of the Lease.

11.1    Option Consideration.  The price that Holder has accepted from Owner for Holder's conveying the Real Estate to Owner is less than the price that Holder would have required if Owner did not grant the Purchase Option to Holder; and the difference between those two prices is the consideration for Owner's granting the Purchase Option.

11.2     Exercise Notice.  If the Lease is terminated at any time before its originally scheduled expiration date, Owner and Operator shall each immediately give Holder written notice of the termination (the "**Lease Termination Notice**").  If the Supply Agreement or the Franchise Agreement is terminated, Holder shall immediately give Owner written notice of the termination ("**BP Termination Notice**").  Holder may exercise the Purchase Option by giving Owner and Operator written notice of Holder's exercise of the Purchase Option (the "**Exercise Notice**") within 60 days ("**Exercise Period**") after the date (i) Holder receives the Lease Termination Notice or (ii) the termination of the Supply Agreement or Franchise Agreement becomes effective.  During the Exercise Period, Holder and its agents, employees, contractors, and consultants may enter on the Real Estate to conduct reasonable and customary environmental assessments and tests of the Real Estate.

11.3     Early Termination of Option; Termination Document.  If Holder does not exercise the Option within the Exercise Period, the Purchase Option will terminate on the day after the Exercise Period expires ("**Option Early Termination Date**").  Upon Owner's written request made after the Option Early Termination Date, Holder shall sign, acknowledge, and deliver to Owner a recordable document confirming that this Agreement and the Purchase Option have terminated.

11.4     Real Estate Value.  Holder shall have the option to purchase the Real Estate at a price equal to its fair market value as agreed to by Holder and Owner, or failing their agreement, as determined in accordance with Sections 11.6 and 11.7 below (the "**Real Estate Value**").

11.5     Business Property Value.  Holder shall have the option to purchase the Business Property (if any is owned by Owner) at a price equal to its fair market value as agreed to by Holder and Owner, or failing their agreement, as determined in accordance with Sections 11.6 and 11.7 below (the "**Business Property Value**").

11.6     Appointing Appraisers.  If Holder and Owner cannot agree on the Real Estate Value or, if applicable, the Business Property Value, the Real Estate Value and Business Property Value will be determined in accordance with the appraisal procedures contained in this Section 11.  Within fifteen (15) days after Holder or Owner receives a demand from the other for an appraisal in accordance with this Section 11.6, Holder and Owner shall each appoint a Qualified Appraiser (as defined in Section 10.4).  If one of them fails to timely appoint a Qualified Appraiser, the Qualified Appraiser appointed by the other will determine the Real Estate Value and Business Property Value.

11.7     Determination of Values.  If only one appraiser is appointed, the appraiser must deliver a signed report (an "**Appraisal Report**") to Holder and Owner within thirty (30) days after his or her appointment.  An Appraisal Report must set forth the appraiser's determination of the Real Estate Value and Business Property Value and the considerations on which his or her opinion is based.  If two appraisers are appointed and they agree on the Real Estate Value and Business Property Value, they must deliver a signed joint Appraisal Report to Holder and Owner within thirty (30) days after the appointment of the second appraiser.  If two appraisers are appointed and they fail to agree on the Real Estate Value, Business Property

Value, or both, each appraiser must deliver his or her signed Appraisal Report to Holder and Owner within 35 days after his or her appointment.  If the lower of either appraiser's determinations as to Real Estate Value and Business Property Value is at least ninety percent (90%) of the higher, the applicable value will be the average of the two determinations.  If not, then within ten (10) days after Holder or Owner requests the two appraisers to do so, they must mutually appoint a third appraiser who is a Qualified Appraiser.  Within ten (10) days after his or her appointment, the third appraiser must select one of the two determinations as being the same as or closer to the amount that he or she determines as the Real Estate Value and/or the Business Property Value; and the selected determination will be the value to be used herein.

11.8    Appraisal Fees.  Holder and Owner shall each bear the cost of the appraiser that it appoints and one-half of the cost of the third appraiser.

11.9    Excluded Business Property.  Holder may elect not to buy all or part of the Business Property.  If Holder wishes to exercise this election, Holder must give notice to Owner on or before the fifth day before Escrow closes.  Holder's notice must (i) state that it is electing not to buy the Excluded Business Property and (ii) identify the items of the Excluded Business Property with sufficient particularity to allow Owner to remove from the Real Estate the items of the Excluded Business Property that are tangible personal property.  Owner shall remove those items of tangible personal property from the Real Estate within two business days before Escrow closes.

11.10    Escrow and Closing Date.  The Transaction will occur through an escrow with a title insurance company acceptable to Holder ("**Title Company**").  The escrow will close on or before the later of (i) the 90th day after the date on the Exercise Notice is given ("**Exercise Date**"), (ii) the date on which Holder receives notice from the applicable governmental authority that the authority has transferred to Holder (or an affiliate of Holder) any Alcoholic Beverage License that is included in the Business Property, or (iii) the tenth (10th) business day following the final determination of the Real Estate Value (pursuant to the provisions of Section 11.4).

11.11    Escrow Procedures.  If Holder exercises the Purchase Option, Holder and Owner shall promptly sign escrow instructions and open the escrow ("**Escrow**").  Owner shall apply to the Title Company for a preliminary title report on the condition of title of the Real Estate.  The following will apply to the consummation of the Transaction through the Escrow:

(a)    Deed and Title Insurance.  Owner shall provide the Title Company with a deed conveying title to the Real Estate, free of encumbrances, except those that Holder elects to accept.  Owner shall provide Holder with an ALTA Standard Coverage Owner's Policy of Title Insurance insuring title, subject only to the printed exceptions of the policy and those encumbrances that Holder elects to accept.  The policy must be issued by the Title Company (or another insurer acceptable to Holder) and have a liability amount equal to the portion of the purchase price of the Option Property ("**Purchase Price**") that is attributable to the Real Estate.  Closing will be considered effected when the County Recorder accepts the deed for recording.

(b)      Bill of Sale.  Owner shall provide the Title Company with a bill of sale conveying title to the Business Property (if any) to Holder, free of encumbrances.

(c)      Taxes and Rent.  Taxes, rentals, and other items of income and expense related to the property that Holder is buying will be prorated as of the date that Escrow closes.

(d)      Closing Costs.  Owner and Holder shall each pay one half of the Title Company's ("**Escrow Agent**") fee for handling the Escrow.  Owner shall pay the premium for Holder's title insurance policy.  Owner and Holder shall pay all other closing costs in accordance with the custom in the County.  But if there is no custom for a particular closing cost, each shall pay one half of that cost.

(e)      Extended Coverage Title Policy; Survey.  Notwithstanding the provisions of Section11.11(a), Holder may require that the title policy be an ALTA extended coverage owner's policy of title insurance ("**Extended Coverage Title Policy**"). In that event, Holder shall (i) obtain and provide to the title insurer any survey that the title insurer might require in order to issue the title policy as an Extended Coverage Title Policy and (ii) pay the increase in the premium attributable to the extended coverage.  Within three days after the Escrow opens, Owner shall send to Holder a copy of the most recent survey (if any) of the Real Estate that Owner has in its possession.

(f)      Deductions by Holder.  Holder may deduct from the Purchase Price or from any other amounts that Holder is required to pay to Owner in connection with the Transaction any or all of the following:  (i) Any trade payables or other amounts that an Owner Entity (defined below) owes to Holder or any of its affiliates with respect to (A) the operation of the business conducted at the Real Estate or (B) all or any part of the Real Estate, (ii) any transfer fee that an Owner Entity is required to pay to Holder under any of the Dealer Agreements pertaining to the business conducted at the Real Estate, (iii) the unpaid balance of principal and accrued interest on any loan that is payable to Holder or any of its affiliates and that is secured, wholly or partially, by any property that Holder is buying in the Transaction, whether or not the deducted amounts would otherwise be due when Escrow closes and (iv) the unpaid balance of principal and accrued interest on, and all other amounts due in connection with, any Secured Obligation (as defined in Section 17) as of the date that Escrow closes.  If Holder elects to buy the Option Property, upon the close of Escrow, the Title Company shall use the funds that Holder deposits into Escrow first to pay in full the Secured Obligation. For purposes of this Agreement an Owner Entity is individually and collectively, (i) each person named as Owner in this Agreement ("**Constituent Owner**") and (ii) each person that controls a Constituent Owner, is controlled by a Constituent Owner, or is under common control with a Constituent Owner, in each case whether the control is direct or indirect.

11.12   Environmental Indemnification.  If Holder acquires the Real Estate in accordance with this Agreement, the person transferring the Real Estate to Holder shall sign and deliver to Holder through the Escrow an indemnification agreement containing the following provision:

> *Transferor shall indemnify and defend Holder from all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) that Holder incurs arising from any environmental contamination occurring or hazardous materials existing at the Real Estate, to the extent that the contamination or hazardous materials (i) are present at concentrations that any governmental agency will require to be remediated or otherwise are not in compliance with all applicable statutory and regulatory requirements and (ii) are known or discovered before Holder begins its operations at the Real Estate.  This agreement to indemnify and defend will survive the closing of Transferor's transfer of the Real Estate to Holder.*

12.    Grant of Lease Option.  Owner grants to Holder the option to assume the tenant's rights and obligations under the Lease (the "**Lease Option**"), upon the termination of the Lease, the Supply Agreement, or the Franchise Agreement.  The Lease Option is superior to any option to lease that Operator might hold under the terms of the Lease

12.1   Upon Termination of the Lease.  If the Lease is terminated at any time before its originally scheduled expiration date, Owner and Operator shall each give Holder Lease Termination Notice.  Holder may exercise the Lease Option by giving Owner and Operator notice of Holder's exercise of the Lease Option (the "**Exercise Notice**") within thirty (30) days after Holder receives the Lease Termination Notice, regardless of any earlier date of Lease termination as between Owner and Operator.  If Holder exercises the Lease Option, the Lease will become a direct lease between Owner, as landlord, and Holder, as tenant, upon all the Lease's terms (except as provided in Section 13 of this Agreement), commencing on the date of the Exercise Notice.  But Holder will only be obligated to perform those obligations that accrue under the Lease after the date on which Owner delivers vacant possession of the Real Estate to Holder.  On the date of the Exercise Notice, (i) title to (A) the underground storage tanks and gasoline lines at the Real Estate (unless owned by Owner), (B) all furniture, equipment (including gasoline dispensers), trade fixtures, resalable inventory, and transferable licenses and permits (including any permit for the sale of beer or wine) owned or leased by Operator in connection with the operation of the business at the Real Estate, (C) and all Operator's monitoring and maintenance records for that equipment, will automatically pass from Operator to Holder; and (ii) Operator shall take all steps necessary or appropriate to transfer to Holder the interest of Operator in those items.

12.2   Upon Termination of the Supply Agreement or the Franchise Agreement. If the Supply Agreement or the Franchise Agreement is terminated and Holder desires to exercise the Lease Option, Holder shall give Owner notice of the termination and shall give Owner and Operator notice of Holder's exercise of the Lease Option (the "**BP Lease Notice**")

within thirty (30) days of notice of the termination.  The Lease will become a direct lease between Owner, as landlord, and Holder, as tenant, upon all the Lease's terms (except as provided in Section 13 of this Agreement), commencing on the later to occur of (a) the termination date of the Supply Agreement or Franchise Agreement (as applicable); or (b) the date of the BP Lease Notice.  But Holder will only be obligated to perform those obligations that accrue under the Lease after the date on which Owner delivers vacant possession of the Real Estate to Holder.  On the date of the BP Lease Notice, (i) Operator's rights under the Lease will automatically terminate; (ii) title to (A) the underground storage tanks and gasoline lines at the Real Estate (unless owned by Owner), (B) all furniture, equipment (including gasoline dispensers), trade fixtures, resalable inventory, and transferable licenses and permits (including any permit for the sale of beer or wine) owned or leased by Operator in connection with the operation of the business at the Real Estate, (C) all Operator's monitoring and maintenance records for that equipment, will automatically pass from Operator to Holder; and (iii) Operator shall take all steps necessary or appropriate to transfer to Holder the interest of Operator in those items.

> 12.3    Payment for Equipment.  In connection with Holder's exercise of the Lease Option, Holder shall pay Operator the lower of then current fair market value or Operator's then current depreciated book value for the underground storage tanks and gasoline lines at the Real Estate (unless owned by Owner), the furniture, equipment (including gasoline dispensers), and trade fixtures owned by Operator. Owner shall pay Operator seventy percent (70%) of the retail price for  Operator's resalable inventory (excluding damaged, out-of-code items and/or items with Operator's logos). Operator's transferable licenses and permits  and monitoring and maintenance records shall be transferred to Holder without compensation. Payment for the above items shall be made to Operator within thirty (30) days after the date on which the Lease becomes a direct lease between Owner and Holder.

> 13.    Holder's Assignment and Sublease Rights.  If Holder (i) exercises the Right with respect to the Leasehold Interest or (ii) exercises the Lease Option, Holder may assign to a dealer or franchisee the Leasehold Interest and Holder's interest under the lease covering any furniture, equipment, and trade fixtures that Holder then leases from Owner (the "**Leased Personal Property**"), without obtaining Owner's consent.  Or Holder may sublease to a dealer or franchisee the Real Estate and the Leased Personal Property, without obtaining Owner's consent. But the assignment or sublease will not relieve Holder from liability for the performance of the tenant's obligations under the Lease and under the lease covering the Leased Personal Property.

> 14.    Amendment or Assignment of Lease.  Operator and Owner shall not enter into any agreement that amends the Lease without Holder's prior written consent, which Holder shall not unreasonably withhold.  If Holder does not exercise the Right with respect to an intended transfer by Operator of the Leasehold Interest, Operator shall not assign the Leasehold Interest to the intended transferee unless Holder approves the transferee.  Holder shall not unreasonably withhold its approval of the transferee.  Any assignment of the Leasehold Interest made by Operator without Holder's approval of the transferee will be void.

> 15.    Notice to Holder.  Owner shall give Holder prompt written notice of any default by Operator under the Lease.

16.     Default on Obligations Secured by Junior Liens.

16.1    Definitions for Section 16.  When used in this Section 16, each underlined, capitalized term set forth below in this Section 16.1 has the meaning set forth beside it.

(a)     Accelerated Amount:  Any amount that became due on or under the Secured Obligation because Lender exercised an acceleration right arising from the Loan Default.

(b)     Default Amounts:  All amounts that were added to the balance of the Secured Obligation by reason of the Loan Default, whether those amounts have been paid or remain unpaid.  "Default Amounts" include, without limitation, (i) late charges, (ii) the excess of any interest that accrued at a default rate over the interest that would have accrued if Lender had not imposed the default rate, (iii) any prepayment penalty, and (iv) any interest that accrued on any of the amounts described in clauses (i) through (iii) of this sentence.

(c)     Elected Property:  The items of real property and personal property that Holder intends to buy from Owner and/or Operator, as appropriate, in accordance with this Section 16 after giving a Foreclosure Exercise Notice.

(d)     Foreclosure Exercise Notice:  A notice from Holder to Owner and/or Operator, as appropriate, and Lender stating that Holder elects to buy the Real Estate in accordance with this Section 16.

(e)     Foreclosure Purchase Right:  The right to buy the Real Estate in accordance with this Section 16.

(f)     Lender:  A person for whose benefit a particular Lien exists.  "Lender" includes, without limitation, (i) the beneficiary under a deed of trust, (ii) a mortgagee, and (iii) a judgment lien holder.

(g)     Lien.  A lien that (i) encumbers an interest in the Real Estate, (ii) secures a monetary obligation, and (iii) is junior to Holder's rights under this Agreement.

(h)     Lien Enforcement Notice:  A notice from Lender to Holder notifying Holder of Lender's intent to enforce its Lien.  The Lien Enforcement Notice must include (i) a copy of the recorded lien document, (ii) a copy of the promissory note or other document evidencing the Secured Obligation, (iii) a statement of the amount of the unpaid balance of the Secured Obligation, (iv) a description of the Loan Default, (v) an itemization of the portion of the unpaid balance of the Secured Obligation

that is in default, (vi) an itemization of the Default Amounts, and (vii) a statement of any Accelerated Amount.

(i)      Loan Default:  The breach for which Lender intends to foreclose its Lien.

(j)      Secured Obligation:  The monetary obligation secured by a Lien.

16.2     Coverage of this Section 16.  The provisions of this Section 16 will apply with respect to each Lien and to each Lender who holds a Lien.

16.3     Lender's Lien Enforcement Notice to Holder.  Before Lender begins enforcement of its Lien (whether by private power of sale, judicial foreclosure, or otherwise), Lender shall send a Lien Enforcement Notice to Holder.

16.4     Holder's Right to Buy.  Before Lender begins enforcement of its Lien, Holder will have the Foreclosure Purchase Right.

16.5     Holder's Exercise Notice to Owner and/or Operator and Lender.  If Holder wishes to exercise the Foreclosure Purchase Right, Holder must send a Foreclosure Exercise Notice to Owner and/or Operator, as appropriate, and Lender within 30 (thirty) days after Holder actually receives the Lien Enforcement Notice.

16.6     Holder's Purchase of Real Estate.  If Holder exercises the Foreclosure Purchase Right, the Foreclosure Purchase Right will include the right to buy the Real Estate and all Improvements, together with any Business Property that Holder wishes to buy and in which Owner and/or Operator, as appropriate, holds an interest.

16.7     Procedures for Holder's Purchase.  If Holder exercises the Foreclosure Purchase Right, the purchase and sale transaction will be consummated in accordance with the procedures described in Paragraph 8.  Holder will have a period of time to close the purchase that is equal to the longer of (i) 60 days after the opening of Escrow, or (ii) the date on which Holder receives notice from the applicable governmental authority that the authority has transferred to Holder (or an affiliate of Holder) any Alcoholic Beverage License that is included in the purchase, but under no circumstances longer than 120 (one hundred twenty) days following Lender's delivery of the Lien Enforcement Notice.

16.8     Purchase Price for the Elected Property Resulting From Holder's Exercise of the Foreclosure Purchase Right; Reduction and Credits.  The purchase price for the Elected Property resulting from Holder's exercise of the Foreclosure Purchase Right arising under this Section 16 will be equal to the Purchase Price, reduced by the total costs (including attorneys' fees) that Holder incurs in connection with the purchase and sale of the Elected Property.  If Holder elects to buy the Elected Property subject to a lien that secures a monetary obligation other than the Secured Obligation that was the subject of the Lien Enforcement Notice, Holder will receive a credit against the Purchase Price for the unpaid balance of that monetary obligation as of the date that Escrow closes.  If Holder elects to buy the Elected Property, upon the close of Escrow, the Title Company shall use the funds that Holder deposits into Escrow first to pay in

full the Secured Obligation that was the subject of the Lien Enforcement Notice, including all unpaid Default Amounts.

      16.9   <u>No Impairment of Lien</u>.  Holder's exercise of the Foreclosure Purchase Right will not defeat, discharge, or impair any Lien or the Secured Obligation.  No Lien will be released of record or otherwise extinguished until the Secured Obligation, including all unpaid Default Amounts, is paid in full.

      17.   <u>Liens</u>.

      17.1   <u>Coverage of this Section 17</u>.  The provisions of this <u>Section 17</u> will apply with respect to each Lien and to each Lender who holds a Lien.

      17.2   <u>No Impairment of Lien</u>.  Anything in this Agreement to the contrary notwithstanding, (i) Holder's Right, Lease Option, and Purchase Option (collectively "**Options**") and the exercise thereof shall not defeat, discharge, or impair any Lien or Secured Obligation, and (ii) in the event Holder exercises any of its Options and elects to buy or lease the Real Estate, no Lender shall be obligated to release of record its Lien unless and until the entire Secured Obligation with respect thereto is paid and discharged in full.

      17.3   <u>Foreclosure</u>.  If an event shall occur entitling Holder to exercise any of the Options and in connection therewith a Lender commences foreclosure of its Lien and for any reason Holder does not pay to such Lender the amount required to terminate the foreclosure within the time and in the manner required thereby, then such Lender may proceed to foreclose its Lien and the Options and all other rights of Holder under this Agreement shall automatically terminate and be of no further force and effect and Holder shall execute and furnish to such Lender within ten (10) days after such Lender's written request therefor, a written release and termination of the Options and all other rights of Holder under this Agreement in recordable form and otherwise in form and substance satisfactory to such Lender, which such Lender may record in the real estate records for the county(ies) where the Real Estate is located to give record notice thereof.

      17.4   <u>Effect of Options on Liens</u>.  If an event shall occur entitling Holder to exercise any of the Options, and Holder elects to proceed with the exercise of the relevant Option, and the Real Estate is subject to a Lien or Liens for which the Lender(s) does not initiate a foreclosure, Holder may elect to either: (A) direct the Escrow Agent to apply the Purchase Price first to payment in full of any or all Secured Obligations, the Lender(s) of such Secured Obligation(s) shall release of record its Lien(s), and Holder shall acquire fee title to the Real Estate free and clear of all such Secured Obligation(s), or (B) direct the Escrow Agent to apply a portion of the Purchase Price necessary to cure any defaults, if any, under any or all Secured Obligations, and Holder shall assume such Secured Obligations upon Holder's acquisition of the fee title to the Real Estate.

      18.   <u>Notices</u>.  Notices relating to this Agreement must be in writing and sent to the addresses set forth below.  But a party may change its address for notices by giving notice as required by this <u>Section 18</u>.  A written notice will be considered given (i) when personally

delivered, (ii) two business days after deposit in the United States Mail as first class mail, certified or registered, return receipt requested, with postage prepaid, (iii) one business day after deposit with a reputable overnight delivery service for next business day delivery, or (iv) on the business day of successful transmission by electronic facsimile.  The parties' addresses for notices are as follows:

| | |
|---|---|
| To Owner | A.N.A. Developments, LLC |
| | 3515 Cascade Road |
| | Atlanta, GA 30331 |
| | Attn:   Ali Mourad |
| | Telephone: (714) 926-6033 |
| | Facsimile:  (949) 679-2810 |
| | |
| To Operator: | M.R.M.Energy, Inc. |
| | 3515 Cascade Road |
| | Atlanta, GA 30331 |
| | Attn:   Ali Mourad |
| | |
| | Facsimile:  _____ |
| | |
| To Holder: | BP Products North America Inc. |
| | 1323 Bond Street, Suite 179 |
| | Naperville, IL 60563 |
| | |
| | Facsimile:  _____ |

19.   <u>Entire Agreement; Modification; Waiver</u>.  This Agreement (including any attached Exhibits) contains the entire agreement between Owner and Holder, and Operator and Holder, with respect to Holder's rights to acquire Offered Parcels.  Any modification of this Agreement must be in writing and signed by all the parties to this Agreement.  Any waiver of a provision of this Agreement by a party must be in writing.

20.   <u>Governing Law</u>.  The internal laws of the State where the Land lies govern this Agreement.

21.   <u>Interpretation</u>.  The captions appearing in this Agreement are for convenience of reference only, and they do not affect the meanings of the provisions of this Agreement.  In this Agreement, each gender includes the other gender.  Words in the singular include the plural and vice versa, when appropriate.  The word "person" includes natural individuals and all other entities.  The word "cost" includes any cost or expense.  The word "term" includes any covenant, condition, representation, warranty, or other provision that is part of an agreement.  Whenever a provision of this Agreement requires a party to this Agreement to perform an act, that person must do so at its sole cost (unless otherwise stated in connection with that provision).

22.     <u>Dates</u>.  If the date by which an event is to occur under this Agreement falls on a Saturday, Sunday, or other legal holiday under United States or applicable State law, the event may occur on the next business day.

23.     <u>Successors and Assigns</u>.  The rights and obligations under this Agreement bind and benefit the successors and assigns of each party to this Agreement.  For example, the covenants and obligations of Owner contained in this Agreement will bind each future owner or tenant of all or part of the Real Estate; and each of those persons will be considered "Owner" under this Agreement with respect to the applicable part of the Real Estate while that person is the owner or tenant.

24.     <u>Further Acts</u>.  Each party to this Agreement shall do all things that another party reasonably requests to carry out the purpose of this Agreement.

25.     <u>Attorneys' Fees</u>.  If a dispute arises between Owner and Holder, or between Operator and Holder, with respect to this Agreement and if Holder prevails in the dispute, then Holder will be entitled to recover from Owner or Operator (as applicable) the reasonable costs and expenses that Holder incurred in enforcing its rights under this Agreement, including reasonable attorneys' fees.

26.     <u>Several Obligations</u>.  Owner's and Operator's obligations under this Agreement are several, not joint and several.

27.     <u>Counterparts</u>.  The parties may sign this Agreement in counterparts.  The signature pages from the separately signed counterparts may be attached to one copy of this Agreement to form a single document.

(Signature Page Follows)

WITNESS:

_____
(Unofficial Witness)


Sworn to and subscribed before me
this ___ day of _____, 2007.

_____
Notary Public
My Commission Expires:


WITNESS:

_____
(Unofficial Witness)


Sworn to and subscribed before me
this ___ day of _____, 2007.

_____
Notary Public
My Commission Expires:


WITNESS:

_____
(Unofficial Witness)


Sworn to and subscribed before me
this ___ day of _____, 2007.

_____
Notary Public
My Commission Expires:


OWNER:

**A.N.A. DEVELOPMENTS, LLC,**
a Georgia limited liability company

By:_____

Name:_____

Title:_____


OPERATOR

**M.R.M. ENERGY, INC.,**
a Georgia corporation

By: _____

Name: _____

Title: _____

**[CORPORATE SEAL]**


HOLDER:

**BP PRODUCTS NORTH AMERICA,
INC**., a Maryland corporation, f/k/a
Amoco Oil Company, a Maryland
corporation

By: _____

Name:_____

Title:_____

**[CORPORATE SEAL]**

## EXHIBIT "A"
### Legal Description

All that tract or parcel of land lying and being located in Land Lot 122, 7th District, Gwinnett County, Georgia and being more particularly described as follows:

Beginning at a 1/2" rebar found at the intersection of the Northeast right of way (R/W) line of Sugarloaf Parkway (R/W varies) and the existing Southeast R/W line of Meadow Church Road (80' R/W); thence following the existing R/W line of Meadow Church North 62º51'44" East, a distance of 66.83 feet to a 1/2" rebar set; thence leaving said existing R/W line South 10º30'18" East, a distance of 10.44 feet to a 1/2" rebar set on the proposed R/W line of Meadow Church Road (50' from centerline) and the True Point of Beginning; thence following said proposed R/W line North 62º51'44" East, a distance of 220.56 feet to a 1/2" rebar set; thence leaving said R/W line South 27º08'22" East, a distance of 22.34 feet to a 1/2" rebar set; thence North 62º51'38" East, a distance of 2.00 feet to a 1/2" rebar set; thence South 27º08'22" East, a distance of 200.22 feet to a 1/2" rebar set; thence 30.63 feet along a curve to the right, said curve having a chord of South 17º51'38" West 27.58 feet and a radius of 19.50 feet to a 1/2" rebar set; thence South 62º51'38" West, a distance of 219.95 feet to a 1/2" rebar set; thence North 27º08'22" West, a distance of 5.01 feet to a 1/2" rebar set; thence South 62º51'38" West, a distance of 21.91 feet to a 1/2" rebar set; thence North 23º53'23" West, a distance of 79.88 feet to a point; thence 102.18 feet along a curve to the right, said curve having a chord of North 17º22'27" West 101.94 feet and a radius of 426.15 feet to a point; thence North 10º30'18" West, a distance of 59.33 feet to the True Point of Beginning.

Said tract contains 1.378 acres or 60012 square feet.

Said tract being depicted on th Survey bearing Job No. 96146.03, dated May 27, 1998, prepared by Rochester & Associates, Inc. under seal and certification of James C. Jones, Georgia Registered Land Surveyor No. 2298, which Survey is incorporated herein by reference.

Together with those easement rights arising under that certain Declaration of Covenants, Restrictions and Easements by Sugarloaf Parkway, LLC, a Georgia limited liability company, dated July 14, 1998, filed for record July 15, 1998 at 1:24 p.m., recorded in Deed Book 16379, Page 140, Records of Gwinnett County, Georgia; as amended by that certain First Amendment to the Declaration of Covenants, Restrictions and Easements by Sugarloaf Parkway, LLC, a Georgia limited liability company, dated July 16, 1998, filed for record July 17, 1998 at 12:20 p.m., recorded in Deed Book 16400, Page 226, aforesaid Records; affected by that certain Agreement by and between Sugarloaf Parkway, LLC, a Georgia limited liability company and Amoco Oil Company, a Maryland corporation, dated July 24, 1998, filed for record July 24, 1998 at 12:12 p.m., recorded in Deed Book 16444, Page 1, aforesaid Records.

Also together with those easement rights arising under that certain Easement Agreement by and between Gwinnett County, Georgia and Sugarloaf Parkway, LLC, dated as of February 17, 1998, filed for record February 17, 1998 at 3:46 p.m., recorded in Deed Book 15468, Page 183, aforesaid Records.

Also together with those easement rights arising under that certain Declaration of Covenants, Restrictions and Easements by and between Elrod Development, LLC, a Georgia limited liability company and Sugarloaf Parkway, LLC, a Georgia limited liability company, dated February 17, 1998, filed for record February 18, 1998 at 10:36 a.m., recorded in Deed Book 15475, Page 55, aforesaid Records.

Also together with those easement rights arising under that certain Slope Drainage and Access Easement Agreement by and between Martha E. Trollinger and Sugarloaf Parkway, LLC, dated March 20, 1998, filed for record March 27, 1998 at 2:00 p.m., recorded in Deed Book 15716, Page 177, aforesaid Records.

Also together with those easement rights arising under that certain Fill and Drainage Easement Agreement by and between Martha E. Trollinger and Sugarloaf Parkway, LLC, dated May 22, 1998, filed for record June 1, 1998 at 8:00 a.m., recorded in Deed Book 16100, Page 129, aforesaid Records.

# EXHIBIT C

Service Station Number
**7046/50061**


# bp

**Dealer Supply Agreement Franchise**
DSAUSCOF (11-2005LDF)

THIS DEALER SUPPLY AGREEMENT ("Agreement") dated _____ 9/5/07 _____,
is made between BP Products North America Inc. (hereinafter "BP") having its place of business at

**1323 Bond Street, Naperville, IL. 60804**
[insert Region Address]

and _____ **M.R.M. Energy, Inc.** _____ (hereinafter "Dealer")
regarding the purchase and sale of branded motor fuel at the motor fuel sales facility ("Facility") located at

**3515 Cascade Road SW, Atlanta  Georgia  30331**

The purpose of this Agreement is for Dealer to act as a reseller of BP's trademarked motor fuels, motor oils and other products to the motoring public. Dealer understands that BP expects a full service facility to be fully stocked with its trademarked products at all times. Dealer recognizes that BP has entered into a dealer relationship only with respect to the particular station subject to this Agreement and that BP will deliver products to the particular station identified in this Agreement and will not be required to deliver products pursuant to this Agreement to any premises other than this Facility.

Now Therefore, BP and Dealer, intending to be legally bound, agree to the following:

**1.  Term**

(a) The term covered by this Agreement will be for a period of  20   years beginning on _____

(the "Commencement Date") and ending on _____, unless terminated earlier by law or by the terms of this Agreement or unless extended by BP upon written notice. If no date has been set forth in this paragraph, the Commencement Date shall be established by the Notice of Final Inspection and Readiness and ends on the first day after the last day of the 240th full calendar month following the Commencement Date, unless terminated earlier by law or by the terms of this Agreement or unless extended by BP upon written notice. If the franchise relationship underlying this Agreement continues for any reason beyond the expiration date indicated above, this Agreement will be extended until terminated or until superseded by a new dealer supply agreement, if offered. This Agreement and any renewal term is offered only in conjunction with a simultaneously executed am/pm mini market franchise agreement for the Facility at the address above on BP's then-current form of franchise agreement.

(b) In the event of a termination for any reason whatsoever of this Agreement from BP to Dealer for the Facility, all associated agreements (except any financial security agreements, mortgages, amortization agreements, notes or guarantees) automatically terminate.

**2.  The Facility.**

(a) This Agreement applies only to Facility and is expressly contingent on Dealer providing to BP evidence satisfactory to BP that Dealer holds and will maintain through the term of this Agreement a legally binding and enforceable possessory interest in the Facility.

(b) This Agreement is expressly contingent on Dealer having in place at all times on the Facility a canopy which covers all retail gasoline Fuel Islands and which meets BP's image standards as revised from time to time.

(c) BP will require all facilities branded with its Trade Identities to have retail gasoline fuel dispensers which are enabled to accept card readers in dispensers (CRINDS). Dealer will install such capability at its Facility no more than 6 months after BP requires such dispensers in Dealer's market.

**3. Prices**

(a) The price for motor fuels purchased by Dealer from BP will be BP's dealer buying price for Dealer's brand (plus all taxes, duty, fees or charges levied on the products) for each grade of said products in effect for BP's pricing area in which the above-identified Facility is located at the time when title to said products passes from BP to Dealer or when the product is loaded, at BP's option. BP has the right to change prices for all products at any time. BP will notify Dealer of such changes in the normal course of business.

(b) If this Agreement is assigned by BP to a BP jobber or other party, the prices to be paid by Dealer for motor fuel and other products hereunder will be as established by said jobber or other party.

**4. Delivery—Motor Fuels**

    (a) During the term of this Agreement, BP will deliver branded motor fuels to Dealer at the Facility in accordance with the Electronic Dealer Delivery Plan (EDDP) Agreement in effect at the time of delivery. The EDDP Agreement will automatically terminate in the event of the termination or expiration for any reason whatsoever of this Agreement between BP and Dealer for the Facility to which this Agreement pertains. BP has the ability to terminate or change delivery methods with 24 hour notice to Dealer.

    (b) BP has the right to specify minimum delivery quantity to be full loads only. BP has the right to impose a surcharge for delivery of less than a full load.  Currently, the surcharge is $ _____500.00_____ . BP reserves the right to amend this provision, from time to time, to increase the amount of the surcharge as BP deems appropriate.

    (c) The quantities of motor fuels delivered to Dealer hereunder will be determined on the basis of the temperature thereof at 60°F in accordance with "Table No. 6B of API Standard 2540, Manual of Petroleum Measurement Standards, Chapter 11.1- Volume Correction Factors-Volume II" (or any API/ASTM reissue or replacement thereof in effect at the time of measurement), or, on the basis of gross volume, such election as established by BP, or as otherwise required by law.

    (d) Measurements of quantities to be delivered will be made by BP at its terminal. In the case of EDDP deliveries, Dealer and BP's driver may jointly take a measurement at the time of delivery in a manner acceptable to BP.

    (e) Dealer grants BP or its contract carriers 24 hour-per-day access to Dealer's motor fuel storage for purposes of delivery.

    (f)  Title to motor fuel shall pass to Dealer in accordance with the terms of the EDDP Agreement. Title to all products other than motor fuels shall pass to Dealer at the time of delivery except as otherwise provided.

    (g) Within 24 hours of receipt of product, Dealer must notify BP's regional account executive of any claimed deficiencies in the quantity of any fuel or other products delivered to Dealer. Dealer must notify BP in writing within 10 days of said notification of any claimed deficiencies in the quality or quantity of any fuel or other products delivered to Dealer. Unless Dealer so notifies BP of such deficiencies within 10 days of delivery, the quality and quantity of product will conclusively be presumed to conform to the specifications included in the invoices and delivery documents provided to Dealer and to the terms and conditions of this Agreement.

**5. Hours of Operation**
Dealer agrees that the Facility will be kept open for operation, properly lighted and staffed 7 days a week, 24 hours per day, unless otherwise approved in writing by the Regional Sales Manager and noted below. In seeking such approval, Dealer must provide to BP, in writing, for the Regional Sales Manager's review and approval, the business reasons why the Facility cannot be open 7 days a week, 24 hours a day.

☑ **7 Days per Week /24 Hours per Day**

☐ **Same Hours of Operation All 7 Days per Week**
        From: _____ A.M.   To: _____ P.M.

☐ **Other hours of operation** (complete the section below)

| Day | Minimum Open Hours | | | |
|-----|-----|-----|-----|-----|
| | From: | | To: | |
| Monday | _____ | A.M. | _____ | P.M. |
| Tuesday | _____ | A.M. | _____ | P.M. |
| Wednesday | _____ | A.M. | _____ | P.M. |
| Thursday | _____ | A.M. | _____ | P.M. |
| Friday | _____ | A.M. | _____ | P.M. |
| Saturday | _____ | A.M. | _____ | P.M. |
| Sunday | _____ | A.M. | _____ | P.M. |

**6. Credit Terms**

(a) BP is not obligated to extend credit to Dealer. If BP does extend credit to Dealer, such extension of credit is subject to the following requirements, including but not limited to: Dealer maintaining with BP a business risk deposit in the minimum amount of $40,000.00; and Dealer paying for all product and open account purchases by electronic funds transfer ("EFT"). BP reserves the right to change its credit terms at any time without notice to the Dealer. Further, during each contract year, BP reserves the right to increase the required amount of the business risk deposit upon 30 days written notice to Dealer. More than 1 incident of failure by Dealer, within a 12 month period, to make payment according to BP's EFT policy causing a draft to be dishonored for nonsufficient or uncollected funds, or failure to supply financial information or documentation as required, entitles BP to suspend deliveries, impose other payment or prepay terms, and/or terminate or nonrenew this Agreement, in addition to exercising any other rights BP may have under this Agreement at law or in equity or under BP's then current Credit Policy. BP reserves the right to change the Credit Policy at any time, without giving notice to Dealer.

(b) Dealer agrees to establish an account with a financial institution on terms acceptable to BP that provides EFT services and to authorize BP to initiate certain transfers of funds between that account and designated accounts of BP for payment of any and all amounts due to BP under this or any other agreement with Dealer. Dealer will provide BP with the information and authorization necessary to debit and credit Dealer's account via EFT transactions. Dealer agrees to provide the necessary authorization and assistance to implement such additional EFT's promptly upon the request of BP.

(c) BP has the right to assess finance charges on all amounts not paid by Dealer on the due date. Finance charges will be assessed at the monthly periodic rate established by BP. BP has the right to impose a service and late payment charge for each check and/or EFT that is dishonored for nonsufficient or uncollected funds, whether or not subsequently paid by Dealer.

(d) Dealer's failure to keep all credit obligations current or one or more incidents of financial distress or anticipated financial distress may result in the Dealer automatically being placed on prepay by wire transfer.

(e) The $40,000 BRD shall be refundable in 2 installments. If BP has received a cash BRD, BP will return an installment of $30,000 (or that amount above $10,000 that has been paid pursuant to payment terms), less any outstanding monies Dealer owes to BP, within 30 days after the cancellation, termination, or nonrenewal of this Agreement. BP will return an installment of the $10,000 remaining BRD within 180 days after the cancellation, termination or nonrenewal of this Agreement.

(f) BP shall pay interest on the business risk deposit only to the extent required by then existing BP Credit Policy applicable to Dealer in the marketing area in which Dealers' Facility is located or applicable state law.

(g) Dealer must notify BP in writing of any questions or disputes regarding any charges or other items included on any invoice or statement issued to Dealer by BP within 60 days after such invoice or statement is received by Dealer (except for disputes regarding the quality or quantity of products delivered, which must be submitted pursuant to paragraph 4(g) above). Unless Dealer provides BP with such written notification, the invoice or statement will be conclusively presumed to be accurate as of the 61st day following its receipt by Dealer.

**7. Payment Methods including Credit Cards**

(a) BP may from time to time endorse and sponsor specific proprietary and third party payment methods including certain credit cards, charge cards, fleet cards, debit cards, pre-paid cards and the like (collectively, "Payment Methods") for use at facilities selling BP's products. BP will not be obligated to sponsor or participate in any specific payment methods program, or may withdraw its sponsorship of, or participation in, any such program at any time, or may condition any sponsorship or participation upon payment of service and equipment fees by Dealer. If BP does sponsor a payment methods program, ("Payment Methods Program") Dealer agrees that BP's proprietary Payment Methods and all BP-approved third party Payment Methods specified by BP will be accepted at each payment point (including card- readers-in-dispensers) at the Facility. Dealer will strictly comply with the operating rules, terms and conditions of any Payment Methods Program that BP may sponsor and distribute, through any manuals, bulletins, or other forms of written or electronic communications, as issued and as amended from time to time. BP has the right to charge back to Dealer sales transaction amounts made by Dealer's customers up to and including 6 months from the date of the transaction. Dealer must maintain all sales drafts for 6 months from the date of transaction.

(b) The Facility will be equipped with electronic point-of-sale ("POS") equipment (including all related hardware and software) approved by BP for processing transactions at the Facility. All BP approved POS equipment will, at all times, be connected to BP's network and will be operated using BP's most current software. Dealer will install BP's most current software at the request of BP. Unless otherwise specified, no right, title or ownership interest in any software will be transferred to Dealer. Dealer acknowledges that the software and the specifications are proprietary products of BP or its vendors. Under no circumstances will Dealer reverse engineer, decompile, disassemble or otherwise attempt to derive the source code for the software or alter its intended functionality. Within 6 months of Company's request, Dealer will pay all costs or fees associated with the operation of the POS equipment, including but not limited to, costs associated with software and hardware maintenance and upgrades, satellite connections, access fees and telecommunications costs.

BP reserves the right to change the fee for the leasing of BP approved POS equipment by giving Dealer 60 days written notice of such fee change.

## 8. Taxes, Fees and Utilities

(a) Dealer will pay all property taxes on the Facility and any tax, excise (manufacturer's or otherwise), inspection fee, duty (import or export), license fee (import or export), tonnage charge, assessment, or other like charge which is levied, assessed or imposed by federal, state or local authority upon the personal property, products and/or transactions contemplated hereunder (including the delivery, sale, use or consumption of the products or privilege of doing any of same), and/or which is imposed on or measured by the price of the products or the proceeds of sale hereunder.

(b) Dealer will pay any license, occupation and inspection fees or charges for Dealer's use or occupancy of the Facility. Dealer will obtain and maintain any licenses and permits in Dealer's name.

(c) Dealer will pay all sewer, water, heat, light and other operating expenses in connection with the use of the Facility.

(d) If Dealer fails to pay any charges which Dealer is obligated to pay under this Agreement, BP may do so and charge the items to Dealer's account.

## 9. Operation and Condition of Facility

Dealer recognizes that BP has developed a favorable reputation for the sale of motor fuel and associated products and the rendering of high quality services and that the BP Trade Identities and facility designs and appearance represent an image distinguished for high standards of product quality, facility appearance (inside and out) and customer service. Therefore, Dealer agrees to manage, operate and maintain the Facility in a manner that will maintain and enhance this image and which in no event will detract from or disparage this image.

(a) In particular, without limiting the foregoing obligation, Dealer (and employees where applicable) agrees to do the following:

(1) Comply with all applicable federal, state, and local laws, ordinances, rules and regulations, pertaining to health and safety, recognizing that clean, sanitary and healthful conditions are essential in the operation of the Facility. Dealer agrees all date-coded consumable products must be within date code.

(2) Keep the premises, buildings (interior and exterior), restroom, sidewalks, approaches, driveways and landscaping in good condition, properly lighted, clean, safe, sanitary and free of trash, rubbish and other debris at Dealer's own cost and expense.

(3) Operate the Facility in a manner that actively promotes the sale of BP branded motor fuels and branded motor oils and other merchandise and services customarily sold at such facilities, keeping the Facility open for operation for the hours stated in paragraph 5, and having available for retail sales all grades of trademarked motor fuels which BP offers to Dealer in amounts sufficient to satisfy the foreseeable customer demand for such fuels.

(4) Sell product only to end users for their personal volumes not exceeding the capacity of each customer's motor vehicle fuel tank, any auxiliary fuel tank directly linked to the customer's motor vehicle engine and any emergency container with a capacity of 10 gallons or less.

(5) Keep the approaches, driveways, entrances, fuel areas, and service areas uncluttered and free at all times of parked vehicles, trailers, and other obstructions, including ice or snow.

(6) Render courteous, prompt, efficient and diligent service to customers. Dealer acknowledges that providing superior customer service is essential to the success of Dealer's business and to the reputation and integrity of BP and therefore agrees to appropriately respond to customers within 72 hours of receipt of an inquiry or complaint and to resolve customer inquiries or complaints within a maximum of 15 business days from notification of said complaint. Dealer will actively work to resolve all customer complaints as quickly as possible. Dealer will keep BP apprised of any delays, and the reason for those delays, in resolving complaints. (This time frame applies both to inquiries and complaints received directly by the Dealer and to those received by BP and directed to the Dealer for response.) In addition, Dealer agrees to monitor the quality of service and cleanliness.

(7) Dress in BP-approved, coordinated uniforms with visible and approved logos used by the BP. Dealer and Dealer's employees must be able to communicate clearly and effectively with customers and to render superior service to customers.

(8) Provide a safe place to work for Dealer's employees, and maintain and operate the Facility in compliance with all applicable laws, regulations and rules concerning safety of the work place and environmental protection and compliance. Dealer will provide all employees with adequate training concerning workplace safety, safe work

practices and environmental protection and compliance; Dealer acknowledges that safety of the workplace and environmental protection and compliance are Dealer's responsibility and not BP's.

(9)  Notify BP's regional sales office immediately in the case of an emergency at the Facility or otherwise involving BP branded operations. Emergency events include: death of customers, employees or contractors; injuries of any nature to any person on the Facility including but not limited to customers, employees or contractors; transport or tank truck accidents; product spills or environmental damages from a spill or underground release; any event that may have a negative impact on BP's public image or community relations.

(10) Keep abreast of the changing competitive environment, reacting to such changes in a way to maximize the level of fuel and non-fuel business at the Facility.

(11) Have daily internet access for the purpose of communication with BP within 60 days of signing this Agreement. Dealer will regularly review the dealer internet portal for the purpose of keeping abreast of information that may impact upon the Dealer's business operations.

(12) Provide customer access to compressed air for the purpose of tire inflation.

(13) Keep public restrooms, where available and as approved by BP, clean and adequately stocked with soap and paper products.

(14) Upon the request of BP, operate at least one of the fuel islands (or one of the dispensers if the Facility has only one fuel island) on a self-serve basis if permitted by law.

(15) Comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Facility and the conduct of Dealer's business at the Facility.

(16) Maintain all times for purposes of resale to the public a volume and variety of convenience products if Dealer operates a convenience store operation. Dealer will use best efforts to keep the retail selling space fully stocked at all times.

(17) Display only signs and advertising materials which are in conformity with BP's standards. Dealer agrees not to utilize any of the following at the Facility (unless approved by BP Regional Management or required by law to maintain necessary permits or licenses to conduct business at the Facility): window signs, banners, exterior signs with graphics and colors other than those specified by BP, handwritten signs, neon signs, exit door signs placed in areas other than those designated on the plot plan and interior signs attached to walls, and ceiling or cigarette merchandisers.

(18) Participate in any BP sponsored mystery shop, PRIDE or applicable program. BP will notify Dealer of the specific requirements of any such program. Dealer must score no less than the established retail target as specified by the then current requirements of the mystery shopper, PRIDE or applicable program. Dealer will promptly correct any operations that fail to meet BP's requirements. Failure to do so may result in termination of this Agreement.

(19)  Dealer agrees to attend all local business meetings conducted or sponsored by BP for the purposes of the introduction of marketing programs or for the exchange of information that may have an impact upon the business operations of the Dealer, or the flow of information between the Dealer and BP. Attendance at these meetings will be at Dealer expense unless otherwise noted. Failure of Dealer to attend the required BP business meetings may result in the termination of this Agreement. Dealer will attend all training required at Dealer Training School.

(b) Dealer will not do or allow anything to occur at the Facility that could detract from or disparage the image or reputation of the Facility or the BP Trade Identities. In particular, without limiting the foregoing, Dealer will not do or permit anyone else to do or allow at the Facility any of the following:

(1) Operate any business or engage in any activity other than the sale of motor fuels, motor oils, automotive accessories and services and convenience store merchandise without BP's prior written approval. Prohibited activities include, without limitation, the parking, storage, rental or sale of motor vehicles or trailers, or wrecked or abandoned vehicles. After securing BP's prior written approval, Dealer must further secure any necessary licenses or permits as applicable.

(2) Use the Facility for any additional purposes (including without limitation, parking lot, car rentals or sales, trailer rentals, equipment rentals, or the sale of other goods and services), erect or place on the Facility any permanent or temporary buildings, structures, trailers, signs or pennants, nor make any permanent or temporary alterations in, or additions or attachments to the Facility without first obtaining the written consent of BP. BP may grant or withhold its consent. If such consent is granted, the buildings, structures or trailers must meet BP's approved standards for location and appearance. After securing BP's prior written approval, Dealer must further secure any necessary licenses or permits as applicable.

(3) Operate ATMs, pay phones, vending machines, pinball or amusement games, unless Dealer has received BP's prior written approval on the type and placement of such machines. After securing BP's prior written approval, Dealer must further secure any necessary licenses or permits as applicable.

(4) Store or sell any alcoholic beverage unless Dealer has secured all necessary permits and licenses and liability insurance and Dealer and all Dealers' employees are trained by Dealer in the proper procedures of selling alcoholic beverages. Dealer will not permit alcoholic beverages to be consumed by anyone at the Facility, and will not permit anyone to work at the Facility while under the influence of an alcoholic beverage. If permitted to sell alcoholic beverages, Dealer agrees to strictly adhere to federal, state and local regulations regarding the sale of alcoholic beverages.

(5) Store, sell or consume any illegal drugs, or permit drug paraphernalia for illegal drug use or other products that are used in the preparation or use of illegal drugs, or otherwise promote illegal activity (such products to be specified by BP in its sole judgment), to be present or tolerated on the Facility; and no one shall be permitted to work on the Facility while under the influence of an illegal drug.

(6) Conduct any illegal, immoral, pornographic, sexually explicit, offensive, noisy or dangerous activities, including without limitation, the sale or display of any illegal, immoral, pornographic or sexually explicit materials or items, which in BP's judgment may offend an appreciable segment of the public.

(7) Allow loitering by persons who at the time have no proper business purpose on the Facility.

(8) Maintain or permit to be present on the Facility any item, animal or condition that may endanger the health, safety or well being of persons on the Facility.

(9) Attach or place anything anywhere which could diminish the BP Trade Identities or confuse or deceive the public.)

(c) To the extent any of the above terms of operations and condition of the Facility conflict with requirements established in that certain Franchise Agreement, executed contemporaneously herewith and pertaining to a "BP Connect" or "am/pm" convenience store franchise to be conducted at the Facility (the "Franchise Agreement"), the terms of operation and condition of the Facility outlined in the Franchise Agreement shall control.

## 10. Training

Dealer must attend and successfully complete all components of BP's current Dealer Training School prior to commencing business operations at the Facility, unless Dealer is already an approved dealer at another BP-branded facility.

Dealer must provide sufficient, trained and qualified employees to operate the Facility during all required hours of operation. Dealer or employees will, at BP's request, participate in BP's training programs as required by BP's Dealer Training School. Dealer shall be responsible for the costs associated with such training, including any mandatory training courses.

## 11. Environmental

(a) Dealer will report any environmental contamination known to Dealer to the proper governmental authorities with jurisdiction (the "Department") in accordance with applicable statutes and regulations, including without limitation, any contamination shown in a report generated by either party in accordance with this Agreement. BP may report the results of any report or any other information BP has about the Facility to the Department if BP believes that BP is legally obligated to do so, or BP is asked by the Department about the presence or possible presence of environmental contamination on the Facility, or BP in its sole judgment deems this reporting prudent.

(b) Dealer will comply with applicable laws and regulations regarding environmental matters. Any past, existing or future contamination on the Facility is Dealer's responsibility and not the responsibility of BP. Dealer assumes all financial and legal responsibility for any and all remediation activities required to be undertaken at the Facility or off site resulting from the past, existing or future contamination and agrees to remove contamination, including without limitation contaminated soils and groundwater, and to restore the Facility in accordance with the rules, orders or other directives of the Department.

(c) Dealer releases and indemnifies BP from and against any and all liabilities, claims, suits, losses, costs, damages, demands, and costs (including without limitation reasonable attorneys' fees, costs of investigation and remediation) of contamination arising out of or resulting from any past, present or future contamination of any nature (including without limitation contamination of air, water, ground water, soil and other environmental media) on the Facility or off site but emanating from the Facility, except those due solely to the gross negligence or willful misconduct of BP. This indemnification includes without limitation, all liabilities that may accrue or be assessed in accordance with all present and future laws, statues, rules, regulations, orders and determinations pertaining to all hazardous materials, pollution or the environment, whether federal, state or local including without limitation the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 *et seq.* (CERCLA), the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.* (RCRA); the Toxic Substances Control Act, 15 U.S.C. Section 2601 *et seq.*; the Clean Air Act, 42 U.S.C. Section 7401 *et seq .*; and the Clean Water Act, 33 U.S.C. Section 1251 *et. seq.;* and any federal or state or local environmental law including those regarding any petroleum product, waste or other material handled, generated, transported, treated, stored or disposed of on or off the Facility by Dealer, its contractors, subcontractors, agents or employees.

(d) For each Facility not already supplied with fuel by BP at the time this Agreement is signed, Dealer will provide BP with environmental test results, including without limitation Phase I and Phase II environmental assessments and soil and groundwater test results as requested by BP. These tests and results must be satisfactory to BP. Dealer will re-test the Facility as required by BP if the manner or extent of testing is not acceptable to BP. Dealer will bring the Facility into compliance before BP's first delivery of gasoline if BP determines that the Facility is not in compliance with any applicable law, code or regulation. The parties recognize that any remediation need not be completed prior to BP's first delivery of gasoline. Dealer must, however, commence and continue with due diligence any required remediation. All tests and compliance activities will be done by Dealer at its cost and expense. BP may terminate this Agreement at any time upon notice to Dealer if the soil or groundwater are contaminated at levels unacceptable to BP.

(e) All underground storage tank systems at the Facility must pass a NFPA #329 precision test or other tests as determined by BP before BP will first deliver gasoline to the Facility. All testing of existing tank systems including all piping will be done at Dealer's expense. Dealer will perform tests no more than 30 days before supply begins and will provide BP with the test results. All underground storage tanks must have overfill protection and meet all applicable governmental codes and regulations and BP specifications. If the tanks or piping do not pass the NFPA #329 precision test or do not meet any applicable governmental codes or regulations or BP's specifications, Dealer will replace and repair the tanks and piping at Dealer's sole cost and expense. If Dealer is unable or unwilling to replace or repair the tanks and piping, BP may terminate the Agreement by written notice to Dealer. If the underground storage tank system is a new installation, BP may accept copies of the installer's certification and warranty in lieu of the test. Any product delivered for testing purposes under this Paragraph will not be deemed "delivery of product" for purposes of this Agreement, unless and until all tests and investigations are completed and results are obtained satisfactory to BP. If the Agreement is terminated for any reason under this Paragraph, Dealer will pay BP the then current dealer buying price for regular unleaded gasoline for all product that cannot be economically reclaimed. In such case, said product may not be sold by Dealer as BP branded product. Dealer will also indemnify and hold BP harmless from any claims or cause of action arising out of any release of product that may occur in connection with the aforesaid testing.

(f) If BP sold the Facility to Dealer, the environmental provisions in the sales contract will control if in conflict with this Section 11.

## 12. Daily Inventory

Dealer must keep daily and monthly inventory reconciliation records of the amount of gasolines an/or diesel fuels in storage at the Facility, and retain them for a one year period or such longer period as required by law or as may be specified by BP, and shall make them available and report them to government enforcement agencies and BP as required by BP. Dealer must cooperate with BP's approved inventory reconciliation program. Dealer understands the importance of inventory reconciliation in preventing product loss, leakage or contamination. Dealer must report any detected or suspected shortage(s) or contamination, abnormal loss or gain not explained by spillage, temperature variations, or other causes immediately to BP's regional account executive, terminal manager or other authorized representative. Nothing in the foregoing shall take away in any manner from any obligation of Dealer, including, but not limited to, any obligation relating to contamination and any

obligation to repair and maintain the tanks and or to prevent leakage therefrom; nor shall it shift any such obligation, in whole or in part to BP.

### 13. Compliance with Laws

(a) Dealer agrees to become informed about and comply fully with all federal, state, and municipal laws, rules, regulations, ordinances, use permits, and all conditions and restrictions with regard to the use and condition of the Facility and with regard to Dealer's activities thereon. Without limiting the foregoing, Dealer must comply with all requirements of federal, state, and local occupational, health and safety agencies, and environmental protection agencies, concerning the receipt, storage, handling, use, sale and dispensing of motor fuels, the disposal of waste materials, and Dealer's other activities on the Facility, including particularly those governing recovery of vapors, and the like.

(b) Without limiting the generality of the foregoing, Dealer must comply with all of the obligations imposed by the federal Clean Air Act and any corresponding state counterparts, as amended, including but not limited to: (1) 40 C.F.R. Part 80, Subpart D, regarding reformulated gasoline; (2) 40 C.F.R. Part 80, Subpart C., regarding oxygenated gasoline; (3) 40 C.F.R. Part 80, Subpart B (specifically 40 C.F.R. sections 80.27 and 80.28), regarding gasoline volatility; (4) 40 C.F.R. Part 80, Subpart B (specifically 40 C.F.R. sections 80.29 and 80.30), regarding sulfur content in diesel fuel; (5) 40 C.F.R. Part 80, Subpart G, regarding deposit control additives in gasoline; (6) 40 C.F.R. Part 80, Subpart H, regarding low sulfur gasoline; (7) the Resource Conservation and Recovery Act, as amended, 42 USC Section 6901 et seq.; (8) The Clean Water Act, as amended, 33 USC Section 1251 et seq.; and (9) the Safe Drinking Water Act, as amended, 42 USC Section 300f et seq.

(c) Dealer agrees to comply with all applicable local, state and federal underground storage tank ("UST") compliance requirements and maintain written records of all maintenance and inspections of UST equipment for as long as required by law.

(d) BP has the right at all times to perform physical measurements and reconciliations, inspect products, books and records in the possession or control of Dealer to determine compliance with this Agreement and all related agreements. In addition, Dealer hereby grants BP the right to copy any such records, inspect any monitoring equipment, or take samples for any products covered by this Agreement. However, BP is not obligated to make any such inspections or tests.

(e) Dealer will maintain accessible features and accessible paths of access on the Facility in compliance with all applicable federal, local and state accessibility laws including, but not limited to, the Americans with Disabilities Act ("ADA").

(f) Dealer will comply with all laws regarding youth access to tobacco. Violation(s) of such laws can constitute grounds for termination or nonrenewal of this Agreement.

### 14. Dealer's Independent Business

It is mutually agreed that the business conducted by Dealer on the Facility is the independent business of Dealer, and this Agreement will not be construed as reserving to or conferring upon BP any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer has no authority to employ any person as an agent or employee of BP for any purpose, and neither Dealer nor any other person performing any act in connection with the operation of Dealer's business at the Facility will be deemed to be an employee or agent of BP. Dealer will not erect or permit any sign or other advertising device on or near the Facility which in any way indicates or represents that BP is the owner or operator of the business conducted by Dealer at the Facility. Dealer agrees to permit BP to erect and maintain a sign identifying Dealer as an independent business person.

### 15. Liability, Indemnity

To the fullest extent permitted by law, Dealer must indemnify, defend and hold harmless BP, its Affiliates, and their respective shareholders, directors, officers, agents and employees (collectively "BP"), from and against any and all losses, suits, claims, demands, causes of action, liabilities, costs or expenses (including reasonable attorneys' fees and costs of defense) of whatever kind or nature including but not limited to those for personal injury, death or property damage to BP or Dealer, their shareholders, directors, officers, employees, agents, contractors, invitees, licensees and any other person(s) entering upon the Facility, directly or indirectly arising in whole or in part from or as a result of:

(a) Any default or breach by Dealer of any obligation contained in this Agreement or any other agreement with BP.

(b) Any act, omission, fault or negligence of Dealer or Dealer's agents, employees, contractors, invitees or licensees, regardless of whether caused by the joint concurrent, contributory or comparative fault, negligence, breach of warranty, strict liability or breach of any legal duty whatsoever by BP, unless due in whole to the sole negligence of BP without any contributory fault on the part of Dealer;

(c) Any allegation of agency or any other relationship by which BP would be held responsible for the acts or omissions of Dealer or Dealer's employees or agents.

(d) Dealer's use of BP's Trade Identities.

(e) The purchase, sale, use or storage of any goods, products, equipment or other items on the Facility, or the repair, maintenance or condition of the Facility and all equipment and fixtures appurtenant thereto, or the purchase or sale of any services from the Facility.

(f) The conduct of any illegal activity conducted on the Facility or from the violation of any federal, state or local law, rule, regulation or court order or governmental or agency directive.

(g) Excluding BP's sole negligence, any and all acts of any nature which result in damage to BP's property.

## 16. Force Majeure and Allocation

(a) BP is excused from delay or nonperformance if BP is unable to meet the demand for its products at BP's normal and usual distribution points for supplying Dealer (regardless of whether or not BP may have diverted certain supplies from such distribution points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of product, or stock or component necessary in the manufacture or production of such products. Either party is excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control, including, without limitation: unavailability, failure, or delay of transportation; Acts of God; labor difficulties; explosions; storms; breakdown of machinery or equipment; fire, riots, war conditions in this or any other country; and compliance with any law or governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary) affecting directly or indirectly said party's ability to perform hereunder.

(b) In the event of any of the contingencies or conditions referred to in the preceding subparagraph, BP has the right to curtail deliveries or allocate its supply of products for sale among its customers in any manner which in its sole discretion is fair and reasonable in the circumstances, and shall not be obligated to obtain or purchase other supplies of product or to in any way make up any product not delivered. BP is not responsible in any manner for any losses or damages which Dealer may claim as a result of any such curtailment or allocation by BP.

## 17. BP's Trade Identities

(a) Dealer may use, on a limited and nonexclusive basis, BP's trade names, trademarks, service marks, logos, brand names, trade dress, design schemes, insignia, color schemes, and the like ("Trade Identities") only in connection with the advertising, distribution, and/or sale of products and services specifically designated by BP. BP's Trade Identities includes those in use at the time this Agreement is entered into by the parties, as well as those Trade Identities that BP may subsequently adopt or are the subject of a license to use as may be acquired by BP.

(b) The permission to use BP's Trade Identities is governed by the terms and conditions of this Agreement and all related agreements. In addition, Dealer will use BP's Trade Identities only in accordance with the guidelines, policies, image programs, procedures, requirements, specifications and standards issued by BP, as amended from time to time, including BP's policy for proper handling of motor fuels and operation of Facility.

(c) BP has exclusive discretion as to whether and in what manner its Trade Identities shall be displayed at the Facility and may enter the Facility, at any time during or after the term hereof to erect or remove said Trade Identities without any liability or obligation to Dealer.

(d) Dealer must not use BP's Trade Identities in connection with the advertising, distribution, or sale of: (1) any mixture, blend, dilution or adulteration of a product selected or supplied by BP; (2) products not sold in BP's original packages and containers or not sold through dispensing equipment approved by BP, or (3) any product not selected or supplied by BP. BP has the right at all times to inspect products, bills of lading, books and records in the possession or control of Dealer to determine compliance with these provisions and quality standards.

(e) Dealer or any Affiliate of Dealer, or agent or representative thereof cannot use BP's Trade Identities as part of Dealer's own trade identities. If Dealer wishes to use BP's Trade Identities in conjunction with Dealer's business forms, advertising materials and the like, Dealer may do so only if the words "Products Dealer" appear adjacent to the Trade Identities so as to read "BP/Amoco Products Dealer".

If Dealer adopts "BP" or "Amoco" or "BP Amoco" or any successor as part of the Dealer's corporate name, then Dealer agrees that, upon the expiration or termination of this Agreement for any reason whatsoever, Dealer will immediately take steps to amend its corporate charter to delete "BP" or "Amoco" or "BP Amoco" or any successor as part of the corporate name, and will take all necessary steps to immediately terminate any further use of the company name.

(f) If Dealer for any reason whatsoever discontinues the sale from the Facility of Representative Amounts of any grade of BP's motor fuels, Dealer, as a step to eliminate possible confusion of the public, shall remove from display on the Facility or conceal in a manner approved by BP, all signs, decals, logos, emblems, and Trade Identities of BP. The provisions in paragraph 32 regarding Franchise Relationship shall also take effect. As used in this Agreement, "Representative Amounts of

BP's trademarked motor fuels" means a sufficient amount of each grade and type of motor fuel offered to Dealer so that Dealer shall at all times have each grade and type available for resale from the Facility in such quantities as are necessary to satisfy customer demand for such grades and types.

(g) Upon the expiration or termination of this Agreement for any reason whatsoever, Dealer must immediately cease using BP's Trade Identities and any marks confusingly similar thereto and return to BP all signs loaned by BP to Dealer, in accordance with the provisions of this Agreement. If Dealer fails to discontinue or cause to be discontinued any and all use and display of BP's Trade Identities after such expiration or termination, BP is hereby expressly given the right to enter upon the premises and remove or obliterate all or any part of any signs, logos, decals, emblems and other materials bearing or displaying Trade Identities at Dealer's expense, without any liability or obligation to Dealer.

(h) BP retains, at all times and for any reason, a sole and unlimited right to make other provisions for the marketing of its motor fuels and any other products and services under its Trade Identities and in the geographic area of the Facility, including but not limited to establishing its own directly operated retail facilities and establishing other dealer and/or jobber supplied retail facilities.

(i) Notwithstanding the foregoing, BP may at any time withdraw the grant to use the Trade Identities and substitute any of its other Trade Identities in their place.

## 18. Grounds for Termination and Nonrenewal

BP has the right at any time to terminate or nonrenew this Agreement, all associated agreements and any applicable franchise relationship for any reason and ground permitted by the PMPA or other applicable federal, state or local law. Without limiting the generality of the foregoing, BP has such right of termination or nonrenewal upon the occurrence of any of the following:

(a) Breach by Dealer of any provision of this Agreement.

(b) Breach by Dealer of any provision of the Franchise Agreement.

(c) Abandonment of the Facility by Dealer or failure by Dealer for any reason to operate the Facility for normal sales of motor fuel during the business hours specified herein for 7 consecutive days or such lesser period which under the facts and circumstances constitutes an unreasonable period of time.

(d) Conviction of Dealer of any felony involving moral turpitude.

(e) Commission by Dealer or any of Dealer's employees or agents of any deceptive, fraudulent, illegal, immoral, or other improper act relevant to the operation of the business on the Facility which is detrimental to BP or to any member of the public, including without limitation: (1) participation in any fraudulent or improper use of any credit, debit or pre-paid card or motor club membership card issued or honored by BP; (2) tampering with pump meters, misrepresentation of pump meter readings and/or the reporting thereof, and the like; (3) violation of any consumer protection law or regulation; and (4) purchase by Dealer, without BP's consent, of credit card tickets from other dealers covering sales of BP's products.

(f) Failure by Dealer to pay to BP in full or in a timely manner when due all sums to which BP is legally entitled.

(g) Death of Dealer.

(h) Failure of Dealer to devote Dealer's personal attention at the Facility managing the business activities of said Facility as provided herein, without first securing a written consent from BP, it being the essence of the parties' relationship that Dealer's personal physical presence be upon the Facility for reasonable periods of time during normal business hours.

(i) A continuing severe physical or mental disability or alcohol or substance abuse of Dealer of at least 3 months duration (or such shorter duration which under the facts and circumstances is reasonable) which renders Dealer unable to provide for the continued proper operation of the Facility activities referred to herein.

(j) Removal of, or significant reduction in, Dealer's assets located on the Facility.

(k) Destruction of all or a substantial part of the Facility.

(l) Failure of Dealer to exert good faith efforts to carry out the provisions of this Agreement, and/or the obligations and responsibilities under any applicable franchise relationship.

(m) Condemnation or other taking, in whole or in part, of the Facility pursuant to the power of eminent domain or a conveyance in lieu thereof.

(n) Failure of Dealer to comply with any law or regulation relevant to the operation of Dealer's business on the Facility.

**19. Procedures for Termination or Nonrenewal**

(a) If Dealer fails to perform any of the provisions of this Agreement, or if any other ground permitting BP to terminate or nonrenew occurs, BP has the right to terminate or not renew this Agreement and any applicable franchise relationship upon 90 days (or such lesser period of notice as is reasonable in the circumstances) written notice.

(b) For purposes of the foregoing and any statute governing termination and nonrenewal, all provisions hereof granting rights of termination and nonrenewal to BP will be construed as imposing upon Dealer an affirmative duty to take action to avoid the event which justifies BP's exercise of a right of termination or nonrenewal, regardless of whether or not the provision is expressly stated in terms of such an affirmative duty.

**20. Remedies**

On the termination or expiration of this Agreement or any renewal or extension thereof, BP, at any time thereafter, has the right to sue for and recover all damages accrued or accruing under this Agreement, or arising out of any violation thereof, and BP may so sue and recover without declaring this Agreement void. BP may pursue any other remedies for any violation of this Agreement or any of its covenants by Dealer. The above enumerated remedies are concurrent and are at the option and discretion of BP, and the pursuit of any one shall not amount to an election or bar the pursuit of any other remedies, whether or not listed herein. Termination of this Agreement shall not affect or abridge in any way the rights and obligations of the parties accruing prior to termination.

**21. Succession in Interest Designation**

Dealer designates the following as a Successor in Interest to any franchise relationship between Dealer and BP resulting from this Agreement:

Primary Successor in Interest

Name: _Tamara Quadri_

Address: _60   Duet   Fruine   CA.   92603_

Birth Date: _04/18/84_

Relationship to Dealer: _Wife_

Alternate Successor in Interest

Name: _Mohamed   Dakroub_

Address: _6239   E.   Allison   crcl   orange, CA.   92869_

Birth Date: _10/3/59_

Relationship to Dealer: _Uncle_

Dealer acknowledges that designated successors in interest will be considered for a franchise relationship provided they meet BP's then current standards and qualifications for dealer candidates. BP reserves the right to request additional documentation to verify designees.

**22. Right of Inspection**

At any time during the term of this Agreement and any holdover period, BP has the right, without process of law and without any liability or obligation to the Dealer, to enter upon the Facility at any time, with or without notice, for the purpose of inspection of the Facility, testing and sampling of product, reading meters, measuring product inventory, or installing, removing or obliterating BP's Trade Identities wherever displayed, or exercising any rights that BP may have in this Agreement or in any other contract or agreement between the parties.

**23. Insurance**

(a) Without limiting Dealer's obligations, Dealer agrees to purchase and maintain at all times, at Dealer's expense and in compliance with any requirements of applicable law, insurance as outlined in this section. This insurance must be satisfactory in form and in substance to BP and must be of at least the following minimum kinds and limits:

(1) Commercial general liability insurance, in an amount of at least $1,000,000 per occurrence, covering Dealer's liability for business, operations, use and occupancy of the Facility;

(2) Automobile liability insurance in an amount not less than $1,000,000 combined single limit for any auto used in the Dealer's operations;

(3) Workers compensation insurance as required by statute, unless Dealer qualifies and remains qualified as a self-insurer under applicable federal and state laws;

(4) Employers' liability insurance with limits of not less than $500,000 for each accident, disease - policy limit, and disease - each employee;

(5) If alcoholic beverages will be sold at the Facility, liquor liability insurance in an amount not less than $1,000,000 per occurrence.

(b) The insurance policies required by Subsection 23(a) hereof shall be written by companies satisfactory to BP, and shall be primary and non-contributory to any coverage carried by BP. Insurance policies satisfying the requirements of subsections 23(a)(1),(2) and (5) shall include BP and its Affiliates as additional insureds.

(c) Dealer agrees to increase the amount of any insurance described herein promptly upon execution of this Agreement or upon receiving written notice from BP to do so. In addition, BP reserves the right to require additional types of coverage such as, without limitation, environmental impairment liability insurance to satisfy governmental requirements for financial responsibility. Dealer agrees to obtain such additional insurance promptly upon receiving written notice from BP to do so.

(d) Dealer agrees to provide BP with a certificate of insurance evidencing coverage promptly upon request by BP. If Dealer qualifies as a self insurer for purposes of Subsection 23(a)(3) above, Dealer shall furnish BP with evidence of such qualification and any changes thereto, in lieu of the insurance certificate.

(e) Dealer will not materially change, amend, or cancel any of the insurance policies that Dealer is required to obtain under this Agreement, without first providing BP with 30 days written notice of the intent to do so, and obtaining BP's prior written consent to such change, amendment or cancellation.

(f) The existence or non-existence of any insurance shall not limit Dealer's liability for indemnity and other obligations contained in this Agreement.

## 24. Discontinuance of Product or Services

BP may at any time: (1) discontinue the production or sale of any product covered hereby; (2) change the specifications of any such product; (3) replace any such product with another product; (4) change or withdraw the Trade Identities applicable to any such product; and/or (5) change or withdraw services and facilities offered in connection with any such product. BP shall not be liable to Dealer by reason of any such discontinuance, replacement, change or withdrawal.

## 25. Assignment, Subletting

(a) Dealer acknowledges and understands that Dealer's personal commitment to the operation of Dealer's Facility and Dealer's qualifications and abilities are essential to the operations conducted pursuant to this Agreement. In the absence of Dealer's personal commitment, qualifications and abilities, BP would not have entered into this Agreement. Dealer cannot sublet the Facility or any part thereof without the prior written consent of BP.

(b) Dealer cannot undergo any Change of Control, or make any assignment, including of any interest in this Agreement or any franchise relationship that arises in connection with this Agreement without the prior written consent of BP. BP will not unreasonably withhold its consent to Dealer's assignment of any franchise relationship that arises in connection with this Agreement. But, BP may condition its consent to assignment upon (1) the satisfaction by the proposed assignee of all BP's then current requirements for the qualification of new dealers; (2) the agreement of the proposed assignee to enter into a Trial Franchise or new Dealer Supply Agreement in conformity with the provisions of the PMPA;  (3) at least 7 days prior to the effective date of the assignment, the execution by Dealer of a Mutual Cancellation of this Agreement and associated agreements in conformity with the PMPA; and (4) Dealer simultaneously executes an am/pm mini market franchise agreement for the Facility at the above Facility address on BP's then-current form of franchise agreement..  The terms "assign" and "assignment" shall include any Change of Control.

(c) In addition, BP will condition its consent on the satisfaction by Dealer of all indebtedness owed by Dealer to BP and on the express agreement of Dealer to remain liable for the observance by the proposed assignee of all the terms and conditions of this Agreement.

(d) If BP gives its consent to an assignment by Dealer, or if BP agrees to enter into a new Dealer Supply Agreement with Dealer's assignee, Dealer will pay to BP before the Dealer change, BP's administrative cost to effect the Dealer change. This cost is $10,000.00. No administrative fee is due if this Agreement is transferred pursuant to paragraph 21, if BP assigns its rights to a third party, or if BP exercises its right of first refusal pursuant to paragraph 26.

(e) Nothing in the above will constitute a limitation in any manner on BP's right to reasonably withhold its consent to any proposed assignment by Dealer for reasons not mentioned or to impose other qualifications to the giving of consent.

(f)  In situations where subparagraph 18(f) or 18(h) are or may be applicable, and "successor in interest" forms have been executed by the dealer, the successor in interest form will supersede the provisions in this paragraph 25.

## 26. Right of First Refusal

(a) If at any time after execution of this Agreement, or during the term of this Agreement or any extension, Dealer either (1) receives an offer to purchase the Facility, or any contiguous premises that include the Facility, and desires to accept the offer, or (2) makes an offer to sell the Facility, or any contiguous premises that include the Facility, or (3) undergoes a Change of Control, Dealer must give BP 60 calendar days written notice of the offer providing the name and address of the proposed purchaser, the amount of the proposed purchase price, and an accurate and complete copy of the offer, including any side agreements or information provided to or by Dealer that may induce the offer or its acceptance.  Dealer must also provide BP any additional information, facts, and data, including, but not limited to, profit and loss statements and tax returns, as BP deems necessary for BP to make an informed decision regarding exercising any right of first refusal herein.   BP may then purchase the premises that are the subject of the offer by giving written notice to Dealer within the 60 calendar day period at the same price and on the same terms of the offer, and as provided in this Agreement. BP may substitute cash for any non-cash consideration offered by a prospective purchaser.

(b) In addition to the right-of-first refusal specified in 26(a), if the Dealer desires to lease or sublease the Facility or other property owned or leased by Dealer of which the Facility is a part, at any time after execution of this Agreement, or during the term of this Agreement, or any renewal or extension, and Dealer gives or receives a bona fide offer to lease that is acceptable to Dealer, Dealer must submit to BP an accurate and complete copy of the offer, and BP will have 60 calendar days from the date of receipt to elect to lease the premises on the same terms and conditions as contained in the offer, and as provided in this Agreement BP may substitute cash for any non-cash consideration offered by a prospective tenant.

(c) Each option and right is independent of the other, is preemptive and continuing, and is binding on Dealer, Dealer's heirs, devisees, legal representatives, grantees, successors or assigns. An election by BP not to purchase or lease the Facility in case of any particular bona fide offer does not terminate or in any manner affect any option, whether the premises are sold, leased, otherwise conveyed, but each continues unaffected.

(d) If any option or right to buy is exercised by BP, Dealer will convey a merchantable title in fee simple or a valid leasehold interest to the real estate by good and sufficient warranty deed or lease, with release of dower, homestead, courtesy and other rights of the respective spouses, if any, and free from all encumbrances.

(e) Within 60 calendar days of the date of exercise of any of option or right, Dealer will furnish to BP a Commitment for title insurance issued by a title insurance company acceptable to BP, together with legible copies of all documents affecting title to the premises. At closing or lease commencement date, Dealer will furnish to BP the then current ALTA Form Owner's or Leasehold Policy of Title Insurance, in extended coverage form, with Standard Exceptions deleted, brought current to the date of closing or lease commencement date, guaranteeing Lessee against loss or damage to the extent of the purchase price or leasehold value by reason of defects in or liens upon Dealer's title, subject only to exceptions that are permitted or waived in writing by BP. In the case of purchase, settlement of the purchase price and conveyance to the BP will be made within 90 calendar days of date of exercise, but actual tender of the purchase price by BP or tender of deed by Dealer will not be necessary, and neither party will be in default until after written demand for performance been made by the other. Taxes, rent, and other current expenses will be prorated as of the date of settlement.

(f)  Non-exercise by BP of its right of first refusal or any other right contained in this Paragraph 26 will not constitute a waiver of any rights BP has under Paragraph 25 or 26.

## 27. Business Name
Dealer must notify BP, in writing, of any decision to change the name of Dealer's business. Dealer is required to use the name designated on the opening paragraph of this Agreement as the name in Dealer's business operations.

## 28. Notices
All notices given pursuant to this Agreement are considered to be properly given if delivered personally or sent by certified mail addressed to Dealer at the Facility address as shown in the introduction to this Agreement and to BP at

**4 Centerpointe Drive,  La Palma, CA 90623**

[Address]

directed to the attention of the Regional Vice President, or at such other address as BP may from time to time notify Dealer of in writing. Date of service of a notice served by certified mail is the date deposited in the United States Mail.

29. **Petroleum Marketing Practices Act**

(a) Each party hereby expressly reserves all rights under the PMPA. No omission of any reference herein to any specific such right shall constitute a waiver of that right.

(b) Dealer acknowledges receipt of Revised Summary of Title 1 of the Petroleum Marketing Practices Act.

Dealer's signature: _____          _____

Ali Mourad                                    Ayad Jaber

30. **Franchise Relationship**

If Dealer for any reason whatsoever, at any time, discontinues the sale from the Facility of Representative Amounts of motor fuels chosen by BP to be sold under BP's Trade Identities, BP shall have the right to terminate any franchise relationship between BP and Dealer upon 90 days notice. All other agreements related to the terminated franchise relationship shall automatically terminate except any financial security agreements, mortgages, amortization agreements, notes or guarantees.

31. **Confidentiality**

Dealer acknowledges that the systems, methods, procedures and information provided by BP to its dealers are the confidential and valuable property of BP and Dealer must keep such information in a secure and confidential manner and must not disclose it to third parties or use it or allow others to use it other than for the purposes of and as authorized by this Agreement. Dealer may disclose such information to employees only on a "need to know" basis and only if they undertake to keep such information confidential. Dealer must ensure that such employees observe Dealer confidentiality obligation under this clause.

32. **No Waiver**

No failure to act on an incident of breach, and no course of dealing will be construed as the waiver of the right to act. The waiver of any breach of any covenant, condition or stipulation contained herein shall not be taken to be a waiver of any subsequent breach of the same or any other covenant, condition or stipulation. Any failure of BP to enforce rights or seek remedies upon any default of Dealer with respect to any of the obligations of Dealer hereunder, will not prejudice or affect the rights or remedies of BP in the event of any subsequent default of Dealer.

33. **Entirety-Known Claims**

This Agreement constitutes the entire agreement and understanding between BP and Dealer, canceling and superseding all prior agreements, understandings, warranties and representations, obligations, agreements, whether written or oral, express or implied, relating to the subject matter thereof except those establishing renewal periods or indebtedness of Dealer to BP (or its predecessors) including, but not limited to, previous supply agreement riders and associated agreements, Lease Modifications, Promissory Notes, Personal Guarantees, Unlimited Guarantees, Mortgages, and EOM letters. No obligations, agreements or understandings shall be implied from any course of dealing or from any of the terms and provisions of this Agreement, all obligations, agreements and understandings with respect to the subject matter hereof having been expressly set forth herein, were relied upon by either of the parties in entering into this Agreement. All prior franchise relationships and all prior agreements between BP and Dealer relating to supply of product to the Facility are hereby terminated. Dealer represents that it has no known claims against BP arising from any dealings prior to the date of this Agreement, except as set forth here.

_____ **None**_____
[State claims or put "None"]

34. **Headings**

Paragraph headings are for convenience only and shall not be construed as a part of this Agreement.

35. **Severability**

Should any of the provisions contained in this Agreement become illegal or unenforceable as to Dealer by state or federal statute or otherwise, this Agreement, absent such provision(s) will remain in full force and effect. In the event any provision hereof deemed material by BP is invalidated or voided, BP, at its option, may terminate this Agreement. If subsequent to the date of this Agreement valid state or federal laws or regulations governing the relationship between Dealer and BP take effect, this Agreement will be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provisions of this Agreement in conflict with those laws shall be void.

36. **Certain Definitions**

The following terms shall have the meanings set forth below:

"**Affiliate**" when used herein in connection with BP or Dealer, includes each person or Entity which directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with BP or Dealer, as applicable. Without limiting the foregoing, the term "Affiliate" when used herein in connection with Dealer includes any Entity 40% or more

of whose Equity or voting control, is held by person(s) or Entities who, jointly or severally, hold 40% or more of the Equity or voting control of Dealer.  For purposes of this definition, control of a person or Entity means the power, direct or indirect, to direct or cause the direction of the management and policies of such person or Entity whether by contract or otherwise.

"**Change of Control**" shall mean : (i) the sale, assignment, transfer, conveyance, gift, pledge, mortgage, or other encumbrance of more than 40% in the aggregate, whether in one or more transactions, of the Equity or voting power of Dealer, by operation of law or otherwise or any other event(s) or transaction(s) which, directly or indirectly, effectively changes control of Dealer; (ii) the issuance of any securities by Dealer which itself or in combination with any other transaction(s) results in its Owners, as constituted on the Commencement Date, owning less than 60% of the outstanding Equity or voting power of Dealer; (iii) if Dealer is a Partnership, the resignation, removal, withdrawal, death or legal incapacity of a general partner or of any limited partner owning more than 40% of the Partnership Rights of the Partnership, or the admission of any additional general partner, or the transfer by any general partner of any of its Partnership Rights in the Partnership, or any change in the ownership or control of any general partner; (iv) the death or legal incapacity of any Owner of Dealer owning more than 40% of the Equity or voting power of Dealer; and (v) any merger, stock redemption, consolidation, reorganization, recapitalization or other transfer of control of the Dealer, however effected.   "Equity" means capital stock, membership interests, Partnership Rights, or other equity ownership interests of an Entity.

"**Entity**" means any limited liability company, Partnership, corporation or other entity which is not an individual

"**Owner**" means any direct or indirect shareholder, member, general or limited partner, trustee, or other equity owner of any Entity, except, that if BP or any Affiliate of BP has any ownership interest in Dealer, the term "**Owner**" shall not include or refer to BP or that Affiliate or their respective direct and indirect parents and subsidiaries, and no obligation or restriction upon the "Dealer", or its Owners shall bind BP, or said Affiliate or their respective direct and indirect parents and subsidiaries or their respective officers, directors, or managers.

"**Partnership**" means any general partnership, limited partnership, or limited liability partnership.

"**Partnership Rights**" means voting power, property, profits or losses, or partnership interests of a Partnership.

### 37. Execution

Dealer is aware that this Agreement may be signed on behalf of BP only by a regional account executive or one having authority superior to a retail account executive and acknowledges that this Agreement is not executed until so signed. Dealer expressly acknowledges and agrees that no agent or employee of BP below the level of a regional account executive's superior may waive, alter or modify any of the provisions of this Agreement or in any way bind BP to obligations not set forth in this Agreement. The provisions of this Agreement may not be waived, altered or modified except by a written agreement which is executed by Dealer and BP and delivered to Dealer. THIS AGREEMENT SHALL NOT BE BINDING UNLESS FULLY EXECUTED.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed.

| M.R.M. Energy, Inc. | BP |
| --- | --- |
| (Name of Dealer) | |
| Dealer's Signature: _Ali Mourad_  9/5/07 | By _Humberto Marroquin_ |
| Ali Mourad           Date | Humberto Marroquin |
| _Ayad Jaber_  09/05/07 | **Regional Sales Manager** |
| Ayad Jaber           Date | Title |

**Owner's Consent**
The undersigned owner(s) of the Facility on which the above described equipment is to be or has been installed, consent(s) to the installation of Dealer's retail gasoline service station and its related improvements and equipment, and agree(s) to be bound by the terms and conditions of this Agreement with reference to the equipment of BP and any damages to the Facility.

Land Owner Name  A.N.A. Developments, LLC

Land Owners Address

Land Owners City, State and Zip



**bp**

**Rider**
**Dealer Supply Agreement**
**Business Entity Dealer**
26-461-R (10-2003)

The parties execute this Rider simultaneously with and hereby make this Rider a part of the Dealer Supply

Agreement dated _____ 9/5/07 _____ ("Supply Agreement"), between.
BP Products North America Inc. (hereinafter "BP")

and _____ M.R.M. Energy, Inc. _____ a _____ Georgia Corporation _____ ("Dealer") regarding

the Facility located at _____ 3515 Cascade Road SW, Atlanta Georgia 30331 _____.

The parties agree that the Supply Agreement is subject to the following terms and conditions:

**1. Personal Attention.**

_____ Ayad Jaber _____ ("Dealer—Principal"), as an officer or majority stock holder of Dealer if Dealer is a corporation, or as a partner having a majority active interest in Dealer if Dealer is a partnership, or as a member having a majority active interest in Dealer if Dealer is a limited liability company, shall in good faith during the whole of the term of the Supply Agreement, and any renewals or extensions thereof, devote his personal attention, as his principle occupation, to managing the business activities referred to in the Supply Agreement. Violation of this covenant gives BP the immediate right to terminate the Supply Agreement upon notice given in accordance with the provisions of the Supply Agreement.

**2. Bound to Supply Agreement Terms.**
The Dealer—Principal is bound by and subject to all the terms and conditions contained in the Supply Agreement and shall perform all the duties and covenants of Dealer therein.

**3. Guarantee of Debts.**
The Dealer—Principal personally guarantees payment of the debts, if any, owed to BP by the Dealer incident to the Dealer's use of the facility in connection with the Supply Agreement and any dealings with BP relative thereto.

**4. Business Entity Ownership.**
Dealer—Principal represents, warrants, and covenants that Dealer—Principal is the owner of all or a majority of the capital stock of Dealer if Dealer is a corporation, or is a partner having a majority active interest in Dealer if Dealer is a Partnership, or is a member having a majority active interest in Dealer if Dealer is a limited liability company. Violation of this covenant gives BP the immediate right to terminate the Supply Agreement upon notice given in accordance with the provisions of the Supply Agreement.

**5. No Release.**
Nothing in this Rider releases Dealer from any of Dealer's obligations, duties, covenants or conditions of the Supply Agreement.

**6. Miscellaneous.**
(a) In the event of any sale, lease or Change in Control, the Supply Agreement will continue in full force and effect unless terminated by BP upon written notice, or unless assigned by Dealer with BP's written consent. BP's decision not to exercise its right of first refusal will not prevent BP from withholding its consent to assign the Supply Agreement to any third-party purchaser.

(b) BP may assign its Right to Purchase to a third-party of its choosing.

(c) Within 30 days of the date of Company's exercise of any right of first refusal, Dealer will furnish to BP a guaranty policy issued by a title insurance company acceptable to BP, in its usual form, brought down to the date of exercise, guaranteeing BP against loss or damage to the extent of the purchase price or leasehold interest by reason of defects in or liens upon Dealer's title. Dealer will convey to BP the fee or leasehold title within 90 days from the date of BP's exercise of its option. Taxes, water, and other current expenses will be adjusted as of the date of conveyance. Notwithstanding the terms of any offer, BP may substitute cash for any form of payment proposed in any offer and BP's credit is deemed equal to the credit of any proposed purchaser.

(d) Each right of first refusal and other option to purchase, if any, are independent of the others, preemptive, continuing, and binding upon Dealer, Dealer's devisees, legal representatives, grantees, successors and assigns. The election by BP not to exercise its right of first refusal in any instance will not terminate or in any manner affect any of BP's options, in any

subsequent instance, whether the stock or interest is or is not sold, conveyed or changed, but each option will thereafter continue unaffected as set forth in this Rider.

**BP:**

By: _____
Signature

Name and Title:   **Humberto Marroquin/ Regional Sales Manager**

Date: _____2/7/08_____

**Dealer:  M.R.M. Energy, Inc.**

By: _____
Signature

Name and Title:   Pres.                          G.M.

Date: _____9/5/07_____

**Dealer—Principal: Ayad Jaber**

By: _____
Signature

Name and Title:                    **Ayad Jaber**

Date: _____09/05/07_____



**bp**

**Rider**
**Dealer Supply Agreement**
**Business Entity Dealer**
26-461-R (10-2003)

The parties execute this Rider simultaneously with and hereby make this Rider a part of the Dealer Supply
Agreement dated _____ 9/5/07 _____ ("Supply Agreement"), between.
BP Products North America Inc. (hereinafter "BP")

and _____ **M.R.M. Energy, Inc.** _____ a ____ **Georgia Corporation** ____ ("Dealer") regarding

the Facility located at _____ **3515 Cascade Road SW, Atlanta Georgia  30331** _____ .

The parties agree that the Supply Agreement is subject to the following terms and conditions:

**1.  Personal Attention.**

_____ **Ali Mourad** _____ ("Dealer—Principal"), as an officer or majority stock
holder of Dealer if Dealer is a corporation, or as a partner having a majority active interest in Dealer if Dealer is a partnership,
or as a member having a majority active interest in Dealer if Dealer is a limited liability company, shall in good faith during the
whole of the term of the Supply Agreement, and any renewals or extensions thereof, devote his personal attention, as his
principle occupation, to managing the business activities referred to in the Supply Agreement. Violation of this covenant gives
BP the immediate right to terminate the Supply Agreement upon notice given in accordance with the provisions of the Supply
Agreement.

**2. Bound to Supply Agreement Terms.**
The Dealer—Principal is bound by and subject to all the terms and conditions contained in the Supply Agreement and shall
perform all the duties and covenants of Dealer therein.

**3. Guarantee of Debts.**
The Dealer—Principal personally guarantees payment of the debts, if any, owed to BP by the Dealer incident to the Dealer's
use of the facility in connection with the Supply Agreement and any dealings with BP relative thereto.

**4. Business Entity Ownership.**
Dealer—Principal represents, warrants, and covenants that Dealer—Principal is the owner of all or a majority of the capital
stock of Dealer if Dealer is a corporation, or is a partner having a majority active interest in Dealer if Dealer is a Partnership, or
is a member having a majority active interest in Dealer if Dealer is a limited liability company. Violation of this covenant gives
BP the immediate right to terminate the Supply Agreement upon notice given in accordance with the provisions of the Supply
Agreement.

**5. No Release.**
Nothing in this Rider releases Dealer from any of Dealer's obligations, duties, covenants or conditions of the Supply
Agreement.

**6. Miscellaneous.**
(a) In the event of any sale, lease or Change in Control, the Supply Agreement will continue in full force and effect unless
terminated by BP upon written notice, or unless assigned by Dealer with BP's written consent. BP's decision not to exercise its
right of first refusal will not prevent BP from withholding its consent to assign the Supply Agreement to any third-party
purchaser.

(b) BP may assign its Right to Purchase to a third-party of its choosing.

(c) Within 30 days of the date of Company's exercise of any right of first refusal, Dealer will furnish to BP a guaranty policy
issued by a title insurance company acceptable to BP, in its usual form, brought down to the date of exercise, guaranteeing
BP against loss or damage to the extent of the purchase price or leasehold interest by reason of defects in or liens upon
Dealer's title. Dealer will convey to BP the fee or leasehold title within 90 days from the date of BP's exercise of its option.
Taxes, water, and other current expenses will be adjusted as of the date of conveyance. Notwithstanding the terms of any
offer, BP may substitute cash for any form of payment proposed in any offer and BP's credit is deemed equal to the credit of
any proposed purchaser.

(d) Each right of first refusal and other option to purchase, if any, are independent of the others, preemptive, continuing, and
binding upon Dealer, Dealer's devisees, legal representatives, grantees, successors and assigns. The election by BP not to
exercise its right of first refusal in any instance will not terminate or in any manner affect any of BP's options, in any

subsequent instance, whether the stock or interest is or is not sold, conveyed or changed, but each option will thereafter continue unaffected as set forth in this Rider.

**BP:**

By: _____
      Signature

Name and Title: **Humberto Marroquin/ Regional Sales Manager**

Date: _____2/7/08_____

**Dealer: M.R.M. Energy, Inc.**

By: _____
      Signature

Name and Title: _Ayad Juber_

Date: ____09 / 05 / 07____

**Dealer—Principal: Ali Mourad**

By: _____
      Signature

Name and Title: _____**Ali Mourad**_____

Date: _____9/5/07_____

EXHIBIT D

mrm cascade

| 2010 figures | | |
|---|---|---|
| dates | fuel gallon sales | c store sales |
| 1/1-1/31 | 310472.32 | 109943.23 |
| 2/1-2/28 | 296463.10 | 112184.43 |
| 3/1-3/31 | 304884.32 | 128803.22 |
| 4/1-4/30 | 322832.16 | 115600.68 |
| 5/1-5/31 | 324792.20 | 116652.81 |
| 6/1-6/30 | 261210.83 | 107429.88 |
| 7/1-7/31 | 253857.17 | 110927.90 |
| 8/1-8/31 | 235163.40 | 102820.56 |
| 9/1-9/30 | 220003.20 | 97278.42 |

| | | |
|---|---|---|
| 4/1-4/20 | 214085.46 | 77903.81 |
| 4/21-4/30 | 108746.70 | 37696.87 |

| 2009 figures | | |
|---|---|---|
| dates | fuel gallon sales | c store sales |
| 1/1-1/31 | 440487.97 | 99465.62 |
| 2/1-2/28 | 390248.22 | 104527.28 |
| 3/1-3/31 | 398829.26 | 124897.79 |
| 4/1-4/30 | 408809.13 | 130230.37 |
| 5/1-5/31 | 402416.86 | 134726.81 |
| 6/1-6/30 | 387211.03 | 128198.13 |
| 7/1-7/31 | 386679.39 | 133694.65 |
| 8/1-8/31 | 380491.63 | 124848.59 |
| 9/1-9/30 | 332828.40 | 109988.32 |

| variance | from 2009-2010 | |
|---|---|---|
| dates | fuel gallon sales | c store sales |
| 4/1-4/30 | -85976.97 | -14629.69 |
| 5/1-5/31 | -77624.66 | -18074.00 |
| 6/1-6/30 | -126000.20 | -20768.25 |
| 7/1-7/31 | -132822.22 | -22766.75 |
| 8/1-8/31 | -145328.23 | -22028.03 |
| 9/1-9/30 | -112825.20 | -12709.90 |

| | | |
|---|---|---|
| TOTALS | -680577.48 | -110976.62 |

MRM ENERGY, INC                                                    10/26/2010 2:24:44 PM (EST)

# Daily BOS Sales and Receipts

**Station(s): 3515 CASCADE RD.SW - 0011900314 #21314 From 4/1/2009 To 4/30/2009**

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $110,314.25 | $106,101.08 | 51,442.95 |
| Regular Unleaded | $565,467.63 | $576,754.15 | 293,588.27 |
| Super Unleaded | $139,091.15 | $134,171.53 | 59,777.92 |
| **Total Gasoline** | **$814,873.03** | **$817,026.76** | **404,809.13** |
| **Total Fuel** | **$814,873.03** | **$817,026.76** | **404,809.13** |
| **C-Store** | | | |
| Alcohol | $5,334.88 | $3,780.05 | |
| BP Branded Food Service | $7,478.64 | $2,467.06 | |
| Car Care | $1,565.66 | $819.29 | |
| Fresh Foods | $1,548.66 | $600.33 | |
| Frozen | $465.66 | $210.60 | |
| Grocery | $938.17 | $290.16 | |
| Hot & Cold Drinks | $8,197.17 | $0.00 | |
| Ice Cream | $629.54 | $416.77 | |
| Lottery | $29,451.00 | $0.00 | |
| Non Foods | $2,074.37 | $816.38 | |
| Printed Materials | $1,020.73 | $771.71 | |
| Salty / Savoury Snacks | $5,115.77 | $3,451.36 | |
| Shop Services | $0.00 | $0.36 | |
| Soft Drinks | $16,761.70 | $10,589.55 | |
| Sweet Snacks & Confectionery | $7,127.28 | $3,888.28 | |
| Tobacco | $42,521.14 | $43,055.20 | |
| **Total C-Store** | **$130,230.37** | **$71,157.10** | |

MRM ENERGY, INC                                                    10/26/2010 2:26:43 PM (EST)

## Daily BOS Sales and Receipts

### Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 5/1/2009 To 5/31/2009

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $122,130.18 | $190,183.53 | 51,257.73 |
| Regular Unleaded | $639,446.72 | $1,188,713.04 | 293,342.64 |
| Super Unleaded | $149,322.57 | $177,760.91 | 57,816.50 |
| **Total Gasoline** | **$910,899.47** | **$1,556,657.48** | **402,416.86** |
| **Total Fuel** | **$910,899.47** | **$1,556,657.48** | **402,416.86** |
| **C-Store** | | | |
| Alcohol | $5,556.28 | $5,106.38 | |
| BP Branded Food Service | $7,085.74 | $2,553.08 | |
| Car Care | $1,677.19 | $883.03 | |
| Fresh Foods | $1,537.65 | $663.21 | |
| Frozen | $951.22 | $430.20 | |
| Grocery | $1,302.78 | $1,157.28 | |
| Hot & Cold Drinks | $7,597.00 | $0.00 | |
| Ice Cream | $690.77 | $797.23 | |
| Lottery | $26,669.00 | $0.00 | |
| Non Foods | $1,661.17 | $768.91 | |
| Printed Materials | $914.71 | $746.39 | |
| Salty / Savoury Snacks | $5,172.36 | $3,471.01 | |
| Shop Services | $0.00 | $0.29 | |
| Soft Drinks | $17,567.25 | $11,464.65 | |
| Sweet Snacks & Confectionery | $6,889.22 | $3,790.35 | |
| Tobacco | $49,454.47 | $49,788.82 | |
| **Total C-Store** | **$134,726.81** | **$81,620.83** | |

MRM ENERGY, INC                                                    10/26/2010 2:27:37 PM (EST)

# Daily BOS Sales and Receipts

## Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 6/1/2009 To 6/30/2009

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $132,933.10 | $694,277.85 | 48,929.59 |
| Regular Unleaded | $709,322.18 | $4,561,510.58 | 282,020.82 |
| Super Unleaded | $164,075.02 | $584,895.54 | 56,260.63 |
| **Total Gasoline** | **$1,006,330.30** | **$5,840,683.97** | **387,211.03** |
| **Total Fuel** | **$1,006,330.30** | **$5,840,683.97** | **387,211.03** |
| **C-Store** | | | |
| Alcohol | $5,088.08 | $4,402.22 | |
| BP Branded Food Service | $7,211.11 | $2,563.42 | |
| Car Care | $1,833.93 | $946.73 | |
| Fresh Foods | $1,637.19 | $710.86 | |
| Frozen | $1,506.43 | $681.30 | |
| Grocery | $1,414.05 | $759.07 | |
| Hot & Cold Drinks | $7,904.84 | $0.00 | |
| Ice Cream | $637.17 | $907.25 | |
| Lottery | $21,582.50 | $0.00 | |
| Non Foods | $1,593.12 | $753.91 | |
| Printed Materials | $843.35 | $686.33 | |
| Salty / Savoury Snacks | $5,216.68 | $3,486.69 | |
| Shop Services | $0.00 | $0.49 | |
| Soft Drinks | $22,054.04 | $15,954.10 | |
| Sweet Snacks & Confectionery | $6,261.46 | $3,479.10 | |
| Tobacco | $43,414.18 | $43,719.48 | |
| **Total C-Store** | **$128,198.13** | **$79,050.95** | |

MRM ENERGY, INC                                                   10/26/2010 2:28:24 PM (EST)

# Daily BOS Sales and Receipts

### Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 7/1/2009 To 7/31/2009

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $123,556.62 | $1,147,511.76 | 47,672.03 |
| Regular Unleaded | $670,965.96 | $7,763,359.69 | 281,456.67 |
| Super Unleaded | $161,028.83 | $1,009,505.43 | 57,550.69 |
| **Total Gasoline** | **$955,551.41** | **$9,920,376.88** | **386,679.39** |
| **Total Fuel** | **$955,551.41** | **$9,920,376.88** | **386,679.39** |
| **C-Store** | | | |
| Alcohol | $5,343.39 | $4,903.05 | |
| BP Branded Food Service | $7,067.46 | $2,322.92 | |
| Car Care | $1,802.86 | $934.67 | |
| Fresh Foods | $1,535.94 | $678.77 | |
| Frozen | $1,499.41 | $680.40 | |
| Grocery | $1,218.40 | $627.84 | |
| Hot & Cold Drinks | $7,628.21 | $0.00 | |
| Ice Cream | $600.97 | $1,206.50 | |
| Lottery | $24,776.50 | $0.00 | |
| Non Foods | $1,950.12 | $895.47 | |
| Printed Materials | $840.74 | $649.51 | |
| Salty / Savoury Snacks | $5,601.13 | $3,509.37 | |
| Shop Services | $0.01 | $0.36 | |
| Soft Drinks | $20,063.48 | $15,256.82 | |
| Sweet Snacks & Confectionery | $6,491.05 | $3,554.07 | |
| Tobacco | $47,274.98 | $46,436.09 | |
| **Total C-Store** | **$133,694.65** | **$81,655.84** | |

MRM ENERGY, INC                                                          10/26/2010 2:29:29 PM (EST)

## Daily BOS Sales and Receipts

**Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 8/1/2009 To 8/31/2009**

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $124,982.16 | $1,627,302.37 | 46,523.81 |
| Regular Unleaded | $687,780.65 | $11,636,165.63 | 278,281.57 |
| Super Unleaded | $160,993.99 | $1,260,187.27 | 55,686.25 |
| **Total Gasoline** | **$973,756.80** | **$14,523,655.27** | **380,491.63** |
| **Total Fuel** | **$973,756.80** | **$14,523,655.27** | **380,491.63** |
| **C-Store** | | | |
| Alcohol | $5,039.52 | $4,334.36 | |
| BP Branded Food Service | $6,599.59 | $2,077.39 | |
| Car Care | $1,870.33 | $945.77 | |
| Fresh Foods | $1,517.30 | $617.74 | |
| Frozen | $1,277.58 | $577.80 | |
| Grocery | $1,182.74 | $632.58 | |
| Hot & Cold Drinks | $7,483.78 | $0.00 | |
| Ice Cream | $631.82 | $1,394.29 | |
| Lottery | $28,850.00 | $0.00 | |
| Non Foods | $1,994.14 | $1,095.38 | |
| Printed Materials | $808.40 | $636.61 | |
| Salty / Savoury Snacks | $5,605.49 | $3,351.11 | |
| Shop Services | $0.00 | $0.28 | |
| Soft Drinks | $20,296.82 | $15,006.72 | |
| Sweet Snacks & Confectionery | $5,981.61 | $3,270.90 | |
| Tobacco | $35,709.47 | $33,082.84 | |
| **Total C-Store** | **$124,848.59** | **$67,023.77** | |

MRM ENERGY, INC                                                    10/26/2010 2:31:08 PM (EST)

# Daily BOS Sales and Receipts

### Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 9/1/2009 To 9/30/2009

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $112,873.64 | $2,022,995.44 | 43,911.37 |
| Regular Unleaded | $556,367.87 | $13,188,141.32 | 236,435.17 |
| Super Unleaded | $145,401.43 | $1,477,537.16 | 52,481.87 |
| **Total Gasoline** | **$814,642.94** | **$16,688,673.92** | **332,828.40** |
| **Total Fuel** | **$814,642.94** | **$16,688,673.92** | **332,828.40** |
| **C-Store** | | | |
| Alcohol | $4,674.73 | $4,139.44 | |
| BP Branded Food Service | $6,702.46 | $2,171.78 | |
| Car Care | $1,581.12 | $803.44 | |
| Fresh Foods | $1,442.86 | $578.25 | |
| Frozen | $754.24 | $339.25 | |
| Grocery | $1,022.87 | $601.82 | |
| Hot & Cold Drinks | $7,204.09 | $0.00 | |
| Ice Cream | $427.02 | $840.53 | |
| Lottery | $22,365.50 | $0.00 | |
| Non Foods | $1,908.55 | $1,086.62 | |
| Printed Materials | $849.23 | $644.52 | |
| Salty / Savoury Snacks | $4,911.43 | $3,019.11 | |
| Shop Services | $0.00 | $0.30 | |
| Soft Drinks | $15,620.32 | $10,728.74 | |
| Sweet Snacks & Confectionery | $5,525.25 | $3,048.87 | |
| Tobacco | $34,998.65 | $32,193.76 | |
| **Total C-Store** | **$109,988.32** | **$60,196.43** | |

MRM ENERGY, INC                                                    10/26/2010 2:39:09 PM (EST)

# Daily BOS Sales and Receipts

### Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 4/1/2010 To

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $128,876.91 | $118,911.92 | 43,666.15 |
| Regular Unleaded | $630,925.90 | $606,876.23 | 229,541.02 |
| Super Unleaded | $156,363.52 | $142,071.26 | 49,625.00 |
| **Total Gasoline** | **$916,166.33** | **$867,859.41** | **322,832.16** |
| **Total Fuel** | **$916,166.33** | **$867,859.41** | **322,832.16** |
| **C-Store** | | | |
| Alcohol | $5,350.16 | $4,742.77 | |
| BP Branded Food Service | $6,507.32 | $9,229.68 | |
| Car Care | $1,587.41 | $886.98 | |
| Fresh Foods | $1,254.03 | $706.51 | |
| Frozen | $679.59 | $317.24 | |
| Grocery | $943.24 | $1,063.96 | |
| Hot & Cold Drinks | $7,300.10 | $0.00 | |
| Ice Cream | $501.49 | $1,402.36 | |
| Lottery | $27,309.50 | $0.00 | |
| Non Foods | $2,630.22 | $1,298.63 | |
| Other Branded Food Service | $269.01 | $10.94 | |
| Printed Materials | $627.41 | $542.01 | |
| Salty / Savoury Snacks | $6,679.59 | $4,173.16 | |
| Shop Services | $0.00 | $0.18 | |
| Soft Drinks | $18,556.47 | $13,484.59 | |
| Sweet Snacks & Confectionery | $6,850.63 | $3,641.86 | |
| Tobacco | $28,554.51 | $26,480.99 | |
| **Total C-Store** | **$115,600.68** | **$67,981.86** | |

MRM ENERGY, INC                                                    10/26/2010 2:40:20 PM (EST)

# Daily BOS Sales and Receipts

**Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 5/1/2010 To 5/31/2010**

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $132,681.49 | $116,796.29 | 44,042.05 |
| Regular Unleaded | $645,167.24 | $590,373.09 | 231,073.37 |
| Super Unleaded | $159,493.36 | $140,567.62 | 49,676.78 |
| **Total Gasoline** | **$937,342.09** | **$847,737.00** | **324,792.20** |
| **Total Fuel** | **$937,342.09** | **$847,737.00** | **324,792.20** |
| **C-Store** | | | |
| Alcohol | $5,064.25 | $4,561.67 | |
| BP Branded Food Service | $6,137.63 | $10,023.41 | |
| Car Care | $1,442.11 | $792.94 | |
| Fresh Foods | $1,307.06 | $726.16 | |
| Frozen | $1,052.71 | $491.97 | |
| Grocery | $1,253.80 | $869.09 | |
| Hot & Cold Drinks | $6,883.46 | $0.00 | |
| Ice Cream | $582.12 | $1,150.02 | |
| Lottery | $28,047.00 | $0.00 | |
| Non Foods | $2,655.56 | $1,341.45 | |
| Other Branded Food Service | $177.06 | $9.12 | |
| Printed Materials | $586.54 | $530.26 | |
| Salty / Savoury Snacks | $6,514.47 | $4,170.56 | |
| Shop Services | $0.00 | $0.24 | |
| Soft Drinks | $18,840.78 | $13,182.00 | |
| Sweet Snacks & Confectionery | $6,687.12 | $3,631.05 | |
| Tobacco | $29,421.14 | $26,313.72 | |
| **Total C-Store** | **$116,652.81** | **$67,793.66** | |
| **Sales Tax** | | | |

MRM ENERGY, INC                                                  10/26/2010 2:41:00 PM (EST)

# Daily BOS Sales and Receipts

## Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 6/1/2010 To 6/30/2010

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $105,437.87 | $79,927.73 | 35,679.02 |
| Regular Unleaded | $498,478.02 | $402,103.91 | 186,313.57 |
| Super Unleaded | $126,566.99 | $94,521.70 | 39,218.23 |
| **Total Gasoline** | **$730,482.88** | **$576,553.34** | **261,210.83** |
| **Total Fuel** | **$730,482.88** | **$576,553.34** | **261,210.83** |
| **C-Store** | | | |
| Alcohol | $4,252.61 | $4,151.64 | |
| BP Branded Food Service | $6,388.26 | $11,362.90 | |
| Car Care | $1,415.11 | $792.37 | |
| Fresh Foods | $1,565.54 | $869.83 | |
| Frozen | $1,163.26 | $543.34 | |
| Grocery | $1,589.53 | $855.01 | |
| Hot & Cold Drinks | $7,053.14 | $0.00 | |
| Ice Cream | $478.52 | $1,176.81 | |
| Lottery | $20,890.00 | $0.00 | |
| Non Foods | $2,446.17 | $1,243.04 | |
| Other Branded Food Service | $13.63 | $6.38 | |
| Printed Materials | $519.49 | $473.32 | |
| Salty / Savoury Snacks | $6,095.79 | $4,612.91 | |
| Shop Services | $0.00 | $0.19 | |
| Soft Drinks | $19,166.29 | $13,617.15 | |
| Sweet Snacks & Confectionery | $5,775.28 | $3,141.64 | |
| Tobacco | $28,617.26 | $25,123.97 | |
| **Total C-Store** | **$107,429.88** | **$67,970.50** | |

MRM ENERGY, INC                                                    10/26/2010 2:41:55 PM (EST)

## Daily BOS Sales and Receipts

### Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 7/1/2010 To 7/31/2010

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $100,978.72 | $71,539.35 | 34,216.00 |
| Regular Unleaded | $486,826.08 | $363,491.87 | 180,864.30 |
| Super Unleaded | $124,038.94 | $86,912.93 | 38,776.88 |
| **Total Gasoline** | **$711,843.74** | **$521,944.15** | **253,857.17** |
| **Total Fuel** | **$711,843.74** | **$521,944.15** | **253,857.17** |
| **C-Store** | | | |
| Alcohol | $4,630.78 | $3,890.21 | |
| BP Branded Food Service | $6,351.78 | $9,945.43 | |
| Car Care | $1,438.50 | $814.39 | |
| Fresh Foods | $1,647.13 | $951.38 | |
| Frozen | $1,626.96 | $750.38 | |
| Grocery | $1,728.14 | $1,119.85 | |
| Hot & Cold Drinks | $7,166.87 | $0.00 | |
| Ice Cream | $427.69 | $713.85 | |
| Lottery | $23,295.50 | $0.00 | |
| Non Foods | $2,542.70 | $1,241.57 | |
| Other Branded Food Service | $7.66 | $3.65 | |
| Printed Materials | $533.46 | $484.18 | |
| Salty / Savoury Snacks | $6,027.44 | $5,450.17 | |
| Shop Services | $0.01 | $0.19 | |
| Soft Drinks | $18,801.71 | $13,874.06 | |
| Sweet Snacks & Confectionery | $5,853.40 | $3,142.44 | |
| Tobacco | $28,848.17 | $25,203.97 | |
| **Total C-Store** | **$110,927.90** | **$67,585.72** | |

MRM ENERGY, INC                                           10/26/2010 2:47:17 PM (EST)

## Daily BOS Sales and Receipts

### Station(s): 3515 CASCADE RD.SW - 0011900314 #21314  From 8/1/2010 To 8/31/2010

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $95,364.29 | $76,484.73 | 31,898.38 |
| Regular Unleaded | $454,764.59 | $335,123.79 | 167,102.56 |
| Super Unleaded | $117,506.74 | $111,854.55 | 36,162.46 |
| **Total Gasoline** | **$667,635.62** | **$523,463.07** | **235,163.40** |
| **Total Fuel** | **$667,635.62** | **$523,463.07** | **235,163.40** |
| **C-Store** | | | |
| Alcohol | $3,762.82 | $3,253.93 | |
| BP Branded Food Service | $6,075.46 | $10,053.89 | |
| Car Care | $1,579.71 | $882.99 | |
| Fresh Foods | $1,441.83 | $784.45 | |
| Frozen | $1,107.51 | $512.35 | |
| Grocery | $1,598.24 | $1,049.92 | |
| Hot & Cold Drinks | $7,234.90 | $0.00 | |
| Ice Cream | $374.30 | $679.66 | |
| Lottery | $21,876.00 | $0.00 | |
| Non Foods | $2,750.01 | $1,273.69 | |
| Other Branded Food Service | $10.96 | $2.73 | |
| Printed Materials | $493.71 | $434.67 | |
| Salty / Savoury Snacks | $5,628.78 | $4,929.84 | |
| Shop Services | $0.00 | $0.19 | |
| Soft Drinks | $16,799.50 | $12,623.42 | |
| Sweet Snacks & Confectionery | $5,594.48 | $2,894.48 | |
| Tobacco | $26,492.35 | $22,905.60 | |
| **Total C-Store** | **$102,820.56** | **$62,281.81** | |

MRM ENERGY, INC                                                      10/26/2010 2:48:49 PM (EST)

# Daily BOS Sales and Receipts

## Station(s): 3515 CASCADE RD.SW – 0011900314 #21314  From 9/1/2010 To 9/30/2010

| Description | Net Sales($) | Cost of Goods($) | Sales Gallons |
|---|---|---|---|
| **Fuel** | | | |
| Plus Unleaded | $90,774.29 | $64,203.89 | 30,648.70 |
| Regular Unleaded | $416,365.24 | $313,288.39 | 155,698.69 |
| Super Unleaded | $108,724.21 | $75,670.90 | 33,655.81 |
| **Total Gasoline** | **$615,863.74** | **$453,163.18** | **220,003.20** |
| **Total Fuel** | **$615,863.74** | **$453,163.18** | **220,003.20** |
| **C-Store** | | | |
| Alcohol | $4,347.36 | $4,092.85 | |
| BP Branded Food Service | $5,798.01 | $9,491.33 | |
| Car Care | $1,367.28 | $786.04 | |
| Fresh Foods | $1,115.99 | $663.83 | |
| Frozen | $856.99 | $394.90 | |
| Grocery | $1,584.05 | $817.43 | |
| Hot & Cold Drinks | $6,677.27 | $0.00 | |
| Ice Cream | $326.52 | $1,007.37 | |
| Lottery | $20,765.50 | $0.00 | |
| Non Foods | $2,653.61 | $1,317.80 | |
| Other Branded Food Service | $141.08 | $47.72 | |
| Printed Materials | $608.59 | $557.53 | |
| Salty / Savoury Snacks | $5,164.98 | $3,997.86 | |
| Shop Services | $0.00 | $0.19 | |
| Soft Drinks | $15,106.03 | $11,376.45 | |
| Sweet Snacks & Confectionery | $5,394.17 | $2,807.81 | |
| Tobacco | $25,370.99 | $21,939.53 | |
| **Total C-Store** | **$97,278.42** | **$59,298.64** | |

EXHIBIT E

From: **Bryan, Daren S** <BryanDS2@bp.com>
Date: Tue, Oct 26, 2010 at 1:59 PM
Subject: Bob Dudley speech to US Fuel Marketers
To: Ali Mourad <ali@ajenergyinc.com>, nasser el radi <nasser@ajenergyinc.com>, Jonathan Khoshnood
<khosrow@pacbell.net>, lcleveland@clipperpetroleum.com, gilkar786@yahoo.com, Ed Hong
<ehong@clipperpetroleum.com>

http://www.bp.com/genericarticle.do?categoryId=98&contentId=7065716

All,

Last week Bob Dudley spoke at the BPAMA and even took questions from the audience. Don't know if you heard or read about the speech so sending you a link. He addresses things we often hear from others about the commitment to the cleanup, staying in the US, changing the brand to amoco etc. It is good reading,

**Speaker:** Bob Dudley, group chief executive, BP
**Speech date:** 22 October 2010
**Venue:** BP Amoco Marketers Association Convention

Thank you for your welcome. I am very glad to be here. In fact, there is no more important place I could be today.

I wanted to take the opportunity to join you because I appreciate the challenges you have faced and the support you have given.

I want to start by making the apology you deserve from BP. We are truly sorry for the tragedy that occurred on April 20. We deeply regret the loss of 11 colleagues' lives and the impact on the Gulf Coast. And we are sorry for the impact on your businesses.

I'm here today to thank you for your support in representing BP over the past six months and to ask you to continue that support. I recognise that we need to earn your trust all over again and I want to give you some clear reasons to believe in BP's future.

Because for three million customers a day in 10,000 gas stations in 27 states, you are BP.

You have had to face a lot of anger over the last few months on our behalf. Some of you experienced protests at your sites and you managed those difficult situations very professionally.

In the Gulf region, sales were down year on year by up to 30% in some sites. Across the whole East of Rockies region we lost around 8% of sales this summer against last.

I appreciate what this has meant for you. Please do not think it has gone unnoticed. I appreciate it because while you were feeling the heat at the gas pumps it was also being felt by all of us in BP throughout America as we worked to kill the well and clean the beaches and marshes. It has been a very difficult time.

And for me, it has been very personal. I grew up in Hattiesburg, Mississippi. I spent summers with my family swimming and fishing in the Gulf.

These events have reconnected me to friends of my family from many years ago who are working in the region and on the coast. I wish I could have met them again in happier circumstances, but the personal connection has certainly further motivated me to make things right.

It has been very tough and to be candid with you I think we have come through this simply because of the quality of the people who work for us and with us – including you and all the members of this association.

On behalf of the board, the executive team and everyone in BP, thank you for what you have done.

And while we cannot relax our vigilance and our commitment, we are now seeing signs of improvement. No oil has flowed into the Gulf since mid-July. Along the coast, little oil is being washed up. Fishing grounds are reopening rapidly. Tourists are coming back.

Sales are recovering too. While they were 8% down in mid summer, by September we were only 4% behind last year and we continue to see improvements.

So we are moving in the right direction. I think that is not due to any single action performed at management level, actually I am sure of that. I think it's happening because of thousands of interactions every day in which people like yourselves – and our own employees - who represent BP to the world are doing the right thing and demonstrating that our underlying values as a responsible company remain strong.

We still face major challenges and uncertainties but we also have some abiding strengths and I'd like to set those out today as I think they give you the basis to believe in BP. I'll call them 'foundations for the future'. In my view there are five – our response to the tragedy; our ongoing relationships; our financial and operational strength; our willingness and readiness to learn and change; and our commitment to America.

**BP's response**

The first foundation for the future is the way we have responded to the tragedy. We were all shattered by this incident; but I am actually proud of the way our people and our partners have responded.

We believe this has been the largest and most extensive response ever undertaken by any company to any industrial accident. Within two days of the explosion, BP mobilized hundreds of people, a fleet of 30 vessels and thousands of feet of protective boom. With time, the scale of the activity grew until at its peak in July there were over 48,000 people deployed along with more than 7,000 vessels and over 15 million feet of boom which is equal to about 3,000 miles of boom.

We trained thousands of volunteers to cope with oil and injured wildlife. Rapid response teams scoured the beaches for oil that came ashore.

We are paying legitimate claims from individuals and businesses and have now paid out over one and a quarter billion dollars.

We've made significant investments to help local economies recover. We provided $70 million to help the Gulf Coast states promote tourism, $175 million in block grants to those same states. We've supported the seafood industry, which is so important to the region, particularly Louisiana. For our jobbers, we provided additional incentives and support through this year of around $100m.

BP people have been on the ground in the Gulf, doing everything from training volunteers to answering telephones to heading out on the water with our partners to look for oil and injured wildlife.

We shared our message through media activities focused on "Making things right". And at a market level, we created a message of reassurance through communications which emphasised that retail outlets are locally owned, locally operated'.

In other words, we have not, and will not, stint on doing whatever is necessary to meet our commitment to restore the Gulf.

But much remains to be done. The capping of the well has led to speculation that BP is now preparing to pack up and go home. That's not on our agenda. We have said that we will make this right over the long term, and we will. And we continue to work in the region to meet our responsibilities.
We know that environmental and economic restoration means more than just cleaning up the oil and handling immediate concerns. People across the Gulf Coast region want to know the long-term impact of the oil spill, and want to know that we will address that impact.

So we have committed $500 million to create a broad, independent research program to be known as the Gulf of Mexico Research Initiative (GRI). Working with the Gulf of Mexico Alliance, the GRI will fund independent research to investigate the impacts of the oil, dispersed oil, and dispersant on the ecosystems of the Gulf of Mexico and affected coastal states. This will help ensure that lessons learned from this incident can be applied anywhere necessary in the future.

And BP has pledged to donate net revenue from oil recovered from the spill to the US National Fish and Wildlife Foundation, whose mission is to preserve and restore America's native wildlife species and habitats. In addition, we have created a $100 million fund to support rig workers that have been displaced by the drilling moratorium, and we have we have committed more than $50 million to support behavioral health programs in the region to help people affected by the spill and its aftermath.

Like all large companies, BP can often seem like a big, impersonal organisation. But it is made

up of people, many thousands of them in the US and many throughout the Gulf Coast region. They get up every morning and believe they are making a positive difference by providing the energy people need to drive to work, get their kids to school, cook the family meals and live a decent life.

They are deeply saddened by what has happened, but they aren't paralyzed by it. They are determined to meet our commitments and to help earn trust in our company, because this is their home too, and because they believe their company should live up to its responsibilities.

**BP's relationships**

A second foundation for the future is our relationships. We are still part of the American community, as we have been for over a century. In all these activities we have been working closely with others. The Coast Guard has been an indispensable partner from the night of the disaster. We have worked closely with the Departments of Interior, Energy and Homeland Security as well as myriad federal, state and local agencies and the White House itself.

The scientists from NOAA, the EPA, the Fish and Wildlife Service, as well as the state and local scientific agencies, have also been of boundless assistance. Governors and state and the local officials have worked tirelessly with us on the response.

All of these people have of course been saddened by what happened. But they have not completely lost faith in BP. Our relationships have survived and we have a base on which to rebuild. The scale of our response, much of it going beyond the demands of legal compliance, has not gone unnoticed. Make no mistake, we have a long way to go to earn back trust – but the journey has at least started.

**BP's financial strength**

A third foundation for the future is BP's underlying strength. BP is financially healthy, and up to the task of meeting its future commitments. We have announced the sale of up to $30 billion in assets over the next 18 months, selected on the basis that they are worth more to other companies than to BP. That will make us somewhat smaller and wiser, but a more focused higher quality, company. We have cut back on capital spending. We have secured additional credit lines. And following the spill, we decided not to pay further dividends in 2010.

These measures will enable us to meet our commitments in respect of the spill response – commitments we have estimated at over $30 billion. Our operations around the world - from Alaska to Australia and Angola to Azerbaijan - are proceeding satisfactorily. Our underlying operational and financial performance is sound.

**BP's learning**

A fourth foundation for the future is the fact that we are learning the lessons of the Deepwater Horizon tragedy.

We have mounted a major inquiry under our head of safety and operational integrity, a man named Mark Bly, with external as well as internal experts on the team. That inquiry found that no single factor caused the tragedy. Rather, a sequence of failures involving a number of different parties led to the explosion and fire. The report makes 26 recommendations relating specifically to deepwater drilling, which BP has accepted and on which we will be acting.

However our response to the incident needs to go beyond deepwater drilling. There are lessons for us relating to the way we operate, the way we organise our company and the way we manage risk. Many of our businesses have excellent safety records but there is always more that can be done to provide more layers of protection and resilience.

So looking to those wider questions, we have announced that we will create a new safety division with authority to oversee and audit the company's operations around the world. It will have its own expert staff, independent from the project teams, and will be fully empowered to intervene in all aspects of BP's technical activities. That new function will be headed by Mark Bly, report directly to me and the role will be elevated to the senior-most leadership team.

We are also going to re-structure our upstream segment from a single business into three functional divisions – Exploration, Development and Production. This will foster the long-term development of specialist expertise and reinforce and re-invigorate accountability for risk management. In addition we are carrying out a detailed and wide-ranging review of how we manage third-party contractors.

We're also conducting a fundamental review of how we incentivize and reward performance, with the aim of encouraging excellence in safety and risk management. I am a great believer that you get the behaviours that you incentivize.

To make it clear that this is our absolute priority, in the current quarter we have made performance in safety, compliance and operational risk management the sole criterion for performance reward across our operating businesses.

So we're acting in the areas where we need to act.

**BP's commitment to the US**

The fifth foundation I want to mention is our commitment to the US. People have been asking whether the US will turn its back on BP or we will turn our back on the US.

I have already indicated that I believe our relationships with the US government, states and the

American people can survive this crisis. We intend to be very co-operative and transparent with regulators and others and I do not believe we will lose our license to operate here.

And for our part, I can promise you that I did not become chief executive of BP in order to walk away from my home country. BP will not be quitting America.

There is too much at stake, both for BP and the US. The US has major energy needs and BP is a vital contributor to fulfilling them.

BP's heritage companies such as Amoco, ARCO and Sohio can trace their roots back many decades, in come cases to the 1860s and 70s. Today as BP, we are the leading producer of oil and natural gas in the United States. We currently employ around 23,000 people directly in this country and we support around 200,000 further jobs. We have 75,000 retirees. They live in all 50 states. We have ½ million individual shareholders. We have over $55 billion in operating capital employed, including five refineries, and we sell more than 15 billion gallons of gasoline here every year.

In addition to our offshore operations, we are opening up new supplies of unconventional gas. We are becoming a leading wind energy player and we have a long established solar business. BP is one of the largest blenders of biofuels in the nation and we are leading in developing the next generation of biofuels.

We are part of America's fabric and that is how we intend to stay. I think the very idea that BP could 'leave' presumes that BP is somehow an outsider in the US. As far as I am concerned, our headquarters may be in London but my roots are in Mississippi and Illinois, and on my watch this company will stay in America, grow in America and build ever-stronger relationships in America.

**BP's brand**

I want to conclude with the way we present ourselves to customers. People have asked whether we will be sticking with the BP brand in the US or perhaps returning to using the Amoco brand instead.

We don't plan any changes - and let me tell you why. A brand, represented by a logo, is a company's personality and its promise. It triggers in people's minds every impression they have of a company, good or bad, accumulated over time. It's their perceptions – rather than what we say -- that add to or detract from brand value.

When people look at a BP logo on a gas station today they probably associate it with the accident and the spill. But our actions can help inform perceptions.

And I would hope that people are starting to think about the magnitude and intensity of our response to that spill and the way we are doing as much as we can to restore livelihoods, look after the environment and rebuild relationships.

I would hope they would also see a company that has suffered a terrible accident but has the humility and courage to learn from that incident and prevent such a thing happening again. I'd hope they would also see a company that is determined to do the right thing by the people of the Gulf region and across the United States.

I prefer to look our customers in the eye and say to them 'We're sorry about what happened, but we're not running away and we're going to make it right'.

Now I appreciate that it's not me, but you, that has to look the customer in the eye day by day. And it's asking a huge amount for you to stick with BP and to stick up for BP. But I urge you to keep faith with us. I promise we will do everything in our power to earn back the public's trust and if you stand by us I believe you will see sentiment changing over time – as indeed it has already started to do.

I am quietly confident that over the longer term if we continue to act with responsibility and humility – as well as delivering quality products - we will not only recover - but recover in a way that earns back people's trust. Our company and our brand will emerge as strong if not stronger than before.

That is my vision and I ask you to share it. Like you, I have been with this company many years. Like many of you, I started with Amoco and then I moved into BP. That means that I know BP and its people pretty well. And I know that we have the right people to come through this tragedy as a wiser and stronger company. And when I talk about having the right people, I am looking at all of you. We know you have a choice and it's up to us to earn your trust and your confidence.

So I want to end by thanking you once again for your support and asking you to stick with us. We need your expertise and your experience. Join us on the journey to help us win back public support and make BP the great company it should be.

Thank you.