# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  OIL SPILL by the OIL RIG | * | CIVIL ACTION |
| "DEEPWATER HORIZON" | * | |
| In the GULF OF MEXICO, on | * | MDL NUMBER:  2179 |
| APRIL 20, 2010 | * | |
| | * | SECTION  J |
| | * | |
| | * | |
| | * | Honorable CARL J. BARBIER |
| | * | |
| This document relates to: | * | |
| | * | |
| 10-CV-04573 | * | Magistrate Judge SHUSHAN |
| | * | |
| | * | |
| | * | |
| | * | |
| ************************************* | * | |
| | * | |

## OPPOSITION OF BP DEALER PLAINTIFFS TO

## MOTIONS TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION  AND PROCEDURAL HISTORY  ................................................. 1

BP DEALER PLAINTIFFS JOIN IN THE OPPOSITION
    OF THE PSC TO BP'S MOTION TO DISMISS THE OPA CLAIM.................... 4

THE BP DEALER PLAINTIFF'S BRAND CLAIMS
    ARE NOT GOVERNED BY MARITIME OR ADMIRALTY LAW.................... 8

    The Court's August 26 Order ................................................................ 9

    The Tobatex Brand Claims.................................................................... 10

    Application of the Grubart Test............................................................. 14

CONCLUSION............................................................................................ 17

# TABLE OF AUTHORITIES

## Cases

Page

*Benefiel v. Exxon Corp.,* 959 F.2nd 805 (9th Cir. 1992) ............................................... 7

*Egorov, Puchinsky, Afanasiev, & Juring v. Terriberry, Carroll & Yancey,*
   183 F.3d 453 (5th Cir. 1999) ...................................................................................... 4, 14

Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972) ................................... 16

*Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527 (1995) ............................ *passim*

*Gulf Coast Shell v. Newlin, 623 F.3rd 235 (5th Cir. 2010)* ....................................................... 4, 17

*In re Taira Lynn Marine Ltd No. 5 LLC,* 444 F.3rd 371 (5th Cir. 2006) ........................................ 7

*O'Dwyer v. B & K Constr. Co. (In re Katrina Canal Breaches Litig.),*
   324 Fed.Appx. 370 (5th Cir. 2009) ........................................................................ 4, 16, 17

*Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1927) ............................................ 4, 8, 20

*Woessner v. Johns-Manville Sales Corp.*, 757 F.2d 634 (5th Cir. 1985) ................................... 16

## Statutes and Rules

28 *U.S.C.* § 1332 ..................................................................................................................... 1

33 *U.S.C.* § 2702 ..................................................................................................................... 6

Rule 9, *FRCP* ......................................................................................................................... 9

Plaintiffs TOBATEX, INC. and M.R.M. ENERGY, INC. ("BP Dealer Plaintiffs") submit the following opposition to the Defendants' Motions to Dismiss.

## INTRODUCTION AND PROCEDURAL HISTORY

On December 16, 2010, the BP Dealer Plaintiffs filed their complaint herein which was given the case number 10-CV-04573 (the "Tobatex Complaint). This action was assigned to this Court. To the extent not previously stayed by Paragraph 8 of Pre-Trial Conference Order 1 [Rec. Doc. 2], this action was stayed pursuant to Paragraph 8 of Pre-Trial Order 25. [Rec. Doc. 983] This putative class action complaint alleges state common law claims for economic damages related to the loss of revenue and profits from the defendants' injury to the BP brand and Logo which the plaintiffs and plaintiff class utilized in their business pursuant to license from BP. Jurisdiction of this Court is based upon diversity and the Class Action Fairness Act. 28 *U.S.C.* §§ 1332(a) & (d)(2). Neither admiralty nor maritime jurisdiction is invoked in this complaint.

On February 9, 2011, the PSC filed its First Amended B1 Master Complaint. [Rec. Doc. 1128] This complaint asserted, among other claims, an OPA claim. Pursuant to Pre-Trial Order 25, the Tobatex Complaint was deemed amended to include this OPA claim for "procedural and administrative" purposes.

On June 12, 2012, this Court entered an order permitting defendants to move to dismiss the claims of the BP Dealer Plaintiffs.  [Rec. Doc. 6657]  In response, Defendants Halliburton Energy Services, Inc., Transocean and M-I L.L.C. (collectively "Halliburton") have filed their motion to dismiss the claims contained in the Tobatex Complaint.  [Rec. Doc. 6892]  In addition, BP Exploration & Production Inc., BP America Production Company and BP p.l.c (collectively "BP") moved to dismiss the BP Dealer Claims contained in the Amended B1 Master Complaint but did not move to dismiss the claims in the Tobatex Complaint.  [Rec. Doc. 6893]  Finally, Defendant Cameron International Corporation ("Cameron") filed a brief asking that this Court "confirm" the dismissal of claims by the BP Dealer Plaintiffs against it even though it has never moved to dismiss the Tobatex Complaint.  [Rec. Doc. 6899]

The PSC is filing opposition to the motion of BP opposing the dismissal of the BP Dealer claims against BP under the OPA.  The BP Dealer Plaintiffs join in certain portions of that opposition insofar as BP seeks to dismiss the OPA claims now incorporated into the Tobatex Complaint.

The primary purpose of this memorandum is to oppose the Halliburton motion to dismiss insofar as it seeks dismissal of the common law claims contained in the Tobatex Complaint.[1]

Halliburton argues that because this Court determined that generally maritime law applied to the claims asserted in the Amended B1 Master Complaint, thereby preempting state common law, and since the Tobatex Complaint does not allege physical injury to property, the non-OPA claims of the BP Dealers Plaintiffs should be dismissed.[2]  Halliburton assumes without discussion that this Court's analysis of admiralty jurisdiction contained in this Court's August 26, 2011, Order [Rec. Doc. 3830] applies equally to all claimants and claims for economic damages included in this proceeding.

As will be discussed in more depth below, the common law brand claims asserted in the Tobatex Complaint differ from the claims of other claimants herein seeking purely economic damages and are not maritime claims because they fail both the "location" and "connection with maritime activity" tests established by *Grubart, Inc. v. Great Lakes Dredge & Dock Co.* 513 U.S. 527, 534 (1995).  In

---

[1]      To the extent that the Court deems BP's motion and Cameron's brief to constitute motions to dismiss the common law brand damage claims contained in the Tobatex Complaint, this opposition should be construed as also opposing those motions.

[2]      BP and Cameron make similar arguments directed at the Amended B1 Master Complaint, but the only common law claims asserted therein were for nuisance, trespass and fraudulent concealment and not the type of brand claims alleged in the Tobatex Complaint.

this case, the effect of the alleged misconduct was felt by the BP Dealer Plaintiffs only on dry land and brand claims asserted in the Tobatex Complaint have no connection with traditional maritime activity.  See *Egorov, Puchinsky, Afanasiev, & Juring v. Terriberry, Carroll & Yancey,* 183 F.3d 453 (5th Cir. 1999); *O'Dwyer v. B & K Constr. Co. (In re Katrina Canal Breaches Litig.)*, 324 Fed.Appx. 370 (5th Cir. 2009) and *Gulf Coast Shell v. Newlin,* 623 F.3[rd] 235 (5th Cir. 2010).  As a result, general maritime law does not apply to these claims and the Economic Loss Rule contained in *Robins Dry Dock & Repair Co. v. Flint* 275 U.S. 303 (1927) does not defeat those claims.

## BP DEALER PLAINTIFFS JOIN IN PORTIONS OF THE OPPOSITION OF THE PSC TO BP'S MOTION TO DISMISS THE OPA CLAIM

The Amended B1 Master Complaint asserts an OPA claim on behalf of the BP Dealers, among others.  Pursuant to Pre-Trial Order 25, the Tobatex Complaint is deemed amended and supplemented to include that OPA claim.

The PSC is filing opposition to BP's motion and the BP Dealer Plaintiffs join in Sections I, II, III and IV of that opposition and incorporate with this opposition the affidavits and declarations, including those of the BP Dealer Plaintiffs, submitted by the PSC.

The BP Dealer Plaintiffs not only do not join in Section V of the PSC opposition but instead disagree with that portion of the PSC's brief and dispute that the PSC is authorized to make any concession on behalf of the BP Dealers, including the BP Dealer Plaintiffs, that maritime law applies to the brand damage claims. Rather and for the reasons stated herein, the BP Dealer Plaintiffs assert that (i) maritime law does not apply to the common law brand damage claims asserted in the Tobatex Complaint and (ii) this Court's August 26, 2011, Order dealt only with the common law nuisance, trespass and fraudulent concealment claims asserted by the PSC in the Amended B1 Master Complaint.

The PSC has argued in opposition to BP's motion to dismiss that viable OPA claims have been alleged and that BP has gone outside the pleadings which renders its motion more akin to a motion for summary judgment. As a result, the motion either should be denied outright or denied at this point to allow for discovery and that test cases should be established for this purpose.[3] The BP Dealer Plaintiffs join in that argument.

This Court has held that unlike maritime law claims, OPA allows recovery for economic losses resulting from or due to an oil spill regardless of whether the

---

[3] The PSC has not asserted that its OPA claim should remain against either Halliburton or Cameron, who were not found to be Responsible Parties under the OPA for the massive subsurface oil spill which resulted from the Deepwater Horizon incident. While an argument could be made that Transocean also bears some responsibility as a Responsible Party for the surface oil spill, the magnitude of the subsurface spill dwarfs this claim and the BP Dealer Plaintiffs do not assert that its OPA claims against either Halliburton or Cameron should remain.

claimant has sustained physical damage to a proprietary interest.  August 26, 2011 Order @ Page 21.  The Amended B1 Master Complaint alleges that the BP Dealers suffered economic losses resulting from the oil spill and the evidence submitted by the PSC is response to BP's motion demonstrate that the BP Dealers began to suffer losses immediately following the spill.

This Court has held that the OPA provides for the recovery of economic damages if those damages were "due to" injury or destruction or loss of personal property.  33 *U.S.C.* § 2702(b)(2)(E).  Certainly, BP Dealers suffered losses along with other recently settled retailers in the Gulf Coast Area from the loss or tourism resulting from the soiled beaches and the loss of seafood sales.  However, BP Dealers have an even stronger claim for damages in that they stand in a unique position and unlike other retail establishments who were untouched by the oil but who only lost revenues and profits resulting from the oil spill.  The BP Dealers have a personal property right (i.e. license) to sell products to the public using the BP name and logo.[4]  It is this personal property right which is intertwined with real property rights and which has been severely damaged due to the oil spill.  There is thus a nexus between damage to real and personal property and loss which is the trigger for liability under OPA.

---

[4]      Indeed, BP Dealers are deed restricted from selling motor fuel products under other brands and cannot simply change brands and logos at will.  Rather, they are required to purchase BP's motor fuel products for 20 years.

Contrary to the allegations of the Amended B1 Master Complaint, BP argues that the losses suffered by the BP Dealers were the result of "consumer choices." Every retail loss is the result of consumer choices.  The question is why did the consumers make the choices they did?  Clearly, it was "due to" the oil spill. Consumers chose not to travel to the Gulf Coast Area to visit contaminated Gulf Coast beaches.  As a result, all Gulf Coast Area retailers suffered losses based upon consumer choices but nonetheless "due to" the oil spill and resulting damages caused.  Other BP Dealers suffered losses based upon consumer choices to not do business with a company which caused the worst oil spill in history.  Thus, this was also "due to" and "resulting from" the oil spill.

BP places particular reliance on *In re Taira Lynn Marine Ltd No. 5 LLC*, 444 F.3rd 371 (5th Cir. 2006).  *Taira* is not on point.  In that case a barge collided with a bridge and discharged gas into the air along with a small amount of oil in the water.  Adjacent business sued under OPA.  The court held that the losses were due to a gas release and not the oil spill.  In this case, there was also an explosion and fire along with the massive oil spill.  However, no one can seriously argue that the retailer losses were as a result of the fire rather than the oil spill.  BP cannot point to any other reason for the losses suffered other than the massive oil spill.

BP also relies on the pre-OPA decision in *Benefiel v. Exxon Corp.,* 959 F.2nd 805 (9th Cir. 1992).  This case is also not on point.  In *Benefiel,* a consumer class

action was brought in California alleging that gasoline prices increased because the Exxon Valdez oil spill resulted in the closure of a refinery in the area.  Using a traditional proximate cause analysis, the Court held that there was a supervening, intervening cause for these losses, namely the unscrupulous actions of other oil companies taking advantage of the incident to raise wholesale prices, which were actions which Exxon could not control.  Here there is no supervening, intervening cause.  Rather, the losses all flow from the massive oil spill caused by BP as the Responsible Party resulting from actions which BP could have controlled.

As a result, BP's motion to dismiss the OPA claim should be denied.

## THE BP DEALER PLAINTIFF'S BRAND CLAIMS
## ARE NOT GOVERNED BY MARITIME OR ADMIRALTY LAW

The issue addressed in this section is whether the brand damage claims alleged in the Tobatex Complaint are governed by admiralty or maritime law or state common law.[5]  Relying solely on this Court's August 26, 2011, Order, Halliburton argues that the Tobatex Complaint must be dismissed because the BP Dealer Plaintiffs have not alleged physical damage to property as required by *Robins Dry Dock.*  However, Halliburton's argument assumes that the unique claims alleged in the Tobatex Complaint are governed by maritime or admiralty

---

[5]      Note that the OPA claim does not depend on the application of maritime law.  It is a federal statute creating its own jurisdictional grant of authority and supplants maritime law.

law and not common law.  The BP Dealer Plaintiffs have not invoked admiralty law in the Tobatex Complaint.  As shown below, Halliburton has failed to demonstrate that the Tobatex brand claims satisfy both the "location" and "connection with traditional maritime activities" tests required for the application of maritime law.

## The Court's August 26 Order

This Court's August 26, 2011, Order resulted from motions to dismiss the Amended B1 Master Complaint and not the Tobatex Complaint.  The Amended B1 Master Complaint was filed pursuant to Pre-Trial Order 25 and, among other goals, ambitiously sought to consolidate in a single pleading the claims of all claimants seeking economic damages in this proceeding.  This complaint specifically alleged at Paragraph 27 that the claims asserted therein were admiralty or maritime claims within the meaning of Rule 9(h) *FRCP*.  This complaint also lumped the claims of the BP Dealers with all "Dealer Claimants" including "automobile and boat business, dealers, and service stations."  See Paragraph 28(m).  This pleading then alleged common law claims only for nuisance, trespass and fraudulent concealment.  None of the brand claims, which are alleged in the Tobatex Complaint, are alleged in the Amended B1 Master Complaint.

This Court analyzed whether admiralty jurisdiction exists generally for the claims asserted in the Amended B1 Master Complaint.  See Order @ Pages 7-8.  This Court noted that the controlling test was outlined by the Supreme Court in *Grubart, supra.*  It is a two part test focusing first on whether the tort occurred on navigable water and then on the two part connection test.  Having already determined that the Deepwater Horizon was a "vessel," the court held that the blowout, explosions, fire and subsequent discharge of oil occurred on navigable waters, which satisfies the location test.  With regard to the connection test, this Court held that blowout, explosions, fire and oil discharge exceeded the potentially disruptive to maritime commerce threshold and that the operations of the Deepwater Horizon bore a substantial relationship to traditional maritime activity.

### The Tobatex Brand Claims

The Tobatex Complaint alleges entirely different claims than were alleged in the Amended B1 Master Complaint and claims which the August 26, 2011 Order did not analyze.[6]  The Tobatex brand claim arises out of a contractual license provided by BP to its dealers for dry-land based service stations.  The claim is based upon actions taken in the corporate offices of defendants both before and

---

[6]     Normally when faced with a motion to dismiss, a plaintiff is allowed to amend his complaint.  Since it was not clear whether the June 12, 2012 Order vacated the stay such as to permit the BP Dealer Plaintiffs to amend their complaint, they did not do so but now seek leave to do so to more accurately set forth their claims.  This memorandum will discuss the facts which such an amended complaint would allege.

after the oil spill which had the effect of injuring the BP Dealers' franchise operations on dry land and entirely unrelated to traditional maritime activities or commerce.

The BP Dealer Plaintiffs allege that they are the holders of a license from BP to sell their products using the BP name and logo.  Indeed, that license was granted by BP as part of a franchise and supply agreement and usually accompanied by a deed restriction which precludes the licensee from selling the products of BP's competitors on the service station site for 20 years.  See Knoshnood and Jaber declarations.  BP recognizes that its brand is a valuable asset and imposes severe restrictions on the operations of BP Dealers to protect that brand on pain of losing the franchise.[7]

BP Dealers are numerous and located throughout the United States.[8]  Many are located in the Gulf Coast Area.  BP Dealers do not merely sell gasoline.  Most BP Dealers have convenience stores, some of which sell Gulf Coast seafood.

---

[7]     Recognizing the uneven bargaining power of service stations franchisees, Congress enacted the Petroleum Marketing Practices Act ("PMPA") governing such franchises.  15 *U.S.C.* §2801-2806.

[8]     In publically apologizing for the damages caused to BP Dealers by the Deepwater Horizon incident, BP stated that BP Dealers number 10,000 although it is not clear whether that figure is only nationally or (cont.)

internationally.  Discovery by the BP Dealer Plaintiffs of the identity of the BP Dealers has been stayed since the commencement of the Tobatex action.  Nevertheless, BP concedes liability by its apology and by the small pittance of compensation it has provided to its dealers.  See Exhibit D to Jaber Declaration.

Many have fast serve restaurants, some of which sell Gulf Coast seafood, car washes and other retail businesses catering to service station customers.[9]

Just like the BP Dealers are obligated not to damage the BP brand and logo by their operations at the risk of losing their petroleum franchise, the BP Dealer Plaintiffs have alleged that BP and the other defendants have a duty not to damage the BP name and logo upon which the BP Dealers rely.  None of the defendants have asserted in their motions that such a duty does not exist.

The BP Dealer Plaintiffs allege that BP and the other defendants intentionally and negligently took actions which severely damaged the BP name and logo resulting in substantial lost profits and revenues by the BP Dealers throughout the United States.  Certain of those actions occurred well before the Deepwater Horizon incident and certain of those actions occurred after and in the wake of the Deepwater Horizon incident.  In addition to damaging the BP name and logo, certain of the defendants' action before the Deepwater Horizon incident also resulted in that incident as well.  However, the alleged misconduct of defendants which occurred after the event, did not cause the event but have only served to damage the BP name and logo further.

---

[9]      The BP Dealers are no different than the other branded services stations and retailers with whom BP has recently settled for substantial payments based on lost profits and revenues.

The BP Dealer Plaintiffs have alleged that many years ago BP adopted a corporate strategy of taking imprudent risks, violating statutes and regulations and failing to follow customary industry practices on land and at sea in order to maximize short term profits.  This strategy has resulted in a number of incidents many of which occurred on dry land.[10]  The Deepwater Horizon incident is but the latest and clearly the largest incident to have resulted from this corporate strategy.

Clearly, BP understood that the larger and more dramatic the incident resulting from the pursuit of this corporate strategy, the greater the risk of damage to the brand.

The Deepwater Horizon incident was horrific.  Many were killed and injured.  However, had appropriate safeguards been taken, the Deepwater Horizon incident would have rapidly faded from public view and little damage to the brand would have occurred.  But that was not the case, because of the massive oil spill which also resulted.

BP's response to the incident was to make on dry land the corporate decision to minimize the nature of the spill.  BP made numerous public press releases estimating the magnitude of the spill which were constantly found to be false and

---

[10]     For example, a fire and explosion occurred at BP's Texas City Refinery in Texas City, Texas, on March 23, 2005, killing 15 workers and injuring more than 170 others. BP was charged with criminal violations of federal environmental laws, and has been subjected to lawsuits from the victims' families. The Occupational Safety and Health Administration slapped BP with a then-record fine for hundreds of safety violations, and subsequently imposed an even larger fine after claiming that BP had failed to implement safety improvements following the disaster.

readjusted.  The public watching the national news was exposed to live pictures of the continuing spill day after day after day.  BP's methods of operation and corporate strategy along with its prior incidents were investigated, disclosed and republicized to the public.  For months, the BP Oil Spill as it became known was the lead story throughout the nation.  Reports issued that BP was not serious in stopping the spill, instead attempting efforts which would preserve the well for later economic value.  Profits were still placed above damage to the environment.

Thus, it was the corporate decisions of BP, aided by the finger pointing of the other defendants, which caused injury to the BP brand and logo on which the BP Dealers relied.

<h3 style="text-align:center">Application of the <em>Grubart</em> Test</h3>

As noted above, *Grubart* applies both a "location" and a "connection with traditional maritime activity" test to determine whether admiralty jurisdiction applies to the Tobatex brand claims.

With regard to the location test, the leading authority in the Fifth Circuit is found in *Egorov, supra.*  In that case, a vessel was seized pursuant to an attachment emanating out of a Louisiana state court proceeding.  The seizure resulted in the constructive discharge of the Russian seamen on board.  The Egorov firm was retained to represent the seamen for back wages earned at sea and penalty wages.

The vessel was subsequently sold and the purchaser, working around the Egorov firm, reached a settlement with the seamen and indeed rehired them to work on the vessel.  The Egorov firm filed suit in federal court against the purchaser and others claiming that the settlement interfered with their contingency fee agreement with the seamen.  The suit sought to apply maritime law to the claims asserted therein. The Fifth Circuit held to the contrary based upon the location test in *Grubart*.[11]

The Court noted that the burden of satisfying the *Grubart* test falls on the party seeking to invoke federal admiralty jurisdiction, which in this case is Halliburton.

With regard to the location test, the Court stated at 456 as follows:

> A court applying the 'location' test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." ***Grubart***, *513 U.S. at 534, 115 S. Ct. at 1048*.  In determining whether the tort occurred on navigable water, this court looks to where the alleged wrong took effect rather than to the locus of the allegedly tortious conduct. **See Wiedemann & Fransen APLC v. Hollywood Marine, Inc.**, *811 F.2d 864 (5th Cir.1987)*(quoting **Executive Jet Aviation, Inc. v. City of Cleveland**, *409 U.S. 249, 266, 93 S. Ct. 493, 503, 34 L. Ed. 2d 454 (1972))*; **Kuehne & Nagel v. Geosource, Inc.**, *874 F.2d 283, 288-89 (5th Cir.1989)*.

---

[11]     The Court assumed without deciding that the seamen wage issue had a sufficient connection with traditional maritime activity to satisfy the second *Grubart* test.

The court then found that the alleged contractual interference in question took effect on dry land and, as a result, admiralty jurisdiction did not apply but rather Louisiana law governed the claim.

In this case, there is no question but that the effect of the damage to the brand took effect on dry land and at the BP Dealer stations located throughout the United States.  There are no BP Dealer stations in navigable waters – they are located on dry land.  While there may have been a small amount of tortious conduct occurring on the "vessel," the bulk of the alleged misconduct occurred on dry land.  As a result and with regard to the torts alleged in the Tobatex Complaint, admiralty jurisdiction does not attach and those claims are governed by state law, as Halliburton is unable to satisfy the *Grubart* "location" test.

In addition, Halliburton is also unable to establish that the "connection with traditional maritime activity" test has been met in this case.  *Grubart* relied on *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249 (1972) in applying this test.  While *Executive Jet* involved a plane crash into navigable waters, the claims were found to have no connection with traditional maritime activities.

The "connection" test was recently discussed at length in *O'Dwyer, supra.* The Fifth Circuit renewed its prior holding in *Woessner v. Johns-Manville Sales Corp.*, 757 F.2d 634, 648-49 (5th Cir. 1985) that admiralty jurisdiction should be

-16-

exercised with caution as it may "preempt state regulation of matters traditionally committed to local resolution."  The Court then concluded that admiralty jurisdiction did not apply as the Canal improvement project at issue only "implicated only local, land-based interests, and the connection, if any, to admiralty law is 'wholly fortuitous'".  *O'Dwyer,* at 380.

A similar holding is found in *Gulf Coast Shell, supra.*  In that case the Court examined both contract and tort claims involving a dredging vessel and found that the claims being asserted had insufficient relationship with traditional maritime activities to support admiralty jurisdiction.

The claims asserted in the Tobatex Complaint involve the franchising and branding of service stations.  This is not a maritime activity, traditional or otherwise.  Service stations are almost entirely located on dry land.  The franchise relationship is contractually based and is governed not only by the federal PMPA but also by laws in almost every state.  Any impact on maritime commerce by service station franchising is negligible.  As a result, the connection test has not been met and the Tobatex Complaint claims are not governed by maritime law.

## **CONCLUSION**

The BP Dealers have asserted three claims in this proceeding.

-17-

One claim is a common law claim for brand damages asserted in the Tobatex Complaint and arising out of moving defendants' tortious misconduct occurring both before and after the Deepwater Horizon incident and resulting in dry land effects to BP Dealers throughout the United States for which diversity jurisdiction has been invoked.

One claim is under the OPA asserted in the Amended B1 Master Complaint and pursuant to Pre-Trial Order 25 is deemed included in the Tobatex Complaint for which jurisdiction arises from that act.[12]

One claim is for nuisance, trespass and fraudulent concealment also asserted in the Amended B1 Master Complaint which sought to invoke admiralty jurisdiction and for which neither the PSC nor the BP Dealer Plaintiffs seek to pursue.

In response to this Court's June 12, 2012, Order, two defendants (BP & Halliburton) have moved to dismiss some of these claims and Cameron has merely filed a brief claiming that the foregoing claims have already been dismissed.  Of these motions, only Halliburton has directly sought dismissal of the BP brand damage claims alleged in the Tobatex Complaint while BP has moved to dismiss the incorporated OPA claim.

---

[12]     This claim is only being pursued against BP.

The PSC has opposed BP's motion to dismiss the OPA claim and the BP Dealer Plaintiffs join in that portion of the opposition for the reasons stated both above and in the PSC's opposition.

With regard to the brand damage claims, the Halliburton motion relies on the false premise that those claims are governed by admiralty or maritime law rather than the common law of the states in which the BP Dealers' stations are located even though the BP Dealer Plaintiffs have not sought to invoke maritime or admiralty jurisdiction. As a result, the Halliburton's motion requires an analysis of whether the movant has demonstrated that admiralty jurisdiction applies to the brand damage claims. The BP Dealer Plaintiffs submit that this issue has not been previously decided by this Court.

Admiralty jurisdiction applies only if the two prong test in *Grubart* has been satisfied. The first prong is the "location" test and requires that the Court examine the tort alleged and the location of the "effects" of the alleged tortious misconduct. As discussed above, the effect of the tort alleged in the Tobatex Complaint occurred on dry land and had absolutely no impact on navigable waters.

The second prong of the *Grubart* test (connection with traditional maritime activity) also has not been satisfied. The franchising and branding of service stations is not a traditional maritime activity. Such brand and franchising activities have historically been and continue to be governed by non-maritime statutes both

-19-

federal (PMPA) and in virtually every state.  The franchising and branding of service stations have no impact on maritime commerce.

Since maritime law does not apply to the brand damage claims contained in the Tobatex Complaint, the Economic Loss Rule arising out of *Robins Dry Dock* and relied upon to support dismissal does not apply.

The BP Dealer Plaintiffs' brand damage claims have been effectively stayed since they were filed in 2010 and have not been prosecuted.  No discovery has been undertaken by the BP Dealer Plaintiffs.  The BP Dealer Plaintiffs now request that the Court sever the BP Dealer Claims from the Amended B1 Master Complaint, lift the stay related to the Tobatex Complaint and allow that complaint to proceed.

**RESPECTFULLY SUBMITTED BY:**

(s) Samuel T. Rees

Samuel T. Rees (LA Bar No. 30203)
26 Muirfield Place
New Orleans, Louisiana 70131
Telephone: (213) 220-9988
Fax: (323) 874-1234
STReesEsq@earthlink.net

AND


Thomas P. Bleau (CA Bar No. 152945)
Martin R. Fox (CA Bar No. 155783)
Bleau Fox
A Professional Law Corporation

-20-

3575 Cahuenga Boulevard West, Suite 580
Los Angeles, CA 90068
Telephone: (323) 874-8613
Fax: (323) 874-1234
tbleau@bleaufox.com
mfox@bleaufox.com

Attorneys for Plaintiffs and Plaintiff Class

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing have been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of August 2012.

/s/ Samuel T. Rees
Samuel T. Rees