# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG     MDL NO. 2179
"DEEPWATER HORIZON" IN THE
GULF OF MEXICO, ON APRIL 20, 2010     SECTION:  J

THIS DOCUMENT RELATES TO:     JUDGE BARBIER
2:10-cv-02771, 2:11-cv-00925     MAG. JUDGE SHUSHAN

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTIONS TO DISMISS "PURE STIGMA CLAIMS" AND "RECREATION CLAIMS"

NOW INTO COURT, through undersigned counsel, come the plaintiffs in Civil Action

No. 11-925 (Rec. Doc. 1) and the respondents/claimants in the limitation proceeding associated

with Civil Action No. 10-2771 (Rec. Doc. 388) ("Plaintiffs"),[1] which are consolidated with MDL

2179 pending before this Honorable Court, and respectfully submit this Memorandum in

Opposition to the Defendants' Rule 12(b)(6) Motions to Dismiss "Pure Stigma Claims" and

"Recreation Claims."  The Plaintiffs also adopt and incorporate as if set forth fully herein any

oppositions to the defendants' motions filed by the Plaintiffs Steering Committee ("PSC") and

any other plaintiffs/claimants to the present proceedings, except to the extent they may be

inconsistent with the Plaintiffs' arguments.[2]  As the defendants' arguments fail as a matter of

law, the Plaintiffs respectfully urge this Honorable Court to deny the Rule 12(b)(6) motions.

---

[1]    The named plaintiffs herein include Gary and Deborah  Sellno, Kerry and Sandra Lauricella, William and
Georgia Gibson, Dale and Denise LeBrun, Larry and Kelly Tapp, E.P. and M.B. Gebhardt, Michael L. and
Dawn Dawson, Michael L. Dawson Construction, Ned and Ginger Naquin, Gordon R. Cordes, James Agent,
Clark Barrios, Rose Baudoin, Rex and Beverly Rambo, Vincent and Marlene Lobue, Mark and Carol Dawson,
Henry J. Becnel, Jr., Anthony Caramonta, Paul Leone, David and Dodie Brown, Brian Reuther, Peter and Karen
Casbarian, Gerard Cormeaux, Keith and Boksoon Fabre, Kevin and Kelly Poteet, Quality Metal Works, Inc.,
Kirk Fabre, Denise and Sean Migliore, Casbarian Engineering Associates, L.L.C., Jody and Tammy Sellno,
Carolyn Campo, Robin Campo and Richard A. Campo III, Buddy and Luanna Cambas, Buddy and David
Cambas, Cambas Electric, Inc., Doug and Mary Moore, Juro Bezmalinovic, Bez Fabrication, Inc., and Caleb H.
Didriksen and Sondra Brown.

[2]    It is the Plaintiffs' understanding that this pleading does not require approval by the PSC pursuant to PTO 11
(Rec. Doc. 569) and, therefore, it has not been submitted to the PSC for support or non-support.

## FACTUAL BACKGROUND

The Plaintiffs consist of sixty-one (61) homeowners and businesses located in Jefferson Parish, Orleans Parish, and the Mississippi Gulf Coast.  Many of the Plaintiffs own waterfront property, camps, and homes in or near Louisiana coastal areas that were directly impacted by oil from the spill.  Some of the Plaintiffs own interior lots in coastal areas with access to waters affected by the spill, and others own property with no access to the water.  Yet all of the Plaintiffs have one thing in common -- they sustained general and economic damages as a result of the oil spill, including diminution in the value of their homes and loss of use of local waters, as a direct, proximate result of the defendants' acts and omissions.

Although not identically situated, the Plaintiffs jointly file this opposition to the defendants' motions to dismiss the so-called "Pure Stigma Claims" and "Recreation Claims."  A judgment dismissing these claims could potentially affect all of the Plaintiffs.  Many of the Plaintiffs own waterfront property that, according to certain unreliable sources, did not have oil impact.  Nevertheless, many of these Plaintiffs personally witnessed oil on their property, and additional forensic evidence is expected to substantiate their claims.  These Plaintiffs should not be affected by the Court's ruling because their properties were "touched" by oil.  However, the defendants have not identified which of the thousands of claims they believe actually meet the Court's definition.  The defendants may attempt to carve out these claims to erroneously exclude the waterfront homeowners who did indeed have oil on their land.[3]  For these reasons, and out of an abundance of caution, the Plaintiffs jointly oppose the defendants' motions to dismiss.

---

[3]   Some of the Plaintiffs may have also suffered the effects of the spill on their land through air contamination.  The Court has not specified whether its definition of "Pure Stigma Claims" includes or excludes property that was "touched" by the oil and chemicals through the air, as opposed to water.  As the Court has not asked the parties to identify which claims seek purely economic losses and are the subject of the pending motions, the Plaintiffs do not address that distinction at this time.  However, the Plaintiffs respectfully reserve the right to present this argument to the Court at a later date.

Most of the individual Plaintiffs are also recreational boaters, fishermen, crabbers, shrimpers, beachgoers, swimmers, and divers whose lives were substantially affected by the oil spill.  For example, Kerry and Sandy Lauricella are owners of a waterfront home in Barataria.  *See* Exhibit A, Affidavit of Kerry Lauricella.  Their ownership includes the bank of the property, the bulkhead, water bottoms in their boathouse, and a pier.  On this waterfront property is also a boathouse that stores multiple boats which the Lauricella's, historically, used nearly every week.  They have owned the property since 2003.  The property is their primary investment, the value of which plummeted after the oil spill.  The Lauricella's purchased their home on the water because they loved being on water, and as part of their retirement plan it was their primary home.  The oil disaster ruined, at least temporarily, their enjoyment of having a home in that area.

A second major impact on the Lauricella's was that they were prevented from using their boats and enjoying the waters that they normally used for fishing and other recreation.  The Lauricella's regularly used their waterfront home to take their family on boat rides, water skiing, tubing, and fishing.  They also own a licensed and registered boat trailer.[4]  The recreational aspect of having waterfront property has always been one of the Lauricella's primary reasons for living and spending their time in that area.  Yet for a long period of time after the oil spill, the government prohibited the Lauricella's from leaving the opening of Bayou Barataria into the waters to the south.  They were told they were not allowed to enter the area as a result of the spill.   Additionally, there was a strong smell of oil in the air for several months.  In fact, the Lauricella's left their waterfront property for several days because it created such anxiety knowing that the water was toxic, polluted, and unusable for boating, fishing, swimming, or other recreational activities.  This is just one example of the Plaintiffs' claims at issue.

---

[4]   The documentation that the Lauricella's obtained in connection with boating include the boat license and registration and trailer license and registration.  Additionally, younger boaters in their family have had to undergo training and take a boating exam in order to get a boater's license and fishing licenses.

## PROCEDURAL HISTORY

On December 15, 2010, the PSC filed on behalf of all claimants a B1 Master Complaint asserting detailed factual allegations and setting forth numerous claims under state and federal law, including negligence, gross negligence and willful misconduct, nuisance, trespass, punitive damages, and declaratory relief.  (Rec. Doc. 879).  The PSC subsequently filed a First Amended B1 Master Complaint on February 9, 2011, alleging the same causes of action.[5]  (Rec. Doc. 1128). The First Amended B1 Master Complaint is the subject of the motions to dismiss.

On April 20, 2011, the Plaintiffs filed their own complaint in the Eastern District of Louisiana, designated as Civil Action No. 11-925 ("Complaint") (Rec. Doc. 1).[6]  On the same date, the Plaintiffs filed their answer, counterclaim, cross-claim, and third party complaint (Rec. Doc. 388) in response to Transocean's complaint and petition for exoneration from or limitation of liability in Civil Action No. 10-2771 ("Limitation Action").   In both actions, the Plaintiffs asserted claims for property loss, economic damages, other costs, and general damages arising from the defendants' intentional, willful, wanton, reckless, negligent, and grossly negligent acts and omissions that caused or contributed to the fire, explosions, and sinking of the DEEPWATER HORIZON; the failure to stop the flow of oil and toxins into the Gulf of Mexico; and the botched clean-up efforts.  Many of the Plaintiffs also claimed -- with respect to their residences and/or businesses -- diminution of value, loss of value and/or use, lost contracts and income, loss of business opportunities, lost rents, lost earning capacity, and emotional damages.

---

[5]   Although the PSC is tasked with representing the interests of all plaintiffs/claimants, this is a nearly impossible chore.  The PSC cannot adequately represent all interested parties.  Some of the claimants' positions are contradictory to or inconsistent with others.  This is reflected in the Proposed Settlement Agreement.  Many classes of claimants are excluded from the proposed settlement, such as the plaintiffs with claims that are subject to the pending motions.  Further, the establishment of Economic Loss Zones appears to be arbitrary and discriminatory, particularly to business owners that reside in Jefferson Parish who must meet a higher standard of proof than their neighbors.  As a result, the Plaintiffs jointly file this opposition to protect their rights.

[6]   A copy of the Complaint is attached as Exhibit B for the Court's convenience.

Most of the Plaintiffs also seek damages for the loss of use of the public waterways.  In addition to filing suit, the Plaintiffs timely filed Plaintiff Profile Forms and/or Short-Form Joinders.

On June 12, 2012, the Court ordered the defendants to file motions to dismiss the so-called "Pure Stigma Claims," defined by the Court as "claims by or on behalf of owners, lessors, and lessees of real property that they have suffered damages resulting from the taint of their property caused by the oil spill, although no oil or other contaminant physically touched the property," and the so-called "Recreation Claims," defined by the Court as "claims by or on behalf of recreational fishermen, recreational divers, beachgoers, recreational boaters, etc., that they have suffered damages that include loss of enjoyment of life from the inability to use portions of the Gulf of Mexico for recreation and amusement purposes."  (Rec. Doc. 6657).

 On July 11, 2012, motions to dismiss the "Pure Stigma Claims" and "Recreation Claims" were filed by BP Exploration & Production Inc., BP American Production Company, and BP p.l.c. (collectively "BP") (Rec. Doc. 6894 & 6895), as well as Halliburton Energy Services, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., and M-I L.L.C. (Rec. Doc. 6889 & 6891).  On July 17, 2012, Cameron International Corporation filed, with leave of court, a memorandum to confirm the dismissal of the claims (Rec. Doc. 6921 & 6923). These motions are referred to herein as the "Stigma Motions" or the "Recreation Motions."

The arguments presented in the motions to fail to meet the Rule 12(b)(6) standard and should be rejected by the Court.  The Plaintiffs have asserted claims for damages that may be recoverable under the applicable law, and the Plaintiffs deserve the right to present evidence supporting their claims at trial.  Accordingly, the defendants' Stigma Motions and Recreation Motions should be denied.  The Plaintiffs respectfully request the opportunity to address the Court during oral argument at the status conference scheduled for September 14, 2012.

## **LEGAL STANDARD**

When ruling upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff. *Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 1894 (5th Cir. 1996); *Tanglewood E. Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988). "A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff," as this Court noted in *Who Dat Yat LLC v. Who Dat? Inc.,* No. 10-1333 c/w 10-2296, 2011 U.S. Dist. LEXIS 513, at *16 (E.D. La. Jan. 4, 2011) (quoting *Lorman v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009)). "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'" *Berthelot v. Boh Bros. Constr. Co.*, No. 05-4182, 2006 U.S. Dist. LEXIS 57817, at *77 (E.D. La. July 19, 2006) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992)).

To defeat a motion to dismiss, a plaintiff must merely "plead enough facts 'to state a claim to relief that is plausible on its face.'" *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 U.S. Dist. LEXIS 16290, at *5-6 (E.D. La. Feb. 17, 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Court observed that a "claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at *6 (quoting *Iqbal*, 556 U.S. at 678).

On March 22, 2011, the Supreme Court issued a unanimous decision in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011), clarifying the role of a district court in applying the pleading standards of *Twombly* and *Iqbal*. *Matrixx* reaffirms that the factual allegations in a complaint must be taken as true, that there are no "bright line" pleading

requirements under *Twombly/Iqbal*, and that the functional test is whether the complaint, taken as a whole, raises "a reasonable expectation that discovery will reveal evidence" that could enable the ultimate trier-of-fact, weighing contested evidence and opinions and making the allowable inferences, to decide the case for the plaintiff.  131 S.Ct. at 1323 (citing *Twombly*, 550 U.S. at 556).  Accordingly, the plaintiffs need only state facially plausible claims that "raise a reasonable expectation that discovery will reveal evidence" to support their claims at trial.  *Id.* at 1323 (quoting *Twombly*, 550 U.S. at 556).

## LAW AND ARGUMENT

**I.    "Pure Stigma Claims" Are Recoverable Under the OPA.**

    **A.    Property Owners Who Sustained Economic Damages Absent Oil Impact Are Entitled to Recovery of Economic Damages Under the OPA.**

As the Court recognized in its Order and Reasons as to the defendants' motions to dismiss the First Amended B1 Master Complaint ("B1 Order") (Rec. Doc. 3830), the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et. seq.* ("OPA"), broadened the scope of persons who can recover economic losses "resulting from" or "due to" an oil spill, regardless of whether the claimant sustained physical damage to a proprietary interest.  Section 2702(b)(2)(E) provides that "any claimant" can recover damages equal to the loss of profits or impairment of earning capacity due to the destruction or loss of real property.  33 U.S.C. § 2702(b)(2)(E).  The claimant need not be the owner of the damaged property to recover.  H.R. Conf. Rep. 101-653, 781 (1990); *see also In Re: Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 382 (5th Cir. 2006) (citing *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 631 (1st Cir. 1994)).

The Plaintiffs claim economic damages, including diminution or loss in value of their homes and property, loss of profits, loss of business opportunities, loss of contracts and income, lost rents, and lost earning capacity.  *See* Exhibit B, ¶¶ 1-8, 10-20, 22-27, 29-30, 32-33, 35-37,

74; *see also* First Am. B1 Master Complaint, ¶¶ 161-62, 182, 209(h), 621-22, 698 (Rec. Doc. 1128).  It is plausible that these economic claims meet the requirements for recovery under the OPA.  First, "any claimant" clearly encompasses the Plaintiffs.  Second, the Court is well aware of the extensive physical damage to property and resources along the Louisiana coastline.  This satisfies the "destruction or loss of real property" requirement.   And lastly, the Plaintiffs sustained "loss of profits" as a result of that damage.

###### B.      Plaintiffs' Claims for Economic Damages Qualify as "Loss of Profits."

The term "loss of profits" is not defined by the OPA.  The word "profit" is defined in Black's Law Dictionary as, *inter alia*, "the benefit, advantage, or pecuniary gain accruing to the owner or occupant of land from its actual use."  BLACK'S LAW DICTIONARY 1090 (5th Ed. 1979).  The common understanding of the word is even broader.  Dictionary.com defines "profits" as:

> a.      pecuniary gain resulting from the employment of capital in any transaction.
>
> b.      the ratio of such pecuniary gain to the amount of capital invested.
>
> c.      returns, proceeds, or revenue, as from property or investments.

http://dictionary.reference.com/browse/profits?s=t

The Fifth Circuit looks to the "common, ordinary and contemporary understanding" of a term if it is not statutorily defined.  *United States v. Ford*, 509 F.3d 714, 720 n. 11 (5th Cir. 2007) (quoting *United States v. Gonzales*, 484 F.3d 712, 716 (5th Cir. 2007)).  It is plausible that a trier-of-fact could find that the common, ordinary understanding of the term "loss of profits" encompasses any or all of the Plaintiffs' economic damages, including loss of profits, loss of business opportunities, loss of contracts, lost income, lost rents, and lost earning capacity. Therefore, the Plaintiffs' claims for these damages cannot be dismissed.

### C.     Claims for Diminution or Loss of Value Are Likewise Covered by the OPA.

The Plaintiffs' claims for diminution or loss of value of a residence are also recoverable under the statute.  Whether a homeowner has sold the home and locked in a "loss of profit" in the present day is not relevant, much less dispositive.  A plaintiff who may incur future lost profits on a sale still has a viable cause of action.  A case from the Eastern District is illustrative.  In *Sekco Energy, Inc. v. M/V MARGARET CHOEST*, 820 F. Supp. 1008 (E.D. La. 1993), the plaintiff's drilling platform was struck by the defendant's vessel, causing no physical damage to the platform but requiring the plaintiff to shut down operations pending a pollution inspection. Before the *Sekco* court were cross motions for summary judgment.  After determining that the plaintiff could not recover its losses under Section 2702(b)(2)(B) or (C) of the OPA, the court found that the plaintiff could maintain a claim under Section 2702(b)(2)(E) of the OPA -- the same provision at issue here.  The *Sekco* court concluded that future revenues or earnings constitute "loss of profits" under the OPA, regardless of whether they are characterized as real or personal property.  The defendants' summary judgment motions were denied.

The same logic applies in the case at bar.  Many of the Plaintiffs may -- and very likely will -- sustain a loss of profit from selling a home in the coastal areas affected by the oil spill.   A residence is typically one's largest investment.  *See* Exhibit A.  The Plaintiffs should have an opportunity to submit evidence (such as appraisals or expert testimony) to show that the defendants' acts and/or omissions caused the diminution or loss in the value of their investment.

The Court's role in considering the pending motions is not to weigh the likelihood of success, determine if causation can be proven, or consider the measure of damages.  The Court must only evaluate whether the claims are plausible and whether the Plaintiffs should be allowed to present their evidence to the trier-of-fact.  In other words, the Plaintiffs need only allege

*facially plausible claims*.    The Plaintiffs have pleaded sufficient facts to meet the *Twombly/Iqbal/Matrixx* standard set forth by the U.S. Supreme Court.  Drawing all reasonable inferences in the Plaintiffs' favor, the Court must find that the so-called "Pure Stigma Claims" constitute a credible cause of action under the OPA.

## II.   "Pure Stigma Claims" and "Recreation Claims" May Be Recoverable Under General Maritime Law.

### A.   Plaintiffs Who Alleged Intentional Conduct Are Not Precluded from Recovery by *Robins Dry Dock*.

To the extent that certain claims are not covered by the OPA, the Plaintiffs have alleged claims under general maritime law that survive dismissal under Rule 12(b)(6).  The PSC asserted in the First Amended B1 Master Complaint that the defendants acted with gross negligence, reckless disregard, and willful (*i.e.*, intentional) misconduct.[7]  *See, e.g.,* First Amended B1 Master Complaint, ¶¶ 169-174 (Rec. Doc. 1128).  Furthermore, the Plaintiffs expressly pled intentional conduct against all defendants.  *See, e.g.,* Exhibit B, ¶¶ 2-37, 44, 72, 74, 77.

This Court ruled in the B1 Order that economic loss claims asserted by claimants who do not allege physical injury to their property or other proprietary interest are barred from recovery under general maritime law by the rule established in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).  These are the so-called "Pure Stigma Claims."  The defendants also argue that the "Recreation Claims" are similarly barred by *Robins Dry Dock*.[8]  What neither the Court nor the defendants have heretofore considered is that some plaintiffs/claimants to the MDL have alleged that the defendants are liable for ***intentional conduct*** that led to the oil spill disaster.

---

[7]    Although the PSC did not explicitly use the term "intentional" in relation to the defendants' conduct, the word "willful" is synonymous with "intentional."  Black's Law Dictionary defines "willful" as "proceeding from a conscious motion of the will; voluntary; . . . ***intentional***; not accidental or involuntary."  BLACK'S LAW DICTIONARY 1434 (5th Ed. 1979) (emphasis added).

[8]    Plaintiffs do not concede that *Robins Dry Dock* precludes any of their claims.  *See* Sections III and IV, *infra*.

- 10 -

Courts have consistently acknowledged that the *Robins Dry Dock* rule applies only to unintentional torts. *See Reserve Mooring Inc. v. Am. Commercial Barge Line, LLC*, 251 F.3d 1069, 1071-72 (5th Cir. 2001) ("Under TESTBANK, physical injury to a proprietary interest is a prerequisite to recovery of economic damages in cases of unintentional tort."); *Dunham-Price Group, L.L.C. v. Port Aggregates, Inc.*, No. 05-2214, 2006 U.S. Dist. LEXIS 55285, at *14-15 (W.D. La. July 26, 2006) ("However, where the plaintiff asserts an intentional tort, the plaintiff's claim is taken 'out of the *Robins Dry Dock* parameters.'") (quoting *Showa Line, Ltd. v. Diversified Fuels, Inc.*, No. 88-2421, 1991 U.S. Dist. LEXIS 14662, at *3 (E.D. La. Sept. 30, 1991)); *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, No. 05-1978, 2006 U.S. Dist. LEXIS 62098, at *11 (E.D. La. Aug. 31, 2006) ("The plaintiff also alleged fraud and an intentional tort, 'taking the claims out of the *Robins Dry Dock* parameters as well.'") (quoting *Showa Line*, 1991 U.S. Dist. LEXIS 14662, at *3). In essence, *Robins Dry Dock* is limited to negligence actions. The Plaintiffs' well-pleaded intentional tort claims cannot be dismissed under *Robins Dry Dock*.

**B.    Plaintiffs' Allegations that the Defendants Are Liable for Intentional Tortious Conduct Are Sufficient to Defeat the Rule 12(b)(6) Motions.**

The only question for the Court to resolve is whether the Plaintiffs sufficiently pleaded their intentional tort claims. As both the the First Amended B1 Master Complaint and the Plaintiffs' Complaint plainly evidence, the Plaintiffs set forth specific facts that could lead a trier-of-fact to find that any or all of the defendants acted intentionally. Assuming the facts alleged to be true in the context of Rule 12(b)(6), it is certainly plausible that some or all of the defendants' conduct was intentional, to wit: (1) the numerous, deliberate decisions that led to the fatal fires and explosions on the DEEPWATER HORIZON and caused the sinking of the mobile offshore drilling unit ("MODU"); (2) the calculated efforts to deceive the public about the

volume of oil and toxins spewing from the well and the success (or lack thereof) of the efforts to cap the well for several months after the blowout; (3) the calamitous clean-up in response to the millions of gallons of oil and toxins poured into the Gulf of Mexico; (4) the repeated public statements revealing the defendants' total and utter disregard for the environment and residents of the Gulf Coast; and (5) the purposeful maneuvering to avoid all liability for their actions.

Any or all of these acts -- and others that may yet be revealed in discovery -- could plausibly be deemed intentional by a trier-of-fact.  It defies the purpose of a Rule 12(b)(6) motion to question whether these claims have merit at this juncture of the case.  Indeed, the Court has not yet had an opportunity to be presented with evidence at trial due to the postponement of the liability trial until January 2013.  To deny the Plaintiffs the ability to continue discovery and uncover evidence that the defendants acted intentionally -- particularly in light of the Supreme Court's mandate to accept all well-pleaded facts as true and draw all reasonable inferences in favor of the Plaintiffs -- would simply be unjust.  Accordingly, the Stigma Motions and the Recreation Motions should be denied under Rule 12(b)(6).

### III. Public Policy Mandates the Expansion of the Commercial Fishermen's Exception to Include Recreational Boaters, Fishermen, Divers, and Waterfront Property Owners.

If the Court determines that *Robins Dry Dock* does apply to the Plaintiffs' claims, public policy requires the Court to expand the exception to include recreational boaters, fishermen, divers, and waterfront property owners.  As the Court noted in the B1 Order, one of the few exceptions to the *Robins Dry Dock* rule is the commercial fishermen exception.[9]  *See La. v. M/V TESTBANK*, 524 F. Supp. 1170, 1173 (E.D. La. 1981) (stating that "claims for economic loss

---

[9]   The Plaintiffs also point out that the Fifth Circuit has recognized an exception for mitigation costs.  In *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198 (5th Cir. 1995), the appeals court affirmed the district court's award of the costs plaintiff incurred in mitigating damages, despite the fact that it had not suffered any direct physical damage to a proprietary interest.  To the extent any of the Plaintiffs sustained costs related to mitigating damages from the oil spill disaster, those claims cannot be dismissed.

asserted by the commercial oystermen, shrimpers, crabbers, and fishermen raise unique considerations requiring separate attention . . . seamen have been recognized as favored in admiralty and their economic interests require the fullest possible legal protection") (citing *The DEL RIO*, 209 F.2d 178, 182 (9th Cir. 1953)).   The rationale underlying the exception applies equally to recreational boaters, fishermen, divers, and waterfront property owners who suffered as a result of the oil spill.   It can certainly also be expanded to included waterfront property owners who also invest heavily in the water and its use.

The district court in *TESTBANK* approved of the commercial fishermen exception on the grounds that, although such individuals have no property rights that are harmed by oil pollution, "they could sue for tortious invasion of a public right, having suffered damages greater in degree than the general public." *Id.*   The district court concluded that "where plaintiff fishermen have established a course of business conduct which makes commercial use of a public right with which the defendant interferes, pecuniary losses may be recoverable." *Id.*   On appeal, the Fifth Circuit recognized the argument in favor of the exception, but "left the contours of such an exception for another day…." *In Re: Taira Lynne Marine Ltd. No. 5, LLC*, 444 F.3d 371, 378 n. 1 (5th Cir. 2006) (citing *TESTBANK*, 752 F.2d 1019, 1027 n. 10 (5th Cir. 1985)).   Thus, the parameters of the exception are still an open question in this circuit.   The cases before the Court at this time beg a closer examination as to what the contours of the exception should be.

The Plaintiffs believe at least three classes of recreational boaters should fall under the expanded exception:  (1) those with licensed boats which are stationed at their waterfront homes; (2) those with licensed boats located in a slip; and (3) those with licensed boats stored on a licensed and registered trailer.   All of these boat owners have invested time, money, and resources in recreational boating, fishing, diving, and similar activities.   *See, e.g.,* Exhibit A,

Affidavit of Kerry Lauricella.  Indeed, many of the Plaintiffs invested substantial resources in buying homes in Barataria, Lafitte, and New Orleans East to be on water or closer to the waterways so they could spend more time fishing, boating, and diving.  *See id.*  For months after the oil spill, the Plaintiffs were unable to enjoy the activities that are such an important part of their lives because many bodies of water were polluted, shut off from access, or both.  *See id.* No one can deny that the impact caused by the oil spill on the lifestyle enjoyed by so many of the Plaintiffs -- not to mention thousands of other boaters, fishermen, and divers -- who "suffered damages greater in degree than the general public."

The Plaintiffs described herein have just as much of a right to use the public waterways as a commercial fisherman.[10]  As the Fifth Circuit has observed, the right of use is a "thing of value" that deserves protection under the law.  *Vicksburg Towing Co. v. Miss. Marine Transport Co.*, 609 F.2d 176, 177 (5th Cir. 1980)).  *TESTBANK*'s acknowledgement that commercial fishermen are entitled to protection denied to others should be extended to those who legally use or seek to use the waterways.  Every waterfront homeowner has invested as much or more in the sanctity of that waterway as a commercial fisherman.  In Louisiana, boaters are required to obtain boater's licenses.  Waterfront homeowners who own boats are entitled to the same protection afforded commercial fishermen.  They have invested in the sea, and have a legal right to the use and benefit of the sea that was abrogated by the defendants' actions.  In prohibiting recreational boaters and fishermen from venturing out on the water adjacent to or near people's homes, they were injured just as significantly, if not more so, than commercial fishermen.

---

[10]   BP's reliance on the 115-year-old Supreme Court case entitled *The Conqueror*, 166 U.S. 110 (1897), appears to be misplaced.  That case (and the ones citing it) involved recovery of lost profits or repairs for a ***commercial*** vessel.  The Plaintiffs here seek recovery for loss of use of recreational vessels, an entirely different type of claim. A thorough search has not revealed any Fifth Circuit precedent affirming the proposition that a claim for loss of use of a recreational vessel is barred by *The Conqueror* and its progeny.  Moreover, the cases cited by BP bear little resemblance to the facts or issues before the Court today.

Accordingly, the Court should expand the exception to *Robins Dry Dock* to include all individuals who enjoy the public waters by use of a licensed boat and/or waterfront home.

**IV.  *Robins Dry Dock* and *TESTBANK* Are No Longer Good Law Because Congress Amended CERCLA to Overrule and Supersede that Line of Jurisprudence.**

**A.  Section § 9607(h) of CERCLA Modifies General Maritime Law.**

Alternatively, the Plaintiffs respectfully suggest that *Robins Dry Dock* and *TESTBANK* have been statutorily overruled.  Shortly following the *TESTBANK* decision in 1986, Congress amended the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.* ("CERCLA"), to ostensibly overrule *TESTBANK* and *Robins Dry Dock.*  The amendment provided, in pertinent part, as follows:

> ***The owner or operator of a vessel shall be liable*** in accordance with this section [for a release or threatened release of hazardous substances], ***under maritime tort law***, and as provided under section 114 of this Act notwithstanding any provision of the Act of March 3, 1851 (46 U.S.C. 183ff) [the Limitation of Liability Act] or ***the absence of any physical damage to the proprietary interest of the claimant***.

42 U.S.C. § 9607(h) (emphasis added).

These statutory amendments were intended to alter claims brought under the general maritime law. The current version of Section 9607(h) was enacted by Amendment 671, which provides: "Section 107(h) of [CERCLA] is amended by inserting 'under maritime tort law,' after 'with this section' and by inserting before the period 'or the absence of any physical damage to proprietary interest of the claimant.'"  Pub. L. No. 99-499, 94 Stat. 2767 (October 17, 1986). The House Report explained the amendment as follows: "Section 107 of CERCLA is amended to clarify that a vessel owner would be liable in accordance with section 107 under maritime tort law and that physical damage to the proprietary interest of the claimant is not required as a condition of liability."  H.R. Rep. No. 99-962, at 56 (1986) (Conf. Rep.).

- 15 -

One commentator suggests that these legislative pronouncements were intended to implicitly overrule *Robins Dry Dock* and *TESTBANK*, stating:

> The subsection can be understood to mean that the requirement of physical injury to a proprietary interest and the Limitation of Liability Act are inapplicable in three situations: (1) actions brought under section 9607 of CERCLA, namely the Act's liability provisions; (2) ***actions brought under the general maritime law***; and (3) actions brought under state law pursuant to the authority of section 9614 of CERCLA.
>
> S. Olssen, *Recovery for the Lost Use of Water Resources: M/V TESTBANK on the Rocks?*, 67 Tul. L. Rev. 271, 300 (1992) (emphasis added).

Thus, Congress' intent in passing the amendment to CERCLA was to supersede *Robins Dry Dock* and *TESTBANK* and to provide a remedy for those who suffer harm caused by parties who pollute the environment -- even when there is no physical damage to a proprietary interest. This interpretation is further supported by Senator Bentsen's introduction of the amendment:

> Additionally, I have clarified that under CERCLA and maritime tort law, third parties may recover for economic loss due to releases of hazardous substances even though there is no direct physical damage.
>
> *Id.* at 299 (quoting 2 A LEGISLATIVE HISTORY OF THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986, at 1180).

The government's and the public's understanding and appreciation of the risks and dangers posed by hazardous substances have matured manifold since 1927 when *Robins Dry Dock* was decided. In part due to the increased appreciation of health and cancer risks and other long-term deadly diseases, the "bright line" rule of *Robins Dry Dock* is an idea out of time that needs to be retired. The "stigma" of being connected to a polluted waterway is not an imaginary cross to be borne. It is real.

The rights of third parties established by Congress should not be disregarded in favor of the courts' dogged adherence to a nearly century-old "bright line" rule used to reduce litigation, particularly when the so-called "practical limitation on the doctrine of foreseeability" leads to unjust consequences.  The Court should deny the Stigma Motions and the Recreation Motions on the grounds that *Robins Dry Dock* and its progeny have been legislatively superseded.

### B.    The Petroleum Exclusion in Section 9601(14) Is Not Applicable Because Hazardous Substances Commingled with Oil and Contaminated the Water.

CERCLA provides the framework for a party's liability for a "release or threatened release of hazardous substances."[11]  Section 9601(14) enumerates the chemicals that constitute "hazardous substances," specifically excluding material that is "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance."  42 U.S.C. § 9601(14).  However, there are limitations on the statutory exception.  A number of courts have ruled that the petroleum exclusion does not apply when the oil is commingled with material that is a "hazardous substance" covered by the statute.[12]  The Macondo Well oil was commingled with numerous non-petroleum hazardous substances.

---

[11]   To establish a prima facie case of liability under CERCLA, a plaintiff must prove, among other things, that the site in question is a "facility" as defined by the statute.  Under the law, the term "facility" is defined, *inter alia*, as "any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), **well**, pit, pond, lagoon . . . but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9) (emphasis added).  The Macondo Well therefore constitutes a "facility" for purposes of CERCLA.  To the extent the DEEPWATER HORIZON rig may not be classified as a vessel in this context, it would properly be considered a "structure" or "installation."

[12]   *See Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 893 (10th Cir. 2000) (observing that "hazardous wastes have commingled with the petroleum products in the soil and floating on the groundwater beneath the refinery, thus rendering the CERCLA petroleum exclusion inapplicable"); *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001) ("However, petroleum products mixed with hazardous substances not constituent elements of petroleum are hazardous substances [under CERCLA].") (citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 267 (3d Cir. 1992)); *Jastram v. Phillips Petroleum Co.*, No. 92-763, 1994 U.S. Dist. LEXIS 3137, at *2 (E.D. La. March 16, 1994) (holding that it could not conclude that the petroleum exclusion applied in light of the argument that spilled crude oil may have been contaminated by hazardous substances).

It is undeniable that hazardous substances covered by CERCLA were dispersed in the Gulf of Mexico as a result of the oil spill and the effort to contain the millions of barrels of crude oil.[13]   The Plaintiffs alleged in the Complaint that chemical dispersants soiled the coast of Louisiana as a result of the oil spill, thereby damaging natural resources including air, land, water, marine life, and personal and real property.  *See* Exhibit B, ¶ 72.  The PSC alleged in the First Amended B1 Master Complaint that the oil released during the spill contained toxic substances such as benzene, toluene, naphthalene, polyaromatic hydrocarbons, polynuclear aromatic hydrocarbons, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, idenopyrenes, fluoranthene, arsenic, cadmium, copper, mercury, and nickel.  *See* First Am. B1 Master Comp., ¶¶ 487-88 (Rec. Doc. 1128).  Each of these chemicals is designated by the EPA as a "hazardous substance."  *See* Exhibit C, 40 C.F.R. § 302.4.  Additionally, chemical dispersants used in the clean-up operations contained numerous substances that are classified as hazardous substances under CERCLA.  *See id.* at ¶ 489.

The Plaintiffs have sufficiently alleged that hazardous substances as defined by CERCLA contaminated the Gulf of Mexico as a result of the oil spill and of the chemical dispersants used to contain the oil.[14]   It is unnecessary for the Plaintiffs to submit evidence at this juncture to demonstrate who is responsible or how fault should be apportioned.[15]   Assuming the factual allegations to be true, it is certainly plausible that the defendants may be liable under CERCLA.

---

[13]   In fact, the defendants jointly stipulated that several sources of hydrocarbon release were found just days after the explosion.  The hydrocarbons flowing from the Macondo Well were not diverted or controlled until June 3, 2010.  *See* Stipulated Facts Concerning Source Control Events, ¶¶ 27, 40, 92, 121, & 132 (Rec. Doc. 7076).

[14]   CERCLA also allows for the recovery of response costs incurred when one necessarily acts to contain a release.  *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669-70 (5th Cir. 1989).   Some of the Plaintiffs have incurred costs to clean up the oil on their land, which costs are recoverable under the statute.

[15]   CERCLA does not "cast the plaintiff in the impossible role of tracing chemical waste to particular sources in particular amounts, a task that is often technologically infeasible due to the fluctuating quantity and varied nature of the pollution at a site over the course of many years." *Lyondell Chem. Co. v. Albemarle Corp*., No. 01-890, 2007 U.S. Dist. LEXIS 101795, at *212 (E.D. Tex. Dec. 3, 2007) (quoting *United States v. Davis*, 261 F.3d 1, 36 (1st Cir. 2001)).

And as in any CERCLA case, once the plaintiff alleges a release or threatened release of hazardous substances, the party asserting the benefit of the petroleum exclusion bears the burden of proof on that issue. *Tosco*, 216 F.3d at 893 n. 5 (citing *Organic Chem. Site PRP Group v. Total Petroleum Inc.*, 58 F. Supp. 2d 755, 763 (W.D. Mich. 1999)). Accordingly, the Stigma Motions and the Recreation Motions should be denied.

**V.     Alternatively, Plaintiffs Are Entitled to Recover Under Louisiana Law.**

If, for the purposes of the "Pure Stigma Motions," one assumes the properties at issue suffered no "damage" or were not "touched by oil," then maritime law and the Admiralty Extension Act, 46 U.S.C. § 30101, *et seq.* ("AEA"), do not apply and state law governs.

**A.     The Admiralty Extension Act Does Not Bar Plaintiffs' State Law Claims.**

The defendants argue that because there is admiralty jurisdiction over the "Pure Stigma Claims," principles of general maritime law bar them. The Plaintiffs assert, in the alternative, that there is no admiralty jurisdiction over the "Pure Stigma Claims" and that the defendants' arguments in favor of the application of general maritime law are without merit.

The economic losses inflicted on the Plaintiffs, including the devaluation of their property, did not occur on navigable waters. The losses occurred on land. General maritime law does not reach those claims except through the AEA. Although the AEA extends admiralty jurisdiction -- and, therefore, general maritime law -- landward if the damage inflicted by maritime torts occurs on land, it applies only to those cases described in the statute:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of, ***damage or injury to*** person or ***property***, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.
>
> *Id.* (emphasis added).

This expansion of jurisdiction is expressly limited to particular *cases*.  The AEA does not throw a net of admiralty jurisdiction over a geographic area and transform the law of that area from state to federal.  If the "case" does not arise out of damage or injury to property, the AEA does not apply.  Therefore, the first question to ask is whether damage or injury to property has occurred.  The "Pure Stigma Claims" are defined as cases in which there was no damage to property.  Therefore, the AEA does not apply to them.

During the enactment of the AEA, "Congress was focused on physical-harm cases."  D. Robertson and M. Sturley, *The Admiralty Extension Solution*, 34 J. Mar. L. & Com. 209, 268 (2003).  Why would Congress include cases of pure economic loss in a statute expanding admiralty and maritime jurisdiction if general maritime law generally bars such claims?  If pure economic loss -- rather than physical damage or injury to property -- has occurred, the AEA does not apply.  Without the AEA, general maritime law has no power to bar claims for pure economic losses and *Robins Dry Dock* cannot apply to the "Pure Stigma Claims."

Even if the scope of the AEA extends to inland claims for pure economic losses such as the devaluation of property, the Plaintiffs' claims do not satisfy the "maritime relationship" rule that the Fifth Circuit has imposed, pursuant to *Executive Jet*, 409 U.S. 249 (1972), on claims under the AEA.  *See Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132, 1136 (5th Cir. 1981).  The fact that a vessel causes shore-inflicted harm is not itself enough to trigger application of the AEA.  There must be a maritime nexus.  *Id.*

Four factors must be considered in order to determine the existence of a substantial maritime relationship: (1) the functions and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and type of injuries; and (4) traditional concepts of the role of admiralty law.  *Id.* (citing *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1973)).

- 20 -

As to the vehicles and instrumentalities involved, this Court has already concluded that the DEEPWATER HORIZON may meet "some abstract definition of 'vessel' under certain circumstances." *Id.* at 1137. However, the other involved "instrumentality" is land found within the geographical boundaries of the State of Louisiana.  That land and its improvements have no "salty flavor" whatsoever, particularly those homes and lots located away from the shoreline, which may be affected by the Court's ruling on the "Pure Stigma Motions."

The causation in the present case is similar to that asserted in *Sohyde*:

> . . . the failure of Sohyde to maintain proper mud levels during the process of changing rams on the blowout preventers, the failure of Sohyde to complete the ram change operations within a reasonable period of time under the prevailing emergency conditions, the failure of Sohyde to maintain its equipment in fit condition, and the failure of Coastal properly to supervise the operations.  ***All of these causative factors could just as easily have occurred on land***.

> *Id.* (emphasis added).

The same conclusion can be reached in the present case.  The injuries alleged by some of the Plaintiffs have no relationship to maritime commerce whatsoever.  The economic losses they claim are indistinguishable from losses they would have sustained had the source of the oil been a hole in the middle of a corn field rather than a hole in the sea bottom.

Lastly, no important national interest will be undermined by the application of state rather than general maritime law to the "Pure Stigma Claims."  As the Fifth Circuit noted in *Kelly*:

> The admiralty jurisdiction of federal courts stems from the important national interest in uniformity of law and remedies for those facing the hazards of waterborne navigation.

> *Id.* at 1138 (citing *Kelly*, 485 F.2d at 526).

The instant case arose out of oil well drilling on the Outer Continental Shelf, not waterborne navigation.  The Plaintiffs' claims simply do not meet the maritime nexus test established by

*Executive Jet.*  *See also Dean v. Maritime Overseas Corporation*, 770 F. Supp. 309 (E.D. La. 1991).[16]   In the present case the Plaintiffs' claims are not "salty" enough to warrant the extension of admiralty jurisdiction and general maritime law to their land-based losses.   If general maritime law does not apply, then state law applies.

**B.      The OPA Contains a Savings Clause for State Law Claims.**

As the Court recognized in the B1 Order, the OPA preserves state law claims.  *See also Russo v. M/V Dubai Star*, 2010 U.S. Dist. LEXIS 50967 (2010 AMC 1401) (citing *United States v. Locke*, 529 U.S. 89, 104-06 (2000), and *Tanguis v. Westchester*, 153 F. Supp. 2d 859, 863 (E.D. La. 2001));  *The St. Joe Co. v. Transocean Offshore Deepwater Drilling, Inc.*, 774 F. Supp. 2d 596, 604-605 (D. Del. 2011).

**C.      Louisiana Law Allows Recovery of Pure Economic Losses.**

The law of Louisiana permits recovery for purely economic loss.  In *PPG Industries, Inc. v. Bean Dredging*, 447 So.2d 1058 (La. 1984), the Louisiana Supreme Court adopted a duty-risk analysis approach to the question whether increased fuel costs resulting from damage to an underwater fuel line was recoverable.  Although ultimately deciding that the economic losses sustained were not within the scope of the duty imposed, the use of a duty-risk analysis has since distinguished Louisiana's approach to pure economic losses from the rule of *Robins Dry Dock*. The application of the duty-risk analysis supports the Plaintiffs' claims.

The threshold issue in the duty-risk analysis is whether a duty exists in favor of the plaintiff.  *Posecai v. Wal-Mart Stores, Inc.*, 99-1222 (La. 11/30/99); 752 So.2d 762.  Whether a

---

[16]     The *Dean* court considered whether the AEA applied to extend admiralty jurisdiction over personal injuries that occurred on land as the result of gaseous emissions by a ship docked two blocks away in navigable waters: "No party asserts that the allegedly injured plaintiff worked aboard the vessel or, for that matter, in any type of marine-related activity.  Next, while the vehicles and instrumentalities involved a vessel whose emissions allegedly caused injuries to plaintiff on the stairway of her home, the vessel's involvement seems to be tangential at best.  Third, the court does not find that hydrocarbons emitted into the atmosphere, nor plaintiff's alleged fall, to be purely maritime.  Last, the traditional concepts of maritime law will not be violated by applying state law to the unusual factual circumstances of this case."  *Dean*, 770 F. Supp. at 313.

duty exists is a question of law.  *Peterson v. Gibraltar Savings & Loan*, 98-1601, 98-1609 (La. 5/18/99); 633 So.2d 1198, 1204.  The foreseeability of the risk presented by the defendant's conduct and the gravity of the risk are important factors in determining the existence and extent of a duty running from the defendant to the plaintiff.  *Clomon v. Monroe City Sch. Bd.*,, 572 So.2d 571 (La. 1990).  Equally important is the fundamental principle of Louisiana Civil Code Article 2315 that favors full reparation of wrongfully injured persons.  *Lejeune v. Rayne Branch Hosp.*, 556 So.2d 559, 568 (La. 1990).  In formulating each delictual duty, the social, moral, and economic factors and other policy considerations must be weighed.  *Id.*

No Louisiana cases have addressed whether the duty of the defendants to conduct their drilling activities in a manner that prevents uncontrolled releases of oil, gas, and other hazardous substances into the Gulf of Mexico encompasses the risk that owners of real property in the vicinity of the released hazardous substances will suffer a devaluation of that property. A determination of whether the duty encompasses that risk requires an evaluation of the following:

(1)  Foreseeability:  The risk that a massive oil spill into a body of water that washes up on shorelines, infiltrates marshes and interior waterways (both natural and man-made), and generates noxious fumes that turn bracing sea air into a vaporized petroleum cloud would stigmatize property in the vicinity is foreseeable if for no other reason than that is what has happened in the past when millions of gallons of oil have wound up in the water.

(2)  Gravity:  "Stigma" is defined as something that detracts from character or reputation. The properties in question in this case have been unquestionably stigmatized.  Their reputation as desirable places to live has been damaged by a catastrophic release of oil, gas, and hazardous chemicals, by dead and dying seabirds and waterfowl, fish, other wildlife, by sheets of oil and tarballs washed ashore, and stinking fumes.  The stigmatized properties themselves bear no

physical mark of damage but the damage to their reputation is real and has reduced their value. Thousands of properties have been stigmatized.  The gravity of this cumulative loss is great.

(3)  <u>Social and moral considerations</u>:  The "stigma" plaintiffs in this case are generally not multi-state or multi-national corporations.   A large part of their patrimony consists of their homes many of which were purchased for retirement. A loss in their value is not theoretical or speculative.  It is loss that will inevitably be realized and significantly affect their estates.  The "stigma" plaintiffs are without fault for any of the events leading up to or following the catastrophe.  The defendants, alleged to have acted intentionally and willfully, should, as a moral and social policy matter, bear the economic brunt of the stigmatization of plaintiffs' property.

## VI.   Plaintiffs Are Not Precluded from Recovering Punitive Damages.

Halliburton, Transocean, and M-I argue in their motions that plaintiffs with "Pure Stigma Claims" or "Recreation Claims" are barred from recovering punitive damages.  The basis of their argument is that if plaintiffs have no underlying claims, they cannot assert punitive damages claims.  The PSC alleged punitive damages in the First Amended B1 Master Complaint.  *See* ¶¶ 562, 707, 731, & 748-70 (Rec. Doc. 1128).  The Plaintiffs also alleged exemplary and punitive damages in their Complaint.  *See* Exhibit B, ¶¶ 75-76.  As set forth *supra*, the Plaintiffs have viable causes of action under the OPA, CERCLA, general maritime law, and/or Louisiana law, and, thus, the claims for punitive damages should not be dismissed.

## CONCLUSION

The Plaintiffs have alleged that they sustained damages as a result of the acts or omissions of the defendants that caused or contributed to the massive oil spill. Pursuant to the OPA, CERCLA, general maritime law, and/or Louisiana law, the Plaintiffs have asserted facially plausible claims under the *Twombly/Iqbal/Matrixx* standard. As the Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the Plaintiffs, the Stigma Motions and the Recreation Motions should be denied.

Respectfully submitted,

**DIDRIKSEN LAW FIRM**

*/s/ Caleb H. Didriksen*_____
**CALEB H. DIDRIKSEN**, La. Bar No. 1334
**DIANE R. COSENZA**, La. Bar No. 4419
**MICHAEL D. LANE**, La. Bar No. 30364
3114 Canal Street
New Orleans, LA 70119
Telephone: (504) 586-1600
Facsimile: (504) 822-3119
Email: caleb@didriksenlaw.com
        diane@didriksenlaw.com
        mike@didriksenlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel of record by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 10th day of August, 2012.

*/s/ Caleb H. Didriksen*_____

- 25 -