IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc.; BP America Production Company; BP p.l.c.,<br><br>Defendants. | * * * * * * * * * * * * * * * * | Civil Action No. 12-970<br><br>SECTION: J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

DECLARATION OF JOSEPH F. RICE
RE: OVERALL SETTLEMENT NEGOTIATIONS

I, JOSEPH F. RICE, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of South Carolina and in the District of Columbia. I am admitted to appear before the United States Fifth Circuit Court of Appeals and the United States Supreme Court, among others.

2. I work with the law firm of Motley Rice LLC, and my principal office is located in Mount Pleasant, South Carolina. Over the course of my legal career I have been extensively involved in complex litigation starting in 1979 in the Asbestos litigation. Among some of the more significant cases I have been involved in are the Tobacco Litigation representing Attorneys General where I served as Lead Negotiator for the Settling States, groundbreaking asbestos cases of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and I served on the Asbestos Creditor's Committee and/or Trust Advisory Committee in the bankruptcy cases of asbestos defendants Armstrong World, Federal Mogul, Johns Manville, Celotex, Garlock, WR Grace, Babcock& Wilcox, US Gypsum, Owens Corning, Pittsburgh Corning. In most if not all of the bankruptcy committees my function was to be extensively involved in the resolution and negotiations. For further detail about my background please see the attached bio.

3. In the *Deepwater Horizon* litigation Plaintiffs' Steering Committee ("PSC") member Calvin F. Fayard, Jr. was appointed by Co-Liaison Counsel at the outset to explore and pursue potential opportunities to resolve some or all of the litigation. In the Fall of 2010 Mr. Fayard contacted me asking if I would work with him in exploring resolution for some or all of the BP MDL2179 litigation. I accepted Mr. Fayard's invitation upon

approval of the PSC leadership and assurance that we would be acting on behalf of the entire PSC and began working with him.

4. Over the course of the next 5 months Mr. Fayard and I set out to set the stage and prepare for negotiations. We held numerous meetings and participated in numerous phone conferences with all involved in the massive litigation, including representatives of the party defendants, PSC members, private attorneys, public officials, GCCF leadership and staff, court representative, and others. By way of example, we met with Special Master McGovern, Ken Feinberg and members of his GCCF staff, the leadership of the PSC, many of the PSC individual attorneys, we attended working sessions of the PSC Science subgroup, Damages subgroup, Trial Preparation subgroup, and general PSC working sessions and strategy meetings. We met with and reviewed the case with the many expert witnesses including Science, Seafood, and Accounting experts. We met with former executives with companies similar to BP. We reviewed the pleadings that had been filed and Orders of the Court. We met with Insurance Counsel working with the PSC to explore the defendants' available insurance, and we met with experts who had been retained by the GCCF to review the work they had done. We reviewed the transcripts from the Senate Homeland Security and Government Affairs Subcommittee meetings, Coast Guard and other public records.

Throughout this period of preparation and investigation Mr. Fayard and I were focused on determining what the real needs of the claimants were and what their ability was to provide proof of their losses, what evidence had been generated and was available

concerning the extent of damage, the types and nature of damage, and all other items that were relevant to preparing for a resolution of the case.

5. During the Spring of 2011 we began to solidify an approach to resolution that would comply with the instructions we had received from the PSC. Our goal was to achieve a court supervised resolution that was claimant-friendly, transparent, neutral, fair, and provided effective communication with Claimants that would provide economic recovery for the Claimants in a timely fashion, giving due consideration to the rulings of the Court and the facts as we knew them.

6. From the beginning of the process Mr. Fayard and I established the principle that we would negotiate this settlement by proceeding from the needs and requirements of each category of economic loss Claimant and develop tools within the settlement to best enable each Claimant to maximize their recovery by demonstrating their economic loss in ways that were most appropriate for the damage category. We recognized that while there were common principles affecting all members of the economic class, the proof and recovery of damages was not a one-size-fits-all standard and we were intent to develop significant optionality for a claimant in proving not only causation but documenting their loss and calculating the compensation.

7. During the Spring of 2011 we began to reach out to the various defendants and held preliminary meetings with their corporate representatives to explore the possibility of entering good faith settlement negotiations. In addition to Mr. Fayard, Attorney Wanda Edwards was involved from Fayard & Honeycutt, and Fred Baker, John Baden, Lisa

Saltzburg, and Rebecca Deupree were involved from Motley Rice in doing the investigative work and early formation of a plan of resolution. By June of 2011 we reached a general comfort level with BP's counsel that they were prepared to explore potential resolution.

Defendants other than BP were reluctant to engage in settlement discussions. Thus we narrowed our focus to BP.

The major hurdle for Mr. Fayard and me in the beginning was to establish our credibility and our and the PSC's ability to deliver a unified settlement on behalf of the plaintiffs. Likewise, Mr. Fayard and I had a duty to confirm that we would be dealing with the appropriate representatives of BP.

8. To be certain we were dealing with the appropriate persons and had the attention of the top level management of BP Mr. Fayard and I traveled to London in early June to observe depositions and to meet with the representatives of BP. During the June 2011 trip to London we met with Rupert Bondy, General Counsel of BP, Jim Neath, Head of Litigation Worldwide for BP, and attorneys with Kirkland & Ellis LLP. Mr. Fayard and I wanted to be certain we were dealing with the appropriate representatives from BP and that they had the authority on behalf of the Board to enter good faith settlement discussions. At the conclusion of the June meetings we had the assurances from Mr. Bondy that BP was entering the negotiations in good faith to seek to reach a reasoned resolution and that while Mr. Neath had authority, any and all final agreements were subject to General Counsel and Board approval.

At those preliminary meetings we established a settlement class action as the most appropriate way to proceed in our discussions.

For the next month we worked in the United States with attorneys for BP to lay out the framework of a potential class action and to exchange underlying information on the history of the filings and information available about payments.

9. On June 29, 2011, Mr. Fayard and I returned to London where we again met with Mr. Bondy to make certain we were continuing to deal with the appropriate people and that they understood the concepts of the class action we were proposing.

10. In July of 2011 settlement negotiations began in earnest to develop the detailed framework which would ultimately lead to the class actions pending before the Court. Throughout the process we were cautious to avoid any negotiations that would create inner class allocation conflicts.

In the Summer of 2011 as the negotiations picked up their intensity we separated the discussion and the negotiating parties of the Economic Loss Class and the Medical Class. The Medical Class negotiations were led initially by Fred Baker and Wanda Edwards. They were subsequently joined by PSC members Robin Greenwald and Matt Lundy. That core group, with assistance from their offices, became the lead negotiators for the Medical Class. While PSC leadership, Mr. Fayard, and myself maintained constant communication with them to be certain that any common issues were being coordinated, the details of the Medical Class were negotiated by the separate group.

11. Early in the process we determined that once we separated the Economic Loss Claims from the Medical Claims, there would be no necessity to create cumbersome sub-classes within the Economic Loss Class since we were approaching the settlement on a Category by Category level with no economic cap.

12. From July of 2011 through the end of 2011 meetings were held several days each week at locations throughout the United States to continue to build the framework of the resolution.  During this process Mr. Fayard and I would bring different members of the PSC to meetings depending on the topic that was being discussed.  Persons who participated included by way of illustration but not limitation, Jim Roy, Steve Herman, Rhon Jones, John Tomlinson, Wanda Edwards, Caroline Fayard, Robin Greenwald, Elizabeth Cabraser, Matt Lundy, Phil Cossich, John Baden, and as needed other representatives from the Motley Rice law firm.  As the framework of the settlement began to solidify and the negotiations moved to a more intense level, the sessions were held principally in New Orleans.  Once we began meeting in New Orleans in late 2011 and early 2012, Magistrate Judge Shushan became extensively involved in overseeing and mediating the discussions.

13. Throughout the discussions we approached the resolution of claims on a category by category basis.  We looked at the types of losses that were incurred and we worked to negotiate a framework to establish the causation, the documentation requirements to prove the loss, and the compensation formula that would be applied to determine the amount of the loss.  The PSC never seriously entertained discussion about capping the recovery of any individual claimant or group of claimants prior to the Spring of 2012

when the Seafood Program was developed. BP made it clear that they valued closure and therefore would pay a premium to Class Members in exchange for a class-wide release and would add additional benefits that were class-wide benefits. Those benefits included among other things, the application of the Risk Transfer Premium, the Marketing Fund, the adoption of a claimant-friendly mandate directive for the Claims Administrator, splitting causes of actions, an administrative process completely funded by BP, and other items that appear in the Settlement Agreement.

14. During the negotiations the parties presented arguments involving the application of punitive damages, pre-judgment interest, consequential damages, nuisance damages, and other potential elements of recovery. As a result of all of these arguments the parties developed the concept of the Risk Transfer Premium that was implemented to provide for known and unknown, present and future, risk and damages, including punitive damages, other than specific damages laid out in the compensation model.

15. Throughout the negotiation process Mr. Fayard and I continued to stay in constant communication with the leadership of the PSC and with the various attorneys working on the PSC. We continued to be updated periodically by the Science Committee, Discovery Committee, Trial Committee, Damage Committee, and the Seafood Committee. We continued to receive updated information from experts retained by the PSC, and review all relevant pleadings and key documents presented.

16. These negotiations were extremely contentious, tough, hard-fought, but done with respect to the victims, the parties, and the counsel involved.

> During the negotiations we decided to limit the membership in the Class to individuals or entities that lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, performed their full-time services while physically present in, or owned or leased or worked on a vessel harbored or home ported in the Gulf Coast Areas at any time from the date of the Spill until we concluded the settlement negotiations. This allowed us to maintain a cohesive group of Class Members who presented the common elements that could lead to a resolution.

17. By the Spring of 2012 we had reached agreement in principle on each of the Categories of damages and began to develop the entire Settlement Agreement as one document.

    During this process we addressed the issues related to opt outs, exclusions, transition, administration, and ultimate drafting of the document. Over the course of approximately two months the drafting took place with assistance from numerous members of the PSC and attorneys working on their staff. We continued to consult with experts on these issues and continued to receive the able mediation assistance of Magistrate Judge Shushan. On March 2, 2012, Mr. Fayard, Mr. Roy, Mr. Herman, and I made a presentation to all members of the PSC on the complete details of the settlement. There had been previous meetings, but the purpose of this meeting was to get final sign-off from all members of the PSC on the Agreement In Principle. After several hours of presentation and discussion, Mr. Roy received verbal confirmation from each member of the PSC that they fully and completely supported entering into the Economic and Property Damage Class Action Settlement. This was followed by a written vote confirming the same.

At the same meeting Robin Greenwald made a presentation concerning the Medical Class Action and again, Mr. Roy received complete verbal confirmation from all members of the PSC that they were fully supportive of the Medical Class Action, and this was followed by a written vote confirming the same.

18. After receiving unanimous approval from the PSC the PSC and the BP attorneys and corporate representatives worked together to reduce all agreements to the final Settlement Class Actions filed with the Court on April 18, 2012.

Signed under penalty of perjury, this 10th day of August, 2012, in Mount Pleasant, South Carolina.

_____
JOSEPH F. RICE

# Joseph F. Rice
**FOUNDING MEMBER**



Motley Rice co-founding member Joe Rice is recognized as a skillful and innovative negotiator of complex litigation settlements. As lead private counsel for 26 jurisdictions, including numerous State Attorneys General, he played a central role in crafting the landmark Master Settlement Agreement, the largest civil settlement in U.S. history, in which the tobacco industry agreed to reimburse states for smoking-related health costs. Over the past two decades, Joe has also been recognized for his role in structuring some of the most significant resolutions of asbestos liabilities on behalf of victims injured by asbestos-related products.

Joe has held leadership and negotiating roles involving the bankruptcies of several large organizations, including AWI, Federal Mogul, Johns Manville, Celotex, Garlock, W.R. Grace, Babcock & Wilcox, U.S. Gypsum, Owens Corning and Pittsburgh Corning. He remains a key player in developing and negotiating the structured settlements of asbestos manufacturers emerging from bankruptcy and has worked on numerous Trust Advisory Committees.

Currently, Joe directs the Motley Rice securities litigation team in securities fraud litigation, shareholder derivative cases and actions against proposed merger and acquisition transactions. He is sought after by investment funds for guidance on strategies to increase shareholder value and enhance corporate governance reforms and asset recovery through litigation. He also serves on the Plaintiffs' Steering Committee for the Deepwater Horizon oil spill MDL *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010. A*s a lead negotiator, he helped reach the two settlements with BP that were granted preliminary approval on May 2, 2012, one of which is the largest civil class action settlement in U.S. history.

Joe continues to negotiate on behalf of the firm's clients in anti-terrorism and human rights, environmental, drugs, devices and catastrophic injury cases. He held a crucial role in executing the strategic mediations and/or resolutions in more than 50 aviation liability and damages cases against multiple defendants on behalf of families of the victims of the 9/11 attacks who opted out of the Victim Compensation Fund. In addition to providing greater answers, accountability and recourse to victims' families, the resulting settlements shattered a settlement matrix developed and utilized for decades, and the litigation helped provide public access to evidence in an archive of selected discovery materials gathered in the litigation.

A frequent guest speaker, Joe has presented as numerous conferences and seminars nationwide, including the National Asbestos Litigation Conference, the National Conference on Public Employee Retirement Systems, the Public Funds Summit, Class Action Settlements: Approval, Distribution and Oversight Workshop and several asbestos bankruptcy and complex litigation conferences.

Described as one of the nation's "five most feared and respected plaintiffs' lawyers in corporate America" in a poll of defense counsel and legal scholars conducted by *Corporate Legal Times*, Joe was cited time after time as one of the toughest, sharpest and hardest-working litigators they have faced. As the article notes, "For all his talents as a shrewd negotiator ... Rice has earned most of his respect from playing fair and remaining humble." Joe was a 2012 recipient of the *SC Lawyers Weekly* Leadership in Law Award. In 2011, the University of South Carolina School of Law Alumni Association honored him with its platinum Compleat Lawyer Award, and he was highlighted in the 2011 and 2012 Litigation editions of *The Legal 500 United States* (mass tort and class action: plaintiff representation- toxic tort). The inaugural 2012 edition of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized Joe as a "Litigation Star" in its national rankings for mass torts/products liability, as well as its South Carolina rankings in environmental, mass tort and products liability. Recognized as an AV® rated attorney by Martindale-Hubbell®, he has been named to each annual edition of *The Best Lawyers in America*® since 2007 and was selected by his peers for inclusion in the 2012 edition for his work in mass tort litigation/class actions-plaintiffs. He has been included in every edition of *South Carolina Super Lawyers*® since 2008 and, in 2010, was named by The National Trial Lawyers as one of its *Top 100 Trial Lawyers*™ in South Carolina. *The American Lawyer* described Joe in 2006 as "one of the shrewdest businessmen practicing law."

In 1998, Joe received the President's Award of the National Association of Attorneys General. In 1999 and 2000, he served on the faculty at Duke University School of Law as a Senior Lecturing Fellow, and he has taught classes at the University of South Carolina School of Law, Duke University School of Law and Charleston School of Law on the art of negotiating. Joe serves his community through several organizations, including First Tee of Greater Charleston, the Center for Birds of Prey and the Dee Norton Lowcountry Children's Center, for which he co-chaired the inaugural Campaign for the Next Child. In 2010, MUSC Children's Hospital honored Joe with its Johnnie Dodds Award for his longtime support of its annual Bulls Bay Golf Challenge Fundraiser and continued work on behalf of our community's children. The University of South Carolina awarded Joe and his family with its 2011 Garnet Award for their passion for and devotion to Gamecock athletics. Joe was also awarded the 2011 Tom Fazio Service to Golf Award in recognition of his efforts to help promote the SC Junior Golf Association Programs.

He is a member of the American Association for Justice, American Bar Association, American Inns of Court, South Carolina Association for Justice and the American Constitution Society for Law and Policy.

\* *The Best Lawyers in America® 2012 (Copyright 2011 by Woodward/White, Inc., of Aiken, S.C.)*

**"EXHIBIT A"**  Page 2 of 2