## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179 <br><br> SECTION J <br><br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br><br> BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., <br><br> Defendants. | * * * * * * * * * * * * * * | Civil Action No. 12-970 <br><br> SECTION: J <br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF JOSEPH F. RICE
## RE:  SEAFOOD PROGRAM

I, JOSEPH F. RICE, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of South Carolina and in the District of Columbia. I am admitted to appear before the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court, among others.

2. I work with the law firm of Motley Rice LLC, and my principal office is located in Mount Pleasant, South Carolina. Over the course of my legal career I have been extensively involved in complex litigation starting in 1979 in the Asbestos litigation. Among some of the more significant cases I have been involved in are the Tobacco Litigation representing Attorneys General where I served as Lead Negotiator for the Settling States, and the groundbreaking asbestos cases of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). I served on the Asbestos Creditor's Committee and/or Trust Advisory Committee in the bankruptcy cases of asbestos defendants Armstrong World, Federal Mogul, Johns Manville, Celotex, Garlock, WR Grace, Babcock& Wilcox, US Gypsum, Owens Corning, and Pittsburgh Corning. In most if not all of the bankruptcy committees my function was to be extensively involved in the resolution and negotiations. For further detail about my background please see the attached bio.

3. In the *Deepwater Horizon* litigation Plaintiffs' Steering Committee ("PSC") member Calvin F. Fayard, Jr. was appointed by Co-Liaison Counsel at the outset to explore and pursue potential settlement opportunities. In the Fall of 2010 Mr. Fayard contacted me about the potential to work with him in exploring a resolution for some or all of the BP MDL2179 litigation. I accepted Mr. Fayard's invitation upon approval of the PSC

leadership and assurance that we would be acting on behalf of the entire PSC and began working with him.

4.  In developing the standards and application of the rules to be applied in Seafood we began by reviewing all of the available data concerning the history of revenue production from the seafood harvesting in the Gulf of Mexico, including but not limited to materials and data from Congressional proceedings and from federal government agencies such as the U.S. Department of Commerce, including the National Marine Fisheries Service ("NMFS") of the National Oceanic and Atmospheric Administration ("NOAA"), materials and data prepared by and/or for state government agencies such as the Louisiana Department of Wildlife and Fisheries, literature and studies concerning the fisheries in and around the Gulf of Mexico, including but not limited to Gulf States Marine Fisheries Commission ("GSMFC") reports, materials and data relating to and/or developed by the GCCF.  In doing so we reached a general comfort level with the historical revenue derived from the study of the NOAA data.  When I use the terms "Seafood" or "Seafood Harvesting Claimants" I mean the seafood industries and businesses and individuals ultimately included in the Seafood Compensation Program. These are commercial fishermen, boat captains, vessel owners and lessees, oyster leaseholders, IFQ holders and seafood crew.  The industries included are shrimp, oyster, finfish, blue crab and other seafood with the exception of menhaden.

5.  In negotiations with BP we initially made demands that followed a categorization similar to the Business Economic Loss models.  However during these negotiations it became

apparent that the parties saw the future risk of injury on the harvesting of Seafood

dramatically different and had different approaches to developing model methodologies.

After weeks of negotiations back and forth on potential resolutions, we were presented

with the opportunity to negotiate a guaranteed lump sum payment of a fixed amount of

money to this category of claimants.  Upon fully analyzing the implications of that fund,

we determined that fund would provide much greater compensation to the claimants than

they would be able to establish using the Federal Rules of Evidence, the Court's rulings,

and the application of OPA and maritime law.  After consulting with all members of the

Plaintiffs' Steering Committee involved in representing Seafood Harvesting Claimants,

representatives of the Seafood Harvesting industries that would be eligible for

compensation from the fund, and experts, we agreed to establish a $2.3 billion guaranteed

payment by BP to Seafood Harvesting Claimants, including the vessels, the Boat

Captains, and the Deckhands.  This fund would require BP to remain responsible for a to-

be-agreed-to percentage of persons that might opt-out of the Class and those opt-outs, if

they occurred, would not reduce the fund.  In addition, the fund would be paid regardless

of the number of persons who participated in the Class Action.

6. The total $2.3 billion Seafood Compensation Program Amount will be unaffected by Opt

Outs up to: (1) 15% of all potential claimants with claims under Category III of the

Seafood Crew Compensation Plan, and/or (2) 17.5% of all potential claimants with

claims under the Shrimp Compensation Plan, Oyster Compensation Plan, Finfish

Compensation Plan, Blue Crab/Other Seafood Compensation Plan and Categories I and II

of the Seafood Crew Compensation Plan. In the event that these percentages are

exceeded, BP will get a credit for what the additional Opt Outs would have received under the Seafood Compensation Program, as determined by the Court-appointed neutral.

7. In evaluating the appropriateness of the compensation fund we determined that with a $2.3 billion fund the historical average gross dollars paid into the harvest of Seafood throughout the Gulf of Mexico, including application of half of the Seafood landed in the State of Texas, could be paid would be roughly five times the historical average gross dollars in revenue generated by Seafood harvesting in the areas of the Gulf of Mexico covered by the Program.  In addition, we focused on all available data concerning the percentage of revenue and harvest lost as recorded by the state reporting agencies and the federal reporting agencies for 2010 and subsequently for 2011.  We requested and received from the GCCF general information concerning the volume of Seafood related claims paid by the GCCF, and confirmation that in excess of $700 million had been paid in the claims which from the information available appeared to meet the definitions within our Seafood Compensation Program.

8. The amount of compensation for a Claimant is determined by applying the terms of the applicable provisions of the Seafood Program.  Any prior payments made to the Claimant by the GCCF or BP for the same loss are then deducted prior to the Seafood Program paying the Claimant.  If it is ultimately determined that $350 million (approximately 50% of the previous payments made by the GCCF) were for claims that are now being compensated by the Class, then that $350 million would be part of the total economic recovery for these Seafood Harvesting Claimants under the Program.  So the total

economic recovery paid to the Class Claimants participating in the Settlement Program would be $2.65 billion.

9. Once the parties reached agreement on the establishment of the $2.3 billion Seafood Compensation Fund, the PSC asked the Court to appoint a neutral party to oversee the allocation of the Seafood Fund. The Court appointed John Perry as a neutral to establish the allocation model. From the date of Mr. Perry's appointment until the time of the preliminary hearing the parties worked with Mr. Perry and his law partner, Mr. Balhoff, to provide all information requested and all data available to allow them to determine a reasoned allocation of the Seafood compensation amount.

Signed under penalty of perjury, this $\underline{16}$ day of August, 2012, in Mount Pleasant, South Carolina.

_____
JOSEPH F. RICE

# Joseph F. Rice

**FOUNDING MEMBER**



Motley Rice co-founding member Joe Rice is recognized as a skillful and innovative negotiator of complex litigation settlements. As lead private counsel for 26 jurisdictions, including numerous State Attorneys General, he played a central role in crafting the landmark Master Settlement Agreement, the largest civil settlement in U.S. history, in which the tobacco industry agreed to reimburse states for smoking-related health costs. Over the past two decades, Joe has also been recognized for his role in structuring some of the most significant resolutions of asbestos liabilities on behalf of victims injured by asbestos-related products.

Joe has held leadership and negotiating roles involving the bankruptcies of several large organizations, including AWI, Federal Mogul, Johns Manville, Celotex, Garlock, W.R. Grace, Babcock & Wilcox, U.S. Gypsum, Owens Corning and Pittsburgh Corning. He remains a key player in developing and negotiating the structured settlements of asbestos manufacturers emerging from bankruptcy and has worked on numerous Trust Advisory Committees.

Currently, Joe directs the Motley Rice securities litigation team in securities fraud litigation, shareholder derivative cases and actions against proposed merger and acquisition transactions. He is sought after by investment funds for guidance on strategies to increase shareholder value and enhance corporate governance reforms and asset recovery through litigation. He also serves on the Plaintiffs' Steering Committee for the Deepwater Horizon oil spill MDL *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010. A*s a lead negotiator, he helped reach the two settlements with BP that were granted preliminary approval on May 2, 2012, one of which is the largest civil class action settlement in U.S. history.

Joe continues to negotiate on behalf of the firm's clients in anti-terrorism and human rights, environmental, drugs, devices and catastrophic injury cases. He held a crucial role in executing the strategic mediations and/or resolutions in more than 50 aviation liability and damages cases against multiple defendants on behalf of families of the victims of the 9/11 attacks who opted out of the Victim Compensation Fund. In addition to providing greater answers, accountability and recourse to victims' families, the resulting settlements shattered a settlement matrix developed and utilized for decades, and the litigation helped provide public access to evidence in an archive of selected discovery materials gathered in the litigation.

A frequent guest speaker, Joe has presented as numerous conferences and seminars nationwide, including the National Asbestos Litigation Conference, the National Conference on Public Employee Retirement Systems, the Public Funds Summit, Class Action Settlements: Approval, Distribution and Oversight Workshop and several asbestos bankruptcy and complex litigation conferences.

Described as one of the nation's "five most feared and respected plaintiffs' lawyers in corporate America" in a poll of defense counsel and legal scholars conducted by *Corporate Legal Times*, Joe was cited time after time as one of the toughest, sharpest and hardest-working litigators they have faced. As the article notes, "For all his talents as a shrewd negotiator ... Rice has earned most of his respect from playing fair and remaining humble." Joe was a 2012 recipient of the *SC Lawyers Weekly* Leadership in Law Award. In 2011, the University of South Carolina School of Law Alumni Association honored him with its platinum Compleat Lawyer Award, and he was highlighted in the 2011 and 2012 Litigation editions of *The Legal 500 United States* (mass tort and class action: plaintiff representation- toxic tort). The inaugural 2012 edition of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized Joe as a "Litigation Star" in its national rankings for mass torts/products liability, as well as its South Carolina rankings in environmental, mass tort and products liability. Recognized as an AV® rated attorney by Martindale-Hubbell®, he has been named to each annual edition of *The Best Lawyers in America*® since 2007 and was selected by his peers for inclusion in the 2012 edition for his work in mass tort litigation/class actions-plaintiffs. He has been included in every edition of *South Carolina Super Lawyers*® since 2008 and, in 2010, was named by The National Trial Lawyers as one of its *Top 100 Trial Lawyers*™ in South Carolina. *The American Lawyer* described Joe in 2006 as "one of the shrewdest businessmen practicing law."

In 1998, Joe received the President's Award of the National Association of Attorneys General. In 1999 and 2000, he served on the faculty at Duke University School of Law as a Senior Lecturing Fellow, and he has taught classes at the University of South Carolina School of Law, Duke University School of Law and Charleston School of Law on the art of negotiating. Joe serves his community through several organizations, including First Tee of Greater Charleston, the Center for Birds of Prey and the Dee Norton Lowcountry Children's Center, for which he co-chaired the inaugural Campaign for the Next Child. In 2010, MUSC Children's Hospital honored Joe with its Johnnie Dodds Award for his longtime support of its annual Bulls Bay Golf Challenge Fundraiser and continued work on behalf of our community's children. The University of South Carolina awarded Joe and his family with its 2011 Garnet Award for their passion for and devotion to Gamecock athletics. Joe was also awarded the 2011 Tom Fazio Service to Golf Award in recognition of his efforts to help promote the SC Junior Golf Association Programs.

He is a member of the American Association for Justice, American Bar Association, American Inns of Court, South Carolina Association for Justice and the American Constitution Society for Law and Policy.

*\* The Best Lawyers in America® 2012 (Copyright 2011 by Woodward/White, Inc., of Aiken, S.C.)*