# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf of** | * | |
| **Mexico, on April 20, 2010** | * | **SECTION: J** |
| | * | |
| This filing relates to: | * | **JUDGE BARBIER** |
| *Cases in Pleading Bundle B1, and* | * | |
| *VoO Charter Dispute Cases.* | * | **MAGISTRATE SHUSHAN** |
| | * | |
| *  *  *  *  *  *  *  *  *  *  * | * | |
| | * | |
| *Bon Secour Fisheries, Inc., et al v.* | * | |
| *BP Exploration and Production, Inc.., et al* | * | |
| | * | |
| Civil Action No. 12-970 | * | |
| | * | |
| *  *  *  *  *  *  *  *  *  *  * | * | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF ECONOMIC AND PROPERTY DAMAGES CLASS SETTLEMENT

## **Introduction**

This class settlement is unique.

Unlike proposed mass tort classes which cannot be effectively litigated to conclusion, this settlement seeks to efficiently manage the claims arising from a single-source event, without the frequent accrual, exposure, statute of limitations, comparative fault, learned intermediary, choice-of-law or Seventh Amendment concerns.  Unlike proposed mass tort settlements which have thrown plaintiffs together in an uncertain contest for limited available funds, this class was negotiated at arms length on a claim-by-claim basis, and sets forth specific, detailed and objective frameworks for uncapped recovery by the plaintiffs.  Even with respect to the $2.3 billion Seafood Fund, a Court-appointed neutral set forth specific, detailed and objective frameworks for distribution in advance, while providing a procedural safeguard against potential intra-class conflict with respect to allocation.  Moreover, the unique legal requirements imposed on the BP Defendants by the Oil Pollution Act dictated, as a matter of policy, that some accelerated comprehensive settlement framework be implemented as an alternative to *seriatim* litigation.

While, arguably, a settlement framework could have been implemented outside of the class action context, the plaintiffs have benefitted greatly from the proposed structure.  First, BP was willing to pay a premium to the participating classmembers in exchange for the prospective class-wide release.  Second, the class was able to negotiate an assignment from BP while reserving their own punitive damages against third-party defendants, a doubly beneficial outcome that could not have been achieved on a piecemeal basis.  From a superiority standpoint, the class settlement structure establishes definitive deadlines, stipulations and other requirements, which help move the litigation towards finality.  And the class is afforded the benefit of formal Court supervision, approval, class representation, and the other safeguards and protections provided by Rule 23.

The common and strict liability imposed for the benefit of all classmembers under the Oil Pollution Act unites each and every classmember with a question whose answer is true with respect to each and every member of the Settlement Class.  The class is further united as to numerous factual issues regarding the underlying causes of the explosion and spill whose answers are the same for all classmembers with respect to the assigned and reserved third-party claims.  Moreover, the common and classwide legal interpretation of causation under OPA, as well as the largely overlapping bodies of economic and environmental evidence, establish cohesiveness among the classmembers even with respect to the somewhat individualized causation and damage issues, if tried.

From a substantive standpoint, the proposed settlement provides fair, reasonable and adequate relief.  The damage frameworks, developed at arms length over months of intense negotiations, under the supervision of the Court, and further informed by almost two years and seven billion dollars of experience with the GCCF, objectively quantify the damages suffered in 2010, and in most cases add to that base a "risk transfer premium" (RTP) multiplier, which further compensates the affected individuals and businesses for unknown effects, punitive damage exposure, the time value of money, and other residual uncertainties.  The members of the settlement class will receive additional individualized and collective benefits, including: reimbursement of reasonable claims preparation expenses; a $57 million Gulf Tourism and Seafood Promotional Fund; the class-wide assignment of BP's claims against Transocean and Halliburton; the satisfaction by BP of all common benefit costs and fees;  a Transocean insurance proceeds reserve fund;  and an express reservation of punitive damage claims against Transocean and Halliburton (as well as other Expressly Reserved Claims against BP).  These substantive benefits are implemented in an objective and transparent

way, through a Court-supervised and neutral Claims Administrator, with rights to formal reconsideration and appeal.  If any class member is dissatisfied with the settlement, he or she has the right to opt out.

For these reasons, and for the reasons set forth below, the Economic & Property Damages Settlement should be fully and finally approved by the Court.

# TABLE OF CONTENTS

**Page**

**Introduction**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Table of Contents**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**Table of Authorities**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

**Procedural Background**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Overview of Proposed Settlement**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       Background: The GCCF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       Structural and Procedural Protections Afforded by the Settlement. . . . . . . . . . . . . . . . . . . 9

       Protection Against Future Risks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       Basic Compensation Frameworks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       The Seafood Compensation Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       Appeal Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       Assignment and Other Class-Wide Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       Satisfaction of Class' Responsibility for Common Benefit Fees. . . . . . . . . . . . . . . . . . . 18

**Status and Progress of Claims Administration**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Notice Was Provided in Accordance with Rule 23 and the Due Process Clause**. . . . . . . . . 20

**The Settlement is Fair, Reasonable and Adequate**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       The Settlement is Free of Fraud or Collusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       The Complexity, Expense and Likely Duration of Litigation Demonstrate the
       Reasonableness and Superiority of the Class Settlement. . . . . . . . . . . . . . . . . . . . . . . . . 29

       Settlement was Reached at a Mature Stage of the Proceedings, with Phase I
       Discovery Complete, and on the Eve of the Scheduled Phase I Limitation Trial. . . . . . . 33

       The Probability of Success on the Merits is Reflected in the Terms of the Settlement. . . 34

       The Range of Possible Recovery is Reflected in the Settlement's Terms and Benefits. . 35

       The Opinions of Class Counsel, Class Representatives and Class Members
       Support Approval. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**The Economic and Property Damages Class Satisfies the Requirements of Rule 23(b)(3)**. . 38

       Numerosity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Typicality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Adequacy of Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Ascertainability of the Class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

The Common Issues Predominate Over the Individual Issues.. . . . . . . . . . . . . . . . . . 47

The Class Action is Superior to Other Methods for the Comprehensive
Determination and Resolution of Claims in this Litigation. . . . . . . . . . . . . . . . . . . . . 48

**The Proposed Common Benefit Fee Structure Further Enhances the Benefits of the
Settlement to the Class.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**Certificate of Service.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Altier v. Worley Catastrophe Response, LLC</u>, No.11-241, 2012 WL 161824
(E.D. La. Jan. 18, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

<u>Amchem Products v. Windsor</u>, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). . . . 45, 47

<u>Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.</u>, 211 F.R.D. 457 (S.D. Fla. 2002). . . . . . . . . 33

<u>Ayers v. Thompson</u>, 358 F.3d 356 (5th Cir. 2004),
*cert. denied*, 543 U.S. 951 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36

<u>Billiteri v. Securities Am., Inc.</u>, No.09-1568, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011). . . 32

<u>Castano v. American Tobacco</u>, 84 F.3d 734 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 47-48

<u>Cobell v. Salazar</u>, 679 F.3d 909 (D.C. Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

<u>Cotton v. Hinton</u>, 559 F.2d 1326 (5th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 36, 37

<u>DeBremaecker v. Short</u>, 433 F.3d 733 (5th Cir. 1970) (per curiam). . . . . . . . . . . . . . . . . . . . . . 47

<u>DeHoyos v. Allstate Corp.</u>, 240 F.R.D. 269 (W.D. Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 36

<u>Domingue v. Sun Elec. & Instrumentation</u>, No.09-682, 2010 WL 1688793
(M.D. La. Apr. 26, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Eatmon v. Palisades Collection LLC</u>, No.08-306, 2011 WL 147680
(E.D. Tex. Jan. 18, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008). . . . . 31-32

<u>Faircloth v. Certified Finance, Inc.</u>, No.99-3097, 2001 WL 527489
(E.D. La. May 16, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>Feder v. Elec. Data Sys. Corp.</u>, 429 F.3d 125 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 42, 43

<u>Hamilton v. First Am. Title Ins. Co.</u>, 266 F.R.D. 153 (N.D. Tex. 2010). . . . . . . . . . . . . . . . . . 43

<u>Heartland Payment Systems, Inc. Litigation (MDL No. 246)</u>, No.09-2046, 2012 WL 948365,
2012 U.S. Dist. LEXIS 37326 (S.D. Tex. March 20, 2012). . . . . . . . . . . . . . . . . . . . 41

In re Catfish Antitrust Litig., 939 F.Supp. 493 (N.D. Miss. 1996). . . . . . . . . . . . . . . . . . . . . . . . 26

In re CertainTeed Roofing Shingle Prods. Liab. Litig., 269 F.R.D. 468 (E.D. Pa. 2010). . . . . . . 21

In re Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047, 2012 WL 92498
        (E.D. La. Jan. 10, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 47

In re Combustion, Inc., 968 F.Supp. 1116 (W.D. La. 1997). . . . . . . . . . . . . . . . . . . . . . 33, 35, 36

In re Corrugated Container Antitrust Litig., 643 F.2d 195 (5th Cir. 1981). . . . . . . . . . . . . . 35, 36

In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110 (S.D.N.Y. 2009),
        aff'd sub nom. Priceline.com Inc. v. Silberman, 405 F.App'x 532 (2d Cir. 2010). . . . . . 26

In re Enron Corp. Secs. Litig., 529 F.Supp.2d 644 (S.D.Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . 42

In re Enron Corp. Secs., Derivs., & "ERISA" Litig., No. MDL-1446,
        2008 WL 4178151 (S.D. Tex. Sept. 8, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

In re Exxon Valdez, 229 F.3d 790 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34

In re Katrina Canal Breaches Litigation, 628 F.3d 185 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . 45

In re Mills Corp. Sec. Litig., 265 F.R.D. 246 (E.D. Va. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

In re OCA, Inc. Sec. & Derivative Litig., No.05-2165, 2008 WL 4681369
        (E.D. La. Oct. 17, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

In re Shell Oil Refinery, 155 F.R.D. 552 (E.D. La. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

In re Serzone Prods. Liab. Litig., 231 F.R.D. 221 (S.D. W.Va. 2005). . . . . . . . . . . . . . . . . . . . . 21

In re Train Derailment Near Amite La., No.1531, 2006 WL 1561470
        (E.D. La. May 24, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

In re U.S. Oil & Gas Litig., 967 F.2d 489 (11th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Warfarin Sodium Antitrust Litigation, 391 F.3d 516 (3d Cir. 2004). . . . . . . . . . . . . . . . . 47

In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig., 678 F.3d 409
        (6th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Int'l Union, United Auto., Aerospace & Ag. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

James v. City of Dallas, 254 F.3d 551 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Juris v. Inamed Corp., No.10-12665, 2012 WL 2681445, 212 U.S. App. LEXIS 13841 (11th Cir. July 6, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Kincade v. Gen. Tire & Rubber Co., 635 F.2d 501 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . 34

Klein v. O'Neal, 705 F. Supp. 2d 632 (N.D. Tex. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Maywalt v. Parker & Parsley Pet. Co., 67 F.3d 1072 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . 26

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . 40

Newby v. Enron Corp., 394 F.3d 296 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). . . . . . . . . . 45

Pettaway v. American Cast Iron Pipe Co., 576 F.2d 1157 (5th Cir. 1978). . . . . . . . . . . . . . . 29, 36

Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Priddy v. Edelman, 883 F.2d 438 (6th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Reed v. Gen. Motors, Corp., 703 F.2d 170 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . 27, 29, 36, 37

Rodriguez v. West Publ'g Grp., 563 F.3d 948 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 32, 33

Salinas v. Roadway Express, Inc., 802 F.2d 787 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . 33

San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio, 188 F.R.D. 433 (W.D. Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Smith v. Tower Loan of Miss., Inc., 216 F.R.D. 338 (S.D. Miss. 2003). . . . . . . . . . . . . . . . . . . 26

Sullivan v. DB Invs., Inc., 667 F.3d 273 (3d Cir. 2011), cert. denied, 132 S.Ct. 1876 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40, 46, 47, 50, 52

Turner v. Murphy Oil USA, Inc., 472 F.Supp.2d 830 (E.D. La. 2007). . . . . . . . . . . . . . . . . . . . . 34

Union Asset Mgmt. Holding A.G. v. Dell, 669 F.3d 632 (5th Cir. 2012). . . . . . . . . . 27, 29, 33, 47

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 180 L.Ed.2d 374 (2011). . . . . . . . . . . . . . . . 40

## Rules and Statutes

FED. RULE CIV. PRO. 23(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

FED. RULE CIV. PRO. 23(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

FED. RULE CIV. PRO. 23(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

OIL POLLUTION ACT OF 1990 ("OPA"), 33 U.S.C. §§ 2701, et seq.. . . . . . . . . . . . . . . . . . . . 7, 48

       33 U.S.C. §2705(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 48

       33 U.S.C. §§ 2713 and 2714. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## Other Authorities

MANUAL FOR COMPLEX LITIGATION, FOURTH, §21.12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

MANUAL FOR COMPLEX LITIGATION, FOURTH, §21.311. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

NEWBERG ON CLASS ACTIONS §1:112 (5th ed. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

NEWBERG ON CLASS ACTIONS §3:12 (5th ed. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

NEWBERG ON CLASS ACTIONS §3:13 (5th ed. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (American Law Institute 2010)
       §1.03.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-51

"Class Action Notice Pages" JUDGES' CLASS ACTION NOTICE AND CLAIMS
PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE (Federal Judicial Center 2010)
(posted on www.fjc.gov). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Procedural Background**

On April 20, 2010, a blowout, explosion, and fire occurred aboard the semi-submersible offshore drilling rig *Deepwater Horizon*, as it was engaged in drilling the Macondo Well on the Outer Continental Shelf off the coast of Louisiana.  This "*Deepwater Horizon* Incident" resulted in eleven deaths, multiple injuries, and a massive discharge of oil into the Gulf of Mexico that continued for approximately three months.[1]

This Court took early charge of the cases filed in this Judicial District, and, on August 10, 2010, the Judicial Panel on Multidistrict Litigation centralized all related actions in this District, and assigned them to this Court, pursuant to 28 U.S.C. §1407.[2]  Since that time, the Court has actively managed, as a centralized and coordinated litigation, Transocean's Limitation Action; the individual suits, class actions, and joinders filed in this District; and the cases filed throughout the federal system, and sent here, asserting claims (primarily under maritime law and the Oil Pollution Act) by and on behalf of those whose businesses, livelihoods, properties, and lives have been affected by the *Deepwater Horizon* Incident.

On October 19, 2010, the Court issued Pre-Trial Order No. 11 [Rec. Doc. 569], organizing the pleadings and categorizing the claims and issues by creating pleading bundles for various types of claims.  The "B1 bundle" encompasses all private claims for economic loss and property damage

---

[1]The Settlement Agreement defines the *Deepwater Horizon* Incident as "the events, actions, inactions and omissions leading up to and including (i) the blowout of the MC252 Well; (ii) the explosions and fires on board the *Deepwater Horizon* on or about April 20, 2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010; (iv) the release of oil, other hydrocarbons and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances; (v) the efforts to contain the MC252 Well; (vi) Response Activities, including the VoO Program; (vii) the operation of the GCCF; and (viii) BP public statements relating to all of the foregoing." Economic and Property Damages Settlement Agreement §38.43 [Rec. Doc. 6430-1].

[2]*See* In re Oil Spill By The Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 (MDL No. 2179), 731 F.Supp.2d 1352 (J.P.M.L. 2010).

[PTO 11, ¶III(B1)].  The PSC filed the original B1 Master Complaint on December 15, 2010 [Rec. Doc. 879], and a First Amended B1 Master Complaint on February 9, 2011 [Rec. Doc. 1128]. Numerous Defendants filed motions to dismiss, and, on August 26, 2011, the Court issued an Order and Reasons granting in part and denying in part these motions [Rec. Doc. 3830].[3]  BP thereafter answered the First Amended Complaint on September 27, 2011 [Rec. Doc. 4130].  Phase One of a multi-phase trial centered around Transocean's Limitation Action (No. 10-2771) was scheduled for February 27, 2012.[4]

In the 24 months since the JPML's centralization order, the parties have engaged in extensive discovery and motion practice.  They have taken over 300 depositions, produced approximately 90 million pages of documents, and exchanged more than 80 expert reports, on the intense and demanding schedule appropriately set by the Court to keep this massive litigation on course. Depositions were conducted on simultaneous multiple tracks, on two continents. Discovery was ably managed and kept on schedule by weekly discovery conferences before Magistrate Judge Shushan and by monthly status conferences held by the Court. The proceedings and rulings in the case were transparent to the parties and the public, and were posted on the Court's MDL No. 2179 website, www.laed.uscourts.gov/OilSpill/OilSpill.htm.

In February 2011, against the backdrop of intensive discovery and pretrial proceedings, the parties began to explore settlement opportunities.  Given the nature and extent of the claims, the mutually perceived need for ongoing judicial supervision, and the procedural due process protections

---

[3]These ORDER AND REASONS (8/26/2011) [Doc 3830] are reported at In re Oil Spill by the Oil Rig Deepwater Horizon, 808 F.Supp.2d 943 (E.D.La. 2011) and are referred to as the "B1 ORDER" herein.

[4]This trial has now, in light of the proposed BP settlement, been reset to commence on January 14, 2013.

unique to Rule 23, the class action was selected early on as the most appropriate structure for any comprehensive resolution.  Settlement discussions intensified in July 2011, thereafter occurring on an almost-daily basis.  In late 2011, Magistrate Judge Shushan became involved in the economic settlement negotiations, at the request of the parties and designation by the Court.   In all, over 145 day-long, face-to-face negotiation meetings took place, in addition to numerous phone calls and WebEx conferences.[5]

In negotiating the Settlement Agreement, the parties followed the same protocol for each type of claim:  rather than negotiating a total settlement figure for an aggregate class settlement, the parties determined, at arms length, the strength and value of each type of claim. Without regard to the potential total payout figures, the parties negotiated claims frameworks, programs, and processes, including the types of proof would be required for claimants to receive a settlement benefit, what categories of claims would be paid, whether certain claimants would benefit from causation presumptions, and how settlement benefits would be calculated. The negotiations were exclusively focused, from the outset, on producing claims frameworks that could be administered fairly, objectively, and consistently, based on the merits of the underlying claims.[6]

During this process, PSC members and other Plaintiffs counsel familiar with each of the claims were consulted by the negotiators to help ensure that the frameworks reflected the actual situations faced by people and businesses affected by the spill.  For example, attorneys representing seafood restaurants contributed to the development of the business economic loss framework, which

---

[5] *See* TRANSCRIPT (April 25, 2012) [Rec. Doc. 6395], p.83.

[6] *See generally* DECLARATION OF STEPHEN J. HERMAN *and* DECLARATION OF JOSEPH F. RICE (NEGOTIATIONS).

details the steps by which businesses recover for losses due to the spill.  So, too, did attorneys representing employees inform the development of the individual lost wages framework; attorneys representing wetlands owners; the property damage framework; attorneys representing homeowners, the real estate sales loss framework; and so on.[7]

With the exception of the Seafood Compensation Program, there is no limit or "cap" on the amount to be paid by BP under these frameworks.  Rather, all claims that meet the criteria will be paid in full.  Such claims will be paid without delay—claimants need not await final settlement approval for payment.  Claimants may submit claims in multiple categories to recover on all demonstrable losses arising from the *Deepwater Horizon* Incident.

The parties also negotiated the Seafood Compensation Program claims for an extensive period of time.  Initially negotiated as a group of open-ended frameworks, as described above, it became clear in late February that a guaranteed sum of $2.3 billion would best compensate the eligible participants for their losses and future risks of loss.  At the parties' suggestion, the Court appointed John W. Perry to act as a neutral to determine how the Fund should be allocated.[8]

On February 26, 2012, the literal eve of the Limitation and Liability Trial, the Court adjourned proceedings for one week, at the parties' request, to enable further progress on the settlement talks. [Rec. Doc. 5887]  On March 2, 2012, the Court was informed that the parties had reached an Agreement-in-Principle on the proposed settlements.  The Court adjourned Phase I of the

---

[7]*See generally* HERMAN DECLARATION *and* RICE DECLARATION (NEGOTIATIONS).

[8]The Order appointing Mr. Perry can be found at REC. DOC. 5998.  The detailed 85-page Seafood Compensation Program he developed can be found as EXHIBIT 10 to the ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT [Doc 6276-22] (amended at REC. DOC. 6415-5).

trial, because of the potential for realignment of the parties and potential changes to the trial plan. [Rec. Doc. 5955]

While work continued finalizing the details of the settlement, the Court entered, at the parties' request, an Order facilitating a transition from the Gulf Coast Claims Facility ("GCCF") to the Court Supervised Settlement Program, and appointed a Transition Coordinator and Claims Administrator [Rec. Doc. 5995].   On April 16, 2012, the PSC filed a new class action complaint to serve as the vehicle for the proposed Economic and Property Damage Settlement.  This action, *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al*., was amended on May 2, 2012 [Rec. Doc. 6412].  On April 18, 2012, the PSC and BP filed the proposed Economic Settlement [Rec. Doc. 6276] and Motions for Preliminary Approval and Class Certification [Rec. Docs. 6266, 6269, 6414], which were granted, after a multi-hour preliminary approval hearing conducted on April 25, 2012.[9]

## Overview of Proposed Settlement

The Proposed Settlement is designed to resolve claims by private individuals and businesses for economic loss and property damage resulting from the *Deepwater Horizon* Incident. To effectuate the settlement, the PSC seeks final certification of the "Economic Loss and Property Damage Settlement Class" for settlement purposes pursuant to Federal Rule of Civil Procedure 23(b)(3).  The detailed class definition consists of individuals and entities defined by (1) geographic bounds and (2) the nature of their loss or damage.[10]  If both criteria are not met, or the plaintiff opts

---

[9]*See* PRELIMINARY APPROVAL ORDER (May 2, 2012) [Doc 6418].

[10]*See* PRELIMINARY APPROVAL ORDER [Doc 6418], at pp. 4-10 "Overview of the Proposed Settlement." The full text of the Economic Class Definition is contained in, *inter alia*, the Preliminary

out, that individual or entity is not within the settlement class and the claims are completely unaffected by the Proposed Settlement.  Where a person or entity has multiple claims, some falling within the settlement and some falling outside of the settlement, only the former claims are included. In several cases, claims falling outside of the Proposed Settlement are Expressly Reserved.[11]

The geographic bounds of the settlement are Louisiana, Mississippi, Alabama, and certain coastal counties in eastern Texas and western Florida, as well as specified adjacent Gulf Waters, such as estuaries, inlets and bays.  Individuals must have lived, worked, owned property, leased property, etc., in these areas between April 20, 2010 and April 16, 2012.[12]  Similarly, entities must have conducted certain business activity in these areas between April 20, 2010 and April 16, 2012.[13]

The Proposed Settlement recognizes six basic categories of damage:

(1)     Economic Loss (including frameworks for individual loss of wages, business economic loss, multi-facility businesses, start-up businesses, failed businesses, and failed start-ups)

(2)     Property Damage (including frameworks for coastal property, wetlands, and realized sales losses)

(3)     Vessel of Opportunity ("VoO") Charter Payment Claims

(4)     Vessel Physical Damage and Decontamination

(5)     Subsistence

(6)     Commercial Fishing Losses (*i.e.* the Seafood Compensation Program)

---

Approval Order, the long-form court-approved Class Notice sent to identifiable class members, Sections 1 and 2 of the Settlement Agreement, the website of the Deepwater Horizon Court-Supervised Settlement Program, and the Court's MDL 2179 website, www.laed.uscourts.gov/OilSpill/OilSpill.htm.

[11]*See generally,* SETTLEMENT AGREEMENT, §§ 3, 8.2.3 and 10.2.

[12]For individuals who worked on a vessel in the specified Gulf Waters, the date range is "after April 20, 2009."  Similarly, for "Seafood Crew" claims, the individual must have worked on a vessel that landed seafood in the specified Gulf Coast Areas "after April 20, 2009." SETTLEMENT AGREEMENT, §1.1.

[13]For entities owning, operating, or leasing a vessel that landed seafood in the specified waters, the date range is April 20, 2009 to April 16, 2012. SETTLEMENT AGREEMENT, §1.2.3.

Certain individuals, entities and claims are specifically excluded from the Proposed Settlement.[14]   Substantial claims are reserved to claimants, who can be compensated for their included claims under the Proposed Settlement while also preserving and pursuing the reserved claims outside of the Settlement Class.[15]   Class Members may submit multiple claims and receive compensation for multiple categories of damage.[16]

Background:  The GCCF

In the wake of the spill, BP had established the Gulf Coast Claims Facility ("GCCF") to satisfy its obligation as the "Responsible Party" under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701, *et seq*. ("OPA"), which was intended to provide a mechanism for compensating economic losses without the expense and delay of protracted litigation.[17]  As the Court noted in its February 2, 2011 order granting the plaintiffs' motion to supervise *ex parte* communications between BP and

---

[14]Exclusions from the Economic Class Definition are listed in Section 2 of the Settlement Agreement.  The economic loss claims of excluded categories of claimants, such as casinos, banks, real estate developers, and members of the oil and gas industry are complicated by economic and other factors in addition to the spill, such that fair compensation could not successfully be negotiated.  Class Counsel believe that the inclusion of their economic loss claims within the Proposed Settlement, either at a significantly discounted rate or with no compensation at all, would not have served such claimants, and would have compromised the prospects of the judicial approval to the detriment of the class as a whole.  The rights of these excluded claimants are unimpaired, as their economic loss claims may continue to be prosecuted in this litigation or elsewhere.

[15]For example, members of the Oil & Gas Service and Support Industry may make general economic loss claims under the Proposed Settlement, while their claims for "Moratoria" losses are Expressly Reserved.  Real Estate Developers cannot make economic loss claims under the Proposed Settlement, but they can make claims for Coastal or Wetlands Property Damages and for realized Sales Losses; while, at the same time, their general economic loss claims are Expressly Reserved. *See* SETTLEMENT AGREEMENT, §§ 2.2.4, 3, 8.2.3 and 10.2; EXCLUDED INDUSTRIES CHART (Ex. 16). (*See also,* INDIVIDUAL RELEASE (Ex. 26), §§ 1(s) and 18.)

[16]*See* SETTLEMENT AGREEMENT, §4.4.8.

[17]33 U.S.C. §2705(a) requires the Responsible Party to "establish a procedure for the payment or settlement of claims for interim, short-term damages."  On August 23, 2010, BP replaced its original claim process with the GCCF, which later expanded its interim "emergency payment" program into an extension of final offers in exchange for a full and comprehensive release.

putative class members, the Court has the responsibility "to ensure that the mandates of OPA are implemented" and to prevent "inaccurate, confusing, or misleading communications" to members of the putative class. ORDER AND REASONS (2/2/2011) [Doc 913], at pp. 7, 11-12; *citing,* FED. RULE CIV. PRO. 23(d); MANUAL FOR COMPLEX LITIGATION, FOURTH, §21.12.  At issue was the perception and dissatisfaction of many claimants that the GCCF was operating in an adversarial manner, rather than in the neutral and independent manner that it then advertised.

The Court, in its ruling, set the stage for the transformation of the GCCF into a fair, neutral, and transparent program to compensate spill-related claims:

> The Court encourages and commends any claims process that will fairly, quickly and effectively resolve claims in this litigation. Innovative and thoughtful procedures are to be encouraged. These procedures must, however, be fully transparent so that claimants can evaluate them properly.[18]

This judicial prescription set the tone and laid out the general requirements for an appropriate settlement framework, and the resulting Settlement's animating principles, and express provisions, include Court supervision, neutrality, transparency and effective communications with claimants. As the Court observed:

> Full disclosure concerning the relationship between the responsible party and the third party acting in accordance with OPA is consistent with the policy underlying other court-overseen claims resolution facilities — such as class actions or other settlement funds and bankruptcy trusts — and is consistent with the transparency policies of many defendants. The legitimacy of a third-party claims-resolution facility is derived in no small part from the claimants' ability to learn, comprehend, and appreciate how that facility is operated so that the claimants can fully evaluate the rationale behind the communications made to them by the facility. Full disclosure and transparency can insure that the reality of the operation of a third party will be consistent with any publicity concerning that entity. Full disclosure can also give protection to the responsible party from

---

[18] *See* ORDER AND REASONS, at p.8.

possible future legal attacks on the validity of the evaluation, payment, and release of claims.[19]

Just as the Court employed Rule 23(d) in the pre-certification phase of this litigation to protect the rights of claimants as putative class members, the Proposed Settlement, upon approval, vests these rights in a certified settlement class, that guarantees ongoing transparency, disclosure, fairness and responsiveness, by placing the claims operations within a detailed framework, under the ongoing supervision of the Court.

**Structural and Procedural Protections Afforded by the Settlement**

The Proposed Settlement sets forth a detailed series of objective frameworks and criteria, which were negotiated at arms length and are fully available to all potential class members.[20]   The Proposed Settlement is subject to ongoing Court supervision,[21] provides for an independent Claims Administrator,  and ensures that all class members will be treated fairly and consistently under the settlement frameworks:

> The Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and **faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class**....

Section 4.3.1 (emphasis supplied).

---

[19]*See* ORDER AND REASONS, at pp.7-8.

[20]The full text of the Settlement Agreement (including the Exhibits) is widely available to class members and the public, including on the Eastern District of Louisiana's MDL No. 2179 website, Class Counsel's website, and the Official Court Supervised Settlement Program website, www.deepwaterhorizonsettlements.com.

[21]*See* SETTLEMENT AGREEMENT, §4.4.7;  *see also,* §4.3.1 (Court appoints and directs the Claims Administrator); §4.3.4 (Court resolves any issues which cannot be resolved by the Administrative Review Panel); §6.6 (Court has discretion to review appeals); 18.1 (continuing jurisdiction of the Court).

The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes. **The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.**

Section 4.3.7 (emphasis supplied). *See also,* SETTLEMENT AGREEMENT, §4.3.8.

.... **The criteria, documentation, proof, and Compensation Amount provisions of each of the Claims categories shall apply equally to all Claimants** regardless whether they are proceeding individually, represented by others, or proceeding as an assignee of an individual Claim.

Section 4.4.7 (emphasis supplied).

An Economic Class Member who had a claim with the GCCF that was rejected or denied by the GCCF for any reason shall be treated like any other Economic Class Member submitting a Claim to the Settlement Program. Specifically, there shall be no negative inference or presumption of any kind as to the eligibility or right of any Economic Class Member to receive a Settlement Payment under the terms of the Settlement Agreement.

Section 4.4.9.  In addition, each class member who submits a claim is entitled to his or her file, including the forms, calculations and worksheets relied upon by the Settlement Program for the claims determination.[22]

The deadline for filing most claims with the Settlement Program is the later of April 22, 2014 or six months after the "Effective Date" of the Proposed Settlement.[23]  Claims submitted to the

---

[22]SETTLEMENT AGREEMENT, §§ 4.4.14 and 6.1.2.1.1.

[23]*See* SETTLEMENT AGREEMENT, §§ 5.11.8 and 38.60.  Due to some of the unique features under the frameworks established by the Court-appointed neutral, Claimants in the Seafood Compensation Program must submit their claim within 30 days of this Court's final approval order. *See* SETTLEMENT AGREEMENT, §5.11.9.

Settlement Program will be evaluated and processed by claims administration vendors pursuant to the detailed maps and frameworks for the various damage categories and procedures attached to the Economic Settlement as Exhibits 1A through 25.   The Proposed Settlement explains how compensation is determined and what documentation is required to support a claim.[24]   The Settlement Program also contains a formal Reconsideration and Appeal process, with Court-appointed panelists, and the discretionary right of the Court to review any appellate determination.[25]

The Proposed Settlement is different from many other class settlements in that payments are not delayed pending the Court's fairness hearing and final approval process. Once preliminary approval was given, the Settlement Program began to process claims and make settlement payments to class members who execute an individual release.

With the exception of the Seafood Compensation Program, (which includes a guaranteed $2.3 billion fund), there is no limit on the amount to be paid by BP.[26]   BP will also pay all administrative costs, including the costs of providing notice to the class.  Further, BP is responsible for satisfying the class members' common benefit fee obligations, and will reimburse claimants for accounting services required for the preparation and filing of their claims.  BP will additionally provide a $57 million Gulf Coast Tourism and Seafood Promotional Fund, an assignment of claims against Transocean and Halliburton, a Transocean insurance proceeds fund, and up to $5 million to fund a supplemental publicity campaign to be designed and administered by the PSC.

---

[24]*See generally,* SETTLEMENT AGREEMENT, §5 (and Exhibits cited therein).

[25]*See generally,* SETTLEMENT AGREEMENT, §6.

[26]The structure and sufficiency of the Seafood Compensation Fund and Program are discussed more fully *infra.*

**Protections Against Future Risks**

In addition to baseline compensation payments, most claims also will receive a Risk Transfer Premium (or "RTP"), which is a multiple enhancement of the baseline compensation.  RTPs range from .25 to 8.75, and are added to the baseline Compensation Amount, for an effective multiplier of 1.25 to 9.75 under the Proposed Settlement.[27]  The RTP enhancements are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, the liquidation of legal disputes about punitive damages, and other factors.

**Basic Compensation Frameworks**

In general, individual economic losses under the Proposed Settlement are calculated as the estimated difference between a claimant's expected earnings during May to December of 2010 and the claimant's actual earnings during that claim period.  To that base compensation amount is added any applicable RTP. Some individuals may also receive additional compensation for lost health insurance, pension benefits, and qualified training costs or qualified job search costs.  Causation is presumed for claimants in geographic proximity to the spill, and for many tourism and seafood category claimants, whose losses from the Incident are categorically more direct and less conjectural; other claimants must demonstrate that a loss is due to the oil spill based not on individualized, subjective, or inconsistent criteria, but on the objective criteria set forth in the Proposed Settlement.

For existing businesses, economic loss claims are generally determined using a two-step process. Step one calculates the value of the business's reduction in profit during a claimant-selected

---

[27] *See* RTP Chart (Ex. 15) [Doc 6276-33] and Seafood Compensation Program (Ex. 10) [Doc 6276-22].

loss period (any three or more consecutive months of the eight-month period following the spill).

Step two accounts for expected profits by estimating the business's growth trend along with a

general, economy-wide growth factor.  The sum of step one (loss calculation) and step two (expected

profit but-for the spill) results in the business claimant's base compensation amount.  This amount

is generally enhanced by an RTP and/or offset by prior payments received, depending on the type

of business and location.  Again, causation is presumed for some businesses, and must be shown for

others.  The Proposed Settlement includes additional or alternative frameworks for multi-facility

businesses, failed businesses, start-up businesses, and failed start-up businesses.

Claimants with eligible Coastal Real Property are compensated for loss of use and enjoyment

by multiplying the "2010 Applicable Property Tax" (defined as 1.18% of the County Appraised

Value) by 30%-45%, depending on the presence of oil and the environmental sensitivity of the

property.  This amount is enhanced by an RTP of 2.5.[28]  Additional compensation is available if

claimants establish physical damage from response operations.

Compensation schemes for Wetlands Real Property are based on whether parcels were

directly affected with oil.  Oiled parcels are paid a minimum of $35,000 per acre.  Where no oil was

observed, compensation is a minimum of $4,500 per acre.  Wetlands Real Property claims are

enhanced by an RTP of 2.5.

The Proposed Settlement also provides compensation for certain individuals and entities that

realized sales losses as a result of the spill. The compensation amount is 12.5% of the sale price.

---

[28]For example, if the County Appraised Value of a certain piece of property is $350,000, the
"Applicable Property Tax" is $4,130 [350,000 x .0118].  If this property falls into "Compensation
Category A2," the Applicable Property Tax is multiplied by 45%, for a base compensation of $1,859
[4,130 x .45].  After an RTP of 2.5 is added, the total compensation is $6,507  [1,859 + (2.5 x 1,859)].
*See* Coastal Real Property Framework, (Ex 11A), ¶ 2.G. [Rec. Doc. 6276-23].

Subsistence claimants — those individuals who fish, hunt, or harvest Gulf of Mexico natural resources, including seafood and game, in a traditional or customary manner and to sustain the basic dietary, economic, shelter, tool, or clothing needs of themselves and their families—are entitled to compensation for the total value of the subsistence natural resources that they lost due to the oil spill, plus an RTP enhancement of 2.25.

The VoO Charter Compensation provisions are intended to compensate all working VoO participants with 26 days of additional payments under the applicable rates provided in their charter agreements, while class members who executed charter agreements but were never formally dispatched will receive three days of compensation at the applicable charter rate.

Vessel owners whose vessels were physically damaged as a result of the oil spill or cleanup operations may recover the lesser of repair or replacement costs.

**The Seafood Compensation Program**

The parties attempted to negotiate separate frameworks for commercial fishing and oyster leaseholder claims at arms length for a number of months.  The lead negotiators for the plaintiffs frequently consulted with other attorneys, stakeholders and industry representatives to gain insight and achieve consensus and support for the models being discussed with BP.  While these frameworks, like the other settlement frameworks, were being negotiated within the context of an uncapped or "evergreen" structure, the plaintiff negotiators, through the course of these discussions, came to have a good understanding of the overall picture with respect to commercial fishing in the Gulf and the documented effects of the spill on the industry.

When, therefore, BP moved the discussion to a non-reversionary fund that would satisfy all class commercial fishing claims, the $2.3 billion that BP was willing to guarantee to the class was almost *five times* the entire revenue of annual catch landed in the Gulf Coast Areas, and significantly more than the total of the projected aggregate pay-outs under the separate shrimp, oyster harvester, oyster leaseholder and deckhand compensation models that were being discussed by the stakeholder contingencies.[29]  Given the negotiating dynamic, (in which Judge Shushan was participating as an active mediator), and the available evidence,[30] Class Counsel believed (and continue to believe) that a guaranteed $2.3 billion fund would provide significantly more compensation to the class than could be achieved under frameworks separately negotiated with BP.[31]

Out of an abundance of caution, and in order to prevent any claims of potential intra-class conflict, the parties asked the Court to appoint noted mediator, John W. Perry, Jr., to determine the allocation.

Mr. Perry's independent research and determinations lend further support to the conclusion that $2.3 billion is more than sufficient to fully and fairly compensate the classmembers participating

---

[29]"2.3 billion replaces the entire catch in affected areas of the Gulf of Mexico for seven years, buys a 15 year supply of fuel, ice and food for every affected vessel, and is 22 times the 2010 loss caused by the spill. Split fairly, the Seafood Program should be enough to protect fishermen even in the worst case situation, total fishery collapse." - Joel Waltzer, Statement to the Press, March 19, 2012. *See generally,* PLAINTIFFS' EXHIBIT A (*in globo*).

[30]The NOAA ALS data comparing averages for 2007-2009 with the average for 2010 and preliminary estimates for 2011 show a 16.5% decline in the volume of shrimp landings, a 23.85% decline in the volume of blue crab landings, a 34.39% decline in the volume of oyster landings, and a 14.66% decline in the volume of finfish landings.  The Seafood Program developed by Mr. Perry, by comparison, compensates the plaintiff for an annual 35% loss of shrimp and blue crabs, an annual 40% loss of oysters, and an annual 25% loss of finfish.  In terms of overall revenue, the Seafood Program would account for an approximate 480% loss to the industry, in annual terms. *See generally,* PLAINTIFFS' EXHIBIT A (*in globo*).

[31]*See* DECLARATION OF JOSEPH F. RICE (SEAFOOD PROGRAM) *and* HERMAN DECLARATION, ¶11.

Page 15

in the Seafood Program.[32]  Specifically, the Seafood Compensation Program frameworks, which are themselves conservative, are projected to pay out an initial amount of approximately $1.9 billion, in full and fair compensation to the relevant classmembers, leaving an approximate $400 million reserve.  In addition to this $400 million "head room":  (i) more than $700 million was already paid to commercial fishermen by the GCCF;  (ii) BP assumes full responsibility for up to 17.5% opt-outs;[33] and (iii) class members' punitive damage claims, as well as the BP-assigned claims, against Transocean and Halliburton are reserved.[34]

Within the Seafood Compensation Program frameworks developed by Mr. Perry, captains and vessel owners are generally awarded a base compensation amount derived from historical benchmark earnings, taking into account the vessel size and predetermined cost factors, price increases, and loss factors generally experienced by the relevant species.  With the exception of shrimpers who can elect an "expedited" (or "reduced expedited") lump sum payment, these base compensation amounts for captains and vessel owners are enhanced with substantial RTPs.  The Seafood Compensation Program also provides for a per-acre compensation payment to oyster leaseholders, and a separate formula to compensate holders of Individual Fishing Quota ("IFQ") shares.  Finally, the Program provides varying levels of compensation to crew members, based  on the level and quality of their supporting documentation.

---

[32]*See* DECLARATION OF JOHN W. PERRY, JR.; DECLARATION OF DANIEL J. BALHOFF; *see also,* PLAINTIFFS' EXHIBIT A (*in globo*).

[33]BP is responsible for up to only 15% of Category III Deckhands ("Seafood Crew").

[34]*See generally* PERRY DECLARATION; BALHOFF DECLARATION, HERMAN DECLARATION, ¶11, *and* RICE DECLARATION (SEAFOOD PROGRAM).

**Appeal Process**

Claimants have the right to appeal the denial of claims for insufficient documentation and to challenge any final determination made in their cases by the Settlement Program. (BP, in contrast, will be able to appeal only where an individual claimant is awarded more than $25,000 in base compensation.) Appeals will be decided using the so-called "baseball arbitration" method, where the appellate panel must select either the amount advanced by the claimant or the amount advanced by BP. All appellate panelists have been appointed by the Court from a list agreed upon by the parties.[35] If the amount at issue is more than $1 million in base compensation, an appeal will be considered by a three-member panel; in such an instance, at least one panel member must be from the claimant's home State.[36]

**Assignment and Other Class-Wide Benefits**

Under the Proposed Settlement, BP will pay all compensatory damages (including those that might be attributed to the fault of Transocean or Halliburton), but at the same time allow the plaintiffs to continue to seek punitive damage recoveries from Halliburton and Transocean.[37] BP, moreover, under the terms of the Proposed Settlement, assigns certain of its claims against Transocean and Halliburton to the Settlement Class.[38]

---

[35]*See* Rec. Doc. 6796.

[36]*See generally,* SETTLEMENT AGREEMENT, §6.

[37]SETTLEMENT AGREEMENT, §§ 3.6 and 10.2. The parties have agreed to a set of special rules to effectuate the parties' intent to allow the plaintiffs to seek exclusively punitive damages against Halliburton and Transocean, including the plaintiffs' agreeing not to seek compensatory damages from Halliburton or Transocean. *See* EXHIBIT 21 to the Settlement Agreement [Doc6276-39].

[38]BP, for example, assigns its claims against Transocean and Halliburton relating to the repair, replacement and/or re-drilling of the Macondo Well, the costs BP incurred to control the well and/or to clean up the spill, and for punitive damages. *See* EXHIBIT 21, ¶1.1.3.

BP is further responsible for all administrative costs, and the cost of providing notice to the class.  BP will provide a $57 million fund to promote tourism and seafood on the Gulf Coast,[39] and a fund of up to approximately $150 million in recoveries from Transocean insurance proceeds.[40]

## Satisfaction of Class' Responsibility for Common Benefit Fees

BP has agreed to pay an award for common benefit and/or Rule 23(h) attorneys' fees, as may be determined by the Court.  The parties began negotiating the $600 million cap only after there was agreement on all material terms of this Proposed Settlement and the Medical Benefits Proposed Settlement, having delivered an executed Settlement Agreement to the Court, and having received express authority from the Court to do so.[41]  In light of the agreement, the undersigned moved to modify the existing Hold-Back Order so that no payments made by and through the Settlement Program will be held back, reserved, or deducted from any payments to the Settlement Class [Rec. Doc. 6286].  By Order dated May 3, 2012, Interim Class Counsels' motion was granted, whereby it was made clear "that no Settlement Payments made by and through the Court-Supervised Settlement Program, or other benefits paid to or for the members of the Medical Settlement Class and/or the Economic Settlement Class . . . shall be 'held back,' reserved, or deducted from such payments or benefits" [Rec. Doc. 6528].

---

[39] *See* SETTLEMENT AGREEMENT, §5.13.

[40] *See* EXHIBIT 21, ¶1.1.4.2.

[41] *See* DECLARATION OF JOSEPH F. RICE (ATTORNEYS FEES), ¶5.

## Status and Progress of Claims Administration

To aid in the transition from the GCCF to the Court-Supervised Settlement Program, the Court appointed Patrick Juneau as the Claims Administrator.[42]  The Court further appointed (a) Lynn Greer as Transition Coordinator; (b) James Parkerson Roy and Stephen J. Herman as Interim Class Counsel;[43] and (c) John W. Perry, Jr. as neutral to preside over the design of the seafood program.[44]

Per the terms of the Settlement Agreement, the Court's Transition Order directed the Transition Coordinator to pay 60% of all unexpired GCCF offers without requiring a release.[45] Moreover, "[i]f the claimant receiving the 60% payment is a member of the proposed settlement class, the claimant has a right to additionally recover from the Court-Supervised Claims Program *the greater of*:  the remaining 40% of the GCCF offer, or the class settlement payment minus any amount previously paid by the Transition Process." TRANSITION ORDER [Doc 5995] at p.3 (emphasis supplied).  Hence, in no case will any class member who had an offer pending at the time of the settlement receive less than that class member would have recovered through the GCCF.

The Order also provided for the termination of the GCCF "Quick Pay" program on May 7, 2012, (later extended to June 11, 2012); provided for notice to all eligible participants;  and indicated that the transition process would terminate upon entry of preliminary approval.

---

[42]*See* TRANSITION ORDER [Doc 5995], at p.1; *see also,* Office of Court Appointed Administrator, Court Supervised Claim Program, Press Release, *available at* http://www.gulfcoastclaimsfacility.com/PressRelease -03-23-12.pdf (March 23, 2012).

[43]ORDER [Doc 5960].

[44]ORDER [Doc 5998].

[45]As the Court has noted, the Economic Settlement proposed for final approval is "somewhat unique from typical class action settlements in that claims will be paid pursuant to terms of the proposed Settlement before the Court grants final approval, provided the claimant executes a release." [Doc 6684]

As second transition order was entered on May 22, 2012, providing for the formal transfer of all GCCF claims to the Court-Supervised Settlement Program, subject to the existing Confidentiality Order (Pre-Trial Order No. 13).[46]

On June 4, 2012, the Court-Supervised Settlement Program commenced operation under Mr. Juneau as Claims Administrator.[47]   The Program employs over 1,500 people in nineteen Claimant Assistance Centers throughout the Gulf Coast Area, assisting class members and making claims determinations under the detailed protocols and claim forms derived from the Settlement Agreement.[48]  Claim Forms, Maps, FAQs, Court Orders, and other documents are readily available at the official Settlement Program Website, www.deepwaterhorizoneconomicsettlement.com. Information is provided in English, Spanish and Vietnamese.  Claims may be made in person, by mail or on-line.  The FAQs section includes 177 questions and answers, which are refined and supplemented on an ongoing basis.  Over 48,000 claims have been submitted to date, and over 2,000 determination letters have already been issued, totaling over $75,000,000 in recognized claims.

## Notice Was Provided in Accordance with Rule 23 and the Due Process Clause

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of the settlement pursuant to Rule 23(e), "notice of the class action must meet the requirements of

---

[46]ORDER REGARDING SETTLEMENT IMPLEMENTATION (5/22/2012) [Doc 6573].  An additional Confidentiality Order has since been entered making it clear that all individual claims information submitted to the Court-Supervised Settlement Program will be kept confidential. *See* ORDER (6/29/2012) [Doc 6822].

[47]*See* CLAIMS ADMINISTRATOR'S STATUS REPORT [Doc 6619].

[48]In addition, Class Counsel have established a physical office in New Orleans, with a toll-free number, website, and settlement questions e-mail address to provide additional guidance to classmembers.  And individual *pro bono* assistance is further available to qualified claimants under a grant to the Mississippi Center for Justice and affiliated Gulf Coast legal aid societies.

both Rule 23(c)(2) and Rule 23(e)."  In re CertainTeed Roofing Shingle Prods. Liab. Litig., 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord,* In re Serzone Prods. Liab. Litig., 231 F.R.D. 221, 231 (S.D. W.Va. 2005).  Where a class is certified pursuant to Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  FED RULE CIV. PRO. 23(c)(2).  The notice is required to state (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues or defenses; (4) that a class member may enter an appearance though an attorney if the member so desires; (5) that the court will exclude from the class any member who requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment under Rule 23(c)(3).  In this case, the notice protocol submitted jointly by the parties, approved by the Court at preliminary approval, and since implemented by the notice providers, complies with all requirements pertaining to both the manner of distribution and the contents of class notice.

The Settlement Agreement provides for both individual and media notice.  Thus, individual notice has been mailed to every plaintiff in any lawsuit that has been consolidated into the MDL and every plaintiff who has filed a short-form joinder into the B1 Master Complaint, as well as GCCF claimants, and other available lists of potential class members.  To ensure that no individuals are unintentionally omitted, all addresses are checked against the National Change of Address Database.  As of August 8, 2012, a total of 1,113,655 individual notices had been sent *via* postal mail, and 335,038 individual notices transmitted *via* e-mail.[49]

---

[49]*See* DECLARATION OF CAMERON R. AZARI, ESQ., ¶ 9.

Because "Rule 23 itself contemplates that current address information might not be available for all potential class members," Eatmon v. Palisades Collection LLC, No.08-306, 2011 WL 147680, at *4 (E.D. Tex. Jan. 18, 2011), the parties also agreed upon a massive, nationwide media effort that includes publication in (1) leading national consumer magazines, (2) trade, business, and specialty publications, (3) local newspapers; (4) African American, Vietnamese, Spanish, and Cajun language publications; (5) local television advertising; (6) local radio advertising; (7) online banner advertising; (8) an informational release; (9) a nationally televised public service announcement; and (10) a case website. The proposed plan is more than sufficient to comply with the dictates of Rule 23(c)(2)(B). *See, e.g.,* MANUAL FOR COMPLEX LITIGATION, FOURTH, §21.311 ("Publication in magazines, newspapers, or trade journals may be necessary if individual class members are not identifiable after reasonable effort or as a supplement to other notice efforts").

In addition to satisfying the distribution requirements, the proposed notice also satisfies the requirements pertaining to its contents. In compliance with Rule 23(c)(2)(B), in simple terms written in plain English. As the experts at Hilsoft Media and Kinsella Media concluded:

> The proposed notice states (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues or defenses; (4) that a class member may enter an appearance though an attorney if the member so desires; (5) that the court will exclude from the class any member who requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment under Rule 23(c)(3). *See also In re OCA*, 2008 WL 4681369,  at *15 (approving class notice where  the "plain language of the Notice apprises all class members of the nature of the action, the definition of the class, the class claims and the defenses, the class members' right to be heard, the class members' right to exclusion, the time and manner for requesting exclusion, and the binding effect of a class judgment") (citations omitted).

The requirements of Due Process are straightforward in the settlement context. Notice must only be "reasonably calculated, under all the circumstances, to apprise interested parties of the

pendency of the [settlement] and afford them an opportunity to present their objections." <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314 (1950); *accord*, *e.g.*, <u>Int'l Union, United Auto., Aerospace & Ag. Implement Workers of Am. v. Gen. Motors Corp.</u>, 497 F.3d 615, 629 (6th Cir. 2007).  Significantly, compliance with Rule 23(c)(2) itself can satisfy the Due Process Clause. *See* <u>In re Enron Corp. Secs., Derivs., & "ERISA" Litig.</u>, No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008).

Although the Economic Settlement is necessarily complex, since it must provide customized and detailed claims criteria and procedures to address the many categories of individual and business economic loss and damage resulting from the single-source *Deepwater Horizon* Incident, the parties and their notice experts were also mindful of the importance of clear and effective communication of the settlement's terms, benefits, and procedures; and all of the deadlines set by the Court for the conduct of the settlement approval process.  In this regard, the parties were guided not only by Rule 23 itself, and Due Process caselaw, but also by the helpful advice provided by the Federal Judicial Center in the Class Action Notice Pages of its website.[50]

The Settlement Notice Program was designed with the foregoing requirements of Rule 23, Due Process and judicially developed best practices in mind.  The heart of the notice program is a multi-media campaign that covers the entire United States, with a particular focus on the Gulf Coast region. The media notice effort includes publication in over 2,100 local and national newspapers, and nationwide publication in leading national consumer magazines, trade, business and specialty publications, local television, radio and newspapers in the Gulf Coast Areas, and online banner

---

[50]*See* <u>www.fjc.gov,</u> "Class Action Notice Pages" JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE (2010).

advertising. The campaign also includes individually mailed notice to class members (who have been identified from court filings, court records, and GCCF records), including to all those class members who filed short-form joinders as part of pre-trial preparation for the Limitation Trial. To the extent that records indicate that individual class members are represented by counsel, individual notice has also been mailed to their attorneys.

The parties are making available multiple channels through which class members can learn more about the settlement. The settlement administrator has established a toll-free number staffed by representatives who field class members' questions and help them through the claims process. The administrator has also established a comprehensive notice and claims website through which class members can learn about the settlement, submit their claims online, and check their claim status. The settlement web address is included in all notice materials.

This notice campaign has been designed and implemented to stand as one of the most comprehensive and elaborate notice programs in litigation history.  Significantly, notice expert Cameron Azari estimates that 95% of the adults in the Gulf Coast has been exposed to class notice materials on average 10.3 times, and 83% of U.S. adults will be exposed on average 4 times each.[51]

In addition to the formal notice program, Class Counsel have put on nine free full-day seminars to almost 2,000 attorneys and accountants across the Gulf Coast Area to explain the Settlement, and have established a physical office in New Orleans with a toll-free number and

---

[51] AZARI DECLARATION , ¶10; *see also* ¶77 ("Although not calculable, reach and frequency of exposure was further enhanced by the notice placements in trade, business and specialty publications, African-American, Vietnamese and Spanish language publications, Cajun radio programming, the Informational Release, TV PSAs, Internet sponsored listings and the Settlement website.  This reach and average frequency of exposure surpasses other court-approved settlement notice programs and indicates that the notice campaign was highly successful in providing notice to potential class members").

settlement questions e-mail to provide additional information to members of the class.  Additionally, BP has agreed to provide up to $5 million in funds for a supplemental publicity campaign managed by the Plaintiffs Steering Committee.

## **The Settlement is Fair, Reasonable and Adequate**

The Proposed Settlement provides fair, reasonable and adequate relief.  The damage frameworks, developed over months of intense negotiation, objectively quantify the losses suffered in 2010, and in most cases add an RTP, which further compensates for unknown and future effects, punitive damage exposure, the time value of money, and other legal uncertainties.  The differences within these frameworks, developed through arms-length negotiation, are rationally related to the relative strengths and merits of similarly situated claims:  The causation presumptions are generally afforded to the types of business and/or geographical  locations  most likely to have been impacted by the spill, while the higher RTPs are generally afforded to industries and locations which face the greatest risk of ongoing loss and/or are most likely to have claims for punitive damages.

The members of the settlement class will receive additional individualized and collective benefits, including:  reimbursement of reasonable claims preparation expenses; a $57 million Gulf Tourism and Seafood Promotional Fund; the class-wide assignment of BP's claims against Transocean and Halliburton; the satisfaction by BP of all common benefit costs and fees;  a Transocean insurance proceeds reserve fund;  and an express reservation of punitive damage claims against Transocean and Halliburton.  These substantive benefits are implemented in an objective and transparent way, through a Court-supervised and neutral Claims Administrator, with rights to formal reconsideration and appeal.

If any class member is dissatisfied with the settlement, he or she has the right to opt out.

It is well settled that such "negotiated result of an adversarial proceeding is an indication of its fairness." Domingue v. Sun Elec. & Instrumentation, No. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010); *see also,* In re Train Derailment Near Amite La., No.1531, 2006 WL 1561470, at *19 (E.D. La. May 24, 2006) ("The fact that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate …."); In re Mills Corp. Sec. Litig., 265 F.R.D. 246, 255 (E.D. Va. 2009) ("Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of Class Counsel's decision to enter into the settlement and the proceedings leading thereto").

It also is important to note that Magistrate Judge Shushan played an important supervisory role in facilitating and mediating the agreement.  Her evenhanded, daily (and often minute-by-minute) efforts throughout the last three months of negotiations strongly counsel in favor of approving the settlement. *See, e.g.,* Maywalt v. Parker & Parsley Pet. Co., 67 F.3d 1072, 1079 (2d Cir. 1995) ("the supervision of settlement negotiations by a magistrate judge, as occurred here, makes it less likely that … [class counsel have promoted] their own interests over those of the class"); In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (settlement reached after mediation is entitled to a presumption of arms-length dealings and fairness), *aff'd sub nom.* Priceline.com Inc. v. Silberman, 405 F. App'x 532 (2d Cir. 2010); Smith v. Tower Loan of Miss., Inc., 216 F.R.D. 338, 353 (S.D. Miss. 2003) (upholding settlement where the Magistrate Judge's "mediation efforts" helped facilitate the settlement); In re Catfish Antitrust Litig., 939 F. Supp. 493, 497 (N.D. Miss. 1996) (upholding settlement where the Magistrate Judge "was intimately involved with the settlement negotiations among the parties in this action").

Page 26

On May 5, 2012, this Court issued its PRELIMINARY APPROVAL ORDER, taking initial steps under the judicial approval process prescribed by Rule 23, federal practice within the Fifth Circuit, and best practices suggested by the Manual for Complex Litigation, to disseminate notice of the proposed settlement to the members of the settlement class, and, unique to this settlement, to establish and initiate the Claims Administration process.   In granting preliminary settlement approval, this Court not only found that the proposed settlement met the customary standards and criteria for preliminary approval, and forecast the standards the settlement would be required to satisfy in order to obtain final approval.   Specifically:

> In considering whether to grant final approval to the Settlement Agreement after the Fairness hearing, the Court will review the six 'Reed factors':
>
> (1) [T]he existence of fraud or collusion behind the settlement;
> (2) the complexity, expense, and likely duration of the litigation;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the probability of plaintiffs' success on the merits;
> (5) the range of possible recovery; and
> (6) the opinions of the class counsel, class representatives, and absent class members.
>
> *Reed v. Gen. Motors, Corp.,* 703 F.2d 170, 172 (5th Cir. 1983) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)); *see also Union Asset Mgmt. Holding A.G. v. Dell,* 669 F.3d 632, 639 (5th Cir. 2012);[52] *In re Katrina Canal Breaches Litigation,* 678 F. 3d 185 (5th Cir 2010); *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).

PRELIMINARY APPROVAL ORDER [Doc 6418], at p.33.   While each of these "*Reed* factors" is addressed in turn below, it is important to recognize that the *Reed* factors "are ultimately only a means to an end – determining whether the proposed settlement comports with basic requirements

---

[52]In *Union Asset*, Judge Patrick E. Higginbotham reaffirmed, as the Fifth Circuit's guiding settlement approval standards, those he had established 30 years before in his seminal opinion in *Reed*. Union Asset Mgmt., 669 F.3d at 639, n.11; Reed, 703 F.2d at 172.

of fairness."[53]   The touchstone of fairness is whether the settlement delivers substantial benefits to the class.

The *Reed* factors presume that the settlements evaluated thereunder are compromises, delivering less than what might be proved at trial, in exchange for relative swiftness and certainty of recovery.[54]   The factors are judicially-developed guidelines for determining, in each case, whether such tradeoff, which public policy supports, is fair in that particular case.   With respect to this Proposed Settlement, it should be remembered that it delivers to its class members a highly unusual, and perhaps unique, combination of benefits:   full compensation for losses, without reduction of class counsel fees.

## The Settlement is Free of Fraud or Collusion

The Proposed Settlement was negotiated, at arm's length, over the course of at least 145 days of negotiating sessions, under the guiding principle of full, fair, consistent and individualized compensation for victims of the oil spill.[55]   The total recovery is uncapped, with no pre-ordained overall limits.[56]   All claims presented will be evaluated, and all qualified claims will be paid in full, at the maximums allowed under the applicable frameworks.   The settlement does not grant any

---

[53]DECLARATION OF ROBERT H. KLONOFF, ¶70.

[54]In most cases, this compromised amount (settlement discount) is further reduced by the award of a reasonable attorney's fee from the settlement fund. Because class counsel are, in such cases, in a sense competing with class members for shares of a pre-set fund, the *Reed* factors which focus on the possibility of collusion, (and the timing of the settlement), are crucial:  Did the settlement come too soon?  Did the class members get enough?  Did the lawyers get too much?   In this case, however, both the structure of the settlement, and the nature and scope of its benefits – unrestricted by any overall upper limit – answer the *Reed* factor questions to promote final approval.

[55]*See generally,* RICE DECLARATION (NEGOTIATIONS), which provides an overview of the settlement negotiations. (*See also,* HERMAN DECLARATION.)

[56]The $2.3 billion Seafood Fund will be discussed more fully *infra.*

preferential treatment to class representatives, and militates against any favoritism within the Program by providing detailed, objective and transparent frameworks, and no discretion on the part of the Claims Administrator or a "Special Master" to favor any claimants or attorneys in the process.

The principal negotiators on the plaintiffs' side were Court-appointed members of the PSC, previously selected by the Court.  They reported regularly to the Court-appointed Co-Liaison Counsel, who themselves also participated at various stages of the process.  These regulators likewise reported to Magistrate Judge Shushan, who generally supervised the process, and, in its final stages, personally mediated the resolution of difficult issues, and oversaw the drafting process.  The $2.3 billion Seafood Fund was established (with Judge Shushan's mediation) at the very end of the process, informed by months of arms-length negotiation and meetings among plaintiffs counsel, experts, class members and industry representatives;  and the ultimate Seafood Compensation Program frameworks were determined by a Court-appointed neutral.   These structural assurances of arm's-length, un-conflicted negotiations demonstrate the absence of fraud or collusion.[57]

**The Complexity, Expense and Likely Duration of Litigation Demonstrate the Reasonableness and Superiority of the Class Settlement**

Plaintiffs certainly believe that their claims against the BP Defendants are strong.  BP, as the "Responsible Party" is strictly liable for damages recoverable under OPA, and the plaintiffs certainly believe that BP is liable for negligence, if not gross negligence, under general maritime law.  The effects of the spill, moreover, on the Gulf Coast region from an environmental and economic standpoint have been well-documented and profound.

---

[57] *See* DECLARATION OF JOHN C. COFFEE, JR., ¶¶23-33; DECLARATION OF ROBERT H. KLONOFF, ¶¶72-78; DECLARATION OF SAMUEL ISSACHAROFF.  *See also,* Reed, 703 F.3d at 172; Pettaway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1214 (5th Cir. 1978); Union Asset, 669 F.3d at 639.

At the same time, however, there are many practical and legal hurdles that make the prospects of full recovery complex, expensive and subject to delay.   Even putting aside the entanglement of BP's liability with the Transocean Limitation proceeding, the 14(c) and other cross-claims, the unresolved indemnity issues, the scope of potential punitive damages, and other liability questions, there are over 130,000 claims which have been filed in the MDL.   The mere Court time that would be necessary to try the individual damage issues alone would be quite substantial.

Moreover, from a causation standpoint, the long-term effects of the spill are still uncertain, and are confounded with other environmental, ecological, social, political and economic risks and factors.   To develop *Daubert*-compliant expert testimony (and the associated research, reliance materials, motion practice and discovery) with respect to the scope and extent of environmental and/or economic damages caused and/or likely to be caused in the future as a result of the spill is a time-consuming and expensive (if not potentially risky) prospect.

While much of this evidence can be established on a common and class-wide basis, each plaintiff would likely face a significant burden (if not litigation risk) in proving causation and damages specific to his or her individual claim.

As this Court has noted on prior occasions, the *Deepwater Horizon* Incident is not entirely unprecedented.   In 1989, the *Exxon Valdez* ran aground in Prince William Sound, Alaska, discharging over a eleven million gallons of oil.   Like the *Deepwater Horizon* Incident, the wreck of the *Exxon Valdez* was an open and obvious disaster. None of its victims shared culpability, and the process of assessing, adjudicating, and awarding compensation for the economic damage caused by the *Exxon Valdez* spill should have been straightforward.

Page 30

The commercial fishermen's claims were certified as a class action, with liability, compensatory damages, and punitive damage questions determined in a three phase class action jury trial.   From disaster through verdict, the trial court process took five years.   In the aftermath of the trial, (a clear-cut victory for plaintiffs), the litigation embarked upon a fifteen year odyssey of appellate review, remand to the district court, appellate re-review, and ultimate determination by the Supreme Court.   Two years later, the remnant of the original punitive damages verdict, greatly reduced, was finally distributed among the surviving class members.[58]

While many circumstances converged to protract the *Exxon Valdez* litigation, similar events could combine in this case, in the absence of a comprehensive settlement, despite the best efforts of the Court and the good will of the litigants and their counsel. Verdicts are appealed. The governing law can change. A defendant can adopt an intractable anti-resolution stance. The public can forget. Litigation is inherently uncertain, and, in the case of the *Exxon Valdez* it was almost endless, notwithstanding circumstances that called for swift resolution.

While BP has acknowledged its "responsible party" designation, BP continues to seek complete exoneration from liability based on the fault of others, notably Transocean and Halliburton. BP contests that its conduct constitutes gross negligence or wilful misconduct, or that it should be liable for punitive damages on both factual and legal grounds.   BP parts ways with the plaintiffs on the overall magnitude of loss, on issues of presentment, on the legal standard for causation under

---

[58] The jurisprudential odyssey of the Exxon Valdez is chronicled, *inter alia*, in In re Exxon Valdez, 1996 U.S. Dist. LEXIS 8173 (D. Alaska 1996); Alaska Native Class v. Exxon Corp. (In re Exxon Valdez), 104 F.3d 1196 (9th Cir. 1997); In re Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001); Baker v. Exxon Corp., 239 F.3d 985 (9th Cir. 2001); In re Exxon Valdez, 236 F. Supp. 2d 1043 (D. Alaska 2002); In re Exxon Valdez, 296 F. Supp. 2d 1071 (D. Alaska 2004); Baker v. Exxon Mobil Corp. (In re Exxon Valdez), 490 F.3d 1066 (9th Cir. 2007); Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008); and Exxon Valdez v. Exxon Mobil Corp., 568 F.3d 1077 (9th Cir. 2009).

OPA, and on the issue of whether damages were caused by the spill in many specific factual cases. Indeed, BP argues that many of the categories of damages recognized under the Proposed Settlement fall outside the scope of OPA.

It is thus appropriate in this as in all cases to "consider the vagaries of litigation and compare the significance of immediate recovery by way of compromise to the mere possibility of relief in the future, after protracted and expansive litigation." In re: Shell Oil Refinery, 155 F.R.D. 552, 560 (E.D. La. 1993); *see also,* Rodriguez v. West Publ'g Grp., 563 F.3d 948, 966 (9th Cir. 2009) (affirming approval of settlement where "a number of serious hurdles remained" for the plaintiffs"); In re U.S. Oil & Gas Litig., 967 F.2d 489, 493 (11th Cir. 1992) ("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules of Civil Procedure authorize district courts to facilitate settlements in all types of litigation, not just class actions"); Billitteri v. Securities Am., Inc., No. 09-1568, 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) (noting there was little doubt that the amount of time it would take to recover on behalf of class members "would measure in years rather than the months contemplated by the parties at this stage"); Klein v. O'Neal, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) ("When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened").

Nor would the road end with the entry of judgments in this Court. This litigation has raised numerous difficult legal questions, many of first impression.  Given the complexities inherent in litigation of this nature, it is not surprising that nearly twenty years elapsed between the *Exxon Valdez* spill and the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).

Such litigation represents "an enormous financial and psychological burden on all parties involved" and counsels in favor of settlement. In re Combustion, Inc., 968 F. Supp. 1116, 1127 (W.D. La. 1997); *see also,* Rodriguez, 563 F.3d at 966 (noting that the "[i]inevitable appeals would likely prolong the litigation, and any recovery by class members, for years"); Faircloth v. Certified Finance, Inc., No.99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving a settlement where, as here, the applicable statutes were "extremely intricate and technical"); Ass'n For Disabled Ams., Inc. v. Amoco Oil Co., 211 F.R.D. 457, 469 (S.D. Fla. 2002) ("[A]bsent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain").

Because "the most controversial and hard-fought of all the issues in this case" (including punitive damages against BP) remain to be litigated, Salinas v. Roadway Express, Inc., 802 F.2d 787, 790 (5th Cir. 1986) (per curiam), this settlement "eliminates the transaction costs that further proceedings would impose" and "provides relief for the class sooner than continued litigation would," Ayers v. Thompson, 358 F.3d 356, 369 (5th Cir.), *cert. denied*, 543 U.S. 951 (2004). While it could be entirely "proper to take the bird in the hand instead of a prospective flock in the bush." Shell Oil, 155 F.R.D. at 560, here the "bird in the hand" is full compensation, and, for many claims categories, includes RTPs: the total compensation being paid can be several multiples greater, not less, than presently demonstrable injury.

**Settlement was Reached at a Mature Stage of the Proceedings, with Phase I Discovery Complete, and on the Eve of the Scheduled Phase I Limitation Trial**

The Fifth Circuit has repeatedly held that extensive formal discovery is not essential to a fair and informed settlement. Union Asset, supra, 689 F.3d at 639; Newby v. Enron Corp., 394 F.3d 296,

307 (5th Cir. 2004); Cotton v. Hinton, 559 F.2d 1326, 1332-33 (5th Cir. 1977). Nonetheless, this settlement was reached simultaneously with the scheduled start of trial, at a decidedly mature stage of the proceedings, with the benefit, as noted above, of hundreds of depositions, scores of expert reports, many millions of documents, and a complex bench trial fully prepared to embark upon the first of several, carefully constructed, sequential trial phases. The parties were informed of the factual and legal issues relating to Defendants' liability, by their own investigations and discovery, and by the Court's numerous pretrial rulings. The Court is similarly well-versed in the issues and well-positioned to make an independent and informed evaluation of the settlement, based on the knowledge, insights and familiarity obtained, *via* its own rulings, its conduct of numerous hearings and regular status conferences, and the weekly discovery conferences and discovery management of the Magistrate Judge.

**The Probability of Success on the Merits is Reflected in the Terms of the Settlement**

It is often said that a settlement is "a compromise, a yielding of the highest hopes in exchange for certainty and resolution." Altier v. Worley Catastrophe Response, LLC, No.11-241, 2012 WL 161824, at *14 (E.D. La. Jan. 18, 2012).   Such compromise is accepted and encouraged in furtherance of the "overriding public interest in favor of settlement," especially in large and complex litigation like this one. Kincade v. Gen. Tire & Rubber Co., 635 F.2d 501, 507 (5th Cir. 1981); Turner v. Murphy Oil USA, Inc., 472 F. Supp. 2d 830, 843 (E.D. La. 2007); Sullivan v. DB Invs., Inc., 667 F.3d 273, 295 (3d Cir. 2011), *cert. denied,* 132 S.Ct. 1876 (2012); In re Exxon Valdez, 229 F.3d 790, 795 (9th Cir. 2000).   Accordingly, courts presume settlements to be fair, and avoid

engaging in "a trial on the merits" in evaluating fairness at the final approval stage. In re Corrugated Container Antitrust Litig., 643 F.2d 195, 219 (5th Cir. 1981); Cotton, 559 F.2d at 1330.

This Proposed Settlement does not reflect a discount for risk with respect to success on the merits with respect to liability;  rather, it is designed to fully compensate class members' economic loss in the included claims categories.  In those instances where the law might provide for punitive damages and/or where spill-related economic damage may be recurring, the Proposed Settlement further includes a Risk Transfer Premium that compensates, rather than discounts or ignores, such risks.

**The Range of Possible Recovery is Reflected in the Settlement's Terms and Benefits**

Under this standard, the "fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement." Priddy v. Edelman, 883 F.2d 438, 447 (6th Cir. 1989); *see also,* Combustion, supra, 968 F.Supp. at 1129 ("The proposed settlement need only reflect a fair, reasonable, and adequate estimation of the value of the case in view of what might happen at trial"); Cotton, supra, 559 F.2d at 1330.

In this case, the proposed settlement provides more than sufficient and adequate compensation to satisfy this standard. In the Proposed Settlement, BP has voluntarily assumed the responsibility to pay not only its fair share of the recovery necessary to make the proposed class members whole, but to pay *all* compensatory damages to class members.  BP has also agreed to pay RTPs applicable to many categories of class members.  Under the baseline process of "comparing the settlement to the estimated recovery times a multiplier [*i.e.,* a percentage multiplier < 1] derived from the likelihood of prevailing on the merits,"  which the Fifth Circuit counsels as a touchstone

of the analysis here, *see* <u>Corrugated Container</u>, 643 F.2d at 217, this proposed settlement, with its Risk Transfer Premium feature (which adds multipliers of 1 and *greater than 1* to the base compensation) applicable to many types of claims, easily passes muster.  Were the settlement to be rejected, further litigation would be unlikely to provide the plaintiffs with the negotiated RTPs, so any consideration of the range of possible outcomes favors approval of the settlement. *See, e.g.*, <u>Ayers</u>, 358 F.3d at 373.  The "range of possible recovery" thus likewise robustly supports approval.


### The Opinions of Class Counsel, Class Representatives and Class Members Support Approval

In this case, Class Counsel include a broad and diverse cross-section of class action, maritime and environmental litigators.  They individually represent through their own firms a broad and diverse cross-section of class members, and strongly believe that the proposed settlement represents a fair and reasonable resolution of this sharply contested litigation.

It is well-settled, in this regard, that where "counsel for both parties have significant experience in litigating and negotiating settlement of class actions," this fact is strong evidence that the settlement is fair and reasonable. <u>DeHoyos v. Allstate Corp.</u>, 240 F.R.D. 269, 287 (W.D. Tex. 2007) (quotations omitted); *see also, e.g.,* <u>Reed</u>, 703 F.2d at 175 ("the value of the assessment of able counsel negotiating at arm's length cannot be gainsaid" because "[l]awyers know their strengths and they know where the bones are buried"); <u>Pettaway</u>, 576 F.2d at 1216 (holding that if experienced counsel determine a settlement is in the class's best interests, "the attorney's views must be accorded great weight"); <u>Cotton</u>, 559 F.2d at 1330 ("In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties"); <u>Combustion</u>, 968 F.Supp. at 1128 (noting it was "not lost on the Court that counsel for the compromising parties, some of the

most able attorneys in the country, when armed with extensive knowledge of the facts, decided that settlement rather than a . . . trial was in the best interest of their clients"); In re OCA, Inc. Sec. & Derivative Litig., No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) ("The settlement was reached after over three years of litigation and extensive discovery, and thus counsel for all parties were experienced and familiar with the factual and legal issues in the case"); San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio, 188 F.R.D. 433, 461 (W.D. Tex. 1999) ("In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to assess the potential risks and rewards of litigation . . . ." (internal quotation marks omitted)).

The response and participation of the class has been overwhelmingly positive.  While the Claims program (if granted final approval) will run until at least April 22, 2014, over 48,000 claims have already been submitted.  The Proposed Settlement is further supported by the Class Representatives.[59]  Objections, while inevitable, are likely to be few in comparison to the magnitude of class members participating in the program.[60]  Many of the "objections" which have been filed to date complain that excluded businesses or individuals should be included – an effective endorsement of the Proposed Settlement.

---

[59]See Declarations of Class Representatives Bon Secour Fisheries, Inc.; Brad Friloux; Corliss Gallo; Ronald Lundy; Fort Morgan Realty, Inc.; LFBP#1, LLC d/b/a GW Fins; Henry Hutto; Jerry J. Kee; John Tesvich; Lake Eugenie Land & Development, Inc.; Michael Guidry; Panama City Beach Dolphin Tours & More, LLC; William Sellers; Kathleen Irwin; and Zeke's Charter Fleet.

[60]It is worthy to note, in this context, that the seminal Fifth Circuit settlement approval decision, Reed itself, which established the proposition that a "settlement can be fair notwithstanding a large number of class members who oppose it," (Cotton, 559 F.2d at 1331), affirmed the approval of a class settlement over the objections of 23 of 27 named plaintiffs and nearly forty percent of the class. Reed, 703 F.2d at 174.

Page 37

## The Economic and Property Damages Class
## Satisfies the Requirements of Rule 23(b)(3)

This economic and property damages class action raises none of the issues which have marred Rule 23(b)(3) litigation and settlement classes in the past.   Although the Court does not have to wrestle with the issue of how the class members' claims could be tried to conclusion, (as the proposal is that there be no trial), this action does not present any of the issues which have prevented the certification of "mass tort" litigation classes.   The claims arise from a single-source event, without the problems associated with long-term or varying periods of exposure or accrual.   There are no statute of limitations issues, comparative fault issues, learned intermediary defenses, multi-state choice-of-law issues, or Reexamination Clause concerns.

Unlike mass tort settlements which have thrown plaintiffs together in a contest for limited funds, this class was negotiated at arms length on a claim-by-claim basis, and sets forth specific, detailed and objective frameworks for uncapped recovery by the plaintiffs.   There are no unknown "future claimant" issues.   Nor yet-to-be-determined pay-outs left to a special master's discretion. Even with respect to the $2.3 billion Seafood Fund, a Court-appointed neutral set forth specific, detailed and objective frameworks for distribution *in advance,* while at the same time providing a procedural safeguard against potential intra-class conflict with respect to allocation.

From a superiority standpoint, the unique legal requirements imposed on the BP Defendants by the Oil Pollution Act dictated, as a matter of policy, that some accelerated comprehensive settlement framework be implemented as an alternative to *seriatim* litigation.

While, arguably, a similar settlement framework could have been implemented outside of the class action context, the plaintiffs have benefitted greatly from the proposed structure.   BP was

willing to pay a premium for the class-wide release, and the class was able to negotiate an assignment from BP, and reservations for their own punitive damages against third-party defendants, which could not have been achieved on a piecemeal basis.  There are other common benefits, such as a Gulf Tourism and Seafood Promotional Fund and the collective right to proceeds from various Transocean insurance policies.  The Proposed Settlement promotes judicial economy, by bringing these numerous claims to resolution.  And, of course, the class is afforded the benefit of formal Court supervision, approval, class representation, and the other Rule 23 safeguards and protections.

**Numerosity**

Under Rule 23(a)(1)'s "numerosity" requirement, the showing that joinder is impracticable is made through "some evidence or reasonable estimate of the number of purported class members." In re Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047, 2012 WL 92498, at *9 (E.D. La. Jan. 10, 2012).  "A good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable." 1 William B. Rubenstein, NEWBERG ON CLASS ACTIONS (5th ed. 2011) §§ 3:12, 3:13.

The Rule 23(a)(1) "numerosity" requirement promotes three primary objectives:  (1) it ensures judicial economy, by freeing federal courts from the onerous rule of compulsory joinder otherwise inherited from English practice, such that courts no longer need to conduct a single, administratively burdensome action with all interested parties compelled to join and be present. NEWBERG, *supra*, §1:112; (2) it promotes judicial economy by sparing courts the burden of deciding numerous, sufficiently similar individual actions *seriatim*.  *Id.* at § 3:11; and (3) it creates greater

access to judicial relief, especially for those persons whose claims would be uneconomical to litigate individually, *see* Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985).

The case management history of this litigation demonstrates the propriety and advantages of utilizing a Rule 23 representative model in order to fairly, economically and efficiently effectuate the comprehensive remedial and compensatory goals of the settlement.

**Commonality**

The Fifth Circuit's established standard has been that commonality is met "when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 625 (5th Cir. 1999) (quotations and citations omitted).   Under the Supreme Court's recent decision in Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), even a single common question of sufficient import to all claims will suffice.

The functional test of commonality under *Dukes* is that class members' "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S. Ct. at 2551; *see also, e.g.,* In re: Whirlpool Corp. Front-Loading Washer Products Liab. Litig., 678 F.3d 409, 418 (6th Cir. 2012) (affirming class certification of economic loss claims); Sullivan, supra, 667 F.3d at 299.  Commonality is not a counting game.  "Even a single common question will do." Dukes, 131 S.Ct. at 2556.

In this case, the common and strict liability imposed for the benefit of all classmembers under the Oil Pollution Act unites each and every classmember with a question whose answer is true with

respect to each and every member of the Settlement Class.  The class is further united as to numerous factual issues regarding the underlying causes of the explosion and spill, with respect to the assigned and reserved third-party claims.  What happened (and did not happen) during the design and planning process, at the well, and on the rig?  Who is responsible, and what is their level of culpability?[61]  The answers to these common factual questions are the same for each and every member of the class.  Moreover, the common and classwide legal interpretation of causation under OPA is a common question of law affecting the clams of the entire class.

**Typicality**

The claims of the classmembers arise under the same legal theories, based on the same course of conduct by BP and the other defendants.  As the Class Representatives have suffered the same types of losses generally suffered by the members of the class as a whole, it is irrelevant that some class members may have suffered varying harms or varying degrees of injury. *See, e.g.,* Heartland Payment Systems, Inc. Litigation (MDL No. 246), No.09-2046, 2012 WL 948365, 2012 U.S. Dist. LEXIS 37326, at *34 (S.D. Tex. March 20, 2012); James v. City of Dallas, 254 F.3d 551, 571 (5th Cir. 2001) ("If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality").

Significantly, there is no issue of comparative fault, as between BP and the classmembers, in this case.  Unlike some personal injury mass tort scenarios, no classmembers were claimed to have

---

[61]For example: **(i)** Should BP have used a linerback, rather than a long strong casing design? **(ii)** Whether BP properly converted the float collar? **(iii)** Whether BP should have used more centralizers? **(iv)** Whether BP should have run a full "bottoms-up" calculation? **(v)** Whether BP should have run a cement bond log? **(vi)** Whether Halliburton's cement slurry was unstable? **(vii)** Whether the BOP was properly maintained? **(viii)** Whether Transocean should have activated the EDS?

been at partial fault for the *Deepwater Horizon* Incident.  Thus, the concern that unique defenses against a particular named plaintiff could threaten to become the focus of the litigation is absent. Were this class to proceed in litigation, none of the class representatives "would be required to devote considerable time to rebut the Defendants' claims."   In re Enron Corp. Secs. Litig., 529 F.Supp. 2d 644, 674 (S.D.Tex. 2006).  The Fifth Circuit has rejected the notion that "the presence of a unique defense necessarily destroys typicality."  Feder v. Electronic Data Systems Corp., 429 F.3d 125, 137 (5th Cir. 2005).  Yet there are no such unique defenses here.

The spill damaged a complex and diverse economy within the class boundaries.  No single, simple formula could fairly address the losses of all categories of economic activity that incurred economic loss as a result of the disaster.  That is precisely why the settlement was negotiated, and the claims program reflects, categorical criteria based on individuals' and businesses' actual economic activities.  Along these lines, the class representatives present an array of such business and individual economic pursuits.

The fifteen Economic & Property Damages Settlement Class Representatives include both business entities and natural persons.  They cover the spectrum of economic loss and property damage, and include claimants in each of the settlement's claims categories:  Economic Damage, Subsistence Damage, Wetlands Real Property Damage, Coastal Real Property Damage, Real Property Sales Damage, Seafood Program, VoO Charter and Vessel Damage.[62]  They constitute a representative cross section whose claims are typical of the claims of the settlement class.

---

[62]*See* Declarations of Class Representatives Bon Secour Fisheries, Inc.; Brad Friloux; Corliss Gallo; Ronald Lundy; Fort Morgan Realty, Inc.; LFBP#1, LLC d/b/a GW Fins; Henry Hutto; Jerry J. Kee; John Tesvich; Lake Eugenie Land & Development, Inc.; Michael Guidry; Panama City Beach Dolphin Tours & More, LLC; William Sellers; Kathleen Irwin; and Zeke's Charter Fleet.

**Adequacy of Representation**

The adequacy requirement is satisfied where: "(1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members." Hamilton v. First Am. Title Ins. Co., 266 F.R.D. 153, 163-64 (N.D. Tex. 2010); *see also* Feder v. Elec. Data Sys. Corp., 429 F.3d 125, 129 (5th Cir. 2005).

The same structural characteristics and safeguards of integrity employed throughout the settlement negotiation process are equally relevant to the adequacy of representation requirement, as they are to the demonstration of absence of fraud or collusion under *Reed*.  The negotiations were conducted, and assisted, by a broad-based and diverse group of attorneys, selected by the Court to serve as members of the Plaintiffs' Steering Committee.  Their work for the common benefit throughout the discovery and trial preparation phase, and their prior experience in class actions and complex litigation of all types, including admiralty and maritime proceedings, equipped them to serve as informed and insightful negotiators for the broad array of economic interests included in the class.

Recognizing the overarching commonality of the impact of the *Deepwater Horizon* Incident on the individuals and businesses that comprise an organically resulting Economic Class — a class with damages caused by, and resulting from, the conduct of BP and other defendants — the PSC's negotiators determined, at the very outset of the negotiations, to negotiate a settlement from the "bottom up":  that is, by proceeding from the needs and requirements of each category of economic loss claimants, to best enable them to maximize their recovery by demonstrating economic and

property damage in ways most appropriate to their own businesses.  This was not a "one size fits all" class, nor could recovery be maximized using a single claim form or claims protocol.  Rather, a number of frameworks were developed for different categories of claims, as explained above.  The compensation frameworks, protocols, and requirements were negotiated for each of these independently, assisted by attorneys knowledgeable and interested in such categories, experts, and by representatives of those categories themselves.

The negotiators determined, early on, not to place any of these groups in direct or indirect conflict with each other.  Such conflicts would have complicated the negotiations, might have worked to the disadvantage of some groups, and might have arguably required the formation of formal subclasses — which was not realistically possible in this case due to the overlap between and among individual classmembers who share various different types of claims.[63]  As a practical matter, moreover, the establishment of formal subclasses can work to the disadvantage of some or all categories within the class, by unduly impeding the negotiation process and/or weakening their bargaining position(s).[64]  Accordingly, negotiations for each claims category proceeded so as to maximize the recoveries of each.  This was possible because there was no pre-set or pre-negotiated cap or limit on the overall settlement:  class members and their negotiators were *not* competing with each other maximize their respective shares of a pre-limited fund.

---

[63]Specifically, there is no "sub-class" of plaintiffs who have Wetlands Claims, as distinct from the "sub-class" of plaintiffs who have Seafood Program claims, as distinct from the "sub-class" of plaintiffs who have Subsistence claims.  Rather, one class member may have an Individual Economic Loss Claim, a Wetlands Claim, and a Subsistence Claim; while a second class member may have a Seafood Program Claim and a Subsistence Claim; while a third class member may have a Business Economic Loss Claim and a Wetlands Claim.

[64]*See* DECLARATION OF JOHN C. COFFEE, JR., ¶¶29-32; DECLARATION OF ROBERT H. KLONOFF, ¶¶32-37; DECLARATION OF SAMUEL ISSACHAROFF, ¶11.

As soon as the Seafood Fund was agreed to, an independent neutral was brought in to provide structural assurances against the potential for intra-class conflict.

The appropriate representation of the class was further buttressed by the Court's ongoing awareness of, and participation in, the settlement process.  The Court was kept regularly apprised of the status of settlement discussions.  Such discussions did not impair or impede, in any way, the important work of ongoing discovery and trial preparation: litigation and settlement tracks proceeded in parallel.  The Magistrate Judge was both an observer and mediator during the settlement process.  No short-cuts were taken during the negotiations:  they were intensive, ongoing, and continuous, and lasted over eight months.

Both as a matter of process and as a matter of substance, this class settlement avoids all of the concerns that have prevented approval in cases like *Amchem, Ortiz* and *In re Katrina.*[65]   All classmembers – even as to the Seafood Compensation Program – are protected by specific, detailed and objective frameworks, promulgated in advance.   The differences within the frameworks, developed through arms-length negotiation, are rationally related to the relative strengths and merits of similarly situated claims.[66]

None of the class members (outside of the Seafood Program) have interests which are even potentially adverse to one another, and, in all cases, each class member was represented in the negotiations by a lawyer unfettered in his incentive or attempt to maximize the recovery for that

---

[65] *See* <u>Amchem Products v. Windsor</u>, 521 U.S. 591 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); <u>Ortiz v. Fibreboard Corp.</u>, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); <u>In re Katrina Canal Breaches Litigation</u>, 628 F.3d 185 (5th Cir. 2010).

[66] As noted, the causation presumptions are generally afforded to the types of business and/or geographical  locations  most likely to have been impacted by the spill, while the higher RTPs are generally afforded to industries and locations which face the greatest risk of ongoing loss and/or are most likely to have claims for punitive damages.

particular plaintiff with respect to the particular claim in question.  Hence, the Class Representatives and their counsel have satisfied the requirement of adequate representation.[67]

## Ascertainability of the Class

As Professor Coffee describes it, the Economic Class definition "is a conservative class definition which stops well short of reaching every person or entity who might arguably bring an OPA or general maritime law claim based on the *Deepwater Horizon* disaster.  The net result of this caution is a list of easily identifiable categories of individuals and entities who are permitted to show objective losses from that disaster."[68]  The detailed notice packet sent by the Court-appointed Notice Administrator carefully, and in detail, delineates the Class Definition, and takes interested persons through a series of questions and considerations, step-by-step, to enable them to determine whether they are members of the Class, the categories of claims for which they may qualify, and how to act on their Class membership determination, by making the appropriate claims.  The same materials are available online, to potential Class members and the public, at www.DeepwaterHorizonSettlements.com, and information is also available on the toll-free assistance line, 1-866-992-6174.  The notice packet, and the notice website, include maps to enable interested persons to determine whether they fit within the geographic bounds of the Class, and the Zones relevant to particular claims categories and claims requirements.  As Professor Coffee points out, "this combination of a geographic test plus a careful definition of what losses or injuries give

---

[67]*See* COFFEE DECLARATION, ¶¶41-45; KLONOFF DECLARATION, ¶¶29-38; ISSACHAROFF DECLARATION. *See also, e.g.,* Juris v. Inamed Corp., 212 U.S. App. LEXIS 13841 (11th Cir. July 6, 2012); Cobell v. Salazar, 679 F.3d 909 (D.C. Cir. 2012); Sullivan, 667 F.3d 273, 336 n.5.

[68]COFFEE DECLARATION, ¶19.

rise to cognizable claims for benefits under the Settlement Agreement easily satisfies the Fifth Circuit's standard for ascertainability."[69]

## The Common Issues Predominate over Individual Issues

When, as in this case, class certification is sought for settlement purposes only, the Court need not inquire whether the case, if tried, would present intractable management problems. Amchem Products v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997); Sullivan, 667 F.3d at 297.  "Together, Rule 23(a)(2) and (b)(3) requirements insure that a proposed class has sufficient unity so that the absent class members can fairly be bound by decisions of the class representatives."  Chinese-Manufactured Drywall, 2012 WL 92498 at *8; Sullivan, 667 F.3d at 297.  The focus of the predominance inquiry "is on whether the defendants' conduct was common as to all of the class members, and whether all of the class members were harmed by the defendants' conduct." Sullivan, 667 F.3d at 298; In re Warfarin Sodium Antitrust Litigation, 391 F.3d 516, 522 (3d Cir. 2004).

In this case, the BP Defendants' conduct did not vary within the class.  The single unfolding disaster in which BP's conduct was implicated was the same sequence of events, and gives rise to the same questions of law and fact, whether the class member is a fisherman, a tourist guide, or a retail clerk.   There are no statute of limitations issues.  Nor comparative fault issues.  There are no personal injury exposure or accrual issues, or learned intermediary type defenses.  There are no multi-state choice-of-law issues.  Nor Seventh Amendment concerns.[70]

---

[69]Coffee Declaration, ¶19; *citing,* Union Asset, 669 F.3d at 639-640; DeBremaecker v. Short, 433 F.3d 733, 734 (5th Cir. 1970) (per curiam); *see also,* Klonoff Declaration, ¶20 ("the class definition passes muster under the most exacting criteria").

[70]Even assuming *arguendo* that a jury trial might attach to some or all issues or claims, liability can be (and to a large extent has been) successfully bifurcated without running afoul of the Seventh Amendment. Unlike product liability cases that might raise the issue of comparative fault, the liability determinations in this case would not have to be re-examined by any subsequent fact-finder or jury. The

There exist common and overlapping bodies of environmental, ecological and economic evidence applicable to the claims of the individual classmembers.  And the common and classwide legal interpretation of OPA causation further brings cohesiveness to the class.

**The Class Action is Superior to Other Available Methods for the Comprehensive Determination and Resolution of Claims in This Litigation**

The unique legal requirements imposed on the BP Defendants by the Oil Pollution Act dictated, as a matter of policy, that some accelerated comprehensive settlement framework be implemented as an alternative to *seriatim* litigation.[71]  While BP was utilizing the GCCF to try to accomplish this, it had not been designed to operate with the structural protections nor the legitimacy that only a Court-supervised process can provide.  By structuring the settlement as a class settlement, the plaintiffs were able to negotiate additional levels of compensation and other individual and class-wide benefits that could not have been achieved on a piecemeal basis.[72]

The superiority of the Proposed Class Settlement can further by established by comparison to the predecessor GCCF.  In this regard, the Proposed Settlement:

- Provides the class members with more flexible Benchmark Periods from which to establish loss and, where necessary, causation.[73]

---

Court could, to the extent necessary, easily "carve at the joint." Castano v. American Tobacco, 84 F.3d 734, 751 (5th Cir. 1996); In re Rhone- Poulenc, 51 F.3d 1293, 1303 (7th Cir. 1995).

[71]*See* 33 U.S.C. §§2701, *et seq.,* (including particularly 33 U.S.C. §§2705(a), 2713 and 2714).

[72]As noted, the Proposed Settlement provides, in addition to the compensation under the various frameworks: **(i)** a $57 million Gulf Tourism and Seafood Promotional Fund; **(ii)** an assignment of BP's claims against Transocean and Halliburton; **(iii)** up to approximately $150 million in Transocean insurance proceeds; **(iv)** reimbursement of reasonable claims preparation expenses; **(v)** satisfaction of the payment of any class counsel or other common benefit fees; **(vi)** a $5 million supplemental information program; **(vii)** all notice and administration costs; **(viii)** the reservation of punitive damage claims against Transocean and Halliburton; and **(ix)** the reservation of Expressly Reserved claims against BP.

[73]In particular, the GCCF generally used 2008-2009 as a benchmark.  *See generally,* PLAINTIFFS' EXHIBIT B.  Under the Settlement Program, by contrast, class members can generally go back to 2007.  In addition, class members have the flexibility to use different sets of benchmark months to establish Causation versus the months they use to establish the amount of Base Compensation Loss sustained.

- Replaces a vague baseline "loss of income" (LOI) determination with concrete, objective and flexible methods to establish base compensation loss, under a two-step process that accounts for both (i) losses, as compared to benchmark earnings periods, and (ii) the difference between 2010 profit and what the business would have earned but for the spill.

- Identifies specific "fixed" versus "variable" costs to be applied in the compensation calculations.

- Allows for causation presumptions based on industry and location, and, with respect to other classmembers, provides various alternative methods of establishing, by objective means, that the business or individual suffered a loss caused by the spill.

- Compensates class members for Coastal and Wetlands Property Damages, VoO Charter Compensation, Real Estate Sales Losses, and other damages which were not being compensated by GCCF.

- Includes RTP enhancements that are in virtually all cases equal to or greater than the "multipliers" under the GCCF stated methodology.[74]

- Guarantees of independence, transparency, Court supervision, and no "special deals".

In addition to these substantive and procedural benefits to the class members, the class action device further promotes judicial economy, with the expedited resolution of literally tens of thousands of claims.  The class settlement structure, in this regard, establishes definitive deadlines, stipulations and other requirements, which help move the litigation towards conclusion.   The class, moreover, is afforded the benefit of formal Court supervision, approval, class representation, and the other safeguards and protections provided by Rule 23.

---

[74]In general, the GCCF claimed that it was applying a multiplier of two (*i.e.* an RTP of 1) to most claims.  At some point, the GCCF announced that it would apply a multiplier of four (*i.e.* an RTP of 3) to shrimper, crabber and shrimp and crab processing claims.  A multiplier of four (*i.e.* an RTP of 3) was generally applied to oyster harvesters, while at some point a Future Risk Multiple raging from 1 to 7 was to applied to oyster leaseholder claims. *See generally,* PLAINTIFFS' EXHIBIT B.

As Judge Scirica pointed out in his concurring opinion in *Sullivan*, there have been recent, successful, mass tort (personal injury) settlements that did not utilize the formal class mechanism. Sullivan, 667 F.3d at 334 (Scirica, J., concurring) (describing the *Guidant* and *Vioxx* settlements). Nonetheless, as he points out, outside of the Federal Rules governing class actions, there is no prescribed independent review of the structural and substantive fairness of a settlement including counsel's allocation of settlement funds among class members, potential conflicts of interest, and the evaluation of attorney's fees. Id.  In class actions, the class members know what their rights are, the scope and nature of the court's authority is clear, and Due Process protections dictate that those similarly situated be similarly treated.[75]

Recognizing both the success of, and the challenges posed by, aggregate litigation and settlement, and particularly the efforts made in the wake of *Amchem* to resolve mass tort litigation outside of the strictures of Rule 23, the American Law Institute commissioned an ambitious treatise, now finalized and in use by the courts.  These principles set forth the following aspirational goals for all aggregate proceedings:

> Aggregation should further the pursuit of justice under law by advancing the following goals:
>
> (a)  enforcing substantive rights and responsibilities;
>
> (b)  promoting the efficient use of litigation resources;

---

[75]It should be noted that Rule 23(c)(1)(B), at the same time, guards against overly sweeping class definitions by requiring that certification orders define the claims and issues included within the class. The Economic Settlement Class Definition protects both class members, *and those excluded from the settlement,* by identifying and preserving individuals and claims which are excluded. Thus, everyone can continue to prosecute claims for which BP refused to provide fair compensation – *e.g.* "Moratorium" claims, casino worker claims, real estate developer claims, and claims by those who executed a GCCF release.

(c)  facilitating binding resolutions of civil disputes; and

(d)  facilitating accurate and just resolutions of civil disputes by trial and settlement.

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (American Law Institute 2010) §1.03.  In some mass torts, involving injuries of long latency or uncertain causation, scattered across the country, and arising under many state's laws, the non-class aggregate model has been determined to be compatible with these principles.[76]   In this litigation, however, which arises from a single-source disaster, involving massive economic losses traceable to the *Deepwater Horizon* Incident, the judicial observations in *Sullivan* illuminate the reasons while a Rule 23(b)(3) settlement class best "further the pursuit of justice under law" in this litigation.

The Class structure is best-suited to these tasks of "enforcing substantive rights and responsibilities," as between the settling parties, through continued judicial oversight (the Court Supervised Settlement Program); "promoting the efficient use of judicial resources" by shifting the administrative burden of claims determination from the limited resources of the Court to the substantial resources of the BP defendants; by "facilitating binding resolutions" of the claims and claimants encompassed by the Economic Settlement via the binding effect of a class action judgment; and facilitating both an "accurate" and "just" resolution of a broad swath of the civil disputes centralized in these proceedings, through a transparent, court-supervised, and procedurally fair class action program.[77]

---

[76]*Vioxx* is an example with which this Court is no doubt familiar.  For a discussion regarding a comparison of the *Vioxx* settlement to the present approach, *see* KLONOFF DECLARATION, ¶¶ 54-58.

[77]*See generally,* KLONOFF DECLARATION, ¶¶50-61; COFFEE DECLARATION, ¶¶57-62.

The proposed class action settlement corrects the perceived inadequacies and deficiencies of the GCCF, fulfills BP's ongoing obligations as an OPA responsible party, fully vests this Court with the ongoing supervisory powers essential to make a resolution of this scope and scale work fairly and effectively, and satisfy the settling defendants' legitimate interests in "finality," at the same time as delivering to plaintiffs "redress of their claimed injuries without the burden of litigating individually." <u>Sullivan</u>, 667 F.3d at 339.

<b><u>The Proposed Common Benefit Fee Structure<br>Further Enhances the Benefits of the Settlement to the Class</u></b>

The provisions for payment by the settling BP Defendants of common benefit attorneys' fees pursuant to an Order of this Court awarding same are contained in Exhibit 27 to the Deepwater Horizon Economic and Property Damages Settlement Agreement.  As noted, these were negotiated, drafted, and finalized only after the Settlement Agreement itself had been completed, signed, and submitted to the Court.

This structure is unlike the typical "common fund" situation, in which class counsel request, as a fee and cost award, some reasonable percentage of the fund negotiated and obtained for the settlement class.  Instead of competing with class members for a percentage of the fund, the structure of the fee award in this case enlists class counsel as the ongoing allies and champions of the class, incentivizing them to maximize the compensation paid to class members under the settlement.

In the event that this proposed class settlement is fully and finally approved, BP will pay up to $600 million in common benefit costs and fees, if and as may be awarded (at some future time)

by the Court.[78]  This amount is not to be deducted, directly or indirectly, from any benefits to any members of the Economic or Medical classes.  There is no "holdback" as to class members, and class members will be compensated in full, to the extent of their qualified claims, under the provisions of their respective compensation frameworks, without any deduction or reduction for the class counsel fees and costs that this Court, in the exercise of its independent discretion, determines to award.

Accepting BP's own estimate of the value of the accord it has reached with Class Counsel, $7.8 billion, a full $600 million dollar award would be the equivalent of approximately 7.3% of the total value expected to be paid.[79]  This would fall well within the range of reasonable percentage awards in the largest of settlements, those of $1 billion or more (sometimes known "super-mega-fund" settlements), which have averaged around 11.73%, and have gone as high as 14.5%.  *See generally,* KLONOFF DECLARATION, ¶128; (*see also* Exhibit A to RICE DECLARATION (FEES)).[80]

Of course, Class Counsel do not herein seek an award or distribution of any common benefit fees.  Such an application would be made at an appropriate time in the future, under Rule 23(h).  Plaintiffs merely point to the common benefit cost and fee structure as further evidence of the overall fairness, reasonableness and adequacy of the proposed settlement to the class.[81]

---

[78]In the event that the class settlement is not fully and finally approved, BP will pay up to six percent of the settlement payments to class members, either as part of the Transition Program or pursuant to an Individual Release, subject to a limitation of $480 million, (*i.e.* six percent of $8 billion).  These payments by BP are over and above any and all settlement payments, and will not be "held back" out of the class members' recoveries. The award of any such funds to Class Counsel and/or other common benefit attorneys is, of course, subject to the discretion, approval and award by the Court.

[79]*See* KLONOFF DECLARATION, ¶94 (after accounting for the approximate $30 million in litigation expenses, the common benefit fee would be $570 million, which is 7.3% of $7.8 billion).

[80]In the $7.2 billion *Enron* settlement, for example, the common benefit fee awarded was approximately 9.5%.

[81]*See generally,* KLONOFF DECLARATION, ¶¶ 90-133.

Page 53

## Conclusion

For the above and foregoing reasons, and for the reasons set forth in the accompanying Exhibits and Declarations, as well as the underlying record in these proceedings, the Court should enter a final order and judgment that: **(i)** confirms the certification, for settlement purposes, under Rule 23(a)(1)-(4), 23(b)(3) and 23(e), of the Economic Class; **(ii)** finds and concludes that the multi-media class notice program, as previously approved and as thereafter conducted, satisfies all applicable notice requirements of Due Process and Rule 23; **(iii)** grants final approval to the proposed Economic and Property Damages Settlement Agreement as fair, adequate, and reasonable under Rule 23(e); **(iv)** confirms the appointment of the undersigned as Class Counsel under Rule 23(g); **(v)** reserves and exercises continuing and exclusive jurisdiction over the implementation, administration, and completion of the Court Supervised Settlement Program; and **(vi)** makes such other and further orders as this Court deems necessary and appropriate in connection with the approval, implementation, enforcement, and completion of the Economic and Property Damages Settlement.

This 13th day of August, 2012.

Respectfully submitted,

/s/   Stephen J. Herman
**Stephen J. Herman**, La. Bar No. 23129
**Herman Herman & Katz LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

 /s/ James Parkerson Roy
**James Parkerson Roy**, LA Bar No. 11511
**Domengeaux, Wright, Roy & Edwards, LLC**
556 Jefferson Street, Suite 500
Lafayette, LA 70501
Telephone: (337) 233-3033
Fax: (337) 233-2796
Email: jimr@wrightroy.com
*Co-Lead Class Counsel*

## ECONOMIC CLASS COUNSEL

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:  (843) 216-9159
Telefax: (843) 216-9290
E-Mail:  jrice@motleyrice.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA 70360
Office:  (985) 876-7595
Telefax: (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 13th day of August, 2012.

   /s/ Stephen J. Herman and James Parkerson Roy