# PLAINTIFFS' EXHIBIT B

(*in globo*)

[GCCF Stated Methodologies]



**GULF COAST CLAIMS FACILITY**
**FINAL RULES GOVERNING**
**PAYMENT OPTIONS, ELIGIBILITY AND SUBSTANTIATION CRITERIA, AND**
**FINAL PAYMENT METHODOLOGY**

**February 18, 2011**

The Gulf Coast Claims Facility ("GCCF") hereby announces its Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology ("Final Rules"). The GCCF is acting for and on behalf of BP in fulfilling its statutory obligations as a "responsible party" under the Oil Pollution Act of 1990. All claimants have the right to consult with an attorney of their own choosing prior to accepting any settlement or signing a release of legal rights.

## I.      INTRODUCTION

This document describes:  1) the eligibility criteria required for all private, individual and business claimants to file a claim with the GCCF seeking a Final Payment or an Interim Payment from the GCCF;  2) the calculation methodology being used by the GCCF to determine compensation sought by the claimant; 3) the documentation requirements that need to be met as a prerequisite for compensation; and 4) new procedures designed to promote greater transparency and consistency in the GCCF claims process.

On February 2, 2011, the GCCF published a draft Announcement of Payment Options, Eligibility and Substantiation Criteria and Final Payment Methodology.  In an effort to promote full disclosure and transparency, the GCCF's Announcement requested public comment during the period February 2 through February 16, 2011, from all claimants and other interested parties.

During the past two weeks the GCCF has received some 1,440 comments from claimants, businesses, experts, public officials and other interested parties expressing opinions concerning these and other related issues.  These comments have been posted for public view on the GCCF website (www.gulfcoastclaimsfacility.com.).  The GCCF has carefully considered all comments in the drafting of these Final Rules and, in response to the comments, has revised certain of its proposals to the draft Announcement published on February 2, 2011.

The GCCF continues to seek a comprehensive understanding of the impact caused by the Deepwater Horizon Incident (the "Oil Spill") and its aftermath.  Experts retained by the GCCF have researched and studied  various reports and data pertaining to the future of the Gulf, and have compiled an extensive list of references.  All of these materials were posted on the GCCF website on February 2, 2011, and remain available for review at www.GulfCoastClaimsFacility.com. In adopting its Final Rules governing payment of Final and Interim Claims, the GCCF has gathered facts and opinions from various sources in an effort to develop a credible and fair payment program.

With the promulgation of the Final Rules, the GCCF will now commence the next phase of the Payment Program:  the payment of Final and Interim Claims to those claimants who have been damaged as a result of the Oil Spill.  All claimants should carefully consider three options:

1.  A Final Payment:  A Final Payment will provide compensation to the claimant for all documented past damage plus estimated future damage due to the Oil Spill and will resolve the claimant's entire claim against BP and all other potentially liable parties for any and all past and future damages. **To receive a Final Payment, a claimant will be required to sign a release precluding the claimant from seeking further compensation from the GCCF, the Coast Guard, or in court from either BP or any other defendant companies allegedly responsible for the Oil Spill.**

2.  An Interim Payment:  An Interim Payment will provide compensation to the claimant for all past documented damage due to the Oil Spill; the damage must be documented but **no release will be required.**  Under this option, the claimant may return to the GCCF once each quarter of the calendar year seeking additional documented past damage.  This Interim Payment option does not require that the claimant surrender any litigation rights.

3.  A "Quick Payment:"   A Quick Payment of $5,000 to an individual claimant or $25,000 to a business claimant. This option is available to <u>any</u> claimant who has received either an Emergency Advance Payment or an Interim Payment from the GCCF without any requirement that the claimant provide additional documentation.  **This Quick Payment option will be accompanied by a full release,  precluding the claimant from seeking further compensation from the GCCF, the Coast Guard, or in court from either BP or any other defendant companies allegedly responsible for the Oil Spill.**

II.    **ELIGIBILITY CRITERIA**

The GCCF adopts the following principles governing the eligibility criteria applicable to both Final and Interim Claims for individuals and businesses.

1.  All individuals and businesses that incurred losses due to the Oil Spill are entitled to and are encouraged to file a Final or Interim Claim with the GCCF.  Neither physical proximity to the Oil Spill nor a particular type of work or business engaged in by the claimant is a prerequisite to eligibility for payment of a claim.  ***But adequate documentation of damage attributable to the Oil Spill is required***.  Physical proximity to the Oil Spill, and the nature of the business or work engaged in by the claimant, are important factors when it comes to the proof needed to document a claim that the damage was caused by the Oil Spill.  (See IV, below.)  The ability of the claimant to link the alleged damage to the Oil Spill – as opposed to other factors such as a general downturn in the Gulf region economy or other financial uncertainty unrelated to the Oil Spill -- is required.  (See Attachment A.)

2.  The GCCF will evaluate each claim to determine whether a loss was caused by the Oil Spill.  Each claim will stand on its own individual merits.  In all cases, there must be an identifiable link between an actual loss and the Oil Spill.  Evidence establishing this connection is required.

3.  Claimants who were deemed ineligible for a GCCF Emergency Advance Payment are invited to resubmit a claim seeking a Final Payment or an Interim Payment, accompanied by documentation proving a connection to the Oil Spill.

4.  Individuals who were physically injured or who represent decedents who suffered  death due to the Oil Spill are eligible to receive compensation from the GCCF.  Such claims must be documented, proving that the physical

injury or death is attributable to the Oil Spill and not some other cause.  In cases where claimants assert a disability caused by the Oil Spill, evidence of partial or permanent disability (such as a Social Security or State Workers' Compensation determination of disability) will be required in order to determine the extent of any long term impact on the ability of the claimant to work in his/her chosen profession.

5.  Individuals and businesses with claims for damage to real or personal property are eligible to receive compensation from the GCCF.

6.  Individuals who use the natural resources that have been injured or destroyed as a result of the Oil Spill to obtain food, shelter, clothing, medicine or other subsistence use are eligible to receive compensation from the GCCF.

7.  **Claims related to the moratorium on deepwater drilling, property damage claims for vessels used in the Vessels of Opportunity Program and claims by all Government entities are ineligible for compensation from the GCCF.**

III.    CALCULATION OF AWARDS FOR FINAL AND INTERIM PAYMENTS

The GCCF has retained scientific and economic experts to comprehensively research and review studies pertaining to the impact of the Oil Spill on Gulf resources.  These experts reviewed numerous studies analyzing the economic recovery rates from other major catastrophic events affecting tourism.  In addition, the GCCF consulted with numerous individuals and businesses located in the Gulf region in order to understand the possible impact to individuals and Gulf businesses due to the Oil Spill.  Finally, the GCCF benefitted from input from claimants, experts and other interested parties during the recent two-week public comment period.  The GCCF's goal is to determine the impact of the Oil Spill on seafood harvests, the tourism industry and any other effect on the general Gulf economy.   An effort has been made by the GCCF to determine the estimated length of time to full economic recovery and the related pattern of gradual recovery over time.

The GCCF will base its calculation of awards for Interim Payments on actual documented losses incurred by a claimant during the period immediately following the Oil Spill on April 20, 2010 and the date the Interim Claim is filed.  For Final Payments, the GCCF will base its calculation on two important factors:  1) actual documented losses incurred by the claimant from the date the losses began since the Oil Spill on April, 2010 and, 2) a recovery factor to value the risk of possible future losses as determined by the retained experts and other input received during the public comment period.

Having examined available expert opinions, studies, reports and public comments, the GCCF believes that based on the existing information available:

1.  There is evidence of a strong economic recovery underway.  However, the GCCF has concluded that it is reasonable to base its future payment calculations on the principle that a full economic recovery in the Gulf region is likely (but not certain) within two to three years from the date of the Oil Spill.

2.  Prediction is not an exact science.  In light of the uncertainty that remains, the GCCF believes that it is appropriate to provide claimants desiring finally to resolve their claim at this time with a payment that accounts for the inherent uncertainty concerning the future.

3.  The GCCF conclusions are based on current data, the opinions of the experts and the comments submitted by claimants and other interested parties during the public comment period.  The GCCF will undertake a renewed evaluation of available data every four months.  If such reevaluation suggests a change in the relative

uncertainty concerning the future that warrants an adjustment to the payment for future risk, the GCCF will make the appropriate adjustment and will apply the adjustment to all claims submitted from that date forward. However, final claims previously submitted with complete documentation but not yet evaluated will be paid the higher of the Future Recovery Factor applicable at the time the claim submitted was completely documented, or the adjusted Future Recovery Factor.

4.  <u>Any claimant who disagrees with the GCCF's approach regarding future payment calculations or is not ready to accept it, is free to opt for Interim Payments based upon documented past damage, while awaiting further evidence of Gulf region economic recovery.</u>

    a.  Actual Documented Losses:  Once claimants have demonstrated a direct connection linking the sustained losses for past and present damages to the Oil Spill, eligible claimants will be compensated for documented losses directly caused by the Oil Spill incurred during the period immediately following the Oil Spill on April 20, 2010 and the date of the filing of an Interim or Final Claim with the GCCF ("the loss period").  The calculation of these actual documented losses will be based on a comparison to income from prior years for the same months (for example a comparison of income earned in 2008-2009 or another appropriate historical comparison deemed most relevant to the claimant's experience).  In these cases, the claimant's actual loss will be determined by taking the difference between the claimant's income during the loss period and the comparison period (in most cases years 2008-2009) to arrive at the claimant's actual loss.

    Each claim will be reviewed and evaluated on its own merits and specific circumstances, including but not limited to business trends leading up to the Oil Spill including January through April 2010.  For example, business claims for "start-up" companies which anticipated generating income in 2010, will be subject to a different methodology.  Start-up businesses present a unique forecasting challenge due to the limited available historical financial data.  In measuring losses for startup businesses, the GCCF will consider business plans, market comparables, pre- and post-loss financial data, start-up costs, industry trends and other relevant information. Special attention will also be given to those businesses that closed as a direct result of the Oil Spill.

    Many comments were received regarding the Loss of Income ("LOI") percentage used for businesses. The LOI used for each business is usually calculated based on the financial  information of that particular business.  Typically, the LOI percentage calculated for each business is based on the business' own pre-loss (e.g., 2009) annual Profit and Loss statement or Tax Return, depending on documentation provided by the claimant.  The LOI percentage adjusts the lost revenues to reflect the saved or discontinued expenses for that particular business.  Expenses that are typically considered to be fully or partially saved or discontinued as a result of lost sales include, but are not limited to, costs of goods sold, commissions, payroll and utilities.

    b.  Interim Payments:   Claimants who are not ready to accept a Final Payment Offer may continue to file Interim Payment Claims for documented past damage.  Interim Payment Claims may be filed once each calendar quarter.   For many claimants, much of their documented loss has already been compensated by BP and the GCCF Emergency Advance Payment Program.  The total amount previously received by a claimant for damages as a result of the Oil Spill from BP or the GCCF will be deducted from the Interim Payments.

    c.  Calculation of Future Losses:   The calculation of future losses will be based upon the actual losses incurred during the period immediately following the Oil Spill on April 20, 2010, through December 31, 2010.   The GCCF will use these actual documented 2010 losses and a Future Recovery Factor that

anticipates the gradual economic recovery to estimate the anticipated future losses associated with the Oil Spill.  Experience with other unanticipated and catastrophic events suggests that for all businesses other than oyster harvesting and oyster processing, recovery will continue in 2011, with full recovery reasonably expected in 2012.  Recovery over this time period would result in a Final Payment Offer of two times the actual documented losses in 2010.  During the public comment period, the GCCF received comments from various claimants, experts, public officials and other interested parties urging the GCCF to increase or decrease the Future Recovery Factor.  After reviewing all received comments <u>the GCCF continues to believe that a Future Recovery Factor of 1.0 (two times the actual documented losses) in 2010 is fair and reasonable.  Claimants who disagree with this conclusion are urged to opt for an Interim Payment for past damage.</u>

Many comments were received regarding the GCCF's proposed calculation of future losses based upon the actual losses incurred during the period immediately following the Oil Spill on April 20, 2010 through December 2010.  These comments stated that the GCCF's proposed doubling of the 8 month loss period would only compensate claimants for 16 months' losses and that it would be more equitable to use the 12 month period instead.  These comments misunderstand the proposed calculation of future losses for the following reasons:

- If a 12 month loss period was used to calculate future losses rather than an 8 month period, the total Final Offer amount would not change.  This is because the Future Recovery Factor was constructed to provide payment to the claimant for the estimated actual losses in the "missing" four months.
- If the GCCF were using a full year of losses (May 2010 through April 2011) no Final Offers could be made until May 2011 at the earliest.

For a more detailed response to comments on the calculation of future losses, see the attached explanation of ARPC, an expert firm of economists retained by the GCCF.  (See Attachment B for "Response to Comments on the Derivation and Calculation of Future Damages.")

    d.  Some experts anticipate that individuals and businesses engaged in harvesting and processing oysters destroyed as a result of the Oil Spill, or due to the diversion of fresh water into the Gulf in reaction to the Oil Spill, will likely require a longer recovery period than that experienced by other claimants, without the same degree of gradual recovery.  Accordingly, <u>the Final Payment Offer for those claimants will be equal to an amount four times the actual documented losses in 2010.</u>

5.  For claimants with actual documented losses in 2010 of $500,000 or more, the GCCF will not automatically apply the Future Recovery Factor to the claimant's actual 2010 total losses.  The Final Payment calculation for these claimants will be determined on an individualized basis after analyzing input from the claimant as well as the experts.  The Final Payment Offer will be the actual documented losses in 2010 and an additional amount to compensate for the recovery and risk of possible future losses.

6.  In sum, claimants who have documented and proven a financial loss attributable to the Oil Spill will be paid <u>two times</u> actual documented 2010 losses due to the Oil Spill to compensate for all past and anticipated future losses (except, as described above, for claimants with 2010 losses of $500,000 or more).  Oyster harvesters who have documented and proven a financial loss attributable to the Oil Spill will be paid <u>four times</u> actual documented 2010 losses due to the Spill to compensate for all past and anticipated future losses.  After reviewing all received public comments, the GCCF has concluded that the Future Recovery Factor of four times actual documented 2010 losses will also be applied to actual documented 2010 losses for oyster processors.  (For all claimants, the Final Payment Offer will be reduced by compensation already received in Emergency Advance Payments from

5

BP, Emergency Advance Payments and Interim Payments received from the GCCF and other offsets.)   <u>If any claimant believes that the future of the Gulf continues to be uncertain and is not yet prepared to file a Final Claim, that claimant may continue to file Interim Payment Claims demonstrating ongoing damages linked to the Oil Spill with the GCCF.  Claimants filing Interim Claims will not be required to sign a release.</u>

7.  Final Payments or Interim Payments:   The GCCF will pay eligible individuals or businesses either a Final Payment or an Interim Payment, as the claimant may request.  The Future Recovery Factor, as determined by the GCCF, may be modified going forward as more information becomes available about the future of the Gulf Coast economy.  It is, therefore, entirely possible that the Future Recovery Factor for determining the future impact of the Oil Spill in the Gulf will be increased or reduced as more information becomes available.  Claimants should take this possibility into account in deciding whether to file an Interim Payment Claim or a Final Payment Claim.

8.  **For claimants who have filed a Final Payment Claim with incomplete 2010 documentation, the GCCF will determine and calculate the claim based upon submitted documented actual 2010 losses**.  Claimants will have the option to accept the Final Payment Offer based upon submitted 2010 documentation of actual loss that was available to the GCCF for determination and calculation, or request the re-evaluation of the Final Payment Claim after they have submitted additional documentation of 2010 losses.

---

**EACH CLAIMANT'S FINAL PAYMENT OFFER AMOUNT WILL BE THE LARGER OF:**

(1)  **Two times each eligible claimant's 2010 Actual Documented Losses (except for claimants with 2010 losses in excess of $500,000); four times 2010 Actual Documented Losses for oyster harvester's and oyster processor's 2010 Actual Documented Losses, or**

(2)  **The total actual documented losses through the date of the filing of the Final Claim.**

---

IV.    DOCUMENTATION/SUBSTANTIATION

Although much of the public comment period was devoted to issues concerning the calculation methodology for determining Final Payments, it is important that all claimants seeking Final Payments or Interim Payments focus their attention on the issues of documentation and the ability of each claimant to prove his/her alleged damage caused by the Oil Spill.

**It is imperative that all claimants prove their claims by providing the GCCF with adequate documentation that supports the claim for damages.  (See Attachments A, C and D for information to assist all claimants with an understanding of the financial tests used by the GCCF to establish a loss, and the required documentation and the evidence required to establish a connection between the loss and the Oil Spill.)**

**The GCCF advises all claimants that the documentation of both Final Payment and Interim Payment Claims is lacking in most cases.  This is particularly true for 2010 supporting documentation.  As of the date of this Notice, less than 17% of claimants have submitted completed 2010 documentation.  Incomplete records will delay a claim's review, affect the damages calculation and could result in denial of the claim.**

6

1. As expressly indicated from the very beginning of the Emergency Advance Payment Program, the documentation requirements for receiving either a Final Payment or an Interim Payment are more rigorous and exacting than the minimal documentation requirements that governed administration of the Emergency Advance Payment Program. Each claimant is required to establish both actual financial loss and a connection between the loss and the Oil Spill.

2. Each claim stands on its own merits, and the GCCF will evaluate each submission to determine whether a loss was caused by the Oil Spill. When evaluating each claim for compensation, the GCCF will make certain presumptions that losses were caused by the Oil Spill based on the claimant's proximity to the Gulf shore and the nature of the claimant's business activity.

3. The following blueprint for substantiation required by the GCCF to prove a compensable claim is based upon input from the retained experts who evaluated the likelihood of a link between the Oil Spill and a claim for damages. The following blueprint is offered as guidance only.

   a. Physical Proximity to the Oil Spill/Workers and Businesses Directly Dependent Upon Gulf Resources: A connection to the Oil Spill is easiest to demonstrate in cases involving workers and businesses that are heavily dependent on Gulf resources and tourism and are located in **the immediate vicinity of the Gulf shore as well as claimants that were already determined eligible for an Emergency Advance Payment from the GCCF.** Examples are fishermen, shrimpers, oyster harvesters, boat captains, seafood processors, as well as heavily tourist-dependent business activities in the immediate vicinity such as marinas, hotels, restaurants and rental properties located on Gulf Coast beaches. In these cases, as well as in cases where claimants have already submitted adequate documentation to receive an Emergency Advance Payment, the submission of adequate financial information and data contrasting wages and income before and after the Oil Spill will usually be deemed sufficient to document a claim. **Nevertheless, even as to these types of claims, currently the GCCF has found that most filed claims are pervasively lacking documentation contrasting pre- and post-Oil Spill wages and income and complete 2010 financial documentation**.

   b. Physical Distance From the Oil Spill/Workers and Businesses Less Dependent Upon Gulf Resources: For Businesses and individuals that are not in the immediate vicinity of the Gulf shore but are operated in Gulf Alliance counties that are less sensitive to an interruption to Gulf Coast tourism or seafood harvesting, more exacting documentation is required. The GCCF bases this conclusion on the experts' opinion that additional substantiation is necessary to conclude that losses are due to the Oil Spill, the further a business is from the immediate vicinity of the Oil Spill, or the less dependent the business is on Gulf resources. In such cases, the GCCF will adopt the experts' recommendations that the claimant prove that his/her "positive trend" of lost wages or profit during the immediate period preceding the Oil Spill was interrupted by the Deepwater Horizon incident. **Simply contrasting pre- and post-Oil Spill wages/income may not be sufficient. Claimants in this category will receive compensation by establishing loss and by the use of a financial test that analyzes relative financial performance in the immediate pre-Oil Spill and post-Oil Spill periods.** Attachment C describes the Financial Test the GCCF will use to establish whether there was damage due to the Oil Spill and the required documentation.

   c. All Other Claimants: The GCCF has received claims from claimants residing outside of the Gulf states, claims from businesses located many miles from the Oil Spill, and claims from businesses that do not appear directly dependent on Gulf resources such as dentists, veterinarians, and chiropractors. Many of these claims comprise business activities that are more dependent on general economic conditions than on tourism or seafood harvesting on the Gulf Coast. In these cases (numbering in the thousands), the most exacting type of proof demonstrating an identifiable link between the asserted damage and the Oil Spill will be required. Claimants in this category may receive compensation by establishing loss, by passing the

financial test that analyzes relative financial performance in the immediate pre-Oil Spill and post-Oil Spill periods, and by providing evidence that establishes the link between losses and the Oil Spill.  For example, the claimant might provide documentation of cancelled orders for goods or services sold to a Gulf business; consistent sales in the past two years or more to a Gulf business that failed to recur due to the Oil Spill; bad debt written off and associated with failure to pay by a Gulf business; failure of a contractual arrangement involving a Gulf business that results in demonstrable lost sales or income; higher expenses or cost of goods due to having to obtain them from another vendor other than the traditional Gulf business; a specific termination of employment or reduction in wages that an employer confirms was as a result of the Oil Spill, etc.  Examples of the type of evidence that may link a claimant's loss to the Oil Spill are described in Attachment A.  **Providing general financial information about losses sustained in 2010 after the Oil Spill will not be sufficient documentation for claimants in this category.  Instead, proof will be required specifically linking the sustained loss to the Oil Spill.**

Claimants are reminded that, in the absence of necessary documentation proving their claim for a Final Payment Claim or an Interim Payment Claim, the "Quick Payment" option is available to any claimant who has already received an Emergency Advance Payment without the necessity of submitting any further documentation to the GCCF.  Quick Payments of $5,000 will be made to individuals and $25,000 to businesses.  **Quick Payments require a full release. Before accepting any settlement or signing a release of legal rights, claimants have a right to consult with an attorney of their own choosing.  Free legal assistance is available for claimants who cannot afford an attorney.**

## V.      GREATER TRANSPARENCY AND CONSISTENCY

In an effort to promote greater transparency and consistency in the GCCF claims process, the GCCF is initiating a series of measures designed to provide claimants with greater access to information about their individual claims, including the status of the claim and the reasons for determinations made by the GCCF (claim acceptances or denials; calculation of compensation and the reasons related thereto, etc.). (See Attachment E for Sample Payment Letters and Evaluation Calculations.)  In conjunction with the beginning of the Final Payment and Interim Payment process, the GCCF reminds all claimants of the following:

1.  Additional local personnel have been retained by the GCCF and are now in place in the claims site offices throughout the Gulf region to assist claimants in securing more information about the status of their claims and the underlying reasons for GCCF claim decisions.  These local personnel are residents of the region, who are familiar with the nature of Gulf Coast businesses and occupations.  They are present in the Gulf to assist claimants in the processing of their GCCF claims.  All staff members at the claims site offices are subcontractors of the GCCF; BP provides the funding for the expenses of the administration of the GCCF, including compensation for GCCF subcontractors.

2.  Claimants are also invited to seek the assistance of local accountants and accounting firms in the preparation and processing of their individual claims or for an evaluation of the GCCF's Interim or Final Payment Offer. These accounting firms are not subcontractors of the GCCF, are not retained by the GCCF and are not working for the GCCF; they are available to assist claimants in assessing their business losses.  Reasonable costs associated with the work of these accounting firms can be added to the overall damage claim submitted by the claimant and will be paid by the GCCF as part of the compensation provided any claimant who shows a loss due to the Oil Spill.

3.   In appropriate cases, the GCCF will resolve a group of claims submitted by a particular attorney or law firm, accounting firm, or specific localized region of the Gulf, by sending GCCF accountants and GCCF support staff to meet with the attorney, accounting firm, or claimants in a specific localized region  in an effort to resolve claims quickly and efficiently at the local level.

4.  For all claims other than those for physical injury, if a claimant disagrees with the GCCF's decision on the claim (either because it was denied or the claimant deems the compensation inadequate), or if the GCCF has not acted on the claim within 90 days of the date the claim was presented to BP or to the GCCF, the claimant may submit the claim to the National Pollution Funds Center ("NPFC"), the Coast Guard office responsible for evaluating and determining claims; as an alternative, the claimant may file a claim in court, including the multidistrict litigation pending before the United States District Court for the Eastern District of Louisiana, titled, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179.* The multidistrict litigation is a consolidated grouping of federal law suits arising out of the Spill. General information on the procedure for filing a claim with the NPFC may be obtained from the Director of the National Pollution Funds Center, NPFC MS 7100, U.S. Coast Guard, 4200 Wilson Blvd., Suite 1000, Arlington, VA 20598-7100, (800) 280-7118, or from the NPFC website at www.uscg.mil/npfc/claims. Information regarding the multidistrict litigation may be obtained from the court's website at www.laed.uscourts.gov.

5.   As to all claims, including those for physical injury, under the GCCF Protocol governing Final Claims, the claimant may appeal a Final Claim determination of the GCCF  if a total monetary award (including any Emergency, Interim or Final Payment made by  BP or the GCCF) is in excess of $250,000.  The appeal will be reviewed by a panel of three neutrals (not selected by the GCCF) who will make an independent determination of the claim's value.  BP will have the right to appeal to this panel of three neutrals where the claimant receives compensation in excess of $500,000.


**THE GCCF WILL CONTINUE TO MONITOR AND REVISE THESE FINAL RULES GOVERNING PAYMENT OPTIONS, ELIGIBILITY AND SUBSTANTIATION CRITERIA, AND FINAL PAYMENT METHODOLOGY.  THE GCCF WELCOMES ONGOING INPUT FROM CLAIMANTS AND OTHER INTERESTED PARTIES AS IT MOVES FORWARD WITH FINAL PAYMENTS, INTERIM PAYMENTS AND QUICK PAYMENTS.**

**ATTACHMENT A**

**ESTABLISHING EVIDENCE OF A CONNECTION TO THE SPILL**

The  GCCF will review each claim case by case to determine whether the claimant has established that a financial loss occurred as a result of the Oil Spill. The following guidance has been developed to assist claimants with formulating the basis of a claim and providing sufficient supporting documentation.

| Assertion | Description | Examples of Evidence |
|---|---|---|
| Losses due to the effects of the spill on the Gulf seafood supply chain | The use of and/or reliance on Gulf seafood must be established. Documentation to support this assertion may include evidence of sourcing seafood from the Gulf and/or dependence on commercial fishing activities.<br><br>Example: a multi-purpose trucking company with cancelled contracts for hauling Gulf seafood. Appropriate documentation to support this assertion would include the original agreement and a letter from the customer/supplier explaining that the contract was cancelled as a result of the spill. | <ul><li>List of customers/suppliers within Gulf region</li><li>Evidence of cancelled orders/agreements/contracts as a result of the oil spill</li><li>Evidence of modified orders/agreement/contracts as a result of the oil spill</li><li>Historical evidence of consistently placed orders</li><li>Third party affidavits/letters</li><li>Third party invoices/receipts of Gulf seafood product</li><li>Evidence of the traditional location of the affected business activity</li></ul> |
| Losses due to the effects of the spill on the Gulf's tourism sector | A connection to the tourism industry in the Gulf region must be established. Documentation to support this assertion may include evidence of a business-to-business relationship or a primary customer base of tourists within the region. | <ul><li>List of customers/suppliers within Gulf region</li><li>Evidence of cancelled orders/agreements/contracts as a result of the oil spill</li><li>Evidence of modified orders/agreement/contracts as a result of the oil spill</li><li>Historical evidence of consistently placed orders</li><li>Third party affidavits/letters</li><li>Third party invoices/receipts</li></ul> |

| | | |
|---|---|---|
| | Example: a regional distributor of ice cream with a loss of sales to beachfront hotels and restaurants.  Appropriate documentation to support this assertion would include records reflecting a post-spill reduction in purchases by identified tourism-dependent customers and letters from the purchasers explaining that the reduction in orders was a result of the spill. | • Evidence of the traditional location of the affected business activity<br>• Records of sales reflecting the percentage of sales to out-of-state/out-of-town purchasers |
| Losses due to business interruption as a direct result of the oil spill | An interruption to a business would include a partial or complete inability to engage in business activities. Example: a commercial shipping business that experienced a partial business interruption when the waters its carriers normally travel were temporarily closed to traffic due to the oil spill.  Appropriate documentation to support this assertion would include evidence of prior navigation routes passing through closed areas and contemporaneous communications between the claimant and its customers reporting on the resulting delays. | • List of customers/suppliers within Gulf region<br>• Evidence of cancelled orders/agreements/contracts as a result of the oil spill<br>• Evidence of modified orders/agreement/contracts as a result of the oil spill<br>• Historical evidence of consistently placed orders<br>• Third party affidavits/letters<br>• Third party invoices/receipts<br>• Evidence of the traditional location of the affected business activity |

ATTACHMENT B

# RPC
analysis·research·planning

1220 19th Street, NW
Suite 700
Washington, D.C.  20036
Phone: (202) 797-1111
Fax: (202) 797-3619

# Response to Comments on the Derivation and Calculation of Future Damages

Future damages are calculated when the claimant wishes to file for a *Final Claim*. The GCCF provides claimants with two alternative final payment options, the *Quick Payment Final Claim* and the *Final Claim*. It also provides claimants with the ability to receive *Interim* payments. The Final Claim option provides for a payment that is the sum of the claimant's losses incurred in 2010 plus a payment for claimant's anticipated future damages.  This option requires the documentation of losses.  The calculation of future damages is equal to 2010 losses multiplied by the so called *Future Recovery Factor*.

Several comments have been received on the derivation and calculation of the Future Recovery Factor in the Final Claim option.  The comments focus on two issues.  One issue is the order of magnitude of the Future Recovery Factor.  The comments question whether the Factor is high enough – does it undervalue the losses facing claimants in the future?  A second concern is that the Factor applies only to 2010 losses rather than a full year of losses.  Since, for all practical purposes the financial affects of the oil spill did not begin until May, losses in 2010 are for only eight months.

*Derivation of the Future Recovery Factor*

The GCCF worked closely with outside experts to estimate the impact of the oil spill on the Gulf economy.  It was determined that the oil spill has two effects:  (1) an effect on tourism, and (2) an effect on harvesters and related sectors from the closing of waters and potential damage to stocks of fish, shrimp, crabs, oysters and other species.

The derivation of the Future Recovery Factor is based on the analysis of the economic recovery experience of individuals and businesses subjected to other unanticipated and catastrophic events. Experts have studied many of these events from the past and recorded estimated rates of economic recovery.

*Effect on Tourism*

It is expected that the greatest financial damage caused by the oil spill results from its effect on tourism.  The Gulf economy is heavily dependent on tourism and revenue from tourism potentially affects a broad swath of the economy.  It is clear that the oil spill significantly reduced tourism in 2010 reducing the income of individuals and businesses dependent on tourism.  In addition, the effect on tourism will likely continue into the future.  Indeed, the experience observed from other events affecting tourism suggests that these losses will continue (though at a diminishing level) for two to three years from the time of the oil spill.

There are two key issues: (1) the length of time until tourism fully recovers and (2) the rate of the recovery. There is an important distinction between these two issues.  The first issue is relatively straightforward – how many months will it take to get back to the number of tourists and the dollars they spend that would have occurred without the oil spill.  The second is a bit more complicated.  It is concerned with the speed of the recovery.  If it takes 30 months to full recovery, what percent of the recovery is achieved in the first 15 months? The speed of the recovery is equally important to the estimate of future damages as the time to full recovery.

The GCCF staff and its experts reviewed all of the relevant research conducted on the effects of various events on tourism.  The research included the analysis of a broad range of events including other oil spills, hurricanes, terrorism, health issues and other natural disasters.  This review included an analysis of the Gulf oil spill prepared by Oxford Economics on behalf of the US Travel Association entitled "Potential Impact of the Gulf Oil Spill on Tourism".

The conclusions reached from this review and analyses are as follows:

- We assume that it would take tourism 30 months to achieve full recovery (the upper end of the Oxford Economics analysis). While for most events, full recovery was achieved within twelve months from the event, some of the studies and Oxford Economics suggest that full recovery would be reached in 15 to 36 months.
- We assume that the recovery would occur at a nearly proportional rate – 54% recovery at the end of the first year after the oil spill, 75% recovery at the end of the second year after the oil spill and reaching full recovery at 30 months after the oil spill.  This recovery rate is heavily dependent on the review of the academic research and the analysis conducted by Oxford Economics.  It is also influenced by our analysis of various economic indicators related to tourism.  These include hotel revenues, travel expenditures, tourist visits, sales tax revenues for tourism related sectors, gaming revenues and other indicators. Taken together they suggest a recovery beginning by the fall of 2010.
- The 30 month full recovery period and the assumed recovery rate yields a Future Recovery Factor of 1.0.

*Effect on Harvesters*

The effect on harvesters was presented in the study prepared for the GCCF by John W. Tunnell Jr. of the Harte Research Institute for Gulf of Mexico Studies, Texas A&M University, Corpus Christi, Texas entitled "An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill".  Dr. Tunnell concludes that while there are unknowns and some risk, it appears that the ecosystem is recovering very quickly and waters are nearly completely reopened to harvesting.  These indicators reflect an assessment of the pace of physical recovery of the Gulf's marine resources. The pace of economic recovery of the Gulf's marine resources may not be identical.  Out of an abundance of caution, the GCCF has adopted the same assumptions concerning harvester sector recovery as it has adopted for the tourism sector. The single exception with potentially even longer term issues are oysters, since it is likely that oysters were killed in some areas and it may be that in some cases the oyster bed foundations were damaged. The Future Recovery Factor as it applies to oysters is based on a different calculation, described elsewhere.

*Application of the Future Recovery Factor*

The remaining issue was how to apply these conclusions to the individual circumstances of each claimant. First, it is assumed that every claimant will experience the same recovery rate as the Gulf economy in general. While we understand that claimants may actually recover from their 2010 losses at different rates, it is not practical to account for such differences.  It is not possible to distinguish the potential disparate effect of the oil spill on claimants versus individual preferences and characteristics that are unrelated to the oil spill.

Second, 2010 losses were selected as the base for calculation.  We understand that this is only an eight month period, but it is assumed that this period constitutes the most significant losses.  In addition, the Future Recovery Factor was constructed to account for the fact that only eight months are in the base period.  Indeed, the total amount offered to the claimant using the eight month base period is the same as the offer if the base period was twelve months.  If, in the case of an individual claimant, this is not true, then (as described elsewhere) interim payments are always available.  Otherwise, relying on a full year would mean that no claimants could file for a Final Payment before the end of April 2011.

**ATTACHMENT C**

**FINANCIAL TEST**


The financial test is to establish whether there was damage due to the Oil Spill.

- First, 2010 is divided into two parts – pre-Oil Spill and post-Oil Spill.
  - The pre-Oil Spill period is January through April
  - The post-Oil Spill period is May through December of that year

- Second, the January through April financial performance in 2010 is compared to the average financial performance in the January through April period from prior years (for example January through April for 2008/2009) – pre-Oil Spill Financial Performance

- Third, the May through December end of year financial performance in 2010 is compared to the average financial performance in May through December from prior years (for example May through December for 2008/2009) – post-Oil Spill Financial Performance.

To qualify for compensation, the financial performance test must show:

- #1:  A decline in revenue from the average revenue earned May through December in 2008/2009.  In effect, the business must show there is a decline in post-Oil Spill financial performance relative to earlier years.

- #2:  The percent decline in 2010 post-Oil Spill revenue from #1 above must exceed the percent decline in 2010 pre-Oil Spill revenue.

15



# Gulf Coast Claims Facility
## www.GulfCoastClaimsFacility.com

**GULF COAST CLAIMS FACILITY**

**Modification to Final Rules Governing Payment Options,**

**Eligibility and Substantiation Criteria, and Final Payment Methodology (dated February 18, 2011)**

August 16, 2011

The GCCF believes that, although the economy continues to improve, some businesses will recover more slowly than others. The following modification to the GCCF's Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology (dated February 18, 2011) ("Final Rules"), is designed to provide a methodology for a fair and consistent approach to determine and calculate final and interim payments for individuals and businesses for 2011 losses sustained due to the Oil Spill. The GCCF Final Rules are amended as follows:

***I. Final Payment Offers***

The GCCF recognizes that recovery in the Gulf is well underway. However, the GCCF believes the future of the Gulf region remains sufficiently uncertain as to warrant the continuation of the Future Recovery Factor for actual documented 2010 losses as set forth in the GCCF's Final Rules.

- Final Payment Offers will continue to be calculated according to the rules previously set forth in the GCCF Final Rules as follows (except as noted below for claimants with 2011 losses with no documented 2010 losses, and in Section IV: Modification for Oyster Leaseholders):

> Each Claimant's Final Payment Offer Amount will be the larger of:
>
> 1) Two times each eligible claimant's 2010 Actual Documented Losses (except for claimants with 2010 losses in excess of $500,000); four times 2010 Actual Documented Losses for oyster harvesters and oyster processors, and for **Oyster Leaseholders only**, the addition of the Future Risk Multiple as noted below in Section IV: Modification for Oyster Leaseholders; or
> 2) The total actual documented losses through the date of the determination of the Final Claim.

- Final Payment Offers for claimants **with no documented 2010 losses** will be reviewed and calculated using 2011 losses that can be ascribed to the Oil Spill. These claimants must provide evidence

specifically linking the claimed 2011 losses to the Oil Spill.    The Final Payment Offer for such claimants will be calculated on a case by case basis.

Consistent with the Final Rules,[1] the Final Payment Offer will be reduced by compensation already received by the claimant in Emergency Advance Payments from BP, Emergency Advance Payments and Interim Payments received from the GCCF, payments received from Gulf state real estate funds and other offsets.

## II. *Interim Payment Claims*

- Interim Claims for Businesses:

  For Interim Claims submitted by businesses for second quarter 2011 losses (and thereafter), the GCCF will <u>require</u> that all businesses demonstrate an actual revenue growth rate of at least 5% from 2010. Losses associated with revenue less than the 5% growth rate are presumed to be from non-Oil Spill related factors and will not be compensated.    (For greater detail on the methodology for the calculation of 2011 losses, see Attachment A:  "ARPC Methodology for Calculating Interim Payment for 2011 Losses Due to the Oil Spill," prepared by ARPC, an expert firm of economists retained by the GCCF.)

- Interim Claims for Individuals:

  o The GCCF will <u>require</u> that all employed individuals demonstrate an actual growth in earnings of at least 5% from 2010 earnings.  However, for these individual claimants, this modification will not become effective until the submission of interim claims in the third quarter of 2011 (and thereafter), for losses sustained beginning July 1, 2011.  (Losses for individual claims filed for first and second quarter 2011 will be paid according to the GCCF's current calculation methodology as set forth in the GCCF Final Rules.)  Losses associated with earnings less than the 5% growth rate are presumed to be from non-Oil Spill related factors and will not be compensated.

  o For individuals who assert unemployment as a result of the Oil Spill, the GCCF will allow an eligible individual to continue to be paid through the GCCF interim payment process for a maximum of 78 weeks of compensation for unemployment caused by the Oil Spill as supported by documentation provided by the claimant.  The GCCF will review such continuing claims and will determine additional documentation requirements for individuals who have exhausted the 78 week unemployment maximum.

---

[1] See Final Rules page 5-6, *Calculation of Awards for Interim and Final Payments,* http://www.gulfcoastclaimsfacility.com/FINAL_RULES.pdf.

- Claims for Businesses and Individuals <u>who have not been found by the GCCF to be eligible for compensation:</u>  These claimants must first qualify for eligibility for payment as set forth in Section IV.3. (a) (b) and (c) of the GCCF Final Rules.   <u>If no 2010 losses can be demonstrated, all claimants must provide evidence specifically linking the claimed 2011 losses to the Oil Spill to be deemed eligible for compensation from the GCCF.</u>

### III.   Modification to Financial Test (Attachment C to the GCCF Final Rules)

The financial test explained in Attachment C to the "GCCF Final Rules" is an eligibility analysis to determine whether damage due to the Oil Spill should be presumed.  The financial test is used to indicate whether any decline in revenue in the pre-Oil Spill period, relative to revenues during the same period in prior years, is due to the Oil Spill or some other factor(s).  To "pass" the financial test currently, there must be some deterioration from the first four months of 2010 (pre Oil Spill) as compared to the last eight months of 2010 (post Oil Spill).

In a number of cases, the high variability of historical revenues does not fit the parameters for which the test was initially designed.  Some claimant businesses lack historical financial data needed to perform the financial trending test. In certain of these situations the financial performance test as described in the GCCF Final Rules may not be sufficient to determine financial eligibility.  Such claims will be reviewed and considered carefully according to the specific circumstances of the claimant's financial history in order to determine whether or not the financial data provided by the claimant indicates any potential impact due to the Oil Spill.

### IV. Modification for Oyster Leaseholders

This modification is designed to provide a methodology for a fair and equitable approach to compensate oyster **leaseholders** in the Gulf of Mexico who have been financially harmed by the closure of the oyster beds, fresh water diversions, and/or possible oil contamination as a result of the Oil Spill.  This modification recognizes that there is significant uncertainty regarding possible ongoing damage to the oyster crop and oyster producing areas in the Gulf.  This modification recognizes three different types of potential losses to oyster leaseholders as follows:

- Initial loss of earnings/revenue during the Oil Spill in 2010 due to:
  - state/federal closures, or
  - inventory reductions from fresh water incursions related to government actions to divert the Oil Spill that may have increased the mortality rate in that year;[2]
- Subsequent potential losses during the anticipated recovery period given the production cycle of oysters;[3] and/or
- The residual risk of long-term Oil Spill related damage to the oyster beds and their ability to support the reproduction cycle of future generations of oysters.

---

[2] Other fresh water incursions took place as the Mississippi crested during the Oil Spill period and flooded the lower delta region.  Dr. Earl Melancon of Nicholls State University indicated that this action, coupled with the remedial action by the state of Louisiana, caught the oyster beds in a "vice."

[3] See *"ARPC Response to Comments on the Derivation and Calculation of Future Damages"* on GCCF web site as follows – http://www.gulfcoastclaimsfacility.com/FINAL_RULES_B.pdf.

Under the current procedures, the Final Payment Offer calculation begins with the determination of 2010 Losses for all harvesters.  The GCCF's current calculation methodology for determination of the Final Payment Offer for claimants directly involved in the oyster industry, e.g. leaseholders, harvesters (captains and crew) and processors, is four times 2010 Lost Profits/Earnings.    Their compensation continues to be determined in the same manner as described in the GCCF's Final Rules.  The modification discussed below will be applied to oyster leaseholders only as described below.

This modified methodology continues to compensate for 2010 Loss and subsequent losses during the anticipated recovery period in exactly the same way.    However, for oyster leaseholders only, the Final Payment Offer will, in addition, include a special Allowance for Future Risk that will be added to compensate for the risk of as yet undetected and possibly ongoing damage to oyster-producing areas in the Gulf and the possibility of significant delay before affected oyster beds are repaired.   For leaseholders in Louisiana, Mississippi, Alabama and parts of the Florida Panhandle, the Allowance for Future Risk will be a multiple (the "Future Risk Multiple") of net income in a comparison year ("Comparison Year Net Income") added to the claimant's Final Payment Offer.    **The Future Risk Multiple will apply to the leasehold component of the business only.  To be eligible for the Future Risk Multiple, Oyster Leaseholders will be asked to file a GCCF Property Damage Claim in addition to their Lost Earnings/Profits Claim.**  Comparison Year Net Income is generally based on either the average of 2008-2009 or the claimant's 2009 income, whichever is higher.[4] Businesses that are directly involved in the oyster industry e.g., harvesters (captains and crew) and production and processing businesses are not eligible for the Allowance for Future Risk.  Only leaseholders are eligible for this special Allowance for Future Risk.

**Future Risk Multiple**

The GCCF has defined three distinct damage categories and has assigned a Future Risk Multiple to each depending upon the physical location of the oyster beds.  The Allowance for Future Risk is equal to the product of the Comparison Year Net Income and a Future Risk Multiple based on the geographic location of the oyster beds.

- Based on a review of the lease locations within harvest areas ("Quads") in Louisiana (Map 1)[5], data on fresh water diversions (Map 2)[6] and oil infiltration (Map 3)[7], the GCCF has defined three distinct damage categories and assigned a Future Risk Multiple to each  (See Attachment B for Maps 1-4.)

---

[4] If an oyster harvester indicates that his/her historic catch during these periods is not representative of a "normal" period, the GCCF will consider reasonable evidence of a more appropriate period.
[5] Louisiana Department of Wildlife and Fisheries – Oyster Lease Survey Section.
[6] Louisiana Department of Wildlife and Fisheries, March 2005.  Flow Rates retrieved from Office of Coastal Protection and Restoration, LA;  http://coastal.louisiana.gov/index.cfm?md=newsroom&tmp=detail&articleID=1216&catID=1.
[7] "Deep Water Horizon, One year Later", The Economist: http://www.economist.com/node/18587367.
Data for Map 3 was sourced from the Office of Response and Restoration - Deepwater Horizon Trajectory Map Archive Near shore Surface Oil Forecasts.
http://response.restoration.noaa.gov/topic_subtopic_entry.php?RECORD_KEY%28entry_subtopic_topic%29=entry_id,su

High:        (Multiple = 7 times Comparison Year Net Income)

Medium:   (Multiple = 3.5 times Comparison Year Net Income)

Low:         (Multiple = 2 times Comparison Year Net Income)

(Multiple = 1 times Comparison Year Net Income for **Florida (only leases in Apalachicola Bay & points west)**

These scores are the Future Risk Multiples to be used in the Allowance for the Future Risk formula and added to the claimant's Final Payment Offer.

(Note:  the Comparison Year Net Income only applies to the net income related to the leasehold component of the claim.)

- Leaseholders in **Louisiana** will be assigned a Future Risk Multiple for each distinct lease area, called "Quads" by the Louisiana Department of Wildlife and Fisheries.[8]  The Multiple will be based on the highest rated Quad for the specific lease.  Map 4[9] shows the Quad boundaries and their Future Risk Multiples.  <u>(Oyster leaseholders whose acreage has not been productive for five years will not be compensated for future losses.)</u>  The maximum Future Risk Multiple for fresh water and oil damage to a lease in Louisiana is a multiple of 7 times the Comparison Year Net Income.  The minimum is a multiple of 2 times the Comparison Year Net Income for Quads where only a small amount of oil contamination has been noted.

- Leaseholders in **Mississippi** and **Alabama** will be assigned a Future Risk Multiple of 3.5 times the Comparison Year Net Income.  This reflects the fact that most of the shorelines of Mississippi and Alabama experienced a significant degree of oil contamination similar to that experienced in the most affected shorelines of Louisiana.  However, fresh water incursion was not significant in these states.

- Certain leaseholder claims in **Florida (only leases in Apalachicola Bay and points west)** will be assigned a Future Risk Multiple of 1.0 times the Comparison Year Net Income.  This reflects the fact that most of these shorelines experienced some oil contamination, though less than that experienced in Mississippi and Alabama.  Fresh water incursion was not significant in these areas.

---

btopic_id,topic_id&entry_id(entry_subtopic_topic)=831&subtopic_id(entry_subtopic_topic)=2&topic_id(entry_subtopic_topic)=1.

[8] The Louisiana Department of Wildlife and Fisheries' public website posts the locations of each Quad as well as a database of the leases held by private leaseholders.  Each private lease is assigned by the State to a Quad.  GCCF will rely on this list to designate the leases for an individual claimant.   http://oysterlease.wlf.la.gov/oysterlease1/framesetup.asp.
[9] Louisiana Department of Wildlife and Fisheries – Oyster Lease Survey Section for "Quads".

**Oyster Leaseholders in Florida east of Apalachicola Bay and all oyster leaseholder claims in Texas are <u>not eligible to</u> receive an Allowance for Future Risk. [10] Oyster beds in these areas did not experience significant fresh water or oil incursion.**

An adjustment (reflecting the percentage reduction in production) will be made to the Future Risk Multiple in the event that a leaseholder has harvested oysters in 2011 or thereafter from a lease for which future losses are claimed. [11]

---

[10] In 2002, there were 43 oyster leases in Texas, all of which were in Galveston Bay.  Oysters from leased beds accounted for approximately one-third of Texas oyster landings.  There are very few leased oyster beds in Florida and most of them are in the Apalachicola Bay area.

[11] For Quads rated a 7, the adjusted Future Risk Multiple will be a minimum of 3.5; for Mississippi and Alabama leases and Quads rated 3.5, the adjusted Future Risk Multiple will be a minimum of 1.75; for Quads rated 2.0, the adjusted Future Risk Multiple will be a minimum of 1.0 and for the western Florida Panhandle rated 1.0, the adjusted Future Risk Multiple will be a minimum of 0.5.



# GULF COAST CLAIMS FACILITY

### Second Modification to Final Rules Governing Payment Options,

### Eligibility and Substantiation Criteria, and Final Payment Methodology (dated February 18, 2011)

November 30, 2011

The GCCF has analyzed various economic data including tourism-related revenues and taxable sales to continue to monitor the status of the recovery, both Gulf-wide and on regional levels.  The following modification to the GCCF's **Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology** (dated February 18, 2011) ("Final Rules") is designed to reflect the current economic situation in the Gulf while continuing to provide a methodology for a fair and consistent approach to determine and calculate final and interim payments for individuals and businesses for 2011 losses sustained due to the oil spill.

Modifications to the Final Rules outlined below (with the exception of Section I Changes in Compensation for Commercial shrimp and crab Harvesters and Processors), will be effective immediately and applied to all claims <u>submitted</u> to the GCCF postmarked, filed electronically, faxed or hand delivered on or after November 30, the date of this modification.   For claims filed on or after November 30, 2011**, including claims new to the GCCF and existing claimants filing additional interim or new final claims (including those claimants who previously received an Emergency Advance Payment from the GCCF),** the eligibility requirements and computations for Interim Payments and Final Payments will follow the modified rules.

The GCCF Final Rules are modified as follows:

## I.    Changes in Compensation for Commercial Shrimp and Crab Harvesters and Processors

The GCCF recognizes the ongoing uncertainty regarding the state of the commercial harvesting of shrimp and crab in the Gulf and the uncertainty of any ongoing impact from the spill.   As a result of this uncertainty, the GCCF has adjusted its methodology for compensation to commercial shrimp and crab harvesters and processors to include additional compensation.  This modification for compensation for commercial shrimp and crab harvesters and processors will apply to all Final Payment Offers made by the GCCF <u>for claims currently under review by the GCCF but not yet determined or accepted, and for all claims received on or after November 30, 2011</u>, the date of this modification.   Note that commercial shrimp and crab harvesters and processors will continue to be required to prove 2010 losses.   Commercial shrimp and crab harvester business claimants must provide evidence of their license to harvest in the loss year that they are claiming losses.

Specific Eligibility and Documentation Requirements:

- Business Claimants:  Commercial shrimp and crab harvester and processor business claimants must provide tax returns for the past three years (2008 – 2010).  In addition, business claimants who are shrimp harvesters must provide evidence of:  1) a commercial shrimp license or shrimp vessel license; 2) a shrimp captain's license; 3) proof of ownership of a shrimping vessel; or 4) a commercial gear license.  For business claimants who are crab

harvesters, claimants must provide: 1) a commercial crab catcher license; 2) a commercial crab trap license; or 3) a commercial crab fisherman's license.  More generic saltwater product or commercial fisherman's licenses will be considered for both shrimp and crab harvesters on a case by case basis.

- Individual Claimants:  Individual shrimp and crab harvester or processor claimants who are employed by commercial harvesters and processors of shrimp or crab must provide proof of employment by a captain or owner of a vessel or business entity who has submitted a claim to the GCCF for a similar loss period and whose claim has been deemed eligible for payment, received a final payment offer or has been paid by the GCCF prior to or after the effective date of this modification, or the claimant must provide an appropriate harvesting license and a letter from the employer confirming the dates and type of employment.

Therefore, the following rules for compensation for commercial shrimp and crab harvester and processor claimants will be applied.  (For generic seafood harvesters and processors, only the portion of losses attributable to Gulf shrimp or crab will be eligible for the new compensation calculation provided with this modification to the Final Rules described below.)

---

Each Commercial shrimp and crab Harvester Claimant (who meets the specific eligibility and documentation requirements as noted above) and who provides the required documentation to harvest in the loss year that they are claiming losses <u>and</u> Commercial shrimp and crab Processors will be **eligible for a Final Payment Offer Amount of the larger of:**

1) **Four times each  claimant's 2010 Actual Documented Losses (except for claimants with 2010 losses in excess of $500,000); or**

2) **The total actual documented losses through the date of the determination of the Final Claim.**

---

Consistent with the Final Rules, the Final Payment Offer will be reduced by compensation already received in Emergency Advance Payments from BP, Emergency Advance Payments from the GCCF and Interim Payments from the GCCF.

## II.    Changes in Eligibility Rules for All Individuals and Businesses in the Florida Peninsula and Texas

Based on an analysis of recent revenue trends at beachfront hotels along the Gulf as well as taxable sales data at a county level in Florida and Texas, the GCCF has concluded that there is a significant differential impact of the oil spill between (1) the Gulf Alliance counties along the western coast of Florida south of the Panhandle (hereafter called "Florida Peninsula") and Texas, and (2) other areas in the Gulf.  See Appendix A for a list of the Gulf Alliance counties in the Florida Peninsula.)  (Availability of data varies from state to state.)

The GCCF has analyzed the performance of three economic components related to tourism and compared the performance level observed in the Florida Peninsula and Texas with the performance in Mississippi, Alabama and the

Florida Panhandle.  The three components are:  (1) revenues for beachfront hotels; (2) taxable sales of restaurants and (3) taxable sales of amusement activities.   (See Appendix B, Figures 1, 2 and 3.)

The GCCF will ensure that claimants from the Florida Peninsula and Texas that were affected by the oil spill are appropriately compensated.

Accordingly, the following modifications will be made to the eligibility requirements for individuals and businesses where the place of work or business is in a county in the Florida Peninsula or Texas.

- In general, losses claimed by **Individuals and Businesses** in the Florida Peninsula and Texas are no longer presumed to be the result of the oil spill as defined in Section IV 3a of the Final Rules.  This rule previously allowed a presumption of loss due to the oil spill solely if the claimant was "in the immediate vicinity of the Gulf Shore."[1]  This rule no longer applies to any claimants except seafood harvester and processor claimants.

- **Business Claimants** claiming 2010 losses in the Florida Peninsula and Texas will hereafter be treated as follows:

  o All Business claimants (including claimants in the immediate shore vicinity) will now have to satisfy the requirements of the financial test.[2]

  o All Business claimants who either (1) fail the financial test, or (2) are outside of the immediate vicinity of the Gulf shore, will also have to provide specific proof demonstrating an identifiable link between the asserted damage and the oil spill.  (See the Final Rules, Section IV. 3c and Attachment A for examples of such proof.) [3]

- **Individual Claimants:**   Individuals are deemed to be eligible for compensation for their losses if they can demonstrate that their employer has either been made an offer or has been paid by the GCCF under the revised eligibility rules described herein.   Otherwise, Individual claimants will need to provide specific proof demonstrating an identifiable link between the asserted damage and the oil spill.  This link could be a specific proof of termination of employment or reduction in wages that an employer confirms was a result of the oil spill.

- **All claimants in the Construction Industry in the Florida Peninsula and Texas**, both Individuals and Businesses, will now have to provide proof demonstrating an identifiable link between the asserted damage and the oil spill.  Businesses in the Construction Industry will also be required to pass the financial test.

## III.   Changes in the Rules for Computing Comparison Year Income for Individuals

- Actual Documented Losses for Individuals will continue to be based on the difference in financial performance between the loss year and a Comparison Year as described in the Final Rules.[4]  Effective with this modification, the Comparison Year income will be the average of the annual incomes for 2008, 2009 and 2010[5] except under the following circumstances:

---

[1] *Final Rules*, Section IV 3a.
[2] *Final Rules,* Attachment C.
[3] *Final Rules,* Attachment A.
[4] *Final Rules*, Section III 4a.
[5] For this purpose, the GCCF will annualize 2010 using January through April results provided by the claimant.

- o If annual income from 2008 through 2010 shows either a consistent increase or decrease, 2010 will be used.
- o If the income for two of the three years is more than 10% different from the average of all three, the claim will be evaluated under a Special Review process.
- o 2008 income must be made available unless the difference between 2009 and 2010 is less than 10%.
- o Income for 2010 will be based on the January through April period and annualized as follows:
  - ▪ Bonus or special award payments will be deducted from income prior to annualization.
  - ▪ The income, after deduction of bonus or special award payments, will be annualized using a seasonality factor that is a function of:
    - Location (Florida Peninsula vs. all other areas)
    - Business type  (Tourism related vs. other)
    - Compensation type (Salary vs. Hourly)
  - ▪ Bonus or special award payments will be added back to total income after annualization.

- Individual claimants who provide either insufficient income data or were laid off during any of the Comparison Years (2008, 2009) or the pre-spill months in 2010 (January – April)  will be evaluated under Special Review.

Note:  For all claimants with actual documented losses in 2010 of $500,000 or more, the GCCF will not automatically apply the recovery factor to claimant's actual 2010 total losses.  The Final Payment calculation for these claimants will be determined on an individualized basis after analyzing input from the claimant as well as the GCCF's economists.  The Final Payment Offer will be the actual documented losses in 2010 and an additional amount to compensate for the projected recovery and risk of possible future losses.