UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>These Pleadings apply to:<br>*Cases in Pleading Bundle B1,*<br>*Cases in Pleading Bundle B3,*<br>*and VoO Charter Dispute Cases.*<br><br>(Including Nos. 12-968 and 12-970) | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SUSHAN |

## DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. James Parkerson Roy and I were appointed Interim Co-Liaison Counsel for the plaintiffs in the consolidated cases that were pending in Section J of the Eastern District of Louisiana on or around June 4, 2010. We were appointed Plaintiffs Co-Liaison Counsel in MDL No. 2179 on or around August 27, 2010. We were also appointed Interim Co-Class Counsel on or around March 5, 2012, and Co-Lead Class Counsel on or around May 2, 2012.

3. I teach complex litigation as an adjunct professor at Tulane Law School and a class action seminar as an adjunct professor at Loyola Law School; I have authored and/or delivered numerous speeches, articles and papers on class actions, complex litigation,

ethics and professionalism; and I have actively participated in numerous class actions, multi-district litigations and other complex cases, including, for example: In re: Vioxx Products Liability Litigation, MDL No. 1657; In re: Chinese-Manufactured Drywall Products Liability Litigation, MDL No. 2047; Scott v. American Tobacco, 795 So.2d 1176 (La. 2001); 830 So.2d 294 (La. 2002); 949 So.2d 1266 (La. App. 4th Cir. 2/7/07), *writ denied*, 973 So.2d 740 (La. 2008), *cert. denied*, 128 S.Ct. 2908 (2008); 36 So.3d 1046 (La. App. 4th Cir. 4/23/2010), *writ denied*, 44 So.3d 686 (La. 2010), *cert. denied*, 131 S.Ct. 3057 (2011); Oubre / Orrill v. Louisiana Citizens Fair Plan, 26 So.3d 994 (La. App. 4th Cir. 12/09/09); 38 So.3d 457 (La. App. 4th Cir. 4/21/2010), *writ denied*, 45 So.3d 1035 (La. 2010); 79 So.3d 987 (La. 2011); Bauer v. Dean Morris, 2011 WL 3924963 (E.D.La. Sept. 7, 2011); Schultz v. Texaco Inc., 127 F.Supp.2d 443 (S.D.N.Y. 2001); 308 F.Supp.2d 289 (S.D.N.Y. 2004); 2009 WL 455163 (S.D.N.Y. Feb. 24, 2009); and Andrews v. TransUnion Corp., 917 So.2d 463 (La. App. 4th Cir. 8/17/2005), *writ denied*, 926 So.2d 495 (La. 2006); MDL No. 1350.

4. In the *Deepwater Horizon* Litigation, PSC Member Calvin F. Fayard, Jr. was appointed by Co-Liaison Counsel at the outset to explore and pursue potential settlement opportunities. Mr. Fayard would report directly to Co-Liaison Counsel, who would maintain confidentiality over the status of discussions, if any. Early on, with the approval of Co-Liaison Counsel, Mr. Fayard enlisted prominent negotiator Joseph F. Rice to assist in the exploration and development of potential settlement opportunities.

5. In or around May of 2011, Mr. Fayard, Mr. Roy, Mr. Rice and I had a dinner in New Orleans with BP Counsel, Rick Godfrey and Jim Neath, at which time a June meeting in London with BP plc General Counsel, Rupert Bondy, was arranged. At the June 2011 meeting in London, the parties committed to meet on an ongoing basis to attempt to resolve some or all of the extant claims.

6. Over the course of the negotiations, Mr. Fayard, Mr. Rice, and their team, would solicit direct input from Co-Liaison Counsel and other PSC Members to address the nature, location, scope and extent of existing claims. Fairly early on, PSC Member Rhon Jones and members of the Beasley Allen firm were brought in to assist with accounting and

economic loss issues, and preeminent class action lawyer, Elizabeth Cabraser, was brought in to address class, structural and drafting concerns. PSC Members Robin Greenwald and Matt Lundy were brought in to separately negotiate the medical class settlement, along with attorneys Wanda Edwards and Fred Baker. At the same time, Mr. Rice and Mr. Fayard, along with Co-Liaison Counsel, solicited information from various PSC Members on discreet issues, keeping within the bounds of confidentiality. They were provided access to scientific, economic and other experts, and to attorneys and/or plaintiffs who were large stakeholders and/or who were particularly knowledgeable about different types of claims, (*e.g.* oyster, shrimper, wetlands, subsistence, VoO). In addition, Mr. Fayard and Mr. Rice consulted with representatives of the Gulf Coast Claims Facility ("GCCF"), and obtained data regarding the nature, scope and extent of claims which had pursued, and resolved, in the GCCF. The lead negotiators also communicated with lawyers and experts for various Governmental bodies and agencies, as well as representatives of industry trade groups, (*e.g.*, Oyster Task Force, Louisiana Shrimp Association). Similarly, Ms. Greenwald, Mr. Lundy and the other members of the medical settlement negotiating team consulted with experts and solicited information and insight from PSC members and others representing clients with medical claims. Based on my own direct participation in the negotiations, and my observations of the interaction between the lead negotiators and other attorneys, plaintiffs, experts and industry leaders from whom they were gathering information, it is clear to me that the settlement reached is the product of "bottoms up" (as opposed to "top down") negotiations, that were fought with BP on a claim-by-claim basis, with direction and interaction from the relevant constituencies. Indeed, and as one example, as our firm has a large number of clients with Vessel of Opportunity ("VoO") charter disputes, I was involved directly in the negotiation of the VoO charter dispute and vessel damage claims.

7. On or around December 14, 2011, Mr. Fayard, Mr. Rice and Co-Liaison Counsel made a presentation to the entire PSC regarding the basic contours of the economic and property damages settlement, while Ms. Greenwald and Mr. Lundy presented the basic contours of the medical benefits class. From that point forward, the members of the entire Steering Committee, who collectively represented an extremely diverse and representative cross-

section of claims, provided direct input on a host of geographical, economic, environmental and other issues, considerations and concerns. The negotiating team also continued to solicit input from non-PSC attorneys, clients (including class representatives), industry leaders, experts, and government officials, who had different interests, stakes, and perspectives.

8. Professor Samuel Issacharoff, a leading class action expert, Professor Lynn Baker, a leading expert on the ethical issues that sometimes arise in complex litigation, and Basile Uddo, who has served as the PSC's ethics counsel since the inception of the litigation, were all present for the December 2011 PSC presentation, and were actively providing independent legal advice and feedback regarding the nature and structure of the settlement.

9. Around this same time, the Honorable Sally Shushan, the U.S. Magistrate Judge assigned to the MDL, became much more directly involved in the mediation of the settlement.

10. The various settlement frameworks (or "modules") were negotiated over the course of several months, each with many iterations, repeatedly tested with experts and attorneys and modified to best represent the interests of the class members.

11. At the time we agreed to the $2.3 billion Seafood Fund on or around February 26, 2012, we had conducted recent meetings with commercial fishing stakeholders. These meetings included PSC attorneys, non-PSC attorneys, industry trade group representatives, and plaintiffs with large stakes. As consensus was being developed between and among the plaintiff constituencies, BP insisted on shifting from an unlimited "evergreen" model to a guaranteed non-reversionary fund approach. With the direct participation and mediation of Judge Shushan, we ultimately agreed to a $2.3 billion Seafood Fund, which I believed would be more than sufficient to adequately compensate past and future commercial fishing losses, based on NOAA and other economic data, as well as the consensus that had developed over the preceding weeks. In light of the Supreme Court's opinion in *Amchem*, and out of an abundance of caution, we asked the Court to appoint a well-respected neutral, John W. Perry, Jr., to preside over the

allocation. Mr. Perry was provided with relevant Government data, peer-reviewed studies, and available expert opinions; was introduced to, and received information and input from, PSC attorneys, non-PSC attorneys, plaintiffs (including class representatives), representatives of industry organizations, and experts; and received various written submissions from interested parties; before making the determination on allocation. I believe that Mr. Perry's independent research and conclusions lends further support to the conclusion that $2.3 billion is more than sufficient to fully and fairly compensate the classmembers participating in the Seafood Program. Specifically, the Seafood Compensation Program frameworks, which are themselves conservative, are projected to pay out an initial amount of $1.9 billion, in full and fair compensation to the relevant classmembers, leaving a $400 million reserve.[1]

12. It could also be noted that, at the same time these intense negotiations with the BP Defendants were occurring, the parties were also engaged, on a parallel track, in extremely intense and ongoing discovery and trial preparation efforts, in advance of the commencement of the Limitation and Liability Trial, scheduled for February 27, 2012.

13. Based on my direct involvement in the negotiations, as well as my general observation of the process, and the terms of the settlement agreements themselves, it is my opinion and belief that the class members have been fairly and faithfully represented throughout the course of the negotiations, and that the proposed Settlement Agreements represent the most favorable resolution available to the economic and medical classes.

Signed, under penalty of perjury, this 23rd day of July, 2012, in New Orleans, Louisiana.

_____
Stephen J. Herman

---

[1] In addition to this $400 million "head room" in the Seafood Program: **(i)** I understand that more than $700 million was already paid to commercial fishermen by the GCCF; **(ii)** BP assumes full responsibility for up to 17.5% opt-outs, (15% of Category III Deckhands "Seafood Crew"); and **(iii)** class members' punitive damage claims, as well as the BP-assigned claims, against Transocean and Halliburton are reserved.