# Joint Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to all actions. | * * * | HONORABLE CARL J. BARBIER |
| | * * | MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated, | * * * * | Civil Action No. 12-970 SECTION J |
| Plaintiffs, | * * | |
| v. | * * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production, Inc.; BP America Production Company; BP P.L.C., | * * * | MAGISTRATE JUDGE SHUSHAN |
| Defendants | | |

# Declaration of Daniel J. Balhoff

## Assignment

On March 8, 2012, the Honorable Carl Barbier appointed John W. Perry, Jr. "to preside over the proposed settlement of the seafood program," which constitutes part of a larger proposed class settlement in this matter. Docket No. 5998. Mr. Perry and I are partners in the firm of Perry, Atkinson, Balhoff, Mengis & Burns, L.L.C. I have worked closely with John W. Perry, Jr. since 1990. Mr. Perry asked me to assist him in discharging his duties as the court-appointed neutral. I have worked with Mr. Perry in similar capacities several times before. I am attaching my curriculum vitae as Exhibit A.

## Investigation

Over the next two months, I attended meetings in New Orleans and Baton Rouge on an almost daily basis, with additional substantial time spent in telephone conferences.[1] I coordinated my investigation with Mr. Perry and took ultimate direction from Mr. Perry at all times. During the course of the assignment, I also apprised Magistrate Judge Shushan of developments from time to time.

Mr. Perry and I met with:

- Lay persons (non-lawyers) representing and/or participating in the shrimp industry, the oyster industry, the finfish industry, and the crab industry. Many of these industry representatives worked as harvesters, boat captains, oyster leaseholders, quota holders and/or vessel owners in their respective industries.

- Lawyers for persons engaged in each of these segments of the above-named industries including harvesters, boat captains, oyster leaseholders, quota holders and/or vessel owners.

- Members of the Plaintiffs' Steering Committee.

- Representatives and lawyers for BP.

- Experts who had been retained by the parties to the settlement.

Mr. Perry attended some, but not all, of these meetings. I telephoned Mr. Perry to report on progress almost daily when Mr. Perry could not be physically present.

I followed up on the initial investigation with additional communications with many of the representatives listed above. All of the persons involved were extremely cooperative and helpful.

In addition to the numerous meetings discussed above, I reviewed historical evidence concerning the performance of each sector of the seafood industry and the available data with respect to the impact of the spill, including:

- Materials and data from Congressional proceedings and from federal government agencies such as the U.S. Department of Commerce, including the National Marine Fisheries Service ("NMFS") of the National Oceanic and Atmospheric Administration ("NOAA").

---

1   The Seafood Compensation Program was substantially complete on April 17, 2012. Thereafter, Mr. Perry and I continued to make minor adjustments to the Seafood Compensation Program. The final Seafood Compensation Program was filed with the Court on May 2, 2012.

- Materials and data prepared by and/or for state government agencies such as the Louisiana Department of Wildlife and Fisheries.

- Literature and studies concerning the fisheries in and around the Gulf of Mexico, including but not limited to Gulf States Marine Fisheries Commission ("GSMFC") reports.

- Materials and data relating to and/or developed by the Gulf Coast Claims Facility ("GCCF").

- The Agreement-In-Principle Regarding *Deepwater Horizon* Economic and Property Damages Settlement and relevant exhibits signed by the parties on March 2, 2012.

## Methodology

After conducting the initial investigation, and after discussing the matter with Mr. Perry, I (under Mr. Perry's supervision) sought to develop a fair program, and ultimately a set of plans, by which to fairly allocate the Seafood Compensation Program Amount. The prospective class members that Mr. Perry and I interviewed conveyed that they wanted the funds to be distributed quickly, but they were even more vehement in their desire that the funds be distributed based upon a transparent and principled methodology.

In designing the Seafood Compensation Program, we were guided by the following principles:

- The Program should be transparent so that eligible class members can understand the required documentation and the compensation amounts that they will receive under the Program.

- The Program should have consistent guidelines that apply across all the common characteristics of species and claimants, while recognizing special characteristics arise within and among the species and among the claimants.

- The Program should be easy to administer.

- The Program should be as specific as possible to lessen the potential for inconsistent treatment of claimants.

- The Program should incorporate rules that take into account unique hardship exceptions.

- The Program, above all, should provide for fair and adequate compensation under the circumstances to each potential claimant affected by the spill and its aftermath.

## Conclusions

First, Mr. Perry and I endorse the Seafood Compensation Program that was submitted to the Court and believe, for the reasons stated above (and for the reasons implicit in the Seafood Compensation Program itself), it will provide fair, reasonable and adequate compensation to the Claimants under the circumstances. The Seafood Compensation Program adopts rules that address the volume of catch loss and the impact of cost, price and undocumented catch. The Seafood Compensation Program applies Risk Transfer Premiums ("RTPs") consistent with the overall Settlement Agreement.

Second, and independent of the first conclusion, based on available data that Mr. Perry and I (along with the settling parties) reviewed and evaluated, it is conservatively projected that initial payments (those that will constitute fair, reasonable and adequate compensation) under the Seafood Compensation Program will total approximately $1.9 billion. This estimation is conservative (i.e., it probably is a larger number than that which will be paid out in the initial distribution) for the following reasons:

- The estimate does not take into account a reduction of the potential total compensation amount for payments previously made to Class Members by the GCCF. The GCCF reported over $700 million payments in Seafood claims and undoubtedly some of this amount will result in a dollar-for-dollar reduction in payments to those claimants from the Seafood Compensation Program.

- The estimate assumes that all Seafood Compensation Program businesses and non-Category III seafood crew class members claims will be compensated from the $2.3 billion Seafood Compensation Program Amount. Under the settlement, BP is responsible for paying up to 17.5% of opt-outs from such claimant categories outside of the Seafood Compensation Program; so payments to such persons, while reducing the number of Seafood Compensation Program claimants, will not reduce the $2.3 billion Seafood Compensation Program Amount.

- The estimates assumes that all of the Seafood Compensation Program Category III seafood crew class members will be compensated from the $2.3 billion Seafood Compensation Program Amount. Under the settlement, BP is responsible for paying up to 15% of opt-outs from this claimant category outside of the Seafood Compensation Program, so payments to such individuals likewise reduce the number of Seafood Compensation Program claimants but do not reduce the $2.3 billion Seafood Compensation Program Amount.

Based on these conservative elements of the projection, the Seafood Compensation Program may well pay less than $1.9 billion in the first distribution, which would result in a second distribution to be made under the Seafood Compensation Program in an amount in excess of $400 million. The balance will be distributed consistent with the distribution methodology described in the Seafood Compensation Program (Docket No. 6430-22, Exhibit 10, p.3).

_____
DANIEL J. BALHOFF

8-10-12
_____
DATE



**Daniel J. Balhoff**   |   *balhoff@pabmb.com*   |   (225) 767-7730

Dan is a partner in the Baton Rouge office of Perry, Atkinson, Balhoff, Mengis & Burns, L.L.C. He holds chemical engineering (1985) and law (1988) degrees from LSU. While in law school, he served as the managing editor of the Louisiana Law Review. He later clerked for the Honorable Frank J. Polozola of the U.S. District Court for the Middle District of Louisiana and for the Honorable Daniel A. Manion of the U.S. Court of Appeals for the Seventh Circuit. He has authored several law review articles and has spoken at legal seminars concerning brief-writing, oral argument, and the functions of Special Masters.

**Special Master, ADR, and Attorney Chair Experience**

- Over 20 years of practice in federal and state trial and appellate litigation, including complex litigation, mass torts, and class actions

- Appointed to serve as Multidistrict Litigation Special Master; appointed as Special Master by the U.S. District Court for the Eastern and Western Districts of Louisiana; Louisiana's 18th, 19th, 21st, and 23rd Judicial District Courts; and the Civil District Court in New Orleans

- Served as or assisted Special Master in matters involving:
    - Case management
    - Pretrial discovery, including resolution of privilege issues
    - Allocating settlement funds to class and mass tort claimants (including development and implementation of methodology)
    - Reviewing reasonableness of attorneys' fees
    - Allocating attorneys' fees (including resolution of common fund/benefit issues)

- Served as arbitrator and mediator in both federal and state cases by both court appointment and private party selection

- Served as attorney chair in well over 100 medical malpractice cases

**Professional Licenses**

Admitted to Bar: Louisiana; U.S. Supreme Court; U.S. Court of Appeals for the Fifth Circuit; U.S. District Courts for the Eastern, Middle, and Western Districts of Louisiana

**Memberships, Honors, Professional Associations**

Academy of Court Appointed Masters • Federal Bar Association • Louisiana State Bar Association • Baton Rouge Bar Association • AV rating from Martindale-Hubbell



# Court Appointments and Settlement Allocation Assignments

**Multidistrict Litigation**

- *In re: FEMA Trailer Formaldehyde Products Liability Litigation*, MDL No. 1873 (E.D. La. J.P.M.L.) (appointed Special Master to allocate multiple settlement funds to tens of thousands of claimants who alleged chemical exposure while occupying temporary housing after Hurricane Katrina; served as Court-Appointed Mediator)

- *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 (E.D. La. J.P.M.L.) (served as chief assistant to Court-Appointed Neutral; developed methodology for allocating $2.3 billion settlement fund to thousands of Gulf of Mexico seafood harvesters who alleged economic damage as a result of the BP oil rig disaster; served as Court-Appointed Mediator)

- *In re: Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (E.D. La. J.P.M.L.) (served as chief assistant to Court-Appointed Mediator for case in which homeowners alleged defendants were responsible for installation of defective drywall; secured commitments from more than 500 defendants to global settlement)

- *In re: Denture Products Liability Litigation*, MDL No. 2051 (S.D. Fla. J.P.M.L.) (selected to allocate aggregate settlement fund to plaintiffs who were allegedly injured by defective denture products)

**Other Federal Court Litigation**

- *John Burford, et al. v. Cargill, Inc.*, 05-0283 (W.D. La.) (appointed Special Master to disburse nationwide class settlement funds to thousands of farmers who used allegedly defective dairy feed product)

- *Junior Cerdes, et al. v. Cummins Diesel Sales Corp., et al.*, 06-922 (E.D. La.) (served as chief assistant to Special Master responsible for determining reasonableness of attorneys' fee request in products liability class action case)

**State Court Litigation**

- *In re: Honeywell, July 20, 2003 Chlorine Release*, 511,626 (La. 19th J.D.C.) (appointed Special Master to allocate class settlement funds to several thousand persons allegedly affected by two separate releases from chemical plant; appointed Special Master to allocate attorneys' fees)

- *Arthur Schexnayder, Jr., et al. v. Entergy Louisiana, Inc., et al.*, 28,907 (La. 23rd J.D.C.) (appointed Special Master to allocate class settlement funds to property owners in more than 20 parishes against utility company for alleged trespass claims)

- *Noretta Thomas, et al. v. A. Wilbert & Sons, L.L.C., et al.*, 55,127 (La. 18th J.D.C.) (appointed Special Master to allocate class settlement funds to several thousand of residents of and visitors to trailer park alleging ground water contamination; appointed Special Master to allocate attorneys' fees; appointed joint Special Master to allocate class settlement funds to several thousand landowners alleging chemical pollution claims)

- *Toussaint Battley, Sr., et al. v. Pointe Coupee Parish Police Jury, et al.*, 41,792 (La. 18th J.D.C.) (appointed Special Master to allocate class settlement funds to property owners damaged by flood)

- *Kristen M. Rhodes v. BG Estate Servs., Inc., et al.*, 2001-18355 (La. C.D.C.) (appointed Special Master to allocate class settlement funds to mold exposure claimants)

- *Mark S. Creech, et al. v. Acadian Ambulance Service, Inc.*, 61,236 (La. 18th J.D.C.) (appointed joint Special Master to allocate settlement funds to insurance policyholders in class action requesting payment reimbursement)

- *Carey C. Abbott, et al. v. Waste Management, Inc., et al.*, 87,182 (La. 21st J.D.C.) (appointed joint Special Master for allocating settlement funds to residents allegedly affected by environmental contamination)

- *Rita H. Holzenthal, et al. v. Sewerage & Water Board of New Orleans*, 2001-16969 (La. C.D.C.) (appointed joint Special Master to allocate settlement to residents allegedly affected by New Orleans Sewerage and Water Board project)

- *Ivan Guidry, et al. v. City of Denham Springs*, 28,907 (La. 21st J.D.C.) (named Court-Appointed Arbitrator to allocate settlement funds among claimants who were allegedly affected by waste water contamination)

- *In re: Vulcan Litigation – April 2001 Incidents*, 69,388 (La. 23rd J.D.C.) (served as chief assistant to Special Master with responsibility of allocating common benefit fund among attorneys)

- *Terry Giaque, et al. v. Clean Harbors Plaquemine, LLC, et al.*, 60,195 (La. 18th J.D.C.) (served as chief assistant to Special Master with responsibilities of case management and resolution of discovery issues, including privilege claims)