# Joint Exhibit C

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>This document relates to all actions. | MDL NO. 2179<br><br>SECTION:  J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| **Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated,**<br><br>    **Plaintiffs,**<br><br>v.<br><br>**BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,**<br><br>    **Defendants** | Civil Action No. 12-970<br><br>SECTION:  J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF JOHN C. COFFEE, JR.

JOHN C. COFFEE, JR. declares as follows:

### I.    INTRODUCTION

1.    This declaration focuses on one central question:  Can the proposed class specified in the "Deepwater Horizon Economic and Property Damages Settlement Agreement," dated April 18, 2012, as amended May 2, 2012 (the "Settlement

Agreement"), be certified as a settlement class against the BP Parties (collectively, BP Exploration & Production Inc. and BP America Production Company)?

2.      My background, experience and qualifications relevant to the opinions expressed in this declaration are set forth in Exhibit A hereto.  However, I should note at the outset that I have long been a skeptic of sprawling mass tort class actions[1] (and have been so cited by the Supreme Court[2]).  Although I remain skeptical of overbroad class actions, this case has no similarities with the open-ended, sprawling class actions that I have criticized.  Thus, I begin by focusing on the special factual characteristics of this class action, deferring until later my discussion of the legal precedents and the specific requirements of Fed. R. Civ. Pro. 23.  Even though the total recovery in this case is a probable record, the most distinctive fact about this class action is not its size, but its simplicity.  Large as it may be, the class is also compact and cohesive; the claims are simple; the chain of causation is short for the members of the settlement class, and sufficient structural protections have been adopted to assure adequate representation.  At the outset, let me therefore stress the following critical factual points that distinguish this case from most large class actions:

A.      First, this case is based on, and united by, a single, interconnected body of law — the Oil Pollution Act and general maritime law.

3.      The Oil Pollution Act, 33 U.S.C. § 2701 *et seq.* ("OPA") is at the core of this case.  It integrates with general maritime law in a manner that enables this action to

---

[1] See e.g., John C. Coffee, Jr., Class Wars:  The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995); John C. Coffee, Jr., Class Action Accountability:  Reconciling Exit, Voice and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370 (2000).

[2] See, e.g., Amchem Products, Inc. v. Windsor, 521 U.S. 591, 621 (1997), and Ortiz v. Fibreboard Corp., 527 U.S. 815, 850 n. 28.

sidestep all of the complexity and problems that have arisen in many proposed multi-state

class actions when the claims arise under multiple bodies of law (usually those of

different states).  As this Court well knows, OPA both (a) imposes strict liability on

"Responsible Parties" for economic losses resulting from oil spills into navigable waters

and shorelines,[3] thus eliminating any need to show fault or culpability on the part of the

BP Parties to establish the OPA claims, and (b) expands the kinds of economic losses that

are recoverable.  The case is further simplified by this Court's ruling on the application of

the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1301, which recognizes

the Outer Continental Shelf as an area of "exclusive Federal jurisdiction."[4]  That special

legal status undergirds this Court's decision to apply general maritime law in a uniform

fashion.  Given this Court's ruling that federal maritime law supersedes and preempts

state law claims, both statutory and common law, the interplay of OPA and general

maritime law produces an effectively uniform body of law applicable to this class action.[5]

      4.     Also simplifying this case is the fact that the class definition carefully

excludes remote claimants — for example, by requiring that, to be within the class,

natural persons must have resided or worked or owned or leased property within the area

directly affected by the Deepwater Horizon incident.  This deliberately narrow definition

of the class (both in terms of geographic location and the economic losses covered)

ensures that this class action will remain compact and that class members will be

---

[3] See <u>Rice v. Harken Exploration Co</u>., 250 F. 3d 264, 266 (5th Cir. 2001).

[4] See 43 U.S.C. §§ 1332(2), 1333(a)(1)(a).

[5] See Order and Reasons As to Motions to Dismiss the B1 Master Complaint, August 26, 2011 (Doc. 3830).

similarly situated (and hence more cohesive).[6]  This narrow class definition also simplifies proof of causation, because persons situated within tightly defined geographic areas can make use of common evidence to support a showing of economic loss.  From all these perspectives, the bottom line is that the claims covered by this class action are either expressly authorized by OPA or are clear-cut and narrowly bounded.

B.  Second, this case grows out of a single-event, single-location disaster that has principally impacted a limited geographic area.

5.       As a result, not only is the class compact, but the chain of causation is kept short.  Causation of the injuries covered by the Settlement Agreement inevitably leads back to the Macondo well blowout, the Deepwater Horizon explosion and the resulting oil spill.  Although it might be possible to argue that persons at considerable distance from the explosion and oil spill were economically injured through layoffs or reduced business activity, the class definition stops well short of attempting to incorporate such claims.  As a result, the class is more compact and cohesive than if it attempted to assert all possible claims.

C.  Third, causation issues are less problematic in this case where the root cause is undisputed and the chain of causation is short.

6.       In many tort-based class actions, proximate causation is the principal barrier to class certification.  These cases — e.g., tobacco, asbestos, and toxic emissions

---

[6] Indeed, to the extent that this class action pleads claims not based on OPA, they are governed by general maritime law (as this Court has held), which employs a narrow, bright line standard that excludes precisely those claims that might be the most difficult to prove or that might depend on more individualized issues of fact and law.  See Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303 (1927) I understand that an exception to this rule has been recognized by this and other courts in the case of commercial fisherman, and that exception further reinforces this settlement.  To the extent that OPA applies, it has liberalized and relaxed this doctrine, thereby enhancing the legal strength of the claims settled in this action.

— involve persons who have been exposed to a toxic substance and may or may not have been aware of, or injured by, this exposure.  For example, those exposed to asbestos might have also smoked or had some other injury-inducing experience or genetic characteristic that more directly caused the injury.  This is not such a case.  If an explosion causes an oil spill and the spill reaches a beach with the result that a beach resort sustains economic injury, the laid-off workers can more easily and logically show that they had been injured by a short chain of causation, and individual evidence on an employee-by-employee basis is not required in such instances.  Indeed, the Settlement Agreement reflects this clear connection by creating presumptive injury zones in which, negotiating at arm's length, plaintiffs and defendants recognized that, within these areas, causation of the economic injury could be objectively resolved.

     D.  <u>Fourth, both the Supreme Court and the Fifth Circuit look principally to the degree of cohesion within the class in determining whether it is appropriate for class certification,[7] and the level of cohesion within this class is uniquely high.</u>

     7.     In order to receive compensation, each class member must have (i) suffered economic loss as the direct result of a single incident (the April 20, 2010 explosion of the Deepwater Horizon), (ii) resided or worked within tightly defined

---

[7] In <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S.  591 (1997), the Court made clear that the key issue under Fed. Rule Civ. Proc. 23, which applies to both litigation classes and settlement classes, is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id*. at 621. Two pages later in this decision, the Court returned to this same point, stressing that the focus of the predominance requirement in Rule 23 (b)(3) is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Id</u> at 623. The Fifth Circuit has similarly stressed that cohesion is lacking when "class members . . . suffered a wide variety of injuries, ranging from property damage to personal injury and death, and no method is specified for how these different claimants will be treated vis-à-vis each other." <u>In re Katrina Canal Breaches Litigation</u>, 628 F. 3d 185, 193-94 (5th Cir. 2010). As will be seen this case is entirely different, both in its narrow class definition and its more specific plan of allocation.

geographic areas, and (iii) experienced economic loss or property damage within a relatively brief duration.  Further enhancing their cohesion is the obvious fact that all were unquestionably conscious of the events triggering this litigation and the impact of that incident on them.  Next, the interests of each of the various constituencies of claimants — e.g., Vessels of Opportunity (or "VoO") claimants, the tourism industry, fisherman, etc. —were represented from early in the negotiating process that yielded this settlement by representatives and counsel closely aligned with their interests and who had represented them in the past.  Regular consultations between counsel and constituency representatives were held to test ideas, evaluate settlement proposals and counter-proposals, and gather data; this interactive process continued through the extended negotiations.  The result was a process that was far more democratic and decentralized than in most other large class action settlements.  That greater democratic participation in turn produced greater cohesion and unity.

     E.    <u>Fifth, the structural assurances of adequate representation and fair treatment in this case start with the fact that the liability of the BP Parties is uncapped under the Settlement Agreement</u>.[8]

     8.    Most class action settlements reach a bargain on the aggregate payment that the defendants will make and then defendants will step back and plaintiffs' counsel proposes a plan of allocation that distributes this amount among the contending constituencies of class members. The result is often to give rise to intense intra-class rivalries, and internal conflicts, as various subclasses compete for the same limited funds.

---

[8] This uncapped liability is not a new development, but has been implicit since the BP Parties waived the statutory limitations on liability under OPA.  See Statement of BP Exploration & Production Inc. Re Applicability of Limit of Liability Under Oil Pollution Act of 1990, dated October 18, 2010 (Doc. 559) (waiving statutory limitation on liability under OPA).

Such rivalry is entirely absent here.  Because the liability of the BP Parties is uncapped, a payment to one claimant in no way depletes the funds available for others.  In short, there is no zero-sum game.  To be sure, one modest qualification is necessary here: the Seafood Compensation Program is capped, but in its case the allocation of funds has been made by a court-appointed neutral party (Mr. John W. Perry, Jr.), and this objective allocation did not invite competition or jockeying for position within the class.  Thus, unlike in other proposed class actions (for example, In re Katrina Canal Breaches Litigation, supra), the major issues of allocation have all been resolved in an impartial manner prior to settlement approval.

F. Sixth, this case does not present the special, complicating factors that have caused the Supreme Court to reject settlement classes.

9.     In Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) and Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999), the Court rejected settlement classes on grounds that are entirely inapplicable to this settlement.  Simply put, there are no "future claimants" in this class, thus distinguishing Amchem Products.  The difficult problems posed by future claimants – i.e., persons who have been exposed to a toxic substance but have not yet manifested any injury – are simply absent in this case because, in order to recover, every person in this class, by the very definition of the class, must have already experienced economic loss or property damage.  Hence, the problems of notifying future claimants and protecting them from the danger that the settlement fund may be exhausted before they experience any injury are wholly inapplicable.  Similarly, this is not a "limited fund" case (as Ortiz was); rather, the BP Parties will remain liable without any aggregate limitation on their liability.

G.  <u>Seventh, in contrast to many class actions, which are lawyer-driven with counsel simply imposing a settlement matrix or grid on largely passive class members, this case was organized, and compensation negotiated, from the bottom up</u>.

10.     As later discussed in more detail, the various subgroups of class members actively participated in settlement negotiations, thereby strengthening the cohesion within the class.  Attorneys representing various claimant groups were also members of the Plaintiffs' Steering Committee ("P.S.C."), and thus were aware from the outset of their constituencies' specific needs and concerns.  Far more than in the typical class action, the class members included persons who were well informed, held significant claims, and did not in any way resemble the often passive small claimants in many other varieties of class actions. Their higher level of involvement and awareness translates into greater unity and cohesion.

H.  <u>Finally, from its outset, this was a settlement class action in which the principal focus was on the creation of an improved, more transparent and objective compensation program to replace the Gulf Coast Claims Facility ("GCCF")</u>.

11.     Normally, litigation is focused on establishing or rebutting the defendant's liability.  In such cases, the need for judicial scrutiny of the settlement is based on a fear that absent class members might be abused if their right to sue individually was extinguished but the settlement was inadequate.  That concern is, however, much less relevant to this case where the liability of the BP Parties is uncapped and they have long accepted their responsibility to pay compensation to victims of the Deepwater Horizon incident.  Indeed, from shortly after the April 20, 2010 spill, the BP Parties have acknowledged their responsibility for losses resulting from the spill.  On August 6, 2010,

certain BP entities entered into a $20 billion trust agreement that funded the Deepwater

Horizon Oil Spill Trust (the "Trust"),[9] which was administered by the GCCF.  Given the

Trust, the enormous payments already made by the GCCF, and the BP Defendants'

waiver of the statutory limitation of liability under OPA, the negotiation process that

resulted in the Settlement Agreement was very different from the typical adversarial

battle over liability in most litigation.  Because liability was uncapped, this enabled the

parties to focus primarily on structuring a transition from an existing compensation

system to a new and much enhanced one.  Specifically, that transition was from the

GCCF to the Deepwater Horizon Court Supervised Settlement Program (the "Settlement

Program").  To be sure, these negotiations were still tough and hard fought, but they

focused less on the amount of liability and more on what evidence would be necessary to

support a particular claim.  Both sides wanted a transition that would improve, enhance,

and perfect the GCCF's procedures, ensuring both broader coverage and more objective

and transparent criteria.

        12.     Such a settlement process does not raise (at least to the same degree) the

dangers of collusion and inadequacy that Rule 23 seeks to guard against, and thus courts

can properly approach such an uncapped settlement differently, recognizing that it

presents a more benign context.  Equally important, Rule 23(b) focuses on "superiority,"

and, on this score in particular, this settlement merits superlatives, because it is vastly

superior to both individual litigation or a continuation of the GCCF process.

---

[9] See Annual Report and Form 20-F of BP p.l.c. for the fiscal year ended December 31, 2011 at p. 168. The BP Parties have also waived the statutory limitation on liability under OPA. See supra note 8.

13.      In addition, this settlement represents exactly the type of outcome that OPA was intended to produce.  As others have said, OPA "was meant to provide an effective system for prompt oil spill removal and fair compensation for those damaged by such spills."[10] That is also the goal of the Settlement Agreement.  Because the Settlement Agreement is uncapped and therefore does not reduce the potential liability of the BP Parties, it stands apart from the vast majority of class action settlements.  Essentially, the negotiation process produced a more precise, transparent, and less discretionary system than existed under the GCCF.  The uncapped nature of this settlement should simplify the judicial determination as to its adequacy and shift the focus to the new claims resolution system that the parties have designed, from the ground up, to match compensation to the needs and injuries of the class members.  The key goals of OPA — i.e., prompt resolution and fair compensation — are consistent with the superiority standard of Rule 23(b)(3) and both favor an expeditious resolution that fosters the economic and social recovery of the Gulf Coast region.  In contrast, if claimants had to proceed individually, and not by means of this class action, the process would be long and possibly interminable, and the courts would be flooded with repetitive litigation to no one's advantage — all in conflict both with OPA's goals and Rule 23 (b)'s focus on superiority.  In this light, the "superiority" of this settlement over any alternative feasible procedure is its most striking characteristic.

14.      Put most simply, this has been a negotiation that began from a starting point of assumed responsibility on the part of the BP Parties.  That unique fact distinguishes this case and merits judicial recognition.  Although Rule 23 should be a

---

[10] See Steven R. Swanson, OPA 90 + 10 = The Oil Pollution Act of 1990 After Ten Years, 32 J. Maritime Law & Commerce 135, 174 (2001).

shield against inadequate settlements, courts may properly recognize that less risk surrounds a settlement in which the defendant has accepted both uncapped liability and full compensatory responsibility to the class (without any contribution from the other major defendants). In addition, this is a case in which the procedural form (i.e., a class action) fits the statutory purpose of OPA like the proverbial glove because OPA intends an early resolution of claims.

15.    For all the foregoing reasons, this is a class action case that will rarely, if ever again, be seen in the federal courts: enormous in its financial size, the negotiating process focused primarily on the structure of the settlement and possible additional non-monetary benefits to the class, not issues of aggregate liability. Not only is the class definition tightly defined in scope, but the structure of the settlement is organized around common issues, because more speculative and legally debatable claims have been excluded from the class definition.

16.    The balance of this declaration will be organized around the following roadmap: Part II will examine the Settlement Agreement in more detail and the process by which it was reached; Part III will then review the requirements of Fed. R. Civ. Proc. 23. My background and experience in the field of class action certification are described in Appendix A.

## II. THE STRUCTURE OF THE SETTLEMENT ASSURES BOTH ADEQUACY OF REPRESENTATION AND FAIR COMPENSATION

### A. The Class is Objectively Defined and Fully Ascertainable. Moreover, It Does Not Attempt to Reach All Possible Claims, But Conservatively Focuses on Those Most Easily Proven.

17.     In many class actions, the class definition is broad, expansive and virtually unlimited in its attempt to shoehorn into the class every possible claim.  Here, the class definition is much more limited.  Section 1 of the Settlement Agreement sets forth the class definition in terms that are objective, precise, and closely track the language and concerns of OPA.  Essentially, individuals are covered (with some exceptions) if they "lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, or owned or leased or worked on a vessel harbored or home ported" in the Gulf Coast Areas or Specified Gulf Waters at any time between April 20, 2010 and April 16, 2012.  Similarly, entities are covered in equally precise terms if they (i) owned, operated or leased a physical facility or vessel or conducted a service business in the Gulf Coast Areas or Specified Gulf Waters during the same above time interval, and (ii) satisfied certain other limiting criteria with respect to the nature of their business operations or their ownership or leasing of real property in the Gulf Coast Areas.[11]

18.     Individuals and entities who meet the geographical criteria described above still only fall within the class definition if their claims fall within one of six carefully defined damage categories, each of which arises out of, or relates to, the Deepwater Horizon incident.  These damage categories are:  (1) Economic Loss (2) Property Damage, (3) Vessels of Opportunity ("VoO") Charter Payment, (4) Vessel Physical Damage, (5) Subsistence Damage, and (6) Seafood Compensation Program. These categories are not arbitrary, but were refined with the assistance of a variety of experts (including economists, accountants and real estate professionals).

---

[11] These criteria are set forth in Sections 1.2.1 to 1.2.4 of the Settlement Agreement

19.     Further limiting the class, certain persons and entities are specifically excluded from the class under Section 2 of the Settlement Agreement (for example, financial institutions, insurance companies, and gaming entities).  This is a conservative class definition which stops well short of reaching every person or entity who might arguably bring an OPA or general maritime law claim based on the Deepwater Horizon disaster.  The net result of this caution is a list of easily identifiable categories of individuals and entities who are permitted to show objective losses from that disaster.  This combination of a geographic test plus a careful definition of what losses or injuries give rise to cognizable claims for benefits under the Settlement Agreement easily satisfies the Fifth Circuit's standard for ascertainability.  See Union Asset Management AG v. Dell, 669 F.3d 632, 639-40 (5th Cir. 2012); DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).

20.     This objective definition of the class contrasts sharply with the much looser definition employed in a case such as In re Katrina Canal Breaches Litigation, 628 F.3d 185 (5th Cir 2010).  There, a broad, sprawling class consisted of persons injured — both physically and economically — by Hurricanes Katrina and Rita.  The class definition in that case did not seek, as here, to group the class members within tightly defined subcategories of similarly situated persons, and causation issues were either ignored or left to the discretion of a special master.  Worse yet, there was no plan of allocation.  Thus, class members could not have any idea of what they might receive, if anything.  Even apart from its character as a "limited fund," the Katrina class was a dysfunctional paradigm of precisely the kind of class action that, in Amchem's phrase,

lacked "sufficient unity so that the absent members can fairly be bound by decisions of class representatives." See Amchem Products, 521 U.S. at 621.

21.     In marked contrast, this class action does not hand the allocation of the settlement fund to some omniscient special master for the latter to make deferred decisions allegedly in the best interests of class members. Rather, the settlement has been bargained out in advance of its submission for judicial approval. Class members will know what benefits they are eligible for, how they must apply, and how they must document their losses. On this basis, they can accept the settlement, object to it at the court's hearing, or opt out. The choice is theirs, and it is an informed choice.

22.     The clarity of this choice presented to class members also answers Amchem's key question: Is there sufficient unity or cohesion within the class "so that absent class members can fairly be bound by decisions of class representatives"? 521 U.S. at 621. Here, where the negotiations have given class members a payoff that is clear and defined, it is easy to find that the vicarious representation of these class members by their class representatives and counsel was fair and adequate. In contrast, in Katrina Canal Breaches, supra, where class members were faced effectively with an opaque settlement — in effect, they were asked to buy the proverbial pig in a poke — , the representation was inadequate because both the process and the outcome were undefined.

B.     Adequacy of Representation is Easily Satisfied in This Case Because the Principal Subgroupings of Class Members — e.g., VoO claimants, Subsistence claimants, Property Damage claimants, and Economic Damage claimants, etc. — Participated Actively in the Settlement Process Through the Mechanism of the P.S.C., and Benefitted From Elaborate Technical and Expert Assistance.

23.     Because the liability of the BP Parties under the Settlement Agreement is not capped, the interests of these subgroups are not in conflict.  Ultimately, it is the existence of conflicts of interest within the class (and the resulting necessity of tradeoffs in settlement negotiations) that creates the need for subclasses.  The only group of claimants whose total recovery is capped in this case are those seeking recovery against the Seafood Compensation Program, and in their case, any realistic possibility of conflict among claimants for a fixed fund has been eliminated by the use of a special master (Mr. Perry).

24.     Although an uncapped settlement eliminates most of the potential for collusion (because it eliminates the prospect that some stronger groups may conspire to overreach a weaker group, assigning it an unfairly smaller share of a fixed fund), that is not the only protection in this Settlement Agreement.  Other aspects of the settlement negotiations also should demonstrate to this Court that this was entirely an arm's length negotiation.  First, the structure of the P.S.C. is inconsistent with collusion with the defendants.  In comparison to most class action plaintiff steering committees, it is uncharacteristically large, consisting of two lead co-counsel and a seventeen member committee.  Moreover, the P.S.C.'s members are geographically diverse.  While several are located in Louisiana and Alabama, others are based in California, New York, Texas and Florida.  It is my understanding that most of them had not regularly interacted in their law practices prior to the Deepwater Horizon disaster.  The larger the group that must collude, the harder that collusion becomes.  Similarly, long-time associates can collude more easily than strangers.

25.     Next, many of the P.S.C.'s members had clients within the specific subgroups specified in the Settlement Agreement.  For example, some had represented VoO claimants; others, clients in the tourist industry, and still others represented claimants under the Seafood Compensation Program.  Given this background, it would be predictable that if a settlement agreement disfavored their special clients, those counsel associated with the disfavored group would have protested and probably resigned.  But that has not happened.  The P.S.C. is unanimous in the support of the Settlement Agreement.  Given the diverse composition of the P.S.C., that is inconsistent with a collusive outcome.

26.     The settlement negotiations in this case have been extended and intense — and unusually so.  They appear to have begun in early 2011, then picked up speed in the Spring of 2011, and shifted into constant face-to-face negotiations around July, 2011.  All told, they consumed nearly 15 months.  Frankly, a collusive settlement can be accomplished much more quickly than that.

27.     More importantly, the negotiations followed the same protocol for different types of claims.  Rather than negotiating a total figure for the settlement and then allocating among contending groups, the parties instead developed claim frameworks for each type of claim on an independent basis, never trading off claims against each other, but instead assessing the strength of each claim category, the factors relevant to it, and the types of proof that would be required to establish it.  As each type of claim was analyzed, the members of the P.S.C. most familiar with it would participate actively in the negotiations (which, after early 2012, were supervised by Magistrate Judge Shushan).  Thus, for example, I am advised that attorneys representing seafood

-16-

restaurants helped to develop the business economic loss framework, while attorneys representing wetland owners worked on the property damage framework.

28.     This process exemplified the "bottom up" negotiation protocol used by the parties, precisely to avoid determining a fixed amount and then allocating it.  When needed, experts — accountants, economists, real property consultants, etc. — were brought in to advise the negotiators.  In this sense, the class members received a vicarious representation by attorneys closely aligned with the interests of the various constituent groups.

29.     Conceivably, someone might still object that each of these subgroups should have been treated as a formal subclass.  Practical experience makes clear, however, that extensive use of subclasses introduces an undesirable complexity and rigidity and can result in the "Balkanization" of the class action, seriously slowing and impeding the negotiation process.  Here, if each of the above subgroups were to have been treated as a separate subclass, that would have implied at least six subclasses (and possibly more), each with their own counsel.  Under such a structure, progress would have likely slowed to a snail's pace — and for no good reason.  Indeed, if all the diverse interests covered by the Seafood Compensation Plan are considered to be distinct and potentially antagonistic groups, the number of separate counsel required to negotiate the settlement might rise to a dozen or more.  In all likelihood, settlement negotiations would collapse under the weight of such a superstructure.

30.     But such a rigid approach is both unnecessary and inappropriate here. Subclasses inherently force the counsel for each subclass into an adversarial relationship with each other, negotiating for a bigger piece of the normally limited pie.  Not only is

-17-

the size of the pie unlimited in this case (thus reducing the need for subclasses), but if subclasses were used, class members would likely fall into multiple, overlapping subclasses.  That is, the typical VoO claimant may be a small boat owner who is also a commercial fisherman (and thus belongs to a second subclass) and possibly a wetlands resident (thus belonging to a third subclass).  Given this high overlap, the use of formal subclasses would inherently impose an inappropriately adversarial relationship on counsel representing the same flesh-and-blood human beings.  No class member needs two or more counsel negotiating with each other to represent his common interest.

31.    Recent cases have made clear that there is no absolute requirement for subclasses under Fed. R. Civ. P. 23.  Just last month, the Eleventh Circuit wrote in Juris v. Inamed Corporation, 2012 U.S. App. LEXIS 13841 (11th Cir. July 6, 2012) that:

> "We are not the first court to suggest that Amchem and Ortiz
>
> impose a requirement of adequate structural assurances, as
>
> opposed to a per se requirement of formally designated sub-
>
> classes. . . . Commentators have also suggested (or at least implied)
>
> that the certification of subclasses is just one example of structural
>
> protection capable of ensuring adequate representation in the face
>
> of intra-class conflicts. [citing authorities]."

Id. at * 77 n. 25.  On the facts of Inamed (which was a mandatory limited fund class action that the Eleventh Circuit expressly recognized needed closer judicial scrutiny), the Eleventh Circuit found that:

> "[t]he structure of the negotiations in the case at bar ensured that
>
> that the class representatives operated with a proper understanding
>
> of their representative responsibilities."

Id at * 78.  But that is even truer here where the multiple class representatives were

chosen to represent each of the different constituencies and where counsel had previously

represented these same constituencies.

32.    In contrast, when courts have recently required subclasses, it has usually

been because the interest of one discrete and disfavored group appeared to have been

subordinated to that of more dominant groups.  See e.g., In re Literary Works in Elec.

Databases Copyright Litig., 654 F.3d 242 (2d Cir. 2011) (where "fundamental conflict"

existed between one of the three groups and the other two, subclasses were required).

Central to the holdings in these cases that have required subclasses was the fact that "a

capped settlement fund was allocated differently among categories of claims of different

strength without separate counsel to protect each category's interests." Id. at 256.  See

also Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-

Medco Managed Care, L.L.C., 504 F.3d 229, 246 (2d Cir. 2007).  Obviously, this

settlement (holding aside the Seafood Compensation Fund) is not capped.  Nor is there

any allocation being made among these groups by class counsel; instead, a disinterested,

neutral expert has been used.

33.    Moreover, a much superior technique for avoiding even the appearance of

collusion was employed in this case.  Magistrate Judge Shushan personally monitored the

settlement negotiations over many months.  Alone, this factor would weigh very heavily

against finding collusion in a settlement.  See Collins v. Sanderson Farms, Inc., 568 F.

Supp. 2d 714, 725 (E.D. La. 2008) (citing NEWBERG ON CLASS ACTIONS §11.51 (4th ed. 2010) to the effect that participation of a Magistrate Judge reduces the possibility of collusion and should be given significant weight).  But even more was done here.  The participation of a Magistrate Judge was further backstopped by the use of a neutral, court-appointed expert (i.e., Mr. Perry).  Finally, class counsel and defense counsel did not discuss the issue of attorneys' fees until all issues relating to the settlement itself were first resolved and they were invited to commence fee negotiations by Magistrate Shushan.  Class counsel's fees will also not be subtracted from the settlement or borne by class members.  Given all these safeguards, the possibility of collusion declines to virtually zero.

      C.  <u>Structural Protections Have Also Been Incorporated to Assure Fair and Adequate Representation</u>.

      34.    Beyond the earlier noted facts that the settlement is basically uncapped and negotiations were conducted under the supervision of a Magistrate Judge, there are also an abundance of procedural safeguards surrounding this settlement that collectively assure that class members will be treated fairly.  First, the Deepwater Horizon Court Supervised Settlement Program that will replace the GCCF will be "subject to the ongoing supervision of the court."  See Settlement Agreement, Section 4.4.7.  Next, this program will have objective and transparent rules for claims, covering both the claims allowed and the documentation required.  Submitted claims will be evaluated and processed by independent claims administrators.  See Settlement Agreement, Section 4.3.8.  Finally, claimants will have the right to appeal denials of claims for insufficient documentation and to challenge any final determination made in this case.  In contrast,

BP can challenge only awards over $25,000 in base compensation.  Appeals will be

decided by an appellate panel using a procedure designed to emulate the rules

successfully used in baseball arbitration,[12] and will be subject to a discretionary review

by the Court.  Further, all appellate panelists will be selected by this Court from a list

submitted by the parties.  In cases involving claims above $1,000,000 in base

compensation, at least one appellate panelist must be from the claimant's home state.

Class members will also retain the right to seek punitive damages from Transocean and

Halliburton and will receive an assignment of substantially all of the BP Parties' rights to

damages or recoveries from these defendants, including any right to punitive damages.

III.  THIS CLASS ACTION EASILY SATISFIES THE REQUIREMENTS OF FED. R.
     CIV. P. 23

A.  Rule 23(a) Poses No Serious Obstacle to Class Certification.

35.     Rule 23(a) lists four basic requirements that must be satisfied before a

class may be certified:  numerosity, commonality, typicality, and adequacy of

representation.  Simply put, there is no legitimate doubt on any of these issues.

1.  Numerosity.

36.     As the Court knows, over one hundred thousand persons have identified

themselves through the short form joinder procedure in the Limitation proceeding that

was about to go to trial.  Many more did not exercise this procedure but will happily

remain within the class and not opt out.  In determining numerosity under Rule 23 (a), the

Court is permitted to rely on its own common sense, particularly when it is apparent that

---

[12] That is, the appellate panel must choose between the amount submitted by the claimant or the
amount advanced by BP Parties and cannot split the difference.  This procedure deters strategic
underbidding by the defendants (as well as exaggeration by claimants).

the class is very large.  See William B. Rubenstein, Alba Conte, and Herbert B. Newberg, 1 Newberg on Class Actions, §3.3 (4th ed. 2010).

2.  <u>Commonality</u>.

37.      Under <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541 (2011), the commonality requirement focuses on questions that have common answers that will drive the resolution of the litigation.  Today, commonality requires considerably more than simply the presentation of one or more questions that are common to the class or even a showing that the common issues will "affect a significant number of the putative class members."  See <u>M.D. v. Perry</u>, 675 F.3d 832, 839-840 (5th Cir. 2012) ("Stukenberg").  Rather, it requires that the resolution of the common questions must be "central to the validity of each one of the claims in one stroke."  See <u>Wal-Mart Stores, Inc. v. Dukes</u>, supra, at 2551; <u>M.D. v. Perry</u>, supra, at 840.  Here, the questions that are central to all class members' claims include both factual and legal issues.  Representative factual issues relating to BP's alleged negligence would include:  (1) BP's decision to use a long string design, rather than a liner tieback; (2) whether BP properly converted the float collar; (3) whether BP should have used more centralizers; (4) whether BP should have run a full "bottoms-up" circulation; (5) whether BP should have run a cement bond log; (6) whether BP should have developed the casing hanger lockdown sleeve before displacement; (7) whether BP used "unusual" spacer during displacement; (8) whether BP negligently misinterpreted the failed negative pressure tests; and (9) the propriety and soundness of BP's decisions along with the Unified Command concerning use of dispersants, boom, and other containment options to intersect oil.  In common, these issues all involve the defendants' conduct.  Representative legal issues (some of which

have been passed on by this Court) would include:  (1) what is the scope of the BP

Parties' liability as "responsible parties" under OPA; (2) preemption issues under

OCSLA, the Clean Water Act and federal maritime law; (3) the proper construction of

OPA's economic loss provision; (4) the standard of causation under OPA; (5) the

availability of punitive damages under federal maritime law; and (6) the applicability of

the divisibility doctrine to OPA.  Because resolving these issues would resolve central

questions of liability in each of the class members' cases, commonality is satisfied.  See

Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir. 1993); In re Dell Inc. Sec.

Litig., 2010 U.S. Dist. LEXIS 58281 (W.D. Tex. June 11, 2010), Fed. Sec. L. Rep.

(CCH), P 95, 771.  This case is entirely unlike M.D. v. Perry ("Stukenberg"), supra, in

which the asserted common issues involved deficiencies in the state's treatment of certain

children.  Even if these deficiencies were proven, resolution of these issues would not

necessarily resolve the claims of the plaintiffs.  In contrast, in this case, establishing the

liability of the BP Parties on the theories advanced does significantly advance each

individual case.

   38. Finally, commonality is most easily satisfied "by the defendant's conduct

as to all class members."  See Sullivan v. DB Invs., Inc., 667 F.3d 273, 297 (3d Cir.

2011).  Here the BP Parties are alleged to have acted in common towards all class

members by their conduct in causing the Deepwater Horizon oil spill and in their

response to it.  As in Dell, the "class members' claims all arise out of the same set of

operative facts and are based on common legal theories."  2010 U.S. Dist. LEXIS 58281,

at *12.  Finding commonality in this case is straightforward, because the common

questions are central, not peripheral.

3.  <u>Typicality</u>.

39.    The Fifth Circuit has recognized that:  "the test for typicality is not

demanding."  <u>Mullen v. Treasure Chest Casino L.L.C.</u>, 186 F.3d 620, 625 (5th Cir. 1999).

The test for typicality "focuses on the similarity between the named plaintiff's legal and

remedial theories and the theories of those whom they purport to represent."  <u>Id</u>.  Here,

the class members are asserting claims based on OPA and general maritime law, which

arise out of the same event and the same conduct of the BP Parties before and after that

common oil spill.  There is thus an identity between the legal theories of the class

representative and the class.

40.    Equally important, typicality is not defeated by the class members

suffering varying harms or varying degrees of injury.  Differences in damages "will not

affect their legal or remedial theories, and thus does not defeat typicality."  <u>Mullen</u>, supra,

at 625.  As the Fifth Circuit has summarized:

> "If the claims arise from a similar course of conduct and
> share the same legal theory, factual differences will not
> defeat typicality."

<u>James v. City of Dallas</u>, 254 F.3d 551, 571 (5th Cir. 2001).  Here, it is self-evident that the

claims of class members all relate to the same event and the same course of conduct.

4.  <u>Adequacy of Representation</u>.

41.    The Supreme Court has observed that the adequacy requirement "tends to

merge" with the commonality and typicality requirements, which collectively "serve as

guideposts for determining whether" a class action is "economical and whether the

named plaintiff's claim and the class claims are so interrelated that the interests of the

class members will be fairly and adequately protected in their absence."  <u>Amchem</u>, 521

U.S. at 626n.20.  Here, there are 15 class representatives, coming from a variety of occupations and social and economic statuses.  All are united by the fact that their injuries emanate directly from a common occurrence.

42.     The adequacy of representation requirement usually poses a significant barrier to certification when there are intra-class conflicts.  But as already noted, both because the liability of the BP Parties is basically uncapped and because the Seafood Compensation Program is supervised by a court-appointed master, conflicts of interest simply do not arise in this case.  Moreover, even in cases where there are potential conflicts (unlike this case), the Fifth Circuit has still held that "so long as all class members are united in asserting a common right, such as achieving  the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."  In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir. 1981).

43.     In this case, the class was represented by a large and sophisticated Plaintiff's Steering Committee ("P.S.C."), which included attorneys representing class members having suffered losses falling into each of the different categories of loss recognized in the definition of this class.  In effect, class members with diverse injuries were represented by a joint Plaintiffs' Steering Committee, which established the overall framework for compensation of each type of injury.

44.     Finally, the P.S.C. negotiated each claims process separately with the BP Parties under the supervision of Magistrate Judge Shushan.  This independent, claim type-by-claim type negotiating process greatly reduced the possibility of tradeoffs under which the interests of one category of worker or property owner were sacrificed or subordinated to the interests of others.  Nor would the P.S.C. benefit from any such

subordination, as it would not translate into a lower recovery for defendants to pay or a higher fee award for the P.S.C.  The usual incentives for collusion are simply not present in this case.

45.     Even in far more difficult cases, the Fifth Circuit has still approved "irregular settlement negotiations" if the evidence shows that the advocacy was zealous and the settlement fair.  See In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir. 1981).  (approving settlement agreement where interests of two subclasses diverged but they shared a common interest in achieving the largest possible compensation and did achieve that interest).  It is highly relevant here that, in Corrugated Container, the Fifth Circuit found that "logic dictates that one set of negotiators, with authority to release defendants from all claims, would be in a better bargaining position than negotiators with authority to compromise only part of the action."  Id.  The Fifth Circuit's point is that subclasses can weaken plaintiffs' negotiating stance because no single subclass can confer the needed general release on the defendants.  Here, the use of a large, but unified, P.S.C. negotiating team not only improved plaintiffs' bargaining power, but also gave all the participants greater transparency as to how the negotiations were being conducted.  As the Fifth Circuit stated in Corrugated Container, there is no reason to believe that separate negotiations on behalf of each of the subclasses would have produced a superior outcome — and considerable reason exists to believe to the contrary.  Moreover, as noted earlier, a distinctive fact about this case is that most class members fell into multiple subcategories (e.g., they can belong to two or three different subcategories, suffering damage in each).  As a result, use of subclasses would achieve

little of value, but would slow and confuse the negotiations, which were more efficiently conducted with the full P.S.C., rather than with individual subclasses.

B.  Rule 23(b)(3) is Satisfied on the Facts of This Case Because The Common Issues Clearly Predominate.

46.     Rule 23(b)(3), of course, requires that the "questions of law or fact common to class members predominate over any questions affecting only individual members."  This is often the principal roadblock to the certification of tort-based class actions.  But, as earlier noted, this case is markedly different.

47.     First, this is a single event, single location mass disaster which began at an easily defined point:  the Macondo well blowout.  Unlike those more problematic cases that involve extended exposure to a potentially dangerous product or emission, this case pivots on an actual physical invasion of the properties of many class members.  This starting point was equally and highly visible to all.  Unlike most exposure cases (such as tobacco or asbestos), there was not simply a statistical possibility of future injury, but an immediate trespass.

48.     Second, the conduct of the BP Parties was common to all class members. This is critical, because as virtually all have agreed:

> "When common questions represent a significant aspect of the case and they can be resolved for all members of a class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis."

See 7A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §1778 (3rd ed. 2012).  Along with other Circuits, the Fifth Circuit has agreed.  See also Jenkins v. Raymark Indus., 782 F.2d 468, 472 (5th Cir. 1986); see also Sullivan v. DB

Investments, Inc., 667 F.3d 273, 335 (3d Cir. 2011) (concurring opinion by Scirica, J.) (noting that the "focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence").

49.     Third, in the Fifth Circuit, the balance between common and individual issues is not computed mechanically by simply counting each issue. Rather, the focus is on the efficiencies of class treatment. See Jenkins v. Raymark Industries, 782 F.2d 468, 472 (5th Cir. 1986). Thus, a "class issue predominates if it constitutes a significant part of the individual cases." See Watson v. Shell Oil Co., 979 F.2d 1014, 1022-23 (5th Cir. 1992), on reh'g, 53 F.3d. 663 (5th Cir. 1994). Ultimately, this is a matter of weighing, not counting, issues. See Mullen v. Treasure Chest Casino L.L.C., 186 F.3d 620, 626 (5th Cir. 1999).

50.     Fourth, key legal issues are common to the cases of virtually all class members, because this is a case that relies on the closely interconnected body of law that OPA and general maritime law together establish. OPA necessarily places two legal issues at center stage in this case:  (1) Scope of Liability:  What is the scope of the BP Parties' liability arising from their status as "responsible parties" under Section 1002(a) of OPA?;[13] and (2) Degree of Fault:  Did the BP Parties engage in gross negligence or willful misconduct?  If cases were litigated on an individual basis, these issues would have to be faced repeatedly, and thus efficiency considerations dictate the use of a class action in order to avoid repetitive litigation of these issues.

51.     Finally, the fact that the parties have achieved a settlement also deserves significant weight, particularly to the extent that it underscores and demonstrates the

---

[13] See 33 U.S.C. § 2702(a).

cohesiveness of the class.  This is the essential holding in <u>Sullivan v. DB Investments, Inc.</u>, 667 F.3d 273, 297 (3d Cir. 2011), which is an important recent appellate decision on settlement class actions.  Where there is core nucleus of common facts (as there is in this single event, single location disaster that affects a geographically closely knit class), the cohesion of class members is more evident.  That a large class (totaling probably several hundred thousand members) was able to achieve a complicated settlement without its also sizable Plaintiffs' Steering Committee fracturing (and some original members dissenting) also demonstrates cohesion.  Ultimately, under <u>Amchem Products</u>, the bottom line issue is whether the class is "sufficiently cohesive to warrant adjudication by representation." <u>Amchem</u>, 521 U.S. at 623.  Here, the unity of the class clearly justifies the vicarious representation of the class by its class representatives and counsel.

52.    In contrast to the foregoing clearly common issues, there is only one individual issue that may need to be balanced against these common issues.  This is the issue of causation.  Potentially, the losses suffered by individual class members could involve individual issues relating to causation.  Still, it would be a superficial analysis that failed to recognize that causation tends to involve more common issues when the class members are similarly situated.  In general, the Third Circuit has held in a related context that "'at the class certification stage, the Court need not concern itself with whether Plaintiffs can prove their allegations' so long as they 'make a threshold showing that the elements of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class.'" <u>Sullivan v. DB Invs. Inc.</u>,  667 F.3d 273, 291-292 (3d Cir. 2011) (citing <u>In re Linerboard Antitrust Litig.</u>, 305 F.3d 145, 152 (3d Cir. 2002).  Such generalized proof is equally possible and

appropriate here.  For example, OPA imposes liability on the part of a responsible party

to a person who uses natural resources for subsistence for "damages for loss of

subsistence use of natural resources . . . which have been injured, destroyed or lost."[14]

Similarly, "any claimant" may recover for "damages equal to the loss of profits or

impairment of earning capacity due to the injury, destruction, or loss of . . . natural

resources."[15]

       53.     On the facts of this case, such issues are susceptible to common proof.

For example, if the population of "finfish," oysters, shrimp, and crabs were reduced by

the Deepwater Horizon Incident, both commercial fisherman and those who depend on

such "natural resources" for "subsistence" have claims for damages under OPA.  But the

extent of any damage to natural resources — such as the reduction in the populations of

"finfish," lobsters, crabs and shrimp — would invite common proof, including through

scientific evidence.

       54.     More specifically, Section 2702(b)(2)(E) of OPA requires a claimant

under OPA who wishes to recover lost profits or damages for the impairment of earnings

capacity to show that the claimant's loss was "due to the injury, destruction, or loss of

real property, personal property, or natural resources."  As commentators have noted, this

language does seem to contemplate showing a causal connection of some sort.  But that

showing can often be made through common evidence.  For example, if a series of hotels

and motels abutting oil-fouled beaches laid off employees directly as a result of reduced

travel by tourists to their hotels, the reasons that these employees were laid off can be

shown through common evidence (for example, the testimony by hotel managers about

---

[14] See 33 U.S.C. § 2702(b)(2)(C).
[15] See 33 U.S.C. § 2702(b)(2)(E).

the reasons for their layoffs).  This is a common issue because it involves many class members, and the chain of causation is short.

55.     The problem of showing causation pursuant to Section 2702(b)(2)(E)'s "due to" requirement is also greatly simplified in this case by the circumscribed definition of the class.  Conceivably, a chain of economic falling dominoes can be imagined under which the closing of a hotel on the Gulf Coast in Alabama might cause suppliers in New York or headquarters employees in Chicago in the same hotel chain also to be laid off.  But those remote claimants in New York or Chicago are simply not within the class definition, which requires that the class member reside, work (or have been offered work), or own or lease property, in the "Gulf Coast Areas."  By thus refining the class definition, the complexity of showing causation is greatly reduced.  Economic surveys and related statistical evidence can all help to demonstrate the common impact of the Deepwater Horizon incident within this narrower geographic range.

56.     Even with respect to issues of causation, the degree of similarity within each type of claimants (e.g., fishermen, tourist industry entities and workers, property owners in highly contiguous areas) makes causation much more subject to common proof than in cases involving the nationwide exposure of much larger classes to toxic substances or cases involving more dispersed and delayed injuries.  In many tort cases, there are issues about the contributory negligence or comparative fault on the part of the plaintiffs, but those issues do not arise here.  Put simply, the existence of a common nucleus of core factual and legal issues in this case implies that class treatment is efficient and that individual litigation would be unduly repetitive and burdensome.

C. <u>Rule 23(b)(3)'s Superiority Standard is Also Satisfied Because A Class Action Is the Vastly Superior Method by Which to Adjudicate the Losses Experienced by the Class Members and Will Yield Benefits That Could Not Have Been Obtained in Individual Litigation</u>.

57.     Several independent reasons make class treatment "superior" for purposes of Rule 23(b)(3).  First, class treatment is highly efficient, as otherwise the federal and state courts would be inundated with a continuing flow of Deepwater Horizon individual cases, extending well into the future, all of which cases would need to relitigate repetitive issues.

58.     Second, the Settlement Agreement replaces the GCCF with the Deepwater Horizon Court Supervised Settlement Program, which, among other things, will employ more objective and transparent criteria.

59.     Third, the Settlement Agreement has unique provisions that could only be obtained in a comprehensive class settlement:  Three stand out:  (1) Class Members will receive Risk Transfer Premium ("RTP") payments that will liquidate potential claims for pre-judgment interest, the risk of oil returning, consequential damages, emotional distress, possible future damages, claims for punitive damages, and other factors; (2) Section 2 of the Agreement assigns the BP Parties' spill-related claims against Transocean and Halliburton to the class, which assignment includes the BP Parties' claims to punitive damages and reimbursement of clean-up costs;[16] and (3) All payments

---

[16] The BP Parties estimated their total expenditures over the last two years to compensate governmental entities, individuals and businesses and "to engage in response and cleanup in the Gulf Coast" at "over $22 billion."  At the preliminary hearing on certification, the BP Parties advised this Court that "most of that has been assigned" to the class pursuant to this provision. See "Transcript of Hearing on The Motions for Conditional Certification of Rule 23(B)(3) Class

determined by the Claims Administrator can be received on an accelerated basis, even before final resolution of any appeals of the Court's approval of the settlement's fairness.

60.    Fourth, BP has also agreed to finance a $57 million fund to promote the Gulf Coast.  This "Gulf Coast Promotional Fund" seeks to encourage tourism and to rebuild the Gulf Coast's seafood industry and will benefit both class members and non-members alike.  It is inconceivable that such a fund could have been obtained through individual litigation.

61.    These differences again underscore that this settlement reflects a broad and aspirational program of compensation and rehabilitation by which the BP Parties are seeking to revitalize the Gulf Coast area damaged by the Deepwater Horizon disaster.

## IV. CONCLUSION

62.    Several points, made earlier, merit a final underscoring:

A.  This case is <u>sui generis</u> and will seldom, if ever, reoccur in the federal courts. It is less about establishing liability than restructuring a claims resolution process.  The path to settlement began with the creation by the BP Parties of the Trust and GCCF well before the commencement of the earliest settlement discussions.  Counsel for both sides have worked for over a year to restructure that earlier claim resolution process into an improved one that is both more transparent and less discretionary.  The broader goal is not simply the compensation of plaintiffs, but the economic and social rehabilitation of the Gulf Coast areas affected by the Deepwater Horizon disaster.

---

for Settlement Purposes Heard Before The Honorable Carl J. Barbier United States District Judge," April 25, 2012 at p. 82.

B.  Both for this reason and because the settlement is uncapped, this case will not establish any precedent making mass tort class actions easier to bring and resolve.  In all candor, uncapped settlements are less common than unicorns.

C.  The class definition in this case is extremely cautious and does not push the envelope in terms of what might be litigated in the form of a class action.  As a result, many potential litigants with more remote claims are not within the class, will not be covered by the release given on behalf of the class members, and can still sue the BP Parties in other litigation.

D.  The Fifth Circuit has long recognized that the "existence of a negative value suit" supplies "[t]he most compelling rationale for finding superiority in a class action."  See Castano v. Am. Tobacco Co., 84 F.3d 734, 748 (5th Cir. 1996).  In other more recent decisions, it has endeavored to protect such claims.  See In re Monumental Life Ins. Co., Inc., 365 F.3d 408, 411-12 (5th Cir. 2004).  This class action clearly contains a disproportionate number of negative value claim holders, and it is also possible that some of the most valuable legal claims may well be asserted outside this settlement framework by class members who opt out.  But, that is exactly the outcome that this Circuit has approved in its prior opinions, and thus it should be no barrier to class certification that some claimants may prefer to sue individually.

E.  The benefits that class members will receive are remarkably well defined and leave little discretion or allocation authority to others.  The frameworks are clear and objective, as is the documentation that needs to be submitted.  Procedural rights, including the right to appeal, are clearly specified and much more protective than those specified in typical plans of allocation.

F.   Under the Settlement Agreement, the class members receive much more than simply compensation for their losses, but will also gain an assignment of substantially all of the BP Parties' rights against Transocean and Halliburton (including any right to punitive damages) and the indirect benefits of the $57 million Gulf Coast Promotional Fund.

G.   These additional benefits, coupled with the BP Parties' early acceptance of responsibility and waiver of the statutory ceiling on liability under OPA, underscore that this is not ordinary litigation, but rather a negotiated resolution of a broad program of social remediation and rehabilitation.  Given this purpose and the reduced risk of collusion in an uncapped settlement, courts can have greater confidence in the adequacy of the representation and the zealous protection of the class's interests.

H.   Under any reasonable reading of Rule 23, the critical predominance test under Rule 23(b)(3) tips sharply in the favor of a finding that the common issues do predominate over the individual issues.  Because the defendants' conduct injured the class members through a common course of conduct in a single-event, single-location mass disaster and because common legal standards apply (OPA and general maritime law), these common issues easily outweigh the individual issues.

I.  Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied.

I declare under the penalties of perjury that the foregoing analysis and opinions are true and correct to the best of my knowledge and belief.

August 10, 2012                                         John C. Coffee, Jr.

<u>EXHIBIT A</u>

<u>**BACKGROUND, EXPERIENCE AND QUALIFICATIONS**</u>

1. I am the Adolf A. Berle Professor of Law at Columbia University Law School, where I have taught since 1980, and am a member of the Bars of the State of New York and the District of Columbia (and am admitted to various federal courts). I am also a Fellow of the American Academy of Arts and Sciences, a Life Fellow of the American Bar Foundation, and a Life Member of, and former Reporter for, the American Law Institute. I have also been a Visiting Professor of Law at Harvard Law School, Stanford Law School, the University of Virginia Law School, and the University of Michigan Law School. I began my academic career teaching at Georgetown University Law School from 1976 to 1980. Prior to that, I practiced law with the firm of Cravath, Swaine & Moore in New York City from 1970 to 1976. I am a 1969 graduate of Yale Law School.

2. As a law professor, one of my principal academic interests has been class action litigation (with a special focus on the organization and management of the large class action). My law review articles on class actions have been cited on several occasions by the U.S. Supreme Court, including in <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 621 (1997), and <u>Ortiz v. Fibreboard Corp.</u>, 527 U.S. 815, 850n.28.

3. I have on a number of occasions testified before Congressional committees with regard to class actions, have appeared as a witness before the Advisory Committee on the Civil Rules of the United States Judicial Conference, and regularly appear as a panelist at symposia and institutes on the topic of class actions. For the past sixteen years, I have been the opening lecturer at the annual ABA National Institute on

Class Actions, and my annual survey of class action developments for this Institute is regularly published by the Bureau of National Affairs ("BNA"). During 1995, I served as an adviser to the White House's Office of General Counsel with regard to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which chiefly seeks to regulate securities class actions. More recently, I advised the staff of the Senate Banking Committee with respect to the drafting of both the Sarbanes-Oxley Act in 2002 and the Dodd-Frank Act in 2010.

4.      In addition, I have authored the following articles on class actions (which I cite in part to indicate that I am not contradicting prior positions or inventing a novel argument that I would not endorse apart from the facts of this case): John C. Coffee Jr., Litigation Governance:  Taking Accountability Seriously, 110 Colum. L. Rev. 288 (2010); John C. Coffee Jr., Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534 (2006); John C. Coffee Jr., Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working, 42 Md. L. Rev. 215 (1983); John C. Coffee Jr., The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation, 48 Law & Contemp. Probs. 5 (Summer 1985); John C. Coffee Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669 (1986); John C. Coffee Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987); John C. Coffee Jr., and Donald E. Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposed Legislative Reform, 81 Colum. L. Rev. 261 (1981); John C. Coffee Jr., Rethinking the Class Action: A Policy Primer on

Reform, 62 Ind. L. Rev. 625 (1987); John C. Coffee Jr., Class Wars: The Dilemma of the

Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995); John C. Coffee Jr., The Future

of the Private Securities Litigation Reform Act: or Why the Fat Lady Has Not Yet Sung,

51 Bus. Law. 975 (1996); John C. Coffee Jr., Class Action Accountability: Reconciling

Exit, Voice, and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370 (2000).

     5.    My work in the area of class actions and representative litigation also

includes service (for over a dozen years) as a Reporter for the American Law Institute in

connection with its effort to codify the common law rules of corporate law and fiduciary

duties in a Restatement-like volume.  See A.L.I., PRINCIPLES OF CORPORATE

GOVERNANCE: Analysis and Recommendations (1992).  I served as the Reporter for

Litigation Remedies.

     6.    I have also served as an expert witness in a number of the largest class

actions, including a number in the Fifth Circuit.  These include Amchem Prods., Inc. v.

Windsor, 521 U.S. 591 (1997); In re Enron Corp. Securities, Derivative & "ERISA"

Litig., 586 F. Supp. 2d 732 (S.D. Tex. 2008); In re Visa Check/MasterMoney Antitrust

Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003); In re AOL Time Warner Inc. Sec. &

"ERISA" Litig., No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28,

2006); In re Royal Ahold Sec. & "ERISA" Litig., 461 F. Supp. 2d 383 (D. Md. 2006); In

re NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465 (S.D.N.Y. 1998); In re

Sumitomo Copper Litig., 74 F.Supp. 2d 393 (S.D.N.Y. 1999); In re Cendant Corp. Sec.

Litig., 182 F.R.D. 144 (D.N.J. 1998); In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d

235 (D.N.J. 2000), aff'd 264 F.3d 201 (3d Cir. 2001); In re Lucent Tech. Inc. Sec. Litig.,

327 F. Supp. 2d 426 (D.N.J. 2004); In re Waste Management, Inc. Sec. Litig., No.

97C7709 (N.D. Ill. 1999); <u>In re Lease Oil Antitrust Litig. (No. II)</u>, 186 F.R.D. 403 (S.D.

Tex. 1999); <u>Shaw v. Toshiba America Info. Sys.</u>, 91 F. Supp. 2d 942 (E.D. Tex. 2000);

and <u>In re Diet Drugs Products Liability Litigation</u>, MDL Docket No. 1203 (E.D. Pa.

2000).