# Joint Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to all actions. | * * * * | HONORABLE CARL J BARBIER |
| | * * * | MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, | * * * | Civil Action No. 12-97 SECTION J |
| Plaintiffs, | * * | |
| v. | * * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * | MAGISTRATE JUDGE SHUSHAN |
| Defendants. | * | |

DECLARATION OF MEADE MONGER IN SUPPORT
OF CONFIRMATION OF THE ECONOMIC AND PROPERTY SETTLEMENT
AGREEMENT AND EXPERT OPINION REGARDING THE VALUE OF THE CLAIMS
PROCESS TO THE CLASS MEMBERS

I, Meade Monger, submit this declaration in support of the BP Defendants'

Memorandum In Support of Motion For Final Approval of *Deepwater Horizon* Economic and

Property Damages Settlement Agreement, As Amended On May 2, 2012. I am over the age of

18; the opinions, statements and conclusions expressed in this declaration are my own.

1.      I am a Managing Director of AlixPartners, LLP ("AlixPartners"). I

founded and co-lead the Information Management Services practice of AlixPartners, a business

unit with nearly 200 people globally.  I am an independent expert retained by counsel for BP Exploration and Production Inc. and BP America Production Company ("BP") in the MDL No. 2179 litigation.  I submit this declaration in support of BP Defendants' Memorandum In Support of Motion For Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended on May 2, 2012[1].

2.     Except as otherwise noted, I have personal knowledge as to all of the information set forth below.  All facts and opinions set forth in this declaration are based upon my personal experiences and knowledge, information supplied to me by BP's attorneys, my review of other relevant information, and my opinion based upon my knowledge of the Settlement Program and understanding of the Settlement Agreement.

**Professional Background**

3.     I received my MBA from the University of Texas at Dallas and my Bachelor of Science degree in accounting from Oklahoma State University.  I am scheduled to graduate in December 2012 with a Masters Degree from the University of Texas at Dallas in the field of information technology.  I am also a Certified Public Accountant.

4.     I have approximately twenty-five (25) years of professional consulting experience focused on litigation, bankruptcy, and corporate information management.  My team and I have extensive claims management experience working on many of the most complex claims assignments in history.  Examples include claims associated with the restructuring of General Motors Corporation, claims of Aon's insurance policyholders over a twelve year period related to contingent commission payments, investor claims subject to the Bernard L. Madoff

---

[1] Capitalized terms in this declaration are defined in the Settlement Agreement.

Investments fraud, customer claims against London based Lloyds TSB bank resulting from the UK Financial Service Authority payment protection insurance ruling of April 2011, claims associated with Kmart's restructuring that was the largest trade claims case in history, lead paint product liability claims against chemical company Lyondell and environmental claims against the large mining company Asarco.  I have worked on dozens of other claims matters in addition to these examples.  These case experiences have included matters where there are hundreds of thousands of claims and matters where there are mass tort and business and property damages claims such as are in this matter.  Furthermore, I have provided testimony as an interim company officer or company advisor on numerous occasions, including some of the matters above.    See Exhibit I for my curriculum vitae.

**Tasks Performed in Reaching My Opinions**

5.     The primary steps that were taken in connection with preparing this report included reviewing the Settlement Agreement and Exhibits thereto, researching other claims matters, and evaluating the Settlement Program.  As part of this research, I also reviewed the www.deepwaterhorizonsettlements.com website, Settlement Agreement claim forms and instructions, as well as summary and status reports prepared by the Claims Administrator.  The research performed on other claims matters included the cases for which I have been involved and publicly available information from other selected matters.

6.     In addition to the claims matters where I was involved such as the ones mentioned herein, I reviewed publicly available information from other claims matters.  These cases included Vioxx, Diet Drugs, Dow Corning, Chinese Manufactured Drywall, Agent Orange, the Valdez oil spill and the 9-11 Fund.  Exhibit II contains a listing of the facts and data I used in

forming my opinions.

**Key Settlement Agreement Terms Relevant to Opinions**

7.　　In my expert opinion as discussed in more detail below, there are many terms of the Settlement Agreement that provide unique value to Class Members.  The points contained in Exhibit III highlight some of these terms.

**Opinions**

**Opinion 1** – The Settlement Program provides Class Members with the unique benefit of obtaining Settlement Payments prior to final approval, including the conclusion of any appeals.

8.　　The benefit of obtaining Settlement Payments prior to final approval is very beneficial to Class Members.  A common theme throughout my experiences is that claimants desire to be paid as soon as possible.  Payments to claimants in other claims matters are often delayed due to legal processes and approvals as well as payment delays that are caused by claims administration logistics and reserve calculations.  The Settlement Agreement provides multiple mechanisms for Class Members to receive payments on their claims expeditiously.

9.　　*New Claims Paid Prior to Approval of Settlement Agreement (section H of the Settlement Agreement recitals)* – Class Members determined to qualify for Settlement Payments shall have the option to receive payment prior to the date that the Settlement Agreement is finally approved including the conclusion of any appeals and upon the execution of

a release.[2]  This feature is beneficial to Class Members in that they have the ability to receive a payment based on the framework of the Settlement Agreement without having to wait for final Court approval of the agreement, including the conclusion of any appeal periods or pursue an individual claim against BP.  This provision of the Settlement Agreement that provides the ability to pay claims prior to the final approval of the Settlement Agreement is beneficial to claimants that desire to be paid on their claim sooner rather than later.

**Opinion 2** – The Settlement Program offers different mechanisms for Class Members to maximize their claims.

10.    Class Members benefit by terms of the Settlement Agreement that provide mechanisms for claimants to maximize their claims.  These terms include a requirement by the Settlement Program to evaluate various claim payment calculation scenarios as well as requirements for claims funds to be replenished as necessary.  My experiences are that claims operations usually do not have the capacity and certainly not the requirements to assist claimants with evaluating multiple claims payment calculation scenarios.  Furthermore, my experiences are that most claims processes have limited assets available to distribute to claimants that can result in delays in payments and lower recoveries to claimants.  Class Members are fortunate in this matter to have assistance that claimants typically do not receive along with well funded claims funds.

11.    *Claimants With Economic Damage Claims Will Receive Largest Claim Amount Possible (Settlement Agreement section 4.3.8)* – "The Claims Administration Vendors

---

[2] The Effective Date of the Settlement is defined in Section 38.62 of the Settlement Agreement.

shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework. By way of example, but not to be exclusive, if the Claimant selected a Compensation Period or Benchmark Period based on information in a completed Claim Form and all supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied."[3]  It is not typical in claims administration of settlements to have requirements that claim amounts are maximized.  The typical requirement is to validate the asserted claim and not evaluate whether the claimant should have considered other things that may yield a higher claim amount.  In addition, this requirement ensures that applicable Claimants are not penalized from a lack of knowledge of the settlement program or from a clerical or mathematical error in filling out Claim Forms.

12. *No Cap on Funds (Settlement Agreement section 5.12.1.3)* – The BP Parties are required to replenish the General Claims Fund as much as necessary to pay claims, with the exception of the Seafood Compensation Fund.  Many claims matters have capped payouts through agreed upon settlement amounts or are often constrained by the amount of assets available to pay claims.  With no finite amount set to pay all claimants, Class Members should receive full payments on their claims faster than in other claims matters.  It is common in other

---

[3] Settlement Agreement Section 4.3.8

claims matters that cash reserves are considered and set at levels where all claimants are paid on a fractional basis pro-rata based on the assets that are available to distribute to claimants. In other claims matters, unresolved claims can inflate the liability exposure thereby diluting recovery amounts by creating significant cash reserves that limit the amount of cash that can be distributed earlier on in the process to claimants with resolved claims. When considering these requirements to replenish claims funds hand-in-hand with a two-year period of time to file claims after the preliminary approval of the Settlement Agreement, with the exception of the Seafood Compensation Program deadline, Class Members are provided with comfort that there is plenty of time and sufficient funding to be compensated properly for their claims.

13. *Promotional Fund of $57 Million Provides Additional Benefits to Class Members (Settlement Agreement section 5.13)* – The Promotional Fund will be administered by the Claims Administrator to promote tourism and the seafood industry in the Gulf Coast areas impacted by the *Deepwater Horizon* Incident. The Class Members, which include property owners, business owners and people that work in the seafood industry in this area will benefit from these investments above and beyond payments on their claims through increased value to their properties and businesses from these investments.

14. *Settlement Agreement Exhibits* – The Settlement Agreement criteria for determining amounts to be paid on claims provides Class Members flexibility and options with regard to proving causation and calculating damages. Claimants often struggle with how best to present their claims based on their own situations and the information they have available to support their claims. This flexibility and options of the claims resolution process provides additional value to claimants by giving them multiple options for establishing their claims depending upon their particular circumstances and the documentation that is available to them.

**Opinion 3** – The Settlement Program has implemented processes and procedures that deliver a high level of support and assistance to Class Members.

15.     There are multiple terms of the Settlement Agreement that provide assistance to Class Members that are not often required in other claims matters and provide benefits to Class Members.   The Settlement Program is required to "work with Economic Class Members . . . to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes."[4]   It is also required to "use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement."[5]   This requirement of a "claimant friendly" process that maximizes the opportunity of a Claimant to be determined eligible and receive a settlement payment is unusual and very beneficial to claimants, who likely are not experienced in pursuing claims.   I have not seen this extent of required support to claimants in other claims matters.   Class Members that may not be familiar with filing claims and claims processes in general are fortunate in this situation to have support from the Settlement Program, abilities to seek additional claims and be privy to comprehensive and consistent details of how claim payments are determined.

16.     *Claims Filing Support (Settlement Agreement section 4.3.7)* – The Settlement Program is required to "use its best efforts to provide Economic Class Members with

---

[4] Settlement Agreement Section 4.3.7
[5] Settlement Agreement Section 4.3.7

assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement."[6]   In other claims matters, additional information is often required in order to calculate and validate claims, but the requirement to notify claimants that more information is needed is unusual.  This condition provides Class Members with the opportunity to receive the full Settlement Payment for which they are entitled and minimizes the amount of claims that do not provide sufficient information.  Class Members who may not have familiarity with legal processes and claims programs are provided assistance with filing claims that is not typical in other claims matters.  Although many claims administrators provide general support to claimants, the contractual obligation of the Settlement Program to ensure that Class Members get support with submitting claims to provide them the "best opportunity" to recover (as set forth in Section 4.3.7 of the Settlement Agreement) is typically not a requirement in other claims matters.  It is unusual that claims administrators play this role.  I understand from my experiences how important it is to claimants to get support with properly complying with the claims process.  Therefore, these unique requirements under the Settlement Agreement are beneficial to claimants.

17.   *Accounting Fees Reimbursed (Settlement Agreement section 4.4.13)* – Eligible claimants can seek help from accounting professionals to prepare and submit claims and get reimbursed for fees (limited to reasonable incurred fees up to specific limits and subject to certain guidelines and restrictions).  Claimants who utilize 3rd party bookkeepers and would have to incur out of pocket expenses to calculate and assert their claim can be reimbursed for

---

[6] Settlement Agreement Section 4.3.7

those expenses.  A requirement to reimburse fees to claimants is unusual and generally does not happen in most claims matters.

18.     *Claims Submission Deadline Two Years Away (Settlement Agreement section 4.4.4)* – The deadline for submitting claim forms is April 22, 2014 or six months after the Effective Date, whichever occurs later, except for Claims under the Seafood Compensation Program.  This provides Class Members with more than adequate time to gather information in support of and to file their claim.  This length of time available to submit a claim through the Settlement Program is much longer than most claims matters.  This settlement provides for approximately four years to submit a claim from the date of the oil spill incident.  My experience is that many claimants often file claims shortly before the claims submission deadline and request to have more time.  Based on these experiences, I believe that the unusually long period of time to submit claims under the terms of the Settlement Agreement is beneficial to Class Members.

19.     *Right to File Additional Claims (Settlement Agreement section 4.4.8)* – Claimants have six months from the date of the initial payment by the Settlement Program of the Claimant's first paid claim to file additional claims,  with the exception of Seafood Compensation Program claims.  Although Class Members are required to submit a release in order to get paid, the release provides for the ability to file additional claims.  In other claims matters, claimants are often precluded from asserting additional claims after being paid for previously submitted claims.  This aspect of the Settlement Agreement provides Claimants with the ability to file claims immediately and receive payments on those claims without having to determine and assert all claims at the same time.

20.     *GCCF Denied Claims Not Precluded (Settlement Agreement section 4.4.9)*

– A Class Member with a claim that was rejected or denied by the GCCF can still have this claim fully considered for payment by the Settlement Program.  There is no negative influence or presumption if the claim was denied by GCCF.  Most claims matters adopt previous decisions and rarely give consideration to claims that were previously denied.

21.     *Comprehensive and Transparent Claims Resolution Criteria (Settlement Agreement section 1.3 and Exhibits 1A-15)* – All criteria for determining whether a Class Member qualifies and the how payments for qualifying Class Members are calculated have been laid out in detail in the publicly filed settlement documents, thereby making the claims resolution process quite transparent.  This level of transparency to Class Members is unique and an element of the Settlement Program that provides additional value to Class Members.  As a result, Class Members know that there are objective measures being applied in connection with resolving claims that are consistent among Class Members.  In addition, transparency of the claims resolution criteria should speed up the process by eliminating disputes over how to calculate how much claimants should be paid on their claims.  This transparency also further aids claimants in considering their option to opt out of the Settlement Agreement.

**Opinion 4** – The multi-tiered appeal rights for Class Members is a unique and beneficial element of the Settlement Program.

22.     *Multiple Claims Review Opportunities (Settlement Agreement section 6)* – Class Members will have multiple opportunities to have their claim reconsidered and reviewed to assure accuracy, transparency, independence and adherence by the Settlement Program to the terms of the Settlement Agreement.  This includes: (i) an appeal for insufficient documentation;

(ii) reconsideration of final determination by the Settlement Program; and (iii) an appeal to the Appeal Panel.  Such multi-tiered review rights are uncommon.  Some claims settlements are silent on appeals and some contain an appeals process, but none seem to be as robust as the multiple layer appeals process set forth in the Settlement Agreement.  My experience is that claimants are often disappointed with claims resolution outcomes and do not have the experience or resources that might be required to contest decisions regarding amounts to be paid on claims. Therefore, the requirements under the Settlement Agreement for a multiple claims review structure are beneficial to Class Members in this matter.  Furthermore, it is not commonly set forth in the beginning of a claims process that claimants will be entitled to additional amounts above and beyond their claim amount if they prevail upon appeal.  If the Claimant prevails upon the appeal in this settlement, the Claimant is entitled to an additional amount to their claim and a refund of any filing fees paid for the appeal.

**Opinion 5** – The Settlement Program is uniquely accommodating to Class Members through a substantial and comprehensive infrastructure and guidelines in place to thoroughly handle claims expeditiously and is very generous to Claimants in comparison to most claims processes.

23.     The size and capacity of the Settlement Program operations are significantly larger than most claims operations.  This opinion is based on my own experiences and research of other claims matters and are explained in more detail below.

24.     The operations of the Settlement Program that have been established to process, resolve and pay claims is extraordinarily large and robust in comparison to typical claims operations.  The operations consist of the Claims Administrator and his staff of 25

personnel.  This team consists of specialists in legal, financial, technology, fraud, appeals, communications, Subsistence Damage claims, and policy, along with administrative support. The operations also utilize the services of five Claims Vendors currently with over 2,600 full time equivalent people.  Each vendor specializes in a unique area, including claims processing, the evaluation of claims by type, fraud, quality assurance, and claims operations.  While the Settlement Program staffing levels may be adjusted over time as the estimated volume of claims is better ascertained and the number of claims decrease, the Settlement Program operations will likely remain substantially larger than most claims processes.

25.     The central operations of the Settlement Program are geographically well situated in New Orleans.  In addition, there are 19 Claims Assistance Centers dispersed across the Gulf Coast region.  These locations provide relative ease of physical access for Class Members to the Settlement Program.

26.     As an example of how claims are being handled expeditiously by the Settlement Program, the transition period proved to be an example of how good progress has been made.  The progress that was accomplished during the Transition Process and since the Settlement Program commenced is impressive thus far.  The Transition Process commenced on March 8, 2012 subject to the First Amended Order Creating Transition Process.  The Transition Process lasted until June 4, 2012 at which time the Settlement Program got underway subject to the Preliminary Approval Order dated May 2, 2012.  The Transition Process lasted from March 8, 2012 though June 4, 2012 with continuation of processing through July 19, 2012.  During this period of time, there were 8,194 new Determination Letters mailed and nearly 16,000 claims paid totaling $403 million.  The paid claims included 6,687 claimants that received $244.1 million for 60% partial payments under the Settlement Agreement, 8,780 claimants that received $144.6

million under interim and quick payment mechanisms, and other payments totaling $14.3 million.

27.     During the first nine weeks of the Settlement Program operations (June 4, 2012 and through August 7, 2012), the Settlement Program recorded 47,078 claims.  In addition, the Settlement Program operated 19 Claims Assistance Centers and received over 132,000 calls of which nearly 75,000 were handled by live operators.  The Settlement Program websites (www.deepwaterhorizonsettlements.com and affiliated websites) received 155,000 first time visitors.  Based on my experience, the Settlement Program's ability to establish these operations and handle the recorded volume of claims, calls and website visitors is impressive.

28.     The claims portal has also proven to be accommodating to clients. Approximately 73% of the claims recorded through the Settlement Program through August 7, 2012 were submitted through the claims portal.  Claims portals provide for ease of submission to claimants and can speed up the overall claims process when widely used.  Submitting claims over the internet has not been common in most other claims matters.

29.     The Settlement Program contains outreach elements that make it easier for Class Members to obtain information about the settlement and receive assistance in understanding and pursuing their claim.  First, the Settlement Program website provides comprehensive information about the settlement, the status of the MDL No. 2179 litigation and instructions about how to complete claim forms, including FAQs, tutorials and instructional videos.  Second, the Settlement Program operates 19 Claims Assistance Centers throughout the Gulf Coast, providing Class Members the ability to meet face to face with Settlement Program representatives without having to travel to a single, central location.  Finally, the Settlement Program website provides ready access to the multiple claim forms available as well as the

ability to request paper copies of claim forms.  While many claims programs contain some of these outreach elements, the combination of all these features provides unique benefits to Class Members.

30.     *Claims Administration Panel (Settlement Agreement section 4.3.4)* – A three-person Claims Administration Panel shall address and attempt to resolve unanimously any issues or disagreements that arise regarding the Settlement Program.  Moreover, the Claims Administration Panel includes a representative of Lead Class Counsel who represents Class Members' interests.  This provides a good governance mechanism to the Settlement Program for Class Members to have confidence that the Settlement Program is operating in accordance with the Settlement Agreement.  In addition, the ability of unresolved matters to be referred to the Court provides additional governance.  Although advisory and oversight boards are common in my experiences, the ease of access to and the involvement of the Claims Administration Panel in this settlement provide greater value to claimants than most claims matters.  Other claims matters often have claim amount threshold requirements and other criteria for involving advisory and oversight boards.

**Opinion 6 –** The Settlement Agreement created a unique mechanism to transition Class Members with GCCF claims into the Settlement Program without interrupting the processing and payment of claims.

31.     A transition of a large claims project to a new process could be very disruptive to claimants and result in a disorganized and incomplete new process. Claimants may not have retained all of the information that was previously submitted and could easily incur

additional costs to resubmit information to a new program.  The transition in this matter was seamless with relatively no impact on claimants.  Class Members are not required to start from scratch and resubmit claims-related information that was previously provided to the GCCF.  My experience is that claimants often put lots of effort into preparing and submitting claims including all supporting documentation. The fact that all information submitted to the GCCF or the Transition Process was transferred to the Settlement Program without a requirement that Claimants resubmit all supporting documentation for this claim is an important benefit to those Class Members.

32.     *Transition Process (Settlement Agreement section 4.2.2)* – The Transition Process provided benefits to Class Members before the Settlement Agreement was preliminarily approved and the Settlement Program commenced operations, which is not a feature that is typical in most claims matters.  The Transition Process evaluated claims that were pending with the GCCF as well as any new claims that were submitted and reached the evaluation stage before the Settlement Program began.  In general, a transition such as this is not common for such a large claims operation. Providing a continuous review and payment of claims to Transition Claimants who are Class Members was a valuable benefit to that group.

33.     *More Information Needed Notification (Settlement Agreement section 4.4.2)* – The Settlement Program is required to notify Pending Transition Claimants (those who received and/or accepted a 60% offer or whose claim was still being processed at the end of the Transition Process) if additional information may be necessary to pursue claims under the Settlement Agreement.  As a result, the Settlement Agreement provides additional benefit to Class Members by allowing for smooth and complete transition to the Settlement Program while minimizing the burden of the transition placed on Class Members.  In my experience, claimants

place value on the provision of assistance by a settlement program when it comes to streamlining the process necessary to submit a complete claim.

34.     *Pending Offers Paid at 60% (Settlement Agreement section 4.2.3)* – Claimants with pending offers from the GCCF, pending claims with the GCCF, and claimants who filed new claims during the Transition Process were eligible to receive 60% of the offer amount without having to sign a release or give up their rights to pursue a claim of any amount. If the claimant receiving the 60% payment is a Class Member, the claimant has a right to additionally recover from the Settlement Program the greater of:  (a) the remaining 40% of the GCCF offer, or (b) the Class Settlement Payment minus any amount previously paid by the Transition Process, in either case in exchange for an Individual Release.  This provision enables payments to be made to claimants sooner and provides a bridge for settlements that were in process during the GCCF program.  This was beneficial to claimants by helping them obtain relatively prompt financial relief without jeopardizing what the claimants feel they are ultimately entitled to receive on their claim.  Other claims cases that have provided quick-interim financial relief typically require a release from the claimant and court approval of a settlement agreement. Furthermore, interim payments typically do not happen in most claims cases in general.  In addition, the ability of a Class Member to obtain the greater of the remaining 40% of the GCCF offer of the Class Settlement Payment (minus any amount previously paid by the Transition Process) is, in my experience, very unusual.  It gave these Class Members the ability to obtain the best outcome between the GCCF program and the Settlement Program.  This is a unique and clear benefit to the applicable Class Members.

35.     *Interim Payments Continued to be Made (Settlement Agreement section 4.2.6)* – Claimants continued to receive interim payments during the Transition Process.  Class

Members that received these payments were not required to sign a release and are still entitled to submit a claim to the Settlement Program.  It is unusual in other claims matters that claimants are paid on their claims without having to sign a release and before the settlement is court approved. This unique feature of the Settlement Agreement is valuable to claimants that can get payments on their claims promptly without having to understand what it means to agree to a release and being precluded from asserting other future claims.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 13th day of August, 2012.

_____

Meade Monger
Managing Director
AlixPartners, LLP

18

EXHIBIT I

Curriculum Vitae of Meade Monger

Professional Highlights

Mr. Meade Monger founded and co-leads AlixPartners' Information Management Services practice, which manages bankruptcy processes for large companies, provides litigation technology and electronic discovery services in large litigation matters, and provides corporate information management services.  He has 25 years of consulting experience and has worked on many of the nation's largest bankruptcy and litigation cases.  He has testified in both litigation and bankruptcy matters and has developed and led numerous large and complex claims processes.  He has also led corporate consulting assignments where he applied information management skills to drive enhanced earnings and balance sheet improvements for his clients.

For the first nine years of his career, Meade worked in Arthur Andersen's New York office (six years) and Dallas office (nearly three years) and performed turnaround consulting and litigation services.  He left Arthur Andersen at the end of 1995 and founded Monger & Consultants, a firm that provided bankruptcy advisory and case management services along with other financial consulting services.  His firm was acquired by AlixPartners in April 2001 and the Information Management Services practice was established.


Client Experience

Meade has worked on numerous bankruptcy cases and litigation settlements with a heavy focus on resolving claims.  He has worked on bankruptcy cases such as General Motors, LyondellBasell, Kmart, WorldCom, and dozens of others.  He has served or is currently serving as Chief Restructuring Officer, Trustee and/or Plan Administrator for many of these cases.  Meade also provides litigation consulting and support including serving as Settlement Administrator of large litigation matters.  In addition to Meade's bankruptcy and litigation consulting client experiences, he has numerous information management consulting experiences with corporations relating to effective uses of information technology to improve business performance.


Affiliations

Meade graduated from Oklahoma State University with an accounting degree and received his Masters Degree from the Executive MBA program at the University of Texas in Dallas, where he has nearly completed a second Masters Degree in Information Technology.  He is also a Certified Public Accountant.  His publications include "Control the Denominator to Enhance Creditor Recoveries", published in the *American Bankruptcy Institute Journal*, September 1, 2004

EXHIBIT II

Facts and Data Used in Forming Opinions

- *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012; DKT 6430

- Settlement Agreement between Merck & Co., Inc. and Negotiating Plaintiff's Counsel, in the VIOXX Products Liability Litigation

- *Deepwater Horizon* First Amended Order Creating Transition Process; DKT 5995

- *Deepwater Horizon* Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement]; DKT 6418

- GCG Transition Run-Off Report as of July 19, 2012

- End of Day Dashboard Report, 8/7/12, *Deepwater Horizon* Claims Center

- Economic Loss Organization Chart, 8/8/12, *Deepwater Horizon* Claims Center

- www.deepwaterhorizonsettlements.com

- FAQ Drafted by the MDL No. 2179 Plaintiffs' Steering Committee, March 9, 2012

- Gulf Coast Claims Facility Protocol for Interim and Final Claims, February 8, 2011

- Gulf Coast Claims Facility Final Rules Governing Payment Options Eligibility and Substantiation Criteria and Final Payment Methodology, February 18, 2011

- Final Report of The Special Master for the September 11th Victim Compensation Fund of 2001

- Settlement Facility and Fund Distribution Agreement *Between* Dow Corning Corporation and The Claimants Advisory Committee

- In re "Agent Orange" Product Liability Litigation, 597 F. Supp 740 (E.D. N.Y. 1984)

- In re "Agent Orange" Product Liability Litigation, 603 F. Supp 239; 1985 U.S. Dist

- In re "Agent Orange" Product Liability Litigation, 689 F. Supp 1250; 1988 U.S. Dist

- Order Preliminarily Approving Knauf Settlement, Conditionally Certifying a Knauf Settlement Class, Issuing Class Notice, Scheduling a Settlement Fairness Hearing, and Staying Claims as to the Knauf Defendants

- Oil Pollution Act of 1990

- Exxon Qualified Settlement Fund News as of July 25, 2012

- In re: The EXXON VALDEZ Declaration of Lynn Lincoln Sarko in Support of Lead Counsel's Application for an Order Distributing Exxon Qualified Settlement Funds to NATV, NOOS, F00E, S01E, S03E, S04E, S01H, S01K, S02K, S04K, and S01L,

Claimants and their Attorneys

- Review of other materials from my work experience that are relevant to this report

EXHIBIT III

<u>Key Settlement Agreement Terms</u>

- Section H – Class Members determined to qualify for one or more Settlement Payments shall have the option to receive prompt payment of such compensation prior to the Effective Date upon the execution of a release.

- Section 1.3 and Exhibits 1A-15 – The criteria for determining whether a Class Member qualifies and how payments for qualifying Class Members are calculated is transparent to Class Members.

- Section 4.2.2 – The Transition Process had to be implemented in an orderly, transparent and timely manner.  This included requirements to evaluate claims that were pending with the GCCF and evaluate any new claims submitted and that reach the evaluation stage before the Settlement Program was opened.

- Section 4.2.3 – Class Members who received a claims determination offer based on the final GCCF rules were entitled to receive 60% of the offer without having to provide a release.  Class Members who received 60% of the offer during the Transition Process have the right to receive from the Settlement Program the greater of: (i) the remaining 40% of the GCCF offer; or (ii) the Class Settlement Payment minus what was paid during the Transition Process.

- Section 4.2.6 – The Transition Coordinator processed and issued interim payments pursuant to the final GCCF rules as amended by the Court's March 8, 2012 Order until the date on which the Settlement Program commenced processing Claims.

- Section 4.3.4 – A three-person Claims Administration Panel provides additional governance to further ensure that the Settlement Program operates in accordance with the terms of the Settlement Agreement.  Moreover, the Claims Administration Panel has involvement of Lead Class Counsel who represent Class Members' interests.  Matters considered by the Claims Administration Panel that cannot be decided unanimously are referred to the Court for resolution.

- Section 4.3.7 – "The Settlement Program, including the Claims Administrator and Claims

Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes.  The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement."[7]

- Section 4.3.8 – "The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework. By way of example, but not to be exclusive, if the Claimant selected a Compensation Period or Benchmark Period based on information in a completed Claim Form and all supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied."[8]

- Section 4.4.2 – The Settlement Program must review previously filed claims information that was transferred by the GCCF to the Settlement Program and is required to notify each Pending Transition Claimant if more information is needed to support the claim.

- Section 4.4.4 – With the exception of the Seafood Compensation Program, the deadline for

---

[7] Settlement Agreement Section 4.3.7
[8] Settlement Agreement Section 4.3.8

submitting claims is the later of six months after the Effective Date or April 22, 2014, which is at least two years after the settlement and approximately four years after the incident.

- Section 4.4.8 – Claimants have the option not to file all their Claims with the Settlement Program at one time.  Claimants may file additional Claims after receiving payment on their first paid Claim, subject to a six month limitation and a deadline for submission of Seafood Program Compensation Claim Forms of 30 days after the date of entry of the Final Order and Judgment by the Court.

- Section 4.4.9 – Even though the GCCF denied a claim, a Class Member is not precluded from participating in the Settlement Program.  There shall be no negative inference or presumption of any kind as to the eligibility or right of any Class Member to receive a Settlement Payment under the terms of the Settlement Agreement.

- Section 4.4.13 – Accounting fees incurred by claimants that receive Economic Damage Compensation Amount payments or Seafood Compensation Fund Payments are reimbursed subject to certain criteria and limitations.

- Section 5.12.1.3 – There is no cap on the funds required to be paid by The BP Parties to satisfy all claims (with the sole exception of the $2.3 billion Seafood Compensation Program).

- Section 5.13 – The BP Parties will fund $57 million to promote the Gulf Coast areas and waters ("Promotional Fund").

- Section 6 – Economic Class Members have multiple opportunities to have their claims reviewed and are entitled to additional compensation when prevailing upon appeal.