# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>This Document Relates to:<br><br>*Plaisance et al. v. BP Exploration & Production Inc., et al.*, No. 12-cv-968 | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF MEDICAL BENEFITS CLASS ACTION SETTLEMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

I.  INTRODUCTION ...................................................................................................1

II.  PROCEDURAL BACKGROUND..........................................................................3

III.  SUMMARY OF THE PROPOSED MEDICAL BENEFITS
CLASS ACTION SETTLEMENT AGREEMENT.................................................6

IV.  DISSEMINATION OF THE MEDICAL SETTLEMENT NOTICE AND
FULFILLMENT OF THE NOTICE PLAN CONSTITUTES THE BEST
PRACTICABLE NOTICE UNDER RULE 23(c)(2)(B) AND RULE 23(e)(1)...............13

V.  THE MEDICAL BENEFITS CLASS ACTION SETTLEMENT IS FAIR,
ADEQUATE, AND REASONABLE, AND MERITS FINAL APPROVAL
UNDER PREVAILING JUDICIAL STANDARDS ...............................................17

    A.  The Medical Settlement Is Free of Fraud or Collusion, Which
Weighs in Favor of Final Approval ..........................................................19

    B.  The Complexity, Expense, and Likely Duration of Litigation Between
Class Members and the BP Defendants in the Absence of Settlement
Demonstrates the Reasonableness and Superiority of the Medical Settlement
and Weighs in Favor of Final Approval ....................................................22

    C.  The Current Stage of the Proceedings and Considerable Discovery
Conducted Weigh in Favor of Final Approval ..........................................25

    D.  The Probability of Success on the Merits Weighs in Favor of Final Approval...........27

    E.  The Range of Possible Recovery Weighs in Favor of Final Approval.......................28

    F.  The Opinions of Class Counsel and Members of the Class Weigh in
Favor of Final Approval............................................................................31

VI.  THE MEDICAL BENEFITS SETTLEMENT CLASS FULFILLS ALL
APPLICABLE CRITERIA FOR CONFIRMATION AND CERTIFICATION
UNDER RULE 23(a) AND RULE 23(b)(3). ..........................................................33

    A.  The Medical Benefits Class Fulfills Rule 23(a)'s Criteria for Class
Certification ..............................................................................................34

i

1.   The Class Satisfies the Numerosity Requirement ................................................... 35

2.   The Questions of Law and Fact Common to the Class
     Satisfy the Commonality Requirement .................................................................. 36

3.   The Claims and Defenses of the Class Representatives are Typical
     of the Class, and the Typicality Requirement is Satisfied ..................................... 38

4.   Class Counsel and the Representatives of the Class Satisfy the
     Adequacy Requirement .......................................................................................... 39

5.   The Class Definition Satisfies the Ascertainability Requirement .......................... 41

B.   The Medical Benefits Class Meets the Requirements of Rule 23(b)(3) .................... 42

1.   The Predominance Requirement is Satisfied ......................................................... 42

2.   A Class Action is Superior to Other Methods of Adjudication ............................. 46

VII.   THE PROPOSED COMMON BENEFIT FEE STRUCTURE FURTHER
       ENHANCES THE BENEFITS TO THE SETTLEMENT CLASS ................................. 47

VIII.  THE COURT SHOULD CONFIRM THE APPOINTMENT OF
       GARRETSON RESOLUTION GROUP AS THE CLAIMS ADMINISTRATOR ......... 48

IX.    THE COURT SHOULD CONFIRM THE APPOINTMENT OF THE CLASS
       REPRESENTATIVES, CLASS COUNSEL, TRUSTEE, AND DIRECTED
       TRUSTEE, AND SHOULD MAINTAIN CONTINUING JURISDICTION
       OVER THIS MATTER ................................................................................................ 49

X.     CONCLUSION ........................................................................................................... 49

       CERTIFICATE OF SERVICE .................................................................................... 53

## TABLE OF AUTHORITIES

### Cases

*Arabie v. Citgo Petroleum Corp.*,
   89 So.3d 307 (La. Ct. App. 2012) ........................................................................29

*Adams v. CSX Railroads*,
   902 So.2d 413 (La. Ct. App. 2005) .......................................................................28

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ...........................................................................21, 34, 40, 42

*Association for Disabled Americans, Inc. v. Amoco Oil Co.*,
   211 F.R.D. 457 (S.D. Fla. 2002) ..........................................................................23

*Ayers v. Thompson*,
   358 F.3d 356 (5th Cir. 2004) ................................................................................24

*Bentley v. Honeywell International, Inc.*,
   223 F.R.D. 471 (S.D. Ohio 2004) .........................................................................45

*Boggs v. Divested Atomic Corp.*,
   141 F.R.D. 58 (S.D. Ohio 1991) ...........................................................................45

*Castano v. American Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) ............................................................................45, 46

*Collins v. Sanderson Farms, Inc.*,
   568 F. Supp. 2d 714 (E.D. La. 2008) ..............................................................19, 23

*Cook v. Rockwell International Corp.*,
   151 F.R.D. 378 (D. Colo. 1993) ............................................................................45

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ........................................................................17, 28

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) ...................................................................26, 32

*Doerr v. Mobil Oil Corp.*,
   935 So.2d 231 (La. Ct. App. 2006) .......................................................................28

*Domingue v. Sun Electrical & Instrumentation, Inc.*,
   No. 09-682, 2010 WL 1688793 (M.D. La. Apr. 26, 2010) ....................................20

*Eatmon v. Palisades Collection LLC*,
No. 08-306, 2011 WL 147680 (E.D. Tex. Jan. 18, 2011) .......................................15

*Ehrheart v. Verizon Wireless*,
609 F.3d 590 (3d Cir. 2010) ...................................................................................17

*Faircloth v. Certified Financial, Inc.*,
No. 99-3097, 2001 WL 527489 (E.D. La. May 16, 2001) ......................................23

*Feinberg v. Hibernia Corp.*,
966 F. Supp. 442 (E.D. La. 1997) ...........................................................................27

*Howard v. Union Carbide Corp.*,
50 So.3d 1251 (La. 2010) ........................................................................................28

*In re Amaranth Natural Gas Commodities Litigation*,
269 F.R.D. 366 (S.D.N.Y. 2010) ............................................................................35

*In re Cendant Corp. Litigation*,
264 F.3d 201 (3d Cir. 2001) ....................................................................................33

*In re CertainTeed Roofing Shingle Products Liability Litigation*,
269 F.R.D. 468 (E.D. Pa. 2010) ..............................................................................13

*In re Chinese-Manufactured Drywall Products Liability Litigation*,
MDL No. 2047, 2012 WL 92498 (E.D. La. Jan. 10, 2012) ..............................35, 46

*In re Combustion, Inc.*,
968 F. Supp. 1116 (W.D. La. 1997) ...................................................................23, 28

*In re Corrugated Container Antitrust Litigation*,
643 F.2d 195 (5th Cir. 1981) ..............................................................................21, 22

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)
Products Liability Litigation*,
Nos. 1203, 99-20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ..........31, 41, 44

*In re Education Testing Services*,
447 F. Supp. 2d 612 (E.D. La. 2006) .......................................................................25

*In re Enron Corporation Securities, Derivatives, & "ERISA" Litigation*,
MDL No. 1446, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ................................14

*In re FEMA Trailer Formaldehyde Products Liability Litigation*,
MDL No. 071873, 2008 WL 5423488 (E.D. La. Dec. 29, 2008) .............................34

*In re Fosamax Products Liability Litigation,*
  248 F.R.D. 389 (S.D.N.Y. 2008) ........................................................................41

*In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation,*
  MDL No. 09-2046, 2012 WL 948365 (S.D. Tex. Mar. 20, 2012)............................27

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,*
  241 F.R.D. 435 (S.D.N.Y. 2007) ........................................................................41

*In re Monumental Life Insurance Co.,*
  365 F.3d 408 (5th Cir. 2004)...............................................................................34

*In re OCA, Inc. Securities & Derivative Litigation,*
  No. 05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ...................................15

*In re Oil Spill of the Oil Rig "Deepwater Horizon"*
*In the Gulf of Mexico, On April 20, 2010,*
  MDL No. 2179, 731 F. Supp. 2d 1352 (J.P.M.L. 2010 .....................................3, 37

*In re Serzone Products Liability Litigation,*
  231 F.R.D. 221 (S.D. W. Va. 2005)......................................................................13

*In re Shell Oil Refinery,*
  155 F.R.D. 552 (E.D. La. 1993).................................................................22, 23, 24

*In re Train Derailment Near Amite Louisiana,*
  MDL No. 1531, 2006 WL 1561470 (E.D. La. May 24, 2006) .................................20

*In re U.S. Oil & Gas Litigation,*
  967 F.2d 489 (11th Cir. 1992)..............................................................................22

*In re Vitamins Antitrust Litigation,*
  305 F. Supp. 2d 100 (D.D.C. 2004) ................................................................26, 27

*International Union, United Automobile, Aerospace, & Agricultural*
  *Implementation Workers of America v. General Motors Corp.,*
  497 F.3d 615 (6th Cir. 2007)...........................................................................14, 17

*James v. City of Dallas,*
  254 F.3d 551 (5th Cir. 2001)...............................................................................38

*Jenkins v. Raymark Industries, Inc.,*
  782 F.2d 468 (5th Cir. 1986)...............................................................................42

*Lightbourn v. County of El Paso, Texas,*
  118 F.3d 421 (5th Cir. 1997)................................................................36, 39

*Maywalt v. Parker & Parsley Petroleum Co.,*
  67 F.3d 1072 (2d Cir. 1995)................................................................19

*M.D. ex rel. Stukenberg v. Perry,*
  675 F.3d 832 (5th Cir. 2012)................................................................36

*Mehl v. Canadian Pacific Railway Ltd.,*
  227 F.R.D. 505 (D.N.D. 2005)................................................................43

*Mejdreck v. Lockformer Co.,*
  No. 01-6107, 2002 WL 1838141 (N.D. Ill. Aug. 12, 2002),
  *aff'd*, 319 F.3d 910 (7t1h Cir. 2003) ................................................................45

*Mullane v. Central Hanover Bank & Trust Co.,*
  339 U.S. 306 (1950) ................................................................14

*Mullen v. Treasure Chest Casino, LLC,*
  186 F.3d 620 (5th Cir. 1999)................................................34, 35, 38, 43, 45

*O'Connor v. Boeing North America, Inc.,*
  184 F.R.D. 311 (C.D. Cal. 1998) ................................................................45

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999) ................................................................40

*Parker v. Anderson,*
  667 F.2d 1204 (5th Cir. 1982)................................................................17

*Pederson v. Louisiana State University,*
  213 F.3d 858 (5th Cir. 2000)................................................................34

*Petrovic v. Amoco Oil Co.,*
  200 F.3d 1140 (8th Cir. 1999)................................................................34

*Pettway v. American Cast Iron Pipe Co.,*
  576 F.2d 1157 (5th Cir. 1978)................................................................31

*Priddy v. Edelman,*
  883 F.2d 438 (6th Cir. 1989)................................................................28

*Reed v. General Motors Corp.,*
  703 F.2d 170 (5th Cir. 1983)................................................18, 27, 28, 31, 33

*Rivera v. United Gas Pipeline Co.*,
    697 So.2d 327 (La. Ct. App. 1997)................................................................28

*Sala v. National Railroad Passenger Corp.*,
    120 F.R.D. 494 (E.D. Pa. 1988)................................................................43

*Senter v. General Motors Corp.*,
    532 F.2d 511 (6th Cir. 1976)................................................................38

*Smith v. Tower Loan of Mississippi, Inc.*,
    216 F.R.D. 338 (S.D. Miss. 2003) ................................................................19

*Sosna v. Iowa*,
    419 U.S. 393 (1975)................................................................39

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002)................................................................39

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) (en banc)................................................33, 36, 46

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007) ................................17, 18, 22, 33, 38, 45

*Union Asset Management Holding A.G. v. Dell*,
    669 F.3d 632 (5th Cir. 2012)................................................................41

*Wal-Mart Stores, Inc. v. Dukes*,
    --- U.S. ---, 131 S. Ct. 2541 (2011) ................................................................36

*Watson v. Shell Oil Co.*,
    979 F.2d 1014 (5th Cir. 1992), *on reh'g*, 53 F.3d 663 (5th Cir. 1994)................42, 43, 45, 46

*Wehner v. Syntex Corp.*,
    117 F.R.D. 641 (N.D. Cal. 1987) ................................................................45

## Rules and Statutes

Fed. R. Civ. P. 23(a) ................................................................34

Fed. R. Civ. P. 23(a)(1) ................................................................35

Fed. R. Civ. P. 23(a)(3) ................................................................38

Fed. R. Civ. P. 23(a)(4) ................................................................39

Fed. R. Civ. P. 23(b)(3)............................................................................................46

Fed. R. Civ. P. 23(c)(2)............................................................................................14

Fed. R. Civ. P. 23(e)(2)............................................................................................17

**Other Sources**

7A CHARLES A. WRIGHT ET AL.,
    FEDERAL PRACTICE AND PROCEDURE § 1760 (3d ed. 2008) .........................................35, 41, 42

MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.132 (Fed. Judicial Ctr. 2004) ......................34

MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.311 (Fed. Judicial Ctr. 2004) ......................15

1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:12 (5th ed. 2011).......................35

1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:13 (5th ed. 2011).......................35

1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:29 (5th ed. 2011).......................38

1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:54 (5th ed. 2011).......................39

## I.     INTRODUCTION

The Medical Benefits Settlement Class Representatives,[1] by and through Class Counsel, respectfully submit this Memorandum in Support of Final Approval of the Medical Benefits Class Action Settlement Agreement, including certification of the Medical Benefits Settlement Class, and related matters.

This case arises out of the explosion and fire on board the *Deepwater Horizon* mobile offshore drilling unit on April 20, 2010; the subsequent release of oil from the well prospect site located at Mississippi Canyon Block 252 in the Gulf of Mexico; and efforts by Defendants BP Exploration & Production, Inc. and BP America Production Company (collectively, "BP") to remediate the spill through, *inter alia*, the widespread application of petroleum-based dispersant chemicals. The *Deepwater Horizon* Incident resulted in eleven deaths, multiple injuries, and a massive discharge of oil into the Gulf that continued for approximately three months. During this period, hundreds of thousands of individuals, both clean-up workers and Gulf Coast residents, were exposed to oil and oil-dispersing chemicals and many fell ill from that exposure.[2]

The Medical Benefits Class Action Settlement ("Medical Settlement") seeks relief for potentially hundreds of thousands who, because of a single-event, single-location mass disaster,

---

[1] Unless otherwise defined herein, terms with initial capital letters used in this Memorandum have the meanings ascribed to the fully capitalized rendering of such terms in the Medical Benefits Class Action Settlement Agreement. "Trustee" and "Directed Trustee" have the meanings ascribed to such terms in the Medical Settlement Trust.

[2] Indeed, studies conducted in the wake of the spill confirm the harmful toxicity of the oil and dispersant chemicals to which the Gulf and its residents were exposed. The latest, appearing in the *Times-Picayune* on July 31, 2012, reported that the dispersant chemicals that were applied in unprecedented quantities during the spill response may have had dire impacts on the food chain in the Gulf of Mexico. *See* Associated Press, *BP Oil Spill Dispersants May Have Hurt Gulf of Mexico Food Chain, Study Says*, NEW ORLEANS TIMES-PICAYUNE, July 31, 2012, *available at* http://www.nola.com/news/gulf-oil-spill/index.ssf/2012/07/bp_oil_spill_dispersants_may_h.html (last visited Aug. 12, 2012). This study, and others like it, vividly illustrates the significant toxicity of the oil-dispersing chemicals used in the Gulf, and underscores the importance of the human health benefits provided for in the Medical Benefits Class Action Settlement.

suffered past exposure to the same harmful substances during the same limited period of time and who developed the same general acute symptoms within 24 to 72 hours of exposure. This exposure period is confined, the exposure pathways limited, and the manifestation period is relatively immediate. And while the Medical Settlement compensates claims for presently manifested injuries, it also preserves class members' right to pursue compensation for later-manifesting injuries caused by past exposure to oil and/or oil dispersants.

The benefits are consistent among class members. Compensation for Specified Physical Conditions is based upon objective criteria and the settlement fund is uncapped. Each class member shares equally in his or her right to participate in a 21-year Periodic Medical Consultation Program, and also has the right to a Back-End Litigation Option for later manifested illness. In addition, the settlement provides for a Gulf Region Health Outreach Program to improve the capacity, quality, and accessibility of health care and to increase environmental health literacy in the affected region.

The Medical Settlement is designed to make benefits promptly available and spare class members the delays of protracted litigation. In this vein, and pursuant to its obligations under the agreement, BP has already begun to fund the Claims' Administrator's work, and the Claims Administrator has begun to accept claims for settlement benefits and establish a network of providers to implement the Periodic Medical Consultation Program. Moreover, BP has commenced to fund the Gulf Region Health Outreach Program. Class members thus stand to receive relief far sooner than they otherwise would. This is particularly important in the context of relief that is directed at the identification and prevention of disease, for the value of any such benefit can—and likely will—diminish if protracted litigation, rather than amicable resolution, charts the way forward.

In sum, the Medical Settlement will resolve specified exposure-related claims of class members in exchange for a range of significant benefits, all of which will become available promptly following the Effective Date and will last well into the future.  Accordingly, and for the reasons set forth below, the Medical Settlement is fair, reasonable, and adequate, and the Medical Benefits Settlement Class ("Class") meets the requirements imposed by Federal Rule of Civil Procedure 23.  The undersigned respectfully request that the Court fully and finally approve the Medical Settlement and certify the Class.  Further, the undersigned respectfully request that the Court confirm appointment of the Class Representatives, Co-Lead Class Counsel and Class Counsel, the Claims Administrator, the Trustee, and the Directed Trustee, retain continuing jurisdiction over this matter as provided in the Medical Settlement, and grant such other relief consistent with Section XVIII of the Medical Settlement.

## II.     PROCEDURAL BACKGROUND

The *Deepwater Horizon* Incident gave rise to hundreds of lawsuits.  On August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in this district and assigned them to this Court pursuant to 28 U.S.C. § 1407.  *In re Oil Spill of the Oil Rig "Deepwater Horizon" In the Gulf of Mexico, On April 20, 2010*, MDL No. 2179, 731 F.Supp.2d 1352 (J.P.M.L. 2010).  In its assignment order, the Panel observed that common factual issues among the suits supported their joinder, explaining that each proceeding "indisputably share[s] factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it."  731 F.Supp.2d at 1354.

Since that time, the Court has actively managed all of these lawsuits as a centralized and coordinated litigation.   Pretrial Order No. 11 ("PTO 11") organized the pleadings and categorized the claims and issues by creating pleading bundles.  [*See* Rec. Doc. 569.]  The "B3

bundle," entitled "Post-Explosion Clean-Up Claims," encompasses "all claims, of any type, relating to post-explosion clean-up efforts . . . as well as claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  [PTO 25 ¶ 1, Rec. Doc. 983; *see also* PTO 11, Rec. Doc. 569.]  The Plaintiffs' Steering Committee ("PSC") filed the B3 Master Complaint on December 15, 2010 [Rec. Doc. 881], and the First Amended B3 Master Complaint on March 30, 2011 [Rec. Doc. 1812]. Numerous Defendants filed motions to dismiss and, on September 30, 2011, the Court issued an Order and Reasons granting in part and denying in part those motions.  [Rec. Doc. 4159.]

In 24 months since the JPML's August 2010 assignment order, the parties have engaged in extensive discovery and motion practice.  Over 300 witnesses have been deposed, 90 million pages of documents produced, and more than 80 expert reports exchanged.  Monthly status conferences before the Court and weekly conferences before Magistrate Judge Shushan have kept the parties focused and on course.  The intense pace of litigation, scores of depositions, millions of pages of discovery—all was leading to the initial phase of a multi-phase trial, scheduled for February 27, 2012, and focusing on liability for the explosion aboard the *Deepwater Horizon*.[3]

In early 2011, however—one year prior to the trial date, and against the backdrop of intensive discovery and pretrial proceedings—the parties began to explore settlement opportunities.  [*See* Declaration of Stephen J. Herman, Esq. ¶ 4 (hereinafter "Herman Decl.").[4]] Given the nature of the B3 Bundle claims, the mutually perceived need for ongoing judicial

_____

[3] In light of the settlement agreements reached with BP, this Court reset the trial to commence on January 14, 2013.

[4] The declarations referenced in this Memorandum are, unless otherwise noted, submitted along with Plaintiffs' Motion for Final Approval of Medical Benefits Class Action Settlement, Class Certification, and Related Matters, and are attached hereto.

supervision, and the procedural due process protections unique to Rule 23 class actions, the class device was selected early on as the most appropriate structure for any comprehensive resolution. [*See* Declaration of Samuel Issacharoff ¶ 10 (hereinafter "Issacharoff Decl.") (discussing advantages of class treatment given particularities of this MDL).]   In June 2011, settlement discussions focused in earnest on the claims contained in the B3 Bundle.  A separate negotiating team took responsibility for navigating a resolution for these claims.  [Herman Decl. ¶ 6.]  This negotiation intensified in October 2011 and, as explained in more detail in the declaration of Class Counsel Robin Greenwald, settlement discussions thereafter became an almost-daily affair. [Declaration of Robin L. Greenwald, Esq. ¶ 3 (hereinafter "Greenwald Decl.")]; *see also* Rec. Doc. 6419 at 3 (recounting that the Medical Settlement negotiators engaged in "120 face-to-face negotiation meetings" and "numerous phone calls and 'WebEx Conferences'").]

On February 26, 2012, the literal eve of the Phase One Trial, the Court adjourned proceedings for one week, at the parties' request, to enable further progress on the settlement talks.  [Rec. Doc. 5887.]  On March 2, 2012, the parties informed the Court they had reached an Agreement-in-Principle.  Recognizing that changes were necessary to the trial plan as a result, the Court adjourned the Phase One Trial.  [Rec. Doc. 5955.]

On April 16, 2012, the PSC filed a new class action complaint to serve as the vehicle for the proposed Medical Benefits Class Settlement.  *See Plaisance et al. v. BP Exploration & Production Inc. et al.*, No. 12-968.  Two days later, the PSC and BP filed the proposed Medical Settlement [Rec. Doc. 6273], along with Motions for Preliminary Approval and Class Certification [Rec. Docs. 6267, 6272].  The Court conducted a hearing on these motions on April 25, 2012.  Both motions were granted on May 2, 2012.  [*See* Rec. Doc. 6419.]

III.   **SUMMARY OF THE PROPOSED MEDICAL BENEFITS CLASS ACTION SETTLEMENT**

The proposed Medical Settlement will resolve personal and bodily injury claims of the Class that were related to past exposure to oil and/or chemical dispersant.  The Class consists of:

> All Natural Persons who resided in the United States as of April 16, 2012, and who:
>
> a)      Worked as Clean-Up Workers at any time between April 20, 2010, and April 16, 2012; or
>
> b)      Resided in Zone A for some time on each of at least sixty days between April 20, 2010, and September 30, 2010 ("Zone A Resident"), and developed one or more Specified Physical Conditions between April 20, 2010, and September 30, 2010; or
>
> c)      Resided in Zone B for some time on each of at least sixty days between April 20, 2010, and December 31, 2010 ("Zone B Resident").[5]

[MEDICAL SETTLEMENT § I.A.]  The Class definition was crafted to encompass those individuals residing near shoreline areas most affected by the spill, as well as those involved in response and clean-up activities during the *Deepwater Horizon* Incident, including: workers employed on Vessels of Opportunity ("VoO") or other vessels, workers who performed decontamination of vessels, onshore personnel, and workers involved with the recovery, transport, and decontamination of wildlife.[6]

---

[5]  Zone A includes specified Gulf Coast beachfront areas and Zone B includes specified Gulf Coast wetlands areas.  Both Zones are clearly and objectively described in the Medical Benefits Settlement Agreement and Exhibit 9 thereto.

[6] The Class excludes (i) those who timely elect to be excluded from the Class; (ii) BP employees; (iii) the Court; (iv) anyone who was on the *Deepwater Horizon* on April 20, 2010; (v) any person who has previously asserted and released his or her claims against BP that would be covered by the Medical Settlement; and (vi) any Zone A or Zone B Resident who was not a Clean-Up Worker and who worked in certain capacities for at least five years prior to April 20, 2010.  [*See* MEDICAL SETTLEMENT § I.B.]

The Medical Settlement offers class members four types of benefits: **(i)** compensation for Specified Physical Conditions; **(ii)** a 21-year Periodic Medical Consultation Program; **(iii)** a Back-End Litigation Option process for later-manifested injuries alleged to arise out of pre-Complaint exposure; and **(iv)** an integrated Gulf Region Health Outreach Program to strengthen healthcare capacity and increase health literacy throughout the Gulf Coast areas of Louisiana, Mississippi, Alabama, and the Florida Panhandle.

*Compensation for Specified Physical Conditions.* Clean-Up Workers and residents of Zone A or Zone B may qualify for compensation for various Specified Physical Conditions. [MEDICAL SETTLEMENT § VI.] The Specified Physical Conditions consist of symptoms and conditions that reasonably could arise from exposure to petroleum-based substances released from the MC252 Well during the *Deepwater Horizon* Incident and/or dispersants or decontaminants used during the Response Activities,[7] as well as heat-related illnesses suffered by Clean-Up Workers.

The level of compensation is determined by the Specified Physical Conditions Matrix,[8] which was specifically negotiated and designed to address the claims of the Class. It sets compensation levels based on the class member's status as a Clean-Up Worker or Zone A or Zone B resident, whether the class member's Specified Physical Condition is acute or chronic, and the proof that the class member submits to the Claims Administrator. To qualify for compensation, class members do not need evidence of medical causation. Rather, class members simply identify the Specified Physical Condition(s) suffered and the route, circumstances, and

---

[7] The Medical Settlement defines "Response Activities" as the "clean-up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the release of oil, other hydrocarbons, and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances that were done under the auspices of the Unified Command, BP, or a federal, state, or local authority." [MEDICAL SETTLEMENT § II.NNNN.]

[8] The Specified Physical Conditions Matrix is attached as Exhibit 8 to the Medical Settlement.

dates of their alleged exposure; geographic proximity to oiled areas and objective timing criteria then serve as a proxy for causation.

The Specified Physical Condition Matrix provides for lump sum payments to all qualifying class members, as well as an additional lump sum Hospital Enhancer and compensation for Actual Hospital Expenses if the class member provides appropriate documentation. Class members may be compensated for conditions typically experienced by individuals exposed to oil and/or dispersants for a similar duration. Thus, acute ocular, respiratory, ear/nose/throat, dermal, or neurophysical/neurological/odor-related conditions are eligible for compensation under the Medical Settlement. Compensation is also available to Clean-Up Workers who experienced heat-related conditions that occurred during or immediately following a shift. Specified chronic conditions are compensated at higher levels than acute conditions to recognize their lasting presence.

The Specified Physical Conditions Matrix compensates Clean-Up Workers in amounts greater than Zone A or Zone B residents because, as a result of their activities, such workers were more likely to experience exposure to oil and/or dispersants at higher levels and/or of greater duration. As Doctor Michael Harbut, who worked with the PSC to design the Specified Physical Conditions Matrix, explains in his accompanying declaration, Clean-Up Workers were, "by definition," in "closer and more prolonged contact with the petroleum and/or petroleum products." [Decl. of Michael R. Harbut, M.D., M.P.H., F.C.C.P. ¶ 41 (hereinafter "Harbut Decl.")]

***Periodic Medical Consultation Program ("PMCP").*** Under the Medical Settlement, BP will fund a medical consultation program available to all Clean-Up Workers and Zone B Residents, as well as those Zone A Residents who qualify for compensation for a Specified

Physical Condition. [MEDICAL SETTLEMENT § VII.]  The PMCP provides far-reaching benefits that include an evaluation for conditions reasonably related to exposure to oil and/or petroleum-based dispersants, as well as other conditions prevalent among the general population.  [*See* Harbut Decl. ¶ 51.]  Under the PMCP, participating class members are entitled to an initial medical consultation followed by additional visits every three years during the 21-year life of the program. [MEDICAL SETTLEMENT § VII.B.]  It is not a medical monitoring protocol, but rather a benefit that could not be obtained through litigation.  The Claims Administrator will establish a network of medical service providers to provide the consultation visits, and such providers will be selected based on their geographic proximity to class members, their qualifications, and their ability to provide the consultation services required by the program.  [*Id.* § VII.C.]  In addition, the Claims Administrator will communicate annually with participating class members and will set up a call center and website to schedule appointments for class members' medical consultation visits.  [*Id.* § VII.D.]  Such efforts are intended to ensure greater participation throughout the life of the program.  [*See* Greenwald Decl. ¶ 9.]

     ***Back-End Litigation Option ("BELO").***    The Medical Settlement provides a mediation/litigation process for class members who seek compensation from BP in the future for a Later-Manifested Physical Condition (*i.e.*, a condition diagnosed in the class member after the date on which the Medical Class Action Complaint was filed, but that the class member claims to be due to exposure prior to the Complaint's filing date) that is claimed to have resulted from exposure during the Response Activities to oil and/or dispersants chemicals.  [*Id.* § VIII.]  Class members diagnosed with a Later-Manifested Physical Condition may elect whether to seek relief for that condition pursuant to the BELO or workers' compensation law or the Longshore and Harbor Workers' Compensation Act, as applicable.  [*Id.* § VIII.B.]

If the class member elects to proceed with the BELO, he or she must notify the Claims Administrator within four years after either the first diagnosis of the later manifested condition or the Effective Date of the settlement, whichever is later.  [*Id.* § VIII.A.]  BP has the option to attempt to resolve the claim through mediation.  [*Id.* § VIII.C.]  If mediation is unsuccessful, or if BP elects not to mediate, then the class member has the right to file a BELO lawsuit in the Eastern District of Louisiana.  [*Id.* § VIII.F.]  In such a lawsuit, the BP shall agree that the following need not be litigated or proven at trial: the fact of the Medical Settlement, the alleged fault of BP for the *Deepwater Horizon* Incident, and the exposure of the class member to oil and/or dispersants during the *Deepwater Horizon* Incident or Response Activities.  BP also agrees it must forego defenses based on, *inter alia*, prescription, any statute of limitations or repose, and the doctrine of laches.  [*Id.* § VIII.G.2.]  As a result, the only issues that may be litigated are the fact of diagnosis; the level and duration of exposure;[9] legal causation, including whether alternative causes for the alleged condition exist; and the amount, if any, of compensatory damages.  [*Id.* § VIII.G.3.]  The class member may not seek or recover punitive damages in a BELO lawsuit.  [*Id.* § VIII.G.2.]

**Gulf Region Health Outreach Program ("Outreach Program").**  The Outreach Program has been established "to expand capacity for and access to high quality, sustainable community-based healthcare services, including primary care, behavioral and mental health care, and environmental medicine, in the Gulf Coast."  [*Id.* § IX.A.]  The program's intent, as its Steering Committee Chair has explained, is to address health disparities that have plagued the Gulf region for decades and fill critical deficiencies in the existing public healthcare structure.  [Decl. of

---

[9] Parties may also litigate the amount and location of oil, other hydrocarbons, and other substances released from the MC252 Well, and/or dispersants or decontaminants used in connection with Response Activities, and the timing thereof.  [MEDICAL SETTLEMENT § VIII.G.3.]

Bernard D. Goldstein, M.D. ¶¶ 8-16 (hereinafter "Goldstein Decl.").[10]] The *Deepwater Horizon* Incident exacerbated these problems, and the proposed Outreach Program "is designed to bridge these gaps by improving the region's healthcare infrastructure and access to care for all members of the community, especially those most medically at risk." [*Id.* at 4-5.] BP will provide $105 million in grants to fund four integrated Outreach Program Projects ("Projects") in Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle. The Projects will help to build a "comprehensive, integrated and sustainable network of healthcare providers across the Gulf Region," and are specifically designed to (i) expand and improve access to health care in underserved areas; (ii) address behavioral and mental health needs, expertise, capacity, and literacy; (iii) train community health workers on peer listening, community resiliency and other issues; and (iv) expand and improve environmental health expertise, capacity and literacy. [MEDICAL SETTLEMENT § IX.C.]

In addition, the Outreach Program requires BP to fund the creation and maintenance, for 21 years, of a publicly accessible online library of health and environmental-related materials relevant to the *Deepwater Horizon* Incident and Response Activities. [*Id.* § IX.H.] Pursuant to the Medical Settlement, funding for the Outreach Program has commenced and the Claims Administrator has begun collecting materials for the library.

A Gulf Region Health Outreach Program Coordinating Committee ("GRHOP Coordinating Committee"), with members from each of the Projects as well as three independent members, has also been organized to ensure the Projects function in a cooperative and integrated manner and retain the flexibility to respond to changed needs and circumstances. [*Id.* § IX.G.] The GRHOP Coordinating Committee brings together authors of leading articles on the health

---

[10] Doctor Goldstein's Declaration will be submitted as part of a separate, Joint Filing.

impacts of the *Deepwater Horizon* Incident, including medical doctors and psychiatrists, well-known experts familiar with the impacts of the *Exxon Valdez* oil spill, and non-profit groups that have been at the forefront of efforts to improve health care in affected Gulf communities.  These experienced and highly-regarded individuals have begun to collaborate successfully in implementing their respective Projects.  [*See* Goldstein Decl. ¶ 36.]

*Claims Administration.*  The Medical Settlement provides for an efficient and transparent claims administration process.  To qualify for benefits under the settlement, class members submit Claim Forms, which clearly identify the information and documentation they must provide.  Class members will have an opportunity to cure most deficiencies with their claims and a right to re-review of their claim in the case of an allegedly erroneous factual determination.  [MEDICAL SETTLEMENT *Id.* § V.M.]  Although payments will not be made until after the Effective Date, class members are permitted to file claim forms now and the Claims Administrator will stand ready to communicate his determination following the Effective Date.

Claims Forms, Zone maps, FAQs, and other relevant documents are readily available at the official Medical Settlement program website, www.deepwaterhorizonmedicalsettlement.com.  Information is provided in English, Spanish, and Vietnamese.  Claims may be filed in person, via U.S. mail or online.  A toll-free customer service line is available 24 hours per day, and live operators are accessible between 8 a.m. and 6 p.m. Monday through Friday.  In short, information and assistance is easy to obtain and user-friendly.

*Administrative Expenses and Attorneys' Fees.*  The Medical Settlement requires BP to pay all costs associated with the settlement. [*Id.* § IV.F.]  In addition, BP has agreed to pay Class Counsels' fees, expenses, and costs with respect to this Medical Settlement and the Deepwater Horizon Economic and Property Damages Class Action Settlement, over and above the

settlement benefits, up to $600 million, subject to approval by the Court. [*Id.* § XIX.] [11] Attorneys' fees were negotiated only after full agreement was reached as to all other terms of the proposed Medical Settlement.   Neither administrative expenses, attorneys' fees, costs, nor amounts paid under any other settlement agreement will in any way affect BP's obligations to provide full benefits to all qualifying class members under the Medical Settlement.

*Release.*   In exchange for the benefits provided to class members, the Medical Settlement provides for a carefully crafted release of certain claims related to past exposure to oil and/or dispersants, as well as heat injury suffered while performing Response Activities (excepting claims made in accordance with the BELO) against BP and its co-defendants in the *Deepwater Horizon* Incident.   Transocean and Halliburton are not, however, included in this release.   [*Id.* § XVI.]   Nonetheless, class members agree not to pursue claims for compensatory damages against Transocean and Halliburton, but they preserve their ability to seek punitive damages against these parties.   The release does not encompass claims arising out of post-Complaint exposure or claims unrelated to oil and/or dispersant chemical exposure.

## IV.   DISSEMINATION OF THE MEDICAL SETTLEMENT NOTICE AND FULFILLMENT OF THE NOTICE PLAN CONSTITUTES THE BEST PRACTICABLE NOTICE UNDER RULE 23(c)(2)(B) AND RULE 23(e)(1)

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e), "notice of the class action must meet the requirements of both Rule 23(c)(2) and Rule 23(e)."   *In re CertainTeed Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005).   A court that certifies a Rule 23(b)(3) class must "direct to class members the best notice that is practicable under the circumstances, including individual

---

[11] In the event that the Economic Settlement is not fully and finally approved, but this Medical Benefits Settlement is, BP will pay the equivalent of 6% of the value of all benefits made available to the Medical Benefits Class Members for common benefit costs and/or fees, subject to approval by the Court.

notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2).

The notice must state (1) the nature of the action; (2) the definition of the class certified; (3) the

class claims, issues or defenses; (4) that a class member may enter an appearance through an

attorney if the member so desires; (5) that the court will exclude from the class any member who

requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect

of a class judgment under Rule 23(c)(3).  *Id*.  The notice protocol agreed upon by the parties,

approved by the Court at preliminary approval, and since implemented by the notice providers,

complies with all requirements pertaining to both the manner of distribution and the contents of

class notice.

Class notice must also satisfy Due Process. The requirements of Due Process are

straightforward in the settlement context. Notice must only be "reasonably calculated, under all

the circumstances, to apprise interested parties of the pendency of the [settlement] and afford

them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*,

339 U.S. 306, 314 (1950); *accord, e.g.*, *Int'l Union, United Auto., Aerospace, & Agricultural

Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007). Compliance

with Rule 23(c)(2) itself can satisfy the Due Process Clause. *See In re Enron Corp. Secs.,

Derivatives & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8,

2008).

In accordance with Rule 23 and Due Process, the parties have provided both individual

and media notice.  Individual notice was mailed to, *inter alia*, every plaintiff who alleges a

medical injury in any lawsuit consolidated into the MDL and every plaintiff who has filed a

short-form joinder into the B3 Master Complaint.  In addition, notice was sent to all Clean-Up

Workers and Zone B Residents.  To ensure that no individuals were unintentionally omitted, all

addresses were checked against the National Change of Address Database.  As of August 9, 2012, a total of 366,242 individual notices have been sent by postal mail, and 56,136 individual notices have been emailed.  [*See* Declaration of Cameron R. Azari, Esq. ¶ 9 (hereinafter "Azari Decl.").[12]]

Because "Rule 23 itself contemplates that current address information might not be available for all potential class members," *Eatmon v. Palisades Collection LLC*, No. 08-306, 2011 WL 147680, at *4 (E.D. Tex. Jan. 18, 2011), the parties also agreed upon a massive, nationwide media effort.  That effort included, among other things, publication by (1) leading national consumer magazines; (2) trade, business, and specialty publications; (3) local newspaers; (4) African American, Vietnamese, and Spanish language publications, and African-American, Spanish, and Cajun radio programming; (5) local television advertising; (6) local radio advertising; (7) online banner advertising; (8) an informational release; (9) a nationally televised public service announcement; and (10) a case website. The plan was more than sufficient to comply with the dictates of Rule 23(c)(2)(B).  *See, e.g.*, MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.311 (Fed. Judicial Ctr. 2004) ("MCL FOURTH") ("Publication in magazines, newspapers, or trade journals may be necessary if individual class members are not identifiable after reasonable effort or as a supplement to other notice efforts.").

The content of the proposed notice was also sufficient.  Medical Benefits Settlement Class Notice Agent Hilsoft Media concluded that the notice was written in simple terms and in plain language, and that it clearly and concisely stated all of the elements required by Rule 23(c)(2)(B).  [*See* Azari Decl. ¶¶ 12-16]; *see also In re OCA*, No. 05-2165, 2008 WL 4681369, at *15 (E.D. La. Oct. 17, 2008) (approving class notice where  the "plain language of the Notice

---

[12] Mr. Azari's Declaration will be submitted as part of the Joint Filing.

apprises all class members of the nature of the action, the definition of the class, the class claims and the defenses, the class members' right to be heard, the class members' right to exclusion, the time and manner for requesting exclusion, and the binding effect of a class judgment") (citations omitted)).

In addition to the individual and media notice campaign, the parties have made available multiple additional channels through which class members could learn more about the Medical Settlement.  The administrator established a comprehensive notice and claims website through which class members may learn about the settlement, submit claims online, and check a claim's status.  The settlement web address, set forth above, was included in all notice materials, and the Claims Administrator established a toll-free number staffed by representatives who field class members' questions and assist them with the claims process.

This notice campaign has been designed and implemented to stand as one of the most comprehensive and elaborate notice programs in litigation history.  Hilsoft conservatively estimates that 95% of the adults in the Gulf Coast have been exposed to class notice materials on average 10.3 times, and 83% of all U.S. adults have been exposed on average 4 times. [*See* Azari Decl. ¶ 10.]  The clear and concise content of the notice, as well as its broad distribution, satisfies both the requirements of Rule 23 and due process.[13]  [*See* Azari Decl. ¶¶ 84-86.]

Finally, in addition to the formal notice program, Class Counsel hosted nine free, day-long educational seminars across the Gulf Coast since the Medical Settlement was preliminarily approved.  Nearly 2,000 attorneys attended.  Class Counsel also opened a physical office in New Orleans with a toll-free telephone number, a settlement questions e-mail address, and attorneys

---

[13] The Notice Plan also satisfied the requirement of the Class Action Fairness Act that notice be sent to the Attorney General of the United States, the attorneys general of each of the 50 states and the District of Columbia, and the attorneys general of Puerto Rico, the Northern Mariana Islands, American Samoa, the Virgin Islands, and Guam.  [*See* Azari Decl. ¶¶ 17-18.]

on-site to answer inquiries and provide information to members of the Class.  In light of these extensive efforts, the Court should find that dissemination of the notice and fulfillment of the Notice Plan satisfies Rule 23 and Due Process.

**V.**     **THE MEDICAL BENEFITS CLASS ACTION SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE, AND MERITS FINAL APPROVAL UNDER PREVAILING JUDICIAL STANDARDS**

"[T]here is a strong judicial policy favoring the resolution of disputes through settlement." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) (internal quotation marks omitted); *see also, e.g.*, *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982) (same).  This policy is particularly weighty in class actions and other complex mass tort cases, where the public interest in curtailing protracted litigation is readily apparent and amicable resolution conserves substantial resources, benefitting both the parties and the court system.  *See, e.g.*, *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement"); *see also Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) ("This presumption [in favor of settlement] is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation" (internal quotation marks omitted)); *Int'l Union*, 497 F.3d at 632; *Turner*, 472 F. Supp. 2d at 843 ("The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses" (quoting *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004)).

Class action settlements require judicial approval. Fed. R. Civ. P. 23(e)(2).   If the settlement is "fair, reasonable, and adequate," it warrants approval by the court.  *Id.*  "[A]

presumption is made in favor of the settlement's fairness, absent contrary evidence." *Turner*, 472 F.Supp.2d at 843 (citing *Smith*, 91 F. App'x at 955).

On May 2, 2012, this Court preliminarily approved the Medical Settlement as fair, reasonable, and adequate, and ordered the initial steps in the judicial approval process prescribed by Rule 23 and federal practice within the Fifth Circuit.  In its Preliminary Approval Order, the Court not only determined that the Medical Settlement satisfied the standards for preliminary approval, but also explained that to warrant final approval, the settlement would be required to meet the requirements set forth by the Fifth Circuit in *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983), to wit:

> (1) the existence of fraud or collusion behind the settlement;
> (2) the complexity, expense, and likely duration of the litigation;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the probability of plaintiffs' success on the merits;
> (5) the range of possible recovery; and
> (6) the opinions of the class counsel, class representatives, and absent class members.

[Rec. Doc. 6419 at 33 (citing, *inter alia*, *Reed*, 703 F.2d at 172).]

Viewed in the context of these six *Reed* factors, the Medical Settlement merits final approval by the Court.  Indeed, as noted class action expert Professor Robert Klonoff observes, the Medical Settlement is "one of the fairest and most impressive settlements I have seen in more than 20 years of practicing, teaching, and writing in the field of class actions."  [Decl. of Robert H. Klonoff, Esq. ¶ 90 (hereinafter "Klonoff Decl.").]  The Court should grant final approval to the Medical Settlement pursuant to Rule 23(e)(2).

A.     **The Medical Settlement Is Free of Fraud or Collusion, Which Weighs in Favor of Final Approval**

The Court "may presume that no fraud or collusion occurred between counsel[] in the absence of any evidence to the contrary." *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 725 (E.D. La. 2008).   Here, there can be no suggestion that the parties engaged in any fraudulent or collusive conduct.   The Medical Settlement was negotiated at arm's length over an extended period during which Medical Benefits Class Counsel reported to, and received mediation assistance and supervision from, the Court.   Furthermore, both the structure of the negotiations and the Medical Settlement's terms disprove the existence of collusion.

The structure of the settlement negotiations guarded against fraud or collusion.   The settlement negotiators, on the plaintiffs' side, were Court-appointed members of the PSC who reported regularly to the Court-appointed Co-Liaison Counsel -- themselves also, at various stages of the process, negotiating participants.   The negotiators likewise reported to Magistrate Judge Shushan, whose supervisory role in facilitating and mediating substantial provisions of the settlement strongly counsels in favor of final approval.   *See, e.g.*, *Maywalt v. Parker & Parsley Pet. Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("[T]he supervision of settlement negotiations by a magistrate judge, as occurred here, makes it less likely that … [class counsel have promoted] their own interests over those of the class."); *Sanderson Farms*, 568 F. Supp. 2d at 725 (finding no fraud or collusion when, among other things, the parties engaged in a mediation session with the magistrate judge); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003) (upholding settlement where the magistrate judge's "mediation efforts" helped facilitate the settlement).

In addition, this well-supervised process consisted of arm's-length negotiations during the course of a lengthy adversarial proceeding. [*See* Greenwald Decl. ¶ 6 (describing the final

six-month negotiation period as "hard fought, and at times contentious").] Such a negotiation process, in the shadow of contested litigation, is evidence of the settlement's fairness and generally gives rise to a presumption that it satisfies the requirements of Rule 23. *See Domingue v. Sun Elec. & Instrumentation*, No. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010) ("[T]hat this settlement is the negotiated result of an adversarial proceeding is an indication of its fairness"); *In re Train Derailment Near Amite La.*, MDL No. 1531, 2006 WL 1561470, at *19 (E.D. La. May 24, 2006) ("The fact that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate").

Yet even more structural assurances are present. Instead of negotiating a global dollar figure and then engaging in a "top down," or "one-size-fits-all" allocation, the negotiators proceeded from the opposite point: the bottom up. [*See* Greenwald Decl. ¶ 8 (explaining that the PSC "conducted these negotiations from the bottom up; that is, we did not attach compensation amounts to any of the conditions or symptoms until we had finalized all acute and chronic conditions and symptoms that would be compensated"); *see also* Herman Decl. ¶ 6 (stating that "the settlement reached is the product of 'bottoms up' (as opposed to 'top down') negotiations").] Further, the total recovery that BP has agreed to provide is uncapped; the negotiators were not restricted by a sum certain. One class member's gain is not subtracted from any other and all class members receive the benefits of the settlement. Aside from the obvious financial benefit to class members, however, an uncapped fund provides additional structural assurances of fairness. Noted scholar on complex litigation Samuel Issacharoff explains: "the absence of an overall recovery cap [means] the negotiators [are] never in the position of 'robbing Peter to pay Paul.'" [Issacharoff Decl. ¶ 14.]

The absence of any conflict of interest among the class members further bolsters the structural assurances of fairness.   Each class member shares the same interest in obtaining prompt compensation for past injury; obtaining augmented healthcare benefits to better preserve his or her health and promptly identify disease; and protecting his or her right to pursue claims for compensation, with minimal burden, if he or she becomes ill in the future.   The settlement does not reach any claims arising out of future exposure, and such claims are not compensated, released, or affected in any other way by its terms.   Moreover, the Medical Settlement provides a mechanism for resolving any future claim for a later-manifested injury.   Accordingly, unlike in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), there are no conflicts between class members with manifested physical injury and "exposure-only" class members who have not yet manifested such injuries. *Id.* at 626; [*see also* Issacharoff Decl. ¶ 8 (observing that the PSC avoided an *Amchem* problem by, *inter alia*, ensuring that "no one would be bound by the settlement who had not suffered some tangible harm and who did not receive some benefit").] Even those class members who have already manifested an injury run the risk of manifesting another, potentially more serious, disease in the future, and thus all are similarly situated with respect to their potential for future disease, their fear thereof, and their ability to evaluate the Medical Settlement's benefits.   Finally, and most importantly, whereas the *Amchem* class contained some members who had no knowledge of their toxic exposure, the fact of exposure is known by all members of this Class, and all members have sufficient information to determine whether to participate in the settlement.

Not only does the structure of the process ensure fairness, the Medical Settlement's terms likewise validate the negotiating process.  If the terms of the Medical Settlement are fair, then the reviewing court can deem the formative negotiations to have been proper. *See In re Corrugated*

*Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting"); *Turner*, 472 F.Supp.2d at 846 ("[A] presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair").  The Medical Settlement does not improperly grant preferential treatment to the class representatives or to any other segment of the Class.   No category of claimants were sacrificed to advance the interests of others, and no category of claimants for whom fair, adequate and reasonable treatment could not be obtained was included in the class.  There is, in short, nothing to suggest the presence of fraud or collusion in this case.  Indeed, according to Professor Klonoff, the settlement "is the result of hard-fought, arm's-length negotiations between experienced counsel."  [Klonoff Decl. ¶ 74.]

>    **B.    The Complexity, Expense, and Likely Duration of Litigation Between Class Members and the BP Defendants in the Absence of Settlement Demonstrates the Reasonableness and Superiority of the Medical Settlement and Weighs in Favor of Final Approval**

In assessing the second *Reed* factor, courts consider the vagaries of litigation and compare the settlement to potential future relief.  *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993).  Cases that are procedurally complex and that present the prospect of numerous, potentially lengthy proceedings, with controversial legal and factual claims, are particularly well-suited for settlement.  *See id.* at 559; *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.").  There is no doubt that, in the instant matter, the vagaries of litigation are significant and compare favorably to the prospects for immediate relief.

Although remarkable and swift progress has been made in MDL 2179 under this Court's oversight, the scale of this disaster and resulting litigation will necessarily require many months for the trial process alone.  The undertakings here are immense.  Not one, but multiple trial phrases must be completed—a burden heavier than that previously found to weigh in favor of swift resolution through settlement.  *See Sanderson Farms*, 568 F. Supp. 2d at 726 (holding that potential trial lasting "several weeks" weighed in favor of approving a settlement); *Faircloth v. Certified Fin., Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving settlement where trial "was estimated to last at least two weeks"); *In re Shell Oil*, 155 F.R.D. at 560 ("[E]ven a six month trial is considered extremely lengthy and the expense for the parties, the claimants, and the judicial system would be enormous").  Moreover, these trial phases would only partially address the claims of the plaintiffs who filed suit, as well as the 16,000 existing claimants who have filed MDL 2179 short-form joinders alleging injury from exposure to oil, dispersants, or other chemicals released or used in the wake of the *Deepwater Horizon* Incident. Individual claims would likely entail many years of expensive litigation.

Nor would the road conclude with the entry of judgments in this Court. This litigation has raised several legal questions of first impression.  It is not unreasonable to assume that class members' claims would engender years of appeals.  Such litigation represents "an enormous financial and psychological burden on all parties involved," and counsels in favor of settlement. *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997); *see also Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002) ("[A]bsent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain").  Because some of the more controversial and hard fought issues in this case remain to be litigated, the Medical Settlement "eliminates the

transaction costs that further proceedings would impose" and "provides relief for the class sooner than continued litigation would." *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004). For the parties, it is therefore entirely "proper to take the bird in the hand instead of a prospective flock in the bush." *In re Shell Oil*, 155 F.R.D. at 560.

As this Court has observed on multiple occasions, the *Deepwater Horizon* Incident, though unprecedented in scope, is not unprecedented in nature. In 1989, the tanker *Exxon Valdez* ran aground in Prince William Sound, Alaska, discharging over eleven million gallons of oil into the Sound's pristine waters. Like the *Deepwater Horizon* Incident, the wreck of the *Exxon Valdez* was an open and obvious disaster. None of its victims shared culpability. Liability for the spill should have been straightforward. Yet many of those harmed by Exxon's tortious acts waited decades for compensation; some were never compensated at all.[14] The point is simply this: litigation, especially complex litigation, is inherently uncertain and, even where the tortfeasor's identity is clear, may stretch on for decades. It is eminently reasonable for the class members in this case to seek prompt resolution for the personal injuries caused by BP during the *Deepwater Horizon* Incident rather than risk the vagaries of protracted legal action.

There is yet another reason for class members to seek amicable resolution of their claims: the necessary litigation costs for the extensive pre-trial and trial activity would likely outweigh recovery for many class members. Professor Klonoff elaborates: "the overarching liability issues are so complicated, and would be so expensive to prove, that few class members, apart from the most egregiously harmed, would have the financial incentive to take their individual cases to trial." [Klonoff Decl. ¶ 45.] Pursuit of such compensation would likely be economically

---

[14] Professor Klonoff expands on the *Exxon Valdez* narrative in his attached declaration and observes, in particular, that "even after two decades of litigation, few claimants with medical claims were compensated." [Klonoff Decl. ¶ 83.]

irrational when compared to the cost to obtain the complex scientific analyses and expert testimony necessary to litigate a claim to victory.  In short, the expense of proceeding with an individual suit threatens to outweigh the recovery for most class members and foreshadows similar difficulty should such an individual seek justice, for the first time, after developing a later-manifested condition at some future date.  Settlement now, however, maximizes the benefits available to the Class.  This *Reed* factor counsels strongly in favor of approval, particularly at this stage of proceedings.

### C.   The Current Stage of the Proceedings and Considerable Discovery Conducted Weigh in Favor of Final Approval

The third *Reed* factor "asks whether the parties have obtained sufficient information to evaluate the merits of the competing positions." *In re Educ. Testing Servs.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (quotations omitted).  "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed." *Id.* at 620-21.  This factor is readily satisfied here, for few settlements are as well supported by the parties' detailed knowledge of the factual and legal issues.

The Medical Settlement was reached simultaneously with the scheduled start of the Phase One trial, at a decidedly mature stage of the proceedings, with the benefit of hundreds of depositions, scores of expert reports, and millions of documents.  Counsel was fully prepared to embark upon the first of several, carefully constructed trial phases.  Plaintiffs also possessed considerable knowledge acquired outside the formal discovery process.  According to Robin Greenwald, PSC negotiators consulted with other common benefit attorneys to ascertain the range and frequency of illnesses actually suffered by Clean-Up Workers and coastal residents in

the wake of the *Deepwater Horizon* Incident. [*See* Greenwald Decl. ¶ 5.]  In addition, the PSC closely consulted Doctor Harbut, who provided crucial expertise with respect to petroleum exposures and the afflictions expected to arise therefrom. [*Id.* ¶ 4.]  Thus, through both discovery and independent investigation,[15] the parties were well-informed of the factual and legal issues of the case.  The Court is similarly well-versed in the issues and well-positioned to make an independent and informed evaluation of the settlement, based on the knowledge it has obtained throughout the course of the proceedings.

The parties have also supplemented formal discovery by informally exchanging information pursuant to Federal Rule of Evidence 408.  Most notably, Plaintiffs' counsel had access to health incident reports from Clean-Up Workers, which assisted their negotiation of the Specified Physical Conditions Matrix and allowed Plaintiffs' counsel to ensure that the covered conditions were comprehensive and the system of proofs developed for the class members was fair. [*Id.* ¶ 5.]  The scope of information acquired outside the formal discovery process, in short, further demonstrates that the parties had sufficient information to reach a settlement that was fair, reasonable, and adequate.  *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007).

The advanced stage of proceedings and considerable formal and informal discovery conducted thus far weighs in favor of final approval, as the Medical Settlement "do[es] not come

---

[15] Plaintiffs also acquired significant information made available in the public domain by government agencies and investigative bodies, as well as independent research teams.  And, as Class Counsel Robin Greenwald explains, information procured from government sources in turn shaped the PSC's decision making.  To take but one example, PSC settlement negotiators learned, from reports published by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, that the spill had significant, adverse mental health impacts upon Gulf Coast residents, many of whom lacked any capability to feasibly obtain mental health support services.  [Greenwald Decl. ¶ 11.]  Once negotiators on the medical settlement team became aware of such deficiencies, they successfully sought "the inclusion of [mental health programs into] the Outreach Program." [*Id.*]

too early to be suspicious nor too late to be a waste of resources." *In re Vitamins Antitrust Litig.*, 305 F.Supp.2d 100, 105 (D.D.C. 2004).   The fourth *Reed* factor weighs in favor of final approval.

### D.     The Probability of Success on the Merits Weighs in Favor of Final Approval

The fourth *Reed* factor asks the Court to compare the settlement terms and benefits with plaintiffs' prospects for victory at trial.  *See Reed*, 703 F.2d at 172.  The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial."  *Id.*

Class Counsel and BP have markedly different opinions regarding the strength of the claims at issue and ultimate recovery in this litigation; however, there can be no doubt that both sides have advanced significant arguments, and neither side can confidently expect a complete victory.  Plaintiffs believe they would ultimately prevail but acknowledge that adjudication of their claims would require resolution of several contested legal and factual issues, including, for example, questions of medical and legal of causation and disputes over the types and amounts of damages to which class members are entitled.  Further, as the *Exxon Valdez* litigation demonstrated, any favorable judgment would likely be the subject of post-trial motions and appeals, thereby prolonging the case for years.

This Court is well aware of the contested issues presented herein, and its experience in the litigation to date makes clear that the fourth *Reed* factor weighs in favor of final approval. *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 09-2046, 2012 WL 948365, *17 (S.D. Tex. Mar. 20, 2012).

### E.     The Range of Possible Recovery Weighs in Favor of Final Approval

Evaluating the fifth *Reed* factor requires the Court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case." *Reed*, 703 F.2d at 172.   Under this standard, "[t]he proposed settlement need only reflect a fair, reasonable, and adequate estimation of the value of the case in view of what might happen at trial." *In re Combustion,* 968 F. Supp. at 1129; *Cotton*, 559 F.2d at 1330; *see also Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) (stating that the "fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement").

The benefits of the Medical Settlement stack up well against the relief Plaintiffs might obtain if they endured a lengthy adversarial process, and in fact include benefits that could not be obtained through litigation.  First, the monetary compensation for Specified Physical Conditions compares favorably with—and exceeds in some cases—awards obtained after a verdict in similar cases.  *See Howard v. Union Carbide Corp.*, 50 So.3d 1251 (La. 2010) (reducing general damage awards of $1,500 to $3,500 for "eyes, nose, or throat irritation, coughing, choking or gagging or nausea" as the result of a chemical spill to between $100 and $500); *Doerr v. Mobil Oil Corp.*, 935 So.2d 231 (La. Ct. App. 2006) (lump sum damages ranging from $500 to $2,000 awarded for personal injury, emotional distress, and inconvenience caused by a discharge of oil, grease, and other contaminants that infiltrated a Parish drinking water supply); *Adams v. CSX R.Rs.*, 902 So.2d 413 (La. Ct. App. 2005) ($500 in damages awarded to one plaintiff for pain and suffering due to eye irritation, nose irritation, and ongoing stomach cramps, and $200 to another plaintiff who suffered eye, nose, and throat irritation); *Rivera v. United Gas Pipeline Co.*, 697 So.2d 327 (La. Ct. App. 1997) (compensatory damage awards ranging from $100 to $3,000 and equal amounts of punitive damages awarded to plaintiffs in bellwether trials following the accidental

release of natural gas); *see also Arabie v. Citgo Petroleum Corp.*, 89 So.3d 307 (La. Ct. App. 2012) (individual plaintiffs received $7,000-$15,000 in general damages and $30,000 in punitive damages after suffering "contemporaneous or near-contemporaneous symptoms of eye irritation, nausea, nasal and throat irritation, and difficulty breathing" when exposed to fumes and odors from a "major oil spill").

Second, both the compensable Specified Physical Conditions and the class definition were carefully chosen based on the advice of highly skilled experts.  Doctor Harbut, Plaintiffs' medical expert, states that "the conditions in the SPC matrix [] reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants."  [Harbut Decl. ¶¶ 17, 25-38.]  Likewise, the time frames and pathways of exposure in the matrix conform with "a consensus of the findings in the medical literature based on clinical, laboratory, medical and epidemiological evidence."  [*Id.* ¶ 19.]  Finally, the Class is composed of those with sufficient exposure to the oil and/ or dispersants to manifest a Specified Physical Condition.  [*See Id.* ¶¶ 39-42.]  In short, Doctor Harbut found that the "proposed settlement is consistent with the best science available."  [*Id.* ¶ 25.]

Third, the PMCP likewise provides significant, tangible benefits to help class members identify health issues that may arise from their exposure to oil and/or dispersants, manage their health, and move forward after the disaster.  The program includes a comprehensive initial health evaluation, followed by periodic consultations related not only to the conditions associated with petroleum exposure, but also to health problems prevalent among the general population.  As Doctor Harbut explains, the PMCP provides a "critically important benefit to class members" because it acknowledges the information known about exposure to oil and/or dispersants,

establishes a physician-patient relationship for those participating, and "finds its basis in generally accepted medical practice." [*Id.* ¶¶ 48-50.] Such relief could not be obtained through litigation.

Fourth, the BELO further benefits all class members. This aspect of the Medical Settlement preserves class members' rights to pursue relief, other than punitive damages, for Later-Manifested Physical Conditions. As Professor Klonoff explains, "class members need not worry that, by releasing claims against BP, they are somehow releasing claims for future injuries." [Klonoff Decl. ¶ 67.] At the same time, the BELO reduces the costs and burdens of filing a future suit should it become necessary. BP agrees to stipulate to certain issues, not to raise certain defenses that would take time and resources to litigate, and to bear the costs of mediating claims it might amicably resolve.

Finally, the Outreach Program, which commenced with preliminary approval, fills critical gaps in the healthcare system along the Gulf coast, addresses the mental and behavioral needs of communities most impacted by the spill, and improves health education, literacy, and access to medical services. This program provides sustainable, long-term benefits through four integrated Projects and the creation of a publically accessible on-line library containing materials related to the health consequences of the *Deepwater Horizon* Incident. This library, of course, may be of immense benefit to BELO plaintiffs. As the Outreach Program's Steering Committee Chair explains, "the Program is well focused and comprehensive and provides much needed public health benefits to the Gulf Coast region most impacted by the Deepwater Horizon oil spill." [Goldstein Decl. ¶ 8.]

Each of the benefits provided under the Medical Settlement is significant and valuable. What is more, these benefits are available to the many class members whose claims could not be

economically pursued on an individual basis.  For those class members who prefer to pursue claims individually, however, it offers choice. *See In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, MDL 1203, No. 99-20593, 2000 WL 1222042, *47-49 (E.D. Pa. Aug. 28, 2000) (approving medical settlement enabling class members to make informed participatory choices and avoid risk).  Members of the Class may choose immediate compensation for already manifested injuries, medical consultations to assist in managing their health, and a streamlined process to address any future conditions arising out of their past exposure.  Or, they may elect to pursue relief through the adversarial process by opting out of the settlement.  The choice is theirs.  [*See* Klonoff ¶ 58 (observing, for example, that class members with serious injuries may elect to opt out).]

Because the Medical Settlement offers class members significant benefits, the fifth *Reed* factor weighs in favor of final approval.

### F.   The Opinions of Class Counsel and Members of the Class Weigh in Favor of Final Approval

The Fifth Circuit has recognized that courts must rely to a large degree on the judgment of competent counsel, calling them the "linchpin" of an adequate settlement. *Reed*, 703 F.2d at 175 (explaining that "the value of the assessment of able counsel negotiating at arm's length cannot be gainsaid" because "[l]awyers know their strengths and they know where the bones are buried"); *accord Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978) (holding that if experienced counsel determine a settlement is in the class's best interests, "the attorney's views must be accorded great weight").  Class Counsel strongly believe that final approval of the Medical Settlement is in the best interests of the Class.  [*See* Herman Decl. ¶ 13 (stating that "the proposed Settlement Agreements represent the most favorable resolution available to . . . the medical class[]"); Greenwald Decl. ¶ 13 (stating that the proposed medical

settlement agreement "represents the greatest medical benefits to the greatest number of individuals whose health has been impacted by the post-explosion consequences of the BP oil spill").]

In this case, Class Counsel have decades of experience prosecuting and defending class action and mass tort lawsuits. The Court conditionally appointed members of the PSC to serve as Class Counsel and the PSC, in turn, was selected through a transparent process that included applications from hundreds of experienced attorneys. Further, the Court has observed the PSC over nearly two years of discovery, court conferences, and trial preparation, as well as in the settlement negotiations themselves. Collectively, Co-Lead Class Counsel and Class Counsel have been involved in some of the largest and most complex class and mass tort settlements in the nation's history, involving asbestos, tobacco, retiree healthcare benefits, insurance, discrimination, defective products, and pharmaceutical products. Where "counsel for both parties have significant experience in litigating and negotiating settlement of class actions," this fact is strong evidence that the settlement is fair and reasonable. *DeHoyos*, 240 F.R.D. at 287 (internal quotation marks omitted).

In addition, the class members' response and participation has been positive. Even though the Medical Settlement will not provide compensation or medical consultation services until the Effective Date, the Claims Administrator has already received 2,395 Proof of Claims Forms and 744 Data Disclosure Forms. Moreover, despite the fact that the Class comprises tens of thousands of individuals, only three objections have been filed thus far.[16] This is strong

---

[16] Only two of these objections are substantive. Halliburton Energy Services, Inc. objects but it has no standing to do so. [*See* Rec. Doc. 6350.] The remaining objections—proffered by Malcolm Coco, a Clean-Up Worker, and Charles Boggs, an apparent coastal resident, will be addressed more fully at a later date, after all objections are due to the Court. Suffice it to say, however, that Boggs will receive compensation under the settlement more than sufficient to

evidence of Class support.  *See Turner*, 472 F.Supp.2d at 852-53 (affirming settlement where

93% of the class accepted the settlement by not opting out or excluding themselves); *see also In*

*re Cendant Corp. Litig.,* 264 F.3d 201, 235 (3d Cir. 2001) ("The vast disparity between the

number of potential Class Members who received notice of the Settlement and the number of

objectors creates a strong presumption that this factor weighs in favor of the Settlement . . . .").

        In summary, as Judge Higginbotham observed in *Reed*:

> In reviewing proposed class settlements, a trial judge is dependent
> upon a match of adversary talent because he cannot obtain the
> ultimate answers without trying the case. Indeed, that uncertainty
> is a catalyst of settlement. Because the trial judge must predict, the
> value of the assessment of able counsel negotiating at arm's length
> cannot be gainsaid.

*Reed*, 703 F.2d at 175.  Here, the opinions of Class Counsel as well as the clear support of the

Class weigh in favor of final approval.

## VI.    THE MEDICAL BENEFITS SETTLEMENT CLASS FULFILLS ALL APPLICABLE CRITERIA FOR CONFIRMATION AND CERTIFICATION UNDER RULE 23(a) AND RULE 23(b)(3)

        Certification of a settlement class, like certification of a class for litigation, is governed

by Federal Rule of Civil Procedure 23.  To approve a class action settlement, "a district court

first must determine that the requirements for class certification under Rule 23(a) and (b) are

met."  *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 285 (3d Cir. 2011) (en banc) (quoting *In re Pet*

*Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010)).  There is, however, one notable

exception to this principle: because the settlement will necessarily obviate trial, the court need

---

cover his medical expenses; nonetheless, he appears to contend that he is entitled to more.  [*See*
Dkt. No. 2:10-cv-7777, Rec. Doc. 41.]  Boggs' basis for his demand is not altogether clear but he
is free to opt out and pursue a larger damage award.  Coco's objection is not directed at the terms
of the Medical Settlement; it is, rather an attack on the holdback order originally entered by the
Court on December 28, 2011.  [*See* Rec. Doc. 5022.]  The PSC and the Court previously have
addressed similar complaints, [*see, e.g.*, Rec. Doc. 4507], and the Court should not reconsider
these issues at this time.

not evaluate the manageability of the proposed class, as ordinarily required by Rule 23(b)(3)(D). *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there would be no trial"); MCL FOURTH §21.132.

The appropriateness of the class device, given the particularities of the case at hand, is a matter within the sound discretion of the district court. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999); *see also Pederson v. La. State Univ.*, 213 F.3d 858, 866 (5th Cir. 2000). Indeed, the Fifth Circuit has observed that a district court has "great discretion" in rendering a certification decision. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999). Underpinning this discretion "is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) (internal quotation marks omitted). For the reasons set forth above, and because the Class meets each of the requirements of Rule 23, Plaintiffs respectfully request that the Court exercise its discretion to certify the Class.

## A.   The Medical Benefits Class Fulfills Rule 23(a)'s Criteria for Class Certification

Compliance with Rule 23(a) necessitates a showing that: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative(s) are typical of the claims or defenses of the class, and (4) the representative(s) will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). As this Court has explained, "[t]he first two requirements focus on the characteristics of the class; the second two focus on the desired characteristics of the class representatives." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, MDL No. 071873, 2008

WL 5423488, at *3 (E.D. La. Dec. 29, 2008).  In addition to the four prerequisites above, courts have read an "implied requirement of ascertainability" into Rule 23(a).  *See In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 376 (S.D.N.Y. 2010) (internal quotation omitted).  A class is ascertainable where "the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1760 (3d ed. 2008).

### 1.      The Class Satisfies the Numerosity Requirement

Rule 23(a)(1) states that the numerosity requirement is met if "joinder of all members is impracticable."  To show that this is the case the movants must proffer "some evidence or reasonable estimate of the number of purported class members."  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498, at *9 (E.D. La. Jan. 10, 2012) (quoting *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006)).  Where the exact number of class members is not known, "[a] good-faith estimate of the class size is sufficient."  1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS §§ 3:12, 3:13 (5th ed. 2011).  There is no fixed number of class members necessary to satisfy Rule 23(a); nonetheless, the Fifth Circuit has recognized that a class size in excess of 100 members generally fulfills the numerosity requirement.  *Mullen*, 186 F.3d at 624.

The instant action involves tens of thousands of individuals who allege they were exposed to oil and/or chemical dispersant released in connection with the *Deepwater Horizon* Incident.  Class members were on the front lines of, and/or resided in the areas most impacted by, the oil spill and Response Activities.  There are estimated to be as many as 90,000 Clean-Up Workers and nearly 5,000 Zone B residents.  Further, according to the 2010 U.S. Census, approximately 100,000 people reside in Zone A.  What is more, over 16,000 people filed short-

form joinders in the MDL asserting a B3 Bundle claim by checking the appropriate box on the "Plaintiff Profile Form."  Approximately 780 other individuals expressly indicated that they were asserting a "Personal Injury/Death" claim, and over 12,000 did not adopt the B3 Bundle or indicate that they were pursuing a personal injury claim, but did indicate that they were pursuing a claim for fear of future injury and/or medical monitoring.

The Class size thus far exceeds the 100-person general threshold identified by the Fifth Circuit.  Numerosity is satisfied.

### 2.    The Questions of Law and Fact Common to the Class Satisfy the Commonality Requirement

Rule 23(a)(2) requires a showing of a question of law *or* fact common to the class.  This standard is met where there is any common contention central to the resolution of each of the class member's claims.  *See Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2551 (2011); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012).  Commonality, even after *Dukes*, is not a counting game.  "Even a single common question will do."  *Dukes*, --- U.S. ---, 131 S. Ct. at 2556.  In other words, "[t]he commonality test is met when there is at least one issue the resolution of which will affect all or a significant number of the putative class members."  *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997).  Further, in the context of a settlement class, the focus "should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence."  *Sullivan*, 667 F.3d at 335 (Scirica, J., concurring).

This action has at its core numerous questions of law and fact common to all class members.  Foremost among them is the question of BP's liability under general maritime law for the April 20, 2010 blowout of the Macondo Well and explosion aboard the *Deepwater Horizon*.  Determining whether and to what extent BP is liable for the *Deepwater Horizon* Incident lies at

the root of each class member's claims.  The JPML recognized this fact when it centralized all federal actions (excepting securities suits) in this district and observed that each proceeding "indisputably share[s] factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that [BP] played in it."  *In re Oil Spill of the Oil Rig "Deepwater Horizon" In the Gulf of Mexico*, 731 F. Supp. 2d at 1354.

The liability question alone requires resolution of numerous common legal and factual questions.  Indeed, according to Professor John C. Coffee, Jr., expert on class action jurisprudence, "the class [here] is essentially asserting a negligence cause of action, which places the defendant's course of conduct at center stage."  [Decl. of John C. Coffee, Esq. ¶ 61 (hereinafter "Coffee Decl.").[17]]  In each class member's case, the finder of fact must determine whether BP owed and breached a duty of care in, among other things: using a long string design instead of a liner tieback; improperly converting the float collar; using an inadequate number of centralizers; failing to run a full "bottoms-up" circulation; failing to run a cement bond log; failing to develop the casing hanger lockdown sleeve before displacement; using "unusual" spacer during displacement; misinterpreting the failed negative pressure tests; failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the Gulf of Mexico; causing and/or allowing the oil spill to remain ongoing for months; and failing to use reasonably safe dispersant chemicals in its attempt to respond to the oil spill.  Answers to these liability issues are central to the validity of each one of the class member's claims.  Commonality is therefore satisfied.

---

[17] Professor Coffee's Declaration will be submitted within the Joint Filing.

**3.    The Claims and Defenses of the Class Representatives are Typical of the Class, and the Typicality Requirement Is Satisfied**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties" be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The threshold for typicality is low. *Turner*, 234 F.R.D. at 605; *see also, e.g.*, *Mullen*, 186 F.3d at 625 (stating that "the test for typicality is not demanding"). Courts construe Rule 23(a)(3) liberally, holding that a claim is typical if it arises from the same events, practices or course of conduct that gives rise to the claims of other class members, and if the claims are based on the same legal theories. *See, e.g.*, *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by*, *M.D. ex rel. Stukenberg*, 675 F.3d 832; *Senter v. Gen. Motors Corp.*, 532 F.2d 511 (6th Cir. 1976); 1 W. Rubenstein, Newberg on Class Actions § 3:29 (cases collected).

The Fifth Circuit has explained that "'[t]ypicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representatives' claims have the same essential characteristics as those of the putative class.'" *James*, 254 F.3d at 571 (quoting 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.24[4] (3d ed. 2000)). Typicality, in other words, is not defeated when class members suffer varying harms or varying degrees of injury, and a damages differential has no place in the relevant inquiry. *See id.*; *Mullen*, 186 F.3d at 625 (explaining that where class members proffer similar theories of liability, variation in class members' illnesses does not affect typicality).

It bears repeating that Plaintiffs' claims, like those of all members of the Class, arise out of the same events and course of conduct engaged in by BP, and these claims are alleged under, and governed by, uniform principles of general maritime law. All class members allege harm from exposure to the oil and oil-dispersing chemicals during a discrete, relatively short period of time in a tightly defined geographic area and in the same general manner—through inhalation

and/or dermal exposure.  Plaintiffs and the Class also seek the same relief: compensatory damages, punitive damages, and medical monitoring.  Consequently, it is as true here as it was in *Lightbourn* that "[i]n the event the class members in this case were to proceed in a parallel action, they would advance legal and remedial theories similar, if not identical, to those advanced by the named plaintiffs."  *Lightbourn*, 118 F.3d at 426 (holding that when plaintiffs and class members advance conceptually similar legal and remedial theories, the typicality requirement is met).  Typicality is readily satisfied.

### 4.    Class Counsel and the Representatives of the Class Satisfy the Adequacy Requirement

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To meet this requirement, plaintiffs must show: "(1) the zeal and competence of the representatives' counsel and (2) the willingness and ability of the representatives to take an active role in and control the litigation to protect the interests of absentees."  *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (alteration and quotation marks omitted).  Although Rule 23(a)(4) is largely satisfied by the absence of any disabling antagonism or intra-class conflict, the adequacy inquiry also looks to the vigor with which the representative party can be expected to assert and defend the interests of the class and the qualifications of class counsel.  1 W. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:54.  *See also Sosna v. Iowa*, 419 U.S. 393, 403 (1975).

Plaintiffs' interests are fully aligned with those of the Class.  Through this litigation, Plaintiffs seek compensation for personal injury and damages suffered in the wake of the *Deepwater Horizon* explosion.  Plaintiffs' claims are co-extensive with those of the absent class members, who seek the very same compensation.  What is more, all class members, including Plaintiffs, share an interest in the PMCP and the BELO should illness develop in the future.

Indeed, as Professor Klonoff states, "class members' interests are aligned and not in conflict." [Klonoff Decl. ¶ 38.]   Because the interests of the named representatives match those of the Class so closely, there is no question that Plaintiffs will prosecute this action vigorously on behalf of the Class.  And indeed they have.[18]

In addition, the structure of the Medical Settlement shows the absence of intra-class antagonism.  BP's financial obligation to pay all costs of the Medical Settlement is uncapped, meaning that distributing settlement benefits is not a zero-sum game.  All class members are eligible to participate in the PMCP so long as they timely and properly submit Proof of Claim Forms, and the amount of Medical Settlement benefits provided to any class member has no bearing on the benefits available to another.  As a result, the instant settlement avoids the flaws presented by the class in *Amchem*, 521 U.S. 591, and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (finding fault with capped settlement funds).

Further, the Medical Settlement does not predetermine the resolution of, or compensatory damages available for, claims for Later-Manifested Physical Conditions.  All class members share a risk that the exposures at issue may manifest in new or different disease(s) at some future date, [*see* Harbut Decl. ¶ 45], as well as an interest in preserving and facilitating the right to seek compensatory damages from BP for any such later-manifested injury, and all are entitled to the BELO protection.  Professor Klonoff succinctly summarizes: "this settlement leaves open the right of class members to recover compensatory damages for later-manifested injuries." [Klonoff Decl. ¶ 34.]  Thus, all class members are similarly situated with respect to any later-manifested illnesses or injuries arising out of the exposures at issue, and there is no conflict between class members with currently manifested and yet-to-be manifested injury.  *See In re*

---

[18] Each of the Class Representatives has submitted an affidavit in support of the Medical Settlement.

*Diet Drugs*, 2000 WL 1222042, at *41 (certifying personal injury class and finding no intra-class conflicts where members retained back-end option to sue for later-manifested injuries).

With respect to the qualifications of counsel, Plaintiffs submit that among their legal team are some of the most experienced class action litigators in the nation.  *See supra* PART V.6.  As the Court recognized in its Preliminary Approval Order conditionally certifying the Medical Benefits Class, "Medical Benefits Class Counsel have substantial experience in prosecuting environmental, mass tort, and complex class actions, and have dedicated substantial resources to the prosecution of this action."  [Rec. Doc. 6419 at 17, ¶ 2(e)]; *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 447 (S.D.N.Y. 2007) (explaining that where attorneys have prosecuted a multi-district litigation for several years, they are qualified to represent the class under Rule 23(a)(4)).

### 5. The Class Definition Satisfies the Ascertainability Requirement

"[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).  The ascertainability requirement, at bottom, scrutinizes whether a definable class exists.  *See* 7A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1760.  This is a question of fact, based upon the varying circumstances of each case.  *Id.*

A class is ascertainable when its members can be identified by reference to objective criteria.  *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008).  The Medical Benefits Class is tightly confined and limited to individuals who suffered past exposure during a finite time period.  Inclusion in the Class is based on objective criteria, including participation in Response Activities, objectively-defined geographic criteria, and the presence of clearly

identifiable physical conditions.  [*See* Coffee Decl. ¶¶ 10, 52-53.]  Under these criteria, the Class is sufficiently ascertainable.  *See* 7A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1760 (explaining that the class description must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member").

### C.    The Medical Benefits Class Meets the Requirements of Rule 23(b)(3)

To be certified, a class must satisfy Rule 23(b)(1), (2), or (3), as well as Rule 23(a).  *Amchem*, 521 U.S. at 614.  Plaintiffs seek certification of a class under Rule 23(b)(3).  The Rule 23(b)(3) inquiry turns on elements of predominance and superiority.

### 1.    The Predominance Requirement Is Satisfied

The predominance inquiry found in Rule 23(b)(3) tests "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  In assessing whether common questions predominate, most courts have adopted a pragmatic approach that emphasizes the efficiencies of class treatment. *See, e.g.*, *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472-73 (5th Cir. 1986).  Such an approach is particularly appropriate in complex proceedings such as this one, for the class device lends itself to efficiencies that would otherwise be unavailable to the litigants and the court.  *See Sullivan*, 667 F.3d at 297 (explaining that predominance tests whether the class action would "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated" (internal quotation omitted)); *see also  Jenkins*, 782 F.2d at 473.  The Fifth Circuit has held that, in the context of mass tort litigation, "a class issue predominates if it constitutes a significant part of the individual cases." *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022-23 (5th Cir. 1992), *on*

*reh'g*, 53 F.3d 663 (5th Cir. 1994).  This is a matter of weighing, not counting, issues.  *Mullen*, 186 F.3d at 626.

Here, the common issues plainly represent a significant part of all class members' cases. Fundamentally, the claims of each member of the Class arise out of a single disastrous event— the Macondo Well blowout and the resulting oil spill.  This mass disaster, in turn, can be traced to a single root: a chain of irresponsible decisions and actions made by BP leading up to and causing the spill.

Courts have long recognized that in single-event mass tort actions such as this, predominance is more often satisfied because, quite obviously, the defendant caused all of the plaintiffs' harms through a single course of conduct common to all class members.  [*See* Klonoff Decl. ¶ 47 (explaining that there is "a long line of cases finding 'single incident' tort cases to be suitable for class certification")]; [Coffee Decl. ¶¶ 22-28 (observing that personal injury classes have "frequently" been certified in single-event mass disaster cases)]; *see also, e.g.*, *Watson*, 979 F.2d at 1022 (finding predominance where class filed suit over explosion at an oil refinery and explaining that "a class issue predominates if it constitutes a significant part of the individual cases"); *Mehl v. Canadian Pac. Rwy. Ltd.*, 227 F.R.D. 505, 521-22 (D.N.D. 2005) (finding predominance where class of injured plaintiffs claimed defendant caused a train derailment and subsequent release of harmful chemicals, and explaining that in such a case, all class members share common issues of defendant's negligence for the accident, the toxic nature of the released chemicals, and the injuries caused by exposure to those chemicals); *Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494, 499 (E.D. Pa. 1988) (certifying class of persons injured by train accident).

Further, Plaintiffs and class members allege exposure to discrete, identifiable substances—oil and the petroleum-based dispersants used during the Response Activities—and Plaintiffs allege that exposure to these substances has known, harmful effects.  Indeed, according to Doctor Harbut, "the health effects of petroleum and petroleum distillates, petroleum-based dispersants and crude oil are often quite similar if not identical, because the chemicals causing insult to the living organism are substantially the same."  [Harbut Decl. ¶ 20.]  The exposures alleged occurred in a relatively confined time frame and geographic area, and through one of two exposure pathways.  What is more, all class members who manifested conditions and symptoms did so within 24 to 72 hours, thus dispensing with variations in symptom manifestation that have plagued classes in which exposure occurs over a period of months or years.[19]  *See In re Diet Drugs*, 2000 WL 1222042, at *42 (explaining that predominance was satisfied in putative personal injury class when two diet products caused identifiable injury through single method of exposure over a "finite and  relatively short period" of use—approximately sixty days).  In this fashion, causation is "straightforward," and therefore, explains Professor Coffee, the manifestation requirements "significantly reduce[] the possibility of alternative causes for the symptom or condition."  [Coffee Decl. ¶ 47.]  Professor Klonoff echoes this sentiment, adding that "predominance [is] especially easy to satisfy here."  [Klonoff Decl. ¶ 46.]

This tightly-defined Class is cabined by temporal, geographic, and other restraints to ensure cohesiveness.  The class definition is carefully tailored to exclude individuals whose

---

[19] Professor Coffee contrasts the relatively brief manifestation of Specified Physical Conditions in this Class with cases attempting (unsuccessfully) to certify personal injury classes for exposure to asbestos, tobacco, or other harmful chemicals, "where there may be a twenty year or longer latency period and there is no direct proof of the original exposure (or its duration)." [Coffee Decl. ¶ 47.]

claims would likely raise unique, individual issues.[20]  Class members are those who, by virtue of residence or work station, were exposed to petroleum or petroleum-based dispersants.  To the extent they experienced a Specified Physical Condition, each manifested similar conditions—those known to result from short-term exposure—and became ill through one of two exposure pathways.  In short, "this class has many common characteristics and few, if any, dissimilar ones."[21]  [Coffee Decl. ¶ 52.]

Finally, predominance is further satisfied because the significant, common factual issues will be resolved under the uniform principles of general maritime law and, therefore, no choice of law issues exist that might otherwise counsel individual treatment.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741-44 (5th Cir. 1996) (explaining that a multitude of choice of law issues may, in certain situations, recommend against class certification); *see also Mullen*, 186 F.3d at 626 (noting that where each of the class member's claims arose under a single body of law, and no "complex choice-of-law issues" were present, predominance was satisfied); [*see also* Klonoff Decl. ¶ 48 (stating that "this case is free of the choice-of-law issues that have caused many courts to reject class certification of mass torts")].

In sum, where, as here, the issues common to the class stand to resolve "integral elements" of claims by tens of thousands of similarly injured individuals, predominance is

---

[20] In particular, individuals who were on the *Deepwater Horizon* on the day of the explosion are excluded from the Class, thus avoiding any cohesiveness issues raised by those individuals' serious injury and death claims, and recognizing their potentially superior ability to pursue or settle their claims individually.  In addition, claims such as those for trauma, later-manifesting injury, or future injury are neither proposed for class treatment nor released by class members.

[21] Indeed, environmental disaster cases are frequently certified by courts for many of the same reasons present in this matter.  *See, e.g.*, *Watson*, 979 F.2d 1014; *Turner*, 234 F.R.D. 597; *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 487 (S.D. Ohio 2004); *Mejdreck v. Lockformer Co.*, No. 01-6107, 2002 WL 1838141, at *6-7 (N.D. Ill. Aug. 12, 2002), *aff'd*, 319 F.3d 910 (7th Cir. 2003); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388-89 (D. Colo. 1993); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D. Ohio 1991); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987).

satisfied.  *See Watson*, 979 F.2d at 1022-23 (concluding that "[t]here can be no serious contention that the district court abused its discretion in determining that [common] issues predominate" where such issues "form[ed] integral elements of the claims asserted by each of the more than 18,000 plaintiffs" in the class); *see also In re Chinese-Manufactured Drywall*, 2012 WL 92498, at *11 (finding predominance inquiry satisfied, for preliminary approval purposes, where a single defendant's liability was integral to all members' claims); *see also Sullivan*, 667 F.3d at 298 (explaining that "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct").

### 2.    A Class Action Is Superior to Other Methods of Adjudication.

Rule 23(b)(3) directs the court to determine whether a "class action is superior to other available methods for fair and efficient adjudication of the controversy."  A class action is superior to the only other available alternative—litigation via multiple trials.  Given the likely range of recovery available to each individual class member, few could afford to shoulder the litigation costs of a complex matter such as this, and the costs of protracted litigation threaten to outweigh even relatively substantial claims.  [*See* Klonoff Decl. ¶ 61 (observing that "the individual claims are, in general, too small to justify the enormous expense of bringing an individual lawsuit").]  As a result, it is likely that many class members would be unable, as a practical matter, to seek their rightful legal recourse *via* individual suit.  The Fifth Circuit has explained that the "existence of [such] negative value suit[s]" represents "[t]he most compelling rationale for finding superiority in a class action." *Castano*, 84 F.3d at 748.  This class action provides its members a means of recourse, avoids the delays inherent in complex litigation, and

offers substantial and expedited benefits to the Class, some of which could not be obtained through litigation.

Further, claims alleging exposure to oil and petroleum-based chemicals are "mature" torts, and the medical and scientific communities have identified injuries clearly resulting from such exposures. Therefore, the range of damages available at trial and the risks of litigation can be weighed reasonably by the class members as each considers whether to remain in the Class or to opt out and proceed alone. [*See* Coffee Decl. ¶¶34-37; Klonoff Decl. ¶58.] Because the certification of the proposed settlement Class would obviate manageability concerns, the use of the class device here would allow the Court to conserve valuable judicial resources that would otherwise be needed for individual litigation of the thousands of separate claims held by persons claiming personal injuries from the *Deepwater Horizon* Incident. In the words of Professor Coffee, the Medical Settlement "easily satisfies the 'superiority' test" of Rule 23(b)(3). [*Id.* ¶ 14.] The Court should accordingly certify the Class.

## VII.  **THE PROPOSED COMMON BENEFIT FEE STRUCTURE FURTHER ENHANCES THE BENEFITS OF THE SETTLEMENT TO THE CLASS**

Exhibit 27 to the Economic and Property Damages Settlement sets forth the provisions by which BP has agreed to pay common benefit attorneys' fees. These provisions were negotiated, drafted, and finalized after both the Economic and Property Damages Settlement and the Medical Settlement were completed, signed, and submitted to the Court. For the reasons presented in Plaintiffs' Memorandum in Support of Final Approval of Economic and Property Damages Class Settlement, [Rec. Doc. 7104, at 52-53], the common benefit fee structure illustrates the fairness, reasonableness, and adequacy of the proposed Medical Settlement.

## VIII.  THE COURT SHOULD CONFIRM THE APPOINTMENT OF GARRETSON RESOLUTION GROUP AS THE CLAIMS ADMINISTRATOR

The parties have jointly nominated, and the Court has preliminarily approved, Garretson Firm Resolution Group, Inc. (d/b/a Garretson Resolution Group) ("GRG") as the Claims Administrator of the Medical Settlement.  [*See* Rec. Doc. # 6419 at 21]; [MEDICAL SETTLEMENT § X.B.6.]

Under the Medical Settlement, the Claims Administrator is responsible for implementing and administering the Settlement for the benefit of the Class, including, among other duties, (i) processing all claims for Specified Physical Conditions; (ii) implementing the PMCP; (iii) performing certain administrative functions regarding the Outreach Program, including creation and maintenance of the library; and (iv) administering the BELO process.  [*See* MEDICAL SETTLEMENT § II.P; *id.* § XXI.A (detailing the responsibilities of the Claims Administrator).]

GRG has more than fourteen years of experience in the administration and resolution of mass tort and complex class action settlements.  It was involved in the Vioxx®, Medtronic, and World Trade Center settlements, among many other high profile matters.  GRG also has expertise in several areas specific to medical settlement claims resolution and vital to the Medical Settlement.  That expertise is set forth more fully in the parties' Memorandum in Support of Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval, and Related Matters, filed on April 18, 2012.  [Rec. Doc. 6267 at 34-35.] Plaintiffs incorporate the relevant section of the Memorandum herein, and respectfully request that the Court confirm the appointment of GRG as Claims Administrator.

IX.    **THE COURT SHOULD CONFIRM THE APPOINTMENT OF THE CLASS REPRESENTATIVES, CLASS COUNSEL, TRUSTEE AND DIRECTED TRUSTEE, AND SHOULD MAINTAIN CONTINUING JURISDICTION OVER THIS MATTER**

In its Preliminary Approval Order, the Court preliminarily and conditionally appointed Medical Benefits Class Representatives Kip Plaisance, Jason Perkins, Camille Warren, Christian Pizani, Max Plaisance, Benjamin Judah Barbee, Cornelius Divinity, Janice Brown, Carlton Caster, George Baker, and Duffy Hall.  Each of those Representatives has submitted an affidavit, attached hereto, expressing support for the Medical Settlement, and each has the ability, incentive, and willingness to represent the Class vigorously.  Plaintiffs respectfully request that the Court confirm its appointment of the above-named Plaintiffs as Class Representatives.

In addition, Plaintiffs respectfully request that the Court confirm the appointment of Co-Lead Class Counsel and Class Counsel, [*see* Rec. Doc. 6419 at 22-23 (appointing Co-Lead Class Counsel and Class Counsel)], as well as the Trustee and Directed Trustee.  Further, Plaintiffs respectfully request that the Court expressly incorporate the terms of the Medical Settlement and maintain exclusive and continuing jurisdiction over the Medical Settlement, to interpret, implement, administer, and enforce its terms.   To ensure transparency, efficiency, and accountability, Plaintiffs respectfully request that the Court maintain continuing and exclusive jurisdiction over the Parties, the class members, the Claims Administrator, and the Medical Settlement Trust, which is a qualified settlement fund.  [*See* MEDICAL SETTLEMENT § XXIII.]

X.    **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in the accompanying exhibits and declarations, as well as the underlying record in these proceedings, Plaintiffs respectfully request that the Court enter a final order and judgment that **(i)** confirms the certification of the Class for settlement purposes pursuant to Rule 23(a)(1)-(4), 23(b)(3), and 23(e); **(ii)** finds and concludes

that the Notice Program, as previously approved and as thereafter conducted, satisfies all applicable notice requirements of Rule 23 and Due Process; **(iii)** grants final approval to the proposed Medical Settlement as fair, adequate, and reasonable under Rule 23(e); **(iv)** finds that, with respect to any class members who are minors, lack capacity, or are incompetent, the Medical Settlement is fair, **(v)** confirms the appointment of Garretson Resolution Group as Claims Administrator, confirms the appointment of the Trustee and Directed Trustee, and retains continuing jurisdiction over the qualified settlement fund established pursuant to the Medical Settlement and the Medical Trust Agreement; **(vi)** confirms the appointment of the undersigned as Class Counsel under Rule 23(g); **(vii)** confirms the appointment of the Class Representatives; **(vii)** expressly incorporates the terms of the Medical Settlement and retains continuing and exclusive jurisdiction over the Parties, the class members, and the Medical Settlement to interpret, implement, administer and enforce the Medical Settlement in accordance with its terms; **(viii)** finds that to the extent the Medical Settlement results in the splitting of the claim of any class members, that such result has been agreed to by the Parties, and that any remaining claim of a class member not released under the Medical Settlement is expressly preserved; and **(ix)** makes such other and further orders as this Court deems necessary and appropriate in connection with the approval, implementation, enforcement, and completion of the Medical Settlement consistent with Section XVIII of the Medical Settlement.

This 13th day of August, 2012

Respectfully Submitted,


_____/s/ Stephen J. Herman_____                    _____/s/ James Parkerson Roy_____
Stephen J. Herman, La. Bar No. 23129            James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN & KATZ LLC                    DOMENGEAUX WRIGHT ROY &
820 O'Keefe Avenue                                        EDWARDS LLC
New Orleans, Louisiana 70113                         556 Jefferson Street, Suite 500

50

| | |
|---|---|
| Telephone: (504) 581-4892 | Lafayette, Louisiana 70501 |
| Fax No. (504) 569-6024 | Telephone: (337) 233-3033 |
| E-Mail: sherman@hhklawfirm.com | Fax No. (337) 233-2796 |
| | E-Mail: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |

## MEDICAL BENEFITS CLASS COUNSEL

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:  (843) 216-9159
Telefax: (843) 216-9290
E-Mail:  jrice@motleyrice.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA 70360
Office:  (985) 876-7595
Telefax: (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

## CERTIFICATE OF SERVICE

We hereby certify that the above and foregoing Memorandum will be served on All

Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with

Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court

of the United States District for the Eastern District of Louisiana by using the CM/ECF System,

which will send a notice of electronic filing in accordance with the procedures established in

MDL 2179, this 13th day of August, 2012.


         /s/ Stephen J. Herman and James Parkerson Roy