| | |
|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | MDL NO. 2179 <br><br> SECTION:  J <br><br> |
| This document relates to all actions. | HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |
| **Plaisance,  et  al.,  individually  and  on behalf of himself and all others similarly situated,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,** <br><br> **Defendants.** | Civil Action No. 12-968 <br><br> SECTION:  J <br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## EXPERT REPORT OF ROBERT H. KLONOFF RELATING TO THE PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I. INTRODUCTION

1. I am Dean and Professor of Law at Lewis & Clark Law School.  I am submitting this expert report on the issues of certification of the medical benefits class under Rule 23(b)(3), the fairness of the proposed medical benefits class settlement, and the reasonableness of the proposed structure for awarding attorneys' fees and costs.  In a separate submission, I address the

economic and property damages class settlement.  I am offering my opinions for the Court's consideration based on my background and experience.  I recognize that my role is limited and that the Court will make the ultimate decision.

## II. QUALIFICATIONS

2.  I have held my current position as Dean and Professor of Law since July 1, 2007. Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor. I taught courses on complex litigation, civil procedure, and appellate procedure.  While at UMKC, I organized and chaired a major class action symposium in which leading class action scholars presented and published articles (Vol. 74, No. 3, UMKC Law Review).  Prior to my academic post at UMKC, I served for more than a dozen years as a partner with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  While serving as a partner at Jones Day, I also served for many years as an adjunct professor of law at Georgetown University Law Center, where I taught courses on class actions.  Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States.  I also served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit.  I received my law degree from Yale Law School.

3.  I am a co-author of the first casebook devoted specifically to class actions (Robert H. Klonoff, Edward K.M. Bilich, and Suzette Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed. 2012)).  I am also the author of the Nutshell on class actions (Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 4th ed., forthcoming Oct. 2012)).  These texts are used at law schools throughout the United States and have been cited by numerous courts and commentators.  I have also authored or co-authored numerous scholarly articles on class actions.  As a textbook author in the class action field, I annually supplement my casebook, and thus remain up to date on the latest case law developments.  I also serve on the advisory board of *Class Action Litigation Report*, a Bloomberg/BNA publication.

4.  I served for five years as an Associate Reporter for the American Law Institute's ongoing

class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation* ("*ALI Aggregate Litigation*").  I was the principal author of the chapter that addresses class action settlements and attorneys' fees (chapter 3).  The project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published in May 2010.  It has been cited extensively by courts and commentators.[1]

5.   As a lawyer at Jones Day, I personally handled more than 100 class action cases, primarily (but not exclusively) on the defense side.  These cases have included some of the largest and most highly publicized civil cases in U.S. history.  My class action experience includes, among other things, class discovery, class certification, notice, settlement, claims administration, and a variety of appellate issues.  I have handled many types of class actions, including mass torts, antitrust, consumer, insurance, securities fraud, employment discrimination, RICO, and numerous others.  I have given lectures on class action issues throughout the United States and abroad, including lectures at top law schools in Canada, China, Ecuador, India, and South Korea.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[2]

6.   In September 2011, John G. Roberts, Jr., Chief Justice of the United States, appointed me

---

[1] *See, e.g., Smith v. Bayer Corp.*, 131 S.Ct. 2368, 2382 n.11 (2011); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266, 269, 273 (3d Cir. 2011); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196, 198 (5th Cir. 2010);  *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 35 (1st Cir. 2009); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 n.14–16 (5th Cir. 2011); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007); *Tilzer v. Davis, Bethune & Jones, L.L.C.*, 204 P.3d 617, 628 (Kan. 2009).

[2] For example, I spoke at two conferences on class actions in April 2012: one sponsored by Loyola Chicago School of Law, and the other sponsored by Washington University School of Law and the Institute for Law & Economic Policy.  In August 2011, I was an invited speaker at an environmental law conference at Kangwon University Law School in Chuncheon, South Korea, where I spoke on environmental class actions.  In May 2011, I was an invited speaker at a class action conference at Duke University School of Law, sponsored by the Federal Judicial Center.  In April 2011, I was an invited speaker at an aggregate litigation conference at the University of Cincinnati College of Law.  In May 2010, I was a speaker on class actions at Seoul National University School of Law.  In March 2010, I was a moderator at a symposium on aggregate litigation at George Washington University School of Law.  The subject of the symposium was the recently completed *ALI Aggregate Litigation* project, and many of the country's top class action scholars participated.  In the summer of 2009, I was a featured speaker at an international class action conference in Beijing, China (co-sponsored by the American Law Institute and Renmin University).  That same summer I spoke on class actions at several law schools in India.  In the summer of 2008, I was a featured speaker on class actions at a meeting in Chicago of more than 100 state appellate judges from around the country.  I also spoke on class actions in the summer of 2008 at a conference of European judges, scholars, and practitioners in Florence, Italy (jointly sponsored by the American Law Institute, New York University, and the European University Institute).  I have been invited to speak at several upcoming conferences, including the American Bar Association's National Institute on Class Actions (October 2012) and conferences at the University of Michigan School of Law (March 2013) and George Washington University School of Law (March 2013).

to serve a three-year term as the only academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure.  That Committee considers and recommends amendments to the Federal Rules of Civil Procedure.  The Chair of the Committee, Judge David Campbell, has appointed me to serve on a Class Action Subcommittee, which will be considering possible amendments to the federal class action rule, Fed. R. Civ. P. 23.

7.  I have testified on class action issues in several cases.  My five most recent cases are: *Robichaux v. State of Louisiana, et. al* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (gave deposition testimony on class action attorneys' fee issues on March 7, 2012, and testified in court on April 11, 2012); *In re AT&T Mobility Wireless Data Svcs. Sales Tex Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (submitted declarations on the fairness of a proposed settlement and on attorneys' fees and incentive payments, and testified in court on March 10, 2011); *In re Motor Fuel Temperature Sales Practice Litig.*, No. 07-MD-184KHV, MDL No. 1840 (D. Kan.) (submitted a declaration on Mar. 19, 2010, on the fairness of a proposed settlement); *Walsh v. Principal Life Ins. Co.*, No. 407-cv-00386 (S.D. Iowa) (gave deposition testimony on class certification issues on Sept. 10, 2009 and also submitted a declaration); and *In re WorldCom, Inc., et al.*, Ch. 11, Case No. 02-13533 (Bankr. S.D.N.Y.) (submitted declaration on Feb. 2, 2006, on the fairness of a proposed settlement).

8.  Additional information regarding my qualifications and experience—including a complete list of my publications—can be found in my curriculum vitae, attached hereto as Exhibit A.

9.  I offer this report solely in my capacity as a class action scholar and practitioner, not in my capacity as a law school dean or as a member of the Advisory Committee on Rules of Civil Procedure.

## III.  BASIS FOR TESTIMONY

10.  I have reviewed numerous pleadings, orders, briefs, and exhibits in this case, along with the settlement agreement documents.  I have also reviewed press coverage and academic analyses of the *Deepwater Horizon* oil spill and its aftermath.

## IV. BACKGROUND

11.   This Court is thoroughly familiar with the terms of the proposed settlement agreement and with the background leading up to the settlement. *See* Preliminary Approval Order as to the Proposed Medical Benefits Class Action Settlement (Doc. 6419) (filed 05/02/12) ("Order 6419"), at 2–4.   In discussing class certification, fairness of the settlement, and attorneys' fees, I highlight facts that I believe are essential.

## V.  CLASS CERTIFICATION

12.   In this section of my report, I offer my opinion on whether the medical benefits class is suitable for class certification.   The fact the parties have reached a settlement does not relieve this Court of its duty to assess whether this case should be certified as a class action.   In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court rejected the argument that when a case settles prior to certification, a court's only obligation is to determine if the settlement is fair and reasonable under Rule 23(e).   In *Amchem*, the issue was whether a class had been legitimately certified for purposes of a global settlement of current and future asbestos-related claims.   To resolve the issue, the Court had to determine whether the standards for certification under Rule 23(b)(3) were less demanding when the case was certified for settlement purposes rather than for trial.   The Court held that settlement *was* relevant to one aspect of class certification.   In a settlement class, "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial." 521 U.S. at 620.   The Court concluded, however, that the other requirements of Rule 23—"those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.*   Thus, under *Amchem*, although this Court is not required to address manageability under Rule 23(b)(3)(D), it *is* required to address all of the other criteria for class certification.

13.   To obtain class certification, plaintiffs must satisfy three threshold requirements (a proper class definition, and a representative who is both a member of the class and has a live claim); four explicit requirements under Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation); and all the elements of at least one subdivision of Rule 23(b)— (b)(1)(A), (b)(1)(B), (b)(2), or (b)(3).   *See* Robert H. Klonoff, *Class Actions and Other Multi-*

*Party Litigation in a Nutshell* 23–25, 30–133 (West 4th ed. forthcoming Oct. 2012).  In this case, plaintiffs seek certification under Rule 23(b)(3), and thus they must satisfy both "predominance" and "superiority" (excluding manageability).  *Id.* at 25, 112–133.  In this section, I examine this case in light of the requirements for certification of a settlement class.

14.  Before I turn to the elements of Rule 23, however, I believe it is important to recognize that, under established law, mass tort personal injury cases are *ordinarily* not suitable candidates for class certification. *See, e.g.*, *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006) ("A 'mass accident' resulting in injuries to numerous persons is *ordinarily* not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways") (emphasis added; quoting Fed. R. Civ. P. 23(b)(3) advisory committee's note (1966)).  Nonetheless, "ordinarily" unsuitable does not mean "always" unsuitable.  The Supreme Court and the Fifth Circuit have made clear that certification of personal injury claims may be appropriate in some cases. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting that Rule 23 "does not categorically exclude mass tort cases" and that "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement"); *Madison v. Chalmette Ref., L.L.C.,* 637 F.3d 551, 557 (5th Cir. 2011) (while remanding class certification order in case involving release of petroleum coke dust because the district court failed to conduct a rigorous analysis, the court emphasized that it did "not suggest that class treatment [was] necessarily inappropriate," and that "class treatment on the common issue of liability may indeed be appropriate").

15.  This case, in my opinion, is one of those exceptional cases in which the certification of personal injury claims is indeed appropriate.  In every material respect, it differs from personal injury cases in which courts have found certification to be inappropriate.  Specifically, courts have found that the major barriers to certification of personal injury mass torts include the following:

- Class actions are not superior for high-value individual personal injury claims, which generally should be litigated individually. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Castano v. American Tobacco Co.*, 84 F.3d 734, 747–48 (5th Cir. 1996); *Matter of Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293,

1300 (7th Cir. 1995). Here, as discussed *infra*, the claims are generally small and not economically viable as individual lawsuits.

- Choice of law issues and the difficulty of applying 50 states' laws preclude certification of geographically large class actions based on state law. *See*, *e.g.*, *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001); *Castano*, 84 F.3d at 742–43; *Rhone–Poulenc*, 51 F.3d at 1300–1302. Here, as explained *infra*, this Court has held that the cases are all governed by uniform federal law.

- Mass tort classes are often unascertainable from the class definition. *See*, *e.g.*, *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 397 (S.D.N.Y. 2008); *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 336–37 (E.D.Ky. 2002). Here, as discussed below, the class definition is objective and precise.

- Personal injuries often cannot be litigated on a class-wide basis because individual issues of causation tend to predominate over the common issues. *See*, *e.g.*, *In re American Medical Systems*, 75 F.3d 1069, 1085 (6th Cir. 1996); *Amchem*, 521 U.S. at 622–23; *Castano*, 84 F.3d at 744–45. Here, as discussed *infra*, the common issues are complex and important, while the individual issues are easily resolved.

- Many mass tort personal injury cases involve injuries relating to mass-marketed products, in which no single event applies to the whole class. *See*, *e.g.*, *In re Northern Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982); *American Medical Systems*, 75 F.3d at 1084–85. This case, by contrast, arises out of a single incident—the oil spill and its aftermath—and the overarching liability determinations will govern every member of the class.

- Defendants often have individualized defenses (*e.g.*, contributory negligence or learned intermediary doctrine) that a class action simply cannot accommodate efficiently. *See*, *e.g.*, *Castano*, 84 F.3d at 745; *Dalkon Shield*, 693 F.2d at 853. Here, as discussed *infra*, these kinds of defenses do not arise, since there is no viable argument that class members somehow contributed to the oil spill.

- In personal injury cases, structural conflicts often exist between those asserting

claims for present injuries and those seeking to ensure adequate compensation for future injuries. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626–27 (1997); *Ortiz v. Fibreboard Co.*, 527 U.S. 815, 856–57 (1999).  Here, as explained below, because claims for future injuries are preserved for all class members, no such structural conflicts exist.

- In many unsuccessful mass tort class actions, the claims were of questionable merit due to scientific uncertainty. *See, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 506 F. Supp. 762, 783 (E.D.N.Y. 1980); *Rhone–Poulenc*, 51 F.3d at 1299.  Here, as discussed *infra*, the matrix of injuries is based on established science.

- Mass tort class actions can threaten defendants with ruinous liability and coerce them into nuisance settlements in order to avoid insolvency. *See, e.g.*, *Rhone–Poulenc*, 51 F.3d at 1298–99; *Castano*, 84 F.3d at 746.  Here, BP indisputably has the assets to cover the claims at issue, and it has already created a trust fund to cover these and other claims.

As I explain throughout this section, utilizing these factors as benchmarks, this case is truly an exception to the general rule that mass tort personal injury cases should not be certified.  Indeed, if this case—with all of its unique attributes—does not qualify, then as a practical matter, no mass tort personal injury case is *ever* appropriate for certification.

16.  In this section, I first turn to the three threshold requirements for certification.  Next, I evaluate the proposed settlement class with respect to the four requirements of Rule 23(a). Following that, I address Rule 23(b)(3)'s predominance and superiority requirements.

### A. Rule 23's Threshold Requirements

17.  Two of the three threshold requirements can be dealt with summarily.   The class representatives clearly fall within the class definition and thus are members of the class. *See* Medical Class Action Complaint, Case 2:12-cv-00968-CJB-SS (Doc. 1) (filed 04/16/12) (hereinafter "Complaint") at ¶¶ 5(a)–(k) (listing eleven plaintiff class representatives). Moreover, the claims of the representatives are indisputably live, not moot. *See, e.g., id.* at ¶¶ 5(k) (alleging, *inter alia*, that class representative Duffy Hall "was diagnosed with chemical keratitis" as a result of exposure to oil while installing barriers to protect Mississippi wetlands

from the *Deepwater Horizon* spill); 5(f) (class representative Benjamin Judah Barbee alleged to have suffered "headaches and breathing difficulties" during remediation efforts).

18.  Likewise, I do not have any concerns regarding the class definition.  A class definition is critical to ascertain who is in the class, who is subject to notice, and who is bound by the judgment.  Prior to 2003, the class definition requirement was solely a matter of case law, and no such requirement was even mentioned in Rule 23.  In 2003, Rule 23 was amended to state that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses."  The Rule, however, does not elaborate on what constitutes an adequate class definition.

19.  The Manual for Complex Litigation (Fourth) contains useful guidance in evaluating a class definition.  First, the definition should contain "objective criteria" and "avoid subjective standards (*e.g.*, a plaintiff's state of mind) or terms that depend on resolution of the merits (*e.g.*, persons who were discriminated against)." *Id.* at § 21.222; *see also Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 639 (5th Cir. 2012) ("In order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.") (citation, alteration, and internal quotation marks omitted).  A definition that turns on the merits is sometimes called a "fail-safe" class, because the class is certified (and a binding judgment entered) only if plaintiff wins the case.  Second, "the class definition should capture[] all members necessary for efficient and fair resolution of common questions of fact and law in a single proceeding." *MCL(4th)*, *supra*, at § 21.222.  Third, "[t]he class definition should describe the operative claims, issues, or defenses." *Id.*  The *Manual* also recognizes that more specificity is needed for (b)(3) classes, which require notice and opt-out rights, than for (b)(1) and (b)(2) classes, which are mandatory. *Id.*; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104–1105 (5th Cir. 1977) (observing that, absent a clear class definition, prospective class members lack adequate notice and cannot exercise their rights under (b)(3) to make an "informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment").

20.  Here, the medical benefits class definition is objective and precise and does not turn on the merits.  The proposed definition is very detailed. *See Deepwater Horizon* Medical Benefits Class Action Settlement Agreement as amended on May 1, 2012 (Doc. 6427-1) (filed 05/03/12)

9

(hereinafter "Medical Agreement") at 6–7 (setting forth class definition); Order 6419 at 15–16 (adopting proposed class definition).  Under the definition, the class consists of persons who resided in the United States between April 20, 2010, and April 16, 2012, and who (1) resided in Zone A (certain specified beachfront areas) for some time on each of at least 60 days between April 20, 2012, and September 30, 2010, and who developed specified physical conditions and symptoms (vision, upper airway/respiratory, ear, nose, and throat, skin, neurophysical/neurological/odor-related, gastrointestinal or stomach, or heat-related (all set out in the Specified Physical Conditions Matrix, *see* Medical Agreement, Ex.8 (Doc. 6427-10))); (2) resided in Zone B (specified wetlands areas) for some time on each of at least 60 days between April 20, 2010, and December 31, 2010; or (3) worked as Clean-Up Workers (a defined term under the proposed settlement, *see id.* at 11–12) between April 20, 2010, and April 16, 2012. Both Zone A and Zone B are defined objectively and with great clarity in the Medical Agreement and Exhibit 9 (Doc. 6427-11) thereto.  Further clarity is provided through maps of Zone A (Ex.10; Doc. 6427-12) and Zone B (Ex.11; Doc. 6427-13).  Likewise, the Medical Agreement defines the term "Clean-Up Workers" with great clarity, including specification of five categories of natural persons who performed "Response Activities" (itself a defined term), namely, those relating to the cleanup, remediation efforts, and all other responsive actions involving the oil spill.  The definition contains various exclusions, including opt-outs, employees of BP, judges and clerks from the Eastern District of Louisiana, anyone who was on the Deepwater Horizon on April 20, 2010, anyone who previously released the claims herein, and certain defined oil and gas workers. *See* Medical Agreement at 6–7.

21.   As Dr. Michael R. Harbut explains in his August 11, 2012 Declaration, the class definition is firmly grounded in modern science with respect to the extensively studied health effects of exposure to petroleum and petroleum-based dispersants, such as those at issue in this case.  The geographical scope of the class, as Dr. Harbut points out, reaches broadly enough to include all those individuals whose proximity to the oil spill was such that they would have been sufficiently exposed to oil and/or oil-based dispersants to cause one or more of the specified medical conditions or symptoms on the Specified Physical Conditions matrix.  He opines that Zone A covers the coastal residential population that, "merely by virtue of their residency," could have had sufficient exposure to the oil and/or chemical dispersants to develop one or more

of the conditions or symptoms listed in the matrix. Harbut Decl. ¶ 39.  Similarly, he explains how Zone B covers the marshland residential population that, "merely by virtue of their residency," could have had sufficient exposure to the oil and/or chemical dispersants to develop one or more of the conditions on the matrix.  *Id.* at ¶ 40.  Finally, he explains that the Clean-Up Workers, "by virtue of their work status," were almost certainly exposed to oil or dispersants, noting that "it would be unusual for a worker involved in petroleum cleanup operations to not have petroleum exposure." *Id.* at ¶ 41.  Dr. Harbut also explains why the geographical and temporal scope of the class definition avoids sweeping too broadly—which would bring in cases in which the proof of causation was much more attenuated.  With respect to Zones A and B, Dr. Harbut explains that the boundaries are consistent with contemporary scientific understanding of the chemicals and physical conditions involved.  He notes that, while it might be possible for someone who lives outside those areas to manifest a specified physical condition as a result of exposure, it would be less likely, "because one would expect concentrations of toxins to diminish as distance from point source exposure increases." *Id.* at ¶¶ 39, 40.  Similarly, as noted, he observes that "it would be unusual" for Clean-Up Workers not to have been exposed to petroleum or petroleum-based dispersants, since "by definition, oil cleanup workers are involved in the cleanup of oil," which "puts them in closer and more prolonged contact with the petroleum and/or petroleum products" than the Zone A and Zone B residents. *Id.* at ¶ 41.  Thus, the carefully calibrated class definition ensures that similarly-situated individuals will be similarly defined within the class.  The same, however, could not be said of a more sweeping definition.

22.  The precision of the proposed medical benefits class definition is further reflected in the effectiveness of the sending of notice to class members.  Based on the class definition, individual notices were sent by mail to many thousands of class members.  In short, the class definition passes muster under even the most exacting criteria.

**B. Rule 23—Explicit Requirements for Class Certification**

       **1. Rule 23(a) Requirements**

             **a. Rule 23(a)(1)—Numerosity**

23.  Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all members is impracticable." *Id.*  "To demonstrate numerosity, Plaintiffs must establish that

11

joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'" *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 604 (E.D.La. 2006) (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000)).  According to the Fifth Circuit, numerosity is generally met if a class consists of more than 100–150 members. *See, e.g.*, *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999).

24.   Here, there is no serious dispute about numerosity.  The medical benefits class is estimated to include approximately 200,000 individuals. *See* Order 6419 at 16 ("the parties estimate that there are approximately 90,000 Clean-Up Workers and 105,000 Zone A and Zone B Residents. . . . In addition, approximately 16,000 individuals have filed Short-Form Joinders asserting claims for bodily injury as a result of the Deepwater Horizon incident, and more such claims continue to be filed.")

### b. Rule 23(a)(2)—Commonality

25.   To satisfy Rule 23(a)(2)'s requirement of "questions of law or fact common to the class," the class claims "must 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *M.D. v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)) (citations omitted).  A single common question satisfying this criterion will suffice. *Dukes*, 131 S. Ct. at 2556.  "Commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members." *In re Heartland Payment Sys.*, 2012 U.S. Dist. LEXIS 37326, at *29 (S.D. Tex. Mar. 20, 2012) (citation, alteration, and internal quotation marks omitted).  "The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence." *Id.* at *29–30 (quoting *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273, 335 (3d Cir. 2011) (Scirica, J., concurring), *cert denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012)).

26.   Here, commonality is easily satisfied.  Every class member's case turns on the common question of BP's liability, under general maritime law, for the Deepwater Horizon explosion.  Furthermore, because the claims all arise from the same discrete, single-location, single-event disaster, they share a multiplicity of common questions.  Common questions include whether BP

was grossly negligent in its conduct with respect to the Deepwater Horizon and whether alternative safety precautions would have prevented or mitigated the oil spill. Additional common issues that are specific to the medical benefits class include questions involving the capacity of oil and oil-dispersing chemicals to cause the alleged ailments[3] and the amounts of particular chemicals that were released into the environment during the Deepwater Horizon disaster. *See also* Complaint at ¶¶ 91–95 (listing numerous common legal and factual questions). As the MDL Panel noted in its Transfer Order, these proceedings "indisputably share factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, 731 F. Supp. 2d 1352, 1354 (J.P.M.L. 2010).

### c. Rule 23(a)(3)—Typicality

27. "In order to meet the typicality requirement, 'the claims or defenses of the parties [must be] typical of the claims or defenses of the class.'" *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting Fed. R. Civ. P. 23(a)(3); alteration by *James* court). A claim is typical if it arises from the same events, practices, or course of conduct that gives rise to the claims of other class members, and if the claims are based on the same legal theories. *Id.* "Typicality does not require a complete identity of claims." *Id.* Instead, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id.*

28. Typicality is amply satisfied here. Every claim arises out of the same single-event, single-location disaster, and every case turns on the question of BP's negligence. Every plaintiff either claims to have already suffered one or more specified physical conditions set forth in the matrix (Medical Agreement, Ex.8 (Doc. 6273-10)), or is at risk of suffering physical injury as a result of the oil spill. There are no reasonable defenses to the effect that the plaintiffs or class members were somehow responsible for their own injuries.

29. To be sure, there will be some variation among the class members' individual claims, but this fact does not change the typicality analysis. Courts in the Fifth Circuit have held that "[t]he major concern under Rule 23(a)(3) is if unique defenses against a named plaintiff threaten to

---

[3] *See* Harbut Declaration at ¶ 17 ("I find the conditions in the . . . matrix to reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants.")

become the focus of the litigation," and that the key to the typicality inquiry is "whether a class representative would be required to devote considerable time to rebut the Defendants' claims." *In re Enron Corp. Secs. Litig.*, 529 F. Supp. 2d 644, 674 (S.D. Tex. 2006) (citation and internal quotation marks omitted); *see also Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (rejecting the argument that "the presence of a unique defense necessarily destroys typicality").

30.   In this case, I can think of no unique defenses that would "become the focus of the litigation" and thereby undercut the typicality requirement.  The primary focus of a trial would be on BP's conduct.  The testimony relating to specific conditions will be largely the same because there are only two routes of exposure—"direct dermal contact or the inhalation of airborne chemicals"—and the symptoms would have occurred with 24 to 72 hours of exposure to petroleum and/or petroleum-based dispersants. Harbut Decl. ¶¶ 18, 26–38.  And all of the class members are claiming injury from the oil spill and/or cleanup operations.  As such, I believe that typicality is met.

### d. Rule 23(a)(4)—Adequacy of Representation

31.   "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (citation omitted).  "In addition to measuring the competence of class counsel and the class representatives' willingness and ability to serve, . . . the Rule 23 adequacy inquiry also uncovers conflicts of interest between the named plaintiffs and the class they seek to represent." *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir. 2007) (citations and internal quotation marks omitted).  "Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members." *Stott v. Capital Fin. Servs.*, 277 F.R.D. 316, 325 (N.D. Tex. 2011) (citations and internal quotation marks omitted).  As I explain below, based on these criteria, it is my opinion that adequacy is readily satisfied.

### i. Zealousness of Class Representatives

32.  My understanding is that the class representatives have zealously pursued the claims and would have continued to do so in the absence of a settlement.  To my knowledge, no issues have been raised regarding the willingness or ability of the class representatives to serve.

### ii. Absence of Conflicts

33.  Unlike *Amchem*, in which there was a conflict between those presently asserting claims and those with future claims, *see* 521 U.S. at 626, here the claims of all of the class members are aligned.  There is no cap on the total damages available to the class.  Each class member can pursue his or her claims for conditions specified in the matrix to the full amount authorized in the settlement agreement.   And the Back-End Litigation Option preserves class members' compensatory claims for "Later-Manifested Physical Condition[s]," *i.e.*, a physical condition first diagnosed after April 16, 2012, that is allegedly caused by BP's actions at issue, provided that the exposure occurred on or before September 30, 2010 (for Zone A residents), on or before December 31, 2010 (for Zone B residents), and on or before April 16, 2012 (for Clean-Up Workers). Medical Agreement at 17, 56–59.

34.  Several other factors assure me that this case does not raise conflict-of-interest concerns.

- First, through the careful mediation efforts of Judge Shushan, who mediated key provisions of the medical settlement, structural integrity was assured during the negotiations. *See* Order 6419 at 3 (with Judge Shushan as mediator, teams from BP and the PSC "met or spoke on a nearly daily basis . . . to negotiate over every aspect of the Proposed Settlement").  The negotiations between the PSC and BP were conducted with great skill and dedication over a ten-month period.  *See id.* at 3; Decl. of Robin Greenwald (Aug. 13, 2012) (to be filed with plaintiffs' brief).  The medical benefits settlement was negotiated separately from the economic and property damages settlement, and a different group of PSC attorneys led the negotiations.  Professor Samuel Issacharoff—a widely-respected class action expert who advised the PSC on legal and ethical issues surrounding the negotiations—explains that "[i]n designing the process of settlement negotiations, the PSC took care to ensure that all affected constituencies in the settlement had advocates and that no one with negotiating authority had either the incentive to or the ability to trade off the interests of one group

in favor of another." Decl. of Samuel Issacharoff at ¶ 8 (Aug. 13, 2012) (to be filed with plaintiffs' brief).

- Second, during the negotiations, the parties consulted with medical and other scientific experts with respect to the structure of the medical benefits class settlement. *See* Order 6419 at 4.  The PSC attorneys also consulted with attorneys representing individual class members who suffered from the specific ailments at issue. *See also* Issacharoff Decl. at ¶ 11 (noting that the "PSC was appointed by the Court well before any settlement negotiations were undertaken . . . based on the need to represent the various affected constituencies").

- Third, although plaintiffs' counsel made clear that they expected BP to pay fees on top of class member payments, there was no specific discussion of attorneys' fees until all of the other terms of the settlement had been negotiated. *See* Order 6419 at 8; Doc. 6273-21, Ex. 19, at ¶ 1.  Thus, the negotiations were not tainted by any concern that a substantial portion of what had been negotiated would end up going to counsel rather than to class members or that counsel and the class members were competing for the same limited dollars.

- Fourth, the instant settlement is free of the structural deficiencies that have derailed other attempts to settle large numbers of individual claims on a class basis, especially in the mass torts context.  In particular, the settlement avoids any inherent conflict between current and future claimants of the sort that prompted the Supreme Court to disapprove of the sprawling asbestos classes attempted in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Co.*, 527 U.S. 815 (1999).  In contrast to those cases (and many others), the claimants here are not in competition with each other for a fixed amount. *Cf. Amchem*, 521 U.S. at 626 (interests of class members not aligned where the interests of the currently-injured in "generous immediate payments . . . tug[ged] against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future"). *See also* Issacharoff Decl. at ¶ 14 (noting that "the absence of an overall cap meant that the negotiators were never in the position of 'robbing Peter to pay Paul'" by, for example, seeking "to induce a hold-out within the settlement class to accept the offered terms by redirecting funds

16

[into] that group"). Notably, as discussed above, this settlement leaves open the right of class members to recover compensatory damages for later-manifested injuries. Thus, those with present injuries are not competing with those who want to ensure an adequate fund for the future.

35. Because of the absence of conflicts, I do not believe there is a need for subclasses. Indeed, the creation of subclasses might actually make this case more complex. Because there are three categories of class members in the medical benefits class, and various types of physical injuries subject to compensation, there would be no rational way to limit the case to only a few subclasses. First, there are three broad groups (Zone A, Zone B, and Clean-Up Workers). Second, there are dozens of specified acute and chronic conditions and symptoms listed in the matrix. *See* Medical Agreement, Ex. 8. Those conditions and symptoms fall into at least seven broad categories: vision; upper airway/respiratory; ear, nose, and throat; skin; neurophysiological/neurological/odor-related; gastrointestinal or stomach; and heat-related. *Id.* (Doc. 6427-10). Within these broad categories are numerous sub-categories. Thus, conceivably dozens of subclasses could be necessary. Creating such subclasses—each with separate representatives and counsel—would only lead to more confusion because some class members could fall into multiple subclasses (*e.g.*, because they have multiple physical symptoms of the type specified in the notice).

36. To be sure, the creation of subclasses is sometimes a salutary procedure for ensuring structural fairness in cases where interests within the class diverge to such a degree that a fundamental conflict exists. Yet, as the Third Circuit recently explained in *Dewey v. VW Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012), subclassing is not the only means by which procedural fairness may be attained. In *Dewey*, the plaintiff class alleged that several models of Volkswagen and Audi automobiles had "defectively designed sunroofs, that, when clogged by plant debris and pollen, allowed water to leak into the vehicle." *Id.* at 174. The district court certified a settlement class. The Third Circuit reversed in part, rejecting one of the objectors' adequacy arguments but agreeing with another. First, the appellate court rejected the argument that there was "an intra-class conflict between those class members who have already suffered leakage, and those who have not yet suffered leakage" in their vehicles. *Id.* at 185. While conceding that the case bore "some resemblance to *Amchem*," the Third Circuit concluded that

17

the objectors "fail[ed] to recognize a critical distinction between the representative plaintiffs here and the representative plaintiffs in *Amchem*." *Id.* at 185.  The court explained:

> The problem with the representative plaintiffs in *Amchem* was that they "would care little" for benefits that would have been valuable to other members of the class.  This is because once a class member manifested symptoms of asbestos-related injuries, that class member would be solely concerned with obtaining a "generous immediate payment[]" for the injury, not securing an "ample, inflation-protected fund for the future."  This resulted in a misalignment of interests— certain members of the class had an incentive to pursue protections for future claims, while the representative plaintiffs lacked any such an incentive.
>
> Here, on the other hand, the alignment of interests is not so starkly problematic. A class member who has already suffered leakage, and is thus a "past" claimant, can continue to suffer leakage into the future to the same extent as a future claimant, and can continue to make future claims.  As such, past claimants also have an incentive to protect the ability of class members to make claims for future damage.  Moreover, the settlement is structured to ensure that even past claimants have an incentive to protect the rights of all members of the class to make future claims, and thus to align the interests of the representative plaintiffs with those of the class.

*Id.* at 185–86 (citation and footnote omitted).

37.   The Third Circuit in *Dewey* did agree, however, with a different argument by the objectors about an intraclass conflict.  That conflict stemmed from the fact that the settlement created a "reimbursement group" and a "residual group," but that all the class representatives were members of the reimbursement group.  The settlement provided that the reimbursement group received the right to reimbursement for certain qualifying damages, paid from an $8 million fund, while the remaining class members (the residual group) had to wait until the reimbursement group made its claims, at which point the residual group could make "goodwill" claims on the remaining money in the fund. *Id.* at 173.  The conflict requiring reversal, according to the Third Circuit, was that "representative plaintiffs had an interest in excluding other plaintiffs from the reimbursement group, while plaintiffs in the residual group had an interest in being included in the reimbursement group." *Id.* at 188.  Importantly, however, the court made clear that, on remand, the creation of subclasses was just one way in which the parties could remedy the adequacy problem.  Alternatively, the class could:

> simply do away with the distinction between the reimbursement group and the residual group, and allow all members of the class to submit reimbursements with

18

no difference in priority. Without any need to draw a line between themselves and other members of the class, representative plaintiffs' interest in maximizing their own returns would align with the interests of the rest of the class.

*Id.* at 189.

38.   In the instant case, there is no "need to draw a line between" the claims of the class representatives and those of the absent class members, because this settlement does not amount to a zero-sum game in which different categories of plaintiffs are in competition for a fixed amount. Rather, because the settlement funds for the medical benefits class are not subject to an overall cap, and because there is no conflict between present and future claimants, class members' interests are aligned and not in conflict. Accordingly, the Third Circuit's opinion in *Dewey* supports a finding of adequacy of representation in this case.

39.   Other recent appellate decisions are in accord with *Dewey*'s finding that the creation of subclasses is not the *sine qua non* of structural fairness. These decisions provide further support for my conclusion that subclassing was not required here. For instance, in *Juris v. Inamed Corp.*, ___ F.3d ___, 2012 U.S. App. LEXIS 13841 (11th Cir. July 6, 2012), the plaintiff filed an individual personal injury action in 2006, alleging injuries caused by defective silicone breast implants manufactured by the defendant. Plaintiff's suit was enjoined, however, on the ground that the *res judicata* effect of a 1999 class settlement precluded her claims. On appeal to the Eleventh Circuit, plaintiff collaterally challenged the 1999 settlement class, arguing that she had been denied due process because, *inter alia*, she had lacked adequate representation at the earlier class settlement that purported to extinguish her rights. *Id.* at *37. In particular, plaintiff urged that the 1999 settlement had failed Rule 23(a)(4)'s adequacy requirement by failing to create subclasses. The Eleventh Circuit disagreed, observing that the Supreme Court's decisions in *Amchem* and *Ortiz* "appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, but may not necessarily require, formally designated subclasses." *Id.* at *73 (emphasis in original; citations omitted). The appellate court added that it was "not the first court to suggest that *Amchem* and *Ortiz* impose a requirement of adequate structural assurances, as opposed to a *per se* requirement of formally designated subclasses." *Id.* at 73–74 n.25 (citing numerous authorities). *See also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 336 n.5 (3d Cir. 2011) (en banc) (Scirica, J., concurring) (noting that "[t]rial courts can certify

subclasses in situations where divergent interests implicate fair allocation—a situation not presented . . . [where the] class members have aligned interests"), *cert. denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

### iii. Competence of Class Counsel

40.  In my view, counsel have vigorously and effectively pursued this case from its inception. The PSC includes many of the nation's most prominent and experienced class action attorneys. These attorneys have had broad experience in aggregate litigation involving tobacco, asbestos, pharmaceutical products, insurance, retiree health benefits, and discrimination, among other types of cases.  The PSC also includes attorneys with substantial maritime and admiralty practices.  They were selected by the Court from among hundreds of attorney applicants for the PSC.  Their skill and experience are reflected in the crafting of the complaints, the filing of and opposition to myriad motions, the thoroughness in approaching discovery, the tireless and steadfast approach to settlement negotiations, and ultimately, the impressive results accomplished for the class.

### B. Rule 23(b) Requirements

41.  As noted, the parties seek settlement under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Predominance of Common Questions

42.  "The predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene and Gene, LLC v. BioPay, LLC,* 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  "In the context of mass tort litigation," the Fifth Circuit has held "that a class issue predominates if it constitutes a significant part of the individual cases." *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992) (footnote omitted).

43.  Here, the common issues are critical, and in the absence of settlement would entail considerable proof in each individual case.  The centerpiece of this litigation is the responsibility

of BP (and other corporate entities) for the blowout, explosion, and fire that occurred aboard the *Deepwater Horizon* offshore drilling rig and the subsequent discharge of oil into the Gulf over a three-month period, causing the largest oil spill in history.  The proof at trial would be lengthy, technical, and complicated.   Indeed, the Court has structured the proceedings in phases to address common issues first. Second Amended Pretrial Order No. 41 (Doc. 6592) (filed 05/30/12).  By contrast, the individualized issues are more easily resolved: Was the specified medical condition of a Zone A resident, Zone B resident, or Clean-Up Worker caused by the person's exposure to oil or petroleum-based dispersants?  *If* the class member was exposed to the petroleum substance and *if* the specified physical condition manifested itself shortly thereafter (within 24–72 hours), much of that proof will be common to the class, along the lines of Dr. Harbut's declaration.  Common evidence will prove that the medical condition is one that can be caused by exposure to petroleum, and common evidence will demonstrate the likelihood that, for Zone A residents, Zone B residents, and Clean-Up Workers, being a member of one of those categories meant that there was a high likelihood of exposure.  Thus, even issues of individual causation would, for the most part, be proven by common evidence.  Indeed, after hearing proof from a few individuals, the trier of fact would soon develop the ability to resolve the individual questions quickly and consistently.  The fact that some individualized issues exist does not defeat certification as long as the common issues predominate.  For example, as myriad courts have stated, mere differences in damages do not defeat class certification.[4]

44.  As discussed in ¶¶ 14–15, *supra*, mass tort personal injury cases are usually not suitable for class certification.   Among other class certification requirements, the "predominance" requirement of Rule 23(b)(3) has been a major stumbling block.  Yet, as noted in ¶ 14, *supra*,

---

[4] *See, e.g., Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003) (recognizing that "relatively few motions to certify a class fail because of disparities in the amount of damages suffered by the class members" and that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate"); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)") (citations omitted); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2009) ("common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues" (citation and internal quotation marks omitted)); *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 428 (4th Cir. 2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations . . . forecloses class certification"); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010) ("the amount of damages is invariably an individual question and does not defeat class action treatment") (citation, alteration, and internal quotation marks omitted).

numerous authorities have made clear that this rule is not absolute.  The instant case is precisely the kind of personal injury case in which the usual predominance problems do not exist.

45.  First, in contrast to most attempted mass tort personal injury class actions, the medical claims in this case are, in the main, classic "negative value" cases (*i.e.*, claims that are not economically viable as individual lawsuits because the likely recovery is less than the costs of bringing suit). *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (noting that the drafters of Rule 23(b)(3) "had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'") (citation omitted).  I am advised that, for the most part, the injuries claimed are relatively minor.  The more serious injuries—those that would be covered by the Back-End Litigation Option—can take years to manifest themselves. Harbut Decl. ¶¶ 45, 46.  For those with minor injuries, the overarching liability issues are so complicated, and would be so expensive to prove, that few class members, apart from the most egregiously harmed, would have the financial incentive to take their individual cases to trial.  Few class members would attempt the herculean task of litigating alone against a sophisticated and well-heeled corporate defendant such as BP, even given the strong likelihood that plaintiffs would ultimately prevail.  This lack of incentive for plaintiffs to go it alone, even when they have strong claims, describes precisely the problem to which the class action device supplies a time-tested solution: aggregating similar claims and thereby alleviating the asymmetry between the parties.

46.  Second, the narrow and precise class definition limits the scope of the class to those most likely exposed to oil or oil-dispersing chemicals.  As noted, given that the injuries must have manifested themselves within 24 to 72 hours after exposure, that the injuries could have been caused through only two pathways, and that the class includes only those most likely to have been exposed to oil or petroleum-based dispersants, the likelihood of serious competing causation arguments is remote.  The narrowly defined class makes predominance especially easy to satisfy here.  Because the class includes only individuals who were in close geographic and temporal proximity to the spill, a class member who shows that he or she suffers from a specified medical condition that manifested itself (or worsened) following the oil spill should not have serious trouble proving individual causation.  Indeed, the tight causal nexus between the spill and class members' injuries makes it much more difficult for BP to assert individualized defenses

involving alternative causation. Because of the circumstances of causation in this case, the medical benefits class is worlds away from the typical kind of case in which courts have found personal injury claims to be inappropriate for class treatment.

47. Third, the injuries were caused by a single event, the oil spill and its aftermath, and there is no argument that class members somehow contributed to the cause. A finding of predominance is supported by a long line of cases finding "single incident" tort cases to be suitable for class certification. For example, in *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1021–22 & n.37 (5th Cir. 1992), the Fifth Circuit affirmed the district court's (b)(3) certification of a class alleging injury from an a explosion at defendant's manufacturing facility. *Accord, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D.La. 2006) (certifying (b)(3) class alleging property damage from an oil spill at defendant's refinery); *In re Train Derailment near Amite, La.*, 2006 U.S. Dist. LEXIS 32839 (E.D.La. May 24, 2006) (certifying (b)(3) class and approving settlement).[5] As the Sixth Circuit has explained:

> In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).

48. Fourth, this case is free of the choice-of-law issues that have caused many courts to reject class certification of mass torts.[6] Rather, as this Court has ruled, this case is governed by

---

[5] *See also, e.g.*, *Sala v. Nat'l R. Passenger Corp.*, 120 F.R.D. 494, 500 (E.D.Pa. 1988) (certifying (b)(3) class of "all passengers who suffered injuries as a result of" the collision and derailment of defendant's train); *In re Three Mile Island Litigation*, 87 F.R.D. 433, 438–40 (M.D. Pa. 1980) (classes of residents suffering economic harm from nuclear accident certified); *Coburn v. 4-R Corp.*, 77 F.R.D. 43, 45–46 (E.D. Ky. 1977) (certifying class of representatives of patrons killed in nightclub fire); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla. 1973) (class of injured cruise passengers certified), *aff'd without opinion*, 507 F.2d 1279 (5th Cir. 1975); *Bentkowski v. Marfuerza Compania Maritima, S.A.*, 70 F.R.D. 401, 404–406 (E.D. Pa. 1976) (certifying class of injured cruise passengers; court noted that it viewed the case as "the exception which proves the rule that generally mass accidents are not the basis of a class action"); *Petition of Gabel*, 350 F. Supp. 624, 630–31 (C.D. Cal. 1972) (certifying class of representatives of passengers killed in air crash); *Mehl v. Canadian Pac. Ry.*, 227 F.R.D. 505, 521–22 (D.N.D. 2005) (certifying (b)(3) class of victims of train derailment and release of anhydrous ammonia gases).

[6] *See, e.g.*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Matter of Rhone-Poulenc*, 51 F.3d 1293, 1300–1303 (7th Cir. 1995); *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996); *Zinser v.*

23

federal maritime law. *See* Order and Reasons (Doc. 4159) (filed 09/30/11), at 5 (so holding).  By contrast, many of the mass tort cases rejecting class certification involved serious predominance problems stemming from the fact that the laws of all 50 states and the District of Columbia were applicable.  But even if state law were applicable here, only five states' laws would be relevant: Louisiana, Alabama, Mississippi, Texas, and Florida.  Applying the laws of five jurisdictions is a far cry from applying the laws of fifty-one jurisdictions. See *Principles of the Law of Aggregate Litigation* (ALI 2010) § 2.05(b)(3), Cmt. b (noting that § 2.05(b)(3) "recognizes that different states' laws can form manageable clusters or groupings, even when they are not entirely uniform," and that "[c]ommon issues may exist within the respective clusters so as to make aggregate treatment permissible").[7]

49.   In rendering an opinion on predominance, I have given careful consideration to Fifth Circuit jurisprudence.  I believe that a finding of predominance is fully consistent with that jurisprudence.  One case that appears superficially to be in tension with certification here is *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006).  The case involved a fire at an Exxon Mobil chemical plant, causing a smoke plume to spread to surrounding areas.  A class action was filed, seeking damages for personal injuries, emotional distress, and economic harm. The scope of the class encompassed anyone in East Baton Rouge or West Baton Rouge claiming harm from the fire.  The district court denied class certification on several grounds, including a lack of predominance, and the Fifth Circuit affirmed. *Steering Committee*, however, differs in crucial respects from the instant case.  First, in *Steering Committee*, the Fifth Circuit was reviewing the lower court's decision to deny class certification under an abuse of discretion standard. *See id.* at 601, 603.  Just because the Fifth Circuit affirmed the lower court's denial of certification does not mean that the lower court would have abused its discretion had it granted certification. *Cf. Watson v. Shell Oil Co.*, 979 F. 2d 1014, 1022–23 (5th Cir. 1992) ("There can

---

*Accufix Research Institute, Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 70–71 (S.D.N.Y. 2002).

   [7] *See also, e.g., In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 315 (3d Cir. 1998) (rejecting an argument that predominance was defeated where the class claims were subject to the laws of all fifty states; the court found that the "elements of [the] common law claims are substantially similar and any differences fall into a limited number of predictable patterns"); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997) ("state law does not have to be universal in order to justify nationwide class certification"); *cf. Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (when assessing predominance, "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"), *cert denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

be no serious contention that the district court abused its discretion in determining that [the common] issues predominate for the purpose of class certification.")   Second, in *Steering Committee* the district court found that individual issues would consume the trial.  In the instant case, by contrast, the individual claims against BP can be resolved relatively easily once the common issues are adjudicated.  Third, *Steering Committee* involved claims alleging "emotional and other intangible injuries," which "implicate[d] the subjective differences of each plaintiff's circumstances." *Id.* at 602.  *Accord*, *e.g.*, *Ancar v. Murphy Oil, U.S.A., Inc.*, 2008 U.S. Dist. LEXIS 68490, at *27 n.12 (E.D.La. July 25, 2008) (predominance not met in a case involving similar facts to *Steering Committee*, where plaintiffs' claims were primarily for "mental distress and intangible injuries").  Again, this is a far cry from the discrete physical injuries at issue in this case.[8]  Even in *Steering Committee*, the Fifth Circuit acknowledged the possibility of class certification in an appropriate mass accident case. *Id.* at 603 (citing *Watson*, 979 F.2d at 1022–23 (affirming class certification of claims arising from refinery explosion)).

50.  In sum, it is my opinion that common issues predominate over individual ones, and thus the predominance requirement of Rule 23(b)(3) is satisfied.

### 2. Superiority

51.  Superiority under Rule 23(b)(3) is met when a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Here, in my opinion, the class action device is the superior vehicle for resolving the claims.   In addressing superiority, I first address the overarching question of whether a class action is superior to other methods of resolving the claims in this case.  I then address the precise factors set out in Rule 23(b)(3)(A)–(D) that courts should weigh in evaluating superiority.

### a. Superiority of Class Adjudication Over Other Mechanisms

52.  In considering alternatives to a class action, this Court need not analyze the issue in the abstract.  Rather, the Court can take note of an actual mechanism used to compensate claimants injured by the oil spill, namely, the GCCF.  In my view, a comparison between the GCCF and the class action device underscores the superiority of the proposed class settlement.  Indeed, the

---

[8] The Economic and Property Damages class is also distinguishable from *Steering Committee*, as I explain in my Economic/Property Damages Report.

GCCF did not even compensate for physical injuries, except in a small number of cases.

53.   Initially, I should note that the GCCF process—overseen by respected mediator Kenneth Feinberg (who had previously overseen the 9/11 Victims Compensation Fund)—was impressive in a number of ways.  For one thing, the GCCF, which was created in the immediate aftermath of an unprecedented environmental catastrophe, "was among the largest claims processing facilities in U.S. history."  Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings & Observations to the U.S. Dept. of Justice (BDO Consulting, June 15, 2012), *available at* http://www.justice.gov/iso/opa/resources/66520126611210351178.pdf  (last  visited  July  30, 2012), at 56.  Despite facing momentous challenges and public criticism, the GCCF paid out a total of over $6.2 billion to over 220,000 individual and business claimants during the one-and-a-half-years of the program's existence. *Id.* at 59; *see also* George Talbot, *Ken Feinberg: 'The GCCF  did  what  it  said  it  would  do'*,  Apr.  21,  2012,  http://blog.al.com/live/2012/04/ ken_feinberg_the_gccf_did_what.html (last visited Aug. 5, 2012) (interview with Mr. Feinberg in which Feinberg describes the GCCF as "a very speedy, efficient way to get money out, in light of an unprecedented environmental disaster").  These are impressive numbers, and they reflect favorably on the diligence and creativity of Mr. Feinberg and his team.

54.   Nonetheless, despite some success, the GCCF was also subject to criticism.  First, some argued—and this Court in essence agreed—that the GCCF suffered from a lack of independence from BP.  As this Court held in its Order and Reasons dated Feb. 2, 2011, "[w]hile BP may have delegated to Mr. Feinberg and the GCCF independence in the evaluation and payment of individual claims, many other facts support a finding that the GCCF and Mr. Feinberg are not completely 'neutral' or independent from BP." 2011 U.S. Dist. LEXIS 10497, at *15 (E.D.La. Feb. 2, 2011); *see also*, *e.g.*, George W. Conk, *Diving into the Wreck: BP and Kenneth Feinberg's Gulf Coast Gambit*, 17 Roger Williams U.L. Rev. 137, 143 (2012) (asserting that "the GCCF has failed to garner the credibility as a neutral forum that BP sought").  Second, critics also expressed concern about a lack of transparency. *See*, *e.g.*, Linda S. Mullenix, *Prometheus Unbound: The Gulf Coast Claims Facility as a Means for Resolving Mass Tort Claims—A Fund Too Far*, 71 La. L. Rev. 819, 847 (2011) (noting that "[t]he ad hoc nature of the BP claims processing efforts inspired numerous complaints about the lack of standards . . . in claim processing" (footnote omitted)); Conk, *supra*, at 140 (observing that "because the GCCF is

private and unregulated its criteria and performance are difficult to gauge and it remains un-monitored"); John Schwartz, *Final Settlement Phase Starts for BP Oil Spill*, N.Y. Times, Nov. 24, 2010, at A16, *available at* http://www.nytimes.com/2010/11/24/us/24fund.html (last visited July 29, 2012) (reporting that Kenneth Feinberg himself "said it was a 'fair criticism' that the claims process had been opaque, and he pledged to improve the information available"). Third, the lack of transparency led to the impression—whether correct or not—that similarly-situated people were not being treated the same. *See*, *e.g.*, Mullenix, *supra*, at 847 (noting "numerous complaints about . . . inconsistency in claim processing"); *cf.* Independent Evaluation of the Gulf Coast Claims Facility, Executive Summary at 10 (Apr. 19, 2012) (noting that a "variety of factors . . . contributed to different outcomes for claimants that may appear to have been similarly situated"). It is certainly true that some of the criteria changed over time. *See*, *e.g.*, GCCF, Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology (to be filed by plaintiffs with their brief on or before August 13, 2012). Finally, it is my understanding that the GCCF gave virtually no awards to claimants seeking damages for personal injuries. Thus, absent a new mechanism for resolving claims, those individuals seeking recovery for physical injuries would have been out of luck.

55. Whether the concerns expressed about the GCCF were accurate or exaggerated, they created a perception regarding independence, transparency, and consistency that was not helpful to the program. Thus, even if the GCCF had been receptive to physical injury claims, these other concerns about the GCCF made it an inferior mechanism for resolving claims. The class action device, by contrast, enables class counsel, with this Court's supervision, to address the concerns expressed by the GCCF's critics. First, whereas Mr. Feinberg was criticized for a perceived lack of neutrality, there is no question that the Court and Judge Shushan, who mediated key aspects of the settlement, are neutral and objective, giving the settlement a high degree of integrity and legitimacy. Second, the instant settlement is very transparent: The criteria for compensation are set forth objectively and with great precision, meaning that there should be few disputes about who is and who is not entitled to compensation and in what amount. Third, the precise, and clearly spelled out, settlement terms ensure that the criteria will remain the same over time and will be consistent among similarly-situated claimants.

56. Just as the GCCF process was not superior to a class action, I do not believe that a non-

class aggregate settlement model would be superior.  At first blush, given that the claims here involve personal injuries, one might have thought to look to non-class aggregate mechanisms to resolve the claims.  In the *Vioxx* litigation, for example, defendant pharmaceutical company Merck and various plaintiffs' counsel agreed to a $4.85 billion non-class settlement to resolve approximately 50,000 claims of personal injury allegedly caused by defendant's since-recalled painkiller. *See* Settlement Agreement Between Merck & Co., Inc. and the Counsel Listed on the Signature Pages Hereto (Nov. 9, 2007), *available at* www.merck.com/newsroom/ vioxx/pdf/Settlement_Agreement.pdf (last visited July 30, 2012); Alex Berenson, *Merck Agrees to Settle Vioxx Suits for $4.85 Billion*, N.Y. Times, Nov. 9, 2007, *available at* http://www.nytimes.com/2007/11/09/business/09merck.html (last visited July 30, 2012).  In certain respects, *Vioxx* represented a triumph—an innovative aggregate settlement in which the plaintiffs' attorneys managed to overcome the trend against certification of personal injury mass torts by structuring a settlement entirely outside of the constraints of Rule 23.  There is much to praise about that historic settlement.

57.  At the same time, the *Vioxx* settlement has generated controversy.  Because *Vioxx* was not suitable for class certification, and because it was, therefore, an opt-in settlement, the parties needed to create a mechanism to ensure that the vast majority of claimants participated in the settlement.  As two respected scholars have explained, the settlement in that case contained two terms designed to achieve that purpose:

> First, under the terms of the agreement, for a lawyer to participate in the deal— that is, for any of the lawyer's clients to avail themselves of the settlement offer— the lawyer was required to recommend the settlement to all of the lawyer's eligible clients.  Second, if any clients decided not to participate in the settlement, the lawyer was required to withdraw from representing the nonsettling clients.  A client wishing to decline the settlement, in other words, faced the prospect of losing her lawyer and finding that every other lawyer handling Vioxx claims was similarly unavailable.

Howard M. Erichson & Benjamin C. Zipursky, *Consent Versus Closure*, 96 Cornell L. Rev. 265, 266 (2010).  According to Erichson and Zipursky, the *Vioxx* approach violated the principle that the decision to settle belongs to the client and not the lawyer.  "A lawyer who tells the client, 'Settle or you're fired!' is hardly abiding by the client's decision." *Id.* at 283.  *See also* Elizabeth Chamblee Burch, *Group Consensus, Individual Consent*, 79 Geo. Wash. L. Rev. 506, 514 (2011)

(comparing *Vioxx* settlement proposal to one famously made by The Godfather's Don Corleone—"I'll make him an offer he can't refuse" (citation omitted)).

58.   Regardless of the merits of the *Vioxx* settlement under the circumstances of that litigation, I believe that a similar approach here would be ill-advised.   A Rule 23(b)(3) class action provides a time-tested and procedurally superior vehicle by which to resolve the myriad claims involved in this case.   It is a vehicle with built-in mechanisms that ensure fairness in the aggregation decision, in the terms of a settlement, and in the award of attorneys' fees.   The requirements in *Vioxx*, *i.e.*, that the plaintiffs' lawyers recommend the settlement to all their clients, and that the lawyers withdraw from representing any non-settling clients, are controversial.   Yet, the lawyers apparently felt that such provisions were needed to hold the settlement together.   A class action avoids these approaches, as this case demonstrates.   The individual PSC attorneys were not required to agree, in accepting their appointment, that they would necessarily recommend any settlement endorsed by a majority of PSC members.   In addition, class members have full disclosure regarding the terms of the settlement, and are free to opt out or object.   Those whose injuries are serious, for example, can opt out and sue on their own.   But should they choose not to opt out, they are bound even though they have not affirmatively opted into the settlement.   The binding effect of a class action serves the goal that *Vioxx* was trying to achieve without the mechanism of Rule 23.   In my mind, the class action opt-out process is preferable in the instant case to the approach used in *Vioxx*.   Significantly, some of the PSC attorneys here were involved in *Vioxx*.   Yet these attorneys all argue here for a class action, not for a replica of the *Vioxx* approach.

59.   One other problem with aggregating cases utilizing a non-class-action approach is that there are no prescribed criteria for the mass settlement of claims on a non-class basis.   Courts in cases such as *Vioxx* have analogized such cases to class actions, calling them quasi-class actions. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 554 (E.D. La. 2010) ("the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness") (citation omitted); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) (court reviewed reasonableness of fees because private settlement "has many of the characteristics of a class action and may properly by characterized as a quasi-class

action subject to general equitable powers of the court" (citations and internal quotation marks omitted)); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (to the same effect). Yet, there is no procedural rule governing quasi-class actions. A court that oversees a mass settlement that does not fall under Rule 23 is forced to make up the rules of the game instead of relying on the time-tested criteria of Rule 23.

60. At bottom, then, this settlement is preferable to a non-class aggregate settlement for the simple reason that this settlement will be subjected to the rigorous requirements of Rule 23. A non-class aggregate settlement, no matter how effective and well-intended the judicial oversight, lacks the well-defined structural protections of Rule 23. Judge Scirica of the Third Circuit spoke to this point in his concurring opinion in that court's recent decision in *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) (en banc), *cert denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012). As Judge Scirica noted:

> [S]ome observers believe there has been a shift in mass personal injury claims to aggregate non-class settlements. This is significant, for outside the federal rules governing class actions, there is no prescribed independent review of the structural and substantive fairness of a settlement including evaluation of attorneys' fees, potential conflicts of interest, and counsel's allocation of settlement funds among class members.

*Id.* at 334 (Scirica, J., concurring) (citations omitted).

61. Likewise, individual lawsuits are neither a feasible nor a sensible alternative to a class action in this case. As noted above, the individual claims are, in general, too small to justify the enormous expense of bringing an individual lawsuit. Thus, as a practical matter, limiting claimants to individual lawsuits would mean that the claims would not be pursued at all. As the Supreme Court explained in *Amchem*, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." 521 U.S. at 617 (citation omitted); *see also*, *e.g.*, *Castano v. American Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (existence of a negative value suit is "[t]he most compelling rationale for finding superiority in a class action"). But even if these cases were worth bringing individually, the prospect of more than 100,000 lawsuits clogging the court system is hardly superior to Rule 23.

62. Because the GCCF approach, the non-class aggregate settlement approach, and the

individual lawsuit approach are problematic, I would urge the Court to approve the use of the class action mechanism.  In my opinion, a class action settlement is a conservative, time-tested approach, and the superior vehicle for adjudicating the claims in this case.

### b. Superiority Criteria

63.  Apart from the broad inquiry as to whether a class action is superior to other mechanisms for resolving the litigation, Rule 23(b)(3) instructs a court to look at four criteria in assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).  As noted in ¶ 13, *supra*, factor (D) is inapplicable because this is a settlement class.  Regarding factor (A), class members have little interest in controlling their own cases because, as noted, the cost of bringing suit is so high that the claims could be cost prohibitive.  And even if a case were financially viable as an individual suit, a claimant would be forced to find and hire an attorney and agree up front to pay costs and a hefty percentage of any recovery to that attorney.  Here, common attorneys' fees and costs are paid separately by BP.  And even those claimants who hired separate counsel are limited to a 25% contingency fee. *See* Order Setting Caps on Individual Attorneys' Fees (Doc. 6684) (filed 06/15/12), at 1 n.1 (ordering that contingent fee arrangements for attorneys representing plaintiffs settling claims through the medical and/or economic damages settlements be capped at 25% plus reasonable costs).  Factor (B) is likewise consistent with the class settlement: The claims arising out of the oil spill have been centralized in this Court by the Multi-District Litigation Panel, so there is no risk of competing litigation (except perhaps by some opt-out plaintiffs).  Regarding factor (C), the MDL Panel has already determined—correctly, in my view—that the cases should be concentrated in one forum for pretrial purposes.  It similarly makes sense for one court to oversee an overall settlement.  Thus, the criteria of Rule 23(b)(3)(A)–(C) confirm the superiority of the class action

mechanism.

## C. Conclusion on Class Certification

64.   In sum, it is my opinion that the proposed medical benefits settlement satisfies all of the requirements for certification of a settlement class.

## VI.   FAIRNESS OF PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT

65.   Next, I address the fairness of the proposed settlement under Rule 23(e).   "To safeguard the interests of absent class members, district courts must determine whether proposed class-action settlements are fair, adequate, and reasonable." *Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 639 (5th Cir. 2012) (citation omitted); *see* Fed. R. Civ. P. 23(e)(2) (a court may approve a settlement "only after a hearing and on finding that it is fair, reasonable, and adequate").   The Fifth Circuit evaluates the fairness of a proposed class settlement with reference to the six factors set forth in *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).   I analyze the *Reed* factors in ¶¶ 72–89, *infra*.   Based on the facts of this case, however, I believe it is appropriate to begin the fairness assessment by looking at the substantial benefits that the proposed settlement provides to class members.

66.   In *Katrina Canal Breaches Litig. v. Bd. of Comm'rs*, 628 F.3d 185 (5th Cir. 2010), the district court had certified a class and approved the settlement after finding that all six *Reed* factors weighed in favor of approval. *See id.* at 195.   The Fifth Circuit, however, "[w]ithout quarreling with the district court's findings" on the *Reed* factors, concluded that the settlement was not "adequate, fair, and reasonable under Rule 23(e)" because the record failed to show "that the settlement [would] benefit the class in any way[.]" *Id.*   By parity of reasoning (and consistent with common sense), a settlement that provides significant, demonstrable benefits to class members is far more likely to be fair than one with questionable benefits. *See*, *e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("In determining the fairness, adequacy and reasonableness of the proposed compromise, the inquiry should focus upon the terms of the settlement.")   For that reason, before addressing the *Reed* factors, I discuss the overall benefits to the class.

## A. Benefits to the Class

67.  This proposed class action settlement is a far cry from many class action settlements, in which class members recover for only a fraction of their harm.  Here, class members receive significant benefits:

- Qualifying class members are compensated for specified physical conditions in lump sum amounts set forth in the Specified Physical Conditions matrix.  In addition to lump sum payments, the matrix provides for specified hospital expenses.  Compensation levels vary, based on specified factual circumstances.  For instance, Clean-Up Workers are compensated in higher amounts than Zone A and Zone B residents; those with chronic conditions receive higher payments than those with acute conditions; and lump sums vary depending on the quality and reliability of proof.  All of these variations are spelled out in detail in the matrix.  Moreover, class counsel advise me that, based on their research (particularly of Louisiana law), the amounts that medical benefits class members recover under the settlement are comparable to what they would receive after a successful trial. *See*, *e.g.*, *Doerr v. Mobil Oil Corp.*, 935 So.2d 231 (La. Ct. App. 2006) (awarding lump sum damages ranging from $500 to $2,000 for personal injury, emotional distress, and inconvenience caused by a discharge of oil, grease, and other contaminants into Parish drinking water supply); *Howard v. Union Carbide Corp.*, 50 So.3d 1251 (La. 2010) (awarding general damages from $1,500 to $3,500 class members who suffered "any or all of the following—eyes, nose, or throat irritation, coughing, choking or gagging or nausea" as a result of a chemical spill).

- Qualifying class members are entitled to participate in a Periodic Medical Consultation Program that will operate for 21 years.  Specifically, all class members who do not opt out are entitled to participate in the Program.  The Program entitles class members to an initial medical examination and one every three years thereafter for a total of 21 years.  The examinations include a complete medical, occupational, and environmental history, vision screening, and specified blood, urine, cardiac, and respiratory tests (at the discretion of the physician).  Service providers will be established in close proximity to class members.  The purpose of the Program is to provide medical evaluation for conditions relating to oil or petroleum-based dispersants that manifest themselves after

the cutoffs for the conditions on the matrix and for conditions prevalent in the general population.

- A "Back-End Litigation Option" permits class members to mediate or sue if certain physical conditions manifest in the future.  Thus, class members need not worry that, by releasing claims against BP, they are somehow releasing claims for future injuries. Under this option, the settlement provides that major elements of liability will be stipulated to by BP, and thus need not be proven by class members.  In particular, class members who choose this option will not have to prove that BP was at fault for the spill or that the class member was exposed to petroleum and/or petroleum-based dispersants. Medical Agreement at 67.  In addition, BP is precluded in any Back-End Litigation from asserting any defense based on preemption, statute of limitations or repose, laches, or other defenses based on failure to assert the claim in a timely manner, provided that the class member follows the requirements for the Back-End Litigation Option (*e.g.*, notifying BP of a later-manifested injury within the time period prescribed by the agreement). *Id.* at 56, 64.  Thus, the only issues to be litigated are the fact of diagnosis; the amount and location of oil released from the Macondo Well and/or the Deepwater Horizon; the class member's level and duration of exposure to petroleum or petroleum-based dispersants; whether the later condition was caused by the exposure (or by some other alternate cause); and the amount of compensatory damages.  *Id.* at 65–66.  This feature of the medical benefits settlement allows the class members to resolve their claims for existing conditions now, while still retaining the right to litigate if more serious injuries manifest themselves down the road.

- A "Gulf Region Health Outreach Program" is established.  The outreach program is designed to strengthen healthcare infrastructure in Louisiana, Mississippi, Alabama, and the Florida Panhandle.  The five-year grants under the program total $105 million: $50 million to improve access to healthcare, $36 million for behavioral and mental health needs, $4 million to train community health workers, and $15 million to improve environmental health expertise. Medical Agreement at 70–71.  Part of the program includes the creation and maintenance (for 21 years) of a public online electronic library containing health and environmental materials relating to the BP spill and its

aftermath. *Id.* at 80–85.

- In addition to the above-discussed benefits, BP has also agreed to pay all costs of administration, and of providing notice to the class members.  These undertakings are notable because, in most other settlements, costs are deducted from the class recovery.  The costs here, moreover, are enormous: I am advised by class counsel that they have incurred close to $30 million in common benefit costs as of the date of this report, and are expected to incur substantial additional costs.  BP is incurring administrative costs of about $50 million per month. *See* MDL No. 2179 Sections 5.12.1.4—Required Monthly Administrative Expense Report (July 23, 2012), Ex. A.  The fact that none of these costs will be deducted from the class recovery is a substantial benefit to the class members, one that distinguishes this case from virtually all other class actions and individual lawsuits, in which the claimant is responsible for paying costs.

- BP is also paying common benefit attorneys' fees separately from the medical benefits class recovery, representing another significant benefit for the class.

- The settlement preserves and assigns to the class BP's punitive damages claims against Transocean and Halliburton. *See* Order 6419 at 8.

68.  Class members who conclude that they can do better on their own are free to opt out. Because of the extensive notice campaign, which includes individual mailings and a mass media campaign, class members will in fact learn about the settlement.  They will be able to decide whether they would prefer to opt out and litigate separately.  Indeed, because most of the medical benefits claims are likely to be for relatively modest amounts, and because class members are likely to receive actual notice of the proposed settlement, the opt-out provided under Rule 23(b)(3) is a realistic and potentially viable option for a medical benefits class member who has suffered serious injuries.  The availability of opt-out rights afforded by this Rule 23(b)(3) class is another factor favoring settlement approval. *See*, *e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (rejecting challenge to certification of settlement class where "the notice provided to the absent class members provided each member with the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery"); *In re Prudential Ins. Co. America Sales Litigation*, 148 F.3d 283, 323 (3d Cir. 1998)

("whether class or subclass members are accorded the right to opt out of the settlement" should be considered where appropriate when evaluating settlement's fairness).  Importantly, if a class member has regrets about opting out, the agreement permits him or her to opt back in as a matter of right prior to November 5, 2012, and the person may do so with BP's permission even after November 5, 2012.

69.  The *Katrina* case, which overturned a class settlement, is at the other end of the spectrum.  As noted in ¶ 66, *supra*, in that case, the Fifth Circuit found that the settlement approved by the district court was so deficient, in terms of the benefit to the class, that it failed Rule 23(e), even assuming that the *Reed* factors were satisfied. 628 F.3d at 189.  The settlement at issue in *Katrina* provided $21 million for class relief.  As the Fifth Circuit pointed out, however, the settlement also provided that both administrative costs and attorneys' fees would be paid from the class fund, and there was no indication in the record as to what these costs would be.  The appellate court held that "the district court erred by approving the settlement without any assurance that attorneys' costs and administrative costs will not cannibalize the entire $21 million settlement." *Id.* at 196.  The court noted that the burden is on the proponents of a settlement to show that it is fair, reasonable, and adequate, and that the settlement's proponents had "failed to provide any basis for their assertion that there will be money remaining after payment of these costs to effect even a *cy pres* distribution, let alone a monetary distribution." *Id.*

70.  Another recent case similar to *Katrina* is *Dennis v. Kellogg*, ___ F.3d ___, 2012 U.S. App. LEXIS 14385 (9th Cir. July 13, 2012).  There, the Ninth Circuit reversed a district court's certification of a settlement class because the benefits to the class were, in that court's words, "unacceptably vague." *Id.* at *19.  The plaintiffs in *Dennis* alleged false advertising claims against the defendant cereal company.  The parties negotiated a settlement prior to the class being certified, which included *cy pres* distributions of money and food to unnamed charities, as well as $2 million in attorneys' fees.  Class members would recover, at most, $15 each. *Id.* at *2.  Like the Fifth Circuit in *Katrina*, the Ninth Circuit was troubled by the lack of proof that the settlement would benefit the class members, describing the settlement as "result[ing] in vaporous benefit to the class members" and being "flawed at its core." *Id.* at *23–24.  Because the appellate court could not determine the value of the settlement fund, it held that the district court erred in approving it. *Id.* at *19–20.

71.  The common theme of *Katrina* and *Dennis* is that, while the factors in *Reed* (or other circuits' analogous decisions) are important, they are ultimately only a means to an end— determining whether the proposed settlement comports with basic requirements of fairness.  If a settlement is deficient on its face, or unsupported by adequate proof that it will benefit the class, the *Reed* factors become academic.  The instant settlement, however, is a polar opposite of the settlements in *Katrina* and *Dennis*.  The settlement here provides substantial benefits to the class members.

### B. The "*Reed* Factors"

72.  I now address the six *Reed* factors.  Those factors are:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

703 F.2d at 172 (citations omitted).  These six factors are premised on the assumption that the settlement is a compromise and that the class attorneys are being paid out of the common fund.  Because neither assumption is true here, analysis of these factors strongly underscores the fairness of the settlement in this case.  I address each *Reed* factor in turn.

### 1. Existence of Fraud or Collusion

73.  The first *Reed* factor is "the existence of fraud or collusion behind the settlement." *Reed*, 703 F.2d at 172.  "Because the parties' interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings." *Braud v. Transp. Serv. Co.*, 2010 U.S. Dist. LEXIS 93433, at *9 (E.D.La. Aug. 17, 2010) (citation omitted).  At the same time, "[a] strong presumption exists in favor of settlement if the district court determines that the settlement resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 844 (E.D.La. 2007) (citation omitted).

74.  In my review of this proposed settlement, I have seen nothing to suggest that the settlement is the result of collusion.  Rather, it is the result of hard-fought, arm's-length

negotiations between experienced counsel.  Prior to the settlement, class counsel litigated this case forcefully, cutting no corners.  In just under two years that have passed since this litigation was centralized before this Court pursuant to the MDL statute, 28 U.S.C. § 1407, the parties have taken over 300 hundred depositions, exchanged over 80 expert reports, produced about 90 million pages of documents, and engaged in extensive discovery and motion practice. *See* Order 6419 at 3.  The settlement discussions themselves were protracted, time consuming, and contentious.  They began in February 2011, with the medical settlement negotiations starting individually in July 2011, when the parties met almost daily.  Furthermore, Judge Shushan mediated key aspects of the medical settlement.  There were more than 120 day-long meetings, as well as myriad phone calls and web-based conferences. *See* Tr. of Prelim. Approval Hr'g, 4/25/12 (Doc. 6395), at 84.

75.   The hands-on involvement of Magistrate Judge Shushan provides powerful assurance that the proposed settlement is free from any taint of collusiveness. *See*, *e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("the supervision of settlement negotiations by a magistrate judge . . . makes it less likely" that class counsel "promot[ed] their own interests over those of the class"); *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 725 (E.D.La. 2008) (fact that the parties had engaged in mediation with a magistrate judge demonstrated a lack of collusion behind settlement); *Ridgely v. FEMA*, 2010 U.S. Dist. LEXIS 136368, at *3 (E.D.La. Dec. 13, 2010) (same); *McBean v. New York*, 233 F.R.D. 377, 383 (S.D.N.Y. 2007) (supervision of settlement negotiations by magistrate judge "goes a long way toward assuring that the process was free of collusion or undue pressure") (citation and internal quotation marks omitted).

76.   Still another consideration is that the medical benefits settlement was negotiated separately from the economic and property damages settlement, and a different group of PSC attorneys led the negotiation. *See* ¶ 34, *supra*.  This structure assured vigorous advocacy by the particular PSC attorneys, who focused on obtaining the best deal for their category of claims.

77.   Ultimately, any theory of collusion must be based on a wholly implausible interpretation of the facts.  The Sixth Circuit recently made a similar point in a case in which the parties reached settlement following years of litigation and "months of supervised negotiations, two facilitated mediations and a settlement conference with the court." *Moulton v. US Steel Corp.*,

581 F.3d 344, 351 (6th Cir. 2009).  Rejecting an argument that the settlement was tainted by collusion, the Sixth Circuit wrote:

> It is difficult to maintain that Class Counsel took all of these steps merely to mask its collusion with [defendant], and that the one entity with a bird's eye view of the proceedings—the district court judge—somehow missed the signs that the parties were merely engaged in pretense and posturing.

*Id.* at 351.

78.    Finally, the fact that attorneys' fees and costs were not negotiated until after the settlement was in place—and that fees will be paid separately by BP and not out of the settlement fund—provides further assurance that no collusion took place.  As the court noted in *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D.La. 2007), the fact that fees would be paid separate from the class recovery, and that the fee amount was left to the court's discretion, is "significant because it exponentially decreases the possibility of collusion among counsel."  *Id.* at 845. *See also*, *e.g.*, *McBean v. New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2007) (finding that where attorneys' fees are "entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").  Moreover, class counsel advises me that the negotiations over fees were hard-fought and contentious.  (A declaration from PSC attorney Joe Rice detailing the fee negotiations will be filed with plaintiffs' brief.)

79.  In sum, there is nothing to indicate that the proposed settlement agreement is the result of fraud or collusion.

## 2. Complexity, Expense, and Likely Duration of the Litigation

80.    The second *Reed* factor is "the complexity, expense, and likely duration of the litigation." *Id.* at 172.  Essentially, the more complex, expensive, and time-consuming litigation is likely to be, the greater the gains to all parties from a negotiated settlement.

81.    As this Court knows, the instant case is exceedingly complicated—factually, legally, and logistically.  Already, this Court has issued numerous opinions on a dazzling array of complex legal matters, including questions of whether and to what extent plaintiffs' state law claims are displaced by federal maritime common law, *see* Order and Reasons (Doc. 4159) (filed 09/30/11);

whether the plaintiffs are entitled to medical monitoring damages, *id.* at 15–18; whether the Deepwater Horizon was a "vessel in navigation" at the time of the disaster, *see* Order and Reasons (Doc. 3830) (filed 08/26/11) at 4–7; and whether BP must defend and indemnify Transocean for pollution claims asserted by third parties, *see* Order and Reasons (Doc. 5446) (filed 01/26/12). This Court's docket for this case now contains over 7,000 entries. PACER Docket History, 2:10-md-02179-CJB-SS (as of 07/30/12). And there is little doubt that, were the litigation to continue, BP's able counsel would continue to mount a vigorous defense. Plaintiffs might well still prevail in such circumstances, but only at great cost in time and money. Also, the savings in terms of judicial resources from this settlement stand to be substantial.

82. It follows, then, that in the absence of a settlement, this case could continue for many years. And with added years of litigation comes increased expense, not to mention the indefinite postponement of the class members' compensation.

83. The *Exxon Valdez* litigation provides a vivid illustration of the significant disadvantages that can accompany the parties' refusal or inability to reach a settlement. That case, like this one, arose from a massive oil spill that had devastating effects on the surrounding communities. The oil spill of the Exxon Valdez tanker took place in Alaska's Prince William Sound in 1989. Approximately 40,000 class members filed suit against Exxon, and in 1994 a jury awarded the class $287 million in compensatory damages and $5 billion in punitive damages. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 480–81 (2008). Because of multiple appeals, however, the case continued for another 14 years before reaching the Supreme Court. By the time the Court issued its 2008 opinion in *Exxon Shipping*, what might have once seemed like a spectacular plaintiffs' victory had been eroded by scores of appeals, multiple reductions of the punitive damages award and, perhaps most of all, by the *two decades* that had elapsed between the Exxon Valdez oil spill and the Supreme Court's decision. Indeed, it is critical to note that, even after two decades of litigation, few claimants with medical claims were compensated. The case focused almost entirely on economic damages. Absent a settlement, the thousands of class members here could face a similar prospect: protracted litigation with no certainty that there would ever be any compensation for physical injury claims.

### 3. Stage of the Proceedings and Amount of Discovery Completed

84.   The third *Reed* factor is "the stage of the proceedings and the amount of discovery completed." *Id.* at 172.  Here, there is no doubt that there has been extensive discovery—as noted previously, the parties took about 300 depositions, reviewed millions of pages of documents, and submitted more than 80 expert reports. *See* Order 6419 at 3.  One might argue that, given the complicated and massive claims at issue, two years of litigation was not long enough to fully understand the claims and reach an informed view on what constitutes a fair settlement.  In fact, given the substantial discovery, both sides had extensive knowledge and could negotiate effectively and with eyes wide open.  Indeed, this proposed settlement was finalized on the very eve of the scheduled limitation of liability trial. *See id.* at 4.

85.   In any event, while it is true that some major cases have taken much longer than two years to settle, the parties' ability to reach a comprehensive settlement in just two years is a testament to the highly skilled work of the PSC under the supervision of Magistrate Judge Shushan and this Court.  It is not a negative factor in my view.  Indeed, the Court's carefully planned phased trial plan clearly put considerable pressure on the parties, and they settled just prior to the commencement of the first trial phase. *See* Order 6419 at 3.   In her concurring opinion in *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003), Judge Graber made precisely the point I am making here when she disputed the majority's suspicion about the promptness of the settlement at issue:

> Early dispute resolution is salutary, and we should not encourage the unnecessary expense, delay, and uncertainty caused by lengthy litigation when the parties are prepared to compromise.  Nor should we hold . . . that a prompt settlement necessarily suggests a failure to prosecute or defend the action with due diligence and reasonable prudence.  To the contrary, an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of the strengths and weaknesses of their positions and of the interests to be served by an amicable end to the case.

*Id.* at 959 (Graber, J., concurring) (citation omitted). *See also* ALI Principles of Aggregate Litigation § 3.05 cmt. a (recommending that "[a] court, in reviewing a settlement, should not give any predetermined weight either to the fact that the case was pending for a substantial period of time before a settlement was reached or to the fact that a settlement was reached early in the case"); Reporters' Notes to § 3.05 at 211 ("This Section agrees with the approach of Judge Graber.")

41

### 4. Probability of Plaintiffs' Success on the Merits

86.  The fourth *Reed* factor is "the probability of plaintiffs' success on the merits." *Id.* at 172. Although it cannot be disputed that the case against BP is strong, especially in light of BP's responsibility for the oil spill under the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*, I can attest—based on 20 plus years of trial and appellate experience—that no case is a slam dunk.  As one of the *Exxon Valdez* attorneys wrote in an op-ed piece in the *Washington Post*, "no matter how outrageously spillers behave in court, trials are always risky . . . . Historically, U.S. courts have favored oil spillers over those they hurt." Brian O'Neill, *Lessons for the Gulf from Exxon Valdez, Washington Post*, May 17, 2010.  Here, BP—represented by skilled and creative counsel—would no doubt raise numerous arguments to eliminate or reduce its liability.  For instance, were trials for the individual claims to be held years from now, BP might assert that class members cannot prove that they suffered physical conditions or it might claim that the conditions were *de minimis* and not worthy of compensation.  And BP might assert technical legal arguments for dismissing or narrowing the claims, or tie up the cases on appeal with disputes about whether state law should apply.

### 5. Range of Possible Recovery

87.  The fifth *Reed* factor is "the range of possible recovery" by the class. *Id.* at 172.  Of course, in the absence of a settlement, BP would no doubt try to secure outright dismissal of the case, which would mean zero recovery.  Alternatively, as noted above, BP would assert that class members' exposure to the oil was *de minimis* and that their alleged illnesses were not caused by the oil and/or chemical dispersants.  At the other end of the spectrum, class members could secure full compensation for their injuries (and in some circumstances punitive damages).  As noted above, however, this settlement replicates what class members might recover after a successful trial.  Indeed, it is more attractive because BP is paying attorneys' fees and costs separately.

### 6. Opinions of Class Counsel, Class Representatives, and Absent Class Members

88.  The sixth and final *Reed* factor is "the opinions of the class counsel, class representatives, and absent class members." *Id.* at 172.  Here, all of the members of the PSC support the settlement.  This unanimity is significant because these experienced lawyers

represent a cross-section of injured class members.   Under these circumstances, the opinions of counsel are entitled to weight.  *See*, *e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (in performing the "balancing task" of reviewing a class settlement, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties") (citation omitted).   Moreover, all of the class representatives support the settlement.   Perhaps of even greater importance, the settlement has the imprimatur of Magistrate Judge Shushan, who oversaw the negotiation of key terms.

89.  I am not yet able to comment on the exact number of objections, because the deadline for filing objections is August 31, 2012.  I can certainly say, however, that thus far, relatively few objections have been filed for a class with approximately 200,000 members.

### C.  Conclusion on Fairness, Adequacy, and Reasonableness of the Proposed Settlement

90.   For all of the aforementioned reasons, I believe that the Proposed Class Settlement is fair, reasonable, and adequate.  I am highly impressed by the significant compensatory damages available to class members, the periodic medical consultation program, the Back-End Litigation Option, the Gulf Region Health Outreach Program, and the fact that class members do not have to pay costs and common fund attorneys' fees.   These factors combine to make this one of the fairest and most impressive settlements I have seen in more than 20 years of practicing, teaching, and writing in the field of class actions.

## VII.  ATTORNEYS' FEES[*]

### A.  Overview

91.  It is my understanding that plaintiffs' counsel are not applying for fees or costs at the present time.   Nonetheless, they have asked me to comment on the general structure of the fee agreement they reached with BP on April 18, 2012, following the parties' agreement on the other settlement terms.   The fee agreement was made a part of the settlement agreement at issue here.

---

[*] Because the attorneys' fee agreement applies both to this case and to the economic and property damages class settlement, the discussion in this section essentially duplicates the attorneys' fee discussion in Section VII of my economic and property damages report.  It is included herein simply for the Court's convenience.  If the Court has already reviewed Section VII of my economic and property damages report, it need not read Section VII of the instant report.

(Doc. 6273-21, Ex. 19).  In this section, I begin by explaining why I believe the Court should address the proposed fee structure now, rather than waiting until the end of the settlement's implementation or until counsel file an interim fee request.  Following that, I describe the key provisions of the proposed fee structure.  Next, I review the so-called *Johnson* factors in the context of the instant agreement.

### 1. Desirability of Addressing Fee Structure Now

92.  If it is the case that class counsel do not make a Fed. R. Civ. P. 23(h) fee request at this time, I still believe that it makes good sense for the Court to address the fee structure now.  The parties would benefit by obtaining the Court's assessment of the attorneys' fees agreement.  That assessment will guide class counsel when they later file their fee application.  The fee agreement is part of the settlement package before the Court, so there would be no surprise if the Court chose to opine on it.  Indeed, some of the objections filed thus far have addressed the fee agreement.  This Court has already found it appropriate to consider individual attorneys' fees in advance of the final fairness hearing.  *See* Order Setting Caps on Individual Attorneys' Fees (Doc. 6684) (filed 06/15/12), at 1 n.1 (ordering that contingent fee arrangements for attorneys representing plaintiffs settling claims through the medical and/or economic damages settlements be capped at 25% plus reasonable costs).

93.  The wisdom of seeking the Court's approval of the fee structure on fees at this stage is reflected in the *ALI Aggregate Litigation* project, for which I served as an Associate Reporter.  In chapter three of the ALI project, for which I had primary drafting responsibility, the following black-letter principle appears:

> In appropriate cases, the court should consider defining the expected fee recovery as a percentage set early in the litigation rather than after the fact.  When courts do so, they may, where appropriate, adjust the fees in exceptional cases where settlement is reached very early in the litigation or the level of recovery is extraordinary.

*ALI Aggregate Litigation* § 3.13(d) at 249 (ALI 2010).  *Accord* Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809, 1836 (2000) (observing that "trial judges in Texas have begun to set fee guidelines at the time of certification").  Accordingly, in the next section, I review the potential range of fee percentages

under the terms of the proposed fee agreement.

### 2. Range of Percentages Under the Agreement

94.   The April 18, 2012 agreement provides for a maximum common benefit fees and costs award of $600 million upon final judgment. *See* Settlement Ex. 19 (Doc. 6276-46).[9]   Because class counsel have already spent about $30 million in costs, the maximum possible fees would be $570 million, assuming class counsel request the maximum amount available under the agreement with BP.   (Pursuant to the agreement, BP has already made a $75 million non-refundable payment into the common benefit fee and costs fund.)

95.   This settlement (including both economic and property damages and medical benefits) is valued by BP at about $7.8 billion.   This figure is not a mere guess, divorced from the facts. Rather, it is the number that, according to BP's annual report, represents the company's "reliable best estimate of the cost of the proposed settlement." BP Annual Report and Form 20-F (2011) at 163 (cautioning, however, that "it is possible that the actual cost could be higher or lower than this estimate depending on the outcomes of the court-supervised claims processes"), *available at* http://www.bp.com/assets/bp_internet/globalbp/globalbp_uk_english/set_branch/STAGING/com mon_assets/bpin2011/downloads/BP_Annual_Report_and_Form_20F_2011.pdf   (last   visited Aug. 5, 2012).   For purposes of my analysis, I assume (1) that this estimate is correct, and (2) that it includes the attorneys' fees, expenses, and other administrative costs paid by BP. Plaintiffs' counsel have advised me that they have already incurred common benefit expenses of almost $30 million and that they expect to incur substantial additional expenses.   Thus, the actual fees would be no greater than $570 million ($600 million less $30 million in expenses).   Taking the $570 million in fees and dividing by the $7.8 billion settlement value results in an award of 7.3%.

96.   If, contrary to my assumption, the $7.8 billion estimate did not include attorneys' fees and costs, then my analysis *understates* the value of the settlement.   This is because "fees and costs are properly included in the settlement valuation," even where the fees are paid directly to the attorneys rather than deducted from the class recovery. *In re Heartland Payment Sys.*, 2012

---

[9] The $600 million also covers fees and costs for the separate economic and property damages class settlement, *see* Exhibit 27 to Economic and Property Damages Agreement (Doc. 6273-21) (filed 04/18/12), which I address in a separate report.

U.S. Dist. LEXIS 37326, at *111 (S.D. Tex. Mar. 20, 2012); *see also*, *e.g.*, *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("The award to the class and the agreement on attorney fees represent a package deal. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery") (citation omitted); *Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 364 (D.D.C. 2007) ("because the attorneys' fees are borne by defendants and not plaintiffs, they represent a valuable part of the settlement") (citation omitted).  If the $600 million in fees and expenses is paid separately, that amount should be added to the $7.8 billion.  I also understand that BP itself is spending $50 million per month in expenses; as an estimate, therefore, it will incur expenses of about $600 million over a 12-month period (the actual time period, of course, could be longer or shorter).  *See* MDL No. 2179 Sections 5.12.1.4—Required Monthly Administrative Expense Report (July 23, 2012), Ex. A.  If these figures are added to the $7.8 billion value, the total would be $9 billion.  Under that scenario, the requested fees would come to 6.3% ($570 million / $9 billion). For purposes of my analysis, however, I will use the $7.8 billion amount.

97.  Of course, the actual benefit to the class could be higher or lower than $7.8 billion.  It could be higher because the settlement is not capped (except for seafood compensation), and claims submitted and paid could exceed BP's expectations.  Alternatively, the benefit to the class could be lower because claims submitted and paid could be lower than BP's expectations.  In order to account for those possible outcomes, it is helpful to look at the probable range of percentage awards under the proposed fee structure.  To that end, I examine the operation of the fee structure at the lower and upper bounds of the settlement's value.

98.  At the low end, it is certainly possible that the actual benefits will be less than $7.8 billion.  At the same time, we already know that guaranteed payments will be substantial.  They include the $2.3 billion Seafood Compensation Program, the $57 million Gulf Coast publicity campaign, the $105 million Gulf Coast Health Outreach Program, and a $5 million fund for supplemental publicity (to be designed and administered by the PSC).  In addition, it is certain that the total benefits will exceed the guaranteed benefits, since I am advised that numerous class members have already submitted claims.  Moreover, the benefit to the class will include costs and attorneys' fees paid by BP.  For all of these reasons, $5 billion ($2.8 billion below BP's estimate) is, in my opinion, a conservative estimate of the settlement's lowest value.  Under this

unlikely scenario—and assuming that plaintiffs' counsel requested the entire $570 million in fees—the fee percentage would be 11.4%.

99.  At the same time, as noted, it is also possible that BP has *underestimated* the value of the settlement.  To estimate the high end of potential fees, I will use $10.6 billion for the high-end settlement value ($2.8 billion above BP's estimate).  Even if the actual benefits to the class are $10.6 billion, fees are still capped at $570 million, meaning that under such circumstances the fee percentage would be about 5.3%.

100.  In sum, the maximum possible award is almost certainly no greater than 11.4%, the percentage based on benefits of $7.8 billion is 7.3%, and the possibility exists that fees could be 5.3% or lower.  Because I have no reason to second-guess BP's well-informed estimate of $7.8 billion, I believe that the most likely outcome is a fee percentage in the neighborhood of 7.3%.

## B. The "*Johnson* Factors"

101.  Courts in the Fifth Circuit evaluate the reasonableness of attorneys' fees in common fund cases under the so-called "*Johnson* factors," first articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).  The twelve *Johnson* factors are: (1) the time and labor required to prosecute the case; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[10]  Even if plaintiffs' counsel do not submit, in advance of the November 8, 2012 hearing, a specific fee request pursuant to Fed. R. Civ. P. 23(h), these factors are instructive in the Court's review of the April 18, 2012 Agreement's overall fee structure.  I discuss the *Johnson* factors below.

---

[10] Courts have made clear that not every factor need be given the same weight. *See, e.g., Cobb v. Miller*, 818 F.2d 1227, 1232 (5th Cir. 1987) (refusing to reverse fee award, although district court did not analyze every *Johnson* factor, where the "district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation"); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1135 (W.D.La. 1997) (noting that, although "the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered").

### 1. Time and Labor Involved to Prosecute Case

102.   Class counsel advises me that they have thus far invested over 384,000 hours in this case.  Much more work remains to be done before the settlement will be completed.  Plaintiffs' counsel have told me that total hours invested could exceed 800,000.[11]   While the hours are impressive, I believe this Court should give only limited weight to them in setting the fee.  In particular, I do not believe that the Court should use the hours expended by class counsel to calculate fees under a lodestar model.  I believe the central focus should be on the value obtained for the class, not on the precise number of hours devoted to the case by class counsel.

103.   Objector Selmer Salvesen claims that the Court should do a lodestar cross-check and argues that plaintiffs' counsel will need to work two million hours to be entitled to a common benefit fee of $600 million. Plaintiff's Memo. in Support of Motion to Vacate Prelim. Approval Order (Doc. 6831-1) (filed 07/02/12), at 14.  If counsel did not spend more than 800,000 hours, Salvesen's approach would yield a fee percentage of at most about 3.1%, assuming benefit to the class of $7.8 billion.   But whatever the final number of hours turns out to be, the Court's assessment should be based, first and foremost, on the extraordinary results achieved for the class.

104.   Courts and commentators have discussed the myriad deficiencies with the lodestar method.[12]   For instance, a Third Circuit Task Force established to evaluate the lodestar method noted that the lodestar (1) "increases the workload of an already overtaxed judicial system," (2) "creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law," (3) is "subject to manipulation by judges," (4) "creates a disincentive for the early settlement of cases," and (5) "does not provide the district court with enough flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered." Report of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 246–

---

[11] To be clear, I have not reviewed any attorney time records from this litigation in preparing this report.  Nor have I attempted to assess or verify any such records for reasonableness or accuracy, as one might do in the context of a lodestar calculation.  Indeed, as I explain in this section, the time-consuming and difficult nature of undertaking such a review is among the reasons that the lodestar approach has fallen out of favor in common fund class settlements.

[12] *See, e.g.*, Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809 (2000); John Bronsteen, *Class Action Settlements: An Opt-In Proposal*, 2005 U. Ill. L. Rev. 903, 911 n.54.

49 (1985).  Courts in Louisiana have also noted significant flaws with the lodestar method. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 650 (E.D. La. 2010); *In re Educ. Testing Serv. Praxis Principle*, 477 F. Supp. 2d 612, 628 (E.D. La. 2006); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D.La. 1997).

105.    By contrast, courts and commentators have identified several advantages of the percentage approach.  Most importantly, the percentage approach is a simple calculation for the court to perform:  it "does not bog the court down in the review of the minutiae of the plaintiffs' attorneys' bills."  Report on Contingent Fees in Class Action Litigation: January 11, 2006: Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, 25 Rev. Litig. 459, 469 (2006).  In addition, a percentage approach ensures a direct correlation between the success of the lawsuit and the attorneys' fee award. *See, e.g.*, *Gaskill v. Gordon,* 942 F. Supp. 382, 386 (N.D. Ill. 1996) (holding that percentage-of-the-fund approach would be utilized to encourage lawyers to make prudent economic decisions during course of representation).  And, unlike the lodestar approach, which creates an incentive for attorneys to bill as many hours as possible, even to the detriment of their clients and to judicial efficiency, the percentage method "provides more predictability to attorneys and class members, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 860 (E.D.La. 2007).  Finally, the percentage fee is an accepted part of the legal system, as a result of its use as the standard method of payment in personal injury litigation. *See, e.g.*, *McKinnie v. JP Morgan Chase Bank*, 678 F. Supp. 2d 806, 815 (E.D. Wis. 2009) (percentage method "most closely replicates the market for the legal services provided").

106.  I also do not believe that the Court needs to conduct a lodestar cross-check before it opines on the fee agreement.  Although some courts have found it appropriate to perform a lodestar cross-check to validate a percentage award, others have determined that even a cross-check is unnecessary (or worse).  For example, in *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011), the court found that a lodestar cross-check was not only unnecessary, but perhaps "difficult and misleading" where it was clear that counsel would likely "spend tens of thousands of hours administering [the] settlement." *Id.* at 1040. *See also*, *e.g.*, *Will v. Gen. Dynamics Corp.*, 2010 U.S. Dist. LEXIS 123349, at *3 (S.D.

Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."); *In re Eunice Train Derailment*, 2005 U.S. Dist. LEXIS 46237, at *33 (W.D.La. Mar. 29, 2005) (awarding 40% of common fund in fees; court did not perform a lodestar cross-check, noting that lodestar "has been described as cumbersome and difficult") (citation omitted); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Award*, 7 J. Empirical Legal Stud. 811, 833 (2010) (noting that "district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded" in just 49% (218 of 444) of cases "where district courts used the percentage method with or without a lodestar cross-check and the fee percentages were ascertainable"). *Cf. Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 644 (5th Cir. 2012) (endorsing the use of "the percentage method with a meticulous *Johnson* analysis"). Especially where, as here, the fees will be paid separately by BP and not taken out of the class members' recovery, I see no need for a lodestar cross-check. *Cf. In re Prudential Sales Practices Litig.*, 106 F. Supp. 2d 721, 732 (D.N.J. 2000) (observing, in class settlement where attorneys' fees were to be paid by defendant separate from the class recovery, that "[i]f the Court were to reduce Class Counsel's fee, that would not confer a greater benefit on the class, but instead would benefit only" the defendant).[13] Rather, given that counsel have plainly put in a lot of time and effort and will continue to do so, this Court should focus its primary attention on the benefit to the class. *See* Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 250 (2010) (concluding that "the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class").

107.   In any event, Salvesen's assumption that two million hours would be necessary to justify fees in the $570 million to $600 million range is based on a fatal flaw: It assumes no risk multiplier.  Under a lodestar analysis, a court "scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly

---

[13] Of course, some class members have signed fee agreements with counsel and may be obligated to pay up to 25% of their recovery in fees. *See* Order Setting Caps on Individual Attorneys' Fees (Doc. 6684) (filed 06/15/12) (capping contingent fee agreements in this case between attorneys and individual clients at 25% on the rationale that the common benefit work by the PSC helped "create tremendous economies of scale for the lawyers who would otherwise be responsible for preparing thousands of individual cases for trial." *Id.* at 3 (quoting *In re Vioxx Products Liability Litig.*, 650 F. Supp. 2d 549, 560 (E.D.La. 2010)).

rate." *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43, 47 (2d Cir. 2000) (citation omitted).  "Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Id.* (citation omitted).  In particular, in many of the largest class settlements in which a lodestar was used, courts have approved a generous lodestar in recognition of the value attained by the settlement at issue.  For example, in *Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), which involved a $7.2 billion settlement, the court approved a lodestar multiplier of 5.2 percent. *See id.* at 803.  Salvesen's argument is also flawed because it is based on an hourly rate of only $300.  In the *Enron* case, by contrast, the court used a blended hourly rate of $456.

108.  As explained above, counsel have already put 384,000 hours into this case. *See* ¶ 102 n.11.  Assuming they do not put in another hour, which is obviously an absurd proposition, and assuming the average hourly rate of $456 used in *Enron*, the lodestar amount would be $175,104,000, resulting in a lodestar multiplier (with fees of $570 million) of 3.26, far below the multiplier of 5.2 approved in *Enron*. 586 F. Supp. 2d at 803; *see also, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1999) (lodestar multiplier of 3.97 in $1.027 billion settlement); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (multiplier of 4 in $6.133 billion settlement); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007) (multiplier of 5.9 in $600 million settlement).  If counsel end up putting in 800,000 hours, the lodestar would be $364,800,000, resulting in a lodestar multiplier of 1.56, which is dramatically below the multiplier in *Enron* and far below the 3%–4.5% multipliers that are "common" in the largest class settlements (over $1 billion, known as super-mega-fund cases, *see* ¶ 123, *infra*). *In re NASDAQ*, *supra*, at 489 (citation and internal quotation marks omitted).  Thus, the lodestar multiplier range here (1.56–3.26) only corroborates the reasonableness of the attorneys' fees structure.  Indeed, even using the $300 per hour rate proposed by Salvesen, a lodestar cross-check would raise no concerns.  Assuming 384,000 total hours, the lodestar would be $115.2 million and the multiplier would be 4.95.  Were class counsel to invest 800,000 hours, the lodestar would be $240 million and the multiplier would be 2.37.  Because all of these ranges support fees of $570 million, the Court need not await the final

total of hours, and need not conduct a lodestar cross-check before giving its blessing to the fee agreement.

### 2. Novelty and Difficulty of Questions Involved

109.  This case arises from the largest oil spill in world history.  It raises myriad legal and factual questions of first impression under the Oil Pollution Act, maritime law, and the Outer Continental Shelf Lands Act.  The wide variety of economic, property, and personal injuries involved has necessitated participation by scientists, economists, medical doctors, and numerous other experts.  One need only look at the settlement agreements themselves—one involving economic and property damages (totaling 114 pages plus hundreds of pages of exhibits) and the other involving medical benefits (totaling 190 pages plus more than a hundred pages of exhibits)—to gauge the novelty and complexity of the claims. *See also* ¶¶ 80–83, *supra* (discussion of second *Reed* factor, "complexity, expense, and likely duration of the case"). Given the large number of claimants, the wide variety of claims, and the highly complicated factual and legal issues, this settlement is truly historic.

### 3. Skill Required to Perform Services

110.  The skill required to litigate and settle a case of this magnitude is enormous.  Thus, it is not surprising that this Court, in selecting members of the PSC, chose some of the most capable and prominent plaintiff lawyers in the United States.  These lawyers needed to become versed in multiple sources of law, science, economics, and medicine.  They needed strong advocacy and negotiating skills, and the ability to manage complicated, high-profile litigation.  The lawyers chosen possess all of those talents.

### 4. Preclusion of Other Work

111.  I am advised that the PSC attorneys have been heavily occupied with this case for about two years.  With the possibility of multi-phase trial proceedings lasting for many years, these attorneys had to watch carefully what they took on in addition to this litigation.  Because the cases are putative class actions, these attorneys could not simply walk away.  When they agreed to serve on the PSC, they undertook a commitment to press the claims, potentially for decades (if *Exxon Valdez* was any guide).  Moreover, I am advised by class counsel that a number of the

PSC attorneys temporarily relocated to New Orleans specifically to handle this case.  Clearly, for those lawyers who live and practice elsewhere, such a move would have made it especially difficult for them to take on additional work as long as this case remained active.

### 5. The Customary Fee

112.  The proposed fee in this case fares especially well in comparison to the customary fee that a plaintiff would likely agree to if he or she retained counsel to bring an individual lawsuit. "Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases." *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006) (citations omitted); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlement and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 830 (2010) (noting that class settlement fee "percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33 percent"); *cf. In re Bayou Sorrel Class Action*, 2006 WL 3230771, at *2 (W.D.La. Oct. 31, 2006) (awarding 36% of $28 million common fund environmental class action; court noted that "40% fees have been awarded in similar cases by Louisiana District Courts").  This factor favors approval of the attorneys' fees agreement because the fee percentage in this case—even at the high end (11.4%)—is significantly lower than the typical 33% contingency fee.  (Of course, some of the class members will pay up to 25% based on their own contingent fee agreements (*see* ¶ 106 n.13), but their recovery under the settlement will not be reduced by common fund fees because BP will pay those fees separately.)[14]

### 6. Whether the Fee is Fixed or Contingent

113.  The PSC attorneys took these cases on a contingent fee basis.  To my knowledge, they are not receiving any hourly payments.  For common benefit work, which amounts to virtually all of the time and money they have expended, they are relying entirely on fees awarded by the Court.  Under this arrangement, the lawyers took a substantial risk.  While advancing millions of dollars in costs and devoting hundreds of thousands of hours of time, the lawyers had no assurance that, at the end of the day, they would recover anything, even their out-of-pocket costs.

---

[14] As I discuss below, the common fund range here (5.3%–11.4%) also compares favorably with fees in other large class action settlements. *See* ¶¶ 127–133.

On the other hand, this is a somewhat unusual case of a prosperous corporate defendant that wanted to resolve these claims quickly to mitigate the negative publicity caused by the spill. On balance, this factor favors approval of the settlement, but not as heavily as in some cases.

### 7. Time Limitations Posed by the Client or the Circumstances

114.   Given the history of the protracted *Exxon Valdez* case, and the dire circumstances faced by class members in this high profile case, class counsel were under enormous pressure to obtain compensation for the victims right away.   President Obama was personally involved in the designation of Kenneth Feinberg to initially run the GCCF.   Moreover, Section 2705(a) of the Oil Pollution Act calls for interim payments, thus clearly recognizing that the money needs to get to the victims immediately.  As one commentator explained the situation:

> [W]ith any environmental disaster, time is of the essence.  With each passing month, reports of Gulf fishermen filing for bankruptcy, marina owners shuttering their doors, and cleanup efforts stalling for lack of funds continue to surface.

Drew Cohen*, Resuscitating Erin Brockovich After the BP Oil Spill: Carving Out an Exception to the Class Action Fairness Act for Environmental Disaster Suits*, Journal of Energy & Environmental Law 73 (Winter 2011).

### 8. Amount Involved and Results Obtained

115.   As described above and in my report on the economic and property damages class settlement, this settlement provides enormous benefits to the class. *See* ¶¶ 67–68, *supra*.  As noted, BP estimates that the economic value of this settlement is about $7.8 billion, which would make this the largest class action settlement in history.  It is difficult to envision a better outcome for the class, even if class counsel had instead taken the case to trial and been fully successful.

### 9. Experience, Reputation, and Ability of Attorneys

116.   As noted earlier, the PSC attorneys are some of the most experienced and renowned plaintiff lawyers in the United States. They have been involved in some of the largest class actions and other aggregate matters in history.   Throughout this litigation the attorneys have displayed exceptional skill.

### 10. The "Undesirability" of the Case

117.   Because of the massive damage caused by the oil spill, and the possibility of huge payoffs, this case was understandably attractive to many plaintiffs' attorneys.  Indeed, this Court is well aware that competition among attorneys vying to be appointed to the PSC was intense. On the other hand, with the experience of *Exxon Valdez*, the case also raised the specter of years of litigation, and the prospect of advancing of many millions of dollars in costs, without any certainty of recovery.   Moreover, plaintiffs' counsel faced the prospect that BP would be vigorously defended by a law firm with a strong reputation for fighting hard and leaving no stone unturned.  On balance, this factor does not weigh heavily in this case.

### 11. Nature of the Professional Relationship with the Client

118.   Although I understand that some PSC members had prior relationships with some of the class representatives, for the most part these attorneys and clients did not have prior dealings. Accordingly, this factor is of little relevance here.

### 12. Awards in Similar Cases

119.   As I explain in detail below, the possible range of percentages under the fee agreement is demonstrably low when reviewed based on empirical studies of fee awards in class actions generally.  *See* ¶¶ 120–126, *infra*.   Moreover, the proposed fee percentage is comparatively modest even when compared to other awards in the largest class settlements to date.  *See* ¶¶ 127– 133, *infra*.   To be sure, this type of comparison is an imperfect method for ascertaining the proper fee award in this case, since each case has its own set of characteristics relevant to the fee inquiry. *See, e.g., Newby v. Enron Corp.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (noting, in reviewing this *Johnson* factor, that "there are no other 'similar' cases when one examines all the circumstances of the litigation"); *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) ("There are no reported cases similar to this one.") (citations omitted).  All the same, it is useful to examine fee awards in other cases.

### (A) Empirical Studies

120.   Numerous courts have looked to empirical studies for guidance.[15]   The most current,

---

[15] *See, e.g., In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 653–54 (E.D. La. 2010); *In re Educ. Testing Svc. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 628–29 (E.D. La. 2006); *In*

and in my view the most complete, study was conducted by Professor Brian Fitzpatrick of Vanderbilt University Law School in 2010. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlement and Their Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010).   Fitzpatrick attempted to collect all federal class action settlements approved between 2006 and 2007, in both published and unpublished decisions.   Based on his research, Fitzpatrick discovered and analyzed 688 settlements.  *Id.* at 813.

121.   Looking at all 688 cases, Fitzpatrick found that fee awards in the cases using a percentage approach ranged from 3% to 47%, with a median of 25% and a mean of 25.4%. Fitzpatrick also analyzed the data on a federal circuit-by-circuit basis.  For the U.S. Court of Appeals for the Fifth Circuit, the median award in percentage cases was 29.0%, and the mean was 26.4%. *Id.* at 23, 24, 27, 29, 30.

122.   Another important study was conducted by Professors Eisenberg and Miller in 2004, and later updated to include cases through 2008.  *See* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004) [hereinafter "Eisenberg & Miller"]; and Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) [hereinafter "Eisenberg & Miller II"].  Courts often cite Eisenberg and Miller in cases considering class action attorneys' fees.[16]  Eisenberg & Miller II reviewed 689 class action settlements in a 16-year period (1993–2008).  The resulting mean and median fees awarded by district courts were, respectively, 24% and 25% of the settlement nationally and 24% and 23% in the Fifth Circuit. *Id.* at 260.  Eisenberg and Miller found that the "overwhelmingly important determinant of the fee [was] simply the size of the recovery obtained by the class." *Id.* at 250.

123.   Many courts and commentators use the term "mega-fund" to refer to settlements of $100 million or more.  Relatedly, recent cases have used the term "super-mega-fund" to describe the category of settlements valued at $1 billion or more. *See, e.g.*, *In re Diet Drugs Prods. Liab.*

---

*re OCA, Inc. Secs. & Derivative Litig.*, 2009 WL 512081, at *20 (E.D. La. Mar. 2, 2009); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 864 n.30 (E.D. La. 2007).

[16] *See, e.g.*, *In re Puerto Rican Cabotage Antitrust Litigation*, 815 F. Supp. 2d 448, 461 (D.P.R. 2011); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D.La. 2010); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 862–64 (E.D.La. 2007).

*Litig.*, 552 F. Supp. 2d 442, 478 (E.D.Pa. 2008) (describing "super-mega-fund" cases as those "with valuations larger than one billion dollars"); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 266 (D.N.H. 2007) (same).

124.   Prior to the Fitzpatrick study, commentators had concluded that attorneys' fees percentages were, in general, smaller in "mega-fund" cases.[17]  Put another way, as the amount of the settlement fund increased, the percentage going to the lawyers decreased.   Fitzpatrick's empirical results, as detailed in the following chart, support that view.   Significantly, however, even in the largest cases, fee percentages were in the 18%–19% range, well above the likely maximum amount here of 11.4%.

### FITZPATRICK (2010 STUDY)

| **Range of Class Recovery** (in millions) | **Mean** Attorneys' Fee Award (as a percentage of total recovery) | **Median** Attorneys' Fee Award (as a percentage of total recovery) |
|---|---|---|
| $0 to $0.75 | 28.8% | 29.6% |
| $0.75 to $1.75 | 28.7% | 30.0% |
| $1.75 to $2.85 | 29.5% | 29.3% |
| $2.85 to $4.45 | 26.0% | 27.5% |
| $4.45 to $7 | 27.4% | 29.7% |
| $7 to $10 | 26.4% | 28.0% |
| $10 to $15.2 | 24.8% | 25.0% |
| $15.2 to $30 | 24.4% | 25.0% |
| $30 to $72.5 | 22.3% | 24.9% |
| $72.5 to $6,600 | 18.4% | 19.0% |

---

[17] Eisenberg & Miller, *supra* ¶ 122, at 8; Eisenberg & Miller II, *supra* ¶ 122, at 265; Theodore Eisenberg, Geoffrey Miller & Michael A. Perino, *A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after* Goldberger v. Integrated Resources, Inc., 29 Wash. U. J.L. & Pol'y 5, 14–24 (2009); Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*, *available at* http://ssrn.com/abstract=870577 (last visited Aug. 9, 2012).

125.  Concededly, the upper band of settlements in the Fitzpatrick chart above groups all settlements of $72.5 million or more in the same category, which means that group includes mega-fund cases, super-mega-fund cases, and cases in the $72.5 million to $100 million range. This grouping does, however, have the advantage of allowing for a larger sample of cases. Settlements in excess of $1 billion, by contrast, comprise a much smaller group.

126.  Courts have, in large part, rejected a rule that would require a fee percentage to be capped at some arbitrary low figure in mega- or super-mega-fund cases. *See, e.g., Newby v. Enron Corp.*, 586 F. Supp. 2d 732, 753 (S.D. Tex. 2008) (noting that appellate courts that have examined a "megafund rule requiring a fee percentage to be capped at a low figure when the recovery is quite high . . . have rejected it as a blanket rule") (citations omitted); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund. Put simply, the declining percentage concept does not trump the fact-intensive . . . analysis."); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212–13 (S.D. Fla. 2006) (citing cases); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, 2005 WL 1213926, *9–10 (E.D.Pa. May 19, 2005).  At the same time, courts have acknowledged that, in general, as settlement amounts increase, fee awards tend to decline in terms of a percentage. *See, e.g., In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 267 (D.N.H. 2007) ("objectors' contention that super mega-fund cases warrant lower [percentage] awards than smaller cases . . . may well be true as a general matter") (citation omitted); *cf. In re Prudential Sales Practices Litig.*, 106 F. Supp. 2d 721, 731 (D.N.J. 2000) (although "percentage fee awards generally decrease as the amount of the recovery increases, there is no automatic correlation") (citation and internal quotation marks omitted).

### (B) Comparison of This Case to Other Large Settlements

127.  In *Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), which involved the largest settlement up to this case ($7.227 billion), the court reviewed a list of high-value settlements and their respective percentage fee awards, as well as more detailed information about the circumstances of each. *See id.* at 776–78.  The court found that "a number of quite variable factors" were relevant to the reasonableness of fees, "not merely the actual amount of

the fee or the percentage of the settlement fund it constitutes . . . ." *Id.* at 777.

128.   Ultimately, the determination of whether requested fees are reasonable is as much qualitative as it is quantitative.  That is, while looking to other cases is helpful insofar as it gives a good sense of the outer limits, the proper award here depends on this Court's assessment of the circumstances of *this* case.  And, as I explain below, the circumstances surrounding this case strongly suggest the proposed fee structure is a reasonable one.

129.   In comparing the instant case to a list of the largest reported settlements to date, one thing is initially striking—this settlement is larger in dollar amount than any of them.  At $7.8 billion, this class settlement is more than half a billion dollars greater than the *Enron* securities settlement, which (according to my research) currently tops the list. *See Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($7.227 billion).  In *Enron*, the court awarded fees of 9.52%.  Including *Enron*, the ten largest reported private aggregate settlements are:

### TEN LARGEST FEDERAL AGGREGATE PRIVATE SETTLEMENTS

| Case | Settlement Value | Fee Percentage | Fee Amount |
|---|---|---|---|
| *Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7.227 billion | 9.52% | $688,010,000 |
| *In re Diet Drugs*, 553 F. Supp. 2d 442 (E.D.Pa. 2008) | $6.44 billion | 6.75% | $434,700,000 |
| *WorldCom, Inc. Securities Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 billion | 5.5% | $337,315,000 |
| *In re Vioxx Products Liability Litig.*, 760 F. Supp. 2d 640 (E.D.La. 2010) | $4.85 billion | 6.5% | $315,250,000 |
| *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) | $3.383 billion | 6.5% | $219,895,000 |
| *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) | $3.3 billion | 14.5% | $478,500,000 |
| *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003) | $3.186 billion | 1.73% | $55,117,800 |
| *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 U.S. Dist. LEXIS 78035 (S.D.N.Y. 2006) | $2.65 billion | 5.9% | $156,350,000 |
| *Shaw v. Toshiba*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $2.1 billion | 15% | $315,000,000 |
| *In re Prudential Sales Practices Litig.*, 106 F. Supp. 2d 721 (D.N.J. 2000) | $1.325 billion | 6.8% | $90,100,000 |

*See also*, *e.g.*, *In re Nortel Networks Corp. Secs. Litig.*, 2006 U.S. Dist. LEXIS 93390 (S.D.N.Y. 2006) ($1.14 billion; approximately 5%); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D.Md. 2006) ($1.1 billion; 11.88%); *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) ($1.075 billion; 33.33%); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ($1.07 billion; 14%); *In re Sulzer Hip Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) ($1.045 billion; 4.8%); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) (approximately $1 billion; 20%).

130.    Looking at sheer numbers, the list of the largest settlements is not especially illuminating with respect to fees.  The fee awards range from 1.73% to 33.33%, an exceptionally wide range.  The percentage awarded in the largest of the settlements (*Enron*) is 9.52%.

131.    To be sure, this list of cases does show that awards in cases involving large settlements tend, in general, to be lower in percentage terms than awards in smaller cases—the conclusion reached by all of the empirical studies that have examined the question.  Beyond that, however, the list does not shed a great deal of light on the proper award in this case.  As found by Fitzpatrick, for class actions overall in the Fifth Circuit, the median and mean awards were 29% and 26.4%, respectively. *See* ¶ 121, *supra*.  Under no circumstances can the fee awards here be even close to those amounts.  As I explained in ¶ 98, *supra*, the highest award (realistically) is 11.4%, which falls comfortably at the low end of the range in super-mega-fund cases.

132.    Looking beyond the dollar figures, this settlement compares favorably to its peers in a number of respects.

- **Benefit to the Class**.  Perhaps the most exceptional feature of this settlement is not its sheer size, but rather the fact that class members can expect to recover full compensation for their injuries.  This sort of recovery is virtually unprecedented, and is not a feature in *any* of the super-mega fund cases cited above, with the exception of *AT&T*, in which the award was 20% of the proceeds available to the class.  For example, in *Enron*, the settlement was very large ($7.227 billion), but, as that court noted, the losses suffered by the class members were estimated to be much higher.  As

such, the *Enron* settlement, impressive as it was, ultimately recovered only a fraction (8.39%) of the decline in market capitalization resulting from the fraud alleged in that case. 586 F. Supp. 2d at 775.   Yet the court in *Enron* approved fees of 9.52%. Moreover, *Enron* itself noted that in *WorldCom*, the $6.133 billion settlement amounted to a mere 2.9% recovery in the decline of market capitalization. *See id.* at 775.   The court in *WorldCom* awarded 5.5% in fees.  In the *Vioxx* non-class aggregate settlement, users of Merck's painkiller Vioxx received much less than they could have received if they had been successful at trial. *Compare*, *e.g.*, David Voreacos & Allen Johnson, *Merck Paid 3,468 Death Claims To Resolve Vioxx Suits*, http://www.bloomberg.com /news/2010-07-27/merck-paid-3-468-death-claims-to-resolve-vioxx-suits.html (July 27, 2010) (last visited Aug. 5, 2012) (average payment under *Vioxx* settlement for claimants who suffered heart attacks allegedly caused by the drug was $186,825), *with* Star-Ledger Wire Services, *Court dismisses Merck's appeal in Vioxx death*, http://www.nj.com/business/index.ssf/2009/09/court_dismisses_mercks_appeal.html (Sept. 30, 2009) (last visited Aug. 5., 2012) (New Jersey Supreme Court rejected Merck's appeal of $4.5 million jury award to heart attack victim).  Of course, Merck *won* a number of the individual trials and appeals, so going to trial was risky.

This same analysis could be done with almost all settlements, class or non-class. Almost by definition, settlement means compromise, and a plaintiff who settles will receive less than full compensation.  That is why this case is so unusual.  Here, class members can expect to be made whole by the settlement's compensatory benefits. Even in *litigation*, obtaining all of the relief to which a plaintiff is entitled is a challenge under the best of circumstances.  For example, in the *Vioxx* litigation, some plaintiffs who went to trial ended up with nothing.  But in the *settlement* context, full recovery is even less likely, because a settlement, by its very nature, usually means agreeing to accept less than full recovery in exchange for prompt and certain payment.  Here, class members receive both promptness and full recovery, making this a truly exceptional case.

- **Size of the Settlement**.  This estimated $7.8 billion settlement, if approved by the Court, would (according to my research) be the largest class settlement in history.  In

my mind, this is a monumental achievement, not one to be denigrated by a mechanical rule that the fee percentage should be low when the settlement is large.  Indeed, despite this achievement, the fee award under the proposed agreement is capped at $570 million ($600 million minus $30 million in costs to date), which is less than the $688 million in fees awarded in *Enron* (a case involving both a lower total settlement amount and a much lower percentage of losses recovered).

- **Unique Aspects of this Case**.  In a literal sense, of course, every case has "unique" features.  And certainly, cases in the super-mega-fund range are by definition unusual.  Yet even among this rarified group of cases, the instant settlement stands out as unique.  Most importantly, a large number of super-mega-fund settlements and other large settlements have been in securities cases.[18]  To be sure, securities fraud is a challenging and difficult area of the law, requiring great skill and effort.  Yet, the catastrophic oil spill created legal, factual, scientific, and economic issues that were even more complex than those in most other kinds of class actions.  And class counsel could not look to precedent to guide their strategy on most issues, because this case was truly unprecedented in magnitude and complexity.

133.  Based on the foregoing discussion, the anticipated award ($570 million based on a settlement worth $7.8 billion) is on the low end, even when examined in light of other mega-fund or super-mega-fund cases.  Of course, the percentage could be even lower if the value of the settlement turns out to be greater than $7.8 billion.  But even the high theoretical percentage (11.4%), which is very unlikely to occur, is well within the fee percentages in mega-fund and super-mega-fund cases.  These ranges are especially reasonable here, given the benefits to the class, the unique complications of this case, and the fact that fees are being paid separately by BP.

### C. Assessment Based on the *Johnson* Factors

134.  As shown above, the pertinent *Johnson* factors overwhelmingly support the proposed fee structure here.  The attorneys, all of whom have superb reputations and abilities, have

---

[18] Of the ten largest settlements, five are securities cases. *See Enron*, *WorldCom*, *Tyco*, *Cendant*, *AOL Time Warner*.

expended considerable time, and are expected to spend much more time, before the claims process is completed.  The questions involved are novel and difficult, requiring enormous skill and impeding the lawyers' ability to take on other work.  Even the highest theoretical fee percentage of 11.4% is much smaller than the customary 33% in private contingent-fee cases.  The fee here is contingent, meaning the lawyers took a risk that they might receive no award.  Because the case involved an environmental disaster, time was of the essence.  The results obtained, as explained throughout this report, are impressive.  And even the highest theoretical fee award of 11.4% is comfortably within the range of awards in super-mega-fund cases.

## VIII.  CONCLUSION

135.  This Court, Magistrate Judge Shushan, class counsel, and counsel for BP deserve high praise for producing this historic settlement, one that provides meaningful and substantial benefits to the class.  For the foregoing reasons, it is my opinion that this Court should certify the case as a Rule 23(b)(3) class, uphold the settlement as fair, reasonable, and adequate, and approve the attorneys' fee structure agreed to by class counsel and BP.


I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.



Robert H. Klonoff

August 13, 2012

# EXHIBIT A

### R É S U M É

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:  March 15, 1955
Place of Birth:  Portland, Oregon

## EDUCATION:

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

## WORK EXPERIENCE:

### Current Position:

Dean and Professor of Law, Lewis & Clark Law School (since July 1, 2007)

### Prior Positions:

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (from August 2003-June 2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, August 2003-June 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Member, United States Judicial Conference Advisory Committee on Civil Rules

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Fellow, American Bar Foundation

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

**MEMBERSHIPS**:

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

**PUBLICATIONS**:

**Books**:

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (forthcoming 2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012) (with teacher's manual)

Klonoff ( associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010)(along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials: Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000) (with teacher's manual; supplemented annually)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy:  Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

## **Articles and Book Chapters:**

*The Decline of Class Actions,* 90 Wash. U. L. Rev. ____ (2012) (forthcoming)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. ___ (forthcoming 2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. ____ (2012) (forthcoming)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (fall 2010)

Book Review, *In the Public Interest,* 39 Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13 J. Internet Law 1 (2009)

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006) (part of a symposium on class actions)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006) (part of a symposium on class actions)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005) (part of a symposium on class actions)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review

137 (2006) (part of a collection of papers presented on April 1, 2005, at a competition class action symposium sponsored by the University of Western Ontario College of Law)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004) (part of a symposium on class actions)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women: Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy: A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts: The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies: Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes: Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Served as an expert witness in several class action cases

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT SPEAKING ENGAGEMENTS

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Lecturer on class actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta, Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on class actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on class actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on class actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on class actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on antitrust class actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on class actions, Missouri CLE (Nov. 18, 2005)

Speaker on class actions, Practising Law Institute (July 29, 2005)

Speaker on class actions, Kansas CLE (June 23, 2005)

Speaker on class actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting lecturer on class actions, Peking University (May 30-June 3, 2005)

Speaker on oral argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on class actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at antitrust class action symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at class action symposium, Mississippi College of Law (February 18, 2005)

Speaker on class actions, Practising Law Institute (July 30, 2004)

Visiting lecturer on class actions, Peking University (June 2004)

Visiting lecturer on class actions, Tsinghua University (June 2004)

Speaker at class action symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on class actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on class actions, Practising Law Institute (July 31, 2003)

Speaker on class actions, Practising Law Institute (Aug. 5, 2002)

Speaker on class actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy" (1990-present) and advocacy before the U.S. Supreme Court (1988-present)

## OTHER LEGAL ACTIVITIES:

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Member, Advisory Committee, Lawyers' Campaign for Equal Justice (Portland, Oregon)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Organizer and coordinator of class action symposium edition for spring 2006 UMKC Law Review (contributing authors included prominent law professors, judges, and practitioners)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Helped to develop walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood