## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig **"Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | MDL NO. 2179 |
| | SECTION:  J |
| This document relates to all actions. | HONORABLE CARL J. BARBIER |
| | MAGISTRATE JUDGE SHUSHAN |
| **Plaisance et al.,** **Plaintiffs,** v. **BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,** **Defendants** | Civil Action No. 12-968 SECTION:  J HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

### DECLARATION OF SAMUEL ISSACHAROFF RELATING TO THE PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT

SAMUEL ISSACHAROFF declares based on personal knowledge as follows:

### PURPOSE OF DECLARATION

1.       As I will set forth below, I am a law professor at New York University School of Law.  I submit this declaration in my capacity as counsel to the Plaintiffs' Steering Committee and Interim Class Counsel.

2.        I have submitted a parallel declaration concerning the proposed settlement of the economic benefits class action.  I submit this declaration to address issues regarding the medical benefits settlement.

3.        I have been involved in this case since October of 2011, having been brought in to assist plaintiffs' counsel with legal and ethical issues surrounding the negotiations of this complex settlement.  While I have worked on other matters in the case, such as the successive mandamus petitions to the Fifth Circuit, my primary responsibility has been and continues to be the legal requirements for the proper negotiation of a complex settlement and how the settlement itself was structured.  I submit this Declaration to review this aspect of the proposed settlement.

## CREDENTIALS AND BACKGROUND

4.        I am the Reiss Professor of Constitutional Law at New York University School of Law, a faculty that I joined about six years ago.  Previously I was the Harold J. Medina Professor in Procedural Jurisprudence at Columbia Law School, where I was a member of the faculty from 1999 to 2005.  Before that I spent ten years as a professor of law at the University of Texas School of Law, where I held the Joseph D. Jamail Centennial Chair in Law.

5.        In my scholarship and teaching I specialize in complex litigation.  I have published many articles on various aspects of complex litigation, including matters such as class actions and attorneys' fees, which have been cited by numerous courts, including the United States Supreme Court.  I routinely teach and lecture on matters of

complex litigation in the United States and abroad.  One of my regular academic courses is complex litigation, which I teach with my NYU colleague Arthur Miller.

6.        I have also been involved as counsel, as an expert and as a consultant in a large number of complex cases, including dozens of class actions, on behalf of both plaintiffs and defendants. In addition, I have served as special master in a mass tort class action in the Eastern District of Texas.  I have testified before the Advisory Committee on the Rules of Practice and Procedure of The Judicial Conference of the United States and the Third Circuit Task Force on the Selection of Class Counsel regarding proposed amendments to the federal class action rule and other matters pertaining to the selection and compensation of class counsel.  I served as Reporter for the Project on Aggregate Litigation of the American Law Institute, which unanimously approved its proposed final report three years ago.  This work was published in 2010 as Principles of the Law of Aggregate Litigation.  I have provided a copy of my curriculum vitae as an attachment to this submission.

## INVOLVEMENT IN THE CASE

7.        I began working on this case in late October of 2011.  I was brought into the case when plaintiffs' counsel determined that there was a realistic possibility that a global settlement could be realized in this matter.  I was contacted initially by Elizabeth Cabraser and then subsequently by Calvin Fayard and Joe Rice.  I was told that Fayard and Rice were members of the court-appointed PSC and had been directed to undertake confidential settlement negotiations while the remainder of the PSC continued to prepare for trial.  I was further informed that Cabraser had been integrated into the team for

negotiations, and that these three lawyers had primary responsibility for structuring the settlement process and for developing the terms of any potential settlement.  I was also informed that these three lawyers performed this role at the direction of the co-chairs of the PSC, James Roy and Stephen Herman, and that I would formally serve as counsel to the co-chairs.

8.      I met with Fayard, Rice and Cabraser in New York about ten days later, which began my active involvement in the settlement process.  Since that time, I have traveled to New Orleans on several occasions, including for the December 14th meeting with the entire PSC at which the preliminary terms of the settlement were explained to all counsel.  I was also present in New Orleans in late February and early March 2012, during the final phases of the settlement negotiations.  I participated in some aspects of the negotiations themselves, although my main activity was to advise on the settlement process and to assist in the preparation of settlement documents.  I also participated in the March 2, 2012 presentation to the PSC of the terms of the final settlement for the ratification vote.  After the settlement was approved, I was asked to explain the obligations of class counsel and answer questions about the change in roles of the PSC were the Court to grant class certification.

9.      During this entire process, my work turned on a few key legal issues and, specifically, on avoiding legal conflicts that had compromised prior mass harm class action settlements.  To my mind, the key issues were:

   a.   Avoiding conflicts in representation.

   b.   Avoiding intraclass allocation conflicts.

    c.   Establishing an independent distribution system for the fixed fund for Seafood.

    d.   Maintaining separate tracks for Economic Loss and Medical Classes.

    e.   Resolving the merits of the settlement before addressing the issue of attorneys' fees.

    f.   Providing for representation for class members in the settlement process so as to realize the maximum recovery to the classes.

## DISCRETE LEGAL ISSUES

10.    ***Conflicts in Representation.***  The law governing proper settlement classes is still dominated by the Supreme Court's asbestos decisions in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  Together these cases establish that there must be "structural assurances" of fairness in the class settlement process, as defined by *Amchem.*  In designing the process of settlement negotiations, the PSC took care to ensure that all affected constituencies in the settlement had advocates and that no one with negotiating authority had either the incentive to or the ability to trade off the interests of one groups in favor of another.  Further, the PSC took care that no one would be bound by the settlement who had not suffered some tangible harm and who did not receive some benefit, thereby removing any "futures" issues from the negotiations.

11.    The structure of the settlement negotiations served as the initial and central guarantee of unconflicted representation.  As set forth in the declaration of Joe Rice, two members of the PSC were selected to negotiate confidentially on behalf of the

entire PSC, with the ability to draw on specialized knowledge as need be.  The PSC was acting pursuant to court appointment and was actively (and at all times during the settlement negotiations) pursuing litigation against BP and the other defendants.  This was in no sense a case in which "disarmed" counsel, again using the language that *Amchem* adopted from Professor Coffee, would be seeking a settlement on behalf of a class that had no coherence without the settlement.

12.     Despite the size of the settlement class, the breadth of the claims resolved, and the magnitude of the damages and the ensuing settlement, this was in my view a remarkably suitable case for class-based resolution.  All claims arose from a single catastrophic incident and all claimants were passive victims whose individual circumstances defined the scope of their damages but did not differentiate them in terms of establishing the liability of the various defendants.  Moreover, the centrality of the federal statutory scheme under the Oil Pollution Act and the statutory imposition of strict liability radically simplified this case.

13.     One of the first decisions made as the negotiations matured was not to try to create subclasses for the negotiation process, but rather to divide only the medical relief claims from those for economic harm.  This was done for three primary reasons.  First, the claims all arose from a single event and were presented against the same cohort of defendants.  Second, the settlement process itself would unravel if discussions were held among a growing number of subgroups, which would then likely beget further subgroups by the same logic.  Third, the settlement process could be organized to secure the participation of counsel for all affected groups, while avoiding trade-offs among the various groups.  This last point was particularly significant in light of the structure of the

PSC.  This case was unlike the fact scenario in *Amchem,* for example, where the Supreme Court was clearly disturbed by the fact of a class being organized by lawyers who represented only a partial group of the affected population, and who sought authority to bind those with whom they had no relation, particularly as it affected future claimants. Here, by contrast, the PSC was appointed by the Court well before any settlement negotiations were undertaken, and was appointed based on the need to represent the various affected constituencies.   Class counsel were thus benefitted by the Court's decision to take applications for positions on the PSC and to consider in the selection process the presence in New Orleans of counsel who would direct the case and that they represented diverse constituencies of claimants.

14.        In deciding that the settlement process could go forward in integrated fashion with two appointed lead negotiators serving on behalf of the entire PSC, we were following the logic well addressed by the Eight Circuit in *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140 (8th Cir. 1999):

> If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person ( *i.e.,* a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would).

> We also do not believe, as the objectors suggest, that the stark conflicts of interest that the Supreme Court discerned in *Amchem* and *Ortiz* are present here. In those cases the Court found that a conflict existed between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size). We note that the

injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured. Our case, on the other hand, involves a discrete and identified class that has suffered a harm the extent of which has largely been ascertained.

*Id.* at 1146 (citations omitted).

15.     ***Intraclass Allocation.***  At no point in the settlement negotiations was a fixed amount of money to be distributed among rival claimants in the plaintiff class.  As set forth in the declaration of Joe Rice, all care was taken to ensure that each category of claim was separately negotiated.  Most obviously, the medical claims were separated from the economic harms.  But even within the economic harm category, each specific type of claim was separately negotiated independent of any claim offset against any other category.  The final settlement was uncapped, meaning that the ability of any subgroup to be paid, or the ability of any individual to be paid, is independent of any overall amount that is owing.  Professor Coffee colorfully refers to uncapped class action settlements as being more rare than unicorn sightings, a wonderful tribute to the care taken to avoid the most common form of intraclass conflict.

16.     This structure of negotiation avoided two critical potential conflicts. First, it meant that there was never any claim that counsel were responsible for shifting funds from one group to another to facilitate the class resolution – something that the Supreme Court identified as a specific problem in *Ortiz*.   At each point in the negotiations, PSC members with ties to specific interests were drawn in to assist the negotiators in formulating the needs of that relevant group and in trying to maximize the recovery of that group.  Second, the absence of an overall cap on the recovery meant that the negotiators were never in the position of "robbing Peter to pay Paul" – that is, there was never a failure of representation as the negotiators sought to induce a hold-out within

8

the settlement class to accept the offered terms by redirecting funds in to that group. While the negotiators had overall responsibility for securing desirable settlement terms, there was never a breakdown in the representational integrity of PSC members whose interests were directly aligned with the various subcomponents of the affected class of claimants.

17. ***Allocation of the Seafood Recovery.*** The only "fixed" component to the settlement is the sum assigned to the Seafood industry as a whole. Two precautions were taken to ensure that there was no conflict in this form of settlement.

18. First, the settlement amount of $2.3 billion is an extraordinary recovery given two facts. It exceeds by many multiples the ***total*** annual seafood revenues in the affected Gulf region before the Deepwater Horizon calamity and it follows payment of roughly $700 million by the GCCF to the beneficiaries of the Seafood Fund. In other words, the settlement structure begins with recoveries far in excess of objectively quantifiable actual damages. As a result, the great bulk of the settlement proceeds for the Seafood recovery is devoted to the designated Risk Transfer Premium ("RTP"), representing the risk associated with the recovery of the Gulf from the oil spill, and the corresponding risks with reemergence of submerged oil pockets. Of critical importance, this means that the bulk of the Seafood Recovery is a guarantee of the recovery of the Gulf and its seafood industry. This is necessarily a common and shared concern among all participants in seafood enterprises.

19. Second, great care was taken to ensure that the allocation process among the various subcomponents of the seafood group was structured so that each subgroup had its interests advocated by counsel seeking to maximize the relative

9

recovery of each group from the $2.8 billion total recovery.  Further, the actual distribution was not undertaken by counsel but by a Court-appointed neutral, John W. Perry.  Finally, the decisions of Mr. Perry are now presented in a fully transparent form so that all class members in the Seafood group may determine their actual minimum recoveries and can make informed decisions on acceptance or not of the settlement.

20.      ***Medical and Economic Recoveries.***  One part of the settlement was negotiated separately.  Early on in the process, a separate group of counsel, including PSC member Robin Greenwald and others, undertook to negotiate medical benefits for persons exposed to oil and other contaminants in the clean-up and containment process. In my view this was entirely correct.  The decision to separate out the negotiations was not the product of conflict, as many of the persons physically exposed to oil were also in the Seafood group or were part of the VoO workers and boat owners.  Many were represented by members of the PSC, just as had been the case with the distinct groups of economic actors in the economic class.  In my view, it would have been entirely proper to conduct the medical and economic negotiations in the same process, with the same form of inputs from PSC members and other counsel with specialized knowledge and interests on these issues.

21.      Nonetheless, separating the two parts of the negotiations was prudent because the issues were distinct.  In my role as providing advice on class and settlement issues, I was often consulted by the medical class negotiators on discrete issues that they confronted, including the attempt to structure a long-term medical benefits protocol for the affected population.  The negotiations proceeded along separate tracks, directed by separate counsel, and confronted distinct issues.

22.      ***Attorneys' Fees.***   The Court is well aware of the tremendous expenditure of costs and devotion of attorney time under the leadership of the PSC.  I am not aware of any private class action with a higher level of out-of-pocket costs and investment of attorney time in any other litigation.  Clearly counsel were entitled to be compensated for their efforts and for the benefits they brought to the proposed settlement class.

23.      From my personal involvement in the negotiations, I can attest that there were no discussions or agreements concerning fees until the merits of the class claims had been resolved.  Counsel took care to report to the Court when they had reached agreement on the merits before initiating discussions of fees, and began discussions only after securing Court permission to do so.

24.      I can further attest that, prior to the initiation of negotiations on fees, there was no understanding as to the quantity of fees, how they would be structured, or even how they would be assessed.  The parties entered into negotiations with all these questions left open.

25.      Further, the merits settlement was not conditioned on either the fee agreement or the extent of the ultimate award by the Court.  There was no blow-up amount negotiated based on the ultimate fee award.

26.      ***Settlement consultation and representation.***  There is no escaping the fact that a disaster of the magnitude of the Deepwater Horizon affects many people and communities in many ways.  Settlement counsel created a participatory mechanism to draw in the specialized knowledge and concerns of discrete parts of the class.  Settlement counsel built on the broad representation the Court had structured into the PSC and used

that as the mechanism for input from all discrete sections of the class on desired provisions of the settlement.

27.      In my view, this was the optimal way of accommodating the diverse needs of the affected population.  Separate representation for all groups at the settlement negotiations was not feasible.  Further, even with the huge resources being invested in the litigation, trial preparedness would have been compromised had the process of negotiations not been handled by separate counsel.  Indeed, BP followed the same strategy and had a negotiating team working separate from its trial counsel.

## SETTLEMENT BENEFITS

28.      The purpose of this Declaration is primarily to set forth the risks avoided in terms of how the settlement process was structured to avoid conflicts in representation.   The settlement materials and other declarations detail the specific benefits obtained for the class.  I will limit myself to a few observations about how the settlement itself reflects the care that was taken in the negotiation process.

29.      ***Premium Settlement Values.***   This settlement picks up where the GCCF left off.  The GCCF was structured as a one-by-one offer and settlement process, and was hamstrung as such.  Although BP paid billions to settle claims through the GCCF, it achieved only limited results in obtaining closure, and the one-by-one nature of the settlement process generated great controversy and frustration among the claimants. The class structure, by contrast, offers greater certainty to the settling parties.  For BP, in particular, there is a fixed date set by this Court for potential claimants to opt out or be

bound by the terms of the settlement, if approved. The class structure offers greater prospects of closure than does the non-binding quality of the GCCF approach.

30. In exchange for greater certainty, the claimants should receive additional compensation. During the negotiations, I repeatedly questioned the lead negotiators about the comparative values obtained by the proposed class settlement and the historic payouts by the GCCF. On the medical side, this was easy; there had been no comparable payment system established by the GCCF process. On the economic side, the proposed class settlement is superior to any payments made by the GCCF to any category of claimant. This is accomplished in two ways. First, for individuals and businesses making claims on lost earnings, the calculation of the baseline for comparison is improved to allow the best economic quarters to serve as the denominator for the calculation of losses. Second, and most significant, the compensation amounts and the RTP are in each category superior to the payments and multipliers used by the GCCF.

31. This is as it should be. As the Third Circuit recently noted in a major opinion on class action settlements, "A defendant … may be motivated to pay class members a premium and achieve a global settlement ..." *Sullivan v. DB Investments. Inc.,* 667 F.3d 273, 339 (3d Cir. 2011). As reflected in the settlement amounts, this "peace premium" translates to substantial economic benefits, most notably in the generous RTPs. Moreover, class members may even recover more benefits based on the preservation of punitive damages claims against Transocean and Halliburton, and most notably, by the assignment of BP's first-party claims against Transocean and Halliburton.

32. ***Transparency.*** Because the proposed settlement is a class settlement, the terms of recovery have to be set forth with sufficient specificity for class members to

make informed judgments about accepting the settlement terms or opting out.  This too differentiates the settlement from the nontransparency of the decisional criteria of the GCCF, a source of frustration for many claimants.  Although the proposed settlement is complicated in having to incorporate a wide range of economic activities across diverse parts of the Gulf region, it is fully transparent.  Class members can calculate their expected payout by an exact application of the settlement criteria to their particular claim.  Class counsel have been actively engaged in training lawyers throughout the Gulf region in how to use the settlement information to advise their clients.  In addition, class counsel have retained many professionals to assist class members in evaluating their proposed recoveries and in subsequently making claims, if the settlement is approved.

33.     ***Intraclass Equity.***  Early on in my involvement in this case, I tried to get a handle on the reasons that the GCCF process was having difficulties and why a class settlement might be preferable.  It was readily apparent to me that BP desired greater finality and was potentially willing to pay a premium to claimants to get that finality – as I have already addressed.  But I also wanted to get a sense of why the claimant population might prefer an alternative to the GCCF.

34.     Among the points I repeatedly heard from various members of the PSC was that there was suspicion that some claimants before the GCCF were getting paid more than others on similar claims.  There was also a suspicion that the GCCF was strategizing the negotiations in order to reserve funds for more difficult negotiations.  I write this not to assert that this was necessarily the case, nor to criticize Kenneth Feinberg or the GCCF administration.  The frustration and suspicions were probably an inevitable

by-product of the way in which the GCCF process had to proceed as a one-at-a-time settlement offer and negotiation.

35.     Transparency is the best guarantee of intraclass equity.   When the criteria for compensation are clearly established and when settlement administrators do not have discretion to adjust criteria for particularly attractive or problematic claimants, class members can be assured that similarly situated persons are being treated in like fashion.   Indeed, this is one of the great benefits of a comprehensive class action settlement as opposed to any other form of mass claim resolution.

36.     Having participated in structuring the negotiation process and in structuring the class settlement processes, I can readily attest that preserving intraclass equity was a paramount consideration throughout the settlement discussions.  In my view, the transparency of the settlement offer reflects the care with which the settling parties – and class counsel in particular – undertook the process of representing the interests of all class members.

## CONCLUSION

37.     Accordingly, I believe that the Court should certify the settlement classes and approve the proposed settlement.   This settlement is an extraordinary achievement that realizes the great objectives behind court supervised class settlements. As well captured by Judge Anthony Scirica of the Third Circuit:

> The class action device and the concept of the private attorney general are powerful instruments of social and economic policy. Despite inherent tensions, they have proven efficacious in resolving mass claims when courts have insisted on structural, procedural, and substantive fairness. Among the goals are redress of injuries, procedural due process, efficiency, horizontal equity among injured claimants, and finality.

*Sullivan v. D.B. Investments, Inc.,* 67 F.3d 273, 340 (3d Cir. 2011) (Scirica J., concurring).

38.     I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

_____
Samuel Issacharoff

Dated: August 13, 2012

16