IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

This Document Relates to:

*Plaisance et al. v. BP Exploration & Production Inc., et al.*, No. 12-cv-968

MDL No. 2179

SECTION: J

JUDGE BARBIER

MAGISTRATE JUDGE SHUSHAN

DECLARATION OF ROBIN L. GREENWALD

I, Robin L. Greenwald, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am a licensed attorney in the State of Illinois. In October 2010, this Court appointed me to the Plaintiffs' Steering Committee in MDL 2179.

2. I have extensive experience in litigating complex, large-scale cases. Prior to my appointment to the PSC in the instant case, I was court-appointed liaison counsel in *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL No. 1358, a lawsuit brought by water providers from around the country against over 50 petroleum companies for polluting the nation's groundwater with a gasoline additive. The suit settled after approximately five years of litigation. In addition to MDL 1358, I have litigated several other mass tort actions around the country. For the first nearly twenty years of my legal career, I was a prosecutor and enforcement

attorney for the United States Attorney's Office for the Eastern District of New York and the U.S. Department of Justice, where I litigated and resolved dozens of large scale, complex cases.

3. In October 2011, I joined the negotiation team for the medical benefits class settlement on a full time basis, along with fellow PSC member Matthew Lundy, Esq. At the time Mr. Lundy and I joined the negotiation team, attorneys Wanda Edwards and Fred Baker had been involved in medical settlement negotiations with BP counsel for several months. As the declaration of Andrew Bloomer, Esq., sets forth, from October 2011 through April 20, 2012, the negotiations between the PSC and counsel for BP took place nearly daily, usually in person but sometimes via the web and/or telephone.

4. Over the course of the negotiations, Mr. Lundy and I consulted regularly with our medical consultant, Dr. Michael Harbut. We had worked with Dr. Harbut on health issues related to exposure from the oil and/or chemical dispersant, including the Corexit® dispersants used in the remediation efforts, well before the medical settlement negotiations began. Based on his knowledge and vast clinical experiences treating patients in connection with exposure to petroleum products, I believe that Dr. Harbut was best suited to guide the PSC through the medical settlement negotiations. Indeed, we consulted Dr. Harbut throughout the negotiations of the Specified Physical Conditions Matrix and the Periodic Medical Consultation Program, and his medical opinions guided the substance of those aspects of the settlement.

5. In addition to Dr. Harbut, Mr. Lundy and I solicited input from other PSC members, as well as other counsel, who represented plaintiffs alleging personal injury from post-explosion activities. These consultations provided information to help us better understand fully the range of illnesses and symptoms that coastal residents and Clean-Up Workers had and/or

were currently experiencing, as well as the proof that would be available to injured residents and workers to prove their claims, all the while maintaining the confidentiality of the settlement negotiations as we were required to do. As members of the PSC science workgroup, Mr. Lundy and I also had regular access to information and data about the environmental and ecological impacts of the oil spill, further guiding our negotiations about the extent of the oil spill, exposure pathways and the geographic impact of the oil spill. Further, Mr. Lundy and I were active participants in the Vessels of Opportunity ("VoO") PSC workgroup, and in that capacity we also learned not only about these plaintiffs' VoO economic losses but also about the physical conditions and symptoms they often experienced while performing VoO work. Moreover, both Mr. Lundy's firm and my law firm represent numerous individuals who were Clean-Up Workers and/or are or were near shore residents of the Gulf states, and who are now litigating against BP and others for personal injuries sustained as a result of their exposure to the oil and/or chemical dispersants. Finally, BP provided us access to general information contained in its Medical Encounters Database, a database of illnesses and injuries sustained by Clean-Up Workers during response activities. The database provided yet further confirmation of the information we had learned from our other sources about commonly experienced health impacts from exposure to the oil and/or chemical dispersants.

6. Our guiding negotiation principle was to ensure that the medical settlement would provide the greatest amount of good for the greatest number of people. With that backdrop, the PSC spent approximately six months in hard fought, and at times contentious, negotiations with counsel for BP. During those negotiations, the PSC steadfastly held the position that the medical settlement ultimately had to include (i) all individuals most impacted by the post-explosion health consequences of the oil spill; (ii) those medical conditions and

3

symptoms that individuals most often experienced and, in numerous cases, still are experiencing as a result of their exposure to the oil and/or chemical dispersant; (iii) adequate compensation for those conditions and symptoms; and (iv) benefits in addition to compensation for Specified Physical Conditions.

7. Our negotiations generally centered on the four benefits provided by the medical settlement: the Specified Physical Conditions ("SPC") Matrix; the Periodic Medical Consultation Program ("PMCP"); the Back-End Litigation Option; and the Gulf Region Health Outreach Program.

8. As to the SPC Matrix, we vigorously negotiated each and every aspect of the matrix, including each condition and symptom that should be included, the proofs that would be required to establish causation for each of the acute A1 – A4 and the chronic B1 proof categories of the matrix, and the time frames within which the symptoms/conditions would have had to manifest. We conducted these negotiations from the bottom up; that is, we did not attach compensation amounts to any of the conditions or symptoms until we had finalized all acute and chronic conditions and symptoms that would be compensated. These negotiations took months, and at each step of the way we consulted with Dr. Harbut, PSC members and other plaintiffs' counsel to ensure that the SPC Matrix was comprehensive and addressed the conditions actually and most typically experienced by Clean-Up Workers and coastal residents. As Dr. Harbut describes the medical settlement, "I find the conditions in the SPC matrix to reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants." *See* Declaration of Michael R. Harbut, M.D., M.P.H., F.C.C.P, dated August 11, 2012 ("Harbut Decl.") at ¶ 17. Dr. Harbut further opines that the pathways of exposure and time frames within which the symptoms would

4

have manifested, as set forth in the SPC Matrix, conform to the prevailing medical literature and his clinical experiences. *See* Harbut Decl. at ¶¶ 18-19.

9.  As to the Periodic Medical Consultation Program, we similarly negotiated vigorously the components of the program to ensure that they were comprehensive and tailored to address the overall health issues of class members, and that the consultation program established a physician/patient relationship. In speaking with our own clients, PSC counsel and other plaintiffs' counsel representing individuals with personal injury claims from exposure to the oil and/or chemical dispersants, we learned that, not only were coastal residents and Clean-Up Workers exposed to oil and/or chemical dispersants that could put them at risk of future injury, but many of these individuals also do not have health insurance and, therefore, do not have regular medical examinations. Thus, the PSC negotiated for a PMCP to provide class members the opportunity to obtain much-needed medical examinations, regardless of risk from oil exposure, as well as a mechanism to learn if they have signs suggesting that they could develop a later-manifested illness associated with their exposure to the oil and/or chemical dispersant. Indeed, even class members who have not manifested a physical condition from exposure to the oil and/or chemical dispersants will benefit from the PMCP. Further, because we learned from Dr. Harbut and others that individuals in similar consultation programs oftentimes do not participate in the program long term, we negotiated for the medical settlement Claims Administrator to provide class members with annual updates about their rights to benefits under the PMCP, to schedule class members' baseline examination and consultation program every three years thereafter, and to ensure, whenever possible, that the facility at which the class members receives medical consultation is no more than 25 miles from his or her home (and if greater than 25 miles that the class members receive mileage reimbursement for distances over

5

25 miles). Similar to the SPC Matrix, we consulted with Dr. Harbut throughout the PMCP negotiations, not only about the components of the consultation program itself but also about the various safeguards established to encourage full participation for the lifetime of the PMCP.

10. Because exposure to petroleum products can cause later-manifested, serious medical conditions, the PSC further negotiated that no class member would give up his or her right to seek compensation for a later-manifested physical condition that he or she can prove was caused by exposure to the oil and/or chemical dispersants from the oil spill. In negotiating what is referred to in the settlement agreement as a "Back-End Litigation Option" ("BELO"), the PSC ensured that a class member who brings a BELO action will not have to prove either that BP caused the oil spill or that oil was in fact in the vicinity of class members; rather, a class member need only prove that his or her illness was caused by exposure to the oil and/or chemical dispersants. This was important because of the complexity of the issues relating to liability for the oil spill, the numerous witnesses and documentary evidence necessary to show liability, and what we believed would be BP's vigorous efforts to defend against liability in the absence of such an agreement in a BELO action. And while BP has the right to mediate the claim before litigation, if the parties do not reach agreement through mediation the class member may pursue his or her claim in court.

11. Finally, the PSC vigorously negotiated for the individual projects and the grant amounts for each project of the Gulf Region Health Outreach Program. We fought for this benefit, which would not be available to litigants through litigation, because we learned throughout the litigation and settlement process that physicians in the impacted Gulf region oftentimes did not have the expertise or experience to identify the health impacts people were experiencing from exposure to the oil and/or chemical dispersants. Indeed, Mr. Lundy and I

6

often were told by class members that their doctors informed them that they did not know how to identify whether their condition or symptoms were associated with exposure to the oil and/or chemical dispersant. We further learned that in many parts of the Gulf areas most impacted by the oil spill, there is a dearth of medical professionals available to provide care or treatment for the conditions that often affect the people in these areas, whether from exposure to petroleum products or other causes. Further, we learned through the Presidential National Commission Report on the BP oil spill, and discussions with class members, counsel for class members and health professionals in the Gulf states, that the BP oil spill had a significant impact on the mental and behavioral health of adults and children alike, yet the geographic areas most impacted by the oil spill are and traditionally have been underserved by mental health professionals. Because of these various deficiencies in the health care system, we negotiated the inclusion of the Outreach Program into the medical settlement. In the words of Dr. Bernard Goldstein, the chair of the Steering Committee for the Outreach Program, "Overall, the Program is well focused and comprehensive and provides much needed public health benefits to the Gulf Coast region most impacted by the Deepwater Horizon oil spill." *See* Declaration of Bernard D. Goldstein, MD, dated August 2, 2011, at ¶ 8.

12. While all components of the above-described medical settlement were hard fought, in February 2012 the parties found themselves at an impasse on critical components of the SPC Matrix and the Outreach Program in particular. At that juncture, Magistrate Judge Shushan became involved in mediating the medical settlement. With Judge Shushan's direct participation in the negotiations, the parties were able to reach agreement on the outstanding issues. This resolution, in my opinion, resulted in the fair and reasonable allocation of benefits to the medical class.

13.  Based on my direct involvement in the medical settlement negotiations, I believe that the medical class members have been fairly and faithfully represented by the PSC throughout the course of the negotiations and that the proposed medical settlement agreement represents the greatest medical benefits to the greatest number of individuals within a cohesive class whose health has been impacted by the post-explosion consequences of the BP oil spill.

Signed, under penalty of perjury, this 13th day of August, 2012, in New Orleans, Louisiana.

*Robin L. Greenwald*
Robin L. Greenwald