# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | |
| | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| | * | |

| | | |
|---|---|---|
| Plaisance, *et al.*, individually | * | NO. 12-CV-968 |
| and on behalf of the | * | |
| Medical Benefits Settlement Class, | * | SECTION: J |
| | * | |
| Plaintiffs, | * | |
| | * | HONORABLE CARL J. BARBIER |
| v. | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| BP Exploration & Production Inc., *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## BP'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
## FINAL APPROVAL OF THE MEDICAL BENEFITS CLASS ACTION SETTLEMENT

*COUNSEL LISTED AT END OF MEMORANDUM*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 3

I.     HISTORY OF THE LITIGATION. ................................................................... 3

II.    HISTORY OF THE SPILL AND RESPONSE ACTIVITIES. .......................... 6

     A.     The *Deepwater Horizon* Response Was a Massive Undertaking. ........... 6

     B.     The Government Took a Command and Oversight Role in the Response. ............ 8

     C.     The Use of Oil Dispersants Was Carefully Controlled. ......................... 10

     D.     Workers Were Provided with First-Class Training and Protection. ..................... 13

III.     THE EVIDENCE SHOWS THAT THE RISK OF HARMFUL EXPOSURES TO WORKERS AND RESIDENTS WAS LOW. ......................................... 15

     A.     The Extensive Monitoring and Sampling Data Permit a Thorough Analysis of the Possible Health Risks. ................................................. 16

     B.     The Health Risks to Clean-Up Workers and Gulf Residents Were Low. .............. 17

     C.     The Coast Guard Evaluation Stressed the Importance of Health and Safety. ..................................................................................... 23

     D.     The EPA and OSHA Also Observed That Health Risks Were Limited. ............... 23

SUMMARY OF THE SETTLEMENT .......................................................................... 24

I.     THE NEGOTIATING HISTORY DEMONSTRATES THAT NEGOTIATIONS WERE CONDUCTED AT ARM'S LENGTH. .................................................. 24

II.     THE MEDICAL CLASS IS DEFINED TO RESOLVE MOST EXPOSURE-BASED PERSONAL INJURY CLAIMS. ................................................. 25

III.     THE MEDICAL SETTLEMENT PROVIDES SIGNIFICANT BENEFITS. ................. 26

     A.     The Settlement Provides Compensation for Specified Physical Conditions. ........ 27

     B.     The Settlement Establishes a Periodic Medical Consultation Program. ................ 30

i

C.      The Settlement Establishes the Gulf Region Health Outreach Program. ..............31

D.      The Settlement Provides a Back-End Litigation Option.......................................36

E.      Other Aspects of the Settlement. .......................................................................37

IV.    IMPLEMENTATION OF THE MEDICAL SETTLEMENT TO DATE. ........................39

A.      The Class Notice Agent Implemented the Extensive Class Notice Plan. ..............39

B.      Work on the Projects for the Gulf Region Health Outreach Program Has Begun...............................................................................................................39

C.      The Claims Administrator Implementing the Settlement and Preparing for the Payment of Claims. ............................................................................................42

D.      The Reaction of Class Members to the Settlement Has Been Very Positive Thus Far. .............................................................................................................42

ARGUMENT .............................................................................................................................43

I.      THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE. ............................................................43

A.      The Parties Agreed to Settle Only After Many Months of Protracted Negotiations..............................................................................................45

B.      Settlement Is Appropriate Given That Litigation of Plaintiffs' Claims Would Be Complex, Expensive, and Lengthy.......................................................47

C.      The Advanced Stage of the Proceedings and the Amount of Discovery Completed Strongly Support Settlement. .............................................................51

D.      Plaintiffs Face Serious Risks on the Merits. .........................................................53

E.      The Settlement Benefits Are Generous Given the Range of Possible Recovery Through Litigation.................................................................................54

F.      The Opinions of Class Counsel, Class Representatives, and Absent Class Members Favor Settlement. .................................................................................56

II.     THE SETTLEMENT LACKS THE FEATURES THAT HAVE PREVENTED APPROVAL OF OTHER MEDICAL SETTLEMENTS...................................................60

III.    THE   NOTICE   APPROVED   BY   THE   COURT   EXCEEDED   THE REQUIREMENTS OF RULE 23 AND DUE PROCESS..................................................65

A.      The Notice Distribution Method and Notice Contents Satisfied Rule 23(c)(2). ..............................................................................................................65

**Page**

    B.      The Notice Satisfied Rule 23(e) and the Requirements of Due Process................70

IV.    THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT.......................71

CONCLUSION....................................................................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)......................................................................... 62, 64

*Arabie v. CITGO Petroleum Corp.*,
    89 So.3d 307 (La. 2012) ................................................................. 55

*Association For Disabled Americans, Inc. v. Amoco Oil Co.*,
    211 F.R.D. 457 (S.D. Fla. 2002)............................................... 3, 49, 58

*Ayers v. Thompson*,
    358 F.3d 356 (5th Cir. 2004) ....................................................... 50, 53, 60

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001)........................................................... 43

*Beaulieu v. EQ Industrial Services, Inc.*,
    No. 5:06-CV-00400, 2009 WL 2208131 (E.D.N.C. July 22, 2009)................................ 47

*Billitteri v. Securities America, Inc.*,
    No. 09-1568, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011)............................. 47

*Bond v. Ferguson Enterprises, Inc.*,
    No. 1:09-cv-1662, 2011 WL 2648879 (E.D. Cal. June 30, 2011) ................................ 45

*Bowling v. Pfizer, Inc.*,
    143 F.R.D. 141 (S.D. Ohio 1992) ................................................... 63

*Boyd v. Bechtel Corp.*,
    485 F. Supp. 610 (N.D. Cal. 1979) ................................................. 60

*Bryan v. Pittsburgh Plate Glass Co.*,
    494 F.2d 799 (3d Cir. 1974)......................................................... 60

*Castano v. American Tobacco Company*,
    84 F.3d 734 (5th Cir. 1996) ........................................................ 62

*Charron v. Pinnacle Group N.Y. LLC*,
    No. 07 Civ. 6316, 2012 WL 2053530 (S.D.N.Y. June 6, 2012)....................... 45

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)......................................................... 59

iv

*Collins v. Sanderson Farms, Inc.*,
    568 F. Supp. 2d 714 (E.D. La. 2008) .................................................. 43, 44, 48

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) .................................................... passim

*Dauphin Island Property Owners Association v. United States*,
    90 Fed. Cl. 95 (2009) .................................................................. 60

*DeBremaecker v. Short*,
    433 F.2d 733 (5th Cir. 1970) .......................................................... 61

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) ................................................ passim

*Doerr v. Mobil Oil Corp.*,
    935 So.2d 231 (La. App. 2006) ........................................................ 55

*Domingue v. Sun Elec. & Instrumentation*,
    No. 09-682, 2010 WL 1688793 (M.D. La. Apr. 26, 2010) ................................ 46

*Duncan v. N.W. Airlines, Inc.*,
    203 F.R.D. 601 (W.D. Wash. 2001) .................................................... 64

*E.E.O.C v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) .......................................................... 60

*Ebbert v. Nassau County*,
    No. CV 05-5445, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) ........................... 45

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010) ........................................................... 43

*Elliott v. Sperry Rand Corp.*,
    680 F.2d 1225 (8th Cir. 1982) ......................................................... 60

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008) ................................................................... 49

*Faircloth v. Certified Finance, Inc.*,
    No. 99-3097, 2001 WL 527489 (E.D. La. May 16, 2001) .............................. 48, 51

*Feinberg v. Hibernia Corp.*,
    966 F. Supp. 442 (E.D. La. 1997) ...................................................... 52

*Fisher Brothers v. Cambridge-Lee Industries*,
    630 F. Supp. 482 (E.D. Pa. 1985) ...................................................... 72

*Fowler v. Birmingham News Co.*,
608 F.2d 1055 (5th Cir. 1979) ........................................................................ 70

*Fussell v. Wilkinson*,
No. 03CV704, 2005 U.S. Dist. LEXIS 30984 (S.D. Ohio Nov. 22, 2005) ...................... 72

*Garza v. Sporting Goods Properties, Inc.*,
No. 93-108, 1996 WL 56247 (W.D. Tex. Feb. 6, 1996).................................... 59

*Gates v. Rohm and Haas Co.*,
655 F.3d 255 (3d Cir. 2011)............................................................................. 64

*Geier v. Alexander*,
801 F.2d 799 (6th Cir. 1986) ........................................................................... 59

*Giusti-Bravo v. U.S Veterans Administration*,
853 F. Supp. 34 (D.P.R. 1993)......................................................................... 60

*Gong-Chun v. Aetna Inc.*,
No. 1:09-cv-01995, 2012 WL 2872788 (E.D. Cal. July 12, 2012).................................. 45

*Granada Investments, Inc. v. DWG Corp.*,
962 F.2d 1203 (6th Cir. 1992) ......................................................................... 46

*Grant v. Bethlehem Steel Corp.*,
823 F.2d 20 (2d Cir. 1987)............................................................................... 60

*Hammon v. Barry*,
752 F. Supp. 1087 (D.D.C. 1990) ..................................................................... 58

*Howard v. Union Carbide Corp.*,
50 So.3d 1251 (La. 2010) ................................................................................. 55

*In re Austrian & German Bank Holocaust Litigation*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000)................................................................. 58

*In re Budeprion XL Marketing & Sales Litigation*,
MDL No. 2107, No. 09-md-2107, 2012 WL 2527021 (E.D. Pa. July 2, 2012) .............. 45

*In re Cardinal Health, Inc. Securities Litigation*,
550 F. Supp. 2d 751 (S.D. Ohio 2008) ............................................................. 59

*In re Cardizem CD Antitrust Litigation*,
218 F.R.D. 508 (E.D. Mich. 2003) ................................................................... 58

*In re Checking Account Overdraft Litigation*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ............................................................. 59

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016 (5th Cir. 1997) ............................................................... 61

*In re Chinese-Manufactured Drywall Products Liability Litigation*,
    MDL No. 2047, 2012 WL 92498 (E.D. La. Jan. 10, 2012) ........................................ 66, 67

*In re Combustion, Inc.*,
    968 F. Supp. 1116 (W.D. La. 1997) .......................................................... passim

*In re Corrugated Container Antitrust Litigation*,
    643 F.2d 195 (5th Cir. 1981) ............................................................. 3, 47, 52

*In re Currency Conversion Fee Antitrust Litigation*,
    263 F.R.D. 110 (S.D.N.Y. 2009) ............................................................... 46

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)
    Products Liability Litigation*,
    MDL 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) .................................... 53, 63, 73

*In re Domestic Air Transportation Antitrust Litigation*,
    148 F.R.D. 297 (N.D. Ga. 1993) ............................................................... 72

*In re Educational Testing Services Praxis Principles of Learning & Teaching:
    Grades 7-12 Litigation*,
    447 F. Supp. 2d 612 (E.D. La. 2006) ....................................................... 44, 51

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation.*,
    228 F.R.D. 541 (S.D. Tex. 2005) ............................................................... 3

*In re Enron Corp. Securities, Derivatives, & "ERISA" Litig.*,
    No. MDL-1446, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ..................................... 70

*In re Exxon Valdez*,
    229 F.3d 790 (9th Cir. 2000) ................................................................. 43

*In re Four Seasons Securities Laws Litigation*,
    58 F.R.D. 19 (W.D. Okla. 1972) ............................................................... 69

*In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation*,
    --- F. Supp. 2d ---, MDL No. 09-2046, 2012 WL 948365
    (S.D. Tex. Mar. 20, 2012) ................................................................. 45, 46

*In re Ikon Office Solutions, Inc. Securities Litigation*,
    194 F.R.D. 166 (E.D. Pa. 2000) ............................................................... 67

*In re Initial Public Offering Securities Litigation*,
    243 F.R.D. 79 (S.D.N.Y. 2007) ................................................................ 53

*In re Insurance Brokerage Antitrust Litigation*,
    MDL No. 1663, No. 04-5184, 2012 WL 1071240 (D.N.J. Mar. 30, 2012) ..................... 45

*In re Katrina Canal Breaches Litigation*,
    673 F.3d 381 (5th Cir. 2012) ........................................................................... 60

*In re Lease Oil Antitrust Litigation,*
    186 F.R.D. 403 (S.D. Tex. 1999) ...................................................................... 45

*In re Lloyd's American Trust Fund Litigation*,
    96 CIV.1262 RWS, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) .............................. 60

*In re Mills Corp. Securities Litigation*,
    265 F.R.D. 246 (E.D. Va. 2009) ....................................................................... 46

*In re OCA, Inc. Securities and Derivative Litigation*,
    No.05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ............................................ 58

*In re Partsearch Technologies, Inc.*,
    453 B.R. 84 (S.D.N.Y. 2011) ........................................................................... 45

*In re Pharmeceutical Industry Average Wholesale Price Litigation*,
    520 F. Supp. 2d 274 (D. Mass. 2007) ................................................................. 59

*In re Philips/Magnavox Television Litigation*,
    No. 09-3072, 2012 WL 1677244 (D.N.J. May 14, 2012) ............................................. 45

*In re Prudential Insurance Co. of America Sales Practices Litigation*,
    962 F. Supp. 450 (D.N.J. 1997) .................................................................... 59, 67

*In re Prudential Securities Inc. Ltd. Partnerships Litigation*,
    164 F.R.D. 362 (S.D.N.Y. 1995) ...................................................................... 69

*In re Rio Hair Naturalizer Products Liability Litigation*,
    MDL No. 1055, 1996 U.S. Dist. LEXIS 20440 (E.D. Mich. Dec. 20, 1996) .................. 72

*In re Shell Oil Refinery*,
    155 F.R.D. 552 (E.D. La. 1993) ............................................................. 47, 48, 50, 58

*In re TD Ameritrade Account Holder Litigation*,
    No. C 07-2852, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ..................................... 45

*In re Terazosin Hydrochloride Antitrust Litigation*,
    No. MDL 99-1317, 2005 WL 2451960 (S.D. Fla. July 8, 2005) ................................... 44

*In re Train Derailment Near Amite, Louisiana*,
    MDL No. 1531, 2006 WL 1561470 (E.D. La. May 24, 2006) ........................................ 45

*In re U.S. Oil & Gas Litigation*,
   967 F.2d 489 (11th Cir. 1992) ...................................................................... 47

*In re UnitedHealth Group Inc. PSLRA Litigation*,
   643 F. Supp. 2d 1107 (D. Minn. 2009) ......................................................... 59

*In re Warfarin Sodium Antitrust Litigation*,
   391 F.3d 516 (3d Cir. 2004) ........................................................................... 43

*In re Washington Public Power Supply System Securities Litigation*,
   720 F. Supp. 1379 (D. Ariz. 1989),
   *aff'd* 955 F.2d 1268 (9th Cir. 1992) ............................................................. 72

*In re Wells Fargo Loan Processor Overtime Pay Litigation*,
   MDL No. C-07-1841, 2011 WL 3352460 (N.D. Cal. Aug. 2, 2011) ............... 45

*International Union, UAW v. General Motors Corp.*,
   No. 07-CV-14074DT, 2008 WL 2968408 (E.D. Mich. July 31, 2008) ........... 56

*International Union, United Auto, Aerospace, &*
   *Agricultural Implement Workers of America v. General Motors Corp.*,
   497 F.3d 615 (6th Cir. 2007) .................................................................. 43, 70

*IUE-CWA v. General Motors Corp.*,
   238 F.R.D. 583 (E.D. Mich. 2006) ................................................................. 59

*Jermyn v. Best Buy Stores, L.P.*,
   No. 08 Civ. 214, 2012 WL 2505644 (S.D.N.Y. June 27, 2012)...................... 45

*Kelly v. Phiten USA, Inc.*,
   277 F.R.D. 564 (S.D. Iowa 2011) ................................................................... 45

*Klein v. O'Neal, Inc.*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010) .......................................................... 47

*Lazar v. Pierce*,
   757 F.2d 435 (1st Cir. 1985)........................................................................... 43

*Lazy Oil Co v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997), *aff'd,* 166 F.3d 581 (3rd Cr. 1999) ................ 56, 58

*Lucas v. Kmart Corp.*,
   234 F.R.D. 688 (D. Colo. 2006) ..................................................................... 46

*Luevano v. Campbell*,
   93 F.R.D. 68 (D.D.C. 1981)............................................................................ 72

*Mars Steel Corp. v. Continental Illinois National Bank & Trust Co. of Chicago*,
    834 F.2d 677 (7th Cir 1987) ................................................................... 47

*Maywalt v. Parker & Parsley Petroleum Co.*,
    67 F.3d 1072 (2d Cir. 1995)..................................................................... 46

*McAlarnen* v. *Swift Transportation Co., Inc.*,
    No. 09-1737, 2010 WL 365823 (E.D. Pa. Jan. 29, 2010)................................. 46

*McDonough v. Toys"R"Us, Inc.*,
    834 F. Supp. 2d 329 (E.D. Pa. 2011) ........................................................ 45

*McKenzie v. Federal Express Corp.*,
    No. CV 10-02420, 2012 WL 2930201 (C.D. Cal. July 2, 2012) ...................... 45

*McLennan v. LG Electronics USA, Inc.*,
    No. 2:10-cv-03604, 2012 WL 686020 (D.N.J. Mar. 2, 2012) ......................... 45

*Michigan Hospital Association v. Babcock*,
    No. 5:89-cv-00070, 1991 U.S. Dist. LEXIS 2058 (W.D. Mich. Feb. 11, 1991) ............. 59

*Moore v. United States*,
    63 Fed. Cl. 781 (Fed. Cl. 2005) ............................................................... 44

*Morris v. Affinity Health Plan, Inc.*,
    No. 09 Civ. 1932, 2012 WL 1608644 (S.D.N.Y. May 8, 2012)....................... 45

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)............................................................................... 70

*Navarro-Ayala v. Hernandez-Colon*,
    951 F.2d 1325 (1st Cir. 1991) ................................................................. 70

*Neff v. VIA Metropolitan Transit Authority*,
    179 F.R.D. 185, 208 (W.D. Tex. 1998) ..................................................... 44

*Odom v. Hazen Transport, Inc.*,
    275 F.R.D. 400 (W.D.N.Y. 2011)............................................................. 45

*Okeefe v. Mercedes-Benz USA, LLC*,
    214 F.R.D. 266 (E.D. Pa. 2003)............................................................... 59

*Olden v. LaFarge Corp.*,
    472 F. Supp. 2d 922 (E.D. Mich. Jan. 29, 2007) ........................................ 44

*Ortiz v. Fibreboard*,
    527 U.S. 815 (1999)............................................................................... 60

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ........................................................................ 58

*Phemister v. Harcourt Brace Jovanovich, Inc.*,
    No. 77 C 39, 1984 WL 21981 (N.D. Ill. Sept. 14, 1984) .................................... 72

*Priddy v. Edelman*,
    883 F.2d 438 (6th Cir. 1989) .......................................................................... 56

*Quigley v. Braniff Airways, Inc.*,
    85 F.R.D. 74 (N.D. Tex. 1977) ........................................................................ 70

*Radosti v. Envision EMI, LLC*,
    717 F. Supp. 2d 37 (D.D.C. 2010) ................................................................... 53

*Reed v. General Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) ..................................................................... passim

*Ripley v. Sunoco, Inc.*,
    No. 10-1194, 2012 WL 2402632 (E.D. Pa. June 26, 2012) ............................... 45

*Rivera v. United Gas Pipeline Co.*,
    697 So.2d 327 (La. App. 1997) ....................................................................... 55

*Robinson v. Ford Motor Co.*,
    No. 04-844, 2005 WL 5253339 (S.D. Ohio June 15, 2005) ......................... 44, 58

*Rodriguez v. West Publishing Group*,
    563 F.3d 948 (9th Cir. 2009) ..................................................................... 47, 49

*Ruiz v. McKaskle*,
    724 F.2d 1149 (5th Cir. 1984) ................................................................... 45, 71

*Salinas v. Roadway Express, Inc.*,
    802 F.2d 787 (5th Cir. 1986) .......................................................................... 50

*San Antonio Hispanic Police Officers Organization, Inc. v. City of San Antonio*,
    188 F.R.D. 433 (W.D. Tex. 1999) .................................................................... 58

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) .......................................................... 45, 47

*Sewell v. Bovis Lend Lease, Inc.*,
    No. 09 Civ. 6548, 2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012) ........................ 45

*Silber v. Mabon*,
    18 F.3d 1449 (9th Cir. 1994) .......................................................................... 69

*Smith v. Ajax Magnethermic Corp.*,
No. 02-0980, 2007 WL 3355080 (N.D. Ohio Nov. 7. 2007)........................................... 49

*Smith v. Crystian*,
91 F. App'x 952 (5th Cir. 2004) ........................................................................... 43, 44

*Smith v. Tower Loan of Miss., Inc.*,
216 F.R.D. 338 (S.D. Miss. 2003) ............................................................................... 46

*Stoetzner v. U.S. Steel Corp.*,
897 F.2d 115 (3d Cir. 1990)...................................................................................... 60

*Strong v. BellSouth Telecomm., Inc.*,
137 F.3d 844 (5th Cir. 1998) .................................................................................... 59

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003).......................................................................... 58

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011)......................................................................... 3, 43, 45

*Sunrise Toyota, Ltd. v. Toyota Motor Co.*,
No. 71 Civ. 1335-LFM, 1973 U.S. Dist. LEXIS 14862 (S.D.N.Y. 1973)...................... 72

*Taifa v. Bayh*,
846 F. Supp. 723 (N.D. Ind. 1994) .................................................................... 58, 60

*Trombley v. National City Bank*,
759 F. Supp. 2d 20 (D.D.C. 2011) .............................................................................. 53

*Turner v. Murphy Oil USA, Inc.*,
472 F. Supp. 2d 830 (E.D. La. 2007)................................................................... passim

*UAW v. General Motors Corp.*,
235 F.R.D. 383 (E.D. Mich. 2006) ........................................................................ 3, 54

*Union Asset Management Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) ..................................................................................... 61

*United States v. New Jersey*,
No. 88-5087, 1995 WL 1943013 (D.N.J. Mar. 14, 1995) ................................................ 44

*Van Horn v. Trickey*,
840 F.2d 604 (8th Cir. 1988) .................................................................................... 60

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)................................................................................................ 45

*Weinberger v. Kendrick,*
    698 F.2d 61 (2d Cir. 1982)............................................................................ 56, 69

*Whitford v. First Nationwide Bank,*
    147 F.R.D. 135 (W.D. Ky. 1992)..................................................................... 44, 59

*Williams v. Vukovich,*
    720 F.2d 909 (6th Cir. 1983) ............................................................................ 44

*Zimmer Paper Products, Inc. v. Berger & Montague, P.C.,*
    758 F.2d 86 (3d Cir. 1985).................................................................................. 69

**Other Authorities**

2 Newberg on Class Actions § 11.47 (2d ed.............................................................. 58

2 Newberg on Class Actions § 11.58 (3d ed.) .......................................................... 72

40 C.F.R. § 300.105(d) ............................................................................................ 9

40 C.F.R. § 300.120(a)............................................................................................. 9

6 Newberg on Class Actions § 18:57 (4th ed.) ........................................................ 59

*Exxon Shipping Co. v. Baker,*
    Brief for Respondents, No. 07-219, 2008 WL 194284 (U.S. Jan. 22, 2008).................... 49

Fed. Prac. & Proc. § 1797.1 ..................................................................................... 72

Federal Judicial Center,
    *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide
    (2010)* ................................................................................................................. 69

J. Steven Picou, WHEN THE SOLUTION BECOMES THE PROBLEM:
    THE IMPACTS OF ADVERSARIAL LITIGATION ON SURVIVORS OF THE EXXON VALDEZ OIL SPILL,
    7 U. St. Thomas L.J. 68 (2009)........................................................................... 49

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................ 65, 66, 67

Fed. R. Civ. P. 23(e)(1)................................................................................... 65, 70

Fed. R. Civ. P. 23(e)(3)....................................................................................... 25

# INTRODUCTION

After nearly a year of hard-fought negotiations, including crucial sessions overseen by Judge Shushan, BP and Class Counsel, on behalf of the Class Representatives, reached agreement on the Medical Benefits Class Action Settlement.[1]  This Settlement resolves the claims of Clean-Up Workers and Residents of defined Gulf Coast beachfront and wetlands areas for specified bodily and/or personal injuries allegedly arising from exposure to oil and/or dispersants released through the *Deepwater Horizon* oil spill and Response Activities.[2]  The Settlement is more than "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and provides significant and concrete benefits to qualifying Class Members, including benefits that could not be obtained in litigation or ordered by a court.  These benefits are particularly generous when weighed against the cost, delay, and uncertainty of continued litigation, as well as the risk that all or many Class Members would ultimately receive no recovery at all.  In particular, benefits under the Settlement include:

- Compensation for Specified Physical Conditions claimed to be caused by exposure to oil and/or dispersants;

- A comprehensive Periodic Medical Consultation Program providing regular medical examinations to Class Members every three years over a 21-year period;

- Preservation of Class Members' rights to sue BP for compensatory damages for physical conditions that manifest at a later date; and

- A transparent and efficient claims administration process.

---

[1] Terms with initial capital letters used in this Memorandum have the meanings ascribed to the fully capitalized rendering of such terms in the Medical Benefits Class Action Settlement Agreement.  In addition, "Class", "Class Members", "Medical Settlement Agreement" (or "Agreement"), and "Medical Benefits Settlement" (or "Settlement") are also used herein to refer, respectively, to the Medical Benefits Settlement Class, the Medical Benefits Settlement Class Members, the Medical Benefits Class Action Settlement Agreement, and the Medical Benefits Class Action Settlement.

[2] References in the brief to "oil and/or dispersants" refer to the crude oil, other hydrocarbons, dispersants, decontaminants, and/or other substances resulting from the *Deepwater Horizon* Incident, including the resulting mixture of the substances, as well as the byproducts of *in situ* burns.

The Settlement also establishes a Gulf Region Health Outreach Program that will benefit not only Class Members but also other residents of coastal areas in the Gulf States.  It provides $105 million over five years to a set of integrated programs designed to improve healthcare capacity and health literacy in the region.  This Outreach Program addresses the needs of Class Members while providing lasting benefits to communities on the Gulf Coast, and implementation of it has already begun.

As outside observers have pointed out, the Medical Benefits Class Action Settlement and the Economic and Property Damages Settlement are unique, and represent a significant step forward in addressing actual and perceived injuries allegedly resulting from the *Deepwater Horizon* oil spill.  For example, Professor David Uhlmann, former Chief of the Justice Department's environmental crimes section, commented that the "settlement announcement is good news for the victims of the Gulf oil spill who will see their losses compensated much more quickly than the victims of the Exxon Valdez oil spill."[3]  Professor Zyg Plater, who was chairman of Alaska's oil spill commission legal research task force after the Exxon Valdez incident, similarly noted that "[i]f this had come to us in Alaska, I think everyone in the commission and in the coastal communities of Alaska would have been ecstatic."[4]  Attorney Tim Howard praised the agreement as "more beneficial to claimants," and further noted that "[a]t first look there will be more transparency than the Gulf Coast Claims Facility, and higher returns for claimants."[5]  By contrast, the few objections filed to date provide no basis on which the Court should reject the Settlement.

As BP demonstrates below, the Settlement satisfies each of the *Reed* factors specified by the Fifth Circuit for approval of class action settlements and is more than fair, reasonable, and

---

[3] *BP in $7.8bn Settlement of Gulf Claims*, Financial Times, Mar. 3, 2012.
[4] *BP Oil Spill Health Settlement Details Are Still a Mystery*, The Times-Picayune, Mar. 11, 2012.
[5] *New Macondo Settlement Gains Favor with Claimants' Attorneys*, Platts Commodity News, Mar. 5, 2012.

adequate.  *See Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).  Although the Court necessarily must consider the Settlement in light of the facts that have been developed and the recovery that the Class might obtain outside the Settlement, the Court's scrutiny should not rise to the level of a trial.  *Id.* ("The court . . . must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial.") (quotations and alterations omitted).[6] *In re Enron Corp. Sec., Deriv. & "ERISA" Litigation.*, 228 F.R.D. 541, 553 (S.D. Tex. 2005)  Rather, the Court should bear in mind that any objectors to the Settlement have the "heavy burden" of demonstrating that the settlement agreement is not fair, reasonable, and adequate—and that their objections are both valid and relevant.  *See*, *e.g., DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 293 (W.D. Tex. 2007).  Because the Settlement easily satisfies the requirements of Rule 23, BP requests that the Court enter a final order approving the Medical Benefits Settlement.

## BACKGROUND

## I.    HISTORY OF THE LITIGATION.

The BP defendants are corporations engaged in the business of oil and gas exploration and production.  Plaintiffs are the Medical Benefits Settlement Class Representatives named in

---

[6] *See also In re Corrugated Contained Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) (evaluation of a settlement "is not and cannot involve a trial on the merits"); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 228 F.R.D. 541, 553 (S.D. Tex. 2005) (evaluation of a settlement cannot involve a trial on the merits "because the policy of encouraging settlements is effected by 'the very uncertainty of the outcome of the litigation and the avoidance of wasteful litigation and expense.'") (quoting *In re Corrugated Container*, 643 F.2d at 212); *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) ("[A] fairness hearing is not a trial, but instead has a very singular and narrow purpose—to determine whether the settlement at issue is fair, reasonable, and adequate."); *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("In evaluating these considerations, the Court must not try the case on the merits."). Nor is it the Court's responsibility to determine whether, had negotiations proceeded differently, the class conceivably might have obtained even greater recovery. *See Sullivan v. DB Invs.*, 667 F.3d 273, 324 (3d Cir. 2011) (*en banc*) ("Notably, in conducting the analysis, the court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (the "trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.") (internal quotations marks omitted).

the Medical Class Action Complaint.  Plaintiffs' claims for bodily and/or personal injury arise from, and were filed as a result of, their alleged exposure to oil and/or dispersants.  The events leading to the alleged exposure include: (i) the blowout of the MC252 Well; (ii) the explosions and fire on board the *Deepwater Horizon* on or about April 20, 2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010; (iv) the release of oil, other hydrocarbons, and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances; (v) the efforts to contain the MC252 Well; and (vi) Response Activities to address the spill.

In accordance with this Court's pretrial orders, the Plaintiffs' Steering Committee filed the B3 Master Complaint on December 15, 2010 (Rec. Doc. 881), and filed an amended B3 Master Complaint on March 30, 2011 (Rec. Doc. 1812).[7]  To date, more than 17,000 plaintiffs have filed short-form joinders in MDL 2179 adopting the B3 Master Complaint.  A significant number of these plaintiffs are likely Class Members.[8]

Plaintiffs' Medical Class Action Complaint, filed on April 16, 2012, is brought on behalf of thousands of individuals asserting bodily and/or personal injury claims from alleged exposure to oil and/or dispersants arising from the *Deepwater Horizon* Incident.  Plaintiffs assert claims under maritime law for negligence, negligence *per se*, and gross negligence, and seek compensatory damages, punitive damages, and costs for medical monitoring.  BP denied Plaintiffs' allegations and claims, and asserted various legal, affirmative, and other defenses in

---

[7] The B3 bundle includes "all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  (PTO 25 (Rec. Doc. 983).)  BP moved to dismiss the B3 Master Complaint on February 28, 2011.  (Rec. Doc. 1406.)  The Court issued a decision granting in part and denying in part BP's motion on September 30, 2011.  (Rec. Doc. 4159.)  The Court ruled that plaintiffs' claims were governed by maritime law, rather than state law, and that plaintiffs had stated certain maritime law claims against BP.  (*Id.* at 23-24.)  The Court dismissed plaintiffs' claims for negligence *per se*, battery, and nuisance under state law, but held that plaintiffs could replead their claim for negligence *per se*.

[8] In addition, there are approximately 780 plaintiffs who did not adopt the B3 Master Complaint, but indicated that they were pursuing a personal injury/death claim.  There are also more than 12,000 plaintiffs who did not adopt the B3 Master Complaint or indicate that they were pursuing a personal injury/death claim, but did indicate that they are pursuing a claim for fear of future injury and/or medical monitoring.  Some of these plaintiffs are also likely Class Members.

its Answer and Affirmative Defenses to Plaintiffs' Medical Class Action Complaint, filed on May 7, 2012.  (Rec. Doc. 6454.)

On April 18, 2012, Plaintiffs and BP filed the Medical Benefits Class Action Settlement Agreement and a joint motion for preliminary approval of the Settlement.  (Rec. Docs. 6273, 6267.)[9]  On the same date, Plaintiffs moved to certify the Class for purposes of settlement. (Rec. Doc. 6272.)  On April 25, 2012, the Court heard argument on the preliminary approval of the Medical Benefits Settlement, as well as the Economic and Property Damages Settlement.  On May 2, 2012, the Court preliminarily approved the Medical Benefits Settlement and preliminarily and conditionally certified the Class for settlement purposes only. (Rec. Doc. 6419.)[10]  The Court found, among other things, that "the proposed Settlement (i) is fair, reasonable, and adequate based on the Court's preliminary inquiry; (ii) is the result of protracted and intense negotiations conducted by the parties at arms' length and in good faith, and is not the result of collusion; (iii) discloses no reason to doubt its fairness and has no obvious deficiencies; (iv) does not improperly grant preferential treatment to the Medical Benefits Class Representatives or segments of the class; and (v) falls within the range of possible judicial approval."  (*Id.* at 18.)  The Court also held that the "Class satisfies the [ ] requirements of Federal Rule of Civil Procedure Rule 23(a) and Rule 23(b)(3)."  (*Id.* at 16.)  The Court directed that notice be sent to the Class and that a Fairness Hearing be held on November 8, 2012.

---

[9] Following the original filing, the parties made some minor amendments to the agreement, and executed those amendments on May 1, 2012.  On May 3, 2012, they filed the as-amended (and still current) version of the Medical Settlement Agreement with the Court.  (Rec. Doc. 6427.)
[10] The Court's order also established certain deadlines and granted certain other relief related to the Settlement.

## II.   HISTORY OF THE SPILL AND RESPONSE ACTIVITIES.

### A.   The *Deepwater Horizon* Response Was a Massive Undertaking.

On April 20, 2010, the mobile offshore drilling unit *Deepwater Horizon* was in the process of temporarily closing an exploratory well at the Mississippi Canyon Block 252 lease block.  That evening, a loss of well control and then explosions and fire aboard the *Deepwater Horizon* set off a chain of events that eventually led to the sinking of the *Deepwater Horizon*, the oil spill, and the Response Activities that are the subjects of this litigation.[11]

BP, together with government agencies and private entities, immediately initiated a massive response to the incident.  (Declaration of David R. Dutton ¶ 14, attached as Exhibit A.) The response consisted of an unprecedented armada of personnel, equipment, technologies, and methodologies that collectively represented the best oil spill response resources available.  (*Id.* ¶ 7.)  At its peak, the response involved approximately 48,000 people engaged in a multitude of Response Activities.  (*Id.*)  response workers engaged in near-shore and offshore Response Activities in the Gulf of Mexico, operating approximately 6,500 marine vessels, including approximately 5,800 Vessels of Opportunity, and undertaking all of the recognized measures of responding to an oil spill at sea.  (*Id.*)  These efforts included: (i) skimming oil from the surface; (ii) conducting approximately 400 controlled *in-situ* burns; (iii) placing more than 13 million feet of containment and sorbent boom; and (iv) applying approximately 1.8 million gallons of government-approved dispersants to disperse oil and protect the shoreline.  Each aspect of the

---

[11] Certain government reports related to the *Deepwater Horizon* Incident, the Response Activities, and related issues provided information relied on by the parties in informing their negotiations.  Fact and expert witnesses who have provided declarations have also relied on and/or cited certain government reports.  The Court has properly ruled that several of these government reports and related investigations are inadmissible in any trial, and BP does not waive its objections to the use of any such reports at trial.  To the extent BP and its witnesses rely on the facts and/or conclusions found in any reports, BP submits that such facts and/or conclusions are well-supported by the evidence that would ultimately be presented at any trial on these matters.

response was directed and authorized by the federal government, through the Unified Area Command ("UAC") structure, described further below in Section II.B of the Background.

The objectives of an oil spill response are two-fold: protect human health and minimize environmental harm.   In the case of an offshore oil spill, one of the primary ways of accomplishing both objectives is by preventing oil from reaching the shore.   As detailed below, there are several oil spill response methods that can be utilized to remove oil from the marine environment or otherwise prevent it from reaching shore.   All of these response methods were utilized during the *Deepwater Horizon* response and, importantly, were used under the direction of and with approval from the UAC under the leadership of the Federal On Scene Coordinator ("FOSC").   (Dutton Decl. ¶ 14.)

First, there are a number of mechanical means of containing or collecting oil, which include containment of the oil at the source of the discharge and skimming and booming of surface oil.   A number of containment devices were utilized during the response to contain oil and gas at the source of the discharge and transport them through risers to vessels on the ocean surface.   Using such containment methods, BP and the UAC were able successfully to collect over 800,000 barrels of oil, preventing its release into the Gulf of Mexico.   (*Id.* ¶ 15.)

In addition, an unprecedented number of skimmers and length of boom were utilized during the response to remove oil from the surface of the Gulf of Mexico and redirect oil away from the shoreline and other sensitive environments.   Skimmers are devices that collect oil from the surface of the water, and boom are long, tube-like floating barriers that are placed at strategic locations along the water surface to absorb oil (sorbent boom) or to provide a barrier against oiling of the shoreline or other sensitive environmental locations (hard boom).   Numerous types

of skimming devices and more than 13 million feet of boom were utilized during the response to collect surface oil and prevent shoreline oiling.  (*Id.* ¶ 16.)

In addition to mechanical means of oil recovery, controlled *in situ* burning and application of oil dispersants can be used to minimize shoreline oiling.  The use of dispersants is discussed in greater detail below in Section II.C of the Background.  Controlled *in situ* burning is a well-established oil spill response method by which oil is corralled using fire-resistant boom and then burned in order to remove the oil from the water surface.  This is particularly effective for removing weathered oil, which is less susceptible to degradation through dispersants.  Under the direction of and with approval from the UAC, approximately 400 controlled *in situ* burns were conducted during the response to remove oil from the surface of the Gulf.  (*Id.* ¶ 17.)

A number of response methods were also implemented onshore to clean up oil that reached the Gulf Coast.  These response methods included mechanical and manual methods of removing tar balls, tar mats, and submerged oil.  Thousands of response workers were engaged in onshore Response Activities.  (*Id.* ¶ 19.)

BP successfully controlled the wellhead on July 15, 2010.  (D1 Mot. to Dismiss Order (Rec. Doc. 2784) at 6 n.1.)  The well was permanently sealed in September 2010, when a relief well was used to pump cement into the well.  (*Id.*)

### B.      The Government Took a Command and Oversight Role in the Response.

The massive response was a highly coordinated effort among BP, federal, state, and local governments, and private corporations and citizens.  The federal government, through a unified command structure, was in charge of the response and related activities.  BP, of course, played a significant role, but the ultimate authority was in the hands of the federal government.

As required by the National Contingency Plan ("NCP"), a unified command structure was used.[12]  Although the UAC structure is designed to bring different stakeholders together to make decisions, it recognizes that ultimate decision-making authority must rest with one individual.  Under the NCP, that individual is the FOSC, who for purposes of a response to an incident of this nature is a Coast Guard official.  Rear Admiral Mary Landry was named as the first FOSC.  (Dutton Decl. ¶ 8.)

The Coast Guard, of course, was not the only governmental agency involved in the response.  The UAC structure also included the U.S. Environmental Protection Agency ("EPA"), the National Oceanic and Atmospheric Administration ("NOAA"), and other government agencies.  (Dutton Decl. ¶ 8.)  In addition, a number of other federal agencies, including the U.S. Occupational Safety and Health Administration ("OSHA"), the Centers for Disease Control and Prevention ("CDC"), and the National Institute for Occupational Safety and Health ("NIOSH"), participated in the response in advisory roles.  (*Id.*)  State and local agencies and entities participated as well.

The UAC was divided into a number of functional groups or departments, which included, among others, Operations, Environmental, Safety, Situation, Logistics, and Finance.  (*Id.* ¶ 9.)  In addition to participating in other activities, various agencies played important roles in overseeing response worker safety and monitoring the potential exposure of workers and the public to harmful substances.

---

[12] The NCP, codified as 40 C.F.R. Part 300, is the federal government's blueprint for responding to oil spills.  The NCP requires oil spill responses to be organized pursuant to the UAC structure that brings together federal and state governments and the responsible party to achieve an effective and efficient response where the FOSC maintains authority and directs response efforts.  40 C.F.R. §§ 300.105(d), 300.120(a).

### C.      The Use of Oil Dispersants Was Carefully Controlled.

A key aspect of the response was the use of dispersants.  Chemical dispersant application is a well-established, core component of oil spill response.  (Dutton Decl. ¶ 22.)  Dispersants break down oil into smaller droplets, which increases the surface area of the mass and disperses oil into the water column (as opposed to remaining on the water surface), which together render the oil more available for biodegradation.  (*Id.*)  As a result of this dispersion process, oil more readily degrades.  Dispersants also reduce the size of and substantially eliminate surface slicks, which would risk direct impact to sensitive shoreline habitats and wildlife.  (*Id.*)  When applied in accordance with regulatory requirements and guidance, dispersants can prevent the worst of the possible impacts from an oil spill in terms of harm to the ecosystem and environment.  (*Id.*)

Two types of dispersants were used during the response: Corexit® EC9500A ("Corexit 9500A") and Corexit® EC9527A ("Corexit 9527A").  Both Corexit® products were, and still are, on the NCP Product Schedule, which is a list of dispersants pre-approved by EPA for use in oil spill response efforts.  Corexit 9527A was used in the response from April 22, 2010 to May 22, 2010.  Corexit 9500A was used from April 27, 2010 to July 19, 2010.  (*Id.* ¶ 24.)[13] Both BP and EPA investigated the toxicity, effectiveness, and availability of dispersants approved for use by EPA on the NCP Product Schedule.  (*Id.* ¶ 25.)  This testing showed that the Corexit® products used to respond to the oil spill are as safe as other available alternatives and are more effective at dispersing oil.  (*Id.*)  SMART testing[14] throughout the response confirmed the effectiveness of the dispersants that had been applied.  (*Id.*)  Dispersants were applied during the response only under the direction of and with approval of the UAC; BP requested approval

---

[13] There was an additional small application of Corexit 9500A on September 4, 2010, within the moon-pool (an opening in a vessel's floor) of a recovery vessel that brought the capping stack to the surface of the Gulf of Mexico. (Dutton Decl. ¶ 24.)

[14] Special Monitoring of Applied Response Technologies is a cooperatively designed monitoring program for *in situ* burning and dispersants.  SMART relies on small, highly mobile teams that collect real-time data using portable, rugged, and easy-to-use instruments during dispersant and *in situ* burning operations.  (Dutton Decl. at 10 n.1)

for the use of dispersants, but BP itself could not and did not authorize the use of dispersants during the response.  (*Id.* ¶ 23.)

Dispersants were applied during the response using three methods of application: aerial, vessel, and subsea.  (*Id.* ¶ 26.)  The primary method of dispersant application during the response was aerial.  (*Id.*)  Aerial dispersant operations were conducted from April 22, 2010 to July 19, 2010.  (*Id.*)  Over the course of the response, approximately 970,000 gallons of dispersant were applied by aerial application to surface oil slicks.  (*Id.*)  Dispersant was applied by aircraft to surface oil in the Gulf of Mexico over an operational area of approximately 18,000 square miles.  (*Id.* ¶ 28.)

Dispersant also was applied by vessel, primarily near the source-control area (*i.e.*, within five miles of the MC252 Well).  (*Id.* ¶ 29.)  The primary reason for applying dispersant by vessel was to control airborne levels of volatile organic compounds ("VOCs") directly above the wellhead in order to protect response workers functioning in the source-control area from elevated levels of those compounds, when they were released to the atmosphere as oil reached the surface.  (*Id.*)  The dispersants were effective in reducing VOC levels by dispersing the surface oil slicks.  (*Id.*)  Over the course of the response, approximately 95,000 gallons of dispersant were applied by vessel application.  (*Id.*)

Dispersants were also applied subsea directly at the wellhead under the direction of and with approval from the UAC.  (*Id.* ¶ 31.)  The subsea application of dispersant improved the effectiveness of dispersant application and helped to reduce the overall amount of dispersant needed.  (*Id.*)  Subsea dispersant use also contributed to worker safety by reducing airborne concentrations of VOCs.  The National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling noted in its Working Paper No. 4 that subsea dispersant application "served an

important function by increasing the safety of the working conditions faced by responders in the immediate vicinity of the spill." (*Id.* ¶ 32.) In its final report, the Commission noted that "the subsea use of dispersants proved helpful in preventing huge surface slicks," which in turn reduced VOC levels near the wellhead, improving the air quality for nearby workers. (*Id.*)¶

The UAC implemented a number of safety controls to ensure that response workers and Gulf Coast Residents were not harmed by the aerial application of dispersants. (*Id.* ¶ 27.) For example, safety setbacks were implemented such that dispersant was not to be sprayed (i) within two nautical miles of any platform, rig, or vessel; (ii) within five nautical miles of controlled-burning activities; (iii) within five nautical miles of the source-control area; or (iv) within three nautical miles of the shore. (*Id.*) In addition, the Aerial Dispersant Group required that aircraft applying dispersant fly into the wind and established weather limitations restricting when dispersants could be applied (related to visibility, cloud ceiling, wind, and wave heights). (*Id.*)

The UAC Environmental group, along with researchers from NOAA, conducted water sampling in the vicinity of dispersant application. (*Id.* ¶ 34.) The researchers collected water samples near a number of locations where dispersants had just been applied. (*Id.*) They discovered that within minutes after application, the dispersant components were present in water at the point of application either at non-detectable levels or at levels in the low parts per billion range. (*Id.*) Concentrations of dispersant components in water at these levels do not pose any hazard to human health. (*Id.*) At locations sampled that were farther away from points of application, dispersant components were almost never present in water at detectable levels. (*Id.*)

According to the After Action Report prepared by the Houma Incident Command Post Aerial Dispersant Group, all aerial dispersant applications were applied greater than three

nautical miles offshore, except for one emergency release,[15] and 98% of the aerial dispersant applications were applied more than ten nautical miles offshore.[16]  The limitations on dispersant use greatly reduced any risk of harmful exposure to responders and those living near the shore. OSHA itself "found no evidence of unsafe dispersant exposure among responders."[17]

In sum, the use of dispersants was safe, effective, and important in reducing potential exposure of response workers to oil, particularly at the source of the spill.  As EPA Administrator Lisa Jackson explained:

> "[B]ased on all the information we have to date, [dispersant use] has proved to be an effective tool in preventing the oil from devastating the gulf's delicate coastline.  EPA science tells us dispersant was effective in breaking up the oil. The U.S. Food and Drug Administration tells us dispersant does not accumulate in the food chain.  Science from the National Oceanic and Atmospheric Administration confirms that dispersant has stayed more than 40 miles away from the shore and wetlands.  In fact, of more than 2,000 samples collected by NOAA, only two detected the potential presence of dispersant at all."[18]

### D.   Workers Were Provided with First-Class Training and Protection.

Throughout the response, BP made substantial efforts to protect workers from possible harmful exposures or injuries.  Responders were provided safety training, protective equipment, and access to medical care.  As with the other aspects of the response, the federal government was heavily involved in these efforts.  OSHA worked as part of the coordinated federal response to evaluate BP's efforts and to ensure that BP put in place all necessary precautions to protect

---

[15] The one aerial dispersant application that occurred less than 3 nautical miles offshore involved an emergency incident (airplane engine failure) on April 29, 2010,  involving the release of approximately 1,000 gallons of Corexit 9500A into the western portion of Barataria Bay/Caminada Bay.  On June 18, 2010, water samples were collected from the site to assess whether dispersant residues remained in the area.  Analysis of the samples indicated that the dispersant was not present.  (Dutton Decl. at 11 n.3.)

[16] *See* Houma ICP, Aerial Dispersant Group, *After Action Report: Deepwater Horizon MC252 Response, Aerial Dispersant Response*, at 14 (Dec. 31, 2010).  In addition, BP employee David Dutton, who served as the Industrial Hygiene Lead for the UAC, is not aware of any aerial dispersant application that did not comply with the safety setback procedures described above, aside from the emergency situation described in note 15.  (Dutton Decl. ¶ 28.)

[17] Report to the President, National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling, January 2011, at 144.

[18] Lisa P. Jackson, *EPA Kept Close Watch on Use of Dispersants*, Tampa Bay Times, August 24, 2010.

workers.  Between April 26 and October 1, 2010, OSHA had between 20 and 40 professionals assigned solely to monitor the safety of workers involved in the spill response.[19]

**Training.**  BP, in coordination with the UAC and with daily input, oversight, and approval by OSHA, developed and instituted task-specific response worker training.  This training was designed to educate response workers concerning potential hazards and risks, functions to be performed, and relevant operating procedures for their work.  (Dutton Decl. ¶ 47.)  Trained workers were provided a yellow card to certify the level of training they received, and were required to show that card before entering response work sites.  (*Id.* ¶ 50.)  Supervisors, professional responders, workers involved in decontamination activities, and source control workers had to complete the full 40-hour Hazardous Waste Operations and Emergency Response training (as defined by OSHA 29 C.F.R. 1910.120).  (*Id.* ¶ 53.)

Workers also received daily safety talks at the beginning of each shift.  (*Id.* ¶ 54.)  These talks advised workers of safety issues and reminded them regarding key safety concepts that had been taught during the trainings, such as the requirement that workers inform their supervisor, a safety officer, or a health officer if they suffered any injuries or illnesses.  (*Id.* ¶¶ 52, 54.)

**Personal Protective Equipment**.  BP, in conjunction with and with approval from the UAC and OSHA, developed Personal Protective Equipment ("PPE") requirements for all response workers.  (*Id.* ¶ 55.)  The most common PPE provided to response workers included protective clothing, disposable gloves, protective boots, and life jackets.  (*Id.* ¶ 57.)  PPE use was monitored throughout the response to ensure workers had and were using the appropriate protection given the nature of their work.  (*Id.* ¶ 59.)

**Medical Stations.**  Further to ensure response worker safety, the response operations plan identified and required implementation of a medical program that provided emergency and first

---

[19] *See* http://www.osha.gov/oilspills/index.html ("OSHA's Efforts to Protect Workers")

aid treatment, including access to Emergency Medical Technicians ("EMTs") or paramedics, at numerous locations across the response.  (*Id.* ¶ 66.)  In addition, the UAC Industrial Hygiene and Safety groups closely and exhaustively tracked all reports of occupational-related illnesses and injuries, which they analyzed for trends so that corrective actions and improvements could be instituted, as needed.  (*Id.*)  Medic stations were established in Louisiana, Mississippi, Alabama, and Florida.  (*Id.* ¶ 67.)  These medic stations were staffed by EMTs or paramedics employed by local ambulance companies that had contracted with BP to provide medical services during the response.  (*Id.*)

As part of their required training, response workers were instructed to inform their supervisor, a safety officer, or a health officer, if they suffered any injuries or illnesses and, when appropriate, the response workers were then directed to seek treatment at a medic station for any such injuries or illnesses.  (*Id.* ¶ 68.)  Data regarding response worker visits to a medic station were logged into individual MC252 Medical Data Forms and daily tracking sheets.  (*Id.* ¶ 69.)  This information was subsequently compiled into a Medical Encounters Database maintained by BP.  (*Id.*)  Where appropriate, information about the underlying incident or illness was also reported to a UAC Health or Safety professional, usually within 24 hours, and an incident report was generated for OSHA reporting purposes.  (*Id.* ¶ 70.)  After receiving treatment at a medic station, response workers were either allowed to return to work, referred to intermediate care, or, where necessary, transported to a treatment facility or local emergency room by ambulance.  (*Id.* ¶ 71.)

## III.   THE EVIDENCE SHOWS THAT THE RISK OF HARMFUL EXPOSURES TO WORKERS AND RESIDENTS WAS LOW.

Given the significant precautions taken to protect Clean-Up Workers and coastal Residents, extensive data and analyses demonstrate that there was a very low risk of significant

health concerns due to potential exposure to oil and/or dispersants.  The federal government (NIOSH, EPA, and OSHA), BP, and others conducted extensive monitoring and sampling of air, water, and land throughout the response period.  (*See* Declaration of Peter S.J. Lees at 6-8, attached as Exhibit B.)  As a result, there are substantial data confirming the low risks to health from the spill and Response Activities.  Moreover, as discussed below, government studies consistently concluded that the spill and response posed a low health risk to Clean-Up Workers and Gulf Coast Residents, and the reported public health surveillance "reveal[ed] no trends of public health concern related to the oil spill."[20]

> **A.     The Extensive Monitoring and Sampling Data Permit a Thorough Analysis of the Possible Health Risks.**

The environmental and occupational health exposure data collected in connection with the response represent an unprecedented, systematic, and comprehensive collection of data related to a single incident.  (Lees Decl. ¶ 12.)  Unlike many other cases, in which exposure-related data are collected for another purpose and subsequently analyzed for their human health impacts, the collection of data related to this event was guided by sampling plans jointly conceived by the members of the UAC to ensure worker and public safety.  (*Id.*)  These sampling plans and protocols were well considered and included identification of individuals and groups of individuals believed to be at particular risk, selection of appropriate petroleum-marker and health-related substances for measurement, development of standardized protocols governing sampling strategy and procedures, the use of appropriate quality controls, and data verification. (*Id.*)  These plans and protocols were specifically designed for the purpose of assessing and analyzing worker and community exposures, with a focus on job tasks and locations with the highest potentials for exposure (*i.e.*, worst-case scenarios).  (*Id.*)

---

[20] http://www.bt.cdc.gov/gulfoilspill2010/2010gulfoilspill/health_surveillance.asp.

The massive exposure dataset assembled in connection with the *Deepwater Horizon* Incident is extremely robust and sufficient to allow an expert to assess accurately the significant adverse health effects that might result from this incident and to draw complete and decisive conclusions regarding the likelihood of potentially harmful exposures to those in the Gulf Region during the response to the oil spill.  (*Id.*)  These data are more than adequate to assess possible significant health consequences to the populations potentially at risk.

### B. The Health Risks to Clean-Up Workers and Gulf Residents Were Low.

There were two primary ways that Clean-Up Workers and Residents could be exposed to oil and/or dispersants: inhalation or dermal exposure.  As to both paths, the level of potential exposure was low and unlikely to cause significant adverse health effects.  (*See id.* ¶ 13; Declaration of Robert Cox ¶ 11, attached as Exhibit C; Declaration of Laura C. Green ¶ 5, attached as Exhibit D.)

*Geographic factors limited exposure.* The spill occurred almost one mile beneath the ocean surface.   Therefore, water-soluble oil components (including benzene, toluene, ethylbenzene, and xylenes) dissolved in the water column, before reaching the surface or coming on shore, significantly reducing the potential for exposure to these compounds. (Cox. Decl. ¶ 45.)  The spill also occurred 50 miles offshore.  Volatile compounds underwent evaporation, photodegredation, and significant dilution before reaching the coast, resulting in lower potential for onshore exposure to the volatile chemicals typically associated with oil spills. (*Id.* ¶ 46.)  The oil that remained was at sea for weeks to months before reaching the coast. Photo-oxidation, biodegredation, and evaporation acted on this oil, depleting most of the remaining toxic components of crude oil.  (*Id.* ¶ 47.)

With respect to dispersants, geographic factors also limited exposure.  As discussed above, application was specifically designed to limit exposure.  (*See also* Green Decl. ¶ 9.)

17

Aerial spraying was not permitted within two nautical miles of any boat, vessel, or platform, or within five nautical miles of the MC252 Well, or within three miles of the shoreline, protecting VoO and other vessel workers as well as beach and near-shore workers.

*Risks to Clean-Up Workers were low.*  Health risks to Clean-Up Workers from both airborne and dermal exposures to oil and/or dispersants were low.  Monitoring and other data show that Clean-Up Workers were not typically exposed to airborne concentrations of the components of oil and/or dispersants at levels that would be expected to result in significant or widespread health effects.  (Lees Decl. ¶ 45; *see also* Green Decl. ¶ 5.)  Instead, the occupational and environmental exposure data consistently demonstrate low airborne concentrations of chemical substances released into the environment as a result of the oil spill.  (Lees Decl. ¶¶ 13, 37.)  In fact, the airborne concentrations were usually so low as to be undetected and very rarely at levels that exceeded even the most stringent occupational exposure limits.  (*Id.* ¶ 45.)  For the populations of workers responding to the incident both at sea and on land, occupational exposure standards and guidelines designed to protect workers' health were exceeded only on very rare and isolated occasions.  (*Id.* ¶ 13.)  Indeed, dispersant ingredients were never detected in air at concentrations in excess of recognized health-protective limits.  (Green Decl. ¶ 19.)  Therefore, the potential risk of significant adverse health effects associated with exposure to airborne concentrations of the constituents of oil and/or dispersants is low for Clean-Up Workers.  (Lees Decl. ¶ 13.)

Clean-Up Workers potentially could have had dermal exposure to crude oil that was weathered to varying degrees, depending on the location where they were working.  (Cox Decl. ¶ 85.)  Clean-Up Workers engaged in Response Activities near shore and onshore potentially could have been exposed to weathered oil.  (*Id.*)  As described in further detail below,

18

intermittent dermal contact with weathered crude oil is unlikely to result in significant adverse health effects, particularly if good personal hygiene practices are utilized.  (*Id.*)

Even Clean-Up Workers engaged in Response Activities directly above the MC252 Well were typically not exposed to "fresh" crude oil, as the released oil traveled through approximately one mile of water prior to reaching the ocean surface, during which time it was significantly "scrubbed" of a number of the more water-soluble, volatile components.  (*Id.* ¶ 86.) Moreover, all Clean-Up Workers were required to wear appropriate PPE, which should have prevented or substantially reduced dermal exposures to crude oil.  (*Id.* ¶ 89.)  In addition, many Clean-Up Workers at the source were professional oil spill responders, with extensive training in protecting themselves from potentially harmful exposures to crude oil.  (Dutton Decl. ¶ 53.)

Clean-Up Workers could also potentially have had dermal exposure to dispersants, but any such exposure would likely have been limited and posed few, if any, significant health risks. Appropriate personal protection measures and procedures were in place to limit workers' exposure to dispersants.  (*Id.* ¶ 55; Green Decl. ¶ 9.)  At any rate, occasional dermal contact with dispersants would at most be moderately and reversibly irritating.  (Green Decl. ¶ 5.)

***Risks to coastal Residents were low.***   The risks to coastal Residents from either inhalation or dermal exposure with the potential to cause significant adverse health effects were also low.  Based on community air monitoring data, Gulf Coast Residents were not exposed to airborne concentrations of the components of crude oil or dispersants at levels that would be expected to result in significant adverse health effects.  (Cox. Decl. ¶ 43; Lees Decl. ¶ 46.)

First, the concentrations of the crude oil components or other potentially spill-related compounds measured at EPA and BP fixed-monitoring stations were extremely low, and were far below levels at which any significant adverse health effects might be expected.

(Cox. Decl. ¶ 52.)  In addition, the concentrations measured at the fixed-monitoring stations were not necessarily related to the oil spill, because many onshore sources (such as industries, cars, and cigarette smoke) emit the same compounds.  (*Id.*)[21]

Second, the potential for Gulf Coast Residents to be exposed to airborne concentrations of the components of the two Corexit® dispersants was also extremely low.  The vessel and subsea applications of dispersants occurred at or around the MC252 Well—approximately 50 miles offshore from the southernmost point of Louisiana and over 100 miles from population centers in Mississippi and Alabama.  (*Id.* ¶ 62.)  Likewise, all aerial dispersant applications (except in the emergency situation described in note 15) were applied greater than three nautical miles offshore, and 98% of the aerial dispersant applications were applied greater than ten nautical miles offshore.  (*Id.*)  As a result, it is highly unlikely that Gulf Coast Residents were exposed to potentially harmful levels of the dispersant components.  (*Id.*)[22]

That Gulf Coast Residents were not exposed to airborne concentrations of the dispersant constituents at levels of concern is further supported by the available air monitoring data.  (*Id.* ¶ 64.)  As discussed in greater detail below, the EPA conducted monitoring and concluded that the levels were well below those likely to cause significant health effects.

Moreover, the industrial hygiene results collected by BP, OSHA, and NIOSH provide a useful "worst case" scenario for assessing potential inhalation exposures experienced by Gulf Coast Residents to the components of dispersants.  (*Id.* ¶ 65.)  In this respect, if Clean-Up Workers, who were the closest in proximity to the sources of dispersants, were not exposed at

---

[21] With respect to benzene in particular, it is likely that the concentrations measured were not related to the oil spill, because studies have shown that benzene was almost entirely absent from the oil by the time it reached the surface of the Gulf of Mexico (which was approximately 100 miles away from the majority of the Gulf Coast monitoring locations).  (Cox. Decl. ¶ 52.)

[22] The CDC, in a report prepared for health professionals in connection with the oil spill, reached a similar conclusion: "Once the dispersant is applied to the oil slick it begins to break down in the environment.  In aquatic environments it begins to break down within 16 days.  Because of the strict guidelines that must be followed to utilize dispersants it is unlikely that the general public will be exposed to straight product."  (Cox. Decl. ¶ 63.)

levels of concern, it is highly unlikely that Gulf Coast Residents located onshore were exposed at levels of concern.  (*Id.*)  Those data support the conclusion that Gulf Coast Residents were exposed to negligible levels, if any, of the chemicals in Corexit 9500A and Corexit 9527A, and would not be expected to develop any significant adverse health conditions as a result of these minimal exposures.  (*Id.* ¶ 68.)

With respect to dermal exposure risks, Gulf Coast Residents located onshore had no potential for exposure to fresh crude oil, which was released from approximately one mile beneath the ocean surface and approximately 50 miles offshore.  (Cox. Decl. ¶ 76.)  Although Gulf Coast Residents potentially could have come into contact with weathered oil, the primary compounds of concern were either no longer present or significantly depleted by the time such oil reached the shoreline, thus reducing the potential for health risks to Gulf Coast Residents from dermal exposure to weathered oil or tar balls.  (*Id.* ¶ 77.)

In addition, Gulf Coast Residents' exposure to weathered oil and tar balls near the shoreline would have been restricted to short-term dermal exposure.  (*Id.* ¶ 78.)  Significant adverse health effects are not expected without repeated, prolonged dermal exposure to these compounds.  (*Id.*)  In addition, intermittent or occasional skin contact with weathered oil is not expected to have significant adverse health effects if good personal hygiene measures are followed (*e.g.*, washing any contacted oil off of the skin).  (*Id.*)

Risk assessments performed by the second Operational Science Advisory Team ("OSAT-2") also demonstrate low risk from dermal contact.  (*Id.* ¶ 80.)  At the request of the FOSC, the OSAT-2 team evaluated the risk from dermal contact with weathered oil in connection with the oil spill.  (*Id.*)  The OSAT-2 team concluded that the risk from exposure to

weathered oil from the spill was far below EPA standards for both carcinogenic and non-carcinogenic human health risks.  (*Id.*)

Furthermore, Gulf Coast Residents had little or no potential for significant dermal exposure to the two Corexit® dispersants.  (*Id.* ¶ 81.)  As discussed above, in almost all cases, dispersants were applied greater than ten nautical miles offshore, and on no occasion were dispersants applied less than three nautical miles offshore (save for the emergency situation described in note 15).  In addition, because the dispersants biodegraded and were significantly diluted after they were applied to oil slicks on the water surface, any components of the Corexit® dispersants that did reach shore would have done so at levels too low to have a meaningful impact on human health.  (*Id.* ¶ 82.)

The conclusion that the Corexit® dispersants biodegraded and were diluted in the Gulf, and thus would be unlikely to reach the shore in any significant quantities, is corroborated by water sampling data collected by the first Operational Science Advisory Team ("OSAT-1").  (*Id.* ¶ 83.)  Specifically, in a report prepared for the FOSC, the OSAT-1 team analyzed 4,850 near-shore water samples collected between May 13, 2010 and October 20, 2010 for dispersant-related compounds.  (*Id.*)  The OSAT-1 team concluded that "none of the concentrations of dispersant-related chemicals found in water samples collected during the response exceeded the [EPA] benchmarks," and "[o]nly 66 samples (60 water and 6 sediment, 1.4% of total) had detectable levels of dispersant-related chemicals."  (*Id.*)

As a result, Gulf Coast Residents had limited potential for dermal exposure to Corexit® dispersants and their constituents, and any exposures that did occur would have been to extremely low levels of these compounds.  (*Id.* ¶ 84.)  Short-term dermal exposures to low levels

of Corexit® dispersants and their constituents (which, in any event, would have been rare) would not be expected to result in any significant adverse health effects.  (*Id.*; Green Decl. ¶ 14.)

## C.      The Coast Guard Evaluation Stressed the Importance of Health and Safety.

The Coast Guard's On Scene Coordinator Report, released in September 2011, reviewed health and safety issues related to the response.  The Coast Guard specifically noted that "Health and Safety was the number one strategic goal through the response."[23]  The Coast Guard found that this goal was reflected in the substantial efforts "made to address potential public health impacts of the spill" and in the "remarkably low injury rate for responders across the operation."[24]  The agency also stated that "the safety record of the entire response operation reflected an effective and persistent safety program" and that the *Deepwater Horizon* response produced an exceptional safety record."[25]  Overall, the Coast Guard concluded that "[t]he efforts and commitment to ensure the safety of those who worked on the spill, and that of the public, is one of the single most notable accomplishments of the *Deepwater Horizon* response."[26]

## D.      The EPA and OSHA Also Observed That Health Risks Were Limited.

The EPA monitored for the two chemicals found in Corexit® dispersants that had the highest potential to get into the air in any significant amounts: EGBE (2-butoxyethanol) (which is part of the formulation only of Corexit 9527A and is not found in Corexit 9500A) and dipropylene glycol monobutyl ether.  The EPA noted that these compounds are also found in cleaning products and coatings.  The EPA detected the compounds only at a limited number of the locations sampled, and, when detected, levels were very low.  The EPA explained that "the

---

[23] On Scene Coordinator Report *Deepwater Horizon* Oil Spill, September 2011 at ix.
[24] *Id.*
[25] *Id.* at 90.
[26] *Id.*

levels found were well below those that are likely to cause health effects, and suggest that the use of dispersants on the oil spill would not have a significant impact on air quality on land."[27]

Finally, OSHA also conducted independent air monitoring, both on shore and on cleanup vessels, and reviewed data from BP, the EPA, and NOAA.  OSHA stated that "[t]o date, no air sampling by OSHA has detected any hazardous chemical at levels of concern."[28]

## SUMMARY OF THE SETTLEMENT

**I.      THE NEGOTIATING HISTORY DEMONSTRATES THAT NEGOTIATIONS WERE CONDUCTED AT ARM'S LENGTH.**

The parties engaged in protracted, intense, good-faith, and arm's-length negotiations before finally reaching agreement on the terms of the Settlement and incorporating those terms into a final written agreement.  (*See* Declaration of Andrew B. Bloomer, attached as Exhibit E.) These extensive settlement negotiations, conducted in person and via telephone and web conferences, occurred over approximately ten months.   Judge Shushan also supervised discussions related to key terms of the Medical Settlement Agreement.  (*Id.* ¶¶ 45, 49, 59.)

A core group of highly experienced personal injury and class action lawyers served as lead negotiators on behalf of the class, and a core group of similarly experienced mass tort and complex litigation defense lawyers served as lead negotiators for BP.   (*Id.* ¶¶ 4.)   These negotiating teams met or spoke on a nearly daily basis over approximately ten months.  Face-to-face meetings were held nearly every week from late July 2011 until the filing of the Agreement with the Court on April 18, 2012.  (*Id.* ¶¶ 11-62.)  In addition, on days when no face-to-face meetings occurred, telephone and web conferences were frequently held.  (*Id.*)

These negotiations ultimately resulted in the parties reaching agreement on a settlement that would fairly address the Plaintiffs' claims.   Counsel drew from their own extensive

---

[27] EPA website (http://www.epa.gov/bpspill/taga.html#dispdata).
[28] OSHA Website (http://www.osha.gov/oilspills/index.html).

experience in class action settlements and consulted with medical and scientific experts concerning data relating to oil and dispersants; the potential health effects of possible exposure to these substances; the claims asserted by Clean-Up Workers, Residents, and others; the benefits provided under the Settlement; and the structure for providing those benefits.  Because the parties crafted the Settlement from the ground up, they negotiated every aspect of the agreement: standards of proof, levels of compensation, and conditions to be included in the Specified Physical Conditions Matrix; the components, duration, and frequency of the Periodic Medical Consultation Program; scientific support for Plaintiffs' claims and BP's defenses; Plaintiffs' claims and BP's alleged liability; the need for, components of, and funding of the Gulf Region Health Outreach Program; the circumstances under which lawsuits for Later-Manifested Physical Conditions could be brought; the terms and provisions of the written settlement agreement; notice documents, forms, and other exhibits; and procedures for resolving third-party liens.

The parties filed the Medical Settlement Agreement resulting from these negotiations on April 18, 2012.   (Rec. Doc. 6273.)   There is no "agreement made in connection with the [settlement] proposal" other than the parties' written settlement agreement.   Fed. R. Civ. P. 23(e)(3).[29]

## II. THE MEDICAL CLASS IS DEFINED TO RESOLVE MOST EXPOSURE-BASED PERSONAL INJURY CLAIMS.

The Settlement seeks to resolve the vast majority of post-Incident personal injury claims based on alleged exposure to oil and/or dispersants.  Accordingly, the Class consists of:

> [A]ll Natural Persons who resided in the United States as of April 16, 2012, and who:
>
> > 1)  Worked as Clean-Up Workers at any time between April 20, 2010, and April 16, 2012;

---

[29] As noted above, *see* note 9, the parties made certain minor amendments and filed the as-amended Settlement with the Court on May 3, 2012.  (Rec. Doc. 6427.)

2) Resided in Zone A for some time on each of at least sixty days between April 20, 2010, and September 30, 2010 ("Zone A Resident"), and developed one or more Specified Physical Conditions between April 20, 2010, and September 30, 2010; or

3) Resided in Zone B for some time on each of at least sixty days between April 20, 2010, and December 31, 2010 ("Zone B Resident").[30]

(Medical Settlement Agreement ("MSA") § I.A.)   The Medical Benefits Settlement Class excludes (i) those who timely elect to be excluded from the class; (ii) BP employees; (iii) the Court; (iv) anyone who was on the *Deepwater Horizon* on April 20, 2010; (v) any person who has previously asserted and released his or her claims against BP that would be covered by the Agreement; and (vi) any Zone A or Zone B Resident who was not a Clean-Up Worker and who worked in certain capacities for at least five years prior to April 20, 2010.  (*See id.* § I.B.)

## III.    THE MEDICAL SETTLEMENT PROVIDES SIGNIFICANT BENEFITS.

The proposed Settlement provides significant benefits to both Class Members and to the wider Gulf community.   These benefits include (1) compensation for Specified Physical Conditions; (2) the Periodic Medical Consultation Program; (3) the Gulf Region Health Outreach Program, which will help improve the healthcare system for Class Members as well as Gulf Coast communities; and (4) the Back-End Litigation Option, which preserves Class Members' ability to sue BP for compensatory damages for Later-Manifested Physical Conditions.   In exchange, Class Members provide a comprehensive Release of specified physical and bodily injury claims against BP and other entities involved in the *Deepwater Horizon* Incident.  (*Id.* § XVI.)

---

[30] Zone A includes specified Gulf Coast beachfront areas and Zone B includes specified Gulf Coast wetlands areas. Both Zones are clearly and objectively described in Exhibit 9 to the Medical Settlement Agreement.

A.      **The Settlement Provides Compensation for Specified Physical Conditions.**

The Medical Settlement provides compensation to qualifying Class Members who can

demonstrate that they have manifested during a specified timeframe a Specified Physical

Condition covered by the Agreement.   The level of compensation that a qualifying Class

Member receives depends on various factors, including the Class Member's status as a Clean-Up

Worker or Resident, whether the Class Member's condition was Acute or Chronic, and the type

of proof that the Class Member presents.   The Specified Physical Condition program is an

uncapped, claims-made process.   The framework for this compensation is set out in the Specified

Physical Conditions Matrix (Exhibit 8 to the Agreement), and summarized as follows:

| Level | Clean-Up Workers | Zone A and Zone B Residents | Enhancer for Overnight Hospitalization and Payment of Actual Hospital Expenses, if applicable |
|-------|------------------|------------------------------|------------------------------------------------------------------------------------------------|
| A1    | $1,300           | $900                         | No                                                                                             |
| A2    | $7,750           | $5,450                       | Yes                                                                                            |
| A3    | $12,350          | Not applicable               | Yes                                                                                            |
| A4    | $2,700           | Not applicable               | Yes                                                                                            |
| B1    | $60,700          | $36,950                      | Yes                                                                                            |

*Levels A1, A2, and A3 (compensation for certain acute physical conditions)*.   The

Settlement awards compensation under levels A1, A2, and A3 for certain acute ocular,

respiratory, ear/nose/throat, dermal, and neurophysiological/neurological/odor-related conditions

described in greater detail in the Specified Physical Conditions Matrix.   Payments increase from

levels A1 to A2 to A3 based on the quality of evidence that Class Members must produce in

order to qualify at higher levels.   For example, a Clean-Up Worker Class Member may qualify

for a payment of $1,300 under Level A1 by providing a declaration (1) asserting the

manifestation of one of the Specified Physical Conditions; (2) asserting that the condition

manifested in the applicable timeframe; and (3) identifying the route, circumstances, and date of

27

the Class Member's alleged exposure.  A Clean-Up Worker may qualify for a payment of $7,750 under Level A2, however, by providing such a declaration plus appropriate medical records. Finally, a Clean-Up Worker may qualify for a payment of $12,350 under Level A3 by providing a declaration if a database that documented Clean-Up Workers' medical information during the Response Activities corroborates that declaration.

Due to this database requirement, Resident Class Members are not eligible for payments under Level A3.  A Resident Class Member may qualify for payment of $5,450 under Level A2 by providing the declaration and medical records described above.  A Resident Class Member may qualify for a Level A1 payment of $900 by providing a declaration plus certain additional corroborating evidence such as a declaration from a family member or co-worker.

*Level A4 (compensation to Clean-Up Workers for certain heat-related conditions)*. Clean-Up Workers who experienced certain heat-related conditions that occurred during or immediately following a shift working as a Clean-Up Worker may qualify for a payment of $2,700.  Such a Class Member must provide a declaration describing the manifestation of the condition, asserting that the condition manifested in the applicable timeframe, and information concerning and corroborating that condition must also be found in the database described above.

*Level B1 (compensation for certain chronic physical conditions)*.  Compensation may be provided under level B1 for certain chronic ocular, respiratory, and dermal conditions.  Clean-Up Workers may receive $60,700 and Residents may receive $36,950.  Class Members receiving compensation under this level must provide a declaration and there must be supporting medical records or corroboration of their condition in the database described above.  In addition, they must provide medical records showing ongoing treatment and/or symptoms, and which indicate

that either the Class Member or the medical professional considered the symptoms to be related to the Class Member's exposure to oil and/or dispersants.

*Enhancers for hospitalization/reimbursement of Actual Hospital Expenses*.   Class Members who receive payments under Levels A2, A3, A4, and B1 may also qualify for additional payments based on overnight hospitalization, ranging from $8,000 to $10,000 per day, as well as reimbursement for Actual Hospital Expenses.

*Conditions represented on the Matrix*.   The Specified Physical Conditions Matrix consists of those conditions for which there is some medical basis to conclude that contact with oil and/or dispersants could cause those conditions, if an individual's contact had occurred at sufficient levels and for sufficient duration.  (Declaration of Jessica Herzstein ¶ 14, attached as Exhibit F.)   The conditions included are consistent with: (1) medical and scientific literature; (2) those conditions that have actually been reported or alleged by Clean-Up Workers and Residents; (3) published health surveillance reports; and (4) conditions reported by response workers and residents in connection with other oil spills.  (*Id.* ¶¶ 14–18.)  The Matrix includes a broad array of conditions: ocular, upper airway/respiratory, dermal, otolaryngological, and neurophysiological, neurological, and odor-related (including gastrointestinal distress).[31]   The Matrix does not include potentially latent conditions, which are discussed in greater detail below in connection with the Back-End Litigation Option.

*Requirements for compensation under the Matrix*.   The Matrix requires that the Specified Physical Conditions manifest themselves within a very short time period after a Class Member's alleged exposure.  The timeframes vary from 24 to 72 hours after exposure to first manifestation, depending on the condition.  The timeframes set forth in the Matrix accurately

---

[31] With respect to payments under Level A4, the Matrix also includes appropriate heat-related conditions which Clean-Up Workers could have experienced while performing Response Activities.

reflect the period of time within which the conditions would be expected to manifest after contact with oil and/or dispersants.  (*Id.* ¶ 20.)

The amounts paid under the Matrix were the product of lengthy negotiations between the parties (including with the involvement of Judge Shushan), with each side taking into account the strengths and weaknesses of the claims.  Finally, the proof required for compensation under the Matrix is more than reasonable.  Class Members may receive compensation even without medical records.  However, if they can provide medical records or show corroboration in the appropriate database, they can qualify to recover greater amounts.

> **B.   The Settlement Establishes a Periodic Medical Consultation Program.**

The Settlement also provides a Periodic Medical Consultation Program ("PMCP") available to all Clean-Up Workers and Zone B Residents, as well as those Zone A Residents who qualify for compensation for a Specified Physical Condition.  (MSA § VII.)  Under the PMCP, these Class Members are entitled to an initial medical consultation followed by additional visits every three years over the 21-year life of the program.  (*Id.* § VII.B.)  The Claims Administrator will establish a network of medical services providers to provide the consultation visits, selected based on their geographic proximity to Class Members and their ability to provide the consultation services required by the Program, among other things.  (*Id.* § VII.C.)  As discussed in the report to this Court by the Claims Administrator, the process of identifying and contracting with such providers is well underway.  (Rec. Doc. 7105-1 at 13–15.)  The Claims Administrator will communicate annually with Class Members participating in the Program and will set up a call center and website to schedule appointments for medical consultation visits.  (MSA § VII.D.)

The PMCP is not medical monitoring and is not designed to provide a monitoring or screening program for later-manifested diseases potentially related to exposure to oil and/or

dispersants.  (Herzstein Decl. ¶ 22.)   The PMCP instead provides access to general medical services without charge to participating Class Members, which is a significant and tangible benefit to Class Members.  (*Id.*)   Establishing a physician-patient relationship with a primary care physician is a significant benefit for those Class Members who do not already have a primary care physician.   (*Id.*)   The consultation visits also provide an opportunity for participating Class Members to engage in dialogues with qualified medical providers regarding their individual health concerns and to address behaviors and preventive measures to improve their health.  (*Id.*)

The PMCP provides that physicians performing the examinations may use their discretion to order, without charge to the participating Class Members, certain blood, urine, cardiac, and respiratory tests that can help in the identification and diagnosis of certain conditions.  (MSA Ex. 12.)   These tests provide a benefit because (1) some of the tests can be used to obtain information regarding certain pre-existing medical conditions (*e.g.*, monitoring diabetic patients); (2) some of the tests can provide diagnostic information regarding disease in symptomatic individuals; and  (3) some of the tests can detect medical conditions in asymptomatic individuals.  (Herzstein Decl. ¶ 25.)

### C.    The Settlement Establishes the Gulf Region Health Outreach Program.

The Gulf Region Health Outreach Program (the "Outreach Program") is intended "to expand capacity for and access to high quality, sustainable community-based healthcare services, including primary care, behavioral and mental health care, and environmental medicine, in the Gulf Coast."   (MSA § IX.A.)   The specific projects address the fact that many Gulf Coast Residents lack ready access to effective physical and mental/behavioral health care.   Benefits from the Outreach Program will be available to both Class Members and the general public. Under the Settlement, BP will provide $105 million over five years to a set of integrated projects

designed to improve healthcare capacity and health literacy in Gulf Coast Communities.  By the end of August 2012, initial distributions totaling over $20 million will have been made to the projects.  The project leaders identified in the Medical Settlement Agreement are now working to implement their projects according to terms of the Settlement.  (Declaration of Bernard D. Goldstein ¶ 36.)[32]

The Outreach Program consists of four integrated projects:

(a)     The Primary Care Capacity Project will expand access to high quality, sustainable, community-based primary care.  It focuses on the development of Federally Qualified Health Centers with links to specialty mental and behavioral health care, as well as environmental and occupational health services;

(b)     The Mental and Behavioral Health Capacity Project will provide mental and behavioral health treatment in the short term.  In the longer term, it will provide supportive services to improve the overall well-being of individuals, families, and communities affected by the *Deepwater Horizon* Incident;

(c)     The Environmental Health Capacity and Literacy Project is designed to strengthen the resilience of vulnerable Gulf Coast communities by building environmental health capacity to deliver coordinated specialty care; integrating community health workers, with training in environmental health issues, into primary care clinics; and creating an environmental health science curriculum in public schools and universities across the region to promote environmental health literacy; and

(d)     The Community Health Workers Training Program will provide training for Community Health Workers on primary care capacity.  It will also assist community members in obtaining mental and behavioral health services and environmental health care, and expand traditional health capacity by actively engaging community residents as participants to strengthen community resilience, build social capital, and improve overall health literacy.

The parties included the Outreach Program in the Settlement in recognition of the need for improvement in healthcare capacity in the Gulf Region.  The Outreach Program is designed to put infrastructure in place that will improve health capacity and literacy.  The ultimate goal of the Outreach Program is to enable Class Members and residents of Gulf Coast communities to be

---

[32] BP and the Plaintiffs are jointly filing the declaration of Dr. Goldstein, which is attached to their separate Notice of Joint Filing of Declarations.

educated about their own health and to have access—now and in the future—to skilled general healthcare providers as well as to specialists to diagnose and treat their physical, behavioral, and mental health needs.

   ***Healthcare Capacity in the Gulf***.  Health disparities have plagued the Gulf Region for decades.  (*Id.* ¶ 10)  Alabama, Louisiana, and Mississippi consistently rank at the bottom of states in many important measures of public health, including overall health, infant mortality, and prevalence of chronic conditions such as diabetes, hypertension, stroke, and obesity. Florida, while not ranked as low as the other states, also remains in the bottom 50 percent.  (*Id.*)

   These health disparities have many causes, but include environmental factors, both man-made and natural.  (*Id.* ¶ 11.)  Disease prevention and basic health maintenance are significant issues along the Gulf Coast.  There is a significant shortage of clinicians at both the primary care and specialty levels, particularly in rural areas.  High poverty and lack of private insurance coverage, especially among unemployed individuals and the working poor, make it difficult to attract and sustain high quality health care in the area.  (*Id.* ¶ 12.)  There are also insufficient numbers of clinicians who participate in federally-funded health programs.  To improve the healthcare system in the Gulf, residents need better access to preventive services and to health care and heightened health literacy.  (*Id.*)

   Efforts are being made throughout the region to improve healthcare systems and structures.  (*Id.* ¶ 14.)  Especially after Hurricanes Katrina and Rita, there have been numerous programs to rebuild—or in many cases, build—the public health and public healthcare infrastructure, with funding from federal and state governments, charitable foundations, and even some international donors.  Significantly, these programs have included creative efforts that have leveraged federal and private dollars.  (*Id.*)

33

In spite of these recent efforts, more needs to be done. Residents of Gulf Coast communities still lack sufficient access to effective preventive, acute and specialty care for a wide range of physical, mental, and behavioral health concerns, and gaps remain in:

 (a) scope (certain needed health services are not available, such as environmental health specialists and adequate numbers of behavioral and mental healthcare providers);

 (b) scale (existing providers, where the capacity exists, are overwhelmed and have limited ability to respond to the population in need during an emergency);

 (c) quality (there is a need to ensure that the care provided is of a consistently high quality); and

 (d) efficiency (many existing providers lack the administrative skills and technology to provide health services efficiently).

(*Id.* ¶ 15.)

 *How the Outreach Program Addresses Healthcare Capacity Needs in the Gulf*. The Outreach Program is designed to bridge the gaps in healthcare capacity by improving the region's healthcare infrastructure and providing access to care for members of the community, especially those most medically at risk. It will build a comprehensive, integrated and sustainable network of healthcare providers across the Gulf Region, with expertise in primary care, environmental health, and behavioral and mental health. (*Id.* ¶ 16.)

 Significantly, the Outreach Program will complement, rather than detract from or replace, the existing efforts being undertaken by the public health community. Working with providers and experts from across the Gulf Coast, the Outreach Program will bring together local community leaders, health professionals, and residents to understand the health needs and existing capacities of coastal communities across the Gulf. A key to the overall strength of the Outreach Program is the fact that an assessment of needs and capacity is being conducted at the outset by those knowledgeable about the region. (*Id.* ¶ 17.)

The linchpin to the sustainability of the Outreach Program is the use of Federally Qualified Health Centers ("FQHCs") and other local health clinics as hubs that will integrate all four of the Outreach Program's projects. (*Id.* ¶ 19.) FQHCs are community-based healthcare organizations operated under the supervision of the Health Resources and Services Administration of the United States Department of Health and Human Services. (*Id.* ¶ 20.) They are required to provide comprehensive primary and preventive care, including health, oral, and mental and behavioral health services, regardless of the patient's ability to pay.

FQHCs receive a number of benefits from the federal government, including enhanced Medicare and Medicaid reimbursement rates and the ability to purchase prescription and non-prescription outpatient drugs at a below-market price. Perhaps the greatest strength of the Outreach Program is its leveraging of its funds with existing federal programs. This will be key to the sustainability of the projects funded through the Medical Settlement. (*Id.* ¶ 21.)

The Primary Care Capacity Project, led by the Louisiana Public Health Institute, will leverage high-performing FQHCs and other healthcare providers in the region. It will help highly-effective centers to expand their reach into neighboring communities and, if necessary, to establish new primary care centers or networks. The project will also identify lower performing providers and help them increase efficiency and effectiveness. These efforts include helping clinics qualify as FQHCs or simply improving particular aspects of healthcare delivery, including record-keeping, billing, and pharmaceutical services. (*Id.* ¶ 22.)

Through these efforts and the integration of the Outreach Program projects into the FQHCs and other health clinics, the Outreach Program will build a strong foundation on which the region can continue to build its healthcare system for years to come. (*Id.* ¶ 23.) The Outreach Program's reliance on the existing resources in the Gulf area will deepen its impact.

(*Id.* ¶ 24.)  The projects will build capacity from the "ground up," engaging local communities, each of which may have very different needs.  (*Id.* ¶ 25.)

There are many organizations that are doing good work for the health of Gulf Coast residents, but no single project can overcome the hurdles facing these underserved communities. The Outreach Program will bring a significant influx of resources and talent to help address many of the needs that have gone unmet.  (*Id.* ¶ 33.)  The Outreach Program will have a rapid, positive impact, and these benefits will be felt not just for the next five years, but long thereafter. (*Id.* ¶ 37.)

### D.    The Settlement Provides a Back-End Litigation Option.

The Medical Settlement also provides a mediation/litigation process for Class Members who seek compensation from BP in the future for a Later-Manifested Physical Condition (*i.e.*, a condition diagnosed after the filing of the Medical Class Action Complaint) that is claimed to have resulted from exposure, before the complaint was filed, to oil, other hydrocarbons, or other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or exposure to dispersants and/or decontaminants used during Response Activities.  (MSA § VIII.)  Class Members diagnosed with a Later-Manifested Physical Condition have the option to seek compensation for that condition through the Back-End Litigation Option or, as applicable, pursuant to workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (*Id.* § VIII.B.)

If a Class Member elects to proceed with the Back-End Litigation Option, he or she must notify BP within four years of either the first diagnosis of the condition or the Effective Date of the Settlement, whichever is later.  (*Id.* § VIII.A.)  BP then has the option to mediate the claim. (*Id.* § VIII.C.)  If the mediation does not resolve the claim, or if BP decides not to mediate, then the Class Member has the right to file a Back-End Litigation Option Lawsuit in federal district

court in the Eastern District of Louisiana.  (*Id.* §§ VIII.C.2; VIII.F.)  The parties have stipulated that in such a lawsuit the following need not be proven and may not be litigated at trial: the fact of exposure of the Class Member to oil and/or dispersants during the *Deepwater Horizon* Incident or Response Activities, the alleged fault of BP for the *Deepwater Horizon* Incident, and the fact and/or existence of the Agreement to prove liability.  BP has also agreed to forego defenses based on prescription, any statute of limitations or repose, the doctrine of laches, and certain other defenses.  (*Id.* § VIII.G.2.)  As a result, the only issues to be litigated are the fact of diagnosis; the amount, location, and timing of oil, other hydrocarbons, and other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants or decontaminants used in connection with Response Activities; the level and duration of the Class Member's exposure; causation, including potential alternative causes; and the amount, if any, of compensatory damages.  (*Id.* § VIII.G.3.)  The Class Member also may not seek or recover punitive damages against BP in a Back-End Litigation Option Lawsuit.  (*Id.* § VIII.G.2.)

### E.    Other Aspects of the Settlement.

*Release*.  In exchange for the benefits BP is providing to Class Members, the Settlement provides for a comprehensive Release of specified physical and bodily injury claims against BP and other parties and entities involved in the *Deepwater Horizon* Incident.  (MSA § XVI.) Under these provisions, Class Members agree to release, forever discharge, and covenant not to sue BP and each one of the Other Released Parties identified on Exhibit 6 of the Agreement for any liability for all Class Members' claims that were or could have been brought arising from the *Deepwater Horizon* Incident in connection with personal or bodily injury, progression or exacerbation of an injury, loss of support, services, consortium, companionship, society, or affection, increased risk, possibility, or fear of suffering in the future, and medical screening and

37

monitoring.  (*Id.* § XVI.A.)  Released parties include other defendants in the *Deepwater Horizon* litigation except Transocean and Halliburton, who are not Released Parties and as to whom different provisions apply as discussed below.  However, Class Members do not release claims against BP for Later-Manifested Physical Conditions provided that they follow the procedures for asserting such claims established by the Agreement.  (*Id.* § XVI.B.)  The release also excludes medical claims (i) arising from alleged exposure of a Class Member, *in utero*, to dispersants and/or decontaminants used in connection with Response Activities, and (ii) for non-exposure-based physical or bodily trauma injury (other than a heat-related injury) related to the *Deepwater Horizon* Incident.  (*Id.* § XVI.G.)  Under the Settlement, Class Members also agree not to accept or attempt to recover any compensatory damages from Transocean and Halliburton, but they do preserve their ability to seek and recover punitive damages from those parties.  (*Id.* § XVII.B.)

*Attorneys' Fees and Costs*.  The Settlement also provides for attorneys' fees, expenses, and costs for Medical Benefits Class Counsel.  These were negotiated by counsel for the parties after full agreement was reached as to all other terms of the Settlement.  Attorneys' fees were not negotiated until April 17 and 18, 2012—literally at the very end of the process—and only after the Court had given its approval for attorney fee negotiations to go forward.  Under the Agreement, BP has agreed not to contest a request by Medical Benefits Class Counsel for fees, expenses, and costs of 6% of the value of benefits actually provided to Class Members pursuant to the Medical Settlement Agreement, provided that the amount paid by BP for fees, expenses, and costs under the Medical Settlement Agreement and the Economic and Property Damages Settlement Agreement cannot jointly exceed a total of $600 million.  Any such awards must be

approved by the Court, will be paid separately from amounts paid to the Class under the Settlement, and will not reduce any payments or benefits to the Class.  (*Id*. § XIX and Ex. 19.)

## IV.     IMPLEMENTATION OF THE MEDICAL SETTLEMENT TO DATE.

### A.     The Class Notice Agent Implemented the Extensive Class Notice Plan.

After the Court's preliminary approval of the Medical Benefits Settlement, Hilsoft Notifications, the Medical Benefits Settlement Class Notice Agent, began implementing the Notice Plan.  The Notice Plan has been implemented as ordered by the Court, including dissemination of individual notice to known potential Settlement Class Members via postal mail and email, an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, highly-trafficked websites, and Sunday local newspapers (via newspaper supplements).  (Declaration of Cameron R. Azari ¶ 8.)[33]  Notice placements also appeared in non-measured trade, business and specialty publications, African-American, Vietnamese and Spanish-language publications, and Cajun radio programming.  (*Id.*)  The implementation of the broad Notice Plan is described further in Section III of the Argument below.

### B.     Work on the Projects for the Gulf Region Health Outreach Program Has Begun.

Each of the Gulf Region Health Outreach Program projects has begun putting initial funds to use to benefit the region's healthcare capacity.  By the end of August 2012, BP will have distributed over $20 million to the Outreach Program projects.  (Goldstein Decl. ¶ 36.)

*Primary Care Capacity Project*.  By August 31, 2012, over $10 million will have been distributed to fund this component of the Outreach Program.  Additional annual distributions are

---

[33] BP and the Plaintiffs are jointly filing the declaration of Mr. Azari, which is attached to their separate Notice of Joint Filing of Declarations.

planned over the next four years.  This project will, over five years, be funded with a total of $50 million from the Medical Benefits Class Action Settlement.

The first part of the Primary Care Capacity Project, the Regional Community Health Assessment, is underway.  In the so-called "Rapid" phase of the Regional Community Health Assessment, which started in June 2012 and will continue through October 2012, the Louisiana Public Health Institute ("LPHI") is conducting a community health needs assessment that looks at the health status of residents, their access to health care, insurance coverage, and the adequacy of existing healthcare options.  This assessment will help LPHI select primary care providers in the community that will receive grants and other assistance to improve their community outreach and provide higher quality health care.  (*Id.* ¶ 36(a).)

A more comprehensive assessment of health needs and capacities will continue into 2013.  This more detailed assessment will help LPHI select additional healthcare clinics to participate in the Primary Care Capacity project and determine the types and levels of financial and technical assistance needed in different communities.  (*Id.*)

***Mental and Behavioral Health Capacity Project***.  By August 31, 2012, over $6 million will have been distributed to fund this component of the Outreach Program—almost $1.4 million in Alabama, over $800,000 in Florida, over $2.4 million in Louisiana, and almost $1.4 million in Mississippi.  In total, this project will be funded over five years with a total of $36 million from the Settlement, divided among the states as follows, Alabama: $8,280,001; Florida: $5,040,000; Louisiana: $14,400,001; and Mississippi: $8,279,998.  (*Id.* ¶ 36(b).)

Each of the state-based mental and behavioral health projects has begun to hire staff and implement its planned activities.  The projects are gearing up to provide immediate mental health services, including through the use of telemedicine.  (*Id.*)

40

The projects have also begun to meet with FQHCs and other clinics in their communities to formulate detailed plans for integrating mental health services into the clinics and increasing the clinics' capacity for providing such services.  They are also meeting with physicians, clinic coordinators and community stakeholders to determine interest in collaborating on enhancing mental and behavioral health capacity.  The state project leaders are also developing plans to increase and improve supportive mental and behavioral health services in schools across the region.  (*Id.*)

*Environmental Health Capacity and Literacy Project.*  By August 31, 2012, over $3 million will have been distributed to fund this component of the Outreach Program.  In total, this project will be funded from the Settlement with a total of $15 million over five years.  (*Id.* ¶ 36(c).)

The environmental health project has begun to work with the Association of Environmental and Occupational Health Clinics to make a network of environmental health specialists available for consultation and referrals in the Gulf Region.  They are also working together to develop environmental health case studies to provide continuing education training to doctors and other health professionals working in the Gulf.  The project is also finalizing its plans for a high school science training program that will focus on environmental health issues. (*Id.*)

*Community Health Workers Training Program*.  By August 31, 2012, over $1.5 million will have been distributed to fund this component of the Outreach Program.  In total, this project will be funded with nearly $4 million over five years from the Settlement, designed to provide high quality educational programs, disaster-related research expertise, and instructional services to community health workers.  (*Id.* ¶ 36(d).)

The Coastal Resource and Resiliency Center, which will house the community health workers program, is in formation.  Office space has been located, the recruitment of staff is in process, and training program materials are being prepared.

### C.     The Claims Administrator Implementing the Settlement and Preparing for the Payment of Claims.

The Claims Administrator has successfully performed its duties to date, including: (1) employing trained and dedicated people in New Orleans; (2) creating the medical settlement web portal; (3) launching its claims service center in New Orleans; (4) reporting to the parties as required by the Agreement; (5) implementing the mapping tool for zone determinations; (6) creating and staffing a call center that has processed over 9,400 inquiries since Notice began; (7) completing a comprehensive survey of prospective medical service providers for the Periodic Medical Consultation Program; (8) developing the Gulf Region Health Outreach web portal; (9) developing and implementing an online Gulf Region Health Outreach Library; and (10) addressing Medicare Secondary Payer Compliance.  The Claims Administrator is on track with all activities and is ready to implement the Settlement upon the Effective Date.  Further details are found in the separate status report submitted to the Court by the Claims Administrator. (Garretson Status Report, Rec. Doc. 7105-1.)

### D.     The Reaction of Class Members to the Settlement Has Been Very Positive Thus Far.

The reaction of the Class to the Settlement has been very favorable.  To date, only three objections to final approval of the Settlement from persons who claim to be Class Members have been received.  (Docket 10-7777, Rec. Docs. 41, 51, 57.).  Only 62 persons have submitted requests to opt out (several of whom do not appear to be Class Members).  (Garretson Status Report (Rec. Doc. 7105-1) at 8.)  Nearly 2,400 persons have already filed claims.  (*Id.*)

<u>ARGUMENT</u>

## I.   THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE.

Federal Rule of Civil Procedure 23(e) requires that class action settlements be court approved.  It is well settled that compromises of class action claims are favored.  *See*, *e.g.*, *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *see also Int'l Union, United Auto, Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (similar); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) ("[T]he public interest in amicable resolution of cases is particularly strong in the context of mass tort and similar litigation."); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) ("[T]here is a 'strong judicial policy favoring the resolution of disputes through settlement.' . . .  The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.") (quoting *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004)); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 311 (3d Cir. 2011) ("'This presumption [in favor of voluntary settlement agreements] is especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts.'") (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010)).[34]

Because "settlement is the preferred means of resolving litigation," there is a "strong presumption in favor of finding a settlement fair."   *Collins v. Sanderson Farms, Inc.*,

---

[34] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"); *In re Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000) ("the general policy of federal courts to promote settlement before trial is even stronger in the context of large-scale class actions"); *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985) (noting "the overriding public interest in favor of the voluntary settlement of disputes, particularly where class actions are involved.").

568 F. Supp. 2d 714, 720 (E.D. La. 2008) (quotation omitted); *see Turner*, 472 F. Supp. 2d at 843 ("a presumption is made in favor of the settlement's fairness, absent contrary evidence") (citing *Smith*, 91 F. App'x at 955); *accord, e.g., In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998).

Furthermore, abundant authority provides that once a court has granted preliminary approval to a class action settlement, the settlement is presumed reasonable and "'an individual who objects has a heavy burden of demonstrating the settlement is unreasonable.'" *DeHoyos*, 240 F.R.D. at 293 (quoting *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 138-39 (W.D. Ky. 1992); *accord, e.g., Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983); *Robinson v. Ford Motor Co.*, No. 04-844, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005); *In re Terazosin Hydrochloride Antitrust Litig.*, No. MDL 99-1317, 2005 WL 2451960, at *5 (S.D. Fla. July 8, 2005); *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 931 (E.D. Mich. Jan. 29, 2007); *United States v. New Jersey*, No. 88-5087, 1995 WL 1943013, at *11 (D.N.J. Mar. 14, 1995); *Moore v. United States*, 63 Fed. Cl. 781, 784 (Fed. Cl. 2005). That principle fully applies here. Accordingly, those objectors who oppose the settlement bear the "heavy burden" of demonstrating that the Court's preliminary approval order was erroneous. As discussed below, they cannot meet that burden. (*See* Argument Section IV, below.)

Courts in the Fifth Circuit evaluate proposed settlements under the six *Reed* factors to determine whether to grant final approval: (1) the assurance that there is no fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class

counsel, class representatives, and absent Class Members. *See Reed*, 703 F.2d at 172.[35] Here, all six *Reed* factors overwhelmingly support final approval of the settlement.[36]

### A.    The Parties Agreed to Settle Only After Many Months of Protracted Negotiations.

The parties reached agreement only after lengthy, hard-fought negotiations. Counsel for both Plaintiffs and BP are thoroughly familiar with the factual and legal issues in this action and vigorously represented their respective clients' interests throughout the litigation, including in the negotiation process. This nearly year-long arm's-length negotiation process supports final approval of the proposed Settlement. *See In re Train Derailment Near Amite, La.*, MDL No. 1531, 2006 WL 1561470, at *19 (E.D. La. May 24, 2006) ("The fact that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate.").[37]

---

[35] *See also Newby v. Enron Corp.*, 394 F.3d 296, 308 (5th Cir. 2004); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 431 (S.D. Tex. 1999) (*citing Reed*, 703 F.2d at 172).

[36] While *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), has received considerable attention, courts routinely consider its holding on class certification and nonetheless grant approval to class settlements. *See, e.g., Cobell*, 679 F.3d 909; *Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011); *Gong-Chun v. Aetna Inc.*, No. 1:09-cv-01995, 2012 WL 2872788 (E.D. Cal. July 12, 2012); *In re Budeprion XL Marketing & Sales Litig.*, MDL No. 2107, No. 09-md-2107, 2012 WL 2527021 (E.D. Pa. July 2, 2012); *McKenzie v. Fed. Express Corp.*, No. CV 10-02420, 2012 WL 2930201 (C.D. Cal. July 2, 2012); *Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214, 2012 WL 2505644 (S.D.N.Y. June 27, 2012); *Ripley v. Sunoco, Inc.*, No. 10-1194, 2012 WL2402632 (E.D. Pa. June 26, 2012); *Charron v. Pinnacle Group N.Y. LLC*, No. 07 Civ. 6316, 2012 WL 2053530 (S.D.N.Y. June 6, 2012); *Morris v. Affinity Health Plan, Inc.*, No. 09 Civ. 1932, 2012 WL 1608644 (S.D.N.Y. May 8, 2012); *In re Philips/Magnavox Television Litig.*, No. 09-3072, 2012 WL 1677244 (D.N.J. May 14, 2012); *Sewell v. Bovis Lend Lease, Inc.*, No. 09 Civ. 6548, 2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012); *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, No. 04-5184, 2012 WL 1071240 (D.N.J. Mar. 30, 2012); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 09-2046, 2012 WL 948365 (S.D. Tex. Mar. 20, 2012); *McLennan v. LG Elec. USA, Inc.*, No. 2:10-cv-03604, 2012 WL 686020 (D.N.J. Mar. 2, 2012); *Ebbert v. Nassau Cnty.*, No. CV 05-5445, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011); *McDonough v. Toys"R"Us, Inc.*, 834 F. Supp. 2d 329 (E.D. Pa. 2011); *Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564 (S.D. Iowa 2011); *In re TD Ameritrade Account Holder Litig.*, No. C 07-2852, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011); *Odom v. Hazen Transport, Inc.*, 275 F.R.D. 400 (W.D.N.Y. 2011); *In re Wells Fargo Loan Processor Overtime Pay Litig.*, MDL No. C-07-1841, 2011 WL 3352460 (N.D. Cal. Aug. 2, 2011); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011); *Bond v. Ferguson Enter., Inc.*, No. 1:09-cv-1662, 2011 WL 2648879 (E.D. Cal. June 30, 2011); *In re Partsearch Tech., Inc.*, 453 B.R. 84 (S.D.N.Y. 2011).

[37] *See also Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) ("trial court 'should be hesitant to substitute its own judgment for that of counsel'" when the settlement has been reached at arm's length without fraud or collusion); *see also Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."); *Domingue v. Sun Elec. & Instrumentation*, No. 09-

Final approval is also supported by the fact and nature of Judge Shushan's involvement in supervising negotiations over crucial elements of the Agreement.  Indeed, agreement on the key compensation elements of the Specified Physical Conditions Matrix and the Outreach Program were reached as Judge Shushan, utilizing shuttle diplomacy, brokered agreement between the class counsel and BP's counsel, who were in different rooms.  This sort of involvement of a Magistrate Judge helps demonstrate a lack of fraud or collusion behind the settlement.  *See*, *e.g.*, *Maywalt v. Parker & Parsley Pet. Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("[T]he supervision of settlement negotiations by a magistrate judge, as occurred here, makes it less likely that . . . [class counsel have promoted] their own interests over those of the class.").[38]

In addition, the parties negotiated over attorneys' fees for class counsel only after reaching final agreement on the relief to be afforded Class Members and only after the Court gave its approval for fee negotiations to commence.  "'Because the parties have not agreed to an amount or even a range of attorneys' fees, there is no threat of the issue explicitly tainting the fairness of settlement bargaining.'"  *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,   --- F. Supp. 2d ---,   MDL No. 09-2046,   2012 WL 948365,   at *16   (S.D. Tex. Mar. 20, 2012) (quoting *Turner*, 472 Supp. 2d at 845).[39]

Finally, the absence of collusion can also be presumed based on the overall fairness and generosity of the proposed settlement toward the Class.  If the terms of the settlement are fair,

---

682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010) ("[T]hat this settlement is the negotiated result of an adversarial proceeding is an indication of its fairness."); *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009) ("Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of Class Counsel's decision to enter into the settlement and the proceedings leading thereto.").

[38] *See also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (settlement reached after mediation is entitled to a presumption of arm's-length dealings and fairness), *aff'd*, 405 F. App'x 532 (2d Cir. 2010); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003) (upholding settlement where the magistrate judge's "mediation efforts" helped facilitate the settlement).

[39] *See also Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006) ("The fact that the parties . . . did not discuss attorneys' fees until all other issues were virtually finalized, is also indicative of a fair and arm's-length process."); *McAlarnen* v. *Swift Transp. Co.*, *Inc.*, No. 09-1737, 2010 WL 365823, at *12 (E.D. Pa. Jan. 29, 2010) ("Furthermore, Class counsel did not discuss attorneys' fees and costs until after they had come to terms with Defendant over substantive relief to the Class.").

then the reviewing court can deem the formative negotiations to have been proper.  *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 588 (N.D. Ill. 2011) (quoting *Mars Steel Corp. v. Cont'l Ill. Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir 1987) ("Rather than attempt to prescribe the modalities of negotiation, the district Judge permissibly focused on the end result of the negotiation, which was more favorable to the class than any Class Member could reasonably have expected.  The proof of the pudding was indeed in the eating.")); *see also In re Corrugated Container*, 643 F.2d at 212 ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting."); *Turner*, 472 F. Supp. 2d at 846 ("[A] presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair.").  In sum, this factor strongly supports final approval of the Settlement.

## B.    Settlement Is Appropriate Given That Litigation of Plaintiffs' Claims Would Be Complex, Expensive, and Lengthy.

In assessing this factor, courts consider the vagaries of litigation and compare the settlement to potential future relief.  *In re Shell Oil Refinery*, 155 F.R.D. 552, 563 (E.D. La. 1993); *see also Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-00400, 2009 WL 2208131, at *26 (E.D.N.C. July 22, 2009) ("[T]he settlement terms reflect plaintiffs' counsel's consideration of the strength of their case, and the delay and cost of proceeding to trial balanced against the certainty, relative promptness, and amount of relief the settlement provides.").  As in *Shell Oil*, there can be "no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases" in the history of the United States.  155 F.R.D. at 559.[40]

---

[40] S*ee also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive."); *Rodriguez v. West Publ'g Grp.*, 563 F.3d 948, 966 (9th Cir. 2009) (affirming approval of settlement where "a number of serious hurdles remained" for the plaintiffs); *Billitteri v. Secs. Am., Inc.*, No. 09-1568, 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) (noting there was little doubt that the amount of time it would take to recover on behalf of Class Members "would measure in years rather than the months contemplated by

The burdens of litigation here are immense.  The Court's pre-trial orders provide for at least three trial phases for the Limitation and Liability Trial, each of which would last months. Moreover, these three phases would only partially address the claims of the plaintiffs and the more than 17,000 claimants who have filed MDL 2179 B3 Bundle Short Form Joinders alleging injury from exposure to oil and/or dispersants.  These individual claims would likely entail many years of expensive litigation and require separate trials and testimony from numerous witnesses and medical experts, with no certainty as to the outcome.  Appeals by the losing parties would be a virtual certainty.

Thus, although there has been swift progress in MDL 2179 under this Court's oversight, even after the completion of the three already-planned trial phases, many additional years of litigation would be required before any individual plaintiff or Class Member received a recovery, especially the B3 claimants.  *Cf. Collins*, 568 F. Supp. 2d at 726 (potential trial lasting "several weeks" weighed in favor of approving a settlement); *Faircloth v. Certified Fin., Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving settlement where trial "was estimated to last at least two weeks"); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997) (finding "the prospect of a trial lasting months" weighed heavily in favor of approving a settlement); *In re Shell Oil*, 155 F.R.D. at 560 ("[E]ven a six month trial is considered extremely lengthy and the expense for the parties, the claimants, and the judicial system would be enormous.").  Moreover, should this case proceed to trial, it is likely to become even more complicated, as there "is no reason to suppose that the case would become less complex or contentious as trial began."  *Faircloth*, 2001 WL 527489, at *4; *see also id.* (concluding from the "contentious motion practice on behalf of virtually all parties involved"

---

the parties at this stage"); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) ("When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened.").

that the case "would undoubtedly continue on a protracted litigation path absent approval of the proposed settlement agreement").

The *Exxon Valdez* litigation provides an example to avoid.  Nearly twenty years elapsed between the *Exxon Valdez* oil spill and the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).  Many of the plaintiffs had died before the case reached the Supreme Court, *see* Brief for Respondents, *Exxon Shipping Co. v. Baker*, No. 07-219, 2008 WL 194284, at *16 (U.S. Jan. 22, 2008), and many others suffered due to the lengthy litigation process.  Indeed, experts who studied the effects of the *Exxon Valdez* litigation on the local populace have said that the litigation "produce[d] an independent secondary disaster, which [rather than the original spill] is the primary source of ongoing secondary trauma."  J. Steven Picou, WHEN THE SOLUTION BECOMES THE PROBLEM: THE IMPACTS OF ADVERSARIAL LITIGATION ON SURVIVORS OF THE EXXON VALDEZ OIL SPILL, 7 U. St. Thomas L.J. 68, 81 (2009).

Litigation represents "an enormous financial and psychological burden on all parties involved" and strongly counsels in favor of settlement.  *In re Combustion*, 968 F. Supp. at 1127; *see also Ass'n For Disabled Ams.*, 211 F.R.D. at 469 ("[A]bsent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain."); *see also Rodriguez*, 563 F.3d at 966 (noting that the "[i]nevitable appeals would likely prolong the litigation, and any recovery by Class Members, for years").  Simply put, "[a]bsent a settlement, there is the potential for further protracted litigation and the additional expenditure of significant money, time, and resources.  Moreover, Plaintiffs are not assured of recovery upon the completion of the litigation.  A fair settlement, therefore, has significant merit as a resolution to this matter."  *Smith v. Ajax Magnethermic Corp.*, No. 02-0980, 2007 WL 3355080, at *6 (N.D. Ohio Nov. 7. 2007).

The necessary litigation costs for the extensive pre-trial and trial activity would likely outweigh the recovery (if any) that most Class Members could hope to receive.  In contrast, this Settlement makes significant benefits available to the Class without extensive delay or cumbersome procedures.  For those with qualifying Specified Physical Conditions, compensation under the Settlement is certain.  If these Class Members with physical injuries instead proceeded with litigation, recovery would not be certain and would take significantly longer.  In addition to compensation, Clean-Up Workers, Zone B Residents, and qualifying Zone A Residents will be able to receive, through the Periodic Medical Consultation Program, regular primary care medical examinations to assist them in managing their health for over two decades.  Such benefits—along with the benefits provided under the Gulf Region Health Outreach Program— could not even be obtained through litigation.  (Declaration of Geoffrey P. Miller ¶¶ 43, 44, 46, attached as Exhibit G; Declaration of John C. Coffee ¶ 79.)[41]

Because many of "the most controversial and hard-fought of all the issues in this case" remain to be litigated, *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986), the Settlement "eliminates the transaction costs that further proceedings would impose" and "provides relief for the class sooner than continued litigation would."  *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004).  For the parties, it is therefore entirely "proper to take the bird in the hand instead of a prospective flock in the bush."  *In re Shell Oil*, 155 F.R.D. at 560.  This *Reed* factor counsels strongly in favor of approval.

---

[41] The parties jointly have submitted the declaration of John C. Coffee, Jr., the Adolf A. Berle Professor of Law at Columbia Law School and a leading expert in class action law.  Professor Coffee's declaration sets forth his *independent opinions* regarding certification of the Medical Benefits Settlement Class, which the parties agree should be considered by the Court.  BP agrees, for settlement purposes, with Professor Coffee's conclusion that the proposed Settlement Class satisfies all the requisites for class certification in this case, even though BP does not necessarily agree with every specific statement in his declaration.  It would be inappropriate to utilize or apply this declaration outside the context of this Class Settlement.  The declaration of Professor Coffee is attached to the parties' separate Notice of Joint Filing of Declarations.

### C.     The Advanced Stage of the Proceedings and the Amount of Discovery Completed Strongly Support Settlement.

This factor "asks whether the parties have obtained sufficient information to evaluate the merits of the competing positions." *In re Educ. Testing Servs.*, 447 F. Supp. 2d at 620 (quotations omitted). "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed." *Id.* at 620-21. Here, where the parties have obtained extensive information through both formal discovery and informal alternatives, including the use of experts and consultants, there can be no doubt that the parties have the necessary information to evaluate all aspects of the case and the merits of the Settlement.

First, the parties have completed an extraordinary amount of discovery. During the 19-month period before settlement was reached, in connection with preparation for the Limitation and Liability Trial, the parties deposed 311 fact and expert witnesses, with 7,416 documents marked as deposition exhibits. In addition, the parties in MDL 2179 had produced approximately 90 million pages of documents and approximately 20 terabytes of data. By any measure, the amount of discovery that has already occurred is more than sufficient to ensure a fair settlement. *Cf. Faircloth*, 2001 WL 527489, at *4 (approving a settlement where "thousands" of pages were produced). Although discovery for later phases of the trial has not advanced as far, the depth and breadth of discovery already completed provides the parties with necessary and extensive information regarding the potential liability of BP and other defendants for the bodily and personal injury claims alleged by the class.

Second, the Fifth Circuit has made clear that formal discovery is not a prerequisite to the approval of a class settlement. Even when "very little formal discovery was conducted," this

"does not compel the conclusion that insufficient discovery was conducted." *Cotton*, 559 F.2d at 1332; *see also In re Corrugated Container*, 643 F.2d at 211, 204 n.10 (noting that even if little formal discovery has been completed, plaintiffs may still have access to information obtained in other ways; "we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table"); *cf. Newby*, 394 F.3d at 306 ("Generally speaking, a settlement should stand or fall on the adequacy of its terms.").

Third, in addition to the formal discovery conducted in MDL 2179, the parties benefited from numerous other sources of information.  These include: (1) extensive scientific data in the public domain concerning the effect of oil exposure on health, specific exposure and sampling data collected during the *Deepwater Horizon* Incident, and analyses from government agencies; (2) health incident reports relating to Clean-Up Workers; (3) investigations and analyses conducted by the parties and their consultants; and (4) government investigations and hearings. Although this information was gathered outside of the formal discovery process and, in some cases, is not admissible in any trial on the merits, these extensive alternate sources of information underscore that the parties were sufficiently informed to reach a settlement.  *See DeHoyos*, 240 F.R.D. at 292.

Here, in light of the substantial amount of formal and informal discovery and investigation, the Court can easily conclude that the Settlement represents an informed, educated, and fair resolution of this dispute.  *See, e.g.*, *Turner*, 472 F. Supp. 2d at 847; *DeHoyos*, 240 F.R.D. at 292; *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997).  The extensive information developed to date allowed the parties to assess their respective positions in fine-grained detail and make a reasonable decision on settlement, which is all that is required. *See, e.g., In re Combustion*, 968 F. Supp. at 1127; *Trombley v. Nat'l City Bank*,

759 F. Supp. 2d 20, 26 (D.D.C. 2011) ("Counsel should have 'sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success . . . .") (quoting *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 62 (D.D.C. 2010)).

### D.    Plaintiffs Face Serious Risks on the Merits.

The serious risks that Plaintiffs face on the merits of their claims strongly support a finding that this Settlement is fair, reasonable, and adequate.  Under this factor, the Court must compare the settlement terms with the likely rewards the class would receive at trial.  *Reed*, 703 F.2d at 172; *see also In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007) (quotation omitted) ("[T]he court must compare the terms of the compromise with the likely rewards of litigation.").  If further litigation is unlikely to lead to greater relief for the class, then this factor weighs in favor of settlement.  *Ayers*, 358 F.3d at 373.

If the claims in this case were to be tried, Plaintiffs would face significant factual and legal hurdles, including with respect to liability and damages.  Monitoring and sampling data from government and private sources show that Clean-Up Workers and Gulf Coast Residents were not exposed to oil and/or dispersants at levels that would give rise to risk of significant harm.  *See* Section III of the Background.  In addition, any damages, particularly for the acute, short-term conditions claimed by most plaintiffs, would be low and would not warrant the burdens and cost of pursuing legal action.  (*See* Coffee Decl. ¶ 76 ("[B]ecause this case is disproportionately composed of  'negative value' claims, it must be expected that many claimants will not assert them"); *id.* ¶¶ 38-41; Miller Decl. ¶ 37.)  *See also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, MDL 1203, 2000 WL 1222042, at *61 (E.D. Pa. Aug. 28, 2000) (describing possible difficulty of establishing present or future damages due to limited exposure to drug or injury that does not affect ability to function normally).

Moreover, even if one were to assume a favorable liability verdict and damages awarded at trial, the resulting recovery, likely years from now, would be diminished by the costs of litigation.  In light of these considerations, certain recovery through settlement is by far the preferable result.

In addition, the Responder Defendants have asserted federal derivative immunity under both the Clean Water Act and the Federal Tort Act, and argued that Plaintiffs' state and maritime law claims are preempted by federal law because the Responder Defendants were following daily directives from the FOSC, as required by federal law, to implement a comprehensive federal response scheme created by the Clean Water Act, the Oil Pollution Act, and the National Contingency Plan.  The Responder Defendants' motions for summary judgment have been fully briefed and argued and, if granted, Plaintiffs would lose a significant additional source of potential recovery.  BP would also argue that its decisions related to, for example, the training and protection of workers and the use of the dispersants were all done with the input and approval of the government, and were therefore reasonable and cannot form the basis for any liability.

Based on these considerations, BP submits that the costs, delay, and inherent uncertainty of litigation would outweigh the final recovery for most or all plaintiffs.  Even for those plaintiffs who might receive a favorable verdict and an award of damages, recovery would not come for years, while congesting the dockets of this Court and others.

###   E.    The Settlement Benefits Are Generous Given the Range of Possible Recovery Through Litigation.

To merit approval, the Settlement must only represent a fair, reasonable, and adequate estimation of the value of the case.  *In re Combustion*, 968 F. Supp. at 1129; *cf. UAW v. Gen. Motors Corp.*, 235 F.R.D. at 387 ("[A] fairness hearing is not a trial, but instead has a very

singular and narrow purpose—to determine whether the settlement at issue is fair, reasonable, and adequate."). The Medical Settlement provides monetary recoveries that are on the generous side of what a Class Member could obtain at trial if successful, and indeed provides additional relief that would be unavailable through litigation.

The Settlement provides compensation for qualifying Specified Physical Conditions without the need for protracted litigation. The Specified Physical Conditions Matrix sets forth recoveries based on whether a condition is acute or chronic (ongoing), the level of proof submitted by the claimant, and whether the Class Member is a Resident or Clean-Up Worker. These payments are well in line with damage awards for similar injuries at trial[42] *Howard v. Union Carbide Corp.*, 50 So.3d 1251, 1256 (La. 2010)—but individual trials in this case are years away and will present significant factual and legal hurdles. In addition, given appeals, any ultimate recovery for any plaintiff would be many years after that.

In addition, the proposed Settlement provides medical consultations under the Periodic Medical Consultation Program for all qualifying Class Members, including Clean-Up Workers and Zone B Residents who have not claimed a Specified Physical Condition. This Periodic Medical Consultation Program provides a substantial benefit to the Class that could not be achieved through litigation. (Miller Decl. ¶ 43.) The Gulf Region Health Outreach Program

---

[42] *Howard v. Union Carbide Corp.*, 50 So.3d 1251, 1256 (La. 2010) (holding that trial court's awards of $1,500 to $3,500 to plaintiffs exposed to a chemical leak were a clear abuse of discretion given that the "damages proven, such as eye, nose, and throat irritations, are not unlike the symptoms suffered by persons afflicted with common seasonal allergies . . . [and] might be characterized as mere annoyances"; reducing damages to $100 to $500); *Arabie v. CITGO Petroleum Corp.*, 89 So.3d 307 (La. 2012) (awarding damages of $7,000 to $15,000 to plaintiff refinery construction workers exposed to toxic chemicals due to oil spill; damages were awarded for symptoms of eye irritation, nausea, nasal and throat irritation, and difficulty in breathing, as well as for fear of developing future injuries such as cancer); *Doerr v. Mobil Oil Corp.*, 935 So.2d 231 (La. App. 2006) (affirming damage awards of $500 to $2,000 to plaintiffs for physical injuries related to the ingestion of drinking water contaminated with oil, grease, and other contaminants); *Rivera v. United Gas Pipeline Co.*, 697 So.2d 327 (La. App. 1997) (affirming jury verdicts that declined to award damages to plaintiffs who as a result of exposure to natural gas suffered "minimal" injuries such as nausea and headaches); *see also* Coffee Decl. ¶¶ 38-41.

likewise provides benefits to the Class and the general public that could only be achieved through settlement.  (*Id.* ¶¶ 44, 46.)

In evaluating the range of possible recovery, the "trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."  *Cotton*, 559 F.2d at 1330 (internal quotations marks omitted).  In this regard, the "fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement." *Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989).  Courts regularly approve settlements that are a fraction of the plaintiffs' claimed (or even actual) damages:

> "Courts routinely recognize that settlements do not equal the full value of the loss claimed by the plaintiffs.  'In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'  *Weinberger v. Kendrick,* 698 F.2d 61, 65 (2d Cir.1982) (approving class settlement where "recovery will be only a negligible percentage of the losses suffered by the class"); *Lazy Oil Co. v. Witco Corp.,* 95 F.Supp.2d 290, 339 (W.D.Pa.1997) (collecting cases where courts approved class action settlements providing from 0.2 percent to 16 percent of potential recovery), *aff'd,* 166 F.3d 581 (3rd Cir.1999)."

*Int'l Union, UAW v. Gen. Motors Corp.,* No. 07-cv-14074 DT, 2008 WL 2968408, at *24 (E.D. Mich. July 31, 2008).  Here, the Settlement provides meaningful, non-negligible benefits for each qualifying Class Member—and it provides them now and in the near future, not years from now if ever.  Because the Settlement compares extremely favorably with the range of possible recovery through litigation, this factor supports settlement approval.

### F.   The Opinions of Class Counsel, Class Representatives, and Absent Class Members Favor Settlement.

In evaluating a settlement, the Court should rely on counsel who know the strengths and weaknesses of their cases.  *See Turner*, 472 F. Supp. 2d at 852 ("Class counsel's opinion should

be presumed reasonable because they are in the best position to evaluate fairness due to an

intimate familiarity with the lawsuit.").   Where "counsel for both parties have significant

experience in litigating and negotiating settlement of class actions," this fact is strong evidence

that the settlement is fair and reasonable.   *DeHoyos*, 240 F.R.D. at 287 (internal quotation marks

omitted); *see Cotton*, 559 F.2d at 1330 ("In performing this balancing task, the trial court is

entitled to rely upon the judgment of experienced counsel for the parties.").   Class counsel and

counsel for BP have thorough knowledge of the case and substantial experience litigating and

settling complex matters and class actions.   After evaluating the risks and benefits of continued

litigation, they believe that settlement is more beneficial to the class than litigation, and that the

Medical Benefits and Economic and Property Damages Settlements are fair, reasonable, and

more than adequate.   For example:

- "I think this settlement is the best that could be done for the most people. . .   I do think it benefits the whole."   *New Deal Protects Gulf Oil Spill Cases*, Montgomery Advertiser, Mar. 22, 2012 (quoting Rhon Jones, Class Counsel);

- "The benefit to society is incredible."   *BP Deal Is Fair, Says Area Attorney*, Pensacola News Journal, Mar. 4, 2012 (quoting Brian Barr, Class Counsel).

- "[T]he settlement provides the most benefit for the largest number of people. . . .   It's a win for the people and businesses that have been hurt."   *Settlement Reached in Gulf Oil Spill Litigation*, Baron & Budd website (http://baronandbudd.com/areas-of-practice/gulf-coast-oil-spill/settlement-reached-in-gulf-oil-spill-litigation/ #ixzz21lOjGtDO, (quoting Scott Summy, Class Counsel).

- "The Court now has before it a settlement structure that is fair and transparent." (Plaintiffs' Mem. in Support of Mot. for Preliminary Class Certification (Rec. Doc. 6267-1) at 24.)

- "We whole heartedly support the court-supervised claims process and think our clients will receive the full and fair compensation they deserve."   BP Settlement Reached: In Principle Agreement to Compensate Hundreds of Thousands of Oil Spill Victims, Motley Rice website (http://www.motleyrice.com/news/view/bp-settlement-reached-in-principle-agreement-to-compensate-hundreds-of-thousands-of-oil-spill-victim), Mar. 3., 2012 (quoting Joe Rice, Class Counsel)

- "[W]e really tried, in putting this together, to have a guiding principle of having – achieving the greatest amount of good for the greatest number of people." (Robin Greenwald, Class Counsel, Prelim Approval Hearing, Tr. at 63:17-23)

These informed views are entitled to substantial weight. *See Combustion*, 968 F. Supp. at 1128 (noting it was "not lost on the Court that counsel for the compromising parties, some of the most able attorneys in the country, when armed with extensive knowledge of the facts, decided that settlement rather than a . . . trial was in the best interest of their clients"); *In re OCA, Inc. Sec. & Deriv. Litig.*, No.05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) ("The settlement was reached after over three years of litigation and extensive discovery, and thus counsel for all parties were experienced and familiar with the factual and legal issues in the case"); *San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 461 (W.D. Tex. 1999) ("In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to assess the potential risks and rewards of litigation . . . ." (quotation omitted)).

Moreover, to date, only three objections to final approval of the Settlement from persons who claim to be Class Members have been received. (Docket 10-7777, Rec. Docs. 41, 51, 57.). Only 62 persons have submitted requests to opt out (several of whom do not appear to be Class Members). (Garretson Status Report (Rec. Doc. 7105-1) at 8.) "While the fact that a relatively small percentage of the Class Members objects to a proposed settlement is not dispositive, '[c]ourts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'" *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990) (citing 2 Newberg on Class Actions § 11.47 (2d ed.), at 463 ); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (same); *see also In re Shell Oil*, 155 F.R.D. at 566-67 (relatively few number of objections and opt outs supported fairness and adequacy of the settlement); *Robinson*, 2005 WL 5253339, at *5 (same).

58

Moreover, "[a] court should not withhold approval of a settlement merely because some Class Members object." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 600 (E.D. Mich. 2006). Because a settlement is presumptively reasonable once it has been preliminarily approved, "an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable." *DeHoyos*, 240 F.R.D. at 293 (quoting *Whitford*, 147 F.R.D. at 138-39). The reason for this is that the Court "'has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement.'" *Id.* (quoting *Mich. Hosp. Ass'n v. Babcock*, No. 5:89-00070, 1991 U.S. Dist. LEXIS 2058, at *10 (W.D. Mich. Feb. 11, 1991)); *see also Reed*, 703 F.2d at 174-75 (approving settlement over objections by 30% of the class).

Stated differently, as a fiduciary to the class, the Court must weigh the risk to the class if the settlement were not approved against any arguments made by objectors. *See*, *e.g.*, *DeHoyos*, 240 F.R.D. at 286 ("[T]he court acts 'as a fiduciary who must serve as a guardian of the rights of absent Class Members'") (citing *Garza v. Sporting Goods Properties, Inc.*, No. 93-108, 1996 WL 56247, at *11 (W.D. Tex. Feb. 6, 1996)); *see also Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998) (the court's role is as guardian of the interests of class members); *see also* 6 Newberg on Class Actions § 18:57 (4th ed.) ("The court has a fiduciary responsibility as guardians of the rights of the absentee Class Members when deciding whether to approve a settlement agreement").

In this case, the number of individuals who have already filed claims seeking the benefits of the Settlement (nearly 2,400 to date), even though no payments will be made until the Effective Date, demonstrates widespread, affirmative approval of the Settlement, and their

interests should be protected against objections by a small minority.[43]  As discussed in Section

I.B of the Argument, the length and difficulty of the litigation, the further expense to the class,

and the uncertain outcome for the class absent settlement all weigh heavily in favor of approval

of the settlement.

## II.      THE SETTLEMENT LACKS THE FEATURES THAT HAVE PREVENTED APPROVAL OF OTHER MEDICAL SETTLEMENTS.

The Settlement avoids the problematic features that have led courts to withhold approval

of certain prior mass tort class action settlements.  Indeed, the Settlement should be considered a

state-of-the-art example of best practices in the field.  (Miller Decl. ¶ 47.)

For example, this Settlement presents none of the concerns that troubled the Court in

*In re Katrina Canal Breaches Litig.*, 673 F.3d 381 (5th Cir. 2012).  Citing the Supreme Court's

decision in *Ortiz v. Fibreboard*, 527 U.S. 815 (1999), the Fifth Circuit there rejected a class

settlement and ordered the decertification of a mandatory limited-fund class under Federal Rule

of Civil Procedure 23(b)(1), on the ground that the settlement failed to provide a procedure for

---

[43] Indeed, even a large number of objections would not establish unfairness.  According to the Fifth Circuit, "'[a] settlement can be fair notwithstanding a large number of Class Members who oppose it.'"  *Reed*, 703 F.2d at 174 (quoting *Cotton*, 559 F.2d at 1331); *see also Ayers v. Thompson*, 358 F.3d 356, 373 (5th Cir. 2004) ("[o]ur jurisprudence . . . makes clear that a settlement can be approved despite opposition from Class Members").  In fact, courts regularly approve settlements as fair, reasonable, and adequate even when a relatively high percentage of Class Members opt out or object.  *See, e.g., Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("only" 29 objections in 281 member class "strongly favors settlement"); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (settlement approved despite opposition of 36% of the total class); *Elliott v. Sperry Rand Corp.*, 680 F.2d 1225, 1226 (8th Cir. 1982) (settlement approved where 790 Class Members out of approximately 3,000 Class Members objected); *E.E.O.C v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985) (settlement approved where thirty-nine out of 253 Class Members objected to settlement); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803-04 (3d Cir. 1974) (settlement fair and reasonable where 20% of class plaintiffs objected); *Van Horn v. Trickey*, 840 F.2d 604, 606. 608 (8th Cir. 1988) (settlement approved where 180 out of 400 Class Members [45%] objected); *In re Lloyd's Am. Trust Fund Litig.*, 96 CIV.1262 RWS, 2002 WL 31663577, at *23 (S.D.N.Y. Nov. 26, 2002) ("[out of the approximately 1,350 Class Members, only 239—or less than 18 percent—have submitted objections.  This relatively low number of objections itself supports approval of the settlement"); *Dauphin Island Property Owners Ass'n v. U.S.*, 90 Fed. Cl. 95, 104 (2009) (addendum to settlement approved where only sixteen percent of those receiving notice responded and, of those who responded, 123 out of 238 respondents objected); *Taifa*, 846 F. Supp. at 728 (settlement approved where 26 of 200 Class Members [13%] objected to settlement); *Giusti-Bravo v. U.S Veterans Admin.*, 853 F. Supp. 34, 41 (D.P.R. 1993) (settlement approved where 277 out of 708 Class Members [39% of Class Members] objected); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (settlement approved where "sixteen percent of the class, including three of four named plaintiffs, have filed some opposition to the settlement").

distribution of the settlement fund that treated class claimants equitably vis-à-vis one another. In essence, the settlement simply left it up to a special master to distribute a limited fund among different groups of claimants, without limits or constraints on the special master's discretion.

The Settlement in the present case could hardly be more different. The process of settlement negotiations and the Agreement itself go to great lengths to define different groups of claimants and to provide them with compensation that maps accurately onto demonstrated health conditions. (Miller Decl. ¶ 49.) Required documentation for all claimants is specifically identified in the Agreement and Exhibits, and reflects a reasonable compromise between the interest in providing compensation to injured parties and the interest in policing against fraudulent or inaccurate claims. For all claimants, moreover, the settlement consideration is uncapped. This means that the amount of settlement benefit provided to one member of the class will in no way reduce or interfere with the benefit obtained by another member. In such a situation the concerns that animated the Court in the *Katrina* litigation are entirely absent. (*Id.*)

The Medical Settlement Agreement is also well designed to avoid the problems that arise when a class is not "adequately defined and clearly ascertainable." *See Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (*per curiam*). The Agreement clearly and objectively identifies the class with respect to geographical location, timing, and categories of injuries for which compensation is recoverable. As noted above, the present case is nearly the epitome of how a class in a mass tort class action ought to be defined. (Miller Decl. ¶ 50.)

Likewise, this case does not present the problem of reliance on an "immature tort" whose legal and factual dimensions and implications have not been fleshed out by judicial decision. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1022 (5th Cir. 1997); *Castano v. American Tobacco*

*Company*, 84 F.3d 734 (5th Cir. 1996).  Nor does the outcome of this case depend on novel legal theories, and there is no need or proposal to establish new law through "bellwether" trials of individual actions.  The underlying legal principles sound largely in admiralty and maritime law—a body of jurisprudence hundreds of years old.  (Miller Decl. ¶ 51; *see also* Coffee Decl. ¶ 34–37.)

The Settlement likewise avoids the type of class conflicts that precluded class certification in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  *Amchem* was a "sprawling" class action involving many plaintiffs asserting exposure to asbestos in many different circumstances, at different times, under different conditions, and with different health conditions and medical histories.  Unlike in *Amchem*, all claims in the present action arise out of a single event—the *Deepwater Horizon* oil spill.  Claims that could have diffused the focus on this overarching issue are specifically excluded.  (Miller Decl. ¶ 52; Coffee Decl. ¶ 10.)

Moreover, unlike in *Amchem*, there are no conflicts between currently injured class members and "exposure-only" class members who have not yet manifested injuries.  *Id.* at 626. Instead, the Settlement preserves the rights of all Class Members with Later-Manifested Physical Conditions to seek compensation through the Back-End Litigation Option.  Because, by definition, it cannot be known at this time which particular Class Members may manifest conditions in the future, all Class Members—those with and without already manifested injuries—have the same interest in being able to seek compensation for Later-Manifested Physical Conditions.  In addition, payment to a Class Member with a qualifying Specified Physical Condition in no way affects the claim of, or the possible compensation available to, a Class Member who claims a Later-Manifested Physical Condition in the future.  The

compensation for Specified Physical Conditions and Later-Manifested Physical Conditions will not come from limited funds.

The imposition of certain procedural requirements and the waiver of certain rights and/or defenses by both parties are also proper. The Back-End Litigation Option involves compromise by and consideration exchanged by both BP and the Class Members. In any such lawsuit, BP agrees not to contest certain issues, including the Class Member's exposure to oil, dispersants, or contaminants, and BP's fault in connection with the Incident. BP also waives certain defenses, including arguments that the lawsuit is untimely, that it is barred by the rule against splitting a cause of action, or that it is precluded by the exclusivity of remedies under a workers' compensation statute or the Longshore and Harbor Workers' Compensation Act. In exchange, the Class Member waives the right to seek punitive damages. These sorts of mutual compromises have been blessed by the courts. *See*, *e.g.*, *In re Diet Drugs*, 2000 WL 1222042, at *49 n.22 ("In sum, the court finds that Class Counsel's agreement to waive punitive damage claims on intermediate and back-end opt outs in exchange for protection against statute of limitations and claim-splitting defenses represents a fair and wholly appropriate trade-off."); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 155, 170 (S.D. Ohio 1992) (punitive damages traded for waiver of statutes of limitation and repose defenses after opt-out and waiver of defenses to arbitration); *see also* MCL § 22.922 (2011) (Back-end opt-outs "differ[] from a front-end decision to opt out because the back-end opt-out Class Member may be bound by an agreement to give up certain rights, such as any right to punitive damages.").

Moreover, the trade-off under which Class Members waive back-end claims for punitive damages in exchange for BP's waiver of defenses was vigorously negotiated by Class Counsel, attorneys who had no conflict of interest with respect to class claims. Accordingly, the

negotiation process provides additional assurance that the interests of potential future claimants were adequately represented and appropriately addressed in this Settlement.   Unlike the settlement at issue in *Amchem*, which the Supreme Court criticized as a "global compromise with no structural assurance of fair and adequate representation," 521 U.S. at 627, the present Settlement took pains to ensure that all relevant interests were properly represented at the bargaining table and in the administration of the Settlement.  (Miller Decl. ¶ 58.)

Finally, the Periodic Medical Consultation Program is not medical monitoring, and the Settlement avoids the problems with medical monitoring classes.   "[S]everal courts have declined to certify classes that seek medical monitoring because of the individualized factual issues involved."  *See Duncan v. N.W. Airlines, Inc.*, 203 F.R.D. 601, 612 (W.D. Wash. 2001) (collecting cases); *see also Gates v. Rohm and Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011) ("Because causation and medical necessity often require individual proof, medical monitoring classes may founder for lack of cohesion.").  Courts have rejected such classes because medical monitoring requires an inherently individualized analysis to determine whether the risks of a proposed program are outweighed by the benefits.  The PMCP is designed to provide primary healthcare services to Class Members, not medical monitoring.  (Herzstein Decl. ¶ 22.)  The Program is made available on the same terms to all Clean-Up Worker Class Members and all Zone B Resident Class Members, as well as all Zone A Resident Class Members who qualify for compensation for a Specified Physical Condition, without regard to any individual Class Member's amount or duration of exposure.   The PMCP is also designed to allow the participating physicians to use their discretion in determining which tests, if any, to order for an individual.   While some of the tests available in the PMCP can help provide diagnostic information regarding manifest and latent physical disease, including cancer, the PMCP is not a

64

medical monitoring program for such conditions.  (*Id.* ¶¶ 22, 25b, c.)  Because the PMCP

provides the significant benefit of primary care services without charge to the Class Members,

not medical monitoring, it thus is a reason to approve, not reject, the Settlement.

### III.    THE NOTICE APPROVED BY THE COURT EXCEEDED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS.

In the Preliminary Approval Order, the Court found that the Notice and Notice Plan

"satisf[ied] the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e)(1) and

due process."  (Rec. Doc. 6419 at 19.)  Specifically, the Court noted that:

> "The Medical Benefits Settlement Class Notice clearly and concisely states in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a Class Member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on Class Members.  *See* Fed. R. Civ. P. 23(c)(2)(B)."

(*Id.* at 20)  In addition, the Court found that the "Notice Plan provide[d] the best notice

practicable under the circumstances pursuant to Fed. R. Civ. P. 23(c)(2)(B)," and "that the

Notice and the Notice Plan compl[ied] with Fed. R. Civ. P. 23(e)(1)'s requirement that the Court

direct notice to Class Members in a reasonable manner."  (*Id.* at 20-21.)  The Court further found

that "[t]he notice is reasonably calculated to inform interested parties of the pendency of the

Settlement and afford them an opportunity to present their objections."  (*Id.* at 21.)  Indeed, the

comprehensive notice program approved by the Court and implemented by the Class Notice

Agent easily satisfies the requirements of Rule 23 and due process.

#### A.    The Notice Distribution Method and Notice Contents Satisfied Rule 23(c)(2).

In an action certified as a class (including a settlement class) pursuant to Rule 23(b)(3),

"the court must direct to Class Members the best notice that is practicable under the

circumstances, including individual notice to all members who can be identified through

reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice must inform the class in "plain, easily understood language" of "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a Class Member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." *Id.*

Here, the Notice is written using concise and simple terminology and addresses all of the elements of Rule 23(c)(2)(B). *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498, at *13 (E.D. La. Jan. 10, 2012) (approving notice "written in plain and straightforward language . . . [that] also objectively and neutrally apprises all Class Members on the nature of the action, the definition of Class and Subclasses, and relevant deadlines and restrictions, as well as the date and location for the final Fairness Hearing."). The Notice includes, among other things: (i) a description of the Class; (ii) a description of the litigation and the proposed Settlement; (iii) an explanation of the rights of Class Members including the deadlines for filing a claim form; (iv) the names of counsel for the class; (v) the fairness hearing date; (vi) a description of the opportunity to appear at the hearing; (vii) a statement of the maximum amount of attorneys' fees that may be sought by Class Counsel; (viii) a statement of the deadline for filing objections to the proposed Settlement; and (ix) how to obtain further information.

For example, the Notice provides clear and specific direction and instructions to Class Members regarding their four options under the Settlement: (1) apply for settlement benefits; (2) opt out of the Settlement, in which case they will not participate in the Settlement and will retain all their rights to pursue individual claims against BP; (3) object to the Settlement, in

which case they will nonetheless remain Class Members; or (4) do nothing, in which case they will also remain Class Members.[44]  The Notice more than satisfies the Rule's form and content requirements.  *See, e.g.*, *id.* at *13; *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 175 (E.D. Pa. 2000); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997).

The broad dissemination method provided for in the Notice Plan and implemented by the Notice Agent also satisfies Fed. R. Civ. P. 23(c)(2)(B).  First, individual notices were sent by postal mail to potential Class Members and, to the extent known, their attorneys.[45]  The mailed notice packet included, among other things, a cover letter informing potential Class Members of the key features of the Settlement and where additional information may be found, a detailed notice, and a claim form.  E-mail notices were also sent where e-mail addresses of identifiable potential Class Members were known.  Through August 9, 2012, a total of 366,242 individual notices have been sent by postal mail.[46]  (Azari Decl. ¶ 9.)  In addition, 56,136 individual notices were e-mailed.[47]  (*Id.*)  As of August 9, 2012, mailings to only 10,700 known or potential Medical Benefits Settlement Class Members–or 3.3%–are known to be undeliverable.  (*Id.*)  This

---

[44] The Notice provides that Medical Benefits Settlement Class Members who wish to opt out of the Class must submit a written request to opt out postmarked by October 1, 2012, as set forth in the Medical Benefits Settlement Agreement.  (*See* Detailed Notice ¶ 27 (attached to Ex. A to BP's Mem. in Support of Preliminary Approval (Rec. Doc. 6267-2)).)  A Class Member may revoke his or her opt out election before the Court enters a Final Order and Judgment by submitting a written request to the Claims Administrator.  (*See id.* ¶ 27.)  The Notice further directs Class Members who wish to object to the Settlement to file and serve a statement detailing their objection and written evidence establishing membership in the Class by August 31, 2012, as specified in the Medical Benefits Settlement Agreement, which further advises that objectors may also appear before the Court at the Fairness Hearing.  (*See id.* ¶¶ 28, 33.)

[45] Names of potential Class Members were drawn from databases listing Clean-Up Workers and other documents and sources of information suggesting that the individuals were potential Class Members.

[46] The return address on the Notice Packet is a post office box maintained by the Medical Claims Administrator, Garretson Resolution Group ("GRG").  As of August 9, 2012, GRG has re-mailed 1,646 Notice Packets for addresses that were corrected through the U.S. Postal Service.  As of the same date, GRG has received 50,668 Notice Packets that were returned by the U.S. Postal Service as undeliverable.  For Notice Packets that were returned as undeliverable, Hilsoft Notifications has undertaken additional public record research which has resulted in the remailing of 23,429 Notice Packets.  (Azari Decl. ¶ 32.)

[47] For the Email Notice, up to three delivery attempts were made to each email address and a total of 9,010 emails were undeliverable after three attempts.  (Azari Decl. ¶ 32.)

3.3% undeliverable rate is well-within the expected range given the multiple data sources and the quality of the data files received.  (*Id.* ¶ 32.)

In addition to the individual notice effort, there was a broad-reaching published notice effort in numerous national and local media, covering the entire United States but primarily focusing on the coastal areas of Louisiana, Alabama, Mississippi, and the Florida Panhandle.[48] The Notice was disseminated via an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, highly-trafficked websites, and Sunday local newspapers (via newspaper supplements).  (*Id.* ¶ 8.)  For example, the Publication Notice ran in 360 local Gulf Coast newspapers.  (*Id.* ¶ 41.)  It also appeared twice in the national newspaper supplements *Parade* and *USA Weekend* and once in *American Profile*, which are inserted in over 2,190 Sunday newspapers nationwide with distribution in large cities and small towns.[49]  (*Id.* ¶ 54.)  Notices also appeared twice in *People*, and once in *Better Homes and Gardens*, *AARP Bulletin*, *National Geographic*, *Cosmopolitan*, *Sports Illustrated*, *Southern Living*, *People en Español*, *Ebony* and *Essence*, for a total of 11 insertions.  (*Id.* ¶ 41.)  Notice placements also appeared in non-measured trade, business and specialty publications, African-American, Vietnamese and Spanish-language publications, and Cajun radio programming.  (*Id.* ¶ 8.)  There is also a case notice website where potential Class Members can obtain additional information and documents.

Notice programs like these, via "mail and publication[,] regularly have been deemed adequate under the . . . notice requirements . . . of Rule 23(c)(2)."  *Zimmer Paper Prods., Inc. v.*

---

[48] The Medical Benefits Notice Plan proceeded contemporaneously with the Economic and Property Damages Settlement Notice Plan, appearing as separate publication notices in a single-ad unit and as shared broadcast spots. Because of this, the local media portion of the Medical Benefits Notice Plan necessarily was as broad as the Economic and Property Damages Notice Plan, with the scope of local media effort defined by the "Gulf Coast Areas" specified in the Economic and Property Damages Settlement Agreement.  (Azari Decl. ¶ 33.)
[49] *Parade*, *USA Weekend* and *American Profile* have a combined estimated circulation of more than 65 million. (Azari Decl. ¶ 54.)

*Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir. 1985).  This Court appropriately approved the notice method at the preliminary approval stage, and similar mixed notice methods (direct mail to potential Class Members combined with publication notice) have been repeatedly approved by the federal courts, often with a much less robust publication notice plan than that utilized here.  *See*, *e.g.*, *Silber v. Mabon*, 18 F.3d 1449, 1451-52 (9th Cir. 1994) (notice by First Class Mail to all "identified Class Members" with published notice in The Wall Street Journal and The New York Times); *Weinberger v. Kendrick*, 698 F.2d 61, 69-71 (2d Cir. 1982) (mailed notice supplemented with published notice in only one newspaper); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 164 F.R.D. 362, 367 (S.D.N.Y. 1995) (mailed notice to Class Members identifiable with "reasonable effort" with published notice twice in the national editions of The Wall Street Journal, The New York Times, and U.S.A. Today); *In re Four Seasons Sec. Laws Litig.*, 58 F.R.D. 19, 32 (W.D. Okla. 1972) (mailed notice to last address supplemented by publication once in the national edition of The Wall Street Journal).

The combined measurable paid print, television, radio and Internet effort alone reached an estimated 95% of adults aged 18+ in the 26 identified DMAs[50] covering the Gulf Coast Areas an average of 10.3 times each and an estimated 83% of all U.S. adults aged 18+ an average of 4 times each.  (Azari Decl. ¶ 10.)  This more than satisfies the guidance provided by the Federal Judicial Center and exceeds the median reach calculation of other effective court-approved notice plans.  *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010)*, at 3 (prescribing that a proposed notice effort should reach between 70-95% of the class and observing, "[a] study of recent published decisions showed that the median reach calculation on approved notice plans was 87%.").

---

[50] DMA or "Designated Market Area" is a term used by Nielsen Media Research to identify an exclusive geographic area of counties/parishes in which the home market television stations hold a dominance of total hours viewed. There are 210 DMAs in the U.S.  (Azari Decl. at 4 n.1.)

The Notice Plan as faithfully implemented by the Notice Agent clearly complies with the requirements of Fed. R. Civ. P. 23(c)(2)(B).

**B.      The Notice Satisfied Rule 23(e) and the Requirements of Due Process.**

Rule 23(e) requires only that the Court "direct notice in a *reasonable manner* to all Class Members who would be bound by the proposal."   Fed. R. Civ. P. 23(e)(1) (emphasis added). Under this Rule, subject to the minimum requirements of due process, the Court has complete discretion over the form and manner of notice.   *See*, *e.g.*, *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979) (noting the "mechanics of the notice process are left to the discretion of the district court subject only to the broad 'reasonableness' standards imposed by due process"); *see also Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1337 (1st Cir. 1991) (same principle); *Quigley v. Braniff Airways, Inc.*, 85 F.R.D. 74, 77 (N.D. Tex. 1977) (noting a district court's "virtually complete discretion as to the manner and method of notice").

Due process requires only that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections."   *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord, e.g.*, *Int'l Union*, 497 F.3d at 629.   Significantly, compliance with Rule 23(c)(2) itself can satisfy the Due Process Clause.   *See In re Enron Corp. Secs., Derivs., & "ERISA" Litig.,* No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008). The extensive Notice Plan here was eminently reasonable and, in fact, was exceptionally far-reaching.

In sum, the form and content of the Notice, together with the actual dissemination under the Notice Plan, was reasonably calculated to reach all Class Members and was the best form of notice available under the circumstances.   The Notice and Notice Plan fully satisfy the dictates of Rule 23 and due process, and the Court should therefore find that notice was proper.

**IV.          THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT.**

To date, only two substantive objections to final approval of the medical settlement have been filed.[51]  First, Charles A. Boggs complains that the Settlement is inadequate.  He does not, however, assert that the Settlement payment would be insufficient to cover his alleged medical expenses.  To the contrary, he acknowledges that the $36,950 payment to which he claims he is entitled under the Specified Physical Conditions Matrix far exceeds his expenses, which he reports as "approximate[ly] $23,000" and which were paid by Medicare.  (*See* Docket 10-7777, Rec. Doc. 41 at 4-5.)  Nevertheless, Boggs asserts that, in addition to a $36,950 payment under the Settlement, BP should pay Medicare the amount Medicare paid for Boggs's medical bills— without deducting any of this payment from his Settlement payment.  *Id.*  Finally, pointing to "extreme respiratory problems and [a] cancer scare," Boggs requests, in addition to the $36,950, an additional payment in the amount of four times his medical bills.  *Id.* at 5.

Boggs does not have any legal basis to assert entitlement to an additional payment four times his claimed medical bills.  Nor does he raise any objection to the structure or process of Settlement negotiations or suggest there was collusion or fraud.  Accordingly, the payments negotiated by Class Counsel and reflected in the Settlement are presumed reasonable and thus are afforded great deference.  *See Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984); *Turner*, 472 F. Supp. 2d at 852 ("Class counsel's opinion should be presumed reasonable

---

[51]  Halliburton Energy Services, Inc. and Malcolm Coco also filed objections to preliminary approval of the Settlement.  (Rec. Docs. 6350, 6318.)  The Court rejected these objections at the preliminary approval stage and nothing has occurred to justify a different result now.  (Rec. Doc. 6419 at 14.)  Indeed, as this Court has already ruled, Halliburton has no standing to challenge the Settlement.  (Rec. Doc. 7038.)  Mr. Coco argued that the Settlement discriminates against parties whose claims are resolved outside of the Medical Settlement Agreement because the Court's pre-settlement holdback order continues to apply to such claims.  The fee award under the Settlement, which BP has agreed not to contest, relates to the common benefit that Class Counsel provided in connection with the Settlement itself.  The PSC's original holdback motion described its many efforts (unrelated to settlement) that have purportedly provided a common benefit to all those making claims related to the *Deepwater Horizon* Incident.  (Rec. Doc. 4507.)  Moreover, the funds assessed under the holdback order will be held in an escrow account until the Court ultimately determines whether the PSC is entitled to a common benefit award based on the PSC's non-settlement efforts.  The continued application of the holdback is therefore not improper and does not provide any reason to reject the Settlement.

because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit.").

Fundamentally, Boggs's objection boils down to a complaint that his Settlement payment is too small. But the payment amounts reflected on the Specified Physical Conditions Matrix represent just one component of a hard-fought, arm's length compromise that included, for example, the standards of proof, levels of compensation, and conditions to be included in the Specified Physical Conditions Matrix, as well as the components, duration, and frequency of the Periodic Medical Consultation Program. That an individual[52] received less than he hoped for from one element of this negotiation does not make the Settlement unfair. *See Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77C39, 1984 WL 21981, *6-7 (N.D. Ill. Sept. 14, 1984) ("Such decisions in class actions 'almost always override the wishes of some Class Members for a bigger slice of the pie.'"). Instead, "[i]n assessing the settlement, the Court must determine 'whether it falls within the "range of reasonableness," not whether it is the most favorable possible result in the litigation.'" *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993) (quoting *Fisher Brothers v. Cambridge-Lee Indus.*, 630 F. Supp. 482, 489 (E.D. Pa. 1985)); *see Cotton*, 559 F.2d at 1330.[53]

---

[52] Boggs's assertion that "there must be" others like him (although he concedes "few in his exact situation") is nothing more than conjecture and an improper basis for an objection. *See In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 U.S. Dist. LEXIS 20440, at *16 (E.D. Mich. 1996) ("General objections without factual or legal substantiation carry little weight") (quoting 2 Newberg on Class Actions § 11.58 (3d ed.)); *see also Fussell v. Wilkinson*, 2005 U.S. Dist. LEXIS 30984, at *11-12 (S.D. Ohio 2005); *Luevano v. Campbell*, 93 F.R.D. 68, 77 (D.D.C. 1981); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 13954 (D. Ariz. 1989), *aff'd* 955 F.2d 1268 (9th Cir. 1992); *Sunrise Toyota, Ltd. v. Toyota Motor Co.*, No. 71 Civ. 1335-LFM, 1973 U.S. Dist. LEXIS 14862, at *14 (S.D.N.Y. 1973) (rejecting objections based on conclusory allegations); Fed. Prac. & Proc. § 1797.1 ("Only clearly presented objections…will be considered.").

[53] Moreover, the payments reflected on the Specified Physical Conditions Matrix are more than reasonable. Indeed, as Boggs's own objection makes clear, the $36,950 payment he claims is more than 1 1/2 times his total claimed medical expenses. If he believes that, because of his unique health issues or otherwise, the Settlement payment is insufficient, the Settlement Agreement fully preserves his right to opt out and pursue an individual claim. *See Cobell*, 679 F.3d at 920 ("Indeed, the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair.").

A second objection to the Medical Settlement was filed by Albio Luis Machuca, who objected to the release of BP and other parties from liability for "medical, legal and punitive damages . . . that may arise in the future" and argued that the Back-End Litigation Option was an "unfair and one-sided proposition."  (Docket 10-7777, Rec. Doc. 57.)  As discussed in Section II of the Argument, the Back-End Litigation Option is not "one-sided" but instead involves an exchange of consideration between BP and Class Members.[54]  Indeed, courts have approved such exchanges even where the consideration provided by the defendant was significantly less than the consideration provided by BP here.  *See*, *e.g.*, *In re Diet Drugs*, 2000 WL 1222042, at *25-26 (approving class settlement in which defendant waived statute of limitations, statutes of repose, and claim-splitting defenses in back-end opt out trials in exchange for bar on plaintiffs' use of prior verdicts or judgments against defendant under collateral estoppel, res judicata, or other doctrine of issue or claim preclusion, and prohibition on punitive, exemplary, or multiple damages).

Finally, this trade-off was vigorously negotiated by Class Counsel, attorneys who had no conflict of interest with respect to class claims.  Accordingly, the negotiation process provides additional assurance that the interests of potential future claimants were adequately represented and appropriately addressed in this Settlement.

## CONCLUSION

The Medical Benefits Class Action Settlement is more than "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and provides significant, concrete benefits to the Class. These benefits are particularly generous when weighed against the cost, delay, and uncertainty of continued litigation, as well as the risk that all or many Class Members would ultimately receive

---

[54] In addition, several letters from Ilease Bartlette, styled as objections to the Settlements have also been filed in the Court's objections docket.  (Docket 10-7777, Rec. Doc. 51.)  Ms. Bartlette's letters do not relate to the Settlement and the injuries that she alleges all appear to predate and be wholly unconnected to the *Deepwater Horizon* Incident.

no recovery at all.  There is no basis in law or fact to reject the carefully crafted compromise

reached by the parties.  Accordingly, BP respectfully requests that the Court grant final approval

to the Settlement.

August 13, 2012

Respectfully submitted,


/s/ Richard C. Godfrey, P.C.              .

James J. Neath                          Richard C. Godfrey, P.C.
Mark Holstein                           J. Andrew Langan, P.C.
BP AMERICA INC.                         Andrew B. Bloomer, P.C.
501 Westlake Park Boulevard             Elizabeth A. Larsen
Houston, TX  77079                      KIRKLAND & ELLIS LLP
Telephone:  (281) 366-2000              300 North LaSalle Street
Telefax:  (312) 862-2200                Chicago, IL  60654


Ellen K. Reisman                        /s/ Don K. Haycraft             .
ARNOLD & PORTER LLP                     Don K. Haycraft (Bar #14361)
777 South Figueroa Street               R. Keith Jarrett (Bar #16984)
Los Angeles, CA 90017-5844              LISKOW & LEWIS
                                        701 Poydras Street, Suite 5000
James P. Joseph                         New Orleans, Louisiana 70139
Ethan P. Greene                         Telephone:  (504) 581-7979
ARNOLD & PORTER LLP                     Telefax:  (504) 556-4108
555 Twelfth Street, NW
Washington, DC 20004-1206               Robert C. "Mike" Brock
                                        COVINGTON & BURLING LLP
*Of Counsel*                            1201 Pennsylvania Avenue, NW
                                        Washington, DC 20004
                                        Telephone:  (202) 662-5985
                                        Telefax:  (202) 662-6291


**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of August, 2012.

*/s/ Don K. Haycraft*
Don K. Haycraft