# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>     Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc., *et al.*,<br><br>     Defendants. | * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF DAVID R. DUTTON, PH.D.

I, David R. Dutton, am over twenty-one years of age and of sound mind and body.  My declaration is based on personal knowledge, experience, and review of the materials described herein.  If called to testify, I could testify to the matters set forth in this declaration.

### *Experience*

1.     Until July 15, 2012, I was the Industrial Hygiene Team Lead for the Gulf Coast Restoration Organization for BP, a position I had held since December 2010.  As Industrial Hygiene Team Lead, I was responsible for designing, implementing, and overseeing BP's industrial hygiene (IH) program, which included establishing programs to monitor workers'

1

potential exposure to potentially hazardous materials, and designing and implementing worker training. I am currently in the process of transitioning to a new position within BP now that the response to the Deepwater Horizon (DWH) oil spill is largely completed.

2. I am a toxicologist and certified industrial hygienist (CIH) by training. I received a Bachelor of Science degree in biology from the University of Arizona in 1978; a Masters degree in toxicology from the University of Arizona in 1984; and a Doctorate in toxicology from Kansas University in 1988. I also did a post doctoral fellowship at the University of California San Francisco from 1988 to 1990 in the field of toxicology. I received my CIH certification from the American Board of Industrial Hygiene in 1995.

3. From 1990 to December 2005, I worked first for Amoco and then for BP (after the merger of BP and Amoco) in various roles as an industrial hygienist and toxicologist. In these roles, my responsibilities included conducting occupational exposure assessments, both at a refinery and a petrochemical plant, and providing industrial hygiene and toxicology support, which included identification and communication of potential risks, development of strategic plans to mitigate those risks, and oversight of toxicology testing programs.

4. From December 2005 to April 2007, I worked as a toxicologist for INEOS Olefins and Polymers. In that role, I provided toxicology and industrial hygiene support similar to that described in paragraph three above. In addition, I provided technical support to the product stewardship group, which included authoring material safety data sheets.

5. Between April 2007 and June 2010, I was an independent contractor for DRD Toxicology Services, Inc. In this position, I performed industrial hygiene and toxicology consulting, relating to, among other things, regulatory compliance, community exposure assessments, and technical oversight of toxicological research regarding chemical products.

2

6.      From June 2010 until July 15, 2012, first as a contractor and then (beginning in December 2010) as an employee, I served as Industrial Hygiene Lead for the Unified Area Command (UAC) on the Deepwater Horizon (DWH) Response.  My role in relation to the DWH Response is described in greater detail below.  This declaration relates to my personal experience as an embedded member of the team that conducted the Response.

### The Deepwater Horizon Response

7.      The Response was comprised of an unprecedented armada of personnel, equipment, technologies, and methodologies that collectively constituted the very best oil spill response resources available.  At its peak, the Response involved approximately 48,000 people engaged in a multitude of response activities.  Response workers engaged in near-shore and offshore response activities in the Gulf of Mexico, manning approximately 6,500 marine vessels (including approximately 5,800 Vessels of Opportunity (VoOs)), and undertaking all of the recognized measures of responding to an oil spill at sea.  These efforts included, but were not limited to:  (i) skimming oil from the surface; (ii) conducting approximately 400 controlled *in-situ* burns; (iii) placing more than 13 million feet of containment and sorbent boom; and (iv) applying approximately 1.8 million gallons of approved dispersants to disperse oil and protect the shoreline.  Response workers also engaged in onshore response activities, which included, among others, beach clean-up and wildlife restoration.  Each step and aspect of the Response was directed and authorized by the UAC.

### The Structure of the Response

8.      The DWH Response was organized and carried out in accordance with the Incident Command System (ICS), as established by the National Contingency Plan (NCP).  Pursuant to the ICS and NCP, the Response was directed by the UAC, which was comprised of

the U.S. Coast Guard (USCG), the U.S Environmental Protection Agency (EPA), the National Oceanic and Atmospheric Administration (NOAA), and other government agencies.  In addition, a number of other federal agencies, including the U.S. Occupational Safety and Health Administration (OSHA), the Centers for Disease Control and Prevention (CDC), and the National Institute for Occupational Safety and Health (NIOSH), participated in the Response in advisory roles.  The UAC was headed by the Federal On-Scene Coordinator (FOSC), a member of the USCG designated by the President of the United States.  Rear Admiral Mary Landry was the first FOSC for the DWH Response.

9.      The UAC was divided into a number of functional groups or departments, which included, among others, Operations, Environmental, Safety, Situation, Logistics, and Finance. The IH group was a component of the Safety group; accordingly, as IH Lead for the UAC, I reported to the Safety Officer, who reported directly to the FOSC.

10.      The Safety and IH groups were responsible for developing policies, procedures, and protocols related to worker safety and health, addressing issues such as exposure assessment, safe work practices, personal protective equipment, and worker training.  In addition, the Safety and IH groups were responsible for monitoring and responding to any incidences of unexpected or potentially harmful exposures to chemicals or other dangerous situations encountered in the course of conducting response activities.  As IH Lead, any such incidents would have ultimately been reported to me through a variety of reporting loops.

11.      One such reporting loop was the twice daily "all hands meetings" held during the height of the Response in which representatives from each department would provide a report on the day's activities and any issues or problems encountered.  This routine information sharing and collaboration was especially important for the Safety group, as safety and IH issues were a

central element of every Response effort. In this respect, in order to protect workers from potential hazards, IH practices and procedures needed to be, and were in fact, incorporated into the design and implementation of all Response activities and operations. As IH Lead, I (or my counterpart, with whom I rotated on and off over the course of the Response) worked daily with the Operations group, and was involved in the decision-making for all Response operations and any associated jobs and tasks performed by Response workers.

12.     Another department with which I worked closely during the Response was the Environmental group, which was responsible for the environmental sampling of air, water, sediment, and other media. As IH Lead, I needed to be aware of the nature, extent, and results of any environmental sampling for two principle reasons. First, I needed to know the results of the environmental sampling to identify, evaluate, and address any potential exposure risks to Response workers. For example, it was necessary for me to know what chemical compounds were in the water near the surface of the Gulf of Mexico to determine whether there was a potential human health risk associated with dermal exposure to water. Second, environmental research vessels, such as the Brooks McCall and the Ocean Veritas, required IH support, so it was necessary that I be informed of all research vessel excursions and activities, in order to provide appropriate IH support and staffing.

13.     In addition to the UAC, the DWH Response was organized and managed through three Incident Management Teams (IMTs) (located, respectively, in Mobile, Alabama; Houma, Louisiana; and Houston, Texas), all of which acted under the direction of the UAC. Each IMT had its own IH group, which was headed by a certified industrial hygienist (CIH) who reported to me in my capacity as IH Lead for the UAC. Each of these IH team leaders, or "leads," was an

5

experienced, well-trained certified industrial hygiene professional.  The primary responsibility of each team lead was to safeguard the health and safety of Response workers.

### Oil Spill Response Activities

14.     Under the direction of the Unified Command, BP and numerous government agencies engaged in a comprehensive, coordinated set of established practices to respond to the effects of the spill, to remove oil from the water to the extent feasible, and to prevent and remediate shoreline oiling.  The objective of the Response, and indeed the objectives of any oil spill response, was two-fold: protect human health and minimize environmental harm.  In the case of an offshore oil spill, one of the primary ways of accomplishing both objectives is to prevent oil from reaching the shore.  As described below, there are several oil spill response methods that can be utilized to remove oil from the marine environment or otherwise prevent it from reaching shore.  All of these response methods were utilized during the DWH Response and, importantly, were integrated with appropriate IH support.

15.     First, there are a number of mechanical means of containing or collecting oil, which include containment and/or capture of the oil at the source, and skimming and booming of oil on the surface.  A number of containment devices, such as the Riser Insertion Tube Tool (RITT) and the *Q4000* Collection System, were utilized during the DWH Response to contain oil at the source of the discharge and to safely transport it through risers to vessels on the ocean surface.  Using such containment methods, BP and the UAC were able to successfully collect over 800,000 barrels of oil, thereby preventing its release into the Gulf of Mexico.

16.     In addition, an unprecedented number of skimmers and length of boom were utilized during the DWH Response to remove oil from the surface of the Gulf of Mexico and redirect oil away from the shoreline and other sensitive environments.  In general, skimmers are

devices that collect oil from the surface of the water, and boom are long, tube-like floating barriers that are placed at strategic locations along the water surface to absorb oil (sorbent boom) or to provide a barrier against oiling of the shoreline or other sensitive environmental locations (hard boom).  Numerous types of skimming devices and more than 13 million feet of boom were utilized during the DWH Response to collect surface oil and prevent shoreline oiling.

17.     In addition to the mechanical means of oil recovery, controlled *in situ* burning and application of dispersants can be used to prevent or minimize shoreline oiling.  Dispersants are addressed in greater detail below.  Controlled *in situ* burning is a well-established oil spill response method by which oil is corralled using fire-resistant boom and then burned in order to remove the oil from the water surface.  Controlled *in situ* burning is a particularly effective response method for removing "weathered" oil, which is less susceptible to dispersal using dispersants.  Approximately 400 controlled *in situ* burns were conducted during the DWH Response under the direction and with approval of the UAC, in order to remove oil from the surface of the Gulf.

18.     Each controlled *in situ* burn was conducted in accordance with strict safety measures to ensure Response workers were protected from potentially harmful exposures and other potentially dangerous situations.  These safety and precautionary measures included (but were not limited to) keeping burn crew vessels upwind of the burn and providing burn crews ten-minute escape respirators in case of emergency.  In addition, BP and several government agencies conducted air monitoring on vessels engaged in burn activities and at other locations near the controlled burns to ensure that Response workers and members of the general public were not being exposed to potentially harmful pollutants released from the burning of oil.

19.     A number of response methods were implemented onshore to clean up oil that reached the Gulf Coast.  These response methods included mechanical and manual removal of tar balls, tar mats, and submerged oil.  Thousands of cleanup workers were engaged in onshore Response activities, with hundreds of additional personnel providing IH and safety support.  The onshore cleanup was extraordinarily effective.  As described in greater detail in the declaration of Dr. Elliot Taylor, using the Shoreline Cleanup Assessment Technique (SCAT), the SCAT workforce, which was comprised of representatives from federal and state government agencies and BP, inspected and assessed thousands of miles of shoreline and has determined that the vast majority of the Gulf Coast is now free of oil and other spill-related materials.  *See* Decl. of Dr. Taylor, at ¶ 22.

20.     Having been embedded in the Response, I can attest that this was an enormous effort involving tens of thousands of people working together to coordinate and implement the largest oil spill response that has ever been carried out.  BP employees and contractors worked side-by-side with expert personnel from a vast array of government agencies, all with the common goal of implementing the best spill response possible.  The degree to which people committed themselves, and the tremendous coordination and collaboration between consultants, government agencies, and BP, directly contributed to the extraordinary success and effectiveness of the Response.

21.     As discussed above, the goals of the DWH Response were to protect Response workers and minimize any environmental and human health impacts from the spill.  I firmly believe that the response methods described above were effective in accomplishing these goals.  I do not believe there was any response method that could have or should have been implemented to best accomplish these objectives that was not, in fact, implemented over the

8

course of the Response.  I am extremely proud to have been part of this effort, and I believe we were successful in achieving both objectives.

*Dispersants*

22.     Chemical dispersant application is a well-established, core component of oil spill response.  Dispersants break down oil into smaller droplets, which increases the surface area of the mass and disperses oil into the water column (as opposed to remaining on the water surface). This, in turn, renders the oil more available for biodegradation.  In other words, as a result of the dispersion process, the oil more readily degrades.  Dispersants also reduce the size of and substantially eliminate surface slicks, which, if left undispersed, would risk direct impact with sensitive shoreline habitats and wildlife.  When applied in accordance with regulatory requirements and guidance, dispersants can prevent the worst of the possible impacts from an oil spill in terms of harm to the ecosystem and environment.

23.     Dispersants were applied during the DWH Response under the direction and with approval of the UAC; BP requested approval for the use of dispersants, but BP itself could not and did not authorize the use of dispersants during the Response.  As IH Lead for the UAC, I was among those responsible for developing policies and procedures to ensure that the dispersants were used safely and to prevent any potentially harmful exposures to Response workers or Gulf Coast residents to the constituents of the dispersants.  Accordingly, the IH group was regularly consulted during the planning and implementation of dispersant operations — especially when there were questions about potential exposure and/or health issues — and, as a result of these interactions, I am familiar with how dispersants were used during the Response.

24.     Two dispersant products were used during the DWH Response: Corexit 9500 and Corexit 9527A.  Both Corexit products were, and still are, on the NCP Product Schedule, which

9

is a list of dispersants pre-approved by EPA for use in oil spill response efforts.  Corexit 9527A was used in the DWH Response from April 22, 2010 to May 22, 2010.  Corexit 9500 was used from April 27, 2010 to July 19, 2010, with one additional small application on September 4, 2010 within the moon-pool of a recovery vessel that brought the capping stack to the surface of the Gulf of Mexico.

25.    During the Response, EPA requested that BP undertake scientific studies to compare the Corexit products that were being used to other dispersants listed on the NCP Product Schedule.  BP and EPA each independently investigated the toxicity, effectiveness, and availability of dispersants approved for use by EPA on the NCP Product Schedule.  This evaluation showed that the Corexit products used to respond to the DWH oil spill were as safe as other available alternatives, and were as or more effective at dispersing oil.  SMART testing throughout the Response confirmed the effectiveness of the dispersants that had been applied.[1]

26.    Dispersants were applied during the DWH Response using three methods of application: aerial, vessel, and subsea.  The primary method of dispersant application during the Response was aerial.  Aerial dispersant operations were conducted from April 22, 2010 to July 19, 2010.  Over the course of the DWH Response, approximately 970,000 gallons of dispersant were applied by aerial application to surface oil slicks.

27.    A number of safety controls were implemented during the Response to ensure that Response workers and Gulf Coast residents were not harmed by the aerial application of dispersants.  For example, pursuant to safety setbacks implemented as part of the Response, dispersant was not to be sprayed:  (i) within two nautical miles ("nm") of any platform, rig, or

---

[1] Special Monitoring of Applied Response Technologies (SMART) is a cooperatively designed monitoring program for *in situ* burning and dispersants.  SMART relies on small, highly mobile teams that collect real-time data using portable, rugged, and easy-to-use instruments during dispersant and *in situ* burning operations.

vessel; (ii) within five nm of controlled-burning activities; (iii) within five nm of the source-control area; or (iv) within three nm of the shore. In addition, the Aerial Dispersant Group also established weather limitations restricting when dispersants could be applied (related to visibility, cloud ceiling, wind, and wave heights) and requirements that aircraft applying dispersant fly into the wind.

28. Dispersant was applied by aircraft to surface oil in the Gulf of Mexico over an operational area of approximately 18,000 square miles.[2] According to the After Action Report for the aerial dispersant response, all but one of the aerial dispersant applications were applied greater than three nautical miles offshore, and 98% of the aerial dispersant applications were applied greater than ten nautical miles offshore.[3] These statistics are consistent with my personal knowledge, as I am not aware of any aerial dispersant application — other than the emergency release described in footnote three — that did not comply with the safety setback procedures described above.

29. Dispersant also was applied by vessel, primarily near the source-control area (*i.e.*, within five miles of the MC252 wellhead). The primary reason for applying dispersant by vessel was to control airborne levels of volatile organic compounds (VOCs) directly above the wellhead in order to protect Response workers functioning in the source-control area from elevated levels of those compounds, as released to the atmosphere from oil that reached the surface of the Gulf. The dispersants were effective in reducing airborne levels of VOCs by dispersing the surface oil

---

[2] *See* Houma ICP, Aerial Dispersant Group, *After Action Report: Deepwater Horizon MC252 Response, Aerial Dispersant Response*, at 14 (Dec. 31, 2010).

[3] *Id.* The one aerial dispersant application that occurred less than 3 nm offshore involved an emergency incident on April 29, 2010 (airplane engine failure) involving the release of approximately 1,000 gallons of Corexit 9500 into the western portion of Barataria Bay/Caminada Bay. *Id.* at 27. On June 18, 2010, water samples were collected from the site to assess whether dispersant residues remained in the area. Analysis of the samples indicated that the dispersant was not present. *See* Aerial Dispersant Operations — Houma Status Report (July 2, 2010).

slicks.  Over the course of the DWH Response, approximately 95,000 gallons of dispersant were applied by vessel application.

30.     The IH group implemented a number of safety controls to ensure that workers on vessels applying dispersants were not exposed to potentially harmful levels of the constituents of the dispersants.  For example, all Response workers who were engaged in dispersant spraying operations were required to wear a respirator, and all other workers on the vessel were required to remain in the cabin area while dispersants were being sprayed.  BP and NIOSH also conducted extensive air monitoring on these vessels to ensure that workers were not being overexposed to the components of the dispersants.  After collecting and analyzing numerous air samples on a vessel engaged in dispersant spraying operations, NIOSH concluded: "The NIOSH industrial hygiene evaluation found that [personal breathing zone] and area air concentrations of the compounds measured [which included the three primary constituents of Corexit 9500 and Corexit 9527A] were all well below [occupational exposure levels]."[4]

31.     Finally, dispersants were also applied subsea directly at source of the discharge under the direction and with approval of the UAC.  The subsea application of dispersant improved the efficacy of the dispersants and helped to reduce the overall amount of dispersant needed.  In this respect, the experience in the DWH Response demonstrates that subsea dispersant application may sometimes require less dispersant than is needed to treat surface oil due to the accuracy of application at a closer range and the more dispersible state of the oil (once the oil reaches the surface, it begins to weather, which makes it harder to disperse without larger amounts of dispersant).  The subsea application of dispersants during the DWH Response thus prevented a portion of the oil that otherwise would have risen to the ocean surface from reaching

---

[4] NIOSH, *Interim Reports #3A and #3B: Health Hazard Evaluation of Deepwater Horizon Response Workers*, HETA 2010-0115, at 3B-8 (July 22, 2010).

the surface, which in turn resulted in less oil reaching the Gulf Coast and coastal habitats.  Over the course of the DWH Response, approximately 770,000 gallons of dispersant were applied subsea.

32.     Subsea dispersant use also contributed to worker safety by reducing airborne concentrations of VOCs.  The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling noted in its Working Paper No. 4 that subsea dispersant application "served an important function by increasing the safety of the working conditions faced by responders in the immediate vicinity of the spill."  In its final report, the Commission noted that "the subsea use of dispersants proved helpful in preventing huge surface slicks," which correspondingly reduced VOC levels near the wellhead, improving the air quality for nearby workers.  *See* National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Deepwater: The Gulf Oil Disaster and the Future of Offshore Drilling*, at 160 (January 2011).

33.     As part of the IH response to the oil spill, and as discussed in greater detail below, BP, OSHA, NIOSH, and others conducted IH air monitoring on workers engaged in response activities to evaluate airborne concentrations of dispersant constituents, including 2-butoxyethanol and propylene glycol.  In most cases, any dispersant constituents in the air were present at levels that were undetectable, and in all cases, the measured levels were well below occupational exposure limits.  As a CIH and toxicologist, it is my firm belief that Response workers and members of the general public were not exposed to airborne concentrations of the two Corexit dispersants or their constituents at levels that would pose a risk of significant adverse health effects.

34.     In addition, the Environmental group, along with researchers from NOAA, conducted water sampling in the vicinity of dispersant application.  The researchers collected

13

water samples near a number of locations where dispersants had just been applied.   The researchers discovered that within minutes after application, the dispersant components were present in water at the point of application either at non-detectable levels or at levels in the low parts per billion range.   Concentrations of dispersant components in water at these levels do not pose any hazard to human health.   Sampling performed at locations further away from points of application showed that dispersant components were almost never present in water at detectable levels.

35.     Overall, dispersant application was a highly effective and very important response tool that helped to mitigate shoreline and other environmental impacts, as well as to reduce human exposure to airborne concentrations of VOCs.   In an August 23, 2010 article in the *St. Petersburg Times*, EPA Administrator Lisa Jackson said that "based on all of the information we have to date, [dispersant use] has proved to be an effective tool in preventing the oil from devastating the gulf's delicate coastline.   EPA science tells us dispersant was effective in breaking up the oil."

### *IH Air Monitoring*

36.     A key component of the IH response to the DWH oil spill was a comprehensive air monitoring program to monitor and characterize potential worker exposures to the constituents of oil and dispersants.   BP conducted extensive IH air monitoring over the course of the DWH Response, beginning on April 27, 2010 and continuing into 2012.   OSHA, NIOSH, and other government agencies also conducted IH air monitoring over the course of the Response.   The IH air monitoring conducted by the federal agencies was generally consistent with the air monitoring conducted by BP, and the results of such monitoring corroborated those

of BP's air monitoring, which showed that the constituents of oil and dispersants released in connection with the DWH oil spill were not present in air at levels of concern for human health.

37.     As IH Lead for the DWH Response, one of my key responsibilities was to develop and implement IH air monitoring plans to be used across the Response.  The IH air monitoring plans were developed in coordination with and with advice from numerous federal and state agencies, including the USCG, OSHA and NIOSH.  Two IH air monitoring plans were developed and implemented by BP during the DWH Response, each designed to protect Response workers' health throughout the course of their responsibilities: the Offshore Air Monitoring Plan (applicable to response operations in the source-control area) and the On-shore/Near Shore IH Monitoring Plan (applicable to all other response operations).

38.     In developing and implementing the IH air monitoring plans described above, we evaluated several key issues to ensure that Response workers were fully protected against potential exposures to airborne concentrations of the constituents of oil, dispersants, and other spill-related materials.  These issues included:

(a)     the proper methods of sampling and analysis;

(b)     the various analytes to be monitored; and

(c)     the appropriate occupational exposure limits and action levels for each analyte.

39.     The IH air monitoring program included the collection of both personal breathing zone (PBZ) samples and "real time" measurements.  PBZ samples, which require laboratory analysis, are collected from the breathing zone of an individual worker over the duration of the worker's shift.  During the DWH Response, BP collected more than 28,000 PBZ samples from workers engaged in the full range of response activities.  All of the PBZ samples collected from

Response workers were analyzed by laboratories that were (and still are) certified by the American Industrial Hygiene Association (AIHA).

40.     In general, PBZ samples were collected from a representative subset of Response workers performing a certain job or task.  This task-based approach was intended to capture representative monitoring data for each job and task performed in locations where oil, dispersants, or other spill-related materials potentially could be found.  Thus, although not every worker was sampled on every day, the samples collected were sufficiently representative to accurately characterize potential exposures for each job and task.  In addition, samples were collected from those workers most likely to have some potential for exposure.  For example, samples for the dispersant constituents were collected primarily from those workers engaged in dispersant-related activities, and samples for oil mist were collected primarily from those workers engaged in decontamination activities (which can result in the creation of oil mist).  As a result, the sampling results are conservative in order to be as protective of human health as possible.

41.     "Real-time" air monitoring is conducted using instruments that provide a nearly instantaneous measurement of a chemical's concentration in air.  During the DWH Response, real-time air monitoring was used primarily as a screening mechanism to support contemporaneous decision-making concerning a range of industrial hygiene and worker safety matters.  For example, real-time measurements were used to trigger mitigation actions, such as engineering and administrative controls or the provision of appropriate personal protection equipment, both of which are described in greater detail below.

42.     The PBZ sampling and real-time air monitoring were conducted by trained IH technicians under the direction of experienced CIHs.  IH technicians and CIHs were present on

16

source-control and other large vessels, and at various Response locations along the Gulf Coast. In addition, designated IH boats staffed with IH technicians were available to conduct real-time air monitoring on and near smaller, near-shore vessels, such as the VoOs.

43.     In selecting the analytes whose properties would be monitored during the DWH Response, the members of the IH team relied initially on their extensive professional experience working with crude oil and other hydrocarbons in the oil and gas industry.  As a result, we monitored for certain volatile compounds — such as benzene, toluene, ethylbenzene, and xylenes — that are components of crude oil that can be present in air after an oil spill.  In addition, we also based our selection of chemicals to monitor on comprehensive air sampling, using summa canisters, conducted directly above freshly surfaced oil.  The summa canister sampling was used to determine which chemicals were present in air directly above freshly surfaced oil released in connection with the DWH oil spill.  Finally, we sampled for components of the Corexit dispersants that were used during the Response.

44.     BP instituted procedures that provided for the continuous review and adjustment of the IH air monitoring program over the duration of the Response.  In this respect, as new jobs and tasks were added to the Response, and as others were eliminated, the IH team leadership adjusted the air monitoring program accordingly.  For example, in July and August 2010, we began to decontaminate vessels that had been engaged in Response activities.  As alluded to above, decontamination activities can result in the creation of oil mist.  As such, we modified the air monitoring program to include sampling for oil mist on Response workers engaged in decontamination activities.

45.     I am familiar with and have reviewed the results of the IH air monitoring data collected in connection with the DWH oil spill.  In general, airborne concentrations of the

17

constituents of oil and dispersants measured during the DWH Response were almost always non-detectable and, with very few exceptions, were below relevant occupational exposure limits. As a CIH and toxicologist, I do not believe that Response workers were exposed to airborne concentrations of the constituents of oil and dispersants at levels that could cause significant adverse health effects.

### *Training*

46.     As mentioned above, among my key responsibilities as IH Lead for the Response was to assist with the design, development, and implementation of training sufficient to protect the health and safety of all Response workers, and to prevent or limit satisfactorily their exposure to potentially harmful chemicals.

47.     To ensure Response worker health and safety, BP IH and safety personnel, in coordination with the UAC and with daily input, oversight, and approval from OSHA, developed and instituted task-specific Response worker training. This training was designed to ensure that Response workers adequately understood the potential hazards and risks associated with their activities, the conduct necessary to perform their Response functions, and the operating procedures they were required to follow to prevent and mitigate any risks.

48.     Specifically, and again with input and oversight from both the UAC and OSHA, BP IH and safety personnel developed a variety of location-specific training modules to address the complete range of Response worker activities. This included, among other types, training that was designed to protect worker health and safety pertaining to chemical exposure, heat stress, safe driving practices, and inclement weather.

49.     The training modules used in the Response were developed by the Texas Engineering Extension Service ("TEEX"), with review and approval provided by BP, OSHA,

and the USCG.  TEEX is associated with Texas A&M University and is one of the nation's largest workforce training providers.  Training of response personnel was generally conducted by BP contractors PEC/Premier, Parsons Corporation, and O'Brien's Response Management.

50.    As discussed above, the training sessions were set up and conducted by BP contractors, such as PEC.  The training sessions were open to all adult members of the general public who wished to participate.  Individuals who participated in the trainings received a yellow card certifying the specific level of training they completed.  Workers were required to present this yellow card in order to enter work sites associated with the Response.  Individuals who completed training had their names entered into the PEC training database.  Such individuals were then permitted to apply for employment on the DWH Response.  However, not all individuals who received the training and whose names appear in the PEC database actually worked on the Response.

51.    BP's training program was comprised of five modules, which evolved over time to address new jobs and tasks, as well as associated potential hazards:

- **Module 1**: A half-hour training session provided to workers assisting with the removal of trash and other debris from the beaches.

- **Module 2**: A 45 minute training session provided to workers who would be assisting with laying down boom or performing other work involving the handling of materials not contaminated by the spill.  This training consisted of a site health, safety and environment orientation related to the DWH incident.

- **Module 3S - Shoreline Spilled Oil Response**: A four-hour training session provided to shoreline Response workers.  These workers were supervised by individuals who had received at least the full 40 hours of Hazardous Waste

<div align="center">19</div>

Operations and Emergency Response (HAZWOPER) training (as defined by OSHA 29 C.F.R. 1910.120).

- **Module 3M - Marine Spilled Oil Response**: A four-hour training session provided to workers on VoOs.

- **Module 4 - Marine Vessel Health and Safety**: An additional four-hour training session provided to workers on VoOs.  Module 4 is similar to Module 3M, but had a greater emphasis on interactive dialogue concerning any recurring problems or issues.  VoO workers were required to receive both Module 3M and Module 4, for a total of eight hours of training.  If the work involved weathered oil, these workers were also supervised by individuals who had at least the full 40 hours of HAZWOPER training.

52.     Two key principles were emphasized in all of the training sessions.  First, trainees were instructed that if they became sick or were injured during Response activities, they were required to report the illness or injury to their supervisor or to IH or safety personnel.  Second, trainees were instructed that no matter what, safety comes first.  In this respect, trainees were explicitly told that if, while working on the Response, they felt that any job, task, or activity was unsafe, they should immediately stop and report their concerns to their immediate supervisor. Examples of training materials addressing these two principles are attached in Exhibit A.

53.     Supervisors, professional responders, workers involved in decontamination activities, and source-control workers also were required to complete, or to have completed, the full 40-hour HAZWOPER  training, which combined classroom and hands-on training.

54.     As part of the training program, workers received daily safety talks at the beginning of each shift and, for each job and task, supervisors were required to post Job Safety

Environmental Analyses (JSEAs) and instruct the workers regarding the terms.  Also, the UAC issued daily safety messages, which were often communicated in the pre-shift safety talks. These messages were used to communicate uniform safety information to all workers across the Response.  These daily talks and messages reiterated key safety issues and concepts that had been provided during the trainings, and apprised workers of developing health and safety issues that arose in the course of the Response.

### *Personal Protective Equipment*

55.     As noted above, BP IH and safety personnel, in conjunction with and with approval from the UAC and OSHA, worked to develop Personal Protective Equipment (PPE) requirements for all workers involved in the DWH Response.  To determine appropriate PPE requirements, we assessed the hazards associated with each Response task using the above-referenced JSEAs.  The proper selection and effectiveness of PPE was continually monitored throughout the Response and adjusted as necessary to provide appropriate protection given the nature of the task, the conditions encountered, and the associated risks.

56.     Pursuant to NIOSH and OSHA interim guidelines issued with regard to the Response, we developed a PPE Matrix using the following recognized general principles:

(a)     administrative and engineering controls should be utilized first to minimize the need for PPE in any particular job or task;

(b)     overprotection from chemical and fire exposure can create a greater potential for heat stress; and

21

(c)     decisions to use respiratory protection should be based on the best available quantitative air monitoring data regarding the type and level of exposure to chemicals.[5]

57.     The most common PPE provided to DWH Response workers included protective clothing, disposable gloves, protective boots, and life jackets.  The most recent version of the PPE Matrix was revised on August 14, 2010, and is attached as Exhibit B to this declaration.

58.     With approval from OSHA and NIOSH, respirators were provided to three categories of workers: (1) workers engaged in response activities at source-control (to be used when VOCs exceeded specified action levels); (2) workers engaged in the vessel application of dispersants; and (3) workers engaged in decontamination activities.  In addition, as noted above, escape respirators containing ten minutes worth of oxygen were provided to controlled *in situ* burn crews to be used in case of an emergency.

59.     BP safety staff continually monitored PPE use throughout the course of the Response and adjusted such use as necessary to ensure that workers received appropriate protection given the nature of their work, the conditions encountered, and associated risks.  That PPE was appropriately monitored, selected, and used is evidenced by NIOSH's Health Hazard Evaluation of Deepwater Horizon Response Workers from August 2011, discussed in greater detail below, which confirmed that appropriate and proper PPE was generally utilized during the Response.[6]

---

[5] *See,* NIOSH & OSHA, *Interim Guidance for Protecting Deepwater Horizon Response Workers and Volunteers* (July 26, 2010), *available at* www.cdc.gov/niosh/topics/oilspillresponse /protecting.

[6] *See* Bradley S. King and John D. Gibbins, NIOSH, *Health Hazard Evaluation of Deepwater Horizon Response Workers*, HETA 2010-0115 & 2010-0229-3138, at 13 (August 2011) (stating that "the use of PPE (gloves, coveralls, face shields, goggles, etc.) was typically found to be matched to the level of expected or potential dermal exposure at many sites," even if PPE was not used as directed in every case).

***Administrative and Engineering Controls***

60. Besides the training and PPE programs referenced above, the BP IH team leadership, in coordination with the UAC, also established administrative and engineering controls (*i.e.*, provided ergonomic recommendations) to further safeguard worker safety and health. Pursuant to the above-described sampling plans, and as described, in part, below, BP also implemented Response-wide administrative work practices (based on real-time industrial hygiene air monitoring readings) to further prevent or limit potential worker exposures and to protect worker health and safety.

61. These engineering and administrative controls reduced the potential exposure of response workers to hazardous chemicals and/or situations. Engineering controls eliminate or reduce exposure to a chemical or physical hazard through the use or substitution of engineered machinery or equipment. Administrative, or work practice, controls are changes in work procedures, such as written safety policies, rules, supervision, schedules, and training, for the purpose of reducing the duration, frequency, and severity of exposure to hazardous chemicals or situations.

62. Engineering and administrative controls were utilized in several aspects of the DWH Response. For instance, we implemented worker rotations, work-rest cycles, and limitations of work hours across the Response in order to minimize the potential risks associated with exposure to heat and other conditions. Specifically with regard to heat, we also installed shade structures and hydration stations, and employed heat stress coaches to monitor workers for signs of heat stress, as part of a Response-wide heat stress management plan.

63. BP, in coordination with the UAC, also established a number of other mitigation measures that were triggered when levels of airborne contaminants exceeded specified action

levels, as determined by real-time air monitoring instruments.  For instance, real-time readings above the specified action levels triggered corrective measures such as using water cannons to break up a sheen, relocating nonessential personnel within the vessel, and reorienting the vessel into the wind (*i.e.*, so that personnel would be located up-wind of any potential exposures). Readings that exceeded the top tier action levels required additional measures, *e.g.*, moving the vessel off location, immediate evacuation of the work area, use of appropriate respiratory protection available, and/or shutdown of flaring operations.

### *NIOSH Health Hazard Evaluations*

64.     In addition to the safety precautions described above, BP also requested in May 2010 that NIOSH perform a health hazard evaluation (HHE) to evaluate potential exposures and health effects among Response workers.  In response to BP's request, NIOSH investigators conducted exposure monitoring, observational assessments, health surveys, and focus groups for a variety of work sites and work activities associated with the Response, including, among others, VoO operations, source-control activities, beach cleanup, decontamination, dispersant application, controlled *in situ* burns, and skimming.

65.     In its final report issued in August 2011, NIOSH concluded that workers at all work sites were well protected during the Response.[7]  Specifically, with respect to potential

---

[7] For example, NIOSH investigated a number of decontamination work sites and found that both inhalation and dermal exposures were well controlled.  With respect to inhalation exposures, NIOSH stated: "Examples of VOCs found to be present included $C_9$-$C_{16}$ aliphatic hydrocarbons, 2-butoxyethanol, propylene glycol t-butyl ether, and limonene.  The air concentrations for these and other chemicals quantified were below applicable [occupational exposure limits]." *See* Bradley S. King and John D. Gibbins, NIOSH, *Health Hazard Evaluation of Deepwater Horizon Response Workers*, HETA 2010-0115 & 2010-0229-3138, at 8 (August 2011).  Similarly, with respect to dermal exposures, NIOSH concluded that "[t]he PPE used by the decontamination workers (eye protection, coveralls, rubber chemical boots, hardhats, and nitrile gloves) minimized the potential for dermal contact with oil and cleaning agents while decontaminating vessels, boom, and pipe." *See* NIOSH, *Interim Reports #8A: Health Hazard Evaluation of Deepwater Horizon Response Workers*, HETA 2010-1019, at A-5 (October 25, 2010).

24

exposures to airborne chemicals, NIOSH found that "results for all airborne chemicals sampled were uniformly nondetectable or at levels well below applicable [occupational exposure limits]." With respect to potential dermal exposures, NIOSH concluded that "worker exposure to oil residue was typically observed to be limited, with no evidence of exposure to dispersant." NIOSH also found that "PPE (gloves, coveralls, face shields, goggles, etc.) was typically found to be matched to the level of expected or potential dermal exposure at many sites," and that PPE was used incorrectly only in limited instances.[8]

*Worker Medical Care*

66.     To further ensure Response worker safety, the Response operations plan required implementation of a medical program that provided emergency and first aid treatment, including access to medics or other emergency medical treatment personnel, at numerous locations across the Response.  In addition, the IH and safety groups closely and exhaustively tracked all reports of occupational-related illnesses and injuries and analyzed for trends so that we could institute corrective actions and improvements, as needed.

67.     BP, in consultation with the UAC, established medic stations in Louisiana, Mississippi, Alabama, and Florida.  These medic stations were staffed by Emergency Medical Technicians (EMTs) or paramedics employed by local ambulance companies that had contracted with BP to provide medical services during the Response.

68.     As part of their required training, Response workers were instructed to inform their supervisor, a safety officer, or a health officer if they suffered any injuries or illnesses. When appropriate, Response workers were then directed to seek treatment at a medic station for any such injuries or illnesses.

---

[8] *See* Bradley S. King and John D. Gibbins, NIOSH, *Health Hazard Evaluation of Deepwater Horizon Response Workers*, HETA 2010-0115 & 2010-0229-3138 (August 2011).

69.     Data regarding each Response worker visit to a medic station was logged into individual MC252 Medical Data Forms and daily tracking sheets. This information was subsequently recorded into a Medical Encounters Database maintained by BP.

70.     Where appropriate, information about the underlying incident or illness was also reported to a health or safety professional, usually within 24 hours, and an incident report was generated for OSHA reporting purposes.

71.     After receiving treatment at a medic station, Response workers were either allowed to return to work, referred to intermediate care, or, where necessary, transported to a treatment facility or local emergency room by ambulance.

I declare under penalty of perjury that the foregoing is true and correct.

Date: August 12, 2012

David R. Dutton

26

# EXHIBIT A

# Reporting Incidents



**IMMEDIATELY REPORT ANY INCIDENT OR INJURY**

- Notification is required for all incidents and/or injuries, regardless how minor or insignificant they may appear

- Notify your immediate supervisor or volunteer coordinator

- Notify your Safety and Health Personnel



# Stop the Job



- 'Stop the Job' or 'Stop Work' authority is granted to everyone involved in this effort

- If conditions or your plan changes—Stop the Job!

- If you "think" that there is a hazard or unsafe condition during the job—Stop the Job!

- If someone who was not involved in planning joins work that is in progress—Stop the Job!

## If it just doesn't feel right….
## Stop the Job!!



- Stopping the Job should not be seen as a negative; It may be the last opportunity to prevent an incident

- After you Stop a job, regroup and talk through the concern to resolve the issue before resuming

# EXHIBIT B

FINAL REVISION

# On-Shore PPE Matrix for Gulf Operations

X= Minimum Requirements

| Task Number | Task Title | Task Description & Requirements | HEAD: Sun Hat / Sun Screen | HEAD: Hard Hat | EYES: Safety Glasses (7) | EYES: Safety Goggles | FACE: Face Shield | EARS: Hearing Protection | HANDS: PVC 26-40 mil Heavy Use Gloves | HANDS: Nitrile 11-26 mil Light Use Gloves | HANDS: Abrasion Resistant Work Gloves | Hi-Visible Garment | BODY: Barrier Apron and/or Barrier Sleeves and/or Barrier Pants | BODY: Breathable Barrier Suit for Solids | BODY: Breathable Barrier Suit for Solids and Light Splash | BODY: Impervious Suit for Extended Oil Contact | BODY: Chest Waders/Hip Boots | BODY: USCG Approved PFD | FEET: Steel-Toe Boots | FEET: Boot Covers (Chicken Boots) | FEET: Rubber Boots | Additional Considerations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Manual Removal of Solid Tar Balls (if no other oil or dispersant is present) | Solid tar balls or patties are removed using shovels, rakes and buckets, etc. No surf entry | X | (1) | X | | | | | (4) | X | (6) | (4) | | | | | | (5) | X | | Rubber Boots may be substituted for boot covers if unavailable. |
| 2 | Mechanical Sand Rake (Beach Cleanup) | Solid tar balls or patties are removed by mechanical device. Upgrade PPE for unloading and maintenance tasks as needed | X | (1) | X | | | | | | | X | (4) | | | | | | X | X | | PPE requirements for sand rake task force. |
| 3 | Manual Scraping (Beach Cleanup) | Oil is scraped from substrate using hand tools. | X | (1) | X | | | | | (4) (INNER) | X (OUTER) | (6) | (4) | (4) | (4) | (4) | | (2) | (5),(8) | (4) | X | Rubber boots are required. Boot covers will be used if steel boots are required. Body protective apparel based on site conditions |
| 4 | Manual Removal of Oiled Materials | Oiled sediments and debris are removed by hand, shovels, rakes, wheel barrows, etc. | X | (1) | X | (4) | (4) | | X | | (4) | (6) | (4) | (4) | (4) | (4) | | (2) | | | | Suit selection based on site conditions |
| 5 | Manual Cutting of Oiled Vegetation | Oiled vegetation is cut by hand, collected and stuffed into bags or containers for disposal. Performed using machete, shearing tools, garden tools, etc. | X | (1) | X | (4) | (4) | | | (4) (INNER) | X (OUTER) | (6) | (4) | (4) | (4) | (4) | | (2) | (5),(8) | (4) | X | **Cut resistant sleeves as required.** Suit selection based on site conditions. |
| 6 | Manual sorbent application (Beach Clean Up) | Sorbents are applied manually to contaminated areas to soak up oil. | X | (1) | X | (4) | | | | | X | (6) | (4) | (4) | (4) | (4) | | (2) | (5),(8) | (4) | X | Suit selection based on site conditions |
| 7 | Manual sorbent retrieval (Beach Clean Up) | Sorbents are retrieved manually to contaminated areas to soak up oil. | X | (1) | X | | | X | | | | (6) | (4) | (4) | (4) | (4) | | (2) | (5),(8) | (4) | X | |
| 8 | Tide line Boom Deployment and Maintenance (Beach Clean up) | Deployment of clean boom and moving of boom at tideline. | X | (1) | X | | | | | (4) (INNER) | X (OUTER) | (6) | (4) | (4) | (4) | (4) | | (2) | (5) | (4) | X | Suit selection based on site conditions |
| 9 | Snare Boom Operations | Snare boom is deployed/retrieved into the water (also tidal pools) from shore. | X | (1) | X | X | (4) | | (X) (INNER) | | X (OUTER) | (6) | (4) | (4) | (4) | (4) | | (2) | | | X | Goggles and faceshield for boom retrieval only. |
| 10 | Sump and Pump/Vacuum Truck/Portable Skimmers | Oil collects in sumps, natural depressions or behind booms. Oil is removed by skimmers and vacuum equipment/trucks. | X | (1) | X | (4) | X | | (4) (INNER) | | X (OUTER) | (6) | (4) | (4) | (4) | (4) | | (2) | X | (4) | | |
| 11 | Manual handling of boom and boom materials | Loading, offloading and retrieval of clean & oiled boom. Bundling and folding boom, handling boom chains, buoy chains and anchors. Lifting and pulling in awkward directions. | X | (1) | X | | | | | (4) (INNER) | X (OUTER) | | (4) | (4) | (4) | (4) | | (2) | X | X | | **Wear cut resistant sleeves.** Suit selection based on site conditions. In addition to chemical hazards, exposure risks may include marine life (barnacles, jellyfish and stingray barbs, etc.). |
| 12 | Decon - low Pressure Cleaning | < 100 psi (e.g. garden hose, hudson sprayer) | X | (1) | X | (4) | | | | | X | (6) | | X | | (4) | | (2) | | | X | |
| 13 | Decon - Medium Pressure Cleaning | Medium pressure water spray flushes oil from substrate and is channeled to recovery points. For pressure washers between 100 and 3,000 psi operating range. | X | (1) | | X | X | X | | | | (6) | | | X | (4) | | (2) | X | X | | PPE alone is not sufficient. Detailed training required on pressure washer use. Task needs to be continually monitored to assess the need for additional PPE. For additional guidance, see the NIOSH PPE Guide. |
| 14 | Decon - High Pressure Cleaning | High pressure (> 3,000 psi), scalding water spray flushes oil from substrate and is channeled to recovery points. | X | (1) | | X | X | X DOUBLE PROTECTION | X | | | (6) | | | | X | | (2) | X | X | | Double Protection entails ear muffs and plugs. PPE alone is not sufficient. Detailed training required on safe pressure washer use. Task needs to be continually monitored to assess the need for additional PPE. For additional guidance, see the NIOSH PPE Guide. |
| 15 | Decon - Dry Ice Blasting | Dry ice pellets remove oil from substrate using a high pressure, thermal shock process. | X | (1) | | X | X | X DOUBLE PROTECTION | | | X | (6) | | | | X | | (2) | X | X | | Dual protection entails ear muffs and plugs. Task needs to be continually monitored to assess the need for additional PPE. For additional guidance, see the NIOSH PPE Guide. |

**FOOTNOTES**

(1) Required only when over head or bump hazards are present. Sun Hat required when hard hat is not required.
(2) Personal Flotation Device (PFD) is required when working on docks, vessels, and if entering water/surf water exceeds knee height.
(3) This footnote intentionally left blank
(4) Wear when a specific hazard associated with the given job exists and warrants wearing of this protection. This will determined by conducting a field JHA prior to the start of the task and will be performed by either Site Safety Officers, Site Supervisors or Team leads that have been trained in the use of the field form, with input from BP Safety / Industrial Hygiene as requested.
(5) Steel-toed boots are required based on worksite conditions
(6) Required when working around heavy equipment or UTVs
(7) Only clear lenses shall be used at night
(8) Wear snake boots based on risk

FINAL REVISION

# Off-Shore PPE Matrix for Gulf Operations

X = Minimum Requirements

| Task Number | Task Title | Task Description & Requirements | HEAD: Sun Hat / Sun Screen | HEAD: Hard Hat | EYES: Safety Glasses (7) | EYES: Safety Goggles | FACE: Face Shield | EARS: Hearing Protection | HANDS: Nitrile 26 40 mil Heavy Use Gloves | HANDS: Nitrile 11-26 mil Light Use Gloves | HANDS: Abrasion Resistant Work Gloves | BODY: Hi-Visible Garment | BODY: Barrier Apron and/or Barrier Sleeves and/or Barrier Pants | BODY: Breathable Barrier Suit for Solids | BODY: Breathable Barrier Suit for Solids and Light Splash | BODY: Impervious Suit for Extended Contact | BODY: Chest Waders/Hip Boots | BODY: USCG Approved PFD | BODY: Fire Resistant Clothing | FEET: Steel-Toe Boots | FEET: Boot Covers (Chicken Boots) | FEET: Rubber Boots | Additional Considerations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Manual Cutting of Oiled Vegetation | Oiled vegetation is cut by hand, collected and stuffed into bags or containers for disposal. Performed from boat using machete, shearing tools, garden tools, etc. | X | (1) | X | (4) | (4) | | (4) (INNER) | | X (OUTER) | (6) | (4) | (4) | (4) | (4) | (4) | (2) | | (5) | (4) | X | **Cut resistant sleeves are required.** Suit selection based on site conditions. |
| 2 | Manual sorbent application (Beach Clean Up) | Sorbents are applied manually to contaminated areas to soak up oil. | X | (1) | X | (4) | | | | | X | (6) | (4) | (4) | (4) | | | (2) | | (5),(8) | (4) | X | Suit selection based on site conditions |
| 3 | Manual sorbent retrieval (Beach Clean Up) | Sorbents are retrieved manually from contaminated areas. | X | (1) | X | (4) | | X | | | X | (6) | (4) | (4) | (4) | (4) | | (2) | | (5),(8) | (4) | X | |
| 4 | Clean Boom Deployment (Hard Boom) | Deployment of clean boom. | X | (1) | X | | | | | | X | | | (4) | | | | X | | X | | | **Wear cut resistant sleeves.** |
| 5 | Boom Retrieval (Hard Boom) | Retrieval of oiled boom. | X | (1) | X | (4) | | | (4) (INNER) | | X (OUTER) | | X | | | (4) | (4) | X | | X | | (4) | **Wear cut resistant sleeves.** Suit selection based on site conditions. In addition to chemical hazards, exposure risks may include marine life (barnacles, jellyfish and stingray barbs, etc.). |
| 6 | Snare Boom Operations | Snare boom is deployed/retrieved into the water (also tidal pools) from boats. | X | (1) | X | X | (4) | | (4) (INNER) | | X (OUTER) | (6) | (4) | | | (4) | | (2) | | | | X | Goggles and faceshield for boom retrieval only. |
| 7 | Sump and Pump/ Vacuum Truck/ Portable Skimmers | Oil collects in sumps, natural depressions or behind booms. Oil is removed by skimmers and vacuum equipment/trucks. | X | (1) | X | (4) | (4) | X | (4) (INNER) | | X (OUTER) | (6) | (4) | (4) | (4) | (4) | | (2) | | (5) | | | |
| 8 | Skimming Operations (outside 5 mile radius from source) | Use of skimming resources to remove oil from the water. Activities include retrieval and skimmer operations including recovered oil transfer. | X | (1) | X | (4) | (4) | (4) | (4) (INNER) | | X (OUTER) | | X | | | (4) | | X | | | | X | If using heavy nitrile gloves, abrasion resistant work gloves are not required. |
| 9 | Skimming Operations (inside 5 mile radius from source) | Use of skimming resources to remove oil from the water. Activities include retrieval and skimmer operations including recovered oil transfer. | X | (1) | X | (4) | (4) | (4) | (4) (INNER) | | X (OUTER) | | X | | | (4) | | X | | | | X | Workers must be respiratory program qualified. If using heavy nitrile gloves, abrasion resistant work gloves are not required. |
| 10 | Decon - low Pressure Cleaning | < 100 psi (e.g. garden hose, hudson sprayer) | X | (1) | X | (4) | | | | X | | (6) | | | | X | (4) | (2) | | | | X | |
| 11 | Decon - Medium Pressure Cleaning | Medium pressure water spray flushes oil from substrate and is channeled to recovery. For pressure washers between 100 and 3,000 psi operating range. | X | (1) | | X | X | X | | X | | (6) | | | | X | (4) | (2) | | X | X | | PPE alone is not sufficient protection. Detailed training required on safe pressure washer use. Task needs to be continually monitored to assess the need for additional PPE. For additional guidance, see the NIOSH PPE Guide. |
| 12 | Decon - High Pressure Cleaning | High pressure (> 3,000 psi), scalding water spray flushes oil from substrate and is channeled to recovery points. | X | (1) | | X | X | X (DOUBLE PROTECTION) | | X | | (6) | | | | X | | (2) | | X | | X | Double Protection entails ear muffs and plugs. PPE alone is not sufficient protection. Detailed training required on safe pressure washer use. Task needs to be continually monitored to assess the need for additional PPE, see the NIOSH PPE Guide. |
| 13 | Decon - Dry Ice Blasting | Dry ice pellets remove oil from substrate using a high pressure, thermal shock process. | X | (1) | | X | X | X (DOUBLE PROTECTION) | | | X | (6) | | | | X | | (2) | | X | | (4) | Double Protection entails ear muffs and plugs. PPE alone is not sufficient protection. Detailed training required on safe pressure washer use. Task needs to be continually monitored to assess the need for additional PPE, see the NIOSH PPE Guide. |
| 14 | In-Situ Burning | Upwind end of contaminated area is ignited to burn down-wind. Respiratory protection may be required if identified in a site-specific task hazard analysis. | X | (1) | X | | | | | | X | | | | | | | X | X | (5) | | | Emergency escape breathing device is required for each person on board. Devices are provided by vessel. |
| 15 | Cargo Inspections on Marine Vessels | Opening tanks and storage compartments holding collected and oil vegetation for visual inspection (H2S exposure potential). | X | (1) | X | (4) | | | | | X | | | | | | | X | | (5) | | | Task needs to be continually monitored to assess the need for additional PPE. |
| 16 | Marsh / Near-Shore Clean-up Operations | SCAT-Pollution Investigation. Workers on foot and aboard small boats and patrol marshes and bayous to search for oil impact. Workers will not be physically cleaning. | X | (1) | X | | | | | (4) | (4) | | | | | | (4) | (2) | | (5),(8) | | | |

**FOOTNOTES**

(1) Required only when over head or bump hazards are present. Sun Hat required when hard hat is not required.
(2) Personal Flotation Device (PFD) is required when working on docks, vessels, and if entering water/surf when water exceeds knee height.
(3) This footnote intentionally left blank
(4) Wear when a specific hazard associated with the given job exists and warrants wearing of this protection. This will be determined by conducting a field JHA prior to the start of the task and will be performed by either Site Safety Officers, Site Supervisors or Team leads that have been trained in the use of the field form, with input from BP Safety / Industrial Hygiene as requested.

(5) Steel-toed boots are required based on worksite conditions
(6) Required when working around heavy equipment or UTVs
(7) Only clear lenses shall be used at night
(8) Wear snake boots based on risk