# EXHIBIT G

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179 <br><br> SECTION: J <br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the putative Medical Benefits Settlement Class, <br><br> Plaintiffs, <br><br> v. <br><br> BP Exploration & Production Inc., *et al.*, <br><br> Defendants. | * * * * * * * * * * * * | No. 12-CV-968 <br><br> SECTION: J <br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF PROFESSOR GEOFFREY P. MILLER

I, Geoffrey P. Miller, declare as follows:

1.     I am the Stuyvesant P. Comfort Professor of Law at New York University located in New York, New York.  I have been retained to provide an expert opinion as to certain features of the Medical Benefits Class Action Settlement Agreement, as amended May 1, 2012 (the "Agreement") which would settle certain claims arising out of the Deepwater Horizon oil spill (the "Incident").

<u>Background and Qualifications</u>

2.     For more than twenty years I have been involved in the area of class action litigation as a teacher, scholar, attorney, consultant, and expert witness.

3.     I am presently teaching or have taught classes covering class action litigation, including Civil Procedure, Complex Litigation, and other courses.  I regularly lecture on class actions at academic conferences and continuing legal education seminars.  I was a member of the Board of Advisors for the American Law Institute's project on "Principles of the Law of Aggregate Litigation."  In June, 2008, I co-organized an international conference in Florence, Italy on "Class Actions in the United States and Europe," sponsored by the European University Institute, the American Law Institute, and New York University Law School.

4.     I have acted as counsel in class actions and shareholders derivative litigation.  I have consulted with attorneys to assist with issues pertaining to class certification, class settlement, and awards of attorney's fees.  I have offered testimony in class action cases in state and federal courts across the United States.

5.     I have written numerous research articles dealing with class action law and practice.  A particular focus of my research concerns the procedures and standards for judicial review of class action settlements.  *See* Jonathan R. Macey and Geoffrey P. Miller, Judicial

Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008).  My articles

on class action law, some of them co-authored with Professor Macey, have been cited by state

and federal courts across the United States.[1]

6.      I am also the author, with Professor Theodore Eisenberg, of leading empirical and

statistical analyses of class action cases.  My work with Professor Eisenberg on class action

litigation has also been cited or relied on in numerous state and federal decisions, including the

Eastern District of Louisiana.[2]

---

[1] *In re Processed Egg Products Antitrust Litigation*, 2012 WL 2885924 (E.D.Pa. 2012); *Louisiana Municipal Police Employees' Retirement System v. Pyott*,--- A.3d ----, 2012 WL 2087205 (Del.Ch. 2012); *Forsythe v. ESC Fund Management Co.*, 2012 WL 1655538 ( Del.Ch. 2012); *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, (7th Cir. 2011); *In re Sauer-Danfoss Inc. Shareholders Litigation*, 2011 WL 2519210 (Del.Ch. 2011); *Thorogood v. Sears, Roebuck and Co.*, 627 F.3d 289 (7th Cir. 2010); *Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3rd Cir. 2010); *In re Revlon, Inc. Shareholders Litigation*, 990 A.2d 940 (Del.Ch. 2010); *Lubin v. Farmers Group, Inc.*, 2009 WL 3682602 (Tex.App. 2009); *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.*, 2007 WL 2269471 (Ohio App. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D.Cal. 2007); *Amalgamated Bank v. Yost*, 2005 WL 226117 (E.D.Pa. 2005); *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3rd Cir. 2003); *Fruchter v. Florida Progress Corp.*, 2002 WL 1558220, (Fl. App. 2002); *In re Microstrategy, Inc.*, 172 F.Supp.2d 778 (E.D.Va. 2001); *In re Cendant Corp. Litigation*, 264 F.3d 201 (3rd Cir. 2001); *Scardelletti v. Debarr*, 265 F.3d 195 (4th Cir. 2001); *In re Auction Houses Antitrust Litigation*, 197 F.R.D. 71 (S.D.N.Y. 2000); *Lealao v. Beneficial California, Inc.*, 82 Cal.App.4th 19, 97 Cal.Rptr.2d 797 (2000); *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202 (2nd Cir. 2000); *Davis v. Carl Cannon Chevrolet-Olds, Inc.*, 182 F.3d 792 (11th Cir. 1999); *In re Baan Co. Securities Litigation*, 186 F.R.D. 214 D.D.C. 1999); *In re Quantum Health Resources, Inc.*, 962 F.Supp. 1254 (C.D. Cal. 1999); *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167 (W.D.La. 1997); *Howard v. Globe Life Ins. Co.*, 973 F.Supp. 1412 (N.D.Fla. 1996); *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996); *In re Asbestos Litigation*, 90 F.3d 963 (5th Cir. 1996); *General Motors Corp. v. Bloyed*, 916 S.W.2d 949 (Tex. 1996); *Brundidge v. Glendale Federal Bank, F.S.B.*, 168 Ill.2d 235, 659 N.E.2d 909, 213 Ill.Dec. 563 (1995); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295 (1st Cir. 1995); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3rd Cir. 1995); *BTZ, Inc. v. Great Northern Nekoosa Corp.*, 47 F.3d 463 (1st. Cir. 1995); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3rd Cir. 1993); *In re Oracle Securities Litigation*, 829 F.Supp. 1176 (N.D. Ca. 1993); *Gottlieb v. Wiles*, 150 F.R.D. 174 (D.Colo. 1993); *Durr v. Intercounty Title Co. of Illinois*, 826 F.Supp. 259 (N.D.Ill. 1993); *qad. inc. v. ALN Associates, Inc.*, 807 F.Supp. 465 (N.D.Ill. 1992); *Wesley v. General Motors Acceptance Corp.*, 1992 WL 57948 (N.D.Ill. 1992); *In re Verifone Securities Litigation*, 784 F.Supp. 1471 (N.D.Cal. 1992); *Davis v. Coopers & Lybrand*, 1991 WL 154460 (N.D.Ill. 1991) .

[2] *Espenscheid v. DirectSat USA, LLC*, --- F.3d ----, 2012 WL 3156326 (7th Cir. 2012); *In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741 (7th Cir. 2011); *In re Amaranth Natural Gas Commodities Litigation*, 2012 WL 2149094 (S.D.N.Y. 2012); *Board of Trustees of AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907 (S.D.N.Y. 2012); *Lane v. Page*, 2012 WL 1940574 (D.N.M. 2012); *Silverman v. Motorola, Inc.*, 2012 WL 1597388 (N.D.Ill. 2012); *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 2012 WL 948365 (S.D.Tex. 2012); *Walsh v. Popular, Inc.*, 2012 WL 769600 (D.Puerto Rico 2012); *American International Group, Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727 (N.D.Ill. 2012); *Ebbert v. Nassau County*, 2011 WL 6826121 (E.D.N.Y. 2011); *In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D.Fla. 2011); *Latorraca v. Centennial Technologies Inc.*, 834 F.Supp.2d 25 (D.Mass. 2011); *In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation*, 280 F.R.D. 364 (N.D.Ill. 2011); *Pavlik v. FDIC*, 2011 WL 5184445 (N.D.Ill. 2011); *In re Puerto Rican Cabotage Antitrust Litigation*, 815 F.Supp.2d 448 (D.Puerto Rico 2011); *In re Vioxx Products Liability Litigation*, 2011 WL 3563004 (E.D.La. 2011) and 760 F.Supp.2d 640 (E.D.La. 2010); *In re AT & T Mobility Wireless Data Services Sales Tax Litigation*, --- F.Supp.2d ----, 2011 WL 2173746 (N.D.Ill. 2011); *Velez v. Novartis Pharmaceuticals Corp.*, 2010 WL 4877852 (S.D.N.Y. 2010); *Braud v. Transport Service Co. of Illinois*, 2010 WL 3283398 (E.D.La. 2010); *In re Lawnmower Engine Horsepower Marketing & Sales*

7.     Further information on my background and qualifications is set forth in my resume, attached hereto.

<u>Summary of Opinions</u>

8.     For the reasons stated below, it is my opinion that:

(a) The Agreement is well designed to reduce confusion, minimize risks of intra-class conflicts, and distribute settlement benefits according to rational criteria of allocation;

(b) The negotiation process ensured that the litigants and this Court are informed of relevant information pertinent to the fairness, adequacy and reasonableness of this settlement;

(c) The claims released in this Agreement are particularly appropriate for resolution in a class action context;

(d) The Agreement responds effectively to concerns raised in other complex, mass-tort class action settlements;

(e) None of the objections to the settlement which I have reviewed alters the opinions set forth in this Declaration.

---

*Practices Litigation*, 733 F.Supp.2d 997 (E.D.Wis. 2010); *Klein v. O'Neal, Inc.*, 2010 WL 143516, at *35 (N.D. Tex. 2010*); Fiala v. Metropolitan Life Ins. Co., Inc.*, --- N.Y.S.2d ----, 2010 WL 716176, at *8 (N.Y. Sup. 2010*); In re Metlife Demutualization Litig.*, 2010 WL 517389, at *55 (E.D.N.Y. 2010); *In re Marsh ERISA Litig.*, 2010 WL 451028, at *17 (S.D.N.Y. 2010) (McMahon, J.); *Strawn v. Farmers Ins. Co. of Oregon*, 233 Or. App. 401, 423, 226 P.3d 86, 99 (Or. App. 2010); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 404 n.35 (S.D.N.Y. 2009); *In re Trans Union Corp. Privacy Litig.*, 2009 WL 4799954, at *12 (N.D. Ill. 2009); *Loudermilk Services, Inc. v. Marathon Petroleum Co. LLC*, 623 F.Supp.2d 713, 724 (S.D. W.Va. 2009); *Rodriguez v. West Publishing Co.*, 563 F.3d 948, 958 (9th Cir. 2009); *In re OCA, Inc. Securities and Derivative Litig.*, 2009 WL 512081, at *20 (E.D. La. 2009); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 800 (S.D. Tex. 2008); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 755 n.2 (S.D. Ohio 2007); *In re Tyco Int'l., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 269 (D.N.H. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853, 862-64, 866, 870 (E.D. La. 2007); *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 n.6 (S.D.N.Y. 2007); *Fireside Bank v. Superior Court*, 40 Cal.4th 1069, 1089, 155 P.3d 268, 281 (Cal. 2007); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38, 42 (D.N.H. 2006); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1209, 1211 (S.D. Fla. 2006); *In re Educational Testing Service Praxis Principles of Learning and Teaching Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 629-32 (E.D. La. 2006); *Hicks v. Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. 2005); *In re Lupron Marketing and Sales Practices Litig.*, 2005 WL 2006833, at *5 (D. Mass. 2005); *In re HPL Technologies, Inc. Sec. Litig.*, 366 F.Supp.2d 912, 914 (N.D. Cal. 2005); *Allapattah Services, Inc. v. Exxon Corp.*, 362 F.3d 739, 760 (11th Cir. 2004) (Judges Tjoflat and Birch, dissenting from denial of en banc review); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 80-81 (D. Mass. 2005), 221 F.R.D. 260, 286 (D. Mass. 2004).

<u>Materials Relied On</u>

9.      In preparing my opinions, I have reviewed an extensive compilation of pleadings and other documents, including but not limited to the parties' briefs and the Court's ruling on Defendants' Motions to Dismiss the B3 Bundle Master Complaint, the Agreement (including exhibits), briefs submitted to the Court in connection with the preliminary approval of the Agreement, the Court's order preliminarily approving the Agreement, and the objections to the Agreement received through close of business on August 8, 2012.   I have also investigated appropriate case law and secondary authorities.

<u>Opinions</u>

10.   In determining whether to approve a proposed class action settlement, this Court is asked to evaluate whether the compromise reached by the parties is "fair, adequate, and reasonable" to the class.   Although these terms are used together, they have somewhat different connotations.   A settlement may be considered fair if its benefits are allocated among class members in proportion to the harm suffered and the strength of the legal claims.   A settlement may be considered adequate if under the circumstances of the case it is sufficient in amount.   A settlement may be considered reasonable if its benefits are tailored to provide remediation for harm and if class members can obtain those benefits without undue difficulty or expense.   As set forth below, it is my opinion that structural features of this settlement are well designed to maximize the likelihood that each of these considerations is satisfied.

<u>This Settlement Is Well Designed to Reduce Confusion, Minimize Risks of Intra-Class Conflicts, and Distribute Settlement Benefits According to Rational Criteria of Allocation</u>

11.   Nearly all class action settlements include class members who are differently situated across a variety of dimensions: the strength of their legal claims, the amount of claimed injury,

the nature of their representation in the litigation, and the documentation required to obtain relief, among other factors.   A challenge for parties crafting a settlement is to ensure, to the extent practicable, that potential conflicts among class members do not impair the fairness, adequacy, or reasonableness of the settlement.

12.   The Agreement contains structural features which are well designed to minimize intra-class conflicts.   Along with the economic loss settlement in the present litigation, this is perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field.

13. Among the most important structural features of this settlement is the class definition, which clearly and objectively defines the class in terms of time period, geographic region, and type of claim.

14.   The class is limited to individuals who realistically may have experienced exposure either to oil or to dispersants in connection with the Incident.   Subject to certain qualifications and exceptions, these include (a) people who worked as clean-up workers; (b) people who resided in defined beachfront areas abutting the Gulf ("Zone A Residents") and experienced a Specified Physical Condition shortly after exposure to oil and/or dispersants; and (c) people who resided in defined wetlands areas ("Zone B Residents").   The terms are further defined in such a way as to clearly and objectively specify criteria for class membership.   The term "clean-up workers" means natural persons who performed Response Activities (as further defined).   Zones A and B are bounded by precise geographic descriptions, as further set forth in Exhibits 9, 10 and 11 of the Agreement.

15.   These definitions clearly and objectively identify the persons who, by virtue of their geographic location or their activities, were positioned to experience possible exposure to oil or

dispersants. Clean-up workers were potentially exposed to oil or dispersants by virtue of the nature of the tasks they performed. Persons in Zone A were potentially exposed because they resided in areas abutting the Gulf where these substances may have come ashore. Persons in Zone B were potentially exposed because, although they did not live on the shoreline, they did reside in wetlands from which oil is being removed by natural attenuation and thus may have been present for a longer period of time than at beaches.

16. Class membership is also clearly defined in terms of time. These chronological criteria serve to exclude people who were not possibly harmed by the Incident. These criteria also minimize risks of conflict or confusion as to whether a given person or entity is or is not entitled to participate in the settlement benefits.

17. For clean-up workers, the class is chronologically defined to include people who worked in such a capacity at any time between April 20, 2010, and April 16, 2012. It is appropriate that the time period applicable to clean-up workers be the entire class period because they were subject to potential exposure as long as they were performing clean-up work. Zone A residents are included if they resided in that area for some period of time on each of at least sixty days between April 20, 2010 and September 30, 2010. This time limitation is appropriate because the Macondo well was capped as of July 15, 2010, and sealed as of September 19, 2010, and no dispersants were used after July 19, 2010 (other than one minimal application near the well site on September 4, 2010). Zone B residents must have resided in that zone for some time on each of at least sixty days between April 20, 2010 and December 31, 2010. The longer period for Zone B residents reflects the fact that because oil could not be removed from wetlands, and was instead allowed to naturally attenuate, there was a longer period of potential exposure.

These time periods are clear, objective, and well-designed to direct the settlement benefits to those who potentially experienced exposure as a result of the Incident.

18. The class definition also contains clear and specific criteria based on physical or medical condition. As to clean-up workers, whose activities likely exposed them most directly and continuously to oil or dispersants, no specific showing of health effect is required for membership in the class (although all class members must still submit qualifying proofs of claim in order to receive compensation under the Settlement). Similarly, because Zone B residents are persons whose residence in wetlands created the possibility of a higher degree of continuity in exposure, no specific medical or health conditions are required for membership in the class, although they too must submit qualifying proofs of claim in order to receive benefits.

19. Zone A residents, on the other hand, were unlikely to be exposed to oil or dispersants unless they spent substantial time at the waterfront. For these people, therefore, the class definition further requires that they have developed one or more Specified Physical Conditions. Exhibit 8 to the Agreement sets forth a precise list of the conditions which serve to include otherwise-qualifying Zone A residents as members of the class. Here, again, the class definition is carefully and clearly crafted in order to clearly specify who is and who is not a class member, and also to ensure that the benefits of the settlement are made available to persons with stronger potential claims.

20. Overall, the Agreement's clear and objective class definition serves important purposes. The criteria for class membership provide clarity in the scope of the overall release and in the preclusive effect of the Agreement for class members who do not opt out. For Zone A residents, the definition provides notice of the specific health-related conditions of membership in the class, thus eliminating surprise and minimizing post-hoc disputes.

21.   Another virtue of the class definition is the careful articulation of those who are *excluded* from the class.

22.   Some of these exclusions are common in class action settlements: for example, judges and law clerks who may have worked on the case, BP entities, class members who opt out, and people who have already executed releases for claims of injury from exposure to oil or dispersants.

23.   Other exclusions are crafted to account for the specific features of this case.  For example, persons who were on the Deepwater Horizon on April 20, 2010 are excluded.  Also excluded are people (other than clean-up workers) whose activities exposed them to potentially harmful substances, such as certain individuals who worked in close proximity to hydrocarbons or petrochemicals or people whose jobs may have exposed them to radioactive materials.

24.   These exclusions were adopted for various reasons, but in each case the effect is to simplify, streamline, and rationalize this settlement.   Opt-outs and people who have signed releases are excluded because they have either indicated that they do not want to participate in this settlement or have already received compensation for their claims.  The claims of persons on the Deepwater Horizon on April 20, 2010 are different because of their proximity to the event and also because their claims are generally more serious and different in kind than the types of injuries covered under the Agreement.[3]

25.   Even if a person is included in the class, certain claims are excluded from the scope of the release.  These include claims of persons *in utero*; claims for non-exposure-based trauma; and most claims for economic or property damage.  These exclusions are sensibly designed as measures for simplifying, streamlining, and rationalizing this settlement.  Claims of unborn

---

[3] Aside from people who have already released their claims, all persons who are excluded from the class remain free to pursue their own health-related claims relating the Incident.

persons present legal and factual complexities not present for the large majority of class members. Trauma claims are more potentially serious, more complicated, and substantially different in proof than other class claims; and claims for economic or property damage are both different in kind from those covered here and also are, in general, covered by the economic loss settlement.

26. In addition to clearly and objectively specifying class membership and the scope of released claims, the Agreement provides an impressively detailed, carefully defined, and rationally structured breakdown of compensation benefits for health-related claims.

27. Exhibit 8 classifies qualifying physical conditions into ocular, upper airway/respiratory, ear, nose and throat, dermal, and neurophysiological/neurological/odor-related. Each of these conditions is associated with symptoms, exposure routes, and parameters defining the short time between exposure and manifestation. Health effects are further classified into acute and chronic conditions. Exhibit 8 further identifies the level of proof required to validate claims (which may vary based on type of claimant), and sets forth the settlement benefits at different levels of proof. These benefits include lump-sum payments and may also include enhancers and hospital expenses. For clean-up workers only, Exhibit 8 sets forth a matrix for heat-related conditions (sunstroke, fainting, exhaustion, and heat rash).

28. The matrices, definitions and compensation levels set forth in Exhibit 8 are well-designed to minimize risks of confusion, surprise or disappointment among class members. Each person who reads the Agreement is placed on clear notice as to types of compensable claims, level of required proof, and the amounts which they could reasonably expect to receive if they do not opt out. Exhibit 8 thus both informs class members about their opt-out decision and also reduces the danger of conflict or misunderstanding among those who participate. Members

of the Plaintiffs' Steering Committee ("PSC") who worked with defense counsel to develop these matrices represented many different clients with different types and severity of potential claims; thus all legitimate interests were adequately represented and appropriately compensated. The clear and objective criteria contained in Exhibit 8 also reduce the complexity, cost and duration of the claims administration process by providing guidance to the claims administrator as to which claims should be paid and how much they should receive.

The Process of Negotiation Supports the Fairness and Reasonableness of the Agreement

29.   The history of settlement negotiations provides strong indicia of the fairness, adequacy and reasonableness of the Agreement.   The following features are particularly noteworthy.

30.   The negotiation process was hard-fought and adversarial, but also characterized by a commendable degree of professionalism.  The PSC includes leading plaintiffs' attorneys in the area of mass tort litigation; and counsel for BP are premier advocates for defense interests in class actions and other complex and mass tort litigation. This Court has had the opportunity to observe the quality of the work product produced in this litigation, as well as the outstanding professionalism and cooperation displayed by both sides.

31.   The negotiations extended over many months and involved numerous all-day (and sometimes all-night) bargaining sessions.   The negotiations over material terms of the settlement were supervised by Magistrate Judge Shushan, whose able and timely guidance resolved key issues.  Magistrate Judge Shushan was instrumental in keeping the parties focused on crafting a settlement that was fair, adequate and reasonable for the class and also protective of BP's legitimate interests.

32.  To assist in the settlement process and to provide counsel with guidance on broad questions of settlement strategy and design, both sides enlisted the aid of academic consultants: myself, for the defendant; Professor Samuel Issacharoff for the plaintiffs; and Professor John C. Coffee.

33.  The settlement negotiations have been informed by massive volumes of civil discovery, including more than three hundred depositions; millions of documents; and extensive investigation and analyses of the facts and legal issues. The parties also had access to information from government and other sources.

34.  Unlike in many class action settlement negotiations, where the absence of reliable information about the extent of harm allows the parties to become entrenched in unrealistically optimistic estimates of case value, the parties operated here with clear objective checks on their negotiating strategy and settlement demands.   The Agreement could thus be finely tailored to direct these benefits according to fair and objective principles of allocation.

35.  I understand that the parties scrupulously avoided discussing the amount of any attorneys' fee payable by the defendant until they had achieved a detailed agreement on the substance of the settlement, and upon specific direction of the Court.  This approach provided assurance that attorneys representing the class could not inappropriately trade off benefits for the class in exchange for a higher fee for themselves.  No such tradeoff was possible because the topic of fees was not even taken up until all essential elements of the merits settlement were complete.

<u>The Claims Released in this Settlement are Particularly Appropriate for Resolution in a Class Action Proceeding</u>

36.  Class actions can be an effective means for resolving claims which would be uneconomic to litigate on an individual basis.  This is, in fact, one of the principal arguments in

favor of the class action procedure: it allows people an avenue for redress of injuries in situations where they would have no other practicable remedy.

37.   While I have not attempted to value individual claims in this settlement, it is evident that many class members experienced conditions that were both short in duration and minor in impact.   Most of the visits to medic stations established during the response were for minor complaints such as rash, sinus problems, or heat-related issues.   The settlement's Specified Physical Conditions Matrix also indicates that most health-related claims are for minor conditions.   Symptoms of "acute conditions" include eye irritation, nasal congestion, post-nasal drip, cough, headache, sinus pain, wheezing, sputum production, pimples, itching, swelling, skin dryness, peeling, nausea, diarrhea, vomiting, cramps, and abdominal pain – all of them non-specific conditions which occur frequently in ordinary life without causing loss of ordinary functions. Claims based on symptoms such as these – without more specific diagnoses of serious underlying conditions – would not, in my opinion, be viable to litigate on an individual basis: the cost of litigation would far exceed any potential recovery, even ignoring the barriers that a plaintiff would face in establishing elements such as causation and fault.

38.   Certain claims for more serious harm – for example, claims of persons who were present on the Deepwater Horizon on April 20, 2010 or claims for physical trauma – are not included in this settlement.   In addition to being substantially different from the claims released in the present settlement, the potential damages associated with such claims are more substantial than the damages allegedly experienced by persons whose claims would be released in the present settlement.

39.   Thus, although some claims covered by the present settlement are relatively substantial (clean-up workers with chronic conditions may receive more than $60,000 (plus

enhancers, if applicable) upon submission of qualifying documentation), the great majority of class claims are smaller in amount.   Thus, it is particularly appropriate, and commensurate with the purposes of Rule 23, that the health-related claims covered by this settlement be resolved on a class-wide basis.

40.   An additional benefit of a class-wide settlement is the fact that the Agreement provides for forms of relief that would not be available if the case had been brought as an individual proceeding.

41.   For example, the Agreement sets up a Periodic Medical Consultation Program.   This program provides benefits for class members whose claims have been determined by the claims administrator to qualify for compensation for a Specified Physical Condition, as well as for clean-up workers and Zone B residents who satisfy certain proof requirements.   Qualifying class members are entitled to receive up to eight periodic medical consultations, including certain standardized medical tests that can be ordered by the physician in his/her discretion, by visits to a network of medical service providers established by the claims administrator.   These visits do not have to be related to medical or health conditions associated with the Incident.

42.   The Periodic Medical Consultation Program provides real and substantial benefits to class members by offering them a convenient, cost-free means to receive visits with health care providers over a 21-year period.   Because it offers health benefits, this program is closely related to the claims at issue in this settlement.

43.   The Periodic Medical Consultation Program is not a form of relief that could be obtained in individual litigation.   A litigated judgment would not likely include such a program. It is also difficult to imagine that a program such as this, providing benefits to many people,

could ever result from a settlement of an individual action.   Accordingly, a class action settlement is an appropriate procedure in which this form of relief can be obtained.

44.   The Gulf Region Health Outreach Program is another benefit that could only realistically be obtained in a class-wide settlement.  The purpose of this program is to enhance high quality, sustainable, community-based healthcare services in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.  In furtherance of this goal, the program would establish four monetary grants: (a) $50 million to expand and improve access to health care in underserved communities; (b) $36 million to address behavioral and mental health issues; (c) $4 million to train community public health workers; and (d) $15 million to address environmental health issues.

45.   Because they are all designed to address health issues in the Gulf Coast region, these grants are closely related to the interests being pursued on behalf of the class.  The Gulf Region Health Outreach Program recognizes that the entire region was affected to some extent by the Incident, and provides benefits that extend beyond individual class members.  The program takes account of broader public health and wellness issues by offering a carefully crafted, diversified set of programs designed to improve physical, mental and behavioral health, especially in communities where the need for such programs is most compelling.  Because the nature and proposed recipients of the grant are fully identified, the process is transparent to all interested or responsible parties, including this Court.  The program, moreover, includes safeguards designed to ensure that funds are disbursed only as work is completed and that the funds are used only for their intended purposes.

46. Like the Periodic Medical Consultation Program, the Gulf Region Health Outreach Program could not have resulted from individual litigation. Only a class action procedure offers the potential – and here, the reality – of an outcome which includes these public benefits.

The Agreement Responds Effectively to Concerns Raised in Other Mass Tort Settlements

47. Although the Agreement is in many respects unprecedented, both as to size and complexity, it is also informed by lessons gained from other mass tort class action settlements. In consequence, the mistakes and problematic features that plagued earlier cases are absent here. This settlement can, in fact, be considered a state-of-the-art example of best practices in the field.

48. For example, this settlement presents none of the concerns that troubled the Court in *In re Katrina Canal Breaches Litigation*, 628 F.3d 185 (5th Cir. 2010). Citing the Supreme Court's earlier decision in *Ortiz v. Fibreboard*, 527 U.S. 815 (1999), the Fifth Circuit there rejected a class settlement and ordered the decertification of a mandatory limited-fund class under Federal Rule of Civil Procedure 23(b)(1), on the ground that the settlement failed to provide a procedure for distribution of the settlement fund that treated class claimants equitably vis-à-vis one another. In essence, the settlement simply left it up to a special master to distribute a limited fund among different groups of claimants, without limits or constraints on the special master's discretion.

49. The settlement in the present case could hardly be more different than in *Katrina*. Here, the Agreement goes to great lengths to define different groups of claimants and to provide them with compensation that maps accurately onto demonstrated health conditions. Required documentation for all claimants is specifically identified in the Agreement and Exhibits, and reflects a reasonable compromise between the interest in providing compensation to injured parties and the interest in policing against fraudulent or inaccurate claims. For all claimants,

moreover, the amount of potentially available settlement consideration is uncapped. This means that the amount of settlement benefit provided to one member of the class will in no way reduce or interfere with the benefit obtained by another member. In such a situation the concerns that animated the Court in the *Katrina* litigation are entirely absent.

50. The Agreement is also well designed to avoid the problems that arise when a class is not "adequately defined and clearly ascertainable." *See Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam). The Agreement clearly and objectively identifies the class with respect to geographical location, timing, and categories of injuries for which compensation is recoverable. As noted above, the present case is nearly the epitome of how a class in a mass tort class action ought to be defined.

51. Likewise, this case does not present the problem of reliance on an "immature tort" whose legal and factual dimensions and implications have not been fleshed out by judicial decision. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997); *Castano v. American Tobacco Company*, 84 F.3d 734 (5th Cir.1996). The outcome of this case does not depend on novel legal theories, nor is the proposal to establish new law through "bellwether" trials of individual actions. The underlying legal principles grow out of or directly sound in admiralty and maritime law – a body of jurisprudence hundreds of years old. Applicable law under the Oil Pollution Act ("OPA") is set forth both in the terms of this statute, in several judicial opinions interpreting its scope and meaning in private disputes, and in numerous administrative decisions issued pursuant to the Coast Guard's authority under OPA to administer the Oil Spill Liability Trust Fund.

52.  Nor does this case present issues of the sort that proved fatal in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).  *Amchem* was a "sprawling" class action involving many plaintiffs asserting exposure to asbestos in many different circumstances, at different times, under different conditions, and with different health conditions and medical histories.  Unlike in *Amchem*, all claims in the present action arise out of a single event – the Deepwater Horizon oil spill.  Claims that could have diffused the focus on this overarching issue are specifically excluded.

53.  A principal defect of the settlement in *Amchem* was the fact that it purported to extinguish claims of persons who were experiencing current health problems along with claims of persons who had merely been exposed to asbestos but who had no current exposure-related problems.  The conflict of interest between these groups required rejection of the settlement.  *Id.* at 626.  The present settlement, in contrast, settles no future claims at all.  There is no promise to provide medical monitoring or to pay out claims if they arise in the future.[4]

54.  Unlike the defective process for handling future claims that the Supreme Court rejected in *Amchem*, the present settlement adopts an innovative approach, the Back-End Litigation Option, which protects the interests of possible future claimants while avoiding the creation of intra-class conflicts.

55.  The Back-End Litigation Option preserves claims for physical conditions which become manifest at some later date.  Within four years after the manifestation of such a condition, a medical benefits class member may submit to the claims administrator a notice of intent to sue.  The complaining class member then has the right (after potential mediation) to file a lawsuit seeking compensation for the later-manifested condition.

---

[4] The Periodic Medical Consultation Program is simply a program of general health check-ups and standardized testing; it is not designed to test for exposure-related claims in particular and includes no provision for treatment of any disease condition that might be identified in the consultation.

56. In any such lawsuit, BP agrees not to contest certain issues, including the class member's exposure to oil or dispersants and BP's fault in connection with the Incident. BP also waives certain defenses, including arguments that the lawsuit is untimely, that it is barred by the rule against splitting a cause of action, or that it is precluded by the exclusivity of remedies under a workers' compensation statute or the Longshore and Harbor Workers' Compensation Act. In exchange, the class member waives the right to seek punitive damages.

57. The Back-End Litigation Option is not subject to the problems that vexed the Court in *Amchem*. It does not purport to resolve or release claims for later-manifested conditions. Nor does it create a fund of potentially limited scope to pay out such claims. Thus there is no risk that the benefits of the settlement will be exhausted by payments to current claimants. Further, unlike *Amchem*, where the class divided into diametrically opposed segments (current and future claimants), here there is no such separation: many if not most of the class members who could take advantage of the Back-End Litigation Option will also be entitled to file claims for current monetary relief.

58. The trade-off under which class members waive back-end claims for punitive damages in exchange for BP's waiver of defenses was vigorously negotiated by members of the PSC, attorneys who had no conflict of interest with respect to class claims. Accordingly, the negotiation process provides additional assurance that the interests of potential future claimants were adequately represented and appropriately addressed in this settlement. Unlike the settlement at issue in *Amchem*, which the Supreme Court criticized as a "global compromise with no structural assurance of fair and adequate representation," 521 U.S. at 627, the present settlement took pains to ensure that all relevant interests were properly represented at the bargaining table and in the administration of the settlement.

## The Objections I Have Reviewed Do Not Affect My Opinions

59.  Although the time period for objections has not yet expired, it is noteworthy that to date only a few objections have been filed out of hundreds of thousands of potential class members.

60.  I have reviewed these objections and find in them no basis for revising the opinions expressed above.

61.  I reserve the right to revise or supplement my opinion in light of further objections that I might review.

I declare under penalty of perjury that the foregoing analyses and opinions are true and correct.

Respectfully submitted,

Geoffrey P. Miller
August 10, 2012

# GEOFFREY P. MILLER

New York University Law School
40 Washington Square South Suite 411G
New York, New York 10012
 (212) 998-6329 (office)
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

## Work Experience

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-present)
  Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007-2009)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)


Faculty Member, Study Center Gerzensee, Switzerland, Spring 2012 (invited)
Visiting Lecturer, University of Genoa Department of Law, 2011 (invited)
Visiting Scholar, European University Institute, Florence Italy, Fall/Winter 2010
Visiting Chair on Private Actors and Globalisation, Hague Institute for the Internationalisation
        of Law, Fall/Winter 2010
Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
        Fall 2009
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
        Summer 2009
Faculty Member, NYU-NUS in Singapore, 2009, 2011 (invited)
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
        Spring 2009, Summer 2010
Visiting Scholar, University of Minnesota Law School, Spring 2008

Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
    Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010
Visiting Professor, Columbia Law School, Fall 2001
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;
    Spring 2009
Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
    2004, 2005, 2007, 2008, 2009, 2010, 2011 (invited)
Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
    Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009, Spring 2010
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Professor, New York University Law School, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
    New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

<u>Corporate Service</u>

Member of the Board of Directors, State Farm Bank (2010) – board and committee service for
nontraditional thrift institution with $15 billion in assets.

<u>Education</u>

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

<u>Publications</u>

<u>Books</u>

Ways of a King: Legal and Political Ideas in the Bible (manuscript 2011)

Trust, Risk, and Moral Hazard in Financial Markets (Il Mulino, 2011) (forthcoming)

The Origins of the Necessary and Proper Clause (with Gary Lawson, Robert Natelson, and Guy Seidman) (Cambridge University Press 2010)

The Economics of Ancient Law (editor) (Edward Elgar 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Banking and Financial Institutions"

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

<u>Articles</u>

<u>Civil Procedure</u>

Group Litigation in the Enforcement of Tort Law, in Jennifer Arlen, ed., The Economics of Torts (forthcoming 2011)

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact:  Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after *Tellabs*, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (2009) (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

### Legal Ethics/Legal Profession

The English vs. the American Rule on Attorneys Fees: An Empirical Study of Attorney Fee Clauses in Publicly-Held Companies' Contracts (manuscript 2010) (with Theodore Eisenberg)

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

Corporate, Contract and Securities Law

A Modest Proposal for Fixing Delaware's Broken Duty of Care, 2010 Columbia Business Law Review 319 (2010)

Un-manifested Harm in Business-to-Business Cases, __ Journal of Theoretical and Institutional Economics __ (forthcoming)

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in 55 Rivista Delle Societá 680 (2010)

Bargains Bicoastal: New Light on Contract Theory, 31 Cardozo Law Review 1475 (2010)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

## Constitutional Law

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

## Financial Institutions

Financial Private Regulation and Enforcement (manuscript, 2010)

Intellectual Hazard and the Design of Financial Stability Regulation, in University of St. Gallen Series in Law and Economics, Peter Nobel, ed. (Zurich: Schulthess, 2010) (with Gerald Rosenfeld)

Intellectual Hazard: How Conceptual Biases in Complex Organizations Contributed to the Crisis of 2008, 33 Harvard Journal of Law & Public Policy 807 (2010) (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund,  Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)
On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds.,  Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito. El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

Legal History

The Common Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

### Jurisprudence

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

### Ancient Law

Logos and Narrative, NYU School of Law, Public Law Research Paper No. 10-78 (2010)

Monarchy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-76 (2010)

Nationhood and Law in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-57 (2010)

Revelation and Legitimacy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-52 (2010)

The Book of Judges: The Hebrew Bible's Federalist Papers, NYU School of Law, Public Law Research Paper No. 10-66 (2010)

Consent of the Governed in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-56 (2010)

Nomadism, Dependency, Slavery and Nationhood: Comparative Politics in the Book of Exodus, NYU School of Law, Public Law Research Paper No. 10-49 (2010)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

34

The Dark Age:   How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Sovereignty and Conquest in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-61 (2010)

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East  113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

Law and Society

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Female Genital Mutilation: A Cultural-Legal Analysis (manuscript)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

Other:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

Book Reviews

Defusing the Banks' Financial Time Bomb, BusinessWeek (Mar. 11, 2010) (review of Robert Pozen, Too Big to Save?  How to Fix the U.S. Financial System

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

Major Lectures

Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Fresco Chair Lectures in Law and Finance, June 2010)

A Simple Theory of Takeover Regulation in the United States and Europe; Intellectual Hazard (Commerzbank Lectures, University of Frankfurt, May 2010)

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

Journal Referee Reports

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization
Review of Law and Economics

Conferences Organized

Judicial Dialogue on Mass Litigation, Florence Italy, October 15-16, 2010 (co-organizer of conference co-sponsored by NYU Law School, the American Law Institute, and the European University Institute)

Finlawmetrics 2010: Central Banking, Regulation & Supervision after the Financial Crisis (co-sponsor and member of steering committee)

Finlawmetrics 2009: After The Big Bang:   Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (co-sponsor and member of steering committee)

NYU Global Economic Policy Forum 2009: The Future of Regulation and Capital Markets (November 5, 2009) (co-organized with Professor Alan Rechtschaffen and with the NYU Law School Alumni Association)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors.   Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007).  Major conference (425 participants) exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007).  Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard. Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006).  Major conference exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997.  This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996).  This conference, sponsored by the NYU Stern School of Business Salomon Center in association with

the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions.  Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996).  This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995).  This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995).  This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994).  This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

<u>Professional Memberships and Positions</u>

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law
    Schools (1995)
Member of the Board of Directors, American Law and Economics Association
    (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and
    Economics Association (1995-2000)

Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,
    Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
    Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
    of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

<u>Courses</u>

Legal Profession (1985-93; 1996-98; 2003-2007)
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008)
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Italy, 2010)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009,
2010 (invited))
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)
Banking Regulation in Crisis (University of Frankfurt, Germany, 2010)

<u>Litigation and Alternative Dispute Resolution</u>

Brief and Reply Brief for Plaintiff-Appellant, <u>Glancy v. Taubman Centers, Inc</u>. No. 03-
1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., <u>In Re: Visa Check/Mastermoney
Antitrust Litigation</u>, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued <u>Moran v. Household Finance Corp</u>. (the "Poison Pill" case) in the
Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts. Conducted depositions and other pretrial discovery. (1982-1983)

Briefed and argued Hodges v. Metts, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of American Psychological Association v. Birch Tree Press, et al. (U.S. District Court, Washington, D.C. 1983).

Deposit Insurance for Thailand. Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

Schatz v. Blanchard. Neutral arbitrator in a commercial arbitration (2000)

### Expert Witness Testimony (past five years)

Lasker v. Kanas (North Fork Bancorporation Litigation), Index No. 06/103557, Supreme Court of the State of New York, County of New York (2007) (affidavit on fees)

John Hancock Life Insurance Co. v. Goldman, Sachs & Co., No. 01-10729-RWZ, United States District Court, District of Massachusetts (2007) (declaration on fees)

Comes v. Microsoft Corp., No. CL8211, Iowa District Court for Polk County (2007) (affidavit on merits relief and affidavit on fees)

Figueroa v. Sharper Image Co., Case No.: 05-21251, United States District Court, Southern District of Florida (2007) (declaration and testimony on coupon relief).

Love v. Blue Cross & Blue Shield Association, et al., No. 03-21296-CIV-MORENO/SIMONTON, United States District Court, Southern District of Florida (2007) (declaration in opposition to settlement)

Feuerabend v. UST, Inc., Case No. 02-CV-7124, Wisconsin Circuit Court for Milwaukee County (2007) (affidavit on fees and settlement; testimony at fairness hearing)

White v. Experian Information Solutions, Inc., Case No. 05-cv-1070, United States District Court for the Central District of California (2007) (declaration on fairness of settlement and fee award)

In re Trans Union Corp. Privacy Litigation, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

Hoffman v. American Express, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

In re Pet Foods Products Liability Litigation, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (2008) (declaration on attorneys' fees)

Hensley v. Computer Sciences Corp., No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

Chivers v. State Farm Fire & Casualty Co., NO.: CV-2004-294-3, Circuit Court of Miller County, Arkansas (2008) (affidavit on certification)

EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009); second supplemental declaration (2010)

Tucker v. Scrushy, et al., Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

In Re: 2007 Wildfire Class Litigation, Master Case No. 2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

In re: Columbia Hospital for Women Medical Center, Inc., Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

In re Vioxx Products Liability Litigation, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

State of Missouri v. SBC Communications, Inc., No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

Alexander v. Nationwide Mutual Insurance Co., No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

Peterman v. North American Company for Life and Health Insurance, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (2009) (declaration on fees)

Holman v. Student Loan Xpress, Inc., Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (2009) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase, No. 09-00686 (Southern District of New York) (2010) (declaration on class certification)

Polion v. Wal-Mart Stores, Inc., No. 01-03645 (Superior Court of Massachusetts, Commonwealth of Massachusetts) (2010) (declaration on fees; supplemental declaration on fees and motion to strike counsel)

In re MoneyGram International, Inc. Securities Litigation, No. 08-883 (DSD/JJG), United States District Court, District of Minnesota (2010) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-00686 (SAS) (DF), United States District Court for the Southern District of New York (2010) (declaration and deposition on certification)

Coffey v. Freeport-McMoran Copper & Gold, Inc., No. CJ-2008-68, District Court of Kay County, State of Oklahoma (2010) (affidavit on certification)

In Re Puerto Rican Cabotage Antitrust Litigation MDL Docket No. 3:08-md-1960 (DRD), United States District Court for the District of Puerto Rico (2010) (declaration on fees)

In re XTO Energy Shareholder Class Action Litigation, No. 352-242403-09, District Court of Tarrant County, Texas, 352nd Judicial District (2010) (affidavit on fees)

The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon, Civil Action No. 09-Cv-06273, Southern District of New York (2011) (declaration on certification)

Iorio v. Asset Marketing Systems, Inc., Case No.: 05-CV-0633-JLS (CAB), Southern District of California (2011) (declaration in fees)

Villaflor v. Equifax Information Services, LLC, Case No.: 3:09-cv-00329-MMC, Northern District of California (2011) (declaration on fees)

Feely v. Allstate Insurance Company, Case No. CV-2004-294-3A, Circuit Court of Miller County, Arkansas (2011) (affidavit on settlement and fees)

Keegan v. American Honda Motor Co., Inc., Case Number: 2:10-cv-09508-MMM-AJW, United States District Court for the Central District of California (2011) (declaration on certification)

Compusource Oklahoma v. BNY Mellon, N.A., Case No: CIV 08-469-KEW, United States District Court for the Eastern District of Oklahoma (2011) (declaration on certification)

ABN Amro Bank v. Dinallo, Index No.: 601846/09 (New York State Supreme Court) (declaration and deposition on corporate restructuring/administrative law issue)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of America case; declaration and supplemental declaration on fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of Oklahoma case; declaration on fairness of settlement and fees)

In re Cell Therapeutics Inc. Securities Litigation, Master Docket No. C10-414 MJP, United States District Court for the Western District of Washington (2012) (declaration on fees)

## Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

## Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

## Languages

Reading knowledge of Spanish, French, and Italian.

## Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, 1989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (1989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 261 (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases 199 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program l987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson:  Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson:  Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors:  Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case:  Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case:  Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case:  What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen:  Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)