# EXHIBIT 2

**IN UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | MDL NO. 2179<br><br>SECTION:  J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| **Kip Plaisance *et al.*, individually and on behalf of the putative Medical Benefits Settlement Class,**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**BP Exploration & Production Inc; BP America Production Company; and BP p.l.c.,**<br><br>       **Defendants.** | No. 12-cv-968<br><br>SECTION:  J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

<u>**DECLARATION OF JOHN C. COFFEE, JR.**</u>

JOHN C. COFFEE, JR. declares as follows:

I. <u>INTRODUCTION</u>

1.       This declaration focuses on, and is limited to, one central question:  Can the proposed class specified in the "Deepwater Horizon Medical Benefits Class Action Settlement Agreement," dated April 18, 2012 and amended May 1, 2012 (the "Medical Benefits Settlement Agreement"), be certified as a class action against the BP Parties (collectively, BP Exploration & Production Inc. and BP America Production Company)? I am also submitting another declaration, of even date herewith, as an expert witness in connection with the proposed certification of a class action with respect to the "Deepwater Horizon Economic and Property Damages Settlement Agreement," dated April 18, 2012 and amended May 2, 2012 (the "Economic Loss and Property Damages Settlement Agreement") involving the same defendants.  These two declarations are, however, substantially different because the issues are substantially different, as discussed below.  My background, experience, and qualifications relevant to the opinions expressed in this declaration are set forth in Exhibit A hereto.

2.       In overview, this Medical Benefits Settlement Agreement provides compensation for acute and chronic physical conditions that are likely to arise from short-term exposure to oil, oil dispersants, or, in certain limited cases, to heat.  Its most distinctive feature is its limited scope.  More serious and more idiosyncratic injuries that might be caused by trauma, exposure or toxic reactions — e.g., heart attacks, strokes, cancer, broken bones — are deliberately not compensated in order both (1) to create a cohesive class whose members have similar injuries (in terms of both the directness of

their causation and their market value as legal claims) and (2) to define a class in which the causation is straightforward.[1]  This gives class members the best of both worlds: immediate compensation without releasing the BP Parties from potential liability for injuries related to long-term exposure, which class members can pursue through individual litigation without having to risk the expiration of the statute of limitations.[2]

       3.       The need to limit the scope of the Medical Benefits class arises because of the special legal problems that the certification of a class action covering personal injuries poses.  Serious as these problems are, I believe the Medical Benefits Settlement Agreement clearly overcomes them.  These obstacles are largely set forth in the Fifth Circuit's well-known decision in Castano v. American Tobacco Company, 84 F.3d 734 (5th Cir. 1996).  In that case, the Fifth Circuit faced "what may be the largest class action ever attempted in federal court"[3]:  namely, a class consisting of "all nicotine-dependent persons in the United States . . . who have purchased and smoked cigarettes manufactured by the defendants" and certain of their relatives.[4]  Beyond simply the size of this proposed class, the Fifth Circuit emphasized that the high level of factual variations within the class precluded certification:

---

[1] In referring to some injuries as "idiosyncratic," I do not mean to imply that these claims are implausible, but only that they involve more complicated and uncertain chains of causation and are relatively few in number.  Such low frequency events — in effect outliers from the mainstream of conditions and injuries covered by this class action — cannot efficiently be consolidated within this class action without some loss of cohesion.  They are also in my judgment too dissimilar to constitute a special subclass.

[2] Under Section VIII ("Back-End Litigation Option for Later-Manifested Physical Conditions"), all class members receive the right to sue for a "Later-Manifested Physical Condition," and certain defenses (including the statute of limitations) are waived by the BP Parties.  See Section VIII. G. The class members may not, however, seek punitive damages in any such proceeding.

[3] 84 F.3d at 737.

[4] Id. The relatives included "spouses, children, relatives and 'significant others' of these nicotine-dependant cigarette smokers as their heirs or survivors." Id.

> "The class members were exposed to nicotine through
> different products, for different amounts of time, and over
> different time periods.  Each class member's knowledge
> about the effects of smoking differs, and each plaintiff
> began smoking for different reasons.  Each of these factual
> differences impacts the application of legal rules such as
> causation, reliance, comparative fault, and other affirmative
> defenses."[5]

Overshadowing even these differences was the next factor that the <u>Castano</u> court emphasized:

> "Variations in state law magnify the differences."[6]

As the court noted, significant variations existed among the states in terms of their requirements for proving a fraud claim.  Next, the <u>Castano</u> panel turned to the Fed. R. Civ. P. 23's requirement of "manageability" and observed (with complete accuracy) that the district court was "faced with managing a novel claim involving eight causes of action, multiple jurisdictions, millions of plaintiffs, eight defendants, and over fifty years of alleged wrongful conduct."[7]

      4.      Having concluded that the variations in state law and factual differences were likely insurmountable barriers to certification, the <u>Castano</u> court then proceeded to what it described as the "district court's second error"[8]:  namely, "that it failed to

---

[5] *Id.* at 743.

[6] *Id.*

[7] *Id.* at 744.

[8] *Id.* at 744.

consider how the plaintiffs' addiction claims would be tried, individually or on a class basis."[9]  Here, it said:

> "Absent knowledge of how addiction-as-injury cases would actually be tried, however, it was impossible for the court to know whether the common issues would be a 'significant' portion of the individual trials."[10]

    5.    Although these were the principal problems stressed in <u>Castano</u>, it is clear that the <u>Castano</u> court was at least as skeptical of other problems surrounding the proposed class.  Much of its discussion (echoing a similar theme first stated by the Seventh Circuit in <u>In re Rhone-Poulenc Rorer, Inc.</u>, 51 F.3d 1293 (7th Cir. 1995)), suggests that the Court was unwilling to certify an "immature" mass tort class action where the underlying theory of liability was novel and had not been successfully tested or applied in individual cases.  Thus, it said:

> "Our specific concern is that a mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by rule 23.  This is because certification of an immature tort results in a higher than normal risk that the class action may not be superior to individual adjudication."[11]

It then generalized (accurately, I believe) in a footnote that:

---

[9] *Id.*
[10] *Id.* at 745.
[11] *Id.* at 747.

"As modern mass tort litigation has evolved, courts have

been willing to certify simple single disaster mass torts, . . .

but have been hesitant to certify more complex mass

torts. . . ."[12]

6.　　Finally, because the district court in <u>Castano</u> had not certified the class on the issue of proximate causation (postponing that issue for individual trials),[13] the Fifth Circuit did not even have to face this issue directly.  Nonetheless, it faced it indirectly, rejecting the district court's approval of partial certification.  The "proper interpretation" of the rule authorizing partial certification, it said, is "that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3). . . ."[14]

7.　　To sum up, <u>Castano</u> raised the following significant obstacles to a multi-state class action based on a mass tort:

(1) Any significant variation in state law is likely to be fatal to certification;

(2) Although single event disasters can be litigated as a class action, more complicated cases involving multiple products, diverse injuries, multiple defendants, lengthy class periods (and the class period stretched back for decades in <u>Castano</u>), or extended exposures could not be certified;

(3) Cases involving an "immature" tort, which had not been tested in individual trials, should also not be certified;

---

[12] *Id.*

[13] *Id.* at 740.

[14] *Id.* at 745n.21.

(4) All significant elements of the cause of action must be susceptible to certification, without postponing some to subsequent individual trials through partial certification.

8.      High as these barriers may seem, they are not insurmountable.  Indeed, at the same time as <u>Castano</u> announced the foregoing requirements, it also recognized that "the most compelling rationale for finding superiority in a class action" was the "existence of a negative value suit."[15]  Although the <u>Castano</u> court noted that "negative value" claims were "missing in this case,"[16] that factor is very much present here.

9.      Against this backdrop of greater obstacles to the certification of a mass tort settlement class action, this declaration will show that this proposed class action relating to acute and chronic conditions arising from the Deepwater Horizon Incident[17] overcomes these obstacles and satisfies the standards for class certification because:

(a) Variations in state or other law are not applicable to this case, as it is governed in all relevant respects by general maritime law;

(b) This is a classic "single-event" disaster of the kind frequently certified; this settlement involves a single related defendant, a short duration,  modest economic injuries that are similar in character, a "straightforward" chain of causation that requires these injuries to have manifested themselves immediately after exposure to oil, dispersants, and/or heat, and a common course of conduct by the defendant; thus, the proposed class action avoids the difficulties in other mass tort class actions that have involved extended exposure, long latency periods, and greater uncertainty as to causation;

---

[15] *Id.* at 748.

[16] *Id.*

[17] The term "Deepwater Horizon Incident" is defined in Section II. X of the Medical Benefits Settlement Agreement and is used herein for purposes of consistency.

(c) This is a "mature" mass tort that has been frequently litigated in individual cases in state and federal court, and the parties could estimate the actual settlement value of claims based on litigated outcomes;

(d) This is a largely "negative value" class action which presents a "compelling rationale" for certification;

(e) The chain of causation for the conditions and injuries covered by this settlement is "straightforward" and hence satisfies the standard for proximate causation that the Fifth Circuit has specified;[18] and

(f) This is a cohesive class of similarly situated claimants, thus satisfying the key standards specified by the Supreme Court in Amchem Products , Inc. v. Windsor, 521 U.S. 591, 623 (1997).[19]

10.    In short, this case could scarcely be more different from Castano.  Nor did that happen accidently.  Rather, the settling parties have cautiously and conservatively structured this settlement to fit within the guidelines laid down by Castano, Amchem, and other major class action decisions.  In particular, the class definition has been kept narrow so that no class member can receive an award of compensation unless that class member had manifested very specifically described injuries in the immediate aftermath of the class members' exposure.  Because these injuries are closely associated with short-term exposure to oil and/or oil-dispersing chemicals or to heat and fatigue experienced in

---

[18] The "straightforward" causation test was most clearly specified in Steering Committee v. Exxon Mobil Corp., 461 F.3d 598, 603 (5th Cir. 2006) (citing Sala v. Nat'l Railroad Passenger Corp., 120 F.R.D. 494 (E.D. Pa. 1988)).  It is also apparent in Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620 (5th Cir. 1999), and Watson v. Shell Oil Co., 979 F.2d 1014, 1022–23 (5th Cir. 1992).

[19] In Amchem Products, the Court stressed that the focus of the predominance requirement is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Id. at 623.

connection with "response activities" (as the medical experts for both sides have testified in their declarations), the manifestations of such conditions within a very short time period (basically 24 to 72 hours) after exposure presents a "straightforward" theory of causation that the Fifth Circuit has indicated that it would accept in single-event disaster cases. These tight criteria for recovery, plus the geographical limitations on class membership, distinguish this case from the sprawling nationwide class actions involving long-term exposure to toxic substances that <u>Castano</u>, <u>Amchem</u>, and other decisions have all rejected. Those more sprawling class actions involve lengthy class periods, multiple products, a variety of types of alleged misconduct, a host of different injuries, long latency periods, and broad geographic areas. Here, in contrast, the limited group who may have suffered more serious injuries that they attributed to the Deepwater Horizon Incident (e.g., heart attack, cancer, stroke or serious trauma injuries) will not be eligible to recover compensation under the Medical Benefits Settlement Agreement for such injuries. That was deliberate and necessary in order to create a cohesive class of persons with similar injuries and experiences, and the cohesiveness of the class is the ultimate criteria for certification under <u>Amchem</u>.[20] These individuals can, of course, pursue their own claims individually. But this class is narrowly defined precisely in order to achieve the cohesiveness within the class that the Supreme Court required in <u>Amchem</u>.

11.     One last preliminary comment seems important. Clearly driving the outcome in <u>Castano</u> was the Fifth Circuit's strong sense that class actions (particularly in the mass tort context) can and do have an extortionate impact on defendants. Thus, the <u>Castano</u> decision emphasized that "certification dramatically affects the stakes for

---

[20] *Id.*

defendants,"[21] "magnifies and strengthens the number of unmeritorious claims,"[22] and

"makes it more likely that a defendant will be found liable and results in significantly

higher damage awards."[23] Above all, it said:

> "[C]lass certification creates insurmountable pressure on
>
> defendants to settle, whereas individual trials would not."[24]

12.    This settlement arises, however, in a much more benign context in which

there was no prospect for extortion. Indeed, before this class was even filed, the BP

Parties had created the Deepwater Horizon Oil Spill Trust (the "Trust"), committing as

much as $20 billion to enable BP to resolve claims from the Deepwater Horizon

Incident.[25] This early acceptance of responsibility and commitment to claim resolution is

a unique fact not associated with any other class action of which I am aware and is

inconsistent with any scenario under which the BP Parties are settling only because

plaintiffs are figuratively "holding a gun" to their heads.

13.    The contrast with <u>Castano</u> could also not be sharper. In <u>Castano</u>, the class

of nicotine-addicted persons was in the range of 40 million persons, and their claims

could have easily bankrupted any tobacco defendant. Here, I am advised that the total

number of all the residents of Zone A and Zone B plus the number of Clean-Up Workers

is in the neighborhood of 200,000 (and presumably not all of these persons will file

claims). Even if they do, the monetary value of these claims can easily be borne by the

BP Parties. Not only is the possibility of extortion thus minimized, but the BP Parties

---

[21] 84 F.3d at 746.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] See Annual Report and Form 20-F of BP p.l.c. for the fiscal year ended December 31, 2011 at
p. 168 (describing formation of the Trust).

have accepted a settlement under which their liability is uncapped.  Again, all this is

inconsistent with any extortion scenario because such a scenario assumes that defendants

agreed to a settlement because they feared greater liability.

14.     In the last analysis, the BP Parties have entered this settlement and

accepted uncapped liability under the Medical Benefits Settlement Agreement, not

because they were forced to by the "extortionate" threat of class certification, but because

they believed it to be in the best interests of their company to resolve the claims arising

from the Deepwater Horizon Incident without extended litigation.  The Medical Benefits

Settlement Agreement structures the allocation of this settlement, specifies the

documentation necessary to support a claim, restricts the possibility of windfalls by

requiring adequate documentation, pays compensation at or above the market rates

applicable to similar injuries in individual litigation, and provides additional non-

monetary benefits that could not be obtained in individual litigation.  In so doing, it easily

satisfies the "superiority" test of Fed. R. Civ. P. Rule 23 by accomplishing much that

individual litigation could not.  Nothing quite like this case has been seen before — or

may be seen again.  All these factors demonstrate the "superiority" of a class resolution

over repetitive individual litigation for small amounts (which many class members might

be unable or unwilling to undertake and which would burden the courts).

## II. A CLOSER LOOK AT THE MEDICAL BENEFITS SETTLEMENT.

15.     As already noted, this class action provides compensation for acute and

chronic physical conditions that are likely to arise from short-term exposure to oil and/or

oil dispersants.  Class members also receive periodic medical consultations, which

involves an initial comprehensive medical exam and follow-up exams every three years

for a 21 year period.  Further, the BP Parties will fund the Gulf Region Health Outreach
Program, which will consist of community-based programs designed to improve physical
and mental health in the coastal areas most impacted by the Deepwater Horizon Incident.
Finally, class members who later develop more serious injuries that they attribute to the
Deepwater Horizon Incident are provided with a "Back-End Litigation Option for Later-
Manifested Physical Conditions" ("BELO") under Section VIII of the Medical Benefits
Settlement Agreement under which they can pursue individual litigation without regard
to the statute of limitations and without having to return or waive payments under this
settlement (although they do waive any claim to punitive damages).

16.     Class members fall into three categories:  (1) Clean-Up Workers who
participated in work to recover, skim or disperse the oil or in certain other "response
activities" on land or on water;[26] (2) residents in Zone A (who resided in Zone A for 60
days or more between April 20, 2010 and September 30, 2010) and who have a specified
physical condition; and (3) residents in Zone B (who resided in Zone B for at least 60
days between April 20, 2010 and December 31, 2010).  Zone A consists of carefully
defined beach front areas within the East–West boundaries touched by oil from the
Deepwater Horizon Incident, while Zone B consists of more sparsely settled "wetlands"
that were also impacted (but in which the oil generally persisted longer).  In order to
recover compensation, members of each category must have already manifested a
specified physical condition or one or more associated symptoms within 24 to 72 hours
after either exposure to oil or dispersants or (for certain specific heat-related conditions)

---

[26] These terms are defined in Section II of the Medical Benefits Settlement Agreement.

participation in "response activities."[27]  The fact that Clean-Up Workers and residents of

Zone B are not required to have a specified physical condition to be within the class

definition is not an exception to this rule that compensation will only be awarded for

actual injury, but rather reflects a decision to allow both groups (Clean-Up Workers and

Zone B residents) to be eligible for the Periodic Medical Consultation Program

("PMCP"), without the need to prove a currently manifested compensable condition.  In

the case of Clean-Up Workers, the rationale here is essentially they generally came into

closer contact (and for a longer duration) with oil and dispersants in connection with their

participation in "response activities" than did Zone A residents.  In the case of Zone B

residents, they also generally experienced longer exposures because of the greater

difficulties in removing oil from wetlands.[28]

---

[27] Acute neurological, neurophysical, and odor-related conditions, acute and chronic ocular
conditions, and Reactive Airways Dysfunction Syndrome must have manifested within 24 hours
after exposure.  Certain acute respiratory conditions, epistaxis (nosebleeding) and acute throat
irritation must have manifested within 48 hours, and acute or chronic dermal problems, other
acute respiratory conditions and chronic rhinosinusitis must have initially manifested within 72
hours after exposure.  Finally, Clean-Up Workers must have manifested a heat-related condition
during or immediately following the shift in which they became ill.  Dr. Jessica Herzstein, the
medical expert retained by the BP Parties, has opined in her declaration that "[t]hese time frames
are appropriate and have a scientific basis."  See Declaration of Dr. Jessica Herzstein at paragraph
20.
[28] Thus, Dr. Michael R. Harbut, a medical expert offered by plaintiffs, testifies in his declaration
that "the circumstances of exposure of residents in Zone B and Clean-Up Workers may be
associated with an elevated incidence of petroleum-associated disease . . . [because] . . . the oil in
Zone B could not be removed, as it was from the beaches, and it would, therefore, largely have to
dissipate through natural attenuation."  This same conclusion follows for Clean-Up Workers, he
added, because "much of their work was involved in oil-spill remediation. . . ."  See Declaration
of Dr. Michael R. Harbut at paragraph 42.
     In addition, it is also true that Zone B is more sparsely settled and has a lower level of
existing medical facilities and resources.  Thus, participation in the PMCP may be particularly
important and beneficial to Zone B residents.

17.     The determination of which acute and chronic conditions to compensate will be discussed at greater length later, but it is an accurate generalization to describe these acute and chronic conditions as dominated by (1) ocular, respiratory, neurological or dermal symptoms or conditions that could reasonably arise from exposure to oil and/or dispersants, or (2) heat-related symptoms that could reasonably be attributed to participation as a Clean-Up Worker in "response activities."  In all these cases, as later discussed, the causation is "straightforward."

18.     This capsule description will be supplemented later, but it suffices here to support this generalization:  this class consists of small claims that would yield modest compensation in individual litigation and, in most cases, would not be attractive to a plaintiff's attorney compensated on a contingent fee basis.  Indeed, the maximum lump sum compensation for an "acute condition" (absent special enhancers) is $12,350 (and this is available to Clean-up Workers only).  The maximum lump sum compensation for a "chronic condition" is $60,700 for a Clean-up Worker and $36,950 for a resident (subject to special enhancers for hospitalization and related hospital costs).  Most symptoms and conditions will receive far lower lump sum recoveries, ranging in the case of acute conditions (which are likely to be more common than chronic conditions) from $900 to $12,350.  High end payments will also require more extensive documentation and medical records, and thus will be more difficult to establish.  As a result, this class action differs radically from famous mass tort class actions involving asbestos, tobacco, and other toxic torts in which many class members held high value claims.

19.     Against this backdrop, the following legal conclusions come into clearer focus:

A.  This Class Action is Based on, and United By, A Single Body of Law:
General Maritime Law.

20.    This Court has so held — twice.  First, in its decision on the B1 Master
Complaint, this Court held that maritime law applied to the B1 claims to the exclusion of
state law.  See In re Oil Spill by the Rig Deepwater Horizon in the Gulf of Mexico, on
April 10, 2010, 808 F. Supp. 2d 943 (E.D. La. 2011).  Then, in its later decision on the
B3 Master Complaint, it similarly found that claims under state law for negligence,
negligence per se, products liability, nuisance and battery were preempted by general
maritime law.  See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico, on April 20, 2010, 2011 WL 4575696 (E.D. La. September 30, 2011).

21.    As a practical matter, the only substantive difference between the law
applicable to this case and the law applicable to the B1 Master Complaint under this
Court's decision is that the Oil Pollution Act ("OPA") does not apply to the personal
injury claims in this case.  Still, in both cases, the possibility of variations in state law has
been eliminated by the preemption of state law by general maritime law.  Variations in
many states law were, of course, the first factor that the Castano court relied upon and
most heavily emphasized in denying class certification in that case.

B.  This Is A Classic "Single-Event" Disaster of the Kind That Has Frequently
Been Certified.

22.    It does not overstate to say that this case is the polar opposite of Castano.
In Castano, the plaintiffs sued the entire industry of tobacco companies.  Not only were
there multiple defendants, but each had marketed multiple brands of cigarettes and over
different periods, making different representations to different audiences.  Each member

-15-

of the class may have smoked different brands at different times and relied (or not relied) on different representations.  The class period in Castano also stretched back for decades. Here, in contrast, there is a single settling defendant (the BP Parties, who are clearly affiliated); the conduct at issue occurred on or about April 20, 2010 and in a very narrow window of time thereafter.  Instead of multiple products and brands, this case is based upon the release of oil and the use of oil dispersants.  Moreover, because this was probably the most carefully monitored and measured oil spill in history, it was possible to plot with relative precision where the oil went.  Much data also exists about the experience of Clean-Up Workers from a special database (known as the "Medical Encounters Database" or "MED") that the BP Parties developed from contemporaneous records of visits by Clean-Up Workers to medic stations.[29]  This database provides a unique record of the types of symptoms, injuries and conditions were being reported to medical personnel at the various medic stations and, as will be seen, documents the close temporal association between exposure and the manifestation of the symptoms and conditions listed on the Specified Physical Conditions Matrix (which specifies the acute and chronic conditions for which compensation can be awarded to class members).

23.     Equally important, single event disasters are class actions with which courts (state and federal) have had much experience.  Often, these cases involve train derailments or oil refinery explosions, which involve the release of contaminants or a toxic gas (often chlorine) or a smoky fire that forces evacuations and causes injuries.

---

[29] Conditions and symptoms reported by Clean-Up Workers at the medic stations they visited if they became ill or were injured during "response activities" were generally recorded and subsequently consolidated onto an Excel spreadsheet, where these reports were identified by the most analogous OSHA code and/or a written statement summarizing each Clean-Up Worker's report of his or her condition.  The MED includes entries for approximately 20,000 visits made by 13,000 individuals.  See Declaration of Dr. Jessica Herzstein at paragraph 16.

Massive as the scale of the Deepwater Horizon Incident may have been, it is but an explosion and toxic release incident — writ large.

24.     Thus, it is useful to begin by examining the facts alleged, and the scope of the class certified, in several recent Fifth Circuit cases that essentially involved "single event" cases.  Within the Fifth Circuit, <u>Mullen v. Treasure Chest Casino, LLC</u>, 186 F.3d 620 (5th Cir. 1999), is particularly relevant because it certified a class of casino workers alleging personal injuries (chiefly respiratory conditions) that resulted from excessive second-hand smoke in their workplace that was caused by a defective ventilation system. The <u>Mullen</u> court distinguished <u>Castano</u>, first, because it saw no complex choice of law problems and, second, because it believed that expert medical testimony at trial would "focus on excessive second-hand smoke as both the effect of the defective ventilation system and the cause of the putative class members' respiratory problems."[30]  The common injury shared by class members and the common causal connection led the <u>Mullen</u> court to find both that the class was cohesive and that the "superiority" requirement of Rule 23(b)(3) had been satisfied on these facts.  No conceptual difference (other than the sheer size of the Deepwater Horizon Incident) is apparent between a defective ventilation system causing respiratory injuries and an oil spill causing respiratory, ocular, neurological and dermal injuries.

25.     Oil spills have also frequently resulted in class certifications.  A recent example in this same judicial district is <u>Turner v. Murphy Oil USA, Inc.</u>, 234 F.R.D. 597 (E.D. La. 2006).  Relying on <u>Mullen</u> and distinguishing <u>Castano</u>, the district court certified the class and permitted the plaintiff home owners and businesses to sue the

_____

[30] 186 F.3d at 627.

defendant refinery, citing two principal justifications: (1) "the same substantive law will apply to all Plaintiffs' claims in these cases,"[31] and (2) "Plaintiffs' claims share large areas of fact in common."[32]  Specifically, it noted both that "the same natural event, Hurricane Katrina" was at stage center and that:

> "Plaintiffs' claims all have in common the circumstances surrounding the leak in Tank 250-2 — how the leak physically occurred, what steps Murphy took or might have taken to contain the oil, and what steps Murphy took or might have taken to prevent the leak."[33]

Substitute the words "Deepwater Horizon" for "Tank 250-2" in Turner, and you have the predominant issues in the instant case:  what steps did or could the BP Parties have taken to prevent and contain the oil spill?

      26.    Louisiana state courts have also recently certified class actions in oil spill cases.  For example, in Arabie v. CITGO Petroleum Corp., 89 So.3d. 307 (La. 2012), the Louisiana Supreme Court this year upheld a trial verdict for plaintiffs in such a class action (but rejected an award of punitive damages).  See also Doerr v. Mobil Oil Corporation, 935 So.2d 231 (La. Ct. App. 2006) (awarding lump sum awards to parish residents in a class action for discharge of oil, grease, and other contaminants by a refinery, with awards covering both minor physical injuries and emotional distress and inconvenience).  Such awards for minor physical injuries and exposure do not appear to be uncommon in state court class actions.

---

[31] 234 F.R. D. at 606
[32] Id.
[33] Id.

27.     Federal courts have also recurrently certified class actions covering personal injuries in functionally similar cases in which an explosion or derailment caused the release of toxic emissions into the air.  For example, in <u>Mehl v. Canadian Pacific Railway, Limited</u>, 227 F.R.D. 505 (D. N.D. 2005), a train derailment triggered the release of an anhydrous ammonia cloud into the air, with resulting minor to moderate injuries. The district court certified a class for litigation purposes consisting of:

> "[A]ll persons who were in the anhydrous ammonia cloud in and around the city of Minot, North Dakota, and who were adversely affected by the release of the hazardous chemical on January 18, 2002, and who have sustained property damages, property value diminution, personal injuries, emotional, mental, or economic damages, or inconvenience as a result of the derailment and hazardous chemical release."[34]

Such a class definition is far broader and less carefully drawn than the two distinct class definitions in the medical benefits and economic loss settlements before this Court.  Still, <u>Mehl</u> again illustrates that in "single event" disaster classes, the common core of operative facts enables courts to find predominance.

28.     A particularly relevant example of a federal court certifying a class covering personal injuries caused by the release of toxic chemicals is <u>In re Graniteville Train Derailment</u>, C.A. No. 1:05–115–NBS (D.S.C. August 8, 2005).  In this case, the derailment of a Norfolk Southern train on January 6, 2005 resulted in the release of

---

[34] 227 F.R.D. at 520.

highly toxic chlorine gas and forced the evacuation of much of the town of Graniteville, South Carolina.  Two separate settlement classes were certified:  one for minor injuries, including the costs associated with evacuation, and the other for those more seriously injured who required medical treatment or hospitalization.  Again, the single event disaster facilitated the finding of proximate causation.

29.   From a broader perspective, single-event disaster cases were probably among the first mass tort class actions to be certified.  See, e.g., Coburn v. 4–R Corp., 77. F.R.D. 43 (E.D. Ky. 1977) (nightclub fire with numerous deaths and serious injuries); Am. Trading & Prod. Corp.v. Fischbach & Moore, Inc.,47 F.R.D. 155 (N.D. Ill. 1969) (fire at convention hall during 1967 National Housewares Convention).  But even these early cases involving fires posed more difficult problems than the instant class does because a wide variation in the severity and types of injuries often characterized these cases (whereas the instant class action was narrowly defined to minimize such variation). After these early certification decisions involving single-event fires, the next step in the development of mass disaster class actions was probably train collisions and derailments and larger scale explosions.  Cf. Sala v. Nat'l Railroad Passenger Co., 120 F.R.D. 494 (E.D. Pa. 1988) (train derailment); Watson v. Shell Oil Co., 979 F.2d 1014, 1022–23 (5th Cir. 1992) (refinery explosion).

30.   Thereafter, in the 1980s and early 1990s, some federal courts began to certify class actions in which there had been a leak or accident that resulted in the release of toxic waste or chemicals, causing larger-scale exposure and/or longer-term contamination.  See Sterling v. Velsicol Chemical Corp., 855 F.2d 1188 (6th Cir. 1988) (water contamination); Wehner v. Syntex Corp., 117 F.R.D. 641, 645 (N.D. Cal. 1987

(dioxin contamination)). Eventually, some courts certified localized geographic classes in which radioactive waste or radioactive emissions were alleged to have caused injury. See In re Three Mile Island Litig., 87 F.R.D. 433 (M.D. Pa. 1980); Boggs v. Divested Atomic Corp., 141 F.R.D. 58 (S.D. Ohio 1991); Cook v. Rockwell Intl. Corp., 151 F.R.D. 378, 388–89 (D. Colo. 1993).

31.     Arguably, not all single-event disasters would be certifiable today under the Fifth Circuit's more demanding standards that were announced in Steering Comm. v. Exxon Mobil Corp., 461 F.3d 598 (5th Cir. 2006) (denying class certification in case involving oil leak that in turn resulted in smoky fire causing mass exposure to smoke). In Exxon Mobil, the Fifth Circuit rejected a proposed mass exposure class, where causation was uncertain and "each individual plaintiff suffered different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result."[35] The Court also found unacceptable the fact that many plaintiffs sought compensatory "damages for emotional and other intangible injuries,"[36] which in its view required subjective determinations and individualized damage computations.

32.     But Exxon Mobil should not be overread. That Court made clear that it approved the outcomes in both Watson and Sala, particularly the latter case in which it said the trial court had "determined that the claims in that case involved injuries sustained from a single cause."[37] Because of this fact, it concluded:

---

[35] 461 F.3d at 602.
[36] Id. at 602.
[37] Id. at 603.

"Thus, causation could be adjudicated on a class-wide

basis."[38]

Exxon Mobil thus draws a line between cases in which the single event has a clear chain

of causation versus those in which "the causal mechanism for plaintiff's injuries . . . is

not so straightforward."[39]  In the instant case, no claims for "fear of exposure to toxic

substances"[40] are recognized or compensated, and, as later discussed, the "causal

mechanism" is "straightforward," as unique data exists in this case (and virtually no

other) showing a large number of persons — both Clean-Up Workers and residents —

reporting the symptoms and conditions compensated by this Medical Benefits Settlement

Agreement within hours of exposure to oil and oil dispersants.

33.    Collectively, the Fifth Circuit's decisions in Exxon Mobil, Mullen v.

Treasure Chest Casino and Watson v. Shell Oil Corp., show that the Fifth Circuit accepts

certification of "single event" disaster cases where (1) there is little variation in the

applicable law, (2) the causation is "straightforward"; and (3) the injuries covered are

sufficiently similar to create a cohesive class and involve more than the mere threat of

exposure or fear of future injury.  Essentially, those three conditions describe this case.

C.    This Is A "Mature" Tort That Has Been Much Litigated and Given Rise to
Well Recognized Compensation Ranges.

34.    As the foregoing discussion has implicitly revealed, oil spill cases are

frequently litigated.  For example, in a case decided this year by the Louisiana Supreme

Court, Arabie v. CITGO Petroleum Corp., 89 So.3d 307 (La. 2012), the trial court held a

_____

[38] *Id.*
[39] *Id.*
[40] *Id.*

two week bench trial in an oil spill case involving some 21 million gallons of waste oil.

Because CITGO had stipulated to its own fault, the only issue was damages, and the

decision discusses a considerable body of law in Louisiana on similar oil spill and

noxious fume release cases.  Ultimately, compensatory damages were awarded, but an

award of punitive damages was reversed.  But the extensive case law discussed in this

opinion shows that oil spills and chemical releases are the stuff of everyday litigation in

oil refining states.

   35. Further, the testimony heard by the trial court in <u>Arabie</u> sounds much like

what would have been heard in this case had it gone to trial.  Specifically, the Louisiana

Supreme Court noted:

> "Plaintiffs all testified that they experienced
>
> contemporaneous or near-contemporaneous symptoms of
>
> eye irritation, nausea, nasal and throat irritation, and
>
> difficulty in breathing when exposed to the odors and
>
> fumes from the slop oil."[41]

Medical and other experts in toxicology and epidemiology testified in that case that the

"reported symptoms were consistent with exposure to toxic chemicals contained in the

slop oil."[42]

   36. Other Louisiana cases involving recoveries for minor injuries from an oil

spill or toxic gas release include:  <u>Adams v. Marathon Oil Company</u>, 688 So. 2d 75 (La.

App. 1997); <u>Rivera v. United Gas Pipeline Co.</u>, 697 So. 2d 327 (La Ct. App. 1997);

<u>Doerr v. Mobil Oil Corp.</u> 935 So. 2d 231 (La Ct. App. 2006); and <u>Howard v. Union</u>

---

[41] 89 So. 3d at 321.

[42] *Id.* at 321–22.

-23-

Carbide Corp., 21 So. 3d 1084 (La. Ct. App. 2009).  As next discussed, the recoveries in these cases have been modest, but such claims are frequently litigated (often for damages for emotional distress and fear of future injury that could not be obtained in the Fifth Circuit).

37.      In sum, oil spill and toxic release litigation is in every respect different from the novel "nicotine addiction" theory in Castano.  These cases are small, recurring and relatively common, and tort liability for oil spills is very established.

D.  The Claims In This Case Are Largely "Negative Value" Claims That Justify Use of The Class Action.

38.      Recoveries in cases involving oil spills or toxic chemical discharges in the Gulf Coast area tend to be extremely modest.  Let us consider some recent examples:

> 1.  In Howard v. Union Carbide Corp., 21 So. 3d 1084 (La. Ct. App. 2009), plaintiffs in a chemical release case sued based on "minor, temporary, irritant symptoms" and received recoveries between $750 to $3,500.   Nonetheless, defendant Union Carbide sought and obtained certiorari to the Supreme Court of Louisiana to challenge these recoveries as excessive.  The Louisiana Supreme Court reduced the awards to between $100 and $500.

> 2.  In Rivera v. United Gas Pipeline Co., 697 So. 2d 327 (La. Ct. App. 1997), the jury awarded compensatory damages of between $500 and $3,000 in a case involving a large natural gas release from a damaged pipeline, but the jury awarded recoveries to only 5 of the 22 bellwether plaintiffs, and the appellate court upheld the low

awards against the plaintiffs' appeal.  In this same appeal, 16 of 24 bellwether plaintiffs in a different natural gas release that had been consolidated for appeal received awards between only $100 and $3,000.

3.  In <u>Adams v. Marathon Oil Company</u>, 688 So. 2d 75 (La. Ct. App. 1997), which involved the release of ethyl mercaptan, an additive to natural gas used for its strong and recognizable odor, the trial court granted judgment in favor of plaintiffs and awarded damages between $0 and $500.  Because only one of the bellwether plaintiffs had been hospitalized (and only briefly in that case), the appellate court rejected plaintiffs' appeal and refused to find the low awards an abuse of discretion.

4.  In <u>Doerr v. Mobil Oil Corp.</u> 935 So. 2d 231 (La. Ct. App. 2006), a class action involving contamination of a parish's water system from defendant's discharge of contaminants, the appellate court did find that the trial court had abused its discretion in not awarding any damages to two plaintiffs who had no physical injuries, and it ordered an award to them of $250 each.  The other plaintiffs, who did have physical injuries or symptoms, received lump sum awards of between $500 and $2,000.  Justifying this result, the appellate court said:

"[I]t is a legitimate concern that the courts

not be bogged down by claims that are

minimal."[43]

5. Some Louisiana cases have awarded more, but the highest recent

recovery for personal injuries in an oil spill appears to be <u>Arabie v.</u>

<u>CITGO Petroleum Corp.</u>, 89 So.3d 307 (La. 2012), in which the

Louisiana Supreme Court upheld compensatory damages of

between $7,000 and $15,000 to those exposed to "slop oil," but it

reversed the awards of punitive damages.

39.    Claims for punitive damages in oil spill and toxic release cases appear to

be rarely successful, at least in cases involving minor injuries, such as those suffered by

class members in the instant case.  The <u>Arabie</u> decision this year by the Louisiana

Supreme Court, which is discussed above, expressly states that punitive damages are

disfavored by Louisiana law and rarely available.[44]  In general, individuals suing in state

courts can expect little compensation for the most common and characteristic injuries that

resulted from the Deepwater Horizon Incident.

40.    Wholly apart from the economic value of the class members' legal claims,

there is an independent reason why these claims are "negative value" claims that could

not be successfully asserted in individual litigation.  Much law in the Fifth Circuit and

elsewhere holds that, in cases involving exposure to an allegedly toxic substance, expert

medical testimony must establish a scientific connection between the exposure and the

illness.  See <u>Moore v. Ashland Chemical, Inc.</u> 151 F.3d 269, 278–79 (5th Cir. 1998);

---

[43] 935 So. 2d at 238.

[44] 89 So.3d at 313–318 (noting state's "general policy against punitive damages").

Allen v. Pennsylvania Engineering Corp., 102 F.3d 194, 199 (5th Cir. 1996); Seaman v. Seacor Marine, LLC, 564 F. Supp. 2d 598, 603 (E.D. La. 2008); Molden v. Georgia Gulf Corp., 465 F. Supp. 2d 606 (M.D. La. 2006).  Such testimony is generally expensive and thus precludes individual cases for smaller amounts.  One need not here attempt to specify the exact cutoff point at which a claim is too small to litigate in order to conclude that much of the class is below that level.

41.     On this basis, the proposed compensatory awards in this case reflect or exceed actual market values in minor injury toxic exposure cases, and, in my judgment, will probably produce both a higher gross recovery and certainly a higher net recovery for class members than individual litigation would because class members will not bear the often high cost of plaintiffs' attorney contingent fees.[45]  Moreover, given the high number of Deepwater Horizon claimants and the likely duration of such litigation, it is highly questionable whether most plaintiffs who have suffered only minor injuries could (1) obtain competent counsel to represent them, or (2) win or resolve their action successfully within a reasonable period.

E.     This Class Has Been Defined and Structured to Award Compensation Only for Injuries That Bear A "Straightforward" Causal Connection to the Deepwater Horizon Incident, Thus Satisfying the Fifth Circuit's Standard for Proximate Causation.

42.     One reason that courts have resisted mass tort class actions is the uncertainty of causation.  An individual may work in an asbestos-laden environment for several years and then thirty years later develop respiratory problems that he (and his

---

[45] I am aware that this Court has entered an order capping individual attorneys' fees at 25%.  See MDL 2179 (Document 6684, dated 6/15/2012).  However had there been no class action, there would have been no occasion for such a capping order, and individual attorneys' contingent fees are often higher than that in mass tort cases.

attorneys) attribute to asbestos.  Tobacco cases provide a similar example, as do silicone gel breast implants.  In individual litigation in these cases, it would be hard to impossible for the plaintiff to prove the causation of the late-developing condition, but in class litigation the individual is submerged within the herd and the defendants may settle out of fear of the risk of astronomic and bankrupting liability being imposed based on a single judge's or jury's decision.  In such cases, not only may weak cases receive excessive compensation, but meritorious cases may be correspondingly undercompensated (at least when, as often happens, the individual fails to opt out) because compensation is based either on the median level of injury or on defendant's maximum ability to pay.  Thus, Castano's skepticism about mass tort class actions is understandable.

43.     But this case is very different.  As Dr. Michael Harbut concisely points out in his declaration regarding the epidemiological evidence:

> "Simply put, petroleum and petroleum-based products have been studied extensively for over 100 years.  Multiple health effects are known and acute health outcomes from exposure to them are reflected in the [Specified Physical Conditions] Matrix."[46]

44.     More specifically, this class action is characterized by three distinctive features, all linking exposure to specific conditions, that were not present in Castano or other exposure-based "mass torts" class action:  (1) the types of injuries that are to be compensated have a clear and established association with exposure to oil and oil dispersants; (2) all conditions (acute or chronic) had to manifest themselves within 24 to

---

[46] See Declaration of Dr. Michael Harbut at paragraph 24.

72 hours after exposure to qualify for compensation (thereby reducing the prospect of intervening or alternative sources of causation); and (3) the injuries listed on the Specified Physical Conditions Matrix bear a strikingly high level of correlation with the conditions and injuries reported contemporaneously to medics and public health officials.

45.     Each of these points needs a brief explanation.  To receive compensation under the Medical Benefits Settlement Agreement, a class member must have documented an acute or chronic condition listed on the "Specified Physical Conditions Matrix" (Exhibit 8 to the Medical Benefits Settlement Agreement).  As the expert medical evidence indicates, each of the acute or chronic conditions listed on this Matrix is of a kind and character that can reasonably be associated with exposure to oil and oil dispersing chemicals and/or heat.[47]  Essentially, these acute and chronic conditions all involve injuries or conditions falling under one of the following headings:

> a.   Ocular.  Typically, these will involve symptoms of eye irritation or eye burn and the time period between exposure and manifestation must be 24 hours or less.
>
> b.   Respiratory.  Here, the symptoms could involve shortness of breath, exacerbated asthma, nose bleeding, headaches, coughs or

---

[47] Both Doctors Michael Harbut and Jessica Herzstein agree on this point and independently confirm each other.  Dr. Harbut finds that persons exposed to oil and/or chemical dispersants are at risk of contracting a variety of the conditions specified in the Specified Physical Conditions Matrix and adds that such conditions could manifest themselves within 24 to 72 hours of the exposure (depending on each condition).  See Declaration of Dr. Michael Harbut at paragraphs 26 to 38.  Similarly, Dr. Herzstein concludes that the "medical literature supports the inclusion of the conditions listed on the Matrix" (Declaration of Dr. Jessica Herzstein at paragraph 15) and further finds that the 24 to 72 hour "timeframes are appropriate and have a scientific basis" (*Id.* at paragraph 20).

nasal problems and the time period between exposure and

manifestation must be 48 hours or less.

    c. <u>Dermal</u>.  Here, the symptoms will typically involve rashes, blisters,

swelling, itching, lesions, welts etc., and the time period is 72

hours or less.

46.    In all the foregoing cases, the means of exposure was either by inhalation

or direct contact with the eyes or skin of the class member.  The symptoms or conditions

must manifest themselves within 24 to 72 hours and have been corroborated by various

forms of evidence (a declaration under penalties of perjury from the class member,

medical visits, affidavits from third parties, etc.).

47.    This is all in sharp contrast to asbestos or tobacco cases, where there may

be a twenty year or longer latency period and there is no direct proof of the original

exposure (or its duration).  Here, the short (24 to 72 hour) latency period significantly

reduces the possibility of alternative causes for the symptom or condition.  The causal

association between exposure and manifestation need not be proven beyond a reasonable

doubt, and the documentary and sworn evidence required by the Specified Physical

Conditions Matrix more than suffices to show reasonable causation.

48.    Indeed, other cases have found the association between exposure to oil and

chemicals and the foregoing ocular, respiratory and dermal conditions to be clear cut and

sufficient.  See, e.g., <u>Arabie v. CITGO Petroleum</u>, 89 So.3d 307 (La. 2012).

49.    Moreover, further demonstrating the causal connection is the high overlap

between the Medical Encounters Database ("MED") and the Specified Physical

Conditions Matrix.  The MED reflects visits by Clean-Up Workers to medic stations

established by the BP Parties during the "response activities."  Overall, some 20,000 visits (by some 13,200 individuals) were contemporaneously recorded.  I am advised that 70% of the persons who visited these medic stations (or approximately 9,200 individuals out of 13,200) reported conditions that are listed on the Specified Physical Conditions Matrix.  30% did not report such conditions, but instead reported other conditions, injury or trauma (for example, cuts, lacerations, broken bones or even snakebites) that are not related to exposure to oil or dispersants and for which compensation will not be paid.

50.     Not only did Clean-Up Workers report conditions listed on the Specified Physical Conditions Matrix, but a substantial majority listed a small number of the same conditions.  I am advised that the 10 most frequently appearing codes on the MED account for approximately 62% (roughly 12,400) of the total visits to the medic stations.  Seven of these 10 most frequently appearing codes (accounting for approximately 47% or 9,400 of the total visits to the medic stations) are specifically listed on the Specified Physical Conditions Matrix.[48]  The medical and epidemiological evidence presented to this Court shows that these seven codes that were most commonly reported appear consistent with conditions that under the temporal and evidentiary conditions of the Specified Physical Conditions Matrix are closely related to exposure to oil or oil dispersants or to exposure to heat.

---

[48] These seven codes are:  (1) 4141—Headache; (2) 0723—Heat fatigue (exhaustion); (3) 141—acute respiratory infections; (4) 4171—nausea and vomiting; (5) 419–other symptoms not elsewhere classified (swelling of limb); (6) 150—Digestive system diseases and disorders; and (7) 9999—not classified.  The other three out of this top ten were:  (1) 0973—Soreness or pain, except the back; (2) 0972—Back pain, back hurt; and (3) 034—cuts, lacerations.  These conditions, while common, cannot be said to be consistent to exposure to oil, dispersants or heat, and will not receive compensation.

51.     The bottom line then is that the medic stations set up in response to the Deepwater Horizon Incident were contemporaneously receiving a large number of reports of conditions and injuries of the same type, character and severity, and these are the conditions and injuries for which compensation will be paid under this settlement.  This reduces the prospect of claimants with creative imaginations later attributing subsequently developing injuries or conditions to exposure to oil.  Moreover, not only were the medic stations receiving these reports, but so were public health authorities who gathered surveillance data on conditions and symptoms reported both by Clean-Up Workers and others.[49]  These reports reinforce each other and find in common that "headache, dizziness, nausea, vomiting, weakness/fatigue and upper respiratory irritation" were the most frequently reported symptoms to public health officials in Louisiana and other Gulf states.[50]  The evidence is overwhelming that Clean-Up Workers reported similar conditions and injuries in high numbers shortly after exposure to oil and oil dispersants (for reasons seemingly unrelated to any desire to obtain compensation), and it logically follows from this that other class members contemporaneously exposed to oil and dispersants in Zone A and Zone B would experience relatively similar acute and chronic conditions falling into the same categories.

F.   This Is a Cohesive Class Meeting The Standard Specified in Amchem.

52.     In Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997), the Supreme Court announced that the central issue in class certification is whether the class

---

[49] See Declaration of Dr. Jessica Herzstein at paragraph 17 (citing series of reports on conditions and symptoms reported by Clean-Up Workers and other individuals in the affected areas to Centers for Disease Control and Prevention (CDC) and other public bodies).

[50] Id. (quoting study by Louisiana Department of Health and Hospitals Office of Public Health). Dr. Herzstein also quotes similar summaries of reports to the American Association of Poison Control Centers and to Plaquemines Branch Incident Command Center.

is sufficiently "cohesive" to justify "adjudication by representation."[51]  As the foregoing

discussion has shown, this class has many common characteristics and few, if any,

dissimilar ones.  In common, class members have incurred injuries of limited severity

that would qualify for only modest compensation in most courts.  To receive

compensation, all must have manifested these conditions within 24 to 72 hours after

exposure.  Together, these factors imply both that (1) there is no conflict between persons

with severe injuries versus those with minor injuries and all persons within the class

definition would normally expect compensation within the same general range, and (2)

there is no conflict between those immediately injured and those with later developing

conditions or injuries.  Such conflicts can render the class non-cohesive, but they are

simply not present here.  Indeed, there are no "future claimants" — persons exposed to a

toxic substance who have not yet manifested any injury — who will receive any

compensation for future injuries under the Medical Benefits Settlement Agreement.  This

was the category of class member that most concerned the Supreme Court in <u>Amchem</u>,

and their absence here increases cohesion.

     53.     Next, the class members reside in a relatively limited geographic area or

worked in the "response activities."  All were necessarily aware (and intensely so) of the

Deepwater Horizon Incident.  Such a self-conscious class is inherently more cohesive

than the class of persons who purchased, for example, a defective toaster or some similar

product that is the subject of the typical consumer class action.  In all likelihood, the

Deepwater Horizon Incident dominated the attention of class members during April, 2010

(and subsequently), and that experience makes this a uniquely cohesive class.

---

[51] 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are
sufficiently cohesive to warrant adjudication by representation.")

III.  THE PERIODIC MEDICAL CONSULTATION PROGRAM ("PMCP").

54.      This Court has already ruled that medical monitoring costs may be recovered under general maritime law by injured class members as an element of damages (but not as an independent cause of action).  See In re Oil Spill by The Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010, 2011 WL 4575696 (E.D. La. September 30, 2011) at *15 to *18.  Specifically, this Court found:

> "[A]ll plaintiffs that have alleged an 'injury' under general
> maritime law may seek medical monitoring as an element
> of their damages."[52]

This holding arguably leaves unresolved the status of those residents of Zone B and Clean-Up Workers who do not have an acute or chronic condition specified on the Specified Physical Conditions Matrix.  However, the absence of such a specified acute or chronic condition does not mean that one is not "injured" for purposes of general maritime law.  In Hagerty v. L & L Marine Services, 788 F.2d 315, 318 (5th Cir. 1986), the Fifth Circuit has held that the term "injury" does not require any manifestation of any current symptoms of disease.  As this court has further noted, the B3 Master Complaint alleged that plaintiffs inhaled fumes or physically contacted oil or dispersants.[53]

55.      It follows from this that any Zone B resident or Clean-Up Worker who has either inhaled fumes or been in physical contact with oil and who experiences dizziness, nausea, or headaches or any other non-specific discomfort within a reasonable period thereafter has been sufficiently "injured" under general maritime law to state a cause of

---

[52] Id. at 18.
[53] Id. at 17.  Similar allegations are also set forth in the Medical Class Action Complaint, No. 12–CV–968.

-34-

action for medical monitoring as an element of damages, and the Medical Benefits
Settlement Agreement can properly settle such claims.  The foregoing description of
persons who inhaled oil fumes or were in contact with oil and experienced non-specific
symptoms presumptively applies to Zone B residents and Clean-Up Workers as well.

56.     Even if there is a small degree of overbreadth (because somewhere there
may be Zone B residents or Clean-Up Workers who did not experience a headache,
nausea or some other non-specific symptom), such a trivial level of overbreadth in the
size of the class should not be fatal to class certification.  Indeed, in Kohen v. Pac. Inv.
Mgmt. Co., LLC., 571 F.3d 672, 677–78 (7th Cir. 2009), Judge Posner, writing for the
Seventh Circuit, recently observed:

> "[A] class will often include persons who have not been
> injured by the defendant's conduct; indeed this is almost
> inevitable because at the outset of the class many of the
> members of the class may be unknown or, if they are
> known, still the facts bearing on their claims may be
> unknown."

Kohen involved claims of market manipulation, and defendants argued that the class was
overbroad because some class members who traded during the relevant time period were
simply hedging and thus had suffered no loss.  Although the Seventh Circuit agreed that
the class definition could not be "so untethered from the elements of the underlying cause
of action that it wildly overstates the number of parties that could plausibly demonstrate

injury,"[54] it found on the facts of that case that any overstatement in the number of those injured was likely modest at most.  That is true here as well.

57.     In deciding when the possible overstatement of the class should prevent certification, the Seventh Circuit has looked to the impact of the liability on the defendant and noted that the money manager (PIMCO) in Kohen was a "very large firm."[55]  Here, the BP Parties are even larger in size and even less threatened by this action in terms of their ability to withstand it.  Finally, this is a settlement class (not the litigation class in Kohen).  Hence, there is far less reason to deny certification because of the possibility that some in the class may not have been injured.

58.     Moreover, the relief at issue here (the PMCP) is not cash compensation or even an award of medical monitoring costs.  The PMCP does not entitle any class member to substantive medical treatment.  Rather, it is a mechanism to assess the individual's health and detect possible injuries.  Such a prophylactic approach can be independently justified as necessary both to implement and make meaningful the Back-End Litigation Option ("BELO") and to mitigate the potential damages faced by the BP Parties.  The purpose of BELO is to allow class members with subsequently manifested, more severe injuries to pursue compensation for those injuries or conditions in mediation or individual litigation.  Yet, residents of Zone B generally live in sparsely settled areas where medical facilities and doctors may not be readily available (or they may simply be unable to afford their services). Hence, the PMCP should be viewed as a protective safeguard that makes the BELO right more effective by enabling class members to learn

_____

[54] Id. at 679.
[55] Id. at 678.  See also McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491 (7th Cir. 2012).

of any subsequently manifested injury.  Correspondingly, from the perspective of the BP

Parties, such periodic examinations should help to avert serious illnesses or conditions

and thereby mitigate their potential liability in BELO actions.  To sum up, because the

PMCP provides only periodic medical examinations, it is best characterized as both (i) a

precautionary procedure intended to inform and protect class members from

unintentionally forfeiting their BELO rights, and (ii) a means of mitigating damages that

benefits all the parties.

    IV.  THIS CLASS ACTION FULLY SATISFIES THE REQUIREMENTS OF
FED. R. CIV. PRO. 23.

        A.  Rule 23(a) Poses No Serious Obstacle to Class Certification.

        59.     Rule 23(a) lists four basic requirements that must be satisfied before a

class may be certified:  numerosity, commonality, typicality, and adequacy of

representation.  Simply put, there is no legitimate doubt on any of these issues.

        60.     A.  Numerosity.  As the Court knows, over one hundred thousand persons

have identified themselves through the Short Form Joinder procedure in the Limitation

proceeding that was about to go to trial, and I am advised that over 17,000 of those

individuals checked one or more boxes on a Short Form Joinder or Plaintiff Profile Form

indicating they were asserting a B3 bundle claim.  I am further advised that

approximately 780 individuals checked no such box, but did expressly indicate that they

were asserting a "Personal Injury/Death" claim in MDL 2179.  Many others did not

exercise this short-form procedure but will predictably remain within the class and not

opt out.  In determining numerosity under Rule 23 (a), the Court is permitted to rely on

its own common sense, particularly when it is apparent that the class is very large.  See

William B. Rubenstein, Alba Conte, and Herbert B. Newberg, 1 Newberg on Class Actions, §3.3 (4th ed. 2010).

61.    B.  Commonality.  Under Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), the commonality requirement focuses on questions that have common answers that will drive the resolution of the litigation.  Today, commonality requires considerably more than simply the presentation of one or more questions that are common to the class or even a showing that the common issues will "affect . . . a significant number of the putative class members."  See M.D. v. Perry, 675 F.3d 832, 840 (5th Cir. 2012) ("Stukenberg").  Rather, it requires that the resolution of the common questions must be "central to the validity of each one of the claims in one stroke."  See Wal-Mart Stores, Inc. v. Dukes, supra, at 2551; M.D. v. Perry, supra, at 840.  Here, the class is essentially asserting a negligence cause of action, which places the defendant's course of conduct at center stage.  The questions that are central to all class members' claims also include a number of specific issues:  (1) BP's decision to use a long string design, rather than a liner tieback; (2) whether BP properly converted the float collar; (3) whether BP should have used more centralizers; (4) whether BP should have run a full "bottoms-up" circulation; (5) whether BP should have run a cement bond log; (6) whether BP should have developed the casing hanger lockdown sleeve before displacement; (7) whether BP used "unusual" spacer during displacement; (8) whether BP negligently misinterpreted the failed negative pressure tests; (9) the propriety and soundness of BP's decisions, along with the Unified Command, concerning use of dispersants, boom, and other containment options in response to the oil spill; and (10) whether BP failed to ensure adequate procedures and safeguards for Clean-Up Workers who participated in oil spill

-38-

remediation and Zones A and B residents.  Because resolving these issues would resolve central questions of liability in each of the class members' cases, commonality is satisfied.  See Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir. 1993); In re Dell Inc. Sec. Litig., 2010 U.S. Dist. LEXIS 58281 (W.D. Tex. June 11, 2010), Fed. Sec. L. Rep. (CCH), P 95, 771.  This case is entirely unlike M.D. v. Perry ("Stukenberg"), supra, in which the asserted common issues involved deficiencies in the state's treatment of certain children.  Even if these deficiencies were proven, resolution of these issues would not necessarily resolve the claims of the other plaintiffs.  In contrast, in this case, establishing the negligence of the BP Parties on the theories advanced above does significantly advance each individual case.

62.    This case should be contrasted with a cause of action sounding in fraud. In a fraud case, the reliance of the plaintiffs is a central issue.  But in a negligence cause of action, the focus is on the defendant's conduct and its standard of care.  In this light, courts have regularly recognized that commonality is most easily satisfied "by the defendant's conduct as to all class members."  See Sullivan v. DB Invs., Inc., 667 F.3d 273, 297 (3d Cir. 2011).  Here the BP Parties are alleged to have acted in common towards all class members by their conduct in causing the Deepwater Horizon oil spill and in their response to it.  As in Dell, supra, the "class members' claims all arise out of the same set of operative facts and are based on common legal theories."  2010 U.S. Dist. LEXIS 58281, at *12.  Here, the common questions are central, not peripheral.

63.    C.  Typicality.  The Fifth Circuit has recognized that "the test for typicality is not demanding."  Mullen v. Treasure Chest Casino LLC, 186 F.3d 620, 625 (5th Cir. 1999).  The test for typicality "focuses on the similarity between the named

plaintiff's legal and remedial theories and the theories of those whom they purport to represent." Id. Here, all class members are asserting claims based on general maritime law, which arise out of the same event and the same conduct of the BP Parties before and after that common oil spill. Moreover, class members not only resided in a tightly defined, contiguous geographic area or participated in localized "response activities," but they also share the common characteristic (if they are to receive compensation) of having experienced symptoms within 24 to 72 hours after exposure. The 11 class representatives share these characteristics with the class, and thus their interests are fully aligned.

64.     Equally important, typicality is not defeated by the class members suffering varying harms or varying degrees of injury. Differences in damages "will not affect their legal or remedial theories, and thus does not defeat typicality." Mullen, supra, at 625. As the Fifth Circuit has summarized:

> "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."

James v. City of Dallas, 254 F.3d 551, 571 (5th Cir. 2001). Here, it is self-evident that the claims of class members all relate to the same event and the same course of conduct.

65.     Adequacy of Representation. The Supreme Court has observed that the adequacy requirements "tend to merge" with the commonality and typicality requirements, which collectively "serve as guideposts for determining whether" a class action is "economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Amchem, 521 U.S. at 626n.20. Here, there are 11 class representatives, coming from a variety of occupations and social and economic statuses.

All are united by the fact that their injuries emanate contemporaneously and directly from a common occurrence.

66.     The adequacy of representation requirement usually poses a significant barrier to certification only when there are intra-class conflicts.  But as already noted, because the liability of the BP Parties is uncapped under the Medical Benefits Settlement Agreement, class members are not in competition with each other for a limited amount of money.  Moreover, whether a class member is a resident of Zone A or Zone B or is a Clean-Up Worker, the class member will only receive compensation if he or she has experienced an acute or chronic condition listed on the Specified Physical Conditions Matrix.  In this respect, they are treated identically.  All persons who fall within the class definition are also eligible for the PMCP and will receive the same Back-End Litigation Option; thus again, there are no disparities in their treatment.

67.     Moreover, even in cases where there are potential conflicts (unlike this case), the Fifth Circuit has still held that "so long as all class members are united in asserting a common right, such as achieving  the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."  In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir. 1981).  In this case, the class was represented by a large and sophisticated Plaintiffs' Steering Committee ("P.S.C."), which through extended negotiations established the overall framework for compensation of each type of injury.  The P.S.C. negotiated the compensation to be paid for injuries on a separate, case-by-case basis with the BP Parties and with Magistrate Judge Shushan supervising the negotiation of the material terms of the Medical Benefits Settlement Agreement.  This independent, claim type-by-claim type negotiating process

greatly reduced any possibility of tradeoffs under which the interests of one category of class member could be sacrificed or subordinated to the interests of others.  Nor would the P.S.C. benefit from any such subordination, as it would not translate into a lower payment by defendants in return for a higher fee award for themselves.  The usual incentives for collusion are simply not present in this case.

B.  Rule 23(b)(3) is Satisfied on the Facts of This Case Because The Common Issues Clearly Predominate.

68.    Rule 23(b)(3), of course, requires that the "questions of law or fact common to class members predominate over any questions affecting only individual members."  This is often the principal roadblock to the certification of tort-based class actions.  But, as earlier noted, this case is markedly different.

69.    First, as has been said before, this is a single event, single location mass disaster which began at an easily defined point:  the Macondo well blowout.  Unlike those more problematic cases that involve extended exposure to a potentially dangerous product or emission, this case pivots on actual physical injury, as the vast majority of class members came into physical contact with or inhaled oil or oil dispersants.  Unlike most exposure cases (such as tobacco or asbestos), there was more than simply a statistical possibility of future injury, but an immediate trespass.

70.    Second, the conduct of the BP Parties was common to all class members.  This is critical, because as virtually all have agreed:

> "When common questions represent a significant aspect of the case and they can be resolved for all members of a class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis."

See 7A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedures of 1778

(3rd ed. 2012).  Along with other Circuits, the Fifth Circuit has agreed.  See Jenkins v.

Raymark Indus., 782 F.2d 468, 472 (5th Cir. 1986); see also Sullivan v. DB Investments,

Inc., 667 F.3d 273, 335 (concurring decision by Scirica, J.) (3d Cir. 2011) (noting that the

"focus in the settlement context should be on the conduct (or misconduct) of the

defendant and the injury suffered as a consequence").

71.     Third, in the Fifth Circuit, the balance between common and individual

issues is not computed mechanically by simply counting each issue.  Rather, the focus is

on the efficiencies of class treatment.  See Jenkins v. Raymark Industries, 782 F.2d 468,

472 (5th Cir. 1986).  Thus, a "class issue predominates if it constitutes a significant part of

the individual cases."  See Watson v. Shell Oil Co., 979 F.2d 1014, 1022-23 (5th Cir.

1992), on reh'g, 53 F.3d. 663 (5th Cir. 1994).  Ultimately, this is a matter of weighing,

not counting, issues.  See Mullen v. Treasure Chest Casino L.L.C., 186 F.3d 620, 626

(5th Cir. 1999).

72.     Fourth, key legal issues are common to the cases of virtually all class

members, because the alleged negligence of the BP Parties and its impact on all class

members are the key issues.

73.     Finally, the fact that the parties have achieved a settlement also deserves

significant weight, particularly to the extent that it underscores and demonstrates the

cohesiveness of the class.  This is the essential holding in Sullivan v. DB Investments,

Inc., 667 F.3d 273, 297 (3d Cir. 2011), which is an important recent appellate decision on

settlement class actions.  Where there is core nucleus of common facts (as there is in this

single event, single location disaster that affects a geographically closely knit class), the

cohesion of class members is more evident.  That a sizable class was able to achieve a complicated settlement without its also sizable Plaintiffs' Steering Committee fracturing (and some members dissenting) also demonstrates cohesion.  Ultimately, under <u>Amchem Products</u>, the bottom line issue is whether the class is "sufficiently cohesive to warrant adjudication by representation."  <u>Amchem</u>, 521 U.S. at 623.  Here, the unity of the class clearly justifies the vicarious representation of the class by its class representatives and counsel.

74.      In contrast to the foregoing clearly common issues, there is only one potential issue that arguably might be considered an individual one and thus might need to be balanced against these common issues.  This is the issue of causation.  Potentially, the losses suffered by individual class members could involve individual issues relating to causation.  But, as noted earlier, this is a unique case of "straightforward" causation with a causal chain that is even tighter than in <u>Mullen</u> or <u>Watson</u> because each member must have manifested injury within 24 to 72 hours after exposure to oil, oil dispersants, or heat (in the case of Clean-Up Workers) to receive compensation.  Further, the MED provides remarkable evidence that Clean-Up Workers who visited medic stations during the "response activities" contemporaneously reported the same symptoms, for which compensation will be paid.  The on-the-ground evidence shows that these injuries and conditions were resulting.  No other mass tort class action (including the ones that the Fifth Circuit has approved) can show this same correlation.

C.  <u>Rule 23(b)(3)'s Superiority Standard is Also Satisfied Because A Class Action Is the Vastly Superior Method by Which to Adjudicate the Claims of Modest Value</u>

Experienced by the Class Members and Will Yield Benefits That Could Not Have Been Obtained in Individual Litigation.

75.     Several independent reasons make class treatment "superior" for purposes of Rule 23(b)(3).  First, class treatment is highly efficient, as otherwise the federal and state courts would likely be inundated with a continuing flow of individual Deepwater Horizon cases, extending well into the future, all of which cases would need to relitigate repetitive issues.  Speculative as it is to predict how many would sue on an individual basis, we do know that over 17,000 have filed Short Form Joinder forms indicating an apparent such intention.  Some may be unable to afford counsel but, as noted below, this is a further grounds for finding superiority.  Others may seek to proceed on a *pro se* basis, which will impose further burdens on the courts.  Frankly, the prospect of large-scale individual litigation of modest value claims would represent a serious misallocation of judicial resources.  As a result, senior judges would be inefficiently converted into small claims court magistrates.

76.     Second, because this case is disproportionately composed of "negative value" claims, it must be expected that many claimants will not assert them.  This may be because they cannot afford counsel (or the contingent fees on their claims will be too low to attract counsel) or because they simply do not learn of or understand their legal rights.  Finally, as earlier noted, claims in mass tort cases based on exposure generally require that the plaintiffs present expert medical testimony that exposure could have caused their conditions or injuries.  Such expert testimony is expensive and so may preclude the filing

of smaller claims.[56]  Whatever the reason, many will only receive compensation if this Medical Benefits Settlement Agreement is implemented.

77.     Third, the Medical Benefits Settlement Agreement improves upon a prior extra-judicial claims resolution procedure (the Gulf Coast Claims Facility) established to implement the intent of the Trust and will employ more objective and transparent criteria. This will increase transparency and reduce the level of low visibility discretionary decision-making.

78.     Fourth, in balancing the judicial economy of the class action against the possible adverse impact of a class action on the defendant, several courts have looked to whether the defendant would face the threat of bankrupting liability in a class action based on an all-or-nothing decision by a judge or jury.  Where the defendant was not so threatened, these courts have favored the class action as the "superior" method of resolution.  See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491 (7th Cir. 2012); Kohen v. Pac. Inv. Mgmt. Co., LLC, 571 F.3d 672 (7th Cir. 2009).  Here, the BP Parties are simply not threatened with liabilities from the medical claims arising from the Deepwater Horizon Incident that could cause their insolvency, and this is a class settlement into which they have voluntarily entered.

79.     Fifth, the Medical Benefits Settlement Agreement has unique provisions that could only be obtained in a comprehensive class settlement:  These include the PMCP and the Gulf Region Health Outreach Program.  The former has already been described, but the latter will involve grants totaling $105 million to expand healthcare

---

[56] The relevant Fifth Circuit decisions are cited earlier at paragraph 40.

facilities and services, and provide access to them, throughout the Gulf Coast areas

impacted by the Deepwater Horizon Incident.

80.     These differences again underscore that this settlement reflects a broad

and aspirational program of compensation and rehabilitation by which the BP Parties are

seeking to revitalize the Gulf Coast area damaged by the Deepwater Horizon Incident.

No system of individual litigation could produce similar results, and rejection of this

settlement would injure many who are relying on this settlement.

IV. CONCLUSION

81.     Although the scale of the Deepwater Horizon Incident was unprecedented,

the scope of this class is narrow, and the amount of the individual recoveries are modest.

Only persons who experienced a defined injury within 24 to 72 hours after exposure will

receive compensation under this settlement.  That is the polar opposite of the sprawling

class actions that this Circuit has rejected involving asbestos, tobacco or toxic drugs

which involved decades long latency periods, resolved the claims of future claimants who

had not been injured in any sense, and treated weak claims and strong claims alike.

82.     Equally important, this is a settlement class in which all the parties are

seeking both to allocate just compensation and to implement a broader program of

medical and social benefits.  Unlike the case of some litigated class actions, there is no

evidence (and no basis even for inference) that defendants have been extorted, pressured

or even compelled to settle.  The BP Parties' desire to settle and accept responsibility for

compensation predates these negotiations.

-47-

83.     For all these reasons, a rejection of this settlement would benefit no one, injure many, and impose legal chaos on the efforts of all to resolve the Deepwater Horizon Incident.

I declare under the penalties of perjury that the foregoing analysis and opinions are true and correct to the best of my knowledge and belief.

August 10, 2012                                          John C. Coffee, Jr.

EXHIBIT A

## **BACKGROUND, EXPERIENCE AND QUALIFICATIONS**

1.      I am the Adolf A. Berle Professor of Law at Columbia University Law School, where I have taught since 1980, and am a member of the Bars of the State of New York and the District of Columbia (and am admitted to various federal courts).  I am also a Fellow of the American Academy of Arts and Sciences, a Life Fellow of the American Bar Foundation, and a Life Member of, and former Reporter for, the American Law Institute.  I have also been a Visiting Professor of Law at Harvard Law School, Stanford Law School, the University of Virginia Law School, and the University of Michigan Law School.  I began my academic career teaching at Georgetown University Law School from 1976 to 1980.  Prior to that, I practiced law with the firm of Cravath, Swaine & Moore in New York City from 1970 to 1976.  I am a 1969 graduate of Yale Law School.

2.      As a law professor, one of my principal academic interests has been class action litigation (with a special focus on the organization and management of the large class action).  My law review articles on class actions have been cited on several occasions by the U.S. Supreme Court, including in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 621 (1997), and Ortiz v. Fibreboard Corp., 527 U.S. 815, 850 n.28.

3.      I have on a number of occasions testified before Congressional committees with regard to class actions, have appeared as a witness before the Advisory Committee on the Civil Rules of the United States Judicial Conference, and regularly appear as a panelist at symposia and institutes on the topic of class actions. For the past sixteen years, I have been the opening lecturer at the annual ABA National Institute on

Class Actions, and my annual survey of class action developments for this Institute is regularly published by the Bureau of National Affairs ("BNA"). During 1995, I served as an adviser to the White House's Office of General Counsel with regard to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which chiefly seeks to regulate securities class actions. More recently, I advised the staff of the Senate Banking Committee with respect to the drafting of both the Sarbanes-Oxley Act in 2002 and the Dodd-Frank Act in 2010.

4.      In addition, I have authored the following articles on class actions (which I cite in part to indicate that I am not contradicting prior positions or inventing a novel argument that I would not endorse apart from the facts of this case): John C. Coffee Jr., Litigation Governance:  Taking Accountability Seriously, 110 Colum. L. Rev. 288 (2010); John C. Coffee Jr., Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534 (2006); John C. Coffee Jr., Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working, 42 Md. L. Rev. 215 (1983); John C. Coffee Jr., The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation, 48 Law & Contemp. Probs. 5 (Summer 1985); John C. Coffee Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669 (1986); John C. Coffee Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987); John C. Coffee Jr., and Donald E. Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposed Legislative Reform, 81 Colum. L. Rev. 261 (1981); John C. Coffee Jr., Rethinking the Class Action: A Policy Primer on

Reform, 62 Ind. L. Rev. 625 (1987); John C. Coffee Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995); John C. Coffee Jr., The Future of the Private Securities Litigation Reform Act: or Why the Fat Lady Has Not Yet Sung, 51 Bus. Law. 975 (1996); John C. Coffee Jr., Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370 (2000).

5.      My work in the area of class actions and representative litigation also includes service (for over a dozen years) as a Reporter for the American Law Institute in connection with its effort to codify the common law rules of corporate law and fiduciary duties in a Restatement-like volume.  See A.L.I., PRINCIPLES OF CORPORATE GOVERNANCE: Analysis and Recommendations (1992).  I served as the Reporter for Litigation Remedies.

6.      I have also served as an expert witness in a number of the largest class actions, including a number in the Fifth Circuit.  These include Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997); In re Enron Corp. Securities, Derivative & "ERISA" Litig., 586 F. Supp. 2d 732 (S.D. Tex. 2008); In re Visa Check/MasterMoney Antitrust Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003); In re AOL Time Warner Inc. Sec. & "ERISA" Litig., No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006); In re Royal Ahold Sec. & "ERISA" Litig., 461 F. Supp. 2d 383 (D. Md. 2006); In re NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465 (S.D.N.Y. 1998); In re Sumitomo Copper Litig., 74 F.Supp. 2d 393 (S.D.N.Y. 1999); In re Cendant Corp. Sec. Litig., 182 F.R.D. 144 (D.N.J. 1998); In re Cendant Corp. Sec. Litig., 109 F.Supp. 2d 235 (D.N.J. 2000), aff'd 264 F.3d 201 (3d Cir. 2001); In re Lucent Tech. Inc. Sec. Litig., 327 F. Supp. 2d 426 (D.N.J. 2004); In re Waste Management, Inc. Sec. Litig., No. 97C7709

(N.D. Ill. 1999); <u>In re Lease Oil Antitrust Litig. (No. II)</u>, 186 F.R.D. 403 (S.D. Tex. 1999); <u>Shaw v. Toshiba America Info. Sys.</u>, 91 F. Supp. 2d 942 (E.D. Tex. 2000); and <u>In re Diet Drugs Products Liability Litigation</u>, MDL Docket No. 1203 (E.D. Pa. 2000).