# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to all actions. | * * * | |
| | * * | Honorable CARL J. BARBIER |
| | * * | Magistrate Judge SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated, | * * * * | Civil Action No. 12-970<br><br>SECTION J |
| Plaintiffs, | * * * | |
| v. | * * | Honorable CARL J. BARBIER |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * | Magistrate Judge SHUSHAN |
| Defendants. | | |

## BP DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012

*COUNSEL FOR MOVING PARTIES ARE LISTED AT END OF MOTION*

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**...........................................................................................................1

**BACKGROUND** ............................................................................................................4

**I.   PROCEDURAL HISTORY** .............................................................................4

    A.    Creation Of MDL 2179.........................................................................4

    B.    Unprecedented Depth And Volume Of Discovery In The Underlying MDL Proceedings ...................................................................................5

    C.    Settlement Negotiations ........................................................................5

    D.    Agreement In Principle And The Transition Process ............................7

    E.    Preliminary Approval And Conditional Class Certification...................8

    F.    Class Notice ..........................................................................................9

    G.    Opening Of The Settlement Program ..................................................10

    H.    Objections And Opt-Outs Versus Claims Volume And Class Size......10

**II.   SETTLEMENT CLASS DEFINITIONS AND EXCLUSIONS** ..................10

**III.   SUMMARY OF THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT** ...............................................................................................12

    A.    The Settlement Agreement Contains Important Features That Guarantee Its Fairness To Class Members.................................................................12

        1.    All But One Program Of The Settlement Agreement Provides For Uncapped Relief.......................................................................12

        2.    The Settlement Agreement Includes Generous Risk Transfer Premiums That Could Not Be Obtained Through Adversarial Litigation..................................................................................14

        3.    The Settlement Agreement Completely Satisfies The Class's Claims For Compensatory Damages, Including For Damages Caused By Transocean And Halliburton. .................................15

        4.    The Settlement Agreement Assigns Various Of BP's Valuable Claims Against Transocean And Halliburton To The Class......16

        5.    The Settlement Agreement Has Allowed Claimants To Receive Settlement Payments Prior To The Court's Grant Of Final Approval. .................................................................................17

6.      The Settlement Agreement Provides For Payment Of Attorneys' Fees Separate And Entirely Apart From The Benefits Paid To The Class...........................................................................................................17

B.     The Settlement Agreement's Procedural Elements Guarantee Fairness To Class Members.......................................................................................18

1.      Creation Of The Court Supervised Settlement Program.........................19

2.      Internal Appellate Procedure ...................................................21

3.      Assignment, Release, And Other Protections ...........................22

4.      Final Judgment.........................................................................23

C.     The Settlement Agreement's Payment Categories Guarantee Fairness To Class Members.......................................................................................23

1.      Economic Loss.........................................................................25

2.      Property Damage ....................................................................34

3.      Vessels Of Opportunity ("VoO") Charter Payment..................38

4.      Vessel Physical Damage ..........................................................38

5.      Subsistence Damage ...............................................................39

6.      Seafood Compensation Program.............................................40

ARGUMENT.........................................................................................................43

I.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE. .....................43

A.     The Court Should Presume That The Settlement Is Fair, Reasonable, And Adequate Because The Public Interest Favors The Voluntary Settlement Of Class Actions. ...................................................................44

B.     Even Absent A Presumption, Analysis Of The *Reed* Factors Further Demonstrates And Confirms The Fairness Of The Settlement To Class Members. ...............................................................................................45

1.      The Settlement Was Negotiated Free Of Fraud Or Collusion. ..................45

2.      Absent Settlement, This Litigation Would Continue To Be Extraordinarily Complex And Expensive, And Would Take Many Years To Resolve. .......................................................................47

3.      The Parties Engaged In An Extraordinary Amount Of Discovery In A Compressed Timeframe, Ensuring That They Had Sufficient Information To Negotiate A Fair Settlement. ...........................................50

       4.       The Probability Of Plaintiffs' Success On The Merits And The Range Of Possible Recovery Counsel In Favor Of Approving The Settlement. ..................................................................................52

       5.       Class Counsel, Class Representatives, And Absent Class Members Strongly Support Final Approval Of The Settlement Agreement. ...........53

II.     **THE SETTLEMENT AGREEMENT PROVIDES GENEROUS COMPENSATION NOTWITHSTANDING SIGNIFICANT WEAKNESSES IN THE PLAINTIFFS' CASE.** .......................................................................56

    A.     At Any Trial, BP Would Establish That The Errors And Omissions Of Its Co-Defendants Were Superseding Or Otherwise Significant Causes Of The Incident, And That BP's Conduct Did Not Constitute Gross Negligence Or Willful Misconduct...........................................................57

       1.       BP's Co-Defendants Bear Significant Responsibility For The Incident. ..............................................................................57

       2.       At Any Trial, BP Would Establish That Superseding Causes Broke The Chain Of Causation Between Its Acts And The Class's Injuries. ..............................................................................62

       3.       At Any Trial, In The Alternative, BP Would Establish That Liability Is Divisible Among BP And Its Co-Defendants. .......................62

       4.       At Any Trial, BP Would Establish That Its Conduct Did Not Constitute Gross Negligence Or Willful Misconduct...............................63

    B.     Many Plaintiffs' Claims Fall Outside The Categories Of Recovery Permitted By OPA. ......................................................................64

    C.     Many Plaintiffs Would Be Unable To Show That They Satisfied OPA's Presentment Requirement. ...............................................................65

    D.     Many Plaintiffs Would Be Unable To Establish That Their Damages Were Caused By The Spill. ......................................................................66

    E.     BP Could Demonstrate On Appeal That Punitive Damages Are Unavailable As A Matter Of Law.........................................................67

    F.     At Any Trial, BP Would Establish That The Gulf Is Undergoing A Robust Recovery, Further Weakening Claims For Economic Damages. ...........................69

       1.       Coastal Areas .....................................................................69

       2.       Wetlands ...........................................................................70

       3.       Water..................................................................................71

       4.       Seafood .............................................................................72

5.      Tourism .................................................................................. 74

G.     New Complexities And Hurdles For Plaintiffs' Claims Would Surely Arise During A Lengthy, Multi-Phased Trial Process. .......................................... 75

**III.   OBJECTIONS RECEIVED THUS FAR LACK MERIT.** ...................................... 76

A.     No One Has Standing To Complain About Exclusion From The Class, As The Settlement Agreement Has No Effect Whatsoever Upon The Legal Rights Of Non-Class Members. .............................................. 76

B.     The Mississippi Attorney General's Objections Lack Merit. ............................... 78

      1.      The GCCF Releases Comported With OPA, Were Not The Product Of Duress, And Are Valid And Enforceable. ............................ 80

      2.      The Parties Are Not Required To Negotiate The Broadest Settlement Agreement Possible, And So The Validity Of The GCCF Releases Is Irrelevant To The Fairness Of The Settlement Agreement. ............................................ 84

      3.      In Any Event, Mississippi Lacks Standing To Object To The Exclusion Of Certain Of Its Citizens From The Class. .............................. 85

C.     The Florida Attorney General's Objections Lack Merit. ...................................... 88

D.     Halliburton's Objections Lack Merit. .......................................... 89

E.     The VoO Offset Was Reasonable. ........................................... 89

F.     Objections To The Seafood Compensation Program Lack Merit. ......................... 91

      1.      GO FISH's Objections Lack Merit. ................................... 91

      2.      The Shrimpers' And Shrimp Processors' Objections Lack Merit ............ 97

G.     Selmer Salvesen's Objections Lack Merit. ...................................... 98

      1.      Salvesen's April 8 Objections ...................................... 98

      2.      Salvesen's July 2 Objections ....................................... 101

H.     Pinellas Marine Salvage, Inc. And John Mavrogiannis's Objections Lack Merit. ................................................. 102

I.     Cass Wilson's Objections Lack Merit .......................................... 103

J.     Alex Toth's Objections Lack Merit ............................................ 104

IV.     THE NOTICE PROVIDED TO THE CLASS MEMBERS FAIRLY
        INFORMED THEM OF THE SETTLEMENT AND ITS TERMS. ........................105

        A.     The Notice Distribution Method And Notice Contents Satisfied Rule
               23(c)(2). ...............................................................................................................106

               1.     The Notice Distribution Method Satisfied Rule 23(c)(2). .......................106

               2.     The Notice Contents Satisfied Rule 23(c)(2)...........................................108

        B.     The Notice Satisfied Rule 23(e)..........................................................................108

CONCLUSION .................................................................................................................109

# TABLE OF AUTHORITIES

**Page(s)**

## **CASES**

*Alfred L. Snapp & Son, Inc. v. P.R., ex rel. Barez*,
   458 U.S. 592 (1982) ......................................................................... 86, 87

*Altier v. Worley Catastrophe Response, LLC*,
   No. 11-241, 2012 WL 161824 (E.D. La. Jan. 18, 2012) ......................... 12

*Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*,
   211 F.R.D. 457 (S.D. Fla. 2002) ............................................................ 2, 49

*Ayers v. Thompson*,
   358 F.3d 356 (5th Cir. 2004) .................................................................. 45, 50

*Bailey v. Estate of Kemp*,
   955 So. 2d 777 (Miss. 2007) .................................................................. 83

*Becker v. Tidewater, Inc.*,
   586 F.3d 358 (5th Cir. 2009) .................................................................. 63, 101

*Billitteri v. Secs. Am., Inc.*,
   No. 09-1568, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ..................... 48

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*,
   51 F.3d 235 (11th Cir. 1995) .................................................................. 65, 80

*Bowling v. Pfizer, Inc.*,
   143 F.R.D. 141 (S.D. Ohio 1992) ........................................................... 46

*Brown v. Gallagher*,
   902 N.E.2d 1037 (Ohio Ct. App. 2008) ................................................. 83

*Burlington N. & Santa Fe Ry. Co. v. United States*,
   556 U.S. 599 (2009) ................................................................................ 63

*Chaplin v. NationsCredit Corp.*,
   307 F.3d 368 (5th Cir. 2002) .................................................................. 22

*Clausen v. M/V NEW CARISSA*,
   171 F. Supp. 2d 1127 (D. Or. 2001) ....................................................... 68

*Cobell v. Salazar*,
   679 F.3d 909 (D.C. Cir. 2012) ................................................................ 55, 93, 98

*Collins v. Sanderson Farms, Inc.*,
  568 F. Supp. 2d 714 (E.D. La. 2008) .......................................................... 44, 46, 48

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ....................................................................... 44, 54

*DeHoyos v. Allstate Corp.*,
  240 F.R.D. 269 (W.D. Tex. 2007) ........................................................ 44, 52, 54, 56

*Domingue v. Sun Elec. & Instrumentation, Inc.*,
  No. 09-682, 2010 WL 1688793 (M.D. La. Apr. 26, 2010) ...................................... 47

*Exxon Co., U.S.A. v. Sofec, Inc.*,
  517 U.S. 830 (1996) ...................................................................................... 62

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ............................................................................ 1, 68, 76

*Exxon Shipping Co. v. Baker*,
  No. 07-219, 2008 WL 194284 (U.S. Jan. 22, 2008) .............................................. 76

*Faircloth v. Certified Fin. Inc.*,
  No. 99-3097, 2001 WL 527489 (E.D. La. May 16, 2001) ...................................... 49

*Feinberg v. Hibernia Corp.*,
  966 F. Supp. 442 (E.D. La. 1997) ...................................................................... 51

*Fowler v. Birmingham News Co.*,
  608 F.2d 1055 (5th Cir. 1979) ......................................................................... 109

*Gabarick v. Laurin Mar. (Am.) Inc.*,
  623 F. Supp. 2d 741 (E.D. La. 2009) ................................................................... 68

*Gabarick v. Laurin Mar. (Am.) Inc.*,
  No. 08-4007, 2009 WL 102573 (E.D. La. Jan. 12, 2009) ..................................... 101

*Garza v. Sporting Goods Props., Inc.*,
  No. 93-108, 1996 WL 56247 (W.D. Tex. Feb. 6, 1996) .................................... 52, 56

*Gen. Mill Supply Co. v. SCA Servs., Inc.*,
  697 F.2d 704  (6th Cir. 1982) .......................................................................... 84

*Granada Invs., Inc. v. DWG Corp.*,
  962 F.2d 1203 (6th Cir. 1992) ......................................................................... 47

*Hammon v. Barry*,
  752 F. Supp. 1087 (D.D.C. 1990) ...................................................................... 55

*Houston Exploration Co. v. Halliburton Energy Services, Inc.*,
   269 F.3d 528 (5th Cir. 2001)..................................................................................... 63, 64, 83

*Humphreys v. HAL Antillen, N.V.*,
   No. 93-3799, 1994 WL 682811 (E.D. La. Jan. 31, 1994)....................................................... 101

*In re Am. Bank Note Holographics*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) .................................................................................. 92

*In re Apple iPhone 3G & 3GS MMS Mktg. & Sales Practices Litig.*,
   --- F. Supp. 2d ----, MDL No. 2116, 2012 WL 1069169 (E.D. La. Mar. 29, 2012) ................ 99

*In re BP p.l.c. Sec. Litig.*,
   --- F. Supp. 2d ----, MDL No. 10-2185, 2012 WL 1098418 (S.D. Tex. Mar 30, 2012) .......... 99

*In re Catfish Antitrust Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996) ..................................................................................... 46

*In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*,
   269 F.R.D. 468 (E.D. Pa. 2010) ......................................................................................... 105

*In re Chinese-Manufactured Drywall Products Liability*,
   MDL No. 2047, 2012 WL 92498 (E.D. La. Jan. 10, 2012) .................................................. 107

*In re Combustion, Inc.*,
   968 F. Supp. 1116 (W.D. La. 1997) .......................................................................... 49, 54, 108

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981)................................................................................... 2, 3, 47, 51

*In re Currency Conversion Fee Antitrust Litig.*,
   263 F.R.D. 110 (S.D.N.Y. 2009)........................................................................................... 46

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*,
   447 F. Supp. 2d 612 (E.D. La. 2006) ............................................................................. 44, 50

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
   228 F.R.D. 541 (S.D. Tex. 2005) ........................................................................................... 2

*In re Estate of Davis*,
   832 So. 2d 534 (Miss. Ct. App. 2001)................................................................................... 83

*In re Exxon Valdez*,
   229 F.3d 790 (9th Cir. 2000)............................................................................................... 44

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*,
   MDL No. 07-1873, 2012 WL 1019856 (E.D. La. Mar. 23, 2012)........................................... 99

*In re Ford Motor Co.*,
  591 F.3d 406 (5th Cir. 2009)..................................................................................99

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
  --- F. Supp. 2d ----, MDL No. 09-2046, 2012 WL 948365 (S.D. Tex. Mar. 20, 2012) ........... 18

*In re Holocaust Victim Assets Litig.*,
  413 F.3d 183 (2d Cir. 2001).................................................................................97

*In re Ingram Barge Co.*,
  No. 05-4419, 2006 WL 5377855 (E.D. La. Oct. 19, 1996) .................................................. 101

*In re Initial Pub. Offering Sec. Litig.*,
  243 F.R.D. 79 (S.D.N.Y. 2007)..............................................................................53

*In re Jim Hood, Att'y Gen. ex rel. State of Miss.*,
  No. 94-1429, 2006 WL 3769644 (Miss. Ch. Ct. Apr. 17, 2006) ............................................ 81

*In re Lease Oil Antitrust Litig. (No. II)*,
  186 F.R.D. 403 (S.D. Tex. 1999) .........................................................................45

*In re Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) ..........................................................................47

*In re Newbridge Networks Sec. Litig.*,
  No. 94-1678, 1998 WL 765724 (D.D.C. Oct. 23, 1998)........................................................92

*In re OCA, Inc. Sec. & Deriv. Litig.*,
  No. 05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ..................................... 54, 108, 109

*In re Oil Spill by "Amoco Cadiz" off the Coast of France on March 16, 1978*,
  4 F.3d 997 (7th Cir. 1993)...................................................................................48

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*,
  731 F. Supp. 2d 1352 (J.P.M.L. 2010) ....................................................................... 4

*In re River City Towing Servs., Inc.*,
  204 F.R.D. 94 (E.D. La. 2001)............................................................................ 101

*In re Serzone Prods. Liab. Litig.*,
  231 F.R.D. 221 (S.D. W. Va. 2005).......................................................................106

*In re Shell Oil Refinery*,
  155 F.R.D. 552 (E.D. La. 1993).......................................................................passim

*In re Taira Lynn Marine Ltd. No. 5, LLC*,
  444 F.3d 371 (5th Cir. 2006)................................................................................68

ix

*In re Terazosin Hydrochloride Antitrust Litig.*,
   No. MDL 99-1317, 2005 WL 2451960 (S.D. Fla. July 8, 2005) ............................................ 44

*In re Tobacco/Governmental Health Care Costs Litig.*,
   83 F. Supp. 2d 125 (D.D.C. 1999) ........................................................................................ 88

*In re Train Derailment Near Amite La.*,
   MDL No. 1531, 2006 WL 1561470 (E.D. La. May 24, 2006) ................................................ 47

*In re U.S. Oil & Gas Litig.*,
   967 F.2d 489 (11th Cir. 1992) ............................................................................................... 48

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) .................................................................................................. 44

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................................... 97

*Int'l Union, United Auto., Aerospace, & Agric. Implement
   Workers of Am. v. Gen. Motors Corp.*,
   497 F.3d 615 (6th Cir. 2007) ................................................................................................. 55

*Int'l Union, United Auto., Aerospace, & Agric. Implement
   Workers of Am. v. Gen. Motors Corp.*,
   No. 07-14074, 2008 WL 2968408 (July 31, 2008) ................................................................ 93

*Karim v. Finch Shipping Co.*,
   265 F.3d 258 (5th Cir. 2001) ....................................................................................... 100, 101

*Kincade v. Gen. Tire & Rubber Co.*,
   635 F.2d 501 (5th Cir. 1981) ................................................................................................. 44

*Klein v. O'Neal, Inc.*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010) .................................................................................. 48

*Kothe v. Smith*,
   771 F.2d 667 (2d Cir. 1985) .................................................................................................. 84

*La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc.*,
   124 F.3d 10 (1st Cir. 1997) ................................................................................................... 83

*Lazar v. Pierce*,
   757 F.2d 435 (1st Cir. 1985) ................................................................................................. 44

*Lazy Oil Co. v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997) ............................................................................... 92, 93

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998) ........................................................................................... 98

*Loscher v. Hudson*,
    182 P.3d 25 (Kan. Ct. App. 2008) ................................................................... 83

*Louisiana ex rel. Caldwell v. Allstate Ins. Co.*,
    536 F.3d 418 (5th Cir. 2008) ........................................................................... 87

*Lucas v. Kmart Corp.*,
    234 F.R.D. 688 (D. Colo. 2006) ....................................................................... 18

*Maywalt v. Parker & Parsley Petroleum Co.*,
    67 F.3d 1072 (2d Cir. 1995) ............................................................................. 46

*McAlarnen v. Swift Transp. Co.*,
    No. 09-1737, 2010 WL 365823 (E.D. Pa. Jan. 29, 2010) ................................ 18

*McBean v. City of N.Y.*,
    233 F.R.D. 377 (S.D.N.Y. 2006) ...................................................................... 84

*Moore v. United States*,
    63 Fed. Cl. 781 (Fed. Cl. 2005) ....................................................................... 44

*Navarro-Ayala v. Hernandez-Colon*,
    951 F.2d 1325 (1st Cir. 1991) ........................................................................ 109

*Neff v. VIA Metro. Transit Auth.*,
    179 F.R.D. 185 (W.D. Tex. 1998) .................................................................... 44

*Newby v. Enron Corp.*,
    394 F.3d 296 (5th Cir. 2004) ..................................................................... 45, 51

*Oxy, USA, Inc. v. Sw. Energy Prod. Co.*,
    161 S.W.3d 277 (Tex. Ct. App. 2005) .............................................................. 84

*P.R. ex rel. Quiros v. Bramkamp*,
    654 F.2d 212 (2d Cir. 1981) ............................................................................. 87

*Parker v. Anderson*,
    667 F.2d 1204 (5th Cir. 1982) ......................................................................... 93

*Paterson v. Texas*,
    308 F.3d 448 (5th Cir. 2002) ........................................................................... 87

*Pearson v. Ecological Sci. Corp.*,
    522 F.2d 171 (5th Cir. 1975) ........................................................................... 78

*Pennsylvania v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ................................................................. 88

*Phemister v. Harcourt Brace Jovanovich, Inc.*,
    No. 77-39, 1984 WL 21981 (N.D. Ill. Sept. 14, 1984) ............................. 97

*Piambino v. Bailey*,
    610 F.2d 1306 (5th Cir. 1980) ................................................................. 78

*Priceline.com, Inc. v. Silberman*,
    405 F. App'x 532 (2d Cir. 2010) ............................................................. 46

*Quigley v. Braniff Airways, Inc.*,
    85 F.R.D. 74 (N.D. Tex. 1979) .............................................................. 109

*Reed v. Gen. Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) ......................................................... 2, 45, 53

*Republic of France v. United States*,
    290 F.2d 395 (5th Cir. 1961) ................................................................. 62

*Robins Dry Dock & Repair Co. v. Flint*,
    275 U.S. 303 (1927) .............................................................................. 64

*Robinson v. Ford Motor Co.*,
    No. 04-844, 2005 WL 5253339 (S.D. Ohio June 15, 2005) ............... 44, 93

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ............................................................. 48, 49

*Royal Ins. Co. of Am. v. Sw. Marine*,
    194 F.3d 1009 (9th Cir. 1999) ............................................................... 83

*Ruiz v. McKaskle*,
    724 F.2d 1149 (5th Cir. 1984) ............................................................... 47

*S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*,
    234 F.3d 58 (1st Cir. 2000) ................................................................... 68

*Salinas v. Roadway Express, Inc.*,
    802 F.2d 787 (5th Cir. 1986) ................................................................. 50

*San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*,
    188 F.R.D. 433 (W.D. Tex. 1999) .......................................................... 54

*Sevarg Co. v. Energy Drilling Co.*,
    591 So. 2d 1278 (La. Ct. App. 1991) ..................................................... 83

*Smith v. Ajax Magnethermic Corp.*,
  No. 02-0980, 2007 WL 3355080 (N.D. Ohio Nov. 7. 2007) .................................................. 50

*Smith v. Crystian*,
  91 F. App'x 952 (5th Cir. 2004).......................................................................... 44, 46

*Smith v. Tower Loan of Miss., Inc.*,
  216 F.R.D. 338 (S.D. Miss. 2003)........................................................................... 46

*State of Oklahoma ex rel. Johnson v. Cook*,
  304 U.S. 387 (1938) ............................................................................................ 87

*Strong v. BellSouth Telecomms., Inc.*,
  137 F.3d 844 (5th Cir. 1998)................................................................................. 56

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) .............................................................................. 3, 48

*Turner v. Murphy Oil USA, Inc.*,
  472 F. Supp. 2d 830 (E.D. La. 2007) ............................................................... passim

*UAW v. Gen. Motors Corp.*,
  235 F.R.D. 383 (E.D. Mich. 2006)............................................................................ 3

*UAW v. Gen. Motors Corp.*,
  No. 05-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006) ................................. 55

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
  669 F.3d 632 (5th Cir. 2012).................................................................................. 45

*United States v. Citgo Petroleum Corp.*,
  No. 08-893, Doc. No. 234 (W.D. La. Sept. 29, 2011) ............................................ 64

*United States v. New Jersey*,
  No. 88-5087, 1995 WL 1943013 (D.N.J. Mar. 14, 1995)........................................ 44

*Walsh v. Popular, Inc.*,
  839 F. Supp. 2d 476 (D.P.R. 2012) ....................................................................... 57

*White v. Murtha*,
  377 F.2d 428 (5th Cir. 1967)................................................................................... 1

*Whitford v. First Nationwide Bank*,
  147 F.R.D. 135 (W.D. Ky. 1992)........................................................................... 44

*Williams v. Phillips Petroleum Co.*,
  23 F.3d 930 (5th Cir. 1994)...................................................................... 1, 22, 81

## **STATUTES**

28 U.S.C. § 1407 ................................................................................................................ 4, 99

28 U.S.C. § 1715 ..................................................................................................................... 85

28 U.S.C. § 1715(b) ............................................................................................................... 86

28 U.S.C. § 1715(f) ............................................................................................................... 86

33 U.S.C. § 2702(a) ............................................................................................................... 66

33 U.S.C. § 2702(b)(2)(B) ............................................................................................... 64, 66

33 U.S.C. § 2702(b)(2)(C) ..................................................................................................... 64

33 U.S.C. § 2702(b)(2)(E) ............................................................................................... 65, 67

33 U.S.C. § 2705(a) ............................................................................................................... 80

33 U.S.C. § 2713 ................................................................................................................ 1, 44

33 U.S.C. § 2713(c) ............................................................................................................... 65

33 U.S.C. § 2714(b)(2) .......................................................................................................... 80

33 U.S.C. § 2715 ............................................................................................................... 80, 81

33 U.S.C. § 2717(f) ............................................................................................................... 66

La. Civ. Code Ann. art. 2004 ................................................................................................. 83

## **RULES**

Fed. R. Civ. P. 23 .................................................................................................................. 89

Fed. R. Civ. P. 23(b)(3) ................................................................................................ 105, 106

Fed. R. Civ. P. 23(c)(2) ....................................................................................................... 106

Fed. R. Civ. P. 23(c)(2)(B) .................................................................................................. 106

Fed. R. Civ. P. 23(e) ....................................................................................................... 45, 91

Fed. R. Civ. P. 23(e)(1) ....................................................................................................... 108

Fed. R. Civ. P. 23(e)(3) ......................................................................................................... 12

Sup. Ct. R. 10(a) .................................................................................................................... 68

## OTHER AUTHORITIES

135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) ........................................................ 80

8 *Williston on Contracts* § 19:23 (4th ed.).................................................................. 83

Bureau of Ocean Energy Mgmt., Regulation & Enforcement,
   *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout* (2011) ............... 16

J. Steven Picou,
   *When the Solution Becomes the Problem: The Impacts of Adversarial Litigation*
   *on Survivors of the Exxon Valdez Oil Spill*, 7 U. St. Thomas L.J. 68 (2009) .......................... 76

Letter from Fifteen State Attorneys General
   to Senators Bill Frist & Harry Reid (Feb. 7, 2005),
   *reprinted in* 151 Cong. Rec. H644-45 (daily ed. Feb. 16, 2005) .............................................. 86

*Manual for Complex Litigation (Fourth)*.............................................................. 56, 84

Nat'l Acad. of Eng'g,
   *Macondo Well-Deepwater Horizon Blowout: Lessons for Offshore Drilling Safety* (2011) .... 16

Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling
   *Deep Water: The Gulf Oil Disaster and the Future of*
   *Offshore Drilling (Final Report)* (2011) .................................................................. 16

Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling,
   *Macondo: The Gulf Oil Disaster (Chief Counsel's Report)* (2011)......................................... 16

*Newberg on Class Actions* (4th ed.)............................................................... 44, 46, 56

Restatement (Second) of Torts (1965).................................................................. 63

S. Rep. No. 109-14 (2005),
   *reprinted in* 2005 U.S.C.C.A.N................................................................... 86

U.S. Coast Guard,
   *Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking &*
   *Loss of Eleven Crew Members Aboard the Mobile Offshore Drilling Unit Deepwater Horizon*
   *in the Gulf of Mexico* (2011) ................................................................. 16

## INTRODUCTION

Settlements are favored in the federal system.  *See Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir. 1994) ("Public policy favors voluntary settlement of claims . . . ."). Interminable litigation, by contrast, is deeply disfavored.  *See White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967) (referring to the "sound public policy that litigation should come to an end"). ***More than two decades*** were spent litigating disputes in both federal and state court arising out of the *Exxon Valdez* spill in 1989 before the Supreme Court brought a substantial measure of legal closure to that incident—and even so, some *Valdez* litigation remains ongoing.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008); *see also infra* n.36.  Indeed, Congress enacted the Oil Pollution Act of 1990 ("OPA") in response to the legal dysfunction revealed by the *Valdez* litigation, and as a result, OPA encourages settlements of spill claims whenever fairly possible. *See, e.g.*, 33 U.S.C. § 2713.

Consistent with the strong public policy favoring settlements, as underscored by OPA's policy favoring prompt resolution of disputes regarding oil spills, both BP (through movants BP Exploration & Production Inc. and BP America Production Company) and the Plaintiffs' Steering Committee ("PSC") were determined to avoid a repeat of the *Exxon Valdez* litigation cycle, and, if possible, to reach common ground for the benefit of the Gulf's citizenry.  In short, the parties sought to balance risks to each side, so that economic relief could be channeled on a timely basis to affected individuals and businesses, while minimizing burdens on the judicial system, potential trial witnesses, and the taxpaying public.  After many thousands of hours of legal negotiation and drafting, analysis from a broad team of experts, and a significant commitment of judicial resources in the form of Magistrate Judge Shushan's oversight and active mediation, BP (alongside the PSC) now seeks from the Court an order of final approval for the settlement that they hammered out over months of hard-fought negotiations.

There is no question that class action settlements require careful judicial scrutiny to ensure the fair treatment of class members, to ensure the absence of collusion, and to make certain that any settlement is constructed for the benefit of the entire class and not for its attorneys alone or even predominantly for its attorneys and class representatives.  But none of the problems that have existed in some other litigated class settlements can seriously be contended to exist here.  Outside of the Seafood Compensation Program, the settlement relief offered by BP is uncapped.  BP also voluntarily assumed the payment of ***all compensatory damages*** for class members, despite the significant—indeed substantial—causal role of other defendants in the incident.  Class representatives were not shown special treatment.  And a collusive arrangement between BP and class counsel simply ***would not*** have required the many months consumed in this settlement's excruciatingly detailed negotiations and indeed ***could not*** have occurred under the watchful eyes of Judge Shushan, who personally oversaw and mediated the settlement process and negotiations.

In this brief, BP explains in detail why this settlement is more than a fair, reasonable, and adequate resolution of this dispute.  Yet, while the Court necessarily must consider the Settlement Agreement in light of the facts that have been developed and the recovery that the class might obtain in litigation, it is important to stress that the Court's scrutiny of the Settlement Agreement should not rise to the level of a trial.  *See, e.g.*, *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) ("The court, however, must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial.") (alteration and quotation omitted).[1]   Rather, the Court should bear in mind that class action

---

[1] *See also Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("In evaluating these considerations, the Court must not try the case on the merits."); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) (explaining that the evaluation of a settlement "is not and cannot involve a trial on the merits"); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 228 F.R.D. 541, 553 (S.D. Tex. 2005) (stating that

settlements are entitled to a presumption of reasonableness, meaning that those few class members who have objected to the Settlement Agreement bear the burden of demonstrating that the Settlement Agreement is not fair, reasonable, and adequate—and that their objections rise to the level of being both valid and relevant. *See infra* Argument Parts I.A, III.A.

Precisely because the great benefits of this historic settlement—including its monetary and structural fairness to class members—are so self-evident, the Court in May 2012 preliminarily approved the comprehensive class action settlement that the parties present here for final approval to resolve the vast majority of the private claims for economic and property damages that arose against BP following the sinking of the *Deepwater Horizon* and the resulting oil spill. *See* Rec. Doc. 6418 ("Preliminary Approval Order"). In preliminarily approving the settlement, the Court concluded that it "appears fair, has no obvious deficiencies, does not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and does not grant excessive compensation to attorneys." *Id.* at 32.

In light of the Court's own initial judgment in May 2012 that the Settlement Agreement is fair and reasonable as well as the strong confirmation of that view by the objective facts developed in the record and the legal analysis summarized below, BP respectfully requests that the Court enter an order granting final approval to the Settlement Agreement.

---

evaluation of a settlement cannot involve a trial on the merits "because the policy of encouraging settlements is effected by 'the very uncertainty of the outcome of the litigation and the avoidance of wasteful litigation and expense'" (quoting *In re Corrugated Container*, 643 F.2d at 212); *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) ("[A] fairness hearing is not a trial, but instead has a very singular and narrow purpose—to determine whether the settlement at issue is fair, reasonable, and adequate."). Nor is it the Court's responsibility to determine whether, had negotiations proceeded differently, the class conceivably might have obtained even greater recovery. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 324 (3d Cir. 2011) (en banc) ("Notably, in conducting the analysis, the court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.") (quotations omitted).

## BACKGROUND

### I. PROCEDURAL HISTORY

#### A. Creation Of MDL 2179

On April 20, 2010, following loss of well control at the Macondo well in the MC 252 block in the Gulf of Mexico, an explosion and fire aboard Transocean's drilling rig *Deepwater Horizon* set in motion a tragic chain of events that led to eleven deaths, dozens of injuries, and an oil spill in the Gulf affecting multiple Gulf Coast communities and States. Notwithstanding BP's immediate and unflagging commitment to pay every legitimate claim for damages, BP quickly faced hundreds of lawsuits from private parties seeking compensation for economic and other losses.

This Court took charge of the cases filed in this District arising from the incident, and on August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding shareholder suits) in this District and assigned them to this Court pursuant to 28 U.S.C. § 1407. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).

On October 19, 2010, the Court issued Pretrial Order 11 ("PTO 11"), creating pleading bundles for various types of claims. *See* Rec. Doc. 569. Among the pleading bundles was the B1 bundle, which encompasses all private claims for economic loss and property damage. *Id.* at 3. In accordance with PTO 11, plaintiffs filed a B1 Master Complaint on December 15, 2010, Rec. Doc. 879, and filed an Amended B1 Master Complaint on February 9, 2011, Rec. Doc. 1128. After numerous defendants filed motions to dismiss the Amended B1 Complaint, the Court issued an order granting in part and denying in part these motions on August 26, 2011. *See* Rec. Doc. 3830. BP subsequently answered the First Amended Complaint on September 27, 2011. *See* Rec. Doc. 4130. To date, more than 109,500 claimants have filed short-form joinders

4

adopting the First Amended B1 Master Complaint.[2]

**B.**     **Unprecedented Depth And Volume Of Discovery In The Underlying MDL Proceedings**

In the 20 months that elapsed between the JPML's centralization order and this Court's preliminary approval order, the parties engaged in what the Court described in an understated fashion as "extensive discovery and motion practice."  Preliminary Approval Order at 3.  As the Court recognized, this extensive discovery included "taking 311 depositions, producing approximately 90 million pages of documents, and exchanging more than 80 expert reports on an intense and demanding schedule."  *Id.*  The parties also had the benefit of numerous governmental and other public investigations, as well as other sources of data reflecting on class members' damages, such as statements made on short form joinders ("SFJs") and information drawn from the record of payments from the Gulf Coast Claims Facility ("GCCF").  As a result of this extensive discovery, and with the benefit of information developed through the SFJs and the GCCF, the parties arrived at the eve of the Limitation and Liability trial scheduled and structured by Pretrial Order 41 (Rec. Doc. 4083) completely apprised of the operative facts and the potential risks and benefits of trial.  *See infra* Argument Part I.C.3.

**C.**     **Settlement Negotiations**

While conducting discovery at a truly breakneck pace (again overseen by Judge Shushan), the parties simultaneously engaged in extensive, good-faith, arms-length settlement negotiations.  All told, the parties engaged in more than 145 days of face-to-face meetings, as

---

[2] On April 16, 2012, following the parties' arrival at an agreement in principle, the PSC filed a new class action complaint captioned *Bon Secour Fisheries, Inc. v. BP Exploration & Production Inc.*, No. 12-970, Doc. No. 1 (E.D. La. Apr. 16, 2012).  The *Bon Secour Fisheries* class action complaint is similar to the Amended B1 Complaint and asserts four causes of action or accompanying forms of relief:  (1) negligence, gross negligence and willful misconduct, and breach of contract, under general maritime law; (2) OPA claims; (3) nuisance, trespass, fraudulent concealment, and strict liability claims, under federal or other applicable law; and (4) punitive damages on the foregoing claims.  *Id.* ¶¶ 319-432.  The PSC filed an amended complaint on May 2, 2012.  *See* Rec. Doc. 6412.  BP answered the amended *Bon Secour Fisheries* complaint on May 7, 2012.  *See* Rec. Doc. 6453.

well as numerous phone calls and WebEx conferences.  *See* Preliminary Approval Order at 3; *see also* Godfrey Decl. (Ex. 8) ¶ 2 (describing "many months of arms-length negotiations between counsel representing the Plaintiffs' Steering Committee ('PSC') and counsel for BP").

The parties initiated contact through their respective counsel and had preliminary meetings in early 2011.  *See* Godfrey Decl. (Ex. 8) ¶ 6.  The parties began negotiating in February 2011, *id.* ¶ 7, and negotiations were held on a sustained basis commencing in May 2011, *id.* ¶¶ 9-53.

"Talks intensified in July 2011, [also] occurring on an almost-daily basis."  Preliminary Approval Order at 3.  "In early 2012, Magistrate Judge Shushan became involved in the negotiations as neutral mediator."  *Id.*  Judge Shushan ensured that the negotiation process was fair and ethical, and her involvement over time became integral to resolving the litigation.  Not only was Judge Shushan heavily involved on a daily basis, but key compensation elements of the settlement were reached in her presence, with Judge Shushan engaged in intense shuttle diplomacy between class counsel and BP's counsel, who were in different rooms as she helped to broker the agreement's key compensation terms.

In negotiating the Settlement Agreement, the parties followed the same protocol for each type of claim:  rather than negotiating a total settlement ceiling, either for an aggregate class settlement or for any type of claim, the parties instead assessed the strength and value of each type of claim.  Without regard to total payout figures, the parties negotiated claims frameworks, programs, and processes, including details such as (1) what categories of claims would be paid, (2) what types of proof would be required for claimants to receive a settlement payment, (3) whether certain claimants should be permitted to benefit from causation presumptions that BP was willing to accept for settlement purposes (despite its informed legal views as to what

OPA or maritime law strictly demanded), and (4) how settlement benefits would be calculated. The negotiations were thus exclusively focused, from the outset, on producing claims frameworks that could be administered fairly, objectively, and consistently.

During this process, PSC and other counsel most familiar with each type of claim advised the negotiators to ensure that the frameworks reflected and were reasonably designed to address the actual situations faced by the claimants falling within each category. For example, attorneys representing business owners contributed to the development of the business economic loss framework. So, too, did attorneys representing employees inform the development of the individual lost wages framework; attorneys representing wetlands owners, the property damage framework; attorneys representing homeowners, the property sales loss framework—and so on. The parties also received input from class members during the process, ensuring that their voices were fully heard during the settlement negotiation process. Finally, as discussed below, *see infra* Part III.A.1, a Court-appointed neutral was central to the development of the Seafood Compensation Program.

### D.    Agreement In Principle And The Transition Process

On March 2, 2012, after the Court had already once adjourned the Limitation and Liability trial originally scheduled for February 27, 2012, *see* Rec. Doc. 5887, the parties informed the Court that they had reached an agreement in principle. After again adjourning the Limitation and Liability trial, *see* Rec. Doc. 5955, the Court entered its First Amended Order Creating Transition Process to facilitate the transition from the GCCF to the Court Supervised Settlement Program envisioned by the Settlement Agreement. *See* Rec. Doc. 5995.

As Meade Monger[3] explains, "The transition in this matter was seamless with relatively no impact on claimants."  Monger Decl. (Joint Ex. D) ¶ 31.  The Transition Order governed the Transition Process pending the Court's preliminary approval of the settlement and initiation of the settlement claims process.[4]  To aid in the transition from the GCCF to the new Settlement Program, the Court further appointed Lynn Greer as Transition Coordinator and directed her to establish the Transition Process.  *See* Rec. Doc. 5995.

### E.  Preliminary Approval And Conditional Class Certification

On April 18, 2012, the parties presented the Court with a joint motion for preliminary approval of the Settlement Agreement.  *See* Rec. Doc. 6266.  The PSC simultaneously moved for preliminary and conditional class certification, *see* Rec. Doc. 6269, and BP filed a conditional non-opposition to that motion the following week.  *See* Rec. Doc. 6348.  On April 25, 2012, the parties appeared before the Court for a preliminary approval hearing.

Following the preliminary approval hearing, on May 2, 2012, the parties presented the Court with a joint motion to approve a slightly amended settlement agreement.  *See* Rec. Doc. 6414.  Later that day, the Court granted the joint motion, preliminarily approved the Settlement

---

[3] Meade Monger founded and co-leads the Information Management Service practice of AlixPartners, where he is a Managing Director. Monger Decl. (Joint Ex. D) ¶ 1.  He has twenty-five years of professional consulting experience with extensive claims management experience working on many of the most complex claims assignments in history. *Id.* ¶ 4.  "Examples include claims associated with the restructuring of General Motors Corporation, claims of Aon's insurance policyholders over a twelve year period related to contingent commission payments, investor claims subject to the Bernard L. Madoff Investments fraud, customer claims against London based Lloyds TSB bank resulting from the UK Financial Service Authority payment protection insurance ruling of April 2011, claims associated with Kmart's restructuring that was the largest trade claims case in history, lead paint product liability claims against chemical company Lyondell and environmental claims against the large mining company Asarco." *Id.*

[4] During the Transition Process, claimants with an unpaid, unexpired offer pending before the GCCF could receive from the Transition Coordinator 60% of such an offer without signing a release.  Those claimants falling within the settlement class then had the option of receiving the greater of the remaining 40% of the GCCF offer, or the class settlement payment less any amount previously paid by the Transition Process.  *See* Rec. Doc. 5995 at 2-3.  During the Transition Process, the Transition Coordinator paid nearly 16,000 claims totaling $403 million.  *See* Monger Decl. (Joint Ex. D) ¶ 26.

Agreement, and preliminarily and conditionally certified the class for purposes of settlement only. The Court concluded that the Settlement Agreement "appears fair, has no obvious deficiencies, does not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and does not grant excessive compensation to attorneys." Preliminary Approval Order at 32. The Court further held that it was appropriate to preliminarily and conditionally certify the class for settlement purposes, *id.* at 26-29, and approved the proposed class notice, *id.* at 36-39. Finally, the Court (1) appointed Patrick Juneau, Esq. as Claims Administrator; (2) appointed Garden City Group, Inc., BrownGreer PLC, PricewaterhouseCoopers LLP, and Postlethwaite & Netterville as Claims Administration Vendors; and (3) ordered the new Court Supervised Settlement Program to open by June 4, 2012. *See id.* at 34-35.

    **F.**    **Class Notice**

Following the Court's grant of preliminary approval, the parties engaged in what is surely among the most thorough and comprehensive notice programs ever undertaken, *see infra* Argument Part IV. As the Court has explained:

> The Notice Plan contemplates direct mailed notice to individual class members, to the extent known, and their attorneys, to the extent known. In addition, the Notice Plan provides for a broad-reaching published Notice in numerous national and local media, with a notice effort covering the entire United States, primarily focusing on the main impact States of Louisiana, Alabama, and Mississippi, and enumerated counties in Texas and Florida. Furthermore, banner notice ads will appear on national and local web properties. A complete copy of the Proposed Settlement with exhibits will be provided to any individuals or entities wishing to determine whether they are class members and what their rights are under the Proposed Settlement. There will also be a case website where potential class members can obtain additional information and documents, including a list of frequently asked questions that will be regularly updated to provide useful information about the Settlement.

Preliminary Approval Order at 37-38.

### G.      Opening Of The Settlement Program

Consistent with the Court's order, the Deepwater Horizon Court Supervised Settlement Program commenced operations on June 4, 2012.  *See* Preliminary Approval Order at 35.  As of August 10, 2012, 48,954 claims had been submitted to the Settlement Program or were in process.  The Program is readily accessible to claimants.  For instance, the Program's presence on the Internet is ubiquitous.  In fact, typing a search into the Google, Bing, or Yahoo! search engines for "Deepwater Horizon" displays the Program's website at or near the top of the search results.  *See Deepwater Horizon Court-Supervised Settlement Program*, http://www. deepwaterhorizonsettlements.com.  Translations of the site into Spanish and Vietnamese enhance its accessibility to claimants.

### H.      Objections And Opt-Outs Versus Claims Volume And Class Size

While the opt-out and objections deadlines have not yet arrived, the initial reception of the Settlement Agreement by the class has been positive.  To date, fewer than 75 persons have objected to the Settlement Agreement, and the number of opt-outs appears to be low in light of the great size of the class.  (In Argument Part III, *infra*, BP summarizes why the few objections received to date—many of which are not from class members, and many of which are duplicative form objections—lack merit.)  In contrast, even in advance of the Court's grant of final approval, nearly 50,000 persons have submitted or started to submit claims to the Court Supervised Settlement Facility.  And, as discussed below, millions of people and businesses have received notice of the Settlement Agreement.  *See infra* Argument Part IV.A.1.

## II.   SETTLEMENT CLASS DEFINITIONS AND EXCLUSIONS

To effectuate the settlement, the PSC is filing a separate motion to finally certify the class of individuals and businesses that the Court preliminarily certified in May.  *See* Preliminary

Approval Order.  BP will not oppose that motion on the condition that the Court grants final approval to the Settlement Agreement.

The class definition is set out in the Preliminary Approval Order and need not be restated here.  But several key features of the economic loss and property damages class definition bear noting by way of background.  *First*, the class definition is detailed.  Its length reflects the care taken by the parties to establish precise metes and bounds for the class.

*Second*, the class definition references geography to reduce or eliminate disputes regarding whether particular claims are included and to focus relief on those in the most affected areas of the Gulf region.  *See, e.g.*, Coffee Decl. (Joint Ex. C) ¶ 4 ("Also simplifying this case is the fact that the class definition carefully excludes remote claimants . . . . This deliberately narrow definition of the class . . . ensures that this class action will remain compact and that class members will be similarly situated (and hence more cohesive).");[5] Miller Decl. (Ex. 15) ¶ 13 ("Among the most important structural features in this settlement is the class definition, which clearly and objectively defines the class in terms of time period, geographic region, and type of claim.").[6]

*Third*, the class definition takes pains to specify a list of exclusions, for two reasons: (1) to exclude claims that BP does not believe are even colorably compensable under OPA or maritime law; and (2) to avoid the inclusion of claims that could not be efficiently resolved by a

---

[5] The parties jointly have submitted the declaration of John C. Coffee, Jr., the Adolf A. Berle Professor of Law at Columbia Law School and a leading expert in class action law.  Professor Coffee's declaration sets forth his independent opinions regarding certification of the Economic and Property Damages Settlement Class, which the parties agree should be considered by the Court.  BP agrees, for settlement purposes, with Professor Coffee's conclusion that the proposed settlement class satisfies all the requisites for class certification in this case, even though BP does not necessarily agree with every specific statement in his declaration.  It would be inappropriate to utilize or apply this declaration outside the context of this class settlement.

[6] Professor Geoffrey P. Miller is the Stuyvesant P. Comfort Professor of Law at New York University and a leading expert in class action law.  *See* Miller Decl. (Ex. 15) ¶ 1.

definable and administrable claims framework.  *See* Miller Decl. (Ex. 15) ¶ 21 ("The exclusions reduce the risk that such claims would distort the orderly and rational allocation of settlement benefits to persons and entities who were most affected by the Incident.").  The result is a class that is neither sprawling nor under-inclusive, but instead carefully tailored to what the parties could reasonably agree on against the backdrop of the uniform body of OPA and maritime law that the Court has ruled is applicable (but while preserving any BP objections to this Court's prior rulings).

## III.     SUMMARY OF THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT

Like any settlement, the settlement that has been reached to resolve this litigation is "a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *Altier v. Worley Catastrophe Response, LLC*, No. 11-241, 2012 WL 161824, at *14 (E.D. La. Jan. 18, 2012) (quotation omitted).  The settlement stands alone, however, in its substantive generosity to class members and in its procedural fairness.[7]

### A.     The Settlement Agreement Contains Important Features That Guarantee Its Fairness To Class Members.

The Settlement Agreement includes six overarching features that guarantee its fairness and adequacy to class members.

#### 1.     All But One Program Of The Settlement Agreement Provides For Uncapped Relief.

A key feature of this settlement is its open-ended commitment to pay all proven claims for economic damages, with no limitation on BP's overall liability.  *See* Preliminary Approval Order at 31 ("The comprehensive system of claims frameworks featured in the Settlement

---

[7] Consistent with Federal Rule of Civil Procedure 23(e)(3), there is no "agreement made in connection with th[is] proposal" other than the Economic and Property Damage Class Settlement Agreement.

Agreement . . . provides for class recovery unlimited by any aggregate cap [and] does not constitute a limited fund to be divided among competing claimants . . . ."); Coffee Decl. (Joint Ex. C) ¶ 8 ("Because the liability of the BP Parties is uncapped, a payment to one claimant in no way depletes the funds available for others.  In short, there is no zero-sum game."); Richardson Decl. (Ex. 16) ¶ 32 ("The most compelling point regarding the fairness of the Economic Damage Claim Frameworks . . . is that there are no limits on the total amount to be paid for individual or business economic losses.").[8]  Rather, all claims that meet the criteria for each program will be paid in full, and without delay.

The only component of the Settlement Agreement that is capped is the Seafood Compensation Program, to which a total of $2.3 billion has been allocated.  *Id.*  Significantly, the PSC agrees that this amount is nearly five times the total annual revenues of seafood harvested in the class geography—and this does not include the more than $700 million that the GCCF spent prior to the settlement compensating persons in the seafood industry.  *See* PSC Slides Supporting Preliminary Approval at 28 (April 25, 2012), *available at* http://www.bpmdl2179.com/sites/www.bpmdl2179.com/files/pdfs/Class%20Presentation.pdf (noting that between 2007 and 2009, the total revenues for harvesting of Seafood species included in the Seafood Compensation Program from the Gulf Coast Area totaled $476.12 million); Apr. 25, 2012 Preliminary Approval Hr'g Tr. at 38:14 (comments of Mr. Rice for the same proposition); Herman Decl. (Rec. Doc. 7101-7) ¶ 11 (describing the $2.3 billion figure as "more than sufficient to adequately compensate past and future commercial fishing losses");

---

[8] Dr. James A. Richardson is the John Rhea Alumni Professor of Economics, the Harris J. and Marie C. Chustz Distinguished Professor in Business Administration, and Director of the Public Administration Institute in the E. J. Ourso College of Business at Louisiana State University.  Richardson Decl. (Ex. 16) ¶ 5.  Dr. Richardson has served continuously since 1987 as the private economist on Louisiana's Revenue Estimating Conference, the panel responsible for providing official revenue estimates for the state.  *Id.* ¶ 14.

13

Balhoff Decl. (Joint Ex. B) at 4 (noting that the GCCF spent more than $700 million compensating seafood claimants);[9] Perry Decl. (Joint Ex. E) at 4 (same).

At the parties' suggestion, the Court appointed John W. Perry, Jr., of Baton Rouge to preside over the negotiation of a settlement framework for the Seafood Compensation Program. *See* Rec. Doc. 5998.  To do so, Mr. Perry and his law partner Daniel Balhoff met with participants in the industry, their attorneys, members of the PSC, counsel for BP, and various experts retained by the parties, overseeing both the development of methodologies for evaluating and compensating various types of seafood claims and other issues regarding the program.  *See* Perry Decl. (Joint Ex. E) at 2; Balhoff Decl. (Joint Ex. B) at 3 (Seafood Compensation Program methodologies designed to: (1) be transparent; (2) be consistently tailored to the types of species and claimants; (3) be easy to administer; (4) be framed with sufficient detail, so as to avoid inconsistent treatment; (5) incorporate hardship exceptions; and (6) overall, provide fair and adequate compensation to claimants); *see also* Coffee Decl. (Joint Ex. C) ¶ 8 ("[T]he Seafood Compensation Program is capped, but in its case the allocation of funds has been made by a court-appointed neutral party . . . and this objective allocation did not invite competition or jockeying for position within the class.").

**2.    The Settlement Agreement Includes Generous Risk Transfer Premiums That Could Not Be Obtained Through Adversarial Litigation.**

Claimants in most of the claims categories will receive, in addition to calculated baseline compensation, Risk Transfer Premium ("RTP") payments.[10]  *See* Agreement Ex. 15.  The RTP

---

[9] Daniel J. Balhoff is a partner in the Baton Rouge law office of Perry, Atkinson, Balhoff, Mengis & Burns, L.L.C. Balhoff Decl. (Joint Ex. B) at 1.  As described in the main text, he worked closely with his law partner John W. Perry, Jr., in overseeing the development of the Seafood Compensation Program.

[10] RTPs are multiples of baseline compensation added to many class members' compensatory damages awards. For example, if the compensation amount is $10,000 for a tourism-related injury, and the RTP applicable to a recovery

14

payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors.

As Dr. Henry Fishkind[11] explains, the use of an RTP multiplier to compensate class members for the risk of future injury "is an economically sound method." Fishkind Decl. (Ex. 4) ¶ 33. While RTPs are available for the majority of claims compensated under the settlement, they are not available for claims that do not involve any risk of future injury, such as claimants seeking compensation for their participation in the Vessels of Opportunity ("VoO") program.

As explained below, *see infra* Argument Parts II.A.4, II.E, claimants would be unable to obtain multiples of their established damages if this case were not resolved by settlement. And even if claimants could seek compensation for future losses outside the context of the settlement, as further explained *infra* Argument Part II.F, the risk of future loss is low in light of the robust recovery that the Gulf is undergoing. Finally, even if a claimant could recover something in the future, it would be in the far distant future, as the *Exxon Valdez* case well illustrates. All of these factors demonstrate that the generous RTPs provided for by the settlement are more than fair, reasonable, and adequate.

> **3.    The Settlement Agreement Completely Satisfies The Class's Claims For Compensatory Damages, Including For Damages Caused By Transocean And Halliburton.**

Paragraph 4.4.10.3 of the Settlement Agreement provides for the satisfaction of all

---

of that type is 2.5, then $10,000 is multiplied by 2.5, which product is then added to the $10,000 to reach the total amount of compensation (*i.e.,* $10,000 + $25,000 = $35,000 in total compensation).

[11] Dr. Fishkind is an economist with over 30 years of experience in economic analysis and forecasting. Fishkind Decl. (Ex. 4) ¶ 4. He has extensive experience as a damages expert in economic loss cases. *Id.* ¶ 21. He has served on the Florida Governor's Council of Economic Advisors under two different administrations, those of Governors Graham and Bush. *Id.* ¶ 9.

economic and property damage claims by class members arising out of the oil spill, even though (1) every prior factfinder to consider the *Deepwater Horizon* incident has concluded that significant causal responsibility must be laid at the feet of BP's co-defendants, Transocean and Halliburton;[12] and (2) BP was prepared to demonstrate as much at trial, *see infra* Argument Part II.A.   In light of BP's demonstrated commitment to the Gulf Coast and its co-defendants' stubborn refusal to contribute or pay anything at all to the citizens and communities that they have damaged, BP alone has taken the extraordinary step of agreeing to pay ***all compensatory damages*** of class members itself even though the incident and resulting spill was a multi-party, multi-causal event.

### 4.     The Settlement Agreement Assigns Various Of BP's Valuable Claims Against Transocean And Halliburton To The Class.

Paragraph 11 of the Settlement Agreement assigns spill-related claims that BP has against Transocean and Halliburton to the class.   *See* Preliminary Approval Order at 6-7 ("Under the Proposed Settlement, BP will also assign certain of its claims against Transocean and Halliburton to the settlement class.").   The assigned claims include claims "relating to the repair, replacement, and/or re-drilling of the Well and the costs BP incurred to control the well and/or respond to and clean up the spill."  *Id.* at 7 n.12.  Indeed, since the blowout of the Macondo well, BP has spent more than $22 billion to compensate governmental entities, individuals, and businesses, as well as to engage in response and cleanup; the assignment to the PSC includes

---

[12] *See, e.g.*, Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling (Final Report)* (2011); Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Macondo: The Gulf Oil Disaster (Chief Counsel's Report)* (2011); Bureau of Ocean Energy Mgmt., Regulation & Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout* (2011); U.S. Coast Guard, *Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking & Loss of Eleven Crew Members Aboard the Mobile Offshore Drilling Unit Deepwater Horizon in the Gulf of Mexico* (2011); Nat'l Acad. of Eng'g, *Macondo Well-Deepwater Horizon Blowout: Lessons for Offshore Drilling Safety* (2011).  While these reports form a backdrop to the parties' negotiations, the Court has correctly ruled that they are inadmissible at any trial.  *See, e.g.,* Rec. Doc. 5810; Rec. Doc. 5635; Rec. Doc. 5448.

claims for recovery of much of that amount.  The class may pursue these claims for additional compensation on top of the settlement's full compensatory payments to class members that already have been augmented by RTPs.  As an added advantage, instead of fomenting waves of follow-on contribution litigation, BP's agreement to satisfy class members' compensatory damage claims and to assign its rights against Halliburton and Transocean will help make any follow-on litigation more self-contained and manageable.

> **5.    The Settlement Agreement Has Allowed Claimants To Receive Settlement Payments Prior To The Court's Grant Of Final Approval.**

In most class settlements, no class member sees a penny of recovery until the objections have been resolved, the district court has entered a final judgment, and all appeals have run their course.  In contrast, in this settlement "claims may be made and paid under the terms of the Proposed Settlement without the imprimatur of final settlement approval."  Preliminary Approval Order at 31.  Indeed, as of this filing, even without the protection of a class-wide final judgment, BP (through the claims facility) has commenced paying claims.  As the Court has previously recognized, "[t]his is an ***unusual and particularly beneficial*** feature of the Proposed Settlement for Class Members."  *Id.* at 31-32 (emphasis added); *accord* Monger Decl. (Joint Ex. D) ¶¶ 8-9 ("A common theme throughout my experiences is that claimants desire to be paid as soon as possible. . . . This feature is beneficial to Class Members in that they have the ability to receive a payment based on the framework of the Settlement Agreement without having to wait for final Court approval of the agreement, including the exhaustion of any appeal periods[,] or pursue an individual claim against BP.").

> **6.    The Settlement Agreement Provides For Payment Of Attorneys' Fees Separate And Entirely Apart From The Benefits Paid To The Class.**

As the Court has previously recognized, "any Class Counsel fees and costs awarded by the Court will not be deducted from Class Members' recoveries or their private attorneys' fees,

but will be paid by BP in addition to other class benefits." Preliminary Approval Order at 32; *see also* Apr. 25, 2012 Preliminary Approval Hr'g Tr. at 54:8-12 ("It's important, I think, for people to understand: In this proposed settlement, the attorney's fees are being paid by, will be paid, whatever the amount is, by BP over and above the amounts that the claimants received."). This provision of the parties' agreement further ensures that each class member will recover one hundred percent of demonstrable losses.

Additionally, the issue of attorney's fees and their amount was not negotiated until all other components of the settlement were agreed upon. In fact, the total amount and all other terms in Exhibit 27 in the Settlement Agreement were not negotiated and agreed to until the final day before the Settlement Agreement was filed, after all other issues had been resolved.[13] "'Because the parties ha[d] not agreed to an amount or even a range of attorneys' fees, there is no threat of the issue explicitly tainting the fairness of settlement bargaining.'" *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, --- F. Supp. 2d ----, MDL No. 09-2046, 2012 WL 948365, at *16 (S.D. Tex. Mar. 20, 2012) (quoting *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D. La. 2007)).[14]

## B. The Settlement Agreement's Procedural Elements Guarantee Fairness To Class Members.

The parties negotiated the Settlement Agreement to be both procedurally and substantively fair. BP begins by describing the Settlement Agreement's procedural elements.

---

[13] *See* Apr. 25, 2012 Preliminary Approval Hr'g Tr. at 53:17-22 ("At the conclusion of the negotiations of all essential terms and agreement, we presented the Court with what we call *a Bubble Wrap document* so that it was clear that everything was done. We received permission from the Court to have discussions about attorneys fees and costs.").

[14] *See also Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006); *McAlarnen v. Swift Transp. Co.*, No. 09-1737, 2010 WL 365823, at *12 (E.D. Pa. Jan. 29, 2010).

### 1.      Creation Of The Court Supervised Settlement Program

The Court Supervised Settlement Program opened for business on June 4, 2012.  It already has begun paying claims to class members.  BP has agreed to pay all administrative costs, which are substantial, but the Settlement Program is and will remain independent of BP.

The Settlement Program is designed to be responsive to claimants.  It functions neither as a depersonalized bureaucracy nor as an adversarial system.  Instead, the parties have agreed that the Settlement Program will offer various forms of assistance to class members in the claims-submission process:

> The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes.  The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

Agreement ¶ 4.3.7; *see also* Monger Decl. (Joint Ex. D) ¶ 16 ("It is unusual that claims administrators play this role. . . . [T]hese unique requirements under the Settlement Agreement are beneficial to claimants.").

Claimants are able to submit claims over the Internet, in person, by mail, or by fax.  *See* Deepwater Horizon Claims Center, Frequently Asked Questions ¶ 91, http://www.deepwaterhorizoneconomicsettlement.com/faq.php; *see also* Monger Decl. (Joint Ex. D) ¶ 28 ("Claims portals provide for ease of submission to claimants and can speed up the overall claims process when widely used."); Richardson Decl. (Ex. 16) ¶ 60 (concluding that the settlement is "sufficiently simple so that an unreasonable burden is not levied against claimants in filing their claims").  Once submitted, claims are evaluated and processed by the Court-

19

appointed claims administration vendors.  *See* Agreement ¶ 4.3.8.  In the evaluation of claims, there is no relevance or effect ascribed to the fact that any claimant has previously had a claim denied or rejected by the GCCF.  *See id.* ¶ 4.4.9; *cf.* Monger Decl. (Joint Ex. D) ¶ 20 ("Most claims matters adopt previous decisions and rarely give consideration to claims that were previously denied.").

The claims administration vendors "shall evaluate and process the information" submitted by the claimant "to produce the greatest Economic Damages Compensation Amount that such information and supporting documentation allows under the terms" of the Settlement Agreement, even if the claimant has not selected the most favorable Benchmark and Compensation periods.  Agreement ¶ 4.3.8; Henley Decl. (Ex. 10) ¶ 16(e) ("Thus, even if the claimant fails to select the optimal Base Year and Compensation Period, the Claims Administrator is required to do that for the claimant to maximize his recovery.");[15] Fishkind Decl. (Ex. 4) ¶ 39(c) ("This sort of 'best outcome' provision is unique in my experience."); Richardson Decl. (Ex. 16) ¶ 64 ("The process is designed so that the average claimant can file the Individual Economic Loss claim form and be assured of getting the highest possible Economic Damage Compensation Amount given that the appropriate information is provided."); Sharp Decl. (Ex. 18) ¶ 20 ("Moreover, the Settlement Agreement provides that, if the claimant fails to select the most favorable Benchmark Period from the standardized options, the Settlement Program shall identify and select the most favorable Benchmark Period (i.e., the Benchmark Period that maximizes the claimant's compensation) in processing the claim.").[16]

---

[15] James L. Henley, Jr., is a certified public accountant and attorney licensed and in good standing in Mississippi. Henley Decl. (Ex. 10) ¶ 3.  He has served as a United States Bankruptcy Trustee, and also as an expert witness in connection with business disputes.  *Id.*  He is also a pastor at Fresh Start Christian Church in Jackson, Mississippi. *Id.* ¶ 4.

[16] Holly Sharp is a Certified Public Accountant, Certified Fraud Examiner, shareholder in a Louisiana CPA firm, and Adjunct Professor of Taxation at the A.B. Freeman School of Business at Tulane University, where she has

Finally, many claimants (those seeking compensation for economic loss and seafood claims) can receive reimbursement for accounting fees reasonably incurred to prepare their claims.  This further ensures that each claimant receives his or her maximum possible recovery. *See* Agreement ¶ 4.4.13; *see also* Henley Decl. (Ex. 10) ¶ 16(d) ("By encouraging claimants to obtain accounting assistance, this provision increases the likelihood that claimants will submit properly documented claims . . . ."); Monger Decl. (Joint Ex. D) ¶ 17 ("A requirement to reimburse fees to claimants is unusual and generally does not happen in most claims matters."); Sharp Decl. (Ex. 18) ¶ 13 ("Reimbursement of accounting fees provides an added benefit to the business claimant under the Settlement Agreement because an ordinary business litigant would not necessarily receive reimbursement of its accounting fees as part of a settlement."); Richardson Decl. (Ex. 16) ¶ 63 ("The availability of reimbursement for accounting fees reasonably incurred to prepare a claim will facilitate potential claimants seeking professional assistance.").

## 2.  Internal Appellate Procedure

Beyond providing transparent, objective, and fair rules for calculating compensation awards, the Settlement Agreement provides for multiple levels of robust internal appellate review.  Claimants have the right to appeal denials of claims for insufficient documentation and to challenge any final determination made in their cases by the Settlement Program.  *See* Agreement ¶¶ 6.1.1, 6.1.2.  BP, in contrast, is able to appeal only where an individual claimant is awarded more than $25,000 in base compensation.  *See id.* ¶ 6.1.2.4.  Appeals as to the amount of compensation will be decided using so-called "baseball arbitration," where the appellate panel must select either the amount advanced by the claimant or the amount advanced by BP.  *See id.*

---

taught since 1999.  Sharp. Decl. (Ex. 18) ¶ 3.  She has extensive experience in analyzing economic loss claims, including work on behalf of plaintiffs, defendants, and insurers in the wake of Hurricane Katrina.  *Id.* ¶¶ 4-5.

¶ 6.2.  If the amount at issue is more than $1,000,000 in base compensation, an appeal will be considered by a three-member panel; if the appeal is taken by a claimant, at least one panel member must be from the claimant's home state.[17]  *See id.* ¶ 6.1.2.2.5.2.  As Monger explains: "Some claims settlements are silent on appeals and some contain an appeals process, but none seem to be as robust as the multiple layer appeals process set forth in the Settlement Agreement." Monger Decl. (Joint Ex. D) ¶ 22.  "Therefore, the requirements under the Settlement Agreement for a multiple claims review structure are beneficial to Class Members in this matter."  *Id.*

The Court appointed 21 appellate panelists on June 26, 2012.  *See* Rec. Doc. 6796.

### 3.     Assignment, Release, And Other Protections

Under the Settlement Agreement, all class members who accept payment from the new Settlement Program must individually agree to release, forever discharge, and covenant not to sue, *inter alia*, (1) BP, (2) all federal and state oil spill liability funds, and (3) every one of the other listed "Released Parties" (including all defendants in the *Deepwater Horizon* litigation except Halliburton and Transocean[18]) for any and all defined released claims arising from or relating in any way to the DWH Spill.  *See* Agreement ¶ 10; *cf. Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 373 (5th Cir. 2002) ("Public policy favors voluntary settlement of claims and enforcement of releases.") (quoting *Williams*, 23 F.3d at 935).  Participating class members, however, have reserved all punitive damage claims against Transocean and Halliburton.  In

---

[17] Both the $25,000 and $1,000,000 appeal thresholds referred to in this paragraph refer to base compensation, prior to application of a risk transfer premium ("RTP").

[18] Under the Settlement Agreement, BP has paid ***all compensatory damages*** of the class members, but the Agreement allows the plaintiffs to continue to seek punitive damage recoveries from Halliburton and Transocean, which is the sole basis for the exclusion of those defendants from the release.  The plaintiffs agreed to settlement terms that effectuate the parties' intent to allow the plaintiffs to seek exclusively punitive damages against Halliburton and Transocean.  This settlement included, among other protections running to BP, an agreement by plaintiffs (1) not to seek compensatory damages against Halliburton or Transocean; and (2) not to execute on any compensatory damages that might be awarded to plaintiffs against Halliburton and Transocean.  *See* Agreement ¶ 11.

addition, the Settlement Agreement expressly reserves specific carved-out claims to class members.[19]

### 4.   Final Judgment

Under the Settlement Agreement, the parties agreed to seek a final judgment approving the Settlement Agreement, certifying the class for settlement purposes, and dismissing all of the released economic loss and property damage claims of the Economic Loss Class against BP and the other released parties.  BP, moreover, agreed not to contest a request by the PSC for fees, costs, and expenses up to a maximum of $600 million jointly for both the Economic Loss and Property Damages and the Medical Benefits Class Settlements, should such an award be approved by the Court.  BP requests here a final judgment approving the settlement and dismissing all released claims; in a separate motion, the PSC is simultaneously seeking both identical relief and final certification of the class for settlement purposes.  *See* Rec. Doc. 7101.

### C.   The Settlement Agreement's Payment Categories Guarantee Fairness To Class Members.

The Settlement Agreement permits class members to submit multiple claims and receive compensation for multiple categories of damages even if they do not file all their claims simultaneously.  Claimants may file additional claims (other than Seafood Compensation Program Claims) up to six months from the date of initial payment by the Settlement Program of the Claimant's first paid claim.[20]  *See* Settlement Agreement ¶ 4.4.8; Monger Decl. (Joint Ex. D) ¶ 19 ("This aspect of the Settlement Agreement provides Claimants with the ability to file claims immediately and receive payments on those claims without having to determine and assert all

---

[19] For example, class members can participate in the settlement while reserving any claims for moratorium-related loss against BP or the Released Parties.  *See* Agreement ¶ 3.3.

[20] The sole exception is the Seafood Compensation Program, in which Claimants must submit claims within thirty days of the Court's final approval order.  *See* Agreement ¶ 5.11.9.

claims at the same time.").   Moreover, for claims other than Seafood Compensation Program

Claims, the deadline for filing all claims is the later of April 22, 2014 or six months after the

Effective Date.  (Settlement Agreement ¶ 5.11.8).

In total, the settlement provides for recovery in the following categories of economic and

property damage or loss:

1.  Economic Damage Compensation

    Individual Economic Loss
    Business Economic Loss
    Multi-Facility Business
    Failed Business
    Failed Start-Up Business
    Start-Up Business

2.  Property Damage

    Coastal Real Property Damage
    Wetlands Real Property Damage
    Real Property Sales Damage

3.  VoO Charter Payment

4.  Vessel Physical Damage

5.  Subsistence Damage

6.  Seafood Compensation Program

    Shrimp
    Oyster
    Finfish
    Blue Crab/Other Seafood
    Seafood Crew

The formulas were negotiated at length by "the Parties' counsel, assisted and informed by

experts and colleagues with specialized knowledge of various aspects of the litigation and the

array of claims categories."   Preliminary Approval Order at 30.  These experts, who included

economists, accountants, and real estate experts, among others, analyzed and responded to

questions posed by both BP and the PSC throughout the negotiation process.  *See, e.g.*, Herman

Decl. (Rec. Doc. 7101-7) ¶ 6; *cf.* Miller Decl. (Ex. 15) ¶ 25 ("To assist in the settlement process

and to provide counsel on broad questions of settlement strategy and design, both sides enlisted

the aid of academic consultants:  myself, for the defendant; Professor Samuel Issacharoff for the

plaintiffs; and Professor John C. Coffee.").

Separate and apart from these claims frameworks, BP has also agreed to fund both

settlement and claims administration and the notice program; to provide a separate fund of $57

million to promote the Gulf Coast and its waters;[21] to fund a supplemental publicity campaign up to $5 million to be designed and administered by the PSC; and to reimburse all categories of claimants for accounting services required for filing their claims.

### 1.   Economic Loss

#### a.   Individuals

As the Court has previously explained, "individual economic loss claims are calculated as the estimated difference between a claimant's expected earnings from a job within the class geography during May to December 2010 (or April 2011 in the case of certain seafood industry claimants), and the claimant's actual earnings during that claim period." Preliminary Approval Order at 7. This method of compensation is designed to assess the loss that individuals suffered as a result of the spill. *See, e.g.*, Henley Decl. (Ex. 10) ¶ 14 ("The IEL Framework applies a well-established approach for analyzing lost earnings that is similar to the approach I and others use in determining lost earnings in litigation."); Sharp Decl. (Ex. 18) ¶ 46 ("The individual economic loss framework in the Settlement Agreement applies generally accepted and established methods for individual claimants to receive compensation for lost earnings."); Landry Decl. (Ex. 13) ¶ 41 ("The framework for individuals provides a reasonable, adequate, and fair process for compensating employees in the hotel and hospitality industry. The process requires documentation of earnings and includes employer's sworn statements for individuals lacking tax or employer documentation.");[22] Richardson Decl. (Ex. 16) ¶ 62 ("The Individual

---

[21] As Dr. Fishkind explains, the fund will "provide a substantial economic benefit to the class because it directly stimulates economic activity in the near-term and enhances brand value of the destinations in the long-term." Fishkind Decl. (Ex. 4) ¶ 116.

[22] Donald J. Landry is the owner of Top Ten Hospitality Advisors, an independent consulting company that provides networking, marketing, and development services to industry owners, operators, developers and suppliers. Landry Decl. (Ex. 13) ¶ 2. He is a 43-year veteran of the lodging industry who began his career at Sonesta Hotels in New Orleans while completing his business management degree at the University of New Orleans, and he has served as president of some of the largest hotel management, real estate, and franchise companies in the world. *Id.* ¶¶ 4-5.

Economic Loss Claims Framework . . . is consistent with the standard calculation of wage losses.").

Causation presumptions that do not exist in OPA are created for those individuals most likely to have been affected by the spill, including those on the coast and those employed in the Tourism Industry, Charter Fishing business, and certain seafood-related businesses. *See* Henley Decl. (Ex. 10) ¶ 16(a) ("For many categories of claimants the IEL Framework presumes causation."); Richardson Decl. (Ex. 16) ¶ 68 (similar). These causation presumptions are rationally tied to the economic impact of the spill. *See* Fishkind Decl. (Ex. 4) ¶ 30-30(a) ("The causation requirements of the Economic Damage Claim Frameworks are transparent and consistent with economic logic and data regarding the impact of the DWH Spill. The use of geographic and industry criteria to establish presumptions of causation for purposes of settlement is economically appropriate and promotes efficiency for both Claimants and claims administration."); Sharp Decl. (Ex. 18) ¶ 51 (describing the causation presumptions as "rational but generous").

Other individual claimants are required to demonstrate a loss of earnings attributable to the spill during April 21, 2010 through December 31, 2010 (or other applicable period in the case of certain Seafood Industry claimants) based on financial information or other supporting documents. The causation standards "provide clear, well-defined standards which offer claimants several options for establishing causation that accommodate various individual circumstances." *Id.*

Four documentation categories are established:

**Category I:** Claimants with Tax Information Documents for 2010 and prior Benchmark Period years, including both full-year and seasonal workers, must submit them, along with Pay Period Earnings Documentation, if they possess it.

**Category II:**  Claimants without such Tax Information Documents, but who have Pay Period or other Earnings Documentation for 2010 and prior Benchmark Period years, must submit such documentation.

**Category III:**  Claimants with Tax Information Documents or Pay Period Earnings Documentation for 2010 but who lack comparable pre-2010 documents because they were New Entrants To Employment, Career Changers, or had less than 12 months of earning history in the Claiming Job as of April 20, 2010, must provide documents for 2010 and prior and subsequent years so that an appropriate basis for comparison of projected and actual 2010 earnings can be established.

**Category IV:**  Claimants without any earnings documentation who were employed in Zones A, B, or C must submit their own sworn written statements, as well as supporting sworn written statements by their employer(s) and are subject to additional requirements for establishing causation.[23]

*See* Agreement Ex. 8A at 2.

Individual compensation includes several components and depends in part on the amount of documentation provided.   As Sharp explains, the "required documents are relevant to causation and damages analysis and are the types of documents that should be kept by or are readily available to individuals."  Sharp Decl. (Ex. 18) ¶ 47; *see also* Henley Decl. (Ex. 10) ¶ 7 ("The documentation requirements are logically related to the information required to evaluate claims, require submission of documentation and information that should be readily available to claimants, and, in addition, are flexible in permitting documentation alternatives."); Landry Decl. (Ex. 13) ¶¶ 41-42 (same, specifically for tourism employees).  Specifically, the documentation requirements balance the need for demonstrating causation and lost earnings with recognition of

---

[23] Self-employed individual vendors are compensated subject to a special compensation framework tailored to their business.  Individual Periodic Vendors, who periodically made retail sales of goods or services to Non-Local Consumers in certain zones during 2009 and 2010, did not maintain a fixed business location in a building from which they made the sales, and do not have Tax Information Documents sufficient to make a claim for Business Economic Loss must provide other information regarding those sales and a supporting Sworn Statement from an adjacent business.  Similarly situated Festival Vendors, who engage in comparable activities at defined Festivals or major sporting events, need to provide similar documentation, including a sworn statement from the Festival Coordinator or other individual with knowledge of the Festival Vendor's activities.

individuals' varying employment circumstances and ordinary record-keeping practices—factors not accounted for in OPA.

Moreover, the "Settlement Agreement is unusual in allowing individual claimants who cannot provide tax documentation or pay period documentation to rely instead on sworn written statements to establish employment, causation and lost income related to that employment." Sharp Decl. (Ex. 18) ¶ 48. "This relaxation of the generally accepted standards for proving economic loss is not typical and therefore benefits class members because it permits claimants who might not otherwise be able to recover to pursue a claim." *Id.*

Expected earnings are estimated based on consideration of (1) the claimant's historical earnings or documented anticipated earnings or, for claimants without sufficiently documented pre-spill earnings, the claimant's 2011 earnings; and (2) for certain claimants with contemporaneous documentation of pre-spill and post-spill earnings, application of defined growth factors so as to take more precise account of year-to-year wage increases. *See id.* ¶ 54 ("[G]rowth factors are applied to individual Benchmark Period earnings in calculating Expected Earnings."). The growth factor is favorable in numerous respects, given the high unemployment rates both nationally and specifically in the Gulf Coast region throughout 2010 and the operation of the growth factor to preclude negative growth even for claimants whose earnings demonstrated negative growth. *See* Henley Decl. (Ex. 10) ¶ 16(b); Fishkind Decl. (Ex. 4) ¶ 36(d) ("In determining compensation, the Business Economic Loss and Individual Economic Loss methodologies incorporate growth factors that result in the assumption of growth, even where the Claimant lacks data demonstrating such growth . . . .").

Also highly favorable to claimants is their ability to select the Benchmark Period and Compensation Period applicable to them, and indeed the assurance that program personnel will

ensure the most advantageous period choices are made.  While in litigation these issues would be hotly disputed, here the claimant is given the benefit of the most advantageous choice fitting the claimant's circumstances.  *See, e.g.*, Richardson Decl. (Ex. 16) ¶ 40 ("Because of the economic conditions of 2009, it benefits claimants to have the option of including 2007 and 2008 or 2008 in the benchmark years if it is to their advantage.").

Depending on the location and/or industry in which the claimant was employed, and the amount of documentation provided, the claimant may be eligible for an RTP multiple of lost earnings.  The RTPs "further assure[] that claimants with valid claims will be fully compensated."  Henley Decl. (Ex. 10) ¶ 16(f).  Eligible claimants may also receive additional compensation for lost health insurance, pension benefits, qualified training costs, and qualified job search costs.  *Id.* ¶ 16(h); *accord* Sharp Decl. (Ex. 18) ¶ 45.

Finally, the individual framework is "broad and flexible in addressing a wide variety of individual circumstances, including individuals without prior employment experience, those who changed jobs, people with multiple jobs, seasonal workers, and individual periodic vendors and festival vendors."  Sharp Decl. (Ex. 18) ¶ 45; *see also* Landry Decl. (Ex. 13) ¶ 42 ("The framework for individual economic loss accounts for individuals whose work is seasonal, periodic or festival related, which may include employees in the lodging and tourism industry."); Richardson Decl. (Ex. 16) ¶ 65 (same). Compensation calculated using the above-listed factors will be paid net of previous spill-related payments made by BP.

### b. Businesses

Business economic damage claimants will also be compensated under the settlement for post-spill losses of earnings and profits.  As with the individual framework, the goal of the business framework is to fairly compensate businesses for their losses suffered as a result of the spill; it "uses the well-recognized approach of measuring lost earnings or profits by comparison

of the post-DWH Spill Compensation Period to a Benchmark Period."  Henley Decl. (Ex. 10) ¶ 26; *see also* Fishkind Decl. (Ex. 4) ¶ 68 ("Consistent with well-established models for establishing economic loss damages, the Framework methodologies generally use pre-Spill benchmark period earnings or revenue data to project expected earnings or revenue in the post-Spill May-December 2010 period, taking into account any reasonably anticipated growth in revenue."); Richardson Decl. (Ex. 16) ¶ 45 ("The Business Economic Loss Frameworks are consistent with standard business practices in assessing any financial losses related to an incident.").  The framework further factors in anticipated growth and, in most cases, enhances the amount with an RTP.[24]

"The compensation calculation in the Settlement Agreement for business economic loss claims is divided into two steps: Step 1 provides compensation for the reduction in variable profit between the Compensation Period and the Benchmark Period. Step 2 provides compensation for increased profits expected to be generated in 2010 'but for' the spill."  Sharp Decl. (Ex. 17) ¶ 9.  "The two-step calculation in the Settlement Agreement applies the generally accepted 'before and after' method to compensate business claimants for post-spill lost profit."  *Id.*; *see also* Fishkind Decl. (Ex. 4) ¶ 92 ("This Settlement Agreement correctly characterizes this standard calculation as a two step process.").

As with the individual framework, businesses may select both the Benchmark Period and the Compensation Period.  *See* Henley Decl. (Ex. 10) ¶ 30(a)-(b); Richardson Decl. (Ex. 16) ¶ 53.  This flexibility "is favorable to claimants and potentially increases the compensation they can receive."  Henley Decl. (Ex. 10) ¶ 30(c); *accord* Sharp Decl. (Ex. 18) ¶ 20 ("The Settlement

---

[24] The following discussion describes the claims process for pre-existing ongoing businesses that lost earnings or profits.  The Settlement Agreement and accompanying exhibits detail a similar process for failed businesses, start-up businesses, and failed start-up businesses.  Each of these processes is also fair, reasonable, and adequate.  *See* Henley Decl. (Ex. 10) ¶¶ 34-35.

Agreement provides options to the business claimant in the selection of its Benchmark Period that are more flexible and generous than what would usually be available in litigation."). "The three month minimum [compensation] period is a reasonable requirement because it eliminates the risk that normal month-to-month variations in business performance are not mistaken for a trend of declining performance due to the DWH Spill." Henley Decl. (Ex. 10) ¶ 30(b).

Businesses must submit documentation to support their claims that reflect their business structure, as well as provide their federal tax returns and profit and loss statements (or other documents) evidencing monthly revenues and expenses. Depending on claimant-specific factors, businesses may be required to submit additional documentation, such as documents evidencing client cancellations that may have depressed earnings during the benchmark period. Businesses in certain geographic zones and industries, such as seafood processing, will not be required to provide documentation demonstrating causation, while businesses in other zones will be required to submit varying degrees of evidence of causation. As with the individual framework, the "documentation requirements for [Business Economic Loss] claims . . . are reasonable and provide flexibility that is favorable to claimants" and "will not unreasonably burden valid claimants." Henley Decl. (Ex. 10) ¶ 23; *see also* Fishkind Decl. (Ex. 4) ¶ 80 ("The documentation requirements needed to support a Claim are tailored to the methodology in the relevant Framework and generally consist of the types of documents businesses keep in the normal course of their business."); Sharp Decl. (Ex. 18) ¶ 12 ("The required business documents are relevant to causation and damages analysis and are the types of documents that businesses must keep in the ordinary course of business, or are readily prepared and produced from a business' books and records."); Richardson Decl. (Ex. 16) ¶ 47 ("Given that companies routinely have this information available, it is reasonable to request it as a part of the Frameworks and

31

should in no way exert an undue burden upon a business.").

Many businesses will benefit from causation presumptions. *See* Sharp Decl. (Ex. 18) ¶ 14 ("Having causation presumed for many business claimants[] benefits those claimants because they are not required to provide any evidence of causation."). As Dr. Fishkind explains, the zones and industry definitions governing causation presumptions are economically reasonable, as they benefit the claimants most likely to have been affected by the spill. *See* Fishkind Decl. (Ex. 4) ¶ 30(a) ("In particular, economic logic and available data support the Settlement's use of presumptions of causation for individuals and businesses located close to the tourist beaches, or that are located slightly further from the beach but involved in Tourism, Charter Fishing, and Seafood Distribution, because these industries are most likely to have been affected by the DWH Spill."); *see also* Landry Decl. (Ex. 13) ¶ 26 ("In general, the Zones are structured to reflect the fact that as distance increases from the coast, the likelihood of damage to tourism businesses is reduced."); *id.* ¶ 36 ("It is appropriate to consider industry type because certain industries are less likely to have been potentially affected by the Oil Spill."); Richardson Decl. (Ex. 16) ¶ 37 ("The zones included in the Economic Loss Zone map logically and reasonably reflect the likelihood of a potential economic effect of the Oil Spill.") (citation omitted). Conversely, requiring proof of causation in other industries and geographic zones is reasonable because there is a less direct connection between these areas and the spill. *See* Fishkind Decl. (Ex. 4) ¶ 30(b) ("[I]t is economically reasonable to require Claimants located further from the Gulf and in industries economically less connected to the Gulf to establish that any losses they suffered were caused by the DWH Spill and not by other factors affecting the economy generally . . . ."); Richardson Decl. (Ex. 16) ¶ 37 ("[A]s distance increases from the coast, the likelihood of damage is reduced.").

For those claimants required to prove causation, however, the tests are reasonable.  *See* Landry Decl. (Ex. 13) ¶ 38 (describing the causation tests as "consistent with . . . economic reality").  Indeed, in many ways the causation principles are remarkably favorable to claimants.  *See, e.g.*, Sharp Decl. (Ex. 18) ¶ 17 ("[O]nce a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.").  In contrast, in litigation, "a detailed analysis of the reasons for the revenue and/or variable profit declines is undertaken because it is part of the plaintiff's burden of proof."  *Id.*

The rules governing the calculation of growth factors are also highly favorable to claimants.  Specifically, (1) there may be no negative growth, even though some businesses surely have experienced such negative growth in the current economy; and (2) the growth period is a minimum of six months, even if the Compensation Period is shorter, and so permits the claimant to be compensated for lost growth even for periods with no damage.  *See* Henley Decl. (Ex. 10) ¶ 30(d)(ii)-(iii).

In addition to the lost profits calculated by the two-step process described above, claimants may receive an RTP multiple of that amount based on a schedule negotiated by the parties.  *See id.* ¶ 31 ("[C]laimants also receive an RTP multiplier that compensates them for, among other things, any potential risk of future losses (which may or may not occur).").  The RTPs provided for by the Settlement Agreement are both reasonable and favorable to claimants.  *See* Fishkind Decl. (Ex. 4) ¶ 33 ("The RTPs, . . . which vary based on the Claimant's geography and industry, are economically reasonable.").

Total claimant compensation equals lost profits plus the applicable RTP, less any OPA payments already received by the claimant from BP or the GCCF.  RTP payments vary according to the Claimant's proximity to the Gulf and the precise type of business involved. This compensation methodology will make claimants entirely whole for their losses, and may make claimants "more than whole."  *See* Sharp Decl. (Ex. 18) ¶ 30.  "[T]his approach is unusually generous."  *Id.*

### 2.    Property Damage

#### a.    Real Property Damage

The Settlement Agreement provides compensation for damages to real property encompassing two sub-categories:  (1) Coastal Real Property Claims and (2) Wetlands Real Property Claims.

Under the Coastal Real Property Claims Process, *see* Agreement Exs. 11A-11C, claimants with residential and commercial parcels, as well as deeded boat slips, located along the coastal shoreline from Wakulla County, Florida, west through Alabama and Mississippi and on Grand Isle (referred to as the "Coastal Real Property Zone") will recover a percentage of their 2010 Applicable Property Tax for the parcel, varying from 30% to 45%, depending on the applicable compensation category.  *See* Dent Decl. (Ex. 3) ¶ 22.[25]  The geography included in the Coastal Real Property Claim Zone encompasses parcels on which the presence of oil was reported, as well as those monitored for the presence of oil.  *Id.*  An RTP of 2.5 will be applied to the Coastal Real Property Compensation Amount.  This amount is meant to compensate coastal real property owners for loss of use and enjoyment.  Additionally, if Coastal Real Property

---

[25] Jerry Dent is a Managing Director with Alvarez & Marsal in Birmingham, Alabama, and co-head of the Environmental Advisory Services practice. Dent Decl. (Ex. 3) ¶ 1.  His practice specializes in matters involving evaluation of properties affected by contamination or hazard.  *Id.*

Claimants can establish that they incurred physical damage from response operations, they can recover additional compensation (without augmentation by an RTP).  Having reviewed the compensation framework, Dr. Elliott Taylor[26] reports that "identifying parcels eligible for compensation under the Compensation Framework for Coastal Real Property Claims in this manner is fair and reasonable."  Taylor Decl. (Ex. 19) ¶ 49; *see also* Dent Decl. (Ex. 3) ¶ 25 ("The total Coastal Real Property Compensation Amount is fair and adequate compensation for any temporary inconvenience or partial interruption in their ability to fully enjoy the beach that eligible claimants may have experienced.").

Under the Wetlands Real Property Claims Process, *see* Agreement Exs. 12A-12D, claimants must own wetlands parcels located in the Wetlands Real Property Claim Zone, an area comprised of parcels in the Louisiana wetlands on which the presence of oil was reported, as well as those that were monitored for the presence of oil.  *See* Dent Decl. (Ex. 3) ¶ 36.  Two categories are established:  (1) Category A, consisting of parcels documented to contain oil on all or part of the relevant acreage; and (2) Category B, consisting of parcels documented as "no oil observed."  Within Category A, claimants receive a base compensation of (1) $25,000 for every acre of Oiled Primary Area; (2) $10,000 for every acre of Buffer Area; and (3) $11,000 for every acre of Non-oiled Primary Area, as well as an RTP of 2.5  This results in a "guaranteed . . . minimum payment of $122,500, including RTP," even if the parcel is less than one acre or if oil was reported in the most minimal quality.  *See id.* ¶ 41.  Claimants in Category B are compensated $4,500 for every acre of Non-oiled Primary are plus an RTP of 2.5, and are

---

[26] Dr. Taylor is a principal at Polaris Applied Sciences, Inc., an environmental consulting firm specializing in technical and scientific support for oil spill response.  Taylor Decl. (Ex. 19) ¶ 5.  (BP hired Polaris to serve as its representative in the shoreline cleanup assessment team ("SCAT") process for the spill).  Dr. Taylor has "more than 20 years of experience in preparing for and responding to major oil spills, with an emphasis on shoreline response."  *Id.* ¶ 1.

"guaranteed a minimum payment of at least $15,750, inclusive of RTP." *Id.* ¶ 45. Having reviewed the compensation framework, Dr. Taylor reports that "identifying parcels eligible for compensation under the Compensation Framework for Wetlands Real Property Claims in this manner is fair and reasonable." Taylor Decl. (Ex. 19) ¶ 53; *see also* Dent Decl. (Ex. 3) ¶ 46 ("The compensation amounts paid to eligible claimants with Category A and Category B parcels, including the RTP of 2.5, are generous.").

Dr. Harold G. Leggett[27] explains that based on personal visits to the several Louisiana wetlands sites, "[e]ven the heavily oiled areas [he] observed appeared to be healthy and recovering well." Leggett Decl. (Ex. 14) ¶ 15; *see also id.* ("I believe that the marsh has made remarkable progress in recovery from this event, and that little to no observable impact will be visible in the next year."). Based on these observations and review of the framework for Wetlands Real Property Claims, Dr. Leggett states: "I believe the Compensation Framework for Wetlands Real Property Claims fairly compensates owners of eligible parcels. Owners of parcels with minimal to moderate oiling have a very generous payment under the settlement. I also believe that property owners of heavily oiled sites are fairly compensated." *Id.* ¶ 18. Dr. Leggett also explains that OPA creates obligations to clean or otherwise remediate oiled sites that are independent of providing compensation to individuals and thus no public rights to cleanups will be surrendered by class members settling their claims. *See id.* ¶ 17. He also notes that the Wetlands framework includes RTPs, which increase class members' compensation. *See id.*

---

[27] Dr. Leggett is currently a consultant at PPM Consultants in Baton Rouge, Louisiana. Leggett Decl. (Ex. 14) ¶ 1. Before that, he was the Secretary of the Louisiana Department of Environmental Quality from 2008 to 2010. *Id.* He was also "a member of the Unified Command for a number of major incident responses, including hurricanes Katrina, Rita, Gustav, and Ike." *Id.* ¶ 3. He has extensive experience in both the public and private sector in assessing wetlands impacts, including those caused by the oil and gas industry in Louisiana. *Id.* ¶¶ 3-6.

Similarly, based on the low risk that he concludes exists of oil returning, Edward Briggs Wharton III[28] concludes that "the Compensation Framework for Wetlands Real Property Claims is fair."  Wharton Decl. (Ex. 21) ¶ 26.  Finally, Dr. Taylor opines that "the risk transfer premium concept in the Compensation Framework for Wetlands Real Property Claims and the Compensation Framework for Coastal Real Property Claims is fair and reasonable because it provides compensation based on the maximum extent and degree of oil that has been observed on the shoreline to date," Taylor Decl. (Ex. 19) ¶ 59, and because "[d]uring two years of repeated systematic surveys, which included observations after tropical storms, SCAT [shoreline cleanup assessment team] has not detected any sources of potentially substantial MC252 re-oiling" other than certain subsurface materials "which are or have been addressed by Unified Command."  *Id.* ¶ 42; *see also infra* Argument Part II.F (discussing the very low risk of oil returning).

### b.   Real Property Sales Damage

The Settlement Agreement also provides compensation for persons who realized sales losses as a result of the spill.  *See* Agreement ¶ 5.9.  Under the Agreement, individuals and entities who sold residential parcels in the Real Property Sales Compensation Zone between April 21, 2010 and December 31, 2010 will receive compensation for sales contracts executed on or after April 21, 2010 or for other sales contracts that were subject to a price reduction due to the DWH Spill (foreclosures or like processes are excluded).  The Real Property Sales Compensation Zone includes the shoreline from Wakulla County, Florida, west through Alabama and Mississippi and on Grand Isle, Louisiana, which is the coastal area monitored for the presence of oil and/or where the presence of oil was reported.  *See* Dent Decl. (Ex. 3) ¶ 13.

---

[28] Wharton is currently the leader of C-K Associates' Ecological Team, as well as a senior project manager for biological and NEPA investigations.  Wharton Decl. (Ex. 21) ¶ 6.  In that capacity, he has been involved in well over one hundred wetlands projects, *id.* ¶ 7, and he has experience in responding to oil spills that includes field data collection, assessment of impacts, and developments of strategies to address impacts, *id.* ¶ 9.  He also serves on C-K Associates' SCAT team following unplanned releases of crude oil or petroleum products.  *Id.* ¶ 10.

"The compensation amount is 12.5% of the sale price," Preliminary Approval Order at 9, and the amount is not eligible for an RTP.  Having reviewed the framework, it is Dr. Taylor's "opinion that identifying residential parcels eligible for compensation under the Compensation Framework for Real Property Sales in this manner is fair and reasonable."  Taylor Decl. (Ex. 19) ¶ 57.  Dent agrees that "the Sales Framework provides a standardized method that generously compensates eligible claimants" and "was established using thorough and comprehensive data."  Dent Decl. (Ex. 3) ¶¶ 12-13.

### 3.      Vessels Of Opportunity ("VoO") Charter Payment

The Settlement Agreement also provides funds for those who participated in the VoO program.  *First*, all working VoO participants are entitled to receive at least $41,600 in compensation, with the amount increasing depending on the size of the boat.  *See* Agreement ¶ 5.5.2.  To prevent double recovery, *see infra* Argument Part III.E, those working VoO participants who also will receive economic loss compensation that directly involves the use of their VoO vessel (except in the case of payments under the Seafood Compensation Program) will have their economic loss compensation partially reduced.  *See* Agreement ¶ 5.5.2.1.  *Second*, those VoO participants who were never placed on hire to perform actual services on the water will be entitled to receive up to $10,200, with no offset, even if such a "non-working VoO participant" will also be receiving an award under the Seafood Program.  *See* Agreement ¶ 5.5.3.  VoO claims, because they are contractual in nature and do not involve a transfer of future tort injury risk, are not eligible for an RTP.

### 4.      Vessel Physical Damage

The Agreement also compensates vessel owners for damage to their vessels.  *See* Agreement Ex. 14.  Under the Agreement, "[v]essel owners whose vessels were physically damaged as a result of the oil spill or cleanup operations may recover the lesser of the costs

38

necessary to conduct a reasonable repair or replace the vessel."  Preliminary Approval Order at 9.  No RTP is applied to this category of claims, and vessels are eligible regardless of whether they were enrolled in the VoO program.  The only vessels that may not recover are those that were working for an Oil Spill Response Organization at the time of the physical injury.

### 5.    Subsistence Damage

The Agreement compensates claimants who traditionally and customarily relied on seafood and game for subsistence purposes for the "total value of the subsistence natural resources that they lost due to the oil spill, plus an RTP enhancement."  Preliminary Approval Order at 10.  Subsistence claimants are defined as individuals who fish, hunt, or harvest Gulf of Mexico natural resources, including seafood and game, in a traditional or customary manner and to sustain the basic dietary, economic, shelter, tool, or clothing needs of themselves and their families.  *See* Agreement ¶ 1.3.1.3.  Given the economic challenges facing subsistence claimants, the Claims Administrator will form a dedicated administrative team to assist subsistence claimants with filing claims and to interview claimants in their geographical area.  *See* Agreement Ex. 9 at 3-4.  Subsistence claims will be augmented by an RTP of 2.25.  *See id.* at 4.

Dr. Laura D. Kelley[29] has explained that the Settlement Agreement "accounts for the way of life—and possible spill-related interruptions to the way of life—in Southeastern Louisiana and in other communities along the Gulf Coast that are dependent on natural resources for basic personal and family needs."  Kelley Decl. (Ex. 12) ¶ 16.  According to Dr. Kelley, the subsistence framework fairly and reasonably compensates subsistence claimants because (1) the settlement permits subsistence claims through 2011, long past when almost all fisheries were

---

[29] Dr. Kelley is an historian at Tulane University who conducts research and teaches courses on Louisiana history and Gulf Coast Native Americans.  Kelley Decl. (Ex. 12) ¶ 1.  She has worked with Native American populations in Southeastern Louisiana for the past seven years, including studying patterns of food acquisition, consumption, and the relationship of food to the domestic economy.  *Id.* ¶ 3.

reopened; (2) claimants are only required to allege closures or impairments of hunting and fishing through sworn written statements, rather than more burdensome documentation; (3) the settlement compensates for lost natural resources used to barter, regardless of whether claimants are permitted to trade seafood legally under their fishing and hunting licenses or license exemptions; (4) the settlement compensates class members for seafood and game that would have been shared with extended family members; (5) class members are not required to provide documentation of the actual cost of replacing subsistence resources; (6) the RTP accounts for the low likelihood of future spill-related impairments; and (7) many subsistence claimants are likely fishermen who will also be eligible for additional payments under the Seafood Compensation Program.  *See id.* ¶¶ 17-23.

### 6.    Seafood Compensation Program

"The Seafood Compensation Program is a $2.3 billion fund to compensate economic losses of commercial fishermen, seafood boat captains, all other seafood crew, oyster leaseholders, and seafood vessel owners."  Preliminary Approval Order at 10.  According to the PSC's calculations, the amount that BP has agreed to pay to fund the Seafood Compensation Program ***exceeds the annual revenue*** of these industries (measured from Galveston, Texas to Key West, Florida)[30] by nearly a factor of five.  *See* PSC Slides Supporting Preliminary Approval at 28 (April 25, 2012) (noting that between 2007 and 2009, the Gulf seafood industry had average revenues of $476.12 million).  Having reviewed the program, Dr. Martin Smith[31] believes that the $2.3 billion allocated to the Seafood Compensation Program is "clearly

---

[30] *See* Apr. 25 Preliminary Approval Hr'g Tr. at 38:10-12 (quoting Mr. Rice:  "If you take from Galveston all the way around to Key West, this is for 2007 through 2009, these are the numbers").

[31] Dr. Smith is the Dan and Bunny Gabel Associate Professor of Environmental Economics with tenure at Duke University.  Smith Decl. (Ex. 17) ¶ 2.  His primary areas of expertise are fisheries economics, seafood markets, coastal resource management, applied econometrics, and modeling of dynamical systems.  *Id.* ¶ 3.

sufficient compensation to meet a standard of fair, reasonable and adequate."  Smith Decl. (Ex.

17) ¶ 18.   As Dr. Smith has explained, $2.3 billion represents between 22% and 72% of the

present value of the entire industry's total revenue *in perpetuity*.  *Id.* ¶ 13; *see also* Balhoff Decl.

(Joint Ex. B) at 4 (noting that the estimated $1.9 billion initial payout is a conservative estimate

and thus that a second distribution will likely exceed $400 million).  Similarly, Dr. Richardson

observes that in contrast to the $2.3 billion available under the Seafood Compensation Program,

the reduction in revenue from commercial fishing in 2010 compared to prior years from the class

counties was approximately $25.5 million.  *See* Richardson Decl. (Ex. 16) ¶ 73.  He therefore

concludes that the amount is "more than adequate to compensate the commercial fishing

industry."  *Id.* ¶ 77.

Under the Seafood Compensation Program, Commercial Fishermen, Seafood Boat

Captains, all other Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners will be

compensated for economic loss claims relating to seafood, including shrimp, oysters, finfish,

blue crab, and other species.  As developed and approved by the Court-appointed neutral, John

W. Perry, Jr., the Seafood Compensation Program fairly and reasonably allocates the funds on

multiple criteria—both between various industries and among different industry participants,

such as vessel owners, boat captains, oyster leaseholders, and seafood crew.  *See* Perry Decl.

(Joint Ex. E) at 4 ("I endorse the Seafood Compensation Program that was submitted to the

Court and believe . . . it will provide fair, reasonable and adequate compensation to the

Claimants under the circumstances."); Fishkind Decl. (Ex. 4) ¶ 37 ("The Seafood Compensation

Program will fairly compensate vessel owners, boat captains, crew members, oyster leaseholders

and finfish quota holders for losses resulting from the DWH spill."); Smith Decl. (Ex. 17) ¶ 72

("I believe that the SCP fairly, reasonably, and adequately compensates the participants in the

program."); Leggett Decl. (Ex. 14) ¶ 19 (opining that the Seafood Compensation Program is fair to the Gulf seafood industry in light of Dr. Smith's conclusions); Henley Decl. (Ex. 10) ¶ 22 ("All in all, the Seafood Crew Compensation Plan is a reasonable, and indeed claimant-friendly process for a claimant to establish lost seafood crew wages due to the DWH Spill and to recover for that loss.").

The Seafood Compensation Program contains five separate plans to provide compensation to claimants. Each plan contains its own eligibility and documentation requirements and each describes the specific compensation methods available to claimants. The independent methods of calculation for claims in each plan ensure that claimants will be compensated fairly and adequately for economic losses related to seafood.

Vessel owners and boat captains in the shrimp, oyster, finfish, blue crab, and other seafood plans will be compensated in relation to their seafood harvesting revenues from previous years in Specified Gulf Waters. Additional payments, such as per-acre compensation to oyster leaseholders and per-share compensation for Individual Fishing Quotas shareholders in the finfish industry are available to eligible claimants. Seafood crew—the mates, boatswains, and deckhands other than the boat captain—are all eligible for compensation, tied either to their former or expected wages and hours. Those seafood crew members who cannot provide tax forms, financial information, or a sworn statement from an employer to establish employment and compensation may be eligible for a lump sum payment if they provide sufficient sworn statements from sponsors or attorneys.

The Seafood Compensation Program allows claimants to file claims for multiple types of economic losses. For example, a shrimping boat captain who also captains a blue crab vessel may be eligible for compensation under both compensation plans. Additionally, a vessel owner

who is also the boat captain may be eligible for vessel owner and boat captain compensation. The RTPs provided are generous, ranging from 2.25 to 8.75.  *See* Preliminary Approval Order at 10.

Seafood Compensation Program claimants need not prove causation.  *See* Fishkind Decl. (Ex. 4) ¶ 122 ("Eligible Claimants do not have to prove that their economic losses were due to the DWH Spill; rather, losses are presumed to have been due to the DWH spill.").  Finally, Dr. Smith submits that the approach for computing base compensation for vessel owners and captains is fair and reasonable, Smith Decl. (Ex. 17) ¶ 20, that RTPs build in "significant cushion to cover uncertain future harms," *id.* ¶ 24; *see also id.* ¶¶ 68-71, and that the documentation requirements are reasonable, *id.* ¶¶ 26-27.  After considering each of the specific compensation categories under the Seafood Compensation Program—shrimp, oysters, blue crab, finfish, other seafood, and crew—Dr. Smith concludes that all are fair and reasonable.  *Id.* ¶¶ 29-67.

## ARGUMENT

## I. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

The Court has already correctly concluded on a preliminary basis that the Settlement Agreement "appears fair, has no obvious deficiencies, does not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and does not grant excessive compensation to attorneys."  Preliminary Approval Order at 32.  Since the Court issued its order, nothing has occurred that would call these preliminary conclusions into doubt.  Both because the Settlement Agreement (like any voluntarily negotiated settlement) is entitled to a presumption of reasonableness, and because it would satisfy the standard for final approval even if no presumption applied, the Court should grant final approval to the Settlement Agreement and bring this litigation to an end—many years before it would otherwise conclude.

A.    **The Court Should Presume That The Settlement Is Fair, Reasonable, And Adequate Because The Public Interest Favors The Voluntary Settlement Of Class Actions.**

The public interest strongly favors settlement in general, and the settlement of class actions in particular.  *See* Preliminary Approval Order at 16 ("'[T]here is an interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a finite share of judicial resources.'") (quoting 4 *Newberg on Class Actions* § 11:55 (4th ed.)).[32]

Because "settlement is the preferred means of resolving litigation," there is a "strong presumption in favor of finding a settlement fair."  *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008) (quotation omitted); *accord, e.g.*, *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998).  The preference for settlement over the expenditure of scarce judicial resources gains added force under the OPA statute, which is designed to catalyze settlements.  *See, e.g.*, 33 U.S.C. § 2713; *see also infra* Part III.B.1.a.  Because this precedent fully applies here, objectors to the settlement bear the burden of demonstrating that the settlement is ***not*** fair, reasonable, and adequate.  As discussed below, they cannot meet this burden.[33]

---

[32] *See also, e.g.*, *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981) ("'Particularly in class action suits, there is an overriding public interest in favor of settlement.'") (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *Smith v. Crystian,* 91 F. App'x 952, 955 (5th Cir. 2004) (per curiam); *Turner*, 472 F. Supp. 2d at 843; *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *In re Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000); *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985).

[33] Some courts have held that an additional presumption of fairness applies where the Court has already preliminarily approved a settlement.  *See, e.g.*, *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 293 (W.D. Tex. 2007) ("'Once the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable.'") (quoting *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 138-39 (W.D. Ky. 1992)); *Robinson v. Ford Motor Co.*, No. 04-844, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005); *In re Terazosin Hydrochloride Antitrust Litig.*, No. MDL 99-1317, 2005 WL 2451960, at *5 (S.D. Fla. July 8, 2005); *United States v. New Jersey*, No. 88-5087, 1995 WL 1943013, at *11 (D.N.J. Mar. 14, 1995); *Moore v. United States*, 63 Fed. Cl. 781, 784 (Fed. Cl. 2005).  Without regard to whether

**B.      Even Absent A Presumption, Analysis Of The *Reed* Factors Further Demonstrates And Confirms The Fairness Of The Settlement To Class Members.**

As explained above, the Court may presume that the settlement is fair both because it has already preliminarily approved this particular settlement and because any voluntarily negotiated settlement agreement is entitled to a presumption of reasonableness.  Even absent these presumptions, however, the Court should conclude that this settlement satisfies the standard of fairness, reasonableness, and adequacy required by Rule 23(e).

In the Fifth Circuit, six factors guide a court's review of whether to approve a class action settlement:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) (quoting *Reed*, 703 F.2d at 172); *accord, e.g.*, *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 637 n.1 (5th Cir. 2012); *Newby v. Enron Corp.*, 394 F.3d 296, 308 (5th Cir. 2004); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 431 (S.D. Tex. 1999).  Each of these "*Reed*" factors counsels in favor of final approval.

### 1.      The Settlement Was Negotiated Free Of Fraud Or Collusion.

As the Court has already concluded, there was no fraud or collusion in the negotiation of the settlement.  Rather, the parties only reached a settlement following "a multi-month, extensive, arms-length settlement process, free of collusion, and overseen by Judge Shushan."

---

that additional presumption is applied here, (1) the authority is uniform that a voluntarily negotiated class action settlement is entitled to a presumption of reasonableness, and (2) even reviewed *de novo*, this settlement clearly meets the standard for final approval.  *See infra* Part I.B.

Preliminary Approval Order at 30.  As the Court explained,

> Over the course of these many months, the Parties' counsel, assisted and informed by experts and colleagues with specialized knowledge of various aspects of the litigation and the array of claims categories, engaged in numerous and ongoing settlement discussions and negotiation sessions, both in person and via telephone conference. These activities were conducted by the authorized representatives (including, for the Plaintiffs, Plaintiffs' Co-Liaison/Interim Class Counsel and many members of the Court-appointed PSC) and proceeded without disrupting, delaying, or detracting from the Parties' thorough trial preparations, under the brisk and systematic trial preparation schedule set and maintained by this Court. During these lengthy settlement negotiations, which commenced in February 2011 and continued for more than one year, the Parties negotiated the detailed, complex, and carefully thought-out claims categories and benefits of this settlement.  Likewise, the Parties negotiated the precise language and terms of the Proposed Settlement and Exhibits; the proposed administrative and transition orders; the claims forms and procedures to enable Class members to make claims under the settlement without delay; and the comprehensive Notice Plan to provide notice of the settlement, the approval process, and the dates, deadlines, and options that are important to the Class.

*Id.* at 30; *see also id.* at 31 ("The comprehensive system of claims frameworks featured in the Settlement Agreement is the product of many months of intensive negotiation . . . .").

As the Court is aware, Judge Shushan played an important, indeed critical, supervisory role in facilitating and mediating the settlement.  Her evenhanded and daily efforts, particularly throughout the last three months of negotiations, strongly counsel in favor of approving the settlement.  *See, e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("[T]he supervision of settlement negotiations by a magistrate judge, as occurred here, makes it less likely that . . . [class counsel have promoted] their own interests over those of the class.").[34]

---

[34] *See also Collins*, 568 F. Supp. 2d at 725 (citing 4 *Newberg on Class Actions* § 11:51 (4th ed.) (same principle)); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (same principle), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003) (same principle), *aff'd sub nom. Smith v. Crystian*, 91 F. App'x 952 (5th Cir. 2004) (per curiam); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 497 (N.D. Miss. 1996) (same principle).  The absence of collusion also should be presumed based on the overall fairness and generosity of the proposed settlement terms under the commonsense "proof is in the eating test."  *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D. Ohio 1992). Under this test, if the terms of the proposed settlement are fair, then the reviewing court can deem the formative

Because the settlement was reached at arms' length, "the trial court 'should be hesitant to substitute its own judgment for that of counsel.'"  *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (per curiam) (citation omitted); *see also Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with.").  Rather, the fact "that this settlement is the negotiated result of an adversarial proceeding is an indication of its fairness."  *Domingue v. Sun Elec. & Instrumentation, Inc.*, No. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010); *see also In re Train Derailment Near Amite La.*, MDL No. 1531, 2006 WL 1561470, at *19 (E.D. La. May 24, 2006) ("The fact that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate. . . ."); *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009) ("Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of Class Counsel's decision to enter into the settlement and the proceedings leading thereto.").

> ## 2. Absent Settlement, This Litigation Would Continue To Be Extraordinarily Complex And Expensive, And Would Take Many Years To Resolve.

The Court has recognized that "th[is] litigation is unusually complex and expensive." Preliminary Approval Order at 29.  Indeed, there can be "no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases" in the history of the United States.  *Cf. In re Shell Oil Refinery*, 155 F.R.D. 552, 559 (E.D. La. 1993).  Given the unprecedented complexity of this litigation, it is appropriate to "consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the

---

negotiations to have been proper.  *See Corrugated Container*, 643 F.2d at 211 ("In general, we think a settlement should stand or fall on the adequacy of its terms. . . . If the terms are fair, the court may reasonably conclude that counsel did perform adequately."); *Turner*, 472 F. Supp. 2d at 846 ("Finally, a presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair.").

mere possibility of relief in the future, after protracted and expensive litigation." *Id.* at 560 (quotation omitted).[35]

Although the parties engaged in extraordinary amounts of discovery and other preparation for trial, *see infra* Part I.C.3, the remaining trial and appellate proceedings, if litigated through final judgment and subjected to appeal, could last for a decade or more.[36]  Each of the phases of the Limitation and Liability trial established under Pretrial Order 41 (Rec. Doc. 6592) raises complex issues of law, engineering, science, and operative fact.  And individual plaintiffs would then need to establish their own separate entitlement to damages, along with the quantum of damages, during discovery and trial phases that have not even been scheduled.

As a result, obtaining final judgments in this Court could take many years.  *See, e.g.*, *Sullivan*, 667 F.3d at 320 (approving settlement where continued litigation "would have been difficult, as multiple parties, multiple claims, extensive jurisdictional problems, and complicated discovery would be involved") (quotation omitted); *Collins*, 568 F. Supp. 2d at 726 (finding a

---

[35] *See also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (affirming approval of settlement where "a number of serious hurdles remained" for the plaintiffs); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.  Accordingly, the Federal Rules of Civil Procedure authorize district courts to facilitate settlements in all types of litigation, not just class actions."); *Billitteri v. Secs. Am., Inc.*, No. 09-1568, 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) (noting there was little doubt that the amount of time it would take to recover on behalf of class members "would measure in years rather than the months contemplated by the parties at this stage"); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) ("When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened.").

[36] Complex cases such as this can take decades to resolve.  For instance, the *Exxon Valdez* spill occurred in March 1989, but litigation remains ongoing in 2012, over twenty-three years after the spill, and eighteen years after the 1994 trial.  *See, e.g.*, Isaac Arnsdorf, *Exxon Valdez to Be Junked Years After Worst U.S. Ship Spill*, http://www.bloomberg.com/news/2012-03-20/exxon-valdez-sold-for-scrap-years-after-worst-u-s-tanker-spill.html (Mar. 20, 2012) ("Last month, a judge ruled that U.S. and Alaskan governments could pursue further damage claims.").  Likewise, while the *Amoco Cadiz* spill occurred in March 1978, the Seventh Circuit was still resolving the liability and damages claims arising out of the spill as of September 1993.  *See In re Oil Spill by "Amoco Cadiz" off the Coast of France on March 16, 1978*, 4 F.3d 997 (7th Cir. 1993).  Absent a settlement, litigation of this case promises to take as much time as those cases, if not more.  As of the day the parties filed their joint motion seeking preliminary approval of the Settlement Agreement, the docket reflected approximately 1,200 motions and more than 6,200 entries.

potential trial lasting "several weeks" to weigh in favor of approving a settlement); *Faircloth v. Certified Fin. Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving settlement where trial "was estimated to last at least two weeks"); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997) (finding "the prospect of a trial lasting months" weighs heavily in favor of approving a settlement); *Shell Oil*, 155 F.R.D. at 560 ("[E]ven a six month trial is considered extremely lengthy and the expense for the parties, the claimants, and the judicial system would be enormous.").  Moreover, if this case did proceed to trial, it almost certainly would become more complicated, since there is no reason to suppose that the case would simplify itself or cease to be contentious as trial began.  *See Faircloth*, 2001 WL 527489, at *4 (concluding from the "contentious motion practice on behalf of virtually all parties involved" that the case "would undoubtedly continue on a protracted litigation path absent approval of the proposed settlement agreement").  Nor would the road end with the entry of judgments in this Court.  This litigation has raised numerous difficult legal questions under federal statutory and general maritime law, many of first impression.  *See id.* (approving a settlement where the statutes were "extremely intricate and technical").  If this Court ever entered a final judgment in plaintiffs' favor, it would surely be subject to years of appeals.

Such years of protracted litigation create "an enormous financial and psychological burden on all parties involved" and counsel in favor of settlement.  *Combustion*, 968 F. Supp. at 1127; *see also Rodriguez*, 563 F.3d at 966 (noting that the "[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years"); *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002) ("[A]bsent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain."); *Smith v. Ajax Magnethermic Corp.*, No. 02-0980, 2007

WL 3355080, at *6 (N.D. Ohio Nov. 7. 2007) ("Absent a settlement, there is the potential for further protracted litigation and the additional expenditure of significant money, time, and resources.  Moreover, Plaintiffs are not assured of recovery upon the completion of the litigation. A fair settlement, therefore, has significant merit as a resolution to this matter.").

Because "the most controversial and hard-fought of all the issues in this case" remain to be litigated, *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (per curiam), this settlement "eliminates the transaction costs that further proceedings would impose" and "provides relief for the class sooner than continued litigation would," *Ayers*, 358 F.3d at 369. For the class, it is therefore entirely "proper to take the bird in the hand instead of a prospective flock in the bush."  *Shell Oil*, 155 F.R.D. at 560 (quotations omitted).  This is particularly true given that the "bird in the hand" includes RTPs, which means that the total compensation being paid is several multiples greater than what plaintiffs could hope to prove or even claim as their presently demonstrable injury.  The second factor counsels strongly in favor of approval.

> **3.      The Parties Engaged In An Extraordinary Amount Of Discovery In A Compressed Timeframe, Ensuring That They Had Sufficient Information To Negotiate A Fair Settlement.**

The third factor "asks whether the parties have obtained sufficient information to evaluate the merits of the competing positions."  *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (quotation omitted). "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ."  *Id.* at 620-21.

Here, the Court has already concluded that the parties engaged in more than sufficient discovery to prepare them to negotiate a settlement of this case:

> In the 20 months that have passed since the JPML's centralization order, the parties have engaged in extensive discovery and motion practice, including taking 311 depositions, producing approximately 90 million pages of documents, and exchanging more than 80 expert reports on an intense and demanding schedule. Depositions were conducted on multiple tracks and on two continents. Discovery was kept on course by weekly discovery conferences before Magistrate Judge Shushan.

Preliminary Approval Order at 3; *see also id.* at 29-30 ("Pretrial discovery and trial preparation included approximately 311 depositions, the production, review, and analysis of millions of documents; the retention and discovery of numerous scientific, technical, and industry experts; and the extensive associated investigation and analyses of the facts and legal issues surrounding relevant claims and defenses."); Miller Decl. (Ex. 15) ¶ 26 ("The settlement negotiations have been informed by massive volumes of civil discovery . . . .").

Significantly, the Fifth Circuit has said that formal discovery is not even a prerequisite to the approval of a settlement. *See Newby*, 394 F.3d at 306. Indeed, "[g]enerally speaking, a settlement should stand or fall on the adequacy of its terms." *Id.*; *see also Corrugated Container*, 643 F.2d at 211 (rejecting the argument that "representation in the settlement process is necessarily inadequate unless informed by the process of discovery"). Here, in light of the staggering amount of discovery that was completed in a compressed timeframe, the Court should readily conclude that the settlement represents an informed, educated, and fair resolution of this dispute. *See, e.g.*, *Turner*, 472 F. Supp. 2d at 847; *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997).

In addition, because of the national significance of the *Deepwater Horizon* incident, the U.S. Government has conducted its own investigations, *see supra* n.12. While much from those investigations and their reports properly has been ruled inadmissible in any trial, *see id.*, they provide a background and context for the negotiations that certainly has informed the parties—particularly the class—of the potential legal issues and wide range of assertions made by factual

witnesses and experts.  For example, in the Marine Board of Investigation ("MBI"), hundreds of thousands of pages of documents were produced; live witness testimony was taken from over 80 witnesses; and two separate reports publicly detailing the MBI's findings and conclusions were issued.  Similarly, the Presidential Commission conducted its own investigation, as did the National Academy of Engineering, and each issued detailed reports setting forth their views concerning the causes of the spill.  *See id.*

Each of the various official federal reports and investigations, as well as other data sources, form the backdrop to this case, and when combined with the massive discovery conducted in this Court, has helped the parties to negotiate a settlement with a comprehensive grounding in the operative facts and attendant litigation risks.  Although conducted outside of this multidistrict litigation, these investigations can be considered in evaluating whether the parties are sufficiently informed to reach a settlement.  *See DeHoyos*, 240 F.R.D. at 292 ("In order to determine whether the parties have sufficient information to evaluate the terms of the settlement, the Court should look to more than simply the amount of formal discovery which has been completed.  The Court should consider all information which has been available to the parties.") (citation omitted); *Garza v. Sporting Goods Props., Inc.*, No. 93-108, 1996 WL 56247, at *13 (W.D. Tex. Feb. 6, 1996) ("Sufficiency of information does not depend on the amount of formal discovery that has been taken because other sources of information may be available to show that the settlement may be approved even when little or no formal discovery has been completed").  The third factor thus also counsels strongly in favor of approval.

> **4.**    **The Probability Of Plaintiffs' Success On The Merits And The Range Of Possible Recovery Counsel In Favor Of Approving The Settlement.**

Two related *Reed* factors direct the Court to consider the strength of the plaintiffs' case: the "probability of plaintiffs' success on the merits" and the "range of possible recovery."  *Reed*,

703 F.2d at 172.  These factors require the Court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case."  *Id.*  Thus, "the court must compare the terms of the compromise with the likely rewards of litigation."  *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007) (quotation omitted).  The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial."  *Reed*, 703 F.2d at 172 (quotation and alteration omitted).

BP addresses these two factors together in Part II, *infra*, where BP demonstrates that the Settlement Agreement provides the plaintiff class with significant recovery notwithstanding serious risks to their case.

> **5.   Class Counsel, Class Representatives, And Absent Class Members Strongly Support Final Approval Of The Settlement Agreement.**

Counsel for both BP and the class, as well as its representatives, strongly believe that the settlement represents a fair and reasonable resolution of this sharply contested litigation.

In its joint memorandum filed with BP, the PSC advised the Court that the Settlement Agreement "stands on its own as a comprehensive, fair, and reasonable" settlement that "***makes whole the myriad of plaintiffs asserting that they have suffered economic loss or property damage as a result of the Deepwater Horizon incident***."  Joint Memorandum In Support of Preliminary Approval (Rec. Doc. 6266-1) at 7 (emphasis added); *see also, e.g.*, PSC Memorandum In Support Of Preliminary And Conditional Class Certification (Rec. Doc. 6269-1), at 28 (describing "the fairness, adequacy, and reasonableness of the Court-Supervised Claims Program, with its structural assurances of fair treatment, its claimant-protective systems, and its enhanced benefits"); Plaintiffs' Steering Committee, Summary of Agreement-in-Principle Between Plaintiffs and BP, at 1 (Mar. 9, 2012), *available at* http://www.lundylawllp.com/

Resources/PSC-Summary-3-9-2012.pdf ("This Settlement is an enormous victory for Gulf Coast workers, businesses and families. . . . Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole as a result of this settlement—regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF.").[37]

Where "counsel for both parties have significant experience in litigating and negotiating settlement of class actions," this fact is strong evidence that the settlement is fair and reasonable. *DeHoyos*, 240 F.R.D. at 287 (quotation omitted); *accord Cotton*, 559 F.2d at 1330 ("In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties."); *Turner*, 472 F. Supp. 2d at 852 (same principle).[38]

Counsel for both the PSC and BP have decades of experience in prosecuting and defending class action lawsuits. *See* Miller Decl. (Ex. 15) ¶ 23. Collectively, they have been involved in some of the most complex class and mass tort settlements in the nation's history—

---

[37] The individual members of the PSC share the view that the settlement is fair, reasonable, and adequate. *See, e.g.*, Press Release, Plaintiffs' Steering Committee, Plaintiffs' Steering Committee and BP Finalize Settlement: Joint Motions Seek Preliminary Court Approval (Apr. 18, 2012), *available at* http://www.prnewswire.com/news-releases/plaintiffs-steering-committee-and-bp-finalize-settlement-147920225.html ("'The people and businesses of the Gulf Coast stand to reap great benefits from these settlements' said Plaintiffs' Co-Liaison Counsel, James P. Roy and Stephen J. Herman. 'We have held BP fully accountable for the Deepwater Horizon tragedy less than two years after the spill. Through extensive arms-length, good faith negotiations, hundreds of thousands of Gulf Coast residents and businesses will be made whole.'"); Press Release, Motley Rice, BP SETTLEMENT FINALIZED: Details of Agreement Submitted to the Court for Approval (Apr. 18, 2012), *available at* http://www.motleyrice.com/news/view/bp-settles ("'These settlements . . . will provide long-deserved compensation to thousands, including business owners, cleanup workers, the seafood industry and other citizens. It has been a real privilege serving as a lead negotiator,' said Joe Rice, Motley Rice LLC member and BP Litigation Plaintiff Steering Committee Member."). Needless to say, BP shares the PSC's assessment of the Settlement Agreement as a fair, reasonable, and adequate resolution of the litigation that makes claimants who choose to remain in the class more than whole.

[38] *See also Combustion*, 968 F. Supp. at 1128 (noting it was "not lost on the Court that counsel for the compromising parties, some of the most able attorneys in the country, when armed with extensive knowledge of the facts, decided that settlement rather than a . . . trial was in the best interest of their clients"); *In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) ("The settlement was reached after over three years of litigation and extensive discovery, and thus counsel for all parties were experienced and familiar with the factual and legal issues in the case."); *San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 461 (W.D. Tex. 1999) ("In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to assess the potential risks and rewards of litigation . . . .") (quotation omitted).

*e.g.*, asbestos, tobacco, retiree healthcare benefits, insurance, discrimination, pharmaceutical products, etc.  In fact, counsel for the PSC and BP have previously been lead counsel with respect to two of the largest settlements ever negotiated in this country—*i.e.*, the tobacco settlement with the States (the PSC's Mr. Rice), and union retiree health care benefits for General Motors (BP's counsel Mr. Godfrey, acting as GM's counsel in the retiree health care class settlements).[39]  These and other extraordinarily experienced negotiating counsel were also armed with the facts developed through the extensive and fully completed Phase I discovery and Phase I trial preparations.  All of that spadework deeply informed the reasonable assessments each side reached as to the range of outcomes in this case.

Finally, while the objections deadline has not yet arrived, the absent class members' reactions to the settlement have been positive thus far.  As noted above, as of August 10, 48,954 claims had been submitted to or were in the process of being submitted to the Court Supervised Settlement Program; in contrast, fewer than 75 persons have submitted objections, and many of those are not class members.  While a class settlement may be approved over the objections of a significant percentage of class members, "courts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'"  *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990) (quotation and alteration omitted); *cf. Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012) ("Indeed, the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair.").  Further confirming the fundamental fairness of the Settlement Agreement, a significant number of the objections received to date are from persons who do not fall within the settlement class but wish that the class were defined so that they did.  *See* Miller Decl. (Ex. 15)

---

[39]  *See UAW v. Gen. Motors Corp.*, No. 05-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006); *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007).

¶ 44 ("What the objections do illustrate—in vivid form—is the fact that this settlement is viewed as so desirable that people are clamoring to get in.").  While the Court need not consider these objections because the objectors lack standing, *see id.*, the judgment of these non-class members further confirms the fairness of the Settlement Agreement.  The sixth factor therefore also supports preliminary approval.

## II.   THE SETTLEMENT AGREEMENT PROVIDES GENEROUS COMPENSATION NOTWITHSTANDING SIGNIFICANT WEAKNESSES IN THE PLAINTIFFS' CASE.

As explained above, and as the Court has concluded, the Settlement Agreement provides the class with extremely generous compensation that is more than sufficient to remedy all established losses, in many cases multiple times over.  Because BP is committed to paying every legitimate claim, the settlement does so notwithstanding serious legal and factual risks to the plaintiffs' theories of the case.

As a fiduciary to the class, the Court must weigh the risk to the class if the settlement were not approved against any arguments made by objectors.  *See, e.g.*, *DeHoyos*, 240 F.R.D. at 286 ("[T]he court acts 'as a fiduciary who must serve as a guardian of the rights of absent class members.'") (quoting *Garza*, 1996 WL 56247, at *11); *see also Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998) (the court's role is as "guardian of the interests of class members"); 6 *Newberg on Class Actions* § 18:57 (4th ed.) ("The court has a fiduciary responsibility as guardians of the rights of the absentee class members when deciding whether to approve a settlement agreement."); *Manual for Complex Litigation (Fourth)* § 21.62 ("Adequacy of the settlement involves a comparison of the relief granted relative to what class members might have obtained without using the class action process.").

Below, BP summarizes just a few of the many obstacles that would stand between the class, if certified in contested proceedings, and the recovery it seeks if this settlement were not

approved.  As a fiduciary to the class, the Court must weigh any objectors' arguments against these risks, as well as the generous compensation—including RTPs—that the Settlement Agreement provides.  *Cf., e.g.*, *Walsh v. Popular, Inc.*, 839 F. Supp. 2d 476, 481 (D.P.R. 2012) ("[W]hile plaintiffs in the instant case are confident that their claims are meritorious, they face a substantial risk of zero recovery if the instant settlement is not approved due to the weight of the burden which they bear.").

### A.   At Any Trial, BP Would Establish That The Errors And Omissions Of Its Co-Defendants Were Superseding Or Otherwise Significant Causes Of The Incident, And That BP's Conduct Did Not Constitute Gross Negligence Or Willful Misconduct.

At any Limitation and Liability Trial, the record evidence—based upon the extensive pre-trial discovery and expert reports—would establish the following, among other things:

### 1.   BP's Co-Defendants Bear Significant Responsibility For The Incident.

Deepwater drilling involves multinational companies bringing substantial resources and specialized skills to bear in harsh environments.  Macondo was no exception, and any assessment of how the defendants acted in drilling the well has to be considered in that light.  The Macondo well represented work performed by the vanguard of the industry: BP, one of the largest operators in the Gulf of Mexico; Transocean, the largest offshore drilling contractor in the world; Halliburton, the largest cementing contractor in the world; and numerous other leading oil field contractors.  Nevertheless, the record compiled in the case reveals the significant mistakes made by Transocean and Halliburton and thus their role in causing the *Deepwater Horizon* incident. The record further reveals that Transocean and Halliburton voluntarily took on duties to act safely—duties that they breached.

>    a.    **The Drilling Of The Macondo Well Involved The Coordinated Efforts Of Multiple Companies.**

>        i.    Transocean

In 2010, Transocean claimed to be the "most experienced multinational company" in the drilling industry.  *See* Transocean 2009 Annual Report, *available at* http://www.deepwater.com/fw/main/Financial-Reports-54.html.   BP relied upon both Transocean's drilling expertise at Macondo and Transocean's contractual promises to BP.   Transocean also had the obligation to provide a seaworthy vessel.   In addition, Transocean accepted and had "primary responsibility for the safety of all its operations," including to "take all measures necessary or proper to protect the personnel and facilities."   *See* Drilling Contract Between Vastar Resources Inc. and R&B Falcon Drilling Co. dated December 9, 1998 § 17.1, *available at*  http://www.sec.gov/Archives/edgar/data/1451505/000145150510000069/exhibit10_1.pdf.  By industry practice, and according to international maritime law, the drilling contractor's safety management system applied on its rigs.  The Macondo drilling program confirmed that the goal of zero incidents, no harm to people, environment, or equipment would be accomplished by implementing Transocean's Health & Safety Management System.   As the owner of the rig, Transocean prepared a Major Accident Hazard Risk Assessment ("MAHRA") for the *Deepwater Horizon*. Transocean's MAHRA identified the risk of a reservoir blowout as a hazard and recognized that preventing it required a well-trained crew, a properly maintained and tested BOP and other well-control equipment, a functioning gas detection system, and redundant BOP controls.

With respect to "**PREVENTION OF FIRE AND BLOWOUTS,**" Transocean's contract with BP was unequivocal:  Transocean was to "maintain well control equipment in accordance with good oilfield practices at all times" and to "use all reasonable means to control and prevent fire and blowouts."  *Id.* § 15.2.

ii.     Halliburton

Halliburton is "the world's largest cementing company, and the world's premium supplier of foam cement." *See* Halliburton, Cementing:  Foam Cement Delivers Long-Term Zonal Isolation and Decreases Remedial Costs, http://www.halliburton.com/public/cem/contents/ Data_Sheets/web/H/H02656.pdf.    According to Halliburton's own expert, its "primary responsibility is . . . for . . . the specific [cement] slurry and design and testing of the slurry and then pumping the slurry into the well." Frederick Eugene Beck Dep. Tr. (Ex. 2) at 350-51.  Its Sperry Sun division was responsible for monitoring drilling operations and serving as "a second set of eyes on the rig" for monitoring the well. *Id.*

iii.    Cameron

Cameron manufactured the blowout preventer ("BOP") used at Macondo, but it was owned and maintained by Transocean.  While their use is routine in drilling operations, BOPs also represent critical safety equipment.  "[W]hen the BOP is called on to function in an emergency situation, it is the main barrier protecting human life, capital equipment, and the environment.  Therefore, it must function without fail."  Melvyn Whitby Dep. Tr. (Ex. 22) at 398-99.  The BOP had several emergency functions, including a "deadman" for the situation where the BOP loses contact with the rig above.  But, as Cameron told customers like Transocean, the BOP had to be regularly inspected and maintained to work properly.

**b.     The Blowout Of The Macondo Well Resulted From Several Interrelated Causes.**

By April 20, the Macondo well had been drilled to its total depth, cased, and cemented, and it was in the final stages of abandonment.  Even then, as with all wells, there was a series of redundant barriers to prevent a blowout. Had any one of those barriers worked, the disaster could have been averted.  But every single one failed in succession on April 20.

First, hydrocarbons were allowed to enter the wellbore because the cement that Halliburton had designed failed.  Although Halliburton's pre-job testing showed repeated slurry failures, those failures were hidden from BP.  Since the April 20, 2010 incident, no laboratory has been able to generate a stable foam cement with the recipe Halliburton designed, recommended, and used at Macondo.

Integrity tests, including a negative pressure test, were performed on the well to simulate conditions once the rig left the well, but they were misinterpreted by all involved.  Plaintiffs' expert, William Gale, testified that BP's inclusion of a negative pressure test at Macondo was a positive safety step.  *See* William Gale Dep. Tr. (Ex. 5) at 243.  Multiple tests were run and discussed on April 20, and the evidence shows everyone on the rig involved in interpreting the negative tests believed it passed and the well had integrity.  In hindsight, Transocean and BP personnel jointly misinterpreted the negative tests.  But as the United States' drilling expert Richard Heenan testified:  "I don't think it was done intentionally" and there was "no evidence that they were unconcerned" about the welfare of those on the rig.  *See* Richard Heenan Dep. Tr. (Ex. 9) at 175-77.

Shortly before 9 p.m., an hour after the last integrity test, the well started to flow, and it continued to flow for more than 45 minutes despite multiple people on the rig from Transocean and Halliburton/Sperry Sun charged with continuously monitoring the well.  The Transocean drillers had primary responsibility to monitor the well; the Halliburton/Sperry Sun mudloggers were the "second set of eyes."  None of them caught it.  This extraordinary well monitoring and well control failure was the immediate cause of this tragedy.

When an anomaly was recognized at 9:30 p.m., Transocean rig personnel stopped the rig pumps but did not shut in the well.  After the crew stopped the pumps at 9:31 p.m., the

Transocean drilling crew should have checked for flow and immediately shut in the well, thereby keeping the hydrocarbon kick safely below the BOP.  Calvin Barnhill Dep. Tr. (Ex. 1) at 205-06, 393-94.  According to Transocean's own expert, such actions represent "basic well control," but did not occur.  *Id.* at 393.

Once drilling mud unloaded onto the rig, Transocean's crew failed to use equipment designed to divert hydrocarbons away from the rig.  The *Deepwater Horizon* was built with large pipes with the sole purpose of diverting hydrocarbons overboard, away from the rig floor and personnel.  The Transocean crew controlled those diverters but did not use them on April 20.  Instead, the flowing well was sent to a mud-gas separator that was overwhelmed.  Shortly thereafter, an explosion occurred.

Finally, the BOP failed to seal the well.  With the rig's confusing command structure, there was a delay in the Transocean crew's attempt to activate the Emergency Disconnect System.  In addition, post-accident evidence shows that each BOP control pod necessary for the "deadman" function failed due to poor maintenance:  one had a mis-wired solenoid; the other had batteries too old and weak to fire.  As noted above, Transocean was responsible for the maintenance of the BOP.

As the record facts developed during discovery and summarized briefly above reflect, significant responsibility for the well blowout and ensuing oil spill belongs to BP's co-defendants.  While BP has generously agreed to make the plaintiffs entirely whole for losses that it did not entirely cause, if this case proceeded to trial, BP would have a strong basis for establishing, in light of the real-world facts, that BP is not solely responsible for the incident.  Instead, the incident was multi-party and multi-causal.

2.      **At Any Trial, BP Would Establish That Superseding Causes Broke The Chain Of Causation Between Its Acts And The Class's Injuries.**

To recover against BP in litigation, the plaintiff class would need to establish that the negligence of BP's co-defendants, including Transocean and Halliburton, did not constitute superseding causes relieving BP of liability.  *See* BP Answer to Am. B1 Complaint (Rec. Doc. 4130) (Sixth Aff. Defense) (invoking a superseding cause defense); *see also Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (holding that superseding cause applies "where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable") (quotation omitted).  As discussed above, however, the numerous well-control errors committed by BP's co-defendants were both "of independent origin" and unforeseeable to BP, which depended and necessarily relied upon these companies' expertise.  Because (1) Halliburton's failure to monitor the drilling and (2) Transocean's errors in responding to the April 20 loss of well control constituted "later causes of independent origin" that were not foreseeable to BP, there is significant risk to the class that BP could invoke this defense and demonstrate that its conduct was not the legal cause of class members' asserted injuries.  On this causation point, we note that the Fifth Circuit—in a massive maritime case involving an explosion and hundreds of deaths in Texas—ultimately exonerated the French Government and held it blameless on appeal because of the lack of direct causation.  *See Republic of France v. United States*, 290 F.2d 395, 399-401 (5th Cir. 1961); *see also Sofec*, 517 U.S. 830 (affirming finding of superseding causation in maritime accident).

3.      **At Any Trial, In The Alternative, BP Would Establish That Liability Is Divisible Among BP And Its Co-Defendants.**

BP has long contended that it cannot be liable for the entirety of plaintiffs' damages, because any alleged negligence committed by BP was not the "sole proximate cause of

Plaintiffs' alleged damages."   BP Answer to Am. B1 Compl. (Rec. Doc. 4130) (Fifth Aff. Defense); *see also* Rec. Doc. 4392 at 13-15 (explaining the legal basis for a divisibility defense under OPA); Rec. Doc. 5124 at 9-10 (same).   Even if BP did not succeed in demonstrating that the errors and omissions of its co-defendants constituted superseding causes breaking the chain of causation, BP would establish that a divisible portion of plaintiffs' damages was caused by actors other than BP.   In light of the numerous errors by BP's co-defendants, BP submits that there are "volumetric, chronological, or other" bases for dividing liability among the defendants. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 617-18 (2009) (quotation omitted).

Although the Court has previously declined to apply the divisibility doctrine, *see* Rec. Doc. 5809 at 12, if this settlement were not approved, that decision would have to be defended on appeal by the PSC.   BP respectfully submits that it has a significant argument that it cannot be liable for damages that it did not cause and that OPA is indistinguishable from CERCLA in its incorporation of basic common law divisibility into the terms of liability.   *See Burlington N.*, 556 U.S. 599; Restatement (Second) of Torts § 433A (1965).   In contrast, under the settlement, BP has committed to pay class members the entirety of their compensatory damages, as the PSC acknowledges by referring to the class as being made whole.   *See* Part I.B.5, *supra*.

### 4.   At Any Trial, BP Would Establish That Its Conduct Did Not Constitute Gross Negligence Or Willful Misconduct.

In *Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528 (5th Cir. 2001), the Fifth Circuit defined gross negligence as "willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence."   *Id.* at 531.   It is "substantially and appreciabl[y] higher in magnitude than ordinary negligence."   *Id.* at 532 (quotation omitted); *see also Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009); *United States v. Citgo*

63

*Petroleum Corp.*, No. 08-893, Doc. No. 234, at 2-3 (W.D. La. Sept. 29, 2011) (appeal pending) (rejecting U.S.'s assertion of gross negligence under Clean Water Act in connection with large oil spill, and observing that "[g]ross negligence is substantially higher in magnitude than regular negligence"). As explained in *Houston Exploration*, "courts have defined gross negligence as the 'entire absence of care,' the 'want of even slight care and diligence,' and the 'utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.'" 269 F.3d at 532 (citations omitted). Willful misconduct represents an even higher standard.

BP's conduct did not violate or even approach these high thresholds. BP studied the Macondo prospect, used a peer-reviewed, government-approved well design, and hired and relied upon reputable contractors to drill, cement, monitor, and control the well consistent with industry practice and contracts. That is not a company engaged in gross negligence or willful misconduct. For that reason, even if punitive damages were available as a matter of law (a point that BP contests, *see* Part II.E, *infra*), they are not available on the facts of this case.

### B. Many Plaintiffs' Claims Fall Outside The Categories Of Recovery Permitted By OPA.

If this case were litigated through final judgment, many plaintiffs would be unable to recover anything under the substantive law. Under OPA—which BP submits provides the only law that can apply to the plaintiffs' claims—only three carefully delineated categories of damages may be recovered by private plaintiffs:[40]

- damages for injury to, or economic losses resulting from destruction of, real or personal property, *see* 33 U.S.C. § 2702(b)(2)(B);

- damages for loss of subsistence use of natural resources, *see id.* § 2702(b)(2)(C); and

---

[40] To the extent that maritime law applied to these claims (a proposition that, as the Court is aware, BP has contested), claims failing under OPA would also fail under the rule of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).

- damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, *see id.* § 2702(b)(2)(E).

The Settlement Agreement provides generous compensation for many kinds of loss that fall into none of these categories, such as to real property owners whose property was not oiled and business owners who have suffered lost profits despite not making use of natural resources that were injured, destroyed, or lost as a result of the spill.  If not for the Settlement Agreement, these claimants would likely receive no compensation whatsoever—and they certainly would not receive the generous compensation provided by the settlement.  *See generally* BP Mot. to Dismiss BP Dealer Claims (Rec. Doc. 6893); BP Mot. to Dismiss Recreation Claims (Rec. Doc. 6894); BP Mot. to Dismiss Stigma Claims (Rec. Doc. 6895).

### C.    Many Plaintiffs Would Be Unable To Show That They Satisfied OPA's Presentment Requirement.

Under OPA, a claimant may not file suit against BP until he or she has first presented a claim to BP, and then either (1) the claim is denied; or (2) a 90-day negotiation period has expired without settlement—a period that begins to run after the claim has been "presented."  33 U.S.C. § 2713(c).  Presentment permits a responsible party a fair opportunity to evaluate the claim for settlement, and so compliance is a "mandatory condition precedent" to filing suit in court.  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995).  BP consistently has argued that under OPA, ***each*** B1 plaintiff must satisfy OPA's claim presentation process ***before filing suit***.  Presentment cannot be satisfied *post hoc* without dismissal and refiling.

The Court has agreed with BP, ruling that "the text of OPA clearly requires that OPA claimants must first 'present' their OPA claim to the Responsible Party before filing suit" and describing this requirement as a "mandatory condition precedent."  *See* B1 Order (Rec. Doc.

3830) at 29-30.  Nevertheless, the Court initially declined to determine which of the B1 plaintiffs have complied with the requirement, effectively maintaining their suits without a threshold determination that presentment has been satisfied.  *See id.* at 30-31.

BP has fully reserved its presentment defense, with only one limited exception for opt-out plaintiffs who have expired offers from the GCCF.  Thus, if this case were to proceed to trial, the Court would have to address the presentment question head on, as BP would seek to enforce the threshold requirement of presentment either before this Court or, as necessary, on appeal.  Those plaintiffs who had not complied with OPA's presentment requirement would see their claims dismissed.  Even if such dismissal were without prejudice, many plaintiffs might find themselves unable to re-file their claims by virtue of OPA's three-year statute of limitations.  *See* 33 U.S.C. § 2717(f).  And of course, during this process, time would pass—in contrast to the settlement process, which will pay claimants now.

### D.    Many Plaintiffs Would Be Unable To Establish That Their Damages Were Caused By The Spill.

During the pendency of this litigation, the parties have vigorously contested the standard of causation that applies under OPA.  BP has consistently argued that plaintiffs may not recover under OPA unless they each can demonstrate that their injuries were proximately and in fact caused by the discharge.  *See, e.g.*, BP Mot. to Dismiss the B1 Master Compl. (Rec. Doc. 1440-1) at 45 n.31; BP Reply in Supp. of Mot. to Dismiss the B1 Master Compl. (Rec. Doc. 2312) at 23; BP Mot. to Dismiss BP Dealer Claims (Rec. Doc. 6893).  This argument ties explicitly to the language in the statute:  "removal costs and damages . . . that ***result from***" an oil discharge, 33 U.S.C. § 2702(a) (emphasis added), "[d]amages for injury to, or economic losses ***resulting from*** destruction of, real property or personal property," *id.* § 2702(b)(2)(B) (emphasis added), and "[d]amages equal to the loss of profits or impairment of earning capacity ***due to*** the injury,

66

destruction, or loss of real property, personal property, or natural resources," *id.* § 2702(b)(2)(E) (emphasis added).  If BP were to prevail on these arguments, either before this Court or on appeal, a significant number of plaintiffs who otherwise would receive compensation pursuant to the settlement would likely obtain nothing at all.  *See Shell Oil*, 155 F.R.D. at 563 (approving settlement where "[p]roving causation could be quite troublesome for some claimants").

Moreover, BP's causation defenses would retain force even if this Court were to hold that OPA demands some causal showing less stringent than proximate cause.  In no case would courts be expected to allow an award of damages based on speculation or highly attenuated assertions of harm allegedly traceable to the spill.  In each case, each plaintiff would need to demonstrate both (1) an injury caused by the spill; and (2) economic damages traceable to the spill, and not some other causal event.  Such proof is extraordinarily difficult—and, unlike in this settlement, would need to be established with admissible evidence subject to the full adversary process.  By contrast, the settlement provides generous compensation based, in many instances, upon presumption zones or other forgiving causation standards that would not apply by statute or general maritime law.

### E.  BP Could Demonstrate On Appeal That Punitive Damages Are Unavailable As A Matter Of Law.

Even putting aside the fact that punitive damages are not warranted on the ***facts*** of this case, there is also significant risk to the plaintiff class that BP would demonstrate that punitive damages are not available as a ***matter of law***.

Rejecting BP's argument that OPA displaces federal maritime law as to OPA responsible parties such as BP, the Court held in its B1 Order that punitive damages are available under federal maritime law.  *See* B1 Order (Rec. Doc. 3830) at 25.  Respectfully, this conclusion is contrary to the conclusions of other courts, *see S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234

67

F.3d 58, 65-66 (1st Cir. 2000); *Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 747 (E.D. La. 2009); *Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127, 1133 (D. Or. 2001).  To affirm the Court's conclusion, the Fifth Circuit would be required to split with the First Circuit in *South Port Marine* and open the ruling to review by the Supreme Court, which looks to circuit splits as the primary criterion for granting *certiorari*.  *See* Sup. Ct. R. 10(a).  BP thus submits that there is a significant risk to plaintiffs that BP would prevail on this issue on appeal.

Moreover, even if plaintiffs could demonstrate their entitlement to punitive damages, the Supreme Court has held that the ratio of punitive to compensatory damages may not exceed 1:1 in the vast majority of maritime cases.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008).  And at the very least, *Robins Dry Dock* would apply to most types of maritime claims, meaning only those who own property that was oiled (or who satisfied the commercial fishermen exception to *Robins* that some lower courts have adopted), would even be eligible to seek punitive damages, *see, e.g.*, *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 377 (5th Cir. 2006) ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit.").  Such obstacles to recovery strongly counsel in favor of approving the settlement.  *See Shell Oil*, 155 F.R.D. at 563 (approving settlement where it was "not clear that the plaintiffs could prove punitive liability").

Finally, the settlement includes generous RTP payments.  These payments represent ***multiples*** of actual compensatory damages to account for future risk and uncertainty and all claimed damages of any type.  Thus, even apart from BP's position that punitive damages are unavailable, the contemplated RTP payments plainly serve as a surrogate for any benefits that

punitive damages might otherwise provide (as well as well as a liquidation of any claimed rights to punitive damages).

**F.   At Any Trial, BP Would Establish That The Gulf Is Undergoing A Robust Recovery, Further Weakening Claims For Economic Damages.**

A further obstacle to the class if this case were to proceed through adversarial litigation is the evidence that the Gulf is undergoing a robust recovery. This evidence would substantially weaken any claim that class members are entitled to compensation for future injury.

**1.   Coastal Areas**

Dr. Elliott Taylor, a lead technical advisor to the SCAT team, reports that he has visited dozens of sites across the Gulf Coast multiple times since the spill began. Taylor Decl. (Ex. 19) ¶ 11. He further opines that the "scope and thoroughness of the SCAT program for the DWH oil spill is unprecedented, and that the SCAT program provides an accurate and detailed understanding of the current level and character of shoreline oiling in the Gulf and the level and character of oiling over time." *Id.* ¶ 23. As he explained, "SCAT teams have surveyed many segments of the Gulf shoreline multiple times over many months since May 2010." *Id.* ¶ 32. "Surveying segments repeatedly allows SCAT to assess changes in oiling over time, assists in understanding the effectiveness of shoreline treatment activities, and provides an understanding of the shoreline's seasonal variability." *Id.*

Dr. Taylor's surveys left him with the clear conclusion that the Gulf was undergoing a strong recovery. As he has explained, "more than 3,900 miles of shoreline have been formally moved out of the response or recommended for removal from the response." *Id.* ¶ 33. Now that "[a] variety of scientists and organizations have searched for oil in near-shore areas for more than two years, throughout all seasons of the year," *id.* ¶ 42, he concludes that any future re-oiling "would almost certainly be minimal, discrete, and localized." *Id.* ¶ 43.

2.      **Wetlands**

Dr. Harold Leggett, former Secretary of the Louisiana Department of Environmental Quality, "made a series of site visits to the Louisiana wetlands so that [he] could personally observe the condition of the wetlands."  Leggett Decl. (Ex. 14) ¶ 12.  He opined that "the marsh appeared to be healthy and recovering well," with the exception of one specific location that Unified Command had selected to test recovery methods.  *Id.* ¶ 15.  "Even the heavily oiled areas I observed appeared to be healthy and recovering well, again with the exception of the 'test plot.'"  *Id.*  In conclusion, he explained,

> I believe that the marsh has made remarkable progress in recovery from this event, and that little to no observable impact will be visible in the next year.  Even now, in many of these sites where heavy oiling occurred, there is no longer any observable oil.  In addition, I personally observed both animal and plant life flourishing in these areas, including many species of birds, several school of porpoises and fish and extensive re-vegetation occurring.

*Id.* ¶ 15.

Similarly, Wharton "made a series of site evaluations of the Louisiana wetlands on March 27, 2012, including aerial observations from a helicopter and ground observations from a boat."  Wharton Decl. (Ex. 21) ¶ 17.  Of the seven sites where he was on the ground, "SCAT reported heavy oil at five of the sites and moderate oil at two of the sites at their maximum level of oiling observed."  *Id.* ¶ 18.  He also visited twenty-one additional sites by boat between June 12 and June 14, 2012.  *Id.* ¶ 20.  "Overall, the wetlands where oil was observed appear to be recovering, including an appearance of healthy vegetation, the emergence of new vegetation shoots, as well as a reduction in the degree of oiling due to response activities or natural attenuation."  *Id.* ¶ 22.  "In fact, oil is currently no longer observed in many areas where oil was observed after the DWH spill."  *Id.*  "Based on my experience, my observations, and the materials I reviewed for this declaration, I expect that the degree of oiling from the DWH spill will continue to decrease over

time along the Louisiana shoreline from both response activities and natural attenuation."  *Id.*
¶ 25.  "I also expect that sites that were once reported as having oil will be reported in the future as having no oil."  *Id.*

### 3.      Water

Dr. Alan Jeffrey[41] explains that the Operational Scientific Advisory Team ("OSAT") was a government-led multi-agency team formed as part of the response to the *Deepwater Horizon* spill.  Jeffrey Decl.  (Ex. 11) ¶ 9.  It brought together expertise from the Bureau of Ocean Energy Management, Regulation, and Enforcement; the Environmental Protection Agency; the National Oceanic and Atmospheric Administration; the Coast Guard; the U.S. Geological Survey; the Fish and Wildlife Service; and BP.  *Id.*

Dr. Jeffrey describes two projects:  OSAT-I, which examined 17,000 water and sediment samples taken between May 5 and October 23, 2010; and OSAT-II, a follow-up investigation to examine the spatial distribution and potential impacts of oil residues in the nearshore, surfzone, and sandy beach environments.  *Id.* ¶ 10.  All told, OSAT "comprised a very broad and scientifically robust detection, sampling, and monitoring program" that "was well-designed and implemented in a way that effectively measured the extent of oil and dispersant components in the nearshore environment following the DWH spill."  *Id.*

The results of the OSAT projects were unequivocal.  As Dr. Jeffrey explains, "the OSAT-I investigation found no samples in the nearshore zone that exceeded human health benchmarks and a very low number of water and sediment samples that exceeded aquatic life benchmarks" for polycyclic aromatic hydrocarbons ("PAH").  *Id.* ¶ 12.  Of 6,909 water and sediment samples

---

[41]  Dr. Jeffrey is a Senior Geochemist at ZymaX Forensics in Escondido, California, where has managed environmental geochemistry projects, including data interpretation and preparation of reports.  Jeffrey Decl. (Ex. 11) ¶ 2.  He holds a Ph.D. in oceanography from Texas A&M University, as well as a Masters degree in organic chemistry and a bachelors degree in biochemistry, both from Queen's University in Canada.  *Id. ¶* 1.

analyzed for PAH, only 35 samples "consistent with MC252 oil or of indeterminate origin" exceeded aquatic life benchmarks, and "[*n*]*one* of the exceedances in samples collected after August 3, 2010, were consistent with MC252 oil." *Id.* (emphasis added).

As for OSAT-II, it "addressed three types of shore and nearshore oil residue, including supratidal buried oil ('SBO'), small surface residue balls ('SSRBs'), and submerged oil mats ('SOMs')." *Id.* ¶ 19. As Dr. Jeffrey explains, findings included (1) recently collected weathered oil samples from the beach environment showed 86-98% depletion of total PAH; (2) the risk of leaching of SBO into groundwater is minimal due to the combined effects of weathering, biodegradation, and the location of the buried oil; (3) in most locations, models predict PAH concentrations in SBO will decrease to 20% of "already substantially depleted" current levels within five years; and (4) the risk of potential cancer and non-cancer health effects from short- and long-term exposures does not rise to the levels EPA deems to pose unacceptable health risks. *Id.* ¶ 20.

### 4. Seafood

Dr. John W. Tunnell, Jr.,[42] has explained that seafood in the Gulf is undergoing a strong recovery. Perhaps most significantly, no seafood tested by Louisiana's Seafood Safety Surveillance Program between July 2010 and November 2011 exceeded levels of hydrocarbon-based compounds deemed sufficient to raise concerns by the Food and Drug Administration or National Oceanic and Atmospheric Administration. *See* Tunnell Decl. (Ex. 20) ¶ 19. Rather, "state and federal officials have determined that seafood from the Gulf of Mexico is as safe to eat now as it was before the spill." *Id.* ¶ 26. But the seafood is not only healthy—it is also available

---

[42] Dr. Tunnell is Associate Director and Endowed Chair of Biodiversity and Conservation Science at the Harte Research Institute for Gulf of Mexico Studies, and Professor of Biology, Fulbright Scholar, and Regent's Professor in the Department of Life Sciences, College of Science and Engineering, Texas A&M University Corpus Christi (TAMU-CC). Tunnell Decl. (Ex. 20) ¶ 1. He helped develop and then taught for almost twenty years at the National Spill Control School at TAMU-CC, focusing on the effects of oil spills on the marine environment. *Id.* ¶ 2.

in numbers nearly unchanged from their pre-spill levels:

*Shellfish*:  Based on landings data listed in NOAA and the Gulf State Marine Fisheries Commission, "there was not much of an effect, if any, on adult shrimp population levels in the northern Gulf of Mexico in 2010 or 2011."  *Id.* ¶ 33; *see also* Fishkind Decl. (Ex. 4) ¶ 77(a) ("The volume of shrimp landed in the class geography during the period from September-December 2010 (when fishing grounds re-opened) was 4% above the average volume of landings over the same period from 2007-2009.").  While oysters dropped in harvest levels in 2010 as compared to the 2007-2009 period as a result of fishery closures and Louisiana's decision to divert freshwater from the Mississippi River to flood estuarine areas, they increased past their 2010 levels in 2011.  *See* Tunnell Decl. (Ex. 20) ¶¶ 40-43.  "Once salinity returns to normal ranges in the relevant areas, oyster populations in those areas should return to pre-freshet trends within 18 to 24 months."  *Id.* ¶ 50.  According to Dr. Tunnell, it appears that salinity is returning to normal levels.  *Id.*[43]  As to blue crab, while there was a drop in landings in 2010 as a result of fisheries closures, the 2011 harvest of 51.7 million pounds is above the 44.1 million pound long-term average of the past sixty years.  *Id.* ¶ 53; *see also* Fishkind Decl. (Ex. 4) ¶ 77(d) ("The volume of blue crab landings in the class geography in May-August 2011 was 36% above the same period in 2010, and only 6% below the average of 2007-2009.").  In sum, "while blue crab populations of the northern Gulf of Mexico showed a decrease in landings during the 2010 fishery closure, by the end of 2011, harvests and abundance were in line with long-term pre-spill historic trends."  Tunnell Decl. (Ex. 20) ¶ 55.  "State data also indicate that abundance in Louisiana is generally above both the long-term average and the benchmark average."  *Id.*

---

[43] Indeed, as Dr. Fishkind notes, the "volume of oysters landed in the class geography in May-August 2011 was 71% above the same period in 2010."  Fishkind Decl. (Ex. 4) ¶ 77(c).

*Finfish*:  By the end of 2011, finfish harvests "appear[ed] to be within or above historic trends."  *Id.* ¶ 56; *see also* Fishkind Decl. (Ex. 4) ¶ 77(b) ("The volume of finfish landed in the class geography in September-December 2010 was 3% above the average of 2007-09 levels.").  With regard to vermillion snapper, preliminary data from 2011 indicate more than three million pounds of commercial landings, which is above the long-term average and approximately the same as the 2007-2009 benchmark period average.  Tunnell Decl. (Ex. 20) ¶ 60.  Because the red snapper population is rebounding after decades of overfishing, the Gulf of Mexico Fishery Management Council recently announced a 25% increase in the quota for 2012, to 3.71 million pounds.  *Id.* ¶ 62.  Black drum commercial landings "were as high as they had been since 2004" in 2011,  *id.* ¶ 66, and yellowfin tuna, which has been subject to a long-term downward trend since at least 1990, increased from 2010 to 2011, *id.* ¶ 68.

In summary, Dr. Tunnell concludes that "most of the fishery species relevant for the Seafood Compensation Program appear to be within pre-spill landings and population trends in most areas of the region."  *Id.* ¶ 71.  This conclusion accords with Dr. Fishkind, who notes that "as a general matter, fishing activity returned to pre-Spill levels of activity after spill-related closures ended in late 2010."  Fishkind Decl. (Ex. 4) ¶ 77.

### 5.    Tourism

In light of the fact that the coast, wetlands, water, and seafood are returning to their pre-spill conditions, it is unsurprising that tourism has also recovered.  According to Landry, based on his review of Smith Travel Research ("STR") data,[44] "it appears any overall loss of business from reduced tourism that may have resulted from the Spill was replaced and more than offset by new demand."  Landry Decl. (Ex. 13) ¶ 39.  In sum, "the destinations do not appear tainted and

---

[44] "STR data is widely relied upon by industry participants and is recognized as the standard source for evaluating tourism and hotel industry performance."  Landry Decl. (Ex. 13) ¶ 20.

did not suffer long term demand decline." *Id.* ¶ 40.  Rather, "the affected area has experienced new record high revenues in 2011 and the trend appears to continue in 2012." *Id.* ¶ 48.  Thus, the settlement "should more than fully compensate businesses and individuals in hospitality and tourism for any economic harm experienced." *Id.*

Drs. Fishkind and Richardson agree.  *See* Fishkind Decl. (Ex. 4) ¶ 70 ("More specifically, available data indicates that tourism recovered by late 2010 and that the summer of 2011, the first following the DWH Spill, was especially strong for the Gulf tourism industry and 2012 continues to be strong."); Richardson Decl. (Ex. 16) ¶ 41 ("In fact, there are signs illustrated by tourism-related activity in 2010 and 2011 suggesting that Louisiana's industry has been on the upswing.").

### G.    New Complexities And Hurdles For Plaintiffs' Claims Would Surely Arise During A Lengthy, Multi-Phased Trial Process.

Finally, actually litigating this case would engender innumerable complexities and proof problems that would take many years to resolve.  By any measure, this case has already been one of the most expensive and complex in history.  *See supra* Part I.C.2.  As explained above, the pretrial briefing has produced a wide variety of extraordinarily difficult and unprecedented legal questions.  Should the case go to trial, the Court would have to resolve those questions.  And given the lack of controlling precedent on so many of the legal issues, a series of complex appeals to the Fifth Circuit and possibly beyond would surely follow.  At the end of that lengthy litigation odyssey, however, it is unlikely that either party would be wholly successful.  The only thing that is certain is that a trial would delay payment to the class for years—likely a decade or longer.

The *Exxon Valdez* litigation provides a clear example of the risks of litigation to the class. As noted above, nearly twenty years elapsed between the 1989 *Exxon Valdez* oil spill and the

Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008). Many of the plaintiffs had died before the case reached the Supreme Court, *see* Brief for Respondents, *Exxon Shipping Co. v. Baker*, No. 07-219, 2008 WL 194284, at *16 (U.S. Jan. 22, 2008), and many others suffered due to the lengthy litigation process. Indeed, experts who studied the effects of the *Exxon Valdez* litigation on the local populace have said that the litigation "produce[d] an independent secondary disaster, which [rather than the original spill] is the primary source of ongoing secondary trauma." J. Steven Picou, *When the Solution Becomes the Problem: The Impacts of Adversarial Litigation on Survivors of the Exxon Valdez Oil Spill*, 7 U. St. Thomas L.J. 68, 81 (2009); *see also supra* n.36 (describing the lengthy *Amoco Cadiz* trial and appellate proceedings).

## III.   OBJECTIONS RECEIVED THUS FAR LACK MERIT.

As discussed above, relatively few objections have been received to date, particularly in light of the comprehensive class notice program, pursuant to which millions of people and businesses received notice of the settlement. This reflects the initial judgment of the class that the Settlement Agreement is fair, reasonable, and adequate. Those objections that have been received, moreover, lack merit. *See, e.g.*, Miller Decl. (Ex. 15) ¶ 43 ("I have reviewed objections filed as of August 8, 2012 and find in them no basis for revising the opinions expressed above."). BP addresses objections that have been received to date herein; BP will address additional objections that are received following the filing of this brief in its reply submission.

### A.   No One Has Standing To Complain About Exclusion From The Class, As The Settlement Agreement Has No Effect Whatsoever Upon The Legal Rights Of Non-Class Members.

Recognizing that the Settlement Agreement provides generous compensation to those who fall within its claims frameworks, certain objectors complain that the settlement negotiated by the parties does not resolve their claims. In some cases, the objector does not fall within the

76

settlement class as a result of the objector's geographic location.  *See, e.g.*, Rec. Doc. 6317; Rec. Doc. 6383; Rec. Doc. 6404; Rec. Doc. 6497; Obj. Doc. 40;[45] Obj. Doc. 42; Obj. Doc. 45; Obj. Doc. 53; Obj. Doc. 55; Obj. Doc. 56.  Other objectors have substantive claims that the parties have not agreed to settle.  Many such claims are ones BP regards as having no colorable legal basis at all.  *See, e.g.*, Rec. Doc. 6345 (BP dealer claims); Rec. Doc. 6382 (same); Obj. Doc. 34 (unrealized reduction in property value); Obj. Doc. 35 (similar); Obj. Doc. 36 (similar); Rec. Doc. 6830 (similar); Obj. Doc. 46 (similar); Obj. Doc. 43 (similar); Obj. Doc. 37 (mortgage brokers).[46]

As the Court has recognized, however, persons falling outside the settlement class are entirely unaffected by the Settlement Agreement, and thus lack standing to challenge it.  *See* Rec. Doc. 7038 at 1 ("In the context of class settlements, non-settling parties generally have no standing to challenge the proposed settlement"); Preliminary Approval Order at 16-17 ("Generally, non-class members do not have standing to object to a class settlement. Significantly, ***claims excluded from the proposed settlement are unaffected and preserved***.") (emphasis added and citations omitted); Apr. 25, 2012 Preliminary Approval Hr'g Tr. at 48:19-49:1 ("[W]hen you say that some category is excluded from this settlement, that does not in any way mean they cannot pursue or continue to pursue their claims in court or otherwise. . . . They are just not affected by the settlement one way or the other."); *cf.* Miller Decl. (Ex. 15) ¶ 44 ("There is no 'right' to be included in a class action settlement, and attorneys who craft a

---

[45] On June 4, 2012, the Court established No. 10 Civ. 7777 (E.D. La.) as a separate case number for the filing of objections.  *See* Rec. Doc. 6616.  Citations to "Obj. Doc." refer to documents filed on this separate objections docket.

[46] Because parties excluded from the settlement suffer no prejudice and remain in their status quo state, the parties need not justify why certain types of claims are or are not included within the settlement.  Nevertheless, BP has previously explained that three particular types of claims are not compensable, one indication of why it has declined to settle these claims.  *See generally* BP Mot. to Dismiss BP Dealer Claims (Rec. Doc. 6893); BP Mot. to Dismiss Recreation Claims (Rec. Doc. 6894); BP Mot. to Dismiss Stigma Claims (Rec. Doc. 6895).

settlement necessarily have discretion to determine who is included and who is excluded from the release.").[47]

Nor need the point be phrased in the language of standing. Fundamentally, the purpose of fairness review under Rule 23(e) is to ensure that absent class members are not bound by an unfair settlement. *See, e.g.*, *Piambino v. Bailey*, 610 F.2d 1306, 1327 (5th Cir. 1980) ("Rule 23(e) requires the trial judge to review any proposed settlement of a class action. The purpose of this salutary requirement is to protect the nonparty members of the class from unjust or unfair settlements **affecting their rights**.") (emphasis added); *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176-77 (5th Cir. 1975) ("The special prophylactic function that subdivision (e) of Rule 23 was designed for is to assure that any person **whose rights would be affected** by a dismissal or compromise has the opportunity to contest the proposed action.") (emphasis added and quotation omitted). Persons excluded from the class remain in exactly the same position as they occupied before the settlement was reached, and so the Court has no basis for considering these persons' objections. They remain free to litigate their claims as they please.

### B. The Mississippi Attorney General's Objections Lack Merit.

On April 26, 2012, Mississippi, through its Attorney General, filed a memorandum opposing the Settlement Agreement. *See* Rec. Doc. 6370 ("Miss. Objs.") Mississippi primarily argued that the Court should reject the Settlement Agreement because the class definition did not include persons who had already reached final settlements with BP through the GCCF. According to Mississippi, the GCCF releases are invalid both because (1) OPA does not permit the use of final releases and (2) the releases here were procured through duress.

---

[47] This conclusion, of course, comports with settled precedent. *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 581 (5th Cir. 2007) (per curiam) (citing *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 974-75 (E.D. Tex. 2000)).

The argument fails for several reasons.  ***First***, OPA clearly contemplates the use of final releases to achieve the statutory goal of facilitating out-of-court settlements.  The thrust of Mississippi's argument is that BP should have to pay twice to release the very same claims the GCCF has already settled using funds from the Deepwater Horizon Oil Spill Trust and that BP has a non-existent duty to agree to such an outcome in settlement negotiations with the plaintiffs.

***Second***, the GCCF system provided numerous options.  Specifically, claimants seeking compensation from the GCCF were presented with a choice between accepting (1) interim payments, which did not require final releases; (2) "Quick Pay" payments, which granted claimants immediate compensation in exchange for a final release; and (3) final payments, carefully calculated to compensate for all past and future losses in exchange for a final release.  *See* Gulf Coast Claims Facility, Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology (Feb. 18, 2011) (Ex. 6), at 2.  Prior to November 23, 2010, the GCCF also made available "emergency advance payments" specifically to ensure that anyone in dire financial straits could receive compensation ***without requiring a final release***.  *See* Gulf Coast Claims Facility, Frequently Asked Questions (Ex. 7) ¶ 14.  Thus, the GCCF both fully satisfied BP's obligations under OPA and ensured that no claimant made a decision under duress.

***Third***, as is particularly relevant here, the exclusion of persons who signed GCCF releases is irrelevant to the Court's disposition of this motion for final approval.  The legal point is that the Court's sole task at this time is to determine if the Settlement Agreement is fair and reasonable ***to the class members who will be bound by the judgment.***  *See supra* Part III.A.  If the Mississippi Attorney General were correct that the GCCF releases could be challenged, then persons who signed such releases could attempt to pursue such claims in litigation.  At that time,

BP would again defend the releases as valid and fully enforceable.  Nothing in this Settlement Agreement affects the legal rights of these non-class members one way or the other.

*Fourth*, putting all other issues aside, Mississippi lacks standing to object to the fairness of either the economic loss or medical settlements.  The Court has already recognized this standing defect with respect to the State of Louisiana.  *See* Rec. Doc. 7038.

### 1.    The GCCF Releases Comported With OPA, Were Not The Product Of Duress, And Are Valid And Enforceable.

OPA was designed to facilitate out-of-court settlements.  *See, e.g.*, 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) (describing the congressional goal "to allow for quick and complete payment of reasonable claims *without resort to cumbersome litigation*") (emphasis added); *Boca Ciega Hotel*, 51 F.3d at 238-39 (noting the "congressional desire to encourage settlement and avoid litigation"); Miss. Objs. at 4 ("[T]he initial underlying congressional intent in creating the OPA-mandated claims process was to encourage settlement and avoid litigation.").  As a result, any argument premised on the incorrect notion that OPA impedes settlements by prohibiting final releases must fail.

### a.    OPA Permits Final Releases And Presupposes Their Use To Reduce The Burden Of Oil Spill Litigation On The Judiciary.

Mississippi argues that the GCCF releases are invalid because OPA does not permit final releases.  In support of this argument, Mississippi relies upon two statutory provisions that require a responsible party to establish, and to advertise, a procedure for the payment of interim damages claims.  *See* 33 U.S.C. § 2705(a); *id.* § 2714(b)(2).  Mississippi further relies upon 33 U.S.C. § 2715, which provides as follows:

(a)    In general

Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any

other law.

(b)     Interim damages

    (1)     In general

If a responsible party, a guarantor, or the Fund has made payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled, subrogation under subsection (a) of this section shall apply only with respect to the portion of the claim reflected in the paid interim claim.

    (2)     Final damages

Payment of such a claim shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law.

*Id.* § 2715.

Taken together, these provisions require a responsible party to have a procedure for the payment of interim claims. Nothing in their text even plausibly bars the use of final releases where the responsible party and the claimant agree upon a final settlement. Unsurprisingly, Mississippi has identified no authority adopting such a novel interpretation. Settling claims with finality and with clarity presumes the use of releases. *See, e.g.*, *Williams*, 23 F.3d at 935 ("Public policy favors voluntary settlement of claims and enforcement of releases."); Att'y Gen. Jim Hood's Resp. In Opp'n to the Mots. to Vacate & Incorporated Mem. of Law, *In re Jim Hood, Att'y Gen. ex rel. State of Miss.*, No. 94-1429, 2006 WL 3769644 (Miss. Ch. Ct. Apr. 17, 2006) ("Should the Movants succeed here, it will *leave all those who enter into settlement agreements with the State indefinitely in doubt as to the finality of such agreements*.") (emphasis added).

The legislative history of the 1996 OPA amendments, which added the provisions about interim damages upon which Mississippi relies, further confirms that the purpose of the amendments was simply to make the payment of interim claims *possible*. Prior to the 1996

81

amendments, there was concern that a claimant's acceptance of an interim payment could foreclose the claimant's ability to receive the rest of his or her damages later. *See Oil Spill Prevention & Resp. Improvement Act:  Hr'gs Before the S. Comm. on Environment & Pub. Works*, 104th Cong. 166 (1996) (statement of Barry M. Hartman, Counsel to Rhode Island Lobsterman's Association) ("Our concern has always been one thing and one thing only, and we've said it until we are blue in the face—there is a provision of OPA, section 1015, that says on its face that if you accept payment from anyone under the Act, you subrogate all your rights under every other law to that person to whom you have accepted payment.  That section can be read by a court looking at the strict language of the statute to mean that if I accept $1 on my claim from the insurer, I have subrogated all my rights under all other laws for all claims that I have."); *id.* at 239 (statement of Bob Smith, President, Rhode Island Lobstermen's Association) ("[I]f I as a claimant accept an interim payment from the insurer under this law, this provision could be construed to require that I give the insurer all my rights to claim damages under *any* other law, even if I was not yet compensated for all my losses.").  In other words, the purpose of the statutory amendments was to "make it clear that interim payments are allowable." *Id.* at 255.

Nothing in the statutory text or the legislative history suggests a congressional intention to provide that final releases are impermissible, and adopting such a rule here would directly frustrate OPA's goal of encouraging out-of-court settlement.

### b.      The GCCF Releases Were Not Procured By Duress.

Mississippi further argues that all GCCF releases are void because they were procured by duress.  Even if this issue were amenable to a class-wide resolution (which it surely is not, given the highly fact-specific showing that a claim or defense of duress requires), Mississippi has failed to demonstrate that the standard of economic duress has been satisfied.  Under Mississippi law (which applies to GCCF releases signed by Mississippi residents), "the complaining party

must establish:  (1) that the dominant party threatened to do something which he had no legal right to do; and (2) that the wrongful threat overrode the volition of the victim and caused him to enter an agreement against his free will."  *Bailey v. Estate of Kemp*, 955 So. 2d 777, 783 (Miss. 2007) (quotation omitted).  Critically, economic duress "cannot be predicated upon a demand which a party has a legal right to do."  *In re Estate of Davis*, 832 So. 2d 534, 538 (Miss. Ct. App. 2001) (quotation omitted).

Mississippi identifies no unlawful threat made by BP or the GCCF, and so it cannot satisfy the first requirement of the duress standard.  Nor can Mississippi satisfy the second requirement, as any individual displeased with the GCCF's offer of a final payment remained free to, among other things, (1) accept only an interim payment, which would not require a final release; (2) accept no payment, and sue BP; or (3) accept no payment, and make a claim against the Oil Spill Liability Trust Fund.  Indeed, Mississippi identifies no evidence whatsoever upon which it would rely to prove that duress occurred in any individual case.  Accordingly, its duress argument must fail.[48]

---

[48] Mississippi further argues that the releases are invalid because they purport to release BP of liability for its assertedly grossly negligent conduct.  While the Court has explained that "gross negligence will invalidate a release," *see* Rec. Doc. 5446 at 14 (emphasis omitted), in context the Court obviously means that a **prospective** release for gross negligence is invalid.  Indeed, *Houston Exploration Co. v. Halliburton Energy Servs. Inc.*, 269 F.3d 528 (5th Cir. 2001), upon which the Court relied in its indemnification order and which Mississippi invokes in its objection, itself relies upon a provision of Louisiana law that unambiguously applies to prospective releases.  *See* La. Civ. Code Ann. art. 2004 ("Any clause is null that, *in advance*, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.") (emphasis added) (quoted *in Houston Exploration Co.*, 259 F.3d at 531 n.1).  The other authority is equally clear.  *See, e.g.*, *Sevarg Co. v. Energy Drilling Co.*, 591 So. 2d 1278, 1281 (La. Ct. App. 1991) ("Sections 18.8, 18.14, and 18.15 of the contract, given the interpretation espoused by Energy, are null, because they, *in advance*, exclude or limit the liability of Energy for intentional or gross fault that causes damage to Sevarg.") (emphasis added); *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999) ("'An attempted exemption from liability . . . for a *future* willful or grossly negligent act is generally held void . . . .'") (emphasis added) (quoting 8 *Williston on Contracts* § 19:23 (4th ed.)); *La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc.*, 124 F.3d 10, 19 (1st Cir. 1997) ("[T]he *prospective* wrongdoer's potential liability should be enough to deter negligence.") (emphasis added and quotations omitted) .  Failure to limit this principle of law to preventing a party from immunizing itself from liability for future gross negligence would effectively prohibit settlement in any case involving gross negligence, which is obviously not the law.  *See, e.g.*, *Loscher v. Hudson*, 182 P.3d 25, 34 (Kan. Ct. App. 2008) ("Unless an indemnity agreement encourages the commission of the illegal act, a contract to indemnify **against the consequences of an illegal act that has already been committed** has generally been upheld."); *Brown v. Gallagher*, 902 N.E.2d 1037, 1040 (Ohio Ct. App. 2008)

2.   **The Parties Are Not Required To Negotiate The Broadest Settlement Agreement Possible, And So The Validity Of The GCCF Releases Is Irrelevant To The Fairness Of The Settlement Agreement.**

Although the GCCF releases are valid and enforceable, the validity of the GCCF releases is irrelevant to the fairness of a settlement that does not affect the legal rights of persons who have signed such releases.   As the Court has recognized, it is "'perfectly reasonable—and not at all unfair or un-adversarial—for class counsel to define the class in a way that, in their opinion, would lead to the best recovery for the class.  ***Fairness does not require class counsel to act on behalf of individuals not in the class, even if at one time those individuals were included in a pretrial class definition***.'"   Preliminary Approval Order at 16-17 (emphasis added) (quoting *McBean v. City of N.Y.*, 233 F.R.D. 377, 384 (S.D.N.Y. 2006)).   Put slightly differently, even if persons who signed GCCF releases still had valid claims, nothing requires the parties to settle such claims, either as a part of a comprehensive class action settlement, or separately.[49]

 Here, the parties had valid reasons for excluding persons who had signed GCCF releases, the simplest of which is that including claims that ***already had been settled and paid for by BP*** would make no sense.  Those claims were terminated by the releases and there is no reason to pay to release the same claims twice.   Hence, BP and the PSC could not reach a voluntary settlement on this issue.   Mississippi may not now ask the Court to require the parties to settle

---

("[O]ne may make an agreement to be indemnified or to indemnify with respect to a crime or illegal act which occurred prior to the making of the agreement. This has been the law for many years throughout the United States and in this State.") (quotation omitted); *Oxy, USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 287 (Tex. Ct. App. 2005) ("We find the public policy argument of deterring misconduct by preventing a party from contracting away liability to be inapplicable in this case because the Indemnity Agreement is limited to actions that have already occurred.").

[49] The authority is uniform that a court may not require parties to a civil suit to reach a settlement that is broader than the one they have themselves negotiated.  *See Manual for Complex Litigation (Fourth)* § 21.61 ("The judicial role in reviewing a proposed settlement is critical, but limited to approving the proposed settlement, disapproving it, or imposing conditions on it.  The judge cannot rewrite the agreement."); *see also Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985); *Gen. Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 712 (6th Cir. 1982) ("In these days of crowded dockets, settlement of civil suits, like plea bargains in criminal cases, are much desired by courts, which cannot force them.").

claims that they have not agreed to settle themselves.  And, of equal importance, Mississippi may not hold up a settlement paying billions of dollars to others on the basis that it wants a different settlement for those whose rights are ***not*** affected by the settlement.  If Mississippi's position were valid, it would create a veto right over any class settlement for a non-party whose rights are not affected by a proposed settlement.  No logic supports such a position, which is contrary to settled law and would mean that no settlement could ever be reached—all to the detriment of the Mississippi citizens with live claims who will receive substantial monies under the settlement.

### 3.   In Any Event, Mississippi Lacks Standing To Object To The Exclusion Of Certain Of Its Citizens From The Class.

Finally, even if the GCCF releases were invalid (which they are not), and even if this purported invalidity were relevant to the fairness of the settlement (which it is not), Mississippi lacks standing to object to the Settlement Agreement on behalf of persons who signed GCCF releases.  While the Court has already correctly concluded that Louisiana lacks standing, BP briefly summarizes the relevant law as it also applies to Mississippi.  *See* Rec. Doc. 7038 at 2 (concluding that the Settlement Agreement "will in no way affect any procedural or substantive rights of . . . Louisiana").

### a.   The Class Action Fairness Act Does Not Vest Mississippi With Standing To Object To The Class Settlement.

Mississippi argues that it may object to the Settlement Agreement pursuant to section 1715 of the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.  That section, captioned "Notifications to appropriate Federal and State Officials," provides as follows:

> Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement ***shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement*** . . . .

28 U.S.C. § 1715(b) (emphasis added).  This procedural statute simply requires notification; it does not create a substantive right of standing that a state official would not otherwise possess. To the contrary, the statute is explicit that "[n]othing in this section shall be construed to expand the authority of . . . State officials."  *Id.* § 1715(f); *see also* S. Rep. No. 109-14, at 35 (2005), *reprinted in* 2005 U.S.C.C.A.N. at 34 ("The state and federal officials are not required to take any affirmative action once they receive the proposed settlement according to new section 28 U.S.C. 1715(f); ***nor does this section expand their current authority in any respect***.") (emphasis added); Letter from Fifteen State Attorneys General to Senators Bill Frist & Harry Reid (Feb. 7, 2005), *reprinted in* 151 Cong. Rec. H644-45 (daily ed. Feb. 16, 2005) (observing that the "notification provision lacks meaning" because it did not create substantive rights for the Attorneys General).

> **b.      Mississippi May Not Object To The Settlement Agreement As *Parens Patriae*.**

Mississippi's *parens patriae* argument reflects a fundamental misunderstanding of the doctrine.  As the Supreme Court has explained, "to have [*parens patriae*] standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest."  *Alfred L. Snapp & Son, Inc. v. P.R., ex rel. Barez*, 458 U.S. 592, 600 (1982).  "Not all that a State does, however, is based on its sovereign character."  *Id.* at 601.  While "a state may, for a variety of reasons, attempt to pursue the interests of a private party, and pursue those interests only for the sake of the real party in interest . . . [***i***]***nterests of private parties are obviously not in themselves sovereign interests***, and they do not become such simply by virtue of the State's aiding in their achievement.  In such situations, the State is no more than a nominal party."  *Id.* at 602 (emphasis added).

At bottom, "the State **must articulate an interest apart from the interests of particular private parties**." *Id.* at 607 (emphasis added); *see also, e.g.*, *State of Okla. ex rel. Johnson v. Cook*, 304 U.S. 387, 396 (1938) (noting the "governing principle that the State must show a direct interest of its own and not merely seek recovery for the benefit of individuals who are the real parties in interest"); *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418, 428 (5th Cir. 2008) (explaining that a proper "interest is lacking when a state undertakes to sue for the particular benefit of a limited number of its citizens" and that the "State must show a direct interest of its own") (quotations omitted); *Paterson v. Texas*, 308 F.3d 448, 451 (5th Cir. 2002) ("As for the State's argument that it represents the interests of Texas class members, we know of no authority that would give it standing in a representative capacity. . . . The class representatives, not the State, are by federal law the parties authorized to prosecute and settle the claims of the class members.").

Here Mississippi seeks to assert the narrow financial interests of a confined subset of its citizens,[50] rendering *parens patriae* standing inappropriate. Indeed, because the citizens whom Mississippi seeks to represent fall outside the class and lack standing to object to the settlement in their own right, *see supra*, Mississippi's invocation of the *parens patriae* doctrine is particularly audacious. Its objections contain no explanation whatsoever of how a settlement agreement that at worst ***fails to affect*** the legal rights of certain of its citizens creates an injury to its sovereign interests.[51]

---

[50] Mississippi has nearly three million citizens. *See* United States Census Bureau, State & County QuickFacts: Mississippi, http://quickfacts.census.gov/qfd/states/28000.html. In contrast, Mississippi itself estimates that the issue it raises affects only 200,000 claimants across all states, who already have been paid substantial sums in exchange for which they signed a release of claims. *See* Miss. Objs. at 1-3.

[51] The *parens patriae* doctrine is further inapplicable because the few citizens whom Mississippi purports to represent are more than capable of asserting their own interests. *Cf., e.g.*, *P.R. ex rel. Quiros v. Bramkamp*, 654 F.2d 212, 217 (2d Cir. 1981) ("A final factor to consider in determining whether to allow a state to proceed as parens patriae is 'the presence or absence of a more appropriate party or parties capable of bringing suit.'") (quoting

87

### C.     The Florida Attorney General's Objections Lack Merit.

On April 13, 2012, five days before the Settlement Agreement was finalized and filed in Court, the Florida Attorney General filed a "statement of interest" regarding the Settlement Agreement.  *See* Rec. Doc. 6239.  Florida complained both that (1) certain Florida residents and businesses would be excluded from the class definition as a result of its geographic boundaries, and (2) the Court's preliminary approval order would result in the immediate discontinuation of the interim claims process.

Florida's first contention lacks merit, as discussed above.  Not only does Florida itself (for the same reasons as Louisiana and Mississippi) lack standing to object to the Settlement Agreement, but the citizens about whose exclusion Florida complains would also lack standing to complain in their own capacity, since they have no individual standing to do so.  *See* Preliminary Approval Order at 16.

The Court has also already rejected Florida's objection with respect to the interim claims process.  As the Court explained in its preliminary approval order, "the parties have represented that BP will continue to receive and process Oil Pollution Act ('OPA') claims for those excluded from the settlement class and those who opt out of the settlement class," and "[p]resumably, that process will include an interim payments process."  *Id.* at 18 n.19.  BP's claims process is now fully operational, and as the Court predicted it permits excluded parties and opt-outs to submit claims for interim damages.  *See* BP, Claims Information, http://www.bp.com/claims ("Under OPA, claims may be filed with the BP Claims Program for interim, short-term damages representing less than the full amount to which the claimant may ultimately be entitled.").  BP

---

*Pennsylvania v. Kleppe*, 533 F.2d 668, 675 (D.C. Cir. 1976)); *In re Tobacco/Governmental Health Care Costs Litig.*, 83 F. Supp. 2d 125, 134 (D.D.C. 1999) ("*Parens patriae* standing is rarely appropriate in 'the presence of a more appropriate party or parties capable of bringing suit.'") (quoting *Kleppe*, 533 F.2d at 675).

has advertised its claims program in a United States Coast Guard-approved campaign, with advertisements appearing in more than a dozen Florida newspapers.

### D.       Halliburton's Objections Lack Merit.

On April 24, 2012, Halliburton filed "preliminary objections" to the Settlement Agreement.  *See* Rec. Doc. 6350.  In response, the Court found in its preliminary approval order that Halliburton's objections were "unavailing," as Halliburton had not "shown any . . . form of legal prejudice that would give it standing to object."  Preliminary Approval Order at 17 & n.18. After Halliburton nevertheless requested discovery regarding the settlement agreements nearly three months later, the Court reiterated that Halliburton lacked standing because "the proposed settlements will in no way affect any procedural or substantive rights of Halliburton."  Rec. Doc. 7038 at 2.

As the Court has now twice ruled that Halliburton lacks standing to object to the Settlement Agreement, BP need not establish once more that (1) Halliburton lacks standing and (2) in any event, Halliburton's arguments are both wrong and irrelevant to the whether the settlement satisfies the standard of fairness, reasonableness, and adequacy required by Rule 23. BP instead respectfully directs the Court to its briefs addressing Halliburton's discovery requests, *see* Rec. Doc. 7033; Rec. Doc. 7037, upon which the Court relied in concluding that Halliburton lacked standing.  *See* Rec. Doc. 7038 at 2 (finding Halliburton lacked standing in part "[f]or reasons expressed by BP").

### E.       The VoO Offset Was Reasonable.

Certain objectors complain about the VoO offset, pursuant to which economic loss payments to charter boat operators are reduced by amounts paid to compensate them for their

participation in the VoO program.[52]   According to these objectors, they are entitled to both (1) full payment for their participation in the VoO program, and (2) full payment for all economic losses sustained, ***calculated as though they had received no payment whatsoever for their participation in the VoO program***.

The reason for a VoO offset is simple; it is to prevent a double recovery.  The obvious fact is that a charter boat operator who chartered his vessel to BP to participate in the VoO program and received compensation for this participation has not suffered as severe an economic loss as someone who could not participate.  In fact, that the offset is only partial is a testament to the hard bargain that the PSC drove during the negotiations, as a VoO participant who was paid for its work usually suffered no loss of income and in many cases made more income than it would have had the oil spill never taken place.

The Coast Guard's National Pollution Funds Center, which administers the Oil Spill Liability Trust Fund, agrees with these obvious points:

FAQ-8:   If I make a claim to the NPFC for lost income as a result of the oil spill, will any income I received from alternative employment, including employment as an oil spill responder, or unemployment benefits, be considered in determining my compensation?

A:   Yes. When considering payment for lost profits or lost earnings claims by businesses and individuals the NPFC will require the claimant to provide information on income from alternative employment, including income related to any employment or sales in connection with the oil-spill response and any unemployment benefits received.  Additionally, 33 C.F.R. § 136.105(b) and other sections of the Claims Regulations require claimants to report any compensation a claimant receives for the claimed amount or other income that results from the oil spill.   That income will be considered in determining the actual loss to compensate.

---

[52] *See, e.g.*, Rec. Doc. 6402; Rec. Doc. 6403; Rec. Doc. 6405; Rec. Doc. 6406; Rec. Doc. 6407; Rec. Doc. 6408; Obj. Doc. 2; Obj. Doc. 3; Obj. Doc. 4; Obj. Doc. 5; Obj. Doc. 6; Obj. Doc. 7; Obj. Doc. 8; Obj. Doc. 9; Obj. Doc. 10; Obj. Doc. 11; Obj. Doc. 12; Obj. Doc. 13; Obj. Doc. 14; Obj. Doc. 15; Obj. Doc. 16; Obj. Doc. 17; Obj. Doc. 18; Obj. Doc. 19; Obj. Doc. 20; Obj. Doc. 21; Obj. Doc. 22; Obj. Doc. 23; Obj. Doc. 24; Obj. Doc. 25; Obj. Doc. 26; Obj. Doc. 27; Obj. Doc. 28; Obj. Doc. 29; Obj. Doc. 30; Obj. Doc. 31; Obj. Doc. 48.

*See* National Pollution Funds Center, *Deepwater Horizon Claimant FAQs* ("*NPFC FAQs*") ¶ 8, http://www.uscg.mil/npfc/claims/DWH_faqs.asp.

Nevertheless, certain VoO objectors complain that the VoO offset applies to charter boat operators seeking compensation under the economic loss framework, but that it does not apply to commercial fishermen seeking compensation under the Seafood Compensation Program.   Yet because charter boat operators who participated in the VoO program chartered their vessels to BP, their normal business was not disturbed to the same extent as commercial fishermen, who were engaged in a different type of work and did not receive profits in their ordinary line of employment.[53]   While BP submits that under the law neither group is entitled to double compensation, BP was willing to provide more generous terms to commercial fishermen in order to reach a settlement.

### F.       Objections To The Seafood Compensation Program Lack Merit.

Certain objectors complain about aspects of the Seafood Compensation Program.  None of these objections has merit.

#### 1.       GO FISH's Objections Lack Merit.

GO FISH—"Gulf Organized Fisheries in Solidarity and Hope," an advocacy group formed after the spill—filed "comments and objections" regarding the Seafood Compensation Program on April 25, 2012.  *See* Rec. Doc. 6353.  GO FISH presents a grab-bag of objections, none of which justify rejection of the settlement.

***First***, GO FISH complains that for many fishermen, the Seafood Compensation Program awards are insufficient to protect against the risk of long-term damage.  *See* Rec. Doc. 6353 at 3.

---

[53] Finally, certain VoO objectors allege that when they were hired to participate in the VoO program, they were told that their payments for participating would not offset any other compensation that they would receive.  Were this issue ever litigated, BP would contest these objectors' version of the facts.  But because a settlement is meant to avoid a trial on the merits—and certainly does not need to provide double compensation to win court approval— these allegations in no way preclude the Court from finding that the settlement is fair, reasonable, and adequate.

But GO FISH offers only its own say-so; it presents no evidence either that (1) the Gulf is not recovering or (2) that the generous RTPs provided by the Settlement Agreement are insufficient to protect against the risk of future loss. In contrast, BP has demonstrated using expert testimony that the Gulf is recovering, such that the risk of future losses is low. *See supra* Part II.F.4. GO FISH also has no response to the point that much of the damage to fisheries that did occur resulted not from the oil spill but from the unilateral decision of Louisiana to divert freshwater into its estuary areas in 2010.[54]

**Second**, GO FISH complains that the program pays too much money to oyster leaseholder property claims, leaving insufficient money in the Fund to pay other claims. *See* Rec. Doc. 6353 at 3. Yet this argument depends upon GO FISH's unsupported fear that there is insufficient money in the Seafood Compensation Program to compensate all claimants under the terms of the program. *See* Rec. Doc. 6353 at 5. Yet as Balhoff has concluded, a "conservative" (*i.e.*, likely too high) estimate of initial payments under the Seafood Compensation Program is $1.9 billion. *See* Balhoff Decl. (Joint Ex. B) at 4. Similarly, Dr. Smith has explained that "$2.3 billion is clearly sufficient compensation to meet a standard of fair, reasonable, and adequate." Smith Decl. (Ex. 17) ¶ 18. Because GO FISH has no basis for its contention that there will be insufficient funds in the Seafood Compensation Program to pay all claims, it cannot show that any claimants will be undercompensated. Its objection accordingly fails for this reason alone.

---

[54] Assume *arguendo* that GO FISH (or other objectors) could somehow come up with evidence supporting such objections. All that would mean is that the parties have disputes as to various facts, but it proves nothing about the settlement's fairness, as the parties here have agreed to **settle** disputed claims. Regardless of whether one agrees with BP with respect to the merits of this lawsuit, the law clearly provides for settlement of even so-called "meritorious" claims, reflecting the fact that settlements are generally based on several different considerations. *See In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 427 (S.D.N.Y. 2001) ("[W]hile Plaintiffs believe that their claims are meritorious, the fairness and reasonableness of the proposed Settlement in light of the risks, burdens and uncertainties of continued litigation are manifest."); *In re Newbridge Networks Sec. Litig.*, No. 94-1678, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) ("Counsel maintain that plaintiffs' legal claims are meritorious, but settlement forestalls the substantial and inevitable uncertainties attendant to proceeding to trial"); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) ("[N]o matter how confident one may be of the outcome of the litigation, such confidence is often misplaced.") (quotation omitted), *aff'd*, 166 F.3d 581 (3d Cir. 1999). If the rule were otherwise, colorable claims could never be settled. That is not the law.

*See, e.g.*, *Cobell v. Salazar*, 679 F.3d 909, 921 (D.C. Cir. 2012) (requiring objectors to show "persuasive evidence of class members who are *under*-compensated by the distribution scheme"). Finally, even if there were some risk that the $2.3 billion allocated to the Seafood Compensation Program is inadequate to fully compensate all relevant claims (and BP submits that there is not), such minor risk still would not counsel against approval of the settlement. *See Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, No. 07-14074, 2008 WL 2968408, at *33 (July 31, 2008) ("Although there is a risk that the assets . . . may not be sufficient to fund benefits at the existing level for the lives of all participants, the parties—in fashioning a compromise—are entitled to allocate the risk of investment performance among themselves."); *see also Robinson v. Ford Motor Co.*, No. 04-844, 2005 WL 5253339, at *5 (S.D. Ohio June 15, 2005) ("[T]he Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis.") (quotation omitted). In fact, while this Settlement Agreement will fully and fairly compensate class members for all established losses, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Parker v. Anderson*, 667 F.2d 1204, 1210 n.6 (5th Cir. 1982) (quotation omitted); *accord Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (collecting cases), *aff'd*, 166 F.3d 581 (3d Cir. 1999).

*Third*, GO FISH complains that to qualify for "expedited" compensation, fishermen must both have good records and be in the top bracket of income earners. This is a problem, GO FISH says, because the "historic method" of compensation places too much risk on class members. *See* Rec. Doc. 6353 at 3. As Dr. Smith has explained, however, the documentation requirements for vessel owners, captains, and crew are all reasonable. *See* Smith Decl. (Ex. 17) ¶¶ 26-27, 67.

Moreover, Dr. Smith has explained that the "historic revenue method is already a fair approach" for those claimants who use it.  *See id.* ¶ 37; *see also* Fishkind Decl. (Ex. 4) ¶ 127 (explaining that the loss percentage that applies under the historic revenue method for shrimp claimants is generous).

*Fourth*, GO FISH complains that the expedited method is not available at all for crabbers, finfish fishermen, and oystermen.  *See* Rec. Doc. 6353 at 9.  Contrary to GO FISH's contention, however, the compensation methods applicable to each of these groups is fair.

- As for blue crab, the compensation approach "accounts for both the downturn in landings in 2010 and the potential that some blue crab fishermen incurred capital losses as a result of damaged or lost fishing gear (such as crab traps) in the period following the oil spill," Smith Decl. (Ex. 17) ¶ 47, and the "RTPs for blue crab claimants are sufficiently large to expect that they will cover any reasonable expectation of future losses."  *Id.* ¶ 51; *see also* Fishkind Decl. (Ex. 4) ¶ 137 ("The standard loss factor for the blue crab industry is set at 35% and the price adjustment factor is set at 20%. Both of these parameters are generous in light of the landings data for blue crabs.").

- With respect to finfish, the "finfish component of the SCP is fair, reasonable, and adequate, likely to over-compensate individual claimants."  Smith Decl. (Ex. 17) ¶ 58; *see also* Fishkind Decl. (Ex. 4) ¶ 142 ("[T]he Seafood Program provides fair and adequate compensation to claimants in the finfish industry.").

- Finally, as to oystermen, "the compensation approach is fair, reasonable, and adequate," Smith Decl. (Ex. 17) ¶ 42, even giving oystermen the benefit of a price increase that was likely caused in part by the reduction in harvest due to closures and

freshwater diversions following the *Deepwater Horizon* incident.  *See id.* ¶ 42; *see also id.* ¶ 135 ("[T]he Seafood Program provides fair and adequate compensation to claimants in the oyster industry.").

While BP has justified the structure and compensation methods of the Seafood Compensation Program by reference to considerable expert testimony (and, indeed, the parties negotiated the agreement with the benefit of expert assistance), GO FISH presents only its own speculative assertions that the compensation amounts are inadequate.

*Fifth*, GO FISH complains that the Seafood Compensation Program uses 2009 as a benchmark year, ostensibly a bad year for some commercial fishermen.  *See* Rec. Doc. 6353 at 11.  In reality, the shrimp, finfish, blue crab, and seafood crew plans permit a claimant to choose among (1) 2009; (2) an average of 2008 and 2009; and (3) an average of 2007, 2008, and 2009. *See* Agreement Ex. 10 at 7 (shrimp); *id.* at 43 (finfish); *id.* at 55 (blue crab); *id.* at 66 (seafood crew).  The oyster plan generally uses a combination of 2007, 2008, and 2009, with the ability to discount a bad year in some circumstances.  *See id.* at 30.  As explained above, the number of options that claimants are given is highly favorable as compared to litigation, where the chosen benchmark year would be highly contested even assuming liability were established.  *See, e.g.*, Smith Decl. (Ex. 17) ¶ 22.  Additionally, declines in the shrimp industry that are unrelated to the *Deepwater Horizon* spill—caused by rising fuel prices, costs of regulatory compliance, and downward pricing pressure caused by imports—mean that "extending the baseline period for revenues further back in time before 2007 could yield results that are not representative of the catch expected in 2010 in the absence of the spill."  *Id.* ¶¶ 29, 32.  "Extending the benchmark period in this way could incorporate information from a period when exogenous market

conditions were more favorable than they were in 2010, and thus may provide a less reliable benchmark for estimating a claimants 'but-for' catch in 2010." *Id.* ¶ 32.

**Sixth**, GO FISH complains that the 2.25 RTP for subsistence claims is too low. *See* Rec. Doc. 6353 at 13. While GO FISH contends that the "seafood that is sold commercially is the same seafood that fishermen bring home to feed their families and communities," *id.* at 13, the "Framework [for Subsistence Claims] amply compensates commercial fishermen for that lost subsistence catch at retail prices — rather than the wholesale prices at which they sell their catch — and those subsistence-related recoveries are independent of payments from the Settlement's Seafood Compensation Program." Kelley Decl. (Ex. 12) ¶ 23.

**Seventh**, GO FISH argues that the release is invalid *ab initio* because it fails to state that, in the event a particular release were procured by fraud, that release would be invalid. *See* Rec. Doc. 6353 at 13. While GO FISH and its members will be free to allege fraud as a defense to any specific release should the facts ever support it (and BP submits that they will not), the release's failure to explicitly state that it would become void in the event of fraud does not mean that it is facially void in all cases, absent any particularized showing of fraud.

**Eighth**, GO FISH complains that the agreement penalizes those who accepted transition interim payments. *See* Rec. Doc. 6353 at 14. According to GO FISH, once class members who accepted a 60% payment during the transition period file a claim form in the settlement program, they are barred from opting out, and instead must either accept the remaining 40% of their offer from the GCCF or accept the settlement program's offer. Rec. Doc. 6353 at 14. No one in this position was compelled to either take the 60% transition payment or to file a claim with the settlement program. Moreover, such claimants have made a choice to proceed to seek the

96

benefits of the settlement program, which are made available to class members.  Hence, their assent to participate in the settlement class has been made clear.

**Ninth**, GO FISH complains that executed releases infringe on constitutional rights by limiting class members' rights to seek remedies relating to the *Deepwater Horizon* incident.  *See* Rec. Doc. 6353 at 14.  But as noted above, *see supra* Part III.B.1.a, OPA permits the use of final releases—and federal courts routinely approve settlements in which one litigant promises not to institute further legal proceedings against the other.  *See, e.g.*, *Williams*, 23 F.3d at 935 (noting that public policy favors the voluntary settlement of claims).  If GO FISH's objection had merit, it would mean that there could never be a settlement of fishing claims in this case—a facially baseless proposition.

## 2.      The Shrimpers' And Shrimp Processors' Objections Lack Merit

The American Shrimp Processors Association complains that shrimp processors who fall outside the Seafood Compensation Program are treated less generously than shrimp harvesters who fall within it.  *See* Rec. Doc. 6368 at 5.  Under the Court's rulings, however, commercial fishermen fall within an arguable exception to the *Robins Dry Dock* principle and thus—notwithstanding BP's arguments to the contrary—conceivably might be eligible for punitive damages under maritime law in a way that processors are not.  *See* B1 Order (Rec. Doc. 3830) at 19-20.  For that reason, there is nothing improper in the parties' negotiation of detailed claims frameworks that compensate class members in light of the strength of their claims.  *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005) ("Settlement proceeds may be allocated according to the strengths and weaknesses of the various claims possessed by Class Members.") (citing *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001)); *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77-39, 1984 WL 21981, at *7 (N.D. Ill. Sept. 14, 1984) (finding a proposed distribution fair and reasonable where different class members had

claims of different strength).   Moreover, even if it could be demonstrated that some class members received supra-compensatory awards while other class members received only compensatory awards, *that is not a basis for rejecting the settlement agreement*.   *See, e.g.*, *Cobell*, 679 F.3d at 921.   It should be noted, as well, that shrimp processors receive the highest RTP in the Economic Damage Claim Frameworks, an RTP of 3.   *See* Agreement Ex. 15.

Additionally, certain shrimp plaintiffs have objected on the basis that the benchmark period under the Shrimp Compensation Plan should be defined to allow shrimpers to select a single benchmark year between 2006 and 2009, as 2009 was a poor year in the shrimp industry. *See* Rec. Doc. 6371.   As noted above, however, declines in the shrimp industry that are entirely unrelated to the *Deepwater Horizon* spill mean that "extending the baseline period for revenues further back in time before 2007 could yield results which are not representative of the catch expected in 2010 in the absence of the spill."   *See* Smith Decl. (Ex. 17) ¶ 32.   Finally, the "RTPs for shrimp are large," *id.* ¶ 39; "the shrimp component of the SCP is fair, reasonable, and adequate, and likely to over-compensate individual claimants."   *Id.*

### G.      Selmer Salvesen's Objections Lack Merit.

#### 1.      Salvesen's April 8 Objections

On April 8, 2012, Selmer M. Salvesen filed an objection to the Settlement Agreement styled as a motion asking the Court to vacate its opinion resolving the various motions to dismiss the Amended B1 Complaint.   *See* Rec. Doc. 6186-1.   The objection first argues that under the Supreme Court's decision in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), the B1 Order somehow constitutes a "trial proceeding" that the MDL court may not conduct.   Second, the objection suggests somewhat vaguely that the Court's trial plan violates Salvesen's right to a jury trial.

Salvesen's *Lexecon* argument is erroneous, ***first*** because it rests on the incorrect premise that an MDL transferee court may not resolve pretrial motions to dismiss. In reality, transferee courts rule on such motions regularly. *See* David F. Herr, *Multidistrict Litig. Manual* § 9:13 ("The transferee court in multidistrict litigation can hear a wide variety of pretrial motions. Any motion that could be heard in a transferor court can be heard by the transferee court while the actions are pending for coordinated or consolidated pretrial proceedings."); *see also, e.g.*, *In re BP p.l.c. Sec. Litig.*, --- F. Supp. 2d ----, MDL No. 10-2185, 2012 WL 1098418 (S.D. Tex. Mar 30, 2012) (ruling on a motion to dismiss); *In re Apple iPhone 3G & 3GS MMS Mktg. & Sales Practices Litig.*, --- F. Supp. 2d ----, MDL No. 2116, 2012 WL 1069169 (E.D. La. Mar. 29, 2012) (Barbier, J.) (same); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, MDL No. 07-1873, 2012 WL 1019856 (E.D. La. Mar. 23, 2012) (same); *cf. In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009) (per curiam) (holding that once the MDL court has ruled on pretrial motions and returned the cases to the transferor courts, the transferor courts "should rarely reverse" the transferee court's resolution of pretrial motions). Salvesen cites no contrary authority.

***Second***, Salvesen's argument depends upon the Court's acting in an MDL capacity. The Limitation Action, however, was transferred to the Eastern District of Louisiana for all purposes, not for pretrial purposes under 28 U.S.C. § 1407. *See In re Triton Asset Leasing GmbH*, No. 10-1721, Rec. Doc. 207 (S.D. Tex. Aug. 16, 2010) (Judge Ellison's transfer order to the Eastern District of Louisiana). For that reason, *Lexecon* has no application to the Limitation and Liability trial, including claims in Limitation and tenders of such claims by the Petitioners in Limitation pursuant to Rule 14(c), or to the resolution of claims filed in the Amended B1 Complaint, which was directly linked to the Limitation Action.

*Third*, Salvesen ignores key points about the powers that the Court wields connected to the Limitation Action:  (1) the Limitation Act and the applicable federal rules give the Court broad discretion and power to resolve third-party claims, *see, e.g.*, *Karim v. Finch Shipping Co.*, 265 F.3d 258, 264 (5th Cir. 2001) (limitation proceedings "look[] to a complete and just disposition of a many cornered controversy . . . . The court of admiralty, in working out its jurisdiction, acquires the right to marshal *all claims*, whether of strictly admiralty origin or not") (emphasis added and quotations omitted); and (2) nothing would prevent the outcome of any Limitation Act trial from creating claim and issue preclusive effects as to cases transferred into the MDL pursuant to Section 1407, since those are purely legal defenses that can be applied on a pretrial basis.  There is no conflict between (1) the class action settlement under review here and (2) litigation on the Amended B1 Complaint for those who opt out of the class and are participants in that complaint and the Limitation Action to which it attaches.

*Fourth*, plaintiffs filed a new class action complaint directly into the Eastern District of Louisiana to effectuate the settlement and thus did not invoke the JPML's processes for transfer, making *Lexecon* wholly irrelevant to the settlement.  *See Bon Secour Fisheries, Inc. v. BP Exploration & Prod. Inc.*, No. 12-970 (E.D. La. Apr. 16, 2012).

*Finally*, Salvesen's jury trial arguments are misguided.  This is true both because binding authority holds that a district court may conduct a Limitation Action without a jury (despite the contrary argument Cameron unsuccessfully advanced in its mandamus petition to the Fifth Circuit, which that court rejected in December 2011),[55] and because the resolution of pretrial motions to dismiss would not infringe upon a jury trial right even if such a right existed as to the

---

[55] *See In re Cameron Int'l Corp*, No. 11-30987 (5th Cir. Dec. 26, 2011).

claims tied to a Limitation Act case.  *See, e.g.*, *Becker v. Tidewater, Inc.*, 405 F.3d 257, 259-60 (5th Cir. 2005); *Karim*, 265 F.3d at 264.

### 2.    Salvesen's July 2 Objections

On July 2, 2012, Salvesen filed a motion to vacate the Court's preliminary approval order.  *See* Rec. Doc. 6831-1.  According to Salvesen, the settlement is unlawful because, once a Limitation Action has commenced with respect to a particular maritime casualty, there can never be a class action regarding the same casualty, even against a party other than the Limitation Act petitioner.  *Id.* at 23-24.

None of the authorities that Salvesen cites supports this proposition.  To the contrary, each case cited by Salvesen involves claims against the Limitation Act petitioner.  *See In re Ingram Barge Co.*, No. 05-4419, 2006 WL 5377855, at *1 (E.D. La. Oct. 19, 1996) (granting a motion to dismiss brought by the Limitation Act petitioner); *In re River City Towing Servs., Inc.*, 204 F.R.D. 94, 94 (E.D. La. 2001) ("Before the Court is a Motion for Class Certification . . . filed by Claimants in this limitation proceeding.  The motion is opposed by Petitioner in Limitation . . . .") (emphasis omitted); *Gabarick v. Laurin Mar. (Am.) Inc.*, No. 08-4007, 2009 WL 102573 (E.D. La. Jan. 12, 2009) (dismissing claims filed against the Limitation Act petitioners).  While *Humphreys v. HAL Antillen, N.V.*, No. 93-3799, 1994 WL 682811, at *2-3 (E.D. La. Jan. 31, 1994) involves claims against a non-Limitation Act petitioner, the Court's holding depended upon the fact that the class defendant had filed a Rule 14(c) claim against the Limitation Act petitioner.  That precedent simply does not apply here, where only BP entities are named in the *Bon Secour* complaint and BP has not sought to implead Transocean.

### H.   Pinellas Marine Salvage, Inc. And John Mavrogiannis's Objections Lack Merit.

On July 13, 2012, Pinellas Marine Salvage, Inc. and John Mavrogiannis (collectively, "Pinellas") submitted an objection speculating that the settlement is the product of collusion. *See* Rec. Doc. 6902-1.  There is no valid basis for such an objection.

Pinellas primarily argues that the settlement is collusive because it retains the claims administration vendors employed by the GCCF.  *See id.* at 5-7.  In so arguing, however, Pinellas ignores the salient facts that (1) the claims administration vendors will answer to a new claims administrator, who will in turn be supervised by the Court; and (2) both the claims administrator and the claims administration vendors will exercise their responsibilities pursuant to new, detailed, transparent, objective, and highly negotiated claims frameworks.  That some of the vendors who will implement these frameworks remain the same preserves these experienced vendors, allowing claims to be processed promptly, while having those vendors governed by a new set of rules.

Pinellas next argues that the settlement is collusive because its total value is not estimated to entirely deplete the Deepwater Horizon Oil Spill Trust.  *See id.* at 7.  To begin with, this argument ignores the fact that the settlement is uncapped (with the exception of the Seafood Compensation Program); there is therefore no guarantee that BP's liability will or will not exceed any particular amount.  Yet more fundamentally, Pinellas cannot explain why, if the claims frameworks are otherwise fair, the settlement is required to deplete the Trust.  This is particularly true where (as Pinellas argues) certain claims fall outside the Settlement Agreement and may be settled at a later date.

Pinellas also claims that the Settlement Agreement provides excessive compensation to the PSC, in light of BP's agreement not to contest an award of up to $600 million for attorneys'

fees and costs as a combined award in connection with resolving the economic loss and medical benefit settlements. *See id* at 7-9. While BP has agreed not to contest such an award, the PSC has yet to request such an award from the Court. At such time as the PSC files a fee/cost petition, Pinellas and other class members may opine on its reasonableness. Until such time, this argument is entirely premature.

Finally, Pinellas contends that the settlement "makes a mockery of the OPA" by defining the class with respect to geographic boundaries, requiring final releases, providing for a shortened limitations period, and failing to pay interest on the amount paid. *See id.* at 15. But no one has standing to complain about exclusion from the class, *see supra* Part III.A, OPA permits the use of final releases, *see supra* Part III.B.1.a, and OPA has textual stopping points that accord with basic causation and background maritime law principles—the same principles that served as a touchstone when drawing the class's geographic boundaries. *See supra* Part II.B. As further discussed above, RTP payments are meant to compensate for, among other things, pre-judgment interest. *See supra* Background Part III.A.2.

## I.   Cass Wilson's Objections Lack Merit

On July 25, 2012, Cass Wilson and his business 2 Stix, Inc. (collectively, "Wilson") submitted an objection. *See* Obj. Doc. 50. According to this objection, the Court should not approve the Settlement Agreement because certain start-up businesses are required to demonstrate that that an increase in revenue following the Spill was attributable to customers located in certain geographic zones. Yet these proof requirements are economically reasonable. *See* Fishkind Decl. (Ex. 4) ¶ 85 ("[I]t is economically reasonable to increase the threshold requirements for establishing causation in industries and locations less closely associated with the Gulf."). It is therefore unsurprising that this requirement was negotiated by experienced counsel in consultation with their many business clients. In any event, the Business Economic

Loss and Start-Up Business Frameworks offer claimants without a presumption several alternative options for establishing causation, and these requirements are far more forgiving than the evidentiary burdens that would apply in adversarial litigation.

### J.      Alex Toth's Objections Lack Merit

On August 8, Alex S. Toth submitted objections on behalf of his business, Captain Al's Restaurant (collectively, "Toth").   Obj. Doc. 54.   ***First***, Toth contends that the settlement discriminates against failed businesses, as their damage framework provides less compensation than businesses that were able to remain in operation.   Toth contends that the owners of failed businesses should receive more compensation, as they are deprived of years of future revenues. In reality, the Failed Business Framework is carefully designed to compensate the claimant for the value of his business, permitting him to use any compensation to generate future revenue. *See, e.g.*, Sharp Decl. (Ex. 18) ¶ 38 ("The Settlement Agreement compensates Failed Businesses based on the sum of their EBITDA for the latest twelve months of operations prior to May 1, 2010 with an industry-specific multiple applied.   This formula calculates the pre-spill total enterprise value."); Fishkind Decl. (Ex. 4) ¶ 103 ("Compensation for a Failed Business provides for payment of the full value of the business at the time of the DWH Spill, generously reflecting the assumption that the DWH Spill was the sole cause of the claimant's failure."); Henley Decl. (Ex. 10) ¶ 34 ("The formula—last 12 months' EBITDA multiplied by an empirical industry multiple minus realized liquidation value—is a widely-recognized measure of damages for failed businesses."); Richardson Decl. (Ex. 16) ¶ 57 ("This allows the Claims Facility to get an estimate of the Total Enterprise Value and then to calculate a net value by subtracting liquidation value of the assets of the firm.").

***Second***, Toth complains about the EBITDA multiplier that applies to his particular business.  *See* Agreement Ex. 6 ¶ V.1.b.  According to Toth, his business should have received a

higher EBITDA multiple than other bars and restaurants, as it was very profitable.   Yet the

EBITDA multipliers selected by the parties were not invented from whole cloth; they were

carefully calibrated from standard, accepted sources.   *See, e.g.*, Sharp Decl. (Ex. 18) ¶ 39 ("The

industry-specific multiples are provided in a table in the Settlement Agreement, and were derived

from data procured from the "Pratt's Stats" database developed by Shannon P. Pratt.   'Pratt's

Stats' is a transaction database that collects and reports details of sales of certain companies

generally allowing for, among other things, the calculation of pricing multiples associated with

such transactions.   The observed multiples can then be used to estimate the value of a

comparable business.") (footnotes omitted); Fishkind Decl. (Ex. 4) ¶ 104 ("I routinely use Pratt's

Stats in my practice and find it to be a reliable source for industry multipliers.   Businesses

routinely value their acquisitions and mergers using industry multipliers and trailing 12-month

EBITDA sums."); Henley Decl. (Ex. 10) ¶ 34 ("The 'Pratt's Stats' that are used as the source for

an industry multiple are widely recognized as the standard source for such multiples.").[56]

## IV.   THE NOTICE PROVIDED TO THE CLASS MEMBERS FAIRLY INFORMED THEM OF THE SETTLEMENT AND ITS TERMS.

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and

approval of a settlement pursuant to Rule 23(e), "notice of the class action must meet the

requirements of both Rule 23(c)(2) and Rule 23(e)."   *In re CertainTeed Corp. Roofing Shingle*

*Prods. Liab. Litig.*, 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab.*

---

[56] Two groups of class members have submitted objections that are highly individualized appeals for particular treatment in their specific cases.  *See* Obj. Doc. 51; Obj. Doc. 52.  Because the goal of the Settlement Agreement is to compensate all class members in highly transparent and predictable ways, consistent with the negotiated claims frameworks, any appeals for special treatment in a particular case must fail.  And if a particular class member or two do not like the settlement, then they can opt out of the settlement, and embark upon a decade of litigation with an uncertain result:  that is their choice.

*Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005).  The notice program that the Court authorized in its preliminary approval order and that the parties faithfully executed easily meets this standard.

### A.   The Notice Distribution Method And Notice Contents Satisfied Rule 23(c)(2).

Rule 23(c)(2) provides that where a class is certified pursuant to Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  The notice is required to state (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues or defenses; (4) that a class member may enter an appearance though an attorney if the member so desires; (5) that the court will exclude from the class any member who requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment under Rule 23(c)(3).  *Id.*  As explained below, the notice program complied with all these requirements.

### 1.   The Notice Distribution Method Satisfied Rule 23(c)(2).

The Court already has stated that the "Notice Plan ***provides the best notice practicable under the circumstances pursuant to Fed. R. Civ. P. 23(c)(2)(B)***."  Preliminary Approval Order at 38 (emphasis added).  As the Court explained,

> The Notice Plan contemplates direct mailed notice to individual class members, to the extent known, and their attorneys, to the extent known.  In addition, the Notice Plan provides for a broad-reaching published Notice in numerous national and local media, with a notice effort covering the entire United States, primarily focusing on the main impact States of Louisiana, Alabama, and Mississippi, and enumerated counties in Texas and Florida.  Furthermore, banner notice ads will appear on national and local web properties.  A complete copy of the Proposed Settlement with exhibits will be provided to any individuals or entities wishing to determine whether they are class members and what their rights are under the Proposed Settlement.  There will also be a case website where potential class members can obtain additional information and documents, including a list of frequently asked questions that will be regularly updated to provide useful information about the Settlement.

*Id.* at 37-38.

As Cameron R. Azari, Esq.[57] explains, "the reach and frequency of the Notice Plan media effort in the Gulf Coast Areas surpassed that of the vast majority of other court-approved notice programs, and as designed, it met and exceeded due process requirements."  Azari Decl. (Joint Ex. A) ¶ 6.  In total, the plan included "dissemination of individual notice to known or potential Settlement Class Members via postal mail and email, an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, highly-trafficked websites and Sunday local newspapers (via newspaper supplements).  Notice placements also appeared in non-measured trade, business and specialty publications, African-American, Vietnamese and Spanish language publications and Cajun radio programming."  *Id.* ¶ 8.  Azari estimates that 95% of adults in the Gulf Coast were exposed to the notice an average of 10.3 times each, and that 83% of all U.S. adults were exposed at least 4 times each.  *Id.* ¶ 10.

Courts routinely approve class notice distribution plans far less robust than that undertaken here.  For example, in *In re Chinese-Manufactured Drywall Products Liability Litigation*, the court approved a notice program consisting of individual notice to all class members and their counsel and the posting of the Settlement Agreement on the Court's MDL website.  *See* MDL No. 2047, 2012 WL 92498, at *13 (E.D. La. Jan. 10, 2012).  The Court found that the notice was "written in plain and straightforward language; it also objectively and neutrally apprises all Class Members on the nature of the action, the definition of Class and Subclasses, and relevant deadlines and restrictions, as well as the date and location for the final Fairness Hearing."  *Id.*  And in *In re Combustion*, in addition to mailing individual notice to class

---

[57] Mr. Azari is the Director of Legal Notice for Hilsoft Notifications, a firm specializing in "designing, developing, analyzing and implementing large-scale, un-biased, legal notification plans."  Azari Decl. (Joint Ex. A) ¶ 3.  The Court appointed Hilsoft Notifications as the Class Notice Administrator.  *See* Preliminary Approval Order at 38.

members, the class notice was "published in two local newspapers, the Baton Rouge Morning Advocate and the Denham Springs News on March 13, 1997." 968 F. Supp. at 1129. The court found the "direct mailings as well as publication in two local newspapers [to be] reasonable and sufficient to satisfy the Due Process requirement of notice, as well as all notice requirements of [Rule 23]." *Id.* The notice plan here, as designed and implemented, has gone well beyond the scope of the judicially approved notices in these and other cases.

### 2.    The Notice Contents Satisfied Rule 23(c)(2).

Similarly, the Court has already approved the contents of the class notice:

> The Economic Loss and Property Damage Settlement Class Notice clearly and concisely states in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members. *See* Fed. R. Civ. P. 23(c)(2)(B).

Preliminary Approval Order at 37; *see also* Azari Decl. (Joint Ex. A) ¶ 12 ("All notice documents were designed to be noticeable, clear, simple, substantive and informative. No significant or required information was missing."). Because the "plain language of the Notice apprise[d] all class members of the nature of the action, the definition of the class, the class claims and the defenses, the class members' right to be heard, the class members' right to exclusion, the time and manner for requesting exclusion, and the binding effect of a class judgment," the notice contents satisfied Rule 23(c)(2). *See In re OCA*, 2008 WL 4681369, at *15.

### B.    The Notice Satisfied Rule 23(e).

The Court also has already concluded that "the Notice and the Notice Plan comply with Fed. R. Civ. P. 23(e)(1)'s requirement that the Court direct notice to Class Members in a

reasonable manner." Preliminary Approval Order at 38. As the Court explained, "[t]he notice is reasonably calculated to inform interested parties of the pendency of the settlement and afford them an opportunity to determine whether they are class members, seek all relevant information about the Proposed Settlement, determine their rights under the Proposed Settlement, and present their objections, if any." *Id.*; *cf., e.g.*, *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979) (noting the "mechanics of the notice process are left to the discretion of the district court subject only to the broad 'reasonableness' standards imposed by due process"); *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1337 (1st Cir. 1991) (same principle); *Quigley v. Braniff Airways, Inc.*, 85 F.R.D. 74, 77 (N.D. Tex. 1979) (noting a district court's "virtually complete discretion as to the manner and method of notice").

In short, the notice program was extraordinarily robust, and far and away exceeded the minimum requirements imposed by the Federal Rules and the Due Process Clause. *See* Azari Decl. (Joint Ex. A) ¶ 16 ("In my opinion, the Notice Plan was the best notice practicable under the circumstances of this case and satisfied the requirements of due process . . . .").

## CONCLUSION

The Agreement that has been reached by the parties is fair, reasonable, and adequate. It makes the plaintiff class more than whole, while sparing class members years of litigation with no guarantee of a recovery rising to the generous levels provided for in the agreement.

Accordingly, BP respectfully requests that the Court grant final approval to the Settlement Agreement.

August 13, 2012                          Respectfully submitted,


                                          _/s/ Richard C. Godfrey, P.C_____
                                          Richard C. Godfrey, P.C.

James J. Neath                            J. Andrew Langan, P.C.
Mark Holstein                             Wendy L. Bloom
BP AMERICA INC.                           Andrew B. Bloomer, P.C.
501 Westlake Park Boulevard               R. Chris Heck
Houston, TX  77079                        Christopher J. Esbrook
Telephone:  (281) 366-2000                KIRKLAND & ELLIS LLP
Telefax:  (312) 862-2200                  300 North LaSalle Street
                                          Chicago, IL 60654
Daniel A. Cantor                          Telephone:  (312) 862-2000
Andrew T. Karron                          Telefax:  (312) 862-2200
Ellen K. Reisman
Matthew J. Douglas
ARNOLD & PORTER LLP
555 Twelfth Street, NW                    Jeffrey Bossert Clark
Washington, DC 20004                      Steven A. Myers
Telephone:  (202) 942-5000                KIRKLAND & ELLIS LLP
Telefax:  (202) 942-5999                  655 Fifteenth Street, N.W.
                                          Washington, D.C. 20005
Jeffrey Lennard                           Telephone:  (202) 879-5000
Keith Moskowitz                           Telefax:  (202) 879-5200
SNR DENTON
233 South Wacker Drive                     _/s/ Don K. Haycraft_____
Suite 7800                                Don K. Haycraft (Bar #14361)
Chicago, IL  60606                        R. Keith Jarrett (Bar #16984)
Telephone:  (312) 876-8000                LISKOW & LEWIS
Telefax:  (312) 876-7934                  701 Poydras Street, Suite 5000
                                          New Orleans, Louisiana 70139
                                          Telephone:  (504) 581-7979
*OF COUNSEL*                              Telefax:  (504) 556-4108


                                          Robert C. "Mike" Brock
                                          COVINGTON & BURLING LLP
                                          1201 Pennsylvania Avenue, NW
                                          Washington, DC 20004
                                          Telephone:  (202) 662-5985
                                          Telefax:  (202) 662-6291


*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.*
*AND BP AMERICA PRODUCTION COMPANY*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of August 2012.

/s/ Don K. Haycraft
Don K. Haycraft