# Exhibit 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | * | |
| GULF OF MEXICO, on | * | |
| APRIL 20, 2010 | * | SECTION J |
| | * | |
| | * | |
| | * | JUDGE BARBIER |
| | * | MAG. JUDGE SHUSHAN |

*******************************************

### DECLARATION OF JERRY M. DENT II

I, Jerry M. Dent II, submit this declaration in support of the BP Defendants'
Memorandum In Support Of Motion For Final Approval Of *Deepwater Horizon* Economic And
Property Damages Settlement Agreement, As Amended On May 2, 2012. I am over the age of
18, and the opinions, statements, and conclusions expressed in this declaration are my own.

### EXPERIENCE

1.    I am a Managing Director with Alvarez & Marsal ("A&M") and co-head of the
Environmental Advisory Services practice. A&M is a professional services firm comprised of
approximately 300 partners and 1,700 professionals in over 30 offices in 16 countries. A&M's
consultants advise on matters involving performance improvement, corporate restructuring, and
business advisory, including real estate and environmental advisory services. Before joining
A&M, I was a founding member of Accounting Economics and Appraisal Group. Prior to that, I
served as Director of the Southeastern Real Estate Damages practice of PricewaterhouseCoopers
and the Coopers & Lybrand legacy firm. My practice specializes in matters involving the
evaluation of properties affected by contamination or hazard.

2.    I hold a Bachelor of Science in Corporate Finance from the University of

Alabama and a Master of Business Administration from the University of Mississippi. I am a designated CRE by the Counselors of Real Estate, FRICS by the Royal Institution of Chartered Surveyors, and ASA by the American Society of Appraisers. I am affiliated with or a member of various real estate organizations including Counselors of Real Estate, Appraisal Institute, National Association of Realtors, and American Society of Appraisers. I have spoken and written on various topics in the area of environmental economics and real estate. I have in the past and currently serve in leadership positions of professional real estate organizations. My resume is attached as Exhibit A.

3.      My primary areas of professional concentration include real estate damages, value assurance programs, settlement fund administration, demographic and geographic information systems, real estate value and economic impact. I have extensive national experience applying financial and economic principles to relevant market data in matters where real property may be impacted by contamination. I have evaluated the impact of contamination on properties in numerous states, including: Alabama, Arkansas, California, Connecticut, Florida, Georgia, Illinois, Kentucky, Louisiana, Michigan, Mississippi, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia.

4.      My real estate and environmental damages experience includes serving as an independent expert and advising on individual properties, mass torts, and class action property value diminution matters involving air, bodies of water, groundwater and soil contaminants; development of geographic information systems in litigation support and non-litigation matters; and analyses of economic damages and lost profits in disputes arising from contamination.

5.      My real estate settlement fund experience involves classes ranging from several hundred parcels to over 60,000 parcels. These matters have involved releases in waterways, groundwater, air emissions, and contaminated soil. My work in this area has included:

Page 2

- Designing and implementing real property settlement compensation programs;

- Administering class action settlements where duties included identifying parcels included in the class, attending community outreach group meetings, performing numerous print and television media interviews, maintaining toll free phone lines, issuing settlement checks and maintaining appropriate financial records;

- Designing and serving as administrator of value assurance programs that were included in class action settlements where property owners were compensated for differences between fair market value and sale price;

- Currently serving as administrator of an institutional control program initiated as part of a class action settlement. Duties include identifying relevant parcels for covenant purchases, calculating compensation, conducting public meetings, performing media interviews, recording executed environmental land use covenants, meeting with regulators and stakeholders, and negotiating the purchase of property to be used in remediation actions.

- Served as court appointed Co-Escrow Agent of a 501c (3) corporation established to oversee disbursement of funds remaining subsequent to payment of expenses and qualified claims in a property damage class action settlement.

6. In addition, I have served as a consulting witness or expert witness in real property class actions and mass torts involving odors, bodies of water, groundwater, air emissions, construction defects, and other issues.

7. In the context of this Settlement Agreement, I was involved as an expert for the BP Defendants in connection with the Compensation Framework for Real Property Sales, Compensation Framework for Coastal Real Property Claims, and Compensation Framework for Wetlands Real Property Claims.

## OPINIONS

8.      In this declaration I offer opinions regarding the three property-related compensation frameworks attached as exhibits to the *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012 ("Settlement Agreement"): (1) the Compensation Framework for Real Property Sales ("Sales Framework") set forth in Exhibits 13A and 13B, (2) the Compensation Framework for Coastal Real Property Claims ("Coastal Framework") set forth in Exhibits 11A, 11B, and 11C, and (3) the Compensation Framework for Wetlands Real Property Claims ("Wetlands Framework") set forth in Exhibits 12A, 12B, 12C and 12D.

### A. Documents Reviewed

9.      In reaching my opinions, I reviewed the following documents and data:

- The Settlement Agreement and Exhibits 11A-11C, 12A-12D, 13A–13B, and 15

- Declarations of Elliott Taylor, Tre Wharton and Harold G. Leggett

- Shoreline Cleanup Assessment Technique cleanup data ("SCAT")

- Pre-assessment data conducted as part of Phase 1 of the Natural Resource Damage Assessment process ("NRD Pre-assessment"); Rapid Assessments data conducted as part of Phase 1 of the Natural Resource Damage Assessment process ("NRD Rapid Assessment"); Coastal Wetland Vegetation Assessment data conducted as part of the Restoration Planning Phase of the Natural Resource Damage Assessment process ("NRDA CWVA")

- National Oceanic and Atmospheric Administration ("NOAA") Environmental Sensitivity Index data ("ESI")

- House Price Index data compiled by the Federal Housing Finance Agency for Gulf and Non-Gulf Metropolitan Statistical Areas

- County and parish property records for properties located in the Real Property Sales Compensation Zone, Coastal Real Property Claim Zone, and Wetlands Real Property Claim Zone

- Real property sales data for transactions taking place in the counties included in the Real Property Sales Compensation Zone and Wetlands Real Property Claim Zone

- The Plaintiffs' Steering Committee's and BP Defendants' Joint Motion for (1) Preliminary Approval of Class Action Settlement, (2) Scheduling a Fairness Hearing, (3) Approving and Issuing Proposed Class Action Settlement Notice, and (4) BP's Motion for Adjourning the Limitation and Liability Trial ("Joint Motion for Preliminary Approval")

- Objections to the Settlement Agreement filed as of the date of this Declaration

- Aerial photographs of the Real Property Sales Compensation Zone, Coastal Real Property Claim Zone and Wetlands Real Property Claim Zone

10. In addition to the documents listed above, I inspected the geographies included in the Real Property Sales Compensation Zone, the Coastal Real Property Claim Zone and the Wetlands Real Property Claim Zone.

- On March 27, 2012, I participated in a helicopter inspection of a portion of the Louisiana wetlands from Barataria Bay west to Terrebonne Bay, and from Terrebonne Bay east towards South Pass near Venice, Louisiana. On the same day, I visited wetlands areas by boat from Myrtle Grove Marina to portions of northern Barataria Bay.

- On April 29, 2012 to May 1, 2012, I conducted drive by inspections of parcels located in Jefferson, Lafourche, Cameron, Vermilion, Iberia, St. Mary, and Terrebonne Parishes in Louisiana.

- On July 16, 2012 to July 18, 2012, I conducted drive by inspections of parcels located in Wakulla, Franklin, Gulf, Bay, Walton, Okaloosa, Santa Rosa and Escambia Counties in Florida and Baldwin County, Alabama.

- On July 30, 2012 to July 31, 2012, I conducted drive by inspections of parcels located in Mobile County, Alabama; Jackson, Hancock and Harrison Counties in Mississippi; and Lafourche and Jefferson Parishes in Louisiana.

11.     The parcels I inspected included detached single family homes, condominiums, vacant lots, unimproved acreage, hotels, restaurants, marinas, and warehouses located throughout the Real Property Sales Compensation Zone, the Coastal Real Property Claim Zone and the Wetlands Real Property Claim Zone. Sales Framework parcels that I inspected included parcels sold throughout the eligibility timeframe of April 20, 2010 to December 31, 2010 and at various price points. Coastal Framework parcels that I inspected included parcels with numerous County Land Use Designations. Wetlands Framework parcels that I inspected included parcels where the presence of oil was observed by SCAT, NRD Pre-assessment, NRD Rapid Assessment and/or NRD CWVA, as well as parcels where no oil was observed.

## B.     Real Property Frameworks

### (i)   Compensation Framework For Real Property Sales

12.     The Compensation Framework for Real Property Sales resolves claims by former owners of residential properties along the shoreline that was monitored for the presence of oil after the *Deepwater Horizon* Spill ("DWH Spill") who sold their homes during April 21 to December 31, 2010 and allege that they obtained lower sale prices than they otherwise would

Page 6

have due to the DWH Spill. (Exhibits 13A and 13B of the Settlement Agreement) Given my background, training and education, and my professional experience in similar matters involving environmental issues, and my analysis of relevant residential property sale prices and benchmark values, it is my opinion that the Sales Framework provides a standardized method that generously compensates eligible claimants.

13.     As an initial matter, the Real Property Sales Compensation Zone, which is reflected in the blue shaded portion of the Real Property Sales Compensation Zone Map (Exhibit 13B to the Settlement Agreement), was established using thorough and comprehensive data to define a zone that includes residential parcels on which the presence of oil was reported, as well as those that were monitored for the presence of oil. Specifically, the Real Property Sales Compensation Zone includes residential parcels along the shoreline from as far east as Wakulla County, Florida west through Alabama and Mississippi and on Grand Isle, Louisiana, which: (i) were monitored by SCAT[1], (ii) were not directly monitored by SCAT but which touch a portion of the coast which was assessed by SCAT (*e.g.*, parcels touching a beach that was monitored by SCAT), and (iii) were not directly monitored by SCAT but are located between the termination of the areas assessed by SCAT and particular physical boundaries like a bridge or a waterway. In addition, residential parcels where oil was observed by the NRD Pre-assessment are also included in the Real Property Sales Compensation Zone.    The Declaration of Elliott Taylor provides additional information about SCAT and the NRD data.

14.     As an added measure to ensure that all parcels intended for inclusion in the Real Property Sales Compensation Zone are captured, the Sales Framework provides that parcels

---

[1] Shoreline Cleanup Assessment Technique ("SCAT") was the process used following the DWH Spill by Unified Area Command ("Unified Command") to assess shoreline oiling and inform shoreline treatment.  SCAT has assessed more than 4,300 miles of shoreline in the Gulf, from Wakulla County, Florida through Louisiana.  The SCAT assessments included all shoreline areas where MC252 oil was observed by SCAT, and extended beyond those areas for completeness.  For example, no oil was observed by SCAT east of Franklin County, Florida, but SCAT surveys extended east through Wakulla County, Florida.

inadvertently excluded from the Real Property Compensation Zone Map, or parcels that are misclassified as non-residential on the Real Property Compensation Zone Map, can be included if official real property ownership records showing the need for a correction are provided. Such corrected parcels will then be eligible for the Real Property Compensation Amount, if the other Sales Framework terms are met.

15.     During my driving tours of the Real Property Sales Compensation Zone, I observed residential parcels that were sold during April to December 2010, and I observed that these parcels were located along the shoreline. The Zone is primarily comprised of coastal beach and/or tourism areas. During my observations this summer, I observed clean beaches with no signs of oiling and people out enjoying the shoreline and the waters of the Gulf of Mexico.

16.     Under the Sales Framework, eligible claimants are paid 12.5 percent of the sale price they received for their home. My analysis of real estate transaction prices during the eligibility period indicates that the Real Property Sales Compensation Percentage of 12.5 percent is generous. The analysis compares, for the period April to December 2010, actual sale prices and benchmark values for residential properties located in the Real Property Sales Compensation Zone to actual sale prices and benchmark values for residential properties located within the same Gulf Coast Counties as the Real Property Sales Compensation Zone but inland of the shoreline. The benchmark values for each residential property are based on the 2010 County Appraised Value (*see* Appendix C of Exhibit 13A to the Settlement Agreement). Actual sales prices that are lower relative to benchmark values for residential parcels in the Real Property Sales Compensation Zone compared to the percentage reductions of actual sales prices relative to benchmark values for inland properties might reflect spill-related reduction in price (as well as other potential factors). The Real Property Sales Compensation Percentage of 12.5 percent negotiated by the parties exceeds the differences in coastal and inland prices implied by this

Page 8

benchmark analysis.

17. Moreover, the information and documentation requirements of the Sales Framework are narrowly tailored in that only the standard documents needed to establish ownership of an eligible residential parcel are required.

18. The Sales Framework fairly accounts for circumstances in which a parcel was owned by multiple parties during the eligible timeframe. In such circumstances, each owner will receive his or her pro rata share of the Real Property Sales Compensation Amount based on his or her ownership percentage.

### (ii) Compensation Framework for Coastal Real Property Claims

19. The Coastal Framework for Coastal Real Property Claims provides compensation to owners and long-term lessees of shoreline properties who may have experienced temporary inconvenience or partial interruption in their ability to fully enjoy the beach during April 20 to December 31, 2010 as a result of the DWH Spill and Unified Command shoreline clean-up operations. (See Settlement Agreement Exhibits 11A, 11B and 11C) Eligible claimants are those with property located along Gulf Coast shoreline where oil was observed or where the Unified Command monitored for the presence of oil, an area referred to in the Coastal Framework as the Coastal Real Property Claim Zone. This Zone primarily consists of coastal beach and/or tourist areas, as distinct from the Louisiana wetlands. The Coastal Framework is generous in that owners of properties with a vast array of County Land Use designations, including residential and commercial, as well as deeded boat slips, are eligible if located in the Zone. (See Appendix C to Settlement Agreement Exhibit 11A)

20. In addition, the Coastal Framework provides compensation for physical damage that occurred to an eligible claimant's real or personal property located on an eligible parcel if the damage occurred in connection with the DWH Spill or as a result of approved response

Page 9

cleanup operations. Claimants are paid the lesser of the cost of repairing or replacing the damaged property. Examples of physical damage include damage caused by a vehicle in use for DWH Spill response cleanup operations to landscaping, a dock or deck furniture located on the parcel.

21. Given my background, training and education, professional experience in similar matters involving environmental issues and the materials I reviewed, it is my opinion that the Coastal Framework provides a standardized method that provides generous compensation to eligible claimants.

22. As an initial matter, the Coastal Real Property Claim Zone, which is reflected in the blue shaded portion of the Coastal Real Property Claim Zone Map (Exhibit 11B to the Settlement Agreement), was established using thorough and comprehensive data to delineate a zone that encompasses parcels on which the presence of oil was reported, as well as those that were monitored for the presence of oil. Specifically, the Zone includes parcels along the shoreline from as far east as Wakulla County, Florida west through Alabama and Mississippi and on Grand Isle, Louisiana, which: (i) were monitored by SCAT, (ii) were not directly monitored by SCAT but which touch a portion of the coast which was assessed by SCAT (*e.g.*, parcels touching a beach that was monitored by SCAT), and (iii) were not directly monitored by SCAT but are located between the termination of the areas assessed by SCAT and particular physical boundaries like a bridge or a waterway. In addition, parcels where oil was observed by the NRD Pre-assessment are also included in the Coastal Real Property Sales Claim Zone. As Dr. Elliott Taylor explains in his declaration, SCAT and the NRD Pre-assessment data identify whether a portion of the shoreline was observed to have MC252 oil, and the SCAT Line, which was used to establish the Coastal Real Property Claim Zone, is the shoreline surveyed by SCAT for the presence of MC252 oil.

Page 10

23.    A claimant-friendly feature of the Coastal Framework is that it allows for a parcel not located within or inadvertently excluded from the Coastal Real Property Claim Zone to be added to the Zone by the Claims Administrator if the parcel is documented as containing the presence of oil under the criteria in the Coastal Framework. In this way, the Settlement ensures that owners of all parcels located along the coastal shoreline where enjoyment of the beach may have been interrupted or intruded upon as a result of the presence of MC252 oil or Unified Command clean-up operations have the opportunity for compensation.

24.    The method for calculating the amount paid to eligible claimants is objective and transparent. For each eligible property, the 2010 appraised value of the property as set by the county or parish tax appraiser (referred to as the "County Appraised Value" in the Coastal Framework) is multiplied by a property tax rate of 1.18 percent (referred to as the "2010 Applicable Property Tax Rate" in the Coastal Framework). The base compensation amount paid to the claimant is then one of four specified percentage amounts of the 2010 Applicable Property Taxes: 30%, 35%, 40% or 45%. The applicable percentage depends upon two factors: (i) whether or not the presence of oil was observed on the property by SCAT and/or NRD Pre-assessment; and (ii) whether the shoreline of the property includes environmentally sensitive areas such as marsh or mangroves, as reflected by a NOAA ESI classification of 10A to 10D. The use of ESI is a generally accepted and fair method to identify the environmental sensitivity of a particular shoreline to oiling and cleanup. The claimant's total compensation (referred to as "total Coastal Real Property Compensation Amount") is then the base compensation amount plus the base compensation amount multiplied by a Risk Transfer Premium ("RTP") of 2.5.

25.    The total Coastal Real Property Compensation Amount is fair and adequate compensation for any temporary inconvenience or partial interruption in their ability to fully enjoy the beach that eligible claimants may have experienced. Almost 58,000 parcels (over 90

Page 11

percent of all parcels in the Coastal Real Property Claim Zone) may be eligible to receive a Coastal Real Property Compensation Amount (inclusive of RTP) that is greater than the eligible parcels' 2010 annual property tax. It is significant to note that eligible claimants should not have incurred costs to clean-up MC-252 oil from the shoreline or to monitor for the presence of oil because these activities were coordinated by Unified Command and paid for by BP, and under this agreement BP will pay for additional costs of repairing or replacing damaged property.

26.     In my driving tours of the Coastal Real Property Claim Zone this summer, I observed people out on the beaches enjoying the shoreline, and the beaches looked beautiful. I walked parts of the shoreline and beaches in each county in the Coastal Real Property Claim Zone. I am very familiar with the Gulf Coast because I have vacationed along the Gulf Coast my entire life and have visited the area twice this summer with my family. The beaches, shopping areas, and restaurants have all been far more crowded than last year and, for that matter, any summer in recent memory.

27.     The temporary nature of any inconvenience to claimants is reflected in the fact that, as of August 9, 2012, over 98% of the shoreline in the Coastal Real Property Claim Zone surveyed by SCAT has reported oiling levels of no oil observed or trace oiling based on the results of the most recent survey completed for each portion of the shoreline. In addition, based on the Declaration of Dr. Elliott Taylor, any future MC252 re-oiling, if it occurred, would almost certainly be minimal, localized and discrete, and classified as trace, very light or light oiling under SCAT criteria. (see Declaration of Dr. Elliott Taylor) In addition, the cost of any future monitoring or clean-up related to the DWH Spill will similarly not be borne by claimants; nothing in the Coastal Framework impinges upon federal or state authority to engage in future cleanup or remediation activities.

Page 12

28.     The Coastal Real Property Compensation Amount is claimant-friendly and easy to administer in that eligible claimants are not required to show that they actually were prevented from using or enjoying their parcels because of the DWH Spill in order to receive the total Coastal Real Property Compensation Amount. The total Coastal Real Property Compensation Amount is provided to eligible claimants regardless of whether they lived in, used, or even visited their parcel during the eligible timeframe.

29.     It is notable that this methodology contains features that are very favorable to claimants. *First*, the Coastal Framework allows for any homestead exemption (tax exemptions granted to homeowners if they can demonstrate that the owned property serves as a primary residence) to be added back to a property's County Appraised Value in the event the County Appraised Value is net of such homestead exemption. *Second*, the 1.18-percent tax rate used for all claimants is the highest weighted average tax rate among the counties of Florida, Alabama and Mississippi represented by the shoreline segments in the Coastal Real Property Claim Zone and it is applied to all eligible parcels, regardless of the county in which they are located. *Third*, claimants are guaranteed a minimum compensation (determined by each parcel's Compensation Category) if certain eligibility criteria is met under the Coastal Framework. *Fourth*, the Coastal Framework allows for parcels to be reclassified to higher compensation categories if a claimant provides specified supporting documentation. For example, a parcel may move from Compensation Category B1 or B2 (non-oiled) to Compensation Category A1 or A2 (oiled), or from Compensation Category A1 or B1 (less environmentally sensitive) into Compensation Category A2 or B2 (more environmentally sensitive).

30.     Documentation requirements under the Coastal Framework are narrowly tailored such that parcel owners are only required to provide the minimum level of documentation for the Claims Administrator to confirm ownership – a copy of the deed and a copy of the tax

assessment notice. Moreover, a lessee of a parcel is only required to provide the minimum level of documentation for the Claims Administrator to confirm lessee status – a copy of the executed lease and documents showing the lease payments were made.

31.    The Coastal Framework fairly allocates the Coastal Real Property Compensation Amount for a particular parcel between eligible claimants – including both owners and/or lessees – based on the period of legal possession of the particular eligible parcel by each eligible claimant during the eligible time period. For example, if a parcel was owned by a party during the entire eligible timeframe and leased to another party for more than 60 days during the eligible timeframe, the Coastal Real Property Compensation Amount will be allocated between the two parties based on each party's legal right to possess the parcel. In addition, if ownership of a parcel was transferred during the eligible timeframe, the Coastal Real Property Compensation Amount will be allocated between owners based on their period of legal possession.

32.    To aid in the efficient administration of the Coastal Framework, the GIS Database provided to the Claims Administrator includes all the available environmental data for parcels and shoreline in the Coastal Real Property Claim Zone (including SCAT, NRD Pre-assessments and NOAA ESI shoreline classifications for parcels), as well as all the available documentation obtainable from the county and parish tax assessor offices for parcels located in the Coastal Real Property Claim Zone (including County Land Use Designations, official parcel boundaries, property tax assessment data).

### (iii)    Compensation Framework for Wetlands Real Property Claims

33.    The Compensation Framework for Wetlands Real Property Claims provides compensation to owners of Louisiana wetlands properties to account for the presence of oil on their parcels and any temporary or partial inconvenience or interruption to their ability to enjoy their property as a result of the DWH Spill and Unified Command marshland clean-up

Page 14

operations. (See Settlement Agreement Exhibits 12A, 12B, 12C and 12D) Eligible claimants are those with wetlands property located in the Louisiana wetlands where oil was observed or where the Unified Command monitored for the presence of oil, an area referred to in the Framework as the Wetlands Real Property Claim Zone. The Wetlands Framework is claimant-friendly and easy to administer in that eligible claimants are paid regardless of whether they lived on, used, or even visited their parcel during the eligible timeframe.

34.     In addition, the Wetlands Framework provides compensation for physical damage that occurred to an eligible claimant's real or personal property located on an eligible parcel if the damage occurred in connection with the DWH Spill or as a result of approved response cleanup operations. Claimants are paid the lesser of the cost to repair or replace the damaged property. Examples of physical damage include damage to a dock or appurtenance located on the parcel that was caused by a vessel in use for DWH Spill response cleanup operations.

35.     Given my background, training and education, professional experience in similar matters involving environmental issues and the materials I reviewed, it is my opinion that the Compensation Framework for Wetlands Real Property Claims is an objective, transparent methodology that provides generous compensation to eligible claimants.

36.     As an initial matter, the Wetlands Real Property Claim Zone, which is comprised of parcels in the Louisiana wetlands and is reflected in the blue shaded portion of the Wetlands Real Property Claim Zone Map (Exhibit 12B to the Settlement Agreement), was established using thorough and comprehensive data to delineate a zone that encompasses parcels in the Louisiana wetlands on which the presence of oil was reported, as well as those that were monitored for the presence of oil. Specifically, the Zone includes i) all parcels along the Louisiana Gulf Coast shoreline, with the exception of Grand Isle, that were intersected by the SCAT Line, regardless of whether or not oil was ever observed; ii) parcels in which oil was

observed by either the NRD Pre-assessment, NRD Rapid Assessment, or NRD CWVA[2]; and iii) in certain cases where there is a break in the SCAT Line, parcels that would have been intersected by the SCAT Line, had it been continuous.

37. The declaration of Dr. Elliott Taylor explains that SCAT and the NRD Pre-assessment and CWVA data identify whether a portion of the shoreline was observed to have MC252 oil, and the SCAT Line, which was used to establish the Wetlands Real Property Claim Zone, is the shoreline surveyed by SCAT for the presence of MC252 oil.

38. A claimant-friendly feature of the Wetlands Framework is that it allows for a parcel not located within the Wetlands Real Property Claim Zone to be added to the Zone by the Claims Administrator if the parcel is documented as containing the presence of oil under the criteria in the Wetlands Framework. Additionally, parcels inadvertently excluded from the Zone can be included by providing official real property records.

39. The Wetlands Framework can be easily and efficiently administered because it provides for just two Compensation Categories: (i) Compensation Category A for oiled parcels and (ii) Compensation Category B for non-oiled parcels, with parcels in Category A receiving a higher compensation amount. The Wetlands Framework relies upon four datasets (SCAT, NRD Pre-assessment, NRD Rapid Assessment, and NRD CWVA) to determine whether a parcel was oiled at any point during the eligible timeframe. These four data sets provide detailed and accurate information about whether a portion of the shoreline was observed to have MC252 oil under the systematic surveys done by the state and federal governments and BP. If any one of the data sets identifies that a parcel was oiled at any point during the eligible timeframe, the parcel is placed in Compensation Category A even if oil was present for only a short time. The Wetlands Framework is claimant-friendly because a parcel is categorized as Compensation

---

[2] I understand that NRD Rapid Assessment and NRD CWVA were studies performed in Louisiana only.

Category A or B based on the data set which yields the best categorization for the parcel. In addition, the Wetlands Framework permits reclassification into Category A if a claimant can provide the appropriate supporting data.

40. The method for calculating the Wetlands Real Property Compensation Amount for Compensation Category A is claimant-friendly. If any oil was observed on any portion of a SCAT zone within an eligible parcel, that parcel is compensated for i) an area 50 feet inland from that SCAT zone (the Oiled Primary Area), ii) an additional 30 feet immediately inland from the Oiled Primary Area (the Buffer Area) and iii) 30 feet immediately inland from SCAT zones on the parcel that do not contain the presence of oil (the Non-Oiled Primary Area). The total acreage is calculated in this manner for all Category A claimants regardless of how far inland oil was actually observed on their property, which in the vast majority of cases is much less.

41. The Compensation Amount for Compensation Category A is generous as reflected in the fact that even the minimum Compensation Amount for Compensation Category A is substantially greater than the typical per acre fair market value for wetland parcels. Discussions with local appraisers that value wetland parcels and analysis of recent wetland parcels transaction indicate a fair market value range of $300 to $2,000 per acre. In contrast, parcels in Category A receive a base compensation of: (i) $25,000 for every acre of Oiled Primary Area, (ii) $10,000 for every acre of Buffer Area, and (iii) $11,000 for every acre of Non-oiled Primary Area. In addition, the resulting base compensation amount is multiplied by an RTP of 2.5 and that multiplied amount is added to the base compensation amount. Thus, parcels in Category A are guaranteed a minimum payment of $122,500, including RTP, for one acre of Oiled Primary Area and one acre of Buffer Area, even if their parcel is less than one acre or if oil was reported in the most minimal quantity.

42. The fairness of compensation is reinforced by the fact that, according to the

Page 17

declarations of Dr. Elliot Taylor and Tre Wharton, the wetland areas where oil was observed appear to be recovering, including an appearance of healthy vegetation, the emergence of new vegetation shoots, and a diminished degree of oiling due to response activities or natural attenuation. In fact, eligible parcels in Category A receive the Wetlands Real Property Compensation Amount regardless of whether oil is currently present on their parcel. This is particularly notable given that as of July 19, 2012, over 97% of the shoreline in the Wetlands Real Property Claim Zone surveyed by SCAT has reported oiling levels of no oil observed or trace oiling based on the results of the most recent survey completed for each portion of the shoreline. The percentage of shoreline where oil is not observed will likely continue to increase over the life of the settlement through continued response activities and natural attenuation. Moreover, based on the declaration of Dr. Elliott Taylor, any future MC252 re-oiling, if it occurred, would almost certainly be minimal, localized and discrete, and classified as trace, very light or light oiling under SCAT criteria.

43.     Indeed, I personally observed portions of the Wetlands Real Property Claim Zone in boat tours this summer. I observed people boating and fishing out in the water and on the banks. I did not observe any oil even on parcels where SCAT or NRD data indicated that oil might still remain, other than one area where oil was intentionally preserved by the Unified Command for scientific testing.

44.     The method for calculating the Wetlands Real Property Compensation Amount for Compensation Category B is also standardized and generous. Parcels in Category B are those that were never documented as oiled by any of the four relevant datasets (SCAT, NRD Pre-assessment, NRD Rapid Assessment and NRD CWVA). Despite the fact that oil was never observed on parcels in Compensation Category B, owners of those parcels are compensated for an area 30 feet inland from the SCAT zones within the parcel (the Non-oiled Primary Area).

45.     The Compensation Amount paid to owners of Category B parcels is greater than the typical per acre fair market value for wetland parcels, which, as noted above, ranges from $300 to $2,000 per acre. Parcels in Category B are compensated $4,500 for every acre of Non-oiled Primary area, and are guaranteed a minimum payment of at least $15,750, inclusive of RTP, for one acre of Non-oiled Primary Area.

46.     The compensation amounts paid to eligible claimants with Category A and Category B parcels, including the RTP of 2.5, are generous. It is significant to note that eligible claimants should not have incurred costs to clean-up MC-252 oil from the shoreline or to monitor for the presence of oil because these activities were coordinated by Unified Command and paid for by BP. In addition, the cost of any future monitoring or clean-up related to the DWH Spill will similarly not be borne by claimants; nothing in the Wetlands Framework impinges upon federal or state authority to engage in future cleanup or remediation activities. Moreover, it is my understanding from review of Exhibit 15 of the Settlement Agreement (the RTP Chart) and the Joint Motion for Preliminary Approval that RTP payments are meant to compensate class members for pre-judgment interest, any risk of oil returning, consequential damages, inconvenience, aggravation, any risk of future loss, lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors. In addition, based on the declaration of Dr. Elliott Taylor, the risk of any future MC252 re-oiling is slight and to the extent it occurred, it would almost certainly be localized and discrete, and classified as trace, very light or light oiling or tarballs under SCAT criteria.

47.     Documentation requirements under Wetlands Framework are fair and reasonable. Claimants are only required to provide the minimum level of documentation for the Claims Administrator to confirm ownership – a copy of the deed and a copy of the tax assessment notice. Claimants are also permitted to provide alternative documentation to show ownership if

Page 19

they are not identified on the deed and/or tax assessment notice.

48.     The Wetlands Framework fairly accounts for circumstances in which a parcel was owned by multiple parties during the eligible timeframe. In such circumstances, each owner will receive his or her pro rata share of the Wetlands Real Property Compensation Amount based on his or her ownership percentage. In addition, if ownership of a parcel was transferred during the eligible timeframe, the Wetlands Real Property Compensation Amount will be allocated between owners based on their period of legal possession.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Jerry M. Dent II

Dated: August 13, 2012

Page 20

# APPENDIX A
## JERRY M. DENT II, CRE, FRICS, ASA

 Mr. Dent is a Managing Director with Alvarez & Marsal in Birmingham, Alabama where he serves as co-head of the firm's Environmental Advisory Services practice.  Mr. Dent was formerly a founding member of Accounting Economics & Appraisal Group.  Previously, he served as Director of the Southeastern Real Estate and Environmental Damages practice of PricewaterhouseCoopers LLP. He has over twenty years of experience providing business and financial advice to clients operating in a broad range of industries including, among others: energy, chemical, financial service, real estate, hospitality and utilities.  Mr. Dent's experience includes advising clients in connection with environmental damages to real estate, real estate counseling, economic damages, settlement fund administration, and demographic and geographic information systems. Representative examples of Mr. Dent's engagements include the following:

### *Environmental Damages to Real Estate*

- Issued an expert report in a class action involving alleged property damage as a result of groundwater contamination from a manufacturing facility in Pennsylvania.
- Analyzed the impact of sinkholes on property value allegedly caused by quarry operations on surrounding agricultural land.
- Determined categories of financial impact to commercial properties as a result of air emissions associated with a galvanizing facility in North Carolina.
- Issued an affidavit in a class action matter involving alleged property damage resulting from airborne ash materials stored at a paper mill in Florida.
- Analyzed a claim of property diminution on the value of a landfill in Illinois resulting from the dumping of non-permitted materials.
- Issued an affidavit in opposition to a plaintiff's attempt to offer lay testimony on property value diminution attributed to contamination.
- Evaluated property damage claims from a hotel operator as a result of alleged offsite migration of petroleum products from a convenience store location in Georgia.
- Coordinated analysis of the impact of leaking underground storage tanks on surrounding property values in a national class action.
- Analyzed alleged property damage to parcels in Alabama and Georgia attributable to air emissions from a carbon black manufacturing facility.
- Researched the diminished value of a manufacturing facility resulting from the previous owner's election not to pay the cost of TCE cleanup as required in an indemnification agreement.
- Issued an affidavit in a class action matter involving alleged property damage as a result of air emissions from a private waste water treatment facility in Georgia.
- Evaluated claims of property value diminution in several residential class actions and numerous individual commercial claims brought by property owners surrounding a former PCB manufacturing facility.

- Coordinated the analysis of an adjoining property owner's claim of property value diminution due to TCE groundwater contamination on an office warehouse.
- Researched property value diminution claims brought by multiple individuals in regard to an alleged construction materials defect.
- Researched the impact on property value of proposed construction of an above ground alternative sewage system on a residential property.
- Analyzed claim of property damage to a rural residential property resulting from alleged increased groundwater runoff due to development of adjacent land.
- Researched claims of property damage brought by multiple waterfront property owners in a matter involving a textile manufacturer's permitted releases into a stream.
- Analyzed damage models arising from multiple plaintiffs' claims of diminution remaining after repair of previous termite damages.
- Issued an affidavit in a class action matter involving alleged property damage as a result of air emissions from a pulp and paper mill in Arkansas.
- Analyzed an opposing expert's methodology and provided an appropriate methodology to determine impact, if any, in a post-repair termite damage matter.
- Performed an analysis of alleged impact on property value associated with a ruptured sewer line underneath a commercial property in Georgia.
- Issued an expert report and presented findings to a city planning commission illustrating residential property trends around existing quarries.
- Issued an expert report involving a proposed class of over 50,000 residential parcels in a matter involving alleged property damage as a result of foundry operations.
- Analyzed property value trends as a result of a claim of property damage due to alleged odor emissions from a poultry processing facility.
- Researched potential impact to residential property value subsequent to interior cleanup and repair of a sewer line rupture.
- Evaluated claims of property value diminution attributed to air emissions brought by property owners surrounding a coke facility.

### *Real Estate Counseling*

- Currently serve as Administrator for an Institutional Control Program involving nearly 2,200 parcels.  Duties include identifying relevant parcels, calculating payouts, conducting public meetings, performing media interviews, negotiating the purchase of environmental covenants, recording executed covenants, meeting with regulators, meeting with stakeholders, negotiating the purchase of property to be used in remediation actions, and other functions.
- Studied sale price trends of residential properties surrounding existing cemeteries in New York as part of a permitting response.
- Issued a land use study as part of an overall exposure assessment.  Analyses included number of parcels, approximate size, land use, and presence of crops, wells, irrigation equipment, livestock, or produce, and other land attributes.
- Performed due diligence and made portfolio recommendations on hospitality and residential planned community properties owned by a bankrupt investment fund at multiple locations throughout the southeast.

- Performed a market study of historical property value and lease trends of commercial office and research and development space located in a science and technology research park.
- Researched the market for water accessible industrial properties and provided valuation alternatives for a 1,000-acre site located in a heavy industrial park.
- Analyzed the impact on current and future land use development patterns surrounding a proposed intermodal center in Georgia.
- Assigned risk levels and analyzed potential commercial and residential real estate damage exposure for a former refinery site in Ohio utilizing decision analysis techniques.
- Quantified various dispute resolution alternatives for an adjoining property owner including indemnities, value assurance, relocation, and sale leaseback in a matter involving TCE groundwater contamination on a commercial property in Tennessee.
- Evaluated the proposed privatization of a municipal landfill department on behalf of a county government.
- Calculated the economic impact of a proposed impoundment in North Carolina. Analyses included construction, surrounding property development and infrastructure development.
- Analyzed the profile of typical big box retail customers relative to convenience store customers and the difference in geographic draw of big box retail sites relative to convenience store locations.
- Coordinated the development of financial models and projections for a startup company engaged in the manufacture and development of affordable housing projects in under developed countries.
- Provided valuation consultation on a $300,000,000 portfolio of retail properties located throughout several southern states.

### *Value Assurance Programs / Property Purchase Programs*

- Developed and currently administer a Value Assurance Program involving single family and multi-family properties on the footprints of two former manufactured gas plant sites in California.
- Developed and currently administer a Value Assurance Program as part of a class action settlement involving over 61,000 residential parcels.
- Led the development of a Temporary Rental Offset Program offered to apartment owners to compensate for lost rents as a result of issues related to environmental surveys, testing, and remediation, if needed.
- Directed the real estate research used to establish a Property Purchase Program for residential properties surrounding a manufacturing facility.
- Coordinated the development of a Value Assurance Program for potential use in a residential property value diminution dispute involving over 1,000 parcels.
- Developed a Value Assurance Program for residential and commercial properties on the site of a former manufactured gas plant site in Ohio.
- Assisted in the development of a Value Assurance Program for use in a neighborhood surrounding a former manufactured gas plant site in Virginia.
- Developed and administered a Value Assurance Program for use in a matter involving over 3,600 residential parcels located around and downstream from a manufacturing facility in Alabama.

- Currently developing a Value Assurance Program for use in a matter involving several hundred property owners located down river from a manufacturing facility in the Midwest.
- Advised and co-developed a benefits program to property owners surrounding the site of a pipeline explosion. Offerings included a Value Assurance Program, Property Purchase Program and Neighborhood Restoration Program.

### *Economic Damages / Lost Profits*

- Calculated damages and rebutted opposing experts on a matter involving lost profits as a result of TCE/DCE/PCE contamination.
- Critiqued damages calculation and performed a market study in connection with a dispute over alleged PCB contamination and resulting lost profits in the appliance sales and repair industry.
- Critiqued damages calculation in connection with a dispute over alleged PCB contamination and resulting lost profits in the automotive repair industry.
- Analyzed the damages claim to a shopping center resulting from the closure and relocation of a big box retailer.
- Consulted on claims of lost profits allegedly resulting from offsite migration of petroleum products brought by a hotel operator against a convenience store chain.
- Evaluated lost profits of a hotel associated with fire damage repair delays.
- Critiqued a financial model involving damages to a mixed use development allegedly resulting from an inaccurate calculation of wetlands acreage.

### *Settlement Fund Administration*

- Appointed Settlement Administrator in a class action settlement involving over 61,000 residential parcels.
- Served as Settlement Administrator in a class action settlement involving over 3,600 residential parcels.
- Court appointed Co-Escrow Agent of a 501c (3) corporation established to oversee disbursement of funds remaining subsequent to payment of expenses and qualified claims in a real estate class action settlement.
- Served as Settlement Administrator in a class action settlement involving over 1,500 residential parcels in a matter involving TCE contamination. Identified all parcels included in the class, attended community outreach group meetings, performed numerous print and television media interviews, maintained toll free phone lines, issued settlement checks and maintained appropriate financial records.
- Appointed as Settlement Administrator in a matter involving a class action property damage claim resulting from a Dursban spill into various surrounding waterways.
- Served as Settlement Fund Administrator in a class action matter involving alleged releases into waterways from a steel manufacturing facility.

### *Demographic and Geographic Information Systems ("GIS") / Databases*

- Performed a demographic analysis of grocery store sites as part of a deepening insolvency analysis in a matter against the former Board and management of a now-defunct chain.

- Coordinated the GIS team in a residential toxic tort matter.  Mapping overlays included: EPA testing areas, plaintiff properties, soil test results, and identification of properties that would likely require remediation under known EPA standards.
- Coordinated the GIS efforts in a residential toxic tort matter involving over 1,500 properties. Mapping overlays included: Bureau of Labor Statistics demographic data, police and fire districts, school zones and other disamenities located within the area.
- Issued an affidavit illustrating the locations of plaintiff properties spread across two judicial jurisdictions.
- Issued an affidavit illustrating proposed plaintiff properties were located within the boundaries of a prior class action settlement.
- Coordinated the development of a web-based GIS site for use in a class action toxic tort matter.
- Assisted in the development of a demographic database for use in the analysis of several thousand properties.  Data included school zone, land use, zoning, assessed values, improvement types, income, population, and other variables.
- Developed a database to analyze property use, property value, township, school zone, improvement size, improvement value, and other demographic variables.
- Developed and maintain a GIS database for use in the purchase of approximately 700 deed restrictions.  Data assembled includes owner information, property-specific information, and demographic data from public and private sources.
- Assembled data and constructed a database for use in a retail dispute.  Data included traffic count, population, housing stock, land use, competitors, etc.
- Developed a GIS system to analyze key demographic factors related to the proposed relocation of a regional hospital.  Data analyzed included: population, age, income, household size, employment, traffic count, adjacent land uses, access to major transportation arteries, proximity to retail districts, etc.

### *Professional / Business Affiliations*

- American Bar Association
  - Associate Member
  - Co-Chair, Damages Subcommittee of the Section of Litigation Environmental Committee
  - Program Co-Chair, "Real Estate Damages: Environmental Conditions, Systems & Strategy", Regional Continuing Legal Education Workshop, Costa Mesa, CA, November 18, 2010.

- Appraisal Institute, Associate Member

- American Society of Appraisers
  - Designated ASA
  - Board of Directors, Alabama-Mississippi Chapter
  - Treasurer, Alabama-Mississippi Chapter
  - Vice President, Alabama-Mississippi Chapter

- Counselors of Real Estate
  - Designated CRE

- o National Membership Development Committee
- o Rice University / Counselors of Real Estate – MBA Mentor
- o New Member Ambassador

- National Association of Realtors, Affiliate Member
    - o Alabama Association of Realtors
    - o Birmingham Association of Realtors

- Royal Institution of Chartered Surveyors, Designated FRICS

### *Community Involvement*

- *Birmingham Business Journal*, Top 40 Under Forty

- City of Vestavia Hills, Financial Advisory Committee

- Kiwanis Club of Birmingham
    - o Birmingham Business Hall of Fame Committee
    - o Membership Committee
    - o Reading is Fundamental Program – Calloway Head Start Center

- Kiwanis Club of Metropolitan Birmingham
    - o Board of Directors
    - o Programs Chair

- Liberating Technologies, Advisory Board

- National Multiple Sclerosis Society, Alabama Chapter
    - o MS Leadership Class
    - o MS Leadership Class Advisory Council

- Salvation Army, Youth Services Council

- United Way, Visiting Allocation Team

- University of Mississippi, School of Business
    - o MBA Case Study Competition Judge
    - o Speaker's Edge Competition Judge
    - o MBA Program Mentor
    - o MBA Alumni Board of Directors
        - ▪ Chair, By-Laws Revision Committee
        - ▪ Chair, Membership Committee

- Vestavia Hills Board of Education
    - o Vice President
    - o Board Member
    - o Policy Committee

- o   Financial Advisory Committee
- o   Vestavia Hills City Schools Foundation Liaison

### *Publications*

- "Value Assurance Programs: A Case Study in the Model City" with Christina M. McLean, Reprinted from the American Bar Association Tort Trial & Insurance Practice Section Spring CLE and Leadership Forum Course Materials, May 2011 to American Bar Association Tort Trial & Insurance Practice 21st Annual Spring CLE Meeting Course Materials, March 2012.

- "Value Assurance Programs: A Case Study in the Model City" with Christina M. McLean, Reprinted from the American Bar Association Tort Trial & Insurance Practice Section Spring CLE and Leadership Forum Course Materials, May 2011 to <u>The Environmental Litigator</u>, Summer 2011.

- "Value Assurance Programs: A Case Study in the Model City" with Christina M. McLean, American Bar Association Tort Trial & Insurance Practice Section Spring CLE and Leadership Forum Course Materials, May 2011.

- "Value Assurance Programs: An Alternative Response to Property Value Disputes" with Christina M. McLean, Reprinted from <u>The Environmental Litigator</u>, Spring 2009 to American Bar Association Regional Continuing Legal Education Workshop Course Materials, November 18, 2010.

- "Responding to Property Damage Claims: A Case Study Review of the McWane, Inc. Value Assurance Program" with Christina M. McLean and E. Bryan Nichols, Defense Research Institute – Toxic Torts and Environmental Law Course Materials, March 2010.

- "Worth More, Worth Less or Worthless: Assessing the Impact of Contamination on Residential Property Value" with Christina M. McLean, <u>The Environmental Litigator</u>, Fall 2009.

- "Value Assurance Programs: An Alternative Response to Property Value Disputes" with Christina M. McLean, <u>The Environmental Litigator,</u> Spring 2009.

- "Managing and Coordinating Information for Litigation in Multiple Jurisdictions" with William J. Long, <u>Commercial and Business Litigation</u>, Fall 2005.

- "Issues in the Appraisal of Contaminated Property", <u>Alabama Appraiser</u>, August / September 1999.

### *Speaking Engagements*

- "Creative Paths to the Settlement of Complex Environmental Litigation" with James M. Proctor II, Marcy Hogan Greer, Sheri L. Moreno, Christopher J. Williams, and Lowell M. Rothschild, American Bar Association Tort Trial & Insurance Practice 21st Annual Spring CLE Meeting, Phoenix, AZ, March 30, 2012.

- "Creative Paths to the Settlement of Complex Environmental Litigation" with James M. Proctor II, Marcy Hogan Greer, W. Warren Hamel, Sheri L. Moreno, and Deborah M. Reyher, American Bar Association Tort Trial & Insurance Practice Section Spring CLE and

Leadership Forum, Jacksonville, FL, May 19, 2011.

- "Real Estate Damages: Environmental Conditions, Systems & Strategy", Program Co-Chair, Presentation entitled "Value Assurance Programs: Proactively Addressing Property Damage Claims", American Bar Association Regional Continuing Legal Education Workshop, Costa Mesa, CA, November 18, 2010.

- "Show Me the Money: Using Value Assurance Programs to Compensate Real Property Owners That Are Truly Damaged", Defense Research Institute – Toxic Torts and Environmental Law Seminar, New Orleans, LA, March 18, 2010.

- "Environmental Covenants: A Case Study" with Ashley C. Cousins, 2009 Alabama Department of Environmental Management Groundwater Conference, Montgomery, AL, June 10, 2009.

- "Value Assurance Programs: Addressing Environmental Property Value Issues and Remedies" with Charles E. Finch, William A. Ruskin, Trevor E. Phillips, and Daniella D. Landers, Epstein Becker & Green / Alvarez & Marsal Continuing Legal Education Seminar, Houston, TX, June 18, 2008.

- "Uniform Environmental Covenants Act and Implementation" with E. Bryan Nichols and Ashley C. Cousins, Alabama State Bar – Environmental Section, Destin, FL, June 13, 2008.

- "Environmental Covenants and the Coliseum Boulevard Plume" with Floyd R. Gilliland, Jr. and Ashley C. Cousins, Alabama Real Estate Appraisers Board – Continuing Education, Montgomery, AL, August 24, 2007.

- "Environmental Covenants and the Coliseum Boulevard Plume" with Floyd R. Gilliland, Jr. and Ashley C. Cousins, Alabama Bar Association – Continuing Legal Education, Montgomery, AL, August 22, 2007 and September 6, 2007.

- "Brownfields and Institutional Control Programs" with Bernard E. Cox, Jr., Ashley C. Cousins, and Andrew C. Eversull, Business Council of Alabama – Energy and Environment Conference, Perdido Beach, AL, June 11, 2007.

- "Crisis Management: The First Reaction", Presentation entitled "Value Assurance Programs – An Overview of Alternatives" with Ashley C. Cousins, Darlene Rotch, and Willard Bowers, Alabama State Bar – Environmental Section, Perdido Beach, AL, June 24, 2005.

- "Environmental Damages and Property Value", Guest Lecturer, Birmingham-Southern-College Department of Business and Accounting, Birmingham, AL, January 7, 2003.

- "Demonstration of Expert Deposition" with Joseph B. Mays, Jr., and Artur Davis, Alabama Bar Institute for Continuing Legal Education 2001 Depositions Seminar, Montgomery, AL, December 19, 2001.

- "Due Diligence: Evaluating the Impacts of the Problems and Solutions", AIG Environmental Forum, Atlanta, GA, October 2000.

- "Everything You Ever Wanted to Know About Damages But Were Afraid to Ask – Business Damages After Kumho Tire" with James A. Chalmers, Theodore R. Hawkins, Jr., Roy C. Cheatwood, Dennis M. Campbell, Nancy Scott Degan, and Hon. Denny Chin, American Bar Association Annual Meeting, New York, NY, July 10, 2000.

- "Valuing a Closely-Held Business", Office for the Advancement of Developing Industries, University of Alabama at Birmingham, Birmingham, AL, September 25, 1996.

### *Education and Designations*

- Bachelor of Science
  Major: Corporate Finance
  University of Alabama

- Master of Business Administration
  Concentration: Finance
  University of Mississippi

- Designated CRE
  Counselors of Real Estate

- Designated FRICS
  Royal Institution of Chartered Surveyors

- Designated ASA
  American Society of Appraisers