# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in the Gulf of | * | |
| Mexico, on April 20, 2010 | * | SECTION J |
| | * | |
| | * | |
| | * | HONORABLE CARL J. |
| | * | BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| | * | |

## DECLARATION OF HENRY H. FISHKIND, Ph.D.

I, Henry H. Fishkind, submit this declaration in support of the BP Defendants' Memorandum In Support Of Motion For Final Approval Of *Deepwater Horizon* Economic And Property Damages Settlement Agreement, As Amended On May 2, 2012.  I am over the age of 18; the opinions, statements and conclusions expressed in this declaration are my own.

## INTRODUCTION

1. My name is Henry H. Fishkind, Ph.D.

2. In this declaration, I offer opinions regarding the Economic Damage Claim Frameworks, which include frameworks for Business Economic Loss Claims, Multi-Facility Businesses, Start-Up Businesses, Failed Businesses, Failed Start-Up Businesses, Individual Economic Loss Claims, and the Seafood Compensation Plan of the *Deepwater Horizon* Economic And Property Damages Settlement Agreement, As Amended On May 2, 2012 ("Settlement Agreement").

3.      Except as otherwise indicated below, I have personal knowledge of the facts stated herein. I did not personally participate in (i) drafting or preparing the Settlement Agreement or its Frameworks; (ii) the settlement negotiations; or (iii) advising any of the Parties whether to agree to the terms of the Settlement Agreement.

## PROFESSIONAL QUALIFICATIONS AND EXPERIENCE

4.      I am an economist with over 30 years of experience in economic analysis and forecasting.  I am President of Fishkind & Associates, Inc., an economic and financial consulting firm in Florida with offices in Orlando, Naples, and Port St. Lucie. My clients in matters other than this case include state and municipal governments, the U.S. Department of Justice, Fortune 500 Companies, property developers, and plaintiffs and defendants in litigation.

5.      I hold a Bachelor's Degree in Economics from Syracuse University, and a Ph.D. in Economics with specialties in Urban and Regional economics and in Econometrics from Indiana University.  My Curriculum Vitae is attached as Exhibit A.

6.      My career began in the public sector where I worked as an economist and associate professor at the University of Florida from 1975 to 1983.

7.      For many years I was a Research Economist with the Bureau of Economic and Business Research ("BEBR") at the University of Florida.  In 1980, I became Associate Director for Programs at BEBR.  From time-to-time, I served as its Acting Director.  BEBR is an applied research center in the College of Business Administration at the University of Florida.  BEBR collects, analyzes and generates economic and

demographic data on Florida; conducts economic and demographic research to inform public policy and business decision making; and distributes data and research findings throughout the state and the nation. BEBR has published the *Florida Statistical Abstract* each year since 1967. This award-winning research volume is the leading source of statistical data on Florida, its cities and counties, providing information on population, housing, employment, income, education, health, tourism, and much more.

8.     At BEBR I conducted numerous surveys. I designed, launched, and administered BEBR's monthly economic confidence index which involved sample surveys of Floridians. I designed and executed BEBR's economic forecasting program.

9.     I have served on the Governor's Council of Economic Advisors under two different administrations, those of Governors Graham and Bush.

10.     I began my private sector career in 1984 as President of M.G. Lewis Econometrics, a wholly owned subsidary of a municipal bond financing firm.

11.     In 1987, I formed Fishkind & Associates as a full service economic and financial consulting firm. We now have 29 professionals. Fishkind & Associates has extensive experience in economic and fiscal impact analysis, forecasting and finance throughout Florida and the United States. We provide regular economic forecasts for all 67 Florida counties. We also manage three large-scale, master planned, Florida communities, including the 8,000 acre Tradition project in Port St. Lucie, Florida.

12.     Fishkind & Associates is involved in key financial advisory and consulting roles to special districts, local governments, redevelopment agencies and real estate

developers. In this capacity, the firm formulates financing plans, provides economic advice and direction, and evaluates financing alternatives. The firm has participated in structuring over $4 billion in infrastructure and municipal financings.

13. Fishkind & Associates conducts residential real estate feasibility research. This involves price, product and supply analysis as well as extensive consumer research and focus group studies. As a result, the firm has considerable skill in analysis and interpretation of consumer preferences, behavior patterns and demographic trends.

14. Fishkind & Associates has performed large and complex cost-benefit analyses. These include the 1991, 1993 and 1996 Military Base Closure process in the United States, and currently the Florida Everglades Environmental Restoration Project.

15. Examples of some of the Florida Panhandle projects for which I have provided economic analyses include: relocation of the Panama City International Airport; Pier Park (a shopping and entertainment destination in Panama City Beach); a Hilton Hotel feasibility study; Aqua Green (a marine life center in Panama City Beach); and beach restoration in Okaloosa County.

16. I also have extensive experience consulting with the Visitor & Convention Bureaus charged with promoting tourism in Florida and many other states. Included in this experience is my work on Governor Jeb Bush's Council of Economic Advisors and working on promotional advertising programs after 9/11. I also have performed econometric studies quantifying the impact of advertising on tourism.

17.     I served as a founding board member for two publicly-traded real estate development companies, Engle Homes and Summit Properties, until these companies were sold.  I also served as a board member of First National Bank in Winter Park, Florida and Bank of the Islands in Sanibel until these banks were sold.

18.     As a standard part of my business practice over the last 30 years, I have monitored economic conditions in the entire Gulf Coast on a regular basis.  This type of comparative analysis of the Florida economy to the rest of the Gulf Coast is necessary to support the day-to-day conduct of our research and business consulting activities.  I am therefore knowledgeable about the economic conditions in this region.

19.     To monitor economic conditions, I regularly review a wide variety of economic data related to the Gulf Coast region.  The types of economic data that I routinely review include data related to employment, income, residential and commercial construction and leasing, tourism, and tax revenues at the state and local levels.  Specific data sources include, among other types of data:

(a)     Smith Travel Research ("STR") hotel and lodging data, which is the professional industry standard reference on hotel occupancy, rental rates, and associated statistics as well as hotel and lodging data published by Convention and Visitors' Bureaus in the Gulf region;

(b)     Navis reports concerning rental of vacation properties, which is one of the few survey-based sources of data on the resort rental industry;

(c)     General state and local sales tax, lodging tax and other tax receipt reports, which provide data from public sources reflecting economic activity in a wide array of industries;

(d)     Local, state and regional financial data and forecasts, which are public data showing the financial condition of the banking system;

(e)     Residential and commercial construction, leasing and sales reports, which are gathered from public sources and private surveys on the construction and development industries;

(f)     Reports by the National Oceanic and Atmospheric Administration ("NOAA") of the U.S. Department of Commerce concerning the seafood industry in the Gulf States, including industry surveys and data on seafood landings; and

(g)     Business-specific data provided by ESRI and Info USA, which are private companies that re-package detailed data from the census and supplement it with their own proprietary information.

20.     I am personally familiar with the geography of the Gulf Coast region. During the past 30-years I have traveled extensively throughout the region for professional and personal reasons.  I am familiar with the tourism destinations, major roads leading to those destinations, and major population centers.

21.     I have served as an expert witness more than 50 times in the federal and state courts in Florida and in federal courts in Tennessee and Washington, D.C. on issues of valuation of businesses, evaluation of causation and damage allegations in economic loss cases, on behalf of both plaintiffs and defendants.  I have also served as a court-appointed expert to provide valuation reports to the U.S. Tax Court.

## MATERIALS AND INFORMATION REVIEWED AND CONSIDERED

22.     I have reviewed the following documents, materials and data:

(a)     The Settlement Agreement and Exhibits thereto, motions and related documents filed by Interim Class Counsel and BP in support of the Settlement Agreement, Judge Barbier's Order preliminarily approving the Settlement, objections to the Settlement Agreement filed with the Court, and the Declarations of Mr. Daniel Balhoff, Mr. John Perry, Dr. Elliott Taylor, Dr. Alan Jeffery, Mr. Edward Wharton, and Dr. John Tunnell.

(b)     Claim Forms, Instructions, Frequently Asked Questions and claims data published by the *Deepwater Horizon* Court-Supervised Settlement Program;

(c)     Data from the sources identified in paragraph 19, above.

23.     It is my understanding, based on the motion papers in support of Preliminary Approval of the Settlement, and Judge Barbier's Preliminary Approval Order, that the Settlement Agreement was the result of lengthy, arms-length negotiations between experienced litigation counsel for plaintiffs and BP, which were mediated by Magistrate Judge Shushan.  I further understand that the Parties had conducted extensive discovery in the case and had the benefit of other work to develop the facts.   These facts are relevant to my economic analysis of the Settlement Agreement because they indicate that it represents the product of arms-length negotiations between Parties with access to the information required to make informed, rational economic decisions in attempting to resolve the large number of economic loss claims of businesses and individuals presented in the *Deepwater Horizon* litigation. These characteristics are consistent with the classical market-based type of transactions that are freely entered into by knowledgeable participants and widely recognized as fair and equitable.

## SUMMARY OF OPINIONS

24.   The Economic Damage Claim Frameworks and the Seafood Compensation Program applies well accepted economic methodologies that will result in fair and adequate compensation for losses experienced by claimants due to the *Deepwater Horizon* Spill ("DWH Spill").

25.    The Frameworks and the Seafood Compensation Program are consistent with well-established methodologies for determining whether an economic loss was caused by an event and for quantifying that loss.

26.    The Frameworks and Seafood Compensation Program use transparent and objective methods, and provide clearly-defined standards to be applied to relevant data supplied by the Claimant.  This has at least two important implications.

    (a)    The clear criteria and requirements of the Frameworks and Seafood Compensation Program are fair to Claimants because they permit Claimants to evaluate their claims and the Settlement and make an informed judgment whether it is in their interest to participate or to opt out.

    (b)    The objective standards and express methodologies of the Frameworks and Seafood Compensation Program minimize Claims Administrator discretion, which helps to ensure that similarly situated Claimants are treated alike -- what economists refer to as horizontal equity.

27.    The Tourism Definition, which is Exhibit 2 to the Settlement Agreement, reflects a fair and reasonable application of North American Industry Classification System (NAICS) codes, which are the standard definitions used by federal government agencies and economists to collect, analyze and organize statistical data related to businesses in the U.S. economy.  The Charter Fishing definition, Section 38.18 of the Settlement Agreement, accurately describes that industry.

28.    The Seafood Distribution Chain Definitions, which are Exhibit 3 to the Settlement Agreement, reflect a fair and reasonable effort to distinguish among levels of the Seafood distribution chain beginning with commercial fishermen (who are compensated through the Seafood Compensation Plan), then primary seafood industry

participants and next secondary industry participants (both of which are compensated through the Economic Damage Claim Frameworks).

29.     The use of geographic zones depicted in the Economic Loss Zones map, and accompanying definitions and classifications, (Exhibits 1A-1C of the Settlement Agreement), for causation requirements and Risk Transfer Premiums (RTPs) for the Economic Damage Claim Frameworks is consistent with economic logic.  These zones fairly reflect the nature of economic activity in the Gulf region.

30.     The causation requirements of the Economic Damage Claim Frameworks are transparent and consistent with economic logic and data regarding the economic impact of the DWH Spill.

(a)     The use of geographic and industry criteria to establish presumptions of causation for purposes of settlement is economically appropriate and promotes efficiency for both Claimants and claims administration.  In particular, economic logic and available data support the Settlement's use of presumptions of causation for individuals and businesses located close to the tourist beaches, or that are located slightly further from the beach but involved in Tourism, Charter Fishing and Seafood Distribution, because these industries are most likely to have been affected by the DWH Spill.

(b)     Similarly, given the multiple factors that can affect economic performance, it is economically reasonable to require Claimants located further from the Gulf and in industries economically less connected to the Gulf to establish that any losses they suffered were caused by the DWH Spill and not by other factors affecting the economy generally -- such as, for example, the weak economy in 2010 or high unemployment -- or business-specific factors such as increased competition, poor business management or other factors.

31.     The compensation calculation formulas in the Economic Damage Claim Frameworks are consistent with well-established methodology for quantifying economic loss.  In general, they rely on historical benchmark data supplied by the Claimant,

supplemented by a growth factor, to determine what the Claimant's predicted earnings would have been.  Those projected earnings during a Claimant-selected post-DWH spill compensation period are compared to actual earnings during that period and the difference is deemed a compensable loss.  This "but for" analysis is the traditional framework for analyzing economic loss.  For Failed Business, the methodology of using EBITDA to determine the pre-Spill value for the business is a traditional methodology used for business valuations and for determination of losses.

32.    Selection of the time period, May 1 to December 31, 2010, in the Economic Damage Claim Frameworks and Seafood Compensation Program as the compensation period to measure actual losses is reasonable in several respects:

(a)    The Macondo oil well was successfully capped in September 2010.

(b)    By late 2010, Gulf Coast tourism had returned to or above 2009 performance levels, and this upward trend continued into 2011 and thereafter. By late 2010, Gulf Coast tourism had returned to or above 2009 performance levels, and this upward trend continued into 2011 and thereafter.

(c)    Nearly all federal and state waters were re-opened for commercial fishing by November 2010.  Also, available data for 2011 indicate that seafood landings are generally back to pre-Spill levels for all species except oysters, which are showing a slower rebound

33.    Incorporating a Risk Transfer Premium (RTP) in the Economic Damage Claim Frameworks and Seafood Compensation Plan is an economically sound method for taking into account any risk of future loss, any risk of oil returning, liquidation of legal disputes about punitive damages, and other factors it is designed to address.  With the RTP, a Claimant is paid a multiple of his or her compensation period losses on top of those actual compensation period losses.  The RTPs, as reflected in Exhibit 15 to the

Settlement Agreement and in the Seafood Compensation Program, which vary based on the Claimant's geography and industry, are economically reasonable.

34.     The Economic Damage Claim Frameworks also contain elements designed to ensure that a Claimant is fully made whole for a variety of types of losses. For example, the Frameworks provide for recovery of lost benefits, training and job-seeking expenses for individuals, and for recovery of sweat equity for failed start-up businesses.

35.     The offsets in the Economic Damage Claim Frameworks to compensation for amounts already paid in respect of the DWH Spill are a rational means of preventing double recovery.

36.     The Economic Damage Claim Frameworks favor Claimants in several respects:

(a)     Most Claimants are permitted to select one of three alternative Benchmark Periods: (i) 2009, (ii) the average of 2008 and 2009 or (iii) the average of 2007, 2008 and 2009.  This flexibility allows Claimants in varying circumstances to maximize their recovery by selecting the period that produces the best result for them – an option that in all likelihood would be unavailable in litigation.  At the same time, the use of standardized alternatives for the Benchmark Periods ensures administrative simplicity and consistency.

(b)     The Multi-Facility Business Framework is beneficial to Claimants with facilities in multiple locations, providing an option that allows them to maximize their recovery by submitting claims only for facilities within the class geography that can establish compensable losses.  Thus, for example, if a business experienced a sizeable loss in one facility that was offset by extraordinary profit in others, the business can still recover for the loss if that facility satisfies the causation and compensation requirements.

(c)     The methodologies address a variety of circumstances that economic loss Claimants may face and reasonably address those circumstances.

There are methodologies for failed, failed start-up and start-up businesses, provisions for recovery of extraordinary one-time losses, provisions governing new entrants to employment and job changers.

(d)     In determining compensation, the Business Economic Loss and Individual Economic Loss methodologies incorporate growth factors that result in the assumption of growth, even where the Claimant lacks data demonstrating such growth and in largely ignoring negative growth reflected in data submitted by Claimants that possess growth data.  Particularly in light of the weak economy in 2010, with its accompanying high unemployment, this growth factor methodology yields a generous estimate of 2010 loss to many Claimants, which is then amplified through application of the RTP.

37.     The Seafood Compensation Program will fairly compensate vessel owners, boat captains, crew members, oyster leaseholders and finfish quota holders for losses resulting from the DWH Spill.  The Seafood Compensation Program is based on sound economic logic, consistent with industry data, and tailored to the specific characteristics of industry participants.  The Program provides $2.3 billion to compensate industry participants.  Since the DWH Spill affected a wide variety of on-the-water industry participants in a similar manner, establishment of a transparent compensation program specific to the industry is reasonable and beneficial to claimants.

38.     The Seafood Compensation Program uses a common framework tailored to the nature of the commercial seafood industries included in the Program with plans for: (1) shrimp, (2) oysters, (3) finfish, (4) blue crab and other, (5) other seafood, and (6) crewmembers.  Each plan has eligibility, documentation requirements, and compensation methods tailored to the particular species-specific industry.  The Seafood Compensation Program provides for a prompt claims payment process estimated to provide initial compensation of $1.9 billion, or 83% of compensation covered under the program.  Standing alone, these initial payments for each category, which include

RTPs, constitute full and adequate compensation.  In addition, Program claimants are expected to receive additional second-round payments bringing total payments to $2.3 billion.

39.     Several claims processing aspects of the Settlement help Claimants to maximize their recovery:

      (a)     The availability of reimbursement of fees for accounting services used to prepare Economic Damage and Seafood Compensation Program claims, as provided for in Section 4.4.13 of the Settlement Agreement, enables Claimants to obtain assistance in properly documenting their claims and selecting the most favorable Benchmark and Compensation periods.

      (b)     Section 4.3.7 of the Settlement Agreement provides that the Claims Administrator and Vendors are to use best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that Economic Class Members have the best opportunity to be determined eligible for and receive Settlement Payments to which they are entitled.

      (c)     Section 4.3.8 of the Settlement Agreement requires the Claims Administration Vendors to evaluate Claimant information and documentation to produce the greatest Economic Damage Compensation Amount that the submitted information allows under the terms of the Economic Damage Claim Frameworks.  This sort of "best outcome" provision is unique in my experience.

## I.  OPINIONS REGARDING THE ECONOMIC DAMAGE CLAIM FRAMEWORKS

40.     The Economic Damage Claim Frameworks are a reasonable, rational, and fair process for compensating Class Members for their claimed economic losses.  The Frameworks are firmly grounded in economic theory, and they are consistent with the relevant economic data for the affected area.

**A. The Incorporation Of Geographic Zones And Industry Distinctions In The Frameworks Is Based On Sound Economic Logic And Is Consistent With Economic Data Regarding The Gulf Economy.**

41.    The Economic Damage Claim Frameworks employ a compensation methodology that is consistent with standard economic theory and practice and consistent with the nature of economic activity in the Gulf Region.

42.    In broad terms the coastal economy of the Gulf Coast Area is dominated by economic activities related to tourism (including seasonal residences and second homes), seafood, marine shipping, and energy production.[1] These industries constitute the economic base ("Base" or "Basic Industries") of the Gulf Coast Area's economy. These Basic Industries are the driving economic force for the area's economy.  Their addition of income and salaries to the area's economy then supports local industries that sell directly to the Basic Industries or sell goods and services to employees in the Basic Industries.  Without the Basic Industries there would be very little economic activity beyond subsistence activity.  This simplified economic model is rooted in the well accepted Economic Base theory.[2]

43.    The seafood industry is a classic export Base Industry since it exports most of its products outside the local region, bringing in income which supports its production and its employees.  The tourism industry along with the related seasonal

---

[1] http://stateofthecoast.noaa.gov/gulfreport.html.

[2] Tiebout, Charles (1956). "A Pure Theory of Local Expenditures". *Journal of Political Economy* 64 (5): 416–424; and  (1956). "Exports and Regional Economic Growth". *Journal of Political Economy* 64 (2): 160–164; and (1960). "Community Income Multipliers: A Population Growth Model". *Journal of Regional Science* **2** (1): 75.  Krickelas, Andrew (July/August 1992), "Why Regions Grow: A Review of Research on the Economic Base Model", Economic Review, Atlanta, GA: Federal Reserve Board.

residential and second home businesses are also export Base type activities, but instead of physically exporting a vacation at the beach, the customers have to physically come to the area to enjoy the experience.  The end result is a far larger degree of physical development related to the tourism industry than to the seafood industry. Nevertheless, both are integral parts of the Gulf Coast Area's economic Base.

44.    The DWH Oil Spill had some direct implications for tourism and seafood industries with consequential effects on some businesses in related industries.  The tourism and seafood industries are concentrated in the immediate coastal area.  As distance from the coastal area increases, the composition of economic activity shifts, with tourism and seafood becoming less important drivers of economic activity.

45.    The Economic Damage Claim Frameworks explicitly incorporate these economic realities in the methodologies for compensating Class Members.  The Frameworks have four main parts: (1) definitions for Tourism, Charter Fishing and the Seafood Distribution Chain with causation presumptions that attach for certain businesses and individuals in these industries and larger Risk Transfer Premiums (RTPs); (2) geographic Zones with causation presumptions and larger RTPs for businesses and employees more proximate to the coast; (3) Economic Damage Claim Frameworks with general applicability yet also tailored to the specific circumstances of businesses and individuals asserting Claims; and (4) RTPs used to compensate Class Members for, among other things, potential future loss.

46.    The Tourism Definition, Exhibit 2 to the Settlement Agreement, is expansive in using detailed NAICS codes to define businesses "which provide services

such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community." NAICS codes are the standard classification system used by governmental agencies and economists to classify businesses for analysis. The NAICS codes in the Tourism Definition include attractions of all types, lodging places, eating and drinking establishments, retail stores of all types, and transportation companies, among others. The Tourism definition is broad and encompassing. For example, it includes nearly the entire retail sector.

47.     The inclusive scope of the Tourism Definition is favorable to Class Members because claimants meeting the definition are benefitted by causation presumptions if also located in Zones A and B and by higher RTPs than non-Tourism and non-Seafood claimants in all Zones.

48.     Claimants satisfying the Charter Fishing definition, Section 38.18 of the Settlement Agreement, are benefitted by causation presumptions if located in Zones A, B and C and, by higher RTPs than Tourism claimants for Zones B and C.

49.     The Seafood Distribution Chain Definition, Exhibit 3 to the Settlement Agreement, reasonably distinguishes among three aspects to the distribution of Seafood:  (i) Commercial fishermen (including vessel owners, crew, and oyster leaseholders), who are on-the-water harvesting Seafood; (ii) Primary Seafood Industry participants (land-based businesses that handle raw Seafood); and (iii) and Secondary Seafood Industry participants (land-based businesses that handle Seafood that was packaged or processed in the primary industry component, including seafood retailers). Commercial fishermen are compensated in the Seafood Compensation Program which

features presumptions for causation and the highest RTPs.  Primary and Secondary Seafood Industry participants are compensated in the Economic Damage Claim Frameworks.  Primary Seafood Industry participants benefit by a causation presumption no matter the zone in which they are located and Secondary Seafood Industry participants enjoy a causation presumption in Zones A, B and C.  Both Primary and Secondary Seafood Industry participants are benefitted by RTPs equivalent to or higher than Tourism Industry participants.

50.    The requirements for proving that a claimant's loss is attributable to the DWH Spill, and the RTP associated with claims, vary by Economic Loss Zones defined in Exhibits 1A-1C of the Settlement Agreement.  The four Zones (Zones A, B, C and D) logically and rationally reflect the likelihood of potential economic harm from the DWH Spill and are consistent with the nature of economic activity in the region.  In general, the Zones are structured to reflect the fact that as distance increases from the coast, the likelihood of damage due to the DWH Spill is reduced just as economic theory would expect.  The Frameworks permit Claimants to establish causation anywhere in the class geographic boundaries, but recognize that the likelihood that losses suffered by a Claimant were due to the DWH spill is lower for Claimants located farther from the coast and is lower for Claimants not in the Tourism, Charter Fishing, or Primary or Secondary Seafood industries.

(a)    Zone A includes the primary coastal tourism portion of the Gulf Coast Areas.  While its precise distance from the coast varies for areas within Zone A, it generally includes the area from the coastline to the first major roadway or geographic boundary (such as the Intracoastal Waterway).  Zone A also includes downtown New Orleans, which is the primary tourism destination in the

region.  All businesses in Zone A are presumed to have been affected by the oil spill and do not have to prove causation.

(b)      Zone B is a transitional zone landward of Zone A.  Zone B consists of supplemental tourism areas that rely heavily on Gulf Coast-related tourism but whose economic activity also serves permanent residents.  For example, portions of Fairhope, Foley, downtown Pensacola, Panama City, Apalachicola, and Port St. Joe contain businesses that beach tourists may patronize during their time vacationing along beaches, but they also contain tourism-related businesses that cater to permanent or seasonal residents of those cities and surrounding areas. Tourism, Charter Fishing and Primary and Secondary Seafood Industry participants do not have to prove causation if they are located in Zone B, but all other Claimants in Zone B must satisfy causation requirements.

(c)      Zone C is generally landward of Zones A and B.  It includes portions of major cities where businesses within the Tourism definition generally cater primarily to permanent residents, but also might rely partially on Gulf-related tourism.  Zone C also includes key roads that tourists use to travel to Zone A tourist destinations.  Businesses on these roads cater to both tourists in-season, and primary residents year round.  Claimants in Zone C must satisfy causation requirements except for Charter Fishing and Primary and Secondary Seafood Industry participants.

(d)      Zone D is the balance of the Gulf Coast Area outside of Zones A-C. Claimants in Zone D must establish causation unless they qualify as a Primary Seafood Industry participant.  The causation threshold for Zone D is higher than the causation thresholds for Zones B and C.  This comports with economic theory, and is consistent with the data as demonstrated below.

51.    The treatment of roadways in the specification of the Zones is noteworthy. In particular, incorporation of "feeder roads" in Zones A, B and C appropriately recognizes that the coastal Tourism destinations in the Gulf Coast are "drive-to markets." Businesses along these feeder roads are affected by performance of the coastal Tourism industry since these are the primary routes by which tourists access the prime tourist destinations.  The main feeder routes to Zone A destinations are mostly designated as Zone C.  Some of the feeder routes, including I-110 to Biloxi and SR 59 to Gulf Shores, are appropriately classified as Zone A roads because of their prominent

positions in conveying tourists to Zone A coastal destinations. Battleship Parkway, Foley Beach Expressway, US 98 from Gulf Breeze to Fort Walton Beach, and CR 293 in Destin are reasonably classified as Zone B roads given their important but somewhat lesser roles in bringing tourists to Zone A and Zone B. In addition, the Zone definitions favor claimants by providing that businesses located on a roadway bordering two different Zones may choose the more preferred Zone for quantifying their claimed losses.

52.     My analysis of the types of businesses included in each Zone bears out the reasonableness of the Zone definitions. The methodology I used to analyze the concentration of Tourism businesses by Zone began with geographically specific shape files for all business locations as provided by ESRI, a data provider which repackages the 2010 business location data from InfoUSA. Businesses were assigned to each of the four Zones based on their locations. Thirteen businesses were not placed within a zone using this method, so these were manually located based on their addresses.

53.     The analysis shows that the percentage of all businesses classified as Tourism (using the Tourism Definition in the Settlement Agreement) is highest for Zone A. Tourism businesses account for far smaller shares of total businesses in the other zones, generally decreasing from Zones B through D.

54.     Moreover, I note that the broad Tourism Definition includes a wide range of firms in industries such as restaurants and bars which serve both local customers as well as tourists. The results of my analysis likely overstate the percentage of businesses in Zones C and D that generate a substantial portion of sales from tourists.

For example, the Tourism Definition includes full service restaurants (NAICS code 722110). A Waffle House restaurant in Orange Beach (Zone A) would cater to tourists primarily, while an identical Waffle House in an urban area such as Montgomery, Alabama (Zone D) would mostly serve its local customers.  Yet, both establishments are included in the Tourism Definition.   So the measurement for the concentration of Tourism businesses I conducted using the Tourism Definition actually overstates the true percentage of tourist-serving restaurants in Montgomery, yet the analysis still clearly demonstrates that Tourism businesses are far more concentrated in Zone A than the other Zones and generally decrease moving from Zone A to Zone D.

55.    These results confirm the economic reasonableness of the Zone definitions.  The results of the analysis of Tourism businesses by Zone is exactly what economic theory would predict, and shows that the concentration of Tourism businesses declines with distance from the coast and in consideration of the feeder routes to the coast.

## B. The Causation Methodology In Business And Individual Economic Loss Frameworks Is Consistent With Well-Established Economic Principles

56.    Businesses and individuals may suffer losses for a wide variety of reasons.  Thus, it is necessary and economically appropriate to evaluate the likelihood that a Claimant's losses were due to the DWH Spill or to other unrelated factors.  The standardized approaches established in the Settlement Agreement for determining the likelihood that a Claimant's losses were caused by the DWH Spill, including granting a presumption that certain Claimants' losses are spill-related, are clearly defined, reasonable and based on sound economic principles.

57.     For many Claimants (including all industry types in Zone A, Primary Seafood Industry participants in all Zones, Secondary Seafood Industry and Charter Fishing participants in Zone A, B, and C, and Tourism participants in Zone B, economic losses incurred post-Spill in 2010 are presumed to be due to the DWH Spill and the Claimant need not provide evidence to establish causation.[3]   This approach is consistent with economic principles, which would predict that the DWH Spill would most directly affect industries tied to the Gulf.   The available data reflect some decline in performance in these industries in the months after the DWH Spill.   Granting a presumption that losses experienced by such Claimants are spill-related benefits Claimants by simplifying the Settlement claims process to avoid costs associated with determining causation for Claimants in areas and industries most likely to have been directly affected by the DWH Spill.

58.     Claimants in industries and geographic areas that do not receive a presumption must establish causation by satisfying defined thresholds for establishing that their losses were spill-related, with different revenue threshold for Claimants in Zones B and C as compared to Zone D.

59.     areas more distant from the coast and Claimants in industries other than Tourism, Charter Fishing, and Primary and Secondary Seafood facing higher causation thresholds.

---

[3] *See,* Settlement Agreement Exhibit 4.B. ¶ I, Exhibit 6 § II.1-5, Exhibit 7 § III.A, Exhibit 8 §§ IB, IIB, IIIB.

60.     The Settlement Agreement establishes a variety of standardized mechanisms that can be used by Claimants that do not receive a presumption to establish that their losses are due to the DWH Spill.   These mechanisms are straightforward and transparent, facilitating the review of a claim as well as a Claimant's decision about whether to participate in the Settlement or to opt out and continue to the claim through litigation.

61.     Claimants can establish that losses were spill-related by showing that their revenue (i) fell at the time of the DWH Spill and (ii) later recovered after the DWH Spill ended and clean up efforts were (largely) complete.   These causation criteria are reasonable and economically appropriate, because revenue or earnings that fell due to the DWH Spill would be expected to rebound after the DWH Spill ended.   Losses that continued after the DWH Spill ended are likely to be due to factors other than the DWH Spill.   The dates selected for the decline and recovery in revenues are supported by economic data regarding the performance of the Tourism and Seafood industries in the wake of the DWH Spill.

62.     Moreover, the Frameworks provide Claimants with options to establish causation based on a comparison of a period of any three consecutive months between May-December 2010 to the same three months in the benchmark years (2009, average of 2008 and 2009, or average of 2007, 2008 and 2009).   The availability of these options provides the flexibility supporting my conclusion that the causation rules are fair and reasonable.

63.     The causation criteria established in the Settlement Agreement are straightforward focusing, for example, on the pattern of a Claimant's change in revenue (rather than profit), facilitating claims submission and processing.

64.     The multiple methods available to Claimants to establish causation encompass a wide variety of circumstances in which Claimant's revenue or earnings might have been affected by the DWH Spill.

65.     The Frameworks for business and individual economic loss claims correctly recognize the combined role of both geography and industry in setting causation criteria.   For example, firms in tourism industries – such as restaurants – serve both local patrons as well as tourists.   In establishing causation criteria, the Frameworks correctly recognize that the mix of local customers and tourists for firms that qualify as "Tourism" businesses differs in different geographic areas.   For example, local patrons are likely to account for a larger share of customers for restaurants in non-beach areas.     Thus, the specification of different causation thresholds in the Frameworks for Tourism businesses in different Zones, and the use of different causation thresholds for different types of business in the same Zone, is reasonable from an economic perspective.

**C. The Approach In The Economic Damage Claim Frameworks
To Compensate Eligible Claimants Is Reasonable And Is Based On
Sound Economic Principles and Available Economic Data.**

66.     The Settlement Agreement applies standard economic principles of damage analysis in establishing compensation for business and individual economic loss Claimants.   For these Claimants, compensation is based on (i) losses suffered by

the Claimant post-Spill in 2010 and (ii) a Risk Transfer Premium (RTP), which, among other things, compensates Claimants for any harm in 2011-12 and potential harm in future years.   The RTP also compensates Claimants for releasing rights to potential punitive damage claims, among others.

67.     The formula for determining compensation for 2010 losses outlined in the Settlement Agreement is consistent with broadly accepted principles of damage analysis that are recognized in the economic literature.   Specifically, the Settlement Agreement establishes Frameworks for estimating the difference between: (i) the profit or earnings that a Claimant would have expected to earn in a Claimant-selected Compensation Period within the period May-December 2010 in the absence of the DWH Spill and (ii) the actual earnings or profits earned by the Claimant in the selected Compensation Period in 2010.

68.     Consistent with well-established models for establishing economic loss damages, the Framework methodologies generally use pre-Spill benchmark period earnings or revenue data to project expected earnings or revenue in the post-Spill May-December 2010 period, taking into account any reasonably anticipated growth in revenue.[4]   For businesses or individuals without comparable pre-Spill data, other reasonable benchmarks are used consistent with professional practice and economic theory[5].

---

[4] Weil, Roman, et al. (2001), <u>Litigation Services Handbook The Role of the Financial Expert</u>, John Wiley & Sons, Inc.: New York, pages 5.1 through 5.41.

[5] Weil, Op. Cit., pages 6.1 through 6.26.

---

69.     While the Economic Damage Claim Frameworks address specific circumstances faced by various groups of Claimants – individuals with one employer, individuals with multiple employers, businesses, start-up businesses, failed businesses, multi-establishment business, seafood vessel owners, captains of seafood vessels, etc. – each of these Frameworks adheres to the same set of well-recognized principles of damage analysis.

70.     Determining compensation based on losses suffered in 2010 and RTPs specific to the Claimant's location of loss and industry is consistent with available evidence regarding the performance of the Gulf Coast economy during and after the DWH Spill.   There were some declines in economic performance in the Tourism industry in the second and third quarters of 2010.   More specifically, available data indicates that tourism recovered by late 2010 and that the summer of 2011, the first following the DWH Spill, was especially strong for the Gulf tourism industry and 2012 continues to be strong.   For example an analysis of STR data on RevPAR (Revenue Per Available Room), a standard metric used to analyze tourism industry performance, shows that:

> (a)     In May-August of 2010, RevPAR was 8% percent below 2009 (pre-Spill) levels in Florida's Emerald Coast (for hotels within 1-mile of the beach from Pensacola to Panama City).  However, by September-December 2010, the fall season immediately following the DWH Spill, RevPAR was 7% above 2009 levels.

> (b)     In May-August of 2011, the summer following the DWH Spill, RevPAR along Florida's Emerald Coast was 12% above (pre-spill) 2009 levels and 21% above 2010 levels.

71.     Data from the Alabama Gulf Coast Convention and Visitor's Bureau (GCCVB) also show that Gulf tourism rebounded quickly after the DWH Spill and further

demonstrate the absence of longer harm to area tourism.  The GCCVB covers the oceanside Alabama communities of Orange Beach, Gulf Shores and Fort Morgan and reports monthly trends in RevPAR for area hotels and revenue per available unit (RevPAU) for area condos that are available for rental.  The GCCVB data indicate that tourism had rebounded to pre-spill patterns by fall of 2010 after experiencing a sharp decline in the summer of 2010:

> (a)     In June-August 2010, RevPAR for hotels in coastal Alabama was 34% below the same months of 2009.  However, by September-October 2010, area RevPAR was 22% above 2009 levels.

> (b)     For condos in coastal Alabama, RevPAU in June-August 2010 was 50% below the same period in 2009.  But by September-October 2010, condo RevPAU was nearly equal to 2009 levels.

72.     The GCCVB data also show that the rebound in area tourism seen in fall 2010 continued in 2011, with peak summer tourism metrics substantially surpassing pre-spill levels observed in 2009.  The most recent available data indicate that this growth has continued into the summer of 2012:

> (a)     In June-August 2011, RevPar for hotels in coastal Alabama was 10% above (pre-spill) 2009 levels for the same months, and

> (b)     In June-August 2011, condo RevPAU was 21% above 2009 levels.

73.     For June 2012, the most recent data available, RevPAR for Alabama coastal hotels was 17% above June 2011 levels (26% above June 2009) levels for the same months, and condo RevPAU was 13% above June 2011 levels (36% above June 2009 levels).

---

74.     Moreover, tourism officials and businesses in the Gulf Coast Areas report that tourism has recovered along the Gulf Coast Areas, and in some instances, in record fashion.  The following examples support this observation.

(a)     Kelly Schulz, Vice President for Communications and Public Relations for the New Orleans Convention and Visitors Bureau observed, "New Orleans' tourism industry also ended 2010 as the number one destination in the country for year-over-year REVPAR growth, according to Smith Travel";[6] and

(b)     Lee Sentell, director of the Alabama Tourism Department said "We are excited that Alabama's Gulf Coast Beaches were able to re-bound so quickly and to set record numbers on top of it."[7]

75.     Exhibit B contains more quotations from industry participants describing the recovery in the tourism industry in the Gulf Coast Areas.

76.     Total taxable sales dropped 2% in May-September of 2010 (Spill period) compared to May-September 2009 (pre Spill) in the Emerald Coast counties (Escambia, Santa Rosa, Okaloosa, and Bay).   However, taxable sales were up 8% in May-September 2011 compared to May-September 2010.  The post DWH Spill decline in taxable sales in the tourism industry, and the subsequent post-spill recovery, was even more dramatic.  Tourist related taxable sales dropped 7% during the DWH Spill period of May-September in the Emerald Coast and then rebounded 19% higher in May-September 2011 compared to May-September 2010.

77.     Available data also indicate that, as a general matter, fishing activity returned to pre-Spill levels of activity after spill-related closures ended in late 2010:

---

[6] Kelly Schulz, Vice President for Communications and Public Relations for the New Orleans Convention and Visitors Bureau, April 15, 2011.
[7] GlobeNewswire, "Cohesive Marketing Efforts Result in $200 Million Rebound for Alabama Beaches Impacted by Gulf Oil Spill", November 4, 2011.

(a)      The volume of shrimp landed in the class geography during the period from September-December 2010 (when fishing grounds re-opened) was 4% above the average volume of landings over the same period from 2007-2009.

(b)      The volume of finfish landed in the class geography in September-December 2010 was 3% above the average of 2007-09 levels.

(c)      The volume of oysters landed in the class geography in May-August 2011 was 71% above the same period in 2010, and only 11% below the average volume in 2007-2009.

(d)      The volume of blue crab landings in the class geography in May-August 2011 was 36% above the same period in 2010, and only 6% below the average of 2007-2009.

78.     Similarly, the RTPs specified in the Settlement Agreement for land-based economic loss claims in various geographic areas and industry groups also are reasonable, consistent with economic principles and consistent with available data.  As noted above, RTPs in part provide compensation for risks of future losses.  Any such risks are likely to be higher for Claimants in beach resort areas relative to other geographic areas (Zone A) compared to Claimants in other areas where economic activity is less affected by tourism and that were further from the spill areas.  For similar reasons, risks of future losses are likely to be smaller for Claimants in non-Tourism, non-Charter Fishing and non-Seafood business than Tourism, Charter Fishing, and Seafood-related businesses.

## II.  OPINIONS REGARDING SPECIFIC SETTLEMENT CLAIM FRAMEWORKS

### A.  Business Economic Loss Framework

79.     I conclude that, as a general matter, the detailed articulation of the Business Economic Loss Claim Framework accounts for the varying circumstances of the different businesses in the Gulf Coast Areas in a standardized manner that will yield

economically reliable measures of spill-related harm for a wide variety of Claimants. The sensitivity of the Framework to the circumstances of various groups of Claimants provides assurances that the Settlement will provide fair and adequate compensation for a wide variety of Claimants.

80.    The documentation requirements needed to support a Claim are tailored to the methodology in the relevant Framework and generally consist of the types of documents businesses keep in the normal course of their business.  All Claimants must fill out a Claim Form.  In addition, all business Claimants must provide federal income tax returns, monthly and annual financial statements, and documents reflecting the business structure and ownership of the Claimant.

81.    As discussed above, the causation requirements of the Business Economic Loss Framework are consistent with economic theory and data regarding the Gulf Area economy.  As explained above, the industry and geographic presumptions are economically reasonable and promotes an efficient claims process.

82.    For business Claimants that must establish causation, the causation tests are clearly specified, in a standardized framework, and as demonstrated below consistent with the economic data during the relevant time period.   In general, businesses that are not entitled to a presumption of damage caused by the DWH Spill can demonstrate their Business Economic Loss Claim in one of three ways: (1) a showing that their revenue pattern was depressed compared to historical results and subsequently recovered, including a variety of additional alternatives available to claimants that did not experience a recovery to demonstrate that losses were DWH Spill

related, (2) use of a proxy Claimant for small businesses with less than $75,000 in revenue, or (3) documenting lost reservations or contracts.

83.     To demonstrate that their losses were the result of the DWH Spill, Business Economic Loss Claimants not entitled to a presumption of causation must show that their revenue was disrupted by the DWH Spill compared to a Benchmark Period.  Essentially, causation is determined by showing that gross revenue trends were consistent with a temporary disruption to business between May 2010 and December 2010, the period during and immediately after the DWH Spill.

84.     Business Claimants can select from a variety of models to establish causation: (a) V-Test, (b) Modified V-Test, or (c) Down Only Test.  The test thresholds become higher when a Claimant is located in Zone D compared to Zones B or C.

85.     The parameters set forth in the V-Test test, Modified V-test, and Down Only Test are economically reasonable and fair.  As explained above, the time periods for showing decline and recovery are consistent with economic data showing post-Spill decline and recovery in the Tourism and fishing-related industries most likely to have been affected by the DWH Spill.  As also explained above, it is economically reasonable to increase the threshold requirements for establishing causation in industries and locations less closely associated with the Gulf.  Tourism and Seafood-related industries were the most likely to have been affected by the DWH Spill.

86.     Moreover, in light of the lower concentration of Tourism industry businesses in locations farther from the Gulf, and the broad inclusiveness of the

Tourism definition, the requirements in the Modified V test (which has lower decline and recovery percentages than the V-test) and the Decline-Only test that a Claimant demonstrate decline and recovery in non-local business are economically reasonable.

87.     The numerical thresholds for the tests are also economically reasonable. Furthermore, the requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring that the data reflect a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any unusual event.   The specific thresholds in the causation requirements appear reasonable because they are generally consistent with the decline and recovery data for the Tourism and Seafood industries discussed in above.  The numerical thresholds in all tests are consistent with the reduction in hotel revenue experienced along the Emerald Coast in May-December 2010 (relative to 2009), and they are generally consistent with the reduction in hotel and condominium rentals experienced in coastal Alabama in May-December 2010 (relative to 2009).

88.     My conclusion that the causation requirements are reasonable and fair from an economic perspective for Claimants that must establish causation is further supported by the provisions of the Business Economic Loss Framework that provide Claimants with the ability to select as their Benchmark Period years for both causation and compensation purposes including: (i) 2009, (ii) the average of 2008 and 2009, or (iii) the average of 2007, 2008 and 2009.  Inclusion of a 2007 time period is significant because it permits businesses particularly affected by the recession to include a pre-

recession period in establishing a benchmark for evaluating causation.  This flexibility, coupled with the Claimant's ability to choose the months used to measure decline, permits the Claimant to select the most favorable periods to establish causation.  And, as noted, Settlement Agreement § 4.3.8 further requires the Settlement Program to evaluate the claim to produce the maximum recovery permitted under the Framework.

89.    The causation requirements also are economically reasonable in permitting a Claimant that did not experience recovery in 2011 to identify other specific factors or events that prevented the recovery that normally would have been expected. This provision appropriately takes account of specific circumstances that might affect a specific Claimant's results and resulted in divergence from the normal pattern.

90.    Similarly, the provision that hospitality businesses can receive compensation by providing documentation of lost reservations or contracts specifically cancelled due to the DWH Spill is economically reasonable and favorable to Claimants, because it permits them to establish causation and obtain compensation for specific losses even if they cannot establish a broader decline in revenues caused by the DWH Spill.

91.    The Business Economic Loss Framework causation provision for businesses with gross revenue of $75,000 or less in revenue to establish causation based on proximity to another business that meets the causation threshold also is favorable to small businesses. This "proxy" causation approach is economically reasonable because it appropriately recognizes that the performance of a small business can depend on a larger linked business.

92.    The Compensation Framework for Business Economic Loss Claims is clearly articulated and, for the reasons described below, economically reasonable and, indeed, generous to Claimants.   Compensation is calculated by comparing variable profits expected in the absence of the DWH Spill in 2010 and actual variable profits earned by the Claimant in 2010.  This Settlement Agreement correctly characterizes this standard calculation as a two step process:

> Step 1 compensates for any loss in profit between the Claimant's 2010 Compensation Period and the comparable months of the Benchmark Period.
>
> Step 2 compensates for any loss of incremental profits that the Claimant might have earned but for the DWH Spill.  This calculation includes a Claimant Specific Factor that captures the growth or decline in the pre-spill months of 2010 compared to the comparable months of the Benchmark Period and a 2% General Adjustment Factor.

93.    As described in the Business Economic Loss Framework, the Compensation Amount is calculated by comparing the claimant's variable profits expected in the absence of the DWH Spill, based on the claimant's prior earnings and accounting for growth opportunities, less the actual variable profits earned by the claimant in 2010. The total is then multiplied by the applicable RTP (Risk Transfer Premium), and then reduced by any payments the Claimant has already received from GCCF or BP.  RTP accounts for the risk of future damage arising from uncertainty, reputation damage, future oiling, and the like.  Net compensation is the Compensation Amount less any payments from BP or the GCCF or any VoO Settlement Payment Offset and VoO Earned Income Offset.

94.     The use of a variable margin comparison to determine losses is economically reasonable and consistent with traditional damage analysis[8].  The use in the Settlement Agreement of agreed defined fixed and variable costs is efficient, because it provides clarity to Claimants.  This comparison is fair because it is objective and will result in similarly situated Claimants being treated alike.

95.     Moreover, the definitions of fixed and variable costs are, if anything, generous to Claimants because at least some costs classified as "fixed" and therefore excluded from the variable margin calculation are likely to have some element of variable cost embedded in them.  For example, advertising expenses are classified as a fixed cost in the Settlement Agreement.  If a Claimant was able to reduce its advertising in response to the DWH Spill, this savings would not be reflected in the compensation calculation, which would treat the "fixed" cost as actually incurred.  This is a favorable outcome for the Claimant, whose compensation is not reduced despite the Claimant's actual mitigation of its loss.

96.     The growth factors used in the Business Economic Loss Framework compensation calculation are generous to Claimants.  The Framework provides that, for Claimants that can provide data establishing growth between the comparable months in their Benchmark Period and 2010, negative growth will be capped at -2%.  That cap, coupled with an assumed 2% General Growth Factor, means that even Claimants that actually experienced negative growth between the Benchmark Period and Compensation Period will not have their compensation reduced to account for that

---

[8] Weil, Op. Cit., pages 5.1 through 7.25.

negative growth.  It is also means that Claimants that actually experienced no growth will be assumed to have experienced 2% growth in the absence of the DWH Spill, despite weak general economic conditions in the summer of 2010.  This is generous to all of these Claimants, in that it gives them a more favorable result than is supported by the actual data based on assumptions that are very favorable given the economic environment.

97.    Moreover, to the extent the growth factors are generous, that benefit to claimants is magnified by two other features of the Business Economic Loss Framework.  First, the growth factor is applied over a minimum of six months, even if the Claimant-selected Compensation Period is shorter.   Second, the calculated Compensation Period loss which incorporates the growth factor methodology, is multiplied by the applicable RTP.

### B.  Other Business Economic Loss Frameworks

98.    As noted above, the Settlement provides for specialized treatments for multi-facility businesses, failed businesses, start-up businesses, and individuals.  In this way the Settlement provides flexibility for tailoring compensation to businesses and individuals affected by the DWH Spill, consistent with well established economic principles.

99.    The Framework for a multi-facility business allow the business a number of favorable options for making its Business Economic Loss ("BEL") Claim.  The options are determined by: (a) the location of a business' headquarters (either inside or outside of the Gulf Coast Area), (b) whether the business maintained separate profit and loss

statements for its various locations, and (c) whether all of the business' facilities are located within the Gulf Coast Areas.

100.    The Settlement thus provides multi-facility businesses substantial flexibility for the Business Claimant allowing it to make its best case for compensation. Businesses that do not maintain separate profit and loss statements for their facilities may still make separate facility-based claims by creating such financial statements from contemporaneously-maintained business records and providing additional accounting information to support their claims.  Alternatively, they can claim on a consolidated basis if this best serves their interest.

101.    The Settlement also provides start-up businesses with additional flexibility in establishing benchmarks for determining compensation for spill-related losses.  A start-up business is defined as one with less than 18 months of operating history at the time of the DWH Spill.  Generally, the Framework for Start-Up Business Claims adapts the compensation, causation and documentation standards contained in the general Business Economic Loss Claims Framework for the situation of a start-up business with two main differences.   First, the Compensation Period includes three consecutive months between May 2010 and April 2011 (compared to the end period of December 2010 for non start-ups).  Second, the Claimant Compensation can be established in one of two ways since there is a lack of pre-spill historical financial information for the business: (i) use of a Benchmark Period of May 2011 through April 2012 or (ii) projections for the months included in the Compensation Period which were prepared prior to the DWH Spill and provided to and utilized by a qualified lender.  Again, this

flexibility is favorable to the Claimant, which can use the most advantageous benchmark for comparison.

102.   The Frameworks also provide a compensation framework for failed businesses.  A Failed Business includes those that began operations prior to November 1, 2008 and ceased operations between May 1, 2010 and December 31, 2011.   A method for Failed Start-Up Businesses is also specified in this Framework.  Identical to the definition of a Failed Business, a Failed Start-Up Business is defined as one that began operations on or after November 1, 2008 and ceased operating between May 1, 2010 and December 31, 2011.   The causation requirements for a Failed Business or a Failed Start-Up Business are similar to those for businesses in general.  However, the Failed Business or Failed Start-Up Business must also demonstrate its ability to continue as a going concern at the time of the DWH Spill by showing that: (a) it had positive EBITDA for the 12-month period prior to May 1, 2010 (or for a Start-Up Business with less than 12-months of operating history that it had positive EBITDA during the period of time it did operate prior to May 1, 2010); (b) it was not in default under any existing financing agreements; and (c) it was not located in Zone D (except for Tourism or Seafood businesses).

103.   Compensation for a Failed Business provides for payment of the full value of the business at the time of the DWH Spill, generously reflecting the assumption that the DWH Spill was the sole cause of the claimant's failure.  To calculate total enterprise value ("TEV") for a failed business the Framework multiplies: (a) the sum of the latest 12-months of EBITDA of the business prior to May 1, 2010 by (b) the industry valuation

multiplier.  The industry valuation multipliers are taken from Pratt's Stats.  Finally, the liquidation value of the Failed Business is deducted from its TEV to determine the net amount of compensation to its owners.

104.   Pratt's Stats is a widely used and respected source of data on private company mergers and acquisitions reflecting actual closed transactions.  I routinely use Pratt's Stats in my practice and find it to be a reliable source for industry multipliers.  Businesses routinely value their acquisitions and mergers using industry multipliers and trailing 12-month EBITDA sums[9].  This well established approach is the methodology followed in the Frameworks for valuing a Failed Business.  Since an owner of a Failed Business is compensated for the fair market value of their business, no RTP is applied, a result that is reasonable and economically appropriate.

105.   Compensation for a Failed Start-Up Business provides for a full return of the investment in that business including "sweat equity."  The Claimant owner's sweat equity is documented by a submission of affidavits setting forth the basis for the sweat equity claim along with supporting income documentation for the Sweat Equity Benchmark Period.

106.   These provisions for Failed Businesses and Failed Start-Up Businesses are economically appropriate and, if anything, favorable to Claimants.  Owners of failed businesses are reimbursed for their investments or paid the fair market value of their business.  And, as mentioned above, the Settlement essentially treats the DWH Spill as

---

[9] Fishman, Jay, et al. (February 2012), Guide to Business Valuation, Thompson Reuters: Ft. Worth, Texas, pages 5-31 through 5-42.

---

the sole cause for the business failure despite the fact that start-ups have significant failure rates in general and that some businesses fail all the time regardless of an oil spill.

### C. Individual Economic Loss

107.   Similar to the Business Economic Loss Frameworks, the Individual Economic Loss Framework takes account of the Claimants' circumstances, including geographic location of their job, the type of industry in which they are employed, seasonality, actual pre- and post-spill earnings, and the anticipated growth of earnings in 2010.   The Individual Economic Loss Framework also accounts for individuals who held multiple jobs, new entrants to employment, job-changers and seasonal workers. This permits a wide range of potential individual claimants to seek recovery with compensation determined in a transparent way.   The Framework also is extraordinarily flexible in permitting individual claimants without contemporaneous records of employment to assert claims based on sworn declarations (Category IV).   There are also methodologies applicable to the specialized circumstances of Individual Periodic Vendors and Festival Vendors.

108.   The causation methodology for individual claimants is similar to that for business claimants.   Causation is presumed for some individual claimants who work in certain geographies and/or certain industries (Tourism, Seafood or Charter Fishing in Zone A, B, or C).   Other individual claimants must establish that a claimed loss is due to the DWH Spill.   Claimants whose employer is an Eligible Employer that received a compensation offer from the Gulf Coast Claims Facility or satisfied causation under a

claim with the Court Supervised Claim Facility can "piggyback" on that employer's causation; other individuals must obtain a Sworn Written Statement from the employer attributing the employee's loss of income to the DWH Spill.[10]

109.   The Individual Economic Loss Framework applies generally accepted methods for individual claimants who satisfy the threshold causation requirements to receive compensation for lost earnings.  It is generally accepted that lost earnings for individuals are calculated as the difference between expected earnings and actual earnings over the compensation period.  Expected earnings in a compensation period are determined by taking earnings during a comparable Benchmark Period in a Base Year and adjusting them for anticipated growth.   This is a standard measure of damages for individual economic loss and is similar to the method used in the Business Economic Loss Framework.

110.   Notably, the Individual Economic Loss Framework applies this approach in a manner that takes account of the possibility that individuals whose wages are reduced may seek to compensate by working additional hours or finding secondary employment. The provisions focusing on lost earnings from a Claiming Job, and providing that earnings are related to hours worked, are logical and fair means of ensuring that an individual who maintained his earnings only by working additional hours during his selected Compensation Period to compensate for lost wages in his Claiming Job is not penalized for that.[11]  Put differently, this provision recognizes the economic value of the

---

[10] See Sections I(B), II(B), and III(B)(1)(c) in Exhibit 8A of the Settlement Agreement.

[11] Settlement Agreement Exhibit 8A, definition O "Offsetting Earnings."

---

individual's time, and compensates him not only for the difference in earned income between the Benchmark Period and the Compensation Period but also for the value of any free time lost due to the need to work extra hours to maintain his income. Thus, the framework applies the traditional analysis in a manner designed to compensate the individual for the economic loss, whether measured in lost dollars or the dollar value of lost time at the individual's established wage rate.

111.   The Individual Economic Loss Framework provides great flexibility to claimants by allowing them to select the Base Years and Compensation Period to maximize recovery. Claimants in Categories I (those with Tax Documentation) and II (those with Pay Period Documentation) can select 2009, the average of 2008 and 2009, or the average of 2007, 2008 and 2009 as their Base Year.[12]  Similarly, a Claimant can select a Compensation Period of 90 or more consecutive days that corresponds to the pay periods in his Claiming Job.[13]  This 90-day requirement is comparable to the three-month minimum Compensation Period for Business Economic Loss claims. As with the Business Economic Loss Framework, the option to select a Base Year and Compensation Period  allows Claimants  to select the periods that they believe provide the best basis for comparison. Moreover, in the event the Claimant does not select the Base Years and Compensation Period that optimize his recovery permitted under the Individual Economic Loss Framework, Section 4.3.8 of the Settlement Agreement

---

[12] See Settlement Agreement Exhibit 8A at 3, Definition B.  Category III claimants, including new entrants to employment and job changers, do not have comparable prior period earnings and so cannot use these prior years as  Base Years.  Category IV claimants, who lack prior period earnings records, are restricted to 2009 as their Base Year.

[13] Ibid. at 5.

obligates the Settlement Facility to do so.  As I have noted previously, this provision is unusual and extraordinarily beneficial to Claimants.

112.   The Individual Economic Loss Framework also resembles the Business Framework in its favorable provisions for Claimants relating to the use of "growth" in projecting earnings.   First, claimants who can provide pay period documentation establishing earnings growth can obtain the benefit of such growth in the calculation up to a maximum of 10%.[14]  Second, the use of presumed General Growth and Industry Growth Factors for many individual claimants is quite favorable given the economic conditions in many parts of the Gulf Areas in 2011.[15]  Also, the operation of the growth factors to preclude negative growth for many types of claimants and limit it to -0.5% for any claimant whose earnings demonstrated negative growth is highly favorable to claimants.[16]

113.   The Individual Economic Loss Framework similarly resembles the Business Economic Loss Framework in providing that most claimants receive RTP multiples of their documented earnings losses based on their industry and the location of their employment.  Thus, such claimants are compensated for, among other things, any potential risk of future losses.

114.   The Individual Economic Loss Framework also contains additional provisions reasonably designed to ensure that claimants are made whole for out of

---

[14] See Settlement Agreement Exhibit 8A at 5-6, Definition N.

[15] Ibid.

[16] Ibid.

---

pocket employment-related losses and other employment-related economic losses they are able to document.  These include provisions permitting claimants to recover for out of pocket expenses associated with seeking alternative employment, or job training that led to alternative employment, or lost health insurance or pension benefits.  These provisions are economically reasonable and fair because they are reasonably designed to determine the value of such out of pocket expenses or lost benefits.

115.   Overall, the Individual Economic Loss Framework contains provisions that clearly are designed to give claimants a fair opportunity to show they lost income because of the DWH Spill and, for claimants who can meet the tests establishing such a showing, to maximize their recovery.

**D. Promotional Fund**

116.   The Settlement Agreement also provides for a $57 million fund to promote the Gulf Coast Areas and waters in Section 5.13.  This will provide a substantial economic benefit to the class because it directly stimulates economic activity in the near-term and enhances brand value of the destinations in the long-term.  At $57 million the promotion fund is significant compared to the amounts spent on promotion by the various convention and visitors bureaus in the Gulf Coast Areas in a typical year.

**II.  SEAFOOD COMPENSATION PROGRAM**

117.   The Seafood Compensation Program provides $2.3 billion to compensate vessel owners, boat captains, crew, oyster leaseholders and finfish quota (IFQ)

holders.[17]  The Program is structured to offer prompt initial claims payments estimated to total $1.93 billion with the balance distributed in a supplemental round of payments. The Framework accounts for a variety of industry-specific characteristics and provides fair and reasonable compensation for economic losses experienced in 2010 and potential future loss.

118.   My analysis of the Seafood Program begins with the data on Seafood landings from 2007-2010 as shown in Table 1.   Consistent with the design of the program, the Table reports data for five categories of species:  shrimp, oysters, blue crab, finfish and other.

### Table 1. Gulf Coast Area Seafood Landing Data 2007-2010

| Category | Average 2007-2009 | | 2010 | | Reduction | |
|---|---|---|---|---|---|---|
| | Revenue ($M) | Pounds (M) | Revenue ($M) | Pounds (M) | Revenue ($M) | Pounds (M) |
| Shrimp | $264.9 | 174.4 | $241.5 | 135.1 | -8.8% | -22.5% |
| Oyster | $65.7 | 21.3 | $51.6 | 14.8 | -21.4% | -30.6% |
| Blue Crab | $42.4 | 54.6 | $39.8 | 39.6 | -6.2% | -27.4% |
| Finfish | $69.8 | 53.1 | $55.0 | 45.2 | -21.2% | -14.9% |
| Other | $33.4 | 8.9 | $43.0 | 8.4 | 29.0% | -4.8% |
| | ====== | ======== | ======== | ======== | ======== | ======== |
| Total | $476.1 | $312.4 | $430.9 | $243.2 | -9.5% | -22.1% |

Source: NOAA ALS Landings Data for Class Geography

119.   The data show that total catch in the class geography was reduced by 22% and total revenue reduced by 9.5% in 2010 over the average of the 2007 to 2009. These data also provide a benchmark for evaluating whether the Program is sufficient to fairly compensate claimants.   As Table 1 shows, the $2.3 Program is almost five times the total revenue the industry generated on average between 2007-2009.

---

[17] Settlement Agreement Exhibit 3.

120.   The data show that total catch in the class geography was reduced by 22% and total revenue reduced by 9.5% in 2010 over the average of the 2007 to 2009. These data also provide a benchmark for evaluating whether the Program is sufficient to fairly compensate claimants.  As Table 1 shows, the $2.3 Program is almost five times the total revenue the industry generated on average between 2007-2009.

121.   The structure of the Seafood Compensation Program accounts for the economic characteristics of the industry, including, among other factors, changes in production volume in 2010, changes in price between 2010 and prior years and estimates of the variable costs of production.  The Program also recognizes vessel owner and captain share in the earnings and accounts for typical risk-sharing rules in each sector of the industry.

122.   Eligible Claimants do not have to prove that their economic losses were due to the DWH Spill; rather, losses are presumed to have been due to the DWH Spill.

123.   While the Seafood Program is tailored to the specifics of the main industry categories, it applies a conceptual framework that is common to all parts of the industry. For example, each species-specific Compensation Plan (i) utilizes formulas that compensate Claimants based on their historical catch, (ii) applies standardized measures of the decline in industry catch in 2010; (iii) applies standardized measures of non-labor costs; (iv) accounts for risk sharing among vessel owners and captains; and (v) includes RTPs which compensate Claimants for future risks and releasing future punitive damage claims.  Seafood Crew compensation has its own documentation and structure that will be discussed below.

124.    The documentation requirements for vessel owners, vessel lessees and boat captain claims are limited and tailored to the information required to establish eligibility and a claimant's historical catch or earnings and are limited to information routinely maintained in the normal course of business.  For example, a vessel owner or lessee must show proof of ownership, a government license authorizing commercial fishing in the Specified Gulf Waters, and that it was either home ported in the Gulf Coast Areas or landed seafood in the Gulf Coast Areas.  A boat captain must document that they meet licensing requirements and worked on a vessel that was home ported in the Gulf Coast Areas or landed seafood in the Gulf Coast Areas.  Vessel owners and boat captains are required to provide information on the size of their historical catch, which is routinely reported to state officials and collected in the normal course of business. Alternatively, tax information can be used to document historical catch.

**A. Shrimp Compensation Plan**

125.    Shrimp generated more than 50% of the total Seafood landing revenue from 2007-2010.  The Shrimp Compensation Plan contains various features based in part of the wider scope of information available for commercial shrimping compared to other industry sectors. Government survey data on the shrimp industry in the Gulf Coast Areas are used to parameterize cost elements in the compensation formula and information on the number of vessels by size class and are used in developing the

expedited compensation models.[18]  Government survey data of this type are unique to the shrimp industry.

126.    Shrimp Compensation Plan Claimants can establish their loss using the Historical Revenue Method common across the different species-specific Plans, or they may claim using one of two "expedited" payment methods or a new entrant method:  (a) Expedited Compensation Method or (b) Reduced Expedited Method.  In both cases, Claimants may qualify if they establish vessel revenue during the benchmark period at or above a qualifying threshold for that vessel's size and type.

127.    In the Historical Revenue Method for Shrimp industry Claimants the loss percentage is set at 35%.  This is a generous loss estimate based on the shrimp industry data on landings.  The compensation formula also includes an upward adjustment of 20% for the expected price increase for shrimp in 2010.

128.    The New Entrant Compensation Method compensates vessel owners and captains who are new to the shrimp industry, if they can demonstrate a substantial investment prior to the 2010 season.

129.    The shrimp industry RTP is 8.25 for vessel owners and 7.25 for captains in the shrimp industry.  As discussed above, 2011 shrimp harvests are in line with pre-spill years.

---

[18] See for example Liese, Christopher and Michael Travis (March 2010), <u>The Annual Economic Survey of Federal Gulf Shrimp Permit Holders</u>, NOAA Technical Memorandum NMFS-SEFSC-601 and National Marine Fisheries Service (April 2011), <u>2009 Economics of the Federal Gulf Shrimp Fishery Annual Report.</u>

---

130.      In light of these facts, the Seafood Program provides fair and adequate compensation to claimants in the shrimping industry.

**B. Oyster Compensation Plan**

131.   The Oyster Compensation Plan has several features tailored to the economic structure of the oyster industry, and provides compensation to oyster leaseholders both for lost income and potential harm to the leasehold interest.

132.   The Leaseholder Interest Compensation is paid on a per acre basis depending upon the location of the leasehold.  Leasehold income claims reflect the potential loss in income earned by payments from harvesters.

133.   The required documentation includes standard business records such as valid oyster lease and location information for leasehold interest claims and standard business records to document lost income for harvesters and leaseholders.

134.   The compensation formula for Leaseholder Lost Income is tailored to the specific situation of the oyster industry, and recognizes the distinct role of harvesters and leaseholders, including the fact that many industry potential claimants participate in both activities.  The framework accounts for price increases in 2010 and reflects an assumed loss percentage of 40%, which is higher than in the shrimp program.  The RTP for the oyster industry is 8.75 for vessel owners and 7.75 for captains.

135.   In light of these facts, the Seafood Program provides fair and adequate compensation to claimants in the oyster industry.

## C.  Blue Crab Compensation Plan

136.    The parameters of the Blue Crab Compensation Plan are also tailored to reflect the specific circumstances and practices in this industry segment.  For example, the Blue Crab Compensation Plan includes a lump sum of $7,500 per vessel for owners who receive a Final Blue Crab Compensation payment.  At a price of $25 per trap, that represents nearly 300 traps per vessel.

137.    The documentation requirements are tailored to the industry and require information used in the ordinary course of business.  The standard loss factor for the blue crab industry is set at 35% and the price adjustment factor is set at 20%.  Both of these parameters are generous in light of the landings data for blue crabs.  The RTP for the blue crab industry is 6 for vessel owners and 5 for boat captains,

138.    In light of these facts, the Seafood Program provides fair and adequate compensation to claimants in the crab industry.

## D.  Finfish Compensation Plan

139.    The Finfish Compensation Program provides for compensation for vessel owners, boat captains, and holders of Individual Fish Quotas (IFQs), which permit holders to harvest a specified level of catch for given species.  There are many finfish species for which NOAA gathers landing data.  Combining these into one Finfish Compensation Plan is reasonable because: (a) similar fishing gear is used by fisherman harvesting a variety of species; (b) many finfishermen catch multiple species of fish.

140.   The documentation requirements to establish eligibility for the Finfish Compensation Plan are tailored to the finfish industry and are limited to documents typically maintained in the ordinary course of business.

141.   Similarly the compensation formula is calibrated to reflect industry costs as represented in NOAA data, changes in prices in 2010, and the decline in industry catch in 2010.  The standard loss factor for the finfish segment of the industry is set at 25%.  The RTP factors for the finfish industry are 6 for the vessel owner and 5 for the Boat Captain.  As noted above, a unique feature of the Finfish Plan is its additional compensation for Individual Fishing Quota ("IFQ") shareholders.  A fund of $50 million is available to IFQ shareholders which will be divided based on the percentage of IFQ shares owned.

142.   In light of these facts, the Seafood Program provides fair and adequate compensation to claimants in the finfish industry.

**E.  Other Species Compensation Plan**

143.   The all other category principally includes spiny lobsters and stone crabs but also includes other fishery products not elsewhere covered.  The eligibility requirements and documentation are similar to those for the other Plans.

144.   The compensation formula reflect characteristics specific to this category. The loss factor is set at 10%, which is generous compared to industry data. The RTP for other species is 5.5 for the vessel owner and 4.5 for the Captain.

145.    In light of these facts, the Seafood Program provides fair and adequate compensation to claimants in the other parts of the seafood industry.

**F.  Seafood Crew Compensation Plan**

146.    The Seafood Crew Compensation Plan allows eligible crew to claim compensation using one of three methods depending upon the documentation they have available.  Category 1 Claimants have tax returns or evidence of pay period earnings.  Category 2 Claimants lack tax returns or pay period records.  They can claim based on a Claimant Sworn Statement and an Employer Sworn Statement to establish their earnings.  Category 3 Claimants do not have tax returns, pay period records, or an Employer Sworn Statement.  They can establish their earnings by submitting: (a) Claimant Sworn Statement, (b) a Sponsor Sworn Statement, and (c) an Attorney Sworn Statement (if applicable).

147.    Category I Claimants are compensated at 37% of their average Actual Earnings from the Claiming Jobs that they held during the Benchmark Period they select.  In addition, those Category 1 Claimants who also provide documentation that they were present and available to work between April 21, 2010 and December 31, 2010 (termed "Work Availability") are eligible for an RTP of 2.25, a figure consistent with RTPs for individuals employed by Tourism businesses in Zone A, Charter Fishing businesses in Zones A, B or C, and Primary and Secondary Seafood Industry participants located in any Zone.

148.    Category II Claimants may receive 37% of their Actual Earnings during their Benchmark Period, or 37% of their potential earnings between April 21, 2010 and

December 31, 2010.  If the Claimant can document work availability, then an RTP of 2.25 is also applicable.  However, compensation for Category II is capped at $9,500, and there is an overall cap on all Category II awards of $80 million.

149.    Category III Claimants will receive a lump sum of $5,000 assuming the total payments to Category 3 Claimants does not exceed $50 million.  Otherwise, Category III Claimants are paid on a pro rata basis.  Allowing compensation claims based on sworn statements, as is the case for Category II and III, is a generous procedure and unusual in my experience as an expert economist who often renders opinions on economic damages in court.

150.    The Seafood Crew Compensation Plan recognizes the possibility of undocumented earnings and permits great flexibility in permitting crew members without standard documentation to receive compensation.  For crew members with documentation, Category I offers crew members a compensation methodology comparable to the Individual Economic Loss Claims Framework.

151.    In light of these facts, the Seafood Crew Compensation Plan provides fair and adequate compensation to claimants in the other parts of the seafood industry.

## G. Concluding Opinions Concerning the Seafood Compensation Program

152.    The Seafood Compensation Program is based on sound economic logic, and is firmly grounded in economic theory.  The Program appropriately accounts for available industry data and incorporates generous assumptions with respect to the impact of the DWH Spill on catch and other factors.  The Compensation Program is

based on a uniform framework appropriately tailored to reflect the circumstances of industry segments.  The initial $1.9 billion distribution is sufficiently large to ensure that all claimants receive fair and adequate compensation.  Overall the $2.3 billion program is roughly five times annual industry revenue.

**SUMMARY OF CONCLUSIONS**

153.    It is my opinion that the Economic Damage Claim Frameworks and the Seafood Compensation Program are fair, equitable, transparent, and in fact generous to the Claimants.  As noted above, the Frameworks are fully consistent with the standard approach and professional practice of determining causation and damages.  Further, the Frameworks provide for a uniform approach to evaluating claims, while also including alternatives that permit consideration of Claimants' specific circumstances.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

.                                             Henry H.
                                              Fishkind, Ph.D.

Digitally signed by Henry H. Fishkind, Ph.D.
DN: cn=Henry H. Fishkind, Ph.D.,
o=Fishkind and Associates, Inc., ou,
email=Hankf@fishkind.com, c=US
Date: 2012.08.13 19:23:11 -04'00'

Henry H. Fishkind, Ph.D.

Dated:  August 13, 2012

**EXHIBIT A**

**RESUME FOR HENRY H. FISHKIND, PH.D.**



SELECT CLIENT LIST
AEGON
Baron Collier
BP
Cemex/CSR/Rinker Materials
Centex
Colonial Properties Trust
Collier Enterprises
Fannie Mae
Florida Power Corporation
Forrest City Enterprises
Waste Management, Inc.
FPL
King Ranch
Lennar
Major Central FL Attraction Co.
Mosaic
Newland Communities
Perry Capital
State of Florida
State of Pennsylvania
St. Joe
U.S. Department of Justice
The Villages
Waste Management, Inc.
WCI Communities

# Henry H. Fishkind, Ph.D.
## President

hankf@fishkind.com 

### PROFESSIONAL SYNOPSIS

With over 30 years of experience in economic analysis and forecasting, Dr. Henry Fishkind is widely regarded as one of Florida's premier economists and financial advisors. Dr. Fishkind's career began in the public sector where he worked as an economist and associate professor at the University of Florida. In 1980 Dr. Fishkind became the associate director for programs at the University of Florida's Bureau of Economic and Business Research. During his tenure at the university, Dr. Fishkind served from 1979-1981 on the governor's economic advisory board. He began his career as a private sector consultant when he became president of M.G. Lewis Econometrics in Winter Park, Florida. In 1988 Dr. Fishkind formed Fishkind & Associates, Inc. as a full service economic and financial consulting firm.

From 2001-2003 Dr. Fishkind was a member of Governor Bush's Council of Economic Advisors, and also served on the board of directors of Engle Homes and Summit Properties until the companies were sold.

### AREAS OF EXPERTISE

Economic Analysis
Econometric Modeling
Project Finance & Feasibility
Financial Analysis & Advisory
Fiscal Analysis
Intellectual Property and Fiscal Impact Analysis
Real Estate Economics

### PROFESSIONAL EXPERIENCE

| | |
|---|---|
| Chairman, FLSAFE | 2008 - 2011 |
| Managing Partner, Woodbridge Vintage Chips | 1994 - 2007 |
| President, Fishkind & Associates, Inc. | 1988- Present |
| President, M.G. Lewis Econometrics, Inc. | 1984 - 1987 |
| Associate Director for Programs, | 1980 - 1983 |
|   Bureau of Economics & Business Research, | |
|   University of Florida | |
| Economist/Associate Professor, University of Florida | 1975 – 1983 |

### EDUCATION

Indiana University, Doctor of Philosophy, Economics, 1975
Syracuse University, BA, Economics, 1971



Fishkind & Associates, Inc., 12051 Corporate Blvd., Orlando, FL  32817, 407.382.3256/Office, 407.382.3254/Fax

**EXHIBIT B**
**TOURISM INDUSTRY QUOTATIONS**

**FLORIDA PENINSULA**

**Article 1:**  Claire Simms, *Busy Spring Break Should Mean Busy Summer Tourism*, First Coast News, March 28, 2011.

- "'The hotels have been sold out, which has been amazing,' explained Patty Hinkle, manager at the Hilton Garden Inn in St. Augustine Beach."
- "'This year it seems stronger than it has been in a while,' said Hastings.  He said that is a good sign of things to come, because the spring break season often acts as a barometer for how strong the summer tourist season will be. 'We hope it translates into good summer business,' he said."

**Article 2:**  South Florida Business Journal, *Statistics show Florida tourism continues to rebound*, May 16, 2012.

- "The 23.4 million visitors that came to Florida in the first quarter of 2012 represented an increase of 2.4 percent over last year's first quarter, Visit Florida, the state's tourism marketing arm, reported on Wednesday. Direct travel-related employment in Florida rose 1.9 percent to 1.03 million, adding 19,200 jobs over the past year and representing the largest employment total since first quarter 2008, the agency said."
- "'On the heels of a record year for the Florida tourism industry in 2011, it's encouraging to see the trend of more visitors and more jobs extending into 2012,' Gov. Rick Scott said in a press release."
- "Florida's 14 major airports had a 2.5 percent increase in total enplanements and recreation taxable sales for Florida the first two months were up 8.7 percent. The average daily room rate rose 5.7 percent and the occupancy rate for Florida hotels increased 2.7 percentage points."

**Article 3:** Trevor Pettiford, *Record-breaking tourism numbers for Pinellas County*, Bay News 9, May 8, 2012.

- "Pinellas hotels and beaches had a great March. Numbers from the tourist development tax, also known as the bed tax, show the county collected nearly $4.5 million in March. That amount is the highest amount ever for a single month."
- "Visit St. Petersburg/Clearwater Deputy Director David Downing said it adds up to more than just a good month. 'That's a record for March,' Downing said. 'It's a record for any month in the history of Pinellas County. So we're actually very pleased.'"

**Article 4:**  Rick Flagg, *Gulf Oil Spill Distant Memory for Tourism Industry*, Florida Broadband News, April 18, 2012.

- "'It's remarkable, really, when you think about the challenges that we went through just two years ago,' Seccombe said. 'The fact that the state of Florida had record visitation last year. We saw visitation from in-state travelers, from domestic travelers around the U.S. and from all our international markets really rebounded.'"
- "Nearly 86 million tourists visited the state last year... breaking the old record set in 2007. Seccombe says marketing was a big reason why."


## FLORIDA PANHANDLE

**Article 1:** Dave Heller, *Panhandle Tourism Stages Big Comeback from BP Oil Spill*, First Coast News, September 6, 2011.

- "'The visitors prove that Panama City Beach is back. The real good news is that in addition to being 51 percent up from last year, we are 28 percent up from the next highest month that we had. So it was the best month that this beach has ever had in terms of lodging revenue.'"
- "Business in the Panhandle is up 30 percent from last year and some areas are setting new records in lodging revenues. Panama City Beach is one of the tourist destinations on a record pace this year. It posted its biggest month ever in July – up 51 percent from a year ago when the region was struggling with the Deepwater Horizon oil spill."
- "'People are pretty happy. This has been a very good year for us. We're up 18.5 percent year-to-date so it's not just July's numbers. Throughout the entire year the business has been good.'"

**Article 2:**  Lauren Sage Reinlie, *Scott praises region's use of BP funds to rebound from oil spill*, Florida Freedom Newspapers, October 14, 2011.

- "Gov. Rick Scott on Thursday praised local officials' use of BP funds to revive the tourism economy and repeated his goal to create jobs in the region at the annual Focus Northwest Florida event sponsored by Florida's Great Northwest."
- "He said he would continue to work to bring jobs to the entire state, but expected Northwest Florida to do 'extremely well… people want to live here,' he said."

**Article 3:** Dusty Ricketts, *Emerald Coast completes record-breaking summer with August figures*, Northwest Florida Daily News, October 6, 2011.

- "Tourist development agencies in Okaloosa, Santa Rosa and Walton counties recently released their bed tax collection data for August. Collections were up

61.99 percent in Okaloosa County, 63.88 percent in Walton County and a staggering 101.3 percent in Santa Rosa County."

- "For the months of June, July and August, Okaloosa County's bed tax collections were up 57.81 percent from 2010. Santa Rosa County was up 63.11 percent and Walton County was up 42.26 percent. Earlier in the summer, Okaloosa and Walton counties broke records on the amount of bed taxes collected in a single month."

- "'Down here, you expect June and July to be good,' Russell said. 'That's a given, and they were great months and so much better than last year. What's encouraging is not only was the summer strong, but the spring was strong and the fall was strong. For this economy, this is really what we need. We need to do well in the shoulder months.'"

- "'What has been the most gratifying for us has been the way August performed,' he added. 'August is kind of the shoulder season, but our leisure business in August was up 156 percent over last year and our group business was up 40 percent over last year. It was just an incredible month.'"

**Article 4:**  Dusty Ricketts, *Bed tax collections finish strong*, Northwest Florida Daily News, November 9, 2011.

- "September was the final month for the local tourist development agencies' fiscal year, and bed tax collections in Okaloosa, Walton and Santa Rosa counties each were up roughly 30 percent compared to 2010."

- "Walton County's bed tax collections for fiscal 2011 were up 29.54 percent compared to last year and set a new record. Okaloosa County's numbers were up 31.98 percent and Santa Rosa County's were up 34.98 percent."

- "'A lot of people learned about us and came to visit us this year, so I don't think we'll have any trouble keeping the momentum,' [Kate] Wilkes, [executive director of Santa Rosa County's TDC] added. 'We have to keep ourselves out there with smart advertising.'"

- "'…the Emerald Coast had its best June, July, August and September months ever,' Mark Bellinger, executive director of the Okaloosa County TDC, wrote in an email."

**Article 5:**  Dusty Ricketts, *Local tourism industry is red-hot,* Northwest Florida Daily News, March 16, 2012.

- "'All the reports from everybody I've talked to, they said the reservations are great,' said Kate Wilkes, executive director of the Santa Rosa County Tourist Development Council. 'They're way ahead of where they usually are…All of that advertising (with BP money) wasn't just for last year,' Wilkes added.  'It put us on the map. We also went into markets that we never had money to do before — Tennessee, Texas. We did a lot of television, things we couldn't do before and it really helped.'"

- "Okaloosa County collected $297,124 in bed taxes in January, a 15.71 percent increase from January 2011 and the third most ever collected in a January. Only January 2006 and 2007 posted larger collections."

**Article 6:**  Dusty Ricketts, *Emerald Coast completes record-breaking summer with August figures,* Northwest Florida Daily News, October 5, 2011.

- "Tourist development agencies in Okaloosa, Santa Rosa and Walton counties recently released their bed tax collection data for August. Collections were up 61.99 percent in Okaloosa County, 63.88 percent in Walton County and a staggering 101.3 percent in Santa Rosa County."
- "The recovery from last year's oil spill even caught the attention of Florida Gov. Rick Scott, who visited the area earlier this week. 'You had a great tourist season,' Scott said. 'We think you're headed in the right direction. All of your regional efforts had a big impact.'"
- "Mark Bellinger, executive director of the Okaloosa County Tourist Development Council, said several factors contributed to the strong rebound from last year. 'Visitor numbers this past summer far exceeded the majority of businesses' pre-summer forecasts and expectations,' Bellinger wrote in an email. 'The Emerald Coast received a fantastic positive economic boost from our destination's record-breaking months of June and July of 2011.'"

**Article 7:**  Dusty Ricketts, *Okaloosa sets February record for bed tax collections*, Northwest Florida Daily News, April 4, 2012.

- "Having a county break a record for the amount of bed taxes collected in a given month now happens so frequently it's beginning to be the norm rather than the exception. The trend continued in February when Okaloosa County collected $437,614 in bed taxes, a 19.7 percent increase from last year and the best February on record."
- "'Everybody is doing really, really well,' said Kate Wilkes, executive director of the Santa Rosa County Tourist Development Council. 'The predictions for spring break have been great and summer reservations are up. Everybody is thrilled. You can just tell by the cars around. It's amazing.'"
- "In Walton County, $444,324 in bed taxes was collected in February, an increase of 23 percent from February 2011 and only about $55,000 shy of its top February in 2007."

**Article 8:**  Pat Kelly, *Tourism pivots toward summer*, Panama City News Herald, April 11, 2011.

- "'I think there is a real pent-up demand from last year,' Mike Bennett, of Seahaven Beach Resorts, said of the coming summer season. 'We think they will be hungry to get down here.'"

- "Bed tax take in February totaled $483,178.62, an increase of $40,387.98 over 2010 collections of $442,790.64, or 9.12 percent, according to Charlene Honnen, Bay County tourist development tax specialist."

**Article 9:**  Pensacola News Journal, *Hotel revenue soars in Escambia*, Pensacola News Journal, March 18, 2011.
- "Hotel revenues in Escambia County soared 30 percent in February, boding well for the spring and summer tourist season."
- "Pensacola Convention and Visitor Center head Ed Schroeder attributed the revenue spike in large part to unseasonably mild weather in February and pent-up demand brought on by last year's BP oil spill. 'We expected good hotel revenue numbers for February, but to see a 30 percent increase is incredible,' Schroeder said."
- "In addition to the revenue increase, hotel occupancy for February was up 15.3 percent over the same period last year."

**Article 10:**  Dusty Ricketts, *Panhandle TDC officials "very pleased" with surging bed tax numbers*, Florida Freedom Newspapers, July 5, 2011.

- "A local tourism official said she did not believe last year's oil spill was causing any lasting impacts on the area, and May's bed tax numbers back her up."
- "Compared to 2010, bed tax collections from short-term rentals in Santa Rosa County increased 25.22 percent, Okaloosa County had a 12.98 percent increase and Walton County's collections were up 15.13 percent."
- "'Hopefully it will continue,' Wilkes added. 'I've been getting some good reports. June and July Fourth we know were great.' Wilkes said the only lasting effect she has seen from the oil spill is that more people continue to wait until the last minute to book their vacation."

**Article 11:**  PRWeb, *Bookings to Northwest Florida Vacation Destinations Surge by Almost 20%*, May 21, 2012.

- "The trend of increased bookings to Northwest Florida vacation destinations immediately follows what has been described as a record breaking College Spring Break season in Panama City Beach, Florida. Shannon Posovad of Collegiate Marketing Group (CMG), an agency that markets Panama City Beach to students, claims that the beach destination saw a nearly 20 percent increase during the month of March according to the latest round of bed tax numbers, exceeding expectations."
- "Eager to capitalize on this increase in tourism, and to maintain Panama City Beach's marketing efforts, Rowe, and the TDC is looking to extend the 5th cent bed tax for Panama City Beach, which is currently set to expire in 2014. Last fiscal year it was responsible for collecting nearly $2.6 million dollars."

**ALABAMA**

**Article 1:**  David Ferrara, *Baldwin beaches set spring lodging record*, AL.com, August 1, 2011.

- "More than $64.9 million was spent in lodging rentals, which is almost 13 percent higher than 2007, the previous high mark, Gulf Shores & Orange Beach Tourism reported…"
- "Since the start of the year, the area has seen a 14 percent increase in lodging rentals, according to the release. The spring's retail sales came in at $167.7 million."
- "'These lodging figures show that the area is continuing to recover in a strong manner as lodging revenue is the best indicator of tourism growth,' said Herb Malone, president and CEO of the CVB."

**Article 2:**  David Ferrara, *Baldwin County beaches set record for spring lodging, trend expected for year*, AL.com, August 2, 2011.

- "Even though Pleasure Island now has 16,151 units — about 1,000 more than in 2007 — the lodging revenue figure proves a 'huge, huge boost' for the area, said Mike Foster, the tourism group's vice president of marketing."
- "'I really believe '11 will be the best year ever,' [Orange Beach Mayor Tony] Kennon said. 'And I'm enthusiastic about that, but I want to caution everybody: a spike does not a trend make. We've just got to be very, very frugal in our budgeting process, and over time, I think there is going to be some huge silver linings to this entire oil spill fiasco.'"
- "Since the start of the year, the area has seen a 14 percent increase in lodging rentals, according to the release. The spring's retail sales came in at $167.7 million."

**Article 3:**  Staff, Press-Register, *Beach lodging, retail sales hit new highs for July, officials say*, AL.com, September 20, 2011.

- "Data released today by Gulf Shores & Orange Beach Tourism shows that Alabama's beaches gathered $69.8 million in lodging revenue during July. This figure represents a 34.5 percent increase -- equaling $17.9 million -- over July 2007, which recorded $51.9 million, which is the previous benchmark year, tourism officials said."
- "Gross retails sales for July 2011 ($94.8 million) also saw an increase of 17.9 percent ($14.3 million) over July 2007 ($80.4 million)."
- "When comparing year-to-date lodging figures, the area is currently 22.2 percent above the same period for 2007."
- "These lodging and retail figures contribute to the income of more than 40,000 Baldwin County residents, who are employed in travel-related jobs, according to Malone."

**Article 4:**  Guy Busby, *Lodging, sales revenues smash records in Gulf Shores, Orange Beach*, AL.com, September 21, 2011.

- "Income from hotel and condo rentals for the year through July is 22.2 percent ahead of that during the previous best year of 2007, the report said."
- "July brought gross retail sales of $94.8 million. That was 17.9 percent above the $80.4 million in July 2007, the report said."

**Article 5:**  Kathy Jumper, *Tourism revenues increase on Gulf Coast; SEC Beach Fest set,* AL.com, May 10, 2012.

- "Lodging revenues jumped 15.6 percent and retail sales rose 12.3 percent compared to this time last year as the coast continues its energetic comeback from the Gulf oil spill, according to data Tuesday from Herb Malone, president and CEO of Gulf Shores and Orange Beach Tourism."
- "'When we think of what happened two years ago, and look at 2011, we had 4.9 million people choose to come here on vacation,' Malone said. 'They left behind $2.6 billion in direct spending in Baldwin County.'"

**Article 6:**  Guy Busby, *Numbers show beach business bouncing back*, The Birmingham News, September 21, 2011.

- "A year after the oil spill, July lodging rental revenues in Gulf Shores and Orange Beach smashed the record for that month set in 2007 and more than doubled revenues from July 2010, according to a report released Tuesday."
- "July's $69.8 million lodging revenue marked a 37 percent increase from the previous July high of $51.9 million in 2007, according to the report. And it compared to $27.3 million last July while the spill was at its height."
- "'We had a little over 13,000 people for the month of July,' Bailey said. ''We ended up having a really good summer. As of September 1, we had over 74,000 visitors. For the whole fiscal year last year, all the way through our accounting period, we had 55,129.' Bailey said the fort recorded 74,539 visitors in 2007."

**Article 7:**  *Cohesive Marketing Efforts Result in $200 Million Rebound for Alabama Beaches Impacted by Gulf Oil Spill,* GlobeNewswire, November 4, 2011.

- "A strong partnership between Gulf Shores & Orange Beach Tourism (CVB) and the Alabama Tourism Department (ATD) allowed both agencies to fully maximize marketing funds provided by British Petroleum (BP) to propel the Gulf Shores, Orange Beach and Foley area to a $200 million* summer rebound for this beach community that suffered the gulf's largest economic loss from the Deepwater Horizon explosion."
- "The Pleasure Island communities (Gulf Shores, Orange Beach and Fort Morgan) gathered a record setting $154 million in summer lodging revenue -- an 18 percent ($24 million) increase over the previous benchmark year of 2007,

which saw $130 million collected in that summer. Continuing this pace, the area is posed to exceed the 2007 record year by 17 percent (year-to-date)."

- "The Pleasure Island communities also saw record-breaking summer retail sales figures as $235 million flowed through local cash registers -- a 51 percent ($80 million) increase over summer 2010 and most importantly, a 7 percent ($16 million) increase over the benchmark year of 2007."

- "'We are excited that Alabama's Gulf Coast Beaches were able to re-bound so quickly and to set record numbers on top of it,' said Lee Sentell, director of the Alabama Tourism Department. 'The BP funding allowed us to market effectively to travelers and those efforts paid off. We will continue to promote our Gulf Coast and hope to continue to set records.'"

**Article 8:**  Debbie Williams, *It's Official: Record Breaking Tourism Season on Baldwin Beaches*, WKRG News, October 31, 2011.

- "The figures that stand out for tourism officials is summer retail sales. Even with sluggish economy retail sales in Gulf Shores, Orange Beach and Fort Morgan broke records at 235 million dollars according to numbers provided by Gulf Shores and Orange Beach Tourism."

- "'For the most part we're at record levels or near record levels. July itself was a phenomenal month it was at record levels,' says Herb Malone with Gulf Shores and Orange Beach Tourism."

**MISSISSIPPI**

**Article 1:**  Rhonda Miller, *Tourism on Mississippi Gulf Coast Appears to Be Bouncing Back After Difficult Years*, Mississippi Public Broadcasting, March 23, 2012.

- "Tourism on the Mississippi Gulf Coast appears to be bouncing back after years of lost revenue from Hurricane Katrina, the BP oil spill and the Mississippi River flooding."

- "'We've had three weekends in a row sold out.  I expect to be sold out every weekend now through October.'  That's Bob Bennett, owner of the Edgewater Inn, just across from the beach in Biloxi."

- "As president of the Mississippi Hotel and Lodging Association, Bennett says he's glad to see golfers, weddings and family reunions coming back to the Gulf Coast."

**Article 2:**  Kaija Wilkinson, *Jimmy Buffett's Margaritaville, packed beaches point to Gulf Coast tourism resurgence*, AL.com, May 1, 2012.

- "'Numbers don't lie,' said Beth Carriere, director of the Mississippi Gulf Coast Convention & Visitors Bureau. 'New major attractions, major investors buying into our destination, and new additional activities and attractions coming online

through both public and private sector ventures' are clear signs of recovery, she said."

- "Lodging tax revenue increased month to month in January, February and March, she said, and in each case was higher than the same months in 2011, she said. That's especially encouraging since the lodging industry's typically busy spring through summer season has only just begun, she said."
- "A spirit of cooperation among state, local and BP officials has lent itself to what Malone describes as a 'tremendous rebound' in 2011, he said."

**Article 3:**  Kara Kimbrough, *Gulf Coast continues to be key player in state's tourism efforts*, Sun Herald, May 21, 2012.

- "Hurricanes, oil spills and stiff competition from tourist attractions around the state haven't been strong enough to keep the Gulf Coast's tourism industry down, say tourism officials with the Mississippi Development Authority, touting strong economic impact figures to back up their claims that area tourism is not only back to pre-disaster levels, but shows signs of surpassing previous records."
- "'There have been certain areas that have not fared as well as others but from an overall perspective the statewide tourism industry has been holding steady,' [Mary Beth] Wilkerson [MDA's director of tourism] added. 'This is evidenced by the fact that our economic contributions for FY11 increased over figures recorded in FY10 and visitors' expenditures were up 8 percent. Tourism is booming in Mississippi and indicators point to a continued increase in this area. The Gulf Coast has always and is expected to continue to be a major contributor to the sizable economic impact our state experiences from the tourism industry.'"

**Article 4:**  *Another View:  Rebounding Mississippi coast needs focus and cohesion*, thetowntalk.com, July 12, 2012.

- "Special tourism tax collections, an excellent indicator of how the broader tourism industry on the Gulf Coast is performing, are larger than before the oil spill. And overall sales tax collections for the region are also growing."
- "From April 2011 to April 2012, the tourism industry added 940 jobs, leading every other sector of the region's economy."

**NEW ORLEANS**

**Article 1:**  AP, *New Orleans tourism officials expect strong spring*, CBS News, April 4, 2011.

- "'The only way that I can characterize it would be that it's robust. The spring is terrific,' said Stephen Perry, president of the New Orleans Metropolitan Convention & Visitors Bureau. 'You can actually feel it when you're out on the street. We've had weekends this year where it's been difficult to find a room.'"

- "The 13 events will generate 185,983 room-nights. That compares with 114,800 in attendance last year, a more than 18 percent increase in the number of convention attendees."
- "'We're expecting this year's spring to be equally as strong if not up 3 to 5 percent' in terms of hotel occupancy, Perry said."

**Article 2:**  Kelly Schulz, Vice President for Communications and Public Relations for the New Orleans Convention and Visitors Bureau, April 15, 2011**.**

- Kelly Schulz, Vice President for Communications and Public Relations for the New Orleans Convention and Visitors Bureau, observed that "New Orleans' tourism industry also ended 2010 as the number one destination in the country for year-over-year REVPAR growth, according to Smith Travel."
- "New Orleans welcomed 8.3 million visitors in 2010, a 10.7 percent increase over 2009, and the first time to reach 8 million visitors since Katrina. Those 8.3 million visitors spent $5.3 billion, a $1.1 billion increase over 2009 and the highest spending in the city's history, according to a study by the UNO Hospitality Research Center."

**Article 3:**  Jaquetta White, *Tourism sector hopes to keep up heat this summer; Strong Memorial Day stirs optimism*, The New Orleans Times-Picayune, June 19, 2011.

- "According to data from Smith Travel Research, which surveys hotels, New Orleans was one of six cities to record a RevPar increase of more than 20 percent for the week ending May 28. The local RevPar, or revenue per available room, was up 24.7 percent to $96.79 that week as compared with the same week a year ago. RevPar is a measure of profitability for hotels."
- "'There is every expectation that we're going to pick up more summer business,' Epton said. 'The leisure market has been strong. Hoteliers are upbeat about the summer this year.'"
- "Cooker said the BP grant will supplement the agency's budget, allowing it to spend more money to do targeted television advertising on television channels watched by the coveted 25- to 34-year-old age group.  'There is an effort to attract somewhat of a younger demographic. That's reflected in the television campaign. If there's something different from last year, that's it,' Cooker said."

**Article 4:**  Jennifer Duell Popovec, *More Good Times Ahead for New Orleans Hospitality*, globest.com, April 25, 2011.

- "[Randy] McCaslin,[ vice president and practice leader for PKF Consulting] points out that 2010 was a 'great year' for New Orleans' hospitality sector. In comparison, however, he expects the next three years to be even better."
- "In 2010, New Orleans hotels finished the year with a RevPAR gain of 14.8%-- significantly better than the national average of 5.5%, according to Colliers PFK Hotel Horizons market report for March 2011 to May 2011. This was the result of

---

an increase in occupancy of 12.7% and a 1.9% gain in average daily room rates (ADR)."

- "Looking towards 2011, New Orleans RevPAR is expected to grow 2.3%. Although occupancy is forecast to drop 2.7%--primarily is comparison to last year's huge gains--average room rates are projected to increase 5.1%."

**Article 5:**  HOTELS Editors, *New Orleans market posts top hotel rate increase in June*, HOTELS Magazine, June 22, 2011.

- "Hoteliers in New Orleans have seen booked rates spike 27% this month on discount online travel agency site Hotwire.com, the biggest year-over-year increase in North America.  A 4-star guestroom in New Orleans is averaging US$108 on Hotwire in June."

**LOUISIANA GULF COAST**

**Article 1:**  Kathrine Schmidt, *Outlook for tourism brighter this year*, The Daily Comet, June 5, 2011.

- "Joan Glover of the Coco Marina in Cocodrie said the weekend went well and bookings were looking strong for the rest of the summer, both local visitors and those from out of state. 'It's normal business,' she said. 'It's wonderful. We would love to be blessed with just a normal year.'"
- "'We have seen in the last couple months an increase in not only calls, but overall interest in people actually visiting,' [said Kelly Gustafson, a spokeswoman for the Houma Area Convention and Visitors Bureau] in terms of tourists who come in to pick up brochures or other information. The same is true for buses and trips from nearby New Orleans, she said. 'When their tourism is up, our tourism is up. Hopefully we're on an upswing right now if we can avoid any future disasters.'"

**Article 2:**  Brent St. Germain, *Fishing industry is back*, The Daily Comet, July 5, 2011.
- "The trend of easily finding fish continued for the Grand Isle International Tarpon Rodeos' trip. After venturing out more than 25 miles, it quickly became apparent that the offshore fishing has not missed a beat. We quickly limited out on red snapper and also reeled several mangrove snappers and king mackerels."
- "After an unexpected summer off, the fish are bigger and ready to be caught."
- "The experts were wrong because the Gulf coast's fishing industry and ecosystem has found a way to bounce back. After the uncertainty of last summer, that's all we can ask for."

**Article 3:**  Richard Thompson, *Louisiana's economic recovery from BP oil spill has been quicker than expected*, The New Orleans Times-Picayune, April 15, 2012.
- "Some business economists and others say that places like Houma, which touts itself as 'the hub of the bayou region,' and other nearby communities that rely on

the offshore industry have seen a quicker recovery than they had expected, in large part due to the hundreds of millions of dollars that BP has doled out in oil spill damages since the April 2010 spill."

- "Louisiana's preliminary unemployment rate for February was 7 percent, the same as it was this time two years ago, just before the spill, according to the U.S. Bureau of Labor Statistics. In the Houma area, including Bayou Cane and Thibodaux, the preliminary unemployment rate for February was 5 percent, down from 5.8 percent a year ago. That's more than three percentage points lower than the U.S. unemployment rate, which posted at 8.3 percent."

- "Meanwhile, personal income…rose 4.8 percent in Louisiana to $176.5 billion in 2011, the U.S. Bureau of Economic Analysis said last month. And the number of jobs related to the petroleum industry grew by 3,900 in 2011, according to the Louisiana Workforce Commission."

**Article 4:**  Lauren Wilson, *Tourists return to Grand Isle*, KATC, July 4, 2011.

- "The Courier reported on Sunday that it was like old times with beaches open and oil free, and fishermen cleaning big catches.  Businesses that had closed because of the spill last year, or had seen their profits plummet, were eager to welcome visitors back."

- "'The fish are back.  It's on now' he said [Gil Hildebrand] on Thursday, 'It's like it was in the past.'"