# Exhibit 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| | * * | |
| | * * | HONORABLE CARL J. BARBIER |
| | * * | |
| | * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

---

## DECLARATION OF JAMES L. HENLEY, JR.

I, James L. Henley, Jr., submit this declaration in support of BP Defendants' Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012.  I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are my own.

## INTRODUCTION

1.      This declaration is based upon my own personal knowledge and reflects my opinions, analysis, and conclusions, except where otherwise indicated, and if called to testify I could testify to the opinions set forth in this declaration.

2.      I am an independent expert retained by counsel for BP Exploration & Production Inc. and BP America Production Company (collectively, "BP").  I did not assist and was not involved in any way in the negotiation, drafting, development, or revision of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement (the "Settlement" or "Settlement Agreement") or the compensation frameworks incorporated in the Settlement Agreement.  Nor have I provided any advice or consultation to BP in connection with its defense

of the above-captioned lawsuit or any other matter relating to the Deepwater Horizon oil spill ("DWH Spill").

3.     I am a certified public accountant and attorney licensed and in good standing in Mississippi.  Additionally, I have obtained the CFF (Certified in Financial Forensics) designation from the American Institute of Certified Public Accounting ("AICPA").  In addition to operating a private practice, I also have served as a United States Chapter 13 Bankruptcy Trustee for the Southern District of Mississippi since March 2000.  I also have served as an expert witness in connection with business disputes, including those involving business interruption claims and lost profits.  In connection with my private practice, work as a Bankruptcy Trustee, and experience as an expert witness, I am familiar with preparation of individual and business tax returns, bankruptcy filings, business records and accounting, and analysis of damages.  A copy of my curriculum vitae is attached as Exhibit A.

4.     I am also a pastor at Fresh Start Christian Church in Jackson, Mississippi, a part of Fresh Start Ministries, Inc.  In the wake of Hurricane Katrina, the church established a charitable fund for the benefit of victims of Hurricane Katrina.  I served as administrator of the fund.  In that capacity, I was responsible for developing eligibility criteria and documentation requirements for applicants for benefits from the fund, and for reviewing applications for benefits.  Applicants had to prove they had come to Jackson, Mississippi from New Orleans or the Mississippi coast, and in many cases the fund relied on third parties for verification of eligibility and need.  The fund also required proof of identification.  In making the determination whether to grant funds, the fund required documentation and information relevant to determining the actual need of the applicant.  For example, if the family needed assistance in obtaining an apartment, the fund required a copy of the completed application and direct contact information

2

for the leasing agent.  Additionally, the fund required the applicant to verify they were not being assisted by any other agency regarding the housing sought.  Finally, the fund made the check payable to the apartment complex and verified that the applicant would not be reimbursed money from the complex.  If the request was for food, the fund utilized the IRS standards for food costs by family size and, once the applicant provided documentation to prove family size, the fund would make appropriate payments for groceries consistent with the IRS standards.[1]  These were one-time payments.

5.      In order to reach my opinions regarding the Settlement Agreement, I considered the following materials:

(a)      The Settlement Agreement, as amended on May 2, 2012, and Appendices 1A-27, with a focus on those containing the frameworks for business and individual economic loss and the Seafood Compensation Program.  This includes compensation frameworks for general business economic loss claims (Exhibits 4A-E of the Settlement Agreement), multi-facility businesses (Exhibit 5 of the Settlement Agreement), failed businesses (including failed start-up businesses) (Exhibit 6 of the Settlement Agreement), and start-up businesses (Exhibit 7 of the Settlement Agreement), individuals (Exhibit 8A-8E of the Settlement Agreement), and the Seafood Compensation Program (Exhibit 10 of the Settlement Agreement).

(b)      Interim Class Counsel's and BP's Joint Supplemental Motion Related to the Economic and Property Damages Settlement, filed May 2, 2012.

---

[1] Such standards are regularly relied upon by Chapter 7 and 13 bankruptcy trustees to evaluate bankruptcy reorganization plans.

(c)     The Plaintiffs' Steering Committee's and BP Defendants' Joint Motion for:  (1) Preliminary Approval of Class Action Settlement; (2) Scheduling a Fairness Hearing; (3) Approving and Issuing Proposed Class Action Settlement Notice; and (4) BP's Motion for Adjourning the Limitation and Liability Trial, filed April 18, 2012.

(d)     The Claim Forms and their instructions and Frequently Asked Questions ("FAQ's") and answers are available to claimants on the Claims Administrator's website.[2]

(e)     The Court's Preliminary Approval Order.[3]

(f)     Objections relevant to business and economic loss claims.

(g)     The Claims Administrator's claims statistics, as posted on the settlement website.[4]

(h)     Certain independently identified authoritative references, as cited herein.

## GENERAL OBSERVATIONS, CONCLUSIONS, AND OPINIONS

6.     The methodologies used in the compensation frameworks for Business Economic Loss ("BEL") (including the BEL framework and the frameworks for Start-Ups, Failed Businesses and Multi-Establishment Facilities) and Individual Economic Loss ("IEL") are consistent with well-established methodologies for determining economic loss.   They are

---

[2] Available at www.deepwaterhorizonsettlement.com

[3] Docket No. 6418, Preliminary Approval Order as to the Proposed Economic and Property Damages Class Action Settlement, May 2, 2012.

[4] Available at www.deepwaterhorizonsettlement.com

transparent and objective, relying on mathematical formulas applied to data provided by claimants.  The methodologies are reasonably designed to provide claimants with full compensation for earnings lost due to the DWH Spill.  Moreover, the application of a Risk Transfer Premium (RTP) to lost earnings for most claimants, based on their industry and the geography where they work, further assures that claimants with valid claims will be fully compensated.  As I understand from review of the Motion for Preliminary Approval filed by the parties and the Settlement Agreement itself, the RTP payments are meant to compensate class members for potential future loss, as well as pre-judgment interest, any risk of oil returning, and any claims for consequential damages, inconvenience, aggravation, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors, some or all of which may never occur.[5]  Thus, the methodologies are designed to make claimants who can establish valid claims fully whole.

7.      The documentation requirements are logically related to the information required to evaluate claims, require submission of documentation and information that should be readily available to claimants, and, in addition, are flexible in permitting documentation alternatives.

8.      The transparency and objectivity of the frameworks, which rely on expressly-stated requirements or mathematical formulas, assures that claimants can understand how their claims can be treated under the frameworks.  That will permit claimants to make informed decisions about whether to participate in the settlement or to opt out.  The transparency and objectivity of the frameworks should assure that claims will receive consistent treatment -- that is, that similarly situated claimants will receive the same treatment.

---

[5] See also Settlement Agreement Exhibit 15.

5

## INDIVIDUAL ECONOMIC LOSS

9.      The Individual Economic Loss Framework (IEL Framework) is broad and flexible in addressing a wide variety of differing circumstances for individuals who claim lost earnings from employment as a result of the DWH Spill.   It permits recovery by individuals who worked prior to the DWH Spill, including those with a single job, those with multiple jobs affected by the DWH Spill, and those with multiple jobs which were not all affected by the DWH Spill.   It permits recovery by individuals without prior employment experience who had accepted employment to start after April 20, 2010, that was reduced or cancelled due to the DWH Spill, and by seasonal and part-time workers.[6]   It permits recovery by individuals who do not have income tax or pay period earnings documentation, but can provide other evidence of lost earnings.[7]   The IEL Framework also permits recovery by individual periodic vendors and festival vendors who lost sales due to the DWH Spill.[8]   This is a very inclusive settlement for individuals.

10.      In my opinion, the framework clearly is more generous all methodologies utilized by experts in my field to determine actual damages incurred in litigation in that it allows for speculative damages.   It is also more generous in that the framework actually allows for compensation for what is termed unreported income (URI) by individuals.[9]   Unreported income is income which is earned, but which cannot be traced to the records of an individual or business

---

[6] See Settlement Agreement Exhibit 8A at 4, 28-43.

[7] See Settlement Agreement Exhibit 8A at 2, 44-51, Categories III and IV of the IEL Framework.

[8] See Settlement Agreement Exhibit 8D, Addendum to IEL Framework.

[9] See Settlement Agreement Exhibit 8A at 2, 44-51, Categories III and IV of the IEL Framework.

through traditional accounting methods or source documents.  I am unaware of economic loss litigation that allows for compensation of such URI.

11.    The documentation requirements for the IEL Framework are appropriately tailored to require the information needed to establish the claimant's employment history, earnings and lost earnings.  Individuals may provide different types of documents, depending on what they have available.  Eligible individuals are separated by the Framework into four categories depending on the documents they are able to provide to establish causation and loss.[10] In Category I, claimants have tax documents for 2010 and their Benchmark Period.  In Category II, claimants have no tax documents, but have pay period earnings or other similar documentation for 2010 and the Benchmark Period.  In Category III, claimants have earnings documentation for 2010 but not prior years, either because they are new entrants to employment or have recently changed jobs, so that their pre-2010 earnings are not a reasonable predictor of their 2010 earnings.  The documents required for claimants in these categories are documents that they typically would be expected to have.  In Category IV, claimants who lack tax records or pay period documentation may establish causation and damages without any tax or earnings records by submitting individual and employer sworn written statements.

12.    The reasonableness of these documentation requirements is reflected by comparison to what is required for proof of income in bankruptcy proceedings.  Bankruptcy Code Section 521 requires debtors to provide among other things 1) a copy of their Federal income tax return or transcript; 2) a schedule of current income and expenditures; 3) copies of all payment advices or other evidence of payments received within 60 days before the filing of the

---

[10] See Settlement Agreement Exhibit 8A at 2.

petition by the debtor from any employer of the debtor; 4) a statement of the amount of monthly net income, itemized to show how the amount is calculated; and 5) a Statement of Financial Affairs in which the debtor identifies the source and amount of the prior two years' earnings. While the context is different, the Bankruptcy Code requirements reflect a recognition that tax and payroll documents are the usual and preferred evidence of income.

13.     Similarly, the documentation requirements for Individual Periodic Vendors and Festival Vendors require documents that such vendors should reasonably be expected to have and are logically related to the claim analysis methodology for such claims.  As noted, the provision permitting Category IV claimants who lack tax records or pay period documentation to establish causation and damages without any tax or earnings records by submitting individual and employer sworn written statements, is unusually flexible in my experience.  The information sought, including licensure information and earnings history, appears logically related to the causation and compensation provisions governing such claims.

14.     The IEL Framework applies a well-established approach for analyzing lost earnings that is similar to the approach I and others use in determining lost earnings in litigation. Under a typical (or standard) approach, the individual's historical earnings are determined based on a review of the prior earning history.  Documents evidencing earning history typically include W-2 wage statements, social security statements and federal tax returns filed under penalty of perjury by the Plaintiff.   The typical model for determining the loss generally considers: earnings in a base-year period prior to the loss; and the income growth rate between the base year and the compensation period to project anticipated earnings in the compensation period when the loss was alleged to have occurred.  The projected earnings are compared to the amount actually earned during the compensation period to determine the compensable loss.  A claimant

may also receive compensation for demonstrable lost fringe benefits. The compensable loss amount calculated in this fashion is reduced by any offsets for any mitigation (loss compensation payments already received). This methodology is captured in AICPA Practice Aid 06-4 dealing with the calculation of Loss Profits.

15. The IEL Framework applies this approach. For most individual claimants, their actual earnings during their claimant-selected Compensation Period of 90 or more consecutive days between April 21, 2010 - December 30, 2010, from a "claiming job" that the claimant asserts was affected by the DWH Spill, are compared to the earnings that the claimant would have expected to earn during that period *but for* the DWH Spill.[11] The expected "but for" earnings are determined through comparison of the actual earnings to the same 90-or-more-consecutive-day Benchmark Period during claimant-selected Base Year(s), including adjustments to make the comparison a fair one. For example, the "but for" earnings projection includes a growth factor adjustment to account for expected wage increases from the Benchmark Period to the Compensation Period.[12] Similarly, the analysis also takes into account the number of hours worked during the two periods, so that if a claimant maintained his earnings level during the Compensation Period only by working more hours to make up for reduced hourly wages, those extra wages earned during his reduced free time do not reduce his recovery.[13] For a "career changer" whose prior employment is not comparable to their employment during the Compensation Period, or for a first time employee, the IEL Framework uses as a Benchmark

---

[11] See Settlement Agreement Exhibit 8A at 14-18, 23-27, 37-43.

[12] See Settlement Agreement Exhibit 8A at 5-6, 15, 24, 39-40.

[13] See Settlement Agreement Exhibit 8A at 6-7.

Period a comparable period in 2011, after the Compensation Period, or other evidence of expected wages during the Compensation Period.[14]

16.     The IEL Framework contains numerous provisions that clearly are designed to give claimants a fair opportunity to show they lost income because of the DWH Spill and, for claimants who can make such a showing, to maximize their recovery.   These include the following:

(a)     For many categories of claimants the IEL Framework presumes causation.[15] Thus, such claimants need not prove causation at all, and all of their demonstrated losses will be attributed to the DWH Spill.  Moreover, even for claimants who must establish causation (and who have several options for doing so), once they have done so, all losses are attributed to the Spill.

(b)     In taking account of growth in projecting "but for" earnings, the IEL Framework has several features that favor claimants.  First, claimants who can provide pay period documentation establishing earnings growth during the period January to April 2010 compared to the same period in the Base Year can obtain the benefit of such growth in the calculation (up to a maximum of 10%).[16] Second, the use of a presumed general growth factor for claimants in Categories I and II is inherently favorable, given

---

[14] See Settlement Agreement Exhibit 8A at 39-40.

[15] Causation is presumed for claimants who worked for an employer located in Zone A; worked for a tourism business located in Zone A or B; worked for a primary seafood industry business (as defined in the Settlement Agreement) in Zones A, B, C, or D; worked for a secondary seafood industry business (as defined in the Settlement Agreement) in Zones A, B, or C; or worked for a charter fishing business in Zones A, B, or C.  See Settlement Agreement Exhibit 8A at 13, 21-22, 32-33.

[16] See Settlement Agreement Exhibit 8A at 5-6, Definition N.

high unemployment in many parts of the region in 2011.[17]  Similarly, the operation of the growth factors to preclude negative growth for most claimants whose earnings demonstrated negative growth is highly favorable to claimants.[18]

(c)     The Framework provides (most) individual claimants with the flexibility to choose the Base Year(s) and a Compensation Period to maximize their recovery. Claimants with prior comparable employment as shown by tax or pay period documentation can select 2009, the average of 2008 and 2009, or the average of 2007, 2008 and 2009 as their Base Year(s).[19]  This allows them to identify the Base Year(s) that they believe is truly most representative of their prior earnings and/or will maximize their recovery.  Similarly, claimants in Categories I, II and III can select their Compensation Period of 90 days or more, provided that it coincides with pay periods' beginning and end dates (which is a reasonable requirement for administrative manageability).[20]

(d)     Section 4.4.13 of the Settlement Agreement provides that claimants may be reimbursed for reasonable and necessary accounting fees relating to claims preparation.  By encouraging claimants to obtain accounting assistance, this provision increases the likelihood that claimants will submit properly documented claims and be able to make the Base Year and Compensation Period choices most favorable to them.

---

[17] See *id.*

[18] See *id.*

[19] See Settlement Agreement Exhibit 8A at 3, Definition B.

[20] Category IV claimants who lack such contemporaneous documentation are limited to using 2009 as a Base Year and their Compensation Period is the entire period April 20, 2010 - December 31, 2010.  These limitations are reasonable given the lack of documentation.

(e)    Section 4.3.8 of the Settlement Agreement provides further assurance that claimants will benefit from the choices they are given with respect to selecting a Base Year and Compensation Period.  It provides that the Claims Administrator must evaluate the information submitted by the claimant to produce the greatest Economic Damage Compensation Amount that the Framework allows given the facts of the claimant's case. Thus, even if the claimant fails to select the optimal Base Year and Compensation Period, the Claims Administrator is required to do that for the claimant to maximize his recovery. In my experience this type of requirement that the claims administrator go beyond merely processing a claim to produce the best possible result is unprecedented.  Indeed, it is a more favorable standard than exists in litigation, where litigants' recoveries are generally limited to the claims they make and prove.

(f)    The application of a Risk Transfer Premium (RTP) to lost earnings for most claimants, based on their industry and the geography where they work, further assures that claimants with valid claims will be fully compensated.[21]  The RTP compensates claimants for, among other things, the possible risk of future loss -- which may never occur.  In the few instances where RTP is not provided, those omissions appear reasonable either because the claimant has not established the likelihood of future employment at the claiming job (and, therefore, that he/she is at any risk of additional or future loss) or because the documentation of lost earnings is very limited.

(g)    The One Time Loss Addendum to the IEL Framework for individuals in Categories I-III similarly reflects an effort to assure that claimants are made whole for

---

[21] See Settlement Agreement § 38.126.

DWH Spill-related lost earnings.[22]  This provision addresses the circumstance where a claimant lost earnings in 2010 due to the loss of an opportunity for earnings from an extraordinary "One Time, Non-Recurring Event" that did not occur in prior years.  In such circumstances the Benchmark Period earnings would not reflect earnings from such an event, and use of those earnings to project expected "but for" post-DWH Spill 2010 earnings would understate those earnings and the claimant's loss.  The one-time, non-recurring loss provision avoids this result by permitting the claimant to establish such a one-time, non-recurring loss.  The requirements of the provision are logical and reasonably designed to ensure that the claimed one-time loss is truly an unusual "One Time, Non-Recurring Event" that would not already be reflected in prior period earnings.

(h)     The IEL Framework also provides for recovery by individuals in Categories I-III of additional amounts necessary to make them whole.  These include reimbursable job search costs, reimbursable training costs (for training that resulted in employment),[23] and compensation for lost benefits, including health insurance and retirement/pension benefits.[24]  The criteria for these additional elements of recovery seem reasonably designed to permit recovery for demonstrated employment-related expenses or lost benefits due to the loss of employment or earnings.

17.     The IEL Framework also includes other provisions that are particularly generous in my experience.  For example, Category III of the IEL Framework provides for compensation of individuals who were offered and accepted employment that was subsequently revoked, even

---

[22] See Settlement Agreement Exhibit 8A at 52.

[23] See Settlement Agreement Exhibit 8A at 18, 26-27, 43.

[24] See Settlement Agreement Exhibit 8C.

if they have not worked since then because family obligations, a medical condition, or a return to school precluded such work.  This approach takes account of claimants' circumstances and, in effect, gives the "benefit of the doubt" to claimants facing family obligations or medical challenges.[25]

18.     The IEL Framework is similarly generous in allowing Category IV claimants who do not have tax returns or pay period documentation to establish lost earnings by providing sworn individual and employer written statements.[26]  This means that even individuals who lack tax returns or pay period documents because they earned so little that they were not required to file returns, or because they were working "off the books," can potentially recover URI under the Settlement Agreement.  I am unaware of any other settlement or compensation system that permits recovery for lost earnings without tax returns or pay period documents based only on sworn written statements, but the use of third parties to corroborate claimed income is a reasonable method of verification.  For example, in my church's granting of Katrina relief funds, the fund required third party verification to ensure that applicants were eligible and were for example, renting an apartment at a given complex, in order to avoid paying fraudulent claims.  Given that the absence of contemporaneous tax or pay period documentation creates at least some heightened risk of fraud, which is inherent in any payment program, it also is reasonable to cap compensation at $20,000 -- particularly, where, as here, such claimants may still receive an RTP of 1.

---

[25] See Settlement Agreement Exhibit 8A at 28-43.

[26] See Settlement Agreement Exhibit 8A at 44-51.

19.    The provisions permitting recovery by Individual Periodic Vendors and Festival Vendors are similarly favorable to claimants.[27]  Such claimants are technically self-employed and, under the tax laws, should normally be expected to file tax returns reflecting such self-employment income on a Schedule C attached to their Federal 1040.  The IEL Framework, however, permits such individuals to provide alternative documentation of their losses even if they have not filed such returns (for any reason).  Once again, this flexibility in the framework benefits potential claimants, using an approach that permits them to demonstrate and recover for losses, even if they do not appear to be not in strict compliance with applicable tax requirements.

20.    The Seafood Crew Compensation Plan For Individuals is similar in several respects to the IEL Framework which I have concluded appears reasonable, adequate, and fair to claimants.[28]

(a)    Like the IEL Framework, the Seafood Crew Plan categorizes claimants by the type and quality of earnings documentation they can provide.[29]

(b)    The definitions of Tax Information Documents or Pay Period Earnings Documentation that a claimant may use to establish historical earnings are essentially identical between the two frameworks and include documents that are reasonably related to establishing earnings and that are likely to be possessed by claimants.[30]

---

[27] See Settlement Agreement Exhibit 8D.

[28] See Settlement Agreement Exhibit 10 at 65-84, Seafood Crew Plan.

[29] Compare Settlement Agreement Exhibit 8A at 2 with Settlement Agreement Exhibit 10 at 65.

[30] Compare Settlement Agreement Exhibit 8A, Categories I and II with Settlement Agreement Exhibit 10, Seafood Crew Plan, Category I.

(c)     Like the IEL Framework, the Seafood Crew Plan uses earnings in a
Claiming Job in a Base Year as the basis for determining compensation for lost earnings
in 2010 after the DWH Spill.  Claimants in Seafood Crew Category I, which requires
documentation comparable to Individual claimants in Categories I and II, similarly may
choose as their Base Year(s) 2009, the average of 2008 and 2009 or the average of 2007,
2008 and 2009.

(d)     Like the IEL Framework, the Seafood Crew Plan contains a provision that
is favorable to claimants because it permits claimants who lack Tax Information
Documents or Pay Period Documentation to establish earnings history in 2009, or
anticipated earnings from a job they were offered and accepted in 2010, with a claimant
Sworn Written Statement and an employer Sworn Written Statement.[31]  As I observed in
regard to the similar provision under the IEL Framework, a provision permitting recovery
for undocumented income is unusual in my experience.  Under both the IEL Framework
and the Seafood Crew Plan, the claimant may be subject to an interview for verification
of information and is limited to using 2009 as the Base Year.  Under both the IEL
Framework (except for certain limited exceptions (i.e., Category IV)) and the Seafood
Crew Plan, there is a cap on compensation.  These requirements and restrictions on
compensation and appeal rights are reasonable protections against fraud given the
absence of contemporaneous employment documentation.

---

[31] Compare Settlement Agreement Exhibit 8A, IEL Framework, Category IV with Settlement Agreement Exhibit 10, Seafood Crew Plan, Category II.

(e)     Finally, the RTPs of 2.25 for Seafood Crew in Categories I and II are comparable to the RTPs available under the IEL Framework for most Primary Seafood Processors, Secondary Seafood Processors and Landing Sites.

21.     The Seafood Crew Plan goes even farther than the IEL Framework in permitting claimants without documentation of historical earnings to recover.  Category III of the Seafood Crew Plan permits a claimant without Tax Information Documents or Pay Period Earnings Documentation, and who cannot obtain an employer Sworn Written Statement, to recover nonetheless if he can provide Sponsor Sworn Written Statements from individuals other than close family members and, if applicable, an Attorney Sworn Written Statement.[32]   In my experience, I have not previously seen a benefit or claim plan that permits a claimant to recover for lost wages with such limited supporting information; this is an extraordinarily favorable provision for claimants.  The required documentation of the claimant's employability and the requirements for the contents of the claimant, Sponsor and Attorney Sworn Written Statements all seem logically related to establishing the claimant's employability and actual employment history on which he bases his claim.  The provisions that the claimant may be subject to an interview for verification of information and is limited to using 2009 as the Base Year, that there is a cap on compensation, and that there are no appeal rights, all appear to be reasonable protections against fraud given the absence of contemporaneous employment documentation or even an employer Sworn Written Statement.

_____

[32] See Settlement Agreement Exhibit 10.

22.   All in all, the Seafood Crew Compensation Plan is a reasonable, and indeed claimant-friendly process for a claimant to establish lost seafood crew wages due to the DWH Spill and to recover for that loss.

## BUSINESS ECONOMIC LOSS

23.   The documentation requirements for BEL claims (including Start-Up and Failed Business Claims) are reasonable and provide flexibility that is favorable to claimants. The required documents are logically and directly relevant to analyzing causation and compensation under the frameworks. Moreover, the documentation requirements will not unreasonably burden valid claimants. The required documents are those claimants would either keep in the ordinary course of business or may readily prepare from records that would be kept in the ordinary course of business. Claimants' ability to use contemporaneously maintained records to prepare required financial statement schedules that may not have been prepared in the ordinary course of business[33], and the availability of reimbursement for accounting services necessarily incurred to prepare documentation or complete the claim form (see Settlement Agreement § 4.4.13), assure that documentation requirements will not pose a barrier to valid claims.

24.   The causation requirements of the BEL Framework appear more than reasonable. For businesses in Zone A or in certain industries in Zones B and C or Primary Seafood Processors in Zone D, there is a presumption of causation, which will inevitably include businesses that were not economically or financially affected by the DWH Spill.[34] This alone is an unusually generous feature and atypical, in my experience, in economic loss cases. For those

---

[33] See, e.g., Settlement Agreement at § 38.38, definition of "contemporaneous"; Settlement Agreement Exhibit 4A ¶ 4; Settlement Agreement Exhibit 5 at § IV.2.

[34] See Settlement Agreement Exhibit 4B at 1

businesses that do not qualify for a presumption of causation, there are multiple tests under which they can qualify and establish causation.[35]  This variety of test options gives claimants multiple ways to establish causation, which appears to be more than fair.

25.     Moreover, the causation tests reflect reasonable expectations about the economic harm the DWH Spill could have caused to a business, and therefore are appropriate tests for the purpose of establishing causation.  The "V tests" require that a business demonstrate a loss after the DWH Spill and a subsequent recovery.  Based on my experience analyzing economic loss litigation cases, it is reasonable to expect a recovery at some point after a demonstrated loss where the circumstances claimed to have caused the loss have changed.  The tests reflect this reasonable expectation.  Moreover, the tests contain exceptions where it is reasonable to expect that other factors may have prevented a recovery, such as entrant of a new competitor or construction preventing customer access.

26.     Like the IEL Framework, the BEL Framework uses the well-recognized approach of measuring lost earnings or profits by comparison of the post-DWH Spill Compensation Period to a Benchmark Period.  One specific example of this would be the National Pollution Funds Center's methodology for recovering claims for Lost Profits and Earnings Capacity due to an oil spill.  (See www.uscg.mil/npfc/claims/damages_lost_profits.asp#top). To prove lost profits the claimant must show among other things:  1) that income was reduced; 2) the amount of profits and earnings during similar periods (BENCHMARKS); and 3) how much income was received from alternative business (for example, VoO payments).

---

[35] See Settlement Agreement Exhibit 4B at 1-10.

27.     The BEL Framework's measurement of lost profits by reference to differences in variable profit between Benchmark and Compensation Periods is reasonable and consistent with the general approach used in business economic loss cases.  Variable profit is a widely-accepted, traditional metric for measuring business performance and profitability.[36]

28.     The BEL Framework's classification of expenses as "fixed" or "variable" is reasonable.[37]  Many categories of business expenses have both fixed and variable elements.  It is reasonable for ease of administration and consistency of treatment to categorize expenses as fixed or variable.  The categorizations are sensible based on my knowledge of the nature of these types of expenses.

29.     Indeed, if anything, the categorizations -- and, therefore, the compensation formula that relies on them -- favor claimants, because certain costs categorized as "fixed" also can be variable.  For example, rent is categorized as "fixed," even though a business facing a decline in revenues might seek to abate or reduce its rent.  Under the BEL Framework, to the extent a claimant actually received abated rent and reduced its expenses, that reduction of a "fixed" cost would not be reflected in the compensation calculation and would not reduce the size of the claimant's claim and the compensation amount paid.  Put differently, the claimant would recover for the "loss" attributed to rent payments, even though in fact he managed to avoid the loss (or some part of it) by obtaining a rent holiday or reduction.  Additionally based on my experiences dealing with multiple businesses over the years, expenses such as Auto, Cleaning and Housekeeping, Security, Supplies and Utilities – all of which are classified as fixed

---

[36] See, e.g., AICPA Financial Valuation Services Practice Aid 06-4 – Calculating Lost Profits.

[37] See Settlement Agreement Exhibit 4D.

– should have decreased; however, these costs, even if avoided, would not be taken into consideration to decrease the recovery by a claimant.  In such a circumstance, this benefit is magnified by the RTP multiplier.

30.     The BEL compensation methodology is reasonable and flexible in several ways that benefit claimants.

(a)     Claimants may select one of three Benchmark Period years (2009, average 2008-09, average 2007-09).[38]  This allows a claimant to select the most favorable period for comparison.  It takes into account specific facts and circumstances of the business' performance.  It also takes into account the possibility that 2009, a recession year, may not be a typical benchmark.  If that is the case for a claimant, the business is permitted to choose a different Benchmark Period that averages 2009 with 2008 or 2007 and 2008.  At the same time, if 2007 and/or 2008 were not particularly good years for the business but 2009 was an unusually good year, the business has the option of using only 2009 for its Benchmark Period and therefore increasing its compensation.  In my experience, if claimants were to litigate, the period used for the benchmark period would be fiercely disputed and the claimant would be unlikely to end up with the most beneficial period.  In fact, it would be unreasonable to allow the claimant to "cherry pick" the period in litigation.  Historical data would be utilized to establish a base amount or benchmark to reflect both good and bad periods.  Under the BEL Framework, the settlement gives claimants whatever Benchmark Period is best for their individual circumstances among the three options.

---

[38] See Settlement Agreement Exhibit 4C at 1-2.

(b)      In addition to having a choice as to Benchmark Period years, claimants also get to choose their Compensation Period of three or more consecutive months.[39] This additional element of choice also provides flexibility and the ability to take into account the specific facts and circumstances of their business.  The three month minimum period is a reasonable requirement because it eliminates the risk that normal month-to-month variations in business performance are not mistaken for a trend of declining performance due to the DWH Spill.

(c)      Moreover, the provision of the Framework that a claimant may select Compensation Period months different than the months used to establish causation also is favorable to claimants and potentially increases the compensation they can receive.[40] Typically, a claimant's compensation is calculated based on the period during which the claimant establishes that the defendant's conduct caused damage.  Permitting claimants the flexibility to choose a different three or more month period for compensation and causation maximizes their ability to establish causation and the amount of compensation received.

(d)      The BEL Framework employs a growth factor methodology that also is favorable to claimants.

(i)      First, the use of a growth factor assures claimants will be made whole.  That is, rather than assuming that a business would have performed identically in 2010 compared to the prior claimant-selected benchmark years "but

---

[39] See Settlement Agreement Exhibit 4C at 1.

[40] See Settlement Agreement Exhibits 4B and 4C, *Addendum to Causation Requirements for Business Economic Loss Claims and Compensation Framework for Business Economic Loss Claims.*

for" the DWH Spill, the methodology takes account of the possibility that the business might have experienced growth in 2010 compared to prior years and compensates for lost or diminished growth in variable profit.[41]

(ii)     Second, the Framework includes certain assumptions about growth that are favorable to claimants.  The use of a presumed growth factor of 2% means that even claimants whose economic performance in the pre-DWH Spill period of January-April 2009 compared to the comparable pre-DWH Spill period of January-April 2010 indicates that their business was not growing -- or, indeed, was declining -- prior to the DWH Spill will get the benefit of a growth factor.[42] Thus, a business that actually was experiencing negative growth prior to the DWH Spill will not have its compensation reduced to account for that negative growth.  Moreover, the presumed 2% growth factor means that for businesses that grew less than 2%, or which declined, their growth factor used in the compensation will reflect greater growth than they actually experienced in the January-April period (up to a 10% cap).

(iii)     Third, the Framework provides that the growth factor is applied to a period of no less than 6 months, even if the claimant-selected Compensation Period is shorter than that.[43]  This unusual but beneficial feature will increase compensation for some claimants who pick Compensation Periods of less than

---

[41] See Settlement Agreement Exhibit 4C at 2-4.

[42] See Settlement Agreement Exhibit 4C at 2.

[43] See Settlement Agreement Exhibit 4C at 4.

three months by providing them compensation for lost growth even in months where the claimant has not alleged losses due to the DWH Spill.

(e)     As with claims under the IEL Framework, claims under the BEL Framework are covered by Section 4.4.13 of the Settlement Agreement, which provides that claimants may be reimbursed for reasonable and necessary accounting fees relating to claims preparation.  By encouraging claimants to obtain accounting assistance, this provision increases the likelihood that claimants will submit properly documented claims and be able to make the Benchmark Year and Compensation Period choices most favorable to them.

(f)     Similarly, BEL claims are subject to the requirement of Settlement Agreement § 4.3.8 that the Claims Administration process must process the information provided in the Claim Form to provide a BEL claimant with the greatest economic damage compensation amount.  Under this provision, even if the claimant does not select the most advantageous Benchmark Period or Compensation Period, the Claims Administration process is required to analyze and process the claim in a way that does pick the periods most advantageous to the claimant.  In my experience, this provision is unique: I am not aware of any other claims process that provides this protection to business economic loss claimants.  This is significant in that it seeks to provide for the maximum recovery by claimants regardless of whether their own analysis or choices require a lower payout.

31.     The BEL compensation methodology is reasonably designed to make claimants whole for their losses.  In addition to compensation for lost profits during the Compensation

Period, as explained above, including a growth factor, claimants also receive an RTP multiplier that compensates them for, among other things, any potential risk of future losses (which may or may not occur).[44]

32.     Claimants who qualify for compensation but have already received some DWH Spill-related compensation through other mechanisms (e.g., the GCCF), benefit from the framework's method of subtracting such prior payments.[45]  The prior payments are subtracted after the addition of the RTP rather than before the RTP multiple is applied.  This approach means that the RTP multiplier, which compensates for potential future damages, assumes no offsetting variable profit that might mitigate such future damages if they ever occurred.  This a generous approach, because it provides compensation for future losses that might (or might not) occur, while not subtracting amounts for mitigation that might also occur if the future losses were to occur. .

33.     The Multi-facility Business Framework benefits claimants by providing them with flexibility.  Businesses with multiple facilities all located in the Gulf Coast Areas have a choice of filing a claim for the entire business or filing separately for each facility.[46]  This permits businesses that experienced losses in some but not all facilities to file claims for the facilities that experienced losses, even where the business as a whole did not suffer a loss. Similarly, it permits multi-facility businesses with facilities outside the Gulf Coast Areas to file claims for facilities within the Gulf Coast Areas.  The documentation requirements, which require a business filing separate claims for each facility to provide stand-alone financial

---

[44] See Settlement Agreement § 38.126 and Exhibit 4C at 5.

[45] See Settlement Agreement Exhibit 4C at 5.

[46] See Settlement Agreement Exhibit 5.

statements for each facility, seek information logically required for analysis under the framework.  Moreover, the provision permitting claimants to construct such stand-alone financial statements based on contemporaneously-maintained books and records means that even claimants who did not need to prepare contemporaneous monthly financial statements may take advantage of this framework if they maintained appropriate contemporaneous business records.[47] The availability of accounting fee reimbursement can also be expected to encourage multi-facility business claimants to take advantage of this option.  The requirement that business-wide costs be allocated among facilities based on each facility's share of revenues is reasonable and consistent with established practice.

34.     The Failed Business Framework provides a reasonable methodology for evaluating and compensating claims by failed businesses and failed start-up businesses.[48]  The formula--last 12 months' EBITDA multiplied by an empirical industry multiple minus realized liquidation value--is a widely-recognized measure of damages for failed businesses.  The "Pratt's Stats" that are used as the source for an industry multiple are widely recognized as the standard source for such multiples.[49]  Indeed, the Failed Business Framework is more generous than the typical methodology for evaluating failed start-up business claims because it includes a methodology permitting a failed start-up business claimant to recover for uncompensated "sweat equity" labor performed in connection with the business.[50]  It is also more generous because to the extent the business was not even a viable business at the time of the DWH Spill, the

---

[47] See Settlement Agreement Exhibit 5 at 3.

[48] See Settlement Agreement Exhibit 6.

[49] See Settlement Agreement Exhibit 6 at 10.

[50] See Settlement Agreement Exhibit 6 at 6-9.

framework assumes that its failure was a result of the DWH Spill (depending on geographic zone of the business), unless one of the exclusion criteria in Section 3 of the Failed Business Framework were to apply.  This is the case even where there might be indicators of imminent business failure prior to the DWH Spill.  For example, in litigation, the failed business would be forced to prove its demise was not already imminent.  Cash flow analysis, sales trends and increased competition in the market over a period of time would be analyzed to show whether or not the business was indeed a viable going concern prior to the DWH Spill.  The lack of an RTP multiplier for a failed business claim is reasonable, given that there is no continuing or future loss because claimants are being compensated for the total pre-DWH Spill value of the business.

35.    The Framework for Start-Up Business Claims provides a reasonable methodology for evaluating and compensating claims by a start-up business.[51]  The definition of a start-up business with limited history is reasonable, as are the options provided to the claimant for the Benchmark against which the 2010 Compensation Period earnings are to be compared.  Given the limited history of the business, the first option, which uses the 2011 period as the Benchmark Period to be compared to the 2010 Compensation Period, is sensible.  Similarly, the alternative option, under which the claimant may rely on projections for the 2010 Compensation Period that were used by a third-party lender,[52] is reasonable:  this option provides the claimant with flexibility while at the same time providing some assurance (through the third-party lender requirement) that the projections were reasonable.[53]  Reliance on an independent third-party's

---

[51] See Settlement Agreement Exhibit 7.

[52] See Settlement Agreement Exhibit 7 at 8-9.

[53] See Settlement Agreement Exhibit 7 at 8-9.

use of projections is a recognized method of corroborating the reasonableness of such projections.

36.    In summary, in my opinion the methodologies provided in the Settlement Agreement for compensating business economic loss claims (including for multi-facility, failed business, failed start-up business, and start-up claimants) and individual economic loss claims (including for seafood crew under the Seafood Compensation Program) are reasonable, adequate, and indeed, generous.    The basic approaches are well-recognized.    The documentation requirements for individuals, including seafood crew, are significantly more liberal than is typical. The presumptions of causation that apply to many businesses and individuals in zones closest to the DWH Spill is unusually generous in eliminating what is normally a significant proof requirement to recover in litigation for lost revenue or wages.  And the compensation methodologies, including RTP for most claimants, are generous in compensating claimants for all losses they can prove and even for potential future losses that may never occur. In sum, the compensation methodologies are fair, reasonable, and adequate from my perspective and in my experience.

37.    I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this //⁴ᵗʰ day of ___*Aucus7*___, 2012.

James L. Henley, Jr.

28

# Henley Declaration
# Exhibit A



## James L. Henley, Jr., J.D., CPA, CFF
**(Certified Public Accountant – Certified in Financial Forensics)**
P.O. Box 31464
Jackson Mississippi 39286-1464
601-519-7873

## EDUCATION:

Doctor of Jurisprudence with Special Distinction, Mississippi College School of Law
May 14, 1994
B.B.A. Accounting, Millsaps College, May 1983
C.P.A. License 3098 - April 26, 1985
Mississippi State Bar License 9909 – September 2004

## LAW EMPLOYMENT HISTORY:

**The Law Office of James L Henley, Jr.**
P.O. Box 31464
Jackson, Mississippi 39286-1464
December 20, 1995 - Present

**Butler, Snow, O'Mara, Stevens & Cannada, PLLC**
Deposit Guaranty P1aza
Jackson, Mississippi 39201
August 16, 1994 - December 19, 1995

## FINANCIAL EMPLOYMENT HISTORY:

Currently: **Chapter 13 Trustee, U.S. District for the Southern District of Mississippi**
Appointment Effective: March 1, 2000
Administrator of Chapter 13 Bankruptcy filings in the United States Bankruptcy
Court for the Southern District of Mississippi. Analysis of financial condition of
Chapter 13 Plaintiffs.
March 2000 - Present

Currently: **Henley & Company, CPA's**
P.O. Box 31464, Jackson, MS 39286-1464
Position: Partner
Work Experience: Tax and business consultation, review, compilations and analysis

1

of various business areas of clients. Clients include HMO's medical clinics, physicians, pharmacists, podiatrist, dentists, attorneys, and musicians.
December 1991 - Present

**Department of Justice — Office of United States Trustee**
100 W. Capitol Street, Suite 706, Jackson, M5 39269
Position: Bankruptcy Analyst
Work Experience: Examination/analysis of financial information, disclosure statements and plans in Chapter 11 cases.  Supervision and monitoring of performance of Chapter 7 and 13 trustees via report reviews and on site reviews.
November 1989 – May 1992

**Performance Evaluation Expenditure Review Committee**
**Joint Legislaative Investigative Committee**
P.O. Box 1204, Jackson, MS 39205
Position:  Senior Analyst
Work Experience: Investigation, analysis and write-up of various governmental entities who received funding from State of Mississippi. Supervision of staff on projects.  Revenue and cost projections of proposed legislation.
May 1988 – October 1989

**Arthur Anderson & Co., CPA's**
201 St. Charles Ave, Suite 4500, New Orleans, LA 70170
Position: Semi-Senior, Audit Division
Work Experience: Audits, reviews and compilations of various industries. Primary areas were (1) Financial Institution audits and, (2) Southern Baptist Hospital audit and review of compliance with construction bond requirements as they related to cost reimbursements.
May 1983 – August 1985

## OTHER EMPLOYMENT HISTORY:

**IBM**
Grand Rapids, Michigan
Position: Systems Analyst
Work Experience: Analysis and review of various industry financial accounting systems. Development and implementation of software solutions to assist management in the evaluation of economic results related to financial operations. Development and presentation of financial solutions. Development and implementation of system conversions.
August 1985 – August 1987

**Jackson State University** — Adjunct Instructor of Entrepreneurship, Business Law and Collective Bargaining.

**Tougaloo College** — Adjunct Instructor of Accounting Principles, Advanced Accounting and Auditing.

**Jackson Public Schools** — Adult Learning Instructor of Introduction to Computers and Small Business Taxes.

## ORGANIZATIONS:

American Bar Association
Mississippi Bar Association
Magnolia Bar Association (Past President)
Magnolia Bar Foundation (Past President)
Mississippi Society of Certified Public Accountants
American Institute of Certified Public Accountants
Omega Psi Phi Fraternity
Board of Directors of Metropolitan Jackson YMCA, Inc. (Former Treasurer & Executive Board Member)
Board of Directors of Bethany Christian Services, Inc. (Former)
Leadership Jackson - Class of 1996
Fresh Start Ministries, Inc. - President

3