# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF DONALD J. LANDRY

I, Donald J. Landry, submit this declaration in support of the Motion For Final Approval Of *Deepwater Horizon* Economic And Property Damages Settlement Agreement As Amended On May 2, 2012 filed by BP Exploration & Production Inc. and BP America Production Company ("BP") in the above-captioned litigation. I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are my own.

## INTRODUCTION

1. My name is Donald J. Landry.

2. I am currently the owner of Top Ten Hospitality Advisors, an independent consulting company that provides networking, marketing and development services to hospitality industry owners, operators, developers and suppliers.

3. I also currently serve on the board of directors of Hersha Hospitality Trust, a real estate investment trust, Supertel Hospitality Inc., a real estate investment trust, and on the advisory boards of Unifocus, a systems and technology company specializing in hospitality,

Campo Architects, a architectural firm specializing in hotels and adaptive reuse, Revenue Performance Interactive, an e-commerce marketing company specializing in hospitality, Windsor Capital Group, an owner and operator of hotels, VOILA' Hospitality Rewards, a company that markets frequent traveler rewards programs for independent hotels, and Armstrong Hospitality, a hotel development company.

4.   I am a 43-year veteran of the lodging industry, and served as president of some of the largest hotel management, real estate and franchise companies in the world. A copy of my *Curriculum Vitae*, which lists my professional experience and areas of expertise, is attached as Exhibit A.

5.   I began my career at Sonesta Hotels in New Orleans while studying at the University of New Orleans. I hold a Bachelor of Science in Business Management from UNO where I was 1999 Alumnus of the year. I currently serve on the board of the UNO hotel school.

6.   I was the former vice chairman of the board and CEO of Sunburst Hospitality Corporation, a hotel real estate and management company which owned and operated 75 hotels with over 10,000 rooms in 25 states including Florida and Texas.

7.   I was also president of Choice Hotels International, a company with over 4,000 franchised hotels in 30 countries. During my tenure at Choice, I launched MainStay Suites and Choice Picks food courts. Prior to Choice, I served as president of Manor Care's hotel division and assisted living division. As president I was personally involved in acquiring 36 hotels and building 37 hotels throughout the USA. This required detailed analysis of markets including those in Florida, Louisiana, Texas and Alabama.

8. I also served as Executive VP and COO and President of the management division of Richfield Hotel Management, Inc. where I was responsible for the management of 171 hotels and President of MHM, Inc. a hotel management company acquired by Richfield. I previously served as SVP of marketing for MHM and VP of operations for the Southeast U.S. My operations and marketing responsibilities included market studies and operational reviews of properties in the Gulf Coast states, specifically, New Orleans, Baton Rouge, Lafayette, Houma, Alexandria, Shreveport, Biloxi, Mobile, Gulf Shores, Pensacola, Tampa, Beaumont, Orange City, and Panama City Beach.

9. I am a former board member of Friendly Hotels in the UK, HotelTools, Revpac, Arescom and Choice Hotels Canada. I served as the vice chairman of the Educational Institute of the American Hotel and Lodging Association, the chair of the Johnson and Wales University advisory council, chair of the International Society of Hotel Management Companies, President of the Dallas Hotel Association, and on the board of the Texas Hotel Association.

10. I am a frequent speaker at hotel industry conferences including The Lodging Conference, The Midwest Lodging and Investment conference, the Hunter Lodging Investment conference, The American Lodging Investment Seminar and at hospitality schools including University of New Orleans, Cornell University, Michigan State University, University of Houston and all four campuses of Johnson and Wales University.

11. As a standard part of my business practice over the last 40 years, and as chairman of both Hersha's acquisition committee and Supertel's investment committee, I have monitored economic conditions in all major markets including the Gulf Coast on a regular basis. This type of comparative analysis of the Gulf Coast economy is necessary to support my research and

3

business consulting activities.  I am therefore knowledgeable about the economic conditions in this region.  Data sources I routinely review include Smith Travel Research ("STR"), Lodging Econometrics, Pannell Kerr Forster (PKF) and Hotel Valuation Services (HVS) data.

12. Through my experience in the hospitality industry, I am personally familiar with the geography of the Gulf Coast region, particularly Louisiana. I have traveled extensively throughout the region and am familiar with the major feeder roads and tourism destinations in Louisiana and the Gulf Coast.

13. I also currently reside in Slidell, Louisiana.  I understand that I may be eligible to file a claim as an owner of an eligible parcel of wetlands property.  However, I have no opinions about Wetlands Real Property Compensation or the Wetlands Real Property Claim Framework.

14. I am an independent expert retained by counsel for BP for the purpose of evaluating the proposed *Deepwater Horizon* Economic and Property Damages Settlement Agreement (the "Settlement Agreement") between BP and the Plaintiffs (collectively, the "Parties").

15. I did not personally participate in: (i) drafting or preparing the Settlement Agreement or the settlement frameworks or methodologies that are incorporated into the Settlement Agreement; (ii) the settlement negotiations between BP and Plaintiffs' counsel, the Plaintiffs' Steering Committee ("PSC"); or (iii) advising any of the Parties whether to agree to the terms of the Settlement Agreement.

**MATERIALS REVIEWED**

16. In preparation for submitting this declaration, I have reviewed the Settlement Agreement and all of its appendices that are applicable to Business and Individual Economic Loss. This includes the Map of Economic Loss Zones (Exhibit 1A to the Settlement Agreement); Zone Definitions (Exhibit 1B to the Settlement Agreement); Zone Classifications and Implementation (Exhibit 1C to the Settlement Agreement); Tourism Definition (Exhibit 2 to the Settlement Agreement); the documentation, compensation, and causation frameworks for businesses (Exhibits 4A-E to the Settlement Agreement); the specialized frameworks for multi-facility (Exhibit 5 to the Settlement Agreement), failed (Exhibit 6 to the Settlement Agreement), and start-up businesses (Exhibit 7 to the Settlement Agreement); the compensation, causation, and documentation framework for individuals (Exhibits 8A-E to the Settlement Agreement); and the economic loss and property class definition exclusions, including the applicable NAICS codes (Exhibits 16-19 to the Settlement Agreement).

17. I also reviewed the Claim Forms and their instructions and Frequently Asked Questions ("FAQ's") and answers available to claimants on the Claims Administrator's website.[1]

18. I also reviewed the Claims Administrator's claims statistics, as posted on the settlement website.[2]

19. I also reviewed objections relevant to tourism-related business and individual economic loss claims.

---

[1] Available at www.deepwaterhorizonsettlement.com

[2] Available at www.deepwaterhorizonsettlement.com

20.     In addition, I have reviewed the STR data for periods before and after the start of the oil spill on April 20, 2010 as well as data from the Alabama Gulf Coast Convention and Visitor's Bureau (AGCCVG). STR data is widely relied upon by industry participants and is recognized as the standard source for evaluating tourism and hotel industry performance. STR reports from April 2008 to June 2012 were sampled for trends. In general, the Gulf Coast markets recovered quickly from the spill and exceeded 2009 pre-spill RevPAR ( Revenue Per Available Room) in the fall of 2010, 2011 and spring of 2012.

## OPINIONS

21.     I have been asked to render an opinion regarding the fairness and reasonableness of several aspects of the Settlement Agreement, including the Economic Loss Zone designations, particularly as to those Zones defined in Louisiana, the definition of "Tourism," and the Economic Loss frameworks for businesses and individuals in the hospitality industry.

22.     Based on my experience in the hospitality industry along the Gulf Coast, I believe the Zones negotiated by the Parties are logical, fair and reasonable and, among other things, take into account well-established tourism patterns in the Gulf Coast area.

23.     I also conclude that the definition of "Tourism" businesses used by the frameworks is fair and reasonable and appropriately and adequately encompasses the businesses in the tourism industry.

24.     Finally, I also conclude that the frameworks for business and individual economic loss are reasonable-to-generous and will provide more than full compensation to businesses and individuals in the tourism industry (including hospitality, lodging, and related businesses) along the Gulf Coast.

25.     The remainder of this declaration provides the basis for my opinions.

**Economic Loss Zones**

26.     The Zones included in the economic loss maps (*see* Exhibit 1A to the Settlement Agreement) logically and rationally reflect the likelihood of a potential economic effect of the oil spill on tourism businesses and risk of potential future harm. In general, the Zones are structured to reflect the fact that as distance increases from the coast, the likelihood of damage to tourism businesses is reduced. The presumption of causation lessens as distance from the coast increases, but the frameworks permit claimants to establish causation anywhere in the class geographic boundaries. Further, the use of feeder roads throughout the Zones appropriately recognizes that the tourism destinations in the Gulf Coast are "drive markets" and businesses along these feeder roads can be affected by performance of the tourism industry. In addition, as distance increases from the coast, the likelihood of future damage to tourism is further reduced, which is consistent with the lower RTPs used in more distant zones.

27.     More specifically, Zone A consists of areas where the primary economic activity revolves around Gulf Coast-related tourism. The key determinant of inclusion in Zone A is that the area relies almost entirely on the Gulf of Mexico as the resource enjoyed by visitors (*e.g.*, Grand Isle, LA).

28.     Moreover, Zone A also includes downtown New Orleans, which is the primary tourism destination in Louisiana. New Orleans is the only metropolitan area in the Gulf Coast where the primary focus is on tourism. Within New Orleans, the French Quarter is the core area of tourism activity.

29. Zone B consists of supplemental tourism areas which rely heavily on Gulf Coast-related tourism but whose economic activity also serves permanent residents. For example, portions of Uptown New Orleans and Southern Louisiana contain businesses that beach tourists may patronize during their time vacationing, but they also contain tourism-related businesses which cater to permanent or seasonal residents of cities and surrounding areas.

30. Zone C consists of broader areas proximate to the Gulf Coast which include businesses which rely both on Gulf-related tourism but also permanent residents. These include major cities (portions of New Orleans, Lafayette, Lake Charles, etc.) where businesses within the "Tourism" definition in fact generally cater primarily to permanent residents, but also might rely partially on Gulf-related tourism.

31. Zone C also includes feeder roads which tourists use to travel to Zone A tourist destinations (for example to New Orleans or Grand Isle). Businesses on these feeder roads cater to both traveling tourists and primary residents year round. The term "feeder road" is utilized in the hospitality industry to describe a main access road to a tourist destination.

32. Zone D consists of the other areas outside of Zone A, B, and C - the remainder of the Class geographic area.

33. Certain industry definitions and the Exclusions in the Settlement Agreement, including the Tourism definition, rely on the NAICS Codes. The NAICS Codes were developed by the U.S. Government as the standard classification of business types. Economists, analysts, and government agencies uniformly rely on NAICS Codes to categorize businesses. Use of the NAICS Codes will provide claimants and the court-approved Settlement Program with an objective, transparent standard for determining how a business should be classified.

34. The Tourism Definition relies on the NAICS Codes associated with the tourism industry. It accurately and expansively captures the nature and scope of the industry in the Gulf Coast region. The NAICS Codes do not isolate Travel and Tourism under one general code. The complete NAICS Codes can be used to identify Travel and Tourism related business classifications. The codes used under the Tourism definition in the Settlement Agreement appear to be broad and inclusive of businesses related to tourism. It also is important to recognize that the nature of tourism can vary from zone to zone. For example, restaurants in all zones are likely to serve non-local customers, but restaurants in Zone A are more likely to serve more non-local customers than restaurants in Zone C. The higher causation standards and lower RTPs for tourism businesses in more distant zones appropriately reflect the lesser importance of non-local customers for tourism business in these areas. As a result, the possibility that a decline in revenue is due to the spill is smaller in areas more distant from the coast, and the likelihood of future spill-related harm is also smaller in these areas.

35. The geographic zones used for Louisiana appear different from the states of Florida, Mississippi and Alabama. Louisiana, unlike FL, MS, and AL, does not have a hard defined coast with continuous beaches. The coast is primarily marsh and the nature of tourism is substantially different. Tourism consists of some beach visits but primarily fishing, hunting, and eco, wildlife, and historic site tours. Zone A extends much further away from the coastline than in other states, and this is rational based on the nature of tourism in the state. Visitors to the Gulf Coast beaches also frequently expand travel to include New Orleans and/or south Louisiana wetlands.

36. Overall, the Zones and Tourism Definition are fair and reasonable. They take into account geographic location, industry type, seasonality, actual pre- and post-spill economic

9

performance, and anticipated growth in 2010. It is appropriate to consider industry type because certain industries are less likely to have been potentially affected by the Oil Spill.

**Individual and Business Economic Loss Frameworks**

37. The Economic and Property Loss Settlement framework for business economic loss reasonably, fairly, and adequately compensates businesses in the hospitality and tourism industry that experienced loss due to the oil spill.

38. The framework for business economic loss generally reflects the reality of the economic recovery by the beginning of 2011. The "V Tests" requiring revenue declines in the post-spill 2010 time period followed by revenue increases in 2011 are consistent with this economic reality. The recovery is also demonstrated in RevPAR data as reported by STR for May to August 2011 was higher than the same months in pre-spill 2009 for Louisiana, Mississippi, Alabama and Florida.

39. Historically, travel trends have been impacted by a multitude of factors including, weather, economic environment, demand generators, competition and social trends to name a few, and trends can be quite volatile. Based on the STR data reviewed, it appears any overall loss of business from reduced tourism that may have resulted from the Spill was replaced and more than offset by new demand leading to higher RevPAR in 2011 than in pre-spill 2009.

40. For example, data from the Alabama Gulf Coast Convention and Visitors Bureau (AGCCVB) indicate that RevPAR for May through August 2010 for the beach resort areas of Orange Beach, Gulf Shores, and Fort Morgan was 29% lower than in the comparable months of 2009. However, by May through August 2011, RevPAR for these Alabama resort areas reported

by the AGCCVB fully recovered from the 2010 decline and was 9% above 2009 levels. A similar pattern is observed in data from the Florida Panhandle. RevPAR based on STR data for hotels within one mile of the coast in Florida Panhandle counties showed a decline of 10% from May-August 2009 to the same period in 2010. However, in the same months of 2011, RevPAR had fully recovered and was 9% above 2009 levels over the same period. The destinations do not appear tainted and did not suffer long term demand decline.

41. The framework for individuals provides a reasonable, adequate, and fair process for compensating employees in the hotel and hospitality industry. The process requires documentation of earnings and includes employer's sworn statements for individuals lacking tax or employer documentation. Because completing the claim forms can be challenging for some tourism industry workers, numerous assistance centers have been and will be available at no charge to assist individuals in preparing a claim. In my opinion, the settlement proposed is fair-to-generous. Based on my experience in the hospitality industry, I conclude that the documents required by the framework are the types of documents hospitality industry employees would typically have, so that those who experienced economic loss would be able to qualify for compensation without additional burden.

42. The framework for individual economic loss accounts for individuals whose work is seasonal, periodic or festival related, which may include employees in the lodging and tourism industry. The framework permits seasonal employees in different employment categories to make a claim and qualify. The framework's requirements allow for a large variety of both direct and indirect documentation, even including personal interviews, to establish reasonable loss compensation claims. I believe the framework is flexible and more than fair. (*See* Exhibit 8A to the Settlement Agreement, Definitions E and W.) The causation requirements account for

11

seasonal employees in Exhibit 8A to the Settlement Agreement. Seasonal employees are given the benefit of a general growth factor or industry growth factor. (Exhibit 8A to the Settlement Agreement at 21-24.)

43. The Settlement Program has locations throughout Louisiana to assist claimants with understanding their rights as Class Members and the claims process. This makes compensation accessible to tourism and hospitality industry employees throughout Louisiana in a way that appears to be proactive in attempting to reach and compensate any and all such employees who may have been economically harmed by the oil spill.

**Recovery of Tourism and Hospitality on Gulf Coast**

44. Available data demonstrate both that tourism recovered quickly from the spill and that, even during the summer of 2010, some tourist-related businesses received a positive impact from the cleanup-related demand.

45. As noted above, AGCCVB data indicate that RevPAR was 29% lower in May-August 2010 compared to the same period in 2009. However, by September-October 2010, RevPAR for hotels in Alabama resort areas of Orange Beach, Gulf Shores, and Fort Morgan on the Gulf Coast was 22% higher than in the same period in 2009. A similar pattern is observed for hotels within one mile of the coast in the Florida Panhandle. As noted above, STR data indicate that RevPAR was 10% lower in May-August 2010 compared to 2009. However, by September-October, RevPAR in 2010 was 4% above levels in the comparable period of 2009 for this area.

46. The positive spill-related impact realized by some tourism businesses is reflected in the STR RevPAR data for coastal counties in the summer of 2010. These data, which cover the entire county, not just areas within one mile of the coast, indicate that RevPAR in May-August 2010 in Mobile and Baldwin counties in Alabama was 37% higher than in the same period in 2009. Similarly, in May-August 2010 RevPAR in coastal Mississippi was 14% higher than in the same period in 2009, and RevPAR in south Louisiana was 26% above 2009 levels.[3] Even in the Florida Panhandle, where there was less clean-up related demand, RevPAR in May-August 2010 was still 55% of that from the same period of the prior year.

47. As discussed above, available data indicate that tourism in the summer of 2011 more than fully recovered from declines observed in 2010, with the RevPAR measures discussed above typically exceeding pre-spill data from 2009 by a substantial margin. These data indicate that there has been no long-lasting negative impact on tourism from the spill. The strong recovery of tourism in the Gulf Coast area is verified by very consistent comments from many area tourism officials on record-setting tourism.[4] For example, in coastal tourist destinations

---

[3] Coastal Mississippi counties for which STR data are available include Hancock and Jackson and Louisiana parishes for which STR data are available include Iberia, Jefferson, LaFourche, Orleans, St. Mary, St. Tammany, and Terrebonne.

[4] "New Orleans' tourism industry also ended 2010 as the number one destination in the country for year-over-year REVPAR growth, according to Smith Travel," Kelly Schulz, Vice President for Communications and Public Relations for the New Orleans Convention and Visitors Bureau, April 15, 2011.

"We are excited that Alabama's Gulf Coast Beaches were able to re-bound so quickly and to set record numbers on top of it," Lee Sentell, director of the Alabama Tourism Department. GlobeNewswire, "Cohesive Marketing Efforts Result in $200 Million Rebound for Alabama Beaches Impacted by Gulf Oil Spill", November 4, 2011.

"All the reports from everybody I've talked to, they said the reservations are great," said Kate Wilkes, executive director of the Santa Rosa County Tourist Development Council. "They're way ahead of where they usually are. All of that advertising (with BP money) wasn't just for last year," Wilkes added. "It put us on the map. We also went into markets that we never had money to do before — Tennessee, Texas. We did a lot of television, things we couldn't do before and it really helped." Ricketts, Dusty, "Local tourism industry is red-hot", Northwest Florida Daily News, March 16, 2012.

such as Grand Isle, a beach community known for its recreational fishing and beaches, well known fishing tournaments have returned.

48.     In my opinion, the increased exposure from the spill of the high quality beaches of the Gulf Coast may well have a positive impact on overall future demand from tourists to visit the Gulf Coast. In general the affected area has experienced new record high revenues in 2011 and the trend appears to continue in 2012. The proposed settlement, which compensates for experienced losses and adds an RTP, payments meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors, should more than fully compensate businesses and individuals in hospitality and tourism for any economic harm experienced.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

_____
Donald J. Landry

Dated: 08/10/12

# Landry Declaration
# Exhibit A



**Donald J. Landry**
1492 Lakeshore blvd
Slidell, LA 70461
985 643 3877   cell 301 996 2242
Dlandry1@aol.com     www. DonLandryTopTen.com

   Don Landry CHA, is the owner of Top Ten Hospitality Advisors, an independent consulting company. He serves on the board of directors of Hersha Hospitality Trust (NYSE:HT), a real estate investment trust, Supertel Hopsitality Inc. (NASDAQ:SPPR) and on the advisory boards of Unifocus, Campo Architects, Revenue Performance Interactive, Windsor Capital Group and VOILA' Hospitality Rewards.
   A 40+ year veteran of the lodging industry, Landry served as president of some of the largest hotel management, real estate and franchise companies in the world. He is the former vice chairman of the board and CEO of Sunburst Hospitality Corporation (NYSE:SNB), a hotel real estate and management company which owned and operated 75 hotels with over 10,000 rooms in 25 states. He was president of Choice Hotels International (NYSE: CHH), a company with over 4000 franchised hotels in 30 countries. During his tenure at Choice, he launched MainStay Suites and Choice Picks food courts. Prior to Choice, Landry served as president of Manor Care's hotel division and assisted living division.
   Landry also served as EVP and COO of Richfield Hotel Management, Inc. where he was responsible for the management of 171 hotels and president of MHM, Inc. a hotel management company acquired by Richfield.
   Landry began his career at Sonesta Hotels in New Orleans while studying at the University of New Orleans. He holds a Bachelor of Science from UNO where he was 1999 Alumnus of the year. He currently serves on the board of the UNO hotel school.
   Landry is a former board member of Friendly Hotels in the UK, HotelTools, Revpac, Arescom and Choice Hotels Canada. He has served as the vice chairman of the Educational Institute of the American Hotel and Lodging Association, the chair of the Johnson and Wales University advisory council, chairman of the International Society of Hotel Management Companies, President of the Dallas Hotel Association, and on the board of the Texas Hotel Association.
   Landry is a frequent speaker at hotel industry conferences and hospitality schools. His most requested speech is  "F-Words for Success": Focus, Fast, Fresh, Flexible, Fun, Family, Friends, Faith, Fitness and Finances.

**Donald J. Landry**
1492 Lakeshore Blvd
Slidell, LA 70461
985 643 3877 cell 301 996 2242
[Dlandry1@aol.com](mailto:Dlandry1@aol.com)
[www.TopTenDonLandry.com](http://www.TopTenDonLandry.com)

**Employment history**

**Sonesta Corporation 1969 – 1972**
 Various food and beverage positions and Breakfast Manager at the Royal Orleans hotel while attending college in New Orleans.  Assistant Director of Management Services at the Royal Sonesta and the Royal Orleans Hotel.
 Assistant Controller of the Plaza Hotel New York City.

**Hotel Circle Inc 1972 -1976**
 Resident Manager then General Manager of the 373 room Le Baron Hotel Dallas Texas.

**MHM Inc.  1976 – 1989**
 Vice President of Operations, Sr. Vice President of Marketing and  President of the USA's largest independent hotel management company in Dallas Texas, operating 91 hotels.

**Richfield Hospitality  1989 -1992**
 EVP and COO of Richfield Hospitality, and President of the management division after a merger of MHM, AIRCOA, HMS and Regal Hotels, operating 171 owned and managed hotels based in Denver CO.

**Manor Care Inc. 1992 – 1996**
 President of Manor Care Hotel Division and Assisted Living Division, developing and operating 75 hotels and three assisted living facilities based in Silver Spring MD.

**Choice Hotels International  1996 -1998**
 President of Choice Hotels Inc. a publicly traded spinoff from Manor Care of 4000 franchised hotels and the Manor Care Hotel Division real estate.

**Sunburst Hospitality Inc. 1998 – 2001**
 Vice Chairman of the Board and CEO of Sunburst. Owned and operated 71 hotels, after a public spinoff of Choice Hotels. Sold the company after creating $450 million in value for the investors.

**Top Ten Hospitality Advisors  2001 – present**
 Owner of this private consulting and advisory company in Slidell LA.