# Exhibit 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

*******************************************

# DECLARATION OF HAROLD LEGGETT

I, Harold G. Leggett, Ph.D., submit this declaration in support of BP Defendants' Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012. I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are my own.

*Experience*

1. I am a consultant in regulatory affairs at PPM Consultants in Baton Rouge. In that capacity I participate in regulatory negotiations, planning and strategy for the clients of PPM. Prior to that, I was the Secretary of the Louisiana Department of Environmental Quality (LDEQ) from 2008 to 2010, where I served as the Governor's senior advisor and appointed representative for environmental policy and compliance efforts in Louisiana, and Assistant Secretary from 2004-2008. A copy of my current CV is attached hereto as Exhibit A.

2. LDEQ's mission is to provide service to the people of Louisiana through comprehensive environmental protection in order to promote and protect health, safety and welfare while considering sound policies regarding employment and economic development. During my tenure as Secretary and before that as Assistant Secretary at LDEQ I was responsible,

together with other State and Federal agencies, for monitoring, maintaining and protecting the quality of some of the Louisiana resources that are the subject of this settlement. In that role, I was involved with and led negotiations, and finalized and implemented settlements and consent decrees in situations involving environmental accidents and non-compliance issues, including oil spills and chemical spills. In my role as Secretary and Assistant Secretary, my responsibility was to ensure that settlements were fair to all stakeholders -- including the public, the responsible party, the impacted interests and the environment.

3. As part of my job as Secretary and Assistant Secretary, I represented the State and the Governor on federal, state and local environmental, emergency response, natural resource management and stewardship policy development. I also served as one of the Louisiana trustees for natural resource damage assessments. I was a member of the Unified Command for a number of major incident responses, including hurricanes Katrina, Rita, Gustav, and Ike. As Assistant Secretary during Katrina and Rita, I oversaw field activities and emergency response activities of the LDEQ. As Secretary during Gustav and Ike, I oversaw all emergency activities of the agency.

4. My duties at LDEQ also involved developing new regulations and environmental policy. One of my roles as Assistant Secretary was to monitor non-compliance events in a manner consistent with the Department's mission. My responsibilities included oversight of compliance and oversight of regulated facilities including dealing with oil spills.

5. After hurricanes Katrina and Rita, I was closely involved with debris and waste removal and cleanup, including assessing impacts to the marshes. I worked extensively with the U.S. Department of Justice, EPA, the U.S. Attorneys' offices, and the Louisiana Attorney General's office, including overseeing a number of settlement and consent agreements

2

regarding environmental incidents. One example is the resolution of the oil spill in Chalmette, LA from the Murphy Oil Refinery after hurricane Katrina. As Assistant Secretary, I oversaw the development of a cooperative agreement between EPA, LDEQ, Murphy Oil Refinery and others, which included a protocol to determine when areas had been remediated to an acceptable level.

6. Prior to my positions at LDEQ, I worked at Gulf South Pipeline, where I was responsible for the analysis of the impacts of the pipeline on the environment, including wetlands, coastal zones and endangered species in the Gulf Coast region. I spent nine years at Georgia-Pacific before that working on health, safety, environment, process and project engineering. It was during my time at Georgia-Pacific that my facility received the Governor's Award for Environmental Excellence and the Chairman's Award for Environmental Excellence. These awards were given in recognition of the remarkable improvement in environmental compliance in the facility.

7. I received my bachelors in science from Southeastern Louisiana University in 1979, a masters in science in biology at Southeastern Louisiana University in 1981, and a Ph.D. in biology at the University of Southern Mississippi in 1992.

8. I have served on the adjunct graduate faculty for Southern University in Baton Rouge. I have received numerous awards and recognition from a variety of entities, including the Louisiana Environmental Leadership Award from LDEQ and the Governor's Award for Environmental Excellence. I have served on several LDEQ task forces to help shape environmental management programs in Louisiana. In addition, I have been appointed by several Louisiana Governors to advisory groups and commissions. I serve as a Commissioner of the Louisiana Groundwater Resource Commission and represented Louisiana on the Gulf of Mexico

Alliance (an association of the Gulf States). Through the latter I also participated in EPA's Gulf of Mexico Program. In addition, I served on the Wetlands Advisory Task Force in the early 1990s (an effort to consider the future of the wetlands).

9. I have lived in the Gulf region my whole life. Besides my professional affiliations, I am also very involved in community service and activities, including being a keynote speaker on environmental management and presenting educational talks to schools and community groups. I was elected to the school board in Zachary, Louisiana and served as President of the Board. I am also an avid outdoorsman and fisherman, and have spent countless hours roaming the marshes, swamps and lakes of Louisiana, hunting, fishing, and recreating. I am very familiar with the Louisiana coastal lands that are the subject of the settlement.

10. I have never been an expert witness. I did not personally participate in drafting or preparing the settlement frameworks or methodologies; the settlement negotiations between the plaintiffs and BP; or in advising any of the parties whether to agree to the terms of the settlement.

*Materials Reviewed*

11. As part of my work on this declaration, I reviewed the following materials:
    - The *Deepwater Horizon* Economic And Property Damages Settlement Agreement As Amended On May 2, 2012, including the following exhibits thereto:
        o Exhibit 10 - Seafood Compensation Program and attachments thereto
        o Exhibit 12A - Compensation Framework for Wetlands Real Property Claims, and appendices thereto
        o Exhibit 12B - Appendix A to Compensation Framework for Wetlands Real Property Claims: Wetlands Real Property Claim Zone Map

4

- o Exhibit 12C - Appendix C to Compensation Framework for Wetlands Real Property Claims: Eligible Parcel Compensation Category Map
- o Exhibit 12D - Appendix D to Compensation Framework for Wetlands Real Property Claims: Area of Potential Eligibility Map
- o Exhibit 15 - RTP Chart ("RTP Chart")
- Photographs of various Louisiana wetlands sites taken over a period of time after the *Deepwater Horizon* ("DWH") spill as part of the NRD Coastal Wetlands Vegetation Assessment ("CWVA") and photographs of those same sites taken by Tre' Wharton in connection with my site visits.
- Declarations of Tre' Wharton, Dr. Elliott Taylor, Dr. Wes Tunnell, and Dr. Martin Smith
- The Plaintiffs' Steering Committee's and BP Defendants' Joint Motion for (1) Preliminary Approval of Class Action Settlement, (2) Scheduling a Fairness Hearing, (3) Approving and Issuing Proposed Class Action Settlement Notice, and (4) BP's Motion for Adjourning the Limitation and Liability Trial ("Joint Motion for Preliminary Approval")
- Objections to the Deepwater Horizon Economic and Property Damages Settlement Agreement filed as of the date of this Declaration

*Site Evaluations*

12. In connection with preparing this declaration, I made a series of site visits to the Louisiana wetlands so that I could personally observe the condition of the wetlands. On March 27, 2012, I made a visit to the Louisiana wetlands, making aerial observations from a helicopter and ground observations from a boat. The aerial observations encompassed large portions of

5

Louisiana wetlands, including the wetland areas from Barataria Bay west to Terrebonne Bay, and from Terrebonne Bay east towards South Pass near Venice, Louisiana. I also observed some of the wetland areas by boat, from Myrtle Grove Marina to portions of northern Barataria Bay.

13. During this site visit, I observed seven sites in the Wetlands Real Property Claim Zone. Of the seven sites, Shoreline Cleanup Assessment Technique ("SCAT") teams reported heavy oil at five of the sites and moderate oil at two of the sites at their maximum level of oiling observed. It is my understanding that SCAT is the standard process to assess shoreline oiling and inform shoreline treatment following a spill. Further, six of the locations I visited are sites included in the Natural Resource Damage Assessment ("NRD") CWVA study. The other site was designated by Unified Area Command for the DWH spill response ("Unified Command") as a marsh test plot to evaluate different treatment methods.

14. From June 12-14, 2012 I made another series of site visits, this time observing twenty-one NRD CWVA sites by boat (including re-visiting the sites I had visited in March of this year). These sites included parcels in the Wetlands Real Property Claim Zone in different geographic regions of Louisiana that have been reported under the SCAT maximum oiling data as having various levels of oiling, from heavy to no oil observed.

15. In the areas I observed, the marsh appeared to be healthy and recovering well, with the exception of one site that I understand has been designated by Unified Command as a "test plot" to evaluate different treatment methods, including natural recovery. Even the heavily oiled areas I observed appeared to be healthy and recovering well, again with the exception of the "test plot." Based on my personal observations and experience, and my review of Tre' Wharton's declaration, I believe that the marsh has made remarkable progress in recovery

6

from this event, and that little to no observable impact will be visible in the next year. Even now, in many of these sites where heavy oiling occurred, there is no longer any observable oil. In addition, I personally observed both animal and plant life flourishing in these areas, including many species of birds, several schools of porpoises and fish and extensive re-vegetation occurring.

16. I have also reviewed information about hunting closures from the Louisiana Department of Wildlife and Fisheries. There were no areas in Louisiana that were closed to hunting as a result of the DWH spill.

*Opinions*

17. I have reviewed the Compensation Framework for Wetlands Real Property Claims, including its appendices, and I believe it is fair. BP's obligation to clean or otherwise address an oiled site is not affected by the settlement. Nothing in the Compensation Framework for Wetlands Real Property Claims impinges upon the authority of the State of Louisiana or the federal government to engage in cleanup or remediation activities in the Louisiana wetlands. Also, the framework includes compensation for a risk transfer premium ("RTP"). It is my understanding from reviewing the RTP Chart and the Joint Motion for Preliminary Approval that RTP payments are meant to compensate class members for pre-judgment interest, any risk of oil returning, consequential damages, inconvenience, aggravation, any risk of future loss, lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors. Based on the declaration of Dr. Elliott Taylor, any risk of future MC252 oiling appears to be small. In addition, the declaration of Tre' Wharton, a wetlands specialist, includes an assessment of the health of the wetlands

vegetation based on his observations, experience, and scientific data. Mr. Wharton's declaration supports my field observations of a recovering coastal environment.

18. I believe the Compensation Framework for Wetlands Real Property Claims fairly compensates owners of eligible parcels. Owners of parcels with minimal to moderate oiling have a very generous payment under the settlement. I also believe that property owners of heavily oiled sites are fairly compensated. Specifically, the owner of an eligible parcel that was documented as containing the presence of any oil by SCAT, NRD Pre-assessment, NRD Rapid Assessment, or NRD CWVA, is entitled to a minimum payment under the framework of $122,500, including the risk transfer premium. Such a significant payment is fair given the recovery of the wetlands and the fact that nothing in the settlement impinges upon the authority of the State of Louisiana or the federal government to engage in cleanup or remediation activities in the Louisiana wetlands. Even owners of eligible parcels where no oil was observed by SCAT, NRD Pre-assessment, NRD Rapid Assessment or NRD CWVA receive some compensation. Furthermore, the Compensation Framework for Wetlands Real Property Claims is also fair and reasonable because claimants need only provide proof of property ownership, and the framework uses a transparent, standardized formula for compensation which provides a level playing field and will be easy to administer.

19. I have also reviewed the declaration of Dr. Martin Smith, a fisheries economist. Based on my review of that report and his conclusions, I believe that the amount of compensation in the Seafood Compensation Program is fair and reasonable. According to Dr. Smith, the compensation to the Gulf seafood industries covered by the Seafood Compensation Program is several times the combined average gross revenue of those industries for an entire year, and many times over the actual losses from 2010 according to NOAA fisheries data. That

level of compensation also accounts for the potential of future impacts (if any were to occur) that have not yet been identified. In addition, I have reviewed the declaration of Dr. Wes Tunnell, a fisheries biologist. Dr. Tunnell states that currently available data shows that the commercial fishing species have either recovered or are recovering from any impacts the oil spill may have caused, which further supports my view that the total Seafood Compensation Program amount is reasonable and fair. The commercial fishing industry in Louisiana is an important part of the state's economy, and the Seafood Compensation Program puts money into the hands of the citizens working in that industry in the near term, including vessel owners, captains and crew, oyster leaseholders, and other participants in the industry, which would be a significant benefit to the people of this state.

20. In my former position as Secretary and Assistant Secretary of LDEQ, a key component of my responsibility included the negotiation and evaluation of settlements relating to impacts on the natural resources of Louisiana. In that capacity, I relied on my experience, on the reports, analyses, and recommendations of other experts, and my assessment of scientific data to determine and ultimately recommend for approval an outcome that was reasonable and fair to all stakeholders, including the public, the responsible party, the impacted interests, and the environment. In my opinion, this settlement provides fair and adequate compensation to the Louisiana class members eligible for compensation under the Compensation Framework for Wetlands Real Property Claims and the Seafood Compensation Program.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Date: August 13, 2012

_____
Harold G. Leggett

# Harold Leggett, Ph.D. — Senior Manager



## PROFESSIONAL SUMMARY

Dr. Leggett has more than 25 years of professional and consulting experience in environmental management, environmental compliance, health and safety compliance, PSM, natural resource management and assessment, NEPA and FERC coordination and compliance assessment. Dr. Leggett's brings unique professional knowledge, experience and perspective having been gained from employment in industry (Forest Products and Interstate Natural Gas Pipeline companies), regulatory (La Dept of Environmental Quality and US Navy- Industrial Hygiene) and consulting engineering firms.

In addition, Dr. Leggett has been a member of the Unified Command Group (UCG) for the State of Louisiana and has served as lead contact between the state and federal agencies for emergency response and environmental and debris management recovery activities following Hurricanes Katrina, Rita, Gustav and Ike.

He has served on numerous task force and appointments to develop and implement comprehensive environmental regulations for Louisiana and the United States. Dr. Leggett has presented numerous presentations, white papers and position publications on the impact of environmental rules and regulations on Louisiana. Recently, Dr. Leggett has had a publication accepted for publication in the May/June issue of the Environmental Forum Journal which discusses the impact of environmental policy on economic and business interest in the United States.

### Qualifications Quickview

**Area of Expertise:**
- Environmental Compliance
- Emergency/Disaster Response
- Regulatory Coordination

**Experience:**
- 25 years in environmental field
- Member of the Unified Command Group (UCG) for the State of Louisiana and has served as lead contact between the state and federal agencies for emergency response and environmental and debris management recovery activities following Hurricanes Katrina, Rita, Gustav and Ike.
- Industrial Compliance Assessment
- Regulatory & Legislative liaison skills
- Facility Optimization and Efficiency
- "Out-of-the-box" solutions
- Capable of managing large teams on complex projects

**Registrations:**
- B.S. Agriculture, Southeastern Louisiana University, 1979
- M.S. Biology, Southeastern Louisiana University, 1981
- Ph.D. Biology, University of Southern Mississippi, 1992

## RELEVANT EXPERIENCE:

- Dr. Leggett's project experience includes: NEPA & Natural Resource investigations for the US Army Corp of Engineers (USACOE) across the United States. These projects included EA and EIS investigations. The evaluation of T&E species and feasibility studies were other investigations provided for the USACOE.
- Specific environmental program experience has included EPA and State permitting and compliance programs including SPCC, Storm water Management and NPDES permitting, Resource Conservation and Recovery Act (RCRA) permitting and feasibility studies, RCRA delisting, multimedia compliance reviews and audits, Due Diligence investigations (Phase 1 & 2).

## Harold Leggett, Ph.D.    Senior Manager

- His occupational safety experience includes employment as an Industrial Hygienist for the US Navy Medical Command. This included activities at Naval Air Station –Pensacola for the US Naval Hospital and outlying bases. Dr. Leggett has worked for private industry and manufacturing. He has also been elected and served as President of the Zachary Community School Board.
- He has conducted optimization, streamlining and efficiency evaluations for business, industry and state government. The process has included the utilization of activity analysis, performance based standards and benchmarking techniques.
- **Louisiana Department of Environmental Quality, Secretary,** January 2008- January 2010, Baton Rouge, LA. The Secretary serves as the Governor's representative for environmental policy and compliance efforts in Louisiana. Responsibilities include oversight of the LDEQ and associated functions. In addition, Dr. Leggett served as a member of the Unified Command for the state of Louisiana.  This includes implementation of environmental policy and compliance statewide. Other duties include representation of the State and Governor on Federal, State and local environmental, emergency response, natural resource management and stewardship policy development.  Other duties include interaction with community and governing authorities statewide. Extensive interaction with Federal regulatory and legislative representatives is another important function of the Secretary.
- **Louisiana Department of Environmental Quality, Assistant Secretary**, March 2004 –January 2008, Baton Rouge, LA. Responsibilities include assessment of environmental compliance for regulated facilities statewide in all environmental media (air, water, waste). This included compliance inspections, audits and surveillance activities statewide. Other responsibilities included interpretation and enforcement of environmental rules and regulations. Representation of the LDEQ, interaction with the public, regulated entities and elected officials are other responsibilities. Development of new regulations and environmental policy are other responsibilities associated with this position. Additionally, Dr. Leggett served as coordinator of the LDEQ Incident Command, emergency response, debris management and field activities following Hurricane Katrina and Rita for the state of Louisiana.
- **Gulf South Pipeline Company, Senior Environmental Engineer**, November 2003- February 2004, Covington, LA. Mr. Leggett was responsible for the coordination of the environmental efforts of Gulf South Pipeline.  This included all environmental media (air, water & waste) and permit and compliance activities associated with the pipeline system.  This also included NEPA and FERC compliance evaluations and coordination throughout the system.  Extensive interaction and coordination with federal and state oversight and regulatory agencies, company employees and contractors to ensure compliance with regulatory requirements were key components of Mr. Leggett's responsibilities.
- **HLA, LLC, Senior Manager**, September 1998- present, Zachary, LA. As Senior Manager Mr. Leggett coordinated the environmental services, consulting and training activities of HLA.  This includes compliance assessment of multi-media (air, water & waste) activities, planning and impact assessment(s), regulatory (LDEQ, EPA, Corps of Engineers, OSHA, USFWS, SHPO, etc) interface and coordination, emergency response and debris management, facility inspections and audits, preparation & negotiation of regulatory permits, industrial hygiene and process safety management (PSM).  In addition, HLA conducted assessments and evaluations of indoor air quality for clients. HLA clients included the chemical, petrochemical, forest products, mining and power generation industries, tribal and public sector.
- **Georgia-Pacific Corporation, Manager, Compliance & Technology- Senior Environmental Engineer,** July 1989-September 1998, Port Hudson Operations, Zachary, LA.  The *Manager of*

**Harold Leggett, Ph.D.**          Senior Manager

*Compliance and Technology* was directly responsible for the environmental, health and safety programs of the facility. PSM was implemented and OSHA recognized the facility as a Star Site in the OSHA VPP program. This included training and interaction with all union employees (875) of the facility to ensure compliance. Long term strategic planning were key components of the job responsibilities as well as interaction with regulators, legislators, neighbors and the community. Prior to becoming manager, Mr. Leggett was *Technical Superintendent*, (January 1994- September 1997), The Technical Superintendent was responsible for facility compliance and customer support and quality control activities of the Environmental Services Group (4 Environmental Engineers) and Laboratory Services (Chemist and 12 technicians) for the Port Hudson Operations. The superintendent also supervised the Project Engineers (11) and Process Engineers (9). These engineers were responsible for capital project installation and process modification and improvement. As the *Environmental Superintendent*, (August 1992-January 1994), Mr. Leggett supervised the Facility compliance and permitting efforts in air, water, solid waste and hazardous waste management. This included coordination with state and federal regulatory agencies. Responsibilities also included the development of an employee awareness and involvement program for the union and salaried employees. In addition, extensive community involvement on facility related issues was required of this position. Mr. Leggett was employed as *Senior Environmental Engineer* from July 1989-July 1992; He was responsible for oversight of solid waste and wastewater activities. This included regulatory interaction and permitting.

- **Gulf Engineers & Consultants, Program Manager (Environmental Services)** May 1988- June 1989, Baton Rouge, LA. The Program Manager supervised the consulting services and activities of the Environmental Services efforts of Gulf Engineers. GEC work efforts focused on Economic and Environmental projects for the Corps of Engineers as a NEPA compliance contractor for DOD.
- **Gulf South Research Institute, Biologist**, September 1986- May 1988, Environmental Services Group, Baton Rouge, LA. Prepared proposals and conducted project related work to support the program efforts of GSRI. GSRI focused on NEPA compliance activities and included EA's, EIS's and other environmental projects for governmental agencies. Mr. Leggett was also active in the Biomonitoring Program for GSRI. This program evaluated the impact of industrial activities on water quality in Louisiana.
- **Louisiana Department of Environmental Quality, Environmental Program Specialist**, July 1985-August 1986, Office of Water Resources, Water Pollution Control Division, Baton Rouge, LA. Mr. Leggett was a compliance inspector for the LDEQ. Mr. Leggett was involved in reviewing permits and facility compliance efforts. He also was involved in sampling and surveillance activities of facilities. Mr. Leggett helped to establish the LDEQ Biomonitoring Laboratory for the State of Louisiana. This lab was funded from an EPA grant and was responsible for evaluating the impact of industrial and non-point sources discharges statewide.
- **University of Southern Mississippi, Research Associate & Teaching Assistant**, August 1981-June 1985, Department of Biological Sciences, Hattiesburg, MS. During graduate studies at USM, Mr. Leggett taught classes in Anatomy & Physiology, Honors Biology, Biology for Science Educators, and laboratory classes in Physiology, Anatomy and Physiology and Introductory Biology. In addition, Mr. Leggett worked as a Research Associate evaluating the impact of eutrophication and heavy loading on water quality in aquatic systems. Research led to the development and patenting of a unique allelopathic aquatic inhibitor for blue-green alga.
- **Louisiana Department of Wildlife and Fisheries, Biologist**, May 1985- August 1985, Louisiana Offshore Oil Platform (LOOP) Project, Baton Rouge, LA. Worked for LDWF as a marine biologist

| **Harold Leggett, Ph.D.** | Senior Manager |
|---|---|

- evaluating the impact of the LOOP on water quality, benthos and fisheries resources in coastal Louisiana. Efforts included aquatic and benthic sampling and identification of species and water quality testing.
- **Southeastern Louisiana University, Graduate Teaching Assistant**, June 1979- April 1981, Southeastern Louisiana University, Department of Biology, Hammond, LA. Taught freshman laboratory classes in Zoology and Botany. In addition, taught a summer class in Comparative Anatomy.

### EDUCATION/ PROFESSIONAL REGISRATIONS/SPECIALTY CERTIFICATIONS:

- B.S. Agriculture, Southeastern Louisiana University, 1979
- M.S. Biology, Southeastern Louisiana University, 1981
- Ph.D. Biology, University of Southern Mississippi, 1992

### TRAINING/PUBLICATIONS/AFFILIATIONS:

- FBI Award for Exceptional Public Service, 2010
- Louisiana Environmental Leadership Award, LDEQ, 2010
- Governor's Exe. Homeland Security Training, DHS & Naval Postgraduate School, 2008
- Louisiana Emergency Preparedness Association, Outstanding Service Award, 2006
- National Incident Management System (NIMS - 100,200,700 & 800)
- Incident Command System (ICS)-300 & 400
- Governor's Award for Environmental Excellence, 1998
- CEI, 1997
- Environmental Auditor, Georgia-Pacific Corporation, 1996
- Chairman's Award for Environmental Excellence, 1995
- Compliance Inspector, EPA
- Adjunct Graduate Faculty, Southern University, Baton Rouge
- Instructor, LDEQ and Univ. of Louisiana, Solid Waste Certification Program
- Commissioner, Louisiana Emergency Response Commission
- LDEQ Solid Waste Advisory (SWMP) Committee
- LDEQ Proposed Penalty Task Force
- Wetlands Advisory Task Force
- Capital Area Groundwater Conservation Commission, Board of Directors
- Capital Area Groundwater Conservation Commission, Vice-Chairman, Tech-Committee
- Louisiana Environmental Leadership Program
- The Zachary Chamber of Commerce