# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179**<br><br>**SECTION J** |
| This document relates to all actions. | * * * * * | **HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

---

## DECLARATION OF DR. JAMES A. RICHARDSON

I, Dr. James A. Richardson, submit this declaration in support of BP Defendants' Motion For Final Approval Of *Deepwater Horizon* Economic And Property Damages Settlement Agreement As Amended On May 2, 2012. I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are my own.

### Introduction and Purpose of Declaration

1.      My name is James A. Richardson, John Rhea Alumni Professor of Economics at Louisiana State University.

2.      I have completely and thoroughly reviewed the *Deepwater Horizon* Economic And Property Damages Settlement Agreement As Amended On May 2, 2012 ("Settlement Agreement"), and entered into by BP Exploration & Production Inc. and BP America Production Company ("BP") and Plaintiffs.

3.      I did not participate in: (i) drafting or preparing of the Settlement Agreement or the settlement frameworks or methodologies that are incorporated into the

2

Settlement Agreement; (ii) the settlement negotiations between BP and the Plaintiffs; or (iii) advising any of the Parties whether to agree to the terms of the Settlement Agreement.

4.      I am an expert in Economics with long-standing knowledge of the Louisiana economy, retained by counsel for BP for the purpose of evaluating the proposed Settlement Agreement between BP and the Plaintiffs.

## Qualifications of Dr. James A. Richardson

5.      I am currently the John Rhea Alumni Professor of Economics, the Harris J. and Marie C. Chustz Distinguished Professor in Business Administration, and Director of the Public Administration Institute in the E. J. Ourso College of Business at Louisiana State University (LSU) in Baton Rouge, Louisiana.

6.      I have an undergraduate degree in Economics from St. Mary's University of Texas in 1966; a Master's degree in Economics from the University of Michigan (Ann Arbor) in 1970; and a doctoral degree in Economics from the University of Michigan in the fall 1971.

7.      I started as an Assistant Professor of Economics at LSU in the fall 1970, was promoted to Associate Professor, and then to Professor.  In addition to teaching and research responsibilities, I have served as Director of Graduate Studies in the Department of Economics, Chairman of the Department of Economics, Acting Dean of the College of Business Administration, Associate Vice Chancellor for Academic Affairs at Louisiana State University, and Director of the Public Administration Institute.

3

8.     My research activities at LSU have focused on regional forecasting, including an economic outlook for the state of Louisiana and its metropolitan areas, state and local taxation issues, economic development projects, energy economics, and the analysis of national and global economic developments and the Louisiana economy.

9.     My articles have been published in numerous journals such as *National Tax Association Proceedings*, *State and Local Government*, *Public Finance Quarterly*, *Growth and Change*, *Natural Resources Journal*, *Journal of Energy and Development*, and *Journal of Economic Dynamics and Control*.

10.     I am a Professor who has taught Public Finance for over 20 years, which includes tax policy and tax administration. I have edited major books on local, state, and federal tax issues, which includes tax administration. I have done extensive research on tax issues, and I have worked with state agencies, local organizations, and private businesses on tax issues.

11.     In 1975 I (with a colleague) developed the first econometric model (a mathematical model of the state's economy) of the Louisiana economy.  This model was developed for the Louisiana Legislative Fiscal Office.  The model focused on major industries in Louisiana and its principal output was the projection of state employment for the upcoming period of two years and anticipated state taxes associated with the projected economic activity.

12.     In 1983 I, along with a colleague, developed the Louisiana Economic Outlook, a statewide projection for businesses, local governments, and state

organizations.  The Louisiana Economic Outlook has been prepared each year since 1983 through the present, and I have been continuously involved in its preparation.

13.    In 1985 I was asked by LSU and The Council for A Better Louisiana to develop a study of Louisiana's tax structure with this study eventually becoming an edited book, **LOUISIANA FISCAL ALTERNATIVES: FINDING PERMANENT SOLUTIONS TO RECURRING BUDGET CRISES** published by the LSU Press in 1988.

14.    In 1987 I was asked to serve as the private economist on the Louisiana Revenue Estimating Conference, the panel with the constitutional authority and responsibility to provide official revenue estimates for the state.  This Conference includes the Governor of the State or his or her representative, the President of the Senate, and the Speaker of the House of Representatives. I have served continuously on this Conference since 1987 with five different governors.

15.    I served as fiscal advisor for Governor Buddy Roemer from 1988 through 1991.

16.    In 1995 I worked with Governor Edwin Edwards to restructure the Unemployment Trust Fund so that high business taxes could be adjusted downward, benefits for unemployed workers could be increased, and the overall balance in the unemployment trust fund would be sufficient to withstand any economic disruption. This model is still followed currently and the state of Louisiana has never had to borrow from the federal government in order to pay unemployment insurance benefits.

17.    In 1999 I co-edited a major book **HANDBOOK ON TAXATION** that was published by Marcel Dekker.  It covered state and local tax issues, federal tax issues, and international tax issues.

18.    Following Hurricane Katrina in 2005-2006, I was asked by the Financial Services Roundtable of Washington, D.C. to prepare a study focusing on ways of accelerating the recovery of the New Orleans metropolitan area.  After the study, I was asked by the Roundtable to accompany them for a meeting with the U.S. Secretary of Commerce to discuss various federal government responses to the recovery from Hurricane Katrina.

19.    I have completed studies for the Louisiana Department of Social Services, the Louisiana Department of Natural Resources, the Louisiana Workforce Commission, the Louisiana Department of Wildlife and Fisheries, and the Louisiana Department of Revenue.

20.    In 2010 I was presented the S. Kenneth Howard Award by the Association of Budgeting and Financial Management Association for lifetime achievements in public budgeting.

21.    In 2011 I was asked by the Mayor's Office of the City of New Orleans to assist its Tax Fairness Committee in evaluating the present tax structure in the city and to evaluate the fairness, competitiveness, and stability of various changes in its tax and fee structure. This study was completed and is now available to be used by the City of New Orleans.

6

22.    I served as an expert witness for various local governments, the State of Louisiana, and the U.S. Department of Justice in evaluating economic losses associated with Hurricane Katrina and the flooding in various parts of New Orleans due to issues with the levee system. (In re Katrina Canal Breaches Consolidated Litigation, Judge Stanwood R. Duval, Jr., United States District Court for the Eastern District of Louisiana).  I submitted an affidavit in 2010 in state court with respect to a second case regarding claims against governmental entities due to Hurricane Katrina and the issues with the levee system (Maurice De La Houssaye, Individually and On Behalf of All Others Similarly Situated vs. Parish of Jefferson, Aaron Broussard, and American Alternative Insurance Company).  I have been qualified as an expert witness over twenty times including in the United States District Court in the Eastern Division of Louisiana, United States District Court in the Middle Division of Louisiana, United States District Court in the Western Division of Louisiana, and in the United States Bankruptcy Court in New Orleans.  I have also provided expert testimony for the United States Bankruptcy Court, Southern District of New York.

23.    I have prepared numerous economic impact reports on major developments in Louisiana, including Juban Crossing in Livingston Parish; the RiverView in West Baton Rouge Parish; River Park in East Baton Rouge Parish; Perkins Rowe in East Baton Rouge Parish; Reinventing the Crescent in New Orleans; a retail area along Interstate 20 in Ruston, Louisiana; Americana, a Traditional Neighborhood Development in East Baton Rouge Parish; and the Audubon Nature Institute in New Orleans.

24.     I serve as a member of the Board of Directors of the Public Affairs Research Council (PAR) and as a member of the Board of Trustees of the Council for A Better Louisiana. I served as Chairman of the Board of PAR and have served as Chairman of the Research Committee of PAR for approximately the past twenty years.

25.     My curriculum vitae is attached to this declaration.

### Criteria and Basis for Evaluating Settlement Agreement

26.     As a standard and long-standing part of my academic research, my community involvement, and my active consulting business, I have monitored economic conditions in Louisiana on a regular basis. This type of knowledge of the Louisiana economy and its comparison to the rest of the country, especially Louisiana's neighboring states, is essential to my academic and consulting activities.  As noted in my qualifications in this declaration and on my curriculum vitae, I have worked extensively on studies of the Louisiana economy as well as the major metropolitan areas of the state, major industries of the state, and major events in the state.  And, again, as noted in this declaration, I have been asked in the past by state agencies, local governments, major industries and industrial groups, and national entities to comment and provide guidance on the condition of the Louisiana and regional economies.

27.     Throughout my career as an academic and consulting economist, I have reviewed an assortment of data compiled by public and private organizations.  This data ranges from employment by sector and by region from state and federal sources, population from the Census, prices from the federal government, interest rates and other financial data from the Federal Reserve System and several of the Federal Reserve

8

Banks, industry data from trade organizations, information on specific sectors of the economy from industry-specific publications, and state information regarding specific industries in the state. I have gathered information regarding the agricultural/fisheries/timberland sector of the economy relevant to an evaluation of the cost of major tax exemptions applying to agricultural activities. I have gathered information on the state's economy and specific industries in the state, or overall economic activity in certain regions of the state (found in published newspapers and other regional publications). In my research following the economic conditions of Louisiana and other regions and evaluating various proposals for their economic effectiveness and impact, I have frequently used the business categorization scheme outlined by the North American Industry Classification System, or NAICS. I also gather and follow sources providing information on state and local tax collections. These data are collected on a monthly basis and made available very frequently. The most important issue in gathering and using information is to be confident in its accuracy and its consistency.

28.     In addition to the public sources of information with which I am familiar, I have reviewed the Settlement Agreement and focused on the exhibits relating to Economic Damage Compensation and the Seafood Compensation Program.

29.     Specifically, I have considered the following materials:

(a)     The Settlement Agreement and Exhibits 1A-27 with a focus on those containing the frameworks for business and individual economic loss. This includes the Map of Economic Loss Zones (Exhibit 1A), Geographical Definitions of Zones (Exhibit 1B), Zone Classifications and Implementation (Exhibit 1C), Tourism Definition (Exhibit 2), the Compensation, Causation, and Documentation Frameworks for general business economic loss claims (Exhibits 4A-E), Multi-Facility Businesses (Exhibit 5), Failed Businesses (including failed

9

start-up businesses (Exhibit 6), Start-up Businesses (Exhibit 7), Individuals (Exhibits 8A-8E), and the Seafood Compensation Program (Exhibit 10).

(b)     The Claim Forms and their instructions and Frequently Asked Questions ("FAQ's") and answers available to claimants on the Settlement Program's website.[1]

(c)     The court's Preliminary Approval Order.[2]

(d)     Objections relevant to economic loss claims and the Seafood Compensation Program.

(e)     The Settlement Program's claims statistics, as posted on the settlement website.[3]

30.     A claims process should abide by the following characteristics: it should be sufficient to pay compensation amounts established under the claims process; it should be equitable and fair so that similar individuals and businesses incurring similar losses are appropriately and similarly compensated; and it should be sufficiently simple so that an unreasonable burden is not levied against claimants in filing their claims—in other words, the settlement process should be efficient.

31.     I have been asked to render opinions with respect to the fairness and efficiency of the Settlement Agreement with respect to how it identifies and compensates economic loss claimants for alleged losses relating to the Oil Spill that occurred on April 20, 2010.

---

[1]   Deepwater Horizon Court-Supervised Settlement Program, (last updated June 6, 2012), at http://www.deepwaterhorizonsettlement.com.

[2]   Prelim. Approval Order as to the Proposed Economic and Property Damages Class Action Settlement, May 2, 2012, Dkt. No. 6418.

[3]   Deepwater Horizon Court-Supervised Settlement Program, (last updated June 6, 2012), at http://www.deepwaterhorizonsettlement.com.

10

## Analysis and Opinion

### 1. Economic Damage Compensation

32.    The most compelling point regarding the fairness of the Economic Damage Claim Frameworks listed in Section 5.3 of the Settlement Agreement is that there are no limits on the total amount to be paid for individual or business economic losses. At the time of the settlement announcement, BP estimated the overall cost of the settlement to BP, including the Seafood Compensation Program, would be $7.8 billion, but this is only an estimate and not a limit. The claimants benefit because there is not a cap on the potential claim amounts for individuals and businesses eligible for Economic Damage Compensation.[4]

#### *Tourism Industry Definition and Economic Loss Zone Map*

33.    The Tourism industry was one of the economic sectors potentially influenced by the Oil Spill given that tourists were reluctant to commit to a beach vacation without more information about the impact of the Oil Spill.  This sector has been expansively defined in the Settlement Agreement using the NAICS Codes associated with the Tourism industry.  These NAICS Codes capture the nature and scope of the tourist industry in the Gulf Coast region.  NAICS, developed under the auspices of the Office of Management and Budgeting of the Federal Government, is the standard used by federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to U.S. businesses.

---

[4]    There is, however, a cap under the Seafood Compensation Program.

Economists, analysts, and government agencies uniformly rely on NAICS Codes to categorize businesses. Use of the NAICS Codes will provide claimants and the Court-Administered Claims Facility with an objective, transparent standard for determining how a business should be classified.

34.     The Tourism Definition, as described in Exhibit 2 of the Settlement Agreement, includes a variety of businesses included in the tourist trade.  These business types vary from the obvious, such as Scenic and Sightseeing Transportation, Water (NAICS 487210), to a business that might sell to some tourists but whose major business would almost surely be local residents, such as Men's Clothing Stores (NAICS 448110). This last business type, as well as others included in Exhibit 2, exemplify the broad scope of the Tourism Definition and give claimants a benefit because it includes businesses that are not exclusively, or even primarily, tourist-oriented.

35.     Claimants satisfying the Tourism Definition who are located in Zones A and B of the Economic Loss Zone, claimants in the Charter Fishing industry who are located in Zones A, B and C, and certain claimants identified in the Seafood Distribution Chain Definition are provided a benefit in that they are not required to provide any evidence of causation.  (*See* Exhibits 2, 3, 4B, 6, 7, and 8 to the Settlement Agreement.) Also, claimants falling within the Tourism, Charter Fishing and Seafood Distribution Chain definitions are eligible for Risk Transfer Premiums (RTPs) that are larger than the RTPs for Non-Tourism and Non-Seafood Businesses. (*See* Exhibit 15.)

36.     Given the number of class members and potential claimants and the variety of business types, a streamlined administration that, for the purposes of a

negotiated settlement claims process, presumes causation for certain industry sectors more likely to be impacted by a spill in certain geographic areas is both fair and reasonable. The presumption of causation reduces the documentation and efforts required of a business or individual.

37. The zones included in the Economic Loss Zone map (*see* Exhibit 1A to the Settlement Agreement) logically and reasonably reflect the likelihood of a potential economic effect of the Oil Spill. In general, the zones are structured to reflect the fact that as distance increases from the coast, the likelihood of damage is reduced. New Orleans, the single most prominent tourist destination in the region, is also included in Zones A, B, and C. Zone A in New Orleans includes the parts of the city that cater to the tourist trade, and Zone B includes parts of the city that tourists might visit. The Settlement Agreement also recognizes that many of the tourist destinations are accessed by automobile and it includes these access roads as part of Zones A, B and C.

38. Based on my knowledge of the geographical and economic characteristics of Louisiana, and the connection between different areas of the state and industries and businesses connected to activities along the Gulf Coast, it is my judgment and opinion that the zones are reasonable. The zones are important in how they relate to the question of causation. For those closest to the water and for certain industries, it is reasonable for the purposes of a negotiated settlement to presume that the Oil Spill affected businesses and workers for a period of time, so any proof of causation would be unnecessarily costly and inefficient; however, as distance increases away from areas directly impacted by the Oil Spill, it is reasonable to require evidence that the financial losses were related to the Oil Spill. The economic zones, based on my observations about the Louisiana economy,

its general geographic characteristics, and the tourism and commercial fishing industries, are fair and reasonable.

### Southern Louisiana Economic Activity Pre- and Post-DWH Spill

39.     As part of my review regarding the fairness of the Economic Damage Claim Frameworks, I also find that data regarding the economy of southern Louisiana are relevant and highlight the reasonableness of the Settlement Agreement.  By example, employment in the Louisiana economy declined from 2008 to 2009 in each quarter based on information from the Louisiana Workforce Commission.  This trend was the same for Regional Labor Market ("RLM") 1 (New Orleans) and for Regional Labor Market 3 (Houma-Thibodaux).[5]  Statewide, employment continued to fall in the first three quarters of 2010 as compared to 2009, but the rates of decline from 2009 to 2010 were substantially smaller than the rates of decline in employment from 2008 to 2009.  The effects of the national recession had a delayed impact upon the economy of Louisiana. The economy in Louisiana took a downward turn in the first quarter of 2009. This downturn was sustained throughout the state into the first quarter of 2010. In the second quarter of 2010 (the quarter in which the Oil Spill occurred), the state was beginning to rebound from the recession. Employment in 2010 was at its lowest level overall throughout the state during the period of 2007 to 2011 suggesting that there may not have been any growth in the second half of 2010 even if the Oil Spill had not occurred.  This

---

[5]     The parishes of RLMA 1 include Jefferson, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, and St. Tammany.  RLMA 3 consists of Assumption Parish, Lafourche Parish, and Terrebonne Parish.

14

level was in part the product of a sustained downturn that began in the first quarter of 2009.

40.     The impact of the recession in Louisiana shows the usefulness of the flexibility in benchmark period options for claimants with Economic Damage Compensation claims. Because of the economic conditions of 2009, it benefits claimants to have the option of including 2007 and 2008 or 2008 in the benchmark years if it is to their advantage. Moreover, given the fact that the first four months of 2010 were sluggish, the use of presumed General Growth and Industry Growth Factors for businesses and certain individuals is quite favorable to claimants under the Settlement Agreement as the inclusion of such growth factors limits negative growth. These data are important in informing my opinion that providing claimants with a choice to include 2007 and 2008 as part of the benchmark years and including growth factors helps to ensure that the Economic Damage Claim Frameworks are fair and favorable to the claimants.

41.     In fact, there are signs illustrated by tourism-related activity in 2010 and 2011 suggesting that Louisiana's tourism industry has been on the upswing. According to a study by the University of New Orleans Hospitality Research Center, New Orleans had 8.75 million visitors in 2011 with estimated spending of approximately $5.5 billion. According to the New Orleans Metropolitan Convention and Visitors Bureau, New Orleans had 8.3 million tourists in 2010 spending just over $5 billion and in 2009 New Orleans had an estimated 7.5 million tourists spending an estimated $4.2 billion. The number of tourists increased in the New Orleans area by almost 11 percent from 2009 to

15

2010 and spending increased by almost 20 percent. This increase continued in 2011: the number of visitors increased by 5.4 percent and spending increased by 10 percent.

42.     Based upon specific tax receipts (Convention and Visitors Bureau, Exhibition Hall Authority—Hotel, Exhibition Hall Authority—Food and Others, and Louisiana Stadium and Exhibition District) provided by the Louisiana Department of Revenue related to tourist activity in the New Orleans area, the City of New Orleans has seen a marked uptick in tourist activity. From 2009 to 2010, the city received a 21.2 percent increase in tax receipts in the summer months of May to August. During this same period in 2011, the tax receipts were up 3.8 percent. This suggests that visitors to New Orleans rebounded strongly during the period immediately after the Oil Spill and sustained this growth into the next year for the tourist industry. This trend in New Orleans tourism is also illustrated in the January through April data from 2007 through 2012. Tax receipts as mentioned previously in this paragraph increased from 2007 to 2008 and then declined in 2009 in line with the general downturn in Louisiana related to national economic conditions. In 2010, 2011, and 2012 these tax receipts increased when comparing tax receipts in the months of January through April.

43.     Moreover, as noted by a Houma Area Convention and Visitors Bureau spokesperson in the *Daily Comet* of Lafourche Parish (June 5, 2011), tourist activity in New Orleans carries over to areas such as Houma and other recreational centers along the Louisiana coast. The general thrust of the stories was that visitors to these coastal parishes have started coming back to their normal recreational activities and this is good for business. The overall travel picture in the coastal areas can be supported by tourist-related tax collections.

16

44.    In 2011 tourist activity relative to tourist activity in 2009, according to coastal parish tourism-related tax collections for the summer months of May through August, is higher in the Jefferson Parish Convention Center Fund—Grand Isle Account, the overall Jefferson Parish Convention Center Fund, and the Terrebonne Parish Visitor Enterprise Fund.  The only May to August tourist-related fund that did not show a growth from 2009 to 2011 was the Plaquemines Parish Visitor Enterprise Fund—this fund showed a decline of $376 or a decline of 0.5 percent.   I compared 2011 to 2009 for the months of May through August since all of the tourist-related tax collections in Jefferson Parish, Plaquemines Parish, and Terrebonne Parish from 2009 to 2010 were substantial because of the efforts of first stopping and then cleaning up the Oil Spill.  These tourist-related tax collections increased by almost $400,000 from 2009 to 2010 or almost 41 percent.   The tourist-related tax collections in 2010 were not sustainable since much of these tax collections in 2010 were related to stopping and then cleaning up the Oil Spill. Hence, the comparison of 2011 to 2009 represents the tourist activities related to the recreational activities associated with coastal Louisiana.

*Opinions Regarding Business Economic Loss Frameworks*

45.    The Business Economic Loss Frameworks are consistent with standard business practices in assessing any financial losses related to an incident.  The Frameworks take into account geographic location, industry type, seasonality, actual pre- and post-spill economic performance, and potential growth in 2010.  It is appropriate to consider industry type because certain industries are less likely to have been affected by the Oil Spill than others. Furthermore, the Frameworks provide for a standardized approach for evaluating claims of similarly situated businesses under the Settlement

Agreement while also including alternatives that permit the consideration of claimants' specific circumstances. This process is a reasonable approach consistent with standard financial analysis and damage assessment especially given the variety of businesses that may have been affected by the Oil Spill.

46.     The documentation requirements for business economic losses are presented in Exhibit 4A of the Settlement Agreement with similar documentation applying in part to start-up businesses and businesses claiming to have ceased operations due to the Oil Spill, each with different forms. The information necessary to file a claim includes federal tax information and monthly and annual profit and loss statements with additional data required for businesses in retail and lodging. Federal, state, and local business licenses are required if such license is necessary to operate a certain type of business. In addition, any payments received from VoO payments, GCCF, or BP's OPA claims process are deducted. Finally, retail and lodging businesses will be asked to provide specific information that is useful in the operations of these businesses.

47.     Common information is an essential starting point in determining a fair and equitable way of rewarding payments under a settlement. By common information I mean information that is routinely gathered and maintained by business enterprises regardless of their size. This information is necessary for the business to monitor its activities and plan its conduct. In addition, this information is typically required for the remittance of taxes. Given that companies routinely have this information available, it is reasonable to request it as a part of the Frameworks and should in no way exert an undue burden upon a business. It also allows for the process to provide equal treatment for

different businesses since businesses are requested to submit a common core of similar data, with certain additional requirements tailored to particular types of businesses.

48.     Further, the documents required by the Business Economic Loss Frameworks are relevant to causation and compensation and are the types of documents that businesses must keep in the ordinary course of business or are readily prepared and produced from a business's books and records, or for individuals, are the types of documents that typically exist for employees.

49.     As noted above, the Settlement Agreement provides for a presumption of causation for many claimants.[6] The presumption of causation reduces the burden on claimants significantly. For those claimants who must prove causation, the Business Economic Loss Frameworks provide multiple options for doing so.

50.     For businesses in Zones B, C and D that must establish causation, the framework for Business Economic Loss Claims allows claimants to show causation using a "V-Shaped Revenue Pattern," a "Modified V-Shaped Revenue Pattern," a "Decline-Only Revenue Pattern," "Proof of Spill-Related Cancellations," or, for certain businesses, a "Causation Proxy Claimant" where a nearby business has already proven causation.[7] The V-Shaped Revenue Pattern test requires a business to exhibit a V-shaped revenue pattern in order to establish a compensable loss.[8] To establish causation, the V-shaped

---

[6]     *See* Exhibits 4B-7 of the Settlement Agreement (requiring no causation proof for businesses in Zone A, unless they fall within an exception; tourism businesses within Zones A or B; or charter fishing businesses in Zones A, B, or C).

[7]     *See* Exhibit 4B of the Settlement Agreement.

[8]     *Id.*

19

revenue tests require that the total revenue of a business should have declined in aggregate over a period of three consecutive months, followed by a period of recovery.[9] It is reasonable to require such a decline of profits for a period of three consecutive months following the Oil Spill. As a comparison, a recession as defined by the National Bureau of Economic Research (NBER) is a significant decline in economic activity spread across the economy, lasting more than a few months, normally visible in real GDP, real income, employment, industrial production, and wholesale-retail sales.[10] Typically, businesses impacted by a major incident, such as the Oil Spill, will see a drop in their revenues and then there will be a recovery.   If there is no upturn, it is possible that other factors may have played a role in delaying or possibly eliminating any upturn. However, it is burdensome to attempt to parse the final cause of a business's failure to recover profits when there are multiple potential factors, and so in the context of this settlement, a presumption that the Oil Spill had at least a partial cause in this sustained downturn is fair and reasonable, even though the failure may have occurred irrespective of the Oil Spill.  It also makes the process administratively feasible.  All businesses have some profit variability, and a minimal variability would not be sufficient to indicate any economic impact from the Oil Spill itself.  The other three options provide a significant amount of flexibility for claimants to prove causation in specific ways that may be better suited to their business-types or the nature of their losses.

---

[9]   *Id.*

[10]   *The NBER's Busines Cycle Dating Procedure:  Frequently Asked Questions,* Nat'l Bureau of Econ. Res., (last updated Aug. 11, 2012),  http://www.nber.org/cycles/recessions_faq.html.

20

51.     The Business Economic Loss Frameworks compare the actual profit of the business during a defined post-spill period of their choice in 2010 to the profit the claimant might have expected to earn in the same post-spill period.[11] The claimant is compensated for any reduction in profit between the 2010 compensation period and a comparable benchmark period.  The claimant will be compensated for incremental profits or losses that the claimant might have expected to receive in the absence of the Oil Spill. This calculation captures a claimant's specific factor that shows a growth or decline in pre-spill months and a general adjustment factor.  In addition to the claimant specific factor, all claimants shall be entitled to a two percent adjustment factor.  A claimant specific factor is a ratio based upon the difference between a claimant's total revenues in the period of January through April of 2010 and the total revenues in the same period of the claimant's selected benchmark period divided by the claimant's January to April revenues in the benchmark period. This factor has a floor of (-2 percent); thus, it is mathematically impossible to have a negative growth factor given the stipulated general growth factor of two percent.[12]  This Compensation Framework allows for the recovery of estimated losses incurred during the compensation period and accounts for a reasonable projection of growth in the business—a framework fully consistent with the estimation of financial damages related to other events.  The Framework is fair with respect to being consistent with normal practices of dealing with the estimation of financial losses and favors the claimants since any chance of incurring a downward trend in profits is eliminated by the nature of the formula.

---

[11]   This does not include Failed Businesses or Start-up Businesses.

[12]   *See* Exhibit 4C in the Settlement Agreement.

52.     In order to uniformly calculate any variable loss of profit due to the Oil Spill, an established division of cost between fixed and variable costs has been agreed upon. By itemizing what is a fixed cost and what is a variable cost, the Framework ensures that costs and claimants are treated consistently and uniformly. In my opinion this is a judicious division of costs and a transparent presentation of how costs are allocated.

53.     The Business Economic Loss Claims Framework allows the claimants to choose the Compensation Period of three or more consecutive months between May and December of 2010.  The claimant chooses the Benchmark Period from either 2009 alone, the average of 2008 and 2009, or the average of 2007, 2008, and 2009.  This allows claimants to tailor the periods to the unique conditions of the business within reasonable constraints and allows beneficial flexibility. This favors the claimant because the flexibility accounts for variation in income and profit year over year and enables the claimant to select the best possible starting point for the loss calculation within a reasonable constraint.

54.     The frameworks' measurement of business lost profits by reference to the difference between Benchmark and Compensation Periods is reasonable and consistent with the general approach to damages calculation in other business economic loss cases. The comparison of actual post-incident profit to estimated profit is a traditional method of calculating economic loss "but for" the incident and is standard methodology in the calculation of such damages in economic loss cases.  One typical, accepted way to establish expected profit is to consider historical profit as adjusted for expected growth or decline. This general approach is consistent with the methodology used in the calculation

of economic losses due to any incident.   The major difference in this particular framework is that the claimants can use their choice of the number of months between May 2010 and December 2010 in establishing the compensation.  This will certainly mean that the claimant will select the most favorable to them or, if the claimant fails to do so, the Settlement Program will select the most favorable outcome for the business.[13] The right to select the most advantageous group of months for the claimant always provides the claimants with the most favored outcome. This is an unusual feature that favors the claimants.   And the claimants are favored even more since the Settlement Program is provided the assignment of making sure each claimant gets the most favorable outcome for his or her business.

55.     The frameworks for categories of business losses are tailored to certain types of businesses and losses sustained by such businesses and therefore provide a reasonable methodology of ensuring compensation for the economic loss. This common framework is expected; however, in addition to general business economic loss, additional frameworks include those for multi-facility businesses, failed businesses (including failed start-up businesses), and start-up businesses. These additional frameworks account for varying business situations: the normal business enterprise, the business that failed, and the new business just getting started. And, given that some businesses have more than one location, it is reasonable to include a special framework for the multi-facility business. The frameworks are meant to account for different

---

[13]     *See* Settlement Agreement § 4.3.8.

economic circumstances given the fact that the nature of this incident affected a variety of business outcomes.

56.     The multi-facility business option allows claimants to choose to file for each individual facility within the Gulf Coast Area or to file a consolidated form with the causation presumption and risk transfer premium being determined by the location of the headquarters of the company.  This allows the company to select the method of filing based on what is most favorable to the company.  Again, the choice of how to file a claim allows the claimant to select the method of filing that fully enhances its compensation.

57.     The failed business framework is another effort to include a wide range of business outcomes or circumstances with the realization that some businesses may not be included in the conventional framework—that is, the businesses that survive but incurred some loss due to the Oil Spill. In this case, the focus is on businesses that existed as of April 20, 2010 but eventually went out of business. The framework includes consideration of the firm's Earnings before Interest, Taxes, Depreciation, and Amortization (EBITDA), a measure of the firm's earnings as well as an estimate of the Market Value of the Invested Capital (MVIC) based on industry information from Pratt's Stats—Private Company Merger and Acquisition Transaction Database.  This allows the Claims Facility to get an estimate of the Total Enterprise Value and then to calculate a net value by subtracting liquidation value of the assets of the firm.   The method is straightforward; the method is used to determine the value of a company that failed due to some event that may have contributed to its failure.  But, more significantly, this is one more attempt to cover the range of circumstances of businesses within the class.

58.     There is a framework for failed start-up businesses, again illustrating an attempt to cover a wide range of business outcomes or circumstances.  In addition to being compensated for the loss of the firm's value, if a failed start-up business made use of "sweat equity" the framework provides for a reasonable means to measure and compensate claimants for the effort to establish their business, even if the amount of capital is not high.[14]  Again, the focus is on being as inclusive as possible with all business outcomes in the area affected by the Oil Spill. Sweat Equity is a major component of most start-up companies—there is no universal definition of how to quantify Sweat Equity; however, the method suggested in the Settlement Agreement is reasonable and workable. The inclusion of Sweat Equity is an unusual and beneficial addition in a compensation framework, but in this settlement context it is an important consideration to be included in the overall approach to treating claimants fairly.

59.     The start-up business framework provides flexibility by offering the option of utilizing either a business plan relied on by a third-party lender or the firm's 2011 financial data.[15]  It is reasonable to include start-up companies because at any period of time individuals may try to initiate new companies, and these efforts could be impacted by the disruptive event. This inclusion increases the thoroughness of the Framework.

60.     The overall process of computing compensation that is payable to a business leads to the outcome so that similar individuals and businesses incurring similar losses are appropriately and similarly compensated; and, it is sufficiently simple so that

---

[14]   *See* Section V(2) of Exhibit 6 of the Settlement Agreement.

[15]   *See* Sections IV(A)(1)(b) and IV(D)(4) of Exhibit 7 of the Settlement Agreement.

25

an unreasonable burden is not levied against claimants in filing their claims—in other words, the settlement process should be efficient.  The overall framework balances the need for adequate information which, if overdone, can create an expensive process with the requirement that businesses of similar circumstances be treated the same.

61.     Moreover, the process for submitting claims under the various Business Economic Loss Frameworks is administratively feasible and the claims forms and instructions are well designed and user friendly.  This characteristic of being minimally complicated satisfies both a need for efficiency in the processing of claims and for a fair outcome for the claimants.  The form identifies all the information necessary to complete the claim; notes the documentation required of the claimant; and provides information about all claimant assistance centers.

***Opinions on Individual Economic Losses***

62.     The Individual Economic Loss Claims Framework presented in Exhibits 8A-E of the Settlement Agreement is consistent with the standard calculation of wage losses.  It compares what one would have expected to earn less what one actually earned, and it allows for general growth, industry specific growth, and claimant-specific growth. It also allows for individuals who may have had one or more claiming jobs.  And it allows for different types of documentation to support the actual earnings that may have been received. The documentation required by the Individual Economic Loss Claims Framework is reasonable and consistent with the types of documents typically produced and relied upon in litigation involving individual economic loss.

26

63.     The Individual Economic Loss claim form requires information regarding the claimant's requested compensation period, information about the claiming job, information about other aspects of the claimant's employment, information about the job for claimants who did not work a full twelve months, information on seasonal employment, information about persons who were not working, any expenses an individual might have incurred for training, and information about benefits available at the claimant's job including health benefits and pension systems.   The availability of reimbursement for accounting fees reasonably incurred to prepare a claim will facilitate potential claimants seeking professional assistance.   The form accomplishes the goal of deriving the necessary information and also being amenable to being completed without undue burden. The form is well organized and seeks information directly relevant to the claim determination being made.

64.     The Settlement Agreement provides for the greatest Economic Damage Compensation Amount possible because the Settlement Program is directed to review the claimant information in the Claim Form and all supporting documentation and process the claim to produce the greatest possible Economic Damage Compensation Amount.[16] The Settlement Program must also use the data that best suits the case for determining that causation is met.   The process is designed so that the average claimant can file the Individual Economic Loss claim form and be assured of getting the highest possible Economic Damage Compensation Amount given that the appropriate information is provided.

---

[16]   *See* Settlement Agreement § 4.3.8.

65.    The Individual Economic Loss Framework is broad and flexible in addressing a wide variety of individual circumstances in a standardized way, including for individuals without prior employment experience, those who changed jobs, and individual periodic and festival vendors. The breadth of the framework is important because of the diversity of potential claimants.

66.    For individual economic loss, individuals may provide different types of documents in order to recover potential losses.  The potential losses that are recoverable include all lost earnings, plus any applicable Risk Transfer Premium, plus compensation for employment-related benefits losses, reimbursable training costs, reimbursable search costs, or one-time, non-recurring event commission compensation, if any.[17]  Individual claimants with tax information must supply the relevant tax documents. Claimants without tax information can provide documentation about employment and compensation with respect to current earnings for 2010 and the benchmark period.  Documentation of earnings can be W-2s, paycheck stubs, other employer-provided payroll information, bank records, receipts from check cashing services, or other information provided by employers. Individuals without any documentary proof can supply sworn written statements on employment and compensation for 2010.   It also provides for compensation of individuals who were offered and accepted employment that was subsequently revoked, even if they have not worked since then due to a family, medical,

---

[17]    *See* I(C) of Exhibit 8A of the Settlement Agreement.

or educational reason. The framework also includes lost benefits in the calculation of loss, which allows individuals to be made whole for such losses.[18]

67.     The different methods of providing information allow individual claimants to apply for compensation even if they have not kept records of their employment and wages. The acceptance of various documentation types permits individuals who felt they were damaged by the Oil Spill to submit a claim given the information that they have available. The information, while not uniform, should be sufficient to maintain the integrity of the claims process.

68.     The causation requirements for individual claimants appear to provide clear, well-defined standards that offer claimants several options to establish causation and accommodate different individual circumstances. Indeed, as discussed above, certain claimants in certain geographic areas near the Gulf Coast and in industries tied to the Gulf (e.g. tourism) do not even need to establish causation.[19] Such presumptions appear reasonable. Other claimants may rely on causation established by their employers through GCCF determinations or employer's proof of causation in the settlement claims process.[20] The claimant is fully compensated for all losses if the claimant meets the causation requirements (which are already presumed for many claimants) and establishes eligibility through the required documentation. This is reasonable and minimizes the burden of proof on claimants.

---

[18]    *See* Exhibit 8C of the Settlement Agreement.

[19]    *See* I(B)(2)(a) of Exhibit 8A of the Settlement Agreement.

[20]    *See, e.g.*, I(B)(2)(b)(i) of Exhibit 8A of the Settlement Agreement.

29

69.     The compensation methodology for individuals considers the relevant factors necessary to allow individuals to be properly compensated.  Comparison of pre-incident and post-incident performance is a standard measure of loss for economic injury. The claimants are provided with significant flexibility to incorporate their unique circumstances when calculating the amount of their compensation.  A growth factor is a standard feature of compensation calculation for potential losses. This growth factor is even available for those who do not provide detailed earnings documentation. An industry specific factor is available for those who are hourly wage earners.

70.     The Settlement Program is directed to review the claimant information in the Claim Form and evaluate all supporting documentation and process the claim to produce the greatest possible Economic Damage Compensation Amount; this is important because it is reasonable to expect that the Settlement Program will be more familiar with the documentation and the process than the claimant. The Settlement Program can also construe the claimant's documentation to determine causation. The calculation of the Economic Damage Compensation Amount is designed to be optimal to the claimant.

**2. Observations Regarding Seafood Compensation Program**

71.     It is reasonable to presume that the commercial fishing industries covered by the Seafood Compensation Program were affected by the Oil Spill.[21] The Seafood Compensation Program amount of $2.3 billion is roughly five times the annual average

---

[21]     Menhaden is not covered by this Seafood Compensation Program.

revenue (over 2007-09) for the commercial fishing industry in the Gulf region covered by the settlement.

72.     To create any annual revenues from the commercial fishing industry, commercial fishing must produce a variety of seafood.   The price per pound is a significant factor in determining the annual revenues associated with commercial fishing activities.   The $2.3 billion cap for the Seafood Compensation Program must be viewed from the perspectives of pounds of seafood produced, the price per pound, and the ultimate revenues.   It appears that the Oil Spill affected the amount of fish caught and then affected, through price per pound and the volume caught, the annual revenues from the landings.   Therefore, it is reasonable to focus on annual revenues from landings in order to put the $2.3 billion amount in context.

73.     The reduction in annual revenues from the landings from 2009 to 2010 in Texas (including class and non-class counties), Louisiana, Mississippi, Alabama, and Florida was about six million dollars, about a one percent decline.[22]   The reduction in annual revenues from commercial fishing from 2009 to 2010 in Texas (only the class counties), Louisiana, Mississippi, Alabama, and Florida was approximately $25.5 million or a six percent decline.[23]   The impact varied by state and type of fish. Louisiana had the largest absolute reduction in annual revenues from the commercial fishing industry with a loss of about $54 million, or a 24 percent decline. This was not the largest percentage decrease, however. Alabama incurred a loss of about 29 percent ($11 million) in annual

---

[22]   ALS Data by States, 07-27-12 (based on confidential ALS Data).

[23]   *Id.*

revenues from the seafood industry and Mississippi suffered a 33 percent decline of $6.5 million. Florida and Texas, including the Texas class counties, actually had a significant increase in annual revenues from their seafood industries.  The increase in Texas in terms of revenues was a product of the increase in per-pound price for shrimp in particular. Florida actually brought to market more shrimp in 2010 than in 2009.[24]  Of the states that suffered a loss in seafood landings in dollar terms, the total loss was roughly $71 million; this is far less than the cap of the Seafood Compensation Program of $2.3 billion.

74.    It should also be noted that the annual revenues from commercial fishing in Texas (only the class counties), Louisiana, Mississippi, Alabama, and Florida had been declining in years prior to the Oil Spill.  Specifically, they declined by about $27 million from 2007 to 2008, approximately $16 million from 2008 to 2009, and a decline of about $26 million from 2009 to 2010.  Every state did not follow this exact pattern.[25]   Annual revenues from commercial fishing had been declining on an annual basis since 2007 with the decline averaging $21.5 million per year from 2007 through 2009 despite the fact that the volume of fish declined from 2007 to 2008 but rose from 2008 to 2009.

### Overall Opinion of Settlement

75.    After a careful review of the Economic Damage Claim Frameworks, which include frameworks for compensating businesses and individuals, it is my opinion that these frameworks are reasonable and objective and consistent with methodology

---

[24]   *Id.*

[25]   *Id.*

typically used and widely recognized in economic loss damages cases. The Settlement Agreement uses multiple geographic zones that reasonably deal with questions about causation and minimize the burden upon claimants. The frameworks are designed to benefit those persons and businesses associated with industries that were most likely to have been impacted by the Oil Spill such as Seafood and Tourism. The Settlement Agreement is designed to reach common outcomes for similarly situated businesses and persons by providing clear procedures and clearly defining terms such as fixed and variable costs, benchmark periods, and growth factors. The Settlement Agreement has balanced the need to have adequate information with the reality that not everyone has the same documentation and that there is a cost to the claimants in gathering the required information.

76.    Moreover, given the economic conditions of Louisiana during the period prior to the Oil Spill, the Economic Damage Claim Frameworks provide flexible ways to determine the revenues and potential losses of the claimant. I believe the settlement broadly defines and provides financial assistance to those individuals and businesses that were potentially damaged by the Oil Spill. It is fair in terms of treating similar persons or businesses with the same basic considerations; and it is as simple as it possibly can be and yet allow for the first two objectives. In summary, the Settlement Agreement's compensation frameworks for business and individual economic loss appear reasonable and objective and consistent with methodology typically-used and widely-recognized in economic loss damages cases. The frameworks are flexible, providing both business and individual claimants reasonable and often generous opportunity to meet the requirements for compensation.

33

77.    The Seafood Compensation Program amount of $2.3 billion is roughly five times the annual average revenue (over 2007-09) for the commercial fishing industry in the Gulf region covered by the settlement.  Such a comparison, in my judgment, suggests that it is more than adequate to compensate the commercial fishing industry.

78.    The Settlement Program is given the responsibility of taking the information from the claimants and to evaluate and process this information and supporting documentation to produce the greatest Economic Compensation Amount. This assignment to the Settlement Program clearly provides assistance to claimants under the Economic Damage Claim Frameworks and the Seafood Compensation Program.

79.    I stated that a claims process should abide by the following characteristics: it should be sufficient to pay compensation amounts established under the claims process; it should be equitable and fair so that similar individuals and businesses incurring similar losses are appropriately and similarly compensated; it should be sufficiently simple so that an unreasonable burden is not levied against claimants in filing their claims—in other words, the settlement process should be efficient.  This Settlement Agreement, in my opinion, satisfies these three components that describe a settlement that is fair to all the claimants.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Dated:  August 12, 2012

James A. Richardson

# Richardson Declaration
# Exhibit A

**Exhibit A**
## Curriculum Vitae for James A. Richardson

JAMES A. RICHARDSON is John Rhea Alumni Professor of Economics and Director of the Public Administration Institute in the E. J. Ourso College of Business Administration at Louisiana State University in Baton Rouge, Louisiana. Dr. Richardson has also served as Chairman of the Department of Economics, Acting Dean of the College of Business Administration, and Associate Vice Chancellor for Academic Affairs at Louisiana State University.

Dr. Richardson has served from 1987 through the present as the private economist on the Louisiana Revenue Estimating Conference, the panel with the constitutional authority and responsibility to provide official revenue estimates for the state. This Conference includes the Governor of the State, the President of the Senate, and the Speaker of the House of Representatives. Dr. Richardson also serves as a member of the Board of Directors of the Public Affairs Research Council and as a member of the Board of Trustees of the Council for A Better Louisiana.

He organized and supervised a major tax study for the state of Louisiana which resulted in *Louisiana Fiscal Alternatives: Finding Permanent Solutions to Recurring Budget Crises,* published by the LSU Press in 1988. Dr. Richardson has co-edited a major book, *Handbook on Taxation,* which was published by Marcel Dekker in January 1999. Dr. Richardson also served on the Louisiana Law Institute's Tax Study Commission, a group that was formed in response to Senate Concurrent Resolution 88, passed in 1999.

Dr. Richardson served as fiscal advisor to the Governor of Louisiana from 1988 through 1991. He contributed to the comprehensive tax study for the state of Kansas in 1995. He served as an advisor to the state of Alabama's Department of Revenue in 1996. He has served as Associate Editor of the *Journal of Education Finance* and the *Texas Business Review*. His work has been published in numerous journals such as the *National Tax Association Proceedings, State and Local Government, Public Finance Quarterly, Growth and Change, Natural Resources Journal, Journal of Energy and Development,* and *Journal of Economic Dynamics and Control.*

Dr. Richardson also participates in the preparation of the Louisiana Economic Outlook, a two-year forecast of the Louisiana Economy published by the E. J. Ourso College of Business Administration at Louisiana State University. The Louisiana Economic Outlook has been published, and Dr. Richardson has participated in the publication, since 1983. This outlook focuses on major industries in Louisiana, specifically the oil and gas industry.

Dr. Richardson prepared analysis of the impact of Katrina on the New Orleans economy and ways to accelerate its recovery for the Financial Services Roundtable. He also testified before the Committee on Financial Services of the United State House of Representatives on Housing and the New Orleans Recovery. He has been involved in numerous studies regarding the New Orleans recovery, including studies regarding the upgrading of the riverfront, enhancing the theater district, developing downtown attractions such as the aquarium and the insectariums, and relating the New Orleans airport to the city's economic development. Dr. Richardson was a member of the team putting together Plan Baton Rouge 2, the master plan for East Baton Rouge Parish, and the master plan for Ascension Parish. Dr. Richardson has also providing fiscal and economic analysis to the parish of Livingston. He has consulted with major mixed-use developments, major industrial projects, various governmental units.

Dr. Richardson received his bachelors of art degree in economics from St. Mary's University of San Antonio, Texas and his Master's degree in economics and the doctorate in economics from The University of Michigan. Dr. Richardson specializes in regional forecasting, state and local tax policy, economic valuation, and energy economics.



**James A. Richardson**
**John Rhea Alumni Professor of Economics**
**Harris J. and Marie C. Chustz Distinguished Professor in Business Administration**
**Director, Public Administration Institute**
**Louisiana State University**

**Bus. Address**:     Public Administration Institute
                      2039 Business Education Complex
                      Louisiana State University

                      Baton Rouge, LA  70803
                      (225) 578-6745
                      (225) 578-9078 FAX
                      parich@lsu.edu

**Home Address**:     3165 Kleinert Avenue
                      Baton Rouge, LA  70806
                      (225) 383-3310
                      (225) 383-2575 FAX
                      jamesrichardson2@cox.net

2

**Personal Data:**    Born, 2/23/44, San Antonio, Texas
Married, 2 children

**Education:**    A.B., (Economics) St. Mary's University of Texas, 1966
A.M., (Economics) University of Michigan, 1970
Ph.D., (Economics) University of Michigan, 1971

**Employment:**    Director, Public Administration Institute and John Rhea Alumni Professor of Economics, Louisiana State University, 1984 –

Associate Vice-Chancellor for Academic Affairs; Director, Public Administration Institute; and Alumni Professor of Economics, Louisiana State University, 1989 – 1994

Acting Dean and Professor of Economics, Louisiana State University, 1983-1984

Chairperson and Associate Professor of Economics, Louisiana State University, 1982-1983

Graduate Coordinator and Associate Professor of Economics, Louisiana State University, 1975-1982

Assistant Professor of Economics, University of Michigan, 1971

Assistant Professor of Economics, Louisiana State University, 1970-1975

Program Analyst, U. S. Bureau of the Budget, 1967

**Boards and Committees:**    Member, Council of Trustees, Gulf South Research Institute, 1982-1987

Member, Board of Trustees, Public Affairs Research Council of Louisiana, 1982-Present

Chairman, Board of Trustees, Public Affairs Research Council of Louisiana, 1996-97

Member, Board of Trustees, Council for A Better Louisiana, 1988-present

Charter Member, Louisiana Partnership for Technology, 1988-present

Member, Revenue Estimating Conference, State of Louisiana, 1987-present

Member, Government Fiscal Affairs Committee, Baton Rouge Chamber of Commerce, 1986-2000

Member, Transition Team, Governor-elect 1988

Member, Transition Team, Louisiana State Treasurer, 1988

Member, Business Tax Issues, National Tax Association

**Editorial Boards:**      <u>Texas Business Review</u>, 1981-84

<u>Journal of Education Finance</u>, 1982-88

**Research Activities**:

<u>Books</u>

**<u>Louisiana's Fiscal Alternatives: Finding Permanent Solutions to Recurring Budget Crises</u>, editor (LSU Press, 1988).**

**<u>Handbook on Taxation</u>, co-editor (Marcel Dekker, January 1999).**

<u>Chapters in Books</u>

"Forecasting Revenues and Expenditures," Chapter 38 in **<u>Handbook of Governmental Accounting and Finance</u>**, edited by N. Apostolou and L. Crumbley, (John Wiley, 1988); also in second edition (1991).

"Severance Tax Reform," Chapter 16 in **<u>Reforming State Tax Systems</u>**, edited by Steven D. Gold, (National Conference of State Legislatures, 1986).

"Introduction, Purpose, and Scope," Chapter 1 in **<u>Louisiana's Fiscal Alternatives</u>**, edited by J. Richardson, (LSU Press, 1988).

"Tax Instability in Louisiana," Chapter 7 in **<u>Louisiana's Fiscal Alternatives</u>**, edited by J. Richardson, (LSU Press, 1988).

"Mineral Taxes and Revenues and Budgeting Stability," (With L. Scott), Chapter 8 in **<u>Louisiana's Fiscal Alternatives</u>**, edited by J. Richardson, (LSU Press, 1988).

"Paying For State Government in Louisiana: Considering the Alternatives," Chapter 19 in **Louisiana's Fiscal Alternatives**, edited by J. Richardson, (LSU Press, 1988).

"Introduction to Handbook on Taxation," chapter in **Handbook on Taxation**, edited by James A. Richardson and W. Bartley Hildreth (Marcel Dekker, 1999).

"Economics Principles of Taxation," chapter in **Handbook on Taxation**. Edited by James A. Richardson and W. Bartley Hildreth (Marcel Dekker, 1999).

"State Severance Taxes," chapter in **Handbook on Taxation**, edited by James A. Richardson and W. Bartley Hildreth (Marcel Dekker, 1999).

"Forecasting State Revenues in Louisiana: From Dramatic Changes in the Oil and Gas Industry in the 1970s and 1980s to the Aftermath of Catastrophic Hurricanes in the 2000s" **Handbook of Government Budget Forecasting,** (Taylor and Francis, 2007).

Peer-Reviewed Articles

"Monetary Rules and Optimal Monetary Policy," Nebraska Journal of Business and Economics (Autumn, 1975)

"Projecting State Revenues in Louisiana:  Progress and Problems," Annals of Mid-South Academy of Economist, (Summer, 1976).

"Projecting State Revenue in Louisiana with an Econometric Model," State and Local Government Review (Fall, 1978) (co-author).

"Tax Rate changes and the Specification of the Tax Equation," Public Finance Quarterly (April, 1979) (co-author).

"A Short-Run Regional Oil and Gas Model:  The Case of Louisiana," (with Loren C. Scott), Growth and Change (Fall, 1979).

"Income and Employment in a State Econometric Model:  The Case of Louisiana," Journal of Economics, Vol. IV (Fall, 1978).

"The Impact of the Energy Shortage on Small Businesses in Region VI," (with Loren C. Scott) Texas Business Review, (July/August, 1980).

"Determining an Appropriate Teacher Salary," (with J. T. Williams) Journal of Education Finance (December 1981).

"Domestic and International Implications of Federal and State Policies Toward Heavy Oil," Heavy Versus Light Oil:  Technical Issues and Economic Considerations, edited by Ragaei El Mallakh, International Research Center for Energy and Economic Development (1983).

"Resource Location Patterns and State Severance Taxes:  Some Empirical Evidence," (with Loren C. Scott) Natural Resources Journal, (Winter, 1983).

"A Review of State Severance Taxes in the United States," (with Loren C. Scott) Texas Business Review (July/August, 1982).

"Government Regulation and Market Distortions:  The Case of the NGPA and the Louisiana Economy," (with Loren C. Scott) Journal of Energy and Development (Autumn, 1982).

"Subjective Evaluation of Composite Econometric Policy Inputs," (with T. Gulledge and J. Ringuest) Socio-Economic Planning Sciences (Fall 1986).

"Spectral Analysis of Nominal Interest Rates," (with U. Erol and T. Gulledge) Journal of Economic Dynamics and Control, (Proceedings) (1987).

"A Re-Examination of the Fisher Hypothesis," 13th World Congress on Computation and Applied Mathematics, Proceedings, Vol 4, (July 1991), pp. 1757-1759 (co-author).

"The Politics and Economics of Taxing Oil and Gas in Louisiana, Proceedings, National Tax Association, 1992, pp. 170-173.

"Taxing Oil and Gas in Kansas," Kansas Business Review, Spring 1995.

"Forecasting State Revenue in Louisiana:  Procedures and Results," 1995 Academy of Business Administration.

"State Severance Taxes," Encyclopedia of Taxation and Tax Policy, (published by National Tax Association, 1998 and 2005).

"Katrina/Rita: The Ultimate Test for Tax Policy," National Tax Journal, (September 2006).

"Natural Disasters and State and Local Finance in Louisiana: A Case Study in 2005," Municipal Finance Journal, (Fall 2006).

<u>What's Needed for Post-Katrina Recovery,</u>  Study for Financial Services Roundtable, (March, 2006).

<u>Other Published Articles</u>

"The Consumer Price Index: Part I," <u>Louisiana Business Review</u>, (April, 1975).

"The Consumer Price Index: Part II," <u>Louisiana Business Review</u>, (May, 1975).

"Louisiana's Revenue Outlook," <u>Louisiana Business Review</u>, (March, 1976).

"A Flowchart Description of the Louisiana Economy," (with Loren C. Scott) <u>Annals of Louisiana Academy of Economists</u>, (Fall 1977).

"The Consumer Price Index:  Revised and Updated for the 1970's," <u>Louisiana Business Review</u>, (April 1978).

"Louisiana Financial Opportunities," <u>Louisiana Business Review</u> (May 1980).

"Louisiana Oil and Gas Severance Tax:  A Historical Review," <u>Louisiana Business Review</u> (July 1978) (with Loren C. Scott).

"Louisiana's Financial Opportunities:  Money and Minerals," <u>Louisiana Business Review</u>, (Spring 1981).

"Experiences With the Combining of Simple Forecasts With Those From Large Econometric Models," <u>Proceedings</u>, American Institute for Decision Science, Toronto, Canada, 1984 (with J.L. Ringuest and T. Gulledge).

"Louisiana State Revenue Outlook," <u>Louisiana Business Review</u>, (Spring 1983).

"Louisiana's 1983 Economic Outlook," <u>Louisiana Business Review</u>, (Spring 1983) (co author).

"Louisiana's 1984 Economic Outlook,"  <u>Louisiana Business Review</u>, (Fall 1983) (co-author).

"Louisiana's 1984 Economic Predictions," <u>Louisiana Business Review</u>, (Winter 1984).

"Louisiana's Economic Outlook, 1985" (co-author) (LSU College of Business Administration, 1985).

"Louisiana's Economic Outlook, 1986" (co-author) (LSU College of Business Administration, 1986).

"Louisiana's Economic Outlook for 1988 and 1989" (co-author) (LSU College of Business Administration, 1987).

"Louisiana's Economic Outlook for 1989 and 1990" (co-author) (LSU College of Business Administration, 1988).

"Louisiana's Economic Outlook for 1990 and 1991" (co-author) (LSU College of Business Administration, 1989).

"Louisiana's Economic Outlook for 1991 and 1992" (co-author) (LSU College of Business Administration, 1990).

"Louisiana's Economic Outlook for 1992 and 1993" (co-author) (LSU College of Business Administration, 1991).

"Louisiana's Economic Outlook for 1993 and 1994" (co-author) (LSU College of Business Administration, 1992).

"Louisiana's Economic Outlook for 1994 and 1995" (co-author) (LSU College of Business Administration, 1993).

"Louisiana's Economic Outlook for 1995 and 1996" (co-author) (LSU College of Business Administration, 1994).

"Louisiana's Economic Outlook for 1996 and 1997" (co-author) (LSU College of Business Administration, 1995).

"Louisiana's Economic Outlook for 1997 and 1998" (co-author) (LSU College of Business Administration, 1996).

"Louisiana's Economic Outlook for 1998 and 1999" (co-author) (LSU College of Business Administration, 1997).

"Louisiana's Economic Outlook for 1999 and 2000" (co-author) (LSU College of Business Administration, 1998)

"Louisiana's Economic Outlook for 2000 and 2001" (co-author) (LSU's E.J. Ourso College of Business Administration, 1999)

"Louisiana's Economic Outlook for 2001 and 2002" (co-author) (LSU's

E.J. Ourso College of Business Administration, 2000)

"Louisiana's Economic Outlook for 2002 and 2003" (co-author) (LSU's E.J. Ourso College of Business Administration, 2001)

"Louisiana's Economic Outlook for 2003 and 2004" (co-author) (LSU's E.J. Ourso College of Business Administration, 2002)

"Louisiana's Economic Outlook for 2004 and 2005" (co-author) (LSU's E.J. Ourso College of Business Administration, 2003)

"Louisiana's Economic Outlook for 2005 and 2006" (co-author) (LSU's E.J. Ourso College of Business Administration, 2004)

"Louisiana's Economic Outlook for 2006 and 2007" (co-author) (LSU's E.J. Ourso College of Business Administration, 2005)

"Louisiana's Economic Outlook for 2007 and 2008," (co-author), (LSU's E. J. Ourso College of Business Administration, 2006)

"Louisiana's Economic Outlook for 2008 and 2009," (co-author), (LSU's E. J. Ourso College of Business, 2007)

"Louisiana's Economic Outlook for 2009 and 2010," (co-author), (LSU's E. J. Ourso College of Business, 2008)

"Louisiana's Economic Outlook for 2010 and 2011," (co-author), (LSU's E. J. Ourso College of Business, 2009)

"Louisiana's Economic Outlook for 2011 and 2012," (co-author), (LSU's E. J. Ourso College of Business, 2010)

Book Reviews

Is Growth Obsolete? By William Nordhaus and James Tobin for The Annals of Regional Science.

Unemployment, Vacancies, and the Rate of Change of Earnings:  A Regional Analysis, by A.E. Webb and Regional Rates of Growth of Employment:  An Analysis of Variance Treatment by B. Weeden. National Institute of Economic and Social Research, Regional Papers III (Cambridge University Press, 1974) for The Annals of Regional Science.

9

**Grants and Research Studies Associated with Grants, LSU:**

> **Louisiana Revenue Projection Model**, grant through Legislative Fiscal Office, 1975, $72,000 (with Loren C. Scott).
> > Louisiana Revenue Projection Model, 80 pages.
> > User's Manual for Revenue Model, 106 pages.
> > Compendium of Louisiana Taxes and Revenues, 343 pages.

> **Energy Policy Evaluation Model**, grant through Department of Natural Resources, 1978-79, $21,000 (with W.P. Culbertson).
> > Energy/Resources Policy Evaluation System, 81 pages.

> **State Taxation of Natural Resources**, grant through U.S. Department of Interior, 1980-81, $72,500 (with Loren C. Scott).

> **Taxation of Natural Resources by States:  Theoretical and Empirical Findings**,   200 pages. Louisiana Econometric Model, grant through Board of Regents, 1981-81, $65,000 (with Loren C. Scott).  Results published in Louisiana Business Review (Winter, 1983).

> **Louisiana Energy Sector**, grant from LSU Center for Energy Studies, 1983, $17,500 (with Loren C. Scott).

> **Louisiana Econometric Model**, grant from Louisiana Board of Regents, 1983-84, $55,000 (with Loren C. Scott).

> KPGM Peat Marwick, **Tax Study for Louisiana**, 1995, $55,000.

**Papers and Discussions at Professional Meetings:**

> "Monetary Rules and Monetary Policy" presented at Southwestern Social Science Meeting, (March 1972).

> "Optimal Time Horizon for Policy Making," presented at Southwestern Social Science Meeting, (March 1973).

> "Measuring the Impact of Monetary and Fiscal Policy," presented at Atlantic Economic Conference, (September 1974).

> "Inflation and Development in the Mexican Economy:  A Discussion," presented at Southern Economic Association, (November 1974).

> "Reduced-Form Models and Monetary and Fiscal Multipliers," presented at Western Economic Association, (June 1975).

"Oil and Gas Forecasting Model," presented at Southwestern Social Science Meeting (April 1976) (with Loren C. Scott).

"Obtaining Consistent and Efficient Estimates with the Kalman Filter," special paper presented to Economics Conference on Optimal Control Theory, sponsored by National Bureau of Economic Research (May 1976), (co-author).

"Oil and Gas Econometric Model:  The Case of Louisiana," presented to Western Economic Association Meeting (June 1976) (with Loren C. Scott).

Comments on "Money, Liquidity, Reverse Causation, and the Transactions Demand for Money," Southern Economic Association Meetings (November 1976).

"A Long-Run Model of Oil and Gas Production" (with Loren C. Scott) at Southern Economic Meetings (November 1977).

"Price Expectations, Interest Rates, and Monetary and Fiscal Authorities," at Southwestern Social Science Meetings (April 1978).

"Income and Employment in a State Econometric Model:  The Case of Louisiana," at Missouri Valley Economic Conference (February 1978).

"Price Expectations and Impact of Monetary and Fiscal Authorities Over the Business Cycle," presented to Southern Economic Meetings, (November 1979).

"Determining an Appropriate Teachers Salary," presented to Education Finance Association, 1980.

"State Taxation of Natural Resources," presented to Western Economic Association, (July 1981).

"Domestic and International Implications of Federal and State Policies Towards Heavy Oil," presented to Conference on Heavy vs. Light Oil, sponsored by International Research Center for Energy and Economic Development, University of Colorado, (March 1982).

"Government Regulations and Market Distortions:  The Case of the NGPA and the Louisiana Economy," presented to International Research Center for Energy and Economic Development, University of Colorado (September 1982).

11

"Experience with the Combining of Simple Forecasts with those of Large Scale Econometric Models," American Institute For Decision Sciences (October 1984).

"Combining Macroeconomic Inputs," Paper presented at the ORSA/TIMS Joint National Meeting, Boston, Mass., (1985).

"Spectral Analysis of Nominal Interest Rates," Conference on Dynamic Modeling and Control of National Economies, Budapest, Hungary (July 1986).

"Projecting the Impact of Offshore Oil and Gas Activity on A Producer State" International Society of Forecasting (Boston: May 1987).

"Tax Reform and Tax Forecasting," International Society of Forecasting (Boston: May 1987).

"The Impact of OPEC on the Louisiana Offshore Industry," Missouri Valley Economic Association (February 1987).

"Perspectives on Louisiana Tax Reform," Alabama Fiscal Policy Symposium (August 1986).

Louisiana Tax Study, moderated and presented three papers, LSU/CABL Tax Conference (January 1987).

"State Tax Reform," Public Affairs Research Conference Annual Report, (March 1987).

"Business and Environmental Taxes," paper discussant, American Economic Association and National Tax Association, (January 1992).

"Politics and Economics of Taxing Oil and Gas in Louisiana," National Tax Proceedings (October 1992).

"Taxing Oil and Gas in Kansas," Task Force of the Governor (October 1995).

"Forecasting State Revenues in Louisiana:  Procedures and Results," presented to International Conference of Academy of Business Administration, Summer 1995.

**Conferences and Public Forums:**

12

"Money and Minerals" presented to Annual Conference of Public Affairs Research Council, 1980.

"Energy and the Louisiana Economy" presented to Annual Conference of Public Affairs Research Council, 1982.

"Louisiana's Financial Future' presented to Annual Conference of Public Affairs Research Council, 1983.

"Economic Outlook for Louisiana," sponsored by the LSU College of Business Administration, 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001,  2002, 2003, 2004, 2005, 2006, 2007,2008,2009, 2010, and 2011.

Electricity Deregulation in Louisiana, Annual Conference of Public Affairs Research Council of Louisiana, 1997

Louisiana Fiscal Reform Efforts, presented to Annual Conference of Public Affairs Research Council, 1998

Katrina and the Recovery of the Gulf Coast, Housing Policy Council, New Orleans, (December 2005).

Katrina and the Recovery of New Orleans, Mortgage Bankers Association, Phoenix, AZ (February 2006)

Katrina and Mega-catastrophes, Financial Services Roundtable, Phoenix, AZ, (March 2006).

Initiating the Recovery after Katrina, Blue Ribbon Commission on Mega-catastrophes sponsored by Financial Services Roundtable, Chicago, IL (June 2006).

Katrina/Rita: The Ultimate Test for Tax Policy, National Tax Association, May 2006.

**Dissertation:**

An Analysis of Alternative Monetary Policies within the Framework of the FRB-MIT Econometric Model (completed August 1971:  Directed by Warren L. Smith, University of Michigan).

**Teaching Activities:**

Courses Taught

Principles of Economics (Michigan and LSU, Undergrad.)
Money and Banking (Michigan and LSU, Undergrad.)
Business Cycle Theory (LSU, Undergrad.)
Aggregate Economics (LSU, Undergrad.)
Urban Economics (LSU, Undergrad.)
Seminar in Monetary and Fiscal Policy (LSU, Grad.)
Advanced Macroeconomic Theory (LSU, Grad.)
Independent Readings (LSU, Undergrad. And Grad.)
Public Administration Colloquium (LSU, Grad.)
Microeconomic Decisions (LSU, Grad.)
Public Finance (LSU, Grad and Undergrad)
Internships/Practicums, (LSU, Grad.)

**Dissertation Committees—25 dissertation committees:**

**Master's Committee (thesis) – 3 thesis committees**

**Professional Service:**

Referee for **Public Finance Quarterly**, **Southwestern Social Science Quarterly**, **Growth and Change**, **Journal of Economics**, **Journal of Education Finance**, **Journal of Macroeconomics**, and **Municipal Finance Quarterly.**

Member of American Economic Association, Southern Economic Association, American Society of Public Administrators, National Tax Association, and National Association of Schools of Public Affairs and Administration.

**University Service:**

Committees

Graduate Advisory Committee for Economics (Chairperson as of September 1976 to 1982)

Computer Center liaison for College of Business Administration, 1974-75, 1975-76, 1976 to 1982

Honors Program Committee, 1971-1973

Committee to Select Computer Hardware for CEBA, Spring 1977

College Policy Committee (Chairperson, 1978-1981)

14

College Courses and Curricula Committee, 1978-1983, Chairperson in 1982

University Courses and Curricula Committee, 1980-1983

University Self-Study Committee, Chairperson Financial Resources, 1982-1983.

Executive Committee, College of Business Administration, 1983-Present.

University Planning Committee, 1990-1994

Computer Advisory Committee, 1990-1994

L.S.U. Faculty Senate, 1999-2002

Faculty Senate Executive Committee, 1999-2001

Review of Evaluation of Faculty Members, Instructors, and Research Associates, 2001-02

Committee to Review Athletic Oversight, 2002

Self-study Committee for upcoming accreditation, 2001-02

Search Committee for Dean of Business School, 2002

Fellow in Reilly Center on Media and Public Policy, 2001-05

Committee to Review Tenure Policy, 2002-2005

University Planning Council, 2006- present

Search Committee for Provost, 2006

Search Committee for Dean, College of Business, 2007

**Service to Community:**

Member, Louisiana Tax Study Commission, 1983-84.

Contributor to Senate Task Force on Economic Development, 1983-1984.

Contributor to House Forum on Economic Development, 1985.

Contributor to House/Senate Task Force on Economic Development Strategies, 1987.

15

Testimony before Numerous Committees of the Louisiana Senate and House of Representatives, since 1975.

Testimony before U. S. Senate Committee on Energy Policy, 1986.

Testimony before U.S. House of Representatives, 2006

Member, Revenue Estimating Conference, State of Louisiana, 1987-present

Fiscal Advisor to Governor of Louisiana, 1988-91

Advisor to Governor of Louisiana, 1995-96, on Unemployment Insurance Program

Member, Louisiana Law Institute's Tax Study Committee, 2000

Speaker at numerous clubs and luncheons such as Rotary, Lions, Kiwanis, Professional Women's Association, Personnel Managers, Financial Analysts, and others.

Chairman, Public Affairs Research Council of Louisiana, 1995-97

Member, Board of Trustees, Public Affairs Research Council of Louisiana, 1980-present

Member, Tax Study Commission, Created by Resolution of Louisiana Senate and House, 1999-2000

Testimony to Committee on Financial Services, U.S. House of Representatives, February 2007.

**Honors:**

Woodrow Wilson Fellowship 1966-67
University Fellowship, 1967-68 (Michigan)
Teaching Fellowship, 1968-69 (Michigan)
FDIC Dissertation Grant, 1969-70
LSU Graduate School Summer Research Fellowship, Summer 1973
LSU Foundation Post Doctoral Research Fellowship, 1973-74, 1974-75, and 1976-77
LSU Foundation Distinguished Service Award, 1987
John Rhea Alumni Professor, 1989-present
Fellow, Reilly Center on Media and Public Policy, 2002 through present

**<u>Selective Consulting and Expert Witness for Governments:</u>**

Department of Education, Louisiana

Department of Wildlife and Fisheries, Louisiana

Department of Revenue and Taxation, Louisiana

Department of Transportation and Development, Louisiana

Division of Administration, Louisiana

Department of Economic Development

Department of Labor, Louisiana

Attorney General's Office, Louisiana

City of Baker, Louisiana

City of Zachary, Louisiana

Sulphur Community, Louisiana

Department of Revenue, Alabama

Office of Governor, Kansas

Office of Governor, Louisiana

Jefferson Parish

New Orleans Levee Board

State of Louisiana

U.S. Department of Justice

New Orleans Sewerage and Water Board

Mayor of New Orleans

Mayor of Baton Rouge