# Exhibit 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179 SECTION J HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF HOLLY SHARP

I, Holly Sharp, submit this declaration in support of BP Defendants' Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012.  I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are my own.

## INTRODUCTION

1.      I am an independent expert retained by counsel for BP Exploration & Production Inc. and BP America Production Company, along with the other BP entities who have been named as defendants in the above-captioned litigation (collectively, "BP"), for the purpose of evaluating the proposed Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement") between BP and the Plaintiffs.   This declaration is based upon my own personal experience, expertise, and analysis, except where otherwise indicated; and if called to testify I could testify to the opinions and analysis I set forth in this declaration.

2.      I did not assist and was not involved in any way in the negotiation, drafting, development, or revising of the Settlement Agreement or its compensation frameworks.

3.      I am a Certified Public Accountant (CPA), Certified Fraud Examiner (CFE), and Certified in Financial Forensics (CFF) and a Shareholder and Director in LaPorte CPAs and Business Advisors, a CPA firm based in Metairie, Louisiana, where I have practiced for more than 30 years.  I have a B.S. in Business Management from Tulane University and a M.S. in Tax Accounting from the University of New Orleans.  I am an Adjunct Professor of Taxation at the A.B. Freeman School of Business at Tulane University, where I have taught since 1999.  I have published extensively on issues related to the calculation of damages, including economic losses from personal injury, lost profits, and other economic damages.  I have taught continuing education courses to accountants and attorneys on the calculation of economic damages.  I have served as the Chairwoman and am a current member of the Economic Damages Task Force of the American Institute of Certified Public Accountants.  My curriculum vitae detailing my education and experience is attached to this Declaration.

4.      Over the course of my professional career, I have performed hundreds of business interruption, loss of business income, and lost profit calculations for individuals and business entities.  I also have performed hundreds of economic loss calculations in matters involving individuals.  These calculations were performed in litigated and non-litigated matters.  In those matters, I have been retained almost equally by the plaintiffs and defendants/insureds and insurance companies.

5.      Virtually every business in the New Orleans area that was in existence at the time of Hurricane Katrina sustained business interruption and loss of business income.  My work from

October 2005 through December 2006 consisted primarily of performing and supervising my employees in business interruption and loss of business income calculations.  This work was performed for individual and business clients of my firm, for insurance companies, and for attorneys with plaintiff or defense clients in litigation proceedings.   These calculations encompassed a variety of businesses including personal service industries, wholesale and retail distributors, apartment rentals, hotels, and restaurants.

6.       I have been asked to render opinions with respect to the economic reasonableness and methodologies of business and individual economic loss under the Settlement Agreement.

7.       In order to reach my opinions, I reviewed and carefully studied the following materials:

(a)       The Settlement Agreement, as amended on May 2, 2012, and Appendices 1A-27 with a focus on those containing the frameworks for business and individual economic loss.  This includes compensation frameworks for general business economic loss claims (Exhibit 4A-4E of the Settlement Agreement), multi-facility businesses (Exhibit 5 of the Settlement Agreement), failed businesses (including failed start-up businesses) (Exhibit 6 of the Settlement Agreement), start-up businesses (Exhibit 7 of the Settlement Agreement), and individual economic loss claims (Exhibit 8A-8E of the Settlement Agreement).

(b)       Interim Class Counsel's and BP's Joint Supplemental Motion Related to the Economic and Property Damages Settlement, filed May 2, 2012.

(c)     The Plaintiffs' Steering Committee's and BP Defendants' Joint Motion for:  (1) Preliminary Approval of Class Action Settlement; (2) Scheduling a Fairness Hearing; (3) Approving and Issuing Proposed Class Action Settlement Notice; and (4) BP's Motion for Adjourning the Limitation and Liability Trial, filed April 18, 2012.

(d)     The Claim Forms and their instructions and Frequently Asked Questions ("FAQs") and answers available to claimants on the Claims Administrator's website.[1]

(e)     The court's Preliminary Approval Order.[2]

(f)     Objections relevant to business and individual economic loss claims.

(g)     The Claims Administrator's claims statistics, as posted on the settlement website;[3]

(h)     Certain independently identified authoritative references, as cited herein.

8.     The methodologies used in the compensation frameworks for business and individual economic loss are clear and objective and will fairly compensate claimants for losses due to the DWH spill.  They apply generally accepted and standardized mathematical formulas to data provided by the claimants.  This should facilitate efficient administration and objective, consistent determinations of compensation.   Similarly, the documentation required by the frameworks is reasonable and consistent with the types of documents typically produced and

---

[1] Available at www.deepwaterhorizonsettlement.com

[2] Docket No. 6418, Preliminary Approval Order as to the Proposed Economic and Property Damages Class Action Settlement, May 2, 2012.

[3] Available at www.deepwaterhorizonsettlement.com

relied upon in litigation involving economic loss damages.  Both the methodologies used and the documents required in the Settlement Agreement are consistent with the methodologies I use and the documents I rely upon for my damages assessments and calculations in similar matters.

**Business Economic Loss**

9.      The Business Economic Loss framework in the Settlement Agreement applies generally accepted and established methods for business claimants to receive compensation.  It is generally accepted that business economic loss is measured by the difference between actual performance during the damage period, and "but-for" performance during the damage period assuming the loss event did not occur.   The compensation calculation in the Settlement Agreement for business economic loss claims is divided into two steps:   Step 1 provides compensation for the reduction in variable profit between the Compensation Period and the Benchmark Period.  Step 2 provides compensation for increased profits expected to be generated in 2010 "but for" the spill.  The two-step calculation in the Settlement Agreement applies the generally accepted "before and after" method to compensate business claimants for post-spill lost profit.

10.     The "before and after" method is commonly used by experts to measure lost profit during a damage period.  This method looks at business operations before and after a loss event to measure expected returns had the loss event not happened.  A base (benchmark) period of revenues and expenditures (benchmark earnings) is selected from the business records to use as a predictor during the damage (compensation) period.   Revenues less variable expenses are calculated for both the Benchmark Period and the Compensation Period, and the difference is measured (Step 1).  The Variable Margin percentage is calculated based on claimant-specific

data (Variable Profit divided by Total Revenues during May through December of the Benchmark Period years).  Growth factors are calculated by analyzing historical revenue trends prior to the loss event.  Growth factors are then applied to benchmark earnings to determine incremental revenue that would have been generated during the Compensation Period if the loss event had not occurred, and the Variable Margin percentage is applied (Step 2).  The sum of Step 1 and Step 2 equals the lost profit; this is the difference between expected returns had the loss event not happened, and actual returns realized during the damage or compensation period.  This generally accepted methodology of the "before and after" approach to calculate business economic loss is the methodology applied in the Settlement Agreement to compensate business economic loss.

11.     I use the "before and after" method to calculate lost profits and have taught certified public accountants how to use this method in numerous continuing education courses. Details of the "before and after" method are found in my publication *Lost Profit Damage Calculation.*[4]  Other publications supporting the use of the "before and after" method include *Recovery of Damages for Lost Profits* by Robert L. Dunn[5]*, The Comprehensive Guide to Lost Profit Damages* edited by Nancy J. Fannon[6]*, Measuring Business Interruption Losses and Other Commercial Damages* by Patrick A. Gaughan[7], and AICPA Practice Aid 06-4, *Calculating Lost Profits*[8].

---

[4] Holly Sharp, CPA, CFP, CFE and Geoffrey P. Snodgrass, JD, *Lost Profit Damage Calculation* (2005).

[5] Robert L. Dunn, *Recovery of Damages for Lost Profits,* (6th ed. 2005).

[6] *The Comprehensive Guide to Lost Profit Damages 2009 Edition,* (Nancy J. Fannon, ed., 2009).

[7] Patrick A. Gaughan, *Measuring Business Interruption Losses and Other Commercial Damages* (2009).

[8] AICPA Practice Aid 06-04, *Calculating Lost Profits* (2006).

12.     The documents required by the Settlement Agreement for business economic loss compensation are typically required to calculate any business economic loss.  The required business documents are relevant to causation and damages analysis and are the types of documents that businesses must keep in the ordinary course of business, or are readily prepared and produced from a business' books and records.  This is also true for self-employed individuals covered by the business economic loss framework.  The Settlement Agreement provides flexibility regarding the documents required for business economic loss claimants:  federal tax returns and monthly and annual profit and loss statements are required for the Benchmark and Compensation Period; however, the business claimant may use financial statements prepared at a later date, provided they are based on its contemporaneously prepared records or documentation.[9]  The business claimant that does not have the required profit and loss statements merely has to use records of its revenues and expenditures that were generated or received at or around the time to which they relate for preparation of these required documents.  The document requirements are therefore not burdensome for the business claimant because these documents are maintained by most businesses or can be readily produced from the contemporaneous books and records of the business.

13.     The business claimant may engage an accountant to assist with the claims preparation and preparation and assembly of the required documents.  The Settlement Agreement provides for reimbursement of accounting fees related to the claim that are incurred by business claimants.  Business claimants shall be reimbursed for accounting fees based on actual fees incurred, subject to limits[10], and the accounting reimbursement is paid over and above any

---

[9] See, for example, Section 38.38 of the Settlement Agreement.

[10] See Section 4.4.13.8 of the Settlement Agreement.

compensation due under the Settlement Agreement.  Reimbursement of accounting fees provides an added benefit to the business claimant under the Settlement Agreement because an ordinary business litigant would not necessarily receive reimbursement of its accounting fees as part of a settlement.

14.     The Settlement Agreement contains causation requirements designed to demonstrate that the claimants business was impacted by the spill; however, causation is presumed for many business claimants.[11]  Having causation presumed for many business claimants' benefits those claimants because they are not required to provide any evidence of causation.

15.     When causation is not presumed, the causation requirements are reasonable and flexible.  Business claimants have several options to prove causation and these options are flexible enough to permit a variety of different businesses to establish causation.  The options to demonstrate causation start with straightforward, reasonable tests of business revenue patterns that show a downturn after the spill and a later upturn ("V-shaped revenue pattern test") of certain established percentage thresholds.  This is exactly the revenue trend one would expect if a business claimant was damaged by the spill, which was of limited duration.  The requirement that the trends be evidenced over several months is a reasonable requirement to ensure that an observed trend is a real trend and not just part of the normal month-to-month variation in a business' performance.  Where the V-shaped revenue pattern tests exhibit a less severe "V" (as set forth in the Business Economic Loss framework), additional tests are required for the

---

[11] See Section I of Exhibit 4B of the Settlement Agreement (requiring no causation proof for businesses in Zone A, unless they fall within an exception, certain seafood businesses, certain tourism businesses, and certain charter fishing businesses in Zones A, B, or C).

claimant to establish causation.  Business claimants with declining revenues (of specific percentage amounts) that did not recover in 2011 still can meet the causation requirements if they meet additional tests and provide specified documentation.  This also provides a reasonable alternative for businesses that do not meet the V-shaped revenue pattern test.  The additional tests and documents required to establish causation for businesses with a downturn in total revenues after the spill but that did not show an upturn for the corresponding 2011 measurement period identify logical reasons the expected recovery might not have occurred -- such as, for example, road construction in front of a business or entry of a competitor.  Claimants may also establish causation by providing contemporaneous written evidence of spill-related cancellations of reservations or contracts that the claimant was unable to rebook or replace.  The causation tests specified in the Settlement Agreement are based on exactly the type of evidence I would use to determine whether lost revenues were caused by an event.

16.     The Business Economic Loss framework also has a causation provision that is very favorable to very small businesses.  It allows a small business (under $75,000 in revenue) located near a larger business that attracts customers who then also patronize the small business to rely on the larger business' causation.  This is favorable to such small business because it simplifies and reduces its cost of establishing its claim which is likely to be small given its size.

17.     Even though the causation tests assume the observed impact on the business is a function of the spill (rather than undertaking a specific analysis to confirm), once a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.  In a typical lost profit case, a detailed analysis of the

reasons for the revenue and/or variable profit declines is undertaken because it is part of the plaintiff's burden of proof.  For this reason, causation is a significant consideration by the expert in lost profit cases because although a plaintiff may have losses relative to expectations, if the losses cannot be shown to be caused (or totally caused) by the actions of the defendant(s), the damages are usually not recoverable or not entirely recoverable.  "Recovery of damages for lost profits is subject to the general principle that damages must be proximately caused by the wrongful conduct of the defendant."[12]  Assignment of liability for losses in litigation disputes with multiple causation factors can be a very difficult and hotly contested determination.  The Settlement Agreement significantly reduces the need for this complicated determination because once causation requirements are met by a business claimant, all the economic losses are presumed to be as a result of the spill.  The business claimant benefits from the causation provisions in the Settlement Agreement by having causation presumed for many, straightforward mathematic tests of causation for others, and no requirement to attribute lost profits to anything other than the spill.  The causation provisions in the Settlement Agreement are more favorable to the business claimant than those for a similarly situated plaintiff in a typical litigation dispute.

18.    Compensation for business claimants is calculated in two steps.  Total Variable Profit in the Benchmark Period is compared to total Variable Profit in the Compensation Period to calculate the reduction in Variable Profit (Total Revenue less Variable Costs) from the Benchmark Period to the Compensation Period (Step 1).  The Compensation Period is three or more months from May through December 2010, selected by the business claimant, and these same months are used for the Benchmark Period.  The business claimant has the choice of using

---

[12] Robert L. Dunn, *Recovery of Damages for Lost Profits* at 2 (6th ed. 2005).

these months in 2009, the average of 2008 and 2009, or the average of 2007 through 2009 as the Benchmark Period.

19.     The Settlement Agreement incorporates the standard lost profit methodology of using a time period close to the loss incident for a Benchmark Period.  The standardized options for the selection of Benchmark Period years are 2009, the average of 2008 and 2009, and the average of 2007, 2008 and 2009.  Consideration of up to three years of historical operations is typical and reasonable.  Moreover, the standardization of choices is a reasonable way of making the claims process simpler and more manageable for both claimants and the Settlement Program. It also means that similarly situated claimants will be treated consistently.

20.     The Settlement Agreement provides options to the business claimant in the selection of its Benchmark Period that are more flexible and generous than what would usually be available in litigation.  In litigation, the parties (and their experts) can contest what periods prior to the loss event (and up to three years prior to the loss event is a typical time period to analyze) are most representative of operations immediately prior to the loss event and best to predict operations during the Compensation Period.  In contrast, the Settlement Agreement allows the business claimant to select the Benchmark Period from the standardized options that is most beneficial to the claimant in terms of establishing causation (if the claimant is not one for which causation is presumed) and loss.  Moreover, the Settlement Agreement provides that, if the claimant fails to select the most favorable Benchmark Period from the standardized options, the Settlement Program shall identify and select the most favorable Benchmark Period (i.e., the Benchmark Period that maximizes the claimant's compensation) in processing the claim.  See Settlement Agreement §4.3.8.

21.     An example illustrates the point.  Assume a plaintiff's Variable Profit totaled $40,000 in 2007, $35,000 in 2008, and $20,000 in 2009.  There would be a substantial argument that $20,000 is the most appropriate benchmark to use in establishing expected 2010 performance (in the absence of the loss event) because the annual revenues show a downward trend.  However, the Settlement Agreement allows the business claimant the option to select Benchmark Period revenues based on the average of 2007 through 2009 ($31,667), or the average of 2008 and 2009 ($27,500), either of which results in higher Benchmark Period Variable Profit.  Since the Benchmark Period result is used to project expected earnings during the 2010 Compensation Period, use of a Benchmark Period that produces a higher Variable Profit benchmark will result in a larger loss claim.  Thus, the Settlement Agreement's provisions giving claimants the ability to select from three possible Benchmark Periods, and requiring the Settlement Program to use the Benchmark Period most favorable to the claimant, are designed to ensure that the claimant receives the highest compensation amount for which the claimant can qualify under the framework.

22.     The business claimant uses its profit and loss statements to calculate Variable Profit for both the Benchmark Period and Compensation Period by adding revenues and subtracting variable costs.  Business costs may be variable or fixed.  Variable costs fluctuate with changes in revenues, output or business activity; therefore if revenue is reduced, the variable costs are also reduced.  Commissions owed as a percentage of sales (e.g., a 1% commission) are an example of variable costs because if the sale is not made, the commission is not owed.  Rent at a set amount (e.g., $2,000 per month) is an example of a fixed cost because rent is owed whether a business has sales or not.  Variable costs in lost profits calculations are sometimes referred to as "saved costs"; if the revenue is lost, the cost is saved.  Lost profits are determined

based on Variable Profits because this measures the net out-of-pocket loss resulting from the loss event.

23.     The Settlement Agreement specifies which cost categories shall be classified as Variable Costs[13], and these specified costs are typically classified as variable costs in any lost profit calculation for any type of business.  The specification of variable costs in the Settlement Agreement simplifies the Variable Profit calculation for the claimants and also provides an appropriate level of standardization and consistency across claimants.   Furthermore, the Settlement Agreement specifies the treatment of fixed and variable components of payroll expenses[14], cost of goods sold[15], and maintenance and repairs[16] in a manner that should be favorable to and provide consistency for the business claimant in calculating its Variable Profit. The allocation of cost categories in the Settlement Agreement to either fixed or variable is very specific and logical and ensures costs are classified in a consistent manner for all business claimants.

24.     The Settlement Agreement classifies certain costs as fixed, but does not require an analysis of fixed costs during the Compensation Period to determine if these costs were reduced or eliminated.   The framework for Business Economic Loss does not require any reduction in compensation for decreases in fixed costs that the claimant may have been able to achieve after

---

[13] See Attachment A to Exhibit 4D of the Settlement Agreement.  General cost categories are classified as fixed or variable, with some costs such as payroll, costs of goods sold, franchise fees and maintenance and repairs allocated between fixed and variable components.

[14] See Section I of Exhibit 4C of the Settlement Agreement: Definition of Fixed and Variable Payroll Expenses.

[15] *Ibid.*, Definition of Variable Portion of COGS.

[16] Attachment A to Exhibit 4D of the Settlement Agreement:  Maintenance is fixed and repairs are variable, but if the claimant's books/records do not distinguish maintenance from repairs, 50% is allocated to each category.

the spill.  This is a benefit for the business claimant that was able to mitigate some of its fixed cost expenses after the spill.[17]  If the claimant managed to reduce some of its fixed expenses, it saved that money and reduced the loss it would otherwise have had.  However, under the Settlement Agreement, that cost savings will not offset or reduce the claimant's losses that can be compensated.  This is because, in Step 1 of the Business Economic Loss compensation framework, losses are calculated based on changes in Variable Profit, which does not consider fixed costs.

25.     Step 2 of the Business Compensation Framework calculates loss attributable to growth that might have been expected to occur during a period in May-December 2010, after the spill.  This consideration of losses due to lost expected growth is also typical of lost profits methodology.

26.     In Step 2, a Variable Margin Percentage is calculated from claimant-provided data by adding up:  (1) Variable Profit in May through December of the Benchmark Period years; and (2) total revenue in May through December of the Benchmark Period years, and dividing sum (1) by sum (2).  The Variable Margin Percentage is used to calculate the amount of variable profit relative to revenues.  For example, if a claimant's Benchmark Period year is 2009, total Variable Profit (revenues less variable expenses) for May through December 2009 [sum (1)] would be compared to (i.e., divided by) the total revenues for May through December of 2009 [sum (2)].  If the result is 50%, this is the Variable Margin percentage.  Application of the Variable Margin Percentage to lost revenues provides the net lost profits.  The Variable Margin Percentage is

---

[17] For example, a business that was unable to operate during May 2010 because of the spill would still owe rent payments pursuant to the terms of the lease.  If the landlord decided to abate the May rent for the business claimant, the saved rent is not subtracted in the compensation calculation.

calculated over a period that may be longer than the Compensation Period; however, the longer period helps to smooth out aberrations that might be present in shorter time periods. This is an acceptable method of calculating the Variable Margin.

27.     The Business Economic Loss Framework provides for calculation of a growth rate using the standard methodology applied in any lost profit calculation: revenue in the period immediately preceding the loss event is compared to a prior period (or prior periods) to determine growth trends prior to the loss event. The Claimant-Specific factor is calculated by comparing the sum of total revenue from January through April of 2010 to the sum of total revenue in January through April of the selected Benchmark Period year(s). The difference is divided by total revenue in January through April of the selected Benchmark Period year(s).

28.     The Business Economic Loss Framework contains provisions that apply an even more favorable growth rate than would typically be selected in a lost profit claim. First, a 2% General Adjustment Factor is assumed for all claims. This is favorable because not all businesses would have grown in the absence of the spill, and undoubtedly there will be claimants whose businesses would not have grown (or would have grown less than 2%). Second, the framework has a growth "collar" of -2% to 10% on actual growth. When the 2% assumed General Adjustment Factor is applied, the effect of the collar is to permit a growth range of 0 to 12%. This is favorable to claimants because it eliminates any reduction for negative growth, even though it is likely that at least some claimants in fact would have experienced or did experience negative growth unrelated to the DWH spill.

29.     There is another way in which the use of the growth factors (Claimant-Specific and General Adjustment Factors) is favorable to claimants. The growth factors are applied to the

sum of six consecutive months of revenues during May-December of the Benchmark Period year(s) (as selected by the business claimant), if the claimant's Compensation Period is six months or less, or to seven or eight months if the claimant's Compensation Period is seven or eight months, respectively.  Thus, for example, if a claimant selects a three-month compensation period, the growth factors are nevertheless applied to six months.  This means that a claimant is being compensated for "growth" even with respect to months that are not in the Compensation Period.  This methodology, in which a claimant receives compensation for alleged lost growth even in periods outside the selected compensation, is unique in my experience.  It is favorable to claimants because it will always result in a higher recovery for lost growth than would be the case if, as is usually the case, the growth period were the same as the Compensation Period.  Moreover, since the calculated loss amount is multiplied by the Risk Transfer Premium ("RTP"), this means that the claimant will receive a multiple of the extra loss amount.

30.     As noted, the Settlement Agreement applies a Risk Transfer Premium (RTP) multiplier to the calculated loss shown by the business claimant in Steps 1 and 2.  The RTP multiplier is based on the definition of the business (e.g., Tourism, Charter Fishing, Seafood, Non-Tourism, Non-Seafood) and the Zone location of the business.[18]  Among other things, the RTP is intended to cover potential future injuries -- which may not ever occur -- as well as pre-judgment interest, any risk of oil returning, and any claims for consequential damages, inconvenience, aggravation, any risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors.[19]  Thus, taken with the calculated loss compensation, the RTP multiplier is designed to make the

---

[18] See Exhibit 15 of the Settlement Agreement.

[19] See Exhibit 15 of the Settlement Agreement and 4/18/12 Plaintiff's and Defendants' Memorandum in Support of Joint Motion, p. 14.

claimant whole for all claimed losses, whether such losses ever could be recoverable or not. Indeed, to the extent it compensates for potential future losses that do not occur, it will make the claimant more than whole.  In my experience, this approach is unusually generous.

31.     Special RTP rules apply for Multi-Facility businesses,[20] and an RTP is not applied for failed businesses and failed start-up businesses.  It is logical to exclude RTPs for failed businesses and failed start-up businesses because the Settlement Agreement compensates these businesses based on the value of the business; therefore, there is no need to add an RTP for failed businesses and failed start-up businesses.

32.     The provision of the Business Economic Loss framework providing that any prior payments received by the business claimant from BP or the GCCF in the BP claims process are then subtracted after application of the RTP multiplier also is logical and generally consistent with traditional methods of compensating businesses for lost profits.  Subtraction of payments already received prevents claimants from receiving double compensation.  The offset after the business compensation has been increased by the RTP multiple is reasonable and, indeed, generous.  Lost profit calculations in litigated claims do not apply RTP multiples and losses are usually reduced by the total amount of any mitigating earnings.

**Business Frameworks Addressing Special Circumstances**

33.     As mentioned above, in addition to the general Business Economic Loss framework, the Settlement Agreement also includes frameworks for businesses with special

---

[20] See Exhibit 5 of the Settlement Agreement.

circumstances:   Multi-Facility businesses, Failed Businesses (including Failed Start-Up Businesses), and Start-Up Businesses.

34.     The Settlement Agreement anticipates the distinctions in compensation calculations for Multi-Facility businesses and provides choices that are dictated by:  (i) where the business' Headquarters are located; (ii) whether the business maintained separate contemporaneous profit and loss statements for each Facility; and (iii) whether all of the business' Facilities are located within the Gulf Coast Areas.  The Settlement Agreement provides Multi-Facility businesses with substantial flexibility by allowing a consolidated Facility claim or separate claims for one, some, or all of its Facilities.  The documentation requirements for Multi-Facility businesses are generally the same as the documentation requirements for business claimants, however, separate profit and loss statements must be provided for each individual Facility during the Benchmark Period and 2010.  This is a reasonable means of ensuring that profit and loss can be associated with the affected Facilities.  In the event the Multi-Facility business did not maintain contemporaneous profit and loss statements for each Facility during the Benchmark Period and 2010, it may create the required profit and loss statements based on its contemporaneous books and records.  The Settlement Agreement provides reimbursement for accounting assistance to prepare the required profit and loss statements, subject to limits.

35.     The Settlement Agreement anticipates there will be shared costs between the Facilities of a Multi-Facility business and provides a method to allocate these shared costs.  Shared costs are allocated among Facilities based on their share of the total revenue of the Multi-Facility business.  This is a logical, objective cost allocation method that makes economic sense.

36.     The compensation provisions for Multi-Facility businesses are fair and, indeed, generous to claimants because the usual method to calculate lost profit evaluates the impact of the loss event on an entire business to determine the overall effect of the loss event.  Typically, if one facility of a business experienced losses, but another facility of the same business had increased profits, the profits and losses of the two facilities might offset and the claimant would not be able to recover for the full amount lost by the one facility.[21]  The Settlement Agreement provides a benefit for a Multi-Facility business by allowing claims to be filed by one, some, or all of its Facilities, enabling the Multi-Facility business to be compensated under the best case scenario.

37.     The Failed Business framework provides a reasonable methodology to evaluate and compensate claims by businesses that failed after the oil spill.  The Failed Business framework applies to a business that commenced operations prior to November 1, 2008, or a Failed Start-Up Business that commenced operations on or after November 1, 2008 and then, subsequent to May 1, 2010, but prior to December 31, 2011 either ceased operations and wound down, entered bankruptcy or initiated or completed a liquidation of substantially all of its assets.  This is a reasonable timeframe to capture businesses that failed as a result of the oil spill or its economic effects, and allows compensation to failed businesses that have ceased operations and wound down, but not filed for bankruptcy protection.

38.     Compensation for Failed Businesses is based on applying a multiple to the widely-recognized and accepted metric EBITDA (Earnings Before Interest, Taxes, Depreciation

---

[21] For example, assume a business has one Facility with a loss related to the spill, but another Facility does better than projected for the same time period because of the spill.  The Settlement Agreement allows each Facility to measure loss, if any, separately, and the business is not required to net the lost profit of one Facility with the net profit of the other Facility.

and Amortization) as a business performance measure.  EBITDA is a standard measure used to evaluate business performance and calculate business values, and is an appropriate standard to measure the value of a business.  The Settlement Agreement compensates Failed Businesses based on the sum of their EBITDA for the latest twelve months of operations prior to May 1, 2010 with an industry-specific multiple applied.  This formula calculates the pre-spill total enterprise value.  Utilization of EBITDA with a multiple applied is a standard market approach used for business valuation and is detailed in the authoritative publication *Valuing a Business: The Analysis and Appraisal of Closely Held Businesses, 5th Edition*, by Shannon P. Pratt and Alina Niculita.

39.    The industry-specific multiples are provided in a table in the Settlement Agreement[22], and were derived from data procured from the "Pratt's Stats" database developed by Shannon P. Pratt.  "Pratt's Stats" is a transaction database that collects and reports details of sales of certain companies[23] generally allowing for, among other things, the calculation of pricing multiples associated with such transactions.  The observed mutliples can then be used to estimate the value of a comparable business.  "Pratt's Stats" is widely-recognized and an accepted authoritative publication for business valuation calculations.  "Pratt's Stats" provides the standard multiples (and the data underlying such multiples) used by business valuation experts to apply to EBITDA to calculate the value of a business.  The Settlement Agreement provides "Pratt's Stats" multiples for 27 industry descriptions, which encompass the typical businesses which may be affected by the spill, as well as an additional multiple provided for "all

---

[22] See Table I of Exhibit 6 of the Settlement Agreement.

[23] The Settlement Agreement "Pratt's Stats" multiples are based on reported private company merger and acquisition transaction data with a disclosed Market Value of Invested Capital to EBITDA and a report date of January 1, 2008.

deals" for any industry not specifically listed in the Settlement Agreement.  The methodology used in the Settlement Agreement to determine the value of established businesses that failed is a widely-recognized measure of business valuation.

40.     The calculated pre-spill total enterprise value is then reduced by the net liquidation value (which is calculated:  (i) by reference to the court-approved reorganization value; or (ii) the sales proceeds from assets liquidated plus certified appraisal values of assets yet to be liquidated under a plan of liquidation, net of liquidation costs[24]) to determine compensation for the Failed Business.  Adjustments to total liquidation value may be made for certain creditor claims and prior amounts received by the claimant from BP[25] or the GCCF.  Although the reason the business failed may not be solely attributable to the spill, the Failed Business that meets the causation requirements (or has causation presumed) and documentation requirements will be compensated according to the formula in the Settlement Agreement.  No forensic analysis is required to determine factors other than the spill that may have contributed to the business' failure, and no reductions to compensation are made to account for any such factors.  As a result, this is a very generous feature of the settlement benefitting failed business claimants.

41.     Failed Start-Up Businesses cannot be valued based on EBITDA because there is no earnings history to rely upon.  The Settlement Agreement compensates Failed Start-Up Businesses based on the book value of equity as of May 1, 2010.  Book value (assets at original cost less depreciation, less liabilities) is a reasonable method to value a Failed Start-Up Business because the assets are newly acquired; therefore, the original cost of the assets less depreciation

---

[24] Book value may be used if no certified appraisal exists for un-liquidated assets.

[25] Including profits earned by the claimant by participating in any BP-sponsored spill remediation program.

should approximate the fair market value of the assets.  Adjustments to book value are made for amounts distributed to equity holders subsequent to the spill, the total current amount of unpaid obligations to creditors, the book value of assets remaining to be liquidated (including cash), and prior amounts received by the claimant from BP[26] or the GCCF.

42.    Compensation to the Failed Start-Up Business may include compensation for an owner's "sweat equity" provided the owner details in an affidavit the nature of uncompensated or under-compensated services, the time period over which the services were rendered, the average weekly amount of time devoted to the Failed Start-Up Business, and a description of any employment outside of the Failed Start-Up Business during the time that the business operated. Claimants who satisfy these criteria shall be entitled to "sweat equity" compensation.  The use of "sweat equity" provides a reasonable means to measure and compensate claimants for uncompensated efforts to establish the business.[27]  The sweat equity participant's earned income prior to commencement of sweat equity contributions to the Failed Start-Up Business is used as the basis to calculate the value of sweat equity.  The sweat equity participant's historical earned income that is used to value sweat equity may begin as early as January 1, 2007 and ends with the last full month preceding the commencement of sweat equity contributions to the Failed Start-Up Business.   The inclusion of compensation for "sweat equity" in the Settlement Agreement is an added benefit to the Failed Start-Up Business as it provides an additional measure of loss that is not typical in my experience.

---

[26] *Ibid.*

[27] See Section V(2) of Exhibit 6 of the Settlement Agreement.

43.     Under the Settlement Agreement, a Start-Up Business is a business claimant with less than eighteen months of operating history at the time of the spill.[28]  The compensation framework for Start-Up Businesses is the same that is used for Business Economic Loss claims; however, the Compensation Period includes three or more consecutive months selected by the claimant between May 2010 and April 2011, with a corresponding Benchmark Period between May 2011 and April 2012, unless, as discussed below, the Start-Up Business elects to use qualified projections for May 2010 through April 2011 to establish expected earnings.  This is logical and consistent with the Business Economic Loss framework, but the Benchmark Period is after the spill instead of before the spill.  This is logical and fair because a start-up business has less than eighteen months of operating history at the time of the spill; therefore, such a business does not have adequate historical operations to measure the loss.

44.     The Start-Up Business compensation framework provides flexibility by offering the option of determining the claimant's expected revenues and costs from the actual revenue earned and actual variable costs incurred by the claimant during the Benchmark Period, or allowing claimants to utilize projections of revenues and costs prepared prior to the spill and provided to and utilized by a financial institution, other entity in the primary business of lending or investing money, or other third-party lender who confirms its use of such projections in extending credit to the Start-Up Business.[29]   The provision to allow the claimant to use projections is a benefit to the claimant because it takes account of the possibility that 2011 results may not be a (or the most) reliable benchmark if the start-up business' growth was significantly slowed as a result of the spill.  The option to use projections prepared prior to the spill allows for

---

[28] See Exhibit 7 of the Settlement Agreement.

[29] See Sections IV(A)(1)(b) and IV(D)(4) of Exhibit 7 of the Settlement Agreement.

compensation to a Start-Up Business to be measured under the best objective scenario for the claimant. The requirement that the Start-Up Business projections be utilized by a third-party lender is reasonable because this provides reasonable assurance that the projections are reliable.

**Individual Economic Loss**

45.     The Individual Economic Loss Framework ("Individual Framework") is broad and flexible in addressing a wide variety of individual circumstances, including individuals without prior employment experience, those who changed jobs, people with multiple jobs, seasonal workers, and individual periodic vendors and festival vendors. Compensation is also available to individuals who were offered and accepted employment that was subsequently revoked, even if they have not worked since then due to a family, medical, or educational reason. Compensation available to individuals includes lost earnings, plus any applicable RTP[30], lost employment-related benefits,[31] qualified training costs, qualified job search costs, and one-time non-recurring event commission compensation, if any.[32] The causation methodology for individual claimants is similar to that for business claimants: causation is presumed for some individual claimants who work in certain geographies and/or certain industries; others must satisfy causation tests designed to establish that a loss is due to the spill.[33]

---

[30] See Exhibit 15 of the Settlement Agreement for RTP multiples available to individuals and note that not all individuals get a RTP. Festival Vendors with insufficient documentation may receive compensation under certain circumstances, but are not entitled to a RTP. Other individuals with insufficient documentation may not be eligible for a RTP.

[31] See Exhibit 8C of the Settlement Agreement.

[32] See Section I(C) of Exhibit 8A of the Settlement Agreement.

[33] See Sections I(B), II(B), and III(B)(1)(c) of Exhibit 8A of the Settlement Agreement.

46.     The individual economic loss framework in the Settlement Agreement applies generally accepted and established methods for individual claimants to receive compensation for lost earnings.  It is generally accepted that lost earnings for individuals are calculated as the difference between expected earnings and actual earnings over the compensation period.[34] Comparison of pre-incident and post-incident performance with consideration of growth factors is a standard measure of damages for individual economic loss and is similar to the "before and after" method used in the Business Economic Loss framework.  This is the general methodology used to calculate economic loss for individuals.

47.     The Settlement Agreement classifies individual claimants into four categories, based upon the supporting earnings documentation they can provide.  The documents required in the Settlement Agreement for individual economic loss compensation are those typically required to calculate any individual economic loss.  The required documents are relevant to causation and damages analysis and are the types of documents that should be kept by or are readily available to individuals.  Federal and state income tax returns (tax information documents) and annual and pay period earnings reports (pay period earnings documentation) are required for individual economic loss claims, if they are available.  Pay period earnings may be supported by a wide variety of documents, including not only pay stubs, but other sorts of pay reports, bank records and other documents.[35]

---

[34] See Randi L. Firus and Keith R. Ugone, *Litigation Services Handbook* Ch. 14, p. 2 - Ch. 14, p. 6 (4th ed. 2007).

[35] Individual claimants with contemporaneous tax information and pay period documents for both year 2010 and the Base Year(s) fall into Category I; Individual claimants who do not have tax information documents, but do have pay period or other earnings documentation for year 2010 and the Base Year(s) fall into Category II; Individual claimants who have earnings documentation for year 2010, but do not have comparable pre-spill Benchmark Period earnings fall into Category III; and Individual claimants without earnings documentation who submit claimant and employer sworn written statements to establish earnings fall into category IV.  The delineation of these categories is reasonable.

48.     The Settlement Agreement is unusual in allowing individual claimants who cannot provide tax documentation or pay period documentation to rely instead on sworn written statements to establish employment, causation and lost income related to that employment.[36] This relaxation of the generally accepted standards for proving economic loss is not typical and therefore benefits class members because it permits claimants who might not otherwise be able to recover to pursue a claim.

49.     Like a claimant asserting a business economic loss claim, an individual economic loss claimant may engage an accountant to assist with the claims preparation and preparation and assembly of the required documents and receive reimbursement for the accounting fees incurred, subject to limits.[37] The accounting reimbursement is paid over and above any compensation due under the Agreement.   Reimbursement of accounting fees provides an added benefit to the individual claimant under the Settlement Agreement.

50.     Specific causation criteria are provided for individual claimants in the Settlement Agreement.   The DWH spill is presumed to be the cause for lost individual earnings if an individual worked in Zone A, worked in a primary seafood industry, or worked in a secondary seafood industry in Zone B or C, worked in tourism in Zone B, or worked in charter fishing in zones A, B or C.   An employee for whom causation is not presumed and whose employer qualified for compensation from the Gulf Coast Claims Facility or the Settlement Program created under the Settlement Agreement can rely on those facts to establish causation.   An employee for whom causation is not presumed and who provides a sworn statement that

---

[36] See Exhibits 8A-E of the Settlement Agreement.

[37] See Sections 4.4.13.7 and 4.4.13.8 of the Settlement Agreement.

attributes the individual's loss of income to the oil spill may also qualify for compensation; however, causation is not presumed and the Claims Administrator shall evaluate the credibility and reliability of the information provided and has the right to request additional information to determine if causation has been established.[38]

51.    The causation requirements for individual claimants provide clear, well-defined standards which offer claimants several options for establishing causation that accommodate various individual circumstances.  Indeed, certain presumptions relative to certain claimants in certain geographic areas near the Gulf shore and in industries tied to the Gulf (e.g., tourism) establish causation automatically.[39]   Such presumptions are rational but generous.   Other claimants may rely on causation established by their employers through GCCF determinations or the employer's proof of causation in the settlement claims process.[40]   These categories are reasonably delineated.

52.    Like the Business Economic Loss framework, the Individual Framework allows the claimant flexibility in selecting a Base Year(s), Benchmark Period and Compensation Period to give them great opportunity to establish causation and maximize compensable loss.  For claimants other than Category III and IV claimants, the Base Years of 2009, the average of 2008 and 2009, and the average of 2007, 2008 and 2009 are comparable to the Business Economic Loss framework.[41]   Similarly, the claimant's ability to pick a Compensation Period of 90 or more

---

[38] See, e.g., Section III(B)(1)(c)(iii) of Exhibit 8A of the Settlement Agreement.

[39] See Section I(B)(2)(a) of Exhibit 8A of the Settlement Agreement.

[40] See, e.g., Section I(B)(2)(b)(i) of Exhibit 8A of the Settlement Agreement.

[41] The post-2010 Base Year for Category III claimants makes sense because they do not have a pre-2010 with comparable earnings.  Limiting Category IV claimants to using 2009 as the Base Year also seems reasonable, given

28

consecutive days between April 21, 2010 and December 31, 2010 closely resembles the three consecutive months or more requirement of the Business Economic Loss framework.   The requirement that Compensation Period dates must correspond with the pay periods used by the employer is a reasonable way of making sure that the pay data are easy to compile and compare between the Benchmark Period and the Compensation Periods.   As in the Business Economic Loss framework, these standardized options for selection of the Compensation and Benchmark Period provide an appropriate level of standardization and consistency across individual claimants.

53.     The individual claimant establishes baseline earnings to use in calculating Expected Earnings from earnings during the Benchmark Period.   Certain claimants, such as individuals not employed between January 1, 2007 and April 20l0, individuals employed on April 20, 2010, but not employed until after April 20, 2009, and an individual who is considered a Career Changer[42] may use earnings in 2011 (with adjustments) for baseline earnings.   This provides these individuals with useful options to best maximize their compensation.   Individuals who received bonuses and/or commissions during the Benchmark Period will have those amounts allocated over the period earned so that those amounts are considered in calculating compensation.

---

the framework's generosity in allowing them to pursue claims even though they have no contemporaneous written documentation of their employment.

[42] An individual who changed employer(s) and line of work between the Benchmark Period and the Compensation Period and whose earnings during the period January 1 to April 30, 2010 changed by more than 20% compared to their earnings during the period January 1 to April 30 of the Base Year(s).

54.     As with the Business Economic Loss framework, growth factors are applied to individual Benchmark Period earnings in calculating Expected Earnings.[43]  A Claimant-Specific Growth Factor is calculated for salaried individuals who can provide pay period documentation by dividing the claimant's actual January through April 2010 base earnings by actual January through April earnings in the Base Year(s).   The framework also provides that individual claimants who lack the documentation to establish a Claimant-Specific Growth Factor will be presumed to have had expected wage growth of 2%.[44]  Finally, an individual with a non-salaried, hourly-wage job receives an Industry Growth Factor of 1.5% in addition to his or her Claimant-Specific Growth Factor or General Growth Factor.[45]

55.     The Individual Framework also follows the Business Framework approach of using a collar that significantly limits the impact of any negative growth in the claimant's earnings.  If the calculated Claimant-Specific Growth Rate shows a decline of more than -1.5%, it is limited for purposes of the Individual Framework to -1.5%.  This means that, for such claimants there will be no negative growth if they qualify for the Industry Growth Factor or, at worst, only -1.5% for other such claimants.  Conversely, the maximum growth rate is capped at 10% (or 11.5% for claimants who qualify for the Industry Growth Factor).

56.     The presumed growth factors and the collar on growth appear to be reasonable and, if anything, generous given the high unemployment rate in 2010.[46]  The presumed growth

---

[43] See Exhibit 8A of the Settlement Agreement, Definition N.

[44] Exhibit 8A of the Settlement Agreement, Definition N(2).

[45] *Ibid.,* Definition N(3).

[46] The unemployment rate for Louisiana, Mississippi, Alabama and Florida averaged 9.7% in 2010; the national unemployment rate averaged 9.6% in 2010; source: United States Department of Labor, Bureau of Labor Statistics.

factors for claimants with insufficient documentation and non-salaried, hourly wage earners are commensurate with the increase in the Consumer Price Index for this time period. The Consumer Price Index decreased .4% from 2008 to 2009 and increased 1.6% from 2009 to 2010[47]; a General Growth Factor of 2% and Industry Growth Factor of 1.5% are reasonable and may be generous. Given the low growth and high unemployment rate in 2010, a limit on negative growth of -1.5% -- and for some claimants, 0% -- is favorable to claimants who otherwise would have had lower Expected Earnings due to negative growth. It seems unlikely the 10% growth cap will affect many claimants; in my experience I have observed that wages rarely rise at that rate in times of high unemployment and low growth.

57.     After Expected Earnings are calculated, there is an offset for actual earnings from jobs forming the basis of any claim, as well as other earnings (e.g., earnings from non-claiming jobs during the Compensation Period in excess of earnings from non-claiming jobs during the Benchmark Period[48]) to determine lost earnings. The actual earnings are adjusted to take account of the number of hours worked, so that a worker who had to work more hours to make up for a lower wage rate is compensated for that extra effort and lost free time.

58.     The Settlement Agreement provides for compensation if the individual claimant can establish lost revenues resulting from the cancellation of a contract for a one time, non-recurring event. This is similar to the treatment provided in the Settlement Agreement for business economic loss and is a fair way to measure such losses.

---

[47] United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index History Table.

[48] But see exceptions in Section O of Exhibit 8(A) of the Settlement Agreement that provide for no offset from non-claiming jobs when the claimant shows that more hours were worked in the Claiming Job(s) during the Compensation Period as compared to the Benchmark Period, or that fewer hours were worked in the Claiming Job(s) during the Compensation Period as compared to the Benchmark Period.

59.     The Settlement Agreement also anticipates that qualifying individuals may be vendors who do not maintain records that would allow them to qualify under the business economic frameworks.   Notably, the Settlement Agreement adds definitions for Individual Periodic Vendors (IPV) and Festival Vendors to include such vendors in the individual framework.   An IPV is defined as someone who regularly sold food, souvenirs, art, tourist-related or water-related goods at retail to specified consumers, did not maintain a permanent business location in a building, was not employed by an employer in connection with the sales, and does not have tax information documents sufficient to support a claim under the Business Compensation Framework.   A Festival Vendor is defined as someone who regularly made festival sales prior to April 20, 2010, was not employed by an employer with the sales, and does not have tax information documents sufficient to support a claim under the Business Economic Loss framework.

60.     The Settlement Agreement provides flexibility to IPVs or Festival Vendors regarding the types of documents required for compensation.   The IPV or Festival Vendor does not have to provide tax information documents, but must have records that establish that they were in the business of regularly making covered sales prior to April 20, 2010 and show the amount of sales from May through December 2009 and 2010.   Records that evidence sales such as sales tax receipts, credit card registers and bank statements may meet the documentation requirements for IPVs or Festival Vendors.

61.     Compensation for IPVs or Festival Vendors is calculated by comparing total revenues less corresponding total expenses for any three-month period selected by the claimant between May 1 and December 31, 2010 to the same months in 2009 for IPVs, or for the full period May through December 2010 as compared to May through December 2009 for Festival

Vendors.  With adequate documentation, an IPV or Festival Vendor shall be compensated up to $12,000 in lost earnings prior to any RTP that may be applicable.  This provision is generous to these individual claimants because they are allowed to recover under the Settlement Agreement even though they do not have documents required for other individual claimants.  This is logical because these are self-employed vendors whose work fluctuates during the year and they may not have sufficient sales to receive IRS Form 1099 to support their sales.[49]  They may not have the documentation required of other individual claimants, but nevertheless may qualify to receive compensation under the Settlement Agreement.

62.     Lost earnings for most individuals are increased by a Risk Transfer Payment (RTP) in the same manner provided in the Business Economic Loss framework.[50]  The RTP for individuals is a multiple applied to lost earnings to compensate for potential future injuries and potential future damages, pre-judgment interest, any risk of oil returning, and any claims for consequential damages, inconvenience, aggravation, any risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors.[51]  The applicable RTPs are summarized in Section 15 of the

---

[49] Form 1099 is required to be issued to a self-employed person when total annual sales to any individual or business exceed $600.  I would not expect the IPVs and Festival Vendors described in the Settlement Agreement to typically sell in excess of $600 annually to an individual or business.

[50] Festival Vendors without sufficient documentation of earnings from festival sales who rely on Festival Coordinator Sworn Statement have no RTP premium applied to their compensation.  See Exhibit 15 of the Settlement Agreement.  Certain claimants without earning documentation classified in Category IV may not be eligible for an RTP.  See Section IV of Exhibit 8A of the Settlement Agreement.  This appears reasonable in light of the generosity of the settlement in letting such individuals recover at all without the normal documentation that would be required.

[51] See Exhibit 15 of the Settlement Agreement and 4/18/12 Plaintiff's and Defendants' Memorandum in Support of Joint Motion, p. 14.

33

Settlement Agreement and are based on the industry of the individual's employer and the Zone in which the individual's employer is located.[52]

63.     Regardless of the periods that individual claimants select for causation or compensation, the Settlement Agreement provides for possible increased economic damage compensation because the Claims Administrator is directed to review the claimant information in the Claim Form and all supporting documentation and process the claim to produce the greatest possible economic damage compensation amount that the claimant's information and supporting documentation allows under the terms of the Economic Damage Claim Framework.[53]

64.     The frameworks are flexible, providing both business and individual claimants reasonable and often generous opportunities to meet the requirements for compensation.  The methodologies used are similar for business and individual claimants, resulting in comparable treatment of these claimants.  The documents required for compensation are reasonable to support a claim and claimants can receive reimbursement for accounting fees they incur that are related to the claim (subject to certain limits).  The calculated compensation for most claimants is increased by a RTP to cover, among other things, any future losses beyond the Compensation Period.  The offsets applied to compensation occur after the RTP is applied; therefore, the claimant receives the RTP premium on the calculated lost earnings before any offsets.  The offsets for spill-related payments and Vessel of Opportunity payments are reasonable

---

[52] See Exhibit 15 of the Settlement Agreement for RTP multiples available to individuals and note that not all individuals gets a RTP.  Festival Vendors with insufficient documentation may receive compensation under certain circumstances, but are not entitled to a RTP.  Individuals terminated from their Claiming Jobs for cause during the Compensation Period are likewise not entitled to a RTP.  An individual claimant may establish an alternative Zone to be used for the RFP by demonstrating that primary employment activities and responsibilities were performed in a location different from the employer's business address and the claimed spill loss occurred in that different location.

[53] See Section 4.3.8 of the Settlement Agreement.

adjustments and comparable to the offset for mitigated earnings in the typical litigated matter. The Settlement Agreement provides an opportunity for businesses and individuals that are class members to seek compensation that should make them whole for any losses caused by the spill.

65.    In summary, the Settlement Agreement's compensation frameworks for business and individual economic loss appear reasonable and objective and consistent with, if not more generous than, methodologies typically used and widely recognized in economic loss damages cases.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis. Executed this 10th day of August, 2012 in Metairie, La.         .

Holly Sharp

# Sharp Declaration
# Exhibit A





**111 Veterans Memorial Blvd.**
**Heritage Plaza Suite 600**
**Metairie, Louisiana 70005**
504.835.5522 | fax 504.835.5535
email | hsharp@laporte.com

## C U R R I C U L U M   V I T A E

## HOLLY SHARP, CPA, CFE, CFF

| | |
|---|---|
| **POSITION** | Shareholder and Director, LaPorte CPAs and Business Advisors |
| | Adjunct Professor of Taxation, A. B. Freeman School of Business, Tulane University |
| **EDUCATION** | M.S. Tax Accounting, University of New Orleans (1981) |
| | B.S. Business Management, Tulane University (1979) |
| **PROFESSIONAL AFFILIATIONS** | American Institute of Certified Public Accountants |
| | *Member, Economic Damages Task Force 2012* |
| | *Member, Litigation and Dispute Resolution Services Committee 1996 - 1999* |
| | *Chairman, Economic Damages Task Force 1998 - 1999* |
| | Society of Louisiana Certified Public Accountants |
| | New Orleans Estate Planning Council, *Past President* |
| | New Orleans Association of Certified Fraud Examiners*, Past Officer* |
| | Women's Professional Council, *Past President* |
| **CIVIC AFFILIATIONS** | Tulane Association of Business Alumni, *Past President* |
| | Tulane University, *Planned Giving Committee* |
| | Tulane Tax Institute, *Planning Committee* |
| | Preservation Resource Center, *President 2009 - 2010* |
| | Contemporary Arts Center*, Board Member* |
| | New Orleans Science and Math Charter School, *Board Member* |
| | The Cultural Landscape Foundation*, Board Member* |
| | Louise S. McGehee School, *Past Board Member* |
| | St. Charles Avenue Presbyterian Church, *Elder* |
| **AWARDS** | New Orleans CityBusiness |
| | *2006 Women of the Year* |
| | A. B. Freeman School of Business, Tulane University |
| | *2001 Outstanding Accounting Alumnae* |
| | Louise S. McGehee School |

Holly Sharp, CPA, CFE, CFF
Curriculum Vitae
*Page 2*

*1994 Outstanding Alumna*

**RANGE OF
EXPERIENCE**      Experience includes extensive consulting work in the areas of taxation for individuals,
corporations and other entities, as well as financial planning, estate planning, and business
succession planning.  Litigation experience includes testimony and forensic accounting services
in accounting, financial, economic and business issues.   Ms. Sharp is a Certified Public
Accountant, Certified Fraud Examiner and Certified in Financial Forensics.

**EMPLOYMENT
HISTORY**          LaPorte CPAs and Business Advisors ......................... 1981- present
Tulane University: ......................................................... 1999 - present

**FEE SCHEDULE**   Holly Sharp, CPA, CFE, CFF ........................................... $275 per hour
Staff Accountants and Managers ..................................... $100 to $195 per hour

**PUBLICATIONS
PAST 10 YEARS**    "Personal Injury," *Litigation Support Report Writing,*
John Wiley & Sons, Inc., 2003

*Measuring Damages Involving Individuals: A CPA's Litigation Service Guide with Case Studies,* AICPA,
2004

*Introduction to Litigation Services,* Bisk Education, Inc., 2005.

*Lost Profit Damage Calculation,* Bisk Education, Inc., 2005.

**SELECTED
SPEECHES**         " Calculation of Damages from Personal Injury, Wrongful Death and Employment
Discrimination," *AICPA National Advanced Litigation Services Conference*, October 14, 1998

" Calculating Loss of Personal Injury, Wrongful Death and Employment Discrimination," *LCPA
Litigation Services Conference,* October 29, 1999

" Calculation of Damages in Personal Injury and Wrongful Death Cases: Advanced Issues,"
*AICPA National Advanced Litigation Services Conference,* October 17, 2000

" Calculating Economic Damages in Louisiana,"
*Lorman Education Services,* November 3, 2000

" Accounting and Financial Statement Analysis for Lawyers,"
*Lorman Education Services,* June 14, 2001

" Calculation of Damages in Personal Injury, Wrongful Death and Wrongful Termination,"
*National Litigation Support Services Association,*
*2002 Spring Conference,* May 9-10, 2002

" Calculation of Economic Damages,"
*ASWA National Conference,* October 17, 2002

" The Role of the Certified Public Accountant in Forensic Accounting,"
*University of New Orleans,* December 6, 2002

Holly Sharp, CPA, CFE, CFF
Curriculum Vitae
*Page 3*

**SELECTED SPEECHES** – *Continued*

" Forensic Accounting: Fraudulent Reporting, Concealed Assets, Computer Theft," *Illinois, Florida, Texas, Michigan and Washington Societies of CPA's,*
various dates

" Business Interruption Losses and Lost Profits Damage Calculations"
*AICPA Conference on Fraud and Litigation Services,* September 28, 2005

" Calculation of Damages in Personal Injury, Wrongful Death and Wrongful Termination cases"
*AICPA National Forensic Accounting Conference,* September 25, 2009

" Personal Injury/ Wrongful Death Damages" *Mississippi Business Valuation & Litigation Support Services Conference,* November 6, 2009

" Taxation for the Non-Taxation Lawyer" *Louisiana State Bar Association Continuing Legal Education,*
October 22, 2010

Holly Sharp, CPA, CFE, CFF
Curriculum Vitae
*Page 4*


## EXPERT WITNESS TESTIMONY
## PAST 4 YEARS

| | |
|---|---|
| Forstall-Geotype Inc. d/b/a Forstall Art Supplies v. Lafayette Insurance Co. | Civil District Court for the Parish of Orleans (2008) *deposition testimony* |
| Tatianna Ostrowiecki, et al. v. Aggressor Fleet, Ltd., et al. | U.S.D.C., Eastern District of Louisiana, Case No. 07-6598 (2008) *deposition testimony* |
| Willows Housing Restoration Corporation v. Crum & Forster Specialty Insurance Co. | U.S.D.C., Eastern District of Louisiana, Case No. 06-7602 (2008) *deposition testimony* |
| Jason Michael Young, et al. v. Raytheon Aircraft Company, et al. | State of La., Parish of West Carroll, No. 25,867 "A" (2008) *trial testimony* |
| Adolph Charles Suhren, III v. Cheryl B. Gibert et al. | Civil District Court for the Parish of Orleans No. 04-16113 (2008) *deposition testimony* |
| Quintessa Huey and Caryn L. Fong, et al. v. Super Fresh/ Sav-A-Center, Inc. et al. | U.S.D.C., Eastern District of Louisiana, Case No. 07-1169 (2008) *deposition testimony* |
| Rutter v. Isuzu et al. | U.S.D.C., Eastern District of Louisiana, Case No. 05-6893 (2008) *deposition testimony* |
| Risk Management Services, LLC et al v. Robert W. Moss, III | 24th JDC for the Parish of Jefferson, No. 614-262 (2008) *deposition and trial testimony* |
| R. W. Day & Associates v. The Architectural Studio | AAA No. 69 110 Y 04366 07 (2008) *arbitration testimony* |
| Phyllis Kay Doerr, et al. v. Mobil Oil Corp. and Chalmette Refining, LLC | 34th JDC for the Parish of St. Bernard, No. 83-912 (2009) *trial testimony* |
| Textron Innovations, Inc. and David Brown Union Pumps Co. v. Centrifugal Technology, Inc. et al. | U.S.D.C., Western District of Louisiana, Case No.5:05CV287 (2009) *deposition and trial testimony* |
| Quest Diagnostics, Inc. v. Factory Mutual Insurance Company | USDC, Eastern District of Louisiana, Case No. 07-3877 (2009) *deposition testimony* |
| Cleveland Rogers v. Tyrone J. Elphage and Transport Service Company | 40th JDC, Parish of St. John the Baptist No. 52312 (2009) *trial testimony* |
| Active Solutions, L.L.C. and Southern Electronics Supply, Inc. v. Dell, Inc. et al. | Civil District Court for the Parish of Orleans, No. 2007-3665 (2009) *deposition and trial testimony* |
| Dominion Exploration & Production, Inc. and Pioneer Natural Resources, USA. Inc. v. Ameron International Corporation, et al. | Civil District Court for the Parish of Orleans, No. 2003-6945 (2009) *deposition testimony* |
| Tim Tatum and Richard Hillard, Jr. v. United Parcel Services, Inc., et al. | 24th Judicial District Court for the Parish of Jefferson, No. 653-300 (2009) *deposition and trial testimony* |

Holly Sharp, CPA, CFE, CFF
Curriculum Vitae
*Page 5*


**EXPERT WITNESS TESTIMONY** – *Continued*

| | |
|---|---|
| Centofani of Oakwood, Inc. v. Hartford Casualty Insurance Company and J.D. Ellington Insurance, Inc. | 24th Judicial District Court for the Parish of Jefferson, No. 635-197 (2009) *deposition and trial testimony* |
| The Conerly Corporation, et al. v. Regions et al. | USDC, Eastern District of Louisiana, Case No. 08-813 (2010) *deposition testimony* |
| Anna Boone v. Eyemasters | USDC, Middle District of Louisiana, Case No. 09-1001 (2010) *deposition testimony* |
| Downtown Development Group et al. v. Landmark American Insurance, et al. | USDC, Eastern District of Louisiana, Case No. 09-6614 (2010) *deposition testimony* |
| Preventive Maintenance Services, Inc. v. Walters Power International, L.L.C. | Arbitration Proceedings (2011) *Arbitration testimony* |
| Centofani of Oakwood, Inc. v. Hartford Casualty Insurance Company and J.D. Ellington Insurance, Inc. | 24th Judicial District Court for the Parish of Jefferson, No. 635-197 (2011) *deposition and trial testimony* |
| Noble Energy, Inc. v. The Prospective Investment And Trading Company, Ltd. | USDC, Western District of Louisiana, CA No. 2:09-CV-0078 (2011) *deposition testimony* |
| Stephen Brower , et al. v. Progressive Security Insurance Co., et al | Civil District Court for the Parish of Orleans, No. 09-3593 (2011) *deposition and trial testimony* |
| J. Brock Neuenhaus et al. v. Matthew C. Foster, et al. | 24th Judicial District Court, Parish of Jefferson, No. 658-744 "K" (2011)  *deposition and trial testimony* |
| SCB Diversified Municipal Portfolio, et al. v. Crews & Associates, Inc., et al | USDC, Eastern District of La., CA NO. 09-7351 "N" (4) (2011) *deposition testimony* |
| Mack Energy Co. et al. v. ExPert Oil & Gas LLD | Arbitration (2012) (2012) *Arbitration testimony* |
| Noble Energy, Inc. v. The Prospective Investment And Trading Company, Ltd. | USDC, Western District of Louisiana, CA No. 2:09-CV-0078 (2012) *trial testimony* |
| Spyridon C. Contogouris and Stephen Baldwin v. Westpac Resources, LLC, Patrick N. Smith, Kevin M. Costner and Rabobank, N.A. | USDC, Eastern District of Louisiana, CA No. 10-4609 "F" (2012) *deposition and trial testimony* |