# Exhibit 19 - Part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF ELLIOTT TAYLOR, PH.D.

I, Elliott Taylor, submit this declaration in support of BP Defendants' Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012.  I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are my own.

### Experience

1.      I have more than 20 years of experience in preparing for and responding to major oil spills, with an emphasis on shoreline response.  I have been involved in the development of the oil spill response process called Shoreline Cleanup Assessment Technique ("SCAT"), which was used in response to the *Deepwater Horizon* ("DWH") oil spill.  SCAT is the standard process used world-wide to assess shoreline oiling in order to direct shoreline treatment following a spill.

2.      I have been applying and helping to refine the SCAT process in the United States and around the world since 1989.  I have worked on more than a dozen oil spills, including the following: Exxon Valdez (1989 and follow-up through 2006), Barge 101 Alaska (1992),

Greenhill blowout Louisiana (1992), New Carissa Oregon (1999), Bolivia Transredes pipeline (2000-2001), Johnson Creek Oregon (2004), SOTE Pipeline Ecuador (2004), Torm Mary Texas (2005), Barge PB20 Washington (2005), Selendang Ayu Alaska (2004), and Kab 121 Well Gulf of Mexico (2007). I have also been responsible for the preparation of more than 100 oil spill contingency plans for companies throughout the United States, Canada, Caribbean, South America, the Middle East and Africa, which describe in detail the procedures that would be used to control, contain and recover oil, if a spill were to occur, including implementation of the SCAT process.

     3.     I earned a Bachelor of Science degree in oceanography from Universidad Autonoma de Baja California, received graduate training at the Scripps Institute of Oceanography at the University of California San Diego, and earned a doctorate in oceanography from Texas A&M University. I have taught undergraduate and graduate level courses in geology and oceanography, and have taught courses world-wide on oil spill preparedness and SCAT, including in the Gulf of Mexico region. I have also conducted extensive field and laboratory research on beach and offshore sediment properties, oceanography, and oil fate and persistence. I am recognized as an oil spill expert by the International Maritime Organization ("IMO"), a United Nations specialized agency with responsibility for international shipping and prevention of marine pollution by ships, and the IMO has recommended me to lead multiple oil spill preparedness programs for several different sovereign governments. My CV is attached as Exhibit A to my declaration.

     4.     My expertise includes oil spill response planning, implementation and management of the SCAT process, including the SCAT program for the DWH oil spill, oil spill cleanup techniques and technologies, and oil fate and persistence on the shoreline.

5.     Since 1998, I have been a principal at Polaris Applied Sciences, Inc. ("Polaris"), an environmental consulting firm specializing in technical and scientific support for oil spill response.  BP hired Polaris to serve as its representative in the SCAT process for the DWH oil spill.

6.     I began working on implementation of the SCAT program for BP within days after April 20, 2010, and have been the lead technical advisor for the SCAT program in Mississippi, Alabama, and Florida since that time.  As lead technical adviser, I have been directly responsible for supervising more than 50 SCAT personnel who surveyed the shoreline from the Mississippi/Louisiana border to Wakulla County, Florida.  In addition to my team, I have worked closely with other members of the DWH shoreline response and SCAT programs, including federal and state representatives, to develop and implement procedures for assessment and treatment of shoreline oiling throughout the Gulf Coast.  As part of my job, I have reviewed substantial volumes of data collected through the SCAT process.  I also provided advice on shoreline treatment strategies and techniques to Unified Area Command ("Unified Command"), the entity managing the response to the DWH oil spill, which is composed of the Federal On-Scene Coordinator (the United States Coast Guard), State On-Scene Coordinators from each Gulf Coast state, and BP.

7.     I did not personally participate in any settlement negotiations between BP and the plaintiffs, nor did I have an advisory role during the settlement process.

8.     In addition to my education, experience, and the knowledge and information gained from my work on the DWH oil spill, I have considered the following materials in writing my declaration: Deepwater Horizon Shoreline Cleanup Completion Plan; MC 252 Stage III SCAT-Shoreline Treatment Implementation Framework Mobile Sector (Alabama, Florida,

Mississippi); MC 252 Stage III SCAT-Shoreline Treatment Implementation Framework for Louisiana; 2011 Shoreline Cleanup Assessment Technique (SCAT) Plan for Alabama, Florida, Mississippi; 2011 Shoreline Plan for Louisiana; Shoreline Treatment Recommendations for areas across the Gulf; Zengel, S. and J. Michel, White Paper - Deepwater Horizon Oil Spill (MC252): Marsh Oiling Conditions, Treatment Testing, and Treatment History in Northern Barataria Bay (October 2011); Silliman, Brian R., et al., Degradation and resilience in Louisiana salt marshes after the BP–Deepwater Horizon oil spill, PNAS Early Edition, published online June, 25, 2012; Summary Technical Report for Submerged Oil Mat Tactical Plan Phase I Execution; data collected during thousands of SCAT surveys; Deepwater Horizon Natural Resource Damage Assessment Data Summary Report:  Submerged Oil Characterization Across Multiple Habitats for Assessment of Persistent Exposures in Nearshore Sediments, 2011; information from Unified Command relating to shoreline cleanup operations; and reports by the Operational Scientific Advisory Team ("OSAT").

9.      I have also reviewed and considered the *Deepwater Horizon* Economic And Property Damages Settlement Agreement, As Amended On May 2, 2012 and certain of the Exhibits thereto, including Exhibit 11A Compensation Framework for Coastal Real Property Claims and appendices; Exhibit 12A Compensation Framework for Wetlands Real Property Claims and appendices; Exhibit 13A Compensation Framework for Real Property Sales and appendices; and Exhibit 15 RTP (Risk Transfer Premium) Chart ("RTP Chart").

10.     I have also reviewed the Plaintiffs' Steering Committee's and BP Defendants' Joint Motion for (1) Preliminary Approval of Class Action Settlement, (2) Scheduling a Fairness Hearing, (3) Approving and Issuing Proposed Class Action Settlement Notice, and (4) BP's Motion for Adjourning the Limitation and Liability Trial  ("Joint Motion for Preliminary

Approval"); and the maps and the written description of Zone A and Zone B in the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012 (the "Medical Benefits Class Action Settlement").

11.    During 2010, I spent approximately 15 weeks working in the Gulf region.  I have visited dozens of sites across the Gulf Coast in my role as technical lead for the SCAT program in Mississippi, Alabama, and Florida, and I continue to regularly visit the Gulf Coast as part of my responsibilities for the SCAT program.

12.    In addition, I made a series of site evaluations of certain Louisiana wetlands on March 27, 2012, including aerial observations from a helicopter and ground observations from a boat.  The aerial observations encompassed large portions of Louisiana wetlands, including the wetland areas from Barataria Bay west to Terrebonne Bay, and from Terrebonne Bay east toward South Pass near Venice, Louisiana.  By boat, I evaluated some of the wetland areas from Myrtle Grove Marina to portions of northern Barataria Bay.  At seven sites, I was able to get off the boat to examine the wetland areas.

### SCAT Program

13.    SCAT is a multi-step process that involves systematically segmenting the shoreline into discrete segments, evaluating the presence and extent of oiling in each defined segment over time, evaluating the potential for re-oiling, and recommending appropriate treatment procedures based on the level and type of oiling and the characteristics of the shoreline.  Companies potentially responsible for an oil spill and relevant government agencies cooperatively implement SCAT, using interagency teams of trained observers that survey coastal areas.  For the last 20 years, SCAT has been the accepted standard around the world for evaluating shoreline oiling to guide response activities.  The SCAT process is part of procedures

5

adopted by the National Oceanic and Atmospheric Administration ("NOAA"), Environment Canada, the U.S. Coast Guard and the Environmental Protection Agency ("EPA"). The SCAT process is also included in numerous U.S. Area Contingency Plans, and is used in oil spill response programs in other countries.

14.     My team and others at Polaris worked on behalf of BP with representatives from Florida, Louisiana, Mississippi, Alabama, NOAA, the Department of Interior ("DOI"), and the U.S. Coast Guard ("USCG") to cooperatively implement the SCAT program for the DWH oil spill in the geographic area from the Florida Keys through Louisiana and parts of Texas. Nearly all of the individuals from Polaris who participated in the SCAT program had prior experience implementing the SCAT process during other spills.

15.     The DWH SCAT program divided the Gulf coastline into relatively small segments, which typically range in size from a few hundred meters to approximately one kilometer, depending on the characteristics of the shoreline. SCAT teams systematically and repeatedly survey segments on foot and by boat and air, meticulously searching for and documenting oiling conditions. When warranted, teams also dig pits or trenches to search for subsurface oil, and they search for oil in near-shore waters. As described below, SCAT teams report the results of these surveys to Unified Command for use in planning shoreline treatment activities.

16.     At minimum, each SCAT survey team includes a representative of the state where the survey is occurring, a representative of the federal government, and a BP representative. During the DWH spill, up to 16 SCAT teams were surveying the Gulf coastline at any given time. In total, through July 2012, SCAT teams have cumulatively spent more than 7,000 field days conducting surveys of more than 4,000 shoreline segments.

17.     Following each survey, SCAT teams complete detailed data forms that describe the survey, including the size and location of the segment searched, the type and location of any oil observed, and the duration and method of survey (*i.e.*, on foot, by boat, etc.). Any oil that SCAT teams observe is classified as either heavy, moderate, light, very light, or trace, using a standardized categorization system that takes into account the width of the oil band, the distribution of oil in that band, and the average thickness of the oil. The data records also include photographs taken by SCAT team members during the surveys. Final, agreed-upon data forms are transmitted to Unified Command.

18.     The information in the data forms is used to create maps that reflect the character and level of oiling on the shoreline over time, including the Maximum Oiling Observed map, which shows all the SCAT segments that were surveyed and the highest level of oil observed in each segment (*i.e.*, heavy, moderate, etc.). NOAA, EPA, and the University of New Hampshire publish these maps on the Environmental Response Management Application ("ERMA") website (*see* http://gomex.erma.noaa.gov/). Attached as Exhibit B to my declaration is the Maximum Oiling Observed map file published on ERMA.

19.     In total, SCAT has assessed more than 4,300 miles of shoreline in the Gulf, from Wakulla County, Florida through Louisiana. The SCAT assessments included all shoreline areas where MC252 oil was observed by SCAT, and extended beyond those areas for completeness. More specifically, SCAT surveys extended to the western border of Louisiana, despite the fact that no oil was observed by SCAT west of Vermillion Parish, Louisiana. Similarly, no oil was observed by SCAT east of Franklin County, Florida, but SCAT surveys extended east through Wakulla County, Florida.

20.     At the peak of shoreline oiling, approximately 1,100 miles of the coast contained some oil, although only approximately one-third of the oiled shoreline (approximately 360 miles) was categorized as heavy or moderate oiling.

21.     The level of shoreline oiling decreased with time. Approximately one year after the spill, the total number of miles of shoreline that contained some oil had decreased by roughly 50 percent to approximately 530 miles. By that point, fewer than 50 miles were classified as heavy or moderate oiling, and more than 99% of the heavy and moderate areas of oiling were located in Louisiana. None of the amenity beaches in Alabama, Mississippi, and Florida were classified as heavy or moderate oiling one year after the spill.

22.     Approximately two years after the spill, the number of miles of shoreline that contained any oiling had decreased to less than 430, of which approximately 15 miles were classified as heavy or moderate oiling. Put differently, as of April 2012, more than 90% of the total miles of shoreline surveyed by SCAT were reported as having no oil observed, and less than one-half of one percent were categorized as moderate or heavy oiling. Attached as Exhibits C and D to my declaration are a series of maps generated from SCAT data showing the categories of oiling observed by SCAT teams over the last two years for Louisiana and the Eastern Gulf States.

23.     It is my opinion that the scope and thoroughness of the SCAT program for the DWH oil spill is unprecedented, and that the SCAT program provides an accurate and detailed understanding of the current level and character of shoreline oiling in the Gulf and the level and character of oiling over time. SCAT data are the definitive source of information regarding shoreline oiling, which Unified Command continues to utilize to guide the shoreline response to the spill.

*Shoreline Response*

24.     The shoreline response program for the DWH oil spill consists of four "stages" and the procedures set out in the Deepwater Horizon Shoreline Cleanup Completion Plan, which are designed to address oiling in a rigorous, systematic manner, including repeated shoreline surveys and treatment actions.

25.     Stage I primarily involved on-water recovery of floating oil in near-shore areas, and Stage II largely consisted of initial removal of bulk oil on the shoreline.  The response completed Stages I and II by approximately September 2010.  Stage III began when Unified Command determined that there was no more recoverable oil on the water, and focused on repeated inspection and treatment of shoreline oiling, including post-treatment monitoring and maintenance.  Stage III ended in approximately March 2011.  Like Stage III, Stage IV involves repeated inspection and treatment, and documented the condition of the shoreline in Spring 2011. As described below, the Shoreline Cleanup Completion Plan defines the ongoing process for determining if segments can be moved out of the response.

26.     Early on in the spill, a focus of the response work was deep cleaning amenity beaches used by Gulf Coast residents and tourists.  These areas could be addressed using more aggressive cleanup techniques like mechanical processing, sieving, and sand washing, whereas manual raking or in some cases natural attenuation might be the only appropriate strategies for handling wetlands because other treatment techniques could cause more harm than oil exposure.

27.     Unified Command established environmentally protective inspection and cleanup standards known as No Further Treatment ("NFT") guidelines to govern the response work in Stages III and IV.  In preparing these standards, Unified Command took into account concerns about the effects of oil on environmental, cultural and recreational resources (*i.e.*, tourist

beaches), while recognizing that in some cases cleanup activities could cause more harm than allowing oil to naturally attenuate. Separate standards were established for different shoreline types (sand beaches, coastal marshes and mangroves, and man-made structures). In order for a segment to be moved out of Stage III or Stage IV, the segment had to be inspected and sometimes treated (as necessary) multiple times to verify that it complied with the NFT guidelines.

28.     Technical working groups of experts recommend treatment methods and strategies to Unified Command. Approved methods are included in formal guidance documents, referred to as Shoreline Treatment Recommendations ("STR"), which describe in detail how to treat specific shoreline segments. A variety of environmental factors are considered when developing STRs, including minimizing sand and sediment loss to avoid erosion, and protection of critical wildlife habitat and archeological and cultural resources. STRs developed for Stages III and IV are highly specific, identifying the location and character of oil observed and recommending procedures for treatment, including suggested tools, techniques, and frequency.

29.     SCAT teams conduct follow up ground inspections after cleanup activities to assess and verify post-treatment conditions. Using information from those surveys, Unified Command evaluated if the treated segment satisfied NFT guidelines and could be moved to the next phase of the response. Segments that did not achieve the standards received further treatment in accordance with the relevant STR, and were then re-surveyed by SCAT. This process was repeated until the segment satisfied the standards in the NFT guidelines.

30.     The Deepwater Horizon Shoreline Cleanup Completion Plan describes the ongoing process and treatment endpoints Unified Command is using for determining if shoreline

segments no longer require any monitoring or treatment as part of the DWH shoreline response program.

31.     The first step under the Shoreline Cleanup Completion Plan is to have SCAT teams conduct inspections so that Unified Command can evaluate whether a segment has achieved relevant cleanup standards.  Segments that do not satisfy the standards receive further treatment.  If the endpoints are met, the segment is monitored for a minimum of 30 days, at which point SCAT teams conduct a second inspection.  If a segment meets the endpoint criteria during the second inspection, Unified Command can determine that removal actions for that segment are complete.  Only the Federal On-Scene Coordinator has the authority to formally end treatment activities on a particular segment and move a segment out of the active response.

32.     As a result of the phased shoreline response program, SCAT teams have surveyed many segments of the Gulf shoreline multiple times over many months since May 2010. Surveying segments repeatedly allows SCAT to assess changes in oiling over time, assists in understanding the effectiveness of shoreline treatment activities, and provides an understanding of the shoreline's seasonal variability.  In addition to the repeated surveys conducted during Stages I through IV, for any segment that received treatment, SCAT teams are required to survey the segment at least three times before Unified Command will consider whether removal actions are complete under the Shoreline Cleanup Completion Plan, and whether to move the segment out of the response.

33.     As of July 28, 2012, more than 3,900 miles of shoreline have been formally moved out of the response or recommended for removal from the response, pending approval in accordance with the Shoreline Cleanup Completion Plan.

11

34.     In my opinion, Unified Command has, and continues to, effectively address shoreline oiling.  At the height of the shoreline response operation, Unified Command had thousands of workers and a wide variety of tools at its disposal to remove oil, including new oil recovery and treatment technologies deployed for the first time during the DWH spill response. In addition to manual cleanup, response crews used mechanical removal and tilling devices, sand washing systems, low-pressure flushing machines, vacuums, vegetation cutting, and sorbents to remove oil.  Attached as Exhibit E are photographs showing examples of beach cleanup operations, along with pictures taken before and after treatment on several amenity beaches.

*Subtidal Oil*

35.     Since July 2010, SCAT teams and Unified Command have been working to locate and mitigate submerged oil material ("SOM," sometimes referred to as "submerged oil mats" or "subtidal oil mats").

36.     As part of the effort to detect, delineate and treat SOM, SCAT developed the Snorkel SCAT program.  Snorkel SCAT targets the surf and breaker zones in wading depths of up to five feet, often encompassing distances out to the first sand bar.  Using snorkeling gear, SCAT teams systematically survey areas suspected to contain SOM based on observations from aerial and shoreline teams and cleanup operations.  Where SOM is found, Snorkel SCAT teams delineate and characterize the type of oil and its distribution, map its size, and provide recommendations for treatment and recovery to Unified Command.

37.     In my opinion, the DWH SCAT program has, and continues to, effectively assess the presence of oil in subtidal areas.  As with shoreline oiling, SCAT teams revisit subtidal areas over time and provide reports of subtidal oiling to Unified Command.

12

38.     The Natural Resource Damages ("NRD") process for the DWH oil spill also considered SOM.  A cooperative study was conducted from June to August 2011 by state and federal trustee agencies and BP to evaluate the presence of SOM.  The study evaluated more than 330 sites in Louisiana, Mississippi, Alabama and Florida that represented a variety of habitat types, including wetlands, and a variety of shoreline oiling conditions, including areas of heavy oiling.  More than 50 sites were located in Barataria Bay, Louisiana.  No oil mats were observed at any of the sampling locations in Barataria Bay or at any of the other sites across the Gulf.

39.     SOM would not be expected to form in protected marsh environments like the Louisiana wetlands because of limited sand and low wave energy, which are key factors in the formation of SOM.

40.     A study conducted by researchers from the University of South Florida in September 2010 addressed the potential for SOM further offshore.  Divers collected approximately 60 core and 60 surface sediment samples off the coasts of Alabama and Florida in areas adjacent to some of the more heavily oiled segments of shoreline.  No visually identifiable oil was found on or below the surface in the near-shore zone at any of the sampling sites.

41.     To investigate the possibility of SOM beyond the first sandbar, Unified Command implemented the SOM Tactical Plan in the summer of 2011 in Florida and Alabama.  Scientists used sonar methods to look for SOM, and supplemented the sonar work with video observations, sediment sampling, coring and laboratory analysis.  These tools identified 33 "anomalies" where sediment characteristics appeared similar to those expected for SOM.  When those areas were investigated, however, none were found to contain oil.  Given this, Unified Command determined that there is no evidence to support the presence of SOM in the area outward of the

near-shore and intertidal zones, and no reason to believe that continued search efforts would yield different results.

42.     In my opinion, any future MC252 re-oiling would almost certainly be localized and discrete, and classified as trace, very light or light oiling under SCAT criteria. A variety of scientists and organizations have searched for oil in near-shore areas for more than two years, throughout all seasons of the year. The data collected from those surveys provide a thorough understanding of the distribution and character of oil on the shoreline and adjacent subtidal areas. During two years of repeated systematic surveys, which included observations after tropical storms, SCAT has not detected any sources of potentially substantial MC252 re-oiling, other than the SOMs Snorkel SCAT identified, which are or have been addressed by Unified Command.

43.     Even after a segment has been moved out of the response, the U.S. Coast Guard would respond, as needed, consistent with the National Contingency Plan, to any future re-oiling, which in my opinion would almost certainly be minimal, discrete and localized.

### Medical Benefits Class Action Settlement

44.     I have reviewed and understand the maps and the written description of Zone A and Zone B in Medical Benefits Class Action Settlement.

45.     Zone A and Zone B of the Medical Benefits Class Action Settlement are defined with reference to the SCAT Line, which is the collection of segments inspected by SCAT teams from the beginning of the spill to the present. The lines are defined by GPS coordinates determined by SCAT teams. Attached as Exhibit F to my declaration is a map showing the SCAT Line.

46.     The east and west boundaries of Zone A and Zone B include the furthest points on the SCAT Line where MC252 oil was observed by SCAT teams.  Zone A is defined as areas appropriately classified as beachfront, half a mile inland from the SCAT Line, and further in some cases where necessary to have an objective, discernable boundary.  Zone B is defined as areas appropriately classified as wetlands, one mile inland from the SCAT line, and significantly further in some places where necessary to have an objective, discernable boundary.  The designation of wetlands areas in Zone B is based on NOAA's Environmental Sensitivity Index ("ESI"), which is a generally accepted and fair and reasonable method to identify the environmental sensitivity of a particular shoreline to oiling and cleanup.

### Compensation Frameworks for Coastal Real Property Claims

47.     I have reviewed and understand the Compensation Framework for Coastal Real Property Claims in the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Economic and Property Damages Settlement"), including the Coastal Real Property Claim Zone.  The Coastal Real Property Claim Zone is reflected in the blue shaded portions of the Coastal Real Property Claim Zone Map, which is Appendix A to the Compensation Framework for Coastal Real Property Claims.  The Zone includes the following: (1) parcels intersected by the SCAT Line (*i.e.*, areas where SCAT teams surveyed), regardless of whether or not oil was ever observed; (2) parcels not directly intersected by the SCAT Line, but touching a portion of the coast on which the SCAT Line is located, regardless of whether or not oil was ever observed; (3) certain other parcels situated between the termination of the SCAT Line and particular physical boundaries (such as waterways, bridges, or roads), if the SCAT Line terminated short of the physical boundaries; and (4) parcels on which oil was observed during a Pre-assessment conducted as part of the NRD process.

48.     The Coastal Real Property Claim Zone includes all parcels, whether they were oiled or un-oiled, along the Gulf Coast shoreline from Wakulla County, Florida through Alabama and Mississippi, and also includes Grand Isle, Louisiana.  Eligible parcels on Grand Isle, Louisiana are included in the Compensation Framework for Coastal Real Property Claims because Grand Isle is appropriately characterized as beach as opposed to wetlands.  Other parcels in Louisiana, not part of Grand Isle, are addressed by the Compensation Framework for Wetlands Real Property Claims (described below).

49.     It is my opinion that identifying parcels eligible for compensation under the Compensation Framework for Coastal Real Property Claims in this manner is fair and reasonable.  SCAT data and the Pre-assessment conducted as part of the NRD accurately identify whether a segment of the shoreline was observed to contain MC252 oil, and the SCAT Line used in establishing the Coastal Real Property Claim Zone accurately identifies the shoreline that was surveyed by SCAT.

50.     In determining compensation categories, the Compensation Framework for Coastal Real Property Claims takes into account NOAA's ESI classification.  As discussed above, the use of ESI is a fair and reasonable method to identify the environmental sensitivity of a particular shoreline to oiling and cleanup.

### Compensation Framework for Wetlands Real Property Claims

51.     I also have reviewed and understand the Compensation Framework for Wetlands Real Property Claims in the Economic and Property Damages Settlement, including the Wetlands Real Property Claim Zone.  The Wetlands Real Property Claim Zone is reflected in the blue shaded portions of the Wetlands Real Property Claim Zone Map, which is Appendix A to the Compensation Framework for Wetlands Real Property Claims.  The Zone includes: (1)

16

parcels intersected by the SCAT Line (*i.e.*, areas where SCAT teams surveyed), regardless of whether or not oil was ever observed; (2) parcels in which oil was observed during the Pre-assessment, Rapid Assessment, or Coastal Wetlands Vegetation Assessment conducted as part of the NRD; and (3) in certain cases where there is a break in the SCAT Line, parcels that would have been intersected by the SCAT Line, had it been continuous.

52.     The Wetlands Real Property Claim Zone includes all areas along the Louisiana Gulf Coast shoreline that were ever observed to contain MC252 oil by SCAT or NRD survey teams and/or were surveyed by SCAT or as part of the NRD, with the exception of Grand Isle, which is included in the Compensation Framework for Coastal Real Property Claims (described above).

53.     It is my opinion that identifying parcels eligible for compensation under the Compensation Framework for Wetlands Real Property Claims in this manner is fair and reasonable. SCAT and NRD data accurately identify whether wetland areas were observed to have MC252 oil, and the SCAT Line accurately identifies the shoreline that was surveyed by SCAT.

54.     When calculating the amount of compensation under the Compensation Framework for Wetlands Real Property Claims and the Compensation Framework for Coastal Real Property Claims, the Claims Administrator uses the Maximum Oiling Observed map in determining if oil was ever observed on a parcel. It is my opinion that the Maximum Oiling Observed map accurately identifies all segments where SCAT observed any MC252 oil along the Gulf Coast shoreline.

*Compensation Framework for Real Property Sales*

55.     I also have reviewed and understand the Compensation Framework for Real Property Sales in the Economic and Property Damages Settlement, including the Real Property Sales Compensation Zone.  The Real Property Sales Compensation Zone is reflected in the blue shaded portions of the Real Property Sales Compensation Zone Map, which is Appendix A to the Compensation Framework Real Property Sales.  The Zone includes the following: (1) residential parcels intersected by the SCAT Line (*i.e.*, areas where SCAT teams surveyed), regardless of whether or not oil was ever observed; (2) residential parcels not directly intersected by the SCAT Line, but touching a portion of the coast on which the SCAT Line is located, regardless of whether or not oil was ever observed; (3) certain other residential parcels situated between the termination of the SCAT Line and particular physical boundaries (such as waterways, bridges, or roads), if the SCAT Line terminated short of the physical boundaries; and (4) residential parcels on which oil was observed during a Pre-assessment conducted as part of the NRD process.  Grand Isle, Louisiana is also included in the Real Property Sales Compensation Zone.

56.     The Real Property Sales Compensation Zone includes all residential parcels from Wakulla County, Florida through Mississippi that were surveyed by SCAT, including both oiled and un-oiled parcels, and also includes residential parcels in Grand Isle, Louisiana.

57.     It is my opinion that identifying residential parcels eligible for compensation under the Compensation Framework for Real Property Sales in this manner is fair and reasonable.  SCAT data and the Pre-assessment conducted as part of the NRD accurately identify whether a segment of the shoreline was observed to contain MC252 oil, and the SCAT Line used in establishing the Real Property Sales Compensation Zone accurately identifies the shoreline that was surveyed by SCAT.

18

*RTP*

58.    It is my understanding from reviewing the RTP Chart and the Joint Motion for Preliminary Approval that RTP payments are meant to compensate class members for pre-judgment interest, any risk of oil returning, consequential damages, inconvenience, aggravation, any risk of future loss, lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors.

59.    It is my opinion that the risk transfer premium concept in the Compensation Framework for Wetlands Real Property Claims and the Compensation Framework for Coastal Real Property Claims is fair and reasonable because it provides compensation based on the maximum extent and degree of oil that has been observed on the shoreline to date; any future MC252 re-oiling would almost certainly be localized and discrete, and classified as trace, very light or light oiling under SCAT criteria; and eligible claimants receive a premium (their payments are increased by a factor of 2.5) to accept the slight risk of re-oiling in the future.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Date:  August 13, 2012                    _____

                                          Elliott Taylor

19

# Taylor Declaration
# Exhibit A





**ELLIOTT TAYLOR, Ph.D.**
*Principal*

### EDUCATION

Texas A & M University, College Station:  Ph.D., Oceanography, 1984
University of California, San Diego:  Graduate Studies, 1977-1979
Universidad Autónoma de Baja California, México:  B.S., Oceanography, 1977

### PROFESSIONAL HISTORY

POLARIS Applied Sciences, Inc., Principal, 1998-Present
TAYLOR Environmental and Marine Services, Inc., Owner, 1993-1998
Woodward-Clyde Consultants, Senior Project Scientist, 1989-1993
University of Washington: Visiting Scholar (oceanography) and Lecturer (geology), 1989
Texas A & M University: Ocean Drilling Program, Staff Scientist, and Dept. of Geology,
    Assistant Professor, 1984-1989; Dept. of Oceanography, Graduate Research Assistant, 1979-1984
Scripps Institution of Oceanography, UCSD, Laboratory Assistant II, 1977-1979
Universidad Autonoma de Baja California, Teaching Assistant, 1973-1976

### REPRESENTATIVE EXPERIENCE

Dr. Taylor is a scientist with over 20 years of experience in environmental and marine sciences.  His projects in oil spill response include implementation and management of the Shoreline Cleanup Assessment Technique (SCAT) process, planning, regulatory compliance, spill exercises, response evaluation, technical support in environmental and shoreline assessment, baseline studies, sediment quality and transport, coastal processes and marine geology.  Dr. Taylor has taught undergraduate and graduate level courses in geology and oceanography. As an International Maritime Organization (IMO) expert consultant, he has been on teams conducting IMO model courses in oil spill response (OPRC) and has worked on regional and national planning initiatives.  Dr. Taylor's field experience encompasses river, lake, harbor, coastal and deep-sea programs and spill response technical support worldwide.   His extensive field and laboratory research includes studies of onshore to offshore marine geology and oceanography.  He has provided leadership and management to numerous multi-disciplinary research programs that required coordinating project teams for both industry and international scientific programs.  Examples of spill response project experience include:

- Scientific support for oiling assessment in emergency response for spill incidents including: Exxon Valdez (1989 and follow-up through 2006), Barge 101 Alaska (1992), Greenhill blowout (1992), New Carissa (1999), Bolivia Transredes pipeline (2000-2001), Johnson Creek (Oregon) (2004), SOTE Pipeline (Papallacta, Ecuador) (2004), Torm Mary (Texas) (2005), Barge PB20 (Washington), Selendang Ayu (Alaska, 2004), Barge Millicoma (Oregon-Washington) (2005), Kab 121 Well (PEMEX Gulf of Mexico, 2007), and Deepwater Horizon MC252 spill (U.S. Gulf of Mexico, April 2010 to present).

- Contracted oil spill expert to support international missions for IMO, IPIECA, RAC-REMPEITC Carib for workshops on environmental risk assessments and national oil spill contingency planning, including SCAT. Workshops delivered in Belize, Costa Rica, Nicaragua, St. Vincent-Grenadines, St. Maarten, Anguilla, and Equatorial Guinea.

- Technical lead for the American Petroleum Institute on workshops and development of "Assessment of Oil Spill Response Capabilities: A Proposed International Guide for Oil Spill Response Planning and Readiness Assessment", presented in a special session of the 2008 International Oil Spill Conference. Developed an international spill response readiness assessment manual and tool (RETOS) as part of an ARPEL initiative for this same program.

- Principal lead in development of the Gulf of Mexico Regional Oil Spill Contingency Plan for PEMEX Exploration and Production. Effort entailed shoreline sensitivity atlas, logistics and spill equipment database, plan analysis and integration with platform (Tier 1) emergency plans, and recommended additional spill response resources and locations. Project encompassed all of PEMEX Exploration and Production activities in the Gulf of Mexico (platforms, pipelines, marine terminals, and floating storage systems – FSO, FSPOs).

- Technical leader for coastal environmental sensitivity mapping and spill response atlas for proposed marine terminal in north British Columbia (Canada) and for river tactics along proposed pipeline route from Alberta.

- Expert review of marine spill response capability assessment of Mexico (Navy and PEMEX) representing the International Maritime Organization through the RAC-REMPEITC Carib office.

- Technical Leader for Exxon Neftegas Ltd. for Sakhalin I regional and facility oil spill contingency plans, equipment readiness, training, and implementation. Project encompasses production alongshore and offshore, on-land and submarine pipelines and flowlines, processing facilities, and marine terminal for conditions ranging from open water to ice-covered operations.

- Spill planning expert on review team for European Bank for Regional Development (EBRD) and Lender's assessment of spill response readiness (plans and implementation) for Caspian Sea development, including ACG Offshore operations and BTC pipeline operations in Azerbaijan, Republic of Georgia, and Turkey.

- Principal lead in development of the Qatar spill response preparedness program, entailing an Oil Spill Contingency for the State of Qatar, audit of existing capabilities and preparation of recommendations for equipment, personnel, and training, development of the Halul Marine Terminal Spill Response Plan, development of the Qatar Coastal Sensitivity and Oil Spill Atlas, and formulation of the Qatar Spill Response Centre.

- Key member of team for preparation of the Sakhalin Energy Corporate Oil Spill Response Plan and template for seven area plans (offshore, pipeline, and terminals), including the Spill Response Plan for the Molikpaq Platform.

- Response Plan Coordinator for more than 100 oil spill contingency plans and spill prevention plans developed to support vessel owners and facility operators throughout the U.S. and Canada. Plans formulated to address state requirements, OPA 90, and/or the Canadian Shipping Act for vessels, marine-transportation related facilities, inland facilities, pipelines, and mobile facilities.

Taylor, Elliott
Page 3                                                                    *POLARIS APPLIED SCIENCES, INC.*

- Developed the Chad/Cameroon General Oil Spill Response Plan, Construction Phase Spill Plans for Chad and Cameroon, and six Area-Specific Spill Response Plans for the 1000 km pipeline route, oil field areas, and offshore terminal. Formulated equipment recommendations and specifications and also developed and implemented a 3-year spill training and exercise regime.

- IMO-certified trainer on oil spill response having provided OPRC Model courses (Level 2) for the SE Pacific Regional Seas program (Chile, Peru, Ecuador, Colombia, Panama) and Caribbean Regional Seas program, in Spanish.

- Technical trainer for oil spill response planning, incident command system, and shoreline assessment, and facilitator in the design and implementation of spill response tabletop and field exercises. Courses and exercises have been provided to Burrard Clean, ExxonMobil, Chevron, Valero, Trumble, PDVSA, Crowley Marine Services, Southern Peru Copper, Captains of Ports Venezuela, Canadian Coast Guard, PetroEcuador, PEMEX, Taiwan EPA, and others.

- Senior Project Coordinator for the development of oil and acid spill response capabilities for Southern Peru Copper, Ltd. Operations at port coastal facilities, railroad right-of-way, and two remote Andean mine sites. Program includes specification and requisitioning of spill response equipment, vessels and HAZMAT trailers, preparation of prevention and response manuals, and training and exercises for field teams and company management.

- Senior Project Coordinator for the development of oil spill response plans and manuals for cleanup organizations, including Clean Sound (WA), Burrard Clean (British Columbia), Great Lakes Response Corp., Eastern Canada Response Corp., ALERT (New Brunswick), and Alaska Chadux Corp.

- Project Manager for the development of oil spill prevention and contingency plan training programs, for facilities and vessels, in Texas, California, Washington, Oregon, and Alaska. Projects entailed preparation of course curricula, handouts, train-the-trainers programs, supplementary training videotapes, tabletop exercises, and exercise evaluation guidelines.

## PUBLICATIONS (Environmental Issues)

Owens, E., TAYLOR, E., O'Connell, K. and Smith, C. 2009. Waste Management Guidelines for Remote (Arctic) Regions. Proc. of the 32nd Arctic and Marine Oil Spill Program Tech. Sem., June 9-11, Vancouver, Env. Canada., ___ (11pp.)

TAYLOR, E., Steen, A., Meza, M., Couzigou, B., Hodges, M., Miranda, D., Ramos, J., and Moyano, M., 2008. IOSC Workshop Report: A Proposed International Guide for Oil Spill Response Planning and Readiness Assessment. Proc. 2008 International Oil Spill Conference, API Publ. I47190, Washington, DC., p. 1-18.

TAYLOR, E. and Reimer, D., 2008. Oil persistence on beaches of Prince William Sound – A review of SCAT surveys conducted from 1989 to 2002. Marine Pollution Bull., 56, p. 458-474.

Owens, E.H., TAYLOR, E., 2007. Guidelines to Evaluate Oil Spill Contingency Plan Adequacy, Response Competency, and Sustained Readiness. Proceedings SPE Asia Pacific Health, Safety, Security and Environment Conference and Exhibition, Bangkok, Thailand. 6 pp.

Owens, E.H., TAYLOR, E, and Dickins, D.F., 2007.  Defining Best International Practices for Oil Spill Response Planning.  Proceedings Annual Symposium Petroleum Association of Japan, Tokyo, 11 pp.

Owens, E., TAYLOR, E., and Parker-Hall, H., 2007. Chapter 2. Spill site investigation in environmental forensic investigations. *In* Oil Spill Environmental Forensics; Fingerprinting and Source Identification, Eds. Z. Wang and S. Stout. Academic Press, MA. USA., p. 55-72.

TAYLOR, E. and Reimer, D., 2005. SCAT Surveys of Prince William Sound Beaches - 1989 to 2002. Proc. 2005 International Oil Spill Conference. API Publ. I4718B. Washington, DC., p. 801-806.

TAYLOR, E., 2003.  Oil spill response planning in developing countries. Proc. 2003 International Oil Spill Conference. API. Washington, DC., p.497-501.

Owens, E.H., TAYLOR, E., and Hale, B. 2003. Oceanographic Studies in Harrison Bay and the Colville River Delta, Alaska, to Support the Development of Spill Response Strategies. Proceedings 26th Arctic Marine Oilspill Program (AMOP) Technical Seminar, Environment Canada, Ottawa ON, 253-269.

TAYLOR, E., 2003. The use of dispersants to minimize the effects of oil spills in sheltered marine environments. Proc., *Pipeline Conference & Exposition 2003*, October 22-24, Rio de Janeiro, Brazil, Brazilian Petroleum and Gas Institute, Ref. IBP418_03.

TAYLOR, E., Buselli, E., Jackson, J., and Geddes, B., 2001. Application of a comprehensive spill management program for oils and bulk hazardous liquids- Southern Peru Copper Corporation. Proc. 2001 International Oil Spill Conference. API. Washington, DC., p.517-522.

TAYLOR, E. and Green, M., 2001. Spill response exercises and lessons learned. In: Proc. of the 24th Arctic and Marine Oil Spill Program Tech. Sem., June 12-14, Edmonton, Env. Canada., p.117-130.

TAYLOR, E. and Geddes, B., 1999. A hazards analysis program for spill prevention and contingency planning. In: Proc. of the 22th Arctic and Marine Oil Spill Program Tech. Sem., June 2-4, Calgary, Env. Canada., p.705-718.

TAYLOR, E. and Egland, L., 1998. Marine spill response planning for the non-persistent oil transportation industry in Alaska. In: Proc. of the 21th Arctic and Marine Oil Spill Program Tech. Sem., June 10-12, Edmonton, Env. Canada., p.221-241.

McEwen, S. and TAYLOR, E., 1997. Development of the Alaska Chadux Corp. In: Proc. of the 20th Arctic and Marine Oil Spill Program Tech. Sem., June 11-13, Vancouver, Env. Canada., p.373-387.

TAYLOR, E. and Owens, E., 1997. Specialized mechanical equipment for shoreline clean-up. Proc. 1997 International Oil Spill Conference. API. Washington, DC., p.79-87.

TAYLOR, E. and Stubblefield, W., 1997. Petroleum in the Freshwater Environment- An annotated bibliography, 1946-1993. Eds. V. Huyck and E. Paulson, American Petroleum Institute Publ. No. 4640. Washington, DC.

TAYLOR, E. and R. Belore, 1995. On the evaluation of mechanical beach cleaning equipment designed for beach cleanup. In: Proc. of the 18th Arctic and Marine Oil Spill Program Tech. Sem., June 14-16, Edmonton, Env. Canada., p.887-900.

TAYLOR, E., Steen, A. and D. Fritz, 1995. A review of environmental effects from oil spills into inland waters. In: Proc. of the 18th Arctic and Marine Oil Spill Program Tech. Sem., June 14-16, Edmonton, Env. Canada., p.1095-1115.

TAYLOR, E., Owens, E., and Nordvik, 1994.  A review of mechanical beach-cleaning machines. In: Proc. of the 17th Arctic and Marine Oil Spill Program Tech. Sem., June 10-14, Vancouver (BC)., Env. Canada., p.621-634.

Fritz, D., E. TAYLOR, A. Steen, and J. R. Williams, 1994. An annotated bibliography of environmental and human health effects from inland freshwater oil spills. In: Proc. of the 17th Arctic and Marine Oil Spill Program Tech. Sem., June 10-14, Vancouver (BC)., Env. Canada., p.501-504.

T.G. Campbell, E. TAYLOR, and D. Aurand, 1994. Ecological risks associated with burning as a spill countermeasure in a marine environment. In: Proc. of the 17th Arctic and Marine Oil Spill Program Tech. Sem., June 10-14, Vancouver (BC)., Env. Canada., p.707-716.

P. Westphal, E. TAYLOR, and D. Aurand, 1994. Human health risk associated with burning as a spill countermeasure. In: Proc. of the 17th Arctic and Marine Oil Spill Program Tech. Sem., June 10-14, Vancouver (BC)., Env. Canada., p.685-705.

Owens, E.H., and TAYLOR, E., 1993. A proposed standardization of terms and definitions for shoreline oiling assessment. In: Proc. of the 16th Arctic and Marine Oil Spill Program Tech. Sem., June 7-9, Calgary (Alberta)., Env. Canada., p.1111-1135.

Owens, E.H., TAYLOR, E., Marty, R., and Little, D.I. 1993. An inland oil spill response manual to minimize adverse environmental impacts. In: Proc. 1993 International Oil Spill Conference, API, Washington, DC. p. 105-109.

## Technical Reports

ARPEL, 2011. Oil Spill Response Planning and Readiness Assessment Manual (and RETOS Excel Tool). Lead author- Elliott Taylor. Developed through funding from the Canadian International Development Fund (CIDA) and Co-Managed by ARPEL and the Environmental Services Association of Alberta (ESAA).

Polaris Applied Sciences, Inc. 2009. A Review of Sorbent Use in Oil Spill Response. Prepared for SINTEF, Trondheim, Norway. 24pp.

TAYLOR, E., Steen, A., Meza, M., Couzigou, B., Hodges, M., Miranda, D., Ramos, J., and Moyano, M., 2008. Assessment of Oil Spill Response Capabilities: A Proposed International Guide for Oil Spill Response Planning and Readiness Assessment, Technical Report IOSC 009. International Oil Spill Conference, API. Washington, DC. 70pp.

TAYLOR, E., Steen, A., Meza, M., Couzigou, B., Hodges, M., Miranda, D., Ramos, J., y Moyano, M., 2008. Evaluación de la Capacidad de respuesta a Derrames de Hidrocarburos: Guía Internacional Propuesta para la Evaluación de Planes y Preparativos para Respuesta a Derrames de Hidrocarburos, Informe Técnico IOSC 009. International Oil Spill Conference, API. Washington, DC. 76pp.

Polaris Applied Sciences, Inc. 2008. Guidelines and Strategies for Oily Waste Management in Arctic Regions. Report prepared for Joint Secretariat Inuvialuit Renewable Resources Committees. 115pp.

*POLARIS APPLIED SCIENCES, INC.*

TAYLOR, E., 2006. Análisis de las Capacidades de Petróleos Mexicanos con Respecto a la Preparación, Respuesta, Lucha y Control de la Contaminación Marina Causada por Derrames de Hidrocarburos. Report for the International Maritime Organization.  IMO PROGRAMME PG-626.

Polaris Applied Sciences, Inc., 2000. Guidance Manual for Oil Spill Countermeasures Requiring Regulatory Approval. Prepared for Burrard Clean Operations, Western Canada Marine Response Organization.

API (American Petroleum Institute), 1999. Fate and Environmental Effects of Oil Spills in Freshwater Environments. API Publication 4675. Prepared by ENSR Consulting and Woodward-Clyde Consultants. API, Washington DC.

TAYLOR, E. and W. Stubblefield, 1997. Petroleum in the Freshwater Environment: An Annotated Bibliography. Huyck, V. and Paulson, E. (Eds.). American Petroleum Institute Health and Environmental Sciences Dept., API Publ. 4640.

TAYLOR, E., E. H. Owens, R. Belore, I. Buist, A. Nordvik, and J. Simmons. 1995. Beach Protection and Cleaning Equipment and Techniques for Oil Spill Response. Marine Spill Response Corp., Washington D.C., MSRC Technical Report Series # 95-006. 334 p.

Buist, I., S. Ross, Trudel, K., E. TAYLOR,  and others, 1994. The Science, Technology, and Effects of Controlled Burning of Oil Spills at Sea. Marine Spill Response Corp., Washington D.C., MSRC Technical Report Series # 94-0131. 387 p.

**Published Abstracts**

Taylor, E., Ramos, J., and Coatanroch, G., 2012. National Contingency Planning and IMO Workshops in the Caribbean Region. In Proceedings Interspil Conference, London.

TAYLOR, E., Egland, L., and Wilson, S., 2001.. Spill response capabilities I remote Western Alaska. Proc. 2001 International Oil Spill Conference. API. Washington, DC., p.1411.

TAYLOR, E.,  VanDyke, N., Craig, A., Steen, A., and Fritz, D., 1993. Oil spills into freshwater environments-Literature review of fate and effects. Proc., 14th Annual Soc. Env. Toxic. and Chem. Conf., Houston, Texas, 14-18 November, 1993.


**AFFILIATIONS**

American Geophysical Union
The Oceanography Society
Marine Technology Society

**COMMITTEES**

ASTM Committee F-20 (Oil Spill)
Scientific Advisory Committee for California Oiled Wildlife Care Network (2000-2004)
Sound Experience Board of Directors and Education Committee Chairman (2004-2008)

**OTHER SKILLS**

Bilingual: English/Spanish

# Taylor Declaration
# Exhibit B



# Taylor Declaration
# Exhibit C

## Oiling Categories Reported by SCAT Teams as of 5/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

1

## Oiling Categories Reported by SCAT Teams as of 6/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

2

## Oiling Categories Reported by SCAT Teams as of 7/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

3

## Oiling Categories Reported by SCAT Teams as of 8/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

4

## Oiling Categories Reported by SCAT Teams as of 9/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

5

## Oiling Categories Reported by SCAT Teams as of 10/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

6

## Oiling Categories Reported by SCAT Teams as of 11/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

7

## Oiling Categories Reported by SCAT Teams as of 12/15/2010



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

8

## Oiling Categories Reported by SCAT Teams as of 1/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

9

## Oiling Categories Reported by SCAT Teams as of 2/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

10

## Oiling Categories Reported by SCAT Teams as of 3/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

11

## Oiling Categories Reported by SCAT Teams as of 4/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

12

## Oiling Categories Reported by SCAT Teams as of 5/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

13

## Oiling Categories Reported by SCAT Teams as of 6/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

14

## Oiling Categories Reported by SCAT Teams as of 7/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

15

## Oiling Categories Reported by SCAT Teams as of 8/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

16

## Oiling Categories Reported by SCAT Teams as of 9/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

17

## Oiling Categories Reported by SCAT Teams as of 10/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

18

## Oiling Categories Reported by SCAT Teams as of 11/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

19

## Oiling Categories Reported by SCAT Teams as of 12/15/2011



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

20

## Oiling Categories Reported by SCAT Teams as of 1/15/2012



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

21

## Oiling Categories Reported by SCAT Teams as of 2/15/2012



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

22

## Oiling Categories Reported by SCAT Teams as of 3/15/2012



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

23

## Oiling Categories Reported by SCAT Teams as of 4/15/2012



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

24

## Oiling Categories Reported by SCAT Teams as of 5/15/2012



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

25

## Oiling Categories Reported by SCAT Teams as of 6/15/2012



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB

26

## Oiling Categories Reported by SCAT Teams as of 7/15/2012



— Heavy
— Moderate
— Light
— Very Light
— No Oil Observed
— Heavy TB
— Moderate TB
— Light TB
— Negligible TB