| | |
|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | MDL NO. 2179<br><br>SECTION:  J |
| This document relates to all actions. | HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| **Plaisance, et al., individually and on behalf of himself and all others similarly situated,**<br><br>      **Plaintiffs,**<br><br>v.<br><br>**BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,**<br><br>      **Defendants.** | Civil Action No. 12-968<br><br>SECTION:  J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## EXPERT REPORT OF ROBERT H. KLONOFF RELATING TO THE PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I.  INTRODUCTION

1.  I am Dean and Professor of Law at Lewis & Clark Law School.  I am submitting this expert report on the issues of certification of the medical benefits class under Rule 23(b)(3), the fairness of the proposed medical benefits class settlement, and the reasonableness of the proposed structure for awarding attorneys' fees and costs.  In a separate submission, I address the

economic and property damages class settlement.  I am offering my opinions for the Court's consideration based on my background and experience.  I recognize that my role is limited and that the Court will make the ultimate decision.

## II. QUALIFICATIONS

2.  I have held my current position as Dean and Professor of Law since July 1, 2007. Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor. I taught courses on complex litigation, civil procedure, and appellate procedure.  While at UMKC, I organized and chaired a major class action symposium in which leading class action scholars presented and published articles (Vol. 74, No. 3, UMKC Law Review).  Prior to my academic post at UMKC, I served for more than a dozen years as a partner with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  While serving as a partner at Jones Day, I also served for many years as an adjunct professor of law at Georgetown University Law Center, where I taught courses on class actions.  Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States.  I also served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit.  I received my law degree from Yale Law School.

3.  I am a co-author of the first casebook devoted specifically to class actions (Robert H. Klonoff, Edward K.M. Bilich, and Suzette Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed. 2012)).  I am also the author of the Nutshell on class actions (Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 4th ed., forthcoming Oct. 2012)).  These texts are used at law schools throughout the United States and have been cited by numerous courts and commentators.  I have also authored or co-authored numerous scholarly articles on class actions.  As a textbook author in the class action field, I annually supplement my casebook, and thus remain up to date on the latest case law developments.  I also serve on the advisory board of *Class Action Litigation Report*, a Bloomberg/BNA publication.

4.  I served for five years as an Associate Reporter for the American Law Institute's ongoing

class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation* ("*ALI Aggregate Litigation*").  I was the principal author of the chapter that addresses class action settlements and attorneys' fees (chapter 3).  The project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published in May 2010.  It has been cited extensively by courts and commentators.[1]

5.   As a lawyer at Jones Day, I personally handled more than 100 class action cases, primarily (but not exclusively) on the defense side.  These cases have included some of the largest and most highly publicized civil cases in U.S. history.  My class action experience includes, among other things, class discovery, class certification, notice, settlement, claims administration, and a variety of appellate issues.  I have handled many types of class actions, including mass torts, antitrust, consumer, insurance, securities fraud, employment discrimination, RICO, and numerous others.  I have given lectures on class action issues throughout the United States and abroad, including lectures at top law schools in Canada, China, Ecuador, India, and South Korea.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[2]

6.   In September 2011, John G. Roberts, Jr., Chief Justice of the United States, appointed me

---

[1] *See, e.g., Smith v. Bayer Corp.*, 131 S.Ct. 2368, 2382 n.11 (2011); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266, 269, 273 (3d Cir. 2011); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196, 198 (5th Cir. 2010); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 35 (1st Cir. 2009); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 n.14–16 (5th Cir. 2011); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007); *Tilzer v. Davis, Bethune & Jones, L.L.C.*, 204 P.3d 617, 628 (Kan. 2009).

[2] For example, I spoke at two conferences on class actions in April 2012: one sponsored by Loyola Chicago School of Law, and the other sponsored by Washington University School of Law and the Institute for Law & Economic Policy.  In August 2011, I was an invited speaker at an environmental law conference at Kangwon University Law School in Chuncheon, South Korea, where I spoke on environmental class actions.  In May 2011, I was an invited speaker at a class action conference at Duke University School of Law, sponsored by the Federal Judicial Center.  In April 2011, I was an invited speaker at an aggregate litigation conference at the University of Cincinnati College of Law.  In May 2010, I was a speaker on class actions at Seoul National University School of Law.  In March 2010, I was a moderator at a symposium on aggregate litigation at George Washington University School of Law.  The subject of the symposium was the recently completed *ALI Aggregate Litigation* project, and many of the country's top class action scholars participated.  In the summer of 2009, I was a featured speaker at an international class action conference in Beijing, China (co-sponsored by the American Law Institute and Renmin University).  That same summer I spoke on class actions at several law schools in India.  In the summer of 2008, I was a featured speaker on class actions at a meeting in Chicago of more than 100 state appellate judges from around the country.  I also spoke on class actions in the summer of 2008 at a conference of European judges, scholars, and practitioners in Florence, Italy (jointly sponsored by the American Law Institute, New York University, and the European University Institute).  I have been invited to speak at several upcoming conferences, including the American Bar Association's National Institute on Class Actions (October 2012) and conferences at the University of Michigan School of Law (March 2013) and George Washington University School of Law (March 2013).

to serve a three-year term as the only academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure.  That Committee considers and recommends amendments to the Federal Rules of Civil Procedure.  The Chair of the Committee, Judge David Campbell, has appointed me to serve on a Class Action Subcommittee, which will be considering possible amendments to the federal class action rule, Fed. R. Civ. P. 23.

7.  I have testified on class action issues in several cases.  My five most recent cases are: *Robichaux v. State of Louisiana, et. al* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (gave deposition testimony on class action attorneys' fee issues on March 7, 2012, and testified in court on April 11, 2012); *In re AT&T Mobility Wireless Data Svcs. Sales Tex Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (submitted declarations on the fairness of a proposed settlement and on attorneys' fees and incentive payments, and testified in court on March 10, 2011); *In re Motor Fuel Temperature Sales Practice Litig.*, No. 07-MD-184KHV, MDL No. 1840 (D. Kan.) (submitted a declaration on Mar. 19, 2010, on the fairness of a proposed settlement); *Walsh v. Principal Life Ins. Co.*, No. 407-cv-00386 (S.D. Iowa) (gave deposition testimony on class certification issues on Sept. 10, 2009 and also submitted a declaration); and *In re WorldCom, Inc., et al.*, Ch. 11, Case No. 02-13533 (Bankr. S.D.N.Y.) (submitted declaration on Feb. 2, 2006, on the fairness of a proposed settlement).

8.  Additional information regarding my qualifications and experience—including a complete list of my publications—can be found in my curriculum vitae, attached hereto as Exhibit A.

9.  I offer this report solely in my capacity as a class action scholar and practitioner, not in my capacity as a law school dean or as a member of the Advisory Committee on Rules of Civil Procedure.

## III.  BASIS FOR TESTIMONY

10.  I have reviewed numerous pleadings, orders, briefs, and exhibits in this case, along with the settlement agreement documents.  I have also reviewed press coverage and academic analyses of the *Deepwater Horizon* oil spill and its aftermath.

## IV. BACKGROUND

11.  This Court is thoroughly familiar with the terms of the proposed settlement agreement and with the background leading up to the settlement. *See* Preliminary Approval Order as to the Proposed Medical Benefits Class Action Settlement (Doc. 6419) (filed 05/02/12) ("Order 6419"), at 2–4.  In discussing class certification, fairness of the settlement, and attorneys' fees, I highlight facts that I believe are essential.

## V.  CLASS CERTIFICATION

12.  In this section of my report, I offer my opinion on whether the medical benefits class is suitable for class certification.  The fact the parties have reached a settlement does not relieve this Court of its duty to assess whether this case should be certified as a class action.  In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court rejected the argument that when a case settles prior to certification, a court's only obligation is to determine if the settlement is fair and reasonable under Rule 23(e).  In *Amchem*, the issue was whether a class had been legitimately certified for purposes of a global settlement of current and future asbestos-related claims.  To resolve the issue, the Court had to determine whether the standards for certification under Rule 23(b)(3) were less demanding when the case was certified for settlement purposes rather than for trial.  The Court held that settlement *was* relevant to one aspect of class certification.  In a settlement class, "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial." 521 U.S. at 620.  The Court concluded, however, that the other requirements of Rule 23—"those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.*  Thus, under *Amchem*, although this Court is not required to address manageability under Rule 23(b)(3)(D), it *is* required to address all of the other criteria for class certification.

13.  To obtain class certification, plaintiffs must satisfy three threshold requirements (a proper class definition, and a representative who is both a member of the class and has a live claim); four explicit requirements under Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation); and all the elements of at least one subdivision of Rule 23(b)— (b)(1)(A), (b)(1)(B), (b)(2), or (b)(3).  *See* Robert H. Klonoff, *Class Actions and Other Multi-*

*Party Litigation in a Nutshell* 23–25, 30–133 (West 4th ed. forthcoming Oct. 2012). In this case, plaintiffs seek certification under Rule 23(b)(3), and thus they must satisfy both "predominance" and "superiority" (excluding manageability). *Id.* at 25, 112–133. In this section, I examine this case in light of the requirements for certification of a settlement class.

14.  Before I turn to the elements of Rule 23, however, I believe it is important to recognize that, under established law, mass tort personal injury cases are *ordinarily* not suitable candidates for class certification. *See, e.g., Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006) ("A 'mass accident' resulting in injuries to numerous persons is *ordinarily* not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways") (emphasis added; quoting Fed. R. Civ. P. 23(b)(3) advisory committee's note (1966)). Nonetheless, "ordinarily" unsuitable does not mean "always" unsuitable. The Supreme Court and the Fifth Circuit have made clear that certification of personal injury claims may be appropriate in some cases. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting that Rule 23 "does not categorically exclude mass tort cases" and that "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement"); *Madison v. Chalmette Ref., L.L.C.,* 637 F.3d 551, 557 (5th Cir. 2011) (while remanding class certification order in case involving release of petroleum coke dust because the district court failed to conduct a rigorous analysis, the court emphasized that it did "not suggest that class treatment [was] necessarily inappropriate," and that "class treatment on the common issue of liability may indeed be appropriate").

15.  This case, in my opinion, is one of those exceptional cases in which the certification of personal injury claims is indeed appropriate. In every material respect, it differs from personal injury cases in which courts have found certification to be inappropriate. Specifically, courts have found that the major barriers to certification of personal injury mass torts include the following:

- Class actions are not superior for high-value individual personal injury claims, which generally should be litigated individually. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Castano v. American Tobacco Co.*, 84 F.3d 734, 747–48 (5th Cir. 1996); *Matter of Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293,

1300 (7th Cir. 1995). Here, as discussed *infra*, the claims are generally small and not economically viable as individual lawsuits.

- Choice of law issues and the difficulty of applying 50 states' laws preclude certification of geographically large class actions based on state law. *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001); *Castano*, 84 F.3d at 742–43; *Rhone–Poulenc*, 51 F.3d at 1300–1302. Here, as explained *infra*, this Court has held that the cases are all governed by uniform federal law.

- Mass tort classes are often unascertainable from the class definition. *See, e.g., In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 397 (S.D.N.Y. 2008); *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 336–37 (E.D.Ky. 2002). Here, as discussed below, the class definition is objective and precise.

- Personal injuries often cannot be litigated on a class-wide basis because individual issues of causation tend to predominate over the common issues. *See, e.g., In re American Medical Systems*, 75 F.3d 1069, 1085 (6th Cir. 1996); *Amchem*, 521 U.S. at 622–23; *Castano*, 84 F.3d at 744–45. Here, as discussed *infra*, the common issues are complex and important, while the individual issues are easily resolved.

- Many mass tort personal injury cases involve injuries relating to mass-marketed products, in which no single event applies to the whole class. *See, e.g., In re Northern Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982); *American Medical Systems*, 75 F.3d at 1084–85. This case, by contrast, arises out of a single incident—the oil spill and its aftermath—and the overarching liability determinations will govern every member of the class.

- Defendants often have individualized defenses (*e.g.*, contributory negligence or learned intermediary doctrine) that a class action simply cannot accommodate efficiently. *See, e.g., Castano*, 84 F.3d at 745; *Dalkon Shield*, 693 F.2d at 853. Here, as discussed *infra*, these kinds of defenses do not arise, since there is no viable argument that class members somehow contributed to the oil spill.

- In personal injury cases, structural conflicts often exist between those asserting

claims for present injuries and those seeking to ensure adequate compensation for future injuries. *See*, *e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626–27 (1997); *Ortiz v. Fibreboard Co.*, 527 U.S. 815, 856–57 (1999). Here, as explained below, because claims for future injuries are preserved for all class members, no such structural conflicts exist.

• In many unsuccessful mass tort class actions, the claims were of questionable merit due to scientific uncertainty. *See*, *e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 506 F. Supp. 762, 783 (E.D.N.Y. 1980); *Rhone–Poulenc*, 51 F.3d at 1299. Here, as discussed *infra*, the matrix of injuries is based on established science.

• Mass tort class actions can threaten defendants with ruinous liability and coerce them into nuisance settlements in order to avoid insolvency. *See*, *e.g.*, *Rhone–Poulenc*, 51 F.3d at 1298–99; *Castano*, 84 F.3d at 746. Here, BP indisputably has the assets to cover the claims at issue, and it has already created a trust fund to cover these and other claims.

As I explain throughout this section, utilizing these factors as benchmarks, this case is truly an exception to the general rule that mass tort personal injury cases should not be certified. Indeed, if this case—with all of its unique attributes—does not qualify, then as a practical matter, no mass tort personal injury case is *ever* appropriate for certification.

16. In this section, I first turn to the three threshold requirements for certification. Next, I evaluate the proposed settlement class with respect to the four requirements of Rule 23(a). Following that, I address Rule 23(b)(3)'s predominance and superiority requirements.

## A. Rule 23's Threshold Requirements

17. Two of the three threshold requirements can be dealt with summarily. The class representatives clearly fall within the class definition and thus are members of the class. *See* Medical Class Action Complaint, Case 2:12-cv-00968-CJB-SS (Doc. 1) (filed 04/16/12) (hereinafter "Complaint") at ¶¶ 5(a)–(k) (listing eleven plaintiff class representatives). Moreover, the claims of the representatives are indisputably live, not moot. *See, e.g., id.* at ¶¶ 5(k) (alleging, *inter alia*, that class representative Duffy Hall "was diagnosed with chemical keratitis" as a result of exposure to oil while installing barriers to protect Mississippi wetlands

from the *Deepwater Horizon* spill); 5(f) (class representative Benjamin Judah Barbee alleged to have suffered "headaches and breathing difficulties" during remediation efforts).

18.  Likewise, I do not have any concerns regarding the class definition.  A class definition is critical to ascertain who is in the class, who is subject to notice, and who is bound by the judgment.  Prior to 2003, the class definition requirement was solely a matter of case law, and no such requirement was even mentioned in Rule 23.  In 2003, Rule 23 was amended to state that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses."   The Rule, however, does not elaborate on what constitutes an adequate class definition.

19.  The Manual for Complex Litigation (Fourth) contains useful guidance in evaluating a class definition.  First, the definition should contain "objective criteria" and "avoid subjective standards (*e.g.*, a plaintiff's state of mind) or terms that depend on resolution of the merits (*e.g.*, persons who were discriminated against)." *Id.* at § 21.222; *see also Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 639 (5th Cir. 2012) ("In order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.") (citation, alteration, and internal quotation marks omitted).   A definition that turns on the merits is sometimes called a "fail-safe" class, because the class is certified (and a binding judgment entered) only if plaintiff wins the case.   Second, "the class definition should capture[] all members necessary for efficient and fair resolution of common questions of fact and law in a single proceeding." *MCL(4th)*, *supra*, at § 21.222.  Third, "[t]he class definition should describe the operative claims, issues, or defenses." *Id.*  The *Manual* also recognizes that more specificity is needed for (b)(3) classes, which require notice and opt-out rights, than for (b)(1) and (b)(2) classes, which are mandatory. *Id.*; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104–1105 (5th Cir. 1977) (observing that, absent a clear class definition, prospective class members lack adequate notice and cannot exercise their rights under (b)(3) to make an "informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment").

20.  Here, the medical benefits class definition is objective and precise and does not turn on the merits.  The proposed definition is very detailed. *See Deepwater Horizon* Medical Benefits Class Action Settlement Agreement as amended on May 1, 2012 (Doc. 6427-1) (filed 05/03/12)

(hereinafter "Medical Agreement") at 6–7 (setting forth class definition); Order 6419 at 15–16 (adopting proposed class definition).   Under the definition, the class consists of persons who resided in the United States between April 20, 2010, and April 16, 2012, and who (1) resided in Zone A (certain specified beachfront areas) for some time on each of at least 60 days between April 20, 2012, and September 30, 2010, and who developed specified physical conditions and symptoms (vision, upper airway/respiratory, ear, nose, and throat, skin, neurophysical/neurological/odor-related, gastrointestinal or stomach, or heat-related (all set out in the Specified Physical Conditions Matrix, *see* Medical Agreement, Ex.8 (Doc. 6427-10))); (2) resided in Zone B (specified wetlands areas) for some time on each of at least 60 days between April 20, 2010, and December 31, 2010; or (3) worked as Clean-Up Workers (a defined term under the proposed settlement, *see id.* at 11–12) between April 20, 2010, and April 16, 2012. Both Zone A and Zone B are defined objectively and with great clarity in the Medical Agreement and Exhibit 9 (Doc. 6427-11) thereto.   Further clarity is provided through maps of Zone A (Ex.10; Doc. 6427-12) and Zone B (Ex.11; Doc. 6427-13).   Likewise, the Medical Agreement defines the term "Clean-Up Workers" with great clarity, including specification of five categories of natural persons who performed "Response Activities" (itself a defined term), namely, those relating to the cleanup, remediation efforts, and all other responsive actions involving the oil spill.   The definition contains various exclusions, including opt-outs, employees of BP, judges and clerks from the Eastern District of Louisiana, anyone who was on the Deepwater Horizon on April 20, 2010, anyone who previously released the claims herein, and certain defined oil and gas workers. *See* Medical Agreement at 6–7.

21.   As Dr. Michael R. Harbut explains in his August 11, 2012 Declaration, the class definition is firmly grounded in modern science with respect to the extensively studied health effects of exposure to petroleum and petroleum-based dispersants, such as those at issue in this case.   The geographical scope of the class, as Dr. Harbut points out, reaches broadly enough to include all those individuals whose proximity to the oil spill was such that they would have been sufficiently exposed to oil and/or oil-based dispersants to cause one or more of the specified medical conditions or symptoms on the Specified Physical Conditions matrix.   He opines that Zone A covers the coastal residential population that, "merely by virtue of their residency," could have had sufficient exposure to the oil and/or chemical dispersants to develop one or more

of the conditions or symptoms listed in the matrix. Harbut Decl. ¶ 39.  Similarly, he explains how Zone B covers the marshland residential population that, "merely by virtue of their residency," could have had sufficient exposure to the oil and/or chemical dispersants to develop one or more of the conditions on the matrix.  *Id.* at ¶ 40.  Finally, he explains that the Clean-Up Workers, "by virtue of their work status," were almost certainly exposed to oil or dispersants, noting that "it would be unusual for a worker involved in petroleum cleanup operations to not have petroleum exposure." *Id.* at ¶ 41.  Dr. Harbut also explains why the geographical and temporal scope of the class definition avoids sweeping too broadly—which would bring in cases in which the proof of causation was much more attenuated.  With respect to Zones A and B, Dr. Harbut explains that the boundaries are consistent with contemporary scientific understanding of the chemicals and physical conditions involved.  He notes that, while it might be possible for someone who lives outside those areas to manifest a specified physical condition as a result of exposure, it would be less likely, "because one would expect concentrations of toxins to diminish as distance from point source exposure increases." *Id.* at ¶¶ 39, 40.  Similarly, as noted, he observes that "it would be unusual" for Clean-Up Workers not to have been exposed to petroleum or petroleum-based dispersants, since "by definition, oil cleanup workers are involved in the cleanup of oil," which "puts them in closer and more prolonged contact with the petroleum and/or petroleum products" than the Zone A and Zone B residents. *Id.* at ¶ 41.  Thus, the carefully calibrated class definition ensures that similarly-situated individuals will be similarly defined within the class.  The same, however, could not be said of a more sweeping definition.

22.  The precision of the proposed medical benefits class definition is further reflected in the effectiveness of the sending of notice to class members.  Based on the class definition, individual notices were sent by mail to many thousands of class members.  In short, the class definition passes muster under even the most exacting criteria.

## B. Rule 23—Explicit Requirements for Class Certification

### 1. Rule 23(a) Requirements

#### a. Rule 23(a)(1)—Numerosity

23.  Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all members is impracticable." *Id.*  "To demonstrate numerosity, Plaintiffs must establish that

joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'" *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 604 (E.D.La. 2006) (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000)). According to the Fifth Circuit, numerosity is generally met if a class consists of more than 100–150 members. *See, e.g.*, *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999).

24.    Here, there is no serious dispute about numerosity. The medical benefits class is estimated to include approximately 200,000 individuals. *See* Order 6419 at 16 ("the parties estimate that there are approximately 90,000 Clean-Up Workers and 105,000 Zone A and Zone B Residents. . . . In addition, approximately 16,000 individuals have filed Short-Form Joinders asserting claims for bodily injury as a result of the Deepwater Horizon incident, and more such claims continue to be filed.")

### b. Rule 23(a)(2)—Commonality

25.    To satisfy Rule 23(a)(2)'s requirement of "questions of law or fact common to the class," the class claims "must 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *M.D. v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)) (citations omitted). A single common question satisfying this criterion will suffice. *Dukes*, 131 S. Ct. at 2556. "Commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members." *In re Heartland Payment Sys.*, 2012 U.S. Dist. LEXIS 37326, at *29 (S.D. Tex. Mar. 20, 2012) (citation, alteration, and internal quotation marks omitted). "The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence." *Id.* at *29–30 (quoting *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273, 335 (3d Cir. 2011) (Scirica, J., concurring), *cert denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012)).

26.    Here, commonality is easily satisfied. Every class member's case turns on the common question of BP's liability, under general maritime law, for the Deepwater Horizon explosion. Furthermore, because the claims all arise from the same discrete, single-location, single-event disaster, they share a multiplicity of common questions. Common questions include whether BP

was grossly negligent in its conduct with respect to the Deepwater Horizon and whether alternative safety precautions would have prevented or mitigated the oil spill.  Additional common issues that are specific to the medical benefits class include questions involving the capacity of oil and oil-dispersing chemicals to cause the alleged ailments[3] and the amounts of particular chemicals that were released into the environment during the Deepwater Horizon disaster. *See also* Complaint at ¶¶ 91–95 (listing numerous common legal and factual questions). As the MDL Panel noted in its Transfer Order, these proceedings "indisputably share factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, 731 F. Supp. 2d 1352, 1354 (J.P.M.L. 2010).

### c. Rule 23(a)(3)—Typicality

27.  "In order to meet the typicality requirement, 'the claims or defenses of the parties [must be] typical of the claims or defenses of the class.'" *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting Fed. R. Civ. P. 23(a)(3); alteration by *James* court).  A claim is typical if it arises from the same events, practices, or course of conduct that gives rise to the claims of other class members, and if the claims are based on the same legal theories. *Id.*  "Typicality does not require a complete identity of claims." *Id.*  Instead, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id.*

28.  Typicality is amply satisfied here.  Every claim arises out of the same single-event, single-location disaster, and every case turns on the question of BP's negligence.  Every plaintiff either claims to have already suffered one or more specified physical conditions set forth in the matrix (Medical Agreement, Ex.8 (Doc. 6273-10)), or is at risk of suffering physical injury as a result of the oil spill.  There are no reasonable defenses to the effect that the plaintiffs or class members were somehow responsible for their own injuries.

29.  To be sure, there will be some variation among the class members' individual claims, but this fact does not change the typicality analysis.  Courts in the Fifth Circuit have held that "[t]he major concern under Rule 23(a)(3) is if unique defenses against a named plaintiff threaten to

---

[3] *See* Harbut Declaration at ¶ 17 ("I find the conditions in the . . . matrix to reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants.")

become the focus of the litigation," and that the key to the typicality inquiry is "whether a class representative would be required to devote considerable time to rebut the Defendants' claims." *In re Enron Corp. Secs. Litig.*, 529 F. Supp. 2d 644, 674 (S.D. Tex. 2006) (citation and internal quotation marks omitted); *see also Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (rejecting the argument that "the presence of a unique defense necessarily destroys typicality").

30.   In this case, I can think of no unique defenses that would "become the focus of the litigation" and thereby undercut the typicality requirement.  The primary focus of a trial would be on BP's conduct.  The testimony relating to specific conditions will be largely the same because there are only two routes of exposure—"direct dermal contact or the inhalation of airborne chemicals"—and the symptoms would have occurred with 24 to 72 hours of exposure to petroleum and/or petroleum-based dispersants. Harbut Decl. ¶¶ 18, 26–38.  And all of the class members are claiming injury from the oil spill and/or cleanup operations.  As such, I believe that typicality is met.

### d. Rule 23(a)(4)—Adequacy of Representation

31.   "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (citation omitted).  "In addition to measuring the competence of class counsel and the class representatives' willingness and ability to serve, . . . the Rule 23 adequacy inquiry also uncovers conflicts of interest between the named plaintiffs and the class they seek to represent." *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir. 2007) (citations and internal quotation marks omitted).  "Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members." *Stott v. Capital Fin. Servs.*, 277 F.R.D. 316, 325 (N.D. Tex. 2011) (citations and internal quotation marks omitted).  As I explain below, based on these criteria, it is my opinion that adequacy is readily satisfied.

### i. Zealousness of Class Representatives

14

32.  My understanding is that the class representatives have zealously pursued the claims and would have continued to do so in the absence of a settlement.  To my knowledge, no issues have been raised regarding the willingness or ability of the class representatives to serve.

### ii. Absence of Conflicts

33.  Unlike *Amchem*, in which there was a conflict between those presently asserting claims and those with future claims, *see* 521 U.S. at 626, here the claims of all of the class members are aligned.  There is no cap on the total damages available to the class.  Each class member can pursue his or her claims for conditions specified in the matrix to the full amount authorized in the settlement agreement.   And the Back-End Litigation Option preserves class members' compensatory claims for "Later-Manifested Physical Condition[s]," *i.e.*, a physical condition first diagnosed after April 16, 2012, that is allegedly caused by BP's actions at issue, provided that the exposure occurred on or before September 30, 2010 (for Zone A residents), on or before December 31, 2010 (for Zone B residents), and on or before April 16, 2012 (for Clean-Up Workers). Medical Agreement at 17, 56–59.

34.  Several other factors assure me that this case does not raise conflict-of-interest concerns.

- First, through the careful mediation efforts of Judge Shushan, who mediated key provisions of the medical settlement, structural integrity was assured during the negotiations. *See* Order 6419 at 3 (with Judge Shushan as mediator, teams from BP and the PSC "met or spoke on a nearly daily basis . . . to negotiate over every aspect of the Proposed Settlement").  The negotiations between the PSC and BP were conducted with great skill and dedication over a ten-month period.  *See id.* at 3; Decl. of Robin Greenwald (Aug. 13, 2012) (to be filed with plaintiffs' brief).  The medical benefits settlement was negotiated separately from the economic and property damages settlement, and a different group of PSC attorneys led the negotiations.  Professor Samuel Issacharoff—a widely-respected class action expert who advised the PSC on legal and ethical issues surrounding the negotiations—explains that "[i]n designing the process of settlement negotiations, the PSC took care to ensure that all affected constituencies in the settlement had advocates and that no one with negotiating authority had either the incentive to or the ability to trade off the interests of one group

in favor of another." Decl. of Samuel Issacharoff at ¶ 8 (Aug. 13, 2012) (to be filed with plaintiffs' brief).

- Second, during the negotiations, the parties consulted with medical and other scientific experts with respect to the structure of the medical benefits class settlement. *See* Order 6419 at 4. The PSC attorneys also consulted with attorneys representing individual class members who suffered from the specific ailments at issue. *See also* Issacharoff Decl. at ¶ 11 (noting that the "PSC was appointed by the Court well before any settlement negotiations were undertaken . . . based on the need to represent the various affected constituencies").

- Third, although plaintiffs' counsel made clear that they expected BP to pay fees on top of class member payments, there was no specific discussion of attorneys' fees until all of the other terms of the settlement had been negotiated. *See* Order 6419 at 8; Doc. 6273-21, Ex. 19, at ¶ 1. Thus, the negotiations were not tainted by any concern that a substantial portion of what had been negotiated would end up going to counsel rather than to class members or that counsel and the class members were competing for the same limited dollars.

- Fourth, the instant settlement is free of the structural deficiencies that have derailed other attempts to settle large numbers of individual claims on a class basis, especially in the mass torts context. In particular, the settlement avoids any inherent conflict between current and future claimants of the sort that prompted the Supreme Court to disapprove of the sprawling asbestos classes attempted in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Co.*, 527 U.S. 815 (1999). In contrast to those cases (and many others), the claimants here are not in competition with each other for a fixed amount. *Cf. Amchem*, 521 U.S. at 626 (interests of class members not aligned where the interests of the currently-injured in "generous immediate payments . . . tug[ged] against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future"). *See also* Issacharoff Decl. at ¶ 14 (noting that "the absence of an overall cap meant that the negotiators were never in the position of 'robbing Peter to pay Paul'" by, for example, seeking "to induce a hold-out within the settlement class to accept the offered terms by redirecting funds

[into] that group").  Notably, as discussed above, this settlement leaves open the right of class members to recover compensatory damages for later-manifested injuries. Thus, those with present injuries are not competing with those who want to ensure an adequate fund for the future.

35.   Because of the absence of conflicts, I do not believe there is a need for subclasses. Indeed, the creation of subclasses might actually make this case more complex.  Because there are three categories of class members in the medical benefits class, and various types of physical injuries subject to compensation, there would be no rational way to limit the case to only a few subclasses.   First, there are three broad groups (Zone A, Zone B, and Clean-Up Workers). Second, there are dozens of specified acute and chronic conditions and symptoms listed in the matrix. *See* Medical Agreement, Ex. 8.  Those conditions and symptoms fall into at least seven broad categories: vision; upper airway/respiratory; ear, nose, and throat; skin; neurophysiological/neurological/odor-related; gastrointestinal or stomach; and heat-related. *Id.* (Doc. 6427-10).  Within these broad categories are numerous sub-categories.  Thus, conceivably dozens of subclasses could be necessary.   Creating such subclasses—each with separate representatives and counsel—would only lead to more confusion because some class members could fall into multiple subclasses (*e.g.*, because they have multiple physical symptoms of the type specified in the notice).

36.   To be sure, the creation of subclasses is sometimes a salutary procedure for ensuring structural fairness in cases where interests within the class diverge to such a degree that a fundamental conflict exists.   Yet, as the Third Circuit recently explained in *Dewey v. VW Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012), subclassing is not the only means by which procedural fairness may be attained.  In *Dewey*, the plaintiff class alleged that several models of Volkswagen and Audi automobiles had "defectively designed sunroofs, that, when clogged by plant debris and pollen, allowed water to leak into the vehicle." *Id.* at 174.  The district court certified a settlement class.  The Third Circuit reversed in part, rejecting one of the objectors' adequacy arguments but agreeing with another.  First, the appellate court rejected the argument that there was "an intra-class conflict between those class members who have already suffered leakage, and those who have not yet suffered leakage" in their vehicles. *Id.* at 185.  While conceding that the case bore "some resemblance to *Amchem*," the Third Circuit concluded that

the objectors "fail[ed] to recognize a critical distinction between the representative plaintiffs here and the representative plaintiffs in *Amchem*." *Id.* at 185.  The court explained:

> The problem with the representative plaintiffs in *Amchem* was that they "would care little" for benefits that would have been valuable to other members of the class.  This is because once a class member manifested symptoms of asbestos-related injuries, that class member would be solely concerned with obtaining a "generous immediate payment[]" for the injury, not securing an "ample, inflation-protected fund for the future."  This resulted in a misalignment of interests— certain members of the class had an incentive to pursue protections for future claims, while the representative plaintiffs lacked any such an incentive.

> Here, on the other hand, the alignment of interests is not so starkly problematic. A class member who has already suffered leakage, and is thus a "past" claimant, can continue to suffer leakage into the future to the same extent as a future claimant, and can continue to make future claims.  As such, past claimants also have an incentive to protect the ability of class members to make claims for future damage.  Moreover, the settlement is structured to ensure that even past claimants have an incentive to protect the rights of all members of the class to make future claims, and thus to align the interests of the representative plaintiffs with those of the class.

*Id.* at 185–86 (citation and footnote omitted).

37.   The Third Circuit in *Dewey* did agree, however, with a different argument by the objectors about an intraclass conflict.  That conflict stemmed from the fact that the settlement created a "reimbursement group" and a "residual group," but that all the class representatives were members of the reimbursement group.  The settlement provided that the reimbursement group received the right to reimbursement for certain qualifying damages, paid from an $8 million fund, while the remaining class members (the residual group) had to wait until the reimbursement group made its claims, at which point the residual group could make "goodwill" claims on the remaining money in the fund. *Id.* at 173.  The conflict requiring reversal, according to the Third Circuit, was that "representative plaintiffs had an interest in excluding other plaintiffs from the reimbursement group, while plaintiffs in the residual group had an interest in being included in the reimbursement group." *Id.* at 188.  Importantly, however, the court made clear that, on remand, the creation of subclasses was just one way in which the parties could remedy the adequacy problem.  Alternatively, the class could:

> simply do away with the distinction between the reimbursement group and the residual group, and allow all members of the class to submit reimbursements with

> no difference in priority.  Without any need to draw a line between themselves and other members of the class, representative plaintiffs' interest in maximizing their own returns would align with the interests of the rest of the class.

*Id.* at 189.

38.   In the instant case, there is no "need to draw a line between" the claims of the class representatives and those of the absent class members, because this settlement does not amount to a zero-sum game in which different categories of plaintiffs are in competition for a fixed amount.  Rather, because the settlement funds for the medical benefits class are not subject to an overall cap, and because there is no conflict between present and future claimants, class members' interests are aligned and not in conflict.  Accordingly, the Third Circuit's opinion in *Dewey* supports a finding of adequacy of representation in this case.

39.   Other recent appellate decisions are in accord with *Dewey*'s finding that the creation of subclasses is not the *sine qua non* of structural fairness.  These decisions provide further support for my conclusion that subclassing was not required here.  For instance, in *Juris v. Inamed Corp.*, ___ F.3d ___, 2012 U.S. App. LEXIS 13841 (11th Cir. July 6, 2012), the plaintiff filed an individual personal injury action in 2006, alleging injuries caused by defective silicone breast implants manufactured by the defendant.  Plaintiff's suit was enjoined, however, on the ground that the *res judicata* effect of a 1999 class settlement precluded her claims.  On appeal to the Eleventh Circuit, plaintiff collaterally challenged the 1999 settlement class, arguing that she had been denied due process because, *inter alia*, she had lacked adequate representation at the earlier class settlement that purported to extinguish her rights.  *Id.* at *37.  In particular, plaintiff urged that the 1999 settlement had failed Rule 23(a)(4)'s adequacy requirement by failing to create subclasses.  The Eleventh Circuit disagreed, observing that the Supreme Court's decisions in *Amchem* and *Ortiz* "appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, but may not necessarily require, formally designated subclasses." *Id.* at *73 (emphasis in original; citations omitted).  The appellate court added that it was "not the first court to suggest that *Amchem* and *Ortiz* impose a requirement of adequate structural assurances, as opposed to a *per se* requirement of formally designated subclasses." *Id.* at 73–74 n.25 (citing numerous authorities).  *See also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 336 n.5 (3d Cir. 2011) (en banc) (Scirica, J., concurring) (noting that "[t]rial courts can certify

subclasses in situations where divergent interests implicate fair allocation—a situation not presented . . . [where the] class members have aligned interests"), *cert. denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

### iii. Competence of Class Counsel

40.  In my view, counsel have vigorously and effectively pursued this case from its inception. The PSC includes many of the nation's most prominent and experienced class action attorneys. These attorneys have had broad experience in aggregate litigation involving tobacco, asbestos, pharmaceutical products, insurance, retiree health benefits, and discrimination, among other types of cases.  The PSC also includes attorneys with substantial maritime and admiralty practices.  They were selected by the Court from among hundreds of attorney applicants for the PSC.  Their skill and experience are reflected in the crafting of the complaints, the filing of and opposition to myriad motions, the thoroughness in approaching discovery, the tireless and steadfast approach to settlement negotiations, and ultimately, the impressive results accomplished for the class.

### B. Rule 23(b) Requirements

41.  As noted, the parties seek settlement under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Predominance of Common Questions

42.  "The predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene and Gene, LLC v. BioPay, LLC,* 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  "In the context of mass tort litigation," the Fifth Circuit has held "that a class issue predominates if it constitutes a significant part of the individual cases." *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992) (footnote omitted).

43.  Here, the common issues are critical, and in the absence of settlement would entail considerable proof in each individual case.  The centerpiece of this litigation is the responsibility

of BP (and other corporate entities) for the blowout, explosion, and fire that occurred aboard the *Deepwater Horizon* offshore drilling rig and the subsequent discharge of oil into the Gulf over a three-month period, causing the largest oil spill in history. The proof at trial would be lengthy, technical, and complicated. Indeed, the Court has structured the proceedings in phases to address common issues first. Second Amended Pretrial Order No. 41 (Doc. 6592) (filed 05/30/12). By contrast, the individualized issues are more easily resolved: Was the specified medical condition of a Zone A resident, Zone B resident, or Clean-Up Worker caused by the person's exposure to oil or petroleum-based dispersants? *If* the class member was exposed to the petroleum substance and *if* the specified physical condition manifested itself shortly thereafter (within 24–72 hours), much of that proof will be common to the class, along the lines of Dr. Harbut's declaration. Common evidence will prove that the medical condition is one that can be caused by exposure to petroleum, and common evidence will demonstrate the likelihood that, for Zone A residents, Zone B residents, and Clean-Up Workers, being a member of one of those categories meant that there was a high likelihood of exposure. Thus, even issues of individual causation would, for the most part, be proven by common evidence. Indeed, after hearing proof from a few individuals, the trier of fact would soon develop the ability to resolve the individual questions quickly and consistently. The fact that some individualized issues exist does not defeat certification as long as the common issues predominate. For example, as myriad courts have stated, mere differences in damages do not defeat class certification.[4]

44. As discussed in ¶¶ 14–15, *supra*, mass tort personal injury cases are usually not suitable for class certification. Among other class certification requirements, the "predominance" requirement of Rule 23(b)(3) has been a major stumbling block. Yet, as noted in ¶ 14, *supra*,

---

[4] *See, e.g.*, *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003) (recognizing that "relatively few motions to certify a class fail because of disparities in the amount of damages suffered by the class members" and that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate"); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)") (citations omitted); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2009) ("common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues" (citation and internal quotation marks omitted)); *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 428 (4th Cir. 2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations . . . forecloses class certification"); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010) ("the amount of damages is invariably an individual question and does not defeat class action treatment") (citation, alteration, and internal quotation marks omitted).

numerous authorities have made clear that this rule is not absolute.  The instant case is precisely the kind of personal injury case in which the usual predominance problems do not exist.

45.  First, in contrast to most attempted mass tort personal injury class actions, the medical claims in this case are, in the main, classic "negative value" cases (*i.e.*, claims that are not economically viable as individual lawsuits because the likely recovery is less than the costs of bringing suit). *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (noting that the drafters of Rule 23(b)(3) "had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'") (citation omitted).  I am advised that, for the most part, the injuries claimed are relatively minor.  The more serious injuries—those that would be covered by the Back-End Litigation Option—can take years to manifest themselves. Harbut Decl. ¶¶ 45, 46.  For those with minor injuries, the overarching liability issues are so complicated, and would be so expensive to prove, that few class members, apart from the most egregiously harmed, would have the financial incentive to take their individual cases to trial.  Few class members would attempt the herculean task of litigating alone against a sophisticated and well-heeled corporate defendant such as BP, even given the strong likelihood that plaintiffs would ultimately prevail.  This lack of incentive for plaintiffs to go it alone, even when they have strong claims, describes precisely the problem to which the class action device supplies a time-tested solution: aggregating similar claims and thereby alleviating the asymmetry between the parties.

46.  Second, the narrow and precise class definition limits the scope of the class to those most likely exposed to oil or oil-dispersing chemicals.  As noted, given that the injuries must have manifested themselves within 24 to 72 hours after exposure, that the injuries could have been caused through only two pathways, and that the class includes only those most likely to have been exposed to oil or petroleum-based dispersants, the likelihood of serious competing causation arguments is remote.  The narrowly defined class makes predominance especially easy to satisfy here.  Because the class includes only individuals who were in close geographic and temporal proximity to the spill, a class member who shows that he or she suffers from a specified medical condition that manifested itself (or worsened) following the oil spill should not have serious trouble proving individual causation.  Indeed, the tight causal nexus between the spill and class members' injuries makes it much more difficult for BP to assert individualized defenses

involving alternative causation.   Because of the circumstances of causation in this case, the medical benefits class is worlds away from the typical kind of case in which courts have found personal injury claims to be inappropriate for class treatment.

47.   Third, the injuries were caused by a single event, the oil spill and its aftermath, and there is no argument that class members somehow contributed to the cause.   A finding of predominance is supported by a long line of cases finding "single incident" tort cases to be suitable for class certification.   For example, in *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1021–22 & n.37 (5th Cir. 1992), the Fifth Circuit affirmed the district court's (b)(3) certification of a class alleging injury from an a explosion at defendant's manufacturing facility. *Accord, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D.La. 2006) (certifying (b)(3) class alleging property damage from an oil spill at defendant's refinery); *In re Train Derailment near Amite, La.*, 2006 U.S. Dist. LEXIS 32839 (E.D.La. May 24, 2006) (certifying (b)(3) class and approving settlement).[5]   As the Sixth Circuit has explained:

> In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next.   No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action.   Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).

48.   Fourth, this case is free of the choice-of-law issues that have caused many courts to reject class certification of mass torts.[6]   Rather, as this Court has ruled, this case is governed by

---

[5] *See also, e.g.*, *Sala v. Nat'l R. Passenger Corp.*, 120 F.R.D. 494, 500 (E.D.Pa. 1988) (certifying (b)(3) class of "all passengers who suffered injuries as a result of" the collision and derailment of defendant's train); *In re Three Mile Island Litigation*, 87 F.R.D. 433, 438–40 (M.D. Pa. 1980) (classes of residents suffering economic harm from nuclear accident certified); *Coburn v. 4-R Corp.*, 77 F.R.D. 43, 45–46 (E.D. Ky. 1977) (certifying class of representatives of patrons killed in nightclub fire); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla. 1973) (class of injured cruise passengers certified), *aff'd without opinion*, 507 F.2d 1279 (5th Cir. 1975); *Bentkowski v. Marfuerza Compania Maritima, S.A.*, 70 F.R.D. 401, 404–406 (E.D. Pa. 1976) (certifying class of injured cruise passengers; court noted that it viewed the case as "the exception which proves the rule that generally mass accidents are not the basis of a class action"); *Petition of Gabel*, 350 F. Supp. 624, 630–31 (C.D. Cal. 1972) (certifying class of representatives of passengers killed in air crash); *Mehl v. Canadian Pac. Ry.*, 227 F.R.D. 505, 521–22 (D.N.D. 2005) (certifying (b)(3) class of victims of train derailment and release of anhydrous ammonia gases).

[6] *See, e.g.*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Matter of Rhone-Poulenc*, 51 F.3d 1293, 1300–1303 (7th Cir. 1995); *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996); *Zinser v.*

federal maritime law. *See* Order and Reasons (Doc. 4159) (filed 09/30/11), at 5 (so holding).  By contrast, many of the mass tort cases rejecting class certification involved serious predominance problems stemming from the fact that the laws of all 50 states and the District of Columbia were applicable.  But even if state law were applicable here, only five states' laws would be relevant: Louisiana, Alabama, Mississippi, Texas, and Florida.  Applying the laws of five jurisdictions is a far cry from applying the laws of fifty-one jurisdictions. See *Principles of the Law of Aggregate Litigation* (ALI 2010) § 2.05(b)(3), Cmt. b (noting that § 2.05(b)(3) "recognizes that different states' laws can form manageable clusters or groupings, even when they are not entirely uniform," and that "[c]ommon issues may exist within the respective clusters so as to make aggregate treatment permissible").[7]

49.  In rendering an opinion on predominance, I have given careful consideration to Fifth Circuit jurisprudence.  I believe that a finding of predominance is fully consistent with that jurisprudence.  One case that appears superficially to be in tension with certification here is *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006).  The case involved a fire at an Exxon Mobil chemical plant, causing a smoke plume to spread to surrounding areas.  A class action was filed, seeking damages for personal injuries, emotional distress, and economic harm. The scope of the class encompassed anyone in East Baton Rouge or West Baton Rouge claiming harm from the fire.  The district court denied class certification on several grounds, including a lack of predominance, and the Fifth Circuit affirmed. *Steering Committee*, however, differs in crucial respects from the instant case.  First, in *Steering Committee*, the Fifth Circuit was reviewing the lower court's decision to deny class certification under an abuse of discretion standard. *See id.* at 601, 603.  Just because the Fifth Circuit affirmed the lower court's denial of certification does not mean that the lower court would have abused its discretion had it granted certification. *Cf. Watson v. Shell Oil Co.*, 979 F. 2d 1014, 1022–23 (5th Cir. 1992) ("There can

---

*Accufix Research Institute, Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 70–71 (S.D.N.Y. 2002).

[7] *See also, e.g., In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 315 (3d Cir. 1998) (rejecting an argument that predominance was defeated where the class claims were subject to the laws of all fifty states; the court found that the "elements of [the] common law claims are substantially similar and any differences fall into a limited number of predictable patterns"); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997) ("state law does not have to be universal in order to justify nationwide class certification"); *cf. Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (when assessing predominance, "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"), *cert denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

24

be no serious contention that the district court abused its discretion in determining that [the common] issues predominate for the purpose of class certification.")   Second, in *Steering Committee* the district court found that individual issues would consume the trial.   In the instant case, by contrast, the individual claims against BP can be resolved relatively easily once the common issues are adjudicated.   Third, *Steering Committee* involved claims alleging "emotional and other intangible injuries," which "implicate[d] the subjective differences of each plaintiff's circumstances." *Id.* at 602.   *Accord*, *e.g.*, *Ancar v. Murphy Oil, U.S.A., Inc.*, 2008 U.S. Dist. LEXIS 68490, at *27 n.12 (E.D.La. July 25, 2008) (predominance not met in a case involving similar facts to *Steering Committee*, where plaintiffs' claims were primarily for "mental distress and intangible injuries").   Again, this is a far cry from the discrete physical injuries at issue in this case.[8]   Even in *Steering Committee*, the Fifth Circuit acknowledged the possibility of class certification in an appropriate mass accident case. *Id.* at 603 (citing *Watson*, 979 F.2d at 1022–23 (affirming class certification of claims arising from refinery explosion)).

50.   In sum, it is my opinion that common issues predominate over individual ones, and thus the predominance requirement of Rule 23(b)(3) is satisfied.

## 2. Superiority

51.   Superiority under Rule 23(b)(3) is met when a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).   Here, in my opinion, the class action device is the superior vehicle for resolving the claims.   In addressing superiority, I first address the overarching question of whether a class action is superior to other methods of resolving the claims in this case.   I then address the precise factors set out in Rule 23(b)(3)(A)–(D) that courts should weigh in evaluating superiority.

### a. Superiority of Class Adjudication Over Other Mechanisms

52.   In considering alternatives to a class action, this Court need not analyze the issue in the abstract.   Rather, the Court can take note of an actual mechanism used to compensate claimants injured by the oil spill, namely, the GCCF.   In my view, a comparison between the GCCF and the class action device underscores the superiority of the proposed class settlement.   Indeed, the

---

[8] The Economic and Property Damages class is also distinguishable from *Steering Committee*, as I explain in my Economic/Property Damages Report.

GCCF did not even compensate for physical injuries, except in a small number of cases.

53. Initially, I should note that the GCCF process—overseen by respected mediator Kenneth Feinberg (who had previously overseen the 9/11 Victims Compensation Fund)—was impressive in a number of ways.  For one thing, the GCCF, which was created in the immediate aftermath of an unprecedented environmental catastrophe, "was among the largest claims processing facilities in U.S. history."  Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings & Observations to the U.S. Dept. of Justice (BDO Consulting, June 15, 2012), *available at* http://www.justice.gov/iso/opa/resources/66520126611210351178.pdf  (last  visited  July  30, 2012), at 56.  Despite facing momentous challenges and public criticism, the GCCF paid out a total of over $6.2 billion to over 220,000 individual and business claimants during the one-and-a-half-years of the program's existence. *Id.* at 59; *see also* George Talbot, *Ken Feinberg: 'The GCCF  did  what  it  said  it  would  do'*,  Apr.  21,  2012,  http://blog.al.com/live/2012/04/ ken_feinberg_the_gccf_did_what.html (last visited Aug. 5, 2012) (interview with Mr. Feinberg in which Feinberg describes the GCCF as "a very speedy, efficient way to get money out, in light of an unprecedented environmental disaster").  These are impressive numbers, and they reflect favorably on the diligence and creativity of Mr. Feinberg and his team.

54. Nonetheless, despite some success, the GCCF was also subject to criticism.  First, some argued—and this Court in essence agreed—that the GCCF suffered from a lack of independence from BP.  As this Court held in its Order and Reasons dated Feb. 2, 2011, "[w]hile BP may have delegated to Mr. Feinberg and the GCCF independence in the evaluation and payment of individual claims, many other facts support a finding that the GCCF and Mr. Feinberg are not completely 'neutral' or independent from BP." 2011 U.S. Dist. LEXIS 10497, at *15 (E.D.La. Feb. 2, 2011); *see also*, *e.g.*, George W. Conk, *Diving into the Wreck: BP and Kenneth Feinberg's Gulf Coast Gambit*, 17 Roger Williams U.L. Rev. 137, 143 (2012) (asserting that "the GCCF has failed to garner the credibility as a neutral forum that BP sought").  Second, critics also expressed concern about a lack of transparency. *See*, *e.g.*, Linda S. Mullenix, *Prometheus Unbound: The Gulf Coast Claims Facility as a Means for Resolving Mass Tort Claims—A Fund Too Far*, 71 La. L. Rev. 819, 847 (2011) (noting that "[t]he ad hoc nature of the BP claims processing efforts inspired numerous complaints about the lack of standards . . . in claim processing" (footnote omitted)); Conk, *supra*, at 140 (observing that "because the GCCF is

private and unregulated its criteria and performance are difficult to gauge and it remains un-monitored"); John Schwartz, *Final Settlement Phase Starts for BP Oil Spill*, N.Y. Times, Nov. 24, 2010, at A16, *available at* http://www.nytimes.com/2010/11/24/us/24fund.html (last visited July 29, 2012) (reporting that Kenneth Feinberg himself "said it was a 'fair criticism' that the claims process had been opaque, and he pledged to improve the information available").  Third, the lack of transparency led to the impression—whether correct or not—that similarly-situated people were not being treated the same. *See*, *e.g.*, Mullenix, *supra*, at 847 (noting "numerous complaints about . . . inconsistency in claim processing"); *cf.* Independent Evaluation of the Gulf Coast Claims Facility, Executive Summary at 10 (Apr. 19, 2012) (noting that a "variety of factors . . . contributed to different outcomes for claimants that may appear to have been similarly situated").  It is certainly true that some of the criteria changed over time. *See*, *e.g.*, GCCF, Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology (to be filed by plaintiffs with their brief on or before August 13, 2012).  Finally, it is my understanding that the GCCF gave virtually no awards to claimants seeking damages for personal injuries.  Thus, absent a new mechanism for resolving claims, those individuals seeking recovery for physical injuries would have been out of luck.

55.  Whether the concerns expressed about the GCCF were accurate or exaggerated, they created a perception regarding independence, transparency, and consistency that was not helpful to the program.  Thus, even if the GCCF had been receptive to physical injury claims, these other concerns about the GCCF made it an inferior mechanism for resolving claims.  The class action device, by contrast, enables class counsel, with this Court's supervision, to address the concerns expressed by the GCCF's critics.  First, whereas Mr. Feinberg was criticized for a perceived lack of neutrality, there is no question that the Court and Judge Shushan, who mediated key aspects of the settlement, are neutral and objective, giving the settlement a high degree of integrity and legitimacy.  Second, the instant settlement is very transparent: The criteria for compensation are set forth objectively and with great precision, meaning that there should be few disputes about who is and who is not entitled to compensation and in what amount.  Third, the precise, and clearly spelled out, settlement terms ensure that the criteria will remain the same over time and will be consistent among similarly-situated claimants.

56. Just as the GCCF process was not superior to a class action, I do not believe that a non-

class aggregate settlement model would be superior.  At first blush, given that the claims here involve personal injuries, one might have thought to look to non-class aggregate mechanisms to resolve the claims.  In the *Vioxx* litigation, for example, defendant pharmaceutical company Merck and various plaintiffs' counsel agreed to a $4.85 billion non-class settlement to resolve approximately 50,000 claims of personal injury allegedly caused by defendant's since-recalled painkiller. *See* Settlement Agreement Between Merck & Co., Inc. and the Counsel Listed on the Signature Pages Hereto (Nov. 9, 2007), *available at* www.merck.com/newsroom/ vioxx/pdf/Settlement_Agreement.pdf (last visited July 30, 2012); Alex Berenson, *Merck Agrees to Settle Vioxx Suits for $4.85 Billion*, N.Y. Times, Nov. 9, 2007, *available at* http://www.nytimes.com/2007/11/09/business/09merck.html (last visited July 30, 2012).   In certain respects, *Vioxx* represented a triumph—an innovative aggregate settlement in which the plaintiffs' attorneys managed to overcome the trend against certification of personal injury mass torts by structuring a settlement entirely outside of the constraints of Rule 23.  There is much to praise about that historic settlement.

57.   At the same time, the *Vioxx* settlement has generated controversy.  Because *Vioxx* was not suitable for class certification, and because it was, therefore, an opt-in settlement, the parties needed to create a mechanism to ensure that the vast majority of claimants participated in the settlement.  As two respected scholars have explained, the settlement in that case contained two terms designed to achieve that purpose:

> First, under the terms of the agreement, for a lawyer to participate in the deal— that is, for any of the lawyer's clients to avail themselves of the settlement offer— the lawyer was required to recommend the settlement to all of the lawyer's eligible clients.  Second, if any clients decided not to participate in the settlement, the lawyer was required to withdraw from representing the nonsettling clients.  A client wishing to decline the settlement, in other words, faced the prospect of losing her lawyer and finding that every other lawyer handling Vioxx claims was similarly unavailable.

Howard M. Erichson & Benjamin C. Zipursky, *Consent Versus Closure*, 96 Cornell L. Rev. 265, 266 (2010).  According to Erichson and Zipursky, the *Vioxx* approach violated the principle that the decision to settle belongs to the client and not the lawyer.  "A lawyer who tells the client, 'Settle or you're fired!' is hardly abiding by the client's decision." *Id.* at 283.  *See also* Elizabeth Chamblee Burch, *Group Consensus, Individual Consent*, 79 Geo. Wash. L. Rev. 506, 514 (2011)

(comparing *Vioxx* settlement proposal to one famously made by The Godfather's Don Corleone—"I'll make him an offer he can't refuse" (citation omitted)).

58.   Regardless of the merits of the *Vioxx* settlement under the circumstances of that litigation, I believe that a similar approach here would be ill-advised.   A Rule 23(b)(3) class action provides a time-tested and procedurally superior vehicle by which to resolve the myriad claims involved in this case.   It is a vehicle with built-in mechanisms that ensure fairness in the aggregation decision, in the terms of a settlement, and in the award of attorneys' fees.   The requirements in *Vioxx*, *i.e.*, that the plaintiffs' lawyers recommend the settlement to all their clients, and that the lawyers withdraw from representing any non-settling clients, are controversial.   Yet, the lawyers apparently felt that such provisions were needed to hold the settlement together.   A class action avoids these approaches, as this case demonstrates.   The individual PSC attorneys were not required to agree, in accepting their appointment, that they would necessarily recommend any settlement endorsed by a majority of PSC members.   In addition, class members have full disclosure regarding the terms of the settlement, and are free to opt out or object.   Those whose injuries are serious, for example, can opt out and sue on their own.   But should they choose not to opt out, they are bound even though they have not affirmatively opted into the settlement.   The binding effect of a class action serves the goal that *Vioxx* was trying to achieve without the mechanism of Rule 23.   In my mind, the class action opt-out process is preferable in the instant case to the approach used in *Vioxx*.   Significantly, some of the PSC attorneys here were involved in *Vioxx*.   Yet these attorneys all argue here for a class action, not for a replica of the *Vioxx* approach.

59.   One other problem with aggregating cases utilizing a non-class-action approach is that there are no prescribed criteria for the mass settlement of claims on a non-class basis.   Courts in cases such as *Vioxx* have analogized such cases to class actions, calling them quasi-class actions. *See*, *e.g.*, *In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 554 (E.D. La. 2010) ("the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness") (citation omitted); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) (court reviewed reasonableness of fees because private settlement "has many of the characteristics of a class action and may properly by characterized as a quasi-class

action subject to general equitable powers of the court" (citations and internal quotation marks omitted)); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (to the same effect). Yet, there is no procedural rule governing quasi-class actions. A court that oversees a mass settlement that does not fall under Rule 23 is forced to make up the rules of the game instead of relying on the time-tested criteria of Rule 23.

60. At bottom, then, this settlement is preferable to a non-class aggregate settlement for the simple reason that this settlement will be subjected to the rigorous requirements of Rule 23. A non-class aggregate settlement, no matter how effective and well-intended the judicial oversight, lacks the well-defined structural protections of Rule 23. Judge Scirica of the Third Circuit spoke to this point in his concurring opinion in that court's recent decision in *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) (en banc), *cert denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012). As Judge Scirica noted:

> [S]ome observers believe there has been a shift in mass personal injury claims to aggregate non-class settlements. This is significant, for outside the federal rules governing class actions, there is no prescribed independent review of the structural and substantive fairness of a settlement including evaluation of attorneys' fees, potential conflicts of interest, and counsel's allocation of settlement funds among class members.

*Id.* at 334 (Scirica, J., concurring) (citations omitted).

61. Likewise, individual lawsuits are neither a feasible nor a sensible alternative to a class action in this case. As noted above, the individual claims are, in general, too small to justify the enormous expense of bringing an individual lawsuit. Thus, as a practical matter, limiting claimants to individual lawsuits would mean that the claims would not be pursued at all. As the Supreme Court explained in *Amchem*, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." 521 U.S. at 617 (citation omitted); *see also*, *e.g.*, *Castano v. American Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (existence of a negative value suit is "[t]he most compelling rationale for finding superiority in a class action"). But even if these cases were worth bringing individually, the prospect of more than 100,000 lawsuits clogging the court system is hardly superior to Rule 23.

62. Because the GCCF approach, the non-class aggregate settlement approach, and the

individual lawsuit approach are problematic, I would urge the Court to approve the use of the class action mechanism.  In my opinion, a class action settlement is a conservative, time-tested approach, and the superior vehicle for adjudicating the claims in this case.

### b. Superiority Criteria

63.  Apart from the broad inquiry as to whether a class action is superior to other mechanisms for resolving the litigation, Rule 23(b)(3) instructs a court to look at four criteria in assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).  As noted in ¶ 13, *supra*, factor (D) is inapplicable because this is a settlement class.  Regarding factor (A), class members have little interest in controlling their own cases because, as noted, the cost of bringing suit is so high that the claims could be cost prohibitive.  And even if a case were financially viable as an individual suit, a claimant would be forced to find and hire an attorney and agree up front to pay costs and a hefty percentage of any recovery to that attorney.  Here, common attorneys' fees and costs are paid separately by BP. And even those claimants who hired separate counsel are limited to a 25% contingency fee. *See* Order Setting Caps on Individual Attorneys' Fees (Doc. 6684) (filed 06/15/12), at 1 n.1 (ordering that contingent fee arrangements for attorneys representing plaintiffs settling claims through the medical and/or economic damages settlements be capped at 25% plus reasonable costs).  Factor (B) is likewise consistent with the class settlement: The claims arising out of the oil spill have been centralized in this Court by the Multi-District Litigation Panel, so there is no risk of competing litigation (except perhaps by some opt-out plaintiffs).  Regarding factor (C), the MDL Panel has already determined—correctly, in my view—that the cases should be concentrated in one forum for pretrial purposes.  It similarly makes sense for one court to oversee an overall settlement.  Thus, the criteria of Rule 23(b)(3)(A)–(C) confirm the superiority of the class action

mechanism.

## C. Conclusion on Class Certification

64.   In sum, it is my opinion that the proposed medical benefits settlement satisfies all of the requirements for certification of a settlement class.

## VI.  FAIRNESS OF PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT

65.   Next, I address the fairness of the proposed settlement under Rule 23(e).  "To safeguard the interests of absent class members, district courts must determine whether proposed class-action settlements are fair, adequate, and reasonable." *Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 639 (5th Cir. 2012) (citation omitted); *see* Fed. R. Civ. P. 23(e)(2) (a court may approve a settlement "only after a hearing and on finding that it is fair, reasonable, and adequate").  The Fifth Circuit evaluates the fairness of a proposed class settlement with reference to the six factors set forth in *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).  I analyze the *Reed* factors in ¶¶ 72–89, *infra*.  Based on the facts of this case, however, I believe it is appropriate to begin the fairness assessment by looking at the substantial benefits that the proposed settlement provides to class members.

66.   In *Katrina Canal Breaches Litig. v. Bd. of Comm'rs*, 628 F.3d 185 (5th Cir. 2010), the district court had certified a class and approved the settlement after finding that all six *Reed* factors weighed in favor of approval. *See id.* at 195.  The Fifth Circuit, however, "[w]ithout quarreling with the district court's findings" on the *Reed* factors, concluded that the settlement was not "adequate, fair, and reasonable under Rule 23(e)" because the record failed to show "that the settlement [would] benefit the class in any way[.]" *Id.*  By parity of reasoning (and consistent with common sense), a settlement that provides significant, demonstrable benefits to class members is far more likely to be fair than one with questionable benefits. *See*, *e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("In determining the fairness, adequacy and reasonableness of the proposed compromise, the inquiry should focus upon the terms of the settlement.")  For that reason, before addressing the *Reed* factors, I discuss the overall benefits to the class.

32

**A. Benefits to the Class**

67.  This proposed class action settlement is a far cry from many class action settlements, in which class members recover for only a fraction of their harm.  Here, class members receive significant benefits:

- Qualifying class members are compensated for specified physical conditions in lump sum amounts set forth in the Specified Physical Conditions matrix.  In addition to lump sum payments, the matrix provides for specified hospital expenses.  Compensation levels vary, based on specified factual circumstances.  For instance, Clean-Up Workers are compensated in higher amounts than Zone A and Zone B residents; those with chronic conditions receive higher payments than those with acute conditions; and lump sums vary depending on the quality and reliability of proof.  All of these variations are spelled out in detail in the matrix.  Moreover, class counsel advise me that, based on their research (particularly of Louisiana law), the amounts that medical benefits class members recover under the settlement are comparable to what they would receive after a successful trial. *See, e.g.*, *Doerr v. Mobil Oil Corp.*, 935 So.2d 231 (La. Ct. App. 2006) (awarding lump sum damages ranging from $500 to $2,000 for personal injury, emotional distress, and inconvenience caused by a discharge of oil, grease, and other contaminants into Parish drinking water supply); *Howard v. Union Carbide Corp.*, 50 So.3d 1251 (La. 2010) (awarding general damages from $1,500 to $3,500 class members who suffered "any or all of the following—eyes, nose, or throat irritation, coughing, choking or gagging or nausea" as a result of a chemical spill).

- Qualifying class members are entitled to participate in a Periodic Medical Consultation Program that will operate for 21 years.  Specifically, all class members who do not opt out are entitled to participate in the Program.  The Program entitles class members to an initial medical examination and one every three years thereafter for a total of 21 years.  The examinations include a complete medical, occupational, and environmental history, vision screening, and specified blood, urine, cardiac, and respiratory tests (at the discretion of the physician).  Service providers will be established in close proximity to class members.  The purpose of the Program is to provide medical evaluation for conditions relating to oil or petroleum-based dispersants that manifest themselves after

the cutoffs for the conditions on the matrix and for conditions prevalent in the general population.

- A "Back-End Litigation Option" permits class members to mediate or sue if certain physical conditions manifest in the future.  Thus, class members need not worry that, by releasing claims against BP, they are somehow releasing claims for future injuries.  Under this option, the settlement provides that major elements of liability will be stipulated to by BP, and thus need not be proven by class members.  In particular, class members who choose this option will not have to prove that BP was at fault for the spill or that the class member was exposed to petroleum and/or petroleum-based dispersants.  Medical Agreement at 67.  In addition, BP is precluded in any Back-End Litigation from asserting any defense based on preemption, statute of limitations or repose, laches, or other defenses based on failure to assert the claim in a timely manner, provided that the class member follows the requirements for the Back-End Litigation Option (*e.g.*, notifying BP of a later-manifested injury within the time period prescribed by the agreement). *Id.* at 56, 64.  Thus, the only issues to be litigated are the fact of diagnosis; the amount and location of oil released from the Macondo Well and/or the Deepwater Horizon; the class member's level and duration of exposure to petroleum or petroleum-based dispersants; whether the later condition was caused by the exposure (or by some other alternate cause); and the amount of compensatory damages.  *Id.* at 65–66.  This feature of the medical benefits settlement allows the class members to resolve their claims for existing conditions now, while still retaining the right to litigate if more serious injuries manifest themselves down the road.

- A "Gulf Region Health Outreach Program" is established.  The outreach program is designed to strengthen healthcare infrastructure in Louisiana, Mississippi, Alabama, and the Florida Panhandle.  The five-year grants under the program total $105 million: $50 million to improve access to healthcare, $36 million for behavioral and mental health needs, $4 million to train community health workers, and $15 million to improve environmental health expertise. Medical Agreement at 70–71.  Part of the program includes the creation and maintenance (for 21 years) of a public online electronic library containing health and environmental materials relating to the BP spill and its

aftermath. *Id.* at 80–85.

- In addition to the above-discussed benefits, BP has also agreed to pay all costs of administration, and of providing notice to the class members.  These undertakings are notable because, in most other settlements, costs are deducted from the class recovery.  The costs here, moreover, are enormous: I am advised by class counsel that they have incurred close to $30 million in common benefit costs as of the date of this report, and are expected to incur substantial additional costs.  BP is incurring administrative costs of about $50 million per month. *See* MDL No. 2179 Sections 5.12.1.4—Required Monthly Administrative Expense Report (July 23, 2012), Ex. A.  The fact that none of these costs will be deducted from the class recovery is a substantial benefit to the class members, one that distinguishes this case from virtually all other class actions and individual lawsuits, in which the claimant is responsible for paying costs.

- BP is also paying common benefit attorneys' fees separately from the medical benefits class recovery, representing another significant benefit for the class.

- The settlement preserves and assigns to the class BP's punitive damages claims against Transocean and Halliburton. *See* Order 6419 at 8.

68.   Class members who conclude that they can do better on their own are free to opt out. Because of the extensive notice campaign, which includes individual mailings and a mass media campaign, class members will in fact learn about the settlement.  They will be able to decide whether they would prefer to opt out and litigate separately.  Indeed, because most of the medical benefits claims are likely to be for relatively modest amounts, and because class members are likely to receive actual notice of the proposed settlement, the opt-out provided under Rule 23(b)(3) is a realistic and potentially viable option for a medical benefits class member who has suffered serious injuries.  The availability of opt-out rights afforded by this Rule 23(b)(3) class is another factor favoring settlement approval. *See*, *e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (rejecting challenge to certification of settlement class where "the notice provided to the absent class members provided each member with the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery"); *In re Prudential Ins. Co. America Sales Litigation*, 148 F.3d 283, 323 (3d Cir. 1998)

("whether class or subclass members are accorded the right to opt out of the settlement" should be considered where appropriate when evaluating settlement's fairness). Importantly, if a class member has regrets about opting out, the agreement permits him or her to opt back in as a matter of right prior to November 5, 2012, and the person may do so with BP's permission even after November 5, 2012.

69. The *Katrina* case, which overturned a class settlement, is at the other end of the spectrum. As noted in ¶ 66, *supra*, in that case, the Fifth Circuit found that the settlement approved by the district court was so deficient, in terms of the benefit to the class, that it failed Rule 23(e), even assuming that the *Reed* factors were satisfied. 628 F.3d at 189. The settlement at issue in *Katrina* provided $21 million for class relief. As the Fifth Circuit pointed out, however, the settlement also provided that both administrative costs and attorneys' fees would be paid from the class fund, and there was no indication in the record as to what these costs would be. The appellate court held that "the district court erred by approving the settlement without any assurance that attorneys' costs and administrative costs will not cannibalize the entire $21 million settlement." *Id.* at 196. The court noted that the burden is on the proponents of a settlement to show that it is fair, reasonable, and adequate, and that the settlement's proponents had "failed to provide any basis for their assertion that there will be money remaining after payment of these costs to effect even a *cy pres* distribution, let alone a monetary distribution." *Id.*

70. Another recent case similar to *Katrina* is *Dennis v. Kellogg*, ___ F.3d ___, 2012 U.S. App. LEXIS 14385 (9th Cir. July 13, 2012). There, the Ninth Circuit reversed a district court's certification of a settlement class because the benefits to the class were, in that court's words, "unacceptably vague." *Id.* at *19. The plaintiffs in *Dennis* alleged false advertising claims against the defendant cereal company. The parties negotiated a settlement prior to the class being certified, which included *cy pres* distributions of money and food to unnamed charities, as well as $2 million in attorneys' fees. Class members would recover, at most, $15 each. *Id.* at *2. Like the Fifth Circuit in *Katrina*, the Ninth Circuit was troubled by the lack of proof that the settlement would benefit the class members, describing the settlement as "result[ing] in vaporous benefit to the class members" and being "flawed at its core." *Id.* at *23–24. Because the appellate court could not determine the value of the settlement fund, it held that the district court erred in approving it. *Id.* at *19–20.

36

71.   The common theme of *Katrina* and *Dennis* is that, while the factors in *Reed* (or other circuits' analogous decisions) are important, they are ultimately only a means to an end— determining whether the proposed settlement comports with basic requirements of fairness.  If a settlement is deficient on its face, or unsupported by adequate proof that it will benefit the class, the *Reed* factors become academic.  The instant settlement, however, is a polar opposite of the settlements in *Katrina* and *Dennis*.  The settlement here provides substantial benefits to the class members.

### B. The "*Reed* Factors"

72.  I now address the six *Reed* factors.  Those factors are:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

703 F.2d at 172 (citations omitted).  These six factors are premised on the assumption that the settlement is a compromise and that the class attorneys are being paid out of the common fund. Because neither assumption is true here, analysis of these factors strongly underscores the fairness of the settlement in this case.  I address each *Reed* factor in turn.

### 1. Existence of Fraud or Collusion

73.  The first *Reed* factor is "the existence of fraud or collusion behind the settlement." *Reed*, 703 F.2d at 172.  "Because the parties' interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings." *Braud v. Transp. Serv. Co.*, 2010 U.S. Dist. LEXIS 93433, at *9 (E.D.La. Aug. 17, 2010) (citation omitted).  At the same time, "[a] strong presumption exists in favor of settlement if the district court determines that the settlement resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 844 (E.D.La. 2007) (citation omitted).

74.  In my review of this proposed settlement, I have seen nothing to suggest that the settlement is the result of collusion.  Rather, it is the result of hard-fought, arm's-length

negotiations between experienced counsel.  Prior to the settlement, class counsel litigated this case forcefully, cutting no corners.  In just under two years that have passed since this litigation was centralized before this Court pursuant to the MDL statute, 28 U.S.C. § 1407, the parties have taken over 300 hundred depositions, exchanged over 80 expert reports, produced about 90 million pages of documents, and engaged in extensive discovery and motion practice. *See* Order 6419 at 3.  The settlement discussions themselves were protracted, time consuming, and contentious.  They began in February 2011, with the medical settlement negotiations starting individually in July 2011, when the parties met almost daily.  Furthermore, Judge Shushan mediated key aspects of the medical settlement.  There were more than 120 day-long meetings, as well as myriad phone calls and web-based conferences. *See* Tr. of Prelim. Approval Hr'g, 4/25/12 (Doc. 6395), at 84.

75.   The hands-on involvement of Magistrate Judge Shushan provides powerful assurance that the proposed settlement is free from any taint of collusiveness.  *See*, *e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("the supervision of settlement negotiations by a magistrate judge . . . makes it less likely" that class counsel "promot[ed] their own interests over those of the class"); *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 725 (E.D.La. 2008) (fact that the parties had engaged in mediation with a magistrate judge demonstrated a lack of collusion behind settlement); *Ridgely v. FEMA*, 2010 U.S. Dist. LEXIS 136368, at *3 (E.D.La. Dec. 13, 2010) (same); *McBean v. New York*, 233 F.R.D. 377, 383 (S.D.N.Y. 2007) (supervision of settlement negotiations by magistrate judge "goes a long way toward assuring that the process was free of collusion or undue pressure") (citation and internal quotation marks omitted).

76.   Still another consideration is that the medical benefits settlement was negotiated separately from the economic and property damages settlement, and a different group of PSC attorneys led the negotiation. *See* ¶ 34, *supra*.  This structure assured vigorous advocacy by the particular PSC attorneys, who focused on obtaining the best deal for their category of claims.

77.   Ultimately, any theory of collusion must be based on a wholly implausible interpretation of the facts.  The Sixth Circuit recently made a similar point in a case in which the parties reached settlement following years of litigation and "months of supervised negotiations, two facilitated mediations and a settlement conference with the court." *Moulton v. US Steel Corp.*,

581 F.3d 344, 351 (6th Cir. 2009).  Rejecting an argument that the settlement was tainted by collusion, the Sixth Circuit wrote:

> It is difficult to maintain that Class Counsel took all of these steps merely to mask its collusion with [defendant], and that the one entity with a bird's eye view of the proceedings—the district court judge—somehow missed the signs that the parties were merely engaged in pretense and posturing.

*Id.* at 351.

78.   Finally, the fact that attorneys' fees and costs were not negotiated until after the settlement was in place—and that fees will be paid separately by BP and not out of the settlement fund—provides further assurance that no collusion took place.  As the court noted in *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D.La. 2007), the fact that fees would be paid separate from the class recovery, and that the fee amount was left to the court's discretion, is "significant because it exponentially decreases the possibility of collusion among counsel." *Id.* at 845. *See also*, *e.g.*, *McBean v. New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2007) (finding that where attorneys' fees are "entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").  Moreover, class counsel advises me that the negotiations over fees were hard-fought and contentious.  (A declaration from PSC attorney Joe Rice detailing the fee negotiations will be filed with plaintiffs' brief.)

79.   In sum, there is nothing to indicate that the proposed settlement agreement is the result of fraud or collusion.

### 2. Complexity, Expense, and Likely Duration of the Litigation

80.   The second *Reed* factor is "the complexity, expense, and likely duration of the litigation." *Id.* at 172.  Essentially, the more complex, expensive, and time-consuming litigation is likely to be, the greater the gains to all parties from a negotiated settlement.

81.   As this Court knows, the instant case is exceedingly complicated—factually, legally, and logistically.  Already, this Court has issued numerous opinions on a dazzling array of complex legal matters, including questions of whether and to what extent plaintiffs' state law claims are displaced by federal maritime common law, *see* Order and Reasons (Doc. 4159) (filed 09/30/11);

whether the plaintiffs are entitled to medical monitoring damages, *id.* at 15–18; whether the Deepwater Horizon was a "vessel in navigation" at the time of the disaster, *see* Order and Reasons (Doc. 3830) (filed 08/26/11) at 4–7; and whether BP must defend and indemnify Transocean for pollution claims asserted by third parties, *see* Order and Reasons (Doc. 5446) (filed 01/26/12). This Court's docket for this case now contains over 7,000 entries. PACER Docket History, 2:10-md-02179-CJB-SS (as of 07/30/12). And there is little doubt that, were the litigation to continue, BP's able counsel would continue to mount a vigorous defense. Plaintiffs might well still prevail in such circumstances, but only at great cost in time and money. Also, the savings in terms of judicial resources from this settlement stand to be substantial.

82. It follows, then, that in the absence of a settlement, this case could continue for many years. And with added years of litigation comes increased expense, not to mention the indefinite postponement of the class members' compensation.

83. The *Exxon Valdez* litigation provides a vivid illustration of the significant disadvantages that can accompany the parties' refusal or inability to reach a settlement. That case, like this one, arose from a massive oil spill that had devastating effects on the surrounding communities. The oil spill of the Exxon Valdez tanker took place in Alaska's Prince William Sound in 1989. Approximately 40,000 class members filed suit against Exxon, and in 1994 a jury awarded the class $287 million in compensatory damages and $5 billion in punitive damages. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 480–81 (2008). Because of multiple appeals, however, the case continued for another 14 years before reaching the Supreme Court. By the time the Court issued its 2008 opinion in *Exxon Shipping*, what might have once seemed like a spectacular plaintiffs' victory had been eroded by scores of appeals, multiple reductions of the punitive damages award and, perhaps most of all, by the *two decades* that had elapsed between the Exxon Valdez oil spill and the Supreme Court's decision. Indeed, it is critical to note that, even after two decades of litigation, few claimants with medical claims were compensated. The case focused almost entirely on economic damages. Absent a settlement, the thousands of class members here could face a similar prospect: protracted litigation with no certainty that there would ever be any compensation for physical injury claims.

### 3. Stage of the Proceedings and Amount of Discovery Completed

84.   The third *Reed* factor is "the stage of the proceedings and the amount of discovery completed." *Id.* at 172.  Here, there is no doubt that there has been extensive discovery—as noted previously, the parties took about 300 depositions, reviewed millions of pages of documents, and submitted more than 80 expert reports.  *See* Order 6419 at 3.  One might argue that, given the complicated and massive claims at issue, two years of litigation was not long enough to fully understand the claims and reach an informed view on what constitutes a fair settlement.  In fact, given the substantial discovery, both sides had extensive knowledge and could negotiate effectively and with eyes wide open.  Indeed, this proposed settlement was finalized on the very eve of the scheduled limitation of liability trial. *See id.* at 4.

85.   In any event, while it is true that some major cases have taken much longer than two years to settle, the parties' ability to reach a comprehensive settlement in just two years is a testament to the highly skilled work of the PSC under the supervision of Magistrate Judge Shushan and this Court.  It is not a negative factor in my view.  Indeed, the Court's carefully planned phased trial plan clearly put considerable pressure on the parties, and they settled just prior to the commencement of the first trial phase. *See* Order 6419 at 3.  In her concurring opinion in *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003), Judge Graber made precisely the point I am making here when she disputed the majority's suspicion about the promptness of the settlement at issue:

> Early dispute resolution is salutary, and we should not encourage the unnecessary expense, delay, and uncertainty caused by lengthy litigation when the parties are prepared to compromise.  Nor should we hold . . . that a prompt settlement necessarily suggests a failure to prosecute or defend the action with due diligence and reasonable prudence.  To the contrary, an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of the strengths and weaknesses of their positions and of the interests to be served by an amicable end to the case.

*Id.* at 959 (Graber, J., concurring) (citation omitted). *See also* ALI Principles of Aggregate Litigation § 3.05 cmt. a (recommending that "[a] court, in reviewing a settlement, should not give any predetermined weight either to the fact that the case was pending for a substantial period of time before a settlement was reached or to the fact that a settlement was reached early in the case"); Reporters' Notes to § 3.05 at 211 ("This Section agrees with the approach of Judge Graber.")

### 4. Probability of Plaintiffs' Success on the Merits

86.   The fourth *Reed* factor is "the probability of plaintiffs' success on the merits." *Id.* at 172. Although it cannot be disputed that the case against BP is strong, especially in light of BP's responsibility for the oil spill under the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*, I can attest—based on 20 plus years of trial and appellate experience—that no case is a slam dunk.  As one of the *Exxon Valdez* attorneys wrote in an op-ed piece in the *Washington Post*, "no matter how outrageously spillers behave in court, trials are always risky . . . . Historically, U.S. courts have favored oil spillers over those they hurt." Brian O'Neill, *Lessons for the Gulf from Exxon Valdez, Washington Post*, May 17, 2010.  Here, BP—represented by skilled and creative counsel—would no doubt raise numerous arguments to eliminate or reduce its liability.  For instance, were trials for the individual claims to be held years from now, BP might assert that class members cannot prove that they suffered physical conditions or it might claim that the conditions were *de minimis* and not worthy of compensation.  And BP might assert technical legal arguments for dismissing or narrowing the claims, or tie up the cases on appeal with disputes about whether state law should apply.

### 5. Range of Possible Recovery

87.   The fifth *Reed* factor is "the range of possible recovery" by the class. *Id.* at 172.  Of course, in the absence of a settlement, BP would no doubt try to secure outright dismissal of the case, which would mean zero recovery.  Alternatively, as noted above, BP would assert that class members' exposure to the oil was *de minimis* and that their alleged illnesses were not caused by the oil and/or chemical dispersants.  At the other end of the spectrum, class members could secure full compensation for their injuries (and in some circumstances punitive damages).  As noted above, however, this settlement replicates what class members might recover after a successful trial.  Indeed, it is more attractive because BP is paying attorneys' fees and costs separately.

### 6. Opinions of Class Counsel, Class Representatives, and Absent Class Members

88.   The sixth and final *Reed* factor is "the opinions of the class counsel, class representatives, and absent class members." *Id.* at 172.  Here, all of the members of the PSC support the settlement.   This unanimity is significant because these experienced lawyers

represent a cross-section of injured class members.  Under these circumstances, the opinions of counsel are entitled to weight.  *See*, *e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (in performing the "balancing task" of reviewing a class settlement, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties") (citation omitted).  Moreover, all of the class representatives support the settlement.  Perhaps of even greater importance, the settlement has the imprimatur of Magistrate Judge Shushan, who oversaw the negotiation of key terms.

89.  I am not yet able to comment on the exact number of objections, because the deadline for filing objections is August 31, 2012.  I can certainly say, however, that thus far, relatively few objections have been filed for a class with approximately 200,000 members.

### C. Conclusion on Fairness, Adequacy, and Reasonableness of the Proposed Settlement

90.  For all of the aforementioned reasons, I believe that the Proposed Class Settlement is fair, reasonable, and adequate.  I am highly impressed by the significant compensatory damages available to class members, the periodic medical consultation program, the Back-End Litigation Option, the Gulf Region Health Outreach Program, and the fact that class members do not have to pay costs and common fund attorneys' fees.  These factors combine to make this one of the fairest and most impressive settlements I have seen in more than 20 years of practicing, teaching, and writing in the field of class actions.

## VII.  ATTORNEYS' FEES[*]

### A. Overview

91.  It is my understanding that plaintiffs' counsel are not applying for fees or costs at the present time.  Nonetheless, they have asked me to comment on the general structure of the fee agreement they reached with BP on April 18, 2012, following the parties' agreement on the other settlement terms.  The fee agreement was made a part of the settlement agreement at issue here.

---

[*] Because the attorneys' fee agreement applies both to this case and to the economic and property damages class settlement, the discussion in this section essentially duplicates the attorneys' fee discussion in Section VII of my economic and property damages report.  It is included herein simply for the Court's convenience.  If the Court has already reviewed Section VII of my economic and property damages report, it need not read Section VII of the instant report.

(Doc. 6273-21, Ex. 19).   In this section, I begin by explaining why I believe the Court should address the proposed fee structure now, rather than waiting until the end of the settlement's implementation or until counsel file an interim fee request.   Following that, I describe the key provisions of the proposed fee structure.   Next, I review the so-called *Johnson* factors in the context of the instant agreement.

### 1. Desirability of Addressing Fee Structure Now

92.   If it is the case that class counsel do not make a Fed. R. Civ. P. 23(h) fee request at this time, I still believe that it makes good sense for the Court to address the fee structure now.   The parties would benefit by obtaining the Court's assessment of the attorneys' fees agreement.   That assessment will guide class counsel when they later file their fee application.   The fee agreement is part of the settlement package before the Court, so there would be no surprise if the Court chose to opine on it.   Indeed, some of the objections filed thus far have addressed the fee agreement.   This Court has already found it appropriate to consider individual attorneys' fees in advance of the final fairness hearing.   *See* Order Setting Caps on Individual Attorneys' Fees (Doc. 6684) (filed 06/15/12), at 1 n.1 (ordering that contingent fee arrangements for attorneys representing plaintiffs settling claims through the medical and/or economic damages settlements be capped at 25% plus reasonable costs).

93.   The wisdom of seeking the Court's approval of the fee structure on fees at this stage is reflected in the *ALI Aggregate Litigation* project, for which I served as an Associate Reporter.   In chapter three of the ALI project, for which I had primary drafting responsibility, the following black-letter principle appears:

> In appropriate cases, the court should consider defining the expected fee recovery as a percentage set early in the litigation rather than after the fact.   When courts do so, they may, where appropriate, adjust the fees in exceptional cases where settlement is reached very early in the litigation or the level of recovery is extraordinary.

*ALI Aggregate Litigation* § 3.13(d) at 249 (ALI 2010).   *Accord* Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809, 1836 (2000) (observing that "trial judges in Texas have begun to set fee guidelines at the time of certification").   Accordingly, in the next section, I review the potential range of fee percentages

under the terms of the proposed fee agreement.

## 2. Range of Percentages Under the Agreement

94. The April 18, 2012 agreement provides for a maximum common benefit fees and costs award of $600 million upon final judgment. *See* Settlement Ex. 19 (Doc. 6276-46).[9] Because class counsel have already spent about $30 million in costs, the maximum possible fees would be $570 million, assuming class counsel request the maximum amount available under the agreement with BP. (Pursuant to the agreement, BP has already made a $75 million non-refundable payment into the common benefit fee and costs fund.)

95. This settlement (including both economic and property damages and medical benefits) is valued by BP at about $7.8 billion. This figure is not a mere guess, divorced from the facts. Rather, it is the number that, according to BP's annual report, represents the company's "reliable best estimate of the cost of the proposed settlement." BP Annual Report and Form 20-F (2011) at 163 (cautioning, however, that "it is possible that the actual cost could be higher or lower than this estimate depending on the outcomes of the court-supervised claims processes"), *available at* http://www.bp.com/assets/bp_internet/globalbp/globalbp_uk_english/set_branch/STAGING/common_assets/bpin2011/downloads/BP_Annual_Report_and_Form_20F_2011.pdf (last visited Aug. 5, 2012). For purposes of my analysis, I assume (1) that this estimate is correct, and (2) that it includes the attorneys' fees, expenses, and other administrative costs paid by BP. Plaintiffs' counsel have advised me that they have already incurred common benefit expenses of almost $30 million and that they expect to incur substantial additional expenses. Thus, the actual fees would be no greater than $570 million ($600 million less $30 million in expenses). Taking the $570 million in fees and dividing by the $7.8 billion settlement value results in an award of 7.3%.

96. If, contrary to my assumption, the $7.8 billion estimate did not include attorneys' fees and costs, then my analysis *understates* the value of the settlement. This is because "fees and costs are properly included in the settlement valuation," even where the fees are paid directly to the attorneys rather than deducted from the class recovery. *In re Heartland Payment Sys.*, 2012

---

[9] The $600 million also covers fees and costs for the separate economic and property damages class settlement, *see* Exhibit 27 to Economic and Property Damages Agreement (Doc. 6273-21) (filed 04/18/12), which I address in a separate report.

U.S. Dist. LEXIS 37326, at *111 (S.D. Tex. Mar. 20, 2012); *see also*, *e.g.*, *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("The award to the class and the agreement on attorney fees represent a package deal. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery") (citation omitted); *Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 364 (D.D.C. 2007) ("because the attorneys' fees are borne by defendants and not plaintiffs, they represent a valuable part of the settlement") (citation omitted).  If the $600 million in fees and expenses is paid separately, that amount should be added to the $7.8 billion.  I also understand that BP itself is spending $50 million per month in expenses; as an estimate, therefore, it will incur expenses of about $600 million over a 12-month period (the actual time period, of course, could be longer or shorter). *See* MDL No. 2179 Sections 5.12.1.4—Required Monthly Administrative Expense Report (July 23, 2012), Ex. A.  If these figures are added to the $7.8 billion value, the total would be $9 billion.  Under that scenario, the requested fees would come to 6.3% ($570 million / $9 billion).  For purposes of my analysis, however, I will use the $7.8 billion amount.

97.  Of course, the actual benefit to the class could be higher or lower than $7.8 billion.  It could be higher because the settlement is not capped (except for seafood compensation), and claims submitted and paid could exceed BP's expectations.  Alternatively, the benefit to the class could be lower because claims submitted and paid could be lower than BP's expectations.  In order to account for those possible outcomes, it is helpful to look at the probable range of percentage awards under the proposed fee structure.  To that end, I examine the operation of the fee structure at the lower and upper bounds of the settlement's value.

98.  At the low end, it is certainly possible that the actual benefits will be less than $7.8 billion.  At the same time, we already know that guaranteed payments will be substantial.  They include the $2.3 billion Seafood Compensation Program, the $57 million Gulf Coast publicity campaign, the $105 million Gulf Coast Health Outreach Program, and a $5 million fund for supplemental publicity (to be designed and administered by the PSC).  In addition, it is certain that the total benefits will exceed the guaranteed benefits, since I am advised that numerous class members have already submitted claims.  Moreover, the benefit to the class will include costs and attorneys' fees paid by BP.  For all of these reasons, $5 billion ($2.8 billion below BP's estimate) is, in my opinion, a conservative estimate of the settlement's lowest value.  Under this

unlikely scenario—and assuming that plaintiffs' counsel requested the entire $570 million in fees—the fee percentage would be 11.4%.

99.  At the same time, as noted, it is also possible that BP has *underestimated* the value of the settlement.  To estimate the high end of potential fees, I will use $10.6 billion for the high-end settlement value ($2.8 billion above BP's estimate).  Even if the actual benefits to the class are $10.6 billion, fees are still capped at $570 million, meaning that under such circumstances the fee percentage would be about 5.3%.

100.  In sum, the maximum possible award is almost certainly no greater than 11.4%, the percentage based on benefits of $7.8 billion is 7.3%, and the possibility exists that fees could be 5.3% or lower.  Because I have no reason to second-guess BP's well-informed estimate of $7.8 billion, I believe that the most likely outcome is a fee percentage in the neighborhood of 7.3%.

**B. The "*Johnson* Factors"**

101.  Courts in the Fifth Circuit evaluate the reasonableness of attorneys' fees in common fund cases under the so-called "*Johnson* factors," first articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).  The twelve *Johnson* factors are: (1) the time and labor required to prosecute the case; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[10]  Even if plaintiffs' counsel do not submit, in advance of the November 8, 2012 hearing, a specific fee request pursuant to Fed. R. Civ. P. 23(h), these factors are instructive in the Court's review of the April 18, 2012 Agreement's overall fee structure.  I discuss the *Johnson* factors below.

---

[10] Courts have made clear that not every factor need be given the same weight. *See, e.g.*, *Cobb v. Miller*, 818 F.2d 1227, 1232 (5th Cir. 1987) (refusing to reverse fee award, although district court did not analyze every *Johnson* factor, where the "district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation"); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1135 (W.D.La. 1997) (noting that, although "the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered").

### 1. Time and Labor Involved to Prosecute Case

102.   Class counsel advises me that they have thus far invested over 384,000 hours in this case.  Much more work remains to be done before the settlement will be completed.  Plaintiffs' counsel have told me that total hours invested could exceed 800,000.[11]   While the hours are impressive, I believe this Court should give only limited weight to them in setting the fee.  In particular, I do not believe that the Court should use the hours expended by class counsel to calculate fees under a lodestar model.  I believe the central focus should be on the value obtained for the class, not on the precise number of hours devoted to the case by class counsel.

103.   Objector Selmer Salvesen claims that the Court should do a lodestar cross-check and argues that plaintiffs' counsel will need to work two million hours to be entitled to a common benefit fee of $600 million. Plaintiff's Memo. in Support of Motion to Vacate Prelim. Approval Order (Doc. 6831-1) (filed 07/02/12), at 14.  If counsel did not spend more than 800,000 hours, Salvesen's approach would yield a fee percentage of at most about 3.1%, assuming benefit to the class of $7.8 billion.   But whatever the final number of hours turns out to be, the Court's assessment should be based, first and foremost, on the extraordinary results achieved for the class.

104.   Courts and commentators have discussed the myriad deficiencies with the lodestar method.[12]   For instance, a Third Circuit Task Force established to evaluate the lodestar method noted that the lodestar (1) "increases the workload of an already overtaxed judicial system," (2) "creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law," (3) is "subject to manipulation by judges," (4) "creates a disincentive for the early settlement of cases," and (5) "does not provide the district court with enough flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered." Report of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 246–

---

[11] To be clear, I have not reviewed any attorney time records from this litigation in preparing this report.  Nor have I attempted to assess or verify any such records for reasonableness or accuracy, as one might do in the context of a lodestar calculation.  Indeed, as I explain in this section, the time-consuming and difficult nature of undertaking such a review is among the reasons that the lodestar approach has fallen out of favor in common fund class settlements.

[12] *See, e.g.*, Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809 (2000); John Bronsteen, *Class Action Settlements: An Opt-In Proposal*, 2005 U. Ill. L. Rev. 903, 911 n.54.

49 (1985).  Courts in Louisiana have also noted significant flaws with the lodestar method. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 650 (E.D. La. 2010); *In re Educ. Testing Serv. Praxis Principle*, 477 F. Supp. 2d 612, 628 (E.D. La. 2006); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D.La. 1997).

105.    By contrast, courts and commentators have identified several advantages of the percentage approach.  Most importantly, the percentage approach is a simple calculation for the court to perform:  it "does not bog the court down in the review of the minutiae of the plaintiffs' attorneys' bills."  Report on Contingent Fees in Class Action Litigation: January 11, 2006: Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, 25 Rev. Litig. 459, 469 (2006).  In addition, a percentage approach ensures a direct correlation between the success of the lawsuit and the attorneys' fee award. *See, e.g.*, *Gaskill v. Gordon,* 942 F. Supp. 382, 386 (N.D. Ill. 1996) (holding that percentage-of-the-fund approach would be utilized to encourage lawyers to make prudent economic decisions during course of representation).  And, unlike the lodestar approach, which creates an incentive for attorneys to bill as many hours as possible, even to the detriment of their clients and to judicial efficiency, the percentage method "provides more predictability to attorneys and class members, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 860 (E.D.La. 2007).  Finally, the percentage fee is an accepted part of the legal system, as a result of its use as the standard method of payment in personal injury litigation. *See, e.g.*, *McKinnie v. JP Morgan Chase Bank*, 678 F. Supp. 2d 806, 815 (E.D. Wis. 2009) (percentage method "most closely replicates the market for the legal services provided").

106.   I also do not believe that the Court needs to conduct a lodestar cross-check before it opines on the fee agreement.  Although some courts have found it appropriate to perform a lodestar cross-check to validate a percentage award, others have determined that even a cross-check is unnecessary (or worse).  For example, in *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011), the court found that a lodestar cross-check was not only unnecessary, but perhaps "difficult and misleading" where it was clear that counsel would likely "spend tens of thousands of hours administering [the] settlement." *Id.* at 1040. *See also*, *e.g.*, *Will v. Gen. Dynamics Corp.*, 2010 U.S. Dist. LEXIS 123349, at *3 (S.D.

49

Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."); *In re Eunice Train Derailment*, 2005 U.S. Dist. LEXIS 46237, at *33 (W.D.La. Mar. 29, 2005) (awarding 40% of common fund in fees; court did not perform a lodestar cross-check, noting that lodestar "has been described as cumbersome and difficult") (citation omitted); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Award*, 7 J. Empirical Legal Stud. 811, 833 (2010) (noting that "district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded" in just 49% (218 of 444) of cases "where district courts used the percentage method with or without a lodestar cross-check and the fee percentages were ascertainable"). *Cf. Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 644 (5th Cir. 2012) (endorsing the use of "the percentage method with a meticulous *Johnson* analysis"). Especially where, as here, the fees will be paid separately by BP and not taken out of the class members' recovery, I see no need for a lodestar cross-check. *Cf. In re Prudential Sales Practices Litig.*, 106 F. Supp. 2d 721, 732 (D.N.J. 2000) (observing, in class settlement where attorneys' fees were to be paid by defendant separate from the class recovery, that "[i]f the Court were to reduce Class Counsel's fee, that would not confer a greater benefit on the class, but instead would benefit only" the defendant).[13]  Rather, given that counsel have plainly put in a lot of time and effort and will continue to do so, this Court should focus its primary attention on the benefit to the class. *See* Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 250 (2010) (concluding that "the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class").

107.  In any event, Salvesen's assumption that two million hours would be necessary to justify fees in the $570 million to $600 million range is based on a fatal flaw: It assumes no risk multiplier.  Under a lodestar analysis, a court "scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly

---

[13] Of course, some class members have signed fee agreements with counsel and may be obligated to pay up to 25% of their recovery in fees. *See* Order Setting Caps on Individual Attorneys' Fees (Doc. 6684) (filed 06/15/12) (capping contingent fee agreements in this case between attorneys and individual clients at 25% on the rationale that the common benefit work by the PSC helped "create tremendous economies of scale for the lawyers who would otherwise be responsible for preparing thousands of individual cases for trial." *Id.* at 3 (quoting *In re Vioxx Products Liability Litig.*, 650 F. Supp. 2d 549, 560 (E.D.La. 2010)).

rate." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (citation omitted). "Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Id.* (citation omitted). In particular, in many of the largest class settlements in which a lodestar was used, courts have approved a generous lodestar in recognition of the value attained by the settlement at issue. For example, in *Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), which involved a $7.2 billion settlement, the court approved a lodestar multiplier of 5.2 percent. *See id.* at 803. Salvesen's argument is also flawed because it is based on an hourly rate of only $300. In the *Enron* case, by contrast, the court used a blended hourly rate of $456.

108.   As explained above, counsel have already put 384,000 hours into this case. *See* ¶ 102 n.11. Assuming they do not put in another hour, which is obviously an absurd proposition, and assuming the average hourly rate of $456 used in *Enron*, the lodestar amount would be $175,104,000, resulting in a lodestar multiplier (with fees of $570 million) of 3.26, far below the multiplier of 5.2 approved in *Enron*. 586 F. Supp. 2d at 803; *see also, e.g., In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1999) (lodestar multiplier of 3.97 in $1.027 billion settlement); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (multiplier of 4 in $6.133 billion settlement); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007) (multiplier of 5.9 in $600 million settlement). If counsel end up putting in 800,000 hours, the lodestar would be $364,800,000, resulting in a lodestar multiplier of 1.56, which is dramatically below the multiplier in *Enron* and far below the 3%–4.5% multipliers that are "common" in the largest class settlements (over $1 billion, known as super-mega-fund cases, *see* ¶ 123, *infra*). *In re NASDAQ*, *supra*, at 489 (citation and internal quotation marks omitted). Thus, the lodestar multiplier range here (1.56–3.26) only corroborates the reasonableness of the attorneys' fees structure. Indeed, even using the $300 per hour rate proposed by Salvesen, a lodestar cross-check would raise no concerns. Assuming 384,000 total hours, the lodestar would be $115.2 million and the multiplier would be 4.95. Were class counsel to invest 800,000 hours, the lodestar would be $240 million and the multiplier would be 2.37. Because all of these ranges support fees of $570 million, the Court need not await the final

total of hours, and need not conduct a lodestar cross-check before giving its blessing to the fee agreement.

### 2. Novelty and Difficulty of Questions Involved

109.  This case arises from the largest oil spill in world history.  It raises myriad legal and factual questions of first impression under the Oil Pollution Act, maritime law, and the Outer Continental Shelf Lands Act.  The wide variety of economic, property, and personal injuries involved has necessitated participation by scientists, economists, medical doctors, and numerous other experts.  One need only look at the settlement agreements themselves—one involving economic and property damages (totaling 114 pages plus hundreds of pages of exhibits) and the other involving medical benefits (totaling 190 pages plus more than a hundred pages of exhibits)—to gauge the novelty and complexity of the claims. *See also* ¶¶ 80–83, *supra* (discussion of second *Reed* factor, "complexity, expense, and likely duration of the case"). Given the large number of claimants, the wide variety of claims, and the highly complicated factual and legal issues, this settlement is truly historic.

### 3. Skill Required to Perform Services

110.  The skill required to litigate and settle a case of this magnitude is enormous.  Thus, it is not surprising that this Court, in selecting members of the PSC, chose some of the most capable and prominent plaintiff lawyers in the United States.  These lawyers needed to become versed in multiple sources of law, science, economics, and medicine.  They needed strong advocacy and negotiating skills, and the ability to manage complicated, high-profile litigation.  The lawyers chosen possess all of those talents.

### 4. Preclusion of Other Work

111.  I am advised that the PSC attorneys have been heavily occupied with this case for about two years.  With the possibility of multi-phase trial proceedings lasting for many years, these attorneys had to watch carefully what they took on in addition to this litigation.  Because the cases are putative class actions, these attorneys could not simply walk away.  When they agreed to serve on the PSC, they undertook a commitment to press the claims, potentially for decades (if *Exxon Valdez* was any guide).  Moreover, I am advised by class counsel that a number of the

PSC attorneys temporarily relocated to New Orleans specifically to handle this case.  Clearly, for those lawyers who live and practice elsewhere, such a move would have made it especially difficult for them to take on additional work as long as this case remained active.

### 5. The Customary Fee

112.  The proposed fee in this case fares especially well in comparison to the customary fee that a plaintiff would likely agree to if he or she retained counsel to bring an individual lawsuit. "Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases." *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006) (citations omitted); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlement and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 830 (2010) (noting that class settlement fee "percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33 percent"); *cf. In re Bayou Sorrel Class Action*, 2006 WL 3230771, at *2 (W.D.La. Oct. 31, 2006) (awarding 36% of $28 million common fund environmental class action; court noted that "40% fees have been awarded in similar cases by Louisiana District Courts").  This factor favors approval of the attorneys' fees agreement because the fee percentage in this case—even at the high end (11.4%)—is significantly lower than the typical 33% contingency fee.  (Of course, some of the class members will pay up to 25% based on their own contingent fee agreements (*see* ¶ 106 n.13), but their recovery under the settlement will not be reduced by common fund fees because BP will pay those fees separately.)[14]

### 6. Whether the Fee is Fixed or Contingent

113.  The PSC attorneys took these cases on a contingent fee basis.  To my knowledge, they are not receiving any hourly payments.  For common benefit work, which amounts to virtually all of the time and money they have expended, they are relying entirely on fees awarded by the Court.  Under this arrangement, the lawyers took a substantial risk.  While advancing millions of dollars in costs and devoting hundreds of thousands of hours of time, the lawyers had no assurance that, at the end of the day, they would recover anything, even their out-of-pocket costs.

---

[14] As I discuss below, the common fund range here (5.3%–11.4%) also compares favorably with fees in other large class action settlements. *See* ¶¶ 127–133.

On the other hand, this is a somewhat unusual case of a prosperous corporate defendant that wanted to resolve these claims quickly to mitigate the negative publicity caused by the spill.  On balance, this factor favors approval of the settlement, but not as heavily as in some cases.

### 7. Time Limitations Posed by the Client or the Circumstances

114.  Given the history of the protracted *Exxon Valdez* case, and the dire circumstances faced by class members in this high profile case, class counsel were under enormous pressure to obtain compensation for the victims right away.  President Obama was personally involved in the designation of Kenneth Feinberg to initially run the GCCF.  Moreover, Section 2705(a) of the Oil Pollution Act calls for interim payments, thus clearly recognizing that the money needs to get to the victims immediately.  As one commentator explained the situation:

> [W]ith any environmental disaster, time is of the essence.  With each passing month, reports of Gulf fishermen filing for bankruptcy, marina owners shuttering their doors, and cleanup efforts stalling for lack of funds continue to surface.

Drew Cohen*, Resuscitating Erin Brockovich After the BP Oil Spill: Carving Out an Exception to the Class Action Fairness Act for Environmental Disaster Suits*, Journal of Energy & Environmental Law 73 (Winter 2011).

### 8. Amount Involved and Results Obtained

115.  As described above and in my report on the economic and property damages class settlement, this settlement provides enormous benefits to the class. *See* ¶¶ 67–68, *supra*.  As noted, BP estimates that the economic value of this settlement is about $7.8 billion, which would make this the largest class action settlement in history.  It is difficult to envision a better outcome for the class, even if class counsel had instead taken the case to trial and been fully successful.

### 9. Experience, Reputation, and Ability of Attorneys

116.  As noted earlier, the PSC attorneys are some of the most experienced and renowned plaintiff lawyers in the United States. They have been involved in some of the largest class actions and other aggregate matters in history.  Throughout this litigation the attorneys have displayed exceptional skill.

### 10. The "Undesirability" of the Case

117.   Because of the massive damage caused by the oil spill, and the possibility of huge payoffs, this case was understandably attractive to many plaintiffs' attorneys.  Indeed, this Court is well aware that competition among attorneys vying to be appointed to the PSC was intense.  On the other hand, with the experience of *Exxon Valdez*, the case also raised the specter of years of litigation, and the prospect of advancing of many millions of dollars in costs, without any certainty of recovery.   Moreover, plaintiffs' counsel faced the prospect that BP would be vigorously defended by a law firm with a strong reputation for fighting hard and leaving no stone unturned.  On balance, this factor does not weigh heavily in this case.

### 11. Nature of the Professional Relationship with the Client

118.   Although I understand that some PSC members had prior relationships with some of the class representatives, for the most part these attorneys and clients did not have prior dealings.  Accordingly, this factor is of little relevance here.

### 12. Awards in Similar Cases

119.   As I explain in detail below, the possible range of percentages under the fee agreement is demonstrably low when reviewed based on empirical studies of fee awards in class actions generally.  *See* ¶¶ 120–126, *infra*.   Moreover, the proposed fee percentage is comparatively modest even when compared to other awards in the largest class settlements to date.  *See* ¶¶ 127–133, *infra*.   To be sure, this type of comparison is an imperfect method for ascertaining the proper fee award in this case, since each case has its own set of characteristics relevant to the fee inquiry. *See, e.g., Newby v. Enron Corp.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (noting, in reviewing this *Johnson* factor, that "there are no other 'similar' cases when one examines all the circumstances of the litigation"); *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) ("There are no reported cases similar to this one.") (citations omitted).   All the same, it is useful to examine fee awards in other cases.

### (A) Empirical Studies

120.   Numerous courts have looked to empirical studies for guidance.[15]   The most current,

---

[15] *See, e.g., In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 653–54 (E.D. La. 2010); *In re Educ. Testing Svc. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 628–29 (E.D. La. 2006); *In*

and in my view the most complete, study was conducted by Professor Brian Fitzpatrick of Vanderbilt University Law School in 2010. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlement and Their Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010).  Fitzpatrick attempted to collect all federal class action settlements approved between 2006 and 2007, in both published and unpublished decisions.   Based on his research, Fitzpatrick discovered and analyzed 688 settlements. *Id.* at 813.

121.   Looking at all 688 cases, Fitzpatrick found that fee awards in the cases using a percentage approach ranged from 3% to 47%, with a median of 25% and a mean of 25.4%. Fitzpatrick also analyzed the data on a federal circuit-by-circuit basis.  For the U.S. Court of Appeals for the Fifth Circuit, the median award in percentage cases was 29.0%, and the mean was 26.4%. *Id.* at 23, 24, 27, 29, 30.

122.   Another important study was conducted by Professors Eisenberg and Miller in 2004, and later updated to include cases through 2008. *See* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004) [hereinafter "Eisenberg & Miller"]; and Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) [hereinafter "Eisenberg & Miller II"].  Courts often cite Eisenberg and Miller in cases considering class action attorneys' fees.[16]  Eisenberg & Miller II reviewed 689 class action settlements in a 16-year period (1993–2008).  The resulting mean and median fees awarded by district courts were, respectively, 24% and 25% of the settlement nationally and 24% and 23% in the Fifth Circuit. *Id.* at 260.  Eisenberg and Miller found that the "overwhelmingly important determinant of the fee [was] simply the size of the recovery obtained by the class." *Id.* at 250.

123.   Many courts and commentators use the term "mega-fund" to refer to settlements of $100 million or more.  Relatedly, recent cases have used the term "super-mega-fund" to describe the category of settlements valued at $1 billion or more. *See, e.g., In re Diet Drugs Prods. Liab.*

*re OCA, Inc. Secs. & Derivative Litig.*, 2009 WL 512081, at *20 (E.D. La. Mar. 2, 2009); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 864 n.30 (E.D. La. 2007).

[16] *See, e.g., In re Puerto Rican Cabotage Antitrust Litigation*, 815 F. Supp. 2d 448, 461 (D.P.R. 2011); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D.La. 2010); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 862–64 (E.D.La. 2007).

*Litig.*, 552 F. Supp. 2d 442, 478 (E.D.Pa. 2008) (describing "super-mega-fund" cases as those "with valuations larger than one billion dollars"); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 266 (D.N.H. 2007) (same).

124.    Prior to the Fitzpatrick study, commentators had concluded that attorneys' fees percentages were, in general, smaller in "mega-fund" cases.[17]  Put another way, as the amount of the settlement fund increased, the percentage going to the lawyers decreased.  Fitzpatrick's empirical results, as detailed in the following chart, support that view.  Significantly, however, even in the largest cases, fee percentages were in the 18%–19% range, well above the likely maximum amount here of 11.4%.

### FITZPATRICK (2010 STUDY)

| **Range of Class Recovery** (in millions) | **Mean** Attorneys' Fee Award (as a percentage of total recovery) | **Median** Attorneys' Fee Award (as a percentage of total recovery) |
|---|---|---|
| $0 to $0.75 | 28.8% | 29.6% |
| $0.75 to $1.75 | 28.7% | 30.0% |
| $1.75 to $2.85 | 29.5% | 29.3% |
| $2.85 to $4.45 | 26.0% | 27.5% |
| $4.45 to $7 | 27.4% | 29.7% |
| $7 to $10 | 26.4% | 28.0% |
| $10 to $15.2 | 24.8% | 25.0% |
| $15.2 to $30 | 24.4% | 25.0% |
| $30 to $72.5 | 22.3% | 24.9% |
| $72.5 to $6,600 | 18.4% | 19.0% |

---

[17] Eisenberg & Miller, *supra* ¶ 122, at 8; Eisenberg & Miller II, *supra* ¶ 122, at 265; Theodore Eisenberg, Geoffrey Miller & Michael A. Perino, *A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after* Goldberger v. Integrated Resources, Inc., 29 Wash. U. J.L. & Pol'y 5, 14–24 (2009); Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*, *available at* http://ssrn.com/abstract=870577 (last visited Aug. 9, 2012).

125.   Concededly, the upper band of settlements in the Fitzpatrick chart above groups all settlements of $72.5 million or more in the same category, which means that group includes mega-fund cases, super-mega-fund cases, and cases in the $72.5 million to $100 million range. This grouping does, however, have the advantage of allowing for a larger sample of cases. Settlements in excess of $1 billion, by contrast, comprise a much smaller group.

126.   Courts have, in large part, rejected a rule that would require a fee percentage to be capped at some arbitrary low figure in mega- or super-mega-fund cases. *See, e.g.*, *Newby v. Enron Corp.*, 586 F. Supp. 2d 732, 753 (S.D. Tex. 2008) (noting that appellate courts that have examined a "megafund rule requiring a fee percentage to be capped at a low figure when the recovery is quite high . . . have rejected it as a blanket rule") (citations omitted); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund. Put simply, the declining percentage concept does not trump the fact-intensive . . . analysis."); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212–13 (S.D. Fla. 2006) (citing cases); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, 2005 WL 1213926, *9–10 (E.D.Pa. May 19, 2005).  At the same time, courts have acknowledged that, in general, as settlement amounts increase, fee awards tend to decline in terms of a percentage. *See, e.g.*, *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 267 (D.N.H. 2007) ("objectors' contention that super mega-fund cases warrant lower [percentage] awards than smaller cases . . . may well be true as a general matter") (citation omitted); *cf. In re Prudential Sales Practices Litig.*, 106 F. Supp. 2d 721, 731 (D.N.J. 2000) (although "percentage fee awards generally decrease as the amount of the recovery increases, there is no automatic correlation") (citation and internal quotation marks omitted).

**(B) Comparison of This Case to Other Large Settlements**

127.   In *Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), which involved the largest settlement up to this case ($7.227 billion), the court reviewed a list of high-value settlements and their respective percentage fee awards, as well as more detailed information about the circumstances of each. *See id.* at 776–78.  The court found that "a number of quite variable factors" were relevant to the reasonableness of fees, "not merely the actual amount of

the fee or the percentage of the settlement fund it constitutes . . . ." *Id.* at 777.

128.   Ultimately, the determination of whether requested fees are reasonable is as much qualitative as it is quantitative.  That is, while looking to other cases is helpful insofar as it gives a good sense of the outer limits, the proper award here depends on this Court's assessment of the circumstances of *this* case.  And, as I explain below, the circumstances surrounding this case strongly suggest the proposed fee structure is a reasonable one.

129.   In comparing the instant case to a list of the largest reported settlements to date, one thing is initially striking—this settlement is larger in dollar amount than any of them.  At $7.8 billion, this class settlement is more than half a billion dollars greater than the *Enron* securities settlement, which (according to my research) currently tops the list. *See Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($7.227 billion).  In *Enron*, the court awarded fees of 9.52%.  Including *Enron*, the ten largest reported private aggregate settlements are:

### TEN LARGEST FEDERAL AGGREGATE PRIVATE SETTLEMENTS

| Case | Settlement Value | Fee Percentage | Fee Amount |
|---|---|---|---|
| *Newby v. Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7.227 billion | 9.52% | $688,010,000 |
| *In re Diet Drugs*, 553 F. Supp. 2d 442 (E.D.Pa. 2008) | $6.44 billion | 6.75% | $434,700,000 |
| *WorldCom, Inc. Securities Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 billion | 5.5% | $337,315,000 |
| *In re Vioxx Products Liability Litig.*, 760 F. Supp. 2d 640 (E.D.La. 2010) | $4.85 billion | 6.5% | $315,250,000 |
| *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) | $3.383 billion | 6.5% | $219,895,000 |
| *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) | $3.3 billion | 14.5% | $478,500,000 |
| *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003) | $3.186 billion | 1.73% | $55,117,800 |
| *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 U.S. Dist. LEXIS 78035 (S.D.N.Y. 2006) | $2.65 billion | 5.9% | $156,350,000 |
| *Shaw v. Toshiba*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $2.1 billion | 15% | $315,000,000 |
| *In re Prudential Sales Practices Litig.*, 106 F. Supp. 2d 721 (D.N.J. 2000) | $1.325 billion | 6.8% | $90,100,000 |

*See also*, *e.g.*, *In re Nortel Networks Corp. Secs. Litig.*, 2006 U.S. Dist. LEXIS 93390 (S.D.N.Y. 2006) ($1.14 billion; approximately 5%); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D.Md. 2006) ($1.1 billion; 11.88%); *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) ($1.075 billion; 33.33%); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ($1.07 billion; 14%); *In re Sulzer Hip Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) ($1.045 billion; 4.8%); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) (approximately $1 billion; 20%).

130.    Looking at sheer numbers, the list of the largest settlements is not especially illuminating with respect to fees.  The fee awards range from 1.73% to 33.33%, an exceptionally wide range.  The percentage awarded in the largest of the settlements (*Enron*) is 9.52%.

131.    To be sure, this list of cases does show that awards in cases involving large settlements tend, in general, to be lower in percentage terms than awards in smaller cases—the conclusion reached by all of the empirical studies that have examined the question.  Beyond that, however, the list does not shed a great deal of light on the proper award in this case.  As found by Fitzpatrick, for class actions overall in the Fifth Circuit, the median and mean awards were 29% and 26.4%, respectively. *See* ¶ 121, *supra*.  Under no circumstances can the fee awards here be even close to those amounts.  As I explained in ¶ 98, *supra*, the highest award (realistically) is 11.4%, which falls comfortably at the low end of the range in super-mega-fund cases.

132.    Looking beyond the dollar figures, this settlement compares favorably to its peers in a number of respects.

- ***Benefit to the Class***.  Perhaps the most exceptional feature of this settlement is not its sheer size, but rather the fact that class members can expect to recover full compensation for their injuries.  This sort of recovery is virtually unprecedented, and is not a feature in *any* of the super-mega fund cases cited above, with the exception of *AT&T*, in which the award was 20% of the proceeds available to the class.  For example, in *Enron*, the settlement was very large ($7.227 billion), but, as that court noted, the losses suffered by the class members were estimated to be much higher.  As

such, the *Enron* settlement, impressive as it was, ultimately recovered only a fraction (8.39%) of the decline in market capitalization resulting from the fraud alleged in that case. 586 F. Supp. 2d at 775.   Yet the court in *Enron* approved fees of 9.52%. Moreover, *Enron* itself noted that in *WorldCom*, the $6.133 billion settlement amounted to a mere 2.9% recovery in the decline of market capitalization. *See id.* at 775.   The court in *WorldCom* awarded 5.5% in fees.   In the *Vioxx* non-class aggregate settlement, users of Merck's painkiller Vioxx received much less than they could have received if they had been successful at trial. *Compare*, *e.g.*, David Voreacos & Allen Johnson, *Merck Paid 3,468 Death Claims To Resolve Vioxx Suits*, http://www.bloomberg.com /news/2010-07-27/merck-paid-3-468-death-claims-to-resolve-vioxx-suits.html (July 27, 2010) (last visited Aug. 5, 2012) (average payment under *Vioxx* settlement for claimants who suffered heart attacks allegedly caused by the drug was $186,825), *with* Star-Ledger Wire Services, *Court dismisses Merck's appeal in Vioxx death*, http://www.nj.com/business/index.ssf/2009/09/court_dismisses_mercks_appeal.html (Sept. 30, 2009) (last visited Aug. 5., 2012) (New Jersey Supreme Court rejected Merck's appeal of $4.5 million jury award to heart attack victim).   Of course, Merck *won* a number of the individual trials and appeals, so going to trial was risky.

This same analysis could be done with almost all settlements, class or non-class. Almost by definition, settlement means compromise, and a plaintiff who settles will receive less than full compensation.   That is why this case is so unusual.   Here, class members can expect to be made whole by the settlement's compensatory benefits. Even in *litigation*, obtaining all of the relief to which a plaintiff is entitled is a challenge under the best of circumstances.   For example, in the *Vioxx* litigation, some plaintiffs who went to trial ended up with nothing.   But in the *settlement* context, full recovery is even less likely, because a settlement, by its very nature, usually means agreeing to accept less than full recovery in exchange for prompt and certain payment.   Here, class members receive both promptness and full recovery, making this a truly exceptional case.

- *Size of the Settlement*.   This estimated $7.8 billion settlement, if approved by the Court, would (according to my research) be the largest class settlement in history.   In

my mind, this is a monumental achievement, not one to be denigrated by a mechanical rule that the fee percentage should be low when the settlement is large.  Indeed, despite this achievement, the fee award under the proposed agreement is capped at $570 million ($600 million minus $30 million in costs to date), which is less than the $688 million in fees awarded in *Enron* (a case involving both a lower total settlement amount and a much lower percentage of losses recovered).

- *Unique Aspects of this Case*.  In a literal sense, of course, every case has "unique" features.  And certainly, cases in the super-mega-fund range are by definition unusual.  Yet even among this rarified group of cases, the instant settlement stands out as unique.  Most importantly, a large number of super-mega-fund settlements and other large settlements have been in securities cases.[18]  To be sure, securities fraud is a challenging and difficult area of the law, requiring great skill and effort.  Yet, the catastrophic oil spill created legal, factual, scientific, and economic issues that were even more complex than those in most other kinds of class actions.  And class counsel could not look to precedent to guide their strategy on most issues, because this case was truly unprecedented in magnitude and complexity.

133.   Based on the foregoing discussion, the anticipated award ($570 million based on a settlement worth $7.8 billion) is on the low end, even when examined in light of other mega-fund or super-mega-fund cases.  Of course, the percentage could be even lower if the value of the settlement turns out to be greater than $7.8 billion.  But even the high theoretical percentage (11.4%), which is very unlikely to occur, is well within the fee percentages in mega-fund and super-mega-fund cases.  These ranges are especially reasonable here, given the benefits to the class, the unique complications of this case, and the fact that fees are being paid separately by BP.

### C. Assessment Based on the *Johnson* Factors

134.   As shown above, the pertinent *Johnson* factors overwhelmingly support the proposed fee structure here.   The attorneys, all of whom have superb reputations and abilities, have

---

[18] Of the ten largest settlements, five are securities cases. *See Enron*, *WorldCom*, *Tyco*, *Cendant*, *AOL Time Warner*.

expended considerable time, and are expected to spend much more time, before the claims process is completed.  The questions involved are novel and difficult, requiring enormous skill and impeding the lawyers' ability to take on other work.  Even the highest theoretical fee percentage of 11.4% is much smaller than the customary 33% in private contingent-fee cases.  The fee here is contingent, meaning the lawyers took a risk that they might receive no award.  Because the case involved an environmental disaster, time was of the essence.  The results obtained, as explained throughout this report, are impressive.  And even the highest theoretical fee award of 11.4% is comfortably within the range of awards in super-mega-fund cases.

## VIII.  CONCLUSION

135.  This Court, Magistrate Judge Shushan, class counsel, and counsel for BP deserve high praise for producing this historic settlement, one that provides meaningful and substantial benefits to the class.  For the foregoing reasons, it is my opinion that this Court should certify the case as a Rule 23(b)(3) class, uphold the settlement as fair, reasonable, and adequate, and approve the attorneys' fee structure agreed to by class counsel and BP.

I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

_____
Robert H. Klonoff

August 13, 2012

# EXHIBIT A

### R É S U M É

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:  March 15, 1955
Place of Birth:  Portland, Oregon

## EDUCATION:

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

## WORK EXPERIENCE:

### Current Position:

Dean and Professor of Law, Lewis & Clark Law School (since July 1, 2007)

### Prior Positions:

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (from August 2003-June 2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, August 2003-June 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

WAI-2072762v1

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Member, United States Judicial Conference Advisory Committee on Civil Rules

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Fellow, American Bar Foundation

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

**MEMBERSHIPS**:

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

**PUBLICATIONS**:

**Books**:

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (forthcoming 2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012) (with teacher's manual)

Klonoff ( associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010)(along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials: Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials: Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000) (with teacher's manual; supplemented annually)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy: Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

## **Articles and Book Chapters:**

*The Decline of Class Actions,* 90 Wash. U. L. Rev. ____ (2012) (forthcoming)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. ____ (forthcoming 2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. ____ (2012) (forthcoming)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (fall 2010)

Book Review, *In the Public Interest,* 39 Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work: The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13 J. Internet Law 1 (2009)

*The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements,* 80 Tul. L. Rev. 1695 (co-author) (2006) (part of a symposium on class actions)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium,* 74 UMKC L. Rev. 433 (2006) (part of a symposium on class actions)

*The Adoption of a Class Action Rule: Some Issues for Mississippi to Consider,* 24 Miss. C. L. Rev. 261 (2005) (part of a symposium on class actions)

*Antitrust Class Actions: Chaos in the Courts,* 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy: An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review

137 (2006) (part of a collection of papers presented on April 1, 2005, at a competition class action symposium sponsored by the University of Western Ontario College of Law)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004) (part of a symposium on class actions)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women: Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy: A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts: The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies: Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes: Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Served as an expert witness in several class action cases

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT SPEAKING ENGAGEMENTS

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Lecturer on class actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta,  Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on class actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on class actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on class actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on class actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on antitrust class actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on class actions, Missouri CLE (Nov. 18, 2005)

Speaker on class actions, Practising Law Institute (July 29, 2005)

Speaker on class actions, Kansas CLE (June 23, 2005)

Speaker on class actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting lecturer on class actions, Peking University (May 30-June 3, 2005)

Speaker on oral argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on class actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at antitrust class action symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at class action symposium, Mississippi College of Law (February 18, 2005)

Speaker on class actions, Practising Law Institute (July 30, 2004)

Visiting lecturer on class actions, Peking University (June 2004)

Visiting lecturer on class actions, Tsinghua University (June 2004)

Speaker at class action symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on class actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on class actions, Practising Law Institute (July 31, 2003)

Speaker on class actions, Practising Law Institute (Aug. 5, 2002)

Speaker on class actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy" (1990-present) and advocacy before the U.S. Supreme Court (1988-present)

## OTHER LEGAL ACTIVITIES:

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Member, Advisory Committee, Lawyers' Campaign for Equal Justice (Portland, Oregon)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Organizer and coordinator of class action symposium edition for spring 2006 UMKC Law Review (contributing authors included prominent law professors, judges, and practitioners)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Helped to develop walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig<br>            "Deepwater Horizon" in the<br>            Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 |
| | SECTION:  J |
| This document relates to all actions. | HONORABLE CARL J. BARBIER |
| | MAGISTRATE JUDGE SHUSHAN |
| Plaisance et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc; BP<br>America Production Company; BP p.l.c.,<br><br>    Defendants | Civil Action No. 12-968<br><br>SECTION:  J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

DECLARATION OF SAMUEL ISSACHAROFF RELATING TO THE
PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT

SAMUEL ISSACHAROFF declares based on personal knowledge as follows:

PURPOSE OF DECLARATION

1.        As I will set forth below, I am a law professor at New York University

School of Law.  I submit this declaration in my capacity as counsel to the Plaintiffs'

Steering Committee and Interim Class Counsel.

1

2.      I have submitted a parallel declaration concerning the proposed settlement of the economic benefits class action.  I submit this declaration to address issues regarding the medical benefits settlement.

3.      I have been involved in this case since October of 2011, having been brought in to assist plaintiffs' counsel with legal and ethical issues surrounding the negotiations of this complex settlement.  While I have worked on other matters in the case, such as the successive mandamus petitions to the Fifth Circuit, my primary responsibility has been and continues to be the legal requirements for the proper negotiation of a complex settlement and how the settlement itself was structured.  I submit this Declaration to review this aspect of the proposed settlement.

## CREDENTIALS AND BACKGROUND

4.      I am the Reiss Professor of Constitutional Law at New York University School of Law, a faculty that I joined about six years ago.  Previously I was the Harold J. Medina Professor in Procedural Jurisprudence at Columbia Law School, where I was a member of the faculty from 1999 to 2005.  Before that I spent ten years as a professor of law at the University of Texas School of Law, where I held the Joseph D. Jamail Centennial Chair in Law.

5.      In my scholarship and teaching I specialize in complex litigation.  I have published many articles on various aspects of complex litigation, including matters such as class actions and attorneys' fees, which have been cited by numerous courts, including the United States Supreme Court.  I routinely teach and lecture on matters of

complex litigation in the United States and abroad.  One of my regular academic courses is complex litigation, which I teach with my NYU colleague Arthur Miller.

6.        I have also been involved as counsel, as an expert and as a consultant in a large number of complex cases, including dozens of class actions, on behalf of both plaintiffs and defendants. In addition, I have served as special master in a mass tort class action in the Eastern District of Texas.  I have testified before the Advisory Committee on the Rules of Practice and Procedure of The Judicial Conference of the United States and the Third Circuit Task Force on the Selection of Class Counsel regarding proposed amendments to the federal class action rule and other matters pertaining to the selection and compensation of class counsel.  I served as Reporter for the Project on Aggregate Litigation of the American Law Institute, which unanimously approved its proposed final report three years ago.  This work was published in 2010 as Principles of the Law of Aggregate Litigation.   I have provided a copy of my curriculum vitae as an attachment to this submission.

## INVOLVEMENT IN THE CASE

7.        I began working on this case in late October of 2011.  I was brought into the case when plaintiffs' counsel determined that there was a realistic possibility that a global settlement could be realized in this matter.  I was contacted initially by Elizabeth Cabraser and then subsequently by Calvin Fayard and Joe Rice.  I was told that Fayard and Rice were members of the court-appointed PSC and had been directed to undertake confidential settlement negotiations while the remainder of the PSC continued to prepare for trial.  I was further informed that Cabraser had been integrated into the team for

negotiations, and that these three lawyers had primary responsibility for structuring the settlement process and for developing the terms of any potential settlement.  I was also informed that these three lawyers performed this role at the direction of the co-chairs of the PSC, James Roy and Stephen Herman, and that I would formally serve as counsel to the co-chairs.

8.      I met with Fayard, Rice and Cabraser in New York about ten days later, which began my active involvement in the settlement process.  Since that time, I have traveled to New Orleans on several occasions, including for the December 14th meeting with the entire PSC at which the preliminary terms of the settlement were explained to all counsel.  I was also present in New Orleans in late February and early March 2012, during the final phases of the settlement negotiations.  I participated in some aspects of the negotiations themselves, although my main activity was to advise on the settlement process and to assist in the preparation of settlement documents.  I also participated in the March 2, 2012 presentation to the PSC of the terms of the final settlement for the ratification vote.  After the settlement was approved, I was asked to explain the obligations of class counsel and answer questions about the change in roles of the PSC were the Court to grant class certification.

9.      During this entire process, my work turned on a few key legal issues and, specifically, on avoiding legal conflicts that had compromised prior mass harm class action settlements.  To my mind, the key issues were:

    a.   Avoiding conflicts in representation.

    b.   Avoiding intraclass allocation conflicts.

c.   Establishing an independent distribution system for the fixed fund for Seafood.

d.   Maintaining separate tracks for Economic Loss and Medical Classes.

e.   Resolving the merits of the settlement before addressing the issue of attorneys' fees.

f.   Providing for representation for class members in the settlement process so as to realize the maximum recovery to the classes.

## DISCRETE LEGAL ISSUES

10.   ***Conflicts in Representation.***   The law governing proper settlement classes is still dominated by the Supreme Court's asbestos decisions in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  Together these cases establish that there must be "structural assurances" of fairness in the class settlement process, as defined by *Amchem.*  In designing the process of settlement negotiations, the PSC took care to ensure that all affected constituencies in the settlement had advocates and that no one with negotiating authority had either the incentive to or the ability to trade off the interests of one groups in favor of another.  Further, the PSC took care that no one would be bound by the settlement who had not suffered some tangible harm and who did not receive some benefit, thereby removing any "futures" issues from the negotiations.

11.   The structure of the settlement negotiations served as the initial and central guarantee of unconflicted representation.  As set forth in the declaration of Joe Rice, two members of the PSC were selected to negotiate confidentially on behalf of the

entire PSC, with the ability to draw on specialized knowledge as need be.  The PSC was acting pursuant to court appointment and was actively (and at all times during the settlement negotiations) pursuing litigation against BP and the other defendants.  This was in no sense a case in which "disarmed" counsel, again using the language that *Amchem* adopted from Professor Coffee, would be seeking a settlement on behalf of a class that had no coherence without the settlement.

12.      Despite the size of the settlement class, the breadth of the claims resolved, and the magnitude of the damages and the ensuing settlement, this was in my view a remarkably suitable case for class-based resolution.  All claims arose from a single catastrophic incident and all claimants were passive victims whose individual circumstances defined the scope of their damages but did not differentiate them in terms of establishing the liability of the various defendants.  Moreover, the centrality of the federal statutory scheme under the Oil Pollution Act and the statutory imposition of strict liability radically simplified this case.

13.      One of the first decisions made as the negotiations matured was not to try to create subclasses for the negotiation process, but rather to divide only the medical relief claims from those for economic harm.  This was done for three primary reasons.  First, the claims all arose from a single event and were presented against the same cohort of defendants.  Second, the settlement process itself would unravel if discussions were held among a growing number of subgroups, which would then likely beget further subgroups by the same logic.  Third, the settlement process could be organized to secure the participation of counsel for all affected groups, while avoiding trade-offs among the various groups.  This last point was particularly significant in light of the structure of the

PSC.  This case was unlike the fact scenario in *Amchem*, for example, where the Supreme Court was clearly disturbed by the fact of a class being organized by lawyers who represented only a partial group of the affected population, and who sought authority to bind those with whom they had no relation, particularly as it affected future claimants. Here, by contrast, the PSC was appointed by the Court well before any settlement negotiations were undertaken, and was appointed based on the need to represent the various affected constituencies.   Class counsel were thus benefitted by the Court's decision to take applications for positions on the PSC and to consider in the selection process the presence in New Orleans of counsel who would direct the case and that they represented diverse constituencies of claimants.

14.      In deciding that the settlement process could go forward in integrated fashion with two appointed lead negotiators serving on behalf of the entire PSC, we were following the logic well addressed by the Eight Circuit in *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140 (8th Cir. 1999):

> If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person ( *i.e.,* a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would).

> We also do not believe, as the objectors suggest, that the stark conflicts of interest that the Supreme Court discerned in *Amchem* and *Ortiz* are present here. In those cases the Court found that a conflict existed between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size). We note that the

injuries involved in those cases were extraordinarily various, both in terms
of the harm sustained and the duration endured. Our case, on the other
hand, involves a discrete and identified class that has suffered a harm the
extent of which has largely been ascertained.

*Id.* at 1146 (citations omitted).

15.     ***Intraclass Allocation.*** At no point in the settlement negotiations was a

fixed amount of money to be distributed among rival claimants in the plaintiff class. As

set forth in the declaration of Joe Rice, all care was taken to ensure that each category of

claim was separately negotiated. Most obviously, the medical claims were separated

from the economic harms. But even within the economic harm category, each specific

type of claim was separately negotiated independent of any claim offset against any other

category. The final settlement was uncapped, meaning that the ability of any subgroup to

be paid, or the ability of any individual to be paid, is independent of any overall amount

that is owing. Professor Coffee colorfully refers to uncapped class action settlements as

being more rare than unicorn sightings, a wonderful tribute to the care taken to avoid the

most common form of intraclass conflict.

16.     This structure of negotiation avoided two critical potential conflicts.

First, it meant that there was never any claim that counsel were responsible for shifting

funds from one group to another to facilitate the class resolution – something that the

Supreme Court identified as a specific problem in *Ortiz.* At each point in the

negotiations, PSC members with ties to specific interests were drawn in to assist the

negotiators in formulating the needs of that relevant group and in trying to maximize the

recovery of that group. Second, the absence of an overall cap on the recovery meant that

the negotiators were never in the position of "robbing Peter to pay Paul" – that is, there

was never a failure of representation as the negotiators sought to induce a hold-out within

the settlement class to accept the offered terms by redirecting funds in to that group. While the negotiators had overall responsibility for securing desirable settlement terms, there was never a breakdown in the representational integrity of PSC members whose interests were directly aligned with the various subcomponents of the affected class of claimants.

17.     ***Allocation of the Seafood Recovery.***   The only "fixed" component to the settlement is the sum assigned to the Seafood industry as a whole.  Two precautions were taken to ensure that there was no conflict in this form of settlement.

18.     First, the settlement amount of $2.3 billion is an extraordinary recovery given two facts.  It exceeds by many multiples the ***total*** annual seafood revenues in the affected Gulf region before the Deepwater Horizon calamity and it follows payment of roughly $700 million by the GCCF to the beneficiaries of the Seafood Fund. In other words, the settlement structure begins with recoveries far in excess of objectively quantifiable actual damages.  As a result, the great bulk of the settlement proceeds for the Seafood recovery is devoted to the designated Risk Transfer Premium ("RTP"), representing the risk associated with the recovery of the Gulf from the oil spill, and the corresponding risks with reemergence of submerged oil pockets.  Of critical importance, this means that the bulk of the Seafood Recovery is a guarantee of the recovery of the Gulf and its seafood industry.  This is necessarily a common and shared concern among all participants in seafood enterprises.

19.     Second, great care was taken to ensure that the allocation process among the various subcomponents of the seafood group was structured so that each subgroup had its interests advocated by counsel seeking to maximize the relative

recovery of each group from the $2.8 billion total recovery.   Further, the actual distribution was not undertaken by counsel but by a Court-appointed neutral, John W. Perry.  Finally, the decisions of Mr. Perry are now presented in a fully transparent form so that all class members in the Seafood group may determine their actual minimum recoveries and can make informed decisions on acceptance or not of the settlement.

20.      ***Medical and Economic Recoveries.***   One part of the settlement was negotiated separately.  Early on in the process, a separate group of counsel, including PSC member Robin Greenwald and others, undertook to negotiate medical benefits for persons exposed to oil and other contaminants in the clean-up and containment process. In my view this was entirely correct.  The decision to separate out the negotiations was not the product of conflict, as many of the persons physically exposed to oil were also in the Seafood group or were part of the VoO workers and boat owners.  Many were represented by members of the PSC, just as had been the case with the distinct groups of economic actors in the economic class.  In my view, it would have been entirely proper to conduct the medical and economic negotiations in the same process, with the same form of inputs from PSC members and other counsel with specialized knowledge and interests on these issues.

21.      Nonetheless, separating the two parts of the negotiations was prudent because the issues were distinct.  In my role as providing advice on class and settlement issues, I was often consulted by the medical class negotiators on discrete issues that they confronted, including the attempt to structure a long-term medical benefits protocol for the affected population.  The negotiations proceeded along separate tracks, directed by separate counsel, and confronted distinct issues.

22.     ***Attorneys' Fees.***   The Court is well aware of the tremendous expenditure of costs and devotion of attorney time under the leadership of the PSC.  I am not aware of any private class action with a higher level of out-of-pocket costs and investment of attorney time in any other litigation.  Clearly counsel were entitled to be compensated for their efforts and for the benefits they brought to the proposed settlement class.

23.     From my personal involvement in the negotiations, I can attest that there were no discussions or agreements concerning fees until the merits of the class claims had been resolved.  Counsel took care to report to the Court when they had reached agreement on the merits before initiating discussions of fees, and began discussions only after securing Court permission to do so.

24.     I can further attest that, prior to the initiation of negotiations on fees, there was no understanding as to the quantity of fees, how they would be structured, or even how they would be assessed.  The parties entered into negotiations with all these questions left open.

25.     Further, the merits settlement was not conditioned on either the fee agreement or the extent of the ultimate award by the Court.  There was no blow-up amount negotiated based on the ultimate fee award.

26.     ***Settlement consultation and representation.***  There is no escaping the fact that a disaster of the magnitude of the Deepwater Horizon affects many people and communities in many ways.  Settlement counsel created a participatory mechanism to draw in the specialized knowledge and concerns of discrete parts of the class.  Settlement counsel built on the broad representation the Court had structured into the PSC and used

11

that as the mechanism for input from all discrete sections of the class on desired provisions of the settlement.

27.     In my view, this was the optimal way of accommodating the diverse needs of the affected population.  Separate representation for all groups at the settlement negotiations was not feasible.  Further, even with the huge resources being invested in the litigation, trial preparedness would have been compromised had the process of negotiations not been handled by separate counsel.  Indeed, BP followed the same strategy and had a negotiating team working separate from its trial counsel.

## SETTLEMENT BENEFITS

28.     The purpose of this Declaration is primarily to set forth the risks avoided in terms of how the settlement process was structured to avoid conflicts in representation.   The settlement materials and other declarations detail the specific benefits obtained for the class.  I will limit myself to a few observations about how the settlement itself reflects the care that was taken in the negotiation process.

29.     ***Premium Settlement Values.***   This settlement picks up where the GCCF left off.  The GCCF was structured as a one-by-one offer and settlement process, and was hamstrung as such.  Although BP paid billions to settle claims through the GCCF, it achieved only limited results in obtaining closure, and the one-by-one nature of the settlement process generated great controversy and frustration among the claimants. The class structure, by contrast, offers greater certainty to the settling parties.  For BP, in particular, there is a fixed date set by this Court for potential claimants to opt out or be

bound by the terms of the settlement, if approved.   The class structure offers greater prospects of closure than does the non-binding quality of the GCCF approach.

30.      In exchange for greater certainty, the claimants should receive additional compensation.   During the negotiations, I repeatedly questioned the lead negotiators about the comparative values obtained by the proposed class settlement and the historic payouts by the GCCF.   On the medical side, this was easy; there had been no comparable payment system established by the GCCF process.   On the economic side, the proposed class settlement is superior to any payments made by the GCCF to any category of claimant.   This is accomplished in two ways.   First, for individuals and businesses making claims on lost earnings, the calculation of the baseline for comparison is improved to allow the best economic quarters to serve as the denominator for the calculation of losses.   Second, and most significant, the compensation amounts and the RTP are in each category superior to the payments and multipliers used by the GCCF.

31.      This is as it should be.   As the Third Circuit recently noted in a major opinion on class action settlements, "A defendant … may be motivated to pay class members a premium and achieve a global settlement ..."   *Sullivan v. DB Investments. Inc.,* 667 F.3d 273, 339 (3d Cir. 2011).   As reflected in the settlement amounts, this "peace premium" translates to substantial economic benefits, most notably in the generous RTPs.   Moreover, class members may even recover more benefits based on the preservation of punitive damages claims against Transocean and Halliburton, and most notably, by the assignment of BP's first-party claims against Transocean and Halliburton.

32.      ***Transparency.***   Because the proposed settlement is a class settlement, the terms of recovery have to be set forth with sufficient specificity for class members to

make informed judgments about accepting the settlement terms or opting out.  This too differentiates the settlement from the nontransparency of the decisional criteria of the GCCF, a source of frustration for many claimants.  Although the proposed settlement is complicated in having to incorporate a wide range of economic activities across diverse parts of the Gulf region, it is fully transparent.  Class members can calculate their expected payout by an exact application of the settlement criteria to their particular claim. Class counsel have been actively engaged in training lawyers throughout the Gulf region in how to use the settlement information to advise their clients.  In addition, class counsel have retained many professionals to assist class members in evaluating their proposed recoveries and in subsequently making claims, if the settlement is approved.

33.     ***Intraclass Equity.***  Early on in my involvement in this case, I tried to get a handle on the reasons that the GCCF process was having difficulties and why a class settlement might be preferable.  It was readily apparent to me that BP desired greater finality and was potentially willing to pay a premium to claimants to get that finality – as I have already addressed.  But I also wanted to get a sense of why the claimant population might prefer an alternative to the GCCF.

34.     Among the points I repeatedly heard from various members of the PSC was that there was suspicion that some claimants before the GCCF were getting paid more than others on similar claims.  There was also a suspicion that the GCCF was strategizing the negotiations in order to reserve funds for more difficult negotiations.  I write this not to assert that this was necessarily the case, nor to criticize Kenneth Feinberg or the GCCF administration.  The frustration and suspicions were probably an inevitable

by-product of the way in which the GCCF process had to proceed as a one-at-a-time settlement offer and negotiation.

35.     Transparency is the best guarantee of intraclass equity.  When the criteria for compensation are clearly established and when settlement administrators do not have discretion to adjust criteria for particularly attractive or problematic claimants, class members can be assured that similarly situated persons are being treated in like fashion.  Indeed, this is one of the great benefits of a comprehensive class action settlement as opposed to any other form of mass claim resolution.

36.     Having participated in structuring the negotiation process and in structuring the class settlement processes, I can readily attest that preserving intraclass equity was a paramount consideration throughout the settlement discussions.  In my view, the transparency of the settlement offer reflects the care with which the settling parties – and class counsel in particular – undertook the process of representing the interests of all class members.

## CONCLUSION

37.     Accordingly, I believe that the Court should certify the settlement classes and approve the proposed settlement.  This settlement is an extraordinary achievement that realizes the great objectives behind court supervised class settlements. As well captured by Judge Anthony Scirica of the Third Circuit:

> The class action device and the concept of the private attorney general are powerful instruments of social and economic policy. Despite inherent tensions, they have proven efficacious in resolving mass claims when courts have insisted on structural, procedural, and substantive fairness. Among the goals are redress of injuries, procedural due process, efficiency, horizontal equity among injured claimants, and finality.

*Sullivan v. D.B. Investments, Inc.,* 67 F.3d 273, 340 (3d Cir. 2011) (Scirica J., concurring).

38.     I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

_____
Samuel Issacharoff

Dated: August 13, 2012

16

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  **Oil Spill by the Oil Rig**<br>**"Deepwater Horizon" in the Gulf**<br>**of Mexico, on April 20, 2010**<br><br>**These Pleadings apply to:**<br>*Cases in Pleading Bundle B1,*<br>*Cases in Pleading Bundle B3,*<br>*and VoO Charter Dispute Cases.*<br><br>(Including Nos. 12-968 and 12-970) | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE SUSHAN** |

## DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. James Parkerson Roy and I were appointed Interim Co-Liaison Counsel for the plaintiffs in the consolidated cases that were pending in Section J of the Eastern District of Louisiana on or around June 4, 2010.  We were appointed Plaintiffs Co-Liaison Counsel in MDL No. 2179 on or around August 27, 2010.  We were also appointed Interim Co-Class Counsel on or around March 5, 2012, and Co-Lead Class Counsel on or around May 2, 2012.

3. I teach complex litigation as an adjunct professor at Tulane Law School and a class action seminar as an adjunct professor at Loyola Law School;  I have authored and/or delivered numerous speeches, articles and papers on class actions, complex litigation,

ethics and professionalism; and I have actively participated in numerous class actions, multi-district litigations and other complex cases, including, for example: In re: Vioxx Products Liability Litigation, MDL No. 1657; In re: Chinese-Manufactured Drywall Products Liability Litigation, MDL No. 2047; Scott v. American Tobacco, 795 So.2d 1176 (La. 2001); 830 So.2d 294 (La. 2002); 949 So.2d 1266 (La. App. 4th Cir. 2/7/07), writ denied, 973 So.2d 740 (La. 2008), cert. denied, 128 S.Ct. 2908 (2008); 36 So.3d 1046 (La. App. 4th Cir. 4/23/2010), writ denied, 44 So.3d 686 (La. 2010), cert. denied, 131 S.Ct. 3057 (2011); Oubre / Orrill v. Louisiana Citizens Fair Plan, 26 So.3d 994 (La. App. 4th Cir. 12/09/09); 38 So.3d 457 (La. App. 4th Cir. 4/21/2010), writ denied, 45 So.3d 1035 (La. 2010); 79 So.3d 987 (La. 2011); Bauer v. Dean Morris, 2011 WL 3924963 (E.D.La. Sept. 7, 2011); Schultz v. Texaco Inc., 127 F.Supp.2d 443 (S.D.N.Y. 2001); 308 F.Supp.2d 289 (S.D.N.Y. 2004); 2009 WL 455163 (S.D.N.Y. Feb. 24, 2009); and Andrews v. TransUnion Corp., 917 So.2d 463 (La. App. 4th Cir. 8/17/2005), writ denied, 926 So.2d 495 (La. 2006); MDL No. 1350.

4. In the *Deepwater Horizon* Litigation, PSC Member Calvin F. Fayard, Jr. was appointed by Co-Liaison Counsel at the outset to explore and pursue potential settlement opportunities. Mr. Fayard would report directly to Co-Liaison Counsel, who would maintain confidentiality over the status of discussions, if any. Early on, with the approval of Co-Liaison Counsel, Mr. Fayard enlisted prominent negotiator Joseph F. Rice to assist in the exploration and development of potential settlement opportunities.

5. In or around May of 2011, Mr. Fayard, Mr. Roy, Mr. Rice and I had a dinner in New Orleans with BP Counsel, Rick Godfrey and Jim Neath, at which time a June meeting in London with BP plc General Counsel, Rupert Bondy, was arranged. At the June 2011 meeting in London, the parties committed to meet on an ongoing basis to attempt to resolve some or all of the extant claims.

6. Over the course of the negotiations, Mr. Fayard, Mr. Rice, and their team, would solicit direct input from Co-Liaison Counsel and other PSC Members to address the nature, location, scope and extent of existing claims. Fairly early on, PSC Member Rhon Jones and members of the Beasley Allen firm were brought in to assist with accounting and

economic loss issues, and preeminent class action lawyer, Elizabeth Cabraser, was brought in to address class, structural and drafting concerns. PSC Members Robin Greenwald and Matt Lundy were brought in to separately negotiate the medical class settlement, along with attorneys Wanda Edwards and Fred Baker. At the same time, Mr. Rice and Mr. Fayard, along with Co-Liaison Counsel, solicited information from various PSC Members on discreet issues, keeping within the bounds of confidentiality. They were provided access to scientific, economic and other experts, and to attorneys and/or plaintiffs who were large stakeholders and/or who were particularly knowledgeable about different types of claims, (*e.g.* oyster, shrimper, wetlands, subsistence, VoO). In addition, Mr. Fayard and Mr. Rice consulted with representatives of the Gulf Coast Claims Facility ("GCCF"), and obtained data regarding the nature, scope and extent of claims which had pursued, and resolved, in the GCCF. The lead negotiators also communicated with lawyers and experts for various Governmental bodies and agencies, as well as representatives of industry trade groups, (*e.g.,* Oyster Task Force, Louisiana Shrimp Association). Similarly, Ms. Greenwald, Mr. Lundy and the other members of the medical settlement negotiating team consulted with experts and solicited information and insight from PSC members and others representing clients with medical claims. Based on my own direct participation in the negotiations, and my observations of the interaction between the lead negotiators and other attorneys, plaintiffs, experts and industry leaders from whom they were gathering information, it is clear to me that the settlement reached is the product of "bottoms up" (as opposed to "top down") negotiations, that were fought with BP on a claim-by-claim basis, with direction and interaction from the relevant constituencies. Indeed, and as one example, as our firm has a large number of clients with Vessel of Opportunity ("VoO") charter disputes, I was involved directly in the negotiation of the VoO charter dispute and vessel damage claims.

7. On or around December 14, 2011, Mr. Fayard, Mr. Rice and Co-Liaison Counsel made a presentation to the entire PSC regarding the basic contours of the economic and property damages settlement, while Ms. Greenwald and Mr. Lundy presented the basic contours of the medical benefits class. From that point forward, the members of the entire Steering Committee, who collectively represented an extremely diverse and representative cross-

section of claims, provided direct input on a host of geographical, economic, environmental and other issues, considerations and concerns.  The negotiating team also continued to solicit input from non-PSC attorneys, clients (including class representatives), industry leaders, experts, and government officials, who had different interests, stakes, and perspectives.

8.  Professor Samuel Issacharoff, a leading class action expert, Professor Lynn Baker, a leading expert on the ethical issues that sometimes arise in complex litigation, and Basile Uddo, who has served as the PSC's ethics counsel since the inception of the litigation, were all present for the December 2011 PSC presentation, and were actively providing independent legal advice and feedback regarding the nature and structure of the settlement.

9.  Around this same time, the Honorable Sally Shushan, the U.S. Magistrate Judge assigned to the MDL, became much more directly involved in the mediation of the settlement.

10. The various settlement frameworks (or "modules") were negotiated over the course of several months, each with many iterations, repeatedly tested with experts and attorneys and modified to best represent the interests of the class members.

11. At the time we agreed to the $2.3 billion Seafood Fund on or around February 26, 2012, we had conducted recent meetings with commercial fishing stakeholders.  These meetings included PSC attorneys, non-PSC attorneys, industry trade group representatives, and plaintiffs with large stakes.  As consensus was being developed between and among the plaintiff constituencies, BP insisted on shifting from an unlimited "evergreen" model to a guaranteed non-reversionary fund approach.  With the direct participation and mediation of Judge Shushan, we ultimately agreed to a $2.3 billion Seafood Fund, which I believed would be more than sufficient to adequately compensate past and future commercial fishing losses, based on NOAA and other economic data, as well as the consensus that had developed over the preceding weeks.  In light of the Supreme Court's opinion in *Amchem,* and out of an abundance of caution, we asked the Court to appoint a well-respected neutral, John W. Perry, Jr., to preside over the

allocation.  Mr. Perry was provided with relevant Government data, peer-reviewed studies, and available expert opinions;  was introduced to, and received information and input from, PSC attorneys, non-PSC attorneys, plaintiffs (including class representatives), representatives of industry organizations, and experts;  and received various written submissions from interested parties; before making the determination on allocation.  I believe that Mr. Perry's independent research and conclusions lends further support to the conclusion that $2.3 billion is more than sufficient to fully and fairly compensate the classmembers participating in the Seafood Program.  Specifically, the Seafood Compensation Program frameworks, which are themselves conservative, are projected to pay out an initial amount of $1.9 billion, in full and fair compensation to the relevant classmembers, leaving a $400 million reserve.[1]

12. It could also be noted that, at the same time these intense negotiations with the BP Defendants were occurring, the parties were also engaged, on a parallel track, in extremely intense and ongoing discovery and trial preparation efforts, in advance of the commencement of the Limitation and Liability Trial, scheduled for February 27, 2012.

13. Based on my direct involvement in the negotiations, as well as my general observation of the process, and the terms of the settlement agreements themselves, it is my opinion and belief that the class members have been fairly and faithfully represented throughout the course of the negotiations, and that the proposed Settlement Agreements represent the most favorable resolution available to the economic and medical classes.

Signed, under penalty of perjury, this 23rd day of July, 2012, in New Orleans, Louisiana.

Stephen J. Herman

---

[1] In addition to this $400 million "head room" in the Seafood Program: **(i)** I understand that more than $700 million was already paid to commercial fishermen by the GCCF;  **(ii)** BP assumes full responsibility for up to 17.5% opt-outs, (15% of Category III Deckhands "Seafood Crew");  and **(iii)** class members' punitive damage claims, as well as the BP-assigned claims, against Transocean and Halliburton are reserved.

## IN UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  **Oil Spill by the Oil Rig**
     **"Deepwater Horizon" in the Gulf**
     **of Mexico, on April 20, 2010**

**This Document Relates to:**

*Plaisance et al. v. BP Exploration & Production*
*Inc., et al.*, **No. 12-cv-968**

**MDL No. 2179**

**SECTION: J**

**JUDGE BARBIER**

**MAGISTRATE JUDGE
SHUSHAN**

### DECLARATION OF ROBIN L. GREENWALD

I, Robin L. Greenwald, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a licensed attorney in the State of Illinois.  In October 2010, this Court appointed me to the Plaintiffs' Steering Committee in MDL 2179.

2.      I have extensive experience in litigating complex, large-scale cases.  Prior to my appointment to the PSC in the instant case, I was court-appointed liaison counsel in *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL No. 1358, a lawsuit brought by water providers from around the country against over 50 petroleum companies for polluting the nation's groundwater with a gasoline additive.  The suit settled after approximately five years of litigation.  In addition to MDL 1358, I have litigated several other mass tort actions around the country.  For the first nearly twenty years of my legal career, I was a prosecutor and enforcement

attorney for the United States Attorney's Office for the Eastern District of New York and the U.S. Department of Justice, where I litigated and resolved dozens of large scale, complex cases.

3.      In October 2011, I joined the negotiation team for the medical benefits class settlement on a full time basis, along with fellow PSC member Matthew Lundy, Esq. At the time Mr. Lundy and I joined the negotiation team, attorneys Wanda Edwards and Fred Baker had been involved in medical settlement negotiations with BP counsel for several months. As the declaration of Andrew Bloomer, Esq., sets forth, from October 2011 through April 20, 2012, the negotiations between the PSC and counsel for BP took place nearly daily, usually in person but sometimes via the web and/or telephone.

4.      Over the course of the negotiations, Mr. Lundy and I consulted regularly with our medical consultant, Dr. Michael Harbut.  We had worked with Dr. Harbut on health issues related to exposure from the oil and/or chemical dispersant, including the Corexit® dispersants used in the remediation efforts, well before the medical settlement negotiations began.  Based on his knowledge and vast clinical experiences treating patients in connection with exposure to petroleum products, I believe that Dr. Harbut was best suited to guide the PSC through the medical settlement negotiations. Indeed, we consulted Dr. Harbut throughout the negotiations of the Specified Physical Conditions Matrix and the Periodic Medical Consultation Program, and his medical opinions guided the substance of those aspects of the settlement.

5.      In addition to Dr. Harbut, Mr. Lundy and I solicited input from other PSC members, as well as other counsel, who represented plaintiffs alleging personal injury from post-explosion activities.  These consultations provided information to help us better understand fully the range of illnesses and symptoms that coastal residents and Clean-Up Workers had and/or

were currently experiencing, as well as the proof that would be available to injured residents and workers to prove their claims, all the while maintaining the confidentiality of the settlement negotiations as we were required to do.  As members of the PSC science workgroup, Mr. Lundy and I also had regular access to information and data about the environmental and ecological impacts of the oil spill, further guiding our negotiations about the extent of the oil spill, exposure pathways and the geographic impact of the oil spill.  Further, Mr. Lundy and I were active participants in the Vessels of Opportunity ("VoO") PSC workgroup, and in that capacity we also learned not only about these plaintiffs' VoO economic losses but also about the physical conditions and symptoms they often experienced while performing VoO work.  Moreover, both Mr. Lundy's firm and my law firm represent numerous individuals who were Clean-Up Workers and/or are or were near shore residents of the Gulf states, and who are now litigating against BP and others for personal injuries sustained as a result of their exposure to the oil and/or chemical dispersants.  Finally, BP provided us access to general information contained in its Medical Encounters Database, a database of illnesses and injuries sustained by Clean-Up Workers during response activities.  The database provided yet further confirmation of the information we had learned from our other sources about commonly experienced health impacts from exposure to the oil and/or chemical dispersants.

6.     Our guiding negotiation principle was to ensure that the medical settlement would provide the greatest amount of good for the greatest number of people.  With that backdrop, the PSC spent approximately six months in hard fought, and at times contentious, negotiations with counsel for BP.  During those negotiations, the PSC steadfastly held the position that the medical settlement ultimately had to include (i) all individuals most impacted by the post-explosion health consequences of the oil spill; (ii) those medical conditions and

symptoms that individuals most often experienced and, in numerous cases, still are experiencing as a result of their exposure to the oil and/or chemical dispersant; (iii) adequate compensation for those conditions and symptoms; and (iv) benefits in addition to compensation for Specified Physical Conditions.

7.       Our negotiations generally centered on the four benefits provided by the medical settlement: the Specified Physical Conditions ("SPC") Matrix; the Periodic Medical Consultation Program ("PMCP"); the Back-End Litigation Option; and the Gulf Region Health Outreach Program.

8.       As to the SPC Matrix, we vigorously negotiated each and every aspect of the matrix, including each condition and symptom that should be included, the proofs that would be required to establish causation for each of the acute A1 – A4 and the chronic B1 proof categories of the matrix, and the time frames within which the symptoms/conditions would have had to manifest.  We conducted these negotiations from the bottom up; that is, we did not attach compensation amounts to any of the conditions or symptoms until we had finalized all acute and chronic conditions and symptoms that would be compensated.  These negotiations took months, and at each step of the way we consulted with Dr. Harbut, PSC members and other plaintiffs' counsel to ensure that the SPC Matrix was comprehensive and addressed the conditions actually and most typically experienced by Clean-Up Workers and coastal residents.  As Dr. Harbut describes the medical settlement, "I find the conditions in the SPC matrix to reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants."  *See* Declaration of Michael R. Harbut, M.D., M.P.H., F.C.C.P, dated August 11, 2012 ("Harbut Decl.") at ¶ 17.  Dr. Harbut further opines that the pathways of exposure and time frames within which the symptoms would

have manifested, as set forth in the SPC Matrix, conform to the prevailing medical literature and his clinical experiences. *See* Harbut Decl. at ¶¶ 18-19.

9.     As to the Periodic Medical Consultation Program, we similarly negotiated vigorously the components of the program to ensure that they were comprehensive and tailored to address the overall health issues of class members, and that the consultation program established a physician/patient relationship. In speaking with our own clients, PSC counsel and other plaintiffs' counsel representing individuals with personal injury claims from exposure to the oil and/or chemical dispersants, we learned that, not only were coastal residents and Clean-Up Workers exposed to oil and/or chemical dispersants that could put them at risk of future injury, but many of these individuals also do not have health insurance and, therefore, do not have regular medical examinations. Thus, the PSC negotiated for a PMCP to provide class members the opportunity to obtain much-needed medical examinations, regardless of risk from oil exposure, as well as a mechanism to learn if they have signs suggesting that they could develop a later-manifested illness associated with their exposure to the oil and/or chemical dispersant. Indeed, even class members who have not manifested a physical condition from exposure to the oil and/or chemical dispersants will benefit from the PMCP. Further, because we learned from Dr. Harbut and others that individuals in similar consultation programs oftentimes do not participate in the program long term, we negotiated for the medical settlement Claims Administrator to provide class members with annual updates about their rights to benefits under the PMCP, to schedule class members' baseline examination and consultation program every three years thereafter, and to ensure, whenever possible, that the facility at which the class members receives medical consultation is no more than 25 miles from his or her home (and if greater than 25 miles that the class members receive mileage reimbursement for distances over

25 miles). Similar to the SPC Matrix, we consulted with Dr. Harbut throughout the PMCP

negotiations, not only about the components of the consultation program itself but also about the

various safeguards established to encourage full participation for the lifetime of the PMCP.

10.     Because exposure to petroleum products can cause later-manifested, serious

medical conditions, the PSC further negotiated that no class member would give up his or her

right to seek compensation for a later-manifested physical condition that he or she can prove was

caused by exposure to the oil and/or chemical dispersants from the oil spill. In negotiating what

is referred to in the settlement agreement as a "Back-End Litigation Option" ("BELO"), the PSC

ensured that a class member who brings a BELO action will not have to prove either that BP

caused the oil spill or that oil was in fact in the vicinity of class members; rather, a class member

need only prove that his or her illness was caused by exposure to the oil and/or chemical

dispersants. This was important because of the complexity of the issues relating to liability for

the oil spill, the numerous witnesses and documentary evidence necessary to show liability, and

what we believed would be BP's vigorous efforts to defend against liability in the absence of

such an agreement in a BELO action. And while BP has the right to mediate the claim before

litigation, if the parties do not reach agreement through mediation the class member may pursue

his or her claim in court.

11.     Finally, the PSC vigorously negotiated for the individual projects and the grant

amounts for each project of the Gulf Region Health Outreach Program. We fought for this

benefit, which would not be available to litigants through litigation, because we learned

throughout the litigation and settlement process that physicians in the impacted Gulf region

oftentimes did not have the expertise or experience to identify the health impacts people were

experiencing from exposure to the oil and/or chemical dispersants. Indeed, Mr. Lundy and I

often were told by class members that their doctors informed them that they did not know how to identify whether their condition or symptoms were associated with exposure to the oil and/or chemical dispersant. We further learned that in many parts of the Gulf areas most impacted by the oil spill, there is a dearth of medical professionals available to provide care or treatment for the conditions that often affect the people in these areas, whether from exposure to petroleum products or other causes. Further, we learned through the Presidential National Commission Report on the BP oil spill, and discussions with class members, counsel for class members and health professionals in the Gulf states, that the BP oil spill had a significant impact on the mental and behavioral health of adults and children alike, yet the geographic areas most impacted by the oil spill are and traditionally have been underserved by mental health professionals. Because of these various deficiencies in the health care system, we negotiated the inclusion of the Outreach Program into the medical settlement. In the words of Dr. Bernard Goldstein, the chair of the Steering Committee for the Outreach Program, "Overall, the Program is well focused and comprehensive and provides much needed public health benefits to the Gulf Coast region most impacted by the Deepwater Horizon oil spill." *See* Declaration of Bernard D. Goldstein, MD, dated August 2, 2011, at ¶ 8.

12.     While all components of the above-described medical settlement were hard fought, in February 2012 the parties found themselves at an impasse on critical components of the SPC Matrix and the Outreach Program in particular. At that juncture, Magistrate Judge Shushan became involved in mediating the medical settlement. With Judge Shushan's direct participation in the negotiations, the parties were able to reach agreement on the outstanding issues. This resolution, in my opinion, resulted in the fair and reasonable allocation of benefits to the medical class.

13.     Based on my direct involvement in the medical settlement negotiations, I believe that the medical class members have been fairly and faithfully represented by the PSC throughout the course of the negotiations and that the proposed medical settlement agreement represents the greatest medical benefits to the greatest number of individuals within a cohesive class whose health has been impacted by the post-explosion consequences of the BP oil spill.

Signed, under penalty of perjury, this 13th day of August, 2012, in New Orleans, Louisiana.

Robin L. Greenwald

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| This Document Relates to: | JUDGE BARBIER |
| Actions in Pleading Bundle B3, | MAGISTRATE JUDGE SHUSHAN |
| and | |
| No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.* | |

DECLARATION OF KIP PLAISANCE IN SUPPORT
OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
THE MEDICAL BENEFITS SETTLEMENT

I, Kip Plaisance, declare as follows:

1.     I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.     I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.     I am a representative plaintiff in this case.  Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.     I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.     I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also

generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.      As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice, portions of the Medical Settlement agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.      I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement. Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement. I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.      I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.     For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Golden Meadow, LA, on August __, 2012.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: **Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL No. 2179** |
| This Document Relates to: | **SECTION: J** |
| Actions in Pleading Bundle B3, | **JUDGE BARBIER** |
| and | **MAGISTRATE JUDGE SHUSHAN** |
| No. **12-cv-968**, *Plaisance et al. v. BP Exploration & Production Inc., et al.* | |

## DECLARATION OF JASON PERKINS IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE MEDICAL BENEFITS SETTLEMENT

I, Jason Perkins, declare as follows:

1.      I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.      I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.      I am a representative plaintiff in this case.   Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.      I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.      I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also

generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.      As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice, portions of the Medical Settlement agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.      I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement.  Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement.  I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.      I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.      For all of these reasons, I fully support the Medical Settlement.

        I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Baton Rouge, LA, on August 2, 2012.

_____
Jason Perkins

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| This Document Relates to: | SECTION: J |
| Actions in Pleading Bundle B3, | JUDGE BARBIER |
| and | MAGISTRATE JUDGE SHUSHAN |
| No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.* | |

**DECLARATION OF THELMA CAMILLE WARREN IN SUPPORT
OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
THE MEDICAL BENEFITS SETTLEMENT**

I, Thelma Camille Warren , declare as follows:

1.      I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration. I could testify competently to these facts if called upon to do so.

2.      I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.      I am a representative plaintiff in this case.  Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.      I am informed and believe that I am a Medical Benefits Class Member because I I resided in ZONE A for some time on each of at least 60 days between April 20, 2010, and September 30, 2010, and developed one or more specified physical conditions within the timeframes set forth on the specified physical conditions matrix.

1

5.      I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.      As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice portions of the Medical Settlement Agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.      I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement.  Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement.  I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.      I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program.  I also am aware that Class Members will benefit from the Gulf

Region Health Outreach Program and that that Program is designed to improve access to quality health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.      For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in _Gulf Shores_ Alabama on this _7_ day of _August_, 2012.

_THELMA CAMILLE WARREN_
THELMA CAMILLE WARREN

3

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In re:  **Oil Spill by the Oil Rig**
      **"Deepwater Horizon" in the Gulf**
      **of Mexico, on April 20, 2010**

**This Document Relates to:**

**Actions in Pleading Bundle B3,**

**and**

**No. 12-cv-968,** *Plaisance et al. v. BP Exploration*
*& Production Inc., et al.*

**MDL No. 2179**

**SECTION: J**

**JUDGE BARBIER**

**MAGISTRATE JUDGE
SHUSHAN**

## DECLARATION OF CHRISTIAN PIZANI IN SUPPORT
## OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
## THE MEDICAL BENEFITS SETTLEMENT

I, Christian C. Pizani, declare as follows:

1.    I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.    I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.    I am a representative plaintiff in this case.   Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.    I am informed and believe that I am a Medical Benefits Class Member because I was a Zone B Resident during the relevant time frame of the Medical Benefits Class Settlement.

5.    I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also

generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.     As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice, portions of the Medical Settlement agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.     I have also actively participated in the Medical Settlement by filing my claim for compensation and benefits with the Claims Administrator for the Medical Settlement. I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.     I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.    For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in ~~Grand Isle~~, on August 8, 2012.

Christian C. Pizani

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| This Document Relates to: | SECTION: J |
| Actions in Pleading Bundle B3, | JUDGE BARBIER |
| and | MAGISTRATE JUDGE SHUSHAN |
| No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.* | |

DECLARATION OF MAX PLAISANCE IN SUPPORT
OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
THE MEDICAL BENEFITS SETTLEMENT

I, Max Plaisance, declare as follows:

1.      I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration. I could testify competently to these facts if called upon to do so.

2.      I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.      I am a representative plaintiff in this case.   Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.      I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.      I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also

generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.     As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice, portions of the Medical Settlement agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.     I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement. Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement. I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.     I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.    For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Golden Meadow, LA, on August 6, 2012.

x *Max Plaisance*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig
      "Deepwater Horizon" in the Gulf
      of Mexico, on April 20, 2010

This Document Relates to:

Actions in Pleading Bundle B3,

and

No. 12-cv-968, *Plaisance et al. v. BP Exploration
& Production Inc., et al.*

MDL No. 2179

SECTION: J

JUDGE BARBIER

MAGISTRATE JUDGE
SHUSHAN

## DECLARATION OF BENJAMIN JUDAH BARBEE IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE MEDICAL BENEFITS SETTLEMENT

I, Benjamin Judah Barbee, declare as follows:

1.    I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.    I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.    I am a representative plaintiff in this case.  Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.    I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.    I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also

generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.     As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice, portions of the Medical Settlement agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.     I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement. Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement. I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.     I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.     For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Santa Rosa Beach, FL, on August // , 2012.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>**This Document Relates to:**<br><br>**Actions in Pleading Bundle B3,**<br><br>**and**<br><br>**No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.*** | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

DECLARATION OF CORNELIUS DIVINITY IN SUPPORT
OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
THE MEDICAL BENEFITS SETTLEMENT

I, Cornelius Divinity, declare as follows:

1.      I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration. I could testify competently to these facts if called upon to do so.

2.      I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.      I am a representative plaintiff in this case.  Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.      I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.      I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via

telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.      As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice portions of the Medical Settlement Agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.      I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement. Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement. I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.      I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.      For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Marrero, Louisiana, on this ___3___ day of ___8___ ,

2012.

CORNELIUS DIVINITY

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig<br>"Deepwater Horizon" in the Gulf<br>of Mexico, on April 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| This Document Relates to: | JUDGE BARBIER |
| Actions in Pleading Bundle B3, | MAGISTRATE JUDGE<br>SHUSHAN |
| and | |
| No. 12-cv-968, *Plaisance et al. v. BP Exploration*<br>*& Production Inc., et al.* | |

## DECLARATION OF JANICE BROWN IN SUPPORT
## OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
## THE MEDICAL BENEFITS SETTLEMENT

I, Janice Brown, declare as follows:

1.      I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.      I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.      I am a representative plaintiff in this case.   Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.      I am informed and believe that I am a Medical Benefits Class Member because I was a Zone A Resident during the relevant time frame of the Medical Benefits Class Settlement.

5.      I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also

generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.     As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice, portions of the Medical Settlement agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.     I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement.  Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement.  I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.     I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida.  I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.      For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Fort Walton Beach, FL on August 9, 2012.

*Janice R. Brown*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig
       "Deepwater Horizon" in the Gulf
       of Mexico, on April 20, 2010

This Document Relates to:

Actions in Pleading Bundle B3,

and

No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.*

MDL No. 2179

SECTION: J

JUDGE BARBIER

MAGISTRATE JUDGE SHUSHAN

## DECLARATION OF CARLSON CASTER IN SUPPORT
## OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
## THE MEDICAL BENEFITS SETTLEMENT

      I, Carlson Caster, declare as follows:

1.    I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.    I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.    I am a representative plaintiff in this case.   Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.    I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.    I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also generally made myself available to my attorneys and Medical Benefits Class Counsel, whether

via telephone, e-mail, or in person, throughout the time period that I have served as a Class

Representative, and I will continue to do so for as long as this case remains active.

6.     As Class Representative, I have actively followed and participated in this Medical

Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class

Notice, portions of the Medical Settlement agreement, including attachments and the online

resources regarding the Medical Settlement, such as the Settlement Program website and the

Court's Oil Spill MDL site.

7.     I  have also actively participated in the Medical Settlement by submitting my

Data Disclosure Form to the Claims Administrator for the Medical Settlement in order to receive

full documentation for my claim for compensation and benefits in the Medical Settlement.  I am

in the process of preparing my medical claim for submission to the Settlement Facility and

intend on submitting my claim shortly.  I will be submitting my claim for compensation and

benefits under the Settlement.  I understand, however, that I will not receive payments nor will I

be able to participate in the periodic medical consultation program unless and until the Court

certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that

decision have been decided.

8.     I am  generally familiar with the terms of the  Medical  Settlement, understand

that it is a compromise position following negotiations between counsel for the Plaintiffs'

Steering Committee and counsel for BP, that Medical Class Members will receive compensation

for  specified physical conditions based upon the  documentation they provide and if they do

not provide  documentation for a  specified  physical condition they are still eligible for the

periodic medical consultation program.   I also am aware that Class Members will benefit from

the Gulf Region Health Outreach Program,  which is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.    For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in _Mobile, Alabama_, on July _27_, 2012.

_Carlson Caster_

Carlson Caster

STATE OF ALABAMA              )

COUNTY OF _Mobile_            )

I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that _Carlson Caster_, whose name is signed to the forgoing instrument and is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, (s)he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal, this _27TH_ day of July, 2012

Notary Public
My Commission Expires: _4/14/15_

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| This Document Relates to: | JUDGE BARBIER |
| Actions in Pleading Bundle B3, | MAGISTRATE JUDGE SHUSHAN |
| and | |
| No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.* | |

### DECLARATION OF GEORGE E. BAKER IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE MEDICAL BENEFITS SETTLEMENT

I, George E. Baker, declare as follows:

1.       I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.       I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.       I am a representative plaintiff in this case.   Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.       I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.       I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also

generally made myself available to my attorneys and Medical Benefits Class Counsel, whether via telephone, e-mail, or in person, throughout the time period that I have served as a Class Representative, and I will continue to do so for as long as this case remains active.

6.      As Class Representative, I have actively followed and participated in this Medical Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class Notice, portions of the Medical Settlement agreement, including attachments and the online resources regarding the Medical Settlement, such as the Settlement Program website and the Court's Oil Spill MDL site.

7.      I have also actively participated in the Medical Settlement by submitting any Data Disclosure Form with the Claims Administrator for the Medical Settlement in order to receive full documentation for my claim for compensation and benefits in the Medical Settlement. Once I receive the requested information, I will be submitting my claim for compensation and benefits under the Settlement. I understand, however, that I will not receive payments nor will I be able to participate in the periodic medical consultation program unless and until the Court certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that decision have been decided.

8.      I am generally familiar with the terms of the Medical Settlement, understand that it is a compromise position following negotiations between counsel for the Plaintiffs' Steering Committee and counsel for BP, that Medical Class Members will receive compensation for specified physical conditions based upon the documentation they provide and if they do not provide documentation for a specified physical condition they are still eligible for the periodic medical consultation program. I also am aware that Class Members will benefit from the Gulf Region Health Outreach Program and that that Program is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida.  I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.      For all of these reasons, I fully support the Medical Settlement.


I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Marrero, Louisiana, on July 27 2012.

George E. Baker

-3-

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig<br>"Deepwater Horizon" in the Gulf<br>of Mexico, on April 20, 2010<br><br>**This Document Relates to:**<br><br>Actions in Pleading Bundle B3,<br><br>**and**<br><br>No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.* | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

## DECLARATION OF DUFFY HALL IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE MEDICAL BENEFITS SETTLEMENT

I, Duffy Hall, declare as follows:

1.    I am over the age of 18 years, and I have personal knowledge of the facts set forth in this Declaration.  I could testify competently to these facts if called upon to do so.

2.    I submit this declaration in support of Plaintiffs' Motion for Final Approval of the Medical Benefits Settlement (the "Medical Settlement").

3.    I am a representative plaintiff in this case.   Through my attorneys and Medical Class Counsel, I brought claims on behalf of the Medical Benefits Class.

4.    I am informed and believe that I am a Medical Benefits Class Member because I was a Clean Up Worker during the relevant time frame of the Medical Benefits Class Settlement.

5.    I have consulted with and been informed by my attorneys and Medical Class Counsel regarding the Medical Settlement and my claims in that Settlement.  I have also generally made myself available to my attorneys and Medical Benefits Class Counsel, whether

via telephone, e-mail, or in person, throughout the time period that I have served as a Class

Representative, and I will continue to do so for as long as this case remains active.

6.      As Class Representative, I have actively followed and participated in this Medical

Settlement, including reviewing the Preliminary Approval Order, the Medical Benefits Class

Notice, portions of the Medical Settlement agreement, including attachments and the online

resources regarding the Medical Settlement, such as the Settlement Program website and the

Court's Oil Spill MDL site.

7.      I  have also actively participated in the Medical Settlement by submitting my

Data Disclosure Form to the Claims Administrator for the Medical Settlement in order to receive

full documentation for my claim for compensation and benefits in the Medical Settlement.  I am

in the process of preparing my medical claim for submission to the Settlement Facility and

intend on submitting my claim shortly.  I will be submitting my claim for compensation and

benefits under the Settlement.  I understand, however, that I will not receive payments nor will I

be able to participate in the periodic medical consultation program unless and until the Court

certifies the Medical Class and, if the Court certifies the Medical Class, any appeals of that

decision have been decided.

8.      I am  generally familiar with the terms of the  Medical  Settlement, understand

that it is a compromise position following negotiations between counsel for the Plaintiffs'

Steering Committee and counsel for BP, that Medical Class Members will receive compensation

for  specified physical conditions based upon  the documentation they provide and if they do

not provide  documentation for a  specified  physical  condition they are still eligible for the

periodic medical consultation program.   I also am aware that Class Members will benefit from

the Gulf Region Health Outreach Program,  which is designed to improve access to quality

health care in certain counties and parishes in the States of Louisiana, Mississippi, Alabama and Florida. I think the Medical Settlement provides fair compensation and provides other important medical benefits to Medial Class Members who were harmed by the Deepwater Horizon oil spill.

9.    For all of these reasons, I fully support the Medical Settlement.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in _Wilmer, Al._____, on July _28_, 2012.

_Duffy W. Hall_

Duffy Hall

STATE OF ALABAMA          )
COUNTY OF _Mobile_        )

I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that _Duffy W. Hall_, whose name is signed to the forgoing instrument and is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, (s)he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal, this _28th_ day of July, 2012

_Charles E. Morgan_
Notary Public
My Commission Expires: _02-10-2014_



-3-