**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| Applies to: | * | **JUDGE BARBIER** |
| 12-311, Cameron Int'l Corp. v. Liberty | * | |
| Ins. Underwriters, Inc., a/k/a Liberty | * | **MAGISTRATE SHUSHAN** |
| Int'l Underwriters | * | |
| | * | |

## ORDER & REASONS

This matter concerns member case 12-311, an insurance coverage dispute between Cameron International Corporation ("Cameron") and one of its excess liability insurers, Liberty Insurance Underwriters, Inc. ("Liberty"). Before the Court is Liberty's **Rule 12(c) Motion for Judgment on the Pleadings**, Rec. Doc. 6531, which seeks to dismiss all claims by Cameron. *See also* Liberty's Reply Br., Rec. Doc. 6848. Cameron opposes this motion. Rec. Doc. 6703. Oral argument was held on July 13, 2012. For the reasons set forth below, Liberty's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

Cameron supplies equipment, systems, and services to those in the oil and gas industry. To protect against liability, Cameron purchased a "tower" of insurance consisting of a primary insurance policy and multiple excess insurance policies. Broadly speaking, the tower is structured such that once a loss exceeds the primary policy's limit, coverage is triggered under the first layer of excess insurance. If the loss exceeds the first excess layer's policy limit, then the second layer of excess insurance applies, and so on. During the relevant time period (July 1, 2009 to July 1,

---

[1] The factual background is based on Cameron's amended complaint, Rec. Doc. 6287. As explained below, the allegations of a complaint are accepted as true for purposes of this Rule 12(c) motion.

2010), the primary and first three layers of excess insurance provided a total of $103 million of coverage. Liberty, the defendant and mover herein, provided the fourth layer of excess insurance with a policy limit of $50 million (the "Liberty Policy" or "Policy"). Thus, the Liberty Policy and the underlying policies provided $153 million of coverage to Cameron. There are also six excess insurance policies above the Liberty Policy in Cameron's tower. *See* Am. Compl. ¶¶ 9-16, Rec. Doc. 6287.

Pursuant to two purchase orders and a master service agreement ("MSA") between Cameron and Transocean[2] (collectively, the "Cameron-Transocean Contracts"), Cameron built and maintained the blowout preventer for Transocean's semi-submersible drilling rig, the DEEPWATER HORIZON. The Cameron-Transocean Contracts contained clauses that purported to provide indemnity to Cameron in certain instances for liabilities arising from pollution, a blowout, etc. For example, the MSA stated:

> Transocean agrees that if Transocean is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Transocean will provide Contractor [Cameron] with the benefit of such indemnity to the fullest extent possible.[3]

*See id.* ¶¶ 19, 33-35.

Between January 31 and April 20, 2010, the DEEPWATER HORIZON conducted drilling operations on the "Macondo Well" in the Gulf of Mexico under a contract between Transocean and

---

[2] As used herein, "Transocean" refers to Transocean Offshore Deepwater Drilling Inc., its predecessors, and/or its affiliated entities.

[3] *Id.* ¶ 35. The purchase agreements between Cameron and Transocean similarly stated:

In the event that Purchaser [Transocean] is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Purchaser [Transocean] will provide Seller [Cameron] with the benefit of such indemnity to the fullest extent possible.

BP (the "BP-Transocean Contract").[4]  The BP-Transocean Contract contained a clause that purported to require BP to indemnify Transocean for pollution liabilities.  *See id.* ¶¶ 17-19, 33-35, 42, 45.

On April 20, 2010, a blowout of the Macondo Well occurred, causing a catastrophic explosion and fire aboard the DEEPWATER HORIZON.  Two days later, the DEEPWATER HORIZON sank, and, over the next three months, millions of gallons of oil flowed into the Gulf of Mexico.  These events gave rise to numerous lawsuits for personal injury, wrongful death, economic loss, property damage, etc., that eventually were consolidated in this multidistrict litigation.  Many of these suits named Cameron, Transocean, BP, and others as defendants.  These defendants subsequently brought cross-, counter-, and/or third-party claims against each other for indemnity, affirmative damages, etc.  Cameron claimed, *inter alia*, that Transocean owed it indemnity for third-party pollution claims under the above-quoted provisions in the Cameron-Transocean Contracts.  Transocean denied Cameron's indemnity claim and sued Cameron for damages and for a declaration that it owed no indemnity.  Transocean similarly claimed that BP owed it indemnity under the BP-Transocean Contract; BP denied this claim.  *See id.* ¶¶ 20-23, 36-38, 42, 45.

In the meantime, Cameron gave notice to Liberty shortly after the DEEPWATER HORIZON explosion that it had incurred potential liability that could result in a "loss" under the Liberty Policy.  Cameron alleges that it complied with all of its obligations under the Liberty Policy, including assisting Liberty with its investigation of the potential exposure and keeping Liberty apprised of developments in the litigation.  Liberty also was involved in the settlement process: Cameron provided Liberty with progress reports on settlement negotiations, Cameron sent Liberty draft

_____

[4]  As used herein, "BP" refers to BP America Production Company, its predecessors, and/or its affiliated entities.  BP was an owner of the Macondo Well and lessee of the area where the well was located.

settlement agreements, and Cameron took suggestions from Liberty regarding settlement tactics. *See id.* ¶¶ 26-31.

On November 8, 2011, Cameron moved for summary judgment against Transocean on the issue of Cameron's claim for contractual indemnity under the Cameron-Transocean Contracts. Rec. Doc. 4524. Both Transocean and BP filed oppositions to this motion. Rec. Docs. 4778, 4848. Around this time, Transocean and BP similarly filed cross-motions for summary judgment against one another on issues concerning Transocean's purported right to contractual indemnity from BP. Rec. Docs. 4477, 4827. Oral argument on Cameron's, Transocean's, and BP's motions was scheduled for the same day, December 16, 2011.

Prior to oral argument, Cameron—with the knowledge and consent of its insurers, including Liberty—discussed the possibility of a settlement with BP whereby Cameron would pay a sum of money to BP and BP would waive most of its claims against Cameron and indemnify Cameron for most third-party pollution claims. Cameron states that if it were assigned even a small percentage of the fault for the oil spill, it could face liability in the billions of dollars. However, BP required as a condition to settlement that Cameron's insurers waive their subrogation rights and Cameron waive any indemnification rights it might have against Transocean. Such waivers were necessary, Cameron alleges, to prevent the settlement amount from indirectly becoming BP's obligation by virtue of contractual indemnification.[5] *See* Am. Comp. ¶¶ 39-46, 53, Rec. Doc. 6287.

_____

[5] For example, if Cameron (or one of Cameron's insurers) paid a settlement amount to BP, and then Cameron (or one of Cameron's insurers subrogated to Cameron's rights) sought contractual indemnity for this amount from Transocean (via the Cameron-Transocean Contracts), Transocean might similarly seek contractual indemnity for this amount from BP (via the BP-Transocean Contract). If both contractual indemnity claims succeeded, then the apparent result would be that Cameron would have paid nothing in exchange for BP's release and promise to indemnify it from third party pollution claims, while BP would end up paying to Transocean the exact amount it received from Cameron in settlement. *See* Am. Comp. ¶ 42, Rec. Doc. 6287.

On December 12, 2011, Cameron and BP reached an agreement in principle for $250 million, an amount within the limits of Cameron's insurance tower. Cameron looked to its insurers to fund the settlement, all of whom—save Liberty—approved the settlement terms, including the waivers of subrogation. Cameron alleges that Liberty conceded that $250 million was a reasonable settlement amount,[6] but refused to consent to the settlement, particularly the requirement that Cameron and its insurers waive their rights against Transocean, unless Cameron agreed to a steep discount off Liberty's $50 million obligation. Liberty also took the position that it had no obligation to indemnify Cameron, because the "Other Insurance" clause (quoted in Part IV.C., below) in the Policy required Cameron to exhaust its contractual indemnity with Transocean, in addition to the underlying insurance policies, before Liberty's coverage was triggered. Cameron responds:

> No other insurance, even broadly defined, was available to cover the loss that Cameron had incurred. While Cameron had a claim against Transocean for contractual indemnification, serious issues had been raised as to whether Cameron would actually receive indemnification. Indeed, Transocean had already refused to fund Cameron's legal liabilities, rejected Cameron's indemnification claims, and vigorously contested them in court.
> . . .
> Because Transocean rejected Cameron's requests for indemnity and challenged them in court, Cameron had no indemnity from Transocean at the time of its settlement with BP. Cameron's only protection for the Deepwater Horizon incident was the tower of insurance that it had purchased, including the Liberty Insurance Policy.[7]

Nevertheless, Liberty's refusal left a $50 million "hole" in the settlement funding and effectively stalled the negotiation. With the December 16th hearing date on the indemnity motions looming,

---

[6] Liberty likewise admits in its brief: "Liberty did not object to the settlement amount, but did not consent for Cameron to waive Liberty's subrogation rights and other valuable contractual rights." *See* Liberty's Memo. in Supp. p.18 n.47, Rec. Doc. 6531-1.

[7] *Id.* ¶¶ 51, 38.

BP threatened to increase its settlement demand if a settlement could not be reached soon.[8] Cameron decided to confect the settlement without Liberty's funding: Cameron would contribute Liberty's portion, and Cameron's other insurers would contribute $200 million (hereinafter, "the Cameron-BP Settlement"). At the December 16th hearing, Cameron's counsel announced it had reached a settlement with BP and withdrew its motion against Transocean without prejudice. *Id.* ¶¶ 2, 3, 25, 39, 43, 46-59; *see also* Minute Entry from 12/16/11 Status Conf. p.3, Rec. Doc. 4941.

Cameron subsequently filed this action, alleging Liberty breached its contract when it failed to pay its $50 million policy limit in connection with the Cameron-BP Settlement. Cameron seeks damages resulting from this breach (First Cause of Action) and a declaratory judgment that Liberty must indemnify Cameron (Second Cause of Action). Cameron also seeks a declaratory judgment that Liberty must reimburse Cameron for its defense costs on an unlimited basis until Liberty exhausts its $50 million policy limit (Third Cause of Action). Finally, Cameron asserts claims for exemplary damages and/or penalties under various state-law statutes: Under Louisiana law, La. R.S. 22:1892, Cameron seeks an additional $25 million (50% of the $50 million claimed due), because Liberty's failure to pay Cameron's claim was arbitrary, capricious, and without probable cause (Fourth Cause of Action); under Texas law, Tex. Ins. Code § 541, Cameron seeks treble damages and attorneys' fees, because Liberty engaged in unfair claim settlement practices (Fifth Cause of Action); and, under Texas law, Tex. Ins. Code § 542, Cameron seeks an award of 18% interest on the damages resulting from Liberty's refusal to pay Cameron's defense costs (Sixth Cause of

---

[8] According to Cameron, the parties believed the December 16th oral argument could affect settlement negotiations. *See id.* ¶¶ 45, 48 (" As the parties recognized and Cameron's insurers, including Liberty, were told, a ruling from the bench, or even comments made by the Court during argument concerning the validity of the Transocean indemnity, could easily tip the precarious balance that BP and Cameron were trying to strike and eliminate any chance of settlement or result in substantially higher settlement demands on Cameron – an outcome that would have been potentially disastrous for Cameron.").

Action).

Liberty answered Cameron's original complaint, Rec. Doc. 6146, and subsequently brought the instant motion, Rec. Doc. 6531.

## II. SUMMARY OF THE PARTIES' ARGUMENTS

Liberty's central argument is that the "Other Insurance" clause in the Liberty Policy makes Liberty's obligation "excess of . . . any type of . . . ***indemnification*** or other mechanism by which an Insured arranges for funding of legal liabilities." (Emphasis added; the "Other Insurance" clause is quoted in its entirety in Part IV.C., below). According to Liberty, Cameron had a right to indemnity from Transocean, the extent of which has not been determined, therefore coverage under the Liberty Policy is not triggered. Liberty further asserts that Cameron should be judicially estopped from arguing that Transocean did not owe contractual indemnity, because Cameron took a contradictory position when it moved for summary judgment against Transocean.

Alternatively, Liberty argues that if coverage under the Policy was triggered, Cameron extinguished coverage when it released its claims against Transocean for contractual indemnity, because this act effectively waived Liberty's subrogation rights. In a related argument, Liberty asserts that because it did not consent to the settlement, Cameron's payment was voluntary and not Liberty's obligation. As to Cameron's claim for defense costs, Liberty urges that the Policy expressly negates the duty to defend or to pay such costs. Finally, Liberty argues that Cameron's statutory "bad faith" claims fail because, absent coverage there can be no bad faith, and for other reasons discussed below.

Cameron responds that Liberty's motion improperly seeks to shift the burden to Cameron to show that "other insurance" does not exist as a prerequisite to coverage. Cameron contends that,

on a Rule 12(c) motion, its burden is to plead that its loss is covered by Liberty's policy; Liberty's arguments are affirmative defenses that can only be tested through summary judgment or trial. Additionally and in the alternative, Cameron argues that the "Other Insurance" clause is triggered only "[i]f other insurance *applies* to a "loss" that is also covered by [Liberty's] policy;" because Transocean consistently denied owing Cameron indemnity, there was no "other insurance" that "applied" to the loss when it settled with BP. (Emphasis added; the "Other Insurance" clause is quoted in its entirety in Part IV.C., below). As to the judicial estoppel argument, Cameron argues that it did not take contrary positions, and if it did, the Court never accepted its prior position.

As to Liberty's right to subrogation, Cameron asserts that those rights are expressly preserved in the Cameron-BP Settlement. Alternatively, if Liberty's subrogation rights were extinguished, Cameron contends that this only gives rise to a question of fact as to whether those rights had any value, which cannot be resolved on a Rule 12(c) motion. As to Liberty's argument that the settlement constituted a voluntary payment, Cameron claims that Liberty's counsel waived this argument in a letter to Cameron's counsel. Cameron further notes that the issues surrounding Liberty's consent and voluntary payment—such as whether Liberty's refusal to consent was reasonable—are outside the pleadings and cannot support a Rule 12(c) motion. As to defense costs, Cameron contends that the policy only waived Liberty's duty to defend, not the duty to indemnify defense costs. Finally, Cameron urges it has sufficiently alleged facts supporting the statutory "bad faith" claims and Liberty's other arguments regarding these claims lack merit.

Liberty replies that the "Other Insurance" clause is a condition precedent to coverage; therefore, it is Cameron's burden to show that indemnity from Transocean has been exhausted. As to the subrogation issue, Liberty argues that the purported reservation of Liberty's subrogation rights

in the Cameron-BP settlement is hollow, since Cameron released its indemnification rights against Transocean.  As to the voluntary payment issue, Liberty disputes Cameron's interpretation of the letter from Liberty's counsel.

## III.  LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Rule 12(c) motions are subject to the same standards as a motion to dismiss under Rule 12(b)(6).  *In re: Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010).  Thus, to avoid dismissal, a plaintiff must plead enough facts in her complaint to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  The court is not, however, bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

On Rule 12(c) and 12(b)(6) motions, a court typically will limit itself to the facts stated in the complaint.  However, a court may consider documents outside the complaint if (1) they are attached to the motion, (2) referenced in the complaint, and (3) central to the plaintiff's claims.  *See*

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Quarter Holdings, LLC v. Axis Surplus Ins. Co., Inc.*, No. 11-2765, 2012 WL 1091035, at *2 (E.D. La. Mar. 30, 2012).

## IV. DISCUSSION

### A.    Conflict of Law

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).  The parties briefly dispute what law should apply to the Liberty Policy.  Liberty contends Texas law should apply, because the Policy was issued and executed in Texas.  Liberty's Reply Br. p.1 n.1, Rec. Doc. 6848 (citing *Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 286 n.2 (5th Cir. 2009)). Cameron states that it is not clear whether Texas law applies, and notes that Louisiana law might apply "given that Louisiana is the situs of the lawsuits underlying Cameron's insurance claim, Louisiana property was impacted the most, and both Cameron and Liberty conduct business in Louisiana." Cameron's Opp'n p.10 n.2, Rec. Doc. 6703 (citing *Boutee v. Fireman's Fund Cnty. Mt. Ins. Co.*, 06-34, 930 So. 2d 305 (La. App. 3 Cir. 5/10/06); *In re Combustion, Inc.*, 960 F. Supp. 1056 (W.D. La. 1997)).  However, Cameron contends that this issue need not be resolved, because the laws do not conflict on any of the issues immediately before the Court.

Cameron is correct that it is not necessary to conduct a conflict-of-law analysis when the parties have not identified a conflict in the law.  *Am. Elec. Power Co.*, 556 F.3d at 286 n.2. However, it appears there is at least one conflict here, as Cameron brings "bad faith" statutory claims under both Texas and Louisiana law.  Ultimately, either Texas or Louisiana law must apply to this contract, and it would seem that this would likewise determine any avenues for potential relief.  The Court agrees with Liberty and holds that Texas law applies to this matter.  It is also noted that Cameron's counsel referenced only Texas law during oral argument. Tr. of 7/13/12 Status Conf. p.56:13, Rec. Doc. 6932.

In applying the substantive law of Texas, the Court must follow the decisions of the Supreme Court of Texas. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857-58 (5th Cir. 2010). If that court has not ruled on an issue, this Court must determine, to the best of its ability, what the Supreme Court of Texas would decide under the same circumstances. In this respect the decisions of the intermediate appellate courts of Texas provide guidance, but they are not binding. *Id.*

## B.     Judicial Estoppel

At issue is whether Cameron should be judicially estopped from arguing that it had no indemnity from Transocean at the time it settled with BP. Although Texas law applies to issues like contract interpretation, federal principles govern judicial estoppel. *RSR*, 612 F.3d at 859. "Judicial estoppel applies to protect the integrity of the courts—preventing a litigant from contradicting its previous, inconsistent position when a court has adopted and relied on it." *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000) (citations and quotations omitted). Two requirements must be met in order for judicial estoppel to apply. "First, it must be shown that the position of the party to be estopped is clearly inconsistent with its previous one; and [second,] that party must have convinced the court to accept that previous position." *RSR*, 612 F.3d at 859 (citations and quotations omitted).

Although Cameron urged in its previous motion for summary judgment that Transocean was required to indemnify Cameron, *see* Rec. Doc. 4524, it withdrew this motion immediately prior to oral argument. Therefore, the Court did not rule on Cameron's motion, and, consequently, Cameron did not convince the Court to accept its previous position. Accordingly, the second requirement for judicial estoppel is not met; Cameron is not judicially estopped. The Court need not consider Cameron's alternative argument that its positions were not clearly inconsistent.

## C.    "Other Insurance"

The Court turns to Liberty's primary argument regarding the "Other Insurance" clause.  As this is a Rule 12(c) motion, the ultimate question is whether Cameron has alleged facts that would allow this Court to draw the reasonable inference that it is entitled to coverage under the Liberty Policy with respect to the amount Cameron paid in the Cameron-BP Settlement.  In an insurance coverage case, the initial burden is on the insured, Cameron, to establish coverage under the terms of the policy.  *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).  The burden then shifts to the insurer, Liberty, to show the applicability of any exclusions in the policy or other affirmative defenses to coverage.  *Id.*; *see also* Tex. Ins. Code § 554.002.[9]  If the insurer proves that an exclusion applies, then the insured must show that an exception to the exclusion brings the claim within coverage.  *Gilbert Tex. Constr.*, 327 S.W.3d at 124.

Generally speaking, there is no dispute that the Cameron-BP Settlement is a "loss" covered by the Liberty Policy.[10]  Rather, Liberty argues that its coverage obligation has not been triggered, because the Policy's "Other Insurance" clause makes Liberty's coverage excess of Transocean's indemnity obligation in the Cameron-Transocean Contracts and the amount of this indemnity is yet

---

[9]  Texas Insurance Code section 554.002 provides:

> In a suit to recover under an insurance or health maintenance organization contract, the insurer or health maintenance organization has the burden of proof as to any avoidance or affirmative defense that the Texas Rules of Civil Procedure require to be affirmatively pleaded.  Language of exclusion in the contract or an exception to coverage claimed by the insurer or health maintenance organization constitutes an avoidance or an affirmative defense.

[10]  Liberty states, "There is no dispute that, if the pre-conditions to coverage under the Liberty Excess Policy had been met, and Cameron had not extinguished Liberty's subrogation rights, Cameron's claim - with the exception of its claim for defense costs - would be covered."  Liberty's Memo. in Supp. p.2, Rec. Doc. 6531-1; *see also* Liberty's Answer ¶ 46, Rec. Doc. 6147 ("Specifically, Liberty did not deny coverage, but rather its excess policy does not attach to the settlement until all underlying insurance plus indemnities are exhausted.").

to be determined.  The "Other Insurance" clause states:

> V. CONDITIONS
> . . .
> F.      Other Insurance
> ***If other insurance applies to a "loss" that is also covered by this policy, this policy will apply excess of such other insurance.***  Nothing herein will be construed to make this policy subject to the definitions, terms, conditions and exclusions of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.
>
> Other insurance includes any type of self-insurance, ***indemnification*** or other mechanism by which an Insured arranges for funding of legal liabilities.

(Emphasis added).

At the outset, the parties disagree over whether this clause is a condition precedent to coverage—which, according to Liberty, requires Cameron to show that no "other insurance" applies to its loss—or an exclusion or other affirmative defense—which, according to Cameron, places the burden upon Liberty to show "other insurance" does apply.  In support of its position, Liberty notes that the "Other Insurance" clause appears in the "Conditions" section of the Policy and cites two cases that state it is the insured's burden under Texas law to show underlying insurance is exhausted as a condition precedent to coverage from an excess insurer.  *See D.R. Horton, Inc. v. Am. Guar. & Liab. & Ins. Co.*, No. 11-039, 2012 WL 1893977, at *19, --- F. Supp. 2d ---, (N.D. Tex. May 22, 2012); *Dresser Indus., Inc. v. Underwriters at Lloyd's, London*, 106 S.W.3d 767, 771 (Tex. App. 2003).  Liberty also claims that the Fifth Circuit recognized that an "other insurance" clause may be a condition to coverage in *RSR Corp. v. International Insurance Co.*, 612 F.3d 851, 858-61 (5th Cir. 2010).  Cameron argues that calling a term a "Condition" is not dispositive of its effect and cites several cases from outside Texas that held the existence of "other insurance" is the insurer's burden to prove.

The Court agrees with Cameron and disagrees with Liberty. Both *Horton* and *Dresser* contain language that could be construed as supportive of Liberty's position, but only when that language is considered out of context. *Horton* stated, "[The insured] had the burden to establish that the limits of liability of the [primary insurance] and [first-level excess] policies, as well as [the insured's] self-insured retentions, had been exhausted by payment of claims covered by those policies during that policy year." 2012 WL 1893977, at *19 (citing *Dresser*, 106 S.W.3d at 771; footnote omitted). *Dresser* similarly stated, "[The insured] must prove the exhaustion of underlying insurance as a condition precedent to recovery against the excess carrier." 106 S.W.3d at 771. However, both courts were referring to the various layers of insurance within an insurance tower. Transocean, however, is not an underlying insurer within Cameron's tower of insurance. Instead, Transocean is a party with whom Cameron may have had a claim for contractual indemnity by virtue of the clauses within the Cameron-Transocean Contracts. Thus, while *Horton* and *Dresser* may accurately state the law with respect to underlying insurers, those cases did not consider or address an insured's burden with respect to a party such as Transocean.

More importantly, *Horton* and *Dresser* did not address a situation where the purported source of the "other insurance" rejects and opposes the insured's claim for indemnification, as Transocean has done. In *Horton*, for example, the insured settled twenty-five of twenty-eight lawsuits and then sued its second-level excess liability insurer for refusing to pay for the claims in the three unsettled lawsuits. 2012 WL 1893977, at *2. The opinion indicates the underlying insurers funded the twenty-five settlements up to their policy limits. The court granted summary judgment in favor of the insurer for two reasons: (1) the insured neither pled nor offered probative evidence showing that any of the claims were actually covered by the defendant's insurance policy, and (2) the insured did

not plead or offer probative evidence showing that any claims, assuming they were covered, occurred during the applicable policy year. *See id.* at *6, *13, *19. Based on these conclusions, the court similarly found that the insured had not sufficiently pled or offered evidence to prove exhaustion of insurance below the second-level excess insurer. *See id.* at *21 ("For all one can tell from the conclusory allegations of the pleading, [the insured] is contending that exhaustion occurs as to the underlying policies even though [the insured] has not paid its self-insured retention **and even if the payments that led to the claimed exhaustion [of underlying insurance]** *were arbitrarily made* **without regard to the coverage provided by the underlying policies** or the coverage year in which the payments properly could be assigned for exhaustion purposes." (emphasis added)). *Dresser* concerned similar issues. As indicated above, it does not appear that the underlying insurers in *Horton* or *Dresser* denied the insurer's claim, as Transocean has done. Also, here there is no dispute that the Cameron-BP Settlement is a loss covered by the Liberty Policy, nor is there any dispute that the settlement exhausted the primary insurance and the three levels of excess insurance below Liberty.

The Court also is not persuaded by Liberty's citation to *RSR*. Quoting that case, Liberty states, "It is the *existence* of the indemnity right that triggers the condition, 'whether or not recovery under this 'Other Insurance' is actually sought.'" Liberty's Reply Br. p.3, Rec. Doc. 6848 (quoting *RSR*, 612 F.3d at 859) (emphasis supplied by Liberty; second emphasis omitted). In *RSR*, the Fifth Circuit held that an insured could not recover from International, the insurer from whom it had purchased four Environmental Impairment Liability policies, because the insured had settled with its commercial general liability ("CGL") insurers, fully compensating the insured's loss, and International's "other insurance" clause made its coverage excess of the CGL policies. 612 F.3d at

857.  In other words, after settling with the CGL insurers, there was no "excess loss" for International to cover.  *RSR* did not address the situation here: where the purported source of "other insurance" denies coverage, and another insurer, while admitting that the loss is covered by the policy, attempts to avoid coverage based on the "other insurance" clause.  Moreover, Liberty quotes *RSR* out of context.  The quote comes from the portion of the opinion addressing the insured's argument that settlement payments from the other insurers were not "other insurance" under the terms of the "other insurance clause." *See id.* at 858-59.[11]  Again, this is an entirely different issue from the one here.  Similar to *Horton* and *Dresser, RSR* does not speak to this case.

In contrast to *Horton*, *Dresser*, and *RSR*, the cases cited by Cameron, although not decided under Texas law, are far more relevant.  In *Raytheon Co. v. Continental Casualty Co.*, the insurer argued on a Rule 12 motion that the insured is required to allege in its complaint that no "other

---

[11] Liberty's quote is taken from the following passage:

> RSR contends that the district court erred by holding that a payment pursuant to a settlement agreement could be "other insurance" within the meaning of Condition 8.  This argument is beside the point.  By its plain language, the triggering of Condition 8 requires only (1) the existence of "other insurance" insuring to RSR's benefit and (2) overlapping coverage between that other insurance and International's Environmental policies. The means by which actual recovery might be achieved under the other insurance in question, whether by settlement agreement or by judgment, is irrelevant to Condition 8's applicability. The existence of other insurance that covers the same liability as the Environmental policies is what triggers the condition, whether or not recovery under this other insurance is actually sought.

> There is no dispute that RSR's CGL policies were insurance. Thus, the relevant question for the purposes of determining Condition 8's applicability in this case is not whether RSR's settlements were "insurance." The relevant question is whether RSR sought to recover for liabilities under its Environmental policies that were also "recoverable" under its CGL policies.

*Id.* at 858-59 (citations omitted).

RSR attempted to argue that the CGL policies and International's policy covered differed liabilities, but was judicially estopped from making this argument.  This conclusion mooted any issue of whether the insured's loss was covered by "other insurance;" in essence, it was established that the CGL policies covered the insured's claim against International and the insured had, in effect, been compensated under those policies by settlement with the CGL insurers. Again, this is different from this case, where Transocean refused to indemnify Cameron.  It is also worth mentioning that *RSR* arose from a motion for summary judgment, not a Rule 12 motion.

insurance" was available to satisfy the claims against the insured, because the policy at issue contained an "other insurance" clause stating that the insurer's coverage did not apply "to the extent that any other valid and collectible insurance is available to the insured." 123 F. Supp. 2d 22, 27-28 (D. Mass. 2000). The court disagreed: "The short answer to [the insurer's] claim is that while there may be policy provisions and facts which would support a summary judgment ruling later on, these 'facts' do not have to be included in the complaint." *Id.* at 28. The court also was not persuaded by the fact that the "other insurance" clause appeared in the "Conditions" section of one of the policies at issue. It relied upon a First Circuit case that stated, "If an insurer were able to distribute provisions limiting liability throughout a policy, with the expectation that its shouldering the burden of proof would be limited to the single section entitled, 'Exclusions,' this would create considerable incentive to obfuscation and subterfuge." *Id.* at 28 n.3 (quoting *Andover Newton Theological Sch., Inc. v. Cont'l Cas. Co.*, 946 F.2d 1237, 1242-43 (1st Cir. 1992)). The *Raytheon* court concluded, "In any event, even assuming *arguendo* that the 'condition' of 'other insurance' is a condition precedent, the burden is on the insurer to prove a failure to comply either with a condition precedent or an exclusion." *Id.*

In *Insurance Co. of North America v. Kayser-Roth Corp.*, an "other insurance" clause made the insurer's coverage excess of "valid and collectible insurance available to [the insured] . . . and applicable to" the loss. No. 92-5248, 1999 WL 813661, at *23 (R.I. Super. July 28, 1999). Similar to the Liberty Policy, the "other insurance" clause appeared in the "Conditions" section of the policy. The insurer identified dozens of other potential insurers—all of whom had denied coverage—and contended, as Liberty essentially does here, "that before [the insured] can make out a prima facie case that it is entitled to coverage, and as part of its burden of proving that all of the

17

insurance" was available to satisfy the claims against the insured, because the policy at issue contained an "other insurance" clause stating that the insurer's coverage did not apply "to the extent that any other valid and collectible insurance is available to the insured." 123 F. Supp. 2d 22, 27-28 (D. Mass. 2000). The court disagreed: "The short answer to [the insurer's] claim is that while there may be policy provisions and facts which would support a summary judgment ruling later on, these 'facts' do not have to be included in the complaint." *Id.* at 28. The court also was not persuaded by the fact that the "other insurance" clause appeared in the "Conditions" section of one of the policies at issue. It relied upon a First Circuit case that stated, "If an insurer were able to distribute provisions limiting liability throughout a policy, with the expectation that its shouldering the burden of proof would be limited to the single section entitled, 'Exclusions,' this would create considerable incentive to obfuscation and subterfuge." *Id.* at 28 n.3 (quoting *Andover Newton Theological Sch., Inc. v. Cont'l Cas. Co.*, 946 F.2d 1237, 1242-43 (1st Cir. 1992)). The *Raytheon* court concluded, "In any event, even assuming *arguendo* that the 'condition' of 'other insurance' is a condition precedent, the burden is on the insurer to prove a failure to comply either with a condition precedent or an exclusion." *Id.*

In *Insurance Co. of North America v. Kayser-Roth Corp.*, an "other insurance" clause made the insurer's coverage excess of "valid and collectible insurance available to [the insured] . . . and applicable to" the loss. No. 92-5248, 1999 WL 813661, at *23 (R.I. Super. July 28, 1999). Similar to the Liberty Policy, the "other insurance" clause appeared in the "Conditions" section of the policy. The insurer identified dozens of other potential insurers—all of whom had denied coverage—and contended, as Liberty essentially does here, "that before [the insured] can make out a prima facie case that it is entitled to coverage, and as part of its burden of proving that all of the

17

conditions precedent to coverage have been met, [the insured] must prove the extent to which [the insurer's] coverage will be excess to any other insurance policies providing coverage for the . . . claim." *Id.* at *24. The court disagreed and held that the "other insurance" clause was "not a condition of coverage for which the insured carries the burden of proof." *Id.* at *25 (citations omitted). Similarly, in *Rhone-Poulenc, Inc. v. International Insurance Co.*, the court stated, "the only reasonable construction of [the 'other insurance' clause] is that it may be applied by [the insurer] as a shield against [the insured's] claim, **but only if other carriers have acknowledged coverage**. No. 94-3303, 1996 WL 328011, at *13 (N.D. Ill. June 11, 1996) (emphasis added). Because the other carriers disclaimed coverage, *Rhone-Poulenc* held that the "other insurance" clause was inapplicable. *Id.*

Although the parties have not cited a case on point from the Supreme Court of Texas, this Court notes that the Supreme Court of Texas has stated that a purported "condition" in an insurance policy should not be interpreted as such when doing so would impose an absurd or impossible result. *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 635-36 (Tex. 2008); *see also Coastal Ref. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 285 (Tex. App. 2007) ("More recently, however, the significance of characterizing a notice provision as a condition precedent to coverage has eroded considerably."). Thus, under Texas law, the fact that this "Other Insurance" clause appears in the "Conditions" section of the Liberty Policy is not dispositive of its effect. Furthermore, as explained in *Kayser-Roth*, Liberty's position could lead to absurd consequences:

> The practical effect of First State's [the insurer] contention is certainly curious. First State would require that before coverage is triggered, its insureds must successfully prove the limitations on or reductions in First State's liability. In other words, as a condition precedent to coverage, the insured must prove how little its carrier must pay in damages. The more successful the insured becomes in its proof that it is entitled to coverage, the less First State will have to pay. One wonders what

18

would be the result if the insured took on the burden but failed in its proof that some particular policy of other insurance was valid, collectible, available, and applicable to the loss? Are the conditions of coverage under the First State policy deemed proved or not? What if First State were to take the position that the insured could have done a better job at proving the other policy? Or what if the insured did not believe a particular policy to be valid, collectible, available, or applicable but First State disagreed with that contention? Is the insured required to expend effort in proving what amounts to a limitation on the coverage it seeks in order to protect its right to that coverage? And, in a case where there are several policies potentially afford[ing] concurrent coverage, isn't the insured, as a practical matter, being required to prove First State's pro rata share? And which of the litigants carries the burden of proving the policy exclusions, limitations, or other defenses to coverage or to liability for damages? For example, if the carrier issuing the other policy of insurance refused to pay by claiming the policy was procured by fraud and misrepresentation, is it First State or its insured that must prove that policy defense? Or should the insured attempt to prove both its right to coverage as well as its own fraud? The bugaboo of conflicts and confusion presented by First State's contention concerning burden of proof of other insurance grows exponentially.

1999 WL 813661, at *25; *see also* 15 Lee R. Russ, *Couch on Insurance* § 219:1 (3d ed. 2011 update) ("'Other insurance' clauses govern the relationship between insurers[;] they do not affect the right of the insured to recover under each concurrent policy.").

The Court concludes that, under the circumstances of this case, Liberty's argument regarding the "Other Insurance" clause is in the nature of an affirmative defense for which Liberty must bear the burden. Consequently, Liberty's argument cannot succeed on a Rule 12 Motion.[12]

Liberty's argument fails for another, alternative reason. The operative words in the "Other Insurance" clause are "if" and "applies." The Liberty Policy is excess of the Transocean indemnity only *if* the Transocean indemnity *applies* to the loss. The Policy does not define "applies;" the Court must determine its meaning.

---

[12] Liberty attempts to distinguish Cameron's cases by pointing out that the "other insurance" clauses in those cases required that the purported "other insurance" be "collectible" or "valid and collectible," while this clause lacks such language and merely requires that "other insurance" "applies." As explained below, this is a distinction without a difference.

An insurance policy is interpreted according to ordinary contract principles. *Am. Home Assur. Co. v. Cat Tech L.L.C.*, 660 F.3d 216, 220 (5th Cir. 2011). The primary goal of contractual interpretation is to give effect to the written expression of the parties' intent, which requires the Court to read all parts of the contract together and to strive "to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). Where the policy's terms are unambiguous—i.e., if the terms have definite and certain legal meaning—the terms are enforced according their plain meaning. *Travelers Lloyds Ins. Co. v. Pac. Emp'rs Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010). However, if an ambiguity exists—i.e., if a term is susceptible to two or more reasonable interpretations—the term is interpreted in favor of coverage. *Am. Home Assur. Co.*, 660 F.3d at 220.

There are two reasonable interpretations that could be given to "applies." It could mean that Liberty's coverage is excess of any "other insurance" that might ***potentially*** apply to Cameron's loss, despite the fact that (1) Transocean has denied that it owes Cameron indemnification and (2) the validity/scope of the indemnity clauses in the Cameron-Transocean Contracts has never been judicially determined. However, "applies" could also mean that Liberty's coverage attaches unless "other insurance" ***actually and presently*** applies. Under this interpretation, Transocean's refusal to provide indemnity would mean that there is no "other insurance" that "applies" to Cameron's loss. Given these alternatives, the Court adopts the latter, favoring coverage, for purposes of deciding this motion. *Cf. Benzier v. Iowa Mut. Tornado Ins. Ass'n*, 216 N.W.2d 385, 389 (Iowa 1974) ("As used here [in an 'other insurance' clause], we believe 'available to such insured' is ambiguous and subject to the interpretation an ordinary layman would give it."), *cited in* Lee R. Russ, *Couch on Insurance* § 219:11 (3d ed. 2011 update) ("Where the 'other insurance' clause is based on insurance 'available

to such insured,' the provision requires that the other coverage be ***actually*** available to the insured."

(emphasis added)).

Recall that the issue on this Rule 12(c) motion is merely whether Cameron has alleged facts

that would allow the Court to draw the reasonable inference that it is entitled to coverage under the

Liberty Policy. Cameron pled facts showing that it suffered a loss covered by the Liberty Policy,

which is generally undisputed by Liberty. *See supra* note 10. Cameron also pled that the insurance

policies underlying the Liberty Policy have been exhausted and that Transocean refused its demands

for contractual indemnity. *See* Am. Compl. ¶¶ 37-38, 51. Thus, even if the "Other Insurance"

clause was a condition precedent to coverage, Cameron has sufficiently pled that no "other

insurance" "applies" to its claim. The Court does not interpret the "Other Insurance" clause as

requiring anything further of Cameron. Liberty's other arguments aside, which are addressed below,

Cameron has pled enough facts for the Court to draw the reasonable inference that it is entitled to

coverage under the Policy.

## D.     Impairment of Subrogation Rights; Consent-to-Settle/Voluntary Payment

Liberty urges that when Cameron released its right to seek indemnification from Transocean

in connection with the settlement with BP, Cameron effectively and unilaterally terminated Liberty's

ability to seek recovery from Transocean via subrogation.[13] Liberty claims this forfeits Cameron's

right to coverage under the Liberty Policy. In a related argument, Liberty also asserts that Cameron

did not obtain Liberty's consent before settling with BP, as required by the Liberty Policy; therefore

---

[13] Liberty asserts that the Liberty Policy incorporates the subrogation clause found in the First Underlying Policy, which provides in part: "If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after loss to impair these rights and must help us enforce them." Liberty's Memo. in Supp. p.4 n.4, Rec. Doc. 6531-1.

any payment by Cameron was voluntary and not Liberty's responsibility.[14]

*Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691 (Tex. 1994), speaks to both of Liberty's arguments. Following an automobile accident, the insureds in that case settled with the tortfeasor for the policy limit in the tortfeasor's insurance, $25,000, which was the tortfeasor's only asset. The insureds did not obtain the consent of their insurer before entering this settlement. When the insureds later sought to recover their excess damages under their underinsured motorist policy, the insurer denied coverage on the basis that the insureds breached the "settlement-without-consent" clause of the policy. The Supreme Court of Texas held that the insurer could not deny coverage in that instance, when the breach did not prejudice the insurer. *Id.* at 692, 694.

The *Hernandez* court explained that, under contract law principles, when one party commits a ***material*** breach of contract, the other party to the contract is excused from its obligation to perform. *Id.* at 692. To determine the materiality of a breach, the court would consider, among other things, "the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Id.* at 693 (citations and footnote omitted). "The less the non-breaching party is deprived of the expected benefit, the less material the breach." *Id.* In other words, a breach that does not cause prejudice to other party is not material. *See Coastal Ref. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 294 (Tex. App. 2007) (discussing *Hernandez*). The *Hernandez* court continued:

> [T]here may be instances when an insured's settlement without the insurer's consent prevents the insurer from receiving the anticipated benefit from the insurance contract; specifically, the settlement may extinguish a valuable subrogation right. **In other instances, however, the insurer may *not* be deprived of the contract's**

---

[14] Liberty relies on the Policy's "consent-to-settle" clause found in Article V(E)(4) of the Liberty Policy: "The Insureds will not, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Liberty's Memo. in Supp., Ex. A, Rec. Doc. 6531-2 at 20.

**expected benefit, *because any extinguished subrogation right has no value.*** In the latter situation—where the insurer is not prejudiced by the settlement—the insured's breach is not material. We conclude, therefore, that an insurer who is not prejudiced by an insured's settlement may not deny coverage under an uninsured/underinsured motorist policy that contains a settlement-without-consent clause.

875 S.W.3d at 693 (emphasis added). Largely because the tortfeasor's only asset was the $25,000 insurance policy, the court concluded that the insurer "remain[ed] in the same position it would have occupied had the [insureds] complied with the settlement-without-consent clause." *Id.* at 694. Consequently, the insurer was not prejudiced by the breach, the breach was not material, and the insurer could not avoid its coverage obligation. *Id.* Subsequent cases have applied *Hernandez*'s prejudice requirement beyond the underinsured motorist insurance context.[15]

Citing *Motiva Enterprises, LLC v. St. Paul Fire & Marine Insurance Co.*, 445 F.3d 381 (5th Cir. 2006), and other cases, Liberty argues that it need not show prejudice. *See* Liberty's Memo. in Supp. pp.17-20, Rec. Doc. 6531-1. In *Motiva*, an insurer refused to fund a settlement on the grounds that its consent had not been obtained as required by a consent-to-settle clause. The Fifth Circuit stated that "it is ***not entirely clear*** under Texas law whether an insurer must demonstrate prejudice before it can avoid its obligations under a policy where the insured breaches a prompt-notice provision or a consent-to-settle provision." *Id.* at 386 (emphasis added). The court noted that in *PAJ Inc. v. Hanover Insurance Co.*, 170 S.W.3d 258 (Tex. App. 2005), *rev'd* 243 S.W.3d 630 (Tex. 2008), a Texas appellate court held that a notice provision was a condition precedent to

---

[15] *E.g.*, *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 631, 633-34, 636-37 (Tex. 2008) (relying on *Hernandez* to conclude that a failure to timely notify a commercial general liability insurer of a claim does not excuse coverage if the failure did not cause prejudice to the insurer); *Coastal Ref. & Mktg., Inc.*, 218 S.W.3d at 294-95 (stating that *Hernandez*'s "principle is not limited to uninsured motorist policies" and denying a commercial general liability insurer's motion for summary judgment because it did not show that a settlement without consent caused prejudice to the insurer); *Mendez v. Allstate Prop. & Cas. Ins. Co.*, 231 S.W.3d 581, 586 (Tex. App. 2007) (stating that *Hernandez* "is equally applicable" to an automobile indemnity policy and finding that the insurer was excused from coverage where the insured's extinguishment of subrogation rights caused prejudice to the insurer).

coverage, breach of which did not require the insurer to show prejudice. *Motiva*, 445 F.3d at 386 n.5. The *Motiva* court also noted that it had stated in a footnote to an earlier case that it did not read *Hernandez* as necessarily creating a prejudice requirement for all insurance policies. *Id.* (citing *Ridglea Estate Condo. Ass'n v. Lexington Ins. Co.*, 415 F.3d 474 (5th Cir. 2005)). Despite these reservations, however, the Fifth Circuit assumed that an insurer must show prejudice in order to avoid its coverage obligations, and concluded that the record facts established prejudice as a matter of law. *Id.* at 386.[16]

"Although [*Motiva*] questioned whether an insurer is required to show prejudice resulting from a violation of a consent-to-settle provision in order to avoid coverage, the court did ***not*** conclude, as [Liberty] suggests, that such a violation voids coverage as a matter of law regardless of prejudice." *Coastal Ref. & Mktg., Inc.*, 218 S.W.3d at 290-91 (emphasis added). Moreover, after *Motiva* was decided the Texas Supreme Court reversed *PAJ*, cited in *Motiva* to support its reservation about Texas law, tending to show that Texas law indeed requires an insurer to show that an insured's breach of a policy term caused prejudice before the insurer can avoid coverage. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636-37 (Tex. 2008), *rev'g* 170 S.W.3d 258 (Tex. App. 2005). Furthermore, the facts that led the *Motiva* court to conclude that prejudice was established as a matter of law, *see supra* note 16, are not established on the face of Cameron's amended complaint. To the contrary, Cameron alleged that it gave Liberty notice of potential liability, assisted Liberty with its investigation, kept Liberty apprised of developments in the litigation, provided Liberty with progress reports on settlement negotiations and draft settlement

---

[16] The *Motiva* court explained: "When, as in this case, the insurer is not consulted about the settlement, the settlement is not tendered to it and the insurer has no opportunity to participate in or consent to the ultimate settlement decision, we conclude that the insurer is prejudiced as a matter of law." *Id.*

agreements, took suggestions from Liberty regarding settlement tactics, and provided Liberty with

an opportunity to consent to the settlement. *See* Am. Compl. ¶¶ 26-31, 47-48, Rec. Doc. 6287.

Consequently, the present issue is easily distinguished from *Motiva*. *Cf. Coastal Ref. & Mktg., Inc.*,

218 S.W.3d at 291 ("[*Motiva*'s] narrow conclusion was based on widely different facts than those

presented here."). For these reasons, Liberty's reliance on *Motiva* is unavailing. The other cases

cited by Liberty are also unpersuasive.[17]

Returning to Liberty's impairment-of-subrogation argument, *Hernandez* and its progeny

instruct that Liberty may be excused from its coverage obligation only if Cameron released legally

valid and enforceable indemnity claims against Transocean. If the indemnity claims were not valid,

then Liberty's subrogation rights held no value, and Cameron's release of same caused no prejudice

to Liberty; i.e., Cameron's "breach" was not material.[18] It is Liberty's burden on this Rule 12(c)

---

[17] Liberty cites *Hardesty Builders, Inc. v. Mid-Continent Cas. Co.*, No. 10-142, 2010 WL 5146597 at *9 (S.D. Tex. Dec. 13, 2010), where the district court stated, "The Fifth Circuit [in *Motiva*] has made clear that under Texas law an insurer may escape liability on the basis of a settlement-without-consent provision, with or without a showing of prejudice." For reasons just discussed, to the extent *Hardesty* interpreted *Motiva* as not requiring a showing of prejudice, this Court is not bound by and respectfully declines to follow that interpretation. For similar reasons the Court is not persuaded by Liberty's citation to *Lytal Enterprises, Inc. v. Newfield Exploration Co.*, No. 06-0033, 2006 WL 2990124, at *5 (E.D. La. Oct. 18, 2006). Finally, Liberty's citation to *Foundation Reserve Insurance Co. v. Cody*, 458 S.W.2d 214, 216 (Tex. Civ. App. 1970), is unpersuasive, as that decision preceded the Texas Supreme Court's decision in *Hernandez*. *See, e.g.*, *Mendez*, 231 S.W.3d at 586 (implicitly recognizing that, although older cases such as *Cody* traditionally held that extinguishing an insurer's subrogation rights precludes coverage, *Hernandez* now requires a court to examine whether this breach was material).

[18] At oral argument, Liberty took the position that the Court could not determine the validity of these clauses, because Cameron's actions rendered the issue moot:

> [Liberty's Counsel]: . . . The second thing that's related to that is, independently, that waiver of subrogation constitutes a forfeiture under the policy. As a result, we don't think our client, once again, has been triggered because the underlying policy to which it follows form says that they cannot impair rights of subrogation.
> . . .
> THE COURT: The right of subrogation assumes that they had a valid, a viable indemnity claim against Transocean?
> [Liberty's Counsel]: Absolutely. But my point is that my client lost the ability to pursue that because my client could have pursued it; and, if, in fact, it lost that, then the attachment would have been clear. But because it lost the ability to preserve that, there was no attachment, and there can be no attachment

(continued...)

25

motion to show it has been prejudiced by Cameron's release.  *See Coastal Ref. & Mktg., Inc.*, 218 S.W.3d at 291, 296-97 (holding it was the insurer's burden on a motion for summary judgment to show it was prejudiced by the insured's settlement).  This Court has never determined whether the indemnity clauses in the Cameron-Transocean Contracts were valid and enforceable, and no party contends that the Court could or should make such a determination here.[19]  Consequently, Liberty has not met its burden with respect to this argument.  Liberty's consent-to-settle/voluntary payment argument fails for similar reasons.

The Court need not and does not consider Cameron's alternative argument that the Cameron-BP Settlement preserved Liberty's subrogation rights. The Court also does not consider Cameron's argument that Liberty's counsel waived the consent-to-settle/voluntary payment argument in a letter to Cameron's counsel.  Finally, the Court also does not express an opinion on Cameron's argument

---

[18](...continued)
now because they made the business decision at that point in time not to pursue those motions, but instead to settle. . . .
THE COURT: . . . [W]ould I not have to decide whether, in fact, there was a valid indemnity obligation, whether Transocean owed Cameron indemnity under their contract?
[Liberty's Counsel]: Well, you don't now because of their withdrawal of the motion and their settlement of the case.
THE COURT: So, as part of your case, it seems like I would have to decide that.
[Liberty's Counsel]: Well, we've not briefed those arguments because the resolution of those issues is now moot. Because of the waiver of subrogation, there is no reason to resolve those issues because my client can no longer pursue those rights.

Tr. of 7/13/12 Status Conf. pp.47-48, 50, Rec. Doc. 6932.  It appears that Liberty would like the Court to simply assume the indemnity clauses in the Cameron-Transocean Contracts were enforceable.  As explained above, such an assumption would relieve Liberty of its burden of proving an essential element to its argument, and it would seem especially odd to make this assumption when Transocean and BP previously contested the validity of these clauses.  Liberty is begging the question.  It cannot base its impairment-of-subrogation argument on these indemnity clauses without showing they were valid and enforceable.

[19] Although Cameron's amended complaint mentions the Cameron-Transocean Contracts by way of background and quotes the indemnity clauses contained therein, Cameron argues that these contracts are not central to its claims against Liberty, and thus outside the scope of a Rule 12(c) motion.  Liberty admitted this point when it contended that the *only* items the Court need consider here are "the policy, the settlement agreement, and the allegations."  Liberty Reply Br. p.9, Rec. Doc. 6848; *see also* Liberty's Memo. in Supp. p.10, Rec. Doc. 6531-1("[T]his entire dispute can be appropriately resolved as a matter of law on the clear terms of the insurance policy alone.");  *see also* note 18, *supra*.

regarding whether Liberty's refusal to consent to the settlement was reasonable. *See* Cameron's

Opp'n p.24, Rec. Doc. 6704.

Given the conclusions in this Part IV.D., as well as the conclusions in Parts IV.B. and IV.C.,

Liberty's motion is DENIED insofar as it seeks dismissal of the First and Second Causes of Action.

**E.     Statutory "Bad Faith" Claims under La. R.S. 22:1892 and Tex. Ins. Code. § 541**

Because the Court holds that Texas law applies to this matter, *see supra* Part IV.A.,

Cameron's claim for penalties under Louisiana law (Fourth Cause of Action) must be dismissed.

Accordingly, Liberty's motion is GRANTED insofar as it seeks dismissal of the Fourth Cause of

Action.

Liberty also seeks to dismiss Cameron's claims under Tex. Ins. Code § 541.060, "Unfair

Settlement Practices" (Fifth Cause of Action).  That statute provides, in pertinent part:

> (a) It is an unfair method of competition or an unfair or deceptive act or practice in
> the business of insurance to engage in the following unfair settlement practices with
> respect to a claim by an insured or beneficiary:
> > (1) misrepresenting to a claimant a material fact or policy provision relating to
> > coverage at issue;
> > (2) failing to attempt in good faith to effectuate a prompt, fair, and equitable
> > settlement of:
> > > (A) a claim with respect to which the insurer's liability has become
> > > reasonably clear; or
> > > . . .

Tex. Ins. Code § 541.060.  Cameron alleges Liberty violated this statute by:

> (a) knowingly misrepresenting when Liberty's limit attached and whether Cameron
> is entitled to indemnity for its losses associated with the Deepwater Horizon incident;
> (b) knowingly failing to effect a prompt, fair, and equitable settlement of a claim
> where Liberty's liability is reasonably clear;
> (c) irresponsibly and unjustifiably holding Cameron's settlement with BP hostage in
> order to avoid or reduce Liberty's payment obligations;
> (d) taking advantage of Cameron's precarious situation in the Oil Spill MDL by
> unscrupulously offering Cameron a mere fraction of its full policy; and
> (e) intentionally forcing Cameron to institute suit to recover the $50 million Cameron

was forced to pay to BP due to Liberty's breach.

Am. Compl. ¶ 86, Rec. Doc. 6287.

Liberty argues that this claim should be dismissed because the *Stowers* elements, as applied in *Rocor International, Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 77 S.W.3d 253, 262 (Tex. 2002), are not met. *Rocor* stated:

> [W]e hold that an insurer's liability is not reasonably clear, and liability may not be imposed under article 21.21 [recodified at Tex. Ins. Code § 541.060], unless the insured shows that (1) the policy covers the claim, (2) the insured's liability is reasonably clear, (3) the claimant has made a proper settlement demand within policy limits, and (4) the demand's terms are such that an ordinarily prudent insurer would accept it.

*Id.* Liberty contends that its liability was not "reasonably clear," since the right to contractual indemnification from Transocean was never determined. However, the Texas Supreme Court has expressly "reject[ed] the suggestion that whether an insurer's liability has become reasonably clear presents a question of law for the court rather than a fact issue for the jury." *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997). In light of *Giles*, the Court's conclusions above, the allegations in Cameron's amended complaint, and the standard on a Rule 12(c) motion, this argument cannot succeed at this time.

Liberty also argues that the settlement was not within policy limits, as required by *Rocor/Stowers*. However, the settlement proposed that Liberty contribute only its $50 million policy limit, nothing more. Other insurers in Cameron's tower would fund the balance of the settlement. It appears the Supreme Court of Texas has not addressed whether such a settlement is "within policy limits." *See* Christopher S. Ayres, *Considering Settlement? Current Issues Relating to the* Stowers *Doctrine*, 37 Advoc. (Tex) 25, 27-28 (2006), *and cases cited therein*. However, at least one commentator has stated that a settlement like this could give rise to a *Stower* duty. *Id.* The Court

believes that the Supreme Court of Texas would find that this settlement was within Liberty's policy limits. Accordingly, the Court rejects Liberty's "policy limits" argument.

The Court finds that Cameron's allegations plausibly state a claim for relief under Tex. Ins. Code § 541.060. Liberty's motion is DENIED insofar as it seeks dismissal of the Fifth Cause of Action.

## F.     Defense Costs; Tex. Ins. Code § 542

Cameron claims that an underlying insurance policy, which was incorporated into the Liberty Policy, imposed a duty on Liberty to pay Cameron's defense expenses. Thus, Cameron asserts it is entitled to a declaratory judgment for such expenses (Third Cause of Action) and related penalties under Tex. Ins. Code §§ 542.058 and 542.060 in the amount of 18% per year (Sixth Cause of Action). Liberty counters that the Policy's language excludes the defense provisions in the underlying policy; therefore these claims should be dismissed. Cameron admits that the Policy disclaims the duty to defend, but urges that the obligation to pay Cameron's defense costs is separate from the duty to defend and therefore not excepted from the Policy's incorporation clause.

Article III of the Liberty Policy states:

III.  DEFENSE
A.  We [Liberty] will not be required to assume charge of the investigation of any claim or defense of any suit against you [Cameron].

B.  We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss" under this policy. If we exercise such right, we will do so at our expense.

C.  If the limits of liability of the Underlying Insurance shown in Item 5. of the Declarations are exhausted solely by payment of "loss", we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit which, in our opinion, may give rise to a "loss" under this policy. Such investigation or defense shall be at our own expense. We may, however,

withdraw from the defense of such suit and tender the continued defense to you if our applicable Limits of Liability shown in Item 4. of the Declarations are exhausted by payment of "loss."

At this stage, the Court is not convinced of either party's position. Given this doubt, the limited record before the Court, and the standard on a Rule 12 motion, the Court finds Cameron has stated a plausible claim for defense costs and related penalties under Tex. Ins. Code §§ 542.058 and 542.060.

Liberty also argues that Tex. Ins. Code § 542 only applies to first-party insurance claims, as opposed to a third-party claim. However, the Supreme Court of Texas rejected this argument in *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16-19 (Tex. 2007).

For these reasons, Liberty's motion is DENIED insofar as it seeks dismissal of the Third and Sixth Causes of Action.

## V. CONCLUSION

Liberty's Motion for Judgment on the Pleadings, Rec. Doc. 6531, is **GRANTED IN PART** and **DENIED IN PART**, as follows: Cameron's Fourth Cause of Action (seeking penalties under La. R.S. 22:1892) is **DISMISSED**. In all other respects, Liberty's Motion is **DENIED**.

**SO ORDERED.**

New Orleans, Louisiana, this 16th day of August, 2012.

_____
United States District Judge