```
 1                        UNITED STATES DISTRICT COURT
 2                        EASTERN DISTRICT OF LOUISIANA

 3    *****************************************************************

 4
      IN RE:  OIL SPILL BY THE              Docket No. MDL-2179
 5    OIL RIG DEEPWATER HORIZON             New Orleans, Louisiana
      IN THE GULF OF MEXICO ON              Friday, August 10, 2012
 6    APRIL 20, 2010
      CIVIL
 7

 8    *****************************************************************

 9        TRANSCRIPT OF WORKING GROUP STATUS CONFERENCE PROCEEDINGS
             HEARD BEFORE THE HONORABLE SALLY SHUSHAN
10                  UNITED STATES MAGISTRATE JUDGE

11
      APPEARANCES:
12
      FOR THE PLAINTIFFS:            LEVIN PAPANTONIO THOMAS MITCHELL
13                                   RAFFERTY & PROCTOR
                                     BY:  BRIAN H. BARR, ESQ.
14                                   316 South Baylen Street, Suite 600
                                     Pensacola, FL 32502
15

16                                   WILLIAMSON & RUSNAK
                                     BY:  JIMMY WILLIAMSON, ESQ.
17                                   4310 Yoakum Blvd.
                                     Houston, TX 77006
18

19                                   IRPINO LAW FIRM
                                     BY:  ANTHONY IRPINO, ESQ.
20                                   2216 Magazine St.
                                     New Orleans, LA 70130
21

22    FOR THE STATE OF LOUISIANA:    KANNER & WHITELEY
                                     BY:  DOUGLAS R. KRAUS, ESQ.
23                                   701 CAMP STREET
                                     NEW ORLEANS, LA 70130
24

25
```

```
 1   FOR THE STATE INTERESTS:        ATTORNEY GENERAL OF ALABAMA
                                     BY:  COREY L. MAZE, ESQ.
 2                                        WINFIELD J. SINCLAIR, ESQ.
                                     500 Dexter Ave.
 3                                   Montgomery, AB 36130

 4
     FOR THE UNITED STATES
 5   DEPARTMENT OF JUSTICE:          U.S. DEPARTMENT OF JUSTICE
                                     TORTS BRANCH, CIVIL DIVISION
 6                                   WEST COAST OFFICE
                                     BY:  R. MICHAEL UNDERHILL, ESQ.
 7                                   7-5395 Federal Building, Box 36028
                                     450 Golden Gate Ave.
 8                                   San Francisco, CA 94102-3463

 9
                                     U.S. DEPARTMENT OF JUSTICE
10                                   ENVIRONMENTAL ENFORCEMENT SECTION
                                     BY:  SARAH HIMMELHOCH, ESQ.
11                                        SCOTT CERNICH, ESQ.
                                          A. NATHANIEL CHAKERES, ESQ.
12                                   P.O. Box 7611
                                     Washington, DC 20044
13
14                                   U.S. DEPARTMENT OF JUSTICE
                                     TORTS BRANCH, CIVIL DIVISION
15                                   BY:  SHARON K. SHUTLER, ESQ.
                                          ROBIN HANGER, ESQ.
16                                        LAURA MAYBERRY, ESQ.
                                     P.O. Box 14271
17                                   Washington, D.C. 20044

18
19   FOR BP AMERICA INC., BP
     AMERICA PRODUCTION COMPANY,
20   BP COMPANY NORTH AMERICA,
     INC., BP CORPORATION NORTH
21   AMERICA, INC., BP EXPLORATION &
     PRODUCTION INC., BP HOLDINGS
22   NORTH AMERICA LIMITED, BP
     PRODUCTS NORTH AMERICA INC.:    LISKOW & LEWIS
23                                   BY:  DON K. HAYCRAFT, ESQ.
                                     One Shell Square, Suite 5000
24                                   701 Poydras St.
                                     New Orleans, LA 70139
25
```

```
 1                                  KIRKLAND & ELLIS
                                    BY:  J. ANDREW LANGAN, ESQ.
 2                                       MARK J. NOMELLINI, ESQ.
                                         RYAN S. BABIUCH, ESQ.
 3                                  300 N. LaSalle
                                    Chicago, IL 60654
 4

 5                                  KIRKLAND & ELLIS
                                    BY:  ROBERT R. GASAWAY, ESQ.
 6                                       JOSEPH A. EISERT, ESQ.
                                    655 Fifteenth St., N.W.
 7                                  Washington, D.C. 20005

 8
      FOR HALLIBURTON
 9    ENERGY SERVICES, INC.:        GODWIN RONQUILLO
                                    BY:  DONALD E. GODWIN, ESQ.
10                                       LAUREN L. MITCHELL, ESQ.
                                         ALISON BATTISTE, ESQ.
11                                       JENNY L. MARTINEZ, ESQ.
                                         SEAN W. FLEMING, ESQ.
12                                  Renaissance Tower
                                    1201 Elm Street, Suite 1700
13                                  Dallas, TX 75270

14
                                    GODWIN RONQUILLO
15                                  BY:  R. ALAN YORK, ESQ.
                                         GWEN E. RICHARD, ESQ.
16                                  4 Houston Center
                                    1331 Lamar, Suite 1665
17                                  Houston, TX 77010

18
      FOR CAMERON INTERNATIONAL
19    CORPORATION:                  STONE PIGMAN WALTHER WITTMANN
                                    BY:  CARMELITE M. BERTAUT, ESQ.
20                                  546 Carondelet Street
                                    New Orleans, LA 70130
21

22                                  BECK REDDEN & SECREST
                                    BY:  GEOFF GANNAWAY, ESQ.
23                                  One Houston Center
                                    1221 McKinney Street, Suite 4500
24                                  Houston, TX 77010-2010

25
```

```
 1   FOR ANADARKO PETROLEUM
     CORPORATION, ANADARKO E&P
 2   COMPANY, LP:                    KUCHLER POLK SCHELL WEINER &
                                     RICHESON
 3                                   BY:  SARAH E. IIAMS, ESQ.
                                     1615 Poydras Street, Suite 1300
 4                                   New Orleans, LA 70112

 5
                                     BINGHAM McCUTCHEN
 6                                   BY:  WARREN A. FITCH, ESQ.
                                     2020 K Street, N.W.
 7                                   Washington, D.C. 20006

 8
     FOR M-I, LLC:                   MORGAN LEWIS
 9                                   BY:  DENISE SCOFIELD, ESQ.
                                          R. SEAN BRENNAN, JR., ESQ.
10                                   1000 Louisiana St., Suite 4000
                                     Houston, TX 77002-5006
11

12   FOR TRANSOCEAN HOLDINGS, LLC,
     TRANSOCEAN OFFSHORE DEEPWATER
13   DRILLING INC., AND TRANSOCEAN
     DEEPWATER
14   INC.:                           SUTHERLAND
                                     BY:  DAVID A. BAAY, ESQ.
15                                        CARTER L. WILLIAMS, ESQ.
                                     1001 Fannin St., Suite 3700
16                                   Houston, TX 77002-6760

17
                                     FRILOT
18                                   BY:  KERRY J. MILLER, ESQ.
                                     Energy Centre, 36th Floor
19                                   1100 Poydras St.
                                     New Orleans, LA 70163
20

21

22

23

24

25
```

```
 1   FOR O'BRIEN'S RESPONSE
     MANAGEMENT, INC., SEACOR
 2   HOLDINGS, INC., SEACOR
     OFFSHORE, LLC, SEACOR MARINE,
 3   LLC, SEACOR WORLDWIDE, INC.,
     SEACOR MARINE, INC., SEACOR
 4   MARINE INTERNATIONAL, INC.,
     AND SIEMENS FINANCIAL, INC.:    WEIL GOTSHAL & MANGES
 5                                   BY:  SYLVIA E. SIMSON, ESQ.
                                     767 Fifth Ave.
 6                                   New York, NY 10153

 7
     FOR AIRBORNE SUPPORT
 8   INTERNATIONAL, INC.:            LABORDE & NEUNER
                                     BY:  BEN L. MAYEUX, ESQ.
 9                                   One Petroleum Center
                                     1001 W. Pinhook Rd., Suite 200
10                                   Lafayette, LA 70505

11
     OFFICIAL COURT REPORTER:        Karen A. Ibos, CCR, RPR, CRR
12                                   500 Poydras Street, Room HB-406
                                     New Orleans, LA 70130
13                                   (504) 589-7776

14

15        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2                                      PAGE/LINE:

3   **I. PHASE ONE "CLEAN-UP"**

4        1.  Halliburton Modeling              11/2

5        2.  Briefing for Adverse Inference Motions  11/6

6        3.  Phase One pending motions         11/16

7        4.  Zantaz Phase One Documents        12/12

8   **II.  PHASE II**

9   Equipment Store at Michoud               16/23

10       1.  Testing BOP & Capping Stack       16/25

11       2.  Deadline for BOP Testing          19/9

12       3.  Michoud Lease                     21/7

13       4.  Special Master's Statement        21/12

14  Stipulations for Phase Two               21/16

15  Phase Two Document Production            22/9

16       1.  BP's Challenge to U.S. Deliberative

17           Process Privilege Claims         22/14

18       2.  Schedule I                        22/14

19       3.  Schedule II                       22/23

20       4.  Schedule IV                       27/8

21       5.  Schedule V                        29/25

22       6.  Custodial File Production for

23           All Parties                      32/15

24  Phase Two Fact Depositions

25       1.  Length and Category of Depositions  33/7

1      2.   Lifting of no e-mail Saturday        34/22

2      3.   Time allocations                     35/9

3      4.   U.S. source control witnesses        36/24

4      5.   Scheduling

5           A)  Woods Hole                       39/21

6           B)  Wild Well Control                40/7

7           C)  Halliburton                      40/24

8           D)  Intertek Group                   41/8

9           E)  Isotech                          41/13

10          F)  Weatherford                      41/15

11          G)  Cameron                          41/18

12          H)  DNV                              41/24

13          I)  Schlumberger                     42/13

14          J)  Stress Engineering               42/19

15          K)  Worldwide Oilfield Machine       42/23

16     Last Call for Oceaneering ROV video       43/7

17     BP's designation of 30(b)(6) witnesses    43/15

18     Phase Two Expert Discovery                44/17

19     Pretrial Order No. 51                     46/13

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(FRIDAY, AUGUST 10, 20120)

(WORKING GROUP CONFERENCE)


     (OPEN COURT.)

          THE COURT:  Hello, phone participants.  Sarah, are you
there?

          MS. HIMMELHOCH:  Yes, ma'am, I am.

          THE COURT:  Just checking, wanted to make sure.  Yeah,
and I'm late again, sorry.

          So this is the way we're going to conduct our meeting
today.  And for telephone participants, we have Usain Bolt on the
screen, and that's going to be our motto of the day.

          MR. MILLER:  Are we supposed to be as fast as he is?

          THE COURT:  That is correct, we are going to run through
this at the speed of light.

          MR. MILLER:  We have a very important preliminary matter.

          THE COURT:  You do have an important preliminary matter.

          MR. MILLER:  I'm not sure it's preliminary.

          THE COURT:  Would you like to use the microphone?

          MR. MILLER:  Your Honor, as you know a couple of hours
ago we sent out an invitation for the long talk about the fall
kickoff working group conference.  About an hour after that came
out there was an e-mail from Ben Allums suggesting that next
Friday's conference before Judge Barbier be canceled.

```
1            THE COURT:  Correct.

2            MR. MILLER:  Almost all parties except for Transocean

3   have agreed next Friday's conference can be canceled.  We deferred

4   commenting until we could run the issue past you, is does it make

5   sense to defer the cocktail party until the September, Thursday

6   before the Friday conference.

7            THE COURT:  Cocktail party, I thought it was a work group

8   conference?

9            MR. MILLER:  Work group conference -- forgot there were

10  DOJ lawyers in the room -- 5:00 P.M. Thursday afternoon work group

11  conference on laser scanning issues, I think is what it's for.  And

12  so the issue is can we defer, should we defer?

13           THE COURT:  Well, that's the question.  I mean, I am

14  going to have a conference anyway on Friday.  Now, because we're

15  not going to have a Judge Barbier conference, if people would

16  prefer to attend my meeting next week by telephone, perfectly okay

17  with that.  So in other words, if you're not traveling in, that's

18  great.  But it seems to me that if that's what the majority of

19  people choose, then we should probably do our Thursday conference

20  later.  So maybe what we should do is take a poll who chooses not

21  to come in in person, and if the majority of people want that

22  weekend plus Labor Day weekend off, then we defer.

23           By the way, your choice of music was fantastic.

24           MR. MILLER:  I saw that.  I think they're available, I

25  think the Judge Barbier September conference is not far off, I
```

1   think it's September 16th or 14th.  I think that the same
2   entertainer is available on the 13th, if that matters to anyone in
3   making their decision.
4        THE COURT:  All right.  Let's look at the out-of-towners.
5   I'm looking at Rob.  Rob, would you like to participate next week
6   by phone?
7        MR. GASAWAY:  Good morning, your Honor.  I will be here
8   in person and ready to talk about any laser scanning issues that
9   may come up with Transocean.
10       THE COURT:  Well, what about the rest of the
11  out-of-towners, guys, just seems to me if you're all going to be
12  here, we can go forward.
13       MR. FITCH:  Judge, Tony Fitch.  I probably will be here
14  in person also, but I do think it makes more sense to put it off
15  until September, all things considered.
16       THE COURT:  If that can be done, let's go ahead and put
17  it off.  I'm disappointed personally.
18       MR. MILLER:  You know it might be one degree cooler on
19  September 13th.
20       THE COURT:  Or there could be a hurricane.  Who knows.
21       MR. MILLER:  In which case we'll put it off until
22  October.
23       THE COURT:  Exactly.  So the group has decided to put off
24  the next evening work group conference and we will reschedule.
25  You'll circulate the new announcement, huh?

```
 1            MR. MILLER:  Right.
 2            THE COURT:  All right.  Let's get going.  We had a little
 3   dust up this week on the Haliburton reconstruction of the
 4   modelling.  We are going to take that up in due course, and I don't
 5   think we need to comment further on that.
 6            We have requests to put the motion for adverse inferences
 7   back on Judge Barbier's calendar, and I thought that the U.S.
 8   proposal of the main motions coming in on Friday, October the 12th,
 9   with oppositions on Friday, November the 2nd made sense.  Any
10   opposition, Andy?
11            MR. LANGAN:  It's fine with us, your Honor, thank you.
12            THE COURT:  Okay.  Good, good, good.  And I assume we're
13   going to want a reply, but why don't we get the reply in four days
14   later, whatever that works out to be, and we'll put that in the
15   order.
16            That also raises the issue on Phase One of whether we
17   have other motions that need to be re-teed up.  Kerry, you're
18   nodding.
19            MR. MILLER:  That was exactly the issue I wanted to cover
20   given its relationship to adverse inferences.  I am trying to put
21   together, unless somebody else has any schedule, of the Phase One
22   motions that were filed and left pending at the time of the
23   settlement and continuance, and thought we could all look at it and
24   figure out what needs to be decided, further briefed, or what can
25   be --
```

```
 1              THE COURT:  I am not sure that we need further briefing.
 2    But why don't you take the lead, if you don't mind, Kerry, and
 3    let's put that on the agenda and see what we've got.
 4              MR. MILLER:  It would just identify what motions are
 5    outstanding and pending.
 6              THE COURT:  Exactly.  I'm sure Ben Allums has a list of
 7    that, would you prefer that I get him to give us that?
 8              MR. MILLER:  Sure.  If he doesn't, I'll be happy to.
 9              THE COURT:  We'll let you know, I'm sure he has a list,
10    and we will put that down for next week and cover it, I might even
11    get it out to you all in advance.
12              Okay.  Next up on completion of Phase One is the Zantaz
13    Phase One documents.  Does anybody have anything to report relative
14    to that issue?  Good morning, Rob.
15              MR. GASAWAY:  Good morning, your Honor.  Rob Gasaway for
16    BP.  I got a letter from Sarah Himmelhoch on Wednesday that
17    itemized that as one of a number of items for purposes of moving
18    forward.  Just as we were sitting here waiting for the conference,
19    I was able to respond to that and other issues; so I think that
20    between the United States and BP, we're close on, you know, a
21    schedule for going forward and how to work that out.  And my guess
22    is if Sarah and I talk this week, we can present something before
23    the next working group conference on Friday.
24              THE COURT:  Perfect.
25              MS. HIMMELHOCH:  Your Honor, I think that's right,
```

1  although I think Rob has overlooked that other parties already have

2  also challenged the Zantaz documents.  So I think that with the

3  modification of the adding a time for other parties to challenge

4  their Zantaz logs, we're fine with the schedule he proposes.  So

5  perhaps he should just go ahead and propose it to the remaining

6  parties so that we can report completion of the issue by next week.

7          MR. GASAWAY:  Okay.  The letter that I sent to you,

8  Sarah, was copied to all of the parties.  So maybe if all of the

9  parties can look at that letter that came in just momentarily

10  before the conference and comment on the Zantaz aspect of it.

11          THE COURT:  Yes, let's go ahead and get that taken care

12  of, that's another Phase One hanging participle.

13          MS. HIMMELHOCH:  And, your Honor, if you want I can just

14  quickly run through the schedule for parties so they don't have to

15  dig for it.

16          THE COURT:  That would be great, go ahead.

17          MS. HIMMELHOCH:  Initial brief on challenges as to the

18  Zantaz would be due August 31st -- oh, wait, I don't understand

19  your schedule, Rob, maybe we do have to talk.  The initial briefs

20  would be due August 31st and then you say BP's and other parties

21  would be due September 3rd.

22          MR. GASAWAY:  Yes.  I think we've got that backward.  I

23  think it would be the opposite, the initial briefs would be by BP

24  and the other parties, the U.S. responses, and then the replies

25  would be BP.

1          MS. HIMMELHOCH:  Okay.  So I think then in taking out the

2     extra step in there, initial briefs August 31st, U.S. response, you

3     proposed September 3rd but if we could have a couple of days after

4     the Labor Day weekend, say September 5th, and then reply

5     September 10th?

6          MR. GASAWAY:  Here's what we were thinking is, okay.  So

7     now I see what you're talking about.  We'll meet and confer until

8     August 22nd.  To the extent we don't resolve the meet and confer,

9     we would sort of finalize our list by the 31st.  And then I think

10    what we were proposing, Sarah, was the 3rd, the 10th, and the 17th

11    for the three briefs that would go to the court.  So the filing

12    that we were proposing for the 31st was just going to go to you and

13    you were going to know, you know, after our meet and confer ending

14    on the 27th which ones we were going to proceed with knowing that

15    we often take things off our challenge list after meet and confer.

16         MS. HIMMELHOCH:  And, your Honor, I don't think I need to

17    take up the whole group's time, but I think from my perspective I

18    believe we've done the what we consider meet and confer on the

19    privilege log issues with respect to Zantaz.  We got a list from BP

20    of their challenges, we responded, same thing for TO, same thing

21    for HESI, so I think at this matter it's a matter of a briefing

22    schedule.  But I think maybe Rob and TO or HESI should have a

23    chance to convince you otherwise before we take more of the working

24    group's time.

25         THE COURT:  All right.  Fair enough.  Don, you look

1    concerned.

2           MR. GODWIN:  I'm just listening.  I'm still looking at

3    the screen up there.

4           THE COURT:  Yeah, isn't that neat.

5           MR. GODWIN:  I like the cape on the guy.

6           THE COURT:  While we're at it, what we need to do is hear

7    from Don Haycraft as to where he was last week.

8           MR. HAYCRAFT:  Well, your Honor, I was at the University

9    of California, Santa Cruz.

10          THE COURT:  Installing who?

11          MR. HAYCRAFT:  I was at college No. 8.  That was my

12   vacation.

13          THE COURT:  That was your vacation?  Was it a nice one?

14   You got rid of another kid, huh?

15          MR. HAYCRAFT:  All four of them were left behind, just

16   Madeline and me.

17          THE COURT:  Oh, you're kidding.  Good.  That sounds

18   lovely.

19          MR. HAYCRAFT:  We went back to college, we slept in the

20   dorm, single beds, went to the dining hall at Porter College at

21   University of California, Santa Cruz, and went to class all day

22   from 8:30 in the morning until 9:30 at night.

23          THE COURT:  And your curriculum was?

24          MR. HAYCRAFT:  *Bleak House*, one book.

25          THE COURT:  Really.  Fantabulous.

1          MR. HAYCRAFT:  But the crowd there did not want to talk

2     about the law.  In fact, when I announced that I was a lawyer, this

3     sound was heard (SOUND EFFECT).  They didn't want to know about

4     Tulkinghorn or anything.

5          THE COURT:  None of that.  Well, it sounds like a great

6     week.

7          MR. HAYCRAFT:  It was indeed, a real break.

8          THE COURT:  Well, you were missed.

9          MR. HAYCRAFT:  Thank you.

10          MR. UNDERHILL:  Your Honor, this is Mike Underhill.

11          THE COURT:  Yes, Mr. Underhill.

12          MR. UNDERHILL:  Your Honor, what Don is not saying is

13     that the University of California, Santa Cruz, they are the Banana

14     Slugs.  I am not making that up.

15          THE COURT:  That's their mascot?

16          MR. UNDERHILL:  Yeah.  Actually, they're the Fighting

17     Banana Slugs.

18          MR. HAYCRAFT:  Well, Mike, I heard -- I smelled a

19     distinct odor through the hills of Santa Cruz, and I noticed there

20     was a medicinal pharmacy there in San Jose.

21          THE COURT:  Okay.  Mr. Underhill, we haven't seen you in

22     awhile.  How are you doing?

23          MR. UNDERHILL:  Fine, your Honor.  Count your blessings.

24          THE COURT:  We are.  Okay.  I think that takes care of

25     Phase One.  Let's move on to Equipment at Michoud.

1       We went ahead and entered the order on the 3D laser scan

2  proposal for Phase Two.  Rob, do you want to give us an update on

3  where we're heading in September?

4       MR. GASAWAY:  Yes, your Honor.  I've got a couple of

5  tentative dates in September.  It looks like we're looking at the

6  technical inspection perhaps on September 4th, and the destructive

7  aspect of the testing would be conducted after that, and obviously

8  we need to get a protocol to the court.  But to the extent that

9  people are following up our letter where we describe some technical

10  inspection work, it looks like we're focussing on the 4th.

11       I understand that David Grassmick and Captain Englebert

12  had a conversation maybe yesterday where they selected that date.

13  What I am going to try to do is since we do have a conference next

14  week, come back and confirm that date.  But if you have technical

15  experts and want to know when that September is going to happen,

16  September 4th is the best guess right now.

17       THE COURT:  Okay.  And BP is having whatever technical

18  experts they want there.  Is there going to be any kind of

19  disassembly or otherwise that we need to alert everybody to?

20       MR. GASAWAY:  I don't think it's so much disassembly as

21  inspection, but I know that there's going to be a planning meeting

22  on the 13th that Captain Englebert is going to participate in, so

23  that's Monday.  And my thought was to come out of that Monday

24  meeting, give an update to the court next week about exactly what

25  the final date is, what's entailed, and then people can comment on

1    that next Friday.

2          THE COURT:  Good.  And everybody knows about the planning

3    meeting?  If you want to participate, let Rob know --

4          MR. GASAWAY:  Yeah, or David Grassmick and Captain

5    Englebert.

6          THE COURT:  Good.  So if you want to participate in the

7    planning meeting, participate; if you don't, don't worry about it.

8          MR. GASAWAY:  Thank you, your Honor.

9          THE COURT:  No problem.  Is there any objection to the

10    proposed destructive testing of the material removed from the riser

11    and stored in a bucket?

12          MR. CERNICH:  The United States would just like a

13    clarification on what material is going to be tested, whether it's

14    mud or material that was found inside the riser, or whether it's

15    actually pieces of the riser that were cut and removed from the

16    riser.

17          THE COURT:  Okay.  Fair question.  Rob, do you know the

18    answer or do you want to just circulate a description?

19          MR. GASAWAY:  I'll circulate a description; but the short

20    answer to that dichotomy is it's mud and material, not pieces of

21    the riser that we're looking at.

22          THE COURT:  So if you would, either you or David,

23    circulate to everybody this week, you know, what it is you all are

24    planning.  It doesn't sound like we have any objections, but just

25    the heads up on what you all are planning.

1            MR. GASAWAY:  We'll do that, your Honor.

2            THE COURT:  Scott.

3            MR. CERNICH:  We would like to reserve an objection until

4     we actually see the testing protocol and understand what exactly is

5     going to be done to the materials.

6            THE COURT:  Well, we know it's destructive.

7            MR. CERNICH:  Right, but --

8            THE COURT:  Okay.  We'll try to get that out as soon as

9     possible so that we know whether we have objections or not.

10           So we had talked about last week starting to think about

11    a deadline for completion of testing of the BOP.  It continues to

12    amaze me that we can still come up with more things we want to do.

13    Has anybody got an idea, and I guess I am going to ask BP for that,

14    have you all got a proposal on when we should be winding things

15    down?

16           MR. GASAWAY:  Two comments, your Honor.  Rob Gasaway for

17    BP.  No. 1, we think it's probably the best idea, as we've

18    discussed with Transocean, to keep the BP at Michoud through the

19    Phase One trial and Phase Two expert discovery period.  So there's

20    the independent question of where will the BOP be, we think Michoud

21    under Captain Englebert is the best answer.

22           THE COURT:  Right.  And I think inspections can continue.

23           MR. GASAWAY:  Right.

24           THE COURT:  The question is testing.

25           MR. GASAWAY:  Right.  And in terms of that, famous last

 1   words, we have no further plans for testing at this time.  However,

 2   we do think that if you're looking at a date, it's probably best to

 3   coordinate this with some of the other dates that you asked us to

 4   start thinking about.

 5          Right now we have 30(b)(6) through Thanksgiving, we will

 6   have some fact depositions after that, some expert report deadlines

 7   and depositions after that.  And we think that in terms of testing

 8   of the BOP and other physical evidence at Michoud, it probably

 9   makes sense to coordinate that and say complete that during the

10   30(b)(6) fact deposition time frame; because when we get into

11   experts, people are going to want to have whatever testing results

12   are out there fixed for experts to shoot at.

13          THE COURT:  That's right.  Right.  So we need to have it

14   locked down at a date certain so that the experts can go ahead and

15   say I know everything there is to know and I need to issue my

16   expert report.

17          MR. GASAWAY:  Right.  So we're thinking in terms of the

18   time frame, maybe Thanksgiving or so as the 30(b)(6) ends up, then

19   we will have a fact deposition period, that will give experts time

20   to think about this, then we roll into expert reports and

21   depositions, they can either use that data or not.  That's kind of

22   the general idea of what we're thinking about.

23          THE COURT:  Okay.  All right.  Well, you'll go ahead and

24   make a proposal, huh?

25          MR. GASAWAY:  Yes, we will, your Honor.  Thank you.

```
 1              THE COURT:  Thank you.  Scott?

 2              MR. CERNICH:  Scott Cernich for the United States.  I

 3    think as we move forward that we should think about also a delivery

 4    date for data and not just think about it as a completion of

 5    testing activity, so there should be a deadline for when the data

 6    will be complete and delivered to all of the parties so that

 7    experts can rely upon that material.

 8              THE COURT:  Great.  So, Rob, you can answer from there,

 9    you all went ahead and signed the Michoud lease?

10              MR. GASAWAY:  I am not sure if it's formally signed, we

11    have the approval to sign it and we are going forward.

12              THE COURT:  Okay.  Good enough.  That will come off.

13              Let's see.  We have Captain Englebert's July 31st

14    statement.  For those of you who have an allocated share, if you'll

15    process that promptly; and if you have not processed her June

16    statement, please do so promptly.

17              I have not heard that there's any problem with the Phase

18    Two stipulations.  Brian, do you know whether we've worked out the

19    issue of signatures on that?

20              MR. BARR:  Brian Barr for the PSC.  I am not aware that

21    that's --

22              THE COURT:  Oh, Sharon 's here, I didn't even see you

23    Sharon.  Come on up.  I'm sorry.  I would have asked you had I seen

24    you here.

25              MS. SHUTLER:  Good morning, your Honor.  We filed those
```

1    yesterday.  The U.S. filed on behalf of everybody.

2         THE COURT:  I thought I checked the docket this morning

3    but obviously missed that, that's great.  And thank you.  Let's all

4    give Sharon a round of applause for her perseverance.  We couldn't

5    have done it without you.  And I should have brought my handwritten

6    thing back, but I think I've recycled it since last week.

7         MS. SHUTLER:  I was hoping to see the smiley face.

8         THE COURT:  Oh, let's put it up.  There we go.  "Hooray!"

9    That was special for you, Sharon.

10         Moving into Phase Two document production.  BP has raised

11    the issue of more deliberative process privilege challenges to

12    Phase Two and five specific entries, and my question to BP is,

13    shouldn't that be taken care of by way of extrapolation, or am I

14    missing something?

15         MR. GASAWAY:  Well, I think, your Honor, the question is

16    that these specific -- I think that's an open question I guess is

17    the answer to that.  We saw your order this week with respect to

18    the DPP documents and the extrapolation.  I guess the question is

19    we thought that just like, let's use the BP example, you know,

20    there were 81 challenges to Schedule I BP documents, we resolved a

21    number of those by meet and confer, and you ruled on the rest.

22    There was a reconsideration motion on that.

23         THE COURT:  Right.  And I ruled on that.

24         MR. GASAWAY:  You ruled on that.  The Schedule II

25    challenges we resolved completely, no need for you to rule.  And

1  then the Schedule III challenges, as you remember, there were those

2  modeling documents and you ruled on that.

3          So what we had thought with respect to the DPP was that

4  there would be an opportunity for limited additional rulings on

5  that and then extrapolation.  What we've done in terms of our

6  extrapolation from the BP side is to try to take all of the court's

7  rulings and fold them in to the extrapolation that we issued on

8  Monday, the documents we're going to issue today, and the privilege

9  log next Monday.

10          THE COURT:  Okay.  And, Sarah, have you got a position on

11  that?

12          MS. HIMMELHOCH:  Yes, your Honor.  We believe the five

13  documents fall within the category of documents still properly

14  withheld based on extrapolation of the principles agreed to by the

15  parties and events in your order, your two orders on the

16  deliberative process privilege.  You can see if you look at our

17  privilege logs that the number of deliberative process claims has

18  fallen dramatically.  The vast majority of them are pieces of the

19  chains of e-mails that have already been upheld under the

20  deliberative process claim or fall in the same category of

21  deliberative process documents.

22          So, for instance, of the most recent challenges we got

23  from BP, they challenged a whole series of e-mails that are parts

24  of a chain that were part of the 21 documents related to a draft

25  directive.  The five documents that were moved to Phase Two is part

1   of the later phases challenges fall in that same category, they are

2   e-mails that are part of a discussion that has already been subject

3   to review by the court.  So we think we have extrapolated, and

4   based on that extrapolation, we continue to assert that those five

5   documents, plus the documents challenged by BP on our most recent

6   logs, are still properly withheld as DPP.

7        MR. GASAWAY:  Okay.  Well, I guess maybe we should talk

8   to Sarah one more round on this and see if we can come to a

9   conclusion on this.  This may be one of those points like the

10   earlier point when we were talking about later phases where we had

11   an interpretation procedurally but we were able to come to a close

12   agreement on substance.

13        THE COURT:  Sounds good.  So now -- oh, I'm sorry, Scott,

14   go ahead.

15        MR. CERNICH:  Your Honor, I just wanted to raise an issue

16   regarding the privilege challenges.  We received BP's

17   extrapolation, a number of spreadsheets on Monday, I sent Rob a

18   letter yesterday.  Of the documents that BP released, they released

19   according to their spreadsheets 4,627 new documents.  But going

20   back and looking at BP's prior spreadsheets, over 2,400 of those

21   documents were actually removed on June 8th, 2012, or prior to

22   June 8th, 2012, so those aren't actually part of the extrapolation.

23   So out of the documents we received Monday at best only about 2,200

24   of those documents are the product of BP's extrapolation.

25        Before the court selects the sampling that the court will

1    select to determine whether BP has properly extrapolated, I think

2    that we should get an actual list of the documents that were the

3    subject of BP's extrapolation as opposed to a mishmash of the

4    documents that were released in June, documents that were released

5    between then and the extrapolation.  It should just be the

6    extrapolation documents.

7            THE COURT:  Okay.  And that raises another issue.  Rob,

8    is there any problem with that request?  On the mishmash issue.

9            MR. GASAWAY:  This is a little premature in the sense

10   that we got the accounting reconciliation letter last night.  I

11   told Scott before the hearing, I got your accounting reconciliation

12   letter.  We are going to submit a privilege log on Monday, and I

13   think part of the problem here is that we're kind of halfway

14   through the, what I will call the extrapolation completion process.

15   We had one thing on last Monday the 6th, we are going to produce

16   documents today, we're going to send an updated privilege log on

17   Monday.  We certainly want to make clear what it is that we have

18   held on to after the extrapolation, what it is we released, we

19   certainly want to create an easy target for the court to take

20   samples so you will know what it is.

21           So what I told Scott before the hearing is just, (A) we

22   hear you in terms of the ambiguities; (B) we've got some stuff

23   we're working on for Monday, let's see if we can get this

24   straightened out.

25           THE COURT:  Okay.  Then that raises the issue that Mike

1    raised with me, which is:  When we do that final random selection,

2    do you all want us to do it or do you all want to do it?  In other

3    words, you all know what you're looking at on these and perhaps the

4    final selection should be the by United States and BP rather than

5    just randomly selected by us.

6            MR. GASAWAY:  Let me think about that, your Honor.  I

7    thought that the random selection was going to be by the court with

8    the idea --

9            THE COURT:  And we're happy with that.  Just for this

10   last round I am wondering if we want to modify it.

11           MR. GASAWAY:  Okay.  We're happy with the random

12   selection.

13           THE COURT:  And I think it's worked so far.

14           MR. GASAWAY:  Yeah.  And it's also easier, you know, in

15   that way.  But let us -- we are planning to, like I say, try to get

16   what we think will be the most important document for the court's

17   purposes to you on Monday, which is the post extrapolation

18   privilege log; and hopefully we can get that to you in a way that

19   it's clear, what it is, how it reconciles with the many other

20   privilege logs that we've produced from time to time in this

21   litigation.

22           THE COURT:  Well, speaking of that -- Scott, you want to

23   say something?

24           MR. CERNICH:  Yes, your Honor.  If we could get back to

25   you on Monday in response to your question.

1          THE COURT:  I am perfectly happy doing random selection.

2    This is something that Mike and I spoke about this week, and I

3    thought I would throw it out to you.

4          MR. CERNICH:  We may want to take you up on your offer of

5    us doing the selection, but let us think about it and we'll get

6    back to you on Monday.

7          THE COURT:  Fine.  No problem.  Okay.  Let's see where we

8    are.

9          On the Schedule IV privilege logs, those are the ones

10   that were served by the U.S. between June 22nd and July 31st.

11   Anything to report on that, Rob?

12         MR. GASAWAY:  Yes, your Honor.  We gave the United States

13   our challenges to their Schedule IV privilege logs on Monday, so we

14   just need a timeline and a process to complete that.

15         Second and most important, I think I may have made a

16   misstatement about BP's status in the Schedule IV time period.  It

17   says at the bottom of page three of your working group order that

18   we didn't serve any logs.  As we said in our report to the court

19   that we sent on Monday, actually we did serve one log with 87

20   entries.  And so what we would like to do is just have the court

21   poll the United States and the parties, go ahead and bring on any

22   challenge you would like to those 87 entries, set a date for that,

23   and we will try to work out any challenges the parties bring.

24         MS. HIMMELHOCH:  Your Honor, this is Sarah Himmelhoch.  I

25   have a couple of points in response.  I think the first thing is

1    we're about to serve some additional privilege logs as we complete

2    the DOE re-collection production and the Coast Guard laptop

3    production, and potentially if we get the documents in time the,

4    we'll complete the third-party subpoenas.  And with that there will

5    be a whole new log, and rather than have a set of challenges we're

6    going through right now through July 31st and then another set

7    we're dealing with through August 15th, I think if we can agree on

8    one schedule to wrap up the United States privilege logs and BP's

9    proposed one to me, I am preparing a response right now to them on

10   that schedule, that might be more efficient than dealing with the

11   logs through July 31st and then another round to deal with the logs

12   through August 15th.

13        THE COURT:  Well, that's right.  And, Sarah, I guess that

14   hinges on whether we want a Schedule V or whether we want to just

15   extend the Schedule IV challenges with a deadline for the privilege

16   log, the logs that are coming our way.

17        MR. GASAWAY:  Your Honor, my suggestion would be

18   certainly let's look at the extent of disagreement before you set a

19   briefing schedule.  But again, our challenges to Schedule IV were

20   modest enough, we've talked a lot about trying to get a rolling

21   answer to this.  What I am trying to do is knock off and narrow the

22   Schedule IV thing, which I think should be pretty easy on both

23   sides.  Obviously there's a lot more focus on the DOE privilege

24   logs, the third party privilege logs.  So I do think it's important

25   to get the United States' response to our Schedule IV challenges

```
 1   soon.
 2            MS. HIMMELHOCH:  And, your Honor, I gave it which is we
 3   believe everything that they've challenged is properly asserted as
 4   DPP under the principles set forth in your orders and articulated
 5   by the parties.
 6            THE COURT:  Okay.  And what about the other way around,
 7   the other 87?
 8            MS. HIMMELHOCH:  I don't know that we've made a decision
 9   about that.  Scott would probably be in a better position to speak
10   to when we might be in a position to challenge those 87.
11            THE COURT:  All right.  Scott, you're in a better
12   position?
13            MR. CERNICH:  Apparently so.  Yes, we can.
14            MS. HIMMELHOCH:  I said might be.
15            MR. CERNICH:  I think we will be able to do that some
16   time in the coming week.
17            THE COURT:  Okay.  So let's go ahead and get the Schedule
18   IV challenges done, go ahead and do your final meet and confer,
19   you've already met and conferred on the U.S. log.  Do you want to
20   propose dates for that?  I know you already proposed dates.
21            MR. GASAWAY:  So I guess they're standing on their
22   privilege assertions for Schedule IV.  Let me get back to the court
23   and the parties early next week on what we think the next step on
24   that is.
25            THE COURT:  Okay.  Good enough.
```

1          So then, Sarah, that brings us to the what I am now going

2     to refer to as Schedule V logs, and those are the logs that we're

3     anticipating seeing from DOE and all of the other clean up that

4     you've got going.

5          MS. HIMMELHOCH:  Yes.  I anticipate it's just going to be

6     Coast Guard and DOE, there may be some DOI, although if there is I

7     think it's going to be a very small amount.

8          We had some PFTs that we had produced.  As we found them

9     they weren't able to expand them so we produced them in native

10    format.  We have now found a fool that will expand them, so we may

11    have some additional privilege claims coming out of that; but I

12    expect that it's just going to be DOE and Coast Guard.

13         And then to the extent that we have the third-party

14    documents, we have the third-party documents that got to eat up on

15    or immediately after July 31st, so it will be the third party

16    subpoena documents for Gemini, Telcar, and R.G. Hughes.  And to the

17    extent that we can work it out with University of California, I am

18    hoping we will be able to get the University of California one done

19    as well.

20         Then the DOE recollection and the Coast Guard laptops, we

21    expect to complete those by August 15th.  And then what will be

22    left is whatever we couldn't get from the third parties in

23    sufficient time to do privilege to you by August 15th and then

24    callback logs, to the extent we have anymore.

25         THE COURT:  So are Schedule V logs, but for the clean up

1    you just itemized, should be served by August 15th?

2              MS. HIMMELHOCH:  That is our expectation.

3              THE COURT:  Okay.

4              MS. HIMMELHOCH:  Of course the first time I said that we

5    had a power outage for two days.

6              THE COURT:  Well, or a hurricane or a -- in any event, so

7    what we need to do then is set a schedule for what I am now calling

8    the Schedule V.

9              MS. HIMMELHOCH:  Yes.  And what BP has proposed is pretty

10   much acceptable to us, except that they've only given us three days

11   to respond to their challenges.  So they proposed August 29th to

12   challenge, September 1st for us to respond to the challenge, BP

13   files its brief on September 8th, U.S. responds on September 14th,

14   and we reply on the 17th.  If we could just adjust that so that BP

15   challenges August 29th, U.S. response September 5th, BP brief

16   September 8th, U.S. response September 14th, and BP reply

17   September 17th -- and by BP, I mean BP and anyone else they need to

18   challenge -- that works for us.

19             THE COURT:  Okay.  I am looking at the calendar.  I was

20   hoping we could get the initial challenges in within ten days,

21   which would be the challenge date would be the 26th.  Is that

22   doable, Rob?

23             MR. GASAWAY:  We heard your request and why don't we go

24   ahead and say we'll just get them in by the 26th.

25             THE COURT:  Look at that, sold to the lowest bidder.

1          So if we go with the 26th, how would that affect, Sarah,

2    your schedule from there?

3          MS. HIMMELHOCH:  I think then what we can do, we can go

4    back to the schedule I had proposed to BP, we would respond by

5    August 31st, BP and any other parties' brief would be due on

6    September 4th, U.S. response would be due on September 10th, and

7    replies would be due September 12th.

8          THE COURT:  Okay.

9          MR. GASAWAY:  We would ask for probably a little more

10   time for the reply than September 14th rather than a two-day

11   turnaround if we could do it.

12         THE COURT:  Okay.

13         MS. HIMMELHOCH:  I am fine with that, your Honor.

14         THE COURT:  Okay.  Then that will be the schedule for

15   what we're now referring to as Schedule V.

16         Okay.  Now, on custodial file production I wanted to make

17   it clear that that's a 21-day turnaround, and I can't remember

18   whether I spoke about that last week or not.

19         MS. HIMMELHOCH:  You did, your Honor.

20         THE COURT:  Good.  Thank you.  I can't remember week to

21   week anymore.

22         Tony, do we have any kind of update from you on custodial

23   file production for Anadarko?

24         MR. FITCH:  Tony Fitch for Anadarko.  Basically, no.

25   We're going to get it done between 21-days before our first

```
1    deposition, and I had a conference call with my partner who is

2    handling that earlier this week, I am going to get a report from

3    one of them this Monday and forward it onto the other parties.  So

4    I think we will be well ahead of the 21-day requirement, which you

5    did mention -- not mention, direct last week.

6                THE COURT:  Oh.  I was very clear, huh?

7                MR. FITCH:  Yes, you were.

8                THE COURT:  Okay.  Let's move on to Phase Two Fact

9    Depositions.

10                Mike and I have been looking at the various proposals

11    that have come in, including most recently a response from Mr. Barr

12    at 10:26 last night.

13                MR. BARR:  I had to have dinner first.

14                THE COURT:  Yeah, but I was asleep.  I was already asleep

15    by then.  But anyway, so we're looking at that now, we'll probably

16    chew on it this weekend further and hopefully get a draft out next

17    week for everybody to comment on.

18                I would like by next Tuesday the 14th for everyone to

19    confer and try to see if you can reach agreement on whether a

20    particular designee should be produced for one day or two days and

21    their classification, are they quantification, source control, or

22    hybrid, we might as well start working that out.  And then by

23    Thursday, close of business, Mr. Barr, we would like a report from

24    the PSC identifying each designee, whether there is agreement on

25    one or two days -- if there's disagreement, just note that there's
```

 1   disagreement -- indicating the length of the deposition and the

 2   categories, if you've been able to agree to them.  That would be

 3   very helpful.

 4        MR. BARR:  That's good, your Honor.  I will actually have

 5   a list out today of the depositions that have been scheduled and

 6   what category we believe they fall into so everybody can comment

 7   on.

 8        THE COURT:  Great.  So you're ahead of the game.  Thank

 9   you, Brian.

10        All right.  And then next week we will talk about if

11   there were disagreements how we're going to resolve them.

12        So let's go through real quick and talk about scheduling.

13   Rob Gasaway reported this week that we've got dates for all of his

14   designees except one, so substantial compliance.

15        MR. GASAWAY:  That's right, your Honor.  And I don't know

16   if you want to run down those dates now and put them in the record

17   or not, but if everybody got the e-mail they know what they are.

18   Can I just do a couple of housekeeping points?

19        THE COURT:  Please, go ahead.  I don't see any reason to

20   run through it for the record, we've all got the listing and

21   presumably the United States is going to incorporate that in their

22   next calendar -- oh, it's on there already.  Thank you.

23        MR. GASAWAY:  One issue that we wanted to quickly, is if

24   you could waive e-mail free Saturday, we are meeting with our last

25   potential designee that we need a date for today.  Some of the

1    parties have emphasized that they like to get information if we

2    have it sooner rather than later; so if we have a date for

3    Mr. Sanders we were planing to send that out if it becomes

4    available tomorrow.

5              THE COURT:  That will be fine, we're going to lift it,

6    but only for that purpose.

7              MR. GASAWAY:  Only for that purpose, for that limited

8    purpose.

9              THE COURT:  Does everybody understand that?

10             MR. GASAWAY:  And then on a related topic, just going

11   back a moment.  In terms of the back and forth between the PSC and

12   the United States and the various parties on the time allocations,

13   I think that one of the most productive places for the court to

14   start might be the issue of depositions of source control

15   government witnesses, I think that's really where the rubber hits

16   the road.  If you see the various proposals there you will see that

17   we, on behalf of BP, has asked for a lot of time.  You've noticed

18   in both the Haliburton and the Transocean letters they reference

19   Mr. Barr's statement on pages 11 and 12 of the March 16th hearing

20   where he basically said that they have taken a hard look and that

21   they thought that they had most of the discovery that they would

22   need.

23             And so we think when it comes to United States witnesses

24   on the source control side, those are essentially BP depositions.

25   If you go back to the United States 30(b)(6) topic list, you will

```
 1    see that the first 33 of the approximately hundred topics are

 2    source control, and those are basically topics that were developed

 3    by BP with minimal input from other parties, and we would like to

 4    have the lion's share of the time on that, obviously.

 5             And the other point of contention between us and the PSC

 6    has to do with deposition order.  I think we've got a lot of

 7    agreement, they said on quantification BP should go first, and I

 8    was very pleased to see that I think all of the parties agree with

 9    the breakdown that we did between true independents, affiliates,

10    and so forth.  So I think we've made a lot of progress.

11             THE COURT:  I agree.

12             MR. GASAWAY:  But as you look at the list of government

13    and affiliates, we think that just as really BP was the one that

14    was suggesting the depositions for those affiliates, you know,

15    Woods Hole, all of the pending third parties, we're really the one

16    that's taken the lead on documentary discovery from the Coast

17    Guard, we're the ones taking the lead on the stipulations, we're

18    the one who wrote the 33 topics they will be deposed on for source

19    control, and we could send another letter but the court has asked

20    us to keep letters to a minimum, so I just wanted to point out,

21    focus on government witnesses, source control, and we think that

22    really BP is the proponent party there.  Aside from any, you know,

23    any other considerations.

24             THE COURT:  Okay.  Good, Rob, thank you.  Doug.

25             MR. KRAUS:  Good morning, your Honor, Doug Kraus on
```

1    behalf of Louisiana.  I would just like to raise an issue as it

2    relates to U.S. source control witnesses.  There are several

3    witnesses that we believe have involvement beyond Phase Two, and

4    with the court's ruling that we're only going to be able to depose

5    these witnesses one time, I would just like to protect the request

6    that we made for time and not get our time cut because BP's asking

7    for more time because we're not going to be able to depose these

8    witnesses that were involved in the response beyond Phase Two.

9            THE COURT:  I'll give it to you but take I'll it from

10   Brian.

11           MR. KRAUS:  No.  What I think you should do is give it to

12   us and then we'll divvy it up amongst ourselves, I think that's

13   probably the healthiest solution to the problem.

14           THE COURT:  Yeah, I saw your letter on that and I think

15   that the points you make are good.  I am not going to promise you I

16   am going to give you as much time as you're asking for, but your

17   points are good.  And I am pleased that you all have gotten

18   together and you can divvy it up amongst yourselves, that makes our

19   job a lot easier.

20           MR. KRAUS:  Thank you, your Honor.

21           THE COURT:  Your welcome.

22           MR. BARR:  Your Honor, Brian Barr for the PSC.  I was

23   hoping to make it through the hearing without being a contrarian,

24   but Rob decided to kick the beast.  I mean, we said what we said in

25   March, I still believe what we said, that we have what we believe

1   all that we would need to prove what we need to prove in Phase Two.

2   But with that is a record of hundreds of depositions that have

3   happened, and now we're setting up a process we're going to go take

4   depositions of U.S. witnesses on source control, we've all seen how

5   the stipulation process went where BP is trying to say the U.S.

6   called the shots and ended everything.

7            We said directly throughout that entire process, we need

8   to hear from these people, hear what they said they did, it was a

9   big part of the stipulations.  And we can't sit back and let BP run

10  rough shod over the record we believe we have and not be able to

11  respond to it, and that's why we believe we have to have a

12  significant portion of the time, because at the end of the day we

13  still have the burden of proof here, not BP.  And just because I

14  believe I already have what I need to prove it doesn't mean we

15  should be limited and handcuffed and not be able to get more or

16  respond to BP trying to undo the record.

17            THE COURT:  Okay.

18            MR. BARR:  And that's our position.

19            THE COURT:  So we'll work hard on it and try to have

20  something out in draft next week.  Tony, you have something?

21            MR. FITCH:  Judge, on the same time allocation issue.  I

22  did not submit, make a written submission this week, but you said

23  it could be addressed also here.  Several parties have suggested

24  25 minutes, several parties but not all parties have suggested 25

25  minutes for Anadarko and that is on the one hand acceptable to us

```
 1   certainly.  But on the other hand, I do need to stress it is also
 2   important to us, Anadarko has very distinct, very serious, and very
 3   separate interests in the Phase Two issues, primarily in light of
 4   the United States's outstanding claims against us.  So we do need
 5   the 25 minutes that most of the other parties have suggested for
 6   us.
 7            THE COURT:  Okay.  That puts a wrinkle into things.  Nat?
 8            MR. CHAKERES:  Your Honor, I don't know if this is the
 9   time you would like to address it, I just had a couple of
10   scheduling changes that are on the calendar that I am going to be
11   circulating this afternoon.
12            THE COURT:  Okay.
13            MR. CHAKERES:  And we understand that you want us in the
14   upcoming week to discuss which of these depositions should be one
15   day and what should be two days.  I just wanted to point out that
16   Stuart Griffiths had previously been on the calendar for
17   October 16th and BP had requested on the record that that be a
18   two-day deposition.  He is not available for two days that week so
19   we have tentatively put him back in November, the 14th and the
20   15th, but we're happy to discuss that and the process of figuring
21   out which of these should be one day or two days.
22            The other change is -- and I confess I probably should
23   have talked to Rob about this beforehand -- but we're getting
24   feelers from Woods Hole that they're not available August 28th,
25   29th for their deposition, and I think we're discussing the dates
```

```
 1    of September 12th and 13th.  And I don't know that that's final,

 2    but I understand they're not available 28 and 29th, so I believe

 3    that one is off.  And we'll -- we've got them in pencil right now

 4    on the 12th and 13th, but I believe that BP and Woods Hole are

 5    working that out.

 6              THE COURT:  Okay.  Good enough.  All right.  Jimmy.  We

 7    kicked another beast, huh?

 8              MR. WILLIAMSON:  Not me, Judge.  The Wild Well Control,

 9    we have it set for August 24th.  Wild Well, as the court remembers,

10    produced a bunch of documents in Phase One.

11              THE COURT:  Correct.

12              MR. WILLIAMSON:  Those documents had certain technical

13    problems, which I can't explain but they do.  Haliburton,

14    Transocean, and the U.S. have all raised concerns about that.  I

15    talked with Ms. Mintz, I haven't talked to BP so we need to know

16    what they think and the other parties, but I think everyone else is

17    in agreement that we should probably pull that down from the 24th,

18    solve the technical production problems which requires conversation

19    between IT people, and get back with you with a date, assuming that

20    is acceptable with the court.

21              THE COURT:  Yeah, that's fine.  I would rather have the

22    documents and be straight before you take the deposition.

23              MR. WILLIAMSON:  Fair enough.

24              THE COURT:  Fair enough.  So we will make that notation.

25              Let's just kind of run through things kind of real quick.
```

1   Anything to report on the Haliburton depo of Mr. Vargo?  No status

2   report, we're good to go?

3            MR. GODWIN:  I thought we had it scheduled, Judge?

4            THE COURT:  We do, we do have it scheduled.  We're good

5   on document production, everything's fine?

6            MR. GODWIN:  As far as I know.  We have no issue, Judge,

7   we're ready to go.

8            THE COURT:  All right.  Let's see what other ones I

9   wanted.  Let's talk about Intertek.  Have we gotten the final

10  notice out?  That's a September 12th depo.

11           MR. CERNICH:  Scott Cernich for the United States.  Yes,

12  your Honor, the final notice went out and it should have been

13  served on all of the parties through File & Serve.

14           THE COURT:  Good.  Same with Isotech?

15           MR. CERNICH:  That's right, yes, your Honor.

16           THE COURT:  Same with Weatherford?

17           MR. CERNICH:  Yes, your Honor.

18           THE COURT:  All right.  Moving right along.  Let's see.

19  Any report on the Cameron deposition, let's see, they were working

20  on document production.

21           MR. CERNICH:  And Jeff Gannaway for Cameron and I spoke

22  this morning, Cameron is running the search terms.  Jeff reported

23  to me it's taking a little bit longer than they expected, but we're

24  proceeding there.

25           THE COURT:  Okay.  Good.  All right.  How about DNV?

1    Anything further on that and document production?

2         MR. GASAWAY:  Your Honor, Rob Gasaway were for BP.  I

3    understand from yesterday that DNV Mark Cohen is now looking at

4    November 1, that that's their suggested date.  I believe that in

5    the run up to this that we circulated some proposals to all of the

6    parties and that we are comfortable that that would be a one-day

7    deposition.  So if anybody disagrees, they should obviously get

8    back to us quickly on that.

9         I guess I should also say that in terms of what we saw on

10   the order in terms of one to two day, BP has a lot of comments as

11   to other witness, both for BP and the United States, but we will

12   save all of that to the meet and confer this week and we'll get

13   back to you next week.

14        THE COURT:  Okay.  Thank you.  U.S., how do our

15   discussions with Schlumberger stand?

16        MR. CERNICH:  Very well your Honor, Schlumberger has

17   informed us that we have a date of Tuesday, November 27th for

18   Schlumberger's 30(b)(6) and the deponent will be Mr. Bud Decoste,

19   D-E-C-O-S-T-E.

20        THE COURT:  Good.  And anything, Scott, on Stress

21   Engineering?

22        MR. CERNICH:  We do not, I don't think we have a date.

23   No, we don't have a date.

24        THE COURT:  We'll just carry it over.  And Worldwide?

25        MR. CERNICH:  At this point we're still holding off on

1    scheduling the deposition, we're hoping one will not be necessary,

2    the documents should be coming in soon.  I don't think they've been

3    produced yet.

4         THE COURT:  Okay.  That should take care of the update on

5    deposition scheduling that we want to cover this week.

6         MR. CERNICH:  Your Honor, if I may.

7         THE COURT:  Yes, please, go ahead, Scott.

8         MR. CERNICH:  A couple of items.  One, I sent around an

9    e-mail yesterday to the parties, last call for a request for the

10   Oceaneering ROV video.  I got a couple of requests there, so we're

11   submitting that to Oceaneering to get that process moving.  If

12   other parties want copies, they can let us know; but that will be

13   in subsequent rounds, and I can't promise a date for submission or

14   delivery of that at this time.

15        THE COURT:  Perfect.

16        MR. CERNICH:  I would also like to raise one issue

17   regarding the BP's designation of 30(b)(6) witnesses.  BP's topic

18   four is the manner or methodology that BP or its contractors used

19   to predict, estimate, characterize, and/or measure the daily amount

20   of hydrocarbons flowing from the well.  BP has designated Mr. Adam

21   Ballard, estimated discharge modeling based on subsea temperature

22   and pressure measurements and then Ms. Ellen Williams, flow rate

23   observational.

24        The United States would just like to confirm that those

25   are the only witnesses that will be testifying on that topic.  And

```
1    if so, are those the only methods of flow rate estimation that BP
2    is contending it performed during the response?
3              THE COURT:  Okay.  Rob, why don't you think about that
4    and get an e-mail out responding, unless you want to respond now.
5              MR. GASAWAY:  Yes, those are the only witnesses that
6    we're designating obviously.  We reserved our right to change, but
7    at this point those are the only witnesses we're designating.  And
8    then obviously these are what I will call loose breakdowns, this
9    isn't precise in any way, but we wanted to let them know that there
10   are two at least broad groups of analyses that we did and
11   Mr. Ballard will testify as to one and Ms. Williams will testify as
12   another.
13             THE COURT:  Does that answer your question, Scott?
14             MR. CERNICH:  I think so, your Honor.
15             THE COURT:  He is going to think about that and get back
16   to you.
17             MR. GASAWAY:  Thank you, your Honor.
18             THE COURT:  Okay.  Mike and I are starting to think about
19   Phase Two expert discovery, and exchange of expert reports is going
20   to be made on the basis of the burden of proof on Phase Two issues.
21   We would like to know if there's a disagreement amongst the parties
22   as to that, as to who goes first and who goes second.  Would you
23   all start thinking about that.  Andy?
24             MR. LANGAN:  Your Honor, we obviously agree.  And after
25   your Honor prompted us the other day, we started to think about
```

1    this; and it seems to us that the PSC, the U.S.A., and the states

2    are probably the first tranche, and BP is the second tranche, and

3    maybe other defendants, too, I don't know.  Sort of like we did

4    with Phase One.

5              In terms of timing, which I think maybe is also on your

6    Honor's mind.

7              THE COURT:  It is.

8              MR. LANGAN:  So maybe we're going to make a proposal next

9    week I think was your idea.  But I think just to start the

10   conversation, it feels to us like fact discovery for Phase Two is

11   going to go into January, and I just think inevitably it will, and

12   the reports should be, you know, two tranches sometime in late

13   January into February probably, with opportunity for rebuttal and

14   depositions to follow the record.  Even if it's overlaps with the

15   Phase One trial, that's just the way it's going to be I think.

16             THE COURT:  Well, I think it's going to have to.  So why

17   don't we put that down.  And, Andy, do you want to take the lead on

18   circulating what you think makes sense?

19             MR. LANGAN:  We can do that, we will.

20             THE COURT:  Okay.  That's good.  All right.

21             MR. CERNICH:  Your Honor, Scott Cernich for the United

22   States.  The United States actually wanted to propose a

23   simultaneous expert exchange of expert reports.  Judge Barbier's

24   going to, with regard to quantification he's going to have to

25   ultimately decide on a number, we believe, in order to move forward

 1   in the case; and in doing that we think that BP and the United

 2   States will both be putting up our numbers as to what we think is

 3   the volume of oil that flowed from the Macondo well into the Gulf

 4   of Mexico, and we think it would be appropriate for us to exchange

 5   simultaneous reports.

 6             THE COURT:  Okay.  We will think about that.

 7             MR. LANGAN:  Do I need to comment, your Honor?

 8             THE COURT:  No.

 9             MR. LANGAN:  Okay.  Thank you.

10             THE COURT:  I know your position, Andy.

11             MR. LANGAN:  Thank you, your Honor.

12             THE COURT:  You're welcome.  Have you got something,

13   Anthony?

14             MR. IRPINO:  Yes, real quick, Judge.  Just to draw out

15   everybody's attention, we did get -- and thank you very much for

16   getting Pretrial Order No. 51 out --

17             THE COURT:  Is finished and out there.

18             MR. IRPINO:  -- because it's something new, just to

19   remind everybody that if you're subpoenaing a party, scheduling

20   their deposition, noticing their deposition it's your job, your

21   responsibility to serve Pretrial Order 51 by e-mail on that party

22   along with a copy of Pretrial Order No. 13.  I just wanted to get

23   everybody in the habit of doing that because it's easy to do it

24   without remembering.

25             THE COURT:  I agree.  And you might want to also

1    follow-up with an e-mail reminding everybody.

2                MR. IRPINO:  But not tomorrow.

3                THE COURT:  Not on Saturday, however.

4                Okay.  Let's open up the discussion to anything else we

5    have not covered today.

6                Next week I will have a conference but anyone who wants

7    to participate by phone is free to do so, including Mr. Langan; and

8    if you want to wear your tie while you're on the phone, that will

9    be fine.

10               MR. LANGAN:  Thank you, your Honor.

11               THE COURT:  You know, look, Guys, I encourage it.  The

12   next week we have Labor Day and then we're in it for the long haul

13   until Thanksgiving.  So if you all don't need to travel next week,

14   the next break from a conference is Thanksgiving.  So if you all

15   want to participate next week by phone, I am encouraging it.

16               MR. LANGAN:  Your Honor, from your comments it sounds

17   like Judge Barbier's tentative decision is pretty much final.

18               THE COURT:  Everybody pretty much, I mean I haven't

19   spoken to Judge Barbier this morning, but everybody pretty much

20   said we don't see any reason to have the large conference.

21               MR. LANGAN:  Okay.  I'm sure we will hear from them.

22               THE COURT:  I am anticipating that his answer is going to

23   be no conference next week.

24               MR. MILLER:  And particularly now since the party is off

25   until September.

```
 1              THE COURT:  Particularly since our after hours
 2   conference --
 3              MR. MILLER:  Laser scanning conference.
 4              THE COURT:  -- laser scanning conference is off for next
 5   Thursday.
 6              MR. MAZE:  I'm confused.
 7              THE COURT:  Are you?  You look confused, Corey.
 8              MR. MAZE:  Okay.  You said we will have a conference next
 9   week but then we will take off for Labor Day, but my understanding
10   is Labor Day is the first Monday of September.
11              THE COURT:  You're correct.  I am not having a conference
12   on Friday, August 24th, I will not be in the office that day.
13              MR. MAZE:  So does that mean we are also not having one
14   on the 31st, which is the Friday?
15              THE COURT:  That is correct.  So if you all could
16   participate by phone next week, you would not have a conference the
17   24th and you also would not have not a conference on the 31st, you
18   would come back on Friday, September the 7th.  Okay?
19              MR. MAZE:  Yes.
20              THE COURT:  You can stay home with your bride.
21              MR. MAZE:  I will do that.
22              THE COURT:  Okay.  Anything else?  Going, going, gone.
23   Thank you very much.
24         (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)
25
```

1                        * * * * * *

2

3                    REPORTER'S CERTIFICATE

4

5          I, Karen A. Ibos, CCR, Official Court Reporter, United

6    States District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript, to the

8    best of my ability and understanding, from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11

12    _____

13                    Karen A. Ibos, CCR, RPR, CRR, RMR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25