1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  OIL SPILL BY THE OIL RIG     *    10-MD-2179-CJB-SS
             *DEEPWATER HORIZON* IN THE   *
6            GULF OF MEXICO ON            *
             APRIL 20, 2010               *    August 17, 2012
7                                         *
                                          *
8    Applies to:  All Cases               *    9:30 a.m.
     * * * * * * * * * * * * * * * * * *  *

9

10

11                   WORKING GROUP CONFERENCE
              BEFORE THE HONORABLE SALLY SHUSHAN
12              UNITED STATES MAGISTRATE JUDGE

13

14   Appearances:

15

16   For the Plaintiffs:          Domengeaux Wright Roy
                                     & Edwards, LLC
17                                BY:  JAMES P. ROY, ESQ.
                                  Post Office Box 3668
18                                556 Jefferson Street, Suite 500
                                  Lafayette, Louisiana 70502

19

20   For the Plaintiffs:          Herman Herman Katz & Cotlar, LLP
                                  BY:  STEPHEN J. HERMAN, ESQ.
21                                820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113

22

23   For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                                    Rafferty & Proctor, PA
24                                BY:  BRIAN H. BARR, ESQ.
                                  Post Office Box 12308
25                                316 South Baylen Street, Suite 600
                                  Pensacola, Florida 32591

1    Appearances:

2    For the Plaintiffs:            Williams Law Group, LLC
                                    BY:  CONRAD "DUKE" WILLIAMS, ESQ.
3                                   435 Corporate Drive, Suite 101
                                    Houma, Louisiana 70360
4

5    For the Plaintiffs:            Williamson & Rusnak
                                    BY:  JIMMY WILLIAMSON, ESQ.
6                                   4310 Yoakum Boulevard
                                    Houston, Texas 77006
7

8    For the Plaintiffs:            Lewis Kullman Sterbcow & Abramson
                                    BY:  PAUL M. STERBCOW, ESQ.
9                                   601 Poydras Street, Suite 2615
                                    New Orleans, Louisiana 70130
10

11   For the Plaintiffs:            Breit Drescher Imprevento
                                      & Walker, PC
12                                  BY:  JEFFREY BREIT, ESQ.
                                    600 22nd Street, Suite 402
13                                  Virginia Beach, Virginia 23451

14
     For the Plaintiffs:            Irpino Law Firm
15                                  BY:  ANTHONY IRPINO, ESQ.
                                    2216 Magazine Street
16                                  New Orleans, Louisiana 70130

17
     For the Plaintiffs:            Weitz & Luxenberg, PC
18                                  BY:  ROBIN L. GREENWALD, ESQ.
                                    700 Broadway
19                                  New York, New York 10003

20
     For the State of              Attorney General of Alabama
21   Alabama:                      BY:  COREY L. MAZE, ESQ.
                                    500 Dexter Avenue
22                                  Montgomery, Alabama 36130

23
     For the State of              Kanner & Whiteley, LLC
24   Louisiana:                    BY:  DOUGLAS R. KRAUS, ESQ.
                                    701 Camp Street
25                                  New Orleans, Louisiana 70130

1   <u>Appearances</u>:

2   For the United States          U.S. Department of Justice
    of America:                    Environmental Enforcement Section
3                                  BY:  A. NATHANIEL CHAKERES, ESQ.
                                        SARAH D. HIMMELHOCH, ESQ.
4                                       STEVEN O'ROURKE, ESQ.
                                   Post Office Box 7611
5                                  Washington, DC 20044

6
    For the United States          U.S. Department of Justice
7   of America:                    Torts Branch, Civil Division
                                   BY:  R. MICHAEL UNDERHILL, ESQ.
8                                  7-5395 Federal Bldg., Box 36028
                                   450 Golden Gate Avenue
9                                  San Francisco, California 94102

10
    For Transocean Holdings        Frilot, LLC
11  LLC, Transocean Offshore       BY:  KERRY J. MILLER, ESQ.
    Deepwater Drilling Inc.,       1100 Poydras Street, Suite 3700
12  Transocean Deepwater Inc.:     New Orleans, Louisiana 70162

13
    For Transocean Holdings        Sutherland Asbill & Brennan, LLP
14  LLC, Transocean Offshore       BY:  CARTER L. WILLIAMS, ESQ.
    Deepwater Drilling Inc.,            DAVID A. BAAY, ESQ.
15  Transocean Deepwater Inc.:     1001 Fannin Street, Suite 3700
                                   Houston, Texas 77002
16
    For Transocean Holdings        Munger Tolles and Olson, LLP
17  LLC, Transocean Offshore       BY:  GRANT DAVIS-DENNY, ESQ.
    Deepwater Drilling Inc.,       335 S. Grand Avenue, 35th Floor
18  Transocean Deepwater Inc.:     Los Angeles, California 90071

19
    For BP America Inc.,           Liskow & Lewis, APLC
20  BP America Production          BY:  DON K. HAYCRAFT, ESQ.
    Company, BP Company            701 Poydras Street, Suite 5000
21  North America Inc.,            New Orleans, Louisiana 70139
    BP Exploration &
22  Production Inc., BP
    Holdings North America
23  Limited, BP Products
    North America Inc.:
24

25

1    <u>Appearances</u>:

2    For BP America Inc.,              Kirkland & Ellis, LLP
     BP America Production            BY:  ROBERT R. GASAWAY, ESQ.
3    Company, BP Company             655 Fifteenth Street, NW
     North America Inc.,             Washington, DC 20005
4    BP Exploration &
     Production Inc., BP
5    Holdings North America
     Limited, BP Products
6    North America Inc.:

7
     For BP America Inc.,             Kirkland & Ellis, LLP
8    BP America Production            BY:  J. ANDREW LANGAN, ESQ.
     Company, BP Company                  MARK J. NOMELLINI, ESQ.
9    North America Inc.,                  WILL TREVENA, ESQ.
     BP Exploration &                300 North Lasalle
10   Production Inc., BP             Chicago, Illinois 60654
     Holdings North America
11   Limited, BP Products
     North America Inc.:

12

13   For Cameron International       Stone Pigman Walther Wittmann, LLC
     Corporation:                    BY:  CARMELITE M. BERTAUT, ESQ.
14                                   546 Carondelet Street
                                     New Orleans, Louisiana 70130
15

16   For Cameron International       Beck Redden & Secrest, LLP
     Corporation:                    BY:  THOMAS GANUCHEAU, ESQ.
17                                   1221 McKinney Street, Suite 4500
                                     Houston, Texas 77010
18

19   For Halliburton Energy          Godwin Ronquillo, PC
     Services, Inc.:                 BY:  DONALD E. GODWIN, ESQ.
20                                        BRUCE W. BOWMAN JR., ESQ.
                                          JENNY L. MARTINEZ, ESQ.
21                                        SEAN W. FLEMING, ESQ.
                                          LAUREN L. MITCHELL, ESQ.
22                                        ALLISON BATTISTE, ESQ.
                                          ERIKA TOLEDO, ESQ.
23                                   1201 Elm Street, Suite 1700
                                     Dallas, Texas 75270
24

25

1   <u>Appearances</u>:

2   For Halliburton Energy:        Godwin Ronquillo, PC
    Services, Inc.:                BY:  R. ALAN YORK, ESQ.
3                                       GWEN E. RICHARD, ESQ.
                                   1331 Lamar, Suite 1665
4                                  Houston, Texas 77010

5
    For Anadarko Petroleum         Kuchler Polk Schell
6   Corporation, Anadarko          Weiner & Richeson, LLC
    E&P Company LP:                BY:   SARAH E. IIAMS, ESQ.
7                                  1615 Poydras Street, Suite 1300
                                   New Orleans, Louisiana 70112
8
9   For Anadarko Petroleum         Bingham McCutchen, LLP
    Corporation, Anadarko          BY:   WARREN A. FITCH, ESQ.
10  E&P Company LP:                2020 K Street, NW
                                   Washington, DC 20006
11
12  For M-I, LLC:                  Morgan Lewis & Bockius
                                   BY:   STEVEN A. LUXTON, ESQ.
13                                       R. SEAN BRENNAN JR., ESQ.
                                   1000 Louisiana Street, Suite 4000
14                                 Houston, Texas 77002

15
    Official Court Reporter:       Toni Doyle Tusa, CCR, FCRR
16                                 500 Poydras Street, Room HB-406
                                   New Orleans, Louisiana 70130
17                                 (504) 589-7778
                                   Toni_Tusa@laed.uscourts.gov
18

19

20

21
    Proceedings recorded by mechanical stenography using
22  computer-aided transcription software.

23

24

25

1

<u>I N D E X</u>

2                                                          <u>PAGE</u>

3

PHASE ONE "CLEAN-UP"                               8

4

OTHER PHASE ONE MOTIONS                          16

5

ZANTAZ PHASE ONE DOCUMENTS                       16

6

SCHEDULE V                                       17

7

TESTING BOP & CAPPING STACK                      28

8

DEADLINE FOR BOP TESTING                         33

9

MICHOUD LEASE                                    34

10

SPECIAL MASTER'S STATEMENT                       34

11

BP'S CHALLENGES TO U.S. DPP CLAIMS               35

12

AUGUST 13 OTHER PHASES AND NOT RELEVENT ENTRIES  35

13

SCHEDULE IV                                      36

14

MDL 2185 PARTICIPATION IN PHASE TWO DISCOVERY    38

15

LENGTH AND CATEGORY OF DEPOSITIONS               39

16

ALLOCATION AND SEQUENCE OF EXAMINATION           39

17

SCHEDULING FACT DEPOSITIONS                      43

18

OTHER MATTERS                                    47

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(August 17, 2012)**

1
2
3          (The following proceedings were held in open court.)
4          **THE COURT:**  Good morning.  Guys, I understand we are
5    having dial-in problems for the conference call, if you all
6    want to take a second and e-mail your colleagues and let them
7    know that the dial-in code is 80312.  We had a little problem
8    this morning.
9          **AT&T OPERATOR:**  This is Frances from AT&T
10   teleconference.  Do we have the host on line?
11         **THE COURT:**  You do.  Good morning.
12         **AT&T OPERATOR:**  I have a Gordon Young who is trying
13   to get into the conference and does not have the security code.
14         **THE COURT:**  That would be fine.  We had a little
15   screwup this morning on the correct security code, so we are
16   having everybody e-mail their colleagues with the correct code.
17         **AT&T OPERATOR:**  Okay.
18         **THE COURT:**  Anybody who wants to come in this morning
19   will be fine because we did have a little screwup.
20         **AT&T OPERATOR:**  Okay.
21         **THE COURT:**  Thank you so much.
22         **AT&T OPERATOR:**  You're welcome.
23         **THE COURT:**  Guys, it's 80312.  We are going to let
24   everybody get an opportunity to dial in and then we will start.
25              Good morning, phone participants.  How is

1    everybody?  Sorry about the dial-in snafu.  I'm going to wait a
2    couple minutes, make sure everybody gets dialed in.
3              I don't hear a lot more pop-ons, so I guess we
4    might as well get ourselves going.  Who is supposed to be on
5    for you, Rob?
6         **MR. GASAWAY:**  Good morning, Your Honor.  I know Andy
7    Langan was going to try to join remotely as well Mike Petrino
8    and perhaps Alan Pixton.  I don't know if Andy has been able --
9         **MR. LANGAN:**  I'm on, Your Honor.  Good morning.
10        **THE COURT:**  Andy, do you have a tie on?
11        **MR. LANGAN:**  I do not.
12        **THE COURT:**  Attaboy.  Good boy.
13             Guys, let's get going.  Hopefully it will be a
14   fast one.
15             Let's see.  Let's get an update on Phase One.
16   Do I need a status report on the discussions with regard to the
17   Transocean documents and what discussions have been taking
18   place?
19        **MR. DUKE WILLIAMS:**  Yes, Your Honor.
20        **THE COURT:**  Come on up, Duke.
21        **MR. DUKE WILLIAMS:**  Good morning Your Honor.  Duke
22   Williams for the PSC.  I think we have already covered the
23   background.
24        **THE COURT:**  Yes.  We don't need to rehash.
25        **MR. DUKE WILLIAMS:**  Anthony Irpino and I have had

1    numerous meet-and-confers with Carter at Transocean.  They have

2    all been cordial, and we have done a lot of talking and

3    horsetrading, but we haven't really gotten anywhere.

4              As you will recall, we requested four follow-up

5    depositions as a result of the late-produced documents.  We are

6    not maintaining that the documents were produced late for any

7    reason other than it's just an overwhelming thing.  I think

8    110 million documents have been produced.

9              What we have done is winnowed, with respect to

10   Transocean, all these thousands of late-produced documents to

11   essentially, I think, now we have got a little over 20 left.

12   As of this week, we were willing to even knock that down to

13   about 10 if we could get a stipulation on admissibility.  We

14   have got an agreement on everything else.

15             There is no stipulation on admissibility.  So

16   since there isn't, we need to take these depositions.  We don't

17   need Mr. McMahan.  He is going to be called live at trial.

18   There was some confusion over Mr. Newman, whether he was a

19   will-call or a may-call.  The final witness list that was filed

20   lists him as a may-call.

21             The other two, Mr. Rose has already been deposed

22   and Mr. Newman has already been deposed.  These documents, if

23   you boil them down to their essence -- and, really, if you look

24   at the universe, as everybody says, of these late-produced

25   documents and the larger universe of all the documents, I mean,

1    we are talking like a BB -- if we are going to use celestial

2    terms, it's like comparing a BB to Jupiter.  There isn't much

3    here.

4              We need to take the deposition of Mr. Long.  I

5    mean we need a process.  If they want to take the position that

6    they are not relevant or they are not admissible, we have an

7    order from the Court on admissibility.  That's fine.  But it's

8    not good enough for them just to say that.  We need a process

9    now where we can figure out, number one, whether they are

10   relevant and whether they are truly admissible.  Most of all of

11   these documents really go to issues of process safety, systemic

12   safety failures, those types of things, and a punitive damage

13   claim, gross negligence claim.

14             We are not stuck in any hard and fast box on

15   time of these depositions.  We are willing to go to Houston to

16   do Mr. Long.  Mr. Long is not a Transocean employee anymore.

17   I'm not sure that they have even got control of him.  I suspect

18   if they asked him to, he would appear, but we will go to

19   Houston and we will take his deposition.

20             We are not going to waste time.  I think our

21   track record on the hundreds of depositions that were taken

22   before would indicate that or allay that concern, if it is one,

23   to rest.  But we need to take Mr. Long, we need to take

24   Mr. Rose briefly to follow up on some of these documents, and

25   we also need to talk to Mr. Newman briefly to follow up on some

1    of the newly produced documents.  That's it.

2            THE COURT:  Duke, on the 10 documents, you all have

3    agreed to limit it to those 10 documents?

4            MR. DUKE WILLIAMS:  Well, that was our offer in order

5    to cut through this.  There are another 10 or 15 or so that we

6    had originally requested, but in an effort to reach some sort

7    of accommodation, we agreed to whack it down to 10.

8            THE COURT:  To the 10 essential.

9            MR. DUKE WILLIAMS:  Well, they are all essential, but

10   these are the 10 best, I guess.

11            Now, that was hopefully to get something in

12   return.  We haven't.  But, you know, I mean, if it's 10

13   documents, it's 10 documents.  We have more than that, but not

14   many more than that.  We will limit it to 10.  We are prepared

15   if we have to, and we probably will, to send out requests for

16   admissions on Monday.  That doesn't solve the problem, though,

17   and it doesn't obviate the need for the depositions.

18            Before I forget, on the requests for admissions,

19   we have been discussing these documents for two months now.

20            THE COURT:  Yep.

21            MR. DUKE WILLIAMS:  I would make an oral request --

22   we will file a written motion if we have to -- that when they

23   are served with a request for admissions that the 30 days

24   provided under the Federal Rules be shortened to 15.  It

25   shouldn't be a big problem.

1              As long as we can get these depositions going
2    within the next 45 days or so, it's not going to create any
3    issues.  It won't create prejudice to Transocean in any way,
4    and it's not going to screw up our march to our new trial date
5    at all.
6              **THE COURT:**  Let's hear from Transocean.  Good
7    morning.
8              **MR. CARTER WILLIAMS:**  Good morning, Your Honor.
9    Carter Williams on behalf of Transocean.
10             **THE COURT:**  Good morning, Carter.
11             **MR. CARTER WILLIAMS:**  Your Honor, I think where we
12   got stuck, we all agree that there needs to be good cause at
13   this point in the Phase One proceedings to either amend an
14   exhibit list or certainly to take new depositions.  Where we
15   get stuck is they say it's good cause just because it's late,
16   and late has context here.
17             If it's a document they didn't ask for, didn't
18   hit on their search terms, you know, BP did, we later found it
19   when we were negotiating with them, that negotiation with BP
20   didn't conclude until September 2011.  That's when we started
21   those searches.  That means every document we produce in
22   response to a BP request now subjects us to redeposition.
23             More importantly, the issues they want to go
24   after have been covered.  The 10 documents relate to the
25   Lloyd's report, the safety culture study that Transocean

1    undertook, their e-mails and drafts of the announcement that

2    was produced in advance of Mr. Newman's deposition.  There are

3    275 references in the depositions to the Lloyd's report.  This

4    is just ground that has been covered.

5              Bob Long, Louisiana wanted to depose Bob Long,

6    and you ruled on that on April 4, 2011.  You said this is

7    duplicative of Transocean's 30(b)(6), where they are going to

8    present a witness on these issues, and it's duplicative of

9    Adrian Rose.  We just haven't seen good cause to agree to

10   another deposition.

11             I want to just say what we were willing to do is

12   consent to amendment of the exhibit list for all 50 of their

13   documents.  We are willing to de-designate confidentiality.  We

14   are willing to stipulate to authenticity.  We don't see any

15   reason at this point to agree that they are admissible.

16             Prior events have been covered by Judge Barbier;

17   not in the Transocean context, but there is a precedent here

18   for limiting the use of prior events evidence at this trial.

19   We are happy to move in limine or whatever it takes to deal

20   with that and at an appropriate time, but I can't today say,

21   yes, they are all admissible.

22             **THE COURT:**  Okay.

23             **MR. CARTER WILLIAMS:**  So that's kind of where we are.

24             **THE COURT:**  Gotcha.  All right.  It seems to me that

25   what I would like to do is -- I have all the documents, I have

1    all the arguments -- is just get a list of the 10 documents so

2    that we can pay attention to that limited group, and we will

3    proceed from there.  Okay?

4              **MR. DUKE WILLIAMS:**  I'm sorry, Your Honor?

5              **THE COURT:**  I just need to know which are the 10, the

6    10 documents.

7              **MR. DUKE WILLIAMS:**  They are right here.  I think we

8    submitted those.

9              **THE COURT:**  Yes.  We have them.  We have them.  I

10   just don't know -- have you previously submitted the 10?  I

11   know we have the larger binder.

12             **MR. DUKE WILLIAMS:**  Yes.  Yes, we did.  Listen, I

13   just saw somebody carry in a truckload of documents to Mike

14   this morning.  I can give him another copy.

15             **THE COURT:**  No, no.  If we have the 10, we have the

16   10.  We will look at it.

17             **MR. DUKE WILLIAMS:**  Just one thing.  Duke Williams

18   for the PSC.

19                  Thanks, Carter.  I appreciate your input.

20                  You know, because of this dispute with BP -- I

21   mean, we all worked on search terms together.  That was an

22   evolving -- you know, we give a search term, and Carter comes

23   back and says, "Gosh, we have 200,000 hits on this.  We need to

24   narrow it down."  We worked fine with them and did that.  There

25   was coordination with BP.

1        You know, we tried to avoid duplication.
2  Because Transocean lost the fight with BP over arbitration,
3  whatever it was, and these documents started to be produced
4  again en masse, I think it's just beside the point.  If these
5  10 documents are admissible, we may not even need to take more
6  than one deposition.  I really think that might be the case.
7        It's really not that big a deal, but it's
8  extremely important given -- the drafts are important because
9  it shows what these executives were thinking, what they thought
10  was important, what they wanted to minimize, all that type
11  thing.
12        **THE COURT:**  Okay.  Good enough.
13        **MR. CARTER WILLIAMS:**  Your Honor, I would just like
14  to add to that that there are prerequisites to good cause.  You
15  have to ask us for the document for us to know to produce it.
16  In two letters I have said, "What request are these documents
17  responsive to?"  They haven't pointed to one.
18        I think being late has some context, and you
19  have to be asked -- courts that look at this look at diligence
20  on the part of the requesting party in seeking the information.
21  It starts with asking.  And then if we objected to it and you
22  have a problem with our objections, you need to tell us.  We
23  will meet and confer.  The Federal Rules cover that.
24        **THE COURT:**  Okay.  Well, we will take it up.  We will
25  try to get to it sooner rather than later, move it up to the

1  top of our list.

2          **MR. DUKE WILLIAMS:**  Thank you, Your Honor.

3          **THE COURT:**  Thanks, Carter.

4          **MR. CARTER WILLIAMS:**  Thank you.

5          **THE COURT:**  Other Phase One motions.  Ben Allums was

6  kind enough to send us a list of all pending Phase One motions.

7  Except for the Fifth Amendment briefing, which we set last

8  week, it looks to me as though everything else is briefed and

9  ready for decision.  If you all find something that you believe

10  is not fully briefed, please point it out to us, but I think we

11  are in the can except for the Fifth Amendment stuff.  Okay?

12          Zantaz, Phase One.  We were supposed to have BP

13  and the United States meet and confer.  Anybody want to -- oh,

14  Rob is already here.  Good morning, Rob.

15          **MR. GASAWAY:**  Good morning, Your Honor.

16          **THE COURT:**  Do you want to give us a brief update?

17          **MR. GASAWAY:**  I do.  Sarah was very prompt after the

18  conference last Friday.  She sent me a letter later in the day

19  on Friday saying, "Let's make this easy.  Let's put Zantaz on

20  the same schedule as Schedule V for briefing."

21          Schedule V appears on page 4 of your order of I

22  guess it's August 13, and we are fine with that.  So I think --

23  and Sarah can correct me -- that BP and the United States, at

24  least, are in agreement that we should just use the deadlines

25  that are now scheduled for Zantaz.  We would hope that that

1    would apply to all parties, not just BP and the United States.

2             THE COURT:   Okay.  While we are on Schedule V, I was

3    looking at that yesterday, and I noticed that we didn't have a

4    meet-and-confer period built into that schedule.  It's a pretty

5    abbreviated schedule.  I thought that perhaps we wanted to

6    extend the schedule a little bit to put in a couple of days for

7    meet-and-confer.  Do you think that's something we should do?

8             And, Sarah, please speak up.

9         MS. HIMMELHOCH:  For once I'm in remarkable and 100

10   percent agreement with Rob --

11        THE COURT:  Oh, okay.

12        MS. HIMMELHOCH:  -- on the question of the Zantaz

13   schedule being folded into Schedule V.

14             With respect to meet-and-confer, I do think that

15   when the challenging party provides a description of the basis

16   for their challenge, we can often narrow what actually has to

17   be briefed by turning around a response that says, "Okay.  We

18   withdraw our claims as to the following."  So to bring in a

19   meet-and-confer for the non-Zantaz challenges makes sense to

20   me.  We have been through that process for the Zantaz

21   challenges.

22        THE COURT:  Right.

23        MS. HIMMELHOCH:  For the non-Zantaz, I don't see any

24   harm.  I, in fact, see some benefit from building in a

25   meet-and-confer period.

1          **THE COURT:**  Okay.  So let me give that to you because

2    I tried to work out something that made sense.  You all had

3    given the August 26 date for the deadline by BP.  Tuesday,

4    August 28, will be the deadline for all other parties.  Friday,

5    August 31, is U.S. response, and then a meet-and-confer period.

6    I thought you could go ahead and pick up again on Friday,

7    September 7, with the briefing.

8               So that would give you a week to meet and

9    confer, decide what's left, and then brief on Friday,

10   September 7; U.S. response by September 12; BP and other

11   parties by September 14.  So that gives you a few extra days to

12   meet and confer and see if you can narrow the issues.

13         **MR. GASAWAY:**  Your Honor, this is Rob Gasaway.  I

14   think that's a good suggestion to build in more time for

15   meet-and-confer on that.

16         **THE COURT:**  Okay.  All right.  Well, good, that takes

17   Schedule V off our agenda while we are at it.

18         **MR. GASAWAY:**  Could I mention one thing on

19   Schedule V?  I just want to be clear that there is a dangling

20   participle, as Your Honor would say, with regard to

21   Schedule IV.  We got the United States Schedule IV challenges

22   in to BP's logs this week, and we will go forward in trying to

23   resolve those, but I just wanted to make sure that we were

24   clear that no other party wants to challenge BP's logs that are

25   under Schedule IV.  As you remember, that's just one log of 87

1    entries.

2            **THE COURT:**  Correct.

3            **MR. GASAWAY:**  We have mentioned that a couple of

4    times and in a couple of contexts, but I want to make sure that

5    the door is closed to other challenges to that 87-item log and

6    then we can go forward.

7               I know we had a privilege log in the works.  I

8    don't know if it was served on August 15 or 16, but I do want

9    Your Honor and the other parties to know that we are in the

10   process of producing an additional privilege log with respect

11   to some of our custodial productions and will want to make sure

12   that we promptly pull out of the weeds any challenges to those

13   logs as well.

14           **THE COURT:**  Okay.  Good enough.

15           **MR. GASAWAY:**  Thank you.

16           **THE COURT:**  Thank you.  I appreciate it, Rob.

17           **MS. HIMMELHOCH:**  Your Honor, this is Sarah

18   Himmelhoch.  Would it make sense to include whatever logs have

19   been served by a certain date before Schedule V by BP, to fold

20   those into the Schedule V challenges?

21           **MR. GASAWAY:**  I think that's a good idea, Sarah.  I

22   think if, for instance, we could say that any logs that are

23   served by BP up through the 17th would be on the same time

24   frame, I think that would give you until Sunday, the 26th, to

25   look those over, Sarah, and to have the other parties look

1    those over and bring your challenges.  I think when you see the

2    volume, it won't be too great that you will think that that's

3    too quick.

4            **THE COURT:**  Okay.

5            **MS. HIMMELHOCH:**  That's fine with the U.S.,

6    Your Honor.

7            **THE COURT:**  We will go ahead and make that

8    modification.  So we will include the BP logs in that schedule

9    as well.

10           **MR. GASAWAY:**  Thank you, Your Honor.

11                   Thank you, Sarah.

12           **THE COURT:**  Good.  Thanks, Sarah.

13           **MR. O'ROURKE:**  Your Honor, Steve O'Rourke for the

14   United States.

15           **THE COURT:**  Hello, Steve.  How are you doing?

16           **MR. O'ROURKE:**  Great.  Thank you.  Mr. Gasaway just

17   mentioned the idea of these custodial productions from their

18   upcoming witnesses which may have further logs.  We all know

19   there's a 21-day deadline prior to the deposition, but the

20   United States would like to request that for BP's 30(b)(6)

21   witnesses, they start those productions sooner rather than

22   later.  They have had most of our documents for a long time.

23                   These custodial people, some of them, we don't

24   know who they are.  So we don't want to be in a position like

25   we were in Phase One where we are getting these documents,

1   rolling them through on a fast turnaround, especially where

2   they don't suffer that prejudice because they have had our

3   documents for so much longer.  So we are requesting that BP

4   start the production as soon as they can.  These are simple

5   searches on a unified IT system, and it shouldn't take them

6   more than a week or two to get these things out.

7           **THE COURT:**  Okay.  Thank you.

8           **MR. O'ROURKE:**  Thank you.

9           **MR. NOMELLINI:**  Your Honor, Mark Nomellini.

10          **THE COURT:**  Hello, Mark.

11          **MR. NOMELLINI:**  Good morning.  How are you?

12          **THE COURT:**  Good.  Thank you.  How about you?

13          **MR. NOMELLINI:**  Good.  Your Honor, we heard that

14  suggestion.  So, yes, in addition to extending the period out

15  to 21 calendar days, wherever possible, we are making

16  productions in advance of that.  In fact, we have made some

17  productions for Rohloff and Gochnour and intend to continue

18  pursuing that procedure of producing documents in advance of

19  the 21-day period where it's reasonably possible.

20          **THE COURT:**  Good.  Thank you.

21              Nat.

22          **MR. CHAKERES:**  Thank you, Your Honor.  Nat Chakeres

23  for the United States, and I just had one other follow-up on

24  the privilege challenges.  We saw Your Honor's order this week

25  regarding the BP extrapolation process.  I think there were a

1  couple of outstanding questions we had on that, and we will be

2  providing a letter to the Court today.

3           Just briefly, the issues are we think that most

4  of the gray area on the BP rulings are sort of pre-July 18.  We

5  think the vast majority of post-July 18 documents are

6  protected.  So we thought that maybe if Your Honor wants to

7  look at a few more documents pre-July 18, that may be more

8  productive.

9           We also saw that Your Honor requested

10  information as to what privilege is being challenged for each

11  document.  As to the United States' challenges, we have

12  challenged both work product and attorney-client for

13  everything.

14           **THE COURT:**  For all of them.

15           **MR. CHAKERES:**  The last thing that will be explained

16  in the letter is I believe it's our understanding that we have

17  been extrapolating, the United States, across all our privilege

18  logs, not just our challenge docs, and we want to make sure BP

19  is doing the same thing.  That will all be explained in greater

20  detail in the letter.

21           **THE COURT:**  Good.

22           Rob, I thought you had affirmed the latter as

23  far as extrapolating across all logs, hadn't you?

24           **MR. GASAWAY:**  No, Your Honor.  We extrapolated across

25  the challenge documents, so all logs to the extent that they

1  were challenged.  So if you remember the process here, we had a

2  large group of privilege logs, then there was a group of what

3  we called blunderbuss challenges that other parties thought was

4  a bad adjective, but there was a large --

5            THE COURT:  So you're repeating it, huh?

6            MR. GASAWAY:  With the qualification.  There was a

7  large group of challenges.  So what we did was we went back and

8  we looked at all of the challenges that had been brought sort

9  of expressly or implicitly.  So, for instance, we had been in

10  discussion with the United States for a long time about the

11  notable SharePoint documents.  At the time that they were

12  supposed to narrow our logs for their challenge, they didn't

13  know which documents were on the SharePoint.  We were still

14  going back on the meet-and-confer.

15            We sort of said, okay, we knew all along that

16  they were concerned about the SharePoint documents, so we will

17  consider every document that was on the SharePoint there was a

18  claim of privilege over challenge.  So what we tried to do is

19  look at all of our logs for any document that had ever been

20  challenged.  But as you know, there's a telescoping process

21  where there was all of the logs, then there was thousands of

22  challenges, and then with those thousands of challenges they

23  brought a group of documents before Your Honor.  That was the

24  infamous 87 documents.  Then we released some of those.  I

25  think we ended up briefing 57 of those documents.

1          You ruled on those on July 13.  There was a

2    reconsideration.  Then we went back, based on those rulings on

3    July 13 and the reconsideration, and extrapolated them against

4    all challenged documents that had ever been challenged within

5    our camp.  So that's where we are now.

6               THE COURT:  So, Nat, did that answer your question?

7               MR. CHAKERES:  Not happily.

8               THE COURT:  I understand.  So the difference is that

9    they have extrapolated only as to the challenge documents, not

10   across all logs.

11              MR. CHAKERES:  We appreciate that clarification.  We

12   understand that BP requested and the Court ordered for the

13   United States to go across all privilege documents, and we

14   would ask for the same rule to apply here.

15              THE COURT:  Okay.

16              MR. GASAWAY:  I would be interested to see where we

17   asked for all privilege documents.  Obviously, on the

18   deliberative process privilege, which has been the main focus

19   of back-and-forth with the United States, our position has

20   always been, under the *Branch* case from the Fifth Circuit, that

21   all of those claims of privilege need to be improved because

22   there are declarations for them.  So we have sort of put aside

23   the deliberative process privilege.

24              We have also carved out even from the

25   deliberative process privilege, as you know, all the later

1   phases documents, all the nonrelevant documents.  So I think,

2   as a practical matter, what we were doing on the deliberative

3   process was trying to narrow it to just those we challenged.

4           On the deliberative process, the ones that we

5   challenged were all Phase Two documents because none of them

6   had declarations.  But even as to those, obviously, in order to

7   be accommodating, we didn't insist on declarations for

8   everything.  We had a sampling process and then another

9   sampling process and then an extrapolation process.

10          So I'm not exactly sure which particular

11  communication Mr. Chakeres is referring to; but certainly for

12  our main challenges on deliberative process, we think it's very

13  much a parallel kind of thing but adapted to the unique nature

14  of the deliberative process challenge we brought.

15          **MS. HIMMELHOCH:**  Your Honor, this is Sarah

16  Himmelhoch.  In the same way that in Rob's view they have

17  challenged every single one of the deliberative process claims,

18  the United States challenged every single one of BP's privilege

19  claims because we asserted that their privilege log

20  descriptions were insufficient for us to determine whether or

21  not, in fact, the privilege claim applied.

22          You ruled that, as an initial statement, those

23  privilege log descriptions were sufficient.  But just as we had

24  to go back and extrapolate against all Phase Two privilege

25  claims, we believe given the paucity of information on the

1  privilege log and the challenge that we made to the adequacy of

2  their privilege logs that BP bears a similar burden with

3  respect to Phase Two documents to go back and extrapolate

4  against all privilege documents, not just against what they

5  consider to be what we challenged, because we believe we have

6  challenged the adequacy of the privilege logs as to all

7  privilege documents relative to Phase Two.

8          THE COURT:  Okay.  I understand.  Okay.  We'll think

9  about it.

10         MR. GASAWAY:  Let me just say we look forward to

11  seeing the letter and we will respond in that letter.  The

12  chronology --

13         THE COURT:  I understand.

14         MR. GASAWAY:  -- as to that will be interesting, and

15  I will be interested to see if the view that Sarah put forward

16  is ultimately borne out, but let's wait for their letter.

17         THE COURT:  The discussion was helpful, so I

18  understand the issue.

19         MR. GASAWAY:  Thank you, Your Honor.

20         THE COURT:  Thank for raising it, Nat.

21         MR. NOMELLINI:  Your Honor, it's Mark Nomellini.  I

22  have an additional point now that I heard Nat Chakeres' voice,

23  if I may, relating to documents.  We have had some discussions

24  with Nat over the last few months relating to flow rate

25  modeling software and related documents.

1          You will recall from Phase One there were some

2    issues with respect to developing protocols to view documents

3    that have been generated using the software that was expensive

4    for the parties to obtain, and we had to take some special

5    steps in order to do that.  I'm not sure whether or not that

6    will be necessary here or whether there will be a similar

7    process or some kind of different process or what exactly we

8    are ultimately going to agree on, but I just wanted to raise

9    with Your Honor that we have been discussing that with Nat and

10   trying to figure out a solution.

11          One of the issues, as Your Honor may recall from

12   earlier discussion, with some of the other software is that

13   licenses for the software for some of these programs are very

14   expensive to obtain.  So if the parties are interested in

15   pursuing some of these things, both on the U.S. side and BP,

16   they will have to craft a solution to that.

17          So there's nothing really for Your Honor to

18   decide at the moment.  I just wanted to alert you that we hope

19   to continue our discussions with Nat on that issue.

20          **THE COURT:**  Nat seems happy with that.  Thank you.

21          Rob.

22          **MR. GASAWAY:**  I'm sorry, Your Honor.  As long as Nat

23   opened the door, I wanted to mention one thing about the

24   Court's sampling of 30 documents and the privilege ruling.

25          We will be submitting those documents on Monday.

1    Obviously, Nat previewed a letter where he is going to try to

2    advocate for sort of a hybrid process of you selecting

3    additional documents.  We are going to be submitting with those

4    documents the same type of background materials that we have

5    submitted with other submissions, other documents, etc.,

6    declarations.

7                What you will find on Monday is that one

8    declaration that we had planned to submit we will not have

9    available for Monday, and that's because the declarant has

10   personal counsel who is insisting on obviously looking at the

11   declaration.  That personal counsel is in trial.  So I just

12   wanted to alert you.  We will say it when you see it on Monday,

13   but there is that timing issue.

14          **THE COURT:**  Good enough.  Thank you.

15          **MR. GASAWAY:**  Thank you, Your Honor.

16          **THE COURT:**  Mr. O'Rourke.

17          **MR. O'ROURKE:**  Steve O'Rourke for the United States.

18   As long as Rob opened the door, we have to object to this

19   continuing process where BP provides you secret declarations

20   that we don't get to see.  There's no entry in the docket

21   noting that the declarations are under seal.  The public has no

22   idea these declarations are being submitted.  Thank you.

23          **THE COURT:**  Okay.  Thank you.

24                BOP and capping stack.  We had a communication

25   this week that hopefully everybody has seen where BP reported

1    on its plan to test samples of the materials removed from the

2    riser after the visual inspection on September 4.  BP is going

3    to provide everyone with a protocol to proceed from there.  In

4    addition, BP plans to remove one bonnet to permit inspection of

5    the lower VBR/test ram cavity.

6              Oh, look at that.  What are we looking at?

7         **MR. GASAWAY:**  Your Honor, that is a bonnet.  That's

8    the casing shear ram bonnet, starboard side.  I just wanted to

9    put that up on the overhead so the parties could see what we

10   are talking about.  We are just essentially talking about

11   taking about a 3-foot heavy piece of metal off of the BOP.

12             Captain Englebert, as you know, has said that

13   that's quote/unquote destructive testing because once you take

14   it off, you have altered it; there's a gasket seal there that's

15   no longer sealed.  But just so the parties knew what we were

16   talking about doing on September 4, we are proposing to take

17   that off.  That will allow the cavity to be exposed, the

18   variable bore ram cavity.

19        **THE COURT:**  Right.

20        **MR. GASAWAY:**  Then I wanted to let the parties know

21   that the reason for doing that is to just be able to inspect

22   and photograph that cavity.  That will happen, as we said in

23   the previous letter to the Court, on various days in September.

24   Captain Englebert is the gatekeeper for that.  Obviously, all

25   the parties will know, but our plan is just to bring experts

1  out to look into the cavity, take pictures, video, etc.

2  **THE COURT:** Just so everybody knows,

3  Captain Englebert, although she says that, for example,

4  removing the bonnet could be considered destructive, she has no

5  opposition to it. She just wants to make clear that once you

6  do that, it's altered, but she has absolutely no objection to

7  the suggested procedure.

8  **MR. GASAWAY:** Thank you, Your Honor.

9  **THE COURT:** I know, Jimmy, you have expressed an

10 interest in being out there for the procedure.

11 **MR. WILLIAMSON:** True.

12 **THE COURT:** Everybody else who wants to be there or

13 wants their expert to be there, please make sure that you

14 follow Captain Englebert's normal procedure for entry, who is

15 coming, give her all the identification information so she can

16 make arrangements through NASA, all the stuff that we normally

17 do when we are going out to Michoud.

18         Nat, do you have something on this?

19 **MR. CHAKERES:** I just had one quick question,

20 Your Honor. I think we could probably talk to Rob about it,

21 but I think other parties might be interested in the issue.

22         We have no objection in principle to what's laid

23 out in the letter. I think that the Court mentioned at the

24 last conference you do want an end date for work at Michoud so

25 all the data is in for expert reports.

1          **THE COURT:**  That is right.

2          **MR. CHAKERES:**  We will get to that later on.  We had

3    previously understood one other activity that's still to take

4    place is laying out some of the BOP elements alongside pipe for

5    visual inspection, and at least it was our understanding that

6    around that same September 4 date that was going to happen.

7    Just in terms of scheduling who from our side wants to go and

8    look at that, we just want to clarify everything that's

9    happening September 4 so people don't miss it.

10         **THE COURT:**  That's a very good question.

11              Rob, is that your showroom date or is that your

12   "we are getting started moving" date.

13         **MR. GASAWAY:**  That's our "we are getting started

14   moving" day, but we are happy to work with the other people.

15   So if there's particular showroom dates that they want, we can

16   make sure that they get their experts out there on the showroom

17   dates looking at the equipment they want.  The key point of the

18   September 4 date is just this removal operation is going to

19   happen hopefully on September 4.

20         **THE COURT:**  You will then post-September 4 start

21   moving the equipment into the showroom.  And you, I thought,

22   identified what equipment you were looking for.

23         **MR. GASAWAY:**  Yes.

24         **THE COURT:**  If anybody wants any other equipment

25   moved into the showroom, you may make the request of

1  Captain Englebert.  If she thinks it's feasible, have at it.

2          **MR. GASAWAY:**  Just to make clear, the moving around

3  of stuff at Michoud is going to keep going.  It's not just

4  September 4.  We are going to maybe start turning the nuts,

5  taking the bolts off on September 4.  I don't know if the

6  actual plate will come out on September 5, but we are going to

7  be working out there September 4, September 5, September 6.  We

8  are happy to be joined by any other parties and any other

9  experts.

10          **THE COURT:**  Good.

11          Jimmy.

12          **MR. WILLIAMSON:**  Judge, no objection, of course.  The

13  problem with the Michoud stuff is sometimes you go out there

14  and you can literally be out there five or six days and nothing

15  happens.  All I request is that I be given some sort of notice

16  as to when it is actually going to be available to inspect and

17  photograph so that me or whoever we send doesn't have to stay

18  out there five days drinking coffee.

19          **THE COURT:**  And barbecuing.

20          **MR. WILLIAMSON:**  And barbecuing, yes, Your Honor.

21  I'm sure Mr. Gasaway and BP will comply with that, but I just

22  wanted to be sure that request was in.

23          **THE COURT:**  Right.

24          Rob, you don't need to get up to acknowledge

25  this, but whatever advance notice you can give the parties,

1   that "We think we are going to have the showroom done and

2   available on September 12," whatever the date is, try to give

3   everybody the heads-up so they can plan for it.

4               **MR. MILLER:**  It's so nice and cool out there.

5               **THE COURT:**  The showroom is going to be

6   air-conditioned.  That's the beauty of having the showroom.  Is

7   that right?  That's why it's so nice.  So anybody else who

8   wants to add stuff to that room, it will be the first time we

9   have an air-conditioned environment.

10              So on the issue of deadline for BOP testing, I

11  thought that October 31 sounded like a good deadline.  It gives

12  you time to follow up, but it also puts an end to things so

13  that everybody can know that they can start preparing their

14  expert reports.

15              Mr. O'Rourke.

16              **MR. O'ROURKE:**  Is that for capping stack testing too?

17              **THE COURT:**  I think it's for all testing, all

18  equipment testing, it seems to me.  Beyond that date, the

19  equipment will be available for inspection, photography,

20  whatever you want to do, but it seems to me we should call it

21  quits on testing.  Okay?  That will be your day.

22              Rob, you have something on that?

23              **MR. GASAWAY:**  I was just going to amend that,

24  Your Honor.  At the request of the United States, they said,

25  "Okay.  If your testing ends, let's say, October 31, we need

1   the data," and what we had proposed was maybe by Thanksgiving

2   or something when the core of the Rule 30(b)(6) depositions are

3   closed.  So if the testing occurs by the end of October, then

4   we would try to get the data to everybody by Thanksgiving.

5               **THE COURT:**  Okay.  So it will be an approximately

6   3-week lag period.  You will get it to them on a rolling basis

7   as you get them.

8               **MR. GASAWAY:**  Right.

9               **THE COURT:**  Okay?  Good enough.  So that's taken care

10  of.  Rob, I assume the lease has been executed?

11              **MR. GASAWAY:**  I don't know, Your Honor, but we are

12  going to do it.

13              **THE COURT:**  I'm going to take it off the agenda.

14              **MR. GASAWAY:**  Take it off the calendar.

15              **THE COURT:**  Right.  It's off the agenda.

16              **MR. GASAWAY:**  We will make sure it's done.

17              **THE COURT:**  Good.  I wanted to report to you that I

18  have had communications with Captain Englebert.  She is up in

19  Wisconsin and has bought herself a new SUV.  I tried to have a

20  picture of it for you today, but my systems unit did not

21  comply.  We will have a picture for you probably next week.  We

22  suggested to her she gets a specialty license plate "MDL 2179."

23  She thought it was a good idea.

24              Rob, could we talk about the five remaining DPP

25  challenges on Phase Two.

 1          **MR. GASAWAY:**  I think we challenged them, and I think
 2   they are sort of hanging out there, Your Honor.
 3          **THE COURT:**  So you want us to look at those five
 4   documents?
 5          **MR. GASAWAY:**  Yes.
 6          **MS. HIMMELHOCH:**  These are DPP challenges?
 7          **THE COURT:**  Yes.
 8          **MS. HIMMELHOCH:**  I don't know which five he is
 9   talking about.
10          **THE COURT:**  We got a letter from him listing five
11   further DPP documents that were at issue.
12              Rob, would you send that to Sarah to look at.
13          **MR. GASAWAY:**  Yes.  Why don't I do this?  I will send
14   it to Sarah, let Sarah and I talk about this, and don't do
15   anything.  We will get on the same page, and I will send an
16   e-mail to the Court either later or Monday.
17          **THE COURT:**  Fair enough.
18          **MR. GASAWAY:**  Okay.
19          **THE COURT:**  We do have it on the list of things we
20   need to resolve.
21          **MR. GASAWAY:**  Correct.  Thanks.
22          **THE COURT:**  We are moving along on Schedule I.  Do we
23   have any status report on BP's August 13 other phases and not
24   relevant entries reshuffling?
25              Nat.

1          **MR. CHAKERES:**  Your Honor, Nat Chakeres for the
2     United States.  We are reviewing that, and we will follow up
3     with BP.  There is nothing to report at the moment.
4          **THE COURT:**  Good.  Last but not least is we did not
5     cover Schedule IV yet.
6          **MS. HIMMELHOCH:**  Your Honor, BP has filed its
7     Schedule IV challenges to the U.S. privilege log.  I anticipate
8     getting our response to you today.
9          **THE COURT:**  Okay.
10         **MS. HIMMELHOCH:**  The U.S.A. has issued its
11    Schedule IV challenges to BP.  I don't believe we have a
12    briefing schedule for that yet.  We have just initiated the
13    meet-and-confer process.  I don't know whether any other
14    parties are intending to bring Schedule IV challenges as to
15    either BP or the U.S.
16         **THE COURT:**  Okay, guys.  Everybody else look at those
17    Schedule IV logs.  If you have challenges in addition to the
18    challenges that have been asserted by the United States or by
19    BP, noon Tuesday is your opportunity.  As I said, I don't think
20    that BP and the U.S. are being kind to each other, so I would
21    suspect they have raised all the challenges that need raising.
22    If I'm wrong, that's your deadline.
23              Then do you all want to just agree to a briefing
24    schedule?
25         **MR. GASAWAY:**  Your Honor, with respect to BP's

1  challenges to the U.S., I understood Sarah to say she was going
2  to respond today.  We would like to wait, let's say, until noon
3  Tuesday.  Hopefully nothing new will come in, but then we could
4  respond, let's say, by Thursday of next week, assuming we have
5  Sarah's letter today and there's nothing that comes in on noon
6  Tuesday.

7          THE COURT:  Okay.  Good enough.

8                  Sarah, that's okay by you?

9          MS. HIMMELHOCH:  Yeah, that's fine.

10         THE LAW CLERK:  Could we just put it on the same
11  schedule as Schedule V and Zantaz so everybody is all coming in
12  at the same time?

13         THE COURT:  Do you want to go to Schedule V?

14         MR. GASAWAY:  That's fine with us if you want to make
15  it easy.

16                 Sarah, is that okay with you or do you want to
17  get on with Schedule IV?

18         MS. HIMMELHOCH:  That's fine with me.  That had been
19  my original proposal for all the parties to deal with
20  everything post-May 31 as Schedule V, so I'm fine with that.

21         MR. GASAWAY:  Okay.  I'll tell you what, Sarah.  If
22  you go ahead and file your letter today, we would go ahead and
23  respond to that quickly.  Maybe we can narrow the issues on
24  that, just take one more issue out.  So if you feel like going
25  ahead and filing it, we won't wait until the Schedule V dates.

1          **MS. HIMMELHOCH:**  Yes.  I will file that today.

2          **MR. GASAWAY:**  Then we will respond next week and we

3    will knock that one off.

4          **THE COURT:**  So we will knock off Schedule IV.  I like

5    that better.

6          **MR. NOMELLINI:**  This is Mark Nomellini.  One quick

7    thing.  Have we met and conferred on Schedule IV yet?

8          **MS. HIMMELHOCH:**  We did.  You guys have already filed

9    your brief with Judge --

10         **MR. NOMELLINI:**  Oh, I see.  You're talking about BP's

11   challenges to the United States, the thing that we filed on

12   Monday.

13         **MS. HIMMELHOCH:**  Yes.

14         **MR. GASAWAY:**  Correct.

15         **MR. NOMELLINI:**  I gotcha.  We are to meet and confer

16   on the letter that you just sent us with your challenges.

17         **MR. GASAWAY:**  Correct.

18         **MS. HIMMELHOCH:**  Yes.

19         **MR. NOMELLINI:**  Got it.

20         **MR. CHAKERES:**  Yes.

21         **MR. NOMELLINI:**  Got it.

22         **THE COURT:**  We have a request from the MDL 2185

23   parties to participate in the Phase Two discovery to the same

24   extent that they did in Phase One, sitting in at depositions,

25   receiving copies of the expert reports, all subject to Pretrial

1  Order 27.  Would you all think about that and let us know early

2  next week whether that request is a problem for anyone; and if

3  not, I will go ahead and get an order in that, subject to the

4  same conditions as Phase One, they may participate.  Okay?

5          Mr. Brian Barr gave us a wonderful report --

6  thank you, Brian -- on the length and categorization of

7  depositions, and it looks like you guys made some really good

8  progress with that.

9          **MR. BARR:**  Yes, Your Honor.  Brian Barr for the PSC.

10  I think we made a lot of progress.  We have a couple of issues

11  to iron out.  I think we will be able to do that.  I don't

12  think there's a conference next week, but we can tee it up.

13          **THE COURT:**  Right.

14          **MR. BARR:**  We can tee that up.  There might be a

15  couple where we have to figure it out.

16          **THE COURT:**  If there are a couple that you can't

17  reach agreement on, why don't you give us a letter telling us

18  what the final disagreement may be, and we will go ahead and

19  try to resolve it for you.

20          **MR. BARR:**  Okay.

21          **THE COURT:**  That was really a good report and I

22  appreciate it.

23          We did issue an order for allocation of

24  examination time and sequence.  We have already gotten one

25  request for reconsideration.  Do you want me to set a deadline

1    for a request for reconsideration?

2              **MR. MILLER:**  That would be great.

3              **THE COURT:**  So, I don't know, how about close of

4    business on Wednesday?  Is that doable?  Everybody thinks

5    that's doable?  Good.

6                   Rob.

7              **MR. GASAWAY:**  I was just going to mention --

8              **THE COURT:**  You were going to compliment me on our

9    ruling, huh?

10             **MR. GASAWAY:**  I was going to compliment Your Honor

11   and Mike on your order.  I was going to mention it's not going

12   to come as a surprise to you that we were planning to respond

13   to the motion for reconsideration, but you are a step ahead of

14   us in the sense that we wanted to make sure everybody got their

15   licks in.  So maybe if everybody gets their motions in for

16   reconsideration on Wednesday, we could get a letter to

17   Your Honor, since we don't have a Court conference next Friday,

18   next Friday opposing that.

19             **MR. MILLER:**  Your Honor, the motions are letter

20   briefs?

21             **THE COURT:**  Yes, letter briefs.

22             **MR. MILLER:**  Attached to e-mails?

23             **THE COURT:**  Yes.  That will work.

24             **MR. GASAWAY:**  Actually, let me go Monday if we are

25   going to have multiple ones.  If that's okay, we will respond

1    the following Monday.

2              THE COURT:  Always pushing, always pushing.  Monday

3    it is.

4              MR. GASAWAY:  Thank you, Your Honor.

5              THE COURT:  Okay.

6              MR. O'ROURKE:  Judge --

7              THE COURT:  Mr. O'Rourke.

8              MR. O'ROURKE:  Steve O'Rourke for the U.S,

9    Your Honor.  I'm not sure this is reconsideration on the time

10   order; it's a clarification.  You said that the party putting

11   forth the witness would get time at the conclusion of the

12   deposition.  In Phase One, let's say if it's us going first, we

13   got to go at the very end in rebuttal.  Is that still true?

14   Your order implies that it might not be true anymore.  Can the

15   party who goes first -- say it's the plaintiffs, then the

16   defendants go -- reserve time for rebuttal?

17             THE COURT:  We hadn't thought about that.

18             MR. O'ROURKE:  That's the way they did it the first

19   round.

20             THE COURT:  We'll make that part of our

21   reconsideration.

22             MR. O'ROURKE:  Thank you.

23             THE COURT:  You're welcome.

24                Nat.

25             MR. O'ROURKE:  I didn't do a good enough job because

1  Nat has something.

2          THE COURT:  Well, you forgot something that Nat wants

3  to raise.

4          MR. CHAKERES:  Your Honor, this isn't that same

5  issue.  Nat Chakeres for the United States.  Richard Vargo is

6  going to be next week.  He is a Halliburton witness.  He is on

7  Brian Barr's list as a hybrid witness, and there's not an

8  allocation for a Halliburton hybrid witness.  I don't think we

9  have a big task in front of you.  I think if you pick source

10  control or quantification, just put him in one of those

11  buckets, there's not a huge difference between them.

12          THE COURT:  Right.

13          MR. CHAKERES:  I don't think there's going to be a

14  big fight among the parties, but just so we are clear before we

15  go in there.

16          THE LAW CLERK:  We'll get an order out today.

17          THE COURT:  Okay.  Yes.  We'll get an order out

18  today.  I was going to let Don Godwin decide how he wanted to

19  do it, but that's a bad idea.

20          MR. DAVIS-DENNY:  Your Honor, can I make a quick

21  point on that?

22          THE COURT:  Microphone.  Microphone.  Where's your

23  remote?

24          MR. DAVIS-DENNY:  I'll just go to the podium.

25          THE COURT:  Okay.  Come on up.

1    **MR. DAVIS-DENNY:**  Good morning, Your Honor.

2    **THE COURT:**  Good morning.

3    **MR. DAVIS-DENNY:**  Grant Davis-Denny on behalf of

4    Transocean.  I was just going to ask that the Halliburton

5    witness be considered a source control witness or at least a

6    hybrid witness for purposes of how we treat the deposition

7    time.  There's a big difference in what Transocean has thus far

8    been allocated for source control witnesses versus

9    quantification witnesses, so it matters a lot to us.  As I

10   recall, this Halliburton witness is going to be talking about

11   the Top Kill, so it seems sensible that they will be treated as

12   a source control witness.

13   **THE COURT:**  Okay.  The U.S. has no objection.  Okay.

14   Good, good, good.

15   So we have two upcoming August depositions, and

16   in September we really start to roll.  It looks like we are in

17   pretty good shape.  We have some outstanding issues.  Have we

18   got any update on Pencor as far as identification of the

19   designee and document production?

20   **MR. CHAKERES:**  Your Honor, Nat Chakeres for the

21   United States.  Their document production is in and served on

22   the other parties.  To my knowledge, we do not have the name of

23   the designee yet.  I was just going to run through sort of the

24   other updates we have.

25   **THE COURT:**  Go ahead and do that.

1          **MR. CHAKERES:**  Intertek, Isotech, and WOM should be

2     producing documents to the United States within the next week,

3     which for Intertek and Isotech, right now they are scheduled

4     for depositions.  That will enable us to provide those

5     documents to the other parties in advance of the 21-day border.

6     We don't have, I believe, individual names for those

7     depositions, but we will provide that information to the

8     parties probably by e-mail.  We won't wait until the next

9     working group conference to do so.

10          **THE COURT:**  Good.

11          **MR. CHAKERES:**  The BP Institute, they floated several

12     dates with their witness.  We are still trying to figure that

13     out again.  I think we are probably a couple of days away from

14     providing date ranges.  Again, we are going to do that with the

15     rest of the parties so that we don't have to wait two weeks to

16     get that one on the calendar, at least onto everybody's

17     internal calendars.

18          **THE COURT:**  Good.

19          **MR. CHAKERES:**  We had a good discussion with Cameron

20     this morning about where they are.  They are well on their way

21     with document collection for the subpoena document requests we

22     have made.  Once those documents are collected, we will confer

23     further about dates.  I don't believe we have any other updates

24     in terms of the parties the United States has been working

25     with.

 1           THE COURT:  Good.

 2           MR. CHAKERES:  Oh, excuse me, there is one,

 3   ADD Energy.

 4           THE COURT:  Oh, yes.

 5           MR. CHAKERES:  Unfortunately, there's a

 6   miscommunication and they won't be able to do -- they are on

 7   the calendar for October 2.

 8           THE COURT:  That's right.

 9           MR. CHAKERES:  Right now, I think they want to move

10   that by a day or two, so we are talking to them about what day.

11   I think that's still going to be that week, but it may be the

12   3rd or the 4th.  We have asked them to consider the 3rd because

13   there's already a number of depositions on the 4th.  But if it

14   needs to be on the 4th, we will do it on the 4th.

15           THE COURT:  Good.  That will work.

16               Any update on Weatherford?

17           MR. O'ROURKE:  I just want to note that he lost

18   concentration just before he got to ADD Energy.

19           THE COURT:  Good point.

20           MR. CHAKERES:  No update on Weatherford, Your Honor.

21           THE COURT:  How about on Statoil?  Have we finished

22   production of documents on them?

23           MR. GASAWAY:  Your Honor, Rob Gasaway.  I believe we

24   have finished production of documents, and we have served PTOs

25   13 and 51.  We are trying to identify an attorney who could

1  kind of be a contact for follow-up because of the

2  confidentiality issue, but I will give the definitive update to

3  the parties shortly.  I do believe they have produced all the

4  documents.

5          THE COURT:  Good.

6              Jimmy, anything on Wild Well?

7          MR. WILLIAMSON:  Yes, Your Honor.  Wild Well, when

8  they made their productions, I told the Court the production

9  wasn't perfect, but apparently some of it didn't go to all

10  parties.  It's our responsibility to make sure whatever we did

11  receive will get to everyone.  I think we got it to Transocean,

12  U.S.  I'm in the process of making sure that whatever we have

13  in whatever form it is gets to everyone this week.

14          THE COURT:  What about a date for the deponent,

15  anything on that?

16          MR. WILLIAMSON:  With the Court's permission, I

17  believe the parties want to see what documents they have before

18  we try to reschedule a day, assuming that's acceptable to the

19  Court.

20          THE COURT:  That's fine.  That's fine.  We will just

21  keep that on a deferral basis.

22          MR. WILLIAMSON:  Yes, Your Honor.

23          THE COURT:  Thank you.

24              Okay.  I think I'm at the end of my agenda.  We

25  are going to throw it open for other.

1      **MS. HIMMELHOCH:**  Your Honor, this is Sarah

2  Himmelhoch.  I did want to give you an update on the document

3  production for the U.S.

4      **THE COURT:**  Please.  Thank you, Sarah.

5      **MS. HIMMELHOCH:**  With respect to the DOE

6  re-collection, we completed the production on August 15 with

7  the exception of one custodian.  Dr. Burns had, I think, the

8  most stubborn computer I have ever met.  We have finally

9  managed to get all of the data off of his computer, run the

10  searches.  We are now doing the privilege review.  We expect

11  that his production will be complete by the end of next week at

12  the absolute latest.  I hope it will be much earlier than that.

13  We also are just doing a review to make sure that everything

14  converted and was produced out.  We are almost completely done

15  with the DOE re-collection.

16          For the Coast Guard, we received from BP the

17  privilege document from the loose media to review, and we also

18  are scrambling to complete the production out of the

19  Coast Guard laptop.  Again, we are almost done and we expect to

20  be completely done by the end of next week on those two topics.

21          We have a number of files that we produced to

22  all of the parties in native format because they were corrupt

23  files that we could not process.  We have since purchased some

24  new tools, and as a result there will be some additional

25  custodial productions for some of the 30(b)(6) designees.

1    They have already started seeing that for Herbst

2   and Sogge.  Again, these are files they have had, the other

3   parties have had, but we are now able to render them to TIFF

4   and produce them in a more accessible format.  We will

5   definitely produce those at least 21 business days before the

6   deposition, and my goal is to get them done much sooner than

7   that.

8    We continue to have just a few open issues with

9   BP regarding metadata issues.  Obviously, we are still working

10  to get BP a response on the DOE data issue.

11    With respect to the third-party subpoenas, we

12  had received in time to do privilege review the three

13  nonuniversity third parties and half of the University of

14  California production.  We have the privilege documents from

15  the Purdue production, and we expect to get a privilege log out

16  on that and produce any loose documents by the middle of next

17  week.  We are still awaiting the University of California

18  giving us access to Dr. Leifer's records in order to do our

19  quick privilege review.

20    To give you a sense, we got the University of

21  California data for Dr. Lasheras and his staff, and we were

22  able to do the privilege review and turn out our privilege log

23  in less than 24 hours.  So we are not dillydallying with that,

24  but we don't have the data yet to do that action on.

25    Then I had also noted to you in the last working

1   group conference we were working with the Mexican states.  We

2   have provided our response to their subpoena.  I think we have

3   agreed on the scope of production and we have an August 24

4   return date.  I have every reason to believe we are going to

5   meet that August 24 date.

6           **THE COURT:**  Okay.  Good.  That's a good report.

7                   Rob, any comments?

8           **MR. GASAWAY:**  Your Honor, just this.  Obviously, from

9   our side we are going down the roster of issues that Sarah just

10  mentioned and trying to tick and tie those to what we are

11  seeing, the DOE re-collection, the United States Coast Guard

12  re-collection, the third-party subpoenas, the university

13  subpoenas.

14                  Some of what I heard kind of jives with what we

15  are seeing.  Some of it is news to me.  Some of it is a little

16  bit different from what we are seeing.  What I would propose is

17  that we just take this offline, discuss it a little bit with

18  Sarah, and then sort of get back to the Court promptly next

19  week about any dangling participles from this large amount of

20  material that was all due on August 15.

21          **THE COURT:**  Good.  Okay.  Other "other."  I have one

22  other "other," which is did anybody notice that Mike Underhill

23  is back with us?  What do you think about that?

24                  (Applause.)

25          **MR. UNDERHILL:**  It's not voluntary.  My wife told me

1  to leave town.

2          THE COURT:  Well, whatever the circumstances are, we

3  were happy to see you at the meeting last night and today in

4  court, so that's good.

5              Any other "other"?  Mr. O'Rourke.

6          MR. O'ROURKE:  Your Honor, you asked about an expert

7  report schedule.  We got a letter yesterday from BP.  Would you

8  like us just to reply in writing or do you want me to talk

9  about it?  I know you don't want to hear from me, but it's one

10 or the other.

11          THE COURT:  I said other, so that's fair.  You are

12 other.

13              Did we see that?

14          THE LAW CLERK:  Yes.

15          THE COURT:  We did?  I have to tell you I don't

16 remember -- well, I do remember reading the letter from

17 Mr. Langan.

18          MR. O'ROURKE:  Yes, from Andy yesterday.

19          THE COURT:  Yes, I do remember it.  I thought it

20 looked like a good proposal.  You have trouble with it?

21          MR. O'ROURKE:  A little bit.  Not major.  Not major.

22 Two issues.  I think maybe Mr. Cernich addressed this last

23 week, but I was on vacation, so I don't know that for sure.

24          THE COURT:  That will teach you to take vacation.

25          MR. O'ROURKE:  Whether they should be simultaneous or

1    staggered.

2            **THE COURT:**  I have decided we are going to stagger.

3            **MR. O'ROURKE:**  Let me make my argument anyway.

4            **THE COURT:**  Okay.

5            **MR. O'ROURKE:**  Generally speaking, we agree with them

6    they should be staggered because we have the burden of proof

7    except -- and I think this might not have been clear.  That's

8    why I want to clarify it.  We are saying we are going to come

9    up with a number.  We should have to go first unless BP is

10   going to come up with a number also.  If they are just going to

11   take potshots at our number, well, that's fine.  We go first.

12   They take potshots.  We rebut just like Andy said in his

13   letter.

14            If they are going to come up with their own

15   number, they should be at the same time for several reasons.

16   One, because we all should have the same amount of time with

17   the data from Michoud, with the 30(b)(6)s, with the fact

18   depositions.  Also, if the judge is going to have to pick

19   between two competing numbers, they should both be put on at

20   the same time.  Finally, that could make the schedule perhaps

21   shorter if it's just two numbers, two rebuttals, and then we

22   are done.

23            **THE COURT:**  On the quantification issue, you still

24   want simultaneous?

25            **MR. O'ROURKE:**  Only on quantification, yes, ma'am,

1    that's correct.  That's correct.  Again, if BP is just going
2    to -- or the other parties, Transocean and Andarko might be in
3    on this one as well.  If they are just going to pick at our
4    number, we agree that it should be three tiered.  If they are
5    going to come up with their own number, it should be two
6    tiered.
7            MR. LANGAN:  This is Andy Langan.  Was Steve done?
8            MR. O'ROURKE:  I was going to move on to the timing.
9    So if you want to address the staging, then I will defer for a
10   minute.
11           MR. LANGAN:  Well, I don't want to snatch defeat from
12   the jaws of victory here, but I was just going to say what if
13   BP doesn't know?  We want to hear what the government has to
14   say before we decide whether we are going to offer our own
15   number or just criticize them.  We are a defendant in a civil
16   lawsuit with somebody else having the burden of proof, and I
17   don't think we should be required to commit one way or the
18   other at this point.  That's not how the system works.
19           THE COURT:  Well, Andy, you left off another
20   possibility.  You could agree with the U.S.'s number.
21           MR. LANGAN:  Okay.  Fine.  That's a third
22   possibility, if they come in at some point, sure.
23           THE COURT:  If we are taking bets and you want in on
24   that, I think we have some people here that would like that
25   bet.

1          Okay.  So your second issue was --

2          **MR. O'ROURKE:**  When.  As for when, I had previously

3    said we have to make sure -- I had previously planned to argue

4    that we have to make sure we know when the testing at Michoud

5    and data are in.  You just dealt with that.  Thank you.

6          **THE COURT:**  Right.

7          **MR. O'ROURKE:**  We still think it should wait

8    certainly until the conclusion of fact depositions.  We don't

9    currently have a deadline for fact depositions, when they are,

10   when they start.  So it's difficult for us to commit to a Court

11   deadline when we don't know when those depositions are going to

12   end, so perhaps we should just be deferring.

13          Generally speaking, I think they went with

14   mid-February, a month later, a month later.  I'm sorry.  They

15   went with mid-January, a month later, a month later.  We think

16   maybe mid-February and then stagger it out from there might be

17   more appropriate, but we don't want to commit until the fact

18   depos are over.

19          As long as I'm yammering on about fact depos,

20   I'm also worrying about 26(a) initial disclosure of testifying

21   witnesses, which never happened in Phase One.  We have no idea

22   who BP or Anadarko or Transocean might be planning to call on

23   the quantification issues in the Phase Two trial.  They

24   probably know a lot more about our case because we have already

25   published all our papers and they know who our witnesses are.

1    We think you should start considering not just expert report
2    deadlines but a 26(a) disclosure, not for exhibits, who is
3    likely to be called at trial.
4              **THE COURT:**  Good point.
5              **MR. O'ROURKE:**  Then we select the fact witnesses,
6    then we know the fact deadlines, then we can set an expert
7    report deadline.
8              **THE COURT:**  Okay.
9              **MR. LANGAN:**  Your Honor, on the timing, I'm not sure
10   that we would violently disagree with Steve on what he is
11   saying.  In other words, in a perfect world, it would be nice
12   to know that the Phase Two fact depositions of all kinds are
13   over before this starts.
14              I think we posited a schedule keeping in mind
15   what we have heard from the Court about the Court's wishes
16   about a Phase Two trial.  But if there's general agreement that
17   the schedule ought to be pushed back a little bit, I don't
18   think you are going to hear BP complaining about that.  We hear
19   what he is saying.  I think we can live with probably what he
20   has suggested there, so we are open to that.
21              **THE COURT:**  We do have one person we need to consult
22   with on that.
23              **MR. O'ROURKE:**  Just so it's clear, I was saying
24   February 2013, not 2014.
25              **THE COURT:**  Yes.  We understood that.

1          **MR. LANGAN:**  Got that.

2          **THE COURT:**  You know, I do need to consult with

3    Judge Barbier on that issue as well.  Yes, we will look at that

4    and talk to him about it.

5          **MR. DAVIS:**  Good morning again, Your Honor.

6          **THE COURT:**  Good morning again.

7          **MR. DAVIS-DENNY:**  Grant Davis-Denny on behalf of

8    Transocean.  I just want to throw out one suggestion for your

9    consideration on how the expert reports should be staggered,

10   and that is maybe we should consider having it in three waves

11   rather than two, with the plaintiffs and then BP and then the

12   other defendants going in a third wave, so that we can

13   determine and hopefully avoid duplication and a waste of

14   resources in preparing expert reports that may say the same

15   thing as BP would be saying in their report.  So I wanted to

16   put that idea out there for Your Honor's consideration.

17         **THE COURT:**  It seems to me it would be easier to talk

18   to BP.

19         **MR. DAVIS:**  Thank you, Your Honor.

20         **THE COURT:**  Any other "others"?  Going, going, gone.

21   Thank you, phone participants.

22         **MR. LANGAN:**  Your Honor, actually, there is one more

23   thing.  It's Andy again.  Sorry.

24              I think you will recall that Gaudet Kaiser has

25   gone out of business.  Right?

1          THE COURT:  Yes.

2          MR. LANGAN:  Your Honor issued an order, which was

3   very helpful to at least start the process of retrieving

4   physical documents from the court reporting firm.

5          THE COURT:  Right.

6          MR. LANGAN:  Our staff is reporting to us that they

7   are running into a little bit of headwinds trying to satisfy

8   themselves that every relevant piece of paper has been

9   retrieved.  I think things like acknowledgments of

10  confidentiality and the like.  We are not getting warm and

11  fuzzy feelings that we are getting complete cooperation.

12          I don't have a lot of details on this, but I

13  just want to flag there's an issue there.  We may be coming

14  back to Your Honor really on behalf of all the parties, I

15  think, to try to make sure that Worldwide is physically

16  transferred every single scrap of paper that's possibly

17  relevant to the process.  I just wanted to sort of mention

18  that.  It's kind of late-breaking news that we are not getting

19  the cooperation we think we need.  Can you stay tuned on that?

20  I'm really not asking the Court to do anything other than take

21  note that we think there may be an issue brewing there.

22          THE COURT:  No problem.  We will be glad to work with

23  you on it.  Okay.  We are going to try it one more time.

24  Going, going, gone.  Thanks, guys.

25          (Proceedings adjourned.)

1                       **<u>CERTIFICATE</u>**

2           I, Toni Doyle Tusa, CCR, FCRR, Official Court

3   Reporter for the United States District Court, Eastern District

4   of Louisiana, do hereby certify that the foregoing is a true

5   and correct transcript, to the best of my ability and

6   understanding, from the record of the proceedings in the

7   above-entitled matter.

8

9

10                              <u>s/ Toni Doyle Tusa</u>
                                 Toni Doyle Tusa, CCR, FCRR
11                               Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25