UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL BY THE OIL RIG                    MDL NO. 2179
"DEEPWATER HORIZON" IN THE
GULF OF MEXICO, ON APRIL 20, 2010

THIS DOCUMENT RELATES TO:

*In re the Complaint and Petition of Triton
Asset Leasing GmbH, et al, No. 10-2771*

*SDTX 2012-22886; Harley D. Allen, et al v.
BP American Production Company*

*NDFL 3 11-00189; Abbasi, et al v. Transocean
Deepwater, Inc. et al*
                                                 SECTION:  J
*4:11-cv-06055; Kevin Brannon, et al v.
BP American Production Company;*

*4:11-cv-06055; Harley D. Allen, et al v.*          JUDGE BARBIER
*BP American Production Company;*

*And*

*Unfiled Economic and Property Damages
Class Members*                                   MAG JUDGE SHUSAN

### PLAINTIFFS REPRESENTED BY BRENT COON & ASSOCIATES MEMORANDUM IN SUPPORT OF PLAINTIFFS MOTION IN OPPOSITION AND OBJECTIONS TO THE ECONOMIC CLASS SETTLEMENT

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................ **4**

**BACKGROUND** .......................................................................................... **6**

**A.**    **Historical Background on BCA** .......................................................... **6**

**B.**    **Brent Coon and Associates Oil Spill Client Base** ................................ **7**

**C.**    **Brent Coon And Associates Fund Submissions to Date** ..................... **9**

**I.**    **OBJECTIONS TO CLASS SETTLEMENT** ..................................... **10**

**A.**    **The Class fails to meet Rule 23 requirements concerning the content of the notices.** ........................................................................................ **10**

   **1.**    **Sufficient Notice to Make an Informed Decision** ............................. 11

   **2.**    **The Proof Required May Be Missing in Many Cases** ...................... 13

   **3.**    **The Notice is Not Written in Clear, Concise and Easily Understood Language** ..................................................................................... 14

   **4.**    **Confusion as to who is a member of the class** ................................. 15

**B.**    **Modifying the Opt-Out Provisions Will Help Cure the Due Process Defects** **15**

   **1.**    **An Opt-Out Form Should Be Available to Claimants** ...................... 16

   **2.**    **The Opt-Out Deadline Should Be Extended Past November 1, 2012** ........... 17

   **3.**    **Electronic Opt-Out Submission Should be Allowed** ........................ 18

   **4.**    **Attorneys Should Be Allowed to Sign to Opt-Out Their Clients** .................... 19

   **5.**    **Current Submission Data Does Not Imply that Claims will Not Later Be Opted-Out** .................................................................................. 21

**C.**    **Seafood Claims are Adversely Affected because the Statute of Limitations Has Been Moved Up** ........................................................................ **21**

**CONCLUSION** ......................................................................................... **22**

## Table of Authorities

**Cases**

*Hansberry v Lee*, 311 U.S. 32, 41 (1940) .......................................................................... 4

*Mayfield v. Barr*, 300 U.S. App. D.C. 31, 985 F.2d 1090 (D.C. Cir. 1993) ..................... 18

*Pennoyer v. Neff*, 95 U.S. 714 (1878) ................................................................................ 4

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) ........................................ 4

**Statutes**

28 U.S.C. §§ 620–629 .......................................................................................................... 5

28 U.S.C. 1711 .................................................................................................................... 10

33 U.S.C. §2701, *et. seq.* ................................................................................................... 22

**Other Authorities**

*Manual for Complex Litigation, Third* § 30 ....................................................................... 4

**Rules**

Fed. R. Civ. Proc. 11 .......................................................................................................... 20

Fed. R. Civ. Proc. 23(c)(2)(B) ........................................................................................... 10

Fed. R. Civ. Proc. 6 ............................................................................................................ 21

**Constitutional Provisions**

U.S. Const. amend. VII ......................................................................................................... 4

## INTRODUCTION

The Seventh Amendment to the US Constitution preserves the right to a trial by jury, but sometimes cases involve so many parties that it would be cumbersome to try every case. *See* U.S. Const. amend. VII.  As a result, class action suits arose out of equity to deal with suits where the "number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable."   *Hansberry v Lee*, 311 U.S. 32, 41 (1940). Generally, American jurisprudence has a rule that one is not bound by a judgment where that person has not been joined as a party to the suit.  *Pennoyer v. Neff*, 95 U.S. 714 (1878).   Thus class settlements are a "recognized exception" to this general rule, meaning that "the judgment in a 'class' or 'representative' suit," may bind members of the class who were not made parties to it.  *Hansberry v Lee*, 311 U.S. 32, 41 (1940).

Class actions were created in order to improve judicial efficiency in cases involving large numbers of injured parties with common complaints.   However, class settlements were also intended to have an inherent element of fairness to them.   Most importantly class settlements must satisfy the due process requirements of the United States Constitution.   Where money damages are sought, due process requires: (1) adequate notice to the class; (2) an opportunity for class members to be heard and participate; (3) the right of class members to opt out; and (4) adequate representation by the lead plaintiff(s).  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

Further, the attorneys and named plaintiffs representing the ostensible plaintiff class assume fiduciary responsibilities to protect the interests of the absent class members. *Manual for Complex Litigation, Third* § 30.

Congress created the Federal Judicial Center in 1967 to promote improvements in judicial administration in the courts of the United States.  *See* www.fjc.gov; *See also* 28 U.S.C. §§ 620–629.  The Federal Judicial Center's website pays special attention to class actions and class action notices.  Throughout this memorandum Plaintiffs represented by Brent Coon & Associates (hereinafter referred to as "Plaintiffs" or "BCA Plaintiffs"), refer to the Judges' Class Action Notice and Claims Process Checklist and Plan Language Guide (hereinafter referred to as "Judges' Checklist") which is a guide created by the Federal Judicial Center to assist  Federal Judges properly oversee fair and judicially expedient class actions.[1]

In this case, most, but not all of the items set forth for review in the Checklist have been thoroughly vetted and applied in the creation of the Class Settlement.   First, BCA Plaintiffs recognize that this class settlement is not intended to resolve all claims related to the BP oil spill, and as such lodge no objection as to the makeup of this class either in terms of geography or industry.[2]  Secondly, BCA Plaintiffs lodge no objections to the formulas included in the class action, recognizing that if any class member deems them unfair, they have the option to opt out of the settlement (notwithstanding the arguments laid out below).

Instead, BCA Plaintiffs objections are limited to several defects in the terms of this class that will result in oil spill victims who should properly be part of this class being forced to make an uninformed decision.   First, the class settlement is massive and extraordinarily complicated, yet still devoid of some important specifics.  The settlement

---

[1] See Exhibit 2 – Judges' Class Action Notice and Claims Process Checklist and Plan Language Guide.
[2] However, the terms of the settlement do raise some philosophical objects not addressed in this memorandum.   For example, why are shrimp boats given Risk Transfer Premium multiplier that is 275% higher that the multiplier given to shrimp processors who collectively receive nearly all of the shrimp caught on those boats.

itself comprises nearly 1,200 pages that are so convoluted and confusing that it is difficult even for lawyers to understand and interpret.   Second, the class is only a partial settlement which means that even a determination whether one is actually included or excluded from the settlement requires careful analysis and potentially random guess work regarding how one's industry will be treated under the settlement.[3]   Third, the opt-out deadlines force claimants to make a decision without knowing what their recovery would be under the class.   Furthermore, BCA Plaintiffs believe that there are some relatively simple and obvious modifications that could markedly increase the fairness of this settlement, ensure the due process requirements are met for all BCA Plaintiffs, and noticeably increase participation in the class by claimants who were obviously intended to be part of this class settlement.

## BACKGROUND

### A.  Historical Background on BCA

Brent Coon & Associates (hereinafter referred to as "BCA") was founded in 2001 with a primary focus on mass tort litigation.   Initially, many of the lawsuits brought by BCA were on behalf of victims working in the oil industry who were exposed to any number of harmful materials, many of which were carcinogenic, including asbestos, silica, and various aromatic hydrocarbons.

In 2005, the BP Oil Refinery exploded killing 15 people and severely injuring hundreds others.   Brent Coon served as Plaintiff's Counsel liaison and personally conducted the majority of the discovery in that case. The discovery involved the

---

[3] Under the terms of the settlement the gaming industry itself is excluded, but individual employees working at casinos may not be excluded.   This is entirely dependant on the NCAIS codes used by employers, discussed *infra*, which are not available to individual workers and may not be available to settlement class administrators.

production of nearly 7 million pages of documents and the depositions of nearly 100 corporate representatives.   Brent Coon and BCA unearthed a voluminous amount of information detailing the negligence and arguably gross negligence on the part of BP.  In addition to settling several hundred cases on the behalf of clients affect by the blast, BCA provided their findings to the Texas Attorney Generals Office, U.S. Chemical Safety Board ("CSB"), and the U.S. Department of Justice ("DOJ").   The CSB ultimately used the documentation to recommend sweeping changes to the oil industry in order to improve safety.   BP subsequently plead guilty to felony criminal charges brought by the DOJ, submitted to probation and the payment of a $50 million fine.

Brent Coon attended and argued before the MDL panel hearing in Boise, Idaho during the summer of 2010.  He later volunteered to be a member of the PSC and after the formal creationof the Plaintiff's Steering Committee ("PSC"), BCA co-chaired the Corporate Culture and History discovery committee and was a member of both the BP/MOEX/Anadarko and Jurisdiction Committees.  Additionally, BCA participated in some of the other committees including the Cameron group, the Oyster group and the VOO group.

### B.  Brent Coon and Associates Oil Spill Client Base

To date, Brent Coon and Associates directly represents in excess of 13,000 clients who have been affected by the oil spill, and indirectly represents many more.[4]   BCA works with more than a dozen associated law firms to represent clients in all five Gulf Coast states.   In short, BCA represents thousands of businesses and individuals from a wide range of industries, locations and walks of life.

---

[4] See Exhibit 1 – List of Clients Represented by BCA as of August 31, 2012

BCA represents over 1,000 seafood claims as defined by the settlement class. BCA represents boat owners, boat captains and deckhands from all five categories covered under the seafood portion of the settlement.  Of these, more than 60 of the boat owners have additional Vessel of Opportunity ("VOO") claims.  It is our best estimate that BCA represents a sizeable portion of shrimp boats larger than 75 feet which typically catch the largest amount of shrimp.  Additionally, BCA represents half a dozen seafood processing facilities, 300 seafood process workers, 200 seafood wholesale and retailers, and 300 seafood restaurant workers.

BCA represents thousands of tourism related claims including 700 hotel, bar, and restaurant workers, 1200 spa and salon workers and owners, 300 taxi and limo drivers, and 500 retail shop workers who depend on tourism for their livelihoods.  BCA also represents more than 100 businesses that sell boats, watercraft, or boating/fishing related items and equipment, along with their employees.  Finally, BCA represents 300 real estate related clients who either lost money in the sale of their property, or were unable to use their waterfront property, in addition to several hundred clients who were unable to rent their condo's and beach cabins.

Moreover, BCA represents hundreds of persons affected by the oil spill who are not covered by the terms of the class settlement.  BCA represents more than 300 people who work in the gaming industry, more than 300 oil rig and support workers (including 1 rig worker aboard the Deepwater Horizon the night it exploded), dozens of real estate developers and financial industry workers, and several BP gas stations.   All of these claims are apparently excluded by the terms of the oil spill settlement.   Last, we

represent more than 500 people who experienced physical symptoms as a result of the oil spill.

### C. Brent Coon And Associates Fund Submissions to Date

One of the many factors in filing this objection is the relatively slow response BCA has received on the vast majority of claims submitted to the fund to date.   Without a pattern of payment by the class action, BCA cannot recommend to any of its clients that they remain a part of the settlement class.   To date a precedent setting pattern of payment by the fund has not occurred.  BCA began submitting claims on or about June 6, 2012, two days after the submission period opened.  As of August 29, 2012, BCA has submitted 979 claims to the settlement class.   As of that same date, BCA has received formal responses on only 71 of those submissions.    More importantly, only 19 of those responses have been offers for payment, even there almost all have been very simple VOO calculations which can each be done in a matter of minutes.

Digging deeper into BCA's numbers reveal more evidence as to why there is no clear indication of what exactly a claimant can expect from the fund.  Specifically, out of 219 business economic loss submissions, only 2 have had offers made and out of 390 individual submissions, none have had offers made.   Even more disconcerting is the response to BCA's 285 seafood compensation submissions, only one has had an (extremely small) offer made.    After almost three months, the $2.3 billion seafood compensation portion of this settlement has offered BCA seafood clients less than $10,000.

This is all the more disconcerting when taking into consideration the predecessor funding mechanism, the Gulf Coast Claims Facility ("GCCF").  The GCCF was shut

down at the beginning of this year.   This action has resulted in a delay approaching a year in creating an alternative mechanism for the payment of claims; all of this transpiring in the third year of litigation under a statute that was specifically created by Congress to expedite the resolution of claims.  Even assuming, *arguendo*,  that eligible claimants under this class in the future are paid in a much more timely manner, the vast majority of other meritorious but ineligible claims will be postponed indefinitely.

**I.    OBJECTIONS TO CLASS SETTLEMENT**

**A. The Class fails to meet Rule 23 requirements concerning the content of the notices**

Federal Rule of Civil Procedure 23, governs federal class action settlements. Under F.R.C.P. 23(c)(2)(B), class action notices must clearly and concisely state in plain, easily understood language the nature of the class action, the terms of the class action and how potential class members may be affected.   *See* Fed. R. Civ. Proc. 23(c)(2)(B).  The Class Action Fairness Act of 2005 specifically found that "Claims members often receive little or no benefit from class actions, and are sometimes harmed, such as ` fully understand  and  effectively  exercise  their  rights."   *See* 28 U.S.C. 1711, *note.*   It is undisputed that the class goes to extraordinary measures to provide notice of the class to affected potential class members, yet the content of the notices themselves does not adequately inform potential class members.

In fact, some of the material content in early notices was frankly dead wrong.  For example, under the Coastal Real Property Damage claim, the initial notice's Potential Benefits section indicated that payment range was from 30% to 45% of the homes appraised value resulting in payment amounts in the $35,400 to $53,100 for a $100,000

home.[5]  However, the correct amounts in later notices showed that Potential Benefit to be 30% to 45% of the homes appraised value times 1.18% (average tax rate) resulting in a range of payment values from $1,239 to $1,859 for a $350,000 home.[6]

### 1. Sufficient Notice to Make an Informed Decision

Millions of dollars have been spent to mail and publish notices of the BP Economic Class Settlement, yet these notices do not provide the claimant with the information needed to make an informed decision whether or not to remain in the class. While the notice provision does a good job of advising potential class members that there is a class settlement that may affect their legal rights, it wholly fails to provide enough information for that same claimant to make an informed decision. The Judges' Checklist has a question directly on point to this issue:

> **Do the notices contain sufficient information for a class member to make and informed decision?**

> *Consider the amount of information provided in the notice...*[7]

Claimants can go to www.deepwaterhorizoneconomicsettlement.com and review more detailed explanations regarding how they should be compensated under the fund. The settlement itself encompasses nearly 1,200 pages of highly technical language governing the terms of settlement for eight different categories of economic loss.   These eight categories are typically broken further down into additional types of claims within the main category.   Not only that, but each type of claim may have its own subcategories.   Ultimately the result is an extremely complicated and nested methodology where a thorough analysis is required to even determine the type of claim

---

[5] See Exhibit 3 – Long Form Notice, Revision Date May 7, 2012
[6] See Exhibit 4 – Long Form Notice, Revision Date August 28, 2012
[7] See Exhibit 2 – Judges' Class Action Notice and Claims Process Checklist and Plan Language Guide at Page 5.

that needs to be submitted.   Additionally, understanding the value of the submitted claim for most claims types requires a high-level understanding of math.[8]   For some of the more sophisticated claims forensic accounting may be necessary.

Further exacerbating the problem of having several kinds of claims is that many claimants have the potential to be eligible for multiple types of claim submissions.  For example, the average shrimp boat owner likely has four legitimate claims that need to be filed with the fund:  1) boat owner, 2) boat captain, 3) VOO claim and a 4) subsistence claim (or even possibly a fifth claim should he catch any other kind of seafood besides shrimp).  This typical shrimp boat owner may be able to determine how much he would recover for his VOO claim, because it only involves two variables: 1) length of the boat and 2) whether or not the boat was called out during the clean-up operation.   However, even estimating his recovery for his boat owner and captain claims could prove difficult for all but the most sophisticated shrimper.   First, the Shrimp Compensation Plan allows for four different methodologies to calculate loss (expedited, reduced expedited, historical, and new entrant) and each of these must be reviewed twice—once for the boat owner claim and once for the captain claim.   Second, the formula under the historical method (the method likely to be used most often) requires a good understanding of mathematics as well as comprehensive critical thinking skills.

The calculations for business claims are even more complicated than for shrimpers.   Business claims involve multiple options with several calculations occurring at each step.   Some business owners may be able to work their way through some of the

---

[8] In contrast, the Medical Class Settlement outlines specific dollar amount that each type of claimant will receive.

easier steps.    However, the calculations involved in determining variable versus fixed costs require considerable analytic and investigative skills.

### 2.   The Proof Required May Be Missing in Many Cases

The response from the PSC and BP to concerns that it would be difficult to make an informed decision concerning the value of one's claim would be to respond that class members do not need to calculate their own loss because the fund will do that for them. The claimants are supposed to submit the requisite documentation and wait for the claims facility to compute their number.    Claims are then to be evaluated <u>solely</u> based on the documentation, including sworn statements, provided by the claimant.    Theoretically this will work well for perfectly documented claims.    However, the Judges' Checklist offers guidance for issues such as this:

> **Are the claim form questions reasonable, and are the proofs sought readily available to the class member?**
>
> *Watch for situations where class members are required to produce documents or proof that they are unlikely to have retained.*[9]

In many cases, claimants may lack some small but required documentation, such as a W-2 or Profit & Loss statement.  Should such a claimant fail to produce some minor file material, they are at the mercy of the claims administrators as to whether or not they are entitled to any recovery at all.    Thus, the segment of claimants with well documented claims will undoubtedly be granted preferential treatment under the class.

There are several specific categories where there is a substantial likelihood that a claimant will not have the requisite documentation:   1) businesses that did not keep monthly Profit & Loss statements; 2) individuals with 1099's who are treated as

---

[9] See Exhibit 2 – Judges' Class Action Notice and Claims Process Checklist and Plan Language Guide at Page 6.

businesses, but did not keep Profit & Loss statements and/or have not formally incorporated themselves; 3) individuals who do not have W-2's from past years; and 4) multi-facility businesses that did not keep individual Profit & Loss statements. Individuals and businesses in these categories have no assurance that they will recover anything under the settlement class until they receive an offer.   Even barring an offer, some precedent that similarly situated claims have been paid under the class might allow them a level of comfort to join the class.  Absent some definitive indication that they will be paid, it is in the best interest for claimants such as this to opt out of the settlement rather than be stuck with whatever offer they would get under the settlement.

### 3.  The Notice is Not Written in Clear, Concise and Easily Understood Language

**Are the notices written in clear, concise, easily understood language?**

*Required by Rule 23 since 2003, it is also simply good practice to recognize that communicating legal information to laypeople is hard to do.*[10]

Potential class claimants vary widely in their socioeconomic status.   It is a fact that this class includes illiterate and uneducated members as well as members for whom English is not their native language.  Even more importantly it appears (based on Brent Coon & Associates representation of hundreds of fisherman, shrimpers, oystermen and crabbers) the seafood compensation plan, which is major pillar of this settlement, disproportionally includes more poorly educated members than society at large. Additionally, many of these claimants do not possess e-mail accounts or computer literacy that would allow them to access the additional web based information spelled out in the various notices they may have received.

---

[10] See Exhibit 2 – Judges' Class Action Notice and Claims Process Checklist and Plan Language Guide at Page 5.

**4.   Confusion as to who is a member of the class**

There are a number of excluded industries under the fund that will create confusion by potential class members as to whether or not they are part of the settlement, particularly for individuals.   The class settlement excludes eight different industries based on their North American Industry Classification System ("NAICS") code number. NAICS codes are used by the government to classify business entities according to the nature of their economic activity in North America.   For businesses, NAICS codes will be listed on their tax returns.   However, individuals are not necessarily privy to what NAICS code their employer used when filing taxes.   As a result, individuals who work in industries closely related to an excluded industry may incorrectly assume that they are not members of the class settlement.   This might occur in a situation where someone works in an independent restaurant (not excluded) that is merely located in a casino (excluded).

**B.   Modifying the Opt-Out Provisions Will Help Cure the Due Process Defects**

Once again this notice fails to meet one of the recommendations in the Judicial Checklist:

> **Are there no burdensome hurdles in the way of responding and exercising rights?**
>
> *Watch out for notice language that restricts the free exercise of rights, such as onerous requirements to submit a "satisfactory" objection or opt-out request.*[11]

The Opt Out provision of this settlement clearly and intentionally puts several obstacles on potential class claimants' abilities to exercise their right to opt-out.  Section 8.2 of the Settlement covers Opt Outs,   Section 8.2.1 reads:

---

[11] See Exhibit 2 – Judges' Class Action Notice and Claims Process Checklist and Plan Language Guide at Page 5.

The Economic Class Action Settlement Notice shall provide instructions regarding the procedures that must be followed for Economic Class Members to exclude themselves ("Opt Out") from the Economic Class pursuant to Fed. R. Civ. P. 23(c)(2)(B). The Parties agree that, to validly exclude themselves from the Economic Class, Economic Class Members must submit a written request to Opt Out, which must be received by the Entity identified in the Class Notice Plan for that purpose, properly addressed, and postmarked no later than October 1, 2012, or such later date as the Court orders in the Preliminary Approval Order. A written request to Opt Out may not be signed by any form of electronic signature, but must be signed by a handwritten signature. Economic Class Counsel will be provided with identifying information on **OPT OUTS** on a weekly basis, under a confidentiality Order of the Court, to enable them to determine the validity of Opt Outs and assist those who wish to revoke an Opt Out. All requests to Opt Out must be signed by the Natural Person or Entity seeking to exclude himself, herself or itself from the Economic Class. Attorneys for such Natural Persons or Entities may submit a written request to Opt Out, but they must still be signed by the Natural Person or Entity.[12]

**1.  An Opt-Out Form Should Be Available to Claimants**

The first and most glaring example of a hurdle to opting out is that there is no standardized and approved form for claimants to submit.  The settlement website includes a registration form, eight individual loss or damage forms, nine authorizations and tax forms, three forms for personal representatives, two forms concerning individual attorney representation, 39 sworn statement forms, but does not include an opt-out form.  The parties spent millions of dollars providing notice to potential claimants so that those claimants would have the opportunity to exercise their right to opt out.  Yet, they have not taken the time to create a form that would allow a client to easily remove themselves from the class.  Furthermore, repeated requests to class representatives, by BCA, for this form have been futile.

An approved form would eliminate uncertainty and be in the best interest of the claimants, the Court, and the Class Administrator because it would eliminate the

---

[12] Movants note that the Opt-Out Deadline was extended, on August 28, by Court Order to November 1, 2012, but this does not materially change movants position.

uncertainty concerning what exactly meets the requirements to be considered a "valid" opt-out form.  The ad hoc approach will almost certainly result in disputes by natural person or entities who did not comply with the letter of the opt-out provision, but clearly communicated their intent to opt out within the time allowed.

## 2.   The Opt-Out Deadline Should Be Extended Past November 1, 2012

The Fairness Hearing will not be held until November 8, 2012.   The notice sent to individual claimants, clearly indicates that is the date when claimants and/or their respective attorneys will be given an opportunity to have their objections to the class considered.[13]   However, claimants must make a decision whether or not they want to be included in the settlement on or before November 1, 2012—prior to being able to object to portions of the settlement![14]  Should one of the objections prove valid and the terms of settlement modified, claimants are presumably stuck with the choice they made a week earlier based on obsolete information.  The narrow window to submit a claim and get an offer puts potential class members between the proverbial rock and hard place, forcing them to choose a course of action without being properly informed—something that cuts to the very heart of fairness.

On the other hand potential class members who would do very well under this settlement may have no choice but to opt out due to the uncertainty concerning the class.  One specific example of this is the VOO claimants.  Because these claimants have additional claims they cannot accept the VOO settlement until their other claims are reviewed for fear of not being properly compensated under the class for the lion's share

---

[13] See Exhibits 3 & 4.
[14] The Court's decision to amend the initial October 1, 2012 deadline shows that there is in fact a need for additional time on the part of all parties in order to ensure that this Class Settlement is as effective as it should be.

of their damages.   To date, of the 19 offers for payment BCA has received, 15 have been offers on VOO claims.   Unfortunately, nearly all of VOO claimants have additional claims.

One type of response BCA has received from the fund is a request to verify Employer Identification Numbers ("EIN") on nearly a dozen businesses.   First, it is unclear why this verification is needed, particularly on clients who have submitted tax returns for four and five years using that same EIN number.   Furthermore, clearing up this issue may not be possible prior to the opt-out deadline because verification from the IRS can take many weeks.   Obviously, in some instances official verification may be needed, but it should be used judiciously in order to avoid forcing putative class members from opting out because they could not timely cure a deficiency.

Another issue of note, is that typically claimants who do Opt-Out of a class action do not have standing to object to the settlement. *See Mayfield v. Barr*, 300 U.S. App. D.C. 31, 985 F.2d 1090 (D.C. Cir. 1993).   With the opt-out deadline coming prior to the fairness hearing, there may be no way for some concerns of claimants to be heard by the Court.

### 3.  Electronic Opt-Out Submission Should be Allowed

This settlement almost wholeheartedly adopts a modern approach with regard to the use of technology in order to improve class participation.   The Judges' Checklist includes multiple ideas that have been employed as part of this settlement:

**Will e-mail notices be used instead of postal mailings?**

**Is internet advertising being measured properly?**

**Will documents be available at a neutral website?**

**Have you considered adding an online submission option to increase claims?**[15]

It would appear that all four are being properly handled with regard to most aspects of the settlement.   E-mails and web advertising have been employed, in addition to traditional mailers and print media.   The website has been set up with required documentation and an online submission feature.   Furthermore, this settlement has recognized the fact that electronic signatures are the wave of the future and allows electronic signatures on submitted claims.

Virtually every pleading filed before this MDL (including this one) has been done so electronically.   Indeed, EDLA Local Rule 5 requires all filing to be done so electronically. However, the settlement steps back into the 19th century for anyone wishing to opt out of the settlement, and requires notice signatures to be handwritten and mailed via the United States Postal Service.   Additionally, numerous other Class Actions allow electronic methods, typically e-mail, to opt out of the class action.[16]

### 4.   Attorneys Should Be Allowed to Sign to Opt-Out Their Clients

---

[15] See Exhibit 2 – Judges' Class Action Notice and Claims Process Checklist and Plan Language Guide at Pages 3, 4, and 6.

[16]  *See National Federation of the Blind, the National Federation of the Blind of California, on behalf of their Members and all others similarly situated, Bruce F. Sexton, Jr., on behalf of himself and all others similarly situated, Melissa Williamson, on behalf of herself and all others similarly situated and James P. Marks on behalf of himself and all others similarly situated v. Target Corporation; In the United States District Court for the Northern District of California; Case No. c 06-01802 MPH*; *In Re Literary Works in Electronic Databases Copyright Litigation; MDL No. 1379; In the United States District Court for the Southern District of New York*; *Allison Amador, et al v. California Culinary Academy, Inc., et al; San Francisco Superior Court Case No.* CGC-07-467710; *Jennifer Adams, et al v. California Culinary Academy, et al San Francisco Superior Court; Case No. CGC* -08-473866; *In Re Motor Fuel Temperature Sales Practices Litigation; MDL Docket No. 1840; Case No. 07-MD-1840-KHV; United States District Court for the District of Kansas*

One of the most prejudicial and tedious portions of the opt-out provision of the settlement is that it requires the signature of the Natural Person or Entity, and specifically excludes claimants' respective attorneys from excluding them from the class.    Attorney signatures have long been held to have a binding effect on their clients.    Under Federal Rule of Civil Procedure 11 all pleadings, written motions, and <u>other papers</u> must be signed by at least one attorney of record.    *See* Fed. R. Civ. Proc. 11(a).    Furthermore, that signature implies certain representations to the Court that if not met could subject the attorney to sanctions.    *See* Fed. R. Civ. Proc. 11(b) & 11(c).    Given the number of Plaintiffs represented by BCA, and other individual attorneys, the failure to provide a provision to allow an attorney to protect his clients' rights by signing on their behalf puts yet another obstacle in the way of the success of this class settlement.

As stated above, the nature of many vocations along the coast often involve lower socio-economic classes.    These groups have a disproportionate amount of residency relocations and forwarding addresses.    Tracking down these claimants for proper notice, documents, on short notice is often impractical if not, in fact impossible. Due in part to sever financial hardship caused by the spill many clients have moved or had their phones disconnected.    A high incident rate of natural disasters such as hurricanes and floods further increase the rate of relocation among class members.[17]   Many claimants also are engaged in maritime vocations that take them to sea for weeks and months at a time, again causing significant delays and compromise of effective communication.    This occurs both with regard to notice issues and with regard to client cooperation.    Last, many of the seafood claimants speak English as a second language or are illiterate, and

---

[17] The Federal Court system was shutdown this week for Hurricane Isaac for days, but in the past has been shut down for weeks.

have trouble and/or delays in getting their correspondence read to them to know what and when they are needed to do something in their case.   This results in long delays in receiving signed documents back from thousands of clients.   BCA, and other Plaintiffs attorneys, are forced to choose between collecting the required documentation so that a claim can be submitted to the class settlement and spending time collecting yet another signature from all of their clients just to preserve the clients right to a jury trial.

### 5. Current Submission Data Does Not Imply that Claims will Not Later Be Opted-Out

In their Motion in Support, BP argues that as of the date of the filing, the number of opt-outs is low in light of the size of the class (See Section I. H. of Defendant's Memorandum in Support).   Furthermore, they argue that nearly 50,000 people have submitted or started to submit a claim form, BCA represents several thousand of these fifty thousand clients submitted or registered.   Absent specific "eligibility notices" (settlement offers) for the submitted claimants, many of BCA's previously submitted claims may opt out on the eve of the deadline to do so.

### C. Seafood Claims are Adversely Affected because the Class Settlement Shortens the Statute of Limitations

Except for Seafood Claims, all claims must be submitted by April 22, 2013 (or 6 months after the Court grants "final approval," whichever is later.   The Oil Pollution Act of 1990 provides for a three year statute of limitations which would run on April 20, 2013, but is extended by rule to that following Monday which is April 22, 2013.  *See* 33 U.S.C. §2717(f)(1) (1990);  Fed. R. Civ. Proc. 6.   The deadline to submit all Seafood Compensation Claim Forms is much earlier than the April 22, 2013 deadline to submit any other claim under the Economic and Property Settlement.   The deadline to submit

Seafood claims is set at 30 days after the Court's final approval, potentially as early as mid-December 2012.

The early deadline to submit seafood claims exacerbates the "informed decision" and defects discussed above.   Most fundamentally, the early deadline supersedes and abbreviates the 3 year statute under the Oil Pollution Act of 1990 ("OPA").   33 U.S.C. §2701 *et. seq.* (1990).   The plain language of the OPA statute, gives injured parties at least three years to determine if they were damaged by the spill.   Furthermore, the "reasonably discoverable" language in the statute clearly shows Congressional understanding and intent to allow affected parties ample time to uncover damages.   The seafood claimants are arguably the most harmed by the oil spill, yet they are given disparate treatment under the settlement class.   The settlement should not ask the Court to change the law; rather they should ask the Court to enforce the law.   The settlement agreement would be effective on its face and any verbiage that would restrict any right conferred by Congressional mandate.

## CONCLUSION

It bears repeating that BCA, on behalf of its own Plaintiffs and claimants, is generally supportive of the settlement.   We believe it should amicably resolve hundreds if not thousands of BCA's cases.   Additionally, the class settlement should discharge tens of thousands, if not hundreds of thousands of cases; thereby, clearing the way for the Parties to focus on a significantly smaller group of cases that cannot be resolved under the terms of this class settlement.   BCA has worked regularly with both the PSC liaison counsel as well as the settlement fund administrators to comment on ambiguities and defects contained in the proposal and mechanisms for improvement.   Furthermore, BCA

maintains every intention to continue working with the aforementioned parties to achieve on optimal resolution for all claimants.

However, the most glaring issue concerning a potential class member's ability to understand what exactly they would recover under the fund before they have to make a decision whether or not to accept it has not been resolved.  Accordingly, BCA Plaintiffs request the Court amend the terms of the settlement in such a manner that claimants will not have to choose to opt out of the settlement until the class administrator has made a specific determination regarding the total amount the claimant is eligible to recover.


DATED **on this the 31st day of August, 2012.**

> Respectfully submitted,
>
> BRENT COON & ASSOCIATES
>
> */s/ Brent W. Coon_____*
> Brent W. Coon
> Federal Bar No. 9308
> Texas Bar No. 04769750
> 215 Orleans
> Beaumont, Texas 77701
> Tel.: (409) 835-2666
> Fax: (409) 835-1912


<u>CERTIFICATE OF SERVICE</u>

1 hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on August 31, 2012.

> */s/ Brent W. Coon_____*
> Brent W. Coon