# **<u>EXHIBIT 1</u>**

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
 2

                                 ) MDL NO. 2179
 3    IN RE:  OIL SPILL          ) SECTION "J"
      by the OIL RIG,            )
 4    DEEPWATER HORIZON in       ) JUDGE BARBIER
      the GULF OF MEXICO,        )
 5    April 20, 2010             )
                                 ) MAG. JUDGE SHUSHAN
 6

 7

 8

 9

10

11

12

13

14

15

16

17

                    Deposition of J.J. AZAR, Ph.D., taken
18    at Pan-American Building, 601 Poydras Street,
      11th Floor, New Orleans, Louisiana, 70130, on
19    December 5, 2011.
20

21

22

23

24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 2 of 83

```
 1                    (Exhibit 7808 was marked.)

 2                    THE VIDEOGRAPHER:  This is the

 3       deposition of J.J. Azar In Re:  The Oil Spill of

 4       the Oil Rig DEEPWATER HORIZON in the Gulf of

08:42  5 Mexico on April 20th, 2010.

 6                    Today's date is December 5th, 2011.  The

 7       time is 8:43 a.m.  We are now on the record.

 8                    Will the court reporter please swear in

 9       the witness.

08:43 10                    DR. J.J. AZAR,

11       having been first duly sworn, testified as

12       follows:

13                          EXAMINATION

14       BY MR. UNDERHILL:

08:43 15      Q.  Good morning.

16            A.  Good morning, sir.

17            Q.  My name is Mike Underhill, and I

18       represent the United States, one of the parties

19       in this action.

08:43 20            And, sir, how do you want me to address

21       you:  Professor or Mr. Azar?  Your choice.

22            A.  J.J.

23            Q.  J.J.?

24            A.  Yes.

08:43 25            Q.  Well -- or maybe Mr. Azar.  Let's keep it
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Did George King contribute to that

2    chapter?

3    A.   No, sir.

4    Q.   Did James Lummus contribute to that

09:59 5    chapter?

6    A.   No, sir.

7    Q.   Did David Chen contribute to that

8    chapter?

9    A.   No, sir.

09:59 10    Q.   And did Mr. Samuel contribute to that

11    chapter?

12    A.   He may have reviewed it.  No, he did not

13    contribute writing, but he reviewed.

14    Q.   Got it.  So if I can understand it then,

09:59 15    Chapter 6 is -- you wrote it?

16    A.   Chapter 6 I have wrote it.  The

17    schematics have been given to us, like the BOP

18    stack, pictures, stuff like this from --

19    permission from the industry.

09:59 20    Q.   Got it.

21    A.   Whoever make them.

22    Q.   Got it.  And -- thank you.

23    If you could turn to Exhibit 7809,

24    Chapter 6 of your book.

09:59 25    A.   Yes, sir.

1        Q.   The first page there is titled:
2    Introduction.
3             Do you see it, right there, top page:
4    Introduction?
10:00 5        A.   Yes, sir.
6        Q.   Got it.   And the first two paragraphs
7    there under Introduction, did you write those
8    paragraphs?   And feel free to read it if you'd
9    like first.
10:00 10       A.   Do you want me to read it aloud or just
11   to myself?
12             MR. REGAN:   To yourself.
13       Q.   (BY MR. UNDERHILL)   To yourself for the
14   moment.
10:00 15       A.   Okay.   Yes, sir.
16       Q.   And do you -- as you sit here today, do
17   you still agree with what you wrote in that
18   introductory --
19       A.   Yes, sir.
10:00 20       Q.   -- section?
21             I'm going to read some of it into the
22   record so our judge doesn't have to consult the
23   exhibit.
24       A.   Okay.
10:00 25       Q.   It makes it easier for him.   And when I

**PURSUANT TO CONFIDENTIALITY ORDER**

1    finish reading I'm going to ask you if I've read

2    it correctly.   Okay?   So why don't you read along

3    with me to make sure I --

4        A.   Well, I'd rather listen to you.

10:00   5        Q.   Well, I -- go ahead.   But I'd like you to

6    look, because I'm going to ask you have I read it

7    correctly.

8        A.   Okay, sir.

9        Q.   Okay.   Introduction.   During drilling

10:01  10   operations and intrusion of formation fluids

11   (water, oil, gas, or a combination of the three)

12   into the wellbore is termed a kick and the fluid

13   is called kick fluid.

14        Did I read that correctly?

10:01  15        A.   Correctly.

16        Q.   Continuing on:   When a kick is taken,

17   there is the potential for blowout occurrence.

18   If the well can be successfully shut in with

19   equipment (blowout preventers, BOPs) that will

10:01  20   prevent any further flow of formation fluid into

21   the wellbore, then the situation is referred to

22   as a controlled kick.   Otherwise, it is an

23   uncontrolled kick; therefore, referred to as a

24   blowout, which is potentially dangerous.

10:01  25        Did I read that correctly?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   Correct, sir.

2        Q.   Continuing on:   If the formation

3    fractures while the well is shut in and kick

4    fluid goes into the fractured zone, then the

10:01    5    blowout is called an underground blowout.   If

6    surface equipment fails to control the migration

7    of kick fluid to the surface, then this is

8    referred to as a surface blowout.

9            Did I read that correctly?

10:02    10        A.   Correct.

11        Q.   Next paragraph:   Blowouts can occur

12    during drilling, tripping, casing, or workover

13    operations.   They are regarded as accidents and

14    their occurrence can endanger human lives, the

10:02    15    monetary investment, and the environment.

16            Did I read that correctly?

17        A.   Correct.

18        Q.   Continuing on:   Therefore, their

19    prevention is undoubtedly the most important task

10:02    20    in any drilling venture.

21            Did I read that correctly?

22        A.   Correct, sir.

23        Q.   Final sentence:   This chapter will

24    address the causes, detection, control mechanics,

10:02    25    and equipment that may prevent blowout

PURSUANT TO CONFIDENTIALITY ORDER

1    occurrence.

2         Did I did read that correctly?

3         A.   Correct, sir.

4         Q.   Focusing on some of the sentences in the

10:03  5    second paragraph there, sir, the sentence that

6    says, quote:   Therefore, their prevention is

7    undoubtedly the most important task in any

8    drilling venture, period, close quote, can you

9    tell me what you meant by the word "the drilling

10:03  10   venture"?

11        A.   The well that you are -- that -- we refer

12   to it as a drilling venture or prospect, a new

13   prospect you are drilling.

14        Q.   Well, would the venture include, for

10:03  15   example, the person or the company that owns the

16   lease rights; in this case, BP?

17        A.   The term I'm using here is referred to a

18   drilling venture.   It means you started to

19   actually conduct the operation.

10:03  20        Q.   Okay.   In the case of the DEEPWATER

21   HORIZON, who are the companies that are involved

22   in conducting the drilling operation?

23        A.   The driller or the -- the contractor, the

24   drilling contractor, is the company that is

10:04  25   responsible for the actual drilling of the well.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  Is BP a part -- and I'm focusing on the

2   DEEPWATER HORIZON now in the Macondo prospect.

3   Is BP a part of that venture?

4      A.  They can be a part of the venture in the

10:04  5   planning and design stages.

6      Q.  Well, how about once -- once the well --

7   I guess let me put it this way.

8          Is prevention of a blowout, is it any

9   part of the job description of a well site

10:04  10   leader, such as Mr. Vidrine or Mr. Kaluza, who

11   were aboard the rig on April 20th of 2010?

12      A.  Maybe if you rephrase the question, I may

13   be able to better answer.  I'm not exactly sure I

14   can answer it in the way it's stated.

10:05  15      Q.  Well, let -- let's go back.  Let's

16   start -- I'll read one on of your sentences

17   again.

18      A.  Okay.

19      Q.  Referring to blowouts now, quote:  They

10:05  20   are regarded as accidents and their occurrence

21   can encounter human lives, the monetary

22   investment, and the environment, period, close

23   quote.

24          Would BP's well site leaders be expected,

10:05  25   in your opinion, to understand that a blowout

**PURSUANT TO CONFIDENTIALITY ORDER**

1    could endanger human lives?

2         A.   Yes, sir.

3         Q.   Should BP's well site leaders, in your

4    opinion, understand that a blowout can put at

10:05   5    risk the monetary investment of the well?

6         A.   Yes, sir.

7         Q.   And is it your understanding that BP's

8    well site leaders should also understand that

9    blowouts can cause harm to the environment?

10:06   10        A.   Yes, sir.

11        Q.   And is it your opinion that they should

12   also understand that the prevention of blowouts

13   is undoubtedly the most important task in any

14   drilling venture?

10:06   15        A.   Yes, sir.

16        Q.   And if BP's well site leaders have

17   knowledge of information that could assist in

18   preventing a blowout, do they have the

19   responsibility, in your opinion, to communicate

10:06   20   that to others aboard the rig, including drillers

21   who have the primarily responsibility for

22   controlling blowouts?

23        A.   They do.

24        Q.   And you would understand that as part of

10:06   25   their responsibility, would you not?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  Not the -- the -- the plans -- let me

2  answer the question like this:  The actual

3  planning and well design is done onshore.  The

4  well design and the planning is sent to the rig

10:07  5  floor, given to the contractor.  And the

6  contractor reviews that plan, that this venture

7  that we're going to drill a well is going to be

8  going according to this.

9          So it's shared among all of the parties

10:07  10  on the rig floor, mainly the contractor.  So BP

11  give the information to the contractor and the

12  contractor personnel should be aware of what is

13  going to be happening.

14      Q.  I think I understand what you're saying.

10:07  15  And you used the word "shared."  I take it you're

16  comfortable using the term "shared

17  responsibility" to describe the responsibilities

18  of both well site leaders and the drillers

19  personnel, such as the drillers that are

10:08  20  primarily responsible for controlling blowouts,

21  correct?

22      A.  Correct.

23      Q.  So shared responsibility would -- does

24  that mean, in your opinion, that -- that both of

10:08  25  those parties, the well site leaders and the rig

**PURSUANT TO CONFIDENTIALITY ORDER**

1    I'm not asking who's got primary

2  responsibility for a blowout prevention.  I'm

3  asking who shares in those responsibilities for a

4  moment.

10:09  5    Would you agree with me -- would it be

6  your opinion that BP's well site leaders share

7  responsibility with the driller's employees for

8  the prevention of blowouts?

9    A.  I cannot answer the question as stated in

10:09  10  that form.  I don't know if that is -- you know,

11  sharing a responsibility of well control has a

12  lot of ramifications.

13    Q.  Well, let's assume that the well site

14  leader observes something happening --

10:10  15        MR. REGAN:  One second.

16    Were you finished, Dr. Azar, with your

17  answer?

18        THE WITNESS:  No -- yeah, I'm

19  finished.

10:10  20    Q.  (BY MR. UNDERHILL)  Feel free.  I didn't

21  intend to cut you off.

22    If --

23        MR. REGAN:  Yeah, I just wasn't

24  sure.

10:10  25    Q.  (BY MR. UNDERHILL)  If the BP well site

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 12 of 83

1   leader saw something that he considered an

2   anomaly that was an indication of a blowout --

3   and let's assume in my hypothetical that he

4   determined that the driller wasn't aware of that

10:10   5   anomaly -- would it be good practice for the well

6   site leader to tell the driller about the anomaly

7   so that the driller can investigate it?

8       A.   No.

9       Q.   He has no responsibility?

10:11   10       A.   He has -- I'm sorry.  He has

11   responsibility.  If that is the question you're

12   referring to as responsibility, well site

13   leaders, sharing responsibility with the crew,

14   drilling crew, and see anomaly, yes, they do have

10:11   15   that responsibility.

16       Q.   That was my question.  So just --

17       A.   Well, sorry.

18       Q.   -- make sure we're clear on that.

19       A.   That -- yeah, they do have that

10:11   20   responsibility.

21       Q.   And, again, I'm not assuming that the

22   well site leader is going to go punch the button

23   or pull the lever that says, "Activate the BOP."

24   That's not my question.

10:11   25       A.   Okay.  I apologize.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   At this point I'm -- I'm talking about

2   the responsibility to share information that

3   could help prevent a blowout.

4           I take it you agree with me that the BP

10:11  5   well site leader shares in that responsibility

6   with the driller, correct?

7      A.   Correct.

8      Q.   And in fairness to you, let's reverse it.

9   Let's assume that the driller has information of

10:12  10   an anomaly.  Would you expect him to share that

11   with the well site leader?

12      A.   Correct.  I do.

13      Q.   So -- so it works both ways?

14      A.   Yes.

10:12  15      Q.   So if the well site leader has

16   information about an anomaly, it's part of his

17   responsibility in preventing a blowout to at

18   least make sure the driller is aware of that

19   anomaly, correct?

10:12  20      A.   Correct.  However, the well site leader

21   is not the one who is monitoring.  You know,

22   he -- he does not know 24 hours a day what's

23   happening down below.  It is the driller who is

24   monitoring that well.

10:12  25           And if there is any anomaly, okay, that

**PURSUANT TO CONFIDENTIALITY ORDER**

1    all of a sudden came at midnight, the well site

2    leader may not be aware of it, but he will be

3    informed that an anomaly did take place or there

4    is an anomaly.  But he's not responsible to

10:13    5    detect that anomaly as a site leader -- well site

6    leader.  That's my understanding.

7        Q.  And -- and thank you.  I think I

8    understand what you're saying.  But I want to

9    make sure that we're reading on the same

10:13    10    wavelength here.

11        A.  Okay.  Okay.

12        Q.  My question is making the assumption that

13    the drill site -- or, I'm sorry -- the driller,

14    whether through fault, no fault, whatever, he is

10:13    15    not aware of an anomaly that may be an indication

16    of a kick.  And in the same hypothetical, the

17    well site leader, however he came about the

18    information, he is aware of an anomaly that can

19    indicate that a kick is occurring.

10:13    20        A.  (Witness nods.)

21        Q.  I just want to make sure we understand

22    each other that in that example the well site

23    leader's responsibility would be to make sure the

24    drill -- that the driller is aware of the anomaly

10:14    25    so that the driller, in turn, can take whatever

**PURSUANT TO CONFIDENTIALITY ORDER**

1    actions he needs to do to shut in the well and

2    prevent a blowout from occurring.

3        A.   In that context, yes.

4        Q.   Thank you.   To give a -- sort of what

10:14  5    I'll call a gross example, let -- let's assume

6    that the drill pipe -- or, I'm sorry, the well

7    site leader, there's a -- there's a time bomb, a

8    time bomb aboard the rig and it's going to go off

9    in an hour, and he's aware of it and the driller

10:14  10    is not aware of it.

11            Would you expect the well site leader to

12    tell the driller words to the effect, "There's a

13    time bomb that's expected to go off in an hour.

14    Are you at least aware of it so we can take

10:14  15    action to diffuse the bomb?"

16                MR. REGAN:   Objection, form.   You

17    can answer.

18        A.   Under this hypothetical example, yes.

19        Q.   (BY MR. UNDERHILL)  Could we turn --

10:15  20    thank you.   For the -- at least at the moment --

21    you can go ahead and put away that chapter for

22    the moment at least.

23        A.   Okay.

24        Q.   Could you go to your report?   Could you

10:15  25    turn to Page 45 of your report --

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 16 of 83

74

```
 1    pressure test is conducted to verify the

 2    integrity of the primary cement job by removing

 3    hydrostatic pressure of the mud, period, close

 4    quote.

 5         Did I did read that correctly?

 6    A.  Correct.

 7    Q.  Did the DEEPWATER HORIZON crew perform a

 8    negative pressure test on April 20th of 2010?

 9    A.  Yes, sir.

10    Q.  And do you -- do you know the names of

11    the individuals on behalf of Transocean who you

12    understand were involved in that?

13    A.   I know there were a BP well site leader.

14    I -- I can't tell you exactly the -- you know,

15    who was involved by name.

16    Q.  That's all my question was.

17    A.  Yeah.

18    Q.  We'll get to positions.

19    A.  Okay.

20    Q.  All I'm asking right now, do you know the

21    names of the Transocean personnel who were

22    involved in the negative pressure test?

23    A.  The driller, no, I don't.

24    Q.  Were BP employees involved in the

25    negative pressure test?
```

10:17   5
10:17  10
10:17  15
10:17  20
10:18  25

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.   Yes, sir.

2       Q.   Do you know the names of the BP employees

3  that were involved?

4       A.   Again, I'm going to try to scratch memory

10:18  5  from reading some documents.  They had several,

6  you know, well site leaders.  And one of them, I

7  think, at this time was Vidrine, if I'm not

8  mistaken.  But I don't know for sure.

9       Q.   Don Vidrine, V-I-D-R-I-N-E.  Does that --

10:18  10       A.   I think --

11       Q.   -- refresh your recollection?

12       A.   I think that is about right.  Again, I

13  cannot tell you 100 percent that that is the

14  person.

10:18  15       Q.   This is one where I'd like to make sure

16  that you testify accurately.  Could you turn to

17  Page 47 of your report?  And the first paragraph,

18  why don't you just read that to yourself and tell

19  me whether that refreshes your recollection as to

10:19  20  one of the BP well site leaders involved in the

21  negative pressure test was Don Vidrine?

22       A.   I'm sorry.  Which paragraph?

23       Q.   Page 47, first paragraph.

24       A.   First paragraph.  Okay.

10:19  25       Q.   You just read it to yourself.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Yes.   Yes, sir.

2    Q.   Does that refresh your recollection that

3    it was Mr. Vidrine who was one of the well site

4    leaders involved in the negative pressure test?

10:19  5    A.   Yes, sir, it was.

6    Q.   Thank you.   I'm going to give you some

7    other names just to see if you can recall them.

8    Do you know if Mr. Kaluza, K-a-l-u-z-a,

9    was also one of the well site leaders involved in

10:19  10    the negative pressure test?

11    A.   I am not exactly sure.   I am aware of

12    Kaluza being on the rig as well, but I don't know

13    if he was involved or not, sir.   I can't recall.

14    Q.   How about a gentleman named Lee Lambert,

10:20  15    who I'll represent to you was a BP employee, and

16    I think his title was Well Site Leader of the

17    Future?

18    A.   Yeah, I cannot recall.   I don't know.

19    Q.   But at least with respect to Mr. Vidrine,

10:20  20    according to your own report, he was a well site

21    leader for BP that was involved in the negative

22    pressure test?

23    A.   Yes, sir.

24    Q.   Let's go back to your report on Page 45,

10:20  25    please.

1          Prior to the negative pressure test on

2    April 20th aboard DEEPWATER HORIZON, had the rig

3    crew completed the cement job?

4          A.   Yes, sir.

10:20  5          Q.   Was the purpose, or at least one of the

6    purposes of the negative pressure test on

7    April 20th, to test whether the cement had -- it

8    was adequately acting as a barrier to the influx

9    of hydrocarbons into the casing?

10:21  10          A.   Supposed to, yes.

11          Q.   Is that, in fact, the primary purpose of

12    the negative pressure test?

13          A.   The negative pressure test is simply to

14    establish that there is no leak from that

10:21  15    formation been cemented in place into the

16    wellbore.

17          Q.   If --

18               MR. GODWIN:   Object to the form.

19          Q.   (BY MR. UNDERHILL)   If the -- and I think

10:21  20    I know this, but why don't you try to explain to

21    Judge Barbier, who may review this videotape

22    later.

23               How is it the negative pressure test

24    tests the adequacy of the cement job; that is, to

10:21  25    determine whether the cement job had successfully

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 20 of 83

78

1   acted as a barrier to the influx of hydrocarbons?

2       A.  By under-balancing the formation, if

3   there is a leak that -- coming into the wellbore,

4   it should be indicated on the surface by this

10:22  5   pressure test, negative pressure test.  It could

6   be a failure in the cement itself.  The actual

7   purpose of the negative test is really to test

8   the cement job successfully done or not.  That's

9   bottom line of a negative test.

10:22  10      Q.  If -- hypothetically, now, if a cement

11  job does not do its job of acting as a barrier to

12  the influx of hydrocarbons into the wellbore, and

13  if the well goes under-balanced, what will

14  happen?

10:22  15      A.  If the cement job does not act as a

16  barrier, then the formation fluid come into the

17  wellbore.  That's what we call -- we have an

18  influx or a kick.

19      Q.  And if the kick is not detected in time,

10:23  20  then what will happen?

21      A.  Then we're talking about potentially a

22  blowout; kick reaching the surface, reaching the

23  riser, riser unloading, becoming uncontrolled

24  blowout.

10:23  25      Q.  Do you agree that what happened aboard

**PURSUANT TO CONFIDENTIALITY ORDER**

1    DEEPWATER HORIZON at approximately 9:49 or

2    thereabouts on April 20th was, in fact, a

3    blowout?

4        A.  Yes, sir.

10:23  5        Q.  Have you ever -- in -- can you give me

6    examples of a worse blowout than this particular

7    one aboard DEEPWATER HORIZON?  Any other rigs,

8    any other companies, any other time and place,

9    ocean, et cetera?  Can you give me examples?

10:23  10       A.  I can't right at the moment recall.

11       Q.  Would it qualify in the -- I hate to put

12   it top five, but I will -- in the top five of the

13   worst blowouts that you're aware of in your

14   entire career in this industry?

10:24  15       A.  At this point, the only big blowout that

16   I can recall way back is the Ixtoc in the Gulf of

17   Mexico, Pemex.  As far as comparison of what

18   happened in terms of loss and pollution and

19   environment, I can't account for -- all I know is

10:24  20   the DEEPWATER HORIZON incident was a major.

21       Q.  And I'm not asking you to compare --

22       A.  Yeah.

23       Q.  -- whether this disaster was worse than

24   that disaster.

10:24  25       A.  Ixtoc is the only one that comes to my

**PURSUANT TO CONFIDENTIALITY ORDER**

1    mind that was of a magnitude, and that's about

2    all I can say at this point.

3         Q.  Do you know if the Ixtoc spill, blowout,

4    resulted in any deaths of any of the crewmen or

10:25  5    any people aboard the rig?

6         A.  I do not recall.  I know that the spill

7    in the Gulf of Mexico was very extensive.  And

8    the reason is, it took -- again, approximate

9    numbers here -- over nine months, nine or ten

10:25 10   months, before they actually brought it under

11   control.

12        Q.  So other than the two -- these two, the

13   DEEPWATER HORIZON and the Ixtoc, I-x-t-o-c, spill

14   in the Gulf of Mexico, these are the two worst

10:25 15   spills that come to mind as you sit here today,

16   correct?

17        A.  To my knowledge.  There are other

18   blowouts or accidents, you know, across the globe

19   that I cannot recall all of the details.

10:26 20   Australia, Middle East, Saudi Arabia, and other

21   part of the world that these accidents do occur

22   if you allow a kick to become uncontrolled.

23        Q.  Is it your opinion that the negative

24   pressure test is a safety critical test?

10:26 25        A.  Yes, it is.

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 23 of 83

1      Q.   Is it your opinion that the negative

2  pressure test should be conducted with the utmost

3  care by all involved in the conduct of the test?

4      A.   Yes, sir.

10:26  5      Q.   In your opinion, who has the final say as

6  to whether the negative pressure test aboard

7  DEEPWATER HORIZON could be deemed a success or

8  not a success?

9      A.   It is the responsibility of those -- all

10:27  10  of those who are involved in a negative test.  If

11  any one of those involved in a negative test has

12  any doubt whatsoever, any -- any of those have

13  doubt that that negative test has not proved

14  integrity of the well, then they should have

10:27  15  stopped.

16          MR. GODWIN:  Object to form.

17      Q.   (BY MR. UNDERHILL)  I want to make sure

18  that you're accurate in this answer.  I'm quoting

19  now your previous answer:  If any one of those

10:27  20  involved in a negative test has any doubt

21  whatsoever, any of those doubt that the negative

22  test has not proved integrity of the well, then

23  they should have stopped.

24          Is that your testimony?

10:28  25      A.   That is my statement, yes, sir.

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.   And when you used the words "any of those

2  involved in the test," I take it that would

3  include Transocean personnel?

4      A.   Yes, sir.

10:28   5      Q.   Would it include BP personnel?

6      A.   Yes, sir.

7      Q.   Would it include BP's well site leaders?

8      A.   That's basically the well site leader

9  responsibility there because he is the one who is

10:28  10  witnessing the test.

11      Q.   And if Mr. Vidrine was one of those well

12  site leaders that was involved in conducting the

13  negative pressure test, that means that he

14  also -- if he had any doubt as to the integrity

10:28  15  of the test, he should not have deemed it a

16  success, correct?

17      A.   Correct.

18      Q.   When they conducted the negative pressure

19  test and deemed it a success, they had 1400 psi

10:28  20  in the drill pipe and zero pressure on the kill

21  line, correct?

22      A.   Correct.

23      Q.   Can you, in your opinion, approve --

24  strike that.

10:29  25           In your opinion, can you declare a

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 25 of 83

 1   negative pressure test to be successful if you

 2   have those differential pressures; that is, 1400

 3   pounds on the drill pipe, zero on the kill line,

 4   if the valves are all properly lined up?

10:29    5        A.   Would you repeat the question more -- I

 6   lost track of --

 7        Q.   Sure.   Can you declare a negative

 8   pressure test to be successful if you have 1400

 9   pounds' pressure upon the drill pipe and zero on

10:29   10   the kill line if they're both measuring the same

11   fluid?

12        A.   You cannot say it is successful.

13        Q.   Why is that?

14        A.   Because whenever you see anomaly such as

10:30   15   a pressure, whether it's on the kill line or the

16   drill pipe, it is something that is pushing up,

17   changing that hydrostatic head to give you the

18   extra reading.   Because unbalanced condition, if

19   the well is unbalanced condition, then these

10:30   20   gauges or these pressures on the surface should

21   be reading zero.   Anything else that happened

22   below that changes those readings from zero, then

23   it means there is something else causing that

24   anomaly, and that is anomaly.

10:30   25        Q.   What you've just described, Professor, is

1    this a principle that is fundamental to well

2    control?

3         A.  Yes, sir.

4         Q.  Is it something that any driller should

5    understand?

6         A.  Yes, sir.

7         Q.  Is it something that any well site leader

8    should understand?

9         A.  Yes, sir.

10        Q.  Is it something that anybody who had gone

11   through well control school should understand?

12        A.  Yes, sir.

13        Q.  Is this about as basic as you can get in

14   hydrostatics when you're drilling a well to know

15   that you can't have a successful negative

16   pressure test if you have 1400 on the drill pipe

17   and zero on the kill line?

18        A.  You can't get any more basic than that.

19   That's simple hydrostatic.

20        Q.  Is this something that one of your

21   undergraduate students who had taken the basics

22   of well control should understand?

23        A.  I expect them to do.

24        Q.  So a first-year student taking your class

25   should understand those principles?

A.   If it -- if they have been to a class
that teach well control or been taught in
courses, you know, the indications or indicators
of what may be an anomaly, which this is one of
10:32   the anomalies, it may not actually be a formation
fluid communication, depending on where you are
during that period.

Q.   Once they declared the negative pressure
test a success, do you know what the next step in
10:32   the temporary abandonment procedure was?

A.   The next step was to displace the spacer
that was in the riser still with seawater, and
then begin the cement job, preparing for the
cement plug to be placed at the proposed depth of
10:33   8,367 feet.

Q.   Do you know what the term "riser margin"
refers to?

A.   Yes, I know what riser margin is, yes,
sir.

10:33   Q.   Could you explain to Judge Barbier what a
riser margin means?

A.   The riser margin normally when is
accounted for in your drilling mud program simply
allow you in case of -- again, I'm explaining it
10:33   on my -- in case of emergency, hurricane coming

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.   And in seawater, what is the weight of

2   seawater pounds per gallon?

3      A.   Usually, depending on the salinity, can

4   be anywhere from 8.3, 8.4 --

10:35   5      Q.   Got it.   So if --

6      A.   -- or higher.

7      Q.   So if they were displacing the mud in the

8   riser to seawater, they would have been creating

9   more of an under-balanced condition in the well,

10:35  10   correct?

11      A.   That is very true.

12      Q.   And, again, is this something that any

13   driller should understand; that is, if they

14   replace 12-pound drilling mud with seawater, they

10:35  15   are creating more of an under-balanced condition

16   in the well?

17      A.   Correct.

18      Q.   Is that something any well site leader

19   should also understand?

10:35  20      A.   Correct.

21      Q.   Despite the fact that -- for your

22   testimony, it is fundamental to well control that

23   you cannot have a successful negative pressure

24   test with 1400 pounds on the drill pipe and zero

10:36  25   on kill line?   All of those involved in the test

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 29 of 83

1   nevertheless declared it a successful test, did

2   they not?

3       A.   They did.

4       Q.   And they -- is it your understanding that

10:36  5   they rationalized -- strike that.

6           Is it your understanding that they --

7               MR. REGAN:   Reasoned.

8       Q.   (BY MR. UNDERHILL)   -- reasoned that the

9   differential pressure could be explained because

10:36  10   of something called "the bladder effect"?

11      A.   That is something I have heard for the

12   first time reading reports and documents that has

13   no technical basis to it whatsoever.

14      Q.   As you sit here today, do you know what

10:36  15   the heck "the bladder effect" means in the

16   context of a negative pressure test like they

17   performed on the rig on April 20th?

18      A.   I know what they have explained in terms

19   of bladder effect.   That is the pressure above a

10:37  20   closed annular preventer pushing on that rubber

21   packing, creating pressure to read on the pipe.

22   That is no technical basis for that at all, no

23   technical basis or explanation.   It doesn't

24   exist.

10:37  25      Q.   Can you come up with any engineering

1    explanation for what it means?

2        A.   I can't right now, but if you give me a

3    day or two I may make some calculations to see

4    the compressibility of that thick rubber packing

10:37  5    on an annular preventer.   It has 5,000 feet of

6    fluid.   I can tell you if that annular preventer

7    actually will act as a plunge.   In my belief, I

8    don't believe so.   But --

9        Q.   So you cannot find any technical basis --

10:38  10        A.   I do not, sir.   Not whatsoever.

11        Q.   Do you have an opinion, then, as to how

12    in the world they approved this negative pressure

13    test based upon a theory, the bladder effect,

14    that in your opinion has no technical basis?

10:38  15        A.   They -- they made a mistake.   Someone

16    made a mistake or collectively they made a

17    mistake.

18        Q.   Transocean people involved in the test

19    and its conduct, they made a mistake?

10:39  20        A.   I believe so.

21            However, the bladder effect was

22    explained.   And when that anomaly was showing, to

23    what I have read, it was explained that this is a

24    bladder effect; that the toolpusher said he had

10:39  25    seen it before and the driller said this is

**PURSUANT TO CONFIDENTIALITY ORDER**

90

1    anomaly, we see it -- see it all -- a lot of
2    times.
3        Q.   But you still can't find any technical
4    basis --
10:39  5        A.   I don't.
6        Q.   -- as to what it is?
7        A.   No, sir, I cannot, and I will not --
8        Q.   Have you read the Bly report?
9        A.   Yes, I have.
10:39  10        Q.   And do you recall that in the Bly report
11    they, like you, could find no technical basis for
12    this bladder effect?
13        A.   Yeah, I remember that, sir.
14        Q.   Have you read the Transocean
10:39  15    investigative report?
16        A.   I have very recently, and I don't recall
17    if that -- I don't recall that I really see the
18    word "bladder effect" in their -- in their
19    report.  I don't remember.  It was a big volume,
10:40  20    two volumes, that I can't tell you exactly what I
21    have read.  I don't remember.
22        Q.   I'll represent to you that Transocean, in
23    their report, likewise, could find no technical
24    basis for the bladder effect, or otherwise
10:40  25    referred to as annular compression -- well, let's

**PURSUANT TO CONFIDENTIALITY ORDER**

1    leave Transocean's report out of it for a moment.

2            From -- you can find no technical basis

3    for the bladder effect, BP's Bly investigation

4    can find no technical basis for the bladder

10:40  5    effect.  How in the world did Mr. Vidrine come to

6    the conclusion that there was a phenomena known

7    as the bladder effect?

8            MR. REGAN:  Objection; form.

9        A.  I am not in Mr. Vidrine's place.  I

10:41 10   really don't know, and I can't read his mind to

11   how and why.  It's very difficult for me to

12   explain.  I can't.  I can't tell you how and why,

13   because I wasn't there.  I'm not Mr. Vidrine.

14           Now, if you tell me if I was there

10:41 15   myself, I'll tell you what I would do.

16       Q.  (BY MR. UNDERHILL)  What would you do?

17       A.  If I was right there on that rig site,

18   whether I was a driller, well site leader, OIM,

19   toolpusher -- senior toolpusher, and seen that

10:41 20   anomaly, I shut the well down, sir.

21       Q.  Why?

22       A.  Because I know -- my experiences, my

23   teaching, my writing tells me that if there is an

24   anomaly, shut down and investigate.  Simple.

10:41 25       Q.  Did they do that, that is, shut down and

1    investigate?

2        A.   They tried another negative test --

3        Q.   What happened then?

4        A.   -- from documents I have read.   And

10:42  5    that -- in my book, it's -- make -- it's

6    irreasonable [sic].

7        Q.   It's what?

8        A.   The next negative test they conducted was

9    on the kill line.

10:42  10       Q.   I'm sorry.   Did you say it's reasonable

11    or unreasonable?

12       A.   No.   It is reasonable to say, let's do a

13    second test.

14       Q.   Okay.

10:42  15       A.   And the second test they had conducted

16    was on the kill line.

17       Q.   And when they conducted that second test,

18    did they still have pressure on the drill pipe?

19       A.   After they bled momentarily, no.   And

10:42  20    then after they shut down the kill line, it went

21    up again.

22       Q.   And what is that indicative of; that is,

23    that the pressure in the drill pipe went up

24    again?

10:42  25       A.   It is definitely not a bladder effect.

1    It's an anomaly.

2        Q.   Could it be the influx of formation

3    fluids into the wellbore?

4        A.   I believe so.

10:43  5        Q.   And is that something that should have

6    been investigated?

7        A.   Yes, sir.

8        Q.   But after the second test, you're not

9    aware of any further investigation, are you?

10:43  10        A.   No, sir.

11        Q.   When those involved in the conduct of the

12    negative pressure test on BP's side, the well

13    site leaders, do you have any information that

14    they thereafter -- before declaring the test a

10:43  15    success, that they talked to any engineers in

16    Houston and asked them if there is any such thing

17    as the bladder effect?

18        A.   I -- I'm not aware of that kind of

19    discussion, no, sir.

10:43  20        Q.   Are you aware of whether the well site

21    leaders talked to any other BP people aboard the

22    rig that evening as to whether they understood

23    whether there was anything called the bladder

24    effect?

10:44  25        A.   I don't know, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Q.  You are aware that where there were

 2   other -- at the time -- the very time the

 3   negative pressure test was being performed,

 4   you're aware that there were other BP officials

10:44  5   aboard the rig that night?

 6        A.  I recall that, sir.

 7                MR. UNDERHILL:  We're going to take

 8   a break.

 9                THE WITNESS:  Okay.

10:44 10                MR. UNDERHILL:  Thank you.

11                THE WITNESS:  Thank you.

12                THE VIDEOGRAPHER:  The time is

13   10:44 a.m., and we are off the record.

14                     (Break.)

10:55 15                THE VIDEOGRAPHER:  The time is

16   10:55 a.m., and we're back on the record.

17        Q.  (BY MR. UNDERHILL)  Professor, you've --

18   Page -- I'm sorry -- Footnote 162 of your report,

19   which is on Page 48.  Do you have that?

10:55 20        A.  Yes, sir, I do have it.

21        Q.  All right.  You refer in that footnote to

22   what you call "stop work authority."  What is

23   stop work authority?

24        A.  That means any person on the rig floor --

10:56 25   according to Transocean in this little particular
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    document I've cited, any person, not just the

2    driller but any person -- Transocean -- this is

3    Transocean document -- any person sees something

4    is happening and going to create a risk or some

10:56   5    harmful event, they're supposed to -- they're

6    told to stop the work, meaning quit everything.

7    Stop.  Don't go any farther.

8        Q.  Now, I understand in the context of your

9    footnote that that's a Transocean policy,

10:56  10   correct?

11       A.  That is what I got this from is a

12   Transocean policy.

13       Q.  Even if it wasn't a policy written down

14   in a manual, it just makes common sense, doesn't

10:57  15   it?

16       A.  Yeah, definitely it is a common sense.

17   If you see something that is going to be harmful,

18   it is common sense that you stop.

19       Q.  And to take it the next step, if anyone

10:57  20   on the rig floor saw something that could create

21   a danger to the rig, to the crew, to the

22   environment, to their own lives, it'd be foolish

23   not to take action, including stop the work to

24   prevent the harm from occurring, right?

10:57  25       A.  They should not take the action.

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.   They should what?

2      A.   To -- if they've -- if they fear there is

3   something that if they continue to do will cause

4   some harm, then they should not continue to do

10:58   5   it.   They should stop.

6      Q.   I mean, this isn't even a principle that

7   applies just to working on rigs.   This is a

8   common sense principle that, frankly, applies to

9   life in general, doesn't it?

10:58   10      A.   True.   It's expected even with small

11   children.   They should know that fire is harmful,

12   so don't jump in it.

13      Q.   And in the context of a drilling rig

14   dealing with explosive gases, fuel, this

10:58   15   commonsense principle even assumes greater

16   importance, doesn't it?

17      A.   Repeat the question again, please.

18      Q.   On a drilling rig --

19      A.   Yes, sir.

10:58   20      Q.   -- I mean, we're -- we're drilling for

21   oil?

22      A.   Yes, sir.

23      Q.   One of the purposes of that oil we drill

24   is to put it in our cars and have what we called

10:59   25   a controlled explosion to turn the gears and do

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. UNDERHILL:  I don't think it has

2      any significance --

3          MR. REGAN:  Fair enough.

4          MR. UNDERHILL:  -- for my -- my

11:13  5      questions.

6          Q.  (BY MR. UNDERHILL)  So do you have

7      Page 25 of 25 of the Bly report, Professor?

8          A.  Yes, sir.

9          Q.  The first one I would like to show you

11:13  10      is -- I'm going to point to my copy so you can

11      see.

12          Do you see where it has April 20th, 1835

13      to 1855?

14          A.  Yes, I see that, sir.

11:13  15          Q.  And then below that -- and I'm going to

16      quote:  At 1955 hours, the negative pressure test

17      was concluded and considered a good test.

18          Did I read that correctly?

19          A.  That is correct, what it says.

11:13  20          Q.  And 1955 would be 7:55 p.m., correct?

21          A.  That's what that says, sir.

22          Q.  Thank you.

23          Continue on down.  At the very bottom of

24      that page, the entry at 2052 -- 2052 would be

11:14  25      8:52 p.m., would it not?

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 39 of 83

```
 1          A.   Yes, sir.
 2          Q.   And at 8:52 p.m. -- and I'm reading from
    the report -- calculated that the well went
    under-balanced and started to flow.
11:14  5         Did I read that correctly?
 6          A.   Yes, sir, you have.
 7          Q.   And to the right it says:  OLGA model,
    O-L-G-A in caps.  And is that your understanding
    of the --
11:14 10         A.   Yes, sir.
   11         Q.   -- modeling that BP used --
   12         A.   Yes, sir.
   13         Q.   -- for the Bly report?
   14         A.   Yes, sir.
11:14 15         Q.   Thank you.
   16              So to summarize so far, negative pressure
    test declared successful at 7:55 p.m., and
    according to the OLGA modeling by BP, the well
    started to flow at 8:52?
11:14 20         A.   Yes, sir.
   21         Q.   The next entry -- could you turn to
    Page 27, please?
   23         A.   Okay.
   24         Q.   And I'm going to -- just to make it easy
11:14 25    on you, third entry from the bottom, it has 2138.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

110

1        Do you see that?

2        A.   Yes, sir, I do.

3        Q.   And I'll read that:   At 2138, quoting,

4    calculated that approximately 2138 hydrocarbons

11:15  5    passed from well into riser.

6            Did I read that correctly?

7        A.   That's what it says, sir.

8        Q.   And, again, that's according to BP's OLGA

9    modeling, correct?

11:15 10        A.   Yes, sir.

11        Q.   And if the hydrocarbons passed from the

12    well into the riser, that would mean that they

13    passed above the BOP stack?

14        A.   Yes, sir.

11:15 15        Q.   And 2138 would be 9:38 p.m., would it

16    not?

17        A.   Yes, sir.

18        Q.   Could you go to Page 28, and the third

19    entry from the top at 2141 hours.

11:15 20            Do you see that?

21        A.   Yes, sir.

22        Q.   Right below that in a bracket, I'll

23    quote:   Drill pipe pressures started increasing

24    in response to BOP activation.

11:15 25            Do you see that?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   Continuing on down, third paragraph from

2    the bottom, it begins:   2147 hours.

3         Do you believe -- see that?

4      A.   Yes, sir.

11:16  5      Q.   See if I read this correctly:   Drill pipe

6    pressures started rapidly increasing from

7    1,200 psi to 5,730 psi.

8         Did I read that correctly?

9      A.   Yes, sir, you have.

11:17  10      Q.   And 2147 would be 9:47 p.m., would it

11    not?

12      A.   That is correct.

13      Q.   And then the next paragraph in brackets,

14    quote:   This is thought to have been the BOP

11:17  15    sealing around pipe, possible activation of

16    variable bore rams, VBRs, at 2146 hours.

17         Did I read that correctly?

18      A.   Well, that's what that statement says.

19      Q.   And turn to the next page, Page 29.   The

11:17  20    entry there at April 20th at 2149.

21         Do you see that?

22      A.   Yes, I do.

23      Q.   That would be 9:49 p.m., would it not?

24      A.   Yes, sir.

11:17  25      Q.   See if I read this correctly.   Quote:

**PURSUANT TO CONFIDENTIALITY ORDER**

1  First explosion occurred an estimated five

2  seconds after power loss.

3  A.  I see that, sir.

4  Q.  Second explosion occurred an estimated

11:17  5  10 seconds after first explosion.

6  Did I read that correctly?

7  A.  That is correct.

8  Q.  And that's referring to 9:49 p.m.,

9  correct?

11:18  10  A.  That is correct.

11  Q.  Thank you.

12  Could you turn, please, to Exhibit -- the

13  Tab 3 of your book, which is Exhibit 296.

14  A.  Where would I find that?

11:18  15  MR. REGAN:  (Indicating.)  Tab 3.

16  There you go.

17  A.  Okay.

18  Q.  (BY MR. UNDERHILL)  And could you turn to

19  Page 6?  Actually, why don't you stay on Page 1.

11:18  20  Let's establish some background.  Stay on Page 1

21  of that.  There you go.

22  A.  Page 1?

23  Q.  Page 1 of Exhibit 296.  Have you seen

24  this document before?

11:18  25  A.  Let me take a minute, please.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Take as much time as you need.

2    A.   Don't recall -- I've read some of the

3    interview reports.  I cannot specifically say

4    I've read this or remember this whole interview,

11:19    5    sir.

6    Q.   Before we get into any detail on it, have

7    you seen this document before?

8    A.   Well, I believe I may have.  Like I said,

9    it's very difficult for me to remember with

11:19    10    thousands of documents that came across my desk.

11    Very hard to say I've seen it.  If I take my time

12    to read through maybe one or two sentences.

13    Q.   Have you seen it within the last week?

14    A.   No.

11:19    15    Q.   Have you seen it within the last two

16    weeks?

17    A.   No.

18    Q.   Last month?

19    A.   No.

11:19    20    Q.   Last two months?

21    A.   I would say yes.  Probably after -- I'm

22    not sure.  I can't really tell when I saw it, if

23    I did see it.  I had documents of interviews, but

24    I don't know the time elements.  I don't.

11:20    25    Q.   Fair enough.   Reading from Page 1 of

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Exhibit 296, do you see that this was an

2    interview of Mark Hafle, BP Gulf of Mexico senior

3    drilling engineer?

4        A.   I see that, sir.

11:20  5        Q.   Thank you.   Conducted on July 8th, 2010,

6    at BP Westlake 1 offices 2 p.m. central -- or

7    central daylight time, correct?

8        A.   I see that, sir.

9        Q.   Could you go to Page 6, please, of the

11:20 10    document?

11        A.   To Page 6?

12        Q.   Correct.

13        A.   Okay.

14        Q.   The second full paragraph -- or the

11:21 15    second paragraph under "Negative Test Procedure,"

16    and it begins:   Later on April 20th.

17            Do you see that?

18        A.   Yes, sir.

19        Q.   I'm going to read this in, at least the

11:21 20    first sentence.

21        A.   Okay.

22        Q.   Quoting from Exhibit 296:   Later on

23    April 20th, Don Vidrine called Mark at 8:52 p.m.

24    to talk about how to test the surface plug and

11:21 25    whether they should apply a pressure test or a

**PURSUANT TO CONFIDENTIALITY ORDER**

1    weight test.

2         Did I read that correctly?

3    A.   Yes, sir.

4    Q.   And do you recall when we were just going

11:21   5    through the Bly report a moment ago that 8:52

6    p.m. coincidentally happened to be the minute

7    when, according to the OLGA modeling, the well

8    started to flow?

9    A.   That is what I remember, sir.

11:21   10    Q.   The next sentence, quote:   Mark noted

11    that Don also talked to him about the negative

12    tests.

13         Do you see that?

14    A.   Which sentence in that paragraph, sir?

11:22   15    Q.   Starts on the third line of that

16    paragraph.   Quote:   Mark noted that Don --

17    A.   That Don also talked to him about that --

18    yes, I see that.

19    Q.   Okay.   Did I read that correctly?

11:22   20    A.   That's what it says.

21    Q.   Next sentence:   Vidrine told Mark that

22    the crew had zero pressure on the kill line, but

23    they still had pressure on the drill pipe.

24         Did I read that correctly?

11:22   25    A.   Yes, I read that, sir.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  And continuing on, quote:  Mark said he

2  told Don that you can't have pressure on the

3  drill pipe and zero pressure on the kill line in

4  a test that's properly lined up, close quote.

11:22  5        Did I did read that correctly?

6    A.  That is correct, sir.

7    Q.  Do you agree that that statement that

8  Mr. Mark Hafle made or summarized there, that you

9  didn't have pressure on the drill pipe and zero

11:22 10  pressure on the kill line in a test that's

11  properly lined up?

12    A.  If you're asking me --

13    Q.  I'm asking you.

14    A.  I'm not expressing Mark's feeling or --

11:23 15    Q.  I'm asking you.

16    A.  If you're asking me, the answer, the test

17  is not a successful test.

18    Q.  And it appears Mark agrees with that

19  statement, according to what is written here,

11:23 20  correct?

21    A.  What I read there, that's basically what

22  he's telling Vidrine.

23    Q.  And if, in fact, that's what Mark said to

24  Don that night in a conversation that started at

11:23 25  8:52 p.m., Mark got it right on that point; that

1    is, you can't have a successful test if you have

2    pressure on the drill pipe and zero pressure on

3    the kill, correct?

4              MR. REGAN:  Objection; form.

11:23  5      A.  Again, this is an interview I -- and a

6    telephone call between two individuals.  And I

7    cannot rule the fact that this particular

8    statement right here is or is not.  I don't know.

9    I don't know what actually happened in terms of

11:24 10   telephone conversation during that period between

11   Vidrine and Mark.  I don't know.

12              And I can't offer any opinion on this

13   specific statement.  I agree with it in terms of,

14   yeah, anomaly on drill pipe, no anomaly drill

11:24 15   collar -- of the kill line, there is something

16   wrong.

17              MR. UNDERHILL:  Move to strike --

18   I'm sorry.  Objection as to form.

19      Q.  (BY MR. UNDERHILL)  I hear what you're

11:24 20   saying.  Just let me make something clear.

21      A.  Okay.

22      Q.  Or ask you a question.

23              You're not a mind reader, are you?

24      A.  No.

11:24 25   Q.  You weren't there for the conversation,

1      correct?

2           A.   Absolutely right.

3           Q.   But you can read what BP's Bly

4      investigators wrote when they interviewed

11:24  5      Mr. Hafle, correct?

6           A.   That's what I'm reading here.

7           Q.   All I'm asking you -- I want to make this

8      crystal clear.   I'm not asking you to guess at

9      what they said.   I'm only asking you to read the

11:25  10     lines that are written on this exhibit,

11     Exhibit 296.   That's all I'm asking about.

12                MR. REGAN:   Hold on.   Let him ask a

13     question.

14          Q.   (BY MR. UNDERHILL)   I want you to assume

11:25  15     that when Mr. Hafle talked to the interviews --

16     interviewers, he wasn't lying.   I want you assume

17     for my questions that when the BP interviewers

18     wrote this down, they weren't lying.

19                For my questions, when I read these words

11:25  20     to you out of Exhibit 296, I want you to assume

21     that BP's investigators were not incompetent.

22     When I read these lines to you out of

23     Exhibit 296, I want you to assume that BP's

24     investigators didn't make things up when they

11:25  25     wrote them down.

PURSUANT TO CONFIDENTIALITY ORDER

1      Are you with me so far?

2          A.   I agree so far.   Yes, sir.

3                  MR. REGAN:   Wait for the question.

4          Q.   (BY MR. UNDERHILL)   I want you to assume

11:26  5   all those things.

6          A.   Yes, sir.

7          Q.   They're honest, they didn't make it up,

8   they weren't lying, they weren't incompetent.   Do

9   you understand all that?

11:26  10          A.   I do.

11          Q.   Okay.   Let's go through and read some of

12   this stuff.   So just reading the sentence as it's

13   written, quote:   Mark said he told Don that you

14   can't have pressure on the drill pipe and zero

11:26  15   pressure on a kill line in a test that's properly

16   lined up, period, close quote.

17                  Do you agree with that statement?

18          A.   I do agreement with that statement as is

19   written on this page, yes, sir.

11:26  20          Q.   The next sentence, quote:   Mark said that

21   he told Don he might consider whether he had

22   trapped pressure in the line or perhaps he didn't

23   have a valve properly lined up, period, close

24   quote.

11:26  25                  Did I read that correctly?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.   Yes, you did.

 2        Q.   Based upon what is written here, does it

 3   attempt -- does it appear that Mark is attempting

 4   to troubleshoot this differential pressure?

11:26  5              MR. REGAN:   Objection; form.

 6        A.   It seems like it.

 7        Q.   (BY MR. UNDERHILL)   Does that seem like a

 8   reasonable thing for you to do?

 9        A.   It will be difficult for me, sitting in

11:27 10   my office onshore, to really diagnose exactly

11   what's happening.   It will be difficult.

12        Q.   But based upon what's written here, it

13   appears that that's what Mark is, in fact, trying

14   to do, does it not?

11:27 15        A.   That's what the document says.

16        Q.   And feel free to look at your report if

17   it will help you.

18             You'll recall in your report where you

19   describe the various suggestions that could have

11:27 20   accounted for the differential pressure on the

21   drill pipe in the kill line.   Do you recall that

22   in your report?

23        A.   Yes, I do.

24        Q.   And I think one of the theories to

11:27 25   explain that was that the spacer had backed up
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      trapped pressure is.  The -- a fluid such as the

2      spacer falling below the wellhead, that fluid

3      with the density it has, it can cause some change

4      in balances of two columns of fluid.

11:32  5            If you don't know that that spacer

6      actually -- or take care of that spacer -- has

7      already fallen below the wellhead, that can

8      cause -- possibly can cause -- I'm not saying it

9      did cause, but it can cause a balance, say,

11:32 10      between the kill line, if you want to call it,

11      and that spacer that is exerting additional

12      hydrostatic pressure on the formation below.

13            Say a U-tube.  You take, you know,

14      U-tube.  Both of those communicate the same

11:32 15      container.  If at anytime you unbalance one of

16      those, you're going to see an increase change in

17      pressure on the other one.  Okay?

18         Q.  In any event, whether the anomaly, that

19      is, the 1400 on the kill -- the 1400 on the drill

11:33 20      pipe, I should say, and the zero on the kill line

21      was caused by trapped pressure or whether it was

22      because a valve wasn't properly lined up or

23      whether it was caused by some other force, it

24      still could not be considered a successful

11:33 25      negative pressure test?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  In my opinion, the answer, it should not,

2    because there is unsuccessful test.

3    Q.  Thank you.  Could you turn -- maybe we

4    don't have to.  Do you know how long the

11:33   5    conversation between Mr. Vidrine and Mr. Hafle

6    lasted, this 8:52 conversation?

7    A.  I don't have the faintest idea, no, sir.

8    Q.  Let's see if we can figure that out.

9    Okay?

11:33  10        Could you turn to Exhibit -- I'm sorry --

11   Tab 5 in your binder --

12   A.  Tab 5.

13   Q.  -- which is Exhibit 3575.

14   A.  Okay.  I'm on Page 6 of 3575.  Okay.

11:34  15   Q.  And for your counsel's benefit, the tab

16   after that is Exhibit 7138, which is the actual

17   phone log.  What I've asked you to look for,

18   Professor, Exhibit 3575 is the summary made from

19   the actual phone log.  Okay?

11:34  20        MR. REGAN:  Thank you.

21   Q.  (BY MR. UNDERHILL)  And do you see seven

22   entries down there a conversation -- or I should

23   say a telephone record, April 21st, 2010, 12:47

24   a.m.?  Do you see that?

11:34  25   A.  Let me -- are you looking at the first

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.   And do you see that the hang-up time was

2    at 9:02 p.m. central daylight time?

3    A.   I see that.

4    Q.   And that would be a conversation that

11:36  5   lasted 10 minutes and 9 seconds?

6    A.   I see that, sir.

7    Q.   So if the call started at 8:52 p.m.

8    between Mr. Vidrine and Hafle, then it would have

9    ended at 9:02 p.m. if it was 10 minutes in

11:36  10   duration, correct?

11   A.   That's what it shows.

12   Q.   So if this document is correct and the

13   logs upon which it was based are correct, then

14   Mr. Vidrine and Mr. Hafle had a 10-minute

11:36  15   conversation that night, right?

16   A.   What the document shows.

17   Q.   And if they hung up the phone at 9:02

18   p.m. on April 20th, that would have left 47

19   minutes, roughly, before the first of the

11:37  20   explosions occurred before the rig, right?

21   A.   Yes, sir.

22   Q.   And if the hydrocarbons passed above the

23   BOP stack at 9:38 p.m., that would mean there was

24   a 36-minute gap between the hang-up and when the

11:37  25   hydrocarbons passed above the BOP, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1         A.  If you calculated those minutes, take
 2    your word for it.
 3         Q.  Well, I mean --
 4         A.  Yes, sir.
11:37 5    Q.  -- it's fairly simple math, correct?
 6         A.  Yeah, it's -- yes, correct.
 7         Q.  Just looking at the document itself,
 8    Exhibit 296 --
 9              MR. REGAN:  Would you like him to
11:37 10   refer back to it?
11              MR. UNDERHILL:  Please.
12              MR. REGAN:  Do you happen to recall
13    which tab number?
14              MR. UNDERHILL:  Tab 3, Page 6.
11:38 15             MR. REGAN:  Thank you.
16         A.  Okay.
17         Q.  (BY MR. UNDERHILL)  Now, Mr. Vidrine was
18    one of those well site leaders that had been
19    involved in a negative pressure test, right?
11:38 20   A.  Correct.
21         Q.  And he would have been the well site
22    leader that on BP's behalf approved the negative
23    pressure test that night, right?
24         A.  I agree.
11:38 25   Q.  And Mr. Vidrine was aware that he had
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     approved the negative pressure test despite the

2     fact that it had a 1400 on the drill pipe and

3     zero pounds' pressure on the kill line, correct?

4         A.   Correct.

11:38   5         Q.   And just based upon this document,

6     Exhibit 296, the senior drilling engineer in

7     Houston for BP, Mr. Hafle, had told Mr. Vidrine

8     sometime in this ten-minute conversation between

9     8:52 and 9:02 p.m. that "You can't have a

11:39  10     successful negative pressure test if you have

11     this differential pressure between the drill pipe

12     and the kill line," correct?

13         A.   That's what this document states.  Couple

14     of statements out of here.  An interview.

11:39  15         Q.   Okay.  So if this statement or this

16     document is correct, taking the words at face

17     value, I'm not asking you to put yourself in

18     Mr. Vidrine's mind or Mr. Hafle's mind.  Just

19     based upon the words on Exhibit 296, Mr. Vidrine

11:39  20     had been told that the negative pressure test he

21     had approved with 1400 on the drill pipe and zero

22     on the kill can't be a successful negative

23     pressure test, correct?

24             MR. REGAN:  Object to form.

11:39  25         Q.   (BY MR. UNDERHILL)  Just based upon the

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  (BY MR. UNDERHILL)  I don't want you to

2     do any of those things.

3               MR. REGAN:  Object to the form.

4          Q.  (BY MR. UNDERHILL)  I just want you to

11:40  5     read the document with me according to what BP's

6     Bly investigators wrote down when they

7     interviewed Mr. Hafle.  Okay?  That's all we're

8     doing.

9               Okay.  So based upon what the document

11:41 10     says, Exhibit 296, Mr. Hafle, senior drilling

11     engineer in Houston, told Mr. Vidrine, well site

12     leader on the rig, quote:  Mark said he told Don

13     that you can't have pressure on the drill pipe

14     and zero pressure on the kill line in a test

11:41 15     that's properly lined up.  Close quote.

16               That's what he said, according to the

17     document, correct?

18          A.  Right.

19          Q.  And you agreed with Mark on that

11:41 20     assessment, correct?

21          A.  I agree.  Correct.

22          Q.  So now Mr. Vidrine, according just to

23     this document, Mr. Vidrine has now been told,

24     according to this document, by Mr. Hafle, senior

11:41 25     drilling engineer in Houston, that:  That

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Okay.

2    Q.   I think we agree.

3         MR. REGAN:   Just do questions and

4    answers.

11:43   5    Q.   (BY MR. UNDERHILL)   So according to this

6    document, Mr. Vidrine now has information that

7    that negative pressure test that he has

8    previously approved can't be considered a

9    successful negative pressure test based upon what

11:43   10   Mr. Hafle told him, according to this document?

11        MR. REGAN:   Object to the form.

12   Q.   (BY MR. UNDERHILL)   Correct?

13   A.   Correct.

14   Q.   Now, do you have any evidence whatsoever,

11:43   15   any evidence, any testimony, any documents, any

16   interview notes that Mr. Vidrine, after he hung

17   up with Mr. Hafle at 9:02 p.m. on April 20th,

18   that Mr. Vidrine went down and provided this

19   information to anybody aboard the rig?

11:43   20   A.   I'm not aware of that, no, sir.

21   Q.   Are you aware of whether Mr. Vidrine went

22   down to the driller's shack and said,

23   "Transocean, that test that we collaborated on

24   and jointly approved, are you aware, in fact,

11:44   25   that it wasn't a successful negative pressure

1   test"?

2      A.  I'm not aware of that, sir.

3      Q.  I want to be sure about this.  Do you

4   have any information -- I don't care whether it's

11:44  5   hearsay, somebody told you in a room, a bar, a

6   classroom, passed you a note, do you have any

7   information whatsoever that Mr. Vidrine took any

8   action after he hung up the phone with Mr. Hafle

9   to go warn the Transocean crew that:  That

11:44  10  negative pressure test we approved should not be

11   considered a negative pressure test that's

12   successful?

13      A.  No, sir, I don't have any knowledge.

14      Q.  And when Mr. Hafle and Mr. Vidrine hung

11:45  15  up the phone at 9:02 p.m., the well, according to

16   the OLGA modeling, had already been flowing for

17   approximately 12 -- pardon me -- ten minutes,

18   right?

19      A.  Yes, sir.

11:45  20      Q.  If the well had already been flowing for

21   ten minutes already when they hung up the phone,

22   does that mean that a kick was underway?

23      A.  Yes.

24      Q.  And as we've already gone through in your

11:45  25  book, a kick, if not controlled, becomes a

**PURSUANT TO CONFIDENTIALITY ORDER**

1      blowout, does it not?

2           A.   It does.

3           Q.   And, in fact, a blowout occurred sometime

4      that evening before 10 o'clock, did it not?

11:45   5           A.   That is correct.

6           Q.   So you have no information, no

7      documentation, nothing whatsoever to indicate

8      that Mr. Vidrine took action to prevent the

9      blowout after he took -- after he hung up the

11:45  10      phone with Mr. Hafle at 9:02?

11           A.   No, sir.

12           Q.   Reverse it a little bit.   Do you have any

13      information at all, testimony, documents,

14      hearsay, hints, anything, to indicate that

11:46  15      Mr. Hafle took action after he hung up the phone

16      with Vidrine at 9:02 p.m. to warn anybody that

17      they had an unsuccessful negative pressure test

18      and a potential kick underway?

19           A.   No, sir.

11:46  20           Q.   So you have no documents, no testimony,

21      no information whatsoever that two BP employees,

22      the well site leader, Vidrine, and senior

23      drilling engineer in Houston, Hafle, took any

24      action after the 9:02 conversation, 9:02 p.m.

11:46  25      conversation, to warn anybody that the negative

**PURSUANT TO CONFIDENTIALITY ORDER**

1    pressure test they declared successful at 7:55

2    p.m. in fact should not be considered a

3    successful test?

4                    MR. REGAN:   Object to form.

11:47  5         A.   No knowledge of that.

6         Q.   (BY MR. UNDERHILL)   You have no

7    information that they gave any warning to anybody

8    aboard the rig, do you?

9         A.   No, sir.

11:47  10                    MR. REGAN:   Objection; form --

11   objection.

12        Q.   (BY MR. UNDERHILL)   You have no

13   information that they took any action to inform

14   the cook aboard the rig that they were

11:47  15   potentially going to have a blowout sometime that

16   evening?

17                    MR. REGAN:   Form.

18        A.   No, sir.

19        Q.   (BY MR. UNDERHILL)   You have no

11:47  20   information that Hafle or Vidrine took any action

21   to warn the steward aboard the rig that they were

22   potentially in danger, do you?

23        A.   No, sir.

24        Q.   You have no information that they took

11:47  25   action, Vidrine or Hafle, after 9:02 p.m. to warn

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the drillers that "Fellows, you better watch out,

2    monitor your equipment, we might have a blowout

3    underway."   You don't have any of that, do you?

4                MR. REGAN:   Object to the form.

11:47  5    A.   No, sir.

6    Q.   (BY MR. UNDERHILL)   You don't have any

7    information that Vidrine or Hafle took action to

8    warn the mud logger "Hey, guy, monitor your

9    equipment.   We have an anomaly.   We might have a

11:48  10    blowout underway."   Do you have any information

11    they warned the mud logger?

12    A.   No.

13                MR. REGAN:   Object to form.

14    A.   No, sir.

11:48  15    Q.   (BY MR. UNDERHILL)   Leave the word

16    "warning" out of it.   Do you have any information

17    they provided the mud logger information "We have

18    an anomaly that may indicate we have a blowout

19    occurring"?   Do you have any indication they gave

11:48  20    him that information?

21    A.   I'm not aware.

22    Q.   Take the word "warning" out of it with

23    respect to the drillers.   Do you have any

24    indication, any evidence, any documents, any

11:48  25    testimony, back of a matchbook cover, bar napkin,

1    you name it, that Hafle or Vidrine took action

2    after 9:02 p.m. to provide information to

3    Transocean's driller and/or its toolpusher and/or

4    its OIM to say, "We have an anomaly that hasn't

11:48  5    been explained.  We don't have a successful

6    negative pressure test.  Look at your equipment

7    to find out what's going on"?

8              MR. REGAN:  Object to form.

9         A.  I'm not aware of that.

11:49  10        Q.  (BY MR. UNDERHILL)  Do you have any

11    information that Hafle and Vidrine after

12    9:02 p.m. told the driller or the drill crew

13    "Shut in that well to find out what's going on.

14    Shut it in, then investigate why the anomaly was

11:49  15    there"?  Any indication?

16        A.  No, sir.

17        Q.  Do you have any information, any

18    documents, any testimony that after 9:02 p.m.

19    Vidrine and Hafle called anybody aboard the rig

11:49  20    to say, "Monitor your equipment.  Take special

21    care, fellows.  Find out what this anomaly is,

22    find out if we have a blowout that's under way"?

23        A.  No, sir.

24        Q.  Do you have any indication that after the

11:49  25    9:02 p.m. Hafle and Vidrine took any action to

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    tell the driller, "Monitor your equipment with

 2    extra special care to determine if we have a

 3    problem"?  Do you have any indication of that?

 4        A.  No, sir.

 5        Q.  So to sum up a long series of questions,

 6    you have no indication, no documents, no

 7    testimony, no nothing to indicate that Vidrine

 8    and Hafle took any action after 9:02 p.m. to

 9    prevent that blowout?

10              MR. REGAN:  Object to form.

11        A.  No, sir.

12        Q.  (BY MR. UNDERHILL)  You're aware that 11

13    people died that night, are you not?

14        A.  With respect, sir, I am aware of it, and

15    I know the feeling because I've lost a son --

16        Q.  So --

17        A.  -- in an accident.

18        Q.  -- in the 47 minutes between the hang up

19    and the first explosion, 11 men had 47 minutes of

20    their lives to live, right?

21        A.  Right.

22        Q.  But yet you can find no indication, no

23    documents, no testimony, no nothing that Vidrine

24    and Hafle took any action whatsoever to try to at

25    least find out why the negative pressure test had
```

11:49

11:50

11:50

11:50

11:50

11:50

**PURSUANT TO CONFIDENTIALITY ORDER**

1   those anomalies that, if studied properly, should

2   have indicated it was not a successful negative

3   pressure test?

4               MR. REGAN:  Object to form.  Asked

11:51  5   and answered.

6               You can answer again.

7       A.  I -- I have to say that the

8   responsibility is a collective responsibility,

9   not on the part of the operator, but on the part

11:51  10   of the contractor as well.  It was a collective

11   effort, a collaborated effort on both.  And in my

12   opinion -- and either one of them on the rig

13   floor, the rig crew, or the well site leader,

14   have had -- ever had any doubt whatsoever that

11:51  15   that test was not successful, they would not have

16   proceeded because they know the outcome, what it

17   would be, which is the outcome that you and I

18   have seen.

19       Q.  (BY MR. UNDERHILL)  Thank you.  So if the

11:51  20   well site leader, to use your words, had any

21   indication, any indication that that test was not

22   successful, they should not have approved the

23   test, correct?

24               MR. REGAN:  Object to form.

11:52  25       A.  If he had any doubt that the test is not

PURSUANT TO CONFIDENTIALITY ORDER

1      successful, he should have stopped.

2          Q.   (BY MR. UNDERHILL)   And in a conversation

3      between 9:02 p.m. and eight -- strike that.

4              Between 8:52 and 9:02 p.m., Mr. Hafle,

11:52  5  according to Exhibit 296, had told Vidrine:   You

6      can't have a successful negative pressure test

7      with differential pressure on the drill pipe and

8      the kill line?

9              Correct?

11:52  10      A.   Correct.

11              MR. UNDERHILL:   Let's take our

12     break.

13              THE VIDEOGRAPHER:   The time is

14     11:52 a.m., and we're off the record.

11:52  15              (Break.)

16              THE VIDEOGRAPHER:   The time is

17     12:01 p.m., and we're back on the record.

18         Q.   (BY MR. UNDERHILL)   Continuing on,

19     Professor.   I want you to assume that the

12:01  20  driller, the Transocean driller, had information

21     that would cause him to shut in the well.   Okay?

22     Let's assume he came to that conclusion on his

23     own.   He looked at something in his monitor,

24     whether drill pipe pressure, other data, and

12:01  25  said, I think I've got an anomaly.   I need to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    shut in the well and investigate.

2            I want you to assume that.  Okay?  Are

3    you with me?

4        A.  (Witness nods.)

12:01  5        Q.  You have to answer audibly.

6        A.  Well, I'm thinking here.  Again, repeat

7    the question, please.

8        Q.  Sure.  This is a hypothetical.

9        A.  Okay.

12:02  10        Q.  I want you to assume in my question, or

11    questions, that the Transocean driller looks at

12    all his equipment, he determines that there is

13    some type of an anomaly that leads him to

14    conclude he needs to shut in the well to prevent

12:02  15    a blowout.  With me so far?

16        A.  Yes.

17        Q.  Okay.  Fairly simple question.  Can you

18    give me a ballpark how long it actually takes to

19    shut in the well?  And earlier on we went through

12:02  20    a series of questions where you indicated that

21    you had stopped the pumps, closed the annular,

22    stripped if necessary, at which point you have a

23    shut-in well.  How long does that procedure take?

24        A.  Again, not being a driller myself and

12:02  25    going through these operations, you're not

1   talking in -- in an hour.  You're probably

2   talking a few minutes, or maybe less than a

3   minute, depending on the condition, you know,

4   where you are or what you're doing.

5       Q.   Let's give ourselves some cushion.  Do

6   you think it should be able to -- he should be

7   able to do that within five minutes?

8       A.   I assume they should be able to.  Again,

9   that's knowing the automation and well control

10  and equipment and the communication from a button

11  here on the surface and 5,000 feet below.  It

12  shouldn't take five minutes to communicate

13  between your BOP.

14      Q.   Should not take five minutes?

15      A.   Should not take five minutes --

16      Q.   Meaning it --

17      A.   -- right.

18      Q.   -- should be sometime less than five

19  minutes?

20      A.   Again, I cannot exactly answer that

21  question, but in minutes.

22      Q.   Got it.  So according to the telephone

23  logs, Mr. Vidrine and Mr. Hafle hung up the phone

24  at 9:02 p.m. on April 20th, correct?

25      A.   Correct.

1    Q.   I want you to assume that Mr. Vidrine

2    hangs up the phone and he takes a few moments to

3    think about the conversation he just had with

4    Mr. Hafle.   And I want you to assume that at

12:04    5    9:10 p.m., eight minutes after he hung up the

6    phone, he decides, I'm going to inform the

7    driller that we have an anomaly that needs to be

8    investigated and to shut in the well.

9         You with me so far?

12:04    10    A.   Yes, sir.

11    Q.   Picks up the phone in his stateroom.

12    Let's assume he's not even on the rig floor.   He

13    picks up the phone in his stateroom, he calls the

14    driller and says, Shut it in.

12:04    15         On my hypothetical, and based upon what

16    you just testified to, do you think that the

17    driller should be able to shut in the well, say,

18    by 9:15?

19    A.   I would expect that, yes.

12:05    20    Q.   Okay.   And have you seen any documents to

21    indicate that, in fact, Mr. Vidrine was on the

22    rig floor at the time that the sheen test was

23    being performed?

24    A.   I'm not aware of that, sir.

12:05    25    Q.   Do you know what time the sheen test was

1   volumes, from 2250 hours to 2149 hours.

2        Correct?

3        A.   Yes, sir, that is correct.

4        Q.   And let's take the time tick there at

12:09  5   2120, which would be 9:20 p.m.  Do you see that?

6        A.   2120?

7        Q.   And then if we --

8        A.   Yes, sir.

9        Q.   And if we compare that with the vertical

12:09  10  axis of the graph, it indicates that according to

11  BP's OLGA modeling, at 9:20 p.m., approximately

12  somewhat over 100 barrels had been taken,

13  correct?

14       A.   That's what it looks like.

12:10  15       Q.   So hypothetical now, if at 9:20 p.m.

16  Mr. Vidrine had called down to the rig floor, or

17  if he's on the rig floor, spoken to the driller

18  personally, and said, We have an anomaly that

19  needs to be investigated.  Shut in the well --

12:10  20  based upon our previous discussion, they should

21  have been able to shut it in by at least

22  9:25 p.m., correct?

23       A.   I presume.

24       Q.   And if we go over another few minutes to

12:10  25  9:30 p.m., 2130, do you see that?

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.   Yes, I do.

2            Q.   Actually, the graph indicates that -- and

3       I'm quoting from it:   Cumulative gain at

4       2130 hours, 280 barrels, correct?

12:10   5       A.   I see that.

6            Q.   And 2130 would be 9:30 p.m., would it

7       not?

8            A.   I see that.

9            Q.   A 230-barrel kick is a big kick, is it

12:11   10      not?

11           A.   Very big kick.

12           Q.   And if they had done a flow check by that

13      time, would it be fairly easy to determine that

14      they had a blowout -- or I should say a kick

12:11   15      underway?

16           A.   Not if they have a flow check.   If,

17      actually, they were properly monitoring the flow

18      return, they should have detected that kick way

19      back before the 100 barrels came in.

12:11   20           Q.   Got it.   So let's assume, again, that at

21      9:30 p.m. Vidrine either phones or goes

22      face-to-face with the driller and says at

23      9:30 p.m., We have an anomaly that needs to be

24      investigated.   Shut in the well, the driller

12:11   25      should have been able to accomplish that by at

**PURSUANT TO CONFIDENTIALITY ORDER**

1       least 9:35 p.m., correct?

2           A.   Assuming that the riser has not unloaded

3       yet.

4           Q.   Correct.  Correct.

12:11  5           A.   Yeah.

6           Q.   And I think you'll recall earlier on,

7       according to the Bly report at another page, the

8       hydrocarbons did not pass the BOP stack,

9       according to OLGA modeling, until 9:38 p.m.,

12:12  10      correct?

11          A.   I think I remember the time

12      approximately.

13          Q.   Okay.  So if Vidrine at 9:30 says to a

14      Transocean driller, We have an anomaly, it needs

12:12  15      to be investigated.  Shut in the well right now,

16      he should have been able to perform that job --

17      "he" being the driller -- at least by 9:35 p.m.,

18      correct?

19          A.   Correct.

12:12  20          Q.   And that would be a rough approximately

21      three minutes before the hydrocarbons passed

22      above the BOP, correct?

23          A.   That -- approximately, yes.

24          Q.   And if they had done that, under my

12:12  25      hypothetical, they would shut in the well, at

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that point they have well control, do they not?

2         A.   Yes, before the riser unloading or before

3    the kick flow had -- already had entered the

4    riser.   Once it got to the riser, it's very

12:13  5    difficult to have well control.

6         Q.   But under my hypothetical, they'd now

7    accomplished well control by at least 9:35,

8    which, according to the BP OLGA modeling, is

9    roughly three minutes before hydrocarbons pass

12:13 10    above the riser?

11         A.   Yes, sir.

12         Q.   We -- got it.

13         A.   Yes, sir.

14         Q.   And so at that point they would have

12:13 15    accomplished well control, would they not?

16         A.   Yes, sir.

17         Q.   And then they would have proceeded to

18    circulate out the kick from the casing, would

19    they not?

12:13 20         A.   Again, it depends on the size of the

21    kick, you know, what situation they are in.   I

22    don't know exactly -- when you have that kind of

23    a kick, that big of a kick of 200 barrels or

24    250 barrels, it can pose an extremely critical

12:13 25    conditions on well control.   It is very -- the --

**PURSUANT TO CONFIDENTIALITY ORDER**

1       Q.  Would that indicate to you that they have

2    not been informed by Mr. Vidrine yet, if at all,

3    that, in fact, the negative pressure test that

4    they'd collaboratively determined as being

12:16  5    successful was, in fact, not a successful test?

6                MR. REGAN:  Object to form.

7       A.  If I have any doubt -- if I have any

8    doubt whether the rig crew, any one of the rig

9    crew or the well site leader, any doubt

12:17 10   whatsoever that this may be at -- at 9:31, they

11   were -- the rig crew were investigating, they

12   must have had some doubt.

13          Before I shut down the pump and try to

14   discuss it, I shut down the well first and then

12:17 15   let's talk about, you know, what is causing this

16   anomaly, not discuss the anomaly while the well

17   is open.

18          Shut in the well, number one.

19   Responsibility of the driller, shut in the well.

12:17 20   Shut in the well.  That's number one.

21                MR. MURPHY:  Object to the form.  I

22   can't resist.

23       Q.  (BY MR. UNDERHILL)  So -- so, again, when

24   Transocean's rig crew apparently were doing some

12:18 25   investigation before they had shut in the well,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    there's no indication to you that Mr. Vidrine

2    told them that, We need to redo the negative

3    pressure test to determine whether, in fact, the

4    anomaly is caused by a kick or not, correct?

12:18  5         MR. REGAN:  Object to form.

6         A.  I don't have any knowledge or information

7    of that, no, sir.

8         Q.  (BY MR. UNDERHILL)  Are you aware that

9    some of the men who died that night, Transocean

12:18 10   crew that died that night, were involved in the

11   negative pressure test?

12        A.  I assumed they were, yes, sir.

13        Q.  And I take it your opinion is that

14   whomever they were, whatever their names, the

12:18 15   Transocean crew who had, along with BP, declared

16   the negative pressure test a success, that they

17   did so erroneously, correct?

18        A.  I agree.  They made a mistake.

19        Q.  So despite their mistake, they didn't

12:19 20   deserve to die, did they?

21        A.  I'm sorry.  Repeat.

22        Q.  Despite their mistake, if, in fact, it

23   was a mistake on their part, they didn't deserve

24   to die, did they?

12:19 25        A.  Absolutely not, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 75 of 83

1       Q.   And if someone had information that could

2   save them from their own mistakes, save their

3   lives despite their own mistakes, wouldn't you

4   hope that that person would give them the

12:19  5   information that could help them to save their

6   lives?

7       A.   I can't answer that question.

8       Q.   Really?

9       A.   I was not on the rig floor to know what

12:20 10   has happened between or among these individuals.

11       Q.   I'm not asking -- let's broaden it.

12   Leave aside this rig floor.  Wouldn't you hope

13   that anybody --

14       A.   I --

12:20 15       Q.   -- even hypothetically, even if --

16           MR. REGAN:   Let him ask the

17   question, then you can answer it.

18       Q.   (BY MR. UNDERHILL)   If they had

19   information that could save someone else's life,

12:20 20   save them from their own mistake, wouldn't you

21   hope that they would give them that information

22   to help them save their lives?

23           MR. REGAN:   Objection; form.

24       A.   Absolutely.

12:20 25       Q.   (BY MR. UNDERHILL)   I mean, that's the

158

1    human thing to do, isn't it?

2         A.   It is.

3         Q.   It's the right thing to do, isn't it?

4         A.   It is.

12:20   5    Q.   It's the moral thing to do?

6         A.   I agree.

7         Q.   If I had kind of information, you would

8    hope I would give it to you, would you not?

9         A.   I'd expect you to.

12:20   10   Q.   And if you had that information, would

11   you give it to me to save my life?

12        A.   I would.

13        Q.   Would you think it was your duty as a

14   human being?

12:20   15        MR. REGAN:   Objection; form.

16        A.   Absolutely.

17        Q.   (BY MR. UNDERHILL)   I don't care whether

18   it's a part of your job description or not,

19   wouldn't you do it for me just to save my life

12:21   20   because you're a good, caring, kind,

21   compassionate human being?

22        A.   If I have that information, I would share

23   it.

24        Q.   We expect that from each other, don't we?

12:21   25   As human beings, don't we expect that from each

**PURSUANT TO CONFIDENTIALITY ORDER**

1   other?

2          A.   I agree.

3          Q.   And this isn't a game of hide the

4   information, hide my mistakes.   The crew on the

12:21  5   rig -- and I include the well site leaders in

6   that -- they're there to try to help each other,

7   are they not?

8          A.   Absolutely.

9          Q.   And some of the men that died that night,

12:21  10  they had no part in the negative pressure test,

11  did they?

12         A.   I don't believe so.   If I -- you know, I

13  don't know exactly who and who was not, but

14  definitely nobody deserved to lose their life.

12:21  15  Nobody.

16         Q.   And their wives ashore, they didn't

17  deserve to lose husbands, did they?

18         A.   Absolutely not, sir.

19         Q.   Their kids -- I don't mean to make this

12:21  20  personal, but you said you lost a son, right?

21         A.   Yes, I have.

22             MR. REGAN:  Let's -- let's not make

23  it personal.

24             MR. UNDERHILL:  I understand.  I

12:22  25  understand.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. REGAN:  There is no jury here.

2    Let's ask questions and get answers.

3          MR. UNDERHILL:  Roger that.

4     Q.  (BY MR. UNDERHILL)  To sum it up, we

12:22  5    owe -- we owe to each other as human beings to

6    share information that could help save a life,

7    right?

8     A.  If I have information to share to prevent

9    an incident, yes, I do.

12:22  10    Q.  If Mr. Vidrine had information that night

11    that could have saved the lives of those 11 men,

12    save their families from losing loved ones, did

13    he have a responsibility to provide that

14    information to the Transocean drillers?

12:22  15          MR. REGAN:  Object to the form.

16    A.  I can't answer that question because I do

17    not know if Vidrine had discussed, told after the

18    fact is -- I don't know if he has or has not.  I

19    don't know.

12:23  20    Q.  (BY MR. UNDERHILL)  Precisely my -- go

21    ahead.

22    A.  Yeah.  If -- if I was in that position,

23    and I have information that potentially may cause

24    an incident, I definitely want to share with the

12:23  25    driller, but I don't know if he did or did not,

PURSUANT TO CONFIDENTIALITY ORDER

1   so my answer to the question is I don't know.

2       Q.   My answer -- my question to you was, if

3   he had that information, did he have the

4   responsibility to share it?

12:23   5       A.   Yes, sir.

6               MR. REGAN:   Object to the form.

7   Continue.

8       Q.   (BY MR. UNDERHILL)   But you have no

9   testimony, no documents, no hints, no hearsay, no

12:23   10  proof, no nothing that he did, in fact, share the

11  conversation that he had with Mr. Hafle for 10

12  minutes between 8:52 and 9:02 p.m., correct?

13              MR. REGAN:   Object to the form.   You

14  can answer.

12:24   15      A.   Repeat the question again one more time,

16  please.

17      Q.   (BY MR. UNDERHILL)   You have no

18  indication whatsoever that Mr. Vidrine shared

19  with the Transocean drill crew or anybody aboard

12:24   20  the rig the information that he was provided by

21  Mr. Hafle, according to the words written on

22  Exhibit 296?

23              MR. REGAN:   Object to the form.

24      A.   I'm not aware.   No information.

12:24   25      Q.   (BY MR. UNDERHILL)   Do you understand

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 80 of 83

1    that Mr. Vidrine -- if we just accept the words

2    in Exhibit 296 as being correct, do you

3    understand that he had it within his power to

4    save the lives of those 11 men?

5         MR. REGAN:  Object to the form.

6         A.  If the information he knew, and he

7    believed in it, and did not share it, or if he

8    did share it, which I don't know.  Yes, if that

9    information had been known to the driller, if it

10   is, in fact, the information that you're

11   referring to, yes, it would have saved a lot of

12   us a lot of problems.

13         Also, I would like to add, though, that

14   the rig crew prime responsibility, sir, the very

15   most prime responsibility is for them to detect.

16   They have the ultimate responsibility of

17   monitoring and detection of anything that

18   happened below that rotary table.  Anything.

19   Regardless what the other people, well site

20   leaders, whoever, think or believe.

21         Q.  Thank you.  So if I understand what you

22   just said, they also owe the responsibility to

23   each other?

24         A.  Agree.

25         Q.  Well site leaders to drillers, drillers

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit 1, Page 81 of 83

1    to well site leaders, well site leaders to mud

2    logger, mud loggers to everybody else, they all

3    owed and shared that responsibility to provide

4    information to one another that could help save

12:26    5    lives?

6         A.   I agree.

7         Q.   To save the environment?

8         A.   I agree, sir.

9              MR. UNDERHILL:   I think that's all I

12:27    10    have.   Thank you.   I'll reserve a half hour just

11    in case.   I probably won't need it, but just in

12    case.

13              MR. REGAN:   Off the record.

14              MR. UNDERHILL:   Thank you very much.

12:27    15    You've been very kind.

16              THE VIDEOGRAPHER:   It's 12:27 p.m.,

17    and we're off the record.

18              (Break for lunch.)

19              THE VIDEOGRAPHER:   The time is

01:34    20    1:34 p.m., and we're back on the record.

21                   EXAMINATION

22    BY MR. MURPHY:

23         Q.   Good afternoon, Dr. Azar.

24         A.   Good afternoon, sir.

01:34    25         Q.   My name is Richard Murphy, and I'm here

**PURSUANT TO CONFIDENTIALITY ORDER**

1   SUBSCRIBED AND SWORN to by me this _____ day of

2 _____, 2011.

3

4

5 _____

 TAMARA CHAPMAN, CSR

6 CSR NO. 7248; Expiration Date: 12-31-12

 Worldwide Court Reporters

7 Firm Registration No. 223

 3000 Weslayan, Suite 235

8 Houston, TX 77027

 (713) 572-2000

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**