# **EXHIBIT 6**

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

3

   IN RE:  OIL SPILL       MDL NO. 2179
4  BY THE OIL RIG
   "DEEPWATER HORIZON"    SECTION:   J
5  IN THE GULF OF
   MEXICO, ON APRIL       JUDGE BARBIER
6  20, 2010               MAG. JUDGE SHUSHAN

7

8



14        Deposition of **DAVID C. SIMS,** taken
15  in the Pan American Life Center, Bayou
    Room, 11th Floor, 601 Poydras Street, New
16  Orleans, Louisiana 70130, on Wednesday,
    April 6, 2011.
17

18
    **APPEARANCES:**
19

20        WILLIAMS LAW GROUP, LLC
          (By:  Conrad S.P. (Duke) Williams,
21             III, Esquire and J.
               Christopher Zainey, Jr.,
22             Esquire)
          909 Poydras Street
23        Suite 1650
          New Orleans, Louisiana  70112
24           (Attorneys for MDL plaintiffs)

25

1    which exhibit we were on before?  I may be

2    mistaken.  Okay.  I'm sorry, go ahead.

3         MR. UNDERHILL:

4              Do you have the question in

5    mind, or do you need it again?

6         THE WITNESS:

7              I'm sorry.  I think --

8    EXAMINATION BY MR. UNDERHILL:

9         Q.     It's a real simple one.  The are

10   you going to fire me e-mail was on April

11   15th.  Exhibit 96, the seat of the pants

12   e-mail, was April 17th.  15 from 17 equals

13   two days later; right?

14        A.     Yes.

15        Q.     I heard your testimony in

16   response to counsel, we're going to go

17   through in a bit more detail.

18              When Mr. Guide advised you in

19   his e-mail of April 17th quote, the well

20   site leaders have finally come to their

21   wits' end, the quote it is internal quote

22   flying by the seat of the pants close

23   quote.

24              At any time after Mr. Guide

25   wrote you that e-mail, did you inform your

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1    superiors at BP, anybody above you in the

2    food chain, of what Mr. Guide had written

3    to you?   That's those sentences I just read

4    to you.

5         A.     No.   I do not recall doing that.

6         Q.     And if I also heard your

7    testimony correctly, at no time between the

8    time that Mr. Guide sent that e-mail to you

9    on April 17th, up until at least the time

10   of the blowout of the DEEPWATER HORIZON, at

11   no time in that three-day interval can you

12   recall having discussed this e-mail with

13   Mr. Guide; correct?

14        A.     That is correct.

15        Q.     And your -- I won't use the word

16   spin -- your interpretation of what

17   Mr. Guide was telling you was what?

18               Could you tell me again?

19        A.     When I read this e-mail I saw a

20   question about what is my authority and I

21   interpreted it as a frustration from John

22   with respect to changes that were occurring

23   on the well and the logistics issues that

24   were arising from that.   And so my response

25   was to address the what is my authority

1    question and attempt to give him some

2    support with respect to it's okay that

3    we're having these changes, we just need to

4    manage them as best we can.

5         Q.    And at no time between the time

6    you received this e-mail and the DEEPWATER

7    HORIZON blowout three days later did you

8    contact the well site leaders to ask them,

9    gentlemen, are you at your wits' end?

10              You didn't do that either; did

11   you?

12        A.    When I read this --

13        Q.    Could you answer my question?

14   Did you contact them in the intervening

15   three days and ask them words to the

16   effect, are you, in fact, at your wits' end

17   or are you not?

18        A.    When I saw Bob Kaluza on the

19   20th, I did not ask him if he was at his

20   wits' end but I did not observe while I was

21   there anybody at their wits' end.

22        Q.    And the day that you saw

23   Mr. Kaluza -- I want to make sure I get

24   this one right -- was the day that the

25   DEEPWATER HORIZON blowout occurred, a fire

1   occurred, an explosion occurred, 11 people

2   died and many were injured.

3           Is that the day that you talked

4   to Mr. Kaluza that you just referred to?

5       A.      Yes, it is.

6       Q.      April 20, 2010, that very day is

7   the day that you talked to Mr. Kaluza and

8   you came to the conclusion that nope, he's

9   not at his wits' end.

10          Have I got that right?

11      A.      That is correct.  Actually, I

12  did not talk to him about being at his

13  wits' end.  I did not observe chaos or I

14  did not observe him to be at his wits' end,

15  in my opinion.

16      Q.      And you did not ask him words to

17  the effect, whatever your perceptions were

18  or were not, you did not actually ask him

19  words to the effect, Mr. Guide sent me an

20  e-mail saying that you and possibly your

21  other well site leaders are at your wits'

22  end.  Well, Bob, are you at your wits' end.

23  You never asked him that, either; did you?

24      MS. KARIS:

25          Object to form.

```
 1          MR. GOFORTH:

 2               Object to form.

 3          THE WITNESS:

 4               No, I did not ask him that.

 5     EXAMINATION BY MR. UNDERHILL:

 6          Q.    So you didn't discuss it with

 7     Mr. Guide, you didn't discuss it with the

 8     well site leaders, you didn't discuss it

 9     with anybody above you in the BP reporting

10     chain.  Am I right so far?

11          A.    Correct.

12          Q.    What if Mr. Guide was right?

13     What if, in fact, your two well site

14     leaders aboard the DEEPWATER HORIZON, the

15     same two well site leaders that were there

16     on the day of the fire, explosion, the

17     blowout, the deaths, personal injury and

18     the pollution started, what if, in fact,

19     Guide was right?  They were at their wits'

20     end?

21          MR. GOFORTH:

22               Object to the form.

23          MR. CLARKE:

24               Object to form.

25          THE WITNESS:
```

1            I can't tell you what wits' end

2     is or what they would do if they were at

3     their wits' end.  I don't know what that

4     really means.

5     EXAMINATION BY MR. UNDERHILL:

6          Q.    But you never asked them; right?

7          MS. KARIS:

8                Object to form.

9          THE WITNESS:

10               I did not ask the question.

11    EXAMINATION BY MR. UNDERHILL:

12         Q.    And you didn't ask Mr. Guide;

13    did you?

14         MS. KARIS:

15               Object to form.

16    EXAMINATION BY MR. UNDERHILL:

17         Q.    Well, did you ask Mr. Guide?   I

18    think we've got it five times on the

19    record.

20         MS. KARIS:

21               Agreed.  So object to form.

22         MR. UNDERHILL:

23               So we can stipulate that he

24    didn't ask them.

25         MS. KARIS:

1          He's answered the question five

2     times, as you just stated.

3          MR. UNDERHILL:

4               Okay.  So we can stipulate to

5     fact that he did not, in fact, ask them.

6          MS. KARIS:

7               Object to the form.

8     EXAMINATION BY MR. UNDERHILL:

9          Q.    Did you ask him?

10         A.    Did I ask him what?

11         Q.    Are you at your wits' end?

12         A.    No, I did not.

13         Q.    Has it occurred to you since

14    April 20th of 2010 that maybe Mr. Guide

15    meant exactly what he wrote?  That, in

16    fact, the well site leaders were, in fact,

17    at their wits' end?  Has that occurred to

18    you?

19         MS. KARIS:

20              Object to form.

21         THE WITNESS:

22              I don't believe that I have

23    thought that they were at their wits' end

24    since that time period.

25    EXAMINATION BY MR. UNDERHILL:

1        Q.      So no introspection on that

2     score at all.  Have I got that right?

3        MS. KARIS:

4            Object to form.

5        THE WITNESS:

6            I don't know what you mean about

7     introspection.

8     EXAMINATION BY MR. UNDERHILL:

9        Q.      The same e-mail, sir.

10    Exhibit 96.  Going on.  Quote, the quote is

11    flying by the seat of our pants period

12    close quote.  Did you ask the well site

13    leaders at any time after that e-mail up

14    until the time that the blowout occurred

15    whether, in fact, they had told Mr. Guide

16    that they, the well site leaders, were

17    flying by the seat of their pants?

18        A.      No.  I did not.

19        Q.      Did you take those concerns, or

20    did you inform anybody above you in the BP

21    reporting structure that the well team

22    leader, Mr. Guide, had written an e-mail to

23    you saying that the well site leaders were

24    quote, flying by the seat of their pants,

25    close quote?

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

257

 1       A.      No.   I did not inform anyone.
 2       Q.      And, again, rather than your
 3  interpretation of what Mr. Guide meant, did
 4  you at least consider the possibility that
 5  he meant exactly what he wrote?  That your
 6  two company men, your two well site leaders
 7  aboard the DEEPWATER HORIZON were
 8  apparently, according to Mr. Guide, quoting
 9  them, flying by the seat of their pants?
10       MS. KARIS:
11              Object to form.
12       THE WITNESS:
13              After receiving the e-mail back
14  from John, no, I did not have a concern.
15  EXAMINATION BY MR. UNDERHILL:
16       Q.      So similar question before, what
17  if Guide was right, that they were, in
18  fact, flying by the seat of their pants?
19  The two company men, the two highest
20  ranking BP employees aboard the DEEPWATER
21  HORIZON.  What if he was right?
22       MS. KARIS:
23              Object to form.
24       THE WITNESS:
25              Despite everything we know about

1    what happened, I don't know what, if he was

2    right with me.

3    EXAMINATION BY MR. UNDERHILL:

4         Q.    Well, you never asked; right?

5         MS. KARIS:

6              Object to form.

7         THE WITNESS:

8              Never asked what?

9    EXAMINATION BY MR. UNDERHILL:

10        Q.    Whether the well site leaders,

11   in fact, had told Mr. Guide we're flying by

12   the seat of our pants?

13        MS. KARIS:

14             Object to form.

15        THE WITNESS:

16             I did not ask that question.

17   EXAMINATION BY MR. UNDERHILL:

18        Q.    And you made a judgment call as

19   to what Mr. Guide meant, but you never went

20   back to him and confirmed what he meant or

21   didn't mean.

22             You didn't go above him in the

23   BP reporting structure to say here's what

24   he said, you didn't go to the well team

25   leaders themselves to find out if that's

1    what they said, you did none of those.

2                   Instead, you relied upon your

3    judgment as to how you interpreted what

4    Mr. Guide put in an e-mail; correct?

5        MS. KARIS:

6                   Object to form.

7        THE WITNESS:

8                   When I saw John's e-mail back I

9    was comfortable that the issues were not

10   safety related.   And that was the

11   conclusion that I remained at.

12   EXAMINATION BY MR. UNDERHILL:

13       Q.      And when Mr. Guide wrote to you

14   that quote, this huge level of paranoia

15   from engineering leadership is driving

16   chaos, period close quote, you interpreted

17   that as not to raise any safety concerns;

18   correct?

19       MS. KARIS:

20                  Object to the form.

21       THE WITNESS:

22                  That's correct.

23   EXAMINATION BY MR. UNDERHILL:

24       Q.      Again, if Mr. Guide meant

25   exactly what he wrote, there was paranoia

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 7229-9   Filed 08/31/12   Page 14 of 30
260

1   and there was chaos.   What if he actually

2   meant that?

3        MS. KARIS:

4             Object to form.

5        THE WITNESS:

6             I can't say what would have

7   happened if he actually meant that.

8   EXAMINATION BY MR. UNDERHILL:

9        Q.    Well, we can say what did happen

10  on April 20th; can't we?

11       MS. KARIS:

12            Object to form.

13       THE WITNESS:

14            I think we know what happened on

15  April 20th, yes.

16  EXAMINATION BY MR. UNDERHILL:

17       Q.    But you never went back to

18  Mr. Guide and asked him whether he was

19  raising the safety concern and, instead,

20  you made a judgement call as to what you

21  thought he meant; correct?

22       MS. KARIS:

23            Object to form.

24       THE WITNESS:

25            I made a judgement call based on

```
 1    what I know of John, what I read into this

 2    e-mail and comfortable that the well site

 3    leaders or anyone else on the HORIZON or

 4    John himself would shut things down if he

 5    thought any safety concerns.

 6              That was my judgment.

 7    EXAMINATION BY MR. UNDERHILL:

 8        Q.    So your answer to my question

 9    is, yes, you made a judgment call; correct?

10        MS. KARIS:

11              Object to the form.

12        THE WITNESS:

13              I made a judgment based on his

14    e-mail, yes.

15    EXAMINATION BY MR. UNDERHILL:

16        Q.    Do you know Mr. Guillot?  And I

17    may mispronounce his name, G-U-I-L-L-O-T?

18        A.    Guillot.

19        Q.    Thank you.  Guillot.

20        A.    Can you give me a first name?

21        MR. UNDERHILL:

22              Help me out, anybody.

23        MS. KARIS:

24              Walter.

25    EXAMINATION BY MR. UNDERHILL:
```

1        Q.      Walter.   Do you know
2    Mr. Guillot?
3        A.      I've heard the name and I
4    probably met him.   I don't at this moment
5    recall.
6        Q.      Are you aware that he testified
7    under oath in this very same room that, in
8    fact, Mr. Guide should have shut the well
9    down?
10       MS. KARIS:
11              Object to form.
12       THE WITNESS:
13              I'm not aware of that.
14   EXAMINATION BY MR. UNDERHILL:
15       Q.      Are you aware that Mr. Guillot
16   was, at that time of his testimony and, to
17   my understanding, is now a BP employee?
18       A.      As I said, I don't recall or
19   remember exactly who he is.   But I'll
20   represent that you, you know, you're
21   telling me the truth.
22       Q.      Are you aware that he's a member
23   of the BP internal investigation team that
24   compiled the Bly, what's referred to as the
25   Bly report?

1          A.      No, I'm not.

2          Q.      Continuing on.

3                  Quote, Brian has called me

4    numerous times trying to make sense of all

5    the insanity period close quote.

6                  Did you report to anybody above

7    you in the BP reporting structure that

8    Mr. Guide, the well team leader for the

9    Macondo well, had told you that another

10   member of the team in Houston had used the

11   word insanity to describe the operation?

12         A.      No.  As John had used that word

13   along with other colorful words, some I've

14   heard in here before, I did not report that

15   up to anyone above me.

16         Q.      Did you talk to Mr. Morel after

17   receiving this e-mail on April 17th and

18   say, Brian, what's this about insanity, can

19   you clarify for me what you mean?  Did you

20   go to him and ask for such clarification?

21         A.      No, I did not.

22         Q.      So what if Mr. Morel, as quoted

23   by Mr. Guide, or paraphrased by Mr. Guide,

24   what if they were both correct, that this

25   was an operation that could be described

264

1    with a word insanity?

2              What if they were correct?  Did

3    you consider that?

4        MS. KARIS:

5              Object to form.

6        THE WITNESS:

7              I don't know what -- I don't

8    know what that would mean.

9    EXAMINATION BY MR. UNDERHILL:

10       Q.      Well, my point.  Did you seek

11   clarification from the people, Mr. Morel

12   who apparently said it and Guide who quoted

13   him in an e-mail to you?  Did you seek

14   clarification?

15       MS. KARIS:

16             Object to form.

17       THE WITNESS:

18             I believe I've answered, no, I

19   did not.

20   EXAMINATION BY MR. UNDERHILL:

21       Q.      The final sentence in the

22   e-mail, the operation is not going to

23   succeed if we continue in this manner,

24   period close quote.

25             I heard your testimony about

1    your interpretation of what Mr. Guide

2    meant.

3              Did you go back to him and ask

4    him what he meant by that sentence?

5         A.    No.  I don't recall doing that.

6         Q.    Did you report to anybody above

7    you in the BP reporting structure between

8    the date of the e-mail, April 17th, until

9    the explosion on the 20th, that Mr. Guide

10   had sent you an e-mail with that sentence

11   in it, stating quote, the operation is not

12   going to succeed if we continue in this

13   manner, close quote?

14        A.    No, I did not.

15        Q.    So, again, you made a judgment

16   call as to what Mr. Guide meant by that

17   sentence; correct?

18        A.    By the e-mail.

19        Q.    Correct?

20        A.    Yes.

21        Q.    And yet you didn't seek

22   clarification from him as to what he meant

23   by it; correct?

24        MS. KARIS:

25              Object to form.

1      THE WITNESS:

2            After receiving his e-mail back,

3   I did not seek further clarification.

4   EXAMINATION BY MR. UNDERHILL:

5        Q.      Have you ever heard the phrase

6   the buck stops here?

7        A.      I've heard that phrase.

8        Q.      Where did it stop in the

9   DEEPWATER HORIZON, in the Houston, the BP

10  side of that operation, excluding

11  Transocean, Halliburton, any contractors?

12  On the BP side and not on the rig, but

13  onshore, where did the buck stop?

14       MS. KARIS:

15            Object to form.

16       MR. UNDERHILL:

17            Let me make it specific.

18  EXAMINATION BY MR. UNDERHILL:

19       Q.      Where did the buck stop with

20  respect to safety of the rig, safety of the

21  crew, protection of the environment,

22  prevention of injury?  Where did it stop?

23       MR. GODWIN:

24            Object to the form.

25       THE WITNESS:

 1              I'm not sure what's your

 2     interpretation of the buck stops.

 3     EXAMINATION BY MR. UNDERHILL:

 4          Q.      Responsibility.

 5          MS. KARIS:

 6               Object to the form.

 7          THE WITNESS:

 8               We have a RACI chart that has

 9     responsibilities and accountabilities on

10     it.  And, you know, that, you could refer

11     to that.

12     EXAMINATION BY MR. UNDERHILL:

13          Q.      Well, okay.  Referring to that,

14     where does the buck stop?

15          A.      In multiple aspects to your

16     question and there's multiple places,

17     multiple responsibilities and

18     accountabilities.

19          Q.      I thought it was pretty simple.

20     Who's got ultimate responsibility in

21     Houston for safety of crew, safety of the

22     rig, safety of the environment, protection

23     from personal injury or death with respect

24     to the DEEPWATER HORIZON drilling the

25     Macondo well?  Who ultimately has that

1    responsibility in Houston for BP?

2        MS. KARIS:

3            Object to form.

4        THE WITNESS:

5            I don't know that there is one

6    person that has that.

7    EXAMINATION BY MR. UNDERHILL:

8        Q.    Well, did you have any of those

9    responsibilities?

10       A.    I have accountabilities for a

11   number of things.  John has

12   accountabilities.

13       Q.    Let's take them, let's tick them

14   off.  Did you have any responsibility for

15   safety of the rig, the DEEPWATER HORIZON?

16       A.    For responsibility for safety,

17   safety has a -- there's a lot of aspects to

18   that.

19       Q.    Okay.  Let's take the aspect of

20   11 lives that were lost.  You want me to

21   provide examples, sir, I'll provide you

22   examples.  11 people dead, did you have any

23   responsibility for the safety of those

24   crewmembers, or others that were killed?

25       MR. CASTAING:

1              Object to the form.

2         MS. KARIS:

3              Objection.

4         THE WITNESS:

5              In terms of responsibility for

6    Transocean, direct responsibility for

7    Transocean?

8    EXAMINATION BY MR. UNDERHILL:

9         Q.    No, no, no, no.  Safety.

10   Anybody aboard the rig, did you have any

11   responsibility?

12        MS. KARIS:

13             Object to form.

14        THE WITNESS:

15             I think there's lots of people

16   that have responsibilities.

17        MR. UNDERHILL:

18             I'm asking you, I'm asking if

19   you had.  There might have been ten million

20   people that shared responsibility.  My

21   question is to you.

22   EXAMINATION BY MR. UNDERHILL:

23        Q.    Did you have any responsibility

24   for safety of people aboard the DEEPWATER

25   HORIZON?

270

1           A.      On that day, as a visitor on

2    that rig, it's hard for me to say what my

3    responsibilities were.

4           Q.      Maybe I heard -- I didn't hear

5    an echo.  That wasn't my question.  I

6    didn't limit it to time, didn't limit it to

7    the day of the accident.  You, in your job

8    as -- what was your job title as of

9    April 20th?

10          A.      Drilling and completions

11   operations manager.

12          Q.      Within that context, within that

13   job, within its responsibilities, did you

14   have or share responsibilities for safety

15   of people aboard the DEEPWATER HORIZON?

16       MS. KARIS:

17               Object to form.

18       THE WITNESS:

19               I think everyone had parts of

20   responsibilities for safety.

21   EXAMINATION BY MR. UNDERHILL:

22          Q.      Great answer.  But now can you

23   answer my question?  Did you have any of

24   those responsibilities, whether it was a

25   millimeter of safety or whether it was a

1    galaxy of responsibility for safety, did

2    you have any responsibility for safety of

3    crew aboard the DEEPWATER HORIZON?

4         MS. KARIS:

5              Object to form.

6         THE WITNESS:

7              Indirectly, I think everyone did

8    and I'm included in everyone.

9    EXAMINATION BY MR. UNDERHILL:

10        Q.     Did Mr. Guide?  He's the guy who

11   reported to you, by the way.

12        A.     I believe that Mr. Guide, also,

13   had responsibilities in some ways for

14   safety.  As did everyone on the rig.

15   Transocean, BP, contractors.

16        MR. GODWIN:

17              Object to form.

18   EXAMINATION BY MR. UNDERHILL:

19        Q.     Can we agree that the cook and

20   the bed maker aboard the DEEPWATER HORIZON

21   had responsibility for safety under your

22   definition?

23        A.     Yes, we can.

24        Q.     Okay.  Now, can we agree that

25   the well team leader for DEEPWATER HORIZON,

1    just perhaps, shared a little bit more

2    responsibility for safety than the cook,

3    and the bed maker?

4            Can we agree on that?

5        A.    Depends on what situation you're

6    talking about.

7        Q.    Prevention of blowouts, how

8    about that one?

9        A.    In the hypothetical world, yeah,

10   I don't know where the cook and the bed

11   maker are going to be and I don't know

12   where John's going to be in that, I mean,

13   it's -- I don't know if I can --

14       Q.    I'm not cutting you off.

15   Please.

16       A.    I don't know if I can answer

17   that question.

18       Q.    So you can't tell me whether the

19   well team leader, Mr. Guide, has more

20   responsibility for safety aboard the rig

21   than the rig's cook or its maker of beds;

22   correct?

23       A.    John has some responsibility, as

24   we all do, for safety aboard the rig.

25       Q.    Could you answer my question?

273

```
1          A.        On that well.
2          Q.        Could you answer my question?
3     MS. KARIS:
4               Object to form.
5     EXAMINATION BY MR. UNDERHILL:
6          Q.        My question wasn't whether they
7     all shared safety, my question was whether
8     he has more responsibility for safety than
9     either the cook or the maker of beds aboard
10    the rig?
11         A.        In certain aspects, I would say
12    he has more.   In others, probably not more.
13         Q.        Agreed.   With respect to keep
14    the people from falling out of their bed or
15    eating bad food, I accept your answer that
16    the cook and/or the bed maker had more
17    responsibility.
18              But with respect to blowout
19    prevention, for example, do you think that
20    Mr. Guide has more responsibility for
21    safety than either the bed maker or the
22    cook?
23         A.        With respect to blowout
24    prevention, Transocean is, in my opinion,
25    who has responsibility for blowout
```

1    prevention.

2         Q.    I'll ask it again.  Can you

3    answer my question?  It wasn't Transocean I

4    asked about.  I'm asking whether Mr. Guide

5    had more responsibility for blowout

6    prevention than the cook or the bed maker

7    aboard the rig.  That was my question.

8         MR. GODWIN:

9              Object to form.

10        THE WITNESS:

11              For blowout prevention -- could

12   you explain blowout prevention?

13   EXAMINATION BY MR. UNDERHILL:

14        Q.    I think we got the point, sir.

15              How long -- well, maybe not.

16   How long have you been an employee for BP?

17        A.    28 years.

18        Q.    And you want me to define for

19   you what blowout prevention means?  Me, an

20   attorney.  I guarantee you I've never

21   worked for BP, never been aboard a rig,

22   never been to well control school.

23              So you want me to tell you the

24   definition of blowout prevention.  Have I

25   got that right?

1          A.       Blowout prevention has many,

2     many, many aspects.   From engineering to

3     operation.

4          Q.       Shift from Mr. Guide.

5                   Do you believe that you had more

6     responsibility for safety, such as

7     prevention of blowouts aboard the DEEPWATER

8     HORIZON, than did either the cook or the

9     maker of beds aboard the rig?

10         A.       You know, I would have to say

11    that -- I'm inclined to say yes, I have

12    more, but there's so many aspects of it,

13    some of which I don't have any

14    responsibility for.   So it's hard for me

15    to, it's hard for me to generalize.

16         Q.       You can't even make a

17    generalized statement that you had more

18    responsibility aboard the rig for blowout

19    prevention than do either the cook or the

20    bed maker?

21         A.       If you're talking about -- it

22    depends on the scenario.   If it's a kick in

23    the middle of the night and somebody misses

24    it and I'm in bed and, you know, how much

25    responsibility I have in any given scenario

276

1   until we define one, it's hard for me to

2   say.

3        Q.    Thank you, sir.  Let's shift

4   some gears, at least I think.  Very

5   briefly, turn to Exhibit 18, please.

6   Tab 18.  I'm sorry.

7        MR. UNDERHILL:

8             It will be marked as

9   Exhibit 1130.

10       MR. CASTAING:

11            1130?

12       MR. UNDERHILL:

13            Yes.

14            (Whereupon, the document

15   referred to was marked as Exhibit No. 1130

16   for identification.)

17   EXAMINATION BY MR. UNDERHILL:

18       Q.    Exhibit 1130, sir, is an e-mail

19   from Mr. Guide to you dated April 26th

20   post-sinking.  For the record, I'll quote

21   it.  As I have no assignment or direction

22   should I come to work tomorrow, question

23   mark, close quote.

24            Do you recall receiving that

25   e-mail?