

**DEEPWATER HORIZON CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| Applies to: *All Cases* | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

| | | | |
|---|---|---|---|
| **REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGE SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW** | | | |
| **STATUS REPORT NO.** | 1 | **DATE** | September 5, 2012 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig
"Deepwater Horizon" in the Gulf
of Mexico, on April 20, 2010

Applies to: *All Cases*

MDL NO. 2179

SECTION J

JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

## REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGE SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW

### STATUS REPORT NO. 1, DATED SEPTEMBER 5, 2012

The Claims Administrator of the Deepwater Horizon Economic and Property Settlement Agreement (the "Settlement Agreement") submits this Report to inform the Court of the current status of the implementation of the Settlement Agreement. The Claims Administrator will provide any other information in addition to this Report as requested by the Court.

### OPENING THE SETTLEMENT PROGRAM

On April 28, 2012, counsel for BP Oil and Class Counsel (collectively "the Parties") submitted the Settlement Agreement to the Court for preliminary approval. By Order on May 2, 2012, the Court preliminarily approved the Settlement Agreement and appointed Patrick A. Juneau as the Claims Administrator to oversee the implementation of the Settlement Agreement. The Claims Administrator and the Claims Administration vendors assisting him immediately undertook the task of building a system to receive and equitably process claims from the Class in accordance with the terms of the Settlement Agreement.

The Program's first priority was to design and construct everything necessary to open and permit Class Members to submit claims by June 4, 2012. That step necessitated extensive

planning, development and implementation of the many components of an efficient intake system. The crucial preparatory steps included:

(1) **Call Center:** Staffing, training and operating a toll-free call center to answer questions about the Program. Located in the Gulf, this Call Center provides assistance in several different languages and has handled over 150,000 calls since the inception of the Program.

(2) **Website:** Designing, programming and maintaining a public website, www.deepwaterhorizonsettlements.com, to provide materials and information to the Class. We have prepared and posted 165 Frequently Asked Questions on this website, where we also make available downloadable and printable PDF versions of the Registration Forms, Claim Forms and Instruction booklets, Sworn Written Statements, Tax Forms and Attorney Representation Forms needed by claimants.

(3) **Claim Forms and Instruction Booklets:** Drafting a Registration Form and 12 different Claim Forms to be used by Class Members to submit claims, along with Instruction Booklets for each Form to guide Class Members and their lawyers in the completion of claims. These Instruction Booklets listed the documents required by the Settlement Agreement for each type of claim.

(4) **Other Forms:** Drafting and making available 34 Sworn Written Statement Forms to assist claimants in complying with provisions in the Settlement Agreement requiring sworn statements to support a claim and four Authorization Forms required from claimants to permit the Claims Administrator to obtain certain information from other sources.

(5) **Class Notice:** Assisting in the issuance of the Notice to the Class. A personalized Notice was mailed to over 1,000,000 potential Class Members, emailed the Notice to over 330,000 recipients, handled all Notices returned as undeliverable, and performed on-going advanced address research on all such returned mail.

(6) **Comments from the Parties:** Working with the Parties and obtaining their input and comments on the Claim Forms, Instruction Booklets and Sworn Written Statement Forms.

(7) **Online Claim Submission:** Designing, coding and testing an interactive online intake system through which Class Members may complete Registration Forms and Claim Forms and upload supporting documents instantaneously.

(8) **Claim Form Signatures:** Working with the Parties on the terms of the Settlement Agreement regarding electronic signature of Claim Forms and designing, coding and testing the online system to permit lawyers to sign Forms for their clients and submit a power of attorney or other document authorizing them to do so.

(9) **Translations:** Translating the Registration Form, all the Claim Forms and Sworn Written Statements, as well as all online systems, into Spanish and Vietnamese.

2

(10) **Helpful Webinars:** Preparing and posting on the public Deepwater Horizon website 24 webinars in English, Spanish and Vietnamese instructing claimants and lawyers on how to use the online Claim Form system.

(11) **Questions to the Parties:** Identifying over 240 questions on the meaning of language and the intentions of the Parties as to various provisions of the Settlement Agreement and working with the Parties on repeated exchanges of those questions to obtain guidance from them to permit us to plan the implementation of the Program.

(12) **GCCF Data and Documents:** Obtaining and preparing for use all the data and documents on claims submitted to the Gulf Coast Claims Facility, including having that data ready for law firms to register their clients in this Program and for lawyers and claimants to get the benefit of pre-filled names, addresses and other identifying information in Claim Forms submitted online, to speed up completion of the Forms. We also prepared the GCCF data on prior Spill-related payments to be able to link them to the correct claimant and offset them against Program payments as required by the Settlement Agreement.

(13) **Databases from the Parties:** Obtaining from the Parties various databases on the property Zones used by the Settlement Agreement to define elements of eligibility and rendering those databases in a form usable for this Program.

(14) **Claimant Assistance Centers:** Locating and leasing offices for 18 Claimant Assistance Centers across the five Gulf States and a central claim office in New Orleans, arranging all signage, utilities and internet and other connections for them, and securing and training over 380 staff for those offices to be ready and able to assist claimants in submitting claims the day the Program opened.

(15) **Intake Center:** Locating and leasing an intake center in Hammond, Louisiana, for the receipt of hard copy materials from Class Members, designing the processes for the intake and scanning of such materials, designing, coding and testing the online screens for the tracking and linking of hard copy materials. This required identifying an available facility, placing it under lease, ensuring its access to full utilities and internet connections, and equipping it with the hardware necessary to perform the steps inherent in the intake process. We have secured and trained nearly 400 personnel to handle the intake of hard copy submissions and opened this fully functional facility on June 4, 2012. Since then, we have received, catalogued and scanned over 625,000 pages of forms and supporting materials.

(16) **Central Server System:** Designing, procuring and putting in place in a secure environment the servers and other hardware needed to allow the intake, review and payment systems in this program to operate reliably and quickly.

(17) **Interactive Web Portals:** Designing, coding and testing extensive secure interactive web interfaces or "portals" for lawyers and *pro se* Class Members to submit claims and documents, receive notices and information from the Claims Administrator, and view instantly the status of each claim and all notices from the Claims Administrator and alerts on developments in the Program, including preparing and posting an online User Manual to guide lawyers through the process.

3

(18) **Hard Copy Forms:** Setting up a process to mail hard copies of forms to claimants or lawyers who do not use the interactive online functions. We have mailed out over 150,000 hard copies of Registration Forms and Claim Forms.

(19) **Law Firm Contacts:** Identifying and training Law Firm Contacts to be assigned to every lawyer or firm filings claims in the Program, to provide each firm a personal contact for assistance and to answer questions about the process and the status of claims in the Program.

(20) **Centralized Email Help:** Staffing and training an email response team to provide immediate answers to emailed questions. We have replied to over 5,500 emails from this team alone, in addition to the claims review specialists who answer emailed questions about specifics of claims documents, forms and reviews.

(21) **Reports:** Designing, coding and testing detailed reports for use by the Claims Administrator and for posting publicly on the claims received in the Program. This includes designing and building a secure website for Class Counsel and BP to view reports.

All of the above tasks were completed and we opened the Program with all needed functions staffed and operating on June 4, 2012, just over 30 days after the Claims Administrator's appointment. We were equipped on that day to receive claims, answer questions from Class Members and their lawyers, and enter data and information from the claims and other forms being submitted. As shown in the Claims Report attached as Appendix A, as of September 4, 2012, we had received 58,049 Registration Forms and 49,708 submitted Claim Forms.

## STATUS OF THE CLAIMS REVIEW PROCESSES

### 1. Designing and Building the Review Modules

The Settlement Agreement provides the Class with benefits in 12 different Claim Types: (1) Seafood Compensation Program; (2) Individual Economic Loss; (3) Individual Periodic Vendor or Festival Vendor Economic Loss; (4) Business Economic Loss; (5) Start-Up Business Economic Loss; (6) Failed Business Economic Loss; (7) Coastal Real Property; (8) Wetlands Real Property; (9) Real Property Sales; (10) Subsistence; (11) VoO Charter Payment; and (12) Vessel Physical Damage. Many of these contain further benefit subcomponents. For example, the Individual Economic Loss Claim Type includes potential recoveries for Employment-Related Benefits, Reimbursable Job Training Costs, Reimbursable Job Seeking Costs, and One Time Non-Recurring Losses, while dividing the Individual claimants into four categories, depending on the quality and quantum of proof provided, along with distinctions among claimants for New Entrants, Seasonal Employees, and Employees with Less than 12 Months Earning History. The Seafood Program is actually 22 separate benefit systems.

4

This multiplicity of benefit types, combined with the detailed document requirements, eligibility criteria, and damage calculations prescribed by the Settlement Agreement and the directive in Section 4.3.8 of the Settlement Agreement that the Claims Administrator assess all possible combinations of Benchmark Period and Compensation Period on Individual Economic Loss and all the Business Economic Loss claim types, as well as all proof on Seafood Program claims to maximize the claimant's recovery, regardless of what the claimant asserted, presented a massive undertaking to the Claims Administrator as he prepared, simultaneously with all the steps needed to open the Program, to be ready to review claims and issue outcomes on them to claimants.

Each one of these benefit types necessitated designing, coding, testing and implementing separate claim review modules to be used by reviewers in an automated online system in which intricate software code performs the calculations and determines what required information is missing from the claim file. We have designed these systems to serve the two competing goals in claims review: (1) speed and (2) accuracy. This automated system, while demanding considerable thought and time to design and build, maximizes the speed at which reviews can be done and minimizes the chances for human error.

The review modules provide an automated flow that takes a submitted Claim Form through the system to a result and an outcome Notice of eligibility, denial, or incompleteness because missing documents required by the terms of the Settlement Agreement. We have completed all this work and have functioning review modules in use by our Claims Reviewers on all the many benefit systems provided by the Settlement Agreement, except for the two aspects of the Seafood Program, the Subsistence Program, and the system for review of Individual Economic Loss claims by claimants who had more than one job before and/or after the Spill, which present the most complex questions of Offsetting Earnings and finding the maximum Compensation Period for the claimant across all Claiming Jobs. All those additional Seafood and Individual Economic Loss review modules will be up and running no later than September 20, 2012. The Subsistence program, with the assistance of the recently appointed Court-Appointed Distribution Agent (the CADA), will be reviewing claims by September 20, 2012.

## 2. **Training Claims Reviewers to Assess Claims and Determine Claims Outcomes**

To be ready to review claims, we identified reviewers, prepared extensive training and testing programs, and trained the reviewers on each of the review modules needed to process all the benefit types in the Program, including accountant reviewers to perform the damage calculations on all the Business Economic Loss benefit types. We established a central claims review center in New Orleans, have hired over 280 personnel locally to serve in this Program, and continue to hire and train reviewers to reach maximum capacity.

We have organized and trained these reviewers into 12 teams to be specialists in the 12 primary claim types created by the Settlement Agreement. The first step of every review is Document Categorization, where we separate the electronic PDF images of documents in each claimant's claim file and assign to them document names we have predetermined for this Program, so that we can always tell what the document is when we look at the claimant's

5

electronic file on screen. In addition, we have coded financial document types that contain information required by the Settlement Agreement to calculate losses to prompt our reviewers to enter that data. That occurs in the next step of a review of any of the Economic Loss claim types. In that Data Capture step, reviewers must find payroll, tax return, profit and loss, financial statement, and other wage or revenue information in the documents submitted for any of the years submitted and transcribe that information into on-screen fields we designed and built to capture that needed data. We must retrieve all that information to perform the complex damage calculations and, on some claims, the causation analysis mandated by the Settlement Agreement. On files with large numbers of paychecks, trip tickets or other financial documents, this Financial Data Capture step can take hours, and on some claims has taken two days to complete.

At the conclusion of all the review screens and steps, we have a review result for each claim—Eligible, Denied, or Incomplete—that we send to the claimant or claimant's lawyer, if represented. For lawyers using an interactive web portal to submit and process their client's claims, and for unrepresented claimants who have signed on to use such an individual portal, we issue those notice outcomes electronically by posting them on the portals, which allows for immediate notice. For those not using this function, we mail a hard copy of the notice to them.

### 3. Implementing the Accountant Review Function

Our review system applies algorithms that we built to move claims through the steps after a claim reviewer completes one or more steps of the review process. On the Business Economic Loss claims, non-accountant reviewers perform all Data Capture and run the causation analysis and incompleteness review on Business Claimants, before forwarding the claims to the accountant reviewers for the loss assessment. We have 152 total accountants serving the program, with 149 of them working in New Orleans.

All Business Economic Loss claims that are eligible or potentially eligible are routed to the accountants for review, regardless of whether the Business Claimant has provided complete documentation. Accountant reviewers perform the compensation calculations on Business Economic Loss claims. This calculation involves an in-depth review of the business's monthly Profit and Loss statements to classify each of the Business Claimant's revenue and expense accounts as Variable or Fixed. It also requires accountant reviewers to reconcile the year-end revenue amounts from the claimant's financial statements to the gross revenue amounts on their annual Tax Returns. For particularly complex claims, the compensation assessment required by the Settlement Agreement can take a week or more to prepare. Accountant reviewers perform these calculations in Excel workbook templates and then upload those templates into the DWH Settlement Database Application, where the details of the calculation are stored and used to populate Eligibility Notices that we send to claimants.

The accountant reviewers finalize the incompleteness review on Business Economic Loss claims with incomplete documentation. Accountant reviewers often telephone claimants or their law firms to request specific documentation that the Settlement Agreement Framework requires that is missing from the claimant's file. If the claimant has not provided the requested

documentation within a reasonable time after our phone request, we will send an Incomplete Notice on the claim.

While the majority of Seafood Compensation Claims do not require review by a forensic accountant, accountant reviewers evaluate select Seafood Claims that meet specific criteria designed to identify the most complicated claims under the Seafood Compensation Program that will benefit most from analysis by an accountant. Accountant reviewers evaluate (1) combined Oyster Leaseholder/Oyster Harvester claims; (2) Boat Captain claims supported by financial documentation other than trip tickets; (3) claims from Shrimp Boat Captains who worked on multiple vessels of different specifications; (4) claims where the claimant may have a related Business Economic Loss claim (such as a seafood harvester who also processes its catch); (5) certain claims with a Final Compensation Amount greater than $250,000; and (6) Oyster Harvester and Leaseholder Lost Income and Combined Oyster Harvester/Leaseholder Claims where the revenue information starts after January 1, 2007. On these claims, the accountant reviewers identify the appropriate revenue inputs for each claim type and apply the strict compensation methodologies proscribed by Exhibit 10 to the Settlement Agreement. The amount of time required to perform a review of these Seafood Compensation Claims is comparable to the accountants' work on Business Economic Loss Claims.

### 4. Other Processes Necessary to Implement the Settlement Agreement

In addition to the elaborate preparations required to produce accurately functioning review modules run by trained reviewers, we also planned and are implementing the many other processes required to adhere to the terms of the Settlement Agreement, including:

(1) **Exclusions:** Training reviewers and designing, building and testing the systems to identify claims from entities or individuals not within the Class Definition or subject to any of the 19 groups or claim types excluded by the Settlement Agreement, including how to handle claimants who are subject to the restriction of no recovery for moratoria losses and how to identify "Defense Contractors" on a revenue basis as required by the Settlement Agreement.

(2) **Outcome Notices:** Drafting, coding and testing all the various outcome Notices needed to inform claimants of the results of our review of their claims, to provide detail on the calculations and benefits payable to eligible claimants, explain the basis of a denial, and explain what required documents are missing and made the claim incomplete, in English, Spanish and Vietnamese. These notices are automatically generated by our claims review system and also explain the options available to each claimant after the notice and how to pursue them. In addition, each notice provides a toll-free number to call and talk to a specialist about the notice, what it means and what happens next. We have identified and trained all these specialists.

(3) **NAICS Codes:** Designing, building, and training reviewers on the steps needed to indentify the North American Industry Classification Code (NAICS) to be assigned to each entity claimant and each employer of an individual claimant on all the Economic Loss claim types. The eligibility, causation and exclusions provisions in the Settlement Agreement depend heavily on assigning the correct NAICS number

7

to each entity in the program, including every employer of each Individual Economic Loss claimant.

(4) **Release Generation and Acceptance:** Designing, coding and testing the processes needed to generate the Release required of each claimant before we can issue payment, and planning and training reviewers on the criteria for accepting Releases and properly signed. This requires a different process than other signatures needed in the Program, for the Settlement Agreement mandates that these Releases be returned in hard copy form and with a "wet ink" original signature, unlike Claim Forms and other forms.

(5) **Payment:** Designing, coding and testing the processes for issuing payments by wire or check in the correct amounts to claimants with signed Releases.

(6) **Reponses to Incomplete Notices:** Designing, coding and testing the processes for review of materials submitted by claimants in response to a notice of an incomplete claim.

(7) **Reconsideration Process:** Designing, coding and testing the processes for claimants to seek Reconsideration within 30 days after an Eligible or Denial Notice, as required by the Settlement Agreement, and training reviewers to perform that Reconsideration. We built the system so that lawyers and claimant using an interactive portal can do this quickly online.

(8) **Appeals Process:** Designing, coding and testing the processes to permit claimants and BP to exercise their appeal rights under the Settlement Agreement after final results on claims. This has required working with the members of the Appeal Panel and designing and building a secure interactive web portal to be used by the Appeal Panel.

(9) **Documentation Reviewer:** Designing, coding and testing the processes to be used by the Documentation Reviewer for appeals by claimants from denials of claims as incomplete, as required by the Settlement Agreement.

(10) **Quality Assurance Steps:** Designing, coding and testing the processes for double-checking reviews and performing data analytics to detect possible errors in claims reviews. This required coding separate QA screens and training special QA reviewers.

(11) **Confidentiality:** Designing and implementing the steps to maintain the confidentiality of all claims information, while also permitting access by the claimant and the Parties to that information as required by the Settlement Agreement.

(12) **Guardian Ad Litem and Other Claimants with Special Circumstances:** Designing, coding and testing the processes for identifying claims from minor, incompetent, deceased, bankrupt, or dissolved claimants, as required by the Settlement Agreement, and working with the Guardian Ad Litem required by the Settlement Agreement on claims on behalf of minor and incompetent claimants.

(13) **Liens and Third Party Claims and Demands for Information:** Designing, coding and testing the processes for receiving, analyzing, tracking and responding to

liens asserted by lawyers and other third parties, and garnishments, subpoena and other legal process from third parties seeking to share in a claimant's recovery or to obtain information about claimants.

(14) **Identity Verification and Fraud Detection:** Designing, constructing, and training reviewers on systems to verify that the Social Security Numbers, Employer Identification Numbers or other Taxpayer Numbers used by claimants on claims were genuine and matched the claimant's name, and other data analytics and review steps to detect fraudulent claims submissions.

## 5. Progress on Reviewing Claims

We completed our first reviews and issued our first outcome notices on July 15, 2012. We issued our first payments to claimants on July 31, 2012. The report attached as Appendix B provides detail on the notices and payments issued to date. The non-Economic Loss claim types involve fewer documents and calculations, and thus have moved more quickly than the more complex steps required by the Settlement Agreement on the Economic Loss claim types.

### SPECIFIC PROCESSING ISSUES INVOLVING INCOMPLETE CLAIMS

We have reviewed over 8,100 claims since we began claims reviews in mid-July. We are escalating the pace of reviews as reviewers become more adept at these new systems and as we expand the number of reviewers who are fully trained and are producing reliable results. We have adopted the ambitious goal of issuing by October 1, 2012, notices (whether eligible, incomplete or denied) on at least 30% of the approximately 45,000.00 claims (other than the Subsistence claims) that we have received as of the date of this report. We plan to conclude the processing of all claims as rapidly as possible, while still trying to assure accurate outcomes.

At the outset of the Program, we compiled and circulated Instruction Booklets for each claim type in anticipation of claimants' need to access information on the Settlement Agreement documentation requirements. Each Booklet summarizes the document requirements of the Settlement Agreement and provides claimants with a handy list of documents. The Instruction Booklets are available online, by request and at each Claimant Assistance Center.

We became concerned, however, about the numbers of incomplete claims we are seeing in our reviews. The Settlement Agreement mandates that claimants submit certain types of documents for various time periods for each claim type. If a claimant had submitted a claim to the GCCF, we have the documents the claimant furnished to that program and the claimant need not re-submit them. The Settlement Agreement, however, requires many documents from claimants not required in the GCCF system. Of the claims reviewed thus far, overall around 40% are missing one or more documents that the Settlement Agreement requires us to have before we can call a claimant eligible and issue an offer of payment. Some claim types suffer from even higher deficiency rates. These incomplete claims come from both represented and pro se claimants equally; 52% of incomplete claims are submitted by represented claimants. Around 48% of the claimants with incomplete claims had claims with the GCCF.

For example, the Seafood Program presented an issue that affected many claims. The Settlement Agreement requires Vessel Owners, Commercial Fisherman Vessel Lessees, and Boat

9

Captains to provide documents, such as trip tickets, to allocate their annual revenues by catch type, vessel and landing site. If the claimant cannot furnish such trip tickets, the Settlement Agreement mandates that they submit (1) federal or state tax records showing their revenues and (2) "sufficient documentation" of vessel-specific and catch type-specific revenue derived from Seafood landed in the Gulf Coast Areas in the Benchmark Period. *See* Ex. 10 at 10-12, 14, 17-20, 31-32, 45-47, 56-58. Without this allocation information, the Claims Administrator must consider the claim incomplete.

As of September 1, 2012, 5,798 claimants have filed claims seeking compensation under the Seafood Program. Of them, 4,521 seek compensation as a Vessel Owner, Commercial Fisherman Vessel Lessee, or Boat Captain. Of the 3,352 of these claimants indicating on their Claim Form the type of proof of revenue they will submit, 50.6%, or 1,696, submitted trip tickets in support of their claims. The other 49.4% rely on tax and other financial information, and our reviews to date indicate that 100% of these claimants failed to submit sufficient documentation of the breakdown of their Benchmark Revenue by catch type, vessel and landing site.

Exhibit 10 to the Settlement Agreement provides expressly that, "[i]f necessary, the Claims Administrator may require supplemental information from the Claimant" to make determinations related to (1) the allocation of revenue from a certain catch type as compared to other sources and (2) the allocation of revenue for that catch type derived from landings in the Gulf Coast Areas. *See, e.g.*, Ex. 10 at 19. To streamline the claims process and generate significantly more payable outcomes without changing claims criteria, the Claims Administrator exercised his expressly granted authority and created a Sworn Written Statement to serve as sufficient information to allocate Benchmark Revenue shown in tax returns to specific vessels and specific catch types for Seafood landed in the Gulf Coast Areas.

This "Sworn Written Statement for Sufficient Documentation of Benchmark Revenue," or "SWS-1," became available to all claimants on the public website on July 31, 2012. The Claims Administrator promptly issued a formal portal alert to all registered law firms, proactively called law firms to notify them of the new Form, and posted SWS-1-specific FAQs on the public website. To date, we have received 456 completed SWS-1 Forms. If completed correctly, this SWS-1 Form will cure revenue allocation deficiencies and result in payable notices. Further, claimants may request on the form that the Claims Administrator use SWS-1 in lieu of any submitted trip tickets. If they do so, we can review a Seafood claim much more quickly, for we can omit the incredibly time-consuming step of data capturing trip tickets.

In addition to this issue in the Seafood Program, we have encountered a significant percentage of incomplete claims across all claim types, for various reasons. We assessed possible workarounds for such document requirements and explored possible alternative approaches with Class Counsel and BP. As we were not able to get resolution on all workarounds, such alternative measures or potential modifications to these requirements, the Claims Administrator will continue to adhere to the specifications of the Settlement Agreement and issue the necessary outcome notices to affected claimants and their counsel. After we identify what documents are missing from claims, we alert the claimant or claimant's counsel, if represented, of what information is needed and why. We will work with these claimants and

10

counsel to assist them in completing their claims so that we may evaluate them for possible payment.

## CONCLUSION

We offer this Report to ensure that the Court is informed of the status of the Program to date. If the Court would find additional information helpful, we stand ready to provide it at the Court's convenience.

_____
PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of September 2012.

                                          /s/ Patrick M. Juneau