# **EXHIBIT 4**



# *Deepwater Horizon*
# Accident Investigation Report

September 8, 2010

TREX-00001

BP-HZN-BLY00000001

In *Figure 1*, the eight blocks represent the defensive physical or operational barriers that were in place to eliminate or mitigate hazards. The holes represent failures or vulnerabilities in the defensive barriers. The eight key findings are represented by the holes that lined up to enable the accident to occur.



Adapted from James Reason (Hampshire: Ashgate Publishing Limited, 1997).

**Figure 1.** Barriers Breached and the Relationship of Barriers to the Critical Factors.

If any of the critical factors had been eliminated, the outcome of *Deepwater Horizon* events on April 20, 2010, could have been either prevented or reduced in severity. *Section 5. Deepwater Horizon Accident Analyses* of this report documents the investigation team's analysis and conclusions regarding each key finding or barrier breach.

# Background

*Deepwater Horizon*, which was built in 2001, was a fifth generation, dynamically-positioned semi-submersible drilling unit. The unit employed an automated drilling system and a 15,000 psi-rated BOP system and had operated in water depths (WD) greater than 9,000 ft. The rig had drilled wells up to 35,055 ft. in the nine years it had been owned and operated by Transocean under contract to BP in the deepwater Gulf of Mexico.

The Macondo well was an exploration well in Mississippi Canyon Block 252 in 4,992 ft. WD. The well had been drilled to 18,360 ft. from its last casing point at 17,168 ft. The well penetrated a hydrocarbon-bearing Miocene reservoir and was deemed a commercial discovery. The decision was made to temporarily abandon the Macondo well and complete it as a production well in the future.

Exhibit 4, Page 3 of 9

BP-HZN-BLY00000032

Under *Section 5* of BP's *Engineering Technical Practice (ETP), GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*, if less than 1,000 ft. of cement above a distinct permeable zone is planned, then TOC must be determined by a "proven cement evaluation technique" such as a cement evaluation log. In addition, the plan must include 100 ft. of centralized pipe to be placed above any distinct permeable zone.

The information available to the BP well site leader and the Halliburton rig-based cement operator indicated that cement placement was performed as planned with lift pressure and no observed fluid losses. This post-job information was discussed during the morning operations telephone call involving personnel from BP and its Macondo well contractors. The BP Macondo well team decided not to run a cement evaluation log prior to temporary abandonment, reportedly reflecting consensus among the various parties on the call. The investigation team has not seen evidence of a documented review and risk assessment with respect to well condition and duration of suspension, regarding the annulus cement barriers.

**Analysis—Planning for Temporary Abandonment**
In the investigation team's opinion, evaluating lift pressure and lost returns did not constitute a "proven cement evaluation technique" per *Section 5* of the *ETP GP 10-60*. This section does not specify when a proven cement evaluation technique shall be employed, but typically a cement evaluation log would be run during the completion phase of the well.

By not conducting a formal risk assessment of the annulus cement barriers per the *ETP* recommendation, it is the investigation team's view that the BP Macondo well team did not fully conform to the intent of *ETP GP 10-60*. Such a risk assessment might have enabled the BP Macondo well team to identify further mitigation options to address risks such as the possibility of channeling; this may have included running a cement evaluation log.

## 2.7 Cement Design, Oversight, Communication and Evaluation

The investigation team considered the overarching organizational, decision-making and contractor management aspects of the Macondo well cement design and placement. This part of the analysis describes the investigation team's factual findings and conclusions.

An overview of BP and Halliburton collaboration on the Macondo well follows:

- As the well operator, BP provided to Halliburton well data such as fracture gradient, open hole caliper measurements, well survey measurements, downhole temperatures and pore pressure. BP also provided casing design information and planned mud densities.
- As the cementing advisor and product and equipment provider, Halliburton used this data to design a cement job that was intended to deliver zonal isolation for the well. The design included the types of cement slurry, spacer types, necessary quantities of cement and spacers, pump schedule and horsepower requirements. The Halliburton in-house cementing engineer was co-located with the BP Macondo well team.

BP-HZN-BLY00000066

The rig crew discussed this 1,400 psi pressure abnormality. Witnesses indicated that the toolpusher proposed that the high pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.' The toolpusher and the driller reportedly stated that they had observed this phenomenon before. After discussing this concept, the rig crew and the well site leader reportedly concluded that the explanation was plausible. However, the investigation team could find no evidence that such a phenomenon is possible, leaving the 1,400 psi unexplained unless it was caused by pressure from the reservoir.

According to witnesses, the rig crew and well site leaders interpreted no flow coming from the open kill line as a demonstration of well integrity. This indication of no flow from an open kill line contributed to the incorrect conclusion that well integrity had been achieved.

The investigation team has found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality. Per the *Transocean Well Control Handbook (TWCH), Section 1, Subsection 2* (page 5 of 7) the rig crew was required to consult the Transocean 'manager.' This consultation was intended to verify that the manager was "satisfied that the integrity of the barriers involved . . . [had] been suitably tested." However, the handbook did not clearly define who the manager was for this consultation. (Refer to *Appendix T*.)

The investigation team was unable to confirm whether the policy was adhered to in this instance. According to MBI testimony taken May 26, 2010, the senior toolpusher was not informed of the negative-pressure test result until approximately 21:20 hours or approximately 1.5 hours after the conclusion of the test and after operations had restarted.

The rig crew and well site leaders believed that the negative-pressure test was successful, even though well integrity had not been achieved. The negative-pressure test was an opportunity to recognize that the well did not have integrity and to take appropriate action to evaluate the well further.

# 3 Operational Activities—Monitoring the Well

After the negative-pressure test was concluded and the annular preventer was opened, the hydrostatic head in the annulus returned the well to an overbalanced state, and the influx of hydrocarbons did not occur again until the well was underbalanced with seawater at approximately 20:52 hours.

According to the Transocean policy (provided to the investigation team) per the *TWCH, Section 1, Subsection 3, Paragraph 6, Well Control Responsibilities*, the driller was responsible for monitoring and shutting in the well (closing the BOP) when flow was indicated. The mudlogger provided additional monitoring support to the driller. Both had access to real-time data in their respective cabins.

Analysis 5B

**BP-HZN-BLY00000089**

The *TWCH* stated that the well was to be monitored at all times. However, the policy did not specifically address how the well was to be monitored during in-flow testing, cleanup or other end-of-well activities. Based on the available information, the design of the mud pits could have allowed isolation of one or more pits to enable monitoring of the well, while using other pits for staging fluid before transfer to the supply vessel.

During displacement to seawater, a gain in the pits equivalent to the seawater volume pumped would be observed. The well could be monitored by comparing the seawater volume being pumped to the volume returning to the pits. Any discrepancy in these two volumes could indicate a problem with the well.

The investigation team did not find evidence that the pits were configured to allow monitoring while displacing the well to seawater. Furthermore, the investigation team did not find evidence that either the Transocean rig crew or the Sperry-Sun mudloggers monitored the pits from 13:28 hours (when the offloading to the supply vessel began) to 21:10 hours (when returns were routed overboard).

**Analysis—First Occurrence of Flow from the Well**
Based on the available information, the investigation team determined the following:

- The pumps were slowed at approximately 20:50 hours in anticipation of the returning spacer. Although a decrease in flow would have been expected due to the decrease in pump rate, real-time data indicated that flow out actually increased. This increase of flow at the surface was partially caused by flow from the reservoir. The trip tank was also likely emptied into the flow-line at this time. Emptying the trip tank could have complicated the ability of the driller to observe the increased flow from the well.
- OLGA® well flow modeling indicated that hydrocarbons began to flow slowly into the well from the reservoir at approximately 20:52 hours.
- Starting at approximately 21:01 hours, an abnormality with the well could have been detected by monitoring the drill pipe pressure. Drill pipe pressure increased from 1,250 psi to 1,350 psi (at a constant pump rate), indicating flow from the well. Pressure should have decreased at this time, not increased, due to the removal of 14.17 ppg mud from the wellbore and replacement with 8.6 ppg seawater. This pressure increase should have been an additional indication to the rig crew of an abnormal condition with the well.
- Analysis showed that approximately 39 bbls of fluid gain from the reservoir occurred over the 10-minute period from 20:58 hours to 21:08 hours. (Refer to Figure 8.) This conclusion was based on an analysis of the real-time data by calculating flow out minus flow in and by examining available pit data. (Refer to *Appendix S. First Surface Indications of Well Flow and Pit Gain.*)

The first indication of flow likely would have been at 20:58 hours, but emptying of the trip tank could have masked this flow indication in the real-time data. The pressure abnormality starting at 21:01 hours would have been the first clear indication of flow visible to the rig crew and mudloggers.

BP-HZN-BLY00000092

- At approximately this time, the toolpusher was called to the rig floor, possibly in regard to bringing mud pump #2 online.
- At the May 28, 2010, MBI hearings, testimony indicated that the senior toolpusher called the toolpusher at approximately 21:20 hours and asked about the results of the negative-pressure test. He responded that the test result was "good." He also advised the senior toolpusher that the displacement was "going fine."
- The assistant driller was called for support between 21:20 hours and 21:30 hours. The chief electrician stated that he later observed the assistant driller working on the PRV for mud pump #2.
- At 21:31 hours, approximately 18 minutes before the first explosion, the mud pumps were shut down. Possible reasons for the pumps shutting down were that the rig crew was:
  - Troubleshooting mud pump #2.
  - Responding to the return of the remainder of the spacer. Based on OLGA® well flow modeling results, the spacer would have been fully displaced from the well at approximately 21:30 hours.
  - Responding to the decreasing drill pipe pressure.
- The chief mate testified at the MBI hearings on May 27, 2010, that he observed the toolpusher and driller discussing 'differential pressure' on the well at approximately 21:33 hours.
- OLGA® well flow modeling indicated that hydrocarbons had been continuously flowing into the well since 20:52 hours and that a 300 bbl gain had been taken by 21:31 hours. During this time period, the rig crew's actions did not appear to be consistent with a team that was aware that the well was flowing.
- OLGA® well flow modeling also indicated that hydrocarbons entered the riser at approximately 21:38 hours. As described in *4.2 Well Control Response 21:40 Hours to 21:49 Hours* of this analysis, the first well control response did not occur until approximately 21:41 hours.



**Figure 13.** Mud Pump #2 Pressure Increase at 21:17 Hours (Real-time Data).

BP-HZN-BLY00000098

The OLGA® well flow model was calibrated against the following key data points:

- A 39 bbl fluid gain based on retrospective analysis of pit volume gain derived from real-time data from the time the well began flowing at 20:52 hours through 21:08 hours.
- The pressure increase of 246 psi between 21:08 hours and 21:14 hours with the pumps off.

When the annular preventer was activated at approximately 21:41 hours, the model estimated the influx volume to be approximately 1,000 bbls. By the time the explosion occurred at approximately 21:49 hours, the model estimated the gain to be approximately 2,000 bbls. (Refer to Figure 18 for the cumulative gain over time.)



**Figure 18.** OLGA® Well Flow Modeling Prediction of Cumulative Gain Excluding Pumped Volumes 20:52 Hours–21:49 Hours.

BP-HZN-BLY00000106

# Section 6. Investigation Recommendations

As this was a BP internal investigation, the recommendations in this section relate to BP, its contractors and its service providers. Some recommendations concern matters that the team viewed as inconclusive with respect to causing or contributing to the accident. It should not be inferred that by making such recommendations, the team viewed those matters as causal or contributing factors in this accident.

The investigation team developed a series of recommendations based on eight key findings. These recommendations cover two broad areas:

- *Drilling and Well Operations Practice (DWOP)* and Operating Management System (OMS) implementation.
- Contractor and service provider oversight and assurance.

The purpose of these recommendations is to enable prevention of similar accidents occurring in the future by strengthening the defensive physical or operational barriers needed to eliminate or mitigate hazards. (Refer to Figure 1.) The recommendations are intended to provide a basis for the consideration of actions that can be implemented by both BP and by the contractor community that provides critical services and products to BP's exploration and production operations.



Adapted from James Reason (Hampshire: Ashgate Publishing Limited, 1997).

**Figure 1.** Barriers Breached and the Relationships of Barriers to the Critical Factors.

BP-HZN-BLY00000181