UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE
GULF OF MEXICO ON APRIL 20, 2010

This Document Relates to:  2:12-cv-01483
2:12-cv-01484
SD FL  4:12-cv-10070
and
Unfiled Economic and Property Damages
Class Members

(To be filed in: CV-2010-7777)
MDL No.:  2179
Section "J"

Judge Barbier

Magistrate Judge Shushan

**JACKSON COUNTY, MISSISSIPPI, GAUTIER, MISSISSIPPI
MOSS POINT, MISSISSIPPI, OCEAN SPRINGS, MISSISSIPPI AND
PASCAGOULA, MISSISSIPPI'S MEMORANDUM BRIEF
IN SUPPORT OF BEACON INVESTORS, LLC'S OBJECTION TO PROPOSED
<u>DEEPWATER HORIZON CLASS ACTION SETTLEMENT</u>**

COMES NOW Jackson County, Mississippi; Gautier, Mississippi; Moss Point,

Mississippi; Ocean Springs, Mississippi and Pascagoula, Mississippi, ("Government Entities"),

and presents this Amicus Brief in Support of Beacon Investors, LLC's Objection to the Proposed

Deepwater Horizon Class Action Settlement.  In the proposed settlement, a majority of Jackson

County has been placed in Zone C as opposed to Zone A.  Virtually every other coastal

community, that received oil from the Deepwater Horizon, was placed in Zone A.  As such, the

Government Entities have a real interest in the outcome of this litigation as exclusion from Zone

A will have an immediate and irreparable impact on the citizens and businesses located in said

county and municipalities.



Page 1 of 16 Pages

## I.  THE GOVERNMENT ENTITIES INTEREST IN THIS LITIGATION

The Government Entities, in their respective capacities, have a duty to protect the interest of its citizens.  Implicit in that duty is the obligation to protect the economic well being of its citizens and businesses.  The proposed settlement is not fair as the citizens will be adversely affected by the disparate treatment in the proposed settlement.

## II.  ARGUMENT

The Government Entities adopt and reference herein all arguments set forth in Beacon Investor, LLC's objection to the proposed settlement.

The Master Settlement Agreement provide that Zone A, in Mississippi, extends from the Louisiana border to Halstead Road in Ocean Springs, Mississippi.  The remainder of the Mississippi Gulf Coast is classified as Zone C.  There is no basis, in law or in fact, to justify for the arbitrary exclusion of the majority of Jackson County, Mississippi from Zone A.

## A.    PHYSICAL IMPACT OF DEEPWATER HORIZON SPILL

During the late spring and summer of 2010, the Deepwater Horizon released millions of gallons of oil in the Gulf of Mexico and the Mississippi Sound.   The entities represented not only faced the threat of oil on their beaches but in fact did receive oil on the beaches.  Numerous inspections and studies were done throughout the oil spill documenting where oil reached land. Attached hereto as Exhibit A(1) - (4) are maps  which identified areas with "maximum oiling." It is clear from the inspection reports that the subject county and cities were designated as "max oiling" areas during the duration of the spill.

It is important to point out the treatment of these objectors as compared to all other public entities that were affected by the oil spill.  In reviewing the various maps indicating where actual

oiling occurred, these four cities and one county in Mississippi are the only areas, in the entire Gulf of Mexico, that actually received oil on their beaches but are not classified as a Zone A for economic purposes.  However, there are areas in Florida that received no oil whatsoever (hundreds of miles of coastline) but are in fact now classified as Zone A.

The western boundary of these Zone C entities is Halstead Road in Ocean Springs, Mississippi.  The same amount of oil landed on the beaches to the west of Halstead Road as they did to the east.  To the east of the excluded entities, the City of Bayou LaBatre is approximately fifteen miles away.  Bayou LaBatre, Alabama sits on the same body of water (Mississippi Sound), as these five governmental entities.  Bayou LaBatre, Alabama is not classified as a "max oiling" beachfront area.  However, Bayou LaBatre, Alabama is classified as Zone A for economic losses.  As will be discussed infra, there is simply no basis for this disparate treatment when compared to the areas to the east and west.

**B.    CHARACTERISTICS OF EXCLUDED AREA**

Moving east from Halstead Road in Ocean Springs, Mississippi, there are natural beaches and bayous throughout the entire area.  Included in this area are numerous marinas, Shepard State Park and Shell Landing Golf Course (affiliated with a Biloxi casino).  The eastern area of the excluded area includes industrial facilities such as Ingalls Huntington Shipyard and Chevron U.S.A.

To the south of all the excluded areas are Petit Bois Island, Sand Island and Horn Island. These islands are owned by the National Park Service and are part of the National Seashore system.  Although none of the islands are inhabited or have any business whatsoever, these islands were placed in Zone A for purposes of the economic settlement.

To the north of Pascagoula is the City of Moss Point, Mississippi.  This area is surrounded by water and is home to several eco tourism businesses as well as a marina berthing deep water fishing vessels.  The Pascagoula River, which is the largest unobstructed natural river in North America, runs through Moss Point, Mississippi, and empties into the Mississippi Sound in Pascagoula.

## C.    BUSINESSES AFFECTED BY OIL SPILL:

### 1.    Eastern Ocean Springs/Unincorporated Coastal Areas of Jackson County and Gautier, Mississippi

This entire area is dominated by water related activities that were adversely affected by the oil spill.  From boat repair shops to golf courses surrounded by water, the area is dependent upon both locals and tourists using the facilities.  Unlike many other Zone A communities, this area, along with the other cities, experienced numerous days with the smell of petroleum so thick in the air no one ventured outside.  Instead of enjoying the salt air on the golf course one would feel like they were teeing off inside a refinery.

Gautier, Mississippi's boundary to the east is the West Pascagoula River.  There are numerous marinas, bait shops, and restaurants located along this waterway.  One of these facilities, Mary Walker Marina, was under contract to be purchased by a developer for the construction of condominiums with deeded boat slips.  This 22 million dollar project, which pre-sold eighteen units, collapsed within thirty days of the Deepwater Horizon oil spill.  This is understandable as signs were posted throughout the property (Exhibit 5) advising all interested persons that the coastal fishing waters were closed.

Many of the boat owners and slip rentals from Mary Walker Marina as well as numerous fish camps in Gautier, adjacent to the Pascagoula River, are owned and frequented by residents

from North/Central Mississippi or elsewhere.  None of them came to the area for recreation or fishing in the months and year after the oil spill.

2.      **Pascagoula**

Pascagoula, Mississippi is home to thousands of recreational fishing vessels as well as a significant commercial shrimp and fin fish industry.  It goes without saying that these industries were totally shut down in 2010.  Not only is there a shrimping fleet but there are also several processors.  The largest processor in the area, which had been in existence for approximately 70 years, closed after the oil spill.  This facility has not reopened.  The City of Pascagoula, after 20 years of planning, was moving forward with a city marina.  The investors in this marina withdrew their support after the oil spill.

As alluded to earlier, there was max oiling on the Pascagoula shoreline up and down Beach Boulevard and including "The Point." The Point is an area frequented by both locals and tourists as it is on high ground, and there are views of both the Pascagoula River, the Gulf of Mexico, Ingalls Shipyard and the Greenwood Island.  There are numerous boat launches at this location as well and it is the entry point of the Pascagoula River which is the corridor for many commercial and recreational activities in both Pascagoula, Gautier and Moss Point.  As you travel east on Beach Boulevard there is Beach Park, which has numerous events including weddings, fireworks and a fishing pier.  Much of this was also not able to be used to its fullest extent after the oil spill, and part due to workers cleaning oil on the shoreline.  At the far east of Beach Boulevard is the Yacht Club that has hosted sailing regattas and tennis tournaments for years, and those events were also significantly reduced or nonexistent in the summer of 2010. All of these are general examples of events that, when added up, created a significant strain on

the local economies.

### 3.   Moss Point

Moss Point, Mississippi is home to numerous marinas and commercial fishing industries. A significant employer in Moss Point, Omega Protein, is home to approximately 20 Menhaden boats with over 250 employees.  Following the oil spill, the entire industry moved to Texas. Located in downtown Moss Point, is a 50 slip marina that berthed numerous boats including many boats that are considered offshore sport fishing boats. Following the oil spill, this marina filed bankruptcy.  Moss Point also was home to one of the larger boat dealers on the Mississippi Gulf Coast, Empress Marine & Audio.  Following the oil spill, Empress went out of business.

We are aware that Omega Protein apparently resolved its claims as a result of the oil spill, however the repercussions felt by these local entities certainly is not resolved, as those employees picked up and moved elsewhere to continue working.   They no longer contributed to the local economy.

The barrier islands (Horn and Petit Bois) are undeveloped and uninhabited.  The water and sand on these islands equal, or exceed, that of the more popular tourist destinations to the east.  Salt water activities, whether swimming, fishing or simply boating, is the number one recreational activity of the residents of these communities.  In 2010 the State of Mississippi issued approximately  25,000 salt water fishing permits to residents of these affected areas.  Late spring and summer of 2010, these activities ceased.  Commercial shrimping was closed, salt water fishing was closed and the beaches on the barrier islands were blockaded by oil booms. The islands and adjacent waters were monitored, both by sea and air, to prevent anyone from attempting to use these resources.  The water, the islands, and the coastal beaches were oiled by

the Deepwater Horizon spill.  Yet, these areas have been classified as Zone C.

### D.    CLAIMS ASSERTED BY CITIZENS

The citizens of the entities presenting this objection are well aware that the loss of use of natural resources is not a claim to be made by these entities or its citizens.  Those claims reside solely with the NRDA Trustees.  The damage to the beaches, whether on the mainland or on the islands, is also not a claim for these citizens as these areas are owned by either the local, state or federal government.  (This is also the same with regard to all the beaches in Alabama and Florida).  What is being claimed are the economic losses resulted by the absolute closure of the recreational and commercial use of the Mississippi Sound and Gulf of Mexico in 2010.

The Government Entities fully recognize that some of the examples presented in this brief may receive Zone A treatment under the Seafood Program.  However, all of the affected businesses that did not sell goods to the seafood distribution entities, such as grocery stores and gas stations, do not receive Zone A treatment.  These indirect (seafood) businesses are intricately interwoven in the coastal seafood economy, and they should be classified the same, i.e., Zone A. Recreationally, all of the boaters, fishermen and tourist that did not come to the area, did not spend any money in the area during that time.  Their absence affected businesses throughout the entire region.  Even locals, if not using their boats, did not purchase fuel, food, gear, etc. for these activities.

There is very little difference as to whether a local resident or a tourist comes to an area to enjoy the outdoor activities.  If a tourist fails to come to, for example, Orange Beach, Alabama, then that city, and the businesses located therein, do not receive those monies that would have been spent by that tourist.  With regard to the subject areas in Mississippi, the only difference is

those individuals in Mississippi may not have been renting a hotel or condominium room.  Other than this, all monies lost would be the same.  Again, just as in Alabama and Florida, the "trickle down" effect occurred in Mississippi.  If a person is not buying a boat, buying gas for his boat, buying boating supplies, insurance, etc., then that money is not only lost to the immediate seller but to those that the seller does business with.  When 250 employees of a Menhaden factory leave the area not only is their income lost but all the businesses that supply these facilities have also suffered a loss.  The loss continues down the line.  When shrimpers cannot leave port then they do not pay their deck hands, do not purchase fuel, do not rent dock space, do not sell their products, do not buy food and supplies, etc.  All of those entities that supply this industry are adversely affected and all entities that cater to the suppliers are adversely affected.  It simply goes on and on.

With regard to the commercial fishing fleet, a similar situation occurred in Bayou LaBatre, Alabama.  The shrimping fleet in Pascagoula, Mississippi, is very similar to that in Bayou LaBatre, Alabama. When the shrimping fleet was closed down in Bayou LaBatre, Alabama the city, and businesses located therein were adversely affected.  This was obviously acknowledged by BP and the PSC as Bayou LaBatre has been designated as a Zone A under the proposed economic settlement.  (It cannot be in Zone A because of tourism as there is only one motel in Bayou LaBatre and there is no tourism).  Yet, Pascagoula, located approximately fifteen miles west of Bayou LaBatre, was placed in Zone C.

### E.      GULF COAST CLAIMS FACILITY

No explanation is needed for what the GCCF is and what it did.  Although there was certainly a significant amount of justified criticism as to the operations of the GCCF it is

generally accepted that the amount of payments that were made, to specific areas, was a strong indicator of the economic damage caused.

In Mississippi, only Harrison County received more monies in payments from the GCCF than Jackson County. Throughout the entire Gulf South Region, there are breakdowns of payments made per county. There are numerous counties that have been classified as Zone A that received significantly less payments than the businesses and individuals in Jackson County, Mississippi.

In the well publicized audit of the GCCF certain errors were found. What was not found was widespread fraud in any particular county and certainly not in Jackson County, Mississippi. It stretches the imagination as to how it was determined that this approximately fifteen mile area of the Mississippi Gulf Coast did not receive economic damages from the Deepwater Horizon and yet all the other areas, without oil, did. Even the areas that were heavily oiled received less payments than the businesses and individuals in Jackson County, Mississippi. All these other areas, both oiled and non oiled, were classified as Zone A. The approximate fifteen mile stretch of Mississippi was classified as Zone C.

## F.    WHY IT MATTERS

### 1.    Causation

There is no causation requirement for Zone A. In Zone C, causation requirements are strenuous and require a profit level in 2011 above that of 2010.

The Zone C "rebound" requirement may work well for businesses in areas that were not affected by actual oiling of the beaches and surrounding islands. The formula assumes that in 2011 everything was back to normal. Again, for areas that did not actually receive oil that may be

a valid assumption. However, for areas that received "max oiling" that is simply not the case. We are not back to normal.

Water related businesses have gone out of business, marinas have gone bankrupt and marina/condominium developments have been cancelled. Seafood processors have gone out of business and the view of our part of the country is still stained in many people's mind. (For example, see the ads that continue to run, nationally, promoting the safety of Gulf seafood INCLUDING Mississippi seafood). Despite all this, the settlement agreement places a requirement on the majority of Jackson County businesses to show that their business significantly rebounded in 2011. For most businesses that is a hurdle they cannot overcome.

Presumably, the reason there is no "causation" and "rebound" requirement **for Zone A** is that the effects of the oil spill were ongoing in 2011. Although that is probably absolutely correct, no one has been able to explain to us how this part of Mississippi is different than the other parts of the Gulf Coast that were adversely affected by the oil spill. What are the facts that lead to the conclusion that Bayou LaBatre was still adversely affected in 2011 by the oil spill and Pascagoula was not? How is Biloxi still affected in 2011 but the majority of Ocean Springs not? How did the entire Florida Keys, which received no oil whatsoever, negatively affected in 2011 but we were not? There is, absolutely, positively, no data to support these conclusions.

## 2.    The Multiplier.

Zone A gets a minimum multiplier of 2 and a multiplier of 2.5 if it is tourism related. Zone C, gets a multiplier of 1 and a multiplier of 1.5 if it is tourism related. It is presumed that this multiplier is to compensate for the loss of future business because of the lingering effects of the oil spill. As questioned in the paragraph above, where is the data that supports that this small

area of Mississippi is different from the other areas on the Coast that are Zone A.

The entire Florida Keys are in Zone A.  There certainly was the perception by some that the Florida Keys, and small portion of the coastline near Tampa, Florida, were going to be affected by the oil spill in 2010.  Of course, oil did not get within 200 miles of any Florida Key. However, the perception may have been reality in 2010 for these areas (although the recently released 2010 tourism tax reports indicate that the Florida Keys not only did not lose tourism they actually gained in 2010).  However, giving the Keys a 2 or 2.5 multiplier for losses in 2011 does not make sense when compared to the Coastal section of Mississippi.  Since they never received oil, it is hard to imagine them being compensated for future loss of business because of the oil spill when compared to compensating the businesses and citizens on the Mississippi Gulf Coast a significantly lower rate  when they did actually receive oil.

Finally, it must be pointed out that the oil spill is not over for our businesses and citizens. The barrier islands received significant amounts of oil following the recent tropical depression in June 2012 and Hurricane Isaac in August.  It is widely reported that there are oil mats throughout the Mississippi Sound and NO ONE has stated that our Gulf beaches and Mississippi Sound beaches are free of oil.  Yet, following the rationale of the causation and multiplier, this area had completely recovered from the oil spill by the end of 2010.

## G.    UNFAIR TREATMENT

The unfairness of differential treatment for identical businesses within a thirty mile radius is apparent under the current settlement (all businesses located on the Gulf Coast).  For example, one can use three grocery stores, one in Bayou LaBatre, Alabama, one in Pascagoula, and one in West Ocean Springs.  The grocery store in Pascagoula is located within fifteen miles of both the

store in Bayou LaBatre and in West Ocean Springs. In 2010, each saw a loss of $200,000.00 as a result of the oil spill. In 2011, as the effects linger, each improved their business but still had a $190,000.00 loss. Under the current classifications, the amounts that will be received under the settlement agreement are as follows:

      (a) Bayou LaBatre Grocery Store: $600,000.00;

      (b) West Ocean Springs Grocery Store: $600,000.00

      (c) Pascagoula Grocery Store: $0

We could easily substitute a number of businesses for a grocery store and the results would be the same. This is an outcome without any objective facts to set forth why this portion of Jackson County was treated different than everywhere else.

Government Entities are aware that there is a "strong presumption" in favor of finding a settlement fair. Camp vs. Progressive Corp., 204 Westlaw 2149079, *5 (Ed. La. Sept. 23, 2004) (citing, Reed vs. General Motors Corp., 703 F.2d 170, 172 (5ᵗʰ Cir. 1983). However, proponents of the settlement must meet the burden of proof. In Free vs. Abbott Laboratories, 953 F.Supp. 751, 753 (Md. La. 1997) the District Court stated:

> *"To enable the Court to reasonably assess the fairness of the settlement, the proponents are obligated to furnished adequate information; counsel for the parties are the main source of the information concerning the settlement. It is the proponents burden to explain how the settlement was reached and to prove that it is fair, adequate and reasonable."*

Despite repeated requests, BP and the PSC simply cannot explain what were the factors for removing Jackson County from Zone A and why it is fair, adequate and reasonable to have done so.

**H.    THE REED FACTORS**

The fifth <u>Reed</u> factor deals with the range of possible recovery. There are two Louisiana cases that this Court is aware of that are remarkably similar, with regard to the zones, to the case *sub judice*. In <u>Re: Shell Oil Refinery</u>, 155 F.R.D. 552 (Eastern Dist. La. 1993), there was significant proof put on as to how the zones or classes were determined. In <u>Shell</u>, the PLC created a grid map of a five parish area and created six zones. The amount of the award was dependent on which zone a particular class member was in. Zones were based upon the **"claimant's proximity to the refinery and the direction of the explosion blast."** (Emphasis added). Literally, the Shell PLC based its zones on clearly defined reasonable, objective standards which centered around the proximity to the explosion. If such a reason formula had been used in this case, Jackson County, Mississippi would be in Zone A and the Florida Keys would be in Zone C. In <u>Turner</u>, the District Court for the Eastern District of Louisiana stated:

> *"As noted, the settlement agreement calls for the settlement award to be allocated to class members based upon an allocation plan. The allocation plan requires the entire class area to be divided into four geographic 'zones' . . . the program uses the appropriate factors to determine the amount of harm the individual members suffered - the amount of oil contamination found in the area, the square footage of the residence or commercial building, number of people residing on the property."*

472 F.Supp. at 835.

Clearly, the use of zones in class action settlements is both appropriate and fair. However, there is a caveat to this: the zones must be based upon some reasonable, objective standards. The courts have found such standards as proximity to the disaster and the amount of contamination as to be accepted basis for creating zones. Using either one of these standards, Jackson County would be in Zone A. That is not debatable. Therefore, it is obvious that whatever factors BP and the PSC came up with they were not based upon reasonable objective

facts.

## CONCLUSION

For whatever reason, an approximate 15 mile stretch of the Mississippi coastline was excluded from Economic Zone A. The facts simply do not support this disparate treatment.

This Court is going to hold a "fairness" hearing on November 8, 2012. There simply can be no argument that these areas were disparately treated when compared to other areas. This disparate treatment implies unfairness. The Government Entities respectfully this Court to deny BP and the Plaintiff Steering Committee's Motion to Approve this Settlement.

DATED on this _____ day of September 2012.

Respectfully submitted.

JACKSON COUNTY, MISSISSIPPI;
GAUTIER, MISSISSIPPI; MOSS POINT,
MISSISSIPPI; OCEAN SPRINGS,
MISSISSIPPI; and PASCAGOULA,
MISSISSIPPI

By:    /s/ _____
Robert W. Wilkinson, Esquire
MS Bar No. 7215
W. Charles McVea
LA Bar No.30630
MS Bar No. 102436
734 Delmas Avenue (39567)
Post Office Box 1618
Pascagoula, MS 39568-1618
228-762-2272 telephone
228-762-3223 facsimile

Of Counsel:
Frederick T. Kuykendall, III
AL Bar No. ASB4462A59F
Federal Bar No. KUYF4462
Kuykendall & Associates LLC
2012 1st Avenue North, Ste. 450
Birmingham AL 35203
Phone (205) 453-0060
Fax (205) 453-0042

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Memorandum Brief of Jackson

County, Mississippi; Gautier, Mississippi; Moss Point, Mississippi; Ocean Springs, Mississippi

and Pascagoula, Mississippi in Support of Beacon Investors LLC's Objections to Proposed

Deepwater Horizon Class Action Settlement  has been served on All Counsel by electronically

uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No.12, and that

the foregoing was electronically filed with the Clerk of Court of the United States District Court

for the Eastern District of Louisiana by using the CM/ECF System, in accordance with Pretrial

Order No. 49 established in MDL 2179, on this ___ day of September 2012.

I HEREBY FURTHER CERTIFY that the above and foregoing Statement of Objections

was sent by U.S. first-class mail to: Economic Lead Class Counsel: James Parkerson Roy,

Esquire, Attention: Deepwater Horizon E&PD Settlement, Domegeaux Wright Roy & Edwards,

556 Jefferson Street, Suite 500, Post Office Box 3668, Lafayette, LA 70501; Stephen J. Herman,

Esquire, Attention: Deepwater Horizon E&PD Settlement, Herman Herman Katz & Cotlar LLP,

820 O'Keefe Avenue, New Orleans, LA 70113; Defendants' Counsel: Richard C. Godfrey, P.C.,

Attention: Deepwater Horizon E&PD Settlement, Kirkland & Ellis LLP, 300 North LaSalle

Street, Chicago, IL 60654, on this the ___ day of September, 2012.

Robert W. Wilkinson, Esquire
MS Bar No. 7215
734 Delmas Avenue (39567)
Post Office Box 1618
Pascagoula, MS 39568-1618
228-762-2272 telephone
228-762-3223 facsimile