UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG : | MDL-2179 |
| "DEEPWATER HORIZON" in the : | |
| GULF OF MEXICO, on : | |
| APRIL 20, 2010 : | |
| : | SECTION J |
| : | |
| THIS DOCUMENT RELATES TO: : | JUDGE BARBIER |
| : | MAG. JUDGE SHUSHAN |
| ALL ACTIONS : | |

..................................................................................................

**NOTICE OF THE MISSISSIPPI ATTORNEY GENERAL**
**RELATING TO DEFICIENCIES AND ERRORS IN THE CLASS SETTLEMENT**

The Mississippi Attorney General notices the Court that an error exists in the areas designated as "Zone C" within the State of Mississippi, in Jackson County, and the municipalities of Moss Point, Ocean Springs, Gautier and Pascagoula. Specifically, "Zone A" should be extended from Halstead Road and Hwy 90, Ocean Springs, Mississippi eastward to Pascagoula, Mississippi; with Hwy 90 being designated as the Northern boundary of Zone A -- just as it is in Ocean Springs; and Zone A should include portions of Moss Point, Mississippi to include the areas within a 2-mile radius of City Hall – which fronts the Escatawpa River. The distance from Halstead Road, Ocean Springs to Pascagoula is less than fifteen (15) miles. Currently, this area has been mistakenly designated as "Zone C" – although this area was heavily oiled during the Deepwater Horizon Incident ("DWH Incident"). Including this area in Zone C results in the imposition of a disparate and more stringent burden of proof on class members in this heavily oiled coastal area, that is not imposed on class members in any other heavily oiled area of the Gulf and is not imposed on class members in many areas that were never oiled. No legal or factual basis exists for this disparate treatment of similarly situated class members. As discussed more fully below, it would be impermissible to arbitrarily impose disparate burdens of

1

proof on similarly situated class members in this manner.  This unfair and unreasonable result can be avoided by merely correcting the designation on the Maps attached to the Settlement Agreement to include this area in Zone A.  It is within the Court's authority to direct the parties to correct the designations on this Map as a scrivener's error.  The Mississippi Attorney General has standing to file this objection on behalf of all citizens within Mississippi, pursuant to his *parens patriae* authority and pursuant to the authority conferred on State Attorneys General under the Class Action Fairness Act of 2005 (CAFA).

In addition, the Mississippi Attorney General reasserts the arguments contained in his Statement of Interest and Request for Relief submitted to the Court on April 25, 2012, (MDL Doc. 6356, *et seq*.).  The Court previously failed to rule on the merits of this filing based on the misperception that non-parties could not challenge the fairness of a settlement agreement.  However, because claimants who signed the GCCF releases would be class members, but for the illegal actions of BP's agents in extracting these illegal and illegally obtained releases, and because the rights of these claimants would be stripped of their legal claims and cause of action and, as a result, forever prejudiced in the absence of Court review and action on this challenge – standing exists to challenge the release in this instance.[1]  Further, the Mississippi Attorney General has standing to challenge the use of the illegal and illegally obtained releases to define the class pursuant to his *parens patriae* authority and the authority conferred on State Attorneys General by the Class Action Fairness Act (CAFA).[2]

---

[1] Non-members of a class have standing to challenge a class action settlement when the settlement will prejudice them. *Rahman v. Vilsack,* 673 F.Supp.2d 15, 19 (D.D.C. 2009). " '[P]rejudice' in this context means 'plain legal prejudice,' as when 'the settlement strips the party of a legal claim or cause of action.' " *Id., quoting Mayfield v. Barr*, 985 F.2d 1090, 1093 (D.C. Cir. 1993); and *Agretti v. ANR Freight System, Inc.,* 982 F.2d 242, 247 (7th Cir. 1992).

[2] *See, e.g.* 28 U.S.C.A. § 1715(b) of CAFA.

# I. BASIS FOR OBJECTIONS

### A. Physical Impact of Deepwater Horizon Spill

The Oil Pollution Act of 1990, as amended in 1996, does not recognize nor authorize the use of a geographic proximity test in determining eligibility for compensation under that Act nor does it permit the use of different burdens and standards of proof based on geographic proximity to an oiled beach.  Indeed, claimants are entitled to relief in the absence of *any* actual discharge of oil – the mere significant threat of discharge of oil can result in compensable damages. Accordingly, the use of arbitrary geographical zones, based on proximity to an oiled beach, or the presence of oil, to impose differing rights to compensation or burdens of proof is improper and violates OPA.  More importantly, imposing different burdens of proof on members of the same class is impermissible.

During the late spring and summer of 2010, the Deepwater Horizon poured millions of gallons of oil into the Gulf of Mexico and the Mississippi Sound.  The class members within the area described above all are located within municipalities and political subdivisions within Mississippi that received oil on their beaches.  These municipalities and political subdivisions include: Jackson County, Mississippi; Ocean Springs, Mississippi;  Gautier, Mississippi;  Moss Point, Mississippi, and Pascagoula, Mississippi. Numerous inspections and studies were done throughout the oil spill documenting where oil reached land. Attached hereto as Exhibit A(1) - (4) are maps which identified areas with "maximum oiling."  It is clear from the inspection reports that the subject county and cities were designated as "max oiling" areas during the duration of the spill.

It is important to point out that these five political subdivisions, as compared to all other public entities that were affected by the oil spill, suffered a significant amount of damage as a result of the DWH oil spill – this level of environmental damage translated into a corresponding adverse impact suffered by the

people and businesses within this area. In reviewing the various maps indicating where actual oiling occurred, these four cities and one county in Mississippi are the only areas in the entire Gulf of Mexico that actually received oil on their beaches but are not classified as a Zone A for economic purposes. However, areas in Florida which received *no oil whatsoever* (hundreds of miles of coastline) are, in fact, classified as Zone A.

The western boundary of these Zone C entities is Halstead Road in Ocean Springs, Mississippi. The same amount of oil landed on the beaches to the west of Halstead Road as they did to the east. To the east of the excluded entities the City of Bayou LaBatre is approximately fifteen miles away. Bayou LaBatre, Alabama sits on the same body of water, the Mississippi Sound, as these five governmental entities. Bayou LaBatre, Alabama is not classified as a "max oiling" beachfront area. However, Bayou LaBatre, Alabama is classified as Zone A for economic losses. As will be discussed infra, ***there is no legal or legitimate factual basis for this disparate treatment when compared to the areas to the east and west.***

## II.  Characteristics of Excluded Area

To the east of Halstead Road in Ocean Springs, Mississippi, there are natural beaches and bayous throughout the entire area. Included in this area are numerous marinas, Shepard State Park and Shell Landing Golf Course (affiliated with a Biloxi casino). The eastern area of the excluded area includes industrial facilities such as Ingalls Huntington Shipyard and Chevron, U.S.A. To the south of all the excluded areas are Petit Bois Island, Sand Island, and Horn Island. These islands are owned by the National Park Service and are part of the National Seashore system. Although none of the islands are inhabited or have any business whatsoever, these islands were placed in Zone A for purposes of the economic settlement.

To the north of Pascagoula is the City of Moss Point, Mississippi. This area is surrounded by water and is home to several eco-tourism businesses as well as a marina, berthing deep water fishing vessels.

The Pascagoula River, which is the largest unobstructed natural river in North America, runs through Moss Point, Mississippi, and empties into the Mississippi Sound in Pascagoula.

### III. Businesses Affected by Oil Spill

#### A. Eastern Ocean Springs/Unincorporated Coastal Areas of Jackson County and Gautier, Mississippi

This entire area is dominated by water related activities that were adversely affected by the oil spill. From boat repair shops to golf courses surrounded by water, this area is dependent upon both locals and tourists using the marine facilities. Unlike many other Zone A communities, this area, along with the other cities, experienced numerous days with the smell of petroleum so thick in the air no-one ventured outside. Instead of enjoying the salt air on the golf course one would feel like they were teeing off inside a refinery.

Gautier, Mississippi's boundary to the east is the West Pascagoula River. There are numerous marinas, bait shops, and restaurants located along this waterway. One of these facilities, Mary Walker Marina, was under contract to be purchased by a developer for the construction of condominiums with deeded boat slips. This 22 million dollar project, which presold eighteen units, collapsed within thirty days of the Deepwater Horizon oil spill. This is understandable as signs were posted throughout the property advising all interested persons that the coastal fishing waters were closed.

Many of the boat owners and slip rentals from Mary Walker Marina as well as numerous fish camps in Gautier, adjacent to the Pascagoula River, are owned and frequented by residents from North/Central Mississippi or elsewhere. None of them came to the area for recreation or fishing in the months and year after the oil spill.

### B.   Pascagoula

Pascagoula, Mississippi is home to thousands of recreational fishing vessels as well as a significant commercial shrimp and fin fish industry. It goes without saying that these industries were totally shut down in 2010. Not only is there a shrimping fleet but there are also several processors. The largest processor in the area, which had been in existence for approximately 70 years, closed after the oil spill. This facility has not reopened. The City of Pascagoula, after 20 years of planning, was moving forward with a city marina. The investors in this marina withdrew their support after the oil spill.

As alluded to earlier, there was max oiling on the Pascagoula shoreline up and down Beach Boulevard and including "The Point." The Point is an area frequented by both locals and tourists as it is on high ground and there are views of the Pascagoula River, the Gulf of Mexico, Ingalls Shipyard, and the Greenwood Island. There are numerous boat launches at this location as well, and it is the entry point of the Pascagoula River which is the corridor for many commercial and recreational activities in Pascagoula, Gautier, and Moss Point. As you travel east on Beach Boulevard there is Beach Park which plays host to numerous events including weddings and fireworks. Beach Park also has a popular fishing pier. Much of this was also not able to be used to its fullest extent after the oil spill and was avoided in part due to workers cleaning oil on the shoreline. At the far east of Beach Boulevard is the Yacht Club which has hosted sailing regattas and tennis tournaments for years. Those events were also significantly reduced or nonexistent in the summer of 2010. All of these are general examples of events that, when added up, created a significant strain on the local economies.

### C. Moss Point

Moss Point, Mississippi is home to numerous marinas and commercial fishing industries. A significant employer in Moss Point, Omega Protein, is home to approximately 20 Menhaden boats with over 250 employees. Following the oil spill, the entire industry moved to Texas. Located in downtown Moss

Point, is a 50-slip marina that berthed numerous boats including many boats that are considered offshore sport fishing boats. Following the oil spill, this marina filed bankruptcy. Moss Point was also home to one of the larger boat dealers on the Mississippi Gulf Coast, Empress Marine & Audio. Following the oil spill, Empress went out of business.

Omega Protein apparently resolved its claims as a result of the oil spill, however the repercussions felt by these local entities certainly is not resolved, as those employees picked up and moved elsewhere to continue working. They no longer contributed to the local economy.

The barrier islands (Horn and Petit Bois) are undeveloped and uninhabited. The water and sand on these islands equal, or exceed, those of the more popular tourist destinations to the east. Salt water activities, whether swimming, fishing or simply boating, is the number one recreational activity of the residents of these communities. In 2010 the State of Mississippi issued approximately 25,000 saltwater fishing permits to residents of these affected areas. Late spring and summer of 2010, these activities ceased. Commercial shrimping was closed, saltwater fishing was closed, and the beaches on the barrier islands were blockaded by oil booms. The islands and adjacent waters were monitored, both by sea and air, to prevent anyone from attempting to use these resources. The water, the islands, and the coastal beaches were oiled by the Deepwater Horizon spill. Yet, these areas have been classified as Zone C.

### IV. Claims Asserted

The citizens of the entities presenting this objection are well aware that the loss of use of natural resources is not a claim to be made by these entities or its citizens. Those claims reside solely with the NRDA Trustees. The damage to the beaches, whether on the mainland or on the islands, is also not a claim for these citizens as these areas are owned by either the local, state or federal government. (This is also the same with regard to all the beaches in Alabama and Florida). We do claim the economic losses resulted by the absolute closure of the recreational and commercial use of the Mississippi Sound and Gulf of Mexico in 2010.

7

Although some of the examples presented in submission may receive Zone A treatment under the Seafood Program., all of the affected businesses that did not sell goods to the seafood distribution entities, such as grocery stores and gas stations, do not receive Zone A treatment -- *and should*. These indirect (seafood) businesses are intricately interwoven in the coastal seafood economy, and they should be classified the same, i.e., Zone A. There is no legal or factual justification for treating these businesses differently and it is unfair and unreasonable to impose disparate, harsher burdens of proof on these businesses based solely on their zip code. Recreationally, the boaters, fishermen and tourist who did not come to the area, did not spend any money in the area during that time. Their absence affected businesses throughout the entire region. Even locals, if not using their boats, did not purchase fuel, food, gear, etc. for these activities.

There is very little difference as to whether a local resident or a tourist comes to an area to enjoy the outdoor activities. If a tourist fails to come to, for example, Orange Beach, Alabama, then that city, and the businesses located therein, do not receive those monies that would have been spent by that tourist. With regard to the subject areas in Mississippi, the only difference is those individuals in Mississippi may not have been renting a hotel or condominium room. Other than this, all monies lost would be the same. Again, just as in Alabama and Florida, the "trickle down" effect occurred in Mississippi. If a person is not buying a boat, buying gas for his boat, buying boating supplies, insurance, etc., then that money is lost not only to the immediate seller but also to those with whom the seller does business. When 250 employees of a Menhaden factory leave the area, not only is each employee's income lost, but all the businesses which supply these facilities have also suffered a loss. The loss is compounded as it continues down the economic line of supporting businesses.

When shrimpers cannot leave port - they do not pay their deck hands, they do not purchase fuel, do not rent dock space, do not sell their products, do not buy food and supplies, etc. Without exception, each of those entities that supply this industry are adversely affected and all entities that cater to the suppliers are adversely affected as well.

8

With regard to the commercial fishing fleet, a comparable situation occurred in Bayou LaBatre, Alabama. The shrimping fleet in Pascagoula, Mississippi, is very similar to that in Bayou LaBatre, Alabama. When the shrimping fleet was closed down in Bayou LaBatre, Alabama the city, and businesses located therein were adversely affected. This was obviously acknowledged by BP and the PSC as Bayou LaBatre has been designated as a Zone A under the proposed economic settlement. (It cannot be in Zone A because of tourism as there is only one motel in Bayou LaBatre and there is no tourism). Yet, Pascagoula, located approximately fifteen miles west of Bayou LaBatre, was placed in Zone C.

### V.  Gulf Coast Claims Facility

No explanation is needed for what the GCCF is and what it did. Although there was certainly a significant amount of justified criticism as to the operations of the GCCF it is generally accepted that the amount of payments that were made, to specific areas, was a strong indicator of the economic damage caused.

In Mississippi, only Harrison County received more monies in payments from the GCCF than Jackson County. Throughout the entire Gulf South Region, there are breakdowns of payments made per county. There are numerous counties that have been classified as Zone A that received significantly less in payments than the businesses and individuals in Jackson County, Mississippi. In the well-publicized audit of the GCCF certain errors were found. What was not found was widespread fraud in any particular county and certainly not in Jackson County, Mississippi. It stretches the imagination as to how it was determined that this approximately fifteen mile, oiled area of the Mississippi Gulf Coast did not receive economic damages from the Deepwater Horizon and yet all the other areas *without oil* did. Even the areas that were heavily oiled received less in payments than the businesses and individuals in Jackson County, Mississippi. These other areas, both oiled and non-oiled, were classified as Zone A. The approximate fifteen mile stretch of

9

Mississippi was classified as Zone C. Such a classification is arbitrary, capricious and fails to meet the fairness standards under CAFA.

## VI.     Why it Matters

### A.     Causation

As the Court is obviously aware, there is no causation requirement for Zone A. In Zone C, causation requirements are strenuous and require a profit level in 2011 above that of 2010. The Zone C "rebound" requirement may work well for businesses in areas that were not affected by actual oiling of the beaches and surrounding islands. The formula assumes that in 2011 everything was back to normal. Again, for areas that did not actually receive oil that may be a valid assumption. However, for areas that received "max oiling" that is not the case. We are not back to normal. Water-related businesses have gone out of business, marinas have gone bankrupt, and marina/condominium developments have been cancelled. Seafood processors have gone out of business and the view of our part of the country is still stained in many people's mind. (For example, see the ads that continue to run, nationally, promoting the safety of Gulf seafood INCLUDING Mississippi seafood).

Despite this, the settlement agreement places a requirement on the majority of Jackson County businesses to show that their business significantly rebounded in 2011. For most businesses that is a hurdle they cannot overcome because of the lingering impacts of heavy oiling on the economy in 2011 – making the Zone C burdens unfair and unreasonable for these putative class members. Presumably, the reason there is no "causation" and "rebound" requirement for Zone A is that the effects of the oil spill were ongoing in 2011. Although that is probably absolutely correct, no one has demonstrated how this part of Mississippi is different than the other parts of the Gulf Coast that were adversely affected by the oil spill. What are the facts that lead to the conclusion that Bayou LaBatre was still adversely affected in 2011 by the oil spill and Pascagoula was not? How is Biloxi still affected in 2011 but the majority of Ocean Springs not? How did

the entire Florida Keys, which received *no oil whatsoever*, negatively affected in 2011 but we were not? There is no data to support these conclusions.

### VII. The Multiplier

Zone A gets a minimum multiplier of 2 and a multiplier of 2.5 if it is tourism related. Zone C gets a multiplier of 1 and a multiplier of 1.5 if it is tourism related. It is presumed that this multiplier is to compensate for the loss of future business because of the lingering effects of the oil spill. As questioned in the paragraph above, where is the data that supports that this small area of Mississippi is different from the other areas on the Coast that are designated Zone A.

The entire Florida Keys have been designated Zone A. There was the perception by some that the Florida Keys, and small portion of the coastline near Tampa, Florida, were going to be affected by the oil spill in 2010. Oil did not get within 200 miles of any Florida Key. However, the perception may have been reality in 2010 for these areas (although the recently released 2010 tourism tax reports indicate that the Florida Keys not only did not lose tourism they actually gained in 2010). However, giving the Keys a 2 or 2.5 multiplier for losses in 2011 does not make sense when compared to the Coastal section of Mississippi. Since the Keys never received oil, it is hard to justify compensating an area which did not receive oil for future loss of business due to the oil spill when compensating the businesses and citizens on the Mississippi Gulf Coast a significantly lower rate when they did actually receive oil – heavy amounts of oil, in fact.

Finally, it must be pointed out that the oil spill is not over for our businesses and citizens. The barrier islands received significant amounts of oil following the recent tropical depression in June 2012. It is widely reported that there are oil mats throughout the Mississippi Sound. No one has stated that our Gulf beaches and Mississippi Sound beaches are free of oil. Yet, following the rationale of the causation and multiplier, this area had completely recovered from the oil spill by the end of 2010.

11

### VIII.   Unfair Treatment

It would be unfair to impose differential treatment for identical businesses within a thirty-mile radius (all businesses located on the Gulf Coast).  Fairness mandates that the settlement treat similarly-situated class members the same – imposing the same burdens of proof on similarly-situated class members.  Three grocery stores provide an example.  One is located in Bayou LaBatre, Alabama, one in Pascagoula, and one in West Ocean Springs.  The grocery store in Pascagoula is located within fifteen miles of both the store in Bayou LaBatre and in West Ocean Springs.  In 2010, each saw a loss of $200,000.00 as a result of the oil spill.  In 2011, as the effects linger, each improved their business but still had a $190,000.00 loss.  Under the current classifications, the amounts that will be received under the settlement agreement are as follows:

(a) Bayou LaBatre Grocery Store: $600,000.00;
(b) West Ocean Springs Grocery Store: $600,000.00
(c) Pascagoula Grocery Store: $0

A number of businesses could be substituted for the grocery store and the results would be the same.  This is an outcome without any objective facts to set forth why this portion of Jackson County was treated differently than everywhere else.

### MEMORANDUM OF LAW

### I. Similarly Situated Class Members cannot be Arbitrarily Subjected to Different Burdens of Proof

Class action settlements cannot benefit one group of class members to the detriment of others. *See, e.g., Hanlon v. Crysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1998); *In re General Motors Corp. Engine Interchange Litig.,*  594 F.2d 1106, 1133034 (7th Cir. 1979).  A class action settlement cannot arbitrarily prefer one group of plaintiffs over another—because such a rule would be inimical to the very principle of class advocacy. *In re Diet Drugs*

*(Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, 93 Fed.Appx. 338, 343 2004 WL 326971 (3d Cir. 2004).

## II. STANDING

The Mississippi Attorney General has the authority, standing and duty to vindicate the rights of the citizens and businesses of Mississippi before this Court, based upon the following three grounds:

> (1) The *parens patriae* authority of the State Attorneys General, as keepers of the public trust, conferred by the constitution and laws of each State, as well and the common law, permit the State Attorneys General to appear in this Court on behalf of the interests of all of the citizens of their respective States to vindicate the States' quasi-sovereign interest in the health and well-being - both physical and economic - of its residents in general.
>
> (2) As a consequence of the direct injuries and costs incurred by the Gulf States, and specifically the State of Mississippi, as a result of the failure of BP to fulfill its obligations to compensate the individual and business claimants that have suffered damages as a result of the Deepwater Horizon oil spill. If BP evades its legal responsibilities to fully and fairly compensate private claimants in Mississippi that have suffered injuries as a result of the Deepwater Horizon incident, many of the costs that *should* be borne by BP and other Responsible Parties will be improperly shifted to State taxpayers, in direct contravention of the remedial purposes of OPA.
>
> (3) The Class Action Fairness Act of 2005 (CAFA) confers standing on State Attorneys General to vindicate the rights of putative class members against unfair and unreasonable class action settlements.

Accordingly, the Mississippi Attorney General has standing to appear before this Court and petition for the relief required to protect these public interests, even in the absence of the State of Mississippi filing a direct and discreet action before this Court.

### A. The Mississippi Attorney General Has *Parens Patriae* Standing

As noted by the Court in *Hood ex rel. Mississippi v. Microsoft Corp.*, 428 F.Supp.2d 537, 542-543 (S.D.Miss. 2006):

> In order to maintain a *parens patriae* action, the State must articulate an interest apart from the interests of particular private parties; that is, the State must have a "quasi-sovereign interest" in the litigation to sue in its *parens patriae*

13

> capacity. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel, Barez*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). If the State has such a quasi-sovereign interest, it is a real party in interest for diversity purposes.
>
> A quasi-sovereign interest is a State's interest in the well-being of its populace. *Id.* at 602, 102 S.Ct. 3260. The United States Supreme Court has stated that quasi-sovereign interests fall into two categories:
>
>> "First, a State has a quasi-sovereign interest in the health and well-being-both physical and economic-of its residents in general. Secondly, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system."
>
> Id. at 609, 102 S.Ct. 3260.

*See*, *State of Kansas v. Colorado,* 185 U.S. 125, 142, 22 S.Ct. 552 558,46 L.Ed.836 (1902) (A state may have a justiciable interest only by virtue of its duty to protect the general welfare 'as *parens patriae*, trustee, guardian, or representative of all or a considerable portion of its citizens); *State of Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 451, 65 S.Ct. 716, 89 L.Ed. 1051 (1945)(The State of Georgia, as representative of the public, was allowed to bring suit against twenty railroads to enjoin 'a wrong, which if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States.); *State of Missouri v. Illinois,* 180 U.S. 208, 241, 21 S.Ct 331, 344, 45 L.Ed. 497 (1901)(Missouri allowed to bring a bill to enjoin the dumping of Chicago sewage into a canal draining into the Mississippi River and poisoning the water supply to Missouri land and residents. The Court said that 'if the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them); *State of Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (Georgia allowed to sue to enjoin the defendant from discharging noxious gases from its works in Tennessee over Georgia territory). *Accord, Land O'Lakes Creameries, Inc. v. Louisiana State Bd. of Health,* 160 F.Supp. 387, 388-389 (E.D.La. 1958) (A state in undertaking to sue for particular benefit of a limited number of its citizens, is a mere volunteer and does not have the necessary "justiciable interests" to entitle it to maintain the action. A state may have a justiciable interest sufficient to

participate in litigation as a party only by virtue of its duty to protect the general welfare as *parens patriae,* trustee, guardian, or representative of all or a considerable portion of its citizens.) *See also, Texas v. Scott & Fetzer Co.,* 709 F.2d 1024 (5th Cir. 1983) ("[E]ven without an express grant of *parens patriae* authority, the Attorney General can bring an action on behalf of the State to recover *parens patriae* damages."). *Contrast, State of La. ex rel. Guste v. Verity,* 681 F.Supp. 1178, 1181 18 Envtl. L. Rep. 20,944 (E.D.La. 1988)(State of Louisiana did not have standing to represent interest of distinct group of people - Louisiana shrimpers - who were capable of raising their own claims challenging regulations of the Department of Commerce requiring shrimp trawlers to reduce incidental catch and mortality of sea turtles in shrimp trawls.).

Here, since class counsel are attempting to settle an action which involves class members residing in multiple States, with myriad competing interests and factual bases for their damage claims, it is imperative that the interests of class members in one State are not compromised in the interest of vindicating class members from another State. With such a diverse set of factors to be balanced, the welfare of one State's citizens may be sacrificed in the interest of obtaining settlement across many State borders; however, such a compromise may improperly prejudice the Equal Protection rights of the class members in a particular State. The Mississippi Attorney General believes such an improper compromise is being proposed here and, as a result, only the State Attorney General – not class counsel – can properly represent the economic interests of the class members in Mississippi. Accordingly, the Mississippi has *parens patriae* standing to bring this challenge.

### B. The Mississippi Attorney General Has Standing Under CAFA

The State Attorneys General have standing to oppose any class action that is not "fair, adequate or reasonable," under CAFA. In particular, CAFA's Section 1715(b), is intended to combat the "clientless litigation" problem by adding a layer of independent oversight to prohibit

inequitable settlements. Under this provision: "Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement . . . ." 28 U.S.C. § 1715(b). The "appropriate State official" is defined as the "primary regulatory or supervisory" official with authority over the defendant, or the State Attorney General. 28 U.S.C. § 1715(a)(2).[3] Here, BP is not regulated or supervised by any Mississippi official in connection with the facts of the case, so the "appropriate State official" in Mississippi to whom notice must be provided under CAFA is the State Attorney General. No class settlement can become final until ninety (90) days after notice is provided to the applicable State Attorneys General to permit them the opportunity to evaluate and, if necessary, oppose inequitable settlements.

As explained in the February, 2005, Senate Report on CAFA:

> A federal court cannot issue a final order approving a settlement until 90 days after the appropriate federal and state officials are served. If the defendants do not comply with this provision, a class member can refuse to comply with–or be bound by–the settlement agreement.

S. REP. 109-14, S. Rep. No. 14, 109TH Cong., 1ST Sess. 2005, 2005 WL 627977, 2005 U.S.C.C.A.N. 3 (Leg.Hist.), p. 19; *see also*, 28 U.S.C.A. § 1715(b). The congressional record shows that CAFA's notice requirements "provide a check against inequitable settlements in these cases. Notice will also deter collusion between class counsel and defendants to craft settlements that do not benefit the injured parties." *Id.* Here, the "appropriate state officials" to whom notice

---

[3] See also S. REP. 109-14, S. Rep. No. 14, 109TH Cong., 1ST Sess. 2005, 2005 WL 627977, 2005 U.S.C.C.A.N. 3 (Leg.Hist.), p. 19 (Notice must be provided to the state attorney general. The notice must include: (1) a copy of the complaint and attached materials; (2) the date and time of any scheduled judicial hearing; (3) proposed or final notification to the class members; (4) the proposed settlement; (5) any other agreement between class counsel and the defendant; (6) any final judgment or notice of dismissal; (7) the names of class members who reside in each state and their proportional share of the settlement, or if that is not feasible, a reasonable estimate of the number of class members in the state and their share of the settlement; and (8) any written judicial opinion related to the proposed settlement.)

must be provided under CAFA are the Attorneys General of the five Gulf Coast States (Florida, Alabama, Mississippi, Louisiana and Texas).

Moreover, Section 1715 of CAFA vests the appropriate government officials with the opportunity to object to proposed class settlements and even to participate in fairness hearings. *See Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1302 n. 9 (S.D. Fla. 2007) (citing CAFA for premise that the State Attorneys General "are statutorily empowered by the United States Congress to receive and review all class action settlements"); *In re Amer. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 233-34 (E.D. Penn. 2009) (State Attorneys General submitted objections to settlement release and participated in fairness hearing pursuant to CAFA); *Cohen v. Viray*, 622 F.3d 188, (2nd Cir. 2010) (U.S. Department of Justice filed objections to settlement and participated in fairness hearing following court's award of an extension of time under CAFA to evaluate the proposed settlement); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) (noting lack of objections by government officials pursuant to CAFA in decision to approve settlement); *D.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 80 (E.D. N.Y. 2008) (ordering defendants to provide notice to appropriate government officials pursuant to CAFA, and issuing final approval of settlement "[a]bsent a request for a hearing" by those officials).

Courts routinely reject settlements and parties routinely modify settlements on the basis of objections filed by State Attorneys General to proposed class action settlements and class definitions. For example, in *Farinella v. Paypal, Inc.,* 611 F.Supp.2d 250, 255 (E.D. N.Y. 2009) the Court made changes to a proposed settlement in response to objections made by State Attorneys General:

The parties first submitted a proposed settlement to the Court on October 13,

> 2006. (Docket No. 71.) After minor changes were made *in response to concerns by state Attorneys General* relating to their ability to bring suits in the future, the proposed settlement was resubmitted on March 9, 2007 (the "Original Settlement"). (Docket No. 105.)  The Original Settlement was rejected by the Court for reasons set forth in *Paypal I* [*Karvaly v. eBay, Inc.*, 245 F.R.D. 71 (E.D. N.Y. 2007]. Chief among the reasons for its rejection was an overbroad definition of the class…

(emphasis supplied).

The Mississippi Attorney General has attempted to have the PSC and BP modify these improper Zone designations along the Mississippi Coast.[4]  BP has refused to amend the improper Zone designation of this stretch of Mississippi – apparently in an effort to evade its economic obligations under OPA to claimants and class members in this area – one of the most heavily oiled areas along the Gulf Coast.  It is in the public's interest for the Court to decline to approve the settlement and advise the parties to rectify this Zone issue.  This issue should be decided *before determining whether the proposed settlement is otherwise fair, adequate and reasonable.*  However, in the absence of correction of this improper Zone designation, this settlement cannot be determined to be "fair, adequate and reasonable" with respect to class members in this 15 mile area in Mississippi.  Correcting this designation as a scrivener's error is a solution that should be employed to avoid an objection to the settlement.

## IX. Conclusion

It is clear that a tremendous amount of thought and work went into developing this settlement agreement.  It is complex and made up of numerous components many of them very favorable to Gulf Coast residents.   However, Jackson County and Moss Point, Gautier, Ocean Springs and Pascagoula, Mississippi have been placed at a tremendous disadvantage with regard to claims for economic damages.  Each received the same oil, the same water, the same type injuries as other areas within Zone A – indeed far more oil than many areas in Zone A, yet this area and the similarly-

---

[4]  See, Letter to PSC attached hereto.

situated class members in this 15-mile coastal stretch are being treated disparately – based on an arbitrary designation in the settlement agreement. The facts do not justify this disparate treatment. The Mississippi Attorney General petitions this Court to direct the parties to amend what must certainly be an oversight or scrivener's error as it relates to this 15-mile area in Mississippi.

Furthermore, the Mississippi Attorney General requests that the Court consider and grant the relief requested in his April 25, 2012 Statement of Interest and related Memorandum of Law. (MDL Doc. 6356, *et seq*.). The 1996 amendments to the Oil Pollution Act of 1990 and controlling Fifth Circuit and Gulf State law precedents mandate this relief.

Respectfully submitted this 7th day of September, 2012.

JIM HOOD, ATTORNEY GENERAL
STATE OF MISSISSIPPI

BY: s/Michael C. Moore
Michael C. Moore, MS Bar No. 3452
Mike Moore Law Firm, LLC
10 Canebrake Blvd., Ste. 150
Flowood, MS 39232
Telephone No. (601) 933-0070
Fascimile No. (601) 933-0071
Email: mm@mikemoorelawfirm.com

BY: s/Mary Jo Woods
Mary Jo Woods, MS Bar No. 10468
Special Assistant Attorney General
Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone No. (601) 359-3680
Facsimile No. (601) 359-2003
Email: mwood@ago.state.ms.us

**CERTIFICATE OF SERVICE**

We, the undersigned, hereby certify that on this day, that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL2179.

This, the 7th day of September 2012.

>JIM HOOD, ATTORNEY GENERAL
>STATE OF MISSISSIPPI
>
>BY: s/Michael C. Moore
>Michael C. Moore, MS Bar No. 3452
>Mike Moore Law Firm, LLC
>10 Canebrake Blvd., Ste. 150
>Flowood, MS  39232
>Telephone No. (601) 933-0070
>Fascimile No. (601) 933-0071
>Email: mm@mikemoorelawfirm.com
>
>BY: s/Mary Jo Woods
>Mary Jo Woods, MS Bar No. 10468
>Special Assistant Attorney General
>Office of the Attorney General
>Post Office Box 220
>Jackson, Mississippi  39205
>Telephone No. (601) 359-3680
>Facsimile No. (601) 359-2003
>Email: mwood@ago.state.ms.us