**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUSIANA**

_____

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER | ) |
| HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 | ) MDL No. 2179 |
| | ) |
| IN RE THE COMPLAINT AND PETITION OF | ) Section: J |
| TRITON ASSET LEASING GmbH, ET AL., IN A | ) |
| CAUSE OF EXONERATION FROM OR | ) Judge: Barbier |
| LIMITATION OF LIABILITY | ) |
| | ) Magistrate: Shushan |
| This Document Relates To: | ) |
|     All Cases, | ) |
|     12-970 (Bon Secour Fisheries, Inc., et al. | ) |
|     v. BP Exploration & Production., et al.) | ) |

_____ )

## OBJECTIONS TO THE PROPOSED *DEEPWATER HORIZON* SETTLEMENT CLASS BY GULF ORGANIZED FISHERIES IN SOLIDARITY & HOPE (GO FISH)

### I.    INTRODUCTION

BP's reckless disregard of safety, risk, and preparedness, coupled with BP's dishonest and anemic response to the spill has decimated the fisheries and economy of many Gulf Coast fishing towns. Contrary to statements presented by BP and the Plaintiff Steering Committee ("PSC") in support of the Deepwater Horizon Economic & Property Damages Settlement Agreement (hereinafter "Settlement"), the abundance of harvestable fish is not recovering as advertised, particularly in areas most affected by the spill.  Reductions in catch are causing severe reductions in commercial fishing take home pay and propelling many fishermen near or below the poverty line.[1]  The continuing decline of the fisheries and the possibility of a fishery collapse or closure expose commercial fishermen to significant future risk.

GO FISH membership has consistently held that any settlement of fishing revenue claims must be measured in two ways:  first, the funds must replace past losses *and* afford commercial fishermen a

_____

[1] This exact plight is what led to passage of the Oil Pollution Act of 1990 in the first instance and to its amendment in 1996. BP underpaid interim relief.  Fishermen are now exposed to incredible financial pressures to accept any resolution.

cushion against future risk,[2] a concept GO FISH labels "duration" or "term of protection".   Second, with all of the fisheries in decline, the funds must assure sufficient "parity" between fisheries and the different fishing occupations (owner, captain, crew) involved. Unfortunately, the Settlement "as filed" fails for many both tests of duration and parity.  Contrary to the PSC and BP's promises and the assertions made to this Court, fully half of the $2.3 billion Seafood Compensation Program (SCP) Settlement Fund as currently allocated has been diverted away from commercial fishermen to pay property damage claims.  Further, the allocation formulas for commercial fishermen yield outcomes for different fisheries and occupations that are heavily imbalanced without rational basis or support.

    The root cause of these apparent inequities is the failure to designate represented subclasses for the discrete categories of claimants competing for a slice of the SCP pie. Lawyers who contributed to the negotiation of the allocation formulas have clients in all of the SCP claim categories, and were therefore restricted in their ability to advocate regarding the fairness of the process or result on behalf of any one fishery or occupation.[3]  SCP property claimants, well represented by members of the PSC, obviously fared very well relative to commercial fishermen.  Fisheries that received a lot of factual attention, shrimp and oyster, did better than the fisheries that received little attention, crab and finfish.  Deckhands without any apparent voice in the negotiations received the worst treatment.  These flaws are material class flaws and fatal to the fairness of the SCP.

    GO FISH believes that these problems can still be solved within the confines of the Settlement's terms by creating subclasses and a process for determining a fair "Round Two" distribution from the

---

[2] These funds are needed to replace the income normally earned by the fishermen for the duration of the event, to cover fixed costs and expenses needed to preserve their boats and feed their families.  If the funds do not cover a sufficiently long period, the fishermen (and not BP) will incur financial ruin.  Thus, while a resolution is preferred to protracted litigation, a resolution that fails to protect against reasonable bad outcomes suffers the same hubris and commits the same error that caused the sinking of the *Deepwater Horizon* to begin with.
[3] *See* Exhibit 1, Sworn Statement of Joel Waltzer; Exhibit 2 Sworn Statement of Clint Guidry; Exhibit 3, Sworn Statement of Phuong Nguyen.

Settlement Fund.[4] Without these corrective steps, the Settlement Class cannot be certified. Most likely, the Seafood Fund will have over $1 billion left over after the initial DHECC distribution, contrary to the representations of both the PSC and BP.  As a result of GO FISH's preliminary objections, the Settlement was amended to allow the Court appointed neutral to change the allocation formulas to attain fairness on the second distribution of SCP funds.  GO FISH continues to believe that 2.3 billion dollars, *if distributed fairly*, should be enough to provide all fishermen both duration and parity - assuming fisheries don't fail.  To reach a fair result, a process must be created to remove legal conflicts, and the allocation must be reformed to be more broadly protective and fairly applied.  GO FISH seeks a Court ordered process that assures the fair and ethical consideration of the issues raised herein prior to SCP Round Two.[5]

The objections that follow are presented in the alternative to the reform efforts outlined above.  If the Court feels it cannot create subclasses and an advocacy process that will address conflicts within the SCP prior to the second distribution, GO FISH asks the Court to rule that the class cannot be certified as defined and hence does not meet the criteria necessary for approval.

## II.      LAW REGARDING RULE 23(a)(4)'S "ADEQUACY" INQUIRY

Rule 23 of the Federal Rules of Civil Procedure provides the framework and requirements for certification of a class. GO FISH's objections revolve around the unreasonable allocation of funds among claimants within the Seafood Compensation Program, and so GO FISH directs the Court's attention in particular to the "adequacy of representation" requirements of Rule 23(a)(4). Rule 23(a)(4) provides that "One or more members of a class may sue or be sued as representative parties on behalf of

---

[4] After all claims made in the SCP are paid in the initial distribution of "Round One", money remaining in the SCP fund will be distributed in "Round Two". As explained below, GO FISH believes that "Round Two" will be significant.

[5] A fair process must include certification of a subclass for the SCP participants separate from the uncapped claimants and then further subdivided among the competing claimants for the SCP fund, appointment of advocates for specific fisheries, occupations, and perhaps geographies, and an informal, transparent process that allows the advocates to present relevant facts and opinions for consideration by either the Court or a Court appointed master, prior to the distribution of the remaining SCP funds.

all members only if . . . the representative parties will fairly and adequately protect the interests of the class." "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In addition, "courts have found that class counsel cannot adequately represent two sets of claimants if, in limited fund situations, the recovery of one set will cut directly into those of another." 1 Newberg on Class Actions § 3:75 (5th ed.).

The fact that BP and the PSC jointly urge the Court to approve the settlement and certify the massive unitary class should not relax the Court's vigilance in examining the conflicts presented in the agreement. "[S]pecifications of [Rule 23] – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem*, 521 U.S. at 620. The district court should take "steps at the outset to ensure that the potentially conflicting interests of easily identifiable categories of claimants be protected by provisional certification of subclasses." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831-32 (1999). "[P]ost hoc findings at the fairness hearing that these subclasses in fact had been adequately represented" are inappropriate and insufficient. *Id.* Instead, it is "essential" that "intraclass conflicts [be] addressed by recognizing independently represented subclasses." *Id.* at 864. "'[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement ... on the basis of consents by members of a unitary class, some of whom happen to be members of ... distinct subgroups,' without creating subclasses." *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242, 252 (2nd Cir. 2011) (quoting *In re Joint E. & S. Dist. Asbestos Litig.,* 982 F.2d 721, 743 (2d Cir.1992), *modified on reh'g,* 993 F.2d 7 (2nd Cir. 1993)).

Inquiries regarding the propriety of the class under Rules 23(a)-(b) are distinct from the inquiry into the fairness of a settlement under Rule 23(e). Even a settlement that offers compensation within the reasonable range of "fairness" cannot be approved if the class designation is inappropriate. *Ortiz,* 527 U.S. at 858; *Amchem,* 521 U.S. at 621.[6] However, the substantive provisions of the settlement itself will often guide the Court's appreciation of conflicts that exist among class members.[7] The Fifth Circuit has noted that when the issue concerns the allocation of settlement funds (as opposed to their sufficiency) "objection by [even] a few dissatisfied class members should trigger close judicial scrutiny to ensure that the burden of the settlement is not shifted arbitrarily to a small group of class members." *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1218 (5th Cir. 1978). In *In re General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 797 (3rd Cir. 1995), the Third Circuit cautioned that a "judge [applying Rule 23(a)(4)] must focus on the settlement's distribution terms . . . to detect situations where some class members' interests diverge from those of others in the class. For example, a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group."

In *Langbecker v. Elec. Data Sys. Corp.,* the Fifth Circuit held that "intraclass conflicts may negate adequacy under Rule 23(a)(4)" and "can present problems of constitutional magnitude" 476 F.3d 299, 315 (5th Cir. 2007). Intraclass conflicts arise when named class representatives' interests are not aligned with, and are instead antagonistic to, unnamed absent class members. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999); *Amchem*, 521 U.S. at 625 ("The adequacy

---

[6] Note that statements to the contrary in *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir 1981) and other older cases are no longer good law.

[7] *See, e.g.*, *Literary Works*, 654 F.3d at 252 (2nd Cir.) ("*Amchem* . . . allows courts, in assessing the adequacy of representation, to examine a settlement's substance for evidence of prejudice to the interests of a subset of plaintiffs"); *Corrugated Container*, 643 F.2d at 208 (5th Cir.) (considering, as part of its adequacy inquiry, "whether any specific features of the settlement sacrificed the interests of one class in favor of the interests of the other"); *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983) ("the settlement itself provides insight into adequacy of representation"); *see also* Fed. R. Civ. P. 23 (note on 2003 Amendments) ("The terms of the settlement themselves . . . may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses").

inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent"). It is basic that not every conflict of interest renders class representation inadequate – only "material" or "fundamental" conflicts serve to defeat class certification under Rule 23(a)(4). *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). However, antagonistic economic interests or objectives are routinely found to be sufficiently material to meet this standard.[8] The law does not require, nor would common sense countenance, that a class action settlement benefit all members of the class equally, but the settlement terms must be "rationally based on legitimate considerations." *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396, 1411 (E.D.N.Y.1985) (citing *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983). The case law establishes beyond dispute that advocacy by separately represented subclasses is necessary for legitimate consideration to be given to competing interests within the class.

In a situation very similar to the negotiation of the methodologies for the Seafood Compensation Program, the Second Circuit has found that the failure to appoint separately represented subclasses for purposes of allocation was fatal to class certification. In *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), the court of appeals found that Rule 23(a)(4) was not satisfied, even though "[t]he Settlement was the product of an intense, protracted, adversarial mediation," the "mediators were highly respected and capable," and "associational plaintiffs advanced the interests of all [class members]." *Id.* at 250-55. The Court of Appeal noted that "[a]lthough the mediators safeguarded the negotiation process, and the institutional plaintiffs watched out for the interests of the class as a whole, no one advanced the strongest arguments in favor of Category C's recovery." *Id.* at 253. According to the Second Circuit, only subclasses, with independent counsel representing and advocating for them, could ensure that the value of each subgroup's claims was

---

[8] *See, e.g., Amchem,* 521 U.S. 591 (1997); *Ortiz,* 527 U.S. 815 (1999); *In re Literary Works*, 654 F.3d at 252; *Langbecker,* 476 F.3d at 315.

properly assessed and compensated by the settlement. *Id*. Further, the fact that class representatives actually had the disfavored "Category C" claims did nothing to cure the problem because their duty, and their counsel's duty, was to the class as a whole. *See id*. at 252; *see also Amchem,* 521 U.S. at 627 ("the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent *solely* the members of their respective subgroups.") (internal quotations omitted) (emphasis added).

### III.    STATEMENT OF FACTS REGARDING THE SEAFOOD PROGRAM

### A.    The BP/PSC Fairness Argument Masks Allocation Inequities by Comparing the Full Seafood Fund to Commercial Fishing Revenue.

Proponents brand the Seafood Compensation Program's $2.3 billion Seafood Fund as a program designed for commercial fishermen:  "[W]e agreed to establish a $2.3 billion guaranteed payment by BP to Seafood Harvesting Claimants, including vessels, Boat Captains, and Deckhands." [R.7101-9 (Decl. of J. Rice) at 4.] The experts repeat this mantra:  "The 'SCP Amount' is the amount that vessel owners, captains, and crew will receive as a result of the Seafood Compensation Plan through initial distributions by the Court-Appointed Neutral and secondary pro-rata distributions." [Rec. Doc.7114-19 (Decl. of Martin Smith) at 60].[9] BP and the PSC take this one step further and argue the proposed Settlement is fair by comparing the annual catch of the commercial fishing industries to the full $2.3 billion amount placed in the Seafood Fund.[10]  In fact, that comparison forms the central basis of the expert opinions and

---

[9] *See also*, Rec. Doc. 7101-7 at 4 (Decl. of S. Herman) ("We ultimately agreed to a $2.3 billion Seafood Fund, which I believed would be more than sufficient to adequately compensate past and future commercial fishing losses.")

[10] In its memorandum in support of approval, BP states:  "The only component of the Settlement Agreement that is capped is the SCP, to which a total of $2.3 billion has been allocated. *Id*. ... this amount is nearly five times the total annual revenues of seafood harvested in the class geography." [Rec. Doc. 7114-1 at 13].  As stated in the PSC's memorandum:  "When, therefore, BP moved the discussion to a non-reversionary fund that would satisfy all class commercial fishing claims, the $2.3 billion that BP was willing to guarantee to the class was almost *five times* the entire revenue of annual catch landed in the Gulf Coast Areas, and significantly more than the total of the projected aggregate pay-outs under the separate shrimp, oyster harvester, oyster leaseholder and deckhand compensation models that were being discussed by the stakeholder contingencies." [Rec. Doc.7101-2 at 15].

graphical illustrations attached to the supporting memoranda.[11]  The PSC itself provides this Court with clear evidence that these assertions are simply not true.

The Seafood Compensation Program pays three types of claims:  lost profit or wages by commercial fishermen; claims for the repair of oyster beds under lease, a property damage; and claims for the diminution in value of IFQ quotas, an inchoate injury to financial instruments.[12]  The PSC's "Seafood Compensation Program Projection" chart, Exhibit A to Plaintiffs' Memorandum in Support of Final Approval of Economic and Property Damages Class Settlement shows oyster leaseholders are expected to receive $689 million dollars as compensation for their "Oyster Leasehold Interest" (in addition to the initial payment of $60 million for "Oyster Lost Income").  Likewise, IFQ Quota Holders will receive an initial payment of $50 million for the diminution in value of their financial instruments.



Property and diminution claims are not the same as lost wage claims; nor can they be properly ascribed to commercial fishermen.  The chart above plainly shows that *at least* $800 million of the $2.3

---

[11] As stated by BP's fisheries economist, Dr. Martin Smith:  "Considering higher real discount rates ranging from 9.5 to 14.9 percent, the settlement agreement amount of $2.3 billion is an even larger percentage of the present value of total landing revenues in the class geographies, reflecting between 46 to 72 percent. (Exhibit 2)." [Rec. Doc.7114-19 at 6].  Similarly, Dr. James Richardson observed that "the Seafood Compensation Program amount of $2.3 billion is roughly five times the average annual revenue (over 2007-09) for the commercial fishing industry in the Gulf region covered by the settlement. [Rec. Doc. 7114-17 at 30].

[12] As noted by BP's Dr. Martin Smith:  "The primary stakeholders with direct involvement in seafood harvesting are vessel owners, vessel captains, and crew…  The SCP also compensates other important stakeholders that reflect particularities of the fisheries. In the oyster fishery, for example, there are some individuals with leasehold interests who may not be involved directly in harvesting…  Similarly, there can be owners of Individual Fishing Quotas ("IFQs") who neither engage in fishing nor own fishing vessels." [Rec. Doc. 7114-19 at 10, 11].

billion Seafood Fund will be used to pay the non-revenue based claims of individuals who may or may not be commercial fishermen, in the first round alone.  *At least* $739 million of the initial distribution is in truth not related to fishing income.  Clearly, the proponents are spinning the facts.[13]

> **B.    The PSC And BP Analysis Overstates The Benefits To Fishermen And Fails To Account For Significant Facts.**

The PSC and BP's expert analysis of the proposed Settlement fails to account for several significant yet undetermined variables that drive the amount of compensation actually paid to eligible individual commercial fishermen and the recovery of funds to the fishing industry as a whole.  The setoffs for amounts already paid by BP and GCCF, the value of released claims, the number of excluded claimants, and the SCP program value of oyster leases issued by private parties all will significantly increase the distributional inequities if the second distribution is left proportional.

> **1.    *Setoffs Will Reduce the Amount Received By Commercial Fishermen and Increase the Skewed Benefits Under the Proposed Settlement.***

In proponents' Joint Exhibit A and in the proposed Settlement Agreement itself, the parties state: "The Seafood Compensation Program is estimated to result in claims *payments* totaling $1.9 billion of the $2.3 billion in the Program. There may be a later distribution of the balance. The distribution of any such balance may be affected by the number of other qualified participants in the Seafood Program."[14] [Rec. Doc.7110-1 at 51].

---

[13] The chart has a number of other problems.  The PSC and BP chart significantly overstates the amounts that can be received by commercial harvesters.  If *every* dollar of the 2009 annual fishing revenue is claimed using the Settlement's formulas, the total payout to commercial fishermen would be roughly $1.1B, $150 million below the total indicated on the PSC chart.  The chart does not account for another $150 million of reductions in the Seafood fund:  category 3 deckhands, accounting services, and DHCC transition payments.

[14] *See also*, Settlement Agreement, Exhibit 10 at 3 ("The Seafood Compensation Program is estimated to result in prompt claims payments totaling more than $1.9 billion representing approximately 83% of the $2.3 billion Seafood Compensation Program Amount."); [Rec. Doc. 7101-2 at 16]("Specifically, the Seafood Compensation Program frameworks, which are themselves conservative, are projected to pay out an initial amount of approximately $1.9 billion, in full and fair compensation to the relevant class members, leaving an approximate $400 million reserve.")

The SCP provides:  "Compensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document."  [Settlement Agreement, Exhibit 10 at 3]  This setoff for interim payments constitutes a dollar for dollar reduction in the funds paid to eligible commercial fishermen in the initial distribution.

The GCCF reported that BP and the GCCF together paid $732 million to the fishing industry.[15] None of that money went to pay for oyster leaseholders' property claims. The GCCF's methodologies did not even recognize such a claim. DHECC is reported to have paid an additional $65 million in transition payments using the GCCF's methodologies that serve as interim payments unless a release is subsequently accepted.  While a large portion of the GCCF $732 million was likely paid to fishermen to secure final releases, the amount of interim payments to DHECC eligible commercial fishermen remains uncertain.  Interim payments reduce the amount paid to fishermen in the initial distribution.  The more that the initial distribution is reduced for any one class or subclass, the greater the disparity between classes that will result from the second distribution, assuming the allocation formulas are left undisturbed.

The distribution amongst the classes of potential claimants for the capped proceeds is also impacted by the number of fishermen who signed GCCF releases and the value of their claims.  These fishermen are by definition excluded from the class.  While it can be argued that if $1.15 billion represents the most that can be recovered if the entire commercial fishing industry participated in the settlement, and half of the seafood revenue is GCCF released, fewer remaining eligible fishermen means more funds for those individuals.  But it must also be pointed out that the entire commercial fishing industry will have been severely shortchanged if relief is not provided to those who signed releases. In

---

[15] *See* Exhibit 4, GCCF Statistics (November 29, 2011).  11,468 individuals were paid $134.33 million.  18,628 businesses were paid $597.87 million.  *Id.*

addition, just as with interim payments, the increasing number of releases of commercial fishermen exaggerates the disparate recovery of the property claims.

Finally, BP and the PSC confirmed to GO FISH that the $689 million estimate of oyster lease property claims was based solely on oyster leases issued by state agencies. Louisiana State Land Office records establish that large areas of waterbottoms are actually claimed or owned by private entities (e.g. LL&E and Apache Oil).[16] These landowners also issue oyster leases, some thousands of acres large.[17] While the total number of acres is not known, the SCP calls for payment on these leases. The more acreage that has not been accounted for in the estimate, the less funds are available for commercial fishing claims.

Using the proposed Settlement formulas, assuming for the moment that BP and the PSC correctly estimated the total acres of oyster leases, and assuming commercial fishermen have already received 28% of the gross amount of their DHECC awards in prior interim and emergency payments,[18] and assuming that the value of released claims are comparable to the value of unreleased claims,[19] the

| % CF GCCF Released | 0.00% | 20.00% | 35.00% | 50.00% |
|---|---|---|---|---|
| **Round I** | | | | |
| DHCC Initial Claimant Payouts | $ 1,834 | $ 1,615 | $ 1,451 | $ 1,287 |
| Payments to L/H & IFQ | $ 689 | $ 689 | $ 689 | $ 689 |
| Gross DHCC Award to Eligible CF | $ 1,095 | $ 876 | $ 712 | $ 548 |
| Less Interim Payments | $ 307 | $ 245 | $ 199 | $ 153 |
| Initial DHCC Payment to Fishermen | $ 788 | $ 631 | $ 512 | $ 394 |
| DHCC Deckhand Class 3 Fund | $ 50 | $ 50 | $ 50 | $ 50 |
| Assessment/Accounting Costs | $ 15 | $ 13 | $ 12 | $ 11 |
| TOTAL ROUND 1 | $ 1,542 | $ 1,383 | $ 1,263 | $ 1,144 |
| **Round II** | | | | |
| % to Fishermen | 60% | 54% | 49% | 43% |
| Second Payment to Fishermen | $ 417 | $ 497 | $ 509 | $ 492 |
| % Prop. Claims | 38% | 43% | 47% | 54% |
| Second Payment to L/H & IFQ | $ 262 | $ 391 | $ 492 | $ 619 |
| % Class III DH | 3% | 3% | 3% | 4% |
| Second Payment to Class 3 "Crew" | $ 19 | $ 28 | $ 36 | $ 45 |
| TOTAL ROUND 2 | $ 698 | $ 917 | $ 1,037 | $ 1,156 |
| DHECC TOTAL | $ 2,156 | $ 2,208 | $ 2,202 | $ 2,194 |
| DHECC Total to L/H & IFQ | $ 951 | $ 1,080 | $ 1,181 | $ 1,308 |
| DHECC Total to FISHERMEN | $ 1,205 | $ 1,128 | $ 1,021 | $ 886 |
| YEARS OF PROTECTION | 2.70 | 2.53 | 2.29 | 1.99 |

effect of an increasing percentage of fishermen who signed releases is demonstrated mathematically on the right. The commercial fishery will receive approximately $512 million in the initial distribution. If 35% of fishermen's claims have been excluded by GCCF's questionable releases (a conservative estimate), the property claims of oyster leaseholders and IFQ shareholders will ultimately consume

---

[16] *See* Exhibit 5, State Land Office, Map of Privately Owned and Claimed Water Bottoms.
[17] See Exhibit 6, Sworn Statement of Byron Encalade.
[18] This figure assumes undersigned's clients, 390 SCP vessel owners and captains, are statistically "normal".
[19] To date, the PSC has been unable or unwilling to provide the information that would remove the necessity of making assumptions regarding the fundamental facts that will determine what the settlement truly provides.

$1.181 billion of the Seafood Fund, while the entire commercial fishing industry of the Gulf Coast is left to divide $1.021 billion.

But even that result is overly optimistic for the fishing industry. Holding the commercial fishermen who signed releases constant at 35% and assuming the same 28% prior payment of interim and emergency funds, the effect of underestimating the total acres of oyster leases is also demonstrated mathematically on the right. If the thousands of acres of privately owned oyster leases increase the property claims by only 20% (again a conservative estimate), then the leaseholders take $1.3 billion away from the deal, while the entire Gulf Coast fishing community, a $450 million a year industry, releases everything for little more than $900 million.

| Additional Acres Not Accounted For (% of Public Acres) | 10% | 20% | 30% | 40% |
|---|---|---|---|---|
| **Round I** | | | | |
| DHECC Initial Claimant Payouts | $ 1,520 | $ 1,589 | $ 1,657 | $ 1,726 |
| Non Rev. Payments to L/H & IFQ | $ 758 | $ 827 | $ 896 | $ 965 |
| Gross DHECC Award to Eligible CF | $ 712 | $ 712 | $ 712 | $ 712 |
| Less Interim Payments | $ 199 | $ 199 | $ 199 | $ 199 |
| Initial DHECC Payment to Fishermen | $ 512 | $ 512 | $ 512 | $ 512 |
| DHECC Deckhand Class 3 Fund | $ 50 | $ 50 | $ 50 | $ 50 |
| Assessment/Accounting Costs | $ 13 | $ 13 | $ 14 | $ 15 |
| TOTAL ROUND 1 | $ 1,333 | $ 1,403 | $ 1,472 | $ 1,542 |
| **Round II** | | | | |
| % to Fishermen | 47% | 45% | 43% | 41% |
| Second Payment to Fishermen | $ 453 | $ 402 | $ 355 | $ 313 |
| % Prop. Claims | 50% | 52% | 54% | 56% |
| Second Payment to L/H & IFQ | $ 482 | $ 467 | $ 447 | $ 424 |
| % Class III DH | 3% | 3% | 3% | 3% |
| Second Payment to Class 3 "Crew" | $ 32 | $ 28 | $ 25 | $ 22 |
| TOTAL ROUND 2 | $ 967 | $ 897 | $ 828 | $ 758 |
| DHECC TOTAL | $ 2,205 | $ 2,208 | $ 2,211 | $ 2,213 |
| DHECC Total to L/H & IFQ | $ 1,240 | $ 1,294 | $ 1,343 | $ 1,388 |
| DHECC Total to FISHERMEN | $ 965 | $ 915 | $ 868 | $ 825 |
| YEARS OF PROTECTION | 2.16 | 2.05 | 1.95 | 1.85 |

This math leads to several conclusions.  First, the initial distribution will pay less than 25% of the Seafood Fund to DHECC-eligible commercial fishermen.  Second, commercial fishermen will very likely receive less than half of the Seafood Fund after all distributions.  Third, underestimating the acres under lease in a capped fund can have a profound impact on the fishermen.  Fourth, the "five times annual revenue" argument is fanciful.  Fifth, under any measure, around $1 billion will remain in the Seafood Fund awaiting Round Two's allocation decision and final distribution. Fifth, there is a serious conflict among the categories of plaintiffs making claims on this fund, a conflict that the commercial fishery is losing.

GO FISH reiterates its prayer for a fair, ethical, and transparent process designed to give voice to the concerns of the fisheries that are disparately treated as shown below.  GO FISH objects to the proponents' expert affidavits and contests the assertion that the Settlement is fair because the full $2.3

billion Seafood Fund is five times commercial fishing industry revenues. That analysis is wrong, misleading, or at a minimum, substantially incomplete. Such erroneous bases for opinion cannot survive *Daubert*'s requirements and are not persuasive.

> ### 2.   *Disparate Treatment Among the Claimant Groups Is Proven By the Various Seafood Compensation Commercial Fishing Formulas.*

Commercial fishermen have well recognized maritime and OPA claims for lost income and for punitive damages. For captains and vessel owners, the compensation formula is dependent on their fishery, categorized into five programs: oysters, shrimp, crabs, finfish and other. Most harvester "benchmark" revenues are enhanced for price, shrimp is enhanced for roadside sales too, and all are reduced by costs associated with producing the harvest. The product is called "Vessel Share", the cash margin left to be shared among the owner and captain after a "cost percentage" is deducted from revenue. The vessel share is further reduced by a fixed, presumed fishery specific "fishery loss percentage" to derive a base loss.[20]

The base loss for commercial fishermen range from $0.02 to $0.17 on each dollar of benchmark annual revenue depending on the fishery. Leaseholders have a "base loss" of $0.44 cents on each dollar of benchmark annual revenue. Category 1 deckhands have a base loss of $0.37 for each dollar earned out of eight months of the benchmark year. After the vessel share is divided between captain and owner by a customary industry percentage, a "Risk Transfer Premium[21]" or "RTP" is finally applied.

Deckhands who have W-2's or 1099s are placed in Category One and paid under a unitary formula regardless of fishery. Category Two deckhands prove their claim by an affidavit from the captain or owner. These crew are compensated with the same formula as those with tax records but the

---

[20] See, *infra.*, for discussion of "cost percentages" and the use of fishery "loss percentages".

[21] "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors." (The Plaintiffs' Steering Committee's and BP Defendants' Joint Motion for (1) Preliminary Approval of Class Action Settlement, (2) Scheduling a Fairness Hearing, (3) Approving and Issuing Proposed Class Action Settlement Notice, and (4) BP's Motion for Adjourning the Limitation and Liability Trial, p. 14.)

annual benchmark is capped well below the poverty line.  A low 2.25 RTP is applied to these claimants. Category Three deckhands have no owner or captain to vouch for them.  They are paid $5,000; their total pool is capped at $50 million.

Oyster leaseholders are also awarded compensation for lost revenue from oyster harvesters who had paid to farm their leases.  Unlike all other claimants, there is no cost percentage for leaseholders but an "oyster loss ratio" is applied to fix a base. [22]  The RTP is then applied to reach an offer for the revenue claim. More incredibly, oyster leaseholders are guaranteed a set recovery on a per acre basis with no requirement that they prove that they have ever earned a single dollar from oysters on their leases, or that they ever had an oyster on the lease at all. No fisherman in the entire SCP is afforded a recovery without proving that they had something of value lost to the spill.

### Gross Offer Per Dollar Of Vessel Revenue

| SPECIES | VO Expedited | VO Reduced Expedited | VO Historic | Capt Historic | VO+Capt Historic |
|---|---|---|---|---|---|
| SHRIMP <30 | 3.2 | N/A | 1.6 | 1.4 | 3.0 |
| 30-44 | 3.4 | 2.5 | 1.5 | 1.2 | 2.7 |
| 45-74I | 3.0 | 2.9 | 1.4 | 0.9 | 2.3 |
| 45-74F | 1.7 | 1.7 | 1.2 | 0.7 | 2.0 |
| 75+I | 1.8 | 1.9 | 1.1 | 0.5 | 1.6 |
| 75+F | 1.5 | 1.6 | 1.1 | 0.5 | 1.6 |
| OYSTER   All | N/A | N/A | 1.2 | 1.1 | 2.3 |
| FINFISH   All | N/A | N/A | 0.6 | 0.4 | 1.0 |
| CRAB   All | N/A | N/A | 1.0 | 0.5 | 1.6 |
| OTHER   All | N/A | N/A | 0.2 | 0.1 | 0.4 |
| DECKHAND I | N/A | N/A | | | 1.2 |

After deductions and RTPs, the harvester's chart below, confirmed by BP in a meeting with GO FISH's counsel, indicates the value of gross offers relative to a vessel's annual revenue.  For instance, an oyster boat captain who lands $100,000 per year will receive an offer of $110,000.  These factors or multipliers are "gross" in the sense that any offer made by DHCC will offset amounts already received from BP or GCCF.  As seen, the cost and loss deductions applied prior to the "generous" RTPs cause recoveries to markedly diminish. Oyster leaseholders, not shown on the chart, have a 4.3 multiplier for each dollar of annual revenue.

### Years Gross Offer Replaces Take Home Pay

| SPECIES | VESSEL OWNER | CAPTAIN | OWNER-CAPTAIN | EXPEDITED | REDUCED EXPEDITED |
|---|---|---|---|---|---|
| SHRIMP <30 | | | | 6.6 | N/A |
| 30-44 | | | | 7.2 | 5.3 |
| 45-74I | | | | 6.7 | 6.5 |
| 45-74F | 3.2 | 2.9 | 3.1 | 4.6 | 4.4 |
| 75+I | | | | 5.7 | 6.0 |
| 75+F | | | | 4.4 | 4.7 |
| OYSTER   All | 3.9 | 3.5 | 3.7 | N/A | N/A |
| FINFISH   All | 1.8 | 1.5 | 1.6 | N/A | N/A |
| CRAB   All | 2.5 | 2.1 | 2.3 | N/A | N/A |
| DECKHAND I | | 1.2 | | N/A | N/A |

---

[22] The leases themselves are believed to be inexpensive, around $20/acre.

For a true "apples to apples" comparison, the amount recovered from DHECC and BP/GCCF can be divided by the expected pre-spill income using the assumptions found in the formulas to derive a term of protection in years, shown here. This "term" accounts for both past and future losses and a sizable amount has already been consumed. Unless the PSC and BP are wrong about the $1.93 billion initial distribution, fishermen have little protection left and even less to show for releasing their punitive damage claims.

Assuming the PSC and BP are wrong regarding the amount of money spent in the first distribution, based on the unaccounted for variables discussed above, even though the term of protection improves, the fisheries are widely divergent in recovery:

| 120%LH -33% Released | Gr. Offers Per DHECC Formulas | Prior BP/GCCF Pmts. | DHECC Round 1 (Net GCCF) | DHECC Round 2 (Total) | Total of DHECC Payments | PSC Exh. A: Total DHECC Payments | Diff. | Total All Sources | Total Net Vessel Income | Claimant Years of Prot. | Industry Years of Prot. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Shrimpers | $511 | $339 | $171 | $377 | $548 | $1,044 | ($496) | $887 | $182 | 4.9 | 3.3 |
| Oystermen | $110 | $73 | $37 | $81 | $118 | $259 | ($141) | $191 | $34 | 5.6 | 3.7 |
| Blue Crabbers | $53 | $35 | $18 | $39 | $57 | $116 | ($59) | $92 | $24 | 3.8 | 2.6 |
| Fin Fishermen | $51 | $34 | $17 | $38 | $55 | $121 | ($66) | $88 | $34 | 2.6 | 1.7 |
| Other | $11 | $8 | $4 | $8 | $12 | $22 | ($10) | $20 | $17 | 1.2 | 0.8 |
| DH CL3 | $50 | $0 | $50 | $37 | $87 | $0 | $87 | $87 | | | |
| Oyster L/Hs & IFQ | $807 | $0 | $807 | $597 | $1,404 | $689 | $715 | $1,404 | $12 | 117.0 | 108.0 |
| Total | $736 | $489 | $247 | $543 | $789 | $1,562 | ($773) | $1,278 | $303 | 4.2 | 2.9 |

The two major causes of the low recovery for all fishermen, which also account for a significant portion of the wide differences between the fisheries (in addition to the facially obvious different RTPs), include the fishery specific "cost percentages" and "loss percentages".

As for cost percentages, BP's Martin Smith argues the assessments against revenue are fair and reasonable; figures he finds consistent with NOAA government sources. [Rec. Doc. 7114-19 at 15, 21 (fn.61)]: "The [fishery] cost percentage is used… to adjust for costs not incurred by fishermen when they do not fish." [*Id.* at 23]. "Some of these costs would not be incurred if fishing activity were permanently reduced in response to lower abundance of fish; these include costs for fuel, bait, ice, and

other supplies such as food for the captain and crew" and "variable costs avoided when claimants were not fishing." [*Id.*, at 6, 10].

Smith explains that the loss percentages are "the estimate of the reduction in volume realized by claimants due to the *Deepwater Horizon* incident" and are "fishery-specific and reflect the downturns in the volume of catch experienced in the respective fisheries in 2010 compared to a baseline period." [*Id.*, at 10, 9.] The assumed "loss percentages" found in the SCP formulas in fact act as a *cap on recovery* and are not found elsewhere in the settlement.

The cost and loss percentages explained by BP's expert are mutually exclusive.  If saved expenses should be backed out of lost revenue because a fisherman cannot fish "in response to a lower abundance of fish" isn't the fisherman's loss percentage 100%?  Conversely, if the fisherman is still fishing but catching less, what suggests the vessel will not burn fuel? As the statements of fishermen attached to this objection attest, costs naturally go up when fish is less abundant because it takes more time and effort to bring in an adequate catch.[23] Applying both reductions dramatically reduces the base loss prior to applying the "generous" RTP.  A 45-foot shrimp boat is assessed 42% costs.  Revenue after costs is 58%, times the loss of 35%, equals 20%.  20% of the 9.25 RTP multiplier is 1.85. Under any reasonable construction of fishermen's business losses "saved expenses" should not be assessed, which would afford fishermen their revenue times the 35% loss percentage, times the 9.25 RTP multiplier – or 3.24 –  almost twice as much as the current double reduction.

As noted above, Martin Smith argues for the fairness of the Seafood Program by improperly comparing the present value of all future landings generated by commercial fishermen to the entire amount of the $2.3 billion Seafood Fund.  [Rec. Doc. 7114-19 at 5, 6].  The maximum of $1 billion that may actually be paid to commercial fishermen, using a below market discount rate of 1% to 3% as

---

[23] Exhibit 6, Sworn Statement of Byron Encalade; Exhibit 7, Sworn Statement of Thien Nguyen; Exhibit 2, Sworn Statement of Clint Guidry; Exhibit 3, Sworn Statement of Phuong Nguyen; Exhibit 8, Sworn Statement of Maurice Phillips; Exhibit 9, Sworn Statement of Thomas Olander.

endorsed by the Fifth Circuit[24] or the U.S. OMB recommended discount rate of 7% as suggested by Smith, produces a range of between 4% and 14% of the "*permanent* loss in all future revenue for all fisheries in the class geographies," [*id.*] not in the 22% to 72% range as found in Smith's declaration.[25] No competent evidence introduced by the Settlement's proponents demonstrates how long it will take for the various fisheries to recover from the mortality loss and continuing reproductive effects of the spill.  GO FISH incorporates the comments of the United States regarding the natural resource damages as if reproduced herein *in toto*.

Perhaps more interestingly, applying Smith's own methodology to the various sub-classes of fisheries within the Seafood Compensation Program highlights their unequal treatment.  Shrimp and oyster harvesters recover 20% of their value, crabs and finfish recover about 10% of their value, while oyster leaseholders recover **591%** of the value of all future

| Smith Perpetuity Fairness Evaluation | 2009 Industry Revenues | Present Value of Revenue (@4.5%) | Total DHECC Award | Award as % of Total Value |
|---|---|---|---|---|
| **SHRIMP** | | | | |
| All | $265 | $3,786 | $760 | 20% |
| **OYSTER** | | | | |
| Harvester | $52 | $746 | $164 | 22% |
| Leaseholder | $13 | $192 | $1,134 | 591% |
| **FINFISH** | | | | |
| All | $70 | $997 | $75 | 8% |
| **CRAB** | | | | |
| Blue | $42 | $606 | $75 | 12% |
| **OTHER** | | | | |
| All | $33 | $476 | $13 | 3% |
| **TOTALS** | | | | |
| | $475 | $6,803 | $2,221 | Aver. 77% |

revenues generated by their property interest.  The disparity is striking and lacks any reasonable basis. Clearly commercial fishermen are suffering a reduced recovery that directly benefits oyster leaseholders.

A second serious flaw with the loss percentages and SCP program as a whole is that loss assumptions are based solely on 2010 data and on Gulf-wide averages.  These factors likely under compensate those who fish some of our most contaminated and historically bountiful basins.  The fundamental objection of many GO FISH members is that setting compensation to the average loss Gulf-wide deprives those whose traditional fishing grounds are far from average, those who ply these

---

[24] *Culver v. Slater Boat Co.*, 722 F.2d 114, 121 (5th Cir. 1983); *Rhodes v. Guiberson Oil Tools*,  82 F.3d 615, 623 (5th Cir. 1996).

[25] Economists have long called the use of the higher discount rates found in the Smith declaration an unethical under-valuation of resources to the next generation. *See, e.g.,* RAMSEY, F., 1928, A mathematical theory of saving, *Economic Journal*, 38, 543-559; HARROD, R.F., 1948, *Towards a Dynamic Economics*, Macmillan; SOLOW, R.M., 1992, *An almost practical step toward sustainability*, Resources for the Futures, October 8. That criticism feels appropriate in this instance.

more contaminated waters, an adequate recovery.[26] "The very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that those with ...[greater oil impacts] would have chosen." *Ortiz*, 527 U.S. at 857.

Both the affidavits attached to this objection and the Louisiana Wildlife and Fisheries landings data for 2010 and 2011 clearly demonstrate this weakness. Louisiana Department of Wildlife and Fisheries data confirm what the real fisheries experts, the fishermen themselves, already knew.[27]  In our most contaminated areas, the harvests are demonstrably weakened.[28]  The chart and bullet points below summarize some of the catch data obtained from the government agency:

- In Terrebonne, 2010 crabs are off 45%; 2011's harvest was off 25%.  Half of the "term of protection" for Terrebonne crabbers was eaten even before the Settlement was announced.[29]
- In Barataria and St. Bernard, 2011 white shrimp catch decreased 40% - five times normal seasonal variation.  Using BP's own cost numbers, a 40% decline in abundance means 70% less income. With that cut in pay, many must leave their boats tied at the dock; families subsist in poverty.[30]
- East of the river, oyster harvests on public beds are down 65%, costing fishermen more in fuel than they would otherwise make from their harvest.  Many must crowd into expensive private leases, quadrupling costs, pushing income way down.[31]
- Harvests in the most lucrative shrimping grounds offshore are severely off. Area 13, southwest of the Deepwater Horizon, is off more than 80%.  This leaves GO FISH to wonder if most of that area is simply and entirely dead.[32]

| BASIN | SPECIES | Av 06-09 | Std Dev | StdD | 2010 | % | 2011 | % |
|---|---|---|---|---|---|---|---|---|
| | WhShr | 68,667,428 | 10,393,021 | 15% | 52,826,523 | 77% | 45,843,608 | 67% |
| | BrShr | 36,131,038 | 9,127,389 | 25% | 12,169,742 | 34% | 34,732,389 | 96% |
| TOTALS | ALL | 104,798,466 | 15,469,381 | 15% | 64,996,265 | 62% | 80,575,997 | 77% |
| | Oyster | 11,780,620 | 2,012,739 | 17% | 5,364,361 | 46% | 10,012,991 | 85% |
| | Crab | 45,055,533 | 5,225,477 | 12% | 27,784,142 | 62% | 40,077,297 | 89% |

| BASIN | SPECIES | Av 06-09 | Std Dev | StdD | 2010 | % | 2011 | % |
|---|---|---|---|---|---|---|---|---|
| Atchafalaya | White Shrimp | 2,282,391 | 335,981 | 15% | 2,336,581 | 102% | 2,221,549 | 97% |
| Terrebonne | White Shrimp | 15,917,460 | 3,986,017 | 25% | 19,526,749 | 123% | 14,834,128 | 93% |
| Barataria | White Shrimp | 18,117,275 | 1,290,454 | 7% | 14,730,202 | 81% | 11,025,354 | 61% |
| Mississippi R | White Shrimp | 2,214,122 | 826,160 | 37% | 1,956,630 | 88% | 1,664,057 | 75% |
| Pontchartrain | White Shrimp | 3,798,993 | 1,712,252 | 45% | 4,082,823 | 107% | 2,175,461 | 57% |
| La. Grid 13 | White Shrimp | 6,415,974 | 1,453,946 | 23% | 787,393 | 12% | 1,136,148 | 18% |
| La. Grid 14 | White Shrimp | 5,370,099 | 1,615,070 | 30% | 1,965,954 | 37% | 4,083,619 | 76% |
| La. Grid 15 | White Shrimp | 12,425,934 | 2,069,952 | 17% | 5,483,560 | 44% | 7,039,235 | 57% |
| La. Grid 16 | White Shrimp | 2,125,180 | 854,628 | 40% | 1,956,630 | 92% | 1,664,057 | 78% |
| Total | White Shrimp | 68,667,428 | 14,144,460 | 21% | 52,826,523 | 77% | 45,843,608 | 67% |

Catch in Heavily Oiled Basins Appear to be Moving in the Wrong Direction or Are Recovering Very Slowly

---

[26] Exhibit 2, Sworn Statement of Clint Guidry.

[27] GO FISH relies on Louisiana data because LDWF has been responsive to GO FISH's requests. GO FISH is not suggesting that the dramatic impacts are limited to Louisiana. They are not. Fishermen in Mobile Bay are also noting successive extremely poor seasons.  In fact, the past two shrimping seasons have been called by many the worst in memory.

[28] See, e.g., Exhibit 6, Sworn Statement of Byron Encalade; Exhibit 8, Sworn Statement of Maurice Phillips; Exhibit 10, Sworn Statement of Donald Dardar.

[29] *See also*, Exhibit 10, Sworn Statement of Donald Dardar.

[30] See  Exhibit 3, Sworn Statement of Phuong Nguyen; Exhibit 11 Sworn Statement of George Barasich.

[31] See Exhibit 6, Sworn Statement of Byron Encalade.

[32] *See also* Exhibit 7, Sworn Statement of Thien Nguyen (regarding absence of tuna and swordfish in the same area).

Because the same expenses are incurred by fishermen despite a reduced catch, small declines in volume produce much larger reductions in a commercial fisherman's take home pay.[33]  The loss factors given in the Settlement severely underestimate the losses incurred by the commercial

| Location/Basin | Species | 2006-09 Average Catch | Trip Costs | Pre-Spill Income | 2011 Catch | 2011 Income | % Change in Income |
|---|---|---|---|---|---|---|---|
| SHRIMP | | | | | | | |
| Louisiana | All | $1.00 | 47.5% | $0.53 | 77% | $0.30 | -44% |
| Louisiana | White | $1.00 | 47.5% | $0.53 | 67% | $0.20 | -63% |
| Louisiana | Brown | $1.00 | 47.5% | $0.53 | 96% | $0.49 | -8% |
| Pontchartrain | White | $1.00 | 47.5% | $0.53 | 55% | $0.08 | -86% |
| Barataria | White | $1.00 | 47.5% | $0.53 | 61% | $0.14 | -74% |
| OYSTER | | | | | | | |
| Louisiana | All | $1.00 | 12.0% | $0.88 | 85% | $0.73 | -17% |
| Pontchartrain | All | $1.00 | 12.0% | $0.88 | 35% | $0.23 | -74% |
| CRAB | | | | | | | |
| Louisiana | Blue | $1.00 | 35.0% | $0.65 | 89% | $0.54 | -17% |
| Barataria | Blue | $1.00 | 35.0% | $0.65 | 71% | $0.36 | -45% |
| Terrebonne | Blue | $1.00 | 35.0% | $0.65 | 74% | $0.39 | -40% |

fishing fleet.  A 35% reduction in pay for a crabber is produced by just a 22% decline in catch.  A 19% reduction in catch for a shrimper produces the 35% loss percentage.  30% less sacks, even if an oysterman did not have to pay more to access a lease, produces a 40% decline in pay.  Finally, long-line and inshore fishermen experience a 25% reduction in income if they lose but 18% of the catch. The actual catch reductions experienced by fishermen in hard hit areas vastly exceed these percentages. [34] Hard hit fishermen are nevertheless unreasonably stuck with the average Gulf-wide loss during the 8 months of 2010 following the spill.  In fact, the SCP capped fund is the only program in the Settlement where spill victims are not allowed to use their actual losses.

## IV. ANALYSIS: APPLICATION OF THE LAW TO THE FACTS OF THIS CASE.

The necessary conclusions follow like clockwork when the law is applied to the facts of this case. The unitary class that has been proposed for certification in this matter suffers the same fatal conflicts for participants in the Seafood Compensation Program as those which lead to the reversal of certification in *Amchem*,[35] *Ortiz*,[36] and *Literary Works*.[37] The Seafood Program is a fixed sum of money all of which will be distributed to participating claimants. Accordingly, every dollar that is allocated to

---

[33] Exhibit 6, Sworn Statement of Byron Encalade; Exhibit 7, Sworn Statement of Thien Nguyen; Exhibit 2, Sworn Statement of Clint Guidry; Exhibit 8, Sworn Statement of Maurice Phillips; Exhibit 9, Sworn Statement of Thomas Olander.
[34] The United States and Alabama have submitted responses to the proponent's statements seeking approval of the Settlement, submissions that defang BP's scientific claims concerning the damage caused by the oil spill.  GO FISH incorporates these comments by reference.
[35] 521 U.S. 591 (1997).
[36] 527 U.S. 815 (1999).
[37] 654 F.3d 242 (2nd Cir. 2011).

one type of claimant must be taken away from the remaining types of claimants. That fact alone requires the Court to recognize that a conflict exists among the SCP claimants under the Supreme Court precedent.

As currently configured, the methodologies proposed will award fully half of the $2.3 billion fund to the relatively few oyster leaseholders.[38] Awarding half of the money to leaseholders necessarily cuts deeply into the commercial fishermen's recovery. In addition, shrimpers who can use the expedited methodology will recover double relative to shrimpers who are forced to use the historical methodology. Oyster harvesters and shrimpers will recover double relative to what crabbers and finfishermen will recover. A captain on a shrimp boat will recover more than double relative to what a deckhand on the same boat will recover. A pink shrimp fisherman off the west coast of Florida who never saw a spot of oil will receive the same compensation as a fisherman in Plaquemines Parish, Louisiana.

Each of these are discrete categories of claimants that can be easily identified and that share discrete competing interests. The proposed Seafood Compensation Program contains undeniable distributional inequities among these categories. Whether or not the differing results are justifiable is an open question, but they certainly have not been justified to date with any "rationally based legitimate considerations" advanced by zealous advocates solely concerned with advancing each category's best arguments. The oyster and shrimping industries had strong advocates present during the negotiation of the allocation methodologies.[39] Crabbers, finfishermen, and deckhands did not.[40] The resulting disparities are obvious and otherwise inexplicable. As held by the Second Circuit in *Literary Works* the

---

[38] GO FISH estimates there are roughly 1,200 oyster leaseholders in the class. An advocate for commercial fishermen subclasses might argue that the property damage claims suffer considerable weakness compared to those of commercial fishermen. Nonfishermen oyster leaseholders along the entire Gulf Coast have gross revenues of about $13 million a year from harvesting on their leases as compared to the roughly $450 million a year in revenues by the fishing industry; there is no requirement in the SCP that leaseholders *ever* have earned *any* money from oysters on their leases; the State and not the leaseholders may own the restoration rights; and causation issues surrounding freshwater diversions further complicate leaseholder's claims.

[39] Exhibit 1, Sworn Statement of Joel Waltzer; Exhibit 6, Sworn Statement of Byron Encalade; Exhibit 2, Sworn Statement of Clint Guidry.

[40] Exhibit 1, Sworn Statement of Joel Waltzer; Exhibit 2, Sworn Statement of Clint Guidry.

presence of global advocates and the use of neutral mediators to allocate the funds does nothing to justify the results where "no one advanced the strongest arguments in favor of...recovery" for entire classes of claimants, which predictably ended up short-changed.

All of the cases cited above required rejection of the class and the settlement based on the conflicts present in the allocation of finds. Generally the court "may not make unilateral modifications or alterations to the proposed settlement, but rather may only accept or reject the agreement as a whole."[41] Accordingly, the failure to create subclasses where needed normally requires the court to "send the parties back to the negotiating table" to correct the flaws inherent in a settlement reached without the benefit of represented subclasses. Manual for Complex Litigation (4th) at § 21.612. However, reconfiguration of the class and the creation of a court supervised process for determining the second distribution can potentially save this settlement, even though the agreement has already been reached. The settlement agreement as amended at GO FISH's request contains within its own terms a mechanism to correct the failure to appoint subclasses during the negotiation of the initial allocation methodologies.  Because fishermen's claims are so drastically underpaid in the "First Round" of compensation, the funds remaining for the "Second Round" of compensation will be significant. With this large pot of money available for a potentially different allocation,[42] the efficacy of represented subclasses remains viable despite settlement already having been reached.

## V.    CONCLUSION

GO FISH submits that although a fair settlement is in the best interest of its members and the fishing community, significant flaws in the proposed Seafood Compensation Program make it

---

[41] *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 843 (E.D. La. 2007). *See Klein v. O'Neal, Inc.,* 705 F. Supp. 2d 632, 670 (N.D. Tex. 2010) (*citing Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (The court must "consider the effect of the settlement as a whole, and it cannot delete, modify or substitute certain provisions."(internal quotations omitted)).

[42] Although it has provided strong indications that the initial distribution is unreasonable, GO FISH cannot and does not presume to predict how the second distribution should be different. That is what the findings of fact by a court appointed special master who has the benefit of zealous advocacy should provide.

objectionable if left uncorrected. Inequitable and unsubstantiated disparities in recovery afforded to differing categories of claimants are the result of conflicting interests among the SCP participants that were not adequately safeguarded against in the negotiation of the SCP methodologies. The failure to create separately represented subclasses is fatal to the certification of the Settlement Class insofar as the capped SCP is concerned. It matters not whether the relatively low recovery by certain commercial fishermen groups is within the range that the Court might consider fair, where that low recovery was created by an enhanced recovery for other class members competing for the same dollars. The Court has a heightened duty to protect the unnamed class members in a settlement situation to ensure that some class members are not bearing the burden for the benefit of others. Some courts "have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class" and to impose "the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 280 (7th Cir. 2002). GO FISH believes that high duty of care can be discharged, and the Settlement saved, only by the creation of represented subclasses and an open process for the full airing of each subclass's strongest case for the "Round Two" distribution from the SCP Fund.


Respectfully Submitted:

/s/ Joel Waltzer
Joel Waltzer (LA #19268)
3715 Westbank Expwy, Ste 13
Harvey, LA  70058
Office:  (504) 340-6300
Fax:      (504) 340-6330
joel@waltzerlaw.com

/s/ Robert Wiygul
Robert Wiygul (LA #17411)
1011 Iberville Drive
Ocean Springs, MS 39564
Office: (228) 872-1125
Fax:      (228) 872-1128
robert@waltzerlaw.com

/s/ Clay Garside
Clay Garside (LA #29873)
14399 Chef Menteur Hwy, Ste D
New Orleans, LA 70129
Office: (504) 254-4400
Fax:      (504) 254-1112
clay@waltzerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing motion has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of September, 2012.

/s/ Clay Garside