UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, on APRIL 20, 2010 | * * * * * | MDL NO. 2179  SECTION J |
| Relates to: No.10-8888 Doc. Ref. No. 78634 DHECC Claimant No.: 100021510 | * * * * | JUDGE BARBIER  MAG. JUDGE SHUSHAN |

*********************************************

## SWORN DECLARATION

My name is Joel Waltzer. I am 49 years old and a lawyer with the law firm of Waltzer Wiygul & Garside. Our firm has always serviced disadvantaged communities, doing extensive work in both the Vietnamese and Native American communities in Louisiana and Mississippi. My partners and I, particularly my partner Robert Wiygul, also represent environmental groups and landowners, bringing a great many Clean Water Act, Clean Air Act, Solid Waste Disposal Act, NEPA, and Endangered Species Act cases, to name a few.

The MC252 Oil Spill sits at the confluence of very many of our different experiences. Early in the spill, my firm filed environmental cases to reform the MMS agency, to overturn regulatory waivers that contributed to the rig explosion, and on other matters on behalf of many public environmental organizations. My partners and I spent a great deal of time on emergency response related matters with the Unified Command for the Wisner Donation and the Pointe Au Chien Indian Tribe, who I have been helping for years.

Over the course of the year following the spill, but particularly in the months immediately preceding the April 21, 2011 short form filing date, a great many commercial fishermen sought our representation. We were entrusted to represent all different types of fishermen, including crabbers, oystermen, long-liners, finfish fishers, and most predominantly inshore and nearshore shrimpers. In all, over 450 vessel owners, 250 captains and over 200 deckhands sought our help.

I worked with the Plaintiff Coordinators and members of the Plaintiff Steering Committee on any number of occasions, joining the team and helping however I could to bring BP to justice. Our contributions included work on environmental suits, the GCCF, subsistence damages, the Vessels of Opportunity program and issues related to property contamination and environmental destruction.

Beginning with the opening of white shrimp season and throughout the fall of 2011, it was evident that the contamination out there was impacting the fisheries and that my fishermen clients were really struggling to make a living. For most GCCF had supplied no relief for over one full year.

I began to model the shrimping industry and to gather as much data as I could. I wanted to create a method of compensating fishermen that did not rely on tax records or trip tickets because different states had different standards and individual firm risk was very high, meaning fishing businesses are highly variable. I felt that tying compensation to individual performance in reality rewarded the lucky and punished the

unlucky because commercial fishermen share a similar skill set and most have been doing this all their lives. My idea was to use industry averages to ensure that all fisherman make a fair recovery.

I was working on environmental and land contamination matters and discussed the ideas I was developing regarding the shrimp fishery with Stephen Herman. I think he liked the idea and more generally trusted us to deliver what we promise. He asked me to develop an analysis and framework for the shrimp industry.

In December of 2011, these efforts intensified. I began to help other members of the PSC whom I later learned were involved in negotiations with BP, including Mr. Joe Rice.

At some point in early 2012, it became evident that the parties were in heavy discussions regarding a global settlement, but the details of the settlement were not shared with me. I was kept to my niche, the shrimp industry. I assumed that each fishery had similar help and I believe that I was told for ethical reasons we were kept apart.

From late January through the trial date, I was asked to attend discussions and ultimately ended up assisting the PSC in their talks with BP. I held a factual posture as best I could, even after I was joined by another lawyer who would from time to time reach to favor his client base. I trusted that Mr. Rice and his partner were good at what they do and would see through that. I felt my job was to give Joe the ammunition he needed to better do his job.

Late in February I believe, I was asked to revise my modeling down, to provide a lower level of protection than what I wanted. I was told I needed to because the lawyers for the different plaintiff groups wanted more than BP was willing to pay. I was told that we would all need to "take a haircut". I did what was asked of me but with stated reservations. Again, I assumed that each fishery was being asked the same and in my experience rarely do folks walk away happy from a negotiation.

In client meetings my clients have always expressed that the most important thing to them was their long term security. This made a great deal of sense given the poor results and uncertainty regarding the fisheries. My clients met with me and collectively felt they needed about ten years of protection. I felt if we were able to get around 6 to 8 years of money today, the time value of money would do the rest.

In early March of 2012, the PSC announced that an Agreement in Principle had been reached. I regarded the Seafood Program in light of the term of protection instructions we received from our clients. The details of the Agreement in Principle and the capped fund was explained to a very large group of us. Even though the Seafood Program stated to be subject to change, the examples of different fishery recoveries I was shown convinced me that the fund would provide five to eight years of lost catch, enough to take care the fisheries. I saw examples that led me to conclude the fund would be fairly distributed. I did not then understand that property claims were staking a large share of the fund.

A short time later, my partner and I were asked to attend meetings with Court appointed "neutrals" Balhoff and Perry whom I had just learned was coming into this process to resolve the conflicts in the Seafood Program. I did not know much about what conflicts existed.

We all convened in the Pan Am building. Because I had so many clients from many fisheries, I sat in almost all of the different fishery group meetings. In these meetings I really felt the competition for the fund. I

began to feel very uneasy because I felt constrained by my loyalties to all of the fisheries and claim types involved, with the exception of IFQ holders. Some groups were seeking in my view very large amounts of money. If they were successful, I knew there would not be enough to fairly go around.

I also learned that not all the fisheries had lawyers who had done what I had done for shrimp. So, for two days I pulled several of my clients in to meet with Mr. Balhoff. They presented information and left. Two were requested for interviews to be class representatives. We were also asked to put together something for crabs similar to what we did for shrimp but it was far too short a time. I was also told I would be asked back for more input.

After the meetings we did not hear anything for a few weeks. Then the agreement was filed. The agreement as filed was very different from what we were sold in March. I felt a good bit cheated.

As an environmental lawyer who has worked on public trust, waste and natural resource issues, and through my experiences with lost catch claims and maritime claims over the years, it is my professional opinion that the SCP no longer has adequate parity amongst the different interest groups given the risks involved with the different claim types. I believe the process presents extreme ethical challenges that I frankly don't know how to handle. I am between a rock and a hard place and I now wonder if that is no accident. It is my opinion that the protection afforded to some groups of my clients is generous while to other groups it is insufficient. One interest group, 1300 oyster leaseholders, some of whom I represent, will receive around one million dollars apiece for leases that cost them $30/acre. Other interest groups, like tuna fishermen, receive just over one year of compensation. Tuna fishermen could not even fish in 2010, they missed the entire season as the tuna are pelagic and highly migratory. As a result, I have worked to amend the proposal to make it fair for all of my clients. We need relief now.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on September 7, 2012, Harvey, Louisiana.

_____
Joel Waltzer