**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL-2179 |
| "DEEPWATER HORIZON" | § | |
| in the GULF OF MEXICO, on | § | |
| APRIL 20, 2010 | § | SECTION "J" |
| | § | |
| THIS DOCUMENT RELATES TO: | § | JUDGE BARBIER |
| | § | MAG. JUDGE SHUSHAN |
| *10-cv-3059, 11-cv-0516 and 12-970* | § | |

<u>**STATE OF LOUISIANA'S MEMORANDUM IN RESPONSE AND IN OPPOSITION TO BP'S AND PSC'S MOTIONS FOR FINAL APPROVAL OF ECONOMIC & PROPERTY DAMAGES CLASS SETTLEMENT**</u>

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

    A.  Background ................................................................................................ 3

    B.  Louisiana's Interests ................................................................................ 5

II.  ARGUMENT .................................................................................................... 7

    A.  Legal Standard .......................................................................................... 7

    B.  This Court Should Completely Disregard BP's Gross Misrepresentations
Regarding The Recovery Of The Gulf ........................................................ 10

        1.  Coastal Areas ................................................................................ 12
        2.  Marsh Plants .................................................................................. 13
        3.  Other Ecosystem Species .............................................................. 14

    C.  The Settlement Fails to Acknowledge BP's Unlimited Strict, Joint and Several
OPA Liability and Misrepresents BP's Significant Exposure To Gross Negligence. ... 16

    D.  The Seafood Compensation Cap Is Contrary To BP's Unlimited Liability And
The Claims Deadline Is Arbitrary And Unreasonable. ................................. 18

    E.  The RTPs Do Nothing More Than Transfer BP's Liability For Future Damages
To Claimants, And Ultimately, To The State. ............................................. 21

    F.  The Proposed Settlement Is A Rebranded GCCF Process With No Explanation
Of Whether Improvements Resulted. .......................................................... 22

III.  CONCLUSION ................................................................................................ 25

NOW INTO COURT, through undersigned counsel, comes Plaintiff, the State of Louisiana through James D. "Buddy" Caldwell, Louisiana Attorney General ("Louisiana" or "State"), who respectfully submits this Response in Opposition to BP and the PSC's requests for Final Approval of the Economic and Property Damage Class Settlement ([Rec. Doc. 7101] ("PSC's Motion") and [Rec. Doc. 7114] (BP's Motion")).  Louisiana files this response to correct errors and misrepresentations and to object to those portions of the Settlement that treat claimants unfairly and purport to shift BP's liability for long-term environmental impacts to class members.[1]

## I.   INTRODUCTION

On April 18, 2012, the PSC and BP entered into an Economic and Property Damages Settlement Agreement [Rec. Doc. 6276-1][2] and filed it with the Court together with motions for preliminary approval, certification of a settlement class, approval of a notice plan, and for a final fairness hearing on the settlement.  On May 3, 2012, the settling parties filed an amended settlement agreement, entitled "*Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012" ("E&PD Settlement Agreement" or "Settlement") [Rec. Doc. 6430-1].  The Court entered a Preliminary Approval Order on May 2, 2012, setting a Final Fairness Hearing for November 8, 2012 [Rec. Doc. 6418].  Finally, on August 13, 2012, the PSC and BP each filed their Motions For Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement, as well as supporting declarations.

---

[1] LA also adopts and incorporates those portions of the United States' Memorandum In Response To BP Defendants' Memorandum In Support of Motion For Final Approval Of *Deepwater Horizon* Economic And Property Damage Settlement ("U.S. Memo") [Rec. Doc. 7293] that discuss BP's significant exposure to a finding of gross negligence and the substantial documented environmental harms suffered as a result of the Spill.

[2] More specifically, the agreement is made between BP Exploration & Production, Inc. and BP America Production Company (BP) and the Economic Class Representatives (plaintiffs named in the new economic and property damages class complaint) on behalf of an Economic and Property Damages Settlement Class.

Prior to the filing of BP's and the PSC's Motions, Louisiana requested that the Court permit it to conduct limited discovery regarding the fairness of the proposed E&PD Settlement and the underlying documents or testimony, or lack thereof, supporting the Settlement.  [Rec. Doc. 7035]. The Court denied Louisiana's request, reasoning that Louisiana lacked standing to conduct discovery.  [Rec. Doc. 7038].  In that Order, the Court also stated that the Settlement Agreement "will in no way affect any procedural or substantive rights of …Louisiana". *Id*. at 2.[3]

In light of the unsupported and grossly misleading statements and declarations filed by BP, which were largely uncontested by the PSC, Louisiana is compelled to file this response and oppose BP's Motion, especially its efforts to have this Court accept as true statements regarding the economic damages suffered by the State of Louisiana or its citizens or the alleged "robust recovery" of the Gulf of Mexico ecosystem.  BP's Motion not only misrepresents the degree of damage suffered by the State and its citizens, including potential class members and other non-settling parties, but it is also based on inaccurate and irrelevant factual data and legal conclusions. Specifically, Louisiana objects to BP's blatant misrepresentation of the significant acute and chronic natural resource damages ("NRD") and economic damages suffered by the State and its citizens, as well as those future, long-term ecological damages that will continue to occur for years or decades to come.  To the extent this settlement is premised on such incorrect information, it should be rejected.

Louisiana also opposes other aspects of the Settlement that are not in the best interests of, and that mislead, potential class members.  Given the admitted lack of discovery on the issue of ecological and economic damages[4], Louisiana also has serious concerns about the following:

---

[3] Louisiana maintains its disagreement with these conclusions.
[4] Ltr from PSC to Magistrate Judge Shushan re: HESI and State of LA Requests for Settlement Discovery (July 25, 2012) [Rec. Doc. 7032] ("To this point there has been absolutely no discovery related to the question of damages.")

1. The Settlement's failure to account for BP's unlimited, strict, joint, and several liability imposed upon them by the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701 *et seq.*;
2. The Settlement's provision of a Seafood Compensation cap, which is contrary to BP's unlimited liability, and its claims deadline, which is arbitrary and unreasonable.
3. The Settlement's transfer of risk to claimants, and ultimately the states, through its Risk Transfer Premium ("RTP"), which is insufficiently defined;
4. The improvement, if any, to the claims process (as required by OPA) that was already being implemented through the Gulf Coast Claims Facility ("GCCF"), as a result of the proposed settlements.

Louisiana is in favor of a settlement that fully and expeditiously compensates victims of the *Deepwater Horizon* Oil Spill for all past, current, and future losses.  Indeed, OPA requires such a process.[5]  Here, however, where BP proposes caps on recoveries, imposes unreasonable claim deadlines and submits grossly misleading statements in the form of uncontested declarations, and where the PSC makes no attempt to contradict these misrepresentations, Louisiana files this opposition in an effort to protect the health, safety, and welfare of its citizens.

**A. Background**

On April 20, 2010, the *Deepwater Horizon* drilling platform exploded and subsequently sank in the Gulf of Mexico 48 miles off the coast of Louisiana resulting in the largest oil spill in our nation's history.  The explosion killed 11 people working on the platform and injured 17 others.   Between April 22 and July 15, 2010, it is estimated that 210 million gallons of oil were released from the Macondo wellhead, approximately 172 million gallons of which were released directly into the Gulf of Mexico.  This oil made landfall in the coastal marshes of Plaquemines Parish nine days after the initial release and continues to flow onto Louisiana's shoreline.  After 87 days, BP temporarily capped the Macondo well, but not before millions of barrels of oil,

---

[5] In fact, given the requisite of a continuing claims process under OPA, should this Court reject one or both of the current settlements, BP will still be obligated to provide a claims process as it has through the GCCF and under the terms of the proposed settlements.  No payments dispensed under the previous processes would have to be returned, resulting in no prejudice to the claims made by the citizens of Louisiana.

natural gas, methane and dispersants were released into the Gulf.[6]   The Macondo Well was permanently capped 111 days after the blowout.[7]   NOAA, Approximate Oil Locations from April 28, 2010 to May 2, 2010 (May 2, 2010) (Exh. "A").

In response to the Spill, BP only managed to capture 689,934 barrels of oil from the Gulf, and completely failed to keep oil from making landfall.   According to the U.S. Coast Guard, once the oil began approaching the shore, 3.8 million feet of hard boom and 9.7 million feet of soft boom were deployed in an effort to protect our fragile marshes.   This action failed to achieve its goal and in turn, potentially created more injuries to the environment.   Remarkably for a company that touts its response efforts, BP still has not removed all of the associated boom equipment, including the thousands of boom anchors that were abandoned in Louisiana's waterways.   Not only does BP oil remain uncontrolled in the nearshore Louisiana ecosystem, but BP is executing one of the worst oil responses in history.[8]

Over two years after the spill commenced (and even before Hurricane Isaac),[9] oil continues to wash up on our beaches from submerged tar mats, oil captured in nearshore

---

[6] It is also estimated that 1.84 million gallons of Corexit 9500 and 9527, toxic oil dispersant products, were applied, making the large percentage of the oil unrecoverable, with unknown long-term environmental impacts.

[7] 2,900 cubic feet of natural gas escaped for every barrel of oil.   As of June 21, 2010, at least 4.5 billion cubic feet – and possibly almost twice that amount—leaked.   As John Kessler, Texas A&M oceanographer, described it, "This is the most vigorous methane eruption in modern human history."   Ramit Plushnick-Masti, *Gulf Oil Full of Methane, Adding New Concerns*, THE GUARDIAN (June 8, 2010) (Exh. "B").

[8] Of course, since BP's Oil Spill Response Plan did not anticipate coastal impacts, it is no surprise that their response has been so inadequate.   *See* BP's 2009 Gulf of Mexico Regional Oil Spill Plan [Exh. No. 769 in MDL 2179 Running Exhibit List] ("Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.")   BP did, however, meet the Plans' goal of protecting the walruses; under the heading "sensitive biological resources," the plan lists walruses, sea otters, sea lions and seals, none of which are indigenous to the Gulf. *Id.*

[9] Early investigations confirm re-oiling of BP MC252 on Louisiana shores due to Hurricane Isaac.   *See, e.g., LDWF Closes a Portion of Coastal Waters Due to Emergence of Oil on Adjacent Beaches*, LA. DEP'T OF WILDLIFE AND FISHERIES, http://www.wlf.louisiana.gov/news/35912 (last visited Sept. 6, 2012) (Exh. "D"); *Tar Balls Wash Up in Grand Isle, Mayor Worried About Fishing Community*, WWLTV.COM, http://www.wwltv.com/eyewitness-morning-news/Tarballs-wash-up-in-Grand-Isle-mayor-worried-about-fishing-community-168604466.html,      (last visited Sept. 6, 2012) (Exh. "E"); Cain Burdreau, *Oil From BP Spill Uncovered by Isaac's Waves*, ASSOCIATED PRESS (Sept. 6, 2012), *available at* http://abcnews.go.com/Technology/wireStory/oil-bp-spill-uncovered-isaacs-waves-17164712 (Exh. "F").  .

sediments continues to foul our marshes, and at least four of our fisheries remain closed due to the continued concentrations of oil in the Gulf.  Fisheries Closure Maps, La. Dep't of Wildlife and Fisheries (Exh. "C").  Louisiana is working to ensure that BP continues the response effort until the oil is removed from our coast and the cleanup is complete.

By any measure, Louisiana's coast was the most heavily impacted shoreline area in the Gulf and the immediate and long-term damage to our natural resources (*i.e.*, birds, fish, wildlife, shoreline, marine mammals, etc.) from both the oil and response efforts continue to be both realized and assessed.  The Natural Resource Damage Assessment ("NRDA") is a long-term legal process that will likely span many years, and although BP requested the opportunity to do a cooperative assessment, BP's Motion proves that its cooperative effort extends only so far as suits its economic self-interest.  Teams of state and federal Trustees and scientists have been gathering data for more than two years in order to pinpoint the vast array of injuries from the spill.  The data are currently being processed in laboratories and being analyzed to determine the full extent of how the natural resources were impacted.  These scientists are studying impacts from response activities, direct oiling and other acute or chronic impacts of the oil to the shoreline, nearshore, marshes, and wetland areas and habitats, as well as the Gulf of Mexico food chain, including the long-term damages resulting from impacts to the reproductive and cardiac systems of critical Gulf species.

### B.  Louisiana's Interests

The Attorney General of the State of Louisiana, in furtherance of his interest in protecting citizens of the State, makes a special appearance to urge this Honorable Court to reject BP's attempt to have the Court pre-judge this case based on BP's disingenuous statements regarding liability and the extent of economic and natural resource damages.  Although Louisiana is not a

party to this Settlement, the outcome of the proposed Settlement is of great interest to the State because of the inadequate relief offered to residents of Louisiana in exchange for the relinquishment of strong legal claims against BP.  By BP's own estimate, over 600,000 businesses and 4.5 million individual class members will be affected by the E&PD Settlement.[10]

Louisiana also has a significant interest in responding to BP's and the PSC's Motions because of the implications that BP's unsupported and uncontested declarations may have on the State's claims that are still pending in this MDL, as well as the prejudice that may result to the class by determining the fairness of the Settlement based on the faulty assertions made in such declarations.  Particularly, the State is concerned with the various opinions regarding the health of the Gulf ecosystems that BP offers in support of the fairness of the proposed Settlement.  It must be made clear that these are untested opinions that the State disputes and will be disproven in the State's NRD trial.  These baseless opinions should not be mistaken for facts simply because the PSC failed to contest them.  These opinions, if accepted by the Court to be facts that are binding on other parties to this MDL, will have significant implications on the State's claims for natural resource and economic damages, as well as the determination of the adequacy of settlement payments to compensate for actual damages that private claimants will suffer in the future.  Further, the PSC's failure to offer any evidence to rebut BP's opinions regarding the current and future health of the Gulf provides reason to question whether the negotiations between the parties truly occurred at arms' length.

All of these concerns call into serious question the fundamental fairness, adequacy, and reasonableness of the E&PD Settlement and the Motions filed in support thereof.  Accordingly, the Attorney General now exercises his responsibility provided under the Class Action Fairness

---

[10] This number is based on the CAFA notice received by the Attorney General's office from BP regarding the E&PD Settlement.  Estimates are based on census data.

Act ("CAFA") to protect Louisiana class members from a proposed Settlement that does not meet the fairness standard. In addition to the Attorney General's authority under CAFA, the State also has *parens patriae* authority to submit this response in opposition to the proposed Settlement, as presented to this Court.[11] Consistent with that interest, the State asserts that the Settlement directly impacts the physical and economic well-being of the residents of Louisiana.

## II.   ARGUMENT

### A.  Legal Standard

Although Rule 23 is silent as to the standard, the Fifth Circuit has stated it is "well established" that the Court will not approve a settlement unless it is found to be "fair, adequate, and reasonable." *Parker v. Anderson*, 667 F.2d 1204 (5th Cir. 1982) (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981)). In addition, there must be no fraud or collusion in arriving at the settlement. *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426 (5th Cir. 1977).

The court "must consider the effect of the settlement as a whole," and is "not free to delete, modify or substitute certain provisions of the settlement." *Cotton v. Hinton*, 559 F.2d 1326, 1331-1332 (5th Cir. 1977). In examining a settlement, six factors should be considered: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants,

---

[11] A State may gain *parens patriae* standing if it asserts an injury to "quasi-sovereign interests." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592 (1982). "[A] state has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* at 601. Action on behalf of a state in protecting its quasi-sovereign interest is "necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." *Id.* at 600, (quoting *Mormon Church v. United States*, 136 U.S. 1, 57 (1890)).

including class counsel, class representative, and the absent class members. *Id.* (citing *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978); *see also Turner v. Murphy Oil USA, Inc.* 472 F.Supp2d 830, 843 (E.D. La. 2007).

As stated by the Eastern District of Louisiana in *Turner*, the court considers these six factors "taking into account the statements by counsel, class representatives, and objectors; the Court's own knowledge of the litigation obtained from its management and involvement in the case [including any] recommendations provided by the Special Master." *Turner*, 472 F.Supp.2d at 843.   The proponents of the settlement bear the burden of demonstrating the fairness, reasonableness, and adequacy of the settlement. *Id.*

When evaluating a settlement, the court must compare its terms with the rewards the class would likely receive following a trial and judgment in its favor. *Id.* at 843 (citing *Cotton v. Hinton,* 559 F.2d at 1330).   However, the merits of the case are not at issue during the settlement review process. *Id.* (citing *Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983)).   As stated by the Fifth Circuit in *Cotton v. Hinton*, "[i]t cannot be overemphasized that neither the trial court in approving [a class action] settlement nor [the appeals court] in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."   559 F.2d at 1330.   In determining the adequacy and reasonableness of the proposed settlement, the court "does not adjudicate the dispute," since the "purpose of the compromise is to avoid the delay and expense of such a trial." *Parker v. Anderson*, 667 F.2d 1204, 1209  (5th Cir. 1982) (citing *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)); *see also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974);  *Kaye v. Fast Food Operators, Inc.*, 99 F.R.D. 161, 163 (S.D.N.Y. 1983) (stating that federal courts reviewing propriety of class action settlement "have neither the 'right [n]or the duty to reach any

ultimate conclusions on the issues of fact and law which underlie the merits of the dispute'"). In contradiction to this caselaw, BP has presented conclusory declarations, unrefuted by the PSC, that are inconsistent with the realities faced by Louisiana and its citizens and has indicated that it views the settlements as the result of proof: "the settlements pay class members *for all proven injuries*." 8/2/12 BP Ltr. to Magistrate Shushan re: LA Request for Discovery in connection with Settlements [Rec. Doc. 7037 at 7]  (emphasis added).

In examining the fairness of a proposed class action settlement, a court must consider, among other things, "the stage of proceedings and the amount of discovery completed." *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426 (5th Cir. 1977). This requires the court to determine whether the parties have obtained sufficient information "to evaluate the merits of the competing positions." *In re Educ. Testing Service Praxis Principles of Learning and Teaching*, 447 F.Supp.2d 612 (E.D. La. 2006).  As explained by the Eastern District of Louisiana, the question "is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it." *Id.* at 620-21.

Here, the parties readily admit that there has been absolutely no discovery related to the question of damages, and instead point to the "extensive" discovery produced in connection with liability issues.  The only evidence offered by BP or the PSC relating to damages, both economic and environmental, consist of one-sided declarations from BP-hired witnesses. Without any unbiased information regarding the actual losses and the potential for future harm suffered by

plaintiffs, it is impossible to evaluate the strength of their claims to determine whether the Settlement is fair or reasonable.[12]

**B. This Court Should Completely Disregard BP's Gross Misrepresentations Regarding The Recovery Of The Gulf.**

The most egregious misrepresentation made in BP's Motion is their statement that at trial, it would establish that the Gulf is undergoing a robust recovery. First, the injuries to natural resources that resulted from the *Deepwater Horizon* Oil Spill are not part of the Limitation of Liability trial scheduled to begin in January 2013, so it is unclear at which trial BP would present this evidence.[13] Second, NRDA is a complex and lengthy process designed to allow state and federal Trustees a full and complete opportunity to study how oil affects natural resources, ecosystems, and human uses. In this case, the potential natural resource injury spans five Gulf Coast states, as well as federal waters, and is described by the Trustees as the "largest damage assessment ever undertaken."[14] While the Trustees have found evidence of injury across all habitats, resources and species they have studied, the assessment is far from complete.

Additionally, ongoing re-oiling of Louisiana's shoreline and marshes continues to persist causing further injuries to the natural resources. Photographs of Oiling in Louisiana (Exh. "H").[15] Retrievable, visible oil has been, and continues to be, recovered weekly in the form of

---

[12] Additionally, as addressed by the State in a separate filing, under the circumstances presented by the PSC and BP, and based upon the existing record, the expansive and complex settlement classes presented for certification cannot satisfy the applicable legal standards. *See generally, Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).

[13] Presumably BP would offer this evidence at a subsequent government trial on natural resource and economic damage trial; however, the claims of private plaintiffs would not be implicated in such a trial.

[14] *See* Natural Resource Damage Assessment April 2012 Status Update for the Deepwater Horizon Oil Spill, NOAA, *available at* http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/FINAL_NRDA_StatusUpdate_April2012.pdf (Exh. "G").

[15] This exhibit contains photographs taken by State of Louisiana employees at Bay Jimmy, Louisiana in April 2011, as well as more recent photographs taken at Middle Ground, Louisiana in March 2012. *See also supra*, note 6 (regarding the tar balls and submerged oil mats exposed in the aftermath of Hurricane Isaac). Tests have confirmed that the exposed oil was from the Macondo well. *Tests Confirm Oil Stirred Up by Hurricane Isaac Came from BP Oil Spill*, Associated Press (Sept. 6, 2012), http://www.nola.com/hurricane/index.ssf/2012/09/tests_confirm_oil_stirred_up_b.html (Exh. "I").

tar balls and tar mats from both intertidal and supratidal zones of many beaches.  *See id.*  In light of significant oiling, re-oiling, continued injuries, and ongoing assessment, how can BP and the PSC say with sufficient certainty that the Gulf ecosystem is undergoing a robust recovery?  The Court should not rely on BP's inaccurate and misleading declarations and opinions regarding the health of the Gulf and instead note that their evidence is completely inconsistent with that presented herein, as documented by the publicly available evidence developed by the Trustees.

The inaccuracy of BP's declarations is further evidenced in BP's own Motion when it admits to ignoring the Gulf ecosystem as a functioning whole, and instead looks at only four aspects of the Gulf: (1) coastal areas, (2) wetlands, (3) water, and (4) seafood.  [Rec. Doc. 7114 at 69-74].  The natural resource Trustees, meanwhile, continue to conduct the NRDA, studying and analyzing the effects of the oil spill on multiple resources, habitats, and pathways of exposure, including, but not limited to: (1) marine mammals and sea turtles; (2) fish and shellfish; (3) birds (including shorebirds, colonial seabirds, openwater (pelagic) seabirds, and marsh (secretive) birds); (4) deep water habitat; (5) water column and invertebrates ; (6) intertidal and nearshore subtidal habitat (including sea grass, mud flats, and coral reefs); (7) shoreline habitats (including salt and brackish marsh, beaches, tidal mudflats, and mangroves); (8) terrestrial wildlife and habitats; and (9) human uses of natural resources (*e.g.,* recreational fishing, boating, shoreline recreation, subsistence, cultural uses, etc.).[16]

Finally, all of BP's declarants purporting to offer evidence on the health of the Gulf rely on data that is largely irrelevant to NRDA, or any other effort to study the long-term effects of the oil spill.  For example, the declarations of Dr. Harold Leggett, Dr. Martin Smith, Dr. Wes

---

[16] *See* Natural Resource Damage Assessment April 2012 Status Update for the Deepwater Horizon Oil Spill, NOAA, *available at* http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/FINAL_NRDA_StatusUpdate_April2012.pdf (Exh. "G").

Tunnell, Dr. Elliot Taylor, and Tre´ Wharton are all based almost entirely on Shoreline Cleanup Assessment Teams ("SCAT"), Operational Science Advisory Teams ("OSAT") and commercial fisheries landings data. [Rec. Doc. 7114, Exh. 14, 18, 19 and 21, respectively].  Both SCAT and OSAT data are used to support cleanup response efforts, and their field data are used for decision making associated with shoreline cleanup, not to assess injury or appropriate restoration projects. Additionally, SCAT counts linear miles of marsh and shoreline oiling.  A scientific assessment, as opposed to an operational response assessment, would rely on a survey of the entire shoreline and thoroughly examine the duration and extent of oiling in beaches and marshes and would show about fifty percent more miles of oiling in Louisiana marshes.  Just as SCAT data fail the test of sound science, as it pertains to natural resource injury assessment, reliance on commercial landing data is an equally unreliable and inaccurate means of assessing fish and shellfish health and population dynamics.

It is clear that BP's Motion contains little more than misrepresented, self-serving declarations designed to downplay its liability, the significant harm to the environment, and the amount of economic damages suffered by private citizens and governments.  While Louisiana reserves its right to try its NRD and economic damage case at the appropriate time, in light of the "science" presented by BP, and the fact that this science was not contested by the PSC, the State offers a few examples of the significant acute and chronic injuries that have resulted from the oil spill.

### 1.  Coastal Areas

Louisiana's most productive natural resource is its complex marsh ecosystem.  Oil in marshes is pervasive in some areas even to this day.  (Exh. "H"). Even BP admits that marsh oiling is still an ongoing injury.  As of August 11, 2012, approximately 220 "response miles" of

Louisiana shoreline were still oiled.  BP's declarant, Dr. Elliott Taylor, who limits himself to SCAT data ("response miles"), admits that initial marsh recovery has slowed substantially.[17] Taylor also completely disregards the fact that Louisiana's marshes continue to receive oiling from the tons of oil still in the nearshore environment.  The amount of BP oil in the Gulf is at least the equivalent of twenty *Exxon Valdez* spills, and it may be considerably more.[18]  Below are a just a few examples of the extensive amounts of combined tar balls and tar mats removed from Louisiana by operations patrol and maintenance crews:

i.   A January 24, 2012 Louisiana Department of Wildlife and Fisheries field report documented that a sixty foot by fifteen foot (60' x 15') intertidal tar mat was located in Zone 5 of Elmer's Island.  Operations crews have begun removing this mat and have already recovered approximately 1,000 pounds of oiled material.

ii.  On April 30, 2012, a three by thirty foot (3' x 30') tar mat was located in Zone B of Casse Tette in Lafourche Parish.  On May 18, 2012, Operations crew cleaned a portion of the tar mat and removed 945 pounds of oily material.

iii. Response data indicate that as of May 30, 2012, 424,051 pounds of oily material have been collected in Louisiana alone in 2012.

### 2.  Marsh Plants

---

[17] "At the peak of shoreline oiling, approximately 1100 miles off the coast contained some oil."  Declaration of Elliot Taylor [Rec. Doc. 7114-20, ¶ 20].  "Approximately one year after the spill, the total number of miles of shoreline that contained some oil had decreased by roughly 50 percent to approximately 530 miles." *Id.* ¶ 21. "Approximately two years after the spill, the number of miles of shoreline that contained any oiling had decreased to less than 430, of which approximately 15 miles were classified as heavy or moderate oiling." *Id.* ¶22.

[18] In the *Deepwater Horizon* MC252 Gulf Incident Oil Budget report released on August 4, 2010, the National Oceanic and Atmospheric Administration ("NOAA") estimated that a large part of the oil discharged into the Gulf of Mexico from the Macondo well was gone.  However, just weeks later, a NOAA official conceded that three-fourths of the oil discharged into the Gulf was still lingering in the environment, either as hydrocarbons in dispersed form or possibly evaporated into the atmosphere. "The spill is far from over," admitted Bill Lehr, senior scientist with NOAA's Office of Restoration and Response, when questioned during testimony before a U.S. House of Representatives subcommittee. Suzanne Goldenberg, *BP Oil Spill: Scientist Retracts Assurances of Successful Clean Up*, THE GUARDIAN (Aug. 19, 2010), http://www.guardian.co.uk/environment/2010/ aug/19/bp-oil-spill-scientist-retracts-assurances (Exh. "J").

Lin and Mendelssohn (2012) investigated the impacts of the *Deepwater Horizon* Oil Spill on two dominant coastal saltmarsh plant species.[19] The researchers found that *Deepwater Horizon* oil severely impacted coastal marsh vegetation.  For example, they state the impacts "most likely resulted from oil exposure of the shoots and oil contact on/in the marsh soil, as well as repeated oiling events."  Heavy oiling caused complete mortality of both species (*Juncus* and *Spartina*), while moderate oiling significantly affected *Juncus* but did not significantly impact *Spartina*.[20] *Juncus* had not significantly recovered from shoot coverage within a seven-month period.  Lin and Mendelssohn note that although a number of studies indicate that marsh plants can recover from light soil oiling, heavy soil oiling "could cause negative impacts to marsh vegetation for years to decades."  Thus, although some areas of the oiled marsh may recover quickly, other portions may take far longer to recover. Marsh injuries are among the most damaging injuries that can result from an oil spill.

### 3.  Other Ecosystem Species

Scientists have also confirmed that oil from BP's Deepwater Horizon disaster has entered the marine food chain.[21] For example, researchers from the University of South Carolina, Columbia performed microcosm experiments with *Deepwater Horizon* oil and demonstrated reduced phytoplankton biomass and alterations to the phytoplankton community composition.[22] Their results suggest that exposure to *Deepwater Horizon* oil alters the phytoplankton population in salt marsh estuaries, which may have negative impacts on higher trophic levels in coastal

---

[19] Lin Q and I.A. Mendelssohn. *Impacts and Recovery of the Deepwater Horizon Oil Spill on Vegetative Structure and Function of Coastal Salt Marsh in the Northern Gulf of Mexico*, 46 Environmental Science & Technology 3737-43 (attached to U.S. Memo as Exhibit 15 [Rec. Doc. 7293-16]).

[20] *Id.*

[21] Sue Sturgis, *Oil from BP Disaster Contaminated Ocean Food Chain*, THE LOUISIANA WKLY NEWSPAPER (Mar. 19, 2012). (Exh. "K")

[22] Gilde, K. and J.L. Pinckney, *Sublethal Effects of Crude Oil on the Community Structure of Estuarine Phytoplankton*, 35 Estuaries & Coasts 853-861 (2012) (attached to U.S. Memo as Exhibit 23[Rec. Doc. 7293-24]).

environments. *Id.*  A study of Gulf killifish conducted by LSU found that fish collected from coastal areas in the Gulf that were contaminated with Macondo well oil demonstrated tissue damage and changes in gene expression indicative of adverse physiological and reproductive impairment.[23] Further, the bottlenose dolphin study,[24] which showed signs of severe health impacts to the population, took place in in Barataria Bay, Louisiana, where some of the heaviest oil slicks came ashore.

Noticeably missing from BP's Motion is a discussion of the chronic impacts and injuries that often occur as a result of oil spills.  Chronic injuries result from continued exposure to even low-level amounts of oil pollution.  The classic example of chronic injury is the herring collapse after the *Exxon Valdez* disaster.[25]  Additionally, according to the *Exxon Valdez* Oil Spill Trustee Council, "one of the most stunning revelations of the Trustee Council-funded monitoring over the last 10 years is that Exxon Valdez oil persists in the environment and in places is nearly as toxic as it was the first few weeks after the spill…[t]his was not expected at the time of the spill or even 10 years later."[26]

The lingering effects of the Oil Spill continue to significantly affect Louisiana's citizens' way of life and the State's economy.  The State's commercial and recreational fishing industries have been impacted and many of our residents have lost their livelihoods.  No one has ever seen an environmental disaster of this magnitude.  Local and state economies and household budgets

---

[23] Whitehead, et al., *Genomic and Physiological Footprint of the Deepwater Horizon Oil Spill on Resident Marsh Fishes*, Proceedings of the National Academy of Sciences of the United States of America (2011) (attached to U.S. Memo as Exhibit 18 [Rec. Doc. 7293-19]).  In this report, the authors state that the Gulf killifish, a tiny, sub three-inch baitfish that researchers consider a good indicator of water quality in the Gulf of Mexico, is showing signs that the oil spill is having a negative impact on its health.  The fish have been exposed to hydrocarbon poisoning, the same type of poisoning shown in other animal populations after the Exxon Valdez oil spill in Prince William Sound, Alaska in 1989.

[24] *See* U.S. Memo [Rec. Doc. 7293, at 33].

[25] *See* Exxon Valdez Oil Spill Trustee Council, http://www.evostc.state.ak.us/recovery/status_herring.cfm (last used Sept. 6, 2012)

[26]Exxon Valdez Oil Spill Trustee Council, http://www.evostc.state.ak.us_ (last visited Sept. 6, 2012) ("Exh. "L").

are still suffering, and health impacts, potentially from exposure to the mixture of crude oil and toxic dispersant, are being reported; yet none of these impacts are reported by BP or the PSC.

### C. The Settlement Fails to Acknowledge BP's Unlimited Strict, Joint and Several OPA Liability and Misrepresents BP's Significant Exposure To Gross Negligence.

OPA is the paramount single controlling federal statute exclusively applicable to liability and compensation for all oil discharges to U.S. waters.  OPA was enacted in the wake of the *Exxon Valdez* incident specifically to address disasters like the *Deepwater Horizon* spill.  OPA provides for strict liability and requires responsible parties to pay for all removal costs and damages, including damages to natural resources, property damages, subsistence damages, and economic damages (including loss of revenue, profits, and earning capacity and increased costs of public services).[27]  OPA was also passed and amended specifically to avoid responsible parties' attempts to delay compensating victims of oil spills

Although OPA includes certain caps on liability,[28] BP, likely recognizing that they were grossly negligent and that they violated several federal regulation, waived the OPA liability cap.[29]  In spite of its waiver and OPA's clear and unambiguous language, BP goes to great lengths to convince this Court that its exposure to unlimited, strict, joint, and several OPA liability is small.  For example, BP states, "While BP has generously agreed to make the plaintiffs entirely whole for losses that it did not entirely cause, if this case proceeded to trial, BP would have a strong basis for establishing, in light of real-world facts, that BP is not solely responsible for the incident."  BP's Motion [Rec. Doc. 7114, at 61].

---

[27] 33 U.S.C. § 2702.

[28] 33 U.S.C. § 2704(c)(1) provides for exceptions to OPA's limits on liability if the incident was caused by (1) gross negligence or willful misconduct, or (2) the violation of an applicable federal regulation.

[29] *See* Ex-Parte Agreed Motion Re: Applicability of Limit of Liability Under Oil Pollution Act of 1990 to BP Exploration & Production Inc. (And its Affiliates) (12/23/10) [Rec. Doc. 922].

The fatal flaw in this statement is that OPA requires BP to make the plaintiffs whole, regardless of whether other parties may have contributed to the *Deepwater Horizon* disaster.[30] The fault of another party does not reduce BP's obligation to fully compensate parties that suffered damages.  Instead, OPA recognizes a responsible party's right to seek contribution from another liable or potentially liable person.[31] By making a responsible party strictly liable and providing for a separate right of contribution, OPA seeks to shield plaintiffs from prolonged litigation associated with allocations of fault and liability.  Such a conclusion is supported by the fact that OPA establishes a separate statute of limitations for contribution claims.[32]  Therefore, BP's attempt to disguise its Settlement as "generous" ignores the "real-world" application of OPA.

BP also offers a novel argument that CERCLA law on divisibility applies to OPA.  This argument also fails because (1) BP offers no caselaw supporting this legal claim because indeed none exists, and (2) this Court has already rejected this claim. [Rec. Doc. 5809, at 12] (holding that liability is joint and several). Finally, BP misrepresents its exposure to gross negligence, though interestingly, it cites to no conduct that it specifically rejects as being grossly negligent. Instead, BP states, "BP studied the Macondo prospect, used a peer-reviewed, government-approved well design, and hired and relied upon reputable contractors to drill, cement, monitor, and control the well….That is not a company engaged in gross negligence or willful misconduct."  [Rec. Doc. 7114, at 64].[33]  As represented by the examples of grossly negligent

---

[30] *See Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F.Supp.2d 741,744 (E.D. La. 2009) ("A responsible party…is strictly liable for removal costs and damages.").
[31] 33 U.S.C. § 2709.
[32] 33 U.S.C. § 2717(f)(3); *Gabarick*, 623 F.Supp.2d 741.
[33] The reputable contractors BP states to have relied on are the same contractors it previously accused of causing this event.

conduct reproduced in the United States' recently filed Motion,[34] which Louisiana will not replicate herein, there is more than ample evidence to support a finding of gross negligence and willful conduct on the part of BP.  BP's veiled attempt to argue that its risk of exposure to such a finding is low not only misleads plaintiffs and non-settling parties on the value of a fully compensatory settlement, including punitive damages, but also implicates Louisiana's claims for punitive damages.  Additionally, BP's gross negligence exposes it to treble Clean Water Act penalties, which due to the passage of the Restore Act, directly impacts restoration dollars that will be available to aid in Louisiana's recovery. Louisiana submits that this Court should reject BP's misleading statements and declarations on its liability and should make no finding regarding these statements that could bind or otherwise negatively impact the claims of non-settling parties in this MDL, including Louisiana.  Also, misleading class members prejudices them and prevents informed decision making with regard to opt-out options.

### D. The Seafood Compensation Cap Is Contrary To BP's Unlimited Liability And The Claims Deadline Is Arbitrary And Unreasonable.

The Seafood Compensation Program is arguably the most important component of the E&PD Settlement, because it seeks to compensate economic damages for the segment of the State's population most vulnerable to the *Deepwater Horizon* oil spill: commercial fishermen (vessel owners/lessees and crew), shrimpers, crabbers, and oyster harvesters.  Despite the importance of the Seafood Compensation Program (or perhaps because of),  and BP's unlimited OPA liability, no element of damages being compensated in the E&PD Settlement has a monetary ceiling or cap, except for the Seafood Compensation Program.  No other element of damages in this MDL has as much potential for future catastrophic economic loss resulting from

---

[34] Memorandum In Response To BP Defendants' Memorandum In Support of Motion For Final Approval Of *Deepwater Horizon* Economic And Property Damage Settlement [Rec. Doc. 7293].

the collapse, or severe long-term impairment, of an economically critical seafood species. It is not surprising that BP desires to limit its liability for such a risk and to pass it on to the citizens of Louisiana, and ultimately to the State, but it is surprising that the PSC agreed to it.

BP waived the cap on OPA damages early on in this litigation, which obliged BP, as a responsible party, to pay all OPA damages without limit. Rather than accept this responsibility, BP is now trying to reinstate a cap on certain OPA damages contrary to its previous waiver and contrary to the clear language of OPA.  The settling parties tout the cap as a guaranteed amount that is "nearly five times the total annual revenues of seafood harvested in the class geography." Aside from the fact that this "total annual revenue" number was based in large part[35] on an average of the worst three shrimping years in a decade, and irrelevant past and current commercial fisheries landings data, there is no assurance that the value of claims will not exceed the cap.[36]

***Unreasonable Claims Deadline:***

Another arbitrary term of the Seafood Compensation Program is the exceptionally short and unfair timeframe within which seafood compensation claimants are required to submit claims.  Under the Settlement, the deadline for filing all other claims is the later of April 22, 2014, or six months after the effective date of the proposed Settlement.[37]  However, under the Seafood Compensation Program, claimants are required to submit their claim within 30 days of the Court's final approval of the Settlement.[38]  There are two fundamental problems with this deadline: (1) the Seafood Compensation Program deadline commences upon final approval,

---

[35] According to PSC Exhibit A [Rec.Doc. 7101-3], shrimping accounts for over 55% of the total value of all fisheries covered by the settlement.

[36] Further, the amount of cap is currently unknown since the Settlement includes a potential reduction based on certain opt-out terms.  Louisiana adopts its argument regarding these opt-out terms as outlined in its Request to Conduct Limited Discovery and to Participate at the Fairness and Class Certification Hearing [Rec. Doc. 7035].

[37] *See* Settlement Agreement, § 5.11.8

[38] *Id*. at § 5.11.9.

whereas the deadline for filing all other claims does not commence until the expiration of the deadline for appealing the final approval or, if appealed, the date that an appellate court confirms the final approval order,[39] and (2) the parties offer no explanation for the different deadlines, other than to state that it is "[d]ue to some of the unique features under the frameworks established by the Court-appointed neutral."[40]  While it is difficult to predict the exact dates upon which these timeframes will run, it is clear that non-seafood claimants likely have more than one extra year to assess their damages and file claims.[41]  Given that the Seafood Compensation Program is one of the most important aspects of the Settlement and deals with claimants whose losses are most closely tied with environmental damage which, as discussed above, will take years to fully assess, the requirement that claimants file their claims within thirty days of approval is not only unreasonable, but also seemingly without explanation.

These claimants not only are forced to evaluate their claims much more quickly than other claimants, but are also forced to value their claims before their full losses are known since a large part of their economic damage is directly tied to a full assessment of environmental damages – a process which is slow to fully unfold.  Seafood Compensation claimants must have at least the same period of time to file their claims as all other claimants.  Requiring them to file their claim within thirty days of approval is akin to asking a car accident victim to evaluate their claim before seeing a doctor.  If realities such as the recent release of BP tarballs at Elmer's Island in the wake of Hurricane Isaac and the subsequent closure of certain fisheries, continue to occur, their claims will be much larger than they look after only thirty days following approval.  BP's efforts to impose such unreasonable deadlines on claimants should be rejected.  While this

---

[39] *Id*. at § 38.60.
[40] [Rec. Doc. 7101 at 10.]
[41] If the Court issues a final approval order by Dec. 31, the deadline for filing seafood compensation claims would be January 30, 2013, whereas other claimants would have until at least April 22, 2014 to file claims.

Settlement could be improved on several fronts, at a minimum, this arbitrary deadline must be extended to the date provided for all other claimants.

### E.  The RTPs Do Nothing More Than Transfer BP's Liability For Future Damages To Claimants, And Ultimately, To The State.

The E&PD Settlement provides for the payment of an RTP, an elaborate scheme to add a multiplier onto past damages to compensate for future damages, among other things. In essence, the RTP is exactly what its name implies: a method for transferring BP's risk of having to pay future economic and property damages onto the victims.  In the face of such liability, BP does not want to be burdened with the risk of paying damages occurring in the future as envisioned by OPA, and the Settlement accomplishes BP's goal by passing that risk onto the victims, who can least afford to bear it.  Should that risk turn into reality after Settlement claims and RTPs have been paid, the ultimate safety net for the victims of the oil spill is the State tax payers.  For example, if, as was the case in Alaska following the *Exxon Valdez* oil spill, the Gulf suffers a fisheries collapse as a result of the oil spill, threatening the economy and putting hundreds or thousands of Louisiana citizens out of work, it is the State (through the expenditure of tax payer monies) that will be faced with the financial liability in the form of unemployment compensation benefits and job re-training services.  After the RTPs have long been spent, the State stands as the only insurance against an economic crash due the spill, and it is financially ill-equipped to do so.

Compounding the problems is the fact that the RTP is convoluted and purports to compensate more than just the risk of future losses.  According to the PSC/BP Joint Memorandum in support of this settlement,[42] "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages,

---

[42] [Rec. Doc. 6266-1, at 14.]

inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors."[43] Because of the broad coverage of this multiplier, any attempt to filter out what part of an RTP relates to future OPA damages from the oil spill is an impossible task. At a minimum, the Class must know what portion of their respective RTPs is compensation for future OPA economic damages.  Otherwise, class members will not be able to ascertain the value of the future economic damages they are giving up, making a fairness determination impossible for them and the Court.

### F.  The Proposed Settlement Is A Rebranded GCCF Process With No Explanation Of Whether Improvements Resulted.

A prominent feature of the E&PD Settlement is the establishment of the *Deepwater Horizon* Court Supervised Settlement Program ("Settlement Program"), which completely replaces the GCCF - BP's program to satisfy its claim-paying obligations as a responsible party under OPA. To ensure BP's continuing compliance with its GCCF obligations, the settling parties filed a joint motion and proposed order with the Court on March 8 to establish a "Transition Process" from the GCCF to the new Settlement Program.[44] The Court signed the proposed order the same day, without giving other parties an opportunity to respond.

This Order held that, effective March 8, 2012,"the GCCF shall no longer accept, process, or pay claims submitted to it"[45]and "[w]hen the Court Supervised Claims Program begins processing claims, *there will be no right to request or receive interim payments from the Transition Process or the Court Supervised Claims Program*."[46] The GCCF closed its doors and

---

[43] Some of these items were not alleged in the *Bon Secour* class action lawsuit upon which this settlement is based.
[44] [Rec. Docs. 5987, 5987-1.]
[45] First Amended Order Creating Transition Process [Rec. Doc. 5995, at 5].
[46]*Id.* at 4 (emphasis added).

the Settlement Program began operations on June 4, 2012.[47] As a result, the right to receive interim payments has now been relegated to a newly-created OPA Claims Program, limited to non-class members and opt outs.[48] The BP/PSC Settlement has been put into operation, depriving claimants of their right under OPA to make claims for interim damages without first having to sign a release for all future damages. Should the Settlement be approved at the final fairness hearing, the only remedy for class members to recover economic or property damages is a single payment, which must be accompanied by a full, complete release of all future claims against BP.

The operation and management of the GCCF has been the object of considerable contention since its inception,[49] and the settling parties fail to point to a single thing negotiated that is new or original and not previously part of the GCCF process. Additionally, a major criticism of the GCCF was that, although it had a procedure for paying interim claims for which no release was required, the GCCF was avoiding those payments in favor of a "quick pay" scheme that paid a set amount of money with little or no proof, but which required a full release of all claims against BP. The PSC, joined by Louisiana, opposed the GCCF's operation, because it was contrary to OPA's clear intention to allow interim damage claims. At the specific direction of the Court, inquiring whether BP was complying with its obligation under OPA to pay interim claims,[50] the PSC filed two extensive briefs with the Court arguing against final releases.[51] In those briefs, the PSC convincingly and correctly argued that:

---

[47] *Important Announcement*, GCCF, www.gulfcoastclaimsfacility.com (last visited Sept. 6, 2012) (Exh. "M").

[48] See, *Claims Information*, BP, www.bp.com/claims (last visited Sept. 6, 2012) (Exh. "N").

[49] *See, e.g.,* Motion to Supervise *Ex Parte* Communications Between BP Defendants and Putative Class Members (Dec. 21, 2010) [Rec. Doc. 912].

[50] [Rec. Doc. 1098, at 14-15]

[51] Plaintiffs' Supplemental Memorandum Concerning BP's Failure to Comply with the Mandates of OPA [Rec. Doc. 1318], and Plaintiffs' Supplemental Brief in Support of Supervision over the BP Interim Claims Process [Rec. Doc.

- "OPA unambiguously establishes the rule that a responsible party must pay all claims without limitation."[52]
- "The requirement that a responsible party make continuing payment of interim damages without obtaining a release for more than it paid is woven throughout OPA and is an integral part of its goal of ensuring full compensation." [53]
- "Nowhere in OPA is there authorization for a responsible party to secure a 'final' release from a claimant by any mechanism other than a payment of the full amount ultimately owed."[54]
- "Coast Guard Regulations do not allow the sort of broad release and subrogation that the GCCF is obtaining on BP's behalf."[55]

As recently as July 25, 2011, the date of the PSC's last brief on the subject, the PSC strenuously argued that to give an oil spill claimant a "take it or leave it" final offer without providing interim compensation for damages as they accrue was a clear violation of OPA.

The E&PD Settlement the PSC has now presented to the Court does exactly what the PSC complained about over a year ago: It completely disregards OPA's mandate to pay interim claims as long as they accrue without requiring a claimant to release claims for future damages. Where is a desperate claimant to go? To quote the PSC from earlier days in these proceedings: "Desperate people do desperate things, and BP and the GCCF have been able to extract releases via the quick pay option from those who could no longer afford to wait."[56] Substitute "Settlement Program" for "GCCF" and "E&PD settlement" for "quick pay option" in the foregoing quote and it is clear that BP is continuing to extract releases by a similar form of duress, only this time the PSC does not object to final releases. One can only wonder why the PSC would make a 180° turnabout from its earlier position. Whether the "new and improved" Settlement Program will

---

3423]. Louisiana also filed its Memorandum in Response to Judge Barbier's February 2, 2011 Order on Behalf of the State of Louisiana [Rec. Doc. 1308].
[52] [Rec. Doc. 1318, at 3.]
[53] *Id.*
[54] *Id.* at 6.
[55] *Id.*
[56] [Rec. Doc. 3423 at 19.]

mend the flaws in the GCCF process and provide claimants with adequate compensation is highly doubtful given the information provided in the context of the proposed settlements.

## III.   CONCLUSION

For the reasons stated above, the State of Louisiana respectfully requests that this Court reject BP's attempts to tarnish the record with unsupported statements regarding the economic and environmental well-being of the State, as well as BP's liability under OPA.  The full extent of the oil spill's impact on the Gulf ecosystem has yet to be determined, and BP's assertions to the contrary are not only premature, but inaccurate.  The uncontested declarations offered by the settling parties should not be accepted as facts and should have no implications on the State's NRD and economic claims.  A settlement premised upon these positions should be rejected.

The terms of the Settlement—including the inadequate and unexplained RTPs and the objectionable Seafood Compensation Program—fail to fully compensate victims for the extensive damages already suffered as a result of the spill, and for the damages that are likely to occur in the future especially given the reliance of the seafood industry (and much of Louisiana's economic health) upon the natural resources of the State.  Louisiana has a concern with making its citizens whole as well as addressing the long-term financial health of the State, which is compromised by the continued pervasive contamination affecting the coastal ecosystem.  Accordingly, this Court should reject the proposed Settlement as unfair to all class members.

Dated this 7th day of September, 2012.

Respectfully submitted,

JAMES D. "BUDDY" CALDWELL
LOUISIANA ATTORNEY GENERAL

James Trey Phillips
First Assistant Attorney General
Megan K. Terrell
Assistant Attorney General
Section Chief –Environmental
State of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708


HENRY DART,
ATTORNEYS AT LAW P.C.

/s/ Henry T. Dart
Henry T. Dart
Grady J. Flattmann
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


SHOWS, CALI, BERTHELOT &
WALSH, LLP

/s/ E. Wade Shows
E. Wade Shows
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: (225) 346-1461
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


KANNER & WHITELEY, LLC

 /s/ Allan Kanner
Allan Kanner
Elizabeth B. Petersen
David A. Pote
Douglas R. Kraus
Allison M. Shipp
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


USRY, WEEKS, &
MATTHEWS, APLC

/s/ T. Allen Usry
T. Allen Usry
1615 Poydras St.
Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


MARTEN LAW, PLLC

/s/ Bradley M. Marten
Bradley M. Marten
Linda R. Larson
1191 Second Avenue
Suite 2200
Seattle, WA 98101
(206) 292-2600
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Response and In Opposition to BP's and PSC's Motions for Final Approval of Economic & Property Damages Class Settlement has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of September, 2012.

Kanner & Whiteley, L.L.C.

_/s/ Allan Kanner_____
Allan Kanner
a.kanner@kanner-law.com