# EXHIBIT "A"



Not Reported in F.Supp.2d, 2008 WL 6468611 (E.D.La.)
**(Cite as: 2008 WL 6468611 (E.D.La.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
George BARASICH, et al.
v.
SHELL PIPELINE COMPANY, LP, et al.

Civil Action No. 05–4180.
June 19, 2008.

West KeySummary**Federal Civil Procedure 170A**
**⟜181**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak181 k. In General. Most Cited Cases

Adequate representation did not exist for the certification of a class of oyster fishermen whose oyster beds were allegedly damaged by an oil spill. The fishermen failed to allege a single oyster lease which was specifically damaged by oil released from the oil company's facilities, and failed to identify a named class representative with such a leasehold interest. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

Conrad S. P. Williams, III, Charles Clarence Bourque, Jr., Christopher John St. Martin, Joseph G. Jevic, III, Melanie G. Lagarde, St. Martin, Williams & Bourque, APLC, Houma, LA, Amy Collins Fontenot, Val Patrick Exnicios, Liska, Exnicios & Nungesser, Anthony D. Irpino, Irpino Law Firm, LLP, New Orleans, LA, for George Barasich, et al.

Mary S. Johnson, Johnson, Gray, McNamara, LLC, Mandeville, LA, S. Suzanne Mahoney, Johnson, Gray, McNamara, LLC, Joe B. Norman, Stevia Marie Walther, Thomas Pollard Diaz, Liskow & Lewis, Phillip A. Wittmann, Kathryn Marie Knight, Stone Pigman Walther Wittmann, LLC, Madeleine Fischer, Jones Walker, New Orleans, LA, Charles C. Correll, Jr., Robert E. Meadows, King & Spalding, LLP, James A. Collura, Coats Rose Yale Ryman & Lee,

APLC, Houston, TX, Charles Simon McCowan, III, George William Jarman, Kean Miller, Baton Rouge, LA, Brian Scott Stagner, Dee J. Kelly, E. Glen Johnson, Kelly Hart & Hallman, PC, Fort Worth, TX, for Shell Pipeline Company, LP, et al.

**ORDER AND REASONS**
CARL J. BARBIER, District Judge.

**\*1** Before the Court is Defendants Shell Pipeline Company, LP, Chevron Pipe Line Co., Bass Enterprises Production Company, Sundown Energy, LP, and Venice Energy Services Co., L.L.C.'s (collectively, "Defendants") **Motion to Strike Class Action Allegations or Alternatively, Motion for Judgment on the Pleadings (Rec.Doc.182)** and Defendants' **Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6) (Rec.Doc.184).**

These motions, which are opposed, were set for hearing on April 2, 2008 on the briefs. Upon review of the record, the memoranda of counsel, and the applicable law, this Court now finds, for the reasons set forth below, that Defendants' motions to dismiss and to strike class action allegations should be granted.

*Background Facts*
Plaintiffs are commercial fishermen who have brought claims for damages sustained by the State of Louisiana's waterways and aquatic life when Hurricane Katrina caused Defendants' land-based storage tanks and/or pipelines to burst and release crude oil. These fishermen claim that Defendants failed to take protective measures to ensure that oil would not leak from tanks or pipelines during a hurricane.

Plaintiffs claim a loss of income and loss of use of the estuaries. The proposed class also involves property and/or business owners in Plaquemines Parish who sustained damage to their property as a result of the spills.

Following several rulings on motions to dismiss filed by Defendants and an unopposed motion for voluntary dismissal, the only claims remaining relate to those brought by oyster fishermen who have an ownership interest in oyster leases and whose oyster beds allegedly sustained damage caused by Defend-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 6468611 (E.D.La.)
**(Cite as: 2008 WL 6468611 (E.D.La.))**

ants.

Plaintiffs were ordered to file a restated complaint as to oyster fisherman only. Plaintiffs were to identify the named plaintiffs and indicate where the oyster leases are located. Plaintiffs were also ordered to file a restated motion for class certification,[FN1] and to indicate the class that Plaintiffs are attempting to certify. Plaintiff has so filed its amended complaint and restated motion for class certification. These pleadings are now before the Court as a result of Defendants' motions to dismiss certain claims contained in the complaint, and to strike the class action allegations or enter judgment on the pleadings.

> **FN1.** Plaintiff's original motion for class certification (Rec.Doc.130) was denied without prejudice at an in court status conference held on December 18, 2007.

### Discussion
#### A. Motion to Dismiss

As set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the standard to be applied when deciding a Rule 12(b)(6) motion is not whether it is conceivable that some set of facts could be developed to support the allegations in the complaint, but rather whether the plaintiffs have stated enough facts in the complaint to allow a court to conclude that it is "plausible" that the plaintiffs are entitled to relief. The Court must accept as true all well-plead allegations and resolve all doubts in favor of the plaintiff. *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir.1988).

**\*2** In their motion, Defendants request that this Court dismiss all unsupported claims asserted, including: (1) Plaintiffs' claims under general maritime law, (2) Plaintiffs' claims for damage to non-proprietary State-owned natural resources, and (3) Plaintiffs' claims for punitive damages. Defendants argue that this Court has previously determined that general maritime law is not applicable to Plaintiffs' claims, that Plaintiffs lack standing under federal law for damages to the State's natural resources, and that punitive damages are not available under the claims alleged by Plaintiffs. However, Plaintiffs included such allegations in their amended complaint.

In opposition, Plaintiffs take no issue with De-

fendants' arguments as to the application of maritime law and the availability of punitive damages. According to Plaintiffs, they "inadvertently failed to remove their claims for punitive damages pursuant to maritime law from their recently filed Master Complaint." As for Defendants' arguments regarding standing, however, Plaintiffs argue that they do have the requisite standing to allege the claims contained in their Master Complaint. Plaintiffs cite to this Court's prior ruling stating that oyster fisherman who sustained physical damage to their property have standing to sue. See Rec. Doc. 107. Plaintiffs argue that since Plaintiffs' class definition encompasses such a group,[FN2] Defendants' motion to dismiss based upon lack of standing should be denied.

> **FN2.** Plaintiffs propose the following class definition in their Master Complaint: All commercial oystermen whose oyster leases were contaminated by oil discharged during Hurricane Katrina due to the negligence of defendants.

In reply, Defendants state that Plaintiffs have misunderstood their argument as to standing. Defendants do not challenge the standing of oyster fishermen whose own oyster leases were allegedly damaged. Instead, Defendants seeks the dismissal of Plaintiffs' federal law claims for damages to nonproprietary State-owned natural resources, including marine estuaries.

As this Court has previously ruled that Plaintiffs can not recover damages to non-proprietary State-owned natural resources, Defendants' motion to dismiss such claims should be granted.

#### B. Motion to Strike Class Action Allegations, or Alternatively, Motion for Judgment on the Pleadings

The court may dismiss class allegations via a motion for judgment on the pleadings under Rule 12(c) and/or via a motion to strike under Rule 12(f) (as "immaterial allegations").[FN3] In particular, a court can strike class allegations "where a complaint fails to plead the minimum facts necessary to establish the existence of a class satisfying Rule 23's mandate." See *Aguilar v. Allstate Fire and Cas. Ins. Co.,* No. 06–4660, 2007 WL 734809, at \*2 (E.D.La. Mar.6, 2007). Courts apply the same standard in ruling on a motion to strike under Rule 12(f) and a motion for

Not Reported in F.Supp.2d, 2008 WL 6468611 (E.D.La.)
**(Cite as: 2008 WL 6468611 (E.D.La.))**

judgment on the pleadings under Rule 12(c) as in determining a motion to dismiss under Rule 12(b)(6).

> FN3. The federal courts have also utilized Rule 23(d)(4), which authorizes a district court "to make appropriate orders ... requiring that the pleadings be amended to eliminate therefrom allegations as to the representation of absent persons, and that the action proceed accordingly," to strike class allegations.

**1. The Parties' Arguments**

In their motion, Defendants seek to strike the class action allegations set forth in Plaintiffs' Master Complaint, or alternatively, to obtain a judgment on the pleadings. Defendants argue that despite explicit instruction from the Court to provide more than a "boilerplate" motion in support of a class, and, at a minimum, to identify a class representative with oyster leases in Plaquemines Parish that were damaged by Defendants' respective Katrina-related oil releases, Plaintiffs' Master Complaint and Motion to Certify do nothing to cure those defects but merely recite the criteria set forth in Rule 23 without factual analysis.

**\*3** Defendants go on to argue that the class is not adequately defined and ascertainable; FN4 numerosity is not met as there is no evidence to support Plaintiffs' conclusory statement as to the potential size of the class, which allegedly amounts to "500–600 individual oyster lease holders with thousands of acres of leases in Plaquemines and St. Bernard Parish"; and that there is a lack of adequate class representation. Furthermore, Defendants argue that common issues do not predominate and that the class action device is not superior in this instance. In other words, Plaintiffs do not and cannot satisfy Rule 23 of the Federal Rules of Civil Procedure.

> FN4. Defendants argue that Plaintiffs' "fail-safe class definition" which includes "[a]ll commercial oystermen whose oyster leases were contaminated by oil discharged during Hurricane Katrina due to the negligence of defendants" is inadequate on its face, and that Plaintiffs offer no geographic boundaries.

In opposition, Plaintiffs argue that their experts have developed significant factual information which supports their allegations that the oil from Defendants' spills likely combined and mixed together to create a large oil slick affecting many of the oyster leases in Plaquemines Parish. Plaintiffs refer to this as the "washing machine" theory. Furthermore, their restated Master Complaint sets forth a request for sub-classes that can be geographically defined based on the amount of oil spilled from each facility and the wind and water patterns that resulted during the storm and immediately thereafter. Plaintiffs state that once notice is sent to the class, ideal class representatives for each separate subclass can be identified to ensure that there is adequate representation of each subclass. However, until this occurs, Plaintiffs only need one representative of the class. Plaintiffs allege that Ray Vath "owns leases and fishes other leases, owned by his family, in Plaquemines Parish," FN5 and as such, is a proper class representative.

> FN5. Plaintiffs' acknowledge that of the other two class representatives, George Barasich only owns and fishes leases in St. Bernard Parish, and Randal Assavedo has recently passed away, so his leases are in dispute.

In reply, as to Plaintiffs' suggested subclasses, Defendants argue that each subclass must not only independently satisfy Rule 23, including the requirement of adequate class representation, but given the lack of impact, Plaintiffs have failed to show that any such subclass members exist in the first place. And as to Plaintiff's statement regarding Ray Vath's alleged ownership of leases in Plaquemines Parish, Defendants argue that "this Court cannot rely on new 'facts' alleged without support in plaintiffs' opposition, but is bound by the well-pled allegations in the Complaint."

**2. Analysis**

The threshold requirements for class certification under Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. Proc. 23(a). In addition, the court must determine whether plaintiffs meet one of the three criteria set forth in Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(3), and as such, they must demonstrate: (1) that the questions common to the class members predominate over questions affecting only individual members; and (2) that class resolution is superior to alternative methods for adjudication of the controversy. Fed. R. Civ. Proc. 23(b)(3).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 6468611 (E.D.La.)
**(Cite as: 2008 WL 6468611 (E.D.La.))**

A proposed class should also be capable of being sufficiently defined. "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short,* 433 F.2d 733 (5th Cir.1970).

### a. Adequately Defined Class

**\*4** The Court first considers whether the putative class is adequately defined. Plaintiffs broadly define the class to include "[a]ll commercial fisherman whose oyster leases were contaminated by oil discharged during Hurricane Katrina due to the negligence of defendants." There are no geographical boundaries proposed by Plaintiffs.

In *McGuire v. Int'l Paper Co.,* plaintiffs sought to have certified a class consisting of individuals who were "affected" by the contamination of a river allegedly caused by the defendant. No. 92–593, 1994 WL 261360 (S.D.Miss. Feb.18, 1994). Plaintiffs further sought to divide the class into sub-classes, which Plaintiffs in the instant matter have likewise suggested. The court in *McGuire* determined that not all of plaintiffs' subclasses were clearly defined. *Id.* at \*4. The plaintiffs argued that proposed class members could be required to submit to blood tests and depositions; however, the court concluded that "such an approach would necessitate the holding of an inestimable number of individualized hearings, in order to determine the subclass ..., and would create insurmountable administrative problems." *Id.* at \*5.

The instant circumstances are tantamount to those in *McGuire* insofar as the determination of whether an individual is a member of the proposed class (or sub-class) cannot be determined without inquiring into the merits of each person's claim. Furthermore, Plaintiffs have not submitted any evidence showing that a particular Defendant's oil impacted a particular Plaintiff's oyster lease. See Exh. B to Rec. Doc. 184, at Response to Interr. No. 5.

### b. Numerosity, Typicality, Commonality

Plaintiffs must establish that the members of the class are so numerous that joinder of all members is impracticable. They must show that there are questions of law or fact common to the class as a whole. Plaintiffs must also show that the claims of the named plaintiffs are typical of the claims of each putative

class member. This requirement cannot be satisfied solely by conclusory allegations. See *McGuire, 1994 WL 261360, at \* 5*. Factual differences are acceptable provided the claim arises from the same event or course of conduct and is based on the same legal theory. *Id.*

A readily ascertainable class is "crucial to the plaintiffs' claims of ... numerosity, typicality, and commonality." *Id.* at \*5. As was the case in *McGuire,* because Plaintiffs have failed to adequately define the class, and because of the other findings set forth below, this Court finds it unnecessary to rule on these issues.

### c. Adequacy of Representation

The Federal Rules of Civil Procedure require that the named plaintiffs fairly and adequately represent the interests of the class. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 472 (5th Cir.1986).

**\*5** Also, the party seeking certification must show that its counsel is qualified, experienced, and able to handle the class action. See *McGuire, 1994 WL 261360, at \*6* (record was inadequate to determine whether counsel was qualified as plaintiff had produced no forecast of the financial needs of the action or the funding sources to meet those needs).

In the instant case, Plaintiffs claim that the only difference between the representatives and the class members' claims are the "individual distances from the defendants' facilities and the number of acres owned by each." See Rec. Doc. 180–2 at p. 8.

However, due to the nature of the class allegations, particularly insofar as Plaintiffs allege that individual oil spills from seven different facilities which occurred at different locations and during different times "migrat [ed] ... into the bays, across hundreds of oyster leases, and eventually into open water where it becomes [sic] giant oil slicks and then dissipates," this Court determines that adequate representation of the class is lacking. See Rec. Doc. 180–2 at p. 2. The Court notes that on the face of Plaintiffs' restated motion for class certification and Master Complaint,

Not Reported in F.Supp.2d, 2008 WL 6468611 (E.D.La.)
**(Cite as: 2008 WL 6468611 (E.D.La.))**

Plaintiffs have failed to identify a *single* oyster lease located in Plaquemines Parish which they allege was specifically damaged by oil released from Defendants' facilities, and have failed to identify a named class representative with such a leasehold interest.

### d. Predominance and Superiority

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). One should focus on the number and significance of common questions, as opposed to individual issues when analyzing this requirement. See *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 470 (5th Cir.1986). This inquiry is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem,* 521 U.S. at 623–24.

Observers have cautioned that "the issue of 'predominance' has become the battlefield on which most class certifications are fought, and the outcome depends heavily on a court's assessment of what evidence (i.e., whether class-wide or individualized) will be adduced at the trial." Edward F. Sherman, *Class Action Practice in the Gulf South,* 74 TUL. L.REV.. 1603, 1610–1611 (June 2000).

Additionally, "[t]o meet superiority, the plaintiffs must show that the class action device would be 'better than, and not just equal to, other methods of adjudication.' " *Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 361 (S.D.Ga.1996).

In the instant case, Plaintiffs claim that the oil spills were the common event and submit a list of common questions that amount to the elements of a tort: duty, breach, causation, and damages. However, the dispositive facts are not whether a Defendant's pipeline or tank ruptured during a levee breach or topping caused by Hurricane Katrina, but whether any of the oyster lessees suffered any quantifiable damage caused by a particular Defendant's release of oil. As such, proof will be different for each member of the class depending on the location of his or her lease and the number of acres leased; whether the lessees ever harvested oysters from the lease; and a host of other particularized issues.

**\*6** Furthermore, to succeed on the negligence claim, each oyster lessee must establish that the con-

duct of a particular Defendant was a substantial factor in causing the alleged damage to the particular acreage, and that quantifiable damage to that acreage resulted. Under such individualized inquiries, neither liability nor damages can be established for every class member through proof common to the class.[FN6]

> FN6. Additionally, Plaintiffs cannot use subclasses to contravene the predominance requirement, as each subclass must independently satisfy Rule 23. See Fed. R. Civ. Proc. 23(c)(4)(B).

Because this Court determines that the predominance requirement of Rule 23(b)(3) is not satisfied, it is unnecessary to decide whether or not a class action is superior to alternative methods. It is sufficient to note that there are seven other oyster lawsuits pending in Louisiana federal and state courts arising out of the Shell Nairn pipeline rupture and subsequent repair efforts. The plaintiffs in all of those cases seek recovery for damages to their oyster beds, water bottoms, replacement costs, emotional damages, and punitive damages arising out of a release from one Defendant's facility. As such, the existence of these separate federal and state court cases likely eliminates any advantage of a class action device in this matter.

This Court notes that Plaintiffs' have had ample opportunity and ample chances to provide this Court with sufficient evidence in support of their class allegations, but have failed to do so at every step of the way. This lack of evidence to support class allegations makes clear that this action is inappropriate for class certification under Rule 23 of the Federal Rules of Civil Procedure.[FN7] Accordingly,

> FN7. This Court notes that during the pendency of this putative class action, the statute of limitations was tolled or suspended and remained tolled for all members of the putative class. The denial of class certification has the effect of re-starting the running of prescription, and at this point, putative class members may choose to file their own suits, provided that those actions are instituted within the time that remains on the limitations period, or may elect to intervene as plaintiffs in the pending action. See *Fulford v. Transport Services Co.,* 412 F.3d 609, 613 (5th Cir.2005) (citing *Crown, Cork & Seal*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 6468611 (E.D.La.)
**(Cite as: 2008 WL 6468611 (E.D.La.))**

*Co. v. Parker,* 462 U.S. 345, 354, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983)).

**IT IS ORDERED** that Defendants' **Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)** (Rec.Doc.184) is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' **Motion to Strike Class Action Allegations or Alternatively, Motion for Judgment on the Pleadings (Rec.Doc.182)** is hereby **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that **Plaintiff's Motion for Class Certification (Rec.Doc.180)** is hereby **DENIED.**

E.D.La.,2008.
Barasich v. Shell Pipeline Co., LP
Not Reported in F.Supp.2d, 2008 WL 6468611 (E.D.La.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. Mississippi,
Southern Division.
Kenneth D. McGUIRE and wife, Elsie Jeanette
McGuire, Plaintiffs,
v.
INTERNATIONAL PAPER COMPANY, A New
York Corporation, Defendant.

Civ. A. No. 1:92–CV–593BRR.
Feb. 18, 1994.

John M. Deakle, Curtis Ray Hussey, John M. Deakle, P.A., Hattiesburg, MS, for Kenneth D. McGuire and Elsie Jeanette McGuire.

Joseph R. Colingo, James H. Heidelberg, Colingo, Williams, Heidelberg, Steinberger & McElhaney, Pascagoula, MS, John G. Corlew, William F. Goodman, III, Frank A. Wood, Jr., Watkins & Eager, Jackson, MS, Robert F. McDermott, Jr., Robert H. Klonoff, Jones, Day, Reavis & Pogue, Washington, DC, for International Paper Co.

*MEMORANDUM OPINION*
BRAMLETTE, District Judge.
**\*1** This cause is before the Court on the plaintiffs' Motion to Maintain Class Action, for Certification of Class, and for Notice to Class Members. Having considered the motion and response, as well as the memorandum briefs with arguments of counsel and legal authorities contained therein, and supporting documents, affidavits, and excerpts from depositions, the Court finds as follows:

International Paper Company ("IP") is a New York corporation engaged in the business of making paper. In 1928, IP commenced operation of a "bleach kraft" paper pulp mill at Moss Point, Mississippi, on the Escatawpa River upstream from its confluence with the Pascagoula River. Treated effluent from the mill's paper-making process is discharged into the Escatawpa River.

The plaintiffs, Kenneth D. and Elsie Jeanette

McGuire ("the McGuires") are the owners of Mac's Fishing Camp, located on Bennett Bayou in Jackson County, Mississippi. Mac's Fishing Camp sells bait and tackle, rents and stores boats and other "marine appliances," serves as a launching point for boats, and provides other goods and services for persons using the Escatawpa and Pascagoula Rivers. The plaintiffs are also recreational users of the rivers and have consumed fish from the rivers. They own real property which abuts the Escatawpa and lies within its flood plain.

The plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1332(a)(1). Their complaint charges that IP should have known, no later than 1985,

> that a by-product of the bleach kraft pulp making process is 2.3.7.8–tetrachlorodibenzo-p-dioxin (TCDD) and its mill was discharging at levels which resulted in contamination of the river system and aquatic life downstream from the mill discharge site. Despite possessing such knowledge, International Paper Company continued its operations at Moss Point, Mississippi, and at no time issued any warnings to the public, including plaintiffs, that fish in the Escatawpa and East Pascagoula Rivers might or would be contaminated with TCDD, or that there was any hazard to persons or property.

(Complaint, ¶ 7). The complaint further alleges that

> [t]he International Paper Company mill at Moss Point, Mississippi, also discharges into the waters of the Escatawpa River dark and foul smelling effluent in sufficient quantities that the color of the rivers is often altered. The operation of the International Paper Company mill has been conducted in a manner that has resulted in the aquatic life of the Escatawpa and East Pascagoula Rivers being so contaminated with TCDD and a closely related chemical known as TCDF that the State of Mississippi has banned commercial fishing and consumption of fish from the Escatawpa River below International Paper Company's mill to the Mississippi Sound.

(Complaint, ¶ 7).

Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

According to the complaint, the defendant is dumping toxic chemicals into the Escatawpa, polluting "the entire stretch of river and all creeks, bayous, lakes, other rivers and other bodies of water into which the streams flow." (Complaint, ¶ 8). The plaintiffs attribute this pollution with causing the State of Mississippi to post warning signs banning commercial fishing on the Escatawpa and recommending that fish taken from those bodies of water not be consumed by the public. (Complaint, ¶ 9) The plaintiffs claim they have been damaged through injury to their business, loss of income, damage to real property, and resulting emotional anxiety and worry. (Complaint, ¶ 9).

**\*2** In addition to their individual claims, the plaintiffs propose a class action on behalf of persons falling within one of the following subclasses:

(1) all present and former owners of real property which properties make connection with the flood plain of the Pascagoula/Escatawpa River and estuarine system and who owned such property prior to the posting of notices by the State of Mississippi warning of dioxin contamination of fish taken from the river and estuarine system;

(2) all present and former residents of real property which property makes connection with the flood plain of the affected river system and who resided upon said property prior to the posting of notices by the State of Mississippi warning of dioxin contamination of fish taken from the river and estuarine system;

(3) all present and former marina owners or operators whose marinas are or were affected by the defendant's contamination of the Pascagoula/Escatawpa River and estuarine system and who own [sic] or operated such marinas prior to the posting of notices by the State of Mississippi warning of dioxin contamination of fish taken from the river and estuarine system;

(4) all present or former business owners and operators such as commercial fishermen, bait and tackle shop owners, boat sales and boating equipment businesses whose business premises are located and affected by the contaminated river system;

(5) all persons who claim to have in the past regularly consumed fish taken from the Pascagoula/Escatawpa River and estuarine system and to have made recreational use of the system, and who have suits based upon such consumption or use pending in Mississippi state courts against the defendant herein as well as those persons who are similarly situated who have not filed suit as of the date of the filing of this class action complaint.

(Complaint, ¶ 13). In addition, the plaintiffs, in their Memorandum in Support of Motion for Class Certification, propose a sixth subclass:

(6) Fish or hunting camp owners or lessees, which camps are located within Jackson County, Mississippi, and which lie within two miles of the Escatawpa and Pascagoula Rivers floodplain.

(Memorandum in Support of Motion for Class Certification, p. 5).

The plaintiffs allege seven separate causes of action against the defendant, as follows:

1. Negligence

2. Intentional Infliction of Emotional Distress

3. Strict Liability

4. Nuisance

5. Trespass

6. Violation of Environmental Statutes

7. Conspiracy

The plaintiffs demand compensatory damages from the defendant for:

(a) Toxic pollution of the lands, waters and property of each plaintiff;

(b) Destruction of the value of the plaintiffs' said lands, rendering their said lands unmerchantable and without substantial fair market value;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

(c) Exposure of the lands, waters and property of plaintiffs to toxic chemical pollution, hazardous to health;

(d) Exposure of each plaintiff's body to toxic chemical pollution, hazardous to health;

**\*3** (e) Necessity of each plaintiff undergoing and incurring the expense of undergoing annual toxic chemical medical screening each year for the remainder of his life;

(f) Necessity of each plaintiff testing on a regular basis his property for toxic chemical contamination;

(g) Intense fear, and associated acute and chronic severe mental pain, anguish, distress and depression, which is real and reasonable of each plaintiff, that he will suffer cancer and/or other long-term personal injury from TCDD exposure or exposure to other chemical contaminants released by the defendant, the manifestations of which may be delayed for years or may commence at any time;

(h) Severe mental distress, pain and anguish from having to deal from a business and economic point of view with the fact that plaintiffs' lands, constituting for each plaintiff in this case a major portion of his total assets, are now unmerchantable and without substantial market value because of the aforesaid chemical contamination and exposure to said chemical contamination proximately caused by defendant;

(i) Annoyance, discomfort and inconvenience occasioned by the defendant's created nuisance; or the loss of use and enjoyment of each plaintiff's separate property and the loss of use and enjoyment of the river system itself to each plaintiff.

(Complaint, ¶ 47). The plaintiffs also seek punitive damages, and equitable relief from the "usurpation of [their] riparian rights" in the form of a penal bond "to stimulate the defendant to develop a plan to abate and correct the nuisance within a time certain." (Complaint, ¶¶ 52, 54).

The immediate question before the Court is not the merits of the plaintiffs' suit, but the appropriateness of class action certification, which is a procedural question. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). The burden of proof is on the plaintiffs to show that the suit should proceed as a class action. *See State of Alabama v. Blue Bird Body Co.,* 573 F.2d 309 (5th Cir.1978); *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980); *Miller v. Mackey International, Inc.,* 452 F.2d 424 (5th Cir.1971).

The plaintiffs must show that the necessary requirements for class certification have been met in this case. Those requirements include two that have been found by the courts to be implicit in Rule 23(a) of the Federal Rules of Civil Procedure. In the first place, a class capable of definition must exist. An identifiable class is essential so that the Court can determine whether a particular claimant is a class member. *De-Bremaeker v. Short,* 433 F.2d 733, 734 (5th Cir.1970) (*per curiam* ) ("adequately defined and clearly ascertainable"). The inquiry is whether "it is administratively feasible for the court to determine whether a particular individual is a member." 7A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 2d § 1760 at 121 (1986). This requires that the class be defined "in objective terms that are capable of present ascertainment." *Manual for Complex Litigation* 2d § 30.14 at 213 (1985). In the second place, the representative parties must be members of the proposed class. *Wagner v. Central Louisiana Elec. Co., Inc.,* 99 F.R.D. 279, 281 (E.D.La.1983).

**\*4** Rule 23(a) itself imposes the following prerequisites to the certification and the maintenance of a class action:

(1) that the class is so numerous that joinder of all class members is impracticable,

(2) that there are questions of law or fact common to the class,

(3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) that the representative parties will fairly and adequately protect the interests of the class.

Each of these requirements must be satisfied as to each subclass. *See* Fed.R.Civ.P. 23(c)(4)(B); *Stewart*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

*v. Winter,* 669 F.2d 328, 337 (5th Cir.1982).

In addition, the plaintiffs must show that the action qualifies for class action treatment under at least one of the subsections of Fed.R.Civ.P. 23(b). *Eisen v. Carlisle & Jacqulin, supra,* 417 U.S. at 163; *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 810 n. 9 (5th Cir.1982). Under the particular class approach proposed by plaintiffs' counsel, the plaintiffs must demonstrate under Rule 23(b)(3)

that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

### 1. *A Definable Class*

Not all subclasses proposed to the Court by the plaintiffs are clearly defined. Subjective elements are present in subclasses 3 (marina owners whose marinas are "affected" by the river's contamination), 4 (business owners whose businesses are "located by" and "affected by" the contaminated river), and 5 (persons who "claim" to have "regularly" consumed fish taken from the river and who "claim" to have made recreational use of the river). In their memorandum brief, the plaintiffs modify their definition of subclass 4 to include owners of businesses in Jackson County "directly related" to fishing, recreational or other uses of the river, who sell products and services "directly related" to the use of the river. The terms "related to," "affected by," and "located by" are not capable of the

kind of precise definition needed to facilitate the identification of a class.

Similarly, the criteria for determining the members of the fish consumer subclass are vague and indefinite. The proposed definition depends on the state of mind of each putative claimant, making it difficult, if not impossible, to know if he or she is a member of the subclass. Here, we are not dealing with workers in a laboratory or factory exposed to concentrated amounts of dioxin. In fact, the proposed definition lacks any limitation of time or place that can be objectively ascertained.

**\*5** The plaintiffs, in their rebuttal memorandum, propose that the Court establish criteria for determination of this subclass, such as requiring all proposed class members to submit to blood tests and depositions. However, such an approach would necessitate the holding of an inestimable number of individual hearings, in order to determine a subclass which plaintiffs' counsel estimates to comprise 150,000 people, and would create insurmountable administrative problems. The judicial and litigation costs of making these threshold determinations would eliminate any possibility that a class action would yield any of its intended efficiencies.

### 2. *Membership in the Proposed Class; Numerosity; Typicality; Commonality*

The McGuires must show that they are members of each of the subclasses for which they seek certification, and that the members of the subclasses are so numerous that joinder of all members is impracticable.

They must show that there are questions of law or fact common to the class as a whole. The Court notes that the requirements of Rule 23(a)(2) are less stringent than those of Rule 23(b)(3). Rule 23(a)(2) requires only a showing of a common question. Rule 23(b)(3) requires that those common issues predominate over the individual ones. Rule 23(b)(3) will be discussed at greater length below.

The McGuires must also show that their claims are typical of the claims of each subclass. Typicality ensures that the named plaintiffs' claims are so similar to the absent class members' claims that the named plaintiffs' claims can serve as proxies for those of the absent claimants. 7A Wright, Miller & Kane § 1764 at 232–33. This requirement "cannot be satisfied solely

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

by conclusory allegations." *Id.* at 235. The typicality requirement refers to the nature of the claim and not to the specific facts from which it arose. Factual differences are acceptable provided the claim arises from the same event or course of conduct and is based on the same legal theory.

The Court finds that a readily ascertainable class is crucial to the plaintiffs' claims of membership, numerosity, typicality and commonality. Because of this shortcoming, and because of the other findings set forth below, the Court deems it unnecessary to rule on these issues.

3. *Adequacy*
The basic thrust of Rule 23(a)(4) is whether or not the putative class of plaintiffs will fairly and adequately protect the interests of those whom they claim to represent. Courts are commonly faced with two factors to consider. First, whether the class is assured vigorous prosecution, 7A Wright, Miller & Kane § 1766 at 302–03; and second, whether there is an absence of conflict. *Id.* § 1768 at 326.

The Court must evaluate the adequacy of both the party representatives (the McGuires) and their legal representatives. The Court finds that it is not at all clear that the McGuires understand just how expensive and painstaking the determination of their proposed class action is likely to be. There is no telling analysis of plaintiffs' resources. There has been no forecast presented to the Court of the financial needs of the action and the funding sources to meet them. In addition, the McGuires seem to lack familiarity with their suit, and are not able to articulate the class they seek to represent. (Deposition of Kenneth McGuire, pp. 7, 17–19, 24, 63, 72, 97; Deposition of Elsie McGuire, pp. 8–9). Blind reliance, even on competent counsel, is insufficient. The due process interests of the absent class members require some restraint on the attorneys. Therefore, the Court finds that the record does not support a finding that these plaintiffs will adequately represent absent class members.

**\*6** The attorneys themselves must be qualified, experienced and able to conduct the litigation. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968). In support of this requirement, counsel have directed the Court's attention to class action suits in which they have been involved. Standing alone, citation of these cases does not establish an adequate

record in the type of litigation here involved. Nor is there any indication of how many lawyers will actually devote time to this case or what their support staffs or resources are.

The Court does not question the competence of plaintiffs' counsel. However, having thoroughly reviewed the file, this Court is of the opinion that the record is inadequate to support a positive finding that the plaintiffs' attorneys will adequately represent absent class members. The Court emphasizes that it does not conclude the attorneys are inadequate counsel; rather, the record reflects too little for the Court to make a finding.

4. *Predominance and Superiority*
Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In their memorandum brief, the plaintiffs provide meager analysis of this complex question, except to offer argument on the broad question of whether "class action procedure is appropriate for mass tort litigation." (Memorandum in Support of Motion for Class Certification, pp. 10–16). Their argument is not directed to the specific facts and theories of this case.

If the "main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." 7A Wright, Miller & Kane § 1778 at 535. Where class members' injuries are separate and individual, common questions typically do not predominate. *See, e.g., In re N. Dist. of California, Dalkon Shield IUD Prod. Liab. Litig.,* 693 F.2d 847, 854 (9th Cir.1982), *cert. denied,* 459 U.S. 1171 (1983). In the case *sub judice,* individual issues of liability, causation and damages seem to predominate over any common issues of fact or law. *See id. at 852; see also McDonnell Douglas Corp. v. United States Dist. Court,* 523 F.2d 1083, 1085–87 (9th Cir.1975), *cert. denied,* 425 U.S. 911 (1976).

In the few mass tort cases where a Rule 23(b)(3) class has been approved, unique factors, which are absent here, have been controlling. For instance, in *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004 (1988), the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

Second Circuit approved a Rule 23(b)(3) class, but only because of "the centrality of the military contractor defense." *Id.* at 166. Had that common defense been absent, the Second Circuit observed, "certification of a class action would have been error," because (1) proximate causation is a "highly individualistic" determination which "depends upon the characteristics of individual plaintiffs (*e.g.,* state of health, lifestyle) and the nature of their exposure;" (2) with the exception of the common military-contractor defense, "there may be few, if any, common questions of law;" and (3) "the dynamics of a class action" impair the ability of representative parties to protect the interests of the class because "potential plaintiffs in toxic tort cases do not share common interests because of differences in the strength of their claims." *Id.* at 165–66. Further, the Second Circuit opined that the Agent Orange litigation "justifies the prevalent skepticism over the usefulness of class actions in so-called mass tort cases and, in particular, claims for injuries resulting from toxic exposure." *Id.* at 164.

**\*7** Watson v. Shell Oil Co., 979 F.2d 1014 (5th Cir.1992), *reh. en banc granted,* 990 F.2d 805 (5th Cir.1993), a case which the plaintiffs assert to be factually similar to the case *sub judice,* actually presents a quite different scenario, as it arose from an explosion at an oil refinery. In such "single occurrence" cases, the facts and law are necessarily more common and typical for all injured parties. In contrast, the proposed claimants in this case are affected individually over a long period of time and in different ways.

Both the property damage claims and emotional distress claims depend on a wide variety of individual factors. Individual inquires will also be required relating to causation and damages, *e.g.,* whether a class member might have been exposed to dioxin in other circumstances, whether he or she suffers from a pre-existing disease, or whether other factors may have caused business losses or reduction in property values.

In Mattoon v. City of Pittsfield, 128 F.R.D. 17 (D.Mass.1989), the plaintiffs sought to represent a class of city residents who became ill with a virus brought on by contaminated drinking water. In denying certification, the court held:

[P]roximate cause will necessarily be different for every person in the proposed class, based on each person's length of exposure to contaminated water, notice, pre-existing medical conditions and other factors. For these reasons, defendants' liability can not "be determined on a class-wide basis...." Common questions, in sum, do not predominate. Proximate causation with regard to each party remains a thorny, individual question. The liability of each defendant under the various legal theories asserted in the complaint will also require individual attention. Damages, of course, are individual issues as well.

*Id.* at 21 (quoting Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1197 (6th Cir.1988)).

The present action does not turn on a single act committed by the defendant that affects all class members identically, such as an explosion, a single toxic spill, or an air crash. Rather, the claims concern an alleged course of conduct extending over a number of years, during which class members supposedly claim that they have been affected in different ways and at different times.

IP has also raised affirmative defenses that require individual examination. Depending on their knowledge and conduct, some class members' claims may be barred or diminished by contributory negligence. Claimants who claim to own businesses will be subject to individual defenses, such as failure to mitigate damages. Some claims may be barred by the applicable statute of limitations.

Overall, the issues that are individual in nature predominate over those that are common. Even a recovery by the class representatives will not necessarily entitle other class members to recover. This means that class treatment cannot achieve the economies of time, effort and expense which justify the other sacrifices of class actions.

**\*8** As stated earlier, the plaintiffs are required to prove that a class action suit is a superior medium for adjudication. The Court finds, however, that a class action is not the superior method for the fair and efficient adjudication of this controversy. This is not the only dioxin litigation against IP, nor is it the only such suit involving these plaintiffs and their attorneys. On November 14, 1990, the McGuires filed suit in the Circuit Court of Jackson County, Mississippi, against

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

IP, Georgia–Pacific Corporation, and other defendants. Subsequent to the McGuire's suit, 79 similar suits were filed against IP on behalf of approximately 5,000 plaintiffs. Three of these cases have already been tried, and appeals taken in two of them to the Mississippi Supreme Court. There are compelling reasons for permitting the dioxin cases to remain in state court, where the predominantly state law claims can be resolved. The factors listed in Rule 23(b)(3) support this finding:

(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions.

The major factors supporting individual litigation include extremely large damage claims and a need to tailor trial conduct to individual issues. *See, e.g., Butt v. Allegheny Pepsi–Cola Bottling Co.,* 116 F.R.D. 486, 492 (E.D.Va.1987). Individual interests are at their peak in tort cases, *see, e.g., In re "Agent Orange", supra,* 818 F.2d at 165, and the strength of individual interests can be gauged in large part from the number of individual suits already filed. "[T]he court should inform itself of any litigation actually pending by or against the individuals. The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action." *Advisory Committee Notes to Rule 23,* 39 F.R.D. 69, 104 (1966). *Compare Riordan v. Smith Barney,* 113 F.R.D. 60, 66 (N.D.Ill.1986) (class action found to be "superior" method of adjudication in light of "the fact that no other actions against defendants arising out of the transaction at issue are currently pending").

Here, it is clear that "some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action." 7A Wright, Miller & Kane § 1780 at 570. The defendant has presented affidavits to the effect that there are 79 dioxin cases pending against IP in the Mississippi courts on behalf of almost 5,000 plaintiffs, and additional cases involving thousands of plaintiffs against Georgia–Pacific (many of whom also have cases pending against IP).

(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class.

The plaintiffs are essentially asking this Court to supplant state court litigation with a federal class action. The Court finds, however, that the existing state court litigation is extensive and superior to the proposed class action. *See, e.g., Pennsylvania v. Budget Fuel Co.,* 122 F.R.D. 184, 185–86 (E.D.Pa.1988) (ongoing state court action superior to a federal class action).

(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum.

**\*9** Most of the claims presented in the class action, *e.g.* emotional distress, trespass and nuisance, are state-law claims best resolved in the state courts. In fact, the viability of the claims as a matter of state law is currently pending in the two appeals before the Mississippi Supreme Court. (Defendant's Memorandum in Opposition to Class Certification, p. 32). A federal decision on these issues would be disruptive of the emerging state law. These questions are more appropriately addressed to the Mississippi trial courts, whose decisions, unlike this Court's, may be appealed directly to the Mississippi Supreme Court. Considerations of comity and federalism support denying certification in this case.

(D) The difficulties likely to be encountered in the management of a class action.

Finally, the Court reiterates the anticipated problems in managing a case of this magnitude. If a class were certified, an inordinate amount of time and expense would be spent addressing individual claims, involving evidentiary development at hearings or trials. Whatever efficiency might be gained by a class action would surely be outweighed by the unmanagability of the litigation.

Upon consideration, this Court concludes that the plaintiffs have failed to meet their burden of proof to show that their suit should proceed as a class action. The plaintiffs have not persuasively demonstrated that class certification as requested under Fed.R.Civ.P. 23(b)(3) is appropriate. The plaintiffs have also failed to adequately define a class, and have failed to show that they will fairly and adequately protect the interests of the class. With these deficiencies, the Court finds it unnecessary to rule on any other issues raised. The instant application for class certification shall

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 261360 (S.D.Miss.)
**(Cite as: 1994 WL 261360 (S.D.Miss.))**

accordingly be denied.

     Counsel for the defendant shall submit an Order
in conformity with this Memorandum Opinion within
ten (10) days of the date of entry hereof.

S.D.Miss.,1994.
McGuire v. International Paper Co.
Not Reported in F.Supp., 1994 WL 261360
(S.D.Miss.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

H

United States District Court,
E.D. Louisiana.
In re VIOXX PRODUCTS LIABILITY LITIGA-
TION.
This Document Relates to:
AvMed, Inc., et al.
v.
BrownGreer, PLC, et al., No. 08–1633
1199 SEIU Greater New York Benefit Fund, et al.
v.
BrownGreer, PLC, et al., No. 08–3627.

No. MDL 1657.
Oct. 21, 2008.

### ORDER & REASONS

ELDON E. FALLON, District Judge.

*1 Before the Court are several motions arising out of two non-governmental, third-party payor/provider cases consolidated within the Vioxx Multidistrict Litigation. These cases involve two separate groups of plaintiffs, both of whom sought to enjoin distribution of interim payments in the Vioxx Settlement Program pursuant to § 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1132(a)(3) ( "ERISA"). See Rec. Docs. 14640, 14877. As the named defendant in both actions, BrownGreer, PLC, the Vioxx Claims Administrator, opposed the motions for an injunction. In addition, BrownGreer sought to sever the AvMed Plaintiffs' claims and strike class allegations contained within the Greater New York Plaintiffs' complaint.

The Court heard oral argument on the motions on July 24, 2008, and took them under submission so that the Court could adequately study the thousands of pages of written material and hundreds of sources cited by the parties. On August 6, 2008, less than two weeks after the oral argument, the AvMed Plaintiffs filed a mandamus with the Fifth Circuit urging the Circuit to order this Court to deliver its opinion immediately. On August 7, 2008, the Court issued an order denying the Plaintiffs' motions for a preliminary injunction, in which the Court indicated that it would address the Defendant's motions regarding severance

and class action status in a separate order to follow soon thereafter. See In re Vioxx Prods. Liab. Litig., MDL No. 1657, 2008 WL 3285912 (E.D.La. Aug.7, 2008). The Court has now had an opportunity to draft a considered response to the severance and class action motions.[FN1]

> FN1. The Court will address the NPC's Motion to Dismiss separately.

For the following reasons, in addition to those set forth during oral arguments, the Defendant's Motion to Sever (Rec.Doc.14525) and Motion to Strike Class Allegations (Rec.Doc.15008) ARE GRANTED.

### I. BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate. This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as AP-PROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[FN2]

> FN2. For a more detailed factual background describing the events that took place before the inception of this Multidistrict Litigation, see In re Vioxx Prods. Liab. Litig., 401 F.Supp.2d 565 (E.D.La.2005) (resolving Daubert challenges to a number of expert

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

witnesses).

**\*2** On February 16, 2005, the Judicial Panel on Multidistrict Litigation conferred multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.,* 360 F.Supp.2d 1352 (J.P.M.L.2005). One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for moving forward with the proceedings. Shortly thereafter, the Court appointed committees of counsel to represent the parties and to meet with the Court once every month to review the status of the litigation.[FN3]

> **FN3.** The Court appointed twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6 (Apr. 8, 2005), and five attorneys to serve on the Defendant's Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005).

One of this Court's first priorities was to assist the parties in selecting and preparing certain test cases to proceed as bellwether trials. In total, this Court conducted six Vioxx bellwether trials.[FN4] The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina. The five subsequent bellwether trials took place in New Orleans, Louisiana. One of the trials resulted in a verdict for the plaintiff. Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant. During the same period that this Court conducted its six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida. With the benefit of experience from these bellwether trials, as well as the encouragement of the several coordinated courts, the parties soon began settlement discussions in earnest.[FN5]

> **FN4.** *See Plunkett v. Merck & Co.,* No. 05–4046 (E.D. La. filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.,* No. 06–485 (E.D. La. filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.,* No.

05–4379 (E.D. La. filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.,* No. 06–0810 (E.D. La. filed Feb. 16, 2006) (fifth bellwether trial); *Dedrick v. Merck & Co.,* No. 05–2524 (E.D. La. filed June 21, 2005) (sixth bellwether trial). For a more detailed analysis of both the role of bellwether trials in MDLs generally as well as the specific role of bellwether trials in the Vioxx MDL, see Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation,* 82 TUL. L.REV.. 2323 (2008).

> **FN5.** In their efforts to develop a comprehensive, joint settlement agreement, counsel for Merck and the Negotiating Plaintiffs' Counsel ("NPC") met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court—as well as the coordinate state courts of Texas, New Jersey, and California—informed of their progress in settlement discussions.

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.,* MDL 1657 (E.D.La. Nov. 9, 2007) ("Settlement Agreement"), *available at* http://www.browngreer.com/vioxxsettlement.[FN6] The private Settlement Agreement establishes a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of 4.85 billion dollars. *Id.* § "Recitals". Under the terms of the Settlement Agreement, Merck retains "walk away privileges" in the event that less than 85% of the total number of eligible claimants within each of several defined categories choose to enroll in the program. *Id.* § 11. In other words, if the requisite percentages of claimants did not elect to participate in the voluntary settlement program, Merck had the right to withdraw from the agreement and thereby terminate the program.[FN7]

> **FN6.** When the parties formally announced the settlement agreement, Vioxx-related

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

discovery had been moving forward in the coordinate jurisdictions for more than six years. Over 50 million pages of documents had been produced and reviewed, more than 2,000 depositions had been taken, and counsel for both sides had filed thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology.

FN7. For a more detailed examination of the terms of the Vioxx Master Settlement Agreement, see *In re Vioxx Products Liability Litigation*, MDL No. 1657, 2008 WL 3285912 (E.D.La. Aug.7, 2008).

On July 18, 2008, Merck formally announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met. *See* Rec. Doc. 15362, Minute Entry, July 17, 2008. Merck further advised that it intended to waive its walk away privileges and would commence funding the Vioxx Settlement Program by depositing an initial sum of $500 million into the Program's account, clearing the way for distribution of interim payments to eligible claimants. *Id.* On September 23, 2008, BrownGreer announced that interim payments had begun in late August and would continue to be distributed to eligible claimants on a rolling basis. *See* Rec. Doc. 16144, Minute Entry, September 23, 2008.

## II. PRESENT MOTIONS

### A. Motion to Sever the AvMed Plaintiffs' Claims

**\*3** On April 14, 2008, the AvMed Plaintiffs, a group of forty-eight non-governmental sponsors and administrators of ERISA health benefit plans, filed a complaint seeking equitable relief under § 502(a)(3) of ERISA, naming BrownGreer, PLC, U.S. Bancorp, and certain John Does as Defendants. Although the AvMed Plaintiffs claim to provide healthcare coverage to approximately 70% of the individuals in the United States who have private health insurance, they assert that "only a handful" of their beneficiaries have reported participation in the Vioxx Settlement Program. The AvMed Plaintiffs claim that, without the assistance of the Defendants, they are unable to determine which of their beneficiaries are participating in the settlement.FN8

FN8. It is noteworthy to observe that, although this litigation has been proceeding in this Court for over three years and in the state courts for at least five years, apparently none of the Plaintiffs has until recently made any attempt to determine the identities of their own beneficiaries for purposes of evaluating their potential liens.

On June 9, 2008, the AvMed Plaintiffs filed a motion for a temporary restraining order and preliminary injunction to compel BrownGreer as Claims Administrator: (1) to disclose the identities of the Vioxx claimants participating in the settlement; and (2) to enjoin distribution of settlement funds until such time as the AvMed Plaintiffs are able to assert reimbursement rights against those claimants for whom they have paid medical expenses related to Vioxx.FN9 BrownGreer opposed the Plaintiffs' motion and also filed a separate motion to sever the Plaintiffs' claims. BrownGreer argues that the AvMed Plaintiffs' claims are improperly joined because they involve different healthcare providers, different healthcare contracts, and different claimants. As a result, BrownGreer contends that the AvMed Plaintiffs' claims should be severed because they do not involve common questions of fact or law and do not arise from the same transaction or occurrence.

FN9. On June 11, 2008, the Court held a status conference to address the AvMed Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. *See* Rec. Doc. 14652, Minute Entry, June 11, 2008. For reasons stated during the conference, the Court denied the Plaintiff's motion in part with respect to the request for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b). *See id.*

### B. Motion to Strike Class Allegations in the Greater New York Plaintiffs' Complaint

On June 3, 2008, a second group of plaintiffs, the "Greater New York Plaintiffs," filed a class action complaint naming as Defendants BrownGreer, certain known and unknown law firms representing Vioxx claimants, and unknown Vioxx claimants who have or will have enrolled in the Vioxx Settlement, are beneficiaries of ERISA health plans, and are obligated pursuant to their plan documents to notify and/or reimburse their health plan for any Vioxx-related

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

medical benefits they received. In response to initial objections to their class allegations, the Greater New York Plaintiffs later filed an amended class complaint on July 9, 2008, in which they purport to represent

> All self-funded ERISA-covered health benefit plans that (a) have paid or agreed to pay Vioxx-related medical benefits on behalf of plan beneficiaries who have enrolled or will enroll in the Vioxx settlement, and (b) whose plan documents contained at the time such benefits were paid or agreed to be paid, (1) notification provisions requiring beneficiaries to notify the plan of claims or settlements, and/or (2) reimbursement provisions requiring beneficiaries to reimburse the plan, out of recoveries from any third party, for benefits relating to such recovery which the plan has paid or agreed to pay on the beneficiaries behalf.

**\*4** *See* Rec. Doc. 15210, Greater New York Pl.s' Am. Compl. ¶ 18. In their amended class complaint, the Greater New York Plaintiffs assert that there are "hundreds, and likely thousands," of self-funded ERISA health benefit plans whose plan documents provide for reimbursement rights and who have paid medical benefits on behalf of plan beneficiaries enrolled in the Vioxx Settlement Program. *Id.* ¶ 20. Similar to the AvMed Plaintiffs, though, the Greater New York Plaintiffs claim that, without the assistance of the named Defendants, they will be unable to identify claimants who received Vioxx-related health benefits from class members.

On June 26, 2008, the Greater New York Plaintiffs filed a motion for a preliminary injunction to delay disbursement of interim payments under the Vioxx Settlement Program and to compel production of the identities of plan beneficiaries who may have received health benefits from any health plan that falls within the proposed class definition. *See* Rec. Doc. 14877, Greater New York Pl.'s Mot. Prelim. Inj. 2–3. In response, the NPC and PSC filed a motion to dismiss the Greater New York Plaintiffs' complaint and strike class allegations contained within it. Shortly thereafter, Defendant BrownGreer filed its own motion to strike class allegations in the Greater New York Plaintiffs' complaint. Both parties argue that the purported class definition fails to satisfy the requirements set forth under Rule 23 of the Federal Rules of Civil Procedure. In addition, BrownGreer contends that the proposed class lacks cohesiveness and is not ascer-

tainable by objective criteria. The Greater New York Plaintiffs responded by filing a single opposition to both motions to strike, arguing that the motions had become moot with the filing of the amended complaint. In response, BrownGreer contends that the amendments to the class definition fail to remedy the dispositive shortcomings that were present in the initial class allegations.

**C. The Court's August 7th Order**

On August 7, 2008, the Court issued an order denying both the AvMed Plaintiffs' and the Greater New York Plaintiffs' motions for preliminary injunctions. *See In re Vioxx Prods. Liab. Litig.,* MDL No. 1657, 2008 WL 3285912 (E.D.La. Aug.7, 2008). In denying the motions, the Court found that: 1) neither group of Plaintiffs could demonstrate a substantial likelihood of success on the merits; 2) neither group of Plaintiffs would suffer irreparable harm from disbursement of interim settlement payments; 3) the balance of harms counseled strongly against enjoining the proceedings; and 4) the public interest did not favor an injunction. The Court will now address BrownGreer's Motion to Sever the AvMed Plaintiffs' Claims and Motion to Strike Class Allegations in the Greater New York Plaintiffs' Complaint.

**III. LAW & ANALYSIS**

**A. Motion to Sever AvMed Plaintiffs' Claims**

Federal Rule of Civil Procedure 20(a) establishes the requirements for the permissive joinder of parties: (1) whether the right to relief arises out of the same transaction, occurrence, or series of transaction or occurrences, and (2) whether there are questions of law or fact common to all of the plaintiffs that will arise in the action. Fed.R.Civ.P. 20(a). Both requirements must be satisfied in order for the parties to be properly joined. *Rohr v. Metro. Ins. & Cas. Co.,* Civ. A. No. 06–10511, 2007 WL 163037, *1 (E.D.La. Jan.17, 2007).* "[T]he transaction and common question requirements prescribed by Rule 20(a) are not rigid tests ... they are flexible concepts used by the courts to implement the purpose of Rule 20 and therefore are to be read as broadly as possible whenever doing so is likely to promote judicial economy." *Wade v. Minyard Food Stores,* Civ. A. No. 03–1403, 2003 WL 22718445, *1 (N.D.Tex. Nov. 17,2003)* (internal quotation marks omitted). As instructed by the Supreme Court, district courts should

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

take a liberal approach to permissive joinder in the interest of judicial economy. *United Mine Workers v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**\*5** In addition to the requirements set forth in Rule 20, Rule 21 provides a district court with "broad discretion" to sever improperly joined parties. *Anderson v. Red River Waterway Comm'n,* 231 F.3d 211, 214 (5th Cir.2000); *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 505 (5th Cir.1994). "Once a claim has been severed ... it proceeds as a discrete unit with its own final judgment, from which an appeal may be taken." 7 WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1689 (3d ed.2001).[FN10] Because the Court finds that the AvMed Plaintiffs' claims do not involve common questions of fact or law and do not arise from the same transaction or occurrence, the Court holds that the claims are improperly joined and should be severed.

> FN10. A district court may consider the following factors in order to determine whether claims should be severed: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present common questions of law or fact; (3) whether settlement or judicial economy would be promoted; (4) whether prejudice would be averted by severance; and (5) whether different witnesses and documentary proof are required for separate claims. *See McFarland v. State Farm Fire & Cas. Co.,* Civ. A. No. 06–466, 2006 WL 2577852, \* 1 (S.D.Miss. Sept. 6, 2006) (citing *Morris v. Northrop Grumman Corp.,* 37 F.Supp.2d 556, 580 (S.D.N.Y.1999)).

The AvMed Plaintiffs argue that joinder is appropriate in this case for three reasons. First, they contend that the joined claims present common questions of law because the Court will have to conduct essentially the same legal analysis to resolve each claim. Second, they contend that the claims involve common questions of fact because the health plans are seeking essentially the same information—the names of settling claimants and the amount of reimbursement to which individual health plans might be entitled. Finally, they contend that the claims all arise out of the same transaction—the Vioxx settlement fund. In response, the Defendant counters that the claims do not

involve common issues of law because several material differences between the health plans counsel in favor of severance. The Defendant further asserts that the names of the settling claimants and the amount of individual claimants' settlement awards do not constitute common questions of fact. Finally, the Defendant argues that the Vioxx settlement fund is not a transaction giving rise to the Plaintiffs' claims. The Court will address each of the Plaintiffs' arguments in turn.

First, the AvMed Plaintiffs argue that the joined claims feature common issues of law. As a result of the joinder, the AvMed Plaintiffs seek to enforce as many as 1.1 million distinct health benefit contracts. To demonstrate the type of plans they seek to enforce, the AvMed Plaintiffs have submitted eighty-three plan documents as representative samples. The AvMed Plaintiffs claim that, if they were required to produce all of their plans, which are often specifically tailored to each individual beneficiary and which often contain similar reimbursement provisions, the total documentation for even a single year alone would approach 30 million pages. Despite differences between the plans, the AvMed Plaintiffs contend that joinder is appropriate because this Court will ultimately have to make a single determination as to whether the Supreme Court's decision in *Sereboff v. Mid Atlantic Medical Services, Inc.,* 547 U.S. 356, 368–69, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006) and the Fifth Circuit's decision in *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferer, Poirot & Wansbrough,* 354 F.3d 348, 358 (5th Cir.2003), allow private health benefits providers to assert equitable claims against the Vioxx settlement fund to preserve their reimbursement rights. Under close scrutiny, however, the Plaintiffs' argument oversimplifies the issue.

**\*6** In *Sereboff,* the Supreme Court held that a fiduciary of an ERISA health benefit plan could maintain an action under § 502(a)(3) of ERISA to assert an equitable lien against the proceeds of a beneficiary's settlement with a third party tortfeasor. 547 U.S. at 367–68. Although the Supreme Court did not base its holding on the particular language of the health plan's reimbursement provision, the Court took special care to demonstrate that the plan language complied with the equitable relief sought by the plaintiff. *Id.* at 359. For example, the Court noted that the Sereboffs' health plan "identified a particular fund, distinct from the Sereboffs' general assets—'[a]ll recoveries from a

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

third party (whether by lawsuit, settlement, or otherwise).' " *Id.* at 363. Importantly, the Sereboffs' health plan also identified "a particular share of that fund to which Mid Atlantic was entitled—'that portion of the total recovery which is due [Mid Atlantic] for benefits paid.' " *Id.* Clearly the jurisprudence emphasizes the significance of the plan's language.

A recent, post-*Sereboff* case from the Eleventh Circuit provides further guidance. *See Popowski v. Parrot,* 461 F.3d 1367 (11th Cir.2006). In *Popowski,* the Eleventh Circuit dealt with two separate cases, both of which were brought by fiduciaries of employee health benefit plans seeking reimbursement for medical expenses paid on behalf of plan beneficiaries. *Id.* at 1370. One of the plans—the "United Distributors Plan"—contained a reimbursement provision granting the plan "a lien on any amount recovered by the Covered Person whether or not designated as payment for medical expenses." *Id.* The other plan—the "Mohawk Plan"—contained a provision requiring that the insured "reimburse the plan in full, and in first priority, for any medical expenses paid by the Plan relating to the [beneficiary's] injury or illness." *Id.* Considering the plans in light of *Sereboff,* the Eleventh Circuit held that, although the language in the United Distributors Plan satisfied the requirements for the assertion of an equitable lien, the language in the Mohawk Plan did not. *Id.* at 1373. The court explained that the United Distributors Plan, in "language essentially identical to the Supreme Court's characterization of the plan language in *Sereboff,* specifies both the fund (recovery from the third party or insurer) out of which reimbursement is due to the plan and the portion due ... (benefits paid by the plan on behalf of the defendant)." *Id.* In contrast, the court found that the Mohawk Plan "fails to specify that recovery come from any identifiable fund or to limit that recovery to any portion thereof, [and] fails to meet the requirements outlined in *Sereboff* for the assertion of an equitable lien." *Id.* at 1374. Indeed, the very structure of the *Popowski* opinion is itself instructive—in considering two distinct health plan contracts, the Eleventh Circuit conducted two distinct legal analyses.

**\*7** In the instant case, there appear to be significant variations even between the several health plans submitted as representative samples. For example, the Hawaii Medical Service Association Plan describes the medical benefits it disburses as an "interest-free loan." Some of the plans appear to contain reimbursement provisions that do not identify specific, identifiable funds from which the health plans may recover reimbursement. Further still, some of the plans are not even governed by ERISA. The Government Employee's Health Association, Inc., and the Blue Cross Blue Shield Association plans are governed by the Federal Employees Health Benefits Act. The AvMed Plaintiffs counter that, because ERISA actually *limits* the ability of health plans to collect reimbursement from plan beneficiaries, these non-ERISA plans may be entitled to even greater reimbursement rights. Despite the AvMed Plaintiffs' assurance that "the vast majority of plans" are ERISA plans, however, the inclusion of these disparate plans prompts further concern as to what other plans might be included within the universe of plans the AvMed Plaintiffs seek to enforce. The Court declines to accept the AvMed Plaintiffs' invitation to determine, in a single decision applicable to all of the joined claims, whether ERISA permits more than 1.1 million different health employer plans—some of which are not even governed by ERISA—to assert equitable liens against the settlement fund or the settlement awards of individual Vioxx claimants.

Second, the AvMed Plaintiffs argue that there are factual issues common to each of the joined claims. In light of recent Supreme Court and Fifth Circuit precedent, however, it appears that this analysis will depend on individual facts and circumstances related to each health plan and its individual beneficiaries. Individual claimants' names and their settlement awards are not common questions of fact. The Court can find no authority—and the Plaintiffs have provided none—to support the contention that the Plaintiffs are entitled to information identifying their beneficiaries who are participating in the settlement. Even if the Plaintiffs are entitled to such information as to their own insureds, however, they are not entitled to information identifying claimants for whom they have provided no medical benefits whatsoever. Issues relating to the claimants' names and settlement awards are therefore unique to each plan and do not present common questions of fact.

Finally, the AvMed Plaintiffs assert that the joined claims all arise from a single transaction—the Vioxx settlement fund. The AvMed Plaintiffs claim that both *Sereboff* and *Bombardier* require the Court to find that the Vioxx settlement fund is an "identifiable"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

fund against which the joined Plaintiffs may assert equitable liens under ERISA. The Defendant counters that the Plaintiffs' claims do not arise from the Vioxx settlement but instead arise from the individual re-imbursement provisions that each health plan has negotiated with its respective beneficiaries.

**\*8** In *Campo v. State Farm Fire & Casualty Co.,* the court held that multiple plaintiffs' claims against a single insurer were improperly joined when the plaintiffs sought to enforce separate insurances poli-cies to recover damages caused by Hurricane Katrina. Civ. A. No. 06–2611, 2007 WL 2155792, \*1–2 (E.D.La.2007). Although the plaintiffs all asserted similar legal claims against a single defendant, the court explained that "[t]he only common elements between the plaintiffs' claims are that their claims arise from damages caused by Hurricane Katrina and that each plaintiff had a separate insurance policy with the defendant." *Id.* at * 3. The court noted that these limited factual and legal similarities "cannot serve as a common transaction or occurrence because Hurricane Katrina affected each property differently, each property was different with respect to its prior condi-tion, and each property was covered by a separately negotiated insurance policy." *Id.* As a result, the court held that joinder was inappropriate because the cases did not present common questions of fact or law and did not arise out of the same transaction, occurrence, or series of transactions or occurrences. *See id.; see also Sucherman v. Metro. Prop. & Cas. Ins. Co.,* Civ. A. Nos. 05–6456, 06–8765, 2007 WL 1484067, \* 2 (E.D.La. May 21, 2007) ("[P]laintiffs cannot rely on the fact that one natural disaster, Hurricane Katrina, caused the damage to all of their properties as a basis for joining their claims against [the defendant].... [A]side from Hurricane Katrina as the cause, the claims against [the defendant] do not arise out of the same transaction, occurrence, or series of transactions or occurrences.").

Similarly, the Vioxx settlement fund is not a transaction or occurrence giving rise to the AvMed Plaintiffs' claims. The Vioxx settlement is a private, contractual agreement that did not assign any rights to the AvMed Plaintiffs. The settlement itself did not give rise to the Plaintiffs' claims; rather, the claims arose out of reimbursement provisions in the health plans' contracts with an unknown number of uniden-tified claimants. Any equitable rights that the Plain-tiffs have are attributable not to the settlement itself

but to the individual determination that a particular beneficiary will receive a settlement award. Like the plaintiffs in *Campo,* who sought to enforce similar but distinct insurance policies against a single insurer, each of the AvMed Plaintiffs has entered into "a sep-arately negotiated insurance policy" with each of its beneficiaries. *See Campo,* 2007 WL 2155792 at \*1–2. Because the AvMed Plaintiffs' claims do not feature common questions of law or fact and do not arise out of the same transaction or occurrence, the Court finds that the claims are improperly joined.

As noted above, Rule 21 provides a district court with "broad discretion" to sever improperly joined parties. *Brunet,* 15 F.3d at 505. In this case, joinder does not serve the interests of judicial economy and instead threatens to prejudice the Defendant. Indeed, by the AvMed Plaintiffs' own estimation, the court-ordered production of claimants' identifying information—if appropriate—would instantly trans-form this litigation into an action against approxi-mately 15,000 defendants, each of whom has entered into a separately negotiated health plan contract and each of whom has received medical benefits under highly individualized factual circumstances. Further, because of material differences in the health plans, "[a]ny practical benefit accrued through the conser-vation of judicial resources will be outweighed by the burden imposed on [the Defendant] in defending multiple claims, with different factual scenarios, in one trial." *Rohr,* 2007 WL 163037 at \*2. Accordingly, the Court finds that the AvMed Plaintiffs' claims are improperly joined and should be severed.

**B. Motion to Strike Class Allegations in the Greater New York Plaintiffs' Complaint**
**\*9** BrownGreer argues that the Greater New York Plaintiffs' class allegations fail for several reasons. Specifically, BrownGreer contends that the proposed class: (1) is not ascertainable, (2) is not cohesive, and (3) lacks typicality. The Court will address each of the Defendant's arguments in turn.

**1. The proposed class is not ascertainable**
"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *De Bremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970). "Although the text of Rule 23(a) is silent on the matter, a class must not only exist, the class must be susceptible of precise definition. There can be no

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

class action if the proposed class is 'amorphous' or 'imprecise.' " 5 JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 23.21[1], at 23–47 (3d ed.1997). "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.,* 501 F.3d 443, 445 (5th Cir.2007). The Manual for Complex Litigation explains that

> [a]lthough the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable.... An identifiable class exists if its members can be ascertained by reference to objective criteria. The order defining the class should avoid ... terms that depend on resolution of the merits (e.g., persons who were discriminated against).

See MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.222 (2004). "Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings." *John,* 501 F.3d at 445.

In *Forman v. Data Transfer, Inc.,* the court held that a purported class of "all residents and businesses who have received unsolicited facsimile advertisements" was not ascertainable because the court would have to consider the merits of each case before determining membership in the class. 164 F.R.D. 400, 403, (E.D.Pa.1995). The court noted that it is a "basic tenet of class certification [that] a court may not inquire into the merits of the case at the class certification stage." *Id.* Because the class definition depended upon an initial finding that certain class members had received unsolicited facsimiles, the court explained that it would have to conduct a "mini-hearing on the merits of each case" in order to determine membership in the proposed class. *Id* . As a result, the court held that the class failed to meet the requirements of Rule 23 because it was not ascertainable without first addressing the merits of each individual claim. *Id.*

Similarly, the court in *Barasich v. Shell Pipeline Co.* held that a proposed class was not ascertainable when the class consisted of "all commercial oystermen whose oyster leases were contaminated by oil discharged during Hurricane Katrina due to the negligence of defendants." Civ. A. No. 05–4180, 2008 U.S. Dist. LEXIS 47474, *13–14, 2008 WL 6468611 at *2 (E.D.La. June 19, 2008). The court in *Barasich* noted two fundamental problems with the proposed class definition: first, the plaintiffs had failed to limit membership in the class to any particular geographic area, requiring the court to engage in extensive individual factual development; and second, "the determination of whether an individual is a member of the proposed class ... cannot be determined without inquiring into the merits of each person's claim." *Id., 2008 WL 6468611 at *4* Because the court would have had to address individual issues of negligence and causation on the merits in order to determine membership in the class, the court held that the proposed class was neither ascertainable nor adequately defined. *Id.*

**\*10** In the instant case, the Greater New York Plaintiffs purport to represent a class of

> [a]ll self-funded ERISA-covered health benefit plans that (a) have paid or agreed to pay Vioxx-related medical benefits on behalf of plan beneficiaries who have enrolled or will enroll in the Vioxx settlement, and (b) whose plan documents contained at the time such benefits were paid or agreed to be paid, (1) notification provisions requiring beneficiaries to notify the plan of claims or settlements, and/or (2) reimbursement provisions requiring beneficiaries to reimburse the plan, out of recoveries from any third party, for benefits relating to such recovery which the plan has paid or agreed to pay on the beneficiaries behalf.

Although the Plaintiffs allege that there are "hundreds, and likely thousands" of self-funded ERISA health benefit plans that fit within the class definition, they cannot determine how many plans—or even which plans—they might potentially represent because they do not know who is participating in the settlement.[FN11]

> FN11. As an initial matter, the Court notes that it does not have the benefit of a substantive response to the Defendant's Motion to Strike Class Allegations. The Greater New York Plaintiffs chose not to respond to the substance of the motion, opting instead to argue that the Defendant's motion fails as a matter of procedure because motion was rendered moot by the amended class allegations. The Court is not persuaded. The De-

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

fendant "should not be required to file a new motion ... simply because an amended pleading was introduced while their motion was pending.... To hold otherwise would be to exalt form over substance." 6 WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1476, at 558 (2d ed.1990). If the amended class definition fails for the same reasons that the Defendant argues the initial class definition failed, the Court will not require the Defendant to file an additional motion simply as a matter of procedure.

Because the Greater New York Plaintiffs' proposed class cannot be determined without first inquiring into the substantive merits of each individual claim, the Court finds that the class is not ascertainable. In order to determine membership in the purported class, the Court would first have to determine whether, on the merits, the class is entitled to the very legal relief that it ultimately seeks—specifically, the production of identifying information for claimants enrolled in the Vioxx settlement program. Indeed, the Plaintiffs essentially concede that, without this information, the class membership cannot be determined. Like the proposed class in *Barasich*, which could not be ascertained without first addressing substantive issues of causation and negligence, the Greater New York Plaintiffs' proposed class cannot be ascertained without first deciding that each of the unknown Plaintiffs is entitled to information identifying claimants in the settlement. The Plaintiffs' circular logic—that they are entitled to substantive relief on behalf of a class of unknown health plans so that they can identify the very plans for whom they seek the relief—counsels strongly in favor of finding that the class is not ascertainable.[FN12]

FN12. Although the Court generally does not consider the merits of the case in determining the validity of class allegations, the Court has had occasion to consider the Plaintiffs' request for claimants' personal information in the context of the Plaintiffs' motion to enjoin disbursement of interim settlement payments. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2008 WL 3289512, * 14 (E.D.La. Aug. 7, 2008). In denying the motion for a preliminary injunction, the Court stated that it

questions the appropriateness of the Plaintiffs' request to compel identification of claimants who are participants in a private, contractual settlement like the one reached by the parties in the Vioxx cases. The Court can find no authority—and the Plaintiffs have provided none—to support the contention that the Plaintiffs have a right to the claimants' identifying information, including their social security numbers, dates of birth, employers, etc. The fact that the Plaintiffs have encountered substantial hardship in locating this information does not give rise to a legal right to compel its production here.

*Id.*

Further, the issue of whether Plaintiffs are entitled to the production of claimants' identifying information is merely the first of several substantive decisions necessary to ascertain class membership. For example, the Court would need to determine not only that the Plaintiffs are entitled to the claimants' information, but also that each individual health benefit plan has an enforceable reimbursement provision against each claimant for whom it has provided benefits.[FN13] As noted above, recent Supreme Court and Fifth Circuit precedent suggest that the language of each individual health plan contract might affect a plan's reimbursement rights against a plan beneficiary. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2008 WL 3285912, * 12–13 (E.D.La. Aug.7, 2008). In light of the above precedent, any finding that a class member has an "enforceable" reimbursement provision appears to depend upon a resolution of the merits of each individual claim. *See, e.g., Popowski,* 461 F.3d at 1370 (analyzing two distinct health plan contracts separately in order to determine whether either of the contracts provided equitable reimbursement rights under ERISA). Determining class membership would thus require an exhaustive series of substantive legal and factual determinations particular to the unique facts of each case. Indeed, even a single claimant receiving Vioxx-related benefits from a single health insurance provider may have entered into several different health plan contracts over the period during which the claimant took Vioxx. As a result, the Court finds that the proposed class is not ascertainable by objective criteria. This finding alone is sufficient to

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

warrant striking the Plaintiffs' class allegations on the pleadings.

> FN13. For a more detailed explanation of issues related to enforceability of individual reimbursement provisions, see the Court's opinion denying the Plaintiffs' motion for a preliminary injunction. *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2008 WL 3285912, *7–15 (E.D.La. Aug.7, 2008) (summarizing precedential cases and applying them to the Plaintiffs' request to enjoin distribution of interim payments in the Vioxx settlement).

**2. The proposed class is not cohesive**

*11 A class action may be appropriate under Rule 23(b)(2) when the opposing party "has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). "While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir.1998). The Fifth Circuit has explained that, "because of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group with few conflicting interests among its members." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir.1998). "Although Rule 23(b)(2) does not expressly contain a predominance and superiority requirement ... certification under Rule 23(b)(2) does not relieve a court of its obligation to determine whether the existence of individual issues precludes certification." *Clay v. Am. Tobacco Corp.*, 188 F.R.D. 483, 495 (S.D.Ill.1999). In *In re Propulsid,* the court suggested three factors for use in determining whether a Rule 23(b)(2) class is cohesive: "[1] whether the plaintiff can establish entitlement to injunctive relief with respect to the class as a whole in a single unitary trial .... [2] whether the case would be manageable at such a unitary trial .... [3] whether or not there are significant individual interests that could counsel against certification as a class action." 208 F.R.D. 133, 146 n. 9 (E.D.La.2002).

Turning to the instant case, the Court finds that the proposed class is not cohesive because the putative class members might have significant individual interests that will undermine class treatment. For example, each of the purported class members will necessarily have to rely on highly individualized evidence in order to support its claims. Each health plan is different; each plan uses different policy language; there will be different issues of causation as to each claimant; in many cases, Vioxx may not have been the exclusive cause or even the primary cause of each claimant's medical expenses; the amounts expended per claimant will be different; depending on the particular language of each plan, some expenses may be reimbursable, while others may not; the extent of each plan's reimbursement rights might be affected by whether the beneficiary took Vioxx pre- or post-label change. Because of the highly individual facts of each case and the importance of material differences in policy language, the purported class members may be tempted to advance differing interpretations of *Sereboff* in order to maximize their own potential reimbursement rights. As a result, the Court finds that even if the proposed class were ascertainable, the class would not be a "homogenous and cohesive" group as contemplated by Rule 23(b)(2).

*12 The Court further notes that, although the Greater New York Plaintiffs do not expressly seek monetary reimbursement, the proposed class is in many ways comparable to a(b)(2) class seeking both monetary relief and injunctive or declaratory relief. There can be no dispute that the ultimate relief the Plaintiffs seek is reimbursement for individual medical expenses. As the Defendant accurately points out, even though "Plaintiffs do not purport to seek the assertion of such a lien in this proceeding, [it] is plain that one purpose of the proceeding is to identify Vioxx settlement claimants against whom such a lien could be asserted and to secure declaratory relief confirming as much.... To grant such relief, the Court would need to perform much (if not all) of the legal analysis that would ultimately be required to approve the assertion of such a lien." *See* Defs.' Mot. to Strike 13 n. 3. Before granting the Plaintiffs the "limited" relief that they seek in the context of this proceeding—indeed, before even determining which health plans are members of the class in the first place—the Court would first have to determine that each of the individual health plans is entitled to a particular amount of money from at least one of the settling Vioxx claimants. Not only will these determinations be heavily dependent on individual factual considerations, but, as noted above, each of the determinations will also

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

likely require a separate legal analysis on the merits. Considering that the Greater New York Plaintiffs purport to represent a class of "hundreds, and likely thousands" of health benefit plans, it is clear to the Court that such individual determinations on a class-wide basis will irreparably damage the manageability of this litigation, rendering a single, unitary trial on the merits virtually impossible. This finding further supports the Court's conclusion that the class is not cohesive and that it is therefore appropriate to strike the class allegations on the pleadings.

**3. The proposed class lacks typicality**

Rule 23(a)(3) requires that the claims or defenses of the class representatives be typical of the claims of the class. "Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999). A typicality inquiry may be used to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law and fact are present." 7 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1764 (2008).

A proposed class may fail to establish typicality where significant factual differences may exist among the plaintiffs, because such differences may force the named representatives to make arguments at trial that will be adverse to other class members' claims. *In re Paxil Litig.,* 212 F.R.D. 539, 549–50 (C.D.Cal.2003). For example, in *In re Paxil,* the court explained that, "in the absence of a clearly defined class, the typicality requirement cannot be met. Without knowing who is properly in the class, the number of people in the class, and the surrounding circumstances relating to each plaintiff's symptoms, there is no 'generic' plaintiff properly typified by the class representatives." *Id.* The court further explained that "the potential differences among the putative class members would force the class representatives to make difficult—and ultimately, legally impermissible—choices at trial." *Id.* In holding that the proposed class failed to satisfy the typicality requirement, the court in *In re Paxil* found that the plaintiffs had misconstrued the typicality requirement by focusing their "typicality argument almost exclusively on the fact that there is a single defendant, a single drug, and a single set of alleged

misleading statements nationwide." *Id.* "While the *commonality* requirement might be satisfied by one unifying factual or legal question, the *typicality* requirement may not." *Id.*

**\*13** Turning to the instant case, the Court finds that the Plaintiffs cannot establish that the proposed class will satisfy the typicality requirement, despite the fact that the Plaintiffs' claims may all be governed by ERISA. Like the proposed class in *In re Paxil,* the Greater New York Plaintiffs' proposed class is neither ascertainable nor clearly defined. As a result, the Court cannot determine which plans are in the class, how many plans are in the class, or the circumstances surrounding each of those plans. In addition, the significant individual factual and legal issues inherent in each purported class member's claims will undermine typicality in the class. Depending on the language of each individual policy, class members may be tempted to advance legal theories that would maximize their own potential for reimbursement while sacrificing that of another class member. The Court further notes that the representatives of the proposed class allege that they are trustees, administrators, and fiduciaries of ERISA health plans, but they do not purport to represent a class fiduciaries, trustees, or administrators—rather, they purport to represent a class of ERISA health benefit plans. Under ERISA, the health plans, unlike the plans' fiduciaries, may face significant legal challenges to establish standing. Section 502(a)(3) of ERISA, under which the purported class seeks relief, states that an action may be brought "by a participant, beneficiary, or fiduciary" of an ERISA health benefit plan. Although the ERISA health plans have fiduciaries, the plans themselves are not their own fiduciaries. *See Acosta v. Pac. Enters.,* 950 F.2d 611, 618 (9th Cir.1991) ("A plan covered by ERISA cannot, as an entity, act as a fiduciary with respect to its own assets."). In light of the Fifth Circuit's admonition that, "[w]here Congress has defined the parties who may bring a civil action founded on ERISA, we are loath to ignore the legislature's specificity," the Court finds that the purported class members will advance materially different legal and remedial theories. As a result of the significant factual and legal differences inherent in the Plaintiffs' claims, the purported class cannot satisfy the typicality requirement. Again, this finding alone is sufficient to warrant striking the class allegations on the pleadings.

**IV. CONCLUSION**

Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209
**(Cite as: 2008 WL 4681368 (E.D.La.))**

  For all of the reasons stated above, in addition to those set forth during oral arguments, the Defendant's Motion to Sever and Motion to Strike Class Allegations ARE GRANTED.

E.D.La.,2008.
In re Vioxx Products Liability Litigation
Not Reported in F.Supp.2d, 2008 WL 4681368 (E.D.La.), 45 Employee Benefits Cas. 1209

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)
**(Cite as: 2011 WL 3924963 (E.D.La.))**

---

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Robert BAUER, et al
v.
DEAN MORRIS, L.L.P., et al.
Mary & Larry Patterson, et al
v.
Dean Morris, L.L.P., et al.

Civil Action No. 08–5013, 08–5014.
Sept. 7, 2011.

Jennifer N. Willis, Willis & Buckley, APC, New Or-
leans, LA, David W. Bernberg, Law Office of David
W. Bernberg, New Orleans, LA, Gary Joseph Gambel,
Murphy, Rogers, Sloss & Gambel, New Orleans, LA
Michael E. Enow, Enow & Associates, New Orleans,
LA, for Mary & Larry Patterson, et al.

Gustave A. Fritchie, III, Douglas J. Moore, Edward
Winter Trapolin, Kelly G. Juneau, McDonald Prov-
osty, Irwin Fritchie Urquhart & Moore, LLC, New
Orleans, LA, James C. Klick, Sidney A. Cotlar, Ste-
phen J. Herman, Herman, Herman,
Katz & Cotlar, LLP, New Orleans, LA, William
Everard Wright, Jr., Charlotte Collins Meade,
Deutsch, Kerrigan & Stiles, LLP, New Orleans, LA,
Anthony Rollo, Gerard E. Wimberly, Jr., Stephen
Winthrop Rider, McGlinchey Stafford, PLLC, New
Orleans, LA, Glenn Paul Orgeron, Lisa A. Easterling,
Kean Miller LLP, New Orleans, LA, for Dean Morris,
L.L.P., et al.

### ORDER AND OPINION

ANWOOD R. DUVAL, JR., District Judge.

**\*1** Before the Court in each of the captioned cases
is a "Motion to Strike Class Allegations" filed on
behalf of defendants George B. Dean, Jr., John C.
Morris, III, Charles H. Heck, Jr. and Candace A.
Courteau (Doc. 138, [FN1] 148 [FN2]). Also pending before
the Court are a "Motion to Strike Class Claims" filed
on behalf of defendant Dean Morris, L.L.P. (Doc.
141, [FN3]) and a "Motion to Strike Class Claims" filed
on behalf of defendants Dean Morris, L.L.P., George

B. Dean, Jr., John C. Morris, III, Charles H. Heck, Jr.
and Candace A. Courteau (Doc. 151 [FN4]). Having
reviewed the pleadings, memoranda, and relevant law,
the Court, for the reasons assigned, GRANTS the
motions and dismisses with prejudice the class claims
alleged by plaintiffs.

> FN1. *Bauer v. Dean Morris, L.L.P.,* No.
> 08–5013 (E.D.La.).

> FN2. *Patterson v. Dean Morris, L.L.P.,* No.
> 08–5014 (E.D.La.).

> FN3. *Bauer v. Dean Morris, L.L.P.,* No.
> 08–5013 (E.D.La.).

> FN4. *Patterson v. Dean Morris, L.L.P.,* No.
> 08–5014 (E.D.La.).

### I. FACTUAL BACKGROUND

These motions arise from two separate class ac-
tion cases. The plaintiffs in each suit borrowed money
for residential loans from various lenders and there-
after defaulted on those loans which were either held
or serviced by clients of Dean Morris, L.L.P. Dean
Morris, L.L.P. is a law firm whose practice consists in
large part of "enforcing the security interests of lend-
ing institutions through executory and ordinary judi-
cial foreclosure proceedings...." Doc. 141, p. 2.
George B. Dean, Jr. and John C. Morris, III are part-
ners in the firm; Charles H. Heck, Jr. and Candace A.
Courteau are associates with the firm.

In February 2005, the plaintiffs filed two putative
class action suits against Dean Morris, L.L.P., George
B. Dean, Jr., John C. Morris, III, Charles H. Heck, Jr.,
Candace A. Courteau (herein after collectively "Dean
Morris") and various lender defendants alleging a
variety of claims. The petitions allege, in pertinent
part, that "Dean Morris, acting as the attorney, agent,
and/or employee of all of the Lender Defendants in-
stituted collection and/or foreclosure proceedings
against the named plaintiffs ... for sums alleged to be
due under mortgages held by the Lender Defendants[
]" and that Dean Morris "overstated to the named
plaintiffs and to members of the Plaintiff Class the
amount of court costs, sheriff's fees, attorney's fees

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)
**(Cite as: 2011 WL 3924963 (E.D.La.))**

and/or other expenses, thus impairing the rights of and causing harm to plaintiffs and members of the Plaintiff Class. *Bauer v. Dean Morris, L.L.P.,* No. 08–0513, Fourth Supplemental and Amending Petition for Damages, ¶ X, ¶ XI; *Patterson v. Dean Morris, L.L.P.,* No. 08–0514, Fifth Supplemental and Amending Petition for Damages, ¶ IX, ¶ XI. Plaintiffs also allege that "[t]he Lender Defendants' obligations under the mortgage and related agreements were non-delegable such that the Lender Defendants are liable for the acts and omissions of their attorney, with respect to these obligations." *Bauer v. Dean Morris, L.L.P.,* Fourth Supplemental and Amending Complaint, ¶ XIV; *Patterson v. Dean Morris, L.L.P.,* Fifth Supplemental and Amending Complaint at ¶ XIV.

The *Bauer* petition defines the putative plaintiff class as "[a]ll Louisiana residents (or their heirs, successors, or assigns) who were charged excessive fees and/or expenses by a member of the Defendant Class by or through Dean Morris, L.L.P." [FN5] *Bauer v. Dean Morris, L.L.P.,* Fourth Supplemental and Amending Petition, for Damages, ¶ I. The *Patterson* petition defines the putative class as:

> FN5. "Lender Defendants" are defined as "[a]ll Lenders who used Dean Morris as their attorney, agent, and/or employee, and for whom or during the representation of whom Dean Morris charged and/or collected excessive fees and/or expenses from members of the Plaintiff Class. National banks are specifically excluded from the Defendant Class." *Bauer v. Morris,* Fourth Supplemental and Amending Petition, ¶ IX.

**\*2** All Louisiana residents (or their heirs, successors, or assigns) who were charged excessive fees and/or charges by a member of the Defendant Class by or through Dean Morris, L.L.P. *The Plaintiff Class includes only those persons whose bankruptcy filing would or might support removal to federal court and/or jurisdiction for their claim. Patterson v. Dean Morris, L.L.P.,* Fifth Supplemental and Amending Petition for Damages, ¶ I (emphasis added). The only substantive class wide difference in the facts of the two cases is that the plaintiffs in the *Patterson* litigation all sought bankruptcy protection after defaulting on their residential loans.

The petitions seek damages for a number of causes of action: 1) breach of contract, 2) conversion, 3) unjust enrichment, 4) intentional misrepresentation and fraud; 5) negligent misrepresentation, and 6) civil conspiracy. There has been an extensive motion practice in these cases. In the early stages of the litigation, Dean Morris succeeded in having plaintiffs' negligence claims dismissed. Thereafter the Dean Morris defendants filed numerous motions for summary judgment seeking dismissal of the non-stayed named plaintiff's claims on a number of grounds. With respect to each of those motions the Court painstakingly, and at great length, analyzed the claims of the individual plaintiffs based on the facts specific to each plaintiff. The Court granted Dean Morris's motions for summary judgment in their entirety as to eleven (11) of the plaintiffs.[FN6] As to two other plaintiffs, i.e., Terry Hardy [FN7] and Charles Battiste,[FN8] the Court dismissed the claims against the Dean Morris defendants for breach of contract, unjust enrichment, and civil conspiracy. Additionally, with respect to Terry Hardy the Court dismissed the conversion claim as to each Dean Morris defendant.[FN9] The non-stayed plaintiffs' only extant claims are those of Terry Hardy and Charles Battiste against Dean Morris, L.L.P., George B. Dean, Jr., and John C. Morris, III for intentional misrepresentation and fraud and George Battiste's claim against Dean Morris, L.L.P., George B. Dean, Jr., and John C. Morris, III for conversion. Thus, the remaining claims are delictual or quasi-delictual in nature. No claims for breach of contract remain.

> FN6. In *Bauer v. Dean Morris, L.L.P.,* No. 08–5013, the following plaintiffs' claims against the Dean Morris defendants were dismissed in their entirety: Jim Temple Bright and Debra Bright (Doc. 294), Lionel J. Coleman (Doc. 295), Teresa LeBeaud (Doc. 296), Marsha Gilmore (Doc. 299, 300, 307), Salome Lucineo Boyd (Doc. 300), and Rosalyn Valeary–Dodge (Doc. 301). In *Patterson v. Dean Morris, L.L .P.,* NO. 08–5014, the following plaintiffs' claims against the Dean Morris defendants were dismissed in their entirety: Marlene Aubert (Doc. 302), Jacqueline Withrow (Doc. 303), Alex Hartley (Doc. 304), Willie Brown (Doc. 305), Ronald Singleton (Doc. 306), and Thomas Thibodeaux (Doc. 307).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)
**(Cite as: 2011 WL 3924963 (E.D.La.))**

FN7. *Bauer v. Dean Morris, L.L.P.,* No. 08–5013 (Doc. 297).

FN8. *Patterson v. Dean Morris, L.L.P.,* No. 08–5014 (Doc. 308).

FN9. *Bauer v. Dean Morris, L.L.P.,* No. 08–5013 (Doc. 297).

Dean Morris moves to strike the class claims in both suits contending that neither class is ascertainable, and that plaintiffs cannot satisfy the requirements for a class action identified in the Federal Rule of Civil Procedures.

## II. ANALYSIS

Class allegations may be stricken "where a complaint fails to plead the minimum facts necessary to establish the existence of a class satisfying Rule 23's mandate." *Barasich v. Shell Products Co.,* 2008 WL 6468611 at *2 (E.D.La.6–19–08). The standard applied in determining a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure also applies to analyzing a motion to strike. *Id.*

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Maldonado v. Ochsner Clinic Foundation,* 493 F.3d 521, 523 (5th Cir.2007). A class may be certified if (1) "the class is so numerous that joinder of all members is impracticable," (2) "there are questions of law or fact common to the class," (3) the claims or defenses that will be presented by the class representatives are "typical of the claims or defenses of the class," and (4) the class representatives "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Rule 23(a) must be satisfied by all proposed class actions.

**\*3** However, simply satisfying the requirements of Rule 23(a) is not sufficient to certify a class. A class action must also satisfy the prerequisites of Rule 23(b)(1), (b)(2) or (b)(3). It is undisputed that plaintiffs allege a class under Rule 23(b)(3) which requires a finding that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed.R.Civ.P. 23(b)(3). These findings are commonly referred to as the "predominance" and "superiority" requirements. *Cole v. General Motors Corp.,* 484 F.3d 717, 723 (5th Cir.2007). "Pertinent" to the findings of predominance and superiority requirements are the following:

(A) the class members' interest in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R. Civ.P. 23(b)(3).

Federal courts have "emphasize[d] that the party seeking certification bears the burden of establishing that the requirements of Rule 23 have been met." *Gene and Gene LLC v. Biopay LLC,* 541 F.3d 318, 325 (5th Cir.2008) (citation omitted). A district court has discretion to certify a class, and that decision is reviewed only for abuse of that discretion. *Anderson v. Dep't. of Housing & Urban Devel.,* 554 F.3d 525, 528 (5th Cir.2008). Nonetheless, "[t]he district court must conduct a 'rigorous analysis of the Rule 23 prerequisites' before certifying a class." *O'Sullivan v. Countrywide Home Loans,* 319 F.3d 732, 738 (5th Cir.2003) (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996)). "A district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met." *Castano,* 84 F.3d at 744. "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issue." *Id., citing* Manual for Complex Litigation § 30.11 (3d ed.1995); *accord Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 312 (5th Cir.2005) (district court must "focus on the requirements of [Rule 23], and if findings made in connection with those requirements overlap findings that will be a made in connection with those requirements overlap findings that will have to be made on the merits, such

Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)
**(Cite as: 2011 WL 3924963 (E.D.La.))**

overlap is only coincidental.").

**A. Ability to Ascertain Class**

Dean Morris contends that the classes defined by plaintiffs are not ascertainable and that plaintiffs cannot establish the requisites of Rule 23(a) and (b). "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *De-Bremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970). Both suits define the class to include, in pertinent part, "[a]ll Louisiana residents (or their heirs, successors, or assigns) who were **charged excessive fees and/or expenses** by a member of the Defendant Class by or through Dean Morris, L.L.P." *Bauer v. Dean Morris, LLP* Fourth Supplemental and Amending Complaint, ¶ 1 (emphasis added); *Patterson v. Dean Morris, LLP,* Fifth Supplemental and Amending Complaint, ¶ 1 (emphasis added). Resolving whether a particular individual falls within the class definition would require ascertaining whether Dean Morris had in fact charged that individual excessive fees or expenses. That factual determination could be made in each case only after reviewing the merits of each individual's claim. The need to conduct such individual inquiries to determine who qualifies as a member of the class undermines the administrative benefits of Rule 23. *Barasich v. Shell Pipeline Company, LP,* 2008 WL 6468611 (E.D. La. June 19, 2008) is instructive. There the district court declined to certify a class defined as including "[a]ll commercial fisherman whose oyster leases were contaminated by oil discharged during Hurricane Katrina due to the negligence of defendants." *Id.* at *4. In concluding that the class was not adequately defined, the district judge concluded, in pertinent part, that "the determination of whether an individual is a member of the proposed class ... cannot be determined without inquiring into the merits of each person's claim." *Id.* Given that an inquiry into the merits of each potential class member's claim would be necessary to determine whether an individual fell within the defined class, the Court concludes that the proposed classes are not ascertainable.

**B. Rule 23(b)(3) Inquiry: Predominance**

*4 The predominance inquiry requires a court to consider "how a trial on the merits would be conducted if a class action were certified." *Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 302 (5th Cir.2003) (quotation marks and citation omitted).

This, in turn, "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Id.* (quotation marks and citation omitted). The predominance requirement of Rule 23(b)(3), though redolent of the commonality requirement of Rule 23(a), is "far more demanding" because it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods, [v. Windsor],* 521 U.S. [591,] 623–24, 117 S.Ct. 2231 [ ( 1997) ]. *Gene and Gene LLC v. Biopay LLC,* 541 F.3d at 326. "The predominance inquiry requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *Steering Committee v. Exxon Mobil Corp.,* 461 F.3d at 601 (internal quotation and citation omitted). To put it another way, [i]n order to 'predominate,' common issues must constitute a significant part of the individual cases." *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 626 (5th Cir.1999) (internal quotation and citation omitted). "The cause of action as a whole must satisfy the Rule 23(b)(3)'s predominance requirement." *Id., quoting Castano v. Am. Tobacco Co.,* 84 F.3d at 745 n. 21.

In evaluating the predominance requirement, the Court concludes that individual issues exist with regards to liability, affirmative defenses and damages. When considered together, it is clear that the individual issues predominate over those common to the class. Therefore, plaintiffs fail to satisfy Rule 23(b)(3) as detailed herein after.

**1. Liability**

Plaintiffs allege claims for conversion, unjust enrichment, intentional misrepresentation, fraud, breach of contract and civil conspiracy against Dean Morris. Relying on *Brand v. National Bank of Commerce,* 213 F.3d 636 (5th Cir.2000) plaintiffs contend that liability presents a common issue. They urge that Dean Morris, LLP and all of the defendant attorneys engaged in a policy and practice of overcharging the plaintiffs. Plaintiffs also assert that:

[T]he common issues trial will establish the prerequisites for liability: overcharges on a mass scale

Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)
**(Cite as: 2011 WL 3924963 (E.D.La.))**

as apart [sic] of an established firm/attorney policy and practice, so as to prove intent, which defendants argue is the lynch pin of "adverse attorney" liability and which bears on the fraud claim. The motives, damages, reactions, etc. of individual class members have no bearing on the common issues trial.

Doc. 284, p. 7. Defendants, on the other hand, assert that individual issues predominate with respect to liability, and that individual analysis of issues, including whether individuals were actually over-charged, specific representations with respect to reinstatement figures, individual reliance on the reinstatement figures provided, terms and provisions of individual loan agreements, and terms and provisions of contracts between Dean Morris and individual lenders is required to resolve liability. Having analyzed more than a dozen motions for summary judgment filed by Dean Morris with respect to liability issues, the Court knows first-hand that there are no common issues with respect to liability in these cases. The individual facts of each plaintiff's financial situation, interaction with Dean Morris, and reliance on the representations made by Dean Morris are essential to evaluate that plaintiff's claims.

**\*5** The Court finds that *Brand v. National Bank of Commerce,* 213 F.3d 636 (5th Cir.2000)(unpublished) 2000 WL 554193 (April 11, 2000), is inapposite, and that plaintiffs' allegation of systematic overcharging does not mandate a common liability issue in these cases. In *Brand,* the National Bank of Commerce ("NBC") appealed the district court's grant of class certification in a suit alleging violations of "various contractual, common law, and statutory duties." *Id.* at \*1. In *Brand:*

[t]he plaintiff alleges that NBC systematically forced placement of insurance that: 1) exceeded the coverage permitted by the loan agreement; 2) charged borrowers more than the cost of the insurance under a system of kickbacks from the insurer; 3) charged interest on unauthorized excessive premiums; 4) backdated insurance to cover time periods for which there was no risk; and charged premiums based on the amount of the loan but provided coverage on the cash value of the collateral.

*Id.* NBC appealed the district court's grant of class certification asserting that the suit required individualized proof of fraudulent representations and reliance

by each class member, and therefore the court erred in granting class certification. The Fifth Circuit affirmed, with modifications, the class certification finding that plaintiffs' allegations did not require proof of individual representations or reliance. The Fifth Circuit opined:

Both in the challenge to the class itself and its challenge of the representative, Mays, NBC repeatedly contends that the issues of individual reliance on representations are the basis for this lawsuit. It is true that the complaint contains allegations of fraud and reliance and that Mays testified that she did not discuss the collateral protection insurance with NBC representatives. This does not mean that the class claims will require such individualized proof, because the viability of the class claims will be determined primarily on the basis of the terms of the loan agreement, the terms of the insurance policies, the existence of the rebate system, and NBC's policies regarding collateral protection insurance.

*Id.* Brand, an unpublished and apparently previously uncited case, can be readily distinguished. Each plaintiff in *Brand* had a direct contractual relationship with NBC which resulted in a commonality of issues not present in these cases. Here, plaintiffs did not have a direct contractual relationship with Dean Morris. Moreover, because the class representatives' claims for breach of contract against Dean Morris have been dismissed, these suits no longer have breach of contract claims. The gravamen of plaintiffs' remaining claims are alleged delictual or quasi-delictual acts, claims clearly outside the realm of Brand. Brand therefore is inapplicable.

The tort claims alleged by plaintiffs do not constitute common claims. As Dean Morris's prior motions for summary judgment amply demonstrate, each of plaintiffs' tort claims has elements requiring significant individual analysis to establish liability. ***This*** weighs against a finding that common issues predominate over individual issues.

**\*6** To establish a claim of intentional misrepresentation or fraud, a plaintiff must prove (1) a misrepresentation of a material fact, (2) made with intent to deceive, (3) causing justifiable reliance with resulting injury. *Systems Engineering and Security, Inc. v. Science and Engineering Associates, Inc.,* 962 So.2d 1089, 1091 (La.App. 4th Cir.2007); *Gonzales v. Gonzales,* 20 So.3d 557, 563 (La.App. 4th

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)
**(Cite as: 2011 WL 3924963 (E.D.La.))**

Cir.2009). Because essential components of claims for intentional misrepresentation and fraud are individual misrepresentations and individual reliance, those claims do not present common issues for the class. In *Castano v. American Tobacco Co.,* 84 F.3d at 745, the Fifth Circuit opined "[a]ccording to both the advisory committee's notes to Rule 23(b)(3) and this court's decision in *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880 (5th Cir.1973), a fraud class action cannot be certified when individual reliance will be an issue." Significantly, even in a *Brand* court conceded that "[i]f the class members could only recover by proving the individual reliance, then class certification would be inappropriate ." *Brand v. National Bank of Commerce,* 2000 WL 554193 at *2. Absent proof of individual reliance, a plaintiff cannot prevail on a claim for intentional misrepresentation or fraud, which renders those claims inappropriate for class certification.

Nor are plaintiffs' claims for conversion governed by common issues of liability. Under Louisiana law, "conversion is a tort consisting of wrongfully depriving a person of possession of his property. The fault may be either the wrongful acquisition or the subsequent wrongful detention of possession." *Oge v. Resolute Insurance Company,* 217 So.2d 738, 740–41 (La.App. 3rd Cir.1969). *citing Import Sales, Inc. v. Lindman,* 92 So.2d 574 (1957). Individual inquiry would be required with respect to each plaintiff to determine whether Dean Morris wrongfully acquired or wrongfully detained possession of any property belonging to that plaintiff. Such individual inquiry precludes a common liability analysis on the conversion claims.

Similarly, plaintiffs' claims for unjust enrichment do not present common issues of liability. The requisite elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and the impoverishment, and (5) no other available remedy at law. *Baker v.. Maclay Props Co.,* 648 So.2d at 888, 897 (La.1995). Of the five requisites for liability, only the element of "no other available remedy at law" is susceptible to common analysis and resolution. The other elements require assessments of the specific facts and circumstances of each plaintiff's claim which would mandate a series of mini-trials, a necessity which class action litigation was designed to

avert.

In summary, the liability issues raised in plaintiffs' tort claims are not common throughout the proposed classes. Overwhelmingly, the issues presented require individual analysis for resolution. This conclusion is bolstered by plaintiffs' failure to offer a trial plan addressing the individual issues plaintiffs concede exist in this litigation. The failure to provide a trial plan "severely undermines [plaintiffs'] contention that common issues predominate." *Altier v. Worley Catastrophe Response LLC,* 2011 WL 3205229 at *16 (E.D.La.7/26/11).

**2. Affirmative Defenses**

**\*7** An affirmative defense is not *per se* irrelevant to the predominance inquiry[,]" and "the predominance of individual issues necessary to decide an affirmative defense may preclude class certification. *Gene and Gene LLC v. Biopay LLC,* 541 F.3d at 327. Dean Morris has urged a number of affirmative defenses in response to these suits e.g., prescription, waiver, *res judicata,* judicial estoppel, voluntary payment doctrine, accord and satisfaction, and transaction and compromise. Assessment and resolution of the various affirmative defenses will require the Court to probe the applicability of various affirmative defenses to particular class members based on the facts specific to each borrower. Individualized hearings would be required to resolve the issues related to the viability of the affirmative defenses asserted. Dean Morris's assertion of the cited affirmative defenses suggests that class certification is inappropriate here.

**3. Damages**

A significant predominance issue concerns damages. "Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate into multiple lawsuits separately tried. In such cases, class certification is inappropriate." *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 744–45 (5th Cir.2003) (internal quotation and citation omitted). Furthermore, it has been acknowledged by the Fifth Circuit that "where individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class." *Steering Committee v. Exxon Mobil Corporation,* 461 F.3d at 602.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)
**(Cite as: 2011 WL 3924963 (E.D.La.))**

Plaintiffs seek damages for Dean Morris's alleged systematic overcharging and damages for actual overpayment of attorney's fees and costs. Additionally, plaintiffs seek emotional damages in connection with the intentional misrepresentation claim.

Clearly there would be no common issue with respect to the issue of entitlement to emotional damages. The inquiry into entitlement to emotional damages would require fact-intensive inquiry with respect to each individual borrower. There could be no class wide determination of that element of damages.

Although some elements of the damages sought, e.g., return of any excess amounts actually paid by a borrower, would be subject to a purely mathematical calculation, there is no indication that other elements of the damages sought, e.g., loss of use of any excess amounts paid and emotional damages, could be determined by a formulaic calculation. The Court does not foresee that damages common to the classes could be determined even on those elements of damages not related to emotional damages. Considering the claims for emotional damages, the Court is persuaded that individualized damage inquiries would predominate over common issues.

Based on the foregoing analysis, the Court concludes that class certification is inappropriate in these cases because common issues of liability and damages do not predominate over individual issues with respect to liability and damages. Therefore, plaintiffs cannot establish the predominance requirement of Rule 23(b)(3). Having concluded that plaintiffs cannot satisfy the "predominance" requirement, the Court need not address the requirements of Rule 23(a) or the "superiority" requirement of Rule 23(b). *See Steering Committee v. Exxon Mobil Cor., 461 F.3d 598, 601 (5th Cir .2006)*. Accordingly,

**\*8 IT IS ORDERED** that the "Motion to Strike Class Claims" filed on behalf of defendants Dean Morris, L.L.P., George B. Dean, Jr., John C. Morris, III, Charles H. Heck, Jr. and Candace A. Coutreau in *Patterson v. Dean Morris, L.L.P.,* No. 08–5014 (E.D.La) (Doc. 151) is GRANTED;

**IT IS FURTHER ORDERED** that the "Motion to Strike Class Allegations" filed on behalf of defendants George Dean, John Morris, Charles Heck,

and Candace Coutreau in *Patterson v. Dean Morris, L.L.P.,* No. 08–5014 (E.D.La) (Doc. 148) is GRANTED;

**IT IS FURTHER ORDERED** that the "Motion to Strike Class Claims" filed on behalf of defendants Dean Morris, L.L.P. in *Bauer v. Dean Morris, L.L.P.,* No. 08–5013 (E.D.La) (Doc. 141) is GRANTED;

**IT IS FURTHER ORDERED** that the "Motion to Strike Class Allegations" filed on behalf of defendants George Dean, John Morris, Charles Heck, and Candace Courteau in *Bauer v. Dean Morris, L.L.P.,* No. 08–5013 (E.D.La) (Doc. 138) is GRANTED.

E.D.La.,2011.
Bauer v. Dean Morris, L.L.P.
Not Reported in F.Supp.2d, 2011 WL 3924963 (E.D.La.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

H

United States Court of Appeals,
Fifth Circuit.
M.D., by next friend Sarah R. STUKENBERG; D.I.,
by next friend Nancy G. Pofahl; Z.H., by next friend
Carla B. Morrison; S.A., by next friend Javier Solis;
A.M., by next friend Jennifer Talley; J.S., by next
friend Anna J. Ricker; K.E., by next friend John W.
Cliff, Jr.; D.P., by next friend Karen J. Langsley; T.C.,
by next friend Paul Swacina, Plaintiffs–Appellees,
v.
Rick PERRY, in his official capacity as Governor of
the State of Texas; Thomas Suehs, in his official ca-
pacity as Executive Commissioner of the Health and
Human Services Commission of the State of Texas;
Howard Baldwin, in his official capacity as Commis-
sioner of the Department of Family and Protective
Services of the State of Texas, Defend-
ants–Appellants.

No. 11–40789.
March 23, 2012.

**Background:** Nine children in the custody of Texas's
Permanent Managing Conservatorship (PMC), acting
through their next friends, brought action under §
1983 against three Texas officials, in their official
capacities, seeking to represent a class of all children
who were and all those who would be in the State's
PMC, i.e., long-term foster care. The United States
District Court for the Southern District of Texas, Janis
Graham Jack, J., 2011 WL 2173673, granted class
certification. Defendants appealed.

**Holdings:** The Court of Appeals, Emilio M. Garza,
Circuit Judge, held that:
(1) district court failed to perform rigorous analysis
required to find proposed class satisfied commonality
requirement for class certification, and
(2) class claims did not satisfy provision of class ac-
tion rule providing for maintenance of class action
where party opposing the class acted or refused to act
on grounds generally to the class.

Vacated and remanded.

West Headnotes

**[1] Federal Civil Procedure 170A ⚷171**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak171 k. In general; certification in
general. Most Cited Cases

**Federal Courts 170B ⚷817**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk817 k. Parties; pleading. Most
Cited Cases

Court of Appeals reviews a district court's deci-
sion to certify a class for an abuse of discretion; im-
plicit in this deferential standard is a recognition of the
essentially factual basis of the certification inquiry and
of the district court's inherent power to manage and
control pending litigation, but the district court must
exercise its broad discretion over whether to certify a
class within the framework of the class action rule.
Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⚷172**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak172 k. Evidence; pleadings and
supplementary material. Most Cited Cases

The parties seeking class certification bear the
burden of proof to establish that the proposed class
satisfies the requirements of the class action rule.
Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⚷171**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak171 k. In general; certification in general. Most Cited Cases

    A district court must conduct a rigorous analysis of the prerequisites for class certification before certifying a class. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⊃165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases

    The commonality requirement for class certification demands more than the presentation of questions that are common to the class because any competently crafted class complaint literally raises common questions; further, the members of a proposed class do not establish that their claims can productively be litigated at once, merely by alleging a violation of the same legal provision by the same defendant. Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⊃165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases

    The commonality requirement for class certification requires that all of the class member's claims depend on a common issue of law or fact whose resolution will resolve an issue that is central to the validity of each one of the class member's claims in one stroke. Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⊃181**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak181 k. In general. Most Cited Cases

    In certifying proposed class of all children who were, and all those who would be in Texas's Permanent Managing Conservatorship (PMC), i.e., long-term foster care, in action brought under § 1983 to redress alleged class-wide injuries cased by systemic deficiencies in Texas's administration of the PMC, district court failed to perform the rigorous analysis required to find proposed class satisfied the commonality requirement for class certification; court failed to consider or explain how determination of common questions of fact would resolve an issue that was central to the validity of each one of the individual member's claims in one stroke, court's formulation of common questions of law, "based upon Plaintiffs' claims of constitutional violations, namely substantive and procedural due process, along with associational rights," was too general to allow for effective appellate review, and court conducted no analysis of elements and defenses for establishing any of the proposed class claims. U.S.C.A. Const.Amends. 1, 14; Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⊃165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases

    Mere allegations of systemic violations of the law will not automatically satisfy the commonality requirement for class certification. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⊃181**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

170AII(D)3 Particular Classes Represented
170Ak181 k. In general. Most Cited
Cases

Claims of proposed class of all children who
were, and all those who would be in Texas's Perma-
nent Managing Conservatorship (PMC), i.e.,
long-term foster care, under § 1983, to redress alleged
class-wide injuries cased by systemic deficiencies in
Texas's administration of the PMC, did not satisfy
provision of class action rule providing for mainte-
nance of class action where party opposing the class
acted or refused to act on grounds generally to the
class, thereby making final injunctive relief or corre-
sponding declaratory relief appropriate to the class as
a whole, because they included claims for individu-
alized injunctive relief. Fed.Rules Civ.Proc.Rule
23(b)(2), 28 U.S.C.A.

**[9]** Federal Civil Procedure 170A ⟨☞⟩165

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)1 In General
            170Ak165 k. Common interest in sub-
ject matter, questions and relief; damages issues. Most
Cited Cases

A proposed class cannot avoid prohibition on
claims for individualized relief, under provision of
class action rule providing for maintenance of class
action where party opposing the class acted or refused
to act on grounds generally to the class, thereby
making final injunctive relief or corresponding de-
claratory relief appropriate to the class as a whole, by
petitioning the district court to order the defendant to
craft individualized injunctive-type relief for certain
class members. Fed.Rules Civ.Proc.Rule 23(b)(2), 28
U.S.C.A.

**\*834** Richard Paul Yetter, Dori Kornfeld Goldman,
Yetter Coleman, L.L.P., Houston, TX, Richard
Thaddeus Behrens, Amelia Jean Cardenas, David
Allen Dodds, Barry Frank McNeil, Haynes & Boone,
L.L.P., Dallas, TX, Hector Antonio Canales, Canales
& Simonson, P.C., Corpus Christi, TX, Edward
Caldwell Dawson, April L. Farris, Yetter Coleman,
L.L.P., Austin, TX, Stephen Andrew Dixon, Marcia
Robinson Lowry (argued), Jessica Ann Polansky, Chil-
dren's Rights, Inc., New York City, for Plain-

tiffs–Appellees.

Sean Daniel Jordan, Deputy Sol. Gen. (argued), Jo-
seph David Hughes, James Patrick Sullivan, Asst. Sol.
Generals, James Byron Eccles, Deputy Asst. Atty.
Gen., James Carlton Todd, Asst. Atty. Gen., Shelley
Nieto Dahlberg, Office of the Atty. Gen., Gen. Lit.
Div., Austin, TX, for Defendants–Appellants.

Robert L. Quinan, Office of the Atty. Gen. for the state
of Mass., Boston, MA, for the States of Alaska, Ari-
zona, Colorado, Hawaii, Idaho, Maryland, Massa-
chusetts, Michigan, Nebraska, New Hampshire, Ne-
vada, Rhode Island, Utah and Washington, Amici
Curiae.

Kurt Howard Kuhn, Kurt Kuhn, P.L.L.C., Austin, TX,
for National Assoc. of Counsel for Children, Lucy S.
McGough, **\*835** Cheryl Prestenbach Buchart,
Jacqueline A. Nash, Ramona Fernandez, Barbara
Stalder, Lonny Hoffman, Ellen Marrus, and David
Calder, Amici Curiae.

Appeal from the United States District Court for the
Southern District of Texas.

Before GARZA, CLEMENT and SOUTHWICK,
Circuit Judges.

EMILIO M. GARZA, Circuit Judge:
    Plaintiffs–Appellees, nine children ("Named
Plaintiffs") in the custody of Texas's Permanent
Managing Conservatorship ("PMC"), acting through
their next friends, filed suit under 42 U.S.C. § 1983
against three Texas officials, in their official capaci-
ties, seeking to represent a class of all children who
are now and all those who will be in the State's PMC, i.e.,
long-term foster care. The Named Plaintiffs sought
declaratory and injunctive relief to redress alleged
class-wide injuries caused by systemic deficiencies in
Texas's administration of the PMC. The district court
granted class certification. We VACATE the district
court's class certification order for failure to comply
with Federal Rule of Civil Procedure 23 and RE-
MAND for further proceedings consistent with this
opinion.

I

A

    The Named Plaintiffs filed suit against (1) Gov-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

ernor Rick Perry, in his official capacity, (2) Thomas Suehs, in his official capacity as Executive Commissioner of the Texas Health and Human Services Commission, and (3) Thomas Baldwin, in his official capacity as Commissioner of the Texas Department of Family and Protective Services ("DFPS") (collectively, "Texas"). The complaint asserts claims for relief under 42 U.S.C. § 1983, alleging that Texas has violated the constitutional rights of each of the approximately 12,000 children in its PMC due to various "systemic failures" in the "unitary system" that administers the State's PMC.

The gravamen of the Named Plaintiffs' complaint is that various system-wide problems in Texas's administration of its PMC—such as a failure "to maintain a caseworker staff of sufficient size and capacity to perform the tasks critical to [the] safety, permanency, and well-being" of the purported class members—subject all of the children in the PMC to a variety of harms. Based on these allegations, the Named Plaintiffs claim that the "actions and inactions of [Texas]" violated the purported class members' (1) substantive due process rights to be free from harm while in state custody under the Fourteenth Amendment, (2) liberty interests, privacy interests, and associational rights not to be deprived of a child-sibling or child-parent family relationship where safe and appropriate, under the First, Ninth, and Fourteenth Amendments, and (3) procedural due process rights under the Fourteenth Amendment by depriving them of alleged state law entitlements, relating to monitoring by DFPS of contracted substitute care, TEX. FAM.CODE § 264.106(b); TEX. HUM. RES.CODE § 45.002(c), and the right to have placement decisions be made using "clinical protocols" to match a child to the most appropriate placement resource." TEX. FAM.CODE § 264.107(e). The Named Plaintiffs request broad, classwide declaratory and injunctive relief against Texas to redress the harms caused by the State's alleged systemic failures to properly manage the PMC.

Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), the Named Plaintiffs moved the district court to certify a class of "all children who are now and all those who will be in the [PMC] of **\*836** Texas's [DFPS]." Texas opposed class certification, contending that the proposed class did not meet the requirements of Rule 23. The district court granted the Named Plaintiffs' motion for class certification. This

court subsequently granted Texas's petition for permission to appeal. See FED.R.CIV.P. 23(f).

[1] "We review the district court's decision to certify a class for an abuse of discretion." Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 301 (5th Cir.2003) (citing McManus v. Fleetwood Enters., Inc., 320 F.3d 545, 548 (5th Cir.2003)). "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 523 (5th Cir.2007) (quoting In re Monumental Life Ins. Co., 365 F.3d 408, 414 (5th Cir.2004)). However, the district court must exercise its "broad discretion" over whether to certify a class "within the framework of Rule 23." McManus, 320 F.3d at 548 (citation omitted). "We review de novo whether the district court applied the correct legal standards." Maldonado, 493 F.3d at 523 (citation omitted).

B

Texas administers its foster care system through the combined efforts of state agency officials and state courts. After investigating a report that a child has been abused or neglected, DFPS can seek to remove a child from his parents and/or establish Temporary Managing Conservatorship ("TMC") over the child, usually by court order in a suit affecting the parent-child relationship ("SAPCR"). TEX. FAM.CODE § 262.201. If the court orders that DFPS retain TMC over a child, Texas Family Code § 263.401(a) generally requires that the SAPCR must be dismissed within one year of the court's order placing the child in the State's TMC, "[u]nless the court has rendered a final order or granted an extension." While a child remains in the State's TMC, DFPS is required to file a service plan and a permanency plan with the court (1) describing the steps needed to provide a permanent safe placement for the child and (2) reporting progress toward that end. Id. §§ 263.101–.102; id. §§ 263.3025–.303. Before the statutory deadline for dismissing a SAPCR, the court must hold a final hearing where it may terminate parental rights, place the child in DFPS's PMC, grant a relative PMC without terminating parental rights, or return the child to the parents. Id. §§ 161.001, 263.404.

After a child enters DFPS's PMC, the agency and state courts continue to jointly administer and monitor

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

the state's conservatorship over the child. DFPS is charged with providing the child with substitute care, including residential care and supportive and therapeutic services. 40 TEX. ADMIN. CODE §§ 700.1301–.1302. State law also directs DFPS to engage in permanency planning for children in its PMC in order to meet the child's safety, permanency, and well-being needs. *Id.* § 700.1201; TEX. GOV'T CODE §§ 531.151–.152. While the child remains in DFPS's PMC, state courts must hold periodic placement review hearings to consider, *inter alia,* whether the child's current placement is necessary, safe, and appropriate, whether DFPS has been diligent in attempting to place the child for adoption if eligible, whether efforts have been made to place the child in the least restrictive environment if the child has been placed in institutional care, and, whether DFPS has made reasonable efforts to finalize the effective permanency plan for the child. **\*837**TEX. FAM.CODE §§ 263.502–.503.[FN1]

> **FN1.** The State has charged DFPS with redesigning its foster-care system in accordance with the recommendations contained in the Foster Care Design Report. The Report recommends a host of wide-ranging reforms to the State's foster care system. Act of May 25, 2011, 82d Leg. R.S., ch. 598, § 11, 2011 Tex. Sess. Law Serv. 1445.

The Named Plaintiffs have all been placed in Texas's PMC and seek certification of a class of all children who are or will be in the State's PMC.

## II
### A

[2] "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Maldonado,* 493 F.3d at 523 (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). The Named Plaintiffs, as the parties seeking certification, bear the burden of proof to establish that the proposed class satisfies the requirements of Rule 23. *McManus,* 320 F.3d at 548 (citation omitted); *see Wal–Mart Stores, Inc. v. Dukes,* ——— U.S. ———, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there

are in fact sufficiently numerous parties, common questions of law or fact, etc.").

The requirements of Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Named Plaintiffs only sought certification under Rule 23(b)(2). Thus, assuming the proposed class satisfied the requirements of Rule 23(a), it also had to establish that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED.R.CIV.P. 23(b)(2).

[3] It is well-established that "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class." *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996) (citing *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). We have traditionally construed this directive to require district courts to, *inter alia,* "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.' " *McManus,* 320 F.3d at 548 (quoting *Castano,* 84 F.3d at 744). In its recent opinion in *Wal–Mart Stores, Inc. v. Dukes,* which was decided after the district court granted certification in this case, the Supreme Court has further defined the contours of the "rigorous analysis" required by Rules 23(a) and 23(b)(2). 131 S.Ct. at 2551–52. We will consider whether the district court complied with the requirements of Rule 23 in light of the Supreme Court's instructions in *Wal–Mart.*

### B

On appeal, Texas makes three primary arguments. First, it contends that the **\*838** district court abused its discretion by certifying the purported class because the Named Plaintiffs failed to establish that there were any "questions of law or fact common to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

the class." FED. R. CIV. P. 23(a)(2). In order to satisfy commonality under *Wal–Mart,* a proposed class must prove that the claims of every class member "depend upon a common contention .... that is capable of classwide resolution," meaning that the contention is "of such a nature ... that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 131 S.Ct. at 2551. The State asserts that none of the class claims satisfy this standard. Instead, it maintains that each of the class member's claims require individualized determinations of various issues of law and fact. Similarly, Texas asserts that the proposed class does not satisfy Rule 23(a)'s typicality requirement because the alleged harms suffered by the Named Plaintiffs are not experienced by a majority of the purported class and because the class claims require individualized inquiries.

Second, Texas maintains that the district court failed to conduct the "rigorous analysis" required by Rule 23. In particular, the State asserts that the district court "failed to define with any specificity the class claims, class issues, or defenses, nor ... describe how those claims would be tried on behalf of over 12,000 PMC children." It further contends that the district court failed to consider whether the class claims depend upon a common contention of law or fact whose determination would "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Lastly, Texas contends that the proposed class does not satisfy the cohesiveness requirement of Rule 23(b)(2). The State asserts that the class is not entitled to classwide injunctive relief under Rule 23(b)(2) because (1) the class members have not "been harmed in essentially the same way," *Maldonado,* 493 F.3d at 524, and (2) "a single injunction or declaratory judgment" could not "provide relief to each member of the class." *Wal–Mart,* 131 S.Ct. at 2557.

**C**

Applying the standards announced in *Wal–Mart* for establishing commonality under Rule 23(a)(2), we hold that the district court failed to conduct the "rigorous analysis" required by Rule 23 in deciding to certify the proposed class. Similarly, we hold that the district court abused its discretion by certifying a class that lacked cohesiveness under Rule 23(b)(2). We will first consider the district court's decision finding that

the proposed class satisfied commonality under Rule 23(a)(2) and then consider its finding that a single injunction could provide relief to the whole class under Rule 23(b)(2).

**1**

**a**

The district court found that the proposed class raised common questions of fact and law, thereby satisfying Rule 23(a)(2)'s commonality requirement.

First, it found that the class claims raised factual questions that "relate not to the individual story of each child, but rather the alleged shortcomings of the DFPS system." *M.D. v. Perry,* No. C–11–84, 2011 WL 2173673, at *5 (S.D.Tex. June 2, 2011). Although the district court acknowledged that each class member experienced the alleged shortcomings in the State's administration of its PMC in a different way, it found that the class satisfied commonality because "[a]ll class members are within the same system and **\*839** subject to the alleged deficiencies in that system." *Id.* The district court held that "[t]o require more for the 'common question' analysis would run afoul of the Fifth Circuit's dictate that '[t]he test for commonality is not demanding,' and that merely having 'different claims, or claims that may require some individualized analysis, is not fatal to commonality.' " *Id.* (quoting *James v. City of Dallas,* 254 F.3d 551, 570 (5th Cir.2001)).

Accordingly, the district court found that the class claims raised the following common questions of fact:

(1) whether Defendants failed to maintain a caseworker staff of sufficient size and capacity to perform properly, (2) whether Defendants failed to provide sufficient numbers and types of foster care placements necessary to the Plaintiffs' needs, (3) whether Defendants provided sufficient monitoring and oversight to prevent abuse while in state custody, and (4) whether Defendants' actions in general caused harm or risk of harm to Plaintiffs.

*Id.*

Further, the district court found that the proposed class claims raised common questions of law. The district court rejected Texas's contention that the Named Plaintiffs had only succeeded in attempting to "broadly conflate a variety of claims to establish

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

commonality via an allegation of systemic failures." *Id.* at *8 (citation omitted). Holding that it was persuaded by the reasoning of three of our sister circuits, which found that the claims of similar classes of children in or at risk of being in state custody satisfied commonality,[FN2] the district court concluded that "insofar as the children challenge the scheme for the provision of child welfare services, their claims share a legal basis." *Id.* (quoting *Baby Neal,* 43 F.3d at 61).

> FN2. *DG ex rel. Stricklin v. Devaughn,* 594 F.3d 1188 (10th Cir.2010); *Marisol A. v. Giuliani,* 126 F.3d 372 (2d Cir.1997) (per curiam); *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48 (3d Cir.1994); *but see J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1289 (10th Cir.1999) (affirming district court's order denying certification of similar class of developmentally disabled children in the custody of or at risk of being in the custody of New Mexico) ("We refuse to read an allegation of systematic failures as a moniker for meeting the class action requirements. Rule 23(a) requires a common question of law or fact. For a common question of law to exist, the putative class must share a discrete legal question of some kind.").

Without examining any of the Named Plaintiffs' legal claims with any specificity, the district court then found that the proposed class claims contained "common questions of law, based upon Plaintiffs' claims of constitutional violations, namely substantive and procedural due process, along with associational rights." *Id.*

b

Although the district court's analysis may have been a reasonable application of pre– *Wal–Mart* precedent, the *Wal–Mart* decision has heightened the standards for establishing commonality under Rule 23(a)(2), rendering the district court's analysis insufficient.

In finding that the proposed class satisfied Rule 23(a)(2)'s commonality requirement, the district court relied, in large part, on this circuit's pre–*Wal-Mart* case law finding that "[t]he test for commonality is not demanding." *James,* 254 F.3d at 570 (quoting *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999)). Before *Wal–Mart,* the rule in this

circuit provided that in order to satisfy commonality "[t]he interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when **\*840** there is 'at least one issue whose resolution *will affect all or a significant number of the putative class members.*' " *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir.1993) (emphasis added) (quoting *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982)). Further, the court's pre-*Wal-Mart* caselaw held that "[t]he fact that some of the Plaintiffs may have different claims, or claims that may require some individualized analysis, is not fatal to commonality." *James,* 254 F.3d at 570.

[4] However, in *Wal–Mart,* the Court expounded on the meaning of its precedent providing that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' " 131 S.Ct. at 2551 (quoting *Falcon,* 457 U.S. at 161, 102 S.Ct. 2364). After *Wal–Mart,* Rule 23(a)(2)'s commonality requirement demands more than the presentation of questions that are common to the class because " 'any competently crafted class complaint literally raises common questions.' " *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L.REV. 97, 131–32 (2009)). Further, the members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant. *Id.* ("[T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

[5] Instead, the Court held that the claims of every class member must "depend upon a common contention .... of such a nature that it is capable of classwide resolution—which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.; see id.* (" 'What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceedings to generate common *answers* apt to drive the resolution of the litigation.' ") (quoting Nagareda, 84 N.Y.U. L.REV. at 132). Thus, the commonality test is no longer met when the proposed class merely establishes that "there is 'at least one issue whose resolution *will affect all or a significant number* of the putative

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

class members.' " *Forbush,* 994 F.2d at 1106 (emphasis added) (citation omitted). Rather, Rule 23(a)(2) requires that all of the class member's claims depend on a common issue of law or fact whose resolution "will *resolve* an issue that *is central to the validity* of each one of the [class member's] claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551 (emphasis added).

The Court further clarified that a trial court's obligation to perform a "rigorous analysis" before concluding that a class has satisfied the requirements of Rule 23(a) "[f]requently ... will entail some overlap with the merits of the plaintiff's underlying claim." *Id.; see Falcon,* 457 U.S. at 160, 102 S.Ct. 2364 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action .... [S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.") (internal citation and quotation marks omitted).

Lastly, after the Court concluded that "proof of commonality necessarily overlap[ped] with the [purported class members'] merits contention that Wal–Mart engaged in a *pattern or practice* of discrimination," the Court probed beyond the plaintiffs' pleadings in an effort to decide if an "examination of all the class member's claims for relief will produce a common**\*841** answer to the crucial [merits] question *why was I disfavored.*" *Wal–Mart,* 131 S.Ct. at 2552. In doing so, the Court "focus[ed]" on dissimilarities among the proposed class members "in order to determine whether there is even a single common question." *Id.* at 2556 (internal citation and quotation marks omitted); *see id.* at 2551 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.") (quoting Nagareda, 84 N.Y.U. L.REV. at 132).

c

[6] Given the foregoing directives in the Court's opinion in *Wal–Mart,* the district court's Rule 23(a)(2) analysis was deficient in several respects.

First, in finding that the proposed class claims raised common questions of fact, the district court failed to consider or explain how the determination of those questions would "resolve an issue that is central to the validity of each one of the [individual class member's] claims in one stroke." *Id.* at 2551. Rather,

the district court merely found that the Named Plaintiffs' various allegations of "systemic deficiencies" in the State's administration of its PMC raised common questions of fact.

For instance, the district court found that the class claims raised a common question of fact regarding "whether Defendants failed to maintain a caseworker staff of sufficient size and capacity to perform properly." But the district court's discussion of this "common question" contained no reference to any of the three causes of action advanced on behalf of the proposed class, nor did the district court "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination' " of whether this question satisfies commonality. *McManus,* 320 F.3d at 548 (quoting *Castano,* 84 F.3d at 744). In short, the district court failed to describe how a finding that Texas fails to maintain a caseworker staff that performs "properly" will resolve an issue that is "central to the validity of each one of the [class member's] claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551. That is, the district court did not indicate how the resolution of the alleged common question of fact would decide an issue that is central to the substantive due process claims, family association claims, or procedural due process claims of every class member at the same time.[FN3] Because the remaining common questions of fact found by the district court similarly fail to explain how their resolution would have the capacity to "generate common *answers* apt to drive the resolution of the litigation," they suffer from the same deficiency. *Id.* (citation omitted); *see Vizena v. Union Pac. R.R. Co.,* 360 F.3d 496, 503 (5th Cir.2004) (per curiam) ("[W]e hold that when certifying a class a district court must detail with sufficient specificity how the plaintiff has met the requirements of Rule 23.").

FN3. For instance, it is unclear whether the Named Plaintiffs can even advance a due process claim based on a bare finding that Texas has "organized or managed" DFPS improperly. *See Lewis v. Casey,* 518 U.S. 343, 349–50, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

institutions of government in such fashion as to comply with the laws and the Constitution .... But the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.").

**\*842** The district court's analysis supporting its finding that the class claims presented common questions of law also failed to comport with the requirements of Rule 23 as outlined in *Wal–Mart.* Based on the reasoning of other courts in similar cases, the district court concluded that the claims of the proposed class members share a common legal basis because they "challenge the scheme for the provision of child welfare services" and "share the common legal claim that [DFPS's] systematic deficiencies result in widespread violations of their statutory and constitutional rights." *M.D., 2011 WL 2173673, at \*8* (citations omitted). The district court then found "common questions of law, based upon Plaintiffs' claims of constitutional violations, namely substantive and procedural due process, along with associational rights." *Id.* But the district court's analysis supporting its finding that the class claims raised common questions of law did not comply with the requirements of Rule 23(a)(2) for several reasons.

First, the formulation of these common questions of law is too general to allow for effective appellate review. The Named Plaintiffs allege that Texas's management of its PMC suffers from numerous "systemic deficiencies" that subject all children in the PMC to various harms or to the risk of experiencing those harms. They further contend that these harms violate the constitutional rights of every child in the PMC in various ways. Faced with the broad scope of the Named Plaintiffs' 85–page complaint and the diverse array of claims asserted therein, the district court's certification of "common questions of law, based upon Plaintiffs' claims of constitutional violations, namely substantive and procedural due process, along with associational rights" lacks the specificity required for us to determine whether the alleged common questions of law satisfy the requirements of Rule 23(a)(2). Some of the Plaintiffs' legal claims may depend on common contentions of law capable of classwide resolution, and some may not. But as it

stands, we cannot affirmatively identify the scope of the "common questions of law" found by the district court, let alone determine whether they are capable of classwide resolution under *Wal–Mart. See Vizena,* 360 F.3d at 503 (remanding from appeal of order granting class certification for the district court to make appropriate findings).

Moreover, given the substance of the proposed class claims, the district court failed to perform the "rigorous analysis" required by Rule 23 in failing to "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination' " of whether the alleged questions of law are capable of classwide resolution. *McManus, 320 F.3d at 548* (quoting *Castano, 84 F.3d at 744).* Specifically, the district court conducted no analysis of the elements and defenses for establishing any of the proposed class claims, nor did it adequately explain how those claims depend on a common legal contention whose resolution "would resolve an issue that is central to the validity of each of [the individual's] claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551.

The district court clearly rejected Texas's argument that the resolution of the class claims depends on individualized factual determinations regarding the circumstances of each class member. Relying on the conclusions of other courts that have certified similar classes, the district court found that the class members' individual issues did not preclude commonality because the class members "share the common legal claim that [a state agency's] systemic deficiencies result in widespread violations of their statutory and constitutional rights." **\*843***Perry, 2011 WL 2173673, at \*8* (citing *Baby Neal, 43 F.3d at 61).* However, we conclude that the district court insufficiently analyzed whether the class claims contain individualized issues that prevent certification.

Here, as in *Wal–Mart,* proof of commonality necessarily overlaps with the proposed class's merits contention that systemic deficiencies in Texas's administration of its PMC violate the constitutional rights of every child in the PMC. In such cases, *Wal–Mart* requires district courts to specifically delineate how a class proceeding would allow the court to resolve a discrete question of law whose determination "will resolve an issue that is central to the validity of each of the [individual plaintiff's] claims in

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

one stroke." 131 S.Ct. at 2551. Further, the district court must explain its reasoning with specific reference to the "claims, defenses, relevant facts, and applicable substantive law" raised by the class claims, McManus, 320 F.3d at 548 (citation omitted), in order to ensure that "dissimilarities within the proposed class" do not " 'have the potential to impede the generation of common answers.' " Wal Mart, 131 S.Ct. at 2551 (citation omitted).

The district court failed to meet these requirements by declining to analyze Texas's argument that dissimilarities within the proposed class precluded commonality with specific reference to the elements or defenses for establishing the class claims. For instance, Texas contends that the individual class member's substantive due process claims are not capable of classwide resolution because deciding each plaintiff's claim requires an individualized inquiry regarding whether the State's conduct "shocks the conscience." Texas's Brief at 41–47 (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)) ("[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' ") (quoting Collins v. Harker Heights, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). If the State's assertion is accurate that the resolution of each of the class member's substantive due process claims requires individual analysis,[FN4] then it is not clear how a "classwide proceeding" on those claims has the "capacity ... to generate common answers apt to drive the resolution of the litigation." Wal–Mart, 131 S.Ct. at 2551 (citation omitted). In other words, if the merits of each class member's substantive due process claims depend on an individualized inquiry regarding the harm or risk of harm experienced by each class member from the State's practices, then "dissimilarities within the proposed class" would appear to prevent the class claims from asserting a common question of law that "will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. (citation omitted). The district court may have properly rejected this argument, but, on remand, it must do so with reference to the elements and defenses and requisite proof for each of the proposed class claims in order to ensure **844 that differences among the class members do not preclude commonality.

FN4. We take no position at this time regarding whether the proper standard to evaluate the proposed class's substantive due process claims requires the State to act with "deliberate indifference" that "shocks the conscience," see Nicini v. Morra, 212 F.3d 798, 810 (3d Cir.2000) (en banc), or that the State's conduct was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 811 n. 9 (quoting Youngberg v. Romeo, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

Lastly, we note that in the district court's order denying Texas's motion to stay proceedings in the lower court pending the resolution of this interlocutory appeal, it found Wal–Mart distinguishable from this case. Specifically it found that the proposed class satisfied commonality because (1) the class alleged injuries caused by common deficiencies in the Texas foster care system and (2) the alleged deficiencies were the "glue" holding the class claims together. M.D. v. Perry, No. C–11–84, 2011 WL 7047039, at *1 (S.D.Tex. July 21, 2011) (order denying motion to stay proceedings) (citing Wal–Mart, 131 S.Ct. at 2551). On remand, the district court's conclusion may ultimately be a sound application of Wal–Mart, however, that conclusion must be supported by reasoning based on the elements for establishing the proposed class's various constitutional claims on a classwide basis. See Wal–Mart, 131 S.Ct. at 2553 (discussing methods for bridging gap between individual Title VII claim and the existence of a class of individuals who have suffered the same injury such that their individual claims could be certified under Rule 23(a)); Jamie S. v. Milwaukee Pub. Schools, 668 F.3d 481, 497–98 (7th Cir.2012) (discussing standards for determining whether individual claims under the Individuals with Disabilities Education Act ("IDEA") can be brought together in a class action); Lightfoot v. District of Columbia, 273 F.R.D. 314, 326 (D.D.C.2011) (discussing standards for certifying a class based on a municipal policy that allegedly violated the class's procedural due process rights).

[7] Further, in performing that analysis the district court should consider that the test for commonality "is complicated where, as here, the proffered 'common

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

issue' is a somewhat amorphous claim of systemic or widespread misconduct on the part of the defendant." *Lightfoot,* 273 F.R.D. at 324. We agree that "[m]ere allegations of systemic violations of the law ... will not automatically satisfy Rule 23(a)'s commonality requirement." *DG,* 594 F.3d at 1195 (citing *J.B.,* 186 F.3d at 1288); *see also* Reinholdson v. Minnesota, No. 02 Civ. 795, 2002 WL 31026580, at *8 (D.Minn. Sept. 9, 2002) ("The reciting of the word 'systemic' in mantra-like fashion ... does not overcome the prerequisites to class certification."), *vacated in part on other grounds,* 346 F.3d 847 (8th Cir.2003). Here, the proposed class's proffered common issues "stretch[ ] the notions of commonality" by attempting to aggregate several amorphous claims of systemic or widespread conduct into one "super-claim." *See* Marisol A., 126 F.3d at 377 (finding that the purported class had stretched the notion of commonality by aggregating all of the class claims into one "super-claim"); *Lightfoot,* 273 F.R.D. at 326 ("[L]urking behind the rather vague and conclusory statement that Defendants had a 'policy and practice of failing to provide members of the Plaintiff class Due Process,' lies a wide variety of more discrete and particularized practices that could conceivably serve as the foundation for municipal liability.") (internal citation omitted).

Accordingly, given the "amorphousness" of the proposed class's proffered common issues of fact and law, the district court should be particularly precise when explaining how the resolution of those claims "will resolve an issue that is central to the validity of each of the [individual class member's claims] in one stroke." *Wal–Mart,* 131 S.Ct. at 2551. The district court's present certification order failed to do so; thus, we conclude that it failed to perform the "rigorous analysis" that is required in order to find that the proposed **\*845** class satisfied Rule 23(a)(2)'s commonality requirement.[FN5]

> **FN5.** As in *Wal–Mart,* "[i]n light of our disposition of the commonality question ... it is unnecessary to resolve whether [the proposed class] ha[s] satisfied the typicality requirements of Rule 23(a)." 131 S.Ct. at 2551 n. 5.

### 2
### a
We further hold that the district court abused its discretion by finding that the proposed class could be

certified under Rule 23(b)(2).

Rule 23(b)(2) allows a class action to be maintained when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." We have interpreted this language to create two relevant requirements when a proposed class seeks classwide injunctive relief: (1) the "class members must have been harmed in essentially the same way." Maldonado, 493 F.3d at 524 (citing Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 975 (5th Cir.2000)), and (2) "the injunctive relief sought must be specific." Id. (citing FED.R.CIV.P. 65(d)); *see* Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n, 624 F.3d 185, 198 (5th Cir.2010) ("[T]his rule seeks to redress what are really group as opposed to individual injuries. The uniformity of the injury across the class is what renders the notice and opt-out provisions of (b)(3) unnecessary.") (internal quotation marks and citation omitted).

In *Wal–Mart,* the Supreme Court further expounded on the requirements of Rule 23(b)(2), determining that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." 131 S.Ct. at 2557; *see id.* ("The key to the (b)(2) class is 'the individual nature of the injunctive or declaratory remedy warranted the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' ") (quoting Nagareda, 84 N.Y.U. L.REV. at 132). For a class certified under Rule 23(b)(2), "the relief sought must perforce affect the entire class at once." Id. at 2558.

The proposed class seeks at least twelve broad, classwide injunctions, which would require the district court to institute and oversee a complete overhaul of Texas's foster care system. For instance, the Named Plaintiffs sought the following injunctive relief:

> i. Requiring Defendants to ensure that all children in the plaintiff class are assigned DFPS workers whose overall caseloads do not exceed the caseload standards established by the Child Welfare League

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

of America and the Council on Accreditation;

ii. Requiring Defendants to establish, within DFPS, an administrative accountability structure to ensure that all caseworkers, using professionally accepted case practices, fully identify and address Plaintiff Children's need for [ ] timely permanency; [ ] placement in the least restrictive, most family-like placements that are suited to their needs; and [ ] mental health services suited to their needs.

Relying on the *Baby Neal* line of cases, the district court found that the proposed class complied with Rule 23(b)(2) because **\*846** the relief sought by the Named Plaintiffs would benefit the entire class. The district court reasoned that because the proposed class alleged that "systemic deficiencies" in the State's PMC violated the constitutional rights of every child in the system, "all of the class members will benefit from relief which forces the defendant to provide, in the manner required by law, the services to which class members either are currently or at some future point will become entitled." *M.D.*, 2011 WL 2173673, at \*14 (quoting *Baby Neal*, 43 F.3d at 63–64). Accordingly, the district court found that the class could be certified under Rule 23(b)(2) because "most of the injunctive relief aims to improve the DFPS PMC system as a whole, not to afford relief to individual Plaintiffs." *Id.* at \*15.

Further, the district court held that even though the Named Plaintiffs requested some forms of relief that would not apply to all class members, "such as the creation of 'expert panels to review the cases of all class members who have had more than four placements,' or 'expert panels to review the cases of all class members who have been in the PMC of the state for more than two years,' " that requested relief was not "fatal to Rule 23(b)(2) certification." *Id.* at \*15. The district court found it irrelevant that some of the class's requested relief would not apply to every class member, or even that some of the relief would require individualized analysis and remedies, because all of the class members are in the PMC and would benefit from relief designed to force Texas to administer the PMC, "in the manner required by law." *Id.* at \*16.

Texas asserts that the district court abused its discretion by certifying the proposed class under Rule 23(b)(2). It contends that "individual issues overwhelm cohesiveness" because the class members have

not been harmed in essentially the same way, thereby preventing the district court from crafting classwide injunctive relief without examining the individual circumstances of class members. Further, it asserts that the class does not meet Rule 23(b)(2)'s requirements because the class members allege that they "are all injured by a smorgasbord of day-to-day, case-by-case operational failures on the part of the state, as opposed to the State's implementation of any specific policy uniformly affecting—and injuring—each child."

b

Although some of the proposed class's sub-claims could potentially be certified under Rule 23(b)(2), its "super-claim" cannot be certified under that subsection because it includes requests for individualized relief on behalf of individual children within several subclasses of the class. In *Wal–Mart*, the Supreme Court, in construing the language of Rule 23(b)(2), held "that, at a minimum, claims for *individualized* relief ... do not satisfy the Rule." 131 S.Ct. at 2557. Specifically, the Court concluded that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*

[8] Accordingly, we find that the proposed class claims do not satisfy Rule 23(b)(2) because they include claims for individualized injunctive relief. For instance, the Named Plaintiffs request injunctive relief ordering the formation of "special expert panels to review the cases" of all individual class members in certain subgroups of the class to determine whether their "services" or "permanency" needs were "being adequately addressed and, if **\*847** not, to implement appropriate remedial steps to seek and secure permanency for [or meet the service needs of] these children." The district court concluded that the claims underlying this requested relief satisfy the requirements of Rule 23(b)(2) because the relief (1) was intended to remedy the State's systemic failure to adequately consider the class member's needs and (2) would benefit all children in the PMC by improving the State's foster care system. We disagree.

The requested "special expert panel" relief undermines the Named Plaintiffs' argument that all of

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

their claims seek to remedy "group as opposed to individual injuries." *Casa Orlando,* 624 F.3d at 198. By requesting an injunction creating a "special expert panel" to review the cases of individual class members and then "implement appropriate remedial steps" to remedy their individual injuries, the Named Plaintiffs have attempted to remove any force from the doctrine precluding certification "when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal–Mart,* 131 S.Ct. at 2557; *see id.* at 2558 (holding that for a class certified under Rule 23(b)(2), "the relief sought must perforce affect the entire class at once"); *see also Shook v. Bd. of Cnty. Comm'rs,* 543 F.3d 597, 604 (10th Cir.2008) (" *Shook II* ")("A class action may not be certified under Rule 23(b)(2) if relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant.") (citation omitted).[FN6]

> **FN6.** Our holding is not intended to limit a district court's ability to appoint special masters or other parties to monitor a defendant's compliance with qualifying court-ordered classwide relief, *see Ayers v. Thompson,* 358 F.3d 356, 365 nn. 8–9 (5th Cir.2004), or to prevent courts from fashioning more specific relief in the face of a defendant's failure to comply with a court's earlier orders. *See Wyatt v. Aderholt,* 503 F.2d 1305, 1309–10 (5th Cir.1974).

[9] A proposed class cannot avoid Rule 23(b)(2)'s prohibition on claims for individualized relief by petitioning the district court to order the defendant to craft individualized "injunctive-type" relief for certain class members. *See Jamie S.,* 668 F.3d at 499 (holding that proposed injunctive relief did not satisfy Rule 23(b)(2) when the district court's order "would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final"). Accordingly, we find that the requested individual relief implicitly establishes that at least some of the proposed class's underlying claims allege individual injuries that are not uniform across the class; thus, as currently pleaded, the proposed class lacks cohesiveness to proceed as a 23(b)(2) class. *Maldonado,* 493 F.3d at 524–25 (holding district court did not abuse its discretion in denying class certification under Rule 23(b)(2) be-

cause "individualized issues here overwhelm class cohesiveness").

On the other hand, we do not necessarily agree with Texas's argument that the proposed class can only be certified under Rule 23(b)(2) if its claims are premised on a "specific policy [of the State] uniformly affecting—and injuring—each child." Rather, the class claims could conceivably be based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing—"with respect to the class," so long as declaratory or injunctive relief "settling the legality of the [State's] behavior with respect to **\*848** the class as a whole is appropriate." FED.R.CIV.P. 23(b)(2) 1966 Amendment advisory committee note; *see id.* ("Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.").[FN7] *See also DG,* 594 F.3d at 1201 ("Here the 'grounds' that have general application to the class are that all class members have been placed in [Oklahoma's] foster care program and, as such, caseworkers monitor all class members in a system that allegedly fails to ensure they do not carry caseloads so demanding that they cannot monitor class members adequately.").

> **FN7.** Indeed, it is not clear how several of the State's alleged failures, such as its failure to (1) maintain sufficient licensing standards for its placements, (2) maintain an adequate number and array of placements, or (3) employ a sufficient number of caseworkers, can be considered "day-to-day, case-by-case operational failures."

However, that relief must comply with the requirements of Rule 23(b)(2). In addition to demonstrating that the requested relief does not require individualized determinations and that the class members "have been harmed in essentially the same way," *Maldonado,* 493 F.3d at 524, we find that Named Plaintiffs must make an "effort to give content to what it would mean to provide adequate ... or 'appropriate' levels of services" so that "final injunctive relief may be crafted to 'describe in reasonable detail the acts required.' " *Shook II,* 543 F.3d at 605–06 (citations omitted); *see id.* ("The problem in our case is that

675 F.3d 832, 82 Fed.R.Serv.3d 219
**(Cite as: 675 F.3d 832)**

plaintiffs have eschewed any effort to give content to what it would mean to provide adequate mental health staff, adequate screening, or an adequate system of mental education.").

### III

The common thread running through the proposed class's current deficiencies under both Rule 23(a)(2) and 23(b)(2) is that it has attempted to aggregate a plethora of discrete claims challenging aspects of Texas's PMC into one "super-claim." Yet the only element that these various claims unequivocally share is that they allege the State's administration of the PMC harms or presents a risk of harm to some children in the class. Given the complexity of performing the required "rigorous analysis" under Rule 23 when faced with such an "amorphous" super-claim, we note that the Second Circuit directed the district court in a similar case to certify subclasses under Rule 23(c)(4) on remand.[FN8] *Marisol A., 126 F.3d at 378* (holding that each of the certified subclasses actually "consists of smaller groups of children, each of which has separate and discrete legal claims pursuant to particular federal and state constitutional, statutory, and regulatory obligations of the defendants").

> FN8. We acknowledge that the *Marisol A.* court found that the district court did not abuse its discretion by certifying a similar class action. But the court did acknowledge that the proposed class "stretche[d] the notions of commonality and typicality," 126 F.3d at 377, and it was decided before the Supreme Court's opinion in *Wal–Mart.*

Although we take no position regarding whether the district court should certify subclasses on remand, we note that if the district court decides to do so, it should (1) perform a rigorous analysis regarding whether the class claims of each of the subclasses meets the requirements of Rule 23 and (2) comply with the instructions for certifying subclasses contained in *Marisol A. See id.* at 378–79.[FN9] Lastly, if the district**849** court decides to certify subclasses, it should specifically identify the applicable requested relief for each of the certified subclass claims.

> FN9. We further note that in the only circuit case involving a similar challenge to a State's foster care system, *DG, 594 F.3d 1188,* the district court (1) noted that "many of the

questions of fact and law plaintiffs allege to be common do not appear to be, in fact, common," and (2) only explicitly found that the class claims presented one common question of fact and one common question of law. *DG ex rel. Stricklin v. Henry,* No. 08–cv–074–GKF–FHM, at *8–10 (N.D.Okla. May 5, 2009) (order granting motion to certify class).

### IV

We VACATE the district court's class certification order and REMAND to the district court for proceedings consistent with this opinion.

C.A.5 (Tex.),2012.
M.D. ex rel. Stukenberg v. Perry
675 F.3d 832, 82 Fed.R.Serv.3d 219

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

---

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Patrick G. WELCH, On behalf of himself and others
similarly situated
v.
ATLAS ROOFING CORPORATION.

Civil Action No. 07-2711.
Nov. 2, 2007.

Christopher L. Coffin, Patrick Wayne Pendley, Stanley Paul Baudin, Pendley Law Firm, Plaquemine, LA, for Plaintiff.

David George Radlauer, Aimee M. Quirk, Thomas A. Casey, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Defendant.

### *ORDER AND REASONS*

LANCE M. AFRICK, United States District Judge.

**\*1** Before the Court is a motion for class certification filed by plaintiff, Patrick G. Welch ("Welch"), on behalf of himself and others similarly situated. For the following reasons, plaintiff's motion is **DENIED.**

### *BACKGROUND*

Defendant, Atlas Roofing Corporation ("Atlas"), is a leading manufacturer of residential and commercial asphalt roofing shingles.[FN1] A key component of Atlas's shingles is a material known as "headlap granules."[FN2] At all times pertinent to this case, the headlap granules incorporated into Atlas's shingles were purchased from a single supplier, McCabe Minerals.[FN3]

FN1. Rec. Doc. No. 22, p. 3. Atlas's shingles are distributed under the brand names Pinnacle, Glassmaster, Alpine, Summit, and Legend. Rec. Doc. No. 13-3, p. 2.

FN2. *Id.* at p. 1. Generally, headlap granules comprise the outer surface of asphalt roofing shingles. *Id.*

FN3. Rec. Doc. No. 22, p. 3; *see also* Rec. Doc. No. 13-3, p. 1.

In June, 2003, Welch replaced the roof on his home with shingles that Welch alleges were designed, manufactured, marketed, and sold by Atlas.[FN4] Subsequent to replacing his roof, Welch noticed that his shingles were rusting, causing the side of his home and areas surrounding his home to stain as a rust color.[FN5]

FN4. Rec. Doc. No. 1-4, p. 3, paras. 11-12.

FN5. *Id.* para. 13.

Welch styles his complaint as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. On behalf of himself and others similarly situated, Welch asserts that Atlas designed and manufactured its roofing shingles in a manner that rendered the shingles completely useless for their intended purpose.[FN6] Specifically, Welch alleges that the McCabe headlap granules incorporated into Atlas's shingles contained excessive amounts of metal which caused the shingles to rust and break down prematurely.[FN7] As a result of Atlas's chosen design and method of manufacture, Welch asserts a redhibition claim under Louisiana law on behalf of the putative class members for the following: (1) return of the purchase price of the roofing shingles together with interest from the time the purchase price was paid; (2) reasonable expenses occasioned by the sale; (3) damages caused by use of the defective shingles, including, but not limited to, the expense incurred in attempted repairs and the cost of preserving the shingles; and (4) reasonable attorney fees.[FN8]

FN6. *Id.* para. 9. Welch alleges the defect in Atlas's shingles that caused them to be totally useless existed at the time the shingles were purchased and installed. *Id.* para. 10.

FN7. *Id.* Welch contends that Atlas's shingles are defective because they contain headlap granules with excessive amounts of metal. Rec. Doc. No. 1-4, p. 3, para. 9.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

FN8. *Id.* Welch asserts two theories of liability in his complaint. He first argues that Atlas is liable to the putative class members because of the redhibitory defects in the shingles. *Id.* para. 7. Specifically, Welch alleges that Atlas is liable to the putative class members pursuant to Articles 2531 and 2545 of the Louisiana Civil Code. *Id.*

Alternatively, Welch argues that Atlas is also liable to the putative class members pursuant to the Louisiana Products Liability Act. *Id.* (emphasis added). In his motion to certify the putative class, however, Welch only discusses class certification pursuant to his redhibition claim. Rec. Doc. No. 13-3. Welch's complaint also excludes from the class any claims for personal injury. Rec. Doc. 1-4, p. 2, para. 7.

Subsequent to Welch filing his complaint, the Court, without objection, dismissed Welch's LPLA claims. Rec. Doc. No. 36.

On September 7, 2007, Welch filed this motion for class certification pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. FN9 Welch's proposed class is defined as "all persons and entities who were domiciled in Louisiana, and who are end purchasers of Pinnacle, Glassmaster, Alpine, Summit and/or Legend brand roofing shingles which were manufactured by Atlas Roofing Corporation between January 1, 2002 and December 31, 2004. The class excludes distributors and retailers of these Atlas shingles and contractors and builders who were not end purchasers of these Atlas shingles." FN10

FN9. Rec. Doc. No. 13.

FN10. Rec. Doc. No. 13-3, p. 5.

### *LAW AND ANALYSIS*
**A. *Standard of Review***
    The proponents of a class bear the burden of demonstrating that the case is proper for certification. *Turner v. Murphy Oil,* 234 F.R.D. 597, 603 (E.D.La.2006) (citing *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 n. 4 (5th Cir.2001)). U.S.

District courts are granted sound discretion when certifying classes, as such a decision is essentially a factual inquiry. *Vizena v. Union Pac. R.R.,* 360 F.3d 496, 502-03 (5th Cir.2004). In determining whether to certify a class, the district court should not reach the merits of plaintiffs' claims. *Turner,* 234 F.R.D. at 603. However, it is often necessary for the district court to look beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in order to make meaningful certification decisions. *Id.* "The district court must make findings regarding how the case satisfies or fails to satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.*

**B. *Rule 23(a) Requirements***
    ***2** When certifying a class action, the Court must find that the putative class meets the requirements of Rule 23(a). This initial subsection requires that the class demonstrate: (1) numerosity, *i.e.,* that the class is so numerous that joinder of all members is impracticable; (2) commonality, *i.e.,* that there are questions of law or fact common to the class; (3) typicality, *i.e.,* that the claims and defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy, *i.e.,* that the representative parties fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *see James v. City of Dallas,* 254 F.3d 551, 569 (5th Cir.2001) (citing *Washington v. CSC Credit Servs., Inc.,* 199 F.3d 263, 265 (5th Cir.2000)).

**1. *Numerosity***
    Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). No definite standard has been established as to what size class satisfies the numerosity requirement. *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980) (No arbitrary rules have been established in order to determine numerosity); *Street v. Diamond Offshore,* 2001 WL 56811, at *4 (E.D.La. May 25, 2001) (Although the number of members in a proposed class is not determinative of whether joinder is impracticable, it has been noted that any class of more than forty (40) members should raise a presumption that joinder is impracticable). To satisfy the numerosity requirement, plaintiffs must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members. *James,* 254 F.3d at 570.

    Welch estimates that, during the relevant time

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

period, Atlas manufactured and sold enough defective shingles to roof more than seventy-five thousand (75,000) average size homes in Louisiana, Texas, and Oklahoma.[FN11] According to Welch, Louisiana consumers comprise a substantial portion of the end purchasers of Atlas's allegedly defective shingles and said consumers, therefore, satisfy the numerosity requirement necessary to certify a Louisiana class.[FN12] Even assuming that all of these shingles were not defective, the Court finds that the number of potentially defective shingles sold in Louisiana creates a pool of potential class members sufficient to meet the numerosity requirement of Rule 23(a)(1).[FN13]

> FN11. Rec. Doc. No. 13-3, pp. 8-9.

> FN12. *Id.* Welch offers evidence that an overwhelming majority of the defective shingle claims made to Atlas have been submitted by Louisiana consumers. *Id.* at p. 9, n. 18; Rec. Doc. Nos. 13-21 to 13-26 & 13-27 (Exhibits 1-5, 13).

> FN13. This case presents a fact pattern similar to that presented to the Court in *Hilton v. Atlas Roofing Corp.,* 2006 WL 3524295 (E.D .La. Dec. 5, 2006). In *Hilton,* this Court found that, based on plaintiff's allegation that Atlas distributed enough defective shingles to roof ninety thousand (90,000) homes, the numerosity requirement was satisfied despite the possibility that not all shingles were defective. *Id.* at *2. The Court finds that the same logic applies in this case.

**2. *Commonality***

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). In order to demonstrate commonality, a plaintiff must show that there is one common question of law or fact. *James,* 254 F.3d at 570. "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.' " *Id.* (quoting *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir.1993)). The test for commonality is not demanding. *Id.; see also Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999); *Jenkins v. Raymark Indus.,* 782 F.2d 468, 472 (5th Cir.1986)* ("The threshold of 'commonality'

is not high."). The necessity for resolving somewhat complex individual issues does not supply a basis for concluding that plaintiff has not met the commonality requirement. *James,* 254 F.3d at 570.

*3 Welch alleges that the members of the putative class in this case share common questions of fact and law. He asserts that the issues of fact common to each class member include: (1) whether Welch and each class member purchased shingles which contain excessive metal; (2) whether Welch and each class member had Pinnacle, GlassMaster, Alpine, Summit and/or Legend brand name shingles, manufactured by Atlas between January 1, 2002, and December 31, 2004, installed on their residence or business; (3) whether Welch and the class members have suffered damages as a result of the redhibitory defects in the shingles; and (4) whether Welch and the class members would not have purchased the shingles had they known of the redhibitory defects.[FN14]

> FN14. Rec. Doc. No. 13-3 (list is not exhaustive).

Several questions of law that Welch asserts are common to the class include: (1) whether the shingles contain a redhibitory defect under Louisiana law; (2) whether the defects in the shingles render the shingles useless; (3) whether Welch and the class members are entitled to a rescission of the shingle sales; (4) whether Welch and the class members are entitled to a reduction of the purchase price; and (5) whether the defects existed at the time the shingles were delivered.[FN15]

> FN15. Rec. Doc. No. 13-3, p. 11. The list contained in the text does not provide all questions of law proffered by Welch.

While it is possible that not all of the issues of fact and law previously listed are common to Welch and the class members, the Court finds that, at the very least, the issue of whether the shingles contain a redhibitory defect under Louisiana law is common to Welch and the class members. Considering the fact that the threshold for commonality is not high and that the class members' claims need not be identical, the Court finds that the commonality requirement is satisfied in this case.

**3. *Typicality***

Rule 23(a)(3) requires that the "claims or de-

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

fenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." Mullen, 186 F.3d at 625. "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." James, 254 F.3d at 571. However, there are instances when courts have expressed reservations about finding typicality where the named plaintiffs and the putative class members share similar facts and assert common legal theories of recovery. In re Masonite Corp. Hardboard Siding Products Liability Litigation, 170 F.R.D. 417, 420 (E.D.La.1997) (Court expressed reservations regarding typicality based on, among other things, the fact that all of the products at issue in that case did not exhibit problems). Additionally, courts have found that typicality is not satisfied where plaintiffs' claims and defenses will be dominated by individual evidence. Martin v. home Depot U.S.A., Inc., 225 F.R.D. 198, 201 (W.D.Tex.2004); see also Johnson v. Kansas City S. Railway Co., 208 Fed. Appx. 292, 297 (5th Cir.2006) (Typicality was not satisfied where the issues before the Court were far too individualized).

**\*4** Welch alleges that he and the putative class members have causes of action against Atlas for redhibition as a result of Atlas designing, manufacturing, and distributing defective roofing shingles. Although the Court previously found typicality in *Hilton* based on similar facts, the Court, after reviewing the memoranda filed in this case and case law, is concerned that typicality may not be satisfied in *this* case.

For example, as was the case in *Masonite,* the evidence indicates that the defect alleged by Welch may not be present in all Atlas shingles produced during the pertinent times.[FN16] Nevertheless, considering the Court's findings with respect to predominance and superiority, the Court need not determine whether the typicality requirement has been satisfied.[FN17]

> FN16. Roger Reeves, vice president and chief procurement officer with Hood Companies, Inc., which owns stock in Atlas, testified that some roofs may had only one

shingle with the affected metal granules. Rec. Doc. No. 22-2, p. 21, ll. 3-10 ("Some of them had one shingle that might have rusted, and some of them might have had two or three dozen that we've had rust streaks"); *see also* Rec. Doc. No. 22-2, p. 28, ll. 10-14 (Some shingles would have one speck of metal in an entire shingle; some would have 10 or 12).

> FN17. *See* Section C, *infra.*

**4. *Adequate Protection***
The final requirement of Rule 23(a) is that the representative parties fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). The adequacy requirement "encompasses class representatives, their counsel, and the relationship between the two." Stirman v. Exxon Corp., 280 F.3d 554, 563 (5th Cir.2002) (quoting Berger, 257 F.3d at 479). The test for adequacy requires an inquiry into the competence and zeal of Welch's counsel as well as Welch's ability to control the litigation, take an active role in it, and protect the interests of the absent class members. Berger, 257 F.3d at 480. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." Mullen, 186 F.3d at 625-26.

The Court expresses concern regarding Welch's representation of the putative class. Although Louisiana's redhibition law entitles the purchaser of a defective product to either a rescission of the sale or a reduction in the purchase price, Welch only discusses the putative class's potential claims for rescission.[FN18]

> FN18. La. Civ.Code. Ann. art. 2520. The availability of a remedy depends on the severity of the defect. *Id.* Welch claims that this is a rescission of the sale case for all putative class members. Rec. Doc. No. 31, p. 10.

Courts have held that a class representative is inadequate when he abandons particular remedies to the detriment of the class. *See, e.g., W. States Wholesale, Inc. v. Synthetic Indus., Inc.,* 206 F.R.D. 271, 277 (C.D.Cal.2002); *see also Ardoin v. Stine Lumber Co.,* 220 F.R.D. 459, 466 (W.D.La.2004). Welch does appear to have a sufficient stake in this action and the Court cannot state at this point that his

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

interest is antagonistic to the unnamed class members; however, Welch's failure to address reduction as an available remedy in redhibition claims raises a question as to Welch's adequacy as a class representative and whether Welch recognizes the possible disparities in the claims.[FN19] Regardless, in light of its findings with respect to predominance and superiority, the Court need not determine the adequacy issue.[FN20]

> FN19. Welch fails to analyze how the class may be maintained should the Court determine that reduction is a proper remedy. Welch argues that it cannot be reasonably presumed that the putative class members would have purchased the allegedly defective shingles at a lower price. Rec. Doc. no. 31, p. 10.

> FN20. *See* Section C, *infra; see also Masonite,* 170 F.R.D. at 420 (The Court stated that it need not reach a decision concerning plaintiff's adequacy as a representative because plaintiff failed to satisfy Rule 23(b)(3)).

> The Court further notes that Welch explicitly waives any personal injury claims that may be associated with this class action, which in past cases has resulted in a denial of certification based on inadequacy. *See, e.g., W. States Wholesale,* 206 F.R.D. at 277; *Ardoin,* 220 F.R.D. at 466; *Martin,* 225 F.R.D. at 203. However, the Court does not find it necessary to determine whether Welch's waiver precludes him from being an adequate representative because of the Court's findings with respect to predominance and because the Court is hard-pressed to identify a personal injury that could be caused by the alleged defect. It appears that any personal injury would result installation of the shingles and not from the defect itself.

**C. *Rule 23(b)* Requirement**

In addition to the Rule 23(a) requirements, the Court must also determine whether this action fits within Rule 23(b)(3).[FN21] Rule 23(b)(3) states in pertinent part that questions of law or fact common to the members of the class must predominate over any questions affecting only individual members, and that

a class action must be superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3). "In order to predominate, common issues must form a significant part of individual cases." *Turner,* 234 F.R.D. at 606 (citing *Mullen,* 186 F.3d at 626). The district court should focus on how the class action would proceed at trial and whether any cases would require individual trials on particular issues. *Id.*

> FN21. *See* Rule 23(b)(3) of the Federal Rules of Civil Procedure.

**1. *Predominance***

**\*5** Rule 23(b)(3) requires a plaintiff to demonstrate that questions common to the class members predominate over question affecting only individual members. "By inquiring into predominance, Rule 23(b)(3) ... tests 'whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.' " *Bell Atlantic Corp. v. AT & T Corp.,* 339 F.3d 294, 301 (5th Cir.2003) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997)). "The standard for certification imposed by Rule 23(b)(3) is ... more demanding than the commonality requirement ... and mandates caution, particularly where 'individual stakes are high and disparities among class members [are] great.' " *Id.* at 301-02 (quoting *Amchem,* 117 S.Ct. at 2250).

**a. *Louisiana Redhibitory Defect Claims***

In order to be successful in a redhibition lawsuit, "plaintiff must prove that the thing contained a redhibitory defect, that the defect existed at the time of the sale, and that the defect could not have been discovered by ordinary inspection." *Millspaw v. Knight,* 430 So.2d 1207, 1208 (La.App. 1 Cir.1983); *see also Rey v. Cuccia,* 298 So.2d 840, 843 (La.1974) ("The buyer must prove that the defect existed before the sale was made to him"); *Dougherty v. Petrere,* 123 So.2d 60, 63 (La.1960) ("Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibitory vices"). Article 2520 of the Louisiana Civil Code explains that a defect is redhibitory if it either renders a product useless or if it diminishes the usefulness of the product. La. Civ.Code Ann. art. 2520.

The available remedy in a redhibitory defect claim relates directly to whether the product contain-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

ing the defect is rendered completely useless or whether the product's usefulness is simply diminished. *Id; see also David v. Thibodeaux,* 916 So.2d 214, 217 (La.App. 1 Cir.2005) (Explaining when a purchaser of a product is entitled to rescission of the sale and when a purchaser is entitled to only a reduction of the purchase price). If a defect renders a product useless or the product's use so inconvenient that it must be presumed that the purchaser would not have bought the thing had he known of the defect, the purchaser is entitled to a rescission of the sale. La. Civ.Code Ann. art. 2520; *David,* 916 So.2d at 217.[FN22] Should the defect diminish a product's usefulness, the purchaser is entitled only to a reduction of the purchase price. *Id.*[FN23]

> FN22. As previously stated, Welch specifically argues in his reply memorandum that this case is "clearly a rescission of the sale case ." Rec. Doc. No. 31, p. 10.

> FN23. Welch argues that it cannot be reasonably presumed in this case that the putative class members would have purchased the allegedly defective shingles at a lower price. *Id.*

Welch asserts that all elements necessary to support a redhibition claim are common to the putative class members and have been satisfied.[FN24] Welch further asserts, based on Welch's appreciation of the evidence,[FN25] that the alleged defect in Atlas's shingles rendered all shingles sold during the pertinent times useless and their use so inconvenient that no buyer would have purchased these shingles had they known of the defect.[FN26] As such, Welch argues that he and the members of the putative class are entitled to a return of the purchase price paid for the shingles, interest thereon from the time the price was paid, attorney's fees, and damages.[FN27]

> FN24. Welch argues that the following are issues common to the class and establish a class-wide claim for redhibition: (1) Atlas manufactured millions of defective shingles that were purchased by the putative class members; (2) the shingles Atlas manufactured and sold to the putative class members are defective in that they contain excessive amounts of metal; (3) the defective shingles are so useless that the putative class members

would not have purchased the shingles had they known of the defects; (4) Atlas knew, or should have known, that the defective shingles contained excessive metal at the time they left Atlas's control; and (5) the defective shingles that were manufactured, marketed, and sold by Atlas have resulted in the same or similar type of damage to every putative class member. Rec. Doc. No. 31, p. 2.

> FN25. Subject to objections to Hilton classifying Atlas's shingles as defective, Atlas responded to interrogatories in *Hilton v. Atlas Roofing* by stating that it produced 2.7 million shingles during the times pertinent to that case. Rec. Doc. No. 31-11. "The headlap granules were defective and not fit to be used for incorporation into asphalt roof shingles to be placed on homes." Rec. Doc. No. 13-9, p. 5, para. 24. "You're going to have a problem if you've got metal anywhere in the shingle." Rec. Doc. No. 31-2, p. 33, ll. 13-15.

> FN26. Rec. Doc. No. 31, p. 10.

> FN27. Rec. Doc. No. 1-4, p. 3, paras. 11-12. Welch bases his claims for interest, expenses, attorney's fees, and damages on Louisiana Civil Code Articles 2531 & 2545. Article 2531 provides that, "a seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest thereon from the time it was paid, and to reimburse him for reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing...."

> Article 2545 provides that a seller who knows that the thing he sells has a defect but omits to declare it is liable to the purchaser for reimbursement of the reasonable expenses occasioned by the sale, for damages, and for reasonable attorney's fees. La. Civ.Code Ann. art. 2545. Article 2545 further provides that if the seller of a defective thing is the manufacturer, the seller is deemed to know of the defect. *Id.*

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

**\*6** When analyzing Welch's arguments concerning the predominance of common issues of law and fact and the superiority of a class action, the Court is bound to consider how a trial in this matter would proceed. *Robinson v. Texas Auto. Dealers Ass'n,* 387 F.3d 416, 425 (5th Cir.2004) (citing *Castano,* 84 F.3d at 752). "District courts are required to take a close look at the parties' claims and evidence in making [their] Rule 23 decision." *Unger v. Amedisys, Inc.,* 401 F.3d 316, 321 (5th Cir.2005). While the Court should go beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of certification issues, the Court should not, during class certification hearings, conduct mini-trials on the merits of the class or individual claims. *Id.; see Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372, 395 (5th Cir.2007) (Dennis J., concurring) (Courts are not permitted to go beyond the issues necessary to class certification and rule on the merits of the plaintiffs' claims).

Notwithstanding the evidence presented by Welch, Welch's conclusion that all of Atlas's shingles sold during the pertinent times were so defective as to merit rescission of the sales relates directly to the merits of Welch's and the putative class members' redhibition claims.[FN28] Should the Court adopt Welch's "legal" conclusions as to the existence and severity of the defects in Atlas's shingles, the Court would be making an impermissible preliminary determination on the merits that may substantially prejudice Atlas, as the adoption would not be accompanied by the traditional rules and procedures applicable to civil trials. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-178, 94 S.Ct. 2140, 2152-53, 40 L.Ed.2d 732 (1974).[FN29]

> FN28. Rec. Doc. no. 31, p. 10. Roger Reeves ("Reeves") testified on behalf of Atlas that the problems with Atlas's shingles was intermittent, considering the shingles he has inspected have had varying degrees of metal. Rec. Doc. No. 22-2, p. 28. Reeves further testified that there are many roofs that have Atlas shingles manufactured during the pertinent times that have exhibited absolutely no rusting. *Id.* at 29. Some roofs would have one shingle that might have rusted, while other roofs might have two or three dozen shingles that rusted. *Id.* at 21; *see also* Rec. Doc. No.

13-5, pp. 21-27 (Glynese Ward testifying that every claim submitted to Atlas was different. Some roofs would be covered with rust, while others would only have some areas affected.).

> FN29. In *Eisen,* the United States Supreme Court provided a detailed explanation as to why a court may not inquire into the merits of a claim sought to be certified.

> We find nothing in either the language or the history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it. He is thereby allowed to obtain a determination on the merits of the claims advanced on behalf of the class without any assurance that a class action may be maintained. This procedure is directly contrary to the command of subdivision ©(1) that the court determine whether a suit denominated a class action may be maintained as such '(a)s soon as practicable after the commencement of (the) action....' In short, we agree with Judge Wisdom's conclusion in *Miller v. Mackey Int'l,* 452 F.2d 424 (5th Cir.1971), "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Additionally, we might note that a preliminary determination of the merits may result in substantial prejudice to a defendant, since the necessity of it is not accompanied by the traditional rules and procedures applicable to civil trials. The court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant.

> *Eisen,* 417 U.S. at 178.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

The Court must consider how a trial on a class-wide redhibition claim would proceed, and in so doing, the Court must consider all remedies available, not simply the remedy sought by Welch, to class members in the event Welch establishes Atlas's liability. As stated previously, in addition to rescission of the sale, Louisiana's law of redhibition entitles a plaintiff to a reduction of the purchase price, should the alleged defect simply diminish the product's usefulness. La. Civ.Code Ann. art. 2520. Welch only attempts to demonstrate how the present class may be maintained if rescission is the proper remedy.[FN30] As such, the Court must, absent the presumption of Atlas's liability and the severity of the alleged defect, consider how the class may be maintained under Article 2520.[FN31]

> FN30. Welch believes that Atlas's answer to interrogatories 3 & 4, *see* Rec. Doc. Nos. 31-10, 11, stating that Atlas manufactured and distributed 2.7 million defective shingles constitutes a judicial admission that all shingles manufactured and distributed during the pertinent times contained metal and were defective. The Court notes, however, that in responding to these interrogatories, Atlas objected to the interrogatories to the extent they implied that Atlas's shingles were defective. Considering the fact that Atlas objected to the inference that its shingles were defective, the Court finds that whether all shingles manufactured and sold during the pertinent times were defective remains a disputed fact. *See* Rec. Doc. No. 35, pp. 3-4 (Atlas admits that it produced 2.7 million shingles during the pertinent times, but it does not admit that all of these shingles were defective).

> FN31. *See also* Rec. Doc. No. 31, p. 10. The Court recognizes that Roger Reeves has testified that any amount of metal in a shingle creates a problem. Rec. Doc. No. 31-2, p. 34, ll. 13-15. However, Reeves also testified that some roofs may have had only one shingle with the affected metal granules. Rec. Doc. No. 22-2, p. 21, ll. 3-10 ("Some of them had one shingle that might have rusted, and some of them might have had two or three dozen that we've had rust streaks"); *see also* Rec. Doc. No. 22-2, p. 28, ll. 10-14 ("Some shin-

gles would have one speck of metal in an entire shingle; some would have 10 or 12. So that's an indication of an intermittent problem"). Such testimony creates the possibility that, subsequent to a full trial on the merits, the Court may find that not all shingles were defective and rescission of the sales may not be the only proper remedy.

After review of the substantive law applicable to this case, the Court finds that a class action based on redhibition claims, where Louisiana law allows for both rescission and reduction, will likely be predominated by individualized issues. Should the Court determine that not all Atlas shingles manufactured and sold during the pertinent times contained a redhibitory defect, the Court would be forced to make individualized determinations as to Atlas's liability to each class member. This would likely require either the inspection of each class member's home or the submission of sample shingles from each class member's home.[FN32] In such a case, the determination of Atlas's liability would clearly result in the predominance of individualized issues over issues common to the class.

> FN32. Roger Reeves declared that "Atlas does not normally have a record of any particular end-consumer of Atlas products, unless Atlas receives contact from those consumers." Rec. Doc. No. 22-2, p. 3, para. 9

**\*7** Should Welch prevail on this issue, the Court will likely be required to make individual determinations as to the extent of Atlas's liability. In the event a redhibitory defect is established, the Court will still be required to determine whether each class member's roof possesses a defect that entitles that class member to a rescission of the sale or a reduction of the purchase price. Determining the remedy available to each class member would cause individual issues to predominate over questions common to the class.

In the event Welch establishes liability and the extent thereof, the Court will be required to calculate the amount of damages owed to each class member. While the Court recognizes that a wide disparity among class members as to the amount of damages suffered does not, in and of itself, necessitate denial of class certification, class treatment is nevertheless unsuitable when the calculation of damages "is not susceptible to a mathematical or formulaic calcula-

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

tion, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Bell Atlantic,* 339 F.3d at 306-07.

Welch's proposed method of calculating class damages entails each class member submitting invoices from the purchase of Atlas shingles.[FN33] However, this calculation is based solely on the rescission theory of recovery. The Court must consider whether a mechanical or formulaic calculation is applicable when considering both rescission and reduction as viable remedies.

> **FN33.** Rec. Doc. No. 31, p. 16. Welch suggests the purchase price stated on the invoice shall permit the Court to calculate the total amount of damages suffered and to disburse those damages accordingly. *Id.*

Considering the individualized nature of liability and the extent thereof, any formula for calculating damages in this case would likely require the Court to separate the class members entitled to rescission from the class members entitled to reduction and, thereafter, make case-by case determinations as to the amount by which the Court should reduce the purchase price for those members entitled to reduction. In essence, this would be no formula at all. The Court would still be required to conduct "minitrials" of an overwhelmingly large number of individual claims in order to determine the damages owed to each class member. As such, the need to calculate individual damages clearly defeats predominance. *Id.*

The Court must also consider whether each class member's claim is barred by prescription.[FN34] "The manufacturer of a product is presumed to have knowledge of any defect in what he makes; therefore a claim is timely if [one year] has not elapsed since the discovery of the [defect]." *Div. Place P'ship v. Carl E. Woodward, Inc.,* 806 So.2d 912, 915 (La.App. 4 Cir.2002); La. Civ.Code. Ann. art. 2534(B). "The manufacturer has the burden of proving by a preponderance of the evidence that the purchaser discovered the [defect] more than one year prior to filing the suit." *Id.*[FN35]

> **FN34.** U.S. Circuit Courts of Appeals are split on the issue of whether individualized statute of limitations determinations per se mandate denial of class certification. How-

ever, courts are in agreement that affirmative defenses, such as statute of limitations, are factors to be considered in class certification hearings. *See Mulford v. Altria Group, Inc.,* 242 F.R.D. 615, 629-30 (D. New Mexico 2007).* "While the existence of affirmative defenses that may require individualized evidence does not compel a finding that individual issues predominate over common ones, it does weigh against class certification." *Id.; see also Waste Mgmt. Holdings, Inc. v. Mowbray,* 208 F.3d 288, 296 (1st Cir.2000) ("Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.... As long as a sufficient constellation of common issues binds the class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)").; *Gunnells v. Health Plan Servs., Inc.,* 348 F.3d 417, 438 (4th Cir.2003) ("Regardless of other courts' interpretations of Rule 23, we have flatly held that 'when the defendants' affirmative defenses ... may depend on facts peculiar to each plaintiff's case, class certification is erroneous.' ") (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 342 (4th Cir.1998).

> **FN35.** According to Atlas, the timeliness of each class member's redhibition claim is one in a number of issues requiring individualized determinations that will predominate over issues common to the class. Rec Doc. No. 22, p. 20.

Welch argues that all putative class members have yet to discover the alleged defect, i.e. excessive metal granules, in their shingles because the defect is undiscoverable by mere observation.[FN36] However, there is a likelihood that at least some putative class members have discovered that their Atlas shingles were defective by virtue of an outward manifestation, i.e., rust. As such, determining the timeliness of the putative class's redhibition claim would inevitably require the Court to determine the point at which each class member became or should have become aware,

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

if at all, of the alleged defect in their shingles.[FN37] Such individual determinations would clearly predominate over issues common to the class. Considering the foregoing, the Court finds that Welch has failed to carry his burden of proving that the issues common to the class will predominate over individual issues.

> FN36. Rec. Doc. No. 31, pp. 14-15.

> FN37. *Goodman v. Roberts,* 587 So.2d 807, 810 (La.App. 3 Cir.1991) (explaining that prescription begins to run at the point at which the purchasers knew or should have known that they had a reasonable basis to pursue a claim against defendants); *Beth Israel v. Bartley, Inc.,* 579 So.2d 1066, 1072 (La.App. 4 Cir.1991) (Prescription does not commence to run until the plaintiff has actual or constructive knowledge of the tortious act, the damage caused, and the causal relationship between the tortious act and the damage).

**2. Superiority**

**\*8** The Court must consider the following factors when evaluating whether Welch has satisfied the superiority requirement of Rule 23(b)(3): (1) the class members' interest in individually controlling their separate actions; (2) the extent and nature of existing litigation by class members concerning the same claims; (3) the desirability of concentrating the litigation in the particular forum; and (4) the likely difficulties in class management. *Turner,* 234 F.R.D. at 610; *see also* Fed.R.Civ.P. 23(b)(3). The key inquiry is whether the class action format "is superior to other methods of *adjudication." Id.; see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 186 (3rd Cir.2001) (Superiority calls for a determination that a class action is the best method of achieving a "fair and efficient adjudication of the controversy").

Welch explains that there are only three other lawsuits that have been filed in connection with Atlas's allegedly defective shingles.[FN38] As such, Welch asserts that there has not been a substantial amount of litigation regarding Atlas's shingles and a class action is the "only method" by which the tens of thousands of remaining class members may effectively seek compensation.[FN39]

> FN38. Rec. Doc. No. 13-3, p. 24.

> FN39. *Id.* (speaks to the second factor necessary to satisfy superiority).

Welch also argues that concentrating the putative class in a single forum is desirable, as this Court has already presided over other cases against Atlas alleging similar conduct and all new cases would likely be removed to or transferred to this Court as related.[FN40] He urges that subsequent to class certification, this case would likely be resolved by summary judgment motion practice and those issues left unresolved by motion practice could be resolved at trial, during which the testimony of class members will not be required.[FN41]

> FN40. *Id.* at p. 25.

> FN41. *Id.*

The Court finds Welch's arguments concerning the superiority of a class action unpersuasive. As previously stated, this case would likely require the Court to make case-by-case determinations as to Atlas's liability, the extent of Atlas's liability, the damages owed to each class member, and the timeliness of each class member's claim. Such determinations would undoubtedly render this case unmanageable as a class action because of the need to produce evidence unique to each class member.[FN42] *See, e.g., Masonite,* 170 F.R.D. at 425-26 ("Individual questions of law and fact overwhelm common questions, and class litigation would easily become unmanageable and less efficient than litigation involving state-wide (or smaller) classes...."); *Newton,* 259 F.3d at 191 (holding that proof of plaintiffs' injuries and litigating the defenses available to defendants would present insurmountable manageability problems for the district court). The Court finds that a class action is not the superior method for adjudicating the putative class members' claims.

> FN42. If Welch correctly estimates that there are tens of thousands of putative class members, the Court would be required to review evidence unique to each of those class members.

In summary, individual determinations of liabil-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)
**(Cite as: 2007 WL 3245444 (E.D.La.))**

ity, the extent of that liability, damages, and the time-liness of each class member's claims will predominate over any issues common to the participating class members. Such individual determinations clearly indicate that a class action is not the superior method of fairly adjudicating the class members' claims. Therefore, the Court finds that Welch's action is not appropriate for class certification pursuant to Rule 23(b)(3).

**\*9** Accordingly,

**IT IS ORDERED** that the motion for class certification filed by plaintiff, Patrick G. Welch, on behalf of himself and others similarly situated,[FN43] is **DENIED.**

FN43. Rec. Doc. No. 13.

E.D.La.,2007.
Welch v. Atlas Roofing Corp.
Not Reported in F.Supp.2d, 2007 WL 3245444 (E.D.La.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. Louisiana.
In re FEMA TRAILER FORMALDEHYDE
PRODUCTS LIABILITY LITIGATION.
This Document Relates to All Cases.

No. MDL 071873.
Dec. 29, 2008.

### ORDER AND REASONS

KURT D. ENGELHARDT, District Judge.

**\*1** Before the Court is the Motion for Class Certification (Rec.Doc.764), filed by all plaintiffs named in any Complaint or Petition whose suits have been consolidated or cumulated herein. In their memorandum in support of their Motion for Class Certification, Plaintiffs specifically seek certification of the following subclasses:

a. Louisiana Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Louisiana after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Louisiana law as a result of exposure to formaldehyde in these units.

b. Texas Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Texas after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Texas law as a result of exposure to formaldehyde in these units.

d. Mississippi Subclass:

All individuals who resided for any length of time in

emergency housing units provided by FEMA within the state of Mississippi after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Mississippi law as a result of exposure to formaldehyde in these units.

e. Alabama Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Alabama after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Alabama law as a result of exposure to formaldehyde in these units.

e. Future Medical Services Subclass: FN1

> FN1. In the event that this Court does not certify a class based on all individuals who resided in emergency housing units ("EHUs") in the four states after Hurricanes Katrina and Rita, Plaintiffs request that, pursuant to Rule 23(c)(4), this Court certify a class based upon the future medical services that they claim are needed by all plaintiffs, especially children. Indeed, in the December 2, 2008 class certification hearing, Plaintiffs proposed the following sub-class definition, which differs from the above:
>
> > Any child who lived in a travel trailer which exceeded the ATSDR minimum risk levels for the correspondent period in which they resided in the trailer, and who manifested any symptom of formaldehyde exposure during the time in which they resided in the trailers.
>
> (See Transcript, December 2, 2008 class certification hearing, p. 146). Still another sub-class definition was provided in Plaintiff's Class Certification Post–Hearing Brief:
>
> > Any minor on whose behalf administrative FTCA remedies have been exhausted, who lived in a travel trailer which exceeded the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

ATSDR minimum risk level for the cor-respondent period of residence in the trailer, and who manifested symptoms of formaldehyde exposure during the residency period.

(Rec.Doc.978, pp. 1–2). All of the sub-class definitions shall be analyzed the same herein. The request to certify this sub-class (under any of these three definitions) is properly denied for the general reasons expressed herein. However, when appropriate, the Court notes additional reasons as to why a specifically-defined sub-class should not be certified. This Court also reasons that this sub-class should be denied strictly because it is not adequately defined (i.e., one specific definition has not been provided to this Court for consideration; three very different definitions have been provided).

All individuals who resided for any length of time in emergency housing units provided by FEMA within the states of Louisiana, Texas, Mississippi, and/or Alabama after Hurricanes Katrina and/or Rita, and who are found eligible to participate in a medical services program designed to monitor the physical condition(s) of each such individual for the purpose of ascertaining and responding to diseases caused by, contributed to, or exacerbated by the individual's exposure to formaldehyde while residing in any of the aforementioned units.

f. Economic Loss Subclass:

All individuals to whom FEMA provided an emergency housing unit within the states of Louisiana, Texas, Mississippi, and Alabama after Hurricanes Katrina and Rita and who sustained economic loss recoverable under each state's law as a result of being provided housing not fit for its ordinary purpose.

(Rec.Doc.764–2, pp. 4–5).

An evidentiary hearing was conducted on December 2, 2008. Having considered Plaintiffs' Complaints and Petitions, Plaintiff's motion for class certification, the submissions of the parties, the evidence adduced at the oral hearing, the post-hearing briefs,

the record, and the applicable law, the Court is confident that the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b)(3) are not met. For the following reasons, the Plaintiffs' motion for class certification is denied in its entirety.

**I. BACKGROUND**

 *2 In this multi-district litigation ("the MDL"), referred to as "In Re: FEMA Trailer Formldehyde Products Liability Litigation," certain named plaintiffs have filed suit against the United States and several Defendant manufacturers, claiming that they either lived or resided along the Gulf Coast of the United States in travel trailers, park models, and manufactured homes provided to them by the Federal Emergency Management Agency ("FEMA") after Hurricanes Katrina and Rita made landfall in August and September of 2005, respectively. Plaintiffs claim to have been exposed to purportedly high levels of formaldehyde contained in these EHUs, and to have suffered damages as a result. Specifically, the named class representatives have pled the following causes of action against the Manufacturing Defendants: (1) liability under the Louisiana Products Liability Act ("LPLA") for the negligent design, manufacture, and distribution of their products; (2) strict liability under the Mississippi Code Annotated § 11–1–63 for the negligent design, manufacture, and distribution of their products; (3) liability under Alabama's Extended Manufacturer's Doctrine for the negligent design, manufacture, and distribution of their products; (3) liability under Texas law for the negligent design, manufacture, and distribution of their products; (4) liability for their failure to warn; and (5) liability for their breach of express or implied warranty and/or failure to conform to other express factual representations on which the plaintiffs justifiably relied. (Rec.Doc.764–2, p. 14).[FN2] Further, the named class representatives have, on behalf of the putative class, also asserted the following causes of action against the United States/FEMA: liability under Louisiana Civil Code Articles 2316 and 2317.

FN2. The Court notes that Plaintiffs do not specify whether causes of action 4 and 5 (relating to alleged failure to warn and alleged breach of express or implied warranty) relate to a specific state. Thus, the Court is left to assume that Plaintiffs intend for these causes of action to apply to all four states.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

The Court is presently faced with the issue of whether or not this litigation should be certified and managed as a class action, or more specifically, as six separate sub-classes.[FN3] If the Court chooses not to certify a class, then this matter will proceed as a mass joinder in the MDL.

> FN3. Federal Rule of Civil Procedure 23(c)(5) enables district courts to break a class into subclasses "[w]hen appropriate." Each subclass is treated as an individual class, and must independently meet the requirements of Rule 23. Fed.R.Civ.P. 23(c)(5). If each subclass meets Rule 23's requirements, the matter may proceed in a consolidated action even if the matter could not have been certified as a single, all-inclusive class under the rule. See *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 856, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (discussing division into subclasses under Rule 23(c)(4)(B), the predecessor to Rule 23(c)(5)).

> The Court further notes that in this MDL case, separate sub-classes essentially create separate MDL actions. Whether and to what extent that effects the manageability of this action will be further discussed herein.

## II. CLASS CERTIFICATION STANDARDS

Rule 23 of the Federal Rules of Civil Procedure governs class actions. The rule requires that the court determine, "at an early practicable time after a person sues or is sued as a class representative," whether the suit meets the class certification requirements such that the case should proceed as a class. See Fed.R.Civ.P. 23(c)(1). A class action is not maintainable as such simply because the lawsuit designates the cause as a class action. It is not disputed that the class action proposed in this case must satisfy the requirements for certification outlined in Rule 23(a) and (b).

In ruling upon a motion for class certification, courts treat the substantive allegations contained in the plaintiffs' complaint as true. The issue is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Eisen v. Carlisle &*

*Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2153 (1974); see also *Burrell v. Crown Central Petroleum, Inc.,* 197 F.R.D. 284, 286 (E.D.Tex.2000); and *In re Lease Oil Antitrust Litigation,* 186 F.R.D. 403, 418 (S.D.Tex.1999). The court may look past the pleadings to the record and any other completed discovery to make a determination as to the class certification issue. See *General Telephone Company v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2371–72 (1982)(noting the district court's duty to conduct a "rigorous analysis" before granting class certification and holding that a decision on class certification remains a fact-specific determination); *Spence v. Glock,* 227 F.3d 308, 310 (5th Cir.2000); and *Castano v. American Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996).

**\*3** At the outset, Rule 23(a) sets forth four threshold requirements which must be met in every type of class action case. See *James v. City of Dallas,* 254 F.3d 551, 569 (5th Cir.2001). Rule 23(a) requires that a class: (1) be so numerous that joinder of all members is impracticable [numerosity]; (2) have common questions of fact or law [commonality]; (3) have representative parties with typical claims or defenses [typicality]; and (4) have representative parties that will fairly and adequately protect the interests of the proposed class [adequacy]. See Fed.R.Civ.P. 23(a); *Spence v. Glock,* 227 F.3d at 310 n. 4; *James v. City of Dallas,* 254 F.3d at 569. The first two requirements focus on the characteristics of the class; the second two focus instead on the desired characteristics of the class representatives. The rule is designed "to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." *In re Lease Oil Antitrust Litigation,* 186 F.R.D. at 419 (citing *In re General Motors Corp. Pick–Up Truck Fuel Tank Litigation,* 55 F.3d 768, 799 (3rd Cir.1995)).

If the Rule 23(a) criteria are satisfied, the plaintiffs must show that class treatment is appropriate under one of three alternative class categories prescribed by Rule 23(b). See Fed.R.Civ.P. 23(b); *James v. City of Dallas,* 254 F.3d at 568. Plaintiffs explicitly seek certification pursuant to Rule 23(b)(3), which sets out two requirements: predominance and superiority. See Fed.R.Civ.P. 23(b)(3). Subsection (b) provides that:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

(b) A class action may be maintained if Rule 23(a) is satisfied, and if:

...

(3) the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3)(emphasis added).

To succeed under Rule 23(b)(3), Plaintiffs must sufficiently demonstrate both predominance of common class issues and that the class action mechanism is the superior method of adjudicating the case. See *Mullen v. Treasure Chest Casino,* LLC, 186 F.3d 620, 623–24 (5th Cir.1999)(citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614 (1997)). Together, subsection (a) and (b) requirements insure that a proposed class has "sufficient unity so that absent class members can fairly be bound by decisions of the class representatives." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2246 (1997).

**\*4** In *Allison v. Citgo Petroleum,* the Fifth Circuit explained the different categories of class actions detailed in Rule 23(b), as follows:

Under Rule 23, the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class

members to pursue their claims separately or not at all. The different types of class actions are categorized according to the nature or effect of the relief being sought. The (b)(1) class action encompasses cases in which the defendant is obliged to treat class members alike or where class members are making claims against a fund insufficient to satisfy all claims. The (b)(2) class action, on the other hand, was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary. Finally, the (b)(3) class action was intended to dispose of all other cases in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages. Limiting the different categories of class actions to specific kinds of relief clearly reflects a concern for how the interests of the class member will vary, depending on the nature of the class injury alleged and the nature of the relief sought.

151 F.3d 402, 411–12 (5th Cir.1998).

A class seeking substantial money damages will more likely consist of members with divergent interests. *Id.* at 412. Recognizing that monetary damages are more often related directly to the disparate merits of individual claims, the drafters of the rule saw fit to provide prospective (b)(3) class members the absolute right to notice, to opt out and not be bound by membership in a class. *Id.* Rule 23(b)(3) applies to cases for which a class action would achieve economies of time, effort, and expense, promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. See *Amchem,* 521 U.S. at 615, 117 S.Ct. at 2246. Whether common issues predominate and the class action is superior requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case. See *Berger v. Compaq Computer Corporation,* 257 F.3d 475, 483 (5th Cir.2001)(" '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." ' *Castano,* 84 F.3d at 744.).

In the instant case, Plaintiffs bear the burden of proving that: (1) the proposed class satisfies all of the elements of Rule 23(a); and (2) the proposed class also satisfies both requirements of Rule 23(b)(3). See *Spence v. Glock,* 227 F.3d at 310; *Berger,* 257 F.3d at

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

479–80; *Mullen,* 186 F.3d at 623; *Castano,* 84 F.3d at 743–44 (holding that a court cannot rely on assurances of counsel that any problem with predominance or superiority can be overcome). Within the confines of Rule 23, a district court maintains substantial discretion in determining whether to certify a class.[FN4] See *Smith v. Texaco,* 263 F.3d 394, 403 (5th Cir.2001)(recognizing that the certification inquiry is essentially fact-based and thus the Fifth Circuit defers to the district court's inherent power to manage and control pending litigation, reviewing certification decisions only for abuse of discretion). In the absence of proof of all required elements, the court may not certify a class. See *Berger,* 257 F.3d at 479–80. The Court addresses Plaintiffs' proof as to requisite elements of a Rule 23(b)(3) class action herein.

> FN4. It should also be noted that the certification of mass tort litigation, such as is the case here, is disfavored in the Fifth Circuit.  *Castano,* 84 F.3d at 746.

**III. CLASS CERTIFICATION AS TO CLAIMS AGAINST DEFENDANT MANUFACTURERS–APPLYING, GENERALLY, TO THE PROPOSED CLASS AND ALL SIX PROPOSED SUB–CLASSES**

**A. Rule 23(a) Requirements**

**1. Rule 23(a)(1): Numerosity**

**\*5** As to numerosity, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members. See *James,* 254 F.3d at 570. Numerically speaking, a class of over one hundred members is sufficient for purposes of numerosity and actual numbers are not determinative of the inquiry. See *Street v. Diamond Offshore Drilling,* 2001 WL 568111, at 4 (E.D.La. May 25, 2001)(Duval, J.)("Although the number of members in a proposed class is not determinative of whether joinder is impracticable, it has been noted that any class consisting of more than forty members 'should raise a presumption that joinder is impracticable.' "). In addition to numbers, factors relevant to the numerosity inquiry include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. See *Mullen,* 186 F.3d at 624.

Plaintiffs assert that numerosity is easily established as the class of persons that the named Plaintiffs and putative class representatives seek to represent encompasses thousands of individuals. Plaintiffs further argue that there are practical difficulties with joining and managing all of the proposed class member claims in this case as individual, consolidated claims. Plaintiffs note that they are geographically dispersed as a result of Hurricanes Katrina and Rita. In opposition, the Manufacturing Defendants first note that each proposed subclass must independently meet all of the requirements of Rule 23. Fed. R. Civ. Pro. 23(c)(5). Defendants argue that because Plaintiffs have defined their proposed subclasses so broadly (i.e. all persons who lived in FEMA-provided housing—regardless of manufacturer), the numerosity requirements may not be satisfied. Defendants request that the Court recognize that, at the very least, the Plaintiffs should have proposed a subclass for each manufacturer, thus demonstrating numerosity for each subclass of putative class members as to each manufacturer.

While Plaintiffs have alleged that numerosity exists in general terms (as to the proposed class as a whole[FN5]), they fail to demonstrate or offer any evidence as to whether numerosity exists as to each proposed sub-class. "The creation of subclasses can compromise the ability to satisfy numerosity ..." Manual for Complex Litigation (Fourth) § 21.23. Because Plaintiffs bear the burden of proving that the requirements of Rule 23 are met, this Court finds that, by not analyzing this requirement by proposed sub-class, Plaintiffs have not met this burden. Based on Plaintiffs' lack of analysis and briefing on this subject, it is unclear whether the numerosity requirement is met for some or all of the proposed sub-classes. Thus, this prerequisite to class certification is not met. However, even if this Court concluded that the numerosity requirement was or could be met, class certification of a general class and the proposed sub-classes would still fail for additional reasons.

> FN5. The Court notes that numerosity requirement is likely satisfied as to the proposed class, as a whole, as the named Plaintiffs and putative class representatives seek to represent thousands of individuals. However, Plaintiffs have elected to request certification of several sub-classes, each of which has to satisfy the Rule 23 requirements.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

**2. Rule 23(a)(2): Commonality**

**\*6** The test of commonality is not demanding. See *Mullen,* 186 F.3d at 625. The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members. *James,* 254 F.3d at 570 (citing *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993) (quoting *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982)). The fact that some of the plaintiffs may have different claims, or claims that may require individualized analysis, will not defeat commonality. *Id.*

Plaintiffs assert that all of the claims in this MDL "proceed from one of two hurricane disasters, and the resulting displacement and relocation of citizens which resulted in formaldehyde exposure." (Rec.Doc.764–2, p. 12). Plaintiffs allege that common questions exist relating to why and how formaldehyde exposure occurred, what level of formaldehyde exposure was experienced, and who was exposed to the formaldehyde. Plaintiffs claim that Defendants' conduct or fault in the failure to exercise reasonable care to prevent the exposure of formaldehyde is a central and common issue. Plaintiffs argue that common issues of fact also relate to the scientific nature and behavior of formaldehyde. On the other hand, Defendants argue that there is no commonality because Plaintiffs lived in different EHUs.

The Court agrees with Defendants. While it is true that the test of commonality is not demanding, and the interests and claims of the various plaintiffs need not be identical, this Court finds that this requirement is not satisfied. As Defendants note, this case does not involve one single product that is alleged to have caused Plaintiffs damage. Instead, Plaintiffs have alleged that dozens of different manufacturing defendants have manufactured products or EHUs that have caused them harm. Further, some defendants have manufactured multiple models of EHUs that Plaintiffs claim to have caused them harm.

There are numerous factual issues relating to the EHUs at issue in this case that destroy Plaintiffs' ability to satisfy the commonality requirement for class certification purposes. As Defendants point out:

Even in two EHUs side by side and of the same model and manufacturer, the chemicals present (i.e. possible presence of formaldehyde and other potential chemical sources of irritation) will be different depending upon the habits of the residents.

(Rec.Doc.902, p. 71). The question of Defendants' conduct or fault in the failure to exercise reasonable care is clearly not a common issue because there are dozens of defendants who have manufactured numerous different products that have allegedly caused harm to Plaintiffs. In that regard, a determination of fault as to one defendant will not answer the question as to any other defendant. Last, a determination relating to the scientific nature and behavior of formaldehyde is not common as to all class members as the true issue relates to the specific level of formaldehyde that each plaintiff experienced in his/her EHU unit and the resulting symptoms allegedly suffered by that particular plaintiff. Thus, Plaintiffs have not met their burden of showing that the commonality requirement is satisfied. However, similar to the Court's note regarding the numerosity requirement, even if this Court concluded that the commonality requirement was satisfied, class certification of a general class and the proposed sub-classes would still fail for reasons expressed hereinafter.

**3. Rule 23(a)(3): Typicality**

**\*7** Rule 23(a)'s "typicality" requirement does not require a complete identity of claims. It focuses on the similarities between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. *James,* 254 F.3d at 571. The pertinent inquiry is whether the class representatives' claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality. *Id.*

Like commonality, the test of typicality is not demanding. *Id.;* see also *Mullen,* 186 F.3d at 625 (typicality satisfied when plaintiff employees alleged theories of liability for defective air ventilation aboard casino boat under Jones Act and doctrine of unseaworthiness, despite the defendant's argument that each class member's alleged resulting "respiratory illness" may differ). However, to satisfy Rule 23(a)'s typicality requirement, a class representative must be a part of the class and possess the same interest and suffer the same injury as class members. See *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

S.Ct. 2364, 2370 (1982). Courts consider the elements of the cause(s) of action that the class representatives must prove in order to establish the defendants' liability. If those elements are substantially similar to those needed to be proven by other class members, the representative's claims are deemed typical. See Herbert B. Newberg, *Newberg on Class Actions* § 3:15, 359–60 (4th ed.2002).

Plaintiffs acknowledge that the named plaintiffs, individually and on behalf of the putative class and sub-classes, are asserting various legal theories of liability directed at the Manufacturing Defendants' design, manufacture, and distribution of EHUs, which they allege were unreasonably dangerous in normal use and/or foreseeable misuse. The named class representatives specifically have pled the following causes of action against the Manufacturing Defendants: (1) liability under the Louisiana Products Liability Act for the negligent design, manufacture, and distribution of their products; (2) strict liability under the Mississippi Code Annotated § 11–1–63 for the negligent design, manufacture, and distribution of their products; (3) liability under Alabama's Extended Manufacturer's Doctrine for the negligent design, manufacture, and distribution of their products; (3) liability under Texas law for the negligent design, manufacture, and distribution of their products; (4) liability for their failure to warn; (5) liability for their breach of express or implied warranty and/or failure to conform to other express factual representations on which the plaintiffs justifiably relied.[FN6] Plaintiffs argue that, as for each of these causes of action, the claims asserted by the class representatives are typical of other class member claims under these theories of liability.

> FN6. Some of these legal issues were the subject of a motion to dismiss that was adjudicated by the undersigned on December 12, 2008 (Rec.Doc.984).

**\*8** For example, Plaintiffs explain that Corey Davis ("Davis"), a class representative, claims to have suffered shortness of breath, irritation of the eyes, headaches, dizziness, coughing, nosebleeds every other night and vomiting once or twice a week, from his nearly two-year residency in an EHU. (Exhibit A to Rec. Doc. 764, pp. 20, 57–59). Rayfield Robinson ("Robinson"), a class representative, claims to have suffered watery eyes, breathing problems, vomiting

problems and pains in his stomach during his 25–month residency in an EHU. (Exhibit B to Rec. Doc. 764, p. 31). Robinson asserts that he continues to suffer vomiting, watery eyes, and diarrhea, despite having left the EHU nearly seven months ago. (Exhibit B to Rec. Doc. 764, p. 36). Shane Lee Baker ("Baker"), a minor who resided in an EHU for seven months, allegedly suffered irritation of nasal membranes, nausea, vomiting, skin rashes, abdominal pain, and breathing difficulty. (Exhibit C to Rec. Doc. 764, pp. 89–91, 98). Heavenly Beasley ("Beasley"), a minor who resided in an EHU from October 2005 to April 2008, allegedly suffered troubled breathing, ear infections, and stomach problems. (Exhibit D to Rec. Doc. 764, p. 47, 57). Beasley has been diagnosed with and continues to be treated for bronchitis and upper respiratory infection. (Exhibit D to Rec. Doc. 764, p. 51). Plaintiffs argue that the claims asserted by Davis, Robinson, Baker, and Beasley are typical and representative of the claims asserted by the class as a whole, arise from the same course of conduct, and share the same legal theory as do the claims of the putative class. Plaintiffs allege that the class representatives carry no burden of proof unique to their liability cases, and will continue to advance the interests of all the class members.

In opposition, Defendants argue that the class representatives' claims are not typical with regard to either their theories of liability or the injuries claimed. First, as for the causes of action pled against the Manufacturing Defendants, Defendants note that varying state laws governing manufacturers' liability preclude a finding of typicality-at least in regards to the claims for breach of express or implied warranty and/or failure to conform to other express factual representations on which the plaintiffs justifiably relied.[FN7] As a result, class members in one state cannot obtain the same relief and adequately represent the interests of class members in another state.

> FN7. This is evident in the Court's Order and Reasons, dated December 12, 2008 (Rec.Doc.984), wherein the Court analyzed these claims in considerable detail according to the laws of the applicable states.

Further, Defendants assert that Plaintiffs fail to demonstrate typicality in terms of class injuries. While Plaintiffs' memorandum in support of their motion for class certification mentions only four of the numerous

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

proposed class representatives and discusses several symptoms which some or all of them claim to have experienced based on their exposure to formaldehyde, Defendants note that the remaining proposed class representatives claim a myriad of other symptoms and conditions, including unconsciousness, convulsions, nephritis, and hypothermia. Indeed, the Plaintiff Fact Sheet ("PFS"), which was approved by this Court, designates a total of 47 alleged formaldehyde-related symptoms, ranging from low blood pressure to miscarriage and stillbirth. (Exhibit A to Rec. Doc. 902). Defendants essentially argue that the Plaintiffs will have diverse medical histories, symptoms, and alleged exposures. On that note, Defendants add that typicality is "not satisfied where plaintiffs' claims and defenses will be dominated by individual evidence." *Welch v. Atlas Roofing Corp.*, 2007 WL 3245444 at *3–4 (E.D.La. Nov. 2, 2007) (citing *Martin v. Home Depot U.S.A. Inc.*, 225 F.R.D. 198, 201 (W.D.Tex.2004)). Defendants further contend that Plaintiffs' varying medical histories, symptoms, and exposures will all affect the damages sought and allegedly owed to each, and the only meaningful evaluation of liability and damages would necessarily depend on an individualized inquiry as for each Plaintiff.[FN8]

> **FN8.** Because the Court ultimately determines that the numerous and varying fact issues applicable to each Plaintiff and proposed class representative preclude class certification, it does not address the individualized damages issues. However, because the varying entitlement to and extent of damages sought by each Plaintiff and proposed class representative differs significantly depending on a plethora of different circumstances, such analysis would only strengthen and confirm the Court's decision to deny class certification in this litigation. See *Kuhn v. Skyline Corp.*, 1984 WL 62775 (M.D.Pa.1984).

**\*9** For similar reasons to those espoused by Judge Fallon in *In re Vioxx Products Liability Litigation*, 239 F.R.D. 450, 459–60 (MDL No. 1657 2006), this Court finds that because the instant MDL involves factual variations as to each Plaintiff and proposed class representative which spawn individual issues relating to injury and causation as to each individual, the class representatives' claims are not typical of the class.

Each Plaintiffs' claims and alleged injuries will require an examination of individual evidence, precluding the satisfaction of the typicality requirement for class certification. As mentioned briefly above, each individual has and is affected by his/her own discrete medical history [FN9], has experienced different symptoms and varying degrees of manifestation of those symptoms, and has experienced varying environmental exposures.[FN10] Even Plaintiffs admit that a child's lungs react differently to formaldehyde exposure than an adult's lungs. Plaintiffs' counsel also admits that temperature, humidity, and ventilation affect and contribute to differences in formaldehyde levels in EHUs. (See Transcript, December 2, 2008 class certification hearing, p. 148–150). Further, class representatives did not all reside in one type of EHU, manufactured by one specific manufacturer, manufactured at the same time, and made up of the same component parts. Indeed, class representatives resided in EHUs of varying configurations, manufactured by distinct entities, at different times.[FN11]

> **FN9.** For instance, some individuals have pre-existing medical conditions, like allergies or asthma. Others are or were cigarette users, for varying lengths of time, both before and/or during the time they occupied the EHU. These issues render an individualized causation analysis necessary.

> **FN10.** By environmental exposures, the Court refers to when each Plaintiff lived in an EHU, the weather and temperature conditions while each Plaintiff lived in an EHU, the length of time each Plaintiff lived in an EHU, etc. Other individuals claim to have been exposed to other potentially-harmful chemicals and substances, in addition to formaldehyde. For instance, some plaintiffs complained of exposure to mold while residing in EHUs, while others had been exposed to mold and suffered breathing problems prior to moving into the EHUs. All such factors render a determination of this on a class-wide basis inappropriate.

> **FN11.** Defendants point out that one purported class representative lived in *multiple* EHUs and complained of *differing symptoms in each EHU*. (Exhibit A–15 to Rec. Doc. 902).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

Thus, for all of these reasons, the Court concludes that numerous variables, relating to both legal and factual distinctions, create a myriad of considerations in each individual's case. Plaintiffs have therefore failed to demonstrate that their designated representatives are typical of the overall putative class. Similar to the Court's note regarding the numerosity and commonality requirements, even if this Court concluded that the typicality requirement was satisfied, class certification of a general class and the proposed sub-classes would still fail for reasons expressed hereinafter.

**4. Rule 23(a)(4): Adequacy**

The fourth and final requirement of Rule 23(a) is that the district court must find that the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). Rule 23(a)'s adequacy requirement encompasses consideration of the class representatives, their counsel, and the relationship between the two. Adequacy of the representation of the class cannot be presumed. See Berger, 257 F.3d at 479–80. The adequacy requirement contemplates the absence of antagonistic or conflicting interests, and a sharing of interests between class representatives and absentees. As it should, this Court has assumed for the purposes of this motion for class certification that the injuries alleged by putative class plaintiffs could have and did indeed occur.

The Fifth Circuit in *Berger* emphasized that the party seeking certification bears the burden of establishing that all requirements of Rule 23(a) have been satisfied, and it is error to presume the adequacy of the putative representatives in the absence of specific proof otherwise. *Id.* at 479. The *Berger* Court observed:

**\*10** To the contrary, we have described "[t]he adequacy requirement [as one that] mandates an inquiry into ... the willingness and ability of the representatives to take an active role in control the litigation and to protect the interests of the absentees." Likewise, ... "it must appear that the representative[s] will vigorously prosecute the interests of the class through qualified counsel." Both understandings-even accepting the variance between them-require the class representatives to possess a sufficient level of knowledge and understanding to be capable of "controlling" or "prosecuting" the litigation.

*Id.* at 482–83 (citations omitted). Class action lawsuits are intended to serve as a vehicle for capable and committed advocates to pursue the goals of the class members through counsel, not for capable, committed counsel to pursue their own goals through those class members. Berger, 257 F.3d at 484.

Plaintiffs note that absence of conflict and assurance of vigorous prosecution are two factors that are recognized as the basic guidelines for this prerequisite to class certification. See Newberg, § 3:22, at 409. In support of their assertion that the adequacy requirement is met, Plaintiffs allege that the interests of their representatives do not conflict with the interests of the members of the class they seek to represent, as all seek similar relief. In that regard, Plaintiffs explain that all are individuals who were injured as a result of exposure to formaldehyde from EHUs made by the Manufacturing Defendants, and all present claims for personal injury and property damage. They also assert that the proposed class representatives have a strong interest in prosecuting this action and will diligently prosecute it on behalf of themselves and all other class members.

In opposition, Defendants contend that the putative class representatives do not adequately represent the interests of the class members. For instance, Defendants claim that several putative representatives have expressed an unwillingness to take an active role in the litigation.[FN12] Some have failed to appear at their noticed class depositions. (Exhibits A–65 and A–66 to Rec. Doc. 902). Other proposed class representatives believe that they have no responsibility to other class members. (Exhibits A–3, A–26, and A–47 to Rec. Doc. 902). Still other proposed representatives lack knowledge of how many members there are and have delegated the task of informing potential members about the litigation to their attorneys. (Exhibits A–16 and A–17 to Rec. Doc. 902). One representative has stated that he does not want to be a representative. (Exhibit A–73 to Rec. Doc. 902). Defendants claim that these examples depict a group that is uninformed, disinterested, and lackadaisical when it comes to participating in this case and protecting the interests of absent class members. This evidence is indeed a concern of the undersigned.

FN12. Some of the individuals referenced by

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

Defendants in support of these arguments have, since, been stricken by the Court from serving as class representatives in this matter. (See Rec. Doc. 948). To this extent, the Court only references those individuals mentioned by Defendants who have not been stricken from serving as class representatives.

As for adequacy as to counsel, Defendants argue that class counsel has sought to achieve its own goals, all the while leaving by the wayside the actual representatives, who are, thus, unable to represent adequately the interests of the class members. However, as for the adequacy *of counsel* requirement, this Court finds that it is satisfied. Notably, the undersigned has personally appointed counsel to serve on the Plaintiffs' Steering Committee ("PSC"), which is charged with coordinating the representation of all plaintiffs. The Court went through great lengths to appoint only experienced, capable, and worthy attorneys and firms to the PSC. The Court's selection of them demonstrates its confidence in the adequacy of these attorneys. Further, the Court finds that Plaintiffs' counsel, working in conjunction with the PSC, include experienced attorneys who have pursued, and will continue to pursue, the interests of all potential claimants.[FN13] It is also worth noting that the PSC consists of counsel who regularly engage in major complex litigation and have had extensive experience in class action suits involving complex litigation similar in size, scope and complexity to the present case.

> FN13. Thus far, they have worked together to prepare pleadings and motions, propound and respond to discovery, retain experts, conduct extensive testing of EHUs, evaluate the claims presented, conduct an extensive written claims process, interact with the Defendants and their counsel to insure the protection and preservation of evidence, participate in court appearances, and conduct legal research into the numerous claims and defenses presented in this action.

**\*11** However, despite having adequacy of counsel, the Court finds that Plaintiffs have failed in demonstrating the adequacy *of the proposed class representatives.* As Defendants point out, the varying nature of the class members' claims can act as a bar to adequacy. When the claims of class members raise significantly different factual and legal issues, Plain-

tiffs have difficulty demonstrating that the proposed representatives fulfill the adequacy requirement. See *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 618 (3rd Cir.1996). The adequacy requirement to class certification is closely tied to the typicality prerequisite. Because the Court finds that the proposed class representatives do not have claims typical of class members' claims, the representatives cannot be said to adequately represent those same members. See *In re Vioxx,* 239 F.R.D. at 460 ("the adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members"). Here, for the same reasons the typicality requirement fails, the adequacy requirement is left unsatisfied.

Because the Court has concluded that the Rule 23(a) criteria are not satisfied for the proposed class and sub-classes, generally, the inquiry could legitimately end here and class certification could be denied on that basis alone. However, the Court will continue with its analysis under Rule 23(b)(3) to show that, even if Plaintiffs had demonstrated that all the Rule 23(a) criteria were satisfied, class certification would still be appropriately denied.

**B. Rule 23(b)(3) Requirements**

In *Castano v. American Tobacco Company,* 84 F.3d 734 (5th Cir.1996), the Fifth Circuit made it clear that deciding whether common issues predominate and whether the class action is the superior method to resolve the controversy requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case. *Castano,* 84 F.3d at 744. Rule 23(b)(3)'s express language indicates that for a class or sub-classes to be certified under 23(b)(3), there must not simply be some commonality of issues among claims. Rather the issues that are common must predominate over individual issues.

**1. Predominance**

Plaintiffs allege that certain common issues of fact and law [FN14] predominate over individual issues such as causation and quantum. Plaintiffs claim to "plead the same legal and remedial theories under their respective subclass' state law with respect to the Defendants' conduct" which they claim will assure "class-wide proof and resolution of all significant, common elements of compensatory damage recovery, save for individual causation." (Rec .Doc. 764–2, p.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

17).

> FN14. Plaintiffs argue that all of the common questions listed by them (and summarized herein) constitute a "significant part" of each individual case, and form the common predicate for each claimant's proof of individual harm and recovery. Plaintiffs contend that class action management of these issues will assure fairness and uniformity, whereas individual proceedings would invite inconsistent results, unnecessary repetition, and the waste of judicial and litigant resources.

As for the proposed class and all six of the proposed sub-classes, Plaintiffs seek recovery from all manufacturers on behalf of any individual who resided for any length of time in an EHU provided by FEMA. Defendants complain that this definition is improper as each plaintiff could only reside in one manufacturer's EHU at a time, and no manufacturer can or should be held liable for a product it did not manufacture. Defendants also note that significant differences [FN15] exist in these EHUs, from manufacturer to manufacturer and even from unit to unit (even if manufactured by the same company).

> FN15. Such significant differences include, for example, the specifications for the EHUs, the quantities of any materials containing formaldehyde that make up the component parts of those EHUs, and how and when such EHUs were manufactured. (See Rec. Doc. 902, pp. 26–29).

*12 In addition to the differences existing as to the EHUs themselves, Defendants assert that there are significant and notable variations among the Plaintiffs that affect whether, and the extent to which, any plaintiff was exposed to formaldehyde and experienced health effects resulting from that exposure. (See Rec. Doc. 902, pp. 14–26). Plaintiffs vary by gender, age, personal medical history, family medical history, school, work environments, social environments, and personal lifestyle patterns (for example, whether they are pet owners, smokers, or both). Defendants argue that the extent to which Plaintiffs were exposed to formaldehyde and developed any health effects from that exposure varies according to which EHU the plaintiff lived in; the particular type of EHU, the manufacturer of the EHU, how the EHU was assem-

bled, where the EHU was fabricated, as well as where and how each EHU was installed for residency. Great variability also exists in the amount of time each plaintiff occupied his or her EHU and the number of hours per day each Plaintiff occupied the EHU.

This Court concludes that the predominance requirement is not satisfied for the proposed class or any of the proposed sub-classes. Indeed, the predominance test is "far more demanding" than the commonality test (which this Court has previously concluded is also not satisfied). *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (5th Cir.2005), citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 2249–50, 138 L.Ed.2d 689 (1997). "To predominate, common issues must form a significant part of individual cases." *In re Vioxx 2006,* 239 F.R.D. at 460, citing *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 626 (5th Cir.1999).

Judge Fallon denied class certification in the *In re Vioxx* MDL, determining that the issues among the proposed class members were so distinct and different, even though that case involved a single product from a single drug-maker, manufactured under controlled laboratory conditions, with a known prescribed dosage for each plaintiff, and with alleged damages essentially limited to heart attack and stroke. 239 F.R.D. at 463. This case provides far more reasons to deny class certification. The instant MDL involves hundreds of models of trailers, produced by dozens of different manufacturers. Moreover, even EHUs of the same make and model, made by the same manufacturer, can differ in regards to what components parts were used and when the EHU was manufactured.[FN16] Further complicating this aspect of these claims, and illustrating the difficulty of finding predominant common legal and factual issues, is that exposure to formaldehyde (in certain levels) is fairly common in today's society and is produced by the human body itself. (See Exhibit S–1 to Rec. Doc. 902, section 3; Exhibit S–2 to Rec. Doc. 902, p. 76). Indeed, the Fifth Circuit has previously explained:

> FN16. Even Plaintiffs' own wood-products expert, Dr. Stephen Smulski, admitted, "[C]ommon sense tells me that each manufacturer produces a different product by a different method using different workers in different plants, different raw materials, different models, different brands, et cetera."

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

(Exhibit Q to Rec. Doc. 902, p. 70). Also, another of Plaintiffs' experts, Dr. Judd Shellito, recognized that every individual reacts differently to formaldehyde and must be examined to determine which symptoms result from exposure to formaldehyde as opposed to one of the many other potential causes. (Exhibit P to Rec. Doc. 902, p. 33).

Formaldehyde is a colorless gas composed of carbon, hydrogen and oxygen. It is present in every cell in the human body and in the atmosphere. Formaldehyde has been in widespread commercial use for almost a century ... according to the industry, formaldehyde is a component of products aggregating 8% of this country's Gross National Product.... Such products as shampoo, toothpaste, cosmetics, and paper towels also contain formaldehyde. **\*13** *Gulf South Insulation v. U.S. Consumer Products Safety Commission,* 701 F.2d 1137, 1140 (5th Cir.1983).

As noted previously on page 24 of this opinion, there are many material factual distinctions (relating to age, gender, etc.) that make each Plaintiff unique. Also explained previously on page 24, each Plaintiffs' potential formaldehyde exposure and any resulting health effects vary according to several different factors. Each Plaintiff's habits vary greatly, resulting in the necessity for individualized inquiries delving into the use of heating and air conditioning, and also window or door use (important to how ventilated a particular EHU was). Some Plaintiffs are exposed to sources of formaldehyde and eye/nose/throat irritants unrelated to that said to be found in the EHUs (resulting from contact with air pollution, pesticides, pet dander, cleaning agents, mold, bacteria, and viruses). Many Plaintiffs are current and/or past smokers, or lived in EHUs with smokers. All of the above are individual issues that render analysis on a class-wide basis utterly impossible.

Further, as for the injuries to the Plaintiffs themselves, each one has suffered an individual physical injury that is specific to that particular individual, precluding the predominance of issues relating to the Plaintiffs themselves. Also, the personal injury claims among Plaintiffs vary greatly. [FN17] Considering the foregoing, this Court concludes that Plaintiffs' claims will, to a significant degree, be individualized with respect to causation and will include individual issues

of exposure, susceptibility to illness, and types of physical injuries. See *Steering Committee v. Exxon Mobil Corp.,* 461 F.3d 598, 602 (5th Cir.2006). As the district court properly noted in the *Steering Committee* case, "one set of operative facts would not establish liability and ... the end result would be a series of individual mini-trials which the predominance requirement is intended to prevent." *Id.*

FN17. Personal injury claims among Plaintiffs vary from alleged present injury to fear of future injury, from chronic disease to irritation, from new injury to exacerbation of a preexisting condition or injury, from physical injury to emotional distress. Others are also seeking purely economic damages in the form of medical expenses, lost wages, and under a theory of entitlement to lost housing subsidy.

As already noted herein, the EHUs provided by FEMA and manufactured by the numerous individual Manufacturing Defendants involved in this case vary greatly. Specifically, they vary in manufacturer, make, and model. Significant differences exist from manufacturer to manufacturer and from unit to unit (even with regard to the same manufacturer) in the design, manufacture, and production of these EHUs. Such differences include but are not limited to the types, quantities, age, and storage conditions of construction materials used to make up the EHU,[FN18] the methods used to construct the EHU,[FN19] the quality of construction of the EHU,[FN20] the types and quantities of components containing formaldehyde, whether the EHU residents added or installed their own formaldehyde-emitting materials (i.e., furniture, carpets, drapery or fabrics),[FN21] the transportation of the EHU from the plant to the resident,[FN22] the installation of the EHU,[FN23] and the geographic placement of the EHU.[FN24] Because of the above variables, formaldehyde levels vary greatly from EHU to EHU, resulting in the need for individualized inquiries on a trailer-by-trailer basis. Further, the individual variables affecting each Plaintiff (discussed above) make every plaintiff's exposure to formaldehyde in his or her particular EHU unique.

FN18. Exhibit D to Rec. Doc. 902, ¶ 13; Exhibit Q to Rec. Doc. 902,, pp. 51–51, 58.

FN19. Exhibit I to Rec. Doc. 902, ¶¶ 16–20.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

FN20. *Id.* at ¶ 21.

FN21. *Id.* at ¶ 23.

FN22. *Id.* at ¶ 25.

FN23. Exhibit I to Rec. Doc. 902, ¶ 26

FN24. *Id.* at ¶¶ 27–29; see also Exhibit Q to Rec. Doc. 902, pp. 86–87.

**\*14** Thus, for all the reason explained above, this Court concludes that Plaintiffs have failed to show that the predominance requirement is met for Rule 23(b)(3) purposes for the proposed class and sub-classes, generally.

## 2. Superiority

Rule 23(b)(3) requires that a district court find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). This rule explains that matters pertinent to these findings include: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation in the particular forum; and (4) the likely difficulties in managing a class action. *Id.* Plaintiffs claim that the above factors weigh in favor of class certification. Plaintiffs assert that, here, there is no foreseeable "interest" on behalf of a significant number of class members to individually prosecute their claims. Next, Plaintiffs contend that all cases filed with respect to this case have been filed in Louisiana or neighboring states and have been consolidated before this Court in the instant MDL, eliminating the need to consider both the extent and nature of the litigation already commenced and the desirability of concentrating Plaintiffs' claims in this forum. Finally, Plaintiffs argue that any "management" difficulties that this Court should encounter in the handling of this litigation as a class action will be minimal. In that regard, Plaintiffs assert that the class and subclasses "are easily discernible, and common issues of law and fact predominate with respect to this common disaster." (Rec.Doc.764–2, p. 21).

Defendants contend that litigating an individual case would be simple and could be narrowly focused on a specific model made by a specific manufacturer, resulting in a specific exposure, and concentrating on the unique symptoms allegedly experienced by the particular plaintiff. Defendants also note that determinations of specific causation and damages for any plaintiff would require a trial specific to only that plaintiff. Further, they claim that the question of causation would need to be answered for determination of the class definition. In other words, these determinations could not be made simply by trying the claims of the class representatives.

Next, Defendants assert that the class action Plaintiffs propose cannot be manageably tried. Defendants note that there are numerous class representatives (a few of whom were stricken after Defendants filed their opposition (See Rec. Doc. 948)), with each of them expected to testify and offer evidence on their own behalf. Currently, there are dozens of Manufacturing Defendants (some of which were dismissed without prejudice after Defendants filed their opposition). Defendants reason that each of those Manufacturing Defendants has the right to defend itself and, in that regard, to offer its own witnesses to refute Plaintiffs' claims. Defendants specifically note that ambient formaldehyde levels vary greatly from manufacturer to manufacturer. (Exhibit I to Rec. Doc. 902,¶¶ 11, 14–22). When considered together, Defendants argue that jurors may attribute damaging evidence as to one manufacturer against another manufacturer.

**\*15** Also, Defendants argue that another problem with superiority, and specifically a problem with managing this action, is the fact that federal law will govern several of Plaintiffs' claims while state law will govern the others.[FN25] Defendants claim serious management problems will result when federal law standards will have to be used for some Plaintiffs while and state law will have to be analyzed for others.

FN25. This Court has already recognized that HUD's standards govern the manufacture of mobile homes, while travel trailers and park models are exempt from HUD construction standards. (Rec.Doc.717, p. 4).

Last, Defendants assert that the Seventh Amendment [FN26] presents major obstacles to the

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

manageability of this MDL as a class action. Defendants note that the Fifth Circuit has recognized the limitations that arise in the handling of a class action because of the Seventh Amendment "right of a litigant to have only one jury pass on a common issue of fact." *State of Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 318 (5th Cir.1978). Regarding the Seventh Amendment, the Fifth Circuit has explained:

> FN26. The Seventh Amendment states:
>
>> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

Another factor weighing heavily in favor of individual trials is the risk that in order to make this class action manageable, the court will be forced to bifurcate issues in violation of the Seventh Amendment. This class action is permeated with individual issues, such as proximate causation, comparative negligence, reliance, and compensatory damages. In order to manage so many individual issues, the district court proposed to empanel a class jury to adjudicate common issues. A second jury, or a number of 'second' juries, will pass on the individual issues, either on a case-by-case basis or through group trials of individual plaintiffs. The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues. *Castano,* 84 F.3d at 750.

Considering these arguments, this Court concludes that Plaintiffs have failed in their burden of demonstrating that the superiority requirement is met. Here, the predominance of the individual issues present and sufficiently explained herein detract from the superiority of the class action device in this MDL. As Judge Fallon determined in the *Vioxx* MDL, "the difficulties in class management overwhelm any efficiencies that could be secured through classwide adjudication. *In re Vioxx,* 239 F.R.D. at 463. As argued by Defendants, the variations in law (state versus federal and state-to-state), the dozens of class representatives who would likely testify and offer evidence on their own behalf, the dozens of Manufacturing

Defendants who would likely want to defend themselves at trial by offering their own witnesses to refute Plaintiffs' claims, and the resulting potential for juror confusion based on all of the above prevent this Court from concluding that a class action approach would be superior to individual litigation this MDL.

While these general reasons are sufficient to defeat class certification of the proposed class and all six sub-classes, the Court, in an effort to be completely inclusive, will briefly address the separate sub-classes in an attempt to provide additional reasons why class certification is inappropriate as to each sub-class.

## IV. CLASS CERTIFICATION AS TO CLAIMS AGAINST DEFENDANT MANUFACTURERS—APPLYING SPECIFICALLY TO STATE–SPECIFIC SUBCLASSES

**\*16** In addition to all the general reasons set forth herein for why class certification is inappropriate, the Court offers the following additional analysis as to why certification of the state-specific sub-classes is inappropriate. First, the predominance requirement is not met. While Plaintiffs attempt to present significant class-wide issues of fact and law for each of the four applicable states (i.e., Louisiana, Mississippi, Texas, and Alabama),FN27 Defendants note that Plaintiffs are seeking damages for alleged personal injuries, and the very nature of a personal injury case is that it is *personal* (i.e., the alleged injury varies from person to person, as well as what caused or contributed to the alleged injury). This Court agrees with Defendants and concludes that any member of a proposed class is an inadequate representative of any other member because individualized issues (discussed previously herein on pp. 23–27) predominate over common issues.FN28

> FN27. As for the Louisiana sub-class, Plaintiffs assert that most significant class-wide issues of fact and law include (1) whether the Manufacturing Defendants designed and made EHUs that emitted dangerous levels of formaldehyde; (2) whether the Manufacturing Defendants' EHUs were unreasonably dangerous in normal use and/or reasonably anticipated misuse; (3) whether the Manufacturing Defendants failed to conform to the express warranties made regarding the fitness of their respective products; (4) whether the Manufacturing Defendants failed to properly

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

test the EHUs to properly evaluate the level of emissions of formaldehyde; and (5) whether the Manufacturing Defendants failed to warn the plaintiffs of the unreasonably dangerous nature of the EHUs or of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde.

In addition to those common issues, Plaintiffs claim, as for the Texas sub-class, that other class-wide issues of fact and law include: (1) whether the Manufacturing Defendants breached their duty to Plaintiffs in failing to act reasonably in the design, marketing, distribution and sale of the EHUs; (2) whether the Manufacturing Defendants failed to properly inspect the EHUs; and (3) whether the Manufacturing Defendants failed to sufficiently test the effects and/or the risks of formaldehyde fumes on the Plaintiffs.

As for the Mississippi sub-class, in addition the above, Plaintiffs assert that the following additional class-wide issues of fact and law include: (1) whether the Manufacturing Defendants knew or should have known that their products were defective; (2) whether the defective and unreasonably dangerous condition of the product proximately caused the damages and injuries sustained by Plaintiffs; (3) whether the Manufacturing Defendants properly selected and installed their respective products' component parts; and (4) whether an alternative design would have to a reasonable probability prevented the toxic exposure of the Plaintiffs.

As for the last state-specific sub-class (i.e., the Alabama sub-class), Plaintiffs reassert all the class-wide issues of fact and law listed above.

FN28. This finding was not reached based on Defendants' assertion that the variations in the laws of the four applicable states (i.e., Louisiana, Alabama, Mississippi, and Texas) preclude class certification. In that regard,

Defendants argue that because Plaintiffs have brought claims under the laws of four different states, this Court should consider the differing state laws relating to Plaintiffs' claims when analyzing whether class certification is appropriate. It is, indeed, true that variations in state law impact whether there are common issues of fact or law that predominate among the class members. See *Cole v. GMC,* 484 F.3d 717, 724 (5th Cir.2007). Defendants also argue that because Plaintiff's motion for class certification does not analyze choice of law issues, they have failed to meet their burden of showing that all the elements of class certification are met. It is true that when faced with a multi-state class action, a court must analyze how choice of law questions impact Rule 23's requirements before certifying a class. As the Fifth Circuit explained, differences in states' laws "may swamp any common issues and defeat predominance." *Castano,* 84 F.3d at 741. A court must "know which law it will apply before it makes its predominance determination." *Spence v. Glock, Ges.m.b.H.,* 227 F.3d 308, 313 (5th Cir.2000), citing *Castano,* 84 F.3d at 741. While Defendants argue that Plaintiffs have failed in their burden, this Court notes that Plaintiffs have seemingly attempted to avoid the need for choice of law analysis by requesting the certification of state-specific subclasses. Because each proposed subclass must independently meet all of the requirements of Rule 23 (Fed. R. Civ.Pro.23(c)(5)), separating the sub-classes by state alleviates the issue with variations in state law affecting the Court's class certification analysis; the law of the state of the particular proposed sub-class would apply. Thus, while many, many other reasons exist to deny class certification (as explained herein), Plaintiffs' failure to engage in choice of law analysis for the state specific sub-classes is not one of them.

## V. CLASS CERTIFICATION SPECIFICALLY AS TO FUTURE MEDICAL SERVICES SUB–CLASS

In addition to all the general reasons set forth herein for why class certification is inappropriate, the Court offers the following additional analysis as to why certification of the future medical services

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

sub-class (as defined in Plaintiffs' memorandum in support of their Motion for Class Certification, the December 2, 2008 class certification hearing, and in the Plaintiffs' post-hearing brief) is inappropriate.

As for the future medical services subclass, Plaintiffs contend that class-wide issues of law and fact include: (1) whether certain plaintiffs were significantly exposed to formaldehyde, a hazardous substance; (2) whether certain plaintiffs now suffer a significantly increased risk of contracting a serious latent disease, associated with formaldehyde exposure; (3) whether certain plaintiffs' risk of contracting such a disease is greater than (a) the risk of contracting the same disease had there been no exposure, and (b) the chances of members of the public at large of developing the disease; (4) whether a medical procedure exists that makes the early detection of any such diseases possible; (5) whether the future medical services regime for such detection is different from medical services recommended in the absence of exposure; and (6) whether there is some demonstrated clinical value in the early detection and diagnosis of any such diseases.

The Court agrees with Defendants, however, that the first two allegedly class-wide issues, exposure and increased risk, are actually individual issues. Both require an individualized analysis into which Plaintiffs should be included. [FN29] Further, whether an individual has been "significantly exposed" to formaldehyde will differ depending on several variables already discussed herein (i.e, past and present cigarette use, formaldehyde-containing cosmetics use, etc.). Indeed, an accurate exposure level for a class representative has no bearing on an accurate exposure level for any other member of the class because of these differing variables. Also, determining an individual's risk of developing a particular formaldehyde-related disease or injury is keyed to several individual factors, including level of exposure, duration of exposure, and other individual characteristics such as whether the person has other risk factors for contracting a particular injury or disease. Thus, the Court finds that an individual's risk cannot be determined on a class-wide basis, but instead, would have to be analyzed on an individual basis. This is true for all definitions of this proposed sub-class.

FN29. As Defendants note, Plaintiffs' use of the words "*certain* Plaintiffs" is telling.

Plaintiffs essentially admit that this analysis will not include *all* Plaintiffs.

**\*17** Defendants also point out that Plaintiffs fail to conduct choice of law analysis, which precludes a finding that they have satisfied their burden of demonstrating the predominance requirement. The medical monitoring sub-class [FN30] requires the application of laws of four different states as it purports to include residents of Texas, Louisiana, Alabama, and Mississippi. (See for example, Rec. Doc. 984, pp. 39–43). While Plaintiffs do make an attempt to demonstrate that such claims are available in all of these four states (See Rec. Doc. 764–2, pp. 22–24), they have failed to make any attempt to explain whether any individual variations in those states' laws are manageable here, or whether they would "swamp common issues of law and fact"; they have, thus, failed to satisfy this burden. See *Castano,* 84 F.3d at 741.

FN30. In this part of its discussion, the Court is referring to the proposed sub-class in the Plaintiffs' original motion for class certification. Defendants assert that the newly-proposed, but related, sub-class definition, first introduced during the December 2, 2008 class certification hearing, is far narrower and no longer seeks medical monitoring. (See Rec. Doc. 976, p. 1).

Referring specifically to the proposed sub-class definition introduced during the December 2, 2008 class certification hearing, the Court finds that that definition requires a determination of the level of formaldehyde in every EHU before a plaintiff even qualifies for class membership. That determination would require individualized analysis, essentially requiring perhaps a mini-trial to sort out each EHU. Thus, the Court finds that the predominance requirement is left unsatisfied for that defined sub-class as well.

As for the superiority requirement, Plaintiffs offer additional reasons why certifying this sub-class is allegedly the superior procedure. Plaintiffs allege that without a sub-class for future medical services, they could not bring an action designed to monitor the medical conditions of each subclass member for the purpose of ascertaining and responding to diseases caused by, contributed to, or exacerbated by the ex-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

posure of formaldehyde. Specifically, Plaintiffs claim that a future medical services subclass encompassing all individuals (or at a minimum, all children) who were exposed to formaldehyde while residing in an EHU in Louisiana, Texas, Mississippi, and Alabama provided by FEMA after Hurricanes Katrina and Rita is essential in order to monitor and treat the injuries that have resulted from that exposure. In that regard, Plaintiffs claim that damages in the form of future medical services are allowable under the state laws of Louisiana, Texas, Mississippi, and Alabama. (See Rec. Doc. 764–2, pp. 22–24). Here, Plaintiffs assert that each of them was exposed to formaldehyde as a result of residency in an EHU provided after Hurricanes Katrina and Rita. They further assert that because their experts (Dr. Judd Shellito, Dr. Ken Paris, and Dr. Patricia Williams) have identified an apparent, manifest injury to them (and especially to children), a future medical services subclass should be certified to set up and maintain a program by which Plaintiffs' injuries may be treated.

Plaintiffs analyze the medical effects of formaldehyde exposure to the general population in the memorandum in support of their motion for class certification. (See Rec. Doc. 764–2, pp. 25–30). Plaintiffs highlight that children are an especially susceptible population to the adverse medical effects of formaldehyde exposure. (See Rec. Doc. 764–2, pp. 30–32). Last, Plaintiffs analyze whether medical diagnosis, treatment, intervention, and management can positively reduce the quality of life impact that the alleged adverse health effects related to formaldehyde exposure can cause. (See Rec. Doc. 764–2, pp. 32–34). Plaintiffs essentially call for the development of a program [FN31] aimed to provide help to individuals (especially children) who have been adversely affected by hazardous levels of formaldehyde in the EHUs. They note that the majority of these children have no health insurance, and their families use the emergency rooms of hospitals as their primary care treatment. Plaintiffs reason that these affected children will lack the necessary resources to effectively manage formaldehyde-related problems, and the cost of this void in medical service will be borne in large part by the government, through Medicaid, rather than by those who created and/or contributed to the hazardous exposure in the first place (i.e, the Manufacturing Defendants). (See Transcript, December 2, 2008 class certification hearing, p. 150).

[FN31.] While Defendants spend considerable time summarizing the medical services program of Plaintiffs' expert, Dr. William Stein, an internist and oncologist (See Rec. Doc. 902, pp. 86–88), they acknowledge that Plaintiffs do not discuss this program in their memorandum in support of their motion for class certification. Instead, Plaintiffs make reference to a program focused on treating and educating children who already have asthma, explained by their expert Dr. Kenneth Paris, a pediatrician who specializes in the treatment of children with asthma. (Rec.Doc.764–2, pp. 32–33). Defendants claim that it is unclear how the program discussed in Plaintiffs' memorandum relates to the program proposed in the subclass definition. Specifically, Defendants assert that the program discussed in Plaintiffs' memorandum is far narrower than the sub-class definition and would only apply to children who have asthma. On that note, Defendants contend that even for children who already have asthma, a subclass cannot be used as an excuse to skip Plaintiffs' required proof that any particular class member's asthma was caused or exacerbated by formaldehyde exposure resulting from a defect in an EHU. Thus, Defendants assert that there is no advantage to using a subclass for this program instead of individual treatment and management of children diagnosed with asthma.

**\*18** Defendants argue that, before such a medical monitoring sub-class can be certified, it must be shown by Plaintiffs that (1) they have a manifest physical injury caused by formaldehyde; (2) they had significant exposure to formaldehyde which significantly increased their risk of contracting a latent disease caused by formaldehyde, and (3) that medical monitoring is appropriate when an accurate screening test exists that can detect disease in its latent phase and the disease is more successfully treated when screen-detected. As for the first factor, Plaintiffs lack a *single common* injury caused by formaldehyde,[FN32] so this sub-class is not suitable for class certification. Second, Plaintiffs' individual exposures vary. Thus, exposure cannot be tried representatively. For these reasons alone, the Court finds that this sub-class does not meet the predominance or superiority requirements necessary for class certification.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

FN32. As explained herein, there are over 45 symptoms that are or were experienced by EHU residents that are said to be formaldehyde-related. Arguably, each of these symptoms manifests in different ways and in different degrees in each individual.

Defendants also note that by requesting that a future medical services sub-class be certified, Plaintiffs are essentially attempting to gain the benefit of medical monitoring without treatment or injury.FN33 The Court agrees with Defendants' argument in this regard, and finds that Plaintiffs are indeed attempting to skip over the process of obtaining the requisite liability finding against the Manufacturing Defendants, by holding them responsible for funding a monitoring and treatment service that a jury may later deem was never their responsibility. In other words, the monitoring program requested by Plaintiffs seems to bypass a liability finding in favor of immediate medical monitoring and treatment. Even Plaintiffs' own expert pulmonologist, Dr. Shellito, acknowledged expressing "words of caution" to Plaintiffs regarding medical monitoring:

FN33. Defendants claim that the definition of this sub-class provides for members to be examined periodically by a doctor to determine whether they have developed a disease caused by formaldehyde and, if so, the receipt of treatment therefor. Thus, at least in their memorandum in support of their motion for class certification, Plaintiffs are essentially requesting monitoring *and* treatment. In an individual action (as opposed to a class action), in addition to proving an injury that was caused by formaldehyde (for treatment purposes), an individual who requested treatment and monitoring would also need to prove all the elements of a medical monitoring claim under applicable state law. Defendants argue that if the Court were to certify this sub-class, it would allow sub-class members to receive the monitoring part of the program regardless of whether they have a current injury or disease and regardless of whether they will suffer from a formaldehyde-caused injury or disease in the future. Defendants assert that some sub-class members would be monitored and never treated as some would never develop a current injury. Thus, according to Defendants, subclass members would be relieved of the burden that they would bear in an individual suit, relative to proving a current manifest injury or disease.

And referring to my words of caution, my words of caution would be that medical monitoring for any adverse health effect due to exposure—due to a toxic exposure should be carefully thought out and well justified.

(Exhibit P to Rec. Doc. 902, p. 20). While it is true that most individuals in today's society might benefit from some sort of "medical monitoring," Plaintiffs have failed to demonstrate to this Court why Defendant Manufacturers should be asked to pay for such a program without, first, a finding of liability against them. Ordering the creation of such a program, without first having a finding of liability on which to base it, is shaky ground on which to tread, and this Court declines to do so in this instance.

Another reason why this sub-class should not be certified is because this Court finds that the sub-class definition is imprecise, making it legally insufficient. As in *Snow v. Atofina Chemicals, Inc.*, 2006 WL 1008002 (E.D.Mich. March 31, 2006), there is no objective means here for either the Court or potential claimants to discern who qualifies for this subclass. As explained by the district court in *Snow:*

The problem with this proposed class definition is that the court could not determine whether any individual was a member of the class without hearing evidence on what would amount to the merits of each person's claim. Where that type of inquiry is needed to determine whether a person is a member of a class, the proposed class action is unmanageable virtually by definition.

**\*19** *Id.* at 9. Similarly here, Plaintiffs have failed to explain what criteria would be used to identify those who would be included in this sub-class without an individual assessment of every person who thinks that he or she should qualify. Also, because the Court has been presented with three different definitions of this sub-class (see footnote 1, *supra* ), the Court concludes that this sub-class is defined imprecisely and is, thus, legally insufficient.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

Next, Defendants contend that Plaintiffs, as a group, do not meet the "manifest physical injury" requirement, which is a prerequisite for medical monitoring in Texas, Louisiana, Mississippi, and Alabama. Plaintiffs, on the other hand, assert that they meet this requirement because the physical injury they claim to have suffered is in the form of "cellular and molecular" damage. (Rec.Doc.764–2, p. 22).[FN34]

> [FN34.] Plaintiffs' expert, Dr. Patricia Williams, espoused the theory that cellular and molecular changes involving formaldehyde constitute "manifest physical injury." Defendants argue that Dr. Williams is not qualified to give an opinion on this subject. They also assert and that her testimony is unreliable and irrelevant under *Daubert* standards, and there is a pending *Daubert* motion (Rec.Doc.860) relative to Dr. Williams. However, for all the reasons set forth in this opinion and because the Court finds that the numerous factual differences amongst proposed class and sub-class members preclude class certification, the Court does not even consider the opinions from Dr. Williams or any other experts regarding "manifest physical injury." In other words, this Court does not reach the issue of damages as the numerous factual distinctions present in this MDL preclude class certification. Thus, the Motion in Limine to Exclude Expert Testimony of Patricia M. Williams, PH.D., DABT (Rec.Doc.860) is denied as moot, without prejudice to Defendants' right to re-urge it in connection with trial on the merits.

Even without addressing the issue of damages and assuming that some injury has indeed been manifested for the proposed sub-class, as a whole, the Court would still be faced with the individualized inquiry of whether formaldehyde exposure resulting from EHUs *caused* those injuries. This is not an issue that can be determined on a class-wide basis, based on the numerous variables (discussed in detail herein) that affect this finding. (See Transcript, December 2, 2008 class certification hearing, p. 155). Other requirements of medical monitoring also require individual determinations, especially ascertaining whether a person has had a "significant" level of exposure to formaldehyde from an EHU, and whether a person's risk of contracting a serious latent disease has been signifi-

cantly increased. For all of the above reasons, certification of this sub-class is hereby denied.

## VI. CLASS CERTIFICATION AS TO CLAIMS AGAINST DEFENDANT MANUFACTURERS–APPLYING SPECIFICALLY TO ECONOMIC LOSS SUBCLASS

In addition to all the general reasons set forth herein for why class certification is inappropriate, the Court offers the following additional analysis as to why certification of the economic loss sub-class is appropriately denied.

Plaintiffs seek economic loss damages based upon breaches of implied warranties and redhibitory defects. (Rec.Doc.109, pp. 55–56, 66, 73). Here, Plaintiffs assert that while the Manufacturing Defendants represented their EHUs as fit for their ordinary purpose, the Defendants violated that implied warranty. Thus, Plaintiffs claim to have not received the benefit of their bargain as the EHUs were not fit for residential use.

First, this Court finds that the predominance requirement to certification of this sub-class is not met. While Plaintiffs contend that common, class-wide issues of law [FN35] predominate in the economic sub-class as each state has implied warranty legal theories available to Plaintiffs, Defendants assert that Plaintiffs' economic loss claims require an analysis of facts particular to every proposed sub-class member. However, citing this Court's acknowledgment in its October 3, 2008 Order and Reasons (Rec.Doc.717), Plaintiffs claim they should have been provided alternative housing that was habitable (i.e., safe). (See Transcript, December 2, 2008 class certification hearing, p. 141). Thus, they assert that the failure to provide safe housing violates the implied warranties of the Manufacturing Defendants. Plaintiffs further claim that because "safe housing" is not an issue that varies from state-to-state or person-to-person, this is a common issue that would predominate in this sub-class.

> [FN35.] Such class-wide issues of law identified by Plaintiffs include: (1) whether the EHUs are defective with respect to their ordinary purpose; (2) whether the EHUs were defective at the time they left the manufacturer's possession; and (3) whether the failure to provide safe housing for the use of plain-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

tiffs violated the implied warranties of the Manufacturing Defendants.

*20 Defendants, on the other hand, argue that the laws of Mississippi, Louisiana, and Texas require a determination as to whether every sub-class member was a "purchaser" of an EHU. (See Rec. Doc. 902, pp. 111–115). As for the laws of Alabama, Defendants further note that they require a determination of whether each sub-class member was a "purchaser" and whether privity of contract existed between the Plaintiff and a Manufacturing Defendant. (See Rec. Doc. 902, pp. 115–116). It is true that Plaintiffs have not limited the proposed economic damage subclass to actual purchasers of EHUs. Instead, Plaintiffs' proposed sub-class encompasses "[a]ll individuals to whom FEMA provided an emergency housing unit." (Rec .Doc. 764–2, p. 5). Thus, it appears to Defendants that the Court's determination of the claims of the economic loss subclass would depend on facts that are particular to each class member such that they cannot be resolved by class-wide basis.

Plaintiffs counter that damages can be easily determined on a class wide basis for such economic loss claims. In setting rental assistance payments, Plaintiffs claim that FEMA determined $786.00 per month was the average national fair market rent.[FN36] Where EHUs were provided, the homeowner or renters were ineligible for this financial assistance. (See Transcript, December 2, 2008 class certification hearing, p. 143). Thus, according to Plaintiffs, damages would be a simple mathematical calculation of $786.00, multiplied by the number of months each Plaintiff inhabited an EHU. In this regard, Plaintiffs claim that individual damages would not defeat class certification, because they would be susceptible to a formulaic determination.

FN36. This amount was the basis for FEMA's payments to qualified homeowners and renters whose housing was destroyed.

As explained previously herein, because of the numerous factual distinctions present in this MDL that make class certification inappropriate, this Court need not address how damages inquiries cannot be determined on a class-wide basis. However, Defendants' standing argument has, at least some, indirect affect on this issue. Defendants contend that Plaintiffs have failed to establish that the proposed economic subclass

members have standing to assert claims against them as Plaintiffs have failed to suffered an injury in fact, which is a requirement for standing. While Defendants acknowledge that Plaintiffs claim to have not received the benefit of their bargain, Defendants highlight the fact that Plaintiffs' failure to claim that the proposed subclass members entered into an agreement with any Defendant. Plaintiffs also fail to argue that the economic loss subclass members actually purchased EHUs. Defendants claim that Plaintiffs' attempt to focus on a measure of damages in this case (i.e, the monthly rental value of a safe habitable trailer) does not establish that they have suffered an actual economic injury.

Indeed, in *Rivera v. Wyeth–Ayerst Laboratories, 283 F.3d 315 (5th Cir.2002),* the Fifth Circuit reversed a district court's certification of a class where the plaintiffs, purchasers of an allegedly defective drug, argued that they were entitled to economic damages based on breach of implied warranty, but failed to articulate what economic injury was actually suffered by the proposed class members. The Fifth Circuit reasoned:

*21 The plaintiffs never define this "economic injury," but, instead, spend most of their brief listing helpful suggestions on how a court could calculate damages. These arguments are relevant (if at all) to redressability, not injury. Merely asking for money does not establish an injury in fact.

*Id.* at 319. Defendants claim that the same is true with Plaintiffs' proposed economic damages subclass. This Court agrees. While Plaintiffs have suggested what an appropriate award of damages might be, they have failed to articulate what economic injury, if any, was actually suffered by the proposed class members. Because of this, Plaintiffs have failed to establish that the proposed economic subclass members have standing to bring suit against them. Thus, this sub-class cannot be certified.

Last, the Court notes that Plaintiffs have failed to conduct choice of law analysis for the economic loss sub-class (which again requires the application of laws of four different states as it purports to include residents of Texas, Louisiana, Alabama, and Mississippi). Plaintiffs have the burden of explaining whether any individual variations in the laws are workable or whether they would "swamp common issues of law

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

and fact." *Castano,* 84 F.3d at 741. Plaintiffs have not made any attempt to do so, and thus, have failed to satisfy this burden. For all the above reasons, certification of this sub-class is inappropriate.

## VII. CLAIMS AGAINST THE GOVERNMENT

The named class representatives, on behalf of the putative class and sub-classes, have asserted the following causes of action against the United States/FEMA: liability under Louisiana Civil Code Articles 2316 and 2317. (See Rec. Doc. 764–2, p. 15).[FN37] Plaintiffs contend that these claims all arise out of the government's improper response to disclosures that the EHUs furnished to them were found to have unsafe levels of formaldehyde, claims which were discussed by the Court in its Order and Reasons filed October 3, 2008 (Rec.Doc.717). Plaintiffs assert that the class representatives' claims are typical of class claims in this regard, because class members were improperly allowed to remain in EHUs known to be unsafe, without proper warnings from FEMA prior to exposure. Thus, in this case, Plaintiffs argue that the representatives' claims satisfy the typicality requirement because they arise from the exact same course of conduct and share the same legal theory as do claims of the putative class, and that the class representatives will continue to advance the interests of all the class members.

> FN37. The stated delictual causes of action against the government appear to be asserted only under Louisiana law. (See Rec. Doc. 109, ¶¶ 98–131).

This Court disagrees. Plaintiffs' interactions with FEMA also vary greatly on an individual basis.[FN38] As the government contends in its response to Plaintiffs' motion for class certification, the required individualized assessment of putative class members renders class certification inappropriate. (Rec. Doc. 904, pp. 35–43 of 53). While some plaintiffs complained to FEMA on numerous occasions and had significant contact with FEMA to discuss issues with their EHUs, others reported no complaints to FEMA. Some plaintiffs requested and were allowed to purchase EHUs; others made no such request. Some representatives were offered the opportunity to relocate from their EHU after complaining about potential formaldehyde exposure; some were not. Some Plaintiffs who were offered the opportunity to relocate chose not to. (Exhibit A–50 to Rec. Doc. 902). All of these factual distinctions preclude a finding that the typicality requirement is met. Thus, class certification as to the government could be denied on this basis alone. However, in an effort to be completely inclusive, this Court will address several different reasons, which each render class certification of Plaintiffs' claims against the government inappropriate.

> FN38. As this Court previously noted in its October 3, 2008 Order and Reasons:
>
> ... each plaintiff will have different relevant facts that may or may not afford him/her such a claim. Some plaintiffs may not have a claim against FEMA in this litigation if they were neither supplied nor did they occupy such a travel trailer of park model after the starting date of such time period. As for each plaintiff involved in this litigation, the evidence will undoubtedly differ, just as the individual claims will differ. For instance, some plaintiffs will not have suffered any symptoms from the alleged formaldehyde exposure. Furthermore, those who do claim to have suffered side effects will surely differ as to which side effects each suffered and as to what extent those side effects manifested. Some plaintiffs may have complained about the alleged formaldehyde exposure while still in their EHUs; others will not have complained or voiced any concerns until after relocating from their EHUs. The evidence will also differ as to when FEMA selected an EHU for each plaintiff, when each plaintiff moved in to that EHU, and when each plaintiff moved out of that EHU ... Thus, whether and to what extent FEMA knew of the alleged formaldehyde concerns when these events occurred will likely need to be considered on a case by case basis.
>
> (Rec. Doc. 717, pp. 42–43; Transcript, December 2, 2008 class certification hearing, p. 160).

**\*22** Plaintiffs have failed to show that the numerosity requirement is met. As the government discusses at length in its response to Plaintiffs' motion for class certification, the majority of putative class

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

claimants who have made claims against the government have not exhausted the administrative process, thereby preventing the court from exercising jurisdiction over their potential tort claims. (See Rec. Doc. 904, pp. 26–35 of 53). Indeed, the government notes that there are only nineteen persons whose claims against the United States may be subject to the Court's jurisdiction at this time. (These nineteen individuals have already exercised their option to individually file an FTCA action against the United States). Thus, the government contends that it cannot be said that the joinder of these nineteen persons is "impracticable," and the Court agrees.[FN39]

> **FN39.** Though it is expected that other plaintiffs will complete the process of perfecting their claims such that the Court will have jurisdiction under the FTCA, the Court is unwilling, indeed unable, to consider jurisdiction of claims prospectively and in an anticipatory fashion.

As for the adequacy requirement, Plaintiffs allege that the interests of the plaintiff representatives do not conflict with the interests of the members of the class they seek to represent, as all seek similar relief. Plaintiffs explain that all are individuals who were injured as a result of exposure to formaldehyde from EHUs provided to them by the government, and all present claims for personal injury and property damage.

The Court concludes that because Plaintiffs' interactions with FEMA vary greatly on an individual basis and require an individualized assessment of putative class members (as explained exhaustively, *supra* ), no class representative can be said to adequately represent the interests of *all* of putative class members. Thus, the adequacy requirement is not met.

As for the predominance requirement, Plaintiffs contend that the following common issues exist in regard to the defendant United States/FEMA as to the proposed sub-classes: (1) whether FEMA knew or should have known at some point in time that the EHUs produced excessive formaldehyde emissions, which posed a health risk to plaintiffs; (2) whether FEMA was negligent in failing to ensure that the EHUs purchased and provided to them were habitable, functional, and suitable for their intended use; (3) whether FEMA, on first becoming aware of legitimate

concerns regarding formaldehyde exposure in the EHUs, should have (a) ceased and desisted in furnishing additional EHUs to Plaintiffs, and (b) issued appropriate and effective health warnings to those already residing in the EHUs.

For the reasons stated above, this Court concludes that, when considering the claims of putative class members against the government, individual issues predominate over any common questions of law or fact. A determination as to the merits of claims asserted against the government in this litigation will hinge on numerous individualized factual showings. Further, in examining those class members whose claims against the government are, at this time, potentially subject to the jurisdiction of this Court (i.e., those who have exhausted their administrative remedies by individually filing suit against the government), all such persons are already parties to this MDL. Thus, any common issues among this limited pool of persons can and will be effectively adjudicated through mass joinder.

**\*23** Specific to Plaintiffs' request to certify an economic sub-class against the government, they re-define their sub-class definition in their post-hearing brief as follows:

> All heads of households who have exhausted their administrative FTCA remedies and resided in FEMA EHU's from the date FEMA should have warned occupants of potentially dangerous formaldehyde levels and taken other appropriate measures through the date FEMA's actions would fall within the discretionary function exception.

(Rec.Doc.978, p. 11). Plaintiffs assert that, for predominance purposes, the following class-wide issues of law and fact include: (1) whether FEMA failed to provide safe and habitable EHUs; and (2) whether FEMA's failure to provide safe and habitable EHUs violated Plaintiffs' property interest. In this regard, Plaintiffs point the Court to the Eastern District case of *Mc Waters, et al. v. Federal Emergency Management Agency, et al., 436 F.Supp.2d 802 (E.D.La.2006),* wherein Judge Duval determined that hurricane victims had a property interest in FEMA assistance that was created by the Stafford Act and protected by the Due Process Clause of the U.S. Constitution. Similarly, Plaintiffs contend that the property rights of members of the proposed economic

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622
**(Cite as: 2008 WL 5423488 (E.D.La.))**

loss sub-class were denied when FEMA failed to provide safe and habitable trailers or other EHUs.

This Court concludes that Plaintiffs have failed in their burden of demonstrating that the predominance requirement is met. First, as for the applicability of the *Mc Waters* case to the scenario before this Court, it should be noted that the Fifth Circuit recently held that the Stafford Act, and its accompanying regulations governing the Individual Assistance housing program, even for persons who qualify for housing assistance, does not, in and of itself, create an entitlement to housing assistance. *See Ridgely v. FEMA,* 512 F.3d 727, 634–45 (5th Cir.2008). Further, to the extent that any putative class member has suffered a recoverable injury [FN40], the Court will need to determine on a individual basis whether the putative class member suffered any recoverable economic loss, such as lost income or damage to a leasehold interest. Such inquiries require individualized analysis and render certification of this sub-class against the government inappropriate.

> FN40. Such a finding would require an individualized assessment of class members regarding whether he/she was entitled to housing assistance; whether he/she received an EHU; and whether he/she had his/her use of the EHU impaired, and then to what extent.

Again, Plaintiffs note that damages can be easily determined for claims such as this on a class wide basis. In *McWaters,* the Court approved FEMA's use of $786.00 per month as a "fair market rent figure" for the majority of the victims. 463 F.Supp.2d at 827. Here, Plaintiffs assert that damages would be a simple mathematical calculation of $786.00 times the time period each Plaintiff inhabited the EHU. However, as described in reference to Plaintiffs' claims against the Manufacturing Defendants, because of the numerous factual distinctions that render class certification inappropriate on several grounds, this Court need not reach the issue of whether the damages issues could be decided on a class-wide basis.

## VIII. CONCLUSION

**\*24** Considering the foregoing, **IT IS ORDERED** that **Motion for Class Certification (Rec.Doc.764)** is **DENIED.**

**IT IS FURTHER ORDERED** that, for the reasons expressed in footnote 34, *supra,* the **Motion in Limine to Exclude Expert Testimony of Patricia M. Williams, PH.D., DABT (Rec.Doc.860)** is **DENIED AS MOOT,** without prejudice to Defendants' right to re-urge it in connection with trial on the merits.

E.D.La.,2008.
In re FEMA Trailer Formaldehyde Products Liability Litigation
Not Reported in F.Supp.2d, 2008 WL 5423488 (E.D.La.), 72 Fed.R.Serv.3d 622

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
In the Matter of AMERICAN COMMERCIAL
LINES, LLC, as Owner of the Barge LCD 4907, and
American Commercial Barge Line LLC as Charterer
and Operator of the Barge LCD 4907, Praying for
Exoneration from and/or Limitation of Liability

Nos. Civ.A. 00-252, Civ.A. 00-2967, Civ.A. 00-3147.
May 28, 2002.

MEMORANDUM OPINION DENYING CLASS
CERTIFICATION

ENGELHARDT, J.

**\*1** Before the Court is plaintiffs/claimants motion,[FN1] seeking certification of a class described as follows:

> **FN1.** See Plaintiffs' Motion for Class Certification [Rec. Doc. No. 38].

[A]ll persons and/or entities who suffered injury and/or damage as a result of the subsequent release of toxic and hazardous substances, namely, diesel oil, from a barge in the Mississippi River, near the Orion Dock in St. Charles Parish at or about 9:45 p.m., and continuing for several hours on 7/28/99;[FN2] or

> **FN2.** See Class Action Petition for Damages, at paragraph 2, filed in the matter entitled *Margie Richard, et al, v. American Commercial Lines LLC, et al,* Docket No. 53,756, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt.# 00cv2967 "N", Rec. Doc. No. 3].

[A]ll persons and/or other entities residing in the Parish of St. Charles, State of Louisiana, and who reside in geographic proximity to the Mississippi River, and who or which have sustained damages arising from the release and emission(s) of diesel fuel, which was released from the barge LCD 4907 and/or the Orion Refining Corporation's facility, including, specifically, all persons who reside in the

Parish of St. Charles, State of Louisiana, who have sustained damages, physical, mental and/or emotional injuries, fright, inconvenience, and interruption of or intrusion into their personal lives as a direct consequence of this spill/release.[FN3]

> **FN3.** See Petition for Damages and for Class Action Certification, at paragraph 3, filed in the matter entitled *Aaron Brown, et al. v. Orion Refining Corp., et al,* Docket No. 53,737E, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt .# 00cv3147 "N", Rec. Doc. No. 1].

An evidentiary hearing was conducted on April 24, 2002. Having considered the putative class action plaintiffs' complaints, motion for class certification,[FN4] the submissions of the parties, the evidence adduced at the oral hearing, the post-hearing briefs,[FN5] the record and the applicable law, the Court is confident that the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b)(3) are not met. For the following reasons, the putative class plaintiffs' motion for certification is DENIED.

> **FN4.** Rec. Doc. No. 38.

> **FN5.** Plaintiffs' Post-Hearing Memorandum in Support of Class Action Certification [Rec. Doc. No. 197]; and Defendants' Post-Hearing Brief in Opposition to Class Certification [Rec. Doc. No. 196].

## I. BACKGROUND

This matter arises out of an incident that occurred on July 28, 1999 at approximately 9:45 p.m., involving a spill of diesel fuel into the Mississippi River near the intake, infrastructure, valves and pipeline for the water system supplying east bank residents of St. Charles Parish, Louisiana.[FN6] Putative class action plaintiffs submit that the quantity of # 2 diesel oil spilled into the Mississippi River was reported as five barrels or 210 gallons, but could have been as much 2,795 gallons of diesel fuel (*i.e.,* the estimated spill quantity reported in the December 28, 1999 Coast Guard penalty report, assessing a $5,000.00 penalty

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

against petitioner-in-limitation, American Commercial Lines, LLC ("ACBL")) .[FN7]

> [FN6.] Testimony of Charles Toth, former director of the St. Charles Water Works.

> [FN7.] See Report of A.J. Englande, Jr. [Plaintiffs' Exhibit Englande "2"].

The plaintiffs originally filed petitions for damages arising out of the spill event in state court pursuant to Louisiana Code of Civil Procedure Article 591, asserting their claims under Louisiana negligence and strict liability law,[FN8] and that they are entitled to maintain their causes as a class action.[FN9] Defendants removed claimants' state court lawsuits,[FN10] asserting the original jurisdiction of the federal court pursuant to the Admiralty Extension Act ("AEA"), 46 U.S.C. § 740, over the class action claims against Orion Refining Corporation ("Orion") and the Parish of St. Charles ("the Parish").[FN11] Putative class plaintiffs' lawsuits arising out of the July 28, 1999 spill at Orion's dock involved ACBL's tanker barge (Barge LCD 4907), and thus were consolidated with ACBL's related limitation action filed pursuant to 46 U.S.C. § 183.

> [FN8.] See Louisiana Civil Code Articles 2315 and 2317.

> [FN9.] See Class Action Petition for Damages [USDC/EDLA Dkt.# 00cv2967 "N", Rec. Doc. No. 3]; and Petition for Damages and Class Action Certification [USDC/EDLA Dkt.# 00cv3147 "N", Rec. Doc. No. 1].

> [FN10.] See Notice of Removal filed in *Aaron Brown, et al. v. Orion Refining Corp., et al,* Docket No. 53,737E, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt.# 00cv3147 "N" Rec. Doc. No. 1]; and Notice of Removal filed in *Margie Richard, et al, v. American Commercial Lines LLC, et al,* Docket No. 53,756, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt. # 00cv2967 "N", Rec. Doc. No. 3].

> [FN11.] The AEA provides in pertinent part: "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damages or injury be done or consummated on land." 46 U.S.C. § 740.

**\*2** Putative class action plaintiffs' complaints involve allegations of physical and emotional injuries allegedly sustained by various residents of the close-knit community of east bank St. Charles Parish, living in the area known as Norco, Louisiana. Putative class plaintiffs claim physical and mental injuries on account of both inhalation and drinking toxic elements of the spilled diesel, which migrated down river and infiltrated the Parish's east bank waterworks system supplying Norco residents.

Putative class plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(3), which applies to suits seeking compensatory damages involving common questions of law or fact which predominate over any questions affecting only individual members, such that a class action is the superior method of adjudicating the controversy fairly and efficiently. The predicate to the plaintiffs' claims is that exposure to the vapors and drinking water contaminated by the elements of diesel fuel from the spill caused their personal injuries. Plaintiffs assert that the exposure that gave rise to their injuries occurred during the twenty-four hour period following the spill on the evening (*i.e.,* 9:45 p.m.) of July 28, 1999. They contend that injury and causation can and should be addressed within this time frame since the universe of injured claimants are confined to those east bank residents of St. Charles Parish, and that the class-action format is the superior method of adjudicating their claims because common issues predominate.

II. CLASS CERTIFICATION STANDARDS

Rule 23 of the Federal Rules of Civil Procedure governs class actions. The rule requires that the court determine, "as soon as practicable" after an action brought on behalf of a class is commenced, whether the suit meets the class certification requirements such that the case should proceed as a class.[FN12] A class action is not maintainable as such simply because the lawsuit designates the cause as a class action. It is not disputed that the class action proposed in this case must satisfy the requirements for certification outlined in Rule 23(a) and (b).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

FN12. See Fed.R.Civ.P. 23(c)(1); *Castano v. American Tobacco Company,* 84 F.3d 734, 741 (5th Cir.1996).

In ruling upon a motion for class certification, courts treat the substantive allegations contained in the plaintiffs' complaint as true. The issue is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.[FN13] The court may look past the pleadings to the record and any other completed discovery to make a determination as to the class certification issue.[FN14]

FN13. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 2153 (1974); see also *Burrell v. Crown Central Petroleum, Inc.,* 197 F.R.D. 284, 286 (E.D.Tex.2000); and *In re Lease Oil Antitrust Litigation,* 186 F.R.D. 403, 418 (S.D.Tex.1999).

FN14. See *General Telephone Company v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2371-72 (1982)(noting the district court's duty to conduct a "rigorous analysis" before granting class certification and holding that a decision on class certification remains a fact specific determination); *Spence v. Glock,* 227 F.3d 308, 310 (5th Cir.2000); and *Castano v. American Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996).

At the outset, Rule 23(a) sets forth four threshold requirements which must be met in every type of class action case.[FN15] Rule 23(a) requires that a class: (1) be so numerous that joinder of all members is impractical [numerosity]; (2) have common questions of fact or law [commonality]; (3) have representative parties with typical claims or defenses [typicality]; and (4) have representative parties that will fairly and adequately protect the interests of the proposed class [adequacy].[FN16] The first two requirements focus on the characteristics of the class; the second two focus instead on the desired characteristics of the class representatives. The rule is designed "to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests."[FN17]

FN15. See *James v. City of Dallas,* 254 F.3d 551, 569 (5th Cir.2001).

FN16. See Fed.R.Civ.P. 23(a); *Spence v. Glock,* 227 F.3d at 310 n. 4; *James v. City of Dallas,* 254 F.3d at 569.

FN17. *In re Lease Oil Antitrust Litigation,* 186 F.R.D. at 419 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Litigation,* 55 F.3d 768, 799 (3rd Cir.1995)).

**\*3** If the Rule 23(a) criteria are satisfied, the plaintiffs must show that class treatment is appropriate under one of three alternative class categories prescribed by Rule 23(b).[FN18] Plaintiffs claim only monetary damages, and explicitly seek certification solely pursuant to Rule 23(b)(3), which sets out two requirements-predominance and superiority. See Fed.R.Civ.P. 23(b)(3). Subsection (b) provides that:

FN18. See Fed.R.Civ.P. 23(b); *James v. City of Dallas,* 254 F.3d at 568.

(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

...

(3) the court finds that the *questions of law or fact common to the members of the class predominate* over any questions affecting only individual members, *and* that a *class action is superior* to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.[FN19]

FN19. Fed.R.Civ.P. 23(b)(3) (emphasis supplied).

To pass muster under Rule 23(b)(3), plaintiffs

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

must sufficiently demonstrate both predominance of common class issues and that the class action mechanism is the superior method of adjudicating the case.[FN20] Together, subsection (a) and (b) requirements insure that a proposed class has "sufficient unity so that absent class members can fairly be bound by decisions of the class representatives."[FN21]

> FN20. See *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 623-24 (5th Cir.1999)(citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614 (1997)).

> FN21. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2246 (1997).

In *Allison v. Citgo Petroleum,*[FN22] the Fifth Circuit explained the different categories of class actions detailed in Rule 23(b), as follows:

> FN22. *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998).

Under Rule 23, the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class members to pursue their claims separately or not at all. The different types of class actions are categorized according to the nature or effect of the relief being sought. The (b)(1) class action encompasses cases in which the defendant is obliged to treat class members alike or where class members are making claims against a fund insufficient to satisfy all claims. The (b)(2) class action, on the other hand, was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary. Finally, the (b)(3) class action was intended to dispose of all other cases in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages. Limiting the different categories of class actions to specific kinds of relief clearly reflects a concern for how the interests of the class member will vary, depending on the nature of the class injury alleged and the nature of the relief sought.[FN23]

> FN23. *Id.* at 411-12.

**\*4** A class seeking substantial money damages will more likely consist of members with divergent interests.[FN24] Recognizing that monetary damages are more often related directly to the disparate merits of individual claims, the drafters of the rule saw fit to provide prospective (b)(3) class members the absolute right to notice, to opt out and not be bound by membership in a class.[FN25] Rule 23(b)(3) applies to cases for which a class action would achieve economies of time, effort, and expense, promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.[FN26] Whether common issues predominate and the class action is superior requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case.[FN27]

> FN24. *Id.* at 412.

> FN25. *Id.*

> FN26. See *Amchem,* 521 U.S. at 615, 117 S.Ct. at 2246.

> FN27. See *Berger v. Compaq Computer Corporation,* 257 F.3d 475, 483 (5th Cir.2001)(" '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." ' *Castano,* 84 F.3d at 744.).

In the case at bar the plaintiffs bear the burden of proving that: (1) the proposed class satisfies all of the elements of Rule 23(a); and (2) the proposed class also satisfies both requirements of Rule 23(b)(3).[FN28] Within the confines of Rule 23, a district court maintains substantial discretion in determining whether to certify a class.[FN29] In the absence of proof of all required elements, the court may not certify a class.[FN30] The Court addresses the plaintiffs' proof as to requisite elements of a Rule 23(b)(3) class action serially herein.

> FN28. See *Spence v. Glock,* 227 F.3d at 310; *Berger,* 257 F.3d at 479-80; *Mullen,* 186 F.3d at 623; and *Castano,* 84 F.3d at 743-44 (holding that a court cannot rely on assurances of counsel that any problem with predominance or superiority can be overcome).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

FN29. See *Smith v. Texaco,* 263 F.3d 394, 403 (5th Cir.2001)(recognizing that the certification inquiry is essentially fact based and thus the Fifth Circuit defers to the district court's inherent power to manage and control pending litigation, reviewing certification decisions only for abuse of discretion).

FN30. See *Berger,* 257 F.3d at 479-80.

### III. EVIDENTIARY HEARING

Margie Richard ("Richard"), a retired teacher and student in theology who is active in the community affairs of the residents of Norco, Louisiana, testified that she presently lives on west bank of the river in Destrehan. However, at the time of the incident she lived on 28 Washington Street in Norco, Louisiana, where she had lived most of her life. Ms. Richard, admittedly "*not* a water drinker," testified that she did drink some on the morning of June 29, 1999 when taking her medications, and also used the water bathing. She testified that at night on June 29th, she could smell a diesel odor when she turned on the water. She experienced a throat irritation two days later, headache, stomach ache, nausea and panic. Her symptoms lasted approximately a month.

Richard testified that she is the type of individual that takes care of herself and was fearful of chronic effects, so she saw Dr. Alleman, and was given ampicillin for the irritation of her throat. She further testified that she had previously been a victim and explained in cross-examination that she participated in another class action against Union Carbide for exposure to a steam release allegedly containing methyl ethyl ketone ("MEK"). As to her awareness of any other individuals in the community who exhibited symptoms, Richard testified that her children had sensitive skin, and were scratching because they had taken a bath in the tainted water. She also testified that they experienced some diarrhea. When asked about her awareness of other residents' problems with respect to the exposure involved in this particular case, Richard simply testified that the incident was the talk of the town without any further explanation. Richard testified that she is a member of the board of the environmental justice department associated with Tulane, Louisiana State University ("LSU"), Rutgers and Xavier University, and that she is involved with community monitoring of environmental issues affiliated with the Environmental Protection Agency Board for the Petroleum Sector.

**\*5** Gaynell Marie Johnson ("Johnson") testified that at the time of the subject spill, she lived at 123 Diamond Road in Norco, Louisiana. Ms. Johnson also no longer resides in Norco, but has since moved to Laplace, Louisiana. She admittedly suffered from a number of medical conditions at the time of the spill, including arthritis, a heart condition, residuals from a stroke in 1992, and asthma. Johnson testified that both she and her husband are disabled. On the evening of July 28, 1999, Johnson testified that she stayed up late making a gumbo and drank about two glasses of water. Unlike Richard, who simply drank water to take her medications, Johnson testified that she was a "water drinker," *i.e.,* she habitually drank a lot of water every day. Johnson testified that she became very sick that night with nausea and stomach cramps at approximately 1:00 a.m. in the morning. She testified her husband experienced similar symptoms. Her symptoms subsided by noon the next day and her husband's symptoms got better in one to two days.

Johnson also testified that she was a volunteer in the community organization, Concerned Citizens of Norco, which was formed to help protect the community from exposure to chemicals allegedly emanating from the chemical plants in the area. When questioned about any fear she experienced along with her nausea and cramping, Johnson stated matter-of-factly that she is always fearful, explaining that she lived in fear because of the community's situation between two chemical plants. Smith was cross-examined regarding her prior deposition testimony regarding her belief in filing law suits as a form of protest to "teach" the chemical plants "a lesson."

Samuel Price ("Price") testified that he tasted the water at around noon on June 29th, and approximately 15 minutes later, he began experiencing symptoms. Price testified that he and his wife suffered about three days with nausea after the spill. According to Price, that brief illness did not result in any change in his lifestyle.

Alvin Smith ("Smith") testified *via* deposition that the water smelled and tasted "greasy." Two of his daughters vomited, and the rest in his family felt "queasy." Smith further testified that he experienced some nausea, and dizziness or light-headedness, but

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

that could be attributable to "senility."[FN31] Smith did not see a doctor. Smith testified that as soon as he and members of his family noticed the problem with the water on the morning of July 29, 1999, they stopped drinking it.[FN32] Their symptoms lasted only a couple of days.[FN33] Smith acknowledged that he lived within blocks of Diamond and Washington Streets, emphasizing that the affected community of Norco, Louisiana, is very small, bounded by the Shell Refinery on one side and the Shell chemical plant on the other.[FN34]

> FN31. Deposition of Alvin Smith, at p. 49 [Plaintiffs' Exhibit Smith "1"].

> FN32. *Id.* at pp. 45-50.

> FN33. *Id.* at p. 46.

> FN34. *Id.* at pp. 54, 56 (noting that Diamond was the "Canal Street" of Norco, dividing the community in half).

Shelley Moliere Rainey ("Rainey") testified *via* deposition that she first noticed the taste and an odor similar to that of "exhaust" on the morning of July 29th, when she took a vitamin.[FN35] Rainey and her son live at home with her parents, brothers and sisters on Ormond Boulevard in Norco, Louisiana. Rainey testified that she was the only one in her household who noticed and commented about the water on the morning after the spill. Rainey proceeded to work that day, and drank about a half of a cup of the water at work in the form of herbal tea on that afternoon of July 29, 2002. She testified that other office workers commented that something was wrong with the water.[FN36] Rainey did not find out that there had been a chemical spill until the afternoon. She experienced symptoms on the evening of July 29th, 1999, consisting of a nauseated feeling and a hoarseness in her throat. She did not miss any work or any activities, and did not see a doctor on account of her symptoms.[FN37] Rainey testified that she did not consult a physician until the early part of 2002, and then only pursuant to her lawyer's recommendation, "to make sure everything was okay."[FN38] Her symptoms lasted only about a day and a half. Rainey's two year old son experienced dry skin problems in the days following the incident. The skin condition was treated with Nizoral[FN39] cream. Rainey could not recall complaints from anyone else in the family. She also did not know if any of her co-workers suffered ill-effects. Other than her

own experience with the water on July 29, 2002, Rainey did not know much about the incident, and was unaware of individuals in the community who might have been affected. She could recall no complaints of sickness or injury from anyone and never noticed anyone getting sick, except for her own slow feeling and her son's dry skin patches.[FN40] It is clear from Rainey's deposition testimony that the sum and substance of what she knows about the incident, and the effect, if any, it had on the community, emanates either from her attorney or the workplace "rumor mill."

> FN35. Deposition of Shelley Moliere-Rainey, at pp. 13-15 [Plaintiffs' Exhibit Rainey "1"].

> FN36. *Id.* at 16.

> FN37. *Id.* at 24.

> FN38. *Id.* at 25.

> FN39. Nizoral cream (ketoconazole) is a broad spectrum antifungal agent which inhibits the *in vitro* growth of common dermatophytes and yeasts by altering the permeability of the cell membrane. *In vitro* studies suggest that ketoconazole impairs the synthesis of ergosteraol (a vital component of the fungal cell membrane). It is indicated for topical use in treatment of skin fungi and yeast infections and in the treatment of sebborrheic dermatitis. Its safety and effectiveness for pediatric use have not been established. See Physician's Desk Reference (PDR), 53rd edition (1999), at p. 1427.

> FN40. Deposition of Shelly Moliere-Rainey, at pp. 26-28.

**\*6** Scouring the fifty service orders[FN41] submitted by St. Charles Parish east bank residents for reports of illness, the Court found only one contemporaneous complaint of illness related by a Norco resident named Joan Vass (*i.e.,* "hurting stomach"). Not one of the other forty-nine service orders report a complaint of any illness experienced by east bank residents of St. Charles Parish. The service orders uniformly report complaints of a bad, strong, or oily smell or bad or chemical taste, or both.[FN42]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 7346-1   Filed 09/07/12   Page 89 of 103

Page 7

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

FN41. See St. Charles Parish Department of Waterworks' Service Orders dated July 29 and 30, 1999 [Plaintiffs' Exhibit Toth "4" *in globo* ].

FN42. Forty-four of the service orders contain notations regarding the bad smell of the water, and only fifteen mention the bad taste, or both bad taste and smell. *Id.*

Dr. Evans testified *via* deposition that he had the occasion to see only two of the St. Charles residents who complained of ill-effects, which they related to exposure to diesel. The two patients were not evaluated by Dr. Evans until January of 2002, a year and a half after the subject incident.[FN43] Dr. Evans, a general practitioner in the New Orleans area, testified that he had seen no other patients relating symptoms to the July 28, 1999 spill.[FN44] The only other medical records memorializing any complaints of physical, mental or emotional injury suffered by residents of St. Charles Parish are those of Dr. Earl Alleman, regarding Margie Richard's one visit on August 31, 1999, over a month after the spill, relating her complaints of nausea, diarrhea and headaches to her exposure to diesel oil in the water on July 28, 1999. Dr. Alleman's records regarding Gaynell Johnson's August 16, 1999 visit do not relate her symptoms of gastro-enteritis to diesel oil in the water and do not mention the spill of July 28, 1999.[FN45]

FN43. See Deposition of Dr. Henry M. Evans, Jr., at pp. 16-19, 23-24, 85-109 [Plaintiffs' Exhibit Evans "2"].

FN44. *Id.* at pp. 23-24.

FN45. See Dr. Earl Alleman's Records dated 8/31/99 and 8/16/99 [Joint Exhibit "3"].

Plaintiffs also called Charles Toth, the director of St. Charles Parish Waterworks at the time of the July 28, 1999 spill, as a witness at the evidentiary hearing. He testified that at around 7:00 a.m. on July 29th, Grant Walsh, a senior technician at the east bank waterworks facility, noticed an odor of diesel in the parking lot upon his arrival for work. When he entered the plant, Walsh noticed a petrol sheen on the surface of the water clarifiers. Plant intake was shut down as a precautionary measure. Flushing was initiated to rid the distribution system of tainted water. Neighborhood complaints were received, however, within a two day period, the Norco residents' complaints ceased. Mr. Toth testified that testing accomplished by certified laboratories on July 29th and 30th indicated the presence of elements of diesel far below the level necessary to produce ill health effects.[FN46]

FN46. See also Expert Report of Dr. William George, Professor of Pharmacology and Director of Toxicology at Tulane University School of Medicine, dated April 11, 1993, which similarly provides that: (1) symptoms such as headache, nausea, dizziness, etc. are unlikely in the case of residents, who did not claim exposure to high concentrations of diesel vapor in the air, but rather claim exposure in the course of bathing in and/or consuming contaminated water; (2) the low concentration of diesel/components in the processed water, which according to tests results, contained less that 1 part per million ("ppm") of diesel (*i.e.,* less than the minimal detection levels; and (3) at such low levels there would be no expected adverse health effects. [Defendant's Exhibit George "3"].

Dr. Henry Evans, plaintiffs' expert witness, who had the occasion to evaluate two patients in January of 2002, long after the incident in question, did not hold himself out as an expert in the field of toxicology.[FN47] Dr. Evans agreed that there was a *de minimus* exposure level of diesel/water concentration, a minimal level below concentration which would not cause any harm to the average human being. However, he expressed no opinion as to what level or range that might be, whether 1 ppm or 50 ppm.[FN48]

FN47. See Deposition of Dr. Henry Evans, at pp.24-31 [Plaintiff's Exhibit Evans "2"].

FN48. *Id.* at 50-52, 56, 57.

**\*7** Although the merits of the plaintiffs' substantive allegations are not the focus of the Court's inquiry in making a determination with respect to the issue of certification, plaintiffs submitted expert reports and/or deposition testimony of several expert witnesses whose perfunctory opinions pertain to the merits, but are not grounded in the facts of this case at all, and

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

thus provide only superficial analysis. Whereas plaintiffs' experts in the fields of chemistry, environmental engineering, and toxicology,*i.e.,* Dr. Gordon Goldman, A.J. Englande, and Sharee Rusnak, may be experts in their respective fields of study, their opinions as to causation-in-fact and the credibility of complainants' alleged symptomotology lend little, if any, assistance to this Court in making a determination on the issues inherent in the certification analysis. To the extent that such experts' opinions are relevant, they reinforce this Court's opinion that the predominance factor is not met in this case.[FN49]

FN49. See note 78 *infra,* and accompanying discussion at pp. 26-27.

As previously discussed, for purposes of discussion and analysis of the appropriate factors, the Court assumes that diesel from the July 28, 1999 spill at Orion's dock entered the St. Charles Parish waterworks plant on the east bank of the river, that drinking water tainted with elemental components of diesel of an undetermined concentration was distributed to the homes of putative class plaintiffs (residents of Norco, Louisiana), and that some residents suffered injuries on account of the presence of elements of diesel in their drinking water.

### IV. DISCUSSION
#### A. *Rule 23(a) Requirements*
##### 1. Rule 23(a)(1): Numerosity

As to numerosity, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.[FN50] Numerically speaking, a class of over one hundred members is sufficient for purposes of numerosity and actual numbers are not determinative of the inquiry.[FN51] In addition to numbers, factors relevant to the numerosity inquiry include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim.[FN52]

FN50. See *James,* 254 F.3d at 570.

FN51. See *Street v. Diamond Offshore Drilling,* 2001 WL 568111, at 4 (E.D.La. May 25, 2001)(Duval, J.)("Although the number of members in a proposed class is not determinative of whether joinder is impracticable, it has been noted that any class con-

sisting of more than forty members 'should raise a presumption that joinder is impracticable." ')

FN52. See *Mullen,* 186 F.3d at 624.

Plaintiffs presented very little evidence to the Court in satisfaction of the numerosity inquiry. In terms of sheer numbers of physically, mentally and emotionally injured potential class members, direct evidence of such was absent. Moreover, consideration of the concise geographical area to which the exposure was confined, together with the fact that the individuals affected were members of a very close-knit community, militates against a finding of numerosity.

The fact remains that class members may not have much incentive to bring individual actions because of the amount of perceived damages. Assuming that injuries were sustained on account of the spill, it appears from the evidence adduced at the evidentiary hearing that only in the rare case (*i.e.,* the case of the two or three of the named putative class plaintiffs) did such illness or injury either warrant any contemporaneous complaint of illness to Parish officials, a local doctor, or even to a lawyer. Whether due to the admitted short period of exposure to the elements of diesel fuel from the spill, or other factors, evidence adduced at the evidentiary hearing and discernible from the record are insufficient to allow the Court to presume, for the purposes of the pending motion, that the class would contain a sufficiently large number of members *whose joinder would be impracticable.*

**\*8** In sum, the named representative plaintiffs' own accounts admit that the Norco community affected in any manner or means by the July 28, 1999 spill is indeed a succinct, easily identifiable group of people, all residing in close proximity. Parish waterworks records reflect some 50 complaints of bad taste, bad odor, or both, within a day or two following the incident, with only one complaint of illness. The resident physician, Dr. Earl Alleman, apparently treated only two patients, one of whom related her illness to the spill incident, and then only after a full month elapsed. Putative class plaintiffs produced no evidence to the effect that area hospitals, health care providers, and/or physicians had more than the usual numbers of patients in general, or that area businesses were adversely affected or even mildly interrupted by a twenty-four hour water quality problem experienced

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

on account of the spill. Rather, the evidence suggests that less than ten Norco residents related symptoms of nausea, diarrhea, or headaches to a health care professional within the days or weeks following the incident.

On the other hand, assuming without deciding that the 1600 sworn statements of Norco residents/claimants in the limitation proceeding (*i.e.,* relating one or more illnesses to their exposure to diesel on account of the July 28, 1999 spill) suffice for purposes of Rule 23(a)(1)'s "numerosity" requirement, the Court will proceed with its analysis of the certification issues.

2. Rule 23(a)(2): Commonality

The test of commonality is not demanding.[FN53] The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members.[FN54] The fact that some of the plaintiffs may have different claims, or claims that may require individualized analysis, will not defeat commonality.[FN55]

FN53. See *Mullen,* 186 F.3d at 625.

FN54. *James,* 254 F.3d at 570(citing *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993)(quoting *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982)).

FN55. *Id.*

In this case, the potential members of the plaintiffs' class share a common factual circumstance of allegedly suffering some degree of physical and/or emotional injuries from having their drinking water tainted with elements of diesel fuel spilled into the Mississippi River at or near Orion's dock and upstream from St. Charles Parish Waterworks Department's intake pipe in the Mississippi River. Potential class members also share a common legal theory-*i.e.,* that the conduct of the defendants is actionable under Louisiana law of negligence, pursuant to Article 2315 of the Louisiana Civil Code. One or the other is sufficient to meet the requirement of commonality.

Defendants to not dispute that the plaintiffs met

their burden of proof with respect to Rule 23(a)(2)'s commonality requirement. Thus the Court need only consider the issue of commonality in the context of Rule 23(b)(3)'s more rigorous "predominance" test.[FN56]

FN56. 7A Wright, Miller & Kane, *Federal Practice and Procedure,* § 1763, at 227 (2d ed 1986)(noting the partial redundancy of (a)(2)'s commonality requirement, since the existence of a common question can be viewed as an essential element of (b)(3)'s requirement that common questions predominate over individual issues).

3. Rule 23(a)(3): Typicality

Rule 23(a)'s typicality requirement does not require a complete identity of claims. It focuses on the similarities between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. [FN57]

FN57. *James,* 254 F.3d at 571.

**\*9** [T]he critical inquiry is whether the class representatives' claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.[FN58]

FN58. *Id.* (citations omitted).

Like commonality, the test of typicality is not demanding.[FN59] However, to satisfy Rule 23(a)'s typicality requirement, a class representative must be a part of the class and possess the same interest and suffer the same injury as class members.[FN60] In the case at bar, the named plaintiffs allege the same legal theories of recovery arising out the same incident, an oil spill on the Mississippi River. The putative class plaintiffs all seek the same remedies, *i.e.,* compensatory damages for physical, mental and emotional injuries and fright.

FN59. *Id.;* see also *Mullen,* 186 F.3d at 625 (typicality satisfied when plaintiff employees alleged theories of liability for defective air ventilation aboard casino boat under Jones Act and doctrine of unseaworthiness, despite

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

the defendant's argument that each class member's alleged resulting "respiratory illness" may differ).

FN60. See *General Telephone Co. of Southwest v Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 2370 (1982).

Defendants do not dispute that the typicality requirement is satisfied in this case, and that the claims asserted by Margie Richard, Samuel Price and other named representatives are based on the same theories of liability as potential class members.FN61

FN61. See Defendants' Post-Hearing Memorandum in Opposition to Class Certification, at p. 7.

4. Rule 23(a)(4): Adequacy
The fourth and final requirement of Rule 23(a) is that the district court must find that the representative parties will fairly and adequately protect the interests of the class.FN62 Rule 23(a)'s adequacy requirement encompasses consideration of the class representatives, their counsel, and the relationship between the two. Adequacy of the representation of the class cannot be presumed.FN63 The adequacy requirement contemplates the absence of antagonistic or conflicting interests, and a sharing of interests between class representatives and absentees. As it should, this Court has assumed for the purposes of this motion for class certification that the injuries alleged by putative class plaintiffs could have and did indeed occur.

FN62. Fed.R.Civ.P. 23(a)(4).

FN63. See *Berger,* 257 F.3d at 479-80.

The Fifth Circuit in *Berger* emphasized that the party seeking certification bears the burden of establishing that *all* requirements of Rule 23(a) have been satisfied, and that it is error to presume the adequacy of the putative representatives in the absence of specific proof otherwise.FN64 The *Berger* court observed:

FN64. *Id.* at 479.

To the contrary, we have described "[t]he adequacy requirement [as one that] mandates an inquiry into ... the willingness and ability of the representa-

tives to take an active role in and control the litigation and to protect the interests of the absentees." Likewise, ... "it must appear that the representative[s] will vigorously prosecute the interests of the class through qualified counsel." Both understandings-even accepting the variance between them-require the class representatives to possess a sufficient level of knowledge and understanding to be capable of "controlling" or "prosecuting" the litigation.FN65

FN65. *Id.* at 482-83 (citations omitted).

Class action lawsuits are intended to serve as a vehicle for capable and committed advocates to pursue the goals of the class members through counsel, not for capable, committed counsel to pursue their own goals through these class members.FN66

FN66. *Berger,* 257 F.3d at 484.

**\*10** There is a complete absence of proof regarding the named class representatives' activities with respect to the *instant* litigation. Named class representatives were unable to testify first-hand regarding the plight (*i.e.,* illnesses) suffered by others in the Norco community outside of the individuals who either reside in their household or comprise their close family members. Ms. Richard testified as to no particular specifics regarding the adverse health effects to members of the community outside of her immediate family.

Alvin Smith, intending to serve as a class representative, was present briefly just prior to the commencement of the class certification hearing, but inexplicably left the Courthouse and did not return to testify in support of class certification as scheduled .FN67 Review of Mr. Smith's deposition testimony reveals that: (1) he did not know the location of the spill; (2) he did not view any television programs or review any news that described what happened in the incident; and (3) he did not attend any meetings with Parish officials, the Parish Waterworks' Department, or consult any other sources about the spill.FN68 Smith could not even say for sure whether his own children were treated by a physician on account of adverse effects of drinking the water.FN69 Without question, the requisite zeal on the part of Smith is sorely lacking, even with respect to his own claim for monetary damages against the defendants. Moreover, the Court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

cannot find on this record that the shortcomings on Smith's part are diffused or counterbalanced by the competence or zeal of the few class representatives who appeared and testified live at the evidentiary hearing.

> FN67. The defendants withdrew their objection to admitting Smith's deposition testimony in lieu of his live testimony at the hearing.

> FN68. Deposition of Alvin Smith, Jr., at p. 48.

> FN69. *Id.* at p. 47.

Shelley Moliere Rainey could only speak for herself, her mother and her infant son. She testified in deposition specifically that she could not even speak for her dad or her brothers and sisters, who occupied the same household.[FN70] Rainey testified that after the incident she did not inquire into the situation of any of her neighbors, co-workers or anyone else the community, either regarding information about the spill or its effect on individuals in the community.[FN71] It is clear that Rainey has not taken an active role in the litigation. The full extent of her participation is reactive, and not proactive. Rainey testified that she simply filled out a claim form that was delivered to her at work sometime in June of 2001, and then mailed back.[FN72] She admittedly did not perform any independent inquiry into the nature or size of the spill, or the effects thereof, and has made no efforts to determine what company was responsible, and/or whether or not the offending party had been fined.[FN73]

> FN70. Deposition of Shelley Moliere-Rainey, at pp. 21-22, 28-29.

> FN71. *Id.* at p. 29.

> FN72. *Id.* at pp. 36-37.

> FN73. *Id.* at p. 39.

Not one named class representative fostered the impression that he or she has or had his or her hands on the pulse of the case. It was not apparent that any one or more of the named representatives had assumed an active role in the litigation *vis a vis* the prosecution of a "class" of claims aside from their participation in the evidentiary hearing on class certification.

**\*11** The Court has not ignored and cannot ignore the testimony of Richard and Johnson to the effect that both are generally concerned with issues of environmental justice, and in fact have a special advocacy interest in such issues. Richard's community involvement as a past-president of Norco Concerned Citizen's organization and as a board member of the Environmental Protection Agency Board for the Petroleum Sector are sincerely held commitments. The same is true of Johnson's past community activity concerning issues of "environmental justice." However, both named representatives Richard and Johnson no longer reside in Norco. Even assuming that both remain in close contact with area residents, not a shred of evidence suggests that Richard and Johnson have done so for the purpose of taking an active role in seeking redress for injuries *via* the subject litigation. Indeed, it appears their participation, albeit in name only, rather serves the purpose of ideologies embraced by organizations which they serve (*i.e.,* ideologies which they hold dear). Further assuming that Johnson's disability due to numerous health problems[FN74] would not prevent her from taking an active role in guiding the course of the instant litigation, the Court must express real concern that her professed agenda regarding "environmental justice" (*i.e.,* teaching corporate perpetrators of environmental injustice "a lesson") may well conflict with the less complex much larger interest of the absent class members, who simply seek to secure the recovery monetary damages sufficient to compensate them for their alleged physical, mental and emotional injury, *i.e.,* to be "made whole," as a result of the single incident of July 28, 1999.

> FN74. Johnson testified that she is (1) a disabled stroke victim, (2) no longer lives in Norco, and (3) suffers from a number of debilitating afflictions, including asthma, arthritis, a heart condition, and residuals from a stroke.

The Court further recognizes that potential differences such as allergies, sensitivity, personal habits, and preexisting disabilities[FN75] may create variances in the ways that the named plaintiffs and potential class members prove causation and damages, but such differences do not affect the alignment of their inter-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

ests.[FN76] Nevertheless, no evidence was adduced demonstrating that the named plaintiffs were even close to fluent with the progress of the litigation and/or have made themselves available as a liaison between their counsel and the absent members. Whether or not the named plaintiffs were at any time in the past and/or are presently active in community organizations, regarding environmental issues in general or otherwise, is not the panacea.

> FN75. To be illustrative, the Court reiterates the testimony of Johnson that she is disabled and drinks a lot of water, whereas Richard testified that she is in good health and is "not a water drinker."

> FN76. See *Mullen,* 186 F.3d at 626.

This Court cannot presume adequacy of class representation. At best, the evidence suggests that two of named representatives (Richard and Johnson) are vocal and active participants in organized efforts to quell alleged environmental injustice. However, evidence of their active participation or an intention to become actively engaged in controlling the course of the instant litigation is absent. Because plaintiffs failed to adduce sufficient evidence to satisfy the requirement of adequacy as to their own representation, the Court need not and does not address the competency of counsel prong of the adequacy analysis.

B. *Rule 23(b)(3): Predominance and Superiority*
**\*12** In *Castano v. American Tobacco Company,* 84 F.3d 734 (5th Cir.1996), the Fifth Circuit made it clear that deciding whether common issues predominate and whether the class action is the superior method to resolve the controversy requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case.[FN77] The plaintiffs' class proposal fails to satisfy Rule 23(b)(3)'s requirement that the common questions of law or fact *predominate.* The Rule's express language indicates that for a class to be certified under 23(b)(3), there must not simply be some commonality of issues among claims. Rather the issues that are common must *predominate* over individual issues.

> FN77. *Castano,* 84 F.3d at 744.

As to plaintiffs' claims for compensatory damages under Louisiana law, the focus is almost entirely on facts and issues specific to individuals, rather than as to the class as a whole. Even according to the plaintiffs' experts,[FN78] causation and damages will turn on the following varying individual factors: (1) extent of the exposure of each class member; (2) sensitivities which may be found to exist in individual members of the class which might have precipitated the same symptoms; (3) the mental or emotional stability of each class member; (4) how the injuries may have impacted the individual class member's ability to work or function in daily life; (5) varying medical treatment, if any, each plaintiff received; (6) the expense of such treatment, and so on. Factors such as age, weight, sex, preexisting conditions, and medical history are expected to play a dominant role in resolution of this litigation. Additionally, the predominant ailments (*i.e.,* headaches, nausea, dizziness, and sore throat) are quite common maladies which may be caused by any number of factors other than the individuals' varying types of and degree of exposure to the elements of diesel fuel-during the 24-hour period following the spill. As for fright and emotional injury, Ms. Johnson forthrightly testified that fear is a "constant" for Norco residents. Johnson attributed that constant fear to the happenstance of the location of their residences between Shell's refinery on one side and its chemical plant on the other, without regard to any breach whatsoever in the handling of potentially harmful substances.

> FN78. See Deposition of Sharee Major Rusnak, at 70 (noting that she did not know how long it took St. Charles Parish east bank residents to manifest symptoms, and that would depend vary between individuals, according to a number of factors including whether th person was an adult or a child)[Plaintiffs' Exhibit Rusnak "3"]; and Deposition of Gordon Goldman, at p. 8, 71-72, 109, 135 (testifying that (1) the level of exposure could have an effect on some individuals and absolutely no effect on others, (2) concentration of diesel may pe *partly responsible for health problems,* (3) a lot depends on individuals, and (4) different people have different sensitivities)[Plaintiffs' Exhibit Goldman "3"].

In *Castano,* the Fifth Circuit observed that under such circumstances involving a myriad of individual factors, an action conducted nominally as a "class

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

action" would "degenerate in practice to multiple lawsuits separately tried." [FN79] The predominance of individual-specific issues relating to the plaintiffs' claims for compensatory damages would in turn detract from the superiority of the class action device in resolving the plaintiffs' claims. [FN80] In *Amchem Products, Inc. v. Windsor,*[FN81] the Supreme Court instructed:

> FN79. *Castano,* 84 F.3d at 745 n. 19 (citing Fed. R. Civ. P 23 (advisory committee notes)).

> FN80. See *id.* (explaining that the greater the number of individual issues, the less likely superiority can be established).

> FN81. *Amchem,* 521 U.S. 591, 117 S.Ct. 2231 (1997).

In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Reporter for the 1966 amendments cautioned: "The new provision invites a close look at the case before it is accepted as a class action...."[FN82]

> FN82. *Amchem,* 117 S.Ct. at 2246.

**\*13** The Supreme Court further recognized that although the predominance test is readily met in certain cases involving consumer or securities fraud or violations of anti-trust law, even when arising from a common cause mass tort or mass accident, cases are likely to present *significant questions* affecting individuals in different ways:

> Even mass tort cases arising from a common cause or disaster may, depending on the circumstances, satisfy the predominance requirement. The Advisory Committee for the 1966 revisions of Rule 23 ... noted that "mass accident" cases are likely to pre-

sent "significant questions, not only of damages but of liability and defenses to liability, ... affecting individuals different ways." And the Committee advised that such cases are "ordinarily not appropriate" for class treatment.[FN83]

> FN83. *Id.* at 2250 (citations omitted). However, the *Amchem* Court did recognize that the text of Rule 23 does not categorically exclude mass tort cases from class certification and that the district courts have certified such mass tort cases in increasing numbers since the 1970's. *Id.*

In *Smith v. Texaco, Inc.,* the Fifth Circuit explained that the cause of action as a whole must satisfy Rule 23(b)(3)'s predominance requirement, before Rule 23(c)(4) becomes available to sever common issues for class trial.[FN84] The predominance requirement cannot be met by repeatedly splitting off claims pursuant to subsection (c)(4). The Fifth Circuit explained:

> FN84. *Smith,* 263 F.3d 394, 409 (5th Cir.2001).

> To read the rule [23(c)(4) ] ... as allowing a court to pare issues repeatedly until predominance is achieved, would obliterate Rule 23(b)(3)'s predominance requirement, resulting in automatic certification in every case in which any common issue exists, a result the drafters of the rule could not have intended.[FN85]

> FN85. *Smith,* 263 F.3d at 409.

The instant case is not unlike that considered by the district court in *Mattoon v. City of Pittsfield.*[FN86] That case similarly involved multiple defendants, and proximate causation presented a difficult issue. In the case at bar, the Parish and Orion may be liable under different theories for different courses of conduct. This is not a case where one set of operative facts establishes liability. Proximate cause will necessarily be different for every person in the proposed class, based on each individual class member's likely variances of exposure to contaminated drinking water and/or diesel vapor, notice of the problem, pre-existing medical conditions, individual sensitivities, and a whole host of other factors. For these reasons, liability cannot be determined on class-wide

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

basis in this case. Indeed, here as in *Mattoon,* proximate causation "remains a thorny individual question," and the issue of damages presents individual considerations as well.[FN87]

    FN86. 128 F.R.D. 17 (D.Mass.1989).

    FN87. See *Mattoon,* 128 F.R.D. at 21; see also *Kemp v. Metabolife International Inc.,* 2002 WL 113894, at p. 3 (E.D.La.)(Berrigan, Chief J.)(involving an over-the-counter diet aid containing a combination of ingredients, noting (1) that some illnesses may well be caused by factors other than consumption of the product, and then to varying degrees citing *Kampen v. American Isuzu Motors,* 157 F.3d 306, 315-316 (5th Cir.1998), and (2) "that the cause of action, as a whole, must satisfy rule 23(b)(3)'s predominance requirement ....," and only then is rule 23(c)(4) available to sever the common issues for a class trial, quoting *Smith v. Texaco, Inc.,* 263 F.3d 394, 409 (5th Cir.2001); and *Neely v. Ethicon, Inc.,* 2001 WL 1090204, at p. 11 (E.D.Tex.2001) (observing that any fault on the part of defendant is immaterial if an individual class member is unable to prove that the defendant's conduct caused the injury in fact and concluding that individual issues of causation and comparative fault will predominate over the proposed common issues regarding product defect).

    As to manageability, the lack of it is a foregone conclusion. A finding of fault on the part of one or both of the class action defendants can only be likened to crossing a threshold, or perhaps sticking the proverbial foot in the door. Thereafter, it is a virtual certainty that the proposed class action will degenerate into a series of liability jury trials addressing the predominate issues (*i.e.,* proof as to the requisite findings under Louisiana law as to individual class members including proximate causation, injury-in-fact, and damages). Plaintiffs provide this Court with no reasonable basis to assume that common issues of fault of either the Parish, Orion, or both, resolved *via* class verdict would not be revisited in the context of sure-to-follow individual trials as to liability.

    **\*14** Assuming *arguendo* that certification would

grace the individual trials with some measure of judicial efficiency not otherwise realized, the problems of proof unique to each class member's case predicate to a finding of liability under Louisiana law will likely consume more judicial resources than certification will save, particularly considering the commonplace symptomotology allegedly experienced together, with the plethora of individual-specific factors which figure into the determination of causation and damages B *i.e.,* the "significant" part of each case. Defendants' conduct, while common, is but a minor part of each potential class member's case.[FN88] Suffice it to say, under the circumstances presented, the net result is more likely a waste of judicial resources.[FN89] Ultimately, the battle royale in this case will be fought over causation on an individual basis.

    FN88. See *In re Agent Orange Prod. Liability Litigation MDL NO. 381,* 818 F.2d 145, 165-66 (2nd Cir.1987), *cert. denied, sub nom., Pinkney v. Dow Chemical Co.,* 484 U.S. 1004, 108 S.Ct. 695 (1988); and *Commonwealth v. Puerto Rico v. M/V Emily S.,* 158 F.R .D. 9, 15, 1995 A.M.C. 1025 (D. Puerto Rico 1994)("Even if the plaintiffs succeeded in establishing fault or negligence on the part of one or more of the defendants, the personal injury claimants would still have the bulk of their cases to prove, because any successful personal injury claimant will still have to prove injury in fact and causation.

    FN89. See *Castano,* 84 F.3d at 749, n. 27 (citing *Sterling v. Velsicol Chemical Corp.,* 885 F.2d 1188, 1196 (6th Cir.1988)(the Rule 23(b)(3) device "was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort and expense.").

    Accordingly and for all of the foregoing reasons,

    IT IS ORDERED that the plaintiffs' Motions for Class Certification are DENIED.

E.D.La.,2002.
In re American Commercial Lines, LLC
Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1066743 (E.D.La.)
**(Cite as: 2002 WL 1066743 (E.D.La.))**

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 3160164 (E.D.La.)
**(Cite as: 2009 WL 3160164 (E.D.La.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Nina ALEXANDER et al.
v.
CITY OF GRETNA et al.

Civil Action No. 06–5405.
Sept. 28, 2009.

Cleo Fields, Michael Charles Guy, The Fields Law Firm, Diane Adele Owen, Robert Henry Schmolke, Robert H. Schmolke, APLC, Michael T. Bell, Law Offices of Michael T. Bell, Baton Rouge, LA, for Nina Alexander et al.

Franz L. Zibilich, City Attorney's Office, New Orleans, LA, Daniel Rault Martiny, Martiny & Associates, Metairie, LA, for City of Gretna et al.

***ORDER AND REASONS***
MARY ANN VIAL LEMMON, District Judge.
**\*1 IT IS HEREBY ORDERED** that the motion to certify Subclass A, represented by Nina Alexander, as a class action is **GRANTED. IT IS FURTHER ORDERED** that the motions to certify Subclass B and Subclass C, represented by Cathey Golden, as a class action are **DENIED.** (Documents # 13, # 40, # 87.)

## I. BACKGROUND

In the days immediately following Hurricane Katrina, Nina Alexander, Jocelyn Askew, Quinton Askew, Frances B. Bowie, Signora Durette, and Patryce Jenkins (plaintiffs) attempted to flee New Orleans by crossing the Crescent City Connection on foot. Officers of the Gretna Police Department and deputies from the Jefferson Parish Sheriff's office did not permit them to cross.

The plaintiffs filed a complaint, pursuant to 42 U.S.C. § 1983 against the City of Gretna Police Department through the City of Gretna; Arthur Lawson, Chief of Gretna Police Department; unknown officers of the Gretna Police Department; Jefferson Parish Sheriff's Office; Jefferson Parish Sheriff Newell

Normand; [FN1] and unknown officers of the Jefferson Parish Sheriff's Office.

FN1. Sheriff Normand was named as a party upon the death of Sheriff Harry Lee.

The plaintiffs allege that the law enforcement officers threatened them with the use of physical force, physically assaulted them and committed acts of battery, fired loaded weapons, used excessive force while confining them or placing them under arrest, pressed loaded firearms against their bodies, held them in headlocks or chokeholds, and threw them to the ground to prevent them from crossing the brid'ge and entering the City of Gretna. The plaintiffs contend that Chief Lawson and Sheriff Normand ordered their officers to act in this manner. They allege that the conduct violated their First Amendment right of peaceful assembly, Fifth and Fourteenth Amendment Rights of due process, Fourteenth Amendment right of equal protection, Fourth Amendment right against unreasonable search and seizure, Eighth Amendment right against cruel and unusual punishment, the right to travel freely under Article IV, Section 2, and the right of interstate travel under Article I, Section 8.[FN2] The plaintiffs contend that Chief Lawson and Sheriff Normand are liable under state law for the damages occasioned by the deputies.

FN2. On December 3, 2008, the court granted the motion for partial summary judgment of the City of Gretna, Gretna Police Department, and Chief Lawson, dismissing the substantive due process claims of violation of the right of intrastate travel and interstate travel and the equal protection claims.

The plaintiffs seek to pursue their claims as a class action, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and 23(c)(5). The plaintiffs filed a motion to certify the class, proposing that the class be divided into subclasses.

The court held a class certification hearing and granted the parties an opportunity to submit supplemental memoranda. On June 25, 2009, the court or-

Not Reported in F.Supp.2d, 2009 WL 3160164 (E.D.La.)
**(Cite as: 2009 WL 3160164 (E.D.La.))**

dered the plaintiffs to file an amended motion for class certification, identifying the amended class definition, excluding claims that have been dismissed; amending subclasses, excluding subclasses on claims that have been dismissed; and naming the class representative for each subclass.

The plaintiffs amended the proposed class definition as follows:

All persons who sustained direct and/or consequential injury and/or losses and/or compensable or cognizable damages by being assaulted, battered, placed in situations of serious danger, exposed to risks of serious harm, unlawfully detained through the use of excessive force as a result of the closure of the Crescent City Connection to pedestrian traffic beginning on or about August 30, 2005 through September 2, 2005 on the Crescent City Connection in the Parish of Orleans, State of Louisiana, and in the immediate vicinity of the Crescent City Connection in the Parish of Jefferson, State of Louisiana, by the City of Gretna, City of Gretna law enforcement officials, and Jefferson Parish law enforcement officials while attempting to evacuate from New Orleans in the aftermath of Hurricane Katrina.

**\*2** This class definition subsumes the following sub-classes:

**SUBCLASS A:** An opt-out personal injury class of individuals who were employed by the Regional Transit Authority (RTA), their family members, friends who were assaulted, battered, and unlawfully detained through the use of excessive force as a result of the closure of the Crescent City Connection to pedestrian traffic, on August 30, 2005, in an area surrounding the bus terminal beneath the Westbank Expressway in the Parish of Jefferson.

**SUBCLASS B:** An opt-out personal injury class of individuals who were assaulted, battered, unlawfully detained through the use of excessive force, as a result of the closure of the Crescent City Connection to pedestrian traffic, on September 1, 2005 in and around the area of the Tchoupitoulas access ramps leading to the Crescent City Connection in the Parish of Orleans.

**SUBCLASS C:** An opt-out personal injury class of

individuals who were assaulted, battered, unlawfully detained through the use of excessive force, as a result of the closure of the Crescent City Connection to pedestrian traffic on or about September 2, 2005 in and around the area of the Pontchartrain Expressway near and/or over St. Charles Avenue and the area of the Tchoupitoulas access ramps leading to the Crescent City Connection in the Parish of Orleans.

**Subclass A**

Subclass A is represented by Nina Alexander. Alexander testified in her deposition that she stayed at the administrative building for the Regional Transit Authority on Canal Street during the storm. *See* Document # 73. The RTA converted the building to a shelter for its employees and their families. Kevin Roy, Alexander's boyfriend, worked as a supervisor for the RTA. Approximately 200 people were at the shelter when Hurricane Katrina arrived. When Alexander woke up on the Tuesday after the storm struck, the streets were flooded, and the RTA occupants were running out of food and water.

The supervisors organized approximately ten groups of people to try to make their way to the west bank of the Mississippi River where there would be buses to take them to safety. Alexander's group of approximately 20 people walked down Canal Street to Claiborne Avenue in at least five feet of water. Near the intersection of Tulane Avenue and Claiborne Avenue, the group walked up the ramp to the expressway, walking against traffic toward the west bank of the Mississippi River.

When members of the group arrived at the Crescent City Connection, they encountered other groups which had been stopped by armed police officers, who told them they could not cross the bridge on foot. Two Crescent City Connection police cars were parked facing each other to block access, and another car blocked the ramp. One of the supervisors called the office of Governor Kathleen Blanco, and negotiations began to allow buses to come to pick up the RTA groups.

After approximately one hour, three busses arrived to pick them up and drove them to a bus terminal in Gretna underneath the expressway. While they were under the expressway, Gretna police officers arrived, cocked their weapons, and asked what they were do-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3160164 (E.D.La.)
**(Cite as: 2009 WL 3160164 (E.D.La.))**

ing there. The police officers told them not to move, but left the area when they received an emergency call that an officer had been shot at the Chevron gas station. After approximately one hour and a half, charter buses arrived to take them to the RTA terminal on General DeGaulle where they would await the arrival of buses from Baton Rouge to transport them out of the New Orleans area.

**Subclass B**

**\*3** Cathey Golden is the class representative of subclass B for claims that arose on Thursday, September 1, 2005. Golden testified in her deposition (document # 70) that she, her daughter, her son, and three friends of her children (the Goldens) came to New Orleans from Boston on the Friday before Hurricane Katrina to visit family and friends and stayed at the Monteleone Hotel. Realizing that there was going to be a major storm, Golden called the airport in an attempt to leave the City. The airport was closed; therefore, Golden purchased supplies and returned to the hotel to await the storm.

On the Thursday following the Hurricane, the management of the hotel asked everyone to leave because the hotel had run out of food. The hotel suggested that the guests go to the Convention Center. The Goldens passed the Convention Center, but decided to try to cross the bridge in the hopes that there would be buses to take them out of New Orleans. As they walked up the down ramp at Tchoupitoulas Street, they encountered hundreds of people. When Golden got near the top of the ramp, she heard one shotgun blast. She did not see the type of gun or the person who fired because there were people in front of her.

Golden walked to the front of the crowd to see what was going on. Golden encountered three or four police officers, two of whom were speaking to the crowd about safety issues. Golden identified Lawrence Vaughn as the officer who had the shotgun. A young African American man with a baby was arguing with Vaughn about crossing the river to join family members. As Golden returned to where her children and their friends were, she heard another gunshot. Golden does not know if both shots came from the same gun or the same area because she was walking back to where her children were and her back was turned.

The Goldens walked on the Pontchartrain Expressway in the opposite direction from the bridge for approximately five or ten minutes. They stopped for a couple of hours until an officer jumped out of a car pointing a shotgun in their general direction and told them to "get the f'ing off" of the expressway. The Goldens went down the ramp and took shelter Thursday night in a bus that was abandoned in a nearby church yard.

**Subclass C**

Golden is also the representative for subclass C for claims that occurred on Friday, September 2, 2005. *See* document # 70 at 52. On Friday, the Goldens met two paramedics with cell phone who were able to contact a San Francisco Search and Rescue team. At approximately 8:30 a.m., the Goldens and the paramedics walked toward the bridge. One of the paramedics, Larry Bradshaw, talked to the ranking officer on the bridge. The officer contacted his commanding officer, who gave permission to the Goldens and the paramedics to cross the bridge on foot.

Before the group crossed the bridge, Golden saw an officer put a gun in the face of a white, middle-aged couple. When the man continued to argue with the officer about crossing the bridge, the officer discharged the weapon into the air.

**\*4** When the group arrived on the West Bank, they went to a gas station where law enforcement officers and firefighters gathered. The paramedics borrowed cell phones to contact San Francisco Search and Rescue again. Firefighters arrived with minivans and took them to a rendezvous point that Larry had arranged with the San Francisco Search and Rescue. Helicopters arrived and took them to the Saints training camp on Airline Drive. The Goldens were then taken to the airport and were put aboard a military transport plane, which took them to Texas. The Goldens arrived in Boston on Saturday afternoon.

## II. DISCUSSION

### A. Legal standard

To certify a class, the putative class must meet the four requirements set out in Rule 23(a). "A district court must rigorously analyze Rule 23's prerequisites before certifying a class ." *Spence v. Glock, GES.M.B.H.,* 227 F.3d 308, 310 (5th Cir.2000). "The district court has broad discretion to certify a class, which it must exercise within the confines of Rule

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3160164 (E.D.La.)
**(Cite as: 2009 WL 3160164 (E.D.La.))**

23." *Id.* "The party seeking certification bears the burden of proof ." *Id.*

"Rule 23(a) requires that (1) the class be so numerous that joinder of all members is impracticable [numerosity], (2) there be questions of law or fact common to the class [commonality], (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class [typicality], and (4) the representative parties fairly and adequately protect the interests of the class [adequacy]." *James v. City of Dallas, Tex., 254 F .3d 551, 569 (5th Cir.2001).*

"To satisfy the numerosity prong, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Id. at 570.* "To demonstrate commonality, plaintiffs must allege that there exist questions of law or fact common to the class." *Id.* "The test for commonality is not demanding." *Id.* "The interests and claims of the various plaintiffs need not be identical." *Id.* "In order to meet the typicality requirement, the claims or defenses of the parties [must be] typical of the claims or defenses of the class ." *Id.* at 571.

"Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Id.* "[T]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. "[A] class representative must be a part of the class and possess the same interest and suffer the same injury as class members." *In re FEMA Trailer Formaldehyde Products Liability, 2008 WL 5423488 *7 (E.D.La.2008).* If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dallas, Tex., 254 F.3d at 569.* The court must find that the representative parties fairly and adequately protect the interest of the class. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Id.* "The adequacy requirement to class certification is closely tied to the typicality prerequisite." *In re FEMA Trailer Formaldehyde Products Liability, 2008 WL 5423488 *11 (E.D.La.2008).* "[I]n the absence of typical claims, the class representative has no incentive to

pursue the claims of the other class members." *Id.* (quoting *In re Vioxx,* 239 F.R.D. 450, 460 (MDL No. 1657 2006)).

**\*5** "The court must also find that the class fits within one of the categories of Rule 23(b)." *James v. City of Dallas, Tex.,* 254 F.3d at 569. The plaintiffs seek certification under Rule 23(b)(3), which sets out the requirements of predominance and superiority. Rule 23(b)(3) provides:

(b) A class action may be maintained if Rule 23(a) is satisfied, and if:

....

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Pursuant to Rule 23(c)(5), "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Each subclass must independently meet the requirements of Rule 23. *See In re FEMA Trailer Formaldehyde Products Liability, 2008 WL 5423488 at n. 3 (E.D.La.2008).* "If each subclass meets Rule 23's requirements, the matter may proceed in a consolidated action even if the matter could not have been certified as a single, all-inclusive class under the rule." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3160164 (E.D.La.)
**(Cite as: 2009 WL 3160164 (E.D.La.))**

Rule 23(b)(3) provides class members with the absolute right to notice or to opt out of the class if class members wish to pursue their claims for money damages in individual lawsuits. Fed. Rule Civ. Pro. 23(c)(2)(B). "Providing these rights exclusively to (b)(3) classes demonstrates concern for the effect of monetary claims on class cohesiveness." *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 413 (5th Cir.1998).

**B. Numerosity and commonality**

Subclasses A and B meet the numerosity requirement because subclass A involves approximately 200 people, and subclass B involves between 800 and 1,000 people. Subclass C does not meet the numerosity requirement because it involves between eight and twenty people. However, the court may in its discretion certify subclass C, even if does not strictly meet the criteria if the court finds that it will facilitate the management of the case. *See American Timber & Trading Co. v. First Nat'l Bank of Oregon,* 690 F.2d 781, 786–87 (9th Cir.1982).

The three subclasses also meet the commonality requirement because the question of an Eighth Amendment violation in the use of excessive force in relation to pedestrians crossing the Crescent City Connection is common to all of the subclasses. The remaining Rule 23(a) questions are whether the claims arise from a similar course of conduct and whether the differences between the named plaintiffs' interests and the subclass members' interest create conflicts that render the named plaintiffs inadequate representatives of the subclass. Rule 23(b) requirements of predominance and superiority must also be met.

**C. Typicality and adequacy of representation**

**1. Subclass A**

**\*6** The claims of Alexander, the subclass representative, have the same essential characteristics of those she purports to represent. Subclass A is composed of employees of RTA and their families who allege that they were subjected to excessive force when Gretna police officers arrived, brandishing weapons and threatening them not to move or they would be shot, as they waited underneath the expressway in Gretna to be transported to the RTA terminal on General DeGaulle. There are no differences which create a conflict between Alexander's interests

and the subclass's interest; therefore, the claims meet the requirements of typicality and adequacy of representation. Although some individual members of the group of RTA employees and family members may not have been affected by the alleged arrival and actions of the Gretna police, questions of law and fact common to the subclass members predominate over any questions that may be raised by individuals, and class action treatment is superior to any other means of addressing the claims. The motion to certify subclass A is granted.

**2. Subclass B**

Golden's claims are not typical of the claims of subclass B. The putative plaintiffs are individuals who allege they were assaulted, battered, and unlawfully detained through the use of excessive force. In her deposition, Golden testified that on September 1, 2005 (subclass B), she heard gunshots when she was walking up the ramp near Tchoupitoulas Street that leads to the Crescent City Connection. She did not see the shots fired and cannot know from the sound alone where the shots originated. Moreover, Golden's experience with the officer who jumped out of his car pointing a shotgun and ordering the Goldens off of the expressway is not typical of the experience of the purported members of subclass B who may have heard gunshots near the Tchoupitoulas ramp. Accordingly, Golden's experience is not similar to those she purports to represent that were "assaulted, battered, and unlawfully detained through the use of excessive force." Because of the differences between Golden and the putative class members, Golden is an inadequate representative of subclass B.

Moreover, facts common to subclass members do not predominate. Between 800 and 1,000 people lined the ramp, and many had a different experiences as a result of the sound of gunshots, depending on each position on the ramp and proximity to any gunshots. Certification is not appropriate because the claims focus on facts and issues specific to individuals, rather than the class as a whole. The motion to certify subclass B is denied.

**3. Subclass C**

Similarly, Golden claims are not typical of putative plaintiffs in subclass C. Golden, her children, and their friends met paramedics that were in communication with a search and rescue team from San Francisco. The group of eight walked to the bridge and

Not Reported in F.Supp.2d, 2009 WL 3160164 (E.D.La.)
**(Cite as: 2009 WL 3160164 (E.D.La.))**

were allowed to cross to the west bank, where they were taken to safety. Golden did not suffer the same experience as the people that encountered an officer who brandished his weapon and shot into the air, which she purports to represent. Accordingly, her experience is not typical of the subclass, and she is not an adequate representative. In addition, as discussed above, subclass C does not satisfy the numerosity requirement. Because Golden does not meet the typicality and adequacy prongs of the analysis for subclass C, it is not necessary to determine whether a subclass of so few people should be certified. The motion to certify subclass C is denied.

### III. CONCLUSION

**\*7** The motion to certify subclass A, represented by Nina Alexander, as a class action is granted. The requirements of Rule 23(a) of numerosity, commonality, typicality, and adequacy of representation are met. Further, Rule 23(b)(3) is satisfied because common questions of law and fact predominate, and class action is the superior means of adjudicating the controversy.

The motion to certify subclass B, represented by Cathey Golden, as a class action is denied. The Rule 23(a) requirements of numerosity and commonality of the excessive force issue are present; however, because the plaintiffs have not shown that her claims regarding the use of excessive force while walking up the Tchoupitoulas Street ramp are typical of subclass B, Golden does not provide adequate representation of subclass B.

The motion to certify subclass C, represented by Cathey Golden, as a class action is denied. The subclass does not meet the numerosity requirement of Rule 23(a). Moreover, the claims of excessive use of force when an officer brandished a weapon while removing her group from the expressway, and another officer brandished a weapon and shot into the air while addressing another group of people are not typical and do not provide adequate representation for subclass C.

E.D.La.,2009.
Alexander v. City of Gretna
Not Reported in F.Supp.2d, 2009 WL 3160164 (E.D.La.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.