1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  OIL SPILL BY THE OIL RIG      *   10-MD-2179-CJB-SS
             *DEEPWATER HORIZON* IN THE    *
6            GULF OF MEXICO ON             *
             APRIL 20, 2010                *   August 17, 2012
7                                          *
                                           *
8    Applies to:  All Cases                *   9:30 a.m.
     * * * * * * * * * * * * * * * * * *

9

10

11                     WORKING GROUP CONFERENCE
                  BEFORE THE HONORABLE SALLY SHUSHAN
12                 UNITED STATES MAGISTRATE JUDGE

13

14   Appearances:

15

16   For the Plaintiffs:          Domengeaux Wright Roy
                                    & Edwards, LLC
17                                BY:  JAMES P. ROY, ESQ.
                                  Post Office Box 3668
18                                556 Jefferson Street, Suite 500
                                  Lafayette, Louisiana 70502

19

20   For the Plaintiffs:          Herman Herman Katz & Cotlar, LLP
                                  BY:  STEPHEN J. HERMAN, ESQ.
21                                820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113

22

23   For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                                    Rafferty & Proctor, PA
24                                BY:  BRIAN H. BARR, ESQ.
                                  Post Office Box 12308
25                                316 South Baylen Street, Suite 600
                                  Pensacola, Florida 32591

Exhibit A

1   Appearances:

2   For the Plaintiffs:              Williams Law Group, LLC
                                     BY:  CONRAD "DUKE" WILLIAMS, ESQ.
3                                    435 Corporate Drive, Suite 101
                                     Houma, Louisiana 70360
4

5   For the Plaintiffs:              Williamson & Rusnak
                                     BY:  JIMMY WILLIAMSON, ESQ.
6                                    4310 Yoakum Boulevard
                                     Houston, Texas 77006
7

8   For the Plaintiffs:              Lewis Kullman Sterbcow & Abramson
                                     BY:  PAUL M. STERBCOW, ESQ.
9                                    601 Poydras Street, Suite 2615
                                     New Orleans, Louisiana 70130
10

11  For the Plaintiffs:              Breit Drescher Imprevento
                                       & Walker, PC
12                                   BY:  JEFFREY BREIT, ESQ.
                                     600 22nd Street, Suite 402
13                                   Virginia Beach, Virginia 23451

14

15  For the Plaintiffs:              Irpino Law Firm
                                     BY:  ANTHONY IRPINO, ESQ.
16                                   2216 Magazine Street
                                     New Orleans, Louisiana 70130

17

18  For the Plaintiffs:              Weitz & Luxenberg, PC
                                     BY:  ROBIN L. GREENWALD, ESQ.
19                                   700 Broadway
                                     New York, New York 10003

20

21  For the State of                 Attorney General of Alabama
    Alabama:                         BY:  COREY L. MAZE, ESQ.
22                                   500 Dexter Avenue
                                     Montgomery, Alabama 36130

23

24  For the State of                 Kanner & Whiteley, LLC
    Louisiana:                       BY:  DOUGLAS R. KRAUS, ESQ.
25                                   701 Camp Street
                                     New Orleans, Louisiana 70130

1   Appearances:

2   For the United States          U.S. Department of Justice
    of America:                    Environmental Enforcement Section
3                                  BY:   A. NATHANIEL CHAKERES, ESQ.
                                         SARAH D. HIMMELHOCH, ESQ.
4                                        STEVEN O'ROURKE, ESQ.
                                   Post Office Box 7611
5                                  Washington, DC 20044

6
    For the United States          U.S. Department of Justice
7   of America:                    Torts Branch, Civil Division
                                   BY:   R. MICHAEL UNDERHILL, ESQ.
8                                  7-5395 Federal Bldg., Box 36028
                                   450 Golden Gate Avenue
9                                  San Francisco, California 94102

10
    For Transocean Holdings        Frilot, LLC
11  LLC, Transocean Offshore       BY:   KERRY J. MILLER, ESQ.
    Deepwater Drilling Inc.,       1100 Poydras Street, Suite 3700
12  Transocean Deepwater Inc.:     New Orleans, Louisiana 70162

13
    For Transocean Holdings        Sutherland Asbill & Brennan, LLP
14  LLC, Transocean Offshore       BY:   CARTER L. WILLIAMS, ESQ.
    Deepwater Drilling Inc.,             DAVID A. BAAY, ESQ.
15  Transocean Deepwater Inc.:     1001 Fannin Street, Suite 3700
                                   Houston, Texas 77002
16

17  For Transocean Holdings        Munger Tolles and Olson, LLP
    LLC, Transocean Offshore       BY:   GRANT DAVIS-DENNY, ESQ.
18  Deepwater Drilling Inc.,       335 S. Grand Avenue, 35th Floor
    Transocean Deepwater Inc.:     Los Angeles, California 90071
19

20  For BP America Inc.,           Liskow & Lewis, APLC
    BP America Production          BY:   DON K. HAYCRAFT, ESQ.
21  Company, BP Company            701 Poydras Street, Suite 5000
    North America Inc.,            New Orleans, Louisiana 70139
22  BP Exploration &
    Production Inc., BP
23  Holdings North America
    Limited, BP Products
24  North America Inc.:

25

1   Appearances:

2   For BP America Inc.,              Kirkland & Ellis, LLP
    BP America Production            BY:  ROBERT R. GASAWAY, ESQ.
3   Company, BP Company             655 Fifteenth Street, NW
    North America Inc.,             Washington, DC 20005
4   BP Exploration &
    Production Inc., BP
5   Holdings North America
    Limited, BP Products
6   North America Inc.:

7

    For BP America Inc.,             Kirkland & Ellis, LLP
8   BP America Production            BY:  J. ANDREW LANGAN, ESQ.
    Company, BP Company                  MARK J. NOMELLINI, ESQ.
9   North America Inc.,                  WILL TREVENA, ESQ.
    BP Exploration &                300 North Lasalle
10  Production Inc., BP             Chicago, Illinois 60654
    Holdings North America
11  Limited, BP Products
    North America Inc.:
12

13  For Cameron International         Stone Pigman Walther Wittmann, LLC
    Corporation:                     BY:  CARMELITE M. BERTAUT, ESQ.
14                                   546 Carondelet Street
                                     New Orleans, Louisiana 70130
15

16  For Cameron International         Beck Redden & Secrest, LLP
    Corporation:                     BY:  THOMAS GANUCHEAU, ESQ.
17                                   1221 McKinney Street, Suite 4500
                                     Houston, Texas 77010
18

19  For Halliburton Energy           Godwin Ronquillo, PC
    Services, Inc.:                  BY:  DONALD E. GODWIN, ESQ.
20                                        BRUCE W. BOWMAN JR., ESQ.
                                          JENNY L. MARTINEZ, ESQ.
21                                        SEAN W. FLEMING, ESQ.
                                          LAUREN L. MITCHELL, ESQ.
22                                        ALLISON BATTISTE, ESQ.
                                          ERIKA TOLEDO, ESQ.
23                                   1201 Elm Street, Suite 1700
                                     Dallas, Texas 75270
24

25

```
 1   Appearances:

 2   For Halliburton Energy:      Godwin Ronquillo, PC
     Services, Inc.:              BY:  R. ALAN YORK, ESQ.
 3                                     GWEN E. RICHARD, ESQ.
                                  1331 Lamar, Suite 1665
 4                                Houston, Texas 77010

 5
     For Anadarko Petroleum       Kuchler Polk Schell
 6   Corporation, Anadarko        Weiner & Richeson, LLC
     E&P Company LP:              BY:   SARAH E. IIAMS, ESQ.
 7                                1615 Poydras Street, Suite 1300
                                  New Orleans, Louisiana 70112
 8

 9   For Anadarko Petroleum       Bingham McCutchen, LLP
     Corporation, Anadarko        BY:   WARREN A. FITCH, ESQ.
10   E&P Company LP:              2020 K Street, NW
                                  Washington, DC 20006
11

12   For M-I, LLC:                Morgan Lewis & Bockius
                                  BY:   STEVEN A. LUXTON, ESQ.
13                                      R. SEAN BRENNAN JR., ESQ.
                                  1000 Louisiana Street, Suite 4000
14                                Houston, Texas 77002

15
     Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
16                                500 Poydras Street, Room HB-406
                                  New Orleans, Louisiana 70130
17                                (504) 589-7778
                                  Toni_Tusa@laed.uscourts.gov
18

19

20

21
     Proceedings recorded by mechanical stenography using
22   computer-aided transcription software.

23

24

25
```

1

<u>I N D E X</u>

2                                                                 <u>PAGE</u>

3
PHASE ONE "CLEAN-UP"                                    8

4
OTHER PHASE ONE MOTIONS                                16

5
ZANTAZ PHASE ONE DOCUMENTS                             16

6
SCHEDULE V                                             17

7
TESTING BOP & CAPPING STACK                            28

8
DEADLINE FOR BOP TESTING                               33

9
MICHOUD LEASE                                          34

10
SPECIAL MASTER'S STATEMENT                             34

11
BP'S CHALLENGES TO U.S. DPP CLAIMS                     35

12
AUGUST 13 OTHER PHASES AND NOT RELEVENT ENTRIES        35

13
SCHEDULE IV                                            36

14
MDL 2185 PARTICIPATION IN PHASE TWO DISCOVERY          38

15
LENGTH AND CATEGORY OF DEPOSITIONS                     39

16
ALLOCATION AND SEQUENCE OF EXAMINATION                 39

17
SCHEDULING FACT DEPOSITIONS                            43

18
OTHER MATTERS                                          47

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(August 17, 2012)**

1
2
3          (The following proceedings were held in open court.)

4          **THE COURT:**  Good morning.  Guys, I understand we are

5   having dial-in problems for the conference call, if you all

6   want to take a second and e-mail your colleagues and let them

7   know that the dial-in code is 80312.  We had a little problem

8   this morning.

9          **AT&T OPERATOR:**  This is Frances from AT&T

10  teleconference.  Do we have the host on line?

11         **THE COURT:**  You do.  Good morning.

12         **AT&T OPERATOR:**  I have a Gordon Young who is trying

13  to get into the conference and does not have the security code.

14         **THE COURT:**  That would be fine.  We had a little

15  screwup this morning on the correct security code, so we are

16  having everybody e-mail their colleagues with the correct code.

17         **AT&T OPERATOR:**  Okay.

18         **THE COURT:**  Anybody who wants to come in this morning

19  will be fine because we did have a little screwup.

20         **AT&T OPERATOR:**  Okay.

21         **THE COURT:**  Thank you so much.

22         **AT&T OPERATOR:**  You're welcome.

23         **THE COURT:**  Guys, it's 80312.  We are going to let

24  everybody get an opportunity to dial in and then we will start.

25                Good morning, phone participants.  How is

everybody?  Sorry about the dial-in snafu.  I'm going to wait a couple minutes, make sure everybody gets dialed in.

I don't hear a lot more pop-ons, so I guess we might as well get ourselves going.  Who is supposed to be on for you, Rob?

**MR. GASAWAY:**  Good morning, Your Honor.  I know Andy Langan was going to try to join remotely as well Mike Petrino and perhaps Alan Pixton.  I don't know if Andy has been able --

**MR. LANGAN:**  I'm on, Your Honor.  Good morning.

**THE COURT:**  Andy, do you have a tie on?

**MR. LANGAN:**  I do not.

**THE COURT:**  Attaboy.  Good boy.

Guys, let's get going.  Hopefully it will be a fast one.

Let's see.  Let's get an update on Phase One. Do I need a status report on the discussions with regard to the Transocean documents and what discussions have been taking place?

**MR. DUKE WILLIAMS:**  Yes, Your Honor.

**THE COURT:**  Come on up, Duke.

**MR. DUKE WILLIAMS:**  Good morning Your Honor.  Duke Williams for the PSC.  I think we have already covered the background.

**THE COURT:**  Yes.  We don't need to rehash.

**MR. DUKE WILLIAMS:**  Anthony Irpino and I have had

1   numerous meet-and-confers with Carter at Transocean.  They have
2   all been cordial, and we have done a lot of talking and
3   horsetrading, but we haven't really gotten anywhere.
4            As you will recall, we requested four follow-up
5   depositions as a result of the late-produced documents.  We are
6   not maintaining that the documents were produced late for any
7   reason other than it's just an overwhelming thing.  I think
8   110 million documents have been produced.
9            What we have done is winnowed, with respect to
10  Transocean, all these thousands of late-produced documents to
11  essentially, I think, now we have got a little over 20 left.
12  As of this week, we were willing to even knock that down to
13  about 10 if we could get a stipulation on admissibility.  We
14  have got an agreement on everything else.
15           There is no stipulation on admissibility.  So
16  since there isn't, we need to take these depositions.  We don't
17  need Mr. McMahan.  He is going to be called live at trial.
18  There was some confusion over Mr. Newman, whether he was a
19  will-call or a may-call.  The final witness list that was filed
20  lists him as a may-call.
21           The other two, Mr. Rose has already been deposed
22  and Mr. Newman has already been deposed.  These documents, if
23  you boil them down to their essence -- and, really, if you look
24  at the universe, as everybody says, of these late-produced
25  documents and the larger universe of all the documents, I mean,

1  we are talking like a BB -- if we are going to use celestial

2  terms, it's like comparing a BB to Jupiter.  There isn't much

3  here.

4              We need to take the deposition of Mr. Long.  I

5  mean we need a process.  If they want to take the position that

6  they are not relevant or they are not admissible, we have an

7  order from the Court on admissibility.  That's fine.  But it's

8  not good enough for them just to say that.  We need a process

9  now where we can figure out, number one, whether they are

10  relevant and whether they are truly admissible.  Most of all of

11  these documents really go to issues of process safety, systemic

12  safety failures, those types of things, and a punitive damage

13  claim, gross negligence claim.

14              We are not stuck in any hard and fast box on

15  time of these depositions.  We are willing to go to Houston to

16  do Mr. Long.  Mr. Long is not a Transocean employee anymore.

17  I'm not sure that they have even got control of him.  I suspect

18  if they asked him to, he would appear, but we will go to

19  Houston and we will take his deposition.

20              We are not going to waste time.  I think our

21  track record on the hundreds of depositions that were taken

22  before would indicate that or allay that concern, if it is one,

23  to rest.  But we need to take Mr. Long, we need to take

24  Mr. Rose briefly to follow up on some of these documents, and

25  we also need to talk to Mr. Newman briefly to follow up on some

1  of the newly produced documents.  That's it.

2          THE COURT:  Duke, on the 10 documents, you all have

3  agreed to limit it to those 10 documents?

4          MR. DUKE WILLIAMS:  Well, that was our offer in order

5  to cut through this.  There are another 10 or 15 or so that we

6  had originally requested, but in an effort to reach some sort

7  of accommodation, we agreed to whack it down to 10.

8          THE COURT:  To the 10 essential.

9          MR. DUKE WILLIAMS:  Well, they are all essential, but

10 these are the 10 best, I guess.

11          Now, that was hopefully to get something in

12 return.  We haven't.  But, you know, I mean, if it's 10

13 documents, it's 10 documents.  We have more than that, but not

14 many more than that.  We will limit it to 10.  We are prepared

15 if we have to, and we probably will, to send out requests for

16 admissions on Monday.  That doesn't solve the problem, though,

17 and it doesn't obviate the need for the depositions.

18          Before I forget, on the requests for admissions,

19 we have been discussing these documents for two months now.

20          THE COURT:  Yep.

21          MR. DUKE WILLIAMS:  I would make an oral request --

22 we will file a written motion if we have to -- that when they

23 are served with a request for admissions that the 30 days

24 provided under the Federal Rules be shortened to 15.  It

25 shouldn't be a big problem.

1              As long as we can get these depositions going

2    within the next 45 days or so, it's not going to create any

3    issues.  It won't create prejudice to Transocean in any way,

4    and it's not going to screw up our march to our new trial date

5    at all.

6              **THE COURT:**  Let's hear from Transocean.  Good

7    morning.

8              **MR. CARTER WILLIAMS:**  Good morning, Your Honor.

9    Carter Williams on behalf of Transocean.

10             **THE COURT:**  Good morning, Carter.

11             **MR. CARTER WILLIAMS:**  Your Honor, I think where we

12   got stuck, we all agree that there needs to be good cause at

13   this point in the Phase One proceedings to either amend an

14   exhibit list or certainly to take new depositions.  Where we

15   get stuck is they say it's good cause just because it's late,

16   and late has context here.

17             If it's a document they didn't ask for, didn't

18   hit on their search terms, you know, BP did, we later found it

19   when we were negotiating with them, that negotiation with BP

20   didn't conclude until September 2011.  That's when we started

21   those searches.  That means every document we produce in

22   response to a BP request now subjects us to redeposition.

23             More importantly, the issues they want to go

24   after have been covered.  The 10 documents relate to the

25   Lloyd's report, the safety culture study that Transocean

1   undertook, their e-mails and drafts of the announcement that

2   was produced in advance of Mr. Newman's deposition.  There are

3   275 references in the depositions to the Lloyd's report.  This

4   is just ground that has been covered.

5            Bob Long, Louisiana wanted to depose Bob Long,

6   and you ruled on that on April 4, 2011.  You said this is

7   duplicative of Transocean's 30(b)(6), where they are going to

8   present a witness on these issues, and it's duplicative of

9   Adrian Rose.  We just haven't seen good cause to agree to

10  another deposition.

11           I want to just say what we were willing to do is

12  consent to amendment of the exhibit list for all 50 of their

13  documents.  We are willing to de-designate confidentiality.  We

14  are willing to stipulate to authenticity.  We don't see any

15  reason at this point to agree that they are admissible.

16           Prior events have been covered by Judge Barbier;

17  not in the Transocean context, but there is a precedent here

18  for limiting the use of prior events evidence at this trial.

19  We are happy to move in limine or whatever it takes to deal

20  with that and at an appropriate time, but I can't today say,

21  yes, they are all admissible.

22           **THE COURT:**  Okay.

23           **MR. CARTER WILLIAMS:**  So that's kind of where we are.

24           **THE COURT:**  Gotcha.  All right.  It seems to me that

25  what I would like to do is -- I have all the documents, I have

1  all the arguments -- is just get a list of the 10 documents so

2  that we can pay attention to that limited group, and we will

3  proceed from there.  Okay?

4          **MR. DUKE WILLIAMS:**  I'm sorry, Your Honor?

5          **THE COURT:**  I just need to know which are the 10, the

6  10 documents.

7          **MR. DUKE WILLIAMS:**  They are right here.  I think we

8  submitted those.

9          **THE COURT:**  Yes.  We have them.  We have them.  I

10  just don't know -- have you previously submitted the 10?  I

11  know we have the larger binder.

12          **MR. DUKE WILLIAMS:**  Yes.  Yes, we did.  Listen, I

13  just saw somebody carry in a truckload of documents to Mike

14  this morning.  I can give him another copy.

15          **THE COURT:**  No, no.  If we have the 10, we have the

16  10.  We will look at it.

17          **MR. DUKE WILLIAMS:**  Just one thing.  Duke Williams

18  for the PSC.

19              Thanks, Carter.  I appreciate your input.

20              You know, because of this dispute with BP -- I

21  mean, we all worked on search terms together.  That was an

22  evolving -- you know, we give a search term, and Carter comes

23  back and says, "Gosh, we have 200,000 hits on this.  We need to

24  narrow it down."  We worked fine with them and did that.  There

25  was coordination with BP.

1        You know, we tried to avoid duplication.

2   Because Transocean lost the fight with BP over arbitration,

3   whatever it was, and these documents started to be produced

4   again en masse, I think it's just beside the point.  If these

5   10 documents are admissible, we may not even need to take more

6   than one deposition.  I really think that might be the case.

7        It's really not that big a deal, but it's

8   extremely important given -- the drafts are important because

9   it shows what these executives were thinking, what they thought

10  was important, what they wanted to minimize, all that type

11  thing.

12           **THE COURT:**  Okay.  Good enough.

13           **MR. CARTER WILLIAMS:**  Your Honor, I would just like

14  to add to that that there are prerequisites to good cause.  You

15  have to ask us for the document for us to know to produce it.

16  In two letters I have said, "What request are these documents

17  responsive to?"  They haven't pointed to one.

18        I think being late has some context, and you

19  have to be asked -- courts that look at this look at diligence

20  on the part of the requesting party in seeking the information.

21  It starts with asking.  And then if we objected to it and you

22  have a problem with our objections, you need to tell us.  We

23  will meet and confer.  The Federal Rules cover that.

24           **THE COURT:**  Okay.  Well, we will take it up.  We will

25  try to get to it sooner rather than later, move it up to the

top of our list.

      **MR. DUKE WILLIAMS:**  Thank you, Your Honor.

      **THE COURT:**  Thanks, Carter.

      **MR. CARTER WILLIAMS:**  Thank you.

      **THE COURT:**  Other Phase One motions.  Ben Allums was kind enough to send us a list of all pending Phase One motions. Except for the Fifth Amendment briefing, which we set last week, it looks to me as though everything else is briefed and ready for decision.  If you all find something that you believe is not fully briefed, please point it out to us, but I think we are in the can except for the Fifth Amendment stuff.  Okay?

      Zantaz, Phase One.  We were supposed to have BP and the United States meet and confer.  Anybody want to -- oh, Rob is already here.  Good morning, Rob.

      **MR. GASAWAY:**  Good morning, Your Honor.

      **THE COURT:**  Do you want to give us a brief update?

      **MR. GASAWAY:**  I do.  Sarah was very prompt after the conference last Friday.  She sent me a letter later in the day on Friday saying, "Let's make this easy.  Let's put Zantaz on the same schedule as Schedule V for briefing."

      Schedule V appears on page 4 of your order of I guess it's August 13, and we are fine with that.  So I think -- and Sarah can correct me -- that BP and the United States, at least, are in agreement that we should just use the deadlines that are now scheduled for Zantaz.  We would hope that that

1  would apply to all parties, not just BP and the United States.

2          **THE COURT:**  Okay.  While we are on Schedule V, I was

3  looking at that yesterday, and I noticed that we didn't have a

4  meet-and-confer period built into that schedule.  It's a pretty

5  abbreviated schedule.  I thought that perhaps we wanted to

6  extend the schedule a little bit to put in a couple of days for

7  meet-and-confer.  Do you think that's something we should do?

8          And, Sarah, please speak up.

9          **MS. HIMMELHOCH:**  For once I'm in remarkable and 100

10 percent agreement with Rob --

11         **THE COURT:**  Oh, okay.

12         **MS. HIMMELHOCH:**  -- on the question of the Zantaz

13 schedule being folded into Schedule V.

14         With respect to meet-and-confer, I do think that

15 when the challenging party provides a description of the basis

16 for their challenge, we can often narrow what actually has to

17 be briefed by turning around a response that says, "Okay.  We

18 withdraw our claims as to the following."  So to bring in a

19 meet-and-confer for the non-Zantaz challenges makes sense to

20 me.  We have been through that process for the Zantaz

21 challenges.

22         **THE COURT:**  Right.

23         **MS. HIMMELHOCH:**  For the non-Zantaz, I don't see any

24 harm.  I, in fact, see some benefit from building in a

25 meet-and-confer period.

1      **THE COURT:**  Okay.  So let me give that to you because
2  I tried to work out something that made sense.  You all had
3  given the August 26 date for the deadline by BP.  Tuesday,
4  August 28, will be the deadline for all other parties.  Friday,
5  August 31, is U.S. response, and then a meet-and-confer period.
6  I thought you could go ahead and pick up again on Friday,
7  September 7, with the briefing.

8          So that would give you a week to meet and
9  confer, decide what's left, and then brief on Friday,
10  September 7; U.S. response by September 12; BP and other
11  parties by September 14.  So that gives you a few extra days to
12  meet and confer and see if you can narrow the issues.

13      **MR. GASAWAY:**  Your Honor, this is Rob Gasaway.  I
14  think that's a good suggestion to build in more time for
15  meet-and-confer on that.

16      **THE COURT:**  Okay.  All right.  Well, good, that takes
17  Schedule V off our agenda while we are at it.

18      **MR. GASAWAY:**  Could I mention one thing on
19  Schedule V?  I just want to be clear that there is a dangling
20  participle, as Your Honor would say, with regard to
21  Schedule IV.  We got the United States Schedule IV challenges
22  in to BP's logs this week, and we will go forward in trying to
23  resolve those, but I just wanted to make sure that we were
24  clear that no other party wants to challenge BP's logs that are
25  under Schedule IV.  As you remember, that's just one log of 87

1   entries.

2           **THE COURT:**  Correct.

3           **MR. GASAWAY:**  We have mentioned that a couple of

4   times and in a couple of contexts, but I want to make sure that

5   the door is closed to other challenges to that 87-item log and

6   then we can go forward.

7                I know we had a privilege log in the works.  I

8   don't know if it was served on August 15 or 16, but I do want

9   Your Honor and the other parties to know that we are in the

10  process of producing an additional privilege log with respect

11  to some of our custodial productions and will want to make sure

12  that we promptly pull out of the weeds any challenges to those

13  logs as well.

14          **THE COURT:**  Okay.  Good enough.

15          **MR. GASAWAY:**  Thank you.

16          **THE COURT:**  Thank you.  I appreciate it, Rob.

17          **MS. HIMMELHOCH:**  Your Honor, this is Sarah

18  Himmelhoch.  Would it make sense to include whatever logs have

19  been served by a certain date before Schedule V by BP, to fold

20  those into the Schedule V challenges?

21          **MR. GASAWAY:**  I think that's a good idea, Sarah.  I

22  think if, for instance, we could say that any logs that are

23  served by BP up through the 17th would be on the same time

24  frame, I think that would give you until Sunday, the 26th, to

25  look those over, Sarah, and to have the other parties look

1    those over and bring your challenges.  I think when you see the
2    volume, it won't be too great that you will think that that's
3    too quick.
4              **THE COURT:**  Okay.
5              **MS. HIMMELHOCH:**  That's fine with the U.S.,
6    Your Honor.
7              **THE COURT:**  We will go ahead and make that
8    modification.  So we will include the BP logs in that schedule
9    as well.
10             **MR. GASAWAY:**  Thank you, Your Honor.
11                  Thank you, Sarah.
12             **THE COURT:**  Good.  Thanks, Sarah.
13             **MR. O'ROURKE:**  Your Honor, Steve O'Rourke for the
14   United States.
15             **THE COURT:**  Hello, Steve.  How are you doing?
16             **MR. O'ROURKE:**  Great.  Thank you.  Mr. Gasaway just
17   mentioned the idea of these custodial productions from their
18   upcoming witnesses which may have further logs.  We all know
19   there's a 21-day deadline prior to the deposition, but the
20   United States would like to request that for BP's 30(b)(6)
21   witnesses, they start those productions sooner rather than
22   later.  They have had most of our documents for a long time.
23                  These custodial people, some of them, we don't
24   know who they are.  So we don't want to be in a position like
25   we were in Phase One where we are getting these documents,

1    rolling them through on a fast turnaround, especially where

2    they don't suffer that prejudice because they have had our

3    documents for so much longer.  So we are requesting that BP

4    start the production as soon as they can.  These are simple

5    searches on a unified IT system, and it shouldn't take them

6    more than a week or two to get these things out.

7            **THE COURT:**  Okay.  Thank you.

8            **MR. O'ROURKE:**  Thank you.

9            **MR. NOMELLINI:**  Your Honor, Mark Nomellini.

10           **THE COURT:**  Hello, Mark.

11           **MR. NOMELLINI:**  Good morning.  How are you?

12           **THE COURT:**  Good.  Thank you.  How about you?

13           **MR. NOMELLINI:**  Good.  Your Honor, we heard that

14    suggestion.  So, yes, in addition to extending the period out

15    to 21 calendar days, wherever possible, we are making

16    productions in advance of that.  In fact, we have made some

17    productions for Rohloff and Gochnour and intend to continue

18    pursuing that procedure of producing documents in advance of

19    the 21-day period where it's reasonably possible.

20           **THE COURT:**  Good.  Thank you.

21           Nat.

22           **MR. CHAKERES:**  Thank you, Your Honor.  Nat Chakeres

23    for the United States, and I just had one other follow-up on

24    the privilege challenges.  We saw Your Honor's order this week

25    regarding the BP extrapolation process.  I think there were a

1  couple of outstanding questions we had on that, and we will be

2  providing a letter to the Court today.

3          Just briefly, the issues are we think that most

4  of the gray area on the BP rulings are sort of pre-July 18.  We

5  think the vast majority of post-July 18 documents are

6  protected.  So we thought that maybe if Your Honor wants to

7  look at a few more documents pre-July 18, that may be more

8  productive.

9          We also saw that Your Honor requested

10  information as to what privilege is being challenged for each

11  document.  As to the United States' challenges, we have

12  challenged both work product and attorney-client for

13  everything.

14          **THE COURT:**  For all of them.

15          **MR. CHAKERES:**  The last thing that will be explained

16  in the letter is I believe it's our understanding that we have

17  been extrapolating, the United States, across all our privilege

18  logs, not just our challenge docs, and we want to make sure BP

19  is doing the same thing.  That will all be explained in greater

20  detail in the letter.

21          **THE COURT:**  Good.

22          Rob, I thought you had affirmed the latter as

23  far as extrapolating across all logs, hadn't you?

24          **MR. GASAWAY:**  No, Your Honor.  We extrapolated across

25  the challenge documents, so all logs to the extent that they

1    were challenged.  So if you remember the process here, we had a

2    large group of privilege logs, then there was a group of what

3    we called blunderbuss challenges that other parties thought was

4    a bad adjective, but there was a large --

5              **THE COURT:**  So you're repeating it, huh?

6              **MR. GASAWAY:**  With the qualification.  There was a

7    large group of challenges.  So what we did was we went back and

8    we looked at all of the challenges that had been brought sort

9    of expressly or implicitly.  So, for instance, we had been in

10    discussion with the United States for a long time about the

11    notable SharePoint documents.  At the time that they were

12    supposed to narrow our logs for their challenge, they didn't

13    know which documents were on the SharePoint.  We were still

14    going back on the meet-and-confer.

15           We sort of said, okay, we knew all along that

16    they were concerned about the SharePoint documents, so we will

17    consider every document that was on the SharePoint there was a

18    claim of privilege over challenge.  So what we tried to do is

19    look at all of our logs for any document that had ever been

20    challenged.  But as you know, there's a telescoping process

21    where there was all of the logs, then there was thousands of

22    challenges, and then with those thousands of challenges they

23    brought a group of documents before Your Honor.  That was the

24    infamous 87 documents.  Then we released some of those.  I

25    think we ended up briefing 57 of those documents.

1        You ruled on those on July 13.  There was a

2   reconsideration.  Then we went back, based on those rulings on

3   July 13 and the reconsideration, and extrapolated them against

4   all challenged documents that had ever been challenged within

5   our camp.  So that's where we are now.

6        **THE COURT:**  So, Nat, did that answer your question?

7        **MR. CHAKERES:**  Not happily.

8        **THE COURT:**  I understand.  So the difference is that

9   they have extrapolated only as to the challenge documents, not

10  across all logs.

11       **MR. CHAKERES:**  We appreciate that clarification.  We

12  understand that BP requested and the Court ordered for the

13  United States to go across all privilege documents, and we

14  would ask for the same rule to apply here.

15       **THE COURT:**  Okay.

16       **MR. GASAWAY:**  I would be interested to see where we

17  asked for all privilege documents.  Obviously, on the

18  deliberative process privilege, which has been the main focus

19  of back-and-forth with the United States, our position has

20  always been, under the *Branch* case from the Fifth Circuit, that

21  all of those claims of privilege need to be improved because

22  there are declarations for them.  So we have sort of put aside

23  the deliberative process privilege.

24       We have also carved out even from the

25  deliberative process privilege, as you know, all the later

phases documents, all the nonrelevant documents.  So I think,
as a practical matter, what we were doing on the deliberative
process was trying to narrow it to just those we challenged.

On the deliberative process, the ones that we
challenged were all Phase Two documents because none of them
had declarations.  But even as to those, obviously, in order to
be accommodating, we didn't insist on declarations for
everything.  We had a sampling process and then another
sampling process and then an extrapolation process.

So I'm not exactly sure which particular
communication Mr. Chakeres is referring to; but certainly for
our main challenges on deliberative process, we think it's very
much a parallel kind of thing but adapted to the unique nature
of the deliberative process challenge we brought.

**MS. HIMMELHOCH:**  Your Honor, this is Sarah
Himmelhoch.  In the same way that in Rob's view they have
challenged every single one of the deliberative process claims,
the United States challenged every single one of BP's privilege
claims because we asserted that their privilege log
descriptions were insufficient for us to determine whether or
not, in fact, the privilege claim applied.

You ruled that, as an initial statement, those
privilege log descriptions were sufficient.  But just as we had
to go back and extrapolate against all Phase Two privilege
claims, we believe given the paucity of information on the

1   privilege log and the challenge that we made to the adequacy of

2   their privilege logs that BP bears a similar burden with

3   respect to Phase Two documents to go back and extrapolate

4   against all privilege documents, not just against what they

5   consider to be what we challenged, because we believe we have

6   challenged the adequacy of the privilege logs as to all

7   privilege documents relative to Phase Two.

8           **THE COURT:**  Okay.  I understand.  Okay.  We'll think

9   about it.

10          **MR. GASAWAY:**  Let me just say we look forward to

11  seeing the letter and we will respond in that letter.  The

12  chronology --

13          **THE COURT:**  I understand.

14          **MR. GASAWAY:**  -- as to that will be interesting, and

15  I will be interested to see if the view that Sarah put forward

16  is ultimately borne out, but let's wait for their letter.

17          **THE COURT:**  The discussion was helpful, so I

18  understand the issue.

19          **MR. GASAWAY:**  Thank you, Your Honor.

20          **THE COURT:**  Thank for raising it, Nat.

21          **MR. NOMELLINI:**  Your Honor, it's Mark Nomellini.  I

22  have an additional point now that I heard Nat Chakeres' voice,

23  if I may, relating to documents.  We have had some discussions

24  with Nat over the last few months relating to flow rate

25  modeling software and related documents.

1          You will recall from Phase One there were some

2   issues with respect to developing protocols to view documents

3   that have been generated using the software that was expensive

4   for the parties to obtain, and we had to take some special

5   steps in order to do that.  I'm not sure whether or not that

6   will be necessary here or whether there will be a similar

7   process or some kind of different process or what exactly we

8   are ultimately going to agree on, but I just wanted to raise

9   with Your Honor that we have been discussing that with Nat and

10  trying to figure out a solution.

11         One of the issues, as Your Honor may recall from

12  earlier discussion, with some of the other software is that

13  licenses for the software for some of these programs are very

14  expensive to obtain.  So if the parties are interested in

15  pursuing some of these things, both on the U.S. side and BP,

16  they will have to craft a solution to that.

17         So there's nothing really for Your Honor to

18  decide at the moment.  I just wanted to alert you that we hope

19  to continue our discussions with Nat on that issue.

20         **THE COURT:**  Nat seems happy with that.  Thank you.

21         Rob.

22         **MR. GASAWAY:**  I'm sorry, Your Honor.  As long as Nat

23  opened the door, I wanted to mention one thing about the

24  Court's sampling of 30 documents and the privilege ruling.

25         We will be submitting those documents on Monday.

1  Obviously, Nat previewed a letter where he is going to try to
2  advocate for sort of a hybrid process of you selecting
3  additional documents.  We are going to be submitting with those
4  documents the same type of background materials that we have
5  submitted with other submissions, other documents, etc.,
6  declarations.
7          What you will find on Monday is that one
8  declaration that we had planned to submit we will not have
9  available for Monday, and that's because the declarant has
10 personal counsel who is insisting on obviously looking at the
11 declaration.  That personal counsel is in trial.  So I just
12 wanted to alert you.  We will say it when you see it on Monday,
13 but there is that timing issue.
14         **THE COURT:**  Good enough.  Thank you.
15         **MR. GASAWAY:**  Thank you, Your Honor.
16         **THE COURT:**  Mr. O'Rourke.
17         **MR. O'ROURKE:**  Steve O'Rourke for the United States.
18 As long as Rob opened the door, we have to object to this
19 continuing process where BP provides you secret declarations
20 that we don't get to see.  There's no entry in the docket
21 noting that the declarations are under seal.  The public has no
22 idea these declarations are being submitted.  Thank you.
23         **THE COURT:**  Okay.  Thank you.
24         BOP and capping stack.  We had a communication
25 this week that hopefully everybody has seen where BP reported

on its plan to test samples of the materials removed from the
riser after the visual inspection on September 4.  BP is going
to provide everyone with a protocol to proceed from there.  In
addition, BP plans to remove one bonnet to permit inspection of
the lower VBR/test ram cavity.

Oh, look at that.  What are we looking at?

MR. GASAWAY:  Your Honor, that is a bonnet.  That's
the casing shear ram bonnet, starboard side.  I just wanted to
put that up on the overhead so the parties could see what we
are talking about.  We are just essentially talking about
taking about a 3-foot heavy piece of metal off of the BOP.

Captain Englebert, as you know, has said that
that's quote/unquote destructive testing because once you take
it off, you have altered it; there's a gasket seal there that's
no longer sealed.  But just so the parties knew what we were
talking about doing on September 4, we are proposing to take
that off.  That will allow the cavity to be exposed, the
variable bore ram cavity.

THE COURT:  Right.

MR. GASAWAY:  Then I wanted to let the parties know
that the reason for doing that is to just be able to inspect
and photograph that cavity.  That will happen, as we said in
the previous letter to the Court, on various days in September.
Captain Englebert is the gatekeeper for that.  Obviously, all
the parties will know, but our plan is just to bring experts

 1   out to look into the cavity, take pictures, video, etc.

 2           **THE COURT:**  Just so everybody knows,

 3   Captain Englebert, although she says that, for example,

 4   removing the bonnet could be considered destructive, she has no

 5   opposition to it.  She just wants to make clear that once you

 6   do that, it's altered, but she has absolutely no objection to

 7   the suggested procedure.

 8           **MR. GASAWAY:**  Thank you, Your Honor.

 9           **THE COURT:**  I know, Jimmy, you have expressed an

10   interest in being out there for the procedure.

11           **MR. WILLIAMSON:**  True.

12           **THE COURT:**  Everybody else who wants to be there or

13   wants their expert to be there, please make sure that you

14   follow Captain Englebert's normal procedure for entry, who is

15   coming, give her all the identification information so she can

16   make arrangements through NASA, all the stuff that we normally

17   do when we are going out to Michoud.

18           Nat, do you have something on this?

19           **MR. CHAKERES:**  I just had one quick question,

20   Your Honor.  I think we could probably talk to Rob about it,

21   but I think other parties might be interested in the issue.

22           We have no objection in principle to what's laid

23   out in the letter.  I think that the Court mentioned at the

24   last conference you do want an end date for work at Michoud so

25   all the data is in for expert reports.

1        **THE COURT:**  That is right.

2        **MR. CHAKERES:**  We will get to that later on.  We had

3    previously understood one other activity that's still to take

4    place is laying out some of the BOP elements alongside pipe for

5    visual inspection, and at least it was our understanding that

6    around that same September 4 date that was going to happen.

7    Just in terms of scheduling who from our side wants to go and

8    look at that, we just want to clarify everything that's

9    happening September 4 so people don't miss it.

10        **THE COURT:**  That's a very good question.

11            Rob, is that your showroom date or is that your

12    "we are getting started moving" date.

13        **MR. GASAWAY:**  That's our "we are getting started

14    moving" day, but we are happy to work with the other people.

15    So if there's particular showroom dates that they want, we can

16    make sure that they get their experts out there on the showroom

17    dates looking at the equipment they want.  The key point of the

18    September 4 date is just this removal operation is going to

19    happen hopefully on September 4.

20        **THE COURT:**  You will then post-September 4 start

21    moving the equipment into the showroom.  And you, I thought,

22    identified what equipment you were looking for.

23        **MR. GASAWAY:**  Yes.

24        **THE COURT:**  If anybody wants any other equipment

25    moved into the showroom, you may make the request of

1   Captain Englebert.  If she thinks it's feasible, have at it.

2           **MR. GASAWAY:**  Just to make clear, the moving around

3   of stuff at Michoud is going to keep going.  It's not just

4   September 4.  We are going to maybe start turning the nuts,

5   taking the bolts off on September 4.  I don't know if the

6   actual plate will come out on September 5, but we are going to

7   be working out there September 4, September 5, September 6.  We

8   are happy to be joined by any other parties and any other

9   experts.

10          **THE COURT:**  Good.

11              Jimmy.

12          **MR. WILLIAMSON:**  Judge, no objection, of course.  The

13  problem with the Michoud stuff is sometimes you go out there

14  and you can literally be out there five or six days and nothing

15  happens.  All I request is that I be given some sort of notice

16  as to when it is actually going to be available to inspect and

17  photograph so that me or whoever we send doesn't have to stay

18  out there five days drinking coffee.

19          **THE COURT:**  And barbecuing.

20          **MR. WILLIAMSON:**  And barbecuing, yes, Your Honor.

21  I'm sure Mr. Gasaway and BP will comply with that, but I just

22  wanted to be sure that request was in.

23          **THE COURT:**  Right.

24              Rob, you don't need to get up to acknowledge

25  this, but whatever advance notice you can give the parties,

1  that "We think we are going to have the showroom done and
2  available on September 12," whatever the date is, try to give
3  everybody the heads-up so they can plan for it.
4          **MR. MILLER:**  It's so nice and cool out there.
5          **THE COURT:**  The showroom is going to be
6  air-conditioned.  That's the beauty of having the showroom.  Is
7  that right?  That's why it's so nice.  So anybody else who
8  wants to add stuff to that room, it will be the first time we
9  have an air-conditioned environment.
10          So on the issue of deadline for BOP testing, I
11  thought that October 31 sounded like a good deadline.  It gives
12  you time to follow up, but it also puts an end to things so
13  that everybody can know that they can start preparing their
14  expert reports.
15          Mr. O'Rourke.
16          **MR. O'ROURKE:**  Is that for capping stack testing too?
17          **THE COURT:**  I think it's for all testing, all
18  equipment testing, it seems to me.  Beyond that date, the
19  equipment will be available for inspection, photography,
20  whatever you want to do, but it seems to me we should call it
21  quits on testing.  Okay?  That will be your day.
22          Rob, you have something on that?
23          **MR. GASAWAY:**  I was just going to amend that,
24  Your Honor.  At the request of the United States, they said,
25  "Okay.  If your testing ends, let's say, October 31, we need

the data," and what we had proposed was maybe by Thanksgiving
or something when the core of the Rule 30(b)(6) depositions are
closed.  So if the testing occurs by the end of October, then
we would try to get the data to everybody by Thanksgiving.

       **THE COURT:**  Okay.  So it will be an approximately
3-week lag period.  You will get it to them on a rolling basis
as you get them.

       **MR. GASAWAY:**  Right.

       **THE COURT:**  Okay?  Good enough.  So that's taken care
of.  Rob, I assume the lease has been executed?

       **MR. GASAWAY:**  I don't know, Your Honor, but we are
going to do it.

       **THE COURT:**  I'm going to take it off the agenda.

       **MR. GASAWAY:**  Take it off the calendar.

       **THE COURT:**  Right.  It's off the agenda.

       **MR. GASAWAY:**  We will make sure it's done.

       **THE COURT:**  Good.  I wanted to report to you that I
have had communications with Captain Englebert.  She is up in
Wisconsin and has bought herself a new SUV.  I tried to have a
picture of it for you today, but my systems unit did not
comply.  We will have a picture for you probably next week.  We
suggested to her she gets a specialty license plate "MDL 2179."
She thought it was a good idea.

       Rob, could we talk about the five remaining DPP
challenges on Phase Two.

 1           **MR. GASAWAY:**  I think we challenged them, and I think
 2    they are sort of hanging out there, Your Honor.
 3           **THE COURT:**  So you want us to look at those five
 4    documents?
 5           **MR. GASAWAY:**  Yes.
 6           **MS. HIMMELHOCH:**  These are DPP challenges?
 7           **THE COURT:**  Yes.
 8           **MS. HIMMELHOCH:**  I don't know which five he is
 9    talking about.
10           **THE COURT:**  We got a letter from him listing five
11    further DPP documents that were at issue.
12                Rob, would you send that to Sarah to look at.
13           **MR. GASAWAY:**  Yes.  Why don't I do this?  I will send
14    it to Sarah, let Sarah and I talk about this, and don't do
15    anything.  We will get on the same page, and I will send an
16    e-mail to the Court either later or Monday.
17           **THE COURT:**  Fair enough.
18           **MR. GASAWAY:**  Okay.
19           **THE COURT:**  We do have it on the list of things we
20    need to resolve.
21           **MR. GASAWAY:**  Correct.  Thanks.
22           **THE COURT:**  We are moving along on Schedule I.  Do we
23    have any status report on BP's August 13 other phases and not
24    relevant entries reshuffling?
25                Nat.

1          **MR. CHAKERES:**   Your Honor, Nat Chakeres for the

2    United States.   We are reviewing that, and we will follow up

3    with BP.   There is nothing to report at the moment.

4          **THE COURT:**   Good.   Last but not least is we did not

5    cover Schedule IV yet.

6          **MS. HIMMELHOCH:**   Your Honor, BP has filed its

7    Schedule IV challenges to the U.S. privilege log.   I anticipate

8    getting our response to you today.

9          **THE COURT:**   Okay.

10          **MS. HIMMELHOCH:**   The U.S.A. has issued its

11    Schedule IV challenges to BP.   I don't believe we have a

12    briefing schedule for that yet.   We have just initiated the

13    meet-and-confer process.   I don't know whether any other

14    parties are intending to bring Schedule IV challenges as to

15    either BP or the U.S.

16          **THE COURT:**   Okay, guys.   Everybody else look at those

17    Schedule IV logs.   If you have challenges in addition to the

18    challenges that have been asserted by the United States or by

19    BP, noon Tuesday is your opportunity.   As I said, I don't think

20    that BP and the U.S. are being kind to each other, so I would

21    suspect they have raised all the challenges that need raising.

22    If I'm wrong, that's your deadline.

23          Then do you all want to just agree to a briefing

24    schedule?

25          **MR. GASAWAY:**   Your Honor, with respect to BP's

challenges to the U.S., I understood Sarah to say she was going
to respond today.  We would like to wait, let's say, until noon
Tuesday.  Hopefully nothing new will come in, but then we could
respond, let's say, by Thursday of next week, assuming we have
Sarah's letter today and there's nothing that comes in on noon
Tuesday.

          **THE COURT:**  Okay.  Good enough.

             Sarah, that's okay by you?

          **MS. HIMMELHOCH:**  Yeah, that's fine.

          **THE LAW CLERK:**  Could we just put it on the same
schedule as Schedule V and Zantaz so everybody is all coming in
at the same time?

          **THE COURT:**  Do you want to go to Schedule V?

          **MR. GASAWAY:**  That's fine with us if you want to make
it easy.

             Sarah, is that okay with you or do you want to
get on with Schedule IV?

          **MS. HIMMELHOCH:**  That's fine with me.  That had been
my original proposal for all the parties to deal with
everything post-May 31 as Schedule V, so I'm fine with that.

          **MR. GASAWAY:**  Okay.  I'll tell you what, Sarah.  If
you go ahead and file your letter today, we would go ahead and
respond to that quickly.  Maybe we can narrow the issues on
that, just take one more issue out.  So if you feel like going
ahead and filing it, we won't wait until the Schedule V dates.

1          **MS. HIMMELHOCH:**  Yes.  I will file that today.

2          **MR. GASAWAY:**  Then we will respond next week and we

3    will knock that one off.

4          **THE COURT:**  So we will knock off Schedule IV.  I like

5    that better.

6          **MR. NOMELLINI:**  This is Mark Nomellini.  One quick

7    thing.  Have we met and conferred on Schedule IV yet?

8          **MS. HIMMELHOCH:**  We did.  You guys have already filed

9    your brief with Judge --

10         **MR. NOMELLINI:**  Oh, I see.  You're talking about BP's

11   challenges to the United States, the thing that we filed on

12   Monday.

13         **MS. HIMMELHOCH:**  Yes.

14         **MR. GASAWAY:**  Correct.

15         **MR. NOMELLINI:**  I gotcha.  We are to meet and confer

16   on the letter that you just sent us with your challenges.

17         **MR. GASAWAY:**  Correct.

18         **MS. HIMMELHOCH:**  Yes.

19         **MR. NOMELLINI:**  Got it.

20         **MR. CHAKERES:**  Yes.

21         **MR. NOMELLINI:**  Got it.

22         **THE COURT:**  We have a request from the MDL 2185

23   parties to participate in the Phase Two discovery to the same

24   extent that they did in Phase One, sitting in at depositions,

25   receiving copies of the expert reports, all subject to Pretrial

1  Order 27.  Would you all think about that and let us know early

2  next week whether that request is a problem for anyone; and if

3  not, I will go ahead and get an order in that, subject to the

4  same conditions as Phase One, they may participate.  Okay?

5           Mr. Brian Barr gave us a wonderful report --

6  thank you, Brian -- on the length and categorization of

7  depositions, and it looks like you guys made some really good

8  progress with that.

9        **MR. BARR:**  Yes, Your Honor.  Brian Barr for the PSC.

10  I think we made a lot of progress.  We have a couple of issues

11  to iron out.  I think we will be able to do that.  I don't

12  think there's a conference next week, but we can tee it up.

13        **THE COURT:**  Right.

14        **MR. BARR:**  We can tee that up.  There might be a

15  couple where we have to figure it out.

16        **THE COURT:**  If there are a couple that you can't

17  reach agreement on, why don't you give us a letter telling us

18  what the final disagreement may be, and we will go ahead and

19  try to resolve it for you.

20        **MR. BARR:**  Okay.

21        **THE COURT:**  That was really a good report and I

22  appreciate it.

23           We did issue an order for allocation of

24  examination time and sequence.  We have already gotten one

25  request for reconsideration.  Do you want me to set a deadline

1    for a request for reconsideration?

2            **MR. MILLER:**  That would be great.

3            **THE COURT:**  So, I don't know, how about close of

4    business on Wednesday?  Is that doable?  Everybody thinks

5    that's doable?  Good.

6                 Rob.

7            **MR. GASAWAY:**  I was just going to mention --

8            **THE COURT:**  You were going to compliment me on our

9    ruling, huh?

10           **MR. GASAWAY:**  I was going to compliment Your Honor

11   and Mike on your order.  I was going to mention it's not going

12   to come as a surprise to you that we were planning to respond

13   to the motion for reconsideration, but you are a step ahead of

14   us in the sense that we wanted to make sure everybody got their

15   licks in.  So maybe if everybody gets their motions in for

16   reconsideration on Wednesday, we could get a letter to

17   Your Honor, since we don't have a Court conference next Friday,

18   next Friday opposing that.

19           **MR. MILLER:**  Your Honor, the motions are letter

20   briefs?

21           **THE COURT:**  Yes, letter briefs.

22           **MR. MILLER:**  Attached to e-mails?

23           **THE COURT:**  Yes.  That will work.

24           **MR. GASAWAY:**  Actually, let me go Monday if we are

25   going to have multiple ones.  If that's okay, we will respond

1   the following Monday.

2          THE COURT:  Always pushing, always pushing.  Monday

3   it is.

4          MR. GASAWAY:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          MR. O'ROURKE:  Judge --

7          THE COURT:  Mr. O'Rourke.

8          MR. O'ROURKE:  Steve O'Rourke for the U.S,

9   Your Honor.  I'm not sure this is reconsideration on the time

10  order; it's a clarification.  You said that the party putting

11  forth the witness would get time at the conclusion of the

12  deposition.  In Phase One, let's say if it's us going first, we

13  got to go at the very end in rebuttal.  Is that still true?

14  Your order implies that it might not be true anymore.  Can the

15  party who goes first -- say it's the plaintiffs, then the

16  defendants go -- reserve time for rebuttal?

17         THE COURT:  We hadn't thought about that.

18         MR. O'ROURKE:  That's the way they did it the first

19  round.

20         THE COURT:  We'll make that part of our

21  reconsideration.

22         MR. O'ROURKE:  Thank you.

23         THE COURT:  You're welcome.

24            Nat.

25         MR. O'ROURKE:  I didn't do a good enough job because

1  Nat has something.

2       THE COURT:  Well, you forgot something that Nat wants

3  to raise.

4       MR. CHAKERES:  Your Honor, this isn't that same

5  issue.  Nat Chakeres for the United States.  Richard Vargo is

6  going to be next week.  He is a Halliburton witness.  He is on

7  Brian Barr's list as a hybrid witness, and there's not an

8  allocation for a Halliburton hybrid witness.  I don't think we

9  have a big task in front of you.  I think if you pick source

10 control or quantification, just put him in one of those

11 buckets, there's not a huge difference between them.

12      THE COURT:  Right.

13      MR. CHAKERES:  I don't think there's going to be a

14 big fight among the parties, but just so we are clear before we

15 go in there.

16      THE LAW CLERK:  We'll get an order out today.

17      THE COURT:  Okay.  Yes.  We'll get an order out

18 today.  I was going to let Don Godwin decide how he wanted to

19 do it, but that's a bad idea.

20      MR. DAVIS-DENNY:  Your Honor, can I make a quick

21 point on that?

22      THE COURT:  Microphone.  Microphone.  Where's your

23 remote?

24      MR. DAVIS-DENNY:  I'll just go to the podium.

25      THE COURT:  Okay.  Come on up.

1      **MR. DAVIS-DENNY:**  Good morning, Your Honor.

2      **THE COURT:**  Good morning.

3      **MR. DAVIS-DENNY:**  Grant Davis-Denny on behalf of

4  Transocean.  I was just going to ask that the Halliburton

5  witness be considered a source control witness or at least a

6  hybrid witness for purposes of how we treat the deposition

7  time.  There's a big difference in what Transocean has thus far

8  been allocated for source control witnesses versus

9  quantification witnesses, so it matters a lot to us.  As I

10  recall, this Halliburton witness is going to be talking about

11  the Top Kill, so it seems sensible that they will be treated as

12  a source control witness.

13      **THE COURT:**  Okay.  The U.S. has no objection.  Okay.

14  Good, good, good.

15          So we have two upcoming August depositions, and

16  in September we really start to roll.  It looks like we are in

17  pretty good shape.  We have some outstanding issues.  Have we

18  got any update on Pencor as far as identification of the

19  designee and document production?

20      **MR. CHAKERES:**  Your Honor, Nat Chakeres for the

21  United States.  Their document production is in and served on

22  the other parties.  To my knowledge, we do not have the name of

23  the designee yet.  I was just going to run through sort of the

24  other updates we have.

25      **THE COURT:**  Go ahead and do that.

1   **MR. CHAKERES:**  Intertek, Isotech, and WOM should be

2 producing documents to the United States within the next week,

3 which for Intertek and Isotech, right now they are scheduled

4 for depositions.  That will enable us to provide those

5 documents to the other parties in advance of the 21-day border.

6 We don't have, I believe, individual names for those

7 depositions, but we will provide that information to the

8 parties probably by e-mail.  We won't wait until the next

9 working group conference to do so.

10   **THE COURT:**  Good.

11   **MR. CHAKERES:**  The BP Institute, they floated several

12 dates with their witness.  We are still trying to figure that

13 out again.  I think we are probably a couple of days away from

14 providing date ranges.  Again, we are going to do that with the

15 rest of the parties so that we don't have to wait two weeks to

16 get that one on the calendar, at least onto everybody's

17 internal calendars.

18   **THE COURT:**  Good.

19   **MR. CHAKERES:**  We had a good discussion with Cameron

20 this morning about where they are.  They are well on their way

21 with document collection for the subpoena document requests we

22 have made.  Once those documents are collected, we will confer

23 further about dates.  I don't believe we have any other updates

24 in terms of the parties the United States has been working

25 with.

1          **THE COURT:**  Good.

2          **MR. CHAKERES:**  Oh, excuse me, there is one,

3     ADD Energy.

4          **THE COURT:**  Oh, yes.

5          **MR. CHAKERES:**  Unfortunately, there's a

6     miscommunication and they won't be able to do -- they are on

7     the calendar for October 2.

8          **THE COURT:**  That's right.

9          **MR. CHAKERES:**  Right now, I think they want to move

10    that by a day or two, so we are talking to them about what day.

11    I think that's still going to be that week, but it may be the

12    3rd or the 4th.  We have asked them to consider the 3rd because

13    there's already a number of depositions on the 4th.  But if it

14    needs to be on the 4th, we will do it on the 4th.

15         **THE COURT:**  Good.  That will work.

16              Any update on Weatherford?

17         **MR. O'ROURKE:**  I just want to note that he lost

18    concentration just before he got to ADD Energy.

19         **THE COURT:**  Good point.

20         **MR. CHAKERES:**  No update on Weatherford, Your Honor.

21         **THE COURT:**  How about on Statoil?  Have we finished

22    production of documents on them?

23         **MR. GASAWAY:**  Your Honor, Rob Gasaway.  I believe we

24    have finished production of documents, and we have served PTOs

25    13 and 51.  We are trying to identify an attorney who could

1  kind of be a contact for follow-up because of the

2  confidentiality issue, but I will give the definitive update to

3  the parties shortly.  I do believe they have produced all the

4  documents.

5          THE COURT:  Good.

6              Jimmy, anything on Wild Well?

7          MR. WILLIAMSON:  Yes, Your Honor.  Wild Well, when

8  they made their productions, I told the Court the production

9  wasn't perfect, but apparently some of it didn't go to all

10 parties.  It's our responsibility to make sure whatever we did

11 receive will get to everyone.  I think we got it to Transocean,

12 U.S.  I'm in the process of making sure that whatever we have

13 in whatever form it is gets to everyone this week.

14         THE COURT:  What about a date for the deponent,

15 anything on that?

16         MR. WILLIAMSON:  With the Court's permission, I

17 believe the parties want to see what documents they have before

18 we try to reschedule a day, assuming that's acceptable to the

19 Court.

20         THE COURT:  That's fine.  That's fine.  We will just

21 keep that on a deferral basis.

22         MR. WILLIAMSON:  Yes, Your Honor.

23         THE COURT:  Thank you.

24             Okay.  I think I'm at the end of my agenda.  We

25 are going to throw it open for other.

1       **MS. HIMMELHOCH:**  Your Honor, this is Sarah

2    Himmelhoch.  I did want to give you an update on the document

3    production for the U.S.

4            **THE COURT:**  Please.  Thank you, Sarah.

5            **MS. HIMMELHOCH:**  With respect to the DOE

6    re-collection, we completed the production on August 15 with

7    the exception of one custodian.  Dr. Burns had, I think, the

8    most stubborn computer I have ever met.  We have finally

9    managed to get all of the data off of his computer, run the

10   searches.  We are now doing the privilege review.  We expect

11   that his production will be complete by the end of next week at

12   the absolute latest.  I hope it will be much earlier than that.

13   We also are just doing a review to make sure that everything

14   converted and was produced out.  We are almost completely done

15   with the DOE re-collection.

16           For the Coast Guard, we received from BP the

17   privilege document from the loose media to review, and we also

18   are scrambling to complete the production out of the

19   Coast Guard laptop.  Again, we are almost done and we expect to

20   be completely done by the end of next week on those two topics.

21           We have a number of files that we produced to

22   all of the parties in native format because they were corrupt

23   files that we could not process.  We have since purchased some

24   new tools, and as a result there will be some additional

25   custodial productions for some of the 30(b)(6) designees.

1            They have already started seeing that for Herbst

2    and Sogge.  Again, these are files they have had, the other

3    parties have had, but we are now able to render them to TIFF

4    and produce them in a more accessible format.  We will

5    definitely produce those at least 21 business days before the

6    deposition, and my goal is to get them done much sooner than

7    that.

8            We continue to have just a few open issues with

9    BP regarding metadata issues.  Obviously, we are still working

10   to get BP a response on the DOE data issue.

11           With respect to the third-party subpoenas, we

12   had received in time to do privilege review the three

13   nonuniversity third parties and half of the University of

14   California production.  We have the privilege documents from

15   the Purdue production, and we expect to get a privilege log out

16   on that and produce any loose documents by the middle of next

17   week.  We are still awaiting the University of California

18   giving us access to Dr. Leifer's records in order to do our

19   quick privilege review.

20           To give you a sense, we got the University of

21   California data for Dr. Lasheras and his staff, and we were

22   able to do the privilege review and turn out our privilege log

23   in less than 24 hours.  So we are not dillydallying with that,

24   but we don't have the data yet to do that action on.

25           Then I had also noted to you in the last working

1  group conference we were working with the Mexican states.  We

2  have provided our response to their subpoena.  I think we have

3  agreed on the scope of production and we have an August 24

4  return date.  I have every reason to believe we are going to

5  meet that August 24 date.

6          **THE COURT:**  Okay.  Good.  That's a good report.

7                  Rob, any comments?

8          **MR. GASAWAY:**  Your Honor, just this.  Obviously, from

9  our side we are going down the roster of issues that Sarah just

10 mentioned and trying to tick and tie those to what we are

11 seeing, the DOE re-collection, the United States Coast Guard

12 re-collection, the third-party subpoenas, the university

13 subpoenas.

14                 Some of what I heard kind of jives with what we

15 are seeing.  Some of it is news to me.  Some of it is a little

16 bit different from what we are seeing.  What I would propose is

17 that we just take this offline, discuss it a little bit with

18 Sarah, and then sort of get back to the Court promptly next

19 week about any dangling participles from this large amount of

20 material that was all due on August 15.

21         **THE COURT:**  Good.  Okay.  Other "other."  I have one

22 other "other," which is did anybody notice that Mike Underhill

23 is back with us?  What do you think about that?

24                 (Applause.)

25         **MR. UNDERHILL:**  It's not voluntary.  My wife told me

1   to leave town.

2          THE COURT:  Well, whatever the circumstances are, we

3   were happy to see you at the meeting last night and today in

4   court, so that's good.

5                Any other "other"?  Mr. O'Rourke.

6          MR. O'ROURKE:  Your Honor, you asked about an expert

7   report schedule.  We got a letter yesterday from BP.  Would you

8   like us just to reply in writing or do you want me to talk

9   about it?  I know you don't want to hear from me, but it's one

10  or the other.

11         THE COURT:  I said other, so that's fair.  You are

12  other.

13                Did we see that?

14         THE LAW CLERK:  Yes.

15         THE COURT:  We did?  I have to tell you I don't

16  remember -- well, I do remember reading the letter from

17  Mr. Langan.

18         MR. O'ROURKE:  Yes, from Andy yesterday.

19         THE COURT:  Yes, I do remember it.  I thought it

20  looked like a good proposal.  You have trouble with it?

21         MR. O'ROURKE:  A little bit.  Not major.  Not major.

22  Two issues.  I think maybe Mr. Cernich addressed this last

23  week, but I was on vacation, so I don't know that for sure.

24         THE COURT:  That will teach you to take vacation.

25         MR. O'ROURKE:  Whether they should be simultaneous or

1   staggered.

2           THE COURT:  I have decided we are going to stagger.

3           MR. O'ROURKE:  Let me make my argument anyway.

4           THE COURT:  Okay.

5           MR. O'ROURKE:  Generally speaking, we agree with them

6   they should be staggered because we have the burden of proof

7   except -- and I think this might not have been clear.  That's

8   why I want to clarify it.  We are saying we are going to come

9   up with a number.  We should have to go first unless BP is

10  going to come up with a number also.  If they are just going to

11  take potshots at our number, well, that's fine.  We go first.

12  They take potshots.  We rebut just like Andy said in his

13  letter.

14          If they are going to come up with their own

15  number, they should be at the same time for several reasons.

16  One, because we all should have the same amount of time with

17  the data from Michoud, with the 30(b)(6)s, with the fact

18  depositions.  Also, if the judge is going to have to pick

19  between two competing numbers, they should both be put on at

20  the same time.  Finally, that could make the schedule perhaps

21  shorter if it's just two numbers, two rebuttals, and then we

22  are done.

23          THE COURT:  On the quantification issue, you still

24  want simultaneous?

25          MR. O'ROURKE:  Only on quantification, yes, ma'am,

1   that's correct.  That's correct.  Again, if BP is just going

2   to -- or the other parties, Transocean and Andarko might be in

3   on this one as well.  If they are just going to pick at our

4   number, we agree that it should be three tiered.  If they are

5   going to come up with their own number, it should be two

6   tiered.

7           MR. LANGAN:  This is Andy Langan.  Was Steve done?

8           MR. O'ROURKE:  I was going to move on to the timing.

9   So if you want to address the staging, then I will defer for a

10  minute.

11          MR. LANGAN:  Well, I don't want to snatch defeat from

12  the jaws of victory here, but I was just going to say what if

13  BP doesn't know?  We want to hear what the government has to

14  say before we decide whether we are going to offer our own

15  number or just criticize them.  We are a defendant in a civil

16  lawsuit with somebody else having the burden of proof, and I

17  don't think we should be required to commit one way or the

18  other at this point.  That's not how the system works.

19          THE COURT:  Well, Andy, you left off another

20  possibility.  You could agree with the U.S.'s number.

21          MR. LANGAN:  Okay.  Fine.  That's a third

22  possibility, if they come in at some point, sure.

23          THE COURT:  If we are taking bets and you want in on

24  that, I think we have some people here that would like that

25  bet.

1          Okay.  So your second issue was --

2          **MR. O'ROURKE:**  When.  As for when, I had previously

3     said we have to make sure -- I had previously planned to argue

4     that we have to make sure we know when the testing at Michoud

5     and data are in.  You just dealt with that.  Thank you.

6          **THE COURT:**  Right.

7          **MR. O'ROURKE:**  We still think it should wait

8     certainly until the conclusion of fact depositions.  We don't

9     currently have a deadline for fact depositions, when they are,

10    when they start.  So it's difficult for us to commit to a Court

11    deadline when we don't know when those depositions are going to

12    end, so perhaps we should just be deferring.

13          Generally speaking, I think they went with

14    mid-February, a month later, a month later.  I'm sorry.  They

15    went with mid-January, a month later, a month later.  We think

16    maybe mid-February and then stagger it out from there might be

17    more appropriate, but we don't want to commit until the fact

18    depos are over.

19          As long as I'm yammering on about fact depos,

20    I'm also worrying about 26(a) initial disclosure of testifying

21    witnesses, which never happened in Phase One.  We have no idea

22    who BP or Anadarko or Transocean might be planning to call on

23    the quantification issues in the Phase Two trial.  They

24    probably know a lot more about our case because we have already

25    published all our papers and they know who our witnesses are.

1    We think you should start considering not just expert report
2    deadlines but a 26(a) disclosure, not for exhibits, who is
3    likely to be called at trial.
4            **THE COURT:**  Good point.
5            **MR. O'ROURKE:**  Then we select the fact witnesses,
6    then we know the fact deadlines, then we can set an expert
7    report deadline.
8            **THE COURT:**  Okay.
9            **MR. LANGAN:**  Your Honor, on the timing, I'm not sure
10   that we would violently disagree with Steve on what he is
11   saying.  In other words, in a perfect world, it would be nice
12   to know that the Phase Two fact depositions of all kinds are
13   over before this starts.
14           I think we posited a schedule keeping in mind
15   what we have heard from the Court about the Court's wishes
16   about a Phase Two trial.  But if there's general agreement that
17   the schedule ought to be pushed back a little bit, I don't
18   think you are going to hear BP complaining about that.  We hear
19   what he is saying.  I think we can live with probably what he
20   has suggested there, so we are open to that.
21           **THE COURT:**  We do have one person we need to consult
22   with on that.
23           **MR. O'ROURKE:**  Just so it's clear, I was saying
24   February 2013, not 2014.
25           **THE COURT:**  Yes.  We understood that.

1          **MR. LANGAN:**  Got that.

2          **THE COURT:**  You know, I do need to consult with

3   Judge Barbier on that issue as well.  Yes, we will look at that

4   and talk to him about it.

5          **MR. DAVIS:**  Good morning again, Your Honor.

6          **THE COURT:**  Good morning again.

7          **MR. DAVIS-DENNY:**  Grant Davis-Denny on behalf of

8   Transocean.  I just want to throw out one suggestion for your

9   consideration on how the expert reports should be staggered,

10  and that is maybe we should consider having it in three waves

11  rather than two, with the plaintiffs and then BP and then the

12  other defendants going in a third wave, so that we can

13  determine and hopefully avoid duplication and a waste of

14  resources in preparing expert reports that may say the same

15  thing as BP would be saying in their report.  So I wanted to

16  put that idea out there for Your Honor's consideration.

17         **THE COURT:**  It seems to me it would be easier to talk

18  to BP.

19         **MR. DAVIS:**  Thank you, Your Honor.

20         **THE COURT:**  Any other "others"?  Going, going, gone.

21  Thank you, phone participants.

22         **MR. LANGAN:**  Your Honor, actually, there is one more

23  thing.  It's Andy again.  Sorry.

24              I think you will recall that Gaudet Kaiser has

25  gone out of business.  Right?

1          **THE COURT:**  Yes.

2          **MR. LANGAN:**  Your Honor issued an order, which was

3    very helpful to at least start the process of retrieving

4    physical documents from the court reporting firm.

5          **THE COURT:**  Right.

6          **MR. LANGAN:**  Our staff is reporting to us that they

7    are running into a little bit of headwinds trying to satisfy

8    themselves that every relevant piece of paper has been

9    retrieved.  I think things like acknowledgments of

10   confidentiality and the like.  We are not getting warm and

11   fuzzy feelings that we are getting complete cooperation.

12              I don't have a lot of details on this, but I

13   just want to flag there's an issue there.  We may be coming

14   back to Your Honor really on behalf of all the parties, I

15   think, to try to make sure that Worldwide is physically

16   transferred every single scrap of paper that's possibly

17   relevant to the process.  I just wanted to sort of mention

18   that.  It's kind of late-breaking news that we are not getting

19   the cooperation we think we need.  Can you stay tuned on that?

20   I'm really not asking the Court to do anything other than take

21   note that we think there may be an issue brewing there.

22         **THE COURT:**  No problem.  We will be glad to work with

23   you on it.  Okay.  We are going to try it one more time.

24   Going, going, gone.  Thanks, guys.

25              (Proceedings adjourned.)

1                          **<u>CERTIFICATE</u>**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3   Reporter for the United States District Court, Eastern District

4   of Louisiana, do hereby certify that the foregoing is a true

5   and correct transcript, to the best of my ability and

6   understanding, from the record of the proceedings in the

7   above-entitled matter.

8

9

10                              <u>s/ Toni Doyle Tusa</u>
                                Toni Doyle Tusa, CCR, FCRR
11                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25