# Transcript of the Testimony of
# The Joint United States Coast Guard/Minerals Management Service Investigation

### Date taken: May 27, 2010
### AM Session

### USCG/MMS Marine Board of Investigation

**\*\*Note\*\***
All electronic deposition & exhibit files
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a **Username**
and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:    504-529-5255
Fax:      504-529-5257
Email:    reporters@psrdocs.com
Internet:    www.psrdocs.com



EXHIBIT 2

USCG/MMS BOARD OF INVESTIGATION

INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
POLLUTION AND SINKING
OF MOBILE OFFSHORE DRILLING UNIT

DEEPWATER HORIZON, WITH LOSS OF LIFE

IN THE GULF OF MEXICO, 21-22 APRIL 2010

THURSDAY, MAY 27, 2010

A.M. SESSION

\* \* \* \* \* \*

The Transcript of the Joint United States Coast Guard/Minerals Management Service Investigation of the above entitled cause before CATHY RENEE' POWELL, a certified court reporter authorized to administer oaths of witnesses pursuant to Section 961.1 of Title 13 of the Louisiana Revised Statute of 1950, as amended, reported at the Radisson Hotel, 2150 Veterans Memorial Boulevard, Kenner, Louisiana 70062, on Thursday, May 27, 2010, beginning at 8:00 a.m.

Page 2

1
2  APPEARANCES:
3
   MEMBERS OF THE BOARD:
4
5  CAPTAIN HUNG M. NGUYEN
   CO-CHAIR UNITED STATES COAST GUARD
6
7  DAVID DYKES
   CO-CHAIR MINERALS MANAGEMENT SERVICE
8
9  JASON MATHEWS
   MINERALS MANAGEMENT SERVICE
10
11 JOHN McCARROLL
   MINERALS MANAGEMENT SERVICE
12
13 ROSS WHEATLEY
   UNITED STATES COAST GUARD
14
15 LTR. ROBERT BUTTS, COURT RECORDER
   UNITED STATES COAST GUARD
16
17 REPORTED BY:
18   CATHY RENEE' POWELL
     CERTIFIED COURT REPORTER
19
20      EXAMINATION INDEX
21 EXAMINATION BY MR. MATHEWS: ..........7
22 EXAMINATION BY MR. McCARROLL: ..........30
23 EXAMINATION BY MR. DYKES: ..............32
24 EXAMINATION BY MR. WHEATLEY: ..........36
25 EXAMINATION BY MR. MATHEWS: ..........50

Page 3

1  EXAMINATION BY LT. BUTTS: ..............52
2  EXAMINATION BY MR. DYKES: ..............57
3  EXAMINATION BY MR. LINSIN: .............60
4  EXAMINATION BY MR. JONES: ..............62
5  EXAMINATION BY MR. DYKES: ..............67
6  EXAMINATION BY MR. GODWIN: .............72
7  EXAMINATION BY MR. GORDON: .............91
8  EXAMINATION BY MR. GODFREY: ...........107
9  EXAMINATION BY MR. MATHEWS: ...........128
10 EXAMINATION BY MR. DYKES: .............130
11 EXAMINATION BY CAPTAIN NGUYEN: ........131
12 EXAMINATION BY MR. DYKES: .............144
13 EXAMINATION BY MR. WHEATLEY: ..........152
14 EXAMINATION BY MR. MATHEWS: ...........178
15 EXAMINATION BY MR. McCARROLL: .........184
16 EXAMINATION BY LT. BUTTS: .............185
17 EXAMINATION BY CAPTAIN NGUYEN: ........190
18 EXAMINATION BY MR. GODFREY: ...........198
19 EXAMINATION BY MR. GORDON: ............208
20 EXAMINATION BY LT. BUTTS: .............214
21
22
23
24
25

Page 4

1            PROCEEDINGS
2  CAPTAIN NGUYEN:
3      Good morning. Please be seated so
4  we can get the hearing started.
5      Reporter, please go on record.
6      There is a change in the list of
7  scheduled witnesses this morning. This
8  morning, the board was informed by
9  Mr. Mansfield's counsel that due to medical
10 reasons, he could not be here for this
11 hearing. So the board will reschedule to
12 receive his testimony at the next hearing in
13 mid-July. We will take testimony of
14 Mr. Jimmy Harrell, offshore installation
15 manager, for this morning.
16     Good morning, Mr. Harrell. Are
17 you represented by counsel, do you have your
18 own counsel or are you represented by
19 Transocean counsel?
20     THE WITNESS:
21     Transocean.
22 CAPTAIN NGUYEN:
23     Please rise, and I will give you
24 the oath.
25     JIMMY HARRELL,

Page 5

1  having been first duly sworn as a witness,
2  was examined and testified as follows:
3      CAPTAIN NGUYEN:
4      Mr. Harrell, I want to make sure I
5  understand. You do not have personal
6  counsel; is that right? Transocean is your
7  counsel?
8      THE WITNESS:
9      That's correct.
10 EXAMINATION BY MR. MATHEWS:
11     Q. Mr. Harrell, would you state your
12 name and spell it for the record.
13     A. Jimmy Harrell, H-A-R-R-E-L-L.
14     Q. By whom are you employed, sir?
15     A. Transocean.
16     Q. And what position do you hold?
17     A. Offshore installation manager.
18     Q. And how long have you held the
19 position of OIM?
20     A. About six and a half years.
21     Q. Can you briefly describe your job
22 responsibilities on board the DEEPWATER
23 HORIZON.
24     A. I deal a lot with personnel, you
25 know, but overall responsibility on

2 (Pages 2 to 5)

Page 130

1  vessel lost power for two minutes? What
2  happened to emergency power and all that?
3    A. It was an over-speed problem.
4    Q. But it was only one engine, right?
5    A. Yes, but it took the other one
6  when it went down. I know one engine
7  started back up.
8    Q. But it took two minutes? What
9  happened to the emergency power? Did it
10 come on when the regular power went out?
11   A. I can't remember all the details,
12 but it was close to a couple of minutes.
13   Q. As OIM and you have a total loss
14 of power for two minutes, is that a concern
15 to you?
16   A. It's according to the weather
17 conditions, how fast you drift off.
18   Q. But having — so if the weather
19 were perfect, you would be fine with that?
20   A. Yeah. It takes several minutes.
21 I report to the bridge in case of an
22 emergency like that, and I do remember being
23 up there.
24       I don't recollect getting too far
25 off location during that two minutes.

Page 131

1    Q. So the vessel is a dynamically
2  positioned vessel?
3    A. Yes.
4    Q. And if you lost power, you could
5  start to drift off?
6    A. Yes, sir.
7    Q. What if you were drilling and lost
8  total power, would that be a concern to you?
9    A. Yes, it is any time. You have
10 more steps to go through when you have pipe
11 across there. You have to hang off when you
12 get into a yellow condition; and red, you
13 have to disconnect.
14   Q. So a loss of power should be a
15 concern to you, right?
16   A. Yes, I will be talking to the
17 drill floor.
18   Q. Do you report the incident to
19 anybody?
20   A. Yes.
21   Q. Who do you report it to?
22   A. Upper management, rig management.
23   Q. And what happens after that, after
24 the report up to rig management?
25   A. They go through different

Page 132

1  scenarios, finding out what caused the
2  problem and fixing the problems before they
3  return to work.
4    Q. Did you contact class society?
5    A. I did not.
6    Q. Did you contact the flag state?
7    A. I did not.
8    Q. Have you seen this organizational
9  chart before?
10   A. Yes. We have it posted on the
11 rig.
12   Q. The BP vessel, when would it not
13 be under way?
14   A. When you are latched up to the
15 wellhead. That means you are latched up to
16 the BOP with a wellhead.
17   Q. Is that their definition of "under
18 way"?
19   A. I thought you said "not under
20 way."
21   Q. That's right. What I am saying
22 is, "latched up," does that mean it is not
23 under way?
24   A. That's correct.
25   Q. According to whose definition?

Page 133

1    A. To the chart here. I mean, any
2  time we are not latched up, we have to go
3  through customs and all that. And the
4  captain on board the DEEPWATER HORIZON, he
5  is in charge when we are not latched up,
6  under way. OIM is in charge when we're
7  under way.
8    Q. Nautical terminology, "under way,
9  not under way," those are standard
10 terminologies. What I am saying is,
11 latching up is not an anchoring system, so
12 would the vessel be continuously under way?
13   A. No.
14   Q. Who says "no"? Is it Transocean?
15   A. I say no, because you are
16 restricted in your maneuverability when you
17 are latched up.
18   Q. So is the drilling system an
19 anchoring system?
20   A. No, it is a DP.
21   Q. But a DP is not an anchoring
22 system?
23   A. Correct.
24   Q. So the vessel is continuously
25 under way, is it not?

34 (Pages 130 to 133)

Page 134

1  A. No, it is not. You are holding,
2  maintaining position when you are latched
3  up. You are not making any way.
4  Q. But you are under way?
5  A. No.
6  Q. You are not making way, but you
7  are under way. Correct?
8  MR. CLEMENTS:
9  It has been asked and answered
10 several times.
11 CAPTAIN NGUYEN:
12 I understand.
13 EXAMINATION BY CAPTAIN NGUYEN:
14 Q. When you say that you are the OIM
15 and in charge of the vessel and its
16 personnel, it seems to me that you don't
17 have visibility on some of the activities
18 going on on the vessel in terms of the
19 testing, the results and things like that.
20 So I want to make sure that when I
21 look at the safety net, somebody is in
22 charge of that vessel at all times. And I
23 want to make sure that people understand
24 that. Okay? If the vessel is under way,
25 what does it mean? Who is in charge?

Page 135

1  From my understanding of the
2  configuration of the vessel, this vessel is
3  a little under way. It may not be making
4  way, but it is under way. So according to
5  your organization there, it is always going
6  to be the master of the vessel who is in
7  charge.
8  Let's say you were in charge when
9  you were latched up. Now, according to your
10 testimony, according to the transfer of
11 command, what you are saying is, once the
12 abandon ship is ordered by the master, there
13 is some kind of transfer of command that
14 takes place between you and the master,
15 correct?
16 A. Yes.
17 Q. When does that take place? When
18 the EDS is activated? When does that
19 transfer of command take place? Under what
20 conditions?
21 A. Yeah, it would be after the
22 disconnect, because once you disconnect from
23 the well, he would be in command at that
24 time.
25 Q. So from what I understand, you try

Page 136

1  to activate the BOP and you try to activate
2  the EDS and you have no indication of
3  whether the EDS was activated or not.
4  So if it didn't activate, assuming
5  that you were in command before the
6  incident, if the EDS didn't activate, would
7  you still be in command throughout the
8  evolution here instead of the master?
9  A. Yes. If it wasn't latched up,
10 yes. I mean, if it wasn't unlatched during
11 the EDS signals.
12 Q. So it is not very clear, is it, in
13 terms of whether the master was in charge of
14 the situation or you were in charge of the
15 situation, so there was chaos, right?
16 A. There wasn't chaos about that.
17 Q. I don't understand. Did you have
18 a handoff? How did the handoff take place
19 between you and the master in terms of this
20 evolution?
21 A. We worked together, but that is
22 something -- I mean, I do turn it over to
23 him. Like, if we are going to a new
24 location, after we unlatch, he becomes in
25 charge. But I am still responsible for the

Page 137

1  safety of everybody out there no matter
2  what.
3  Q. I'm just trying to understand
4  here, especially in a crisis situation, the
5  line of communication and the chain of
6  command. The line of authority has to be
7  clear here. I am not very clear on what
8  happened. Because of the way the
9  organization is set up, I am not very clear
10 on how that transition of authority took
11 place during the casualty.
12 Did it ever hand off between you
13 and the master of the vessel?
14 A. No, I never made a handoff because
15 it did not unlatch. You could see the slip
16 joint come up in the --
17 Q. So people were still looking to
18 you for direction?
19 A. Yes.
20 Q. People were still looking for you
21 to order the abandon ship?
22 A. Well, yeah, but like I say, the
23 captain, he plays a major role too in an
24 emergency and all.
25 Q. I understand. I think that is --

35 (Pages 134 to 137)

Page 150

```
 1   CAPTAIN NGUYEN:
 2       Yes.
 3   EXAMINATION BY MR. WHEATLEY:
 4   Q. Would you please state and spell
 5   your name.
 6   A. Curt Robert Kuchta, K-U-C-H-T-A.
 7   Q. Do you currently have counsel,
 8   Captain?
 9   A. I do.
10   Q. And is it Mr. Kohnke?
11   A. Yes.
12   Q. Do you hold any Coast Guard
13   licenses or credentials?
14   A. Master 100 tonnage, USCG.
15   Q. When did you first obtain that
16   certification?
17   A. I want to say — on the license
18   right now, I'm not sure of the exact date.
19       Well, the new one was issued
20   May 4. I have been in that position for
21   about two years on the HORIZON.
22   Q. And would you please outline your
23   background for us.
24   A. I graduated from Massachusetts
25   Maritime Academy in 1998. Went to work as a
```

Page 151

```
 1   third mate for Reading & Bates on board the
 2   PATHFINDER. Stayed on board as third mate
 3   until I went to another ship in 2008. I
 4   went to help build two new projects, and
 5   then came back to be master in 2008 on the
 6   DEEPWATER HORIZON.
 7   Q. Thank you. Could you outline your
 8   education, please.
 9   A. Massachusetts Maritime Academy,
10   bachelor of science in marine
11   transportation.
12   Q. What is your current title?
13   A. Master.
14   Q. When did you first assume that
15   role?
16   A. June of 2008.
17   Q. As the master of the DEEPWATER
18   HORIZON, could you outline for us the scope
19   of your duties and responsibilities?
20   A. Sure. Safety of the vessel,
21   navigation of the vessel while under way and
22   station-keeping. I supervise the
23   station-keeping as well as all the
24   regulatory on the vessel side of it. Class,
25   safety, that type of thing.
```

Page 152

```
 1   Q. Would it be fair to say you are
 2   responsible for supervision of required
 3   inspections and certifications and things
 4   related to that for the DEEPWATER HORIZON?
 5   A. Correct.
 6   Q. Could you basically kind of
 7   outline for us what we have seen in the
 8   organizational chart related to the
 9   DEEPWATER HORIZON, your relationship with
10   the OIM?
11   A. In reference to?
12   Q. How do you interact with him, what
13   types of communications do you have, how
14   often do you discuss issues of concern?
15   A. Whenever one arises. We have
16   extremely open communications. Any time any
17   type of question arises, whether on the
18   drilling side or marine side, whatever side,
19   we have very, very good, open
20   communications. We have worked together
21   quite a while.
22   Q. Do you have regular safety
23   meetings as such?
24   A. Yes, we have numerous meetings.
25   Q. Have you ever seen this chart
```

Page 153

```
 1   before?
 2   A. Yes.
 3   Q. Are you familiar with it?
 4   A. Yes.
 5   Q. Is it fair to say this is the
 6   organizational chart for the DEEPWATER
 7   HORIZON?
 8   A. Yes.
 9   Q. It was basically effective on the
10   date of the incident which we are
11   discussing, April 20?
12   A. Yes.
13   Q. You can see here it identifies the
14   OIM as the person in charge, and it places
15   you in the top line on the left. We have
16   had a number of questions, if you will,
17   about who is in charge and at what point and
18   when that role changes, how do you know?
19       Basically, when the vessel is
20   under way, making way, you as the master
21   would be in charge of the vessel. Is that
22   true?
23   A. Correct.
24   Q. At what point, based upon your
25   understanding of this organizational chart,
```

PROFESSIONAL SHORTHAND REPORTERS, INC (800) 536-5255          (504) 529-5255
New Orleans * Baton Rouge * Shreveport

f03a8c7d-d217-473d-b704-d7523628e32c

Page 154

1 does the OIM assume the role of being in
2 charge of the entire rig?
3   A. When we latch up.
4   Q. That's your understanding of the
5 distinction between the two positions?
6   A. Yes, sir.
7   Q. In times of emergency, we heard
8 testimony of the OIM, basically the master
9 assumes the role of being in charge,
10 correct?
11   A. Correct.
12   Q. How do you know when that transfer
13 of role takes place?
14   A. There is always extremely good
15 communication, so it has never been an
16 issue. I mean, there has never been an
17 issue where it has come up.
18   Q. On the 20th of April, when the
19 incident occurred, did you have a formal
20 handoff of responsibility between yourself
21 and the OIM?
22   A. In that short time frame, no.
23 However, we were both on the bridge
24 communicating about what was happening.
25   Q. Now, being a mariner, obviously

Page 155

1 you are familiar with the term "underway,
2 not making way"?
3   A. Yes, sir.
4   Q. When the vessel is latched up to
5 the BOP, is the vessel under way, not making
6 way?
7   A. That would go back to the
8 corporation.
9   Q. Based on your understanding of the
10 COLREGS, when you are under way, is the OIM
11 or you in charge?
12   A. I go back to -- once you are on
13 location, latched up, the dynamic
14 positioning system has it under control.
15   Q. When you are latched up, you are
16 still under way?
17   A. I would say that.
18   Q. So would it be your opinion that
19 COLREGS no long apply at that point?
20   A. No, they still apply. But that is
21 for actual definition. Like I said, it has
22 never been a problem being latched up
23 conducting drilling operations.
24   Q. Could you basically outline for us
25 the scope of the SMS plan on board the

Page 156

1 DEEPWATER HORIZON?
2   A. That is a very broad question. In
3 reference to what aspect of it?
4   Q. If you will, kind of the
5 10,000-foot view level. How about what the
6 SMS is and how it applies to the DEEPWATER
7 HORIZON.
8   A. I'm sorry. It is such a broad
9 question.
10   Q. On board the DEEPWATER HORIZON,
11 did you have an SMS?
12   A. Yes.
13   Q. Do you know who approved that
14 plan?
15   A. Yes.
16   Q. Who was that?
17   A. DNV.
18   Q. Do you know if it complied with
19 IMO standards?
20   A. Yes.
21   Q. Who on the rig is designated as
22 the safety management officer, or the safety
23 officer?
24   A. It has been a long five weeks. At
25 this point in time, I don't recall. Those

Page 157

1 types of questions, a few weeks ago would
2 have been no problem. But as you can
3 imagine, it has been a rather difficult few
4 weeks.
5   Q. I understand, sir.
6     Could you tell us how your company
7 documented their compliance with the Safety
8 Management System?
9   A. I'm sorry, I don't understand.
10   Q. Well, there are certain
11 requirements --
12   A. We go through the inspection every
13 two and a half years as required.
14   Q. Do you have annual inspections?
15   A. Yes, through ABS, class.
16   Q. Is that part of your safety
17 requirements as well?
18   A. Yes.
19   Q. Do you know where those are
20 documented on the DEEPWATER HORIZON, the
21 fact they have been completed?
22   A. They are in a binder in my office,
23 every signed copy.
24   Q. Do you know if you have ternal
25 audits to ensure your compliance --

Page 206

1  but I don't recall.
2  Q. One final question. Was the
3  DEEPWATER HORIZON under a daily rate
4  contract or a yearly contract with BP at the
5  time of the incident?
6  A. I don't recall.
7  MR. GODFREY:
8      Thank you. I have no further
9  questions.
10 MR. GORDON:
11     Captain, would it be okay if I
12 asked questions too?
13 EXAMINATION BY MR. GORDON:
14 Q. I want to talk to you about
15 COLREGS. Are you familiar with them?
16 A. Obviously, a week ago, I was much
17 more familiar with them, but yes.
18 Q. The DEEPWATER HORIZON, was she a
19 vessel?
20 A. Yes.
21 Q. Were you the master of that
22 vessel?
23 A. Yes.
24 Q. Was she operating in U.S. waters?
25 A. International waters.

Page 207

1  Q. Was she subject to the IMO regs?
2  A. Yes.
3  Q. Was Rule 3 of the IMO regs
4  applicable to your vessel, sir?
5  A. In what section of the IMO regs?
6  Q. Rule 3. What is highlighted with
7  an asterisk.
8  A. The word "under way."
9  Q. Okay. So it defines under way,
10 correct?
11 A. Correct.
12 Q. Could you please read that into
13 the record?
14 A. "The word 'under way' means that a
15 vessel is not at anchor or made fast to
16 shore or ground."
17 Q. Okay. Just prior to the
18 explosion, was the DEEPWATER HORIZON fixed
19 to the ground or anchored?
20 MR. KOHNKE:
21     When you say "fixed," do you mean
22 made fast to the ground?
23 MR. GORDON:
24     Yes.
25 THE WITNESS:

Page 208

1      We did have a riser and BOP down.
2  EXAMINATION BY MR. GORDON:
3  Q. Do you consider that, sir, to be
4  anchored to the ground?
5      You are the captain of the vessel,
6  sir?
7  MR. KOHNKE:
8      Here is the problem. Mr. Gordon,
9  this witness has raised his right hand and
10 taken an oath and been told that a false
11 statement is punishable by both jail and a
12 fine.
13     You are asking him now to
14 interpret something. There is no black or
15 white, there is no absolute here. I am
16 very, very reluctant to allow him to
17 interpret something in an argument with
18 counsel. So proceed very carefully, please.
19 EXAMINATION BY MR. GORDON:
20 Q. Have you had a chance to read it,
21 sir?
22 A. If I am going to be asked about
23 it, I would like to keep it in front of me.
24 Q. I would like to introduce this as
25 an exhibit.

Page 209

1      I only have the one -- do you have
2  a copy of this?
3  CAPTAIN NGUYEN:
4      You brought the document.
5      Can I ask you the relevance of
6  your questioning before you introduce
7  something in the record?
8  MR. GORDON:
9      I have here Marine Notice 7-038-2,
10 the Marshall Islands document, which is --
11 this DEEPWATER HORIZON was flagged to the
12 Marshall Islands. In it, under the "Minimum
13 Safe Manning," it has something called "On
14 location."
15     The COLREGS do not have that
16 definition, so I would like to ask the
17 captain if he considered his vessel
18 unoperating (sic) when they had the BOP
19 down. Operating under the Schedule A of
20 2.2.5, or if he considered himself subject
21 to the COLREGS.
22     The reason, if you are on location
23 in the Marshall Islands, you don't need a
24 master, you just need an OIM. So I am
25 trying to figure out under what rules they

Page 214

```
1  THE WITNESS:
2      Yes, sir.
3  CAPTAIN NGUYEN:
4      Thank you, you are dismissed. We
5  are adjourned for the morning, please come
6  back at 1:30.
7      (Recess for lunch.)
```

Page 215

```
 2      REPORTER'S CERTIFICATE
 4      I, Cathy Renee' Powell, Certified
 5  Court Reporter, do hereby certify that the
 6  foregoing proceedings were reported by me in
 7  shorthand and transcribed under my personal
 8  direction and supervision, and is a true and
 9  correct transcript, to the best of my
10  ability and understanding;
11      That I am not of counsel, not related
12  to counsel or parties hereto, and not in any
13  way interested in the outcome of this
14  matter.


19  CATHY RENEE' POWELL, CCR
```

55 (Pages 214 to 215)