**IN RE: DEEPWATER HORIZON LITIGATION**
**MDL NO. 2179**

JAMES PARKERSON ROY
Domengeaux Wright Roy & Edwards LLC
556 Jefferson St. Suite 500
Lafayette, LA 70501
E-Mail: jimr@wrightroy.com
Telephone: (337) 233-3033
Direct: (337) 593-4190
Fax: (337) 233-2796

STEPHEN J. HERMAN
Herman, Herman & Katz, LLC
820 O'Keefe Ave.
New Orleans, LA 70113
E-Mail: sherman@hhklawfirm.com
Telephone: (504) 581-4892
Direct: (504) 680-0554
Fax: (504) 561-6024

September 14, 2012

***VIA* E-MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
500 Poydras Street, Room B345
New Orleans, Louisiana 70130
E-Mail: Sally_Shushan@laed.uscourts.gov

Re: Objector Requests for Settlement Discovery

Dear Judge Shushan:

This letter is sent in response to the Court's Order of September 11, 2012 [Doc 7366], as well as Go Fish's Motion for Scheduling Order [Doc 7474] and Objectors' Notice of Motion for Leave to Take Discovery [Doc 7368]. For the following reasons, all such discovery requests should be denied:

## Introduction

The objectors' requests for discovery are untimely, overbroad, grounded on erroneous contentions, and without any threshold showing of "collusion" as required under Fifth Circuit precedent.

Despite the fact that the Settlement Agreement has been on file for nearly *five months,* over a month after the Court publicly issued an Order denying Halliburton and the State of Louisiana the right to engage in settlement-related discovery, and almost one month after the submission of the Settling Parties' Briefs with Supporting Declarations, these objectors, on the eve of the objection deadline, (indeed after the original deadline for objections, which was extended for one week due to Hurricane Isaac), seek so-called "limited" discovery, which looks more like a request for everything but the kitchen sink.

Notably, the Waltzer & Wiygul law firm, which represents Go Fish, has registered over 970 of its clients into the allegedly "objectionable" Settlement Program and submitted almost 700 settlement claims; Stuart Smith's co-counsel, Krupnick Campbell, has registered over 500 clients and submitted more than 600 claims; and Farrell & Patel has registered over 500 of its clients and submitted at least 352 claims.

The entire set of Deposition Exhibits, which constitute the key liability documents in the case, has been available from the PSC for over a year now to any plaintiff's attorney executing Appendix A to Pre-Trial Order No. 13.

The entire set of Phase One deposition excerpts has been on file with the Court for at least seven months, along with the PSC's Pre-Trial Statement and individual deposition two-page advocacy summaries.

The PSC has always steadfastly asserted that BP is liable for gross negligence – and fully intends to prove same at the trial set to commence on January 14, 2013. Indeed, (despite the somewhat misleading inferences which might be drawn from the State of Louisiana and other filings), Class Counsel never took the position that the factual evidence developed largely by the PSC would be insufficient to establish gross negligence, thereby justifying approval of the settlement. To the contrary, Class Counsel expressly stated in its Class Settlement Final Approval Brief that:

> Plaintiffs certainly believe that their claims against the BP Defendants are strong. BP, as the "Responsible Party" is strictly liable for damages recoverable under OPA, and the plaintiffs certainly believe that BP is liable for negligence, if not gross negligence, under general maritime law. The effects of the spill, moreover, on the Gulf Coast region from an environmental and economic standpoint have been well-documented and profound.[1]

*However*:

> There are over 130,000 claims which have been filed in the MDL. The mere Court time that would be necessary to try the individual damage issues alone would be quite substantial.
>
> Moreover, from a causation standpoint, the long-term effects of the spill are still uncertain, and are confounded with other environmental, ecological, social, political and economic risks and factors. To develop *Daubert*-compliant expert testimony (and the associated research, reliance materials, motion practice and discovery) with respect to the scope and extent of environmental and/or economic damages caused and/or likely to be caused in the future as a result of the spill is a time-consuming and expensive (if not potentially risky) prospect.

[1] CLASS COUNSEL FINAL SETTLEMENT APPROVAL BRIEF [Doc 7104], p.29.

> While much of this evidence can be established on a common and class-wide basis, each plaintiff would likely face a significant burden (if not litigation risk) in proving causation and damages specific to his or her individual claim.[2]

None of this is remotely refuted, or even addressed, in any of the Objections. *Except* that Mr. Smith, in his own Objection, acknowledges that:

> Because of the extraordinarily large number of claims which have been filed in this matter, their diversity of form and substance, and the fact that they are not susceptible to being tried in any way other than individually or in small groups, the cases which are not settled pursuant to any proposed settlement will represent an enormous burden on the Court and, more importantly, will create a backlog so deep that it could be many years, if not decades, before all of the cases could be tried.[3]

At the same time, Objectors attempt to bootstrap their alleged "need" for discovery upon the completely unsupported, and frankly irresponsible, contentions of the Louisiana Attorney General. Taking just a few examples:

- In discussing BP's (alleged) "unlimited" liability under OPA for future damages,[4] the Louisiana AG completely ignores the three-year OPA statute of limitations, which is extended for Class Members by the Settlement for at least an additional year.[5]
- Complaining that no interim payments are provided under the Court-Supervised Settlement Program,[6] the Louisiana AG completely disregards the fact that BP simultaneously established a separate OPA Claims Process to satisfy its continuing obligations under the Oil Pollution Act.[7,8]

---

2 APPROVAL BRIEF, p.30. Class Counsel, of course, provided additional reasons for approval of the settlement. *See generally* APPROVAL BRIEF, pp.30-37.

3 WALKER OBJECTION [Doc 189, No.10-7777], p.3.

4 *See* LOUISIANA FILING [Doc 7345], pp.20-22.

5 SETTLEMENT AGREEMENT, §§4.4.8 and 5.11.8. **The AG also ignores OPA's Presentment requirements, which are also resolved by the Settlement on behalf of Class Members.** SETTLEMENT AGREEMENT, §§4.2.5 and 7.3.2; and STIPULATION [Doc 7130-1].

6 *See* LOUISIANA FILING, p.22.

7 **The AG also ignores the fact that, by and large, the GCCF wasn't providing interim payments anyway.** *See, e.g.,* PLAINTIFFS' SUPPLEMENTAL MEMO CONCERNING BP'S FAILURE TO COMPLY WITH THE MANDATES OF OPA [Doc 1318], PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF COURT SUPERVISION OVER THE BP INTERIM CLAIMS PROCESS [Doc 3423] and STATE OF LOUISIANA MEMORANDUM [Doc 1308] (cited in the AG's filing at p.23 fn.51).

8 The Louisiana AG's filing actually notes this at page 23, but completely disregards its significance. If you want to collect interim payments, you can go to the BP OPA Process until April 2013, and then you still have at least a year to file in the Settlement Program. **If the AG gets his way, and the Settlement is thrown out, anyone who has not both presented and filed his claim by April 20, 2013 may be left completely out in the cold.**

- Contrary to the Louisiana AG's suggestion, the Seafood Program Opt-Out provisions, which have been available to the public as FAQ No. 155 on www.deepwaterhorizon settlements.com, protect settling Class Members who participate in the Seafood Program from any potential reduction in their recoveries in the event of opt outs; indeed, in the event of opt outs, participating Class Members stand to recover even more out of the Seafood Fund.

- Putting forth the somewhat absurd notion that there is "reason to question whether the negotiations between the parties truly occurred at arms' length,"[9] the Louisiana AG naively disregards the fact that Plaintiffs will face the *litigation risk* posed by BP's evidence on scientific, environmental and economic issues, even though there will certainly be contrary evidence available to them.

- Contrary to the statement by the Louisiana AG (repeated by Mr. Smith) that "the settling parties fail to point to a single thing negotiated that is new or original and not previously part of the GCCF process,"[10] Class Counsel spelled out in their Final Approval Brief that the Court-Supervised Settlement Program:

    1. Provides the class members with more flexible Benchmark Periods from which to establish loss and, where necessary, causation.[11]

    2. Replaces a vague baseline "loss of income" (LOI) determination with concrete, objective and flexible methods to establish base compensation loss, under a two-step process that accounts for both (i) losses, as compared to benchmark earnings periods, and (ii) the difference between 2010 profit and what the business would have earned but for the spill.

    3. Identifies specific "fixed" versus "variable" costs to be applied in the compensation calculations.

    4. Allows for causation presumptions based on industry and location, and, with respect to other classmembers, provides various alternative methods of establishing, by objective means, that the business or individual suffered a loss caused by the spill.

    5. Compensates class members for Coastal and Wetlands Property Damages, VoO Charter Compensation, Real Estate Sales Losses, and other damages which were not being compensated by GCCF.

---

9 LOUISIANA FILING, p.6.

10 LOUISIANA FILING, p.25.

11 In particular, the GCCF generally used 2008-2009 as a benchmark. Under the Settlement Program, by contrast, class members can generally go back to 2007. In addition, class members have the flexibility to use different sets of benchmark months to establish Causation versus the months they use to establish the amount of Base Compensation Loss sustained.

6. Includes RTP enhancements that are in virtually all cases equal to or greater than the "multipliers" under the GCCF stated methodology.

7. Guarantees of independence, transparency, Court supervision, and no "special deals".

APPROVAL BRIEF, pp.48-49. These points – apparent from the face of the Settlement Agreement as compared with the GCCF stated methodologies[12] – were **not** refuted by the State of Louisiana, nor the Objectors currently seeking discovery, nor indeed any of the Objections that were filed into the record in this case.

Halliburton "objects" to the Settlement on the basis that BP is paying *too much* to the class.[13]

**Go Fish Request**

First, it is questionable that Go Fish has standing to object. Go Fish is not a Class Member.[14] While, perhaps, a case could be made for Article III standing generally, the Preliminary Approval Order,[15] formal Notice, and class action principles generally require an objection to be lodged by a member of the relevant class.

Second, Go Fish admits that it "continues to believe that 2.3 billion dollars … should be enough to provide all fishermen both duration and parity."[16] That the alleged "problems" can still be solved within the confines of the Settlement's terms by determining a fair "Round Two" distribution from the Seafood Fund.[17] And that "the Settlement was amended to allow the Court appointed neutral to change the allocation formulas to attain fairness on the second distribution of SCP funds."[18] Therefore, Go Fish is not actually objecting to the Settlement Agreement; rather, it is expressing the fear that the Court-appointed neutral might make a Round Two allocation different from what some (but not other) Go Fish members might want or desire.

On that note, Go Fish's Objection and the Declarations filed in support thereof illustrate why formal sub-classing would not have been an effective structural protection under these

---

12 Class Counsel's Final Approval Brief EXHIBIT B [Doc 7104-2].

13 HALLIBURTON FILING [Doc 91, No.10-7777], pp.20-24.

14 *See* GO FISH MEMO IN SUPPORT OF MOT TO INTERVENE [Doc 7314-1], pp.1 and 4-7.

15 PRELIMINARY APPROVAL ORDER [Doc 6418], p.39 ¶38.

16 GO FISH OBJECTION [Doc 7344], p.3.

17 GO FISH OBJECTION, pp.2-3.

18 GO FISH OBJECTION, p.3.

circumstances, as both the lawyers and the plaintiffs involved participated in (or represent clients who have participated in) overlapping aspects of the commercial fishing industry.[19]

Finally, although Go Fish has "raised class concerns regarding adequacy of representation,"[20] it doesn't need "discovery" regarding the process, since – as amply demonstrated by the supporting Declarations – Mr. Waltzer and other Go Fish members were first-hand participants in the allocation process.[21]

Despite directly participating; as well as the facts established by the Perry, Balhoff, Herman and Rice Declarations;[22] as well as undersigned counsel's correspondence to Mr. Guidry of July 7, 2012;[23] Go Fish continues to mischaracterize Mr. Perry as a "mediator" to a "negotiation" involving PSC members who "represented" different interests in coming to a final agreement with BP. There would seem to be no amount of discovery that would enlighten them to the fact that Mr. Perry looked at all of the available data, reviewed all of the available evidence, listened to the viewpoints of various constituencies, (including Go Fish members), and made his own independent neutral un-biased un-conflicted determination as to a fair and appropriate allocation.

**Smith Request**

The statement by Mr. Smith that "undersigned counsel has not been actively involved in these proceedings since his cases have only been recently removed to this Court from State Court and/or transferred to this Court over objection by the MDL Panel" is extremely disingenuous. Mr. Smith appeared before this Court frequently in the initial months of the litigation.[24] He applied to be on the PSC after the MDL Panel transferred the litigation to this District.[25] And he was provided with the opportunity to actively participate in the common benefit effort.

---

[19] *See* WALTZER DECLARATION [Doc 7344-1], pp.2-3 ("Because I had so many clients from many fisheries, I sat in almost all of the different group meetings"); PHILLIPS DECLARATION [Doc 7344-8], p.1 ("I shrimp, crab and harvest oysters…. I am also an oyster leaseholder"); DANDAR DECLARATION [Doc 7344-10] ("I am a shrimper, crabber and oyster harvester"); ENCLADE DECLARATION [Doc 7344-6] (personally delivers shrimp, oysters and fish; describes how Go Fish, as an organization, "represents" a broad range of commercial fishing interests); NGUYEN DECLARATION [Doc 7344-3] (both crabs and shrimps); *see also* GUIDRY DECLARATION [Doc 7344-2], pp.4-5 (while a shrimper, also advocating for charter boat fishermen and processors).

[20] MEMO SUPPORT GO FISH MOT FOR SCHEDULING ORDER [Doc 7374-1], p.2.

[21] *See* WALTZER DECLARATION [Doc 7344-1] and GUIDRY DECLARATION [Doc 7344-2]

[22] PERRY DECLARATION [Doc 7110-5]; BALHOFF DECLARATION [Doc 7110-2]; HERMAN DECLARATION [Doc 7104-5], ¶11; RICE DECLARATION (Seafood Program) [Doc 7104-6, at pp.13-18].

[23] Attached hereto a EXHIBIT A.

[24] *See, e.g.,* COMPLAINT filed in *Barisich v. BP plc,* No.10-1316, on May 2, 2010.

[25] *See* SMITH APPLICATION [Doc 319].

Mr. Smith has submitted into the record his own declarations regarding various observations following Hurricane Isaac in support of his Objection.[26] Putting aside the relevance of such materials, why would he need further discovery on the issue from either Class Counsel or BP?

The "kitchen sink" requests amount to nothing more than a *post hoc* fishing expedition.

**<u>Objectors' Request</u>**

The Objectors provide absolutely no support for the contention that "it is impossible for Objectors and those similarly situated claimants whom undersigned counsel represents to meaningfully evaluate the terms of the Settlement, their alternatives to Settlement, such as opting-out … without expedited access to some limited discovery."[27]

Certainly an attorney who has undertaken and agreed to represent thousands of clients in BP Oil Spill related cases must have given some thought over past two years as to how they would establish causation and damages for their clients, if not liability.

These potential class members and their attorneys have been able, since April 18th, to look at the Settlement Agreement, analyze the benefits made available therein, and determine – *based on the facts and evidence developed by and known to the Objector and his attorney regarding the circumstances of his or her own particular case* – whether the Settlement is more attractive than the prospect of continued litigation.

Indeed, over 500 Farrell & Patel clients have apparently made such a determination.

**<u>The Objectors Do Not Have the Right to Discovery Absent Some Showing of "Fraud" or "Collusion" (Which Doesn't Exist)</u>**

The purpose and function of the approval process is to enable the Court to reach an independent, informed and reasoned decision on the fairness, adequacy and reasonableness of the settlement. Objectors with standing may be heard with respect to such issues, typically *via* briefs or argument at the formal fairness hearing, but courts have consistently declined the invitation to transform the settlement approval process into its own litigation. Accordingly, discovery is limited to what is essential "to aid the court in reaching an independent determination of fairness." *Manual for Complex Litigation*, *Fourth* (Federal Judicial Center 2004) §21.643 n.990, quoting *In re Lorazepam & Clorazepate Antitrust Litig*., 205 F.R.D. 24, 26 (D.D.C. 2001): "Class members who object to a class action settlement do not have an absolute right to

---

[26] DECLARATION OF BRIAN D. MOORE [Doc 189-4, No.10-7777]; DECLARATION OF JAMES H. KIRBY III [Doc 189-5, No.10-7777]; DECLARATION OF EDWIN W. CAKE [Doc 189-7, No.10-7777]; DECLARATION OF WILLIAM SUBRE [Doc 189-9, No.10-7777].

[27] 795 OBJECTORS' REQUEST FOR DISCOVERY [Doc 7368], p.3.

discovery; the court may in its discretion allow discovery if it will help the court determine whether the settlement is fair, reasonable, and adequate."

As a general principle:

> Discovery should be minimal and conditioned on a showing of need, because it will delay settlement, introduce uncertainty, and might be undertaken primarily to justify an award of attorney fees to the objector's counsel. A court should monitor postsettlement discovery by objectors and limit it to providing objectors with information central to the fairness of the proposed settlement. *A court should not allow discovery into the settlement-negotiation process unless the objector makes a preliminary showing of collusion or other improper behavior*.[28]

The U.S. Fifth Circuit, in *Newby v. Enron, Corp.*, 394 F.3d 296, 306 (5th Cir. 2004), endorsed this prevalent view, holding that "formal discovery is not necessary as long as (1) the interests of the class are not prejudiced by the settlement negotiations and (2) there are substantial factual bases on which to premise settlement." *Id.; see also, In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 211 (5th Cir. 1981) ("Formal discovery [is not] a necessary ticket to the bargaining table"); *Vollmer v. Publishers Clearing House,* 248 F.3d 698, 708 (7th Cir. 2001) ("The temptation to convert a settlement hearing into a full trial on the merits must be resisted"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 24, 27–28 (D.D.C. 2001) (citing with approval cases limiting objector discovery to cases where objectors make showing of collusion; nevertheless permitting limited discovery of documents of which parties already had possession, ensuring negligible delay); *Bowling v. Pfizer, Inc.,* 102 F.3d 777, 780–81 (6th Cir. Ohio 1996) (affirming district court's refusal to allow discovery regarding attorney fee agreements); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 4 (1st Cir. 1999) (holding objector discovery of side agreements is limited only to situations where there is evidence of fraud); *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 684–85 (7th Cir. 1987) (Posner, J.) (holding discovery of settlement negotiations is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive); *In re Lupron Mktg. & Sales Practices Litig.*, 2005 U.S. Dist. LEXIS 4039, 6–7 (D. Mass. Mar. 16, 2005) ("In exceptional cases, circumstantial evidence may demonstrate collusion between class counsel and defendants to a degree sufficient to warrant discovery into settlement negotiations").

In *Newby*, "a subset of members" of the settlement class objected to a proposed settlement with one of the defendants. They took issue with the settlement's fairness, reasonableness, and adequacy; specifically, its size, the fraction of the settlement devoted to expenses, the propriety of expense bills, the deferral of payment to class members, and the broad release terms. *Newby*, 394 F.3d at 301. The *Newby* trial court's decision to deny discovery, and to approve the settlement, was affirmed because it did what courts in the Fifth Circuit have been directed to do: It "faithfully applied a six-factor test in determining the appropriateness of the

---

[28] *MCL* 4th, § 21.643, citing *Bowling v. Pfizer*, 143 F.R.D. 141, 153 and n. 10 (S.D. Ohio 1992) (emphasis supplied).

proposed settlement," using the familiar *Reed* factors to evaluate and approve it. 394 F.3d at 301. The objectors, "on the other hand, continue[d] to engage in what we can only describe as a maddening pattern of over-generalization and selective narration." *Id.* Among other arguments on appeal, the objectors raised the district court's refusal to "permit them to conduct discovery relating to the conduct of the negotiations and the settlement terms to determine whether their interests and those of other class members have been adequately represented." 394 F.3d at 306, n.16. Specifically, the objectors requested discovery to explore the potential for securing a larger and broader judgment, and "the possibility of collusion." 394 F.3d at 306. The Fifth Circuit held that the "district court did not abuse its discretion in refusing to order discovery on both fronts." *Id.*

In so doing, Judge Smith, writing for a unanimous panel, reaffirmed earlier Fifth Circuit precedent in rejecting "precisely the proposition the . . . objectors propound: that 'the settlement process is necessarily inadequate unless informed by the process of discovery.'" 394 F.3d at 306. "Generally speaking, a settlement should stand or fall on the adequacy of its terms." *Id.*

Here, as in *Newby*, there has been "massive analysis of the circumstances surrounding Defendants' potential liability." *Id.* Here, as in *Newby*, an allegation of collusion "has never, at any point in the record, been advanced with the slightest factual substantiation." 394 F.3d at 307. *See generally,* FINAL APPROVAL BRIEF, pp.28-29. Here, as in *Newby*, the settlement negotiations included Court-ordered mediation.

**The Discovery Requests Are Not Well-Founded**

The Court, we believe, is in a position to make an appropriate determination as to the fairness and adequacy of the Settlement based on the voluminous record before him.

This is nothing more than publicity-seeking chest-beating by attorneys who have filed thousands of claims into the allegedly "objectionable" Settlement Program.

These attorneys are in a position to evaluate the strengths and weaknesses of their clients' cases, and to determine – based on the face of the Settlement Agreement and the evidence (if any) that they have developed on their own client's behalf – whether the client is better off in the Settlement Program or opting out.

After sitting on the sidelines for months without making any effort to ascertain the facts they claim are necessary to substantiate their objections, they have not demonstrated good cause for discovery at this late time.

As always, Plaintiffs appreciate the Court's time and consideration in this matter.

                                                      Respectfully submitted,

                                                     JAMES PARKERSON ROY
                                                     STEPHEN J. HERMAN
                                                     *Co-Lead Class Counsel*

cc: Stuart Smith, Esq.
    Joel Waltzer, Esq.
    Sarah Springer, Esq.
    LIAISON AND COORDINATING COUNSEL