**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUSIANA**

|   |   |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL No. 2179 |
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | Section: J  Judge: Barbier  Magistrate: Shushan |
| This Document Relates To:  All Cases,  12-970 (Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production., et al.) |   |

# APPLICANT FOR INTERVENTION GO FISH'S RESPONSE TO THE PLAINTIFFS STEERING COMMITTEE AND BP'S OPPOSITON TO GO FISH'S LIMITED DISCOVERY REQUESTS

## I.    WHAT GO FISH IS ACTUALLY SEEKING AND WHY

After reading BP and the Plaintiffs' Steering Committees' responses to the various requests for discovery regarding the proposed class action settlement in this matter, the Court could be forgiven for believing that Gulf Organized Fisheries in Solidarity & Hope (GO FISH) has asked for burdensome, unreasonably delayed, and unnecessary discovery, with the sole intention of blowing up the settlement agreement for its own aggrandizement.[1]  In fact, GO FISH has asked for tightly focused discovery, aimed at better understanding and hopefully correcting identified weaknesses in the Seafood Compensation Program ("SCP").  These weaknesses were identified through extensive research and

---

[1] Or perhaps the aggrandizement of GO FISH's counsel, who are said to be engaged in "publicity-seeking chest-beating." PSC Response at 9.  This is not only a little hyperbolic, and a bit demeaning to GO FISH's leadership, it is demonstrably untrue.  GO FISH chooses its own path and has directed and approved each filing to date.  Undersigned counsel has just done what lawyers are supposed to do - make reasonable arguments based on the facts to try to protect their clients' interests.

fieldwork over the past five months regarding the effect and probable distribution of the capped SCP. A brief summary of GO FISH's efforts and the rationale for the discovery requested follows.

### A. GO FISH'S Extensive Field Work with Fishermen and Review of LWF Landings Data

As explained in its pleadings, GO FISH actively participated in various aspects of the negotiation process which led to the proposed SCP. However, the agreement as filed appeared significantly different than what had been represented as the "agreement-in-principle."[2] As a consequence, GO FISH filed Comments and Objections regarding the Proposed Settlement (Rec. Doc. 6353). Over the past five months GO FISH has held twelve townhall type forums across the Gulf Coast and heard the questions and concerns of over one thousand SCP class members. These efforts culminated in an August 4 Gulf Coast Conference to inform and raise awareness to the issues with the SCP. Panel after panel of fishermen from each effected basin described the oil spill's impacts.

Many fishermen reported that their catch since the oil spill has been drastically reduced. Typically these fishermen were from areas which were hardest hit by the oil, such as the Barataria Basin. Data GO FISH has analyzed from government entities such as the Louisiana Department of Wildlife & Fisheries confirms that there are significant anomalies in catch data from the hardest hit areas. GO FISH also performed extensive analysis of the likely distribution of the SCP funds among fisheries, as well as the potential distribution of funds in an "Round 2" distribution which might occur.[3]

### B. The Weaknesses Identified in the SCP

As detailed in GO FISH's objections to the SCP, this detailed factual analysis revealed that a significant amount of the SCP funds will go to pay property damage claims related to oyster leases, rather than to compensating fishermen for lost income. In addition, the structure of the SCP compensation formula for fishermen contains several variables which do not realistically address the

---

[2] Exhibit 1, Declaration of Byron Encalade, at ¶ 10.
[3] GO FISH Objections, pp. 8, *passim.*

actual and potential impact of the spill on fishermen.  This is particularly so of fishermen in the hardest hit areas, who GO FISH believes require additional protection from the ongoing impacts of the oil spill.[4]

GO FISH's analysis further established that certain information critical to evaluating the likely effect of the SCP was simply missing from BP and the PSC's August 13 presentation.  This included information and analysis regarding: (a)  the number of otherwise eligible claims which had already been released through the GCCF process,  (b)  the acreage of oyster leases expected to be eligible for inclusion in the SCP, and (c) the value of all payments made to fishermen pursuant to BP's interim payment obligations under the Oil Pollution Act.

GO FISH had hoped that the source of these apparent imbalances would be explained, and perhaps even some plan for ameliorating them articulated, in BP and the PSC's later filings in support of the proposed settlement.  For example, if the so-called "second round" distribution of funds, made after all initial claims were paid, allowed a more protective payment to working fishermen, this information would allay some concerns.  Whether this will be the case is of course in part dependent on the missing information regarding the number of potential claimants, the acreage of oyster leases eligible,  and amounts already paid by BP.

GO FISH has long articulated concerns over the distributional equities in the SCP in terms of both duration of protection and parity.  However, the August 13 declarations accompanying the BP and PSC filings did not do anything to help clear up questions about the imbalances.  Rather, the declarations continue to assert, incorrectly, that the settlement will replace "five times annual commercial fishing industry revenues."  Further, the declarations contain incorrect statements regarding the effect of reduced catches on fishermen's cost structures.   These incorrect statements confirm that the SCP formula inappropriately reduces the payments to commercial fishermen by "loss percentages" which are not based on reality.

---

[4] In addition, GO FISH believes that risks to dependent shoreside seafood businesses are not adequately addressed.

These are not conjectural shortcomings and they deserve more than the short shrift they get from BP and the PSC in response to GO FISH'S request for limited discovery. This is particularly so since GO FISH seeks to find a means to make the settlement proposal work for all the parties. Correcting the problems with the current proposal will, however, require something more than the suggestion that anyone who is not happy with the proposal simply opt out.[5]

## II.   THE DISCOVERY REQUESTED IS DIRECTLY RELATED TO THE SHORTCOMINGS IDENTIFIED BY GO FISH

Both BP and the PSC argue generally that the requested discovery is unreasonably broad, and is not tied to a "particular objection."[6] As the discovery requests included with this reply indicate, however, the requests are directly tied to GO FISH's solidly researched objections.

All of these objections are tied to the premise, which BP and the PSC implicitly dispute, that a claimant should be able to determine what level of compensation the settlement will actually provide. What the settlement will actually provide has two components: first, what fishermen will be paid in the "first round" distribution, using the formulas contained in the settlement, and second, what fishermen will be paid in the "second round" distribution, made after all eligible first round claims are paid. GO FISH's analysis has demonstrated that the first round does not provide adequate risk protection for fishermen in the hardest hit areas. It is possible that the second round distribution could help redress this inequity, but that cannot be judged without some specific information on what first round payouts will look like. This is exactly what GO FISH is asking for.

In addition, the SCP is the only element of the proposed class settlement that is capped, and therefore the allocation of payments among the eligible parties is a zero sum game. In this situation, special attention is warranted to whether class representatives are adequate, and whether subclasses should be established. 1 Newberg on Class Actions § 3:75 (5th ed.) ("courts have found that class

---

[5] BP Response, at 19.
[6] *E.g.* BP Response, at 13.

counsel cannot adequately represent two sets of claimants if, in limited fund situations, the recovery of one set will cut directly into those of another."); *In re Literary Work in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011). A reasonable inquiry into the adequacy of the class representatives' actual interests is also eminently reasonable and tied to the specific distributional objections, particularly given the proposed class representatives' essentially identical, general and clearly attorney drafted declarations.[7]

### III. CLAIMS THAT DISCOVERY IS UNNECESSARY AND COMES TOO LATE ARE UNCONVINCING

BP and the PSC argue at some length that the requested discovery is unnecessary, since there has been voluminous discovery on liability issues, as well as a lengthy supervised negotiation process. Both proponents of the settlement also imply that counsel must have been asleep at the switch, and should know what the likely damages to their clients would be.[8] These arguments are basically hortatory and do not cite any actual facts.

BP and the PSC do not point to any discovery performed on the concerns GO FISH's research uncovered – i.e., the differential impact of the spill on different fishery areas, the economic structure of the fishery in those areas, and the likely payouts from the capped fund to property damage vs. actual fisher claims. Counsel have also done the homework to have a pretty good idea of what damages fishermen are looking at, and the future risks against which they should be protected.

As set out above, however, fishermen and their lawyers should not be left to guess, even very educated guesses, regarding material information to which BP and the PSC have exclusive access. It is BP and the PSC's burden to demonstrate the fairness of the proposed settlement and adequacy of the proposed class. Both should be eager to demonstrate fairness, not argue against transparency.

---

[7] *E..g* Rec. Doc. 7101-11,12, 19..
[8] E.g., PSC letter at 9.

BP and the PSC's joint argument that these requests come too late in the day is also unavailing. Affidavits and other information in support of the proposed settlement were filed on August 13, 2012. [Rec. Doc. 7101, et seq.]  Prior to that date, GO FISH had no reason to believe that BP or the PSC would not provide the data or address these concerns.  GO FISH reviewed the information BP and the PSC chose to include, the first technical information made available on the underpinnings of the SCP, and immediately sought discovery (with Hurricane Isaac intervening). This was the responsible approach to these issues, and it should not be punished.

BP further argues that it will be impossible to respond to GO FISH's limited requests prior to the November 8, 2012 fairness hearing.[9]  The information GO FISH seeks, however, is the kind of information that any settlement negotiation would have to include as fundamental premises:  who is eligible to participate, and what they are likely to be paid and when.  If information on the amount of eligible oyster leases, the payments already made by BP, and the number of releases already signed is not available to BP and the PSC, that fact is in itself a good reason for discovery and bears on the adequacy of the SCP.

IV.  CLAIMS OF COLLUSION ARE NOT NECESSARY FOR DISCOVERY

The PSC argues that GO FISH must allege collusion before any discovery is allowed.  This is not correct.  To be sure, discovery into the conduct of negotiations is said to be premised on a showing of collusion, but basic discovery into the facts which must underly the settlement itself requires no such showing.   As the Manual for Complex Litigation puts it, the Court may allow "focused discovery by objectors on a showing of need."[10]  GO FISH has adequately demonstrated that its requests are focused, and they are desperately needed.  Fishermen will not be able to understand what they stand to get out of

---

[9] BP Brief at 12.
[10] Manual for Complex Litigation 4th, § 22.924.

this settlement prior to the opt out date unless they have the information about what the claims made against the limited SCP fund are likely to be, and what share of the fund they may collect.

BP is more restrained than the PSC, arguing only that discovery is not permitted unless an objector has already identified an objection, and that the fairness hearing should not be a trial on the merits.  GO FISH agrees that discovery should not be about conjectural issues, and should not be a fishing expedition.  However, when a party has identified real problems based on careful factual analysis, discovery is appropriate.  That is what GO FISH has done.

V.     GO FISH HAS STANDING TO MAKE THESE REQUESTS,
       AND IN ANY CASE INDIVIDUAL OBJECTORS HAVE BEEN IDENTIFIED

BP argues at some length that GO FISH has no right to appear in this matter or seek limited discovery on behalf of its members.  All of BP's arguments are addressed in GO FISH's application for intervention in this matter [Rec. Doc. 7314],  and those arguments need not be repeated here.  In addition, GO FISH's objections are accompanied by handsigned declarations from numerous individual fishermen who are members of GO FISH and leaders of its constituent organizations, who object to the settlement on the same grounds as GO FISH.  BP's objection is at best a technical one, and should not be allowed to head off necessary inquiry into the factual underpinnings of this critical settlement.

VI.    GO FISH AND THE OBJECTORS HAVE AN IMPORTANT ROLE TO PLAY

"At their best, objectors may speak out on behalf of class interests that have not been fully represented or accounted for in the proposed settlement."[11]  GO FISH and the invidual objectors are trying to fulfill this role.  BP and the PSC spent a lot of time on this settlement, and deserve credit for that.  If the tone of the discourse is heated at times (undersigned counsel not excepted), that may be forgiven in a matter of such import for so many people.  But in the end, what GO FISH seeks for discovery with respect to the Seafood Compensation Program is modest, tied to specific and very

---

[11] Manual for Complex Litigation 4th, § 22.924.

substantive concerns, and is the kind of information which was certainly developed and in hand during the course of negotiations. GO FISH requests that the Court permit these reasonable and necessary measures to insure fairness.

                                                   Respectfully Submitted:

| | |
|---|---|
| /s/ Clay Garside | /s/ Joel Waltzer |
| Clay Garside (LA #29873) | Joel Waltzer (LA #19268) |
| 14399 Chef Menteur Hwy., Ste. D | 3715 Westbank Expressway, Ste. 13 |
| New Orleans, LA 70129 | Harvey, LA 70058 |
| Office: (504) 254-4400 | Office: (504) 340-6300 |
| Fax: (504) 254-1112 | Fax: (504) 340-6330 |
| clay@waltzerlaw.com | joel@waltzerlaw.com |
| | *Counsel for Proposed Intervenors* |
| Robert Wiygul (LA #17411) | |
| 1011 Iberville Drive | |
| Ocean Springs, MS 39564 | |
| Office: (228) 872-1125 | |
| Fax: (228) 872-1128 | |
| robert@waltzerlaw.com | |

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing motion has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of September, 2012.

                                                                                         /s/ Joel Waltzer

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUSIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 ) | MDL No. 2179 |
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | Section: J<br><br>Judge Barbier<br><br>Magistrate Shushan |
| **This Document Relates To:**<br>2:10-CV-02179 | |

## LIMITED DISCOVERY RELATED TO
## CLASS CERTIFICATION AND SETTLEMENT FAIRNESS

Intervenor Gulf Organized Fishermen in Solidarity & Hope ("GO FISH") has filed objections challenging the fairness of the Seafood Compensation Program; specifically, the parity and protection provided by the and the propriety of certifying the class without appropriate procedural protections (subclasses). The following non-public information is needed to flesh out the concerns raised by GO FISH and to address the evidence recently submitted by the PSC and BP in support of their request for settlement approval and class certification.

For purposes of these discovery requests, the "Seafood Compensation Program" ("SCP") includes the general provisions and Exhibit 10 of the Deepwater Horizon Economic and Property Damages Settlement agreement ("Settlement").

For purposes of these requests, "SCP Claim Type" includes each claim method found each fisheries specific compensation plan found in the SCP.  For instance, Oyster Leaseholder Interest Compensation, Oyster Leaseholder Revenue Compensation, Oyster Harvester – Captain, Oyster Harvester – Vessel Owner, Oyster Harvester – Combined; Shrimp Harvester – Captain, Shrimp Harvester – Vessel Owner, Shrimp Harvester – Expedited, Shrimp Harvester – Reduced Expedited

1

Shrimp Harvester – New Entry; Crab Harvester – Captain, Crab Harvester - Vessel Owner, Finfish Harvester – Captain, Finfish Harvester – Vessel Owner; Deckhand Category I, Deckhand Category II, and Deckhand Category III.

"Released Claims" means the claims of individuals or businesses who are excluded from participation in the Seafood Compensation Program under the terms of the DHECC economic settlement agreement by virtue of their having executed a prior release, either through GCCF or BP directly.

Unless otherwise stated, the time frame for each question is that time frame required for eligibility under the terms of the Seafood Compensation Program ("SCP).

DHECC SCP Fairness Discovery

1) Please list the factual bases and underlying assumptions for the following provision found in the DHECC SCP: "The Seafood Compensation Program is estimated to result in prompt claims payments totaling more than $1.9 billion representing approximately 83% of the $2.3 billion Seafood Compensation Program Amount." [R. 6430-22, p.5 (filed 05/03/12).

2) For each factual basis or assumption identified in Request No. 1, if the facts underlying the basis or assumption was found in a document, please produce the document. If the basis or assumption was based on an expert opinion, please provide the name and expertise of the expert and produce the report he or she generated that provides same.

3) Within the Settlement's geographic limits, please provide your best estimate of:

   a) the total number of commercial fishing vessels;

   b) the total number of vessel owners;

   c) the total number of captains;

   d) the total number of deckhands;

   e) the total number of oyster leaseholders who receive revenue on their leases;

   f) the total number of oyster leaseholders who can submit an oyster leasehold interest claim; and

   g) the total number of IFQ quota holders.

4) For each SCP claim type separately (e.g. shrimp, oyster, crab, finfish, other), within the Settlement's geographic limits, please provide your best estimate of:

   a) the total number of commercial fishing vessels;

b) the total number and cumulative value of vessel owners;

c) the total number of captains;

d) the total number of deckhands;

e) the total number of oyster leaseholders who can submit an oyster leasehold interest claim;

f) the total number of oyster leaseholders who received revenue on their leases; and

g) the total number of IFQ quota holders.

5) As of the filing of the proposed Settlement Agreement, for each SCP claim type separately (e.g. shrimp, oyster, crab, finfish, other), within the Settlement's geographic limits, please provide your best estimate of:

a) the total number of commercial fishing vessels made subject of a release signed by the owner;

b) the total number of vessel owners who signed releases, the total amount paid by BP and GCCF to those Released Parties, and the potential cumulative value of those claims under the SCP;

c) the total number of captains who signed releases the total amount paid by BP and GCCF to those Released Parties, and the potential cumulative value of those claims under the SCP;

d) the total number of deckhands who signed releases the total amount paid by BP and GCCF to those Released Parties, and the potential cumulative value of those claims under the SCP;

e) the total number of oyster leaseholders who could submit an oyster leasehold interest claim but signed a release, the total amount paid by BP and GCCF to those Released Parties, and the potential cumulative value of those claims under the SCP;

f) the total number of oyster leaseholders who received revenue on their leases but signed releases, the total amount paid by BP and GCCF to those Released Parties, and the potential cumulative value of those claims under the SCP; and

g) the total number of IFQ quota holders who signed releases, the total amount paid by BP and GCCF to those Released Parties, and the potential cumulative value of those claims under the SCP.

6) As of the filing of the proposed Settlement Agreement, for each SCP claim type separately (e.g. shrimp, oyster, crab, finfish, other) and within the Settlement's geographic limits, please provide your best estimate of:

a) the total number of class members who are eligible to submit a vessel owner claim and the potential cumulative value of those claims under the SCP;

b) the total number of class members who are eligible to submit a captain claim and the potential cumulative value of those claims under the SCP;

    c) the total number of class members who are eligible to submit a deckhand claim and the potential cumulative value of those claims under the SCP;

    d) the total number of class members who are eligible to submit an oyster leaseholder interest claim and the potential cumulative value of those claims under the SCP;

    e) the total number of class members who are eligible to submit an oyster leaseholder revenue claim for revenues received on their leases and the potential cumulative value of those claims under the SCP; and

    f) the total number of IFQ quota holders who signed releases and the potential cumulative value of those claims under the SCP.

7) As of the filing of the proposed Settlement Agreement, for each SCP claim type separately (e.g. shrimp, oyster, crab, finfish, other) and within the Settlement's geographic limits, please provide your best estimate of the potential cumulative value of interim and emergency payments made to eligible class members.

8) As of the filing of the proposed Settlement Agreement, for each SCP claim type separately (e.g. shrimp, oyster, crab, finfish, other) and within the Settlement's geographic limits, please provide your best estimate of the number of opt outs and the potential cumulative value of their claims under the SCP.

9) Regarding Oyster Leasehold Interest claims for compensation, please provide your best estimate of:

    a) the total number of acres eligible for Oyster Leaseholder Interest compensation and the potential cumulative value of those claims;

    b) the total number of acres within each Compensation Zone (A, B, and C) eligible for Oyster Leaseholder Interest compensation and the potential cumulative value of those claims within each zone;

    c) for each compensation zone separately, the number of acres leased under oyster waterbottom leases by political subdivisions of each State to private individuals and the potential cumulative value of those claims;

    d) for each compensation zone separately, the number of acres leased under oyster waterbottom leases by private parties claiming ownership or owning waterbottoms to private individuals and the potential cumulative value of those claims;

10) Please provide by quad and area, the production of oysters in the years 2010, 2011 and 2012.

11) Please provide the following information regarding the proposed class representatives who are asserted to qualify under the Seafood Compensation Program:

    a) The nature of each interest or interests that qualifies the proposed representative for participation in the Seafood Compensation Program (for example, whether the proposed representative is a shrimper, oysterman, oyster lease holder, crabber, etc.).

b) The identity of all attorneys who have a fee interest in the recovery of each proposed class representative; and

c) For each representative asserting a claim for SCP revenue based compensation, the trip tickets or tax returns forming the benchmark revenue of his or her claim; and

d) For each representative asserting a claim for oyster leasehold interest compensation, the lease numbers, the identity of the parties that issued the lease, the acreage of each lease, the SCP compensation zone within which each lease is located and the total amount of compensation the proposed representative believes he or she is due for the acreage under his ownership or control.

Respectfully Submitted:

/s/ Joel Waltzer
Joel Waltzer (LA #19268)
3715 Westbank Expwy, Ste 13
Harvey, LA  70058
Office:  (504) 340-6300
Fax:     (504) 340-6330
joel@waltzerlaw.com
  *counsel for Intervenors*

**CERTIFICATE OF SERVICE**

I certify that this motion has been served on All Counsel via Lexis Nexis File & Serve in accord with Pretrial Order No. 12 and via the CM/ECF with the Clerk of Court, U.S. Eastern District Court of La., in accored with the procedures established in MDL 2179, on this 18'th day of September, 2012.

/s/ Joel Waltzer