**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: Oil Spill by the Oil Rig                     MDL No. 2179
      "Deepwater Horizon"
      in the Gulf of Mexico,
      on April 20, 2010                     SECTION: J

This Document Relates to:

    All Cases                                  JUDGE BARBIER
                                  MAG. JUDGE SHUSHAN

_____/


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO**
**NULLIFY EACH AND EVERY GULF COAST CLAIMS FACILITY**
**"RELEASE AND COVENANT NOT TO SUE" and**
**VACATE PRELIMINARY APPROVAL ORDER**
**[As to the Proposed Economic and Property Damages Class Action Settlement]**

      Pinellas Marine Salvage, Inc., John Mavrogiannis, and Selmer M. Salvesen ("Plaintiffs"),

on behalf of themselves and other Class Members of the Proposed Economic and Property

Damages Class Action Settlement who are victims of the "Delay, Deny, Defend" strategy

of Kenneth R. Feinberg, et al., respectfully request that this Honorable Court: (a) nullify each

and every Gulf Coast Claims Facility ("GCCF") "Release and Covenant Not to Sue;" and

(b) vacate its Preliminary Approval Order [As to the Proposed Economic and Property

Damages Class Action Settlement], Rec. Doc. 6418 dated May 2, 2012, for the following

reasons.

<u>**PRELIMINARY STATEMENT**</u>

      On February 25, 2011, Pinellas Marine Salvage, Inc. and John Mavrogiannis filed their

action against Defendants Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a Gulf Coast

Claims Facility, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County,

Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on August 9, 2011. *See Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.*, 2:11-cv-01987.

On June 15, 2011, Plaintiff Salvesen filed his action against Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, GCCF, and William G. Green, Jr. in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 6, 2011. *See Salvesen v. Feinberg, et al.*, 2:11-cv-02533.

Plaintiffs  Pinellas Marine Salvage, Inc. and John Mavrogiannis re-filed their Motion to Remand and Memorandum in Support with this Honorable Court on November 14, 2011 (Rec. Doc. 4574). On December 1, 2011, Plaintiffs Pinellas Marine Salvage, Inc. and John Mavrogiannis filed their Motion in Opposition to Class Certification of Any Action in MDL No. 2179 and Memorandum in Support (Rec. Doc. 4782). Plaintiffs  Pinellas Marine Salvage, Inc. and John Mavrogiannis filed their Motion to Vacate Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement] and Memorandum in Support on July 13, 2012 (Rec. Doc. 6902 and 6902-1) (a copy of Rec. Doc. 6902-1 is attached hereto as Exhibit A). These three motions remain pending in this Honorable Court.

Plaintiff Salvesen re-filed his Motion to Remand and Memorandum in Support with this Court on November 14, 2011 (Rec. Doc. 4575). On December 4, 2011, Plaintiff Salvesen filed his Motion in Opposition to Class Certification of Any Action in MDL No. 2179 and

Memorandum in Support (Rec. Doc. 4798). Plaintiff Salvesen filed his Motion to Vacate Order and Reasons [As to Motions to Dismiss the B1 Master Complaint] and Memorandum in Support on April 8, 2012 (Rec. Doc. 6186). Plaintiff Salvesen filed his Motion to Vacate Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement] and Memorandum in Support on July 2, 2012 (Rec. Doc. 6831 and 6831-1) (a copy of Rec. Doc. 6831-1 is attached hereto as Exhibit B). These four motions remain pending in this Court.

## I.     BACKGROUND

### A.     The GCCF Payment Methodology

During GCCF Phase I, the GCCF implemented a claims process by which eligible claimants would receive compensation for the loss of earnings or profits, removal and clean-up costs, real or personal property damage, loss of subsistence use of natural resources and physical injury or death caused by the Spill by submitting a lesser level of documentation than would be required in later stages of the GCCF. This was known as the Emergency Advance Payment ("EAP") claims process. The GCCF accepted EAP claims from August 23, 2010 through November 23, 2010. A claimant who received an EAP was not required to execute a release and covenant not to sue BP or any other party.

During GCCF Phase II, known as the "Interim Payment/Final Payment" claims process, the GCCF received the following three types of claims:

(a) Interim Payment Claim: An eligible claimant could elect to file an Interim Payment Claim to receive compensation for documented past losses or damages caused by the Spill for which the claimant previously had not been compensated by the BP-operated facility, the GCCF or the Real Estate Fund. **A claimant seeking an Interim Payment was not required to sign a release and covenant not to sue** and, therefore, was able to file future Interim Payment, Quick Pay Final Payment and Full Review Final Payment Claims. According to the protocol, a claimant was permitted to file only one Interim Payment Claim per quarter.

(b) Quick Payment Final Claim: A claimant who had received a prior EAP or Interim Payment from the GCCF could file for a Quick Payment Final Claim and receive, without further documentation of losses caused by the Spill, a one-time final payment of $5,000 for individuals and $25,000 for businesses. Prior amounts received by the claimant from the BP-operated facility and/or the GCCF were not subtracted from this payment amount. **Claimants seeking a Quick Payment were required to submit with their claim form a release and covenant not to sue** in which the claimant agreed not to sue BP and all other potentially liable parties.

(c) Full Review Final Payment Claim: An eligible claimant could also file a Full Review Final Payment Claim to receive payment for all documented past damages and estimated future damages resulting from the Spill. **Claimants wishing to accept a Final Payment were required to sign and submit a release and covenant not to sue** in which the claimant agreed not to sue BP and all other potentially liable parties. Additionally, any Full Review Final Payment awarded to a claimant was decreased by the amount of any previous payments received from the GCCF, the BP-operated facility or the Real Estate Fund.

Claim forms for Phase II became available to the public on December 18, 2010. The GCCF began receiving Interim Payment and Final Payment Claims shortly thereafter; however, the assessment of claimant eligibility and calculation of losses for those claims did not begin until February 18, 2011. *Independent Evaluation of the Gulf Coast Claims Facility, Report of Findings & Observations*, BDO Consulting (June 5, 2012).

### B.    The "Delay, Deny, Defend" Strategy of Kenneth R. Feinberg, et al.

*Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.* and *Selmer M. Salvesen v. Kenneth R. Feinberg, et al.* are the only two cases of their kind filed in any court in the country. In each case, the complaint alleges, in part, that Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, and GCCF misled Plaintiffs by employing a "Delay, Deny, Defend" strategy against them. This strategy, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the

financially ruined claimant rejects the settlement offer, he or she may sue." In sum, Plaintiffs allege that BP is responsible for the oil spill incident; Feinberg, et al. (independent contractors), via employment of their "Delay, Deny, Defend" strategy, are responsible for not compensating, and thereby financially ruining, Plaintiffs and other victims of the BP oil spill.

**C.     GCCF's "Release and Covenant Not to Sue"**

The ultimate objective of the "Delay, Deny, Defend" strategy of Feinberg, et al. was to obtain a signed "Release and Covenant Not to Sue" from as many BP oil spill victims as possible. Here, the GCCF Status Report as of March 07, 2012 is instructive.

GCCF Overall Program Statistics
(Status Report as of March 07, 2012)

| Type of Claim | Total No. of Paid Claimants | Total Amount Paid |
|---|---|---|
| Interim | 35,261 | $   501,460,085.39 |
| Quick Pay Final | 128,147 | $1,309,185,000.00 |
| Full Review Final | 66,962 | $1,685,315,304.80 |

The status report data indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, **the GCCF forced 84.68% of the claimants to sign a release and covenant not to sue** in which the claimant agreed not to sue BP and all other potentially liable parties; **only 15.31% of the claimants were not required to sign a release and covenant not to sue in order to be paid**. *See* "Gulf Coast Claims Facility Overall Program Statistics" (Status Report, Mar. 7, 2012, p. 1) (a copy is attached hereto as Exhibit C).

## II.     LAW AND ARGUMENT

The standard for reviewing a proposed settlement of a class action by courts in this Circuit, as in other circuits, is whether the proposed settlement is "fair, adequate, and reasonable" and whether it has been entered into without collusion between the parties. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977); *see also Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion."); and *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *32 (E.D. La. Mar. 2, 2009). Rule 23(e) places the burden of persuasion on the movers that the proposed settlement is "fair, reasonable, and adequate." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *7 (E.D. La. Jan. 10, 2012).

In his Preliminary Approval Order, Judge Barbier writes, "The Court preliminarily approves the Economic and Property Damages Settlement Agreement filed with this Court on April 18, 2012 (Rec. Doc. 6276-1), as amended as set forth in Interim Class Counsel's and BP's Joint Supplemental Motion Related to the Economic and Property Damages Settlement, as fair, reasonable, adequate, entered in good faith, free of collusion, and within the range of possible judicial approval……The Parties engaged in a multi-month, extensive, arms-length settlement process, free of collusion, and overseen by Magistrate Judge Shushan." (p. 29, Rec. Doc. 6418). Plaintiffs respectfully disagree.

### A.     GCCF's "Release and Covenant Not to Sue" and the Proposed Settlement's "Release and Covenant Not to Sue" Violate the Oil Pollution Act of 1990.

The proposed Deepwater Horizon Economic and Property Damages Settlement

-6-

Agreement excludes:

> "2.2.6. Any Natural Person or Entity who or that made a claim to the **GCCF**, was paid and executed a **GCCF RELEASE AND COVENANT NOT TO SUE...............**" (Rec. Doc. 6276-1, p. 11).

The Preliminary Approval Order states,

> "Those who accept payments under the Proposed Settlement are required to release their claims against BP, government oil spill liability funds, and all other Defendants in MDL 2179 (except Transocean and Halliburton)............If preliminary approval is given, the Settlement Program will process claims and make settlement payments to class members *so long as they execute an individual release*." (Rec. Doc. 6418, pp. 6-7) (Emphasis added).

The Honorable Carl J. Barbier addressed the issue of whether OPA prohibits Responsible Parties from requiring victims of an oil spill to sign a release and covenant not to sue in order to be paid for their damages. Judge Barbier stated in his Order of August 26, 2011:

> "........nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill." *See* Order and Reasons [As to Motions to Dismiss the B1 Master Complaint] (Document 3830, pp. 34, 35).

Plaintiffs respectfully disagree with Judge Barbier's novel interpretation of OPA. OPA *expressly* prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a release and covenant not to sue in order to receive an inadequate, miniscule payment amount for the damages they incurred as a result of the oil spill.

### 1.    The Text of the OPA Statute

OPA is a strict liability statute. In order to recover damages, a claimant merely needs to show that his or her damages "resulted from" the oil spill. OPA provides,

"Each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident." 33 U.S.C. § 2702(a).

The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:

"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall*** be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).

OPA further provides,

(a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled ***shall not*** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and

(b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] ***shall not*** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law.''
33 U.S.C. §§ 2715(b)(1) and (2) (Emphasis added).

"Shall" means shall. The Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. See *United States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); *Pierce v. Underwood*, 487 U.S. 552, 569-70, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language"); *Barrentine v. Arkansas-Best Freight Sys., Inc.* 450 U.S. 728, 739 n. 15, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (same under Fair Labor Standards Act); *United States v. Myers*, 106 F.3d 936, 941 (10th Cir.) ("It is a basic canon of statutory construction that use of the word 'shall' [in 18 U.S.C. § 3553(f) ] indicates mandatory

intent."), cert. denied, 520 U.S. 1270, 117 S.Ct. 2446, 138 L.Ed.2d 205 (1997); see also *Black's Law Dictionary* 1233 (5th ed. 1979) ("As used in statutes ... [shall] is generally imperative or mandatory."); *Environmental Defense Ctr. v. Babbitt*, 73 F.3d 867 (9th Cir.1995) ("We believe our 'shall'-means-shall approach has been implicitly recognized by the Ninth Circuit); *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) (finding a strict statutory construction); *Yu v. Brown*, 36 F. Supp. 2d 922 (10th Cir. 1999) (agreeing with *Forest Guardians* in finding a strict requirement to force agencies to act under certain circumstances).

"The word 'shall' is ordinarily the language of command." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935). And when the same Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense - the one act being permissive, the other mandatory. See *United States ex rel. Siegel v. Thoman*, 156 U.S. 353 (1895).

Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall' ……normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). "The use of a permissive verb - 'may review' instead of 'shall review' - suggests a discretionary rather than mandatory review process." *Rastelli v. Warden, Metro. Correctional Center*, 782 F.2d 17, 23 (2d Cir. 1986).

Justice Souter, in delivering the opinion of the *Lexecon* Court, explained, "If we do our job of reading the statute whole, we have to give effect to this plain command, see *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992), even if doing that will reverse the longstanding practice under the statute and the rule, *see Metropolitan Stevedore Co.* v. *Rambo*

(1995) ("'Age is no antidote to clear inconsistency with a statute.'"(quoting *Brown* v. *Gardner*, 513 U. S 115, 122 (1994))). The language is straightforward, and with a straightforward application ready to hand, statutory interpretation has no business getting metaphysical."

### 2.    The Legislative History of the OPA Statute

OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("ensure that all victims are fully compensated"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); 135 CONG. REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("assurances that damages arising from spills will be completely compensated"); 136 CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("ensure the fullest possible compensation of oil spill victims"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("full, fair, and swift compensation for everyone injured by oil spills.").

As the Supreme Court explained,

"[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

-10-

"Emergency Advance Payment" is GCCF's name for an "Interim Claim" which is mandated under OPA. The Gulf Coast Claims Facility Protocol for Emergency Advance Payments (Section III.F.2, August 23, 2010) states,

> "2. Emergency Advance Payment applications may be submitted during the period August 23 - November 23, 2010. After that date, applications for Emergency Advance Payments will no longer be accepted. Applications for Final Claims, and in appropriate circumstances applications for interim claims, will continue to be accepted pursuant to the Protocol for Final Claims."

The GCCF essentially stopped processing or paying OPA-mandated interim claims from BP oil spill victims on November 23, 2010. Ending this interim claims program was in direct contravention of OPA's mandates, as that Act only envisions a claims process for presentment of interim claims.

Feinberg, et al. made it clear that they were not interested in providing the OPA-required interim payments to claimants. "'We're interested in total peace,' says Ken Feinberg, 'We're not interested in any halfway measures,' Feinberg adds. What he means is that the fund he'll be administering won't be dispensing any relief for losses already incurred unless the victim also consents to accept an estimate of his future damages, too, and then releases BP from future claims. 'My goal is to settle then and there,' Feinberg says. 'Why bother coming back? Let's resolve it right now.'" Roger Parloff, *BP settlements: A gamble for Gulf Coast victims*, CNN Money (July 12, 2010). As explained *supra*, OPA does *not* contemplate a claims process in which "finality" for the responsible party is the goal.

It is instructive to note that many Claimants who chose to file Interim Claims had their claims denied by Feinberg, et al., but then were offered Final Payments for the Quick Pay amount of $5,000 for individuals and $25,000 for businesses *if* they just signed a Release

relinquishing all of their future litigation rights.

GCCF's "Release and Covenant Not to Sue" violates OPA: (a) by requiring the release of future damages as requirement for receiving a payment from the GCCF claims process, in contravention of 33 U.S.C. § 2705(a) and 33 U.S.C. §§ 2715(b)(1) and (2); and (b) Feinberg, et al. intentionally failed to provide a process for presenting, processing and paying interim, short-term damages, in contravention of 33 U.S.C. § 2705(a) and 33 U.S.C. §§ 2715(b)(1) and (2).

The text and the legislative history of the OPA statute are clear. OPA *expressly prohibits* Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a release and covenant not to sue in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the oil spill.

### B.     GCCF's "Release and Covenant Not to Sue" and the Proposed Settlement's "Release and Covenant Not to Sue" Violate State Contract Law.

Releases, compromises and settlement agreements are *contracts* and the rules of construction applicable to *all* contracts are used in the interpretation of such agreements. *Dore Energy Corp. v. Prospective Inv. & Trading Co. Ltd.*, 570 F.3d 219, 225 (5th Cir. 2009).

Whether a compromise, settlement or release is a *valid* contract between the parties is determined by reference to State substantive law governing contracts generally. *White Farm Equipment Co. v. Kupcho*, 792 F.2d 526, 529 (5th Cir. 1986). Whether a contract or contractual provision is unconscionable or unenforceable on grounds of illegality or public policy is a question of law. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005); *see also, MacPhail v. Oceaneering Int'l, Inc.,* 301 F.3d 274, 278 (5th Cir. 2002), *cert. denied,* 537

U.S. 1110, 123 S.Ct. 891, 154 L.Ed.2d 782 (2003).

In examining whether a contract is unconscionable, the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party. *Booker v. Robert Half Intern., Inc.*, 315 F.Supp.2d 94, 102 (D.C.Cir. 2004).

GCCF's "Release and Covenant Not to Sue" violates State contract law because it:

(1) was obtained through the use of economic duress;

(2) was obtained without free consent (Claimants did not consent to the release by *choice*, because the *only option* for receiving payment required Claimants to sign a release, the terms of which they had no opportunity to negotiate.);

(3) was obtained through fraud;

(4) requires Claimants to discharge, waive and release future claims (including those resulting from gross negligence) for costs and damages (including punitive damages) that are unknown and have not yet arisen;

(5) was obtained in exchange for inadequate consideration; and

(6) has as its objective the circumvention of the OPA.

Accordingly, GCCF's "Release and Covenant Not to Sue" is void *ab initio*.

      **1.**      **Economic Duress**

A contract may be invalid or unenforceable by reason of economic duress if undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him into making the agreement. *Brown v. Cain Chemical, Inc.,* 837 S.W.2d 239, 244 (Tex. App.-Hous. 1st Dist. 1992).

On November 24, 2010, Kenneth R. Feinberg stated in a news release, "*The GCCF will be much more generous than current federal or state law…...*Claimants will have a choice……They can accept a lump sum final payment for all present and future damage and

surrender their right to sue by signing a full release, or they can continue to receive quarterly interim payments based upon documented past damage for that three-month period; *however, there is no guarantee that, in the future, a lump sum final payment will be as generous as it will be currently*." Ali Helgoth, *New guidelines issued for oil spill claims*, The News Herald (November 24, 2010) (Emphasis added). Feinberg's threat of less "generous" payments subjected Claimants, the vast majority of whom were unsophisticated and not represented by counsel, to improper economic duress for the purpose of coercing them into signing a "Release and Covenant Not to Sue." It was an unconscionable, wrongful act.

Feinberg, et al. misled Plaintiffs by fraudulently, recklessly, negligently, and knowingly: (a) delaying payment by informing and requiring Plaintiffs, who had already submitted a Final Payment claim to BP, the responsible party, to resubmit their Final Payment claim to GCCF, and wait at least *another* 90 days for GCCF to not pay their claim before Plaintiffs could commence an action in court against the responsible party or could present the claim to the OSLTF; (b) delaying payment by telling Plaintiffs "claims will be paid within 90 days after substantiation." Unbeknownst to Plaintiffs, according to GCCF, substantiation means "the claim has been received and reviewed by GCCF." This definition of substantiation allows a claim to be received and held "under review" indefinitely by GCCF. When GCCF finally "substantiates" the claim, the claimant is told he or she will be paid within 90 days; and (c) using the fear of costly and protracted litigation to coerce Plaintiffs to accept grossly inadequate settlements from GCCF. During widely-reported town hall meetings organized to promote GCCF, Feinberg repeatedly tells victims of the BP oil spill: "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers." and "I take the position, if I don't find you eligible,

no court will find you eligible." Plaintiff Salvesen having relied on the false and misleading statements of Feinberg, et al. was coerced into delaying the filing of his lawsuit against Feinberg, et al.  As of the date of the filing of his Complaint, approximately 328 days had passed since Plaintiff Salvesen presented a claim for damages to BP. *Salvesen v. Feinberg, et al.*, 2:11-cv-02533. Similarly, many financially distressed victims of the BP oil spill were coerced into surrendering their right to sue in order to accept a miniscule payment from GCCF.

In sum, by employing a "Delay, Deny, Defend" strategy, Feinberg, et al. took undue or unjust advantage of Claimants' economic necessity or distress to coerce them into signing GCCF's "Release and Covenant Not to Sue."

### 2.    Obtained Without Free Consent

A contract is one of "adhesion" when either its form, print, or unequal terms call into question the consent of the non-drafting party and it is demonstrated that the contract is unenforceable, due to lack of consent or error, which vitiates consent. *Velazquez v. Brand Energy & Infrastructure Services, Inc.,* 781 F.Supp.2d 370, 376-377 (W.D. La. 2011).

In *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 167-168 (5th Cir. 2004), the Fifth Circuit noted that: "…Louisiana jurisprudence does recognize that certain contractual terms, especially when contained in *dense standard forms that are not negotiated*, can be too harsh to justly enforce." In order to be invalidated, a provision must possess features of both adhesionary formation and unduly harsh substance. *See Andry v. New Orleans Saints,* 820 So.2d 602, 603-04 (La.App 5th Cir. 2002) ("[A]dhesion contracts are not *per se* unenforceable, but rather lend themselves to an inquiry as to whether the weaker party consented to the fine print, and if so whether the adhesionary clause is unduly burdensome or extremely

harsh.").

Circumstances to be considered in determining whether consent to contract was freely given is assistance of legal counsel in evaluation of the contract and determination of options available. *Averette v. Industrial Concepts, Inc.* 673 So.2d 645-646 (La. App. 1st Cir. 1996).

The vast majority of the BP oil spill victims who signed a GCCF "Release and Covenant Not to Sue" were not represented by legal counsel because they were told by Feinberg that potential claimants do not need to hire a lawyer and will be much better off accepting what GCCF offers rather than going to court.

As noted *supra*, from November 23, 2010, through February 18, 2011, the *only option* provided to Claimants to take a so-called Quick Pay Final Payment, which required a release of all of the claimant's future litigation rights in exchange for $5,000 for individual claimants and $25,000 for businesses. By this point, the vast majority of Claimants needed money immediately. Consequently, Claimants who accepted Quick Pay Final Payments during this period *did not do so by choice* but because *no choice other than a Quick Pay was offered* during this period.

Even the PSC states:

"….the GCCF is strategically and systematically forcing putative class members to accept quick payments with accompanying releases because they are offered no other viable option. It is not limited to a few mistakes or egregious examples. BP has established a claims process with the primary function of convincing putative class members that the only compensation available is a minimal set amount that comes with a full release attached. The delay in responding to interim claims, the near-complete failure to pay interim claims, and the skewed final payment calculation delivers the message to over 112,000 putative class members: the only way to ever get any more compensation is to take the quick payment amount and sign a release." (Rec. Doc. 3423, p. 11).

GCCF's "Release and Covenant Not to Sue" is invalid and unenforceable by reason of economic duress and lack of consent.

-16-

3.     **Fraud**

"[U]nder ordinary contract princip[le]s, transactions entered into in reliance upon material misrepresentations are voidable." *Massey v. Trump's Castle Hotel & Casino*, 828 F. Supp. 314, 325 (D.N.J. 1993). "Intentional misrepresentation and concealment of material facts renders a transaction voidable at the option of the defrauded party." *Konsuvo v. Netzke*, 91 N.J. Super. 353, 367 (Ch. Div. 1966). "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts 164 (1) (1981).

To state a claim for fraud, a plaintiff must establish through particular, ultimate facts: (1) a false statement concerning a material fact; (2) the speaker's knowledge of falsity; (3) the speaker's intent to induce another to act on the false statement; and (4) reliance on the false statement to the injury of the other party. *C & J Sapp Publ'g Co. v. Tand-Corp.*, 585 So. 2d 290 (Fla. Dist. Ct. App. 1991). A fact is *material* if, but for the misrepresentation, the party would not have acted as it did. *Riback v. Centex Real Estate Corp.*, 702 So. 2d 1316, 1317 (Fla. Dist. Ct. App. 1997). In the *Pinellas Marine* and *Salvesen* cases, Plaintiffs established a very clear cause of action for fraud through particular, ultimate facts.

Feinberg, et al., knowing the representations were false at the time the representations were made, made the following false representations of fact to Plaintiffs: (a) The protocol under which GCCF operates is structured to be compliant with OPA and apply the standards of OPA; (b) "Each Emergency Advance Payment application will be evaluated preliminarily within 24 hours of receipt of the completed form and supporting documentation to determine whether an

-17-

Emergency Advance Payment is appropriate based on the information submitted by the Claimant;" (c) "Complex business claims submitted for an Emergency Advance Payment will be evaluated preliminarily within 7 days of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant;" (d) "Upon a determination that the Claimant is eligible for an Emergency Advance Payment, a payment will be authorized within 24 hours;" (e) Plaintiff's claims will be paid within 90 days after "substantiation;" (f) Potential claimants do not need to hire a lawyer and will be much better off accepting what Feinberg, et al. offers rather than going to court; (g) "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers;" (h) "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit;" (i) "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created;" (j) "I take the position, if I don't find you eligible, no court will find you eligible."

Feinberg, et al. made these false representations for the purpose of inducing Plaintiffs to act in reliance on the false representations. Plaintiffs relied on Feinberg et al.'s representations rather than elect to commence an action in court against the responsible party or to present the claim to the OSLTF. Plaintiff's reliance, which was reasonable and foreseeable, resulted in the following damage to Plaintiffs: Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss. *See Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.*, 2:11-cv-01987 and *Salvesen v. Feinberg, et al.*, 2:11-cv-02533.

4.     **Requirement to Waive and Release Future Claims for Damages Resulting From Gross Negligence**

This Court previously noted in its response to a request by BP to nullify an indemnification clause in its contract with Transocean on public policy grounds (MDL Doc. 4287-1, pp. 35-36): "…gross negligence will invalidate a *release***, …**" citing *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001) (noting that a waiver of liability for gross negligence is void); *Sevarg Co., Inc. v. Energy Drilling Co.,* 591 So.2d 1278 (La.App. 3d Cir. 1991). *Restatement (Second) of Contracts* § 195(1), cmt. (b) (updated 2011) (A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy). *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010,*--- F.Supp.2d ----, 2012 WL 246455 at *7, *8 and *9 (E.D.La. 2012) (Barbier, J.) (emphasis supplied). (MDL Doc. 5446, pp. 11, 13-16).

Feinberg, et al. owed a duty to Plaintiffs to exercise reasonable care in regard to the operation of GCCF's claim intake, claim review, claim evaluation and claim settlement and payment services. Feinberg, et al. had a heightened duty of care to Plaintiffs because of the unprecedented  environmental and economic harm resulting from the millions of barrels of oil that had been discharged into the Gulf of Mexico and upon adjoining shorelines by the Deepwater Horizon oil spill incident. The damages suffered by Plaintiffs and other victims of this oil spill incident will be enormous and on-going. The livelihoods of all persons, including Plaintiffs, whose businesses rely on the natural resources of the Gulf Coast are at risk.

Feinberg, et al. breached their legal duty to Plaintiffs, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of

Plaintiffs in their negligent operation of GCCF's claim intake, claim review, claim evaluation and claim settlement and payment services in the following manner: (a) Inadequate Claim Processing; (b) Inadequate Claim Investigation; (c) Delay in Payment (as of the date of the filing of his Complaint, approximately 237 days had passed since Plaintiff John Mavrogiannis presented a claim for damages to BP, on behalf of Plaintiff Pinellas Marine Salvage, Inc., and 97 days had passed since GCCF allowed Plaintiff  to file the GCCF claim form (GCCF 2000-C) for final payment online); and (d) Unreasonable Denial of Claim.

Feinberg, et al. knew or should have known that their wanton or reckless conduct would foreseeably result in the financial ruin of Plaintiff Pinellas Marine Salvage, Inc., thereby causing irreversible damage to the health and the economic interests of Plaintiff John Mavrogiannis. As a direct and proximate result of Feinberg, et al.'s wanton or reckless conduct, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss. Feinberg, et al.'s wanton or reckless conduct, as described herein, constitutes such a conscious disregard or indifference to the rights of Plaintiff Pinellas Marine Salvage, Inc. and the rights and life of Plaintiff John Mavrogiannis that it entitles Plaintiffs to punitive damages. *Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.*, 2:11-cv-01987.

### 5.    Inadequate Consideration

Feinberg, et al. cannot justify limiting payments under the Quick Payment Final Claim program to just $5,000 for individuals and $25,000 for businesses. There is no evidence that these amounts even remotely represent adequate consideration to compensate Claimants for the damages that Claimants did or will suffer as a result of the BP oil spill.

This inadequate compensation and GCCF's "Release and Covenant Not to Sue" are the product of Claimants' lack of bargaining power and Feinberg et al.'s use of coercion and economic duress.

The "Delay, Deny, Defend" strategy, although unconscionable, has proven to be very effective for Feinberg, et al. The numbers do not lie: **the GCCF forced 84.68% of the claimants to sign a release and covenant not to sue** in which the claimant agreed not to sue BP and all other potentially liable parties; **only 15.31% of the claimants were not required to sign a release and covenant not to sue in order to be paid**. *See* Exhibit C. **The GCCF denied payment to approximately 61.46% of the claimants who filed claims. The average total amount paid per Claimant by GCCF was $27,466.47.** *Id*.

"BP has estimated the cost of the proposed settlement to be approximately $7.8 billion." (p. 156, Rec. Doc. 6266-2). Here, Judge Barbier's admonition in his Order of August 26, 2011 is instructive: "*The long term effects [of the BP oil spill] on the environment and fisheries may not be known for many years.*" (p. 31, Rec. Doc. 3830) (Emphasis added). Since the long term effects, and therefore the associated costs, of the BP oil spill on the environment and fisheries may not be known for many years, BP can only estimate its cost by multiplying the approximate number of Claimants by an average amount BP *is willing to pay* each claimant.

What is life worth? According to BP and Feinberg, et al., the life of an individual BP oil spill victim isn't worth very much.

### 6.      Circumvention of the OPA

Under the law in this Circuit, if a contract has as its cause or its object the violation or circumvention of a statute, it is an absolute nullity in contravention of public order. *U.S. v.*

-21-

*Fontenot*, 665 F.3d at 646; *Bach Inv. Co. v. Philip*, 722 So.2d 1222, 1223 (La.Ct.App. 5th Cir.

1998). An absolutely null contract "is deemed *never to have existed.*" *U.S. v. Fontenot,* 665 F.3d

at 646, *citing,* La.Civ.Code Ann. art. 2033 (2009) (Emphasis added).

Although the Court cannot modify the bargained-for terms of the settlement agreement

(See *Klier v. Elf Atochem North America, Inc.,* 658 F.3d 468, 475 (5th Cir. 2011), *citing, Evans*

*v. Jeff D.,* 475 U.S. 717, 726-727, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986)), "[t]here is no doubt

that the courts have the duty and the power to declare void and unenforceable contracts made in

violation of law or in contravention of the public policy of the state…." *Cooper Tire & Rubber*

*Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005)*, citing, Smith v. Simon,* 224 So.2d 565, 566

(Miss. 1969) (citation omitted).

As explained *supra*, OPA is a strict liability statute. In order to recover damages, a

Claimant merely needs to show that his or her damages "resulted from" the oil spill incident.

OPA provides,

> "Each responsible party…… is liable for the removal costs and damages that result from
> such incident." 33 U.S.C. § 2702(a)..."Damages….***shall*** be recoverable by any claimant."
> 33 U.S.C. § 2702(b)(2)(E)……"Payment or settlement of a claim for interim, short-term
> damages……***shall not*** preclude recovery by the claimant for damages not reflected in the
> paid or settled partial claim." 33 U.S.C. § 2705(a) and……"Payment of such a claim…..
> ***shall not*** foreclose a claimant's right to recovery of all damages to which the claimant
> otherwise is entitled under this Act or under any other law.'' 33 U.S.C. §§ 2715(b)(1)
> and (2) (Emphasis added).

GCCF's "Release and Covenant Not to Sue" allows each Responsible Party in the BP oil

spill incident to circumvent the strict liability which Congress intended to impose when it

enacted OPA.

**C.      The Severability Clause in the Proposed Settlement is Not an Adequate Solution.**

The Proposed Settlement includes a Severability Clause that specifically references the unconscionable releases used by the GCCF and the Release proposed for use in the Proposed Settlement's claims process. The Severability Clause states:

> "21.1. In the event that the Release contained in Section 10 above, or the Individual Releases as to all Economic Class Members contained in Section 4 above, or any portion or provision thereof, shall for any reason be held in whole or in part to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision, or portion thereof, if the BP Parties elect in their sole discretion in writing to proceed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been included in this Agreement. Alternatively, the BP Parties, in these circumstances, may elect in writing that the entire Agreement be rendered null and void consistent with the terms described in Section 21.3 below."
> (Rec. Doc 6276-1, p. 82).

The "Release and Covenant Not to Sue" further states:

> "….By signing this document, you are forever waiving and releasing all claims that you may have against BP or any other party in connection with the Deepwater Horizon Incident…….By signing the attached Individual Release, you are forever giving up and discharging any rights that you may have for any costs, damages, causes of actions, claims, or other relief related to or arising from the Deepwater Horizon Incident…even if you are not currently aware of such costs or damages and even if such costs or damages arise in the future (i.e., additional oil impacts) or do not manifest themselves until the future…….By signing this Individual Release you are forever waiving and releasing all claims that you may have against BP…in exchange for the compensation being provided. **In fact, even if the Court does not approve the proposed class action settlement agreement or the approval is reversed by an appellate court, you shall continue to be bound by this Individual Release**." (Rec. Doc. 6276-45)**.**

An illegal condition within a contract annuls the entire agreement "only to the extent to which the agreement depends on it." *Lebouef v. Liner,* 396 So.2d 376, 378 (La.App. 1st Cir. 1981); La. Civil Code Ann. Art. 1893. Thus, where the subject matter of a contract is legal, but the contract contains an illegal provision that is not an essential feature of the agreement, the

illegal provision may be severed and the valid portion of contract enforced; in determining whether a particular provision is severable, the issue is whether the parties would have entered into the agreement absent the illegal parts. *Panasonic Co., Div. of Matsushita Elec. Corp. of America v. Zinn,* 903 F.2d 1039 (5th Cir. 1990).

Any class action settlement that incorporates an unconscionable "Release and Covenant Not to Sue" for the purpose of excluding approximately 200,000 Claimants from the settlement benefits, is not "fair, reasonable, and adequate." However, Plaintiffs respectfully point out to this Honorable Court that merely nullifying the unconscionable releases used by the GCCF, and severing the Release proposed for use in the Proposed Settlement's claims process, and allowing the BP Parties "to proceed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been included in this Agreement" is not an adequate solution. The Proposed Settlement would still: (a) have resulted from the B1 Master Complaint which was inexplicably filed under admiralty law rather than the OPA (a **strict liability** statute);  (b) be in violation of the *Lexecon* Rule; (c) be in violation of *Lloyds Leasing Ltd. v. Bates*; (c) not be "free of collusion;" (d) still not be "fair, reasonable, and adequate;" and (e) still violate the OPA. *See* Exhibit A and Exhibit B.

In sum, GCCF's "Release and Covenant Not to Sue" and the Proposed Settlement's "Release and Covenant Not to Sue" violate federal law, State contract law, and are contrary to public policy. Illegally excluding approximately 200,000 Claimants from the Proposed Settlement also greatly decreases the bargaining power of the Class Members and results in an increased loss of faith in the federal judicial system.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court: (a) nullify each and every GCCF "Release and Covenant Not to Sue;" and (b) vacate its Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement], Rec. Doc. 6418 dated May 2, 2012.

DATED: September 24, 2012                          Respectfully submitted,

**/s/ Brian J. Donovan**
Brian J. Donovan
Attorney for Plaintiffs
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of September, 2012.

**/s/ Brian J. Donovan**
Brian J. Donovan
Attorney for Plaintiffs
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net

-25-