# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig            MDL No. 2179
       "Deepwater Horizon"
       in the Gulf of Mexico,
       on April 20, 2010                       SECTION: J

This Document Relates to:

    All Cases                                      JUDGE BARBIER
                                                      MAG. JUDGE SHUSHAN
_____/

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO VACATE
PRELIMINARY APPROVAL ORDER
[As to the Proposed Economic and Property Damages Class Action Settlement]**

      Pinellas Marine Salvage, Inc. and John Mavrogiannis ("Plaintiffs") respectfully request that this Honorable Court vacate its Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement], Rec. Doc. 6418 dated May 2, 2012, for the following reasons.

INTRODUCTION

      On February 25, 2011, Pinellas Marine Salvage, Inc. and John Mavrogiannis filed their action against Defendants Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a Gulf Coast Claims Facility, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. On March 18, 2011, Defendants removed the *Pinellas Marine* case to the U.S. District Court for the Middle District of Florida. Plaintiffs filed their Motion to Remand on March 30, 2011. The case was subsequently transferred by the JPML to the MDL 2179 Court on August 9, 2011. *See Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.*, 2:11-cv-01987.

Phase I of a multi-phase trial in Transocean's Limitation and Liability Action, Case No. 10-2771, was scheduled for February 27, 2012. On February 26, 2012, the eve of the Limitation and Liability Trial, the Court adjourned proceedings for one week to allow BP and the PSC to make further progress on their settlement talks. (Rec. Doc. 5887). On March 2, 2012, the Court was informed that BP and the PSC had reached an Agreement-in-Principle on the proposed settlements. Consequently, the Court adjourned Phase I of the trial, because of the potential for realignment of the parties in this litigation and substantial changes to the current trial plan. (Rec. Doc. 5955).

On March 8, 2012, at the parties' request, the Court entered an Order creating a process to facilitate the transition from the GCCF to the "Court Supervised Settlement Program" envisioned by the settlement. (Rec. 5995). On April 16, 2012, the PSC filed a new class action complaint to serve as the vehicle for the proposed Economic and Property Damage Settlement. *See* No. 12-970, *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc.*, *et al.* The class action complaint was amended on May 2, 2012. (Rec. Doc. 6412). On April 18, 2012, the PSC and BP filed their Proposed Settlement (Rec. Doc. 6276). On May 2, 2012, the Court entered a Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement] (Rec. Doc. 6418).

Plaintiffs re-filed their Motion to Remand and Memorandum in Support with this Honorable Court on November 14, 2011 (Rec. Doc. 4574). On December 1, 2011, Plaintiffs filed their Motion in Opposition to Class Certification of Any Action in MDL No. 2179 and Memorandum in Support (Rec. Doc. 4782). Both motions remain pending in this Court.

## LAW AND ARGUMENT

The standard for reviewing a proposed settlement of a class action by courts in this Circuit, as in other circuits, is whether the proposed settlement is "fair, adequate, and reasonable" and whether it has been entered into without collusion between the parties. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion."); and *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *32 (E.D. La. Mar. 2, 2009). To do this in the Fifth Circuit, courts evaluate the six *Reed* factors. The *Reed* factors are "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

The United States District Court for the Eastern District of Louisiana [has] defined "collusion" as the "lawful means for the accomplishment of an unlawful purpose" and as a "*secret understanding between two or more persons prejudicial to another, or a secret understanding to appear as adversaries, though in agreement*." Collusion does not require fraudulent conduct. *See Dynamic Marine Consortium, SA v. Latini, MV,* 179 F.3d 278 (5th Cir. 1999) (Emphasis added).

In his Preliminary Approval Order [As to the Proposed Economic and Property Damages

Class Action Settlement], Judge Barbier writes, "The Court preliminarily approves the Economic and Property Damages Settlement Agreement filed with this Court on April 18, 2012 (Rec. Doc. 6276-1), as amended as set forth in Interim Class Counsel's and BP's Joint Supplemental Motion Related to the Economic and Property Damages Settlement, as fair, reasonable, adequate, entered in good faith, *free of collusion*, and within the range of possible judicial approval……The Parties engaged in a multi-month, extensive, arms-length settlement process, *free of collusion*, and overseen by Magistrate Judge Shushan." (p. 29, Rec. Doc. 6418) (Emphasis added). Plaintiffs respectfully disagree; collusion permeates MDL 2179 and this Proposed Settlement.

The following are merely a few examples of the hallmarks of collusive unfairness which are present in MDL 2179 and this Proposed Settlement.

**A. "Centralization May Also Facilitate Closer Coordination with Kenneth Feinberg's Administration of the BP Compensation Fund."**

On June 16, 2010, President Obama announced that BP agreed to set aside $20 billion to pay economic damage claims to individuals and businesses affected by the Deepwater Horizon oil spill. At the request of the White House and BP, Kenneth R. Feinberg ("Feinberg"), acting through and as Managing Partner of Feinberg Rozen, LLP, established the Gulf Coast Claims Facility ("GCCF") for the alleged purpose of administering, settling, and authorizing the payment of certain claims asserted against BP as a result of the explosion at the Deepwater Horizon rig and consequent spillage of oil into the Gulf of Mexico.

On August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in this Court pursuant to 28 U.S.C. § 1407. In its Transfer Order, the JPML clearly stated, "Centralization may also facilitate closer coordination

with Kenneth Feinberg's administration of the BP compensation fund." (p. 3, Rec. Doc. 1).

On August 23, 2010, the GCCF replaced the original BP claims process and commenced performing BP's obligations under the Oil Pollution Act of 1990 ('OPA") with respect to private economic loss claims. Feinberg Rozen, LLP was paid $1.25 million per month by Defendant BP to administer the GCCF claims process.

In sum, the JPML sought to "facilitate closer coordination" between Feinberg (who was an agent of, and being directly compensated by, Defendant BP) and the MDL 2179 Plaintiffs' Steering Committee ("PSC") (which allegedly represents the plaintiffs in MDL 2179). BP, by and through Feinberg, et al., and the PSC entered into "*a secret understanding to appear as adversaries, though in agreement*." This secret understanding has been, and continues to be, prejudicial to all BP oil spill victims. Plaintiffs respectfully point out to this Honorable Court that this collusion was accomplished with the imprimatur of the JPML.

## B. The Court Supervised Settlement Program and the Gulf Coast Claims Facility Are Virtually Identical

On March 8, 2012, the Court entered an Order creating a process to facilitate the transition from the GCCF to the "Court Supervised Settlement Program" ("CSSP") envisioned by the Proposed Settlement. Claims submitted to the CSSP will be evaluated and processed by Claims Administration Vendors pursuant to the frameworks detailed in the Proposed Settlement for the various damage categories. Those who accept payments under the Proposed Settlement are required to release their claims against BP, government oil spill liability funds, and all other Defendants in MDL 2179 (except Transocean and Halliburton). (p. 6, Rec. Doc. 6418).

Under the GCCF, the evaluation and processing of claims were performed by Garden

City Group, Inc., BrownGreer, PLC, and PricewaterhouseCoopers, LLP.

On May 2, 2012, Patrick Juneau was appointed as Claims Administrator to oversee the Claims Administration Vendors, who will process the claims in accordance with the Proposed Settlement. Under the CSSP, the evaluation and processing of claims shall continue to be performed by Garden City Group, Inc., BrownGreer, PLC, and PricewaterhouseCoopers, LLP. Accordingly, although Patrick Juneau has replaced Feinberg, there is no reason to believe that the percentage of claimants denied payment and the average total amount paid per claimant will change under the CSSP.

"I think it's a tribute to the GCCF that all the people we used have been retained," Feinberg said. "I take great satisfaction in that fact." David Hammer, *Louisiana lawyer set to take Kenneth Feinberg's role in BP oil spill claims process*, The Times-Picayune (March 9, 2012). It is unlikely that BP oil spill victims will share Feinberg's satisfaction.

**The Average Total Payment Amount Received From GCCF by Claimants**

GCCF Overall Program Statistics
(Status Report as of March 7, 2012)

| Total Amount Paid | Total No. of Paid Claimants | Average Total Amount Paid Per Claimant |
|---|---|---|
| $6,079,922,450.47 | 221,358 | **$27,466.47** |

The GCCF data indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012. The GCCF paid only 221,358 of these Claimants. In sum, *the GCCF denied payment to approximately 61.46% of the claimants who filed claims*. See "Gulf Coast Claims Facility Overall Program Statistics" (Status Report, Mar. 7, 2012). (Rec. Doc. 6831-1).

-6-

Here again is an example of a "*secret understanding between two or more persons*" (BP, the GCCF, and the PSC) which is "*prejudicial to another*" (the BP oil spill victims).

**C. The Proposed Settlement Provides for a Refund of Approximately $6 Billion to BP While Granting Excessive Compensation to the PSC and Other Counsel Performing "Common Benefit" Work.**

**(1) The Refund**

| | |
|---|---:|
| Deepwater Horizon Oil Spill Trust | $20 Billion |
| (Amount set aside by BP to allegedly pay economic damage claims to individuals and businesses affected by the Deepwater Horizon oil spill.) | |
| Approximate Amount Paid to Claimants by GCCF | $6.2 Billion |
| Cost of the Proposed Settlement | $7.8 Billion |
| **Amount to be Refunded to BP** | **$6.0 Billion** |

**(2) The Excessive Compensation**

The PSC and other counsel allegedly performing common benefit work in MDL 2179 are not double-dipping; they are triple-dipping. The known sources of compensation received by attorneys allegedly doing common benefit work on behalf of BP oil spill victims in MDL 2179 are:

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation. (p. 3, Rec. Doc. 5274);

N.B. - Plaintiffs' Counsel received a Final Payment Offer from GCCF on behalf of Plaintiff Pinellas Marine Salvage, Inc. This offer, dated June 3, 2012 and postmarked June 8, 2012, was received by Plaintiffs' Counsel on June 11, 2012. *This offer, along with probably hundreds of other offers made to Claimants by GCCF, is dated one day before Claimants are no longer required to pay six percent (6%) of the gross monetary settlement they receive to the MDL 2179 common benefit fund.* Plaintiffs respectfully point out to the Court that June 3, 2012 was a Sunday. These offers were dated June 3rd in order to ensure that the PSC received the maximum amount of payment from the 6% hold-back provision.

-7-

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million. (p. 10, Rec. Doc. 6418);

(c) Many attorneys doing common benefit work have their own clients and have also received or will also receive a fee directly from them. (N.B. - On June 15, 2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs.") (Rec. Doc. 6684); and

(d) Co-counsel fees received by member firms of the PSC for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Counsel for Plaintiff Salvesen received an unsolicited mass email from a member firm of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…"

On November 7, 2011, the PSC reported: "In all, 340 lawyers from ninety different law firms have invested over *230,000 hours* and contributed over $11.54 million in out-of-pocket held and shared expenses for the common benefit of claimants and litigants . . . In addition, the PSC members and other Common Benefit Work Group Members and Coordinators have incurred approximately $1.5 million in unpaid expenses, which are still being processed. At the same time, PSC members and other Common Benefit Attorneys have contributed and additional $1.8 million to a joint account for payment of further shared expenses, as incurred." (PSC's Memo. in Supp. p. 9 & n.10, Rec. Doc. 4507-1 at 12 & n.10).

This Court has previously used a range of $300 to $400 per hour for members of a Plaintiffs' Steering Committee and $100 to $200 per hour for associates to "reasonably reflect the prevailing [billable time] rates in *this* jurisdiction." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d at 868-69 (E.D. La. 2007).

-8-

| Amount Awarded | Average Billable Hourly Rate | Hours Required to Have Been Expended on This Litigation |
|---|---|---|
| $600,000,000.00 | $300/hr. | 2,000,000 hours |

In sum, in order to be awarded a common benefit fee of $600 million, this Honorable Court would have to believe that the PSC attorneys worked two million hours. Both of these fee amounts, which do not include the aforementioned (a), (c), and (d) known sources of compensation, fail the reasonableness test. (Rec. Doc. 6831-1).

**"The Total Recovery that BP Has Agreed to Provide is Uncapped."**

In his Preliminary Approval Order Judge Barbier writes, "The comprehensive system of claims frameworks featured in the Settlement Agreement is the product of many months of intensive negotiation, provides for class recovery *unlimited by any aggregate cap*, does not constitute a limited fund to be divided among competing claimants (with the sole exception of the $2.3 billion Seafood Compensation Program, whose allocation was placed with a court-appointed neutral).." (p. 31, Rec. Doc. 6418). "With the exception of the Seafood Compensation Program, *there is no limit or "cap" on the amount to be paid by BP* under these programs. Rather, all claims that meet the criteria for each program will be paid in full. Such claims will be paid without delay - claimants need not await final settlement approval for payment." (p. 5, Rec. Doc. 6266-1). "In this settlement, *the total recovery that BP has agreed to provide is uncapped*; BP's initial estimates place its cost at approximately $7.8 billion." (p. 28, Rec. Doc. 6266-1).

**"There Can Be No Question that the PSC Has Taken Seriously Its Fiduciary Obligations in the Best Interests of all Claimants."**

Judge Barbier writes, "There can be no question that the PSC has taken seriously its

-9-

fiduciary obligations in the best interests of all claimants, both private and governmental." (p. 3, Rec. Doc. 5022). *See also*, "The Parties engaged in substantial discovery and motion practice to evaluate the merits of the claims and defenses and extensively investigated and analyzed the facts and legal issues surrounding those claims and defenses." (pp. 29, 30, Rec. Doc. 6418). "In the 20 months that have passed since the JPML's centralization order, the parties have engaged in extensive discovery and motion practice, including taking 311 depositions, producing approximately 90 million pages of documents, and exchanging more than 80 expert reports on an intense and demanding schedule. Depositions were conducted on multiple tracks and on two continents. Discovery was kept on course by weekly discovery conferences before Magistrate Judge Shushan. The Court also held monthly status conferences with the parties." (p. 3, Rec. Doc. 6418).

In class actions where the attorneys' fee is negotiated by counsel, courts "must be particularly vigilant in evaluating [class counsel's] recommendations because there may be a bias toward settlements in which the class attorney agrees to trade off a smaller total award by the defendant for a larger fee." Wright, et al., *supra*, § 1797.1; *see also* Kent A. Lambert, *Class Action Settlements in Louisiana*, 61 La. L. Rev. 89, 102-04 (2000) (noting that "mixing negotiation of the overall settlement with discussions of attorneys' fees" can, at a minimum, create "an appearance of impropriety"). Pecuniary self-interest of class counsel has long been cited by courts and scholars as a threat to performance of counsel's professional and fiduciary obligations to class members. *See, e.g., Reynolds*, 288 F.3d at 279-80; John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 385-93 (2002); David L. Shapiro, *Class Actions: The Class as Party and*

*Client*, 73 Notre Dame L. Rev. 913, 958-60 & n.132 (1998). It should also be noted that "clear-sailing clauses," which are essentially nothing more than negotiated ceilings on fee awards, have also been subjected to criticism. *See, e.g.*, William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 Tul. L. Rev. 813 (2003) (arguing that courts should reject class action settlements containing clear sailing clauses). *Turner v. Murphy Oil USA, Inc.*, Case 2:05-cv-04206, (p. 20, Rec. Doc. 1072) (E.D. La. 2007).

Given that (a) "the total recovery that BP has agreed to provide is uncapped," and (b) "there can be no question that the PSC has taken seriously its fiduciary obligations in the best interests of all claimants," Plaintiffs respectfully request that this Honorable Court ask this simple question:

> Why has the PSC negotiated a settlement wherein BP receives a $6 billion refund from the Deepwater Horizon Oil Spill Trust when it is clear that the Proposed Settlement will not fully compensate all class members?

## D. The Proposed Settlement Was Not Achieved in the Full Context of the Adversarial Process.

While settlement classes may have certain attractive aspects, such as reducing litigation expenses, many of the traditional aspects of adversarial litigation are missing. As a result……the settlement class is potentially the product of collusion among the parties: defendants who wish to rid themselves of the burden of litigation and plaintiffs' counsel who wish to receive immediate compensation. Douglas G. Smith, *The Intersection of Constitutional Law and Civil Procedure: Review of Wholesale Justice – Constitutional Democracy and the Problem of the Class Action Lawsuit*, Northwestern University Law Review Colloquy, Vol. 104:319 (2010); *See also, e.g.*, John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory*

-11-

*for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 714 (1986) ("Often, the plaintiff's attorneys and the defendants can settle on a basis that is adverse to the interests of the plaintiffs. At its worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorney's fees.").

The Proposed Settlement intends to resolve certain claims by private individuals and businesses for economic loss and property damage resulting from the "*Deepwater Horizon* Incident." The Proposed Settlement defines "*Deepwater Horizon* Incident" as: the events, actions, inactions and omissions leading up to and including (i) the blowout of the MC252 Well; …………. (vii) *the operation of the GCCF*; and (viii) BP public statements relating to all of the foregoing. (Proposed Settlement ¶ 38.43, Rec. Doc. 6276-1 at 99).

*Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.* and *Selmer M. Salvesen v. Kenneth R. Feinberg, et al.* are the only two cases of their kind filed in any court in the country. In each case, the complaint alleges, in part, that Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, and GCCF misled Plaintiffs by employing a "Delay, Deny, Defend" strategy against them. This strategy, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."  In sum, Plaintiffs allege that BP is responsible for the oil spill incident; Feinberg, et al. (independent contractors), via employment of their "Delay, Deny, Defend" strategy, are responsible for not compensating and thereby financially ruining Plaintiffs and other victims of the BP oil spill.

As noted above, the *Pinellas* case was transferred by the JPML to the MDL 2179 Court

-12-

on August 9, 2011. Once the *Pinellas* and *Salvesen* cases were transferred to the MDL 2179 Court, not only were these cases automatically stayed, but the *Pinellas* and *Salvesen* claims were deemed "amended, restated, and superseded" by the allegations and claims of the Master Complaint in Pleading Bundle B1 (*See* Pre-Trial Order No. 25, Para. 5, Jan. 12, 2011), in which Feinberg, Feinberg Rozen, LLP, and GCCF are not even named as Defendants.

On August 29, 2011, Plaintiffs' Counsel emailed a letter to James Parkerson Roy wherein he informed Mr. Roy that the *Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.* case had been transferred to MDL 2179. The letter, in pertinent part, stated "I would like to commence discovery as soon as possible. Since this action does not involve common questions of fact with actions previously transferred to MDL No. 2179, please advise as to how we may most expeditiously initiate and coordinate discovery......I look forward to working with you on this case." On September 5, 2011, Plaintiffs' Counsel received an email from Stephen J. Herman wherein Mr. Herman stated, *"please be advised that the Court has, thus far, declined to permit formal discovery on Feinberg or the GCCF."*

Judge Barbier writes, "…the PSC has actively lobbied and argued for increased supervision and monitoring of the GCCF and Kenneth Feinberg/Feinberg Rozen, LLP. These efforts have met with at least partial success. For instance, on February 2, 2011 the Court granted the PSC's motion (in part) and ordered the GCCF and BP to:

> (1) Refrain from contacting directly any claimant that they know or reasonably should know is represented by counsel, whether or not said claimant has filed a lawsuit or formal claim.
> (2) Refrain from referring to the GCCF, Ken Feinberg, or Feinberg Rozen, LLP (or their representatives), as "neutral" or completely "independent" from BP. It should be clearly disclosed in all communications, whether written or oral, that said parties are acting for and on behalf of BP in fulfilling its statutory obligations as the "responsible party" under the Oil Pollution Act of 1990.

-13-

> (3) Begin any communication with a putative class member with the statement that the individual has a right to consult with an attorney of his/her own choosing prior to accepting any settlement or signing a release of legal rights.
> (4) Refrain from giving or purporting to give legal advice to unrepresented claimants, including advising that claimants should not hire a lawyer.
> (5) Fully disclose to claimants their options under OPA if they do not accept a final payment, including filing a claim in the pending MDL 2179 litigation.
> (6) Advise claimants that the "pro bono" attorneys and "community representatives" retained to assist GCCF claimants are being compensated directly or indirectly by BP."
> Rec. Doc. 1098 at 14.

Judge Barbier further writes, "The PSC has advocated for a full and transparent audit of the GCCF and its claims handling practices, and together with the U.S. Department of Justice, *has persuaded Mr. Feinberg to agree to such an audit* which is now in progress. The PSC has advocated, again with some success, for the GCCF to employ a more liberal causation standard in evaluating claims and has advanced similar causation arguments in this MDL proceeding." *See* Order of Aug. 26, 2011, Rec. Doc. 3830 at 32-33. (pp. 4-5, Rec. Doc. 5022).

The PSC allegedly represents the Plaintiffs in MDL 2179. These Plaintiffs deserve more than the PSC merely: (a) "lobbying" for increased supervision and monitoring of Feinberg, et al.; (b) trying to "persuade" Mr. Feinberg to agree to an audit; and (c) "advocating," again with some success, for the GCCF to employ a more liberal causation standard in evaluating claims.

The JPML believes, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund." However, formal discovery on Feinberg and the GCCF, and the associated pressure of a trial, are required in order exert pressure on the parties to negotiate a settlement which reflects the true value of the claims and not one which focuses on minimizing the liability of BP. Certainly, without formal discovery on Feinberg and the GCCF, "certain claims by private individuals and businesses for economic loss

-14-

resulting from *the operation of the GCCF*" may not be properly resolved.

**E. The Proposed Settlement Makes a Mockery of the Oil Pollution Act of 1990 ("OPA").**

Plaintiffs respectfully point out to this Honorable Court that the Proposed Settlement makes a mockery of the OPA for at least the following four reasons:

1. The Proposed Settlement defines Class Members by geographic bounds and certain business activities while requiring proof of a heightened, vague standard of causation.

2. The Proposed Settlement requires Class Members to waive their right to sue in exchange for a miniscule single final settlement payment.

3. The Proposed Settlement provides for a shortened Period of Limitations.

4. The Proposed Settlement fails to pay interest on the amount paid.

This Honorable Court has already been fully briefed on these issues. *See, e.g., Plaintiff's Memorandum in Support of His Motion to Vacate Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement]* filed in this Court on July 2, 2012 by Plaintiff Selmer M. Salvesen (pp. 15-23, Rec. Doc. 6831-1).

Plaintiffs respectfully bring to the Court's attention that on April 25, 2012 Mississippi Attorney General Jim Hood filed his Statement of Interest, also objecting to the use of the illegal and illegally-obtained GCCF Releases as an eligibility criteria to exclude 200,000 individuals and entities from the "Economic and Property Damages Settlement Class" definition and from the benefits of the proposed "*Deepwater Horizon* Economic and Property Damages Settlement," and renewing his request to nullify the illegal, illegally-obtained and unconscionable GCCF Releases. (Rec. Doc. 6356).

As Judge Barbier aptly stated in his Order of August 26, 2011, "*The long term effects [of*

-15-

*the BP oil spill] on the environment and fisheries may not be known for many years.*" (p. 31, Rec. Doc. 3830) (Emphasis added). Requiring Class Members to prematurely waive their right to sue in exchange for a miniscule single final settlement payment is unconscionable..

Notwithstanding the utter failure of the Proposed Settlement to comply with the OPA, Interim Class Counsel and the PSC state, "*To give it utmost credit, the GCCF can be said to be a good faith effort to fulfill BP's OPA obligations……………..*" (p. 29, Rec. Doc. 6269-1).

**F.  A Pattern of Collusive Unfairness Permeates the Proposed Settlement.**

For the following reasons, Plaintiffs respectfully point out to this Honorable Court that the Proposed Settlement is not a "fair, adequate, and reasonable" settlement (at least not for the Class Members) which has been entered into without collusion between the parties.

(1)  Prior to the Settlement, the Deepwater Horizon Oil Spill Trust had a balance of approximately $13.8 billion from which BP oil spill victims believed they would be compensated by GCCF for all "legitimate" claims.

(2)  After the Settlement, the proposed "Settlement Trust" will only have a balance of $7.8 billion from which BP oil spill victims are being told they will be compensated by the CSSP "so long as they execute an individual release." (p. 7, Rec. Doc. 6418).

(3)  Under the Proposed Settlement, BP will receive a refund of approximately $6 billion; the PSC and other counsel allegedly performing common benefit work will receive $600 million.

(4)  The Proposed Settlement doesn't actually provide for funds to be distributed to Class Members; it merely gives BP oil spill victims the right to submit, *yet again*, a claim for economic and property damages. Plaintiffs respectfully ask, "Where's the settlement?"

(5) Prior to the Proposed Settlement, under the GCCF, the evaluation and processing of claims were performed by Garden City Group, Inc., BrownGreer, PLC, and PricewaterhouseCoopers, LLP. *The GCCF denied payment to approximately 61.46% of the claimants who filed claims*; the *average total amount paid per claimant was $27,466.47.*

(6) After the Proposed Settlement, under the CSSP, the evaluation and processing of claims shall continue to be performed by Garden City Group, Inc., BrownGreer, PLC, and PricewaterhouseCoopers, LLP. Accordingly, there is no reason to believe that the percentage of claimants denied payment and the average total amount paid per claimant under the GCCF will increase under the CSCP.

(7) "BP has estimated the cost of the proposed settlement to be approximately $7.8 billion." (p. 156, Rec. Doc. 6266-2). Here, Judge Barbier's admonition in his Order of August 26, 2011 is instructive: "*The long term effects [of the BP oil spill] on the environment and fisheries may not be known for many years.*" (p. 31, Rec. Doc. 3830) (Emphasis added). Since, as Judge Barbier points out, the long term effects, and therefore the associated costs, of the BP oil spill on the environment and fisheries may not be known for many years, BP can only estimate its cost by multiplying the approximate number of Claimants by an average amount BP is willing to pay each claimant.

The average amount BP proposes to pay each Claimant under the Proposed Settlement is not difficult to surmise. "The BP Parties may appeal a final compensation award determination only where the compensation amount determined by the settlement program is in excess of *$25,000.*" (p. 58, Rec. Doc. 6276-1).

(8) "The BP Parties shall make a non-refundable payment of $75 million (the "Initial

-17-

Payment") into the Common Benefit Fee and Costs Fund on the first date on which all of the following have occurred: (i) 30 days have elapsed after the Court has granted preliminary approval of the Economic Agreement, and (ii) the Court has entered an Order modifying the Holdback Order to provide that it shall not apply to any Settlement Payments or Other Economic Benefits paid pursuant to the Economic Agreement….." "……within 15 days after the end of each calendar quarter, the BP Parties *shall irrevocably pay* into the Common Benefit Fee and Costs Fund an amount equal to *6 % (six percent) of the aggregate Settlement Payments paid under the Economic Agreement in respect of Claimants that have executed an Individual Release.*" (pp. 3-4, Rec. Doc. 6276-46). In sum, the PSC and other counsel allegedly performing common benefit work are financially motivated to have as many Claimants execute an Individual Release as expeditiously as possible regardless of whether the negotiated settlements reflect the true value of the claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court vacate its Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement], Rec. Doc. 6418 dated May 2, 2012.

DATED: July 13, 2012                                Respectfully submitted,

                                                    **/s/ Brian J. Donovan**
                                                    Brian J. Donovan
                                                    Attorney for Plaintiffs
                                                    Florida Bar No. 143900
                                                    3102 Seaway Court, Suite 304
                                                    Tampa, FL 33629
                                                    Tel: (352)328-7469
                                                    BrianJDonovan@verizon.net

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of July, 2012.

/s/ Brian J. Donovan
Brian J. Donovan
Attorney for Plaintiffs
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net