**No. 12 - 30012**

# United States Court of Appeals for the Fifth Circuit

## *IN RE: DEEPWATER HORIZON*

On Appeal From the United States District Court
for the Eastern District of Louisiana

Civ. Action Nos. 2:10-md-2179 and member cases: 2:10-cv-1106,
2:10-cv-1113, 2:10-cv-1156, 2:10-cv-1159,  2:10-cv-1480, 2:10-cv-1757,
2:10-cv-1758, 2:10-cv-1759, 2:10-cv-1760, 2:10-cv-2087, 2:10-cv-2731,
2:10-cv-2996, 2:10-cv-2997, 2:10-cv-9999 (consolidated)

## BRIEF OF BP DEFENDANTS-APPELLEES

Jeffrey Bossert Clark
Aaron L. Nielson
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington,  D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Elizabeth A. Larsen
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel for BP Defendants-Appellees*
(additional counsel listed inside front cover)

August 15, 2012

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION .......................................3

QUESTIONS PRESENTED ....................................................4

STATEMENT OF THE CASE AND FACTS.........................4

    A.    The *Deepwater Horizon* Incident..........................................4

    B.    The United States' Cleanup Activities. ..........................5

    C.    The Natural Resource Damage ("NRD") Assessment Process.................................................................................6

    D.    The United States' Civil Suit.............................................7

    E.    Statutory Background........................................................8

    F.    Procedural Background....................................................15

SUMMARY OF THE ARGUMENT ...................................19

STANDARD OF REVIEW ....................................................20

ARGUMENT.............................................................................21

I.    FEDERAL COURT JURISDICTION EXISTS FOR THESE CASES......21

    A.    OCSLA Jurisdiction Exists Because the Dispute Would Not Have Arisen "But For" Defendants' Operations On The Shelf. ......................................................................23

    B.    The "Efficient Exploitation" of Shelf Resources Test Invoked by the Parishes Is Inapplicable But Met in Any Event..............................................................................25

C.    The Parishes' Argument That OCSLA Section 1349(b)(1) Jurisdiction Contains a Situs Requirement Also Fails. ...............28

D.    OCSLA Jurisdiction Is Further Reinforced by Federal Enclave Jurisdiction. .........................................................35

E.    In Any Event, Diversity Jurisdiction Would Exist. .....................39

II.    THE PARISHES' CLAIMS ARE PREEMPTED AND FAIL FOR OTHER REASONS. .....................................................43

A.    An Affected State Has No Authority to Regulate Pollution Originating from an Out-of-State Source. ....................43

B.    No Savings Clause Precludes Preemption. ...................................49

C.    The Parishes' Cannot Distinguish *Ouellette*...................................55

D.    Alabama's Reliance on the "Effects Doctrine" Is Unavailing. .........................................................57

E.    Two Alternative Grounds for Affirmance Support the Dismissal of the Parish Wildlife Claims on the Merits. ..............60

F.    The Iberia Parish Brief Presents Frivolous Double Jeopardy and Tenth Amendment Arguments. ...........................64

CONCLUSION .....................................................65

## INTRODUCTION

The Outer Continental Shelf ("Shelf" or "OCS") is an exclusive federal enclave. *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986); *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 785 (5th Cir. 2009) (en banc). Since the beginning of our nation, this vast expanse of submerged land has *always* been outside the jurisdiction of any State. *See Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 685 (2012).

The *Deepwater Horizon* spill began with a loss of control over an oil well embedded thousands of feet deep into the lands of the Shelf and covered by one mile of water. No party disputes that the spill occurred approximately 50 miles out into the Gulf of Mexico from Louisiana, the closest State. Therefore, two propositions control:

***First***, activity on the Shelf is subject to federal control alone, and any state law cause of action is preempted. *See West River Elec. Ass'n, Inc. v. Black Hills Power and Light Co.*, 918 F.2d 713, 719 (8th Cir. 1990) (explaining that federal enclaves are not subject to state authority absent express congressional authorization). Just as state law *of its own force* could not penalize an arsenal on a federal military enclave for emitting pollutants, *cf. Symonds & Day v. Zimmerman, Inc.*, 981 F.2d 1255, 1992 WL 387003, *2 (5th

Cir. Dec. 15, 1992) (federal law controls employment disputes at enclave munitions plant), a State cannot regulate accidents occurring on the Shelf during oil and gas exploration activities authorized by Congress.

***Second***, for similar reasons, legal controversies such as the *Deepwater Horizon* spill, arising directly from activities regulated under the Outer Continental Shelf Lands Act ("OCSLA"), fall well within federal court jurisdiction.  Indeed, it could not be otherwise.  *See Mater v. Holley*, 200 F.2d 123, 124-25 (5th Cir. 1952) ("It would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate controversies arising there, but must relegate the parties to the courts of another sovereign for relief."); *Stokes v. Petroleum Helicopters*, No. Civ. A. 97-0508, 1997 WL 695557, *5 (E.D. La. Nov. 5, 1997) (applying *Mater* to the Shelf).   Moreover, OCSLA's jurisdictional provision, 43 U.S.C. § 1349(b)(1), provides jurisdiction over all "cases and controversies arising out of, or in connection with … any operation conducted on the outer Continental Shelf."

The Shelf's nature as an exclusive federal enclave, along with the Supreme Court's ruling in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), that the Clean Water Act ("CWA") restricts States to regulating only

2

in-State sources of water pollution, disposes of the two basic assignments of error the Parishes (and their *amici*, the States of Louisiana, Alabama, and Mississippi) urge here: (1) that BP improperly removed the Parish wildlife actions; and (2) federal law does not preempt the application of state law to this Shelf incident.  Neither argument can overcome the fact that the spill occurred on a federal enclave subject to exclusive federal jurisdiction and control.  The district court thus must be affirmed.

## STATEMENT OF JURISDICTION

BP agrees that the Court has appellate jurisdiction under 28 U.S.C. § 1291.[1]   The district court below also possessed both original subject matter jurisdiction and removal jurisdiction pursuant to (A) OCSLA, 43 U.S.C. § 1349(b)(1); (B) 28 U.S.C. § 1441; (C) precedent defining the nature

---

[1]  Consistent with its duty of candor, however, BP notes that the State of Louisiana is still pursuing claims in the district court that remain to be adjudicated.  This matters because — in an effort to escape diversity jurisdiction — the Parishes insist that "[t]he state of Louisiana is the plaintiff party at interest in this case."  Orleans Br. 14; Iberia Br. 1 (referring to "penalty actions of the State of Louisiana").  Hence, the question could arise whether the lack of a final judgment against Louisiana as a whole prevents appellate jurisdiction from attaching to the present Parish appeals.  BP does not advance that position because it believes the Parishes here are real parties in interest.  The contradictions in the Parishes' positions on jurisdiction are explored in Section I.E.

of federal enclaves (pursuant to which federal question jurisdiction also inherently exists under 28 U.S.C. § 1331); and (D) diversity jurisdiction under 28 U.S.C. § 1332 (*see* Section I.E below).

## QUESTIONS PRESENTED

1. Does federal jurisdiction exist over the Parish cases such that BP could properly remove them to federal court?

2. Does the CWA preempt the Parish actions?

3. Does OCSLA preempt the Parish actions where no gap exists in federal law for state law to fill?

4. Do the Parish cases contravene the Louisiana Oil Spill and Response Act ("LOSPRA")?

## STATEMENT OF THE CASE AND FACTS

### A. The *Deepwater Horizon* Incident.

The *Deepwater Horizon* was a mobile offshore drilling unit owned and operated by Transocean Ltd. and/or its affiliates ("Transocean"). *See In re Oil Spill*, 841 F. Supp. 2d 988, 992 (E.D. La. 2012). BP hired Transocean to employ the *Deepwater Horizon* to drill the Macondo oil well, located on the seabed at Mississippi Canyon Block 252 in the Gulf of Mexico. On the evening of April 20, 2010, a loss of well control allowed hydrocarbons to

escape from the *Deepwater Horizon* and its appurtenances, which were then connected to the Shelf seabed. *Id*. at 991.[2] The resulting fire destroyed and sank the rig on April 22, 2010. Eleven men tragically perished. *See* Orleans Record Excerpts ("Orleans R.E.") 110.

Hydrocarbons thereafter flowed from the *Deepwater Horizon*'s appurtenances until July 15, 2010, when BP installed a capping stack. *See In re Oil Spill*, 792 F. Supp. 2d 926, 930 n.1 (E.D. La. 2011). BP, under the direction of the United States, permanently sealed the well in September 2010. *See id.*

## B.    The United States' Cleanup Activities.

The United States' involvement began within minutes of the rig explosions, with Coast Guard personnel launching a search and rescue effort, followed shortly by response and investigation operations. *See id.* at

---

[2] Contrary to the position of some litigants in the MDL proceedings, it is very much disputed whether oil was discharged "from the well." BP's factual and legal position, which is preserved below but not ripe for review here, is that oil flowed from the *Deepwater Horizon* and/or its appurtenances to jurisdictional waters under the CWA. The issue of whether oil flowed from the well or from the *Deepwater Horizon* is important to a decision not on appeal here and should not be prejudged. *See In re Oil Spill*, 844 F. Supp. 2d 746 (E.D. La. 2012). The key undisputed fact for purposes of this appeal is that the oil spill arose outside of state lands and waters.

930.    Within days, a comprehensive response infrastructure took shape under the direction of the Federal On-Scene Coordinator ("FOSC").

The governmental and BP response to the *Deepwater Horizon* incident was unprecedented in scope.  Through the FOSC, the Unified Command, and the National Incident Command, the United States directed a military-style operation that engaged more than 47,000 individuals, thousands of vessels, and dozens of aircraft.[3]  Numerous state agencies also participated directly in the Unified Command's response.  *Id*.

## C.    The Natural Resource Damage ("NRD") Assessment Process.

The United States and the States have also been involved from the earliest days in assessing the incident's impact on natural resources.  The National Oceanic and Atmospheric Administration ("NOAA") and the U.S. Fish and Wildlife Service, along with other entities including the affected States, act as a Trustee Council.[4]

Since April 2010, the Trustees and BP have formed technical working

---

[3]  *The Ongoing Administration-Wide Response to the Deepwater BP Oil Spill*, http://www.restorethegulf.gov/release/2010/07/30/ongoing-administration-wide-response-deepwater-bp-oil-spill (last visited Aug. 15, 2012).

[4]  *Co-Trustees*,    http://www.gulfspillrestoration.noaa.gov/about-us/co-trustees/(last visited Aug. 15, 2012).

groups to assess potential impacts on fish, shellfish, terrestrial and marine mammals, turtles and birds, and other organisms, and their habitats.[5]  NRD teams have also surveyed thousands of miles of shoreline.[6]

The Trustees are working to identify and implement restoration projects.[7]  In fact, pursuant to BP's April 21, 2011 agreement to fund $1 billion in projects, the Trustees have developed early restoration projects designed to "fast track" restoration activities.[8]

### D.    The United States' Civil Suit.

A third component of the United States' response was the filing of a

---

[5]  *Deepwater Horizon Incident Natural Resource Damage Assessment*, http://oceanservice.noaa.gov/news/weeklynews/june10/nrda-deepwater.html.  Note that any assertion that "hundreds of millions of fish, birds, wildlife, and aquatic life" (Iberia Br. 1, 4, 10) have been killed or injured by the spill is unfounded, contrary to federal findings to date, and is not plausibly averred in any of the relevant Parish complaints.

[6]  *NRDA By The Numbers*, http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/2011/02/NRDA_by_the_Numbers_1_11_FINAL.pdf (last visited Aug. 15, 2012).

[7]  *NOAA Gulf Stream Restoration*, http://www.gulfspillrestoration. noaa.gov/restoration/ (last visited Aug. 15, 2012).

[8]  *NRDA Trustees Announce $1 Billion Agreement to Fund Early Gulf Coast Restoration Projects*, http://www.restorethegulf.gov/release/2011/04/21/nrda-trustees-announce-1-billion-agreement-fund-early-gulf-coast-restoration-proj (last visited Aug. 15, 2012).

civil enforcement action.  *See* Complaint, *United States v. BP Exploration & Prod., Inc.*, No. 2:10-cv-04536-CJB-SS (E.D. La. Dec. 15, 2010).  The United States: (1) seeks civil penalties against BP and others under CWA Section 311, declaratory relief under OPA, and "injunctive relief"; (2) alleges causes of the oil spill; and (3) reserves its right to bring additional claims, including for NRD.  *See id.* ¶¶ 2, 65-66, 92 & Prayer for Relief.

### E.    Statutory Background.

#### 1.    Applicable Federal Statutes.

##### a.    OCSLA.

National authority over the Shelf is exercised in three interconnected ways — through (A) OCSLA's assertion of federal sovereignty, 43 U.S.C. § 1333(a)(1); (B) OCSLA's "surrogate federal law" provision, 43 U.S.C. § 1333(a)(2)(A); and (C) OCSLA's jurisdictional provision, 43 U.S.C. § 1349.

##### i.    Section 1331(a)(1).

OCSLA declares that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition," 43 U.S.C. § 1332(1), thus establishing "national authority over the OCS at the expense of both foreign governments and the governments of the individual states," *Tennessee Gas*

*Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 153 (5th Cir. 1996). Federal law extends to the subsoil and seabed of the Shelf, including all "installations and other devices permanently or temporarily attached" thereto if those devices are being used to explore, develop, or produce mineral resources, making such areas, installations, and devices the equivalent of "area[s] of exclusive Federal jurisdiction located within a State." 43 U.S.C. § 1333(a)(1).

### ii.    Section 1333(a)(2).

OCSLA also "makes federal law exclusive in its regulation of the OCS …." *Tenn. Gas Pipeline*, 87 F.3d at 153; *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480-481 (1981). Indeed:

> To the extent that they are applicable and *not inconsistent with this subchapter or with other Federal laws* and regulations of the Secretary … , the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf …. *All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States.*

43 U.S.C. § 1333(a)(2)(A) (emphasis added).

Under this framework, state law only fills "gaps" in substantive

9

federal law.  Even so, when state law is borrowed to fill a gap it is adopted "as surrogate federal law," and "shall be … enforced by the … courts of the United States."  *See, e.g., Gulf Offshore Co.*, 453 U.S. at 480-81; *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1052 (5th Cir. 1990).

Any cases that fall within OCSLA's assertion of national sovereign authority under section 1333(a)(1), but that are not governed by section 1333(a)(2)(A), are governed by substantive OCSLA provisions or by federal maritime law.  *See, e.g., Tenn. Gas Pipeline*, 87 F.3d at 153.

Taken together, therefore, section 1333(a)(2)(A), substantive OCSLA provisions, and maritime law provide a body of law that is "intended 'to govern the *full range* of potential legal problems that might arise in connection with operations on the Outer Continental Shelf.'"  *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994) (emphasis added); *see also* H.R. Rep. No. 95-590, at 128 (1977) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534.

### iii.    Section 1349(b)(1).

Lastly, OCSLA grants federal courts broad jurisdiction to decide any dispute "arising out of, or in connection with" operations conducted on the OCS:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies *arising out of, or in connection with* (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.

43 U.S.C. § 1349(b)(1) (emphasis added).  *See also EP Operating*, 26 F.3d at 569 ("[B]road reading of the jurisdictional grant of section 1349 is supported by the expansive substantive reach of the OCSLA.").

OCSLA's definitions establish that section 1349(b)(1) encompasses all drilling activities on the Shelf.  *First*, OCSLA defines "minerals" as including "oil, gas, sulphur, geopressured-geothermal and associated resources …."  43 U.S.C. § 1331(q).  *Second*, "exploration" is defined as the "process of searching for minerals, including … any drilling," and "development" includes "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered."  43 U.S.C. § 1331(k), (l).  *Third*, the term "operation" is to be read expansively as "the doing of some physical act."  *Amoco Prod.*

11

*Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1207 (5th Cir. 1988).

### b.    CWA.

The CWA is a "complicated statute … where technical definitions are worked out with great effort ….  Of particular significance are the words *discharge of pollutants*."  *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 380 (2006) (emphasis added; quotation omitted).  Under the CWA, the location of where a "discharge" initially occurs is of immense significance (*see* Section II, below, discussing the *Ouellette* case).  Here, it is undisputed that the "discharges" comprising the *Deepwater Horizon* spill and sinking of the rig initially occurred exclusively in federal waters and that the well over which the *Deepwater Horizon* lost control was embedded in the Shelf.

CWA Section 311 prohibits and penalizes the discharge into the waters of the United States of two types of pollutants — oil and hazardous substances.   *See* 33 U.S.C. § 1321(b)(7).   The relevant CWA regulatory program establishes the National Pollutant Discharge Elimination System ("NPDES").   *See* 33 U.S.C. § 1342.   NPDES permits "allow the issuer to assure that the applicant meets any applicable water quality standards, treatment standards, or schedule of compliance standards in addition to the basic effluent limitations."   *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055,

1060 n.3 (5th Cir. 1991).  "NPDES permits may be either individual or general; that is, either site-specific or generally applicable to a whole category or subcategory of point sources ….  The EPA frequently uses such general permits for the oil and gas industry."  *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 929 (5th Cir. 1998).

Relevant to this incident, EPA NPDES General Permit 290000 was issued to govern operations on the Macondo portion of the Shelf.  *See* Notice of Final NPDES General Permit, 72 Fed. Reg. 31,575 (June 7, 2007) ("Permit 290000").  Shelf mineral lessees such as BP and mobile offshore drilling unit ("MODU") operators like Transocean were permitted to opt into Permit 290000, which establishes a range of restrictions on oil and gas operations.

### c.     The Oil Pollution Act ("OPA").

Congress enacted OPA in the wake of the *Exxon Valdez* incident to provide federal damages and cleanup remedies for oil pollution.  *See* S. Rep. 101-94 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 730.  OPA defines "responsible parties" (33 U.S.C. § 2701(32)); requires "responsible parties" to pay both specified cleanup costs and damages "that result from" the incident (33 U.S.C. §§ 2702(a)-(b)); and assigns carefully defined causes of

13

action for six specified categories of damages to private or governmental actors, respectively. *See* 33 U.S.C. § 2702(b)(2)(A)-(F).

Two federal agencies exercise authority under OPA. The Coast Guard administers the payment of private damages from the Oil Spill Liability Trust Fund. *See* 26 U.S.C. § 9509; 33 U.S.C. §§ 2701(11), 2712, 2716; *see also* 33 C.F.R. parts 133-138. And NOAA oversees the NRDA process described above. *See* 33 U.S.C. § 2706; *see also* 15 C.F.R. part 990.

### 2. Relevant Louisiana Statutes.

#### a. Wildlife Value Recovery Statute.

Louisiana's Wildlife Value Recovery Statute provides that "[a] person who kills ... or injures any fish, wild birds, [or] other wildlife and aquatic life in violation of this Title, or a regulation adopted pursuant to this Title, or a federal statute or regulation governing fish and wildlife … is liable to the state for the value of each fish, wild bird, [or] other wildlife and aquatic life, unlawfully killed, … or injured." La. Rev. Stat. Ann. § 56:40.1. Ordinarily, suits to recover the value Louisiana places on such injured or killed wildlife may be brought by (a) the attorney for the LDWF, (b) the Louisiana Attorney General, or (c) "the district attorney of the parish in which the violation occurred." *Id.* § 56:40.4. If such a violation can be

shown by a Parish District Attorney, any recovery is split 60/40 between the LDWF's Conservation Fund and the Parish District Attorney. *Id*. § 56:40.9(A)-(B). The 40% award Parish District Attorneys are empowered to seek is not an attorney's fee. The Louisiana Legislature knew how to establish a fee award when it wanted to do so. *See id*. § 56.40.3(F) (granting an attorney's fee recovery in addition to the liability awards).

### b. LOSPRA.

*For the State of Louisiana*, LOSPRA is the "*exclusive authority* on oil spill prevention, response, removal, and the limitations of liability" and its provisions apply to any "responsible party" as well as any "potentially responsible party" for an oil spill. La. Rev. Stat. Ann. §§ 30:2496 (emphasis added), 30:2454(22); *see also id*. § 30:2480(G); La. Admin. Code, tit. 43, pt. XXIX (hereinafter "LOSPRA Reg.") § 115(A). The Act establishes a comprehensive and detailed regime governing the assessment and determination of natural resource damages claims, and *any* alleged violation of LOSPRA is *exclusively* subject to that Act's provisions. *See id*. §§ 30:2492, 30:2491(A), 30:2496.

### F. Procedural Background.

In mid-2010, the various Parish Appellants each filed a suit in state

15

courts located in their jurisdictions seeking wildlife damages from BP (and, in some cases, other defendants) pursuant to Louisiana law, *see* La. Rev. Stat. Ann. § 56:40.1 *et seq.* BP removed these suits to federal court, with the consent of other defendants when necessary. And when MDL 2179 was created by the Judicial Panel on Multidistrict Litigation and assigned to the Eastern District of Louisiana, all such Louisiana Parish suits were consolidated there. The Parishes moved for remand, but Judge Barbier rejected their motions in a decision issued October 6, 2010: "[T]his Court finds that it has original jurisdiction under 43 U.S.C. § 1349, and that neither the well-pleaded complaint rule, the Eleventh Amendment, nor admiralty jurisdiction serves as a bar to removal in this matter." Orleans R.E. 105.

On March 4, 2011, the Local Government Entity Master Complaint ("Master Complaint") was filed. MDL 2179 (Rec. Doc. 1510). Drawing on the individual complaints filed by the Parishes, this Master Complaint included a cause of action brought under the Louisiana Wildlife statute against BP and the other Defendants-Appellees. *See id.* at ¶¶ 146, 736-37.

For administrative purposes, Judge Barbier also grouped the amended complaints of Alabama and Louisiana into the so-called "Bundle

16

C" collection of state and local government cases.  BP and other defendants moved to dismiss those two state cases in June 2011.  On November 14, 2011, the district court granted these motions in part and denied them in part.  *See* Orleans R.E. 150-176.  Relevant to this appeal, the district court dismissed the States' state law claims (including for civil penalties), on the grounds of preemption by the CWA as found by the Supreme Court in *Ouellette*.  *See id.* at 157.

Judge Barbier also rejected arguments by Alabama and Louisiana that OPA's preemption savings clauses shielded state-law claims from preemption.  The district court held that in OPA "Congress did not intend to change *Ouellette*'s interpretation of the CWA," and rejected any argument that "without state penalties, there is no incentive for a defendant to prevent its oil spill from entering state waters."  *Id.* at 162.

The district court also pointed out that the States were not harmed by the preemption ruling:  "[T]he States may recover [in addition to removal costs under 33 U.S.C. § 2702(b)(1)] all OPA damages … which includes damage to natural resources and property, lost revenues and profits, and the cost of providing additional public services.  *See* 33 U.S.C. § 2702(b)(2)."

*Id.* at 164.[9]  The district court pointed out that, if anything, the implications of the States' view that up to five separate Gulf States could *separately and cumulatively penalize* the same Shelf conduct raised serious concerns under the Due Process Clause:  "This would seem excessive given that the source of the discharge occurred in no State ….  By contrast, had the source of the discharge occurred within a State, the discharger would certainly be on notice that penalties under federal law and the source State's law [are all that] would apply."  *Id.* at 166 (citing *BMW v. Gore*, 517 U.S. 559, 574 & n.22 (1996)).

Finally, when the district court turned to adjudicating the claims of the local governments in the Master Complaint and the underlying Parish wildlife claims, it held that its dismissal of Alabama's and Louisiana's

---

[9]   The district court also stated the States may be able to recover punitive damages under general maritime law.  *See* Orleans R.E. 164.   BP disagrees that punitive damages are available against OPA responsible parties because OPA displaces federal maritime common law.  Hence, BP requested that the district court certify his contrary decision for interlocutory appeal, but Judge Barbier declined to do so.  *See* MDL Doc Nos. 4291 (motion), 4378 (denial).  Other courts have recognized that after the enactment of OPA, punitive damages are no longer available against OPA responsible parties as to economic and property injury caused by an oil spill.  *See South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000); *Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 747 (E.D. La. 2009).

state-law based claims logically disposed of such local government claims and so dismissed those as well.  *See* Orleans R.E. 185-186.

## SUMMARY OF THE ARGUMENT

This case requires nothing more than straightforward application of a long-settled principle:  conduct relating to oil exploration that occurs on the Shelf is governed by federal law.  Each of Appellants' arguments must be rejected because they conflict with that basic principle.

*First*, BP was well within its rights to remove these actions to federal court.  This Court has repeatedly held that where, as here, the subject of the suit could not have occurred "but for" conduct that occurred on the Shelf, removal is appropriate.  Appellants strain in vain to find an exception to that rule.  In any event, there are other, independent bases of jurisdiction here: federal enclave jurisdiction and diversity jurisdiction.  By any measure, this case falls within the adjudicatory power of the federal courts.

*Second*, the state law causes of action pursued by the Parishes are preempted by federal law.  A State does not have power to regulate oil discharges that occurred on a federal enclave like the Shelf, even if those discharges have an effect on an adjacent State.  Indeed, that outcome is compelled by the Supreme Court's decision in *Ouellette* and later

confirming decisions of that Court. As with federal jurisdiction, the Parishes strenuously seek to escape this black-letter law. But no amount of pleading can change what the Supreme Court held. Even leaving *Ouellette* aside, moreover, there are numerous other reasons why the Parishes' claims must be dismissed, including the fact that they are not even authorized as a matter of Louisiana law.

At bottom, the law in this case is well-established. Federal law unsurprisingly governs oil exploration on the Shelf. Congress, looking to preserve a vibrant energy sector, selected federal law to regulate oil exploration and development. That the local district attorneys here seek to interject themselves into the federal realm by bringing tenuous state claims does not alter that reality. To the contrary, it illustrates vividly why Congress preempted state law and empowered federal courts with jurisdiction to ensure such preemption would be vigorously enforced.

## STANDARD OF REVIEW

This Court reviews the denial of a remand motion *de novo*. *See Guillory v. PPG Indus., Inc.*, 434 F.3d 303, 308 (5th Cir. 2005). The same standard is applied to related jurisdictional questions. *See, e.g., McKnight v. Dresser*, 676 F.3d 426, 429 (5th Cir. 2012).

20

In resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court only accepts allegations that state "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 559 (2007). A court does not accept "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). Legal conclusions concerning preemption and the meaning of the state law are also reviewed *de novo. See, e.g., Grissom v. Liberty Mut. Fire Ins. Co.*, 678 F.3d 397, 400 (5th Cir. 2012); *United States v. DeCay*, 620 F.3d 534, 537 (5th Cir. 2010).

Finally, no presumption against an exercise of removal jurisdiction or against preemption applies. OCSLA is to be given a "broad" construction. *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994). And given the "clear exertion of federal sovereignty" over the Shelf, *id.*, which has *never* been part of state territory, no presumption against preemption exists. *See, e.g., United States v. Locke*, 529 U.S. 89, 108 (2000).

## **ARGUMENT**

## I.    **FEDERAL COURT JURISDICTION EXISTS FOR THESE CASES.**

Federal courts have jurisdiction over these wildlife suits under Section 1349 of OCSLA. By its terms, Section 1349(b)(1)(A) grants federal

courts power to decide any action "arising out of, or in connection with" exploration and drilling operations on the Shelf.  A district court thus has subject matter jurisdiction over a plaintiff's action if it would not have arisen "but for" exploration and drilling operations on the OCS.  *See, e.g., Tenn. Gas*, 87 F.3d at 154.  OCSLA is an independent grant of federal jurisdiction, and hence is *not* subject to the well-pleaded complaint rule.  *Compare Sea Robin Pipeline*, 844 F.2d at 1205 *with* Orleans Br. 15-16.

All of the arguments that the Parishes offer to overcome OCSLA jurisdiction fail.  Indeed, because the Parishes are real parties in interest *proceeding in their own right* as local governments (and only nominally in the name of the State), diversity jurisdiction also exists.[10]

---

[10] The State of Louisiana remains able to release the underlying subject matter of lawsuits brought under La. Rev. Stat. 56:40.1 *et seq.,* which provides that such lawsuits are brought in the State's name.  Louisiana can thereby override the Parishes' ability to litigate further against released defendants.  As set forth in the separate Brief of MOEX Offshore 2007 LLC and MOEX USA Corporation, this is an independent reason to dismiss the Parish wildlife claims against the MOEX entities:  a state-wide settlement with the State of Louisiana pursuant to a Consent Decree has left no further claims for the Parishes to litigate against them.  BP's argument that the Parishes are real parties in interest does not alter the conclusiveness of the MOEX settlement with the State.  The Parish District Attorneys cannot proceed on a cause of action that the Louisiana Attorney General and other State officials chose to surrender.

## A.    OCSLA Jurisdiction Exists Because the Dispute Would Not Have Arisen "But For" Defendants' Operations On The Shelf.

The district court correctly found federal jurisdiction.  This Circuit applies an expansive "but for" test, under which federal jurisdiction lies if the parties' dispute would not have arisen "but for" the exploration or development operations on the Outer Continental Shelf.  *See, e.g., Tenn. Gas*, 87 F.3d at 155.  This but-for test reflects the "broad jurisdictional grant under § 1349." *Id.*  *See also Texaco Exploration & Prod., Inc.* v. *AmClyde Engineered Prods. Co.*, 448 F.3d 760, 770 (5th Cir. 2006) (Fifth Circuit "has consistently read OCSLA's jurisdictional grant broadly").

Applying that broad standard, the *Tennessee Gas* panel had "no difficulty in deciding that § 1349 grants original jurisdiction in federal court" over a claim involving an allision with a platform affixed to the OCS.  87 F.3d at 154.  "The undeniable fact is that there would not have been an accident had Tennessee Gas not built its platform to extract minerals from the OCS."  *Id.* at 155.  *See also Barger v. Petroleum Helicopters, Inc.*, 692 F.2d 337, 340 (5th Cir. 1982) (OCSLA applied because the pilot "would not have been killed in a helicopter crash in the Gulf of Mexico 'but for' the fact that he was employed to transport eleven workers to a fixed

platform on the Shelf"); *EP Operating*, 26 F.3d at 567-68 (OSCLA applied in an action to determine ownership interests in an offshore platform and other facilities, even though active operations at the site had ceased).

Applying these well-settled standards, the exercise of jurisdiction over these cases must be upheld. Appellants concede that the oil spill that forms the basis of their suits connects to "the [United States Minerals Management Service] Mineral Lease G32306," which is in the Gulf of Mexico, located approximately 52 miles southeast of the port of Venice, Louisiana. Terrebonne Pet. ¶ 9; St. Tammany Pet. ¶ 9; *see also* Lafourche Pet. ¶ 8. "When it exploded, the Deepwater Horizon was operating on the outer continental shelf. Its operations were part of the exploration for, and intended development and production of, continental-shelf oil." *Phillips* v. *BP p.l.c.*, 2010 WL 3257737, at *1 (N.D. Fla. Aug. 17, 2010).

Hence, there would have been no claim of damage to Louisiana wildlife "but for" the operation on the Shelf. That is enough to establish jurisdiction. *See Tenn. Gas*, 87 F.3d at 155; *Barger*, 692 F.2d at 340.

### B.    The "Efficient Exploitation" of Shelf Resources Test Invoked by the Parishes Is Inapplicable But Met in Any Event.

Instead of accepting cases like *Tennessee Gas*, Orleans Parish argues that without a direct effect on the exploitation of Shelf resources, OCSLA jurisdiction cannot attach.  *See* Orleans Br. 16-22.  This is not the law, and even if it were, it would not undermine the district court's decision.

*Tennessee Gas* and similar cases define the "but for" test that controls the reach of OCSLA jurisdiction generally and especially in *tort* cases.  In *contract* cases, this Court has sometimes referred to a need to show that a particular dispute threatened to affect the "efficient exploitation" of Shelf resources in order to establish jurisdiction.  Three Fifth Circuit cases use the phrase.  All involve contract or property disputes involving voluntary business dealings and not tort-like actions:  (1) *EP Operating*, 26 F.3d at 570 (property rights); *United Offshore Co. v. Southern Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990) (contract dispute); and (3) *Sea Robin*, 844 F.2d at 1210 (same).  The wildlife cases do not involve voluntary transactions and so are not subject to any sort of "efficient exploitation" impact requirement.

Moreover, even if such a requirement did apply here (it does not), it is readily met.  This Court has held that "any dispute that alters the

progress of production activities on the OCS threatens to impair the total recovery of ... federally-owned minerals" and so "was intended by Congress to be within the grant of federal jurisdiction contained in § 1349." *Sea Robin*, 844 F.2d at 1210.  Tort rules and statutory liability rules will inevitably affect how mineral exploitation activities on the Shelf are conducted.  *Compare* RESTATEMENT (SECOND) OF TORTS § 286 (recognizing that tort law effectively sets "standard[s] of conduct," as do statutes or regulations).  The imposition of state liability would clearly affect how mineral lessees on the Shelf would carry out their operations.  And such liability would also clearly affect the balance struck in OCSLA between promoting economic interests and protecting environmental values.  *See* 43 U.S.C. § 1802(2); *NRDC v. Hodel*, 865 F.2d 288, 291-92 (D.C. Cir. 1988). Under the law of this Circuit, such clear and inevitable effects are more than sufficient to ground federal jurisdiction.

Indeed, the whole point of the OPA limited liability regime, which is closely tied to OCSLA's creation of the Oil Spill Liability Trust Fund (*see* 43 U.S.C. § 1802(8)), is to avoid imposing liability so ruinous that oil development activities on submerged Shelf lands would be rendered infeasible.  *See* 33 U.S.C. § 2704.  Congress deemed the limitation of liability

purpose of OPA so important that it listed that purpose first: "AN ACT to establish limitations on liability for damages resulting from oil pollution, to establish a fund for the payment of compensation for such damages, and for other purposes." Pub. L. No. 101-380, 104 Stat. 484 (1990).[11]

None of the district court cases the Orleans brief string cites, *see* Orleans Br. 18 n.27, warrants a different result. Those cases involve (1) a lawsuit that arose out of the independent cause of faulty medical treatment at an *onshore* medical facility where a plaintiff injured on the Shelf was treated, *see Sea Robin Pipeline Co. v. New Mexico Head Clinic Facility*, Civ. A. No. 94-1450, 1996 WL 84441 (E.D. La. Feb. 26, 1996); (2) contractual (or assignment) disputes "regarding the payment/price of services which have been already rendered, not provisions governing production or development," *NXC Co., LLC v. Samedan Oil Corp.*, No. Civ. A. 03-3284, 2004 WL 203079, at *3 (E.D. La. Jan. 28, 2004); *see also Brooklyn Union Exploration Co. v. Tejas Power Corp.*, 930 F. Supp. 289, 291 (S.D. Tex. 1996) (contractual dispute concerning "provisions governing the price of gas, not

---

[11] BP has voluntarily decided to forego the protections of the OPA liability caps to ensure that all legitimate OPA claims are paid. But that decision does nothing to detract from the existence of OCSLA jurisdiction.

provisions governing its production or development"); and (3) a fight about contractual assignments that only tangentially involved Shelf conduct, *see Harris Trust & Sav. Bank v. Energy Assets Int'l Corp.*, 124 F.R.D. 115, 119 (E.D. La. 1989). The factual circumstances in those cases are not remotely like the claims here, which directly stem from an explosion on the Shelf and the resulting spill and alleged impacts on state wildlife.

### C. The Parishes' Argument That OCSLA Section 1349(b)(1) Jurisdiction Contains a Situs Requirement Also Fails.

Both of the briefs filed by the Parishes also assert that OCSLA jurisdiction exists only as to disputes that occur *entirely* on an OCSLA situs. *See* Orleans Br. 22-27; Iberia Br. 14-16. This claim is meritless.

The text of OCSLA's jurisdictional provision contains no hint of a situs requirement: "[T]he district courts of the United States shall have jurisdiction of cases and controversies *arising out of, or in connection with* (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf ...." 43 U.S.C. § 1349(b)(1) (emphasis added). That ends the matter. "[W]hen the plain language of a statute is unambiguous and does not lead to an absurd result, our inquiry begins

and ends with the plain meaning of that language." *United States v. Clayton*, 613 F.3d 592, 596 (5th Cir. 2010) (quotations omitted). Congress would not have used such broad language if it intended a narrow geographic situs requirement.

That Section 1349 lacks a situs requirement is underscored by the inclusion of specific situs requirements in other sections of OCSLA. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotations omitted).

In *Valladolid*, the Supreme Court held that Section 1333(b) of OCSLA, which extends the Longshore and Harbor Workers' Compensation Act to certain injuries resulting from Shelf operations (and like Section 1349 also contains no explicit situs requirement) applies to injuries sustained beyond the Shelf. In so holding, the Court declined to read a situs requirement into Section 1333(b), reasoning that "Congress' decision to specify, in scrupulous detail, exactly where the other subsections of § 1333 [*e.g.*, § 1333(a)(1) and (2)] apply, but to include no similar restriction on injuries

29

in § 1333(b), convinces us that Congress did not intend § 1333(b) to apply only to injuries suffered on the OCS." *Valladolid*, 132 S. Ct. at 688. This reasoning applies equally to Section 1349. If anything, the language of Section 1349 ("arising out of, or in connection with (A) any operation") suggests an even looser connection to Shelf activities than the language examined in *Valladolid* ("the result of operations").

Grafting a situs requirement onto Section 1349 also would be contrary to numerous published Fifth Circuit decisions. *See, e.g., Sea Robin*, 844 F.2d at 1203 (upholding OCSLA jurisdiction over a dispute "concern[ing] take-or-pay obligations in contracts for the sale/purchase of natural gas"); *EP Operating*, 26 F.3d at 569 (upholding OSCLA jurisdiction over "merely an action to determine property rights" for "offshore facilities"); *United Offshore*, 899 F.2d at 407 (upholding OSCLA jurisdiction even though the case was "one step removed from the actual transfer of minerals to shore," because "it involve[d] a contractual dispute over the control of an entity which operate[d] a gas pipeline"). Each of these decisions upheld OCSLA jurisdiction over cases that arose "in connection with" operations on the Shelf, but did not themselves arise on the Shelf.

Likewise, many of the decisions upon which the Parishes rely considered provisions of OCSLA *other than* Section 1349. For example, Iberia Parish invokes *Tallentire*, 477 U.S. at 219, and *Demette v. Falcon*, 280 F.3d 492, 496 (5th Cir. 2002). But *Tallentire* considered only whether Section 1333(a) of OCSLA provided the appropriate *substantive* remedy for a helicopter crash in the Gulf. It did not address *jurisdiction* under Section 1349 at all. Similarly, *Demette* addressed choice-of-law issues in the context of Section 1333(a)(1)-(2), not jurisdiction under Section 1349.[12] Those decisions are irrelevant.

The Parishes also argue that OCSLA's jurisdictional and substantive law provisions are co-extensive. Orleans Br. 17. Numerous decisions, however, recognize the distinction between OCSLA's jurisdictional provision (Section 1349) and its choice-of-law provision (Section 1333)—a point Iberia Parish ironically concedes. *See* Iberia Br. 6 & n.9; *see also Dahlen*

---

[12] *Demette* dealt with an indemnity contract dispute and its situs analysis on those facts was overruled by the Fifth Circuit *en banc* in *Grand Isle*, 589 F.3d at 788 & n.8. Similarly, the Parishes cite *Mills v. Director, Office of Workers' Comp. Programs*, 877 F.2d 356, 357 (5th Cir. 1989). *See* Iberia Br. 15 n.13. But *Mills* applied a situs requirement to Section 1333(b), not Section 1349. In any event, *Mills* was overruled by the Supreme Court's decision in *Valladolid*, which held that Section 1333(b) has no situs requirement. *See* 132 S. Ct. at 688.

*v. Gulf Crews, Inc.*, 281 F.3d 487, 491-92 (5th Cir. 2002) (recognizing distinction); *Recar v. CNG Producing Co.*, 853 F.2d 367, 369-70 (5th Cir. 1988) (same); *AmClyde Engineered Prods.*, 448 F.3d at 768-70 (separately considering Section 1333(a)(2)(A) questions *after* first holding Section 1349 jurisdiction existed); *Walsh* v. *Seagull Energy Corp.*, 836 F. Supp. 411, 417 (S.D. Tex. 1993) (recognizing that the "jurisdictional grant of OCSLA is more broad than its legal scope," *i.e.*, Section 1333).[13]   Accordingly, the court below correctly recognized the distinction between OCSLA's jurisdictional and choice-of-law provisions, explaining that "arguments related to OCSLA § 1333 [are] not applicable to whether this Court has jurisdiction."  Orleans R.E. 100 n.1.

Appellants rely heavily on *Golden v. Omni Energy Services Corp.*, 242 F. App'x 965 (5th Cir. 2007) (per curiam), an unpublished opinion.  But even if

---

[13] Orleans Parish ignores all else to focus on an isolated statement from *EP Operating* that the jurisdictional grant should "read co-extensively" with OCSLA's substantive reach.  Orleans Br. 17.  As shown above, however, the jurisdictional scope of Section 1349 is broader than the substantive scope of Section 1333, as numerous other Circuit cases recognize. Indeed, Orleans' own authority acknowledges as much.  *See Landry v. Island Operating Co. Inc.*, 2009 WL 3241560, *2 (W.D. La. Sept. 30, 2009) ("jurisdiction granting provision [*i.e.*, Section 1349(b)], in reality, is somewhat broader in scope" than Section 1333(a)(1)).

the opinion had precedential force (which it does not), the Parishes' broad reading of *Golden* cannot be reconciled with the law of the Circuit. In particular, in *Golden*, the court restated "three conditions for employing OCSLA" as the substantive governing law:

> "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law."

*Id.* at 967 (quoting *AmClyde*, 448 F.3d at 774).

This three-part test, however, does not displace the but-for test for OCSLA jurisdiction adopted in *Tennessee Gas*. Rather, it *only* applies in determining whether to substantively apply adjacent state law under Section 1333(a)(2). *See AmClyde*, 448 F.3d at 774 (explaining that the three-part test "bear[s] upon the question of whether adjacent state law applies as surrogate federal law under OCSLA"). Importantly, the three-part test was originally adopted in *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990) ("*PLT*").

It makes no sense to apply the *PLT* test to determine OCSLA jurisdiction under Section 1349. If courts did so, federal jurisdiction would be proper only if "[t]he state law [were] not … inconsistent with Federal

law" — *i.e.*, only if state law and federal law were consistent. *AmClyde*, 448 F.3d at 774. Such a rule would deny federal jurisdiction under OCSLA in any case where state law conflicted with federal law — a bizarre result that is precisely the *opposite* of the scheme Congress enacted in OCSLA, which is designed to make federal law supreme and to use state law (transformed into surrogate federal law) only to fill gaps. *See* 43 U.S.C. § 1333(a)(2)(A). Similarly, the *PLT* test would preclude OCSLA jurisdiction where "[f]ederal maritime law appl[ied] of its own force," *AmClyde*, 448 F.3d at 774 — despite Fifth Circuit precedent to the contrary. *See, e.g.*, *Tenn. Gas*, 87 F.3d at 155 ("conclusion that OCSLA confers original jurisdiction over this suit is unaffected by the maritime nature of the underlying claim").

Unsurprisingly, courts and commentators alike have warned against an expansive reading of the unpublished decision in *Golden*. *See Phillips*, 2010 WL 3257740, at *6 ("*Golden* is probably wrongly decided as it conflates the substantive law issue of § 1331(1) with the subject matter jurisdictional issue of § 1349(b)(1)."); David W. Robertson & Michael F. Sturley, *Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits*, 33 TUL. MAR. L.J. 381, 464-65 (2009) (Section 1349 "includes no requirement that the incident in suit occur on the OCS, and

34

the opinion in *Golden* provides no policy reasoning and cites no authority that supports reading such a situs requirement into § 1349(b)(1)"). If nothing else, the Supreme Court's 2012 instruction in *Valladolid* as to the proper approach for determining whether situs requirements apply to OCSLA provisions controls and renders *Golden* invalid.

Judge Barbier acknowledged *Golden*, but concluded that "neither the Supreme Court nor the Fifth Circuit has held that the situs requirement has to be satisfied for jurisdiction to be proper under § 1349." Orleans R.E. 100 n.1 (citation omitted). If *Golden* did adopt a situs requirement for OCSLA jurisdiction, that panel would have impermissibly overruled *sub silentio* the Fifth Circuit's trio of prior decisions in *Sea Robin*, *EP Operating*, and *United Offshore*.[14] Needless to say, that is impossible. *See, e.g.*, *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001).

### D.    OCSLA Jurisdiction Is Further Reinforced by Federal Enclave Jurisdiction.

Under OCSLA, "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control and

---

[14] *Golden* is also in tension with the decision in *Barger*, 692 F.2d 337 (see above), which also involved a helicopter crash ferrying employees to work on the Shelf, but where federal jurisdiction went unquestioned.

power of disposition." 43 U.S.C. § 1332(1). As part of that "jurisdiction, control and power," OCSLA declares that:

> Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all . . . other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom . . . *to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . .*

43 U.S.C. § 1333(a)(1) (emphasis added). *See Tallentire*, 477 U.S. at 217 ("The intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State ….").

Areas of "exclusive Federal jurisdiction located within a State" are more commonly known as federal enclaves. *See, e.g.*, BLACK'S LAW DICTIONARY (9th ed. 2009). Section 1333(a)(1), when its conditions are met, thus extends"exclusive Federal jurisdiction" to "all installations and other devices . . . attached to the seabed"—including devices that have been "temporarily attached."

Indeed, quite apart from applying the well-established body of law concerning federal "enclaves" as a term of art (which is itself

determinative), the very fact that "federal law [is] exclusive in its regulation of the OCS," *Tenn. Gas*, 87 F.3d at 153, logically means that "arising under" jurisdiction must exist for purposes of 28 U.S.C. § 1331 and removal jurisdiction under § 1441(a) because, by definition, all Shelf events are controlled only by federal law.

It is settled that claims that have their genesis inside federal enclaves "arise under" federal law. *See, e.g., Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

In *Mater*, this Court reversed the district court's disavowal of federal jurisdiction, reasoning that:

> [A]ny law existing in territory over which the United States has "exclusive" sovereignty must derive its authority and force from the United States and is for that reason federal law, even though having its origin in the law of the state within the exterior boundaries of which the federal area is situate.

200 F.2d at 124. Indeed, "[i]t would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate controversies arising there, but must relegate the parties to the courts of another sovereign for relief." *Id.*

at 124-25.   In short, claims brought within federal enclaves necessarily "arise under" federal law.

The same logic applies here.   In fact, two district courts have noted the logic of applying *Mater* to the Shelf.   In *Stokes*, the court observed that the Supreme Court had treated the Shelf as a "federal enclave," and reasoned that, accordingly, "cases interpreting the effect of applying state law in other federal enclaves provide guidance here."   1997 WL 695557, at *5 (citing *Mater*).   And in *Hodges v. Shell Oil Co.*, 1997 WL 473809 (E.D. La. Aug. 19, 1997), the Court reasoned that "the application of laws on the … Shelf should be analogous to the application of laws in federal enclaves within a state."   *Id.* at *4.   *Mater* thus had determined that "any law that applies to such an area [namely, a federal enclave] is federal law."   *Id*. at *5.

Because the Shelf is an enclave, federal law applies to events having their genesis there.   Thus, any argument that the *Deepwater Horizon* incident should be governed by maritime law misses the mark.   *See* Orleans Br. 28-29; Iberia Br. 14-18.   Maritime law is federal law.   Further, even if state law could be applied pursuant to OCSLA Section 1333(a)(2)(A) to fill a gap in federal law, state law *still* would not apply of its own force but only as surrogate federal law.   Hence, for jurisdictional purposes, federal law must

govern the *Deepwater Horizon* incident.  In any event, as explained in Section II below, state law is unavailable under OCSLA for gap-filling purposes both because there are no relevant gaps and because the wildlife law is inconsistent with federal law.

### E.    In Any Event, Diversity Jurisdiction Would Exist.

Finally, even apart from these other bases of federal jurisdiction, diversity jurisdiction also exists over the Parish complaints.

At the outset, diversity jurisdiction must be assessed by consulting the complaints filed in state court by each individual Parish and removed, not the purely administrative Master Complaint filed directly into federal court.  Doing so reveals that nine of the eleven complaints involve claims on which there is complete diversity on their face.[15]

The only two exceptions involve Weatherford U.S., L.P. (a Louisiana partnership), which is named in two complaints (those of St. Charles and Jefferson Parishes).  But there is complete diversity as to Weatherford U.S.,

---

[15] Needless to say, the amount in controversy exceeds $75,000 and the Parishes have never contended otherwise.  Appellants assert that Appellees "killed or injured thousands of animals …."  Orleans Br. 15; *see also* Iberia Br. 1, 4, 10 (alleging "hundreds of millions" of injuries).  If proven, liability would far exceed $75,000.  *See generally* La. Rev. Stat. Ann. §§ 56:40.1-40.2.

L.P as well, despite the fact that it is organized under Louisiana law. Merely because a limited partnership ("LP") is organized under the laws of a particular State does not mean that the LP it is a jurisdictional citizen of that State. *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990). Instead, for purposes of diversity jurisdiction, a court must look to the citizenship of the LP's underlying partners.

Here, the underlying partners are WUS Holding, L.L.C. and Weatherford Limited Partner, L.L.C., both of which are organized under the laws of Delaware. Under this Court's decision in *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008), it is necessary to consider the jurisdictional status of the owners of a limited liability company ("LLC") to see whether diversity jurisdiction exists. The sole owner of both WUS Holding, L.L.C. and Weatherford Limited Partner, L.L.C. is WEUS Holding, Inc., a Delaware corporation and itself a jurisdictional person. This means that Weatherford U.S., L.P. must be deemed a citizen of Delaware and thus there is complete diversity. Accordingly, diversity jurisdiction under 28 U.S.C. § 1332 provides a straightforward alternative basis for jurisdiction over all eleven suits.

Against the existence of diversity jurisdiction here, the Parishes claim that the State of Louisiana is the real party in interest, so diversity jurisdiction does not apply. But that is wrong. The Parishes, which are citizens of Louisiana, are real parties in interest, and the State pursued its own litigation rather than joining their suits.

The law is settled that "[t]he real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990). Here, Appellants hold a substantive right to bring their own claims *and they will ultimately benefit from the recovery*. The wildlife statute allows "the district attorney of the parish in which the violation occurred" to bring suit. La. Rev. Stat. Ann. § 56:40.4(c). In bringing suit on that basis, a local government is not acting as an arm of the State, as the Parishes have effectively conceded in the MDL below. *See* Master Compl. ¶ 178 (filing Complaint on behalf of "local public or governmental bodies of any kind which are *not* state agencies") (emphasis added). Instead, each Parish pursues its *own* case to retain 40% of the recovery for itself. La. Rev. Stat. Ann. §§ 56:40.9(A)-(B).

Moreover, the Parishes' stake in this litigation is not a mere attorney's fee. The Louisiana Legislature included a fee award elsewhere in the statute but chose different language when describing the parishes' right to sue. *Compare id.* § 56:40.3(F) *with id.* § 56:40.9(B). Because Appellants exercised their right to file suit and sought an award that would be theirs to keep, *Farrell* defines them as a party in interest.

Tellingly, the Parishes contradict themselves on whether the State of Louisiana is now a litigant. To defeat diversity jurisdiction, the Parishes insist that, although they are local governments, these wildlife suits are brought in the name of the State, and so the removal cannot stand on diversity grounds because States are not citizens under 28 U.S.C. § 1332. *See* Orleans Br. 12; Iberia Br. 12. But the Parishes fail to realize that if the State of Louisiana is the only real party in interest, then these appeals must be dismissed because Louisiana continues to possess live claims, unadjudicated in MDL 2179 below. *See* Fed. R. Civ. P. 54(b). Protecting those interests is precisely why Louisiana appears here as an *amicus*. Accordingly, appellate jurisdiction would fail for lack of a final judgment under 28 U.S.C. § 1291.

The Parishes cannot blow hot and cold on the issues of appellate versus district court jurisdiction (original and removal). Either these suits are to be conceived as brought by the State of Louisiana, in which case there is no appellate jurisdiction (for lack of finality), or these wildlife suits are to be conceived as properly brought by the Parishes as real parties in interest, in which case there is not only appellate jurisdiction over all eleven Parish cases but diversity jurisdiction over each of them as well.

## II.    THE PARISHES' CLAIMS ARE PREEMPTED AND FAIL FOR OTHER REASONS.

Where, as here, the source of pollution is on the Shelf — a federal enclave — pollution control is exclusively a matter of federal law. Otherwise, state liability would interfere with the federal scheme, "upsetting the balance of public and private interests so carefully addressed by the [Clean Water] Act." *Ouellette*, 479 U.S. at 494. Accordingly, the Parishes' state law wildlife claims are barred.

### A.    An Affected State Has No Authority to Regulate Pollution Originating from an Out-of-State Source.

The Parishes may not seek a recovery under the Louisiana wildlife statute because the source of the *Deepwater Horizon* oil spill is outside