# EXHIBIT B

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig        MDL No. 2179
       "Deepwater Horizon"
       in the Gulf of Mexico,
       on April 20, 2010            SECTION: J

This Document Relates to:

     All Cases               JUDGE BARBIER
                              MAG. JUDGE SHUSHAN

_____/

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION TO VACATE PRELIMINARY APPROVAL ORDER
### [As to the Proposed Economic and Property Damages Class Action Settlement]

Selmer M. Salvesen ("Plaintiff") respectfully requests that this Honorable Court vacate its Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement], Rec. Doc. 6418 dated May 2, 2012, for the following reasons.

## INTRODUCTION

On June 15, 2011, Plaintiff Salvesen filed his action against Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, GCCF, and William G. Green, Jr. in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. On July 6, 2011, Defendants removed the *Salvesen* case to the U.S. District Court for the Middle District of Florida. Plaintiff Salvesen filed his Motion to Remand on July 18, 2011. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 6, 2011. *See Salvesen v. Feinberg, et al.*, 2:11-cv-02533.

Phase I of a multi-phase trial in Transocean's Limitation and Liability Action, Case No.

10-2771, was scheduled for February 27, 2012. On February 26, 2012, the eve of the Limitation

and Liability Trial, the Court adjourned proceedings for one week to allow BP and the PSC to

make further progress on their settlement talks. (Rec. Doc. 5887). On March 2, 2012, the Court

was informed that BP and the PSC had reached an Agreement-in-Principle on the proposed

settlements. Consequently, the Court adjourned Phase I of the trial, because of the potential for

realignment of the parties in this litigation and substantial changes to the current trial plan. (Rec.

Doc. 5955).

On March 8, 2012, at the parties' request, the Court entered an Order creating a process

to facilitate the transition from the GCCF to the "Court Supervised Settlement Program"

envisioned by the settlement. (Rec. 5995). On April 16, 2012, the PSC filed a new class action

complaint to serve as the vehicle for the proposed Economic and Property Damage Settlement.

*See* No. 12-970, *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc.*, *et al.*

The class action complaint was amended on May 2, 2012. (Rec. Doc. 6412). On April 18, 2012,

the PSC and BP filed their Proposed Settlement (Rec. Doc. 6276). On May 2, 2012, the Court

entered a Preliminary Approval Order [As to the Proposed Economic and Property Damages

Class Action Settlement] (Rec. Doc. 6418).

Plaintiff Salvesen re-filed his Motion to Remand and Memorandum in Support with this

Court on November 14, 2011 (Rec. Doc. 4575). On December 4, 2011, Plaintiff Salvesen filed

his Motion in Opposition to Class Certification of Any Action in MDL No. 2179 and

Memorandum in Support (Rec. Doc. 4798). Plaintiff Salvesen filed his Motion to Vacate Order

and Reasons [As to Motions to Dismiss the B1 Master Complaint] and Memorandum in Support

on April 8, 2012 (Rec. Doc. 6186). These three motions remain pending in this Honorable Court.

-2-

<u>LAW AND ARGUMENT</u>

**A.     The Proposed Settlement Is Not Fair, Reasonable, and Adequate.**

Rule 23(e) places the burden of persuasion on the movers that the proposed settlement is "fair, reasonable, and adequate." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *7 (E.D. La. Jan. 10, 2012). If the proposed settlement "discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval." *In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008).

**1.   The Proposed Settlement Provides Misleading Information to Class Members.**

Under the Oil Pollution Act of 1990 ('OPA"), claims for damages must be presented first to the responsible party. 33 U.S.C. § 2713(a). In the event that a claim for damages is not paid by the responsible party within 90 days, the claimant may elect to commence an action in court against the responsible party or to present the claim to the Oil Spill Liability Trust Fund. 33 U.S.C. § 2713(c).

"The Court is satisfied that, pursuant to the terms of the Proposed Settlement, Class Members who opt out or who possess reserved claims will be able to pursue those claims effectively outside the Class Settlement." (p. 26, Rec. Doc. 6418). BP and the PSC have misled this Honorable Court and Class Members.

**(a)  The Oil Spill Liability Trust Fund**

The OPA provides the Oil Spill Liability Trust Fund ("OSLTF") to pay for oil spill costs

when the responsible party cannot or does not pay. The OSLTF, administered by the U.S. Coast Guard through its National Pollution Funds Center ("NPFC"), is primarily financed through a tax on petroleum products, and is subject to a $1 billion cap on the amount of expenditures from the OSLTF per incident. For any one oil pollution incident, the OSLTF may pay up to $1 billion. Victims of the BP oil spill are at risk as a result of this cap. The cap is for total expenditures. *This $1 billion expenditure limit applies even if the OSLTF is fully reimbursed by the responsible party and net expenditures are zero*. OSLTF expenditures for natural resource damage assessments and claims in connection with a single incident are limited to $500 million of that $1 billion. NPFC administers the OSLTF by disbursing funds to government agencies to reimburse them for their oil spill cleanup costs (cost reimbursements), monitoring the sources and uses of funds, adjudicating claims submitted by individuals and businesses to the OSLTF for payment (claims), and pursuing reimbursement from the responsible party for costs and damages paid from the OSLTF (billing the responsible party).

On March 9, 2012, Mr. Craig A. Bennett, Director - NPFC, provided the following OSLTF status report in regard to the Deepwater Horizon oil spill incident:

Deepwater Horizon OSLTF Costs     =     $619 million
Deepwater Horizon Pending Claims  =     $410 million (for 1,659 claims received)

On March 9, 2012, total OSLTF expenditures (paid + pending claims) in regard to the Deepwater Horizon was $1.019 billion. In sum, since the OSLTF has exceeded, or will very shortly exceed, its $1 billion expenditure cap for the Deepwater Horizon oil spill incident, the OSLTF cannot pay valid individual or business claims which are not paid by BP.

**(b)  The Litigation Option**

OPA, a strict liability statute, governs the MDL 2179 cases alleging economic loss due to

-4-

the BP oil spill. The Outer Continental Shelf Lands Act ("OCSLA") governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law.

Judge Barbier aptly stated in his Order dated August 26, 2011, "The Court finds that the text of OPA clearly requires that OPA claimants must first "present" their OPA claim to the Responsible Party before filing suit….The text of the statute is clear. Congress intended presentment to be a mandatory condition precedent to filing suit....There are likely large numbers of B1 claimants who have completely bypassed the OPA claim presentation requirement, others who have attempted to present their claims but may not have complied with OPA, and others who have properly presented their claims but have been denied for various reasons. Claimants who have not complied with the presentment requirement are subject to dismissal without prejudice, allowing them to exhaust the presentment of their claims before returning to court. In the ordinary case, the Court would simply dismiss those claims without prejudice. However, as the Court has previously noted, this is no ordinary case….. A judge handling an MDL often must employ special procedures and case management tools in order to have the MDL operate in an orderly and efficient manner. In this massive and complex MDL, the Court is faced with a significant practical problem. It would be impractical, time-consuming, and disruptive to the orderly conduct of this MDL and the current scheduling orders if the Court or the parties were required to sort through in excess of 100,000 individual B1 claims to determine which ones should be dismissed at the current time. Moreover, such a diversion at this time would be unproductive and would not advance towards the goal of allowing the parties and the Court to be ready for the limitation and liability trial scheduled to commence in February 2012. No matter

how many of the individual B1 claims might be dismissed without prejudice, the trial scheduled for February would still go forward with essentially the same evidence…..In summary on this issue, the Court finds that presentment is a mandatory condition precedent with respect to Plaintiffs' OPA claims. The Court finds that Plaintiffs have sufficiently alleged presentment in their B1 Master Complaint, *at least with respect to some of the Claimants*." (pp. 29, 30, 31, Rec. Doc. 3830) (Emphasis added).

Pursuant to the terms of the Proposed Settlement, "Regardless of whether the Agreement becomes effective, Claims with a sum certain and some documentation and/or other proof that are submitted to the Settlement Program shall be deemed to satisfy presentment and all requirements of 33 U.S.C. § 2713." (pp. 62-63, Rec. Doc. 6276-1); "OPA Process shall mean the claims presentment procedure pursuant to the OPA, including claims that have been submitted to the BP Parties or claims that have been submitted to the GCCF as part of the OPA Process." (p. 104, Rec. Doc. 6276-1); "Economic Class Members with expired offers from the GCCF who Opt-Out of the Economic Class shall be deemed to have satisfied the presentment requirements under the Oil Pollution Act of 1990 ("OPA")." (p. 15, Rec. Doc. 6276-1).

BP and the PSC clearly understand that, under OPA, Congress intended presentment to be a mandatory condition precedent to filing suit. However, yet again, the parties mislead this Honorable Court and Class Members by intentionally failing to counsel those Claimants who may opt-out of the Proposed Settlement that, under OPA, claims for damages must be presented first to the responsible party. 33 U.S.C. § 2713(a). In the event that a claim for damages is not paid by the responsible party within 90 days, the claimant may elect to commence an action in court against the responsible party. 33 U.S.C. § 2713(c). If a Claimant files a Complaint against

BP under OPA prior to first presenting his, her, or its claim to BP and then waiting 90 days, the case will be subject to dismissal and the claimant will again be left out in the cold.

BP and the PSC are obviously aware that the OSLTF is not a viable alternative for Claimants who opt-out and, for many opt-out Claimants, filing a suit against BP under OPA will be either thwarted or delayed by the OPA presentment requirement. However, the Proposed Settlement "generously" provides that, "Any Economic Class Member may revoke his, her or its Opt Out from the Economic Class and thereby receive the benefit of this Economic and Property Damage Settlement up until three (3) days prior to the Fairness Hearing; or later, if the BP Parties consent in their sole and unilateral discretion.." (p. 40, Rec. Doc. 6418).

**(i)  The Statute of Limitations**

The PSC further misleads Class Members by intentionally failing to counsel those Claimants who may opt-out of the Proposed Settlement that a lawsuit brought against a non-Responsible Party, e.g., a lawsuit asserting claims for gross negligence, fraud, etc. against Kenneth R. Feinberg, et al, may be barred by the statute of limitations. In federal question cases, the federal court will apply the specific statute of limitations period established by the federal statute under which the plaintiff is seeking relief. Federal courts that are hearing a controversy based on diversity of citizenship of the parties must apply the applicable state law of the forum state. In this case, the statute of limitations for a suit brought against a non-Responsible Party may be only two years.

**2.  The Proposed Settlement Grants Excessive Compensation to Attorneys.**

The question is whether the Proposed Settlement grants excessive compensation to the PSC and other counsel performing common benefit work in MDL 2179. This issue can be

determined by a simple two-prong comparison test: **First**, by comparing the common benefit fees received by attorneys in MDL 2179 with the average total payment amount received by the claimants; and **Second**, by comparing the common benefit fees received by attorneys in MDL 2179 with the common benefit fees received by attorneys in comparable MDLs.

### (a)  The Average Total Payment Amount Received From GCCF by Claimants

GCCF Overall Program Statistics
(Status Report as of March 7, 2012)

| Total Amount Paid | Total No. of Paid Claimants | Average Total Amount Paid Per Claimant |
|---|---|---|
| $6,079,922,450.47 | 221,358 | **$27,466.47** |

The GCCF data indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012.  The GCCF paid only 221,358 of these Claimants. In sum, *the GCCF denied payment to approximately 61.46% of the claimants who filed claims*. *See* "Gulf Coast Claims Facility Overall Program Statistics" (Status Report, Mar. 7, 2012) (a copy is attached hereto as Exhibit A).

On March 8, 2012, this Honorable Court terminated the GCCF claims process and appointed Patrick Juneau as the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program ("CSCP"). On May 2, 2012, Patrick Juneau was appointed as Claims Administrator to oversee the Claims Administration Vendors, who will process the claims in accordance with the Proposed Settlement. Under the CSCP, the evaluation and processing of claims shall continue to be performed by Garden City Group, Inc., BrownGreer, PLC, and PricewaterhouseCoopers, LLP. Accordingly, there is no reason to believe that the percentage of claimants denied payment and the average total amount paid per claimant will change under the CSCP.

**(b)  The Common Benefit Fees Received by Attorneys in Comparable MDLs**

In order to determine an appropriate common benefit fee, this Court looks to comparable

MDL set-aside assessments and awards of common benefit fees. *E.g.*, *In re Diet Drugs Prods.

Liab. Litig.*, 553 F. Supp. 2d at 442, 457-58, 491-96 (E.D. Pa. 2008) (describing 9% federal and

6% state assessments later reduced to 6% and 4%, respectively; awarding less than total fund

created by assessments); *In re Zyprexa*, 467 F. Supp. 2d at 261-63 (E.D.N.Y. Aug. 17, 2007)

(1% and 3% of separate settlement amounts); *In re Sulzer Hip Prosthesis & Knee Prosthesis

Liab. Litig.*, 268 F. Supp. 2d at 907, 909, 919 n.19 (N.D. Ohio 2003) (awarding common benefit

fees out of $50,000,000 fund created through assessment representing 4.8% of settlement value);

*In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*, MDL No. 1387, 2002 WL 31834446, at

*1, *3 (D. Md. Apr. 12, 2002) (9% federal, 6% coordinated state assessments); *In re Rezulin

Prods. Liab. Litig.*, MDL No. 1348, 2002 WL 441342, at *1 (S.D.N.Y. Mar. 20, 2002) (6%

withholding in federal cases, 4% in participating state cases); *See also* William B. Rubenstein,

*On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 Class Action Att'y Fee Dig. at

87 (2009) (collecting cases and concluding that most common benefit assessments range from

4% to 6%); 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:9 (4th ed.

2002) ("Most [MDL] courts have assessed common benefit fees at about a 4-6% level, generally

4% for a fee and 2% for costs."); Paul D. Rheingold, *Litigating Mass Tort Cases* § 7:35 (2010)

("[P]ercentages awarded for common funds in recent MDLS ... were in the 4-6% range.")

(citation omitted). *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010) ("October

19, 2010 Order and Reasons").

The Court's analysis in the *Vioxx* MDL case is instructive. *In re Vioxx Prods. Liab. Litig.*

("MDL 1657") involves the prescription drug Vioxx. Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On September 20, 2004, Merck withdrew it from the market after data indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country.

On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).

On November 9, 2007, Merck and the Negotiating Plaintiffs' Counsel ("NPC") formally announced that they had reached a Settlement Agreement. The private Settlement Agreement established a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion.

In *Vioxx*, Judge Fallon stated, "The Settlement Agreement created a $4.85 billion fund for the compensation of Vioxx claimants. The Court finds no reason to omit any portion of that settlement fund from consideration with respect to the reasonable amount of common benefit fees. Accordingly, $4.85 billion is the appropriate amount for calculation of a reasonable

-10-

percentage of common benefit fees."

The *Vioxx* Court awarded a common benefit fee of $315,250,000, which is equivalent to 6.5% of $4,850,000,000. In *Vioxx*, unlike MDL 2179, the attorneys came from states across the country. Accordingly, the Court found that an average hourly billable rate of $443.29 was reasonable.

There are two significant differences between MDL 1657 and MDL 2179:

**(i)  The Time and Labor Required**

The PSC and other counsel performing common benefit work in MDL 1657 documented and submitted over 560,000 hours of work during the course of the litigation. The PSC operated on many fronts, preparing pleadings and Master Class Action complaints, taking over 2,000 depositions, reviewing and compiling over 50,000,000 documents, briefing and arguing over 1,000 discovery motions, assembling a trial package, conducting bellwether trials, negotiating the global Settlement Agreement, and implementing the payout under the Agreement.

In contrast, "In the 20 months that have passed since the JPML's centralization order, the parties [in MDL 2179] have engaged in extensive discovery and motion practice, including taking 311 depositions, producing approximately 90 million pages of documents, and exchanging more than 80 expert reports on an intense and demanding schedule........BP and the PSC report that in February 2011 settlement negotiations began in earnest for two distinct class action settlements: a Medical Benefits Settlement and an Economic and Property Damages Settlement." (p. 3, Rec. Doc. 6418).

In sum, the PSC and other counsel allegedly performing common benefit work in MDL 2179 only took 311 depositions and initiated settlement negotiations "in earnest" merely six (6)

-11-

months after the JPML created MDL 2179.

The MDL 1657 Court conducted six Vioxx bellwether trials. During the same period that the Court was conducting six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in various state courts.

The MDL 2179 Court did not conduct a single bellwether trial.

**(ii)  The Results Obtained**

Attorneys doing common benefit work on behalf of Vioxx users in MDL 1657 achieved a favorable and meaningful global resolution. The Settlement Agreement ensured fair and comprehensive compensation to all qualified participants. In only 31 months, the parties to the *Vioxx* case were able to reach a global settlement and distribute $4,353,152,064 to 32,886 claimants, out of a pool of 49,893 eligible and enrolled claimants.

In contrast, attorneys doing common benefit work on behalf of BP oil spill victims in MDL 2179 did not remotely achieve "a favorable and meaningful global resolution." The MDL 2179 Proposed Settlement does not ensure fair and comprehensive compensation to all qualified participants. This conclusion is supported by the following comparison:

Average Total Amount Paid Per Claimant in MDL 1657 =  $132,370.98
Average Total Amount Paid Per Claimant in MDL 2179 =  $ 27,466.47

**(c)  The Common Benefit Fees Received by Attorneys in MDL 2179**

The PSC and other counsel allegedly performing common benefit work in MDL 2179 are not double-dipping; they are triple-dipping.

The known sources of compensation received by attorneys allegedly doing common benefit work on behalf of BP oil spill victims in MDL 2179 are:

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation. (p. 3, Rec. Doc. 5274);

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million. (p. 10, Rec. Doc. 6418);

(c) Many attorneys doing common benefit work have their own clients and have also received or will also receive a fee directly from them. (N.B. - On June 15, 2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs.") (Rec. Doc. 6684); and

(d) Co-counsel fees received by member firms of the PSC for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Counsel for Plaintiff Salvesen received an unsolicited mass email from a member firm of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…"

Over the years courts have employed various methods to determine the reasonableness of an award of attorneys' fees. These methods include the "lodestar" method, which entails multiplying the reasonable hours expended on the litigation by an adjusted reasonable hourly rate, *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 & n.15 (5th Cir. 1980); the percentage method, in which the Court compensates attorneys who recovered some identifiable sum by awarding them a fraction of that sum; or, more recently, a combination of both methods in which a percentage is awarded and checked for reasonableness by use of the lodestar method.

### (i)  The Percentage Method

As noted above, "percentages awarded for common funds in recent MDLS ... were in the

4-6% range." Given that the PSC and other counsel allegedly performing common benefit work in MDL 2179 only took 311 depositions and initiated settlement negotiations "in earnest" merely six (6) months after the JPML created MDL 2179, the appropriate percentage should be no greater than 4%.

BP has estimated the cost of the proposed settlement to be approximately $7.8 billion. (p. 156, Rec. Doc. 6266-2). A 4% award would yield $312 million for common funds.

**(ii) The Lodestar Cross-Check**

The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross-check on the reasonableness of the fee arrived at by the percentage method.

This Court has previously used a range of $300 to $400 per hour for members of a Plaintiffs' Steering Committee and $100 to $200 per hour for associates to "reasonably reflect the prevailing [billable time] rates in *this* jurisdiction." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d at 868-69 (E.D. La. 2007).

| Amount Awarded | Average Billable Hourly Rate | Hours Required to Have Been Expended on This Litigation |
|---|---|---|
| $312,000,000.00 | $300/hr. | 1,040,000 hours |
| $600,000,000.00 | $300/hr. | 2,000,000 hours |

In sum, in order to be awarded a common benefit fee of $312 million, this Honorable Court would have to believe that the PSC attorneys worked more than one million hours; in order to be awarded a common benefit fee of $600 million, this Honorable Court would have to believe that the PSC attorneys worked two million hours. Both of these fee amounts, which do not include the aforementioned (a), (c), and (d) known sources of compensation, fail the reasonableness test.

-14-

**B.    The Proposed Settlement Violates the Oil Pollution Act of 1990 ("OPA").**

Judge Barbier clearly states, "Moreover, OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters. *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." (p. 11, Rec. Doc. 3830); "OPA is a comprehensive statute addressing responsibility for oil spills, including the cost of clean-up, liability for civil penalties, as well as economic damages incurred by private parties and public entities. Indeed, the Senate Report provides that the Act "builds upon section 311 of the Clean Water Act to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution." S. Rep. 101-94, at 730 (1989). One significant part of OPA broadened the scope of private persons who are allowed to recover for economic losses resulting from an oil spill. OPA allows recovery for economic losses "resulting from" or "due to" the oil spill, regardless of whether the claimant sustained physical damage to a proprietary interest. OPA allows recovery for "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, or natural resources, which shall be recoverable by *any claimant*." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added). Furthermore, the House Report noted that "[t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income." H.R. Conf. Rep. 101-653, at 781 (1990)." (pp. 20-21, Rec. Doc. 3830).

The Proposed Settlement is replete with references to the OPA: "….the operation of BP's separate OPA facility…" (p. 27, Rec. Doc. 6276-1); "This provision does not apply to Economic Class Members who have gone through the OPA Process and provided a release as part of that OPA Process." (p. 66, Rec. Doc. 6276-1); "The Release is not intended to prevent BP from

-15-

exercising its rights of contribution, subrogation, or indemnity under the OPA……" (p. 72, Rec. Doc. 6276-1); "BP is hereby subrogated to any and all rights that the Economic Class Members, or any of them, may have had or have arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident under the OPA." (p. 72, Rec. Doc. 6276-1); "Notwithstanding the law applicable to the underlying claims, which the Parties dispute, this Agreement and the Release and Individual Releases hereunder shall be interpreted in accordance with General Maritime Law as well as in a manner intended to comply with OPA." (p. 90, Rec. Doc. 6276-1); "OPA Process shall mean the claims presentment procedure pursuant to the OPA, including claims that have been submitted to the BP Parties or claims that have been submitted to the GCCF as part of the OPA Process." (p. 104, Rec. Doc. 6276-1); "….the parties have represented that BP will continue to receive and process Oil Pollution Act ("OPA") claims for those excluded from the settlement class and those who opt out of the settlement class. (Tr. of Prelim. Approval Hr'g, 4/25/12, pp. 14-15, 49-50, Rec. Doc. 6395); *see also* Attach. "A" to Supp. Decl. of Cameron Azari, Ques. 15 & 25, Rec. Doc. 6414-4 at 15, 23). Presumably, that process will include an interim payments process, as well as any other requirements imposed by OPA. *See* 33 U.S.C. §§ 2705(a), 2714(b)(2)." (p. 18, Rec. Doc. 6418); "This is, unlike most mass torts, a single-incident disaster, governed predominantly by a single body of federal law including OPA and uniform federal maritime law." (p. 28, Rec. Doc. 6418).

Clearly, BP and the PSC are very familiar with the OPA and quite capable of applying the statute. Unfortunately, BP and the PSC cherry-pick OPA's provisions for their benefit at the detriment to Claimants and Plaintiffs.

1.  **The Proposed Settlement Defines Class Members by Geographic Bounds and Certain Business Activities While Requiring Proof of a Heightened, Vague Standard of Causation.**

OPA is a strict liability statute. In order to recover damages, a claimant merely needs to show that his or her damages "resulted from" the oil spill. OPA, in pertinent part, states:

> "The responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident." *See* 33 U.S.C. § 2702(a).

The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:

> "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which *shall* be recoverable by *any* claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).

OPA's legislative history is shot through with general statements indicative of congressional intent to authorize recovery of "a broad class of damages." 135 CONG. REC. E842, (daily ed. Mar. 16, 1989) (statement of Rep. Jones). *See also* S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("full, fair, and swift compensation for everyone injured by oil spills"; "residents of States will be fully compensated for all economic damages").

The OPA statute was carefully drafted by Congress. It seems plain that the combination of Sections 2702(a) and 2702(b)(2)(E) requires an economic-loss claimant to establish that the defendant's spill was a factual cause of injury, destruction, or loss of tangible property or natural resources that in turn was a factual cause of the claimant's damages - nothing more and nothing less. Because the prevailing, default test for factual causation in Anglo-American tort law is the

-17-

but-for test, we can be fairly precise about the evident meaning of Sections 2702(a) and

2702(b)(2)(E) for an economic-loss claimant: The claimant is required to show that if the spill

had not brought about the injury, destruction, or loss of tangible property or natural resources,

the damages complained of probably would not have been sustained. *See* David W. Robertson,

*The Oil Pollution Act's Provisions on Damages for Economic Loss,* 30 Miss. C.L. Rev. 157

(2011).

     An early version of a bill culminating in OPA provided that economic loss plaintiffs

*would* have to prove "proximate cause;" Congress took that out of the bill. Neither Section

2702(a) nor Section 2702(b)(2)(E) includes any mention of "proximate cause." Where Congress

includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may

be presumed that the limitation was not intended. *Russello v. United States,* 464 U.S. 16, 23-24

(1983). Therefore, *Russello* counsels us to conclude that the OPA Congress did not want to

require claimants seeking economic loss damages to meet a proximate cause requirement. *Id.*

     OPA's predecessor legislation included an explicit proximate cause limit. Title III of the

Outer Continental Shelf Lands Act Amendments of 1978 provided for the recovery of pollution-

caused damages that were "proximately caused by the discharge of oil from an offshore facility

or vessel." OPA repealed this provision, replacing it with Section 2702(a). So here again, the

*Russello* canon calls for the presumption that the OPA Congress did not intend a proximate cause

limit to be read into its economic loss provisions. *See* H.R. REP. NO. 101–653 (1990) (Conf.

Rep.) (presenting § 1002(a) of H.R. 1465 as providing for liability for removal costs and

damages "that result from" a spill or substantial threat of a spill; the language is identical to the

enacted Section 2702(a)). Here once again, the *Russello* canon requires a presumption that the

-18-

OPA Congress intended that for purposes of recovering economic loss damages, *the only causation requirement should be factual causation* (Emphasis added). *Id.*

The Preliminary Approval Order states that the Economic Loss and Property Damage Settlement Class "would consist of individuals and entities defined by (1) geographic bounds and (2) the nature of their loss or damage. If both criteria are not met……..the individual or entity is not within the settlement class." "The geographic bounds of the settlement are Louisiana, Mississippi, Alabama, and certain coastal counties in eastern Texas and western Florida, as well as specified adjacent Gulf waters, bays, etc. Individuals must have lived, worked, owned property, leased property, etc., in these areas between April 20, 20108 and April 16, 2012. Similarly, entities must have conducted certain business activity in these areas between April 20, 2010 and April 16, 2012." (p. 5, Rec. Doc. 6418). "Causation is presumed for some claimants; other claimants must demonstrate that a loss is due to the oil spill as outlined by the Proposed Settlement." (p. 8, Rec. Doc. 6418).

OPA's legislative history specifically mentioned classes of claimants as entitled to protection. These included, but were not limited to, fishermen and beachfront hotel owners, fish processing plant employees, and those who work at the companies depending on the fisheries. 135 CONG. REC. E1237 (daily ed. Apr. 13, 1989) (statement of Rep. Miller); "an employee at a coastal motel" 135 CONG. REC. H7898 (daily ed. Nov. 1, 1989) (statement of Rep. Jones); "restaurant operators" 135 CONG. REC. H8263 (daily ed. Nov. 9, 1989) (statement of Rep. Studds); "fishermen and others whose livelihood depended on the once-pristine waters" 135 CONG. REC. H8271(daily ed. Nov. 9, 1989) (statement of Rep. Slaughter).

The following is merely one example of how the Proposed Settlement limits BP's

liability at the expense of BP oil spill victims:

> Jack owns a seafood restaurant located in Macon, Georgia which serves seafood exclusively from the Gulf of Mexico. Jack's restaurant has always catered to those diners who prefer fresh seafood, delivered straight from the Gulf of Mexico, over the processed seafood dishes served by the national seafood restaurant chains.

> The BP oil spill incident devastated the commercial fishing industries of Louisiana, Mississippi, Alabama and Florida, thereby virtually eliminating the ability of Jack's restaurant to serve fresh seafood to its customers. Fresh oysters and mini-shrimp, two of Jack's most popular items, were unavailable. Jack was forced to pay higher prices for frozen seafood to East Coast seafood suppliers. The negative publicity generated by the constant media coverage of this oil spill incident made even Jack's loyal customers fearful of eating seafood from the Gulf of Mexico. A marketing survey commissioned by Louisiana's seafood promotion board reported in January, 2011 that about 71 percent of consumers polled nationally expressed some level of concern about seafood safety.

> Jack claims that the stoppage of fresh seafood deliveries from the Gulf of Mexico, the increase in the price of alternative East Coast seafood, and the fear of seafood contamination and seafood poisoning that resulted from the BP oil spill incident decreased gross sales to the point that the restaurant, after approximately 25 years of successful and profitable operation, was forced to close its doors.

In the above example, Jack was forced to close his restaurant as a result of the BP oil spill. Under OPA, since the damages resulted from the BP oil spill incident, damages *shall* be recoverable by Jack. Under the Proposed Settlement, due to the arbitrary geographic bounds established by BP/PSC, Jack is out of luck.

As the Supreme Court recently explained:

[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

Congress never intended that a claimant's recovery of damages under OPA be limited by geographic bounds, pertain solely to certain business activities, or require a heightened, and in this case vague, proof of causation between his or her damages and the oil spill incident.

### 2. The Proposed Settlement Provides for a Shortened Period of Limitations.

Under OPA, an action for damages shall be barred unless the action is brought within three years after the date on which the loss and the connection of the loss with the discharge in question are reasonably discoverable with the exercise of due care. 33 U.S.C. § 2717(f)(1)(A)

In violation of OPA, the Preliminary Approval Order states, "The deadline for filing most claims with the Settlement Program is the later of April 22, 2014 or six months after the "Effective Date" of the Proposed Settlement. Claimants in the Seafood Compensation Program must submit their claim within 30 days from the date of entry of a Final Order and Judgment of the Court after it rules upon final approval of the Proposed Settlement."  (p. 6, Rec. Doc. 6418).

The Proposed Settlement's "take it or leave it" period of limitations and the final settlement offer are unconscionable, requiring the financially-stressed Plaintiffs to file a claim before Plaintiffs know, and are able to corroborate, the full extent of the damages incurred as a result of the BP oil spill. As Judge Barbier aptly stated in his Order of August 26, 2011, "*The long term effects [of the BP oil spill] on the environment and fisheries may not be known for many years.*" (p. 31, Rec. Doc. 3830) (Emphasis added).

### 3. The Proposed Settlement Requires Class Members to Waive Their Right to Sue in Exchange for a Miniscule Single Final Settlement Payment.

OPA further provides: (a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled *shall not* preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a); and (b) Any person, including the [Oil Spill Liability Trust] Fund, who pays compensation pursuant to OPA to any claimant for damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law.

Moreover, *payment of such a claim shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under OPA or under any other law*. 33 U.S.C. § 2715(b)(2).

The Preliminary Approval Order states, "Those who accept payments under the Proposed Settlement are required to release their claims against BP, government oil spill liability funds, and all other Defendants in MDL 2179 (except Transocean and Halliburton)….If preliminary approval is given, the Settlement Program will process claims and make settlement payments to class members so long as they execute an individual release." (pp. 6-7, Rec. Doc. 6418).

OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("ensure that all victims are fully compensated"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); 135 CONG. REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("assurances that damages arising from spills will be completely compensated"); 136 CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("ensure the fullest possible compensation of oil spill victims").

No claimant should receive any less compensation from the Proposed Settlement than they are entitled to under the OPA. Under OPA, as noted above, the term "claim" means "a request, made in writing for a *sum certain*, for compensation for damages or removal costs

resulting from an [oil spill] incident" and *payment of such a claim shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under OPA or under any other law*. 33 U.S.C. § 2715(b)(2).

### 4. The Proposed Settlement Fails to Pay Interest on the Amount Paid.

Under OPA, 33 U.S.C. § 2705(a), the responsible party or the responsible party's guarantor is liable to a claimant for interest on the amount paid in satisfaction of a claim. The period for which interest shall be paid is the period beginning on the 30th day following the date on which the claim is presented to the responsible party or guarantor and ending on the date on which the claim is paid. The Proposed Settlement fails to pay interest on the amount paid in satisfaction of a claim.

Plaintiff Salvesen respectfully points out to this Honorable Court that the Proposed Settlement makes a mockery of the OPA.

### C. A Class Action May Not Be Brought in a Limitation Proceeding.

The MDL 2179 Court may not certify a class in the limitation action because it would contravene the Fifth Circuit's holding in *Lloyds Leasing Ltd. v. Bates,* 902 F.2d 368 (5th Cir. 1990). In *Lloyds Leasing*, the Fifth Circuit squarely held that a class action may not be brought in a limitation proceeding. *Id*. at 370.  In affirming the district court's denial of class certification, the Fifth Circuit reasoned as follows: **First**, the class action interferes with the concursus contemplated by the limitation of liability proceeding. . . . **Second**, the notice requirements of the limitation proceeding are more restrictive than the notice requirements of the class action. . . . **Third**, the entire thrust of Supplemental Rule F is that each claimant must appear individually and this is obviously inconsistent with the class action. Staring, *Limitation Practice and*

*Procedure*, 53 Tul.L.Rev. 1134, 1150 (1979). In sum, "[t]he two rules are incompatible, and class representation in the sense of Rule 23 should therefore not be allowed in limitation proceedings." *Id*.

Following *Lloyd's Leasing*, courts in this district have routinely stricken class action allegations when they are filed within a limitation proceeding or dismissed class action complaints when they are filed after a limitation proceeding has been instituted. See, e.g., *In re: Ingram Barge Co.,* No. 05-4419, 2006 U.S. Dist. LEXIS 79403, 2006 WL 5377855, at *1 (E.D. La. Oct. 19, 2006) (striking class allegations pursuant to *Lloyd's Leasing*); *In re: River City Towing Servs., Inc.*, 204 F.R.D. 94, 97 (E.D. La. 2001) (same); *Humphreys v. Antillen, N.V.*, Nos. 93-3799, 93-3714, 1994 WL 682811, at *3 (E.D. La. Jan. 31, 1994) (dismissing class action complaint filed after limitation proceeding). The limitation proceedings need not be resolved and limitation of liability upheld in order to dismiss class action allegations. For example, Judge Berrigan in *Ingram Barge* and Judge Feldman in *Humphreys* struck or dismissed class action allegations before deciding the limitation issue. See *Gabarick v. Laurin Mar. (America), Inc.*, 2009 U.S. Dist. LEXIS 27180.

**D.   The MDL 2179 Court Has Overreached Its Authority.**

The Supreme Court has held that a district court conducting pretrial proceedings pursuant to 28 U.S.C. §1407(a) has no authority to invoke 28 U.S.C. §1404(a) to assign a transferred case to itself for trial. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998). *See* Plaintiff Salvesen's Memorandum in Support of His Motion to Vacate Order and Reasons [As to Motions to Dismiss the B1 Master Complaint] (Rec. Doc. 6186-1) attached hereto as Exhibit B.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court vacate its Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement], Rec. Doc. 6418 dated May 2, 2012.

DATED: July 2, 2012                             Respectfully submitted,

**/s/ Brian J. Donovan**
Brian J. Donovan
Attorney for Plaintiff
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 2nd day of July, 2012.

**/s/ Brian J. Donovan**
Brian J. Donovan
Attorney for Plaintiff
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net

-25-