UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br><br>v.<br><br>BP Exploration & Production, Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

REPORT OF GUARDIAN AD LITEM
MEDICAL BENEFITS CLASS ACTION
PROPOSED SETTLEMENT AGREEMENT

MAY IT PLEASE THE COURT:

Now comes Jack Crozier Watson, Justice Retired, Louisiana Supreme Court, to report and make a recommendation to the Court in his capacity as duly appointed GUARDIAN AD LITEM FOR MINORS AND INCOMPETENTS, MEDICAL SETTLEMENT.

Assignment:

Make an independent investigation and report to the Court whether the proposed settlement is fair to the minors and incompetents injured by the Deepwater Horizon spill.

Investigation:

The GAL (referred to hereafter in the third person) first attempted to resolve what would be an appropriate independent investigation. He concluded that, in general terms, he should attempt to learn as much as possible about the law and the facts. This report will summarize what he has learned and his conclusions based on the law and facts of the proposed settlement.

Law:

The term "fair" is not easily defined. At the outset, *Webster's Third New International Dictionary* is noted to spend more than a half page trying to cover all the various meanings of the term, beginning with "...attractive in appearance; pleasant to view..." and ending with "(a church fair)". *Webster's Third New International Dictionary* p. 815.

More to the point of the Court's order is the dictionary definition "7a characterized by honesty and justice; free from fraud, injustice, prejudice or favoritism..." and the synonyms to "fair" are listed as "...just, equitable, impartial, unbiased, dispassionate,

1

uncolored, and objective...". Id. The usual jurisprudential phrase is "fair, reasonable, and adequate," taken from Federal *Rule of Civil Procedure* 23(e).

So the inquiry essentially is whether the proposed settlement is fair, reasonable, and adequate for the minors and incompetents injured by the spill. The proposed settlement divides the claimants into three groups: (1) cleanup workers; (2) persons living within one-half mile of beaches affected by the spill; and, (3) persons living within one mile of wetlands affected by the spill. By reason of the passage of time, the GAL thinks that any minors in the cleanup group have reached or will reach majority when and if the settlement becomes effective.

Criteria for Settlement Approval:

The authoritative treatise Newburg on Class Actions indicates eight criteria for determining fair, reasonable, and adequate, citing *City of Detroit v. Grinnell Corp.* 495 F.2d 448 at 463 (2 Cir. 1974) (impliedly overruled on other grounds); see *U.S. Football League v. National Football League*, 887 F.2d 408 (2d Cir. 1989).

Other authorities restate or fine tune the factors, which need not be analyzed here because the U. S. Fifth Circuit has declared that "...in the Fifth Circuit, courts evaluate the six *Reed* factors." *Union Asset Management Holding v. Dell Inc.,* 669 F. 3d 632 at 639; cert. den. *Schuleman v. Union Asset Management Holding A. G.,* 2012 WL 2921869 (U. S. Oct 01, 2012).

For purposes of this report, the factors listed in *Reed v. Gen. Motors Corp.*, 703 F.2d 170 at 172 (5th Cir. 1983) will be considered.

The GAL's comments are in brackets:

(1) the existence of fraud or collusion behind the settlement [The proposed settlement appears to have been reached after long and vigorous negotiation between armies of lawyers representing the putative Plaintiff class and armies of lawyers representing BP; no evidence of collusion has been observed or alleged to the GAL's knowledge.]

(2) the complexity, expense, and likely duration of the litigation [This case would be terrifically complex, wildly expensive, and extremely lengthy. The GAL was told by one attorney representing a minor that he strongly favored the settlement because it would be relatively simple and quick as compared to trial and a possible appeal.]

(3) the stage of the proceedings and the amount of discovery completed [The trial was going to start but had to be postponed for a week while the proposed settlement was completed; no doubt a large amount of discovery had been completed.]

(4) the probability of Plaintiffs' success on the merits [All indications are that the Plaintiffs had a good chance of success as to liability but only after a long and arduous trial with considerable probability of lengthy appeals. Additionally, any recovery and amount of damages are unknown.]

(5) the range of possible recovery [Due to a multitude of Plaintiffs and a probable wide range of injuries, the amount of recovery is not something on which the GAL would choose to speculate.]

(6) the opinions of class counsel, class representatives, and absent class members. [Obviously, class counsel for Plaintiffs and counsel for BP strongly feel that the settlement should be approved; the opinions of class representatives and absent class members are unknown to the GAL.]

Persons Making Claims:

The GAL is advised that claims have been made by about 64 minors and by 60 incompetents as of October 1, 2012, and he assumes that these individuals would be residents of Zone A or Zone B.

Interviews with Physicians:

The various attorneys involved suggested that the GAL speak with certain doctors who had been involved during negotiations or consulted after the settlement was agreed between the parties. He first talked to Dr. Herzstein in Washington D.C. who gave him the names of Drs. Cox, Lees, and Dutton. Due to time conflicts, a Jackson, Mississippi meeting with Dr. Cox could not be arranged, resulting in a conference call with Dr. Cox. Only one lawyer, Ellen K. Reisman, participated. Conference calls were also arranged with other experts. Summaries follow.

Dr. Jessica Herzstein:

Dr. Herzstein holds degrees from both Harvard (A.B. in Chemistry) and Yale (M.D. and M.P.H. in Environmental Health) and did an internship at the University of California, San Francisco. She has lectured at Harvard School of Public Health and Northwestern School of Medicine and she has served on the faculty at Temple School of Medicine and West Virginia School of Medicine. Her resumé includes an impressive list of government service positions and an expansive list of publications.

Dr. Herzstein was not involved or consulted in the confection of the settlement. She was engaged, after an agreement was made, to review the provisions and file an opinion. The key questions posed to Dr. Herzstein, as well as the other experts interviewed, were whether she knew of any reasons why the proposed settlement is not

fair to minors and incompetents; whether the one-half mile limitation for residents of Zone A; and, the one mile limitation for residents of Zone B were fair and the same question as to the 24 hour, 48 hour, and 72 hour manifestation requirements. She answered "no" to the question concerning any reason the proposed settlement is unfair. She said the distance and time restrictions are "generous."

Dr. Michael R. Harbut:

Dr. Harbut has a medical degree from the American University of the Caribbean, a B.A. from Madonna University, and a Masters of Public Health from the University of Michigan. He began his medical studies at the Polish University of Breslau but had to leave Poland because of social and political instability. His experience includes work during the Rwanda genocide and at a Zaire refugee camp. He worked in Poland from 1988 to 1992 with the Solidarity leader, Lech Walesa.

Dr. Harbut assisted the Plaintiffs' Steering Committee during the negotiation of the SPC matrix. He says the matrix reflects the state of the science and conforms with medical literature regarding the health effects of exposure to petroleum and petroleum-based dispersants. He gives his opinion that the time frames, although complex, reflect the predominant guides as to when there would be clinical manifestations in most people.

Dr. Harbut affirmed that the 24 hour, 48 hour, and 72 hour manifestation provisions are in accord with his experience and the medical literature. He adds that Zone A and Zone B are appropriately designed to include the residents who are most likely to experience the medical conditions provided for by the matrix. Dr. Harbut

expressed his opinion that the periodic consultation program is a "…critically important benefit to class members."

Other Experts:

In addition to Drs. Herzstein and Harbut, the Guardian ad litem spoke by telephone with Dr. Robert Cox, Dr. Peter Lees, and Dr. David Dutton.  Some of the lawyers participated slightly in the individual conference calls.  It is not necessary to detail the calls to each of these doctors—suffice it to say that they stated individually that the exposure to the potential claimants in the settlement was minimal.  It was under an amount which would have been injurious.  Also, these doctors stated in the individual telephone conversations that there is nothing in the proposed settlement unfair to minors and incompetents.  As to the limitations of one-half mile for residents of Zone A, and one mile for residents of Zone B, they each said that the limits were reasonable.  The same was said about the 24, 48, and 72 hour manifestation requirements.

The other two experts of which the Guardian ad litem is aware were reviewed only by way of their declarations.  For one reason or another, it was not possible to speak personally with or by telephone to Dr. Laura Green or Dr. Elliott Taylor.  The only contact the Guardian ad litem had with them was through the study of their declarations.

Dr. Green indicated that she was requested to answer the question of whether the use of oil dispersants in response to the spill poses a risk to plaintiffs' health.  Her reply in the declaration was that to a reasonable degree of medical certainty, the answer is "no".

Dr. Taylor holds a doctorate in oceanography from Texas A. & M.  He has worked on major oil spills for more than 20 years.  His declaration is an interesting

account of the cleanup work on the Deepwater Horizon spill.  He had no role in the settlement negotiations.  He was a leader in what is called the "SCAT" program for spill cleanup and assessment.  The program checked more than 4,300 miles of shoreline from Florida to Louisiana.  Dr. Taylor declares that, as of July 28, 2012, more than 3,900 miles of shoreline have been moved out or has been recommended to be moved out of the response area.

Neither Dr. Green nor Dr. Taylor made any comment in declarations that the proposed settlement is unfair in any way to minors or incompetents.

Periodic Medical Consultation Program:

One of the outstanding features of the settlement, the GAL has discovered, is the Periodic Medical Consultation Program.  This program appears to be unique.  None of the lawyers or experts interviewed is aware of any similar program provided by a spill resolution in the United States.  Essentially, any settlement class member who has been determined by the Claims Administrator to be qualified for compensation is automatically qualified to participate in the consultation program.  This entitles the class member to receive for a period of 21 years, a free periodic medical examination.  The program is to be set up by the Claims Administrator, who is to establish a network of medical service providers.  The Claims Administrator is to be responsible for coordinating and scheduling all medical consultation visits. (See proposed settlement agreement, pp. 44-55.)

Gulf Region Health Outreach Program:

The GAL met Dr. Joy Osofsky and Dr. Eric T. Baumgartner who explained in detail the plans and goals for the PRIMARY CARE CAPACITY PROJECT and the MENTAL AND BEHAVIORAL HEALTH CAPACITY PROJECT.

These two features of the Outreach program would expand and improve access to health care in under-served Gulf Coast communities of the states impacted by the spill and would address behavioral and mental health needs in the same area.

The Outreach Program is a <u>lagniappe</u> benefit of the settlement which at a cost of over one hundred million dollars to the settling defendant will significantly help the communities recovering from the effects of the disaster.

Objections:

The GAL and one of his assistants have studied the objections filed by various persons, companies, and governmental bodies.  None of the objections appear to raise any issue which would suggest unfairness to minors or incompetents in the proposed settlement.  The objection filed by the State of Louisiana, while difficult to understand, covers or implies many objections, but none of them seem to relate to minors or incompetents.

Reservation:

The GAL has only one reservation as to the provisions of the settlement and this may be a matter for the Court rather than the settling parties.  It is the absence of any protection for the funds given by the settlement to the minors or incompetents.  It appears that the protection to a minor or incompetent would be an order that the money be deposited in a bank, with withdrawals allowed only on order of the court.  The GAL

had a phone conversation with a lawyer who had served as GAL for several minors injured by fumes from a large factory fire and she expressed her concern as to what happens to the money given for the minors' benefit in the settlement.

Conclusion:

Considering the lengthy settlement negotiations, the *Reed* factors as applied by the U. S. Fifth Circuit Court of Appeal, the opinions gathered from the experts who were either involved in confecting the settlement or who have reviewed it since, agreement by the parties, through their extremely able attorneys, and after studying the settlement itself without finding any part unfair to either minors or incompetents, the Guardian ad litem recommends that the Court approve the settlement.

RESPECTFULLY SUBMITTED:

October 4, 2012
DATE

JUSTICE JACK C. WATSON (RTD.)
LA BAR #13270
2706 BOCAGE LANE
LAKE CHARLES, LA 70605
Phone: (337) 474-3074
Facsimile: (337) 474-6833
E-mail: Justiwatson@aol.com

## CERTIFICATE OF SERVICE

I, Justice Jack C. Watson (Rtd.), hereby certify that on October 4/4, 2012, a copy of this report has been served electronically on counsel of record for the settling parties.

Lake Charles, Louisiana, this 4th day of October, 2012.

JUSTICE JACK C. WATSON (RTD.)
Guardian ad litem, Medical Settlement