EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010, | § | |
| | § | JUDGE BARBIER |
| Applies to: | § | |
| | § | MAG. JUDGE SHUSHAN |
| *All Cases,* including No. 10-2771 | § | |
| | § | |

## HALLIBURTON ENERGY SERVICES, INC.'S FIRST AMENDED ANSWER TO BP'S CROSS-COMPLAINT AND THIRD-PARTY COMPLAINT

Subject to its Previously Filed Motion to Dismiss, Third-Party/Cross Defendant Halliburton Energy Services, Inc. ("HESI") files this First Amended Answer to the BP Defendants' ("BP") Cross-Complaint and Third-Party Complaint (the "Complaint") (Doc. No. 2082), and respectfully shows this Court as follows:[1]

## ANSWER[2]

HESI is not required to deny and/or respond to the various headings and subheadings in BP's Complaint.  However, to the extent a response is required, HESI denies each and every heading and/or subheading contained in BP's Complaint.

For answer to each and every allegation of BP's Complaint, HESI responds as follows:

---

[1] In addition to virtually identical claims asserted by BP in its Cross-Claims (Doc. No. 2082) and Third-Party Claims (Doc. No. 2083), BP also asserted mirror image claims in an independent lawsuit filed in the Southern District of Texas.  *See  BP Exploration & Production Inc et al., v. Halliburton Energy Services, Inc.*, Cause No. 4:11-cv-01526, (S.D. Tex.) (Doc. No. 1).  BP filed this independent claim as a "protective" measure, and the basis of the claim is, again, virtually identical to the allegations of BP's Cross-Claims and Third-Party claims.  *Id.* at p. 1.  BP sought transfer of its SDTX lawsuit to this MDL proceeding, and the JPML granted that request.  *See* CTO 18.  Pursuant to this Court's Pre-Trial Order No. 1, paragraph 8, HESI is relieved of any obligation to answer or otherwise respond to BP's SDTX complaint until further order of this Court.

[2] HESI files this amended answer subject to its Motion to Dismiss and Memorandum in Support of the Same.

1.      HESI admits the allegations in Paragraph 1, but is without sufficient information or knowledge as to whether BP complied with the terms of its lease with MMS.

2.      HESI admits the allegations in Paragraph 2.

3.      HESI denies the allegations in Paragraph 3.

4.      HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 4, except HESI admits that: Transocean filed a Complaint and Petition for Exoneration from or Limitation of Liability, Civil Action No. 10-2771 ("Petition in Limitation"); and on February 28, 2011, Transocean filed a Rule 14(c) Third-Party Complaint against BP, HESI and others ("Transocean's 14(c) Complaint").   The allegations contained in Transocean's Petition in Limitation and Transocean's 14(c) Complaint speak for themselves.

5.      HESI admits the allegations in Paragraph 5.

6.      HESI admits the allegations in Paragraph 6.

7.      HESI admits the allegations in Paragraph 7.

8.      HESI admits the allegations in Paragraph 8.

9.      The allegations in Paragraph 9 draw legal conclusions, to which no response is required.  To the extent a response is required, the allegations in paragraph 9 are denied.

10.     BP's claims speak for themselves and are denied by HESI.   Subject matter jurisdiction allegations, as set forth in Paragraph 10, draw legal conclusions to which no response is required.  HESI admits that the *Deepwater Horizon* was a vessel.

11.     HESI admits the allegations in Paragraph 11.

12.     HESI admits the allegations in Paragraph 12.

13.     HESI admits the allegations in Paragraph 13.

14.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 14 with regard to what BP relied on or believed. HESI admits that on its website, HESI states that it "originated oilfield cementing" and that it "leads the world in effective, efficient delivery of zonal isolation and engineering for the life of the well."

15.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 15 with regard to what BP relied on or believed. HESI admits that HESI states on its website "Halliburton's Surface Data Logging from Sperry Drilling Services ensures you get the best information from your well, so you can make better decisions, faster."  HESI would note that its contracts with various third parties, including BP, speak for themselves.  To the extent the allegations in Paragraph 15 assert legal conclusions, no response is required.

16.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 16 with regard to what BP relied on or believed. HESI admits that on its website, HESI states that "Sperry Drilling Services is the preferred deepwater drilling provider in the Gulf of Mexico, where we serve more than half the rigs drilling in ultra-deepwater of 5000 feet or more.  When you've got challenges out of the ordinary, we are the company to go to."  To the extent the allegations in Paragraph 16 assert legal conclusions, no response is required.

17.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 17 with regard to what BP relied on or believed. HESI admits that on its website, HESI states that "Detecting fluid influx and mud losses while circulating, [Sperry's] Early Warning System immediately alerts operators to flow changes, and

identifies washouts or restrictions in the system, as well as hole 'breathing' or ballooning, so you can take action to avert trouble."   To the extent the allegations in Paragraph 17 assert legal conclusions, no response is required.

18.     HESI admits the allegations in Paragraph 18.[3]

19.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 19, including but not limited to whether BP complied with the terms of its lease with the former Minerals Management Service ("MMS"), except HESI admits that: BP was issued a lease by the MMS, now re-organized as the Bureau of Ocean Energy Management Regulation & Enforcement, ("BOEMRE") allowing it to perform oil exploration, drilling, and production-related operations in the oil and gas well located on Mississippi Canyon Block 252.

20.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 20, except HESI admits that at some point in time, MOEX Offshore 2007 LLC became a 10% owner in the Macondo prospect, Anadarko Petroleum Corporation obtained a 2.5% interest in the prospect, and Anadarko Exploration & Production LP obtained a 22.5% interest in the prospect.

21.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 21.

22.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 22.

---

[3] Following Paragraph 18, BP included Figure 1, titled "Geographic Location of the Lease and Well." HESI is not being asked to deny and/or respond this Figure, but to the extent a response is required, HESI is without sufficient knowledge or information to for a belief as to the truth of Figure 1.

23.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 23, except HESI admits that BP began drilling the Macondo well with the Transocean *Marianas* rig, which later sustained damage from Hurricane Ida, and drilling resumed with the Transocean *Deepwater Horizon* rig.

24.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 24, except HESI admits that: the *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible vessel, designed to drill subsea wells for oil exploration and production.

25.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 25, except HESI admits that the *Deepwater Horizon* was owned and operated by one or more Transocean Entities.[4]

26.     HESI admits the allegations set forth in Paragraph 26.

27.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 27 with regard to what BP relied on or believed, except HESI admits that it was engaged by BP to perform certain cementing operations and to provide certain other drilling support services (*e.g.*, mudlogging, measurement while drilling) in the Gulf of Mexico.  All other allegations in Paragraph 27 are denied.

28.     With regard to the allegations in Paragraph 28, HESI admits that:

a.      on its website, HESI states that it is "an industry leader in cementing innovation, offers proven solutions for every cement job;"

b.      on its website, HESI states that it is that it "originated the cementing process and remains today the world leader in market position and customer perception;"

---

[4] Triton Asset Leasing GmbH, Transocean Holdings, LLC, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc., hereinafter the "Transocean Entities,"  have each claimed to be the owner, managing owner, owners pro hac vice, and/or operators of the MODU *Deepwater Horizon*.  *See* Transocean's Cross-Claims/Counter-Claims, Dkt. No. 2068.

c.      on its website, HESI states that "while the majority of wells drilled can be cemented with standard slurries and equipment, Halliburton has also distinguished itself as a reliable provider of cementing solutions to meet challenging down hole and environmental conditions;"

d.      on advertising materials, HESI states that "From Halliburton, the cementing and drilling fluids pioneer, comes another innovative, fit-for purpose cementing first:  our Tuned Cementing Solutions$^{TM}$ process;"

e.      on advertising materials, HESI states that "Foam cement helps improve mud displacement, helps prevent gas migration and helps protect the formation: …the compressed gas bubbles in foam cement shrink or expand, but they don't move around or coalesce.  Instead they maintain pressure while the cement hydrates.  Result:  Virtually no gas migration into the cement, ever—while cement is being placed or while it sets."

f.      All other allegations in Paragraph 28 are denied.

29.      The allegations contained in Paragraph 29 are denied.

30.      HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 30 with regard to what BP relied on or believed. HESI admits that it was engaged by BP to perform certain cementing operations and to provide certain other drilling support services (*e.g.*, mudlogging, measurement while drilling) in the Gulf of Mexico for which HESI was compensated.  All other allegations in Paragraph 30 are denied.

31.      The allegations contained in Paragraph 31 are admitted.

32.      HESI admits that pursuant to the Well Services Contract, HESI performed a number of services in support of BP's drilling operations in the Gulf of Mexico, including certain cementing and mud logging services.  The terms of the Well Services Contract, including the "work" contemplated thereunder, speak for themselves.  All other allegations in Paragraph 32 are denied.

33.      HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 33 with regard to what BP relied on or believed, and

the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

34.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 34 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

35.    With regard to the allegations set forth in Paragraph 35, the terms of the Well Services Contract speak for themselves.  To the extent Paragraph 35 asserts legal conclusions and/or an interpretation of contractual obligations, no response is required.

36.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 36 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

37.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 37 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any warranties, promises, representations, or guarantees to BP.

38.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 38 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

39.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 39 and its subparagraphs with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

40.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 40 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

41.     With regard to the allegations in Paragraph 41, the terms of the Well Services Contract speak for themselves.  Moreover, Paragraph 41 draws legal conclusions or requires contractual interpretation, to which no response is required.

42.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 42 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

43.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 43 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

44.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 44 with regard to what BP relied on or believed, and

the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any agreements, promises, or representations to BP.

45.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 45 and its subparagraphs with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

46.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 46 with regard to what BP relied on or believed, and the terms of the Well Services Contract speak for themselves.  Other than the terms of the Well Services Contract, HESI denies that it made any promises or representations to BP.

47.    The allegations set forth in Paragraph 47 are denied, except HESI admits that: HESI, in conjunction with BP, designed the nitrified foam cement slurry to cement the production casing in the Macondo well per BP's specifications and at BP's direction; and the cementing design for the Macondo well, which likewise was designed, in conjunction with BP, per BP's specifications and at BP's direction, called for the use of base oil, spacer, bottom wiper plug, cap cement, foamed cement, tailed cement, top wiper plug and spacer and that BP ultimately decided to accept the design.  HESI is without sufficient knowledge or information to form a belief as to BP's reliance.

48.    The allegations set forth in Paragraph 48 are denied, except HESI admits that the purpose of cement jobs in general is to isolate formation fluids and form a protective barrier to flow.

49.     The allegations set forth in Paragraph 49 are denied, except HESI admits that cement slurry utilized on cementing the production casing on the Macondo well reflected the following specifications:

Fluid 4: Foamed Tail Cement – **Foamed to average density of 14.5 ppg**

| Premium Cement | | |
|---|---|---|
| 94 lbm/sk  Premium Cement (Cement) | Fluid Weight | 16.74 lbm/gal |
| 0.07 %  Halliburton EZ-FLO (Bulk Flow Enhancer) | Slurry Yield: | 1.37 ft$^3$/sk |
| 0.25 %  D-AIR 3000 (Defoamer) | Total Mixing Fluid: | 5.04 Gal/sk |
| 1.88 lbm/sk  KCL (Additive Material) | Top of Fluid: | 17400 ft |
| 20 %  SSA-1 (Additive Material) | Calculated Fill: | 904 ft |
| 15 %  Common White-100 Mesh, SSA-2 | Volume: | 55.41 bbl |
| 0.2 lbm/sk  SA-541 (Additive Material) | Calculated Sacks: | 191.44 sks |
| 0.11 Gal/sk  Zonesealant 2000 (Foamer) | Proposed Sacks: | 200 sks |
| 0.09 Gal/sk  SCR-100L (Retarder) | | |

**1 lbm/bbl  WellLife 734 (Additive Material) – added by hand to down hole side**

50.     The allegations contained in Paragraph 50 are denied except HESI admits that D-AIR 3000, KCL and SCR-100L are additives, each of which, in isolation may possess a dispersant property to varying degrees.

51.     The allegations contained in Paragraph 51 are denied except HESI admits that it and BP knew that EZ-FLO, D-AIR 3000, KCL and SCR-100L were additives in the foamed cement slurry used to cement the production casing on the Macondo well.

52.     The allegations contained in Paragraph 52 are denied, but HESI would refer BP to a Technology Bulletin No. CMA-99-021.

53.     The allegations contained in Paragraph 53 are denied.

54.     The allegations contained in Paragraph 54 are denied, except HESI admits that HESI designed, in conjunction with BP, the nitrified foam cement slurry to cement the production casing in the Macondo well per BP's specifications and at BP's direction.

55.     The allegations contained in Paragraph 55 are denied, except HESI admits that on or about February 12, 2010, HESI initiated a foam stability test that was conducted on a pilot cement slurry mix that differed from the slurry mix ultimately utilized on the cement job for the

Macondo well's production casing and that such test did not utilize the final down hole conditions as they were not yet known.  The nature of the results obtained from this foam stability test suggested another test be run.  The foam stability test was, therefore, repeated and transmitted to BP.

56.    The allegations contained in Paragraph 56 are denied except HESI would note that the laboratory worksheet, dated February 12, 2010, speaks for itself, and HESI admits that it did not provide to BP any observations noted on such worksheet in writing.

57.    The allegations contained in Paragraph 57 are denied except HESI admits that: on or about February 16, 2010, HESI initiated a  foam stability test on a cement slurry that differed from the slurry mix ultimately utilized on the cement job for the Macondo well's production casing and that such test did not utilize the final down hole conditions as they were not yet known; the slurry mix tested contained an additive, SA-541; and the slurry was "conditioned" for two hours.

58.    The allegations contained in Paragraph 58 are denied except HESI admits that, on the rig, cement is not "conditioned" before foaming.

59.    The allegations contained in Paragraph 59 are denied, except HESI admits that: the second foam stability test referenced in Paragraph 59 resulted in a test result showing uniform density of 1.91 S.G. on the top and bottom of the test sample, which is an indication of stability; and the density of the foamed test sample was greater than the target density.

60.    The allegations contained in Paragraph 60 are denied, except HESI admits that it performed a crush compressive strength test on a cement slurry that differed from the slurry mix ultimately utilized on the cement job for the Macondo well's production casing and that such test

did not utilize the final down hole conditions as they were not yet known.  The laboratory worksheet speaks for itself.

61.     The allegations contained in Paragraph 61 are denied, except HESI admits that its internal laboratory worksheets, dated February 12, 2010 and February 16, 2010, respectively, were not provided to BP prior to April 20, 2010.

62.     The allegations contained in Paragraph 62 are denied.

63.     The allegations contained in Paragraph 63 are denied.

64.     The allegations contained in Paragraph 64 are denied except, HESI admits that the customer report provided by Jesse Gagliano to BP on March 8, 2010 and again on April 1, 2010, contains a clerical error in that the reported conditioning time for the foam stability test reflects "00.00" hrs:mins when the test sample was actually conditioned for 2 hours.

65.     The allegations contained in Paragraph 65 are denied and the laboratory results transmitted to BP on March 8, 2010 and again on April 1, 2010 speak for themselves.

66.     The allegations contained in Paragraph 66 are denied.

67.     The allegations contained in Paragraph 67 are denied, except HESI admits that on March 23, 2010, HESI employee Jesse Gagliano met with several BP engineers where various topics were discussed, including casing options and the use of foamed cement, which was also recommended by another BP engineer.

68.     The allegations contained in Paragraph 68 are denied.  HESI is without sufficient knowledge or information to form a belief as to BP's awareness, belief or reliance.

69.     The allegations contained in Paragraph 69 are denied except HESI admits that on or about April 13, 2010, it initiated a foam stability test on a different cement slurry that, at that time, was representative of what was intended to be used to cement the production casing at the

Macondo well (using .08 gallons of retarder per sack of cement) and that took into account down hole conditions that were then known to HESI about the well; the result generated by that foam stability test—1.88 S.G. on top and 1.82 S.G. on bottom—was anomalous suggesting the test needed to be repeated.  The foam stability test was, therefore, repeated.  HESI denies that the anomalous  test result can be construed as a "failed" foam stability test or can be otherwise used to indicate whether the foam cement slurry that was tested was stable.

70.     The allegations contained in Paragraph 70 are denied except HESI admits that: Jesse Gagliano met with BP engineers on April 14, 2010, and based in part on information given by BP, advised BP that a long-string production casing could be successfully cemented with foam cement at the Macondo well provided the casing was adequately and properly centralized; that Jesse Gagliano sent to BP or provided BP with various cement programs and OptiCem modeling reports in the following days ultimately culminating in a recommendation that 21 centralizers should be used to successfully cement the production casing, which recommendation BP decided not to follow; and that between April 14 and April 18, 2010, Jesse Gagliano did not discuss with BP the invalid test result obtained from the foam stability test initiated on or about April 13, 2010.

71.     The allegations contained in Paragraph 71 are denied, except HESI admits that: on April 16, 2010 a laboratory worksheet was printed, one of the purposes of which was to run an additional foam stability test on the cement slurry intended to be used to cement the production casing at the Macondo well, but this time, per BP's request, using .09 gallons of retarder per sack of cement; Jesse Gagliano instructed the lab to cancel this test and such instruction is reflected in the laboratory worksheet, dated April 16, 2010; no foam stability test was run on a slurry with a retarder concentration of .09 gallons per sack of cement; and the internal laboratory worksheet,

dated April 16, 2010, was not provided to BP prior to April 20, 2010. Further, the laboratory worksheet, dated April 16, 2010, speaks for itself.

72.     The allegations contained in Paragraph 72 are denied, except HESI admits: that on April 17, 2010, Jesse Gagliano sent an email to BP attaching two customer reports, one reflecting results then obtained for tests on a slurry using .08 gallons of retarder per sack of cement and the other reflecting results then obtained for tests on a slurry using .09 gallons of retarder per sack of cement and that Jesse Gagliano did not attach any other tests.

73.     The allegations contained in Paragraph 73 are denied, except HESI admits that: as reflected in HESI's response to Paragraph 69, the first foam stability test conducted in April 2010 was repeated; the repeated foam stability test on the slurry using .08 gallons of retarder per sack of cement is reflected on the laboratory worksheet, dated April 17, 2010; the slurry sample for this foam stability test was conditioned for three hours; and the repeated foam stability test generated results of 1.8 S.G. on top and 1.799 S.G. on bottom, indicating a stable foam cement slurry.

74.     The allegations contained in Paragraph 74 are denied except HESI admits that: on April 18, 2010, Jesse Gagliano sent BP, among other things, a document entitled, "9 7/8" x 7" Production Casing" which incorporated a procedure for cementing the production casing in the Macondo well that had been developed with BP's input and after incorporating BP's requirements; and the document entitled, "9 7/8" x 7" Production Casing" speaks for itself.

75.     The allegations contained in Paragraph 75 are denied.

76.     The allegations contained in Paragraph 76 are denied, except HESI admits it did not inform BP that the cement slurry intended to be used to cement the production casing at Macondo was "unstable" because, indeed, it was stable.

77.     The allegations contained in Paragraph 77 are denied, except HESI admits it did not inform BP that the cement slurry intended to be used to cement the production casing at Macondo was "unstable" because, indeed, it was stable.

78.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 78 with regard to what BP relied on or believed, except HESI admits that: on April 19, 2010, BP gave HESI the approval to begin the production casing cement job on the Macondo well despite being advised by HESI that the cement job likely would not achieve zonal isolation due to channeling; and the purpose and intent of any cement job is or should be to achieve zonal isolation and to form a barrier to flow.

79.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegation that "[b]ased on this information, BP personnel on the rig communicated to BP personnel onshore that the cement job was a success."  The other allegations contained in Paragraph 79 are denied except HESI admits: that its personnel commenced the production casing cement job on Macondo well at approximately 8:00 pm on April 19, 2010 and finished execution of the job at approximately 12:30 am on April 20, 2010; HESI's personnel on the rig, including Sperry mudloggers, monitored certain job data at various points during the cement job; at the conclusion of the cement job, HESI reported to BP that the cement job was executed successfully; at the conclusion of the cement job, HESI reported that it had observed lift pressure during the cement job; at the conclusion of the cement job, HESI reported that there were full returns, which information was provided to HESI throughout and at the end of the cement job by non-HESI rig personnel on the drill floor.  HESI denies that any report to BP that the cement job was executed successfully can be construed as a report that the cement job successfully met its goal of achieving zonal isolation.

80.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegation that Jesse Gagliano attended a morning meeting with BP's onshore team on April 20, 2010 or the allegations as to what may have been discussed at this morning meeting, but denies any discussions about running a cement bond log, only that BP told everyone that it would not run a cement bond log.  The other allegations contained in Paragraph 80 are denied except HESI admits that: one other HESI employee attended at least part of the April 20, 2010 morning meeting via telephone from the rig and that employee reviewed for BP and the attendees the volumes of cement and fluids pumped during the cement job on the production casing; HESI did not, at the morning meeting, request that BP run a cement bond log (CBL) as it is the well owner's responsibility to determine whether to run a CBL before relying on the cement as an effective barrier in this situation.

81.     The allegations contained in Paragraph 81 are denied except HESI admits that, after HESI finished the production casing cement job on April 20, 2010: BP continued operations without performing a cement bond log or any other proven cement evaluation technique; BP and the rig crew proceeded with a negative pressure test that underbalanced the well, the results of which were misinterpreted by BP and the rig crew; and a blowout of the well occurred later on April 20, 2010 resulting in an explosion aboard the *Deepwater Horizon*, loss of life and personal injuries, and subsequent flow of oil into the Gulf of Mexico.

82.     The allegations contained in Paragraph 82 are denied.

83.     The allegations contained in Paragraph 83 and its subparagraphs are denied, except HESI admits that after the Incident, HESI provided stock cement and additive samples to Chevron for testing.

84.     The allegations contained in Paragraph 84 are denied, except HESI admits that: after the cement job was finished, the *Deepwater Horizon* crew continued its steps to temporarily abandon the Macondo well; a negative pressure test was run, displacing the heavy drilling mud in the well with seawater; and as a result of the displacement of drilling mud, the well bore became underbalanced relative to the pore pressure exerted from the formation.  HESI further admits that its mud loggers, as a second set of eyes to the Transocean drilling crew and BP company man, visually monitor sensor data in an effort to detect trends that may indicate the occurrence of a kick in the well.  Except as otherwise specifically admitted, HESI denies each and every other allegation contained in Paragraph 84.

85.     The allegations contained in Paragraph 85 are denied, except HESI admits that: the HESI mudlogger on duty on April 20, 2010 during the displacement of the riser was Joseph Keith; Keith began his shift at approximately 5:30 pm on April 20, 2010; Keith was stationed in at the mudloggers' shack; while on duty in the mudloggers' shack, mudloggers monitor real time data pertaining to the well, including flow in versus flow out, drill pipe pressure, and mud levels in the trip tanks, among other data.

86.     The allegations contained in Paragraph 86 are denied, except HESI admits that from approximately 7:00 pm to 8:52 pm on April 20, 2010, crew of the *Deepwater Horizon* engaged in steps to temporarily abandon the Macondo well, and at approximately 8:00 pm the crew began displacing the drilling mud in the well with seawater, purposefully under-balancing the well.  Mr. Keith's statements and sworn testimony speak for themselves.

87.     The allegations contained in Paragraph 87 are denied.

88.     The allegations contained in Paragraph 88 are denied except HESI admits that data from the *Deepwater Horizon* indicates that by 9:08 pm, the trip tank had gained 39 barrels.

89.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 89, except to admit that: data from the *Deepwater Horizon* indicates that by 9:08 pm, the drill pipe pressure had climbed from 1250 psi to 1350 psi.

90.     The allegations contained in Paragraph 90 are admitted.

91.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 91, except to admit that: from 9:08 pm to 9:14 pm, while the sheen test was conducted, the rig's pumps were shut off and during this time period, the drill pipe pressure increased an additional 250 psi.

92.     The allegations contained in Paragraph 92 are admitted.

93.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 93, except to admit that: from 9:14 pm to 9:25 pm the drill pipe pressure increased to over 2500 psi.  Mr. Keith's sworn testimony and statements speak for themselves.

94.     HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 94, except to admit that: at approximately 9:41 pm drilling mud had reached the rig floor; thereafter the first explosion onboard the *Deepwater Horizon* occurred.

95.     The allegations contained in Paragraph 95 and it subparagraphs are denied except HESI admits that on April 23, 2010, HESI sent BP a post-job report summarizing the results of the cement job on the Macondo well that commenced April 19, 2010. The post-job report speaks for itself. HESI further denies the allegation that all of the information conveyed to BP in the post-job report was determined by HESI.

96.    The allegations contained in Paragraph 96 and its subparagraphs are denied except HESI admits that on April 23, 2010, HESI sent BP a post-job report summarizing the results of the cement job on the Macondo well that commenced April 19, 2010. The post-job report speaks for itself. HESI further denies the allegation that all of the information conveyed to BP in the post-job report was determined by HESI.

97.    The allegations contained in Paragraph 97 are denied.

98.    The allegations contained in Paragraph 98 are denied except HESI admits that: on April 26, 2010, HESI sent to BP a consolidated customer report reflecting the valid and relevant tests conducted by HESI related to the slurry used to cement the production casing at the Macondo well, including test results related to a slurry using .08 gallons of retarder per sack of cement and a slurry using .09 gallons of retarder per sack of cement.  The test results provided to BP on April 26, 2010 and any email by Jesse Gagliano used to convey those results speak for themselves. Except as otherwise specifically admitted, HESI denies each and every other allegation contained in Paragraph 98.

99.    The allegations contained in Paragraph 99 are denied except HESI admits that the consolidated customer report sent to BP by HESI on April 26, 2010, reflects and identifies separately, by slurry identification numbers, the test results associated with a slurry using .08 gallons of retarder per sack of cement and a slurry using .09 gallons of retarder per sack of cement.

100.    The allegations contained in Paragraph 100 are denied.

101.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 101, except that HESI would admit that:  D-Air 3000 was an additive in the foam cement slurry used to cement the Macondo well's production

casing; it was identified as an additive in multiple customer reports and cementing program documents provided to BP prior to April 19, 2010; and the foam stability test performed prior to the cement job, which tested a slurry that contained D-Air 3000 as an additive, indicated that the foam cement slurry was stable.   In addition, the customer report provided to BP by Jesse Gagliano on April 26, 2010 speaks for itself.   Except as otherwise specifically admitted, HESI denies each and every other allegation contained in Paragraph 101.

102.   With regard to the allegations in Paragraph 102, HESI admits that on April 30, 2010, it issued a press release related to the Macondo well.   The press release and its substance speak for themselves.   Except as otherwise specifically admitted, HESI denies each and every other allegation contained in Paragraph 102.

103.   The allegations contained in Paragraph 103 are denied except HESI admits that on September 26, 2010, during testimony before the National Academies of Science, Tommy Roth stated on behalf of HESI, that "using rig cement, additives, and rig water, a stable foam cement system was designed, tested, delivered and quality assured on location" and that the "foam slurry passed all API 10B-4 9.3.4 requirements" because "the density of the cured foam slurry, using the Archimedes principle, was identical at top and bottom," indicating "no free water" and "no settling."  Except as otherwise specifically admitted, HESI denies each and every other allegation contained in Paragraph 103.

104.   HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 104, except HESI admits that: after the Incident, BP formed an internal investigation team and Jesse Gagliano was interviewed by the investigation team.   Any statements made by Jesse Gagliano or information provided by Jesse Gagliano speak for themselves, although any note prepared by BP of any interview may or may not be accurate.

105.    The allegations contained in Paragraph 105 are denied except HESI admits that BP's internal investigation team requested HESI's test results for the foam cement used on the Macondo well.  HESI is without sufficient knowledge or information to form a belief as to why BP requested HESI test results for the foam cement used on the Macondo well.

106.    The allegations contained in Paragraph 106 are denied, and any statements made by Jesse Gagliano or other HESI engineers or representatives speak for themselves.

107.    The allegations contained in Paragraph 107 are denied except HESI admits it possessed knowledge and expertise concerning cement slurry, design, formulation and foam cement design and formulation.

108.    The allegations contained in Paragraph 108 are denied.

109.    The allegations contained in Paragraph 109 are denied.

110.    The allegations contained in Paragraph 110 are denied.

111.    The allegations contained in Paragraph 111 are denied, except HESI admits that: oil and gas flowed from the Macondo well into the Gulf of Mexico until July 15, 2010; a response program was undertaken; and BP has publicly expressed an intention to pay legitimate OPA claims.

112.    The allegations contained in Paragraph 112 are admitted.

113.    The allegations contained in the complaint of the Department of Justice speak for themselves.

114.    The allegations contained in the complaint of the Department of Justice speak for themselves.

115.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 115.

116.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 116.

117.    Paragraph 117 is an incorporating paragraph and thus no response is required.

118.    The allegations contained in Paragraph 118 and its subparagraphs are denied.

119.    The allegations contained in Paragraph 119 are denied.

120.    The allegations contained in Paragraph 120 are denied.

121.    The allegations contained in Paragraph 121 are denied.

122.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 122 as to what BP would or would not have done. HESI denies each and every other allegation contained in Paragraph 122, including but not limited to, that HESI made any misrepresentations.

123.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 123 as to what BP would or would not have done. HESI denies each and every other allegation contained in Paragraph 123, including but not limited to, that HESI made any misrepresentations.

124.    The allegations contained in Paragraph 124 are denied.   To the extent the allegations in Paragraph 124 draw legal conclusions, no response is required.

125.    Paragraph 125 is an incorporating paragraph and thus no response is required.

126.    The allegations contained in Paragraph 126 and its subparagraphs are denied.

127.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 127 as to what BP would or would not have done. HESI denies that it concealed any material testing information from BP and/or that it failed to disclose relevant "failed test results" to BP.

128.    The allegations contained in Paragraph 128 are denied.

129.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 129 as to what BP would or would not have done. HESI denies that it concealed any relevant testing information from BP.

130.    HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 130 as to what BP would or would not have done. HESI denies that concealed any relevant testing information from BP.

131.    The allegations contained in Paragraph 131 are denied.   To the extent the allegations in Paragraph 131 draw legal conclusions, no response is required.

132.    Paragraph 132 is an incorporating paragraph and thus no response is required.

133.    The allegations contained in Paragraph 133 and its subparagraphs are denied.  To the extent the allegations contained in Paragraph 133 draw legal conclusions, no response is required.

134.    The allegations contained in Paragraph 134 are denied.   To the extent the allegations in Paragraph 134 draw legal conclusions, no response is required.

135.    Paragraph 135 is an incorporating paragraph and thus no response is required.

136.    The Oil Pollution Act of 1990, 33 U.S.C. § 2709, is a statute, the terms of which speak for themselves.

137.    The allegations contained in the complaint of the Department of Justice speak for themselves.

138.    The allegations contained in Paragraph 138 are denied.

139.    The allegations contained in Paragraph 139 are admitted.

140.   The allegations contained in Paragraph 140 are denied.   To the extent the allegations contained in Paragraph 140 draw legal conclusions, no response is required.

141.   The allegations contained in Paragraph 141 are denied.   To the extent the allegations contained in Paragraph 141 draw legal conclusions, no response is required.

142.   The allegations contained in Paragraph 142 are denied.

143.   The allegations contained in Paragraph 143 are denied.

144.   The allegations contained in Paragraph 144 are denied, except HESI admits that an actual controversy exists between it and BP pertaining to the *Deepwater Horizon* and any potential liability for the *Deepwater Horizon* incident.   To the extent the allegations contained in Paragraph 144 draw legal conclusions, no response is required.   Except as otherwise specifically admitted, HESI denies each and every other allegation contained in Paragraph 144.

145.   Paragraph 145 is an incorporating paragraph and thus no response is required.

146.   The Oil Pollution Act of 1990, 33 U.S.C. § 2709, is a statute, the terms of which speak for themselves.

147.   HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 147.

148.   HESI is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 148.

149.   The allegations contained in Paragraph 149 are denied.

150.   The allegations contained in Paragraph 150 are denied.

151.   The allegations contained in Paragraph 151 are denied.

152.   The allegations contained in Paragraph 152 are denied.

153.   The allegations contained in Paragraph 153 are denied.

154.    HESI denies the allegations in BP's prayer for relief, including subparagraphs 1-13.

## AFFIRMATIVE DEFENSES TO BP'S COMPLAINT

WHEREFORE, HESI respectfully requests that the Court dismiss BP's Complaint in this proceeding because:

### FIRST AFFIRMATIVE DEFENSE

Any injury, damage or loss sustained by BP was proximately caused by and/or contributed to by BP's own gross, sole, contributory or comparative negligence and/or the willful misconduct of BP or its alleged servants, employees, agents or anyone for whom BP is legally responsible and by BP failing to take precautions against foreseeable acts or omissions of others. Under any applicable law, recovery by any claimant for any damages proximately caused by any alleged conduct for which HESI may be held liable is to be reduced and/or allocated to reflect the contributory fault of others.

### SECOND AFFIRMATIVE DEFENSE

HESI asserts the defenses of set off, recoupment, payment and release, and further asserts that it is entitled to a credit for any and all monies paid by third-party defendants, cross-defendants, co-defendants, a collateral source, and/or that BP receives from any source as compensation for alleged losses.

### THIRD AFFIRMATIVE DEFENSE

The damages referred to in BP's Complaint were not caused or contributed to in any way by HESI, its alleged servants, employees, agents, or anyone for whom HESI is legally responsible.

## FOURTH AFFIRMATIVE DEFENSE

The incident and resulting alleged damages that are the subject of BP's Complaint were caused in whole or in part by the sole or comparative fault, negligence, breach of contract, breach of warranty, statutory and/or regulatory violations, and other actions of other persons or entities for whom HESI is not legally responsible and over which HESI had no control and/or the willful misconduct of BP or its alleged servants, employees, agents or anyone for whom BP is legally responsible and by BP failing to take precautions against foreseeable acts or omissions of others.

## FIFTH AFFIRMATIVE DEFENSE

The actions of others for whom HESI is not legally responsible and over which HESI had no control are the superseding, supervening, and/or intervening causes of BP's alleged damages, and, therefore, BP may not recover from HESI as a matter of law and all such Claims are barred in whole or in part by superseding and intervening causation and because of the willful misconduct of BP or its alleged servants, employees, agents or anyone for whom BP is legally responsible and by BP failing to take precautions against foreseeable acts or omissions of others.

## SIXTH AFFIRMATIVE DEFENSE

HESI did not owe any duty or warranty, either express or implied, to BP and did not breach any such duty.

## SEVENTH AFFIRMATIVE DEFENSE

At all material times, HESI acted with due diligence and reasonable care and did not breach any duty owed to BP.  HESI is not liable under OPA or maritime law.

## EIGHTH AFFIRMATIVE DEFENSE

HESI pleads the negligence, superseding negligence and/or breach of duty of Transocean, and third parties, and the unseaworthiness of the *Deepwater Horizon* as the proximate cause of the blowout, explosions, fire and oil spill.

## NINTH AFFIRMATIVE DEFENSE

While denying that it is liable for any claim relating to oil spill recovery, HESI states that its potential liability with respect to such claims for oil spill recovery is limited by OPA.  33 U.S.C. § 2702(d)(2).  In addition, to the extent Plaintiffs and/or Claimants have not complied with OPA's mandatory presentment requirements, any claim for indemnification and/or contribution for such claims likewise fails.

## TENTH AFFIRMATIVE DEFENSE

OPA displaces and/or preempts BP's claims with respect to its oil spill damages or otherwise.  HESI is not a Responsible Party as that term is defined in  OPA; OPA limits or eliminates BP's alleged right to recover for certain economic loss claims; OPA does not provide for or allow the recovery of punitive or exemplary damages, and OPA does not provide for or allow the imposition of joint and several liability.

## ELEVENTH AFFIRMATIVE DEFENSE

Although HESI continues to assert that state law is inapplicable to the instant litigation, to the extent that any state's "mini-OPA" statutory scheme is found applicable, HESI's liability is limited thereby, and HESI asserts any and all defenses available to it under such mini-OPA statutory scheme.

## TWELFTH AFFIRMATIVE DEFENSE

BP has failed to plead, and cannot satisfy, conditions precedent to recovery.

- 27 -

## THIRTEENTH AFFIRMATIVE DEFENSE

With respect to claims for purely economic losses and/or claims lacking a physical injury to a proprietary interest, recovery against HESI is barred in whole or in part pursuant to *Robins Dry Dock & Repair Co. v. Flint*, 271 U.S. 303 (1927), and by the economic loss doctrine.

## FOURTEENTH AFFIRMATIVE DEFENSE

To the extent the damages sought are too speculative and/or remote, BP may not recover on its claims.

## FIFTEENTH AFFIRMATIVE DEFENSE

The injuries and resulting damages alleged to have been suffered by the BP were not foreseeable as a matter of law.

## SIXTEENTH AFFIRMATIVE DEFENSE

BP has not reasonably mitigated its damages.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Any affirmative defenses pleaded by the other defendants and not pleaded by HESI are incorporated herein to the extent such defenses do not conflict with HESI's claims or affirmative defenses.

## EIGHTEENTH AFFIRMATIVE DEFENSE

HESI asserts any other defenses to which it may be entitled to under Fed. R. Civ. P. 8(c).

## NINETEENTH AFFIRMATIVE DEFENSE

Pursuant to the mandatory forum selection clause in the Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services in the Gulf of Mexico, dated April 15, 2009, any claims for fraud and/or fraudulent concealment should be dismissed because the venue provision mandates venue in the state courts of Harris County, Texas.

### TWENTIETH AFFIRMATIVE DEFENSE

BP's claims for fraud and fraudulent concealment should be dismissed because they are more properly asserted as compulsory counterclaims in HESI's lawsuit against BP filed April 19, 2011 in the 157th Judicial District Court of Harris County, Texas, Cause Number 2011-23914, styled *Halliburton Energy Services, Inc. v. BP Exploration and Production, Inc.*

### TWENTY-FIRST AFFIRMATIVE DEFENSE

The Economic and Property Damages Settlement Agreement and the Medical Benefits Class Action Settlement Agreement, (together, the "Settlement Agreements"), between BP and the Plaintiffs fail to fully release all non-settling Defendants, including HESI. Accordingly, no contribution claim can be asserted against HESI.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

No contribution claim can be maintained without strict compliance with the presentment requirement of OPA. Any waiver of such presentment by BP is voluntary and without HESI's consent.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

No contribution claim can be maintained where BP waived proof of causation for individual claims underlying the contribution claim.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

By the terms of the Settlement Agreements, settling Plaintiffs expressly agree that they have been fully compensated for all compensatory damages. Further, HESI is entitled to indemnification from BP for compensatory damage claims, and settling Plaintiffs are precluded from collecting any compensatory damage claims against HESI in light of BP's indemnity obligations. As a result of these proposed settlement terms, no contribution claims exist against

HESI.  In addition, to the extent BP purports to assign to settling Plaintiffs any contribution claim for punitive damages paid by BP, such assignment is void.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

The Settlement Agreements attempt to toll the statutes of limitation.  BP's voluntary agreement to toll the statute of limitations as to claims against BP will improperly increase the amount of contribution ultimately sought from HESI.  No contribution claim can be maintained for any portion of the claim that is attributable to BP's waiver of the statute of limitations without HESI's consent.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

BP's purported assignment of claims to settling Plaintiffs is invalid.  By the terms of the Settlement Agreements, BP expressly agrees that if its purported assignment of claims is declared invalid, it will not to pursue the claims made the subject of the purported assignment. Therefore, BP has waived any right to recover on any of the purportedly assigned claims.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

No contribution claim can be maintained for any amount above the appropriate cap under OPA.  Any waiver of such cap by BP is voluntary and without HESI's consent.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

As a matter of law, BP is not entitled to contribution or indemnification, whether contractual or equitable, for any fines or penalties assessed against it under the Clean Water Act or any other statute allowing for the imposition of fines and penalties.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

No contribution claim can be maintained for any amount resulting from BP's failure to mitigate damages.

- 30 -

## THIRTIETH AFFIRMATIVE DEFENSE

To the extent BP agrees by the terms of the Settlement Agreements to make any payment beyond its legal obligation, such payment is voluntary, and HESI is not liable to BP and/or the settling Plaintiffs for contribution based on any such payment.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

To the extent any payment made by BP pursuant to the terms of the Settlement Agreements is determined to be unreasonable, HESI is not liable to BP and/or settling Plaintiffs for contribution based on any such payment.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

By the terms of the Settlement Agreements, BP purports to assign to settling Plaintiffs certain claims against HESI.  Any such assignment is void, unenforceable, and of no effect based upon the provisions of the contract between BP and HESI governing performance of work in the Gulf of Mexico, generally, and work performed on the Macondo well, specifically.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

To the extent settling Plaintiffs purport to assert claims by way of assignment from BP, which purported assignment is invalid, HESI is entitled to indemnity from BP for any such claims.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

To the extent settling Plaintiffs purport to assert claims by way of assignment from BP, which purported assignment is invalid, BP has previously released those claims against HESI, thus negating any purported assignment of such claims.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

By the terms of the Settlement Agreements, BP purports to assign to settling Plaintiffs punitive and exemplary damages.   As a matter of law, any such assignment is void, unenforceable, and of no effect.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

The terms of the Settlement Agreements prevent the determination or calculation of actual compensatory damages paid to the settling Plaintiffs, individually or collectively.  Lack of a verifiable compensatory basis renders calculation of contribution claims and/or alleged exemplary and punitive damages impossible.  Accordingly, amounts paid pursuant to the Settlement Agreements cannot serve as the basis for any claims for contribution or exemplary and punitive damages against HESI.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

Neither BP nor the settling Plaintiffs are entitled to contribution for any punitive damages paid by BP to settling Plaintiffs.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

The Settlement Agreements will improperly align the interests of BP and the settling Plaintiffs in any subsequent trial on liability in this Court.  The Settlement Agreements will incentivize settling Plaintiffs to change their strategic posture to minimize any determination of BP's share of liability and argue for a greater share of liability by other Defendants, including HESI, and will prevent a true arms length adversarial trial.   Accordingly, the Settlement Agreements will encourage a determination of liability by the defending parties based upon a collusive alliance between BP and the settling Plaintiffs rather than the factual merits of the dispute.

### THIRTY-NINTH AFFIRMATIVE DEFENSE

While no award of punitive damages is proper against HESI, any such award must nonetheless satisfy all applicable standards for propriety and amount of the award.

### FORTIETH AFFIRMATIVE DEFENSE

Because HESI is not a party to the Settlement Agreements, the Settlement Agreements in no way affect HESI's procedural or substantive rights, and may not be used in any way to HESI's prejudice.

### FORTY-FIRST AFFIRMATIVE DEFENSE

HESI reserves the right to amend its answer and other affirmative defenses as discovery proceeds and as more specific allegations are asserted against it.

### FORTY-SECOND AFFIRMATIVE DEFENSE

BP has failed to state a claim upon which relief may be granted.

### FORTY-THIRD AFFIRMATIVE DEFENSE

HESI would assert any combination of the foregoing first through forty-second affirmative defenses.

WHEREFORE, PREMISES CONSIDERED, HESI prays that its First Amended Answer be deemed good and sufficient, that after due proceedings there be judgment denying BP's Complaint with all costs to be borne by BP; and for such other relief to which HESI may show itself to be justly entitled.

### DEMAND FOR TRIAL BY JURY

Subject to and without waiving its previously filed Motions to Dismiss, HESI respectfully demands trial by jury of all issues triable of right by a jury in this case pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  October 11, 2012

Respectfully submitted,

**GODWIN RONQUILLO PC**

/s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
ayork@GodwinRonquillo.com
Jerry C. von Sternberg
jvonsternberg@GodwinRonquillo.com
Misty Hataway-Coné
mcone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Halliburton Energy Services, Inc.'s First Amended Answer to BP's Cross-Complaint and Third-Party Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 11th day of  October 2012.

/s/ Donald E. Godwin
Donald E. Godwin