UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:**  Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010<br><br>**This document applies to:**<br>**ALL CASES** | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

### DEFENDANT TRANSOCEAN'S AMENDED MOTION FOR ADVERSE INFERENCES BASED ON BP EMPLOYEES' REFUSAL TO TESTIFY

COME NOW Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean"), by and through their undersigned counsel, and following the Court's August 13, 2012 Order regarding Briefing for Adverse Inference Motion (Rec. Doc. 7107), Transocean amends its motion for adverse inferences, previously filed on February 24, 2012 (Rec. Doc. 5879). Transocean continues to request that the Court draw the same adverse inferences from the refusal to testify by BP employee Mark Hafle that it sought in its February 24 motion and has incorporated those inferences below. In addition, Transocean moves for additional adverse inferences based on BP employees Mark Hafle, Robert Kaluza, and Brian Morel's refusal to testify.

**I.   Introduction**

As set forth in Transocean's Motion in Limine to Preclude Any Adverse Inferences Against Transocean (Rec. Doc. 5111), adverse inferences may be drawn against a party based on a non-party-witness's invocation of the Fifth Amendment only in narrow circumstances.  In

considering whether to draw an adverse inference against a party based on a non-party's refusal to testify, the "overarching concern" is to determine "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for truth." *Libutti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997). In making this determination, courts generally consider (1) the nature of the relationship; (2) the degree of control of the party over the non-party; (3); the compatibility of the interests of the party and the non-party in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. *Id.* at 123-24. Because of the need for trustworthiness in drawing any adverse inference, a court may not draw an adverse inference without some corroborating evidence to support the point; nor may a court draw adverse inferences based on a refusal to answer self-serving questions, questions outside a witness's personal knowledge, questions that are ambiguous or overly broad, questions that would elicit inadmissible evidence, or questions that seek legal conclusions. (Rec. Doc. 5111, at 4-8 [collecting authorities].) Moreover, each adverse inference must be evaluated on a question-by-question basis. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000).

In light of these principles, Transocean seeks a limited number of adverse inferences from the refusal to answer questions by three BP witnesses, Hafle, Kaluza, and Morel. These witnesses had substantial responsibility at BP over the Macondo well, the unanswered questions from which adverse inferences should be drawn sought specific admissible testimony about areas in which these witnesses' interests are aligned with BP's and where they would have personal knowledge. In particular, the questions relate to these witnesses' mishandling of cementing decisions on behalf of BP and to their mishandling of the negative pressure test on April 20, 2010. The Court should draw the adverse inferences set forth below based on these BP employees' refusal to testify on Fifth Amendment grounds.

## II.    Inferences from Mark Hafle's Assertion of the Fifth Amendment

Mark Hafle was BP's senior drilling engineer in charge of daily operations for the Macondo well. (*See* TREX #4454.) He was working in his Houston office on the night of April 20, 2010. (TREX #4447.) At 8:52 p.m. that evening, Hafle spoke with the BP well-site leader aboard the *DEEPWATER HORIZON*, Don Vidrine, about the negative pressure test. (TREX #3575.) Vidrine reported results showing zero pressure on the kill line, but pressure on the drill pipe. (TREX #4447.) Although Hafle told Vidrine that, "You can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly lined up," neither man stopped work, and the Transocean drill crew was instructed to continue with well displacement. (*Id.*) Neither Hafle nor Vidrine has testified in this proceeding about this April 20, 2010 telephone discussion. To date, Vidrine has refused to testify due to alleged health issues.[1] At his July 22, 2011 deposition, Hafle invoked the Fifth Amendment in response to all questions.

Transocean continues to ask the Court to draw adverse inferences based upon Hafle's assertion of his Fifth Amendment privilege with respect to the following specific questions relating to the negative pressure test. As a senior drilling engineer in charge of daily operations for the Macondo Well and as a participant in the phone call and events to which these following questions relate, Hafle had personal knowledge about the negative pressure test and could speak about it on behalf of BP. Transocean accordingly seeks adverse inferences from the following questions, all of which sought admissible evidence within Hafle's knowledge:

---

[1] This Court ordered Vidrine to submit to an independent medical review, and Vidrine appealed from that order (C.A. No. 12-30237). On October 9, 2012, the Fifth Circuit issued a notice that oral argument is tentatively scheduled for the week of December 3, 2012. Transocean reserves the right to supplement this motion if Vidrine is deposed and invokes the Fifth Amendment.

3

1. So you knew sir, did you not, that the rig was reporting pressure on the drill pipe at the conclusion of the negative test, didn't you? (Deposition of Mark Hafle, July 22, 2011, at 31:7-10) **[Yes.]**[2]

2. [Y]ou knew, sir, there shouldn't have been any pressure on the drill pipe on the negative test; isn't that correct, sir? (*Id.* at 31:13-16) **[Yes.]**

3. In fact, you told Mr. Vidrine that you can't have pressure on the drill pipe and a zero pressure on the kill line in a test that's properly lined up, didn't you? (*Id.* at 31:19-23) **[Yes.]**

4. And, sir, you let operations go forward on the rig at that time, didn't you, sir? (*Id.* at 32:18-20) **[Yes.]**

5. And you let them complete a displacement of the riser, didn't you, sir? (*Id.* at 32:23-24) **[Yes.]**

The Court should also draw an additional inference based on Hafle's assertion of his Fifth Amendment privilege with respect to one question relating to cementing. Again, as a senior drilling engineer in charge of daily operations at the Macondo well, Hafle had personal knowledge about the actions taken by his team with respect to the cementing of the well, and his interest in the matter is no different than BP's. Transocean accordingly seeks the following adverse inference:

6. [Y]our team approved of the manner and type of cement that were to be used on the Macondo well, particularly in the final cement job; is that correct, sir? (*Id.* at 49:2-5) **[Yes.]**

### III. Inferences from Robert Kaluza's Assertion of the Fifth Amendment

Robert Kaluza, along with Don Vidrine, was a well-site leader on the rig and reported directly to John Guide. (Deposition of Brett Cocales, Apr. 25, 2011, at 361:12-21.) Kaluza was on the rig on April 20, 2010. (*Id.* at 186:24-187:4.) Kaluza made the decision to monitor negative pressure test results on the kill line, after the crew had began to monitor the drill pipe.

---

[2] For clarity, the answer Transocean seeks to infer for each question is bracketed and bolded after each question and deposition citation.

4

(Deposition of Lee Lambert, May 9, 2011, at 332:10-15.)  During his deposition on July 11, 2011, Kaluza refused to answer any questions, asserting his Fifth Amendment privilege.

As the well-site leader, Kaluza had personal knowledge and aligned interest with BP as to specific facts relating to cementing and the negative pressure test.  The Court should draw inferences based on Kaluza's assertion of his Fifth Amendment privilege with respect to the following questions, all of which sought specific admissible evidence within Kaluza's personal knowledge:

1. [Y]ou know in your experience as a BP Well Leader that four barrels per minute is less than an optimal rate of cement flow, don't you? (Deposition of Robert Kaluza, July 11, 2011, at 28:24-29:2) **[Yes.]**

2. In fact, you know it was very—it was a very ineffective rate of flow to ensure a good cement job, isn't that correct, sir?  (*Id.* at 29:24-30:2) **[Yes.]**

3. Yet, BP and you endorsed such a flow rate, correct? (*Id.* at 30:5-6) **[Yes.]**

4. Although you knew at the time that you had concerns about the flow rate, correct, sir? (*Id.* at 30:14-16) **[Yes.]**

5. [D]id you ever receive a report or confirm for yourself that the foam cement that Halliburton had mixed for the well was adequate for the pressure and heat present at the bottom of the Macondo Well, sir? (*Id.* at 37:6-11) **[No.]**

6. Isn't it true that the rig crew told you that they normally conducted negative tests on the pipe? (*Id.* at 148:13-15) **[Yes.]**

7. Do you deny that the Transocean rig crew was addressing the issues created by the pressure readings on the drill pipe during the negative test? (*Id.* at 217:15-18) **[No.]**

8. Well Site Leader Don Vidrine arrived during the discussion, and rather than complete the test on the drill pipe, Mr. Vidrine instructed the Transocean crew to line up the test with a kill line, isn't that correct? (*Id.* at 217:21-218:1) **[Correct.]**

9. Do you deny that the Well Site Leader makes the final decision regarding whether the negative test has passed or failed? (*Id.* at 219:13-16) **[No.]**

**IV.     Inferences from Brian Morel's Assertion of the Fifth Amendment**

Brian Morel was a drilling engineer for the Macondo well who worked in BP's Houston office. (Deposition of Gregory Stephen Walz, Apr. 21, 2011, at 102:22-103:4.) Morel was responsible for developing the Macondo well plan. (*Id.* at 109:25-110:3.) Morel sent an email on April 15, 2010, distributing an MMS approved drilling permit and a temporary abandonment procedure. (Deposition of Patrick O'Bryan, July 15, 2011, Ex. 565.) Morel was also involved in planning the negative pressure test. (Deposition of Brett Cocales, Apr. 26, 2011, at 708:22-709:5.) During his July 21, 2011 deposition, Morel refused to answer any questions, asserting his Fifth Amendment privilege.

As a drilling engineer with responsibility for Macondo who was specifically involved with developing the drilling plan and planning the negative pressure test, Morel has both personal knowledge about the issues addressed in the questions below and could have testified reliably as to these issues as a BP employee with responsibility for Macondo. Accordingly, the Court should draw adverse inferences based on Morel's assertion of his Fifth Amendment privilege with respect to the following questions, which sought specific admissible evidence within Morel's personal knowledge:

**1.**     Did you also receive, on the 18th of April, a casing design report stating that if only seven centralizers were used, that there would be a severe gas problem? (Deposition of Brian Morel, July 21, 2011, at 52:16-19) **[Yes.]**

**2.**     [Y]ou were aware that it was a requirement within BP that lab tests be reviewed before a cement job was pumped, correct? (*Id.* at 89:18-21) **[Yes.]**

**3.**     [Y]ou . . . allowed the cement for the production casing to be pumped and performed and allegedly completed without first receiving and reviewing all of the lab tests for the production casing, correct? (*Id.* at 89:24-90:4) **[Yes.]**

**4.**     You did not notify the MMS that the Temporary Abandonment Procedure used on April 20th, 2010, deviated from the Temporary Abandonment

6

    Procedure approved by the MMS, didn't you? (*Id.* at 116:19-23) **[No, I did not.]**

5.  You did not tell Transocean that the Transo—the Temporary Abandonment Procedure used on April 20, 2010, deviated from the Temporary Abandonment Procedure approved by the MMS, did you? (*Id.* at 117:1-5) **[No, I did not.]**

6.  Did Transocean play any part in the decision not to run a bottoms-up? (*Id.* at 119:16-17) **[No.]**

7.  Did Transocean have any involvement in deciding how much cement to pump? (*Id.* at 120:12-13) **[No.]**

8.  You would agree that Transocean had no involvement in deciding how slow or fast to pump the cement? (*Id.* at 120:15-17) **[Yes.]**

9.  You never told anyone at Transocean that the only stability test you ever got from [Jesse] Gagliano showed that the cement was unstable, did you? (*Id.* at 121:6-9) **[No.]**

10.  You never told anyone at Transocean that you never got a good stability test for the cement, did you? (*Id.* at 121:13-15) **[No.]**

11.  Transocean had no involvement in BP's decision not to run a cement bond log, correct? (*Id.* at 123:5-7) **[Correct.]**

12.  You agree that Transocean had no involvement in BP's decision to run a long string instead of a liner? (*Id.* at 136:23-25) **[Yes.]**

13.  You never completed the checklist required by BP's Guidelines for Cement Design, did you? (*Id.* at 208:22-24) **[No, I did not.]**

## V.  Conclusion

  For the foregoing reasons, this Court should draw adverse inferences from the witnesses' refusals to answer the specific questions set forth above.

Dated: October 12, 2012             Respectfully submitted,

| By: s/ Brad D. Brian | By: s/ Steven L. Roberts |
|---|---|
| Brad D. Brian | Steven L. Roberts |
| Michael R. Doyen | Rachel Giesber Clingman |
| Allen M. Katz | SUTHERLAND ASBILL & BRENNAN LLP |
| Daniel B. Levin | 1001 Fannin Street, Suite 3700 |
| MUNGER TOLLES & OLSON LLP | Houston, Texas 77002 |
| 355 So. Grand Avenue, 35th Floor | Tel: (713) 470-6100 |

| | |
|---|---|
| Los Angeles, CA 90071<br>Tel: (213) 683-9100<br>Fax: (213) 683-5180<br>Email: brad.brian@mto.com<br>            michael.doyen@mto.com<br>            allen.katz@mto.com<br>            daniel.levin@mto.com | Fax: (713) 354-1301<br>Email: steven.roberts@sutherland.com,<br>            rachel.clingman@sutherland.com<br><br>By:  s/ Kerry J. Miller<br>Kerry J. Miller<br>FRILOT, LLC<br>110 Poydras St., Suite 3700 |
| By:  s/ Edwin G. Preis<br>Edwin G. Preis, Jr.<br>PREIS & ROY PLC<br>Versailles Blvd., Suite 400<br>Lafayette, LA 70501<br>(337) 237-6062<br>  and<br>601 Poydras Street, Suite 1700<br>New Orleans, LA 70130<br>(504) 581-6062 | New Orleans, LA 70163<br>Tel: (504) 599-8194<br>Fax: (504) 599-8154<br>Email: kmiller@frilot.com<br><br>John M. Elsley<br>ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP<br>711 Louisiana Street, Suite 500<br>Houston, TX 77002<br>(713) 224-8380 |

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC,* and *Triton Asset Leasing GmbH.*

**CERTIFICATE OF SERVICE**

    I hereby certify that on October 12, 2012, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

                                                   /s/ Kerry J. Miller