# EXHIBIT B-1
# MARK HAFLE

01-37507
TB

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG          )          MDL NO.  2179
"DEEPWATER HORIZON" in the          )
GULF OF MEXICO,  on          )          SECTION: J
APRIL 20, 2010          )
          )          JUDGE BARBIER
          )
          )          MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Mark Hafle

**VOLUME 1**

JULY 22, 2011

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

**21**

1    MR. SCHWARTZ: Objection, form.
2    A.    Same answer.
3    Q.    And, sir, you and your team also
4  knew that you had a narrow window to get a
5  successful cement job; is that correct?
6    MR. MORRISS: Object to form.
7    A.    Same answer.
8    Q.    Okay.  And, sir, I direct your
9  attention to this second to last paragraph
10  on -- or the last full paragraph on page 2
11  where it states, although the team understood
12  they had a narrow window to get a successful
13  cement job, they thought it would be
14  manageable, based upon Halliburton model
15  output.
16         Is that what you told the
17  members of the investigation team?
18    A.    Same answer.
19    MR. SCHWARTZ: Objection, form.
20    Q.    And so, sir, your reliance in
21  terms of running a long-string and doing a
22  cement job -- doing a successful cement job
23  was based upon Halliburton model outputs, was
24  it not?
25    MR. MORRISS: Objection, form.

**22**

1    MR. SCHWARTZ: Objection, form.
2    A.    Same answer.
3    Q.    And that's what you told this
4  investigative committee in July of 2010,
5  isn't it, sir?
6    MR. SCHWARTZ: Objection, form.
7    A.    Same answer.
8    Q.    And, in fact, you and Mr. Brian
9  Morel were the lead BP cement program
10  engineers on this job, were you not?
11    A.    Same answer.
12    Q.    And, in fact, you told that on
13  page 3 to the investigative committee, did
14  you not?
15    A.    Same answer.
16    Q.    You didn't lie to the
17  investigative committee, did you, sir?
18    A.    Same answer.
19    MR. MORRISS: Object to form.
20    Q.    And, sir, it is a fact that on
21  the final cement job, you do not recall
22  seeing any lab test results from Jesse
23  Gagliano that were run on the slurry that was
24  used on the final cement job, did you?
25    MR. MORRISS: Objection, form.

**23**

1    MR. SCHWARTZ: Objection, form.
2    A.    Same answer.
3    Q.    And, sir, in fact, you stated
4  that to the investigators, didn't you?
5    A.    Same answer.
6    Q.    And, in fact, you stated that
7  you did not recall seeing any lab test
8  results from Jesse on the last cement test
9  run on the slurry.
10         Is that what you told the
11  investigators?
12    A.    Same answer.
13    Q.    And isn't it a fact, sir, that
14  lab tests were usually run on slurries that
15  you do on cement jobs?
16    A.    Same answer.
17    Q.    And isn't it a fact, sir, that
18  it is -- it was good practice to review such
19  lab results prior to the cement job being
20  finished; is that correct, sir?
21    MR. MORRISS: Form.
22    A.    Same answer.
23    Q.    Now, sir, you -- you went on to
24  state that you had prepared a decision tree
25  regarding the final T&A of the well; is that

**24**

1  correct, sir?
2    A.    Same answer.
3    Q.    And you reduced that decision
4  tree logic to what are called drilling --
5  DWOP; is that correct?
6    A.    Same answer.
7    Q.    And, sir, part of -- was part of
8  that decision tree a cement bond log?
9    A.    Same answer.
10    Q.    And who, sir, decided that a
11  cement bond log would or would not be run on
12  the final cement job?
13    A.    Same answer.
14    Q.    Now, sir, you told the
15  investigative committee that you had
16  discussions relating to DWOP zonal isolation
17  requirements, didn't you?
18    A.    Same answer.
19    MR. MORRISS: Form.
20    Q.    And that -- that you were
21  consulted on the -- that they asked you the
22  question about whether or not the casing
23  cement was above the top hydrocarbon bearing
24  layer -- bearing zone pursuant to BP policy,
25  didn't they?

6 (Pages 21 to 24)

**PURSUANT TO CONFIDENTIALITY ORDER**

29

1    Q.    And you knew, sir, that
2  Mr. Kaluza was new to this wellsite, did you
3  not?
4        MR. MORRISS: Form.
5    A.    Same answer.
6    Q.    And you knew that Mr. Kaluza had
7  substituted on arriving at the DEEPWATER
8  HORIZON on April 16th, 2010, to replace Murry
9  Sepulvado, did you not?
10    A.    Same answer.
11    Q.    And the reason -- and you knew,
12  sir, that Mr. Kaluza was not familiar with
13  this particular well, the Macondo well; is
14  that correct?
15        MR. MORRISS: Form.
16    A.    Same answer.
17    Q.    And you knew, sir, that
18  Mr. Kaluza had problems with the -- with the
19  flow rate in which the cement was pumped in
20  the well, do you not?
21        MR. MORRISS: Form.
22    A.    Same answer.
23    Q.    And you know, sir, that his
24  concern was that you weren't going to get a
25  proper good cement job at the flow rate that

31

1    a weight test.
2        Mark noted that Don also talked
3  to him about the negative test.  Vidrine told
4  Mark that the crew had zero pressure on the
5  kill line, but they still had pressure on the
6  drill pipe.
7        So you knew -- you knew, sir,
8  did you not, that the rig was reporting
9  pressure on the drill pipe at the conclusion
10  of the negative test, didn't you?
11        MR. MORRISS: Form.
12    A.    Same answer.
13    Q.    And you knew, sir, there
14  shouldn't have been any pressure on the drill
15  pipe on the negative test; isn't that
16  correct, sir?
17        MR. MORRISS: Form.
18    A.    Same answer.
19    Q.    In fact, you told Mr. Vidrine
20  that you can't have pressure on the drill
21  pipe and a zero pressure on the kill line in
22  a test that's properly lined up, didn't you?
23        MR. MORRISS: Form.
24    A.    Same answer.
25    Q.    And, in fact, the report -- the

30

1  was being used, correct, sir?
2        MR. MORRISS: Form.
3    A.    Same answer.
4    Q.    And you knew that Mr. Kaluza
5  also had some problems with the
6  negative-pressure test, did you not, sir?
7        MR. MORRISS: Form.
8    A.    Same answer.
9    Q.    And, in fact, you spoke to
10  Mr. Vidrine, also, about the
11  negative-pressure test, did you not?
12        MR. MORRISS: Form.
13    A.    Same answer.
14    Q.    And you knew that Mr. Vidrine
15  had some problems with the negative-pressure
16  test, did you not, sir?
17        MR. MORRISS: Form.
18    A.    Same answer.
19    Q.    And, in fact, you told the
20  investigators, noting page 6 of your
21  statement, sir -- of the interview notes,
22  sir, that later on April 20th, Don Vidrine
23  called Mark at 8:52 p.m., to talk about how
24  the test -- how to test the surface plug and
25  whether they should apply a pressure test or

32

1  interview note states specifically that,
2  quote, Mark said he told Don that you can
3  have pressure on the drill pipe and a zero
4  pressure on the kill line in the test that's
5  properly lined up.
6        Is that what you told the
7  interviewer, sir?
8    A.    Same answer.
9    Q.    And is that what you told
10  Mr. Vidrine, sir?
11    A.    Same answer.
12    Q.    And so you knew, sir, sitting
13  at -- onshore at BP at the headquarters, that
14  the negative-pressure test was not
15  successful, didn't you, sir?
16        MR. MORRISS: Form.
17    A.    Same answer.
18    Q.    And, sir, you let operations go
19  forward on the rig at that time, didn't you,
20  sir?
21        MR. MORRISS: Form.
22    A.    Same answer.
23    Q.    And you let them complete a
24  displacement of the riser, didn't you, sir?
25        MR. MORRISS: Form.

**PURSUANT TO CONFIDENTIALITY ORDER**

41

1    A.   Same answer.
2    Q.   Have you reviewed these
3  interview notes, sir?
4    A.   Same answer.
5    Q.   Are they accurate -- are they
6  accurate in terms of the information that you
7  provided the individual who wrote down the
8  notes?
9    A.   Same answer.
10   Q.   I'm going to ask you to turn to
11 tab number 45, which I'm going to mark as
12 exhibit number 4451.
13   (Exhibit Number 4451 marked.)
14   Q.   These are interview notes --
15 these are notes with your name on the top,
16 dated 5-1-2010, and ask you if you've seen
17 this document before?
18   A.   Same answer.
19   Q.   Okay.  And, sir, this -- the
20 notes that are contained in here, are they
21 notes of an interview that you gave --
22   A.   Same answer.
23   Q.   -- on 5-1-2010?
24   A.   Same answer.
25   Q.   And, sir, are the -- do the

42

1  notes accurately set forth what you -- the
2  information that you gave the interviewer,
3  sir?
4    A.   Same answer.
5    Q.   And were you truthful, sir?
6    A.   Same answer.
7    Q.   I ask you to turn to tab
8  number 46, sir.  This purports to be a
9  May 2nd, 2010, interview with Mark Hafle,
10 senior drilling engineer at BP.
11       Have you seen this document
12 before, sir?
13   A.   Same answer.
14   Q.   Do you recall giving this
15 interview, sir?
16   A.   Same answer.
17   Q.   Is the information that's set
18 forth in these notes an accurate description
19 of the information that you provided the
20 interviewer, sir?
21   A.   Same answer.
22   Q.   Who was the interviewer, sir?
23   A.   Same answer.
24   Q.   Who was there, sir?
25   A.   Same answer.

43

1    Q.   Were you truthful, sir?
2    A.   Same answer.
3    MR. MORRISS:  Scott, did you mark that
4  as an exhibit?
5    MR. BICKFORD:  I did not yet.  It is
6  exhibit 4452.
7    (Exhibit Number 4452 marked.)
8    MR. BICKFORD:  Thank you.
9    Q.   Turn to tab -- sir, I ask you to
10 turn to tab 48.  Sir, tab 48 is a typed
11 version of a May 2nd, 2010 -- or purports to
12 be a typed version of a May 2nd, 2010,
13 interview with yourself, sir.
14       Do you recognize that document,
15 sir?
16   A.   Same answer.
17   Q.   I'm going to go ahead and mark
18 this as exhibit number 4453.
19   (Exhibit Number 4453 marked.)
20   Q.   And, sir, who was the -- this
21 interview with?
22   A.   Same answer.
23   Q.   And, sir, did you -- was it true
24 that the primary objective was -- on the
25 Macondo well, was to make it a discovery

44

1  well?
2    A.   Same answer.
3    Q.   And the secondary objective was
4  to make it a keeper well?
5    A.   Same answer.
6    Q.   Sir, did you tell the
7  interviewer that during logging, had a
8  week-long session on what casing to run?
9    A.   Same answer.
10   Q.   Did you tell the interviewer
11 that you were debating the pros and cons of a
12 liner?
13   A.   Same answer.
14   Q.   And did you tell the interviewer
15 that they could and should have run a cement
16 plug?
17   A.   Same answer.
18   Q.   And were you concerned, sir,
19 that the culture trained in 1989 didn't
20 support that?
21   A.   Same answer.
22   MR. MORRISS:  Form.
23   Q.   And, sir, what did you mean, was
24 the Lone-Wolf on wanting to do the P&A, David
25 Sims, John Guide, Morel, Doris Reiter --

11  (Pages 41 to 44)

**PURSUANT TO CONFIDENTIALITY ORDER**

45

1 that's R-e-i-t-e-r -- Brad Simpson?
2      A.   Same answer.
3      Q.   What does that mean, sir?
4      A.   Same answer.
5      Q.   And, ultimately, it was David
6 Sims who decided to do an MOC to run the
7 liner?
8      A.   Same answer.
9      Q.   Sir, was it a fact that in the
10 middle of deciding what the cement program
11 for this particular well was going to be,
12 that the system that was running the
13 simulations crashed?
14      MR. MORRISS:   Form.
15      A.   Same answer.
16      Q.   And, sir, you're not even sure
17 that the entire T&A process got a final MOC,
18 were you?
19      MR. MORRISS:   Form.
20      A.   Same answer.
21      Q.   Sir, were all the statements
22 that you made during that interview truthful
23 and correct?
24      A.   Same answer.
25      Q.   And, sir, were they taken down

46

1 accurately?
2      A.   Same answer.
3      Q.   Sir, have you given any other
4 statements?
5      A.   Same answer.
6      Q.   And, sir, have you been
7 interviewed by state or federal prosecutorial
8 agencies?
9      A.   Same answer.
10      Q.   That includes the U.S.
11 Attorney's Office or any state Attorney
12 General's Offices?
13      A.   Same answer.
14      Q.   Any local district attorneys?
15      A.   Same answer.
16      Q.   Have you been interviewed by any
17 federal or state agencies, such as the EPA or
18 the FBI?
19      A.   Same answer.
20      Q.   Have you been subpoenaed to
21 appear before a grand jury?
22      A.   Same answer.
23      Q.   Have you appeared before a grand
24 jury?
25      A.   Same answer.

47

1      Q.   Sir, as a result of the Macondo
2 well incident, have you been reprimanded by
3 BP?
4      A.   Same answer.
5      Q.   Sir, did you receive a bonus
6 payment for the year 2010 from BP?
7      A.   Same answer.
8      Q.   Sir, if you'll turn to tab 41,
9 please, white book.
10           I'll go ahead and mark that as
11 exhibit number 4454.
12           (Exhibit Number 4454 marked.)
13      Q.   Sir, this document purports to
14 be a PDP, or personal data profile, of Mark
15 Hafle.
16           Is that you, sir?
17      A.   Same answer.
18      Q.   Okay.  And is it correct that
19 your job title, as of January 2010 and during
20 the course of the drilling of the Macondo
21 well, was senior drilling engineer, sir?
22      A.   Same answer.
23      Q.   And is it true, sir, that you
24 worked for BP for 20 -- 23 years, sir?
25      A.   Same answer.

48

1      Q.   And is it true, sir, that you
2 worked in engineering roles in the Gulf of
3 Mexico and other places, sir?
4      A.   Same answer.
5      Q.   And, sir, did you fill out the
6 information in this particular personal data
7 profile?
8      A.   Same answer.
9      Q.   Are they true, sir?
10      A.   Same answer.
11      Q.   And, sir, as the senior drilling
12 engineer, your team had design of the well
13 control on the Macondo well, did it not?
14      A.   Same answer.
15      MR. MORRISS:   Form.
16      Q.   And you were responsible for
17 designing the Macondo well, were you not?
18      A.   Same answer.
19      Q.   And, sir, your team designed the
20 casing on the Macondo well, did it not?
21      A.   Same answer.
22      Q.   And your team approved of the
23 cementing job on the Macondo well, did it
24 not?
25      MR. MORRISS:   Form.

12  (Pages 45 to 48)

PURSUANT TO CONFIDENTIALITY ORDER

57

1   Q.   And, sir, is it not a fact that
2   such a change was being proposed under --
3   isn't it a fact, sir, that that change should
4   have been subjected to an MOC procedure?
5      MR. MORRISS: Form.
6   A.   Same answer.
7   Q.   And isn't it a fact that it
8   wasn't?
9   A.   Same answer.
10  Q.   And isn't it a fact there was no
11  risk assessment done on that, sir?
12     MR. MORRISS: Form.
13  A.   Same answer.
14     MR. BICKFORD: How much time do I have?
15     VIDEOGRAPHER: Seven minutes.
16     MR. BICKFORD: Why don't we break,
17  then.
18     VIDEOGRAPHER: Off the record at
19  9:26 a.m., ending tape 1.
20     (Off the record.)
21     VIDEOGRAPHER: Back on the record at
22  9:37 a.m., beginning tape 2.
23  BY MR. BICKFORD:
24  Q.   Mr. Hafle, the -- isn't it true
25  that you were an advocate of a process called

58

1   Fast Drill?
2   A.   Same answer.
3   Q.   And I'm going to ask you to turn
4   to -- I think it's tab -- it's in the white
5   book, sir, 32.
6      And, sir, I'm marking this as
7   exhibit number 4455.
8      (Exhibit Number 4455 marked.)
9   Q.   And, sir, this is your annual
10  individual performance assessment, is it not?
11  A.   Same answer.
12  Q.   And this is for the year
13  period -- review period of 2009; isn't that
14  correct, sir?
15  A.   Same answer.
16  Q.   At the end of 2009, you were
17  involved with the Macondo well, were you not,
18  sir?
19  A.   Same answer.
20  Q.   And, sir, your line manager was
21  David Sims in this particular case, was he
22  not, sir?
23  A.   Same answer.
24  Q.   And I direct your attention to
25  what is the last Bates number, 7264, of the

59

1   individual performance assessment, sir.
2      And note that you are
3   actually -- you are actually praised for
4   utilizing a Fast Drill method to minimize PAD
5   mud usage, were you not, sir?
6   A.   Same answer.
7   Q.   And that was on the Macondo
8   well, sir; isn't that true?
9      MR. MORRISS: Form.
10  A.   Same answer.
11  Q.   And you employed the Fast Drill
12  method on the Macondo well, didn't you, sir?
13  A.   Same answer.
14  Q.   And it was your decision as
15  senior drilling engineer to do that, sir,
16  wasn't it?
17     MR. MORRISS: Form.
18  A.   Same answer.
19  Q.   And, sir, in fact, Fast Drill
20  saved time and money, did it not, sir?
21     MR. MORRISS: Form.
22  A.   Same answer.
23  Q.   And sir, the Tiger Team at BP
24  was, in fact, in the lead group of
25  professionals working with BP on different

60

1   wells; is that not correct, sir?
2   A.   Same answer.
3   Q.   And the Tiger Team actually
4   reviewed your Fast Drill methods on the
5   DEEPWATER HORIZON Macondo well, did it not?
6   A.   Same answer.
7   Q.   And isn't it true, sir, that the
8   Tiger Team warned you against fast drilling
9   on the Macondo well, sir?
10     MR. MORRISS: Form.
11  A.   Same answer.
12  Q.   And isn't it true that the Tiger
13  Team warned you that fast drilling was
14  overrunning the ability to interpret
15  real-time data, sir?
16     MR. MORRISS: Form.
17  A.   Same answer.
18  Q.   And isn't that one of the
19  lessons learned from the March 2010 kick,
20  sir?
21     MR. MORRISS: Form.
22  A.   Same answer.
23  Q.   Sir, I'd ask you to look in the
24  black book under tab 19. Sir, this is an
25  e-mail chain which has been previously marked

PURSUANT TO CONFIDENTIALITY ORDER



**65**

1    MR. MORRISS: Form.
2    A.   Same answer.
3    Q.   Was he saying that you had to
4  reform your practices in order to drill a
5  Macondo-type well, sir?
6    MR. MORRISS: Form.
7    A.   Same answer.
8    Q.   Was one of Mr. Bellow's
9  recommendations to slow down the drilling
10  process, sir?
11    MR. MORRISS: Form.
12    A.   Same answer.
13    Q.   Sir, wasn't it a fact that the
14  Macondo well was far behind schedule?
15    A.   Same answer.
16    MR. MORRISS: Form.
17    Q.   Wasn't it a fact, sir, that the
18  Macondo well was far over cost?
19    MR. MORRISS: Form.
20    A.   Same answer.
21    Q.   And wasn't it true that your --
22  that you and the people on the drilling
23  engineering team were anxious to plug and
24  abandon this well and move on to the next
25  project?

**66**

1    MR. MORRISS: Form.
2    A.   Same answer.
3    Q.   And, sir, at the point that in
4  April of 2010 when your drill team was trying
5  to P&A this well, you were anxious to save
6  time and money, were you not?
7    MR. MORRISS: Form.
8    A.   Same answer.
9    Q.   And by not placing
10  21 centralizers in the well as recommended by
11  the Halliburton OptiCem model, you saved time
12  and money, did you not?
13    MR. MORRISS: Form.
14    A.   Same answer.
15    Q.   By not waiting for the results
16  of the foam stability test on the cement
17  slurry that was actually used in the well,
18  time and money was saved, wasn't it, sir?
19    MR. MORRISS: Form.
20    A.   Same answer.
21    Q.   By not using a spacer -- by
22  using a spacer from combined lost circulation
23  material to avoid transporting that material
24  off the rig into hazardous waste disposal,
25  you saved time and money, didn't you, sir?

**67**

1    MR. MORRISS: Form.
2    A.   Same answer.
3    MR. BRENNAN: Object to form.
4    Q.   And, sir, that combined lost
5  circulation material was never tested, was
6  it, sir?
7    MR. MORRISS: Form.
8    A.   Same answer.
9    Q.   And you didn't know what the
10  effect of using that spacer on -- in the well
11  would have been, did you, sir?
12    MR. MORRISS: Form.
13    MR. BRENNAN: Form.
14    A.   Same answer.
15    Q.   By the displacing the mud in the
16  riser before setting the surface cement plug,
17  BP saved time and money, did it not, sir?
18    MR. MORRISS: Form.
19    A.   Same answer.
20    Q.   By setting the cement plug
21  3,000 -- some 3300 feet below the mud line in
22  seawater, you saved time and money, didn't
23  you, sir?
24    MR. MORRISS: Form.
25    A.   Same answer.

**68**

1    Q.   By not performing further well
2  integrity diagnostic tests in -- light of
3  a troubling unexplained negative-pressure
4  test, BP saved time and money, did it not,
5  sir?
6    MR. MORRISS: Form.
7    A.   Same answer.
8    Q.   And you would agree with me,
9  sir, that the negative test results were
10  anomalous, would you not, sir?
11    MR. MORRISS: Form.
12    A.   Same answer.
13    Q.   And you would agree with me,
14  sir, that further well integrity diagnostic
15  tests should have been performed in light of
16  that anomalous finding, sir; is that correct?
17    MR. MORRISS: Form.
18    A.   Same answer.
19    Q.   And that would have cost time,
20  sir; is that correct?
21    MR. MORRISS: Form.
22    A.   Same answer.
23    Q.   And that would have cost money,
24  sir; is that correct?
25    MR. MORRISS: Form.

**PURSUANT TO CONFIDENTIALITY ORDER**

**69**

```
 1      A.   Same answer.
 2      Q.   By bypassing the pits and
 3  pumping mud directly to the DAMON BANKSTON,
 4  BP saved time and money, did it not, sir?
 5      MR. MORRISS: Form.
 6      A.   Same answer.
 7      Q.   And there was no top to bottom
 8  circulation performed on this well prior to
 9  the cementing process, was there, sir?
10      A.   Same answer.
11      Q.   And in not performing a
12  top-to-bottom circulation, sir, BP saved time
13  and money, did it not, sir?
14      MR. MORRISS: Form.
15      A.   Same answer.
16      Q.   Okay.  By using a long string
17  versus a liner tieback, BP saved time and
18  money, did it not?
19      MR. MORRISS: Form.
20      A.   Same answer.
21      Q.   In fact, it saved, by your own
22  estimate 7 to $12 million; isn't that
23  correct, sir?
24      MR. MORRISS: Form.
25      A.   Same answer.
```

**70**

```
 1      Q.   And, sir, if a liner tieback had
 2  been used, there would have been a lower ECD;
 3  is that correct, sir?
 4      A.   Same answer.
 5      Q.   And, sir, that would have more
 6  likely provided a better cement job; isn't
 7  that correct, sir?
 8      MR. MORRISS: Form.
 9      A.   Same answer.
10      Q.   And, sir, the liner hanger
11  packer would have acted as an additional
12  annular barrier once the tiebacks had been
13  run; is that correct, sir?
14      A.   Same answer.
15      Q.   And, sir, can you tell me what
16  the total savings of time and money that
17  your -- that your team accomplished by not
18  using a -- a tieback, by not using
19  21 centralizers, by not doing a cement bond
20  log, by using the LCM spacer on the rig and
21  not running a top-to-bottom circulation?
22      MR. MORRISS: Form.
23      A.   Same answer.
24      Q.   Did you calculate what that cost
25  savings was, sir?
```

**71**

```
 1      MR. MORRISS: Form.
 2      A.   Same answer.
 3      Q.   Sir, when you drafted the
 4  negative-pressure test procedure in this
 5  matter, were there clear instructions as to
 6  how to interpret that test?
 7      A.   Same answer.
 8      Q.   Did anyone call Mr. Kaluza or
 9  Mr. Vidrine to tell them how to interpret the
10  test?
11      A.   Same answer.
12      Q.   Did anyone tell them exactly
13  what they should expect as a result of the
14  test?
15      A.   Same answer.
16      Q.   Sir, have you ever heard of a
17  bladder effect?
18      A.   Same answer.
19      Q.   In fact, sir, during your entire
20  petroleum education and experience, you've
21  never heard of a bladder effect on a
22  negative-pressure test, have you, sir?
23      A.   Same answer.
24      Q.   And, sir, you wouldn't expect
25  that your wellsite leaders aboard the
```

**72**

```
 1  DEEPWATER HORIZON, Mr. Kaluza or Mr. Vidrine,
 2  to have accepted a bladder effect as an
 3  anomalous result for a negative test, would
 4  you, sir?
 5      MR. MORRISS: Form.
 6      A.   Same answer.
 7      Q.   Sir, were you -- were you aware
 8  of Mr. Kaluza's ranking as wellsite leader by
 9  BP?
10      A.   Same answer.
11      Q.   Were you aware that BP had
12  ranked Mr. Kaluza at the bottom of all of its
13  wellsite leaders in the Gulf of Mexico?
14      MR. MORRISS: Form.
15      A.   Same answer.
16      Q.   Sir, going back to Fast Drill,
17  isn't it true that Fast Drill resulted in ECD
18  exceeding leak-off pressures --
19      MR. MORRISS: Form.
20      A.   Same answer.
21      Q.   -- on several occasions, sir?
22      A.   Same answer.
23      Q.   And isn't it true where the ECD
24  exceeded leak-off pressures, those were not
25  reported to the MMS, sir?
```

PURSUANT TO CONFIDENTIALITY ORDER

105

1     A.    Same answer.
2     Q.    You did not change or modify the
3  temporary abandonment procedure so that there
4  was more than one barrier to flow, correct?
5     MR. MORRISS: Form.
6     A.    Same answer.
7     Q.    You were aware that the
8  negative-pressure test was a safety critical
9  test, correct?
10    A.    Same answer.
11    Q.    And you also knew that it was
12 the final test to ensure the integrity of the
13 well prior to temporary abandonment?
14    MR. MORRISS: Form.
15    A.    Same answer.
16    Q.    The e-mail from Brian Morel
17 entitled Ops note, sent on 4-20-10, purported
18 to contain the procedure for performing the
19 negative-pressure test, correct?
20    MR. MORRISS: Form.
21    A.    Same answer.
22    Q.    And the negative test
23 procedure -- negative-pressure test procedure
24 was not the same as the negative-pressure
25 test procedure approved by MMS, correct?

106

1     MR. MORRISS: Form.
2     A.    Same answer.
3     Q.    And, in fact, you discussed with
4  John Guide whether the change in the
5  negative-pressure test procedure required
6  approval from MMS, didn't you?
7     MR. MORRISS: Form.
8     A.    Same answer.
9     Q.    MMS did not approve the
10 negative-pressure test that was in the Ops
11 note, correct?
12    MR. MORRISS: Form.
13    A.    Same answer.
14    Q.    MMS did not approve the
15 negative-pressure test procedure that was
16 actually performed on the rig, did they?
17    MR. MORRISS: Form.
18    A.    Same answer.
19    Q.    You knew that despite anomalous
20 pressure results observed during the
21 negative-pressure test, the rig crew deemed
22 the test to be successful, correct?
23    MR. MORRISS: Form.
24    A.    Same answer.
25    Q.    You also knew there was

107

1  confusion about the negative-pressure test,
2  correct?
3     MR. MORRISS: Form.
4     A.    Same answer.
5     Q.    You did not advise anyone of
6  those concerns, did you?
7     MR. MORRISS: Form.
8     A.    Same answer.
9     Q.    And you did not suggest that the
10 negative-pressure test be run again, did you?
11    MR. MORRISS: Form.
12    A.    Same answer.
13    Q.    Did you tell anyone at that time
14 that the well should be shut in until the
15 anomalous negative-pressure test results
16 could be explained?
17    MR. MORRISS: Form.
18    A.    Same answer.
19    Q.    You were aware that excess
20 lost-circulation material was used as a
21 spacer in the Macondo well, correct?
22    A.    Same answer.
23    Q.    You were aware that LCM
24 materials are not designed for use as spacer,
25 correct?

108

1     MR. MORRISS: Form.
2     MR. BRENNAN: Object to form.
3     A.    Same answer.
4     Q.    You were not aware of any
5  manufacturer specification indicating that
6  LCM could be used as spacer, were you?
7     MR. MORRISS: Form.
8     MR. BRENNAN: Object to form.
9     A.    Same answer.
10    Q.    You were not aware of any
11 information whatsoever indicating that LCM
12 material could be used as spacer, were you?
13    MR. BRENNAN: Form.
14    MR. MORRISS: Form.
15    A.    Same answer.
16    Q.    If the premixed LCM wasn't
17 circulated through the wellbore, there were
18 restrictions on how the material could be
19 disposed of, correct?
20    MR. MORRISS: Form.
21    MR. BRENNAN: Form.
22    A.    Same answer.
23    Q.    You were aware that if the LCM
24 wasn't circulated through the wellbore, it
25 would have to be disposed of as a RCRA

27 (Pages 105 to 108)

**PURSUANT TO CONFIDENTIALITY ORDER**

109

1    hazardous substance, correct?
2        MR. MORRISS: Form.
3        MR. BRENNAN: Form.
4        A.    Same answer.
5        Q.    And you also knew that disposal
6    of LCM as a RCRA hazardous substance was
7    expensive, didn't you?
8        A.    Same answer.
9        MR. MORRISS: Form.
10       Q.    You believed that if the LCM was
11   circulated through the wellbore, you would be
12   able to dispose of the material overboard?
13       MR. BRENNAN: Form.
14       MR. MORRISS: Form.
15       A.    Same answer.
16       Q.    You also believed -- I'm sorry.
17       MS. CHANG: Strike that.
18       Q.    Even though you were aware that
19   LCM was not designed or intended to be used
20   as a spacer, you approved its use as a
21   spacer, correct?
22       MR. MORRISS: Form.
23       MR. BRENNAN: Form.
24       A.    Same answer.
25       Q.    Even though you were aware that

110

1    LCM was not designed or intended to be used
2    as a spacer, you did not perform a risk
3    assessment prior to using it as a spacer,
4    correct?
5        MR. BRENNAN: Form.
6        MR. MORRISS: Form.
7        A.    Same answer.
8        Q.    Even though you were aware that
9    LCM was not designed or intended to be used
10   as a spacer, you did not request that anyone
11   else perform a risk assessment regarding the
12   use of LCM as a spacer, did you?
13       MR. MORRISS: Form.
14       MR. BRENNAN: Form.
15       A.    Same answer.
16       Q.    Even though you knew that LCM
17   was not designed or intended to be used as a
18   spacer, you did not do any tests to determine
19   where the LCM was placed prior to performing
20   the negative-pressure test, correct?
21       MR. BRENNAN: Form.
22       MR. MORRISS: Form.
23       A.    Same answer.
24       Q.    Was the sole purpose for
25   allowing the LCM to be used as spacer to

111

1    avoid having to -- having to dispose of it as
2    a RCRA hazardous substance?
3        MR. MORRISS: Form.
4        MR. BRENNAN: Form.
5        A.    Same answer.
6        Q.    You could access INSITE Anywhere
7    day or night, 24 hours a day, correct?
8        MR. MORRISS: Form.
9        A.    Same answer.
10       Q.    And INSITE Anywhere was
11   reliable, correct?
12       A.    Same answer.
13       MR. MORRISS: Form.
14       Q.    So you and BP, onshore, had
15   access to the real-time data captured by the
16   Sperry-Sun system, correct?
17       A.    Same answer.
18       Q.    That data included drill pipe
19   pressure, correct?
20       MR. MORRISS: Form.
21       A.    Same answer.
22       Q.    It also included kill line
23   pressure?
24       MR. MORRISS: Form.
25       A.    Same answer.

112

1        Q.    The -- the data available on --
2    in INSITE Anywhere also included data from
3    the pit volume sensors, correct?
4        MR. MORRISS: Form.
5        A.    Same answer.
6        Q.    And it also included flow-in
7    rates?
8        MR. MORRISS: Form.
9        A.    Same answer.
10       Q.    That data was -- continued to be
11   transmitted to shore up until the time of the
12   explosion, correct?
13       MR. MORRISS: Form.
14       A.    Same answer.
15       Q.    You knew that the rig personnel
16   were conducting a negative-pressure test the
17   afternoon and evening of April 20th, 2010,
18   correct?
19       MR. MORRISS: Form.
20       A.    Same answer.
21       Q.    And you also knew that the
22   process would involve conducting the test
23   after displacement of the mud with seawater,
24   correct?
25       MR. MORRISS: Form.

28  (Pages 109 to 112)

**PURSUANT TO CONFIDENTIALITY ORDER**

165

1  were left with the impression that Mr. Kaluza
2  was not really clear about the
3  negative-pressure test; isn't that correct?
4      MR. MORRISS: Form.
5      A.   Same answer.
6      Q.   Did you do anything to notify
7  the MMS that the temporary abandonment
8  procedure used on April 20th, 2010, deviated
9  from the temporary abandonment procedure
10 approved by the MMS?
11     MR. MORRISS: Form.
12     A.   Same answer.
13     Q.   Did you ever tell Transocean
14 that the temporary abandonment procedure used
15 on April 20, 2010, deviated from the
16 temporary abandonment procedure approved by
17 the MMS?
18     MR. MORRISS: Form.
19     A.   Same answer.
20     Q.   Did you ever determine whether
21 there was actually any need to displace mud
22 out of the well down to 8,367 feet?
23     MR. MORRISS: Form.
24     A.   Same answer.
25     Q.   Did you perform any calculations

166

1  to determine if it was actually necessary to
2  displace the mud out of the well down to
3  8,367 feet?
4      MR. MORRISS: Form.
5      A.   Same answer.
6      Q.   Did you do any risk assessments
7  to determine the effect of displacing the
8  well down to 8,367 feet?
9      A.   Same answer.
10     Q.   Did you ever calculate the
11 amount of stress that would be placed on the
12 downhole cement job if you displaced the well
13 down to 8,367 feet?
14     A.   Same answer.
15     Q.   Did you do anything to override
16 Mr. Guide's decision to deviate from the
17 MMS --
18     MR. HYMEL: Strike that.
19     Q.   Did you do anything to override
20 Mr. Guide's decision to deviate from the
21 temporary abandonment procedure approved by
22 the MMS?
23     MR. MORRISS: Form.
24     A.   Same answer.
25     Q.   You agree that you could have

167

1  overridden Mr. Guide's decision to deviate
2  from the temporary abandonment procedure
3  approved by the MMS?
4      MR. MORRISS: Form.
5      A.   Same answer.
6      Q.   And you agree that you should
7  have overridden Mr. Guide's decision to
8  deviate from the temporary abandonment
9  procedure approved by the MMS?
10     MR. MORRISS: Form.
11     A.   Same answer.
12     Q.   Now, do you agree that the API
13 recommends a full bottoms-up before
14 production cement job?
15     MR. MORRISS: Form.
16     A.   Same answer.
17     Q.   Were you aware that Halliburton
18 recommended as a best practice, a full
19 bottoms-up before the production cement job?
20     MR. MORRISS: Form.
21     A.   Same answer.
22     Q.   The BP onshore engineering team
23 decided not to run a full bottoms-up,
24 correct?
25     A.   Same answer.

168

1      Q.   And the BP onshore engineering
2  team thought that the bottoms-up was not
3  necessary, correct?
4      A.   Same answer.
5      Q.   The BP onshore engineering team
6  decided not to perform a bottoms-up because
7  the well was behind schedule; isn't that
8  correct?
9      MR. MORRISS: Form.
10     A.   Same answer.
11     Q.   And the -- the BP onshore
12 engineering team decided to reduce the rate
13 of circulation from eight barrels per minute
14 to four barrels per minute because of the
15 drilling margin, correct?
16     MR. MORRISS: Form.
17     A.   Same answer.
18     Q.   The onshore -- the BP onshore
19 engineering team was also concerned that
20 doing a full bottoms-up would have taken an
21 additional 10 to 12 hours, correct?
22     MR. MORRISS: Form.
23     A.   Same answer.
24     Q.   You knew that reducing the
25 volume and rate of mud circulation increased

**PURSUANT TO CONFIDENTIALITY ORDER**

173

1      Q.     You agree that BP had never used
2  or even tested the combination of
3  loss-control materials that were used as a
4  spacer during the negative-pressure test?
5      MR. MORRISS: Form.
6      A.     Same answer.
7      Q.     You agree that BP also chose to
8  use an abnormally large volume of the spacer?
9      MR. MORRISS: Form.
10     A.     Same answer.
11     Q.     You agree that by choosing to
12 have a spacer, BP increased the risk that the
13 spacer would fall downward through the
14 lighter seawater during displacement and
15 potentially end up beneath the BOP when the
16 lower annular was closed for the
17 negative-pressure test?
18     MR. MORRISS: Form.
19     A.     Same answer.
20     Q.     You agree that BP was warned in
21 advance that this loss-control material could
22 cause some of the spacer to congeal in small
23 restrictions in tools and drill pipe?
24     MR. MORRISS: Form.
25     A.     Same answer.

174

1      Q.     Go to tab 21 in the PSC's
2  volume 2, which is the white binder.  And it
3  is the MBI testimony that's been marked as
4  exhibit 4448.  And, sir, I want you to turn
5  to page 100.  No, I'm sorry, sir, page 68.
6          In the testimony that is
7  included in exhibit 4448, specifically on
8  page 68, you gave that testimony under oath,
9  correct?
10     A.     Same answer.
11     Q.     Okay.  And then on line 10, a
12 question was asked to you.  And in addition
13 to the pressure testing, which seeks to
14 determine if you have, in fact, a sealed
15 wellbore, there were also two negative tests.
16 Are you aware of that today?
17          And your answer was, I am aware
18 that they were going to be doing negative
19 tests.  I'm not sure if they did two or if
20 they did one or if they did three, to be
21 honest.
22          And that was your response to
23 that question, correct?
24     A.     Same answer.
25     Q.     And then the next question

175

1  starting on line 18 states, and the testimony
2  on this record has been that the negative
3  tests, both of them, were successful.
4          And your response was, that is
5  my indication from the information that I was
6  given from the rig, also.
7          And that was your response to
8  that question, correct?
9      A.     Same answer.
10     Q.     Okay.  Now, you gave the
11 testimony on page 8 knowing that you had
12 talked to Mr. Vidrine on April 20th, 2010,
13 and Mr. Vidrine had told you that during the
14 negative-pressure test, there was zero
15 pressure on the kill line but still pressure
16 on the drill pipe; isn't that correct?
17     MR. MORRISS: Form.
18     A.     Same answer.
19     Q.     And you knew that a
20 negative-pressure test with zero on the kill
21 line but pressure on the drill pipe was not a
22 successful negative-pressure test, correct?
23     MR. MORRISS: Form.
24     A.     Same answer.
25     Q.     And you knew that a

176

1  negative-pressure test with zero on the kill
2  line with pressure on the drill pipe was not
3  a successful negative-pressure test when you
4  testified under oath at the MBI that the
5  negative-pressure test was successful,
6  correct?
7      MR. MORRISS: Form.
8      A.     Same answer.
9      Q.     During your conversation with
10 Mr. Vidrine, did he ever say anything to you
11 about the bladder effect?
12     A.     Same answer.
13     Q.     During your conversation with
14 Mr. Vidrine on April 20, 2010, did he ever
15 say anything to you about annular
16 compression?
17     A.     Same answer.
18     Q.     Did you ever tell Mr. Vidrine to
19 shut down the operation until he got the
20 pressure on the drill pipe to zero and it
21 stayed at zero?
22     MR. MORRISS: Form.
23     A.     Same answer.
24     Q.     The surface cement plug was
25 planned to be set 3300 feet below the mud

44  (Pages 173 to 176)

**PURSUANT TO CONFIDENTIALITY ORDER**

181

1    A.    Same answer.
2    Q.    You agree that BP should have
3  told the Transocean crew that it was using
4  loss-control material as a spacer?
5    MR. MORRISS: Form.
6    A.    Same answer.
7    MR. HYMEL: Those are all the questions
8  I have. Thank you.
9    VIDEOGRAPHER: Off the record at
10  11:52 a.m.
11        (Off the record.)
12    VIDEOGRAPHER: Back on the record at
13  12:01 p.m., beginning tape 5.
14        EXAMINATION
15  BY MR. SCHWARTZ:
16    Q.    Hi, Mr. Hafle. My name is
17  Jon-Bernard Schwartz, and I represent
18  Halliburton.
19        Do you understand who I am and
20  who I represent?
21    A.    Yes.
22    Q.    Okay. BP has a history of
23  choosing cost saving over safety, doesn't it?
24    MR. MORRISS: Form.
25    A.    Same answer.

182

1    Q.    And cost savings was
2  particularly important to you and your role
3  at BP at the time of the blowout, wasn't it?
4    MR. MORRISS: Form.
5    A.    Same answer.
6    Q.    And when making decisions
7  regarding the well design, you considered the
8  associated costs very important, didn't you?
9    MR. MORRISS: Form.
10    A.    Same answer.
11    Q.    In fact, at the end of 2009,
12  your performance review commended you for the
13  cost-saving decisions you made on the Macondo
14  well; isn't that right?
15    MR. MORRISS: Form.
16    A.    Same answer.
17    Q.    And I'm going to hand you what's
18  previously been marked today as exhibit 4455.
19  It's tab 7 on the CD. I wanted you to look
20  at that for a second.
21        Mr. Hafle, that's your annual
22  individual performance assessment, isn't it?
23    A.    Same answer.
24    Q.    And under part 2 of your
25  assessment, you can really see that you were

183

1  really focused on cost at the time of your
2  performance review; isn't that true?
3    MR. MORRISS: Object to form.
4    A.    Same answer.
5    Q.    In fact, bullet point number 3
6  says, complete the Macondo well in under
7  45d/10K with nonproductive time, NPT, less
8  than 25 percent; isn't that true?
9    A.    Same answer.
10    Q.    So your goal was to get the
11  non-productive time on the Macondo well to
12  below 25 percent?
13    A.    Same answer.
14    Q.    And y'all did so at any way you
15  could; isn't that true?
16    MR. MORRISS: Form.
17    A.    Same answer.
18    Q.    And also under part 2,
19  performance, it says, complete one proposal
20  for NPT reduction on the DEEPWATER HORIZON
21  operation.
22        Did I read that correctly?
23    A.    Same answer.
24    Q.    And NPT stands for
25  non-productive time; isn't that true?

184

1    A.    Same answer.
2    Q.    So one of your goals is to
3  complete a proposal to reduce non-productive
4  time on the DEEPWATER HORIZON operation;
5  isn't that true?
6    A.    Same answer.
7    Q.    And you did so at any cost?
8    MR. MORRISS: Form.
9    A.    Same answer.
10    Q.    Including safety; isn't that
11  true?
12    MR. MORRISS: Form.
13    A.    Same answer.
14    Q.    If you go to the fifth bullet
15  point under part 2, performance, it says,
16  work at least one cost savings idea to
17  completion; isn't that true?
18    A.    Same answer.
19    Q.    So under part 2 of your
20  individual performance assessment, which is
21  performance, three of those bullet points
22  dealt only with cost issues; isn't that true?
23    MR. MORRISS: Form.
24    A.    Same answer.
25    Q.    If you go down to midyear

46 (Pages 181 to 184)

PURSUANT TO CONFIDENTIALITY ORDER

185

1  performance conversation performance, the
2  first bullet point says, complete the Puma 4
3  well in under 30 days/10K; isn't that true?
4      A.   Same answer.
5      Q.   And if you go to the fifth
6  bullet point, it says, complete the Macondo
7  well under 45 days, 10K, with NPT less than
8  25 percent?
9      Didn't I read that right?
10     A.   Same answer.
11     Q.   So the most -- almost entirely
12 of this first page of your annual individual
13 performance assessment dealt specifically
14 with your performance to bring costs down at
15 BP?
16     MR. MORRISS: Form.
17     A.   Same answer.
18     Q.   If you go to the second page,
19 sir, and if you go halfway down under
20 year-end assessment, I'm going to read to
21 you -- it is the seventh bullet point,
22 complete one proposal for NPT reduction on
23 the DEEPWATER HORIZON operation.
24     Did I read that correctly?
25     A.   Same answer.

186

1      Q.   And the next bullet point,
2  planning for no cement NPT, shoe squeezes for
3  Macondo on MARIANAS.
4      Did I read that correctly?
5      A.   Same answer.
6      Q.   So you were concerned that any
7  cement that was being run into the Macondo
8  well not put the well's construction at risk
9  for an NPT; isn't that true?
10     MR. MORRISS: Form.
11     A.   Same answer.
12     Q.   In fact, you were concerned
13 early on with the well's design, that you not
14 lose any NPT?
15     MR. MORRISS: Form.
16     A.   Same answer.
17     Q.   Or that you not have any NPT
18 when you are planning a cement job; isn't
19 that right?
20     A.   Same answer.
21     Q.   In fact, you -- in your year
22 (sic) performance, it says you were looking
23 to avoid any kind of squeeze jobs on the
24 Macondo; isn't that true?
25     MR. MORRISS: Form.

187

1      A.   Same answer.
2      Q.   And the reason you were trying
3  to avoid squeeze jobs is to save cost; isn't
4  that right?
5      MR. MORRISS: Form.
6      A.   Same answer.
7      Q.   If you go down further, one of
8  the bullet points under the year-end
9  assessment performance says, ongoing.  To
10 date, one hole section done.  Bit/UR
11 combination deal with Hughes working so far.
12 I have specifically been checking invoices to
13 ensure agreed rates are being applied through
14 invoicing process.  Estimated savings for the
15 well to be approximately $500,000.
16     Did I read that right?
17     A.   Same answer.
18     Q.   So, again, the focus of your
19 performance aspect of your year-end review
20 has to do with saving money for BP; isn't
21 that right?
22     MR. MORRISS: Form.
23     A.   Same answer.
24     Q.   And wouldn't you say that BP's
25 value -- BP valued you, in one respect, how

188

1  much money you could save BP in the
2  production -- in the construction of its
3  wells, including the Macondo?
4      MR. MORRISS: Form.
5      A.   Same answer.
6      Q.   It says under this bullet point
7  I just went over, the next bullet point is,
8  also supported the Fast Drill method for the
9  riserless sections on Macondo.  Significant
10 savings by reducing volume of pump and dump
11 mud.  Estimated savings, $250,000.
12     Did I read that correctly?
13     A.   Same answer.
14     Q.   Were you valued more at BP as
15 someone who could save them money than you
16 were as someone who could get wells completed
17 safely?
18     MR. MORRISS: Form.
19     A.   Same answer.
20     Q.   If you go to the third to the
21 last bullet point, it says, took on
22 additional responsibility to review all
23 Macondo invoices forwarded from project
24 services.  I focused on the Allis-Chalmers
25 rental tools and pipe, and Baker Hughes

PURSUANT TO CONFIDENTIALITY ORDER

189

1  bit/UR invoices for accuracy.  Found errors
2  amounting to over $60,000 to date.
3       Did I read that right?
4       A.    Same answer.
5       Q.    Would you agree with me that
6  most of your role at BP dealt with saving BP
7  money?
8       MR. MORRISS:  Form.
9       A.    Same answer.
10      Q.    When you were working on the
11 Macondo well before the blowout, isn't it
12 true that you were concerned with saving BP
13 all the money you could?
14      MR. MORRISS:  Form.
15      A.    Same answer.
16      Q.    If you go to page BP-HZN-2179,
17 MDL 382901.  And the Bates labels are at the
18 bottom right-hand corner.  If I could direct
19 your attention to the bottom right-hand
20 corner where it says, energize people, the
21 second paragraph.
22      It says, since our team has
23 several younger members, it is important to
24 maintain a positive energized atmosphere,
25 even when things seem to be heading in the

190

1  wrong direction.
2       Did I read that correctly?
3       Q.    Did you maintain that positive
4  energized atmosphere when there were
5  questions regarding the accuracy of the
6  negative test?
7       MR. MORRISS:  Form.
8       A.    Same answer.
9       Q.    Did you keep that positive
10 energized atmosphere even when there were
11 questions about whether or not this well
12 should be displaced?
13      MR. MORRISS:  Form.
14      A.    Same answer.
15      Q.    If you go to the next page, sir,
16 where it says line manager.  About halfway
17 down the first column, it says, mud losses
18 and a kick on Macondo exposed the degree to
19 which the team needed and relied on Mark's
20 drilling expertise.
21      Did I read that correctly?
22      MR. MORRISS:  Form.
23      A.    Same answer.
24      Q.    Did the team need you when they

191

1  were running the negative test?
2       A.    Same answer.
3       Q.    Did the team need you when they
4  were making decisions as to whether or not
5  the float collar had converted?
6       A.    Same answer.
7       Q.    Did the team rely on you to
8  offer them advice with regards to the
9  negative test?
10      A.    Same answer.
11      Q.    Did the team rely on you to
12 determine whether or not the float collar
13 properly converted?
14      A.    Same answer.
15      Q.    Isn't it true that you basically
16 left the well in the hands of Brian Morel,
17 who had much less experience than you did as
18 a drilling engineer?
19      MR. MORRISS:  Form.
20      A.    Same answer.
21      Q.    If you would, sir, go halfway
22 through the second column on that same page,
23 and I'm going to read it to you.
24      It says, planning for Macondo
25 met all expectations, another very good well

192

1  for mentoring Brian Morel.  I gave Brian more
2  room to expand his skills and knowledge.
3       We implemented the Fast Drill
4  method on the riserless section to set the
5  performance pace for the well and would
6  surely have finished in the top quartile had
7  it not been for BOP repairs and hurricane rig
8  damage.
9       Did I read that correctly?
10      A.    Same answer.
11      Q.    If you look at that last clause,
12 it says, and surely would have finished in
13 the top quartile had it not been for BOP
14 repairs and hurricane rig damage.
15      Isn't it true that that's yet
16 another example that your concern was speed
17 over safety with regards to this well?
18      MR. MORRISS:  Form.
19      A.    Same answer.
20      Q.    On April 20, 2010, while the
21 cement job was being pumped, you didn't
22 observe it, did you?
23      A.    Same answer.
24      Q.    You left that in the hands of
25 people who were not as experienced as you,

**PURSUANT TO CONFIDENTIALITY ORDER**

193

1  such as Brian Morel; isn't that true?
2      MR. MORRISS: Form.
3      A.  Same answer.
4      Q.    In fact, at the time that the
5  final cement job was being pumped, you were
6  busy calculating cost estimates for BP; isn't
7  that right, sir?
8      A.  Same answer.
9      MR. MORRISS: Form.
10     Q.    Mr. Morel (sic), I'm going to
11 hand you what's already been marked in this
12 case, or referred to in this case, as exhibit
13 4453, and I'll just hand you another copy of
14 that.  These are notes from an interview
15 taken of you on May 2nd of 2010.
16         And if you would, sir, go to the
17 second page -- well, the third page of that
18 document, which is the second page of the
19 notes.  I'm going to the end of the first --
20 the end of that column, right before the
21 paragraph -- paragraph break.
22         It says, he did not watch the
23 cement job live.
24         Did I read that correctly?
25     A.  Same answer.

194

1      Q.    Isn't that what you told them
2  when they interviewed you, that you did not
3  watch the cement job live?
4      A.  Same answer.
5      Q.    And then the next line says,
6  worked late on Monday until about 8:30, and
7  again on Tuesday night, doing cost estimates.
8      Did I read that correctly?
9      A.  Same answer.
10     Q.    So you were doing cost estimates
11 instead of observing the cement job; isn't
12 that right?
13     MR. MORRISS: Form.
14     A.  Same answer.
15     Q.    Do you think you should have
16 been watching the cement job?
17     MR. MORRISS: Form.
18     A.  Same answer.
19     Q.    You'd agree with me, sir, that
20 your design of the production casing and BP's
21 design of the production casing affected the
22 cement job?
23     MR. MORRISS: Form.
24     A.  Same answer.
25     Q.    Cementing a long string is more

195

1  difficult than cementing a liner, isn't it?
2      MR. MORRISS: Form.
3      A.  Same answer.
4      Q.    But it's substantially cheaper,
5  isn't it?
6      MR. MORRISS: Form.
7      A.  Same answer.
8      Q.    Doing so saved BP around 7 to
9  $10 million; isn't that right?
10     MR. MORRISS: Form.
11     A.  Same answer.
12     Q.    Isn't it true that using a long
13 string rather than a liner increased the risk
14 of cement contamination?
15     MR. MORRISS: Form.
16     A.  Same answer.
17     Q.    This risk was further increased
18 by using a tapered long string because the
19 wiper plugs could not wipe it properly; isn't
20 that right?
21     MR. MORRISS: Form.
22     A.  Same answer.
23     Q.    Using the long string did not
24 permit moving or rotating the casing during
25 the cement job; isn't that right?

196

1      MR. MORRISS: Form.
2      A.  Same answer.
3      Q.    Rotating the casing would have
4  improved the likelihood of a quality cement
5  job, wouldn't it?
6      MR. MORRISS: Form.
7      A.  Same answer.
8      Q.    Cementing the long string
9  required a higher cement pumping pressure and
10 resulted in a higher ECD than cementing a
11 liner.
12         Wouldn't you agree with me on
13 that?
14     MR. MORRISS: Form.
15     A.  Same answer.
16     Q.    If you had chosen a liner, you
17 could have obtained a lower ECD; isn't that
18 true?
19     MR. MORRISS: Form.
20     A.  Same answer.
21     Q.    In fact, with a liner, you could
22 have ignored the ECD completely because you
23 would have had the mechanical seal as another
24 barrier to the hydrocarbon flow?
25     MR. MORRISS: Form.

PURSUANT TO CONFIDENTIALITY ORDER

197

1   A.   Same answer.
2   Q.   If you had chosen a liner, you
3   would have been more prone to remediate a
4   cement job because remediation is easier with
5   a liner than a long-string; isn't that true?
6   MR. MORRISS: Form.
7   A.   Same answer.
8   Q.   And you knew this at the time
9   that BP chose the long-string over the liner
10  for the final production casing; isn't it
11  true?
12  MR. MORRISS: Form.
13  A.   Same answer.
14  Q.   In fact, during the week
15  preceding the blowout, when you were making
16  changes to the temporary abandonment
17  procedure, you did not consider how the risks
18  associated with these changes to the
19  temporary abandonment procedure should be
20  mitigated in accordance with the risk
21  register; isn't that true?
22  MR. MORRISS: Form.
23  A.   Same answer.
24  Q.   Mr. Hafle, I'm going to hand you
25  what's been previously marked in this case as

198

1   exhibit 901.
2   And this is the MOC for the
3   final production casing; isn't that right?
4   A.   Same answer.
5   Q.   And by MOC, I mean
6   management-of-change; isn't that true?
7   A.   Same answer.
8   Q.   And I ask you to look at the
9   last paragraph on this page, and I'm going to
10  read it to you, or I'm going to try to read
11  it to you.
12  If losses occur during the
13  cement job, possible cement evaluation or
14  remedial cement operations, dispensations
15  and/or MMS approvals will be required prior
16  to performing TA operations due to a lower
17  than required top of cement in the annulus.
18  Possible hydrocarbon zones could
19  be left exposed in the annulus with only the
20  casing hanger seal as a single barrier for
21  the TA.
22  Did I read that correctly?
23  A.   Same answer.
24  Q.   And that's in tab 3.
25  So you'd agree with me, then,

199

1   when BP recommended the final long-string
2   design, you knew that possible hydrocarbon
3   zones could be left exposed in the annulus
4   with only the casing hanger seal as the
5   single barrier for the temporary abandonment;
6   isn't that right?
7   MR. MORRISS: Form.
8   A.   Same answer.
9   Q.   And you knew this because you
10  were specifically listed on exhibit 901 as
11  the verifier of this MOC; isn't that true?
12  MR. MORRISS: Form.
13  A.   Same answer.
14  Q.   But you didn't do anything to
15  mitigate this risk, did you?
16  MR. MORRISS: Form.
17  A.   Same answer.
18  Q.   In your -- and senior managers
19  of BP, including Sims, Greg Walz, John Guide,
20  Jonathan Sprague, they reviewed the
21  management-of-change document, they were
22  aware of this risk, but they approved it
23  anyway; isn't that true?
24  MR. MORRISS: Form.
25  A.   Same answer.

200

1   Q.   In fact, using a liner would
2   have mitigated the risk described in this
3   management-of-change at exhibit 901, because
4   it would have provided a mechanical seal that
5   would have served as an additional barrier to
6   the annular flow; isn't that right?
7   MR. MORRISS: Form.
8   A.   Same answer.
9   Q.   You agree with me that if you
10  had chosen a liner, you would not have had to
11  use a lower volume cement; isn't that true?
12  MR. MORRISS: Form.
13  A.   Same answer.
14  Q.   If you had chosen a liner, you
15  would not have had to use a slower pump rate;
16  isn't that true?
17  MR. MORRISS: Form.
18  A.   Same answer.
19  Q.   Mr. Hafle, if you had chosen a
20  liner, you would not have had to use nitrogen
21  cement with reduced density; isn't that
22  right?
23  MR. MORRISS: Form.
24  A.   Same answer.
25  Q.   In fact, wouldn't you agree with

PURSUANT TO CONFIDENTIALITY ORDER

201

1   me, Mr. Hafle, that BP's engineering team did
2   not adequately consider the effect that the
3   long-string design would have on a cement
4   job; isn't that true?
5         MR. MORRISS: Form.
6         A.   Same answer.
7         Q.   As we discussed before,
8   Mr. Hafle, BP made numerous cost-saving
9   decisions that increased the chance of a
10  blowout without running a formal risk
11  assessment; isn't that true?
12        MR. MORRISS: Form.
13        A.   Same answer.
14        Q.   In fact, isn't it true that in
15  the days preceding the blowout, many of your
16  decisions regarding the well were affected by
17  the fact that the well was over budget; isn't
18  that true?
19        MR. MORRISS: Form.
20        A.   Same answer.
21        Q.   And isn't it true that in the
22  days preceding the blowout, many of your
23  decisions regarding the well were affected by
24  the fact that the well was overallocated and
25  was past -- was overallocated in time for its

202

1   completion; isn't that true?
2         MR. MORRISS: Form.
3         A.   Same answer.
4         Q.   Because of that, in the days
5   preceding the blowout, BP made many decisions
6   that were cost-driven; isn't that right?
7         MR. MORRISS: Form.
8         A.   Same answer.
9         Q.   And BP made these decisions
10  without any formal risk assessment?
11        MR. MORRISS: Form.
12        A.   Same answer.
13        Q.   And these changes were made on
14  an ad hoc basis; isn't that right?
15        MR. MORRISS: Form.
16        A.   Same answer.
17        Q.   You discussed today in your
18  testimony, that you decided -- that BP
19  decided not to wait for more centralizers to
20  be delivered to the rig; isn't that correct?
21        MR. MORRISS: Form.
22        A.   Same answer.
23        Q.   This saved BP time, didn't it?
24        MR. MORRISS: Form.
25        A.   Same answer.

203

1         Q.   And this saved BP money; isn't
2   that true?
3         MR. MORRISS: Form.
4         A.   Same answer.
5         Q.   Mr. Hafle, I'm going to hand
6   you what's already been marked in this case
7   as exhibit 2041.  Take a second to
8   familiarize yourself with it.
9         MR. KRAUS: What tab number?
10        MR. SCHWARTZ: This is not a tab
11  number.  I apologize.  It's one of the tabs
12  in our materials from yesterday, if you still
13  have that with you.
14        Q.   And if you would, Mr. Hafle,
15  look at the e-mail on the first page of this
16  exhibit 2041.  It's an e-mail from Brian
17  Morel to you and to others dated April 15,
18  2010.
19              And you see that you are in the
20  "to" of this e-mail; is that correct?
21        A.   Same answer.
22        Q.   And I'm going to read it to you.
23  It's from Brian Morel to you and others.  It
24  says, we have six centralizers.  We can run
25  them in a row, spread out, or any

204

1   combinations of the two.  It's a vertical
2   hole, so hopefully the pipe stays centralized
3   due to gravity.
4               As far as changes, it's too late
5   to get any more product to the rig.  Our only
6   option is to rearrange placement of the
7   centralizers.  Please see attached diagram
8   for my recommendation.
9               Did I read that correctly?
10        A.   Same answer.
11        Q.   And you received this e-mail,
12  didn't you, Mr. Hafle?
13        A.   Same answer.
14        Q.   And you received this e-mail
15  approximately five days before the blowout;
16  isn't that right?
17        A.   Same answer.
18        Q.   And you read this e-mail, didn't
19  you?
20        A.   Same answer.
21        Q.   But you would agree with me that
22  it's never too late to get more product to
23  the rig; isn't that true?
24        MR. MORRISS: Form.
25        A.   Same answer.

PURSUANT TO CONFIDENTIALITY ORDER

205

1      Q.    The only reason it was too late
2  was because it was going to cost BP time in
3  finishing the well; isn't that true?
4      MR. MORRISS: Form.
5      A.    Same answer.
6      Q.    And the only reason it was too
7  late is because if it's going to cost BP
8  time, it's also going to cost BP more money;
9  isn't that true?
10     MR. MORRISS: Form.
11     A.    Same answer.
12     Q.    In fact, when you got this
13 e-mail, you didn't do anything to instruct
14 Brian Morel to do anything other than pass on
15 to others that it was too late to get any
16 more product to the rig; isn't that right?
17     MR. MORRISS: Form.
18     A.    Same answer.
19     Q.    In fact, you could have told
20 Brian Morel it's not too late; isn't that
21 right?
22     MR. MORRISS: Form.
23     A.    Same answer.
24     Q.    But you didn't; isn't that true?
25     MR. MORRISS: Form.

207

1      MR. MORRISS: Form.
2      A.    Same answer.
3      Q.    And it saved BP money?
4      MR. MORRISS: Form.
5      A.    Same answer.
6      Q.    BP decided not to run a cement
7  evaluation log; isn't that true?
8      MR. MORRISS: Form.
9      A.    Same answer.
10     Q.    This decision saved BP time;
11 isn't that right?
12     MR. MORRISS: Form.
13     A.    Same answer.
14     Q.    And it saved BP money; isn't
15 that true?
16     MR. MORRISS: Form.
17     A.    Same answer.
18     Q.    BP decided to use a spacer made
19 from combined lost-circulation materials to
20 avoid disposal issues; isn't that right?
21     MR. MORRISS: Form.
22     A.    Same answer.
23     Q.    This decision saved BP time.
24           Wouldn't you agree with me on
25 that?

206

1      A.    Same answer.
2      Q.    Not only could you have waited,
3  Brian Morel could have shut in the well;
4  isn't that true?
5      MR. MORRISS: Form.
6      A.    Same answer.
7      Q.    And you could have -- or you
8  could have told Brian Morel to shut in the
9  well while you were waiting for the
10 additional centralizers; isn't that true?
11     MR. MORRISS: Form.
12     A.    Same answer.
13     Q.    But you didn't; isn't that
14 right?
15     MR. MORRISS: Form.
16     A.    Same answer.
17     Q.    Other examples of BP choosing
18 cost over safety is the fact that BP decided
19 not to wait for the foam stability test
20 results before authorizing the cement job;
21 isn't that right?
22     MR. MORRISS: Form.
23     A.    Same answer.
24     Q.    And this decision saved BP time;
25 isn't that true?

208

1      MR. MORRISS: Form.
2      A.    Same answer.
3      Q.    And it also saved BP money?
4      MR. MORRISS: Form.
5      A.    Same answer.
6      Q.    BP decided to displace mud
7  before setting a surface cement plug; isn't
8  that right?
9      MR. MORRISS: Form.
10     A.    Same answer.
11     Q.    This decision saved BP time;
12 isn't that correct?
13     MR. MORRISS: Form.
14     A.    Same answer.
15     Q.    And it saved BP money?
16     MR. MORRISS: Form.
17     A.    Same answer.
18     Q.    BP also decided not to install
19 additional physical barriers during the
20 temporary abandonment procedure; isn't that
21 right?
22     MR. MORRISS: Form.
23     A.    Same answer.
24     Q.    This decision saved BP time?
25     MR. MORRISS: Form.

PURSUANT TO CONFIDENTIALITY ORDER

209

```
 1      A.   Same answer.
 2      Q.   And it saved BP money?
 3   MR. MORRISS: Form.
 4      A.   Same answer.
 5      Q.   Also, BP decided not to perform
 6   additional tests regarding well integrity,
 7   given the dubious negative test results;
 8   isn't that true?
 9      A.   Same answer.
10      Q.   This decision saved time, didn't
11   it?
12   MR. MORRISS: Form.
13      A.   Same answer.
14      Q.   And it saved BP money?
15   MR. MORRISS: Form.
16      A.   Same answer.
17      Q.   And you know, as well as I do,
18   that there's no such thing as a bladder
19   effect?
20   MR. MORRISS: Form.
21      A.   Same answer.
22      Q.   And if you had heard anyone from
23   the rig telling you that the negative test
24   was showing a bladder effect, you would have
25   tried to find out what in the world they were
```

210

```
 1   talking about?
 2   MR. MORRISS: Form.
 3      A.   Same answer.
 4      Q.   In fact, if you had heard that
 5   they were claiming that the negative test
 6   results showed the bladder effect, you would
 7   have told them not to proceed further without
 8   shutting in the well, wouldn't you?
 9   MR. MORRISS: Form.
10      A.   Same answer.
11      Q.   But you didn't; isn't that true?
12   MR. MORRISS: Form.
13      A.   Same answer.
14      Q.   So all of these cost-saving
15   decisions I've discussed with you today
16   complicated the cement job or rendered its
17   success less likely; isn't that true?
18   MR. MORRISS: Form.
19      A.   Same answer.
20      Q.   You never emphasized to the
21   individuals conducting the negative test, the
22   importance of a successful result, did you?
23   MR. MORRISS: Form.
24      A.   Same answer.
25      Q.   I want to ask you some questions
```

211

```
 1   about BP using a lower volume of cement and
 2   how that affected the cement job.
 3      Isn't it true that it is better
 4   to pump more rather than less cement into a
 5   well for production casing jobs such as the
 6   Macondo?
 7   MR. MORRISS: Form.
 8      A.   Same answer.
 9      Q.   Pumping more cement reduces the
10   risk of contamination of cement by diluting
11   the amount of contaminants; isn't that true?
12   MR. MORRISS: Form.
13      A.   Same answer.
14      Q.   Pumping more cement also reduces
15   the impact of various cement placement; isn't
16   that true?
17   MR. MORRISS: Form.
18      A.   Same answer.
19      Q.   BP made a conscious decision to
20   pump less cement, though?
21   MR. MORRISS: Form.
22      A.   Same answer.
23      Q.   You recognized that this small
24   volume of cement provided little margin of
25   error?  Don't you recognize that, Mr. Hafle?
```

212

```
 1   MR. MORRISS: Form.
 2      A.   Same answer.
 3      Q.   BP's decision to pump only
 4   61 barrels of cement meant that there would
 5   be less cement above the hydrocarbon zone;
 6   isn't that right?
 7   MR. MORRISS: Form.
 8      A.   Same answer.
 9      Q.   In fact, displacement of the
10   cement only 500 feet above the hydrocarbon
11   zone violated BP's own engineering practice,
12   ETP 10-60; isn't that true?
13   MR. MORRISS: Form.
14      A.   Same answer.
15      Q.   BP's decision to use less cement
16   also increased the risk that placement errors
17   would leave insufficient cement in the shoe
18   track or in the annular space corresponding
19   to the hydrocarbon zone; isn't that true?
20   MR. MORRISS: Form.
21      A.   Same answer.
22      Q.   BP's decision to use less cement
23   also increased the chance of cement
24   contamination; isn't that true?
25   MR. MORRISS: Form.
```

53  (Pages 209 to 212)

**PURSUANT TO CONFIDENTIALITY ORDER**

Hafle
5/28/10

1

1        USCG/MMS MARINE BOARD OF INVESTIGATION
         INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
2              POLLUTION, AND SINKING
           OF MOBILE OFFSHORE DRILLING UNIT
3          DEEPWATER HORIZON, WITH LOSS OF LIFE
           IN THE GULF OF MEXICO 21-22 APRIL 2010
4                 Friday, May 28, 2010

5

6              *   *   *   *   *   *

7

           The transcript of The Joint United
8      States Coast Guard Minerals Management Service
       Investigation of the above-entitled cause,
9      before Dorothy N. Gros, a Certified Court
       Reporter, authorized to administer oaths of
10     witnesses pursuant to Section 961.1 of Title
       13 of the Louisiana Revised Statutes of 1950,
11     as amended, reported at the Radisson Hotel,
       2150 Veterans Memorial Boulevard, Kenner,
12     Louisiana, 70062, on Friday, May 28, 2010,
       beginning at 8:00 a.m.

13

14

15

16

17

18

19

20

21

22

23

24

25



4448

Exhibit No. ——————
Worldwide Court
Reporters, Inc.

2

1    APPEARANCES:

2    MEMBERS OF THE BOARD:

3    CAPT HUNG M. NGUYEN, CO-CHAIR
     UNITED STATES COAST GUARD

4

     DAVID DYKES, CO-CHAIR
5     MINERALS MANAGEMENT SERVICE

6    JASON MATHEWS
      MINERALS MANAGEMENT SERVICE

7

     JOHN McCARROLL
8     MINERALS MANAGEMENT SERVICE

9    ROSS WHEATLEY
     UNITED STATES COAST GUARD

10

     LTR ROBERT BUTTS, COURT RECORDER
11    UNITED STATES COAST GUARD

12

     REPORTED BY:  DOROTHY N. GROS, CCR
13          CERTIFIED COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                    I N D E X
                                    PAGE
 2     Caption. . . . . . . . . . . . . . . . . 1
       Appearances. . . . . . . . . . . . . . 2
 3     Certificate. . . . . . . . . . . . . . 404
       Examination of MARK HAFLE:
 4         BY MR. MATHEWS . . . . . . . . 7, 47, 62
           BY MR. McCARROLL . . . . . . 33, 94, 104
 5         BY CAPT NGUYEN . . . . . . . . . . . .48
           BY LT BUTTS. . . . . . . . . . . .60, 95
 6         BY MR. KOHNKE. . . . . . . . . . . . .63
           BY MR. DYKES . . . . . . . . . . 94, 103
 7         BY MR. GODWIN. . . . . . . . . . . . .98
           BY MR. KAPLIN. . . . . . . . . . . . 101
 8
       Examination of CHRISTOPHER PLEASANT:
 9         BY MR. MATHEWS . . . . . . . . .110, 145
           BY MR. McCARROLL . . . . . . . . . .131
10         BY MR. DYKES . . . . . . . . . .148, 164
           BY MR. WHEATLEY. . . . . . . . . . .153
11         BY LT BUTTS. . . . . . . . . . . . .155
           BY CAPT NGUYEN . . . . . . . .167, 182
12         BY MR. JONES . . . . . . . . . . . .170
           BY MR. SEELY . . . . . . . . . . . .184
13         BY MR. GODFREY . . . . . . . . . . .190

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1    EXAMINATION: (CONT'D)
     Examination of GREGORY MECHE:
2        BY MR. MATHEWS . . . . . . . . . . .202
         BY MR. McCARROLL . . . . . . . . .215
3        BY MR. DYKES . . . . . . . . . . . .220
         BY MR. WHEATLEY. . . . . . . . . . .221
4        BY LT BUTTS. . . . . . . . . . . .222
         BY MR. LINSIN. . . . . . . . . . .236
5        BY MR. KOHNKE. . . . . . . . . . .240
     Examination of CHRISTOPHER HAIRE:
6        BY MR. MATHEWS . . . . . .243, 267, 271
         BY MR. McCARROLL . . . . . . .250, 268
7        BY MR. WHEATLEY. . . . . . . . . . .251
         BY LT BUTTS. . . . . . . . . . . .255
8        BY MR. DYKES . . . . . . . . . . . .268
         BY CAPT NGUYEN . . . . . . . . . .269
9    Examination of MILES EZELL:
         BY MR. MATHEWS . . . 274, 307, 315, 318
10       BY MR. McCARROLL . . . . . . . . .298
         BY LT BUTTS. . . . . . . . . . . .300
11       BY CAPT NGUYEN . . . . . . . .309, 326
         BY MR. KOHNKE. . . . . . . . . . .312
12       BY MR. DYKES . . . . . . . . . . . .317
         BY MR. SEELY . . . . . . . . . . .322

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1    EXAMINATION: (CONT'D)

2    Examination of WILLIAM STONER:

3         BY MR. MATHEWS . . . . . . . . . . . 334

4         BY MR. McCARROLL . . . . . . . . . . 355

5         BY LT BUTTS . . . . . . . . 359, 369, 399

6         BY MR. WHEATLEY . . . . . . . . . . 367

7         BY MR. LINSIN . . . . . . . . . . . 376

8         BY MR. GORDON . . . . . . . . . . . 384

9         BY CAPT NGUYEN . . . . . . . . . . 395

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

```
1            PROCEEDINGS
2    CAPT NGUYEN:
3        Please be seated so we can re-start
4          the hearings. Court reporter, let's go
5    on the record.  Before we start the
6    hearing this morning I would like to
7    make a couple of comments.  To maintain
8    the dignity and efficiency of these
9    hearings, I respectfully request that
10   all Parties In Interest not to engage
11   in conversations just like the one at
12   the end of yesterday's hearings.  Clear
13   guidance on the rights of the Parties
14   In Interest are in the regulations and
15   Coast Guard marine safety manual.
16   Particularly if you have witnesses or
17   evidence that you would like to -- for
18   the board to consider please do so in
19   writing.  When a witness is subpoenaed
20   by the board, as with all U.S.
21   citizens, they have the right to
22   exercise their constitutional rights.
23   There is no presumption of innocence or
24   guilt.  We have other means to gather
25   information and the other information
```

7

1       that we have would allow us to make

2       proper conclusions and

3       recommendations.

4               So, with that, our first witness

5           this morning is Mr. Mark Hafle of BP.

6       Mr. Hafle, please rise so I can put you

7       under oath.

8           THE WITNESS:

9               (Witness complies.)

10      *   *   *   *   *   *

11                  MARK HAFLE,

12      after being first duly sworn in the cause,

13      testified as follows:

14          CAPT NGUYEN:

15              Thank you, sir, for being here.

16              Please be seated.

17          THE WITNESS:

18              (Witness complies.)

19          E X A M I N A T I O N

20      BY MR. MATHEWS:

21          Q.  Mr. Hafle, for the record can you state

22      your full name and spell your last name?

23          A.  Mark Edwin Hafle, H–A-F, like in

24      "Friday", L-E.

25          Q.  And by whom are you employed, sir?

8

1    A.  BP.

2    Q.  What position do you currently hold

3    within BP?

4    A.  Drilling engineer.

5    Q.  How long have you had that position as

6    drilling engineer?

7    A.  23 years and a few months.

8    Q.  All with BP?

9    A.  Yes.

10   Q.  What is your educational background,

11   sir?

12   A.  I have a bachelor of science in

13   petroleum engineering.

14   Q.  From where?

15   A.  Marietta College, Marietta, Ohio.

16   Q.  Do you have any special certifications

17   as being a qualified engineer?  License?

18   A.  No, no.

19   Q.  Can you please briefly describe your

20   job responsibilities as BP as a drilling

21   engineer?

22   A.  We take -- drilling engineers, myself

23   included, take all the geologic data that gets

24   generated by the geology department, as well

25   as all of the offset information from wells in

9

1    the area where we would be drilling a well,

2    take that data, come up with a reasonable

3    assumption going into the well from a pore

4    pressure frac gradient standpoint and design

5    how many strings of casing it's likely to take

6    to drill that well.  We put together drilling

7    plans, we do the permits, we do cost

8    estimates. During the drilling operations we

9    answer day to day questions from operations.

10   We write in the well reports, capture lessons

11   learned, transfer those onto the next well.

12       Q.  So you do review the daily reports that

13   are submitted to you?

14       A.  Everyday.

15       Q.  Have you had any special subsea

16   operations and deep water drilling experience?

17       A.  I've been involved in deep water since

18   1993.

19       Q.  And what is your experience -- about

20   how many wells have y'all drilled since that,

21   1993?

22       A.  Wells that I've personally involved in?

23       Q.  Yes, sir.

24       A.  I've lost track of the numbers.  It's

25   somewhere probably between 20 and 50, but I

10

1    don't recall the exact number.

2        Q.  Thank you.  When the original Macondo

3    well was being drilled with the MARIANAS, did

4    you ever visit the MARIANAS during that time?

5        A.  I visited the MARIANAS when it was

6    dockside in Galveston.

7        Q.  Did you visit it during the drilling

8    process?

9        A.  No, sir.  I don't think I did, I'm

10   pretty sure.

11       Q.  What problems did BP run into on the

12   Macondo original wellbore to bypass it?

13       A.  On the original wellbore?

14       Q.  Yes.

15       A.  With the DEEPWATER HORIZON?

16       Q.  THE MARIANAS.

17       A.  THE MARIANAS did not do a bypass.

18       Q.  No, the MARIANAS wellbore that you came

19   back and later bypassed with the DEEPWATER

20   HORIZON?

21       A.  I'm not sure I understand the question.

22       Q.  Did BP arrive with the MARIANAS in

23   November, remove off location in November

24   drilling the wellbore for Mississippi Canyon-

25   252 and then come back in February with the

11

1    DEEPWATER HORIZON to complete the bypass?

2        A.  No, we came back and reestablished the

3    wellbore and continued drilling, but we were

4    not in the bypass phase.

5        Q.  Then you got stuck with THE HORIZON?

6        A.  When the HORIZON came on location in

7    February that was to resume drilling

8    operations because we had released the

9    MARIANAS from contract obligations to BP.

10       Q.  So, how many times did you visit the

11   HORIZON at the current location?

12       A.  One time.

13       Q.  And when was that?

14       A.  During the month of March.

15       Q.  And was that for a special reason?

16       A.  I went offshore for -- I'm not sure

17   exactly what was the primaries when I went

18   offshore, but we were going to do a squeeze

19   job on one of the casing shoes, I went out

20   there to oversee that.  It had been quite a

21   while since I had been on the HORIZON, several

22   years prior, and went out there with the

23   assumption I was going to be there a weekend

24   and I end up spending ten days there.

25       Q.  Okay.  What is your specific authority

12

1    to make revisions to casing programs in deep

2    water wells?

3        A.  It's the engineer's job that if a

4    casing change is needed we engineer that

5    change, make that proposal and get it approved

6    through the proper channels at BP.

7        Q.  Is that approved by you or somebody

8    above you?

9        A.  It's recommended by me, approved by

10    somebody above me.

11        Q.  Can you briefly define what "fracture

12    gradient" is, sir?

13        A.  Fracture gradient is the strength of

14    the rock.  All rock has a kind of a given

15    strength under certain constraining forces.

16        Q.  And, also, can you give me a brief

17    definition of pore pressure?

18        A.  Pore pressure is in a rock that has

19    pore spaces it would be the pressure that is

20    contained in those pore spaces.

21        Q.  Can you explain the relationship

22    between the two in deep water drilling?

23        A.  So, pore pressure is always less than

24    or equal to frac gradient.  Frac gradient is

25    the higher number in most cases.  There are

13

1    very, very rare instances that pore pressure

2    and frac gradient can be not exactly the same

3    number, but close enough that for all

4    practical purposes it would be the same

5    number.

6        Q.  During the design of your well, does BP

7    take in any consideration for risk?

8        A.  Every well has risks.

9        Q.  Do you take into consideration the

10    location of casing?

11        A.  Absolutely.

12        Q.  How about shallow gas?

13        A.  All the time.

14        Q.  Ballooning?

15        A.  Ballooning is kind of a result of

16    drilling.  It's not something that exist

17    naturally.

18        Q.  How about cement jobs?  Do you take

19    poor cement into any type of risk

20    calculations?

21        A.  Absolutely.

22        Q.  How about station keeping of a MODU?

23        A.  Absolutely.

24        Q.  And how do you evaluate and manage that

25    risk?

14

1      A.  It's done at all different levels.

2    From the well side we do a risk management

3    kind of plan and then we put together a risk

4    management document, capture all of the risks

5    that we think exist going into a well. We --

6    we -- we take previous wells risk, look at how

7    those turn out, learn from them. But we have

8    a risk register. It's kind of the official

9    terminology that you might find within BP.

10      Q.  Did you design the casing program for

11    Mississippi Canyon-252?

12      A.  I came up with the basis of design and

13    then we have that design validated by our

14    technology group.

15      Q.  And who's on that technology group,

16    sir?

17      A.  Specifically for this well would be

18    Steve More (phonetic).

19      Q.  Just one person? Okay.

20      A.  Yeah, other people involved in that

21    casing design would be Rich Miller and Mike

22    Payne and Phil Patillo, Sr., Phil Patillo, Jr.

23      Q.  Do you recall how many times you

24    revised the casing program for this specific

25    well?

15

1      A.  Not specifically, no, but it was

2    multiple.

3      Q.  If I told you there was four changes to

4    the casing program submitted to the MMS is

5    that accurate?

6      A.  It's possible.

7      Q.  Is it possible or do you not know?

8      A.  Well, I would say that when we set out

9    to drill the well we thought it was going to

10   take six strings to drill the well.  It ended

11   up taking eight strings to drill the well.

12   Some of those strings were shortened and some

13   of them were deepened.  As all expiration

14   wells, when you go into an expiration well you

15   have a plan and there's going to be changes to

16   that plan because of the nature of the type of

17   well you're drilling.

18     Q.  So, in the initial casing program you

19   submitted, there was seven casings and it was

20   changed to nine?

21     A.  No, the initial permit had six strings

22   of casings.

23     Q.  So, you talked about why those changes

24   were needed.  Why specifically in this well

25   were those changes needed to go from different

16

1  strings?

2     A.  So when you start the well you have a

3  pore pressure frac gradient implied with some

4  assumptions based on offset information,

5  seismic data calculations.  So, when you

6  actually drill the well, you essentially prove

7  or disprove that prediction.  And the

8  prediction in this case was not accurate, as

9  it is in most expiration wells.  So the plan

10  initially had six strings of casing, but we

11  know that we have two, three or four

12  contingency strings that are available.  We

13  don't permit those contingency strings, it's

14  not required to permit contingency strings.

15  Sometimes they show up on wellbore diagrams

16  that the MMS has to kind of identify where

17  potential contingency strings are.  But, in

18  drilling an expiration well, as you drill

19  along and, depending on where you are

20  according to the plan, you will then begin

21  start adjusting the plan mobilizing those

22  contingency strings.

23     Q.  Okay, thank you.  What was your

24  interaction with the MMS drilling engineer?

25     A.  Which drilling engineer would that be?

17

1     Q.  Frank Patton or whoever's in the New

2    Orleans District?

3     A.  I had no one on one interaction with

4    Mr. Patton.

5     Q.  Do you normally have any interaction

6    with the MMS drilling engineer or is that

7    solely through your regulatory department?

8     A.  That's usually through our regulatory

9    department.

10     Q.  Prior to the drilling of the Macondo

11    well, did anyone from BP or yourself go visit

12    with the New Orleans District about the

13    exploratory well?

14     A.  For the Macondo well?

15     Q.  Yes, sir.

16     A.  I did not participate in any meeting.

17    In the past we have had meetings when we drill

18    really special wells we'll go and inform the

19    MMS personally.  I've been involved in those

20    in the past.

21     Q.  Why did you add the -- in that casing

22    program, why did you specifically add the 11

23    7/8ths and the 9 7/8ths liners to the casing

24    program?

25     A.  Those casings were going to required to

18

1    reach the objective depth due to the pore

2    pressure frac gradient.

3        Q. Are you familiar with BP's management

4    of change program, sir?

5        A. Yes.

6        Q. Is the program that you use in the

7    engineering department the same that's

8    outlined in their HSE manual?

9        A. I'm not sure what's in the HSE manual.

10       Q. Would you mind if I just showed it to

11   you real quick?

12       A. Sure. I would say that the drilling

13   department's MOC is -- this is what it's

14   talking about, yeah.

15       Q. Okay. So --

16       A. But I have not personally -- I do not

17   personally have a copy of this document or --

18       Q. Oh, no problem. I'm just trying to see

19   if -- I was going to ask you some general

20   questions about the management of change

21   process and it might not be that one. That's

22   why I asked if it was similar.

23       A. Right.

24       Q. When you change an APD, application

25   permit to drill, with the specific casings, do

19

1    you go through a management of change process

2    that's initiated by someone?

3        A.  We do go through a management of change

4    process.

5        Q.  And how often does that -- how long

6    does that take?

7        A.  It depends on the nature of the change.

8        Q.  Okay.

9        A.  Depends how many risks there are with

10   the change, how much -- you know, how much

11   time's going to be involved with the change.

12   There's a lot of various factors.

13       Q.  So, a casing program change does

14   actually initiate a management of change

15   process?

16       A.  Yes.

17       Q.  And who verifies that process?

18       A.  There's -- there's multiple people

19   involved in both the review and approval of

20   management of change.

21       Q.  And who would review such a change of

22   the casing program and actually sign off on

23   it?

24       A.  It would depend on the scope of the

25   change, the level would change -- the level of

20

1    approval would change depending on what the

2    exact change that you want to know about.  You

3    know, if it's -- if it's -- if it is setting a

4    casing string shower by 300 feet because of

5    pore pressure frac gradient does not allow you

6    to get to the original planned depth, that

7    management of change is a much different scale

8    than trying to deepen a casing string by 3,000

9    feet.

10    Q.  Okay.  Do you recall why you use a 7

11    inch casing in the hole at the very end of the

12    production casing?

13    A.  Yes.

14    Q.  Can you please elaborate on why?

15    A.  Well, 7 inch fits inside an 8 and «

16    inch hole.  We had to run the 9 and 7/8ths

17    contingency liner, so the original plan was to

18    run a 9 and 7/8ths long string due to the fact

19    we were in a 9 and 7/8ths contingency string

20    it's unable to get a full 9 and 7/8ths inch

21    long string to the reservoir.

22    Q.  But you still have the option to run a

23    5 inch casing if you wanted?

24    A.  You can run any size casing that will

25    fit in that 8 and a half inch hole, yes.

21

1    Q.  Are you familiar with the economics

2    between a 5 inch and a 7 inch casing, the flow

3    rate?

4    A.  I don't run economics and I don't do

5    flow rate calculations.

6    Q.  Earlier we talked about ballooning, can

7    you inform me or give me a brief definition of

8    what formation ballooning is, sir?

9    A.  So, while you're drilling the hole

10   section, you have a certain mud weight in the

11   hole and you know prior to drilling -- prior

12   to drilling out -- when you drill out that

13   casing string you get a frac gradient

14   estimation by doing a leak off test or a

15   formation integrity test and then you have a

16   mud weight that you're drilling ahead with.

17   In a ballooning situation you will start

18   losing mud or, you know, you're pumping --

19   let's just use for example 1,000 gallons a

20   minute in the hole and you may be getting 900

21   or 800 back.  So, you're having loss

22   circulation event, you're not getting full

23   returns.  So, you would shut the pumps down,

24   monitor the hole and perhaps during a

25   ballooning event the formation is either

22

1    swelled or fractured. It's not an exact

2    science. You don't really know what's going

3    on down in a hole. The ballooning is given in

4    the fact that if you expand the hole then the

5    hole contracts when you turn the pumps off and

6    gives the mud back.

7        Q.  During the Macondo well, were there any

8    ballooning incidents that you were aware of?

9        A.  Yes.

10       Q.  And what were your recommendations to

11   address those ballooning incidents?

12       A.  Well, we have many different ways to

13   combat ballooning.

14       Q.  Can you elaborate?

15       A.  In one instance we slowed down the pump

16   rate, which lowers the ECD or equivalent

17   circulating density. You can also cut the mud

18   weight back. You can pump lost circulation

19   materials to help bridge off any fractures or

20   permeable zones that may be causing the

21   ballooning. We actually did all three of

22   those in multiple hole sections, as well.

23       Q.  At any time did BP consider using

24   managed pressure drilling?

25       A.  No.

23

1      Q.  Did you encounter any other

2   abnormalities during the drilling of this

3   well?

4      A.  We had major lost circulation events,

5   we had well control events.

6      Q.  Did you have any swabbing?

7      A.  Not to my knowledge.

8      Q.  Did you pull any drill pipe wet?

9      A.  Not to my knowledge.

10     Q.  Were there any tight spots in this

11   well?

12     A.  I can't recall specifically.

13     Q.  Was there a stuck bottom hole assembly?

14     A.  Yes.

15     Q.  What was the maximum background gas

16   that you received when drilling this

17   production casing?

18     A.  While drilling the last hole section I

19   don't recall that number exactly, but it was

20   not the highest background gas we had seen

21   while drilling this well.

22     Q.  Not the highest.  Do you have a range

23   or —

24     A.  Well, when you use the units it's

25   either zero and the maximum's 3,000.

24

1     Q.  While you were drilling that production

2     section, did you have any gas cut mud due to

3     high drilling gas?

4     A.  I'm not -- not sure.

5     Q.  Did you have a detailed procedure for

6     performing a negative test on the production

7     casing?

8     A.  I wrote the permit for that temporary

9     abandonment.

10     Q.  Yes, sir.

11     A.  Which included the negative test.

12     Q.  Yes, sir.

13     A.  The detailed procedures are generated

14     at the rig site.

15     Q.  And those are sent to the rig?

16     A.  The permit's sent to the rig.

17     Q.  Okay.

18     A.  The detailed procedure is created on

19     the rig site.

20     Q.  And that procedure, did it say

21     "Negative test casing to sea water gradient

22     equivalent for 30 minutes with the kill line"?

23     A.  I believe that's what the permit said.

24     Q.  And there was no other permit that was

25     submitted to the rig other than this one?

25

1      A.   There's only one permit for the

2   temporary abandonment.

3      Q.   Thank you.  I'm just trying to clarify

4   something that was told to me yesterday.

5      A.   Yeah.

6      Q.   Do you know if the DEEPWATER HORIZON

7   crew set the top plug before they circulated

8   the riser?

9      A.   The top plug --

10      Q.   Yes, sir.

11      A.   -- or the surface plug?

12      Q.   Top plug, did I say surface?

13      A.   Well, it is the surface plug.  Was not

14   set.

15      Q.   Oh, sorry.  We have different

16   terminology in the MMS, we call it a top plug.

17   He was talking to me when you answered my

18   question, I'm sorry.

19      A.   Well, in the CFRs I thought it was

20   known as a surface plug, sorry.  But that plug

21   was not set.

22      Q.   Okay.  Do you think they should have

23   set that plug before they started circulating

24   out the riser?

25      A.   No.

26

1      Q.  In your opinion would it have reduced

2   the risk of that operation?

3      A.  I don't know.  I don't believe so.

4      Q.  Did you -- are you involved with the

5   procedure of how to route the mud when you're

6   circulating out the riser?

7      A.  No, sir.

8      Q.  Were you aware if they -- who was

9   responsible to monitor the circulating of the

10   riser? Do you know if anybody at BP removed

11   someone from monitoring levels on the well?

12      A.  The monitoring is all done at the rig

13   site.  I'm not sure who -- there's multiple

14   people from all parties that monitor that mud

15   flow.

16      Q.  Is it common for BP, from reading the

17   morning reports, to remove someone from

18   monitoring a mud logger from monitoring the

19   returns?

20      A.  If they made a decision on the rig site

21   to change people I'm not aware of that.

22      Q.  Do you have any specific well control

23   training, sir?

24      A.  Yes, sir.

25      Q.  And what is that?

27

1        A.  I've been, per kind of BP's plan with

2     the MMS, we do recurring well control

3     training.  My last school was kind of within

4     the last two years with wild well control.

5        Q.  Have you ever witnessed a BOP test on

6     the DEEPWATER HORIZON?

7        A.  I have not like personally overseen a

8     complete BOP test.

9        Q.  Were you aware of any BOP problems

10    while they were drilling that well?

11       A.  No.  Every test had been satisfactory

12    during the drilling of this well to my

13    knowledge.

14       Q.  Were you aware —

15       A.  The MARIANAS had BOP problems while we

16    were drilling the first section with that --

17    you know, the first section of The MARIANAS.

18    In fact, the BOP problems was why that rig was

19    kind of on standby when Hurricane Ida

20    occurred.  So --

21       Q.  So, you weren't aware of any problems

22    before they splashed that BOP stack of any

23    leaks?

24       A.  On the HORIZON?

25       Q.  Yes, sir.

28

1      A.  No, nope.

2      Q.  Can you please explain what a dead man

3  function on a BOP stack is?

4      A.  It is if you lose full communications

5  with the stack for whatever reason the stack

6  has power and hydraulic capabilities to close

7  in certain functions automatically.

8      Q.  How about an auto shear, can you

9  explain that too?

10      A.  That's part of the dead man system that

11  the shear rams would close.

12      Q.  Does BP require any testing on those

13  systems?

14      A.  I'm not aware of any requirement, but I

15  don't -- I don't get involved in the BOP

16  testing.  That's something that's done with

17  Transocean and the well site leaders.

18      Q.  So, you're not familiar with any of the

19  BOP functionalities?  Like you're not familiar

20  with any of the type of components of the

21  stack and what roles they play in and what

22  types of lock outs or any type of bypasses or

23  anything that they can have on it?

24      A.  I have a general knowledge of subsea

25  BOP systems, but that is not one of my primary