# EXHIBIT C-1
# JIMMY HARRELL

01-37354
TC

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG
"DEEPWATER HORIZON" in the
GULF OF MEXICO, on
APRIL 20, 2010

)
)
)
)
)
)
)

MDL NO.  2179

SECTION: J

JUDGE BARBIER

MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Jimmy Wayne Harrell, III

**VOLUME 1**

JULY 12, 2011

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

65

1  present?
2       A.   I take the Fifth.
3       Q.   Okay.  And counsel for other
4  parties and interests were present during
5  that examination?
6       A.   I take the Fifth.
7       Q.   Okay.  We're going to turn first
8  to Page 6.  Isn't it true that you testified
9  under oath that you were over the entire rig
10 along with the captain in terms of your
11 responsibility?
12       MR. KINCHEN: Object to the form.
13 Instruct the witness not to answer as to his
14 testimony at the MBI hearing.
15       Q.   (BY MR. HAYCRAFT) You can
16 answer that.
17       A.   I take the Fifth.
18       Q.   Isn't it true that on the
19 DEEPWATER HORIZON the captain reported to
20 you?
21       A.   I take the Fifth.
22       Q.   Isn't it true that you were the
23 ultimate authority aboard the DEEPWATER
24 HORIZON?
25       MR. KINCHEN: Object to the form.

66

1       A.   I take the Fifth.
2       Q.   (BY MR. HAYCRAFT)  Isn't it true
3  that you were the ultimate authority on
4  DEEPWATER HORIZON for safety?
5       MR. KINCHEN: Object to the form.
6       A.   I take the Fifth.
7       Q.   (BY MR. HAYCRAFT)  Isn't it true
8  you were the ultimate authority on DEEPWATER
9  HORIZON for preventing pollution?
10       MR. KINCHEN: Object to the form.
11       A.   I take the Fifth.
12       Q.   (BY MR. HAYCRAFT)  Turning to
13 Page 9 of your MBI testimony.  Isn't it true
14 that you testified under oath that you were
15 in the shower during this -- the beginning of
16 this incident?
17       MR. KINCHEN: Object to the form.
18 Instruct the witness not to answer regarding
19 his testimony at the MBI hearing.
20       A.   I take the Fifth.
21       Q.   (BY MR. HAYCRAFT)  Isn't it true
22 that you were in the shower at the time of
23 the well control situation aboard the
24 DEEPWATER HORIZON?
25       A.   I take the Fifth.

67

1       Q.   Isn't it true that the first
2  thing you knew about any influx or kick was
3  an actual explosion?
4       A.   I take the Fifth.
5       Q.   Isn't it true that in your
6  experience it takes time for a gas bubble to
7  rise up 17,000 feet past the riser -- past
8  the BOP and into the riser; isn't that true,
9  sir?
10       MR. KINCHEN: Object to the form.
11       A.   I take the Fifth.
12       Q.   (BY MR. HAYCRAFT) Isn't it true
13 that during that time, changes occur in
14 pressures and pit returns?
15       MR. KINCHEN: Object to the form.
16       A.   I take the Fifth.
17       Q.   (BY MR. HAYCRAFT) Isn't it true
18 that the driller in the driller shack has
19 gauges and monitors, computer screens to
20 monitor pressures and pit returns?
21       A.   I take the Fifth.
22       Q.   Isn't it true that there's
23 supposed to at least be two people on duty in
24 the driller shack at all times?
25       A.   I take the Fifth.

68

1       Q.   Isn't the -- it true that the
2  drill crew is supposed to be immediately
3  available to use the IBOP in an incident --
4  to -- in the beginning of an incident?
5       MR. KINCHEN: Object to the form.
6       A.   I take the Fifth.
7       Q.   (BY MR. HAYCRAFT) Isn't it true
8  that the driller's key responsibility is to
9  continuously monitor data on the computer
10 screens available in the driller shack?
11       MR. KINCHEN: Object to the form.
12       A.   I take the Fifth.
13       Q.   (BY MR. HAYCRAFT) Isn't it true
14 that the immediate first step of the drilling
15 crew is to shut in the well?
16       MR. KINCHEN: Object to the form.
17       A.   I take the Fifth.
18       Q.   (BY MR. HAYCRAFT) Isn't it true
19 that the immediate first step of the drilling
20 crew is to shut in the well rather than take
21 time to diagnose what the problem is?
22       MR. KINCHEN: Object to the form.
23       A.   I take the Fifth.
24       Q.   (BY MR. HAYCRAFT) Isn't it true
25 that the first job of the drill crew is to

PURSUANT TO CONFIDENTIALITY ORDER

85

:27 1 in the first -- in the -- in the sequence of
:22 2 the first negative test, there were 23
:24 3 barrels that came back, correct?
:28 4     MR. KINCHEN: Objection; form.
:28 5     A.   I take the Fifth.
:38 6     Q.   (BY MR. HAYCRAFT)  But you
:29 7 thought that was okay because ordinarily in
:35 8 your experience there was some flow after a
:36 9 negative pressure test?
:39 10     MR. KINCHEN: Objection; form.
:39 11     A.   I take the Fifth.
:40 12     Q.   (BY MR. HAYCRAFT)  The
:42 13 company -- the BP wellsite leader, however,
:45 14 requested that Transocean crew do a second
:45 15 negative test, did he not?
:59 16     MR. KINCHEN: Objection; form.
:50 17     A.   I take the Fifth.
:55 18     Q.   (BY MR. HAYCRAFT)  Isn't it true
:52 19 that in the second negative test, that both
:58 20 the BP company man and the toolpusher from
:59 21 Transocean as well as the driller and
:07 22 assistant driller conferred about whether or
:08 23 not the second negative test had been a
:09 24 success?
:10 25     MR. KINCHEN: Objection; form.

86

:18 1     A.   I take the Fifth.
:18 2     Q.   (BY MR. HAYCRAFT)  And in fact
:18 3 it was the toolpusher, Randy Ezell, who
:22 4 reported to you that the second test had been
:24 5 successful, correct?
:23 6     MR. KINCHEN: Objection; form.
:30 7     A.   I take the Fifth.
:34 8     Q.   (BY MR. HAYCRAFT)  Isn't it true
:35 9 that on April the 20th both the Transocean
:38 10 drill crew, including its senior toolpusher
:39 11 and driller and the BP company men,
:39 12 interpreted the negative pressure test?
:43 13     MR. KINCHEN: Objection; form.
:48 14     A.   Take -- I take the Fifth.
:51 15     Q.   (BY MR. HAYCRAFT)  And I'm going
:54 16 to direct your attention to Page 85 of your
:56 17 MBI testimony, Line 2:  Who on the DEEPWATER
:57 18 HORIZON was interpreting the negative test
:59 19 data for the first and second test?  Your
:05 20 answer on Page 85, Line 5 and 6:  Who was
:00 21 interpreting the data?  The company man and
:09 22 the toolpusher up there.
:20 23     Did I read that correctly?
:23 24     A.   I take the Fifth.
:28 25     Q.   Let's turn to the subject of

87

1 centralizers.
2     Isn't it true that as OIM you
3 thought that BP made a decision to leave
4 centralizers out altogether after the cement
5 job -- or during the -- excuse me -- during
6 the cement job?
7     MR. KINCHEN: Objection; form.
8     A.   I take the Fifth.
9     Q.   (BY MR. HAYCRAFT)  Did you
10 understand my question?
11     A.   No, I didn't.
12     Q.   Okay.  Let me try it again.
13     MR. FANNING: His answer is the same, I
promise you.
15     MR. HAYCRAFT: Fair enough.
16     Q.   (BY MR. HAYCRAFT)  Looking at
17 Page 88 of your MBI testimony and looking at
18 the question on Line 14, you didn't know
19 anything about that and the context there as
20 the number of centralizers that would be used
21 prior to the cement job.
22     And question:  You didn't know
23 anything about that?  Answer:  No, sir.  I
24 thought they left them off.
25     And my question to you is, is

88

1 that -- did I read that accurately?
2     A.   I take the Fifth.
3     Q.   Isn't it true from your point of
4 view and your years of experience as an OIM
5 that as far as the drill crew is concerned,
6 whether or not centralizers or the number of
7 centralizers are used, that the driller's
8 responsibility remains the same, to
9 constantly monitor the well?
10     MR. KINCHEN: Objection; form.
11     A.   I take the Fifth.
12     Q.   (BY MR. HAYCRAFT)  And that
13 regardless of whether 5, 6, or 21
14 centralizers are used, the drill crew's
15 responsibility is to constantly monitor the
16 well.  Isn't that a fact?
17     MR. KINCHEN: Objection; form.
18     A.   I take the Fifth.
19     Q.   (BY MR. HAYCRAFT)  Looking at
20 Page 104 of your MBI testimony, and I'm
21 looking at -- we're talking about getting the
22 results of the second negative test.  The
23 question on Line 21:  Were you aware of any
24 others, sir?  Answer:  I know the senior
25 toolpusher told me he talked to the

22  (Pages 85 to 88)

PURSUANT TO CONFIDENTIALITY ORDER

105

1  were you not?
2      A.   I take the Fifth.
3      Q.   If you turn with me in your MBI
4  testimony to Page 115 -- 116, you were asked
5  whether you alone as the OIM were responsible
6  for safety, the conditions and the procedures
7  on board the DEEPWATER HORIZON.  And your
8  response was:  Yes, as OIM I was responsible
9  for the safety of everyone.
10         Correct?
11     A.   I take the Fifth.
12     Q.   That was a true statement when
13 you gave that in May, correct?
14     MR. KINCHEN: Object to the form.
15     A.   I take the Fifth.
16     MR. KINCHEN: Instruct the witness not
17 the answer as to his MBI testimony.
18     Q.   (BY MR. FLEMING) And sitting
19 here today, you would still state that you
20 are -- as OIM, as of April 20, 2010, were
21 responsible for the safety of everyone on
22 board the HORIZON, correct?
23     MR. KINCHEN: Object to the form.
24     A.   I take the Fifth.
25     Q.   (BY MR. FLEMING) It is your

106

1  understanding as OIM that if the EDS, or
2  emergency disconnect system, did not
3  activate, you were still in charge of the
4  rig, correct?
5      MR. KINCHEN: Object to the form.
6      A.   I take the Fifth.
7      Q.   (BY MR. FLEMING) And you
8  testified to this, in fact, in May before the
9  MBI panel.  On Pages 135 and 136 of your
10 testimony you were asked --
11     MR. KINCHEN: Object --
12     Q.   (BY MR. FLEMING) -- you were
13 asked if it didn't activate -- referring to
14 the EDS system -- assuming that you were in
15 command before the incident, if the EDS
16 didn't activate, you would still be in
17 command throughout the -- the -- I believe
18 that should be evacuation here in instead of
19 the master -- your answer was:  Yes, if it
20 wasn't latched up, yes.
21         That was your testimony, sir?
22     MR. FANNING: If we were answering the
23 question, we would have an objection as to
24 the form, but I don't guess we need to do
25 that under the circumstances.

107

1      MR. FLEMING: I'm just reading what --
2      MR. FANNING: I couldn't follow your
3  question.  I'm sorry.
4      MR. FLEMING: That's the question that
5  was there in the record.  I didn't make the
6  question.
7      MR. FANNING: Oh, okay.  Well, it
8  doesn't matter anyway.  Go ahead.
9      A.   I take the Fifth.
10     Q.   (BY MR. FLEMING) The question,
11 though, is -- let me see if I can get it a
12 little bit cleaner just for the record.
13     MR. FANNING: I'm doing that for you,
14 not for me.
15     MR. FLEMING: No, that's fine.
16     MR. FANNING: Our answer is the same.
17     MR. FLEMING: That's fine.
18     Q.   (BY MR. FLEMING) If the EDS
19 does not activate, you were in charge of the
20 rig, correct?
21     MR. KINCHEN: Object to the form.
22     Q.   (BY MR. FLEMING) Correct?
23     MR. FANNING: Go ahead.  I take the
24 Fifth.
25     A.   I take the Fifth.

108

1      Q.   (BY MR. FLEMING) Okay.  And the
2  EDS system did not, in fact, activate on
3  board the HORIZON at time, did it?
4      MR. KINCHEN: Object to the form.
5      A.   I take the Fifth.
6      Q.   (BY MR. FLEMING) So that means
7  until the time that the rig actually sank,
8  you were technically in charge of the
9  HORIZON, correct?
10     MR. KINCHEN: Object to the form.
11     A.   I take the Fifth.
12     Q.   (BY MR. FLEMING) There was
13 never a formal or informal handoff to the
14 captain from you at any time to the HORIZON
15 from April 19th to April 22nd, was there?
16     MR. KINCHEN: Object to the form.
17     A.   I take the Fifth.
18     Q.   (BY MR. FLEMING) Let's talk
19 about the visitors that were on the rig on
20 April 20th.  There were four visitors on
21 board the rig on April 20th, were there not?
22     A.   I take the Fifth.
23     Q.   And those visitors were Pat
24 O'Bryan and David Sims from BP and Daun
25 Winslow and Buddy Trahan from Transocean; is

27  (Pages 105 to 108)

**PURSUANT TO CONFIDENTIALITY ORDER**

109

1 that correct?
2     A.  I take the Fifth.
3     Q.  They were on board the rig at
4 10:30 in the morning; is that correct?
5     A.  I take the Fifth.
6     Q.  And the purpose of their visit
7 was to congratulate the HORIZON on having no
8 lost-time incidents for a period of seven
9 years, correct?
10     MR. KINCHEN: Object to the form.
11     A.  I take the Fifth.
12     Q.  (BY MR. FLEMING) You were with
13 these four men from the time that the -- they
14 were originally on board the rig until late
15 in the evening, were you not?
16     A.  I take the Fifth.
17     Q.  And you were engaged in
18 conversations with them pretty much the whole
19 day on April 20th, correct?
20     MR. KINCHEN: Object to the form.
21     A.  I take the Fifth.
22     Q.  (BY MR. FLEMING) If you would
23 turn with me to Page 41 of your MBI
24 testimony. You were asked what you were
25 doing with these four men. Do you see that?

110

1     You answer was: It was pretty
2 much a conversation with them the whole day.
3     Do you see that?
4     A.  I take the Fifth.
5     Q.  And that was a correct statement
6 when you gave it in May, correct?
7     MR. KINCHEN: Object to the form.
8 Instruct the witness not the answer as to his
9 MBI testimony.
10     A.  I take the Fifth.
11     Q.  (BY MR. FLEMING) Let's talk
12 briefly about the negative pressure test.
13 You spoke about this with Mr. Haycraft, but
14 I'd like to ask you a few more questions.
15     You were aware that the drill
16 crew was running a negative pressure test on
17 April 20th, correct?
18     A.  I take the Fifth.
19     Q.  And you became aware that the
20 drill crew actually ran two different tests
21 during that day, correct?
22     MR. KINCHEN: Object to the form.
23     A.  I take the Fifth.
24     Q.  (BY MR. FLEMING) And you
25 state -- you were aware that the first test

111

1 and the second test, according to your
2 knowledge, both came back fine. Was that
3 your understanding?
4     MR. KINCHEN: Object to the form.
5     A.  I take the Fifth.
6     Q.  (BY MR. FLEMING) Now, it is --
7 as OIM you would not have conducted a
8 displacement without having the results of a
9 negative pressure test, would you?
10     MR. KINCHEN: Object to the form.
11     A.  I take the Fifth.
12     Q.  (BY MR. FLEMING) Is this your
13 practice for deepwater drilling, in general?
14     MR. KINCHEN: Object to the form.
15     A.  I take the Fifth.
16     Q.  (BY MR. FLEMING) Would you ever
17 conduct a displacement at a deepwater depth,
18 such as the depths that the HORIZON were
19 drilling, without conducting a negative
20 pressure test first?
21     MR. KINCHEN: Object to the form.
22     A.  I take the Fifth.
23     Q.  (BY MR. FLEMING) Did BP in the
24 original drill plan that you were aware of
25 have a provision for conducting a negative

112

1 pressure test?
2     A.  I take the Fifth.
3     Q.  They did not, did they?
4     A.  I take the Fifth.
5     Q.  You would not have allowed the
6 displacement to continue without first having
7 a negative pressure test, correct?
8     A.  I take the Fifth.
9     Q.  And in fact, you testified to
10 that effect at your MBI panel hearing,
11 correct?
12     A.  I take the Fifth.
13     MR. KINCHEN: Object to the form.
14 Instruct the witness not to answer as to his
15 MBI testimony.
16     Q.  (BY MR. FLEMING) If you turn to
17 Page 24 of your MBI testimony, you stated
18 that: The first plan I seen didn't have a
19 negative test in it, so I told him --
20 referring to the company men -- you know, it
21 was my policy to do a negative test before
22 displacing with seawater.
23     And that was your testimony in
24 May before the MBI panel, correct?
25     A.  I take the Fifth.

28 (Pages 109 to 112)

**PURSUANT TO CONFIDENTIALITY ORDER**



**113**

MR. KINCHEN: Object to the form.
Instruct the witness not to answer as to his
MBI testimony.

Q.   (BY MR. FLEMING)  And again, on
Page 81 of your MBI testimony you stated, and
I quote:  I would not displace without doing
a negative test.

A.   I take the Fifth.

Q.   And you also said earlier on
that page:  I said there was not a negative
test in the plan.

You were asked:  Did you think
there should be one called for?

And you said:  Again, I would
not displace without doing a negative test.

A.   I take the Fifth.

Q.   And that was correct testimony
when you gave it in May in -- before the MBI
panel?

MR. KINCHEN: Object to the form.
Instruct the witness not to answer as to his
MBI testimony.

Q.   (BY MR. FLEMING)  Okay.

A.   I take the Fifth.

Q.   So you were the one that

**114**

actually insisted on conducting a negative
pressure test, correct?

MR. KINCHEN: Object to the form.

A.   I take the Fifth.

Q.   (BY MR. FLEMING)  That wasn't
anybody else.  That was you, right?

MR. KINCHEN: Object to the form.

A.   I take the Fifth.

Q.   (BY MR. FLEMING)  And you
instructed the drill crew, including Jason
Anderson, to begin that test, correct?

A.   I take the Fifth.

Q.   You did not actually observe the
entire test, though, did you?

A.   I take the Fifth.

Q.   You were informed of the results
of the test after it was conducted, were you
not?

A.   I take the Fifth.

Q.   But you did not actually
physically maintain your presence while the
test was being conducted, correct?

MR. KINCHEN: Object to the form.

A.   I take the Fifth.

Q.   (BY MR. FLEMING)  And you

**115**

weren't there for either of the two tests
that were conducted, correct?

MR. KINCHEN: Object to the form.

A.   I take the Fifth.

Q.   (BY MR. FLEMING)  Now, you
were -- at some point you became aware that
the drill crew was having some difficulties
with running the first negative pressure
test, correct?

MR. KINCHEN: Object to the form.

A.   I take the Fifth.

Q.   (BY MR. FLEMING)  At some point
you became aware that there was a psi reading
on the drill line of between 1200 to
1400 psi, correct?

THE WITNESS: He said drill line.

MR. FANNING: Just, I take the Fifth.

A.   Okay.  I take the Fifth.

You woke me up.

Q.   (BY MR. FLEMING)  You woke me up
there, too.  I'm sorry.  The drill pipe.
How's that?  It's not going to make any
difference, but just for the clean record,
let me go back and ask the question.

A.   I still take the Fifth.

**116**

Q.   Still I take the Fifth.

So there was a negative -- there
was a 1200 psi reading on the drill pipe, not
the drill line, correct?

A.   I take the Fifth.

Q.   You became aware of some
anomalous readings during the first negative
test, did you not?

A.   I take the Fifth.

MR. KINCHEN: Object to the form.

Q.   (BY MR. FLEMING)  And you
instructed the crew who were conducting the
negative test to increase the annular
pressure to assist in being able to get a
negative test and hold the mud in the riser
between it and the drill pipe, correct?

MR. KINCHEN: Object to the form.

A.   I take the Fifth.

Q.   (BY MR. FLEMING)  And that was
in fact your testimony before the MBI panel
in May of 2010, if you look at Page 113 of
your testimony?

MR. KINCHEN: Object to the form.
Instruct the witness not to answer as to his
MBI testimony.

**PURSUANT TO CONFIDENTIALITY ORDER**

133

1  first explosion but before you went up to the
2  bridge?
3      A.   I take the Fifth.
4      Q.   (BY MR. FLEMING)  Is that time
5  that could have been better spent going to
6  the bridge directly and giving the order to
7  EDS?
8      MR. KINCHEN:  Object to the form.
9      A.   I take the Fifth.
10     Q.   (BY MR. FLEMING)  Let's talk
11 about the cement job.  You were aware, were
12 you not, that Halliburton was actually
13 running a cement job on April 19th and
14 April 20th, correct?
15     A.   You were not aware that
16     Q.   You were not aware that
17 Halliburton had run an OptiCem model that
18 predicted a severe gas potential?
19     MR. HAYCRAFT:  Objection; form.
20     A.   I take the Fifth.
21     Q.   (BY MR. FLEMING)  I'm sorry, a
22 severe gas flow potential?
23     MR. HAYCRAFT:  Objection; form.
24     A.   I take the Fifth.
25     Q.   (BY MR. FLEMING)  You were not

134

1  aware of that, sir?
2      A.   I take the Fifth.
3      Q.   Turn to Tab 22.  I'm going to
4  mark this as Exhibit 3810.
5      (Exhibit 3810 was marked.)
6      Q.   (BY MR. FLEMING)  This is an
7  article from the Los Angeles Times dated
8  July 20th, 2010.  In this article there is a
9  quote that is attributed to your lawyer,
10 Mr. Fanning, in which Mr. Fanning states
11 that, I quote, Patrick Fanning, an attorney
12 for Jimmy Harrell, the rig's offshore
13 installation manager and employee of rig
14 owner, Transocean, recalled Harrell's
15 previous testimony that he did not receive
16 the report warning of possible severe gas
17 leak and sure would have liked to have known
18 as well.
19     Do you see that, sir?
20     A.   I take the Fifth.
21     Q.   It continues:  How did he find
22 it out if Halliburton tells BP and BP doesn't
23 share, correct?
24     A.   I take the Fifth.
25     Q.   These are accurate statements,

135

1  as far as you're concerned, are they not,
2  sir?
3      A.   I take the Fifth.
4      Q.   You did not, in fact, receive a
5  copy of the OptiCem report predicting a
6  severe gas flow potential, did you?
7      A.   I take the Fifth.
8      Q.   Mr. Haycraft asked you some
9  questions about a bottoms-up circulation.  Do
10 you recall that?
11     A.   I take the Fifth.
12     Q.   You knew it was better in a
13 cement job to run a bottoms-up circulation,
14 correct?
15     A.   I take the Fifth.
16     Q.   And in fact you testified to
17 that in your MBI panel hearing on Page 111,
18 did you not?
19     MR. KINCHEN:  Object to the form.
20 Instruct the witness not to answer as to his
21 MBI testimony.
22     A.   I take the Fifth.
23     Q.   (BY MR. FLEMING)  You're aware
24 that David Brown, during his 2010 MBI
25 testimony, testified that he heard you leave

136

1  a meeting with the BP officials stating:
2  Guess that's what we have those pinchers
3  for -- or the pinchers.
4      Are you aware of that, sir?
5      MR. KINCHEN:  Objection; form.
6      MS. CHILDRESS:  Objection; form.
7      THE WITNESS:  Who is David Brown?
8      MR. FANNING:  What name did you give
9  him, David Brown?
10     MR. FLEMING:  David Brown.
11     A.   I still take the Fifth anyway.
12 I don't know David Brown.
13     Q.   (BY MR. FLEMING)  Okay.  Okay.
14 You made a comment, did you not, to a BP
15 official at some point on April 20th, 2010,
16 that:  I guess that's what we have those
17 pinchers for.
18     Correct?
19     MR. HAYCRAFT:  Objection; form.
20     MR. KINCHEN:  Objection; form.
21     A.   I take the Fifth.
22     Q.   (BY MR. FLEMING)  And in fact
23 you testified about this in your MBI panel
24 hearing, correct?
25     A.   I take the Fifth.

34  (Pages 133 to 136)

**PURSUANT TO CONFIDENTIALITY ORDER**

137

1    Q.   On Page 54 of your MBI panel
2  hearing you were asked about a pincher, and
3  you stated that a pincher would be a super
4  shear or a blind shear ram.  You were asked
5  about testimony that occurred the previous
6  day that you were, quote, grumbling on the
7  way out about a pincher.  You stated that it
8  wasn't on that day.  I think it was over the
9  foam cement job, watching the nitrogen in the
10 riser because you know that was a foam cement
11 job.
12       Do you see that?
13     MR. KINCHEN: Object to the form.
14     A.   I take the Fifth.
15     Q.   (BY MR. FLEMING) And that is an
16 accurate statement?
17     MR. KINCHEN: Object to the form.
18     Q.   (BY MR. FLEMING) Correct?
19     A.   I take the Fifth.
20     Q.   And on Page 97 of your MBI
21 testimony, you were asked:  Is it true that
22 you said, well, that is what they make those
23 pinchers for.  And your answer was:  I
24 probably did say that.  Like I said earlier,
25 I don't recall it.  I probably did say a lot

138

1  of things that I don't recall.
2       Correct?
3     MR. KINCHEN: Object to the form.
4     A.   I take the Fifth.
5     Q.   (BY MR. FLEMING) At the time
6  the cement job was going on, you did not find
7  that there was anything odd or unusual about
8  the cement job, did you?
9     MR. KINCHEN: Object to the form.
10    A.   I take the Fifth.
11    Q.   (BY MR. FLEMING) And you did
12 not have any doubt about the cement job as it
13 was going through, did you?
14    MR. KINCHEN: Object to the form.
15    A.   I take the Fifth.
16    Q.   (BY MR. FLEMING) And sitting
17 here today, you don't believe that
18 Halliburton did anything wrong with respect
19 to the cement job, correct?
20    A.   I take the Fifth.
21    MR. KINCHEN: Object to the form.
22    Q.   (BY MR. FLEMING) Looking at the
23 float collar conversion, you were aware that
24 it took several times to convert the float
25 equipment, correct?

139

1    MR. ZERINGUE: Object to the form.
2    A.   I take the Fifth.
3    Q.   (BY MR. FLEMING) And in fact
4  that was what you testified to on Page 79 of
5  your MBI testimony, correct?
6    MR. KINCHEN: Object to the form.
7    MR. ZERINGUE: Object to form.
8    A.   I take the Fifth.
9    Q.   (BY MR. FLEMING) Sir, was it
10 Transocean's policy that anyone on the rig
11 could stop work at any time to call a timeout
12 for safety?
13    MR. KINCHEN: Object to the form.
14    A.   I take the Fifth.
15    Q.   (BY MR. FLEMING) And this is
16 referred to as a TOFS, timeout for safety?
17    A.   I take the Fifth.
18    Q.   While you were an OIM, are you
19 aware of any times when this actually
20 happened?
21    A.   I take the Fifth.
22    MR. KINCHEN: Object to the form.
23    Q.   (BY MR. FLEMING) You did, in
24 fact, call a timeout for safety with respect
25 to the negative pressure test, did you not?

140

1    MR. KINCHEN: Object to the form.
2    A.   I take the Fifth.
3    Q.   (BY MR. FLEMING) You refused to
4  move forward with the displacement until
5  negative pressure tests had been conducted,
6  correct?
7    A.   I take the Fifth.
8    Q.   Would you regard that as a
9  timeout for safety?
10    A.   I take the Fifth.
11    Q.   You would not have continued the
12 operations on the rig with displacement until
13 a negative pressure test had been conducted,
14 correct?
15    A.   I take the Fifth.
16    Q.   You were asked a number of
17 questions about the centralizers from
18 Mr. Haycraft.  Do you recall that?
19    A.   I take the Fifth.
20    Q.   You were aware, were you not,
21 that BP was not running a number of
22 centralizers on the drill pipe, correct?
23    MR. KINCHEN: Object to the form.
24    Q.   (BY MR. FLEMING) Correct?
25    A.   I take the Fifth.  I think the

35  (Pages 137 to 140)

**PURSUANT TO CONFIDENTIALITY ORDER**



3806

Exhibit No. _____
Worldwide Court
Reporters, Inc.

# Transcript of the Testimony of
# **The Joint United States Coast Guard/Minerals Management Service Investigation**

## Date taken: May 27, 2010
## AM Session

## USCG/MMS Marine Board of Investigation

### ***Note***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 1

USCG/MMS BOARD OF INVESTIGATION

INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
POLLUTION AND SINKING
OF MOBILE OFFSHORE DRILLING UNIT

DEEPWATER HORIZON, WITH LOSS OF LIFE

IN THE GULF OF MEXICO, 21-22 APRIL 2010

THURSDAY, MAY 27, 2010


A.M. SESSION


*    *    *    *    *    *


The Transcript of the Joint United
States Coast Guard/Minerals Management
Service Investigation of the above entitled
cause before CATHY RENEE´ POWELL, a
certified court reporter authorized to
administer oaths of witnesses pursuant to
Section 961.1 of Title 13 of the Louisiana
Revised Statute of 1950, as amended,
reported at the Radisson Hotel, 2150
Veterans Memorial Boulevard, Kenner,
Louisiana 70062, on Thursday, May 27, 2010,
beginning at 8:00 a.m.

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

1

2     APPEARANCES:

3

     MEMBERS OF THE BOARD:

4

5     CAPTAIN HUNG M. NGUYEN
     CO-CHAIR UNITED STATES COAST GUARD

6

7     DAVID DYKES
     CO-CHAIR MINERALS MANAGEMENT SERVICE

8

9     JASON MATHEWS
     MINERALS MANAGEMENT SERVICE

10

11    JOHN McCARROLL
     MINERALS MANAGEMENT SERVICE

12

13    ROSS WHEATLEY
     UNITED STATES COAST GUARD

14

15    LTR. ROBERT BUTTS, COURT RECORDER
     UNITED STATES COAST GUARD

16

17    REPORTED BY:

18        CATHY RENEE' POWELL
         CERTIFIED COURT REPORTER

19

20             EXAMINATION INDEX

21    EXAMINATION BY MR. MATHEWS: ............7

22    EXAMINATION BY MR. McCARROLL: ..........30

23    EXAMINATION BY MR. DYKES: .............32

24    EXAMINATION BY MR. WHEATLEY: ..........36

25    EXAMINATION BY MR. MATHEWS: ...........50

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255          (504) 529-5255
New Orleans * Baton Rouge * Shreveport

Page 3

1   EXAMINATION BY LT. BUTTS: ..............52

2   EXAMINATION BY MR. DYKES: ..............57

3   EXAMINATION BY MR. LINSIN: ............60

4   EXAMINATION BY MR. JONES: .............62

5   EXAMINATION BY MR. DYKES: ..............67

6   EXAMINATION BY MR. GODWIN: ............72

7   EXAMINATION BY MR. GORDON: ............91

8   EXAMINATION BY MR. GODFREY: ..........107

9   EXAMINATION BY MR. MATHEWS: ..........128

10  EXAMINATION BY MR. DYKES: .............130

11  EXAMINATION BY CAPTAIN NGUYEN: ........131

12  EXAMINATION BY MR. DYKES: .............144

13  EXAMINATION BY MR. WHEATLEY: ..........152

14  EXAMINATION BY MR. MATHEWS: ..........178

15  EXAMINATION BY MR. McCARROLL: ........184

16  EXAMINATION BY LT. BUTTS: .............185

17  EXAMINATION BY CAPTAIN NGUYEN: ........190

18  EXAMINATION BY MR. GODFREY: ..........198

19  EXAMINATION BY MR. GORDON: ............208

20  EXAMINATION BY LT. BUTTS: .............214

21

22

23

24

25

Page 4

1                    P R O C E E D I N G S

2        CAPTAIN NGUYEN:

3              Good morning.  Please be seated so

4    we can get the hearing started.

5              Reporter, please go on record.

6              There is a change in the list of

7    scheduled witnesses this morning.  This

8    morning, the board was informed by

9    Mr. Mansfield's counsel that due to medical

10   reasons, he could not be here for this

11   hearing.  So the board will reschedule to

12   receive his testimony at the next hearing in

13   mid-July.  We will take testimony of

14   Mr. Jimmy Harrell, offshore installation

15   manager, for this morning.

16             Good morning, Mr. Harrell.  Are

17   you represented by counsel, do you have your

18   own counsel or are you represented by

19   Transocean counsel?

20       THE WITNESS:

21             Transocean.

22       CAPTAIN NGUYEN:

23             Please rise, and I will give you

24   the oath.

25             JIMMY HARRELL,

USCG/MMS Marine Board of Investigation          The Joint United States Coast Guard/Minerals Management Service Investigation

Page 5

1    having been first duly sworn as a witness,

2    was examined and testified as follows:

3         CAPTAIN NGUYEN:

4              Mr. Harrell, I want to make sure I

5    understand.  You do not have personal

6    counsel; is that right?  Transocean is your

7    counsel?

8         THE WITNESS:

9              That's correct.

10   EXAMINATION BY MR. MATHEWS:

11        Q.   Mr. Harrell, would you state your

12   name and spell it for the record.

13        A.   Jimmy Harrell, H-A-R-R-E-L-L.

14        Q.   By whom are you employed, sir?

15        A.   Transocean.

16        Q.   And what position do you hold?

17        A.   Offshore installation manager.

18        Q.   And how long have you held the

19   position of OIM?

20        A.   About six and a half years.

21        Q.   Can you briefly describe your job

22   responsibilities on board the DEEPWATER

23   HORIZON.

24        A.   I deal a lot with personnel, you

25   know, but overall responsibility on

Page 6

1    everything, you know.  I am over the entire

2    rig along with the captain.

3        Q.    Prior to becoming an OIM, did you

4    have any previous oil and gas experience?

5        A.    Yes, I did.

6        Q.    Can you elaborate.

7        A.    I was toolpusher, driller, derrick

8    hand, floorhand, all the way down.

9        Q.    All with Transocean?

10       A.    Not all.  I have been working with

11   Transocean since 1979.  I worked for two

12   other companies prior to.

13       Q.    How long have you been assigned to

14   the DEEPWATER HORIZON?

15       A.    January 22, 2004, it will be a

16   little over six years, six and a half.

17            Not all of it.

18       Q.    At the time of the incident, how

19   long were you on your hitch?

20       A.    I had been out a little over two

21   weeks.  I had six days remaining on a 21-day

22   hitch.

23       Q.    At any time during the duration of

24   the well, were you made aware of any

25   specific drilling problems such as lost

USCG/MMS Marine Board of Investigation                The Joint United States Coast Guard/Minerals Management Service Investigation

Page 7

1    returns, stuck pipe, cement in the casing,

2    any other issues?

3         A.   You are talking about --

4         Q.   The drilling of the well that was

5    taking place March through April?

6         MR. CLEMENTS:

7              That entire period of time?

8         THE WITNESS:

9              Oh, yeah.

10   EXAMINATION BY MR. MATHEWS:

11        Q.   Can you please elaborate on what

12   kinds of problems you encountered.

13        A.   It was several cases of lost

14   returns, and we took a couple of kicks and

15   had stuck pipe.  Actually had a side

16   attraction.

17        Q.   Can you please inform me of what a

18   lost return is.

19        A.   That is when the formation won't

20   hold the weight of the drilling fluid.  The

21   hydrostatic pressure exerts.

22        Q.   How about a kick?

23        A.   That is when your mud grade is not

24   dense enough to handle the pressure exerted

25   by the formation.

USCG/MMS Marine Board of Investigation                 The Joint United States Coast Guard/Minerals Management Service Investigation

Page 8

1      Q.    And all of these are potential

2   problems that could lead to later problems

3   in the well?

4      A.    Well, I wouldn't say that, you

5   know.

6      Q.    Okay.  Can you briefly go through

7   the day of the 20th and up to the time of

8   the incident?

9      A.    Yes.  We had run a casing the day

10   before, a string of 9 and 7/8ths by 7 inch,

11   and cemented and were actually pulling out

12   of the hole to go and displace and run a top

13   plug.  We did have a lot of visitors come

14   out that day, BP and Transocean.  Spent the

15   bigger part of the day, you know, talking

16   with them.

17      Q.    And after that discussion, up to

18   the incident?

19      A.    Up to the incident, I got out of a

20   meeting roughly, I would say, at 2115, and

21   got through with the meeting.  I went to the

22   bridge, central control room and looked at

23   permits, closed out permits and talked with

24   the senior toolpusher.

25            Then later on, I got -- went and

Page 9

1    took a shower about the time of the

2    incident, because I was in the shower during

3    the incident.

4         Q.    Can you please elaborate on what

5    happened during the incident as to what you

6    heard and saw up to leaving the DEEPWATER

7    HORIZON.

8         A.    Well, it was a major explosion,

9    followed by, you know, a second explosion.

10   A lot of back draft in the living quarters.

11   It totally destroyed the living quarters

12   over there on the starboard side where I was

13   taking a shower in my stateroom.  And I

14   managed to get debris out of the way and

15   crawled and walked up toward the bridge.

16              And also, I seen some injured

17   personnel, you know, during the way up

18   there.

19              I got to the bridge, the captain,

20   he was up there.  The subsea engineer, Chris

21   Pleasant, he was up there also, you know,

22   looking at the disaster we had.  I knew we

23   needed to get away.  So Chris, I told him to

24   go ahead and disconnect the EDS.

25              Also, I went back down to the

Page 10

1    lifeboat stations to check out the damage to

2    make sure that, you know, they were safe to

3    load personnel in.  It was very chaotic, a

4    lot of people jumping over the side.  It was

5    all during this explosion.

6         Q.   You just made a reference to

7    disconnect, what is that?

8         A.   Disconnect the upper marine riser

9    package, the lower marine riser package.

10        Q.   How is that activated?

11        A.   From either the driller's panel or

12   the toolpusher's panel.

13        Q.   Who has the authority to actually

14   activate that system?

15        A.   Well, there is a drill floor, and

16   it would be the driller or the toolpusher,

17   myself, and I guess at times, you know,

18   during a real emergency, even the captain,

19   you know.  If we exceeded a safe distance,

20   you can bend that wellhead if you wait too

21   long.

22        Q.   Was the attempt to do the

23   emergency disconnect before or after the

24   explosion?

25        A.   It was after.

Page 11

1      Q.   And do you think that the driller

2   or anybody on the rig floor had the

3   capability to activate the EDS at that time?

4      A.   I wouldn't think so because I

5   actually tried to call up there via

6   telephone and radio.  No response.

7      Q.   Back up to a few seconds ago, you

8   said something about you had some visitors

9   on your rig that day.  What time of day did

10   they arrive from BP and Transocean?

11      A.   It was roughly around 10:30.

12      Q.   Who was that?

13      A.   Pat O'Brien, David Sims, Don

14   Winslow and Buddy Trahan.

15      Q.   And Don --

16      A.   Don and Buddy were with

17   Transocean.  The other two were with BP.

18      Q.   And why were they coming?

19      A.   For a rig visit.  And recently, we

20   had just made seven years with no lost-time

21   incidents, and they wanted to go over that

22   with us and congratulate us on that.

23         Pretty much -- the only other

24   things we went over -- we went over, you

25   know, our planned maintenance, trying to get

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 12

1    a good relationship with the client to where

2    we could meet their needs and they could

3    meet ours as well.

4         Q.   You were on the DEEPWATER HORIZON

5    in 2008; is that correct?

6         A.   2008?  That's correct.

7         Q.   Could you refer to the incident

8    report right there.

9         A.   Yes.

10        Q.   Can you refer to the date that is

11   highlighted at No. 1.  What is the date?

12        A.   6th of March, 2008.

13        Q.   Could you --

14        A.   It says "LTA," but according to

15   our records, we did not have an LTA.  It

16   says "53 days," so that couldn't be right.

17        Q.   So who reported that to the MMS?

18   You can refer to the top of that thing.  Who

19   reported that, BP or Transocean?

20        A.   I guess it was BP.

21        Q.   So the only reason they were

22   coming out there to recognize you-all was

23   for no lost-time incidents and to discuss

24   safety?

25        A.   That's correct.

Page 13

1    Q.    Nothing about the well, nothing

2    about any problems of being delayed?

3    A.    No, nothing about delays or

4    anything.

5    Q.    To your knowledge, is there any

6    policy within Transocean to lock out any

7    portion of the BOP stack?

8    A.    No, there was nothing locked out.

9    Q.    If there isn't a policy, are you

10   aware of any time that this does occur on a

11   Transocean rig?

12   A.    I have seen it before, you know,

13   on a different rig.  I mean, if you had a

14   problem, but like I say, everything is

15   reported, you know, to BP and MMS, any

16   problems with the BOP stack.

17   Q.    We don't see a report on the BOP

18   stack is locked out.  Can you elaborate --

19   A.    Locking out -- what are you

20   talking about?  Locking out a function or a

21   ram?

22   Q.    Yes.  A function and a ram.

23   MR. CLEMENTS:

24   Do you understand the question?

25   THE WITNESS:

USCG/MMS Marine Board of Investigation

The Joint United States Coast Guard/Minerals Management Service Investigation

Page 14

1          Not really.

2      MR. CLEMENTS:

3          Can you be more specific?

4  EXAMINATION BY MR. MATHEWS:

5      Q.   Did you disable the autoshear of

6  the BOP stack?

7      A.   Yes, you can disable it from the

8  panel.

9      Q.   Was it disabled in this incident?

10     A.   No.

11     Q.   Do you know if any modifications

12 can be made to the stack?  Any type of

13 modification?

14     MR. CLEMENTS:

15          Is it possible to make any

16 modifications to the stack is the question?

17     MR. MATHEWS:

18          Yes, from Transocean's standpoint.

19     THE WITNESS:

20          Is it possible to make them?  I

21 guess you could if it was up on the surface.

22 EXAMINATION BY MR. MATHEWS:

23     Q.   Who would make such modifications,

24 or would it have to go through the OIM?

25     A.   It would have to go through the

Page 15

1   OIM, but it would have to be management and

2   engineering involved also.

3       Q.   Prior to the incident, were you

4   aware of any BOP issues, like leaks to the

5   accumulator, deadman series modifications,

6   any modifications to the BOP stack's logic?

7       A.   Well, that is a pretty broad

8   question.

9       Q.   I think it is pretty defined.

10      A.   Are you talking about a leak?

11  What kind of leak?

12      Q.   On the accumulator system?

13      A.   No, I wasn't aware of any on the

14  accumulator system.

15      Q.   Were there any modifications to

16  the deadman series?

17      A.   No, sir.

18      Q.   Was there any modifications to the

19  BOP stack's logic?

20      A.   No, sir, not that I know of.

21      Q.   Were there any modifications made

22  by Cameron at the rig?  The people who sold

23  you the BOP stack?

24      A.   At what time?

25      Q.   At any time when you were on rig,

Page 16

1    did Cameron show up and make any

2    modifications to the logic of the stack?

3         MR. CLEMENTS:

4              During the six-year period?

5    EXAMINATION BY MR. MATHEWS:

6         Q.   Any time?

7         A.   I don't know.  They changed some

8    piping and manifolds.  Other than that, I

9    don't know.

10        Q.   Are you familiar with the

11   HORIZON's BOP Assurance Analysis that was

12   completed in March 2001?

13        A.   Yes, I am.  I do remember it.

14        Q.   Is there a copy of that on your

15   rig?  Or was there?

16        A.   Yes, there was a copy.

17        Q.   In that study, it identified there

18   were 260 failure modes that would require

19   the pulling of the BOP on the lower marine

20   riser packet; is that correct?

21        A.   I'm not aware of that.

22        Q.   Can you refer to the RKB Falcon

23   study that is right in front of you, please.

24              I am referring to a study that is

25   entitled "RKB Falcon BOP Assurance

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 17

1    Analysis."

2         Can you reference the number that

3    says how many failure modes that could

4    require pulling for the BOP?

5         A.    I see where it says, "250 failure

6    modes that could require pulling the BOP."

7    "That could."

8         Q.    Were there any problems with the

9    control pods on the BOP at the time of the

10   incident?

11        A.    Not that I am aware of.

12        Q.    Were there any problems with the

13   accumulators at all at the time of the

14   incident?

15        A.    Not that I am aware of.

16        Q.    How about the hydraulic systems?

17        A.    Not that I can recall.

18        Q.    What would be required if you

19   identified that one of your control pods had

20   been -- what would be the result if you

21   identified you had a control pod failure,

22   what would you have to do?

23        A.    We would probably have to pull the

24   BOP.

25        Q.    In your written statement you

Page 18

1    provided to the Coast Guard after the

2    incident, you reported, in the bridge, the

3    BOP control panel as being abnormal after

4    the explosion on the rig.

5            Can you please elaborate as to

6    what you meant by "abnormal."

7        A.   Well, the lighting and all, it

8    didn't look right, like something had taken

9    out the power to the controls during the

10   explosion.

11       Q.   I have done some -- a cursory

12   review of some of the other written

13   statements, and it appears there was some

14   form of simulation going on with the BP reps

15   at the rig and some people on the bridge

16   that are controlling BP.

17            Did you have any involvement with

18   that?

19       A.   I was not involved with it.  They

20   did go up there with the captain and the

21   marine crew, you know, and go through some

22   BP simulator controls.  Simulation only,

23   though.

24       Q.   So that simulation would not

25   impact the Emergency Disconnect System at

Page 19

1    all?

2         A.   No, sir, not at all.

3         Q.   You ordered the subsea engineer to

4    activate the EDS?

5         A.   Yes, I did.

6         Q.   Who was that?

7         A.   Chris Pleasant.

8         Q.   Did you see him?

9         A.   Yes.

10        Q.   What happened after the attempt to

11   activate?

12        A.   It didn't do anything.  It was

13   like the panel was dead.

14        Q.   Were you aware of any of the

15   changes to the drilling program on the

16   MACANDO well during the last 30 days?

17        A.   The drilling plan was constantly

18   changed.

19        Q.   Who were you in communication with

20   directly about those changes?

21        A.   The company man.

22        Q.   And who was that?

23        A.   It was different ones during the

24   time period.  Earnest Pavado, Ross Pavado,

25   Don Vidrine, Bob Kaluza.

USCG/MMS Marine Board of Investigation          The Joint United States Coast Guard/Minerals Management Service Investigation

Page 20

1      Q.   At the time of the incident, was

2  it the typical company man's schedule that

3  was your relationship at the time?

4      A.   It is pretty typical.  I think Bob

5  and Don was doing a shortchange that day.

6  One would be on the unit while he was

7  cementing, and the other one, he stayed up

8  to meet with the BP visitors that came out.

9      Q.   Did you receive and actually view

10 the permits that were approved by the MMS

11 and BP?

12     A.   Yes.  They are all posted in the

13 oil plant.

14     Q.   Are you familiar with the BP and

15 Transocean bridging document for the

16 DEEPWATER HORIZON?

17     A.   Yes, I have a copy.

18     Q.   What is your role in that bridging

19 document?

20     A.   Just -- I have to look over it.

21 It is not a whole lot of changes.  The

22 bridging document is pretty short.

23     Q.   But the bridging document

24 references back to the Transocean agency

25 manual?

Page 21

1      A.    That's correct.

2      Q.    So what are your roles and

3  responsibilities per the HSE, in that

4  manual?

5      A.    To make sure -- we have policies

6  we have to follow as far as Transocean, and

7  also, we have to liaison with BP to meet

8  their policies also.

9      Q.    So according to that document, or

10  as you alluded to earlier, you are

11  responsible for the operations while the

12  well is being drilled on the DEEPWATER

13  HORIZON?

14      A.    Yes, sir.

15      Q.    After the cementing of the

16  production casing, what was the next step in

17  the well?

18      A.    Had to pull out and displace with

19  seawater, and then run the last plug; I

20  think it was 8367 depth.  And then they had

21  some remedial work to do for us.  They had

22  to run a lid impression, lockdown sleeve.

23      Q.    But that plug wasn't set

24  correctly?

25      A.    No, sir, it wasn't.

Page 22

1      Q.   You were in the process of setting

2  it?

3      A.   Yes.

4      Q.   Do you remember the day of the

5  incident getting a 15-barrel gain after

6  testing the casing at 11:55?

7      A.   No, I don't recall that.

8      Q.   You don't recall or --

9      A.   I just don't know.  I'm not up

10  there in the operations at all times.

11      Q.   What time did you begin offloading

12  to the boat?

13      A.   I don't know.  I know the boat was

14  alongside.  Are you talking about offloading

15  or pumping mud?

16      Q.   Pumping mud.

17      A.   I don't know that we pumped any

18  mud that day.

19      Q.   What were you offloading to the

20  vessel?  You weren't doing anything with the

21  support vessel next to you?

22      A.   I can't recall at the time.  I

23  mean --

24      Q.   You are the OIM and you don't know

25  what the support vessel was doing next to

Page 23

1    the rig --

2        A.   He was it getting ready to pump

3    mud from the rig to the vessel.

4        Q.   Prior to the actual displacement

5    of the riser, were there any discussions

6    with you or any other Transocean people with

7    the BP visitors on the rig that day?

8        A.   Yes, we had a tour and went to

9    various places on the rig.

10       Q.   What was discussed?

11       A.   Nothing really.  I did stay behind

12   once we got to the drill floor because they

13   were having a little trouble with the

14   annular holding.  I talked to the operator

15   and asked him to increase the annular

16   pressure.

17       Q.   How many times did it take to

18   successfully test the production casing

19   cement job?

20       A.   Negative, positive or what?

21       Q.   Negative.

22       A.   They had a good test the first

23   time, but they wanted to do it again before

24   the company man come on, Don Vidrine.

25       Q.   Why did they want to do it again?

Page 24

1      A.    They wanted to bring it up the

2   kill line also.

3      Q.    Was there any discussion between

4   BP and Transocean on this procedure or why

5   they were doing this?

6      A.    No, sir.  I mean, I don't have

7   any -- I don't have any problem, you know,

8   if they want to do another negative test.

9      Q.    Was there any discussion between

10  you and BP of any type of unsafe,

11  unworkmanlike activities with displacing the

12  riser?

13     A.    No.  We had one little discussion.

14  The first plan I seen didn't have a negative

15  test in it, so I told him, you know, it was

16  my policy to do a negative test before

17  displacing with seawater.

18     Q.    Did y'all do that?

19     A.    Yes, sir.

20     Q.    Earlier yesterday we had some

21  testimony saying that there was some type of

22  heated debate between you and the company

23  man.

24         Do you know what he may be

25  referring to?

Page 25

1        A.   I don't remember, but I know he

2    didn't debate.  We did talk about the

3    negative test.  He had given me a plan, and

4    I looked at it, and it didn't have anything

5    about a negative test.  We just remained

6    after the meeting, and I talked with them

7    and the driller and the senior pusher, you

8    know, to make sure we did a negative test

9    before displacing the seawater.

10       Q.   Was there ever a Think or Start

11   drill held prior to displacing the riser on

12   the rig floor?

13       A.   I'm sure there was.  We do that

14   before every ---

15       Q.   What was covered in the drill?

16       A.   I was not at the drill.  I was

17   actually with the visitors.

18       Q.   Was anyone monitoring the returns

19   at the time of the incident to see what kind

20   of flow was coming back from the well?

21       A.   I'm sure there was.  You have a

22   shakerhand, and also you have the drilling

23   e-monitors, and also you have the mud

24   loggers monitoring.

25       Q.   Do you know why the mud logger,

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 26

1   Joseph Keith, was taken off from monitoring

2   the flow of returns before the well was --

3        A.   I don't know he was.  I wasn't

4   aware of it.

5        Q.   Do you recall some tank cleaners

6   being on the DEEPWATER HORIZON the day of

7   the incident?

8        A.   Yes, I do.

9        Q.   What were those tank cleaners

10  there for?

11       A.   They were cleaning the mud pits.

12       Q.   Were they in the process of

13  cleaning the mud pits prior to the incident?

14       A.   I believe they had finished the

15  column tanks, and they were getting ready to

16  clean some of the surface pits after

17  displacement was complete.

18       Q.   Are you aware of any training or

19  safety notices that TO has implemented since

20  this incident?

21       A.   No, I am not.

22       Q.   Do you know where the DEEPWATER

23  HORIZON was going after its completion at

24  Mississippi Canyon 252?

25       A.   Yes.  It was going to the Nile

Page 27

1    well to do a completion --

2        Q.   From our records, it indicates

3    that the HORIZON was 43 days late from an

4    application that was submitted by BP to go

5    to a well and abandon that well, actually --

6    which they paid for on February 2 -- and

7    they were actually going to be at that site

8    on March 8, and the incident occurred on

9    April 20.

10           Was there any pressure on you from

11    anyone within Transocean or BP to complete

12    the job that you were doing at Mississippi

13    Canyon 252?

14        A.   Not at all.

15        Q.   What is the day rate of the

16    HORIZON, sir?

17        A.   $525 a day.

18        Q.   So there was no pressure, from

19    what you told me, being about 20 million

20    behind on a well?

21        A.   No, sir.  Not on me, for sure, or

22    my people.

23        Q.   Is there any time you feel you

24    have operational safety being affected by

25    rig efficiency and rig rates?

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 28

1      A.   I'm sure at times people want to

2   get it done and try to meet timelines, but

3   no, you never jeopardize safety.

4      Q.   I want to clarify one more time,

5   the only reason the vice president of

6   drilling and completions at BP and his

7   counterpart were on the rig was to come talk

8   safety?

9      A.   Yes.

10     Q.   Who normally comes from BP to talk

11  safety in those rig visits?

12     A.   We have a lot of different --

13     Q.   Is it the vice president of

14  drilling and completions?

15     A.   Yes.

16     Q.   Normally?

17     A.   Yes.

18  MR. MATHEWS:

19         Thank you.  That is all I have,

20  sir.

21  EXAMINATION BY MR. McCARROLL:

22     Q.   Good morning.  Were you on the rig

23  when it transferred from Panama to the

24  Marshall Islands as far as a flag state?

25     A.   Yes.

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 29

1        Q.    Are you aware of that transfer?

2        A.    Yes.

3        Q.    About the same time, Transocean

4   stopped having ABS inspect the rig package,

5   are you aware of that?

6        A.    No, we still have ABS to come out.

7        Q.    Yeah, but you stopped having them

8   inspect the rig package.    To inspect the

9   rig, but not the package, I'm sorry.

10       A.    Yes.

11       Q.    Was that about the same time,

12  2005?

13       A.    Pretty close.

14       Q.    Is there any connection between

15  transferring of the flag state and stopping

16  of inspecting the drilling package by ABS?

17  Or is that just a coincidence?

18       A.    I don't know.    I can't answer that

19  question.

20       Q.    Okay.   When ABS comes out, do they

21  come talk to you?

22       A.    Yes, I talk to them when they

23  come.

24       Q.    And explain to you why they are

25  out there and what they are going to

Page 30

1 inspect?

2  A. Yes, sir.

3  Q. And when they came out in 2005,

4 did they let you know they were not going to

5 inspect the drilling package?

6  A. I can't say that. I don't know

7 even if I was on board when they came out in

8 2005.

9  Q. Okay. So you might have been off

10 duty and someone else may have been there?

11  A. That's correct.

12 MR. McCARROLL:

13  Thank you.

14 EXAMINATION BY MR. DYKES:

15  Q. In the course of conducting your

16 negative test, how do you line up your

17 valves? You said Mr. Vidrine wanted to do a

18 second negative test. How did you conduct

19 the first one?

20  A. You do it by bleeding off back to

21 Halliburton up your drill pipe. You pump

22 seawater into your tail pipe and all the way

23 back up to above your annular with your

24 spacer.

25  Q. Okay. So then what did you do?

Page 31

1    You close your annular, keep your mud above

2    your annular, seawater in the back side?

3         A.   Yes.   You hold the mud in the

4    riser with the annular closed.

5         Q.   So it is not full, it is not

6    completely to a seawater gradient at that

7    point in time, correct?  Because you have

8    seawater down the drill pipe, but you are

9    holding it down on the back side.   You have

10   no common back -- on the annular all the way

11   back to the surface?

12        A.   You have seawater in the drill

13   pipe, and you have seawater in the kill

14   line.   Either one would be seeing the same

15   pressure as far as from that depth of 8367.

16        Q.   What did he want to do on the

17   second test?

18        A.   He just wanted to come up the kill

19   line, you know.   I guess to make sure

20   everything wasn't plugged and use one line.

21        Q.   If you did it the second time

22   coming up the kill line on the back side,

23   how did you do it the first test?

24        A.   We done it up the drill pipe.

25        Q.   So you had the drill pipe, you had

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 32

1    water in the drill pipe all the way down to

2    83 --

3         A.    That's correct.

4         Q.    -- 67.  And then you had it back

5    up to the annular, correct?

6         A.    That's correct.

7         Q.    And then you had your annular

8    closed, and you had your choke and kill

9    lines closed?

10        A.    (Witness nods head affirmatively.)

11        Q.    But then putting it up the choke

12   line gave you a seawater gradient on the

13   front side on your drill pipe and on the

14   back side?

15        A.    That's correct.

16        Q.    So the first test you did didn't

17   give you a true seawater gradient because

18   you were stopping it on the back side?

19        A.    Well, it would.  Still from that

20   depth, I mean, seawater -- you got seawater,

21   if it is going to flow, it will flow because

22   you have seawater all in the drill pipe.

23        Q.    Where would you see that flow at?

24        A.    Up the chicksan and back down to

25   Halliburton.

Page 33

1    Q.    On the drill pipe?

2    A.    On the drill pipe.

3    Q.    Did you-all observe any flow at

4  that time?

5    A.    We did.  We had to pinch down on

6  the annular at one time and raise the

7  pressure.

8    Q.    Why?

9    A.    There was fluid coming out of the

10  riser, dropping down, in the riser tubing.

11    Q.    The fluid on the riser side was

12  dropping, and you were getting flow on up

13  the drill pipe?

14    A.    Yes, sir.

15    Q.    Which annular did you have closed,

16  the upper or the lower?

17    A.    I believe it was the upper.

18    Q.    When you start displacing, what is

19  the normal procedure for displacing that

20  mud?  Do you displace it right back to the

21  tanks?

22    A.    The mud in the hole?

23    Q.    Yes, sir.

24    A.    For the negative test?

25    Q.    For the negative test.

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 34

1        A.    Yes, it goes back to the mud pit.

2        Q.    What is the normal process for

3    displacing mud off the rig to the DAMON

4    BANKSTON?

5        A.    You displace from the mud pits to

6    the workboat.

7        Q.    You didn't displace directly out

8    of the hole to save time?

9        A.    We're not set up to do that.

10        Q.    You are not set up to displace

11    directly out of the hole to a trip tank and

12    then directly to the boat?

13        A.    No, sir, we come from a manifold.

14        Q.    And that trip tank is not on the

15    manifold?

16        A.    No, sir.

17    MR. DYKES:

18        Thank you.

19    EXAMINATION BY MR. WHEATLEY:

20        Q.    Good morning, sir.  I would like

21    to go back and get some clarification on a

22    couple of items you mentioned.

23        Do you hold any Coast Guard-issued

24    licenses or certificates?

25        A.    Yes, I do.

USCG/MMS Marine Board of Investigation          The Joint United States Coast Guard/Minerals Management Service Investigation

Page 35

1      Q.    What do you hold, sir?

2      A.    I hold the offshore installation

3   manager license.

4      Q.    Do you hold a master's license as

5   well, sir?

6      A.    No, sir, mine's not a master's

7   license.

8      Q.    When you are on a rig such as the

9   one you are dealing with, we had some

10  discussions or questions concerning the

11  chain of command?

12        Once you are on the hole, who is

13  in charge, the master or you?

14     A.    You say "on the hole," you mean

15  latched up?

16     Q.    Yes.

17     A.    Latched up, it would be the OIM,

18  which would be me.

19     Q.    Does the captain work for you at

20  that point?  Or what is the relationship

21  between you and him?

22     A.    The captain and I work together.

23  Like I say, when we are latched up, I am in

24  command.  Unlatched, he is in command.

25     Q.    So as long as you are latched up,

Page 36

1    you are in command?  When you are unlatched,

2    then he is in command?

3         A.    That's correct.

4         Q.    And that is according to the

5    organizational chart and directive for TO?

6         A.    That is correct.

7         Q.    Now, you mentioned about

8    activating the BOP, and you mentioned a

9    number of people.  You said that even the

10   captain in an emergency -- are there other

11   times that the captain is not authorized and

12   he has to ask somebody's permission such as

13   yourself, or is he free to do it when he

14   thinks it is appropriate?

15        A.    Normally, I would be up there or,

16   you know, a toolpusher.  But we would be

17   communicating back and forth, you know.

18            Normally, it would be a driller,

19   toolpusher or the OIM to do the EDS.

20        Q.    I guess my question is:  Does the

21   captain have independent authority to

22   basically execute the EDS if he thinks it is

23   appropriate without asking anybody?

24        A.    He does in an emergency.

25        Q.    Define for me what an emergency

USCG/MMS Marine Board of Investigation                The Joint United States Coast Guard/Minerals Management Service Investigation

Page 37

1    would entail, what types of events?

2       A.   Say, some of the key personnel

3    were taken out.  For this explosion, for

4    instance, I mean, you have got a certain

5    time you have to EDS.  But normal

6    situations, he would not EDS.

7       Q.   It would be you, the senior

8    toolpusher or one of the other people you

9    mentioned?

10      A.   Yes.  Or the toolpusher.

11      Q.   You mentioned you had gone to a

12   meeting and it ended roughly at 2115.  Can

13   you tell us who attended that meeting?

14      A.   It was a lot of people.  The

15   department heads from Transocean, like

16   supervisors, along with Pat O'Brien, BP;

17   David Sims, BP; myself; senior toolpusher;

18   and Don Winslow, Transocean, and Buddy

19   Trahan from Transocean.

20      Q.   Do you recall, in general terms,

21   what you talked about?

22      A.   Yes.  We talked a lot about

23   maintenance and a lot of things we had going

24   on, you know, to continue to improve

25   operations.  Along with the seven-years of

Page 38

 1    no lost time incidents.

 2        Q.   Do you recall any of the specifics

 3    about maintenance or other items related to

 4    the progress of the well?

 5        A.   Yeah.  We were talking about -- we

 6    were talking about maintenance, what we were

 7    going to do at the end of the Macondo,

 8    between there and now.  And in general, just

 9    being open with BP, you know, on the

10    maintenance we needed to perform at the end

11    of each well.  That way, they could tend to

12    their business and plan for their schedule.

13        Q.   Was there any particular issues

14    related to maintenance that you were

15    concerned about as you prepared to move to

16    the next well?

17        A.   Not concerned.  I mean, we always

18    do a maintenance list, you know, to go over

19    it with Transocean in town, and BP on the

20    rig and in town.

21        Q.   Have you ever had an occasion

22    where, you know, you believed that a certain

23    maintenance procedure was necessary,

24    required or advisable, and basically BP told

25    you no, that you needed to move on because

1   they needed you someplace else?

2       A.   Not really.  I can't recollect

3   that.

4       Q.   So if you decided that maintenance

5   is required, basically it is going to get

6   done?

7       A.   If it was critical maintenance,

8   yes, it would be done.

9       Q.   Was there any critical maintenance

10  that needed to be done to your rig before it

11  moved off station to the next spot?

12      A.   Yes, we had some critical

13  in-between well moments.

14      Q.   Do you recall what that was, to

15  the best of your recollection, sir?

16      A.   Yes, we had a few issues with the

17  racker we wanted to do.  Inspect some arms.

18  We had some UPSs that we had to change out.

19      Q.   Could you explain UPS to me?

20      A.   That is a battery backup system.

21      Q.   For what, sir?

22      A.   Oh, I can't recall that right now.

23  I would have to look at -- I would have to

24  look in our RMS to figure out what-all

25  battery UPSs had to be changed.  It was a

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 40

1  pretty lengthy list of things to do.

2      Q.   Do you recall how long it was

3  estimated it would take to do all of this

4  maintenance?

5      A.   Yes, it is usually six to seven

6  days.

7      Q.   Okay.  So a substantial period of

8  time?

9      A.   Yes, sir.

10      Q.   I want to shift focus again, and I

11  am not trying to embarrass you or anything

12  else, but it is important as we look at all

13  of the possible factors that may have been

14  involved in the casualty.

15      At the time of the casualty on the

16  day in question, were you under any kind of

17  medical condition that required you to take

18  prescribed medication, sir?

19      A.   The only medication I take is high

20  blood pressure.

21      Q.   Thank you, sir.

22      In the 24 hours preceding the

23  event on the 20th, do you recall how much

24  sleep you had, again, in those two previous

25  days?

Page 41

1          A.    I would say six or seven hours.

2     Six or seven hours each day, total of 12 to

3     14.

4          Q.    Is that pretty normal for you when

5     you are out there working?

6          A.    Pretty much.

7          Q.    You mentioned there were a number

8     of company people out there both from

9     Transocean and BP.

10          Did you feel any pressure or

11     concerns because they were out there or was

12     it just part of the job?

13          A.    It is part of the job.  No

14     pressure concerns whatsoever.

15          Q.    Could you outline, real briefly,

16     what were your interactions with them that

17     day?  You took them on a tour of the rig,

18     had some meetings.  What else did you do?

19          A.    It was pretty much a conversation

20     with them the whole day.

21          Q.    So lots of discussions?

22          A.    Yeah.  The tour lasted a long

23     time, just getting everything set up, you

24     know.  Seeing what people they wanted to

25     meet with and speak with while they were out

USCG/MMS Marine Board of Investigation       The Joint United States Coast Guard/Minerals Management Service Investigation

Page 42

1    there.  So it pretty much took the whole

2    day.

3        Q.    You said it is part of the job.

4    Do you see it as a distraction while you are

5    out there to have to do that?

6        A.    Not really.  If it was, I would

7    prioritize what I needed to do.

8        Q.    You felt if there were demands of

9    the job as far as drilling going on that you

10   could say, "Sorry, guys, I have got to go

11   take care of this"?

12       A.    Yes, we would take a time-out for

13   that any time.

14       Q.    I want to ask you about lifesaving

15   drills, things of that nature on board the

16   vessel.

17           Are you familiar with, basically,

18   the Watch, Quarter and Station Bill on the

19   DEEPWATER HORIZON?

20       A.    Yes.

21       Q.    What are your general

22   responsibilities in situations such as

23   firefighting and abandon ship?  What are

24   your responsibilities, sir?

25       A.    I go to the bridge.  I'm in charge

Page 43

1    of well control and all that at any time

2    during the drilling to make sure the well is

3    shut in.

4        Q.    Do you have any specific

5    responsibilities concerning firefighting?

6    For example, obviously, we heard there was

7    an explosion followed by a fire, what is

8    your role in a firefighting situation on a

9    rig?

10       A.    Well, the captain, he is basically

11   over the firefighting.

12       Q.    So the captain takes over, and he

13   is responsible for that?

14       A.    He is responsible for

15   firefighting.

16       Q.    What are your responsibilities

17   during the firefighting?

18       A.    I would be on the bridge

19   coordinating whatever we need with different

20   teams, emergency room teams, backup teams,

21   what have you.

22       Q.    During your time on the DEEPWATER

23   HORIZON, is it fair to say you participated

24   in drills, safety drills?

25       A.    Every week.

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 44

1      Q.    You say that with a smile?

2      A.    Yes, sir.

3      Q.    When did you do it?  Did you have

4   a set time you did it, or did it vary?

5      A.    Normally on Sunday at 10 o'clock.

6      Q.    Pretty much routine?

7      A.    Pretty much.

8      Q.    Did you ever vary that and do one

9   of them at night or maybe in bad weather?

10   Do you recall?

11      A.    Not a planned one at night.

12      Q.    So pretty much every Sunday at

13   10:00?

14      A.    Pretty much.

15      Q.    Do you recall whether or not you

16   individually received training on launching

17   of the lifeboats?

18      A.    Yes, I did receive training on

19   that.

20      Q.    Do you recall how frequently that

21   was conducted?

22      A.    I know it was done when I first

23   got on there, and I have actually went to

24   the lifeboats, you know, with other people

25   to try and just refresh myself on training.

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255          (504) 529-5255
New Orleans * Baton Rouge * Shreveport

Page 45

1     Q.    Did you ever actually practice

2   lowering the lifeboats when you were there?

3     A.    Yes.

4     Q.    Did you guys ever load the

5   lifeboat and lower it and -- excuse me, load

6   it and lower it during a drill?  Do you

7   recall?

8     A.    Yes.  Yes, we did.

9     Q.    Do you recall how many times, sir?

10     A.    Well, you say loaded.  A lot of

11   times, we will lower it without all the

12   people on it.

13     Q.    Sometimes you load it to see if

14   you can do that and then other times, you

15   practice lowering it, but -- do you recall

16   an occasion on which you actually loaded the

17   lifeboat and lowered it with those people in

18   the boat?

19     A.    Not while I was there.

20     Q.    You mentioned that following the

21   explosion and fire, you went to your abandon

22   ship position, and where was that?

23     A.    Lifeboat No. 1 on the forward

24   deck.

25     Q.    What was your role?

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 46

1      A.    Tried to make sure everybody was

2    mustered.   It was hard to do that because

3    you had people that was actually jumping

4    overboard.   I did want to inspect the

5    lifeboat davits on account of the explosion.

6    The rig took a pretty good hit from the

7    explosion on the starboard and middle

8    forward of the ship.

9      Q.    Did you have the opportunity to do

10   that before you actually lowered the

11   lifeboats?

12     A.    I did the best I could.   I had a

13   lot of insulation and methane gas in my

14   eyes.   I done the best I could to inspect.

15     Q.    Do you remember who was taking the

16   head count there before launching the boat

17   with respect to your boat, sir?

18     A.    I think it was Darren Rapinski --

19   I'm not sure -- to the best of my

20   recollection.

21     Q.    Do you recall when it finally came

22   time to abandon ship and launch the

23   lifeboats, who gave the command?

24     A.    Who gave the command?

25     Q.    If anybody?

Page 47

1    A.    I don't recall.  We were trying to

2    gather everybody up and get them in the

3    lifeboats and go over the muster.  I can't

4    recall.  It was a lot of trauma with a lot

5    of people at that time.

6    Q.    Yes, sir.

7          Do you recall any particular

8    problems with the launching of the lifeboat

9    you were in?  Did it work the way it was

10   supposed to, the way you practiced it in the

11   drill?

12   A.    Yes, it worked real good.

13   Q.    To the best of your recollection,

14   what kind of equipment was contained in the

15   lifeboat when you guys launched?  Was there

16   water, food?

17   A.    There is always water and food in

18   it.

19   Q.    Do you recall if there was any

20   kind of cutting device, a knife, something

21   like that?

22   A.    In my lifeboat?

23   Q.    Yes.

24   A.    I don't know why you need a knife,

25   you can't --

USCG/MMS Marine Board of Investigation

The Joint United States Coast Guard/Minerals Management Service Investigation

Page 48

1      Q.   We have all heard testimony

2   concerning the life raft that was launched,

3   and potentially some problems with getting

4   it away from the rig, the tether was

5   difficult and they couldn't get it off and

6   ultimately had to cut it, but nobody -- and

7   reportedly nobody on the life raft had a

8   knife.

9           That's the reason for my question.

10      A.   They did, but they did find the

11   cutting device once they got it on the DAMON

12   BANKSTON, but they were unable to find it in

13   the pouch.

14      Q.   I see.  Thank you, sir.

15   MR. WHEATLEY:

16           I don't think I have any other

17   further questions at this point.

18   MR. MATHEWS:

19           Just some quick questions.

20   EXAMINATION BY MR. MATHEWS:

21      Q.   Earlier you were talking about the

22   communication with the Emergency Disconnect

23   System.

24           Are you familiar with emergency

25   shutdowns in the engine room?

Page 49

1        A.    Am I familiar with them?

2        Q.    Yes.

3        A.    Yes, I know we have emergency

4   shutdowns in the engine room.

5        Q.    Was there any communication with

6   anyone to shut down the engine?

7        A.    Not that I am aware of.

8        Q.    Any reason why there was no

9   communication with them?  Or, in the normal

10  well control drill, is there communication

11  with the engine room?

12       A.    Yes, with the dredge.  But like I

13  say, I'm not aware of what kind of

14  communication they had with the bridge.

15       Q.    Also, are you aware of any BOP

16  action log that is kept on the DEEPWATER

17  HORIZON electronically that is transmitted

18  to the beach?

19       A.    Yes, we do have a log in the CCU

20  room.  You can go back and check anything,

21  any kind of event.

22       Q.    That data is submitted --

23       A.    It is a data logger.

24       Q.    And it is sent to the beach and

25  backed up?

Page 50

1      A.    Yes, sir.

2    EXAMINATION BY LT. BUTTS:

3      Q.    Mr. Harrell, you said you were in

4    your accommodations when the explosion

5    occurred.  As far as construction standards

6    go for mobile offshore drilling units, I

7    think your testimony and your statement was

8    that "things were falling upon you."

9           I think you mentioned you had

10   insulation in your eyes.  Is that true?

11     A.    Yes, I did have insulation and

12   methane gas was very strong.  There were no

13   walls and no ceiling left inside the

14   quarters on the starboard side.

15     Q.    Was that a result of the explosion

16   or perhaps gas coming through the

17   accommodations, or do you know?

18     A.    I would say both.

19     Q.    Both?  All right.

20           When did you get notification that

21   the company folks were going to come out and

22   visit with you?  Was it on that morning?  Or

23   was it well planned out?

24     A.    I knew several days ahead of time.

25   I did make some changes to the personnel

Page 51

1    that actually came out.

2        Q.    I know in the Coast Guard, when

3    people visit our unit, we don't necessarily

4    like it too much because it kind of messes

5    up our day-to-day schedules.  I think you

6    said something about there were visitors

7    coming on and you probably would have

8    attended a meeting, a test-start meeting,

9    but because you had visitors, you wanted to

10   obviously go accommodate them?

11       A.    Yeah, I try to attend, you know,

12   all the meetings I can with the guys,

13   different operations.

14       Q.    Sure.

15             When the Coast Guard and MMS, any

16   classification society comes out, and you

17   have a crew meeting and you start talking

18   about why they are there, why is regulatory

19   there -- for example, let's say a

20   classification society, ABS, comes out, and

21   they are coming out to do their annual

22   inspections of the engines.  How do you

23   determine together which engines are going

24   to be tested?  Do you look at, "Well, we are

25   using 3 and 6, those are online, let's not

Page 52

1    look at those, let's look at, maybe, 4 and

2    5"?

3          What is the process for

4    determining what gets looked at?

5          A.   When they come on board, we have a

6    meeting with maintenance and myself and the

7    ABS, the captain.  Everybody involved.

8          Q.   Does everybody have a say in what

9    is going to be looked at?

10         A.   We definitely talk about it to

11   make sure everybody is on track.

12         Q.   If I came out and said I wanted to

13   test No. 3, and it was online, could we

14   shift it, take it off-line, parallel it up

15   with something else and test it?

16         A.   Definitely.

17         Q.   What if ABS asked?

18         A.   Same thing.

19         Q.   You would accommodate them?

20         A.   Yes.  As long as it wouldn't

21   affect the operation.

22         Q.   As long as it did not affect the

23   operation, you would be okay with it?

24         A.   Yes, sir.

25         Q.   How many manuals you got up there

Page 53

1    to look at?  Have you got enough guidance

2    out there on what you need to do?

3         A.   I have plenty manuals to refer to.

4         Q.   You were talking about it was

5    chaos.  You were talking about getting off

6    the rig after the explosion and rightfully

7    so.  Part of our responsibility when we come

8    out there to visit with you is to make sure

9    that people are comfortable evacuating the

10   rig, mustering, taking accountability,

11   getting in the boats and getting away from

12   the rig.  Same goes with those davit launch

13   life rafts.

14        When we visit with you and we fly

15   off, we feel like you pretty much have got

16   it. Is there anything you think we could do

17   to get better at that?  Do we need to alter

18   the times we run those drills?

19        A.   It would probably help to do a

20   surprise drill and make sure everybody went

21   to their proper stations and done what they

22   were supposed to.

23        Q.   Because you know what they say,

24   you do your job as you practice, so to

25   speak.  So that is why I asked.

Page 54

1          What is a pincer?

2      A.    A pincer?  Talking about something

3  on the BOP?

4      Q.    Yes.

5      A.    That would be a super shear or

6  blind shear ram.

7      Q.    There was testimony yesterday that

8  said you were grumbling on the way out about

9  a pincer.

10      A.    It wasn't on that day.  I think it

11  was over some -- about the foam cement job,

12  watching the nitrogen in the riser, because,

13  you know, that was a foam cement job.

14      Q.    We heard yesterday that anybody on

15  the rig had the authority to stop work at

16  any time?

17      A.    Yes.

18      Q.    And that is Transocean's policy?

19      A.    That's correct.

20      Q.    If the company man turns to you

21  and says, generally, this is what we are

22  going to do, what do you do?

23      A.    I look at the situation to see if

24  it is possible to do what he wants to do.

25  We don't just do it because the company man

Page 55

1   says do it.

2        LT. BUTTS:

3            Okay.  Thank you very much, sir.

4   EXAMINATION BY MR. DYKES:

5        Q.   You mentioned foam cement job.

6   Why would you do a foam cement job?

7        A.   On account of the losses that we

8   had, to assist in the cement, hoping we

9   wouldn't have losses.

10       Q.   Was there anything typical about

11  this cement job or atypical?  Was anything

12  odd about this cement job?

13       A.   Not really.

14       Q.   But you were pumping foam cement.

15  How many times have you-all pumped foam

16  cement on this rig?

17       A.   We do it a lot on the surface.

18  Usually don't do it quite this deep.

19       Q.   How many times have you done it at

20  this depth?

21       A.   I have done it before around the

22  same depth.  I would say a couple of times

23  before this.

24       Q.   Two times before this on the

25  HORIZON, or two times before this in your

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 56

1    experience?

2        A.   In my career on other rigs.

3        Q.   How many times on the HORIZON?

4        A.   This was the first time on the

5    HORIZON that I can recall.

6        Q.   Okay.  Being the OIM, I would

7    think that you've got pretty good knowledge

8    of your crew.  What do you think about the

9    experience level of your crew?  How many

10   times have they experienced a foam cement

11   job, your driller, toolpushers, all your

12   personnel in those key positions?

13       A.   I do at every well.  But now, they

14   are not the actual personnel doing the foam.

15   They have a Halliburton crew out to do the

16   foam job.

17       Q.   But these guys are on the floor?

18       A.   Yeah, they do it basically at

19   every well.

20       Q.   So you have had foam cement jobs

21   on every well at this depth?

22       A.   Not at this depth.  I didn't say

23   at this depth.

24       Q.   Was there anything odd about this

25   job?  Was it a perfect, textbook cement

Page 57

1    case?  Did you take any losses on returns

2    while you were doing this cement job?

3        A.   Well, there was some things that

4    were odd, you know, because they said if I

5    didn't get a good lift pressure of at least

6    60 to 70 psi, they would run a CBL with

7    Schlumberger.

8        Q.   And a CBL would be?

9        A.   I would tell them where they had

10   cement --

11       Q.   What would CBL be?

12       A.   Cement bond log.

13       Q.   Did they get the lift they thought

14   they were going to get?

15       A.   Yes, sir, they did.

16       Q.   Did you get your returns back?

17       A.   We had returns throughout the

18   cement job.

19       Q.   Did you have the right returns?

20       A.   Yeah, we had full returns.

21       Q.   Full returns?  Okay.

22   MR. DYKES:

23            Thank you.  I don't have anymore

24   questions.

25            CAPTAIN NGUYEN:

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 58

1          Flag state?

2      MR. LINSIN:

3          Thank you, Captain.

4  EXAMINATION BY MR. LINSIN:

5      Q.    Good morning, Mr. Harrell.

6      A.    Good morning.

7      Q.    Mr. Harrell, you testified a few

8  moments ago, sir, about smelling methane gas

9  or having methane gas in your eyes when you

10 were attempting to evacuate the rig.  Did I

11 understand that correctly?

12     A.    Well, I got it inside the quarters

13 is when I first noticed the gas, you know,

14 breathing it in and getting in your eyes.

15 Also, I mentioned insulation, so it was

16 either the methane or insulation in my eyes.

17     Q.    My question, Mr. Harrell, is do

18 you recall hearing any high gas alarms at

19 any point prior to the explosion the evening

20 of April 20?

21     A.    No, I don't.

22     Q.    Do you recall smelling any gas or

23 anyone commenting about gas being around the

24 rig that day?

25     A.    You said that day?

USCG/MMS Marine Board of Investigation                    The Joint United States Coast Guard/Minerals Management Service Investigation

Page 59

1        Q.    The day of April 20, yes?

2        A.    Not prior to the explosion.

3        Q.    All right.  You were also asked

4   some questions, sir, about the change over

5   of this rig from Panama to the Marshall

6   Islands and the stopping of the inspection

7   of the drilling equipment.

8             Do you recall those questions?

9        A.    I recall.  I couldn't give you any

10  exact time.

11       Q.    My question, sir, between 2005 and

12  2010, do you recall at any point either the

13  Coast Guard or the Minerals Management

14  Service requiring that your rig have a

15  certification for your drilling equipment?

16       A.    No, I can't recall that.  I have

17  to look at all my records.

18       Q.    Let me ask the question a slightly

19  different way:  Between 2005 and 2010, was

20  your rig inspected on a regular basis by

21  Coast Guard representatives and

22  representatives of the Minerals Management

23  Service?

24       A.    Yes, it was.

25       Q.    Do you recall during any of those