# EXHIBIT D
# ROBERT KALUZA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**IN RE:** OIL SPILL ) MDL NO. 2179
**BY THE** OIL RIG )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010 ) JUDGE BARBIER
) MAG. JUDGE SHUSHAN

*****************
VOLUME 1
*****************

Deposition of Robert Matthew Kaluza, Jr., taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 11th day of July, 2011.

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
Mr. Scott R. Bickford
MARTZELL & BICKFORD
338 Lafayette Street
New Orleans, Louisiana 70130

APPEARING FOR BP, INC.:
Mr. Chadwick Morriss
COVINGTON & BURLING
1201 Pennsylvania Avenue, Northwest
Washington, D.C. 20004-2401

APPEARING FOR TRANSOCEAN:
Mr. Richard J. Hymel
PREIS & ROY
Versailles Centre, Suite 400
102 Versailles Boulevard
Lafayette, Louisiana 70501

APPEARING FOR ANADARKO PETROLEUM COMPANY:
Ms. Diane C. Hertz
BINGHAM MCCUTCHEN
399 Park Avenue
New York, New York 10022-4689

APPEARING FOR MOEX:
Mr. Greg T. Lembrich
PILLSBURY WINTHROP SHAW PITTMAN
1540 Broadway
New York, New York 10036-4039

APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
Mr. Geoff Gannaway
BECK, REDDEN & SECREST
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010

APPEARING FOR DRIL-QUIP, INC.:
Ms. Wendy Ware Bishop
WARE, JACKSON, LEE & CHAMBERS
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019-7101

APPEARING FOR HALLIBURTON:
Mr. Floyd R. Hartley, Jr.
Ms. Elisaveta Dolghih
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-204

APPEARING FOR THE STATE OF LOUISIANA:
Mr. David A. Pote
Attorneys for Louisiana Attorney General
KANNER & WHITELEY
701 Camp Street
New Orleans, Louisiana 70130-3504

APPEARING FOR THE STATE OF ALABAMA:
Ms. Rebecca E. Patty
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
STATE OF ALABAMA
1400 Coliseum Boulevard
Montgomery, Alabama 36130

APPEARING AS OBSERVER FOR THE U.S. DEPARTMENT OF THE INTERIOR:
Ms. Sarah Doverspike
U.S. DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
1849 C Street, N.W.
Room 6453
Washington, D.C. 20240

APPEARING FOR M-I SWACO:
Mr. Steven A. Luxton
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004

APPEARING FOR WEATHERFORD:
Mr. Michael G. Lemoine
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP
600 Jefferson Street, Suite 1600
Lafayette, Louisiana 70501
Mr. William J. Joyce
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170

APPEARING FOR THE UNITED STATES:
Ms. Rachel Hankey
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL & NATURAL RESOURCES DIVISION
PO Box 7611
Ben Franklin Station
Washington, D. C. 20044

APPEARING FOR WITNESS ROBERT MATTHEW KALUZA:
Mr. Shaun Clarke
GERGER & CLARKE
1001 Fannin Street, Suite 1950
Houston, Texas 77002

ALSO PRESENT:
Mr. Mark Hendrix, Videographer
Mr. Carlos Rodriguez

PURSUANT TO CONFIDENTIALITY ORDER

that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, in fact, sir, that took place over a two-hour period, did it not?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, isn't it a fact that rather than using 500 to 700 psi, you had a pressure up to 3142 psi to achieve what you thought was a conversion?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, when you finally got what you thought was the conversion of the collar, you were only able to achieve a flow rate of about 1 barrel per minute; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And it was your duty, as BP's Representative, to interpret the data and declare that the float collar was converted, was it not?

MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, the reason it was important to convert the float collar is to ensure that the final cement job would provide a good cement job free of contaminants, which would serve as a barrier from hydrocarbon seeping into the well; isn't that true?
A. Same answer.
Q. And isn't it a fact, sir, that despite how it was -- and isn't it a fact, sir, that despite how important -- I'm sorry. Strike that.
Sir, isn't it a fact that it was important to achieve the conversion of -- of the -- the float collar but you were not really certain that it had converted?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And isn't it -- and isn't it a fact, sir, that it was a factor that you should have considered before BP told Transocean to begin displacing the well with seawater?

MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Now, sir, as BP Well Site Leader, you also responsible to ensure that there was a proper cementing of the Macondo Well work; isn't that true?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, prior to the cementing job, the final cementing job in this case, there was not bottoms-up circulation of the well, was there?
A. Same answer.
Q. And the bottoms-up circulation of the well is a procedure that often helps to remove drilling debris in order to effect a cement job which would ensure the integrity of the well; is that true?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And despite that objective no bottoms-up was done, was it?

MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And no bottoms-up was done because the bottoms-up of the -- because the bottom of this well was so fragile that BP didn't want to risk fracturing it with that procedure; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, when you did begin cementing, you could only introduce cement at four barrels per minute or less; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, again, it was because BP was worried about causing damage to the fragile formation of the bottom of the well, sir; isn't that correct?
MR. MORRISS: Form.
MR. CLARKE: Objection.
A. Same answer.
Q. (By Mr. Bickford) And you know in your experience as a BP Well Leader that

PURSUANT TO CONFIDENTIALITY ORDER

four barrels per minute is less than an optimal rate of cement flow, don't you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, in fact, sir, in Exhibit No. 3188 --
MR. CLARKE: What Tab is that?
MR. BICKFORD: That is Tab --
MR. CLARKE: 44?
MR. BICKFORD: 44, I believe. That one.
MR. CLARKE: (Nodding.)
Q. (By Mr. Bickford) Sir, in -- in your statement to BP, in fact, you -- you were quoted as saying, quote: "that is odd you guys this is very low."
That's what you've told them about the cement flow; is that correct?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) In fact, you know it was -- excuse me.
In fact, you know it was very -- it was a very ineffective rate of flow to

ensure a good cement job; isn't that correct, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Yet, BP and you endorsed such a flow rate, correct?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And you endorsed such a flow rate, didn't you, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Although you knew at the time that you had concerns about the flow rate, correct, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And the concern that you had, sir, was the flow -- flow rate was so little that it was likely that you would not get a good, consistent cement job; is that correct?
MR. MORRISS: Form.
A. Same answer.

Q. (By Mr. Bickford) And, sir, isn't this a fact that you should have considered before you approved the displacing of the well with seawater?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Sir, when the cement was pumped into the well, rather than achieving an annular cement column with a thousand feet above the uppermost hydrocarbon zone, you as BP Representative knew that the rig had achieved only an annular cement column of 500 feet above the uppermost hydrocarbon zone, didn't you?
MR. CLARKE: Objection.
MR. MORRISS: Form.
MR. HARTLEY: Form.
A. Same answer.
Q. (By Mr. Bickford) Now, Mr. Kaluza, you had the authority to stop this job at any time, didn't you?
A. Same answer.
Q. And you never chose to do this despite the float collar problem and despite

the cementing issues, did you?
MR. HARTLEY: Object to form.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, in fact, Mr. Kaluza, not cementing to a thousand feet above the uppermost hydrocarbon-bearing zone is a direct violation of BP's internal guidelines, is it not?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And you as the Well Site Leader knew that, sir, didn't you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Yet, despite the direct violation of BP's own policies and practices, sir, you chose not to shut this job down; is that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) In doing so, sir, you knew that the lives of the men and women aboard the DEEPWATER HORIZON were in peril by your decision, didn't you?

there was a decision made to use a combination of Form-A-Set and Form-A-Squeeze on -- as a spacer on this particular negative test; is that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, that combination of spacer was a highly viscous, thick liquid, was it not?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And when a spacer was ran, you knew there was a possibility that the spacer was sitting across the BOP during the negative testing procedure; is that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And you knew, sir, that this highly thick liquid was sitting across the P -- BOP during the test might have compromised some of the results of the test, don't you?
MR. MORRISS: Form.
A. Same answer.

Q. (By Mr. Bickford) And, sir, when you -- when the test was conducted, ultimately, there was observed a 1,400 psi pressure on the drill pipe with no flow out of the existing kill line; is that correct?
A. Same answer.
Q. And just so that we understand thing -- things, sir, the drill pipe was in direct communication with the kill line, was it not?
A. Same answer.
Q. And if there were 1,400 psi in the drill pipe, when you opened the kill line, you should have observed flow out of the kill line, shouldn't you have, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) But that -- but you did not, sir, and it was not -- strike that.
But you did not, sir, correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And there was no finding of -- on the second negative test,

there was no finding of any flow out of the kill line was there, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) It was like opening a high pressure fire hydrant, but nothing came out, right?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And just so that we're clear, sir, 1,400 psi of pressure on this particular negative test in the drill pipe was not even close to an expected finding, was it, sir?
MR. MORRISS: Form.
MR. CLARKE: Objection.
A. Same answer.
Q. (By Mr. Bickford) In fact, it clearly indicated that there was a breach of the cement barrier, allowing a direct communication between the hydrocarbons and the reservoir outside the well and the well itself; is that correct?
MR. MORRISS: Form.
A. Same answer.

Q. (By Mr. Bickford) Instead of consulting experts in Houston about the findings in this well, of 1,400 psi on the drill pipe and no flow out of the kill line, sir, you and Mr. Vidrine chose to explain it away with something called "the bladder effect." Is that correct?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Referring back to Exhibit No. 45, or Tab No. 45, which is Exhibit No. 3189 --
A. M-h'm.
Q. -- sir, in any of those courses that you took between April of 2010 and December of 1997, 13 years of courses, and 549.75 hours during those 13 years, did any one of those courses ever cover what was called a "bladder effect"?
A. Same answer.
Q. Did any of those courses cover how a bladder effect might compromise a negative pressure test on a well?
MR. CLARKE: Objection.

PURSUANT TO CONFIDENTIALITY ORDER

53

BP.
MR. CLARKE: Can you show it to me?
(Discussion off the record.)
MR. BICKFORD: Where is the -- third paragraph: "At the time the guys said they were" --
MR. CLARKE: Sorry, what page?
MR. BICKFORD: "...had a well from hell." (Indicating.)
MR. CLARKE: Okay. So you're saying that your good-faith basis is the guys said they called it from -- "the well from hell." Your question premised that this witness said it.
Now, I -- I'm just going to object, but I -- I do believe there should be a good-faith basis for the question, and I'm not aware of any evidence anywhere in the record to the effect that this witness ever called it "the well from hell."
With that objection noted, you can answer the question, Bob.
A. Same answer.
Q. (By Mr. Bickford) And knowing

54

that this well was termed "the well from hell," sir, you chose not to call the experts onshore to confirm your theory that the 1,400 psi found in the drill pipe was, in fact, caused from a bladder effect, did you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Okay. And BP had a number of experts onshore who you could have consulted on this so-called bladder effect; is that true, sir?
A. Same answer.
Q. Sir, the Macondo Well employed a long string well design, did it not?
A. Same answer.
Q. And the well design had been changed several times, had it not?
A. Same answer.
Q. And you, as the Well Site Leader on the DEEPWATER HORIZON, should have known that; is that correct, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And the fact that BP chose to employ a long string well

55

design should have put you on notice to use added vigilance for any signs of cement failure; is that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) You should have had a heightened concern that the cement job was performed properly; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, you were provided with reports -- with two reports from Halliburton on the casing design, were you not?
MR. MORRISS: Form.
MR. HARTLEY: Object to form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, those reports contained what are called OptiCem reports; is that correct?
A. Same answer.
Q. Okay. And the first report by Halliburton that you would have seen would have been the production casing proposal and

56

OptiCem report of April 15, 2010; is that correct, sir?
A. Same answer.
Q. Direct your attention to Tab 38, sir.
THE COURT REPORTER: Want it marked?
MR. BICKFORD: Yes, sure.
(Exhibit No. 3191 marked.)
THE WITNESS: Turn the --
MR. CLARKE: You're welcome to if you want to look at it.
THE WITNESS: Yeah. Oh, okay.
MR. CLARKE: You know, it's up to you.
THE WITNESS: M-h'm.
Q. (By Mr. Bickford) Sir, the -- I'm going to mark the E-mail in front as -- and the attachment as Exhibit 3191.
Sir, what you're looking at in Exhibit 3191 is an E-mail from Don Vidrine to you dated April 16, 2010, attaching the production casing report from Halliburton and a production casing design report; is that correct, sir?
A. Same answer.
Q. Okay. And, as Well Site Leader

PURSUANT TO CONFIDENTIALITY ORDER

MR. CLARKE: Yeah. Do you want him to look through the whole thing? I mean, I --
MR. BICKFORD: No. I'll direct him through it.
Q. (By Mr. Bickford) It is a -- is an E-mail from DEEPWATER HORIZON Foreman to you, Robert Kaluza, dated April 20th, at 11:36 a.m.; is that correct, sir?
A. Same answer.
Q. And that E-mail is attaching the Revised Production Casing Report, as well as the Revised Production Casing Design Report?
A. Same answer.
Q. Okay. And as the Well Team Leader on -- the Well Site Leader on the DEEPWATER HORIZON, you would have reviewed this document, sir?
A. Same answer.
Q. And, sir, you knew that Halliburton had recalculated the -- recalculated the well using seven centralizers; is that correct?
A. Same answer.
Q. And I direct your attention to Page 16 of this second Report, which is the

Production Casing Design Report. Bates stamps ends in 1050.
THE COURT REPORTER: One zero?
MR. BICKFORD: Five zero.
Q. (By Mr. Bickford) And that indicates that seven centralizers were utilized, in this Production Design Report; is that correct, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Okay. And, sir, referring you to Page 18 of that Report, the Report states that by using seven centralizers, quote, "Based on an analysis of the above outlined well conditions, this well is considered to have a SEVERE gas flow problem," close quote. Did I read that correctly?
A. Same answer.
Q. Okay. And, sir, as Well Site Leader, you should have reviewed this report before the well was displaced to seawater; is that correct, sir?
MR. MORRISS: Form.
A. Same answer.

Q. (By Mr. Bickford) And as Well Site Leader, sir, you knew that, based upon the use of seven centralizers, that it was Halliburton's opinion that this well may have a severe gas flow problem; is that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And you knew, sir, that Halliburton had recommended the use of 21 centralizers to prevent se -- severe gas flow problems and channeling, did you not, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, channeling in a cement job would raise serious questions as to the integrity of the cement job, would it not, sir?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, again, you were relying on this particular cement job as the only barrier you had to an un -- underbalanced well prior to the setting of the cement plug; is that correct, sir?

MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Sir, you attended a pre -- a morning pre-tour meeting on -- on April 20th, 2010, did you not?
A. Same answer.
Q. And that tour meeting occurred some ten hours before the explosion which eventually sank the DEEPWATER HORIZON; is that correct?
A. Same answer.
Q. And at that pre-tour meeting, you and Jimmy Harrell, the OIM of the DEEPWATER HORIZON, had a heated discussion, did you not?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, in fact, Mr. Harrell disagreed with the final plan of plugging and abandoning the well, did he not?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) In fact, he thought that the manner in which BP proposed to go forward with the displacement of the

PURSUANT TO CONFIDENTIALITY ORDER

mud to seawater was a dangerous method, did he not?
MR. CLARKE: Objection.
A. Same answer.
Q. (By Mr. Bickford) And you told Mister -- and you told Mr. Harrell, the headman on a Transocean rig, "This is how it's going to be," didn't you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And as Mr. Harrell left that meeting, he replied to you, "I guess that's what we have pincers for"; is that correct, sir?
MR. HARTLEY: Object to form.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) And, sir, you knew he was referring to the blowout preventer on the seafloor that was supposed to be the last resort in preventing a leak in the event of an emergency?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.

Q. (By Mr. Bickford) Sir, did you tell them that was how it was going to happen?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Bickford) Sir, can you tell me the details of the conversation that you had with Mr. Harrell?
MR. CLARKE: Objection.
A. Same answer.
Q. (By Mr. Bickford) Mr. Kaluza, I need to cover some of the exhibits with you, if you'd just go to the front.
MR. BICKFORD: How much time do we have?
THE VIDEOGRAPHER: About 15 minutes --
MR. BICKFORD: OKAY.
THE VIDEOGRAPHER: -- left on the Tape.
MR. BICKFORD: I need an exhibit sticker.
(Exhibit No. 3193 marked.)
Q. (By Mr. Bickford) Tab 1, Mr. Kaluza, is a -- which I've labeled as 3193 -- is an April 13th E-mail regarding your access to information on the DEEPWATER

HORIZON. Had you ever seen this E-mail before, sir?
MR. MORRISS: Object to form.
A. Same answer.
Q. (By Mr. Bickford) Did you know, sir, that you were being granted limited access on the DEEPWATER HORIZON to certain IT -- IT ports?
MR. MORRISS: Form.
A. Same answer.
(Exhibit No. 3194 marked.)
Q. (By Mr. Bickford) Tab No. 2, sir, which I've labeled as Exhibit 3194. This is an Ap -- purports to be an April 16th, 2010 E-mail from Robert Sepulvado to you and Lee Lambert. Can you identify the document, sir?
A. Same answer.
Q. Can you tell me why you received the document, sir?
MR. CLARKE: Objection.
A. Same answer.
Q. (By Mr. Bickford) Can you tell me what the document means, sir?
A. Same answer.

Q. Can you further comment on the document, sir?
A. Same answer.
(Exhibit No. 3195 marked.)
Q. (By Mr. Bickford) Tab No. 3, which I've labeled as Exhibit 3195, is an E-mail pur -- purportedly sent from Robert Sepulvado to you and a number of other recipients, dated April 16, 2010. Can you identify the document, sir?
A. Same answer.
Q. And can you tell me what the document is, sir?
A. Same answer.
Q. Can you tell me what the -- the attachment to the document is, sir?
A. Same answer.
Q. Can you explain the attachment to the document to me, sir?
A. Same answer.
Q. Did you review the attachment to the document, sir?
A. Same answer.
Q. Was it your obligation to review the attachment to the document, sir?

PURSUANT TO CONFIDENTIALITY ORDER

**severe gas flow prob -- of a severe ga -- gas flow problem cause or contribute to the release of hydrocarbons from the wellbore and the subsequent explosion?**
**MR. MORRISS:** Form.
**MR. CLARKE:** Objection.
A. Same answer.
**Q. (By Ms. Hankey) Now I want to ask you some questions about the tem -- Temporary Abandonment Procedure, and I'm going to ask you to look at Tab 1, which has been previously marked as Exhibit 5, and I'm going to ask you to turn to Page 2. At the top of Page 2, it says: "Hafle called, wanted to ensure Bob had seen TA procedure and permit to modify."**
**MR. CLARKE:** I'm sorry. Page 2?
**MS. HANKEY:** Yeah. Whoops. Sorry. Ending with the Bates Number --
**MR. CLARKE:** Okay. We got it.
**MS. HANKEY:** -- 212 --
**MR. CLARKE:** Thanks.
**MS. HANKEY:** -- 76.
**Q. (By Ms. Hankey) Is this what happened?**

**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) There had been several changes to the Temporary Abandonment Procedure, correct?**
**MR. CLARKE:** Objection.
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) Was Mr. Hafle concerned that with all the changes, the procedure was not understood?**
**MR. CLARKE:** Objection.
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) On the same page, it says, a few lines down: "...team in town, wanted to do a combined displacement and negative test which may conflict with APD"; is this true?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) Was the negative test changed to a combined displacement, which was not in the APD?**
**MR. MORRISS:** Form.

A. Same answer.
**Q. (By Ms. Hankey) Was the procedure being changed to save time?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) This is what you thought, was it not, that it was changed to save time?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) It says: "Town" -- lower down, it says: "Town decided to de" -- "deviate..." and then it says: "Not sure if talked to MMS or not about procedure" being changed. Is this what happened?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) Did they decide to use a different procedure than what was approved by MMS?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) Is this common, to deviate from the reported procedures?**

**MR. CLARKE:** Objection.
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Ms. Hankey) Do you know whether MMS was ever told that you would be deviating from the approved procedures?**
**MR. MORRISS:** Form.
**MR. CLARKE:** Objection.
A. Same answer.
**Q. (By Ms. Hankey) How you -- have you ever used lost circulation material as spacer before?**
**MR. CLARKE:** Objection.
**MR. MORRISS:** Objection.
A. Same answer.
**Q. (By Ms. Hankey) Are you aware of anyone else using lost circulation material as spacer before?**
**MR. CLARKE:** Objection.
**MR. MORRISS:** Objection, form.
**MR. LUXTON:** Objection.
A. Same answer.
**Q. (By Ms. Hankey) You were never provided any formal training by BP on how to conduct a negative pressure test, were you?**

PURSUANT TO CONFIDENTIALITY ORDER

145

MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) You were never provided any training on what was required for a pressure test to be successful; is that correct?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) There were no writings from BP on the rig, any procedure or document that you could refer to for guidance on how to co -- conduct a negative pressure test; is that right?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) And the same was true for -- and there were no documents on the rig from BP on how to interpret the results of the negative pressure test?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.

146

Q. (By Ms. Hankey) And this is true, even though a negative pressure test is a safety-critical test?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) And I'm going to ask you to look at Tab 9.
MS. HANKEY: I'm going to mark that as Exhibit 3566.
(Exhibit No. 3566 marked.)
Q. (By Ms. Hankey) And this is an E-mail from Brian Morel to Robert Kaluza, Don Vidrine and Lee Lambert, correct?
A. Same answer.
Q. And it says: "FYI - Deeper plug approval," correct?
A. Same answer.
Q. And attached to that document is the "Application for Permit to Modify"?
A. Same answer.
Q. And if we turn to Page 3, there's a document entitled "Temporary Abandonment Procedure," correct?
A. Same answer.

147

Q. And Item No. 1 says: "Negative test casing to seawater gradient equivalent for 30 minutes with kill line," correct?
A. Same answer.
Q. This is not the procedure that was conducted, correct?
MR. MORRISS: Form.
A. Same answer.
Q. And is that what you meant when you said that the procedures were -- that modified from the APD?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Were there two attempts made to conduct the negative pressure test?
MR. CLARKE: Objection.
A. Same answer.
Q. (By Ms. Hankey) You first attempted to conduct the negative pressure test on the drill pipe; is that correct?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.

148

Q. (By Ms. Hankey) And if we're looking back at Exhibit 5, it says: "Comment that Randy pushed for" the "negative test on" the "drill pipe."
Is that what happened?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did the real -- rig crew tell you that they wanted to run the test on the drill pipe?
MR. MORRISS: Form.
A. Same -- same answer.
Q. (By Ms. Hankey) Isn't it true that the rig crew told you that they normally conducted negative tests on the drill pipe?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) The crew told you that the procedures being followed were not how they typically conducted a negative pressure test?
MR. MORRISS: Form.
MR. CLARKE: Objection.
A. Same answer.
Q. (By Ms. Hankey) Was the

PURSUANT TO CONFIDENTIALITY ORDER

157

Q. (By Ms. Hankey) Did you ever ask him how many times he had performed a negative pressure test under these procedures?
MR. CLARKE: Objection.
A. Same answer.
Q. (By Ms. Hankey) Did you consider the effect of the lost circulation material being used as spacer in interpreting the test results?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Given that lost circulation material has never been used as spacer before, would you know what effect it could have had on the negative pressure results?
MR. CLARKE: Objection.
A. Same answer.
Q. (By Ms. Hankey) Did you consider in evaluating the negative pressure results that you may have blown something up the casing when converting the float collar as you, yourself, had stated?
MR. CLARKE: Objection.

158

MR. MORRISS: Objection, form.
A. Same answer.
Q. (By Ms. Hankey) And then I'm going to ask you to go back to Tab 4, Page 25 of the -- or 24 of the BP report. On April 20th, at 12:00 o'clock, it says: "Deepwater Horizon started offloading mud to the M" -- N -- MN -- "Damon Bankston.
Do you dispute that that's what happened?
MR. CLARKE: It -- "M/V."
Q. (By Ms. Hankey) Oh, sorry, "M/V."
A. Same answer.
Q. And then on April 20th, at 17:17, it says: "Mud offloading from Deepwater Horizon mud pits to" N -- "M/V Damon Bankston ceased. Mudlogger not notified."
Do you dispute that this is what happened?
A. Same answer.
Q. The mud logger was not notified that offloading had ceased; is that correct?
MR. MORRISS: Form.

159

A. Same answer.
Q. (By Ms. Hankey) And without being notified, the mud loggers would not have known to be monitoring volume in the pits; isn't that true?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Isn't it true that the mud loggers informed you that with the mud pups be -- mud pits being -- the mud being offloaded, that they would be unable to monitor the volume in the pits?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) During crane operations, the ability to monitor flows is affected, true?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) And also it affects the ability to monitor pit volume; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Isn't it true,

160

then, that crane operations during the displacement would have affected the ability to monitor the well?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) And I'm -- if you would turn to Page 26 in the same report, on April 20th at 20:58, it says: "Trip tank was emptied into the flow-line at this time."
Do you dispute that this is what happened?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) And emptying the trip tank would have affected the flow out meters, correct?
A. Same answer.
Q. It also affected the ability to monitor pit volume; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) At 21:08, it says: "Overboard dump line opened during sheen test; Sperry-Sun flow meter bypassed."
Do you dispute that this is what

PURSUANT TO CONFIDENTIALITY ORDER

161

happened?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Once discharges were directed overboard, the flow could not be monitored by the Sperry-Sun flow meters, correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Isn't it true that the only reason that el -- lost circulation material was used as spacer was so it could go overboard?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did you consider not sending the spacer overboard so that returns could be bet -- mon -- better monitored?
MR. MORRISS: Form.
MR. CLARKE: Objection.
MR. HARTLEY: Objection, form.
A. Same answer.
Q. (By Ms. Hankey) On the HORIZON,

162

you could select which screens to watch the flow at, correct?
A. Same answer.
Q. Did you direct anyone to which screens to watch during the displacement?
A. Same answer.
Q. After the negative pressure test, you began -- they began -- or the rig began pumping seawater dis -- to displace mud from the riser, correct?
MR. MORRISS: Form.
MR. CLARKE: Objection.
A. Same answer.
Q. (By Ms. Hankey) Before displacement, did you calculate the expected returns?
A. Same answer.
Q. Did you ensure that someone else had calculated the expected returns?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did you, given the anomalous results in the negative pressure test, give any instructions to carefully monitor returns?

163

MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did you ask exactly how the returns would be monitored during displacement?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Given your concerns during the attempted conversion of the float collar, did you give any instructions to the rig crew to carefully monitor for any problems?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) And, in fact, neither you or Mister -- Mr. Vidrine gave any indication to the rig crew that should -- they should be carefully monitoring the well during displacement; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did you give any instructions that any operations that might

164

affect monitoring of the well be delayed until after the cement plug had been installed?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did you direct, for example, that any crane operations be de -- be delayed until after the cement plug had been installed?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did you give any instructions that mud transfers, either between pits or from trip tanks or sand trips, should be limited in order to ensure effective well monitoring?
MR. MORRISS: Form.
A. Same answer.
Q. (By Ms. Hankey) Did you give any instructions after the negative pressure tests to watch for any other increases in the drill pipe pressure?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.

PURSUANT TO CONFIDENTIALITY ORDER

A. Same answer.
Q. (By Mr. Hymel) Do you deny that the rig crew was trying to figure out the reason for the pressure readings on the drill pipe during the negative test?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Do you deny that the Transocean rig crew was taking -- was talking about various possibilities for the pressure readings on the drill pipe during the negative test?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Do you deny that the Transocean rig crew was addressing the issues created by the pressure readings on the drill pipe during the negative test?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Well Site Leader Don Vidrine arrived during the discussion, and rather than complete the test on the drill pipe, Mr. Vidrine instructed the Transocean crew to line up the test with a

kill line; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Do you deny that Mr. Vidrine instructed you to call the BP office in Houston and tell them that he was going to move the test to the kill line?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Do you know deny that you called the BP office in Houston to tell them that Mr. Vidrine was going to move the negative test to the kill line?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Do you deny that you returned to the drill shack and told Mr. Vidrine that you had notified the BP office in Houston that Mr. Vidrine was going to move the negative test to the kill line?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Did you discuss the pressure on the drill pipe during the negative test with Mr. Vidrine?

A. Same answer.
Q. Do you deny that when BP declares a negative test a success, it's reasonable for the Drill Crew to rely on that interpretation?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Do you deny that it is -- it was BP's responsibility to interpret the negative test?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Do you deny that the Well Site Leader makes the final decision regarding whether the negative test has passed or failed?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) And Mr. Vidrine ultimate conclu -- ultimately concluded that the negative test had been successful; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) And Mr. Vidrine

concluded that the negative test was successful because he had seen no flow from the kill line for 30 minutes; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) Now, with regard to well site operations, such as those being directed by BP for the Macondo Well, would you agree with -- with the notion that the Transocean rig crew should be provided with all information that would assist them in well control efforts?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) As Well Site Leader, it would be your expectation that the rig crew would be provided with any information that could help them maintain well control; isn't that correct?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hymel) And it is your understanding that BP shares that expect -- expectation; isn't that right?

PURSUANT TO CONFIDENTIALITY ORDER

the low circulating volume to mud going through that hole rather than circulating through the float collar?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You commented shortly after that ninth effort to convert the float collars, quote, "I'm afraid that we've blown something higher up in the casing joint," end quote.
Isn't that right?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) After that ninth effort to convert the float collar, pressuring up to 34 p -- 42 psi, you never ran any additional tests to determine the casing integrity or whether, in fact, something had ruptured higher up, did you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) Did you call anybody at BP onshore to express any concerns about the float collar conversion efforts?
A. Same answer.



Q. To this day, you don't know whether the float collar actually converted on April 20th, 2010, do you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You still think there may have been some damage to the casing or the -- or the joint higher up?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) Turning to the cement job, you were on the DEEPWATER HORIZON on April 19th and 20th while the cement job was pumped, weren't you?
A. Same answer.
Q. In fact, you were involved in drafting the cement job procedure that was implemented, weren't you?
A. Same answer.
MR. MORRISS: Form.
Q. (By Mr. Hartley) You had conversations with Mr. Chaisson and Mr. Tabler from Halliburton about the cement job?



A. Same answer.
Q. You directed the pump rate for the cement job?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You set forth the volume of cement that was going to be pumped in the cement job?
MR. MORRISS: Form.
A. Same answer.
(Phone ringing.)
Q. (By Mr. Hartley) You were involved in determining the volume of cement to be pumped during the cement job?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You were involved in determining the pump rate to be used during the cement job?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You -- the decision as to the amount of cement utilized in the cement job and the rate at which to pump that cement was driven, again, by ECD



concerns downhole?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) Prior to the cement job, you did not circulate bottoms-up, did you?
A. Same answer.
MR. MORRISS: Form.
Q. (By Mr. Hartley) Would you agree that part of the function of bottoms-up circulation is to better clean the drill pipe and annulus?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You would also agree that a bottoms-up circulation is implemented in part to break up the gel strength of mud that's been standing in the -- in the hole?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) Failing to perform bottoms-up circulation increases the risk of channeling in the subsequent cement job?



PURSUANT TO CONFIDENTIALITY ORDER

MR. MORRISS: Form.
Q. (By Mr. Hartley) Wouldn't you agree with that?
A. Same answer.
Q. You would agree that failing to do a bottoms-up further compromises the ability of a cement job to obtain zonal isolation due to the risk of contamination and/or channeling?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) Prior to April 20th, 2010, you never saw a standard procedure from BP for a negative test, did you?
A. Same answer.
Q. You never saw one on the DEEPWATER HORIZON?
A. Same answer.
Q. And the initial displacement procedure that you were involved in creating did not include a negative test, did it?
A. Same answer.
Q. It was only after conversations with the OIM, Mr. Jimmy Harrell, that a

negative test procedure was then added to the procedure?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You left it out of your initial forward ops notes?
MR. CLARKE: Objection.
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) There were two negative tests run on April 20th, 2010; isn't that right?
A. Same answer.
Q. The first one was run on the drill pipe?
A. Same answer.
Q. Despite trying to bleed off the pressure several times, you were never able to establish a zero psi pressure on the drill pipe, were you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) After some time of being unable to establish that zero psi, you and Mr. Vidrine instructed that there be

a negative test performed on the kill line --
MR. MORRISS: Form.
Q. (By Mr. Hartley) -- is that right?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) At that point, although there was no flow from the kill line, the pressure on the drill pipe remained?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You were aware on April 20th while the negative test was being performed that between 1200 and 1400 psi remained on the drill pipe during all those negative test procedures?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You were involved in interpreting the negative test on April 20th, weren't you?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) In consultation

with others, you deemed it a successful test?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) You would agree today, though, that the test was not successful on the drill pipe?
A. Same answer.
Q. You would similarly agree today that the test was not successful when performed on the kill line due to the remaining pressure on the drill pipe?
MR. MORRISS: Form.
A. Same answer.
Q. (By Mr. Hartley) In trying to determine what that pressure arose or why it existed in the drill pipe, you had conversations with Jason Anderson and Dewey Revette, didn't you?
A. Same answer.
Q. On April 20th, 2010 you attempted to identify the nature source of that drill pipe pressure during the negative test, didn't you?
MR. MORRISS: Form.
A. Same answer.

PURSUANT TO CONFIDENTIALITY ORDER

**Q. (By Mr. Hartley) Jason Anderson explained to you that -- that it was a bladder effect or annular compression?**
**MR. MORRISS:** Objection, form.
A. Same -- same answer.
**Q. (By Mr. Hartley) Prior to April 20th, 2010, you had never heard of a bladder effect with respect to negative pressures -- negative tests, did you?**
A. Same answer.
**Q. You've never heard of that since April 20th, 2010, either, have you?**
A. Same answer.
**Q. Later in the day on April 20th, after Mr. Anderson explained this to you, you had a conversation with Lee Lambert about the negative test, didn't you?**
A. Same answer.
**Q. In your conversation with Mr. Lambert, you explained him -- to him this bladder effect that Mr. Anderson conveyed to you, didn't you?**
A. Same answer.
**Q. In your conversation with Mr. Lambert, you told him that it was a**

**possibility as an explanation for the drill pipe pressure, didn't you?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Hartley) And as we saw earlier this morning in response to Ms. -- Mr. Bickford's questionings, even five days after the incident, you were explaining the drill pipe pressure during the negative test as a bladder effect to those within BP?**
**MR. CLARKE:** Objection.
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Hartley) Have you ever talked to anybody other than Mr. Anderson or Mr. Revette who's explained to you the viability of a bladder effect during a negative test?**
**MR. HYMEL:** Objection, form.
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Hartley) During the displacement procedure, a spacer was pumped using two separate lost circulation material pills, weren't -- wasn't it?**

**MR. MORRISS:** Objection, form.
A. Same answer.
**Q. (By Mr. Hartley) There was a Form-A-Set lost circulation material pill on the DEEPWATER HORIZON prior to the displacement procedure?**
A. Same answer.
**Q. There was also a Form-A-Set AK LCM, or lost circulation material, pill on the DEEPWATER HORIZON prior to displacement; is that right?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Hartley) Those LCM pills on the DEEPWATER HORIZON, had they not been run downhole, would have had to have been disposed of as hazardous waste; would you agree with that?**
**MR. MORRISS:** Form.
A. Same -- same answer.
**Q. (By Mr. Hartley) On April 19th, 2010, was that your understanding of how those LCM pills would have had to be disposed if they were not used as spacers?**
**MR. MORRISS:** Form.

**MR. LUXTON:** Objection, form.
A. Same answer.
**Q. (By Mr. Hartley) Okay. You've never used a Form-A-Squeeze LCM as a spacer before, have you?**
**MR. MORRISS:** Form.
**MR. LUXTON:** Form.
A. Same answer.
**Q. (By Mr. Hartley) You've never used a Form-A-Set AK LCM pill as a spacer before, have you?**
**MR. MORRISS:** Form.
**MR. LUXTON:** Form.
A. Same answer.
**Q. (By Mr. Hartley) You've never used those pills in combination as a spacer before, have you?**
**MR. LUXTON:** Objection, form.
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Hartley) In fact, you've never heard of anybody in the industry using either a Form-A-Set AK, Form-A-Squeeze, or a combination of the two as a spacer prior to April 20, 2010, have you?**

**PURSUANT TO CONFIDENTIALITY ORDER**

**drilling or the attempt to temporarily abandon the Macondo Well?**
A. Same answer.
**Q. To your knowledge, did MOEX or any of its Representatives express any concerns to BP with regard to any of the operations or equipment at the Macondo Well?**
A. Same answer.
**Q. To your knowledge, did BP express any concerns to MOEX with regard to any of the operations or equipment at the Macondo Well?**
A. Same answer.
**MR. LEMBRICH:** That's all the questions I have. Thank you, Mr. Kaluza.
**MR. CLARKE:** Thank you.
**THE VIDEOGRAPHER:** We're off the record at 1:26.
(Recess - 1:26 p.m. to 1:28 p.m.)
**MR. GANNAWAY:** Ready.
**THE VIDEOGRAPHER:** All set?
We are on the record at 1:28.
EXAMINATION
**QUESTIONS BY MR. GANNAWAY:**
**Q. Mr. Kaluza, my name is Geoff**

**Gannaway. I represent Cameron International Corporation in this litigation, and I have some questions for you.**
**It's my understanding that you plan to continue assert your Fifth Amendment rights in response to questions regarding the Macondo Well and the DEEPWATER HORIZON?**
**MR. CLARKE:** Well, we'll stip -- we'll stipulate to that.
**Q. (By Mr. Gannaway) Okay. Would you agree that you and BP misinterpreted the negative test on the DEEPWATER HORIZON?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Gannaway) Would you agree that differentials pressures on the drill pipe and the kill line would have indicated that there was a problem that should have been investigated?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Gannaway) Under those circumstances, would you agree that you should have shut down operations at the DEEPWATER HORIZON on the Macondo Well and**

**investigated further?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Gannaway) Would you agree that at that point, the well should have been shut-in with the BOP immediately upon seeing those differential pressures?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Gannaway) Do you agree that the BOP was not shut-in immediately upon seeing pressures that would have indicated a kick or flow in the well?**
A. Same answer.
**Q. Do you agree that the well should have been shut-in with the BOP before the blowout and explosion actually occurred?**
A. Same answer.
**Q. Would you agree that there was -- would have been time to do so if the flow had been detected and recognized properly and appropriately?**
**MR. HARTLEY:** Object to form.
A. Same answer.
**Q. (By Mr. Gannaway) You have**

**attended Well Control School, correct?**
A. Same answer.
**Q. And you've been taught the best practices with respect to controlling a well?**
A. Same answer.
**Q. And the best practice with respect to using a BOP to control a well?**
A. Same answer.
**Q. Would you agree that those best practices regarding using a BOP and controlling a well were not followed on April 20th, of 2010?**
A. Same answer.
**Q. And would you agree that, in fact, poor decisions were made regarding well control and using the BOP on April 20th of 2010?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Gannaway) And those poor decisions led to the explosion and loss of life and oil spill on the DEEPWATER HORIZON?**
**MR. MORRISS:** Form.
A. Same answer.
**Q. (By Mr. Gannaway) Would you**

PURSUANT TO CONFIDENTIALITY ORDER