# EXHIBIT G
# WYMAN WHEELER

01-37876
TB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )     MDL NO. 2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO, on    )     SECTION: J
APRIL 20, 2010    )
   )     JUDGE BARBIER
   )
   )     MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Wyman Wheeler
### VOLUME 1

AUGUST 25, 2011

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

33

1      A.      Same answer.
2      Q.      Would those -- those pressures
3  would have been recorded somewhere, though,
4  right?
5      A.      Same answer.
6      Q.      Do you remember after the first
7  negative-pressure test, reporting to someone
8  that the results were abnormal?
9      A.      Same answer.
10     Q.      Do you remember that there was a
11 meeting afterwards to discuss the results and
12 to decide how to proceed?
13     A.      Same answer.
14     Q.      Do you remember that someone
15 called a timeout after those results were
16 reviewed?
17     A.      Same answer.
18     Q.      Did you have any other meetings
19 on April 20th with BP or rig personnel?
20     A.      Same answer.
21     Q.      And would you tell us who was at
22 any of the meetings that -- all of the
23 meetings that you were -- attended in --
24     A.      Same answer.
25     Q.      Were you on the rig or on duty

34

1  during other well-control events?
2      A.      Same answer.
3      Q.      And if I ask you about any of
4  the follow-up or any of the lessons from
5  those well-control events, I would get the
6  same answer; is that right?
7      A.      Same answer.
8      Q.      If I asked you how those other
9  well-control events were -- were ultimately
10 returned back to normal drilling, I would get
11 the same answer?
12     A.      Same answer.
13     Q.      And if I ask you about any
14 follow-up meetings with Transocean or with BP
15 about those other well-control events, I
16 would get the same answer?
17     A.      Same answer.
18     Q.      Do you have anything to do, as
19 toolpusher, with monitoring pore pressure or
20 frac gradient?
21     A.      Same answer.
22     Q.      And do you know how to maintain
23 that balance?
24     A.      Same answer.
25     Q.      Is that a Transocean procedure

35

1  that you followed to -- to keep it -- keep
2  the well balanced?
3      A.      Same answer.
4      Q.      Do you know whether or not the
5  balance was fragile in -- in the Macondo
6  well?
7      A.      Same answer.
8      Q.      Do you know anything about the
9  kick that was sustained on April the 3rd of
10 2010?
11     A.      Same answer.
12     Q.      Do you know what caused that?
13     A.      Same answer.
14     Q.      And do you know what was done
15 about it?
16     A.      Same answer.
17     Q.      Do you know whether or not there
18 were any follow-up meetings?
19     A.      Same answer.
20     Q.      Would -- would I get the same
21 answer for any other well-control events or
22 kicks that were sustained during the drilling
23 of the Macondo well?
24     A.      Same answer.
25     MR. LEMMON: I'm going to pass the

36

1  witness and reserve the remainder of my time.
2      MR. WALSH: We'd like to take a break,
3  please.
4      MR. LEMMON: Sure.
5      VIDEOGRAPHER: The time now is
6  9:22 a.m.  We are now off the record.
7      (Off the record.)
8      VIDEOGRAPHER: Time now is 9:35 a.m.
9  we are now back on the record.  This is
10 beginning of tape 2.
11          EXAMINATION
12 BY MR. STEPHANY:
13     Q.      Good morning, Mr. Wheeler.  My
14 name is Bryan Stephany from Kirkland & Ellis,
15 and I represent BP.  If I ask a question that
16 you don't understand, feel free to let me
17 know.  I'll try and rephrase it.  If you
18 answer a question, I'll assume that you
19 understood the question; is that fair?
20     A.      Okay.
21     Q.      I understand that you intend to
22 assert your Fifth Amendment privilege against
23 self-incrimination in response to some of
24 the -- my questions here today.
25     Have you been advised as to

9  (Pages 33 to 36)

**PURSUANT TO CONFIDENTIALITY ORDER**

---

109

1      Q.   On the petition -- I'm not going
2 to introduce it as an exhibit because it's a
3 public document.
4      MR. GOFORTH: Objection to the sidebar.
5      Q.   But you have sued both BP and
6 Halliburton, right? Correct?
7      A.   I didn't -- I didn't understand
8 you.
9      Q.   I'm sorry. You have sued both
10 BP and Halliburton in your individual
11 capacity, right?
12      A.   Yeah. If you have any
13 questions, you need to talk to my lawyer.
14      Q.   Okay. Well, my question to you
15 is that on page 5 of your petition, you
16 state, the Halliburton defendant was
17 negligent and grossly negligent in the
18 following particulars, and then you list five
19 areas.
20      I would like for you, if you
21 would, please tell me all of the facts that
22 you have to support this particular paragraph
23 on paragraph [sic] 5.
24      MR. WALSH: Mr. Fleming, I'm going to
25 advise him to take the Fifth Amendment on

---

110

1 those questions.
2      MR. FLEMING: Okay.
3      MR. WALSH: I know you're getting short
4 on time.
5      MR. FLEMING: Yes.
6      Q.   So you're going to follow your
7 counsel's advice on that?
8      A.   Yes.
9      Q.   Okay. On the first -- there
10 were two negative-pressure tests conducted on
11 the HORIZON, right?
12      A.   I plead the Fifth.
13      Q.   And you were not comfortable
14 with the first -- with the results of the
15 first negative-pressure test, correct?
16      A.   Same answer.
17      Q.   And on the second
18 negative-pressure test, you discussed that
19 issue with Don Vidrine, correct?
20      A.   Same answer.
21      Q.   Did you discuss any anomalies
22 with that?
23      A.   Same answer.
24      Q.   You also had some concerns about
25 the loss of the mud that the Macondo well was

---

111

1 experiencing on April 20th, correct?
2      A.   Same answer.
3      MR. FLEMING: And that's all I have,
4 sir.
5      MR. WALSH: Thank you.
6      VIDEOGRAPHER:
7      Time now is 11:16 a.m. We are
8 now off the record. This is the end of
9 tape 3.
10      (Off the record.)
11      VIDEOGRAPHER:
12      Time now is 11:24 a.m. We are
13 now back on the record.
14      EXAMINATION
15 BY MR. REYNOLDS:
16      Q.   Mr. Wheeler, my name is Jack
17 Reynolds. I'm with the law firm of Pillsbury
18 Winthrop Shaw Pittman. We represent MOEX
19 Offshore and related MOEX entities. And for
20 the purposes of my questions here today, when
21 I refer to MOEX, I'm referring to all of the
22 MOEX entities collectively.
23      Do you understand that?
24      A.   Yes.
25      Q.   Okay. Do you have any knowledge

---

112

1 of a joint operating agreement governing the
2 relationship between BP, Anadarko, and MOEX
3 Offshore?
4      MR. WALSH: You can answer that.
5      A.   No.
6      Q.   Okay. So you never saw the
7 agreement, never read it or anything?
8      A.   No.
9      Q.   So you would have no knowledge,
10 then, of the rights, duties,
11 responsibilities, powers, given to each of
12 those entities in that agreement?
13      A.   No.
14      Q.   Did you have any personal
15 contact or communications with MOEX or any of
16 its representatives in connection with the
17 Macondo well?
18      A.   No.
19      Q.   Did you have any discussions
20 with MOEX or its representatives in
21 connection with any technical matters related
22 to the Macondo well?
23      MR. WALSH: Can we confer?
24      MR. REYNOLDS: Sure.
25      A.   No.

---

**PURSUANT TO CONFIDENTIALITY ORDER**