UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 SECTION: J |
| This filing relates to: *Cases in Pleading Bundle B1, and VoO Charter Dispute Cases.* | * * * * | JUDGE BARBIER MAGISTRATE SHUSHAN |
| * * * * * * * * * * * | * * | |
| *Bon Secour Fisheries, Inc., et al v. BP Exploration and Production, Inc.., et al* Civil Action No. 12-970 | * * * * * | |
| * * * * * * * * * * * | * | |

**CLASS REPRESENTATIVES'
OPPOSITION TO GO FISH MOTION TO INTERVENE
(AND PRASHIELA OBJECTORS' APPEAL OF DISCOVERY ORDER)**

For the reasons expressed in Judge Shushan's Order of September 25, 2012 [Doc 7480], for the reasons stated in Class Counsel's Letter Brief of September 14, 2012 [Doc 7417], and for the reasons further outlined below, the Go Fish Motion for Intervention [Doc 7314] and Objections to the Magistrate's Recommendations [Doc 7602] should be denied:

**MAY IT PLEASE THE COURT:**

As set forth in Plaintiffs' Approval Brief and supporting Declarations, the parties attempted to negotiate separate frameworks for commercial fishing and oyster leaseholder claims at arms length for a number of months. The lead negotiators for the plaintiffs frequently consulted with other attorneys, stakeholders and industry representatives, (including Mr. Waltzer and Mr. Guidry), to gain insight and achieve consensus and support for the models being discussed with BP. While these

frameworks, like the other settlement frameworks, were being negotiated within the context of an uncapped or "evergreen" structure, the plaintiff negotiators, through the course of these discussions, came to have a good understanding of the overall picture with respect to commercial fishing in the Gulf and the documented effects of the spill on the industry.

When, therefore, BP moved the discussion to a non-reversionary fund that would satisfy all class commercial fishing claims, the $2.3 billion that BP was willing to guarantee to the class was almost five times the entire revenue of annual catch landed in the Gulf Coast Areas, and significantly more than the total of the projected aggregate pay-outs under the separate shrimp, oyster harvester, oyster leaseholder and deckhand compensation models that were being discussed by the stakeholder contingencies.  Given the negotiating dynamic, (in which Judge Shushan was participating as an active mediator), and the available evidence, Class Counsel believed (and continue to believe) that a guaranteed $2.3 billion fund would provide significantly more compensation to the class than could be achieved under frameworks separately negotiated with BP.

Out of an abundance of caution, and in order to prevent any claims of alleged "inadequate representation", Class Counsel asked the Court to appoint John Perry to determine the allocation.[1] Mr. Perry would be provided with the pertinent data;  review the available evidence;  listen to the viewpoints of various constituencies;  and make his own independent, un-biased, un-conflicted, neutral determination as to a fair and appropriate allocation of the Seafood Fund to the participating classmembers.[2]

---

[1] *See* ORDER (March 8, 2012) [Doc 5998] (appointing John W. Perry as a Court-Designated Neutral).

[2] *See generally,* PLAINTIFFS' FINAL APPROVAL BRIEF [Doc 7104], pp.14-16; PERRY DECLARATION [Doc 7110-5]; BALHOFF DECLARATION [Doc 7110-2]; HERMAN DECLARATION [Doc 7104-5], at ¶11; RICE DECLARATION (Seafood Program) [Doc 7104-6, at pp.13-18]; PLAINTIFFS EXHIBIT A (*in globo*) [Doc 7104-1].

Go Fish did not object to this process. Indeed, Go Fish members were supportive of the $2.3 billion guaranteed Seafood Fund, and actively participated in discussions with Mr. Perry to assist his efforts to impartially arrive at a fair and final allocation.[3]

Now, however, Go Fish has filed a "Motion to Intervene" which appears to be based on a number of misunderstandings of the Seafood Compensation Program, and which also raises a number of questions under Article III, Federal Rule 24, and Rule 23, including:

- What standing could "Go Fish" have to become a "party" to this proceeding?

- To the extent that Go Fish members are Class Members who are making claims with the Court-Supervised Settlement Program, aren't they already parties to the *Bon Secour* action, represented by the Class Representatives and Class Counsel? [4]

- To the extent that Go Fish members might object to the proposed Class Settlement, isn't there already a process for those arguments and objections to be advanced by Go Fish members or other Class Members who had the opportunity to file formal Objections to the proposed Class Settlement?[5]

- To the extent that Go Fish members have opted out of the *Bon Secour* Settlement Class, then what standing, rights or interests would they have to be advanced by Go Fish within the *Bon Secour* action or Settlement Class?

---

[3] *See, e.g.,* PLAINTIFFS' EXHIBIT A [Doc 7104-1] at p.7 ("2.3 billion replaces the entire catch in affected areas of the Gulf of Mexico for seven years, buys a 15 year supply of fuel, ice and food for every affected vessel, and is 22 times the 2010 loss caused by the spill. Split fairly, the Seafood Program should be enough to protect fishermen even in the worst case situation, total fishery collapse." - Joel Waltzer, Statement to the Press, March 19, 2012); E-MAIL FROM JOEL WALTZER TO JOE RICE (March 3, 2012) (attached hereto as Exhibit 1); LETTER FROM HERMAN TO GUIDRY (July 7, 2012) [Doc 7417-1]; *see also,* WALTZER DECLARATION [Doc 7344-1]; GUIDRY DECLARATION [Doc 7344-2]; NGUYEN DECLARATION [Doc 7344-3].

[4] *See* PRELIMINARY APPROVAL ORDER [Doc 6418], ¶¶ 19-21, pp.33-34.

[5] *See* PRELIMINARY APPROVAL ORDER, ¶38, p.39.

- From the standpoint of redress, isn't the Court generally asked to approve or reject a Class Settlement as presented by the parties?[6] Is the Court even empowered to provide Go Fish with the relief it seeks?

- If, as Go Fish suggests, the Seafood Fund is sufficient, and any alleged "problems" in allocation can be fixed by the Court-Appointed Neutral with respect to the distribution of the anticipated reserve;[7] then isn't Go Fish's concern about the way such reserve might be allocated hypothetical, conjectural and premature?

- How could Go Fish "represent" the diverse interests of its members when its lawyer apparently believes that he is operating under a "conflict of interest"?[8]

- If, as Go Fish, suggests, the organization "does *not* seek to represent any fishery, location, or claimant group against another"[9] – (and "is not seeking to intervene in order to recover damages or compensation for any member"[10]) – then what role exactly does Go Fish propose to take on behalf of some or all plaintiffs in the *Bon Secour* litigation?

- Hasn't Go Fish's demand that the Court appoint a "special master" to make findings regarding a second round distribution already been satisfied by the Court's appointment of Mr. Perry?

- Why does Go Fish assume that Mr. Perry will not solicit the input of Go Fish members and other Class Members – as he did the first time – in making a final determination about whether any reserve will continue to be distributed *pro rata,* or whether to make any adjustments to the allocation?

---

[6] *See, e.g.,* MANUAL FOR COMPLEX LITIGATION, FOURTH (Fed. Judicial Center 2004) §21.61 ("The judicial role in approving a proposed settlement is critical, but limited to approving the proposed settlement, disapproving it, or imposing conditions on it. The judge cannot rewrite the agreement").

[7] *See* GO FISH OBJECTION [No.10-7777, Doc 226], at pp.2-3.

[8] *See* WALTZER DECLARATION [Doc 7344-1], at pp.2-3 ("I began to feel very uneasy because I felt constrained by my loyalties to all of the fisheries and claim types involved.... **I believe that the process presents extreme ethical challenges that I frankly don't know how to handle.** I am between a rock and a hard place....") (emphasis supplied).

[9] GO FISH APPEAL [Doc 7602-1], at p.9, (emphasis supplied).

[10] GO FISH APPEAL, at p.9.

- If, as Go Fish suggests, the Court were to create formal sub-classes, how would the Court choose sub-class representatives? Or sub-class counsel? And what would happen if, at the end of the day, these new sub-classes could not (or refused to) come to an agreement as to the second round allocation?

The Go Fish Motion to Intervene, Objection, and supporting Declarations actually provide the Court with a perfect illustration of why the process that was employed by the parties was and is preferable to the creation of formal sub-classes. For these reasons, and for the reasons further outlined below, the Go Fish Motion to Intervene should be denied.

**Go Fish's Motion and Objection Reflect False Assumptions About the Seafood Compensation Program**

Initially, it is important to recognize that Go Fish believes "that 2.3 billion dollars … should be enough to provide all fishermen both duration and parity"[11] and maintains that the alleged "problems" can still be solved within the confines of the Settlement's terms by determining a fair "Round Two" distribution from the Seafood Fund.[12] Therefore, because "the Settlement was amended to allow the Court appointed neutral to change the allocation formulas to attain fairness on the second distribution of SCP funds,"[13] Go Fish is not actually objecting to the Settlement Agreement; rather, it is expressing the fear that the Court-appointed neutral might make a Round Two allocation different from what some – but not other – Go Fish members might want or desire.

---

[11] GO FISH OBJECTION [No.10-7777, Doc 226], p.3.

[12] GO FISH OBJECTION, pp.2-3.

[13] GO FISH OBJECTION, p.3. (*See* AMENDMENTS TO SEAFOOD PROGRAM [Exhibit 10], General Framework and Overview, at p.3 [Doc 6414-5, at p.5]).

In the process of advancing its Motion and Objection, Go Fish expresses several concerns which appear to be based upon a misreading of the terms of the Seafood Compensation Program:

1. **Go Fish incorrectly assumes that the Seafood Program models do not account for numerous acres held by "private" oyster leaseholder claimants.** Under the Seafood Compensation Program, an oyster leaseholder is required to have a valid lease.[14] In Louisiana, this means that you have to have a lease that is *registered* with the Department of Wildlife and Fisheries – irrespective of whether you are leasing from a "public" or "private" landowner. All eligible (*i.e.* registered) leases were accounted for in the original Seafood Program models.

2. **Go Fish incorrectly assumes that a "Round Two" *pro rata* distribution will be taken from post-set-off determinations.** Go Fish suggests that a *pro rata* "Round Two" allocation will be unfairly skewed due to previous payments to some Class Members, but not others, by the Gulf Coast Claims Facility ("GCCF"). As expressly stated in the Settlement Agreement, the Round Two allocation will be made from pre-set-off determinations: "The balance will be distributed to each Claimant in proportion to the Claimant's *gross* compensation" which "reflects compensation paid by the Claims Administrator *prior to* the deduction of Seafood Spill-Related Payments."[15]

3. **Go Fish incorrectly assumes that the initial Frameworks and/or any Round Two distribution was and/or will be divided by industry.** The Seafood Compensation Program Frameworks, while informed by the nature and conditions of the relative species, were *not* designed to deliver a certain amount of total compensation to a particular industry, (*i.e.,* Shrimp versus Oyster Harvester versus Fin Fish). Rather, the frameworks were designed by the Court-Appointed Neutral, from the bottom up, to provide full compensation to *each* individual Class Member participating in the Seafood Compensation Program.

4. **Go Fish incorrectly assumes that the Court-Appointed Neutral will not consult with constituencies or obtain other relevant information and data before coming to a final decision as to any Round Two allocation.** Before there is a distribution of any reserve in the Seafood Fund, the Court-Appointed Neutral will solicit information from Seafood Program participants, and the Parties will provide formal notice and an opportunity for each participant (or his counsel) to provide input, prior to final approval by the Court.

---

[14]SETTLEMENT AGREEMENT, Exhibit 10, Oyster Compensation Plan, General Provision No.6, at p.26.

[15]SETTLEMENT AGREEMENT, Exhibit 10, General Framework and Overview, p.3 (emphasis supplied).

**Go Fish Disregards the Structural Assurances Provided by the Appointment of a Court-Appointed Neutral to Determine a Fair and Appropriate Allocation of the Seafood Fund**

Mr. Perry did *not* serve as a "mediator" to a "negotiation" among PSC members who "represented" different interests in coming to a final agreement on the Seafood Program Frameworks with BP.

Rather, it was Mr. Perry, as the Court-Appointed Neutral, who, with the assistance of Mr. Balhoff, looked at all of the available data; reviewed all of the available evidence; listened to the viewpoints of various constituencies, (including Go Fish members); and made his own independent, un-biased, un-conflicted determination as to a fair and appropriate allocation.[16]

**The Claims of Crabbers, Deckhands and Fin Fishermen Were Fairly Represented**

First, it is important to note that Mr. Perry worked from objective NOAA and other data. Therefore, while the perspectives of the various constituent members were likely informative, there were many objective factors upon which the Court-Appointed Neutral could base the allocation.

Nevertheless, the Go Fish members are mistaken to suggest that the claims of crabbers, deckhands or fin fishermen were not considered. In addition to interviewing crabbers, including Mr. Nguyen himself,[17] Mr. Perry was provided with a written submission from Henry W. Kinney on

---

[16]*See* PERRY DECLARATION [Doc 7110-5]; BALHOFF DECLARATION [Doc 7110-2]; HERMAN DECLARATION [Doc 7104-5], at ¶11; RICE DECLARATION (Seafood Program) [Doc 7104-6, at pp.13-18]; *see also, e.g.,* LETTER FROM HERMAN TO GUIDRY (July 7, 2012) [Doc 7417-1]; MEMO IN SUPPORT OF MOTION FOR LEAVE TO FILE REPLY BRIEF [Doc 7525-1] (attorneys Nolting, et al, who represent more than 1,500 commercial fishermen, were, along with some of their clients, directly involved in the negotiation and Court-Appointed Neutral determination process, including the presentation of expert analyses and damage calculations).

[17]NGUYEN DECLARATION [Doc 7344-3]. (*See also,* GUIDRY DECLARATION [Doc 7344-2], p.2 (acknowledging that at least a couple of crabbers were interviewed).)

behalf of eighty-four businesses and individuals in the blue crab industry.[18] Attorney John Cracken directly participated in several meetings with Mr. Balhoff and Mr. Perry representing thousands of deckhands, and – in addition to Mr. Thien[19] – attorney Jimmy Williamson and several of his clients shared the perspectives of the fin fishing industry.

**The Go Fish Motion, Objections and Supporting Declarations Demonstrate Why Formal Sub-Classes Would Not Have Provided Effective Structural Assurances for the Adequate Representation of the Class Members in this Case**

That the Seafood Compensation Program participants and other Class Members were at all times adequately represented by the Class Representatives and Class Counsel has been addressed in the Declarations of Professor Klonoff, Professor Issacharoff and Professor Coffee.[20]

Yet the Go Fish Motion, Objection and supporting Declarations provide a perfect example of why the appointment of a neutral was – and remains – preferable than an attempt to create formal sub-classes.  Among other practical impediments, there are no discrete "sub-classes" of Seafood Compensation Program participants (*i.e.,* of Shrimpers versus Crabbers versus Oyster Leasehold Owners).  Rather, the Class Members at issue have frequently participated in different fishing activities, and have multiple potential claims within the Seafood Program.  Similarly, the lawyers who represent large groups of these Class Members and are most knowledgeable about the industry typically represent people who have various interests and multiple claims with respect to different

---

[18]LETTER FROM KINNEY TO LIAISON COUNSEL (April 12, 2012) (and E-Mail from Herman to Balhoff and Perry (April 12, 2012)) (attached hereto as Exhibit 2).

[19]*See* NGUYEN DECLARATION [Doc 7344-3]. (*See also,* GUIDRY DECLARATION [Doc 7344-2], p.2 (acknowledging that at least one long liner provided information).)

[20]*See* KLONOFF DECLARATION [Doc 7104-3], ¶¶ 29-38;  COFFEE DECLARATION [Doc 7110-3], ¶¶ 8-10, 23-34, 41-45; ISSACHAROFF DECLARATION [Doc 7104-4], ¶¶ 8-17.

aspects of the commercial fishing industry. *See generally,* WALTZER DECLARATION [Doc 7344-1], pp.2-3 ("Because I had so many clients from many fisheries, I sat in almost all of the different group meetings");[21] PHILLIPS DECLARATION [Doc 7344-8] ("I shrimp, crab and harvest oysters.... I am also an oyster leaseholder"); DANDAR DECLARATION [Doc 7344-10] ("I am a shrimper, crabber and oyster harvester"); ENCLADE DECLARATION [Doc 7344-6] (personally delivers shrimp, oysters and fish; describes how Go Fish, as an organization, "represents" a broad range of commercial fishing interests); NGUYEN DECLARATION [Doc 7344-3] (both crabs and shrimps); *see also* GUIDRY DECLARATION [Doc 7344-2] (while a shrimper currently, notes that he was previously a fin fisherman, and appears to be advocating for charter boat operators and processors, whose claims do not even fall within the Seafood Compensation Program).

**The Court Was Correct to Deny the Requested Discovery**

For the reasons stated by Judge Shushan in her Order of September 25, 2012 [Doc 7480], and for the reasons stated in Class Counsel's Letter Brief of September 14, 2012 [Doc 7417], the rejection of Objectors' discovery requests was appropriate, and both the Go Fish Objection [Doc 7602] and the Prashiela Appeal [Doc 7612] should be denied.

---

[21]*See also* WALTZER DECLARATION, at pp.2-3 ("I began to feel very uneasy because I felt constrained by my loyalties to all of the fisheries and claim types involved.... I believe that the process presents extreme ethical challenges that I frankly don't know how to handle. I am between a rock and a hard place").

**Conclusion**

For the above and foregoing reasons, the Go Fish Motion to Intervene, the Go Fish Objection to the Magistrate's Recommendation, and the Prashiela Objectors' Appeal of Magistrate Shushan's Order should be denied.

This 15th day of October, 2012.

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, LA Bar No. 11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX, WRIGHT, ROY & EDWARDS, LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, LA 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax: (337) 233-2796 |
| E-Mail: sherman@hhklawfirm.com | Email: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 15th day of October, 2012.

/s/ Stephen J. Herman and James Parkerson Roy