# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

October 12, 2012

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Re:  MDL No. 2179 — Sampling and Testing of Materials Collected at Michoud

Dear Judge Shushan:

Thank you again for your prompt consideration of the protocols provided by BP's October 9, 2012 letter and for allowing BP to begin the lab testing of the materials without further delay with the understanding that the items set forth by the Court on October 11, 2012, are properly taken care of.

We address each of the topics raised by the Court below.

*1.    There are a few elements the testing groups have collected in addition to the items listed in the original protocol (paragraph 5.2 page 10) which should be listed in the revisions so that it is clear what BP (or its collectors) is taking.  In addition, a summary statement of the information to be shared would be appreciated for the purposes of clarity.*

BP's Proposal:  Once the collection is complete, BP will provide a complete list of all sub-samples collected.  BP will also produce data reflecting the measured mass of each individual sub-sample collected by BP.  When Intertek has completed its testing work, BP will produce standard-form Intertek reports showing the relevant test results.

*2.    As far as sub-samples remaining at Intertek on "hold," I wonder whether those samples can be sent back to the air-conditioned storage containers at Michoud.*

BP's Proposal:  BP is willing to return to Captain Englebert for storage at Michoud all sub-sample material collected at Michoud that remains after testing is complete.  Alternatively, if the Court would prefer, BP would be willing to properly preserve any sub-sample material that remains after testing at an appropriately secure BP storage facility.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 12, 2012
Page 2


*3.     I assume that this is a typographical error, but on page 2 of the materials testing protocol there is a "q" with no entry. Please confirm.*

BP Response:  The Court is correct; this is a typo.

*4.     Relative to 12 hour days for the scanning protocol, Captain Englebert will try to arrange for overtime, but she thinks the projection is probably not practical when you account for cleaning the BOP in areas to be scanned, etc.  She projects a minimum of 4 days will be necessary for the scanning if the weather is good.  The deadline of the 25th includes moving the evidence from 404a back to the evidence yard before October 25th.  She therefore recommends that BP prioritize the sub-sample work in order to fit all of the planned laser scanning into the schedule.  The only other thing that I can think of that might assist is extending the lease on the 404a building so that the moving of the evidence can take place in November at the time the preservation work will be done.  If you want to pursue this option, please contact NASA directly.*

BP Proposal:  BP has spoken with Captain Englebert (who has been quite helpful), and we believe we may have resolved this issue. BP will work with NASA to arrange additional time in building 404a, and BP has agreed to provide "video recording" support to Captain Englebert to allow her to operate at multiple sites.  Under this proposal, the BOP "washing" activity would take place next Wednesday, October 17, and laser scanning would begin the following day, on October 18.

*5.     In your letter (third paragraph), you talk about possible changes to the testing protocol.  I know you intend this, but we would like advance notice of any proposed changes so that everyone may consider the proposals.*

BP's Proposal:  BP will provide 24 hours notice to the Court and all parties before making any change to the laboratory testing protocol.

Based on very recent conversations with laboratory personnel at Intertek, BP knows at this point about the following proposed protocol modifications:

- Steps 4a and 5a – change the size of the centrifuge tube to 50 cc.  Scale the experiment accordingly to 2.5 g of material and 25 ml of DI water.

- Steps 4h, 5h, 5r, 6f, 7, and 9 – add ICP-OES (optical emission spectroscopy) as an option to complement the ICP-MS.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 12, 2012
Page 3

- Steps 4i, 5i, and 5r – add ion selective electrode (ISE) as an option to complement the IC.

- Step 5 – add that as an option the sample could be scraped or cut to obtain a sample clean from the loose debris or dry dust. The scraped or cut sample could then be analyzed without the requirement of the washing steps.

- Step 5p – change the size requirement for XRF to 100 mg.

- Step 6 – add measurement of hardness to complement crush strength measurement.

- Step 8 – add measurement of hardness to complement compressive strength measurement.

- Step 9 – add measurement of hardness.

*6.     Your letter does not mention the 8 items which Captain Englebert recommended not be destructively tested. I assume that we have reached agreement on that issue and would appreciate your confirming.*

BP's Proposal: BP appreciates the concern with these items. But as discussed with the Court and United States, we would emphasize that the reason the items were collected and preserved in the first place was so that they could be tested and the results of the testing could be shared with the MDL parties and used in the MDL proceedings (among other things). Against this backdrop, BP sees no reason not to go forward with its original proposal for this testing, including of course the limits on that testing that would be permit its later verification.

As an initial step, while the Court considers BP's request for "destructive" testing of these items, BP proposes to perform at Michoud next Monday and Tuesday, October 15 and 16, an XRF analysis of the metallic items that appear on the singular items list compiled by Captain Englebert. XRF analysis is a non-destructive procedure, and it can be performed on site using a hand-held XRF device.

Relatedly, BP also seeks permission to perform a similar XRF scan on certain BOP components in order to obtain exemplar data for Intertek. Specifically, BP proposes to perform XRF scan on (1) a "finger" from each of the variable bore rams; (2) a "finger" from the upper annular; (3) a "finger" from the lower annular; and (4) a section of drill pipe that was removed from the BOP. The data from this XRF scan will be produced to the parties as a standard Intertek XRF scan report.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 12, 2012
Page 4


*7.     Although it is my understanding that all of the sampling and testing will be photographed, I would appreciate your verifying for all parties BP's intent regarding photographs and video.*

BP's Proposal:  BP has developed a plan to create a video recording of laboratory testing work done at Intertek.  BP will produce this video to the parties as instructed by the Court.

*8.     I assume that the results of the new laser scans will be made available on a rolling basis as we have done in the past.  I would appreciate confirmation of that as well.*

BP's Proposal:  BP will produce laser scan data to the parties on a rolling basis as it becomes available.

\* \* \* \* \*

BP respectfully requests that the Court approve the attached XRF analysis protocol for the work described under item #6 above.

Thank you again, Your Honor, for your prompt attention to BP's materials sampling and testing proposals.  We look forward to further discussing these topics with the Court and parties.

Sincerely,

Robert R. Gasaway


Attachment

cc (via electronic mail):

United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross
Allison B. Rumsey
David E. Grassmick

# ATTACHMENTS

XRF Michoud Protocol

*Metallic Materials*

Non-destructive testing of metallic materials, including the drill pipe and the teeth or fingers from the VBRs and each of the upper annular elements, will be conducted using a portable XRF instrument. A laboratory representative who is trained in the use of this instrument will conduct the testing activities.

Operation, maintenance, and calibration of the XRF equipment (Niton XLt 898 alloy analyzer) will be conducted in accordance with Intertek ASA-SOP-LAB-Metal-7 (previously produced in MDL 2179). Video and photo documentation shall be performed to document the location of tested material.

Protocol for Non-Destructive Testing of Unique Metallic Sample Piece

The metallic pieces from the set of eight "singular" items will be tested onsite using the XRF instrument in accordance with the protocol described above. BP will also test one "finger" from each of the VBR elements; one "finger" from each of the annular elements; and one section of drill pipe from the BOP. In addition to those items, BP will test singular items described below.

Information for the singular metallic materials is provided below:

| Evidence Storage # | FBI# | Description |
| --- | --- | --- |
| A/C Container # 1603 | 85 | Metal pieces from bore of BOP |
| A/C Container # 1603 | 86 | Metal pieces from bore of BOP |
| A/C Container # 1603 | 87 | Metal pieces from bore of BOP |
| A/C Container # 1603 | 88 | Metal pieces from bore of BOP |
| A/C Container # 4470 | 100 | Casing shear ram pin STBD side with debris scrapings from fracture face |
| A/C Container # 4470 | 186 | Metal Ball found in Riser after cutting to remove drill pipe |