**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| | ) | |
| In Re: Oil Spill by the Oil Rig "Deepwater | ) | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | ) | |
| April 20, 2010, | ) | Section:  J |
| | ) | |
| This document relates to: | ) | Honorable Carl J. Barbier |
| | ) | |
| All Actions, Including: | ) | Magistrate Judge Shushan |
| | ) | |
| Case No. 11-CV-3180 and 11-CV-2766, | ) | |
| | ) | |
| | ) | |

---

**MEMORANDUM IN RESPONSE TO OPPOSITION BY STATE OF LOUISIANA TO
MOTION FOR FINAL APPROVAL OF ECONOMIC AND PROPERTY DAMAGES
CLASS SETTLEMENT**

---

**INTRODUCTION**

This Memorandum is filed on behalf of the direct action plaintiffs in *Thanh Hai, Inc., et al. v. BP American Production Company, et al.*, U.S.D.C. for the Eastern District of Louisiana, Case No. 2:11-cv-03180 (OPA90 Complaint), and *Hong Van Truong, et al. v. BP American Production Company, et al.*, U.S.D.C. for the Eastern District of Louisiana, Case No. 2:11-cv-02766 (Vessels of Opportunity Complaint), who are also members of the proposed *Deepwater Horizon* Economic and Property Damages Settlement Class. It is filed in support of the proposed class action settlement and in response to the Opposition to that settlement filed by the State of Louisiana ("State" or "Louisiana"), on the ground that the proposed settlement, while not perfect and not satisfactory for every member of the settlement class, is fair and adequate and serves the interests of the class members as a whole.

## FACTS

The State's Opposition to the class action settlement focuses primarily on the Seafood Compensation Program, and is premised on the alleged absence of accurate and unbiased information regarding both the losses suffered by class members to date, and the potential for future damages. The State argues:

> The only evidence offered by BP or the PSC relating to damages, both economic and environmental, consist [*sic*] of one-sided declarations from BP-hired witnesses. Without any unbiased information regarding the actual losses and the potential for future harm suffered by plaintiffs, it is impossible to evaluate the strength of their claims to determine whether the Settlement is fair or reasonable.

Louisiana's Memorandum at 9-10. In reality, while the State may be unaware of the fact, an extensive analysis of the class action plaintiffs' damages has been carried out by experts in the relevant fields acting at the request of counsel for some of the plaintiffs. That analysis, based on rigorous scientific and accounting principles, addressed both the damages sustained by various groups of plaintiffs to date, and the risk of additional damages in the future. The work of these experts, acting on behalf of proposed class members and not on behalf of defendants, informed settlement negotiations and helped to shape the contours of the ultimate settlement agreement— in particular, the Seafood Compensation Program. The experts' work therefore provides strong grounds for the Court to approve the settlement, even while recognizing that individual circumstances vary and some class members will properly choose to opt out of the settlement.

The undersigned, as noted above, represent the direct action plaintiffs in the *Thanh Hai, Inc.* and *Hong Van Truong* cases, as well as other clients. This group of more than 1,500 commercial fishermen and more than 900 Vessels of Opportunity oil spill response participants is one of the largest groups of direct action plaintiffs in the *Deepwater Horizon* Oil Spill Litigation, if not the largest. Cognizant of the need to develop credible and persuasive damage

claims on behalf of fishermen and other clients, the undersigned had already begun, by the end of

2010, to assemble a team of experts to evaluate plaintiffs' damages. That team included:

- Jeffrey June. Mr. June is a fisheries scientist with over 40 years of experience who has a

  particular expertise in assessing the risk of future damages resulting from oil spills. He

  worked as an expert on behalf of either plaintiffs or defendants in connection with the

  Glacier Bay oil spill in Cook Inlet, Alaska, in 1987; the 1989 Exxon Valdez oil spill in

  Prince William Sound, Alaska; the Huntington Beach oil spill in California in 1990; the

  1993 Shetland Islands oil spill in the North Sea; the Selendang Ayu oil spill off Unalaska

  Island, Alaska, in 2004; and the 2007 Cosco Busay oil spill in San Francisco Bay. Mr.

  June and his team at Natural Resources Consultants, Inc., worked on damages issues in

  this case for two years, collaborating with regional experts on Gulf fisheries, compiling

  databases, and ultimately developing a compensation model for fishermen (boat owners,

  captains and crews) damaged by the *Deepwater Horizon* spill. That compensation model

  used multipliers of projected lost earning capacity to compensate plaintiffs for the risk of

  future damages. *See generally* the Declaration of Jeffrey A. June filed herewith, as

  Exhibit B.

- Robert Mosher, CPA. Mr. Mosher has maintained an accounting practice in Biloxi,

  Mississippi since 1981, serving as the accountant for thousands of shrimpers, oystermen,

  crabbers and fin fishermen located in Mississippi, Louisiana, Alabama, Florida and

  Texas. Relying on that experience, Mr. Mosher developed a model that estimates the

  annual earning capacity of shrimping vessels operating in the Gulf of Mexico as a

  function of two variables: the length of the vessel and the storage system used to store the

  shrimp (ice or freezer system). He developed analogous models for public-reef oysters,

fin fish and crab. These models provided baselines that can be used to calculate losses for individual fishermen in 2010. These, in turn, were used, in conjunction with the multipliers developed by Mr. June, to measure potential future losses. *See generally* the Declaration of Robert F. Mosher, CPA, filed herewith, as Exhibit C.

- William "Corky" Perret. Mr. Perret is a former Assistant Secretary of the Office of Fisheries in the Louisiana Department of Wildlife and Fisheries and Deputy Director of the Mississippi Department of Marine Resources. He was retained to analyze the impacts of the *Deepwater Horizon* spill on shrimp, crab and fin fish. Mr. Perret co-authored a paper titled *"Deepwater Horizon* Oil Spill: Damage Assessment and Risk Analysis" that was submitted to the Gulf Coast Claims Facility on August 1, 2011, and subsequently was provided to the Plaintiffs' Steering Committee and BP. The co-authors included Jeffrey June, Robert Nickinovich, Ed Cake, Steve Hughes and Scott Goodman. *See generally* the Declaration of William S. "Corky" Perret filed herewith, as Exhibit D.

- Scott Porter and Dr. Ed Cake, oyster biologists, Heather Reed, a fin fish biologist, and Robert Nickinovich, an expert on seafood processing, contributed input within their respective spheres of expertise that allowed the other experts to attune their models to the unique circumstances of the Gulf fisheries.[1]

The *Thanh Hai, Inc.* and *Hong Van Truong* plaintiffs initially chose to pursue their claims through the Gulf Coast Claims Facility overseen by Kenneth Feinberg. Using the models prepared by their team of experts, counsel submitted claims on behalf of many of these individuals to the GCCF. Plaintiffs and their team of experts submitted documentation and made presentations that persuaded Feinberg to increase substantially the offers the GCCF was making

---

[1] The work done by all of the experts is summarized in the Declaration of William L. Roberts, paragraphs 7 through 15, attached herewith, as Exhibit A.

to individual commercial fisher claimants. *See* the Declaration of Jeffrey A. June, paragraphs 22

through 24:

> 22.     Between February and July 2011, my staff, our team of experts and I conducted additional research and analyses, and drafted a comprehensive 144-page white paper. Our report: (a) described the major commercial fisheries in the Gulf, (b) provided a historical review of fishing effort, catch, price and value, (c) described the markets for the products, (d) documented the impacts of oil spill-related fishing closures on catch and net value, (e) provided estimates of potential future damages using data pertaining to the extent of the *Deepwater Horizon* spill and analyses of previous oil spills, and (f) provided a methodology for calculating past, present and likely future damages. This report was provided to the GCCF.

> 23.     In August 2011, my team of experts, Faegre attorneys and I met with Kenneth Feinberg and his GCCF staff to discuss our report and approach to damages as compared to the GCCF settlement methodology. In September 2011, my staff and I continued to work with the GCCF and its economists to refine damage assessment and settlement methodologies for oyster, crab and finfish. NRC's efforts culminated in a supplement to the "white paper," which we published in November, 2011.

> 24.     As confirmed by Mr. Feinberg's correspondence with Mr. Nolting, GCCF agreed to increase compensation for the shrimp industry from two to four years of losses. Indeed, initially GCCF said it was going to do more. In an October 13, 2011 letter, Mr. Feinberg stated:

>> Gerry, you have done an extraordinary job for your clients. The Information shown in Table 5 comparing the compensation methodologies demonstrates the very substantial increases in our revised shrimper methodology from that of our current methodology for calculating damages for each of your clients. True, the GCCF cannot agree to pay the amounts you requested in the submission of your various representative claims; but, the GCCF has agreed to accept a "revised Nolting Methodology" for shrimpers, resulting in substantial increases in the amounts awarded to each client. You can observe first-hand in Table 5, the important financial impact on your clients. We plan to move forward with this new methodology and welcome any suggestions you may have. Thanks again for all you have done in this regards.

Ultimately, the GCCF enhanced the risk multiplier in its commercial shrimper

compensation formula from 2 to 4. However, notwithstanding Mr. Feinberg's assurances, the

GCCF failed to adopt other critical improvements. Therefore, despite the improvement in the

GCCF's methodology, the offers ultimately received from GCCF still fell short of fair and

adequate compensation for the vast majority of commercial fishers and processors.[2] Meanwhile,

the Multi-District Litigation was moving forward rapidly toward trial. Therefore, substantially all

of the clients that had been represented by the undersigned counsel in asserting claims with the

GCCF became direct action plaintiffs in the MDL, in the *Thanh Hai, Inc.* and *Hong Van Truong*

cases. Counsel thus brought to the MDL the damages theories and expert workups that had

initially been prepared for the GCCF.

Once they began participating in the MDL, counsel shared the damage analyses that had

been prepared by the experts with the Plaintiffs' Steering Committee, BP, and John Perry and

Dan Balhoff, the Court-appointed neutrals who were involved in drafting the Seafood

Compensation Plan. *See, e.g.*, the Declaration of Jeffrey A. June, paragraphs 26 and 27:

> 25.     In January 2012, I provided a summary of our experts' opinions and loss
> compensation methodologies to the Plaintiffs' Steering Committee ("PSC"). This
> summary detailed our opinions, estimates and methodologies on fair
> compensation for fishermen for past, present and future damages resulting from
> the *Deepwater Horizon* spill.

> 26.     In February and March 2012, N[atural] R[esources] C[onsultants] and the
> above-described team of experts provided technical and expert information, data
> and analyses regarding the Gulf fishing industry and projected damages to the
> PSC and to the Faegre Attorneys working to ensure a fair settlement for
> commercial fishing plaintiffs. We worked closely with PSC member Joseph Rice
> to ensure that the settlement calculation methodologies being discussed in
> conjunction with the settlement negotiations (a) were consistent with methods
> used for previous oil spills and (b) provided fair and equitable compensation for
> the fishers, processors and others in the Gulf fishing industry.

---

[2] *See* the Declaration of Robert F. Mosher, CPA, paragraphs 14 and 15:

> 14.     Our efforts led to the GCCF increasing its "multiplier" from 2 to 4 years. The results,
> however, were much less than our clients hoped for, as the GCCF did not incorporate the earning
> capacity model that we advocated for and instead continued to use the decrease in net income from
> 2009 to 2010 as the baseline for their calculations. …

> 15.     In late 2011, when it became apparent that the GCCF was not going to increase its
> compensation models further and in consultation with our clients, Faegre Baker Daniels filed a
> lawsuit in the MDL.

*See also* the Declaration of William L. Roberts, paragraphs 19 and 20.

While the settlement that was ultimately crafted did not fully reflect the damages theories that the experts supported—it was, of course, a settlement—several of the proposed Economic and Property Damages Settlement's main features were carried over from plaintiffs' expert analyses. To cite one important example, Louisiana criticizes the proposed settlement's use of Risk Transfer Premiums ("RTPs") to calculate the payments available to plaintiffs, characterizing them as a device that benefits only BP:

> The E&PD Settlement provides for the payment of an RTP, an elaborate scheme to add a multiplier onto past damages to compensate for future damages, among other things. In essence, the RTP is exactly what its name implies: a method for transferring BP's risk of having to pay future economic and property damages onto the victims….[T]he Settlement accomplishes BP's goal by passing that risk onto the victims, who can least afford to bear it.

Louisiana's Memorandum at 21. In fact, the purpose of the RTP is almost precisely the opposite: it protects the plaintiffs and ensures that the risk of future damages is both scientifically evaluated and fairly compensated.[3] The RTPs in the Seafood Compensation Program originated in the multipliers that were developed by plaintiffs' experts, including Jeffrey June. *See* paragraphs 29 and 30 of the Declaration of Jeffrey A. June:

> 29.    The Seafood Compensation Plan utilizes as a foundation methodologies successfully utilized in many of the previous large oil spills discussed above. In particular it uses multipliers, or risk transfer premiums ("RTPs") that attempt to quantify the value of projected future risks of harvest losses due to the oil spill by serving as a multiplier of projected lost earning capacity. It is similar to, and largely consistent with, the compensation model that my team of experts and I developed and presented to the GCCF and the PSC.

---

[3] The State appears to suggest that it may be preferable for there to be no settlement, so that plaintiffs can periodically make renewed claims against BP if and when they incur additional losses in the years to come. It probably goes without saying that the overwhelming majority of plaintiffs prefer to reach a final settlement and receive a lump sum payment, rather than retaining an open-ended claim that must be re-asserted and re-fought year after year.

30.     Based on my review of historical data and the likely biological and market effects that the *Deepwater Horizon* oil spill is likely to have on the Gulf seafood industry in the future, I believe that the Seafood Compensation plan provides for a fair method of compensation for seafood industry participants based on species harvested, boat size (for shrimp) and proof of historical fishing revenue. The RTPs used in the proposed settlement are similar to the multipliers that I proposed for each fishery. The baselines to which the RTPs are applied are lower than in my proposed methodologies, but I regard the settlement overall as reasonable.

*See also* the Declaration of William S. "Corky" Perret, paragraph 6 b:

There is inherent uncertainty regarding the future effects that the Deepwater Horizon spill will have on the Gulf of Mexico fisheries. … The settlement's multipliers, or Risk Transfer Premiums (RTPs) are a reasonable way of dealing with uncertain future impacts.

Louisiana argues further that the proposed settlement is a "rebranded GCCF process" and alleges that there is no evidence that the settlement provides more benefit to the class members than the offers made by the GCCF:

The operation and management of the GCCF has been the object of considerable contention since its inception, and the settling parties fail to point to a single thing negotiated that is new or original and not previously part of the GCCF process. …

Louisiana's Memorandum at 23. The State accuses the PSC of inconsistency, since the PSC endorses the proposed settlement while it opposed the GCCF extracting releases from claimants in exchange for a quick payment under OPA:

The E&PD Settlement the PSC has now presented to the Court does exactly what the PSC complained about over a year ago: It completely disregards OPA's mandate to pay interim claims as long as they accrue without requiring a claimant to release claims for future damages. … One can only wonder why the PSC would make a 180º turnabout from its earlier position. Whether the "new and improved" Settlement Program will mend the flaws in the GCCF process and provide claimants with adequate compensation is highly doubtful given the information provided in the context of the proposed settlements.

Louisiana's Memorandum at 24.

In fact, the State is simply mistaken. The proposed class action settlement does provide absent class members with far greater benefits than the formulas that were used by the GCCF,

even after those formulas were upgraded as a result of input from plaintiffs' experts. As a result, there is no inconsistency between rejecting the inadequate offers made by the GCCF, while recommending approval of the Economic and Property Damages Settlement.

The Declaration of Robert F. Mosher, CPA, explains some of the ways in which the proposed class action settlement is superior to the GCCF's formulas from the perspective of the class members:

> The baseline model in the Seafood Compensation Plan is the historical revenue model, which provides a formula for determining the payout under the settlement before prior seafood payments are deducted. The historical revenue model is substantial improvement over the GCCF model. The biggest improvement is that the model is not dependent on net income to determine compensation. Instead, like the model I developed, gross revenue is the starting point for the calculations, and only variable costs are deducted before the multiplier or RTP is applied to account for future risks. Both my model and the historical revenue model recognize the significance of the relationship of revenue to variable costs and ignore fixed costs that cannot be altered regardless of sales and production. This approach is both fair and beneficial to compensate vessel owners, lessees and captains as opposed to the net income approach championed by the GCCF model. That model severely short-changed shrimpers who, by choice or necessity, incurred fixed expenses to provide working capital, safeguard their boats, and comply with the laws and regulations governing sea-going vessels.

Declaration, paragraph 21. Jeffrey June adds:

> As a point of reference, the settlement provides substantially more compensation to commercial shrimpers than the GCCF offered, even after the GCCF increased its amounts in response to the information we provided to it.

Declaration, paragraph 31. Thus, Louisiana's claim that the proposed class action settlement does not represent an improvement for class members compared with the GCCF formulas is incorrect.

Louisiana argues further that the proposed Economic & Property Damages Settlement is not fair and adequate because the amount that BP will pay claimants under the Seafood Compensation Program is "capped" at $2.3 billion:

The Seafood Compensation Program is arguably the most important component of the E&PD Settlement, because it seeks to compensate economic damages for the segment of the State's population most vulnerable to the *Deepwater Horizon* spill: commercial fishermen (vessel owners/lessees and crew), shrimpers, crabbers, and oyster harvesters. Despite the importance of the Seafood Compensation Program (or perhaps because of it), and BP's unlimited OPA liability, no element of damages being compensated in the E&PD Settlement has a monetary ceiling or cap, except for the Seafood Compensation Program…It is not surprising that BP desires to limit its liability for such risk and to pass it on to the citizens of Louisiana, and ultimately to the State, but it is surprising that the PSC agreed to it.

…BP is now trying to reinstate a cap on certain OPA damages contrary to its previous waiver and contrary to the clear language of OPA.

Louisiana's Memorandum at 18-19.

While the $2.3 billion allotted to the Seafood Compensation Program has conventionally been referred to as a "cap," it is more properly termed a guarantee. If the settlement provided that payments would be made to seafood claimants up to $2.3 billion, it would be a cap. In fact, the agreement provides that $2.3 billion will be paid,  regardless of the fact that the total claims submitted under the program may be a lesser amount. This makes it a guarantee rather than a cap. And, in fact, the parties anticipate that the total claims submitted will be well under $2.3 billion, as measured by the agreement's formulas, and a substantial amount will be paid out in a second-round distribution. This $2.3 billion guarantee is one of the elements of the settlement that make it desirable for a large majority of seafood claimants. Not only is the amount fair and adequate, but the fact that BP has committed to pay $2.3 billion regardless of the aggregate amount of the claims submitted means that BP has no incentive to minimize any plaintiff's individual claim, and payments can be made more expeditiously as a result.

Robert Mosher explains that the $2.3 billion guarantee, with its promise of a second-round payout, ensures the fairness and adequacy of the Seafood Compensation portion of the settlement, specifically with respect to shrimp:

10

Although my work did not focus on the future biological and market risks faced by the shrimp industry, in general, and based on my experience in the shrimp industry and based on the many conversations I have had with shrimpers participating in the Deepwater Horizon settlement, I believe that the shrimp compensation plan provides for a fair method of compensating boat owners and captains based on boat size, type, and documented revenue. Further, my analysis has focused only on the formulas that are used to determine round one payments. My opinion is buttressed by the fact that the settlement contemplates that a substantial round 2 payment will be made using the "left-over" funds remaining after round 1 is completed.

Declaration of Robert F. Mosher, CPA, paragraph 24.

For the foregoing reasons, the criticisms lodged against the proposed class action settlement by Louisiana are without merit. The experts who prepared the damages claims on behalf of the *Thanh Hai, Inc.* and *Hong Van Truong* plaintiffs endorse the fairness and adequacy of the settlement. Jeffrey June writes:

Based on my experience with damage assessments in response to previous oil spills, my research and work on this case, and our team's assessment of future impacts from the *Deepwater Horizon* oil spill, I believe that for most fishermen, the proposed settlement agreement will provide fair and equitable compensation damages from the *Deepwater Horizon* oil spill to the Gulf of Mexico fishing industry. The settlement is not without flaws, but on the whole it is fair and reasonable. As a point of reference, the settlement provides substantially more compensation to commercial shrimpers than the GCCF offered, even after the GCCF increased its amounts in response to the information we provided to it. This helps support my view that the settlement on the whole is fair and reasonable.

Declaration of Jeffrey A. June, paragraph 31. The Declaration of William S. "Corky" Perret states at paragraph 6 d:

In general, based on my extensive experience in the Gulf of Mexico fishing industry, knowledge of the effects of past disasters—both natural and oil-based—have had on various fishing industries, research and literature I have read on the biological and economic impact of the oil spill, as well as conversations with fishermen, I believe that the Seafood Compensation Plan provides fair and reasonable, but not generous, compensation for most Gulf of Mexico commercial fishermen affected by the Deepwater Horizon spill.

Robert Mosher likewise endorses the proposed settlement:

I believe, based on my experience, my work in this case, and from interviews with my clients, that the shrimp compensation plan provides fair and reasonable compensation to most shrimp boat owners and captains. The shrimp compensation plan makes several substantial improvements over the GCCF compensation formula and leads to first-round payouts that are much higher than the offers our clients received from the GCCF, although not as high as the payouts our models originally contemplated.

*****

The public-reef oyster, finfish and crab models I developed do not track as closely to the settlement formula as did my shrimp model. My oyster and crab models determined compensation on a per sack and per trap basis. My finfish model included a number of sub-categories and types of finfish. That being said, I have the following observations on the settlement formulas for these fisheries:

> a.  My public oyster model's cost per sack ration would track within 1% of the settlement formula's 12% variable harvest cost. Further, the settlement formula accounts for price changes whereas my model did not—this is an improvement. …
>
> b.  Finfish is the smallest segment segment of seafood coming from the Gulf. … The settlement's formula compresses the finfish into a smaller and less variable model. There are probably fishermen who fall on either end of the model and are outside the range that the model is producing, but the fishermen outside of the high end have the opportunity to opt out. I concur with the compression for the sake of developing a simplified compensation model without trying to expand it into a massive set of formulas for the smallest fishing segment.
>
> c.  The crab model I developed was based on a per-trap revenue and cost estimation that suffered from the weakness that there was no consistent way to document the number of traps that a fisherman had. The settlement model eliminates this weakness.

Declaration, Paragraphs 19 and 25.

For the foregoing reasons, the criticisms that the State lodges against the Economic and

Property Damages Settlement are factually incorrect. In reality, the settlement, in particular the

Seafood Compensation Program, is supported by objective data developed on behalf of plaintiffs,

not BP; the settlement represents a significant improvement over the payment program

12

developed by the GCCF; the Risk Transfer Premiums protect plaintiffs against the risk of future damages; and the $2.3 billion Seafood Compensation guarantee assures that the large majority of seafood claimants will be fairly compensated.

## LEGAL ARGUMENT

The criteria governing approval of a class action settlement have been set out by other parties and will not be repeated here.

Louisiana's district courts have recognized a "'strong judicial policy favoring the resolution of disputes through settlement' and that a presumption is made in favor of the settlement's fairness absent contrary evidence." *See, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) (citations omitted).

In evaluating objections to class action settlements, courts have emphasized that objections should be accorded weight only to the extent that they are solidly based in fact. Courts routinely overrule objections that are lacking in factual support or fail to address factual realities. *See Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir. 1983) (finding the objector's argument to be "without factual support"); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, (D.N.J. 2005) (rejecting an objection that the "settling parties' valuation of the benefits to the proposed class as at least $30 million is unsupported" because both the plaintiffs and defendants had submitted actuarial reports in support of the valuation); *Camp v. The Progressive Corp.*, Nos 01-2680, 03-2507, 2004 WL 2149079, at *18 (E.D. La. Sept. 23, 2004) ("[T]hese objections are general laments about the perceived unfairness of working long hours for what the objectors now deem to have been low pay. They have nothing to do with the unemotional legal factors and factual realities, divorced from sympathy or passion, that this court must consider in making its judgment."); *In re Rio Hair Naturalizer*, No. MDL-1055, 1996 U.S. Dist. LEXIS

20440, at *16 (E.D. Mich. Dec. 20, 1996) ("General objections without factual or legal

substantiation carry little weight.") (quotation omitted). And, in any event, "a court may approve

a class action settlement even if opposition exists." *Turner*, 472 F. Supp. 2d at 853.

Expert evidence is commonly relied upon in evaluating the adequacy and fairness of a

proposed class action settlement. Because "settlement benefits are somewhat speculative in

nature and capable of only approximate valuation," 4 Alba Conte & Herbert Newberg, Newberg

on Class Actions § 11:46, at 142-43 (4th ed. 2002), courts routinely rely on expert testimony to

determine the adequacy of a settlement. *See, e.g.*, *Sugarman v. Ducati N. Am., Inc.*, No. 5:10-cv-

05246, 2012 WL 113361, at *3 (N.D. Cal. Jan. 12, 2012) ("Given two expert opinions that the

proposed repairs are adequate, and absent any evidence to the contrary, the Court concludes that

the proposed repairs will resolve the safety issues upon which the lawsuit is focused."); *In re*

*Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1737867, at *3 (D.D.C. Mar. 31, 2000)

("Plaintiffs' expert economist Dr. Beyer has submitted a detailed affidavit summarizing his

investigation, statistical analysis and opinion with respect to the probable range of damages that

would be presented to a jury if plaintiffs' claims had gone to trial; and the Settlement percentage

of 18-20 percent was well within Dr. Beyer's projected range."); *In re Crazy Eddie Secs. Litig.*,

948 F. Supp. 1154, 1171-72 (E.D.N.Y. 1996) (finding an expert's attribution of 78.93% of the

total damages of $242.1 million to the securities fraud perpetrated by defendants—as opposed to

market factors—to be credible, and concluding that the resultant adjustment to $191 million was

an appropriate measure of damages).

The Sixth Circuit has specifically recognized the importance of expert testimony in

confirming the fairness and adequacy of class action settlements:

Obtaining expert opinions and engaging in formal discovery are usually essential
to establishing a level playing field in the settlement arena because it enables the

> class counsel to develop the merits of their case. Indeed, without expert opinions or formal discovery, the class counsel could not have had much—if any—evidence on the issues of causation, negligence, or damages. Without such evidence, the class counsel could not have entered into the settlement negotiations with much more than an uneducated guess as to the merits of the case and the propriety and fair value of a settlement.

*Olden v. Gardner*, No. 07-1953, 2008 WL 4297245, at *7, 9 (6th Cir. Sept. 18, 2008) (affirming a district court's approval of a class settlement, but noting that "we may well have made a different decision if we were the trial judges" in light of the lack of information collected by class counsel with which to negotiate a settlement).

Here, the record before the Court shows that the proposed Economic and Property Damages Settlement was negotiated with extensive input from experts working on behalf of the plaintiffs, and that the settlement as agreed upon reflects and largely incorporates the experts' analyses of plaintiffs' past and future claims for damages. Further, the fairness and adequacy of the proposed Economic and Property Damages Settlement is supported by a substantial body of expert opinion.

## CONCLUSION

It is axiomatic that a class action, whether resolved by settlement or trial, can provide only imperfect justice. No set of remedies or formulas is likely to satisfy every absent class member, when class members number in the many thousands. Certainly in this case, some claimants will find that the approaches adopted in the Economic and Property Damages Settlement will not, in their judgment, compensate them fairly. Those claimants have every right to opt out of the settlement. But a class action settlement should not be disapproved because it fails to satisfy everyone. Where, as in this case, a class action settlement creates a framework that will fairly and expeditiously compensate a large majority of those who have been injured by a disaster like the *Deepwater Horizon* oil spill, the Court should approve the settlement.

Respectfully submitted:


By: */s/Stephen S. Kreller*_____

THE KRELLER LAW FIRM
Stephen Skelly Kreller (LA 28440)
757 St. Charles Avenue, Suite 301
New Orleans, Louisiana 70130
T: (504) 484-3488
F: (888) 294-6091
E: ssk@krellerlaw.com

FAEGRE BAKER DANIELS, LLP
William L. Roberts (admitted pro hac vice)
Craig S. Coleman (admitted pro hac vice)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
T: (612) 766-7000
F: (612) 766-1600
E: william.roberts@faegrebd.com
E: craig.coleman@faegrebd.com

LANGSTON & LOTT, PA
Duncan Lott (admitted pro hac vice)
Casey L. Lott (admitted pro hac vice)
100 South Main Street
Booneville, MS 38829
T: (662) 728-9733
F: (662) 728-1992
E: clott@langstonlott.com
***Attorneys for Thanh Hai, Inc, et al. and
Hong Van Truong, et al. Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of October, 2012.

_/s/Stephen S. Kreller_____