IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig, "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> * MDL no. 2179 <br> * <br> * CIVIL ACTION NO. 2:10-MD-02179 <br> * SECTION: J <br> * |
| THIS DOCUMENT RELATES TO: | * HONORABLE CARL BARBIER <br> * MAGISTRATE JUDGE SHUSHAN |
| *All Actions* | * |

## DECLARATION OF WILLIAM L. ROBERTS

1.  My name is William L. Roberts, and I am submitting this declaration in response to the State of Louisiana's Memorandum in Response and in Opposition to BP's and PSC's Motions for Final Approval of Economic & Property Damages Class Settlement. In particular, I am responding to the State of Louisiana's contention on page 9 of its brief, that the only evidence pertaining to damages consists of "one-sided declarations from BP-hired witnesses" and that unbiased information is needed to examine the fairness of the proposed settlement.

2.  I lead a team of lawyers at Faegre Baker Daniels LLP who, together with Louisiana co-counsel, The Kreller Law Firm, and Mississippi co-counsel, Langston & Lott, represent over 1,500 commercial fishers, seafood processors, and other businesses damaged by the *Deepwater Horizon* explosion and oil spill.[1] Our clients include all plaintiffs named in the direct action lawsuits filed in this Multi-District Litigation entitled *Thanh Hai, Inc., et al. v. BP America Production Company, et. al.*, U.S.D.C. for the Eastern District of Louisiana, Case No. 2:11-cv-03180 (OPA 90 Complaint), and *Hong Van Truong, et al. v. BP*

---

[1] Our team was led by my partner Gerard M. Nolting until he suddenly and unexpectedly passed away of a heart attack on October 8, 2012.

1



*America Production Company, et al.*, U.S.D.C. for the Eastern District of Louisiana, Case No. 2:11-cv-02766 (Vessels of Opportunity Complaint).

3. Throughout this matter, our focus has been on obtaining prompt, fair compensation for commercial fishers, processors, and related businesses for the damages caused by the explosion of the *Deepwater Horizon* and subsequent oil spill. To that end, starting in the Fall of 2010 we commissioned a group of highly qualified experts to conduct a damage assessment and risk analysis concerning the oil spill's impact on the Gulf Coast fisheries and commercial fishers, as well as seafood processors. This group of experts developed damages models supported by extensive data and analysis.

4. Initially, we presented our data, analysis, and evidence to the Gulf Coast Claims Fund ("GCCF"), headed by Mr. Kenneth Feinberg. Mr. Feinberg assured us that GCCF would fairly compensate our clients if we "showed him the proof." We took Mr. Feinberg at his word, and presented to him multiple expert reports, compilations of data, economic models, and other evidence. We also held multiple in-person and telephonic meetings with Mr. Feinberg and his team. We achieved a degree of success in that effort, persuading the GCCF to, among other things, double the program's risk multiplier for shrimpers and crabbers. In the end, however, the GCCF compensation program proved inadequate.

5. As a result, in late 2011 we filed the two direct action multi-plaintiff cases noted above. We promptly began sharing with the Plaintiffs' Steering Committee and others the wealth of information we developed about the damages the spill has caused to commercial fishers. We shared all material aspects of the models, data, and analysis our expert group developed with other key parties involved in the negotiation of the Economic

2

and Property Damages Settlement, and in particular those involved in crafting the methodologies of the Seafood Compensation Program. This includes the Plaintiffs' Steering Committee, BP's counsel and experts, and court-appointed neutrals John Perry and Dan Balhoff. These facts demonstrate that the damages evidence available to the architects of this settlement was not one-sided in BP's favor, but rather also included extensive evidence and models developed by independent experts retained by plaintiffs.

6. I will summarize in the following paragraphs the qualifications of our group of experts, the work they did, and the expert data, information and analysis they generated that was shared with other key parties involved in the crafting of the Economic and Property Damage settlement, and in particular the Seafood Compensation Program. Further details can be found in the Declarations of Jeffrey A. June, Robert F. Mosher and William S. "Corky" Perret, submitted herewith.

7. The expert group that we assembled is led by Mr. Jeffrey A. June and his firm, Natural Resources Consultants, Inc. ("NRC"). Mr. June is one of the foremost authorities in the world on the environmental and economic impacts of major oil spills. He has been involved as an expert in assessing the impacts of most of the large oil spills that have occurred around the world, including (1) the 1987 *Glacier Bay* oil spill in Cook Inlet, Alaska, (2) the 1989 *Exxon Valdez* oil spill in Prince William Sound, Alaska, (3) the 1990 Huntington Beach oil spill in California, (4) the 1993 Shetland Islands oil spill in the North Sea, (5) the 2004 *Selendang Ayu* grounding and oil spill off Unalaska Island, Alaska, and (6) the 2007 *Cosco Busan* oil spill in San Francisco Bay. In response to each of these oil spills, Mr. June's role was to assess the evidence and develop reasonable, fair and equitable

compensation models for both documented damages and the risk of future damages. His deep experience and qualifications are described in detail in his Declaration.

8. The other members of our expert team include:

a. Robert F. Mosher, a licensed Mississippi C.P.A. with a B.S. in accounting from the University of Southern Mississippi. Mr. Mosher has maintained a private accounting practice in Biloxi, Mississippi since 1981. Since then, his practice has been focused on serving Gulf of Mexico seafood fishermen in routine business administration and tax matters, lawsuits, disputes with the IRS, and applications for SBA and disaster loans. Mr. Mosher has expertise in helping fishing clients with various financial issues, including preparing estimates of lost income. He has detailed knowledge of the financial aspects of the commercial fishing business in the Gulf of Mexico.

b. William S. "Corky" Perret, formerly the Deputy Director of the Mississippi Department of Marine Resources and the Assistant Secretary of the Office of Fisheries in the Louisiana Department of Wildlife and Fisheries. He is currently a voting member and formerly the Vice Chairman of the Gulf of Mexico Fishery Management Council. Mr. Perret has been involved in the research, management and administration of marine fisheries in the Gulf of Mexico for over 45 years. He has a B.S. and M.S. from the University of Louisiana Lafayette.

c. Heather Reed of Ecological Consulting Services ("ECS"). For the past five years, Ms. Reed has owned and acted as the primary consultant/project manager of ECS, a firm which specializes in natural resource habitat restoration, scientific research, sampling, environmental permitting, long-term environmental monitoring and grant proposal writing. Prior to ECS, Ms. Reed worked at the Department of Environmental Protection and the Environmental Protection Agency. She has a B.S. in Marine Biology from Hawaii Pacific University and an M.S. in Environmental Science from LaCrosse University in St. Louis Bay, Mississippi.

d. Dr. Ed Cake of Gulf Environmental Associates ("GEA"), a certified oyster biologist with more than 40 years of academic, research, and consulting experience in the Gulf. He is currently the CEO and Chief Science Officer (CSO) of GEA, a private environmental consulting firm in Ocean Springs, Mississippi. For the past 31 years, Dr. Cake has assisted the oyster industry and oil, gas, and sulfur industries along the Gulf Coast in the assessment and resolution of environmental and legal problems that arise when those industries have conflicts in coastal waters. Dr. Cake was the Head of the Oyster Biology Section of the Gulf Coast Research Laboratory for 13 years from 1973 to 1987. He also served as an adjunct professor and taught

4

        Environmental Science at branch campuses of the University of Southern Mississippi for 25 years. Dr. Cake has an M.S. and Ph.D. in Marine Biology and Biological Oceanography from Florida State University.

    e. Scott Porter of Ecologic Environmental ("Ecologic"), an oyster biologist certified by the Louisiana Department of Natural Resources Oyster Lease Damage Review Board. Since 1992, Mr. Porter has owned and served as the primary environmental consultant/marine ecologist of Ecologic, where he specializes in shellfish and reef surveys on oyster grounds to determine oyster population dynamics and bottom productivity. He as a B.S. in Marine Biology from Nichols State University.

    f. Robert Nickinovich, a seafood industry expert with over 30 years of experience in marketing, sales and executive management, mainly in the Alaskan seafood industry, working in both domestic and international markets. He has experience in production and processing; broker network management; strategic planning; fresh, frozen, and shelf stable product development; budgeting and finance; trading and overseas reprocessing; and domestic/international marketing. Mr. Nickinovich worked for Bumble Bee Seafoods as director of canned seafood products, including salmon from Alaska, during the *Exxon Valdez* oil spill.

    g. Scott Goodman of NRC, a partner with over 15 years of experience in fisheries consulting. He has a B.S. in Fisheries and a Master of Marine Affairs from the University of Washington, College of Ocean & Fisheries Science. He was involved in NRC's work with documenting oil spill effects on fisheries and developing compensation methodologies following the *Selendang Ayu* and *Cosco-Busan* oil spills.

    h. Steve Hughes, the president of NRC. He has a B.S. and a M.S. in Biology and has worked in the Alaska/North Pacific fishing industry for 43 years, the first 13 years for the National Marine Fisheries Service and the past 30 years with NRC. Mr. Hughes was heavily involved calculating losses in the *Exxon Valdez*, *Selendang Ayu* and *Cosco Busan* oil spills.

    9.     Our expert team's work began in earnest in November 2010. During November and December 2010, Jeff June, Scott Goodman and Steve Hughes began reviewing information and data on the extent of the *Deepwater Horizon* oil spill, including a comparison with prior oil spills, such as the 1989 *Exxon Valdez* oil spill in Alaska and the 1979 *Ixtoc* oil spill in the Gulf. They developed an initial oil spill assessment and derived a

5

strategy for the development of comprehensive compensation models for the Gulf fishing industry.

10.    In early 2011, June, Goodman and Hughes began interviewing fishers, processors, state and federal fishery managers and regional experts to obtain information on their losses. They also began performing a market-impact analysis, monitoring changes in demand, brand image, price and product substitution pertaining to Gulf seafood. The NRC team reviewed over 17,000 pages of technical information on Gulf of Mexico resource abundance and management, historical fishery effort, catch, value, pricing, and markets for seafood products and the effects of this and previous oil spills on Gulf resources. They also interviewed 38 regional experts on Gulf fisheries, compiled hundreds of databases, figures, tables and maps on Gulf fishing effort, permits, licenses, catch, price, value, product forms, and seafood imports and exports.

11.    Dr. Cake and Scott Porter sampled dozens of oyster leases in 2011 and conducted laboratory analyses in order to assess damages to oyster reef productivity and mortality in Louisiana's private oyster grounds. They sampled dozens of oyster leases across the coast of Louisiana – including leases in Northwest Jack Williams Bay, Fishing Smack Bay, Cranetown Bay, Christmas Camp Lake, Indian Mound Bay, Lake Eugenie, Redfish Bayou, Lake Machias, Seven Dollar Bay, Skiff Lake, Lake Athanasio, Lake Borgne, Martin Box Bayou, Flore Lagoon, Kerchimbo Bay, Joe Shiman Pass, Lake of Second Trees, Black Bay, Bayou Maringouin, Grand Bayou, Bay Batiste, Barataria Bay, Bay Black, and Bay De La Cheniere.

12.    Robert Mosher worked to develop a model to estimate the annual earning capacity of shrimping vessels operating in the Gulf of Mexico based on vessel size and the

6

vessel's shrimp storage system. He reviewed trip tickets and tax documents from hundreds of boats, interviewed fishermen and drew from his extensive knowledge of the shrimping industry to develop a model incorporating his findings as to harvest, price and cost while accounting for many of the variables that affect shrimping. He also developed cost determinations for oyster dredging and tonging, the projection of per-trap revenue and variable costs for crab fishing, and an earning capacity model for various finfishing vessels.

13. Heather Reed analyzed the impacts of the *Deepwater Horizon* oil spill on finfish in the Gulf of Mexico. Ms. Reed tested approximately 35 finfish samples using alkylated methods. She used a combination of methods promulgated by the EPA and ASTM, as well as the guidances set forth in the MC252 Analytical Quality Assurance Plan that was written by NOAA. Her work revealed the presence of crude oil in finfish, whereas the State of Florida's more limited testing (which tested for a more limited number of PAH's geared toward detecting pollution levels rather than crude oil) had failed to detect such contamination.

14. The work of our experts culminated in several reports:

   a. *Deepwater Horizon Oil Spill: Damage Assessment and Risk Analysis* dated August 1, 2011, a 144-page "white paper" which described the major commercial fisheries in the Gulf, the markets for Gulf seafood, the effect of the oil spill on harvests and revenues, our experts' estimates of the potential future damages to Gulf fisheries and our experts' methodology for calculating past, present and likely future damages;

   b. *Oyster Lease Supplement* and *Finfish Supplement* to the white paper, dated August 29, 2011 and October 2011, respectively, which refined the damage assessment and compensation methodologies for oyster leases and finfish;

   c. The *Report of Robert F. Mosher, CPA*, dated August 1, 2011, which detailed his development of an annual earning capacity model for shrimp,

7

cost determinations for oyster dredging and tonging, and his projection of per-trap revenue and variable costs for crab fishing; and

d. *The Supplemental Report of Robert F. Mosher, CPA*, dated October 7, 2011, which detailed Mr. Mosher's development of annual earning capacity models for finfishermen.

15. The compensation models developed by this expert team consisted of two main components: (1) a determination of the annual earning capacity of the shrimp boat/oyster boat/crab trap/finfish vessel, and (2) a risk multiplier to take into account future biological and market risks that fishers face as a result of the massive *Deepwater Horizon* oil spill. The compensation model for Louisiana private leaseholders differed due to the unique aspects of that fishery and the oil spill's impacts on it, including a major property damage component.

16. We submitted all of the above-described expert reports to the GCCF. Following the submission of the August 1 reports, attorneys from Faegre Baker Daniels LLP, Stephen Kreller from the Kreller Law Firm in Louisiana, and Casey Lott from Langston & Lott, P.A. in Mississippi, along with several members of our team of experts (including among others Jeff June, Robert Mosher, and Corky Perret) met with Mr. Feinberg and his team in Washington, D.C. We and our experts had numerous follow-up videoconferences, conference calls, e-mails and correspondence with Mr. Feinberg, his team, and the GCCF's consultants in September and October, 2011. Our efforts were geared toward convincing the GCCF to change its seafood compensation methodology – both in terms of its multiplier of two years and its use of the loss in net income as the base compensation amount. Our team's efforts caused the GCCF to increase its multiplier from two to four years. But because the GCCF continued to base its compensation on the subject fisherman's loss of net income –

which for multiple reasons is not a fair measure of lost earnings – the GCCF offers remained inadequate and unfairly low.

17.  Our team's efforts also helped convince the GCCF to recognize a real property damage interest in private oyster leases in Louisiana, which it previously did not recognize or provide for a measure of compensation.

18.  After it became apparent that the GCCF was unwilling to further increase the level of compensation, in November and December 2011 we filed two lawsuits on behalf of our clients. We then focused our efforts on providing information and assistance to the lead negotiators and Court-appointed neutrals during the negotiations and crafting of the class settlement.

19.  In late December, 2011 and early January, 2012, we provided our experts' reports to the PSC and granted permission that they could be shared with BP. During January, February and March 2012, we were in frequent contact with the PSC, mainly responding to the PSC's requests for information. These requests came primarily from PSC members Joseph Rice and Calvin Fayard. We provided the PSC with information, data, analyses and opinions supplied by our experts pertaining to: (1) our compensation models, revised versions of our models, and reality checks on our models using different assumptions as to participation levels, and (2) the Gulf of Mexico fishing industry—the numbers of boats and participants in the fishing industry, fishing practices, seafood prices, the numbers and utilization of licenses and permits, historical and predicted revenue figures (both in the aggregate and in relation to particular fisheries), estimates of post-oil spill fishing losses in 2010 and 2011, proper "benchmark" or comparison years, the future biological and market effects of the oil spill, and comments on various settlement compensation methods being

discussed. We also participated in a meeting with BP representatives during which we and PSC members discussed expert data and analysis.

20. We also had several meetings and correspondence with John Perry and Dan Balhoff, the Court-appointed neutrals charged with drafting the Seafood Compensation Plan. We met with Mr. Perry and/or Mr. Balhoff on March 20, 21 and 29, 2012. Our expert Jeff June was on call for the first two of these meetings. We provided Mr. Perry and Mr. Balhoff with:

    a. our damage models and revised versions of our damage models;

    b. reality-checks pertaining to our damage models and other damage models;

    c. input regarding a trip-ticket based compensation system; and

    d. a memo, charts and supporting links answering a list of questions Mr. Balhoff posed seeking definitions, licensing requirements, data on total numbers and income levels of commercial fishermen, captains and Louisiana's "Certified Commercial Fisherman" program;

21. Critical to the models we proposed as well as the Seafood Compensation Program models is the concept of a multiplier or "Risk Transfer Premium" ("RTP"). Our multiplier was a method of quantifying our experts' best estimate of the future risks associated with the oil spill to the Gulf of Mexico's fisheries. These risks include both biological risks and market-based risks. The RTPs that the Seafood Compensation Program incorporates are very similar to the multipliers our expert group recommended. "Risk Transfer Premium" is somewhat of a misnomer. Risk is not actually *transferred*. Rather, risk is being quantified using the best information available and compensated accordingly.

22. Some criticism has been leveled at the fact that, contrary to the other compensation methods in the settlement agreement, the total compensation under the

Seafood Compensation Program is fixed at $2.3 Billion. This feature of the settlement serves as a guarantee: the total compensation cannot be lower or higher than $2.3 Billion. Thus, it serves to assure the class of participating fishers of total compensation in a reasonable amount, and should facilitate claims being processed more promptly and with fewer disputes than would otherwise be the case.

23. I declare that the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

*/s/ William L. Roberts*
William L. Roberts

Dated: October 19, 2012