IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig, "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> * MDL no. 2179 <br> * <br> * CIVIL ACTION NO. 2:10-MD-02179 <br> * SECTION: J <br> * |
| THIS DOCUMENT RELATES TO: | * HONORABLE CARL BARBIER <br> * MAGISTRATE JUDGE SHUSHAN |
| *All Actions* | * |

### DECLARATION OF JEFFREY A. JUNE

I, JEFFREY A. JUNE, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

#### Introduction

1. I am making this declaration in response to the State of Louisiana's Opposition to BP and the Plaintiff Steering Committee's ("PSC") Motion for Final Approval of the Economic and Property Damages Class Settlement. In particular, I am responding to the State of Louisiana's contention that the Seafood Compensation Plan portion of the Agreement lacks an unbiased expert basis or foundation for its methodology.

2. It is my belief, based on my extensive background in developing compensation models in other oil spill cases, the research, analysis, sampling, testing and other work that my team of experts and I have done in this case in developing and sharing our compensation model with BP and the PSC, and my supplying of information, analysis and expert opinion either directly or through Faegre Baker Daniels LLP to the PSC during settlement negotiations, that the State of Louisiana's contention is without merit. The Seafood Compensation Plan is conceptually similar to the model my team of experts and I developed and appears to incorporate much of our work and insight. A discussion of my experience and work on this case which has led me to this belief is set forth below.

#### Background

3. I am a fisheries scientist in good standing as a member of the American Institute of Fishery Research Biologists. For the past 27 years, I have been a partner and chief scientist of Natural Resources Consultants, Inc. ("NRC") a world-renowned natural resource consulting firm in Seattle, Washington. Prior to joining NRC, I was a chief


EXHIBIT B

scientist for the National Marine Fisheries Service, National Oceanic and Atmospheric Administration at the Northwest and Alaska Fisheries Science Center in Seattle, Washington. There, I was responsible for fishery stock assessment surveys in Alaska and along the U.S. West Coast. I have over 40 years of experience as a fisheries scientist and marine biologist. I have a Master's of Science degree in Fishery Science from the University of Washington.

4. I grew up in a fishing family in Southern California that was impacted by the 1969 oil spill in Santa Barbara – at that time, the largest oil spill in U.S. waters. I personally experienced the catastrophic physical, biological, financial and sociological devastation that oil spills cause. Since then I have dedicated myself to studying the impacts of oil spills on marine resources and the people who depend on those resources.

5. I have been an expert representing either plaintiffs or defendants on many of the large oil spills that have occurred around the world: the 1987 *Glacier Bay* oil spill in Cook Inlet, Alaska; the 1989 *Exxon Valdez* oil spill in Prince William Sound, Alaska; the 1990 Huntington Beach oil spill in California; the 1993 Shetland Islands oil spill in the North Sea; the 2004 *Selendang Ayu* grounding and oil spill off Unalaska Island, Alaska; and the 2007 *Cosco Busan* oil spill in San Francisco Bay.

6. As a fisheries expert, my role in each of these oil spill events was virtually the same whether representing plaintiffs or defendants. I coordinated with response agencies to assess the extent of the damages to habitat and wildlife, identified affected parties and assessed catch and valuation damages, collected evidence of oil spill effects on price, brand name and market perception, projected likely future damages from reviewing similar previous oil spills and developed reasonable, fair and equitable compensation models that integrated actual documented losses with shared risks for the probability of future losses.

7. In the 1987 *Glacier Bay* oil spill, a dedicated team of recognized regional experts and I represented the plaintiffs – mainly fishermen and processors. We worked cooperatively with scientists and fishery managers from the Alaska Department of Fish and Game to determine fishery damages and estimate financial losses to the fishing industry. We developed a financial loss model that explained present and future losses likely to be incurred by the fishing industry and worked in negotiations with the oil company's experts to come to a reasonable and fair settlement agreement.

8. Following the 1989 *Exxon Valdez* oil spill, I was a member of a team of fishery scientists, wildlife scientists, habitat specialists, chemists, oceanographers and economists representing a varied group of plaintiffs. After an extensive period of research and fact-finding, I was directly involved in developing a series of financial loss models covering a number of fisheries and target species. We presented the results of our loss analyses in court, and a jury awarded to plaintiffs virtually all of the compensation we had calculated.

9. After the 1990 Huntington Bay oil spill, I represented local finfish and shellfish harvesters and several local processors. I worked with plaintiffs' attorneys and attorneys representing the oil spill vessel owner's insurance company to develop a comprehensive financial loss model that was agreed upon in a settlement. The harvesters and processors were awarded damages for documented past, present and potential future losses. This was one of the first oil spills where a future damage risk multiplier was incorporated into the loss assessment calculation in order to fairly reflect and compensate fishermen for the risk of future losses.

10. Immediately following the 1993 *Braer* oil spill in the Shetland Islands in the North Sea, I was employed by several Shetland Island fishing associations representing salmon aquaculture, sandeel trawlers and shellfish fisheries to assist in the mitigation of oil spill damages, determine financial losses and develop a fair method of compensation. I organized a team of experts and directed immediate mitigation measures to limit spill damages such as harvesting and processing salmon from aquaculture pens in the path of the oil and relocating juvenile salmon from pens in the path of the oil to areas likely to be safe from oiling. I directed the implementation of area fishing closures and testing of harvested seafood from open areas to ensure that no tainted seafood entered the market stream. Eventually, my team of experts and I developed present and future loss assessments for the affected fisheries. We also worked cooperatively with representatives acting on behalf of the 1992 International Convention on Civil Liability for Oil Pollution Damage ("CLC"), an international maritime treaty that was adopted to ensure adequate compensation from oil tanker spills, and the 1992 Fund Convention ("FC"), an international treaty that provided for compensation from oil spills caused by laden tankers when damages exceed the ship owner's liability or ability to pay. After extensive negotiations, we agreed upon a fair and equitable financial damage assessment model very similar to that used in the Exxon Valdez and Huntington Beach oils spills. The settlement agreement included a future damage risk multiplier similar to that used in the Huntington Beach oil spill. This was the first settlement that the CLC and FC reached on a large oil spill, and it set the model for future damage settlements.

11. Prior to the *Selendang Ayu* oil spill in 2004, I worked on a damage assessment model for a superfund site in the Hylebos Waterway in Tacoma, Washington. I worked with a team of private and NOAA economists to modify a standardized probabilistic risk assessment model (PRA) to assess the risks of human-caused disturbances to natural resources. Our efforts resulted in the development of a Habitat Equivalency Assessment (HEA) to incorporate damage mitigation for all past, present and future natural resource damages. The U.S. Government (Dept. of Commerce, EPA, USFWS) accepted the HEA we developed as the standard methodology for natural resource damage mitigation. The method has been applied to most large, man-caused natural resource damage assessments in the U.S. I modified the PRA and HEA methodology for use in the *Selendang Ayu* oil spill damage assessment to include

compensation for the risk of future damage that are fairly shared between the two parties.

12. In 2004, after the *Selendang Ayu* grounding and oil spill off Unalaska Island, Alaska, my firm (NRC) and I were engaged by the insurance company representing the vessel owner. The insurance company wanted to avoid litigation in the matter and sought NRC because of our experience and success in developing loss compensation models for fishermen in previous oil spills. We contracted with several regional experts and implemented damage mitigation measures in cooperation with the Alaska Department of Fish and Game. These measures included managing fisheries in the area and preventing tainted seafood from entering the market stream to limit market perception and brand name damage. We also worked closely with state and federal agencies and NGOs on the clean-up of the spill site and resolution of the vessel status. We organized meetings with fishers and their representative organizations and collected records of past harvests and values for seafood from the area. We developed financial loss models that included present and future damage assessments which eventually led to a settlement agreement with fishers resolving all of their damage claims.

13. In 2009, NRC was contacted by the insurance company representing the vessel owner of the *Cosco Busan* that, in 2007, struck a bridge support platform resulting in an oil spill in San Francisco Bay. The insurance company faced imminent litigation after failing to reach settlement with plaintiffs over fishery damages. My team of experts and I reviewed historical fishery harvest information and the loss analyses developed by the plaintiffs' experts. The contentious element of the claim was the future loss estimate. We recommended the use of a future damage risk multiplier based on the PRA and HEA methodologies employed by the federal government in natural resource damage assessment and mitigation cases. The plaintiffs contributed to the value assigned to the risk of future losses due to the oil spill to improved stock assessment analyses for herring fisheries in the Bay in lieu of personal future damages, a unique application of the future damages model.

### Summary of Work on the Deepwater Horizon Spill and Participation in the Settlement Process

14. In November 2010, following the *Deepwater Horizon* oil spill, NRC and I were hired by Faegre & Benson LLP (now Faegre Baker Daniels LLP). I previously worked as an expert for Faegre on the 1987 *Glacier Bay* and 1989 *Exxon Valdez* oil spills. Faegre and local legal counsel were representing commercial fishers, processors, and other businesses in Florida, Alabama, Mississippi and Louisiana affected by the spill and developing their claims for both litigation and submission to the Gulf Coast Claims Facility ("GCCF"). We were hired to assist Faegre in developing a fair damages model and to provide information on the Gulf of Mexico fishing industry, impacts of oil spills, and to help educate GCCF claims personnel.

15. Over the course of the ensuing two years, my staff at NRC, our team of regional experts and I have reviewed over 17,000 pages of technical information on Gulf of Mexico resource abundance and management, historical fishery effort, catch, value, pricing, and markets for seafood products and the effects of this and previous oil spills on Gulf resources. I personally have made 11 trips to the Gulf, interviewed 38 regional experts on Gulf fisheries, compiled hundreds of databases, figures, tables and maps on Gulf of Mexico fishing effort, permits, licenses, catch, price, value, product forms, and seafood imports and exports. I conducted two months of oyster damage field assessment studies in Louisiana with oyster biologists Scott Porter and Dr. Ed Cake. Together, NRC, our team of experts and I produced over 30 technical reports and developed damage assessment and loss mitigation models for each fishery and fisher group. We met with Mr. Kenneth Feinberg of the GCCF and his team to provide them with information that resulted in modifications to their GCCF settlement methodologies. I have provided valuable technical information to members of the Plaintiffs' Steering Committee and made recommendations to ensure that the settlement methodology is consistent with compensation models developed in response to previous oil spills. All of my actions in this case have been on behalf of plaintiffs including commercial fishing vessel owners, captains, crew members, and processors.

16. As part of my work in this matter, I reviewed the GCCF claims process and methodology for calculating financial losses. It became immediately apparent to me that the GCCF claims process unfairly addressed fishers' and processors' past and present losses and virtually ignored the likelihood of future losses. It was also obvious that the GCCF claims adjusters were completely unfamiliar with the nature of the fishing industry in the Gulf of Mexico. I reviewed information and data on the commercial fisheries in the Gulf of Mexico and provided an overview report that described commercially significantspecies, vessels, gear and harvest methods employed and a historical context of volume and value and import, export and domestic markets for the Gulf shrimp trawl fishery.

17. Throughout November and December 2010, my staff and I reviewed information and data pertaining to the extent of the oil distribution from the *Deepwater Horizon*. Using that information and data on probable damages from a previous large Gulf oil spill (the 1979 *Ixtoc* oil spill), we developed an initial oil spill damage assessment with an emphasis on the shrimp industry. We provided recommendations about the information needed from fishers to establish their losses in the fishery due to the *Deepwater Horizon* oil spill.

18. In January 2011, I made my first trip to the Gulf Coast region to meet with fishers, processors, state and federal fishery managers and regional experts to obtain first-hand information on oil spill damages and losses. I began performing a market-impact analysis in conjunction with my contacts in the processing and wholesale seafood industry. We monitored changes in demand, brand image and price, as well as the substitution of alternative domestic and foreign products for Gulf seafood.

19. We organized a team of regional experts on oysters (Scott Porter and Dr. Ed Cake), shrimp and crab (Mr. William "Corky" Perret), finfish (Ms. Heather Reed) and seafood processing (Mr. Robert Nickinovich). Mr. Perret, formerly a high ranking official of both the Louisiana and Mississippi state fishery management agencies and a member of the Gulf States Fishery Management Council, also provided valuable insight into fishery management in the Gulf.

20. In April and May, 2011, Scott Porter and Dr. Ed Cake sampled approximately 35-40 oyster leases throughout the Louisiana coast from as far north as Lake Borgne to as far Southwest as Barataria Bay in order to determine the level of productivity and the rate of mortality of our clients' leases.

21. Ms. Reed conducted organ and tissue-testing, sampling and observation of finfish, confirming the presence of crude oil within lesioned finfish.

22. Between February and July 2011, my staff, our team of experts and I conducted additional research and analyses, and drafted a comprehensive 144-page white paper. Our report: (a) described the major commercial fisheries in the Gulf, (b) provided a historical review of fishing effort, catch, price and value, (c) described the markets for the products, (d) documented the impacts of oil spill-related fishing closures on catch and net value, (e) provided estimates of potential future damages using data pertaining to the extent of the *Deepwater Horizon* spill and analyses of previous oil spills, and (f) provided a methodology for calculating past, present and likely future damages. This report was provided to the GCCF.

23. In August 2011, my team of experts, Faegre attorneys, and I met with Kenneth Feinberg and his GCCF staff to discuss our report and approach to damages as compared to the GCCF settlement methodology. In September 2011, my staff and I continued to work with the GCCF and its economists to refine damage assessment and settlement methodologies for oyster, crab and finfish. NRC's efforts culminated in a supplement to the "white paper," which we published in November, 2011.

24. As confirmed by Mr. Feinberg's correspondence with Mr. Nolting, GCCF agreed to increase compensation for the shrimp industry from two to four years of losses. Indeed, initially GCCF said it was going to do more. In an October 13, 2011 letter, Mr. Feinberg stated:

> Gerry, you have done an extraordinary job for your clients. The Information shown in Table 5 comparing the compensation methodologies demonstrates the very substantial increases in our revised shrimper methodology from that of our current methodology for calculating damages for each of your clients. True, the GCCF cannot agree to pay the amounts you requested

6

      in the submission of your various representative claims; but, the GCCF has agreed to accept a "revised Nolting Methodology" for shrimpers, resulting in substantial increases in the amounts awarded to each client. You can observe first-hand in Table 5, the important financial impact of your clients. We plan to move forward with this new methodology and welcome any suggestions you may have. Thanks again for all you have done in this regards.

25. However, the GCCF did not adopt all of the changes described in this letter. Instead, it only raised the multiplier from two to four.

26. In January 2012, I provided a summary of our experts' opinions and loss compensation methodologies to the Plaintiffs' Steering Committee ("PSC"). This summary detailed our opinions, estimates and methodologies on fair compensation for fishermen for past, present and future damages resulting from the *Deepwater Horizon* spill.

27. In February and March 2012, NRC and the above-described team of experts provided technical and expert information, data and analyses regarding the Gulf fishing industry and projected damages to the PSC and to the Faegre attorneys working to ensure a fair settlement for commercial fishing plaintiffs. We worked with PSC member Joseph Rice to ensure that the settlement calculation methodologies being discussed in conjunction with the settlement negotiations: (a) were consistent with methods used for previous oil spills, and (b) provided fair and equitable compensation for the fishers, processors and others in the Gulf fishing industry. Below is summary of the information, data and analyses provided to the PSC during that time period:

    a. Careful analysis of the number of boats, likely Gulf seafood industry participants, and compensation amounts in a global settlement using the compensation model we developed (as well as several variations of that model) based on our review of data, interviews with Gulf seafood industry officials, scientists and participants, and interviews with and the extensive harvest records of Faegre Baker Daniels clients;

    b. An analysis and prediction of, and information and statistics pertaining to, how productive the 2010 Gulf shrimp season was and would have been (had the fishery closures not occurred), based on our interviews of Gulf shrimp experts, information regarding juvenile and larval stock assessments, analysis of catch in previous La Nina years, and a comparison of the early 2010 harvest with the early harvests in prior years.

    c. Industry information and statistics regarding the post-oil spill reduction in shrimping effort in the Gulf in 2011;

7

d. Detailed industry information and statistics regarding Gulf of Mexico seafood harvesting in general and by species, and the proportional value of the four types of catch in the Gulf (shrimp, oysters, crab and finfish);

e. Critical analyses of the sources and reliability of data that BP set forth pertaining to historical Gulf seafood industry revenue, landings, and participants, and in particular, the limitations of the National Marine Fisheries Service's ("NMFS") reporting of shrimp harvest statistics and our discussions with government officials regarding the same;

f. A defense of the compensation model we developed in the face of BP's criticisms;

g. Data and opinions pertaining to pre-*Deepwater Horizon* oil spill Gulf seafood harvests and benchmark years;

h. Analyses of the effects of the *Deepwater Horizon* oil spill on the Gulf seafood brand and market share;

i. Information pertaining to the number of crab trap permits in Louisiana and the number of permits for which there was recorded catch in recent years;

j. Expert analyses and opinions pertaining to full and fair compensation for projected shrimp, oyster, finfish and crab seafood industry participants in a potential settlement and fair allocation of the same.

**Opinions Pertaining to the Proposed *Deepwater Horizon* Seafood Compensation Plan**

28. I have thoroughly reviewed the Seafood Compensation Plan attached as Exhibit 10 to the proposed Settlement Agreement.

29. The Seafood Compensation Plan utilizes as a foundation methodologies successfully utilized in many of the previous large oil spills discussed above. In particular it uses multipliers, or risk transfer premiums ("RTPs"), that attempt to quantify the value of projected future risks of harvest losses due to the oil spill by serving as a multiplier of projected lost earning capacity. It is similar to, and largely consistent with, the compensation model that my team of experts and I developed and presented to the GCCF and the PSC.

30. Based on my review of historical data and the likely biological and market effects that the *Deepwater Horizon* oil spill is likely to have on the Gulf seafood industry in the future, I believe that the Seafood Compensation plan provides a fair method of compensation for seafood industry participants based on species harvested, boat size (for shrimp) and proof of historical fishing revenue. The RTPs used in the proposed

8

settlement are similar to the multipliers that I proposed for each fishery. The baselines to which the RTPs are applied are lower than in my proposed methodologies, but I regard the settlement overall as reasonable.

31. Based on my experience with damage assessments in response to previous oil spills, my research and work on this case, and our team's assessment of future impacts from the *Deepwater Horizon* oil spill, I believe that for most fishermen, the proposed settlement agreement will provide fair and equitable compensation damages from the Deepwater Horizon oil spill to the Gulf of Mexico fishing industry. The settlement is not without flaws, but on the whole it is fair and reasonable. As a point of reference, the settlement provides substantially more compensation to commercial shrimpers than the GCCF offered, even after the GCCF increased its amounts in response to the information we provided to it. This helps support my view that the settlement on the whole is fair and reasonable.

Signed under penalty of perjury, this __19TH__ day of October, 2012, in __SEATTLE__, Washington.

_____
Jeffrey A. June

fb.us.9282434.05