IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig, "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | *  <br> * MDL no. 2179 <br> * <br> * CIVIL ACTION NO. 2:10-MD-02179 <br> * SECTION: J <br> * |
| THIS DOCUMENT RELATES TO: | * HONORABLE CARL BARBIER <br> * MAGISTRATE JUDGE SHUSHAN |
| *All Actions* | * |

### DECLARATION OF ROBERT F. MOSHER, CPA

### INTRODUCTION

1. My name is Robert F. Mosher, and I am submitting this declaration in response to the State of Louisiana's Memorandum in Response and in Opposition to BP's and PSC's Motions for Final Approval of Economic & Property Damages Class Settlement. In particular, I am responding to the State of Louisiana's contention on page 9 of its brief, that the only evidence pertaining to damages consists of "one-sided declarations from BP-hired witnesses" and that unbiased information is needed to examine the fairness of the proposed settlement.

2. As explained below, I played a substantial role in the process of developing the shrimp compensation method that is part of the proposed settlement agreement. I supplied expert and industry data, models and opinions with respect to the appropriate methodology for compensating shrimp fishermen. The model that was ultimately provided for in the agreement is consistent in large part with the model that I developed. I also provided the same type of information described above with respect to per sack costs for oyster harvesters, per trap earning capacity for crab fishermen, and the annual earning capacity of finfish vessels.

### QUALIFICATIONS

3. I am a Certified Public Accountant with a B.S. in accounting from the University of Southern Mississippi and a Certified Public Accountant license from the state of Mississippi.

4. I have maintained an accounting practice in Biloxi, Mississippi since 1981, serving as the accountant for thousands of Vietnamese-American and other shrimpers, oystermen, crabbers and finfishermen located throughout Mississippi, Louisiana, Alabama, Florida and Texas.

EXHIBIT C

5. Prior to starting my own practice, I was an accountant at Texas Eastern Transmission Corporation (now Spectra Energy) in the corporate tax department. After that, I worked at a large regional CPA firm in Biloxi, Mississippi, where I ultimately managed its Mississippi Gulf Coast office.

6. I am a longtime resident of the Gulf coast, and have been involved with the shrimp, oyster and crab industries for nearly my entire life. When I was growing up, several of my family members owned, operated and worked on fishing vessels in the shrimp, crab and oyster fisheries, while others worked in seafood processing plants picking crabs and peeling shrimp. During high school, I shucked oysters and crabbed for my grandfather and worked on my great uncle's shrimp boat.

7. Following high school, I entered the U.S. Army, serving in the 82nd Airborne Division. I attended Officer Candidate School and subsequently served with the Green Berets in the Special Forces. I left the service in 1969, after serving in Vietnam and various other foreign nations.

8. Since starting my own office, I have provided tax preparation and business planning services to thousands of Gulf fishers. My involvement with, and representation of, Vietnamese-American shrimpers expanded greatly in 1988, when large numbers of Vietnamese fishers faced significant repercussions for allegedly violating a tax law that they did not understand. Since then, I have worked with thousands of Vietnamese fishers, seafood processors and charter boats, successfully representing many of these seafood processors in a dispute with the IRS. My firm's fishing clientele continued to grow through the 1990's, and 2000's when the fishing industry was enjoying unprecedented success and growth. Throughout this time, I worked with fishing clients in lawsuits, helping them prepare estimates of their lost income. Major hurricanes in the Gulf of Mexico also led to a significant influx of clients and work in the fishing industry. Presidential disaster declarations made shrimp vessels eligible for Small Business Administration ("SBA") Physical Damage Disaster Loans and the Economic Injury Disaster Loan Program, and our success with these loan programs led to a new influx of Vietnamese fishing clients throughout Texas and Louisiana. During a period of time in the 1990's, I also acted as an auditor for the Gulf States Marine Fisheries Commission.

9. In August 2005, Hurricane Katrina devastated the Gulf coast and destroyed my firm's office building. Following the disaster, we operated out of a small satellite office and volunteered our time processing SBA disaster loans for our clients. Our fishing clients in particular suffered severe damage from Katrina and were still struggling to re-open their businesses. On January 1, 2009, I sold my full-time practice to one of the CPAs I had assisted in the aftermath of Katrina. I now work part-time as a consultant with that firm, doing tax returns for fishing vessel clients and their crew members.

10. In order to represent fishing clients successfully before the IRS, SBA and other organizations and governmental agencies, I have obtained thorough knowledge of the income and earning potential of fishing vessels. I have reviewed thousands of tax returns of shrimp vessels and tens of thousands of trip tickets in order to forecast the income of fishing vessels and prepare income projection models for fishing vessels involved in litigation for lost income. In response to federally declared disasters, I assisted fishing boats in preparation of historical income and cost data to obtain SBA compensation for economic injury losses. I also have extensive experience in presenting fishing-boat income and cost data for use in determining my clients share of proceeds raised by anti-dumping tariffs levied against foreign countries that export farm-raised shrimp to the United States.

## INVOLVEMENT WITH, AND INPUT IN, THE SEAFOOD COMPENSATION PLAN

11. In early 2011, the law firm of Faegre & Benson LLP (now Faegre Baker Daniels LLP) hired me to analyze the following issues:

    a. The annual earning capacity of shrimp vessels operating in the Gulf of Mexico, including each vessel's capacity for gross revenues and net income.

    b. The costs associated with oyster fishing, measured in terms of costs incurred to catch a sack of oysters.

    c. The annual earning capacity of crab fishing operations in the Gulf of Mexico, including revenue and costs for crab fishing measured on a per-trap basis.

    d. The annual earning capacity of deepwater reef, king mackerel, in-shore and shark fishermen, including their vessels' capacity for gross revenues and net income.

12. Over the course of the spring and summer of 2011, I engaged in a thorough analysis of these issues and prepared two reports that were provided to Ken Feinberg and the Gulf Coast Claims Facility (GCCF) on August 1, 2011 and October 7, 2011. A summary of my findings is discussed here briefly:[1]

    a. For shrimp, I developed a model that predicts the annual earning capacity of shrimping vessels operating in the Gulf of Mexico in relation to two variables: size (length), and the storage system used to store the shrimp (ice or freezer system). The model provides a baseline annual earning capacity that can be used to calculate losses that occurred in 2010 during the height of the disaster and to measure potential future loss. Vessel categories include: a) freezer boats 80 or more feet in length; b) freezer boats less than 80 feet in length; c)

---

[1] Copies of the reports, data, models and opinions that I or Faegre Baker Daniels have provided to BP and the PSC are available upon request.

ice boats 65 or more feet in length; d) ice boats 45 to 64 feet in length; and e) ice boats less than 45 feet in length. Boats within each category generally have similar capacities and earning power, with some greater variability in the smallest category of ice boats.

b. In developing the shrimp model, I reviewed trip tickets and tax returns (Schedule C forms) from hundreds of boats of all sizes and models, and interviewed many of those boat owners. I also drew from my vast knowledge and experience in the fishing industry, and applied accounting principles as well as mathematics. I also analyzed this data in consideration with other relevant factors, including vessel hold capacity, seasonality, and other factors that affect the productivity of a Gulf fishing enterprise. My shrimp model was similar to ones that I prepared for other clients for the purpose of loan applications and litigation, and embodied generally accepted financial and accounting principles.

c. There are three main components to the shrimp model I developed: harvest, price, and cost. All of these components were based on the historical records that I analyzed and accounted for many variables, such as boat size, the number of trips that boats of different sizes make, hull capacity, shrimp prices and fuel costs. The model provides for subcategories in different boat categories, which was closely followed by the expedited and reduced expedited models in the Seafood Compensation plan. The model provides a realistic assessment of annual earning capacity of these vessels that is likely to hold true over the longer term of several years when highs and lows are likely to even out. To establish the boat categories and subcategories, I performed a detailed analysis using the historical data of vessels over a four-year period that measured the average performance relative to the vessel capacity.

d. I also presented a cost determination for oyster dredging and tonging, a projection of per-trap revenue and variable costs for crab fishing, and an earning capacity model for deepwater reef, king mackerel, in-shore and shark-fishing vessels. In order to develop these models, I relied on a combination of interviews with fishermen, general knowledge and experience, an analysis of trip tickets, average fuel costs and burns, bait usage and costs, fishing days, and the application of independent mathematical formulas to measure fuel consumption of marine engines. Mathematical formulas were used to confirm the reports of fishermen and the industry about fuel consumption.

13. Following the submission of my expert reports to the GCCF and periodically throughout the months of September and October, 2011, I participated in conference calls with Faegre Baker Daniels attorneys and the GCCF and its consultants from ARPC. I also provided Faegre Baker Daniels attorneys my thoughts and suggested responses to the GCCF's counterproposals on a revised damages methodology. In addition, I accompanied Faegre Baker Daniels attorneys and several other experts on

a trip to Washington, D.C., where we met face-to-face with Mr. Feinberg and several of his representatives.

14. Our efforts directly led to the GCCF increasing its "multiplier" from 2 to 4 years. The results, however, were much less than what our clients hoped for, as the GCCF did not incorporate the earning capacity model that we advocated for and instead continued to use the decrease in net income from 2009 to 2010 as the baseline for their calculations. Although experts may disagree as to the future effect that the oil spill will have as it necessarily involves questions of interpretation, opinion and conjecture, the GCCF's failure to move away from a compensation model based on net income (where fixed costs are treated the same as variable costs) ensured that the GCCF's compensation model remained fundamentally (and fatally) flawed. Few, if any, of our clients chose to accept their GCCF offers under the new model. Many never received offers before the GCCF shut its doors in the spring of 2012.

15. In late 2011, when it became apparent that the GCCF was not going to increase its compensation models further and in consultation with our clients, Faegre Baker Daniels filed a lawsuit in the MDL. Following the filing of the lawsuit, Faegre Baker Daniels provided my expert analyses and reports to the Plaintiffs Steering Committee for use in their negotiations with BP.

16. In January, February, and March 2012, I had considerable involvement with respect to supplying expert and industry data and information to the PSC in connection with the Seafood Compensation Plan negotiations. This included:

    a. Determining the number of days various categories of shrimpers spent shrimping and the number of trips they made;

    b. Providing data regarding crab prices; and

    c. Performing a "reality check" on my earning capacity model for shrimp (that was shared with the negotiating parties) and determining that it was an accurate estimate in relation to the Gulf States Marine Fisheries Commission's annual report of Gulfwide shrimp harvests when extrapolated to the federally permitted shrimping population.

17. In addition, I spoke on the phone several times with PSC member Joe Rice to discuss and answer questions regarding:

    e. the fuel consumption models I developed and my findings;

    f. the concept and method of captains earnings;

    g. shrimp prices, fluctuations thereto, and the role of shrimp prices in determining whether and when a fisherman chose to fish or forego fishing; and

  h. the classification of shrimp fishermen as full or part-time, and determining a minimum level of fishing effort.

## Analysis of Proposed Settlement Agreement

18. I have reviewed the Seafood Compensation Plan attached to the Proposed Settlement Agreement as Exhibit 10.

19. I believe, based on my experience, my work in this case, and from interviews with my clients, that the shrimp compensation plan provides fair and reasonable compensation to most shrimp boat owners and captains. The shrimp compensation plan makes several substantial improvements over the GCCF compensation formula and leads to first-round payouts that are much higher than the offers our clients received from the GCCF, although not as high as the payouts our models originally contemplated.

20. Like the model I developed, the Seafood Compensation Program breaks shrimp boats down by size and type, although the divisions are somewhat different: (a) freezer boats over 75 feet; (b) ice boats over 75 feet; (c) freezer boats from 45-74 feet, (d) ice boats from 45-74 feet; (e) boats 30-44 feet; and (f) boats under 30 feet. These are rational delineations for shrimp boats.

21. The baseline model in the Seafood Compensation Plan is the historical revenue model, which provides a formula for determining the payout under the settlement before prior seafood payments are deducted. The historical revenue model is a substantial improvement over the GCCF model. The biggest improvement is that the model is not dependent on net income to determine compensation. Instead, like the model I developed, gross revenue is the starting point for the calculations, and only variable costs are deducted before the multiplier or RTP is applied to account for future risks. Both my model and the historical revenue model recognize the significance of the relationship of revenue to variable costs and ignore fixed costs that cannot be altered regardless of sales and production. This approach is both fair and beneficial to compensate vessel owners, lessees and captains as opposed to the net income approach rigidly championed by the GCCF model. That model severely short-changed shrimpers who, by choice or necessity, incurred fixed expenses to provide working capital, safeguard their boats, and comply with the laws and regulations governing sea-going vessels.

22. The other adjustments to benchmark revenue used in the historical revenue model are also supported by my findings. For instance, like the historical revenue method, my model also attempted to compensate for additional catch and for a future increase in price. These adjustments are critical to arriving at a fair determination of compensation to use in calculating a Vessel Owner/Vessel Lessee's loss. In addition, my model's equivalent of the shrimp cost percentage was comparable to that used in the historical revenue model.

23. The next two formulas, the "reduced-expedited" and "expedited" methods provide for higher set sums in each boat size/type category based on a minimum level of fishing revenue in the baseline years. In most cases, the sums in these methods are higher than what would be available to boats with the same revenue under the historical method, although in rare instances where baseline gross revenues are extremely high, boats actually can do better with the historical method than the expedited method. These distinctions and the upward "bump" that these models provide is consistent in large part with my model, which provided for increased levels of compensation within boat size/type categories for different performance thresholds.

24. Although my work did not focus on the future biological and market risks faced by the shrimp industry, in general, and based on my experience in the shrimp industry and based on the many conversations I have had with shrimpers participating in the Deepwater Horizon Settlement, I believe that the shrimp compensation plan provides for a fair method of compensating boat owners and captains based on boat size, type and documented revenue. Further, my analysis has focused only on the formulas that are used to determine round one payments. My opinion is buttressed by the fact that the settlement contemplates that a substantial round 2 payment will be made using the "left-over" funds remaining after round 1 is completed.

25. The public-reef oyster, finfish and crab models I developed do not track as closely to the settlement formula as did my shrimp model. My oyster and crab models determined compensation on a per sack and per trap basis. My finfish model included a number of sub-categories and types of finfish. That being said, I have the following observations on the settlement formulas for these fisheries:

    a. My public oyster model's cost per sack ratio would track within 1% of the settlement formula's 12% variable harvest cost. Further, the settlement formula accounts for price changes whereas my model did not – this is an improvement. I was never able to get a firm understanding of the GCCF's secret method of calculating the losses of oyster harvesters other than to extrapolate that they were working from a net income approach, which, as I've said above, does not generate a fair loss compensation. The biggest difference between the settlement formula and my model is that I assumed that on most days, oyster harvesters would catch their sack limits. The settlement formula produces similar results to my formula when historical revenue is used, instead of basing compensation on the assumption that daily sack limits are met.

    b. Finfish is the smallest segment of seafood coming from the Gulf. My model had a number of sub-categories and different models because there is a wide range of type, species and mode of catch involved in finfishing. The settlement's formula compresses the finfish into a smaller and less variable model. There are probably fishermen who fall on either end of the model and are outside the range that the model is producing, but the fishermen outside of the high end have the opportunity to opt out. I concur with the compression

      for the sake of developing a simplified compensation model without trying to expand it into a massive set of formulas for the smallest fishing segment.

    c. The crab model I developed was based on a per-trap revenue and cost estimation that suffered from the weakness that there was no consistent way to document the number of traps that a fishermen had. The settlement model eliminates this weakness.

26. I also believe that the claim submission deadline for the Seafood Compensation Plan is reasonable. Fishermen have a great interest in being paid quickly and speeding up what will likely be substantial round 2 payments. Further, all of the fishermen that I have talked to have been monitoring the litigation and settlement process closely and with great interest. These fishermen have a good idea of how much the settlement agreement will provide them. Most of the fishermen I know that have either opted to take the settlement offers they have received or plan to submit their claims, rather than opt out.

27. I declare that the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

                                                           Robert F. Mosher, CPA

Dated: October 11, 2012