```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
      ********************************************************************
 3

 4    IN RE:  OIL SPILL BY THE          Docket No. MDL-2179
      OIL RIG DEEPWATER HORIZON         New Orleans, Louisiana
 5    IN THE GULF OF MEXICO ON          Friday, October 12, 2012
      APRIL 20, 2010
 6    CIVIL

 7
      ********************************************************************
 8
           TRANSCRIPT OF WORKING GROUP STATUS CONFERENCE PROCEEDINGS
 9            HEARD BEFORE THE HONORABLE SALLY SHUSHAN
                  UNITED STATES MAGISTRATE JUDGE
10

11    APPEARANCES:

12    FOR THE PLAINTIFFS:              LEVIN PAPANTONIO THOMAS MITCHELL
                                       RAFFERTY & PROCTOR
13                                     BY:  BRIAN H. BARR, ESQ.
                                       316 South Baylen Street, Suite 600
14                                     Pensacola, FL 32502

15
                                       LEWIS KULLMAN STERBCOW & ABRAMSON
16                                     BY:  PAUL M. STERBCOW, ESQ.
                                       601 POYDRAS STREET, SUITE 2615
17                                     NEW ORLEANS, LA 70130

18
                                       WILLIAMSON & RUSNAK
19                                     BY:  JIMMY WILLIAMSON, ESQ.
                                       4310 Yoakum Blvd.
20                                     Houston, TX 77006

21
                                       IRPINO LAW FIRM
22                                     BY:  ANTHONY IRPINO, ESQ.
                                       2216 Magazine St.
23                                     New Orleans, LA 70130

24

25
```

```
 1                                      WILLIAMS LAW GROUP
                                        BY:  CONRAD "DUKE" WILLIAMS, ESQ.
 2                                      435 Corporate Drive, Suite 101
                                        Houma, LA 70360
 3

 4    FOR MDL 2185:                     MITHOFF LAW FIRM
                                        BY:  WILLIAM J. STRADLEY, SR., ESQ.
 5                                      One Allen Center - Penthouse
                                        500 Dallas Street
 6                                      Houston, TX 77002

 7

      FOR THE STATE OF LOUISIANA:       KANNER & WHITELEY
 8                                      BY:  DOUGLAS R. KRAUS, ESQ.
                                        701 CAMP STREET
 9                                      NEW ORLEANS, LA 70130

10

      FOR THE STATE INTERESTS:          ATTORNEY GENERAL OF ALABAMA
11                                      BY:  COREY L. MAZE, ESQ.
                                             WILLIAM SINCLAIR, ESQ.
12                                      500 Dexter Ave.
                                        Montgomery, AB 36130
13

14    FOR THE UNITED STATES
      DEPARTMENT OF JUSTICE:            U.S. DEPARTMENT OF JUSTICE
15                                      TORTS BRANCH, CIVIL DIVISION
                                        BY:  R. MICHAEL'S UNDERHILL, ESQ.
16                                           SARAH D. HIMMELHOCH, ESQ.
                                        450 Golden Gate Ave.
17                                      7th Floor, Room 5395
                                        San Francisco, CA 94102
18

19                                      U.S. DEPARTMENT OF JUSTICE
                                        ENVIRONMENTAL ENFORCEMENT SECTION
20                                      BY:  STEVEN O'ROURKE, ESQ.
                                             SCOTT CERNICH, ESQ.
21                                           ABIGAIL ANDRE, ESQ.
                                             STEPHEN FLYNN, ESQ.
22                                           ERICA PENZAC, ESQ.
                                             BETHENY ENGLE, ESQ.
23                                      P.O. Box 7611
                                        Washington, DC 20044
24

25
```

```
 1
     FOR BP AMERICA INC., BP
 2   AMERICA PRODUCTION COMPANY,
     BP COMPANY NORTH AMERICA,
 3   INC., BP CORPORATION NORTH
     AMERICA, INC., BP EXPLORATION &
 4   PRODUCTION INC., BP HOLDINGS
     NORTH AMERICA LIMITED, BP
 5   PRODUCTS NORTH AMERICA INC.:    LISKOW & LEWIS
                                     BY:  DON K. HAYCRAFT, ESQ.
 6                                   One Shell Square, Suite 5000
                                     701 Poydras St.
 7                                   New Orleans, LA 70139

 8
                                     KIRKLAND & ELLIS
 9                                   BY:  J. ANDREW LANGAN, ESQ.
                                          MARK J. NOMELLINI, ESQ.
10                                        RYAN S. BABIUCH, ESQ.
                                     300 N. LaSalle
11                                   Chicago, IL 60654

12
                                     KIRKLAND & ELLIS
13                                   BY:  ROBERT R. GASAWAY, ESQ.
                                          MICHAEL A. PETRINO, ESQ.
14                                        JOSEPH A. EISERT, ESQ.
                                     655 Fifteenth St., N.W.
15                                   Washington, D.C. 20005

16
     FOR HALLIBURTON
17   ENERGY SERVICES, INC.:          GODWIN RONQUILLO
                                     BY:  SEAN W. FLEMING, ESQ.
18                                        LAUREN L. MITCHELL, ESQ.
                                          ALISON BATTISTE, ESQ.
19                                        BRUCE W. BOWMAN, JR., ESQ.
                                          JENNY L. MARTINEZ, ESQ.
20                                        ERIKA TOLEDO, ESQ.
                                     Renaissance Tower
21                                   1201 Elm Street, Suite 1700
                                     Dallas, TX 75270
22

23                                   GODWIN RONQUILLO
                                     BY:  R. ALAN YORK, ESQ.
24                                        GWEN E. RICHARD, ESQ.
                                     4 Houston Center
25                                   1331 Lamar, Suite 1665
                                     Houston, TX 77010
```

```
 1

 2   FOR CAMERON INTERNATIONAL
     CORPORATION:                        STONE PIGMAN WALTHER WITTMANN
 3                                       BY:  ABIGAYLE C. FARRIS, ESQ.
                                         546 Carondelet Street
 4                                       New Orleans, LA 70130

 5

 6   FOR ANADARKO PETROLEUM
     CORPORATION, ANADARKO E&P
 7   COMPANY, LP:                        KUCHLER POLK SCHELL WEINER &
                                         RICHESON
 8                                       BY:  SARAH E. IIAMS, ESQ.
                                         1615 Poydras Street, Suite 1300
 9                                       New Orleans, LA 70112

10
                                         BINGHAM McCUTCHEN
11                                       BY:  WARREN A. FITCH, ESQ.
                                         2020 K Street, N.W.
12                                       Washington, D.C. 20006

13
     FOR M-I, LLC:                       MORGAN LEWIS
14                                       BY:  STEVEN A. LUXTON, ESQ.
                                              R. SEAN BRENNAN, JR., ESQ.
15                                       1000 Louisiana St., Suite 4000
                                         Houston, TX 77002-5006
16

17   FOR TRANSOCEAN HOLDINGS, LLC,
     TRANSOCEAN OFFSHORE DEEPWATER
18   DRILLING INC., AND TRANSOCEAN
     DEEPWATER
19   INC.:
                                         FRILOT
20                                       BY:  KERRY J. MILLER, ESQ.
                                         Energy Centre, 36th Floor
21                                       1100 Poydras St.
                                         New Orleans, LA 70163
22

23                                       SUTHERLAND
                                         BY:  CARTER L. WILLIAMS, ESQ.
24                                       1001 Fannin St., Suite 3700
                                         Houston, TX 77002-6760
25
```

```
 1                                    MUNGER, TOLLES & OLSON
                                      BY:  GRANT A. DAVIS-DENNY, ESQ.
 2                                    355 South Grand Avenue, 35th Floor
                                      Los Angeles, CA 90071-1560
 3

 4     FOR O'BRIEN'S RESPONSE
       MANAGEMENT, INC., SEACOR
 5     HOLDINGS, INC., SEACOR
       OFFSHORE, LLC, SEACOR MARINE,
 6     LLC, SEACOR WORLDWIDE, INC.,
       SEACOR MARINE, INC., SEACOR
 7     MARINE INTERNATIONAL, INC.,
       AND SIEMENS FINANCIAL, INC.:    MONTGOMERY BARNETT BROWN READ
 8                                     HAMMOND & MINTZ
                                       BY:  PATRICK E. O'KEEFE, ESQ.
 9                                     1100 Poydras St., Suite 3300
                                       New Orleans, LA 70163
10

11     AIRBORNE SUPPORT, INC.:         LABORDE & NEUNER
                                       BY:  BEN L. MAYEAUX, ESQ.
12                                     1001 West Pinhook Rd.
                                       One Petroleum Center, Suite 200
13                                     Lafayette, LA 70505-2828

14
       ALSO PRESENT:                   Sylvia Simpson, Secor, et al
15

16     OFFICIAL COURT REPORTER:        Karen A. Ibos, CCR, RPR, CRR
                                       500 Poydras Street, Room HB-406
17                                     New Orleans, LA 70130
                                       (504) 589-7776
18

19          Proceedings recorded by mechanical stenography, transcript
       produced by computer.
20

21

22

23

24

25
```

INDEX

PAGE/LINE:

1. Courthouse Space for Trial of Phase One          8/1

2. Summary of Orders Relating to Phase One          8/22

3. Ongoing Sample Collection and Testing           15/2

4. Captain Englebert's September Activity Report   22/21

5. Phase One Trial Exhibit Database                24/1

6. DPP Entries on Privilege Logs                   31/8

7. Zantaz                                          31/25

8. Professor Ira Leifer Document Production        32/2

9. Update on Fact Depositions                      36/3

10. Other Deposition Matters - Woods Hole          39/9

11. Scheduled 30(b)(6) Depositions                 40/6

12. Cumulative List of Privilege Loge              42/25

13. Phase Two Exhibits                             43/14

14. Proposed Convections for Creating and Exchanging

    Phase Two Trial Exhibit List                   47/18

<pre>
 1                    P R O C E E D I N G S

 2              (FRIDAY, OCTOBER 12, 2012)

 3              (WORKING GROUP CONFERENCE)

 4

 5         (OPEN COURT.)

 6              THE COURT:  Corey, look, we have something for you.  Good

 7    morning, phone participants.

 8              MS. HIMMELHOCH:  Good morning, your Honor.

 9              THE COURT:  How are you doing, Sarah?

10              MS. HIMMELHOCH:  Pretty good.  And yourself?

11              THE COURT:  Good, thank you.

12              MR. MAZE:  I think we should make them guess who is

13    behind the mystery door.

14              THE COURT:  Okay.  So we are looking at a very blue sky,

15    we're looking at a large lift with a machine operator, and there is

16    a person on the other side of the lift.  We're going to let Duke

17    guess who that person is.

18              MR. WILLIAMS:  You?

19              THE COURT:  Bingo.

20              MR. WILLIAMS:  Where is the bungee cord?

21              THE COURT:  You have to admit that's pretty good.  So I

22    thought you might enjoy that.  When we went out to Michoud last

23    Tuesday, a week ago Tuesday, and it was really quite interesting,

24    and I was most impressed with how things are organized and had a

25    great visit.  It was fun.
</pre>

09:37:23  1    Okay.  So let's get rolling.  Let's talk Phase One first

09:37:31  2  off.  We have managed to scrounge up some assignments for everyone

09:37:37  3  except, so far, MI is still out in the cold.  But we're working on

09:37:44  4  MI.

09:37:45  5    DOJ, you're going to have the first floor senior judges'

09:37:50  6  jury room, which is where you were before.  PSC first floor senior

09:37:56  7  judges' courtroom, which is where you guys were before.  BP has

09:38:03  8  their assigned space.  Louisiana will be back in the Attorney

09:38:08  9  Conference Center.  Transocean will be on this floor in the

09:38:13 10  magistrate judges' jury room.

09:38:17 11    MR. MILLER:  Same place as before.

09:38:19 12    THE COURT:  No, you were on the fourth floor before.

09:38:22 13  Weren't you?  You were on the third?

09:38:22 14    MR. MILLER:  No, we were here.  Yes.

09:38:25 15    THE COURT:  Same place.  Haliburton will have Magistrate

09:38:29 16  Judge Moores' chambers.  How do you like that?  Judge Moore retired

09:38:36 17  earlier this year and so we have his vacant chambers to assign to

09:38:42 18  you.  Cameron will have Magistrate Judge Moore's courtroom.  Again,

09:38:49 19  it will be vacant.

09:38:51 20    So the only other party we need to work on will be MI, so

09:38:56 21  there you have it.  That's done.

09:39:00 22    Now, next up on Phase One -- okay.  Next up is Bobo

09:39:22 23  Cunningham took a crack at putting together a summary of all of the

09:39:26 24  orders relating to Phase One trial preparation and BP took a crack

09:39:33 25  at revising that, and it's been a couple of weeks since -- no, it's

09:39:41   1   been a little more than a couple of weeks -- well, about three

09:39:43   2   weeks since that was circulated.  Has everybody had an opportunity

09:39:47   3   to look at the revision, and are there any comments for things that

09:39:54   4   pop out at you as being not feasible?  Kerry?

09:39:59   5              MR. MILLER:  I don't know if "not feasible" is right.

09:40:02   6              THE COURT:  Where is your microphone?

09:40:03   7              MR. MILLER:  Right here.  But I have to find my papers

09:40:12   8   first.

09:40:12   9              THE COURT:  That's okay, find your papers.

09:40:14  10              MR. MILLER:  I think the question I had was related to

09:40:19  11   witnesses and motions, the motions were identified in the work done

09:40:24  12   by Bobo and by BP; motions that were filed by and witnesses that

09:40:33  13   were being brought by parties that are no longer or may no longer

09:40:36  14   be in the case, so whether or not we can scratch those witnesses

09:40:38  15   off and whether or not those motions would be denied as moot so as

09:40:44  16   to require no response.

09:40:45  17              I know there's one in particular that relates to

09:40:49  18   Transocean, and I can give you that document reference number, but

09:40:52  19   I just have to find it in my stack of papers.  But in general,

09:40:55  20   those are my questions.

09:40:56  21              THE COURT:  Very good observation, it's something we have

09:40:58  22   to figure out, so thank you for raising that.  What I'd like to do

09:41:08  23   is think about that issue and any other issues that are on

09:41:10  24   anybody's mind, and then work toward putting this together in to

09:41:13  25   one pretrial procedural order so that everybody can look at one

09:41:20  1   piece of paper rather than 15 status conference reports and see

09:41:26  2   where we are and where to go from there.

09:41:30  3          So why don't we, Kerry, when you find that citation, why

09:41:37  4   doesn't everybody talk, think about the witnesses and motions

09:41:41  5   relating to parties who are no longer in the case.  And then who

09:41:48  6   wants to undertake to try to put one order together?

09:41:53  7          MR. LANGAN:  Andy Langan for BP, your Honor.  I agree

09:41:57  8   with what's been suggested.  Maybe as a productive process

09:42:01  9   suggestion here, I think we circulated the last draft taking

09:42:07 10   Bobo's --

09:42:07 11          THE COURT:  You did.

09:42:09 12          MR. LANGAN:  -- so maybe if people could get back to us

09:42:11 13   with any further comments by the close of business next Wednesday,

09:42:15 14   maybe we can produce a final version of that document; and then

09:42:17 15   we're happy to undertake to try, working with Bobo perhaps, to turn

09:42:22 16   it into a draft pretrial order.

09:42:24 17          THE COURT:  Sounds good.

09:42:26 18          MR. LANGAN:  And then I think separately, it may be a

09:42:28 19   separate process to look at the prior Phase One witness list that I

09:42:31 20   think was circulated on February 24th, and I think your Honor --

09:42:33 21   yeah, we circulated that a couple of weeks ago.  And I don't know

09:42:36 22   that we've ever had a conversation about specifically which

09:42:40 23   witnesses should be dropped.  Maybe we need to have that, maybe --

09:42:44 24   are we going to be together next Friday, maybe we can have that

09:42:48 25   conversation next Friday.  Everyone can think about it.

09:42:50 1     MR. MILLER:  I like having these conferences every two

09:42:53 2  weeks that means I can recycle the same folder.  Look, I think of

09:43:00 3  things very simplistically.  But for example -- and this is what

09:43:03 4  you circulated.  I just circled one, for example, the second guy on

09:43:16 5  the list, this is the Will Call and May Call Fact Witnesses, is

09:43:24 6  Brad Billion being brought by MI.  Is MI even in Phase One anymore?

09:43:32 7     MR. YORK:  Yes.

09:43:34 8     MR. MILLER:  They are, they're still in?  Well, what

09:43:35 9  about the witnesses, you had some MOAX witnesses?

09:43:38 10     MR. LUXTON:  I hope, I'm here.

09:43:40 11     MR. MILLER:  I thought you settled.  This is a MOAX

09:43:43 12  witness, now I know MOAX is not in Phase One.  So are we scratching

09:43:47 13  people like that off the list?

09:43:48 14     THE COURT:  Maybe we should talk about MI being in Phase

09:43:51 15  One and maybe that is a discussion we should have?

09:43:55 16     MR. LUXTON:  We don't have a room yet, your Honor, so.

09:43:57 17     MR. MILLER:  I thought that's why they didn't have a

09:44:00 18  room, maybe they weren't going to be here anyway.

09:44:02 19     THE COURT:  That did not factor into the room

09:44:06 20  assignments.

09:44:06 21     MR. LUXTON:  I can try to catch an earlier flight.

09:44:08 22     MR. LANGAN:  Perhaps Transocean wants to make a proposal

09:44:11 23  that the following, like a show cause kind of order, make a

09:44:15 24  proposal we think the following should be dropped; and if people

09:44:19 25  want to show cause as to why that's not so, then so be it, proceed

09:44:24  1    like that.

09:44:24  2            THE COURT:  I think that's fine.

09:44:27  3            MR. LANGAN:  Does TO want to take the lead on that?

09:44:30  4            THE COURT:  And, Kerry, I know you have a trial starting

09:44:33  5    Monday, so we won't put the onus on you to do it this coming week.

09:44:37  6    But I would like you to circulate a list of witnesses that you

09:44:41  7    think have dropped by the wayside.  If anybody then wants to talk

09:44:47  8    about that, great; and if not, we'll drop them from the list.

09:44:51  9            MR. LANGAN:  Yes.

09:44:52 10            MR. MILLER:  Let me ask a question that might help in

09:44:55 11    confecting this list.  But just to pick an example.  This is a good

09:45:03 12    one because Anadarko is also out of the Phase One trial by virtue

09:45:08 13    of the summary judgment motion.

09:45:09 14            THE COURT:  Right.

09:45:10 15            MR. MILLER:  So they were going to call Darryl Holik,

09:45:12 16    No. 15 on the list, but he was requested by Haliburton.

09:45:19 17            MR. YORK:  And to give you some background on that.  We

09:45:22 18    then before the trial had some discussions with Anadarko's counsel

09:45:26 19    and with the court, and agreed that whatever evidence we wanted to

09:45:30 20    put on with regard to Anadarko, we would do through an offer of

09:45:35 21    proof, would give them prior notice of that, they could also do

09:45:38 22    that through offer of proof, and we would release Mr. Holik from

09:45:42 23    the subpoena from trial.  And the same thing with MOAX's witnesses.

09:45:46 24            MR. MILLER:  To me it's easy if Mr. Holik is an Anadarko

09:45:51 25    employee being brought by Anadarko, and you have that in some

09:45:54  1    circumstances.

09:45:55  2            THE COURT:  Correct.

09:45:56  3            MR. MILLER:  Under my show cause order he is easy, he is

09:45:59  4    off.  But what happens when the request is being made by a party

09:46:02  5    that we know is still in the trial.  I just don't know.  I didn't

09:46:06  6    know about that until now.

09:46:07  7            THE COURT:  That's right, so that we can clarify the list

09:46:08  8    with the kind of stipulation that Anadarko and Haliburton reached.

09:46:13  9    And he will come off the list and any evidence will be by proffer,

09:46:19  10   huh?

09:46:20  11           MR. FITCH:  Tony Fitch for Anadarko.  I would suggest

09:46:25  12   reversing, that's fair to reverse the burden that with respect to

09:46:28  13   Anadarko witnesses -- I don't speak for MOAX anymore, as you may

09:46:32  14   recall -- that they should be presumed not to be on the list unless

09:46:35  15   some party affirmatively notifies the rest of us that they think

09:46:39  16   they have some reason for it.  But, you know, we're out of this

09:46:42  17   case, there's no reason to assume that these people would be

09:46:45  18   witnesses or should be witnesses.

09:46:46  19           THE COURT:  And I think that's Kerry's point, he is going

09:46:49  20   to raise the list of names of witnesses who he believes no longer

09:46:53  21   need to be called, and then the discussion will be does anybody

09:46:59  22   disagree as to any witness or witnesses.  So that will be the --

09:47:05  23           MR. MILLER:  That's certainly my starting paint.  I mean,

09:47:07  24   I am going to paint with a pretty broad bush, and if the party who

09:47:12  25   is affiliated with the witness is out of Phase One by virtue of

09:47:14  1   settlement or summary judgment, I am going to consider that witness

09:47:17  2   off the list.

09:47:18  3          THE COURT:  That's right.

09:47:19  4          MR. MILLER:  Quick question.  What about Weatherford, are

09:47:23  5   they out?

09:47:25  6          MR. YORK:  Yes.

09:47:26  7          THE COURT:  Out.  The only small party still in is MI.

09:47:29  8          MR. MILLER:  Cameron, in or out of Phase One?

09:47:32  9          THE COURT:  In.

09:47:34 10          MR. MILLER:  Cross-claim, huh?

09:47:36 11          THE COURT:  Yes.

09:47:37 12          MR. YORK:  And state claims.

09:47:43 13          THE COURT:  So, Kerry, whenever you can get that

09:47:45 14   circulated is fine, but Kerry has a trial starting Monday so we

09:47:48 15   won't impose a deadline on him of next week.  And Wednesday sounds

09:47:54 16   good, Andy, for circulation of a revised draft order.

09:48:01 17          MR. LANGAN:  Okay.  And then on the witness list,

09:48:05 18   whenever Kerry can do it, we will undertake -- as I think we

09:48:08 19   actually probably had a word version of it around somewhere, to

09:48:10 20   prepare some sort of an updated proposed Phase One witness list and

09:48:15 21   red line it or whatever, we'll go from there.

09:48:18 22          THE COURT:  Good.  That will get us rolling on that, so

09:48:20 23   that's very helpful.  Thanks both to Andy and Bobo for pulling that

09:48:29 24   all together.

09:48:35 25          As we discussed, Judge Barbier and I went out to Michoud

09:48:40  1    last week, so that's all done.

09:48:43  2             We've got ongoing sample collection and testing going on,

09:48:53  3    both at Michoud and I forget where the lab is, Rob.  Pennsylvania?

09:49:03  4    Pennsylvania.

09:49:03  5             MR. GASAWAY:  Good morning, your Honor, Rob Gasaway for

09:49:07  6    BP.

09:49:07  7             THE COURT:  Good morning, Rob.  How are you doing?

09:49:10  8             MR. GASAWAY:  I'm doing good.  It is Pennsylvania.

09:49:12  9             THE COURT:  So why don't you give us a quick update on

09:49:15 10    where we are.

09:49:18 11             MR. GASAWAY:  Okay.  I think things are going well.  The

09:49:21 12    sampling is proceeding at Michoud.  I think everybody saw your

09:49:25 13    Honor's list of eight questions yesterday.

09:49:27 14             THE COURT:  Right.

09:49:28 15             MR. GASAWAY:  We tried to scramble and get eight helpful

09:49:31 16    answers on file at 9:30 A.M. today.

09:49:33 17             THE COURT:  I saw that come in.

09:49:35 18             MR. GASAWAY:  So, you know, I can kind of run down the

09:49:40 19    general answers if you didn't have a chance to read it, as to what

09:49:43 20    your questions were and what the answers are, or however you would

09:49:46 21    like to proceed.

09:49:47 22             THE COURT:  No, that would fine.

09:49:49 23             MR. GASAWAY:  So, your Honor yesterday, Question No. 1,

09:49:54 24    it just had to deal with documentation of subsamples; and our

09:49:57 25    proposal is once the collection is complete, we will provide a

09:50:00  1   complete list of all of the subsamples collected.  And we'll also

09:50:04  2   provide data reflecting the measured mass of those subsamples.

09:50:09  3           The second question had to do with what we would do with

09:50:13  4   leftovers, leftover materials; and basically say if the court wants

09:50:18  5   to store them for perpetuity at Michoud, we would be happy to do

09:50:23  6   that.  It may be easier, I guess, in terms of creating an

09:50:28  7   appropriate environment to put them at a BP storage facility and

09:50:34  8   segregate them out where similar samples are collected.  But we're

09:50:37  9   happy to do either with the leftovers.

09:50:39 10           THE COURT:  Okay.

09:50:40 11           MR. GASAWAY:  Question 3 involved a typo, and we confirm

09:50:44 12   in the letter that it is typo.

09:50:45 13           THE COURT:  Good.

09:50:46 14           MR. GASAWAY:  Question 4 had to do with long days and

09:50:49 15   building 404A.  So the bottom line is, you know, we're going to

09:50:54 16   work with NASA, we will get access to building 404A.  Obviously

09:50:58 17   this is important testing that needs to be done, so however we can

09:51:01 18   get it done, we will get it done; including if NASA is going to

09:51:05 19   wring a few more dollars out of us for 404A, we will try to talk

09:51:10 20   about it, but we will work out an arrangement.

09:51:13 21           We did talk to Captain Englebert about this, and I think

09:51:16 22   another solution to the issue is an additional, if you can believe

09:51:19 23   it, video support so that, you know, Captain can have eyes and ears

09:51:24 24   in multiple places at the same time through video cameras.

09:51:30 25           THE COURT:  Okay.

09:51:31  1        MR. GASAWAY:  On the third paragraph you talk about

09:51:32  2  possible changes to the testing protocol.  Two points here.  I

09:51:37  3  think we have about ten bullet points of sort of further

09:51:44  4  specifications and changes as it is.  And then to the extent the

09:51:49  5  protocol changes, we would propose to give the court and parties

09:51:53  6  24-hour notice of any changes to that protocol.

09:51:57  7        The eight items -- and I guess there's two thoughts here,

09:52:01  8  one, is you remember that we talked about the eight singular items

09:52:06  9  we called them.  We had a conference call that your Honor

09:52:09 10  participated, Captain Englebert, the United States, and some

09:52:13 11  others, and the general point that we made here is obviously this

09:52:17 12  is not the museum of the DEEPWATER HORIZON oil spill.  These items

09:52:22 13  are materials that have no value other than as evidence, and the

09:52:27 14  way to use them as evidence is to test them, to test them and share

09:52:32 15  the results with all of the parties and then see where they come

09:52:35 16  out.

09:52:36 17        So we think that given the fact that we're now at Phase

09:52:40 18  Two, it doesn't make much sense to put them away in a museum and

09:52:44 19  not test them at all, now is the time to test them.

09:52:47 20        And we had a protocol earlier, as your Honor will recall,

09:52:50 21  with respect to these items where we would take part of them and

09:52:54 22  leave another part of them so that if the results of this testing

09:52:58 23  were questioned by any party, there would be additional materials

09:53:03 24  there that they could be retested so we wouldn't be closing off

09:53:07 25  that.  But we think this is literally junk in many ways, it's

09:53:11 1    materials that have been collected solely for the purposes of

09:53:15 2    evidence and now is the time to use it for evidence.

09:53:17 3            With that being said, we didn't want to rush in on this,

09:53:24 4    so one accommodation that we made while your Honor is thinking

09:53:27 5    about our position and the position of other parties on that, is as

09:53:31 6    usual there is a hand-held scanning process we can use and this is

09:53:35 7    the XRF scanning process.  And so what we would like is immediate

09:53:41 8    approval not to sample them or destroy them, but to use our

09:53:45 9    hand-held XRF scanner on Monday and Tuesday to at least scan these

09:53:50 10   items.  And obviously we'll send around all of the scan data to all

09:53:54 11   of the parties as is customary.  But then, your Honor can be

09:53:58 12   considering the other issue of actually taking a piece of that to

09:54:02 13   the lab for testing while we're doing the scanning on Monday and

09:54:06 14   Tuesday.

09:54:06 15           THE COURT:  Good.  And, yes, I have no problem with

09:54:08 16   scanning, so.

09:54:09 17           MR. GASAWAY:  So that will be step one.  And there is, I

09:54:13 18   know it came in exactly at 9:30, there is a scanning protocol

09:54:17 19   that's new that's attached to my 9:30 letter.  So if people are

09:54:21 20   interested in what does the scanning entail, they can look at the

09:54:24 21   attachment to the letter that came in at 9:30 this morning to the

09:54:27 22   court and parties.

09:54:28 23           THE COURT:  Yes, I am looking at it now.  I am scanning

09:54:33 24   it but I am looking at it.

09:54:36 25           MR. GASAWAY:  Then the final two questions your Honor

09:54:38  1    raise were fairly easy.  One is the video accommodations that

09:54:43  2    Intertek lab at Pennsylvania, the answer is we will video all of

09:54:47  3    the lab testing in Pennsylvania.

09:54:49  4         And the final just had to do with the separate issue of

09:54:53  5    laser scanning and producing the results of that on a rolling

09:54:56  6    basis, and we confirm that that will be on a rolling basis.

09:54:59  7         THE COURT:  Perfect.  Okay.  So I know that we heard from

09:55:04  8    Mr. O'Rourke relative to the proposed sampling and testing.  And do

09:55:14  9    you -- I take it you've read his letter?

09:55:16 10         MR. GASAWAY:  I have, your Honor.

09:55:17 11         THE COURT:  Do you want to comment on that?

09:55:19 12         MR. GASAWAY:  I think the general comment is just that

09:55:22 13    what I said before, obviously we are as a general matter trying to

09:55:29 14    give as much specificity as we can.  And as to the specific issues

09:55:34 15    that were itemized in his letter, we will go back and see if we can

09:55:38 16    provide specificity.

09:55:39 17         The general comment is just one that I've made before,

09:55:42 18    we're obviously trying to work in accordance with the deadline

09:55:48 19    under circumstances where steps are not independent and so it may

09:55:52 20    be that we cannot pre-specify them in advance.  We think that the

09:55:57 21    controls that we've put in place are adequate in the sense that we

09:56:02 22    have produced standard operating procedures, quality control

09:56:05 23    procedures through the MDL.  We are going to produce the test

09:56:08 24    results through the MDL.  We have in all cases, including the

09:56:15 25    singular items, provided, left additional materials here.  So this

09:56:19  1   is going to be our best effort to get these tests done within the

09:56:23  2   deadline.

09:56:25  3        If for some reason we make a mistake in this or if the

09:56:29  4   protocols were inappropriate, the testing protocols were

09:56:33  5   inappropriate, shame on us because then that's going to diminish

09:56:36  6   the quality of the evidence that results, and that's ultimately the

09:56:41  7   remedy that's usually provided for in litigation.

09:56:44  8        THE COURT:  Right.

09:56:45  9        MR. GASAWAY:  Obviously this is a little bit different in

09:56:47 10   the sense we have to ask permission from the court, and I think

09:56:50 11   that, you know, the degree of scrutiny and documentation here is

09:56:55 12   certainly beyond what you would ordinarily have in litigation

09:56:58 13   testimony, so we will try to get the specific answers to his

09:57:01 14   specific questions.  But I just would reiterate those other caveats

09:57:05 15   that I've stated before from this podium.

09:57:08 16        THE COURT:  Okay.  Good.  Good report, thank you.

09:57:09 17        Steve, do you want to add anything to what your letter

09:57:12 18   itemized?

09:57:13 19        MR. O'ROURKE:  Steve O'Rourke for the United States, your

09:57:16 20   Honor.  No.  Just in general, you know, we can't shake the feeling

09:57:20 21   that they're taking evidence that's under the special master's

09:57:23 22   auspices, sending it to a secret locale in Pennsylvania, and doing

09:57:29 23   whatever they want with it.

09:57:32 24        And just by way of example, go back and look at the first

09:57:35 25   protocol on sampling.

09:57:36  1          THE COURT:  I did.

09:57:37  2          MR. O'ROURKE:  Pick stuff up, put it in a box and mail it

09:57:40  3   to Pennsylvania, they took 50 pages to explain it.  That's an

09:57:45  4   appropriate standard operating procedure.  It gets to the facility

09:57:47  5   of Pennsylvania and we get three pages of very vague descriptions

09:57:51  6   of what they might do with some of the samples.

09:57:54  7          So that's why we just can't support it.  Some of this

09:57:57  8   material will be destroyed, that will be the end of it.  And it's

09:58:01  9   just not exactly clear what's going to be done with it.  So we're

09:58:05 10   still opposed and that's it.  Thanks.

09:58:07 11          THE COURT:  Right.  And, Steve, you know, if you all want

09:58:12 12   to have an expert there, you've also got that option.

09:58:16 13          MR. O'ROURKE:  Thank you, Judge.  And hearing just now

09:58:19 14   from the 9:30 e-mail that they will be videotaping --

09:58:21 15          THE COURT:  They will be videotaping.

09:58:23 16          MR. O'ROURKE:  -- that's certainly something --

09:58:25 17          THE COURT:  You all will either be able to personally

09:58:28 18   observe or observe by video what the procedures were; and if indeed

09:58:34 19   they are using procedures that you believe were not correct, then

09:58:40 20   you will have the opportunity to object and point out what the

09:58:48 21   problems were.

09:58:49 22          MR. O'ROURKE:  Well, I appreciate that.  It's not a

09:58:51 23   perfect solution, you know, our guys reviewed the standard

09:58:54 24   operating procedure, obviously I did come up with all of that

09:58:59 25   myself.

09:58:59   1           THE COURT:  Yeah, we knew that.

09:59:01   2           MR. O'ROURKE:  We would prefer not to pay some expert to

09:59:06   3   stand there eight hours a day for however many weeks to watch.  We

09:59:09   4   would prefer to know what's happening and then he could decide,

09:59:13   5   they could decide if they need to see it or not.  If they knew what

09:59:16   6   was going on happen clearly, precisely, perhaps they wouldn't have

09:59:19   7   to go at all, save everybody a lot of money or save us a lot of

09:59:23   8   money.

09:59:24   9           THE COURT:  The taxpayers.

09:59:25  10           MR. O'ROURKE:  Yes, taxpayers.

09:59:25  11           THE COURT:  Well, Rob is going to work to see what he can

09:59:28  12   do.  The one thing I want to caution you on is that, you know, this

09:59:32  13   is material that they're opening up and looking at for the first

09:59:38  14   time so some of it may have to be done on the fly, and we all

09:59:42  15   understand that.  But to the extent that he can give you

09:59:45  16   information, he is going to try to do so.

09:59:48  17           MR. O'ROURKE:  And the second protocol was certainly a

09:59:51  18   big improvement over the first, and we do appreciate that, but

09:59:53  19   there's a decision now that needs a lot more clarity, we just don't

09:59:57  20   think it's there yet.

09:59:58  21           THE COURT:  Okay.  Gotcha.  Okay, thank you.  We got

10:00:09  22   Captain Englebert's September activity report, you all kept her

10:00:14  23   very busy.  Rob, you're going to go ahead and do an allocation on

10:00:21  24   that and circulate.  Oh, Rob you're up again.

10:00:25  25           MR. GASAWAY:  Yes, your Honor.  We do hope to be able to

10:00:28  1    allocate that and get that out to the parties today.  There was a

10:00:31  2    lot of activity, BP will be paying the lion's share of it.

10:00:35  3          And I guess, let me just put a thought out there for the

10:00:39  4    court and parties on this level of activity that we see.  Obviously

10:00:44  5    we originally had a November 1 deadline, we tried to move it up for

10:00:49  6    whatever scheduling reason.  Now, we're, you know, we're rushing,

10:00:54  7    and to the extent that we can do things like pay for overtime we're

10:00:59  8    doing that, add video crews to multiply her, we're doing that.

10:01:03  9          But I would want to say that to the extent that the

10:01:07  10   testing that's needed for Phase Two is jeopardized by that

10:01:12  11   October 25th revised deadline, we may come back to the court and

10:01:15  12   see if there's a little wiggle room in that next week.  We're not

10:01:19  13   there yet.  But we are seeing a lot of activity for Captain

10:01:23  14   Englebert, and obviously she is just the tip of the pyramid, so to

10:01:26  15   speak, because she is supervising a bunch of people who are doing a

10:01:29  16   lot of activity.  So just a thought to keep in mind for next week.

10:01:32  17          THE COURT:  Okay.

10:01:33  18          MR. GASAWAY:  Thank you.

10:01:34  19          THE COURT:  Okay.  Good.  Thank you, Rob.  All right.

10:01:45  20   Let's see, we're moving on now to Phase Two document production,

10:01:51  21   deliberative process, privilege entries.  Let's see.

10:01:58  22          MR. YORK:  Your Honor, before we leave Phase One can we

10:02:02  23   address one --

10:02:02  24          THE COURT:  Oh, I'm sorry, Alan, I knew I wanted to ask

10:02:05  25   you to please come up and give us a report and totally forgot.

10:02:11   1          MR. YORK:  Thank you, Judge.  Alan York for Haliburton.

10:02:14   2     As the court will remember, several months ago there were some

10:02:19   3     issues raised about the Phase One trial exhibit database, and

10:02:24   4     Haliburton volunteered to undertake a process to go through the

10:02:28   5     exhibit list, try to identify where the problem documents were, and

10:02:31   6     work with the parties to try to address those issues.  I am happy

10:02:34   7     to report --

10:02:35   8          THE COURT:  Let me interrupt you.  First of all, anybody

10:02:39   9     who thinks that that was a task that was a lot of fun, raise your

10:02:43  10     hand; and everybody who was grateful to Alan and Haliburton for

10:02:50  11     undertaking it, please raise your hand.  Thank you.

10:02:54  12          MR. YORK:  And in fairness, Alan had, and happily Alan

10:02:59  13     had nothing to do with the actual work.  And I do want to thank

10:03:01  14     Carolyn Raines who is a shareholder in our firm, as well as her

10:03:06  15     entire document team who did the yeoman's work of going through

10:03:09  16     these things and trying to identify the problems.

10:03:11  17          Just for context, the process that they went through is

10:03:14  18     they went through each party's identified trial exhibits,

10:03:17  19     identified where the problems were, sent each party a spreadsheet

10:03:20  20     with the problems, asked that they get back with them and work

10:03:24  21     through the problems.  Again, I am happy to report that we were

10:03:28  22     able to work through all of the issues early on with BP, they've

10:03:32  23     worked through I think about 75 percent of the issues with

10:03:35  24     Transocean, Cameron is moving along nicely, and we received the

10:03:40  25     fixed spreadsheet from the PSC this past week and they're working

10:03:44 1    through that, processing through that now.

10:03:47 2          THE COURT:  That would be Mr. Irpino?

10:03:50 3          MR. YORK:  Yes.  And in fairness, that was where the

10:03:54 4    majority of the documents were, we understand it took them a little

10:03:58 5    longer to get through those; but we think we're in good shape to

10:04:01 6    get to from where we are now to a place where we have a cured

10:04:06 7    spreadsheet.

10:04:07 8          So what we have done -- and I will tell the court we

10:04:10 9    haven't shared this proposed time line with any parties, we wanted

10:04:14 10   to throw it out there today, and we're happy to provide it in

10:04:16 11   writing so everyone can review it.  But we think we have developed

10:04:20 12   a time line that would get us to a pristine Phase One trial exhibit

10:04:25 13   database by December 15th, which would be a month out from trial.

10:04:31 14   So the court's indulgence, I'll just run through it real quick.

10:04:34 15        THE COURT:  Please, please.

10:04:35 16        MR. YORK:  Our suggestion would be that by the 22nd of

10:04:38 17   October, assuming that we're able to work with the PSC next week to

10:04:41 18   get through all of the fixes there, that Haliburton will circulate

10:04:45 19   to all of the parties a spreadsheet of all of the exhibits that

10:04:50 20   were on the bad list requiring correction, as well as identifying

10:04:54 21   what the correction was.  Because in about 90 percent of the cases,

10:04:58 22   the correction was not to the document, it was to the description

10:05:01 23   on the exhibit list.

10:05:03 24        THE COURT:  Right.

10:05:04 25        MR. YORK:  But this would give everybody the information,

10:05:08  1   not only for their own exhibits but for everyone else's, what's

10:05:13  2   been touched, what's been proposed to be fixed.  Then all of the

10:05:15  3   parties would have ten days to review that, to look at any of the

10:05:17  4   documents that have been corrected, with the idea that by

10:05:20  5   November 1st any objections to that corrections spreadsheet would

10:05:25  6   have to be resolved.  Not just raised, but resolved.

10:05:28  7          After those objections are resolved, then inData would be

10:05:32  8   provided with all of the corrected documents.  At that point inData

10:05:37  9   would have sort of a quasi pristine database, at which point we

10:05:43 10   believe that it could then go forward -- and we think that they can

10:05:47 11   do it more efficiently than all of the parties individually -- to

10:05:51 12   redact certain information that the court has already said should

10:05:54 13   be redacted from all of the exhibits:  Cell phone numbers, home

10:05:57 14   addresses, social security numbers.  And if anyone wants input on

10:06:02 15   what those sort of objective issues would be for redaction, we're

10:06:08 16   fine with that, as long as everyone agrees to it.  But inData has

10:06:12 17   already assured us they can put a team ongoing on and scrubbing the

10:06:15 18   documents for those objective redaction criteria.

10:06:19 19          Then, by November 15th, which is an additional two weeks,

10:06:24 20   the parties would circulate to all other parties any what we're

10:06:28 21   calling subjective redaction criteria that they're suggesting.

10:06:32 22   Again going back to the prior court's prior rulings, things such as

10:06:37 23   pricing information, things like that, the vanilla pricing stuff

10:06:41 24   that the court I think is in agreement should probably be redacted.

10:06:47 25   But what it would require is that the parties not just give general

10:06:50 1   categories of that subjective redaction criteria, but that they

10:06:55 2   identify by trial exhibit not only in their own exhibits but

10:06:58 3   because of the duplication of exhibits over all of the parties, any

10:07:02 4   exhibit that contains subjective text criteria that they think

10:07:06 5   needs to be redacted by November 15th.

10:07:10 6           THE COURT:  Okay.

10:07:11 7           MR. YORK:  By November 27th the parties would then need

10:07:15 8   to raise any objections to the other parties' subjective redaction

10:07:19 9   criteria.  Those objections would need to be resolved by

10:07:23 10  December 7th.  By resolving them by December 7th we can then

10:07:28 11  provide that subjective redaction criteria to inData, inData can go

10:07:33 12  through, make all of those subjective redactions, and by

10:07:37 13  December 15th they've assured us that they would then have a

10:07:41 14  pristine database which they could then post on an FTP site, all of

10:07:45 15  the parties could download it.

10:07:47 16          And there's one additional belts and suspenders measure.

10:07:51 17  What we would suggest is once we get to that point that inData

10:07:53 18  prepare some type of watermark that would go on each page of the

10:07:58 19  pristine document so that when a document is pulled up at trial it

10:08:04 20  has to have that watermark so that everyone has assurance that the

10:08:08 21  process --

10:08:09 22          THE COURT:  It's been scrubbed.

10:08:11 23          MR. YORK:  Has been scrubbed and we know that the

10:08:13 24  document is being pulled up is one that you don't have to go back

10:08:16 25  and check your own database to see if there's a difference.

10:08:19 1      And that would, like I say, get us to a pristine database

10:08:24 2   for Phase One trial exhibits by December 15th.

10:08:24 3      As I said, I am happy to take the schedule, send it out

10:08:28 4   to everyone and see if anyone has any comments, suggestions, or

10:08:31 5   issues with it.  But I will say, in order for it to work I think

10:08:36 6   that we have to try to make that first deadline of December

10:08:41 7   (SIC) 22nd to get the first cut of all of the cures done.

10:08:45 8      THE COURT:  Okay.  I think that's terrific.  And if

10:08:50 9   anybody sees something that they really think is a problem, please

10:08:55 10  let Alan know ASAP.  But for us to have a clean and ready to roll

10:09:03 11  list of Phase One exhibits will really get us off to a good start,

10:09:09 12  so thank you, Alan.

10:09:12 13     MR. YORK:  And we will get that out, that schedule out in

10:09:13 14  writing this afternoon to everyone so that they will have the

10:09:15 15  weekend to look it over.

10:09:16 16     THE COURT:  Thank you.  Perfect.  Before we move onto the

10:09:19 17  next topic, I want to hear from Mr. Underhill relative to all of

10:09:26 18  the games last night that you were keeping track of.  Could you

10:09:29 19  give us a report, please.

10:09:31 20     MR. UNDERHILL:  Yes.  Happy to.

10:09:33 21     THE COURT:  I knew you would be.

10:09:34 22     MR. UNDERHILL:  And I think I am also pleased that we've

10:09:36 23  developed a wedge between the BP trial teams, very happy to report

10:09:41 24  that.  Andy is a St. Louis fan and if he has even a shred of honor

10:09:48 25  Mr. Gasaway will be a Nats fan.  Do you have a shred of honor, Rob?

10:09:54  1            MR. GASAWAY:  I root for the Nats.

10:09:58  2            MR. UNDERHILL:  So we've developed a wedge.

10:09:59  3            THE COURT:  Which is something you've been looking for

10:10:02  4    for a long time.

10:10:03  5            MR. UNDERHILL:  Absolutely.  So with that preface, my

10:10:05  6    Giants, this vicarious pleasure we get to think we're conquering

10:10:08  7    heroes and all we sit and drink beer and eat hot dogs in the stand.

10:10:12  8    But my Giants won yesterday, they swept three from the Cards --

10:10:16  9    St. Louis -- how about Cincinnati, get the team right.  So we're

10:10:20 10    going to the playoffs, which will be either the Nats or the

10:10:25 11    St. Louis Cardinals.  So Rob and Andy have to get out of here

10:10:28 12    pretty fast.

10:10:29 13            THE COURT:  One of them is going to drop out.

10:10:31 14            MR. UNDERHILL:  Correct.  The Yankees still are in play,

10:10:34 15    it's two for the Yankees, two for Baltimore, so they play today.

10:10:38 16    Giants won.  And who are we forgetting?  Oakland lost.

10:10:43 17            MR. MILLER:  Oakland A's.

10:10:43 18            THE COURT:  Oakland lost?

10:10:45 19            MR. UNDERHILL:  Oakland lost, the Tigers advanced.

10:10:46 20            THE COURT:  I did not know that.

10:10:47 21            MR. UNDERHILL:  So it's going to be interesting.  And I

10:10:50 22    have to say that it troubles me to come down here to the south

10:10:54 23    where you can't even get any attention for baseball, until you

10:10:58 24    thankfully asked.  If you try to get Kerry Miller and all of these

10:11:02 25    football people, even my friend Corey, unless it's that pointy end

10:11:05  1   of that funny ball that looks weird and involved 350-pound guys

10:11:12  2   trying to take the head off 175 or so pound quarterback, they don't

10:11:12  3   get interested.

10:11:17  4           MR. MILLER:  Mike, you need to try to play baseball in

10:11:19  5   New Orleans in August and you'll figure out why.

10:11:21  6           MR. LANGAN:  Also, your Honor, I've actually noticed

10:11:24  7   there's quite a bit of interest in college baseball.

10:11:27  8           THE COURT:  There is.  There's a lot of local interest in

10:11:31  9   college baseball.

10:11:32 10           MR. LANGAN:  It's not a sport that's lost in the area,

10:11:34 11   compared to San Francisco or Chicago, the interest in college

10:11:34 12   baseball here --

10:11:37 13           THE COURT:  LSU and Tulane both.

10:11:39 14           MR. MILLER:  We play in March and April.

10:11:41 15           THE COURT:  That's right, our season is March-April for

10:11:43 16   college baseball, that's exactly right.

10:11:45 17           MR. UNDERHILL:  So wish our teams luck.

10:11:47 18           THE COURT:  I do wish your teams luck and hope you have a

10:11:50 19   lot of hot dogs and beer.

10:11:52 20           MR. O'ROURKE:  This is O'Rourke.  If I could add one

10:11:55 21   thing that only National fans would understand - run Teddy run.

10:12:01 22           MR. LANGAN:  I can translate that.

10:12:04 23           THE COURT:  Come on, come on up.

10:12:05 24           MR. LANGAN:  I believe Mr. O'Rourke is referring to the

10:12:07 25   7th inning contest between the president characters:  Lincoln,

10:12:12 1   Washington, Roosevelt -- who am I missing -- Jefferson.  And

10:12:17 2   finally Mr. Roosevelt finally prevailed, I guess, in game 162.  Do

10:12:21 3   I have that right?

10:12:23 4          MR. O'ROURKE:  First time in seven years.

10:12:25 5          THE COURT:  So you have somebody who is knowledgeable and

10:12:29 6   knows what you were talking about, that's great.  All right, guys.

10:12:33 7   Well, enjoy the playoffs.  That sounds like fun.

10:12:36 8          Okay.  We were going to go into the deliberative process,

10:12:41 9   privilege issues.  Let's see.  We've got privilege logs No. 62 to

10:12:49 10  64.  Sarah, do you have any report on status there?

10:12:55 11         MS. HIMMELHOCH:  Sixty-three and 64, I don't think we

10:13:03 12  have -- we sent you the last set that you asked us to send you for

10:13:09 13  verification of extrapolation, so I think at this point you have

10:13:14 14  under submission the last set of BP documents to review.

10:13:19 15         THE COURT:  Okay.  Any issues with those, BP?  Because,

10:13:28 16  you know, we have to figure out whether we have any.

10:13:30 17         MR. GASAWAY:  No issues, your Honor.

10:13:32 18         THE COURT:  Great, we like that.

10:13:34 19         MR. GASAWAY:  Let me confirm that, but I don't know of

10:13:40 20  any issues.  We do have a couple of privilege issues that we've

10:13:45 21  been talking to Sarah about, we sent her a letter about a clawback

10:13:49 22  and that may be ripe soon and coming your way, but I don't think

10:13:53 23  specifically on that we have anything.

10:13:54 24         THE COURT:  Okay.  And if you do, let us know.

10:13:58 25         Next up we know that we have Zantaz on our desk, and we

10:14:02  1    will be ruling on that shortly.

10:14:08  2           How do we stand on Professor Leifer?  Any info on

10:14:14  3    progress, we're looking for progress, or is he still out of the

10:14:18  4    country?

10:14:18  5           MR. GASAWAY:  Good morning, your Honor.  I am happy to

10:14:20  6    report there has been substantial progress.

10:14:22  7           THE COURT:  Good.

10:14:23  8           MR. GASAWAY:  It took much longer, but we do have the

10:14:26  9    34,000 e-mails in addition to the 195,000 documents.  I will

10:14:31  10   caution your Honor that we as a BP trial team have not yet been

10:14:35  11   able to review those.  You remember the United States was gracious

10:14:38  12   enough to allow those to be sent to our vendor before there was any

10:14:42  13   responsiveness, screening, or any privilege screening, so the next

10:14:46  14   step is obviously to run the search terms, see which ones of those

10:14:50  15   are responsive, identify any privilege documents, et cetera.

10:14:53  16          Time is getting short here and we obviously have told

10:14:56  17   your Honor that we may want Professor Leifer's deposition or other

10:15:01  18   depositions within that category after we get all of the e-mails.

10:15:04  19   So the good news it's now a ministerial process from here on in,

10:15:10  20   and we will obviously turn that crank as quickly as we can.

10:15:12  21          THE COURT:  That's good.  Progress has been made.

10:15:15  22          MR. GASAWAY:  It has, your Honor.

10:15:16  23          THE COURT:  We weren't sure about that, so thank you,

10:15:19  24   Rob.

10:15:19  25          MR. GASAWAY:  You're welcome.

10:15:20  1          MS. HIMMELHOCH:  Your Honor, could I ask Mr. Gasaway.  He

10:15:24  2   said there are some outstanding privilege issues between us and BP,

10:15:27  3   and I am afraid there might be a letter gap here.  Rob, can you be

10:15:33  4   more specific about what the privilege issues are that you see?

10:15:37  5          MR. GASAWAY:  Sarah, I thought I said the opposite, that

10:15:41  6   I didn't know any others, other than the ones -- you got our

10:15:45  7   clawback letter of yesterday?

10:15:47  8          MS. HIMMELHOCH:  About -- yes, and I will respond today.

10:15:52  9          MR. GASAWAY:  So there's that.  I think we may have other

10:15:55 10   targeted issues relating to clawbacks; but in terms of anything for

10:16:00 11   the court, I didn't know of any others.

10:16:02 12          THE COURT:  Okay.  And Sarah and Rob, we had a little

10:16:06 13   round of letters yesterday relative to the cleanup that the U.S. is

10:16:12 14   doing.  Do you all want to do that in a separate call?

10:16:15 15          MR. GASAWAY:  Yes.  I think we got the answers that we

10:16:18 16   were looking for from her.

10:16:19 17          THE COURT:  Good.

10:16:20 18          MR. GASAWAY:  Obviously the 15,000-document figure, the

10:16:24 19   fact that the documents relate to custodians generally as opposed

10:16:28 20   to just deponent custodians, if I heard Sarah correctly on that.

10:16:34 21   That was the information that we were looking for.  If we need to

10:16:38 22   do a follow-up call, I would like to do that separately.  But as an

10:16:41 23   initial matter, we got the answers we were looking for.

10:16:43 24          THE COURT:  Perfect.  And if I don't hear from you it

10:16:46 25   won't be on the agenda next week.

10:16:49  1            MR. GASAWAY:  Thank you, your Honor.

10:16:49  2            THE COURT:  And let's do that one offline, I think that

10:16:52  3  having a discussion amongst the three of us is always very helpful.

10:16:56  4            MR. GASAWAY:  I agree, your Honor.  Mark Nomillini, are

10:16:59  5  you on the phone?

10:17:00  6            THE COURT:  Yes, he is.

10:17:00  7            MR. NOMILLINI:  Yes, I am.

10:17:01  8            MR. GASAWAY:  Is there anything to add, Mark?

10:17:03  9            MR. NOMILLINI:  No.

10:17:05 10            MR. GASAWAY:  Okay.  Thank you.

10:17:06 11            THE COURT:  Thanks, Mark.  How are you doing?

10:17:08 12            MR. NOMILLINI:  I'm doing well, Judge.  How are you?

10:17:10 13            THE COURT:  Fine, thank you.  Okay.  Let's talk about

10:17:12 14  Phase Two fact depositions --

10:17:14 15            MR. LANGAN:  Your Honor, just one more thing.

10:17:17 16            THE COURT:  I'm sorry, Andy, I didn't see you come up.

10:17:19 17            MR. LANGAN:  I believe the last working group order may

10:17:22 18  have been after the September 25th conference, or whatever the last

10:17:25 19  order came out there was a reference in that to the court's desire

10:17:31 20  to make sure that any other outstanding issues that BP might have

10:17:36 21  with the government's discovery come to a head and are resolved.

10:17:41 22  And we share that.

10:17:42 23            I don't know that your Honor set a firm deadline on that,

10:17:45 24  but maybe it's time to do so.  I'm hoping perhaps if we do have

10:17:49 25  anything else to raise, that we could have until maybe a week from

10:17:52 1    today or sometime mid to late next week to either raise it or

10:17:57 2    forever hold our peace.  We're kind of going through our whole

10:18:00 3    punch list now.  I don't know if there will be any or not.  If

10:18:03 4    there are, we're going to let Sarah and her team know and the court

10:18:07 5    know in due course.  But we want to close it off, too, but if we

10:18:10 6    could just have a few more days that would be great.

10:18:12 7           THE COURT:  I think that's fine.  Sarah, do you have any

10:18:14 8    objection to let's say close of business one week from today?

10:18:20 9           MS. HIMMELHOCH:  Well, I hate to be obstinate, but I had

10:18:25 10   understood that Mr. Pixton's last letter was the catalog of what

10:18:30 11   was outstanding, we had responded to that.  Obviously it depends on

10:18:34 12   what they raise next week as to whether I think it's something

10:18:37 13   that's already been under discussion or wasn't raised by the

10:18:42 14   August 15th deadline or relates to new document collection.  So I

10:18:46 15   mean, I feel like the time has come to just finish working through

10:18:50 16   the list that we've already got, but I'll reserve opposition until

10:18:54 17   I see what their list is.

10:18:56 18          MR. LANGAN:  Fair enough.

10:18:57 19          THE COURT:  That's fair.  And we all know that Mr. Pixton

10:19:00 20   is quite thorough, so I don't expect a whole lot beyond that.

10:19:03 21          MR. LANGAN:  Okay.  A week from today?

10:19:05 22          THE COURT:  Yes.

10:19:06 23          MR. LANGAN:  Thank you, your Honor.

10:19:09 24          THE COURT:  Okay.  So let's get a report from Mr. Barr as

10:19:12 25   to why he is being so quiet today?

10:19:14  1          MR. BARR:  I can't be wrong if I am not talking.

10:19:19  2          THE COURT:  There you go, Brian.

10:19:23  3          Okay.  So let's get an update on scheduling Phase Two

10:19:29  4  fact depositions, and I am looking for the same ole list of people:

10:19:34  5  Statoil, Wild Well, Oceaneering, and the conflict between Guthrie

10:19:38  6  and Griffiths.  Mr. O'Rourke?  Good morning.

10:19:46  7          MR. O'ROURKE:  Good morning, Judge.  Steve O'Rourke for

10:19:50  8  the United States.  And Ms. Andre might be correcting me or some of

10:19:53  9  the people on the phone.  Statoil's witness, I think it's Ruben

10:19:59 10  Schalke --

10:20:00 11          THE COURT:  Ruben Schalke.  Tell us how you spell that.

10:20:03 12          MR. O'ROURKE:  R-U-B-E-N S-C-H-A-L-K-E.  Is in Norway,

10:20:12 13  has some sort of heart condition, doesn't want to travel, some

10:20:15 14  health issue.

10:20:16 15          THE COURT:  I can probably travel.

10:20:20 16          MR. O'ROURKE:  Excuse me?

10:20:21 17          THE COURT:  I can probably travel.

10:20:23 18          MR. O'ROURKE:  It's in Norway and it's not the winter.

10:20:25 19          THE COURT:  There you go.

10:20:28 20          MR. O'ROURKE:  They were proposing perhaps doing it by

10:20:30 21  video conference, perhaps November 12th.  Their law firm is in

10:20:35 22  Houston, frankly I don't know which firm it is, but that office in

10:20:40 23  Houston is willing to host attorneys there, they have video

10:20:43 24  conferencing.  So that's what Statoil is proposing November 12th by

10:20:46 25  video.

10:20:47    1              THE COURT:  Okay.

10:20:47    2              MR. O'ROURKE:  So if anybody doesn't like that then.

10:20:50    3              THE COURT:  The only thing we'll have to do is make sure

10:20:52    4    that you pre-mark your exhibits and get them to Mr. Schalke

10:20:59    5    sufficiently in advance so that he will be prepared with the

10:21:04    6    documents you want to question him on.

10:21:06    7              MR. O'ROURKE:  I thought you and I would mark them when

10:21:09    8    we were in Norway.

10:21:10    9              THE COURT:  That's a good point, we can do it that way as

10:21:14   10    well; you all give us a list and we'll mark them.

10:21:17   11              MR. O'ROURKE:  So that's Statoil.

10:21:18   12              THE COURT:  Okay.

10:21:19   13              MR. O'ROURKE:  Anadarko, I think we wanted to confirm

10:21:22   14    that Mr. Quitzau was going to be November 1 and 2.

10:21:25   15              MR. FITCH:  Yes, he's made arrangements to do just the

10:21:28   16    very next day, it's easier for the rest of us.

10:21:33   17              MR. O'ROURKE:  So one and two for Quitzau of Anadarko.

10:21:37   18    Guthrie, the proposed new date -- this is BP wanted to change

10:21:40   19    Guthrie, the proposed new date is November 13 and 14.

10:21:43   20              THE COURT:  Okay.

10:21:44   21              MR. O'ROURKE:  Intertek, we understand there's a

10:21:52   22    supplemental production forthcoming, it will be two witness

10:22:00   23    depositions, probably two days or a little less; they haven't

10:22:04   24    proposed a date yet because they haven't finished the production.

10:22:07   25    I think we're getting to the point where if we don't have that

10:22:09  1    wrapped up we are going to start talking to you next Friday about

10:22:13  2    taking some action on that.

10:22:14  3            THE COURT:  Okay.

10:22:16  4            MR. O'ROURKE:  Wild Well is a similar story, another

10:22:19  5    supplemental production is forthcoming, still waiting on a date.

10:22:22  6    We've told them if we don't hear from them by mid next week we will

10:22:27  7    be asking you to intervene next Friday.

10:22:29  8            THE COURT:  Okay.  And then Oceaneering is the only other

10:22:36  9    one.

10:22:37 10            MR. O'ROURKE:  Oceaneering, I have no information on

10:22:39 11    that.  But I do, I will mention Stress Engineering.  Stress

10:22:44 12    Engineering has ten topics and those are going to be ten different

10:22:50 13    witnesses, and this is the one that's going to be in the end of

10:22:53 14    October.

10:22:54 15            THE COURT:  Right, October 29th.

10:22:58 16            MR. O'ROURKE:  So we still don't have names for those

10:23:00 17    witnesses yet.

10:23:02 18            THE COURT:  Gotcha.

10:23:03 19            MR. O'ROURKE:  We are working on getting the names

10:23:05 20    identified and hopefully we will be able to say half days or full

10:23:09 21    days or what have you.

10:23:11 22            THE COURT:  Good, that's perfect.  Thank you.

10:23:11 23            MR. YORK:  Your Honor, do you have dates that we're

10:23:15 24    setting that up for, Steve?

10:23:17 25            THE COURT:  I show Stress Engineering October 29th

10:23:21  1   through November 2nd, and then the week of November 5th, if

10:23:28  2   necessary.

10:23:30  3           MR. O'ROURKE:  Right.  It depends on whether these ten

10:23:34  4   witnesses are day-long witnesses or if they're short enough to be

10:23:35  5   two per day or what have you.

10:23:41  6           And I believe that's -- I believe that's what we're

10:23:44  7   supposed to update on.

10:23:47  8           THE COURT:  Yep.

10:23:48  9           MR. O'ROURKE:  On deposition scheduling.  While I am up

10:23:50  10  here, we still have outstanding the ruling on Woods Hole's costs.

10:23:57  11          THE COURT:  We do have that outstanding.

10:23:58  12          MR. O'ROURKE:  And our interest in that is that the BP

10:24:01  13  Institute also wants some costs, so we want to see what you do with

10:24:05  14  Woods Hole to see whether or not we pay them or not.

10:24:10  15          THE COURT:  Well that's interesting.  I assumed that's

10:24:14  16  going to be submitted to me as well, or at least that was my

10:24:18  17  assumption.

10:24:19  18          MR. O'ROURKE:  Well, I think at this point we'll see what

10:24:22  19  you do with Woods Hole, and we will go accordingly, unless we have

10:24:28  20  to come to you.

10:24:29  21          THE COURT:  I was assuming it was going to be submitted

10:24:30  22  to me and I was going to take them up both at the same time, but

10:24:34  23  okay, let me think about doing it your way.

10:24:38  24          MR. O'ROURKE:  Would you rather have us submit it and do

10:24:41  25  it that way?

```
10:24:42   1              THE COURT:  Let me think about doing it your way.
10:24:42   2              MR. O'ROURKE:  Thanks.
10:24:46   3              THE COURT:  All right.  You all got the final Phase Two
10:24:51   4    trial preparation time line.  But, Rob, before I go to that, did
10:24:57   5    you have got something else?
10:24:58   6              MR. GASAWAY:  I was just going to follow-up on the
10:25:00   7    Guthrie/Griffiths issue, and just see if I have this straight now.
10:25:04   8    The proposal is Guthrie on November 13 and 14 and Griffiths on the
10:25:08   9    15th and 16th, is that's what's on the table?
10:25:13  10              MR. O'ROURKE:  Griffiths was staying where he was.
10:25:16  11              THE COURT:  Let's see.  Hold on, let me find Griffiths
10:25:19  12    for you.
10:25:20  13              MR. O'ROURKE:  This is --
10:25:23  14              THE COURT:  He is on the 14th and 15th, Rob, for two
10:25:28  15    days, Mr. Griffiths -- and there would be one day of overlap.
10:25:35  16              MR. GASAWAY:  That was the whole problem is that we made
10:25:37  17    no progress here is -- obviously the whole idea here was to
10:25:41  18    separate the two I thought.
10:25:45  19              THE COURT:  Woops.
10:25:46  20              MR. GASAWAY:  And I don't want to take up time here, but
10:25:48  21    I thought that this is a non-solution so let's see if we can get a
10:25:53  22    solution by next week.
10:25:54  23              MS. ENGLE:  Your Honor, this is Betheny Engle for the
10:25:57  24    U.S., how are you?
10:25:58  25              THE COURT:  Hi Beth, I'm fine.  How are you today?
```

10:26:01 1          MS. ENGLE:  Good.  I can confirm, and I'll double check

10:26:04 2  with Nat Chakeres, but I believe Griffiths has been moved to the

10:26:07 3  13th and 14th and Guthrie will be the 15th and 16th.  If that is

10:26:13 4  not the case, I will circulate an e-mail later on but I believe

10:26:16 5  that's correct.

10:26:19 6          MR. GASAWAY:  Hey, Betheny, this is Rob.  Could you just

10:26:21 7  send us an e-mail either way that just confirms what the two dates

10:26:24 8  for those two gentlemen are?

10:26:26 9          MS. ENGLE:  Sure, I will do that.

10:26:26 10          MR. GASAWAY:  Thank you very much.  Sorry to interrupt,

10:26:28 11  your Honor.

10:26:28 12          THE COURT:  It's going to be 13th and 14th and then the

10:26:33 13  15th and 16th.

10:26:36 14          MR. GASAWAY:  Okay.  Thank you, your Honor.  Thank you,

10:26:37 15  Betheny.

10:26:37 16          THE COURT:  And that would work.

10:26:39 17          MR. O'ROURKE:  And I apologize if I got the dates mixed

10:26:41 18  up, I am not sure if I did.

10:26:42 19          MR. DAVIS:  Grant Davis on behalf of Transocean.

10:26:45 20          THE COURT:  Good morning, Grant.

10:26:48 21          MR. DAVIS:  Good morning, your Honor.  Just one quick

10:26:49 22  question, which is whether we could shift Transocean employee Rob

10:26:52 23  Turlak's deposition one day.  It's currently scheduled to be on

10:26:58 24  November 5th and 6th, which is a Monday and Tuesday, and we wanted

10:27:01 25  to see if we could shift it to November 6th and November 7th, which

10:27:05 1    is that Tuesday and Wednesday.

10:27:07 2            THE COURT:  Okay.  Would everybody look at that and let

10:27:10 3    Grant know if that's a problem.  If not, it's good by me.

10:27:17 4            MR. DAVIS:  Thank you.

10:27:23 5            THE COURT:  All right.  Would you let him know as soon as

10:27:26 6    possible, let's say no later than close of business on Monday.

10:27:34 7            Okay.  Everybody got the revised time line and you're

10:27:44 8    working off that at this point.  So I don't think there's much to

10:27:47 9    talk about there.

10:27:55 10           Maybe there is, Mr. O'Rourke?

10:27:57 11           MR. O'ROURKE:  This is Steve O'Rourke for the United

10:27:59 12   States.  I don't think there's much to talk about.  I'll confess

10:28:01 13   disappointment that BP got seven depositions, we got five.  So I'll

10:28:05 14   ask you to reconsider that; or in the alternative, could you

10:28:09 15   clarify that if they're using seven, they can only use no more than

10:28:13 16   five for quantification.  That would make it a little more fair on

10:28:18 17   the quantification track.

10:28:19 18           THE COURT:  Okay.  We will think about that, yes.

10:28:22 19           MR. O'ROURKE:  And if the source control people want to

10:28:24 20   say there can be no more than five source control, some of those

10:28:27 21   tracks can be more even, too.

10:28:29 22           THE COURT:  Okay.  Level playing field, huh.

10:28:32 23           MR. O'ROURKE:  Thanks, Judge.

10:28:33 24           THE COURT:  Okay, thank you.

10:28:36 25           MS. HIMMELHOCH:  Your Honor, I have one minor Phase Two

10:28:39  1    document issue, it will take two seconds.

10:28:41  2            THE COURT:  No problem, Sarah, we have Phase Two

10:28:44  3    documents to still talk about.

10:28:46  4            MS. HIMMELHOCH:  I did want to ask whether you really

10:28:50  5    wanted a cumulative list of privilege logs this week for the U.S.

10:28:56  6    since we didn't serve any this week?

10:28:58  7            THE COURT:  No.

10:28:58  8            MS. HIMMELHOCH:  Okay.  And we will send another next

10:29:02  9    Friday in case we served any next week.

10:29:03 10            THE COURT:  Right.  How is that for an answer?

10:29:04 11            MS. HIMMELHOCH:  Thank you very much.

10:29:05 12            THE COURT:  You're very welcome.  If there are no logs,

10:29:08 13    let's clarify, don't give us an update.  We're fully updated.

10:29:14 14            Let's see.  Allen Pixton circulated a proposed order

10:29:20 15    regarding procedure for objecting to Phase Two deposition exhibits.

10:29:26 16    We did receive comments from the PSC but nobody else commented on

10:29:31 17    that.  I knew it, here comes Mr. Barr.

10:29:39 18            MR. NOMILLINI:  Your Honor, it's Mark Nomillini, I

10:29:41 19    believe I can provide some background on this.

10:29:43 20            THE COURT:  That would be great, Mark.

10:29:44 21            MR. NOMILLINI:  Your Honor expressed an idea a couple of

10:29:48 22    working group conferences ago about addressing more, in a more

10:29:55 23    up-front way to the admissibility of documents used in Phase Two

10:30:01 24    depositions and perhaps achieving some stipulation.  And so we

10:30:07 25    circulated last week a draft order which was our best effort to

10:30:13 1    develop some kind of procedure.  We have received some comments

10:30:20 2    from the PSC, although it's not their final word on it, they want

10:30:24 3    some more time to review it.  I think we received a letter from

10:30:28 4    Mr. O'Rourke last night indicating that the United States was

10:30:32 5    opposed on the idea that it might generate unnecessary -- partly

10:30:41 6    because it might generate unnecessary work because not all of the

10:30:44 7    documents will be used as trial exhibits.

10:30:48 8        We do think it's a good idea to try to do some work

10:30:53 9    upfront.  Having said that, we have no pride of authorship with

10:30:58 10   respect to the proposal, and we're happy to take any constructive

10:31:03 11   suggestions to make it more efficient and to, you know, just help

10:31:10 12   us keep the ball rolling in the right direction.

10:31:13 13       THE COURT:  Good.  Thank you.  Okay.  Brian, let's get an

10:31:17 14   update from you.

10:31:18 15       MR. BARR:  Your Honor, Brian Barr for the PSC.  We've

10:31:21 16   talked, Anthony and I had a conversation with Mark this week and we

10:31:24 17   walked through some of it.  We thought generally the frame work of

10:31:28 18   this was a good start.  We've talked about it some more since then,

10:31:33 19   and I had a chance to talk about Rob about it, but since Mark is on

10:31:38 20   the phone I'll update him with what our current thinking is.

10:31:40 21       We believe the first half of the proposal, which is

10:31:42 22   within 30 days of the date of the deposition you identify exhibits,

10:31:46 23   you know, you object to.  We think that's a good start to at least

10:31:51 24   lay out the field, let's figure out if we have an issue, how big

10:31:55 25   the issue is, and what the issues are.

10:31:58  1          Hopefully when people are identifying an exhibit they

10:32:03  2     object to, it's not on the grounds that foundation hasn't been laid

10:32:07  3     but that it can't be laid.  Because these are 30(b)(6)s and just by

10:32:14  4     the nature of these depositions a lot of these witnesses can't lay

10:32:17  5     those foundations.  So if you truly believe there is no possible

10:32:21  6     way that an exhibit can be admitted, then make your objection and

10:32:24  7     we can figure out what the issues are.

10:32:26  8          But I don't believe that it's appropriate at this point

10:32:28  9     in time to then take to the next step of the proposal and brief

10:32:34 10     this before the court for the court to decide whether or not

10:32:37 11     something is admissible or not before we've even had the chance to

10:32:41 12     lay foundations, take individual fact witnesses, you know.  The

10:32:46 13     whole reason we wanted to start this was to avoid individual fact

10:32:51 14     witnesses, if we could, or custodial depositions, that kind of

10:32:55 15     stuff.  And so hopefully it's not an issue.  But I don't think it's

10:33:00 16     appropriate for the court to rule on it before the parties have had

10:33:03 17     the full opportunity to lay whatever foundations need to be laid,

10:33:07 18     if that's a problem for another party.

10:33:09 19          THE COURT:  Gotcha.  And, Steve, I presume that's part of

10:33:12 20     your objection?

10:33:13 21          MR. O'ROURKE:  Yes.  Steve O'Rourke for the U.S.  That's

10:33:17 22     right.  What Brian Barr just said is an improvement to what was

10:33:22 23     proposed in the order from, the proposed order from last week and

10:33:26 24     from last night.  We weren't a part of the meet and confer, we

10:33:30 25     weren't aware of that, so things are a little bit in flux so not

10:33:33  1    all of my comments are going to be set in stone here.

10:33:36  2            THE COURT:  Fine.

10:33:37  3            MR. O'ROURKE:  The scenario we didn't like was there's a

10:33:41  4    depo today, that means automatically 30 days from today we're going

10:33:45  5    to get standard objections, automatically six days later it will be

10:33:49  6    a meet and confer, all be coming to you.  And you do depositions,

10:33:53  7    you use exhibits, they're not always fruitful, the witness doesn't

10:33:56  8    know what it is, we misinterpreted what it means, can't lay

10:34:01  9    foundation, so we fear the scenario where every single depo exhibit

10:34:07 10    was suddenly the subject of a court order, even if it was something

10:34:10 11    we would never consider using at the trial.  So we were much more

10:34:13 12    interested in a proposal where exhibits get put on an exhibit list

10:34:18 13    and then objections are made, as is usually done and was done in

10:34:23 14    Phase One.

10:34:24 15            I can't say categorically we're opposed to the idea that

10:34:28 16    a month after the deposition you would have to give objections of

10:34:32 17    the nature that Mr. Barr was just saying that there's no

10:34:35 18    conceivable way this newspaper article could ever be admitted as

10:34:41 19    opposed to or this 30(b)(6) wasn't able to lay the business records

10:34:46 20    foundation for this exhibit.  So we're not trying to upset the

10:34:50 21    whole process --

10:34:50 22            THE COURT:  I understand.

10:34:51 23            MR. O'ROURKE:  -- we just do not want to buy into a

10:34:54 24    process where we just have all of these wheels churning on exhibits

10:34:58 25    that nobody cares about.

10:34:59  1            THE COURT:  Okay.  Good enough.

10:35:00  2            MR. NOMILLINI:  Your Honor, it's Mark Nomillini.  I

10:35:03  3   appreciate those comments.  I think -- we have one over-arching

10:35:08  4   goal which is to try to develop a process to address exhibit issues

10:35:13  5   sooner rather than later.  I'm sure there are a lot of good ways to

10:35:18  6   achieve that, and I think some of the ideas that have been talked

10:35:22  7   about this morning have been good.  What I would suggest is that

10:35:25  8   perhaps Steve and I and Brian get together for another call early

10:35:29  9   next week to continue to move the ball forward.

10:35:33 10            THE COURT:  Okay.  Good, Mark, that's fine, and we'll

10:35:36 11   just continue to work on it, another work in progress.  Okay?

10:35:42 12            MR. NOMILLINI:  That sounds good.

10:35:43 13            THE COURT:  All right.  So now we get to ask whether

10:35:49 14   there is anything else we need to cover?

10:35:52 15            Before everybody leaves today, I would like to speak to

10:35:57 16   Brian and I would like to speak to I guess Duke about separate

10:36:03 17   matters.

10:36:06 18            MR. NOMILLINI:  Your Honor, it's Mark Nomillini.  We did

10:36:10 19   have another proposal, it's kind of ministerial in nature, a letter

10:36:14 20   dated October 9, which included proposed conventions for creating

10:36:19 21   and exchanging the Phase Two trial exhibit list.  Basically it had

10:36:26 22   to do with numbering ranges and formatting of Excel spreadsheets,

10:36:30 23   et cetera.  I think it's pretty non-controversial, but it's the

10:36:36 24   kind of logistical stuff that if we can get agreement on will make

10:36:40 25   the process smoother.

10:36:41  1          THE COURT:  I did look at it, Mark, my apologies for not
10:36:44  2     covering it.  It looked fine to me.  I would like anybody who
10:36:50  3     disagrees or has a proposal for improvement to let us know in the
10:36:56  4     coming week, but I thought it was non-controversial and it should
10:37:00  5     be just fine.
10:37:01  6          If there are no comments, either good or for improvement,
10:37:07  7     why don't we go ahead and say next week, a week from today, we'll
10:37:16  8     go ahead and implement on that, Mark.  Okay?
10:37:21  9          MR. NOMILLINI:  Sounds good, your Honor.
10:37:23 10          THE COURT:  Okay.  Good.  All right.  Anything we need to
10:37:27 11     talk about that we haven't covered?  Nothing on your little brains,
10:37:33 12     huh?  All right.  Well, thank you.  I hope everybody has a good
10:37:37 13     weekend and doesn't work too hard.  And we will see you next week.
10:37:45 14          MR. FITCH:  Your Honor, is next week still at 8:30?
10:37:48 15          THE COURT:  Oh, I'm sorry, guys, 8:30 next week.  Don't
10:37:51 16     forget that we've changed the time for next week only.  Judge
10:37:56 17     Barbier and I have very, very important business.  Judge Milazzo is
10:38:01 18     doing a Cajun cookout up in Napoleonville for all of the law clerks
10:38:11 19     and the judges, and so they're cooking and we have to get there to
10:38:15 20     eat.  Just for next week.  Very important.
10:38:26 21          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)
         22
         23                    *  *  *  *  *  *
         24
         25

1

2

3                          REPORTER'S CERTIFICATE

4

5          I, Karen A. Ibos, CCR, Official Court Reporter, United

6   States District Court, Eastern District of Louisiana, do hereby

7   certify that the foregoing is a true and correct transcript, to the

8   best of my ability and understanding, from the record of the

9   proceedings in the above-entitled and numbered matter.

10

11

12                          _____

13                          Karen A. Ibos, CCR, RPR, CRR, RMR

14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25