IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO.   2179 SECTION J |
| This document relates to all actions. | * * * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated,       Plaintiffs, v. BP Exploration & Production, Inc.; BP America Production Company; BP P.L.C.,       Defendants | * * * * * * * * * * | Civil Action No. 12-970 SECTION J HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

# Second Declaration of Daniel J. Balhoff

•   I reiterate the statements and conclusions of my previous Declaration.

On August 10, 2012, I signed a Declaration in this matter, which was later filed as Rec. Doc. 7110-2.  Since then, I have received numerous pleadings (along with attached declarations, affidavits and other exhibits), which have questioned the fairness of the Seafood Compensation Program.  Nothing that I have read has changed the opinions that I stated in my August 10 Declaration.  More specifically, nothing has changed my opinion that the Seafood Compesation Program "will provide fair, reasonable and adequate compensation to the Claimants under the circumstances."

- **The Seafood Compensation Program provides "fair, reasonable and adequate" compensation even absent a second distribution.**

The Seafood Compensation Program clearly enunciates compensation methods by which each class member can identify eligibility and documentation requirements and calculate his or her compensation amount in an initial distribution. John Perry concluded, and I agreed, that the general framework and compensation plans set forth in the Seafood Compensation Program – even without the enhancement of a second distribution – are "fair, reasonable and adequate." Put another way, John Perry and I did not base this conclusion (that the initial recovery available to Seafood Compensation Program Claimants is "fair, reasonable and adequate") upon the size of (or even the existence of) a second distribution.

- **Mr. Perry and I used a bottom-up approach to developing the Seafood Compensation Program.**

Some objectors have expressed a concern that too much money will end up in the hands of (for instance) oyster leaseholders, and too little in the hands of others. But Mr. Perry and I did not develop the Seafood Compensation Program from the top down. In fact, we consciously rejected the suggestion that specified amounts of money be allotted to aggregate groups of Claimants by species or otherwise and developed the Program from the bottom up. We rejected the top down approach because, among other reasons, we were aware that if we had allocated fixed dollar amounts by group, and a disproportionately high number of Claimants within one such group were to opt out or choose not to file claims, there would be a resulting windfall to the members of the group who filed claims. We chose instead to develop a Program from the bottom up by first gaining an understanding of the class member population to be covered by the Program (Commercial Fisherman, Seafood Boat Captains, Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners) and the claims covered by the Program (all economic loss claims by such class members relating to Seafood). Guided by the principles set forth in our initial Declarations, Mr. Perry and I determined that the fair and reasonable approach would be to establish compensation methods set forth in each of the Plans. Each individual Claimant can calculate his or her initial round recovery by using a very specific formula. Mr. Perry and I have concluded that the initial round results from application of each Plan is "fair, reasonable and adequate" to the class members covered by the Seafood Compensation Program.

- **We considered all information and data presented to us; we requested additional information and data and were provided it.**

Some of the objections have questioned whether Mr. Perry and I took into consideration the interests of all class members covered by the Program. We did consider information and data for all types of class members included in the Seafood Compensation Program. This included data from federal and state agencies and information provided by prospective Seafood Compensation Program participants and their counsel. In fact, when Mr. Perry and I believed

that we needed more information, we requested it and we were provided it. Joel Waltzer, an attorney for shrimpers, oyster harvesters and others, met with us both at the beginning of the process and near the end of the process. He also provided us with several models (in a spreadsheet format), narrative analyses, and photographs. Other attorneys did the same. Furthermore, Mr. Waltzer and other attorneys were instrumental in arranging interviews with participants in the various commercial seafood industries. When Mr. Perry and I believed that we needed more information, the plaintiffs' attorneys were always very helpful. This happened throughout the process (not just at the beginning). When an issue arose concerning shrimping, we called Clint Guidry (the President of the Louisiana Shrimp Association), who was kind enough to provide us with his cell phone number. Likewise, when we requested additional information concerning crabbers, finfishermen, and long line fishermen, various plaintiffs' attorneys scheduled meetings for us. Attorney John Cracken was present several days to represent the deckhands' interests. At the end of the process, we considered all information and documentation that had been presented to us, but we did not wholly accept anyone's proposal.

- **We will reach out for new information in recommending the allocation of a second distribution.**

Mr. Perry and I anticipate that there will be a balance after the initial distribution. In deciding how to allocate the balance, we will reach out to Seafood Program Claimants and their attorneys and we will review any data of relevance released subsequent to finalization of the Seafood Compensation Program. We will ask for written evidence and submissions and conduct interviews. Our investigation will not be confined to a species-by-species analysis (although that will factor into our investigation), but will also include analyses of geographic impacts of the spill, etc. (if appropriate). Our principal goal will be, to the extent possible, to distribute any remaining Seafood Compensation Program funds in a manner that takes into account information and data which may not have been available when the Seafood Compensation Program was originally developed.

Baton Rouge, Louisiana, this 19th day of October, 2012.

_____
DANIEL J. BALHOFF