**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | MDL NO. 2179 |
| | SECTION:  J |
| This document relates to all actions. | HONORABLE CARL J. BARBIER |
| | MAGISTRATE JUDGE SHUSHAN |
| **Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated,** | Civil Action No. 12-970 |
| **Plaintiffs,** | SECTION:  J |
| v. | HONORABLE CARL J. BARBIER |
| **BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,** | MAGISTRATE JUDGE SHUSHAN |
| **Defendants** | |

**SUPPLEMENTAL DECLARATION OF JOHN C. COFFEE, JR.**

JOHN C. COFFEE, JR. declares as follows:

## I. INTRODUCTION

1.      I make this supplemental declaration to my earlier declaration, dated August 10, 2012, to respond to various objections filed to the "Deepwater Horizon Economic and Property Damages Settlement Agreement," dated April 18, 2012, as amended May 2, 2012 (the

1

"Economic Damages Settlement Agreement") and the proposed certification of the settlement class defined in that Agreement.  Most of these objections make one or more of the following claims: (1) there is an absence of "commonality," as required by Rule 23(a)(2); (2) the "typicality" requirement of Rule 23(a)(3) is not satisfied; (3) the "adequacy of representation" standard under Rule 23(a)(4) has not been met; (4) the "predominance" and "superiority" requirements of Rule 23(b)(3) have not been demonstrated; or (5) the class is seriously underinclusive or arbitrary in design.  Without restating all that I have said before (and thereby trying this Court's patience), I will respond briefly to each of these contentions, which I believe are easily answered.

## II.  Commonality/Predominance

2.      Although different objectors phrase their claim differently, the common contention of several objectors is that because the Oil Production Act ("OPA") is largely a strict liability statute, there can be no common issue (and thus no predominance of the common issues) because liability under OPA was conceded by the BP Parties.  Thus, some objectors claim that "[t]he only issue for the OPA-claim-only class members is the amount of damages, if any. . . ."[1] At once, this contention both misunderstands OPA and the standards for class certification.  Put simply, the fact that a legal issue is conceded does not bar it from constituting a common issue. As noted below, this has been repeatedly held in the context of litigation classes, but it is even more, and indeed definitionally, true in the context of settlement classes.  As a practical matter, in any settlement class, the parties are agreeing to compromise over certain key liability issues, which arose either under a statute or a common law doctrine.  If this compromise barred the issue

---

[1] See Objection filed by James H. Kirby III, Mike and Patricia Sturdivan and Susan Forsyth, dated August 31, 2012 at p. 9.

2

framed by the statute or rule from being a common issue, then no settlement class might ever be

certifiable. Alternatively, defendants would simply become less transparent, hiding the issues

compromised, but this subterfuge would serve no purpose, other than to avoid a formal

concession that might impede class certification. Here, after this litigation had begun, BP

conceded that it was a "responsible party" under OPA and later waived a statutory ceiling on its

liability (which ceiling might not apply if gross negligence or willful misconduct on BP's part

were found).[2] These compromises may have been only partly the product of this litigation, but,

whatever the answer, this does not change the fact that a conceded legal issue can supply the

requisite commonality.

   3. The Second Circuit concisely explained why conceded issues should satisfy

commonality, including for purposes of the predominance analysis under Rule 23(b)(3), in In re:

Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006):

> "That the class-wide proof comes in the form of a simple
> concession rather than contested evidence certainly

---

[2] The first occasion on which BP announced that it had accepted "responsible party" status was on or about May 3, 2010, which date is after the filing of class action litigation that has been consolidated into this class action. See Letter, dated May 3, 2010, from James Dupree, President, BP Exploration and Production Inc., to Thomas Morrison, Chief, Claims Division, U.S. Coast Guard. Some uncertainty persisted as to the meaning of and scope of this concession, and this issue was discussed at status conferences before this Court on May 27, 2010 and October 15, 2010. At the May 27, 2010 status conference, Mr. Haycraft, counsel for the BP Parties, assured this Court that "BP will pay all legitimate claims" (Transcript of Status Conference Hearing Proceedings Heard Before the Honorable Carl J. Barbier, May 27, 2010 at p. 14). However, at a status conference on October 15, 2010, an issue arose as to whether OPA's $75 million cap limited BP's total obligations as a responsible party. Counsel for the BP Parties indicated that it had not "discussed this issue with BP specifically in this context" and that "I'm just not prepared to respond to that specific question in this context." (See Proceedings Before the Honorable Carl J. Barbier, October 15, 2010 at p. 42–43). Counsel for the BP Parties requested a seven day period to obtain clarification from its client. Thereafter, on October 18, 2010, the BP Parties filed a "Statement of BP Exploration & Production Inc Re The Applicability of Limit on Liability Under Oil Production Act of 1990" (Document 559) in which it waived the $75 million limit of liability under § 2704 (a)(3) of OPA.

 Because class action complaints were filed against the BP Parties even before the earliest statement made by BP conceding "responsible party" status on May 3, 2010, I believe it is undisputed that BP's acceptance of responsible party status and its waiver of the OPA ceiling on liability under § 2704 (a)(3) both came after the commencement of the instant litigation. For example, a class action complaint, captioned "Acy J. Cooper Jr. and Ronnie Louis Anderson v. BP, plc BP Products North America, Inc, BP American Inc" (and certain other defendants), No. 2:10-cv-01229, was filed in this Court on April 28, 2010; which complaint listed Stephen J. Herman, later co-liaison counsel in this consolidated class action, as one of the counsel for plaintiffs. Hence, the bottom line is that the relevant concessions came after the commencement of this litigation.

> shortens the time that the court must spend adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed class, which is the central concern of the predominance requirement. . . . Similarly, the fact that an issue is conceded or otherwise resolved does not mean that it ceases to be an 'issue' for the purposes of predominance analysis. Even resolved questions continue to implicate the 'common nucleus of operative facts and issues' with which the predominance inquiry is concerned. . . . Just as much as do contested issues, resolved issues bear on the key question that the analysis seeks to answer: whether the class is a legally coherent unit of representation by which absent class members may fairly be bound."

4.      From the standpoint of judicial efficiency, the Second Circuit stressed that disqualifying conceded issues from the commonality analysis made little sense, because it "would undermine the goal of efficiency by requiring plaintiffs who share a 'commonality of the violation and the harm' nonetheless to pursue separate and potentially numerous actions because ironically liability is so clear." *Id.* at 228. Summing up, it emphasized the absurdity that would follow if class certification could be "defeated" in this way:

> "[I]t would work the perverse result of allowing [defendants] to escape the cost of their unconstitutional behavior precisely because their liability is too plain to be denied. No other court has sanctioned such a result; nor shall we." *Id.* at 229.

5.      This issue was faced again by the Second Circuit in Seijas v. Republic of Argentina, 606 F.3d 53, 57 (2d Cir. 2010), where Argentina claimed that it could not be sued in a class action by bondholders when it has defaulted on its bonds. Argentina had argued that the only common issue was its liability stemming from its default and that because it had conceded its liability, this concession eliminated that common issue. Once again, the Second Circuit held that "even resolved questions of liability implicate whether a putative class shares a common nucleus of facts." *Id.* at 57.

6.    <u>Seijas</u> actually supplies a remarkably close parallel to this case.  Upon a default, bondholders are unified into a cohesive unit by the fact that their debtor has not paid its debt; all suffer—in varying amounts—the injury of nonpayment; similarly, after an oil spill, the injured victims are united in asserting their claims for oil-related injuries against a "responsible party." In both cases, those financially injured constitute a cohesive unit, united by the defendant's concession of default or "responsible party" status.  In both cases, it would be a perverse elevation of form over substance if the defendant could escape liability in a class action (and thus defeat most "negative value" claims) precisely because its liability could not plausibly be denied.

7.    Those cases that have recognized that conceded issues can satisfy commonality have generally involved attempts to certify litigation classes.  But in the context of settlement classes, it is inevitable that key legal issues will be compromised or conceded; that is the only way that the parties get to settlement.  Nor in the settlement class context, should it make any difference when—early or late in the negotiations—the common issue was compromised or conceded.  This is because the real function of the commonality requirement is to evidence the cohesiveness that permits aggregate representation.  Thus, the stronger the legal position of the plaintiffs, the more that they are united without internal divisions and the greater the cohesion. An early concession by defendants of an issue tends to underscore, not undercut, the unity and cohesion within the class.

8.    From this perspective, it is difficult to imagine a cluster of issues that better satisfy the heightened requirements for commonality than the issues surrounding BP's status as a "responsible party" under OPA.  In this light, I fully recognize that <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S.Ct. 2541, 2551 (2011), and <u>M.D. v. Perry</u>, 675 F.3d 832 (5th Cir. 2012), have raised the standard for finding commonality.  Today, as <u>M.D. v. Perry</u> summarized:

> "Rule 23(a)(2) requires that all of the class member's claims depend on a common issue of law or fact whose resolution 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke." *Id.* at 840.

9.      Both in <u>Wal-Mart</u>, which involved highly decentralized and discretionary decisions made by a host of mid-level executive officers and store managers across the nation, and in <u>M.D. v. Perry</u>, which involved a broad challenge to the provision of child welfare services in Texas and an attack on management practices within a large state bureaucracy, there was no such common issue, but only a host of more localized issues.  But the <u>Deepwater Horizon</u> litigation presents a paradigm of a case that satisfies this heightened commonality standard.  In this single-event mass disaster, there are a number of common issues that are each "central to the validity of each one of the [class member's] claims . . ."  These include:

A) <u>Was BP liable as a "responsible party" under OPA and to what extent?</u>  BP conceded its status as a responsible party early in the litigation,[3] but important defenses remained available to it as to the scope and extent of its liability.[4]  For example, the BP Parties raised a defense under the divisibility doctrine.[5]  The PSC vigorously contested the applicability of this defense, and the outcome of this dispute, had there not been a settlement, would have affected the entire class at a stroke.  Moreover, if the divisibility doctrine had been held inapplicable to OPA (and I cannot predict the outcome here), then a constitutional issue of due process would arise, as well as serious statutory issues as to whether BP could be held liable for the conduct or negligence of

---

[3] BP accepted "responsible party" status on or about May 3, 2010.  See supra note 2.

[4] See e.g. 33 U.S.C. § 2704(a)(1)(3) and (b)(2).

[5] In <u>Burlington Northern & Santa Fe Railway Co. v. United States</u>, 556 U.S. 599 (2009), the Court reversed a finding of joint and several liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and remanded for a consideration of apportionment of liability among the joint responsible parties.  Because both OPA and CERCLA address the costs of environmental liability and impose near strict liability on responsible parties, the Court's holding in <u>Burlington Northern</u> that "apportionment is proper when 'there is a reasonable basis for determining the contribution of each cause to a single harm'" has obvious implications for the instant case.  In addition, a preference for apportionment is also expressed in the Restatement (Second) of Torts.  See Restatement (Second) of Torts § 433A (1976).

persons not defined as responsible parties.[6]  Technical issues of classwide magnitude are present throughout OPA.  An illustrative such issue was the subject of this Court's decision (in response to a motion by another defendant) that the Deepwater Horizon oil rig was a "vessel" within the meaning of admiralty law (and thus OPA).[7]  Although this argument was not available to (or made by) the BP Parties, this issue had the potential for classwide impact.

B)  Could the BP Parties Assert a Defense Based on "Superseding Cause"?  Unlike more technical issues of statutory interpretation, the BP Parties also contended that they were relieved from liability (both under OPA and federal maritime law) because the conduct of other defendants represented a "superseding cause."  Here, they could seek to rely on the Supreme Court's decision in Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830 (1996).  Plaintiffs challenged both whether this defense was factually and legally applicable to this case, thereby framing a significant issue "central to the validity" of the claims in this action.

C)  Could the BP Parties limit their liability under § 2704 of OPA?  Section 2704 ("Limits on Liability") caps the liability of a responsible party for damages (other than removal costs) to $75 million in the case of "an offshore facility," unless "the incident was proximately caused by . . . gross negligence or willful misconduct . . . or . . . the violation of an applicable Federal safety, construction, or operating regulation. . . ."[8]  This was indeed a potentially important defense that the BP Parties could have raised, but which they waived after the commencement of the class actions now consolidated before this Court.  Waiver of this ceiling

---

[6] Moreover, as this Court noted in its November 14, 2011 Order, due process issues are also presented by the magnitude of related punitive liability in this area.  See Order (Rec. Doc. 4578), at 17 (citing BMW v. Gore, 517 U.S. 559, 574 & n.22 (1996)).

[7] The "vessel" status of the Deepwater Horizon was resolved in In re Oil Spill, 808 F. Supp. 2d 943 (E.D. La. 2011), in which this Court determined that the Deepwater Horizon oil rig was a "vessel" and not a "fixed platform" in response to a challenge raised by Cameron.  OPA defines the term "vessel" as admiralty law does.  See 33 U.S.C. § 2701 (37).  My point here is only that this was a common issue that was a prerequisite to liability for some defendants, even if the issue was not meritorious.

[8] See 33 U.S.C. § 2704 (a)(1)(3) and (b)(2).

again directly advanced the common interests of all class members, for whom a mere $75 million recovery from the BP Parties would have funded only a trivial proportion of their losses.

D) Could Plaintiffs Recover Punitive Damages from the BP Parties? This Court has, of course, ruled that punitive damages are available under federal maritime law, but not under OPA. Still, these are novel issues on which little, if any, appellate law exists, and thus each side had an issue that they could appeal. That is, plaintiffs could have appealed the legal issue of the availability of punitive damages under OPA, while defendants could have appealed the availability of punitive damages under federal maritime law, contending that OPA displaced such law. Thus, had this action not settled, plaintiffs' claims for punitive damages, under both OPA and federal maritime law, would have posed common issues affecting all class members and possibly overshadowing even their claims for compensatory relief.

E) Factual Issues. Both the class members' claims for punitive damages and their claim that the "gross negligence" of the BP Parties required the waiver of any ceiling on BP's liability under 33 U.S.C. § 2704 (c) would have in turn framed a series of common factual issues bearing on the alleged culpability of the BP Parties. These factual issues would necessarily include:

1. Did the BP Parties violate any federal safety, construction, or operating regulations, either prior to the oil spill or in connection with the remediation efforts (see Economic Damages Class Complaint at Paragraphs 76, 81, 138, 211, 213, 245, 333, 430)?

2. Did the BP Parties use an improper well design that unreasonably heightened the risk of a blowout and lost well control (see Economic Damages Class Complaint at Paragraphs 87–100)?

3. Should the BP Parties have recognized that Halliburton's proposed cement mixture was unstable and thus have insisted that Halliburton reformulate its cement slurry before proceeding (see Economic Damages Class Complaint at Paragraph 127)?

4. Did the BP Parties misinterpret the negative pressure test (see Economic Damages Class Complaint at Paragraphs 153–160)?

5. Did the BP Parties take appropriate and timely steps to stop the release of hydrocarbons from the well (see Economic Damages Class Complaint at Paragraph 265)?

6. Did the BP Parties unreasonably fail to take precautions to ensure that, in the event of a blowout, the oil would be contained in the immediate vicinity of the well (see Economic Damages Class Complaint at Paragraph 137).

F) Allocation. Although OPA is often described as a strict liability statute, OPA does not provide any specific rules for allocation among defendants.[9] Until such an allocation is made, it would be unclear how much class members could recover from any individual, non-settling defendant. Plaintiffs have asserted joint and several liability, but the issue was unresolved in this action. Thus, determining the allocation among defendants affects all class members "in one stroke." Among the factual issues that would bear on such an allocation among defendants are:

1. Did Halliburton use an improper cement slurry (see Economic Damages Class Complaint at Paragraphs 111 to 132)?

---

[9] To be entirely accurate, OPA does provide for contribution among defendants. See 33 U.S.C. 2709.

    2.  Did the Transocean employees (including the crew members aboard the Deepwater Horizon) fail to take appropriate action both to anticipate and respond to the blowout (see Economic Damages Class Complaint at Paragraph 172 to 194)?

    3.  Did Transocean fail properly to maintain the blowout preventer, resulting in its failure to seal the well (see Economic Damages Class Complaint at Paragraphs 201 to 211)?

G) <u>Other Defenses</u>.  Besides statutory defenses under OPA, the BP Parties could, and were prepared to, raise other defenses to both OPA liability and liability under federal maritime law, including the defenses that:

    1.  because the BP Parties obeyed and were subject to the direction and control of the Federal on Scene Command ("FOSC"), the BP Parties cannot be held liable for any claim that they failed to take appropriate steps to mitigate the damages of the Economic Damage class members;

    2.  the conduct of Transocean and/or Halliburton constituted an intervening and superseding cause that relieved the BP Parties of liability under both OPA and federal maritime law; and

    3.  OPA requires dismissal of all claims that were filed without satisfying the presentment procedures specified in OPA, including those brought under maritime law.

H) <u>Jurisdictional Issues</u>.  Finally, a variety of novel and unresolved jurisdictional issues pervade this case that had to be decided before any litigated recovery was possible.  Each of these raised legal issues that were "central to the validity" of the class member's claims and were

capable of resolving them "in one stroke" (see M.D. v. Perry, 675 F.3d at 840). Moreover, it is well established that jurisdictional issues can raise questions that satisfy the commonality standard.[10] These issues include:

> 1. Does federal jurisdiction exist over the claims of the Economic Damages class such that these claims can be brought in or removed to federal court?
>
> 2. Does OCSLA jurisdiction pursuant to 43 U.S.C. § 1349 (b)(1) extend to economic loss claims?
>
> 3. Does federal enclave jurisdiction exist over such claims, including those experienced outside the enclave?
>
> 4. Is there admiralty jurisdiction over such claims under 33 U.S.C. § 1333 and/or the Admiralty Extension Act (46 U.S.C. § 30101)?

10.    No view is here expressed as to the validity of the foregoing defenses or as to the plaintiffs' claims for punitive damages. But these issues apply on a class-wide basis and could resolve the validity of a substantial portion of plaintiff's claims at a stroke. In glaring contrast, the facts of Wal-Mart and M.D. v. Perry reveal multiple individualized and low-level discretionary decisions being made about individual class members. In these cases, no single "common answer could be given to the crucial question *why was I disfavored*." See Wal-Mart Stores, 131 S.Ct. at 2252. In contrast, in this case, class members seeking recovery of their losses were the victims of a single-event mass disaster and can here answer the "crucial question" of why they were injured with the common answer: "Because a responsible party

---

[10] See e.g., Sullivan v. DB Invs., Inc.; 667 F.3d 273, 292 (3d Cir. 2011) (en banc) ("The District Court also stressed that all class members shared a common jurisdictional question pertaining to De Beer's refusal to submit to the jurisdiction of United States courts and the potential burden of confirming domestic contacts for purposes of establishing personal jurisdiction."); Baxter Healthcare Corp. v. United States, 925 F. Supp. 794, 797 (Ct. Int'l. Trade 1996) (noting common issues as to jurisdiction, constitutionality, statute of limitations and liability for interest).

failed to protect me from dangers under its supervision." This answer, which stresses

defendants' duties to the class members to protect them from a blowout and oil spill, supplies the

class-wide cohesion that was lacking in <u>Wal-Mart</u> and <u>M.D. v. Perry</u>. As another federal court

has just recognized, defendants' duties to protect a class from harmful exposure can both satisfy

commonality and demonstrate the cohesion that is the underlying reason for requiring

commonality.[11]

11.     Finally, before a settlement was reached in this case, this Court had issued a series

of pre-trial orders that had structured this case for trial. See Amended Pretrial Order No. 41

(Document 4083) and Second Amended Pretrial Order No. 41 (Document 6592). Basically,

these orders contemplated a three stage trial, consisting of an "Incident Phase" (which related to

the loss of well control at the Macondo Well), a "Source Control Phase" (which related to the

conduct of the parties in failing to stop the release of hydrocarbons following the Incident from

April 22, 2010 through September 10, 2010), and a "Containment Phase" (which would address

the efforts of the defendants to contain the oil discharged by the Incident). Essentially, these

three phases framed the common factual issues in this case that were relevant to both the issues

of liability of, and the proportion of liability allowable to, the various defendants. Precisely

because these pretrial orders set forth and applied the various theories of liability that remained

in this case, even after BP's status as a "responsible party" was conceded, the orders constitute a

virtual roadmap of the substantial common issues—both factual and legal—that remained in this

case, even as of the time of settlement.

---

[11] Defendants' duties to the class supplied the common legal issue in a very recent mass tort class action that has just been certified, subsequent to the date of my earlier declaration. In <u>Vietnam Veterans of American v. Central Intelligence Agency</u>, 2012 U.S. Dist. LEXIS 142040 (N.D. Cal. September 30, 2012), a federal district court certified a class of approximately 100,000 military personnel who were subjected to certain "testing programs" in connection with chemical weapons research. The core common legal issue was "whether Defendants had duties to provide notice and health care to class members," and the Court found that "plaintiffs have met their burden to establish commonality on these claims." *Id.* at \*60. Similarly, OPA creates duties to this class that here supplies the core common legal issue.

III. Typicality

12.     Some fifteen class representatives provide a broad and diverse leadership for the

Economic Damages Class.  Nonetheless, some objectors assert that this is insufficient.  For

example, Halliburton asserts that "an upscale seafood restaurant in New Orleans like GW Fins

has different business concerns than a McDonalds franchise off Interstate 65. . . ."  It is difficult

to take this contention seriously.  One suspects that if a fast-food franchise had also been

included as a class representative, Halliburton would still respond by claiming that other

important differences remained.  For example, a McDonalds franchise cannot represent fast-food

pizzerias—and so forth.  Mathematically, one can always subdivide any field into two, three, or

an infinite number of smaller fields or subclasses.

13.     But these arguments ignore what the actual Fifth Circuit law on typicality is.  The

most authoritative and comprehensive recent decision on the requirements of Fed. R. Civ. P. 23

is undoubtedly In re:  Heartland Payments Systems Inc. Customer Data Security Breach Litig.,

851 F. Supp. 2d 1040 (S.D. Tex. 2012).  There, United States District Judge Lee H. Rosenthal

specifically addressed the typicality requirement (along with the other requirements of Rule 23)

in the context of a settlement class:

> "Typicality, according to the Fifth Circuit, 'does not require
> a complete identity of claims.  Rather, the critical inquiry is
> whether the class representative's claims have the same
> essential characteristics of those of the putative class.  If the
> claims arise from a similar course of conduct and share the
> same legal theory, factual differences will not defeat
> typicality.'" James, 254 F.3d at 571 (quoting James Wm.
> Moore, et al. MOORE'S FEDERAL PRACTICE, Section
> 23.24 (4) (3rd ed. 2001)).

14.     In Heartland Payment Systems, the court was confronting a nationwide consumer

class action consisting of "over one hundred million payment-card holders . . . dispersed across

13

the country." *Id.* at 1047. The class asserted multiple legal theories under the laws of the various states, including "negligence, breach of contract, and violations of state consumer protection laws," and federal law. *Id.* at 1055. Nevertheless, the Court concluded:

> "Despite possible state-by-state variations in the elements of these claims, they arise from a single course of conduct by Heartland and single set of legal theories." *Id.*

This case is simpler and more focused on a common set of facts than Heartland (where the Court still found typicality satisfied). Here, there are no remaining state law claims; only federal law applies; the size and geographic area covered by the class are much smaller than the nationwide class in Heartland, and the defendant's course of conduct was briefer and centered on a single event. A fortiori, if typicality was satisfied on the facts of Heartland, it is easily satisfied here.

### IV. Adequacy of Representation

15.     Several objectors have questioned whether the class representatives and class counsel could provide adequate representation to the class. None have identified any significant intra-class conflict of interest; nor have any challenged the competency or zeal of class counsel. But some have suggested that class counsel was "disarmed" (in Amchem Products's phrase) because in their view a litigation class could have been certified. See Amchem Products, 521 U.S. 591, at 621 (citing the undersigned in defining the problem of the "disarmed" counsel).

16.     In the Fifth Circuit, "adequacy of representation" requires a focus on both the competency and zeal of class counsel and the absence of intra-class conflicts. See Langbecker v. Elec. Date Sys. Corp., 476 F.3d 299, 314 (5th Cir. 2007). On the first point, little further need be said about class counsel; they include the leading "stars" of the class action plaintiff's bar, and they have litigated and/or settled many of the largest class action recoveries in the mass torts and related fields. As the Heartland Payment court noted, class counsel's skill and competency is

also shown "by their successful negotiation of a settlement with Heartland, which was initially reluctant to settle." 861 F. Supp. 2d 1040, 1056. On that basis, that showing is even clearer here.

17.     The claim by some objectors that class counsel was "disarmed' because they could not certify a litigation class is highly speculative. Neither Rule 23 nor recent Fifth Circuit decisions have discussed this theme, and several decisions in other Circuits have certified settlement classes without finding counsel to have been disarmed, even under circumstances where extreme variations in state law or other factors suggested that individual questions predominated over common ones (and thus made it uncertain that a litigation class could be certified). See, e.g., Sullivan v. DB investments, Inc., 667 F.3d 273 (3d Cir. 2011), cert. denied, 132 S. Ct. 1876 (2012); In re Am. Int'l Group Inc., 689 F.3d 229 (2d Cir. 2012); In re Ins. Brokerage Antitrust Litig., 579 F.3d 241 (3d Cir. 2009). Here, of course, there is neither the variation in state law nor complexity in legal theories that made those other cases more problematic, because here only OPA and federal maritime law apply.

18.     But even if one assumes that there were obstacles to the certification of a litigation class here, there is still much less reason to believe that class counsel were "disarmed" in this case in comparison to other recent settlement class actions. Although many class members in this action do hold "negative value" claims, many others hold valuable claims that would justify the costs of litigation. Indeed, some corporations and business entities hold claims of substantial value that have already been settled at amounts equal to $1 million or above.[12] Moreover, the seventeen attorneys on the Plaintiffs Steering Committee already represented large numbers of claimants (in several cases, this representation extended to several thousand clients).

---

[12] I am advised by counsel that a number of claims have already received final compensation awards in excess of $1 million from the Court Supervised Settlement Program, which BP has not appealed.

As detailed in the next section, these clients included business groups and associations who could afford the costs of individual litigations.   If an attorney has hundreds of clients who have retained him, that attorney is hardly "disarmed" if a class action were not certified, because those clients would still want individual representation.  Rather, such an attorney with a large inventory of clients has inherent leverage.  Hence, this is not a case—as many consumer class actions are—where individual class members have no effective choice and could not afford to opt out.  Realistically, an attorney is only disarmed when the attorney and client have no option other than a class action.  Here, if class certification were denied, many individual actions would have flooded the courts.

### V.  Subclasses and Structural Assurances of Fairness

19.    Several objectors argue that subclasses are needed for this proposed class.  Their logic is that because substantial variation exists among class members, separate subclasses should be created to reflect the differences among their individual positions.  Unconfined, this logic could require an endless number of subclasses and is flawed for at least three distinct reasons:

(a)  Subclasses are needed only when there are "fundamental" conflicts among class members, and in this basically uncapped settlement, no such conflict exists (or has been identified by objectors) because one class member's gain does not imply another's loss;

(b)  Subclassing is only a means to an end (the end being "adequacy of representation"), and superior means were available and were adopted by this Court.  Specifically, this Court protected class members by (1) approving a process under which the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen member Plaintiffs Steering Committee; and (2) appointing an independent master to make any allocation where funding was

16

capped.  In effect, this approach substitutes a broader form of representative oversight in place of the more adversarial system of appointing a different attorney for each identifiable subgroup. Backstopping this system of collective oversight was the use of a neutral expert (John Perry) to make any necessary allocation (subject also to the further oversight of Magistrate Shushan); and

(c)  Subclassing was infeasible and inappropriate in this case, not only because of the endless number of subclasses that can be imagined, but also because many class members would fall into multiple subgroups.  For example, a VoO claimant might also be a Zone B resident; in such cases, an individual class member would have had two counsel competing over different components of the recovery to be paid to this single class member.  This is far different than the ordinary class action where a class member generally belongs to only one subclass and can be represented by one subclass counsel.  Such complexity and overstaffing is inefficient and causes only delay for the client.

20.     Nonetheless, some objectors seem to argue that subclasses are an immutable rule, at least whenever there are substantial differences in the position of various class members.  In reality, this is neither an accurate summary of the law nor a sensible statement of public policy.

21.     Ignored by the objectors is the basic fact that "not every conflict among subgroups of a class will prevent class certification."  See In re Literary Works in Electronic Databases Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011).  Rather, "the conflict must be fundamental to violate Rule 23(a)(4)."  (emphasis added) Id. at 249; see also  In re Flag Telecom Holdings Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009); Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO, 803 F.3d 878, 880 (6th Cir. 1986); UAW v. GMC, 497 F.3d 615, 629 (6th Cir. 2007); In re K-Dur Antitrust Litig., 686 F.3d 197, 223 (3d Cir. 2012) ("Only a fundamental conflict will defeat adequacy of representation").  Indeed the more common recent

tendency is for appellate courts to recommend limits on the occasions when subclassing should

be used. See e.g., <u>Clark Equip. Co. v. Int'l Union</u>, supra at 880 ("Subclassing . . . is appropriate

only when the court believes it will materially improve the litigation" and is not always needed

because "subclassing often leads to more complex and protracted litigation"); <u>UAW v. GMC</u>,

supra at 629 ("[I]f every distinction drawn (or not drawn) by a settlement required a new

subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk

fragmenting the class beyond repair"); <u>In re Cendant Corp. Sec Litig.</u>, 404 F.3d 173, 202 (3d Cir.

2005) ("If subclassing is required for each material legal or economic difference that

distinguishes class members, the Balkanization of the class action is threatened").

22.     What then does make a conflict "fundamental" so as to require subclassing?  In

<u>Literary Works</u>, which is the decision that has taken the strongest, most activist stance in

requiring subclasses, the Second Circuit found the conflict to be "fundamental" primarily

"because the Settlement capped recovery and administrative costs at $18 million. . . ." <u>Id</u>. at 252.

Thus, it said:

> "Any improvement in the compensation of, for example,
> Category C claims would result in a commensurate
> decrease in the recovery for Category A and B claims."
> <u>Id</u>.

Other factors further compounded this conflict.[13]

23.     But none of these problems are present here, because this settlement is basically

uncapped.  Nor is there any evidence that any conspiracy arose (or coalition was formed)

---

[13] A major further complication was that Categories A and B amounted to approximately 1% of the total number of claims in the class.  Thus, if the named plaintiffs fell into all three categories, it was still in their rational self-interest to favor Categories A and B over C and to allocate the recovery to those former categories.  As the Second Circuit expressly found: "[N]amed plaintiffs would receive a greater share of a given amount of compensation allocated to Categories A and B compared to what they would receive if that compensation were spread over the far greater quantity of Category C claims." 654 F.3d at 252.  No similar incentive exists in this case.

whereby one or more powerful groups joined together to overreach some less powerful interest group or set of claimants.  Objectors may have suspicions, but have presented no evidence nor even told a coherent or consistent story.

24.     Not only is this settlement essentially uncapped, but no evidence exists of any antagonism among the various subgroups and each had representation on the PSC.  In cases where subclassing has been required, the facts have been very different.  In <u>Central States Southeast & Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care LLC</u>, 504 F3d 229, 246 (2d Cir. 2007), plaintiffs alleged that a benefits manager (Medco) had breached its fiduciary duties to them by favoring the interests of its parent company (Merck).  Some subclasses appeared to have been significantly more damaged than others because they were more exposed to Medco's misconduct.  This difference in relative claim strength was the principal justification given for subclassing.  Similarly, in <u>Literary Works</u>, supra, "a capped settlement was allocated differently among categories of claims of different strength without separate counsel to protect each category's interests."  654 F.3d at 256.  In the instant case, however, there is no evidence of antagonism among the different constituent groups (fishermen, wetlands owners, VoO claimants, tourist industry businesses, etc.) and also no indications of clear differences in claim strength.  Moreover, as later discussed, each constituent group had attorneys on the PSC who had previously represented its interests.

25.     Indeed, the only relevant legal authority that the objectors have mustered is a citation to the D.C. Circuit's statement in <u>In re Vitamins Antitrust Class Actions</u>, 215 F.3d 26, 30 (D.C. Cir. 2006), that settlement dynamics may sometimes "lead the negotiating parties—even those with the best intentions—to give insufficient weight to the interests of at least some class

members."[14] No doubt, this may sometimes be true, but some showing must be made that such favoritism or collusion occurred; it cannot be simply assumed. Here, objectors can cite only their personal views that the terms of the settlement should have been more favorable to them. Yet, compromise and line drawing is always necessary in any complex settlement, and no evidence has been presented (or claim made) that class counsel had any bias or hostility to any discrete or insular minority within the class. Thus, this case bears no resemblance to Amchem Products Inc. v. Windsor, 521 U.S. 591 (1997) (where future claimants were clearly disfavored) or Literary Works in Elec. Databases Litigation v. Thomson Corp., 654 F.3d 242 (2d Cir. 2011) (where Categories A and B had strong incentives to reduce the compensation to Category C claimants).

26.     Finally, even if there were reasons to believe that antagonisms existed among the various constituent groups in this settlement or that were clear differences in relative claim strength, it still does not follow that subclassing would be the best answer to these problems. Indeed, even Literary Works recognizes this, stating that:

> "It would be imprudent to require subclassing if subclasses were administratively impracticable." 654 F.3d. at 256.

27.     Here, a superior mechanism was used. To explain that mechanism and to respond to objectors' broad and unsupported claim of discrimination against unspecified subgroups, it is necessary to review just how this unique settlement was negotiated. In overview, this review will stress four relatively unique features to this process:

---

[14] See Memorandum—In Support of Objections to the Economic and Property Damages Settlement Agreement By Objectors Hunter Armour and Judith Armour at p. 6.

a) The Court structured a broad and diverse representation into the Plaintiffs' Steering Committee ("PSC"), ensuring that it reflected the full range of claimants and precluding domination by any one group or region with the class;

b) Class Counsel used the PSC as a participatory mechanism and sounding board by which to test proposals, build consensus, and utilize the broad expertise possessed by the highly experienced, "all star" members of the PSC;

c) When allocation decisions had to be made, they were given to an independent neutral expert, and the process was specially subjected to the oversight of Magistrate Judge Shushan; and

d) The issue of attorney fees was delayed until after the settlement agreement was otherwise finalized, and the fee negotiation process was subjected to Magistrate Judge Shushan's oversight.

## A.  Appointment of the PSC

28.     In this section, I am recounting facts that this Court knows much better than I, but it is important to establish that (1) the PSC was a broad and diverse leadership body, staffed by national leaders of the plaintiff's mass tort trial bar; (2) its members had long practiced independently and at a high level or national visibility where they were not dominated by any narrow or local clique of firms; and (3) PSC members already had a large and diverse array of clients at the time of their appointment.  Given that the PSC's seventeen members (plus the two original co-liaison counsel) already represented a broad cross-section of the persons injured by the Deepwater Horizon incident, this description is inconsistent with the claim (or assumption) made by some objectors that the Economic Damages Settlement was dominated by some narrow and special set of interests.

29.    Briefly stated, the essential facts are these:  Initially, this Court appointed interim co-liaison counsel for the plaintiffs:  Messrs.  James Parkerson Roy, Esq. and Stephen J. Herman, Esq.  Both had diverse and balanced expertise, the former in admiralty law and the latter in federal court practice.  By Pretrial Order No. 1, dated August 10, 2010, this Court then requested applications and nominations for positions on the PSC and specified that it would look chiefly to three criteria:  "(a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation."  I am advised that 119 applications were submitted during the Fall of 2010.  This Court appointed 17 members to the PSC (including two additional members added in the Fall of 2011) and re-confirmed the appointment of Messrs. Herman and Roy as co-liaison counsel.  That is a seven to one applicant to appointee ratio and resembles the admission statistics at a very highly competitive, prestigious college.  All members were appointed to a one year term to the PSC, but were re-appointed in 2011 and 2012.

30.    The following summary (presented in alphabetical order) does not do adequate justice to the credentials of these members, but it shows the geographic diversity, differences in professional experience, and the diversity of clients represented by these members.  In particular, each of the Gulf States (Louisiana, Alabama, Mississippi, Texas and Florida) were represented, but other noted counsel came from as far away as New York, California and South Carolina.

1. Brian H. Barr was head of the Environmental Litigation Department at a Florida-based firm (Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A.) and was already counsel of record in cases filed on behalf of a seafood company (Joe Patti Seafood Co.) and a tourist industry firm (Key West Tiki Charters, Inc.).  His firm then "represented over 600 individuals for

damage caused to their business and real estate," including the Florida Restaurant and Lodging Association.[15] He had also previously served on the PSC for another MDL.

2. <u>Jeffrey A. Breit</u>. Based in Norfolk Virginia, and specializing in "maritime personal injury" and products liability, Mr. Breit had represented "the menhaden fishing fleets of Virginia and Louisiana since 1978." A former President of the Virginia Trial Lawyers Association and an adjunct professor at William and Mary School of Law, he was "retained by over 630 fisherman from the Gulf" and had already filed suit for "over 500 menhaden fisherman and over 100 shrimpers, crabbers, oystermen, seafood restaurants and distributors."

3. <u>Elizabeth J. Cabraser</u>. Based in California and a co-founder of the Lieff, Cabraser law firm, Ms. Cabraser is in my judgment the best known and most highly regarded mass torts plaintiff's class action attorney in the country. She has participated in more than 50 MDL proceedings, including the <u>Exxon Valdez</u> oil spill, and *The National Law Journal* has repeatedly named Ms. Cabraser one of its "100 Most Influential Lawyers in America."

4. <u>Philip F. Cossich, Jr.</u> Based in Plaquemines Parish, Louisiana, Mr. Cossich represented Fulton Seafood, which is one of the largest processors of shrimp harvested from the Gulf Coast, oyster farmers who had cultivated over 10,000 acres of oyster beds, and the two largest firms in the domestic menhaden fishing industry. His experience includes service on the PSC "in the largest oil spill/OPA claim" in the Gulf Coast region prior to the Deepwater Horizon.

5. <u>Robert T. Cunningham</u>. Based in Mobile, Alabama, his firm had represented over 4,000,000 homeowners in a nationwide class action with respect to defective hardboard siding (<u>Naef v. Masonite</u>) and had repeatedly represented the State of Alabama in actions against Exxon

---

[15] All quoted references to the PSC members come from their application forms. I have not attempted to verify their assertions.

and Halliburton (the latter action being for environmental contamination and resulting in an over $100 million jury verdict).

6. <u>Michael Espy</u>.  Based in Mississippi, Mr. Espy was a former Congressman from that state and the 25th Secretary of Agriculture under President Clinton.  He has also had significant experience in class actions in the employment discrimination field.

7. <u>Calvin C. Fayard, Jr.</u>  Based in Louisiana, Mr. Fayard had previously served as a PSC chair or member in other MDL cases and is a former President of the Louisiana Trial Lawyers Association and a Member of the Board of Governors of the American Trial Lawyers Association.  His clients in this litigation included the district attorney of three Louisiana counties with respect to claims for civil penalties against the defendant for loss or injuries to wildlife or fisheries in Louisiana.

8. <u>Ervin A. Gonzalez</u>.  Based in Florida, Mr. Gonzalez was retained by, or associated with, counsel "in close to 200 BP Oil related matters."  He thus represented a broad inventory of largely Florida-based claimants.  He has served on the Board of Governors of the Florida Bar Board and taught as an adjunct professor at the University of Miami Law School.

9. <u>Robin Greenwald</u>.  Based in New York City and an expert in environmental litigation, Ms. Greenwald's clients included 150 Vietnamese businesses and fishermen, hundreds of menhaden fishermen, injured clean-up workers, and the Florida Restaurant and Lodging Association and many of its 10,000 members.  She had previously served as liaison counsel in the methyl tertiary butyl ether ("MTBE") litigation.  Although the MTBE litigation was never certified as a class, her efforts resulted in a settlement of over 80% of the cases for $450 million (proving again that counsel is not necessarily "disarmed" when the class is not certified).

10. <u>Rhon E. Jones</u>.  Based in Alabama at Beasley, Allen, Crow, Methvin, Portis & Miles, he reported that he had recovered over $1.1 billion in verdicts and settlements, chiefly in mass environmental disasters.  As of his appointment to the PSC, his firm represented over 1,000 clients from 28 states, consisting of governmental entities, including the State of Alabama seafood processors, wholesalers and distributors, fishermen, and over $500 million in property interests.

11. <u>Matthew E. Lundy</u>.  Licensed to practice in both Louisiana and Texas, he and his firm represent commercial fishermen, property owners and/or businesses in four Gulf states and participated in numerous earlier oil spill and well blowout cases.

12. <u>Michael C. Palmintier</u>.  Based in Louisiana and a past President of the Louisiana Association for Justice, he was an experienced trial attorney who had served as trial counsel in the MRGO class action, which resulted in an important plaintiff's verdict.  His clients chiefly consisted of commercial fishermen.

13. <u>Joseph F. Rice</u>.  Based in South Carolina and a co-founder of Motley Rice LLC, Mr. Rice is without doubt the best known and most respected negotiator of mass tort class actions and has had unique and unmatched experience in the resolution of large scale class actions and complex litigation, including nationwide tobacco and asbestos settlements.  For his work as lead negotiator for the state attorney generals in the tobacco litigation, which resulted in a Master Settlement Agreement under which the tobacco industry reimbursed the states for health costs incurred by them as a result of tobacco, which settlement constituted the largest civil settlement in U.S. history, Mr. Rice has received multiple awards.

14. <u>Paul M. Sterbcow</u>.  Based in New Orleans, Mr. Sterbcow is a specialist in maritime personal injury and death cases and has served as President of the Admiralty Law Section of the

American Association for Justice.  He represents injured workers and also numerous Alabama and Louisiana fishermen and seafood processors.

15. <u>Scott Summy</u>.  Based in Texas with the Baron & Budd law firm, his experience was in environmental complex litigation and he heads the Baron & Budd Water Containment/Environmental Litigation Practice.  He estimated that he had recovered over $1 billion in environmental cases.

16. <u>Mikal C. Watts</u>.  Based in Texas and with extensive service on other Plaintiffs Steering Committees in other mass tort cases, he estimated that he represented over 40,000 plaintiffs in the Deepwater Horizon litigation.

17. <u>Conrad S. P. Williams, III</u>.  Based in Louisiana with special experience in admiralty, he represented large owners of wetlands, over 150 commercial shrimpers and crabbers, rental/commercial property owners in Mississippi and Louisiana, fishing guides, and multiple personal injury cases.

31.     From this review, several conclusions seem obvious.  First, the Court appointed an uncharacteristically large PSC to reflect the size and complexity of the litigation and the desirability of broad representation, covering all affected groups.  Second, this is an All-Star team, and not a group of "good old boys" who regularly interacted at the same courthouse.  Collusion among relative strangers is less likely and harder to achieve.  Third, most PSC members had substantial clients who had earlier retained them, and all the major constituent groups—fishermen, tourist industry businessmen, property owners, etc.—had attorneys under retention by them on the PSC.  Fourth, both geographically and in terms of client diversity, no identifiable group was excluded or left unrepresented.  Although six members of the PSC were based in Louisiana, that is a minority of the 17 member committee, and it hardly enabled them to

dominate the other PSC members.  Unlike in Literary Works, there was no natural antagonism between Categories A and B and the unrepresented Category C.  None stood clearly to gain by depriving the others.

B. The Role and Operation of the PSC

32.    Although I had intended to assemble evidence in this section that the PSC negotiated aggressively and at arm's length, there is no longer any need to do so, as Magistrate Judge Shushan has already found that the negotiations were conducted "in good faith and at arm's length over many months."  See Order Regarding Objectors' Requests for Discovery and GO FISH's Motion to Intervene, dated September 25, 2012 at p. 7.  She adds:

> "All told, BP and the PSC engaged in more than 145 days of face-to-face meetings . . . The negotiations were extensive and highly contested.  In the final months, the negotiations were conducted under the supervision of the undersigned as Court mediator."  Id.

For any objector to assert collusion in the face of this finding would be frivolous.

33.    But one other point needs to be made:  The PSC acted as the collective decision-making body within the plaintiff's camp to draw the necessary lines and determine what was fair and reasonable for the class (and the constituent groups therein).  I am advised that PSC meetings were held basically monthly, beginning in the Fall of 2010 and continuing through the summer of 2012.  Particularly lengthy meetings, with detailed presentations, were held in November 2011, January 2012 and March 2012.  These meetings were aimed at consensus building and resolution of problems in settlement interpretation and implementation.  This process is explained more fully in the declarations already provided to this Court by Stephen J. Herman and Joseph F. Rice.  As Mr. Herman explains, the active negotiations were handled by a smaller group—chiefly Joseph Rice and Calvin F. Fayard, Jr.—who regularly consulted with

27

PSC members to gain a clearer understanding of the nature, scope and extent of the claims that existed (for example, Mr. Herman had represented many VoO claimants and was consulted specifically on this topic). In this way, by consulting with PSC members who had represented specific claimants, the case was negotiated with BP on a claim-by-claim basis, with special input and directions being provided by those PSC member representing special constituencies. Special committees—the Science Committee, Discovery Committee, Trial Committee, Damages Committee and the Seafood Committee—advised and updated these negotiators.

34. Two specific moments stand out and show the democratic nature of this process. On December 14, 2011, Messrs. Fayard, Rice and the two Co-Liaison counsel made a presentation to the entire PSC of the basic contours of the economic and property damages settlement, thus enabling each PSC member to provide more direct input on the issues— geographical, economic, environmental, etc.—of primary interest to such PSC member's clients. Second, the $2.3 billion Seafood Fund was agreed to on or about February 26, 2012. This agreement followed detailed meetings with commercial fishing stakeholders, which included PSC members, industry trade group representatives, and class members with large stakes. To ensure the fair allocation of this $2.3 billion sum, the PSC leadership asked the Court to appoint a neutral mediator to preside over the allocation, and the PSC provided the mediator with the relevant information in its possession. Finally, on March 2, 2012, Mr. Fayard, Mr. Rice, and co-liaison counsel made a full presentation to the PSC on all the details of the proposed Agreement in Principle. After several hours of presentation and discussion, Mr. Roy received verbal confirmation from each member of the PSC that they fully supported the PSC's entry into the Economic and Property Loss Settlement (which verbal agreement was followed by a written vote).

35.     Ultimately, the issue thus posed is whether this approach—use of a broad participatory mechanism—is necessarily inferior to subclassing, with each identifiable group having its own separate counsel. In my view, this process was actually superior, and subclassing would have been administratively infeasible in this case. Not only would each Gulf state want representation as a subclass, but special geographic regions might also want their own subclass. Next, identifiable classes of victims would demand subclasses (e.g., tourist industry firms, residential owners, commercial property owners, fishermen, shrimpers, subsistence wetlands residents, fishing guides, VoO claimants—and the list goes on). Already, Halliburton has objected that an upscale restaurant in New Orleans cannot represent a fast food franchise out on the highway. If this were true, every category could be subdivided endlessly.

36.     The result of such fragmentation of the class would be Balkanization, perpetual bickering, and delay. See In re Cendant Corp. Sec. Litig., 404 F.3d 173, 202 (3d Cir. 2005) (noting this risk of "Balkanization" and citing this author). The superior alternative to this hyper-adversarial model is a more participatory and collective model in which issues are faced and resolved by a representative group. That is in fact how the PSC operated. My earlier declaration (and those of other experts as well) has already focused on the "bottom up" process by which recoveries (and settlement grids) were negotiated on a claimant by claimant basis with the entire PSC approving each identifiable group's range of (and criteria for) recovery. Because all this was done (except in the case of the Seafood Compensation Fund) without any ceiling, there was no antagonism among interest groups or any "fundamental" conflict requiring subclassing. In the case of the Seafood Compensation Fund, a neutral expert also eliminated any need for subclassing.

37.     Most importantly, this process worked.  It is unclear and very speculative whether placing ten or more subclasses into a competitive negotiation would have achieved anything other than futility.  Certainly, it would have produced litigation, objections and appeals, as each subclass counsel would need to justify its fee award.

38.     In addition, this collective process also resolved two issues that could not have been satisfactorily resolved through subclassing.  The PSC ultimately determined to exclude "moratoria" claims from the scope of the settlement agreement,[16] but also to carve such claims out from the release issued pursuant to the settlement, thereby allowing such claim holders to benefit from the settlement (with respect to their other claims).  Otherwise, to preserve their claims, moratoria claim holders would have been forced to opt out and thereby sacrifice other benefits under the settlement agreement.  If, instead, moratoria claim holders had been treated as a subclass, the predictable result would have been stalemate, and their subclass counsel might have objected to the settlement.  Subclass counsel would predictably be motivated to resist any settlement that did not compensate the moratoria subclass because, absent some recovery to the subclass, it would be hard to justify an attorney's fee award for such subclass counsel.  At best, a compromise might have been struck involving a token recovery for moratoria losses, and at worst a lengthy delay would have ensued.  A collective decision by the PSC to exclude, but protect, such claim holders worked better.  More generally, this was an example of reasoned statesmanship that can only occur by collective decision within the structure of a representative PSC.

---

[16] The term "Moratoria Loss" is defined in Paragraph 38.93 of the Economic Damages Settlement Agreement.

39.     A second example of claims that could not easily be resolved through subclassing involves the "Pure Stigma Claims."[17]  Again, there was no prospect that the BP Parties would pay for these more remote claims, and including them within the class would have seriously jeopardized in my judgment the prospects for class certification (for a variety of reasons, including the limited ascertainability of such claimants and the difficulties in satisfying the predominance requirement with respect to such claims).  If a subclass had been created for such claims, stalemate was again likely.  Instead, a collective decision was made by the PSC not to include such claims within the class.  In retrospect, this decision seems correct, because this Court has subsequently dismissed these claims.  See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, 2012 U.S. Dist. LEXIS 141546 (E.D. La. October 1, 2012).  My point again is that the broad use of subclasses would arguably have required representation for these claims and turned the already lengthy negotiations into an exercise in futility.

## C.  An Evaluation of the PSC

40.     Others have pointed out that this was a hard-fought intense negotiation, and I agree.  But here I would point to one objective piece of evidence that others might not emphasize.  In many class actions, once the core settlement is struck, the size of the class is expanded to reach other more peripheral groups.  This last minute substantial expansion is part of the standard settlement dynamics in many class actions because it benefits both defendants and class counsel (but not those within this zone of expansion).[18]  For plaintiff's counsel, an

---

[17] "Pure Stigma Claims" have been defined by this Court as "claims alleging a reduction in the value of real property caused by the oil spill or other contaminant even though (1) the property was not physically touched by oil, and (2) the property was not sold."  See In re:  Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010, 2012 U.S. Dist. LEXIS 141546 (E.D. La. October 1, 2012) at *10.

[18] I have made this point elsewhere at length.  See John C. Coffee, Jr., Class Action Accountability:  Balancing Exit, Voice, and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370 (2000).

expanded class means typically a larger recovery and thus a fee award.  For defendants, the

expansion may give them global peace and reduces the prospect of follow-on litigation.  Those

added to the class will often receive a lesser recovery because their inclusion at a reduced rate at

the 12th hour is part of the benefit to defendants.  This did not happen here, and the careful

exclusion of "moratorium losses" shows that this PSC protected even those not covered by the

settlement.  In my opinion, this is strong evidence of the adequacy of the representation in this

case.

41.     This point leads to a final observation.  Some have objected to the size and

contours of the class, arguing that it is underinclusive.  But these critics should recognize that the

natural self-interest of plaintiff's counsel is to define the class as broadly as possible in order to

increase the damages and the likely fee award.  Here, such expansion of the class would likely

have heightened the chance that class certification would be denied.  Only a tightly defined class

(particularly in geographic terms) was likely to obtain class certification.  Thus, I believe class

counsel made a mature and responsible judgment to define the class tightly and narrowly—even

though this was contrary to their natural self-interest.  The irony in these objections is that many

want the class expanded to include them (or place them within Zones A or B).  Ultimately, such

objections testify to the desirability and superiority of this class action.

## VI. CONCLUSION

42.     The recurrent objection that the class has been too narrowly drawn demonstrates

that this is not the sprawling, loosely defined class action that the Fifth Circuit has frequently

rejected.  This case involves none of the features that usually preclude class certification:  future

claimants, mandatory provisions restricting opt outs, variation in applicable law, a class size

numbering in the millions, "individual" issues (such as reliance), or multiple events.  The leading

objection to certification has ironically been that the BP Parties liability under OPA is so clear that there is no common issue.  But precisely this likelihood of their liability plus the uncapped nature of this settlement demonstrates the cohesion of this class.  There simply was no "fundamental" conflict requiring subclasses, and the use of a neutral master for the Seafood Compensation Fund was a superior alternative in any event.

43.     Ultimately, this class is distinctive in many respects, all showing its superiority. Class members had "voice" in the form of a broad and representative PSC; they had "loyalty" in the form of a disinterested master (Mr. Perry) and the oversight of Magistrate Judge Shushan, and they had effective "exit," because those who are dissatisfied can opt out and utilize the "presentment" procedure under OPA.  This combination of protections—exit, loyalty, and voice—simply has not arisen in other class actions with which I am familiar.

I declare under the penalties of perjury that the foregoing analysis and opinions are true and correct to the best of my knowledge and belief.

John C. Coffee, Jr.

October 22, 2012

33