## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf of** | * | |
| **Mexico, on April 20, 2010** | * | **SECTION: J** |
| | * | |
| This filing relates to: | * | **JUDGE BARBIER** |
| *Cases in Pleading Bundle B1, and* | * | |
| *VoO Charter Dispute Cases.* | * | **MAGISTRATE SHUSHAN** |
| | * | |
| * * * * * * * * * * * | * | |
| | * | |
| *Bon Secour Fisheries, Inc., et al v.* | * | |
| *BP Exploration and Production, Inc., et al* | * | |
| | * | |
| Civil Action No. 12-970 | * | |
| | * | |
| * * * * * * * * * * * | * | |
| | * | |
| Also relates to Objections filed in: | * | |
| | * | |
| Docket No. 10-7777 | * | |
| | * | |
| * * * * * * * * * * * | * | |

## <u>PLAINTIFFS' REPLY BRIEF</u>
## <u>IN RESPONSE TO OBJECTIONS AND IN FURTHER SUPPORT OF</u>
## <u>FINAL APPROVAL OF ECONOMIC AND PROPERTY DAMAGES</u>
## <u>CLASS SETTLEMENT</u>

## Introduction

The objectors and objections to the proposed Economic & Property Damages Class Settlement largely support the fairness, reasonableness and adequacy of the Settlement Agreement with respect to the members of the Settlement Class.

Indeed, many of the "objections" to the Settlement have been filed by people whose properties or businesses are not covered by the Class Settlement, but who view the agreement so favorably that they object to being excluded.

Halliburton, along these lines, though without standing, "objects" to the Settlement on the grounds that BP is paying *too much* money to the Settlement Class.

Moreover, the attorneys asserting objections on behalf of some of their clients have at the same time submitted thousands of claims into the Settlement Program on behalf of these same and/or other clients.

Most of the attorneys or classmembers who object to particular aspects of the settlement do not attempt to explain why the Settlement is "unfair" or "inadequate" to them, as compared with what they believe they would be entitled to, taking into account both the upside potential and the downside risks and delays if their cases were to be litigated to conclusion.  Rather, they complain that the Settlement is "unfairly" compensating other Class Members more favorably,[1]  or contend

---

[1]Even these objections, when taken as a whole, tend to support the overall fairness and adequacy of the Settlement.  For example: While some complain that the Seafood Program RTPs are "inadequate", objecting processors and charter boat operators have argued for *inclusion* within the Seafood Compensation Program.  Similarly: While some have complained that the Coastal Property Compensation (which largely wasn't even recognized by the GCCF) is "inadequate", many property owners with "stigma" claims have argued for *inclusion* within the Coastal and/or Sales Loss Frameworks.

that they would have hypothetically been treated more favorably by the Gulf Coast Claims Facility.[2]

The Louisiana Attorney General and his counsel, in this regard, completely ignore not only the absence of an enforcement mechanism relative to the GCCF's stated policies, but also the fact that a Responsible Party is only required to maintain an OPA Claims Process for three years.

Despite the AG's generic references to the Proposed Settlement as a "rebranded" GCCF, neither those attorneys nor any Objector actually disputes the fact that the Court-Supervised Settlement Program:

- Provides the class members with more flexible Benchmark Periods from which to establish loss and, where necessary, causation.

- Replaces a vague baseline "loss of income" (LOI) determination with concrete, objective and transparent methods to establish base compensation loss, under a two-step process that accounts for both (i) losses, as compared to benchmark earnings periods, and (ii) the difference between 2010 profit and what the business would have earned but for the spill.

- Identifies specific "fixed" versus "variable" costs to be applied in the compensation calculations.

- Allows for causation presumptions based on industry and location, and, with respect to other class members, provides various alternative methods of establishing, by objective means, that the business or individual suffered a loss deemed to be caused by the spill.

- Compensates class members for Coastal and Wetlands Property Damages, VoO Charter Compensation, Real Estate Sales Losses, and other damages which were generally not being compensated by the GCCF.

---

[2]As discussed more fully *infra,* many of the comparisons to what the GCCF allegedly "accepted" or "did" are either: **(a)** unsupported by the formally promulgated GCCF Methodologies; or **(b)** belied by what the GCCF actually did, or, more accurately, did *not* do. Having a formal enforcement mechanism to ensure that each eligible Class Member actually gets what he or she is entitled to under the written terms of the Settlement Agreement (*see* §§ 4.3.1, 4.3.7, 4.3.8, 4.4.7 and 6.6) is, in and of itself, a substantial benefit to the Class.

- Includes RTP enhancements that are in virtually all cases equal to or greater than the "multipliers" under the GCCF stated methodology.

- Effectively extends the statute of limitations for at least an additional year.  And,

- Guarantees independence, transparency, Court supervision, and no "special deals".

It could further be noted that several objections to the Settlement (including a Statement of Interest submitted by the State of Mississippi) have made the case that people who signed GCCF Releases should be able to participate in the proposed Court-Supervised Class Settlement – presumably superior to the GCCF with respect to these settled claims.

Most of the objections on adequacy of representation grounds allege "conflicts" where none exist, and suggest that dozens of sub-classes should have been established without any regard to the fact that there are no separate and discrete "sub-classes" of claimants who have single, non-overlapping claims.

The handful of objections on other Rule 23 grounds appear to be asserted by lawyers who are "professional objectors" or are otherwise seeking to leverage their own interests or agendas.  The objections to the Common Benefit Attorney Fee Agreement fundamentally misunderstand (or mis-state) the structure of the agreement, and its benefit to the Class.

For these reasons, for all of the reasons stated in our original Approval Brief and Exhibits thereto, and for the reasons set forth below, the Economic & Property Damages Class Settlement should be fully and finally approved by the Court.

## TABLE OF CONTENTS

Page

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  viii

The Number of Claims Submitted to the Settlement Program Thus Far Supports the
Overall Fairness, Reasonableness and Adequacy of the Settlement to the Class. . . . . . . . . 1

Many of the Objectors and Objections Support the Overall Fairness and Adequacy of
The Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Many of the "Objections" to the Settlement have been lodged by Excluded People
    and Businesses who *Want* the Benefits of the Court-Supervised Settlement . . . . . . . . . . . 1

    The Attorneys who have filed Objections have Submitted Thousands of Claims.. . . . . . . 3

    As a Practical Matter, Anyone Who Has Lodged an Objection (as Opposed to
    Opting Out) Has Implicitly Recognized the Proposed Settlement as More Favorable
    Than Formal Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The *Amicus* Filings Do Not Call Into Question the Adequacy or Propriety
of the Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Neither the United States nor the State of Alabama Object to the Settlement.. . . . . . . . . . 5

    The Halliburton Filing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    The Go Fish Filing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    The Louisiana Attorney General Filing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

The Court-Supervised Settlement Program is Superior to the GCCF. . . . . . . . . . . . . . . . . 14

    Advantages of the Proposed Settlement Unrefuted by Objectors. . . . . . . . . . . . . . . . . . . 15

    Extension of the Time Periods for Presentment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Arguments for Inclusion of People and Businesses who Settled with the GCCF
    Support Class Settlement as More Favorable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Claims About the Alleged "Superiority" of GCCF Methodologies Are
    Unreliable and Unsupported. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The Economic and Property Damages Class Meets the Applicable Class Certification
Criteria Under Rule 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**All Classmembers Share Common Claims Which Are Appropriate for Certification Under Rule 23**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    OPA Unites Classmembers under a Common Determination of Responsibility.. . . . . . . 24

    Objectors Ignore the Claim for Punitive Damages by OPA Plaintiffs who Lack *Robins Dry Dock* Standing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    Common Bodies of Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Neither the Number nor the Complexity of the Settlement Framework Formulas Negates the Predominance of Common Issues nor Defeats the Ascertainability of the Class.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**The Members of the Class Were At All Times Adequately Represented**. . . . . . . . . . . . . . . 31

    There Are No "Conflicts" Among Businesses and Employees Falling within the Different Economic Loss Zones, which are the Product of Months of Arms-Length Negotiations and Reasonably Trace the Relative Strengths and Weaknesses of the Claims in terms of Causation and Future Risk as informed by Location, and Nature and Type of Industry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    Coastal Property Owners – who Are Treated Fairly and Adequately under the Settlement – Are Treated Differently from Wetlands Due to the Relative Difficulty in Cleaning or Removing Oil Out of the Marsh, as Opposed to Beaches.. . . . . 38

        In General, Many of the "Wetlands" Located Outside of Louisiana that Were Oiled in the *Deepwater Horizon* Incident Are More in the Nature of "Coastal" Properties.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        Contrary to the Suggestion by Professor Hazard in his Declaration, People or Entities that Only Have Claims for Uncompensated non-Louisiana "Wetlands" Are Not Classmembers, and Are Not Affected by the Settlement. . . 40

        With Respect to the Handful of Objectors or Others Who Might Be Class Members Due to the Existence of Other Class Settlement Claims, They Can Make an Informed Choice – Common to Class Actions and Virtually All Cases – as to Whether or Not they Want to Release Claims that Are Broader than the Ones for Which They are Receiving Specific Compensation. . 41

    The Seafood Program Frameworks Developed by an Independent Court-Appointed Neutral Are Fair, Reasonable and Adequate to Participating Class-Members. . . . . . . . . 42

        The Seafood Fund Is Sufficient. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        The Frameworks Are Fair, Reasonable and Adequate, and Were Informed by a Fair, Neutral and Comprehensive Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

            The Claims of Crabbers, Deckhands and Fin Fishermen Were Fairly Represented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

The Structural Protections Provided Were More Appropriate Than Attempting To Create Numerous Sub-Classes, Given the Crossover of Both Class Members and Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

The Seafood Program Claim Deadline is Reasonable and Works to the Benefit of Participating Class Members by Allowing the Court-Appointed Neutral to Determine and Fairly Distribute Any Balance Left in the Fund. . . . . . 47

Courts Do Not Expect or Require the Class Representatives to Sit at the Negotiating Table. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

The Law Does Not Support Objectors' Complaints About Line-Drawing and/or Demands for Infinite Sub-Classing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**Other Fallacies Contained within the Objections**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

The VoO Set-Off Reasonably Takes Into Account the Litigation Risk Posed for Those Who Don't Settle.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Charter Boat Operators – who Are Treated Fairly and Adequately under the Settlement – Face Different Risks than Commercial Fishermen and Have More Difficult Claims for Punitive Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Seafood Processors – who Are Treated Fairly and Adequately under the Settlement – Have More Difficulty in Maintaining Claims for Punitive Damages. . . . . . . . . . . . . . . 55

Class Members who Have either Working VoO or Non-Working VoO Claims Are in a Position to Determine Whether or Not Such Compensation is Reasonable and Adequate to Compensate them for any Section 1981 Claims. . . . . . . . . . . . . . . . . . . 55

People or Businesses Who Only Have Unrealized Diminution in Property Value ("Stigma") Claims Are Not Class Members and Are Unaffected by the Settlement.. . . . . 56

The Court-Supervised Settlement Program is Not Required to Provide Interim Payments; To the Extent that OPA Requires BP, as the Responsible Party, to Provide Interim Payments, That Responsibility Is Presumably Being Fulfilled By and Through the Separate New BP OPA Claims Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

The Submission of Monthly P&Ls Is Not Required Under the Settlement Agreement If They Were Not Created in the Ordinary Course of Business.. . . . . . . . . . . . . . . . . . . . 58

The Base Loss under the Historical Revenue Models are Presumed.. . . . . . . . . . . . . . . . 58

The Offset for Prior Spill-Related Payments from the GCCF Do Not Reduce the RTP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Complaints About the Ability to Establish Causation under the "Customer Mix" Test.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Unfounded Complaints About Lack of Access to Proof of Causation. . . . . . . . . . . . . . 60

Employees Who Performed Substantial Services in Zone A Are Treated
As Zone A, even if their Employers Are Headquartered in Zone D. . . . . . . . . . . . . . . 61

The Criticisms of the Common Benefit Fee Structure are Without Merit. . . . . . . . . . . . 62

The Gulf Tourism and Seafood Promotional Fund is Not a "Prohibited" *Cy Pres*. . . . . . 62

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

**Certificate of Service**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Agretti v. ANR Freight Sys.</u>, 982 F.2d 242 (7th Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8

<u>Allapattah Services v. Exxon Corp.</u>, 333 F.3d 1248 (11th Cir. 2003).. . . . . . . . . . . . . . . . . . . . 51

<u>Amchem Products v. Windsor</u>, 521 U.S. 591, 117 S.Ct. 2231,
    138 L.Ed.2d 689 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34, 35-36, 37

<u>Bateman v. Am. Multi-Cinema, Inc.</u>, 623 F.3d 708 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 29

<u>Berardinelli v. Gen. Am. Life Ins. Co.</u>, 357 F.3d 800 (8th Cir. 2004). . . . . . . . . . . . . . . . . . 42, 56

<u>In re Cendant Corp. Sec. Litig.</u>, 109 F.Supp.2d 235 (D.N.J. 2000). . . . . . . . . . . . . . . . . . . . . . . 35

<u>In re Cendant Corp. Sec. Litig.</u>, 404 F.3d 173 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 52

<u>Central States v. Merck-Medco Managed Care</u>, 504 F.3d 229 (2d Cir. 2007). . . . . . . . . 33-34, 37

<u>Charron v. Pinnacle Group NY LLC</u>, No.07-6313, 2012 WL 2053530,
    2012 U.S.Dist. LEXIS 79550 (S.D.N.Y. June 6, 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO,</u>
    803 F.3d 878 (6th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

<u>Cook v. Rockwell International Corp.</u>, 181 F.R.D. 473 (D. Colo. 1998). . . . . . . . . . . . . . . . . . . 50

<u>In re Corrugated Container Antitrust Litigation</u>, 643 F.2d 195 (5th Cir. 1981).. . . . . . . . . . . 42, 56

<u>In re Currency Conversion Fee Antitrust Lit.</u>, 263 F.R.D. 110 (S.D.N.Y. 2009). . . . . . . . . . . . 48

<u>Dahingo v. Royal Caribbean Cruises, Ltd.</u>, 312 F.Supp.2d 440 (S.D.N.Y. 2004).. . . . . . . . . . . 48

<u>In re Dell, Inc. Securities Litigation</u>, No.06-726, 2010 WL 2371834,
    2010 U.S. Dist. LEXIS 58281 (W.D. Tex. June 11, 2010),
    <i>aff'd,</i> <u>Union Asset v. Dell</u>, 669 F.3d 632 (5th Cir. 2012),
    <i>cert. denied</i>, No. 12-66 (Oct. 1, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

<u>Evon v. Law Offices of Sidney Mickell</u>, 688 F.3d 1015 (9th Cir. 2012).. . . . . . . . . . . . . . . . . . 29

<u>In re Flag Telecom Holdings Ltd. Sec. Litig.</u>, 574 F.3d 29 (2d Cir. 2009). . . . . . . . . . . . . . . . . 52

viii

Helmick v. Columbia Gas Transmission, No.07-743, 2010 WL 2671506,
       2010 U.S. Dist. LEXIS 65808 (S.D.W.Va. July 1, 2010). . . . . . . . . . . . . . . . . . . . . . . 48

In re Holocaust Victim Assets Litigation, No.96-4849, 2000 WL 33241660,
       2000 U.S. Dist. LEXIS 20817 (Nov. 22, 2000), aff'd, 413 F.3d 183 (2d Cir. 2005). . 29-30

In re Insurance Brokerage Antitrust Litigation, 579 F.3d 241 (3d Cir. 2009). . . . . . . . . . . . 30-31

Kay Co. v. Equitable Prod. Co., No.06-612, 2010 WL 1734869,
       2010 U.S. Dist. LEXIS 41892 (S.D.W.Va. April 28, 2010). . . . . . . . . . . . . . . . . . . . . . 48

In re K-Dur Antitrust Litig., 686 F.3d 197 (3d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 51-52

Lawnmower Engine Horsepower Mktg. & Sales Practices Lit., 733 F.Supp.2d 997
       (E.D.Wis. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Lazy Oil Co. v. Witco Corp., 166 F.3d 581 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Lemus v. H&R Block Enterprises, LLC, No.09-3179, 2012 WL 3638550,
       2012 U.S. Dist. LEXIS 119026 (N.D. Cal. Aug. 22, 2012). . . . . . . . . . . . . . . . . . . . . . . 30

In re Literary Works in Electronic Databases Copyright Litig., 654 F.3d 242 (2d Cir. 2011).  . . 52

Maher v. Zapata Corp., 714 F.2d 436 (5th Cir. 1983).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 56

Maywalt v. Parker & Parsley Petroleum Co., 864 F.Supp. 1422 (S.D.N.Y. 1994). . . . . . . . . . . 49

M.D. v. Perry, 675 F.3d 832 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

In re Metlife Demutualization Litig., 689 F.Supp.2d 297 (E.D.N.Y. 2010). . . . . . . . . . . . . . . . 35

In re Nassau County Strip Search Cases, 461 F.3d 219 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . 25

Newby v. Enron Corp., 2008 U.S. Dist. LEXIS 84656 (S.D.Tex. Sept. 8, 2008). . . . . . . . . . . . 35

In re OCA, Inc. Securities and Derivative Litigation, No.05-2165, 2008 WL 4681369,
       2008 U.S. Dist. LEXIS 84869 (E.D. La. Oct. 17, 2008), later proceeding,
       2009 WL 512081, 2009 U.S. Dist. LEXIS 19210 (E.D.La. March 2, 2009). . . . . . . . . . . 48

Perez v. First Am. Title Ins. Co., No. 08–1184, 2009 WL 2486003
       (D.Ariz. Aug. 12, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re Pet Foods Prod. Liab. Lit., 629 F.3d 333 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 48

Petrovic v. Amoco Oil Co., 200 F.3d 1140 (8th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . 50, 51

In re Processed Egg Products Antitrust Litigation, MDL No. 2002, 2012 WL 2885924,
        2012 U.S. Dist. LEXIS 98301 (E.D. Pa. July 16, 2012). . . . . . . . . . . . . . . . . . . . . . . 47

Sala v. National R.R. Passenger Corp., No.88-1572, 1988 WL 84125,
        1988 U.S. Dist. LEXIS 8753 (E.D. Pa. Aug. 4, 1988).. . . . . . . . . . . . . . . . . . . . . . . . 25

Seijas v. Republic of Argentina, 606 F.3d 53 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 25

In re Serzone Products Liability Litigation, 231 F.R.D. 221 (S.D.W.Va. 2005). . . . . . . . . . 31, 48

Shaw v. Toshiba Am. Info. Sys., No.99-120, 2000 U.S. Dist. LEXIS 3592 (E.D. Tex. 2000). . . 48

Slapikas v. First Am. Title Ins. Co., 250 F.R.D. 232 (W.D.Pa.2008). . . . . . . . . . . . . . . . . . . 29

Stearns v. Tickemaster Corp., 655 F.3d 1013 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 51

Sullivan v. D.B. Investments, Inc., 667 F.3d 273 (3d Cir. 2011),
        cert. denied, 132 S.Ct. 1876 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Thacker v. Chesapeake Appalachia, LLC, 695 F.Supp.2d 521 (E.D.Ky. 2010). . . . . . . . . . . . 35

Transamerican Refining Corp. v. Dravo Corp., 952 F.2d 898 (5th Cir. 1992). . . . . . . . . . . . 2, 8

Turner v. Murphy Oil U.S.A., Inc., 234 F.R.D. 597 (E.D. La. 2006). . . . . . . . . . . . . . . . . . . . 50

UAW v. GMC, 497 F.3d 615 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Union Asset Management Holding A.G. v. Dell, Inc., 669 F.3d 632 (5th Cir. 2012),
        cert. denied, No. 12-66 (Oct. 1, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 51

U.S. v. City of New York, No.07-2067, 2011 WL 2259640, 2011 U.S. Dist. LEXIS 60276
        (E.D.N.Y. June 6, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207 (D.N.J. 2005),
        aff'd, 618 F.3d 300 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 56

Veal v. Crown Auto Dealerships, Inc., No.04-323, 2007 WL 2700969,
        2007 U.S. Dist. LEXIS 68133 (M.D.Fla. Sept. 13, 2007) . . . . . . . . . . . . . . . . . . . . . . 50

In re Vioxx Prods. Liab. Litig., 388 F.App'x 391, 395 (5th Cir. 2010).. . . . . . . . . . . . . . . . . 2, 8

In re Visa Check-MasterMoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001). . . . . . . . . . . 29

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011). . . . . . . . . . . . . . . . . . . . . . . 25, 27, 28-29

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96 (2d Cir. 2005). . . . . . . . . . . . . . . . 42, 56

Young v. Nationwide Mutual Insurance Co., 693 F.3d 532 (6th Cir. 2012). . . . . . . . . . . . . . . 29

## Statutes

33 U.S.C. §2701(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

33 U.S.C. §2702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

33 U.S.C. §2703(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. §2704(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. §2704(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. §2713. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

33 U.S.C. §2717(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. §2717(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## Other Authorities

MANUAL FOR COMPLEX LITIGATION, FOURTH (Federal Judicial Center 2004) §21.642. . . . . . . . 49

NEWBERG ON CLASS ACTIONS (4th ed. 2002) §11:34. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

NEWBERG ON CLASS ACTIONS (4th ed. 2002) §11:37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

NEWBERG ON CLASS ACTIONS (4th ed. 2002) §11:41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

### The Number of Claims Submitted to the Settlement Program Thus Far Supports the Overall Fairness, Reasonableness and Adequacy of the Settlement to the Class

To date, over 80,000 claims have been submitted to the Court-Supervised Settlement Program. By contrast, less than 250 unique objections have been lodged – significantly less by actual Class Members who have standing.[3] Many of the Objectors are purportedly represented by six associated law firms who have also submitted over 1,500 claims into the allegedly "objectionable" Class Settlement Program. It is respectfully submitted that their actions speak louder than their words regarding the overall fairness and adequacy of the settlement.

### Many of the Objectors and Objections Support the Overall Fairness and Adequacy of The Settlement

Many of the "objections" to the settlement actually endorse some or all of the terms of the Settlement Agreement, arguing for *inclusion* in the Class Settlement or particular Frameworks. Many of the objecting attorneys, moreover, have, as noted, filed thousands of claims into the Settlement Program. Because each of the objectors was necessarily provided with notice and an opportunity to opt out, (but chose not to do so), he or she has implicitly conceded that the Proposed Class Settlement, if approved, would be adequate for them when compared to the prospects of continued litigation.

Many of the "Objections" to the Settlement have been lodged by Excluded People and Businesses who *Want* the Benefits of the Court-Supervised Settlement

It is well-settled that persons and entities who do not fall within the Class Definition are not parties to the Proposed Settlement, and therefore have no standing to object, as their rights and

---

[3]Attached hereto as Plaintiffs' Exhibit C is a summary of the filings docketed as "Objections" in No. 10-7777. Plaintiffs refer to these filings herein as "Objection No." with reference to the corresponding Document Reference Number within No. 10-7777.

interests remain unaffected.[4]   Objections to exclusion from the Settlement are nevertheless instructive, as each of these objectors has presumably determined that participating in the Settlement would be preferable to formal litigation.[5]   Hence, they demonstrate the fairness, reasonableness and adequacy of the Proposed Settlement to the Class.

Other objections by presumptive Class Members are similarly instructive because they belie the claims of other objectors.   For example, while a few objectors complain that the Seafood Program Frameworks are "inadequate",[6]  both charter boat operators and seafood processors point to the favorable commercial fishing RTPs.[7]   Similarly, while some objectors argue that the Seafood Fund itself is "insufficient",[8] others support the $2.3 billion fund as "enough to provide all fishermen both duration and parity."[9]

The Couhig Partners Objection endorses the Settlement Agreement, but simply desires to see the claims processed more swiftly.[10]   Barbara Adams "objects" that BP is paying too much to Class

---

[4]*See* ORDER (Aug. 3, 2012) [Doc 7038], p.1; *citing,* Transamerican Refining Corp. v. Dravo Corp., 952 F.2d 898, 900 (5th Cir. 1992); Agretti v. ANR Freight Sys., 982 F.2d 242, 246 (7th Cir. 1992); In re Vioxx Prods. Liab. Litig., 388 F. App'x 391, 395 (5th Cir. 2010).

[5]*See* OBJECTION NOS. 33, 34, 35, 36, 37, 42, 43, 46, 53, 55, 67, 70, 71, 87, 125, 127, 148, 152, 178, 191, 237, 242, 244, 253;  *see also,* OBJECTION NOS. 40, 88, 90, 95, 97, 98, 99, 121, 131, 134, 135, 154, 159, 177, 188, 252. *See also,* KLONOFF SUPPLEMENTAL REPORT, at ¶8 (noting a protest by excluded hotels and other small business owners who want to be included).

[6]*See, e.g.,* OBJECTION NOS. 104, 194, 195, 196.

[7]*See, e.g.,* OBJECTION NOS. 86, 139, 147, 232, and the "Form Letter" Objections filed by Charter Boat Operators (*see, e.g.,* OBJECTION NOS. 5, 6, 7).

[8]*See, e.g.,* OBJECTION NOS. 167, 189.

[9]GO FISH OBJECTION [No. 226], p.3; *see also,* MEMORANDUM IN RESPONSE TO STATE OF LOUISIANA (by Hai and Truong Plaintiffs) [Doc 7710] (and supporting Declarations submitted therewith).

[10]OBJECTION NO. 207.

Members.[11]   Halliburton similarly complains that the Proposed Settlement provides too much compensation to the members of the Settlement Class.[12]

The Attorneys who have filed Objections have also Submitted Thousands of Claims

At the outset of this litigation, a consortium of law firms filed a civil action for George Barisich and others affected by the spill.[13]  These lawyers – who each sought to be appointed to the Plaintiffs Steering Committee,[14] but were not selected – have filed a total of 23 Objections to the Economic and Medical Settlements.[15]   Yet they have also submitted almost 1,600 claims into the Proposed Class Settlement on behalf of over 1,300 clients.[16]

Similarly, Mr. Coon, who filed an Objection for ostensibly thousands of "objectors",[17] has also submitted 1,342 claims on behalf of 1,160 clients.   And Waltzer & Wiygul, who filed two different Objections,[18] has, to date, submitted 883 claims and registered 934 clients into the Program.

---

[11]OBJECTION NO. 243.

[12]HALLIBURTON OBJECTION [No. 91], pp.20-24.

[13]See Pleadings filed in Barisich v. BP plc, No.10-1316, listing Sher Garner, Krupnick Campbell, Jones Swanson, Smith Stag, Frederick Kuykendall, Blilek Law Firm and Liska Exnicios as counsel of record.

[14]See, e.g., MCKEE PSC APPLICATION [Doc 151]; SMITH PSC APPLICATION [Doc 319]; GARNER PSC APPLICATION [Doc 354]; SWANSON PSC APPLICATION [Doc 384]; KUYKENDALL PSC APPLICATION [Doc 398]; STAG PSC APPLICATION [Doc 407].

[15]See OBJECTION NOS. 88, 95, 97, 98, 99, 100, 144, 146, 157, 159, 167, 177, 181, 185, 187, 189, 198, 202, 218, 219, 220, 221 and 222.

[16]Specifically, Krupnick Campbell has submitted over 671 claims on behalf of 569 clients. Smith Stag has submitted 76 claims on behalf of 62 clients. Sher Garner has submitted 334 claims on behalf of 81 clients. Jones Swanson has submitted 56 claims on behalf of 19 clients.  Mr. Kuykendall and his co-counsel, Farrell & Patel, have submitted over 439 claims and registered over 600 clients.

[17]See OBJECTION NO. 122.  Mr. Coon has submitted a list of 11,253 supposed "objectors".  It is understood and believed by Class Counsel, however, that a substantial number of these persons or entities may be located outside of the Gulf Coast Area and are not members of the proposed Settlement Class.

[18]See OBJECTION NOS. 225, 226.

Why would these attorneys encourage and assist so many clients to participate in a settlement which they truly believed to be "unfair" or "inadequate"? [19]

If, with respect to the objecting Class Members in particular, the Proposed Settlement were truly "unfair" or "inadequate" to them, why would they object, instead of Opting Out?

<u>As a Practical Matter, Anyone Who Has Lodged an Objection Has Implicitly Recognized the Proposed Settlement as More Favorable than Continued Litigation</u>

As established in the Settling Parties' initial filings, the Class Notice program was comprehensive and robust.[20] Hence, absent Class Members are presumed to be aware of the choices available to them.

Certainly, however, any Class Member who has submitted a formal Objection to the Proposed Settlement has actual knowledge of the Settlement Agreement, and the options available to that person or business entity.

In each case, rather than Opting Out of the Settlement Class, and pursuing his or her claims on an individual basis, the Objector has chosen instead to remain in the Class, even while objecting. In each case, therefore, it can be argued that the Objector has at least tacitly conceded that, in weighing the alternatives, this Proposed Settlement – as presented – would be more favorable than the prospects of individual litigation.

---

[19] *See, e.g.,* Linhardt, "Revenue Losses Due to Oil Spill Estimated at $650k" <u>Citizen</u> (Sept. 26, 2012) (Krupnick Campbell promoting resolution of Key West claims through Settlement Program).

[20] *See* FINAL APPROVAL BRIEF [Doc 7104], at pp.20-25; AZARI DECLARATION [Doc 7110-1].

## THE *AMICUS* FILINGS DO NOT CALL INTO QUESTION
## THE ADEQUACY OR PROPRIETY OF THE SETTLEMENT

Several third parties who do not have standing to object to the Proposed Settlement have nevertheless submitted "Objections" or "Responses" or "*Amicus*" briefs.  Though apparently motivated by different considerations, none of these filings credibly call into question the adequacy or propriety of the Proposed Settlement.

Neither the United States nor the State of Alabama Object to the Settlement [21]

Both the United States and the State of Alabama expressly state, at the outset, that they make no comment on the fairness of the Settlements, nor object to their approval.[22]  They simply urge the Court to avoid making factual findings regarding BP's liability (or lack thereof) as a basis for approving the Settlement.

The PSC has always steadfastly asserted that BP is liable for gross negligence – and fully intends to prove same at the trial set to commence on January 14, 2013.  Indeed, (despite the somewhat misleading inferences which might be drawn from the State of Louisiana and other filings), Class Counsel never took the position that the factual evidence – developed largely by the PSC – would be insufficient to establish gross negligence, and do not seek to justify approval of the settlement on the grounds that it cannot be shown.  To the contrary, Class Counsel expressly stated in its Final Approval Brief that:

> Plaintiffs certainly believe that their claims against the BP Defendants are strong.  BP, as the "Responsible Party" is strictly liable for damages

---

[21] *See, e.g.,* RESPONSE TO BP MOTION FOR APPROVAL FILED BY THE UNITED STATES [Objection No. 215]; STATE OF ALABAMA RESPONSE TO BP MOTION FOR APPROVAL [Objection No. 211]; *see also,* OBJECTION NOS. 164, 187, 218, 219, 220, 221 and 222.

[22] *See* UNITED STATES FILING [No. 215], at p.1; ALABAMA FILING [No. 211], at p.1.

recoverable under OPA, and the plaintiffs certainly believe that BP is liable for negligence, if not gross negligence, under general maritime law. The effects of the spill, moreover, on the Gulf Coast region from an environmental and economic standpoint have been well-documented and profound.[23]

*However*:

> There are over 130,000 claims which have been filed in the MDL. The mere Court time that would be necessary to try the individual damage issues alone would be quite substantial.
>
> Moreover, from a causation standpoint, the long-term effects of the spill are still uncertain, and are confounded with other environmental, ecological, social, political and economic risks and factors. To develop *Daubert*-compliant expert testimony (and the associated research, reliance materials, motion practice and discovery) with respect to the scope and extent of environmental and/or economic damages caused and/or likely to be caused in the future as a result of the spill is a time-consuming and expensive (if not potentially risky) prospect.
>
> While much of this evidence can be established on a common and class-wide basis, each plaintiff would likely face a significant burden (if not litigation risk) in proving causation and damages specific to his or her individual claim.[24]

None of this is remotely refuted, or even addressed, in any of the Objections.  Indeed, several of the Objectors expressly acknowledge and agree that:

> Because of the extraordinarily large number of claims which have been filed in this matter, their diversity of form and substance, and the fact that they are not susceptible to being tried in any way other than individually or in small groups, the cases which are not settled pursuant to any proposed settlement will represent an enormous burden on the Court and, more importantly, will create a backlog so deep that it could be many years, if not decades, before all of the cases could be tried.[25]

---

[23] CLASS COUNSEL FINAL SETTLEMENT APPROVAL BRIEF [Doc 7104], p.29.

[24] APPROVAL BRIEF, p.30.  *See also,* APPROVAL BRIEF, pp.30-37.

[25] OBJECTION NO. 95, at p.3; OBJECTION NO. 167, at p.3; OBJECTION NO. 189, at p.3.

The Proposed Settlement does not afford BP a "discount" based on the notion that BP might not be found responsible, or even grossly negligent.  Indeed, the Proposed Settlement does not afford BP any "discount" at all.[26]

At the same time, it must be acknowledged that, even if one assumes that BP will be found guilty of gross negligence, there are numerous legal, factual and Constitutional questions that would surround the application and extent of any punitive damage award or awards to the Class Members' individual claims, and no one can deny that these could take decades to resolve conclusively through litigation.[27]

Class Counsel respectfully suggest that the Court should consider the delays, uncertainties and risks that are posed by continued litigation when evaluating the overall fairness and adequacy of the Proposed Settlement to the members of the Settlement Class.[28]

---

[26]See APPROVAL BRIEF, pp.34-35.

[27]See APPROVAL BRIEF, pp.30-33.  (It could be additionally noted, along the lines, that the objectors largely ignore the potential value of the assignment of BP's third-party claims to the Economic & Property Damages Class, as well as the express reservation of punitive damage claims against Transocean and Halliburton.)

[28]Indeed, the long-established and prevailing law on settlement evaluation calls for just such considerations. Union Asset Management Holding A.G. v. Dell, Inc., 669 F.3d 632, 639 n.11 (5th Cir. 2012), *cert. denied*, No. 12-66 (Oct. 1, 2012); *citing,* Reed v. General Motors Corp., 703 F.2d 170, 172 (5th Cir. 1983).

<u>The Halliburton Filing</u> [29]

Halliburton lacks standing to object, and raises questions that speak not to the fairness or propriety of the Proposed Settlement, but rather to the merits of the Class' assigned claim and/or the Class Members' reserved claims to be litigated in the future against Halliburton.[30]

The filing is notable, nevertheless, because it supports the fairness, reasonableness and adequacy of the Proposed Settlement by advancing the proposition that BP is paying *too much* to the members of the Settlement Class.[31]

<u>The Go Fish Filing</u> [32]

First, it is questionable that Go Fish has standing to object.[33]  "Go Fish" is not a Class Member.[34]   The Preliminary Approval Order, the formal Notice, and class action principles generally require an objection to be lodged by a member of the relevant class.[35]

Second, Go Fish maintains that "2.3 billion dollars … should be enough to provide all fishermen both duration and parity"[36] and the alleged "problems" can be solved within the confines

---

[29]Docketed as Objection No. 91.

[30]*See generally* Letter Brief in Response to Halliburton and State of Louisiana Requests for Discovery [Doc 7032]; *see also,* Preliminary Approval Order [Doc 6418], at pp.16-17 and fn.18; Order (Aug. 3, 2012) [Doc 7038], at pp.1-2.

[31]Halliburton Objection [No. 91], pp.20-24.

[32]Docketed as Objection No. 226.

[33]*See* Order (Sept. 25, 2012) [Doc 7480], at pp.7-9 (denying Go Fish's Motion to Intervene due to lack of standing); *see also, generally,* Opposition to Go Fish Motion to Intervene [Doc 7648].

[34]*See* Go Fish Memo in Support of Mot to Intervene [Doc 7314-1], pp.1 and 4-7.

[35]*See* Preliminary Approval Order [Doc 6418], p.39 ¶38; *and* Order (Aug. 3, 2012) [Doc 7038], p.1; *citing,* <u>Transamerican Refining Corp. v. Dravo Corp.</u>, 952 F.2d 898, 900 (5th Cir. 1992); <u>Agretti v. ANR Freight Sys.</u>, 982 F.2d 242, 246 (7th Cir. 1992); <u>In re Vioxx Prods. Liab. Litig.</u>, 388 F. App'x 391, 395 (5th Cir. 2010); *see also,* Order (Sept. 25, 2012) [Doc 7480], at pp.7-9 (denying Go Fish's Motion to Intervene due to lack of standing).

[36]Go Fish Objection [No. 226], p.3.

of the Settlement's terms by determining a fair "Round Two" distribution from the Seafood Fund.[37]

Therefore, because "the Settlement was amended to allow the Court appointed neutral to change the

allocation formulas to attain fairness on the second distribution of SCP funds,"[38]  Go Fish is not

actually objecting to the Settlement Agreement; rather, it is expressing the fear that the Court-

Appointed Neutral might make a Round Two allocation different from what some – but not other

– Go Fish members might want or desire.

In this regard, Go Fish's Objection and the Declarations filed in support thereof illustrate why

formal sub-classing would not have been an effective structural protection under these

circumstances, as both the lawyers and the plaintiffs involved participated in (or represent clients

who have participated in) multiple and overlapping aspects of the commercial fishing industry.[39]

With respect to the substance of the Go Fish objection, Go Fish expresses several concerns

which are based upon a mis-reading or mis-understanding of the terms of the Seafood Compensation

Program:

1.     **Go Fish incorrectly assumes that the Seafood Program models do not account for numerous acres held by "private" oyster leaseholder claimants.** Under the Seafood Compensation Program, an oyster leaseholder is required to have a valid lease.[40]  In Louisiana, this means that you have to have a lease that is *registered* with

---

[37]GO FISH OBJECTION, pp.2-3.

[38]GO FISH OBJECTION, p.3.

[39]*See* WALTZER DECLARATION [No. 226-1], pp.2-3 ("Because I had so many clients from many fisheries, I sat in almost all of the different group meetings"); PHILLIPS DECLARATION [No. 226-1], p.29 ("I shrimp, crab and harvest oysters…. I am also an oyster leaseholder"); DANDAR DECLARATION [No. 226-1], p.33 ("I am a shrimper, crabber and oyster harvester"); ENCLADE DECLARATION [No. 226-1], pp.22-23 (personally delivers shrimp, oysters and fish; describes how Go Fish, as an organization, "represents" a broad range of commercial fishing interests); NGUYEN DECLARATION [No. 226-1], p.9 (both crabs and shrimps); *see also* GUIDRY DECLARATION [No. 226-1], pp.5-7 (while currently a shrimper, notes that he was previously a fin fisherman, and appears to be advocating for charter boat operators and processors, whose claims do not even fall within the Seafood Program).

[40]SETTLEMENT AGREEMENT, Exhibit 10, Oyster Compensation Plan, General Provision No.6, at p.26.

the Department of Wildlife and Fisheries – irrespective of whether you are leasing from "public" or "private" landowners.[41]  All eligible (*i.e.* registered) leases were accounted for in the original Seafood Program models.

2.    **Go Fish incorrectly assumes that a "Round Two" *pro rata* distribution will be taken from post-set-off determinations.**  Go Fish suggests that a *pro rata* "Round Two" allocation will be unfairly skewed due to previous payments to some Class Members, but not others, by the GCCF.  As expressly stated in the Settlement Agreement, the Round Two allocation will be made from pre-set-off determinations: "The balance will be distributed to each Claimant in proportion to the Claimant's *gross* compensation" which "reflects compensation paid by the Claims Administrator *prior to* the deduction of Seafood Spill-Related Payments."[42]

3.    **Go Fish incorrectly assumes that the initial Frameworks and/or any Round Two distribution was and/or will be divided by industry.**  The Seafood Compensation Program Frameworks, while informed by the nature and conditions of the relative species, were *not* designed to deliver a certain amount of total compensation to a particular industry, *vis-a-viz* the other industries, (*i.e.,* to Shrimpers collectively, versus Oyster Harvesters collectively, versus Fin Fishermen collectively).  Rather, the frameworks were designed by the Court-Appointed Neutral, from the bottom up, to provide full compensation to *each* Class Member participating in the Seafood Compensation Program.[43]

4.    **Go Fish incorrectly assumes that the Court-Appointed Neutral will not consult with constituencies or obtain other relevant information and data before coming to a final decision as to any Round Two allocation.**  Before there is a distribution of any reserve in the Seafood Fund, the Court-Appointed Neutral will solicit information from Seafood Program participants,[44] and the Parties will provide formal notice and an opportunity for each participant (or his counsel) to provide input, prior to final approval by the Court.

---

[41] *See* FAQ No. 167 (www.deepwaterhorizonsettlements.com) (posted at: https://cert.gardencity group.com/dwh/fs/faq?.delloginType=faqs) (Oct. 17, 2012).

[42] SETTLEMENT AGREEMENT, Exhibit 10, General Framework and Overview, at p.3, (emphasis supplied).

[43] *See* SECOND PERRY DECLARATION, at p.2; SECOND BALHOFF DECLARATION, at p.2.

[44] *See* SECOND PERRY DECLARATION, at p.3; SECOND BALHOFF DECLARATION, at p.3.

Finally, it is important to recognize that Mr. Perry did _not_ serve as a "mediator" to a "negotiation" among PSC members who "represented" different interests in coming to a final agreement on the Seafood Program Frameworks with BP.   Rather, it was Mr. Perry, as the Court-appointed neutral, who, with the assistance of Mr. Balhoff, looked at all of the available data; reviewed all of the available evidence; listened to the viewpoints of various constituencies, (including Go Fish members); and made his own independent, un-biased, un-conflicted determination as to a fair and appropriate allocation.[45]

The Louisiana Attorney General _Amicus_ Brief [46]

The filings submitted by counsel for the Louisiana Attorney General are somewhat incomprehensible.  Putting aside for a moment the interests of Louisiana families and businesses who were not fully compensated by the GCCF and now stand to gain hundreds of millions if not billions from the Proposed Settlement, certainly the State itself will be a direct beneficiary of the Settlement in the form of income taxes paid on settlement proceeds, as well as an indirect beneficiary in the form of sales tax and other derivative revenues generated by Class Members.  The State also stands to benefit directly and/or indirectly from the $57 Million Gulf Tourism and Seafood Promotional Fund, (as well as the Medical Settlement's $105 million community-based health

---

[45]_See_ PERRY DECLARATION [Doc 7110-5]; BALHOFF DECLARATION [Doc 7110-2]; HERMAN DECLARATION [Doc 7104-5], at ¶11; RICE DECLARATION (Seafood Program) [Doc 7104-6, at pp.13-18]; _see also, e.g.,_ LETTER FROM HERMAN TO GUIDRY (July 7, 2012) [Doc 7417-1].

[46]Docketed as OBJECTION NO. 227; (_see also_ OBJECTION NO. 228).

service grants to LSU Medical Center, among others).[47]   Indeed, the State of Louisiana has

submitted 28 applications for a total of over $6.5 million in grants from the Promotional Fund.  It

is somewhat curious that the Attorney General and his private outside counsel have taken a stand

against an agreement that provides the State and its citizens with such enormous benefits and relief.

The Attorney General, of course, has no standing to formally object to the Settlement.[48]

Because, however, several Objectors have boot-strapped some of their arguments on the

Attorney General's back, Class Counsel would respectfully point to at least some of the unsupported

contentions and other fallacies contained within the Louisiana *Amicus* Brief.[49]  Just taking a few

examples:

- In discussing BP's (alleged) "unlimited" liability under OPA for future
  damages,[50] the Louisiana AG completely ignores the three-year OPA statute
  of limitations, which is extended for Class Members by the Settlement for at
  least an additional year.[51]

- Complaining that no interim payments are provided under the Court-
  Supervised Settlement Program,[52] the Louisiana AG completely disregards

---

[47]Specifically, the Louisiana State University Health and Sciences Center stands to receive
$14,400,000.  In addition, the Tulane School of Public Health and Tropical Medicine stands to receive
$15,000,000.

[48]*See* Letter Brief in Response to Halliburton and State of Louisiana Requests for
Discovery [Doc 7032]; Order (Aug. 3, 2012) [Doc 7038], at pp.1-2; *see also,* Preliminary Approval
Order [Doc 6418], at pp.16-17.

[49]*See generally* Letter Brief in Response to Requests for Class Settlement Related
Discovery (Sept. 14, 2012) [Doc 7417]; *see also* Order (Sept, 25, 2012) [Doc 7480].

[50]Louisiana *Amicus* Brief [No. 227], at pp.20-22.

[51]Settlement Agreement, §§4.4.8 and 5.11.8.  The AG also ignores OPA's Presentment
requirements, which are also resolved by the Settlement on behalf of Class Members. Settlement
Agreement, §§4.2.5 and 7.3.2; and Stipulation [Doc 7130-1].

[52]Louisiana *Amicus* [No. 226], at p.22.

the fact that BP simultaneously established a separate OPA Claims Process to satisfy its continuing obligations under the Oil Pollution Act.[53, 54]

- Contrary to the Louisiana AG's suggestion, the Seafood Program Opt-Out provisions, which have been available to the public for months on www. deepwaterhorizon_settlements.com, protect settling Class Members who participate in the Seafood Program from any potential reduction in their recoveries in the event of opt outs;[55] indeed, in the event of opt outs, participating Class Members stand to recover even more out of the Seafood Fund.

- Putting forth the somewhat absurd notion that there is "reason to question whether the negotiations between the parties truly occurred at arms' length,"[56] the Louisiana AG naively disregards that Plaintiffs will face the *litigation risk* posed by BP's evidence on scientific, environmental and economic issues, even though there will certainly be contrary evidence available to them.

- As discussed more fully *infra,* the Louisiana AG, though referring to the proposed Settlement as a "rebranded" GCCF,[57] makes absolutely no attempt to rebut the specific ways in which the Court-Supervised Settlement Program is a fundamentally different and vastly improved program, as set forth in the Final Approval Brief.[58]

---

[53]The AG also ignores the fact that, by and large, the GCCF generally wasn't providing interim payments anyway. *See, e.g.,* PLAINTIFFS' SUPPLEMENTAL MEMO CONCERNING BP'S FAILURE TO COMPLY WITH THE MANDATES OF OPA [Doc 1318], PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF COURT SUPERVISION OVER THE BP INTERIM CLAIMS PROCESS [Doc 3423] *and* STATE OF LOUISIANA MEMORANDUM IN RESPONSE TO JUDGE BARBIER'S FEBRUARY 2, 2011 ORDER [Doc 1308] (cited in the AG's *amicus* filing at p.23 fn.51); *see also,* MISSISSIPPI STATEMENT OF INTEREST [Doc 6356-3], at p.15 ("BP through the GCCF, essentially stopped processing or paying interim claims from individuals and businesses suffering OPA damages on November 23, 2010").

[54]The Louisiana AG's filing actually notes this at Page 23, but completely disregards its significance. If you want to collect interim payments, you can presumably go to the BP OPA Process until April 2013, and then you still have at least a year to file in the Court-Supervised Settlement Program.

[55]*See* FAQ No. 163 (posted at: https://cert.gardencitygroup.com/dwh/fs/faq?.delloginType=faqs) (Oct. 19, 2012), (and linked to additional information at: Seafood_Opt-Out_Terms[1].pdf (Oct. 19, 2012)).

[56]LOUISIANA *AMICUS,* p.6. ***But see***: ORDER (Sept. 25, 2012) [Doc 7480], p.7 ("The Settlement Agreement is the Product of Arms-Length Negotiations").

[57]LOUISIANA *AMICUS*, p.22.

[58]*See* FINAL APPROVAL BRIEF, pp.48-49. Indeed, and as addressed more fully *infra,* the State of Louisiana's apparent support for the GCCF is contrary to the substance of several other Objections; pleadings filed by private plaintiffs;  Statements of Interests previously filed by the States of Alabama, Mississippi and Florida;  and even previous pleadings filed by the Louisiana AG.

Page 13

Most strikingly, the Louisiana AG appears to have given little or no thought to where the citizens and taxpayers of the State of Louisiana would be if the Proposed Settlement is rejected. Under the Settlement, the businesses and families of Louisiana will generally be able to submit claims to the Court-Supervised Settlement Program through at least April 22, 2014.  If, on the other hand, the AG gets his way, and the Settlement is thrown out, anyone who has not both presented and filed his claim by April 20, 2013 could be left completely out in the cold with no remedy.

### THE COURT-SUPERVISED SETTLEMENT PROGRAM IS SUPERIOR TO THE GCCF

Class Counsel initially note that there is nothing in Rule 23 which points to anything like the Gulf Coast Claims Facility as a mandatory benchmark for evaluating the fairness, reasonableness or adequacy of a Class Settlement.  Not only is the statutory OPA structure somewhat unique, but the GCCF was a unique and solitary mechanism for an OPA Responsible Party to attempt to comply with the statutory dictates of the Oil Pollution Act.  Indeed, many Plaintiffs and the States complained that various aspects of the GCCF did not comply with the statutory requirements of OPA.  The BP Defendants, moreover, were only required to maintain the GCCF or other OPA claims facility for three years.  To the extent claims remained unresolved, there was no independent enforcement mechanism to ensure that the GCCF would actually comply with its own stated policies or the requirements of the Act.  In these ways, any court-supervised class settlement generally, and the Proposed Court-Supervised Settlement Program in particular, would be fundamentally different from the unilateral, unregulated and inherently limited BP Gulf Coast Claims Facility.

Nevertheless, a comparison of the Court-Supervised Settlement Program to the previous Gulf Coast Claims Facility was inevitable, and, for both substantive and procedural reasons, the Proposed Settlement is vastly superior.

Advantages of the Proposed Settlement Unrefuted by Objectors

As set forth in Plaintiffs' Final Approval Brief, the Proposed Settlement:

- Provides the class members with more flexible Benchmark Periods from which to establish loss and, where necessary, causation.[59]

- Replaces a vague baseline "loss of income" (LOI) determination with concrete and objective methods to establish base compensation loss, under a two-step process that accounts for both (i) losses, as compared to benchmark earnings periods, and (ii) the difference between 2010 profit and what the business would have earned but for the spill.

- Identifies specific "fixed" versus "variable" costs to be applied in the compensation calculations.

- Allows for causation presumptions based on industry and location, and, with respect to other class members, provides various alternative methods of establishing, by objective means, that the business or individual suffered a loss caused by the spill.[60]

- Compensates class members for Coastal and Wetlands Property Damages, VoO Charter Compensation, Real Estate Sales Losses, and other damages which were not being compensated by GCCF.[61]

_____

[59]In particular, the GCCF generally used 2008-2009 as a benchmark. *See generally,* PLAINTIFFS' EXHIBIT B [Doc 7104-2]. Under the Settlement Program, by contrast, class members can generally go back to 2007. In addition, class members have the flexibility to use different sets of benchmark months to establish Causation versus the months they use to establish the amount of Base Compensation Loss sustained.

[60]To be fair, the GCCF did claim to apply a limited and somewhat subjective "presumption" of loss due to the spill where the claimant's business was "heavily dependent on Gulf resources and tourism and located in **the immediate vicinity of the Gulf shore**." *See* GCCF METHODOLOGIES [Exhibit B] [Doc 7104-2], at p.8, (emphasis in original).

[61]Class Counsel are advised that some property damages claims may have been recognized by the GCCF, but these claims were certainly not paid by the GCCF in a routine or systematic way.

- Includes RTP enhancements that are in virtually all cases equal to or greater than the "multipliers" under the GCCF stated methodology.[62]

- Guarantees of independence, transparency, Court supervision, and no "special deals".

APPROVAL BRIEF, pp.48-49. These points – which are apparent from the face of the Settlement Agreement as compared to the GCCF stated methodologies – were not refuted by a single objector.[63]

Extension of the Time Periods for Presentment and Filing

A claim under the Oil Pollution Act of 1990 must generally be both presented and filed within three years. 33 U.S.C. §§ 2713 and 2717(f).[64]  While Plaintiffs will undoubtedly have various arguments based upon tolling theories, dates of accrual, and/or the discovery rule, prudence would dictate that all OPA claims would need to be both presented and filed by April 20, 2013.

While the GCCF announced that it would accept claims up until August 23, 2013, there was no enforcement mechanism to ensure that the GCCF would continue to do so.[65]  Nor were there any assurances that the submission of a claim – even before April 20, 2013, much less after – would

---

[62]In general, the GCCF claimed that it was applying a multiplier of two (*i.e.* an RTP of 1) to most claims. At some point, the GCCF announced that it would apply a multiplier of four (*i.e.* an RTP of 3) to shrimper, crabber and shrimp and crab processing claims. A multiplier of four (*i.e.* an RTP of 3) was generally applied to oyster harvesters, while at some point a Future Risk Multiple raging from 1 to 7 was to applied to oyster leaseholder income claims. *See generally,* PLAINTIFFS' EXHIBIT B [Doc 7104-2]. (*Compare with*: RTP CHART [Exhibit 15], *and* SEAFOOD COMPENSATION PROGRAM [Exhibit 10], at pp.24, 30, 33, 34, 36, 38, 49, 61, 63.)

[63]*See also, e.g.,* DECLARATION OF JEFFREY JUNE [Doc 7710-2], ¶31 ("the settlement provides substantially more compensation to commercial shrimpers than the GCCF offered, even after the GCCF increased its amounts"); DECLARATION OF ROBERT MOSHER [Doc 7710-3], ¶21 ("the historical revenue model is a substantial improvement over the GCCF model").

[64]*See also,* 33 U.S.C. §2717(h) (three-year statute of limitations on claims for damages against the Oil Spill Liability Trust Fund).

[65]And, in fact, the GCCF is *not* continuing to accept claims.

constitute "Presentment" under OPA.[66] Nor that any GCCF claimant who was not fully compensated by the GCCF as of April 20, 2013 would thereafter be permitted to file his or her claim in a court of law (or with the Oil Spill Liability Trust Find) despite the three-year statute of limitations.

Indeed, there is little reason to believe that the tens of thousands of claims that remained unresolved after eighteen months in the GCCF (and/or were perhaps yet to be filed when the Transition Order was entered on March 2, 2012) would have been resolved in the GCCF prior to April 20, 2013 – if ever.

- As far back as April of 2011, the GCCF stated that it had paid or was in the process of paying "every single legitimate individual and business claim where the claimant can document economic loss due to the oil spill."[67]

- In June of 2011, Mr Feinberg said that the process was "winding down" as the GCCF had already processed 80% of the claims.[68]

  He further indicated that all of the claims that he considered to be "eligible" would be resolved by October 2011.[69]

---

[66]While BP formally stipulated that presentment to the GCCF would constitute presentment to BP as the Responsible Party, (*see* ORDER (Oct. 22, 2010) [Doc 594]), BP did not ever formally stipulate or concede that a claim submitted to the GCCF would, in fact, constitute "Presentment" under OPA. While the Plaintiffs' Steering Committee will certainly take the position that presentment in such cases has been satisfied, Class Counsel believe that BP will likely argue – and such plaintiffs remain at risk that the Court might agree – that some or all plaintiffs did not provide either a "sum certain" or what BP alleges to be "sufficient" documentation to substantiate the claim. *See* 33 U.S.C. §§ 2701(3) and 2713.

[67]*See* PLAINTIFFS EXHIBIT D (*in globo*) [Giardina, "Are Stall Tactics Delaying BP Payments?" WLOX.com (April 20, 2011)].

[68]PLAINTIFFS EXHIBIT D ["GCCF Claims Process Winding Down" Disenfranchised Citizen (June 1, 2011); *citing,* Blackden and Mason, "BP's Oil Victim Fund Closes Some Offices as it Pays Out Just a Fifth of the $20bn Total" Telegraph (May 29, 2011) (Feinberg "told *The Telegraph* that he does not believe there will be many more fresh claims" and "has processed more than 80pc of the claims submitted"); *see also,* Mason, "BP Not Meeting Gulf of Mexico Spill Obligations, US Report Claims" Telegraph (June 2, 2011) ("Mr. Feinberg is in the process of scaling back operations, closing eight regional offices")].

[69]PLAINTIFFS EXHIBIT D [Hammer, "Claims Czar Kenneth Feinberg Says Pace of Payments Quickens" Times-Picayune (June 20, 2011)].

- As of November of 2011, the GCCF began to assume that claims from the Florida peninsula and Texas were not "legitimate" unless they were commercial fishing claims.[70]

- "The job was done" at the time of the Transition.[71]

Nevertheless, and in any event, the Proposed Settlement ensures that Class Members will be able to submit claims to the Court-Supervised Settlement Program until at least April 22, 2014 – or six months after final approval of the Class Settlement, after the exhaustion of any appeals.[72]   The Proposed Settlement further assures that submission of a claim to the Settlement Program will constitute "Presentment" under the Oil Pollution Act.[73]  (BP further stipulates as part of the Proposed Settlement that any Class Member who had received a Final Offer from the GCCF and chooses to Opt Out of the class will be deemed to have satisfied OPA presentment.[74])  Finally, the Proposed Class Settlement tolls the statute of limitations for Class Members until at least 90 days after the Settlement Agreement is terminated, should the Proposed Settlement not be approved by the Court or terminated for some other reason.[75]

---

[70]PLAINTIFFS EXHIBIT D [Hammer, "Ken Feinberg Expands Oil Spill Claims Payments for Shrimpers, Crabbers" Times-Picayune (Nov. 30, 2011); *see also* GCCF METHODOLOGIES [Plaintiffs' Exhibit B] [Doc 7104-2], at pp.24-25 (establishing new criteria for Florida peninsula and Texas claimants).

[71]PLAINTIFFS EXHIBIT D [Shactman, "Managing the BP Oil Spill Fund - No Small Task" CNBC (April 19, 2012)].

[72]SETTLEMENT AGREEMENT, §5.11.8.  The one exception to this is that all Seafood Program claims must be submitted within 30 days of final approval in the District Court. (*See* SETTLEMENT AGREEMENT, §5.11.9.)

[73]SETTLEMENT AGREEMENT, §7.3.2; and STIPULATION [Doc 7130-1].

[74]SETTLEMENT AGREEMENT, §4.2.5.

[75]SETTLEMENT AGREEMENT, §7.3.1.

<u>Arguments for Inclusion of People and Businesses who Settled with the GCCF Support the Class Settlement as More Favorable</u>

Even before preliminary approval, the State of Mississippi filed a Statement of Interest suggesting that the Proposed Settlement should be amended to include people who has signed GCCF Releases.  According to the Mississippi Attorney General:

> The GCCF claims process was a confusing morass of ever-changing standards and procedures and, ultimately, it evolved into little more than a scheme to extract illegal, sweeping general Releases from claimants, through the use of economic duress and delay, often in exchange for inadequate consideration.[76]

The State of Mississippi argues, therefore, that anyone who signed a GCCF Release should be permitted to present their claims to the Court-Supervised Settlement Program.[77]

This sentiment has been repeated in numerous "Objections".[78]

The substance of these Objections[79] – and numerous previous filings by both private plaintiffs and the States[80] – point to the superiority of a Class Settlement with detailed and objective criteria

---

[76]MISSISSIPPI STATEMENT OF INTEREST [Doc 6356-3], at p.14.

[77]MISSISSIPPI STATEMENT OF INTEREST [Doc 6356-3], at pp.35-36.

[78]*See* OBJECTION NOS. 38, 70, 71, 125, 127, 154, 239, 242, 244; *see also,* MEMO IN SUPPORT OF MOTION TO NULLIFY GCCF RELEASES AND VACATE PRELIMINARY APPROVAL ORDER [Doc 7473-1].

[79]*See, e.g.,* SUPPLEMENTAL KLONOFF REPORT, ¶24; *citing,* OBJECTION NOS. 38, 50, 95, 97 and 125. *See also, e.g.,* OBJECTION NOS. 70, 71, 72, 127, 154, 239, 242, 244, 250; *see also,* MEMO IN SUPPORT OF MOTION TO NULLIFY GCCF RELEASES AND VACATE PRELIMINARY APPROVAL ORDER [Doc 7473-1]; DECLARATIONS OF JOEL WALTZER, CLINT GUIDRY and PHOUNG NGUYEN [No.10-7777, Doc 226-1, at pp.1, 7, 10] (GCCF "starved everybody out", didn't make interim payments, obtained releases under duress, and "supplied no relief").

[80]*See, e.g.,* MOTION TO SUPERVISE *EX PARTE* COMMUNICATIONS BETWEEN BP AND PUTATIVE CLASS MEMBERS [Doc 912]; ORDER AND REASONS (Feb. 2, 2011) [Doc 913]; STATE OF LOUISIANA'S MEMORANDUM IN RESPONSE TO JUDGE BARBIER'S FEBRUARY 2, 2011 ORDER [Doc 1308]; FLORIDA STATEMENT OF INTEREST [Doc 1312]; PLAINTIFFS' SUPPLEMENTAL MEMO CONCERNING BP'S FAILURE TO COMPLY WITH THE MANDATES OF OPA [Doc 1318]; BRIEF OF STATE OF ALABAMA RE GULF COAST CLAIMS FACILITY [Doc 1324]; STATE OF MISSISSIPPI MEMO RE GCCF'S FAILURE TO COMPLY WITH OPA [Doc 1327]; STATE OF MISSISSIPPI SUPPLEMENTAL NOTICE OF CONTINUED OPA VIOLATIONS [Doc 1894]; PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF COURT SUPERVISION OVER THE BP INTERIM CLAIMS PROCESS [Doc 3423].  *See also* PLAINTIFFS EXHIBIT D (*in globo*) (which includes various reports of complaints and criticisms of the GCCF).

that are applied in a uniform and consistent way, by an independent administrator, subject to the supervision and enforcement of the Court.

Moreover, it is clear that the substantive benefits provided under the Proposed Settlement will be more favorable to Class Members than to at least many of the people and businesses who resolved their claims in the GCCF.

Claims About the Alleged "Superiority" of GCCF Methodologies Are Unreliable and Unsupported

A few of the objections contend that the GCCF was more favorable to some people or businesses than the Class Settlement.  These comparisons invariably rest on either: **(a)** claims about what the GCCF allegedly did – or was going to do, or had promised to do – that are not supported by the actual GCCF stated methodologies; or **(b)** assumptions that the GCCF hypothetically would have applied its stated methodologies to claims that had not already been resolved in the GCCF as of February 26, 2012.  These unsupported contentions raise of number of questions, including, for example:

- Why the objectors' claims were not satisfied in the manner they contend the GCCF was evaluating and paying claims during the eighteen months that the GCCF was open?

- Whether the contentions by these objectors and their attorneys or accountants merely reflect preliminary discussions with GCCF representatives, and not firm policy changes or commitments to pay?

- Whether these attorneys or accountants merely pretended that they were getting "special deals" from the GCCF in order to solicit more clients?

- Whether the claims that these objectors contend would have been treated more favorably under the GCCF methodology would have been recognized as "eligible" or "legitimate" by the GCCF?

- Didn't the GCCF – (as outlined *supra*) – indicate that it was essentially finished recognizing and paying the claims that it deemed to be "eligible" and "legitimate" at the time of the Transition Order?[81]

- Is the nature and location of the business that an objector claims would have been treated more favorably under the GCCF's stated methodology the type of business or location to which the GCCF had actually made full and final offers under its stated methodologies?

- And, if so, why had the claim not already been paid?

In particular, the American Shrimp Processors Association, which has no standing to object to the Settlement, submitted an *amicus* brief in which it contends that processors would have been treated more favorably by the GCCF, which had (allegedly) "adopted a production/volume based formula."[82]  Yet nowhere in the GCCF stated methodology is there any reference or support for a "production/volume based formula" for shrimp processors or any other claimants.[83]  So was this a "special deal"?  Or a misunderstanding?  Or an advertisement by a lawyer to advance his own agenda?   In either event, there is no evidentiary basis or other support for the conclusion, even with respect to this limited or narrow group of Class Members, that the GCCF was in any way "superior" to the Proposed Settlement.

Similarly, the Daniel Culmo Objectors contend that a number of individuals who "were in the process of or had the intent to make a claim under the GCCF rules when the settlement occurred" would have had a more valuable claim under the GCCF "rules" than the Proposed Settlement.[84]  However, the objectors submitted absolutely no evidence to support this.  There is no way to know

---

[81]*See* PLAINTIFFS EXHIBIT D (*in globo*).

[82]ASPA *AMICUS* [Objection No. 147], at p.5.

[83]*See* GCCF METHODOLOGIES [Plaintiffs' Exhibit B (*in globo*)] [Doc 7104-2].

[84]OBJECTION NO. 155.

what type of claimants these are, what types of businesses or properties or jobs they have, where they are located, what RTP would apply, etc.  Moreover, the specific "rules" that are cited by these objectors are unsupported by the GCCF stated methodologies.  Specifically, the GCCF stated methodology, as of November 30, 2011, indicates that GCCF will use "the average of the annual incomes for 2008, 2009 and 2010" as the "Comparison Year" benchmark[85] – _not,_ as the objectors contend, a comparison of 2008 to 2010.   Similarly, the contention that the Proposed Settlement "does not have a 2010 projected income formula" is completely belied by the entire "Step Two" standard Business Economic Loss Claim formula,[86] as well as the Start-Up Framework, which expressly allows the Class Member to use projections.[87]

Finally, the Prashiela Objectors make numerous assertions about the GCCF claims process that are allegedly more favorable than the Proposed Settlement Frameworks.[88]  Their written objection is ostensibly supported by the declaration of a CPA based on his experience negotiating with the GCCF.[89]  Yet, notably, neither the written objection nor the Dougherty Declaration cite formal stated GCCF methodologies;  rather, they rely largely on what, in Mr. Dougherty's anecdotal experience, GCCF allegedly "did" or "accepted".   At the end of the day, the Prashiela's attorneys purport to have at least 795 clients whose claims were not successfully resolved in the GCCF as of February 26, 2012.  If the GCCF was as fair, consistent, fast and easy as Mr. Dougherty claims it was: How come?

---

[85] GCCF METHODOLOGIES, at pp.25-26.

[86] _See_ SETTLEMENT AGREEMENT, Exhibit 4C.

[87] _See_ SETTLEMENT AGREEMENT, Exhibit 7, Section IV(A)(1)(b).

[88] _See_ OBJECTION NO. 198, at pp.20-21.

[89] _See_ DOUGHERTY DECLARATION [No.10-7777, Doc 198-7].

The Prashiela Objectors, at the same time, make incorrect assertions about the Proposed Settlement.  For example, they complain that the Settlement Agreement does not provide for the submission of annual or quarterly profit and loss reports to establish monthly costs and revenue during the Benchmark and Compensation periods.[90]   However, drawing from the Settlement's allowance for "alternate source documents"[91] (as well as the definition of "contemporaneous"[92]), the Claims Administrator has confirmed that the Program will process and evaluate a small business claim based on bank statements or other underlying data where monthly P&Ls were not prepared in the ordinary course of business.  Hence, there is no requirement for the small business owner to engage in a process that is "overly burdensome and cost prohibitive"[93] in order to submit their claim; rather, the *burden is on the Program* to undertake the accounting work,[94] at BP's expense.[95]

### THE ECONOMIC AND PROPERTY DAMAGES CLASS MEETS THE APPLICABLE CLASS CERTIFICATION CRITERIA UNDER RULE 23

The Proposed Settlement Class's satisfaction of the certification requirements set forth in Federal Rule 23 was addressed in the plaintiffs' opening brief in support of final approval,[96] and the Declarations of Professor Klonoff, Professor Issacharoff and Professor Coffee,[97] and is further

---

[90]*See* OBJECTION NO. 198, at pp.41-42; DOUGHERTY DECLARATION, ¶¶23-26.

[91]SETTLEMENT AGREEMENT, Exhibit 4A, Item 4.

[92]SETTLEMENT AGREEMENT, §38.38.

[93]OBJECTION NO. 198, at p.42.

[94]SETTLEMENT AGREEMENT, Sections 4.3.7 and 4.3.8.

[95]SETTLEMENT AGREEMENT, Section 5.12.1.4.

[96]*See generally,* FINAL APPROVAL BRIEF [Doc 7104], at pp.38-52; *see also,* pp.20-25 (sufficiency of notice under Rule 23 and the Due Process Clause).

[97]*See* KLONOFF DECLARATION [Doc 7104-3]; COFFEE DECLARATION [Doc 7110-3]; ISSACHAROFF DECLARATION [Doc 7104-4]; *see also* AZARI DECLARATION [Doc 7110-1] (establishing the sufficiency of Class Notice).

addressed in the Supplemental Declarations of Professor Klonoff and Professor Coffee, submitted contemporaneously herewith.   The objectors who address the Rule 23 criteria generally focus on commonality [Rule 23(a)(2) and Rule 23(b)(3)] and adequacy of representation [Rule 23(a)(4)], which are each addressed below.[98]   Numerosity [Rule 23(a)(1)] has not been questioned, and the typicality of claims [Rule 23(a)(3)] is reflected in the spectrum of class representatives within the compensation categories.[99]

### ALL CLASSMEMBERS SHARE COMMON CLAIMS WHICH ARE APPROPRIATE FOR CERTIFICATION UNDER RULE 23

The issues of commonality and predominance are addressed in Supplemental Declarations submitted by Professor Klonoff and Professor Coffee.[100]   In sum, the objections that attack the Proposed Settlement on these grounds ignore, not only the common bodies of evidence applicable to the claims of all class members, but particularly: **(i)** the commonality established as a matter of fact and law under OPA, and **(ii)** the existence of a potential claim by *all* class members for punitive damages against BP.

OPA Unites Classmembers under a Common Determination of Responsibility

Contrary to the contention by some objectors that the strict liability provisions of OPA somehow obviate the shared question of BP's liability, the company's Responsible Party status under

---

[98]A few of the objectors attack the Proposed Class Settlement on the basis that the GCCF was allegedly "superior" to the Class Settlement Program under Rule 23(b)(3).  These objections are addressed *supra.*  (*See also,* KLONOFF SUPPLEMENTAL REPORT, ¶¶ 48-51)  A handful of objectors also contend that there is no "ascertainable class", which is addressed, along with commonality, *infra.* (*See also,* KLONOFF SUPPLEMENTAL REPORT, ¶¶ 39-40)

[99]*See* KLONOFF SUPPLEMENTAL REPORT, ¶ 44; COFFEE SUPPLEMENTAL DECLARATION, ¶¶ 12-14.

[100]*See* SUPPLEMENTAL EXPERT REPORT OF ROBERT KLONOFF, ¶¶ 41-43, 47; SUPPLEMENTAL DECLARATION OF JOHN C. COFFEE, JR., ¶¶ 2-11.

the Act unites each and every classmember with a question whose answer is true with respect to each and every member of the Settlement Class.[101]

As noted by Professor Coffee, the questions of BP's gross negligence, willful misconduct and/or violation of a Federal Regulation under OPA are also common questions whose truth or falsity have application to the claims of *each* and *all* classmembers, under 33 U.S.C. §2704(c)(1). The fact that BP may have, at some point, "waived" the potential class-wide limitation under §2704(a) does not extinguish the legal commonality shared by all Class Members, nor the common factual body of evidence teeming with common liability questions. *See generally,* SUPPLEMENTAL COFFEE DECLARATION, ¶¶ 2-11.[102]

Further, the application of the third-party fault defense under 33 U.S.C. 2703(a)(3) presents a common legal issue (with numerous attendant factual issues) directly affecting the claims of *each* and *all* classmembers. These common legal and factual issues have never been conceded or waived by the BP Defendants.

---

[101] *See* Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) ("claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

[102] *See, in particular,* SUPPLEMENTAL DECLARATION OF JOHN COFFEE, ¶3;  *citing,* In re Nassau County Strip Search Cases, 461 F.3d 219, 227-228 (2d Cir. 2006) ("an issue is common to the class when it is susceptible to generalized, class-wide proof. **That class-wide proof comes in the form of a simple concession rather than contested evidence ... does nothing to alter the fundamental cohesion of the proposed class,** which is the central concern of the predominance requirement") (emphasis supplied); *see also, e.g.,* Seijas v. Republic of Argentina, 606 F.3d 53, 57 (2d Cir. 2010) ("Even resolved questions of liability implicate whether a putative class shares the common nucleus of facts"); U.S. v. City of New York, No.07-2067, 2011 WL 2259640, *17, 2011 U.S. Dist. LEXIS 60276, *57 (E.D.N.Y. June 6, 2011) ("issues common to the class that are resolved earlier in the litigation remain 'common' in later phases"); Sala v. National R.R. Passenger Corp., No.88-1572, 1988 WL 84125, *1, 1988 U.S. Dist. LEXIS 8753, *2 (E.D. Pa. Aug. 4, 1988) (defendant's liability concession actually "reinforces this Court's initial determination the questions of law or fact as to liability were common to members of the class").

Nor have the BP Defendants agreed (outside of the Settlement) to a legal interpretation of OPA's causation requirements under 33 U.S.C. §2702.   The question of the proper legal standard of causation to apply to class claims – whether, for example, a traditional "proximate cause" requirement should be read into the statute[103] – presents a common legal issue the resolution of which is shared by each and all members of the Proposed Settlement Class.  As would the common legal question of whether BP could invoke a "superseding" or "intervening" cause defense, despite its Responsible Party status.

Finally, the objectors seem to disregard completely the argument that punitive damages are available to *all* classmembers.

Objectors Ignore the Claim for Punitive Damages by OPA Plaintiffs who Lack *Robins Dry Dock* Standing

To be sure, the Court has ruled that punitive damages are only available to plaintiffs who have traditional *Robins Dry Dock* standing.[104]  And the likelihood that punitive damages are only available to commercial fishermen and others who claim a proprietary interest in property directly affected by the oil is generally reflected in the proposed settlement's RTPs.

Nevertheless, there remains an argument that, once the Court's admiralty jurisdiction is properly invoked, the general maritime law combines with OPA to allow for the potential award of punitive damages to *all* classmembers[105] – thus rendering the truth or falsity of all factual issues

---

[103]*See, e.g.,* B1 ORDER [Doc 3830], at p.33 (rejecting the application of a traditional "proximate cause" standard under OPA).

[104]B1 ORDER [Doc 3830], at pp.26-27 and p.38 Nos. 6, 10.

[105]*See, e.g.,* B1 ORDER, at pp.7-8 and p.37 No.2 ("Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel bore a substantial relationship to traditional maritime activity. With admiralty jurisdiction comes the application of substantive maritime law"); *see also,* ORDER AND REASONS (Oct. 1, 2012) [Doc 7526], at p.15 ("if a claim falls within admiralty jurisdiction, then the substantive law of admiralty applies").

Page 26

related to the gross negligence of BP common questions to each and every member of the Settlement Class.[106]

Common Bodies of Evidence

The evidence to be admitted in connection with the January 2013 Limitation and Liability Trial is a common body of evidence that was largely submitted in advance of the original February 2012 trial setting, and relates to the claims of all Class Members.[107]  Here, to an even greater extent than in *Sullivan*,[108] and to an extent which would satisfy both *Wal-Mart* and *Perry*,[109]  a common course of conduct, centralized decisions, and a single disastrous event are the factual and legal predicates of all class members' claims.  The settling defendants did not act differently with respect to different class members, and all class members' damages and losses were caused by the same unfolding event.  Important, and common, factual and legal questions remain, as the forthcoming Limitation and Liability Trial demonstrates.  It is structured around, and designed to determine, these important questions as they relate to non-settling parties and non-settled claims – based on the same

---

[106]These questions each have **answers** which drive the resolution of the litigation for **all** classmembers, unlike, for example, the "systemic deficiencies" in the *Perry* case, which, even if proven, would not have established a violation of the Constitutional rights of each and every child in that proposed class.  *See* M.D. v. Perry, 675 F.3d 832, 843 (5ᵗʰ Cir. 2012) ("Texas contends that the individual class member's substantive due process claims are not capable of classwide resolution because deciding each plaintiff's claim requires an individualized inquiry regarding whether the State's conduct 'shocks the conscience' ....  If the State's assertion is accurate that the resolution of each of the class member's substantive due process claims requires individual analysis, then it is not clear how a 'classwide proceeding' on those claims has the 'capacity ... to generate common answers apt to drive the resolution of the litigation'").

[107]*See* SUPPLEMENTAL REPORT OF JOHN COFFEE, ¶11.

[108]*See* Sullivan v. D.B. Investments, Inc., 667 F.3d 273, 299-300 (3d Cir. 2011), *cert. denied*, 132 S.Ct. 1876 (2012).

[109]*See* M.D. v. Perry, 675 F.3d at 843, distinguished at Footnote 106, *supra*.

body of common evidence developed in advance of February 27, 2012 with respect to the claims that are included within the Proposed Settlement.[110]

Moreover, as noted in Plaintiffs' original submission, there exist common and overlapping bodies of environmental, ecological and economic evidence applicable to the claims of the classmembers.

<u>Neither the Number nor the Complexity of the Settlement Framework Formulas Negates the Predominance of Common Issues nor Defeats the Ascertainability of the Class</u>

The proposed economic and property damages settlement is characterized by attention to detail in the design and development of compensation programs, claims criteria, procedural and documentation requirements, and claims administration infrastructure, which are tailored for the broad categories of class members who share the common alleged injury or property damage arising from the *Deepwater Horizon* Incident.

Objections that the class comprises businesses and individuals of different types, with different degrees of damage or loss, in different industries or locales, both misapprehend and over-state the commonality and predominance requirements that prevail post-*Wal-Mart*.

Where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists" within the meaning of *Wal-*

---

[110]It should also be noted, along these lines, that the Proposed Settlement itself vests the Settlement Class with BP's single undivided claim against Transocean and Halliburton. (*See* SETTLEMENT AGREEMENT, Exhibit 21, Section 1.1.3.)  Hence, each of the Class Members are united in advancing common legal and factual arguments regarding the scope and effect of the contractual indemnity agreements between BP and Transocean or Halliburton, as well as the numerous common factual questions about what Transocean and Halliburton should have done, but did not do, leading to the *Deepwater Horizon* Incident.  Indeed, with respect to this class-wide claim, each and every Class Member shares a common question regarding the scope and extent of recoverable damages incurred by BP.

*Mart*. Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012); *see also, e.g.,* Young v. Nationwide Mutual Insurance Co., 693 F.3d 532 (6th Cir. 2012) (affirming for trial purposes a Rule 23(b)(3) class for a series of statewide subclasses whose membership would be determined based on the application of objective, albeit complex, criteria). In *Nationwide*, as here, the complexity of the identification and claims processes defeated neither predominance nor ascertainability; it simply reflected the reality of the situation that the class plaintiffs sought to redress. In particular, the Sixth Circuit found that the size of the class and the need to review individual files or other information to identify and pay the claims of its members were not reasons to deny – but, rather, reasons to grant – class certification. Nationwide, 693 F.3d at 538-540; *citing,* In re Visa Check-MasterMoney Antitrust Litigation, 280 F.3d 124, 145 (2d Cir. 2001); Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 722 (9th Cir. 2010); Perez v. First Am. Title Ins. Co., No. 08–1184, 2009 WL 2486003, *7 (D.Ariz. Aug. 12, 2009) ("Even if it takes a substantial amount of time to review files and determine who is eligible for the [denied] discount, that work can be done through discovery"); Slapikas v. First Am. Title Ins. Co., 250 F.R.D. 232, 250 (W.D.Pa.2008) (finding class action manageable despite First American's assertion that "no database exists easily and efficiently to make the determination that would be required for each file").

Contrary to objectors' arguments, the need for complex formulas or methods to determine claims is *best* accomplished through the class action procedure, where consistent treatment of like claims, and ongoing judicial oversight combine to ensure against random, arbitrary, or dissimilar treatment of similar claims, and where claims can be grouped or categorized objectively, ensuring fair treatment to all. This is particularly true where classes are large, consisting of thousands, hundreds of thousands, or even millions of class members and potential claimants. *See, e.g.,* In re

Holocaust Victim Assets Litigation, No.96-4849, 2000 WL 33241660, 2000 U.S. Dist. LEXIS 20817

(Nov. 22, 2000), aff'd, 413 F.3d 183 (2d Cir. 2005) (approving complex plan of allocation of

settlement funds, whose development required over one year of extensive historical and factual

research, reflecting the myriad complexities of allocating a $1.25 billion fund among five categories

of victims of the Nazi regime).  More recently, in Lemus v. H&R Block Enterprises, LLC, No.09-

3179, 2012 WL 3638550, 2012 U.S. Dist. LEXIS 119026 (N.D. Cal. Aug. 22, 2012), the district

court granted final approval of a complex class settlement over objections that there was no need for

a "claims-made process consisting of complicated formulas and confusing mathematical

calculations."  The Lemus decision noted that the settlement and settlement claims process fairly,

adequately and reasonably reflected the realities of the case.

Similarly, in the Insurance Brokerage Antitrust Litigation, the Third Circuit approved a

complex method of distributing class action settlement funds, noting:

> This method for distributing the fund, in which individuals and
> entities may have claims that span several of the allocation groups, did not
> produce a divergence of interest among the class members.  Rather,
> regardless of the type of insurance at issue and the time period during which
> it was purchased, all of the class members shared a unified interest in
> establishing the . . . Defendants' liability for engaging in anticompetitive
> conduct which increased the cost of premiums for all policyholders.

In re Insurance Brokerage Antitrust Litigation, 579 F.3d 241, 272 (3d Cir. 2009).[111]  Holocaust

Victims, Lemus, Insurance Brokers, and many other decisions illustrate that the class action structure

is best designed for circumstances of such complexity:  "The Plan of Allocation was carefully

devised to ensure a fair distribution of the settlement fund to the various types of claimants and was

---

[111]This decision also cuts against the arguments that all differences require formal subclasses.  To the contrary, only a "fundamental conflict" within the class – absent here – justifies subclassing.  See SUPPLEMENTAL COFFEE DECLARATION, ¶ 21.

allocated in such a way that policyholders who likely incurred the most damages are entitled to a larger proportion of the recovery than those whose injuries were less severe." Insurance Brokerage, 579 F.3d at 273.[112]

In the *Serzone Products Liability Litigation*, the court approved a class settlement that included personal injury and economic damages within the same class, establishing multiple categories of injuries, gradations of injury within each category, and a schedule of payments that addressed various types of damages. In re Serzone Products Liability Litigation, 231 F.R.D. 221 (S.D.W.Va. 2005).  In other words, the class action settlement structure brought organization, consistency, and objectivity to a situation in which, otherwise, a wide variety of claims would essentially have had to have been individually negotiated and settled, with the likely result that similar claims would be treated differently, and compensation would not consistently track severity or type of injury, or strength of claim.  The class settlement system cures these defects, and is of most efficacy where, as here, damages claims and calculations are both complex and susceptible to comprehensive categorization.


### THE MEMBERS OF THE CLASS WERE AT ALL TIMES ADEQUATELY REPRESENTED

That the Class Members were adequately represented under Rule 23 was addressed in the plaintiffs' opening brief in support of final approval,[113] and the Declarations of Professor Klonoff,

---

[112] Here, of course, there is no overall cap or "delimited fund" within which claims must be allocated. Thus, this case does even more than did the class settlement structure affirmed in *Insurance Brokerage* to assure equitable treatment of different categories of claimants.

[113] *See generally,* FINAL APPROVAL BRIEF [Doc 7104], at pp.28-29 and 43-46.

Professor Issacharoff and Professor Coffee,[114] and are further addressed in Supplemental Declarations of Professor Klonoff and Professor Coffee, submitted contemporaneously herewith.[115] In sum, the objections which attack the Proposed Settlement on adequacy of representation grounds allege "conflicts" where none exist, and suggest that dozens of sub-classes should have been established without any regard to the fact that there are no separate and discrete "sub-classes" of claimants who have single, non-overlapping claims.

Unlike the situation in *Amchem,* for example, the class members in one Damage Category were never "competing" with the class members in another Damage Category.[116]  Indeed, that would have been impossible, because the Class Members themselves have numerous overlapping types of claims.  The "Zone D" Economic Loss Class Member, for example, may have a "Zone A" Wetlands Claim.  The "Zone A" Wetlands Class Member may have a "Zone B" Economic Loss Claim and a Sales Loss Claim.  The VoO Charter Compensation Class Member may have a "Zone B" Wetlands claim and a Subsistence Claim.  The Seafood Program Class Member may have a VoO Charter Compensation and Sales Loss Claim.

Both in the way the settlement was negotiated, and in the application of the final frameworks without limitation to the number or nature of claims, the compensation under one set of damage

---

[114]*See* KLONOFF DECLARATION [Doc 7104-3], ¶¶ 29-38;  COFFEE DECLARATION [Doc 7110-3], ¶¶ 8-10, 23-34, 41-45; ISSACHAROFF DECLARATION [Doc 7104-4], ¶¶ 8-17; *see also* HERMAN DECLARATION [Doc 7104-5]; RICE DECLARATION (Negotiations) [Doc 7104-6, pp.1-10]; DECLARATIONS OF ECONOMIC CLASS REPRESENTATIVES [Doc 7104-6, pp.31-75].

[115]*See* SUPPLEMENTAL KLONOFF REPORT, ¶¶ 45-46, (*see also,* ¶¶11-14); SUPPLEMENTAL COFFEE DECLARATION, ¶¶ 15-41.

[116]*See* Amchem Products v. Windsor, 521 U.S. 591, 625, 117 S.Ct. 2231, 2251, 138 L.Ed.2d 689 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover *conflicts* of interest between named parties and the class they seek to represent") (emphasis supplied).

category frameworks was not and is not in any way affected by the compensation for any other type of claim. There was, at all times, an unfettered incentive to maximize the recovery of each claimant, for each and every different type of damage claim.[117]

Unlike *Amchem,* in this regard, Class Counsel represented a broad cross-section of people and businesses with all categories of claims.[118] Class Counsel, therefore, from the outset, had the incentive to maximize the recoveries of each and all of the Class Members. The frameworks are the product of months and months of arms-length negotiation, in which the recovery under each damage claim formula was sought to be maximized by attorneys who represented people or businesses with those types of claims.[119]

While several of the objectors seems to suggest that numerous subclasses should have been created for the negotiation of different claim types – or within the damage claim categories – they ignore the fact that there are no discreet "sub-classes" of Class Members with *only* Business Economic Loss, or *only* Wetlands, or *only* Seafood Program claims.[120]

---

[117]The one arguable exception is within the Seafood Compensation Program, which is addressed more fully *infra.*

[118]*See* Amchem, 521 U.S. at 601, 117 S.Ct. at 2239 ("Settlement talks thus concentrated on devising an administrative scheme for disposition of asbestos claims not yet in litigation. In these negotiations, counsel for masses of inventory plaintiffs endeavored to represent the interests of the anticipated future claimants, although those lawyers then had no attorney-client relationship with such claimants"). This was also an issue in *Merck-Medco,* wherein class counsel represented insured plans, and had little incentive to fight for the interests of self-funded plans during the allocation process. *See generally,* Central States v. Merck-Medco Managed Care, 504 F.3d 229, 235-237 (2d Cir. 2007) (class counsel, who represented insured plans, agreed to a $42.5 million fund, and then determined how the fund would be allocated between insured and self-funded plans).

[119]*See* Issacharoff Declaration [Doc 7104-4], ¶¶ 7-11; Rice Declaration (Negotiations) [Doc 7104-6, pp.1-10], ¶¶ 6, 13; Herman Declaration [Doc 7104-5], ¶¶ 6-10.

[120]This doesn't even begin to address all of the real-world practical difficulties in trying to maintain a confidential and productive settlement process, where the Class and the interests of its members are not compromised by sub-class representatives or attorneys with their own interests or agendas that might be leveraged unreasonably against the interests of other sub-classes or the class as a whole. *See, e.g.,* Coffee Declaration [Doc 7110-3], ¶¶ 29-30; Klonoff Declaration [Doc 7104-3], ¶ 33; Issacharoff Declaration [Doc 7104-4], ¶ 11; Supplemental Coffee Declaration, ¶¶ 35-36.

Notably, none of the objectors make a serious attempt to argue that the Proposed Settlement is unfair or inadequate *to them* – based on the facts and circumstances of their cases – as compared with what they would likely be entitled to recover in formal litigation.  They are simply complaining about how other Class Members might be treated.

Many of these comparisons and contrasts are inherently biased and subjective.

But, in any event, and of greatest significance, none of these Objectors even attempt to explain how the differences between or within the frameworks *are the result of* "conflicts of interest" between or among the members of the Class.[121]

This is not like *Amchem,* where, going in, the interests of present claimants and future claimants were in some ways antagonistic to one another.[122]  Nor is this like *Merck-Medco,* where a fund was negotiated first, and then class counsel decided themselves how to allocate the fund between and among competing groups of classmembers.[123]

It is both fair and reasonable that Class Members with more difficult or less valuable cases would generally be provided with less favorable relief.  Indeed, it would be both "unfair" and

---

[121] *See* KLONOFF DECLARATION [Doc 7104-3], ¶¶ 31-32;  COFFEE DECLARATION [Doc 7110-3], ¶¶ 8, 23; ISSACHAROFF DECLARATION [Doc 7104-4], ¶¶ 7-9, 12-13.

[122] *See* Amchem, 521 U.S. at 626, 117 S.Ct. at 2251 ("In significant respects, the interests of those within the single class are not aligned.  Most saliently, for the currently injured, the critical goal is generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future").  While there was no formal "cap" in *Amchem,* there was **(i)** an annual cap, and **(ii)** no assurances that there would be sufficient funds available for future claimants.

[123] *See* Central States v. Merck-Medco, supra, 504 F.3d at 235-237.  With respect to the $2.3 Billion Seafood Compensation Program in this Proposed Settlement, class counsel did *not* determine the allocation – which was made by a Court-Appointed Neutral, after examining all of the available information and different perspectives. *See* PERRY DECLARATION [Doc 7110-5]; BALHOFF DECLARATION [Doc 7110-2]; HERMAN DECLARATION [Doc 7104-5], at ¶11; RICE DECLARATION (Seafood Program) [Doc 7104-6, at pp.13-18].

"unreasonable" to compensate everyone within the Settlement Class exactly the same. As noted by Professor Klonoff:

> Every class settlement is subject to an argument that some class members should have fared better vis-a-vis other class members. But the test is not whether the benefits under a settlement agreement are "perfectly equitable." Rather, the test is whether the allocations are "reasonable".

KLONOFF SUPPLEMENTAL REPORT, ¶12; *citing,* Lawnmower Engine Horsepower Mktg. & Sales Practices Lit., 733 F.Supp.2d 997, 1011 (E.D.Wis. 2010); In re Metlife Demutualization Litig., 689 F.Supp.2d 297, 350 (E.D.N.Y. 2010); In re Cendant Corp. Sec. Litig., 109 F.Supp.2d 235, 252 (D.N.J. 2000).[124]

In general, the Proposed Settlement reflects the relative merits of each category of claim – as determined through arms length negotiations. Certainly, someone will be able to point to be what they consider to be inconsistencies or anomalies in individual circumstances or hypothetical scenarios. But the compensation frameworks are the result of a long and hard-fought negotiation process regarding the relative strengths and weaknesses of general types of claims for people and businesses located in general areas affected by the spill – *not* a "conflict" between or among the members of the Class.

In the few cases at or near the edges, where someone might believe that the settlement is inadequate, they can, of course, opt out and continue to litigate.[125] Unlike *Amchem,* there are no

---

[124]*See also,* KLONOFF SUPPLEMENTAL REPORT, ¶5 ("the test for whether a settlement class should be approved is not whether the settlement is perfect in the estimation of every class member (a test no settlement could pass)"); *and,* KLONOFF SUPPLEMENTAL REPORT, ¶13; *citing,* Newby v. Enron Corp., 2008 U.S. Dist. LEXIS 84656, at *55 (S.D.Tex. Sept. 8, 2008); Thacker v. Chesapeake Appalachia, LLC, 695 F.Supp.2d 521, 533 (E.D.Ky. 2010).

[125]*See, e.g.,* Charron v. Pinnacle Group NY LLC, No.07-6313, 2012 WL 2053530, *28, 2012 U.S.Dist. LEXIS 79550, *80 (S.D.N.Y. June 6, 2012) ("Class Members who wished to pursue [certain] claims and who preferred to go for every last dollar, had ample opportunity to opt out of the Class").

"future" Class Members, who do not know whether they have suffered economic losses from the spill.[126]  The members of the Settlement Class should have the information necessary about the past damages, and future risks of recurrence, to make reasonable and informed decisions about whether they believe the Proposed Settlement sufficiently compensates them for their damages arising from the *Deepwater Horizon* Incident.

Both the structure of the negotiations and the terms of the Settlement Agreement itself provide structural assurances of adequate representation. *See generally,* SUPPLEMENTAL COFFEE DECLARATION, ¶¶ 19-27.[127]

**There Are No "Conflicts" Among Businesses and Employees Falling within the Different Economic Loss Zones – which are the Product of Months of Arms-Length Negotiations and Reasonably Trace the Relative Strengths and Weaknesses of the Claims in terms of Causation and Future Risk as informed by Location, and Nature and Type of Industry** [128]

The fallacy central to all complaints about the drawing of the Economic Zones is the (false) assumption (or assertion) of a "conflict" between the members of the different zones.  The class members in Zone A were never "competing" with the class members in Zone D.   Both in the way the settlement was negotiated, and in the application of the final frameworks without limitation to the number or nature of claims, the compensation to Zone C claimants was not and is not in any way

---

[126] *See* Amchem, 521 U.S. at 628, 117 S.Ct. at 2252 ("Many persons in the exposure-only category, the Court of Appeals stressed, may not even know of their exposure, or realize the extent of the harm they may incur. Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out").

[127] *See also,* COFFEE DECLARATION [Doc 7110-3], ¶¶ 8-10, 23-34, 41-45; KLONOFF DECLARATION [Doc 7104-3], ¶¶ 29-38; ISSACHAROFF DECLARATION [Doc 7104-4], ¶¶ 8-17; SUPPLEMENTAL COFFEE DECLARATION, ¶¶ 15-41.

[128] *See generally, e.g.,* OBJECTION NOS. 89, 90, 115, 116, 117, 118, 138, 145, 151, 153, 167, 184, 186, 189, 198, 206, 233.

affected by the compensation to the claimants in Zone B.  There was, at all times, an unfettered incentive to maximize the recovery of each Business Economic Loss claimant.

Class Counsel, at the commencement of the negotiations, already represented numerous businesses and employees in all four Economic Loss Zones, and had the incentive, from the outset, to maximize the recoveries of each and all businesses and employees within each and every zone. The zones, and the accompanying causation and compensation frameworks, are the product of months and months of arms-length negotiation, in which the recovery of each type and location of business was sought to be maximized by attorneys who represented them.[129]

The Prashiela Objectors, notably, object to the use of geographically-based Economic Zones within the Proposed Settlement, while at the same time lauding the GCCF for utilizing geographically-based areas in which causation was (allegedly) "presumed".[130]

Neither the Prashiela Objectors nor any other objectors have pointed to any actual "*conflict*" of interest between and among the members of the Settlement Class.  This is not like *Amchem*.[131] Going in, the interests of Zone A businesses were not in any way antagonistic to the interests of businesses in Zone C.  Nor is this like *Merck-Medco,* where a limited pot of money was negotiated first, and then class counsel decided how to allocate the fund between and among classmembers in Zone B and Zone D.[132]  Indeed, neither *Amchem* nor *Merck-Medco* – nor any of the cases cited by Objectors – condemn the use of rationally designed geographical zones that are the product of arms-

---

[129]*See* ISSACHAROFF DECLARATION [Doc 7104-4], ¶¶ 7-11; RICE DECLARATION (Negotiations) [Doc 7104-6, pp.1-10], ¶¶ 6, 13; HERMAN DECLARATION [Doc 7104-5], ¶¶ 6-10.

[130]*See* OBJECTION NO. 198, at pp.20-21, ¶57.

[131]*See* Amchem, supra, 521 U.S. at 626, 117 S.Ct. at 2251.

[132]*See* Central States v. Merck-Medco, 504 F.3d at 235-237.

length negotiation; and, given the uncapped nature of the Proposed Settlement, there is no antagonism between the members of the Settlement Class.

The Economic Loss Zones are a general reflection of the geographical areas, and business types within those areas (*i.e.* related principally to tourism and seafood), most likely to have been affected by the spill – as determined through arms length negotiations.   Certainly, someone will be able to point to what they believe to be inconsistencies or anomalies in particular circumstances.  But those distinctions are the result of a long and hard-fought negotiation process regarding the relative strengths and weaknesses of general types of claims for people and businesses located in general areas affected by the spill – *not* a "conflict" between or among the members of the Class.

 Even in the case of perceived inconsistencies or anomalies, the objectors are generally complaining about what *someone else* might be getting under the settlement; not that the Proposed Settlement is inadequate *to them*.   If they do believe that the settlement is inadequate, they could, of course, opt out and continue to litigate.

**Coastal Property Owners – who Are Treated Fairly and Adequately under the Settlement – Are Treated Differently from Wetlands Due to the Relative Difficulty in Cleaning or Removing Oil Out of the Marsh, as Opposed to Beaches** [133]

There is no "conflict" between or among wetlands or coastal property owners.  Wetlands owners have no interests that are antagonistic to coastal owners, and Louisiana wetlands owners have no interests antagonistic to the interests of people who own wetlands in Alabama, Florida or Mississippi.

---

[133] *See generally, e.g.,* OBJECTION NOS. 144, 167, 183, 186, 189, 190, 225.

The distinction between Louisiana Wetlands owners' claims and the claims of Class Members who fall within the Coastal Framework is the product of arms-length negotiations which lasted for months, and turned primarily on the fact that beachfront properties are easier to clean than marshes;  that the marshes in Louisiana that were oiled are mostly unprotected, while the marshes in the other Gulf States are largely protected by barrier islands;  and that many of the "wetlands" that were oiled in the other Gulf States are of a different character.[134]

Contrary to the suggestion of Professor Hazard, many of the landowners with "wetlands" in Alabama, Mississippi and Florida *are* receiving compensation under the Coastal Framework.[135] Moreover, the people or businesses located in Mississippi, Alabama and Florida who *only* have a claim related to their "wetlands" falling outside of the Coastal Framework are <u>not</u> releasing such claims without compensation, as they are *not* members of the Class.

With respect to those few Class Members who may face a release that is arguably broader than the claims for which they are actually being compensated, those are the types of choices that lawyers and litigants make every day.

<u>In General, Many of the "Wetlands" Located Outside of Louisiana that Were Oiled in the *Deepwater Horizon* Incident Are More in the Nature of "Coastal" Properties</u>

Marshes are different than beachfront properties.  They cannot be cleaned or restored in the same manner.  The marshes that were oiled in Louisiana during the *Deepwater Horizon* Incident were generally unprotected and exposed.  The marshes in Mississippi, Alabama and Florida, by

---

[134]The shoreline of Grand Isle is, for example, placed under the Coastal Framework, instead of the Wetlands Framework, even though it is located in the State of Louisiana, because it is essentially beach, as opposed to marsh.

[135]*See generally,* SETTLEMENT AGREEMENT, Exhibits 11B and 11C.

contrast, were largely protected by barrier islands.  In addition, many of the "wetlands" that were

oiled in the other Gulf States are generally in the nature of beaches that have simply been designated

as "wetlands" or have a relatively small marsh component.

Contrary to the Suggestion by Professor Hazard in his Declaration, People or Entities that Only Have Claims for Uncompensated non-Louisiana "Wetlands" Are Not Classmembers, and Are Not Affected by the Settlement

The same Declaration by Professor Hazard was submitted by a number of different objectors,

ostensibly in support of a number of different objections.[136]  His central opinion regarding the

Proposed Settlement relates to the non-Louisiana "wetlands" property owners, and is as follows:

> ...the Agreement, through the maps in Appendix A to Exhibit 12, excludes
> Wetlands Claimants from Mississippi, Alabama and Florida. Yet the
> Agreement purports to settle the claims of that subclass of claimants, without
> any compensation to them.[137]

This is not the case.  Many of the people and businesses who own "wetlands" in Mississippi,

Alabama and Florida will receive compensation for those properties under the Coastal Framework.[138]

The landowners located in Mississippi, Alabama and Florida who *only* have a claim related to their

"wetlands" falling outside of the Coastal Framework are *not* releasing such claims without

---

[136]*See* OBJECTION NOS. 144, 167, 183, 185, 189, 190, 202.

[137]HAZARD DECLARATION [No.10-7777, Doc 144-3], at p.4, ¶4.

[138]While Professor Hazard suggests that "The Agreement purports to .... resolve all wetlands claims of Wetlands Claimants in Mississippi, Alabama and Florida ... without payment to them" (*see* HAZARD DECLARATION [No.10-7777, Doc 144-3], at p.3, ¶3(c)), it is evident from the maps included within the Settlement Agreement as EXHIBITS 11B and 11C that much, if not all, of the affected coastline is included. Indeed, it appears that most, if not all, of the private coastal area both on Dauphin Island and around Wolf Bay are included in the Coastal Framework. *See* SETTLEMENT AGREEMENT, Exhibit 11B, at pp.22, 25, and Exhibit 11C, at pp.31-33, 50.

compensation, as they are *not* members of the Settlement Class.  In particular, the Class Definition provides that:

> Individuals and Entities who meet the geographical descriptions of Section 1.1 or 1.2 above are included in the Economic Class *only* if their Claims meet the descriptions of one or more of the Damages Categories described below.[139]

Because the claims of landowners who have unrecognized "wetlands" claims in Mississippi, Alabama and Florida do not meet the descriptions of either the Wetlands or the Costal Damage Claim Categories as defined within the Settlement Agreement,[140] these people and entities are not Class Members, and the Agreement does *not* purport to settle the claims of that group of claimants without any compensation to them.

<u>With Respect to the Handful of Objectors or Others Who Might Be Class Members Due to the Existence of Other Class Settlement Claims, They Can Make an Informed Choice – Common to Class Actions and Virtually All Cases – as to Whether or Not they Want to Release Claims that Are Broader than the Ones for Which They are Receiving Specific Compensation</u>

Some of the objectors have ostensibly identified a handful of Alabama/Mississippi/Florida "wetlands" owners who are ostensibly Class Members due to the existence of either Business Economic Loss or Coastal or other Claims that meet the descriptions set forth in Section 1.3.

The objection is that these presumed Class Members must make the "Faustian Election" of either participating in the Court-Supervised Settlement Program or Opting Out and continuing to litigate.

This is the type of choice that litigants and their attorneys – both within the class action context and in individual cases – are frequently forced to make.

---

[139] *See* SETTLEMENT AGREEMENT, Section 1.3 (emphasis supplied).

[140] *See* SETTLEMENT AGREEMENT, Sections 1.3.1.6, 1.3.1.7, 5.7 and 5.8, and Exhibits 11 and 12.

Page 41

With respect to class actions in particular, it is well-settled that:

> To the extent objectors argue that the Settlement is not fair because the scope of the release is too broad, including claims not pled in the Complaint or unknown to the Class Member, the Court finds these objections without merit. The Court recognizes that in class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint, releases of known and unknown claims, or even claims over which the court lacked jurisdiction.

Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 244 (D.N.J. 2005), *aff'd*, 618 F.3d 300 (3d Cir. 2010); *see also,* Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 107 (2d Cir. 2005); Berardinelli v. Gen. Am. Life Ins. Co., 357 F.3d 800, 805 (8th Cir. 2004); Maher v. Zapata Corp., 714 F.2d 436, 438 (5th Cir. 1983); In re Corrugated Container Antitrust Litigation, 643 F.2d 195, 221 (5th Cir. 1981).  These Objectors have actual knowledge of the terms of the Settlement Agreement, including the scope of the Release, and can make an informed choice about whether to accept the compensation afforded under the Proposed Settlement or Opt Out and seek to pursue their "wetlands" claims through litigation.


**The Seafood Program Frameworks Developed by an Independent Court-Appointed Neutral Are Fair, Reasonable and Adequate to Participating Class-Members**

As set forth in Plaintiffs' opening submission, the Seafood Fund and its compensation frameworks are fair, reasonable and adequate.[141]  The objectors' claims that either the Fund itself or the separate frameworks are insufficient are completely unsupported by reliable evidence.  They are filled with incorrect statements, or assumptions, about the way that the Seafood Program was established or the information upon which it was based.

---

[141] *See generally,* FINAL APPROVAL BRIEF, pp.14-16; PLAINTIFFS' EXHIBIT A (*in globo*) [Doc 7104-1]; PERRY DECLARATION [Doc 7110-5]; BALHOFF DECLARATION [Doc 7110-2]; HERMAN DECLARATION [Doc 7104-5], ¶11; RICE DECLARATION (Seafood Program) [Doc 7104-6, at pp.13-18].

The Seafood Fund Is Sufficient

Despite vague complaints that the $2.3 Billion fund is "unreasonably" or "arbitrarily" limited, there is no credible refutation of the fact that the overall compensation provided by the Fund is greater than could have been achieved through either formal litigation or through arms-length negotiation of the separate frameworks with BP.[142]

Even Go Fish – who projects that less than $1.3 Billion will be paid out in the initial round under the frameworks[143] – "continues to believe that 2.3 billion dollars … should be enough to provide all fishermen both duration and parity."[144]

The fact that oil was observed in marshes or on beaches following Hurricane Isaac does not provide a body of credible economic or scientific evidence that calls into question the sufficiency of a Fund that provides multiple years of total commercial fishing revenue and Compensation frameworks that provide vessel owners and captains with five to ten years of annual losses.[145]

---

[142]HERMAN DECLARATION, ¶11; RICE DECLARATION (Seafood Program), ¶5.

[143]OBJECTION NO. 226, at p.3.

[144]GO FISH OBJECTION [No. 226], p.3.  *See also,* REPLY MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE IN RESPONSE TO STATE OF LOUISIANA (by Hai and Truong Plaintiffs) [Doc 7588], at p.4 ("far from being prejudicial to seafood compensation claimants, the so-called 'cap' – which can more accurately  be characterized as a guarantee – is consistent with the efforts of plaintiffs' damages experts to assure that seafood compensation claimants will be adequately and fairly compensated not only for their losses incurred to date, but also for potential future losses"); MEMORANDUM IN RESPONSE TO STATE OF LOUISIANA (by Hai and Truong Plaintiffs) [Doc 7710]; DECLARATION OF JEFFREY JUNE [Doc 7710-2], ¶31 ("for most fishermen, the settlement will provide fair and equitable compensation damages from the Deepwater Horizon oil spill").

[145]*See* SETTLEMENT AGREEMENT, Exhibit 10, at pp.24, 30, 33, 34, 36, 38, 49, 61, 63 (Seafood Compensation Program RTPs of 4.5 to 8.75 for captains and vessel owners).

<u>The Frameworks Are Fair, Reasonable and Adequate, and Were Informed by a Fair, Neutral and Comprehensive Process</u>

The Seafood Program compensates fishermen for an annual 35% loss of shrimp and blue crabs, a 40% loss of oysters, and a 25% loss of finfish – as compared with the official Government landing catch data, which only shows a 13.17% decline in the volume of shrimp landings, a 14.18% decline in the volume of blue crab landings, a 24.08% decline in the volume of oyster landings, and a 0.51% decline in the volume of finfish landings.[146]

To those annual base losses, the Program adds RTPs of 7.25 to 8.25 for shrimpers, 7.75 to 8.75 for oyster harvesters, 5 to 6 for fin fishermen, and 5 to 6 for crabbers.[147] The model recognizes a slightly higher level of future risk to the vessel owner than the captain, and a lower level of future risk to the deckhand, who has less invested in the trade and can more easily migrate to a different occupation.

These frameworks, developed by the Court-Appointed Neutral based on the best available evidence, are fair, reasonable and adequate to the participating members of the Settlement Class.[148]

---

[146]Exhibit A submitted with Plaintiffs' Final Approval Brief was based on the preliminary unofficial 2011 NOAA landing catch data, which has now been finalized.  An updated spreadsheet reflecting the official 2011 NOAA Commercial Landings data is submitted herewith.

[147]See Settlement Agreement, Exhibit 10, at pp.24, 30, 33, 34, 36, 38, 49, 61.

[148]See, e.g., Memorandum in Response to State of Louisiana (by Hai and Truong Plaintiffs) [Doc 7710]; Declaration of William Roberts [Doc 7710-1], ¶¶ 21-22; Declaration of Jeffrey June [Doc 7710-2], ¶31 ("for most fishermen, the settlement will provide fair and equitable compensation damages from the Deepwater Horizon oil spill");  Declaration of Robert Mosher [Doc 7710-3], ¶19 ("the shrimp compensation plan provides fair and reasonable compensation to most shrimp boat owners and captains") (see also, ¶¶ 20-26 (re Seafood Compensation Program generally)); Declaration of William Perret [Doc 7710-4], ¶6 ("I believe that the Seafood Compensation Plan provides fair and reasonable, but not generous, compensation for most Gulf of Mexico commercial fishermen affected by the Deepwater Horizon spill").

The Claims of Crabbers, Deckhands and Fin Fishermen Were Fairly Represented

First, it is important to note that Mr. Perry worked from objective NOAA and other data.

Therefore, while the perspectives of the various constituent members were likely informative, there

were many objective factors upon which the Court-Appointed Neutral could base the allocation.

Nevertheless, the objectors are mistaken to suggest that the claims of crabbers, deckhands

or fin fishermen were not considered.  In addition to interviewing crabbers, including Mr. Nguyen

himself,[149] Mr. Perry was provided with a written submission from attorney Henry Kinney on behalf

of eighty-four businesses and employees in the blue crab industry.[150]  Attorney John Cracken directly

participated in several meetings representing thousands of deckhands, and – in addition to Mr.

Thien[151] – attorney Jimmy Williamson and several of his clients shared the perspectives of the fin

fishing industry.[152]

The Structural Protections Provided Were More Appropriate Than Attempting To Create Numerous
Sub-Classes, Given the Crossover of Both Class Members and Counsel

Go Fish and other objectors who suggest that the Seafood Compensation Fund participants

should have been divided into multiple sub-classes disregard the fact that shrimpers also crab;

---

[149]NGUYEN DECLARATION [No. 226-1], p.9.  (*See also,* GUIDRY DECLARATION [No. 226-1], p.5
(acknowledging that at least a couple of crabbers were interviewed).)

[150]LETTER FROM KINNEY TO LIAISON COUNSEL (April 12, 2012) (and E-Mail from Herman to Balhoff
and Perry (April 12, 2012)) [Doc 7648-2].

[151]*See* NGUYEN DECLARATION [No. 226-1], p.9. (*See also,* GUIDRY DECLARATION [No. 226-1], p.5
(acknowledging that at least one long liner provided information).)

[152]*See generally,* SECOND PERRY DECLARATION, at pp.2-3; SECOND BALHOFF DECLARATION, at pp.2-
3; *see also* MEMO IN SUPPORT OF MOTION FOR LEAVE TO FILE REPLY BRIEF [Doc 7525-1] (attorneys Nolting,
et al, who represent more than 1,500 commercial fishermen, were, along with some of their clients, directly
involved in the negotiation and Court-Appointed Neutral determination process, including the presentation
of expert analyses and damage calculations); DECLARATION OF WILLIAM ROBERTS [Doc 7710-1], ¶20;
DECLARATION OF JEFFREY JUNE [Doc 7710-2], ¶27.

crabbers also harvest oysters; IFQ holders own oyster leases; and they are represented by many of the same attorneys.  Indeed, Go Fish's Objection and the Declarations filed in support thereof illustrate why formal sub-classing would not have been an effective structural protection under these circumstances.[153]

Indeed, these declarations demonstrate that what is "fair" is a subjective and inherently biased determination largely in the eye of the beholder,[154] further supporting determinations made by unbiased neutrals looking at objective sets of data.

In this way, Mr. Perry, as the Court-appointed neutral, looked at all of the available information;  reviewed all of the available evidence; listened to the viewpoints of various constituencies;  and made his own independent and impartial determination as to a fair and appropriate allocation.[155]

---

[153] *See* WALTZER DECLARATION [No. 226-1], pp.2-3 ("Because I had so many clients from many fisheries, I sat in almost all of the different group meetings"); PHILLIPS DECLARATION [No. 226-1], p.29 ("I shrimp, crab and harvest oysters…. I am also an oyster leaseholder"); DANDAR DECLARATION [No. 226-1], p.33 ("I am a shrimper, crabber and oyster harvester"); ENCLADE DECLARATION [No. 226-1], pp.22-23 (personally delivers shrimp, oysters and fish; describes how Go Fish, as an organization, "represents" a broad range of commercial fishing interests); NGUYEN DECLARATION [No. 226-1], p.9 (both crabs and shrimps); *see also* GUIDRY DECLARATION [No. 226-1], pp.5-7 (while currently a shrimper, notes that he was previously a fin fisherman, and appears to be advocating for charter boat captains and processors).

[154] *See, e.g.,* KLONOFF SUPPLEMENTAL REPORT, ¶5 ("the test for whether a settlement class should be approved is not whether the settlement is perfect in the estimation of every class member (a test no settlement could pass)").

[155] *See* PERRY DECLARATION; BALHOFF DECLARATION; HERMAN DECLARATION, ¶11; RICE DECLARATION (Seafood Program); *see also,* SECOND PERRY DECLARATION; SECOND BALHOFF DECLARATION.

<u>The Seafood Program Claim Deadline is Reasonable and Works to the Benefit of Participating Class Members by Allowing the Court-Appointed Neutral to Determine and Fairly Distribute Any Balance Left in the Fund</u> [156]

It is well-settled that a class action can impose a claim bar date within the applicable statute of limitations, in order to effectuate assessment and distribution of funds to the classmemers, so long as sufficient notice to the class is provided.[157]   Most class action settlements will feature claims processes with deadlines ("bar dates") that will precede the underlying statutes of limitations.  This is because the courts, and public policy, favor, where possible, the most expeditious resolution of complex litigation. NEWBERG ON CLASS ACTIONS (4th ed. 2002) §11:41.  This policy would be frustrated if settlements were required to remain open and unresolved past often lengthy statutes of limitations.  Moreover, class actions themselves generally toll underlying statutes of limitations; thus, requiring claims processes to remain open until statutes of limitations are exhausted could create an endless process.  The law does not require this.  Rather, the court must determine the reasonableness of claims deadlines in light of the nature of the claim and the objectives of the settlement.  Here, the Proposed Settlement was filed in April of 2012, and the claims period began on June 4, 2012, continuing for 30 days past this Court's final approval.  Many class action

---

[156] *See, e.g.,* OBJECTION NOS. 122, 209.

[157] *See generally,* NEWBERG ON CLASS ACTIONS (4th ed. 2002) §§ 11:34 and 11:37.  For example, the claims period in the settlement affirmed by the Fifth Circuit in *Union Asset Management Co. v. Dell* was less than one year.  *See* In re Dell, Inc. Securities Litigation, No.06-726, 2010 WL 2371834, 2010 U.S. Dist. LEXIS 58281 (W.D. Tex. June 11, 2010).  In the settlement approved in the *Processed Egg Antitrust Litigation*, "class members had 127 days from the postmarked date that the notice of the settlement was mailed by first-class mail to the final postmarked date designated in the Claims Notice to return a completed Claim Form to make a claim for benefits." In re Processed Egg Products Antitrust Litigation, MDL No. 2002, 2012 WL 2885924, *5, 2012 U.S. Dist. LEXIS 98301, *16 (E.D. Pa. July 16, 2012).

settlements feature shorter bar dates, whether for opt-outs or for filing of claims.[158]  Indeed, it is the

opt-out deadline that places plaintiffs in a position facing a re-started statute of limitations, and a

deadline for filing suit.  Remaining within the class renders the statute of limitations irrelevant.

The nature and existence of Seafood Program Claims are known to the classmembers, who

have received ample notice of the Seafood Program Claims Bar Date – which was reasonably

imposed by the Court-Appointed Neutral in order to allow for the allocation and distribution of any

proceeds remaining in the Seafood Food after the initial round of payouts under the frameworks has

been made.[159]

---

[158] *See, e.g.,* Helmick v. Columbia Gas Transmission, No.07-743, 2010 WL 2671506, *11, 2010 U.S. Dist. LEXIS 65808 (S.D.W.Va. July 1, 2010) (claims "bar date" of 45 days after mailing of the claim forms); Kay Co. v. Equitable Prod. Co., No.06-612, 2010 WL 1734869, *10, 2010 U.S. Dist. LEXIS 41892, *33 (S.D.W.Va. April 28, 2010) (90-day claims bar date); In re Currency Conversion Fee Antitrust Lit., 263 F.R.D. 110, 120 (S.D.N.Y. 2009) (claims deadline of 60 days after final approval); In re OCA, Inc. Securities and Derivative Litigation, No.05-2165, 2008 WL 4681369, 2008 U.S. Dist. LEXIS 84869 (E.D. La. Oct. 17, 2008) (preliminary approval), *and,* 2009 WL 512081, 2009 U.S. Dist. LEXIS 19210 (E.D.La. March 2, 2009) (final approval) (claims bar date was set, at preliminary approval stage, to occur before the final hearing, 120 days after the issuance of the preliminary approval order); In re Serzone Prod. Liab. Lit., 231 F.R.D. 221, 230 (S.D.W.Va. 2005) (deadline of six weeks before the final fairness hearing); Dahingo v. Royal Caribbean Cruises, Ltd., 312 F.Supp.2d 440, 443 (S.D.N.Y. 2004) (120-day claims bar date); Shaw v. Toshiba Am. Info. Sys., No.99-120, 2000 U.S. Dist. LEXIS 3592, *10 (E.D. Tex. 2000) (claims period of approximately six months approved); *see also, e.g.,* In re Pet Foods Prod. Liab. Lit., 629 F.3d 333, 340 n.11 (3d Cir. 2010) (claims period closed approximately six weeks after the date of the fairness hearing).

[159] *See, e.g.,* DECLARATION OF ROBERT MOSHER [Doc 7710-3], ¶26 ("I also believe that the claim submission deadline for the Seafood Compensation Plan is reasonable. Fishermen have a great interest in being paid quickly and speeding up what will likely be substantial round 2 payments. Further, all of the fishermen I have talked to have been monitoring the litigation and settlement process closely and with great interest. These fishermen have a good idea of how much the settlement agreement will provide them. Most of the fishermen I know have either opted to take the settlement offers they have received or plan to submit their claims, rather than opt out").

**Courts Do Not Expect or Require Class Representatives to Sit at the Negotiating Table**

Rule 23(a)(4) does not require, and federal courts do not expect, that class representatives have seats at the table to negotiate the settlement on behalf of the class.  Such would be a logistical impossibility, a tactical and strategic disadvantage, and would distort the norms of litigation, in which litigation is conducted, and settlements negotiated, by counsel, as agents for the respective parties themselves.

Indeed, when the *Manual for Complex Litigation* addresses the "Role of Class Representatives in Settlement," it is to make the point that "although the court will ordinarily not approve a settlement that counsel do not recommend, class counsel, like class representatives, have no veto power over settlement of class actions." MANUAL FOR COMPLEX LITIGATION, FOURTH (Federal Judicial Center 2004) §21.642;  *citing,* Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 591 (3d Cir. 1999) (affirming class action settlement approval over lead plaintiff's objections and motions for disqualification of class counsel); Maywalt v. Parker & Parsley Petroleum Co., 864 F.Supp. 1422, 1429-1430 (S.D.N.Y. 1994) (approving settlement as fair, adequate, and reasonable despite objections from class representatives).

In this case, several of the *Bon Secour* class representatives were named as putative class representatives for putative class actions in complaints filed in 2010, before settlement negotiations commenced.  All of the proposed Class Representatives were consulted about the terms of the Proposed Settlement during the negotiation process, and, as of the date of the filing of the Proposed Settlement and the submissions in support of final approval, supported the Proposed Settlement on behalf of themselves and all classmembers.[160]

---

[160]*See* DECLARATIONS OF ECONOMIC CLASS REPRESENTATIVES [Doc 7104-6, pp.31-75].  (*See also,* DECLARATION OF ROBIN L. GREENWALD (Oct. 17, 2012), submitted herewith.)

**The Law Does Not Support Objectors' Complaints About Line-Drawing and/or Demands for Infinite Sub-Classing**

We live largely according to "lines".  By those objective and measurable demarcations: of time, of distance, of magnitude.  These boundaries bring predictability, consistency and stability to our lives and interactions, and enable us to communicate, transact business, and live with others. A number of objections complain of the geographical or temporal boundaries demarcated by the Settlement Agreement – *i.e.* by its "line-drawing."

As a preliminary matter, it must be acknowledged that class actions, and all legal mechanisms and procedures, depend upon line-drawing, upon deadlines, and upon other boundaries as to which all interested parties are on notice.  Complex case management depends upon line-drawing, as do ascertainable classes, and fair class action settlements.

The reasonableness of the line-drawing in this Proposed Settlement emerges from the lengthy and intensive negotiations, by informed attorneys who represented a broad cross-section of Class Members and had incentive, on each point, to maximize the recoveries of each and all class members.

Legally, the importance and necessity of reasonably drawn boundaries or categories are illustrated in recent class settlements arising out of oil spill disasters, such as Turner v. Murphy Oil U.S.A., Inc., 234 F.R.D. 597 (E.D. La. 2006), and Petrovic v. Amoco Oil Co., 200 F.3d 1140 (8th Cir. 1999).  The necessity and efficacy of categorizing classes into discrete groups (without the designation of formal subclasses) has also been repeatedly acknowledged and approved.  *See, e.g.*, Cook v. Rockwell International Corp., 181 F.R.D. 473 (D. Colo. 1998); Veal v. Crown Auto Dealerships, Inc., No.04-323, 2007 WL 2700969, 2007 U.S. Dist. LEXIS 68133 (M.D. Fla. Sept.

13, 2007) (complex class divided into three groups based on circumstances of purchase transactions, without designation of subclasses).

The unique virtue and value of the Proposed Settlement is that it does not arbitrarily or automatically assign a set damages figure that is the same for each class member (*e.g.,* it is not a *pro rata* allocation from a delimited fund) or ignore differences in degree of demonstrable damage. To the contrary, this settlement is designed to enable each class member, within each category, to demonstrate, and be compensated for, full actual loss through a noble and transparent process. Objectors' arguments are essentially that a class settlement is inappropriate because different damages calculations will be required for class members.

The Fifth Circuit and other courts have repeatedly rejected this argument in the class certification and class settlement approval context. For example, in the settlement affirmed in Union Asset Management Holding A.G. v. Dell, Inc., 669 F.3d 632 (5th Cir. 2012), *cert. denied*, No. 12-66 (Oct. 1, 2012), the objection that the settlement would "essentially require a mini-trial to determine whether each potential class member was damaged" was rejected, as the fact that claims may require individualized analysis is not fatal to commonality, and does not preclude approval. As the Eleventh Circuit noted in *Allapattah Services,* "numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." Allapattah Services v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003); *accord,* Stearns v. Tickemaster Corp., 655 F.3d 1013, 1026 (9th Cir. 2011); Petrovic, supra, 200 F.3d at 1146 ("a settlement which contains class members who may recover different amounts is acceptable").

Courts of appeal that have explored the subclass question in recent years agree that, to prevent class certification, or require formal sub-classing, the conflict must be "fundamental." *See*

In re K-Dur Antitrust Litig., 686 F.3d 197, 223 (3d Cir. 2012) ("Only a fundamental conflict will defeat adequacy of representation"); In re Literary Works in Electronic Databases Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011); UAW v. GMC, 497 F.3d 615, 629 (6th Cir. 2007); In re Flag Telecom Holdings Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009).  Sub-classing must have a useful and beneficial function.  It is "appropriate only when the court believes it will materially improve the litigation," and is thus not always needed, because "subclassing often leads to more complex and protracted litigation." Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO, 803 F.3d 878, 880 (6th Cir. 1986).  Indeed, the quest for endless subclasses suggested by the objectors here defeats the unique efficacy of the class mechanism to embody complex settlements.  Courts recognize that treating subclassing as a mandate would force negotiators and courts to the Hobson's choice of confining settlement terms "to the simplest imaginable" or risking "fragmenting the class beyond repair." UAW v. GMC, 497 F.3d at 629; accord, In re Cendant Corp. Sec. Litig., 404 F.3d 173, 202 (3d Cir. 2005).  Given the uncapped nature of most Proposed Settlement frameworks, and the role of an objective and dispassionate neutral in the allocation of the Seafood Fund, no Objector has pointed to an (alleged) "conflict" that is so "fundamental" that it would require formal subclasses. *See generally,* KLONOFF REPORT [Doc 7104-3], ¶¶ 31-32; COFFEE DECLARATION [Doc 7110-3], ¶¶ 8, 23; ISSACHAROFF DECLARATION [Doc 7104-4], ¶¶ 7-9, 12-13; SUPPLEMENTAL KLONOFF REPORT, ¶¶ 45-46; SUPPLEMENTAL COFFEE DECLARATION, ¶¶ 15-41.

## OTHER FALLACIES CONTAINED WITHIN THE OBJECTIONS

Class Counsel respectfully address some of the other fallacies present in the various objections:

The VoO Set-Off Reasonably Takes Into Account the Litigation Risk Posed for Those Who Don't Settle

Class Counsel have advocated from the beginning that BP should not offset earnings from participation in the Vessels of Opportunity Program against compensation for loss of earnings as a result of the spill. Despite an ostensible letter agreement from BP counsel in early May 2010,[161] and success with the GCCF, BP steadfastly clung to the position that the May 2010 letter to Mr. Klick was a "miscommunication"; that OPA only compensated plaintiffs for their "loss" of profits; and that plaintiffs had the duty to mitigate their damages; hence *all* VoO earnings should be offset.[162]

Taking into account the litigation risk posed by BP's arguments, as well as the uncertainties surrounding the ability to establish a formal contract or otherwise hold BP to its representations under theories of detrimental reliance, agency or estoppel, Class Counsel believed it was reasonable to negotiate a *discounted* offset of one-third of the previous VoO income, provided that it was applied to the total compensation amount, *after* the application of the applicable RTP.

After the Seafood Fund was established, the Court-Appointed Neutral decided not to apply any VoO Offset to the compensation frameworks within the Seafood Program.

---

[161] *See* LETTER FROM A.T. CHENAULT TO J. KLICK (May 3, 2010) [No.10-7777, Doc 77-1].

[162] *See, e.g.,* LETTER FROM HAYCRAFT TO HERMAN (Aug. 3, 2010); LETTER FROM CANTOR TO ZINS (Sept. 21, 2011); SUPPLEMENTAL COMMENTS OF BP EXPLORATION & PRODUCTION INC (July 7, 2011), at pp.27-28.

Nevertheless, the partial VoO Offset reasonably takes into account the litigation risk posed for those who don't settle where it applies.

As BP notes, moreover, there is a rational distinction between charter boat operators who are simply chartering their vessels to BP as opposed to other customers, versus commercial fishermen who were engaged in different kinds of economic activities.[163]

Charter Boat Operators – who Are Treated Fairly and Adequately under the Settlement – Face Different Risks than Commercial Fishermen and Have More Difficult Claims for Punitive Damages

Some charter boat operators have complained that they face the same risk, and should therefore get the same RTPs, as commercial fishermen participating in the Seafood Compensation Program.

However, charter boat operators arguably do not fall within the limited "commercial fishermen exception" to the *Robins Dry Dock* rule, and likely have no claims for punitive damages under existing law.

Charter boat operators, it could be argued, also face dissimilar risks than commercial fishermen, because a charter boat operator can get paid to take customers out on trips, even if the customers don't catch any fish.

These objectors, moreover, while pointing to the commercial fishing RTPs, do not make a case that the Proposed Settlement is inadequate *to them*. By comparison to the GCCF, for example, the charter boat operators generally get an effective multiplier of 3.5 (*i.e.* an RTP of 2.5) as compared with the GCCF's multiplier of only two.

---

[163]*See* KLONOFF SUPPLEMENTAL DECLARATION, ¶¶ 17-18; *citing,* BP FINAL APPROVAL BRIEF [Doc 7114-1], at pp.90-91.

<u>Seafood Processors – who Are Treated Fairly and Adequately under the Settlement – Have More Difficulty in Maintaining Claims for Punitive Damages than the Commercial Fishermen Participating in the Seafood Program</u>

As with the charter boat operators, some seafood processors have complained that they face the same risk, and should therefore get the same RTPs, as commercial fishermen participating in the Seafood Compensation Program.[164] Yet the Court has ruled that commercial fishermen have claims for punitive damages, while processors, who generally won't be able to satisfy the *Robins Dry Dock* test, do not.[165,166]

<u>Class Members who Have either Working VoO or Non-Working VoO Claims Are in a Position to Determine Whether or Not Such Compensation is Reasonable and Adequate to Compensate them for any Section 1981 Claims</u>[167]

The VoO Charter Claim payment is intended to compensate Vessel of Opportunity participants on a negotiated basis to accommodate a host of different complaints that people were not paid what they should have been paid in connection with the Vessel of Opportunity Program. To the extent that either a Working VoO or a Non-Working VoO Participant alleges that he or she should have earned more money in the program but was denied opportunities due to his or her ethnic background or race, he or she is in a position to make the decision about whether the compensation provided under the Proposed Settlement is sufficient to compensate them for the Section 1981 claims.

---

[164]*See, e.g.,* OBJECTION NO. 139, at p.2; *see also,* OBJECTION NO. 147.

[165]*See* B1 ORDER [Doc 3830], at pp.26-27 and p.38 Nos. 6, 10.

[166]It could be additionally noted, in this regard, that all of the effective multipliers under the Proposed Settlement for seafood processors are equal to or greater than under the GCCF stated methodologies.

[167]*See* OBJECTION NOS. 114, 141, 245.

The people who were never provided with an opportunity to participate in the VoO Program at all may not be Class Members[168] or they may be potential Class Members by virtue of the existence of other (*e.g.* Seafood, Subsistence) Claims.  If they are not Class Members, then their rights are unaffected, and they can continue to pursue their §1981 claims.  If they are Class Members, then they can decide whether the total compensation provided under the Settlement Program is more favorable than opting out and continuing to litigate (including continued litigation of the Section 1981 claims).  In any event, as noted *supra,* it is well-settled that a class action release can be broader than the claims that are pleaded in the operative complaint or directly compensated under the class settlement.[169]

People or Businesses Who Only Have Unrealized Diminution in Property Value ("Stigma") Claims Are Not Class Members and Are Unaffected by the Settlement

Several people have filed objections complaining about the Proposed Settlement's failure to compensate an unrealized diminution in property value (sometimes referred to as "stigma") claims.[170] First, it should be noted that it is highly questionable whether these claims are cognizable as a matter of law.[171]  Yet if the *only* claim that someone has is a claim that his or her property value is lower than it was at the time of the spill, or was sold at a reduced price after December 31, 2010, then that

---

[168]*See* Settlement Agreement, Section 1.3.

[169]*See, e.g.,* Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 107 (2d Cir. 2005); Berardinelli v. Gen. Am. Life Ins. Co., 357 F.3d 800, 805 (8th Cir. 2004); Maher v. Zapata Corp., 714 F.2d 436, 438 (5th Cir. 1983); In re Corrugated Container Antitrust Litigation, 643 F.2d 195, 221 (5th Cir. 1981); Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 244 (D.N.J. 2005), *aff'd*, 618 F.3d 300 (3d Cir. 2010).

[170]*See, e.g.,* Objection Nos. 43, 123, 230; *see also,* Objection Nos. 34, 35, 36, 42, 46, 53, 55, 67, 97, 98, 99, 152, 188, 191, 252, 253.

[171]*See* Order and Reasons (Oct. 1, 2012) [Doc 7526], at pp.4-12 (dismissing "pure stigma" claims).

person or entity does not have a claim that meets the descriptions of the Damage Claims set forth in the Settlement Agreement,[172] and he is free to pursue such diminution in value claims.

<u>The Court-Supervised Settlement Program is Not Required to Provide Interim Payments; To the Extent that OPA Requires BP, as the Responsible Party, to Provide Interim Payments, That Responsibility Is Presumably Being Fulfilled By and Through the Separate New BP OPA Claims Process</u>

Several objectors complain that the Proposed Settlement does not include an interim claims process, as required by OPA.[173]  The Court-Supervised Settlement Program, however, was never intended to be the claims process maintained by BP as the Responsible Party.  Rather, BP simultaneously established a separate OPA Claims Process to satisfy its continuing obligations under the Oil Pollution Act.[174]   A Class Member can presumably pursue interim claims, as appropriate, from the BP OPA Claims Process,[175] and then has until at least April 22, 2014 to submit claims to the Court-Supervised Settlement Program.

---

[172]*See* SETTLEMENT AGREEMENT, Sections 1.3 and 5.9.3.

[173]*See, e.g.,* OBJECTION NOS. 136, 156, 167, 189.

[174]These objections also ignore the fact that, by and large, the GCCF generally wasn't providing interim payments anyway.  *See, e.g.,* PLAINTIFFS' SUPPLEMENTAL MEMO CONCERNING BP'S FAILURE TO COMPLY WITH THE MANDATES OF OPA [Doc 1318], PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF COURT SUPERVISION OVER THE BP INTERIM CLAIMS PROCESS [Doc 3423] *and* STATE OF LOUISIANA MEMORANDUM IN RESPONSE TO JUDGE BARBIER'S FEBRUARY 2, 2011 ORDER [Doc 1308] (cited in the AG's *amicus* filing at p.23 fn.51); *see also,* MISSISSIPPI STATEMENT OF INTEREST [Doc 6356-3], at p.15 ("BP through the GCCF, essentially stopped processing or paying interim claims from individuals and businesses suffering OPA damages on November 23, 2010").

[175]*See* www.bp.com/claims.

<u>The Submission of Monthly P&Ls Is Not Required Under the Settlement Agreement if they Were Not Generated in the Ordinary Course of Business</u> [176]

The Settlement Agreement allows the Class Members to use "alternate source documents"[177] and to generate "contemporaneous"[178] financial statements based on the records created and maintained in the ordinary course of business.

The Program will process and evaluate a small business claim based on bank statements or other underlying data where monthly P&Ls were not prepared in the ordinary course of business. Hence, there is no requirement for the small business owner to engage in a process that is "overly burdensome and cost prohibitive"[179] in order to submit their claim;  rather, the *burden is on the Program* to undertake the accounting work,[180] at BP's expense.[181]

<u>The Base Loss under the Seafood Program Historical Revenue Models are Presumed</u>

An "emergency motion" filed on behalf of the Apalachicola Bay Seafood Workers after the objection deadline suggests that the Seafood Program Frameworks are "unfair" to them because they didn't suffer losses until 2012.[182]   Even assuming that is the case, the revenue-based Seafood

---

[176]*See, e.g.,* OBJECTION NO. 198, at pp.41-42; *see also,* OBJECTION NO. 167, at p.9; OBJECTION NO. 186, at pp.13-16; OBJECTION NO. 189, at p.9; OBJECTION NO. 209, at p.4.

[177]SETTLEMENT AGREEMENT, Exhibit 4A, Item 4.

[178]SETTLEMENT AGREEMENT, §38.38.

[179]OBJECTION NO. 198, at p.42.

[180]SETTLEMENT AGREEMENT, Sections 4.3.7 and 4.3.8.

[181]SETTLEMENT AGREEMENT, Section 5.12.1.4.

[182]OBJECTION NO. 240.

Compensation frameworks do not consider the actual 2010 losses, but rather, presume a base loss from the benchmark years.[183]

The Offset for Prior Spill-Related Payments from the GCCF Do Not Reduce the RTP [184]

Under the Settlement Agreement, the RTP is applied to the base Compensation Amount, *before* application of any offsets for previous payments by the GCCF.  Therefore, the fact that a Class Member may have already received payments for some of his or her losses will not affect the future risk component to which that classmember may be entitled under the Proposed Settlement.

Complaints About the Ability to Establish Causation under the "Customer Mix" Test [185]

Complaints about the ability to satisfy the "customer mix" test as an alternative to the standard V-curve formulas assume that information about customers by zip code cannot be provided by the major banks or credit card companies, and gloss over the additional and alternative methods of proof.[186]

---

[183]This objection also complains that the Seafood Program is "unfair" to Florida oyster harvesters because they don't have leasehold interests.  If, in fact, these potential Class Members don't have leasehold interests, it's hard to see how or why they would be entitled to compensation for damage to their leases. Nevertheless, and in any event, these objectors are apparently unaware that there is a separate revenue-based framework for oyster harvesters who harvest oysters from public grounds. *See* Seafood Compensation Program [Exhibit 10], at pp.30-39.

[184]*See* Objection No. 132.

[185]*See, e.g.,* Objection Nos. 50, 120.

[186]*See, e.g.,* Letter from Class Counsel to Wilson (Sept. 29, 2012) (re: Objection No. 50) (pointing out that: **(a)** class counsel were in the process of attempting to provide for a Court Order under which the major credit card companies could provide customer mix information by zip code; **(b)** causation was presumed for "Seafood Retailers" in Zone C under Section III(A)(3); and **(c)** a Tourism business in Zone C could establish causation using projections under Section III(B)(2)(e)).

<u>Unfounded Complaints About Lack of Access to Proof of Causation</u>

A number of similar objections filed by the same group of attorneys allege that Class Counsel have somehow "withheld" proof of proximate causation with respect to the claims of their own clients.[187]  Putting aside for a moment whether "proximate cause" is the appropriate legal standard,[188] it is curious that these attorneys would believe that Class Counsel have better insight into or evidence regarding the merits of their own client's cases than they do.  Presumably, they were hired by their clients to investigate and document the presence of oil or other relevant factors.  Yet these objectors claim that:

> ...it remains an open question as to exactly what the responsibility of the Class Counsel may be in regard to proof of causation for the individual victims....  If the Class Counsel does in fact have the duty to prove causation, it must make available to those clients the level of proof which it possesses as to causation so that the victims can knowingly decide whether this settlement is or is not of value to them.[189]

While the Plaintiff Steering Committee has long been engaged in a continuing process to develop common bodies of proof regarding fate and transport and other environmental issues, (much of it covered by attorney and/or expert/consultant work product), which may be of direct or indirect assistance to individual plaintiffs who might one day try their own cases, the responsibilities of the Steering Committee in this regard have always been clear:  In Pre-Trial Order No. 8, the Court assigned to the PSC responsibility for the presentation of evidence in "common issue, 'bellwether'

---

[187]*See, e.g.,* OBJECTION NOS. 88, 97, 98, 99, 100, 157, 159, 177, 181.

[188]*See, e.g.,* B1 ORDER [Doc 3830], at p.33 (rejecting the application of a traditional "proximate cause" standard under OPA).

[189]OBJECTION NO. 88, at p.3 fn.2.

and/or 'test' case trial(s)."[190]  In all other cases, it is up to the objectors and their attorneys to prove causation specific to their own properties or other losses.

Employees Who Performed Substantial Services in Zone A Are Treated As Zone A, even if their Employers Are Headquartered in Zone D [191]

The Settlement Agreement provides that:

> Claimants may establish an alternative location of economic loss for the Claiming Job other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location. For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.[192]

Objectors suggesting otherwise are mistaken.

---

[190]*See* PRE-TRIAL ORDER NO. 8 [Doc 506], at p.3.

[191]*See, e.g.,* OBJECTION NO. 201.

[192]SETTLEMENT AGREEMENT, Exhibit 8A, p.2 fn.4.

<u>Criticisms of the Common Benefit Fee Structure are Without Merit</u>

The objections to the Common Benefit Attorney Fee Agreement appear to be asserted mainly by "professional objectors" or others seeking to leverage their own interests or agendas,[193] and are addressed in the Supplemental Report of Professor Klonoff.[194]

<u>The Gulf Tourism and Seafood Promotional Fund is Not a "Prohibited"</u> *Cy Pres* [195]

The objections to the Gulf Tourism and Seafood Promotion Fund are without merit, and are addressed in the Supplemental Report of Professor Klonoff.[196]

---

[193]*See, e.g.,* OBJECTION NOS. 101, 118, 123, 198, 230, 234.  Mr. Palmer, for example, (who filed Objection Nos. 123 and 124), has been the subject of criticism by several courts due to bad-faith conduct, including false representations made to the Court. *See, e.g.,* <u>Arthur v. Sallie Mae</u>, No. 10-cv-198 (W.D. Wash. Sept. 14, 2012) (in which the Court found that Mr. Palmer made misrepresentations to the Court, including untrue statements in his declaration supporting his motion for attorney's fees, and false certification in a *pro have vice* application that he had not been the subject of formal discipline by a state bar association when in fact he had been suspended from the Colorado Bar Association, the State Bar of Arizona, and the State Bar of California as a result of a Colorado felony conviction); <u>Herfert v. Crayola, LLC</u>, No. 11-cv-1301 (W.D. Wash. Aug. 17, 2012) [Doc 74] (denying Mr. Palmer's *pro hac vice* application); <u>In re: Uponor</u>, No. 11-MD-2247 (D. Minn. Sept. 11, 2012) [Doc 132], at p.5 (requiring objectors affiliated with Mr. Palmer to file appeal bond and noting that "the Palmer Objectors have evidenced bad faith and vexatious conduct").

[194]KLONOFF SUPPLEMENTAL REPORT, ¶¶ 52-55; (*see also,* ¶¶ 30-37).

[195]*See, e.g.,* OBJECTION NOS. 123, 230.

[196]KLONOFF SUPPLEMENTAL REPORT, ¶¶ 26-29.

## Conclusion

For the above and foregoing reasons, for the reasons set forth in the accompanying Exhibits, Declarations and Reports, and for the reasons set forth in Plaintiffs' original Approval Brief and supporting Exhibits, Declarations and Reports, as well as the underlying record in these proceedings, the Court should enter a final order and judgment that: **(i)** confirms the certification, for settlement purposes, under Rule 23(a)(1)-(4), 23(b)(3) and 23(e), of the Economic Class; **(ii)** finds and concludes that the multi-media class notice program, as previously approved and as thereafter conducted, satisfies all applicable notice requirements of Due Process and Rule 23; **(iii)** grants final approval to the proposed Economic and Property Damages Settlement Agreement as fair, adequate, and reasonable under Rule 23(e); **(iv)** confirms the appointment of the undersigned as Class Counsel under Rule 23(g); **(v)** reserves and exercises continuing and exclusive jurisdiction over the implementation, administration, and completion of the Court Supervised Settlement Program; and **(vi)** makes such other and further orders as this Court deems necessary and appropriate in connection with the approval, implementation, enforcement, and completion of the Economic and Property Damages Settlement.

This 22<u>nd</u> day of <u>October</u>, <u>2012</u>.

Respectfully submitted,

/s/   Stephen J. Herman
**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

 /s/ James Parkerson Roy
**James Parkerson Roy**, LA Bar No. 11511
**DOMENGEAUX, WRIGHT, ROY & EDWARDS, LLC**
556 Jefferson Street, Suite 500
Lafayette, LA 70501
Telephone: (337) 233-3033
Fax: (337) 233-2796
Email: jimr@wrightroy.com
*Co-Lead Class Counsel*

## ECONOMIC CLASS COUNSEL

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:  (843) 216-9159
Telefax: (843) 216-9290
E-Mail:  jrice@motleyrice.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA 70360
Office:  (985) 876-7595
Telefax: (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 22nd day of October, 2012.

    /s/ Stephen J. Herman and James Parkerson Roy