| | |
|---|---|
| **In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>This document relates to all actions. | MDL NO. 2179<br><br>SECTION: J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| **Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,**<br><br>**Defendants.** | Civil Action No. 12-970<br><br>SECTION: J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**SUPPLEMENTAL EXPERT REPORT OF ROBERT H. KLONOFF RELATING TO THE PROPOSED ECONOMIC AND PROPERTY DAMAGES CLASS SETTLEMENT**

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I. INTRODUCTION

1. On August 13, 2012, I submitted a report in this case on the issues of class certification under Rule 23(b)(3), the fairness of the proposed economic and property damages class settlement, and the reasonableness of the proposed structure for awarding attorneys' fees and costs. Expert Report of Robert H. Klonoff Relating to the Proposed Economic and Property

Damages Class Settlement, Case 2:10-md-02179-CJB-SS, Doc. 7105-5 (hereinafter Klonoff Economic Report). In a separate submission, I addressed the medical benefits class settlement. Expert Report of Robert H. Klonoff Relating to the Proposed Medical Benefits Class Settlement, Case 2:10-md-02179-CJB-SS, Doc. 7111-4 (hereinafter Klonoff Medical Report).

2. The Court set a date of September 7, 2012, for written submissions by class members who wanted to object to the settlement. Approximately 250 objections have now been filed,[1] although some of them are duplicative and many are from non-class members.[2] The opportunity for class members to object to a proposed settlement, provided by Rule 23(e)(5), is an important part of the Court's process of reviewing the settlement. Thus, I have carefully considered the objectors' arguments. Ultimately, however, none of the objections changes my opinions with respect to the conclusions in my initial Report. To reaffirm in brief: I continue to believe (1) that the class should be certified under Rule 23(b)(3); (2) that the settlement is fair and should be approved; and (3) that the attorneys' fee structure embodied in the settlement is reasonable. Nonetheless, objectors raise a number of points that I believe merit discussion. I concentrate my attention on those objections that, in my view, appear to be arguable or plausible.

3. Because the vast majority of the objections address the fairness of the settlement, I focus first (in Part II) on the fairness arguments. The proposed fee structure has been cited by some objectors in challenging the fairness of the settlement, and I therefore address fee-related fairness arguments in Part II. In Part III, I address the class certification arguments. Finally, in Part IV, I address arguments relating to the attorneys' fees agreement.

---

[1] All citations to specific pages of the objections discussed in this Report refer to the Court-assigned page numbers (located in the upper right corner of the document).

[2] It should be noted that some of the objections purport to be filed on behalf of multiple claimants similarly situated. Several objections are by attorneys representing multiple clients. *See*, *e.g.*, Davis Obj. (##116, 153) at 1 (objection filed on behalf of objector's own law office, as well as on behalf of nine other individual claimants); Florida Claimants Obj. (#155) at 1 ("60 class members"); Net Works Inc. Obj. (#209) at 1 ("Claimants comprise more than 550 businesses, individuals, and/or property owners that have been affected by the *Deepwater Horizon* explosion and subsequent oil spill."); Joachim Obj. (##225, 229) (representing 28 claimants mostly in Louisiana). Other objections were filed by organizations purporting to speak on behalf of the interests of their industries. *See*, *e.g.*, Miglini Obj. (#3) at 1 (objection by executive director of Charter Fisherman's Association); Walker Obj. (#21) at 1 (executive director of National Association of Charterboat Operators). On the other hand, a number of objections are duplicative. *See*, *e.g.*, Obj. ##6–9; 12–16; 22–29; 77–85; 105–113; 170–176.

## II. FAIRNESS OF PROPOSED ECONOMIC AND PROPERTY DAMAGES CLASS SETTLEMENT

### A. Initial Observations

4. In reviewing the objections, I am struck by a number of inconsistencies and contradictions. For example, a number of objectors harshly criticize the Gulf Coast Claims Program (GCCF),[3] while others argue that the GCCF was actually the better mechanism for compensating victims of the spill, and that the settlement suffers by comparison.[4] Likewise, some objectors attempt to support their arguments by claiming that BP could go bankrupt,[5] while others point to BP's large market capitalization, arguing that the company could have afforded to pay far more than the estimated $7.8 billion in this settlement.[6] Some assert that the class sweeps too broadly, creating wide disparities among class members,[7] while others argue that the class definition is too narrow, thus unfairly excluding large numbers of worthy claimants.[8] Some objectors contend that this case does not meet the requirements of Rule 23,[9] while another insists that, as a practical matter, these claims can *only* be settled as a class action.[10] Some contend that the amounts offered to claimants are inadequate;[11] others say the settlement provides ample compensation, but not to all of the right claimants;[12] and a couple of objectors even argue that the settlement is too generous.[13]

5. Overall, these inconsistencies reflect the fact that, in any class settlement of this magnitude, there will be some degree of dissatisfaction and disagreement among the claimants. But, of course, the test for whether a settlement class should be approved is not whether the settlement is perfect in the view of every class member (a test no settlement could pass), but

[3] *See*, *e.g.*, Eureka Specialty Woods Obj. (#33) at 1; Gelzer Obj. (#38) at 1; 2 Stix, Inc. Obj. (#50) at 4; Triton Diving Servs. Obj. (#95) at 4; Boettner Obj. (#97) at 5.

[4] *See*, *e.g.*, Armour Obj. (#101) at 11; Prashiela Enterprises, LLC Obj. (#198) at 13; Maggard Obj. (#136) at 1; Florida Claimants Obj. (#155) at 1–2; Dixon Obj. (#156) at 6.

[5] *See*, *e.g.*, Prashiela Enterprises, LLC Obj. (#198) at 55.

[6] *See*, *e.g.*, Armour Obj. (#101) at 8.

[7] *See*, *e.g.*, Saunders Obj. (#230) at 19.

[8] *See*, *e.g.*, Bayhaven Enterprises Obj. (#167) at 3.

[9] *See*, *e.g.*, Cobb Real Estate Obj. (#118) at 3–4; MRI, LLC Obj. (#235) at 4–5.

[10] *See* Walker Obj. (#189) at 3.

[11] *See*, *e.g.*, Brown Obj. (#130) at 4; Olander Obj. (#194) at 1; Petro Obj. (#234) at 5.

[12] *See*, *e.g.*, Pelican Inlet Aqua Farm, Inc. Obj. (#135) at 1; Slabic Obj. (#139) at 1–2.

[13] *See* Halliburton Obj. (#91) at 21–22; Adams Obj. (#243) at 1.

rather, whether it satisfies the requirements of Rule 23 and due process.

6. In fact, when the objections are examined in their entirety, they reinforce the overall fairness of the settlement in a number of ways.

7. First, given the hundreds of thousands of class members, the comprehensive notice program, and the high-profile nature of the litigation, the fact that only about 250 objections were filed is significant.[14] Had a substantial number of class members viewed the settlement as egregiously unfair, one might have expected to see a much larger number of objections.

8. Second, it is not the low number of objections alone that is notable, but rather the fact that many of the objections are from *non*-class members who are complaining that they were excluded from the settlement.[15] As I noted in my initial Report, Klonoff Economic Report at ¶ 66, if the settlement terms were weak, people would not be objecting on the ground that they were excluded. In my experience, it is highly unusual to see so many objections by people complaining about not being able to participate in a settlement. Indeed, the feelings of those who were not included were apparently so strong that on August 23, 2012, hundreds of hotel owners and other small business owners staged a protest at BP's headquarters in Houston to express their anger at being excluded from the settlement.[16] Surely, protestors would not gather to urge that they be included in a settlement they deemed unfair.

9. Relatedly, one objection—filed by a potentially liable party, Halliburton Energy Services,

---

[14] *See*, *e.g.*, *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853 (E.D.La. 2007) ("[t]he absence or small number of objections may provide a helpful indication that the settlement is fair, reasonable, and adequate" (citations omitted)); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) (although "[a] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members," the existence of a relatively "small number of objections . . . can be viewed as indicative of the adequacy of the settlement" (citations omitted)); *Kay Co. v. Equitable Prod. Co.*, 2010 U.S. Dist. LEXIS 41892, at *25 (S.D.W.Va. Apr. 28, 2010) (finding small number of objections "especially significant because such a high percentage of the Class Members were successfully notified").

[15] Examples of objectors who want to be included in the economic and property damages settlement are Ellis (#34); Cox (#35); Debreczeni (#36); Brannon (#37); C. Boggs (#42); Poulin (#43); Whitley (#46); Morgan (#49); Diversified Holdings (##53, 56, 65, 73, 75); GDC View LLC (##55, 63, 64, 74, 76); Guin (#66); McIntosh (#67); Dion (##70, 71); American Legion Post (#87); Quality Metal Works (#90); Potter (#125); Fore (#127); Goff (#131); Smith (#134); Wilhite (#143); Krueger (#152); Scott (#159); Pathak (#161); McGuire (#191); and Guillory (#242).

[16] *Hotel Owners Protest Exclusion from BP Oil Spill Settlement*, Aug. 24, 2012, http://www.bluemaumau.org/11853/hotel_owners_protest_exclusion_bp_oil_spill_settlement (last visited Oct. 21, 2012); Emily Pickrell, *Hotel owners' anger flares over oil spill deal*, Houston Chron., Aug. 23, 2012, *available at* http://www.chron.com/business/article/Hotel-owners-anger-flares-over-oil-spill-deal-3811331.php (last visited Oct. 21, 2012).

Inc.—discusses in detail why it believes the settlement is *too* generous to the class. Halliburton Obj. (#91). According to Halliburton, "BP is paying a premium to buy peace and restore its reputation after the *Deepwater Horizon* Incident and various other disasters caused by its negligence . . . ." *Id.* at 22. In Halliburton's view, the settlement terms "are well beyond any likely recovery at trial." *Id.* Thus, notes Halliburton, "the payments under the Settlement Agreement are much greater than the corresponding injuries they seek to address." *Id.* at 23. To be sure, Halliburton's concerns are not for the class members. Rather, Halliburton is worried about "inflate[d] payments to claimants, resulting in larger claims for contribution against [Halliburton] and a higher baseline for assessing punitive damages" against it. *Id.* at 15. Nonetheless, Halliburton's argument is significant: The very fact that Halliburton can make a plausible argument that the settlement *overcompensates* class members is remarkable. Moreover, at least one putative class member has made the same argument, albeit in significantly less detail. *See* Adams Obj. (#243) at 1 ("I think enough has been paid out.") In my more than 20 years litigating, researching, and writing about class actions, I have never seen a settlement criticized on the ground that it is *too* generous and provides *more* benefits than class members could have achieved at trial.

**B. Reponses to Specific Objections**

10. In this section, I respond to a number of specific objections. As noted above, I do not purport to respond to every objection.

**1. Objections Based on Line Drawing, Offsets, and the Scope of Releases**

11. Numerous objections are based on the geographical and other lines drawn by the settlement. Claimants in one category argue that they should not receive less compensation than claimants in another category (or should not be burdened with more stringent proof requirements). Other claimants complain that their benefits are unfairly offset by other payments previously received from BP. Still other claimants complain about the scope of the releases they must sign to participate in the settlement.

12. Although I will address the specific factual objections below, all of these arguments are subject to the same response: Every class settlement is subject to an argument that some class members should have fared better vis-à-vis other class members, or that the lines could have

been drawn differently. But the test is not whether the benefits under a settlement are "perfectly equitable." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1011 (E.D. Wis. 2010). Rather, the test is whether the allocations are "reasonable." *Id.* (holding that antitrust settlement providing warranty benefits for purchasers of lawnmowers from most defendant manufacturers (but not Honda) was reasonable based on the facts).[17] In short, the settlement must be reasonable, but it need not be perfect. For the reasons I explain below, the settlement here is eminently reasonable. Indeed, as I explained in my initial Report, the negotiation structure was designed to ensure that class members in each category received the best deal, consistent with the facts and circumstances of that category. *See* Klonoff Economic Report at ¶¶ 31–32, 36. Class counsel had no incentive to negotiate anything other than a fair allocation for each category of claims.

**a. Line Drawing**

13. The line-drawing objections only underscore the wisdom of the principle that courts should not second-guess reasonable judgments made by the settling parties in reaching an agreement. For example, objector Prashiela Enterprises complains about the more "burdensome economic formula and unnecessary documentary requirements" for claimants falling within Zones C and D. Prashiela Enterprises Obj. (#198) at 67. Similarly, Cobb Real Estate objects on the ground that no portion of Texas is included in Zone A. Cobb Real Estate Obj. (#118) at 5.[18] But, as BP's expert, Dr. Henry Fishkind, explains, "[i]n general, the Zones are structured to reflect the fact that as distance increases from the coast, the likelihood of damage due to the [oil

[17] *Accord*, *e.g.*, *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 351 (E.D.N.Y. 2010) ("'[T]here is no rule that settlements benefit all class members equally.'" (citations omitted)); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 252 (D.N.J. 2000) ("[U]nless the court reviewing settlement finds . . . stark conflicts of interest . . . a settlement which contains class members who may recover different amounts is acceptable." (quoting *Petrovic v. Amoco Oil Corp.*, 200 F.3d 1140, 1146 (8th Cir. 1999) (internal quotation marks omitted)), *aff'd*, 264 F.3d 201 (3d Cir. 2001).

[18] *See also*, *e.g.*, Marsh Works LLC Obj. (#89) at 1–2 (objecting to "arbitrary placement" in Zone D when the "overwhelming majority" of its customers reside in Zones A, B, and C); Quality Metal Works Obj. (#90) at 3–4 (arguing that "[i]t simply does not make sense that a similar business in Lake Charles or Lafayette or Baton Rouge would have to prove less to recover than a similar business in Jefferson or Orleans Parish"); Islander Properties, Inc. Obj. (#129) at 3 (arguing that "all barrier islands" in Florida, including "the 45 mile stretch between Siesta Key and Gasparilla Island as well as Fort Meyers Beach and Marco Island," should be included in Zone A); Seaway Marine Center Obj. (#138) at 1 (in Zone C; wants to be in Zone A); Slabic Obj. (#139) at 2 ("Oyster processors should have the same RTP as oyster harvesters."); The Dock Bar and Grill, LLC Obj. (#151) at 1 (in Zone C; wants to be in Zone A); Houghton Obj. (##246, 248) at 2 (same).

spill] is reduced just as economic theory would expect." Fishkind Decl. (Doc. 7114-5) (filed 08/13/12) at ¶ 50. Does this mean that the theory holds true for every single claimant in Zones A, B, C, and D? Of course not. But is the general approach fair and reasonable? In my view, it is. Without question, a court adjudicating claims in a litigation context would, in general, give greater credence to claims of individuals and businesses who are closest to the Gulf. Moreover, an approach that subjected every class member to the same formula and the same proof requirements, regardless of location, would be vulnerable on fairness grounds.[19]

14. Similarly, objector Sturdivant complains about the Risk Transfer Premium ("RTP") multiplier for class members whose property was physically damaged from response operations (versus those whose property was not physically damaged). Sturdivant Obj. (#214) at 36–38. Sturdivant claims that the RTP of 2.5 is too low, given that the RTP for property owners whose property was not physically damaged is also 2.5. But the settlement in fact makes clear that if claimants can prove physical damage from response operations, they are entitled to additional compensation (albeit not in the RTP). *See* BP Defendants' Memorandum in Support of Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 (Doc. 7114-1) (filed 08/13/12) (hereinafter BP Economic Memo) at 34–35.

**b. Releases**

15. MRI and Dauphin Island Property Owners Association (#144) object on behalf of certain wetlands claimants. They offer a declaration of Professor Geoffrey Hazard, who complains that the settlement extinguishes wetlands claims held by class members who are residents of Florida, Alabama, and Mississippi without providing any compensation for those claims (unlike the Louisiana wetlands claimants, who do receive compensation). Hazard Decl. (Doc. 144-3) (filed 09/07/12) at ¶¶ 3–4. I am advised by class counsel, however, that a person asserting only a wetlands claim for property in Florida, Alabama, and Mississippi that is not compensated under the Coastal Framework would not be a member of the class and thus could bring those claims

[19] *See*, *e.g.*, *Newby v. Enron Corp.*, 2008 U.S. Dist. LEXIS 84656, at *55 (S.D. Tex. Sept. 8, 2008) ("While the [settlement] may not satisfy every potential claimant, that does not mean that it is unfair." (internal quotation marks omitted)); *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 534 (E.D.Ky. 2010) (finding "the plan of allocation [to be] fair and reasonable" and noting that "[t]he law does not require pro-rata distribution").

separately. Thus, Professor Hazard's opinion appears to be based on an incorrect reading of the settlement. Indeed, from my reading of the settlement, it appears that class counsel went to great lengths to ensure that the class definition did not encompass individuals who had no program for compensation under at least one category of economic or property damages pursuant to the settlement.

16. To be sure, if someone is a member of the class for other claims *and* has a potential wetlands claim for property in Florida, Alabama, or Mississippi that is not compensated under the Coastal Framework, that class member must release the potential wetlands claim (without compensation) in order to obtain the other benefits of the settlement. *See* Settlement Agreement at ¶¶ 10.1–10.12. But such a provision is neither unfair nor unusual. Indeed, "[t]he weight of authority establishes that . . . a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (citations omitted)).[20] Here, there is no question that BP's conduct relating to the oil spill encompasses the wetlands claims of Florida, Alabama, and Mississippi property owners. Thus, it is entirely proper to require class members to release such claims as part of an overall settlement, even though the class members receive no compensation for those specific claims.[21]

---

[20] *Accord*, *e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 107 (2d Cir. 2005) ("[t]he law is well-established . . . that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct" (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983) (rejecting argument that district court abused its discretion in approving a settlement that could "bar the further prosecution of certain claims pending in related derivative actions," where "notice was adequate and sufficiently informed the shareholders of the possible preclusive effects of the proposed settlement"); *Berardinelli v. General Am. Life Ins. Co.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this.")

[21] A similar issue is presented by the *Foussell* objectors, *see* Foussell Obj. (#245) at 2. These objectors are apparently the plaintiffs in a separate lawsuit against BP, in which they allege that they were discriminated against while participating in the VoO program due to their Native American status. *Id.* at 1–2. They object that the instant settlement "unfairly places them in a Catch-22 situation" because, in order to take part in the settlement, they must release all of their claims, even though "the proposed settlement makes no allocation for payment of damages" for the discrimination claim. *Id.* at 2. Yet while the facts are different from those of the wetlands objectors discussed above, the essential response to the "Catch-22" argument is the same: It is not unfair to put a plaintiff to the choice of either (1) taking part in the settlement on the same terms as all class members, or (2) opting out of the class and retaining whatever claims they may have against BP.

**c. Offsets**

17. Numerous objectors complain about the fact that economic loss payments to charter boat operators under the settlement are offset by payments they received under the VoO program.[22] But this offset is a rational way to avoid double recovery by some class members, and it is consistent with the OPA's concept of mitigation of damages. As BP explained in its Economic Memo, "a charter boat operator who chartered his vessel to BP to participate in the VoO program and received compensation for this participation has not suffered as severe an economic loss as someone who could not participate." BP Economic Memo at 90.

18. Some objectors further complain that an offset similar to the VoO charter boat operators does not apply to fishermen recovering under the Seafood Compensation Program.[23] But as BP points out, "because charter boat operators who participated in the VoO program chartered their vessels to BP, their normal business was not disturbed to the same extent as commercial fishermen, who were engaged in a different type of work and did not receive profits in their ordinary line of employment." BP Economic Memo at 91 (footnote omitted). Thus, the line drawn by the settlement has a rational basis, even if some VoO charter boat operators might have preferred a more generous approach.

19. Finally, there is a simple solution for all of those who contest various details of the settlement: instead of accepting the settlement as structured, they could have opted out and brought their claims separately. As one court noted, "[c]lass [m]embers who wished to pursue

[22] *See*, *e.g.*, Ford Obj. (##2, 165); Miglini Obj. (##3, 4); Gusa Obj. (#5); Lynch Obj. (#6); Whitley Obj. (#7); Lively Obj. (##8, 30); FV Yankee Star Obj. (#9); Salley Obj. (#10); Kruse Obj. (#11); Fish Findor Charters Obj. (#12); Wilhite Obj. (##13, 14, 18, 27, 48, 179); Swartz Obj. (#15); Foust Obj. (#16); Gams Obj. (#17); Chute Obj. (#19); Plaisance Obj. (#20); Walker Obj. (#21); Taylor Obj. (#22); Dineen Obj. (#23); Dana Obj. (#24); Paprocki Obj. (#25); Lathi Obj. (##26, 31); Jarvis Obj. (#28); Rowell Obj. (#29); Plaquemines Parish Charter Captains Obj. (#59); Nash Obj. (#60); Bad Habit Charters LLC Obj. (##77, 105); Sailaway Charters Obj. (##78, 106); Bottoms Up LLC Obj. (##79, 107); Eagle Express Charters Obj. (##80, 113); J & E Charters, LLC Obj (##81, 109); LAB, LLC Obj. (##82, 110); Hey Boy Charters Obj. (##83, 111); Ni-Cole LLC Obj. (##84, 112); Plane 2 Sea Fishing Obj. (##85, 108); Kreller Obj. (#102); R. Boggs Obj. (#133); McDuffie Obj. (##166, 172); Williams Obj. (#168); Barhanovich Obj. (#169); Becker Obj. (#170); Trochesset Obj. (#171); Wilson Obj. (#173); Baunar Obj. (#174); Amberjack Charters Obj. (#175); Annan Obj. (#176).

[23] *See*, *e.g.*, Bad Habit Charters LLC Obj. (#77); Sailaway Charters Obj. (#78); Bottoms Up LLC Obj. (#79); Eagle Express Charters Obj. (#80); J & E Charters, LLC Obj (#81); LAB, LLC Obj. (#82); Hey Boy Charters Obj. (#83); Ni-Cole LLC Obj. (#84); Plane 2 Sea Fishing Obj. (#85). Conversely, another set of objectors, commercial finfish vessel owners, assert that they "attempt[ed] to mitigate their damage" following the oil spill by "continuing to fish rather than participate in the lucrative VoO program." Werner Obj. (#104) at 6. According to these objectors, they did so in reliance on statements by BP representatives "that any VoO earnings would ultimately be deducted from a final claim." *Id.*

[certain] claims and who preferred to go for every last dollar, had ample opportunity to opt out" of the class. *Charron v. Pinnacle Group NY LLC*, 2012 U.S. Dist. LEXIS 79550, at *80 (S.D.N.Y. June 6, 2012). If the objectors choose to remain in the class, they must accept the fact that, however carefully conceived, "[n]o settlement agreement is perfect . . . ." *In Re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 490 (E.D.Pa. 2010) (citation omitted).[24]

**2. Claim that the Benefit to the Class is less than $7.8 Billion**

20. Certain objectors complain that the benefit to the class is in fact less than $7.8 billion, and that a smaller number should be used in assessing the settlement. Armour Obj. (#101) at 30–32. The argument has two components: (1) that the cost to BP is not the same as the benefit to the class, and (2) that the benefit should be offset by what the class members could have recovered under the GCCF had the settlement not occurred. Both parts of the argument are incorrect.

21. The first part of the argument appears to be based on the assumption that "benefit" means only money paid directly to class members. As I explained in my initial Report, however, the benefit to the class also includes fees and costs paid by BP. Klonoff Economic Report at ¶ 95. Presumably, BP's $7.8 billion figure includes its best estimate of both (1) the payments to the class (and other programs funded by BP to benefit the class), and (2) the other costs of the settlement, such as notice and attorneys' fees. Under the case law, both categories constitute benefit to the class. *See id.*

---

[24] *Accord*, *e.g.*, *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) ("If the terms themselves are fair, reasonable and adequate . . . whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance."); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("[s]ettlement is the offspring of compromise; the question [in reviewing a settlement] is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion"); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010) ("A proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances."); *Frew v. Hawkins*, 2007 U.S. Dist. LEXIS 65843, at *20 (E.D. Tex. Sept. 5, 2007) ("Parties give and take to achieve settlements. Typically neither Plaintiffs nor Defendants end up with exactly the remedy they would have asked the Court to enter absent the settlement." (internal citations omitted) (citing *United States v. Armour*, 402 U.S. 673, 681 (1971)); *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate" (citation omitted)); *Great Neck Capital Appreciation Investment P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 409–10 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement." (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992)).

22. Moreover, the objectors erroneously claim that, in my report, I treat the $7.8 billion as being carved in stone. According to the objection, the "$7.8 billion figure [was] referenced but not questioned [in the Klonoff Report]." Armour Obj. (#101) at 30. In fact, I discussed in detail why "the actual benefit to the class could be . . . lower than $7.8 billion." Klonoff Economic Report at ¶ 96. *See also* ¶ 97 (discussing why benefits could "be less than $7.8 billion"). I also discussed why the actual benefits could be greater than $7.8 billion. *See* ¶ 98 (discussing how BP might have "underestimated the value of the settlement" in its $7.8 billion figure) (emphasis deleted); ¶ 96 (noting that actual benefit could be "higher . . . than $7.8 billion").

23. Armour's GCCF argument is equally unpersuasive. Armour does not and cannot show what the class would have received under the GCCF. As I explained in my initial Report (¶ 52), the GCCF was criticized on the ground that it lacked clear criteria. In addition, because the GCCF was voluntary on the part of BP and was not judicially enforceable, BP could have stopped it at any time. BP's sole obligation under the OPA was to maintain some sort of claims facility for three years. After that point, they did not need to accept any claims. Moreover, what constitutes OPA "presentment," and whether OPA presentment tolls statutes of limitations on underlying claims, are contested issues. In addition, it is my understanding that many of the claims that are funded under the settlement agreement were not compensated at all (or only rarely) under the GCCF, such as the medical benefits claims, coastal and wetlands property damages, and real estate sales losses. In short, it makes little sense to offset the benefits under the settlement based on speculation as to how the class would have fared had the GCCF remained in effect. Objectors' failure to recognize the significance of the difference between the completely voluntary efforts by BP via the GCCF and a binding, public, judicially-enforceable class action settlement runs contrary to numerous cases that have recognized the importance of securing judicially-enforceable relief.[25]

24. In all events, other objectors belie Armour's contention that "sizable portions of the

[25] *See*, *e.g.*, *Lane v. Facebook, Inc.*, 2012 U.S. App. LEXIS 19767, at *30 (9th Cir. Sept. 20, 2012) (rejecting objectors' argument that defendant's promise to terminate a program that allegedly violated users' privacy rights "provide[d] no meaningful relief" where, "absent a judicially-enforceable agreement, [defendant] would be free to revive the program whenever it wanted"); *In re Budeprion XL Mktg. & Sales Litig.*, 2012 U.S. Dist. LEXIS 91176, at *54–55 (E.D.Pa. July 2, 2012) (rejecting argument that relief under class settlement was "meaningless [or] illusory" where the settlement "force[d] Defendants to take actions previously not required" and made certain changes implemented by defendants permanent, changes which, "[a]bsent the settlement agreement, Defendants would face no compulsion to keep . . . in place").

settlement are nearly-identical to the GCCF program . . . ." Armour Obj. (#101) at 32. For instance, objector Gelzer asserts that "[t]he GCCF was not an efficient way to pay claimants." Gelzer Obj. (#38) at 1. Objector 2 Stix, Inc. states that "[t]he GCCF gained a national reputation for not paying claims." 2 Stix, Inc. Obj. (#50) at 4. Objector Triton Diving stated that "the majority of the claimants before this Court have already participated in, or at least attempted to participate in, the GCCF process, which was for all these Plaintiffs/Class Members a failed process." Triton Diving Obj. (#95) at 4. Objector Buetter calls the GCCF process "unreliable and slow." Buetter Obj. (#97) at 5. Objector Potter complains that people who signed releases in order to accept final payments from the GCCF should not be precluded from participating in the class settlement, Potter Obj. (#125) at 1, an argument that presumes that payments under the GCCF were less than those under the settlement. The State of Mississippi was particularly emphatic in its April 25, 2012 filing, stating that "[t]he GCCF claims process was a confusing morass of ever-changing standards and procedures and, ultimately, it evolved into little more than a scheme to extract illegal, sweeping general Releases from claimants, through the use of economic duress and delay, often in exchange for inadequate consideration." Memorandum in Support of Statement of Interest and Request for Relief filed by the State of Mississippi Pursuant to § 1715 of the Class Action Fairness Act of 2005 (Doc. 6356-3) (filed 04/25/12) at 14. The concerns about the GCCF expressed by victims of the oil spill led plaintiffs' counsel to focus on a transparent, consistent, judicially-enforceable approach. Thus, for purposes of assessing the settlement, it makes little sense to denigrate or minimize counsel's work based on the possibility that some class members could have also gotten some money had the GCCF remained in effect. *See*, *e.g.*, *Nelson v. Waring*, 602 F. Supp. 410, 413 (N.D. Miss. 1984) ("the Court should not make the proponents of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of which concessions might have been gained").

**3. Objections Based on BP's Right to Appeal Certain Awards under the Settlement**

25. Under the settlement agreement, BP is entitled to appeal an award of damages that exceeds $25,000. Settlement Agreement ¶ 6.1.2.4. The Armour objectors claim that the entire settlement is thereby rendered unfair because "[t]he awards to the class are . . . entirely indeterminate and subjective, and require additional litigation . . . ." Armour Obj. (#101) at 35. This argument is flawed. The purpose of the appeal is not to allow the appellate panel to

invalidate an award on any arbitrary ground. Rather, it is to "enforce compliance with [the Settlement] Agreement as approved by the Court." Settlement Agreement ¶ 6.4. Moreover, while BP's appeal right is limited to awards in excess of $25,000, class members can appeal an award without regard to size. *Id.* at ¶ 6.1.2.3. In my opinion, providing a limited appellate remedy for BP is not unfair.

**4. *Cy Pres* Remedy**

26. Objector Sturdivant challenges the settlement based on the $57 million allocated to the Gulf Tourism and Seafood Promotion Fund. Sturdivant Obj. (#214) at 43. That objection is groundless.

27. This is not a case in which a settlement establishes a *cy pres* award but the class gets little or nothing.[26] Rather, as explained in my initial Report, this settlement is designed to award full compensation to all categories of claimants. Klonoff Economic Report at ¶ 65. Moreover, as I noted, each compensation category under the settlement was negotiated separately. *Id.* at ¶ 32. Distributing the $57 million award to class members on top of the carefully negotiated formulae would arguably constitute a windfall. Because the settlement was designed with the goal of providing full compensation, the additional funds allocated for the Gulf Tourism and Seafood Promotion Fund are the proverbial "icing on the cake."

28. A similar argument was rejected in *Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001), where "[s]everal objectors criticize[d] what they characterize[d] as a reversion of settlement funds to Defendants" in a case where "undistributed settlement funds (except for up to $100,000 for a *cy pres* fund) [would] be retained by Defendants as partial reimbursement for the costs of Settlement, Notice, and related expenses." *Id.* at 230. The court in *Mangone*, however, found the objections to the reversion "ill-founded[,] given the ability of most Settlement Class

---

[26] For recent examples of *cy pres* awards involving deficient relief to class members, *see*, *e.g.*, *Dennis v. Kellogg Co.*, 2012 U.S. App. LEXIS 18576, at *3 (9th Cir. Sept. 4, 2012) (finding *cy pres* portions of class settlement were "not sufficiently related to the plaintiff class or to the class's underlying false advertising claims," and that the $5.5 million valuation the parties had attached to *cy pres* relief was, "at best, questionable"); *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 480 (5th Cir. 2011) (holding district court abused its discretion by ordering *cy pres* distribution instead of distributing unused medical-monitoring funds to class members); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 938 (9th Cir. 2011) (reversing district court's approval of products liability class settlement which "provide[d] the class $100,000 in *cy pres* awards and zero dollars for economic injury, while setting aside up to $800,000 for class counsel and $12,000 for the class representatives").

Members to receive nearly 100% recoveries." *Id.* The court noted that "[t]o give Settlement Class Members more than the amounts they were allegedly damaged would constitute an unfair windfall." *Id.*

29. The Sturdivant objection makes no argument that the fund is unrelated to the purposes of the lawsuit or would not benefit class members. A media campaign to bolster the tourism and seafood industries in the Gulf Region relates directly to class members' interests. Moreover, as I noted in my initial Report, because of First Amendment concerns, this benefit is one that plaintiffs could not have obtained even if they had litigated the case and won at trial. Klonoff Economic Report at ¶ 65.

**5. Attorneys' Fees Issues Related to Fairness under Rule 23(e)**

30. As explained in my initial report, Klonoff Economic Report at ¶ 90, only after the parties negotiated the terms of the settlement, and only after the finalized, signed settlement agreement was delivered to the Court, did the parties negotiate an agreement governing fees and costs. *See* Rice Decl. (Doc. 7101-10) (filed 08/13/12) at ¶ 5. A number of objectors contend that the fee agreement renders the entire settlement unfair. In my opinion, those objections are unsound.

**a. "Clear Sailing" Agreement and "Reversion" of Fees to BP**

31. Some objectors claim that the settlement is collusive, and thus unfair, because it contains a so-called "clear sailing" agreement, *i.e.*, an agreement by a defendant not to oppose a fee request up to a certain amount (in this case, $600 million).[27] These objectors assert that the problem is compounded because, if the Court does not approve the agreed-upon maximum fee but only approves a lesser amount, the difference remains in BP's hands instead of going to class members. *See*, *e.g.*, Armour Obj. (#101) at 25–29. These features, the objectors contend, render the agreement unfair because class counsel "have negotiated to protect their fee award at the expense of potential class benefits . . . ." *Id.* at 26. These objectors rely primarily on *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). In my view, these objections lack merit.

[27] *See*, *e.g.*, Armour Obj. (#101) at 25–29; Sturdivant Obj. (#214) at 28–29; Saunders Obj. (#230) at 17–18; Petro Obj. (#234) at 18–19.

32. Objectors fail to come to grips with the legions of cases, including Fifth Circuit cases, approving class settlements that contain clear sailing fee provisions.[28] Indeed, courts have recognized the critical role that clear sailing agreements can play, given that, in many instances, defendants will only settle if they know the upper limit of their exposure. *See*, *e.g.*, *Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985) ("where . . . the amount of the fees is important to the party paying them . . . an agreement 'not to oppose' an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure"). The key question with respect to a clear sailing agreement is whether it is indicative of collusion.[29] Here, as I explained in my initial Report (¶¶ 72–78), the facts surrounding the settlement belie any claim of collusion. Absent other indicia of collusion, the existence of a clear sailing agreement does not render a settlement unfair. Indeed, most of the cases addressing clear sailing agreements (and approving them) have been in the common fund context, in which the fees are deducted from the common recovery. Here, by contrast, the fees are not even coming out of the fund, so any risk of collusion is even further removed.

33. Nor does it matter that, if fees and costs awarded are less than $600 million, the difference remains with BP and is not distributed to the class. Objectors ignore the myriad cases approving settlements with clear sailing provisions, even when the amount not awarded in fees is kept by the defendant and not distributed to the class.[30] This approach is especially justified

[28] *See*, *e.g.*, *Ayers v. Thompson*, 358 F.3d 356, 367 (5th Cir. 2004) (affirming district court's approval of class settlement under which the parties agreed that class counsel would receive $2.5 million in fees, costs, and expenses); *Blatt v. Dean Witter Reynolds Intercapital, Inc*., 732 F.2d 304, 306–07 (2d Cir. 1984) (affirming district court's fee award of $252,000 to class counsel where defendant had agreed not to object to the fee application up to $300,000); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 329 (3d Cir. 1998) ("Under the settlement, Lead Counsel would request $90 million in attorneys' fees from the district court, a request [defendant] agreed not to oppose." (footnotes omitted)); *Malchman v. Davis*, 761 F.2d 893, 905 (2d Cir. 1985) (finding "no reason to disturb the district court's determination that the conduct of the parties leading to agreement on attorneys' fees was proper," notwithstanding parties' clear sailing agreement); *Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291, 1293 n.4 (11th Cir. 1999) (finding no abuse of discretion in district court's determination that settlement including clear sailing provision was "plainly . . . not collusive in any respect" (citation and internal quotation marks omitted)); *In re Excess Value Ins. Coverage Litig.*, 2004 U.S. Dist. LEXIS 14822, at *35 (S.D.N.Y. July 30, 2004) (clear sailing agreement does not bar settlement approval where "the Court has strictly scrutinized both the process and substance" of the settlement agreement).

[29] *See*, *e.g.*, *Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291, 1293 n.4 (11th Cir. 1999) (declining to address challenge to clear sailing agreement where the district court "made a factual finding that there had not been any collusion among the parties"); *Gooch v. Life Investors Ins. Co. of Am*., 672 F.3d 402, 426 (6th Cir. 2012) ("not every 'clear sailing' provision demonstrates collusion").

[30] *See*, *e.g.*, *Skelton v. General Motors Corp*., 860 F.2d 250, 254 n.1 (7th Cir. 1988) (stating that the presence of a fee reversion clause in antitrust class settlement did not "distinguish [the] case from the typical common fund

where, as here, the results for the class are impressive even without additional distributions.[31]

34. *Bluetooth*—the main case relied upon by objectors—is not to the contrary, and in fact only reinforces why the settlement here is to be commended, not condemned. In that case, over 80% of the total payout by defendant would have gone to the attorneys. Here, by contrast, even under the most conservative scenario, only 11.4% of BP's payout will go towards fees. *See* Klonoff Economic Report at ¶ 97. In *Bluetooth*, the Ninth Circuit vacated and remanded the district court's approval of a class settlement with a clear sailing agreement, finding that "the disparity between the value of the class recovery and class counsel's compensation raise[d] at least an inference of unfairness," and that the record did "not adequately dispel the possibility that class counsel bargained away a benefit to the class in exchange for their own interests." 654 F.3d 935, 938 (9th Cir. 2011). The facts of *Bluetooth* are the polar opposite of those here, and the Ninth Circuit's analysis was carefully tied to the particular facts. As the Ninth Circuit noted:

> Absent any explanation from the district court, we are concerned that the amount awarded [in attorneys' fees] was 83.2% of the total amount defendants were willing to spend to settle the case, viewing the $800,000 allotment for attorneys' fees, the $12,000 allotment for an incentive award, the $100,000 *cy pres* award, and the $50,000 allotment for fees as a 'constructive common fund.'

*Id.* at 945. Plainly, a distribution like the one in the BP settlement—which overwhelmingly benefits the class—does not give rise to the concerns that drove the analysis in *Bluetooth*. Moreover, even with the weak settlement in *Bluetooth*, the Ninth Circuit noted that the district court on remand could potentially find the fee award to be reasonable "in light of the hours reasonably expended and the results achieved." *Id.* at 949–50. In short, *Bluetooth* does not provide a basis for invalidating the settlement at issue here.

---

case"); *Harris v. Vector Mktg. Corp.*, 2012 U.S. Dist. LEXIS 13797, at *5 (N.D. Cal. Feb. 6, 2012) (court approved settlement under which, "[i]f the Court awards less than $2.8 million" in fees, "then half of the remaining amount reverts to [defendant] and half is distributed to" *cy pres* relief under the settlement agreement (citation omitted)); *McKinnie v. J.P. Morgan Chase & Co.*, 678 F. Supp. 2d 806, 810 (E.D. Wis. 2009) (approving settlement and clear-sailing fee award where "any undistributed funds remaining after the deduction of class claims, attorneys' fees, and expenses" would "be divided as follows: a) 35% to be contributed to a *cy pres* charity; and b) 65% to be returned to [defendant]").

[31] *Cf. Glass v. UBS Fin. Servs.*, 331 Fed. Appx. 452, 456 (9th Cir. 2009) (finding no abuse of discretion in district court's approval of class settlement containing fee reversion provision; Ninth Circuit noted that "[t]he fact that class counsel achieved such timely results for the class suggest that the class's interests were not compromised by the reversion clause, and that the district court did not abuse its discretion in finding that the settlement was fair and adequate").

**b. Negotiation of Fees Before Settlement Approval**

35. Some objectors also claim that the negotiation of fees prior to approval of the settlement reveals collusion between BP and class counsel, and thus renders the settlement unfair.[32] This argument is contrary to the many cases upholding settlements as fair despite the fact that fees were negotiated before the settlement's approval.[33]

36. The critical fact here is that the fees were not negotiated until *after* all of the other settlement terms were reached, and after the finalized, signed settlement agreement was delivered to the Court. *See* Rice Decl. (Doc. 7101-10) (filed 08/13/12) at ¶ 5. This two-step process is a fact supporting the fairness of the settlement.[34]

**c. Fact that Fees are Paid Separately and Not Out of the Fund**

37. Certain objectors complain that the settlement is collusive because BP is paying fees separately rather than from a common fund. Sturdivant Obj. (#214) at 44; Armour Obj. (#101) at 26–28. They criticize plaintiffs for "tout[ing] the segregated fee fund as a virtue of the

[32] *See*, *e.g.*, Armour Obj. (#101) at 27 & n.12; Sturdivant Obj. (#214) at 28–29.

[33] *See*, *e.g.*, *Ayers v. Thompson*, 358 F.3d 356, 374–75 (5th Cir. 2004) (rejecting argument that class settlement "should be rejected because the amount of attorneys' fees was negotiated along with the rest of the agreement"); *Blatt v. Dean Witter Reynolds Intercapital, Inc*., 732 F.2d 304, 306 (2d Cir. 1984) (affirming settlement approval where, "[a]fter the parties had reached an agreement with respect to all elements of the settlement it was stipulated that [defendant] would pay attorney's fees to plaintiffs' counsel in an amount to be set by the court and would not object to an application for payment of up to $300,000"); *Gardner v. GC Servs., LP*, 2012 U.S. Dist. LEXIS 47034, at *5–6 (S.D. Cal. Apr. 2, 2012) (approving class settlement of $975,000, which amount "include[ed] attorneys' fees (not to exceed $292,500—30% of the total settlement fund"); *Laguna v. Coverall N. Am., Inc*., 2012 U.S. Dist. LEXIS 23381, at **6, 19 (S.D. Cal. Feb. 23, 2012) (approving settlement including provision under which "[c]lass counsel has sought, and Defendants have agreed to pay, $994,800 in attorney's fees"); *Stokes v. Saga Int'l Holidays, Ltd*., 376 F. Supp. 2d 86, 89 (D. Mass. 2005) (awarding fees where the "agreement between the parties [provided] that the defendants would not oppose attorneys' fees that did not exceed $350,000"); *Mangone v. First USA Bank*, 206 F.R.D. 222, 228 (S.D. Ill. 2001) (approving settlement where, "[i]n addition to $39.9 million being made available to the Settlement Class by Defendants under the Settlement, Defendants have also agreed to pay separately the $2.5 million sought by Class Counsel in attorney's fees"); *In re Vitamins Antitrust Litig*., 2001 U.S. Dist. LEXIS 25067, at *25 (D.D.C. July 16, 2001) (awarding fees requested, "as agreed to by the Settling Defendants," of $123,188,032, plus interest).

[34] *See*, *e.g.*, *Lane v. Page*, 2012 U.S. Dist. LEXIS 74273, at *227 (D.N.M. May 22, 2012) (noting the fact "that the fees were negotiated after the Settlement reduces the risk of any improper bargaining, such as reducing the class award so that the attorney can be paid quickly"); *In re Heartland Payment Sys*., 2012 U.S. Dist. LEXIS 37326, at *63–64 (S.D. Tex. Mar. 20, 2012) ("It is common practice today for class counsel to negotiate a specific fee award after they have successfully negotiated the class's recovery. Because the parties [had] not agreed to an amount or even a range of attorneys' fees [prior to successfully negotiating the class's recovery], there is no threat of the issue explicitly tainting the fairness of settlement bargaining." (citations and internal quotation marks omitted)); *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) ("To eliminate any potential conflict of interest, the parties did not engage in fee negotiation until after the settlement of Plaintiffs' claims on their merits.").

settlement's structure." Armour Obj. (#101) at 26. But plaintiffs were right to do so. As I previously explained, this feature of the settlement is a plus, not a minus.[35] Undoubtedly, had the parties negotiated a fund with fees coming out of the fund, other objectors would have come forward complaining that fees should have been negotiated and paid separately to avoid the same type of "collusion" that objectors here criticize. In any case, the most persuasive evidence that the settlement is free from collusion is the overall settlement itself. Here, the lion's share of benefits goes to the class, not to class counsel.

## III. CLASS CERTIFICATION

38. Several objectors focus on specific requirements for class certification and raise issues involving the class definition, commonality, typicality, adequacy, predominance, and superiority. I address these Rule 23 requirements in turn.

### A. Class Definition

39. The State of Louisiana suggests that the definition of the economic and property damages class does not meet the requirement that it be "'precise, objective, and presently ascertainable.'" State of Louisiana Obj. (#228) at 7 (quoting Manual for Complex Litigtion (4th) § 21.222). Louisiana contends that "[a] class cannot be defined in terms of the merits of the case as is being attempted by the settlements currently before this Court." *Id.* at 8. Simply put, the premise of Louisiana's argument is not correct. If a person or entity claimant is within a particular category and has specified evidence of economic losses during the class period, then that person is in the class. There is no requirement that the person *prove* that his or her economic injuries were caused by BP. Thus, this is not a so-called "fail-safe" class,[36] and the class definition is sufficiently objective and specific to pass muster.

40. In any event, the Fifth Circuit has consistently rejected arguments based on purported

[35] *See* Klonoff Economic Report at ¶ 77. *Accord*, *e.g.*, *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D.La. 2007) (fact that fees would be paid separate from class recovery in an amount left to the court's discretion was "significant because it exponentially decrease[d] the possibility of collusion among counsel"); *McBean v. New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2007) (where attorneys' fees are "entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").

[36] A "fail-safe" class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

"fail-safe" classes, and only weeks ago reaffirmed that proposition. In *Rodriguez v. Countrywide Home Loans, Inc.*, ___ F.3d ___, 2012 U.S. App. LEXIS 19372 (5th Cir. Sept. 14, 2012), the defendant argued that the lower court had erred in certifying a class "whose membership [could] only be ascertained," according to defendant, "by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability." *Id.* at *23–24. The Fifth Circuit, however, disagreed, affirming the lower court and noting that "our precedent rejects the fail-safe class prohibition . . . ." *Id.* at *26; *accord*, *e.g.*, *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 623, 624 n.1 (5th Cir. 1999) (rejecting fail-safe argument for class defined as "all members of the crew of the M/V Treasure Chest Casino who have been stricken with occupational respiratory illness caused by or exacerbated by the defective ventilation system in place aboard the vessel"); *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1105 (5th Cir. 1993) (defendant's fail-safe argument was "meritless and, if accepted, would preclude certification of just about any class of persons alleging injury from a particular action"). The *Rodriguez* court explained that a class is appropriately defined where the class members "are linked by [a] common complaint, and the possibility that some may fail to prevail on their individual claims will not defeat class membership." *Rodriguez*, *supra*, at *25 (citation and internal quotation marks omitted). Thus, Louisiana's argument is contrary to controlling precedent.

**B. Commonality**

41. In my initial Report, I explained that every class member's case turns on the common question of BP's liability for the *Deepwater Horizon* explosion. Klonoff Economic Report at ¶ 23. This overarching question, in my view, satisfies the exacting Rule 23(a)(2) commonality test articulated by the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Indeed, some objectors concede commonality. *See*, *e.g.*, Prashiela Obj. (#198) at 63.

42. Nonetheless, certain objectors claim that the settlement must be rejected because the class cannot satisfy commonality.[37] Cobb states that "the only common issue . . . is which party was primarily responsible for the oil spill," Cobb Obj. (#118) at 3, but does not explain why that issue is insufficient to demonstrate commonality. Sturdivant addresses the overarching question head-on, but argues that because the Oil Pollution Act (OPA) is a strict liability statute, the

[37] *See*, *e.g.*, Halliburton Obj. (#91) at 7–11; Cobb Obj. (#118) at 3–6; Sturdivant Obj. (#214) at 18–20; Saunders Obj. (#230) at 7–12.

common issues are "uncontested." Sturdivant Obj. (#214) at 18. Putting aside that non-OPA negligence claims are not uncontested, the fact that an issue may be easily proven or conceded does not disqualify it for purposes of commonality. As the Second Circuit explained in *In re Nassau County Strip Search Cases*, 461 F. 3d 219 (2d Cir. 2006):

> [A]n issue is common to the class when it is susceptible to generalized, class-wide proof. That the class-wide proof comes in the form of a simple concession rather than contested evidence certainly shortens the time that the court must spend adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed class, which is the central concern of the predominance requirement.

461 F.3d at 227–28 (citations and internal quotation marks omitted).

43. Some objectors argue that this case cannot show commonality under the rigorous standard set forth in *MD ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), which in turn was interpreting the Supreme Court's decision in *Dukes*. *See*, *e.g.*, Petro Obj. (#234) at 8; Halliburton Obj. (#91) at 6. The Fifth Circuit did explain in *Stukenberg* that, "the Supreme Court [in *Dukes*] . . . further defined the contours of the rigorous analysis required by" Rule 23(a)(2). 675 F.3d at 837 (citing *Dukes*, 131 S. Ct. at 2551–52). But while it is true that commonality is more rigorous in light of *Dukes* than in the past, this more rigorous standard is met, as explained in my initial Report, which expressly relies on the *Dukes* test. Klonoff Economic Report at ¶¶ 23–24.

**C. Typicality**

44. Halliburton claims that class representatives Sellers and Irvin are the only representatives with coastal real property claims, and that they are not typical of the class because neither suffered physical damage to property. Halliburton Obj. (#91) at 20. Halliburton cites no legal authority for its argument. As I previously explained, "'[t]ypicality does not require a complete identity of claims.'" Klonoff Economic Report at ¶ 25 (quoting *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)). Both Sellers and Irvin have claims arising out of the BP oil spill, and their claims turn in large part on BP's liability for the spill. As the Fifth Circuit has explained, "the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). The typicality element "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent."

*Id.* (citation and internal quotation marks omitted).

**D. Adequacy of Representation**

45. Several objectors argue that the class representatives are inadequate because of the variety of claims at issue and the failure of plaintiffs' counsel to designate subclasses, each with separate representatives and counsel.[38] All of the objections are premised on the assumption that, when class members assert a variety of claims, subclasses are necessary for each type of claim to avoid conflicts among class members.

46. Class counsel, Professor Coffee, and I all anticipated and addressed the issue of subclasses. *See* Klonoff Economic Report at ¶¶ 33–37; Declaration of John C. Coffee, Jr. (Doc. 7110-3) (filed 08/13/12) at ¶¶ 23–33; Plaintiffs' Memorandum in Support of Final Approval of Economic and Property Damages Class Settlement (Doc. 7101-2) (filed 08/13/12) at 44. For instance, I emphasized that, putting aside the seafood compensation category (under which, I am advised, the compensation is more than adequate to cover all claims), all categories of claimants are eligible for compensation without regard to any overall cap. Class members are not competing for a portion of a defined and limited pot of money. Klonoff Economic Report at ¶ 31. I also pointed out that structural integrity was assured by the involvement of Judge Shushan (who actively mediated and supervised the settlement process), by the participation of lawyers having clients with the particular claims being discussed, by the involvement of Court-appointed neutral John Perry in allocating the Seafood Compensation Fund, and by the fact that fees were not negotiated until the other terms of the settlement were finalized. *Id.* at ¶ 32. Finally, I discussed case law emphasizing that subclasses are not the *sine qua non* of structural fairness. *Id.* at ¶¶ 34–36. The objector's conclusory rhetoric—*e.g.*, "[a] clearer intra-class conflict is harder [sic] to imagine" (Armour Obj. (#101) at 13—is no substitute for addressing carefully (1) the precise structure and negotiation history of this settlement, and (2) the relevant case law on subclassing and conflicts of interest. Objectors have failed to provide such careful analysis.

**E. Predominance**

---

[38] *See*, *e.g.*, Armour Obj. (#101) at 11–15; Sturdivant Obj. (#214) at 21–25; Prashiela Enterprises Obj. (#198) at 49–56; Saunders Obj. (#230) at 13–17; *see also* Allpar Custom Homes, Inc. Obj. (#145) at 3–4 (making similar argument couched in terms of typicality).

47. Objector Sturdivant argues at length that, under Fifth Circuit law, predominance is not satisfied here. Sturdivant Obj. (#214) at 29–32. The case on which Sturdivant relies most heavily is one that I distinguished on several grounds in my initial Report.[39] The objector also does not address my extensive discussion as to why the common issues are critical, whereas the individualized issues are limited, partially resolvable through common proof, free of choice-of-law complications, and easily dealt with because of the narrowly defined class. Klonoff Economic Report at ¶¶ 42–45. In short, objector Sturdivant does not focus on the unique attributes of *this* case but instead merely assumes that, because the settlement involves a variety of claims, predominance cannot be satisfied. That is not the law.

**F. Superiority**

48. Although one objector suggests that the case can *only* be settled as a class action, *see* Walker Obj. (#189) at 3, other objectors claim that a class action is not superior to other ways of resolving the claims. Sturdivant Obj. (#214) at 33–35; Armour Obj. (#101) at 17–24. The arguments that a class action is not superior are not well taken.

49. Sturdivant argues that a class action would somehow "contradict the will of Congress" in enacting the OPA. Sturdivant Obj. (#214) at 34. Nothing in the OPA either expressly or impliedly prohibits the use of the class action device in oil spill cases.

50. Objector Armour argues that a class action is not superior because, given the value of the claims, there is "ample incentive for class members to proceed on an individual basis . . . ."

[39] *See* Sturdivant Obj. (#214) at 31–32 (discussing *Steering Committee v. Exxon Mobil Corp*., 461 F.3d 598 (5th Cir. 2006)). *See* Klonoff Economic Report at ¶ 47 (distinguishing that case). Sturdivant also relies on *Bell Atlantic Corp. v. AT&T*, 339 F.3d 294 (5th Cir. 2003), and *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551 (5th Cir. 2011), both of which are similarly distinguishable. In *Bell Atlantic*, the Fifth Circuit affirmed a denial of class certification where plaintiffs "proposed to calculate damages" for the class "according to a formula that utilized a nationwide average cost of labor and a nationwide average amount of time that the class members would have saved," but for defendants' alleged antitrust violations. 339 F.3d at 304. The Fifth Circuit held that such a one-size-fits-all approach was unacceptable, since "any adequate estimation of actual damages suffered would require consideration of [*inter alia*,] the variegated nature of the businesses included in both the proposed classes[.]" *Id*. Here, the settlement uses a variety of carefully tailored formulae and claims categories designed with appropriate methodologies for determining individual recoveries. Thus, the concerns reflected in *Bell Atlantic* are not present in this case. In *Chalmette*, the Fifth Circuit did not hold that class certification of a "mass accident" was *per se* impermissible, but instead held only that the lower court "fail[ed] to adequately analyze and balance the common issues against the individualized issues" before certifying the class. 637 F.3d at 557. Indeed, the *Chalmette* court went out of its way not to "suggest that class treatment [was] necessarily inappropriate," noting that "class treatment on the common issue of liability may indeed be appropriate." *Id.*

Armour Obj. (#101) at 18 (internal quotation marks omitted). But even though some of the claims are no doubt substantial, the cost of going to trial individually would be enormous, as I previously explained. Klonoff Economic Report at ¶¶ 42, 59. The reality is that, if the claims are not pursued on a class basis, the vast majority of claimants will abandon their claims and will not pursue individual lawsuits.

51. Objector Armour claims that the GCCF process was superior to a class action. But as I noted above (at ¶ 24) and in my initial Report (at ¶¶ 52–53), the GCCF process was subject to substantial criticism. Indeed, as I noted above (at ¶ 24), it was that criticism that led BP and class counsel to find a fairer, more transparent—and judicially enforceable—method for resolving the claims. The GCCF has been closed, and there is no assurance that it would be resumed—either in its most recent form, or in some other iteration—if this Court strikes down the settlement. In any event, I believe that the class action settlement is superior to the GCCF, as explained in my initial Report. *See id.* at ¶¶ 52–53.

## IV. ATTORNEYS' FEES

52. Finally, apart from citing the fee agreement to challenge the fairness of the settlement, some objectors claim that class counsel are not entitled to up to $600 million in fees and costs that BP has agreed to pay on top of the amounts paid to claimants. Objectors make several arguments.

53. Objector Sturdivant contends that class counsel have circumvented Rule 23(h) of the Federal Rules of Civil Procedure and thus have "forfeited [their] right to a fee." Sturdivant Obj. (#214) at 52. Objector Cobb similarly contends that plaintiffs' counsel have not complied with Rule 23(h). Cobb Obj. (#118) at 7–9; *accord* Prashiela Obj. (#198) at 74 (objecting to "any distribution or award of attorneys' fees prior to a motion and evidentiary showing by Class Counsel[] as premature"). These arguments misapprehend the record in this case. Plaintiffs made clear in their memorandum in support of settlement that they were "not [at this time] seek[ing] an award or distribution of any common benefit fees." Plaintiffs' Memo in Support of Final Approval of Economic and Property Damages Class Settlement (Doc. 7101-2) (filed 08/13/12) at 53. Similarly, in urging the Court to validate the overall fee structure, I was not arguing that the Court should award a final fee now and ignore Rule 23(h). *See* Klonoff

Economic Report at ¶ 92 (citing ALI *Principles of Aggregate Litigation* for approach of setting fee structure early but with the ability to revise approach based on the actual facts). When plaintiffs' counsel move for fees under Rule 23(h), class members will have the chance to weigh in on the fees ultimately requested by class counsel.

54. Objector Sturdivant also urges that fees for the OPA-related claims should be minimal because the OPA is a strict liability statute. Sturdivant Obj. (#214) at 56–58. Sturdivant provides no support for the argument that the Court, rather than looking at the settlement as a whole, should instead award fees on a claim-by-claim basis. Negotiating this massive settlement, including recovery for OPA claims, required extensive time and skill.

55. Finally, Sturdivant argues that, even though the fees are being paid separately, the "reality" is that they are coming from the class members' total recovery because "BP was willing to pay a total of $8.4 billion to settle . . . ." Sturdivant Obj. (#214) at 48. Whether the objector is right or not is irrelevant. The practice of attorneys' fees being paid from a common fund is premised on the equitable doctrine that class members benefited from counsel's work and should be required to pay fees out of the recovery.[40] The objector cites no authority for the suggestion that there is something untoward about counsel being compensated for their work.

## V. CONCLUSION

56. For the foregoing reasons and those set forth in my initial Report, the Court should certify the case as a Rule 23(b)(3) class, uphold the settlement as fair, reasonable, and adequate, and approve the overall attorneys' fees structure agreed to by class counsel and BP.

[40] *See*, *e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (observing that "[t]he common-fund doctrine reflects the traditional practice in courts of equity," and that the "doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense" (citations omitted)); *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 384 Fed. App'x. 299, 302 (5th Cir. 2010) (per curiam) ("It is well established that federal courts, through the exercise of their equity powers, may call upon a group that benefits from litigation efforts to share the costs of litigation, including attorneys' fees." (citations omitted)); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D.La. 2010) (explaining that the "common benefit doctrine . . . permits the creation of a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries," and noting that the doctrine "was originally, and perhaps still is, most commonly applied to awards of attorneys' fees in class actions" (citations omitted)).

I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

Robert H. Klonoff

October 22, 2012