# SUPPLEMENTAL COMMENTS OF
# BP EXPLORATION & PRODUCTION INC.

July 7, 2011

In its February 18, 2011 Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology ("Final Methodology"), the Gulf Coast Claims Facility ("GCCF") invited the ongoing submission of comments by interested stakeholders:  "**THE GCCF WELCOMES ONGOING INPUT FROM CLAIMANTS AND OTHER INTERESTED PARTIES AS IT MOVES FORWARD WITH FINAL PAYMENTS, INTERIM PAYMENTS AND QUICK PAYMENTS**."  Final Methodology at 9 (emphasis in original).  BP Exploration & Production Inc. ("BP") respectfully submits the below comments to address several timely issues of importance concerning the GCCF's claims process.

## INTRODUCTION

On August 23, 2010, the GCCF assumed responsibility for the evaluation and resolution of individual and business claims filed with BP pursuant to the Oil Pollution Act of 1990 ("OPA"), as well as certain bodily injury and death claims.  The GCCF has fully satisfied BP's obligation under OPA to establish a process for receiving and evaluating claims.  Indeed, the GCCF has far exceeded OPA's procedural requirements by designing multi-optional, flexible claims programs that permit claimants to select the program that best meets their needs.

Immediately upon transfer of claims handling responsibility from BP, the GCCF launched its Emergency Advance Payment program, which was designed to provide prompt, interim payments with minimal documentation requirements.  Under the Emergency Advance Payment program, claimants could seek up to six months of alleged loss, including prospective loss, with reduced proof.  No claimant was required to sign a release or waiver of liability in order to receive an Emergency Advance Payment.  The GCCF has paid more than $2.58 billion in Emergency Advance Payments to more than 169,000 claimants.

Following the sunset of the Emergency Advance Payment program, the GCCF launched its non-emergency claims program, which provides claimants with multiple options.  Any claimant who does not wish to fully resolve his or her claim has the option of filing an interim claim, which permits recovery of past, substantiated loss.  Claimants who are paid interim amounts do not sign any release or waiver of liability, and may file additional interim claims or a final claim in the future.

Those claimants who do in fact desire to fully resolve their claims at this time may submit substantiation of their claims and receive individualized offers of payment from the GCCF.  In addition, claimants who previously received an Emergency Advanced Payment have the additional option of receiving a "Quick Pay" fixed payment, $5,000 for individuals and $25,000 for businesses, without the need for any further substantiation.  Any claimant who is dissatisfied with the GCCF's final offer may reject the offer and, provided the claimant satisfies applicable legal requirements, file a claim with the federal Oil Spill Liability Trust Fund or participate in litigation.

All told, as of July 1, 2011, the GCCF has paid more than $4.5 billion in compensation to more than 195,000 claimants, and has made approximately $430 million in additional offers that are under consideration by claimants.

Under the GCCF's Final Methodology, payments for final claims include not only compensation for actual loss incurred but also a "future factor" payment, which is intended to address the risk, if any, of future loss caused by the spill.  When the GCCF issued its Final Methodology in February 2011, it noted that "[t]here is evidence of a strong economic recovery underway" in the Gulf.  Final Methodology at 3.  Recognizing the fluid nature of economic

recovery, the GCCF made clear that it would continue to evaluate the performance of the Gulf

economy and make adjustments to the future factor as appropriate:

> The GCCF conclusions are based on current data, the opinions of
> the experts and the comments submitted by claimants and other
> interested parties during the public comment period.  The GCCF
> will undertake a renewed evaluation of available data every four
> months.  If such reevaluation suggests a change in the relative
> uncertainty concerning the future that warrants an adjustment to
> the payment for future risk, the GCCF will make the appropriate
> adjustment and will apply the adjustment to all claims submitted
> from that date forward.

Final Methodology at 3-4.

BP remains committed to paying all legitimate claims under OPA.  Based on the current

state of the Gulf economy, however, a reevaluation of the future factor is required.  Multiple

lines of evidence demonstrate that, to the extent that portions of the Gulf economy were

impacted by the spill, recovery had occurred by the end of 2010, and that positive economic

performance continues into 2011, with 2011 economic metrics exceeding pre-spill performance.

That the Gulf economy is strong, and that there is no basis to assume that claimants, with very

limited exceptions, will incur a future loss related to the oil spill, is evidenced by the following

facts, among others:

- During the first quarter of 2011, hotels in coastal areas of the Gulf states
  performed well above first quarter (pre-spill) 2010 levels.

- Tourist businesses in the Gulf region reported strong, and in some cases, record,
  springs, Memorial Day weekends, and Fourth of July holidays.

- According to the New Orleans Convention and Visitors Bureau, tourist dollars
  spent in the city in 2010 were at a record high and exceeded 2009 by more than
  $1.1 billion dollars.

- All federal fishing grounds are open.

- Upon the reopening of fishing grounds in the summer and fall of 2010, landings
  of shrimp and menhaden were very strong.

- Landings of shrimp and menhaden have remained strong in 2011.

The current economic data do not suggest that individual and business claimants face a material risk of future loss caused by the Deepwater Horizon oil spill. Accordingly, under the principles set forth in the GCCF's Final Methodology, the GCCF should cease paying a future factor, except in the limited circumstances (if any) where an oyster harvester establishes that oil from the Deepwater Horizon spill destroyed the harvester's oyster beds. Any claimant who, notwithstanding the economic data, believes that the risk of future loss is unacceptable has the right to file an interim claim, which provides for the payment of substantiated past loss without signing a release of liability.

While it would be appropriate to maintain a future factor for oyster harvesters (if any) whose beds have been destroyed by oil from the Deepwater Horizon spill, a number of adjustments are required with regard to how the GCCF applies this specialized oyster future factor:

- As an initial matter, it is BP's understanding that no claimant has documented destruction of an oyster bed by oil from the Deepwater Horizon spill. Absent such proof, the GCCF lacks authority to pay any damages for destruction of oyster beds.

- It is our understanding that the GCCF is paying claims for alleged destruction of oyster beds by the State of Louisiana's 2010 freshwater diversion. BP is not liable for the State of Louisiana's actions. Accordingly, the GCCF may not compensate claimants at any level, let alone at an enhanced future factor, for damages caused by the freshwater diversion.

- Even if BP were liable for the State of Louisiana's actions and damages caused by the State's freshwater diversion, the enhanced future factor would only be available to those claimants who could prove diversion-related destruction. But, it is our understanding that the GCCF is applying the enhanced future factor to all claims by oyster harvesters and processors, regardless of their locations. Thus, we understand that the GCCF is paying a 300% future factor to oyster harvesters in Florida and Alabama, even though it is beyond dispute that their beds were not impacted by the freshwater diversion. This is not justified.

In addition to the future factor issues, there are a number of other issues related to how the GCCF determines causation and damages that require re-evaluation and readjustment. The GCCF has significant latitude in its design of claims procedures, but it does not have latitude to award compensation untethered to the boundaries of OPA. The GCCF has described its role as follows: "Mr. Feinberg and the GCCF are acting for and on behalf of BP Exploration & Production Inc. in fulfilling BP's statutory obligations as a 'responsible party' under the Oil Pollution Act of 1990."[1] As the party fulfilling BP's statutory obligations under OPA, the GCCF must pay those claims that qualify for compensation under OPA, and must deny those claims which do not qualify for compensation under OPA. Likewise, for those claims meeting OPA's elements, the amount of compensation is governed by OPA.

In certain instances, the GCCF, in an apparent effort to resolve as many claims as possible, has expanded its compensation system beyond the confines of OPA, and thus beyond that which the GCCF is authorized to award. As a result, there have been payments concerning which the claimant was not entitled to any payment under OPA or the claimant was overcompensated. While BP shares the goal of resolving all legitimate claims, questions regarding compensability and the amount of damages are governed by OPA.

The following is a brief, non-exhaustive list of the ways in which the GCCF, at times, has gone beyond OPA's limitations and thus exceeded its authority:

- In certain cases, we understand that the GCCF is paying damages without assessing whether alleged losses were actually caused by the Deepwater Horizon oil spill. This has resulted in payments to claimants who are geographically and/or economically far removed from the oil spill, including hotels in Baton Rouge, Louisiana and Corpus Christi, Texas; construction companies in the Florida Keys; manufacturers of roofing materials; glass repair companies; earth

---

[1] Gulf Coast Claims Facility home page, *available at* http://www.gulfcoastclaimsfacility.com/index (last accessed July 5, 2011).

moving companies; and home gardening stores, among others.

- In some instances, the GCCF has not taken into account evidence of downward trends in historical economic performance. There have been cases in which the claimant's 2009 economic performance, as well as its January-April 2010 performance, are depressed relative to 2008 and January-April 2009, respectively, yet the GCCF simply assumes that 2010, in the absence of the oil spill, would have been strong.

- In other instances, the GCCF has assumed, without supporting evidence, that very significant improvements in performance by a claimant in 2009 relative to 2008 would have replicated in 2010 but for the oil spill. In some instances, the particular facts surrounding the claim do not support this assumption. Such issues are not appropriately addressed by a general presumption but must instead be evaluated based on claim-specific facts.

- The GCCF has not, as required by OPA, offset amounts earned by claimants in the Vessels of Opportunity program.

In short, while the GCCF has accomplished much in a short period of time and has fully satisfied OPA's procedural requirements, it should re-evaluate the future factor and correct those aspects of its compensation process that are not aligned with OPA.

**I.    A Future Factor Is Not Warranted
        in Light of the Strength of the Gulf Economy**

Multiple lines of evidence show that, to the extent certain portions of the Gulf economy were impacted by the Deepwater Horizon oil spill, the Gulf economy experienced a robust recovery in the fall of 2010, and that economic performance remains strong in 2011.

        A.    The Tourism Industry

                1.    Lodging Data

The lodging industry measures hotel performance by evaluating the combined effect of occupancy and rates per room. The metric Revenue per Available Room ("RevPAR") is a common metric used by the lodging industry to assess relative economic performance. The below chart shows that RevPAR in coastal regions for the fourth quarter of 2010 exceeded

RevPAR for the fourth quarter of 2009.  In other words, to the extent that portions of the lodging industry along the Gulf of Mexico were impacted by the spill, performance had returned to above 2009 levels by the fall of 2010.

**RevPAR Quarterly Performance**
**(% Change vs. Same Period Prior Year)[2]**

| Coastal Region | Increase in 2010 Fourth Quarter RevPAR over 2009 Fourth Quarter RevPAR |
|---|---|
| Louisiana | 10.4% |
| Mississippi | 10.8% |
| Alabama | 20.8% |
| Florida Panhandle | 5.4% |

The GCCF's consultant, ARPC, reached this same conclusion in a report issued with the GCCF's Final Methodology.  Specifically, ARPC analyzed revenues earned by hotels within one mile of the Gulf of Mexico for the period September-October 2010 relative to September-October 2009.  In all locations evaluated by ARPC, September-October 2010 revenues earned were higher than in 2009.[3]

The strong performance in the Gulf hotel industry has continued through the first quarter of 2011.  During the first quarter of 2011, hotels in coastal areas in Gulf states experienced RevPAR above first quarter 2010 levels.

---

[2] Coastal Regions are comprised of counties bordering the Gulf Coast of their respective states for which RevPAR data is available.  Source:  Smith Travel Data

[3] ARPC, "Measures of the Effects of the Gulf Oil Spill on Individuals and Businesses and Proposed Compensation Schema," Jan. 24, 2011, at 10.

**RevPAR Quarterly Performance**
**(% Change vs. Same Period Prior Year)[4]**

| Coastal Region | Increase in 2011 First Quarter RevPAR over 2010 First Quarter RevPAR |
|---|---|
| Louisiana | 9.8% |
| Mississippi | 5.3% |
| Alabama | 8.4% |
| Florida Panhandle | 6.4% |

2.    Media Reports

Statements by business owners and organizations involved with Gulf tourism reaffirm what the data show, namely that tourism is strong.  The following is a selection of quotes from recent media reports:

- **Florida Panhandle** - *Northwest Florida Daily News*, "The numbers are in: The tourists are back," June 7, 2011

    o "Tourist development agencies in Okaloosa, Santa Rosa and Walton counties recently released their bed tax collection data for April, and all three counties posted big increases.  Bed tax collections were up 8.79 percent in Okaloosa County, 21 percent in Santa Rosa County and 18.85 percent in Walton County."

    o "'We had a significant increase and are very excited about those positive numbers coming in and continue to hear good things about the season, the reservations and bookings being very solid,' said Dawn Moliterno, executive director of the South Walton Tourist Development Council."

    o "In addition to outpacing last April's numbers, Mark Bellinger, executive director of the Okaloosa County Tourist Development Council, said April 2011 also outperformed April 2009 and 2008."

---

[4] Coastal Regions are comprised of counties bordering the Gulf Coast of their respective states for which RevPAR data is available.  Source:  Smith Travel Data

- **Florida Panhandle** - *WTVY-TV*, "Memorial Day Brings Business to Gulf Coast," June 1, 2011

  - "It's been just over a year since the BP oil spill and this business is busier than ever.  All along the gulf coast businesses are starting to see an increase in tourism.  'I think this year will be one of the busiest years.  I think people know the oil's not here and they're coming.' [sic] Christian Whitehouse schooner manager said.  According to Florida tourism officials, the number of tourists coming to the beach is expected to rise throughout the rest of this year.  'We didn't do horribly bad last year with the oil spill but this year's been definitely, definitely better,' Whitehouse said."

- **Pensacola, Florida** - *Pensacola News Journal*, "Record-Breaking Weekend Bodes Well for 2011 Beach Season," May 30, 2011

  - "'It was an excellent week.  We're up 60 percent for the weekend and 30 percent for the month,' said Jeff Elbert, owner of Island Style beach shop.  'We've been slammed all day, and we still have (today.)  This is the best Memorial Day weekend since before Hurricane Ivan.  I'm very optimistic about the rest of the season.'"

  - "Based on the vehicle count, early reports from merchants and May revenue counts, so far, 'May is ending on a good note,' [W.A. "Buck" Lee, Santa Rosa Island Authority executive director] said.  'May looks like a record-breaker.  This is after we had our best March ever and a record-breaking April.'"

- **Gulf Shores, Alabama** - *local15tv.com*, "Crowds Pack Beaches for July 4 Celebrations," July 2, 2011

  - "Beach goers packed Gulf Shores Saturday to celebrate Independence Day on the Gulf Coast. . . . Tourists packed the beaches. . . . Hotels and condos are packed along the shores, even RV parks are full for the long weekend."

- **Gulf Shores, Alabama** - *WKRG*, "Record Crowds Could Come to Beach," July 1, 2011

  - "If you are still looking for a condo or hotel room in Gulf Shores or Orange Beach, you may be out of luck.  Many are booked solid."

  - "Tourism officials in Baldwin County said occupancy rates are on a pace to set new records . . . [Kim Chapman with Gulf Shores/Orange Beach Tourism said] '2007 was our best year, and we are seeing some outstanding numbers come in this year.  We are crossing our fingers, and continuing to work hard and, hopefully, we will match, or maybe, beat them.'"

- **Gulf Shores, Alabama** - *al.com*, "Gulf Shores, Orange Beach Fourth of July tourist numbers expected to be highest in years," June 30, 2011

    o "'We're about as full as we can possibly be,' said Bill Brett of Brett Robinson Real Estate & Development Co. in Orange Beach.  The company's more than 2,000 rental units are 95 percent booked, compared to 80 percent in 2009."

    o "'The oil spill last year is a non-issue.  There's no indication otherwise,' Brett said."

    o "The Island House Hotel and Young's Suncoast Vacation Rentals are 100 percent booked for the weekend, according to tourism bureau spokesperson Kim Chapman.  Kaiser Realty reported 93 percent occupancy, compared to 88 percent in 2009, she said."

- **Gulf Shores, Alabama** - *FOX10tv.com*, "Baldwin beach businesses loving Memorial Day," May 30, 2011

    o "Al Sawyer, owner [of] King Neptune's in Gulf Shores, said the crowds were huge this Memorial Day weekend.  'Thursday, Friday, Saturday, Sunday . . . It's been wall-to-wall,' Sawyer said."

    o "Sawyer said he has never seen a Memorial Day weekend like this one.  When he ran the numbers, he got excited.  'Great news!  33 percent up!' Sawyer exclaimed.  That's 33 percent up over a three-year average.  Making it the best Memorial Day weekend he's had in 18 years of running his restaurant."

    o "'We need an indication we're going to have a good summer.  It looks like we're going to have a great summer!' Sawyer said."

- **Alabama Gulf Coast** - *Mobile Press-Register*, "Alabama's beach businesses expect to be 'filled all summer long,'" May 30, 2011

    o "'It's crazy,' manager [of Doc's Seafood Shack & Oyster Bar] Cindy Holden said of the lunch crowd that had packed inside, waiting for a table.  'I think we're about to go into a record season here.'  For businesses along the beach, Memorial Day weekend, the rite of summer, also acts as an indicator of the season ahead.  And this holiday weekend showed signs that tourism would rebound strongly from last year's BP oil spill: from the filled pews in the churches to the occupied beach chairs on the beach, from the packed parking lots of tackle shops and surf shops."

    o "[M]any other companies also reported record numbers."

- o "'Compared to last year, we're crushing all the numbers,' [Blake Blair, employee at Blonde John's Surf & Skate] said."

- o "'I think it's going to be the biggest summer we've ever had,' said Blair, who has been coming to the shop as a customer and a worker as long as he can remember."

- o "'We're really happy to have everybody,' [Jennifer Kaylor, general manager, Cosmo's Restaurant & Bar] said. 'It lets us know that from here on out, it's busy.'"

- o "[Frank Hughes, owner of Adventure Island] was already anticipating an increase over years past. 'We already know it's better,' he said."

- **Alabama Gulf Coast** - *Mobile Press-Register*, "Dauphin Island tourists pack beaches for Memorial Day," May 31, 2011

  - o "The weekend — the traditional start to the summer season — was a crucial one for many small businesses on the barrier island. . . . It appeared to be a success. Vacation rentals were booked. Visitors flowed in and out of local shops and restaurants and continued to pack the beaches on Monday afternoon."

  - o "Robin Linn, broker and owner of ACP Real Estate, said of the roughly 100 units that her firm manages on the island, only three were empty over the weekend. That was more than a third higher than in 2009, she said."

- **Alabama Gulf Coast** - *al.com,* "Experts predict busy Memorial Day weekend on Baldwin beaches," May 27, 2011

  - o "'We're coming back up on those record numbers, which is exceptional,' [ Emily Gonzalez, Kaiser Realty] said. 'Memorial Day kind of sets the pace for what we anticipate for the year and the upcoming season. This gives us a lot of optimistic foresight.'"

  - o "'We're in good shape, and people are ready to get back to the beach,' [Orange Beach Mayor Tony Kennon] said. 'There's going to be a ton of people down here. I'm excited about it. And I don't think there's anything to worry about as far as numbers being down.'"

- **Alabama Gulf Coast** - *Local15tv.com*, "Beach Businesses Seeing Spring Break Boost," April 1, 2011

  - o "With the beaches clean, businesses are hoping for a successful spring break and summer season and appear to be getting their wish. Rentals and restaurants say they've seen a huge boost…. 'Our customers are happy, and we are thrilled they are back,' Sarah Kuzma with Meyer Realty said. Kuzma says rentals are up 30

percent from this time last year."

- **Mississippi Gulf Coast** - *WLOX-TV*, "Biloxi beaches bring tourists for Memorial Day," May 30, 2011

    o "'There's been a lot of people from Alabama, Louisiana, Florida, of course, Mississippi, Texas.  We've had people from New York, Cincinnati.  It's been a complete turn around [sic] from last year,' said Beach Bumps Manager Caleb Heartfield."

- **Mississippi Gulf Coast** - *WWL-TV*, "Holiday weekend crowds signify tourism rebound for Miss. Gulf Coast," May 30, 2011

    o "Biloxi -- like the many other beach communities along the coast -- is on the rebound, after the BP oil spill. . . 'The restaurant taxes are up,' said Janice Jones with the Mississippi Gulf Coast Convention and Visitors Bureau. 'The tourism taxes are up.  All of the indicators are very positive.'  Jones said hotel occupancy rates this weekend are pushing toward 80 percent."

- **Mississippi Gulf Coast** - *WGNO-TV*, "Gulf Coast Beaches are back," May 30, 2011

    o "The Mayor of Bay St. Louis expects this to be a break through [sic] year. . . . 'We had our annual Bridge Festival last weekend.  We had the largest crowds ever even before Katrina.  If that's the kind of indication, we can look forward to a banner year in Bay St. Louis,' said [Mayor] Fillingame."

- **Louisiana Gulf Coast** - *WGNO-TV*, "Grand Isle Beach Open This Memorial Day, A Year After BP Oil Spill," May 30, 2011

    o "Business is booming at many local restaurants, now that the beaches are re-opened."

    o "Missy Raum is a waitress at The Starfish Restaurant, which is so crowded today, there aren't any empty tables."

    o "'It's bringing tourism back. The beaches are beautiful, we got lots of people, and the tourists are back,' Raum said."

- **Letter from the Vice-President, Communications and Public Relations, New Orleans Convention and Visitors Bureau (April 15, 2011):**

    o "[T]he experience of visiting New Orleans is unchanged and is actually better than ever.  New Orleans received very few cancellations or lost tourism business due to the oil spill.  In fact, New Orleans welcomed 8.3 million visitors in 2010, a 10.7 percent increase over 2009, and the first time to reach 8 million visitors since Katrina.  Those 8.3 million visitors spent $5.3 billion, a $1.1 billion increase over

2009 and the highest spending in the city's history, according to a study by the UNO Hospitality Research Center."

o "New Orleans' tourism industry also ended 2010 as the number one destination in the country for year-over-year REVPAR growth, according to Smith Travel."

B.    The Fishing Industry

Following the oil spill, a portion of Gulf commercial fishing grounds were closed. Reopenings began during the summer of 2010, and the majority of all commercial fishing grounds were reopened by the fall of 2010.  All federal commercial fishing grounds are now open.[5]

1.    Seafood Safety

Gulf seafood has undergone extensive safety testing by federal regulators, who have determined that it is safe to eat.  Both NOAA and the Food & Drug Administration have unequivocally concluded that Gulf seafood is safe.  NOAA has issued the following questions and answers:[6]

Question:  What do the [testing] results show?

Answer:  Gulf seafood is passing tests with flying colors.  For each of the 12 hydrocarbons of concern picked up in the chemical test, the seafood is routinely testing 100 to 1000 times lower than FDA's pass-fail threshold known as the level of concern.  <u>Seafood experts are confident that contaminants from the oil or dispersant would be detected by the tests, and state unequivocally that Gulf seafood from waters open to fishing is safe from oil and dispersant contamination.</u>

***

---

[5] Press Release, NOAA: All Federal waters of the Gulf once closed to fishing due to spill now open (April 19, 2011), *available at* http://www.restorethegulf.gov/release/2011/04/19/last-fisheries-re-opening-today (last accessed July 7, 2011).

[6] NOAA: Gulf Seafood Safety: A Primer, *available at* http://www.nmfs.noaa.gov/stories/2011/04/21_sea_food_safety.html (last accessed July 5, 2011) (emphases added).

Question:  Is Gulf seafood safe from dispersants?

Answer:  Yes.  Scientists proved that fish can excrete dispersant
even more efficiently than they process oil, and last year NOAA
and FDA scientists developed a laboratory test that can detect even
trace amounts of dispersant in fish flesh.  Every sample passed that
test, with over 99% of the samples having undetectable amounts –
that is, lower than the detection limit of the highly sensitive
equipment.  <u>Because of the hard work of NOAA, FDA and Gulf
state seafood experts, and the cooperation of Gulf fishermen,
consumers can feel confident that Gulf seafood is safe to eat.</u>

Similarly, in response to the question "Is seafood harvested in the Gulf Coast area safe to

eat?," the Food and Drug Administration answered:  "Fish and shellfish from reopened harvest

areas or areas unaffected by the closures are considered as safe to eat as they were before the oil

spill."[7]

2.    <u>Landings</u>

Publically available fish landings data show that shrimp and menhaden catches were

strong once fishing grounds were reopened.  For example, according to NOAA data, December

2010 was the best December in the last five years with regard to total Gulf shrimp landings.[8]

While there has been variability in certain months in certain states, January-May 2011 was the

second strongest January-May period in the last five years for total shrimp landings.[9]  May 2011

was the strongest May in the last five years for shrimp landings in Florida, Texas, Alabama, and

Mississippi.[10]

_____

[7] FDA, Deepwater Horizon Oil Spill: Questions and Answers, *available at*
http://www.fda.gov/Food/FoodSafety/Product-SpecificInformation/Seafood/ucm221563.htm
(last accessed July 5, 2011).

[8] *See* NOAA Fisheries Service December 2010 Shrimp Statistics, *available at*
http://www.st.nmfs.noaa.gov/st1/market_news/archives/index.html (last accessed July 5, 2011).

[9] *See* NOAA Fisheries Service May 2011 Shrimp Statistics, *available at*
http://www.st.nmfs.noaa.gov/st1/market_news/doc45.txt (last accessed July 5, 2011).

[10] *Id.*

**Shrimp Landings (All Species, Headless, Thousands of Pounds)**[11]

|  | Florida (West Coast) | Alabama | Mississippi | Louisiana | Texas | Total |
|---|---|---|---|---|---|---|
| **May 2011** | 733.0 | 314.0 | 551.0 | 10,630.3 | 2,776.5 | 15,004.7 |
| **May 2010** | 698.5 | 263.0 | 45.9 | 4,135.9 | 1,957.9 | 7,101.2 |
| **May 2009** | 572.7 | 111.0 | 237.1 | 12,701.1 | 2,666.3 | 16,288.3 |
| **May 2008** | 215.7 | 126.0 | 38.7 | 8,614.5 | 1,450.8 | 10,445.7 |
| **May 2007** | 660.9 | 152.5 | 133.8 | 10,684.3 | 1,460.6 | 13,092.1 |
|  |  |  |  |  |  |  |
| **Jan. - May. 2011** | 2,357.7 | 1,372.0 | 994.2 | 14,086.8 | 8,684.7 | 27,495.5 |
| **Jan. - May. 2010** | 2,617.9 | 2,363.0 | 362.6 | 6,628.1 | 6,930.9 | 18,902.4 |
| **Jan. - May. 2009** | 2,464.9 | 1,718.0 | 706.5 | 17,385.7 | 7,596.7 | 29,871.8 |
| **Jan. - May. 2008** | 1,979.3 | 1,442.0 | 320.0 | 12,507.4 | 3,572.7 | 19,821.4 |
| **Jan. - May. 2007** | 2,032.0 | 791.5 | 328.1 | 14,244.7 | 5,485.9 | 22,882.2 |

Gulf menhaden landings have also been strong.  For example, according to NOAA, October 2010, the last month of the 2010 menhaden season and the period following the reopening of menhaden fishing grounds, was the best October in terms of landings since 1983.[12] The 2011 menhaden season is likewise off to a strong start.  Landings through June 30, 2011 are 25.4% above the five-year average.[13]

---

[11] *Id.*

[12] NOAA, Forecast for the 2011 Gulf and Atlantic Menhaden Purse-Seine Fisheries and Review of the 2010 Fishing Season, March 2011, *available at* http://www.st.nmfs.noaa.gov/st1/market_news/menhaden_forecast_2011.pdf (last accessed July 5, 2011).

[13] NOAA, "Status Purse-Seine Landings of Gulf and Atlantic Menhaden for the 2011 Fishing Season," July 5, 2011, *available at* http://www.st.nmfs.noaa.gov/st1/market_news/doc77.txt (last accessed July 7, 2011).

3.   Reports Regarding Snapper

The GCCF recently requested that BP respond to a newspaper article submitted to the GCCF that notes reports of lesions on fish in the Gulf. [14]  Fish lesions are not something new. They have been reported not infrequently in the Gulf of Mexico and water bodies in various locations throughout the world.  Given the intensive focus on the Gulf at this time, reports of lesions have been promptly and intensively studied.  To date, no evidence has emerged suggesting that Gulf fish populations are "sick," let alone that any illness was caused by the Deepwater Horizon oil spill.  Earlier this month, the Deputy Office Director of the Mississippi Department of Marine Resources explained:[15]

> 'Currently we are not seeing any unusual occurrences in fish populations,' Jewell said.  'All available data and information indicate that most, if not all, fish examined that have any visible external or internal conditions are associated with naturally occurring viruses, bacteria or parasites.'
>
> 'We are aware of the recent concerns about red snapper and we want to reassure the public that red snapper are safe and the DMR is monitoring and testing to ensure this safety.'

C.   A Future Factor Is Not Warranted By the Evidence

In sum, multiple lines of evidence demonstrate that, to the extent portions of the Gulf economy were impacted by the spill, the Gulf economy has recovered, and there is not a basis for continuing to pay a future factor to account for the risk of future loss.  Therefore, consistent with the principles underlying the future factor, the GCCF should cease making future factor

---

[14] The GCCF likewise requested that BP respond to an article regarding Kemp's Ridley turtle nesting.  Kemp's Ridley turtles are being studied extensively as part of the ongoing NRDA Cooperative Assessment being conduct by the NRD Trustees and BP.  The article cited by the GCCF does not identify any evidence of spill-related problems with the Kemp's Ridley turtle. To the contrary, the article notes that nesting of Kemp's Ridley turtles on the Texas coast, one of the primary nesting grounds, is above 2009 levels.

[15] *Biloxi Sun Herald*, "DMR Says Red Snapper Stock is Safe," June 14, 2011.

payments, with the limited exception of payments to claimants who harvest oysters from beds destroyed by oil from the Macondo well (and we are not aware of any such instances of oiling) and who cannot acquire alternative sources.  Any claimant who is of the view that, notwithstanding the economic data, there is too much risk of future loss to enter a final settlement has the right to file an interim claim and seek the payment of past loss without signing a release of liability.

In addition, certain adjustments are required with regard to the GCCF's application of its enhanced 300% future factor for oyster harvesters and processors.  BP understands that the GCCF is currently paying all Gulf oyster harvesters and processors who can demonstrate a 2010 loss a 300% future factor.  This is inconsistent with the GCCF's own methodology and has no basis in fact.

The GCCF's Final Methodology provides an enhanced future factor (300% of 2010 loss) to oyster harvesters and processors who harvest/source from oyster beds destroyed by oil, if any, or the State of Louisiana's freshwater diversion on the theory that the regeneration of such beds will take a prolonged period of time:  "Some experts anticipate that individuals and businesses engaged in harvesting and processing oysters destroyed as a result of the Oil Spill, or due to the diversion of fresh water into the Gulf in reaction to the Oil Spill, will likely require a longer recovery period than that experienced by other claimants, without the same degree of gradual recovery.  Accordingly, the Final Payment Offer for those claimants will be equal to an amount four times the actual documented losses in 2010."  Final Methodology at 5 (underline omitted).

To our knowledge, to date the GCCF has not received documentation of a single oyster bed that has been destroyed by oil from the Deepwater Horizon spill.  Subject to evidence to the contrary, no oyster harvester or processor should qualify for the enhanced future factor.

Under the GCCF's Final Methodology, even if no oil touched an oyster bed, the enhanced future factor is available if the bed was destroyed as a result of decreased salinity caused by the State of Louisiana's freshwater diversion into the Gulf in 2010. BP is not liable for the State of Louisiana's actions, and therefore the GCCF may not compensate claimants at any level, let alone at an enhanced future factor, for damages caused by the freshwater diversion.

Even if BP were liable for the State of Louisiana's actions and it was appropriate to provide an enhanced future factor to those harvesters and processors who source from oyster beds destroyed by the State of Louisiana's freshwater diversion, the enhanced future factor would only be available to those claimants who could prove diversion-related destruction. But, we understand that the GCCF is applying the enhanced future factor to all claims by oyster harvesters and processors throughout the Gulf, regardless of their locations. Thus, the GCCF is paying a 300% future factor to oyster harvesters in Florida and Alabama, even though their beds were not impacted by the State of Louisiana's freshwater diversion. Such payments are unjustified under the GCCF's own methodology.

On a closely related point, the United States Army Corps of Engineers recently made the difficult decision to open at least two spillways in Louisiana in an attempt to reduce flooding along the lower Mississippi River. It is predicted that the reduction in salinity resulting from the release of large volumes of fresh water into estuaries and other water bodies might harm oyster populations. The GCCF will need to carefully assess claims of oyster bed damage to determine whether the alleged damage resulted from the spillway releases. If so, those releases are entirely unrelated to BP or the Deepwater Horizon spill, and thus not compensable by the GCCF.

II.     **Several Adjustments to the GCCF's Claims Handling Approach
        <u>Are Required to Properly Align Claims Payments With the Boundaries of OPA</u>**

    A.     OPA Defines the Boundaries of Which Economic
        <u>Loss Claims the GCCF May Pay, And the Amount of Such Payments</u>

In late April 2010, the United States Coast Guard designated BP, together with

Transocean, Anadarko, and MOEX, as responsible parties under OPA.  OPA requires

responsible parties to establish a procedure for the receipt and payment of claims.  *See generally*

33 U.S.C. § 2714.  Within days of the spill, BP established a robust claims process that went

above and beyond the procedural requirements of OPA.  Following a June 16, 2010 meeting, BP

and the White House agreed that BP would transfer responsibility for administering its OPA

claims facility for individual and business claims to a third-party claims facility (subsequently

named the Gulf Coast Claims Facility) to be run by Kenneth R. Feinberg.  In addition to OPA

claims, BP consented to the GCCF administering claims for bodily injury and death, as well.

Because the GCCF is, by consensual transfer, fulfilling BP's OPA obligations, the

GCCF's authority to pay claims is only as broad as the scope of the transfer of authority.  That

transfer, with the exception of bodily injury and death claims, does not authorize the GCCF to

pay claims beyond the boundaries of OPA.  In the contract by which BP authorized the GCCF to

administer BP's OPA claims process, the GCCF expressly agreed that "Feinberg Rozen shall

follow OPA as it operates and administers the GCCF."  Contract among BP and Feinberg Rozen,

§ 1(b).

The GCCF has itself acknowledged that its role is to fulfill BP's obligation under OPA to

maintain a claims process:  "Mr. Feinberg and the GCCF are acting for and on behalf of BP

Exploration & Production Inc. in fulfilling BP's statutory obligations as a 'responsible party'

under the Oil Pollution Act of 1990."[16]  The fact that the GCCF's authority over economic

claims does not transcend OPA is reconfirmed yet again in the GCCF's Protocol for Interim and

Final Claims ("Protocol").  In setting forth the types of non-personal injury/death economic loss

claims that an individual or business claimant may file with the GCCF, the Protocol limits itself

to those set forth in OPA:  removal and clean up costs, damages for damage or destruction to

property, damages for loss of subsistence use of natural resources, and lost earning and profits.

GCCF Protocol, § II.A-D.

      Because it is only authorized to fulfill BP's statutory obligation under OPA, the GCCF

must pay those claims that qualify for compensation under OPA and must deny those that do not.

Where a claim qualifies for compensation, damages are limited to those recoverable under OPA.

In light of BP's transfer to the GCCF, the GCCF, and not BP, is responsible for evaluating and

deciding individual claims.  However, such evaluation and decisionmaking must comply with

and not expand beyond OPA.

      As described below, the GCCF has exceeded its authority in certain regards by, in certain

instances, not applying OPA's causation requirements and calculating damages in a manner that

has resulted in overcompensation.

      B.      Causation Is A Fundamental Requirement of OPA

      The GCCF has adopted several presumptions as part of its non-emergency claims

program that are inconsistent with OPA's causation requirements.  First, if a claimant received a

payment under the GCCF's Emergency Advance Payment program, which was designed to

provide prompt interim relief with limited documentation, the GCCF assumes for purposes of

interim and final claims that any loss incurred by the claimant from May to December 2010 was

---

[16] Gulf Coast Claims Facility home page, *available at*
http://www.gulfcoastclaimsfacility.com/index (last accessed July 5, 2011).

caused by the oil spill.  In addition to being inconsistent with OPA, the lack of a causation requirement for Emergency Advance Payment recipients is particularly inappropriate given that the Emergency Advance Payment program, by design, did not undertake a full assessment of causation.  Rather, in the interest of promoting prompt, interim payments to claimants, the Emergency Advance Payment program erred on the side of compensation, with the intention of undertaking a more thorough causation analysis during the non-emergency phase.  This presumption has resulted in payments to a number of claimants without a determination that they have satisfied OPA's causation requirements.  For example, the GCCF has paid a manufacturer of roofing materials, an earthmoving/excavation company, a construction company in the Florida Keys, a glass repair company, and home gardening stores.

Second, and similarly, the GCCF assumes that the spill was responsible for all losses incurred by claimants who both (i) are located in coastal zip codes and (ii) work in the fishing, hotel, restaurant, bar, and vacation rental property industries.  Once again, such an assumption is inconsistent with OPA's causation requirement.  Individuals and businesses incur financial losses for a multitude of reasons.  One cannot assume that every loss incurred by a broad array of business types and employees was caused by the spill.  This is illustrated by the fact that several claimants who have received payments were incurring losses relative to 2009 before the spill. The GCCF's assumption cannot be justified in any geographic location, but becomes particularly untenable the further away one gets from the oil spill.  For example, even though the spill did not impact the shores of Texas (with the exception of some very limited tar balls in limited locations), the GCCF assumes that all losses incurred by fishing businesses, hotels, restaurants, bars, rental properties, and their respective employees across Texas coastal zip codes were caused by the spill.  The same assumption is made for claimants in the Florida Keys and the

- 21 -

Florida peninsula, even though oil from the Deepwater Horizon never came near the Keys or the Florida peninsula.

Third, for claimants in a wide array of business types located in many non-coastal zip codes located as far as 100 miles from the Gulf coast, the GCCF simply assumes that a claimant's alleged loss was caused by the spill if the claimant's alleged decline in May-December 2010 revenue relative to May-December 2009 is greater than the claimant's decline in January-April 2010 revenue relative to January-April 2009.  This unfounded assumption has resulted in payments to claimants far removed from the Gulf and the oil spill.  For example, based on this assumption, the GCCF has paid a number of hotels in Baton Rouge, Louisiana, all of which are located far from the Gulf of Mexico.

The use of the above presumptions in lieu of determinations of actual causation is inconsistent with OPA and the GCCF's own Protocol.  Causation is a fundamental requirement of OPA.  Under OPA, alleged loss of income or profits is compensable if and only if it is "due to the injury, destruction or loss of real property, personal property or natural resources" and the loss "results from" the oil spill.  33 U.S.C. §§ 2702(a), (b)(2)(E); *see also* U.S. Coast Guard National Pollution Funds Center Claim No. N10036-0009 (denied Dec. 6, 2010, denied again on reconsideration on Mar. 15, 2011) (denying claim where claimant failed to prove the alleged loss was due to the injury to, destruction of or loss of property or natural resources); U.S. Coast Guard National Pollution Funds Center Claim No. N10036-0020 (denied Nov. 12, 2010) (denying claim where the NPFC was "unable to establish that [the alleged] loss of income [was] a consequence of the oil spill").  Recognizing that causation is a mandatory element of an OPA claim, the GCCF's Protocol provides:  "The GCCF will only pay for harm or damage that is proximately caused by the Spill.  The GCCF's causation determinations of OPA claims will be

guided by OPA and federal law interpreting OPA."  Protocol, II.G.  The GCCF's Final

Methodology similarly states:  "The GCCF will evaluate each claim to determine whether a loss

was caused by the Oil Spill.  Each claim will stand on its own individual merits.  In all cases,

there must be an identifiable link between an actual loss and the Oil Spill.  Evidence establishing

this connection is required."  Final Methodology at 2.

       The presumptions adopted by the GCCF have resulted in the payment of certain

geographically and economically remote claims that do not qualify for compensation under

OPA.

              1.       Geographically Remote Claimants

       The GCCF has paid a number of claimants who are located nowhere near the oil spill.

This includes (i) claimants in the Florida Keys and on the Florida peninsula, (ii) claimants along

the Texas coast, and (iii) claimants in locations far removed from the Gulf of Mexico, including

Baton Rouge, Louisiana.  As the GCCF's Final Methodology notes, the geographical

relationship of a claimant to the oil spill and the nature of the claimant's business are highly

relevant to determining both causation and compensability.  Final Methodology at 2.

       Given that loss must be due to injury to property or a natural resource in order to qualify

for compensation under OPA, it is difficult to envision scenarios where a claimant

geographically far removed from the oil spill can meet OPA's statutory requirements, as the

claimant could not have incurred losses that were directly due to injury to property or natural

resources as a result of the spill.  But at a very minimum, the GCCF must evaluate whether a

given claim meets OPA's causation requirements.

       The United States Court of Appeals for the Ninth Circuit addressed this very issue in

litigation arising from the *Exxon Valdez* spill.  In *Adkins v. Trans-Alaska Pipeline Liability Fund*,

101 F.3d 86 (9th Cir. 1996), the Ninth Circuit upheld the dismissal of claims by boat repair and recreational fishing companies under the Trans-Alaska Pipeline Authorization Act ("TAPAA"), which contains a substantively similar but less rigorous causation requirement, because the claimants were "located outside of the geographic limits of the oil spill" and thus did not satisfy the proximate cause requirement.  *Id*. at 89.  Similarly, in *In re Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001), the Ninth Circuit upheld the granting of summary judgment for claimants outside of the closed fishing areas, holding that "the requirement of proximate cause bars remote and speculative claims."  *Id*. at 1253 (emphasis added).

That OPA does not extend to geographically remote claimants was recognized by the GCCF's own legal expert, Professor John Goldberg of Harvard Law School, who explained in a report[17] to the GCCF:

- "[OPA's] statutory language is best understood to allow recovery only by those economic loss claimants who can prove that they have suffered economic loss because a spill has damaged, destroyed or otherwise rendered physically unavailable to them property or resources that they have a right to put to commercial use. . . . By contrast, operators of beach resorts in areas physically unaffected by a spill, but that nonetheless suffer economic loss because of a general downturn in tourism resulting from the spill, are among those who are not entitled to recover under OPA."  Goldberg Memo at 3.

- ". . . Section 2702(b)(2)(E)'s 'due to' clause imposes a second-layer causation requirement on top of the initial 'result from' requirement set by Section 2702(a)."  *Id*. at 17.

- "To read OPA to extend to any and all lost profits and impaired earning capacity . . . would be to ignore the 'due to' clause – to treat it as mere surplusage."  *Id*. at 18.

- "Indeed, even when confronted with statutory liability provisions that use variants on the phrase 'result from' as a *stand-alone* causation requirement, courts have

---

[17] John C. P. Goldberg, "Liability for Economic Loss in Connection with the Deepwater Horizon Spill," Nov. 22, 2010, *available at* http://www.gulfcoastclaimsfacility.com/press (last accessed July 6, 2011).

read into that phrase both an actual causation requirement and a proximate cause limitation – the latter excluding liability for certain kinds of 'remote' consequences."  *Id.* at 20 (emphasis in original).

      2.    <u>Economically Remote Claimants</u>

The GCCF's use of causal presumptions has also resulted in the GCCF paying compensation to claimants engaged in businesses that did not incur losses as a direct result of injury to property or natural resources resulting from the oil spill.  This includes building material retailers and manufacturers; construction contractors; commercial divers; electricians, plumbers; locksmiths; advertising agencies; architects; interior designers; electronics retailers; automobile sales and service; food and beverage wholesalers; and bar and hotel workers in New Orleans (a city which experienced a post-spill economic upturn); among others.

The more indirect the relationship between a claimant and an injured property or natural resource, the less likely it is that the claimant is entitled to compensation under OPA.  There must be "some direct relation between the injury asserted and the injurious conduct alleged."  *Hemi Grp., LLC v. City of New York,* ___ U.S.___, 130 S. Ct. 983, 989 (2010) (citations omitted).  Indirect and derivative loss is not compensable; a link that is "'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient."  *Id.*  Moreover, the proximate cause doctrine precludes recovery by claimants whose losses are indirect on the causal chain.  "'The general tendency of the law, in regard to damages at least, is not to go beyond the first step.'"  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 271-72 (1992) (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 534 (1983), citing *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918)); *United Food & Commercial Workers Union, Emp'rs Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1273 (11th Cir. 2000) (the

law "stops at the first link in the chain of causation, and looks only to the person who is the proximate cause of the injury").

Again, the Ninth Circuit decisions are instructive.  For example, in *Adkins*, the Ninth Circuit upheld the finding that a restaurant claiming that it lost business when its fishermen customers were no longer fishing due to the closure of fishing grounds was too remote to recover.  *Adkins*, 101 F.3d at 88.  In addition, in *Benefiel v. Exxon Corporation*, 959 F.2d 805 (9th Cir. 1992), the court dismissed a purported class action by California consumers alleging that the *Exxon Valdez* spill had caused the price of gas to increase, holding that "Congress in enacting TAPAA did not intend to abrogate all principles of proximate cause."  *Id*. at 807.

C.   The GCCF Must Properly Evaluate
     The History of Claimants' Economic Performance

Under the well-established law of damages, a plaintiff is only entitled to damages that are shown to be reasonably certain.  Speculative damages may not be awarded.  *See, e.g.*, *MKR Svcs., LLC. v. Dean Hart Constr., L.L.C.*, 16 So. 3d 562 (La. Ct. App. 2009); *Holt v. Bethany Land Co.*, 843 So. 2d 606 (La. Ct. App. 2003); *Miller Indus. v. Caterpillar Tractor Co.*, 733 F.2d 813 (11th Cir. 1984) (applying federal maritime common law); *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 638 F. Supp. 2d 619 (M.D. La. 2009) (applying Louisiana law); *In re Discount Cigarette, Cigars, Etc., Inc.*, 399 B.R. 605 (M.D. La. 2009).  This rule is also echoed in the GCCF's Final Methodology, which provides that compensation shall be based on "actual documented losses incurred by the claimant from the date the losses began since the Oil Spill on April [20], 2010."  Final Methodology at 3 (omission in original).

In some respects, the GCCF has not followed these fundamental rules of calculating damages.  As an initial matter, at times the GCCF has not taken account of downward revenue trends.  For example, certain claimants experienced a pre-spill reduction in revenue for the

- 26 -

period January-April 2010 as compared to January-April 2009 or for the year 2009 as compared to 2008. Yet, notwithstanding this negative trending, the GCCF has assumed that, in the absence of the spill, the business in the May-December 2010 time period would have been strong.

In addition, for certain claims, the GCCF has, in certain instances, adopted a practice of presuming that increases of revenue in year 2009 over year 2008 would have been replicated in year 2010 but for the oil spill. Determining whether large increases in revenue in 2009 would repeat themselves in 2010 is not susceptible to a presumption. Rather, the specific facts of each claim must be evaluated to answer this question.

> D.   Income Earned During the Vessels of Opportunity
>       Program Must Be Offset From Damages Awards

To date, the GCCF has not offset from its damages payments amounts earned by claimants from participating in the oil spill response through the Vessels of Opportunity program ("VoO"). OPA requires that VoO earnings are offset from GCCF damages payments.

Section 2702(b)(2)(E) of OPA provides for the recovery of lost earnings and lost profits in certain circumstances. As the Coast Guard regulations governing lost income claims submitted to the Oil Spill Liability Trust Fund make clear, damage payments must be adjusted to account for "[a]ll income resulting from the incident" and "[a]ll income from alternative employment or business undertaken." 33 C.F.R. § 136.235(a)-(b). Income earned by participants in the VoO response effort constitutes both income earned from the spill and income earned from alternative employment, and thus must be offset from any GCCF award of damages.

The Coast Guard confirms this point in Frequently Asked Questions posted on its web site[18]:

> FAQ-5:  If I make a claim for lost income as a result of the oil spill, will any income I received from alternative employment, including employment as an oil spill responder, or unemployment benefits, be considered in determining my compensation?
>
> A:  Yes. When considering payment for lost profits or lost earnings claims by businesses and individuals the NPFC will require the claimant to provide information on income from alternative employment, including income related to any employment or sales in connection with the oil-spill response and any unemployment benefits received.  That income will be considered in determining the actual loss to compensate.

Like the Coast Guard's regulations, the GCCF's own Protocol also contemplates the offsetting of VoO income.  Section II.C.2 of the Protocol for Interim and Final Claims requires that the claimant submit to the GCCF information concerning "[e]arnings received from alternative employment or business during the period when the loss was suffered, and expenses incurred in generating the alternative earnings."

* * *

In sum, BP respectfully requests that the GCCF institute the above-mentioned changes so as to reflect the current state of Gulf tourism and align its claims process with the limitations imposed by OPA.

---

[18] National Pollution Funds Center Deepwater Horizon Claimant FAQs, *available at* http://www.uscg.mil/npfc/Claims/DWH_faqs.asp#GCCF (last accessed July 5, 2011).