# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig
       "Deepwater Horizon" in the Gulf
       of Mexico, on April 20, 2010

This Document Relates to:

Actions in Pleading Bundle B3,

and

No. 12-cv-968, *Plaisance et al. v. BP Exploration
& Production Inc., et al.*

and Objections filed in:

Docket No. 10-7777

MDL No. 2179

SECTION: J

JUDGE BARBIER

MAGISTRATE JUDGE
SHUSHAN

## PLAINTIFFS' REPLY BRIEF IN RESPONSE TO OBJECTIONS
## AND IN FURTHER SUPPORT OF FINAL APPROVAL OF MEDICAL
## BENEFITS CLASS ACTION SETTLEMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.       INTRODUCTION ................................................................................. 1

II.      THE LOUISIANA ATTORNEY GENERAL, HALLIBURTON ENERGY
         SERVICES, INC., AND OTHER NON-CLASS MEMBERS LACK STANDING
         TO OBJECT .......................................................................................... 3

III.     THE MEDICAL SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE .......... 5

         A.      Compensation For Specified Physical Conditions Is Reasonable ........................... 7

         B.      The Settlement Fairly Compensates Claims Only For Past Exposures ................ 10

         C.      The Settlement Fairly Trades Punitive Damages For Immediate
                 Compensatory Payment ........................................................................ 12

         D.      The Time Lapse Between Exposure And Manifestation Of An SPC
                 Is Fair And Reasonable ........................................................................ 13

         E.      All Class Members Are Eligible For Benefits ...................................... 15

         F.      The SPC Matrix Does Not Impose Unfair Or Unreasonable Proof
                 Requirements For Compensation ......................................................... 15

         G.      The Back-End Litigation Option Is Fair And Provides Substantial
                 Benefits To Class Members .................................................................. 20

         H.      The Lack Of A Claims Appeal Process Does Not Constitute Unfairness,
                 Unreasonableness, Or Inadequacy, Nor Is It A Proper Objection To The
                 Settlement ............................................................................................ 22

         I.      None Of The Other Miscellaneous Objections To The Settlement Alters
                 The Agreement's Fairness, Reasonableness, And Adequacy ................. 23

IV.      THE MEDICAL BENEFITS CLASS MEETS THE REQUIREMENTS OF
         RULE 23(b)(3) FOR CLASS CERTIFICATION .............................................. 27

         A.      The Objections To Commonality Are Without Merit ........................... 31

         B.      The Objections To Typicality Are Without Merit ................................ 36

i

C.      The Objections To Adequacy Of Representation Are Without Merit ...................38

D.      The Objections To The Ascertainability Of The Class Are Without Merit..........43

E.      The Objections To Predominance Are Without Merit...........................................45

F.      The Objections To Superiority Are Without Merit................................................48

V.    THE ATTORNEYS' FEES PROVISION IS FAIR AND REASONABLE ...................49

VI.   CONCLUSION...................................................................................................................49

      CERTIFICATE OF SERVICE .........................................................................................53

## TABLE OF AUTHORITIES

**Cases**

*Acosta v. Equifax Information Services, LLC*,
  243 F.R.D. 377 (C.D. Cal. 2007) ............................................................15

*Agretti v. ANR Freight Systems, Inc.*,
  982 F.2d 242 (7th Cir. 1992) .................................................................4

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) ...............................................................48

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................28, 30, 31, 39, 45

*American Honda Motor Co., Inc. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ...............................................................35

*Basarich v. Shell Pipeline Co., LP*,
  Civ. A. No. 05-4180, 2008 WL 6468611 (E.D. La. June 19, 2008) .......................44

*Bell Atlantic v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ............................................................47, 48

*Castano v. American Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ..............................................................28, 29

*Coats v. Penrod Drilling Corp.*,
  61 F.3d 1113 (5th Cir. 1995) ...............................................................21

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ..............................................................8

*Crawford v. Equifax Payment Services*,
  201 F.3d 877 (7th Cir. 2000) ...............................................................15

*DeHoyos v. Allstate Corp.*,
  240 F.R.D. 269 (W.D. Tex. 2007) ...........................................................6

*Frew v. Hawkins*,
  No. 3-065, 2007 WL 2667985 (E.D. Tex. Sept. 5, 2007) .....................................13

*Geier v. Alexander*,
  801 F.2d 799 (6th Cir. 1986) ...............................................................7

iii

*Howard v. Union Carbide Corp.*,
  50 So.3d 1251 (La. 2010)............................................................8, 9

*In re Beef Industry Antitrust Litigation*,
  607 F.2d 1167 (5th Cir. 1979), *cert. denied sub nom*
  *Iowa Beef Processors, Inc. v. Meat Price Investigators Association*,
  452 U.S. 905 (1981).....................................................................4

*In re Black Farmers Discrimination Litigation Settlement*,
  Misc. No. 08-0511 (PLF), ECF No. 232 (D.D.C. Oct. 27, 2011),
  *appeals dismissed*, No. 11-5326 (D.C. Cir. July 25, 2012).....................23

*In re Combustion, Inc.*,
  968 F. Supp. 1116 (W.D. La. 1997)..................................................7

*In re Fosamax Products Liability Litigation*,
  248 F.R.D. 389 (S.D.N.Y. 2008) ....................................................43

*In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation*,
  MDL No. 09-2046, 2012 WL 948365 (S.D. Tex. Mar. 20, 2012)...............33, 36, 42

*In re Insurance Brokerage Antitrust Litigation*,
  579 F.3d 241 (3d Cir. 2009)..........................................................40

*In re Lease Oil Antitrust Litigation (No. II)*,
  MDL No. 1206, 2007 WL 4377835 (S.D. Tex. Dec. 12, 2007) ...............25

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
  241 F.R.D. 435 (S.D.N.Y. 2007) ....................................................45

*In re Pet Foods Products Liability Litigation*,
  629 F.3d 333 (3d Cir. 2010)..........................................................23

*In re WorldCom, Inc.*,
  347 B.R. 123 (Bankr. S.D.N.Y. 2006) .............................................23

*James v. City of Dallas*,
  254 F.3d 551 (5th Cir. 2001), *abrogated on other grounds by*,
  *M.D. ex rel. Stukenberg*, 675 F.3d 832 (5th Cir. 2012) ..................36, 38

*Klein v. O'Neal, Inc.*,
  705 F. Supp. 2d 632 (N.D. Tex. 2010)..............................................6

*Langbecker v. Electronic Data Systems Corp.*,
  476 F.3d 299 (5th Cir. 2007)..........................................................39

*Lobatz, M.D. v. U.S. West Cellular of California, Inc.*,
  222 F.3d 1142 (9th Cir. 2000)...................................................................43

*Madison v. Chalmette Refining, LLC*,
  637 F.3d 551 (5th Cir. 2011)..................................................28, 29, 47, 48

*McLin v. Industrial Specialty Contractors, Inc.*,
  851 So.2d 1135 (La. 2009).........................................................................22

*Mullen v. Treasure Chest Casino, LLC*,
  186 F.3d 620 (5th Cir. 1999)..................................28, 34, 36, 37, 38, 39, 40

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)...................................................................................39

*Paterson v. Texas Western Financial Services, Inc.*,
  308 F.3d 448 (5th Cir. 2002).......................................................................3

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999)...................................................................48

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
  100 F. App'x 296 (5th Cir. 2004) (per curiam) ...........................................47

*Reynolds v. Beneficial National Bank*,
  288 F.3d 277 (7th Cir. 2002).....................................................................15

*Shvartsman v. Apfel*,
  138 F.3d 1196 (7th Cir. 1998)...................................................................45

*Steering Committee v. Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006)..................................................28, 29, 30, 48

*St. Paul Fire & Marine Insurance Co. v. Whitmire*,
  578 So.2d 1180 (La. Ct. App. 1991)..........................................................21

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) (en banc).........................................33, 45, 46

*Turner v. Murphy Oil USA, Inc.*,
  472 F. Supp. 2d 830 (E.D. La. 2007) ..........................................2, 33, 37, 42

*Union Asset Management Holding A.G. v. Dell*,
  669 F.3d 632 (5th Cir. 2012).....................................................................44

*United States v. Armour*,

402 U.S. 673 (1971) ...................................................................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
    --- U.S. ---, 131 S. Ct. 2541 (2011) ................................................................................32, 34

*Watson v. Shell Oil Co.*,
    979 F.2d 1014 (5th Cir. 1992), *on reh'g*, 53 F.3d 663 (5th Cir. 1994)....................................28

*Whirlpool Corp. Front-Loading Washer Products Liability Litigation*,
    678 F.3d 409 (6th Cir. 2012)....................................................................................................34

**Rules and Statutes**

33 U.S.C. § 2702 .................................................................................................................24, 33

Fed. R. Civ. P. 23(a)(3).................................................................................................................38

**Other Sources**

7A CHARLES A. WRIGHT ET AL.,
    FEDERAL PRACTICE AND PROCEDURE § 1760 (3d ed. 2008) ......................................................45

MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.222 (Fed. Judicial Ctr. 2004) ......................43

## I.    **INTRODUCTION**

The Medical Benefits Settlement Class is composed of as many as 200,000 members: Clean-Up Workers who helped to remediate the *Deepwater Horizon* Incident and coastal residents in close proximity to Gulf waters.[1]  Because this class is defined by entirely objective criteria—namely, participation in Response Activities and/or residence in well-defined geographic zones—the parties were able to identify and comprehensively notify class members of their rights under the agreement.[2]  Accordingly, members are aware of the significant benefits they stand to reap from participation in the Medical Benefits Class Action Settlement ("Medical Settlement").

The Medical Settlement reasonably compensates class members for injuries arising from short-term exposures to oil and/or dispersant chemicals.  It provides benefits, such as the Periodic Medical Consultation Program ("PMCP") and Back-End Litigation Option ("BELO"), which are unavailable through litigation.  And it provides compensation that was flatly precluded under the Gulf Coast Claims Facility ("GCCF").  The benefits of the settlement are so attractive that non-class members, who live outside the geographic boundaries of the settlement, have even petitioned for inclusion.

What is more, class members who disagree have the right to opt out and pursue a different course outside the class.  The comprehensive nature of the notice plan, about which not one individual complains, plus the highly publicized oil spill itself, ensures that class members have the information they need to make this decision.  It is precisely for these reasons that Dean

---

[1] Unless otherwise defined herein, terms with initial capital letters used in this Memorandum have the meanings ascribed to the fully capitalized renderings of such terms in the Medical Benefits Class Action Settlement Agreement.

[2] Indeed, it is undisputed on this record that the notice plan was comprehensive, sufficient under Federal Rule of Civil Procedure 23, and satisfied due process standards.

Robert Klonoff described the Medical Settlement as "one of the fairest and most impressive settlements I have seen in more than 20 years of practicing, teaching, and writing in the field of class actions."[3]

The fundamental fairness of the Medical Settlement is only underscored by the relative scarcity of complaints lodged against it.  From a class of potentially 200,000, only twenty objections have been filed, representing 153 objectors.[4]  Indeed, the small number of objections is "a helpful indication that the settlement is fair, reasonable, and adequate."[5] *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853 (E.D. La. 2007).  In addition, there have been very few opt outs, which also suggests that members have assessed their rights and believe the settlement's benefits to be superior to those they may achieve on their own.

In sum, and for the reasons that follow as well as those set forth in Plaintiffs' opening papers, the Court should overrule each of the objections to the Medical Settlement and grant Plaintiffs' Motion for Final Approval.  This settlement will fairly and reasonably resolve the claims of hundreds of thousands of Gulf Coast residents and Clean-Up Workers injured during the spill and its aftermath.  It will do so in just over two years' time—a remarkable feat given the history of similar events and their aftermath, like the *Exxon Valdez* spill.  And it will allow those

---

[3] KLONOFF DECL. ¶ 90. Citations to "Klonoff Decl.," "Coffee Decl.," "Harbut Decl.," and "Greenwald Decl." refer to the declarations submitted by Dean Robert Klonoff, Professor John Coffee, Dr. Michael Harbut, and class counsel Robin Greenwald, respectively, in support of Plaintiffs' Motion For Final Approval of the Medical Benefits Class Action Settlement.  Their supplemental declarations in support of this Reply brief are cited as "Klonoff Supp. Decl.," "Coffee Supp. Decl.," and "Harbut Supp. Decl."

[4] Attached hereto as PLAINTIFFS' EXHIBIT A is a summary of the filings docketed as "Objections" in No. 10-7777.  Plaintiffs refer to these filings herein as "OBJECTION NO." with reference to the corresponding Document Reference Number within No. 10-7777.

[5] *See also* KLONOFF SUPP. DECL. ¶ 7 (calling the small number of objections "significant" and citing cases suggesting that few objections in a large class settlement raises an inference of fairness).

injured to move on with their lives and safeguard their health should a more serious illness develop in the future.  This is a class settlement that warrants approval.

## II.    THE LOUISIANA ATTORNEY GENERAL, HALLIBURTON ENERGY SERVICES, INC., AND OTHER NON-CLASS MEMBERS LACK STANDING TO OBJECT

The Louisiana Attorney General ("Attorney General") and non-settling defendant Halliburton Energy Services, Inc. ("Halliburton") have filed memoranda questioning whether the Medical Settlement is fair, reasonable, and adequate, and arguing that the Medical Class should not be certified under Federal Rule of Civil Procedure 23.  This Court has previously ruled, in response to settlement discovery requests served by these entities, that "the proposed settlements will in no way affect any procedural or substantive rights of Halliburton or Louisiana."[6]  Because neither entity is a party to the Medical Settlement, nor will the rights of either entity be affected by its approval, neither the Attorney General nor Halliburton has standing to file objections to the Medical Settlement.  Several non-class members have also filed "objections" arguing that they should be included in the settlement class.  These individuals also lack standing and their "objections" should be rejected.

The Fifth Circuit has determined that a state lacks standing to contest a class action settlement where the settlement does not involve the resolution or dismissal of the state's own claims.  *Paterson v. Texas Western Fin. Servs., Inc.*, 308 F.3d 448, 451 (5th Cir. 2002).  The state of Louisiana is not a party to the Medical Settlement.  The Medical Settlement does not resolve or dismiss any of the state's claims.  And as this Court has determined, the state's substantive and procedural rights are likewise unaffected by the Medical Settlement.[7] Furthermore, this Court's Order preliminarily approving the Medical Settlement precludes a non-

---

[6] ORDER (Aug. 3, 2012) [DOC. NO. 7038], p. 2.
[7] ORDER (Aug. 3, 2012) [DOC. NO. 7038], p. 2.

class member from objecting.[8]  The Attorney General, in short, lacks standing to interpose objections to the settlement.[9]  The Court should therefore disregard the Attorney General's arguments.

Likewise, non-settling defendant Halliburton also lacks standing to interpose objections to this settlement.  Generally, a non-settling defendant does not have standing to object to the settlement of a class action.  *See, e.g.*, *In re Beef Industr. Antitrust Litig.*, 607 F.2d 167, 172 (5th Cir. 1979), *cert. denied sub nom Iowa Beef Processors, Inc. v. Meat Price Investigators Ass'n*, 452 U.S. 905 (1981); *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992) ("Particularly, non-settling defendants in a multiple defendant litigation context have no standing to object to the fairness or adequacy of the settlement by other defendants." (internal quotation omitted)).  Halliburton's objections raise matters not before the Court at this time, such as indemnification and contribution, which are better addressed and resolved when the issues are ripe and evidence of the costs and damages for which indemnification and/or contribution may be due is not merely speculative.[10]  Indeed, Halliburton presents no compelling reason for this Court to disturb its earlier conclusion that "the proposed settlements will in no way affect any [of Halliburton's] procedural or substantive rights."[11]  For the reasons previously set forth in

---

[8] PRELIMINARY APPROVAL ORDER (May 2, 2012) [DOC. 6419], p. 24.

[9] Plaintiffs set forth the standing argument in more detail in a letter transmitted to the Court on July 25, 2012.  *See* LETTER (July 25, 2012) [DOC. 7032].  Plaintiffs incorporate each of the letter's argument herein.

The Attorney General does not argue that he has standing to object to the Medical Settlement.  Perhaps this is because he labels his brief an "*Amicus Curiae* Memorandum."  The Attorney General has not petitioned for leave to file an amicus brief, and has not set forth how the state—a party to the larger MDL—qualifies as a "friend of the court" in this context.  The Attorney General is, as a matter of fact, attempting to object.  His creative title is nothing more than a transparent attempt to avoid the standing requirements for objectors under the law.  The Court should not countenance such an attempt.

[10] HALLIBURTON OBJECTION [DOC. 93], p. 12.

[11] ORDER (Aug. 3, 2012) [DOC. NO. 7038], p. 2.

Plaintiffs' letter brief addressing Halliburton's standing to object,[12] and for those set forth above, the Court should hold that Halliburton lacks standing to object and disregard its objections to approval of the Medical Settlement.

Finally, several individuals, many of whom reside in Panama City Beach, Florida, have filed "objections" contending that they should be included in the settlement.[13]  Relatedly, some class members' spouses have objected, claiming that they should also be included in the settlement so they may raise loss of consortium claims.   Under this Court's Preliminary Approval Order, these non-class members lack standing to "object."[14]   Further, these "objections," rather than raising criticisms, arguably speak to the settlement's fairness.   The excluded "objectors," by attempting to expand the settlement's scope, are saying, in essence, that they believe the settlement is fair and wish to receive its benefits.   Thus, although the Court should disregard these "objections" for lack of standing, the desire for inclusion may be taken as anecdotal evidence that the agreement is fair, reasonable, and adequate.

Although the above-described "objectors" lack standing to contest approval of the Medical Settlement, out of an abundance of caution, Plaintiffs nonetheless address the claims of these "objectors" on the merits.   At all times, however, Plaintiffs preserve their argument that the non-settling parties and non-class members lack standing; accordingly, the Court need not reach the merits of any of the contentions of the Attorney General, Halliburton, or the "objecting" non-class members.

---

[12] *See* LETTER (July 25, 2012) [DOC. 7032].

[13] SIMS OBJECTION [DOC. 61]; CANIPE OBJECTION [DOC. 203]; MCLANE OBJECTION [DOC. 205]; *see also* ELROD OBJECTION [DOC. 180]; YERKES ET AL. OBJECTION [DOC. 185]; BAIRD ET AL. OBJECTION [DOC. 202]..

[14] PRELIMINARY APPROVAL ORDER (May 2, 2012) [DOC. 6419], p. 24.

III.   **THE MEDICAL SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

Class counsel negotiated and designed the Medical Settlement with the goal of "provid[ing] the greatest amount of good for the greatest number of people."[15]  The settlement is uncapped; no class member receives less than any other based on the availability of funds.  The compensation for Specified Physical Conditions ("SPCs") is based on awards generally provided for similar exposures and the quality of a class member's proof.  Compensation differs between injured residents and injured Clean-Up Workers in recognition that the latter generally incurred more sustained, direct exposure to the oil and dispersants.  All class members share equally in their ability to participate in the 21-year PMCP and benefit from the myriad components and geographic breadth of the Gulf Region Health Outreach Program ("Outreach Program").  In addition, each class member retains BELO rights to sue BP if a Later-Manifested Physical Condition develops in the future.  In short, the Medical Settlement is fair, reasonable, and adequate, and it merits this Court's final approval.

The few objections to the settlement's fairness fail to establish any legitimate ground upon which the settlement should not be approved.  Indeed, none of the objectors, who bear a "heavy burden" to prevail on their claims, *see DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 293 (W.D. Tex. 2007), has come forth with any reason that this settlement is unfair to the class.  Many of the objections simply seek to renegotiate the terms of the agreement or attack the settlement with claims unsupported by legal or factual proof; all such objections are without merit.  *See Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) (explaining that "'whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance'" (citing *In re Corrugated Container Antitrust*

---

[15] GREENWALD DECL. ¶ 6.

6

*Litig.*, 643 F.2d 195, 212 (5th Cir. 1981))); *see also Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986) (stating that to "allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process" (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 449 (2d Cir. 1974))).  In sum, the Court should overrule the objections and approve the Medical Settlement.

### A.     Compensation For Specified Physical Conditions Is Reasonable.

Many objectors argue that the compensation amounts for a SPC are inadequate and thus unfair.[16]  Objectors contend that:

- Medical expenses are high, and compensation should include reimbursement for such expenses;
- Medical expenses are likely to persist because continued care will be necessary;
- A lump sum compensation formula for SPCs is unfair because some class members had (and still have) medical expenses while others do not;
- Clean-Up Workers should not receive greater compensation for the same injuries incurred by residents;
- Opting out is not an option because an individual claim is too small to litigate; and
- The settlement should include a front-end arbitration damages calculation.

The court should approve a class settlement where the proposed agreement "reflect[s] a fair, reasonable, and adequate estimation of the value of the case in view of what might happen at trial."  *In re Combustion, Inc.*, 968 F. Supp. 1116, 1129 (W.D. La. 1997).  Here, the compensation values in the SPC Matrix reflect amounts awarded by juries and upheld by trial and appellate courts for similar injuries under similar exposure conditions.[17]  Indeed, the

---

[16] *See* BOGGS OBJECTION [DOC. 41]; ABREU ET AL. OBJECTION [DOC. 92]; STURDIVANT ET AL. OBJECTION [DOC. 124]; BROWN OBJECTION [DOC. 130]; HALL OBJECTION [DOC. 160]; COCO OBJECTION [DOC. 180]; YERKES ET AL. OBJECTION [DOC. 185]; MCLANE OBJECTION [DOC. 205]; BOOKER ET AL. OBJECTION [DOC. 208]; FORSYTH ET AL. OBJECTION [DOC. 213].  Plaintiffs note that the objections filed by the Sturdivant Objectors [DOC. 124] are identical to those docketed as "Forsyth et al." [DOC. 213].  For ease of clarity, Plaintiffs refer to both objections collectively as those filed by the "Sturdivant Objectors" and cite only to the later-filed objection [DOC. 213].

[17] COFFEE DECL. ¶¶ 38-41.

compensation provided under the settlement "reflect[s] or exceed[s] actual market values in minor injury toxic exposure cases and . . . will probably produce both a higher gross recovery and certainly a higher net recovery for class members than individual litigation."[18]  Notably, no objector points to any case law or precedent that provides greater recovery for similar injuries under similar exposure conditions.  The Court should overrule objectors' argument on this basis alone.  *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (explaining that a "court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes" (internal quotations marks omitted)).

To take but one recent example that illustrates Plaintiffs' point, in *Howard v. Union Carbide Corp.*, 50 So.3d 1251 (La. 2010), the plaintiffs sued for acute injuries suffered from a chemical release at a Union Carbide plant.  The plaintiffs' injuries included: eye, nose, and throat irritation; coughing, choking, and gagging; and nausea—symptoms the court referred to as "relatively minor."  *Howard*, 50 So.3d at 1256.  None of the plaintiffs sought medical treatment. The trial court granted personal injury awards ranging from $750 to $3500 depending on a particular plaintiff's proximity to the defendant's plant.  On appeal, the Louisiana Supreme Court reviewed state-law jurisprudence to determine whether these damage allotments were appropriate.  It found that prior awards for similar injuries ranged from $100 to $500, and *reduced* the awards accordingly.  *Id.* at 1257.

Under the Medical Settlement, class members who experienced one or more SPCs, but did not seek medical treatment for those conditions, receive $900 (Zone A and B residents) or

---

[18] COFFEE DECL. ¶ 41.

$1300 (Clean-Up Workers).[19]   These values, as *Howard* illustrates, are fair, reasonable, and accurate under the case law.   For these same conditions, but under circumstances where medical treatment was sought, class members are compensated thousands of dollars more.   And for class members whose conditions continue today, they receive tens of thousands of dollars more than those with acute conditions.   These distinctions recognize that a member whose condition was sufficiently severe to require him or her to seek medical care likely suffered a greater (and more expensive) injury; in the case of a chronic condition, the SPC Matrix recognizes that the class member might still require medical attention, and compensation is adjusted accordingly.   These distinctions in compensation levels, rooted as they are in the seriousness of the injury and cost of care, are reasonable and fair.

No objector states that his or her medical expenses in fact exceed the compensation amounts in the SPC Matrix.   But in the event that a class member has incurred medical expenses that exceed those set forth in the Matrix, he or she likely manifested more serious health outcomes than the settlement was intended to address.   One objector, for example, states that he is a Zone A resident who underwent chemotherapy for leukemia prior to the spill.[20]   He alleges, therefore, that he was particularly vulnerable to the environmental health impacts arising from toxic exposure, and he incurred substantial additional medical bills because of the oil spill (although based on the objection not even his expenses meet, much less exceed, the compensation amount).   By the objector's own admission, there will be very few, if any, other class members who share his circumstances.[21]   It is unlikely that medical expenses resulting

---

[19] The SPC Matrix is found at Exhibit 8 to the Medical Settlement.   *See* MEDICAL SETTLEMENT [DOC. 6427], EX. 8.

[20] BOGGS OBJECTION [DOC. 41].  This objector has since opted out of the settlement.

[21] BOGGS OBJECTION [DOC. 41], p. 5 (stating that the objector "believes there are few in his exact situation").

from the SPCs would exceed the amounts allotted in the Medical Settlement.  But for those class members for whom medical expenses exceed compensation amounts, they are free to opt out of the settlement.

In contrast to the arguments that the SPC compensation is too low, non-settling defendant Halliburton argues that the SPC compensation amounts are too generous and "well beyond any likely recovery at trial."[22]  For the reasons set forth above, Plaintiffs disagree—the settlement provides compensation that is reasonable based on case law and precedent.  Further, though Halliburton's objection is without merit, Dean Klonoff nonetheless finds it "significant": "The very fact that Halliburton can make a plausible argument that the settlement *overcompensates* class members is remarkable.  In my more than 20 years litigating, researching, and writing about class actions, I have never seen a settlement criticized on the ground that it is *too* generous and provides *more* benefits than class members could have achieved at trial."[23]  The Court should disregard Halliburton's objection.  For the vast majority of exposure plaintiffs, the compensation values are in accord with state-law jurisprudence for similar injuries and the compensation amounts are fair, reasonable, and adequate.

## B.    The Settlement Fairly Compensates Claims Only For Past Exposure.

The Sturdivant Objectors argue that the Medical Settlement releases all claims for future exposure and improperly releases certain past exposure claims.[24]  This is a mischaracterization of

---

[22] HALLIBURTON OBJECTION [DOC. 93], p. 18.
[23] KLONOFF SUPP. DECL. ¶ 8.
[24] STURDIVANT OBJECTION [DOC. 213].

the settlement.   In fact, the Medical Settlement provides full and fair compensation for the Released Claims, and it carefully carves uncompensated claims from the Release.[25]

First, the Sturdivant Objectors erroneously claim that the settlement "waives" claims based on future exposure.[26]  The Release does no such thing.[27]  The Medical Settlement neither compensates nor releases any claims for exposure that occurred after April 16, 2012, the date on which the Medical Class Action Complaint was filed.[28]

These objectors next claim that there are "important periods" of "uncompensated past exposure," an argument that likewise twists the agreement's language.   According to their objection, the Medical Settlement waives claims for exposure that occurred after September 30, 2010 for Zone A residents, and after December 31, 2010 for Zone B residents.[29]  The date-of-residence requirements constrain the time frames for class membership, not exposure or compensation.  Thus, Zone A residents are not class members unless they manifested an SPC by September 30, 2010.  An individual living within Zone A who is exposed *after* September 30, 2010, and who did not have a SPC before that time, retains the right to sue BP for any injury arising from that exposure – that individual has released or settled nothing. His or her personal injury claim would simply fall outside this class.  In contrast, Zone A residents who manifest a SPC by September 30, 2010, are class members, are eligible for full compensation, and release BP for exposures through April 16, 2012.  Zone A class members release exposures through April 16, 2012 because the settlement provides for one-time payment for a SPC, regardless of the

---

[25] For example, claims for non-exposure-related physical or bodily trauma and claims for *in utero* exposure were not well-suited for class treatment and are therefore carved from the Release.  MEDICAL SETTLEMENT [DOC. 6427], § XVI.A.

[26] STURDIVANT OBJECTION [DOC. 213], p. 27-28.

[27] MEDICAL SETTLEMENT [DOC. 6427], § XVI.A-C (setting forth "Released Claims").

[28] MEDICAL SETTLEMENT [DOC. 6427], § XVI.

[29] STURDIVANT OBJECTION [DOC. 213], p. 25-26.

number of exposures.  Similarly, Zone B residents must establish residency in the relevant geographic area for the appropriate duration to be included in the class, although they are class members even if they have not manifested a condition.

### C.  The Settlement Fairly Trades Punitive Damages For Immediate Compensatory Payment.

Several class members filed objections arguing that participation in the settlement unfairly deprives them of the right to punitive damages.[30]  As Dean Klonoff states, "very few settlements award even full compensatory damages, let alone punitive damages.  A settlement, by its nature, is a compromise, and I know of no case that has ever found a settlement unfair because it included only compensatory damages and not punitive damages."[31]

The Medical Settlement is, as Dean Klonoff states, a compromise of members' rights to punitive damages in return for substantial benefits.  Under the SPC Matrix, class members receive a lesser standard of causation, which reduces the risk of recovery, and compensatory benefits as a lump sum comparable to those they would have received after a successful trial.[32]  According to Dean Klonoff, this is superior to "many class action settlements, in which class members recover for only a fraction of their harm."[33]  [*Id.* ¶ 67.]  Furthermore, all class members may participate in the PMCP, which entitles them to periodic medical examinations for twenty-one years, and the BELO, which provides significant benefits in a future action for damages for a Later-Manifested Physical Condition and reduces the proof required to meet causation in such a suit.

---

[30] *E.g.*, Machua Objection [Doc. 57]; Coco Objection [Doc. 180]; Yerkes et al. Objection [Doc. 185]; Baird et al. Objection [Doc. 202].
[31] Klonoff Supp. Decl. ¶ 15.
[32] Klonoff Decl. ¶¶ 46-47.
[33] Klonoff Decl. ¶ 67.

"Parties give and take to achieve settlements." *Frew v. Hawkins*, No. 3-065, 2007 WL 2667985, at *6 (E.D. Tex. Sept. 5, 2007) (citing *United States v. Armour*, 402 U.S. 673, 681 (1971)).  "[I]n exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation."  *United States v. Armour*, 402 U.S. 673, 681 (1971).  Here, the Medical Settlement trades punitive rights, which are not guaranteed, for generous rights today.[34]  If a member feels this trade-off is not worth the bargain, he or she is fully informed and may opt out.

### D. The Time Lapse Between Exposure And Manifestation Of An SPC Is Fair And Reasonable.

Some objectors argue that the time frames required between exposure and manifestation of a SPC is arbitrary and unfair.[35]  Halliburton, on the other hand, argues that the conditions are so common they cannot reasonably be tied to the spill.[36]  These two objections, opposite sides of the same coin, are addressed together because they highlight the fairness and reasonableness of the time frames set forth in the SPC Matrix.

The record evidence is uncontroverted that the time frames set forth in the SPC Matrix between exposure to oil and/or dispersant and physical manifestation of a SPC are medically supported, and on this basis, fair and reasonable.  As Dr. Harbut explained in his declaration in support of final approval, the time frames in the SPC Matrix are supported by the best available medical research and his experience treating patients.[37]  For each condition in the Matrix, Dr. Harbut outlined the medical support undergirding the relevant time frame; an individual in the

---

[34] The Medical Settlement preserves, however, class members' punitive and exemplary damages claims against non-released parties such as Transocean and Halliburton.  MEDICAL SETTLEMENT [DOC. 6427], §§ II.MMM, II.ZZZ, XVI.G.

[35] *E.g.*, BREEDLOVE OBJECTION [DOC. 158] LLEWALLEN OBJECTION [DOC. 182].

[36] HALLIBURTON OBJECTION [DOC. 93].

[37] HARBUT DECL. ¶ 19.

general population would manifest a SPC within 24 to 72 hours after exposure to petroleum-based products under exposure conditions similar to those that occurred during the spill response.[38]

Halliburton is no doubt correct that many, if not most, of the SPCs and symptoms are experienced commonly in the general population, irrespective of petroleum-based exposures. But when a SPC manifests within a short time frame after exposure—between 24 and 72 hours—the likelihood is high that the condition is a *result of* the exposure.[39]  If not for the short duration between exposure and manifestation, it would be difficult to link a SPC to exposure.  But this short time frame makes all the difference.  The undisputed medical evidence demonstrates that these time frames are medically sound and, moreover, they are necessary boundaries for causation and class certification.[40]

Finally, it bears repeating that the temporal requirements of both the class definition and the SPC Matrix were drafted with the assistance of expert medical advice.  Dr. Harbut attested that Zone A and B cover coastal populations that could reasonably be expected to have had sufficient exposure to oil and/or dispersant to manifest one or more SPCs purely by virtue of their residency.[41]  Zone B residents also represent a population that "may be associated with an elevated incidence of petroleum associated disease."[42]  The same is true of Clean-Up Workers, who "by definition . . . are involved in the cleanup of oil" and could be expected to suffer petroleum exposures as part of their employment responsibilities.[43]  In sum, the time-of-manifestation requirements, coupled with other facets of the class definition, together define a

---

[38] HARBUT DECL. ¶¶ 25-33, 35-38.
[39] *See* HARBUT SUPP. DECL. ¶ 8.
[40] COFFEE DECL. ¶¶ 42-51.
[41] HARBUT DECL. ¶¶ 13-14; *see also* HARBUT SUPP. DECL. ¶ 9.
[42] HARBUT DECL. ¶ 15.
[43] HARBUT DECL. ¶ 14.

class whose members, if they became ill, likely did so as a result of exposure to oil and/or dispersant chemicals.

### E.   All Class Members Are Eligible For Benefits.

The Sturdivant Objectors wrongly assert that some class members are ineligible for any benefits under the agreement.[44]  The Medical Settlement provides compensation to each class member who has a qualifying SPC and meets the requisite proof requirements, and it makes both the PMCP and the BELO available to *all* members of the class.  The benefits of the Outreach Program are likewise class-wide.  The Sturdivant Objectors' contention is simply a misreading of the settlement and should be rejected.[45]

### F.   The SPC Matrix Does Not Impose Unfair or Unreasonable Proof Requirements For Compensation.

Objectors attack the SPC proof requirements from opposite angles.  Coco and the Yerkes and Baird Objectors argue that the standards are overly lenient.[46]  Llewallen and the Abreu Objectors contend that the requirements are impossibly strict.[47]  Ultimately, these conflicting claims serve to validate the proof requirements and compensation structure established under the

---

[44] STURDIVANT OBJECTION [DOC. 213], p. 28 (stating that this is a "hot button indicator" of unfairness).

[45] The citations supplied by the Sturdivant Objectors likewise do not support their contention, for the cited cases involve scenarios in which class members, for whatever reason, were left entirely without settlement benefits.  *See Reynolds v. Beneficial Nat'l Bank.*, 288 F.3d 277, 286 (7th Cir. 2002) (finding fault where two distinct classes were "accidentally" swept into a settlement unrelated to their injuries due to a "semantic coincidence"); *Crawford v. Equifax Payment Servs.*, 201 F.3d 877, 882 (7th Cir. 2000) ("Crawford and his attorney were paid handsomely to go away; the other class members received nothing . . . ."); *Acosta v. Equifax Info. Servs., LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007) (rejecting settlement that "inexplicably limit[ed] eligibility for economic relief" so as to "deny it completely" to a segment of the class whose claims had "tremendous" value and which would likely receive "no benefit" from the injunctive relief afforded).

[46] COCO OBJECTION [DOC. 180]; YERKES ET AL. OBJECTION [DOC. 185]; BAIRD ET AL. OBJECTION [DOC. 202].

[47] ABREU ET AL. OBJECTION [DOC. 92]; LLEWALLEN OBJECTION [DOC. 182].

15

agreement.  According to Dean Klonoff, "the settlement simply reflects the fact that, in the trial context, those plaintiffs with supporting documentation are in a stronger position (and thus likely to achieve a better outcome) than those lacking documentation."[48]

The Yerkes and Baird Objectors have each allegedly received medical attention and exposure-related diagnoses.  They complain that the agreement improperly "lumps" their objector group with those who lack such solid proof.  But the settling parties anticipated and accounted for variations in the strengths of class members' claims.  The SPC Matrix provides varying compensation that depends, in part, upon the type and amount of proof the claimant is capable of providing.[49]  Claimants with medical records, such as the Yerkes and Baird Objectors, receive the greatest compensation.

The SPC Matrix is also tailored to accommodate claimants who assert that they lacked the means to obtain medical treatment, did not realize their conditions were exposure-related, or did not appreciate the importance of obtaining medical attention.[50]  Class counsel successfully obtained compensation for class members who could not, or did not, obtain medical attention for their acute conditions.  Level A1 of the SPC Matrix offers payments to eligible class members who lack both medical records and, in the case of Clean-Up Workers, are not part of BP's medical databases.  These claimants need only provide a signed declaration setting forth specified information regarding their injury and, in the case of Zone A or B residents, corroboration from *either* a third party or some other extrinsic evidence.  It would be highly unusual to be awarded personal injury damages at trial with that level proof.

---

[48] KLONOFF SUPP. DECL. ¶ 11.
[49] MEDICAL SETTLEMENT [DOC. 6427], Ex. 8.
[50] *See* ABREU ET AL. OBJECTION [DOC. 92]; BREEDLOVE OBJECTION [DOC. 158]; LLEWALLEN OBJECTION [DOC. 182].

With respect to chronic conditions compensated under SPC Matrix Level B1, there is nothing unfair or unreasonable about requiring minimal medical evidence to support payments ranging in the tens of thousands of dollars.  The objectors contending to the contrary fail to grapple with the fact that, at trial, the absence of proof would likely preclude their recovery.  Thus, to require some proof for greater compensation is a reasonable tradeoff.

Dr. Michael Robichaux, who submits a declaration in support of the Baird Objectors, opines that the Medical Encounters Database, which governs compensation under Level A3, is "useless" because on-site medical personnel allegedly discounted the symptoms exhibited by one Vessel of Opportunity worker who later relayed his experience to Dr. Robichaux.[51]  Proof requirements built into the SPC Matrix address these concerns.  Compensation is based on the Claims Administrator's independent review of the evidence of the symptoms and/or conditions reported by the class member.  For entries in the Medical Encounters Database, presumptions are created for the benefit of the class members based on codes used in the database.  But where those presumptions do not apply, and the Claims Administrator reviews the underlying records, the opinion of onsite medical personnel is but one piece of evidence that the Claims Administrator must consider in reaching his determination.   In the example cited by Dr. Robichaux, the claimant remains free to submit his or her own medical records to support a claim that he suffered a condition more serious than on-site medical personnel reported.

The Abreu Objectors allege that many Clean-Up Workers, themselves included, avoided the on-site medic stations provided by BP contractors for fear of being fired if they reported an injury or illness.[52]  Based on their claim that many Clean-Up Workers were intimidated into not

---

[51] ROBICHAUX DECLARATION [DOC. 202-3], ¶¶ 29-30.

[52] ABREU ET AL. OBJECTION [DOC. 92], p. 7-10.  Counsel notes that not all of the Abreu Objectors can credibly make this argument.  Nine of the 74 Abreu Objectors in fact visited an

attending the medic stations, the Abreu Objectors argue that it is unfair to pay a premium to those who did attend the stations.   Other objectors echo this concern, arguing that the SPC Matrix, particularly Level A3, is based on "false assumptions" regarding the availability of onsite medical care for Clean-Up Workers.[53]  Class counsel considered these arguments and similar anecdotal evidence when negotiating the Matrix.   It is difficult to imagine that such stations were not available, or that workers did not avail themselves of the medical stations, given that the Medical Encounters Database alone contains approximately 20,000 entries documenting the illnesses and injuries experienced by approximately 13,000 Clean-Up Workers.[54]  If such "intimidation" were as widespread as the objectors assert, one would imagine that the database would contain fewer entries.

In addition, class counsel reviewed general information concerning the types and frequency of the medical complaints that were contained in BP's Medical Encounters Database. Using this information, class counsel took care to ensure that the proof requirements would adequately reflect and take advantage of the proof available.[55]  The entries in the database overwhelmingly matched the (non-trauma) conditions and symptoms that Dr. Harbut stated the general public could experience from the BP oil spill exposure conditions.[56]  Thus, based on the totality of facts, class counsel recognized the database accurately reflected the types of health complaints most Clean-Up Workers were reporting shortly after exposure, as well as the conditions that Dr. Harbut said one would expect to experience from such exposure.   It serves as

---

on-site medical station.  *See* DUTTON SUPPLEMENTAL DECLARATION ¶ 26 (submitted together with BP's papers in response to the objections to the Medical Settlement).

[53] *See* ABREU ET AL. OBJECTION [DOC. 92]; BREEDLOVE OBJECTION [DOC. 158]; LLEWALLEN OBJECTION [DOC. 182]; BAIRD ET AL. OBJECTION [DOC. 202].

[54] HERZSTEIN DECLARATION (AUG. 12, 2012) [DOC. 7112-7], ¶ 16 (hereinafter "HERZSTEIN DECL.").

[55] GREENWALD DECL. ¶ 5.

[56] HERZSTEIN DECL. ¶ 16.

a reasonable, objective proxy for proof of contemporaneous manifestation of a SPC.   The strength of this proof reasonably warranted higher compensation.   BP was therefore persuaded to pay greater compensation to those Clean-Up Workers who complied with the requirement to report their injuries as they occurred.   This distinction in the Matrix is thus reasonable and fair.

What is more, because BP's liability under the Medical Settlement is uncapped, the success in acquiring maximum compensation for acute conditions for those who qualify for Matrix Level A3 does not diminish the compensation available to other class members, including the Abreu Objectors.

The Abreu Objectors also argue that the Medical Settlement disfavors non-English-speaking and economically disadvantaged class members.   The objectors offer no examples of how this is so.   As discussed above, compensation for SPCs is available even in the absence of medical or other expert-dependent causation evidence.   Moreover, the class Notice, Proof of Claim Form, and other materials are available in several languages other than English (including Spanish).   The toll-free number maintained by the Claims Administrator likewise provides assistance in English, Spanish, and Vietnamese.[57]   If anything, the Abreu Objectors' (unsupported) contention that "the vast majority" of the class is made up of non-English-speaking day laborers with no understanding of an American court proceeding *supports* approval of the Medical Settlement.   The agreement fairly and adequately communicates options to these individuals and provides a medium, separate from adversarial litigation, to vindicate rights that would otherwise be difficult to obtain through the courts.

Finally, one objector claims that "many" potential claimants are foregoing claims because they believe they will not receive compensation (presumably because they cannot meet the

---

[57] MEDICAL SETTLEMENT [DOC. 6427], § XI.

requisite proof standards).[58]   This claim is speculative and not borne out by the daily records of

the Claims Administrator.   To date, already more than 3,800 claimants have submitted Proof of

Claim Forms, even though compensation for SPCs and participation in the PMCP will not be

available until the Effective Date.   Over 3,500 of these claimants are *pro se*.   If objectors or

anyone else requires assistance with a claim, they may contact the Claims Administrator's toll-

free telephone, consult its website, or visit its physical office, and they may also utilize a toll-free

telephone number maintained by class counsel.   There is, in sum, no shortage of avenues to assist

class members with properly filing a claim.

### G.   The Back-End Litigation Option Is Fair and Provides Substantial Benefits To Class Members.

According to the Sturdivant Objectors, it is unfair to require class members to elect

between exercising their BELO rights and pursuing a workers' compensation claim.[59]   This

objection misses the mark.

The BELO offers substantial benefits, and is also subject to certain conditions, that would

not exist absent the Medical Settlement.   By way of example, a plaintiff who was exposed to oil

and/or dispersant in the summer of 2010, but contracts a disease years later as a result of that

exposure, may sue BP at the time he or she develops the disease.   Absent the BELO, BP would

ordinarily be entitled to contest liability and raise a statute of limitations defense, and the

plaintiff ordinarily would be required to prove the fact that he or she was exposed to oil and/or

dispersant, and that the exposure resulted from the *Deepwater Horizon* Incident.   Yet in a BELO

suit, BP cannot contest liability or raise a statute of limitations defense, and the plaintiff claiming

exposure to oil and/or dispersants from the *Deepwater Horizon* Incident need not prove that he

---

[58] LLEWALLEN OBJECTION [DOC. 182].
[59] STURDIVANT OBJECTION [DOC. 213].

or she was exposed to at least some oil and/or dispersant from the *Deepwater Horizon* Incident. These BELO conditions are thus extremely beneficial to class members because they ease the burden and expense of future litigation, should it become necessary.  It is not unreasonable for BP to insist on the release of certain rights in exchange for these concessions.  The election of remedies—to seek relief through either the BELO or workers' compensation—is one such reasonable demand.

A class member who contracts a Later-Manifested Physical Condition may elect whether to seek relief for the condition pursuant to the BELO or workers' compensation or the Longshore and Harbor Workers' Compensation Act ("LHWCA"), as applicable.[60]  The Sturdivant Objectors claim that if a class member elects to seek relief through workers' compensation, and that claim is then denied, the class member is precluded from seeking relief through the BELO.[61] Their objection mistakenly presumes that the workers' compensation claim may be denied because of a determination that BP, not the claimant's employer, was responsible for the claimant's condition.  The fact that a condition is caused by a third party does not relieve the employer from liability under either workers' compensation law or the LHWCA.  *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Whitmire*, 578 So. 2d 1180, 1182 (La. Ct. App. 1991) ("[A]ll compensation statutes require the wrongdoer to reimburse the blameless employer for the compensation he was obliged to pay because of the fault of the outsider."); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1135 (5th Cir. 1995) (holding that third-party tortfeasors are jointly and severally liable along with LHWCA employers to plaintiffs).  The relevant issue is not fault, but whether there was a nexus between the injury and employment as a Clean-Up Worker, which would place the worker within his course and scope of employment so that he or

---

[60] MEDICAL SETTLEMENT [DOC. 6427], § VIII.B.
[61] STURDIVANT OBJECTION [DOC. 213], p. 29-30.

she might enjoy workers' compensation benefits or compensation under the LHWCA.  *See McLin v. Indus. Specialty Contractors, Inc.*, 851 So. 2d 1135, 1139 (La. 2009).

In addition, the Abreu Objectors argue that the BELO is insufficiently expansive.[62] Specifically, they object to the fact that a BELO suit may not be brought to seek relief for conditions that existed prior to April 16, 2012.  The objectors complain that some conditions, though preexisting, were exacerbated by post-spill exposures, and class members in such a scenario should be permitted to file a BELO suit.  Objectors correctly note that the BELO is not intended for pre-existing, known conditions.  BELO is designed to ensure that class members are not releasing injury claims about which they do not, and could not, know at the time of the settlement.  The SPC Matrix, however, addresses exacerbation of several preexisting conditions—not through the BELO, but through prompt compensatory payments.[63]  Class counsel consulted with medical experts, who explained which conditions were likely to be exacerbated by exposure to oil and/or dispersant; those conditions are included in the Matrix.  If a class member believes that his condition should be included in the Matrix, but is not, he or she is free to opt out.  Likewise, if a class member believes that compensation for exacerbation of his or her pre-existing condition is insufficient, he or she is free to opt out.

The BELO provides a tangible, meaningful benefit to class members.  It preserves members' rights to pursue compensation for Later-Manifested Physical Conditions, while relieving the financial burden and time to litigate certain liability elements and defenses.  That it does not completely eliminate *all* legal requirements does not make it unfair.

---

[62] ABREU OBJECTION [DOC. 92], p. 15-16.
[63] MEDICAL SETTLEMENT [DOC. 6427], Ex. 8.

### H. The Lack Of A Claims Appeal Process Does Not Constitute Unfairness, Unreasonableness, Or Inadequacy, Nor Is It A Proper Objection To The Settlement.

The Sturdivant Objectors argue that the Medical Settlement is unfair because it does not contain a mechanism by which to appeal the Claims Administrator's decision.[64]  Federal courts routinely approve class action settlements that do not contain an appeals process.  *See, e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 339 (3d Cir. 2010) (affirming district court's finding that settlement was fair, reasonable, and adequate in all respects save one, even though claims administrator's decision was final, binding, and not appealable); *In re Black Farmers Discrimination Litig. Settlement*, Misc. No. 08-0511 (PLF), ECF No. 232, at 57-58 (D.D.C. Oct. 27, 2011), *appeals dismissed*, No. 11-5326 (D.C. Cir. July 25, 2012) (rejecting claim that settlement was unfair where awards were permitted up to $250,000 with no appeal option).

In *In re WorldCom, Inc.*, 347 B.R. 123, 155 (Bankr. S.D.N.Y. 2006), the court explained why the fairness of a settlement with designated claims rules does not depend on an appeals process:

> The Objectors argue that the Settlement unfairly denies class members a right to appeal the claim administrator's decisions. However, a right to appeal is not required in every settlement. Moreover, the Movants will jointly designate the rules of construction the Claim Administration will apply.  The Court sees no reason, in light of those circumstances, to demand that a right to appeal be included in the Settlement.

Similar to the structure in *In re WorldCom*, the SPC Matrix, together with the Medical Settlement, sets forth the rules that the Claims Administrator must apply in determining compensation under the agreement and the timing of the PMCP.  Those provisions obviate any need for an appeals process.

---

[64] STURDIVANT OBJECTION [DOC. 213].

**I.      None Of The Other Miscellaneous Objections To The Settlement Alters The Agreement's Fairness, Reasonableness, And Adequacy.**

Coco and the Yerkes and Baird Objectors raise a number of points that warrant only a cursory response.[65]  First, these objectors argue that the Medical Settlement contravenes the Oil Pollution Control Act of 1990 ("OPA") by precluding otherwise permissible claims.  This Court well knows, however, that the claims at issue here fall outside OPA.[66]  *See* 33 U.S.C. § 2702 (identifying the damages and removal costs compensable under OPA).[67]  Consequently, no interim claims responsibility exists.

Second, the objectors contend that the settlement unfairly forces a class member to consent to a stay of proceedings or adjournment of trial pending the Court's fairness review of the settlement.  In fact, however, the Medical Settlement provides only that the BP parties consider a stay of proceedings to be a material condition precedent to the agreement; the ultimate decision whether to stay the case lies in the sound discretion of the Court.

The Sturdivant Objectors contend that the settlement terms improperly allow class counsel to accept material modifications to the agreement where such modifications are imposed by the Court.[68]  This is incorrect.  As Dean Klonoff explains, the provision about which objectors complain "is in effect no more than a restatement of the well-settled legal principle that, while a court may approve or reject a class settlement proposed by the parties, it may not

---

[65] COCO OBJECTION [DOC. 180]; YERKES ET AL. OBJECTION [DOC. 185]; BAIRD ET AL. OBJECTION [DOC. 202].

[66] Incidentally, counsel for some Economic and Property Damages class members has moved to extend the opt-out deadline and, in support of his argument contends that "[m]edical claims under OPA have a three year statute of limitations."  [DOC. 7674-1 at 9.]  This argument is incorrect.  The personal injury claims covered by the Medical Settlement are not encompassed by OPA.

[67] AMENDED ORDER AND REASONS (AS TO MOTIONS TO DISMISS B3 AMENDED COMPLAINT) (OCT. 4, 2011) [DOC. 4209], pp. 2-3.

[68] STURDIVANT OBJECTION [DOC. 213], p. 33.

materially change the settlement terms to impose a settlement to which the parties have not agreed."[69]   Moreover, if material, detrimental changes were made to the settlement after the notice and opt out period, those class members detrimentally impacted would be entitled to new notice and renewed opt out rights.[70]

The Sturdivant Objectors also argue that the Medical Settlement's *cy pres* component is unlawful.[71]   But the Medical Settlement has no *cy pres* component; it specifically identifies the programs it funds and the amounts to be funded.   *See In re Lease Oil Antitrust Litig. (No. II)*, 2007 WL 4377835, at *20 (S.D. Tex. Dec. 12, 2007) (describing a *cy pres* component as the "distribution of funds that have not been individually distributed, by distributing them for the next best use which is for indirect class benefit").   The Objectors seem to ignore that the Medical Settlement is designed to provide full compensation to the class members through the SPC compensation, the PMCP, and the BELO benefits.   Further, the additional benefits made available through the Outreach Program brings much needed environmental and mental and behavioral health capacity and services to class members.   Because the Medical Settlement has no *cy pres* component, and because the Objectors fail to identify one, the Court should overrule this objection.

The Abreu Objectors claim that it is unfair that the settlement fails to provide compensation for both heatstroke and a second oil-related injury.[72]   They suggest that for class members who meet such criteria, compensation is provided only for heatstroke.   It is true that the settlement entitles a class member to compensation for only one SPC, even if he or she experienced several SPCs at different times.   But it is not unfair.   Rather, it is but one component

---

[69] KLONOFF SUPP. DECL. ¶ 22.  *See also* MEDICAL SETTLEMENT [DOC. 6427], § XIV.
[70] KLONOFF SUPP. DECL. ¶ 23.
[71] STURDIVANT OBJECTION [DOC. 213], p. 21.
[72] ABREU OBJECTION [DOC. 92], p. 14-15.

of the negotiated compromise.  In any instance, the class member is entitled to the highest payment available under the SPC Matrix.  Thus, objector Abreu would only be entitled to Level A4 compensation for heatstroke if his other oil-related injury was at a lower compensation on the matrix (which could only be Level A1).  If the Abreu Objectors believe they are entitled to multiple payments for multiple SPCs, they are aware of their rights, are counseled, and have the right to opt out of the settlement.

The Baird Objectors claim that the Medical Settlement fails to account for the fact that oil from the Macondo well remains in the environment, and that testing performed by BP and others during the summer of 2010 did not accurately depict the health risks from the oil spill.[73]  They are wrong.  Regardless of whether BP's data regarding environmental toxicity is accurate, class counsel did not accept this data and it did not provide the foundation for Plaintiffs' negotiation of the SPC compensation amounts, the PMCP, or BELO rights for class members exposed to the oil and/or dispersants from the spill. Further, to the extent class members sustain injury as a result of exposure to oil after April 16, 2012, they have not given up their rights to pursue an action against BP for those injuries.

Lastly, one objector expresses concern that participating in the Medical Settlement may result in widespread distribution of his medical records.[74]  He need not have that concern.  The Medical Settlement carefully circumscribes who may access a claimant's medical records and the purpose for which the records may be used.  The agreement also guarantees compliance with HIPPA.[75]

---

[73] *See* BAIRD ET AL. OBJECTION [DOC. 202], and exhibits attached thereto.
[74] LLEWALLEN OBJECTION [DOC. 182].
[75] MEDICAL SETTLEMENT [DOC. 6427], §§ V.K, VI.E, VII.E, VII.D, and Exs. 3-5.

In sum, none of the objections to the Medical Settlement show it to be unfair, unreasonable, or inadequate.  It is indeed the opposite—a fair, reasonable, and adequate mechanism through which potentially 200,000 individuals will receive significant and meaningful relief.

## IV.   THE MEDICAL BENEFITS CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(3) FOR CLASS CERTIFICATION

In support of Plaintiffs' Motion for Final Approval of Medical Benefits Class Action Settlement, Professor John Coffee surveyed Fifth Circuit precedent and observed:

> the Fifth Circuit accepts certification of "single event" disaster cases where (1) there is little variation in the applicable law, (2) the causation is "straightforward"; and (3) the injuries covered are sufficiently similar to create a cohesive class and involve more than the mere threat of exposure or fear of future injury.[76]

That these conditions are satisfied here is undeniably true.  Each class member's injury flows from a single tortious event.  There is no variation in applicable law.  Members' injuries occurred relatively immediately after exposure to the same harmful substances; causation is thus "straightforward."[77]  The injuries covered are those that medical experts expect to occur in the general population under the exposure conditions set forth in the Medical Settlement.[78]  The benefits are consistent among the class members.  The class is, in short, cohesive, and the benefits are equally shared.

Furthermore, this class is composed of members whose claims are modestly-valued under the case law, but which will necessitate significant expenditures to litigate.[79]  In this sense, the claims are "classic 'negative value' cases"—described by Dean Klonoff as "claims that are not

---

[76] COFFEE DECL. ¶ 33.
[77] COFFEE DECL. ¶ 9(e).
[78] HARBUT DECL. ¶ 27.
[79] COFFEE DECL. ¶¶ 38-40 (setting forth applicable case law).

economically viable as individual lawsuits because the likely recovery is less than the costs of bringing suit."[80]  This point is highly significant, for the Supreme Court has held that use of the class mechanism is most compelling when each of the class members' claims are of the type identified by Dean Klonoff as "negative value."  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).

Those that object to class certification largely fail to grapple with the features that make this class particularly well-suited for certification under Rule 23.  Instead, many point to superficial similarities with non-certifiable classes or contend, in conclusory fashion, that mass personal injury classes are simply not certifiable.[81]  Such objections are wrong on the law; as Dean Klonoff testified, "The Supreme Court and the Fifth Circuit have made clear that certification of personal injury claims may be appropriate in some cases."[82]  More importantly, however, this class is factually unlike the doomed personal injury classes proffered in the cases relied upon by the objectors—*Amchem*, *Steering Committee v. Exxon Mobil*, and *Castano*.[83]

---

[80] KLONOFF DECL. ¶ 45.  Indeed, even some of the objectors acknowledge this point.  *See, e.g.*, BREEDLOVE OBJECTION [DOC. 158], p. 2.

[81] *See, e.g.*, LOUISIANA OBJECTION [DOC. 228], p. 23; STURDIVANT ET AL. OBJECTION [DOC. 213], p. 17-18.

[82] KLONOFF DECL. ¶ 14 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), and *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 557 (5th Cir. 2011); *see also Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999) (affirming certification of personal injury class of those who suffered respiratory illness allegedly caused by the defendant's defective and/or improperly maintained air-conditioning and ventilating system); *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992) (affirming certification of a class of individuals that were, *inter alia*, "physically present" in the area surrounding a refinery after a vapor explosion).

[83] One objector points also points to *Madison v. Chalmette Refining, LLC*, 637 F.3d 551 (5th Cir. 2011), for the proposition that mass personal injury classes are not certifiable.  *See* STURDIVANT ET AL. OBJECTION [DOC. 213], p. 18.  *Madison* holds no such thing.  Although the Fifth Circuit reversed an order certifying a class of individuals exposed to petroleum coke, it did so because the district court failed to consider the manageability of the class action were it to proceed to trial.  *Madison*, 637 F.3d at 556.  The instant class requires no similar inquiry because it is one seeking certification for settlement purposes only.  *See Amchem*, 521 U.S. at 620

Indeed, the factual differences between this class and the decertified classes cited by the objectors only serve to highlight the propriety of certification. The instant class members were exposed to the same toxic substances (petroleum distillates) over the same relatively confined period; there are no choice of law issues and no affirmative defenses; and members seek compensation for a mature tort whose value is roughly known in the case law.[84, 85] As Professor Coffee has explained, this class "is the polar opposite of *Castano*" and cases like it.[86]

Nor is this class like the one refused certification in *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006). There, a fire at an Exxon plant caused a toxic smoke plume to blow across the city of Baton Rouge. *Id.* at 600. Plaintiffs attempted to certify a Rule 23(b)(3) class of all persons residing or located within East Baton Rouge Parish or West Baton Rouge Parish at the time of the incident, and class members brought claims for personal injury and property damage, as well as damages for harder-to-quantify emotional injury. *Id.* at 602. The court of appeals affirmed the denial of certification because causation was uncertain and "each individual plaintiff suffered different alleged periods and magnitudes of exposure." *Id.* Thus, individual issues would overwhelm those common to the class. Not so here. Members of this class suffered short-term exposures followed by relatively immediate illness—evidence that renders the causal association much more certain in this case. Further, the conditions covered by

---

(explaining that manageability concerns are not relevant to certification of a settlement-only class). Furthermore, *Madison* explicitly disclaimed the position the objectors attribute to it—namely, that a personal injury class is uncertifiable. *See Madison*, 637 F.3d at 557 (stating, "We do not suggest that class treatment is necessarily inappropriate," and noting that the common issues among the class may actually favor certification).

[84] By contrast, class members in *Castano* "were exposed to nicotine through different products, for different amounts of time, and over different time periods." *Castano*, 84 F.3d at 743.

[85] Professor Coffee has thoroughly explained the difference between the "immature" tort at issue in *Castano*—namely, the "addiction as injury" theory—and the toxic exposure tort at issue herein. *See* COFFEE DECL. ¶¶ 34-37.

[86] COFFEE DECL. ¶ 22.

the SPC Matrix largely correlate with the symptoms and conditions Clean-Up Workers contemporaneously reported to on-site medics and public health officials within close proximity to exposure to oil and/or dispersants.[87]   Thus, in contrast to *Steering Committee*—and other exposure classes with uncertain exposure conditions[88]—evidence supporting causation is "straightforward"[89] and common to the class.[90]

Furthermore, the *Steering Committee* court also expressed concern with the individualized nature of plaintiffs' emotional injury claims; it observed that "[t]he very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances."  *Id.* at 602 (internal quotation omitted).  The medical class members proffer no similar claim.  Their claims, rather, are uniform negligence actions for personal injuries under general maritime law, and liability flows from a single source.  Such claims require objective determinations—whether one manifested a specific condition and/or lived within a well-defined geographic zone, for example—as opposed to individualized damage computations.   In contrast to *Steering Committee*, the claims here are well-suited to class treatment.[91]

---

[87] COFFEE DECL. ¶¶ 32, 49-51.

[88] Professor Coffee contrasted the "straightforward" causation inquiry here with the uncertain inquiry underlying personal injury classes alleging harm from long-term asbestos exposure, tobacco exposure, or injury from silicone gel breast implants.  COFFEE DECL. ¶¶ 42, 47.  In these latter putative classes, "there may be a twenty year or longer latency period and there is no direct proof of the original exposure (or its duration)."  *Id.* ¶ 47.  The objectors make no attempt to address these differences and their silence is telling.

[89] The "straightforward" nature of the causal inquiry here is further bolstered by data collected in BP's Medical Encounters Database, which records a large number of Clean-Up Workers reporting the types of conditions reflected in the Specified Physical Condition matrix within close proximity to exposure to oil and/or dispersants.  *See* COFFEE DECL. ¶¶ 32, 49-51.

[90] COFFEE DECL. ¶¶ 32, 42-51.

[91] COFFEE DECL. ¶ 31.

Finally, the medical class is unlike the sprawling exposure class decertified in *Amchem*. Each member of this class is seeking benefits for past exposure to oil and/or dispersants.  There are no "'future claimants'—persons exposed to a toxic substance who have not yet manifested any injury—who will receive any compensation for future injuries" under the Medical Settlement.[92]  All class members share equally in the right to participate in the PMCP and all retain the same BELO rights.  Full compensation is available for those who manifested an SPC and BP's liability is uncapped.  Thus, Dean Klonoff explained, each class member may pursue his or her claims to the fullest extent irrespective of what others do.[93]  There is no intra-class conflict.

In short, the law and undisputed facts support certification of this personal injury class and rejection of the objections thereto.  As Professor Coffee observed, "the settling parties have cautiously and conservatively structured this settlement to fit within the guidelines laid down by *Castano*, *Amchem*, and other major class action decisions."[94]  The class is cohesive and provides some benefits unattainable through litigation.  Further, for those who manifested a SPC, "the proposed compensatory awards . . . reflect or exceed actual market values in minor injury toxic exposure cases."[95]  Indeed, Dean Klonoff summarized the propriety of the class thusly, stating that if this class does not qualify for certification, "then as a practical matter, no mass tort personal injury class is *ever* appropriate for certification."[96]  For each of these reasons, and for those set forth below and in the Plaintiffs' opening papers, the Court should certify the class under Rule 23(b)(3), and each of the objections should be overruled.

---

[92] COFFEE DECL. ¶ 52.
[93] KLONOFF DECL. ¶¶ 33-34; *see also* COFFEE SUPP. DECL. ¶ 13 (explaining that "the fact that overshadows all other consideration is that this settlement is uncapped").
[94] COFFEE DECL. ¶ 10.
[95] COFFEE DECL. ¶ 41
[96] KLONOFF DECL. ¶ 15.

### A.      The Objections To Commonality Are Without Merit.

Three objectors raise objections to the commonality of the class under Rule 23(a)(2). The Attorney General argues that the class lacks commonality because its members proffer two distinct theories of BP's liability: some allege liability based on their exposure to oil from the Macondo well blowout, while others allege liability based on their exposure to dispersant chemicals.  According to the Attorney General, "proof of liability for one does not amount to proof of liability for the other." [97]  The Sturdivant Objectors and Halliburton contend that commonality is not satisfied because there is too much factual variation among member's claims; members suffered multiple conditions as a result of a variety of individual circumstances. [98]  Finally, Halliburton contends that the class definition contains arbitrary geographic boundaries and timing requirements, and thus the class is both overinclusive and underinclusive.[99]  Each objection is without merit.

Under the Supreme Court's most recent precedent, commonality is satisfied if there is a single question of law or fact central to the resolution of each class member's claim.  *Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2551, 2556 (2011).  Here, every member of the class must resolve whether BP was legally liable under general maritime law for the April 20, 2010 explosion and its aftermath.[100]  Resolution of this question is highly relevant—indeed, it is central—for all class members, even those who were allegedly only exposed to dispersant

---

[97] LOUISIANA OBJECTION [DOC. 228], p. 14.

[98] STURDIVANT ET AL. OBJECTION [DOC. 213], p. 7-8; HALLIBURTON OBJECTION [DOC. 93], p. 8-9.

[99] HALLIBURTON OBJECTION [DOC. 93], p. 9-10.

[100] Determining whether BP was liable for the April 20, 2010 explosion, in turn, requires the answer to numerous common factual questions concerning BP's conduct before, during, and after the blowout.  These common questions are set forth in detail in Plaintiffs' Memorandum in Support of Final Approval of Medical Benefits Class Action Settlement and Plaintiffs need not repeat them here.  [DOC. 7116 at 37]; *see also* COFFEE DECL. ¶ 61.

chemicals during the Response Activities.[101]  BP was named the party responsible for the spill;

by law, it was required to take remedial action.  *See* 33. U.S.C. § 2702.  Thus, BP's use of

dispersants stems directly from the spill itself; the two are inseparable, and BP's negligence for

the blowout underpins the entirety of its post-explosion conduct.  *E.g.*, *Turner*, 234 F.R.D. at 605

(finding common negligence conduct where some plaintiffs in personal injury class were injured

during initial oil spill and others were injured during post-spill remediation process).  In other

words, the ultimate liability of BP, as Responsible Party, does not differ among, and serves as a

common course of conduct central to, all class members' claims.  Commonality is satisfied.[102]

*See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc) (explaining that

commonality "is informed by the defendant's conduct as to all class members and any resulting

injuries common to all class members"); *In re Heartland Payment Sys., Inc. Customer Data Sec.

Breach Litig.*, MDL No. 09-2046, 851 F. Supp. 2d 1040, 1052-53 (S.D. Tex. 2012) (finding

commonality satisfied when class of credit card holders sued defendant data company for a data

security breach, and holding that "[t]he common factual question in this case is what actions

[defendant] took before, during, and after the data breach to safeguard the Consumer Plaintiffs'

financial information").

     The Sturdivant Objectors and Halliburton contend that commonality is lacking because

not all members of the class suffered from the same SPC, and some members may not yet have

manifested any such condition.  This objection, however, does not defeat commonality, which

---

[101] Plaintiffs assume for purposes of argument that such "dispersant-only" class members exist.  There is no evidence to support the contention, no objector has claimed he or she was *only* exposed to oil, and the Attorney General's assertion to the contrary is based on pure conjecture.  Indeed, the Attorney General offers no evidence that any class members have alleged injury from dispersants but not oil.  *See* COFFEE SUPP. DECL. ¶ 8 (assuming, for sake of argument, that dispersant-only plaintiffs exist).

[102] COFFEE SUPP. DECL. ¶¶ 18-25 (explaining that the *Deepwater Horizon* Incident is properly characterized as a "single event" disaster).

requires the class to share but one common issue of fact or law capable of driving the resolution of each class member's claim. *Dukes*, --- U.S. ---, 131 S. Ct. at 2556. Where, as here, BP's tortious conduct is common to all class members, some variation in injury is acceptable under Rule 23(a)(2). *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624-25 (5th Cir. 1999) (finding commonality satisfied where defendant's conduct was common to the class of toxic exposure plaintiffs, and stating that it was "irrelevant whether the class members uniformly allege damages from second-hand smoke"); *Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 678 F.3d 409, 421 (6th Cir. 2012) (finding commonality satisfied post-*Dukes* and explaining that "there need only be one question common to the class" and that "[n]o matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action" (internal quotation omitted)).

In addition, the fact that there are some class members who may not have manifested a SPC does not defeat commonality. Each class member suffered a past exposure to essentially the same substance.[103] In this sense, all members suffered the same injury, "because in both cases any injury was caused by exposure to petrochemicals that are for all practical purposes medically indistinguishable in effect."[104] Membership in the class hinges on exposure, not the manifestation of a particular condition. Further, because all members suffered a past exposure, it is critical that each retain his or her BELO rights to remain capable of remedying a Later-Manifest Physical Condition. Liability for a Later-Manifested Physical Condition, in turn, flows

---

[103] *See* HARBUT DECL. ¶ 20 (explaining that exposure to petroleum products, including dispersant chemicals, has similar effects).
[104] COFFEE SUPP. DECL. ¶ 7.

from BP's liability for the *Deepwater Horizon* Incident, an issue common to all class members—asymptomatic or not.[105]

Lastly, Halliburton argues that the "geographic boundaries and time horizons" set forth in the class definition are arbitrary.[106]  This is not an objection to commonality.  It also ignores the evidence submitted to the contrary.  Dr. Harbut explained that the boundaries of both Zone A and Zone B were carefully drawn to encompass those individuals who, "merely by virtue of their residency," were likely to suffer a short-term exposure and/or manifest an SPC.[107]  Dr. Harbut further testified that the distance-from-the-coastline requirements, set forth in Zone A and Zone B, remove from the class individuals who were unlikely to suffer exposure simply because of where they lived.[108]  Similarly, the time-of-manifestation requirements make causation more certain by minimizing the possibility that a condition was the result of an intervening or alternate cause.[109]  The geographic boundaries and timing requirements are rational and will, in fact, reduce both over- and underinclusiveness.[110]

---

[105] *See* COFFEE SUPP. DECL. ¶¶ 20-25 (surveying relevant case law and concluding that the *Deepwater Horizon* Incident represents a "single event" for purposes of the class certification inquiry.

[106] In support of its arguments, Halliburton submits a declaration by Marc Velrath, an economist and financial analyst.  Although Velrath may be qualified to provide an opinion in matters economic, he has no expertise in medicine or medical science.  Thus, to the extent Velrath is offering medical opinions (or attempting to rebut those proffered by Dr. Harbut), Plaintiffs object.  *See Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010).

[107] HARBUT DECL. ¶¶ 39-40.

[108] HARBUT DECL. ¶¶ 39-40.

[109] COFFEE DECL. ¶ 47 (stating that "the short (24 to 72 hour) latency period significantly reduces the possibility of alternative causes for the symptom or condition"); *see also* HARBUT SUPP. DECL. ¶ 8.

[110] Moreover, as Professor Coffee has already observed, "Even if there is a small degree of overbreadth (because somewhere there may be Zone B residents or Clean-Up Workers who did not experience a headache, nausea or some other non-specific symptom), such a trivial level of overbreadth in the size of the class should not be fatal to certification."  COFFEE DECL. ¶ 56 (citing cases).

In sum, the medical class meets the requirements set forth for commonality under Rule 23(a)(2).  Indeed, as Professor Coffee observed in his declaration, "this class has many common characteristics and few, if any, dissimilar ones."[111]

### B.    The Objections To Typicality Are Without Merit.

Typicality, under Rule 23(a)(3), requires that "the claims or defenses of the representative parties" be "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Courts have construed this precondition liberally; a class representative's claim is typical when it "arise[s] from a similar course of conduct and share[s] the same legal theory" as the claims of the class. *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1054 (quoting *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001).  According to the Fifth Circuit, the threshold for typicality "is not demanding."  *Mullen*, 186 F.3d at 625.

The Attorney General argues that the claims of the class representatives are not typical because some were exposed to oil and some were exposed to dispersants, and because members suffered different "types" of exposure—*i.e.*, some inhaled toxic fumes, some physically touched oily booms, etc.[112]  Typicality, however, does not require identical exposures; it is satisfied where "the class representative's claims have the same essential characteristics of those of the putative class."  *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by*, *M.D. ex rel. Stukenberg*, 675 F.3d 832 (5th Cir. 2012).  All members of the class share claims with the same essential characteristics.  Each of the members asserts a cause of action for negligence, gross negligence, and medical monitoring under general maritime law. Each of these claims root back to BP's liability for the Macondo blowout and its subsequent OPA-mandated remediation efforts.  The essential characteristics of each member's case are the

---

[111] Coffee Decl. ¶ 52.
[112] Louisiana Objection [Doc. 228], p. 16-18.

same.  *See Mullen*, 186 F.3d at 625 (finding typicality among exposure class where, although some members incurred varying levels of exposure, all members premised liability for personal injury under the Jones Act and the doctrine of seaworthiness); *Turner*, 234 F.R.D. at 605 (finding typicality where all harms derived from defendant's negligent maintenance of its oil refinery, and all or almost all plaintiffs raised property damage and personal injury claims pursuant to theories of negligence, strict liability, and absolute liability under the Louisiana Civil Code).

What is more, the Attorney General ignores the testimony of Dr. Harbut, who explained that exposure to oil and exposure to dispersant chemicals is functionally the same.  According to Dr. Harbut, "the health effects of petroleum and petroleum distillates, petroleum-based dispersants and crude oil are often quite similar if not identical, because the chemicals causing insult to the living organism are substantially the same." [113]  Because exposure to oil and exposure to dispersant is essentially identical, it is not relevant, for purposes of typicality, that some members may have been exposed to either oil or dispersant but not both. [114]  Furthermore, and contrary to the bald contentions of the Sturdivant Objectors, there are no factual variations relating to causation that thwart typicality. [115]  Rather, as Professor Coffee explained, and as set forth in more detail *supra*, causation among the class is "straightforward" and occurred via one

---

[113] HARBUT DECL. ¶ 20.  *See also* HARBUT SUPP. DECL. ¶ 7 (stating that "[b]oth the oil and the chemical dispersants used in the response to the oil spill are petroleum derived, and as such their biological reactivity would be expected to be largely the same").

[114] Again, no objector has come forth claiming that he or she was exposed to dispersant but not oil and thus this "objection" is somewhat conjectural.  But even if such objectors exist, the fact that there may be dispersant-only class members does not affect typicality.  *See* COFFEE SUPP. DECL. ¶ 7 (stating that the claims of the class representatives are typical even if one assumes that there are some members who were exposed to only oil or only dispersant, and explaining that "class representatives suffered in all relevant medical senses the same injury as that experienced by any 'dispersants only' class members, because in both cases any injury was caused by exposure to petrochemicals that are for all practical purposes medically indistinguishable in effect").

[115] STURDIVANT ET AL OBJECTION [DOC. 213], p. 8.

of two exposure pathways.[116]   The causal inquiry does not raise numerous individual issues and the Court should accordingly overrule this objection.

Next, the Attorney General and the Sturdivant Objectors argue that typicality cannot be satisfied because class members suffered from different SPCs, and some members suffered an exposure but have not manifested a SPC.[117]   Again, these objectors ignore the case law and testimony set forth in Plaintiffs' opening brief and supporting documents.   Typicality is not defeated when class members present the same theory of liability but suffer varying harms or varying degrees of injury.[118]   *See James*, 254 F.3d at 571; *Mullen*, 186 F.3d at 625 (explaining that where class members proffer similar theories of liability, variation in class members' illnesses does not affect typicality).   The class representatives each allege claims for negligence under general maritime law; each was harmed from dermal exposure and/or inhalation of the same essential toxic substance.   Each lived in a tightly confined geographic area in close proximity to the water or participated in the Response Activities.   Under such circumstances, it simply makes no difference that one member suffered a skin rash while another was nauseous or vomiting, or that a member has not yet manifested an illness, for each of these variations goes only to a damage differential.[119]

---

[116] COFFEE DECL. ¶¶ 45-47 (relying on declarations provided by medical experts).

[117] LOUISIANA OBJECTION [DOC. 228], p. 18; STURDIVANT ET AL OBJECTION [DOC. 213], p. 8.

Halliburton also raises a typicality objection, but its argument is fairly non-specific and based primarily on its contention that the class shares no common legal or factual issues. HALLIBURTON OBJECTION [DOC. 93], p. 10-11.   Plaintiffs submit that the response above is adequate to respond to the general issues raised by Halliburton.

[118] COFFEE DECL. ¶¶ 63-64.

[119] *See* COFFEE SUPP. DECL. ¶¶ 8, 10-11.

### C.   The Objections To Adequacy of Representation Are Without Merit.

The Attorney General, the Sturdivant Objectors, and Halliburton contend that the representative plaintiffs will not fairly and adequately protect the interests of the class.[120]   The Sturdivant Objectors also argue that counsel for the class are inadequate.[121]

The Rule 23 adequacy inquiry tests, among other things, whether there are "conflicts of interest between the named plaintiffs and the class they seek to represent."   *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314-15 (5th Cir. 2007) (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001)).   The named plaintiffs are adequate for Rule 23(a)(4) purposes where the interests of the class are aligned and no intra-class conflict exists.[122] *Mullen*, 186 F.3d at 625-26.   As Plaintiffs explained in their opening brief, and as Professor Coffee and Dean Klonoff echoed in their respective declarations, the interests of each class member are aligned with the interests of the class representatives.[123]   Those members who manifested a SPC are entitled to full compensatory damages, as set forth in the Medical Settlement.   BP's financial liability for these damages is uncapped.   Therefore, no members are competing for a limited pool of money and the amount paid to one member has no bearing on the amount paid to another.[124]

The Attorney General contends that the representative plaintiffs will not fairly and adequately protect the interests of the class because all of the representatives manifested a SPC,

---

[120] LOUISIANA OBJECTION [DOC. 228], p. 21; STURDIVANT ET AL OBJECTION [DOC. 213], p. 10-11, 13; HALLIBURTON OBJECTION [DOC. 93], p. 8-9.

[121] STURDIVANT ET AL. [DOC. 124], p. 14.

[122] COFFEE DECL. ¶¶ 66-67 (explaining that "[t]he adequacy of representation requirement usually poses a significant barrier to certification only when there are intra-class conflicts").

[123] COFFEE DECL. ¶ 66; KLONOFF DECL. ¶¶ 33-34.

[124] *See* KLONOFF DECL. ¶ 34 (distinguishing instant settlement from those in *Amchem* and *Ortiz v. Fibreboard Co.*, 527 U.S. 815 (1999), two cases featuring problematic capped settlement funds); *see also* COFFEE SUPP. DECL. ¶ 13 (explaining that there is no intra-class conflict because the settlement is uncapped).

while some class members may not have manifested such a condition.  The Attorney General fails to explain, however, why this creates an adequacy of representation deficiency.  All members and representatives were exposed to oil and/or dispersant as a result of the *Deepwater Horizon* Incident.  Further, all members and representatives share equally in the right to participate in the PMCP and retention of BELO rights.  The sole difference between those that manifest a SPC and the members who never did so is the interest in SPC compensation.  Because this difference does not create conflict between class members, however, it is not a difference that matters.[125]  *See Mullen*, 186 F.3d at 625-26 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests.").  Furthermore, it is arguable, according to Professor Coffee, that the class representatives served as better protectors of the rights of asymptomatic class members than such members could have ever done on their own.[126]

Relatedly, the Sturdivant Objectors contend that the class should include subclasses for those who developed a SPC and for those that did not.  These objectors justify their argument with little more than a cursory cite to *Amchem*, yet they fail to grapple with the central deficiency identified in that case—intra-class conflict.  There is no such conflict here, dispensing with the need for subclasses.[127]  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009) (affirming settlement and stating that "subclasses are only necessary when members of the class have divergent interests").  Those class members who developed a SPC have every

---

[125] COFFEE SUPP. DECL. ¶¶ 7, 13.
[126] *See* COFFEE SUPP. DECL. ¶ 17.
[127] COFFEE SUPP. DECL. ¶ 12 (stating that "subclassing is not required by the language of Rule 23, and is only appropriate when there are 'fundamental' conflicts among class members that would deny one group adequate representation under Rule 23(a)(4)").

incentive to protect the interests of all class members, each of whom retains back-end litigation rights for future manifested conditions.[128]  There is, in short, no justification for the creation of subclasses and, as Professor Klonoff explained, "the creation of subclasses might actually make this case more complex."[129]  The objectors fail to address this testimony and their arguments should be rejected.[130]

The Attorney General next argues that the class representatives created a "significant conflict of interest" by waiving Jones Act claims for those Clean-Up Workers that worked aboard vessels during the Response Activities.[131]  According to the Attorney General, such claims are not included in the Medical Class Action Complaint, yet they are released when a class member settles his or her claims.  Substantively, however, class members recoup exactly what they could under the Jones Act—compensatory damages for toxic exposures—and retain something even more valuable: full BELO rights to sue for future injury.[132]  It is true that in exchange for these BELO rights, some class members relinquish the right to maintenance and

---

[128] The Sturdivant Objectors also claim that "[t]he class should have been divided into subclasses to reflect those class members with different injury claims."  STURDIVANT OBJECTION [DOC. 213], p. 13.  Again, there is no attempt to explain (a) how such subclassing would alleviate intra-class conflict, or (b) why intra-class conflict allegedly arises from the fact that relief is provided for multiple SPCs.  Each class member's compensation is uncapped and unrelated to the compensation of each other class member.  Thus, there is no conflict that arises because one member may be compensated, say, for an acute skin rash while another may receive compensation for an acute headache.  See KLONOFF DECL. ¶ 35 (explaining that creation of subclasses would only add confusion to this settlement class).  Halliburton echoes this objection but also fails to explain how variation in the SPC Matrix requires the creation of subclasses.  The Court should overrule these objections.

[129] KLONOFF DECL. ¶ 35.

[130] The Sturdivant Objectors also argue that subclasses should have been created for those plaintiffs who were exposed to oil and/or dispersant in the past and those who will be exposed to oil and/or dispersant in the future.  By definition, however, all class members must have suffered past exposures; plaintiffs with future exposures are not members of this class.  And, the Medical Settlement does not address (or release) future claims.

[131] LOUISIANA OBJECTION [DOC. 228], p. 21.

[132] Claims for bodily trauma are not released.

cure available under the Jones Act.  But this is simply the nature of settlement and does not evidence a fatal conflict.  The Attorney General does not further elaborate on that which the class representatives unlawfully negotiated away.

The Sturdivant Objectors raise two final adequacy objections, both aimed at the adequacy of class counsel.[133]  First, the Objectors argue that class counsel was inadequate because they negotiated a separate agreement for attorney's fees.  This contention is incorrect under clear precedent.  *See In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1072 ("Having two funds—one for the claimants, one for the attorneys—is a well-recognized variant of a common-fund arrangement."); *Turner*, 472 F. Supp. 2d at 845 (approving a fee award that was separate from class recovery and explaining that "not only are attorneys' fees and expenses to be paid by [defendant] over and above the class recovery, but the amount of the fee is left entirely to the Court's discretion. . . . [T]his is significant because it exponentially decreases the possibility of collusion among counsel").  Indeed, Dean Klonoff thoroughly explained that a separate fee structure "indicates a decreased likelihood of collusion"[134] and, contrary to the objectors' contention, is not a sign of inadequacy.  The objectors fail to address this testimony.

The Sturdivant Objectors also contend that class counsel was inadequate because the Medical Settlement contains a "clear sailing provision."  Again, this is incorrect.  This Court has in the past approved such provisions in a class settlement, *Turner*, 472 F. Supp. 2d at 844 (approving settlement with "clear sailing provision" when fees were to be paid separately from class recovery and not subtracted from the common benefit fund), and approval of agreements

---

[133] The Sturdivant Objectors also claim that the class representatives breached a duty to absent class members by negotiating for a *cy pres* award that will benefit non-class members. STURDIVANT OBJECTORS [DOC. 213], p. 13.  They are incorrect.  There is no *cy pres* component of the Medical Settlement.  *See supra*.

[134] KLONOFF SUPP. DECL. ¶ 31.

42

containing such provisions is commonplace where there is no evidence of collusion, *see, e.g.*, *Lobatz, M.D. v. U.S. W. Cellular of Calif., Inc.*, 222 F.3d 1142, 1148-49 (9th Cir. 2000) (rejecting objection to class settlement based on "clear sailing provision" where objector offered no evidence of collusion).  Here, there is no evidence of collusion and, thus the objections to the adequacy of class counsel should be overruled.[135]

### D.    The Objections To The Ascertainability Of The Class Are Without Merit.

The Attorney General claims that the class is not ascertainable because membership requires a Zone A resident to show that he or she developed a SPC between April 20, 2010 and September 30, 2010.[136]  Thus, argues the Attorney General, class membership turns on a causal inquiry and, as such, improperly compels an individual to "prove his case to qualify as a Zone A class member."[137]  The Attorney General misunderstands the class definition.

An ascertainable class is one whose members can be identified by reference to objective criteria.  *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008); *see also* MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.222 (Fed. Judicial Ctr. 2004) ("An identifiable class exists if its members can be ascertained by reference to objective criteria."). Membership in this class turns on entirely objective benchmarks—participation in Response Activities, residence in well-defined geographic areas, and/or manifestation of clearly identifiable physical conditions.[138]  Each of these criteria is meticulously set forth and defined in the Medical Settlement.[139]  Thus, contrary to the Attorney General's contention, inclusion in the

---

[135] *See* KLONOFF SUPP. DECL. ¶¶ 26-27 (explaining that "clear sailing" provisions are routinely approved when there is no evidence of collusion.
[136] LOUISIANA OBJECTION [DOC. 228], p. 9.
[137] LOUISIANA OBJECTION [DOC. 228], p. 9.
[138] *See* KLONOFF DECL. ¶¶ 20-22; COFFEE DECL. ¶¶ 52-53.
[139] KLONOFF DECL. ¶ 20.

class requires no causal inquiry; rather, as Professor Klonoff has testified, the "class definition is objective and precise and does not turn on the merits."[140]

*Basarich v. Shell Pipeline Co., LP*, Civ. A. No. 05-4180, 2008 WL 6468611 (E.D. La. June 19, 2008), a case relied on by the Attorney General, only illustrates the error of the objection.  In *Basarich*, this Court rejected the plaintiffs' class definition because it turned on a finding of the defendant's negligence.  *Basarich*, 2008 WL 6468611, at *4.  Negligence, however, was a question yet to be litigated.  Therefore, the class definition turned on the very merits of the case.  *Id.*  Here, in contrast, the SPCs are defined.  No causal inquiry is necessary. To meet the relevant criteria, a class member need only show the fact that he or she suffered from one of the defined conditions.  The manifestation of an SPC is, therefore, an objective benchmark requiring no causal determination; the Court should accordingly overrule the Attorney General's objection.  *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012) (finding class ascertainable where it set forth "a mechanical and objective standard," and required no "individualized 'causal' determination on the merits").

The Attorney General also contends that the class definition suffers from a lack of precision because the word "capacity" is not defined in § I.B of the Medical Settlement.  Section I.B. governs exclusions from the class and states, in pertinent part, as follows:

> B.     Excluded from the Medical Benefits Settlement Class are the following: . . . .

> 6)     Any person who is a Zone A Resident or a Zone B Resident, but not a Clean-Up Worker, and who worked in one or more of the following capacities for a cumulative duration of at least five years prior to April 20, 2010: . . . .

> c)     Storage, transportation, distribution, or dispensing of gasoline, diesel, jet fuel, kerosene,

---

[140] KLONOFF DECL. ¶ 20.

> motor fuels, or other hydrocarbon-based fuels at any
> bulk storage facility (not including gas stations or
> gas station convenience stores), bulk plant, or bulk
> terminal facility that stores hydrocarbons or
> petrochemicals; . . . .[141]

The Attorney General argues that "[t]he term 'capacity' is simply too vague to determine if one is excluded from the class," and suggests that the definition may encompass mere office staff who worked at a bulk storage facility, bulk plant, or bulk terminal facility but did not physically come into contact with prohibited substances.[142]

This objection should be overruled. A plain reading of the exclusion makes clear that it applies only to those who physically came into contact with gasoline, diesel, jet fuel, kerosene, motor fuels, and other hydrocarbon-based fuels. Section I.B is drafted in the active voice for a reason—the exclusion requires active engagement in storage, transportation, or dispensing tasks. An office secretary with no responsibility to physically engage in one of these tasks is not excluded. What is more, even if the Court finds that the exclusion could be worded more precisely, the appropriate remedy is modification, not rejection of the class. *See Shvartsman v. Apfel*, 138 F.3d 1196, 1201 (7th Cir. 1998) (affirming trial court's decision to redefine the class submitted by the plaintiffs); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435, 438 (S.D.N.Y. 2007); *see also* 7A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1760 (3d ed. 2008) (explaining that the court "has discretion to limit or redefine the class in an appropriate manner").

### E.     The Objections To Predominance Are Without Merit.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The "focus of

---

[141] MEDICAL SETTLEMENT § I.B.6.
[142] LOUISIANA OBJECTION [DOC. 228], p. 9-10.

the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan*, 667 F.3d at 298.  In the opening brief and accompanying documents supporting final approval, Plaintiffs thoroughly detailed the predominant issues shared among the class.  The Attorney General and the Sturdivant Objectors disagree, contending that mass personal injury classes such as this one cannot be certified under Rule 23 and precedents such as *Amchem*, *Steering Committee*, and *Castano*.  Plaintiffs have addressed that incorrect contention *supra*. The Sturdivant Objectors further argue that individualized issues of causation will overwhelm those issues shared by the class.  This objection is without merit.

The Sturdivant Objectors are wrong to contend that individualized proof of specific causation dwarfs any common issues because such a determination requires, among other things, an inquiry into family medical histories, the timing and quantity of exposure, and the precise injury suffered.[143]  The objectors make no attempt to address the undisputed evidence submitted by Plaintiffs with respect to causation, much of which is set forth above.  Dr. Harbut testified that as a matter of science, all class members were exposed to the same substance.[144]  Their injuries are those that medical professionals expect to occur under similar exposure conditions.[145]  The prevalence of these injuries was independently confirmed by BP's Medical Encounters Database. Further, the time between exposure and manifestation of a SPC is extremely brief; by restricting the time of manifestation, the class has presented a "straightforward" theory of causation.[146] Thus, the settlement class is designed to avoid the very pitfalls described by the Sturdivant

---

[143] STURDIVANT OBJECTION [DOC. 213], p. 17.
[144] HARBUT DECL. ¶ 20.
[145] HARBUT DECL. ¶ 25.
[146] COFFEE DECL. ¶¶ 42-51.

Objectors.[147]  Accordingly, individual issues of causation do not overwhelm shared issues among

the class, and the Court should overrule this objection.

Indeed, the cases cited by the objectors do not support their position regarding the role of

individual issues, particularly specific causation and the calculation of damages.  Several of the

referenced decisions chiefly concern manageability issues, and the plaintiffs' failure—in those

particular cases—to propose a workable trial plan.[148]  *See, e.g., Madison v. Chalmette Refining,*

---

[147] The Sturdivant Objectors also contend that predominance is defeated by the fact that "[t]he claims of the Clean-Up Workers are not based on the spill at all; those claims arose from the fact that BP sent them to clean up the oil."  STURDIVANT OBJECTION [DOC. 213], p. 15.  Plaintiffs respectfully disagree; the claims of the Clean-Up Workers are inextricably tied to BP's liability for the spill.  As set forth above, and in Plaintiffs' opening brief, all Response Activities flowed from BP's remedial responsibilities under the OPA.  The incidents are not separate but a single tortious event.

[148] Halliburton cites two decisions rejecting certification where individualized damage calculations overwhelmed common issues.  *See* HALLIBURTON OBJECTION [DOC. 93], p. 11.  Those cases—*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296 (5th Cir. 2004) (per curiam), and *Bell Atlantic v. AT&T*, 339 F.3d 294 (5th Cir. 2003)—do not suggest that predominance is not satisfied here.  The *Piggy Wiggly* case involved a number of sales transactions, and damages were to be calculated by considering the unique variables of each transaction, such as the amount purchased, the geographic market, services accompanying a sale, delivery costs, and negotiated discounts.  *Piggy Wiggly*, 100 F. App'x at 297-98.  Importantly, each plaintiff negotiated a unique price rather than paying a preset amount.  *Id.* at 298.  Thus, although there were common issues among the class, the individualized inquiries bound up with each damage determination were simply overwhelming.  *See id. Bell Atlantic*, an antitrust suit alleging that defendant blocked the passage of caller identification information over its telephone lines, arguably required an even greater number of individualized determinations.  There, plaintiffs proposed to calculate damages for class members "based upon national 'average number of seconds saved per call' [both long-distance and local] through the use of caller ID, an average wage rate for the typical employee answering and processing telephone calls, and the total number of AT&T calls to class members made during the class period."  *Bell Atlantic*, 339 F.3d at 300.  The court rejected the use of national averages because it was "not convinced that this proposed damages represents an adequate approximation of any single class member's damages."  *Id.* at 304.  The alternative to using national averages, however, was an individual inquiry into each class member's personal telephone use—a probe that would overwhelm the commonalities among the class.  In this case, the damage frameworks do not consist of a formula providing an "average" for all class members.  Nor does each damage determination require a uniquely individualized inquiry such as those presented in *Piggly Wiggly*.  Instead, compensation is based upon particular defined conditions and proof.  Further, the authority relied upon by Halliburton betrays its very argument.  Even the court in *Bell Atlantic* recognized that "wide

*LLC*, 637 F.3d 551, 557 (5th Cir. 2011) (rejecting the district court's failure to consider manageability issues and admonishing the court for "adopting a figure-it-out-as-we-go-along approach"); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419-20 (5th Cir. 1998) (explaining that individual questions posed "manageability" problems, which were "exacerbated" by the requirement of a jury trial in that case). Here, because this is a settlement class, the Court need not consider any manageability concerns.

Finally, it bears noting that the decisions Objectors cite stress the deference and discretion afforded the district court in deciding whether to certify a class. *See, e.g.*, *Steering Committee*, 461 F.3d at 603-05 (declining to upset the district court's "discretionary judgment" with respect to predominance and superiority). The decision whether to certify this class, which is essentially fact-based, is made easier by the fact that there is virtually no evidence in the record to contradict Plaintiffs' arguments. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999) (explaining that the appropriateness of class certification depends upon the facts of the case and, as such, must lie within the district court's sound discretion). The Court should exercise its discretion and certify the class.

## F.    The Objections To Superiority Are Without Merit.

The Attorney General argues that the class action device is not superior to other available methods for adjudicating the controversy. His objection reflects a misunderstanding of the Medical Settlement. Specifically, the Attorney General complains that the Medical Settlement "does not even resolve all settled claims on a class-wide basis" because a member's participation

---

disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate." *Id.* at 306. This is especially true here, where class members share much commonality of fact and law and proof is generalized even if some individual circumstances must be considered.

in the PMCP is determined by the Claims Administrator.[149]  The assertion is incorrect.[150]  By definition, a class member is eligible to participate in the PMCP.  Thus, once an individual meets the objective criteria set forth for class membership, he or she may share equally in the PMCP. More importantly, and as discussed above, class members' claims are of modest value but would require significant expenditures to litigate.  Without the class device, many of these claims would go without vindication.  Indeed, class certification is ideally suited for a class of this nature.  The Attorney General's objection should be discarded.

## V.    THE ATTORNEYS' FEE PROVISION IS FAIR AND REASONABLE

The Sturdivant Objectors raise several objections to the provision in the Medical Settlement for attorneys' fees.[151]  For the reasons set forth in Dean Klonoff's initial declaration, and in his supplemental declaration, the attorneys' fees provision is fair and reasonable.[152]

---

[149] LOUISIANA OBJECTION [DOC. 228], p. 24.

[150] Even if it were true, it is not clear how this would defeat superiority—the class action will resolve the claims of potentially hundreds of thousands of personal injury claimants and provide benefits not obtainable through litigation.  Compensation is available that was denied by the GCCF.  The Medical Settlement is, in every way, superior to other means of adjudicating these claims.

[151] STURDIVANT OBJECTION [DOC. 213], p. 33-39.

[152] See KLONOFF DECL. ¶¶ 91-133; KLONOFF SUPP. DECL. ¶¶ 46-49.

VI.     **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in Plaintiffs' Motion for Final Approval of the Medical Benefits Class Action Settlement, the Court should overrule each of the pending objections, certify the class under Rule 23(b)(3), and grant final approval to the Medical Settlement.

Respectfully Submitted,

October 22, 2012

_____
*/s/ Stephen J. Herman*
Stephen J. Herman, La. Bar No. 23129
HERMAN HERMAN KATZ & COTLAR LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhkc.com

*Co-Lead Class Counsel*

_____
*/s/ James Parkerson Roy*
James Parkerson Roy, La. Bar No. 11511
DOMENGEAUX WRIGHT ROY & EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com

*Co-Lead Class Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

**AND MEDICAL BENEFITS CLASS COUNSEL**

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:  (843) 216-9159
Telefax: (843) 216-9290
E-Mail:  jrice@motleyrice.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA 70360
Office:  (985) 876-7595
Telefax: (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

**<u>CERTIFICATE OF SERVICE</u>**

We hereby certify that the above and foregoing Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this <u>22nd</u> day of <u>October</u>, <u>2012</u>.


      /s/ Stephen J. Herman and James Parkerson Roy