| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 |
| | SECTION:  J |
| This document relates to all actions. | HONORABLE CARL J. BARBIER |
| | MAGISTRATE JUDGE SHUSHAN |
| Plaisance, et al., individually and on behalf of himself and all others similarly situated, | Civil Action No. 12-968 |
| Plaintiffs, | SECTION:  J |
| v. | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc; BP America Production Company; BP p.l.c., | MAGISTRATE JUDGE SHUSHAN |
| Defendants. | |

**SUPPLEMENTAL EXPERT REPORT OF ROBERT H. KLONOFF RELATING TO THE PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT**

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

**I. INTRODUCTION**

  1.  On August 13, 2012, I submitted a report in this case on the issues of class certification under Rule 23(b)(3), the fairness of the proposed medical benefits class settlement, and the reasonableness of the proposed structure for awarding attorneys' fees and costs. Expert Report of Robert H. Klonoff Relating to the Proposed Medical Benefits Class Settlement, Case 2:10-md-

1

02179-CJB-SS, Doc. 7111-4 (hereinafter Klonoff Medical Report).  In a separate submission, I addressed the economic and property damages settlement. Expert Report of Robert H. Klonoff Relating to the Proposed Economic and Property Damages Class Settlement, Case 2:10-md-02179-CJB-SS, Doc. 7105-5 (hereinafter Klonoff Economic Report).

2.  The Court set a date of September 7, 2012, for written submissions by class members who wanted to object to the settlement.  The opportunity for class members to object to a proposed settlement, provided by Rule 23(e)(5), is an important part of the Court's process of reviewing the settlement.  Thus, I have carefully considered the objectors' arguments.  Ultimately, however, none of the objections changes my opinions with respect to the conclusions in my initial Report.  To reaffirm in brief: I continue to believe (1) that the class should be certified under Rule 23(b)(3); (2) that the settlement is fair and should be approved; and (3) that the attorneys' fee structure embodied in the settlement is reasonable.  Nonetheless, objectors raise a number of points that I believe merit discussion.  I concentrate my attention on those objections that, in my view, appear to be arguable or plausible.

3.  Because the vast majority of the objections address the fairness of the settlement, I focus first (in Part II) on the fairness arguments.  The proposed fee structure has been cited by some objectors in challenging the fairness of the settlement, and I therefore address fee-related fairness arguments in Part II.  In Part III, I address the class certification arguments.  Finally, in Part IV, I address arguments relating to the attorneys' fees agreement.

## II. FAIRNESS OF PROPOSED MEDICAL BENEFITS CLASS SETTLEMENT

### A. Initial Observations

4.  Perhaps the most noteworthy aspect of the objections to the medical benefits settlement is that there are so few of them.[1]  Out of about 250 total objections filed for both settlements—itself a very low number—only about twenty appear to relate to the medical benefits settlement.[2]  In

---

[1] All citations to specific pages of the objections discussed in this Report refer to the Court-assigned page number (located in the upper right corner of the document).

[2] The medical objections are: C. Boggs Obj. (#41); Bartlette Obj. (#51); Machua Obj. (#57); Sims Obj. (#61); Abreu Obj. (#92); Halliburton Obj. (#93); Sturdivant Obj. (#124); Brown Obj. (#130); Breedlove Obj. (#158); Hall Obj. (#160); Coco Obj. (#180); Llewallen Obj. (#182); Yerkes Obj. (#185); Baird Obj. (#202); Canipe Obj. (#203); McLane Obj. (#205); Booker Obj. (#208); Sturdivant Obj. (#213); State of Louisiana Obj. (#228); and Lucas Obj.

2

my Supplemental Economic Report, I observed a number of inconsistencies among the objectors' contentions.  Here as well, despite the much smaller number of objections filed, contradictions abound: Some objectors argue that the settlement benefits are inadequate,[3] while others complain about *not* being included[4] (an argument that would make no sense if the objectors thought that the settlement was unfair).[5]  Likewise, some objectors emphasize the relatively low value of the medical class claims,[6] while others caution that many high-value individual claims could be undercompensated.[7]  Some criticize the settlement for defining the medical claims categories too narrowly, insisting that further refinements are needed to ensure fair compensation;[8] others allege that the settlement paints with too broad a brush, unfairly grouping stronger claims together with weaker ones.[9]

5.   Overall, these inconsistencies reflect the fact that, in any class settlement of this magnitude, there will be some degree of dissatisfaction and disagreement among the claimants.  But, of course, the test for whether a settlement class should be approved is not whether the settlement is perfect in the view of every class member (a test no settlement could pass), but rather, whether it satisfies the requirements of Rule 23 and due process.

6.   In fact, when the objections are examined in their entirety, they reinforce the overall fairness of the settlement in a number of ways.

7.   First, given the many thousands of class members, the comprehensive notice program, and the high-profile nature of the litigation, the fact that only about twenty objections to the medical

---

(#236).  Objections 124 and 213 appear to be the same, only filed on different days.  Objections 185 and 202 also appear to be the same, only filed on behalf of different-named objectors.

[3] *See, e.g.*, Coco Obj. (#180) at 2; Canipe Obj. (#203) at 2; Lucas Obj. (#236) at 1.

[4] *See, e.g.*, C. Boggs Obj. (#41) at 2.

[5] In fact, one objection includes both complaints. *See* Coco Obj. (#180) at 2 (objectors argue that the settlement is "inadequate" and "does not come close to" awarding the amounts to which the objectors purport to be entitled); 3 (objector complains about being excluded by requirement that class members have spent some time in the area specified by the settlement on at least 60 days during the class period).

[6] *See, e.g.*, Breedlove Obj. (#158) at 1–2 (for "numerous" class members, "the monetary value of these persistent annoyances [from Specified Physical Conditions] would not justify the cost of autonomous litigation").

[7] *See, e.g.*, Coco Obj. (#180) at 2; Sturdivant Obj. (#213) at 30.

[8] *See, e.g.*, Abreu Obj. (#92) at 14 (arguing that the settlement "Matrix creates a disparity because it pays for hospitalization without paying for other medical expenses").

[9] *See, e.g.*, Coco Obj. (#180) at 2; Sturdivant Obj. (#213) at 29.

benefits class settement were filed is significant.[10] Had a substantial number of class members viewed the settlement as egregiously unfair, one might have expected to see a much larger number of objections.

8. Relatedly, one objection—filed by a potentially liable party, Halliburton Energy Services, Inc.—discusses in detail why it believes the medical benefits settlement is *too* generous to the class. Halliburton Obj. (#93). Reiterating the arguments it makes with respect to the Economic and Property Damages settlement,[11] Halliburton contends that "BP is clearly paying a premium to buy peace and restore its reputation after the *Deepwater Horizon* Incident and various other disasters caused by its negligence . . . ." Halliburton Obj. (#93) at 18. In Halliburton's view, the settlement terms "are well beyond any likely recovery at trial." *Id.* at 19 (citation omitted). To be sure, Halliburton's concerns are not for the class members. Rather, Halliburton is worried about "inflate[d] payments to claimants, resulting in larger claims for contribution against [Halliburton] and a higher baseline for assessing punitive damages" against it. *Id.* at 14. Nonetheless, Halliburton's argument is significant: The very fact that Halliburton can make a plausible argument that the settlement *overcompensates* class members is remarkable. In my more than 20 years litigating, researching, and writing about class actions, I have never seen a settlement criticized on the ground that it is *too* generous and provides *more* benefits than class members could have achieved at trial.

## B. Reponses to Specific Objections

9. In this section, I respond to a number of specific objections. As noted above, I do not purport to respond to every objection.

### 1. Objections Based on Line Drawing

10. Several of the objections relate to line drawing aspects of the proposed settlement. I

---

[10] *See, e.g., Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853 (E.D.La. 2007) ("[t]he absence or small number of objections may provide a helpful indication that the settlement is fair, reasonable, and adequate" (citations omitted)); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) (although "[a] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members," the existence of a relatively "small number of objections . . . can be viewed as indicative of the adequacy of the settlement" (citations omitted)); *Kay Co. v. Equitable Prod. Co.*, 2010 U.S. Dist. LEXIS 41892, at *25 (S.D.W.Va. Apr. 28, 2010) (finding small number of objections "especially significant because such a high percentage of the Class Members were successfully notified").

[11] *See* Halliburton Obj. (#91).

4

address these objections in this section.

### a. Better Treatment of Class Members with Medical Records

11.  Some objectors take issue with the proposed settlement's processes relating to medical claims documentation.  Objector Abreu contends that the medical claims process under the settlement is "unrealistic and unfair for many of those economically disadvantaged and non-English speaking Claimants, who were transported miles from their home for work and lacked access to basic on-site medical treatments."[12]  Similarly, objector Coco asserts that the settlement is "unfair and arbitrary because it attempts to lump these [objectors], who have substantial proof of significant and impairing injury and illness, with myriad other claimants who do not possess such proofs."[13]  But the settlement simply reflects the fact that, in the trial context, those plaintiffs with supporting documentation are in a stronger position (and thus likely to achieve a better outcome) than those lacking documentation.  Had the settlement treated those with documentation the same as those lacking documentation, class members in the former category surely would have objected—and with good reason.  Moreover, if these objectors have claims they feel are undervalued by the settlement terms, then the easiest solution would be for them to opt out of the settlement.  In all events, the arguments of these objectors are speculative and unsupported by any facts. *See, e.g.*, *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ("Objectors' argument regarding the sufficiency of the Settlement amount suffers from hindsight bias and an unduly sanguine view of Plaintiffs' litigation risks . . . ."); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 530 (N.D. Miss. 2003) (rejecting objections and approving class settlement where objectors were "seemingly contending that a wholly different settlement should have been negotiated, rather than attempting to show that the actual proposed settlement [was] not fair, adequate, and reasonable").

### b. No Recovery for Medical Expenses

12.  Objector Abreu argues that the settlement is unfair because it requires proof of hospitalization expenses as a precondition to certain recovery under the settlement. Abreu Obj. (#92) at 13.  This argument is unpersuasive.  What Abreu contests as unfair is in fact a carefully

---

[12] Abreu Obj. (#92) at 10.
[13] Coco Obj. (#180) at 2.

drafted settlement that defines precisely—and logically—who is entitled to recover and in what amount. In addition, Abreu contends that, although the settlement offers compensation for certain hospitalization costs, the settlement "Matrix creates a disparity because it pays for hospitalization without paying for other medical expenses." *Id.* at 14. This argument is also nothing more than an attack on carefully drawn lines. If Abreu really believed that, because of his non-hospital medical expenses, he could do better on his own, he was free to opt out of the settlement.

### c. Grouping Strong Cases with Weak Ones

13. Some objectors contend that the medical benefits settlement is unfair because it takes insufficient account of the variety of injuries suffered by the class. For example, objector Sturdivant asserts that the payment amounts for specified physical conditions are "arbitrary and capricious" because "[t]he value of each claim, even for the same type of injury, will vary based on multitude of factors, including the severity of the symptoms, length of the condition, type and cost of medical treatment, and the subsequent impact of the illness." Sturdivant Obj. (#213) at 29. No settlement, however, can take into account every factual difference from one class member to another. Some categorization is inevitable. Such objectors were free to opt out if they believed that they could do better litigating on their own.

### d. Relocation Costs

14. One objector takes issue with the fact that the settlement does "not provide compensation for relocation of anyone affected" by the oil spill. Canipe Obj. (#203) at 1. It is highly unlikely that such costs could be recovered at trial, however. Moreover, it appears that Canipe, by his own admission, is not a class member, *see id.* at 1, but even if he were, he was free to opt out if he believed that he could do better on his own.

## 2. No Recovery for Punitive Damages

15. Some objectors complain that the medical benefits settlement does not provide punitive damages. *See, e.g.*, Machua Obj. (#57) at 1; Yerkes Obj. (#185) at 2. But very few settlements award even full compensatory damages, let alone punitive damages. A settlement, by its nature, is a compromise, and I know of no case that has ever found a settlement unfair because it

included only compensatory damages and not punitive damages. It is neither unfair nor unreasonable for a settlement to condition benefits on the class members' agreement to forgo punitive damages.[14]

16. Again, the bottom line is that class members who believed they could have recovered punitive damages were free to opt out of the class.

### 3. Objections Based on Back End Litigation Option

17. Several objectors make arguments relating to the Back End Litigation Option (BELO).[15]

18. Objector Abreu complains that "[c]laimants who were diagnosed with a condition prior to April 16, 2012, and whose condition was exacerbated as a result thereof, would not qualify . . . [to] recover compensation for such exacerbation in the back-end litigation program." Abreu Obj. (#92) at 15. But the very purpose of the BELO is to provide compensation for serious injuries that develop long after the initial exposure. A condition that develops after April 16, 2012, and that can be linked to the initial exposure, is subject to compensation under the BELO. Those who believe that they have a claim for a condition that existed prior to April 16, 2012, and that was exacerbated by BP's conduct, were free to opt out of the class.

19. Objector Sturdivant correctly notes that a BELO "for damages resulting from an exposure that occurs after [the dates in the class definition] is not permitted[.]" Sturdivant Obj. (#213) at 32–33. This is not a deficiency in the settlement, but is simply a reflection of the fact that a claim such as the objector describes would not be affected by this settlement at all.

20. Finally, objector Sturdivant also argues that it is unfair to deny the BELO to claimants who choose workers' compensation. Sturdivant Obj. (#213) at 35–36. The provision in question, however, is merely a reasonable effort to avoid double recovery.

### 4. Settlement Modification

---

[14] Although the economic and property damages class settlement makes explicit that the potential for punitive damages is among the factors that inform the RTP multipliers of various categories of claims, the medical benefits class settlement does not have an analogous provision. Neither of these settlements, however, purports to actually award "punitive damages," the very idea of which may be incompatible with the instant settlement, in which BP makes no admission of wrongdoing, let alone egregious misconduct.

[15] *See, e.g.*, Machua Obj. (#57) at 1; Abreu Obj. (#92) at 15–16; Sturdivant Obj. (#213) at 32–33.

21. A few objectors express concern about the possibility of material changes to the settlement after the time to opt out has expired. *See, e.g.*, Sturdivant Obj. (#213) at 38. They argue that "[t]he Settlement Agreement gives Class Counsel the right to approve material changes to the Settlement Agreement without notice to class members, without providing class members with a new opportunity to opt out, and without giving class members an opportunity to object to the material change." *Id.* Relying on XIV.C of the medical settlement, the objectors complain that "if the court orders a material modification that reduces the benefits payable to Class Members, or unfairly advantages some class members, Class Counsel would have the power to permit the change, without any notice, opt out rights, or objection rights to class members." *Id.*

22. These objectors misread the settlement. In fact, the provision in question, which allows class counsel to terminate the settlement in the event that the Court "order[s] a material modification of any of" its terms, is in effect no more than a restatement of the well-settled legal principle that, while a court may approve or reject a class settlement proposed by the parties, it may not materially change the settlement terms to impose a settlement to which the parties have not agreed. *See, e.g.*, *Evans v. Jeff D.*, 475 U.S. 717, 726–27 (1986); *Cotton v. Hinton*, 559 F.2d 1326, 1331–32 (5th Cir. 1977).

23. If, in fact, material changes were made to the settlement that detrimentally impacted class members, and if those changes were made after the notice and opt-out period, those class members who were adversely affected would be entitled to new notice and opt-out rights. *See, e.g.*, *Principles of the Law of Aggregate Litigation* § 3.05(e)(1) (West 2010) ("If, before or as a result of a fairness hearing, the parties agree to modify the terms of a settlement in any material way, new notice must be provided to any class members who may be substantially adversely affected by the change. . . . For opt-out classes, a new opportunity for class members to opt out must be granted to all class members substantially adversely affected by the changes to the settlement."); *id.* at 216 Cmt. e (noting, in explanation of rationale for § 3.05(e)(1), that "[p]ermitting material changes in the absence of such procedural protections would be unfair to those who relied upon the earlier terms in deciding whether to remain in the class or whether to object"). Nothing in the settlement takes away the rights of class members to receive notice of, and to object to, material adverse changes to the settlement.

### 5. Attorneys' Fees Issues Related to Fairness under Rule 23(e)

24. Several objectors make fairness arguments that rely upon the proposed attorneys' fee structure of the settlement.[16]

### a. "Clear Sailing" Agreement and "Reversion" of Fees to BP

25. Some objectors claim that the settlement is collusive, and thus unfair, because it contains a so-called "clear sailing" agreement, *i.e.*, an agreement by a defendant not to oppose a fee request up to a certain amount (in this case, $600 million).[17] Objector Sturdivant asserts that the problem is compounded because, if the Court does not approve the agreed-upon maximum fee but only approves a lesser amount, the difference remains in the hands of the defendant instead of going to class members. Sturdivant Obj. (#213) at 36. In my view, this argument lacks merit.

26. Objectors fail to come to grips with the legions of cases, including Fifth Circuit cases, that have approved class settlements containing clear sailing fee provisions.[18] Indeed, courts have noted that in many instances, defendants will only settle if they know the upper limit of their exposure. *See*, *e.g.*, *Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985) ("where . . . the amount of the fees is important to the party paying them . . . an agreement 'not to oppose' an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure"). The key question with respect to a clear sailing agreement is whether it is indicative of collusion.[19] Here, as I explained in my

---

[16] These arguments are largely identical to those raised with respect to the Economic and Property Damages Class Settlement, which is understandable, since both proposed settlements include the same provision for attorneys' fees. *See* Ex. 19 Medical Benefits Class Settlement Agreement; Ex. 27 to Economic and Property Damages Settlement Agreement. If this Court has already reviewed the Klonoff Supplemental Economic Report, it need not read this subsection but can skip directly to Section III, which begins at ¶ 32, *infra*.

[17] *See*, *e.g.*, Sturdivant Obj. (#213) at 20.

[18] *See*, *e.g.*, *Ayers v. Thompson*, 358 F.3d 356, 367 (5th Cir. 2004) (affirming district court's approval of class settlement under which the parties agreed that class counsel would receive $2.5 million in fees, costs, and expenses); *Blatt v. Dean Witter Reynolds Intercapital, Inc.*, 732 F.2d 304, 306–07 (2d Cir. 1984) (affirming district court's fee award of $252,000 to class counsel where defendant had agreed not to object to the fee application up to $300,000); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 329 (3d Cir. 1998) ("Under the settlement, Lead Counsel would request $90 million in attorneys' fees from the district court, a request [defendant] agreed not to oppose." (footnotes omitted)); *In re Excess Value Ins. Coverage Litig.*, 2004 U.S. Dist. LEXIS 14822, at *35 (S.D.N.Y. July 30, 2004) ("the so-called 'clear sailing agreement' by Defendants not to oppose Class Counsel's Fee Application [does not] bar approval of the Settlement, where, as here, the Court has strictly scrutinized both the process and substance of the Settlement").

[19] *See*, *e.g.*, *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 n.4 (11th Cir. 1999) (declining to address challenge to clear sailing agreement where the district court "made a factual finding that there had not been

initial Medical Report (¶¶ 73–79), the facts surrounding the settlement belie any claim of collusion.

27. Nor does it matter that, if fees and costs awarded are less than $600 million, the difference remains with BP and is not distributed to the class. Objectors ignore the myriad cases approving settlements with clear sailing provisions, even when the amount not awarded in fees is kept by the defendant and not distributed to the class.[20] This is especially the case where, as here, the results for the class are impressive even without additional distributions.[21]

28. The recent Ninth Circuit decision, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011), is not to the contrary.[22] In that case, the Ninth Circuit vacated and remanded the district court's approval of a class settlement with a clear sailing agreement, finding that "the disparity between the value of the class recovery and class counsel's compensation raise[d] at least an inference of unfairness," and that the record did "not adequately dispel the possibility that class counsel bargained away a benefit to the class in exchange for their own interests." *Id.* at 938. The facts of *Bluetooth* are the polar opposite of those here. In that case, over 83% of the settlement would have gone to the attorneys. As the Ninth Circuit summarized the pertinent facts:

> Absent any explanation from the district court, we are concerned that the amount awarded [in attorneys' fees] was 83.2% of the total amount defendants were willing to spend to settle the case, viewing the $800,000 allotment for attorneys' fees, the $12,000 allotment for an incentive award, the $100,000 *cy pres* award,

---

any collusion among the parties"); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 426 (6th Cir. 2012) ("not every 'clear sailing' provision demonstrates collusion").

[20] *See, e.g.*, *Skelton v. General Motors Corp.*, 860 F.2d 250, 254 n.1 (7th Cir. 1988) (stating that the presence of a fee reversion clause in antitrust class settlement did not "distinguish [the] case from the typical common fund case"); *Harris v. Vector Mktg. Corp.*, 2012 U.S. Dist. LEXIS 13797, at *5 (N.D. Cal. Feb. 6, 2012) (court approved settlement under which, "[i]f the Court awards less than $2.8 million" in fees, "then half of the remaining amount reverts to [defendant] and half is distributed to" *cy pres* relief under the settlement agreement (citation omitted)); *McKinnie v. J.P. Morgan Chase & Co.*, 678 F. Supp. 2d 806, 810 (E.D. Wis. 2009) (approving settlement and clear-sailing fee award where "any undistributed funds remaining after the deduction of class claims, attorneys' fees, and expenses" would "be divided as follows: a) 35% to be contributed to a *cy pres* charity; and b) 65% to be returned to [defendant]").

[21] *Cf. Glass v. UBS Fin. Servs.*, 331 Fed. Appx. 452, 456 (9th Cir. 2009) (finding no abuse of discretion in district court's approval of class settlement containing fee reversion provision; Ninth Circuit noted that "[t]he fact that class counsel achieved such timely results for the class suggest that the class's interests were not compromised by the reversion clause, and that the district court did not abuse its discretion in finding that the settlement was fair and adequate").

[22] *Bluetooth* is not cited by the objectors to the medical benefits settlement, but it is relied upon by the objectors to the economic and property damages settlement. *See, e.g.*, Armour Obj. (#101) at 24–31.

and the $50,000 allotment for fees as a 'constructive common fund.'

*Id.* at 945. Here, the lion's share of recovery goes to class members. *See* Klonoff Medical Report at ¶¶ 94–100. Moreover, even with the weak settlement in *Bluetooth*, the Ninth Circuit noted that the district court on remand could find the fee award to be reasonable "in light of the hours reasonably expended and the results achieved." *Id.* at 949–50. In short, *Bluetooth* does not provide a basis for invalidating the settlement at issue here.

### b. Negotiation of Fees Before Settlement Approval

29. Some objectors seem to suggest that the negotiation of fees prior to approval of the settlement demonstrates collusion between BP and class counsel, and thus renders the settlement unfair.[23] This argument is contrary to the many cases upholding settlements as fair despite the fact that fees were negotiated before the settlement's approval.[24]

30. The critical fact here is that the fees were not negotiated until *after* all of the other settlement terms were reached, and after the finalized, signed settlement agreement was delivered to the Court. *See* Rice Decl. (Doc. 7101-10) (filed 08/13/12) at ¶ 5 (filed in the Economic and Property Damages settlement submission). This two-step process is a fact supporting the fairness of the settlement.[25]

---

[23] *See, e.g.*, Sturdivant Obj. (#213) at 36, 43–44. This argument is made more explicitly by an objector to the economic settlement. *See* Armour Obj. (#101) at 27 n.12.

[24] *See, e.g.*, *Ayers v. Thompson*, 358 F.3d 356, 374–75 (5th Cir. 2004) (rejecting argument that class settlement approved by district court "should be rejected because the amount of attorneys' fees was negotiated along with the rest of the agreement"); *Blatt v. Dean Witter Reynolds Intercapital, Inc.*, 732 F.2d 304, 306 (2d Cir. 1984) (affirming approval of settlement where, "[a]fter the parties had reached an agreement with respect to all elements of the settlement it was stipulated that [defendant] would pay attorney's fees to plaintiffs' counsel in an amount to be set by the court and would not object to an application for payment of up to $300,000"); *Gardner v. GC Servs., LP*, 2012 U.S. Dist. LEXIS 47034, at *5–6 (S.D. Cal. Apr. 2, 2012) (approving class settlement of $975,000, which amount "includ[ed] attorneys' fees (not to exceed $292,500—30% of the total settlement fund)"); *Laguna v. Coverall N. Am., Inc.*, 2012 U.S. Dist. LEXIS 23381, at **6, 19 (S.D. Cal. Feb. 23, 2012) (approving settlement including provision under which "[c]lass counsel has sought, and Defendants have agreed to pay, $994,800 in attorney's fees"); *Stokes v. Saga Int'l Holidays, Ltd.*, 376 F. Supp. 2d 86, 89 (D. Mass. 2005) (awarding fees where the "agreement between the parties [provided] that the defendants would not oppose attorneys' fees that did not exceed $350,000"); *Mangone v. First USA Bank*, 206 F.R.D. 222, 228 (S.D. Ill. 2001) (approving settlement where, "[i]n addition to $39.9 million being made available to the Settlement Class by Defendants under the Settlement, Defendants have also agreed to pay separately the $2.5 million sought by Class Counsel in attorney's fees"); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *25 (D.D.C. July 16, 2001) (awarding fees requested, "as agreed to by the Settling Defendants," of $123,188,032, plus interest).

[25] *See, e.g.*, *Lane v. Page*, 2012 U.S. Dist. LEXIS 74273, at *227 (D.N.M. May 22, 2012) (noting the fact "that the fees were negotiated after the Settlement reduces the risk of any improper bargaining, such as reducing the class

### c. Fact that Fees are Paid Separately and Not Out of the Fund

31. Objector Sturdivant complains that the settlement is deficient because BP is paying fees separately rather than from a common fund. Sturdivant Obj. (#213) at 36 (arguing that, "[b]y negotiating for a separate payment of attorneys' fees, Class Counsel left money on the table"). Sturdivant asserts that, had the parties instead negotiated an agreement under which class counsel's fees were paid out of a common fund, "the class would have been $600 million richer," because "[t]hat is money that BP was willing to pay to settle the case." *Id.* Yet, as I explained in my initial Medical Report, the fact that fees will be paid separately by BP and not out of the settlement fund does not suggest that class counsel placed their interests above those of the class. Instead, as I have explained, this fee structure indicates a decreased likelihood of collusion.[26] Undoubtedly, had the parties negotiated a fund with fees coming out of the fund, other class members would have objected that fees should have been paid separately to avoid the same type of "collusion" that objectors here allege. In any case, the most persuasive evidence that the settlement is free from collusion is the overall settlement itself. Here, as noted, the lion's share of benefits goes to the class, not to class counsel.

## III. CLASS CERTIFICATION

32. Several objectors focus on the specific requirements for class certification, raising issues involving the class definition, commonality, typicality, adequacy, predominance, and superiority. I address these points in turn.

### A. Class Definition

---

award so that the attorney can be paid quickly"); *In re Heartland Payment Sys.*, 2012 U.S. Dist. LEXIS 37326, at *63–64 (S.D. Tex. Mar. 20, 2012) ("It is common practice today for class counsel to negotiate a specific fee award after they have successfully negotiated the class's recovery. Because the parties [had] not agreed to an amount or even a range of attorneys' fees [prior to successfully negotiating the class's recovery], there is no threat of the issue explicitly tainting the fairness of settlement bargaining." (citations and internal quotation marks omitted)); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) ("To eliminate any potential conflict of interest, the parties did not engage in fee negotiation until after the settlement of Plaintiffs' claims on their merits.").

[26] *See* Klonoff Medical Report at ¶ 78. *Accord, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D.La. 2007) (fact that fees would be paid separate from class recovery in an amount left to the court's discretion was "significant because it exponentially decrease[d] the possibility of collusion among counsel"); *McBean v. New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2007) (where attorneys' fees are "entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").

33. The State of Louisiana argues that the definition of the medical benefits class is "inadequate," thereby rendering the class "uncertifiable on its face." State of Louisiana Obj. (#228) at 9. Specifically, Louisiana contends that the definition is improper because each class member is purportedly required to prove his or her own case—*i.e.*, that the class member suffered from one or more specified physical conditions, and that the conditions were caused by the oil spill—in order to be a class member. *Id.* Simply put, the premise of Louisiana's argument is not correct. If a person is within a specified category and (for certain categories) has one of the acute or chronic conditions, then that person is in the class. There is no requirement that the person *prove* that the injuries were caused by BP in order to be a class member. Thus, this is not a so-called "fail-safe" class,[27] and the class definition is sufficiently objective and specific to pass muster.

34. In any event, the Fifth Circuit has consistently rejected arguments based on purported "fail-safe" classes, and only weeks ago reaffirmed that proposition. In *Rodriguez v. Countrywide Home Loans, Inc.*, ___ F.3d ___, 2012 U.S. App. LEXIS 19372 (5th Cir. Sept. 14, 2012), the defendant argued that the lower court had erred in certifying a class "whose membership [could] only be ascertained," according to defendant, "by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability." *Id.* at *23–24. The Fifth Circuit, however, disagreed, affirming the lower court and noting that "our precedent rejects the fail-safe class prohibition . . . ." *Id.* at *26; *accord, e.g.*, *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 623, 624 n.1 (5th Cir. 1999) (rejecting fail-safe argument for class defined as "all members of the crew of the M/V Treasure Chest Casino who have been stricken with occupational respiratory illness caused by or exacerbated by the defective ventilation system in place aboard the vessel"); *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1105 (5th Cir. 1993) (defendant's fail-safe argument was "meritless and, if accepted, would preclude certification of just about any class of persons alleging injury from a particular action"). The *Rodriguez* court explained that a class is appropriately defined where the class members "are linked by [a] common complaint, and the possibility that some may fail to prevail on their individual claims will not defeat class membership." *Rodriguez, supra*, at *25 (citation and internal quotation

---

[27] A "fail-safe" class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

marks omitted). Thus, Louisiana's argument is contrary to controlling precedent.

### B. Commonality

35. In my initial Report, I explained that every class member's case turns on the common question of BP's liability for the *Deepwater Horizon* explosion. Klonoff Medical Report ¶ 26. This overarching question, in my view, satisfies the exacting Rule 23(a)(2) commonality test articulated by the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

36. Nonetheless, certain objectors claim that the settlement must be rejected because the class cannot satisfy commonality.[28] Some objectors argue that, under the facts and controlling law, BP's liability is clear beyond question.[29] Even if objectors are correct, however, the fact that an issue may be easily proven or even conceded does not disqualify it for purposes of commonality. As the Second Circuit explained in *In re Nassau County Strip Search Cases*, 461 F. 3d 219 (2d Cir. 2006):

> [A]n issue is common to the class when it is susceptible to generalized, class-wide proof. That the class-wide proof comes in the form of a simple concession rather than contested evidence certainly shortens the time that the court must spend adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed class, which is the central concern of the predominance requirement.

461 F.3d at 227–28 (citations and internal quotation marks omitted).

37. Some objectors argue that the settling parties cannot show commonality under the rigorous standard set forth in *MD ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), which in turn was interpreting the Supreme Court's decision in *Dukes*. *See*, *e.g.*, Halliburton Obj. (#93) at 6; State of Louisiana Obj. (#228) at 14. The Fifth Circuit in *Stukenberg* did explain that "the Supreme Court [in *Dukes*] . . . further defined the contours of the rigorous analysis required by" Rule 23(a)(2). 675 F.3d at 837 (citing *Dukes*, 131 S. Ct. at 2551–52). But while it is true that commonality is more rigorous in light of *Dukes* than in the past, this more rigorous standard is met here, as I explain in my initial Report. Klonoff Medical Report at ¶ 25 (expressly

---

[28] *See*, *e.g.*, Sturdivant Obj. (#213) at 13–14; State of Louisiana Obj. (#228) at 10–14; Halliburton Obj. (#93) at 7–10.

[29] *See*, *e.g.*, State of Louisiana Obj. (#228) at 12.

relying on *Dukes* test). Plaintiffs cited and distinguished *Dukes* as well in advocating for approval of the settlement. *See* Plaintiffs' Memorandum in Support of Final Approval of Medical Benefits Class Action Settlement (Doc. 7111-2) (filed 08/13/12) at 36–37.

38. The State of Louisiana contends that, contrary to the opinions in my Report and that of Professor Coffee, this is not a single-event disaster case. State of Louisiana Obj. (#228) at 14. According to the State, the medical class claims involve the "distinct fact patterns" of liability for the oil spill itself, as well as liability for the use of dispersants in the clean-up effort thereafter. *Id.* All the injuries in this case, however, stem either directly from the spill or from conduct that occurred close in time and as a direct result of the spill. It is, therefore, consistent with other cases finding commonality in single-event disaster cases. *See, e.g.*, *In re Train Derailment near Amite La.*, 2006 U.S. Dist. LEXIS 32839, at *26–27 (E.D.La. May 24, 2006) (commonality met where "[a]ll of the injury and damage claims presented" arose from "a single discrete event: the derailment of [defendant's] freight train . . . and the ensuing spill and release of [various chemicals], and the post-derailment evacuation of the area surrounding the derailment and spill site"); *In re Three Mile Island Litigation*, 87 F.R.D. 433, 439 (M.D.Pa. 1980) (commonality met in case arising out of nuclear accident and evacuation, where class members shared "identical questions of law and fact," including "[t]he causes of the mass evacuation, . . . the foreseeability of its fiscal impact on the local population and economy," and "[f]actual matters such as the duration of the evacuation and its financial effect").

C. **Typicality**

39. Several objectors argue that the typicality requirement of Rule 23(a)(3) is not met in this case.[30] For example, the State of Louisiana asserts that class members suffered different levels of exposure and displayed a variety of symptoms. State of Louisiana Obj. (#228) at 16–17. As the Fifth Circuit has explained, however, "the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). The typicality element "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Id.* (citation and internal quotation marks omitted). As I previously noted, "'[t]ypicality does not require a complete identity of claims.'" Klonoff Medical

---

[30] *See, e.g.*, Sturdivant Obj. (#213) at 14; State of Louisiana Obj. (#228) at 15–19.

Report at ¶ 27 (quoting *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)). I also stated that I could think of no unique defenses that likely would become the focus of the litigation and undercut the typicality requirement, *id.* at ¶ 30. In sum, objectors' typicality arguments are misplaced.

### D. Adequacy of Representation

40. Several objectors argue that the class representatives are inadequate because of the variety of claims at issue and the failure of plaintiffs' counsel to designate subclasses, each with separate representatives and counsel.[31] All of the objections are premised on the assumption that, when class members assert a variety of claims, subclasses are necessary for each type of claim to avoid conflicts among class members.

41. In my initial Report, I anticipated and addressed the issue of subclasses. *See* Klonoff Medical Report at ¶ 35–39. For instance, I emphasized that all categories of claimants are eligible for compensation without regard to any overall cap. As a result, class members are not competing for a portion of a defined and limited pot of money. Klonoff Medical Report at ¶ 34. I also discussed case law emphasizing that subclasses are not the *sine qua non* of structural fairness. *Id.* at ¶¶ 34–36. The objectors do not refute these points.

### E. Predominance

42. Objector Sturdivant argues at length that, under Fifth Circuit law, predominance is not satisfied here. Sturdivant Obj. (#213) at 23–25. The case on which Sturdivant relies most heavily is one that I distinguished on several grounds in my initial Report.[32] I also discussed in

---

[31] *See, e.g.*, Sturdivant Obj. (#213) at 15; State of Louisiana Obj. (#228) at 19–22.

[32] *See* Sturdivant Obj. (#213) at 24 (discussing *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006)); Klonoff Medical Report at ¶ 49 (distinguishing that case). Sturdivant also relies on *Bell Atlantic Corp. v. AT&T*, 339 F.3d 294 (5th Cir. 2003), and *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551 (5th Cir. 2011), both of which are similarly distinguishable. In *Bell Atlantic*, the Fifth Circuit affirmed a denial of class certification where plaintiffs "proposed to calculate damages" for the class "according to a formula that utilized a nationwide average cost of labor and a nationwide average amount of time that the class members would have saved," but for defendants' alleged antitrust violations. 339 F.3d at 304. The Fifth Circuit held that such a one-size-fits-all approach was unacceptable, since "any adequate estimation of actual damages suffered would require consideration of [*inter alia*,] the variegated nature of the businesses included in both the proposed classes[.]" *Id.* Here, the settlement uses carefully tailored formulae and claims categories designed with appropriate methodologies for determining individual recoveries. Thus, the concerns reflected in *Bell Atlantic* are not present in this case. In *Chalmette*, the Fifth Circuit did not hold that class certification of a "mass accident" was *per se* impermissible, but instead held that the lower court "fail[ed] to adequately analyze and balance the common issues against the individualized issues"

some detail why the common issues are critical, whereas the individualized issues are limited, partially resolvable through common proof, free of choice-of-law complications, and easily dealt with because of the narrowly defined class. Klonoff Medical Report at ¶¶ 43–48.

### F. Superiority

43. A few objectors take issue with the superiority of the medical benefits settlement over other means of adjudicating the cases, as required by Rule 23(b)(3). *See, e.g.*, State of Louisiana Obj. (#228) at 23–24; Sturdivant Obj. (#213) at 25. In my initial Medical Report, I explained in detail why I believe the proposed medical settlement readily meets the superiority requirement. *See* Klonoff Medical Report at ¶¶ 51–63.

44. The State of Louisiana asserts that a class action is not superior, claiming that "[n]o significant judicial efficiency will be realized by certifying these settlement classes." State of Louisiana Obj. (#228) at 24. This is so, the State contends, because "if approved[,] these settlements will not make the case go away," given that claims such as those against co-defendants Transocean and Halliburton will remain to be litigated, and given that class members participating in the settlement must provide evidence to recover on their individual claims. *Id.* The premise appears to be that, unless the settlement resolves *every* claim and *every* issue arising from the *Deepwater Horizon* incident, there is no gain in judicial economy. Not surprisingly, the State cites no case striking down a settlement on this tenuous rationale. The argument is especially weak where, as here, the medical benefits settlement—and the related economic and property damages settlement—unquestionably resolve the majority of claims.

45. Objector Sturdivant, citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), argues that the rationale of *Castano* supports a finding that superiority is not met here. Sturdivant Obj. (#213) at 25. In particular, Sturdivant argues that many class claims "are not 'negative value suits,'" and, as such, "[t]he most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing . . . ." *Id.* (quoting *Castano*, 84 F.3d at 748). As I explained in my initial Medical Report, however, the majority of the medical benefits class claims are almost certainly negative value claims. *See* Klonoff Medical Report at ¶ 61

---

before certifying the class. 637 F.3d at 557. Indeed, the *Chalmette* court went out of its way not to "suggest that class treatment [was] necessarily inappropriate," noting that "class treatment on the common issue of liability may indeed be appropriate." *Id.*

17

(citing *Castano*, 84 F.3d at 748). The fact that a small number of individual claims may be worth litigating on their own does not undermine the conclusion that a class action is the superior alternative for the great majority of class members, whose claims would be cost prohibitive to prosecute individually.

## IV. ATTORNEYS' FEES

46. Finally, apart from citing the fee agreement to challenge the fairness of the settlement, some objectors claim that class counsel are not entitled to up to $600 million in fees and costs that BP has agreed to pay on top of the amounts paid to claimants.

47. Objector Sturdivant contends that class counsel have circumvented Rule 23(h) of the Federal Rules of Civil Procedure and thus have "forfeited [their] right to a fee." Sturdivant Obj. (#213) at 44. This argument misapprehends the record in this case. Plaintiffs made clear in their memorandum in support of the economic and property damages settlement that they were "not [at this time] seek[ing] an award or distribution of any common benefit fees." Plaintiffs' Memo in Support of Final Approval of Economic and Property Damages Class Settlement (Doc. 7101-2) (filed 08/13/12) at 53; *see also* Plaintiffs' Memo in Support of Final Approval of Medical Benefits Class Action Settlement (Doc. 7111-2) (filed 08/13/12) at 47 (incorporating fee structure arguments from Economic Memo). Similarly, in urging the Court to validate the overall fee structure, I was not arguing that the Court should award a final fee now and ignore Rule 23(h). *See* Klonoff Medical Report at ¶ 93 (citing ALI *Principles of Aggregate Litigation* for approach of setting fee structure early but with the ability to revise approach based on the actual facts). When plaintiffs' counsel move for fees under Rule 23(h), class members will have the chance to weigh in on the fees ultimately requested by counsel.

48. Objector Sturdivant argues that, even though the fees are being paid separately, the "reality" is that they are coming from the class members' total recovery. Sturdivant Obj. (#213) at 41–42. Whether this assertion is right or not is irrelevant. The practice of attorneys' fees being paid from a common fund is premised on the equitable doctrine that class members benefited from counsel's work and should be required to pay fees out of the recovery.[33] The

---

[33] *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (observing that "[t]he common-fund doctrine reflects the traditional practice in courts of equity," and that the "doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's

objector cites no authority for the suggestion that there is something untoward about counsel being compensated for their work out of a fund created on behalf of a class.

## V. CONCLUSION

49. For the foregoing reasons and those set forth in my initial Report, it is my opinion that the Court should certify the case as a Rule 23(b)(3) class, uphold the medical benefits class settlement as fair, reasonable, and adequate, and approve the overall attorneys' fees structure agreed to by class counsel and BP.

---

expense" (citations omitted)); *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 384 Fed. App'x. 299, 302 (5th Cir. 2010) (per curiam) ("It is well established that federal courts, through the exercise of their equity powers, may call upon a group that benefits from litigation efforts to share the costs of litigation, including attorneys' fees." (citations omitted)); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D.La. 2010) (explaining that the "common benefit doctrine . . . permits the creation of a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries," and noting that the doctrine "was originally, and perhaps still is, most commonly applied to awards of attorneys' fees in class actions" (citations omitted)).

I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

_____
Robert H. Klonoff

October 22, 2012