IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179<br><br>SECTION: J |
| This Document Relates to: | JUDGE BARBIER |
| Actions in Pleading Bundle B3,<br><br>and | MAGISTRATE JUDGE SHUSHAN |
| No. 12-cv-968, *Plaisance et al. v. BP Exploration & Production Inc., et al.* | |

## SUPPLEMENTAL DECLARATION OF MICHAEL R. HARBUT, M.D., M.P.H., F.C.C

MICHAEL R. HARBUT, under penalty of perjury, declares as follows:

1. On August 11, 2012, I submitted a declaration in support of the Medical Benefits class settlement. I concluded that (a) the acute and chronic conditions and symptoms identified in the Specified Physical Conditions ("SPC") matrix conform to the state of the science and the world's medical literature regarding health effects of exposure to petroleum and/or petroleum-based dispersants; (b) that it would be highly likely that the SPC conditions and symptoms would manifest within the 24 – 72-hour time frames of exposure to the oil and/or dispersant under the conditions presented in the BP oil spill; (c) the Periodic Medical Consultation Program ("PMCP") includes tests that benefit class members' overall health and that could also identify diseases caused by exposure to petroleum and/or petroleum distillates; and (d) the PMCP is well designed for maximum class member participation and establishes a physician-patient

1

relationship that is critically important for the benefit of class members participating in the program. My opinions have not changed.

2.  Since the submission of my August 11th declaration, I was informed that various entities and individuals have filed objections to the settlement. Counsel provided me with copies of those objections, and I have read them in preparation of this supplemental declaration.[1] I focused my attention on the issues in these objections relating to my expertise in this matter. I submit this supplemental declaration in response to the objections that raise medically-related issues.

3.  As a preliminary matter, I base all of my opinions herein, as well as in my August 11, 2012 declaration, on my education, training and experience, decades of treating patients who have been exposed in the workplace or other environments to petroleum products, my review of currently available medical, scientific and epidemiological literature, treating several patients who traveled from the Gulf region to Michigan to be treated personally by me, my consultation with several Gulf-region physicians and health providers who were treating patients exposed to oil and/or dispersant from the oil spill either as a result of their status as a clean-up worker or Gulf resident and my consultation with the U.S. Navy in connection with its analysis of the safety of training missions relating to the BP oil spill.

4.  I understand Dr. Robichaux to state that the Specified Physical Conditions ("SPC") matrix does not cover the chronic conditions most commonly experienced by Clean-Up

---

[1] The medical objections are: Boggs (Doc. 41); Bartlette (Doc. 51); Machua (Doc. 57); Sims (Doc. 61); Abreu (Doc. 92); Halliburton (Doc. 93); Sturdivant (first filing) (Doc. 124); Brown (Doc. 130); Breedlove (Doc. 158); Hall (Doc. 160); Coco (Doc. 180); Llewallen (Doc. 182); Yerkes (Doc.185); Baird (Doc. 202); Canipe (Doc. 203); McLane (Doc. 205); Booker (Doc. 208); Sturdivant (second filing) (Doc. 213); State of Louisiana (Doc. 228); and Lucas (Doc. 236).

2

Workers. He states that he has seen "hundreds" of patients, and that his patients do not manifest the chronic physical conditions compensated in the SPC matrix. Dr. Robihaux further states that the conditions covered in the matrix are "obscure." I cannot respond to the medical conditions manifested by Dr. Robichaux's patients that he believes are caused by oil and/or dispersant exposure from the oil spill because he does not provide that information, nor does he state the chronic conditions he believes should have been included in the SPC matrix, but I reiterate that the chronic conditions set forth in the SPC matrix are based on the state of the science and the world's medical literature regarding health effects of exposure to petroleum and/or petroleum-based dispersants . Similarly, another objector (Baird, Doc. 202) states that the list of chronic conditions is too restrictive.

5.   As to the chronic conditions identified in the SPC matrix, it is my experience that those conditions are the conditions most commonly experienced by exposed populations under the circumstances presented by the BP oil spill. That is not to say that other chronic conditions could not be manifested, but those conditions would be uncommon and generally experienced by individuals who have an unusual sensitivity to petroleum and/or related products, or have a pre-existing health condition that makes them unusually vulnerable. The SPC chronic conditions were intended to include those conditions that commonly could be experienced by class members under the exposure conditions that occurred here, and it is my opinion that the chronic conditions in the SPC matrix are comprehensive under that standard.

6.   Another objector (Llewallen, Doc. 182)) states that the SPC matrix is unfair because it does not cover "all" neurological conditions that result from exposure. This objector states that he has "pain all over his body." This type of complaint would be too vague to include as a medical condition resulting from exposure to petroleum products. Further, the neurological

3

conditions and symptoms included in the matrix are comprehensive for petroleum-based exposures, and it is my opinion that people exposed to oil and/or dispersant under the circumstances of the BP oil spill, either as a result of where they reside or as a Clean Up worker, who experienced a neurological response to the exposure would manifest one or more of the neurological symptoms in the matrix.

7.  Several objectors state that the medical class is flawed because some people were exposed to only oil, while others were exposed to only dispersant. First, based on my understanding of the oil spill response efforts, it would be difficult, if not impossible, to determine whether an individual was exposed to one but not the other. Nevertheless, from a medical perspective such "differences", even if they exist, would have limited clinical value. Both the oil and the chemical dispersants used in the response to the oil spill are petroleum derived, and as such their biological reactivity would be expected to be largely the same. As a physician, it would be virtually impossible to clinically determine whether a patient's condition or symptoms were caused by exposure to oil, dispersants or both. I further discuss these issues in my August 11, 2012, declaration at ¶¶ 20, 21 (Doc. 7111-3).

8.  Another objection to the medical benefits settlement is based on the time frames included in the matrix; *ie*, that the period of time between exposure and manifestation of a condition or symptom is too restrictive. While I address this issue in my August 11, 2012 declaration at ¶¶ 19, 26-33, 35-38, I further state here that these time frames are based on sound science and link the condition or symptom to the exposure, in contrast to other causes. A contrary objection is raised by Halliburton, which states the conditions and symptoms in the matrix are common among populations irrespective of exposure to oil and/or dispersants and, as a result, the medical settlement is too permissive because people are being compensated for

4

symptoms not necessarily caused by petroleum exposure. I disagree with that position, for the very reason that I also support the time frames between exposure and physical manifestation. Of course it is true that the general population experiences headaches, nosebleeds, coughs, rashes, and many other symptoms and signs set forth in the SPC matrix without being exposed to oil and/or dispersants. But when these findings are linked to a short time frame between petroleum exposure and manifestation, such as in the SPC matrix, it is highly likely that the manifestations are the result of the exposure.

9. Objectors Coco (Doc. 180), Baird (Doc. 202) and others state that it is not fair to cut off class membership for Zone A residents as of September 30, 2010, while extending class membership to December 31, 2010 for Zone B residents. They further believe it unfair that Zone B residents are entitled to participate in the periodic medical consultation program ("PMCP") even if they do not manifest a specified physical condition ("SPC"), while Zone A residents must manifest a SPC by September 30, 2010 to be in the class and, thus, to be entitled to participate in the PMCP. While there are no available studies which would provide certitude in response to these questions, these time frames were intended to address real life situations in light of the best available science. Thus, I believe the time frames are medically sound based on the exposure facts as I understand them. While oil did continue to wash up on beachfronts and shorelines after September 2010, I understand that those events decreased in number by then. In addition, I have been informed that tar balls typically were removed within a short time frame. Essentially, after September 30, 2010, Zone A Residents' exposure to oil and/or dispersants would have been substantially reduced after that date. Zone B Residents, in contrast, live in the marsh areas of the coast where the oil oftentimes could not be removed. It has been explained to me that in these areas some of the oil was removed but not all, and the oil that could not be removed without

5

damaging the marshes was left to naturally attenuate. Because of this, Zone B residents would have had a longer exposure to the petroleum products and their harmful health effects than did Zone A residents. Thus, it is medically appropriate to associate manifestation of the conditions and symptoms on the SPC matrix to oil and/or dispersant exposure for a longer period of time for Zone B residents, whereas for Zone A residents there would be a lower probability that manifestation of these conditions or symptoms would be caused by oil and/or dispersant exposure after September 30, 2010. Clean-Up Workers, similar to Zone B residents, would have had a more sustained and direct exposure to the oil and/or dispersants as well. I also address this in my August 11, 2012 declaration at ¶ 42.

10. Objector Canipe (Doc. 203), states that Reactive Airways Dysfunction Syndrome (RADS) is not always demonstrated by a single methacholine challenge test. While it is my belief that Canipe does not appear to be either a Zone A or B resident or a clean-up worker, I respond that the statement is true, but the SPC matrix does not state that only one methacholine challenge test is permitted, nor that the methacholine test is the only permissible test for diagnosing RADS. Rather, the SPC matrix would allow multiple methacholine tests to be performed to diagnose RADS, as well as other tests and investigations designed to determine the presence of hyperactive airways.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

October 21, 2012                                         Michael R. Harbut