# Exhibit 2

# IN UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION: J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Kip Plaisance *et al.*, individually and on behalf of the putative Medical Benefits Settlement Class,<br><br>    Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc; BP America Production Company; and BP p.l.c.,<br><br>    Defendants. | No. 12-cv-968<br><br>SECTION: J<br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## SUPPLEMENTAL DECLARATION OF JOHN C. COFFEE, JR.

JOHN C. COFFEE, JR. declares as follows:

### I. INTRODUCTION

1. This declaration supplements my earlier declaration, dated August 10, 2012, in light of the objections that have been raised with respect to the "Deepwater Horizon Medical Benefits Class Action Settlement Agreement," dated April 18, 2012 and amended May 1, 2012

(the "Medical Benefits Settlement Agreement"). In this declaration, I will not retrace ground already covered, either in my earlier declaration, or in my contemporaneous Supplemental Declaration with respect to the Economic Loss and Property Damages Class Action. Where possible, I will simply cross-reference arguments made in those other filings.

2. Nonetheless, the few objectors to this settlement have raised several themes that require brief attention. I will not address those objections that simply contend that the Medical Benefits Settlement is unfair or inadequate, as those issues do not directly relate to my continuing focus on class certification. But other objectors have raised essentially three themes (which different objectors articulate in different ways);

> A. The Medical Benefits Settlement Agreement does not properly distinguish between those persons exposed to only oil (or oil and oil-dispersants) versus those exposed only to oil-dispersants; this objection is phrased both in terms of the absence of any "dispersants only" class representative (thus raising issues about "typicality" under Rule 23(a)(3)) and in terms of the asserted need for a "dispersants only" subclass;
>
> B. The Medical Benefits Settlement Agreement fails to address adequately persons who were exposed to oil or dispersants but who remain currently asymptomatic (these objectors may be asserting that the Settlement Agreement is in their judgment fatally underinclusive or that there should be a class representative and/or a subclass for such asymptomatic, but exposed, persons); and

C.  Although the Medical Benefits Settlement Agreement presents itself as a response to "single event" disaster, there were in their view two separate and distinct events: (i) the Macondo well blowout and the resulting explosion, and resulting release of oil, and (ii) the allegedly inadequate containment efforts by the BP Parties, which either failed to halt the spread of the oil spill or exacerbated problems through the allegedly improper or negligent use of various containment techniques (including oil dispersants).

3.  In my judgment, these objectors either misunderstand the legal requirements for class certification or the facts of this case (or both). But because several of these issues overlap, it is simplest to take the more recurring issues first. Thus, I will discuss in order: (a) the need for special class representatives; (b) the need for subclasses; (c) the status of those possibly exposed to "dispersants only"; (d) the status of asymptomatic, exposure-only claimants; and (e) the claim that this was a "dual event" mass disaster, which requires either subclassing or other special treatment for those injured by allegedly negligent or reckless remediation efforts by the BP Parties.

II.  <u>Typicality, Adequacy and the Need for Additional Class Representatives</u>

4.  The various objectors share in common the view that the Medical Benefits Settlement Agreement ignores or undervalues the special claims and status of their asserted subgroup (i.e., either (i) persons exposed only to oil dispersants, (ii) persons who are asymptomatic, but who were exposed to oil or dispersants, or (iii) persons injured during the remediation phase). To the extent that these persons are articulating any legally cognizable claim, it seems to be a claim that the Medical Benefits Settlement Agreement lacks a

3

representative who is "typical" of their injuries and can provide them with adequate representation.

5. Initially, it is important to understand that the class definition includes "individuals who were injured as result of exposure to oil and/or oil dispersing chemicals and/or decontaminants by virtue of their employment as workers cleaning the spill or because of their residence in certain coastal areas near the waters affected by the spill." (See Medical Class Action Complaint at Paragraph 5). Some eleven individuals serve as class representatives for this class, and eight of these eleven were clean-up workers (including persons employed in the Vessels of Opportunity (or "VoO") program). These eight clean-up workers were: Kip Plaisance, Jason Perkins, Max Plaisance, Benjamin Judah Barbee, Cornelius Divinity, Carlton Laster, George Baker and Duffy Hall. Mr. Divinity expressly alleges that:

> "As a result of his exposure to oil and/or dispersants, he experienced blurred vision, shortness of breath, and migraine headaches." (Medical Class Action Complaint at Paragraph 5(g)).

Thus, exposure to dispersants as a cause of injury is specifically alleged, and a large majority of the class representatives are clean-up workers, whose exposure most likely involved a mixture of oil and dispersants.[1]

---

[1] Of course, neither I nor any expert can prove that these clean-up workers were exposed in fact to oil and/or dispersants, but the point is that any rational clean-up worker would reasonably believe that he or she was exposed to both and thus would identify his or her own self-interests with that of those similarly exposed to both oil and dispersants. Thus, the interests of these eight clean-up workers (and certainly Mr. Divinity) are aligned with the interests of those exposed to oil and oil dispersants. The only remaining question is whether the interests of persons possibly exposed only to dispersants differ from those exposed to both oil and dispersants. This is, I believe, a scientific question on which the expert testimony is clear, as discussed below, and to the effect that there is no difference in terms of relative susceptibility to injury of these two groups.

6. The issue thus framed is whether persons who were exposed to both oil and dispersants (as the above eight representatives seemingly were) can satisfy the typicality standard under Rule 23(a)(3) and the adequacy standard under Rule 23(a)(4) for any hypothetical persons who may have been exposed only to dispersants (and not to oil). In the fullest, most extensive recent discussion of the typicality requirement in a Fifth Circuit decision, the district court in In re Heartland Payments Sys, 851 F. Supp. 2d 1040, 1054 (S.D. Tex. 2012), summarized the Fifth Circuit's standards in the context of a settlement class as follows:

> "Typicality, according to the Fifth Circuit, 'does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality'" (quoting James v. City of Dallas, 254 F.3d 551, 571 (5th Cir. 2001).

In that case, which involved a nationwide class, the court found that, even in the face of substantial variation in state law, typicality and adequacy of representation were still satisfied where the claims "arise from a single course of conduct by" the defendant. Id. at 1055.

7. Here, where (1) there are no variations in state law, (2) we are focused on the conduct of the defendants over a much shorter period, and (3) the settlement agreement is uncapped, the interests of class members exposed to oil and those (if any) exposed only to dispersants appear to be fully aligned. This is so for several reasons: (1) Their interests are aligned because the class representatives are not subjectively aware of any difference between their positions and that of "dispersant only" victims (and so would logically act to maximize their common interests); (2) The class members (and their representatives) are not in any sense competing for a limited recovery, so the gain of one does not come at the expense of the other;

(3) The class representatives suffered in all relevant medical senses the same injury as that experienced by any "dispersants only" class members, because in both cases any injury was caused by exposure to petrochemicals that are for all practical purposes medically indistinguishable in effect; and (4) It is highly unlikely that any person exposed only to dispersants is aware of his or her unique status or believes that he or she has interests divergent from those exposed to a mixture of oil and dispersants. Hence, such a "dispersants only" subclass would be a phantom subclass with even its actual members looking instead to the leadership of class representatives exposed to both oil and dispersants, as this was the subclass to which they believed they belonged.

8.  No objector has complained that he or she was exposed only to dispersants and not to oil. Although it is conceivable that there are such "dispersant only" victims, this does not pose an obstacle to class certification because the physical conditions manifested from exposure to oil and dispersant are the same, and thus the claim of an alleged dispersant-only exposure claimant is essentially no different from that of a claimant alleging exposure to oil or a mixture of oil and dispersant.

9.  Here, I rely on the Affidavit, dated August 12, 2012, of David R. Dutton, Ph.D., a toxicologist who served as Industrial Hygiene Team Lead for the Gulf Coast Restoration Organization (Document 7112-2). He testified that "safety setbacks" were implemented under which "dispersant was not to be sprayed: (i) within two nautical miles ("nm") of any platform, rig, or vessel; (ii) within five nm of controlled burning activities, (iii) within five nm of the source-control area; or (iv) within three nm of the shore." (*Id.* at Paragraph 27). With one lone exception (involving an engine failure on a plane), all "aerial dispersant applications were applied greater than three nautical miles offshore, and 98% of the aerial dispersants were applied

6

greater than ten nautical miles offshore." *Id.* at Paragraph 28. In a Supplemental Declaration, dated October 22, 2012, Dr. Dutton further explains that oil-dispersants were used "to break up oil slicks observed on the surface of the Gulf of Mexico" and thus

> "[D]ispersants were not applied on land or to the surface of the Gulf of Mexico not observed to have dispersible oil slicks."

See Supplemental Declaration of David R. Dutton at Paragraph 35. Further, once applied to an oil slick, "the dispersants mix with and become inseparable from oil." *Id.* On the basis of these two declarations, exposure of humans on land exclusively to dispersants through aerial spraying seems unlikely, and any actual exposure would more likely come instead from contact with a mixture of oil and dispersants, which mixture could have resulted from a variety of response activities, including aerial spraying, vessel release and subsea release.

10.    Hence, the vast majority of class members who were exposed to dispersants were exposed to a mixture of oil and dispersants (and so they are adequately represented by the eight class representatives who are clean-up workers and likely similarly exposed).

11.    Even if class members were exposed only to dispersants and recognized their unique status, it still does not follow that they would need or want a "dispersants only" class representative or subclass. This is because, from a medical perspective, there are no relevant differences between these two populations. As Dr. Michael R. Harbut testifies in his Supplemental Declaration:

> "Both the oil and the chemical dispersants used in response to the oil spill are petroleum-based, and as such their biological reactivity would be expected to be essentially the same. As a physician, it would be virtually impossible to determine whether a patient's condition or symptoms were caused by exposure to oil, dispersants or both." Harbut Supplemental Declaration at Paragraph 7.

7

On this basis, the injury is more or less the same to both populations and their claim strengths do not differ.

## II. The Asserted Need for Subclasses

12.     If an additional class representative is not needed, there is even less need or justification for a special subclass. Equally important, any such subclass would raise serious problems as to its ascertainability. As I discuss at greater length in my companion declaration on the Economic Loss and Property Damages Settlement Agreement, subclassing is not required by the language of Rule 23, and is only appropriate when there are "fundamental" conflicts among class members that would deny one group adequate representation under Rule 23(a)(4). See In re Literary Works in Electronic Databases Copyright Litig., 654 F.3d 242, 249 (2d. Cir. 2011). Increasingly, courts have recognized that "subclassing often leads to more complex and protracted litigation." See Clarke Equip Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO, 803 F.2d 878, 880 (6th Cir. 1986). As the Sixth Circuit has recently warned in UAW v. GMC, 497 F.3d 615, 629 (6th Cir. 2007):

> "If every distinction drawn or not drawn by a settlement
> required a new subclass, class counsel would need to
> confine settlement terms to the simplest imaginable or risk
> fragmenting the class beyond repair."

13.     Here, the fact that overshadows all other consideration is that this settlement is uncapped. Thus, the gain of any subgroup does not occur at the expense of any other subgroup and they all share a common interest in maximizing the recovery. The settlement grids in the Specified Physical Conditions Matrix ("SPCM") were established independently and without tradeoffs between different subgroups or symptoms. Exactly the opposite happened in In re

Literary Works, supra, where it was in the interest of some class members (and the class representatives) to shift funds from Category C to Categories A and B.

14.     Moreover, special problems would arise under the ascertainability standard if we attempted to create subclasses. For example, a subclass for "dispersant only" victims would not be ascertainable because virtually all within this group would not know (and could not know) if they had been exposed only to dispersants or to a mixture of oil and dispersants. Yet, courts in the Fifth Circuit have long agreed with other Circuits that a class's membership must be readily ascertainable based on objective criteria if it is to be certified. See John v. Nat'l Sec. Fire & Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007); In re Initial Public Offering Sec. Litig., 471 F.3d 34, 30 (2d Cir. 2006); Oshana v. Coca-Cola Co., 472 F.3d 506, 513 (7th Cir. 2006). Even if some class members believed they were only exposed to dispersants, this is a subjective determination on their part and insufficient to meet the objective ascertainability standard.

### III.  The Status of Asymptomatic Claimants

15.     Some objectors challenge the provisions of the Medical Benefits Settlement Agreement that limit eligibility for compensation to persons manifesting the symptoms and conditions specified in the SPCM within not more than 72 hours after their exposure to oil and/or dispersants. Further, the Medical Benefits Settlement Agreement imposes cutoff dates of September 30, 2010 and December 30, 2010 for residents of Zone A and B, respectively. These objections appear to be partly to the fairness of these provisions and partly to the asserted need for better representation for asymptomatic persons who may subsequently develop symptoms specified in the SPCM that they attribute to exposure to oil and/or dispersants. Yet, the answer to both objections is that the class definition cannot be expanded in this manner without undermining the action's prospects for certification. Absent fixed cutoff dates, the class would

include future claimants, and this was the primary problem that caused the Supreme Court to reverse class certification in Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997). If the class were expanded to cover future claimants, a host of problems would follow. Not only would a subclass for future claimants probably be necessary under Amchem, but different notice procedures would also likely be necessary.

16. Worse yet, the scientific basis for establishing causation would collapse if symptoms or conditions that manifested themselves weeks or months after exposure to oil and/or dispersants were attributed to this exposure. This class action satisfies Rule 23 because of its deliberately close linkage between exposure and the manifestation of illness. As Dr. Harbut has noted in his prior declaration and in his Supplemental Declaration, the SPCM's short "time frames are based on sound science and link the condition or symptom to the exposure, in contrast to other causes."[2] Because the symptoms listed on SPCM are, sooner or later, experienced by a substantial fraction of the general population, it is only the close linkage in time (not more than 72 hours) plus the epidemiological evidence that these are the recognized reactions to exposure to oil and/or dispersants that together demonstrate causation. Sever that linkage and the proximate causation of each class member's injuries would become a more individualized issue that would likely bar a finding of predominance under Rule 23(b)(3). Nothing would work more to the advantage of those who do not want to see any class certified than extending the period over which often generalized symptoms were attributed to exposure to oil and dispersants.

17. Asymptomatic class members do gain significant benefits under the Medical Benefits Settlement Agreement, sharing equally in the PMCP and the BELO rights (which allow them to pursue litigation claims in the future if an injury does later manifest itself and they can

---

[2] See Harbut Supplemental Declaration at Paragraph 8. See also Harbut Declaration dated August 11, 2012 at Paragraphs 19, 26–33 and 35–38.

show causation). Rather than experience discrimination under this settlement, asymptomatic class members appear to do substantially better than if they had sued individually. In particular, as a result of this Court's Amended Order, entered on October 4, 2011 (Document 4209), in which this Court dismissed the claims of exposure-only plaintiffs,[3] it seems unlikely that such asymptomatic claimants could pursue any current individual claim. Thus, if they lack a cause of action, it follows inexorably that they have no valid claim for class representatives or a subclass of their own in this action. Ultimately, there is no need to debate whether asymptomatic claimants need better representation when they lack a valid cause of action to assert.

### IV. A Single or Dual Event Disaster?

18.     A final group of objectors (including the State of Louisiana) has argued that greater representation (whether through a class representative or subclassing) needs to be given to those injured by defendants' allegedly negligent remediation efforts. In effect, this objection sees the Deepwater Horizon Incident as not one event, but two: (1) the blowout, explosion and resulting release of oil, and (2) the allegedly slow or inadequate efforts at containment and remediation following the blowout. Here again, the basic response must be that, to the extent such a distinction is even feasible, no "fundamental" conflict or antagonism exists between class members injured at either stage. Because the settlement is uncapped, there is no reason or incentive for the class representatives to fail to represent either constituency zealously. Moreover, the high proportion of clean-up workers (eight out of eleven representatives) indicates that the interests of those individuals suffering injuries specified on the SPCM during the

---

[3] The Court ruled that "no action has accrued in favor of those plaintiffs who have not alleged an injury. Therefore, these plaintiffs have failed to state a cause of action, and all personal injury claims asserted by such plaintiffs must be dismissed." Document 4209 at 17–18.

11

remediation phase are unlikely to be ignored, or relegated to a lesser priority, because clean-up workers were by definition involved in the remediation.

19.     Indeed, if these objectors believe that those claiming injury as a result of the remediation activities have been in some way discriminated against, the evidence is overwhelmingly to the contrary. Clean-up workers (who were, of course, active during the remediation) receive both medical consultation rights and the back-end opt out option—without the need to demonstrate any manifested injury prior to the September 30, 2010 or December 30, 2010 cutoff dates that apply to other class members. This responds appropriately to the likelihood that clean-up workers experienced a longer and more intense exposure to oil and dispersants than did residents in Zones A and B, but it hardly shows any discrimination against them. Moreover, the claims of those claiming injury as a result of the remediation are not likely to have greater legal strength (and thereby justify special representation), because these claimants are subject to at least the potential defense that decisions about containment and remediation were actually made at this stage by the Federal On Scene Command ("FOSC").[4] Thus, in terms of relative claim strength, I see no reason to believe that those injured at the later stages have inherently stronger claims that justify separate or special representation.

20.     Finally, in determining whether lines need to be drawn through the class and whether the Deepwater Horizon Incident should be subdivided into two components—(1) the blowout, and (2) the containment and remediation phase—, it is certainly useful to examine what has been done in the case of other, recent oil spill class actions. Here, two cases are particularly instructive: (1) Petrovic v. Amoco Oil Co., 200 F.3d 1140 (8th Cir. 1999); and (2) Turner v. Murphy Oil Co., 234 F.R.D. 597 (E.D. La. 2006).

---

[4] I do not mean to endorse, or even evaluate, this defense, but just note that it was plainly foreseeable.

12

21. In Petrovic, the Eighth Circuit rejected demands for subclassing made by objectors who argued that they had been deprived of adequate representation. The settlement agreement in Petrovic divided the over 5,000 member class into three zones (Zones A, B, and C) based on class members' proximity to the source of underground oil seepage originating from an Amoco Oil refinery. Although residents of each zone received a different level of compensation (which was only contingent in the case of Zone C), no subclasses were created, and the Eighth Circuit rejected the challenge of objectors seeking such subclasses. The Eighth Circuit read the major precedents—Amchem Products, supra, and Ortiz v. Fibreboard Corp., 527 U.S. 815 (1995)—as being primarily motivated by a fear of "the possibility of 'collusion between class counsel and the defendant.'" 200 F.3d at 1146. In contrast, the Eighth Circuit saw no danger of such collusion on the facts before it and also emphasized that class representatives came from each of the three zones. It summarized:

> "We see no analogous conflict in our case. Each property owner stands to gain from Amoco's agreement to compensate landowners for damage already sustained to property, and from Amoco's undertaking steps to revitalize the community and increase property values."
> *Id.* at 1147–1148.

It also stressed that all class members had similar "remedial needs" without any "substantial difference" between them. One could easily delete the words "Amoco Oil" from these passages and substitute the words "the BP Parties," and the language and logic would apply equally. Whether class members in the instant case resided in Zone A or Zone B or whether they were injured by oil and dispersants released early or later, the class members in the instant case had in common approximately the same "remedial needs," and hence no fundamental conflict or antagonism existed among them. Here, as in Petrovic, the case for subclassing has not been

made by simply showing some difference in position. Even more than the Eighth Circuit, the Fifth Circuit has recognized that a difference does not imply a conflict. See Mullen v. Treasure Chest Casino LLC, 186 F.3d 620, 626 (5th Cir. 1999).

22. In Turner v. Murphy Oil Co., supra, the court was faced with a number of consolidated class actions seeking recovery for both economic and business losses and personal injuries caused by an oil spill that occurred in the wake of Hurricane Katrina. The Environmental Protection Agency had classified "the oil contamination as either heavy, medium or light within" an "oil-plume perimeter" (Id. at 602). Still, no subclasses were created.

23. Although the action was based on Louisiana law, it essentially asserted gross negligence, negligence and certain strict liability theories. Defendants asserted that "plaintiffs' homes and businesses received . . . different amounts of oil contamination" and that the personal injury claims "do not share common issues of law or fact." Id. at 604. Nonetheless, the court easily found the commonality requirement satisfied:

> "That requirement is clearly met in this case which involves a single accident. These are just a few of the central issues that will affect all or most of the class members: whether Murphy Oil failed to properly maintain Tank 250-2, whether Murphy Oil had adequate hurricane safety plans, and whether those plans were carried out during Hurricane Katrina, and whether the affected areas will experience any long-term contamination. While Plaintiffs' claims will involve some individualized determinations regarding the amount of damage suffered, if any, there are enough common issues regarding Defendant's liability that class treatment would be appropriate under Rule 23." Id. at 604.

24. Turner v. Murphy Oil was in fact a far more ambitious class action in scope than this case, because it combined personal injuries and economic losses into one class action. Plaintiffs identified six class representatives, all of whom alleged "either business or residential

property damage as a result of the discharge of oil from Murphy's refinery, and several allege personal injury." *Id.* at 605. Despite this broad scope, the court found "predominance" satisfied for purposes of Rule 23(b)(3), saying:

> "The great factual similarities between the Plaintiffs' claims merit a finding of predominance here. All, or the great majority, of Plaintiffs . . . have alleged exposure to the same contaminant, crude oil." *Id.* at 607.

Again, one could substitute "the BP Parties" for "Murphy Oil" in these passages without substantial distortion to the facts of this case.

25. Neither in Petrovic nor Turner was subclassing required, although in both there was substantial variation in the degree of oil contamination, and, particularly in Turner, the class period extended through a remediation phase after the initial spill. Little reason, if any, seems apparent why this Court should deviate from the practice of these courts in avoiding unnecessary subclassing.

## V. CONCLUSION

26. A common theme runs throughout this declaration: the dangers of excessive fragmentation. The Third Circuit captured this theme well in In re Cendant Corp. Sec. Litig., 404 F.3d 173 (3d Cir. 2005), where it wrote (citing this declarant):

> "While subclasses can be useful in preventing conflicts of interest, they have their drawbacks. One leading expert writes:
>> If subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened. Such a fragmented class might be unmanageable, certainly would reduce the economic incentives for legal entrepreneurs to act as private attorneys general, and could be extremely difficult to settle if each subclass (and its attorney) had an incentive to hold out for more."

15

> John C. Coffee, Jr., *Class Action Accountability:
> Reconciling Exit, Voice, and Loyalty in Representative
> Litigation,* 100 Colum. L. Rev. 370, 398 (2000). In short, a
> class action containing a multitude of subclasses loses
> many of the benefits of the class action format.

27. Worse than this, a class that represented all the interests that objectors have asked this class to represent (i.e., asymptomatic plaintiffs and persons with delayed injuries not closely related to the time of their exposure) would almost certainly not be certifiable. At their worst, the objectors have offered a prescription for failure. At their best, the objectors have alleged that there are differences within the class. But differences do not imply conflicts. Nothing has been alleged that even hints at the real conflicts that were present in <u>Amchem Products</u> or <u>Ortiz</u>. None of the above-described objections changes my opinion and conclusion that class certification is entirely proper under Rule 23.

I declare under the penalties of perjury that the foregoing analysis and opinions are true and correct to the best of my knowledge and belief.

*/s/ John C Coffee Jr*

October 22, 2012              John C. Coffee, Jr.