# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | * | SECTION J |
| This document relates to all actions. | * * * | |
| | * | Honorable CARL J. BARBIER |
| | * * | |
| | * | Magistrate Judge SHUSHAN |
| | * | |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., *et al.*, individually and on behalf of themselves and all others similarly situated, | * * * | Civil Action No. 12-970 |
| | * | SECTION J |
| Plaintiffs, | * * | |
| | * | |
| v. | * | Honorable CARL J. BARBIER |
| | * | |
| | * | Magistrate Judge SHUSHAN |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * | |
| | * | |
| Defendants. | * | |

## THE BP DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR FINAL APPROVAL OF THE *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MEMORANDUM*

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................................1

ARGUMENT.......................................................................................................................4

I.      The Settlement Is Presumptively Fair, Reasonable, And Adequate. ..........................4

II.     The Low Number Of Objections And Opt-Outs Further Confirms The
Fairness, Reasonableness, And Adequacy Of The Settlement.......................................5

III.    Objectors Who Lack Standing Should Not Be Allowed To Derail The
Settlement. ................................................................................................................9

      A.     The Burden To Establish Standing Falls Individually On Each Objector.
Collective Allegations Do Not Suffice. ...............................................10

      B.     Objectors With Claims That The Parties Have Not Agreed To Settle Lack
Standing. ...............................................................................................12

      C.     Objectors Who Do Not Fall Within The Settlement Class's Geographic
Boundaries Lack Standing. ...................................................................12

      D.     Objectors Who Signed Releases With The GCCF Lack Standing. ........13

      E.     GO FISH Lacks Standing. .....................................................................13

      F.     Non-Settling Defendants Such As Halliburton Lack Standing..............14

      G.     Governmental Entities Lack Standing. .................................................15

           1.     The Settlement Agreement Does Not Create Standing For The
Gulf States By Injuring Them In Their Own Right. ...................16

           2.     CAFA Does Not Confer Standing On The Gulf States. ............16

           3.     The Gulf States May Not Exercise *Parens Patriae* Authority To
Advance The Supposed Financial Interests Of A Narrow Subset Of
Their Citizens................................................................................17

IV.    None Of The Objections Submitted By Class Members Overcomes The
Presumption In Favor Of The Fairness, Reasonableness, And Adequacy Of
The Settlement.........................................................................................................18

      A.     Procedural Objections To The Settlement Lack Merit. ........................18

           1.     Uniquely, The Settlement Program Began Operations Before
Settlement Approval, And It Continues Processing Claims. ......18

2.  Claimants Have No Right To Have The Settlement Program Determine Their Compensation Prior To The Opt-Out Deadline. ...........19

3.  The Settlement Program Has Provided An Unprecedented Degree Of Support To Claimants. ...........................................................21

4.  Consistent With OPA, BP Has Made An Interim Claims Process Available. ............................................................................24

5.  The Settlement Agreement Generously Allows The Submission Of Multiple Claims Within A Six-Month Period..............................24

6.  The Parties Did Not Improperly Rely On Confidential Information From The GCCF To Exclude Valid Claims. ...............................25

7.  The Settlement Agreement's Provisions For Minors And Incompetents Are Fair And Reasonable. ....................................26

8.  No Unfairness Exists Because BP Is Permitted To Appeal Certain Classes of Awards. ...................................................................27

B.  Substantive Objections To The Settlement Lack Merit. .......................................28

1.  BP's Uncapped Liability In Virtually All Areas Answers Louisiana's "Indefinite Liability" Objection. ..............................28

2.  Economic Damage Compensation ............................................................29

3.  Property Damage ....................................................................................45

4.  Vessels of Opportunity ("VoO") Charter Payment ..................................54

5.  Vessel Physical Damage ..........................................................................56

6.  Subsistence Damage ................................................................................56

7.  Seafood Compensation Program..............................................................57

8.  The Parties' Agreement To Fund A Publicity Campaign Advertising The Gulf Coast Does Not Violate The *Cy Pres* Doctrine..................................................................................................74

9.  The Settlement's Level Of Compensation Is Fair, Reasonable, And Adequate; Comparisons To The GCCF Are Legally Irrelevant. ...............76

C.  Class Members Were Provided Clear Information About Their Rights..............77

1.  The Settlement Agreement Is Clear And Specific.....................................77

2.  Class Members Have The Necessary Information To Understand Their Claims Against BP. ..........................................................................79

3.  The Settlement Notice Was More Than Adequate. ..................................80

   D.    The Remaining Objections Do Not Counsel Against Final Approval...................83

        1.    The Scope Of The Release Is Reasonable. ................................................83

        2.    The Settlement Is Not Coercive Because The Alternative Is Litigation........................................................................................................83

        3.    Some Objections Are Too Unique To The Objector To Call Into Question The Overall Fairness And Adequacy Of The Settlement..........84

        4.    BP's Position Regarding Federal Rule Of Civil Procedure 23 And Attorney's Fees Objections.........................................................................84

        5.    Hurricane Isaac Does Not Counsel Against Approval Of The Settlement. ................................................................................................86

        6.    The Remaining Objections Are Indiscernible...........................................87

**V.**    **The Non-Objections Filed By Parties Lacking Standing Raise No Issues That Call The Propriety Of Settlement Into Question. .......................................................88**

**CONCLUSION** .........................................................................................................**90**

# TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>

*AIG, Inc. v. ACE INA Holdings, Inc.*,
  Nos. 07-2898, 09-2026, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ......................................... 9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*,
  458 U.S. 592 (1982) ................................................................................................ 17

*Arrastia v. United States*,
  455 F.2d 736 (5th Cir. 1972) .................................................................................. 27

*Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002) .............................................................................. 8

*Ayers v. Thompson*,
  358 F.3d 356 (5th Cir. 2004) ............................................................................ 4, 83

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*,
  51 F.3d 235 (11th Cir. 1995) ................................................................................ 26

*Bowling v. Pfizer, Inc.*,
  143 F.R.D. 141 (S.D. Ohio 1992) .......................................................................... 76

*Bryan v. Pittsburgh Plate Glass Co.*,
  494 F.2d 799 (3d Cir. 1974) ................................................................................... 7

*Cobell v. Salazar*,
  679 F.3d 909 (D.C. Cir. 2012) ................................................................................ 8

*Collins v. Sanderson Farms, Inc.*,
  568 F. Supp. 2d 714 (E.D. La. 2008) ....................................................................... 4

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ................................................................................ 8

*DeHoyos v. Allstate Corp.*,
  240 F.R.D. 269 (W.D. Tex. 2007) ............................................................................ 5

*Dennis v. Kellogg Co.*,
  --- F.3d ----, Nos. 11-55674, 1155706,
  2012 WL 3800230 (9th Cir. Sept. 4, 2012) ............................................................ 74

*Dobson v. Camden*,
  705 F.2d 759 (5th Cir. 1983) ................................................................................ 52

*Domingue v. Sun Elec. & Instrumentation, Inc.*,
  No. 09-682, 2010 WL 1688793 (M.D. La. Apr. 26, 2010) ........................................................ 4

*EEOC v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) ........................................................ 7

*Feder v. Elec. Data Sys. Corp.*,
  248 F. App'x 579 (5th Cir. 2007) ........................................................ 10

*Foreman v. Wood, Wire & Metal Lathers Int'l Union, Local No. 46*,
  557 F.2d 988 (2d Cir. 1977) ........................................................ 27

*Grant v. Bethlehem Steel Corp.*,
  823 F.2d 20 (2d Cir. 1987) ........................................................ 7

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ........................................................ 81

*Hammon v. Barry*,
  752 F. Supp. 1087 (D.D.C. 1990) ........................................................ 8

*Hosein v. Gonzales*,
  452 F.3d 401 (5th Cir. 2006) ........................................................ 11

*Huguley v. Gen. Motors Corp.*,
  925 F.2d 1464 (6th Cir. 1991) ........................................................ 7

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ........................................................ 14

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179 (2d Cir. 1987) ........................................................ 76

*In re Am. Bank Note Holographics*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ........................................................ 89

*In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*,
  263 F.R.D. 226 (E.D. Pa. 2009) ........................................................ 16

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000) ........................................................ 8

*In re Budeprion XL Mktg. & Sales Litig.*,
  MDL No. 09-2107, 2012 WL 4322012 (E.D. Pa. Sept. 21, 2012) ........................................................ 16

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) ........................................................ 8

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981) ........................................................ 79

v

*In re Diet Drugs Prods. Liab. Litig.*,
  Nos. 1203, 99-20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ........................................ 76

*In re Domestic Air Transp. Antitrust Litig.*,
  148 F.R.D. 297 (N.D. Ga. 1993) ............................................................................................ 31

*In re Exxon Valdez*,
  1995 A.M.C. 1429 (D. Alaska 1994) ...................................................................................... 65

*In re Gen. Am. Life Ins. Co. Sales Practices Litig.*,
  357 F.3d 800 (8th Cir. 2004) .................................................................................................. 83

*In re Global Crossing Sec. Litig.*,
  No. 02-910, 2005 WL 1668532 (S.D.N.Y. July 12, 2005) ......................................................... 9

*In re Holocaust Victim Assets Litig.*,
  413 F.3d 183 (2d Cir. 2005) ................................................................................................... 83

*In re Initial Pub. Offering Sec. Litig.*,
  243 F.R.D. 79 (S.D.N.Y. 2007) ............................................................................................... 53

*In re Motor Fuel Temperature Sales Practices Litig.*,
  MDL No. 07-1840, 2012 WL 1415508 (D. Kan. Apr. 24, 2012) ................................................. 9

*In re Newbridge Networks Sec. Litig.*,
  No. 94-1678, 1998 WL 765724 (D.D.C. Oct. 23, 1998) ........................................................... 89

*In re OCA, Inc. Sec. & Deriv. Litig.*,
  No. 05-2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009) ...................................................... 8, 25

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................................... 11

*In re Serzone Prods. Liab. Litig.*,
  MDL No. 1477, 2006 WL 2345988 (S.D. W. Va.  2006) ......................................................... 27

*In re Shell Oil Refinery*,
  155 F.R.D. 552 (E.D. La. 1993) ................................................................................................ 8

*In re SmithKline Beckman Corp. Sec. Litig.*,
  751 F. Supp. 525 (E.D. Pa. 1990) ............................................................................................. 8

*In re Terazosin Hydrochloride Antitrust Litig.*,
  No. MDL 99-1317, 2005 WL 2451960 (S.D. Fla. July 8, 2005) ................................................. 5

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D. Del. 2002) .................................................................................................. 9

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
  396 F.3d 922 (8th Cir. 2005) ........................................................................ 11

*Iowa ex rel. Miller v. Block*,
  771 F.2d 347 (8th Cir. 1985) ......................................................................... 16

*Klein v. O'Neal, Inc.*,
  705 F. Supp. 2d 632 (N.D. Tex. 2010) .............................................................. 7

*Klier v. Elf Atochem N. Am., Inc.*,
  658 F.3d 468 (5th Cir. 2011) ......................................................................... 74

*Lane v. Facebook, Inc.*,
  --- F.3d ----, Nos. 10-16380, 10-16398,
  2012 WL 4125857 (9th Cir. Sept. 20, 2012) ........................................ 21, 75, 81

*Lenahan v. Sears, Roebuck & Co.*,
  266 F. App'x. 114 (3d Cir. 2008) ................................................................... 65

*Little v. Shell Exploration & Prod. Co.*,
  690 F.3d 282 (5th Cir. 2012) ......................................................................... 11

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 10

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ......................................................................... 83

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1995) .......................................................................... 81

*Moore v. United States*,
  63 Fed. Cl. 781 (2005) .................................................................................... 5

*Morris v. Voinovich*,
  106 F. App'x. 962 (6th Cir. 2004) .................................................................. 27

*Newman v. Stein*,
  464 F.2d 689 (2d. Cir. 1972) ......................................................................... 20

*O'Brien v. Brain Research Labs, LLC*,
  No. 12-204, 2012 WL 3242365 (D.N.J. Aug. 9, 2012) ........................................ 9

*Parker v. Anderson*,
  667 F.2d 1204 (5th Cir. 1982) ......................................................................... 9

*People ex rel. Hartigan v. Cheney*,
  726 F. Supp. 219 (C.D. Ill. 1989) ................................................................... 16

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) ...................................................................... 31

*Quintanilla v. A & R Demolition Inc.*,
No. 04-1965, 2007 WL 5166849 (S.D. Tex. May 7, 2007) ....................................... 8

*Reed v. Gen. Motors Corp.*,
703 F.2d 170 (5th Cir. 1983) .......................................................................... *passim*

*Robinson v. Ford Motor Co.*,
No. 04-844, 2005 WL 5253339 (S.D. Ohio June 15, 2005) ................................. 5, 8

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) .......................................................................... 81

*Shaffer v. Cont'l Cas. Co.*,
362 F. App'x 627 (9th Cir. 2010) .................................................................... 9

*Smith v. Sprint Commc'ns Co.*,
No. 99-3844, 2003 WL 103010 (N.D. Ill. Jan. 10, 2003) ..................................... 9

*Stobnicki v. Textron, Inc.*,
868 F.2d 1460 (5th Cir. 1989) ........................................................................ 4

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003) ............................................................... 8

*Turner v. Gen. Elec. Co.*,
No. 05-186, 2006 WL 2620275 (M.D. Fla. Sept. 13, 2006) .................................. 9

*Turner v. Murphy Oil USA, Inc.*,
234 F.R.D. 597 (E.D. La. 2006) ............................................................... 31, 76

*Turner v. Murphy Oil USA, Inc.*,
No. 05-4206, 2007 WL 4208986 (E.D. La. Nov. 21, 2007) .................................. 26

*UAW v. GMC*,
235 F.R.D. 383 (E.D. Mich. 2006), *aff'd Int'l Union,*
*United Auto., Aerospace, & Agric. Implement Workers of Am.*
*v. GMC*, 497 F.3d 615 (6th Cir. 2007) ............................................................ 80

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) .......................................................................... 4

*United States v. Mendiola*,
42 F.3d 259 (5th Cir. 1994) ............................................................................ 27

*United States v. New Jersey*,
 No. 88-5087, 1995 WL 1943013 (D.N.J. Mar. 14, 1995) .......................................... 5

*Warfield v. Fidelity & Deposit Co.*,
 904 F.2d 322 (5th Cir. 1990) ...................................................................... 36

*Whitford v. First Nationwide Bank*,
 147 F.R.D. 135 (W.D. Ky. 1992) .................................................................. 5

*Williams v. First Nat'l Bank*,
 216 U.S. 582 (1910) ............................................................................... 4

## STATUTES

28 U.S.C. § 1715(f) ................................................................................. 16

33 U.S.C. § 2713 ................................................................................... 26

## RULES

2 NEWBERG ON CLASS ACTIONS § 11.47 (2d ed.) .................................................. 8

4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.) ............................................. 4, 83

## INTRODUCTION

None of the objections filed, taken either individually or as a whole, provides a basis for denying final approval to the Economic and Property Damages Settlement Agreement (the "Settlement" or "Settlement Agreement"). Indeed, the remarkably low number of objections and opt-out requests is strong, objective evidence that the Settlement should be approved.

Critically, none of the objectors makes any attempt to rebut the generosity of the Settlement. The objectors do not contest the many unique features of the Settlement that make claimants more than whole, including:

(1) ***All Compensatory Damages To Class Members Are Being Paid***: BP has taken the extraordinary step of agreeing to pay ***all*** of the Class's compensatory damages even though the spill was a multi-party, multi-causal event to which Transocean and Halliburton were significant, if not predominating, contributors, and even though neither Transocean nor Halliburton has contributed a penny to this Settlement.

(2) ***RTPs Are Provided On Top Of Compensatory Damages***: In most instances, claimants will receive Risk Transfer Premiums ("RTPs") over and above their baseline compensatory damage awards, thus fully compensating them for all potential future, claimed, and unknown losses.

(3) ***Assignment Of Claims Against Transocean And Halliburton***: The Settlement Agreement assigns to the Class BP's spill-related claims against Transocean and Halliburton, which allows for the prospect of additional recoveries by class members that would exceed the total of already generous baseline compensation plus RTP enhancements.

(4) ***No Delay In Commencement Of Settlement Payments***: These benefits are available now, making the Settlement superior not only to the alternative of protracted litigation (as occurred in the *Exxon Valdez* and *Amoco Cadiz* cases), but also to any other class settlement of which counsel is aware.

None of the objections — whether made by those with standing or without — can overcome the combined benefits created by these and other unique features of this Settlement. Instead of explaining why the Settlement is not fair, many objectors simply argue for even more generous recoveries. Most of the objections fall into three broad categories, all of which lack merit.

**First,** the sole complaint of many purported objectors is that that they are not included in the Settlement. Far from demonstrating that the Settlement is unfair, the persistent desire of these "objectors" to access the Settlement's benefits only underscores its attractiveness and value. Others seek to join the Settlement after having already signed releases of their claims against BP, effectively asking to be paid twice. None of these objectors has standing.

**Second,** a handful of objectors protest the Settlement's procedures. For example, some objectors assert that claims are being paid too slowly. But the fact that claims are being paid at all at this stage of the proceedings — before a final approval order — is a unique benefit as compared to the standard class settlement where claimants receive no payments until after final approval, and often must wait for months to be paid, whether for a claims facility to be established, limited-fund claims to be received, or for the resolution of appeals. Other aspects of the Settlement are similarly favorable to claimants, such as allowing class members to make multiple claims over a six-month period and providing substantial resources to assist class members in making claims to ensure they receive the maximum benefit to which they are entitled under the Settlement.

**Third,** other objectors complain about the merits of the Settlement, typically by contending that certain class members are treated more generously than others. Outside the Seafood Compensation Program ("SCP"), however, payments to one class member will have no conceivable effect on payments to another. Moreover, the frameworks were carefully negotiated — with the support of numerous experts — to reflect the strength of class members' claims. And even in the case of the SCP, its ample $2.3 billion funding and the Program's design by a Court-appointed neutral will ensure that all claimants will be made more than whole in the first-round distribution and that participants will, in addition, share generous payments from a second-

round distribution. Indeed, as thousands of class members stated in endorsing the Settlement just days ago, "the agreement provides that $2.3 billion will be paid, regardless of the fact that the total claims submitted under the program may be a lesser amount. This makes it a guarantee rather than a 'cap,'" ensuring that "BP has no incentive to minimize any plaintiff's individual claim." Rec. Doc. 7710 at 10.

The record shows that this Settlement stands as a model for harmonizing the requirements of Rule 23 class actions with the core objectives for efficient claims resolution that Congress built into the architecture of the Oil Pollution Act of 1990 ("OPA"):

> Since **the primary purpose of this Act is to guarantee that claimants will receive rapid and equitable compensation for any economic loss suffered as the result of an oil spill**, the Committee expects that the claims settlement procedures … will be formulated with this purpose in mind. Particular care should be taken to **avoid unnecessary procedural delays or overly complicated bureaucratic processes**. Claimants should be afforded from the beginning a clear idea of their rights and obligations, and the administrative process established should recognize that **severe hardships may be engendered for some claimants if there are delays in the settlement of claims**.

H.R. Rep. No. 101-242, pt. 2, at 67 (1989) (emphasis added); *see also* Coffee Decl. (Rec. Doc. 7110-3) ¶ 13 ("[This settlement represents exactly the type of outcome that OPA was intended to produce . . . . The key goals of OPA — *i.e.*, prompt resolution and fair compensation — are consistent with the superiority standard of Rule 23(b)(3) and both favor an expeditious resolution that fosters the economic and social recovery of the Gulf Coast region."); Miller Decl. (Rec. Doc. 7114-16) ¶ 12 ("[This is] perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field.").

For these and the other reasons discussed by BP in its moving papers, the objections lack merit, and the Settlement should be approved. Any contrary ruling not only would be unjustified under the law and the facts, but would, in effect, inflict its own injury on class members.

3

**ARGUMENT**

The governing legal standard as to whether to grant final approval to the Settlement is set

forth in the six "*Reed*" factors:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity,
> expense and likely duration of the litigation; (3) the stage of the proceedings and
> the amount of discovery completed; (4) the probability of plaintiffs' success on
> the merits; (5) the range of possible recovery; and (6) the opinions of the class
> counsel, class representatives, and absent class members.

*Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) (quoting *Reed v. Gen. Motors Corp.*, 703

F.2d 170, 172 (5th Cir. 1983)); *accord, e.g.*, *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669

F.3d 632, 639 n.11 (5th Cir. 2012).  None of the objections raises any viable issue under any of

the *Reed* factors; nor do they justify rejection of the Settlement.

## I.    The Settlement Is Presumptively Fair, Reasonable, And Adequate.

Courts have "an interest in encouraging settlements, particularly in class actions."

4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.); *accord, e.g.*, *Williams v. First Nat'l Bank*, 216

U.S. 582, 595 (1910); *Stobnicki v. Textron, Inc.*, 868 F.2d 1460, 1465 (5th Cir. 1989).  The

courts' preference for settlement and compromise translates into "a strong presumption in favor

of finding a settlement fair."  *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D.

La. 2008) (quotation omitted); *see also, e.g.*, *Domingue v. Sun Elec. & Instrumentation, Inc.*, No.

09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010).

When applied here, this presumption promises to avoid a thicket of never-ending

litigation.  Litigating the myriad claims that would be resolved under the Settlement would take

years, or perhaps even decades, as in the *Exxon Valdez* and *Amoco Cadiz* cases.  This Court has

scheduled a multi-phase trial on liability (and each phase will take months to complete) with

further MDL proceedings and appeals also taking years to resolve.  By contrast, this Settlement

will provide swift and sure compensation on a class-wide basis.  If ever a case illustrated the

benefits that a presumption in favor of compromise can deliver, this case is it.[1]

## II.     The Low Number Of Objections And Opt-Outs Further Confirms The Fairness, Reasonableness, And Adequacy Of The Settlement.

This Settlement resolves a multitude of claims — indeed, most spill-related private claims.  Approximately 110,000 short-form joinders have been filed into the B1 complaint, and more than 71,000 claims have been filed with the Settlement Program.  *See* Monger Supp. Decl. (Joint Ex. E) ¶ 13.  Yet the Settlement has drawn objections from only a small fraction of the total class members:   Only ***217*** objections have been filed.[2]   The total number of objectors ostensibly represented by these filings is approximately 13,782, but 96% (13,315) of these purported objectors are simply names on lists submitted by a few counsel purporting to represent four large groups of alleged objectors.[3]  Of those names, at least 1,295 do not reside within the class geography, and 3,713 could not be located because the objector failed to comply with this Court's Preliminary Approval Order by failing to provide a valid address.  *See* Rec. Doc. 6418 ¶ 38.  *See* Fishkind Supp. Decl. (Ex. 2) ¶ 2 n.1.

Moreover, counsel for one of these large groups overstated the number of actual clients

---

[1] Some courts have held that an additional presumption of fairness applies where, as here, the court has already preliminarily approved a settlement.  *See, e.g.*, *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 293 (W.D. Tex. 2007) ("'Once the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable.'") (quoting *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 138-39 (W.D. Ky. 1992)); *Robinson v. Ford Motor Co.*, No. 04-844, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005); *In re Terazosin Hydrochloride Antitrust Litig.*, No. MDL 99-1317, 2005 WL 2451960, at *5 (S.D. Fla. July 8, 2005); *United States v. New Jersey*, No. 88-5087, 1995 WL 1943013, at *11 (D.N.J. Mar. 14, 1995); *Moore v. United States*, 63 Fed. Cl. 781, 784 (2005).  Whether or not that additional presumption is applied here, the small body of objections here do not call the Settlement's fairness into question.

[2] The majority of those objections are filed in 10 Civ. 7777 (E.D. La.), the separate objections docket that the Court established for this purpose.  Citations introduced by "Obj. Doc." refer to entries appearing on that docket.

[3] *See* Obj. Doc. 122, filed by Brent Coon & Assoc., P.C., which lists 11,253 objectors; Obj. Doc. 198 and Rec. Doc. 7217, filed by Farrell & Patel, which collectively list 824 unique objectors; Obj. Docs. 167 & 189, two identical objections filed by Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman & McKee, P.A. and Smith Stag, L.L.C. on behalf of the same purported clients, which lists 664 objectors; and Obj. Doc. 209, filed by Arnold & Itkin LLP, which lists 574 objectors.  Notably, while Brent Coon & Assoc., P.C. purports to represent 13,000 clients, *see* Obj. Doc. 122 at 7, its list of clients includes only 11,253 unique names.

by well over a thousand, and included 314 duplicate names as well. These "mass" objection filings do not even attempt to show that these individuals will suffer any unfair prejudice as a result of the Settlement.  Nor is there any basis to believe that the mass filings of unsupported objections by a particular lawyer reflects anything other than the objecting lawyer's own personal views.  Even at that level, the lawyers' views are not clear:  Each of the firms purporting to represent these groups of objectors has also submitted claims to the Settlement Program on behalf of its clients.[4]  In assessing the merit of these objections, the Court will have to consider how counsel can represent one group of claimants seeking the Settlement's benefits, while simultaneously seeking to defeat that very same Settlement on behalf of a few objectors.

The number of legitimate objections is reduced even further if one applies the criteria specified in the Court's Preliminary Approval Order, requiring that each objector submit proof of membership in the class.  *See* Rec. Doc. 6418 ¶ 38.  As an initial matter, 49 out of the 217 objections were made on behalf of 97 "objectors" who by their own factual assertions lack standing to object;[5] indeed, the substance of their objections is that they were not included in the Settlement.  An additional 16 purported objections were filed by governments or associations that by definition lack standing to object.[6]  Moreover, only 51 of the remaining objections were

---

[4] For example, Brent Coon & Assoc., P.C. has submitted 1,342 claims on behalf of its clients; Farrell and Patel has submitted 402 claims on behalf of its clients; Krupnick Campbell has submitted 671 claims on behalf of its clients; and Smith Stag has submitted 76 claims on behalf of its clients; Arnold & Itkin, LLP has submitted 158 claims on behalf of its clients.  *See* Odom Decl. (Joint Ex. F) Tab 1 tbl. 8.

[5] *See* Obj. Doc. 33; Obj. Doc. 34; Obj. Doc. 35; Obj. Doc. 36; Obj. Doc. 37; Obj. Doc. 42; Obj. Doc. 43; Obj. Doc. 45; Obj. Doc. 46; Obj. Doc. 51; Obj. Doc. 67; Obj. Doc. 70; Obj. Doc. 71; Obj. Doc. 87; Obj. Doc. 88; Obj. Doc. 90; Obj. Doc. 97; Obj. Doc. 98; Obj. Doc. 99; Obj. Doc. 100; Obj. Doc. 118; Obj. Doc. 125; Obj. Doc. 127; Obj. Doc. 131; Obj. Doc. 134; Obj. Doc. 142; Obj. Doc. 143; Obj. Doc. 146; Obj. Doc. 148; Obj. Doc. 152; Obj. Doc. 154; Obj. Doc. 161; Obj. Doc. 177; Obj. Doc. 181; Obj. Doc. 188; Obj. Doc. 190; Obj. Doc. 191; Obj. Doc. 237; Obj. Doc. 240; Obj. Doc. 242; Obj. Doc. 243; Obj. Doc. 244; Obj. Doc. 250; Obj. Doc. 252; Obj. Doc. 253; Rec. Doc. 6317; Rec. Doc. 6345; Rec. Doc. 6382; Rec. Doc. 6383.

[6] *See* Obj. Doc. 3; Obj. Doc. 21; Obj. Doc. 59; Obj. Doc. 147; Obj. Doc. 217; Obj. Doc. 223; Obj. Doc. 224; Obj. Doc. 226; Obj. Doc. 227; Obj. Doc. 228; Obj. Doc. 239; Rec. Doc. 6353; Rec. Doc. 6356; Rec. Doc. 6368; Rec. Doc. 6402; Rec. Doc. 6404.

accompanied by affidavits or other documentation that attempted to demonstrate — as required by the Court — that all of the objectors have standing to object.[7]  An additional seven objections provided substantiation for some, but not all, of the objectors referenced in the objection.[8]  Together, these 58 objections provided documentation that arguably satisfies the Court's criteria for only 792 objectors — less than 5.7% of the total number of objectors.

The small number of objections (and the even smaller number of properly filed objections) is consistent with the low number of individuals who have chosen to opt out of the Settlement.  As of October 19, 2012, 983 opt-out requests have been submitted, not all of which were submitted by class members.  Cirami Decl. (Joint Ex. C) ¶ 3.  Additionally, 173 opt-out requests have been validly revoked.  *Id.*  Thus, only a miniscule percentage of the class has asked to be excluded from the Settlement.

Courts, including the Fifth Circuit, have approved settlements with far higher objection rates.  *See, e.g.*, *Reed*, 703 F.2d at 174-75 (approving settlement over objections by 30% of class); *see also Huguley v. Gen. Motors Corp.*, 925 F.2d 1464, at *3 (6th Cir. 1991) (table) (per curiam) (15% of the class); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987) (36% of the class); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985) (15% of the class); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974) (20% of the class); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 661 (N.D. Tex. 2010) ("significant portion of the class").  Given the tiny number of opt-outs to date and the large size of the class, it is no

---

[7] *See* Obj. Doc. 2; Obj. Doc. 13; Obj. Doc. 28; Obj. Doc. 39; Obj. Doc. 50; Obj. Doc. 52; Obj. Doc. 53; Obj. Doc. 54; Obj. Doc. 55; Obj. Doc. 72; Obj. Doc. 77; Obj. Doc. 78; Obj. Doc. 79; Obj. Doc. 80; Obj. Doc. 81; Obj. Doc. 82; Obj. Doc. 83; Obj. Doc. 84; Obj. Doc. 85; Obj. Doc. 86; Obj. Doc. 94; Obj. Doc. 95; Obj. Doc. 96; Obj. Doc. 101; Obj. Doc. 114; Obj. Doc. 115; Obj. Doc. 117; Obj. Doc. 120; Obj. Doc. 126; Obj. Doc. 132; Obj. Doc. 133; Obj. Doc. 135; Obj. Doc. 137; Obj. Doc. 138; Obj. Doc. 140; Obj. Doc. 144; Obj. Doc. 145; Obj. Doc. 150; Obj. Doc. 151; Obj. Doc. 156; Obj. Doc. 157; Obj. Doc. 159; Obj. Doc. 162; Obj. Doc. 183; Obj. Doc. 184; Obj. Doc. 186; Obj. Doc. 206; Obj. Doc. 210; Obj. Doc. 230; Obj. Doc. 246; Rec. Doc. 6405.

[8] *See* Obj. Doc. 14; Obj. Doc. 104; Obj. Doc. 167; Obj. Doc. 189; Obj. Doc. 198; Obj. Doc. 225; Obj. Doc. 234.

exaggeration that the number of opt-outs would still weigh in favor of final approval even if it were to increase by a factor of **ten, twenty**, or far more before the November 1 opt-out deadline.

"While the fact that a relatively small percentage of the Class Members objects to a proposed settlement is not dispositive, '[c]ourts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'" *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990) (alteration in original) (quoting 2 H. NEWBERG, NEWBERG ON CLASS ACTIONS § 11.47, at 463 (2d ed.)); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered . . . ."); *In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2009 WL 512081, at *15 (E.D. La. Mar. 2, 2009) (same principle); *Quintanilla v. A & R Demolition Inc.*, No. 04-1965, 2007 WL 5166849, *5 (S.D. Tex. May 7, 2007) (same principle); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (same principle); *see also Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012) ("Indeed, the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'").[9]

---

[9] *See also Robinson*, 2005 WL 5253339, at *5-6 (sparse number of opt outs supported approval of settlement); *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("[A] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness."); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Lazy Oil Co v. Wotco Corp.*, 95 F. Supp. 2d 290, 332 (W.D. Pa. 1997) ("[I]n the class action context, silence may be construed as assent.") (alteration in original); *In re Shell Oil Refinery*, 155 F.R.D. 552, 566-67 (E.D. La. 1993) (relatively small number of objections and opt outs supported fairness of the settlement); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990) ("[T]he utter absence of objections and the nominal number of shareholders who have exercised their right to opt out . . . militate strongly in favor of approval of the settlement.").

Finally, this small group of objectors has a simple solution to their complaints: opt out. As one court recently stated in approving a class settlement, the "court will not dismantle this settlement for the sake of one class member's unique demands, particularly when the class member . . . had the right (and the means) to opt out and pursue its individual claims without disturbing the settlement for the rest of the class." *AIG, Inc. v. ACE INA Holdings, Inc.*, Nos. 07-2898, 09-2026, 2012 WL 651727, at *11-12 (N.D. Ill. Feb. 28, 2012); *cf. Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) ("[T]he named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands."). Courts regularly explain that if class members object to the terms of a class settlement — such as by claiming that their own compensation is too low or the release is too broad — their remedy is to opt out.[10]   Likewise, each of the objectors here is free to opt out and pursue any claims it may have outside the Settlement, leaving the vast majority of the class to enjoy the benefits under the Settlement.[11]

## III.   Objectors Who Lack Standing Should Not Be Allowed To Derail The Settlement.

As the Court has held repeatedly, only those with standing may object to the Settlement. *See* Rec. Doc. 6418 at 16-17; Rec. Doc. 7038 at 1; Rec. Doc. 7358 at 4-5; Rec. Doc. 7480 at 9. Objections from those who will not be affected by the Settlement should not be allowed to

---

[10] *See, e.g.*, *Shaffer v. Cont'l Cas. Co.*, 362 F. App'x 627, 630 (9th Cir. 2010) ("Moreover, potential class members had the opportunity to opt out of the settlement if they disagreed with the theory under which class counsel prosecuted the case."); *O'Brien v. Brain Research Labs, LLC*, No. 12-204, 2012 WL 3242365, at *15 (D.N.J. Aug. 9, 2012); *In re Motor Fuel Temperature Sales Practices Litig.*, MDL No. 07-1840, 2012 WL 1415508, at *15 n.30 (D. Kan. Apr. 24, 2012); *In re Global Crossing Sec. Litig.*, No. 02-910, 2005 WL 1668532, at *3 (S.D.N.Y. July 12, 2005); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (D. Del. 2002); *Turner v. Gen. Elec. Co.*, No. 05-186, 2006 WL 2620275, at *7 (M.D. Fla. Sept. 13, 2006); *In re Managed Care Litig.*, MDL No. 1334, 2003 WL 22850070, at *2 (S.D. Fla. Oct. 24, 2003); *Smith v. Sprint Commc'ns Co.*, No. 99-3844, 2003 WL 103010, at *2 (N.D. Ill. Jan. 10, 2003); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 482 (S.D.N.Y. 1998).

[11] It is noteworthy that the vast majority of objectors in fact is represented by only five law firms.  Thus, this is not a case in which the objectors reflect the views of many thousands of different people and businesses; instead, a small handful of firms claims to have persuaded an uncertain number of clients to object *en masse*.  We leave it to the Court to weigh the credibility of such lawyer objections.

deprive class members of the Settlement's benefits.

**A.    The Burden To Establish Standing Falls Individually On Each Objector. Collective Allegations Do Not Suffice.**

The burden is on putative objectors to demonstrate that they have standing.  *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579 (5th Cir. 2007) (per curiam) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("[E]ach element [of the three-part standing inquiry] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.")).[12]  Objectors must establish standing with specificity so that the Court may ensure that it is only considering the fairness of the Settlement for the absent class members that it is charged with protecting, and to make a record for any subsequent judicial review.

Notwithstanding the Court's orders, objectors without standing have continued to submit objections.  In fact, nearly all (96%) of the putative objectors have failed to submit objections that comply with the Preliminary Approval Order's clear requirements for objections:

> The written statement of the objection(s) must include (a) a detailed statement of the Economic Class Member's objection(s), as well as the specific reasons, if any, for each objection, including any evidence and legal authority the Class Member has to support each objection and any evidence the Class Member has in support of his/her/its objection(s); (b) the Economic Class Member's name, address and telephone number; (c) *written proof that the individual or entity is in fact an Economic Loss and Property Damage Class Member, such as proof of residency, ownership of property and the location thereof, and/or business operation and the location thereof*; and (d) any other supporting papers, materials or briefs the Economic Class Member wishes the Court to consider when reviewing the objection.  *Any Class Member who fails to comply with these provisions shall waive and forfeit any and all rights to object to the Proposed Settlement, shall be forever foreclosed from making any objection to it, and shall be bound by all the terms of the Proposed Settlement and by all*

---

[12] Because the Court is considering a request to enter a final judgment based in part on facts submitted by the parties that can be contested by objectors with standing, *Lujan* counsels that the Court should demand the same degree of proof of standing that it would in considering a motion for summary judgment, if not the proof that it would require at trial to prove a disputed fact.

>*proceedings, orders and judgments in this matter.*

Rec. Doc. 6418 ¶ 38 (emphasis added).

These provisions of the Preliminary Approval Order are not merely procedural. Rather, they embody the basic elements of standing law. Constitutional standing mandates three elements: "(1) an injury in fact, (2) that the injury is fairly traceable to the challenged conduct, and (3) that a victory in litigation will likely redress the injury." *Little v. Shell Exploration & Prod. Co.*, 690 F.3d 282, 285 (5th Cir. 2012). Meeting each of the three Article III requirements is each objector's own inescapable and individualized burden. *See, e.g.*, *Hosein v. Gonzales*, 452 F.3d 401, 404 (5th Cir. 2006) (per curiam); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932, 934 nn.7-8 (8th Cir. 2005) (class member that challenged release of a certain cause of action lacked standing to object on that ground since that particular class member never asserted that particular cause of action); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1044 (N.D. Cal. 2008) (simply being a class member was not enough to provide standing to object; class member must be "aggrieved").

Hardly any of the objectors can match together these key elements of constitutional standing. For instance, most of the objections fail to allege, much less demonstrate, any link between a claimed injury and how an objection could be sustained to alleviate such an injury. A proper standing objection under the law as well as this Court's Preliminary Approval Order would look like this: "(a) Jane Smith owns a business at a particular address; (b) Ms. Smith owned that business during the relevant time frame; (c) the business is not excluded from the class; (d) the business suffered injury from the spill during the relevant time period; (e) there is proof of each the preceding points, such as documentation demonstrating ownership and showing that the business suffered some injury compensable under the Settlement; and (f) granting Ms. Smith's objection would improve her compensation for an injury recoverable

under the Settlement."  Virtually none of the objections makes even those *prima facie* showings.
Hence, they must be dismissed for lack of standing, for noncompliance with the Preliminary
Approval Order, or both.  And, of course, even where the objectors can satisfy the standing
requirements, that would not mean their objections have validity or merit.

**B.     Objectors With Claims That The Parties Have Not Agreed To Settle Lack Standing.**

A number of "objections" are from those who assert claims the parties have not agreed to
settle and who complain that their claims are not eligible for compensation.[13]  In other words,
their "objection" is that they want to be in the Settlement, not out of it.  Such individuals will not
be affected in any way by the Settlement, *see* Rec. Doc. 7114-1 at 77, and they thus lack
standing.  Nevertheless, their desire to force their way into the Settlement constitutes substantial
evidence of the Settlement's fairness.

**C.     Objectors Who Do Not Fall Within The Settlement Class's Geographic Boundaries Lack Standing.**

Certain objectors fall outside the geographic boundaries of the Settlement Class and
therefore are unaffected by the Settlement.[14]  *See* Dent Supp. Decl. (Ex. 1) ¶ 8 & App'x 1.
(objectors have filed objections relating to 569 parcels which are not eligible for compensation
under the Wetlands, Coastal or Real Property Sales Frameworks because the parcels are located

---

[13] *See, e.g.*, Obj. Doc. 66 (employment in oil and gas industry); Obj. Doc. 95 at 5 (oil companies and banks); Obj. Doc. 210 (adopting this objection); Obj. Doc. 131 (moratorium claims); Obj. Doc. 67 at 1-2 (real estate sale after December 31, 2010); Obj. Doc. 152 at 2 (same); Obj. Doc. 191 (same); Obj. Doc. 253 (same); Obj. Doc. 161 at 1-2 (day trading losses allegedly related to the spill); Obj. Doc. 201 at 2-3 (moratorium claims); Obj. Doc. 201 at 4-5 (pure stigma claim); Obj. Doc. 252 (loss of earnest money following decision not to close on house).

[14] *See, e.g.*, Obj. Doc. 87 at 2-3 (exclusion from Coastal Real Property zone); Obj. Doc. 121 (exclusion from SCP); Obj. Doc. 134 at 1 (exclusion from Real Property Sales Compensation zone); Obj. Doc. 148 at 2 (exclusion from Coastal Real Property zone); Obj. Doc. 152 at 1-2 (exclusion from Real Property Sales Compensation zone); Obj. Doc. 167 at 6 (exclusion  from unspecified frameworks); Obj. Doc. 189 at 6 (same); Obj. Doc. 201 at 4-7 (exclusion from Coastal Real Property zone); Obj. Doc. 225 at 3-8 (same); Obj. Doc. 237 (exclusion from economic loss frameworks); *see also* Letter From Pam Bondi, Fla. Att'y Gen., to John E. (Jack) Lynch, Jr. (July 31, 2012), *available at* http://myfloridalegal.com/webfiles.nsf/WF/MMFD-8WRSHG/$file/8.1.12BPMEMO.pdf (complaining that certain Floridians are excluded from the class).

outside of the zones set forth in those Frameworks).  Furthermore, a series of form objectors, recognizing that their properties fall outside both the Coastal Real Property zone and the Wetlands Real Property zone, describe themselves only as "potential" members of the class.[15] These objectors are not class members; they lack standing.

### D.    Objectors Who Signed Releases With The GCCF Lack Standing.

Other objections are from claimants who settled with the GCCF and executed final releases.[16]  Those claimants, who apparently seek a double recovery, are excluded from the class. *See* Settlement Agreement ¶ 2.2.6.  These final releases and covenants not to sue are valid and enforceable, *see* Rec. Doc. 7615 (denying motions to nullify GCCF releases); *see also* Rec. Doc. 7114-1 at 83, but even if they were not, the more foundational point is that the Settlement does not affect the rights of those who have signed GCCF releases.

Thus, for example, the Mississippi Attorney General again has objected that the Settlement excludes persons who signed GCCF releases.[17]  Mississippi lacks standing to opine on the fairness of the Settlement.  *See infra* Section III.F.  Moreover, the citizens on whose behalf Mississippi attempts to object are not affected by the Settlement because those who signed GCCF releases were excluded from the class, and thus would lack standing even if they were appearing on their own behalf to object.

### E.    GO FISH Lacks Standing.

"GO FISH," an advocacy group formed following the spill, has submitted an objection. *See* Obj. Doc. 226.  In opposing GO FISH's discovery requests, BP explained that GO FISH

---

[15]  *See, e.g.*, Obj. Doc. 88 at 1; Obj. Doc. 97 at 1; Obj. Doc. 98 at 1; Obj. Doc. 99 at 1; Obj. Doc. 100 at 1; Obj. Doc. 146 at 1; Obj. Doc. 157 at 1; Obj. Doc. 159 at 1; Obj. Doc. 177 at 1; Obj. Doc. 181 at 1.

[16]  *See, e.g.*, Obj. Doc. 70; Obj. Doc. 71; Obj. Doc. 125; Obj. Doc. 127; Obj. Doc. 154 at 2; Obj. Doc. 230 at 39-43; Obj. Doc. 234 at 34-36; Obj. Doc. 242; Obj. Doc. 244; Obj. Doc. 250.

[17]  *See*  Obj. Doc. 224 at 2; *see also* Obj. Doc. 239 (adopting the arguments made by Mississippi).

lacked standing to conduct discovery because it is not a class member and cannot satisfy the test for organizational standing set out in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).  *See* Rec. Doc. 7411 at 15-16.  In denying GO FISH's discovery requests, Judge Shushan agreed that GO FISH lacks standing.  *See* Rec. Doc. 7480 at 9.  BP has submitted a brief explaining why Judge Shushan's ruling was correct, which BP incorporates by reference here.  *See* Rec. Doc. 6749.

### F.      Non-Settling Defendants Such As Halliburton Lack Standing.

Non-settling defendants lack standing to object to a settlement, save for the narrow exception where the agreement causes a non-settling defendant plain legal prejudice.  Thus, the Court has concluded that Halliburton lacks standing to challenge the proposed settlements on every occasion that the issue has been presented.  *See* Rec. Doc. 6418 at 17 n.18; Rec. Doc. 7038 at 2.  Despite the Court's rulings, Halliburton's objection rehashes points it made in seeking to take settlement discovery.  *Compare* Rec. Doc. 7036 at 7-9 (objection listing ten bullet points), *with* Obj. Doc. 91 at 15-17 (discovery letter listing same bullet points).  Indeed, these points are recycled from Halliburton's preliminary objections to the Settlement — which this Court also rejected.  *See* Rec. Doc. 7037 App'x A.  In short, Halliburton says nothing new that should lead the Court to revisit its prior standing rulings.  Moreover, Transocean, which is situated identically to Halliburton for these purposes, agrees that it is not prejudiced by the Settlement in any way.  *See* Rec. Doc. 7034.

The Court recently granted Halliburton's motion to file an amended answer to the amended B1 complaint.  *See* Rec. Doc. 7683 (granting Rec. Doc. 7632).  That answer contains 26 "affirmative defenses" that are, in reality, attacks on the Settlement Agreement.  *See* Rec. Doc. 7632-2 at 129-133.  These "defenses" consist mostly of arguments the Court has already rejected.  In them, Halliburton contends that there will be a "collusive alliance between BP and

14

the settling Plaintiffs" at trial.  Rec. Doc. 7632-2 at 134.  Such a claim is unripe and does not

provide valid reason not to approve the Settlement Agreement.  Moreover, even if Halliburton's

new affirmative defense were construed as alleging collusion that began during the settlement

negotiations, Halliburton presents no evidence whatsoever of any such collusion, and indeed

such an argument runs contrary to Judge Shushan's involvement and her recognition that the

negotiations were conducted in good faith and at arms' length.  *See, e.g.*, Rec. Doc. 7480 at 7;

*see also* Coffee Supp. Decl. (Joint Ex. D) ¶ 32 ("For any objector to assert collusion in the face

of this finding would be frivolous.").[18]  Halliburton's speculation that the Settlement Agreement

was the production of collusion is baseless.

### G.    Governmental Entities Lack Standing.

Governmental entities lack standing to object to the Settlement because (1) they are not

class members; (2) they cannot be injured by the Settlement; (3) the Class Action Fairness Act

does not create standing; and (4) they may not use the *parens patriae* doctrine to object on behalf

of a narrow band of their citizens.  *See* Rec. Doc. 7033 at 4-6; Rec. Doc. 7037 at  5-6; Rec. Doc.

7114-1 at 85-87.  In denying Louisiana's requests for discovery, the Court agreed that Louisiana

lacked standing.   *See* Rec. Doc. 7038 at 2.   Neither Louisiana nor any other state sought

reconsideration of this order.  Nevertheless, two states have submitted objections.  *See* Obj. Doc.

224 (Mississippi); Obj. Doc. 227 (Louisiana).  Neither of these states says anything to establish

the standing that the Court has correctly concluded they lack.

---

[18] The parties to the Settlement have jointly submitted the supplemental declaration of John C. Coffee, Jr., the Adolf
A. Berle Professor of Law at Columbia Law School and a leading expert in class action law.  Professor Coffee's
declaration sets forth his independent opinions regarding certification of the Economic and Property Damages
Settlement Class, which the parties agree should be considered by the Court.  BP agrees, for settlement purposes,
with Professor Coffee's conclusion that the proposed settlement class satisfies all the requisites for class certification
in this case, even though BP does not necessarily agree with every specific statement in his declaration.  It would be
inappropriate to utilize or apply this declaration outside the context of this class settlement.

1.      **The Settlement Agreement Does Not Create Standing For The Gulf States By Injuring Them In Their Own Right.**

In seeking discovery, Louisiana contended that it had standing because the Settlement injures the State in its own right, requiring it to pay increased unemployment benefits because the amount of compensation paid to class members is inadequate.  *See* Rec. Doc. 7035 at 5.  BP explained that (1) this argument would give a state standing to object to any settlement of a private dispute; and (2) federal courts have repeatedly rejected similar arguments.  *See* Rec. Doc. 7037 at 6.  Louisiana has abandoned this argument, but Mississippi now mistakenly contends that it has standing based on a similar theory.  *Compare* Obj. Doc. 224 at 13, *with Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (no standing where state claimed that "agriculture production will suffer, which will dislocate agriculturally-based industries, forcing unemployment up and state tax revenues down"), *and People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 225 (C.D. Ill. 1989) ("Assuming, *arguendo*, that these injuries will occur, the harm will fall on the taxpayers and citizens of Illinois and not on the state *qua* state.").

2.      **CAFA Does Not Confer Standing On The Gulf States.**

Nor can the states look to the Class Action Fairness Act ("CAFA") for standing, as the statute merely requires notification and does not "expand the authority of . . . State officials."  28 U.S.C. § 1715(f); *see also, e.g.*, *In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 09-2107, 2012 WL 4322012, at *4 (E.D. Pa. Sept. 21, 2012) ("The statute says nothing . . . of granting states a right to be heard on, or formally appeal, every class action settlement simply because residents of that state are class members.").

While Mississippi has cited certain cases permitting State Attorneys General to file *amicus* briefs or participate in a fashion analogous to a friend of the court, *see, e.g.*, *In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 233 (E.D. Pa. 2009),

16

it cites no decision holding that CAFA renders a state government a party possessing constitutional standing.  *Amici* briefs accepted for filing do not mean that an *amicus* has been granted standing; acceptance of such briefs means no more than that an *amicus* has been allowed to express views a court might consider if it so chooses.  And the State of Louisiana simply references CAFA without making any argument as to how or why CAFA confers standing.

      **3.**      **The Gulf States May Not Exercise *Parens Patriae* Authority To Advance The Supposed Financial Interests Of A Narrow Subset Of Their Citizens.**

      Finally, Louisiana and Mississippi contend that they may exercise *parens patriae* authority to object to the Settlement because they have a quasi-sovereign interest in the health and well-being of their citizens.  *See* Obj. Doc. 224 at 13-15; Obj. Doc. 227 at 7 n.11.  Yet neither state identifies a risk or harm that threatens the well-being of a significant number of its citizens.  Rather, the states simply seek to increase the amount of compensation allocated to a subset of their citizens in this private settlement agreement and lodge unfair criticisms of BP's spill response.[19]  Thus, the states' attempt to invoke *parens patriae* fails because "[i]nterests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 602 (1982).  Tellingly, many businesses and individuals from Mississippi and Louisiana have filed claims seeking the Settlement's benefits. It would be odd indeed to create an unprecedented *parens patriae* right in the states that would operate to injure the very citizens those states claim to represent.

---

[19] Louisiana is wrong to suggest that "BP is executing one of the worst oil responses in history."  Obj. Doc. 227 at 4. To the contrary, "the DWH Response was comprised of an unprecedented armada of personnel, equipment, technologies, and methodologies that collectively constituted the very best oil spill response resources available." Dutton Decl. (Medical Ex. 3) ¶ 32.  "The State of Louisiana's suggestion that the DWH Response was one of the worst in history fails to acknowledge the enormous effort of tens of thousands of people working together to implement the largest oil spill response in history."  *Id.* ¶ 33; *see also* Travis Decl. (Ex. 12) ¶ 3 ("As of September 30, 2012, BP has incurred and/or paid approximately $15.5 billion in costs . . . in connection with response and other cleanup efforts in connection with the Deepwater Horizon spill.").

**IV.** **None Of The Objections Submitted By Class Members Overcomes The Presumption In Favor Of The Fairness, Reasonableness, And Adequacy Of The Settlement.**

   **A.** **Procedural Objections To The Settlement Lack Merit.**

     **1.** **Uniquely, The Settlement Program Began Operations Before Settlement Approval, And It Continues Processing Claims.**

From its inception in early June through October 21, the Settlement Program has received 71,621 claims from class members, *see* Monger Supp. Decl. (Joint Ex. E) ¶ 13, and it has determined, based on claims processed thus far, that 26,719 of the claims are eligible for payments totaling over $1.1 billion, *see id.* ¶ 5. Notwithstanding these impressive figures, certain objectors complain that the Settlement Program is not processing claims quickly enough.[20] There is no basis for this objection. In a typical class settlement, claims are not processed and there are no settlement payments at all until after final approval by the District Court, and many class settlements also withhold payments until all appeals have run. *See* Rec. Doc. 6418 at 31-32; Coffee Decl. (Rec. Doc. 7110-3) ¶ 59; Monger Decl. (Rec. Doc. 7110-4) ¶¶ 8-9. Providing for pre-approval claims processing and payments cannot be objectionable, regardless of the speed at which the claims are paid, when such payments are not required and are rarely offered.

Couhig Partners LLC complains that the Settlement Program is a "bureaucratic nightmare." Obj. Doc. 207 at 5. To support this allegation, the firm cites the Claims Administrator's first Status Report — filed more than six weeks ago — which described the number of claims and the total payments as of September 6, 2012. *Id.* at 4-5. Couhig Partners' opinion regarding the number of claims that had been paid as of September 6, 2012 does not

---

[20] *See, e.g.*, Obj. Doc. 58 at 1.

support the conclusion that the process is "bogged down." *Id.* at 7.[21]  In reality, the Settlement Program is moving as quickly as possible to process and pay claims.  Indeed, "the pace of payment determinations and payments of the Settlement Program is more than reasonable," and "very high in comparison to other claims matters."  Monger Supp. Decl. (Joint Ex. E) ¶ 6. Moreover, "the pace of payment determinations and payments to claimants naturally increases over time." *Id.*  "As with any function of this nature, the more experience that the Settlement Program team has with the process, the more efficient they will become." *Id.*  The Claims Administrator has also implemented mechanisms to speed up the process, including electronic noticing functions and other tools that decrease the time required to process a claim. *Id.* ¶ 7. Remarkably, Monger estimates "that the Settlement Program will pay over 30,000 claims before the Vioxx settlement ever made its first payments." *Id.* ¶ 13.

### 2.   Claimants Have No Right To Have The Settlement Program Determine Their Compensation Prior To The Opt-Out Deadline.

Some objectors contend that the Settlement is unfair because the Settlement Program has not yet informed them of their final payment and allegedly will not do so before the opt-out deadline.[22]  These objections provide no basis to withhold final approval.

***First,*** the assertion that class members are unable to determine the compensation to which they are entitled under the Settlement Agreement is mistaken.  As Judge Shushan has recognized, "[a]ny class member seeking to determine his compensation may simply read the

---

[21] The solution offered by Couhig Partners reveals the self-serving nature of the objection.  It asks for special treatment of claims filed by lawyers and accountants, whom the objection crowns "qualified submitters."  Obj. Doc. 207 at 8.  Regardless of what happens to other claimants, "qualified submitters . . . should be paid in the amount asserted within 45 days." *Id.*  This remedy shows the absence of a genuine, class-wide objection.  While the Couhig firm might wish for an inside track (and the fees it could garner by promising potential clients action within 45 days), this interest is not common to all or most members of the class.

[22] *See* Obj. Doc. 88 at 2; Obj. Doc. 95 at 5; Obj. Doc. 210 (adopting this objection); Obj. Doc. 97 at 2; Obj. Doc. 98 at 2; Obj. Doc. 99 at 2-3; Obj. Doc. 100 at 1-2; Obj. Doc. 115 at 4; Obj. Doc. 122 at 17; Obj. Doc. 141 at 2; Obj. Doc. 146 at 2-3; Obj. Doc. 157 at 2-3; Obj. Doc. 159 at 2-3; Obj. Doc. 167 at 5; Obj. Doc. 177 at 2, 4; Obj. Doc. 178 at 3-4; Obj. Doc. 181 at 2, 4; Obj. Doc. 189 at 5; Obj. Doc. 209 at 3-5.

settlement agreement[] and determine how his circumstances fit into the frameworks." Rec. Doc. 7480 at 6. Unlike common fund settlements in which the total sum of payments is fixed, potential class members here need not speculate on how many of their peers will accept the Settlement in order to estimate their own payments. *See* Monger Decl. (Rec. Doc. 7110-4) ¶¶ 10, 12. Given the uncapped nature of this Settlement and its objective, published methods for evaluating eligibility and compensation, class members have sufficient information to decide whether to opt out. As to the Seafood Compensation Fund, class members can readily estimate their initial distribution that provides full compensatory relief together with the most generous RTP factors in the entire Settlement. Any uncertainty would concern only whether funds will be left over for a second distribution that would provide ***additional*** recovery.

*Second,* the objectors' argument would wrongly transform every Rule 23 class settlement from one in which class members have the right to opt out to one in which the settlement only exists and is binding with respect to those who decide to opt in. For example, objector Judith Corey contends that "no Plaintiff/Class Member can opt into a settlement when he has no idea whether he will receive an offer that is remotely fair." Obj. Doc. 146 at 2. As explained above, it is not true that class members have "no idea" what the Settlement Program will offer them. Moreover, the existence of some uncertainty is not a bar to finding fairness. Rather, as noted previously, in the vast majority of class action settlements, class members must decide whether to remain in or opt out of the class long before a claims administrator begins calculating and paying claims, based on class members' evaluation of the settlement's terms and conditions.

Courts have recognized that "there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d. Cir. 1972); *accord Reed*, 703 F.2d at 173 ("range of possible recovery" in determining reasonableness). Thus, if permissible settlements

fall anywhere within a range of values, class members do not need to know the specific amount they will receive. *See, e.g.*, *Lane v. Facebook, Inc.*, --- F.3d ----, Nos. 10-16380, 10-16398, 2012 WL 4125857, at *7 (9th Cir. Sept. 20, 2012) ("[W]e reject Objectors' argument . . . that the district court was required to find a specific monetary value corresponding to each of the plaintiff class's statutory claims and compare the value of those claims to the proffered settlement award."). As long as the Settlement is designed with criteria that are reasonably calculated to result in recovery amounts that fall within a reasonable range, it deserves approval.

Here, the Settlement easily satisfies the "reasonable range of recovery" standard. *See* Rec. Doc. 7114-1 at 52-53, 56-76. In fact, according to Halliburton, the Settlement is overly generous. *See, e.g.*, Rec. Doc. 7036 at 7-9 (complaining that the settlement is too openhanded, purportedly because it contains causation presumptions, dispenses with satisfaction of the presentment requirement, tolls the statute of limitations, and does not enforce the *Robins Dry Dock* rule); *see also* Fishkind Supp. Decl. (Ex. 2) ¶ 6 ("Dr. Vellrath's fundamental objection to the compensation methodologies of the Settlement is that they are in his view too generous and may overcompensate class members."). In short, the fact that the Agreement does not facially provide a final sum certain for each class member is not an obstacle to approval.[23]

### 3. The Settlement Program Has Provided An Unprecedented Degree Of Support To Claimants.

The Settlement Program goes to extraordinary lengths to ensure that each class member receives the compensation to which the claimant is entitled, including (1) reimbursing many claimants for accounting expenses; and (2) ensuring that each Economic Damage claimant is

---

[23] Relatedly, certain objectors contend that the Settlement is unfair because the parties did not provide an opt-out form or make it possible to opt-out electronically. *See, e.g.*, Obj. Doc. 122 at 15-21; Obj. Doc. 209 at 5-6. This objection has no bearing on the fairness of the Settlement. Indeed, the Court's Preliminary Approval Order specifically approved the relevant opt-out procedures, *see* Rec. Doc. 6418 at 40, and the procedures were disclosed in the notice approved by the Court and sent to class members. *See* Azari Decl. (Rec. Doc. 7110-1) at 56.

paid the maximum amount for which the claimant is eligible based on the documentation submitted, even if the claimant does not choose the most advantageous methodology for determining the value of its claim.  *See* Rec. Doc. 7114-1 at 20-21.

Despite these benefits, several claimants object to the resources provided.  In particular, two objections criticize the advice available through the Settlement Program's regional offices.  *See* Obj. Doc. 142 at 2-3; Obj. Doc. 154 at 2-3.  Others object to the fact that the Settlement does not increase payments to cover attorneys' fees.  *See* Obj. Doc. 162 at 3.  Two other objections complain that the amount of accounting fees reimbursable under the Settlement is limited to 2% of an individual claimant's recovery.  *See* Obj. Doc. 167 at 9; Obj. Doc. 189 at 9.

In reality, the Settlement Program has done far more than most settlements ever contemplate, much less do, to facilitate claims.  As of October 21, the Settlement Program had fielded approximately 181,000 telephone calls.  *See* Monger Supp. Decl. (Joint Ex. E) ¶ 22.  If claimants omit required documentation, the Settlement Program "attempts to reach the Class Member through phone calls, letters, and/or notices on the claims portal to request and explain the missing documentation needed to process the claim."  *Id.* ¶ 23.  As Monger explains, "this level of proactivity is atypical and benefits claimants."  *Id.*  But even though the Settlement Program uses its "best efforts to provide Economic Class Members with assistance, information, opportunities and notice," Settlement Agreement ¶ 4.3.7, occasionally some class members will become unsatisfied.  Such isolated views do not call into question the fairness of the Settlement, particularly given the many forms of assistance offered by the Settlement Program.[24]

The commitment to help potential class members collect the maximum compensation

---

[24] As a recent filing supporting the Settlement recognizes, "[n]o set of remedies or formulas is likely to satisfy every absent class member, when class members number in the many thousands."  Rec. Doc. 7710 at 15.  "But a class action settlement should not be disapproved because it fails to satisfy everyone."  *Id.*

authorized under the Settlement is another unique facet of the agreement.  *See* Monger Decl. (Rec. Doc. 7110-4) ¶ 15.  Specifically, the agreement provides claimants with reimbursement for the expense of hiring an accountant or bookkeeper to prepare Economic Damage claims.  *Id.* ¶ 17; Settlement Agreement ¶ 4.4.13; *see also* Rec. Doc. 7536 at 7.  Although some objectors contend that the amount of reimbursement is insufficient, Obj. Doc. 167 at 9; Obj. Doc. 189 at 9, the reimbursement is more than adequate to cover the cost of claims preparation: the required documents should be on hand or easily reconstructed; the accounting work is relatively simple and should not be a time-consuming task for most claimants; and the hourly rates paid under the Settlement Agreement are consistent with local rates for the type of accounting work involved. Moreover, the Settlement Agreement guarantees a minimum reimbursement amount for eligible claimants.  *See* Sharp Supp. Decl. (Ex. 9) ¶ 23; Henley Supp. Decl. (Ex. 3) ¶ 8.

Likewise, asking that individual claimants pay their own attorneys is fair and reasonable; objectors identify no contrary authority.  OPA does not impose any relevant obligation to pay attorneys' fees.  And this Court rejected the argument that maritime law provides a basis for attorneys' fees or that a "bad faith" exception in maritime law does so.  *See* Rec. Doc. 3830 at 35-37.  Thus, if BP were to litigate the cases and be found liable, BP would not be required to pay individual attorneys' fees and thus should have no obligation to do so in a settlement. Nevertheless, BP has agreed to pay — on top of the settlement payments to class members — hundreds of millions of additional dollars for the common-benefit legal services provided by Class Counsel which have aided all class members.[25]  If certain class members choose to employ additional counsel, they should be responsible for the costs of their own personal attorneys.

---

[25] *See* Settlement Agreement Ex. 27 ¶ 2 ("[T]he BP Parties agree not to contest a joint request by Economic Class Counsel and Medical Benefits Class Counsel . . .  for, nor oppose an award by the Court for, a maximum award of $600,000,000 . . . as a payment of all common benefit and/or Rule 23(h) attorneys' fees, costs and expenses.").

4.      **Consistent With OPA, BP Has Made An Interim Claims Process Available.**

Some objectors incorrectly contend that BP will no longer comply with OPA's requirement to pay interim claims.[26]  But BP provides that anyone may elect not to participate in the Settlement and instead submit interim claims to BP's OPA claims facility.  *See* BP, Claims Information, http://www.bp.com/claims.

5.      **The Settlement Agreement Generously Allows The Submission Of Multiple Claims Within A Six-Month Period.**

Another generous feature of the Settlement is to provide flexibility to claimants in filing their claims, as it does not require a claimant to file all claims at once.  Rather, a claimant may file multiple claims at different times, provided all claims are filed within six months of the first payment on a claim.  *See* Settlement Agreement ¶ 4.4.8.[27]  Nothing requires BP to afford this degree of flexibility to claimants.

Plaintiffs do, however, need to sign a release at the time they accept the Settlement Program's first claims determination — on complete and partial claims alike.  This prompts the Dauphin Island Property Owners Association ("DIPOA") to complain that it is being forced to make an untenable choice.  *See* Obj. Doc. 144.  As the owner of coastal lands containing some marsh acreage in Alabama, DIPOA complains that those lands fall within the Coastal Real Property Zone, whereas it would prefer them to fall within the Wetlands Real Property Zone.  *Id.* at 9.  Separately, DIPOA notes that it has a claim for lost revenue from golf fees as well as food and beverage sales.  *Id.* at 10.  Accordingly, DIPOA argues, "[b]ecause the [Agreement] does not allow for filing of a partial claim DIPOA is forced to make a Faustian election and forego filing

---

[26]  *See, e.g.*, Obj. Doc. 136; Obj. Doc. 156 at 6; Obj. Doc. 167 at 9-10; Obj. Doc. 189 at 9-10; Obj. Doc. 227 at 23-24; *see also* Rec. Doc. 6239 at 4-5.

[27]  To pave the way for a rapid second distribution under the SCP, all SCP claims must be filed within 30 days of the entry of an order, if any, finally approving the Settlement.  *See* Settlement Agreement Ex. 10 at 2.

its economic loss claim (a liquidated loss which it desperately needs to survive) until there is an answer to the instant objection [on the issue of the treatment of its marsh property]." *Id.*

DIPOA is incorrect.  It has two paths available to it:  (1) it can opt out and pursue an interim payment for lost revenue claims under the BP claims process[28] and reserve any purported wetlands claim it has to pursue in litigation; or (2) it can choose not to exercise its right to opt out and thereby present both its lost revenue and Coastal Real Property claims in any order it desires to the Settlement Program within the six-month window.  DIPOA's failure to seek an interim claims payment from BP on its lost revenue claim is the result of its own delay.  The doors of the BP claims process have been open since June 4, 2012.  *See* http://www.bp.com/claims.  There is no "Faustian election."

Moreover, to be approved, a settlement need not permit follow-up claims at all.  *See, e.g.*, *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081 at *4 (E.D. La. Mar. 2, 2009) (approving settlement that required submission of claims by a single deadline).  BP's decisions to provide both a claims process path offering the payment of interim claims and a settlement path, as well as flexibility on timing within the settlement path, are prime examples of the Settlement's fairness to parties that desire additional time to weigh their options.  By the time the opt-out deadline arrives, claimants will have had nearly five months (from June 4, 2012 until November 1, 2012) to evaluate the Settlement and the Settlement Program's operations.

**6.    The Parties Did Not Improperly Rely On Confidential Information From The GCCF To Exclude Valid Claims.**

Objections from Prashiela Enterprises, LLC, *et al.*, assert that the GCCF's sharing of information with BP and the PSC constitutes some kind of privacy violation.  *See* Obj. Doc. 198

---

[28] *See* BP Claims Program, Claims Form For Individuals and Businesses, http://www.bp.com/assets/bp_internet/ globalbp/globalbp_uk_english/gom_response/STAGING/local_assets/downloads_pdfs/demands.pdf  at 2 (referring to ability of claimants to seek non-final, interim payments).

at 14, 18.  Nothing could be further from the truth, as such sharing is a necessary component of the GCCF and OPA.  This Court previously recognized in an order citing the Trust Agreement between BP and the GCCF that "all information gathered from claimants will be turned over to BP, with no restrictions as to its use."  Rec. Doc. 1098 at 9-10.  Moreover, the design of OPA's presentment provision requires the sharing of information necessary to support a valid claim with the responsible party.  *See* 33 U.S.C. § 2713; *see also Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995); *Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, *2 (E.D. La. Nov. 21, 2007).

In addition, the GCCF posted on its website a significant amount of data regarding payments it made.  Members of the PSC also represented clients who had submitted claims to the GCCF, and so those lawyers had access to GCCF data in either aggregate or personalized formats.  Suggesting that BP had an unfair negotiating advantage on account of access to confidential GCCF data is incorrect — particularly where the PSC itself represents many thousands of claimants and thus had unique access to the data and information of those clients.

### 7.  The Settlement Agreement's Provisions For Minors And Incompetents Are Fair And Reasonable.

Consistent with the Settlement Agreement, the Court has appointed Professor P. Raymond Lamonica as guardian ad litem to determine if the Settlement is fair to class members who are minors or incompetents.  *See* Rec. Doc. 6418 at 35-36.  Professor Lamonica's report concludes that the Settlement is fair to such class members.  *See* Rec. Doc. 7536 at 10. Separately, this Court has approved the Claims Administrator's procedure for processing claims on behalf of deceased, minor, and incompetent claimants, which requires the Claims Administrator and "the claimant's representative" to file a joint motion seeking approval of the fairness and adequacy of any payment offered to a minor or incompetent claimant.  Rec. Doc.

7462.  In light of this record, the objections to the Settlement's alleged "disregard for the special needs and legal rights of the disabled,"  Obj. Doc. 68 at 1; Obj. Doc. 193 at 1, are meritless.

### 8. No Unfairness Exists Because BP Is Permitted To Appeal Certain Classes of Awards.

One objection contends that BP's ability to appeal certain awards as part of the settlement process creates such a degree of uncertainty as to make the Settlement unfair and unreasonable. Obj. Doc. 101 at 3, 29.[29]  Far from creating uncertainty, the Settlement's appellate procedures increase the transparency and predictability of settlement payments.  Settlement payments are governed by specific rules under the Settlement, allowing both claimants and BP to determine the amounts to which class members are entitled.   Appellate review reduces uncertainty by assuring that a final payment is correct — *i.e.*, that it complies with what potential class members expect based on the text of the Settlement Agreement.[30]

Furthermore, the objection overstates the range of offers BP has the right to appeal and ignores the benefits the appeal process provides to claimants.  *First,* BP cannot appeal any award of less than $25,000.  Settlement Agreement ¶ 6.1.2.4.  *Second,* BP must exercise its right to appeal within ten to twenty days, depending on the size of the award.  *Id.  Third*, class members

---

[29] The only authority objectors cite for the contrary position is an opinion (subsequently superseded) rejecting a *cy pres* distribution that failed to identify the beneficiaries of the settling party's payment or to indicate that they might have been members of the class.  *See Dennis v. Kellogg Co.*, 687 F.3d 1149 (9th Cir. 2012), *superseded by* --- F.3d ----, Nos. 11-55674, 11-55706, 2012 WL 3800230 (9th Cir. Sept. 4, 2012).  The relevant objection does not implicate the concerns surrounding *cy pres* payments, which BP addresses in Section IV.B.8, *infra*.  Ordinarily, appellate rights are seen as structural guarantees of a superior process.  *See, e.g.*, *United States v. Mendiola*, 42 F.3d 259, 260 n.1 (5th Cir. 1994) (right to appeal "'fundamental to the concept of due process of law'" (quoting *Arrastia v. United States*, 455 F.2d 736, 739 (5th Cir. 1972)).

[30] In fact, courts have approved settlements where both parties have the right to appeal a claim award.  *See, e.g., Morris v. Voinovich*, 106 F. App'x. 962, 964 (6th Cir 2004) (per curiam); *In re Serzone Prods. Liab. Litig.*, MDL No. 1477, 2006 WL 2345988, at *1-2 (S.D. W. Va.  2006); *Foreman v. Wood, Wire & Metal Lathers Int'l Union, Local No. 46*, 557 F.2d 988, 991 (2d Cir. 1977) (in action alleging union engaged in discriminatory practices against union members, noting that as part of court-approved settlement, both union member and union sought reconsideration of court-appointed administrator's award of damages to the union member, which was reaffirmed by the administrator and affirmed by the district court).

possess corresponding (and, indeed, more expansive) appellate rights.  Unlike BP, claimants can appeal awards of any size, not just those over $25,000.  *Fourth*, also unlike BP, claimants are entitled to additional "loser pays" compensation imposed on BP, equal to 5% of their award, if they prevail on appeal.  *See* Settlement Agreement ¶ 6.5.

**B.     Substantive Objections To The Settlement Lack Merit.**

**1.     BP's Uncapped Liability In Virtually All Areas Answers Louisiana's "Indefinite Liability" Objection.**

According to the State of Louisiana, the Settlement is deficient because it "Fails to Acknowledge BP's Unlimited Strict, Joint and Several OPA Liability."  Obj. Doc. 227 at 16.  In particular, Louisiana quarrels with BP's statement in its preliminary approval brief that liability under OPA is divisible, *see* Rec. Doc. 7114-1 at 62-63.

While BP contended that it could prove at trial that liability is divisible, BP made this point only to contrast the possibility of limited relief against BP at trial with the uncapped liability to which BP has agreed in the Settlement.  Even though BP believes that in litigation the class would have had to pursue damages claims against Transocean and Halliburton to be made whole for their compensatory damages, BP — acting alone and without waiting for contributions from those other defendants — has agreed in the Settlement to make class members whole for the entirety of their compensatory damages.  Louisiana's argument is therefore entirely irrelevant to the fairness of the Settlement Agreement.

Additionally, the objection makes no sense.  Neither BP nor the Court must agree with Louisiana's reading of OPA and background principles of tort law in order for the Settlement to be approved.  The entire point of a settlement is that each side agrees to stand down on its legal claims and defenses to reach a non-litigated conclusion of the class claims.  Nothing in Rule 23, OPA, or the case law makes the pre-settlement invocation of a divisibility defense a barrier to

approving a settlement that will make all claimants entirely whole (and more so).

### 2. Economic Damage Compensation

#### a. The Economic Loss Zones That Apply Under The Economic Damage Compensation Frameworks Are Reasonable.

The Settlement creates four economic loss zones.  Certain objectors protest the zone into which their claims were placed and seek a more advantageous zone.[31]  The use of geographic zones, however, is a reasonable, transparent, and administrable method commonly used to compensate claimants in class settlements.  Predictably, claimants placed into less advantageous zones would rather see their claims placed into other zones.  But such attempts to quibble with the outcome of painstaking line-drawing negotiations amongst experienced counsel do not render the Settlement unfair, especially because the zones were drawn using rational criteria.

Each zone has defined causation requirements and RTPs.  These zones are not "arbitrary," "preferential," or "discriminatory" as some objectors contend.  *See, e.g.*, Obj. 94.  Rather, the four zones fairly reflect the nature of economic activity in the Gulf region, and the likelihood of potential real and perceived economic harm from the spill.  *See* Fishkind Decl. (Rec. Doc. 7114-5) ¶¶ 29-30, 44, 51, 57, 59, 78;  Landry Decl. (Rec. Doc. 7114-14) ¶¶ 22, 26-32, 35-36;  Richardson Decl. (Rec. Doc. 7114-17) ¶¶ 37-38;  Sharp Supp. Decl. (Ex. 9) ¶ 9, 16;  Landry Supp. Decl. (Ex. 5) ¶¶ 10-11, 20-24;  Richardson Supp. Decl. (Ex. 8) Decl. ¶ 4(a);  Fishkind Supp. Decl. (Ex. 2) ¶¶ 8-9, 24-25.

The zones take into account well-established tourism patterns in the Gulf Coast area, and are structured to reflect the fact that as distance increases from the coast, especially in tourist

---

[31]  *See* Obj. Doc. 61 at 4; Obj. Doc. 62 at 1; Obj. Doc. 72 at 1; Obj. Doc. 89; Obj. Doc. 90 at 2-7; Obj. Doc. 94; Obj. Doc. 115 at 3-10; Obj. Doc. 116; Obj. Doc. 117 at 3-7; Obj. Doc. 118 at 2; Obj. Doc. 138; Obj. Doc. 151; Obj. Doc. 162 at 2; Obj. Doc. 178 at 4-5; Obj. Doc. 184 at 2-5; Obj. Doc. 186 at 12-13; Obj. Doc. 189 at 6-7; Obj. Doc. 198 at 21-26; Obj. Doc. 201 at 3-4; Obj. Doc. 206 at 1; Obj. Doc. 223-1 at 1-12; Obj. Doc. 224 at 1-12; Obj. Doc. 232; Obj. Doc. 246 at 2-4; *see also id.* at 5 (complaining that community shopping centers are not treated as tourist destinations).

destinations, the likelihood of damage due to the spill is reduced.  Every level of detail was analyzed, including the feeder roads to Zone A, along with data about the exit ramps and frontages on these feeder roads.  For example, a souvenir shop at the end of an exit ramp on an interstate highway frequented by tourists driving to the beach (even though that business may be two hours from the Gulf Coast and would otherwise fall into Zone D) may be eligible for a Zone C classification, because the governing framework would give that business credit for the drive-by tourist traffic it would typically receive.  The zones also incorporate other factors such as industry type, proximity of oil, and economic recovery post-spill.

Moreover attempts by certain objectors to "redraw" the zones have no place here.  *See, e.g.*, Obj. Doc. 94; Obj. Doc.  224.  As one would expect, some objectors ask the Court to expand certain zones in order to receive improved treatment.  *Id.*  Such assertions are baseless.  Many of these objectors are located in geographies that do not fit the criteria of Zone A or B.  For example, objectors seek to rewrite the zones to improve the classifications of certain areas in Mississippi, such as Pascagoula and Moss Point, that are industrial in nature, and service a mix of tourists and permanent residents.  *See* Fishkind Supp. Decl. (Ex. 2) ¶ 25.  In fact, despite the expansive nature of the definition of "tourism" under the Settlement Agreement, areas such as Pascagoula and Moss Point have fewer or nearly the same number of tourism businesses as Zone C or Zone D areas elsewhere in the State.  *See id*.  This demonstrates that the zones are fair and reasonable.  Further, many of the objections are based on inapposite comparisons, such as equating Gulf Coast tourism to tourism in Hawaii or areas along the Atlantic Coast.  *See, e.g.*, Landry Supp. Decl. (Ex. 5) ¶ 18.  Such apples-to-oranges comparisons are without merit.

Because the zones reflect the likelihood that a class member was injured by the spill and would have a greater chance of recovery on a litigated claim, it is reasonable for certain class

members to benefit from presumptions that others do not.  *See, e.g.*, *Reed*, 703 F.2d at 175; *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) (rejecting objectors' "challenge [to] the propriety of the award of compensation to the holders of property in Zone A, which was far greater than the compensation to the holders of property in Zone B, which in turn was far greater than the compensation to holders of property in Zone C"); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 604 (E.D. La. 2006); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 342-43 (N.D. Ga. 1993); *see also* Miller Supp. Decl. (Ex. 6) ¶ 12 ("A class action settlement is not objectionable merely because it draws lines, as long as the distinctions made reflect an informed effort to allocate settlement benefits across class members in reasonable proportion to their damages and the strength of their claims.").

Here, of course, a claimant's zone location does not preclude recovery; it only determines whether he will receive an enhanced opportunity for recovery, including (a) a presumption of causation that eliminates the claimant's obligation to establish causation, and/or (b) additional recovery beyond actual demonstrated damages in the form of a larger RTP.  Any claimant in any zone can recover if the claimant can establish causation and damages according to clearly defined criteria supported by objective economic data.  Moreover, once causation is established, all earnings losses are presumed to be due to the spill — even though other unrelated factors may have played a role.  In this and other respects, including claimants' choices of Benchmark Periods and Compensation Periods, the claimant-friendliness of this Settlement Agreement is unprecedented.  *See* Fishkind Decl. (Rec. Doc. 7114-5) ¶¶ 56-65; Sharp Decl. (Rec. Doc. 7114-18) ¶¶ 14-17; Richardson Decl. (Rec. Doc. 7114-17) ¶ 50; Sharp Supp. Decl. (Ex. 9) ¶¶ 5-7, 13.

### b.    Limiting The Compensation Period To 2010 Is Reasonable.

Certain objectors complain that the Framework For Business Economic Loss Claims and the Framework for Individual Economic Loss Claims are unfair because they do not compensate

31

persons who did not suffer losses until 2011.[32]

As Dr. Fishkind has explained, limiting the compensation period to 2010 is reasonable because (1) the Macondo well was sealed by September 2010 (and, indeed, the flow had been stopped by mid-July); (2) by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (3) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were re-opened for commercial fishing by November 2010.  *See* Fishkind Decl. (Rec. Doc. 7114-5) ¶ 32. As a result, extending the compensation period to cover claimed 2011 losses would result in compensating for losses that were not caused by the spill.  *See id.* ¶ 61 ("Losses that continued after the DWH Spill are likely to be due to factors other than the DWH Spill.").  The objectors offer nothing to overcome the objective grounding provided by Dr. Fishkind for his analysis and conclusions.  Moreover, in certain specified circumstances where potential for impacts extending into 2011 seemed slightly more possible, the compensation period for businesses and individuals extends through April 2011 for claimants in the Primary Seafood Industry and start-up businesses.

### c.   Objections To The Business Economic Loss Framework Lack Merit.

Very few objections have been submitted to the Business Economic Loss Framework, and those that have been submitted lack merit.

### i.   General Business Economic Loss Framework

The Business Economic Loss Framework is extraordinarily favorable to class members in numerous respects:  it provides generous base compensation, its documentation requirements are flexible, and compensation is in most cases augmented by an RTP.

---

[32]   *See, e.g.*, Obj. Doc. 86 at 6-7; Obj. Doc. 95 at 7; Obj. Doc. 210 (adopting this objection); Obj. Doc. 103; Obj. Doc. 126; Obj. Doc. 201 at 3-4.

(A)    **The Base Compensation Available Under The Settlement Is Extremely Generous.**

(1)    **The Benchmark Period Options Are Highly Favorable To Claimants.**

Under the Business Economic Loss Framework claimants are permitted to choose a Benchmark Period of either (a) 2009; (b) the average of 2008 and 2009; or (c) the average of 2007, 2008, and 2009.  *See, e.g.*, Sharp Decl. (Rec. Doc. 7114-18) ¶ 18; Sharp Supp. Decl. (Ex. 9) ¶ 15 ("To the extent 2009 may have been an atypical year, the BEL Framework accounts for this by permitting claimants to choose the average of months in 2008 and 2009 or the average of months in 2007, 2008, and 2009, if that would be more advantageous to their claim or better represent what they believe is a more accurate reflection of their baseline performance.").  Offering class members a variety of choices compares favorably to the litigation option, in which the parties would "contest what periods prior to the loss event . . . are most representative of operations immediately prior to the loss event."  Sharp Decl. (Rec. Doc. 7114-8) ¶ 20.

Certain objectors nonetheless complain that the Benchmark Period options are unfair because they require some consideration of 2009 — a year the objectors assert saw their economic returns depressed by the recession.  *See* Obj. Doc. 95 at 7-8; Obj. Doc. 210 (adopting this objection); Obj. Doc. 198 at 34-38; Obj. Doc. 155 at 1.  There is no merit to this objection.  *First*, a business's most recent experience "is traditionally and typically used as the benchmark predictor of 'but for' and/or future performance in business economic loss cases because it reflects the most recent conditions and trends."  Sharp Supp. Decl. (Ex. 9) ¶ 15; Landry Supp. Decl. (Ex. 5) ¶ 29 ("No business would disregard the immediately prior year's financial performance in developing projections for a year such as 2010.").  Ignoring that the economy was in bad shape in the year before the spill would allow claimants to recover losses caused by the recession rather than the oil spill.  *Second*, because the Louisiana economy did not take a

33

downward turn until the first quarter of 2009, Richardson Decl. (Rec. Doc. 7114-17) ¶ 39, a Benchmark Period that includes 2007 and 2008 would be highly artificial and not in accord with real-world financial practice.  *See* Landry Supp. Decl. (Ex. 5) ¶ 29 ("While 2009 was a very bad year for hotels, 2007 was an especially good year.").  Such fluctuations are inevitable, and plaintiffs are rarely, if ever allowed to pick and choose the most favorable benchmark period in litigation, though here they are given this valuable right.  ***Finally***, the generous RTPs available under the Settlement Agreement are more than sufficient to overcome the purported disadvantages to claimants of including 2009 in the benchmark periods.

### (2)    The Options For Proving Causation Are Favorable To Claimants.

Class members who are required to prove causation under the Business Economic Loss Framework have numerous options for doing so, including use of the V-Shaped Revenue Pattern, the Modified V-Shaped Revenue Pattern, or the Decline-Only Revenue Pattern, or spill-related cancellations.  The range of options is both favorable to claimants and economically reasonable.  *See, e.g.*, Fishkind Decl. (Rec. Doc. 7114-5) ¶¶ 60-64, 82-87; Henley Decl. (Rec. Doc. 7114-11) ¶¶ 24-25; Landry Decl. (Rec. Doc. 7114-4)¶ 38; Sharp Decl. (Rec. Doc. 7114-18) ¶¶ 15-16; Richardson Decl. (Rec. Doc. 7114-17) ¶ 50; Henley Supp. Decl. (Ex. 3) ¶ 5.

Nevertheless, certain objectors complain that requiring use of one of these options is too onerous.  For example, certain objectors complain that if they elect to use the Modified V-Test or the Decline-Only Test, they must further satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located.  *See* Obj. Doc. 120 at 4-8; Obj. Doc. 206 at 2.  Yet objective evidence shows that these proof requirements are economically reasonable, which is why they were negotiated by experienced counsel in consultation with their own business clients and experts.  Claimants unable to satisfy any of the causation standards

available under the Settlement Agreement would likely find it very difficult to prove in court —
by a preponderance of the admissible evidence — that they had any losses, much less losses
caused by the spill.  *See* Fishkind Supp. Decl. (Ex. 2) ¶ 20.

Other objectors complain that before they can invoke the standard V-Shaped Revenue
Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011
as compared to the 2010 baseline period.  *See* Obj. Doc. 198 at 8, 26-34.  According to the
objection, this requirement is not reasonable because some hotels did not see such a recovery.  In
reality, however, "[l]osses that continued after the DWH Spill ended are likely to be due to
factors other than the DWH Spill."  Fishkind Decl. (Rec. Doc. 7114-5) ¶ 61.  Moreover, Smith
Travel Research data confirm that hotels in the Gulf Coast area experienced upturns consistent
with the V-shaped revenue patterns.  *See* Landry Supp. Decl. (Ex. 5) ¶¶ 12-13; Fishkind Supp.
Decl. (Ex. 2) ¶ 11.  Thus, to the extent the objectors' hotels did not experience such 2011 upturns
in revenue, this indicates that their 2010 revenue declines were due to factors other than the spill.
*See* Landry Supp. Decl. (Ex. 5) ¶ 14.  "Hotels, if they were affected by the spill due to lower
levels of tourism on the Gulf Coast, would be expected to recover when tourism recovers."  *Id.* ¶
25.  As these objectors acknowledge, although they have insufficient 2011 upturn, the Business
Economic Loss Framework provides alternative causation tests that they may satisfy — the
Decline-Only Revenue Pattern test or Spill-Related Cancellations.

Finally, other objectors complain that they are required to demonstrate a certain threshold
of loss in order to satisfy the Settlement's causation tests (although the objection does not specify
which test it is complaining about).  *See* Obj. Doc. 115 at 4.  The causation tests were negotiated
with reference to standard economic literature, and unless all limits are to be removed from the
Settlement, some limits must be established.  Those falling just outside the limit can always

35

complain that the lines should have been drawn more favorably, but that does not make the negotiated line arbitrary or unreasonable. *See, e.g.*, *Warfield v. Fidelity & Deposit Co.*, 904 F.2d 322, 327 (5th Cir. 1990) ("A line limiting liability must be drawn somewhere and the appellants fall outside of this line.").

> ### (3)     The Growth Factors Methodology Is Highly Favorable To Claimants.

The Settlement Agreement contains numerous favorable growth assumptions for business claimants, including (1) a bar on use of a negative growth baseline, even though many businesses surely saw negative growth in a recessionary economy; and (2) the use of a growth period lasting at least six months, even where the compensation period is shorter, permitting the claimant to be compensated for lost growth even for periods with no claimed damage. *See* Rec. Doc. 7114-1 at 33. Notwithstanding these generous provisions, one objector complains that the Business Economic Loss Framework is unfair because it caps year-to-year growth at a maximum of 10%. *See* Obj. Doc. 95 at 7; Obj. Doc. 210 (adopting this objection).

As an initial matter, all Business Economic Loss claimants benefit from a 2% General Adjustment Factor, meaning that the true cap on revenue growth is 12%. *See* Settlement Agreement Ex. 4C at 2. Moreover, the cap was negotiated as part of a compromise in which BP agreed not to apply a negative growth factor for any Business Economic Loss claimant even when in fact a claimant had experienced negative growth in revenues in January to April 2010 as compared to the same months in the Benchmark Period. Even for those few class members who might be able to demonstrate that they experienced extraordinary growth before the spill, there is no reason to assume that such growth would have continued uninterrupted but for the spill, or that the objector would be able prove that fact in litigation. As a result, it was reasonable for the parties to negotiate a ceiling on ***assumed*** growth. Finally, any businesses that assert such

extraordinary growth still benefit from numerous other favorable provisions in the Settlement, including its flexible documentation requirements and its high RTPs, as well as the prompt resolution of their claims compared with the alternative of litigation.

### (4)   Subtracting GCCF Payments From Compensation Amounts Prevents Double Recoveries.

One objector complains that GCCF payments received by the claimant should not be subtracted from the claimant's total compensation. *See* Obj. Doc. 132 at 2.  The purpose for such an offset is obvious, however — to avoid double-compensating losses. *See, e.g.*, Fishkind Decl. (Rec. Doc. 7114-5) ¶ 35; Sharp Decl. (Rec. Doc. 7114-18) ¶ 32.  Moreover, because the offset is applied ***after*** compensation is augmented by an RTP, rather than before, this provision is extraordinarily favorable to claimants. *See* Henley Decl. (Rec. Doc. 7114-11) ¶ 32.

### (B)   The Documentation Requirements Are Reasonable.

Certain objectors complain about the requirement that business claimants provide monthly profit and loss statements. *See* Obj. Doc. 122 at 13-14; Obj. Doc. 186 at 13-18; Obj. Doc. 198 at 41.  According to one such objection, many businesses are not required by law to compile such records, and it can be "costly and time consuming" to create them.  Obj. Doc. 186 at 16.  While the objection recognizes that the Settlement Agreement makes the reimbursement of accounting fees available to facilitate the creation of monthly profit and loss statements, *see* Settlement Agreement ¶ 4.4.13, the objectors contend that some accounting firms have been unwilling to do so for fear of incurring professional liability.  Obj. Doc. 186 at 17.

There is no merit to these objections.  The requirement for "monthly and annual profit and loss statements  . . . or alternate source documents," which was negotiated at arms' length between experienced counsel assisted by experts, is directly tied to and necessary for the causation and compensation methodologies to operate properly.  Settlement Agreement Ex. 4A

37

¶ 4; *see also, e.g.*, *id.* Ex. 4B § II; *id.* Ex. 4C § I & p. 3; Sharp Decl. (Rec. Doc. 7114-18) ¶ 12; Henley Decl. (Rec. Doc. 7114-11) ¶¶ 8.  To the extent certain hotel objectors assert they are not required to maintain monthly records in the normal course of business, that unsupported assertion is dubious, as attested to by an expert with more than 43 years as a senior hotel industry executive.  *See* Landry Supp. Decl. (Ex. 5) ¶¶ 27-28 ("In my over 43 years of experience with thousands of hotels, including budget and economy hotels, I have *never* encountered a hotel that does not keep monthly records of revenue and expenses.").

Moreover, accounting experts Sharp and Henley each confirm that compilation of the financial statements and preparation of other required materials should not be an arduous task for the accountants, and, further, that the rates for which reimbursement is available are appropriate. *See* Sharp Supp. Decl. (Ex. 9) ¶ 23; Henley Supp. Decl. (Ex. 3) ¶ 8 ("simple accounting service work").  Accounting firms should not be reluctant to compile such financial statements, which they routinely do for the purposes of business management, bank loans, and the like.  *See* Henley Supp. Decl. (Ex. 3) ¶ 8; Sharp Supp. Decl. (Ex. 9) ¶ 25 ("Other objectors claim that the accounting fee reimbursement provided for in the Settlement Agreement is inadequate because some accounting firms are unwilling to create monthly profit and loss statements due to purported liability reasons.  As a CPA, I find this objection unpersuasive.") (footnote omitted).

Finally, those businesses that lack monthly financial statements and are unable or unwilling to have them prepared may submit their contemporaneous business records as "alternate source documents" to the Settlement Program, which will prepare them to process the claim.  Settlement Agreement Ex. 4A ¶ 4; *see also* Deepwater Horizon Claims Center, Economic and Property Damage Claims, Reminder Regarding Documentation Requirements for Business Economic Loss ("BEL") Claims,   http://www.deepwaterhorizoneconomicsettlement.com/

docs/Alert_Reminder_Regarding_Documentation_Requirements_for_BEL_Claims.pdf.  To the extent this imposes a burden on claimants, it is a substantially lower burden than they would face in litigation.

(C)      The RTPs Are Ample And More Than Reasonable.

Finally, certain objectors complain about the RTP assigned to their type of claim.  *See, e.g.*, Obj. Doc. 59; Obj. Doc. 132 at 2; Obj. Doc. 162 at 2-3; Obj. Doc. 198 at 38-40.  These class members, however, provide no actual evidence that the RTP assigned to their type of claim is insufficient to compensate them for all past, potential future, and other losses.  *See, e.g.*, Fishkind Supp. Decl. (Ex. 2) ¶ 18.  These objections thus fail to overcome the presumption in favor of fairness, reasonableness, and adequacy that applies to any voluntarily negotiated settlement.

ii.      Failed Business and Failed Start-Up Business

(A)      Failed Businesses

There is no merit to the objection that the Settlement Agreement is unfair because failed businesses in the seafood industry are treated the same as failed businesses in other industries.  Obj. Doc. 86 at 7.  Compensation for all failed businesses is determined by multiplying the business's earnings before interest, taxes, depreciation, and amortization ("EBITDA") in the twelve months prior to the spill by a multiplier, yielding the total enterprise value of the business.  This objection contends that failed seafood business should receive a higher multiplier than the 3.9 multiplier provided under the Settlement Agreement.

The industry multipliers are derived from the Pratt's Stats Database, a widely used and standard source which provides, for any type of business, an objective ratio of its value to its prior twelve months' EBITDA.  Fishkind Decl. (Rec. Doc. 7114-5) ¶¶ 103-104; Henley Decl. (Rec. Doc. 7114-11) ¶ 34; Richardson Decl. (Rec. Doc. 7114-17) ¶ 57; Sharp Decl. (Rec. Doc. 7114-18) ¶ 39.  How seafood businesses were impacted by the oil spill is irrelevant to this

39

valuation ratio.  If anything, the database may be generous to seafood industry claimants given declines in the industry that predated the spill.  *See, e.g.*, Smith Decl. (Rec. Doc. 7114-19) ¶ 32.

Nor is there any merit to the objection that the Failed Business Framework requires class members to certify that as of May 1, 2010, (1) they had not initiated a bankruptcy filing, asset liquidation, or debt restructuring; (2) they were in full compliance with all covenants as to financial condition governing outstanding borrowing or credit agreements; and (3) all documents submitted consist of or were derived from documents maintained in the ordinary course of business.  *See* Obj. Doc. 156 at 2-3.  The objection asserts that "[b]usinesses can move out of compliance with credit agreements frequently," *id.* at 3, but that does not mean a business would have failed but for the spill.  As Dr. Fishkind has explained, these requirements are necessary for the failed business to "demonstrate its ability to continue as a going concern at the time of the DWH Spill."  Fishkind Decl. (Rec. Doc. 7114-5) ¶ 102.  A business that had already entered bankruptcy or defaulted on its loans would have a difficult if not impossible time persuading a fact-finder in litigation that its ultimate failure was caused by the spill — particularly given that it already had failed or was failing at the time of the spill.

Finally, another objector complains about the method used to determine failed-business compensation.  According to this objection, this compensation amount is inadequate because it fails to include costs incurred by the business after ceasing operations, such as "storage of assets, wind-down and exit costs," or re-start costs for failed businesses that chose to restart operations.  Obj. Doc. 156 at 4.  However, compensation equal to the value of the business (calculated to include a stream of future revenues) is more than sufficient to pay those incidental wind-down costs and/or restart a business should a class member wish to do so.

### (B)   Failed Start-Up Businesses

An objector contends that the framework for compensating failed start-up businesses is

inadequate because it "uses prior personal income which is an inadequate multiplier for this claim."  Obj. Doc. 72 at 1.  Thus, the objector contends that compensation for an art gallery should be based on "the annual average for Louisiana galleries published by the National Endowment for the Arts."  *Id.*

This objection is mistaken about how compensation for failed start-up businesses is determined.  Because failed start-up businesses have no earnings history, compensation consists of two components:  (1) book value of equity as of May 1, 2010 (that is, total tangible assets minus liabilities as of that date), plus (2) any sweat equity (that is, any unpaid labor contributed to the business).  This is a fair, reasonable, and adequate method of compensating such businesses.  *See* Sharp Decl. (Rec. Doc. 7114-18) ¶¶ 41-42; Fishkind Decl. (Rec. Doc. 7114-5) ¶¶ 105-106; Richardson Decl. (Rec. Doc. 7114-17) ¶ 58.  Moreover, there is no reason to base compensation upon industry-wide averages where individual, claimant-specific data sources are available.  *See* Sharp Supp. Decl. (Ex. 9) ¶ 15; Fishkind Supp. Decl. (Ex. 2) ¶ 22 ("An individual firm's historical performance is the best single indicator of its likely future performance because it necessarily takes account of unique characteristics of the firm.").[33]

### iii.    Start-Up Business Framework

An objection contends that the framework for start-up businesses, which permits class members to use qualified projections relied upon by third-party lenders to establish their baseline earnings, should also permit claimants to use a business plan relied upon by the partners in the business.  *See* Obj. Doc. 140.  The same objection contends that it is unreasonable for a start-up

---

[33] Moreover, economic data indicate that the expected failure rates for start-up art galleries run high.  *See* Fishkind Supp. Decl. (Ex. 2) ¶ 23 ("Economic data indicates that the expected failure rates for start-up art galleries are quite high, with one source calculating a national failure rate in excess of 40% (during approximately the first year and a half of operations). The high failure rate further demonstrates the reasonableness of the failed start-up business compensation methodology generally, and for this claimant specifically, because it does not incorporate a discount to account for the high probability that the business would have failed for reasons having nothing to do with the spill.").

business to be denied compensation where it had a history of negative EBITDA prior to the spill.

As the experts have explained, "[r]eliance on an independent third-party's use of projections is a recognized method of corroborating the reasonableness of such projections." Henley Decl. (Rec. Doc. 7114-11) ¶ 35; *accord* Sharp Decl. (Rec. Doc. 7114-18) ¶ 44. Indeed, "it is not typical or reliable to use projections from a start-up business's own business plan to determine base compensation in damages calculation . . . because a start-up company's business plans typically are unreliable, biased, and overly optimistic: 90-95% of start-ups do not meet their own declared projections." Henley Supp. Decl. (Ex. 3) ¶ 9.[34] For that reason, one of the primary responsibilities of a third-party lender is to analyze risk objectively; such lenders "have a great deal of experience and, typically, structured guidelines, regarding how to evaluate a start-up's business plan and to develop appropriate projections." *Id.* The requirement of reliance by a third-party lender is thus eminently reasonable. And it is also reasonable to assume that a business that had a history of negative EBITDA, and which failed following the spill, did not fail as a result of the spill. *See, e.g.*, Fishkind Decl. (Rec. Doc. 7114-5) ¶ 102.

### d. Objections To The Individual Economic Loss Framework Lack Merit.

### i. The Documentation Requirements Are Reasonable And Flexible.

The Settlement Agreement is unusually flexible in permitting class members to submit individual economic loss claims even when they do not possess tax documentation or other documentation (including pay stubs and bank records), if they instead submit a sworn statement from their employer. *See* Sharp Supp. Decl. (Ex. 9) ¶ 18. Nevertheless, one objection contends that this requirement is too onerous for individuals who were paid "off the books" in cash by

---

[34] *Accord* Richardson Supp. Decl. (Ex. 8) ¶ 4(c) ("[T]he requirement that a third-party lender must rely on a business plan is a reasonable means of assuring that the plan is credible and its projections reasonable, because new businesses using unverified business plans typically tend to be overly optimistic in their profit projections.").

employers who "refuse to pay FICA, FUTA, [and] workers' compensation insurance and do not keep records required by state and federal wage and hour labor laws."  Obj. Doc. 96 at 3-4. According to this objection, this requirement "creates the legally impracticable, if not impossible, requirement that these impoverished workers obtain sworn statements which will, by definition, incriminate their 'employer' who may face civil and criminal penalties for tax evasion, failure to provide state workers compensation and violation of state and federal labor laws." *Id.* at 5.

This objection has no merit.  The requirement of some verification beyond a claimant's statement unsupported by any contemporaneous documentation of lost earnings is a reasonable check against potential fraud.  Indeed, Henley is "unaware of any other settlement or compensation system that permits recovery for lost earnings without tax returns or pay period documents based only on sworn written statements."  Henley Decl. (Rec. Doc. 7114-11) ¶ 18; *see also* Sharp Decl. (Rec. Doc. 7114-18) ¶ 48 ("The Settlement Agreement is unusual in allowing individual claimants who cannot provide tax documentation or pay period documentation to rely instead on sworn written statements to establish employment, causation, and lost income related to that employment."); Henley Supp. Decl. (Ex. 3) ¶ 10.

To be blunt, a settlement cannot be unfair because it does not countenance violations of the civil or criminal tax laws.  With good reason, there is no legal precedent to the contrary. Fishkind Decl. (Rec. Doc. 7114-5) ¶ 107.  If objectors find this requirement too onerous, they are free to opt out.

       **e.**    **The Vellrath Criticisms Of The Economic Damage Compensation Framework Lack Merit.**

Because Halliburton lacks standing to object, its expert Marc Vellrath's criticisms should not even be considered.  *See* Vellrath Decl. (Rec. Doc. 91-2).  Regardless, Vellrath's criticisms

lack merit. Tellingly, after reviewing the Vellrath Declaration, none of the economic and accounting experts who submitted declarations in support of the Settlement found it persuasive or retreated from their prior opinions in any way. *See* Fishkind Supp. Decl. (Ex. 2) ¶ 4; Richardson Supp. Decl. (Ex. 8) ¶ 4; Sharp Supp. Decl. (Ex. 9) ¶¶ 5-22; Henley Supp. Decl. (Ex. 3) ¶¶ 4-7; Landry Supp. Decl. (Ex. 5) ¶ 30.

Vellrath's fundamental objection is that the Settlement is ***too generous*** to claimants. *See, e.g.*, Vellrath Decl. (Obj. Doc. 91-2) ¶ 13 ("While I see little connection between Settlement payments and true damages, I find the Parties' claims that the Settlement payments are 'extremely generous' to be highly credible."). That, of course, is not a valid objection. Instead, it confirms that the Settlement includes many generous and claimant-friendly features. *See, e.g.*, Fishkind Decl. (Rec. Doc. 7114-5) ¶ 36; Richardson Decl. (Rec. Doc. 7114-17) ¶ 32; Henley Decl. (Rec. Doc. 7114-11) ¶¶ 6, 10; Sharp Decl. (Rec. Doc. 7114-18) ¶ 64; Fishkind Supp. Decl. (Ex. 2) ¶ 4; Richardson Supp. Decl. (Ex. 8) ¶ 4(a)-(d), Sharp Supp. Decl. (Ex. 9) ¶¶ 5-7; 13; Henley Supp. Decl. (Ex. 3) ¶ 5; Landry Supp. Decl. (Ex. 5) ¶ 9.

Vellrath's assertion that causation presumptions in certain zones and for certain industries are unsupported by economic data fails because he relies on improperly segmented data that look at aggregate county data rather than data correlating to the zones. *See* Fishkind Supp. Decl. (Ex. 2) ¶¶ 10-11. Correcting for this problem, Vellrath's analysis actually supports the conclusion that the Zones and causation requirements are fair and reasonable. Indeed, Vellrath makes the surprising argument that southern Arkansas counties should be included in the Economic Loss Zones because they can be closer to the Gulf than some northern Louisiana parishes. This is a hyper-technical point comparing as-the-crows-fly distances to the Gulf for some parts of Arkansas to the same information as to some parts of Louisiana. Richardson reminds Vellrath of

44

the basic geographic fact that the entire State of Arkansas lies north of Louisiana and that Arkansas is landlocked, so the decision to exclude Arkansas from the zones was surely reasonable.  *See* Richardson Supp. Decl. (Ex. 8) ¶ 7.

Vellrath's objections that the causation and compensation requirements do not properly evaluate causation and compensation on an individualized basis suffer from two principal flaws. ***First***, as BP's experts observed and have reiterated, the causation requirements are consistent with and supported by relevant data concerning the Gulf Coast economy generally and data on particular geographies and industries forming part of that regional economy.  *See* Fishkind Supp. Decl. (Ex. 2) ¶ 14; Richardson Decl. (Rec. Doc. 7114-17) ¶ 50; Richardson Supp. Decl. (Ex. 8) ¶ 8.  ***Second***, the causation and compensation methodologies provide transparent and consistent criteria for evaluating claims, including flexible alternatives (such as choice of Benchmark Years and Compensation Period) that help tailor payment outcomes to claimants' individual circumstances.  Vellrath's proposed alternative to use *ad hoc*, custom-tailored determinations for each claimant, with no consistent, clearly defined methodology, would become opaque, would not ensure consistent treatment of claimants, would be administratively burdensome for claimants and the facility, and would not be suitable for class-wide application.  *See* Fishkind Supp. Decl. (Ex. 2) ¶ 15; Sharp Supp. Decl. (Ex. 9) ¶ 7.  Vellrath's proposal is difficult to distinguish from the very sort of individualized trials that settlement avoids.

### 3.   Property Damage

#### a.   Coastal Real Property Damage

A series of nearly identical objections contend that the compensation amounts in the Coastal Real Property Framework are too low and that the compensation zone segmentation is

arbitrary.[35]  Neither point is correct.

To begin with, the compensation amounts are not too low, unreasonable, or unfair. According to the objections, the compensation "does not reflect actual loss of value, loss of ability to obtain financing for development, loss of ability to market or lease, loss of the property reputation, stigma damages, or the cost of liability that the current owner or all subsequent owners may face depending upon the degree and type of contamination over time."[36]  Obj. Doc. 97 at 6-7; Obj. Doc. 98 at 7; Obj. Doc. 99 at 7; Obj. Doc. 100 at 4.  The objectors' ability to recover some of these categories of damages is speculative at best.  For example, the Court has recently ruled — months after the Settlement was reached — that "pure stigma" damages are not even available in this case, further weakening the objectors' argument that the compensation is inadequate.  *See* Rec. Doc. 7526 at 4-12.

The Coastal Real Property Framework provides generous compensation that is more than adequate to compensate the losses objectors allege.  For each eligible property, the 2010 appraised value of the property is multiplied by a property tax rate of 1.18%, and the base compensation amount then varies between 30% and 45% depending upon whether oil was observed on the property and whether the shoreline of the property includes environmentally sensitive areas.  Base compensation is increased by the RTP of 2.5.  *See* Dent. Decl. (Rec. Doc. 7114-4) ¶¶ 24-27; Taylor Decl. (Rec. Doc. 7114-20) ¶ 59.  The compensation amount is not

---

[35] *See* Obj. Doc. 88 at 6-7; Obj. Doc. 97 at 6-7; Obj. Doc. 98 at 6-7; Obj. Doc. 99 at 6-7; Obj. Doc. 100 at 3-5; Obj. Doc. 146 at 4-5; Obj. Doc. 157 at 6-7; Obj. Doc. 159 at 6-7; Obj. Doc. 177 at 4-6; Obj. Doc. 181 at 4-5; *see also* Obj. Doc. 167 at 6-8 (making the same points in a different form); Obj. Doc. 189 at 6-8 (same); Obj. Doc 90 at 11-13 (same); Obj. Doc. 225 at 3-8 (same).  Although their objections do not make the point entirely clear, each of the form objectors complains that he falls outside the Coastal Real Property Compensation Zone, making it likely that each lacks standing.  Certainly, these objectors have not satisfied their burden of demonstrating that they do have standing.  Certain other objectors also make similar objections regarding the amounts of compensation and the boundaries of the Coastal Real Property Zone.  *See, e.g.*, Obj. Doc. 61 at 4; Obj. Doc. 62 at 1; Obj. Doc. 90 at 11-13; Obj. Doc. 143.

[36] Three other objections assert that the amounts are inadequate without explaining why.  *See* Obj. Doc. 123 at 37-38; Obj. Doc. 230 at 37-38; Obj. Doc. 234 at 32-33.

inadequate merely because the parties have not broken out the compensation amount by damage sub-categories.  As the Settlement makes clear, RTPs reflect an amount paid "for any and all alleged damage" claimed by the claimant.  *See* Settlement Agreement Ex. 15 at 2.

Additional factors guaranteeing the ample recoveries available under the coastal framework include the following:  ***First***, to the extent class members in the coastal zone sold their residential parcel during April 20 to December 31, 2010, they may be eligible to recover under the Real Property Sales Framework for actual loss of value.  *Id.* Ex. 13.  And for persons who did not realize such losses, market values have returned to pre-spill levels.  *See* Dent Supp. Decl. (Ex. 1) ¶ 14.  ***Second***, with regard to any contamination on a parcel within the coastal zone, the Coastal Framework makes clear that nothing in the framework alters, reduces or expands "BP's obligations for cleanup, removal, spill response and remediation of real property under the applicable federal, state, and local laws, regulations, orders or agreements."  Settlement Agreement Ex. 11A § 4A.  ***Finally***, as explained in Section IV.D.5, *infra*, the argument that coastal property owners face a meaningful risk of future contamination is inaccurate.

Likewise, even assuming that the objectors complaining about exclusion from the Coastal Real Property Claim zone are class members with standing, the boundaries of that zone are reasonable.  *See* Dent Supp. Decl. (Ex. 1) ¶ 8 ("The Real Property Sales, Coastal and Wetlands Zones were . . . established using thorough and comprehensive SCAT data to delineate zones that encompass parcels on which the presence of oil was reported, as well as those that were monitored for the presence of oil.").  According to the objections, the boundaries are inappropriate because the use of dispersants means that the "SCAT line determinants were improper, inaccurate, and not reflecting [*sic*] the real distribution of contamination into various zones."  *E.g.*,  Obj. Doc. 97 at 7; Obj. Doc. 98 at 7; Obj. Doc. 99 at 7; Obj. Doc. 100 at 4; *see*

*also, e.g.*, Obj. Doc. 167 at 6-7.   But these boilerplate objections provide no support for this assertion other than their own say-so, which violates Paragraph 38 of the Preliminary Approval Order.

In addition to showing that use of SCAT lines to define the Coastal Real Property Claim Zone was reasonable, BP has explained that any parcels inadvertently excluded can be included if appropriate documentation is provided.  *See* Dent Decl. (Rec. Doc. 7114-4) ¶ 23; Taylor Decl. (Rec. Doc. 7114-20) ¶¶ 47-49.   Indeed, "the SCAT process is based on specific, well-defined, written procedures that have been extensively and widely used since the *Exxon Valdez* oil spill." Taylor Supp. Decl. (Ex. 11) ¶ 10.   "To characterize the SCAT process as not a scientific assessment is simply false."  *Id.*; *see also* Jeffrey Supp. Decl. (Ex. 4) ¶ 9 (same for OSAT). Moreover, there is no validity to the suggestion that Unified Command's use of dispersants somehow "hid" meaningful amounts of oil that could reappear in the future.  *See* Jeffrey Supp. Decl. (Ex. 4) ¶ 11; *see also infra* Section IV.D.5.

Other objections protest that the same RTP applies whether a property is oiled or not.[37] According to these objections, owners of oiled property may have claims for punitive damages under the Court's rulings, and thus should receive a higher RTP, which is intended to liquidate claims for punitive damages.  BP disputes that punitive damages could ever be imposed in this case.  *See* Rec. Doc. 7114-1 at 57-64; 67-69.  Regardless, under the Settlement Agreement, oiled properties are eligible for greater amounts of base compensation, and the difference in the amount of compensation is increased several times over by the application of an RTP.  *See, e.g.*, Dent Decl. (Rec. Doc. 7114-4) ¶ 24.  There is thus no basis to argue that persons with oiled

---

[37] *See* Obj. Doc. 123 at 30-34; Obj. Doc. 230 at 2, 34-47; Obj. Doc. 234 at 26-29.

property are not appropriately compensated.[38]

Last, other objectors complain that the same RTP applies whether or not the owner sold a property after December 31, 2010, and thus that compensation is arbitrary.  *See* Obj. Doc. 123 at 35; Obj. Doc. 230 at 2; Obj. Doc. 234 at 4.  The settling parties were free, however, to negotiate an RTP for coastal real property claims as a whole without further sub-division.  It is always possible to parse any given category of claims more finely.  These objectors also fail to give any weight to simplification of the claims methodology and administrability.

### b.      Wetlands Real Property Damage

Various objectors complain that some wetlands claims are being given short shrift.  But there are fair and reasonable grounds for placing wetland parcels along the beach in Florida, Alabama, Mississippi, and Grand Isle, Louisiana within the Coastal Framework while placing Louisiana wetland parcels within the Wetlands Framework.

*First*, owners of coastal wetlands along the SCAT line in Florida, Alabama, and Mississippi are eligible for compensation under the Coastal Real Property Framework, just like owners of coastal wetlands along the SCAT line in Grand Isle, Louisiana.  *See* Settlement Agreement Ex. 11A § 1.  Thus, objections that "[n]o claims by owners of wetland properties in the States of Mississippi, Alabama, and Florida are allowed under the Settlement Agreement," are incorrect.  Obj. Doc. 183 at 17.  Likewise, it is wrong for Professor Hazard to claim that the Settlement "would resolve all wetland claims of Wetlands Claimants in Mississippi, Alabama, and Florida . . . without payment to them."  Hazard Decl. ¶ 3(c) (Ex. L to Obj. Doc. 183).  The fact that some class members wish to be included in the Wetlands Real Property Framework

---

[38] Finally, a series of objections submitted on behalf of two claimants — GDC View, LLC, and Diversified Holdings, LLP, challenge their exclusion from both the Coastal Real Property zone and the Real Property Sales Compensation zone.  *See* Obj. Doc. 53; Obj. Doc. 55; Obj. Doc. 64; Obj. Doc. 65; Obj. Doc. 69; Obj. Doc. 73; Obj. Doc. 74.  These objections, however, have been mooted by the parties' provision of updated mapping data to the Claims Administrator.

instead of the Coastal Real Property Framework does not mean that their property claims will be disallowed or resolved without payment.

**Second**, the placement of certain wetlands parcels into the Coastal Framework and other wetlands parcels into the Wetlands Framework is fair and reasonable. The rationale for grouping these wetlands parcels in Alabama, Florida, Mississippi, and Grand Isle, Louisiana within the Coastal Framework is that they are part of a land mass characterized as beach. *See* Taylor Decl. (Rec. Doc. 7114-20) ¶ 48. As wetlands expert Wharton explains, "Grand Isle is predominantly dedicated to residential, tourism, industrial, and commercial use." Wharton Supp. Decl. (Ex. 14) ¶ 17. Within the Coastal Framework, wetlands parcels, due to the environmental sensitivity of wetlands, receive a higher compensation amount than non-wetlands beach parcels. *See* Settlement Agreement Ex. 11A. The following distinctions are illustrative here.

**Properties of Louisiana Wetlands.** With regard to Louisiana wetlands parcels within the Wetlands Framework, it is reasonable for the Settlement to take account of the distinguishing environmental features of those wetlands. Indeed, the Settlement is not the first time these environmental distinctions between Louisiana and the other Gulf States have been recognized. Notably, both the MC252 spill response and SCAT treated Louisiana differently from Alabama, Mississippi, and Florida due to the composition of Louisiana's coastline. *See* Taylor Supp. Decl. (Ex. 11) ¶ 20. Separate response plans and even different treatment methods and standards applied to coastal wetlands in Louisiana. *See id.*

Specifically, there are at least five key differences between Louisiana coastal wetlands and coastal wetlands areas in Mississippi, Alabama, and Florida. "First, the Louisiana coastal wetlands impacted by the *Deepwater Horizon* spill are predominantly open to large bays and the Gulf of Mexico and lack the protective and stabilizing features of nearby and more prominent

barrier islands found in other Gulf States."  Wharton Supp. Decl. (Ex. 14) ¶ 16.  "Second, the Louisiana coastal wetlands differ in general from coastal wetland areas in other Gulf States in soil composition, and geomorphology."  *Id.*  "Third, there are differences in dominant vegetation species composition between the Louisiana coastal wetlands and coastal wetland areas in other northern Gulf States."  *Id.*  "Fourth, the subsidence rate is greater than coastal wetland areas in other Gulf States, specifically in the Mississippi Deltaic Plain.  This results in some coastal wetlands within Louisiana experiencing a higher degree and duration of flooding compared to coastal wetlands in other Gulf States."  *Id.*  Fifth, the Louisiana coastal wetlands are predominantly characterized as large Deltaic or Chenier plains as opposed to the smaller delta formations and coastal plain fringe wetlands that are predominantly found east of Louisiana."  *Id.*

    ***More Extensive Oiling in Louisiana.***  The oiling observed in Louisiana's wetlands was also more extensive than the oiling observed in the coastal wetlands of other Gulf States.  So, it is incorrect to say that "approximately 1.5 million acres of fragile, ecologically and economically valuable wetlands along the coasts of Mississippi, Alabama, and Florida [were] exposed to the same oil, chemical dispersants, and other synergistic contaminants as a direct result of this environmental disaster," Obj. Doc. 183 at 18.  In fact, SCAT observed no oiling in any coastal wetlands in Florida, no heavy oiling in any Alabama coastal wetlands, and only .07 miles of heavily oiled coastal wetlands in Mississippi.  *See* Wharton Supp. Decl. (Ex. 14) ¶ 18.  In contrast, the shorelines of Louisiana's coastal wetlands account for 99.9% of all heavy oiling of coastal wetlands observed by SCAT, *see id.*, and 98.9% of all coastal wetlands shoreline with moderate oiling observed.  *See* Taylor Supp. Decl. (Ex. 11) ¶ 21.

    ***Third,*** objectors focusing on the differences between the Coastal Real Property and Wetlands Real Property Frameworks simply assert that the Coastal Real Property Framework

provides inadequate compensation.  In light of the evidence that the Coastal Real Property Framework is fair and reasonable, *see, e.g.*, Taylor Decl. (Rec. Doc. 7114-20) ¶ 59, the objectors' argument reduces to the claim that the Settlement is too generous to those in Louisiana.  That argument is no basis to withhold final approval.  *See, e.g.*, Dent Supp. Decl. (Ex. 1) ¶ 20 ("Finally, it is not, in my view, reasonable to object on the basis that claimants and class members are being overcompensated"); *see also Dobson v. Camden*, 705 F.2d 759, 768 (5th Cir. 1983) ("When two parties settle in a bipolar lawsuit, no one would consider objecting to the settlement on the ground that the dollar figure reached unfairly overcompensates the plaintiff.").

**Fourth**, a series of objections contends that the zones are arbitrary and that the compensation amounts are inadequate.[39]  Both assertions lack substance and merit.  The zones were "established using thorough and comprehensive data to delineate a zone that encompasses parcels in the Louisiana wetlands on which the presence of oil was reported, as well as those that were monitored for the presence of oil."  Dent Decl. (Rec. Doc. 7114-4) ¶ 36; *accord, e.g.*, Taylor Decl. (Rec. Doc. 7114-20) ¶¶ 51-54; Wharton Decl. (Rec. Doc. 7114-23) ¶ 26.  The compensation amounts are more than adequate to compensate all owners of property situated within the Wetlands Real Property Claim Zone, regardless of whether oil was observed on the property.  *See* Dent Decl. (Rec. Doc. 7114-4) ¶ 41 (explaining that compensation for oiled property, is "substantially greater than the typical per acre fair market value for wetland parcels); Dent Decl. ¶ 45 (same for non-oiled property); *see also* Wharton Decl. (Rec. Doc. 7114-23) ¶ 26.

---

[39] *See* Obj. Doc. 88 at 6-7; Obj. Doc. 97 at 6-7; Obj. Doc. 98 at 6-7; Obj. Doc. 99 at 6-7; Obj. Doc. 100 at 3-5; Obj. Doc. 146 at 4-5; Obj. Doc. 157 at 6-7; Obj. Doc. 159 at 6-7; Obj. Doc. 167 at 8; Obj. Doc. 177 at 4-6; Obj. Doc. 181 at 4-5; Obj. Doc. 189 at 8.   Certain other objectors, though not following the same form, also make similar objections about the amounts of compensation and the boundaries of the Wetlands Real Property Zone.  *See, e.g.*, Obj. Doc. 90 at 7-11.

More specifically, one objection complains that the use of the SCAT line to delineate the Wetlands Claim Zone is inappropriate.  *See* Obj. Doc. 90 at 7-11.  In reality, SCAT "provides accurate and reliable observation-based information to establish the Real Property Sales, Coastal, and Wetlands Zones."  Dent. Supp. Decl. (Ex. 1) ¶ 8; *see also* Taylor Decl. (Rec. Doc. 7114-20) ¶¶ 8-23.

Another objector complains that it is too difficult for a class member to establish that his property was oiled and thus belongs in Category A.  Under the Wetlands Framework, parcels are considered oiled either if they were reported as oiled in the SCAT or NRD process, or if the class member submits other governmental or academic data indicating that the property was oiled.  *See* Settlement Agreement Ex. 12A at 5.  This provision is a reasonable method for determining whether inclusion in Category A is based on accurate, unbiased data.  *See* Dent Supp. Decl. (Ex. 1) ¶¶ 8, 10.  Indeed, in litigation, the claimant would face other proof and evidentiary requirements.  *Cf., e.g.*, *Reed*, 703 F.2d 172 (court must compare settlement terms "with the likely rewards the class would have received following a successful trial of the case"); *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007) (same).

    **c.**    **Real Property Sales Damage**

Some objectors contend that the Real Property Sales Damage Framework should not be limited to sales that occurred prior to December 31, 2010.  *See* Obj. Doc. 90 at 13-14; Obj. Doc. 152 at 2; Obj. Doc. 253.  That cut-off date is reasonable because any reduction in property values that persisted after that date is not predominantly attributable to the spill.  *See, e.g.*, Dent Supp. Decl. (Ex. 1) ¶ 5 ("The data show that residential real estate sales activity and pricing in the relevant Gulf Coast real estate markets had recovered from any potential effect associated with the *Deepwater Horizon* Spill . . . by December 2010.").

Certain other objectors complain that the Real Property Sales Compensation Zone

excludes the Florida Keys.  *See* Obj. Doc. 134 at 1; Obj. Doc. 152 at 2-3.  In addition to the fact

that these objectors lack standing, the Florida Keys are excluded because they fall outside even

the zone that was monitored by SCAT and NRD for the presence of oil.  *See* Dent Supp. Decl.

(Ex. 1) ¶ 8.  Other objections to the boundaries of this zone similarly lack merit.  *See* Obj. Doc.

61 at 4; Obj. Doc. 62 at 1.

### 4.    Vessels of Opportunity ("VoO") Charter Payment

A number of objections complain about the VoO offset, pursuant to which Economic

Loss payments to charter boat operators are reduced by a percentage of their compensation for

their participation in the VoO program.[40]  BP explained in its opening brief why these objections

lack merit.  *See* Rec. Doc. 7114-1 at 89-90.  In overview, (1) the law does not require double

recovery, and such recovery would never be available in litigation; (2) the parties had a

reasonable basis for distinguishing between charter boat operators and commercial fishermen, as

commercial fishermen do not ordinarily lease their vessels for use by third persons; and (3) BP

denies promising that an offset would not be applied.[41]  Finally, such a promise, even if proven,

could not overturn the overall fairness, reasonableness, and adequacy of this Settlement

Agreement designed to compromise disagreements between the parties.

---

[40] *See, e.g.*, Obj. Doc. 59; Obj. Doc. 60 at 1-2; Obj. Doc. 77; Obj. Doc. 78; Obj. Doc. 79; Obj. Doc. 80; Obj. Doc 81; Obj. Doc. 82; Obj. Doc. 83; Obj. Doc. 84; Obj. Doc. 85;Obj. Doc. 133 at 2; Obj. Doc. 149 at 1-2; Obj. Doc. 166; Obj. Doc. 168 at 1; Obj. Doc. 169 at 1-2; Obj. Doc. 170 at 1; Obj. Doc. 171; Obj. Doc. 173; Obj. Doc. 174; Obj. Doc. 175; Obj. Doc. 176; Obj. Doc. 179.  Nine of the objections to the VoO offset are repetitive form objections submitted by the clients of a single attorney, Adam M. Milam.  *See* Obj. Doc. 77; Obj. Doc. 78; Obj. Doc. 79; Obj. Doc. 80; Obj. Doc 81; Obj. Doc. 82; Obj. Doc. 83; Obj. Doc. 84; Obj. Doc. 85.  An additional ten objections, while submitted individually by different class members, are also form objections/lawyer's documents.  *See* Obj. Doc. 166; Obj. Doc. 168; Obj. Doc. 169; Obj. Doc. 170; Obj. Doc. 171; Obj. Doc. 173; Obj. Doc. 174; Obj. Doc. 175; Obj. Doc. 175; Obj. Doc. 176.  Finally, an additional nine filings are simply supplemental filings made to include the objector's previously omitted name, address, phone number, and attempted proof of class membership.  *See* Obj. Doc. 105; Obj. Doc. 106; Obj. Doc. 107; Obj. Doc. 108; Obj. Doc. 109; Obj. Doc. 110; Obj. Doc. 111; Obj. Doc. 112; Obj. Doc. 113.

[41] The objections are internally inconsistent on this point.  Thus, one objection to the Settlement Agreement filed by a commercial fisherman who did not participate in the VoO program complains that he elected not to participate in the VoO program because BP told commercial fishermen that "any VoO earnings ***would*** ultimately be deducted from a final claim."  Obj. Doc. 104 at 6 (emphasis added).

Two objectors also object to the VoO provisions of the Settlement on the grounds that the objectors were not permitted to participate in the VoO program, and thus are not eligible for compensation under the Framework. *See* Obj. Doc. 139 at 1; Obj. Doc. 141 at 1. Because these individuals do not have VoO claims, however, they are not class members. They lack standing to object to a settlement agreement that does not affect their legal rights.

One objector contends that class members should be permitted to receive payment on the entirety of their GCCF offers without foreclosing their ability to accept VoO compensation under the Settlement Agreement. *See* Obj. Doc. 102. According to the objection, the "GCCF consistently and steadfastly refused to address damages resulting from participation in the VoO program," and "[a]ccording to [the] GCCF, any claims related to the VoO program were beyond its mandate." *Id.* at 2. In contrast, the Settlement Agreement's transition process required claimants who wished to accept the remaining 40% of any pending GCCF offer to release all claims. *See* Settlement Agreement ¶ 4.2.3.1. No one in this position was compelled either to (1) take the 60% transition payment, (2) take the 40% residual, or (3) file a claim with the Settlement Program. Such claimants have made a choice to seek the benefits of the Settlement. And nothing limits the claims that this Settlement Agreement can address to those the GCCF chose to address.

Finally, although Halliburton lacks standing, it contends through the Vellrath declaration that "VoO program claims and any economic damages related thereto are likely to be highly individualized, depending very much on the particular circumstances of each claimant." Obj. Doc. 91-2 ¶ 263. The compensation available under the Settlement Agreement is more than sufficient to make each claimant whole, regardless of how allegedly "individualized" the claim. Moreover, the claims are not individualized as Vellrath suspects, because all VoO claims are

ultimately based on the Master Vessel Charter Agreement. *See, e.g.*, Plaintiffs' Original Petition and Request for Disclosure, *Brannon v. BP*, No. 2011-60109 (Harris County, Tex., Oct. 6, 2011) ("The contracts came in the form of **identical agreements** entitled 'Master Vessel Charter Agreement' and/or 'Master Service Contract . . . .'") (emphasis added).

### 5.    Vessel Physical Damage

Other than one comment contained in the Vellrath declaration, which was submitted by Halliburton (a party lacking standing), *see* Vellrath Decl. (Obj. Doc. 91-2) ¶¶ 266-69, no objection challenges any aspect of the Vessel Physical Damage Framework.   Vellrath's arguments, moreover, do not call in question the fairness of the compensation available under this Framework in any meaningful way.

### 6.    Subsistence Damage

An objector opposes the Subsistence Framework because it supposedly "fails to adequately address Objectors' Native American heritage and reliance on the land and water for subsistence, trade, barter, commerce, and as an integral cornerstone of their traditional lifestyle." Obj. Doc. 245 at 2.  The objection ignores the foundation for the Subsistence Claims Framework, which is intended to compensate for traditional and customary reliance on natural resources for subsistence use, including consumption and bartering.  *See* Settlement Agreement ¶¶ 1.3.1.3; 5.4.1; 38.138; Ex. 9 § (A)(2).  As with members of Native American communities, all class members who traditionally and customarily relied for subsistence on natural resources that were diminished or restricted due to the spill are similarly situated.  Objectors provide no legal basis or rationale for why members of Native American heritage should be entitled to more generous payments than other class members who depend on the same subsistence use of natural resources.  In short, subsistence claims are treated evenhandedly, regardless of the cultural or ethnic identity of the subsistence claimant.

Moreover, there is no basis for the relief this objection seeks, which is an added RTP or lump-sum payment for subsistence class members.  There were no hunting closures, and nearly all state and federal waters were open by November 2010.  *See* Kelley Decl. (Rec. Doc. 7114-13) ¶¶ 17, 22 ("[T]he risk of future impairment to subsistence activity appears low.  In my opinion, the risk to family and community culture is also likely to be quite low.")

Additionally, the Vellrath declaration contends that the Subsistence Framework "fails to tie Settlement payments to any usual or commonly accepted measure of economic damages."  Obj. Doc. 91-2 ¶ 274.  As Dr. Fishkind explains, however, retail prices are objectively verifiable, market-based measures of value that are often used as a basis for replacement cost.  *See* Fishkind Supp. Decl. (Ex. 2) ¶ 19.  Using retail prices to calculate base compensation awards is therefore fair and reasonable.  *Id*.  An expert on Native Americans and subsistence in the Gulf States, Dr. Laura Kelley, also agrees that the use of retail prices is part of the subsistence methodology that fairly compensates class members.  *See* Kelley Decl. (Rec. Doc. 7114-13) ¶ 17.

### 7.    Seafood Compensation Program

#### a.    The Seafood Compensation Program Provides Fair, Reasonable, And Adequate Compensation For All Eligible Claimants.

The following key aspects of the Seafood Compensation Program strongly support final approval:

- The $2.3 billion guaranteed payment is sufficient to fairly, adequately, and reasonably compensate the participants in the seafood industry.  *See* Smith Decl. (Rec. Doc. 7114-19) ¶¶ 10-18.

- The RTPs are the most generous of any in the Settlement Agreement and properly account for the future risks to the fisheries.  *See id.* ¶ 24.

- The Court-appointed neutral (John Perry along with Dan Balhoff) developed each compensation plan with a "bottom up" approach and with the goal of fairly, adequately and reasonably compensating each eligible individual claimant.  *See* Balhoff Supp. Decl. (Joint Ex. B) ¶ 3; Perry Supp. Decl. (Joint Ex. G) ¶ 3.

- Recent fisheries data from the National Oceanic and Atmospheric Administration further supports a finding that the SCP is fair, reasonable, and adequate, since most Gulf Coast fishing industries are within pre-spill levels. *See* Tunnell Supp. Decl. (Ex. 13) ¶¶ 5-11; Smith Supp. Decl. (Ex. 10) ¶ 36.

These facts are not seriously challenged by any of the objectors. There are no grounds (much less evidence) for the Court to find that any of the objectors raise valid criticisms of the SCP.

*First*, through the SCP, BP has guaranteed payments to the Gulf Coast seafood industry of $2.3 billion — nearly *five times* the entire annual revenue of the seafood industry and many multiples more than any losses actually suffered by the industry. Smith Decl. (Rec. Doc. 7114-19) ¶¶ 12-18. Several parties, including objectors, agree that the $2.3 billion is sufficient to make the seafood industry whole. In a recent filing, the plaintiffs in *Than Hai, Inc.* expressed support for the $2.3 billion Seafood Compensation amount as follows:

> [F]ar from being prejudicial to seafood compensation claimants, the so-called "cap" — which can more accurately be characterized as a guarantee — is consistent with the efforts of plaintiffs' damages experts to assure that seafood compensation claimants will be adequately and fairly compensated not only for their losses incurred to date, but also for potential future losses.

Rec. Doc. 7588 at 4. Likewise, GO FISH states (subject to their views on the second distribution), that the $2.3 billion is sufficient. Obj. Doc. 226 at 3. Halliburton goes even further and alleges that the $2.3 billion *over-compensates* participants in the seafood industry. *See, e.g.* Vellrath Decl. (Obj. Doc. 91-2) at 181-86. No objector provides any evidence that $2.3 billion is insufficient to fairly, reasonably, and adequately compensate eligible seafood claimants.

*Second*, while objectors assert that there is "significant" uncertainty about possible future impacts to the fisheries in the Gulf of Mexico, the evidence does not support their assertions. As set forth in Dr. Tunnell's declaration, commercial species compensated in the SCP are within "normal annual trends of recent years before the spill." *See* Tunnell Decl. (Rec. Doc. 7114-22) ¶ 7; *see also* Tunnell Supp. Decl. (Ex. 13) ¶ 11. Additionally the RTPs in the SCP recognize

some uncertainty about future impacts and provide substantial recoveries to account for those uncertainties.  *See* Smith Decl. (Rec. Doc. 7114-19) ¶ 24.  Even if there were evidence of "significant" uncertainty, which there is not, the recoveries to eligible claimants under the SCP remain fair, reasonable, and adequate.  *See* Smith Decl. (Rec. Doc. 7114-19) ¶ 68.

*Third*, the Court-appointed neutral developed the compensation plans for the SCP, not BP or the PSC.  The SCP was developed using a "bottom-up approach" to design compensation plans that provide fair, reasonable, and adequate compensation even absent a second distribution (although the neutral anticipates that there will be a balance after the initial distribution).  Perry Supp. Decl. (Joint Ex. G) ¶¶ 3, 5; Balhoff Supp. Decl. (Joint Ex. B) ¶¶ 3, 5.  The Court-appointed neutral developed the SCP with substantial information drawn from class members and counsel representing each of the seafood species include in the SCP and the interests of seafood crew as well.  *See* Perry Decl. (Rec. Doc. 7110-5) at 2-3; Balhoff Decl. (Rec. Doc. 7110-2) at 2-3; Perry Supp. Decl. (Joint Ex. G) ¶ 4; Balhoff Supp. Decl. (Joint Ex. B) ¶ 4; Rec. Doc. 7710 at 7 ("While the settlement that was ultimately crafted did not fully reflect the damages theories that [*Thahn Hai* plaintiffs'] experts supported — it was, of course, a settlement — several of the proposed Economic and Property Damages Settlement's main features were carried over from plaintiffs' expert analyses.").  And the neutral, after reviewing and analyzing all seafood-related objections, continues to believe that the SCP is fair to eligible participants.  *See* Perry Supp. Decl. (Joint Ex. G) ¶ 1; Balhoff Supp. Decl. (Joint Ex. B) ¶ 1.

*Fourth*, the most recent NOAA fisheries data continue to show a recovery in the fisheries across the Gulf of Mexico.  As Dr. Tunnell reports, 2011 landings data recently released by NOAA confirm his conclusions that most of the fishery species relevant for the SCP already "appear to be within pre-spill landings and population trends in most areas of the northern Gulf."

Tunnell Supp. Decl. (Ex. 13) ¶¶ 3, 19.

> **b.** **Objections To The Seafood Compensation Program Lack Merit.**

In total, 37 objections made assertions related to the SCP.[42]  None of the challenges raises

issues or concerns that were not contemplated or evaluated by the Court-appointed neutral in

developing the SCP.  Of the few objectors that submitted declarations or affidavits, none

effectively counters the evidence submitted by BP and Class Counsel.  Where BP and Class

Counsel submitted specific evidence from numerous experts, the objections largely rely on

anecdotal and unreliable evidence, unsubstantiated allegations, and mere speculation and/or

hearsay about possible future impacts.

> **i.** **Challenges To The Seafood Compensation Program Based On Uncertain Future Risks Are Without Merit.**

Several objectors assert that the SCP is inadequate because it fails to account for

uncertain future risks to Gulf of Mexico fisheries.[43]  This is incorrect for several reasons.  *First*,

as Dr. Tunnell reported, most of the relevant commercial fisheries species appear to be within

normal, pre-spill trends.  That conclusion was supported by citations to a sizable body of

scientific data, papers, and information.  No objector directly attacks Dr. Tunnell's analysis or

opinion or challenges the data on which he relied.  *Second*, the most recent NOAA data confirm

Dr. Tunnell's conclusions.  *See* Tunnell Supp. Decl. (Ex. 13) ¶¶ 5-11; Tunnell Decl. (Rec. Doc.

7114-22) ¶ 71; Smith Supp. Decl. (Ex. 10) ¶ 36.  *Third*, the objectors ignore the high RTPs

provided to SCP claimants, which were designed to compensate for such claims of uncertainty.

*See* Smith Decl. (Rec. Doc. 7114-19) ¶ 24.  *Finally*, as Dr. Pearson notes, allegations that the

---

[42] This includes objectors who plainly lack standing, such as the State of Louisiana and GO FISH.  *See* Obj. Doc. 226 (GO FISH); 227 (State of Louisiana).

[43] Obj. Doc. 104 at 3-5; Obj. Doc. 167 at 8-9; Obj. Doc. 189 at 8-9; Obj. Doc. 227 at 21-22; Obj. Doc. 240.

*Exxon Valdez* oil spill caused future unforeseen impacts to the herring populations in Alaska are simply wrong and contrary to the scientific evidence.  *See infra* Section IV.B.7.b.i.B.

> **(A)    The Werner Fishermen Objectors Do Not Provide Any Support For Their Assertions.**

The Werner objectors make vague assertions that there could be a future fisheries collapse in finfish species.  Obj. Doc. 104 at 4-5.  In support, these objectors — without any expert evidence — rely on variances in vermilion snapper catches across certain portions of the Gulf.  Obj. Doc. 104 at 4.  As Dr. Smith explains, however, the way in which the objectors present these variance figures is misleading, and the overall change in landings is smaller than the objectors' numbers suggest.  *See* Smith Supp. Decl. (Ex. 10) ¶¶ 33-34.  Indeed, as Dr. Tunnell notes, vermilion snapper catches in 2011 were above long-term averages and were consistent with  the pre-spill benchmark period.  *See* Tunnell Supp. Decl. (Ex. 13) ¶ 10; Tunnell Decl. (Rec. Doc. 7114-22) ¶ 60.   Objectors' assertions that the quotas for specific fisheries may be reduced are even more speculative and not supported by the commercial fisheries data.  *See* Tunnell Decl. (Rec. Doc. 7114-22) ¶ 62 (noting that quotas for red snapper increased post-spill); Smith Supp. Decl. (Ex. 10) ¶¶ 35-36, 40-42 (noting that average snapper IFQ shares increased post-spill, that finfish 2011 landings exceed the benchmark period, and highlighting the mobile and cross-species nature of fin-fishing activities).

> **(B)    Attempted Analogies To The *Exxon Valdez* Oil Spill Are Without Merit And Should Be Ignored.**

The objectors relying on the herring collapse in Alaska try to substitute alarmism for argument.  The State of Louisiana analogizes to the *Exxon Valdez* incident without any evidence to support its claims.  *See* Obj. Doc. 227 at 21.  But according to Dr. Pearson, a leading expert in the herring population of Alaska, a scientific consensus has formed that the *Exxon Valdez* did not cause the herring fisheries to collapse.  *See generally* Pearson Decl. (Ex. 7).

A group of objectors cites to the declaration of Dr. Cake, but that declaration provides no support for its assertions.  Obj. Doc. 167 at 4; Obj. Doc. 189 at 4.  Indeed, Dr. Cake admits that "some of these statements are expert opinions . . . while some are more political in nature."  Cake Decl.  (Obj. Doc. 167-19) ¶ 1.  Dr. Cake does not specify which assertions are "political" and which are supposedly "expert."  Because Dr. Cake does not cite to any scientific data or analysis, it is difficult, if not impossible, to tell which are which.  Without some reference to evidence, Dr. Cake's assertions should be given no weight.  Indeed, as set forth in the Dr. Tunnell and Dr. Pearson declarations, Dr. Cake's assertions are factually incorrect and his analogies to *Exxon Valdez* and *Ixtoc-I* inappropriate.  As Dr. Tunnell explains, the *Ixtoc-I* oil spill lasted more than nine months and the mangrove oysters Dr. Cake discusses were repeatedly oiled.  Mangrove oysters are not found in the northern Gulf, and the Eastern oysters were not oiled during *Deepwater Horizon.  See* Tunnell Reply Decl. (Ex. 13) ¶¶ 15-16.[44]  And, of course, political opinion and viewpoints do not constitute evidence and certainly are not scientifically reliable.

### (C)    Neither Hurricane Isaac Nor The October Oil Sheen Change The Analysis.

Neither Hurricane Isaac nor the oil sheen reported above the Macondo well site on October 10, 2012 (after Dr. Cake's declaration) changes the analysis.  While Dr. Cake and other objectors mention the potential effects of Hurricane Isaac, the hurricane has not changed Dr. Tunnell's opinion regarding recovery of the commercial fisheries.  *See* Tunnell Supp. Decl. (Ex. 13) ¶ 12.  Likewise, the *de minimis* amount of oil sheen recently reported, which appears to be the result of oil spilled during the incident and until recently trapped in the cofferdam used to try

---

[44] Additionally, the submission by a "group of more than 1,500 commercial fishermen and more than 900 Vessels of Opportunity oil spill response participants" arguing that the Settlement "is fair and adequate and serves the interests of the class members as a whole," considers Dr. Cake to be part of its expert team supporting its advocacy in favor of the Settlement.  Rec. Doc. 7710, at 1-2, 4 (Memorandum in Response to Opposition by State of Louisiana to Motion for Final Approval of Economic and Property Damages Class Settlement).

to contain the spill, *see* Jeffrey Supp. Decl. (Ex. 4) ¶ 14 & Ex., poses no material threat to aquatic life.  As the Coast Guard has stated:  "The sheen is not feasible to recover and does not pose a risk to the shoreline."   FOSC issues Notice of Federal Interest to BP and Transocean, http://www.restorethegulf.gov/release/2012/10/10/fosc-issues-notice-federal-interest-bp-and-transocean (Oct. 10, 2012); *see also* Jeffrey Supp. Decl. (Ex. 4) ¶ 15 ("[S]heen oil located approximately 50 miles offshore would be expected to breakdown and naturally attenuate before reaching the shoreline and would thereby pose no risk to nearshore aquatic life."); Taylor Supp. Decl. (Ex. 11) ¶ 35.

### (D)   The Remaining Objectors Fail To Provide Any Support For Their Claims Of Significant Future Risks.

The Cajun Crab objectors make unsubstantiated allegations about biological impacts to blue crabs and the blue crab fisheries.  *See* Obj. Doc. 150 at 2.  Again, there is no evidence to support those assertions, and the objectors rely on anecdotal revenue data.  The Apalachicola oyster harvesters also raise a concern of future impacts to Florida oysters and note that the State has declared a "local state emergency."  Obj. Doc. 240 at 2.  But tellingly, their suggestions about the causes of the state of emergency are contradicted by Governor Rick Scott's statement that the oysters are being damaged primarily by years of drought and illegal overharvesting.  *See* Tunnell Supp. Decl. (Ex. 13) ¶ 17 & Ex. A. (September 6, 2012 Letter from Gov. Scott to Ms. Blank at 1-2).   Apalachicola offers no evidence of any future impact on Florida oysters from the *Deepwater Horizon* oil spill.

### (E)   As A Matter Of Law, Parties Can And Should Be Permitted to Settle Cases Even Where Uncertainty About Future Risk Remains.

In any event, those objectors who argue that the Settlement cannot be approved because of general uncertainty about future risks prove far too much.  If objectors were correct, few, if

any, mass tort or class actions in the environmental or health-risk areas could ever be settled. While BP disagrees with objectors' assertions about future risks, even if the objectors were correct, approval of the Settlement would still be appropriate. Class members were adequately represented by Class Counsel, and together with BP they struck reasonable compromises taking into account a wide array of uncertainties. Indeed, a core purpose of the Settlement's generous RTPs was to compensate for potential future risks raised by the objectors. *See* Rec. Doc. 7710 at 7 ("[RTPs] protect[] the plaintiffs and ensure[] that the risk of future damages is both scientifically evaluated and fairly compensated.").

In the same vein, if these objectors were correct, this case could also never be tried because on their logic no final judgment could be entered — *i.e.*, until future uncertainties are dispelled, no claimant could reliably be made whole. That is not the law. Future risks and uncertainties are estimated and monetized in settlements and at trials all the time. The evidence before the Court confirms that this Settlement is fair, reasonable, and adequate.

### ii. Objectors Outside The Seafood Compensation Program Seeking To Participate In The SCP Do Not Raise Valid Objections.

A number of seafood processors, including the American Shrimp Processors Association ("ASPA"), argue that they should be included in the SCP eligible for its higher RTPs.[45] Such arguments are not grounds to find that the SCP is not fair, reasonable, or adequate for the claimants who meet the eligibility requirements. Rec. Doc. 7114-1 at 97-98. Simply put, seafood processors have different legal and factual arguments as to the validity and strength of their claims. For instance, processors face an insuperable barrier to recovering punitive damages under *Robins Dry Dock* because they cannot show that they own oiled property. There is nothing improper about compensation frameworks that take the strength and weakness of claims

---

[45] Obj. Doc. 139 at 1-2; Obj. Doc. 141; Obj. Doc. 147.

into account.  *See id.* at 97-98 (citing cases); *see also, e.g., Lenahan v. Sears, Roebuck & Co.*, 266 F. App'x. 114, 119 (3d Cir. 2008); Miller Supp. Decl. (Ex. 6) ¶ 12.  ASPA reiterates its argument that processors should be included for the second time, and this Court should now reject the argument in both of its incarnations.  *Compare* Obj. Doc. 147 *with* Rec. Doc. 6368.[46]

Like ASPA, certain charter fishermen contend that it is unreasonable for them to be excluded from the SCP.  *See, e.g.*, Obj. Doc. 86 at 5-6; Obj. Doc. 133 at 2; *see also* Obj. Doc. 172-176.  Charter fishermen, however, participate in a different market than those who harvest seafood with nets designed to pull in large hauls.  Charter fishermen do not necessarily seek to catch as many fish as possible by the most efficient means, but instead seek to provide tourists with a recreational activity.  Maritime law recognizes these differences, and treats the claims of charter fishermen as distinct from the valid maritime claims of commercial fishermen.  *See In re Exxon Valdez*, 1995 A.M.C. 1429, 1433 (D. Alaska 1994) (granting summary judgment for defendants under *Robins Dry Dock* where plaintiff guides for sport fishermen "failed to show that their economic claims were related to any physical damage to property").  Moreover, as Dr. Fishkind explained, the RTP for charter fisherman fairly takes into account recovery of Gulf tourism by the end of 2010 and re-opening of spill-related fisheries closures by the end of 2010.  Fishkind Decl. (Rec. Doc. 7114-5) ¶¶ 70, 77, 78.  Class Counsel and BP were free to agree to treat charter fisherman differently than those who harvest seafood for sale by the pound in

---

[46] Moreover, ASPA's and Cajun Crab's (Obj. Doc. 150 at 1-2) standing to challenge their non-inclusion in the SCP is doubtful.  Processors are free to seek uncapped recoveries under the applicable non-SCP frameworks.  The agreed-upon amount for the SCP was specifically designed for a collection of claims types that did not include processor claims.  Processors cannot show that such a treatment prejudices them for numerous reasons: (1) their claims are not subject to a limit in the SCP; (2) the separate nature of the SCP makes clear that trade-offs between processors and SCP participants did not occur; (3) the participation of the Court-appointed neutral (John Perry along with Dan Balhoff) negates any prospect of such an improper trade-off occurring; as does (4) the participation of Judge Shushan in mediating all aspects of the Settlement as a whole.  The SCP was designed for the benefit of those bringing in seafood from the environment.  Downstream businesses such processors, wholesalers, retailers, and restaurants were rationally dealt with differently in the Settlement.

established markets located at the docks.

### iii.    Objections To The Benchmark Period Lack Merit.

One objector argues that the benchmark periods are inappropriate because 2007 and 2008 were hurricane years.  Obj. Doc. 141 at 2.  As Dr. Smith explained, using a benchmark period for economic loss claims is necessary and appropriate.  *See* Smith Decl. (Rec. Doc. 7114-19) ¶¶ 19-22.  Further, like the general economic loss framework discussed above, for all fisheries except oysters, the SCP allows substantial flexibility in selecting a Benchmark Period with the choice of averaging 2007-2009, averaging 2008 and 2009, or using only the single year of historical revenue in 2009, plus the flexibility to exclude a year under limited circumstances.  As with the Business Economic Loss Framework, "[o]ffering the class member a variety of choices compares favorably to litigation, in which the parties would "contest what periods prior to the loss event . . . are most representative of operations immediately prior to the loss event."  Sharp Decl. (Rec. Doc. 7114-18) ¶ 20.  Further, the assertion that the benchmark periods represent down years for fisheries ignores the yearly variability in fish harvesting and distortions that might result by reaching further back in time than 2007.  *See* Smith Decl. (Rec. Doc. 7114-19) ¶¶ 22, 32.  Finally, the Court-appointed neutral designed the SCP, including its benchmark periods, to ensure consistency in data and ease in administration while still providing flexibility to claimants.  *See* Balhoff Decl. (Rec. Doc. 7110-2) at 4-5; Perry Decl. (Rec. Doc. 7110-5) at 4-5.

### iv.    The Seafood Compensation Program Provides Adequate Time To Evaluate Claims And File Those Claims.

There is no support for the argument that parties are precluded from settling claims before the statute of limitations expires.  *Cf., e.g.*, Obj. Doc. 122 at 21; Obj. Doc. 209 at 6.  Such a rule would both limit the parties' ability to resolve claims efficiently and tax judicial resources

66

by converting statutes of limitations from docket-clearing into docket-clogging devices.

Additionally, it is entirely feasible for claimants to enter the SCP and settle claims before the termination of the statute of limitations, and objectors do not assert that they are unable to evaluate their claims in the time available.  Finally, there is good reason to have a SCP claims date that expires earlier than other aspects of the Settlement Agreement:  the sooner all seafood claims are submitted, the sooner a determination can be made regarding the second distribution, if any.  Rather than delaying the second distribution, the Court-appointed neutral determined that a claims date shortly after final approval would help achieve the goal of providing compensation quickly to qualifying claimants.  *See* Perry Decl. (Rec. Doc. 7110-5) at 4; Balhoff Decl. (Rec. Doc. 7110-2) at 4.  The goal is to provide compensation sooner, not years from now.  That is a benefit to the program, not a reason to question or reject it.

### v. The Remaining Objections Do Not Raise Legitimate Challenges To The Seafood Compensation Program.

#### (A) The Remaining Werner Fisherman Objections Misstate The Purpose Of Individual Fishing Quotas ("IFQs").

The Werner objectors argue that because it is taking them longer to fulfill their individual fishing quotas ("IFQs"), the SCP is unfair.  As explained by Dr. Smith, one of the primary purposes for IFQ programs is to slow the harvest of a single species and spread that harvest out over time.  Rather than being grounds to challenge the SCP, this objection is instead a sign that the IFQ program is working.  *See* Smith Supp. Decl. (Ex. 10) ¶ 40.

Next, the Werner objectors argue that the specifics in the finfish compensation plan should be altered so that the catch factor reduction is revised from 25% to 50% and the cost percentage reduced from 27% to 15%.  There is no analysis to support either change.  No data are offered to support those values, and no discussion or rationale based upon evidence is set out as to how the requested changes would make the SCP any more fair and reasonable.  All it would

do is increase the payment to finfish claimants with no explanation as to how that would increase overall fairness, reasonableness, or adequacy. In comparison, BP provided the Court with the details explaining that the existing numbers built into the finfish compensation plan were developed and tied to actual data as evidenced by publicly available sources. Indeed, there were extensive discussions between the Court-appointed neutral and representatives of the fisheries industry, as well as evaluations by outside fishery experts. *See generally* Smith Decl. (Rec. Doc. 7114-19); *see also* Balhoff Supp. Decl. (Joint Ex. B) ¶ 4; Balhoff Decl. (Rec. Doc. 7110-2) at 3-4.

### (B) The Objection That Oyster Leasehold Compensation Is Unfairly Structured Is Wrong.

One oyster leaseholder (who failed to comply with Paragraph 38 of the Preliminary Approval Order) argues that the history of production of each oyster leasehold must be considered or the Settlement is unfair. *See* Obj. Doc. 141. The settling parties were free to decide that oyster leasehold compensation would instead be based on the mapped location of such leaseholds, which makes determining such leasehold compensation something that the SCP can readily administer.

### (C) The Apalachicola Oyster Harvesters Are Entitled To Participate In The SCP As Harvesters.

The Apalachicola oyster harvesters mistakenly argue that they are "essentially excluded" from the SCP because "there are no oyster leases" in Apalachicola Bay. *See* Obj. Doc. 240. These objectors misunderstand the SCP's eligibility requirements. Under the SCP, Oyster Harvesters need not hold oyster leases to be eligible for compensation. Eligible Oyster Harvesters in Apalachicola Bay, just like eligible Oyster Harvesters in other states, are entitled to recover under the SCP as Oyster Harvesters even if they harvest exclusively on publicly owned lands. Under the SCP, Oyster Harvesters are entitled to RTPs of 8.75 or 7.75.

### (D) The Pelican Inlet Aqua Farm Objection Expresses Support For The Settlement.

Pelican Inlet Aqua Farms, Inc. ("Pelican Inlet") asserts that the Settlement is "about as fair as this class-action suit can get," but appears to object to the cost percentages in the SCP. *See* Obj. Doc. 135.  Like many other claimants, Pelican Inlet may qualify for compensation under the Business Economic Loss or Seafood Compensation Plan programs.  If Pelican Inlet is entitled to compensation under the SCP because it harvests seafood "caught in the Specified Waters of the Gulf of Mexico," *see* Settlement Agreement, Ex. 3, the cost percentages and other calculations apply in the same manner to Pelican Inlet as they apply to all other claimants.

### (E) Use Of Commercial Landings Data Is Appropriate

The State of Louisiana erroneously asserts that commercial landings data are "irrelevant" and an "unreliable and inaccurate means of assessing fish and shellfish health and population dynamics."  Obj. Doc. 227 at 12, 19.  As both Drs. Smith and Tunnell explain, commercial landings data provide "essential information" and are widely used in fisheries management and in the peer-reviewed literature to assist in assessing the status of fisheries.  *See* Smith Supp. Decl. (Ex. 10) ¶¶ 47, 49; Tunnell Supp. Decl. (Ex. 13) ¶ 4.  Furthermore, contrary to the State of Louisiana's assertion, Obj. Doc. 227 at 11-12, commercial landings data were among numerous types of data considered by Dr. Smith and Dr. Tunnell in forming their opinions.  *See* Smith. Supp. Decl. (Ex. 10) ¶ 45, Tunnell Supp. Decl. (Ex. 13) ¶ 4.

### (F) GO FISH's Objection Is Meritless.

#### (1) Issues Regarding The Round Two Distribution Are Not Ripe.

In a key part of its objection, GO FISH states that with a proper distribution of the "second-round" payments, its objections about the SCP can be resolved.  GO FISH then misconstrues how the second-round payments will be distributed and requests that sub-classes be

established for each species.  GO FISH, of course, lacks standing, and thus the Court need not even consider its many objections.  But regardless, its arguments lack merit.

*First*, the argument is based upon an inaccurate premise, as the second-round distribution method has not been determined.  *See* Perry Supp. Decl. (Joint Ex. G) ¶ 5; Balhoff Supp. Decl. (Joint Ex. B) ¶ 5.  As Perry and Balhoff explain, prior to the Court's final approval of the second-round allocation, they will review written submissions from claimants and "any data of relevance released subsequent to finalization of the Seafood Compensation Program."  Balhoff Supp. Decl. (Joint Ex. B) ¶ 5; *see also* Perry Supp. Decl.  (Joint Ex. G) ¶ 5.

*Second*, GO FISH asserts that the second-round distribution payments will be calculated as a percentage of the payment that each claimant has received from the Settlement Program, rather than as a percentage of combined Settlement and GCCF payments.  That is wrong.  The second-round distribution will most likely be calculated based on the total compensation received by each claimant, regardless of whether payments were made by the GCCF or the Settlement Program.  *See* Settlement Agreement Ex. 10 at 3.

*Third*, even if the distribution were made as GO FISH states, the fairness of the SCP must be measured based upon each claimant's individual recovery, not by comparing what one claimant receives under one compensation plan versus another.  The bottom-up approach to designing the SCP results in fair compensation for all SCP participants.  Balhoff Supp. Decl. (Joint. Ex. B) ¶ 3; Smith Supp. Decl. (Ex. 10) ¶ 18.

*Finally*, as Professor Coffee states in his declaration, there is no need to sub-class across species in the SCP.  Coffee Decl. (Rec. Doc. 7110-3) ¶ 33.  Each SCP compensation plan was developed from the bottom up by the Court-appointed neutral after substantial input from representatives of all portions of the SCP.  There is no conflict among any individual claimants

because each claimant receives fair, reasonable, and adequate compensation through the first distribution and is thus not competing for limited funds from the total SCP.  *See* Perry Supp. Decl. (Joint Ex. G) ¶¶ 2-3; Balhoff Supp. Decl. (Joint Ex. B) ¶¶ 2-3; Perry Decl. (Rec. Doc. 7110-5); at 4-5; Balhoff Decl. (Rec. Doc. 7110-2) at 4-5.  Put simply: each claimant is fairly and adequately compensated in the first distribution; the second distribution is thus irrelevant to the fairness and reasonableness determination.

### (2)    GO FISH Misconstrues How The Compensation Plans Were Developed.

GO FISH  supports its objection by comparing recoveries across species and arguing that differences in recovery make the SCP unfair.  This analysis is deeply flawed from the outset, because the question is whether the individual claimants receive fair, reasonable, and adequate compensation.  They do.  *See* Smith Decl.  (Rec. Doc. 7114-19) ¶ 12.  The Court-appointed neutral developed the compensation plans in the SCP using a bottom-up approach — carefully crafting and negotiating Plans for each species to guarantee fair compensation for that category of claim.  *See* Perry Supp. Decl. (Joint Ex. G) ¶ 3; Balhoff Supp. Decl. (Joint Ex. B) ¶ 3.

### (3)    GO FISH's Distinction Between Property Claims And Income Claims Is Not Tied To The Realities Of Seafood Harvesting.

GO FISH suggests that the oyster leaseholders, IFQ holders, and crab trap payments are improperly included in the SCP, as such payments are not for "commercial fish[ing]."  There is no basis for this objection.  As Dr. Smith notes, assets like IFQs, crab traps, and oyster leaseholds are "essential capital assets to the fishing industry."  Smith Supp. Decl. (Ex. 10) ¶ 10.  To suggest that IFQs, crab traps, and oyster leaseholds "are 'not related to fishing income' is misleading and inaccurate."  *Id.*  Indeed, as explained in GO FISH's own declarations, participants in the commercial fisheries industry are often both IFQ holders and commercial fishermen or oyster harvesters and oyster leaseholders.  *See* Encalade Decl. (Obj. Doc. 226-1) at

22 (oyster harvester and leaseholder); Obj. Doc. 104 at 3-4 (describing fishermen holding IFQs and harvesting).   A program that compensates all such participants in the fisheries industry, including those demonstrating capital and harvesting effort, is entirely appropriate.  *See* Smith Supp. Decl. (Ex. 10) ¶¶ 9-11.

Moreover, the scope of the SCP has been clear since the beginning of these proceedings. GO FISH's counsel was present at numerous meetings with the PSC and the neutral to discuss the allocation of the funds in the SCP, has long been aware that funds were being provided to the IFQ and oyster leaseholders, and did not object to such provisions during those discussions.  GO FISH's *post hoc* objections ring hollow and simply reflect a dissatisfaction with the balancing determinations made by the Court-appointed neutral.  In any event, even if payments for oyster leasehold interests, IFQs, and crab traps are excluded from the fishery-level estimates of the amount paid by the SCP, these fishery-level estimates remain adequately generous.  Smith Supp. Decl. (Ex. 10) ¶¶ 12-17.

### (4)      GO FISH's Set-Off Argument Is Incorrect.

Under the terms of the SCP, persons who received funds from the GCCF for seafood-related losses will have their compensation amount in the initial distribution offset by the prior GCCF payment.  *See* Settlement Agreement Ex. 10 at 3 n.3, 70, 80, and 85.   That is an appropriate method of preventing double recoveries.  Nevertheless, such claimants are eligible for a second-round distribution on the full value of their seafood claims (including any GCCF payouts).  Any argument that fishermen who received GCCF payments will receive less from the second-round distribution is incorrect.

### (5)      GO FISH's Speculations About the Effects Of Oyster Leases On Private Lands In Louisiana Are Irrelevant.

A centerpiece of GO FISH's objection is the erroneous claim that BP and the PSC have

significantly underestimated the number of acres held by leaseholders in Louisiana that would qualify under the SCP for Oyster Leasehold Interest compensation by counting only oyster leases registered with the State.  GO FISH's conclusion rests on the unsupported assertion that the SCP "calls for payment" on unregistered leases issued by private landowners.  However, to be eligible for Oyster Leasehold compensation under the SCP for oyster leaseholds in Louisiana, the leaseholder must be the lessee of an oyster lease for which the State has issued an oyster "lease identification number."  *See* Deepwater Horizon Claims Center, Economic & Property Damage Claims, Frequently Asked Questions ¶ 169, https://cert.gardencitygroup.com/dwh/fs/ faq?.delloginType=faqs.  Thus, estimating the number of acres eligible for oyster leasehold interest compensation based on oyster leases registered with the State is a reasonable thing to do. *See* Smith Supp. Decl. (Ex. 10) ¶ 15.

### (6)   GO FISH's Complaints About Loss And Cost Percentages Are Unfounded.

GO FISH asserts that the cost and loss percentages in the SCP formulas "are mutually exclusive," arguing — without providing any supporting evidence — that when fish are less abundant, fisherman either continue fishing as intensely as before (and catch less fish) or stop fishing altogether.  *See* Obj. Doc. 226 at 16.  However, as Dr. Smith explains, this assertion "paints two extreme views of possible behavioral responses to abundance changes" that "[n]one of the empirical literature in fisheries economics supports."  Smith Supp. Decl. (Ex. 10) ¶ 25.[47] As Dr. Smith also notes, GO FISH's reliance on basin-level landings data to criticize the well-supported loss percentages in the SCP ignores the mobility of most participants in the fishing industry.  *See* Smith Supp. Decl. (Ex. 10) ¶ 32.

---

[47] As Dr. Smith also explains, the Werner Objection's assertion that the loss percentage for finfish is too low, and the cost percentage too high, is not supported by the facts.  *See* Smith Supp. Decl. (Ex. 10) ¶ 6.

### 8.   The Parties' Agreement To Fund A Publicity Campaign Advertising The Gulf Coast Does Not Violate The *Cy Pres* Doctrine.

Certain objectors contend that by agreeing to create a $57 million fund to promote the Gulf Coast, the parties have violated the *cy pres* doctrine.[48]   The objections reflect a fundamental misunderstanding of the limits that the *cy pres* doctrine places upon class settlements.

All three objections cite the Fifth Circuit's decision in *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011).   *Klier*, however, does not apply here.   In that case, "the district court abused its discretion by ordering a cy pres distribution in the teeth of the bargained-for terms of the settlement agreement, which required residual funds to be distributed within the class."  *Id.* at 471.   As the Fifth Circuit explained, "the court cannot modify the bargained-for terms of the settlement agreement," *id.* at 475, and "[t]his is not a case where the settlement agreement itself provides that residual funds shall be distributed via *cy pres*," *id.* at 476.

The promotional campaign at issue here bears no relationship to *Klier*, as the Court is not considering what to do with funds left over in a limited fund settlement following a first round of payments to class members.   Rather, the parties specifically negotiated and agreed to a promotional campaign that will provide a real and lasting benefit to class members.  *See, e.g.*, Fishkind Decl. (Rec. Doc. 7114-5) ¶ 116.   The promotional fund does not limit compensation available to class members, but instead is paid by BP ***on top*** of the full compensation paid to each class member.

Although the settlement at issue in *Dennis v. Kellogg Co.*, --- F.3d ----, Nos. 11-55674, 1155706, 2012 WL 3800230 (9th Cir. Sept. 4, 2012), did call for the challenged payments, that case also has no relevance here.   In *Dennis*, consumers sued Kellogg, alleging that it violated California's consumer protection laws by falsely advertising that breakfast cereal could improve

---

[48] *See* Obj. Doc. 123 at 37; Obj. Doc. 230 at 17; Obj. Doc. 234 at 5, 33.

children's attentiveness at school.  In a class settlement, *Kellogg* agreed to (1) establish a $2.75 million fund, out of which each class member would be eligible to receive up to $15; (2) donate $5.5 million of Kellogg products to feed the indigent; and (3) not contest an award of attorneys' fees of up to $2 million.  Additionally, any money remaining in the $2.75 million fund would be donated to charities to be selected by the parties and approved by the court.  *See id.* at *2-3.

Rejecting the settlement, the Ninth Circuit explained the "*cy pres* awards in the settlement . . . are . . . divorced from the concerns embodied in consumer protection laws."  *Id.* at 6.  In other words, the "noble goal" of feeding the indigent had nothing to do with the allegedly false advertisements made by Kellogg.  Even as to the remaining money in the $2.75 million fund, the court noted that failing to determine how the money would be used "restricted [the Court's] ability to undertake the searching inquiry" required by precedent.  *Id.* at 7.

Like *Klier*, *Kellogg* is distinguishable.  The parties here have disclosed the purpose for which they intend to spend the $57 million: the promotional fund "will provide a substantial economic benefit to the class because it directly stimulates economic activity in the near-term and enhances brand value of the destinations in the long-term."  Fishkind Decl. (Rec. Doc. 7114-5) ¶ 116; *accord* Monger Decl. (Rec. Doc. 7110-4) ¶13 ("The Class Members, which include property owners, business owners and people that work in the seafood industry in this area will benefit from these investments above and beyond payments on their claims through increased value to their properties and businesses from these investments.").  Indeed, because many class members have alleged that the spill stigmatized the Gulf, a promotional fund designed to cure the alleged stigma is particularly beneficial to class members.  *Cf. Lane*, 2012 WL 4125857, at *6 ("The *cy pres* remedy the settling parties here have devised bears a direct and substantial nexus to the interests of absent class members and thus properly provides for the 'next best

distribution' to the class.").[49]

### 9. The Settlement's Level Of Compensation Is Fair, Reasonable, And Adequate; Comparisons To The GCCF Are Legally Irrelevant.

Certain objectors contend that the Settlement does not meaningfully improve upon the compensation that was available from the GCCF.[50]  As an initial matter, BP has long contended that the GCCF properly met the objective of fully and fairly compensating residents of the Gulf Coast who suffered economic losses as a result of the Spill.  In any case, no objector provides a legal basis to argue that the Court may not approve the Settlement unless it is compared in any or all of its particulars to the GCCF and found to be superior.

While certain *Reed* factors require the Court to consider the amounts available under the Settlement with the amounts that would be available *in litigation*, nothing requires the Court to compare the Settlement to a different extra-judicial settlement process that preceded it.  *See Turner*, 234 F.R.D. at 610 ("The analysis is whether the class action format is superior to other methods of *adjudication,* not whether a class action is superior to an out-of-court, private settlement program.") (emphasis added).

This is particularly true here, because at least three key features distinguish the Settlement Program from the GCCF:  (1) the allowance of types of claims here that the GCCF did not pay; (2) the development of entirely new frameworks and proof requirements; and (3) far

---

[49] In fact, the promotional fund here is analogous to the separate fund for a "class assistance program" approved in the *Agent Orange* settlement.  In *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179 (2d Cir. 1987), the Second Circuit held that "a district court may, in order to maximize the beneficial impact of the settlement fund on the needs of the class, set aside a portion of the settlement proceeds for programs designed to assist the class."  *Id.* at 185 (citation and internal quotation omitted).  The court further held that the "district court may in the exercise of its discretion and after consultation with veterans' groups undertake to use portions of the fund for class assistance programs that are consistent with the nature of the underlying action and with the judicial function."  *Id.* at 186; *see also, e.g.*, *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 149 (S.D. Ohio 1992) (approving settlement including funds for research to characterize or reduce the risk of heart valve replacement surgery); *In re Diet Drugs Prods. Liab. Litig.*, Nos. 1203, 99-20593, 2000 WL 1222042, *24 (E.D. Pa. Aug. 28, 2000) (approving settlement including funds for medical research and education related to heart disease).

[50] *See, e.g.*, Obj. Doc. 101 at 1, 2, 5, 10-18; Obj. Doc. 155 at 1-2; Obj. Doc. 198 at 43; Obj. Doc. 227 at 22-25.

greater and indeed exclusive reliance on entirely objective frameworks and the minimization of individualized discretion by an administrator.  There are other favorable differences as well — but the objection ignores the governing legal standard, which is whether the Settlement is fair, reasonable, and adequate, not how it compares with another process.

### C.       Class Members Were Provided Clear Information About Their Rights.

#### 1.       The Settlement Agreement Is Clear And Specific.

Certain objectors contend that the Settlement Agreement is too complicated for claimants to understand.  *See* Obj. Doc. 122 at 15; Obj. Doc. 142 at 1-2.  But these objections fail to recognize that few, if any claimants will have claims falling into so many categories of economic loss and property damage that they would have to read through or master the entire agreement.

The Settlement Agreement is designed to be transparent as a claimant or his or her counsel reviews the frameworks relevant to particular circumstances, but detailed enough to ensure that determinations made by the Court Supervised Settlement Program are consistent and predictable.  *See, e.g.*, Coffee Decl. (Rec. Doc. 7110-3) ¶ 62.E; Henley Decl. (Rec. Doc. 7114-11) ¶ 8; Monger Decl. (Rec. Doc. 7110-4) ¶ 21; Sharp Decl. (Rec. Doc. 7114-18) ¶ 8; Richardson Decl. (Rec. Doc. 7114-17)  ¶ 75.  As Judge Shushan has recognized, "[a]ny class member seeking to determine his compensation may simply read the settlement agreement[] and determine how his circumstances fit into the frameworks."  Rec. Doc. 7480 at 6; *see also, e.g.*, Henley Supp. Decl. (Ex. 3) ¶ 3 ("The frameworks . . . rely on clearly expressed requirements or formulas which make sure that claimants can really understand how their claims will be treated under the frameworks.  This is vital because it allows each individual claimant to make an informed decision concerning that claimant's choice to participate in the settlement or opt out.").  Because the Settlement's frameworks are transparent and easily understood, calculations made by Business Economic Loss claimants, for example, have been consistent with those made by the

Settlement Program.  *See* Monger Supp. Decl. (Joint Ex. E) ¶ 9.

In addition, the settling parties have set up an extraordinary network of resources for claimants to use should they have questions.  For example, class members may access information regarding the Settlement at http://www.deepwaterhorizonsettlements.com.  Claims guides, claims forms, and Frequently Asked Questions have been posted in multiple languages on this website and have been updated to reflect common questions regarding the Settlement.  A multilingual toll-free hotline is also available.

Relatedly, two objectors contend that the Settlement is insufficiently clear because it does not define "significant services" in Paragraph 5.10.3.2, which is used to determine if certain claims should be evaluated as possible moratorium losses.  *See* Obj. Doc. 95 at 3-4; *see also* Obj. Doc. 210 (adopting this objection).  An affirmation that the claimant provides "significant services" to "the offshore oil & gas industry in the Gulf of Mexico" routes the claim to a team dedicated to reviewing claims for potential Moratoria Losses, which are excluded from the Settlement Agreement.  *See id.*  That Triton is confused as to how to respond is dubious.  Based in Metairie, Louisiana, Triton is described by its investors as "a provider of commercial diving services to the offshore oil and gas industry in the Gulf of Mexico."  *Grey Mountain Partners Invests in Triton Diving Servs., LLC*, Jan. 12, 2011, http://www.greymountain.com/ announcement/gm_tritondiving_011211.html.  BP submits that a company so defined — and that alleges $30 million in losses under diving agreements to various oil and gas industry clients, *see* Obj. Doc. 95 at 1 — provides significant services to the Gulf offshore oil and gas industry.[51]

Triton objects that by not defining "significant services" in Exhibit 19, the Settlement is

---

[51] For similar reasons, In-Depth Offshore Technologies' adoption of Triton's objection, Obj. Doc. 210, is also questionable.  *See* In-Depth Offshore Techs., http://www.indepthoffshore.com (content under links for "Deepwater Services," SubSea Construction," "ROV," and "Fabrication" describing In-Depth as almost entirely focused on servicing offshore oil and gas).

unfair because it gives the Settlement Program "nearly unlimited discretion" to exclude class members in the Support Services to Oil & Gas Industry from recovery.[52]  *See* Obj. Doc. 95 at 3-4; *see also* Obj. Doc. 210 (adopting this objection).  The Settlement provides for no such discretion.  Class members routed to the dedicated team reviewing potential Moratoria Losses are not excluded from the Settlement.  But like all class members, they are barred from recovering Moratoria Losses.  *See* Ex. 16 at 1.  Such losses are expressly reserved.  *See* Settlement Agreement ¶ 3.3.  Accordingly, Triton is wrong to say that its "eligibility to recover claims depends on its answer" to the "significant services" question, Obj. Doc. 95 at 4.  Moreover, Triton's attempt to object on behalf of excluded industries, *see* Obj. Doc. 95 at 5, must fail because Triton lacks standing to assert those claims.[53]

### 2.	Class Members Have The Necessary Information To Understand Their Claims Against BP.

Certain objectors contend that the Court may not make a finding that the Settlement is fair because Class Counsel did not make their trial evidence available, and thus class members could not compare the risks of litigating to participating in the Settlement.[54]  There is no legal authority to support this objection.  After all, the evaluation of a settlement "is not and cannot involve a trial on the merits."  *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981).  Evaluation of whether the Settlement is fair cannot turn on the precise quantum of proof by which the PSC was prepared to establish its case at trial.  Unless the class settlement

---

[52] Triton did not provide a basis to determine whether it is a class member.  BP assumes for the purposes of this Reply alone that Triton is a Support Service to Oil & Gas Industry business under Exhibit 19 of the Settlement.

[53] Finally, Florida's "Statement of Interest" (which it filed even before the parties filed the Settlement, *see* Rec. Doc. 6239 at 5-7) is moot in light of subsequent developments.  As explained herein, the filing of the Settlement Agreement and the comprehensive notice program have given class members full information about their rights.

[54] *See* Obj. Doc. 88 at 3; Obj. Doc. 95 at 5-6; Obj. Doc. 97 at 2-3; Obj. Doc. 98 at 3 & n.2; Obj. Doc. 99 at 3 & n.3; Obj. Doc. 100 at 2 & n.2; Obj. Doc. 210; Obj. Doc. 146 at 2-3; Obj. Doc. 157 at 3; Obj. Doc. 159 at 3; Obj. Doc. 167 at 10; Obj. Doc. 177 at 3; Obj. Doc. 181 at 3; Obj. Doc. 189 at 10.

approval hearing is to be transformed into a trial on the merits, there could never be a settlement if this objection were valid.  *See UAW v. GMC*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) ("[A] fairness hearing is not a trial, but instead has a very singular and narrow purpose — to determine whether the settlement at issue is fair, reasonable, and adequate."), *aff'd Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. GMC*, 497 F.3d 615 (6th Cir. 2007).  In any event, objectors ignore the fact that the deposition exhibits, "which constitute the key liability documents in the case," have been available for over a year to any plaintiff's attorney who executes Appendix A to Pre-Trial Order No. 13.  *See* Rec. Doc. 7417 at 2.

Finally, each individual objector should know its own case and individual circumstances best.  Neither BP nor Class Counsel have any obligation to deliver the evidence and chain of reasoning by which each and every potential individual claimant in this large class action would be able to recover in a contested trial.  If that were the rule, the interest of defendants in compromising contested litigation on a class-wide basis would be severely restricted, if not entirely eliminated.  Such a requirement would also be both burdensome and tantamount to a concession that all claims brought against class defendants were valid.

### 3. The Settlement Notice Was More Than Adequate.

#### a. The Settling Parties Complied With CAFA.

Certain objectors contend that BP failed to comply with its notice obligations under CAFA by not mailing notice packets to relevant state officials.  *See* Obj. Doc. 123 at 45 (asserting that because beachfront property is owned by residents through the United States, CAFA required notice to all State Attorneys General); Obj. Doc. 234 at 34 (same); Obj. Doc. 230 at 3 (failing to explain why CAFA not satisfied).  This objection wrongly assumes that only Attorneys General in the Gulf were notified.  This is incorrect.  *See* Azari Decl. (Rec. Doc. 7110-1) ¶ 17 ("Hilsoft Notifications sent a CAFA notice packet by certified mail to 57 state and

federal officials, including the Attorney General of the United States, the Attorneys General of each of the 50 States and the District of Columbia and the Attorneys General of the U.S. Territories of Puerto Rico, the Northern Mariana Islands, American Samoa, the Virgin Islands and Guam."); Azari Supp. Decl. (Joint Ex. A) ¶ 18.  Indeed, though it was not required, the CAFA notice was supplemented with a second notice to all 57 governmental officials on or about August 27, 2012.  Azari Supp. Decl. (Joint Ex. A) ¶¶ 7-8.

### b.    The Notice Complied With All Other Requirements Of Rule 23.

Three objections assail other aspects of the notice program, but each is meritless.  *See* Obj. Doc. 118 at 6 (contending that the notice was inadequate because it failed to explain the basis for the economic loss zones); Obj. Doc. 163 at 6 (same); Obj. Doc. 122 at 10-14 (contending that the notice was not written in easily understood language, particularly because the class allegedly includes many illiterate and poorly educated class members).

The class notice complied with Rule 23's requirements.  There is no requirement that the notice provide a justification for each of the various provisions that the Settlement contains; the notice need only "apprise class members of the essential terms and conditions of the settlement." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009); *see also, e.g., Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995).  Indeed, because the notice must be "presented in a neutral manner," *Rodriguez*, 563 F.3d at 962, it would be inappropriate for the notice to include detailed justifications.  *See, e.g., Lane*, 2012 WL 4125857, at *10 ("That standard does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims . . . ."); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975) ("[T]he notice on its face must be scrupulously neutral . . . .") (quotation omitted). The location for such information is in the settlement proponents' submissions.

As for the objection that the notice is insufficiently clear for any illiterate or poorly

educated class members to understand, the notice was — according to experienced notice experts — "clearly worded with an emphasis on simple, plain language to encourage readership and comprehension."  Azari Decl. (Rec. Doc. 7110-1) ¶ 72; *see also* Wheatman Prelim Approv. Decl. (Rec. Doc. 6266-4) ¶ 10 ("It is designed to encourage readership and understanding, in a well-organized and reader-friendly format."); Azari Supp. Decl. (Joint Ex. A) ¶ 21 ("[O]bjectors offer no examples of notice text that they contend was not drafted clearly enough, nor is any specific assertion made that the . . . [o]bjectors had difficulty understanding any portion of the Notices.").

Moreover, the Settlement Program employs approximately 2,600 people across 19 Claims Assistance Centers throughout the Gulf, further increasing its accessibility.  *See* Monger Decl. (Rec. Doc. 7110-4) ¶¶ 23-29; Landry Decl. (Rec. Doc. 7114-14) ¶¶ 41, 43.  Claimants also can call these centers and receive assistance.  *See* Deepwater Horizon Claims Center, Economic & Property Damage Claims, Contact Us, http://www.deepwaterhorizoneconomicsettlement.com/info.php.  The notice on the website was provided in three different languages — English, Spanish, and Vietnamese — and translation into other languages was available through the claims centers.  *See* Azari Decl. (Rec. Doc. 7110-1) ¶ 60.  In short, the parties have done as much as possible to ensure that all class members will be aware of their rights under the Settlement Agreement.  And the settling parties retained leading experts to make certain that they had the best notice program practicable.  *See generally* Azari Prelim. Approv. Decl. (Rec. Doc. 6266-2); Kinsella Prelim. Approv. Decl. (Rec. Doc. 6266-3); Wheatman Prelim. Approv. Decl. (Rec. Doc. 6266-4); Azari Decl. (Rec. Doc. 7110-1); Azari Supp. Decl. (Joint Ex. A).

### D.       The Remaining Objections Do Not Counsel Against Final Approval.

#### 1.       The Scope Of The Release Is Reasonable.

Certain objectors contend that the release is impermissibly broad.[55]  But the law is settled that defendants entering into a class settlement are entitled to obtain global peace and that class action releases can be broader than the claims directly compensated under the settlement.  *See, e.g.*, *Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983); *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005) (per curiam); *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 805 (8th Cir. 2004); *see also* Miller Supp. Decl. (Ex. 6) ¶ 21 ("Class action settlements serve the socially valuable objective of achieving a definitive end to the litigation.  To accomplish this goal of global peace, it is necessary and appropriate that the release cover a range of claims that were or could have been brought.").  To the extent that objectors believe that the release is too broad, they are free to opt out of the Settlement Class.

#### 2.       The Settlement Is Not Coercive Because The Alternative Is Litigation.

Several objectors would invert the second *Reed* factor to argue that because litigation in this case would be complex, the Settlement is coercive.[56]  But the alternative of future litigation is the baseline from which a settlement looks more or less attractive; it is not a threat wielded against class members by the parties.  If settlements look attractive to parties faced with the prospect of years of hard-fought, complicated litigation, that fact is not an objection to settlement, but the unremarkable expression of the general "interest in encouraging settlements, particularly in class actions."  4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.); *see also Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) ("[S]ettling now avoids the risks and burdens of

---

[55] *See* Obj. Doc. 114 at 5 (contending that the objector should not have to release his section 1981 discrimination claim in order to recover under the Settlement Agreement); Obj. Doc. 245 at 2 (same); Obj. Doc. 247 (contending that a VoO claimant should not have to release all claims in order to be compensated for his VoO claims).

[56] Obj. Doc. 167 at 3; Obj. Doc. 178 at 5-6; Obj. Doc. 189 at 6.

potentially protracted litigation.").  If these objections succeed and the Settlement is rejected, then the parties will be counterproductively plunged back into lengthy and expensive litigation.

### 3.   Some Objections Are Too Unique To The Objector To Call Into Question The Overall Fairness And Adequacy Of The Settlement.

The question before this Court under Rule 23(e)(2) is general in nature.  To answer whether the Settlement as a whole is "fair, reasonable, and adequate," the Court need not consider the unusual facts of individual cases.  This insight is sufficient to dispatch with several objections.  Marganhally Shivaram and Webster MacCartee, for example, both note that they were unemployed at the time they accepted payments from the GCCF.  Obj. Doc. 39 at 1-2; Obj. Doc. 244.   Shivaram also believes that the GCCF failed to account for the number of condominiums he owns in Florida.  Obj. Doc. 39 at 2-3; *see also* Obj. Doc. 52.  Another objector contends that he was not properly paid for all of the days when his vessel was enrolled in the VoO program.  *See* Obj. Doc. 245 at 1.

These assertions are not objections to the Settlement.  The overall fairness of the Settlement is not evaluated by considering objections that try to springboard from the facts of individual cases to a conclusion that the Settlement is not the right path for a particular claimant. If the Settlement is not the preferable resolution for a particular claimant given his or her unique circumstances, the claimant can decide to opt out.

### 4.   BP's Position Regarding Federal Rule Of Civil Procedure 23 And Attorney's Fees Objections.

A variety of objections that have been submitted contend either that the Settlement Class may not be certified under Rule 23 or that Class Counsel is not entitled to the fee award, if any, that BP has agreed not to contest.[57]

---

[57] *See* Obj. Doc. 91 at 3-12; Obj. Doc. 101; Obj. Doc. 118 at 2-9; Obj. Doc. 123 at 8-29, 39-52; Obj. Doc. 144; Obj. Doc. 145; Obj. Doc. 149 at 2; Obj. Doc. 156 at 5-6; Obj. Doc. 198; Obj. Doc. 228; Obj. Doc. 230; Obj. Doc. 234.

As counsel for the party seeking final certification of the Settlement Class, Class Counsel will respond to the objections challenging the certifiability of the Settlement Class.  BP notes, however, that the nation's leading class action experts have concluded that the Settlement Class is appropriate and that this class settlement satisfies all relevant legal standards.  *See generally* Coffee Decl. (Rec. Doc. 7110-3); Issacharoff Decl. (Rec. Doc. 7116-2) at 73; Klonoff Decl. (Rec. Doc. 7116-2) at 1; Miller Decl. (Rec. Doc. 7114-16).   In contrast, the perfunctory submission by Professor Hazard (Obj. Doc. 144-3) misunderstands the Settlement Agreement by implying that owners of "wetland" property outside Louisiana are ineligible for compensation under the Settlement, notwithstanding their ability to submit Coastal Real Property claims.

Similarly, while BP has agreed not to contest an award of fees and expenses to Class Counsel of up to $600 million, BP is not asking the Court to enter such an award.  Accordingly, when such an award is sought by Class Counsel, they presumably will explain why any fee request is justified.  Because Class Counsel has yet to request a fee award, any objections to an award that Class Counsel might request in the future are premature.[58, 59]

---

[58] Somewhat relatedly, two objections contend that BP's agreement not to oppose Class Counsel's fee request is evidence of collusion.  *See* Obj. Doc. 101 at 18-28; Obj. Doc. 230 at 17-18.  These objectors have no answer to the fact that Judge Shushan (who played a significant role in mediating the Settlement Agreement) has concluded that the agreement was negotiated at arms' length, with no evidence of collusion.  *See* Rec. Doc. 7480 at 7.  This Court has reached a similar conclusion.  *See* Rec. Doc. 6418 at 29.

[59] Additionally, two objectors complain that they should not be subject to the Court's holdback orders.  *See* Obj. Doc. 133 at 2; Obj. Doc. 136 at 1.  Complaints about the holdback orders are outside the parameters of whether to grant this Settlement final approval.  Those orders were in large measure also set in place by the Court **before** this Settlement was reached.  Those who do not opt out of the Settlement will either not have to pay the 6% holdback amount or will see any such holdbacks refunded, so there is no basis for their complaint.  *See* Rec. Doc 7660.  And opt outs lack standing to contest the Settlement.  Their quarrel with the holdback orders themselves can be pursued outside of this settlement review proceeding (although we note the quarrel was initiated after the Court granted the relief requested jointly by the settling parties to order refunds of holdback amounts for certain class members, and these objectors sat silent while numerous holdback orders were issued).  Lastly, one recent filing suggests that the class notice is defective as to individuals who opt out because of the latest request to amend the holdback orders, as there is "no notice to potential opt outs that additional fees for class counsel would be assessed against them."  Rec. Doc. 7709 at 3.  This filing was made well past the Court's extended objection deadline of September 7, 2012, and the self-described "opt-out Plaintiffs" and "excluded claims Plaintiffs" lack standing to file any objection.  In any event, the class notice provides a summary of the Settlement and points for details to the Settlement Agreement itself, which is easily available on the informational notice website.  The notice worked as intended here:  The

### 5.   Hurricane Isaac Does Not Counsel Against Approval Of The Settlement.

Certain objectors contend that the Settlement does not adequately compensate class members for the risk of possible re-oiling, particularly in light of Hurricane Isaac.[60]  These objections lack merit.  To begin with, the RTPs were designed to address the risk of any potential future re-oiling.  *See, e.g.*, Taylor Decl. (Rec. Doc. 7114-20) ¶ 58.  Nothing that has occurred since the Settlement was reached, including Hurricane Isaac,[61] has changed the experts' conclusion that the RTPs are sufficient to guard against the risk of future re-oiling.  *See, e.g.*, Taylor Supp. Decl. (Ex. 11) ¶ 34 ("It remains my opinion that the risk transfer premium concept in the Compensation Framework for Wetlands Real Property Claims and the Compensation Framework for Coastal Real Property Claims is fair and reasonable."); Dent Supp. Decl. (Ex. 1) ¶ 4 (following Hurricane Isaac, "I again observed clean beaches and people out enjoying the shoreline and the waters of the Gulf of Mexico . . . . The shoreline and beaches I observed showed no signs of re-oiling and the businesses located along the tourist areas appeared to be operating normally."); Wharton Supp. Decl. (Ex. 14) ¶ 8 ("Nothing I have observed post-Hurricane Isaac changes my August 13, 2012 opinions about the health and recovery of wetlands vegetation from the *Deepwater Horizon* spill."); Tunnell Supp. Decl. (Ex. 13) ¶ 12 ("Hurricane Isaac does not cause me to change the opinions expressed in my August Declaration regarding the recovery of commercial fisheries in the northern Gulf of Mexico.").

After Hurricane Isaac, in Louisiana alone, SCAT conducted rapid assessment surveys on

---

objectors apparently had a concern about attorneys' fees, consulted the Settlement Agreement for specifics, and found the information they sought — a point they concede.  *See id.*

[60] *See* Obj. Doc. 52 at 1; Obj. Doc. 88 at 3-5; Obj. Doc. 97 at 3-5; Obj. Doc. 98 at 3-5; Obj. Doc. 99 at 4-5; Obj. Doc. 144 at 17-18; Obj. Doc. 157 at 3-5; Obj. Doc. 159 at 3-5; Obj. Doc. 167 at 4; Obj. Doc. 178 at 5; Obj. Doc. 183 at 21; Obj. Doc. 186 at 5; Obj. Doc. 189 at 4-5, 12; Obj. Doc. 190 at 20-21; Obj. Doc. 201 at 7.

[61] Hurricane Isaac was not the first storm to occur after the Incident, and prior storms, such as tropical storms Bonnie and Lee, had similar effects.  *See* Taylor Supp. Decl. (Ex. 11) ¶ 27.

a total of 172 discrete shoreline areas, referred to as "segments" in the SCAT process, that were specifically selected by the state.  The surveys encompassed segments with a range of pre-Isaac conditions:  segments where there had been ongoing cleanup operations, segments where removal actions had previously been deemed complete by the federal on-scene coordinator, and segments where no oil had ever been observed.  *See* Taylor Supp. Decl. (Ex. 11) ¶ 29.  While the SCAT response observed "limited, localized residual oil in areas where possible limited residual oiling was anticipated," *id.* ¶ 30, "***there is not a future threat of significant re-oiling***." *Id.* ¶ 33 (emphasis added).  Rather, data indicate "that any future MC252 re-oiling would almost certainly be localized and discrete, and classified as trace, very light or light oiling under SCAT criteria." *Id*.  SCAT and BP, working under the direction of the Federal On Scene Coordinator, will continue to assess segments of shoreline that experienced residual oiling until Unified Command determines that no further treatment is required.

Finally, there is no substance to the objection that Unified Command's use of dispersants somehow "hid" meaningful amounts of oil that could reappear in the future.  *See* Jeffrey Supp. Decl. (Ex. 4) ¶ 11 ("Dispersants work by attaching to oil accumulations and effectively breaking them up.  The OSAT-I investigation was not a visual assessment, but undertook a chemical analysis of water and sediment samples for oil- and dispersant related compounds.  To the extent that the use of dispersants may have facilitated the breakdown of oil accumulations, such that oil-related compounds could not be detected by OSAT's chemical analysis, it is not supported by fact to characterize this as "hidden"; rather, the breakdown of oil accumulations has facilitated the natural attenuation of the oil-related compounds in the environment.  This natural attenuation results in the elimination of any residual toxicity of the oil-related compounds.").

### 6.    The Remaining Objections Are Indiscernible.

Finally, some of the documents referred to as objections to the Settlement Agreement are

mislabeled, at best.  *See, e.g.*, Obj. Docs. 105-113 (technical supplements to other objections);

Obj. Doc. 197 (notice of appearance).  And quarrels with the GCCF's determinations do nothing

to undermine the Settlement.  *See, e.g.*, Obj. Doc. 38.  Other self-styled objections read more like

the groundwork for a claim than an objection to the Settlement or to the administration of the

CSSP.  *See, e.g.*, Obj. Doc. 137 (listing injuries);[62] Obj. Doc. 188 (same).  Still others assert that

the Settlement affords them inadequate compensation, while contradictorily refusing to opt out

of the class.  *See, e.g.*, Obj. Doc. 194; Obj. Doc. 195; Obj. Doc. 196; Obj. Doc. 199; Obj. Doc.

200.  Other submissions are sufficiently difficult to understand that they merit no response at this

time.  *See* Obj. Doc. 44; Obj. Doc. 58.  And GO FISH's motion to intervene, *see* Obj. Doc. 217,

is not itself an objection to the Settlement Agreement.[63]

## V.     The Non-Objections Filed By Parties Lacking Standing Raise No Issues That Call The Propriety Of Settlement Into Question.

Certain parties who are not class members have made submissions that, while explicitly

disclaiming any interest in challenging the fairness of the Settlement, nevertheless quibble with

certain statements made in BP's opening memorandum supporting final approval.  *See* Obj. Doc.

164 (Monroe County); Obj. Doc. 211 (Alabama); Obj. Doc. 215 (United States); Obj. Doc. 216

(City of St. Pete Beach and City of Treasure Island); Obj. Doc. 218 (Mobile County, Alabama);

---

[62] Among the injuries listed by this objector is "[l]oss of use of [a recreational] fishing license $2.87 — 87 days remaining on my license."  Obj. Doc. 137 at 1.  Recreational claims as a category have been rejected by the Court as invalid under OPA, including far more significant recreational claims.  *See* Rec. Doc. 7526 at 23-26.

[63] Finally, various entries appearing on the objections docket are duplicate filings.  *See* Obj. Doc. 47 (duplicate of Obj. Doc. 44); Obj. Doc. 56 (duplicate of Obj. Doc. 53); Obj. Doc. 63 (duplicate of Obj. Doc. 55); Obj. Doc. 75 (duplicate of Obj. Doc. 73); Obj. Doc. 76 (duplicate of Obj. Doc. 74); Obj. Docs. 119, 129, and 192 (duplicates of Obj. Doc. 117); Obj. Doc. 128 (duplicate of Obj. Doc. 120); Obj. Doc. 153 (duplicate of Obj. Doc. 116); Obj. Doc. 163 (duplicate of Obj. Doc. 118); Obj. Doc. 165 (duplicate of Obj. Doc. 2); Obj. Doc. 172 (duplicate of Obj. Doc. 166); Obj. Doc. 204 (duplicate of Obj. Doc. 115); Obj. Doc. 212 (duplicate of Obj. Doc. 122); Obj. Doc. 213 (duplicate of Obj. Doc. 124); Obj. Doc. 214 (duplicate of Obj. Doc. 123); Obj. Doc. 229 (duplicate of Obj. Doc. 225); Obj. Doc. 231 (duplicate of Obj. Doc. 186); Obj. Doc. 233 (duplicate of Obj. Doc. 145); Obj. Doc. 235 (duplicate of Obj. Doc. 144); Obj. Doc. 238 (duplicate of Obj. Doc. 198); Obj. Doc. 248 (duplicate of Obj. Doc. 246); Obj. Doc. 251 (duplicate of Obj. Doc. 250).

*see also* Obj. Doc. 187 (adopting United States filing); Obj. Doc. 219 (same); Obj. Doc. 220 (same); Obj. Doc. 221 (same); Obj. Doc. 222 (same).   None of these submissions counsels against granting final approval of the Settlement, and indeed each makes clear that it is not asking the Court to reject the Settlement Agreement.   And since these non-class members all lack standing, such a request would be obviously deficient even if it were made.

In particular, the filing of the United States, *see* Obj. Doc. 215, does not counsel against approval of the Settlement.   In fact, the United States explicitly states that it does not object to approval of the Settlement.   Like all the objectors discussed in this section, it lacks standing. And while the United States challenges BP's demonstration that the Gulf has undergone a robust recovery since the spill, it offers little evidence that supports its assertions.   Much of the evidence that it has cited to is, in fact, irrelevant to the fairness of the Settlement Agreement, which is the sole question now before the Court.   *See, e.g.*, *id.* at 33-34 (addressing the health of bottlenose dolphins and sea turtles, species that are not included in the Settlement).   Finally, even if the United States had submitted relevant evidence, that would only have indicated that there is a factual dispute between BP and the United States.   The law is clear that the presence of factual disputes does not preclude granting final approval of a settlement agreement.   *See In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 427 (S.D.N.Y. 2001) ("[W]hile Plaintiffs believe that their claims are meritorious, the fairness and reasonableness of the proposed Settlement in light of the risks, burdens and uncertainties of continued litigation are manifest."); *In re Newbridge Networks Sec. Litig.*, No. 94-1678, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) ("Counsel maintain that plaintiffs' legal claims are meritorious, but settlement forestalls the substantial and inevitable uncertainties attendant to proceeding to trial.").

Nor do the United States' arguments regarding BP's alleged gross negligence cut against

final approval.  Indeed, "it has been clear for at least two years that all plaintiffs in this case —
including the PSC, the States, and the United States — would seek to prove BP's gross
negligence at any trial."  Rec. Doc. 7411 at 7 n.4.  As the United States recognizes, however, "in
approving a settlement, the Court should not attempt to reach the merits of claims, nor hold what
amounts to a trial."  Obj. Doc. 215 at 3.  In other words, the important point is that there is a
dispute between BP and the class carrying litigation risk to each side.  The government's views
as to which side of the dispute would prevail if litigation went forward are not relevant to the
fairness question now before the Court, but instead, simply confirm that there is a dispute to be
settled.

## CONCLUSION

Since the filing of the Settlement Agreement last April, nothing has occurred and no
objections have been filed that call the Settlement into question.  The Settlement will bring full
compensation to all class members, including those on the Gulf Coast, while resolving a major
component of the *Deepwater Horizon* litigation.  The alternative is all-out litigation that would
last many years and have an uncertain outcome for class members.  Hence, the Settlement should
be granted final approval as fair, reasonable, and adequate.

October 22, 2012

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
Ellen K. Reisman
Matthew J. Douglas
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
SNR DENTON
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

**OF COUNSEL**

Respectfully submitted,

  _/s/ Richard C. Godfrey, P.C_
Richard C. Godfrey, P.C.

J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
Scott W. Fowkes, P.C.
Timothy A. Duffy, P.C.
R. Chris Heck
Christopher J. Esbrook
Catherine L. Fitzpatrick
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

  _/s/ Don K. Haycraft_
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of October 2012.

/s/ Don K. Haycraft
Don K. Haycraft