# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

### SUPPLEMENTAL DECLARATION OF JAMES L. HENLEY, JR.

I, James L. Henley, Jr., submit this declaration in response to objections to the proposed Economic & Property Damages Settlement Agreement. The opinions, statements, and conclusions expressed in this declaration are my own.

### INTRODUCTION

1. I submitted a declaration in support of the BP Defendants' Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012, attached as Exhibit 10.[1] In my prior declaration I provided details of my qualifications and experience.[2] In preparation for submitting my prior declaration, I reviewed many relevant materials, such as the Settlement Agreement and its exhibits. Since then I have also reviewed objections to the Settlement Agreement that relate to economic loss.

---

[1] Declaration of James L. Henley, August 13, 2012 (Rec. Doc. 7114-11)

[2] I am a certified public accountant and attorney licensed and in good standing in Mississippi. Additionally, I have obtained the CFF (Certified in Financial Forensics) designation from the American Institute of Certified Public Accounting ("AICPA"). In addition to operating a private practice, I also have served as a United States Chapter 13 Bankruptcy Trustee for the Southern District of Mississippi since March 2000. Complete details of my qualifications and experience are included my prior declaration.

## GENERAL OBSERVATIONS, CONCLUSIONS, AND OPINIONS

2.  My overall assessment after review of the objections is that I see nothing which would alter my original opinions regarding the soundness, transparency and objectiveness of the methodologies used in the compensation frameworks for Business Economic Loss ("BEL") (including the BEL framework and the frameworks for Start-Ups, Failed Businesses and Multi-Establishment Facilities) and Individual Economic Loss ("IEL"). These frameworks are consistent with well-established methodologies of determining economic loss.

3.  The frameworks are transparent, objective and provide consistent treatment to similarly situated claimants. They rely on clearly expressed requirements or formulas which make sure that claimants can really understand how their claims will be treated under the frameworks. This is vital because it allows each individual claimant to make an informed decision concerning that claimant's choice to participate in the settlement or opt out.

4.  I reviewed the Declaration of Dr. Marc Vellrath ("Vellrath Declaration") and disagree with his conclusions.[3] Dr. Vellrath states that an allegedly "fatal" flaw of the Settlement Agreement is the lack of a reasonable nexus between the amounts computed under the framework formulas and the economic damages actually suffered by the claimant.[4] I disagree. The damages calculations made under the BEL and IEL common methodological Frameworks apply claimant-specific data from claimants' own financial records. If a claimant

---

[3] Declaration of Marc Vellrath Regarding the Proposed Economic & Property Damages Settlement Agreement ("Vellrath Declaration"), Rec Doc. 91-2. There is, I am informed, a legal issue as to whether Vellrath's Declaration is properly before the Court because of prior rulings that Halliburton lacks standing to object to the setttlement. This Supplemental Declaration provides my analysis of the Vellrath Declaration if the Court considers it in connection with this proceeding.

[4] See, for example, Vellrath Declaration, ¶ 8, 11 and Opinion 10 at ¶ 31.

did not experience an economic loss after the oil spill, the claimant's damages calculation will result in a payment of $0, whether causation is established or presumed. This is more than a reasonable nexus between the damages calculated and paid and a claimant's actual loss.

5.   Dr. Vellrath argues that the causation tests do not adequately take into account the variations and disparities among the individual circumstances of potential claimants and do not reliably identify persons and entities actually harmed by the oil spill.[5] This is wrong for two reasons: First, for the reasons just explained above, I disagree that the BEL and IEL Frameworks will compensate large numbers of claimants who were not actually harmed by the spill. Second, the standardized causation tests are quite flexible and provide each claimant with more than one option under which a claimant could demonstrate causation. This common methodological approach permits claimants who may have experienced losses under varying circumstances to recover under the Settlement. At the same time, the tests are simple and consistent with well-established, common methods for establishing causation in mass action economic loss litigation. By consisting of straightforward revenue tests, the causation requirements focus on what's most important: the shared common experience of economic loss. Those with such losses are then fully compensated. Even Dr. Vellrath admits to the generous nature of the agreement.[6]

6.   I disagree with Dr. Vellrath's opinions that the compensation methodologies I reviewed for the BEL and IEL Frameworks are arbitrary or over-accommodating, or that there is not a reasonable relationship between the amounts computed under the Frameworks and

---

[5]   See Vellrath Declaration, Opinion 10 at ¶ 30 and Opinion 12 at ¶ 32.

[6]   "While I see little connection between Settlement payments and true damages, I find the Parties' claims that the Settlement payments are "extremely generous" to be highly credible." Vellrath Declaration, Paragraph 13.

economic loss suffered by claimants.[7] The Frameworks' compensation methodologies are transparent, objective and adequate. They provide a clear, consistent method to determine damages. The formulas used are standardized, yet flexible across claimants. As I stated in my prior declaration, the approaches utilized are consistent with and similar to the approach I and other damage experts utilize regularly in determining economic damages in litigation. As with the causation tests discussed above, these standardized and common compensation methodologies ensure that compensation is related to economic losses that can reasonably be attributed to the spill.

       7. Nothing in the Vellrath Declaration alters my opinion related to the flexible nature or reasonableness of the documentation requirements. The documentation requirements are logically related to the information required to evaluate claims of economic loss and only require submission of documentation and information which are readily available to claimants in the ordinary course of business or their employment. Dr. Vellrath's complaint that requiring detailed and extensive information about claimants' circumstances and characteristics shows that Class members are not similarly situated is simply wrong.[8] The information required of claimants is typical of information needed in economic loss cases to determine the amount of damages, and the flexibility and options in the information and documentation a claimant may submit demonstrates the Settlement Agreement's fairness in providing claimants sufficient opportunity to submit a successful claim and be paid.

---

[7] See Vellrath Declaration, Opinions 13, 14, and 16 at ¶¶ 35, 36, 38.

[8] See Vellrath Declaration, Opinions 18 at ¶ 40.

8.      I reviewed objections that complain about the requirement that business claimants submit profit and loss statements.[9] First, monthly profit and loss statements are commonly necessary to calculate a business's damages in economic loss cases, and the BEL Framework's requirement is consistent with well-established methods of damages analysis. Second, monthly profit and loss statements are simple compilations of the business's financial records that a company should already keep or which could be easily derived from records normally kept as a part of running any business. The work of compiling these records into monthly financial statements is simple accounting service work. Because the Settlement Agreement reimburses claimants for payment of accounting fees for such financial statement preparation, the objections to this requirement are puzzling.[10]

9.      A different objection to the Settlement Agreement asserts that start-up businesses should be able to use a business plan prepared or used by partners in the business to determine base compensation.[11] Currently, the BEL Framework allows use of projections that have been relied upon by a third party lender to calculate base compensation. In my experience analyzing economic loss cases in litigation and as a bankruptcy trustee, it is not typical or reliable to use projections from a start-up business's own business plan to determine base compensation in damages calculation. This is because a start-up company's business plans typically are unreliable, biased, and overly optimistic: 90-95% of start-ups do not meet their own declared

---

[9] See Objection 186 by Baudin Law Firm and Morain & Murphy, LLC at 13-18; Objections of Unnamed Plaintiffs, Objection #198 at ¶¶ 142-143.

[10] Although the Settlement Agreement caps reimbursement of accounting fees at 2% of a claimant's compensation, it also provides a minimum amount of reimbursement per type of claim to ensure that the basic necessary accounting work can be performed. Given the simplicity of compiling monthly profit and loss statements, this cap should not present any issue for most claimants.

[11] See Objection by William Oliver Peneguy, Uptown Pizza Company, LLC., September 4, 2012 (Rec. Doc. 7777-140).

5

projections.[12] On the other hand, third parties' projections (or projections provided to and vetted and accepted by third parties) are recognized in economic loss cases as more reliable and are regularly used to establish a baseline. Institutional lenders have a great deal of experience and, typically, structured guidelines, regarding how to evaluate a start-up's business plan and to develop appropriate projections. In fact the FDIC and Office of the Comptroller of the Currency Administrator of National Banks have stringent regulations on how lenders should analyze business plans and loan applications.[13]

10. Another objection asserts that requiring individual economic loss claimants who do not possess payroll or tax documentation to submit an employer's sworn written statement is too onerous for individuals who were paid in cash by employers who may not pay FICA, FUTA [and] workers' compensation insurance and do not keep records required by state and federal wage and hour labor laws.[14] The concern is that such workers cannot obtain a sworn statement from an employer who fears civil or criminal penalties.[15] As I stated in my prior declaration, I am unaware of any other settlement or compensation system that permits recovery for lost earnings without tax returns or pay period documentation and only sworn written statements.

---

[12] See Shikhar Ghosh, "Why Companies Fail--and How Their Founders Can Bounce Back," Harvard Business School *Working Knowledge*, March 7, 2011, available at http://hbswk.hbs.edu/item/6591.html

[13] See FDIC Risk Management Manual of Examination Policies, Section 3.2 - Loans, Last Updated February 2, 2005, available at http://www.fdic.gov/regulations/safety/manual/section3-2.html, and Comptroller of the Currency Administrator of National Banks, Loan Portfolio Management - Comptroller's Handbook, April 1998.

[14] See Objection 96 by Yehuda Smolar on behalf of Percy Lewis and others.

[15] This objection is not based on an accurate understanding of the tax code. In my experience, individuals at the economic levels that are referred to in this objection tend to understand the tax benefits of both deductions for payments to individuals and recognition of income by those receiving it. Using the example described in the objection (Objection #96 at 2-3) an individual who babysits for a neighbor who works at a hotel and is paid $100 per week for that work. has an incentive to report that $5,200 annual earned income because it makes them eligible for the Earned Income Tax Credit. Likewise, the hotel worker paying the $100 per week can minimize his or her tax bill by taking a child care credit for the money paid to the babysitter. Nothing about this example leads to the conclusion that the hotel worker should be hesitant to provide a sworn written statement.

That the Settlement Agreement allows for any compensation at all based only on sworn statements (from the individual and his or her employer) is itself very generous.[16]

11.  I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 20th day of October, 2012.

James L. Henley

---

[16] In addition to being generous, by requiring a sworn statement from someone or an entity other than the claimant himself, the Settlement Agreement reduces the likelihood of fraudulent claims.