# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179  <br><br>SECTION J  <br><br><br>HONORABLE CARL J. BARBIER  <br><br>MAGISTRATE JUDGE SHUSHAN |

## SUPPLEMENTAL DECLARATION OF DONALD J. LANDRY

Donald J. Landry declares pursuant to 28 U.S.C. § 1746 as follows:

### INTRODUCTION

1. I submitted a declaration on August 13, 2012 in support of the Motion For Final Approval Of *Deepwater Horizon* Economic And Property Damages Settlement Agreement As Amended On May 2, 2012 filed by BP Exploration & Production Inc. and BP America Production Company ("BP") (Rec. Doc. 7114-14) ("August Declaration"). That August Declaration sets forth in detail my qualifications, the materials I reviewed prior to executing it, and my opinions, analyses, and conclusions regarding the Economic and Property Damages Settlement ("Settlement"). I submit this declaration in further support of final approval.

2. I have reviewed the consolidated objections filed on behalf of 795 Unnamed Class Members as Objection 198 ("Prashiela Objection"), including the Memorandum and all of its exhibits, which were filed after my August Declaration. These include the declaration and report of Mark Newton and supporting documents ("Newton Declaration"). The Prashiela Objection is

sizable but I have studied it closely. The hotels objecting to the Settlement Agreement in the Prashiela Objection are represented by the law firm of Farrell & Patel, and I refer to those hotels in this declaration as the "Farrell & Patel Hotel Clients."

3. I have also reviewed other objections to the settlement related to tourism and the lodging industry.

## QUALIFICATIONS AND MATERIALS REVIEWED

4. I have more than 43 years in the lodging industry, including, among other things, serving as: (a) president of Choice Hotels; (b) president of Manor Care's hotel and assisted living division, in which capacity I built hotels and analyzed markets, including the markets in Florida, Alabama, Louisiana, and Texas; (c) president of the management division of Richfield Hotel Management and MHM Inc., where I was responsible for market studies and operational reviews of properties throughout the Gulf Coast States; and (d) Chairman and CEO of Sunburst Hospitality Corporation, which owned and operated 75 hotels in 25 States including Florida and Texas. *See* August Decl. ¶¶ 2-8 & Ex. A.

5. As a standard part of my business practice over the last 43 years, and as chairman of both Hersha's acquisition committee and Supertel's investment committee, I monitor economic conditions in all major markets including the Gulf Coast on a regular basis. I am therefore knowledgeable about the economic conditions in this region. Data sources I routinely review include Smith Travel Research ("STR"), Lodging Econometrics, Pannell Kerr Forster (PKF) and Hotel Valuation Services (HVS) data.

6. In addition to all of the materials listed in ¶¶ 16-18 of the August Declaration, the Prashiela Objection, and other objections noted below, I have reviewed additional STR data for

2009-2011 for the counties in which Farrell & Patel Hotel Clients operate, as well as for counties in Zones A and B along the Gulf Coast.

## OPINIONS AND CONCLUSIONS

### A.     Summary

7.     In my August Declaration, I concluded that, based on my experience in the hospitality industry along the Gulf Coast, the Zones for economic loss claims negotiated by the Parties and included in the Settlement are logical, fair and reasonable and, among other things, take into account well-established tourism patterns in the Gulf Coast area.

8.     I also concluded that the definition of "Tourism" businesses in the Settlement is fair and reasonable and appropriately and adequately encompasses the businesses in the tourism industry.

9.     Finally, I concluded that the Settlement frameworks for business and individual economic loss are reasonable, and indeed generous, and will provide more than full compensation to businesses and individuals in the tourism industry (including hospitality, lodging, and related businesses) along the Gulf Coast.

10.     I have carefully reviewed the Prashiela Objection and the supporting Newton Declaration. They assert that the Zones are arbitrary, capricious, and have no meaningful relationship to the fact or amount of loss or likelihood of loss.[1]  I disagree. Nothing in the Prashiela Objection, the accompanying Newton Declaration, or any other objection I have reviewed[2] in any way changes the opinions or conclusions contained in my August Declaration.

---

[1]   See Prashiela Objection at ¶ 65.

[2]   This includes the Declaration of Marc Vellrath, Ph.D., CFA (Rec Doc. 7777-91-1).

3

In particular, the Prashiela Objection and Newton Declaration are unconvincing, based on flawed and inaccurate premises, and inconsistent with the tourism and lodging data available for the class area.

11. Based on my more than 43 years of experience in the hotel industry, my familiarity with the Gulf Coast region and its economy and hospitality industry, and my review of relevant data, I continue to conclude and hold the opinion that the economic loss Zones logically and rationally reflect the likelihood of a potential economic effect of the oil spill on tourism businesses and risk of potential future harm. The Zones are generally structured to reflect the fact that as distance increases from the coast, the likelihood of damage to tourism businesses is reduced. The likelihood of causation lessens as distance from the coast increases, but the frameworks permit claimants to establish causation anywhere in the class geographic boundaries. Similarly, as distance increases from the coast, the risk of future damage to tourism is further reduced, which is consistent with the lower RTPs used in more distant zones.

    **B.**  **Just As With Hotels in Zones A & B, Hotels in Zones C & D Recovered in 2011.**

12. The Prashiela Objection is based on premises that the data does not support. Mr. Newton asserts that Farrell & Patel Hotel Clients in Zones C and D experienced higher impacts from the spill in 2010 and did not recover in 2011 as Zone A hotels did.[3] However, my review of the STR data confirms that between 2010 and 2011, revenue per available room (RevPAR) in the counties where Farrel & Patel Hotel Clients are located (in Zones C and D) typically rose between 2010 and 2011. Between 2010 and 2011, RevPAR increased by 6.3% and 8.8% (depending on how the weighted average is calculated) in the counties with Farrel & Patel Hotel

---

[3] See Affidavit of Mark Newton at paragraphs 18-21.

4

Clients. Mr. Newton reports that in 2011 RevPAR for the Farrel & Patel Hotel Clients increased only 2.5%. If true, this indicates that Farrel & Patel Hotel Clients under-performed relative to the hotel industry in the same areas. To the extent the Farrel & Patel Hotel Clients underperformed the industry as a whole, and did not recover as strongly, that underperformance was not related to effects of the spill but instead to hotel-specific factors. Based on data from all hotels in those counties, RevPAR did rebound in 2011 in Zones C and D.

13. The data shows that hotels located in Zones C and D can establish causation under the business economic loss framework. To the extent that Farrel & Patel Hotel Clients cannot establish causation because they did not experience a rebound of RevPAR in 2011 and cannot meet one of the causation tests, this indicates to me that the cause of their RevPAR decline was not the oil spill. The STR data for the counties in which Farrel & Patel Hotel Clients operate proves that other hotels in those Zone C and D counties did experience rebounds and as a result should, therefore, be able to meet one of the causation tests required for economic loss claimants in Zones C and D.

14. Hotel-specific factors must be responsible for the lack of rebound among Farrel & Patel Hotel Clients. The disparity between one group or type of hotels, such as the Farrel & Patel Hotel Clients, and the rest of the hotel industry in the same area, did not surprise me, because in my experience, it is common in the hotel industry for financial performance to be cyclical and volatile and for certain hotels. Often the less competitive ones in a market perform worse because of hotel-specific factors such as location, brand, age of property, and price, among many other factors.

15.  The hotel industry is volatile and revenue is highly dependent on the location and product and demand generators within the local market. Any individual hotel can quickly be affected by changes in the local economy, new competition, changes in area attractions, as well as the quality and condition of the hotel and its management. That said, the hotel industry's performance does typically correlate to GDP. 2009 was a very bad year for the industry, as Mr. Newton's declaration and report point out. 2007 was a good year. Since GDP has been slowly growing since the recession began and the hotel industry has experienced record low supply growth, one would expect 2010 to be better than 2009 (or the average of 2007-2009 as allowed by the settlement) and for 2011 to show continuing improvement if all else in the local market were equal.[4]

16.  Indeed, PKF statistics show that the lower rate segments of hotels were the worst performing segments of the U.S. hotel industry in 2011. To the extent many Farrel & Patel Hotel Clients are in these segments, this factor could very well explain the poor performance in 2011 as much as anything else and more than any purported lingering effect of the oil spill.

17.  Mr. Newton's analysis appears to be flawed and unreliable in several ways. As already noted above, the STR data for Farrel & Patel Hotel Clients shows significant differences in performance between those hotels as compared to other hotels in their counties. Second, he apparently used zip codes when segmenting his data, but the Zones cross zip codes in almost every instance. His data sets are therefore incorrectly segmented and do not correlate accurately to the Zones. Third, Mr. Newton uses wider sets of data that are inapplicable or mix revenue

---

[4] Indeed, Smith Travel Research reports that, nationally, RevPAR in 2010 increased 5.3% over 2009.

data from areas that are irrelevant to the analysis he purports to conduct. These errors render his conclusions and analysis unreliable.

18.     With regard to this third point, Mr. Newton wrongly compares the STR data for the entire South Atlantic and Hawaii to the data from hotels in Zones C and D and reaches the conclusion that the inferior performance is "apparently" due to the effects of the oil spill. Using STR data from the "South Atlantic Region" includes in his comparison hotels in markets that, unlike most of the Gulf Coast region, experienced increases in business after the oil spill, as customers chose, for example, to vacation at beaches other than those along the Gulf Coast.[5] Locations including Daytona, Myrtle Beach, Amelia Island, Miami-Dade, Hilton Head, and the Rio Grande Valley have all published reports documenting their increased business as a result of displacement from the Gulf Coast in 2010. The South Atlantic Region also includes Florida, so Mr. Newton is also apparently overlapping sets of data when he compares the Farrell & Patel Hotel Clients and zip code data (some of which are located in Florida) with the South Atlantic Region hotels. Hawaii is similarly not a proper comparison. Hawaii is what we call in the industry a "fly to, high-end" tourist market that by any and every measure is quite different from the hotels in Zones C and D. The Gulf Coast is generally a "drive to" destination. Mr. Newton's use of Hawaii data is not useful in drawing any conclusions about the relative performance of hotels along the Gulf Coast, and such a comparison is never made among industry participants.

19.     Mr. Newton does not offer any explanation for the performance difference between his clients' hotels in Zones C and D and the hotels in Zones A and B except for his conclusion that hotels in Zones C and D were equally impacted in 2010 by the oil spill and the

---

[5] STR's South Atlantic Region includes: Maryland, Delaware, West Virginia, Virginia, North Carolina, South Carolina, Georgia, Florida, available at http://www.strglobal.com/Resources/Glossary.aspx.

7

long term impact was greater than the impact on hotels in Zones A and B. This defies logic and common sense. The fact that losses were experienced by the Farrel & Patel Hotel Clients does not support a conclusion that the losses were caused by or even related to the spill. As shown above, the STR data comparing county level RevPAR versus the Farrel & Patel hotels suggests that the causes are hotel-specific.

### C. Nothing in the Prashiela Objection Changes My Opinion That The Settlement's Zone Definitions and Boundaries Are Reasonable and Take Into Account Tourism Patterns in the Gulf Coast Region

20. The Prashiela Objection complains that the settlement is overly generous to hotel claimants in Zones A and B. I found in my August Declaration that the settlement frameworks were indeed reasonable-to-generous for all claimants, including those in all Zones, and that the Zones and Tourism Definition are fair and reasonable. They take into account geographic location, industry type, seasonality, actual pre- and post-spill economic performance, and anticipated growth in 2010. To the extent that the settlement is generous to any claimants, that seems to confirm that claimants are fully (or more) compensated for any spill-related losses. This does not mean that other claimants are under-compensated. Given tourism patterns in the Gulf Coast and documented oil spill related impacts on tourism in Zones A and B in 2010, mostly in beach vacation areas, higher compensation for Zone A and B claimants appears reasonable, logical, and fair.[6]

21. The Prashiela Objection and Mr. Newton point out that there are fewer hotels in Zones A and B than in Zones C and D. This is true but irrelevant; it is not a basis to conclude

---

[6] I reviewed an objection which asserts that Olde Town Slidell should be placed in Zone A instead of Zone D because its economy was affected by the oil spill. See Objection #72 (Marie A. Ricca). I believe the placement of Olde Town Slidell in Zone D is reasonable and consistent with the logic of the Zone geography. The businesses in downtown Slidell largely cater to locals who would not have been deterred by the oil spill from patronizing businesses in the area.

8

that the Zones are unreasonable or arbitrary. The percentage of hotels in each zone is a logical result of the geographic size of the zones and the definitions of the nature of the tourism business in the area. There are fewer hotels in Zones A and B because there is a higher percentage of condominiums and vacation rentals in those zones, rather than hotels. It is also logical that Zones C and D have a larger percentage of hotels, because those zones encompass most of the major cities in the Class area and are much larger geographically.

22. The Prashiela Objection misunderstands the use of "permanent" or "local" residents in my August Declaration, where I note that Zone B consists of supplemental tourism areas which rely heavily on Gulf Coast-related tourism but whose economic activity also serves permanent residents, and that Zone C consists of broader areas proximate to the Gulf Coast which include businesses that rely on both Gulf-related tourism and permanent residents. These areas in Zone C include major cities (portions of New Orleans, Lafayette, Lake Charles, Mobile, AL, St. Petersburg, FL, Galveston, TX) where businesses within the "Tourism" definition in fact generally cater primarily to permanent residents, but also might rely partially on Gulf-related tourism. These references to hotels relying on permanent residents refers to the point that the permanent residents, rather than Gulf amenities, are generators of demand. Such local generators of demand include family and friends visiting local residents and businesses, generating hotel stays from vendors and employees and other local, specific demand generators. It does not mean that local residents stay at hotels in the area where they already live or that the hotels' guests are permanent residents in the local area.

23. The Prashiela Objection criticizes my explanation of Zone D by suggesting that I did not attempt an explanation of how Zone D was constituted. In my August Declaration I described that the Settlement Agreement clearly defines Zone D as the remainder of the Gulf

9

States not already included in Zones A, B and C. I also explained why I believed that the definitions of Zones A, B, and C were logical, reasonable, and related to tourism patterns in the Gulf Coast.

24. The Prashiela Objection asserts conflicting, inconsistent objections to the Settlement. On the one hand, the Objection asserts that the Settlement Agreement relies on a "one size fits all" approach. But then, on the other hand, the Objection complains that the Settlement treats claimants in Zones C and D differently than claimants in Zones A and B. These objections fail to consider the Settlement as a whole, and the extent to which it contains flexible yet common methodological frameworks that take into account the circumstances of claimants that may have been affected by the Spill. The settlement's standardized and common methodological frameworks offer claimants multiple approaches to prove causation, document the losses suffered, and establish a successful claim for compensation.

25. The causation tests that claimants must pass are reasonable for claimants in the hotel industry. Hotels, if they were affected by the spill due to lower levels of tourism on the Gulf Coast, would be expected to recover when tourism recovers. Given that there is strong evidence that Gulf Coast tourism recovered by 2011, a test requiring businesses to demonstrate a rebound is reasonable. As I noted in my August Declaration, available data indicate that tourism in the summer of 2011 more than fully recovered from declines observed in 2010, with the RevPAR measures discussed above typically exceeding pre-spill data from 2009 by a substantial margin. These data indicate that there has been no long-lasting negative impact on tourism from the spill. Recovery is demonstrated in RevPAR data as reported by STR: for May to August 2011 RevPAR was higher than the same months in pre-spill 2009 for Louisiana, Mississippi, Alabama and Florida. A lack of recovery by a particular claimant, regardless of its Zone,

suggests that there is a more systemic problem in the immediate local market or factors associated with the specific hotel, rather than a spill-related cause.

26. As I concluded in my August Declaration, the higher causation standards and lower RTPs for tourism businesses in more distant Zones C and D appropriately reflect the lesser importance of non-local customers for tourism business in these areas. As a result, it is less probable that a decline in revenue was caused by the spill in areas more distant from the coast, and the likelihood of future spill-related harm is also less in these areas.[7] It is reasonable that Zones A and B, which are primarily beach-related tourist areas, were naturally seen as the areas most likely to be impacted by the spill as a matter of common sense by the parties when creating the Zones as compared to other non-beach tourist areas. This is logical and reasonable because the oil spill was in the water and primarily affected the beaches.

27. The Prashiela Objection states that the documentation of losses requirement is unreasonable and unaffordable, and unreasonably burdensome. I disagree. Abstracting records can be performed by relatively low-skilled, on-site staff and can be done in the typical down time between morning check-outs and evening check-ins, without much, if any, additional cost. The documentation required is reasonable, readily available and inexpensive, including documentation of road closings, new competition, or bankruptcy cited in the Prashiela Objection.

28. I also do not believe that small businesses are disadvantaged by the documentation requirements for those hotels that the Prashiela Objection claims do not prepare monthly financial statements. In my over 43 years of experience with thousands of hotels,

---

[7] The Prashiela Objection states that the RTP is unfairly not applied to compensation for claimants in Zones C and D but offers no example or explanation as to why Zone C and D would continue to experience losses when Zone A has recovered. Dispersants used in the Gulf will not impact inland properties.

including budget and economy hotels, I have *never* encountered a hotel that does not keep monthly records of revenue and expenses.[8] This objection is not credible.[9]

29.     The Prashiela Objection also objects to the business economic loss framework's use of 2009 as a base year, when 2009 was the worst year for the hotel industry in 75 years. While 2009 was a very bad year for hotels, 2007 was an especially good year. This is the very reason that the settlement framework provides the option to claimants to use an average of 2007-2009 as the base year. In addition, having run companies, I find it more than reasonable to consider the prior year when estimating the next year's revenue and financial performance. No business would disregard the immediately prior year's financial performance in developing projections for a year such as 2010. From a business perspective, it is logical, reasonable, and standard practice to do so.

30.     In addition to the Prashiela Objection and Mr. Newton's Declaration, I reviewed other objections to the Settlement Agreement, including the declaration submitted by Dr. Marc Vellrath. In particular I reviewed sections of the Vellrath declaration in which he criticized the Zones and the Settlement Agreement's definition of Tourism.[10] Nothing in Dr. Vellrath's declaration leads me to reconsider the opinions contained in this or my August Declaration. Further, my understanding is that the Vellrath declaration may not be reviewed by the Court at all because it was submitted by Halliburton, which the Court has said is not a proper objecting party.

---

[8]  There is one exception: Marriott-managed hotels use 13 periods of four weeks each rather than calendar months, but still have financial statements that serve as analogs to monthly statements.

[9]  Many of the objecting Farrell & Patel Hotel Clients are hotel franchisees. Franchise agreements almost always require monthly statements for franchisor monitoring and calculation of franchise fees.

[10] See the Declaration of Marc Vellrath, Ph.D., CFA (Rec Doc. 7777-91-1) at 45-51.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

_____
Donald J. Landry

Dated: 10/20/12