# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

### SUPPLEMENTAL DECLARATION OF DR. JAMES A. RICHARDSON

I, James A. Richardson, submit this declaration in response to certain objections filed against the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement").

### INTRODUCTION

1. I submitted a declaration on August 13, 2012 attached as Exhibit 16 in support of final approval of the Settlement Agreement ("August Declaration"). Thereafter, several objections were filed that are relevant to the opinions I included in my August Declaration. These include an objection attaching the Declaration of Marc Vellrath regarding the proposed Economic & Property Damages Settlement Agreement, filed August 31, 2012 ("Vellrath Declaration").[1] I am informed and aware that the Vellrath Declaration was submitted by Halliburton, which the Court has stated lacks legal standing to participate in this settlement proceeding. Should the Court consider the Vellrath Declaration for any purpose, I wish it also to

---

[1] Declaration of Marc Vellrath Regarding the Proposed Economic & Property Damages Settlement Agreement ("Vellrath Declaration"), Rec Doc. 91-2.

understand that the points made in Dr. Vellrath's declaration are flawed. The Vellrath Declaration criticized the Settlement Agreement and took issue with several of my opinions. I submit this declaration in response to both Dr. Vellrath's claims and to certain other objections filed against the Settlement Agreement.

2. This declaration is based upon my own personal experience, expertise, and analysis, except where otherwise indicated; and if called to testify I could testify to the opinions and analysis set forth in this declaration. The opinions, statements, and conclusions expressed in this declaration are my own.

3. In my August Declaration, I listed my qualifications. In summary, I am the John Rhea Alumni Professor of Economics, the Harris J. and Marie C. Chustz Distinguished Professor in Business Administration, and Director of the Public Administration Institute in the E.J. Ourso College of Business at Louisiana State University. I hold undergraduate, masters, and a doctoral degree in economics and have studied the Louisiana and regional economy for more than forty years. My research activities at LSU have focused on regional forecasting, including an economic outlook for the state of Louisiana and its metropolitan areas, state and local taxation issues, economic development projects, energy economics, and the analysis of national and global economic developments and the Louisiana economy. In my August Declaration I also listed the materials I reviewed and studied in order to reach my opinions. Those same materials were considered in reaching the opinions I provide in this declaration. I have subsequently reviewed objections relevant to the economic loss frameworks of the Settlement Agreement and the Vellrath Declaration, as well as certain data referred to below.

## OPINIONS

4. After reviewing these objections and the Vellrath Declaration, none of the opinions I included in my previous declaration have changed, including but not limited to the following opinions:

    (a) I continue to hold firmly to the opinion that the zones included in the Economic Loss Zone map logically and reasonably reflect the likelihood of a potential economic effect of the Oil Spill and are reasonable. *See* August Declaration ¶¶ 37-38.

    (b) I also continue to hold the opinion that the methodologies of Economic Damage Compensation frameworks for Business Economic Loss, Start-up Businesses, and Failed Businesses, are consistent with standard business practices in assessing any financial losses related to an incident, and include clearly defined options that flexibly and reasonably take account of the circumstances of various types of businesses. *See* August Declaration ¶¶ 45-61. The growth factor provisions of the Business Economic Loss framework, which provide that no claimant will be considered to have negative growth even if that was in fact the case, and that all claimants receive a presumption of 2% growth with a cap on growth of 12% is a reasonable compromise that, overall, is fair and favorable to claimants because it provides that any chance of a claimant that incurred a downward trend in profits being treated as having negative growth is eliminated. *See* August Declaration ¶ 51.

    (c) The Start-Up framework is reasonable in offering the option of utilizing either a business plan relied on by a third-party lender or the firm's 2011 financial data. *See* August Declaration ¶ 59. In this regard, I note that the requirement that a third-party

lender must rely on a business plan is a reasonable means of assuring that the plan is credible and its projections reasonable, because new businesses using unverified business plans typically tend to be overly optimistic in their profit projections.

(d) The Individual Economic Loss framework is consistent with the standard calculation of wage losses and reasonable. *See* August Declaration ¶¶ 62-70.

5. Dr. Vellrath provides information from a Dun & Bradstreet (D & B) report issued in June 2010, less than two months after the Oil Spill and while the spill was continuing, to opine on the sense of the magnitude and complexity of the impact of the Oil Spill on these regions. The D & B report does not reveal anything about the actual impact of the Oil Spill. Rather, it is an early estimate of what D & B thought might be the impact of the Oil Spill. It serves no purpose in terms of evaluating a proposed settlement over two years after the Oil Spill has not only occurred but ended. The proposed settlement as presented to the Court is based on much more reliable information regarding what has actually happened in the local communities after the Oil Spill. Even if the D & B report may have been a reasonable projection at the time, which was during the spill, its use in this particular situation does not make much sense given the availability of actual data.

6. Moreover, the reasonableness of the D & B projection report is subject to serious question because the data on which it appears to be based are unreliable. For example, Table 2 of the D&B projection report states that the number of employees that might be affected in Louisiana numbered over 2.8 million. However, the Louisiana Workforce Commission reports less than 1.9 million persons were employed in Louisiana in the second quarter 2010. Similarly, in Table 3 it is reported that the crude oil and natural gas industries employed less than 3,000

employees in 2010.  Statewide approximately 50,000 persons are employed in the mining sector of the economy with almost 9,000 being in oil and gas extraction and the remainder in services connected to the oil and gas industry.

7.     With respect to the Economic Loss Zones, Dr. Vellrath appears to agree with the statement that I made in my first declaration: namely, "as distance increases from the coast, the likelihood of damage is reduced."  Yet, he appears to bemoan the fact that counties in Georgia and Arkansas are not included in any of the economic zones.  He notes that not a single county in Arkansas is included in the Economic Loss Zones despite the fact that Arkansas has "southern counties that are geographically much closer to the Gulf of Mexico than many northern parishes in Louisiana."  This is not accurate.  The state of Arkansas is located directly north of Louisiana.  While part of the southeastern-most county in Arkansas may, by only a matter of miles, be as close or closer to the Gulf as parts of the northwestern-most parish of Louisiana, the statement that southern counties of Arkansas are "much closer" than "many" northern parishes of Louisiana is not geographically accurate.  More importantly, Dr. Vellrath's statement implies incorrectly that the Arkansas economy somehow relies on the Gulf in the same way or to the same extent as Louisiana.  No part of Arkansas is within 200 miles of the Gulf.

8.     I also disagree with Dr. Vellrath's conclusion that "the variety and heterogeneity of approaches are indicative of the absence of a common impact."  Claimants alleging economic loss all allege the same kind of injury from a common event -- the oil spill -- and its resulting economic impact.  It is my professional judgment and opinion that the overall causation, revenue, and time period common frameworks and methodologies are a judicious and effective manner of addressing the circumstances of businesses and individuals who allege financial losses due to the oil spill.

Declaration of Dr. James A. Richardson, October 22, 2012

9. Dr. Vellrath's comparisons that he suggests illustrate that parishes/counties in the Oil Spill zone did not do any worse and possibly even better than the benchmark parishes/counties (Table 23) reflect a lack of familiarity with the Louisiana economy. For Louisiana there were some comparisons of Orleans Parish with a benchmark of Caddo Parish; Vermilion Parish with a benchmark of Union, Arkansas; and, Terrebonne Parish with a benchmark of Ouachita Parish; but, without any justification of the benchmarks. Orleans is substantially different from Caddo; Vermilion is different from Union, Arkansas; Terrebonne is not similar to Ouachita. One can compare industries in each of these areas, but it is not certain what the comparisons mean regarding the Oil Spill.

10. There are a number of objections regarding the negotiated settlement agreements, other than the declaration of Dr. Vellrath. This is not surprising given the nature of the Oil Spill, the size of the Gulf Coast area, and the large number of individuals and businesses in that area. Nothing in those objections gives me, from a purely economic and professional perspective, any reason to adjust my opinion regarding the approval of the settlement agreement. The economically-oriented reasons for making objections range from the definition of the various economic zones; the burden of proof; the compensation formula; the uncertainty of longer term costs; and, the treatment of claimants with similar claims being treated evenly. The settlement agreement worked through all of these issues in a comprehensive, fair, and reasonable manner.

11. I have also reviewed the Declarations of Henry H. Fishkind and Donald Landry, which address certain additional points raised by Dr. Vellrath and in other objections. I concur in their judgments and opinions in this regard, and in particular in paragraphs 6 through 19 of the Fishkind Declaration and paragraphs 11, 20, 21, 26, 27, and 29 of the Landry Declaration.

7

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 22th day of October, 2012 in Baton Rouge, Louisiana.

_____
James A. Richardson